*The Future of Drug Safety*

A strong postmarket safety system requires a wide array of data resources that permit continuing evaluations.  Some may be directed at tracking patterns of drug use, the indications for the use of a drug in the population, and a general description of the types and frequencies of various AEs.  Others may be directed at signal generation.  For instance, as electronic medical-records databases are further developed, it may be possible to incorporate real-time reporting of AEs that can be made available to FDA for analysis.  Such an effort would require considerable development.

Signals or hypotheses about safety issues may arise from other sources, including known or suspected biologic drug effects that become evident through animal and human studies.  Once a potential signal is identified, followup studies are likely to involve the use of a variety of study designs and data sources, including large electronic administrative databases.  ODS/OSE has four task-order contracts[6] for access to administrative databases for epidemiologic research.  The contractor sites are the HMO Research Network, Ingenix Inc., the Kaiser Foundation Research Institute, and Vanderbilt University (Seligman P, 2005).  Cumulatively, those organizations cover 23.5 million people, and each has characteristics that make it particularly useful.  For example, the Vanderbilt site uses Medicaid data from Tennessee and Washington and thereby obtains information about high-risk and ethnically diverse populations.  The Ingenix site has access to some laboratory data in addition to claims data, and the HMO Research Network and the Kaiser Foundation Research Institute sites have access to electronic medical records.  Study designs for the contracted studies often are presented to the Drug Safety and Risk Management Committee or involve other outside experts through the special government employee mechanism for review and comment as a form of scientific peer review.

The funding for this program is severely limited.  The cooperative agreement program has always been small.  In 1985, the funding level was $1.2 million; since then, resources have varied. Despite inflation in the interim, funding for FDA drug safety cooperative agreements reached a low of only $900,000 in 2000 (personal communication, Gerald Dal Pan, FDA, March 30, 2006).  In FY 2006, funding for FDA drug safety contracts totals only $1.6 million, and it is scheduled to *decrease* to $900,000 in FY 2007.  According to an ODS annual report, the contract program in 2004 supported five feasibility[7] studies and three in-depth studies, but in FY 2006 the program will have sponsored feasibility studies for two drug safety questions and will not have sufficient funds to execute one high-priority in-depth study fully—on the cardiovascular risks posed by drugs prescribed for attention deficit hyperactivity disorder (ADHD) (IOM Staff Notes, 2005-2006).  In contrast, a similar program funded by the Centers for Disease Control and Prevention (CDC) to study safety problems associated with vaccines, the Vaccine Safety Datalink (VSD), included data on more than 7 million people covered by eight managed-care organizations.  CDC supported the VSD with $13 million and eight full-time staff persons in FY 2004 (Davis, 2004).

FDA also works with the CERTs that have access to large healthcare databases, including the HMO Research Network and the Department of Veterans Affairs (VA).  CDER has access in-house to the General Practice Research Database (GPRD)[8] and to proprietary databases[9] that house extensive information on drug use.  Access to the GPRD was expected to provide valuable

---

[6] This program had previously been funded through a cooperative agreement mechanism.
[7] A feasibility study involves preliminary assessments of whether a database contains sufficient exposures or outcomes in appropriate populations to answer the study question.
[8] A computerized database of longitudinal medical records from primary-care practices in the United Kingdom and a source of data for many epidemiologic studies around the world
[9] Verispan, LLC; IMS Health; and Premier.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

information to CDER for drug safety purposes, but ODS/OSE has struggled to get sufficient computer resources and staff trained to use it.  Four full-time safety evaluators now work with those databases, and two staff epidemiologists work part-time with them in their research.[10] CDER staff presented their first findings from the GPRD database at the 2006 summer meeting of the International Society of Pharmacoepidemiology.

VA serves an enrolled population of 7.7 million veterans, their family members, and survivors through its more than 1,300 sites of care, including 154 medical centers.  The presence of automated databases and a prescription drug benefit makes VA a promising setting for postmarket drug studies.  There are some examples of the use of data from the VA system for studies of the prevalence of AEs (Nebeker et al., 2005) and case-control studies of possible adverse effects of drugs (Shannon et al., 2005).  VA and CDER would like to work together to use this resource more broadly, but resource limitations prevent more extensive collaboration.  VA populations are included in a few of the CERTs (CERTS, 2006; UI Health Care News, 2006)

There is near-unanimous agreement that the Medicare Modernization Act and the Medicare Part D benefit offer potential new resources for postmarket drug studies.  As of January 2006, an estimated 43 million people on Medicare were eligible to sign up for prescription drug coverage through Part D plans, and the Department of Health and Human Services (DHHS) indicates that 19.7 million beneficiaries are now enrolled (Kaiser Family Foundation, 2006).  Because the elderly are frequent users of multiple medications for concomitant diseases, data from Medicare Part D could play an important role in postmarket drug studies, particularly given the opportunity to create linkages among pharmacy, outpatient, inpatient, physician office, and emergency-department claims. FDA has endorsed a proposal, lacking in detail, to establish a postmarket surveillance system for prescription drugs that would use billing data and health care information collected from Medicare beneficiaries (Kaiser Family Foundation, 2005). Through the Agency for Healthcare Research and Quality (AHRQ) Developing Evidence to Inform Decisions about Effectiveness (DEcIDE) Network, investigators are developing a methodologic toolbox and data-analytic framework for using population-based claims and administrative data sources in pharmacoepidemiologic and pharmacovigilance research (DHHS and AHRQ, 2006).

This kind of research is labor-intensive, and specialized knowledge is required to use some of the databases.  A small number of ODS/OSE epidemiologists and safety evaluators are trained to use the databases directly or to collaborate with other researchers to design and analyze data, and they have limited time to conduct research because of their other responsibilities (such as responding to OND consults, working to develop needed CDER guidances, and preparing for meetings).

The advantages of research using health care databases include the ability to conduct studies of uncommon diseases or understudied populations with respect to drug exposures, minimization of study costs, reduction in the time required to complete a study, and the opportunity to study large numbers of patients. Those systems can also provide valuable information on the background incidence of AEs, which is helpful in understanding the significance of findings in passive-surveillance systems. The disadvantages include missing data and misclassification of key data on outcomes (Hripcsak et al., 2003), drug use, or potential confounding factors.  Information on severity of illness or functional status is often uniformly missing (Jackson et al., 2006) and selection bias cannot be prevented from influencing results.  The large samples in administrative databases can provide considerable power to assess associations; however, precise but biased estimates of risk are not generally useful.  Other disadvantages are difficulties in gaining

---

[10] Personal Communication, G.DalPan, FDA (ODS/OSE), 2006

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

access to primary medical records (and access to patients themselves), either entirely or on more than just a sample basis; dependence on diagnostic coding systems, which can be problematic for some conditions or topics; and drug-formulary restrictions in some health plans that limit the ability to study newer drugs if they are not on the formulary.  Finally, much of the useful clinical information, such as descriptions of adverse reactions, exists only in narrative form, which makes automated analysis difficult (Jollis et al., 1993). There are strategies for correcting for some of the limitations of the databases (such as chart review to find missing data or to improve the accuracy of information), but they are sometimes resource-intensive.  Consideration must be given to the strengths and limitations of the data in setting priorities within the program and be-tween research methods for addressing a specific safety problem.

In some instances, active surveillance to generate of safety signals and resolve other knowledge gaps is useful.  Active surveillance is the regular, periodic collection of case reports from health care providers or facilities. CDER has been involved in developing a limited number of active-surveillance strategies.  One example is an emergency room-based surveillance project for drug-induced injury, the National Electronic Injury Surveillance System – Cooperative Drug Adverse Event Surveillance System (NEISS-CADES), jointly funded by the Consumer Product Safety Commission, CDC, and FDA.  FDA recently issued a request for information that stated its interest in this regard. In addition, FDA has cosponsored pilot development of a drug-based surveillance system that explores the feasibility of using data-mining techniques to identify safety signals in automated claims databases (Department of Health and Human Services, April 11, 2005). NEISS-CADES was used very recently to document AEs associated with stimulant medications used for ADHD (Cohen et al., 2006).

**4.2:  The committee recommends that in order to facilitate the formulation and test-ing of drug safety hypotheses, CDER (a) increase their intramural and extramural programs that access and study data from large automated healthcare databases and (b) include in these programs studies on drug utilization patterns and background in-cidence rates for adverse events of interest, and (c) develop and implement active sur-veillance of specific drugs and diseases as needed in a variety of settings.**

Other federal partners in the drug safety system (VA and the Centers for Medicare and Medi-caid Services, CMS, in particular) also use automated databases and should work with CDER, as appropriate, to accomplish the goal of improved formulation and testing of drug safety hypothe-ses for the entire drug safety system. As will be described in Chapter 7, CDER and its federal partners in the drug safety system will need increased resources to accomplish these goals.

*Confirmatory Studies*

Passive surveillance, epidemiologic research with administrative databases, and active surveillance can be used to answer many drug safety questions.  When they do not provide de-finitive answers, they can sometimes provide guidance for the development of further studies or provide sufficient information to narrow the uncertainty about drug-related risks and benefits and guide regulatory actions and the decisions of patients and providers.  In some instances, full-scale observational studies or clinical trials will be required to answer key questions, particularly if the outcome of interest is common in the patients taking a drug. Such studies are often expen-

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

sive and time-consuming, but they provide valuable information that less rigorous studies cannot provide.  For example, the Women's Health Initiative (WHI) and the Antihypertensive and Lipid-Lowering Treatment to Prevent Heart Attack Trial (ALLHAT) cost an estimated $725 million and $125 million, respectively, but provided valuable evidence about efficacy and safety.

Although $125 million seems like a lot of money, 28.4% of the adult population, or about 65 million men and women, of the United States have high blood pressure (Fields et al., 2004), and more than half of them are taking medications for it (Hajjar and Kotchen, 2003).  The annual costs of two of the blood-pressure medications used in ALLHAT are about $547 for amlodipine (a calcium-channel blocker) and $83 for chlorthalidone (a low-dose diuretic) (The Medical Letter, 2004).  Demonstration that low-cost and older drugs, such as diuretics, are the most effective first-line treatment for high blood pressure can improve health outcomes and save money.  ALLHAT also helped to resolve uncertainty about the safety profile of the calcium-channel blockers.

There is no realistic mechanism to ensure that important phase 4 clinical trials are done.  As discussed in Chapter 2, some phase 4 studies to be conducted by the drug sponsor are agreed on at the time of drug approval, but for various reasons, many of those studies are never completed.  FDA has no authority to compel the completion of these studies, and industry could be reluctant to conduct them, because of high costs and the possibility that unfavorable results would negatively influence market share.

A significant impediment to the successful completion of studies is that they are typically negotiated between CDER and the industry very late in the approval process.  The study designs can be inadequate, and there is little opportunity given time constraints regarding the Prescription Drug User Fee Act (PDUFA) clock, for CDER to bring in outside experts when they are needed to help in study design.  Experts who are in the pool of potential special government employees (including advisory committee members) can be consulted, but they must be screened for conflicts of interest, and only one can be brought in at a time to comply with the Federal Advisory Committee Act.  Although there may be legitimate reasons for abandoning some of the phase 4 study commitments, many could be useful, especially with study-design improvement.

Once a drug is approved, unless the industry sponsor is looking for a new indication for the drug, CDER has no leverage to require further studies by the company. Pharmaceutical companies continue to do clinical trials of their drugs, and there is an emerging recognition that these are often marketing-driven and their designs may be inadequate for any reliable assessment of safety or efficacy (Psaty et al., 2006), may underreport AEs, may lead to selective publication of favorable results and nonpublication of studies whose findings are unfavorable for marketing (Psaty and Rennie, 2006), and therefore can be misleading.  The concept of these "seeding" trials, performed primarily for marketing purposes, is not new (Kessler et al., 1994)

CDER does not have the resources to fund large randomized clinical trials, nor was it ever intended to do so.  The drug safety system is currently dependent on the industry, the National Institutes of Health (NIH), or foundations to fund such studies.  Other groups have a strong interest in reducing the uncertainty about therapeutic risks and benefits—health care payers, for example—but they have not typically conducted large and expensive Phase 4 trials. No entity is responsible for helping to set priorities among the drug safety and drug efficacy questions that need to be examined, particularly with resource-intensive controlled trials.  Some studies are necessary for answering questions for regulatory purposes (such as whether risks outweigh benefits and what regulatory action should be taken); others are important for public health purposes

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

and are not likely to be funded by industry (such as head-to-head trials of drugs approved for the same indication).

The potential cost of large safety trials has been a concern for many. A model for "large, simple trials" was established in the UK in the 1970s; a series of increasingly large randomized trials was conducted to examine regimens for treatments to prevent cardiovascular mortality in those at elevated risk. These trials were done with very modest budgets. Although the costing of trials in the UK and the US is admittedly very different due to differences in the way health care and biomedical research are supported in the two countries, there may be ways to conduct trials in the US with substantially smaller budgets than has been assumed. The increasing computerization of medical data and move toward electronic medical records may facilitate the implementation of more efficient trials with fewer personnel needs. Research into methods for conducting simpler, less expensive trials that might be suitable for answering straightforward but important safety questions is warranted, and represents a logical area for FDA scientific involvement, even leadership.

**4.3: The committee recommends that the Secretary of HHS, working with the Secretaries of Veterans Affairs and Defense, develop a public-private partnership with drug sponsors, public and private insurers, for profit and not for profit health care provider organizations, consumer groups, and large pharmaceutical companies to prioritize, plan, and organize funding for confirmatory drug safety and efficacy studies of public health importance. Congress should capitalize the public share of this partnership.**

The program for confirmatory studies should focus on the conduct of large, long-term phase 4 clinical trials to evaluate the health risks and benefits associated with chronic-disease medications approved on the basis of short-term trials of surrogate endpoints—such as blood pressure and lipid and hemoglobin A1c concentrations and on comparative safety and effectiveness studies. The public-private partnership (PPP) could also consider studies of cost-effectiveness, particularly comparative cost-effectiveness, which is unlikely to be studied by industry and would be very important for those members of the PPP who are insurers and provider organizations, including the VA, CMS, and DoD. The randomized clinical trial is the optimal method of assessing the efficacy and safety of a drug therapy, nut there are other approaches, including analyses of physical or electronic medical records, patients, and specimens identified in the large automated databases and analyses of data from observational studies.

DHHS agencies with an interest in drug safety include FDA, NIH, AHRQ, CDC, and CMS. VA already partners in a limited way with FDA in some drug safety studies, and both agencies express an interest in expanding that collaboration. With a system of 7.7 million veterans and over 100 million prescriptions filled every year and with excellent electronic records, VA would provide valuable data as well as insight and expertise to this partnership. The committee is not aware of any collaborations with the Department of Defense (DoD) on such studies,[11] but DoD provides health care coverage to over 9 million persons and has excellent epidemiologic research capacity, easily accessible research subjects, and a national interest in the safest and most effective use of drugs for troop readiness and cost containment for the largest healthcare system in the country. That is why the committee included DoD in the partnership. NIH has supported many

---

[11] DoD and other agencies have collaborated in planning and analyzing complementary studies of the safety of the smallpox and anthrax vaccines.

**PREPUBLICATION COPY: UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

important such trials, and the committee expects it will continue to do so.  Each Agency in the collaboration will need staff dedicated to this work in addition to information-technology up-grades and administrative support.

Discussions about needed confirmatory studies should include regulatory findings and related advisory committee input, should address major study-design issues, and should lead to studies that supplement and complement those being done by industry sponsors as part of their postmarket study commitments. The committee urges industry to use the expertise of the proposed public-private partnership for comment on the design of studies and for oversight of study conduct and analysis of results.  Proposals for all confirmatory drug safety studies, whether funded or conducted by public or private entities, should be subject to a peer-review process modeled after NIH study sections to ensure scientific excellence.

An important outcome of the partnership should be that federal agencies provide FDA access to all administrative databases[12] (under conditions consistent with the protection of patient privacy) managed by the federal government for purposes related to postmarketing surveillance, safety monitoring and analysis and risk-benefit assessment of approved drugs.

Funding for the studies planned by the partnership would come from different sources, including congressional appropriations, depending on the questions to be addressed. Some studies planned under this partnership would have been conducted absent the partnership; therefore the resources needed are not all additional costs to the system.  It is hoped that the partnership would help prioritize questions and advise on important study design issues.  The partnership might also facilitate collaborations that otherwise would not occur.  The committee believes that industry bears the responsibility for paying for clinical trials and other observational studies which support a product's approval and its safe and effective use (e.g., specific postmarket study commitments) and that both government and industry, in collaboration with others, bear the responsibility for funding other clinical trials or observational studies performed for broader public health objectives rather than specific regulatory purposes.  Industry also has a social responsibility to make sure that its products are safe and effective, so it should contribute to these trials of public health importance. The secretary of health and human services should provide funding for the administrative management of the partnership, but funds for the research will need to come from a variety of sources. CDER will need support from the FDA commissioner and from the secretary of health and human services to use the information from the studies for the best regulatory policy-making.  The committee understands that priority-setting and collaboration will not be easy, but they are necessary for advances in drug safety.

### Risk Minimization Action Plans

As described above, some drug safety problems are suspected, some are unknown and unsuspected, and others are known at the time of approval.  Risk management is an iterative process that encompasses the assessment of risks and benefits, the minimization of risks, and the maximization of benefits.  The committee views with concern the CDER statement that the "cor-

---

[12] This could be accomplished by training CDER staff to use the databases directly or to work with staff in the other agencies.  In either arrangement, new staff will be needed to implement this recommendation. Access to the databases could be obtained through an interagency task force (either existing or to be created) including representatives of FDA, representatives of federal agencies that manage medical databases, and other members to coordinate and ensure effective use by FDA of such medical databases for post-marketing drug safety.

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

nerstone" of risk management encompasses "efforts to make FDA-approved professional label-ing clearer, more concise, and better focused on information of clinical relevance" (FDA, 2005). There is widespread acknowledgment that product labeling has not been a very effective means of communication to prescribers about risk management.

PDUFA III required FDA to issue guidances to industry on risk management. The preceding sections of this chapter describe tools to assess and clarify drug risks and benefits. Risk minimization is the effort to minimize risks already identified.  Risk minimization action plans (Risk-MAPs) constitute a relatively new approach to minimizing known risks of a drug beyond the standard industry responsibilities related to routine risks, such as labeling and reporting of AEs. According to the guidance entitled "Guidance for Industry, Development and Use of Risk Minimization Action Plans", "RiskMAP means a strategic safety program designed to meet specific *goals* and *objectives* in minimizing known risks of a product while preserving its benefits.  A RiskMAP targets one or more safety-related health outcomes or goals and uses one or more *tools* to achieve those goals" (FDA, 2005).   The guidance describes the following possible RiskMAP tools:

- Targeted education and outreach to communicate risks and appropriate safety behaviors to healthcare practitioners or patients.
- Reminder systems, processes, or forms to foster reduced-risk prescribing and use.
- Performance-linked access systems that guide prescribing, dispensing, and use to target the population and conditions of use most likely to confer benefits and to minimize particular risks.

NDAs for new molecular entities (NMEs) are required to include RiskMAPs, but at the time of approval most non-NMEs will not need RiskMAPs. Known risks can be addressed through standard industry and CDER activities.  Information about possible risks can be sufficiently uncertain that appropriate minimization strategies are not obvious.

RiskMAPs can also be developed or modified after marketing.  Every RiskMAP should be viewed as a "living document" that evolves throughout the lifecycle of a drug.  One of the best examples is the case of isotretinoin, a teratogenic drug indicated for severe cystic acne.  The risk minimization activities for this drug have increased in complexity.  The Pregnancy Prevention Program (PPP) was established in 1988 in an attempt to prevent exposure of pregnant women to isotretinoin.  The PPP asked female users of isotretinoin to enroll voluntarily in a survey administered by Boston University's Sloane Epidemiology Unit and enrolled 45% of women of reproductive age who were using the drug.  Of these women, 36% did not have any type of pregnancy test before beginning treatment, and about 900 pregnancies occurred among enrollees during 1989-1998 (No Author, 2000). A new program, SMART (System to Manage Accutane Related Teratogenicity), was implemented in 2002 (Levine A, 2002; Honein et al., 2004). SMART retained the voluntary registration of PPP and

- Added a requirement for two negative  pregnancy tests before the first prescription with the second pregnancy test occurring during menses.
- Added qualification stickers on each prescription to confirm  that the patient had agreed to use contraception and had signed an informed consent about the teratogenic risks posed by isotretinoin and  to verify that the physician had confirmed the negative pregnancy tests and had counseled the patient about participation in the voluntary followup survey.
- Added a requirement that prescriptions not be filled without a qualification sticker.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

- Added a requirement that prescriptions not be filled more than 7 days later than the qualification date on the sticker.
- Added a restriction that limited all prescriptions to a 30-day supply.
- Disallowed automatic refills and telephoned-in prescriptions.
- Increased incentives for survey participation.

The first-year evaluation of SMART found that127 pregnancies were reported among isotretinoin users in the year before SMART (April 1, 2001, to March 31, 2002) and 120 during SMART's first year (April 1, 2002, to March 31, 2003) (Ackermann Shiff S et al., 2006; Pitts M and Karwoski CB, 2004; Avigan M and DalPan G, 2004).

The ineffectiveness of SMART led to a more aggressive approach.  iPLEDGE, the risk management program instituted in March 2006 drew praise for its comprehensiveness but criticism that the complicated responsibilities  for patients, prescribing physicians, and dispensing pharmacists would discourage use. Key components of iPLEDGE are registration of patients and pharmacists, documentation by female patients of child-bearing potential of two forms of contraception and a laboratory-confirmed negative pregnancy test, verification by the pharmacist that the prescription is valid, and distribution of a medication guide.

RiskMAPs are a fairly new development, and an FDA guidance acknowledges the need for evaluation of plan performance (FDA, 2005).   PDUFA III gave ODS/OSE a role in the review and evaluation of risk management plans. The PDUFA III goals call for ODS/OSE participation in pre-NDA meetings and pre-biologic license application meetings to discuss preliminary risk management plans and proposed observational studies and, in the period 2-3 years after approval, to evaluate risk management plans after implementation.

**4.4:  The committee recommends that CDER assure the performance of timely and scientifically-valid evaluations (whether done internally or by industry sponsors) of Risk Minimization Action Plans (RiskMAPs).** This review should include determining whether an individual RiskMAP is effective and overall evaluations of the strategies used and the processes of CDER staff and industry sponsors for planning and implementing RiskMaps. Evaluations should consider burdens and consequences in addition to design and effectiveness.

### Risk-Benefit Analyses Throughout the Lifecycle

The regulatory decision to approve a drug requires the determination that the benefits of the drug outweigh the risks associated with it when used for the indication for which the drug is approved. That is, the drug must demonstrate a favorable risk-benefit profile. As a country we have chosen to place some significant degree of decision-making about the availability and potential use of medicines in the hands of a science-based regulatory body.  The FDA is the first gatekeeper regarding access to drugs in exercising approval authority.  Some drugs, perhaps even many, will not and should not be permitted to be used by patients who expect their medicines to be safe and effective.  Some believe that drugs should be made much more freely available on the market for anyone who wishes to use them, particularly if the patient has a fatal disease for which they are willing to take chance that a drug will have little benefit and possibly many serious risks (Burroughs F and Walker S , January 19, 2006).  For many of these situations, acceler-

***PREPUBLICATION COPY:  UNCORRECTED PROOFS***

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

ated approval was developed as a mechanism to make selected promising drugs available early in their evaluation[13].  However, it is widely accepted that the FDA has the authority to determine whether the risk-benefit profile for a drug is appropriate to release the drug on the market. Whether the "bar" for approval is too high or too low for particular drugs has not been the focus of this committee's efforts.  In practice, once a drug is approved, health care providers and patients make many decisions about use of a drug.  In this section we discuss ways that the regulator can make those decisions easier, by being more explicit about what is known and not known about the sum total of a drug's benefits and its risk.

       As described elsewhere in this report, there are many uncertainties at the time of approval.  Eliminating all those uncertainties prior to approval would require an unreasonable number of premarketing studies and would have serious implications not only for pharmaceutical companies in terms or research and development but also for patients awaiting new and important medicines.  What regulators and drug sponsors know about the drug at approval will change over time.  Some of that new information will pertain to the benefits of potential new indications for the drug and other new information will pertain to the risks or adverse effects of the drug. For example, the results of additional studies completed during a drug's post-approval period can alter our understanding and perception of the risk-benefit profile and result in new actions on the part of FDA, clinicians, and the public.

       FDA reviews a drug for benefits and risks from the perspective of its intended use (the indication in a population), but in most instances, the drug will not have been evaluated for so called off-label use.  Spontaneous reports of adverse events may indicate a potential safety problem and warrant a safety study. Safety and effectiveness data from studies on uses other than the approved indication are gathered if the sponsoring company is studying the drug in clinical trials for a supplemental NDA for a new indication or if sufficient off-label use occurs.  Formal studies of safety and/or effectiveness can also be undertaken.  There is a "rolling" or incremental increase in information about the risk-benefit of most drugs after licensure and the committee is interested in formalizing the accumulation, integration, and communication of  that increased and improved knowledge.

       In both the pre-approval and the post-marketing setting, the risk-benefit analysis that currently goes into regulatory decisions appears to be ad hoc, informal, and qualitative. For pre-approval, review divisions work relatively autonomously under general guidance on how to review applications in the absence of clear guidelines about how  to make the final decision regarding approval. (CDER et al., February 2005)  Some variability is necessary, due to the very nature of the drugs themselves.  Considerations regarding the balance of efficacy and safety for a new drug to treat a fatal condition are different from those for the 10th drug in a therapeutic category to treat minor symptoms.  However, variability in how review divisions operate are of concern to industry (Tilson H et al., March 2006) and to CDER. CDER leaders have expressed interest in standardizing their means of analyzing risk and benefit and in doing so, when possible, in an integrated way.  A recent study by Boston Consulting Group performed for Pharmaceutical Research and Manufacturers of America (PhRMA) confirms that CDER lacks standard approaches to this important responsibility (Tollman, May 30, 2006).  Consistency in the approval process will benefit the drug sponsors in preparing their NDA packages and in planning postmarket study commitments,

     In addition, increased efforts at risk-benefit analysis will help support postapproval decision making by regulators, drug sponsors, physicians, and patients. More robust risk-benefit analyses

---

[13] Other mechanisms to increase access to drugs include compassionate use protocols and enrollment in clinical trials

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

can provide quantitative estimates that may be useful to clinicians and patients in deciding whether to use a medicine. For example, a recent publication summarizing safety outcomes from the WHI used a relatively simple table to present results from that study.  The WHI was three large clinical trials in one, and the major interventions were hormone replacement therapy, low-fat diets, and calcium plus vitamin D.  The main outcomes for the comparison of estrogen plus progestin with placebo are summarized in the table (Women's Group for the Women's Health Initiative Investigators, 2002).  When all types of outcomes are treated as equal, hormone replacement therapy is associated with an overall increase in adverse health events of about 20 per 10,000 women per year.  Women will vary in their baseline risk of these types of disease conditions, however they will also vary in the preferences for avoiding one type of disease condition or another as well as in their views about the value of symptomatic relief from menopausal symptoms.  The information from the WHI trial provides patients and physicians with a useful empirical basis for the discussion of risks and benefits relating to the use of combined hormone therapy.

Table 4.1.  One-year increase or decrease in the number of major health outcomes among 10,000 women taking estrogen plus progestin compared with women taking placebo

| Event type | Number[14] | |
|---|---|---|
| Coronary heart disease | +7 | |
| Stroke | | +8 |
| Pulmonary embolus | | +8 |
| Invasive breast cancer | | +8 |
| Colorectal cancer | -6 | |
| Hip fracture | | -5 |
| | | |
| Total | +20 | |

Moreover, risk-benefit analyses can help to identify what key questions remain to be answered and thus generate the most important issues or hypotheses that require additional study.

Integrated comprehensive quantitative assessments and weighing of risks and benefits are far from perfect.  Some misleading analyses (with resulting inappropriate regulatory or clinical decision making) are likely because of imperfect information.  Nevertheless, the potential advantages of having a systematic approach to risk-benefit analysis for prescription drugs include increasing consistency of approach to approval decisions among the review divisions; a growing common understanding about the criteria for approval and other regulatory actions; increased transparency for the industry, healthcare providers, patients, and researchers; increased credibility of FDA and CDER; and direct assessments of comparable drugs.  Ideally, the weighing of a product's risks and benefits will be both transparent and reproducible.

The barriers to moving pharmaceutical risk-benefit assessment toward a more systematic and scientific endeavor include those related to data and to methods.  Data are a primary rate-limiting factor in the evaluation of risks and benefits.  Information on a drug's risks and benefits comes from preclinical and clinical studies, but it is phase 3 clinical trials that provide the bulk of

---

[14] A plus sign means that, compared with placebo, there were more events in the women taking hormone therapy, and a minus sign means that there are fewer events in the women taking hormone therapy.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

the data used to make risk-benefit determinations at the time of approval. Risk or safety assessment is limited by what is missing. Most important for risk assessment is the lack of information that would enable estimation of event rates, their comparison across treatment groups, and evaluation of causality. Findings from pre-approval clinical trials may suggest safety signals, but the numbers of events tend to be small and may not lend themselves to precise statistical analyses. The trials lack the ability, both because of their size and because of the relative homogeneity of the typical clinical trial population, to yield confident statements about the plausible range of risks that would affect the populations who would actually take the drug if it were approved. Therefore, when a safety signal is apparent but uncertain, in some cases additional studies should be designed to reduce the uncertainty about potential risk. Benefit data may also be limited by what is missing, namely, information on health benefits if the approval was based on surrogate endpoints rather than health outcomes. Also typically lacking is information on risk-benefit relationships in important subgroups of patients (such as those with severe disease or comorbidities), or large numbers of patients exposed to the drug for long durations, or results of other treatments (head-to-head trials), and on long-term health outcomes.

Regarding methods, a growing set of tools can be used to attempt to quantify the value of research. Because the results of a research program are intrinsically uncertain, the tools are based on a "value of information" approach that identifies the value of research as the expected value of the improvements in outcomes that would be generated by a research project (Claxton et al., 2005) (Meltzer, 2001). The techniques to guide research priorities are beginning to be used in other countries to assess when additional research on a drug should required as part of a regulatory decision. For example, in the UK the National Institute for Health and Clinical Excellence has begun to explore the use of the approaches to evaluate research priorities (Claxton K et al., 2005). Quantitative measures of treatment benefits and the application of risk-benefit analysis should consider such factors as the seriousness of a disease, its chronicity, and the effect of a drug on quality of life or the disease process.

Metrics that have been used to measure benefits include absolute differences in event rates, mortality, number of lives saved, and quality-adjusted life years (the relative differences are not nearly as helpful as the absolute ones in this setting). Quantifying benefits in terms of those metrics is difficult or impossible if efficacy is assessed only in terms of surrogate endpoints. Risks can be summarized in terms of incidence, risk difference, excess risk, severity, and duration. Rates and risks are quantitative, but only the more common events that occur with enough frequency in premarket clinical trials can be incorporated into the metrics with any precision. As the comittee learned in its workshop, the science and the acceptance of approaches to simultaneously and explicitly considering multiple benefits and risks for pharmaceuticals and their preferences is evolving (Weiss Smith S, 2006).

**4.5: The committee recommends that CDER develop and continually improve a systematic approach to risk-benefit analysis for use throughout the FDA in the pre-approval and post-approval settings.** The systematic approach should have the following characteristics:

- Use the most rigorous possible scientific methods to provide guidance about what information should be collected and how that information should be analyzed and used for decision making.
- Help assure that the studies required to conduct risk-benefit analyses are properly designed to answer key public health questions and completed in a timely fashion.

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*

Copyright © National Academy of Sciences. All rights reserved.

- Make the product of these analyses available to patients, physicians, policy makers, and researchers in terms that will aid their decision making. Information on the specific consequences (such as treatment benefits and adverse effects) of therapeutic options, and the level of uncertainty about those consequences should be provided for all drugs.
- Provide when possible population-level measures of effectiveness and cost-effectiveness using standard measures that aggregate across domains of health (such as QALYs) to help inform approval and coverage decisions.[15]
- Calculate when possible the expected value of research to guide recommendations about when to perform additional studies.
- Provide guidance about what new data are needed and how those data should be analyzed
- Be updated as new information becomes available.
- Be described in publicly available documents that are appropriate for all stakeholders.

The benefits of the effort will be harmonization of the work of different review divisions, a growing understanding of the criteria for approval and other regulatory actions, and increased transparency for the industry, healthcare providers, patients, and researchers. The committee believes that with the tools described above, the evidence base on the risks and benefits associated with drugs will be more complete and will serve the health of the public better. In addition to generation and evaluation of data, the drug safety system must be viewed by the public and the prescribing community as credible. The next section describes some concrete steps that will reassure the public that the science on which FDA makes regulatory decisions about risks is credible.

## CREDIBILITY OF THE SCIENCE

As has already been discussed extensively, uncertainty about benefits and risks is common throughout much of a drug's lifecycle. Once safety signals begin to emerge, unless observational studies or controlled trials are done to examine safety endpoints, difficult judgments about the meaning of data that are less than perfect data must be made. As Chapter 3 describes, CDER's functioning is stressed when there is disagreement about the best course of action in the face of uncertainty. It is important that CDER staff—and industry sponsors, healthcare providers, and patients—believe that the best decisions possible have been made. Confidence in the judgments depends on the expertise of those informing the decisions, their wisdom and leadership ability, and the transparency of the information itself.

### Expertise in the Center for Drug Evaluation and Research

The committee has made several recommendations to expand the data on drug risks and benefits to improve decisions. However, appropriate expertise must be brought to bear to plan research and use the resulting data. That expertise comes from the CDER staff and their advisory committees and other nongovernmental experts. The committee believes that there is a need to expand the available expertise to take on the new responsibilities described in recommenda-

---

[15] FDA does not make coverage decisions or consider cost effectiveness, but other partners in the drug safety system do, and this information will be valuable.

***PREPUBLICATION COPY:  UNCORRECTED PROOFS***

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

*The Future of Drug Safety*

tions made in this report.  CDER will need more expert staff, deeper expertise in the staff it already has, and different kinds of expertise.

**4.6:  The committee recommends that CDER build internal epidemiologic and informatics capacity in order to improve the postmarket assessment of drugs.**  In recognition of the limitations in human resources in the current employment market to meet this role, a combination of advancing professional skills through continuing education and support for academic training programs is needed.

Informatics experts should track progress on the national health-information infrastructure, look for opportunities to gather information about drug safety and efficacy after approval, coordinate partnerships with external groups to study the use of electronic health records for AE surveillance, participate in FDA's already strong role in setting national standards and track the development of tools for data analysis in industry and academe, and encourage the incorporation of the tools into FDA practice where appropriate.

Expanded epidemiologic expertise will allow ODS/OSE to apply more sophisticated methods in extracting information from the case reports from the passive-surveillance system and information from administrative databases.  ODS/OSE staff could serve as principal investigators for some research projects in the expanded epidemiology-contracts program; this could help in recruitment and retention of staff.  In addition, the increased sophistication regarding epidemiologic methods could lead to more productive and respectful interactions with other CDER staff, advisory committee members, and industry scientists.  The recommendation in the preceding chapter that would give ODS/OSE staff more responsibilities in both pre-approval and post-approval settings will require increased capacity in numbers of staff and in the expertise that ODS/OSE staff contribute.

However, expanding epidemiologic capacity in CDER staff may be challenging. Few academic centers are capable of providing appropriate training in pharmacoepidemiology. That has led to a national dearth of adequately trained personnel in drug safety and risk management (Lo Re V and Strom B, March 14, 2006) .  A recent commentary from the International Society of Pharmacoepidemiologists echoes the concern for Europe as well (International Society for Pharmacoepidemiology (ISPE), 2006).

Options for improving training in drug safety and risk management have recently been proposed to the committee (Lo Re V and Strom B, March 14, 2006).  The federal government has never offered career-development awards in pharmacoepidemiology, except to those whose interests matched the interests of categorical institutes of NIH, which allowed them to apply to those institutes for mentored career development awards, such as the K01, K08, and K23 Awards. The only federal funding now available for training in pharmacoepidemiology is in the CERTs program (see below). The National Institute of General Medical Sciences is about to award its first pharmacoepidemiology training grant in its clinical pharmacology training program. However, it will contain only two slots per year—this is far too few to meet the needs of FDA alone, much less those of the field in general.

Increasing the epidemiologic capacity of CDER, focusing on ODS/OSE but also in OND if desired, could take the form of hiring new staff with training in epidemiology in addition to their professional medical, nursing, or pharmacy training or could be accomplished through targeted programs of training of existing ODS/OSE staff.  That could range from short courses, to the support of degree programs at either the master's or the doctoral level, to a formal training

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety: Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

program, such as the Epidemic Intelligence Service (EIS) program at CDC.[16]  A first step in laying out the options for increasing training opportunities could be a committee of ODS/OSE and OND staff with input from epidemiologists from CDC, NIH, AHRQ, and other FDA centers. Priority should be given to training programs with direct links to advancing the scientific work that underpins CDER's regulatory mission.

With expanded expertise and resources, CDER could be a more effective steward of postmarket safety and a more credible scientific partner with industry and academe by actively participating in defining important research questions and designing appropriate studies.  More details about increasing CDER resources is presented in Chapter 7.

Increasing the scientific sophistication of the CDER staff should not take place in isolation.  The goal is to support good science-based regulatory decision-making, and a corollary goal is to support the research infrastructure of the agency.  There is a small research program in CDER and in other FDA centers, but history shows a slow decline in that capacity.  The committee notes with satisfaction the recent decision of the FDA Science Board to look into ways to expand the research capacity in FDA.

FDA depends on research conducted by the regulated industry and by academic scientists who are financially dependent on the industry.   The committee believes that the scientific reviewers in CDER would be well served by having opportunities to engage in scientific research that complement but do not conflict with their regulatory duties.  There is little opportunity in CDER for OND and ODS/OSE reviewers (and possibly other offices as well) to engage in research (HHS et al., 2003). For example, the ODS annual report for 2004 reports that ODS staff were coauthors of three papers in the peer-reviewed literature (all of which were with coinvestigators in the cooperative agreement program).  The FDA Center for Biologics Evaluation and Research, CDER's sister center, has long history of research publication in many areas, including postmarket surveillance, as do epidemiologists at CDC, and the committee urges that CDER encourage such efforts.

The progenitor of FDA, the Bureau of Chemistry, established in the Department of Agriculture in 1906, created at its inception the Food Research Laboratory to underscore its commitment to science-based regulation, and for over 50 years special advisory committees to the department secretary or the FDA commissioner have repeatedly affirmed the central importance of intramural scientific research to the functioning of the agency  (see Box 4.1).

---

[16] The committee has not done an independent assessment of how those options are used but understands that they are all viable options.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

---

Box 4.1:  History of Reports Regarding Research at FDA

In 1955, the report of the Citizen's Advisory Committee on the Food and Drug Administration to the secretary of health, education, and welfare, stated: "Research is the heart of any scientific operation.  Although the FDA is primarily a regulatory agency, it must engage in research of the sort that leads to more accurate scientific methods for determining whether a food or drug is safe.  Such research in scientific methodology, and perhaps a limited amount of what might be termed 'random research,' can do much to upgrade the professional competence, elevate the morale of scientific workers, and contribute to the general effectiveness of the FDA."

In May 1991, the final report of the Advisory Committee on the Food and Drug Administration, convened by the secretary of health and human services asserted: "In an era of rapid technological advancement, the FDA must reaffirm its commitment to research as an integral component of its activities.  The FDA's intramural and extramural research projects must be linked to the Agency's primary functions….High levels of scientific expertise are required to review product applications and to respond to public health crises….FDA scientists who are actively engaged in research help build a vital foundation of Agency understanding and expertise.  Without that foundation, the Agency's ability to address emerging regulatory problems is hampered. It is essential that the FDA avoid being blind-sided by rapid advances in biomedical science and tchnoleogy."

*For more information see: Science Board to the Food And Drug Administration. 1955. Appendix D,* An Abbreviated History of at Least Four Decades of Efforts to Upgrade the Quality of Science in the FDA.

---

Since 1955, at least six committees have consistently asserted the centrality of high-quality scientific research to the regulatory missions of FDA and called for major changes in the organization and management of the agency's scientific endeavors.

In response to those committees' recommendations, FDA has established (and then disestablished) multiple new research organizations (centers, bureaus, and at least one institute) and repeatedly recreated the senior management position of scientific director under various names. History indicates that those repetitive efforts all failed, and although the reasons for failure are not self-evident, the record points to the common problem of discordance among well-intentioned scientific aspirations, ever-increasing regulatory mandates and complexities, and annual budgets that were chronically insufficient to accommodate the desired objectives.

The admonition of the 1991 advisory committee that the agency "avoid being blind-sided by rapid advances" in biomedical and other sciences and technologies resonates with the present committee, which reaffirms the importance of a robust program of intramural scientific research to inform FDA's regulatory deliberations and actions.  Such an intramural program would provide an excellent interface with the agency's relatively modest investments in extramural research conducted by CERTs and other contractors.  The committee applauds those extramural investments and does not intend that they be threatened by the recommended strengthening of the intramural research program.  On the contrary, the committee believes that there is an abundance of extraordinary research opportunities that could substantially enhance the agency's regulatory processes with respect to both the efficacy and the safety of new therapeutics.  Many of

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

the opportunities involve the creation and application of new algorithms and methods to improve the processes of preclinical and clinical drug development and new processes to enable effective safety and efficacy monitoring and evaluation over the entire lifecycle of a therapeutic.  If FDA is to take advantage of the many research opportunities, research must be recognized as critical to its core mission and be adequately funded.  Opportunities for research bring opportunities for real and perceived conflicts of interest, and the committee urges that these be watched carefully. The committee urges that the research opportunities be linked explicitly to FDA's regulatory mission. The committee affirms that a strong program of intramural scientific research provides an essential foundation for sound, scientifically based regulatory policy and performance.

**4.7:  The committee recommends that the Commissioner of FDA demonstrate commitment to building the Agency's scientific research capacity by:**

**a. Appointing a Chief Scientist in the office of the Commissioner with responsibility for overseeing, coordinating, and ensuring the quality and regulatory focus of the agency's intramural research programs.**

**b. Designating the FDA's Science Board as the extramural advisory committee to the Chief Scientist.**

**c. Including research capacity in the Agency's mission statement.**

**d. Applying resources to support intramural research approved by the Chief Scientist.**

**e. Ensuring that adequate funding to support the intramural research program is requested in the Agency's annual budget request to Congress.**

**Advisory Committees**

Chapter 2 describes some basic characteristics of FDA drug-product advisory committees.  Those experts and their input constitute an important resource for FDA in tackling particularly difficult or challenging questions related to its regulated products.  Scientific advances, changing technology, and the increasing complexity of new drug products have necessitated the establishment of a strong advisory committee system.  Through its advisory committees, FDA can seek advice experts from outside the agency who serve as "special government employees".  The system enables FDA to tap into critical expertise at major research institutions.

Advisory committees are used as a source of independent advice about questions raised by the agency regarding new drugs in the review process, safety or efficacy issues that emerge after drug approval, methodological approaches in study design, conduct or analysis, and policy issues.  Committees may be asked to comment on whether there are sufficient data to support product approval.  They may be asked to comment on some aspect of safety, effectiveness, or clinical development peculiar to a product.  They may also be asked to recommend whether additional studies are needed for some products or whether changes should be made to a drug's label in response to new risk information.   Typically, after presentations by the sponsor, agency repre-

Copyright © National Academy of Sciences. All rights reserved.

Case 1:05-md-01657-EEF-DEK   Document 7651-2   Filed 10/02/06   Page 17 of 155

*The Future of Drug Safety*

sentatives, and a public comment period, advisors will vote on the questions posed to them. Advisory committee recommendations are not binding, but the agency usually abides by them.[17]

FDA uses its advisory committees selectively because of time and cost considerations. Typically, advisory committees are involved in decisions involving new or complex technologies or issues that involve some element of controversy. Advisory committees tackle issues that do not have simple answers. Soliciting the advice of an advisory committee is usually at the discretion of the division director of one of FDA's five product centers.

Advisory committees promote several goals of the agency. They contribute to the quality of agency decisions and ensure that important public health decisions are based on informed and expert advice. They also increase the transparency of those decisions in that the transcripts of all meetings and the material presented at the meetings are made public, and the meetings receive much mass-media attention. The use of such critical outside expertise to inform agency decision-making lends credibility to the agency's decisions. In addition, because advisory committees always include a consumer or patient representative to provide insight or feedback about the patient's perspective, those meetings are among the few opportunities for the public to play an active role in FDA decisions. Participation in the public comment period is another such opportunity.

The present system has served the agency well, but several factors have made the use of advisory committees more challenging. Review deadlines adopted as part of PDUFA have made it increasingly difficult for the agency to convene advisory committees for questions related to product approval. With review deadlines for priority-rated drugs set at 6 months (10 months for standard-rated drugs), the agency is hard pressed to complete its review, formulate its questions for the advisory committee, and then schedule the meeting within a time frame that permits these 6-month deadlines to be met. Such committees typically must be scheduled 2 months in advance, so regulators cannot fully anticipate the questions or problems that they will encounter in the review process (HHS et al., 2003)(IOM staff notes, 2005-2006). The problem is mainly one of logistics, timing, and complying with the regulations for using special government employees, including the process for considering conflict of interest.

Some in the agency have suggested that the review deadlines have forced it to plan for advisory committee input too early in the process, before the questions to be presented have been fully developed and the appropriate expertise is fully recognized, and hence reduced the effectiveness of this important agency resource. Data also show that from 1998 to 2001 there was a 50% reduction in the agency's use of advisory committees for approved new molecular entities (NMEs) and priority drugs (HHS et al., 2003). NMEs and in particular priority-rated drugs are the most innovative and complex new drug products and have been shown to be associated with increased drug risks (Olson JHE 2004). Although reduction in product submissions has contributed in part to the decline in use of advisory committees, FDA managers indicate that they have little time to hold advisory committee meetings within the current review deadlines (HHS et al., 2003 [p. 11-12]). The reduction in the use of the committees has important implications for the agency. Reduction in input from informed independent experts may reduce the quality of the decisions and thereby lead to a reduction in public confidence in the agency. Reduction in use of advisory committees also reduces the public's role in FDA decisions and reduces the transparency and perhaps the credibility of the regulatory decisions in the public's mind.

---

17 It is precisely the practice of following advisory committee recommendations that makes the Plan B controversy so notable.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety: Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

**4.8:  The committee recommends that FDA have its advisory committees review all NMEs either prior to approval or soon after approval to advise in the process of ensuring drug safety and efficacy or managing drug risks.**

The committee recognizes that it might be impossible for all NMEs to be reviewed by an advisory committee before approval, because of the time constraints described elsewhere.  However, it believes that such review is important and allows for review of the drug after approval if pre-approval review is not possible.  If FDA is granted the authorities that the committee believes it should be granted (as described in Chapter 5), there will ample opportunity for useful input even after approval. Careful review of phase 4 study designs by ACs and/or by the PPP should obviate concerns that giving CDER more control over phase 4 studies could be wasteful and inefficient.  The goal is for better designed studies that will be conducted and answer needed questions

The committee has concerns about the composition of product-specific advisory committees.  Traditionally a statistician serves on these committees, but other than DSaRM, there is no guidance related to epidemiology or other public health expertise.  Because consideration of risk and benefit often depends on understanding the population perspective and review of observational studies and because drug safety problems are not reviewed only by DSaRM, the committee would like to enssure that the recommendations of advisory committees are based on a broad spectrum of disciplinary expertise.

**4.9:  The committee recommends that all FDA drug product advisory committees, and any other peer review effort such as mentioned above for CDER-reviewed product safety, include a pharmacoepidemiologist or an individual with comparable public health expertise in studying the safety of medical products.**

In addition to concerns about advisory committee expertise and appropriate review, the committee shares concerns about the appearance of independence of advisory committees as it is affected by financial relationships of members with pharmaceutical or other private interests.  In making the determination of whether a financial interest poses a conflict, FDA applies the terms of two statutes, 18 U.S.C. § 208, and 21 U.S.C. § 505(n). Under both, FDA may grant a waiver of any conflict of interest provided that some criteria are met. In addition, both statutes provide for public disclosure of financial interest information when a waiver has been granted (see 18 U.S.C. § 208(d)(1) and 21 U.S.C. § 355(n)(4)).

The guidance "FDA Guidance on Conflict of Interest for Advisory Committee Members, Consultants and Experts" describes the type and amount of information that is considered in deciding whether a financial interest presents a potential conflict of interest that needs to be merely disclosed or needs to be reviewed by the ethics staff for consideration of a waiver regarding a topic to be discussed by the advisory committee whose meeting the special government employee is attending (FDA, 2000). Box 4.2 describes key information considered as a level of financial interest that is transmitted to the ethics staff in a memo but does not require a waiver although it is disclosed to the public.  For interests that exceed such levels, FDA uses a "sliding scale" to decide whether levels of conflict of interest are acceptable.  Levels are different for par-

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

ticipation in a "general matter"[18] and in a "party matter".[19] Higher levels of conflicting financial interests require review by the DHHS ethics office and are balanced against the need for a member's expertise and unique contributions. Waivers can be granted for the participation of members who have more than minimal financial conflicts. That information is disclosed on the FDA Web site and is read at the start of each advisory committee meeting. No policies limit the number of advisory committee members receiving waivers who are allowed to vote on any specific matter.

A recent analysis of over 200 CDER advisory committee meetings held between 2001-2004 shows a weak association between the presence of advisory committee members with conflicts of interest and the outcome of votes to approve or not approve a drug for marketing (Lurie et al., 2006), which supports a perception in some that the advisory committee functioning is less than independent. However, Lurie et al acknowledge that "excluding advisory committee members and voting consultants with conflicts would not have altered the overall vote outcome at any meeting studied". FDA responded to the article with additional analyses of the data reviewed by Lurie[20] concluding "…advisory committee members and consultants with financial ties to pharmaceutical companies tend to vote against the financial interest of those companies." (FDA, July 24, 2006). The committee notes that concerns about voting patterns by waivered AC members presume that a vote by someone with a waivered conflict of interest is a "wrong" or "incorrect" vote, but concludes that there is no evidence to suggest that this is necessarily so.

Although some have proposed that there be a zero-tolerance policy regarding conflict of interest on FDA advisory committees (H.R.2744 Sec. 795), others express concern that such a policy could lead to severely underinformed advisory committees or leave a very small pool of potential advisory committee members. The committee recognizes that many leaders in academic medicine with experience designing and conducting clinical trials receive research support from the pharmaceutical industry and that they conduct their research in an unbiased manner. The committee also recognizes that researchers who consult for industry gain important insights that are needed in the review process. However, not all researchers with some of the relevant expertise necessary for these advisory committees have current or recent industry funding (of consultancies or the conduct of clinical trials). NIH, for example, funds clinical trials, and investigators associated with those would bring necessary practical expertise to a drug products advisory committee. The committee also recognizes that financial conflicts are not the only conflicts that could influence votes. It is hard to screen out or to waive positions of intellectual bias (Stossel and Shaywitz, 2006). The committee supports narrowing the policies in place today but acknowledges the difficulties of convening sufficient experts for the numerous advisory committees that review drug products. The committee supports a position of nonwaivable limits, but not a zero-tolerance policy, for financial conflicts of interest on FDA drug-product advisory committees.

---

18 A particular matter of general applicability is a matter that is focused on the interests of a discrete and identifiable class of persons but does not involve specific parties. For example, a guidance document that affects an entire class of products and all similarly situated manufacturers is a matter of general applicability. In addition, the use of a potential product solely as a model or example for general discussion whose results will apply to a class of products may be a matter of general applicability.

19 A particular matter involving specific parties focuses on a specific product application or other matter affecting a specific manufacturer and its competing products or manufacturers (such as, NDA, PMA, PLA or BLA, or efficacy supplement for a new indication). That is, it focuses uniquely and distinctly on a given product/manufacturer.

20 Including votes by AC members with conflicts of interest related to relationships with companies that would be considered competitors to the drug whose approval was being voted upon.

Copyright © National Academy of Sciences. All rights reserved.

**4.10:  The committee recommends FDA establish a requirement that a substantial major-
ity of the members of each advisory committee be free of significant financial involvement
with companies whose interests may be affected by the committee's deliberations.**  The com-
mittee supports 60% as a reasonable definition of <u>substantial majority</u> and believes that a reason-
able definition of <u>free of significant financial involvement</u> are those involvements that currently
require only disclosure and do not require a waiver (see Box 4.2 for a summary).  The committee
urges that FDA issue waivers regarding the participation of the other 40% of advisory committee
members very sparingly.  The committee also urges that FDA routinely analyze the effect of
their conflict-of-interest policies in protecting the objectivity and quality of committee activities.
The committee further urges that each posting of an advisory committee transcript be accompa-
nied by a list of waivers granted and that FDA publish a yearly summary of the number of waiv-
ers granted per advisory committee.

Most members of advisory committees work in academic institutions, particularly medi-
cal schools and teaching hospitals, and policies of those institutions can help to protect the integ-
rity of those who serve.  That is particularly important because the pool of experts in pharmaceu-
tical policy who are free of financial conflicts appears to be shrinking.  Pharmaceutical support
of research and other academic and medical activities is widespread—a fact that the committee
views with some concern. In that vein, it would be helpful if all universities and nonprofit aca-
demic healthcare institutions promulgate and enforce rigorous conflict–of-interest policies gov-
erning academe-industry relationships on the part of their faculty and their institutional leaders.
At a minimum, such policies should require disclosure in all publications, speaking engage-
ments, and consultations with government of any relationships with the pharmaceutical and de-
vice industries.  Policies should also conform with recommendations concerning conflicts of in-
terest developed by the Association of American Medical Colleges.  All universities and
nonprofit academic health care institutions should have standing conflict-of-interest review com-
mittees that are independent of their technology-transfer functions and are staffed by profession-
als who are experienced in managing conflicts of interest.

## Transparency

All stakeholders in the drug safety system have a legitimate interest in understanding the
data on which drug availability in the marketplace depends.  Not all people are interested in
firsthand knowledge of the science and depend on the decisions of others (such as their physi-
cians and regulator) to assure them that drugs they take are safe and effective.  Others wish to
have more knowledge of the data.  Many data are made public in some form, at some time, and
at some place on the FDA or another government or industry Web site, but the process is not sys-
tematic, comprehensive, or well organized. The committee believes strongly in the importance of
increasing the availability to the public and to researchers of information about drug risks and
benefits, whether specific study results or analyses of concerns by agency staff, and it provides
several recommendations related to clinical trial registration and results reporting, Web-site post-
ing of all NDA-review packages, and timely public release of all CDER summaries of emerging
data relevant to the safety and effectiveness of a drug after approval.
As described in Chapters 2 and 3, information related to the efficacy of drugs approved
for use in the United States is examined in extensive detail in the reviews prepared by CDER

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

staff. Most of those review packages are posted on FDA's Web site and summarize a significant amount of data supporting the approval of the drug, yet these postings do not include the entirety of what is known about a drug. A sponsor's NDA is not made public (even in redacted form to protect proprietary interests), and FDA reviews of an NDA are not made public if approval is not granted. Those reviews of unapproved NDAs could provide valuable information about a drug if the application is a supplemental NDA or if it is for a new member of a class of products already on the market. Although pharmaceutical companies are required to submit to FDA information about all studies conducted under an IND, results of studies that are not submitted as part of a sponsor's application package for approval or are finished after approval are not necessarily disclosed to the public. There is no way to know the results of clinical trials involving a drug if those results are not submitted to the FDA as part of an NDA or other review package or are not published in the scientific literature.

Several important efforts in recent years are aimed at increasing the availability of at least a minimum of information about current or completed clinical trials. A recent workshop provides a summary of the major initiatives by DHHS, the pharmaceutical industry, international medical journal editors, and the World Health Organization (WHO) (IOM and Committee on Clinical Trial Registries, 2006). The requirement in the Food and Drug Administration Modernization Act of 1997 (FDAMA), that the federal government develop a way to register clinical trials of drugs intended to treat serious or life-threatening diseases led to the creation of ClinicalTrials.gov in the National Library of Medicine. Section 113 of FDAMA specifically requires companies to register a trial conducted under an investigational new drug application if it is for a drug to treat a serious or life-threatening disease or condition and is a trial to test effectiveness (42 U.S.C. 282(j)(3)(A)). The trial must be registered no later than 21 days after enrollment is opened. Companies can register nonrequired trials in the databank as well. As of July 1, 2006, more than 30,000 trials have been registered on the site. PhRMA encourages its members to do so voluntarily for all hypothesis-testing[21] studies required for the condition being studied.

This registry, which in recent years has won broad acceptance by industry, requires the completion of 20 data fields, developed by the WHO as a "minimum required dataset" for full registration, and provides regularly updated information about federally and privately supported clinical research in human volunteers. The minimum required dataset provides information about a trial's purpose and the therapeutic agent being tested, its primary and secondary hypotheses and prespecified endpoint(s), who may participate, locations, and contact information for more details. It does not, however, include the results of the trials, nor does the registry program have the resources to do so.

In 2002, pharmaceutical companies that are members of PhRMA committed to voluntary disclosure of the results of hypothesis-testing clinical trials for marketed and investigational drugs; and in 2004, PhRMA launched the Web site ClinicalStudyResults.org for this purpose. A review of the site shows great variability in the ease of accessibility and completeness of the information. In addition, in the past few years many drug sponsors have created their own "registries" on company Web sites, which list their clinical trials, and may list summaries of trial results. These voluntary commitments may signify good intentions for increasing transparency, but

---

[21] "Also known as "confirmatory" clinical studies, hypothesis-testing studies are always well-controlled and are intended to provide meaningful results by examining pre-stated questions (i.e., hypotheses) using predefined statistically valid plans for data analysis, thereby allowing firm conclusions to be drawn to support product claims. Hypothesis-testing studies may occur at any stage of drug development and include all phase III studies, some earlier-phase studies, and many studies of marketed products" Clinicalstudyresults.org, 2006).

**PREPUBLICATION COPY: UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety: Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

the history leading to their introduction may, on the other hand, suggest that they may rather represent efforts to avoid mandatory disclosure of results.

**4.11:** To ensure that trial registration is mandatory, systematic, standardized, and complete, and that the registration site is able to accommodate the reporting of trial results, **the committee recommends that Congress require industry sponsors to register in a timely manner at clinicaltrials.gov, at a minimum, all Phase 2 through 4 clinical trials, wherever they may have been conducted, if data from the trials are intended to be submitted to the FDA as part of an NDA, sNDA, or to fulfill a postmarket commitment.   The committee further recommends that this requirement include the posting of a structured field summary of the efficacy and safety results of the studies.** The committee does not offer specific details regarding this summary, preferring that NIH and FDA, in consultation with the pharmaceutical industry, should work together to agree on a reasonable plan.[22]  However, the committee suggests that mandatory fields could include, but are not limited to, (1) primary hypothesis, (2) experimental design, (3) primary pre-defined outcome measure(s), (4) planned and actual sample size per treatment arm, (5) number and type of serious AEs, (6) overview of results, (6) risk-benefit summary.  The company should have the responsibility of submitting the structured field summary to the FDA, who should review it for completeness and accuracy.  The information should then be posted either on an easily accessible website at FDA with linkage to the trial's registration on clinicaltrials.gov, or posted directly on the latter.

For those clinical trials covered by this recommendation, every completed trial would have to comply with this mechanism of results reporting, regardless of trial outcomes.  For every covered trial that is stopped before prespecified completion, the sponsor would have to submit a summary describing the reasons for termination (DSMB action, economic considerations, etc.) to FDA/NIH for review and posting. The committee did not attempt to resolve what to do about postmarket studies conducted by investigators independent of industry. If these studies are federally funded, the funding agency could require as a condition of award that the lead investigators prepare and submit the structured summary to clinicaltrials.gov after publication of the study. Enforcement mechanisms for studies not conducted under federal grant/contract support are less clear.  The committee believes that to ensure that results to be posted that are not vetted by the FDA are described completely, accurately, and in an unbiased manner, clinicaltrials.gov would have to establish some form of editorial review process**.** The National Library of Medicine, which runs clinicaltrials.gov, will need to be provided the necessary authorization and resources to accommodate results posting.

The format of clinical trial registration and results reporting should be done in a way that harmonizes with emerging international standards (such as those specified by WHO, for example, the minimum required dataset for registration, and the requirements for results reporting, in the ICH E3 Summary of Clinical Trial Results).   The committee notes with interest the recent WHO call for registration of *all* interventional trials. The committee strongly urges the Congress to consider the status and benefits of harmonization with international standards when drafting legislative language to implement this Recommendation.

---

[22] Because the committee is not suggesting that raw data be posted, this recommendation should provoke no concerns regarding patient privacy. The committee recognizes that this recommendation will require significant additional resources to NIH, which runs clinicaltrials.gov, and to FDA, for their role in developing the results format and vetting the submissions.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

The committee also encourages further steps to make drug safety and effectiveness information available to the public. The committee believes that CDER is the appropriate body to assume the responsibility for sharing important safety and efficacy information promptly and dependably with patients, providers, and researchers. One important source of this information at the time of approval is the NDA review package.

In response to the Electronic Freedom of Information Act Amendments of 1996, (EFOIA), which were designed to broaden public access to government documents in electronic form, CDER posts NDA review packages[23] on its Web site (at the "drugs@fda" portion of the site http://www.accessdata.fda.gov/scripts/cder/drugsatfda/ ). As of April 2006, review packages for NMEs approved from 1998 to the middle of February 2006 and non-NMEs approved in 1998-2001 are posted. There is a backlog for posting review packages for non-NMEs approved after 2001.[24] All other NDA approval documents (that is, for drugs approved before 1998 and for all supplements) are posted on completion of a Freedom of Information Act (FOIA) request for that information (D. Henderson, personal communication).

**4.12: The committee recommends that FDA post all NDA review packages on the agency's Web site.** Regardless of whether they were disclosed in response to a FOIA request, FDA should post all supplemental-NDA review packages and continue to work to post reviews for drugs approved before 1998 in a timely manner and as resources allow. High priority should be given to posting all review materials related to any product for which there are emerging safety concerns, particularly if they have been discussed at an advisory committee meeting.

OND and ODS/OSE staff prepare reviews or summaries of RiskMAPs and other postmarket safety information and, if discussed at an advisory committee meetings, these reviews are made public in accordance with the Federal Advisory Committee Act; however, reports of general ODS/OSE consultations are not, as a rule, made public. In 2005, ODS/OSE completed 439 reviews of postmarket safety issues (generated in ODS/OSE or as a result of consultations for OND). Materials from advisory committees are found on a portion of the CDER Web site distinct from that where the NDA reviews are posted. There is no one place where every public document regarding a specific drug is posted.

The committee recognizes that public disclosure of every internal document discussing a potential safety problem has drawbacks. Any one document likely describes only one aspect of a complicated topic. Full disclosure of those documents in real time could be confusing to the public and does not necessarily contribute to reducing the uncertainty about the risks and benefits associated with a drug. However, there is a marked imbalance between of the disclosure of data accumulated before approval (the CDER discipline reviews) and disclosure of data summarized and presented after approval. The synthesis by CDER of postmarket information that is made public about risks and benefits is minimal. The committee believes that CDER has a role to play in putting forth the views of the regulatory agency about emerging information and should not leave that task in the hands of the pharmaceutical industry or the academic community[25]. Peri-

---

23 Review packages are described in Chapters 2 and 3 and refer to the set of documents prepared by CDER staff. These packages provide the summary judgment that leads to decisions regarding approval.

24 Of 531 non-NME NDA approvals since 2001, 397 had been posted on the web as of March 31, 2006, as had all the non-NME NDAs approved in 1998 - 2001.

25 Product safety specialists from the Center for Biologics Evaluation and Research (CBER) routinely develop reviews of the postmarket safety experience with a new vaccine within two to three years of the time the vaccine is licensed. These reviews are published in journals and are available on the FDA website's VAERS (Vaccine Adverse Event System) page.

**PREPUBLICATION COPY: UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety: Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

odic and regular review by CDER of risk and benefit information is consistent with a lifecycle approach to drug regulation.

> **4:13:  The committee recommends that the CDER review teams regularly and systematically analyze all postmarket study results and make public their assessment of the significance of the results with regard to the integration of risk and benefit information.**

Drug regulation must follow scientific advances; as science progresses, so must regulation. The role of the regulator is not to impede the development of innovative medicines, but to ensure that needed drugs are available to patients and that risk-benefit information is accurate and widely available.  The regulator must be the gatekeeper of the scientific foundation on which regulatory decisions are made.  CDER must have the best data to review and an expert scientific staff to review them.  Patients and their physicians must be assured that the scientific foundation on which CDER regulates drugs is credible.

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

*The Future of Drug Safety*

**Box 4.2:  Conflicts of Interest That Lead to a "Cover Memo" only (Disclosure Required, but Waiver)**

| Type of Conflict of Interest | Party Matters | General Matters | Any Matter |
|---|---|---|---|
| Stocks and investments | Stock value is less than or equal to $5,000 in aggregate *(5 CFR 2640.202(a) de minimis exemption)* | Stock value is less than or equal to $25,000 per entity/$50,000 in aggregate *(5 CFR 2640.202(b) de minimis exemption)* | |
| Primary Employment | SGE is a federal employee and his agency, not his organizational component, is conducting research on the product under review - funding from the sponsor is less than $500,000/per year | Matters will not have a special or distinct effect on the SGE or employer, the Committee's decision may affect SGE/employer only as a part of a class of product manufacturers (5 CFR 2640.203 (g) *exemption for non-Federal employment interests of SGEs on advisory committees*)<br><br>SGE is a federal employee, and his agency is conducting research for one or more firms with an interest in the general matter before the Committee | |
| Consultant/Advisor | SGE receives less than $10,000 per source per year and consulting on unrelated issue in the past or completed within the past 12 months (all monies paid) | SGE receives less than $10,000 per source per year and consulting on related or unrelated issue completed within the past 12 months (all monies paid) | |

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*The Science of Safety*                                                                                          4-31

| | | | |
|---|---|---|---|
| | SGE receives between $10,000 and $50,000 per source per year and consulting on unrelated issue in the past or completed within the past 12 months (all monies paid) | SGE receives between $10,000 and $50,000 per source per year and consulting on related or unrelated issue completed within the past 12 months (all monies paid) | |
| | | SGE receives more than $50,000 per source per year and consulting on related or unrelated issue completed within the past 12 months (all monies paid) | |
| Contracts/Grants/Cradas | Remuneration is less than $100,000 per source per year to institution /$10,000 per source per year as salary support to the SGE and work on unrelated product is currently active or completed within the past 12 months | Remuneration is less than $100,000 per source per year to institution /$10,000 per source per year as salary support to the SGE and work on unrelated matter is current or completed within the past 12 months | |
| | | Remuneration is less than $100,000 per source per year to institution /$10,000 per source per year as salary support to the SGE and work on related matter has been completed over a year ago | |
| | | Remuneration is between $100,000-$300,000 per source/year to institution/$10,000-$15,000 | |

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

| | | per source/year as salary support to the SGE and work on unrelated matter is current or completed within past 12 months | |
|---|---|---|---|
| Pat-ents/Royalties/Trademarks | SGE receives less than $15,000 in royalties per affected source annually and SGE has a patent on an unrelated product, licensed by a competing firm, and receives royalties | | |
| Expert Witness | | Remuneration is less than $5,000 per affected source per year and SGE makes no statement for or against any product of a sponsor or competitor | |
| Teach-ing/Speaking/Writing | | | SGE receives less than $5,000 per source per year and topic is unrelated to the particular matter and SGE receives no compensation |
| | | | SGE receives less than $5,000 per source per year and topic is unrelated and SGE is compensated |
| | | | SGE receives less than $5,000 per source per year and topic is related but SGE receives no compensation (in- |

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

| | | | |
|---|---|---|---|
| | | | cluding travel)<br><br>SGE receives less than $5,000 per source per year and topic is related but not specific to the matter under discussion by the committee and SGE is compensated |
| Department Heads – Contracts/Grants/Cradas | Remuneration is less than $300,000 per source per year to SGE's department and work on unrelated matter is current or has been completed within the past 12 months | Remuneration is less than $300,000 per source per year to SGE's department and work on unrelated matter is current or has been completed within the past 12 months | |
| | Remuneration is less than $300,000 per source per year to SGE's department and work on related matter has been completed within the past 12 months and SGE had only an administrative role | Remuneration is less than $300,000 per source per year to SGE's department and work on related matter has been completed within the past 12 months, and SGE had only an administrative role | |
| | Remuneration is between $300,000 - $600,000 per source per year to SGE's department and work on an unrelated matter is current or has been completed within the past 12 months | Remuneration is between $300,000 - $600,000 per source per year to SGE's department and work on unrelated matter is current or has been completed within the past 12 months | |

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

| | | Remuneration is be-tween $300,000 - $600,000 per source per year to SGE's department and work on related matter has been completed within the past 12 months and SGE had only an administra-tive role | |
|---|---|---|---|
| Exceptions for Institutional Di-rectors | The interests re-ported are unrelated to the product at is-sue or to the compet-ing products<br><br>(up to $750,000 per source per year) | | |

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

# REFERENCES

Initial therapy of hypertension. 2004. Med Lett Drugs Ther 46(1186): 53-5.

Ackermann Shiff S, Mundkur C, Shamp J . iPLEDGE: Isotretinoin Pregnancy Risk Management Program.  Presented to DSaRM . 2006.

Avigan M, DalPan G. February 2, 2004.  Letter to Seligman, P.

Burroughs F, Walker S Abigail Alliance for Better Access to Developmental Drugs. Presentation to the IOM Committee on the Assessment of the US Drug Safety System. 2006.

CDER, FDA, DHHS. Reviewer Guidance:  Conducting a Clinical Safety Review of a New Product Application and Preparing a Report on the Review.  Good Review Practices.  2005.

CERTS. 06/14/2006. Ongoing Projects. [Online] Available: http://certs.hhs.gov/projects/ongoing.html [accessed 9/14/2006].

Claxton K, Cohen JT, Neumann PJ. 2005. When is evidence sufficient? Health Aff (Millwood) 24(1): 93-101.

Claxton K, Eggington S, Ginnelly L, Griffin S, McCabe c, Philips Z, Tappenden P, and Wailoo A. 2005. A Pilot Study of Value of Information Analysis to Support Research Recommendations for NICE  The University of York.

Clinicalstudyresults.org. 2006. Glossary. [Online] Available: http://www.clinicalstudyresults.org/glossary/#hypothesis [accessed 8/14/2006].

Cohen AL, Jhung MA, Budnitz DS. 2006. Stimulant medications and attention deficit-hyperactivity disorder. N Engl J Med 354(21): 2294-5.

Davis R. Vaccine Safety Datalink: Overview.  Presentation to the Committee on Review of NIP's Research Procedures and Data Sharing Program, Washington, DC.  Washington, DC.

Department of Health and Human Services. Reequest for Information on Active Surveillance Programs in the United States for the Identification of Clinically Serious Adverse Events Associated with Medical Products. 2005.

DHHS, AHRQ. Medicare Prescription Drug Data Development: Methods for Improving Patient Safety and Pharmacovigilance Using Observational Data. [Online] Available: http://effectivehealthcare.ahrq.gov/decide/decide.cfm?topic=12 [accessed 09/14/2006].

FDA. 2000. FDA Guidance on Conflict of Interest for Advisory Committee Members, Consultants and Experts Table of Contents. [Online] Available: http://www.fda.gov/oc/advisory/conflictofinterest/guidance.html [accessed 7/13/2006].

FDA. March 2004. Innovation Stagnation:  Challenge and Opportunity on the Critical Path to New Medical Products. [Online] Available: http://www.fda.gov/oc/initiatives/criticalpath/whitepaper.html; http://www.fda.gov/oc/initiatives/criticalpath/whitepaper.pdf [accessed 10/10/2005].

FDA. 2005. Guidance for Industry: Development and Use of Risk Minimization Action Plans.

FDA. Center for Drug Evaluation and Research-Activities and Level of Effort Devoted to Drug Safety. 2005 .

FDA. Comment on "Financial Conflict of Interest Disclosure and Voting Patterns at Food and Drug Administration Drug Advisory Committee Meetings". 2006.

Fields LE, Burt VL, Cutler JA, Hughes J, Roccella EJ, Sorlie P. 2004. The burden of adult hypertension in the United States 1999 to 2000: a rising tide. Hypertension  44(4): 398-404.

Hajjar I, Kotchen TA. 2003. Trends in prevalence, awareness, treatment, and control of hypertension in the United States, 1988-2000. JAMA 290(2): 199-206.

HHS, FDA, and CDER. Dec. 8, 2005. FDA's Communication of Drug Safety Information: Transcript. Statement at the Dec. 8, 2005 Available Online: http://www.fda.gov/cder/meeting/RiskComm2005/1208fda.pdf.

HHS, Office of Inspector General, Rehnquist J. 2003. FDA's Review Process for New Drug Applications:  A Management Review (OEI-01-01-00590). HHS, Office of Inspector General, Rehnquist J.

Honein MA, Moore CA, Erickson JD. 2004. Can we ensure the safe use of known human teratogens? Introduction of generic isotretinoin in the US as an example. Drug Saf 27(14): 1069-80.

Hripcsak G, Bakken S, Stetson PD, Patel VL. 2003. Mining complex clinical data for patient safety research: a framework for event discovery. J Biomed Inform 36(1-2): 120-30.

International Society for Pharmacoepidemiology (ISPE). 2006.  Response to: "European Commission Public Consultation: An Assessment of the Community System of Pharmacovigilance".

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

IOM, Committee on Clinical Trial Registries. Developing a National Registry of Pharmacologic and Biologic Clinical Trials:  Workshop Report.  Washington, DC: National Academies Press; 2006.

Jackson LA, Nelson JC, Benson P, Neuzil KM, Reid RJ, Psaty BM, Heckbert SR, Larson EB, Weiss NS. 2006. Functional status is a confounder of the association of influenza vaccine and risk of all cause mortality in seniors. Int J Epidemiol 35(2): 345-52.

Jollis JG, Ancukiewicz M, DeLong ER, Pryor DB, Muhlbaier LH, Mark DB. 1993. Discordance of databases designed for claims payment versus clinical information systems. Implications for outcomes research. Ann Intern Med 119(8): 844-50.

Kaiser Family Foundation (Daily Health Policy Report). June 14, 2005. Medicare | FDA Says It Supports Tracking Medication Safety Using Medicare Drug Benefit Data. [Online] Available: http://www.kaisernetwork.org/daily_reports/rep_index.cfm?hint=3&DR_ID=30734 [accessed 09/14/2006].

Kaiser Family Foundation. Medicare: Prescription Drug Coverage Among Medicare Beneficiaries. 2006.

Kessler DA, Rose JL, Temple RJ, Schapiro R, Griffin JP. 1994. Therapeutic-class wars--drug promotion in a competitive marketplace. N Engl J Med 331(20): 1350-3.

Levine A. 2002. FDA enforcement: how it works. In: Pina KR/Pines WL, Eds.  A Practical Guide to Food and Drug Law and Regulation (2nd Ed.). Washington, DC: Food and Drug Law Institute. Pp. 271-298.

Lo Re V, Strom B. The Role of Academia and the Research Community in Assisting FDA and the Drug Safety System. 2006.

Lurie P, Almeida CM, Stine N, Stine AR, Wolfe SM. 2006. Financial conflict of interest disclosure and voting patterns at Food and Drug Administration Drug Advisory Committee meetings. JAMA 295(16): 1921-8.

Meltzer D. 2001. Addressing uncertainty in medical cost-effectiveness analysis implications of expected utility maximization for methods to perform sensitivity analysis and the use of cost-effectiveness analysis to set priorities for medical research. J Health Econ 20(1): 109-29.

Nebeker JR, Hoffman JM, Weir CR, Bennett CL, Hurdle JF. 2005. High rates of adverse drug events in a highly computerized hospital. Arch Intern Med 165(10): 1111-6.

Nissen SE, Wolski K, Topol EJ. 2005. Effect of Muraglitazar on Death and Major Adverse Cardiovascular Events in Patients With Type 2 Diabetes Mellitus. JAMA

No Author. 2000. Accutane-exposed pregnancies--California, 1999. MMWR Morb Mortal Wkly Rep 49(2): 28-31.

Pitts M, Karwoski CB. February 2, 2004.  Letter to Seligman P and Trontell A.

Psaty BM, Rennie D. 2006. Clinical trial investigators and their prescribing patterns: another dimension to the relationship between physician investigators and the pharmaceutical industry. JAMA 295(23): 2787-90.

Psaty BM, Weiss NS, Furberg CD. 2006. Recent trials in hypertension: compelling science or commercial speech? JAMA 295(14): 1704-6.

Seligman P. Assessing Drug Safety.  Presentation to the Committee on the Assessment of the US Drug Safety System on July 20, 2005. 2005.

Shannon J, Tewoderos S, Garzotto M, Beer TM, Derenick R, Palma A, Farris PE. 2005. Statins and prostate cancer risk: a case-control study. Am J Epidemiol 162(4): 318-25.

Stossel T, Shaywitz D. 2006, July 2. What's Wrong With Money in Science? The Washington Post.B03.

Szarfman A, Machado SG, O'Neill RT. 2002. Use of screening algorithms and computer systems to efficiently signal higher-than-expected combinations of drugs and events in the US FDA's spontaneous reports database. Drug Saf 25(6): 381-92.

Tilson H, Gibson B, Suh R. FDA and the Drug Safety System:  The Role of the Pharmaceutical Industry.  Commissioned by the IOM Committee on the Assessment of the US Drug Safety System. 2006.

Tollman P. How Do We Currently Assess Risk/Benefit Ratios for Pharmaceuticals? Advantages and Drawbacks of the Current System. The Boston Consulting Group; 2006:pgs. 1-20.

UI Health Care News. July 3, 2006. UI Center to Focus on Therapeutics Use, Efectiveness Among Elderly. [Online] Available: http://www.uihealthcare.com/news/news/2006/07/03certs.html [accessed 9/14/2006].

Weiss Smith S. Summary of Issues: January 17, 2006 IOM Workshop.  Commissioned by the IOM Committee on the Assessment of the US Drug Safety System. 2006.

Women's Group for the Women's Health Initiative Investigators. 2002. Risk and Benefits of Estrogen Plus Progestin in Healthy Postmenopausal Women. Principal Results From the Women's Health Initiative Randomized Controlled Trail. JAMA 288(3): pgs. 321-333.

Wysowski DK, Swartz L. 2005. Adverse drug event surveillance and drug withdrawals in the United States, 1969-2002: the importance of reporting suspected reactions. Arch Intern Med 165(12): 1363-9.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

# 5

# Regulatory Authorities for Drug Safety

Major components of the Food and Drug Administration (FDA) statutory authority have evolved in response to drug-related public health crises and in response to a changing environment. The social and health care environment has changed and continues to evolve—health care providers and patients expect timely access to effective drugs, the user-fee program established in 1992 has increased the pace of drug review and approval, the practice of medicine and the use of drugs have changed, and the information available to the public from advertising and the Internet and from commercial and government or nonprofit sources has transformed consumer knowledge and the patient's role in health care (see Chapter 1 for more information). In view of those changes, the agency's regulatory authority must be reconsidered and strengthened to ensure that it is equal to the task. However, the committee cautions against assuming that altering the statute alone will solve all difficulties related to FDA's regulatory authorities. FDA needs considerable new resources to perform optimally in a fast changing, challenging environment, including resources to support its regulatory activities, such as regulatory oversight of direct to consumer advertising and staff with training and expertise in drug regulation (see Chapter 7 for more discussion of resources).

This chapter briefly summarizes the history of drug regulation, describes the use of the agency's authority during the preapproval and postapproval processes, identifies needed changes, and makes recommendations to strengthen or clarify FDA's authority.

## HISTORY OF FDA DRUG REGULATION

The foundation of FDA's regulatory authorities was laid in the 1906 Pure Food and Drug Act, which focused on misbranding and adulteration. In keeping with other consumer product laws, it focused on postmarketing remedies only. That is, if a drug already on the market was proven to be a hazard, it could be seized and further sales halted.

In the wake of deaths due to elixir of sulfanilamide in 1937, the 1906 law was replaced with a stronger form of regulation in the Federal Food, Drug, and Cosmetic Act (FD&C Act) of 1938. The new law changed the emphasis to the period of time before a drug enters the market, and required manufacturers to notify FDA before beginning testing on human subjects and to submit proof of the drug's safety (though not of its efficacy) (Hutt, 1993). The requirement was a major advance in drug regulation, but it was nonetheless still somewhat weak, as marketing could begin 60 days after submission of the information to the FDA unless the FDA affirmatively found the drug to be unsafe.

The statutory scheme for drug regulation went through yet another revision in 1962, after thousands of European children with limb defects were born to mothers who had been adminis-

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety: Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

tered thalidomide (FDA, ; Kaplan, 1995). The Drug Amendments of 1962 shifted the burden of proof from FDA (which previously had to prove harm to keep a drug from being marketed) to manufacturers, who now were required to demonstrate both safety and efficacy prior to receipt of marketing approval (Barton Hutt P, 1991). The early 1960s also marked the crystallization of clinical trials into the sequence of phase 1, 2, 3 trials still in use today and described in greater detail in Chapter 2 (DHEW, 1963).

The FDA's ability to form judgments about the safety and efficacy of drugs depends upon the submission of data, usually from drug company sponsors, rather than on the use of data developed independently or on its own initiative.  As a result, the statutory scheme governing drug approval in the U.S. has also included a series of measures to provide an incentive for third parties to develop safety and efficacy data for use by FDA.  These incentives include patent extensions (the Drug Price Competition and Patent Term Extension Act of 1984), and periods of market exclusivity in exchange for developing information about new drugs, new indications for old drugs, and new information about the action of old drugs in special populations, such as children (The Orphan Drug Act of 1982; The FDA Modernization Act of 1997; the Best Pharmaceuticals for Children Act of 2002).  Thus, the statutory scheme is characterized by carrots rather than sticks, in that the development of new information on drug safety and efficacy is achieved more by creating incentives than by issuing mandates.

The 1938 FD&C Act, as amended several times, defines FDA's regulatory jurisdiction and its enforcement powers. The statute empowers FDA to bring enforcement actions through administrative procedures (warning letters, adverse publicity, recalls, and withdrawals of product approvals) and judicial procedures (seizure, injunction, and prosecution) (Bass IS, 1997; Levine A, 2002). FDA's enforcement authority is derived by delegation from the secretary of the Department of Health and Human Services (DHHS) to the commissioner of food and drugs (Bass IS, 1997). Regulations contained in the Code of Federal Regulations empower FDA to enforce the FD&C Act and other statutes, as appropriate. FDA's ability to regulate is also influenced by Congress and its "oversight jurisdiction" exercised by holding congressional hearings (Barton Hutt P, 1991). The judiciary branch also may influence FDA regulation, when FDA's interpretations of the statute and its development of regulations are successfully challenged in court.

## AN AGING AND INADEQUATE STATUTORY FRAMEWORK

The statutory authority for drug regulation was constructed decades ago, and it remains largely unchanged. The existing regulatory framework is structured around the premarketing testing process; few tools are available for addressing postmarketing safety issues, short of the blunt instruments available to respond to clear-cut adulteration and misbranding. As described in Chapter 1, the sciences of drug discovery and development, the practice of medicine and the extent of drug use, and the information environment in which health care providers practice and patients learn about drugs and interact with the health care delivery system have all changed. It is time to reassess and strengthen FDA's postmarketing authorities and tools in view of these changes. The carefully controlled clinical trials currently conducted premarket under the existing statutory framework consists of study populations that are commonly different in composition and health status from populations that will use the marketed drug. Study populations are chosen for a legitimate reason: to make data from the trials clearer and thus to make safety and efficacy testing more efficient. After approval, drugs are used by larger and more heterogeneous populations, and the drug may be used by people who have comorbidities or are taking multiple pre-

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

scription and over-the-counter drugs and dietary supplements. Furthermore, the promotion of drugs has moved beyond health care providers, and substantial industry investment goes into directly targeting consumers. It has also become more important to recognize that the assessment of a drug's risk-benefit profile does not remain static after approval. Every effort must be made to monitor the performance of drugs on the market, to identify safety problems early, and to address them effectively. FDA's ability to regulate drugs effectively in a rapidly changing context requires reconsideration of the laws and a clarification and strengthening of the agency's regulatory authority.

Below, the committee describes main aspects and weaknesses of FDA's authority before and after approval.

### FDA Authority Preapproval

A primary regulatory activity of the FDA Center for Drug Evaluation and Research (CDER) involves shepherding products through phase 1, 2, and 3 trials. If at any point during clinical trials, the agency "does not believe, or cannot confirm, that the study can be conducted without unreasonable risk to the subjects/patients", the agency has the statutory authority to impose a clinical hold on the trial (CDER et al., 1998). This suspends further progress in the study until the underlying reasons for the hold (e.g., adverse events or other safety questions) are addressed. Center review teams can also ask sponsors to develop and submit for review, when appropriate, plans for postmarketing safety surveillance and study to monitor previously undocumented, unexpected risks, and a risk management program when there are known risks. Other risk management measures and data from epidemiologic studies may be needed if safety signals are identified and confirmed when a drug has been on the market, including label changes, communication to health care providers, restriction of marketing, and public health advisories. In recent years, CDER has developed guidance for industry on preparing and evaluating risk minimization action plans (RiskMAPs), which may include an array of educational and administrative activities to address risks that are known at the time of approval.

There appear to be several conditions FDA can impose at the time of approval, for example, requiring distribution limited to a specific medical specialty, distribution with required periodic screening to avoid contraindicated use, distribution with mandatory enrollment in a registry. Certainly such conditions have been imposed in the past, for example with teratogenic drugs such as thalidomide and isotretinoin. However, varying interpretations by occupants of the general counsel's office of the FDA's authority has led to significant variation in the willingness of the FDA to consider using conditions on sale as a condition of approval. And in general, such conditions are even more difficult to put in place after the drug has been approved for marketing, as efforts to impose such conditions nearly always depend upon voluntary compliance by the manufacturer rather than on the threat of withdrawal of the drug from the market as an imminent health hazard.

The Prescription Drug User Fee Act of 1992 (PDUFA) complicated FDA's ability to use its authority before approval. FDA's existing statute required that drug review be completed in 180 days; in practice, that goal proved largely impossible to achieve (Kaplan, 1995). The desire of patients and the general public for more rapid access to important drugs were among the primary drivers of Congressional action to speed up the drug approval process. The 1992 enactment of the Prescription Drug User Fee Act (PDUFA) secured user-fee funds dedicated to enabling FDA drug review divisions to retain the staff and other resources needed to shorten the length of the approval process. PDUFA has clearly expedited agency decision making and has probably led to

### PREPUBLICATION COPY:  UNCORRECTED PROOFS

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

efficiencies in distinguishing important from less important issues in the final stages of the re-view process. However, there is concern that the rapid pace of the process needed to meet PDUFA goals (see Chapters 2 and 3) creates an environment that makes it hard or close to im-possible for CDER reviewers to pursue safety concerns as carefully as they would in a less fre-netic setting (DHHS and OIG, 2003; GAO, 2002b; Levine, 2006; Nickas J, 2006)(IOM Staff Notes). Some also have serious concerns that the regulator has been "captured" by industry it regulates, that the agency is less willing to use the regulatory authority at its disposal (see Chap-ter 3). Patient expectations and misperceptions about drugs, the ever broader array of drugs, the complexity of actual drug use in the real world, and the intense pace of preapproval activities all suggest that FDA needs stronger authority postapproval to conduct adequate surveillance and oversee and enforce safety studies.

### FDA Authority After Approval

The primary expression of FDA's authority is the threat to withhold or withdraw approval; but because a drug may offer unique benefits to a population in need, the threat of postapproval withdrawal can ring hollow.

#### *Authority to compel completion of postmarketing commitments*

Many postmarketing study commitments—a key activity requested by the agency to help to narrow the remaining uncertainty about an approved drug's safety—are not met and many are never undertaken. As described in Chapter 4, postmarketing studies are often planned and de-signed as an afterthought late in the review process, just before approval, and sometimes the study designs may not be the most useful, necessary, or even practicable (IOM, 2005). That ap-pears to be at least partly a result of the frenetic pace of the review process, but it may also re-flect the agency's awareness of its limited authority after approval.

FDA's statutory authority to require postmarketing studies has been a subject of debate for decades. Although the agency has interpreted FD&C Act section 505(k), which grants it power to require "records and reports" from sponsors as giving it the authority to mandate postmarket-ing studies, this interpretation has been contested by the industry (Steenburg, 2006). Several commissioners have admitted that the agency's interpretation of the statute made it vulnerable to court challenges. In 1977 the Review Panel on New Drug Regulation also found that the statute did not give FDA that authority. Many of the Panel's recommendations were incorporated into the 1979 Drug Regulation Reform Act (S. 1075, Kennedy) which passed Senate but failed to garner support in the House (Dorsen et al., 1977; Steenburg, 2006). The panel's final report as-serted that "rather than delay approval of a drug pending additional studies, FDA should have the authority to require a sponsor to conduct additional research as a condition of approval when a drug has been shown to be safe and effective for its intended use, but questions remain, for ex-ample, with regard to its long term effects" (Dorsen et al., 1977). The 1979 bill included a provi-sion to allow FDA to require postapproval studies (Dorsen and Miller, 1979). The 1996 Inspector General found that the FDA "tradition" of asking for voluntary postmarketing studies was not supported by statute in most cases (Gibbs Brown J, 1996).

### PREPUBLICATION COPY:  UNCORRECTED PROOFS

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

   The Food and Drug Administration Modernization Act of 1997 (FDAMA, which included the reauthorization of PDUFA) added a provision to the FD&C Act, requiring sponsor submission of annual updates on progress in meeting postmarketing study commitments. However, PDUFA provided no resources or new authorities to enable the agency to enforce that provision. FDA was required to develop and publish a rule on the reporting format and to report annually on sponsor performance in the *Federal Register*. The 2005 *Federal Register* notice on sponsor progress in meeting postmarketing study commitments showed that 797 (65%) of NDA and abbreviated NDA-related postmarketing commitments are "pending" (they are neither "ongoing" nor "delayed") and 47% of annual reports on studies that were due were not submitted to FDA. FDA's limited authority after marketing and its inability to enforce implementation and fulfillment of important and necessary postmarketing commitments have been at the core of many proposals for strengthening FDA's authority (Ganslaw LS, 2005; GAO, 2002b; Grassley C, 2005; Thaul S, 2005; van der Linden et al., 2003) (Waxman, 2005). A recent DHHS Office of the Inspector General (OIG) report on FDA's Monitoring of Postmarketing Commitments noted that FDA has authority to require postmarketing studies only is certain cases (e.g., accelerated approval) and that 91% of postmarketing commitments between 1990 and 2004 were requested by the agency rather than being required by statute or regulation (DHHS and OIG, 2006). The report also found that postmarketing study commitments do not have a high priority in FDA, the agency lacks a system for managing postmarketing study commitments and the existing database of commitments is not consistently populated with information from commitment letters or from annual status reports, one-third of annual status reports on postmarketing commitments (required by FDAMA) are not submitted or are incomplete, and many completed reports lack useful information. The OIG report also concluded that FDA has no recourse when sponsors do not make progress or do not report on their commitments (DHHS and OIG, 2006). It is clear that FDA authority to require postmarketing studies (in cases other than accelerated approval, etc.) is at best unclear, and statutory change is needed to enable FDA to require such studies when necessary and appropriate.


### *Authority to unilaterally impose risk-reducing remedies, such as label changes and distribution restrictions*

   During the drug development process and up to the point of approval, FDA has a great deal of power.  Its communications with sponsors at meetings and in written exchanges (including approval and other letters issued while an NDA is under review) carry enormous weight; sponsors are highly motivated to accede to FDA's requests and demands during this time to avoid any delay in the approval of their product. After approval, however, unless a case meets the statutory definition of fraud or misbranding or the high threshold for proving imminent hazard to the health of the public, FDA's regulatory and enforcement options generally lie at the ends of the spectrum of regulatory actions: do nothing or precipitate the voluntary withdrawal of the drug.[1] FDA relies on firms to withdraw drugs from the market voluntarily when safety issues are revealed. Doing nothing implies not acting on potential threats to the health of the public, and precipitating withdrawal implies taking the drug from patients who need it, so neither is a satisfactory option. Currently, most actions involve softer remedies negotiated with a drug sponsor;

---

[1] Withdrawals are almost always voluntary rather than mandated by FDA. According to its statute, FDA can institute recalls only for devices and baby formula (1997).

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

FDA cannot unilaterally compel label changes, addition of boxed warnings, or fulfillment of postmarketing study commitments. Nor can it unilaterally restrict marketing, change the content of a package insert (including Medication Guides[2]), or change the content of other documents intended for the public. The process of negotiation works well in many cases, but for some products the process can be long and have potentially adverse repercussions for safety. The diminished FDA authority after approval is of concern because knowledge of a drug's risk–benefit profile is never complete at the time of approval.

FDA takes several approaches to monitoring postmarketing safety. CDER staff members review Adverse Events Reporting System (AERS) reports using data mining techniques for automated monitoring of the AERS database, conduct retrospective and observational studies using external administrative databases, and track the status of phase 4 studies. CDER staff also evaluate and oversee sponsor-designed efforts to manage known risks, such as developing and implementing RiskMAPs for specific products, and negotiate with sponsors on actions needed to confirm and address just-identified risks. Such actions may include additional study, label changes, and risk communication including Dear Health Professional letters. If safety problems are identified, FDA can ask the sponsor to propose label language but cannot require specific language to describe the newly identified risks. Often, companies argue strongly against label changes, limitation of marketing, boxed warnings, and so on.

### *Regulatory oversight of sponsor promotional activities*

Pharmaceutical companies engage in various activities to promote their products to the public and to health care providers. Historically, health care professionals have been the primary target of such promotional activities; even at the time of this writing, more than 80% of promotional budgets are spent on reaching prescribers through such activities as "detailing" (in-person promotion by sales representatives in the health care setting) and sponsorship professional educational opportunities (Rosenthal et al., 2002). An increasing proportion of promotional funds goes toward direct-to-consumer (DTC) advertising, which is an increasingly contentious subject of drug regulation (GAO, 2002a). In 2006, the United States and New Zealand were the only nations that permitted DTC advertising of prescription drugs. However, the European Medicines Agency has for some time considered allowing DTC advertising for three disease categories (HIV/AIDS, diabetes, and asthma and other respiratory conditions).

---

**BOX 5.1 History of FDA's DTC Advertising Regulation**

As a variety of social changes began to transform the passive patient into an empowered seeker and contributor of knowledge and information, the patient-provider relationship and other interactions and spheres of influence around it changed as well. As early as 1968, FDA developed the first patient package insert in recognition of the need to instruct patients on the use of a drug, the inhalational product isoproterenol (Pines, 1999). In the 1970s and 1980s, more health-related information was made available to the general public (such as the *Physician's Desk Reference*), cable television experimented with physician-oriented channels, and pharmaceutical companies began to advertise in print to patients. As FDA and the industry reoriented some of their communication activities to target patients, the agency worked in two different directions: furthering its own role in communicating to patients through patient package

---

[2] Medication guides, or MedGuides, are patient-specific labeling for prescription drug products determined by FDA to have "serious and significant public health concern requiring distribution of FDA-approved patient information" (21 CFR 208.1, 4-1-05 Edition, p. 114) (CDER, 2006).

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

inserts (see Chapter 6) and making determinations about how to regulate and ascertain the public health implications of emerging industry promotional efforts directed at consumers (DHHS et al., 2005; Pines, 1999).

FDA's authority in that respect originates in the FD&C Act, which gave FDA authority over drug labeling and gave the Federal Trade Commission (FTC) authority over advertising (Kaplan, 1995). Current statutes give FDA and FTC overlapping and concurrent authority over the labeling of FDA-regulated products and over advertising of prescription drugs and devices. FTC is responsible for regulating false or deceptive claims about products other than prescription drugs and FDA has primary jurisdiction over false and misleading labeling of all jointly regulated products and, on the basis of the definition of advertising as an extension of labeling, over DTC advertising (1997; Palumbo and Mullins, 2002; Pines, 1999).

In 1983, FDA requested a voluntary moratorium on all drug advertising to allow the agency to determine where there were adequate statutory protections for consumers (Palumbo and Mullins, 2002). After its internal decision making and discussion with academic, consumer, health care, and other communities, the agency concluded in the *Federal Register* (1985) that "current regulations governing prescription drug advertising provide sufficient safeguards to protect consumers." The notice also stated that DTC advertising must meet the same requirements as advertising to physicians, including the "brief summary" of risk information required by statute (21 CFR 202.1).

In the 1990s, as DTC advertising progressed from print to television, pharmaceutical companies found they could not make product claims in advertisements, because that required presenting the statutorily "brief summary" of safety and contraindications information. The television equivalent of the page of minuscule print on the back of magazine advertisements "would take a minute or more at a barely readable scrolling rate" (Woodcock J et al., 2003). For this reason, DTC advertisements did not make product claims and generally consisted of "help-seeking" and "reminder" advertisements. The former described an identifiable condition and urged viewers to "see your doctor," while the latter mentioned the name of a product without the indication. Advertisements that talked about the disease, but not the drug, or about the drug without mentioning the indication left viewers confused and led FDA to reconsider the entire subject of DTC advertising (Pines, 1999). In 1997, FDA produced the draft "Guidance for Industry: Consumer-Directed Broadcast Advertisements." That document, issued in final form in 1999, allowed television product claim advertisements, finding that they could meet the statutory requirement and make "adequate provision" for the information contained in the brief summary by providing a toll-free number or website where consumers could receive the complete information contained in the drug's label.

Around the turn of the 20th century, some analysts became concerned that regulation of DTC advertising was not keeping pace with the rapid evolution in advertising, and the debate that began with the introduction of DTC advertising became multifaceted (Hunt M, 1998). Consumer groups, insurers, providers, and others have identified several interrelated concerns about DTC advertising, such as its influence on drug pricing, patient behavior, and prescriber behavior. A 2002 report from the Government Accountability Office concluded that DTC advertising appears to increase spending on prescription drugs and drug utilization (GAO, 2002a). One concern is that advertising may lead to more rapid uptake of a new drug, which, in cases where the drug in question is later found to present greater risks than older drugs in the same class, could potentially dramatically increase the exposure to that particular drug, even among patients who are not good candidates for it. That exemplifies the continuing tension between safety concerns and benefits that outweigh the risks for certain patients. Also, DTC advertising may distort use patterns within classes of drugs, often driving use of more costly but no more effective therapies at the expense of older, cheaper options, e.g., generics.

As a communication or educational tool, DTC advertising appears to have mixed effects. There is evidence that advertisements have raised awareness about certain health conditions and led people to visit their health care provider and, in some cases, receive needed diagnosis and treatment (Aikin KJ, 2003; Almasi et al., 2006; Calfee JE, 2002; Ostrove NM, 2000)(see Box 5.2 for a sample of public opinion of DTC advertising). Advertisements about drugs may increase consumer familiarity with products available to treat their particular condition(s), perhaps em-

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

5-8                                                                                      *The Future of Drug Safety*

powering them to initiate discussion about therapy with their health care provider, and in some cases, to alert a less well-informed provider to a particular therapy (Almasi et al., 2006; Lyles, 2002; Wilkes et al., 2000). On a potentially more negative note, viewers of television prescription drug advertisements may learn more about the benefits than about the risks. Also, DTC advertising has been shown to have an effect on physician prescribing patterns (Weissman et al., 2004) (Aikin KJ, 2003; Aikin KJ et al., 2004; Mintzes B et al., 2003; Spence M et al., 2005).

---

**BOX 5.3  Public perspectives on DTC advertising**

It has been suggested that DTC advertising is associated with the transformation in the role of patients from passive to actively contributing to the health care encounter (shared decision making). A study of 1999 Princeton Survey Research Associates data found that more than 40% of consumers have used DTC advertisement information in their decision-making process and used information learned from a DTC advertisement to discuss a prescription drug with their health care provider (Deshpande et al., 2004). The study also found that consumers believe advertisements are more effective in communicating benefits than risks of prescription drugs.

An online survey conducted for the Wall Street Journal in 2005 (Harris Interactive, 2005) found that only 35% of American adults believe FDA does a good or excellent job in its oversight of DTC advertising. When asked whether they thought banning DTC advertising for a period of time after a prescription drug is approved by FDA so "doctors have time to become familiar with the drug", 51% agreed. Only 26% of respondents agreed that banning DTC advertising is not a good idea because "it is how many patients learn about new treatments that might be right for them."

---

FDA's authority to regulate prescription drug advertisements is found in Section 502(n) of the FD&C Act, and Title 21 *Code of Federal Regulations* (CFR) section 202.1 is the source of the implementing regulations that describe the content required in such advertisements (Behrman R, 2005). Specifically, regulations require that print advertisements must disclose every risk listed in the FDA-approved label as part of a brief summary, but broadcast advertisements may either contain a brief summary of side effects and contraindications or make "adequate provision" for conveying the product's complete labeling information, that is, a toll-free telephone number or Web site. FDA can regulate advertising that is false or misleading, but its regulatory actions must harmonize with First Amendment protections of truthful commercial speech.

FDA does not have the authority to approve drug advertisements or require that advertising materials be reviewed prior to their use. The agency can require and enforce corrective action only after a drug advertisement has been broadcast (Woodcock J et al., 2003). To avoid having to issue a correction after beginning a marketing activity, a majority of sponsors submit advertising materials for comment to the CDER Division of Drug Marketing and Communication (DDMAC) before airing them (Woodcock J et al., 2003)(see Box 5.3) .

---

**BOX 5.3  The Division of Drug Marketing and Communication**

*The CDER office responsible for reviewing DTC advertisements and other sponsor promotional materials is the Division of Drug Marketing and Communication (DDMAC). Whether or not an advertisement is reviewed in a timely manner depends on the resources available for review activities—DDMAC is small and has limited resources. A forthcoming report from the Government Accountability Office reviews DDMAC's work and resources.*

*In 2005 the Division's staff of 35 received 53,000 pieces of promotional material (up from 36,700 in 2002) (Winter G, 2005) (Woodcock J et al., 2003).  When a company submits material, the appropriate DDMAC staff members (including a social scientist, regulatory counsel, and others) meet to review the proposed promotional material and make a decision. "Drugs that are new products, have new indications, are first in a class to have broadcast advertisements, or are being advertised in a broadcast medium for*

---

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*the first time have more extensive reviews" (Woodcock J et al., 2003). There are several regulatory tools CDER's DDMAC can employ against companies that engage in violative promotional practices. These include*

- Untitled letters (or "notice of violation" letters), requiring sponsors to discontinue use of false or misleading advertising materials
- Warning letters, issued to sponsors for more serious violations than those addressed by untitled letters (i.e., those posing potentially serious health risks to the public)
- Injunctions and consent decrees
- Referrals for criminal investigation or prosecution
- Seizures

The history of court challenges to restrictions on DTC advertising is lengthy and instructive. Attempts to ban DTC advertising have foundered due in part to uncertainty as to whether such a prohibition is constitutional. Drug advertising has been held to be commercial speech deserving First Amendment protection. (Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 762 (1976)).  In Central Hudson Gas & Electric Corp. V. Public Service Commission (447 U.S. 557 (1980)), the Court stated that a governmental restriction upon commercial speech is lawful only if the asserted governmental interest in the restriction is substantial, that the speech restriction directly advances the governmental interest asserted, and that the speech restriction is not more extensive than is necessary to serve the asserted governmental interest.  If the government cannot demonstrate that it meets all three prongs of the Central Hudson test, the speech restriction is unlawful. In Thompson v. Western States Medical Center, 535 U.S. 357 (2002), the Supreme Court applied the Central Hudson test and ruled that the statutory ban on advertising of compounded drugs violated commercial speech rights. How the court would react to restrictions short of outright ban on DTC advertisements is unclear, but it is worth noting that in the western states decision the court was unsympathetic to the argument that DTC advertisements of compounded drugs might affect physician prescribing practices, to the detriment of their patients. The same court cases are relevant to whether FDA can require prior approval of the advertisements. If courts were to conclude that this amounts to a "prior restraint" on First Amendment protected speech, FDA would have to show a compelling government purpose for such a policy.

FDA's regulation of promotional activities was challenged in court by the Washington Legal Foundation in 1994. In its lawsuit, the Foundation claimed FDA had no statutory grounds for regulating companies' truthful statements even if they did not adhere to FDA's requirements for "fair balance" and "full disclosure."  Although the lawsuit involved off-label promotion to health care providers, the decision against FDA was sweeping and many believe it limits FDA's ability to regulate DTC advertising. Washington Legal Foundation continues to scrutinize FDA's actions regarding DTC advertising on First Amendment grounds (FDA and Dockets Management Branch, 2002), and in June 2005, the Foundation launched its "DDMAC Watch," charging that FDA/DDMAC requirements exceed the statutory requirement of full disclosure of risks and that the division does not fully demonstrate how it determines that a given advertisement is misleading to consumers (Washington Legal Foundation, 2005).

In response to the debate about the effects of DTC advertising on prescription drug use and ultimately, on drug safety, Senator Frist called for a two-year moratorium on DTC advertising (Pharma Marketletter July 6, 2005). The Pharmaceutical Research and Manufacturers of America (PhRMA) issued 15 guiding principles on the advertising of prescription drugs (see Box 5.4). One of the principles called for submitting advertising material to FDA prior to broadcast, and informing the agency about the intended time of initial airing. The principles also urged compa-

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

nies to cooperate with FDA to alter or remove DTC advertising when safety issues about an advertised prescription drug arise. Twenty-three drug companies agreed to the new guidelines, and at least two, Bristol-Meyers Squibb and Pfizer, announced moratoria (for one year, and 6 months, respectively) on DTC advertising for newly approved drugs. That was an important action, and one that is consonant with the committee's views about the value of limiting marketing of new molecular entities in order to prevent potentially rapid uptake of a new drug about which considerable uncertainty remains.

| BOX 5-4 |
| :---: |
| **PhRMA's 15 Guiding Principles on DTC Advertising (2005)** |
| |
| * Potential public health benefit<br>* Accurate and not misleading<br>* Educational<br>* Identify product as prescription not OTC<br>* Foster responsible communication between patient and provider<br>* Educate providers about new medicine or new indication for an appropriate (given all facts about the drug, the condition, etc.) length of time before beginning DTC advertising<br>* Working with FDA, alter or discontinue DTC advertising if indicated by new risk information<br>* Submit all new DTC TV advertisements to FDA before releasing them<br>* DTC TV and print advertisements should inform about non-drug options (e.g., lifestyle and diet change) when appropriate<br>* DTC advertisements that identify a product by name should include indications and major risks<br>* Design advertisements to present benefits and risks in a balanced, clear way<br>* Respect seriousness of conditions and drugs<br>* Content and placement should be age-appropriate<br>* Encouraged: promote health and disease awareness as part of DTC advertising<br>* Encouraged: include information for uninsured and underinsured where feasible |

## Rationale for Strengthening Drug Regulation

### *The "bully pulpit" is not enough*

A response to the concern about FDA's limited postmarketing authority (see Box 5.5 for two interesting exceptions) is that FDA has and can use its "bully pulpit", its influence, to compel action on the part of a sponsor. The committee learned in conversations with and from literature about several former FDA leaders that even in cases where authority was not clear-cut, the agency was able to use its bully pulpit to powerful effect in its interactions with sponsors (IOM Staff Notes 2005-2006). However, consumer organizations, legislators, scientists, and others who have called for strengthening and clarifying FDA regulatory authority have provided numerous examples of cases where the agency was unable to effect desired changes. The committee asserts that the bully pulpit route leaves potentially critical regulatory action vulnerable to a subjective and highly variable process of exercising individual or agency influence, and to the vicissitudes of changing attitudes toward regulation. That is why FDA's authorities must be clarified and strengthened to empower the agency to take rapid and decisive actions when necessary and appropriate.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

---

**BOX 5.5  Two Exceptions in FDA's Regulatory Authority**

Pediatric drugs and accelerated approval drugs provide two important incentive mechanisms, with which to circumvent the imbalance in regulatory authority pre- and postapproval, and may be instructive as models for strengthening the statutory authorities available to FDA. The FDA Modernization Act of 1997 included patent exclusivity provisions as an incentive for sponsors who conducted studies of approved drugs in pediatric populations, and the 2002 Best Pharmaceuticals for Children Act renewed those incentives. That legislation exemplifies the "carrot" approach to motivating conduct and completion of studies: no study, no extended period of exclusivity. The "stick" approach to enforcing study commitments, which has not worked so well, is illustrated by accelerated approvals on the basis of surrogate endpoints (e.g., for cancer drugs) "which allows products to be used in nonresearch clinical care settings before they have been reliably established to have a favorable benefit-to-risk profile" (Fleming, 2005). Here again, however, FDA's authority to enforce these commitments rests on withdrawing approval if the company does not complete the requisite studies and the high value of such therapeutic agents makes withdrawal undesirable. FDA's authority to enforce should be made explicit, as it is for accelerated approvals, and the agency should also be given additional tools to enforce that authority. The power to withdraw is not a realistic tool as demonstrated by an FDA study of 8 drugs granted accelerated approvals. The average length of time for completion of required validation studies was 10 years, and it is unclear what FDA is able to do if studies are inconclusive (Fleming, 2005).

---

### *Approval should not be the "last call" for realistic regulatory action on safety*

In acknowledgement of the complexity of regulatory decision-making, the multiple conflicting interests involved, and the undesirability of delaying the approval of important drugs, the committee has sought to recommend tools that will allow FDA greater regulatory flexibility postapproval and throughout a drug's lifecycle. Establishing an interval for reviewing all accumulated information about new molecular entities (NMEs) will provide FDA with the authority to take necessary regulatory action when appropriate. For most drugs, the review of the drug's performance for renewal of approval will be a relatively simple process. For others, the review of postapproval data will give FDA an opportunity to reconsider the drug's risk-benefit profile and respond to safety issues.

Over the years, patient groups and industry representatives have expressed concern that regulatory actions that are too risk-averse could stifle innovation in drug development. Longer and larger preapproval trials to improve certainty about a drug's risk and benefit at the time of approval are often not possible, because the extremely broad based testing in complex populations needed to get a better picture of postapproval use and risks would slow drug development unacceptably in many disease settings. Many scientists agree that CDER needs better resources for research and surveillance and better regulatory tools to manage risk-benefit uncertainty after approval (Avorn, 2006; Deyo, 2004; Ray and Stein, 2006). In earlier chapters, the committee described an organizational culture and a scientific milieu that encourage thinking about and preparing to address postmarketing safety issues much earlier in the development and review process. In this chapter, the committee calls for strengthening FDA's authority so that the point of approval would no longer be the "last call" for major regulatory action.

The committee finds that FDA's authority is built on an aging regulatory framework, that FDA's largely all-or-nothing regulatory tools limits its ability to regulate effectively after approval, and that strengthened agency authority would greatly mitigate the concern that fast review and approval may sacrifice safety. Current enforcement options limit FDA's ability to regulate in a manner that matches the agency's mission—protecting and advancing the health of the

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

public. FDA's strongest tools are largely all-or-nothing, and these are unrealistic options in light of patients' needs for given drugs. The agency needs a more nuanced set of tools to signal uncertainties, to reduce advertising that drives rapid uptake of new drugs, or to compel additional studies in the actual patient populations who take the drug after its approval.


## STRENGTHENING FDA'S REGULATORY AUTHORITIES

The committee has examined five areas of regulation in which it believes that FDA's authority requires strengthening. The committee reasserts the importance of a regulatory system that is dynamic and flexible; a key aspect is that most NDAs and approvals pose few issues of concern and little or no need for unusual postapproval monitoring and risk management. For most drugs, the existing interaction between regulator and sponsor is adequate—incoming safety information does not reveal extremely serious unlabeled adverse events (AEs), and regulatory re-examination (for new indications and labeling changes) is more or less routine. The committee's recommendations for regulatory change apply mainly to what may be a smaller proportion of drugs—which cannot always be identified beforehand—that have complex risk-benefit assessments and both lingering and emergent safety concerns. Possible examples may be found among drugs that are similar to those with a poor safety record, NMEs with unique modes of action, drugs for which preclinical testing revealed a potential for clinical safety problems, and so on. First, clarification or strengthening of existing authority for use postapproval is needed to take important regulatory action out of the realm of negotiation and the bully pulpit. Second, FDA needs a new way to address DTC advertising that has provoked great interest and debate in recent years. Third, FDA needs sufficient enforcement tools to ensure that regulatory requirements imposed at or after approval are fulfilled. Fourth, FDA needs to develop a major strategy to improve public and health care provider awareness that approval is not the end of uncertainty and that as new drugs enter the market, more information about their benefits and risks is likely to become available. Fifth, regulation of drugs in the United States would be greatly strengthened by requiring a milestone in each drug's lifecycle that triggers a comprehensive review of consolidated safety and efficacy data and of the status of postmarketing conditions and commitments.


### Conditions and restrictions on distribution throughout the drug lifecycle

The committee has found that FDA has some ability to ask for and negotiate with sponsors about various risk management and other actions. For example, marketing of isotretinoin is conditioned on a four-step RiskMAP (iPLEDGE) that consists of: registration of and an educational program for patients, pharmacies, prescribers, and distributors; implementation of an education program for the four groups just listed; implementation of a reporting and data collection system for serious AEs in compliance with statutory requirements and as pertaining to the sale and dispensing of isotretinoin outside the iPLEDGE program; and implementation of a plan to monitor and minimize drug exposure during pregnancy through a pregnancy registry (Houn, 2006). It must be noted here that the iPLEDGE program has drawn criticism from providers and patients who find its requirements onerous and the administration of the program inadequate (Ritter, 2006). In another example, FDA issued a public health advisory pertaining to the multiple sclerosis drug natalizumab after an unexpected serious adverse event surfaced. The sponsor later

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

withdrew Tysabri from the market and began working with CDER staff to develop a risk management program (including restricted distribution through certified infusion centers and so on). FDA convened the appropriate advisory committee to review the sponsor's proposed risk management program and CDER's evaluation of it. The advisory committee recommended that Tysabri be returned to the market with the necessary safeguards; after additional FDA consideration, Tysabri was returned to the market in July 2006. Another important example is clozapine (Clozaril), an antipsychotic whose use was conditioned on regular blood work showing that agranulocytosis, a potentially fatal side effect of the drug, was not emerging.  Even more recently, FDA suggested 5-year followup of patients on the HIV drug class of CCR5 antagonists, which target a novel pathway and pose a serious risk of worsening the disease.

The committee believes that although FDA is able to negotiate for label changes (including warnings), and to impose restrictions or conditions on distribution at approval, it exercises those options inconsistently and lacks both the ability to require sponsor agreement with label changes and compliance with conditions imposed after approval and enforcement threats short of withdrawal. The conditions on the distribution of isotretinoin were implemented at the conclusion of an extremely long process. Label change negotiations for some drugs with emergent safety problems (such as Propulsid, Vioxx) have been unreasonably drawn-out, and sponsors have made great effort to soften the language preferred by FDA (Harris G and Koli E, 2005). Such delays and barriers to timely action are problematic given the seriousness of the AEs which such label changes and similar measures are intended to warn about and to prevent (Kweder S, 2004).

FDA's regulatory authorities do not give the agency sufficient flexibility to address safety concerns quickly during a drug's lifecycle and as consistent with the agency's public health mission. No drug is thoroughly understood at the time of approval, but most drugs perform effectively and without major safety concerns once they are on the market. FDA needs more a consistent approach and more nuanced range of enforcement measures to act when an approved drug's risk-benefit profile is in question and when safety concerns arise after marketing.

FDA needs new authority or a clarification of existing authority to apply restrictions and conditions on distribution from the regulatory "tool kit" described below. Some of the regulatory options described have already been used in some cases, but are often exercised at the point of approval. In general, even if FDA is successful in placing a condition or restriction at the time of approval, doing so after marketing is substantially more challenging. For example, FDA's authority over labels is limited to approving the contents of a label prepared by the sponsor, after a sometimes lengthy process of negotiation about the language. Although FDA may disagree with the sponsor and request certain changes, it is the committee's understanding that the agency cannot compel the sponsor to make changes.

**5.1  The committee recommends that Congress ensure that the Food and Drug Administration has the ability to require such postmarketing risk assessment and risk management programs as are needed to monitor and ensure safe use of drug products. These conditions may be imposed both before and after approval of a new drug, new indication, or new dosage, as well as after identification of new contraindications or patterns of adverse events.  The limitations imposed should match the specific safety concerns and benefits presented by the drug product.  The risk assessment and risk management program may include:**

    **a. Distribution conditioned on compliance with agency-initiated changes in drug labels.**

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

> b. **Distribution conditioned on specific warnings to be incorporated into all pro-**
>    **motional materials (including broadcast DTC advertising).**
> c. **Distribution conditioned on a moratorium on direct to consumer advertising.**
> d. **Distribution restricted to certain facilities, pharmacists, or physicians with**
>    **special training or experience.**
> e. **Distribution conditioned on the performance of specified medical procedures.**
> f. **Distribution conditioned on the performance of specified additional clinical**
>    **trials or other studies.**
> g. **Distribution conditioned on the maintenance of an active adverse event sur-**
>    **veillance system.**

As with any grant of regulatory authority, FDA authority to revise labels, require conditions on distribution, and to impose penalties must be accompanied by administrative procedures that protect the due process rights of affected parties. These procedures, as generally used throughout federal law, include adequate notice, opportunity for response, and avenues of appeal within the agency and, typically, with the courts. In this fashion, statutory authority to impose restrictions and remedies is neither dictatorial nor unlimited. It does, however, provide the FDA with a wider range of remedies and a stronger base from which to negotiate voluntary actions, while still providing affected parties an avenue of relief from what are perceived as unwarranted or overly burdensome actions.

The committee also finds that FDA needs enforcement tools to ensure that the regulatory requirements described above are applied and met. Specifically, FDA does not have the set of flexible regulatory actions that it needs to enforce necessary and important postmarketing commitments effectively.

**5.2  The committee recommends that Congress provide oversight and enact any**
**needed legislation to ensure compliance by both the Food and Drug Administration**
**and drug sponsors with the provisions listed above. FDA needs increased enforcement**
**authority and better enforcement tools directed at drug sponsors, which should in-**
**clude fines, injunctions, and withdrawal of drug approval.**

The agency's timely performance of the required postmarketing safety reviews could be listed as one of the goals associated with the Prescription Drug User Fee Act and reported on in the goals letter to Congress (see Chapter 3).

### *A symbol to denote limited knowledge about new drugs*

A recurring theme in this report is the committee's concern that the public and even health care providers may base their choices and behaviors related to prescription drugs on inaccurate assumptions. For example, there may be a lack of general awareness that FDA approval does not represent a lifetime guarantee of safety or the end of uncertainty, that the understanding of a drug's risk-benefit profile evolves over the drug's lifecycle, and that new drugs are approved on the basis of carefully controlled limited testing in relatively small populations and under circumstances that may differ greatly from a drug's use after marketing.

The committee believes that a symbol or icon could be added to the labels and all materials associated with new drugs, new combinations of active substances, and new delivery systems to

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety: Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

alert patients and the general public that such products are new and that the knowledge available about their performance is often incomplete. In the United Kingdom, a black triangle marks every newly marketed drug approved by the Medicines and Health products Regulatory Agency (MHRA). The black triangle signifies that a pharmaceutical product is under intense scrutiny of regulatory authorities, and the symbol is placed next to the product name in the British National Formulary and in the British pharmaceutical industry's compendium of drugs approved for marketing (MHRA, 2006). The black triangle program has an additional purpose of alerting National Health Service providers to report all adverse reactions (rather than only serious ones) associated with drugs labeled with the symbol. Study of reporting patterns indicates that despite the request for both serious event and non-serious event reporting, providers are 5 times more likely to report a serious than a non-serious adverse drug reaction (Heeley et al., 2001). Therefore, it is not clear whether the black triangle program in the UK was successful in increasing provider reporting. However, the black triangle was not intended as a tool to inform or educate consumers, so evidence from the UK would not necessarily be informative in the case of a somewhat different use for such a symbol. The committee believes that marking the label and all promotional material for newly approved drugs or indications with a special symbol and communicating its meaning to patients and consumers may help to increase awareness of the nature of newly approved therapies, for example, the incompleteness of information on safety.

**5.3  The committee recommends that Congress amend the FD&C Act to require that product labels carry a special symbol such as the black triangle used in the UK or an equivalent symbol for new drugs, new combinations of active substances, and new systems of delivery of existing drugs. The FDA should restrict direct-to-consumer advertising during the period of time the special symbol is in effect.**

The symbol should remain on the drug label and related materials for 2 years unless FDA chooses to shorten or extend the period on a case by case basis. The committee believes that companies should refrain from DTC advertising during the black triangle period, and would favor imposition of a formal moratorium on such advertising. Such restraints may be necessary because DTC advertising has the ability to dramatically increase the uptake of a newly approved drug. In some cases, that may expose larger numbers of people (compared with a lower-key market introduction) to a new drug with not-yet-documented safety concerns. Recognizing the legal uncertainties surrounding such an imposition, the committee suggests that at the very least any DTC advertising during this period should include explicit notice that the data related to risks and benefits associated with the product are less extensive than those related to alternative products that have been in use for a longer period and should include a caution to speak to one's health care provider about alternatives. If a moratorium on DTC advertising for the time that the special symbol is in effect is deemed to be inconsistent with First Amendment protections of commercial speech, the committee believes that it is necessary to require placement of the symbol on all promotional materials, patient or consumer information, and all DTC advertising while the special symbol is in effect.

Products carrying the special notation also would be subject to heightened postmarketing scrutiny, with measures that include:

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

- Prompt review of individual 15-day reports of AEs (sponsors are required to report serious, unexpected AEs to the agency within 15 calendar days)[3] in addition to review of regular tabulations of such reports.
- Followup of these reports as needed to obtain additional information, such as that on related health factors and resolution of AEs, that may be helpful in assessing role of product and overall impact of AEs.
- Scheduling of regular meetings of postmarketing and premarket reviewers at which summaries of recent reports of AEs related to newly approved products prepared by the postmarketing reviewers would be discussed.
- Preparation of annual summaries of reports received on new products to be posted on the FDA web site—not simply a list or tabulation, but a thoughtful interpretation of the reported experiences and what they mean for continued use of the drug.

The committee believes that a broad-based discussion of the most appropriate symbol for a US audience would be desirable before the program is launched, and an evaluation of the effect of such a program on public awareness and knowledge would be important.

### *Periodic review of data on new molecular entities*

In 1977, the Review Panel on New Drug Regulation found that "FDA even lacks a basis for judging whether the approved drug and the approved labeling are still correct, since there is no comprehensive system for gathering and utilizing data on an approved drug's performance and effect" (Review Panel on New Drug Regulation, 1977: 91). This continues to be the case.

The committee finds that a lifecycle approach to risk and benefit would be facilitated by establishing a milestone in a drug's lifecycle for a comprehensive review of consolidated safety and efficacy data and the status of postmarketing conditions and commitments (see Chapter 4 for discussion of the assessment of risks and benefits). There is no systematic CDER review of accumulated knowledge about a drug a year or more after its approval for marketing. In 2005, the European Medicines Agency enacted a new statute requiring that prescription drug marketing authorizations in the European Union be reviewed and, if appropriate, renewed at 5 years after initial approval (EMEA, 2005).[4]

**5.4  The committee recommends that FDA evaluate all new data on new molecular entities no later than 5 years after approval.  Sponsors will submit a report of accumulated data relevant to drug safety and efficacy, including any additional data published in a peer reviewed journal, and will report on the status of any applicable conditions imposed on the distribution of the drug called for at or after the time of approval.**

---

[3] Refer to the Code of Federal Regulations, 21 CFR 314.80.

[4] Product safety specialists from the Center for Biologics Evaluation and Research (CBER) routinely develop reviews of the postmarket safety experience with a new vaccine within two to three years of the time the vaccine is licensed.  These reviews are published in journals and are available on the FDA Web site's VAERS (Vaccine Adverse Event System) page.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

   As described above, such conditions on distribution may include a moratorium on DTC advertising, postmarketing studies, monitoring (such as registries, active surveillance, and so on), and restricted distribution. The 5-year report would include results of postmarketing studies, outcomes of monitoring, and, where applicable, the extent of DTC advertising (examples of all advertisements and total expenditure) during the first 5 years. For most drugs, the committee expects the 5-year "review" process to entail nothing more than a one-page FDA letter agreeing with the sponsor's summary of all accumulated (or consolidated) safety and efficacy information. On rare occasions, as a consequence of the review, regulatory action including suspension or withdrawal of approval (for example, if evidence of imminent public health hazard emerged in the course of the review) would be a possibility. This recommendation is not intended to preclude any regulatory action, and it does not constitute a request for new authority for FDA, rather, for the creation of a milestone moment in a drug's lifecycle that would allow FDA to review what has been learned during a drug's first five years on the market.

***PREPUBLICATION COPY:  UNCORRECTED PROOFS***

Copyright © National Academy of Sciences. All rights reserved.

# REFERENCES

Adams DG, Cooper RM, Kahan JS (Eds); Fundamentals of Law and Regulation:  An in-Depth Look at Therapeutic Products . Washington, DC: FDLI; 1997;2.

Aikin KJ. PowerPoint Presentation:  The Impact of Direct-to-Consumer Prescription Drug Advertising on the Physician-Patient Relationship.  Presented at Direct-to-Consumer Promotion:  Public Meeting September 22-23, 2003. 2003.

Aikin KJ, Swasy JL, and Braman AC. Patient and Physician Attitudes and Behaviors Associated with DTC Promotion of Prescription Drugs-Summary of FDA Survey Research Results. November 19, 2004; accessed October 12, 2005. Web Page. Available at: http://www.fda.gov/cder/ddmac/Final%20Report/FRfinal111904.pdf.

Almasi EA, Stafford RS, Kravitz RL, Mansfield PR. 2006. What are the public health effects of direct-to-consumer drug advertising? PLoS Med 3(3):e145.

Avorn J. 2006. Evaluating drug effects in the post-Vioxx world: there must be a better way. Circulation 113(18):2173-6.

Bass IS. 1997. Enforcement Powers of the Food and Drug Administration: Drug and Devices. Adams DG, Cooper RM, Kahan JS, Eds. Fundamentals of Law and Regulation (Volume II). Washington, DC: Food and Drug Law Institute (FDLI). Pp. 55-92.

Behrman R. PowerPoint Presentation:  Adverse Reactions: Information In, Information Out.  Presented at Forum for Drug Discovery, Development, and Translation. 2005.

Calfee JE. 2002. Public Policy Issues in Direct-to-consumer Advertising of Prescription Drugs. Journal of Public Policy and Marketing  21(2):174-193.

CDER. Medication Guides. July 26, 2006; accessed September 18, 2006. Web Page. Available at: http://www.fda.gov/cder/Offices/ODS/medication_guides.htm.

CDER, FDA, and DHHS. The CDER Handbook. March 16, 1998; accessed November 14, 2005. Web Page. Available at: http://www.fda.gov/cder/handbook/handbook.pdf.

Department of Health Review Panel on New Drug Regulation. Dorsen N, Weiner N, Astin AV, Cohen MN, Cornelius CE, Hamilton RW, Rall DP. 1977. Final Report . Washington, DC.

Deshpande A, Menon A, Perri M, Zinkhan G. 2004. Direct-to-consumer advertising and its utility in health care decision making: a consumer perspective. Journal of Health Communication 9:499-513.

Deyo RA. 2004. Gaps, tensions, and conflicts in the FDA approval process: implications for clinical practice. J Am Board Fam Pract 17(2):142-9.

DHEW. 1963. Federal Register : Final Rule on investigational drugs. 28(179):179-180.

DHHS, FDA, Berhman RE. The Impact of Direct-To-Consumer Drug Advertising on Seniors' Health and Health Care Costs.  Statement of Rachel E Berhman Deputy Director, Office of Medical Policy Center for Drug Evaluation and Research  and Director Cross-Center Initiatives Task Force Office of the Commissioner US Food and Drug Administration Department of Health and Human Services "The Impact of Direct-To-Consumer Drug Advertising on Seniors' Health and Health Care Costs" Before the Special Committee on Aging United States Senate. 2005.

DHHS, OIG. Gibbs Brown J. 1996. Postmarketing Studies of Prescription Drugs.

DHHS, OIG. FDA's Review Process for New Drug Applications: a Management Review.  DHHS, OIG. 2003.  OEI-01-01-00590: Department of Health and Human Services, Office of the Inspector General.

DHHS, OIG. 2006. FDA's Monitoring of Postmarketing Study Committements (OEI-01-04-00390).

FDA. Milestones in US Food and Drug Law.  accessed July 7, 2006. Web Page. Available at: http://www.fda.gov/opacom/backgrounders/miles.html.

FDA and Dockets Management Branch. Comments on Submissions Concerning First Amendment Issues Docket No. 02N-0209. October 28, 2002; accessed September 18, 2006. Web Page. Available at: http://www.wlf.org/upload/FDA10-28-02.pdf.

Fleming TR. 2005. Surrogate endpoints and FDA's accelerated approval process. Health Aff (Millwood) 24(1):67-78.

Ganslaw LS. Drug Safety:  New Legal/Regulatory Approaches. 2005:7-10.

Prescription Drugs: FDA Oversight of Direct-to-Consumer Advertising Has Limitations. GAO. 2002a.

GAO. 2002b. Food and Drug Administration:  Effect of User Fees on Drug Approval Times, Withdrawals, and Other Agency Activities (GAO-02-958).

Grassley C. A Bill to amend the Federal Food, Drug, and Cosmetic Act with respect to drug safety, and for other purposes. S.930 : 2005:109th Congress,  1st Session, Senate.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

Harris G, Koli E. 2005, June 10. Lucrative Drug, Danger Signals and the FDA. The New York Times.

Harris Interactive. Majority of US adults think it is a good idea to forbid direct-to-consumer advertising for new prescription drugs when they first come to market. 2005;4: 14.

Heeley E, Riley J, Layton D, Wilton LV, Shakir SA. 2001. Prescription-event monitoring and reporting of adverse drug reactions. Lancet 358(9296):1872-3.

Hunt M. 1998. Direct-to-Consumer Advertising of Prescription Drugs. National Health Policy Forum, George Washington University .

IOM. Appendix A: The Impact of Regulation and Reimbursement on Pharmaceutical InnovationBarton Hutt P. 1991. The Changing Economics of Medical Technology : National Academy Press.

IOM. Transcript: Meeting Three of the IOM Committee on the Assessment of the US Drug Safety System. 2005:Washington, DC.

Kaplan AH. 1995. Fifty years of drug amendments revisited: in easy-to-swallow capsule form. Food Drug Law J 50 Spec:179-96.

Kweder S. Statement of Sandra Kweder, M.D. Deputy Director, Office of New Drugs Center for Drug Evaluation and Research U.S. Food and Drug Administration before the Committee on Finance United November 18, 2. November 18, 2004; accessed May 4, 1911. Web Page. Available at: http://www.fda.gov.ola/2004/vioxx118.html.

Levine. Presentation:  IOM Committee on the Assessment of the US Drug Safety System.  Presented at the January 19, 2006 Meeting of the IOM Committee on the Assessment of the US Drug Safety System. 2006.

Levine A. 2002. FDA enforcement: how it works. Pina KR/Pines WL, Eds.  A Practical Guide to Food and Drug Law and Regulation (2nd Ed.). Washington, DC: Food and Drug Law Institute. Pp. 271-298.

Lyles A. 2002. Direct marketing of pharmaceuticals to consumers. Annu Rev Public Health 23:73-91.

Mintzes B, Barer ML, Kravitz RL, Bassett K, Lexchin J, Kazanjian A, Evans RG, Pan R, Marion SA. 2003. How does direct-to-consumer advertising (DTCA) affect prescribing? A survey in primary care environments with and without legal DTCA . Can Med Assoc J 169(5):405-412.

Nickas J. PowerPoint Presentation:  IOM Committee on the Assessment of the US Drug Safety System:  A Biotechnology Industry Perspective.  Presented at the January 19, 2006 Meeting of the IOM Committee on the Assessment of the US Drug Safety System. 2006.

Ostrove NM. FDA's Research about Consumer-Directed Prescription Drug Promotion, Pharmaceutical Pricing Practices, Utilization and Costs August. 2000; accessed September 6, 2005. Web Page. Available at: http://aspe.hhs.gov/health/reports/Drug-papers/ostrove-final/index.htm.

Palumbo FB, Mullins CD. 2002. The development of direct-to-consumer prescription drug advertising regulation. Food Drug Law J 57(3):423-43.

Pines WL. 1999. A history and perspective on direct-to-consumer promotion. Food & Drug Law Journal 54(4):489-518.

Ray WA, Stein CM. 2006. Reform of drug regulation--beyond an independent drug-safety board. N Engl J Med 354( 2):194-201.

Rosenthal MB, Berndt ER, Donohue JM, Frank RG, Epstein AM. 2002. Promotion of prescription drugs to consumers. N Engl J Med 346(7):498-505.

Spence M, Cheetham C, Millares M, Teleki S, Schweitzer S. Direct-to-Consumer Advertising of Cox-2 Inhibitors:  Effect on Appropriateness of Treatment.  Presented at November 1-2, 2005 FDA Public Hearing on Comsumer-Directed Promotion of Medical Products. 2005.

Steenburg C. 2006. The Food and Drug Administration's Use of Postmarketing (Phase IV) Study Requirements:  Exception to the Rule? Food Drug Law J 61(2):pgs. 1-91.

Thaul S. Drug Safety and Effectiveness:  Issues and Action Options After FDA Approval. March 8, 2005; accessed June 27, 2005. Web Page. Available at: http://www.law.umaryland.edu/marshall/crsreports/crsdocuments/RL3279703082005.pdf.

van der Linden PD, Sturkenboom MC, Herings RM, Leufkens HM, Rowlands S, Stricker BH. 2003. Increased risk of achilles tendon rupture with quinolone antibacterial use, especially in elderly patients taking oral corticosteroids. Arch Intern Med 163(15):1801-7.

Washington Legal Foundation. WLF Launches "FDA/DDMAC Watch". 2005.

Wilkes MS, Bell RA, Kravitz RL. 2000. Direct-to-consumer prescription drug advertising: trends, impact, and implications. Health Aff (Millwood) 19(2):110-28.

Winter G. Inside DDMAC:  A Conversation with Thomas Abrams. 2005.

***PREPUBLICATION COPY:  UNCORRECTED PROOFS***

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

*The Future of Drug Safety*

Woodcock J, DHHS, FDA. Statement by Janet Woodcock, MD Director, Center for Drug Evaluation and Research
   US Drug Administration Department of Health and Human Services Before Senate Special Committee on Ag-
   ing July 22, 2003. 2003.

Copyright © National Academy of Sciences. All rights reserved.

# 6

# Communicating about Safety

> *"Information is ultimately what permits people to make meaningful choices about whether or not to take new drugs" (Greenberg, 2003).*

> *"1962—Consumer Bill of Rights is proclaimed by President John F. Kennedy in a message to Congress. Included are the right to safety, the right to be informed, the right to choose, and the right to be heard" (FDA Milestones).[1]*

Patients use the medications approved by the Food and Drug Administration (FDA) and prescribed by health care providers. Despite that, patients historically have been left out of the loop in much of the communication that has occurred among the biomedical research, health care, and pharmaceutical enterprises and government regulators. As described in Chapter 1, social and technological changes have transformed the practice of medicine, the role of patients, and the information environment that surrounds patients and physicians and influences their interactions (Henwood et al., 2003). Public interest in and knowledge about drugs have also evolved greatly due to direct-to-consumer (DTC) prescription drug advertising, ever wider Internet and e-mail access and breadth of information, a shift in the formerly passive role of patient, and the emergence of a powerful patient advocacy movement (Pew Internet and American Life Project, 2003, 2004, 2005) (Atkin and Wallack, 1990) (Dupuits FMHM, 2002). Finally, the recent safety concerns about widely-used, well-known drugs and drug classes, from antidepressants to anti-inflammatory drugs, have further mobilized public interest in drug safety issues. As noted earlier, FDA, the pharmaceutical industry, the health care delivery system, and other stakeholders have begun to grapple with serious questions about when to inform patients and consumers about risk, how to communicate effectively, and what information is needed for personal health, health care system, and regulatory decision making.

This chapter is intended not to provide a comprehensive assessment of communication issues in the drug system but rather to describe briefly major communication efforts at FDA, discuss some of the challenges that have complicated those activities, and to suggest two specific areas for improvement and makes appropriate recommendations.

Pharmaceutical products constitute 11% of the health care dollar (Smith et al., 2005). They are characterized by complex risk-benefit profiles, long and complicated research processes, and high visibility. They have the potential to provide important health benefits, from reducing risk of death to improving quality of life, and they are subject to extensive regulatory oversight. Those are some of the reasons why effective and timely risk communication about drugs is essential.

---

[1] http://www.fda.gov/opacom/backgrounders/miles.html

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**          6-1

Copyright © National Academy of Sciences. All rights reserved.

## Roles and Needs of Providers and Patients

Despite the greater role patients play in their own health care, and the health care delivery system's recognition of that role, most of the communication "transactions" in the drug safety system occur among regulators, sponsors, providers and payors. There are two types of information that may be communicated: information directed outward from stakeholders in the drug safety system (e.g., educational, risk communication, promotional information), and information directed toward the drug safety system from those who experience drug safety problems directly or indirectly (e.g., adverse drug event reporting by patients or providers).

### *Communication between the public and the drug safety system*

The Committee on the Assessment of the Drug Safety System did not endeavor to conduct a comprehensive examination of the communication needs of patients and the general public. Another IOM committee addressed these issues extensively in their report, *Preventing Medication Errors* (2006). That report recommended specific steps the health care delivery system, FDA, and other federal agencies could take to improve the availability, accessibility, quality, and quantity of patient and consumer information about drugs and their risks and benefits (see Box 6-1 and Appendix A). The present chapter focuses only on two areas where the committee believes FDA could strengthen its programs targeting patients' and consumers' communication needs.

---

**BOX 6-1: Recommendations pertaining to consumers from *Preventing Medication Errors***

Recommendation 1: To improve the quality and safety of the medication-use process, specific measures should be instituted to strengthen patients' capacities for sound medication self-management. Specifically:

- Patients' rights regarding safety and quality in health care and medication use should be formalized at the state and/or federal levels and ensured at every point of care.
- Patients (or their surrogates) should maintain an active list of all prescription drugs, over-the-counter (OTC) drugs, and dietary supplements they are taking; the reasons for taking them; and any known drug allergies. Every provider involved in the medication-use process for a patient should have access to this list.
- Providers should take definitive action to educate patients (or their surrogates) about the safe and effective use of medications. They should provide information about side effects, contraindications, and how to handle adverse reactions, as well as where to obtain additional objective, high-quality information.
- Consultation on their medications should be available to patients at key points along the medication use process (during clinical decision making in ambulatory and inpatient care, at hospital discharge, and at the pharmacy).

Recommendation 2: Government agencies (i.e., the Agency for Healthcare Research and Quality [AHRQ], the Centers for Medicare and Medicaid Services [CMS], the Food and Drug Administration [FDA], and the National Library of Medicine [NLM]) should enhance the resource base for consumer-oriented drug information and medication self-management support. Such efforts require standardization of pharmacy medication information leaflets, improvement of online medication resources, establishment of a national drug information telephone helpline, the development of personal health records, and the development of a national medication safety dissemination plan.

- Pharmacy medication information leaflets should be standardized to a format designed for readability, comprehensibility, and usefulness to consumers. The leaflets should be made available to consumers in a manner that accommodates their individual needs, such as those associated with

---

Copyright © National Academy of Sciences. All rights reserved.

*Communicating about Safety*

variations in literacy, language, age, and visual acuity.
- NLM should be designated as the chief agency responsible for Internet health information resources for consumers. Drug information should be provided through a consumers' version of the DailyMed program, with links to NLM's Medline Plus program for general health and additional drug information.
- FDA, CMS, and NLM working together, should undertake a full evaluation of various methods for building and funding a national network of drug information helplines.
- CMS, FDA, and NLM should collaborate to confirm a minimum data set for personal health records and develop requirements for vendor self-certification of compliance. Vendors should take the initiative to improve the use and functionality of personal health records by incorporating basic tools to support consumers' medication self management.
- A national plan should be developed for widespread distribution and promotion of medication safety information. Health care provider, community-based, consumer, and government organizations should serve as the foundation for such efforts.

Consumers and patients seek to access the information they need about the drugs they use through an incomplete and imperfect patchwork of sources (Seidman, 2005) (Brann and Anderson, 2002). These sources are of varying reliability and usefulness, and they include health care providers and pharmacists, DTC advertising, printed information made available by pharmacies, FDA-required patient package inserts for a limited number of drugs, information from a wide variety of sources made available on the Internet, and so on. Providers develop their knowledge about prescription drugs through a variety of means, including journal articles, interactions with company sales representatives, continuing education, professional associations, communication or education provided by their practice, hospital, or health system, and communiqués from FDA (either direct for those who request FDA electronic communications, or through professional associations that subscribe to or relay FDA's public health advisories).

FDA communicates to the public and to providers about drug safety concerns through public health advisories and warning. Some components of FDA's risk communication are under development, as described in Appendix A. For example, the agency has established a Drug Watch Web site intended for timely communication of safety issues to the public, but concerns arose about communicating complex issues of scientific uncertainty, explaining complex data clearly and in a way that is useful to patients (FDA, 2005). At the time of this writing, the committee had not yet learned of a resolution of these issues.

FDA has historically focused most of its communication activities on health care providers who prescribe FDA-approved drugs and serve as the "learned intermediary" between drug production and regulation and patients. That is evident in the dense, technical language of prescription drug labeling rules. In recent years, FDA has acknowledged the importance of communicating with and to patients and the general public by including them in its mission, which calls for "advancing the public health by . . . helping the public get the accurate, science-based information they need to use medicines and foods to improve their health." FDA has also reoriented some of its information and communication toward patients and the public, and has held several public hearings on issues related to communication and DTC advertising.

At least three types of the Center for Drug Evaluation and Research (CDER) regulatory activities involve communication-related activities pertinent to patients and the public. First, FDA has authority over prescription drug advertising developed and published or broadcast by sponsors, and CDER's Division of Drug Marketing and Communication sends untitled letters[2] and warning letters to sponsors whose advertisements do not convey a fair balance of risk and benefit

---

[2] See Chapter 5 for explanation

Copyright © National Academy of Sciences. All rights reserved.

information. Second, all of FDA's advisory committees include consumer representatives. Those committees' meetings are open to the public and routinely include opportunity for public comment on the issues under discussion. Some committee meetings may address risk communication issues. Third, FDA provides information about prescription drugs and other FDA-approved therapies on its Web site, and in print information about prescription drugs in general on a very small scale.

### The role of other government agencies.

Other agencies in the Department of Health and Human Services (DHHS), such as the Agency for Healthcare Research and Quality (AHRQ), the National Institutes of Health (NIH), and the Centers for Medicare and Medicaid play a role in public communication about drug risk and benefit. For example, AHRQ's Effective Health Care Program develops consumer summaries of reports prepared by its DeCIDE (Developing Evidence to Inform Decisions about Effectiveness) network—prescription drug outcomes are one focus of the network—and other material on evidence-based practice. NIH conducts or sponsors clinical trials and does make public announcements about major health findings from them, good and bad. Recent studies from the WHI have generated such communications, e.g., about the benefits and risks of HRT in postmenopausal women. Through the National Library of Medicine, NIH also operates the *clinicaltrials.gov* trial registration Web site, discussed in Chapter 4.

### Communicating between providers and the drug safety system

Although the present report acknowledges general areas of opportunity and challenges, it does not discuss the communication roles and needs of providers in great detail. The IOM report *Preventing Medication Errors* (2006) describes challenges in this area, including barriers to implementing and perfecting the use of information technology. That report also recommends several measures to improve communication to providers by government agencies and health systems (see Box 6-2 and Appendix C).

---

**BOX 6-2 Recommendations pertaining to providers (and patients) from Preventing Medication Errors**

Recommendation 3: All health care organizations should immediately make complete patient-information and decision-support tools available to clinicians and patients. Health care systems should capture information on medication safety and use this information to improve the safety of their care delivery systems. Health care organizations should implement the appropriate systems to enable providers to:

- Have access to comprehensive reference information concerning medications and related health data.
- Communicate patient-specific medication-related information in an interoperable format.
- Assess the safety of medication use through active monitoring and use these monitoring data to inform the implementation of prevention strategies.
- Write prescriptions electronically by 2010 and all pharmacies to be able to receive them electronically, also by 2010. All prescribers should have plans in place by 2008 to implement electronic prescribing.
- Subject prescriptions to evidence-based, current clinical decision support.
- Have the appropriate competencies for each step of the medication use process.

---

Copyright © National Academy of Sciences. All rights reserved.

*Communicating about Safety*

---

- Make effective use of well-designed technologies, which will vary by setting.

Recommendation 5: Industry and government should collaborate to establish standards affecting drug-related health information technologies, specifically:
- The NLM should take the lead in developing a common drug nomenclature for use in all clinical information technology systems based on the standards for the national health information infrastructure.
- AHRQ should take the lead in organizing safety alert mechanisms by severity, frequency, and clinical importance to improve clinical value and acceptance.
- AHRQ should take the lead in developing intelligent prompting mechanisms specific to a patient's unique characteristics and needs; provider prescribing, ordering, and error patterns; and evidence-based best-practice guidelines.
- AHRQ should take the lead in developing user interface designs based on the principles of cognitive and human factors and the context of the clinical environment.
- AHRQ should support additional research to determine specifications for alert mechanisms and intelligent prompting, and optimum designs for user interfaces.

Recommendation 7: Oversight and regulatory organizations and payers should use legislation, regulation, accreditation, and payment mechanisms and the media to motivate the adoption of practices and technologies that can reduce medication errors, and to ensure that that professionals have the competencies required to deliver medications safely.

- Medication error reporting should be promoted more aggressively by all stakeholders (with a single national taxonomy used for data storage and analysis).
- Accreditation bodies responsible for the oversight of professional education should require more training in improving medication management practices and clinical pharmacology.

---

In the health care delivery system, information about drug safety, and particularly risk management, is integrated into drug prescribing and distribution systems (e.g., claims databases that issue alerts when two drugs with potential interactions are prescribed for the same patient). In its work, the committee learned about a wide variety of communication opportunities and challenges related to involving the general public and disease groups (such as online support groups) in reporting drug-related adverse events, about a movement to counteract commercial pharmaceutical company "detailing" with neutral "academic detailing," (Avorn J, 2005) about First Amendment-based opposition to calls for increased FDA regulation (including banning) of direct to consumer advertising (DTCA), etc.

Providers, including physicians and pharmacists, are encouraged to report adverse drug reactions experienced by their patients to the manufacturer and/or to FDA's Adverse Event Reporting System (providers may report through the MedWatch portal). Although proposals have been made in the US and Europe to mandate provider reporting, there is little evidence that such attempts would be successful. Furthermore, spontaneous reporting is only one component of an effective drug safety surveillance program, and should not be relied on as the sole or primary source of information. Finally, the quality of spontaneous reports is an important concern; a large quantity of incomplete and poorly executed reports would be unhelpful.

## How Industry Communicates to the Public and Patients

The frequently dangerous patent medicines that led to the Pure Food and Drugs Act of 1906 and the Food, Drug, and Cosmetic Act of 1938 were advertised directly to consumers with their

Copyright © National Academy of Sciences. All rights reserved.

colorful labels and claims, but modern prescription drugs, as products of biomedical science are promoted largely to health care providers, mostly to physicians. About 86% of industry promotional budgets still pay for "sampling" (providing free samples to providers), detailing (drug promotion to individual providers), and advertising in professional journals (Kaiser Family Foundation, 2004). However, the 1980s were a period of increased advertising directed at patients, known in some contexts as consumers—the term intended to reflect the changing role of patients to more active engagement with the health care system and involvement in their own health care.[3] In 2005, pharmaceutical manufacturers spent an estimated $4.2 billion on DTC advertising (and $7.2 billion on professional promotion through journal advertising and sales representative contacts) (IMS Health, 2006). A more recent development in pharmaceutical promotion is relationship marketing, in which companies customize their promotional and informational efforts to target patients who have specific diseases, such as diabetics who use a specific product (Ahearne and Bhattacharya, 2005).

## FDA's Challenges in Communicating to the Public and Patients

FDA faces a number of challenges in improving its internal and external communication. As noted in Chapter 1 and 3, CDER has recognized that its credibility can be compromised by adverse publicity with respect to drug safety, and it has made efforts to improve transparency and communication, including establishing the Drug Watch Web site (currently under discussion by the agency), charging its recently constituted Drug Safety Oversight Board (DSB, discussed in Chapter 3) with (among other things) oversight of external communication, and creating a new Office of Safety Policy and Communication. However, the guidance document on the purpose and functioning of the Drug Watch Web site is being reconsidered because of concerns about needlessly alarming the public and about releasing safety data without proper context and analysis (HHS et al., 2005a; HHS et al., 2005b) (S. Cummins, 2006). Representatives of consumer organizations that participated in the December 2005 hearing on drug safety communication told the agency about their concerns and criticisms of the FDA Web site and offered specific suggestions for improving it and making it more user-friendly and broadly accessible (see Box 6-3).

---

**BOX 6-3**
**FDA response to the December 2005 public meeting input**

In December 2005, FDA held a public hearing on communication of drug safety information. The hearing was intended to facilitate discussion on FDA's risk communication with health care providers and patients/consumers. The following topics presented to FDA at the meeting were noted as needing improvement and attention:
- Engaging health-care professionals.
- Improving Internet access for patient information.
- Maintaining benefit-risk balance in communications.

---

[3] The mention of the term consumer is not intended to reflect the committee's views on its validity. The committee is aware of the favorable sides of health consumerism—such as empowerment and self-management—and of the more unfavorable aspects, including the commodification of health. It is also aware of the reality that access to health care and the level of health literacy (IOM, 2005) determine whether a patient has the opportunity to make health care choices and to form productive relationships with health care providers.

Copyright © National Academy of Sciences. All rights reserved.

*Communicating about Safety*

> - Standardizing one-way communications.
> - Addressing needs of those with low health literacy and poor English-language skills.

### Consumer medication information (CMI)

It may surprise many Americans to know that most prescription drugs have only a physician package insert and lack patient package inserts (also known as patient information leaflets), that provide information about a drug's use, risks, and benefits in clearer, more accessible language appropriate for a lay reader (2006). The types of patient package information required by FDA to accompany dispensed drugs include information on oral contraceptives and estrogens (required since 1968 by regulation, 21 CFR 310.501 and 310.515, respectively) and medication guides (MedGuides), which are developed by sponsors (and approved by FDA) from the label text for several hundred drugs that "pose serious and significant public health concern" (CDER, 2006) When patients receive what FDA calls consumer medication information it is in the form of a leaflet developed by health care organizations, or more likely, content included by pharmaceutical software providers with the software that they sell to pharmacies. Sponsors may also choose to prepare patient package inserts, which requires FDA approval. Until 1996, there were no standards and no requirements for the minimal useful information to be provided in patient leaflets.

In 1979 and 1980, FDA published in the Federal Register the draft, and then the final rule requiring written patient information for prescription drugs (2006). The draft rule addressed all prescription drugs, but the final focused only on a limited number of prescription drugs. In 1982, FDA revoked those regulations, partly in response to assurances by the pharmaceutical industry, by health care professional organizations and private sector developers of medication information that the objectives of the final rule would be better achieved without regulation.

The absence of FDA-approved literature on some drugs that are on the market has been criticized by consumer advocates and other parties, and it seems to be a result of legislative obstacles due to private sector resistance, long-standing claims that regulation in this regard might interfere with the practice of medicine and pharmacy, and finally, FDA's lack of resources. According to the current deputy commissioner for operations, "the Agency [in 1980] published a rule requiring FDA approved patient labeling[4] for ten drugs/drug classes, with the expectation that this would be extended to all prescription drugs. In 1982, "the rule was revoked in favor of private sector efforts to provide patient information that FDA would monitor" (Woodcock J, 2002). In 1996, Congress opted to leave consumer medication information in the hands of private sector content providers and instead tasked FDA with oversight to ensure that 95% of consumer medication information meets quality standards by 2006. The quality standards were defined by a broad consortium, the Steering Committee for the Collaborative Development of a Long-Range Action Plan for the Provision of Useful Prescription Medicine Information which was established to develop an action plan for the secretary of DHHS in 1996.[5] FDA expects to complete its review of the quality of consumer medication information in 2007 (see Box 6-2).

---

[4] FDA uses the term labeling to refer to any FDA-approved materials based on the formal label on which FDA and the sponsor agree at the time on approval or to change in the label after marketing.
[5] The action plan is available online at http://www.fda.gov/cder/offices/ods/keystone.pdf.

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

---

**BOX 6-2**
**Criteria for Useful Consumer Medication Information**

Written prescription medicine information should be
       (1) scientifically accurate
       (2) unbiased in content and tone
       (3) sufficiently specific and comprehensive
       (4) presented in an understandable and legible format that is readily comprehensible to consumers
       (5) timely and up-to-date
       (6) useful

Source: Steering Committee for the Collaborative Development of a Long-Range Action Plan for the Provision of Useful Prescription Medicine Information (1996)

---

One function of the Drug Safety Oversight Board (described in more detail in Chapter 3), now located in the Office of Safety Policy and Communication, is to produce patient information sheets for every drug, to be posted on the FDA/CDER Web site. The sheets are intended to provide safety alerts and other emerging information to consumers about specific drugs. However, a footnote to the Drug Watch guidance developed by CDER seems to suggest that the Center's long-term goal is to develop patient information sheets (and provider sheets) for every drug on the market (also confirmed by S. Galson, personal communication, February 22, 2006) (FDA, 2005; Galson S, 2005).

### *Improving communication with the public*

CDER uses the expertise of 17 advisory committees (and the Drug Safety and Risk Management advisory committee, DSaRM) charged with advising FDA and the center on issues related to broad classes of drugs (such as oncologic, cardiovascular and renal). Although communication issues related to specific drugs may emerge in the committees' work, the existing committees are chartered to review and evaluate safety and efficacy data (on marketed or investigational human drug products) and to make recommendations to the agency[6]. The committee has found a 1996 reference to an FDA Committee on Patient Education (1996). To our knowledge, there is no advisory committee devoted to advising the agency (and CDER specifically) on public communication issues that arise during the lifecycle of drugs.

The committee remains perplexed about the tasks of the new Drug Safety Oversight Board (DSB), and how they relate to the Center's other plans for improving communication. The DSB, discussed in Chapter 3, has the dual purpose of addressing disagreements among CDER offices or divisions and assisting the Center in communicating about drug safety issues to patients (Throckmorton, 2006) (Meadows, 2006). As the committee noted in Chapter 3, assigning the two functions to the same internal body may not be effective. Both sets of activities require substantial expertise and resources, and from a management point of view, it seemed unusual that the two functions would be assigned to the same group. Although the committee realizes that the appearance of internal CDER conflict over how drug safety issues are identified, defined, and addressed became associated in the press with poor and delayed communication to the public about those drug safety issues, the committee believes that these two areas should be managed

---

[6] http://www.fda.gov/cder/audiences/acspage/index.htm

Copyright © National Academy of Sciences. All rights reserved.

*Communicating about Safety*

separately. Also, the DSB does not possess substantial expertise in the area of risk communication and consumer or patient behavior. For these reasons, the committee believes that a separate, external entity is needed to advise the agency on the diverse communication needs of the public and patients and on the best evidence on risk communication tools and strategies.

Several FDA centers, including CDER, the Center for Biologics Evaluation and Research, and the Center for Devices and Radiological Health share similar communication challenges. An advisory committee on consumer and patient communication issues could have a dual function, serving as a conduit for public input into FDA's decision making (for example, through surveys), and an advisor to the agency on a range of communication issues. Other government agencies have advisory committees that involve consumers and patients (see Box 6-4).

---

**BOX 6-4: Examples of Federal Advisory Committees on Consumer Issues**

Two DHHS agencies have successfully used consumer advisory committees to obtain input from consumers. The NIH Director's Council of Public Representatives (COPR) advises the NIH director on "matters related to medical research, NIH policies and programs, and public participation in agency activities". The COPR has held workshops and issued reports on enhancing public input in research priority-setting, on strengthening public trust in the research enterprise, and on the organizational structure and management of NIH. The COPR Web site also provides information about the cost of running the council: $222,351 for operations and member expenses and $124,118 for 1.30 full time equivalents of staff. NIH sponsors a public lecture series at which NIH scientists discuss their work in a manner appropriate for a lay audience (NIH, 2006); this series is another example of reaching out to understand consumer concerns.

The National Cancer Institute (NCI) Office of Liaison Activities launched the director's Consumer Liaison Group (DCLG) in 1997; it is NCI's first and only consumer advisory group. The DCLG makes recommendations to the director of NCI from the consumer advocate perspective on a wide variety of issues, programs, and research priorities. The 15 members include advocates, survivors, family members, and health care professionals and are chosen by the NCI director from a pool of applicants. The DCLG complies with the provisions of the Federal Advisory Committee Act. (NCI, 2006a; NCI, 2006b). It also provides a forum for the cancer advocacy community. At the time of this writing, plans were being made for a summit titled "Listening and Learning Together: Building a Bridge of Trust" to bring together many segments of the cancer advocacy community to give them a voice in shaping the interaction and collaboration between NCI and consumers (NCI, 2006c). In 2003, NCI contracted with a consulting firm to conduct a survey of the cancer advocacy community and, among other things, to measure and track advocacy organizations' perceptions of the DCLG. The survey found that DCLG was known in the cancer advocacy community, and 69% percent of respondents thought that the group would be more effective if it worked strategically with NCI rather than monitoring or participating in the implementation of NCI's strategic plan. Respondents also wanted to see the DCLG more involved in research, clinical trials, survivorship, health disparities, and communication.

---

The presence of consumer representatives in FDA's advisory committee process is limited to one member per committee, and communication issues understandably constitute just a small component of advisory committees' work. We believe that the agency, and especially CDER, would benefit from having a new advisory committee focused entirely on communication with the public, including risk communication. Public communication issues cut across CDER, the Center for Biologics Evaluation and Research (CBER), and Center for Devices and Radiological Health (CDRH) such as when and how to warn, how and what to communicate, so the proposed committee should serve all relevant centers.

Copyright © National Academy of Sciences. All rights reserved.

**6.1:  The committee recommends that Congress enact legislation establishing a new FDA advisory committee on communication with patients and consumers. The committee would be composed of members who represent consumer and patient perspectives and organizations. The advisory committee would advise CDER and other centers on communication issues related to efficacy, safety, and use during the lifecycle of drugs and other medical products, and it would support the centers in their mission to "help the public get the accurate, science-based information they need to use medicines and foods to improve their health."**

The proposed advisory committee should also have the role of developing and implementing a comprehensive consumer information program at FDA. The expertise needed on the advisory committee may include consumer and patient perspectives (adult, children, chronic conditions, new reader, consumer organizations, disease specific advocacy groups, and patient safety advocacy groups), risk communication, health literacy, social marketing expertise, public relations expertise, social sciences expertise with an emphasis on qualitative research and survey science, journalism, and ethics. The advisory committee could develop standards for effective communication of risk and benefit information, patient-provider communication, and patient participation in the generation of drug safety information and data, and apply available expertise and evidence to refine the structure and content of public health advisories, develop more robust standards for FDA's assessment of DTC advertising. It would, like all other advisory committees, be based in the Office of the Commissioner, but it would work closely with the new CDER Office of Safety Policy and Communication.[7]

The scope of work for the new CDER Office of Safety Policy and Communication is still under development. Given the reactive, fragmentary, and short-lived nature of previous CDER initiatives and organizational changes, the committee believes that special attention and commitment will be required to allow the new office to succeed. It will be essential to have its scope and goals clearly defined, and for its work to be given a high priority in CDER.

**6.2:  The committee recommends that the new Office of Drug Safety Policy and Communication should develop a cohesive risk communication plan that includes, at a minimum, a review of all Center risk communication activities, evaluation and revision of communication tools for clarity and consistency, and priority-setting to ensure efficient use of resources.**  The work of the Office should be evaluated after one year.

---

[7] The Advisory Committee Oversight and Management Staff in the Office of the Commissioner, works in collaboration with FDA centers to ensure consistent development, implementation, and operations of the FDA advisory committees (FDA. 2003. [Web site] Advisory Committee Oversight and Management Staff. Accessed 4/18/2006 at http://www.fda.gov/oc/advisory/missionandstaff.html.)

Copyright © National Academy of Sciences. All rights reserved.

# REFERENCES

Atkin C, Wallack L. Mass Communication and Public Health: Complexities and Conflicts. London: Sage; 1990.

Avorn J. PowerPoint Presentation: Professional Interactions. Presented at October 24, 2005 IOM Annual Meeting . 2005.

Brann M, Anderson JG. 2002. E-medicine and health care consumers: recognizing current problems and possible resolutions for a safer environment. Health Care Anal 10(4):403-15.

CBER---FDA, CDER, CBER. Guidance Useful Written Consumer Medication Information (CMI). 2006. Rockville, MD.

CDER. Medication Guides. July 26, 2006; accessed September 18, 2006. Web Page. Available at: http://www.fda.gov/cder/Offices/ODS/medication_guides.htm.

Dupuits FMHM. 2002. The effects of the internet on pharmaceutical consumers and providers. Disease Management Outcomes 10(11):679-691.

FDA. Guidance FDA's "Drug Watch" for Emerging Drug Safety Information Draft Guidance. May, 2005; accessed May 6, 2005. Web Page. Available at: http://www.fda.gov/cder/guidance/6657dft.pdf.

Galson S. Statement of Steven Glason, M.D., M.P.H Acting Director Center for Drug Evaluation and Research U.S. Food and Drug Administration Department of Health and Human Services before the Committee on Government Reform United States House of Representatives May 5, 2005. The Committee on Government Reform: 2005.

Henwood F, Wyatt S, Hart A, Smith J. 2003. 'Ignorance is bliss sometimes': constraints on the emergence of the 'informed patient' in the changing landscapes of health information. Sociol Health Illn 25(6):589-607.

HHS, FDA, CDER. FDA's Communication of Drug Safety Information: Transcript. 2005a.

HHS, FDA, CDER. FDA's Communication of Drug Safety Information: Transcript. 2005b.

IOM . Report of the Medication Errors Committee (Delete and insert final name). 2006.

NCI. Director's Consumer Liaison Group: Charter Summary. 2006a; accessed April 20, 2006a. Web Page. Available at: http://deainfo.nci.nih.gov/advisory/dclg/dclgchr.htm.

NCI. Director's Consumer Liaison Group: Fact Sheet. 2006b; accessed April 20, 2006b. Web Page. Available at: http://la.cancer.gov/DCLGFactSheet2006.pdf.

NCI, Office of Liaison Activities. Listening and Learning Together: Building a Bridge of Trust. 2006c; accessed June 8, 2006c. Web Page. Available at: http://www.palladianpartners.com/NCISummit2006/welcome.htm.

NIH. About COPR. 2006; accessed July 13, 2006. Web Page. Available at: http://copr.nih.gov/mission.asp.

Smith C, Cowan C, Sensenig A, Catlin A, the Health Accounts Team. 2005. Health Spending Growth Slows in 2003. Health Aff (Millwood) 24(1):185-194.

Steering Committee for the Collaborative Development of a Long-Range Action Plan for the Provision of Useful Prescription Medicine Information . Action Plan For The Provision of Useful Prescription Medicine Information Present to the Honorable Donna Shalala, Secretary of the Department of Health and Human Services. 1996.

Throckmorton DC. Drug Safety Oversight Board: Recent Activities 2006.

Woodcock J. Statement by Janet Woodcock, MD, Director, Center for Drug Administration before the Subcommittee on Oversight and Investigations Committee on Energy and Commerce, US House of Representatives. US House of Representatives, Committee on Energy and Commerce: Subcommittee on Oversight and Investigations; 2002.

**PREPUBLICATION COPY: UNCORRECTED PROOFS**    6-11

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety: Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

Copyright © National Academy of Sciences. All rights reserved.

# 7

# Resources for the Drug Safety System

The Food and Drug Administration lacks the resources needed to accomplish its large and complex mission today, let alone to position itself for an increasingly challenging future. Despite the fact that so much has changed in drug discovery and development, in the number and complexity of FDA's Congressionally mandated responsibilities, in the practice of medicine, the structuring and delivery of health care, the way drugs are used, the role of patients and consumers, and the information environment, FDA appropriations for new drug review have remained roughly flat (in constant dollars) since the passing of the Prescription Drug User Fee Act (PDUFA) (GAO, 2002; Thompson, 2000).[1] User-fees have led to an overall increase in resources for new drug review, but activities not funded by user fees have received a smaller portion of FDA's total budget. There is little dispute that FDA in general is, and CDER specifically remains, severely underfunded (Goldhammer A, 2005; Wolfe S, 2006). There is widespread agreement that resources for postmarketing drug safety work are especially inadequate and that resource limitations have hobbled the agency's ability to improve and expand this essential component of its mission. Continued resource shortages will impede the agency's ability to use new and future scientific and technological advances in drug research across the lifecycle. In particular, the limited resources could impede the agency's ability to detect risks of new drugs in a timely fashion, analyze emerging drug safety data, and effectively communicate that information to the public in the ways envisioned in the committee's report. For Fiscal Year 2006, CDER's enacted budget was $517,557,000, with $297,716,000 from Congressional appropriations and $219,841,000 (or 42.5% of the total budget) from user fees (see Figures 7-1 and 7-2 for more information on trends in CDER funding and staffing).

Although PDUFA has facilitated substantial expansion of CDER staff, especially in OND, growth has been largely to shorten review times and improve related processes, including interactions with industry representatives and the development of guidances, rather than strategic with respect to the full breadth of functions and disciplines needed to operate the largest center of a world-class regulatory agency. PDUFA I and II did not allow for the use of PDUFA funds to support postmarketing drug safety work. PDUFA III allowed for a very restricted

---

[1] Also of note: "Total FDA appropriations each year (exclusive of user fees and rent payments to GSA) must total at least as much as FDA received in FY 1997, adjusted for inflation at the rate of change in the Consumer Price index since FY 1997. . . . FDA meets this trigger consistently, even though for most years since FY 1997 FDA did not receive increases to cover the cost of pay increases and inflation for its core programs-which was the original intent of this trigger. FDA meets this trigger primarily because FDA has received appropriation increases earmarked for specific initiatives since FY 1997 (e.g., food safety, tobacco, counter-terrorism)" (FDA, 2003 – PDUFA III Five Year Plan).

Copyright © National Academy of Sciences. All rights reserved.

amount of funds to be used for very specific and narrow postmarketing safety work (postmarketing surveillance of drugs for two-to-three years after approval) (FDA, 2003). These restrictions have contributed to a troubling resource imbalance between OND and other CDER units (e.g., postmarketing safety activities, compliance).  Some effects or correlates of the resource imbalance between OND and ODS/OSE are discussed in Chapter 3.

The committee recognizes that the recommendations in this report come with a price tag, one that is most likely large and believes it would be ill-advised to expect CDER to take on the many new responsibilities called for in this report without new funds for strengthening the number and expertise of staff, for intramural and extramural research, and for information technology.  On the other hand, the committee believes that full implementation of the recommendations it offers is essential.  Although some of the recommendations are more far-reaching than others, the committee believes each of its recommendations will serve to improve the drug safety system.

For the past 15 years, user fees have supported a steadily increasing share of CDER's work.  Many have argued that relying so heavily on industry funds is inherently inappropriate and damaging to the reputation and functioning of CDER, indeed, of any regulatory entity. Some CDER staff, as well as some public advocates (Wolfe S, 2006) have expressed discomfort with this funding (DHHS and OIG, 2003; GAO, 2006; IOM Staff Notes, 2005-2006; Union of Concerned Scientists (UCS), 2006) based on real or perceived "capture" of the agency, that is, that the Center's increasing dependence on industry funding in itself creates a sense of obligation "to please" on the part of the agency. The Pharmaceutical Research and Manufacturers of America (PhRMA) itself has expressed a concern about this perception.

> "We share a concern with FDA about the current balance between the user fee portion and the appropriated portion of the review process," PhRMA's Goldhammer says. As industry funding approaches half of the review budget, "it has led to a perceptual issue that industry is paying for the review process and that the American public, through its tax moneys, is not. We would hope that can be dealt with in some way because we don't want there to be the perception that this is an industry-driven program" (Thompson, 2000).

The effects of user-fee funding are experienced differently by different staff at CDER (IOM Staff Notes, 2005-2006).  Some staff recognize no impact on their day-to-day work of the source of their salary and support the principle and practice of the user-fee system, while others expressed concerns about the workload and time pressures that they feel have accompanied the PDUFA funding[2], cognizant that if industry were displeased with CDER performance and worked to eliminate user fees (and appropriations did not increase to close the shortfall), staff would have to be eliminated.  Yet other CDER staff, particularly CDER leadership and managers, describe PDUFA as setting necessary performance goals that any responsible agency should employ regardless of links to funding source, and deny that the goals are used as anything more than targets.  Indeed, the goals allow for approval times longer than the 6- and 10 month approval targets in up to 10% of the cases for standard-rated and priority-rated new drug applications.  However, if CDER were to consistently miss the goals for time-to-approval, the pharma-

---

[2] As described in Chapter 2, some CDER new drug review staff assert that the workload pressures to meet PDUFA goals are compounded by industry submissions that are not well-organized, submissions that come in on paper or with data that are not easily re-analyzed, or on suboptimal management by their direct supervisors or team leaders. Some of these CDER staff also reported that the biggest pressures come from 6-month priority approvals and not from standard applications, the goal for which is 10 months for approval.

Copyright © National Academy of Sciences. All rights reserved.

*Resources for the Drug Safety System*

ceutical industry would push for changes in PDUFA fees or other arrangements in the following round of negotiations. This reality would undoubtedly put pressure on CDER management to meet these targets.

For some staff and policy analysts, user-fee funding, combined with industry's considerable role in shaping PDUFA-associated goals and expectations, further reinforces the perception that the industry has become a primary driver of the agency's priorities and performance.[3] The notion of "regulatory capture"[4] has been employed to describe the state of affairs created or, more likely, exacerbated by the user-fee system[5], namely, that powerful industry interests control or strongly influence the regulatory agency's decision making.

Some have argued that eliminating industry funding for regulatory review is in the best interest of the credibility of the drug safety system. Others have argued that industry receives a valuable service (timely approval of their products) and should be expected to pay for this[6], as long as agency independence and the credibility of its scientific review remain intact. Others argue that without extra funding from user fee revenue, the delays in new drug review observed prior to user fees will return since FDA budgets will then be subject to fluctuations in the policitical climate and increased pressures to reduce government spending. This too may compromise the effectiveness of our drug approval system.

As described elsewhere in the report, PDUFA has included an extensive number of performance goals (see Appendix C for a complete listing). CDER reports yearly to Congress on how well it has met those goals (in the performance goals letter[7] submitted by the Secretary of DHHS, see, for example, http://www.fda.gov/cder/pdufa/default.htm). Along with performance goals, PDUFA includes restrictions on how CDER can use its funds. Each round of PDUFA negotiations has led to more demands on CDER and continued restrictions on CDER's flexibility. The committee is not concerned about the existence of performance goals in principle[8], but finds the limitations or "strings" that direct how CDER can use PDUFA funds the most troubling aspect of the arrangement.[9]

**7.1  To support improvements in drug safety and efficacy activities over a product's lifecycle, the committee recommends that the Administration should request and Congress should approve substantially increased resources in both funds and personnel for the Food and Drug Administration.**

---

[3] Zelaney has proposed eliminating the PDUFA sunset clause as a means to reduce the industry's bargaining power (Zelenay JL, 2005)

[4] Adapted from the capture theory of regulation advanced by Stigler [1976] and critiqued by Laffont and Tirole, (Laffont and Tirole, 1991) and by Carpenter et al. [2006])

[5] The industry has a powerful influence on the political process and on the regulatory environment whether or not it funds the agency.

[6] Similar arguments have been made regarding user-fee program for other regulatory agencies.

[7] http://energycommerce.house.gov/107/hearings/03062002Hearing502/print.htm

[8] See Chapter 3 for a recommendation regarding institution of safety goals.

[9] The committee is aware that other regulatory agencies, for example the Environmental Protection Agency and the Federal Communications Commission, are supported in part by specific user fee programs. Some user fees go directly into the Treasury; other user fees go to the agency and offset congressional appropriations. The committee has not done an exhaustive analysis of other user fee programs but is of the understanding that they are not associated with significant requirements on how the agency uses the fees to achieve programmatic goals.

Copyright © National Academy of Sciences. All rights reserved.

The committee favors appropriations from general revenues, rather than user fees, to support the full spectrum of new drug safety responsibilities proposed in this report. This preference is based on the expectation that CDER will continue to review and approve drugs in a timely manner and that increasing attention to drug safety will not occur at the expense of efficacy reviews but rather it will complement efficacy review for a lifecycle approach to drugs. Congressional appropriations from general tax revenues are a mechanism by which the public can directly, fairly, and effectively invest in the FDA's postmarket drug safety activities. However, if appropriations are not sufficient to fund these activities and user fees are required, Congress should greatly reduce current restrictions on how CDER uses PDUFA funds. Should the sources described above be insufficient, alternatives that could be considered and evaluated by Congress include but are likely not limited to a user fee associated with the consumption of prescription medications and a sales tax on purchase of marketing services by pharmaceutical companies.

By some estimates, more than a billion prescriptions are written each year in the United States. A small tax on prescriptions could generate significant funding to implement the recommendations made in this report. A tax of ten cents on every prescription, for example, would generate more than $100 million for the FDA budget. The administrative costs of collecting such a tax would need to be considered as well as the ultimate incidence of the tax. For example, collecting the tax from retailers or consumers at the point of sale might have higher administrative costs than collecting it from manufacturers. On the other hand, manufacturers might not know how many prescriptions were filled out of a given amount of product sold to a wholesales or retailer. An alternative approach might be to tax manufacturers based on the value of sales (perhaps net of rebates). This would have the advantage of more heavily taxing more expensive drugs, which would tend to be the newest ones and the ones around which there is greatest uncertainty about safety. Regardless of the taxation method used, it must be considered that the ultimate incidence of the tax will be on consumers and will be regressive. This tax would likely also have an effect on the costs of and access to pharmaceuticals..

Another tax-based proposal would seek to accomplish two goals -- revenue enhancement and deterrence of excessive direct-to-consumer advertising. A direct tax on DTCA for newer drugs would have the advantage of linking the decision to impose a tax with the finding that newer drugs necessarily suffer from greater uncertainty with respect to safety and efficacy in the general population, which is more heterogeneous than that studied in the pre-approval clinical trials. On the other hand, taxation of protected speech can raise constitutional objections that have yet to be fully litigated before the courts. An alternative is to deny the tax deductibility of pharmaceutical advertising. Just such a proposal was made in H.R. 1655: America Rx Act,, although in that case the resulting revenues were to be used to offer discounts on prescription drugs to those in need.

Regardless of the source of the funds, the committee reiterates that the functioning of a drug safety system that assesses a drug's risks and benefits throughout its lifecycle is too important a public health need to continue to be under funded.

The committee was charged with reviewing CDER's resources but concluded that it was not feasible to do a financial audit of CDER or a detailed calculation of the costs for CDER or other stakeholders, including the pharmaceutical industry, of implementing the recommendations in this report. Convention dictates that federal agencies do not publicly articulate resource needs that differ from those offered in the President's budget, so the committee was unable to understand fully what CDER and FDA leadership estimate is needed to meet current objectives, let alone the expanded responsibilities the committee envisions for the future. Thus, the committee

Copyright © National Academy of Sciences. All rights reserved.

*Resources for the Drug Safety System*

can only offer general guidance and estimates of resources that will be required to implement its recommendations; it does so with the caveat that this list is most likely incomplete and is but a starting point for discussions between FDA and Congressional appropriations committees. CDER will need carefully to assess their resource needs in light of the recommendations in this report.

Staff:  The first three five-year cycles of PDUFA funding and accompanying process improvements have led to dramatic shortening of the time required for new drug approval, in great part due to the significant staff increases, primarily in OND.  The committee asserts that the next phase of improvements, including staff increases, should focus on the postmarket activities recommended in this report.

The committee notes certain facts about current staffing.  CDER estimated that in 2004 it devoted 700 full-time equivalents (FTEs) for premarket safety work and 393 FTEs (or 36% of total safety-related FTEs) for postmarket safety work. (FDA, 2005)  PDUFA funding supported 1320 FTEs for new drug review in 2004 and appropriations supported 1287 FTEs(Friedman et al., 1999).  CDER staff devoted to new drug review has approximately doubled in the PDUFA era. Between 1996 and 2004, new drug review FTEs supported by PDUFA increased by 125% (from 600 to 1320) whereas ODS staff increased by 75% (from 52 to 90)[10] (FDA, 2005).

The committee recognizes that CDER will require a significant increase in staff to meet the new responsibilities described in this report.  CDER will require new staff, for example,  to participate more actively in efforts to generate more and better safety analyses, such as through an expanded epidemiology contracts program; participate in new drug review teams; develop more consistent approaches to risk-benefit assessment both premarket and postmarket; evaluate RiskMAPS; work with other federal agencies and Departments in their efforts to improve their drug safety-related activities; evaluate industry-submitted five-year reviews; routinely assess and make public emerging safety and effectiveness information, and consider appropriate imposition of the newly clarified conditions on distribution. The committee's recommendations will require additional staff throughout CDER and with varied expertise, e.g. epidemiology, statistics, public health, medicine, pharmacy, informatics, programming, law, regulatory policy, communication, as well as project management and administration.

The committee recognizes that increases in postmarket safety staff must be phased in over time.  As CDER begins to implement the recommendations in this report and gradually increase their staff, the size of the needed increase will become apparent to CDER and the Congress.  Congress can ensure this by requesting that CDER perform and make publicly available a formal evaluation of staff needs, perhaps in the form of a work-audit.   The FDA commissioner can serve an important role as a champion within the government and in discussions with Congress for needed resources. The committee also recognizes that other federal partners in drug safety will require additional staff to achieve a fully-functioning postmarket drug safety system, as described in Chapter 4.

Research funds:  ODS/OSE is the CDER component most likely to have primary responsibility for implementing the extramural and intramural research activities called for in the report.  The committee was concerned by the very small and inadequate amount of funds for the epidemiology contracts programs in particular.  CDER will also require funds for extramural contracts to improve their passive and active surveillance activities, in addition to increased intramural use of drug utilization databases and other datasets such as the General Practice Research Database (GPRD).

---

[10] In 2004 8 of the ODS staff were funded by PDUFA.

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

The committee provides several estimates of needed funds for intramural and extramural research. The committee's lower bound estimate is that an expanded epidemiology contracts program would cost $10 million.[11] The committee estimates that other agencies/Departments also require similar resources for epidemiology research contracts.  The committee offers as a more ambitious estimate that the epidemiology contracts program at CDER should be expanded to $60 million.[12] This upper bound estimate does not include the costs for research to be conducted by other HHS agencies or other Departments, such as CMS or the VA.

The committee acknowledges that a financial investment will be required for the success of the public-private partnership (PPP) it recommends for the prioritization and planning of confirmatory drug safety and efficacy studies. The federal partners will require dedicated staff to make this partnership successful, in addition to research funds for studies.  The committee anticipates that pharmaceutical companies and other health care industries will also fund some of this research.

The committee offers a lower bound estimate of $20 million per year for start-up and administrative costs of the PPP.  This is based on an estimate for a research institute recently proposed to advance the Critical Path Initiative.[13] As Chapter 4 describes, the PPP will have responsibility for prioritizing and planning postmarket studies to address public health concerns, will help advise on the design of such studies (including the postmarket study commitments agreed upon by CDER and industry), and will facilitate necessary collaborations between government agencies and departments, the pharmaceutical industry.  Some studies conducted under the aegis of the PPP will require new resources.  Other studies will be ones likely done absent the PPP.  In these cases the PPP brings added value to the research by advising on study design, but the conduct of the research itself will not require incremental funds.

An upper bound estimate for the PPP should include the cost of a large clinical trial.  Although not all studies to be conducted under the aegis of the PPP are large, complicated, and expensive, some necessary studies will require significant new resources.  The committee asserts that at least one major drug safety question that is best answered with prospective research of some magnitude could be addressed each year under the aegis of the PPP.  Some of these studies would be epidemiology studies using existing data, such as those also conducted under the epidemiology contracts program.  Other studies would address narrowly defined safety concerns in specific populations.  As described in Chapter 4, some, if not most, of these studies would not be incremental costs to the system, because they would have occurred absent the PPP.  However, it is not unreasonable to anticipate, and it would be naïve to suggest otherwise, that on occasion significant new resources will be required to fund a large, prospective, randomized clinical trial to answer drug safety questions of pressing public health concern.  Thus, an upper bound estimate of the resources needed for the PPP on such occasions is on the order of $150 million[14] to be spread out over the period of time the study is conducted.

---

11 The current epidemiology contract program, funded at approximately $1 million, is insufficient to complete one major study. The committee asserts that at least 10 drug safety hypotheses could be explored through this or a similar program per year.

12  This is based on testimony to Congress in 2000 that an expanded epidemiology contracts program would cost $50 million (Federal News Service, 2000).  Using the Consumer Price Index, this would cost $60 million in 2006.

13 The Enhancing Drug Safety and Innovation Act of 2006 (S. 3807) authorizes appropriations for the Reagan-Udall Institute

14 For example, the Clinical Antipsychotic Trials of Intervention Effectiveness (CATIE) cost $42.6 million; the Antihypertensive and Lipid-lowering Treatment to Prevent Heart Attacks trial (ALLHAT) cost $125 million; the Study of Tamoxifen and Raloxifene trial (STAR) cost  $118 million.

Copyright © National Academy of Sciences. All rights reserved.

*Resources for the Drug Safety System*

Information technology:  The committee concluded from its conversations with individual CDER staff that CDER's IT systems are antiquated.  Upgrades of staff workstations are clearly part of CDER and FDA plans, but there will be additional IT needs (e.g. servers, programmers, and training) to implement several of the recommendations in Chapter 4 that should be included in budget projections.

Other resource needs:  The committee was tasked to assess only one aspect, drug safety, of CDER responsibilities.  There are many important areas of CDER work that the committee did not assess, for example compliance, inspections, and the prevention of medication errors.  The committee also realizes that the already-initiated Prescription Drug User Fee Act (PDUFA) IV negotiations will likely result in additional requirements on CDER.  The committee notes that both of these factors could very well require additional funds for staff and research.

It is critical that CDER assess the Center's resource needs with particular attention to ensuring that funding for premarketing product review and postmarketing risk-benefit assessments is commensurate with:

1. The breadth of both sets of programs and activities, and
2. Their importance in achieving a lifecycle approach to drug safety and efficacy that translates into how FDA regulates, studies, and communicates about drugs with stakeholders in industry, health care, academic research, and the public.

This process must be conducted with a keen awareness of the expectations, needs, and perspectives of all stakeholders in the system and in a transparent manner. It is incumbent on the leadership of the Agency and the Center, as well as the Administration, to present to Congress a full review and analysis of the levels of funding needed to fulfill the mission of the Center and the vision the committee has set forth. While resources might not be immediately available, a public statement acknowledging the resource needs is essential.

FDA's centennial offers an occasion to celebrate the past and to give serious consideration to what is needed to strengthen the agency's central role in assuring the safety and efficacy of prescription drugs now and in the future.  Also, PDUFA reauthorization is just months away, and major legislation addressing drug regulation has been prepared and considered[15]. These circumstances make this a golden moment of opportunity to improve fundamentally the way FDA regulation considers and responds to the evolving understanding of risks and benefits of drugs, and the way all stakeholders in the drug safety system perceive, study, and communicate about those risks and benefits.  As described in Chapter 1, there have been many commissions and reports addressing issues similar to those contained in this report.  It is the committee's fervent hope that Congress, FDA, and the other stakeholders will seize the gathering momentum to invigorate the drug safety system.  The agency's credibility and its ability to protect and promote optimally the health of the American people cannot wait another year or another decade.

---

15 The Enhancing Drug Safety and Innovation Act of 2006, http://help.senate.gov/S___.pdf

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

Figure 7-1 History of CDER Funding




Copyright © National Academy of Sciences. All rights reserved.

*Resources for the Drug Safety System*

Figure 7-2 History of CDER Staffing





Copyright © National Academy of Sciences. All rights reserved.

# REFERENCES

DHHS, OIG. FDA's Review Process for New Drug Applications: a Management Review. DHHS, OIG. 2003. OEI-01-01-00590: Department of Health and Human Services, Office of the Inspector General.

FDA. Center for Drug Evaluation and Research-Activities and Level of Effort Devoted to Drug Safety. 2005.

Federal News Service. Prepared Testimony of Richard Platt, MD, MSC, Professor of Ambulatory Care and Prevention Harvard Medical School Director of Research Harvard Pilgrim Health Care. 2000.

Friedman MA, Woodcock J, Lumpkin MM, Shuren JE, Hass AE, Thompson LJ. 1999. The safety of newly approved medicines: do recent market removals mean there is a problem? *JAMA* 281(18):1728-34.

GAO. 2002. *Food and Drug Administration: Effect of User Fees on Drug Approval Times, Withdrawals, and Other Agency Activities (GAO-02-958).*

GAO. 2006. *Drug Safety: Improvement Needed in FDA's Postmarket Decision-Making and Oversight Process.*

Goldhammer A. Statement of the Pharmaceutical Research and Manufacturers of America to Institute of Medicine Committee on the Assessment of the U.S. Drug Safety System . PhRMA Washington, DC: 2005.

IOM Staff Notes. Notes taken from confidential conversations with current and former FDA staff & site visits to FDA. 2005-2006.

Laffont J, Tirole J. 1991. The Politics of Government Decision-Making: A theory of Regulatory Capture. *The Quarterly Journal of Economics* 106(4):pgs. 1089-1127.

Thompson L. 2000. User fees for faster drug reviews. Are they helping or hurting the public health? *FDA Consum* 34(5):25-9.

Union of Concerned Scientists (UCS). 2006.

Wolfe S. Public Citizen: The 100th Anniversary of the FDA: The Sleeping Watchdog Whose Master is Increasingly the Regulated Industries. June 27, 2006; accessed July 11, 2006. Web Page. Available at: http://www.pharmalive.com/News/index.cfm?articleid=353196&categoryid=54.

Zelenay JL. The Prescription Drug User Fee Act: Is a Faster Food and Drug Administration Always a Better Food and Drug Administration. 2005.

**PREPUBLICATION COPY: UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

# Appendix A

*This section was compiled by Institute of Medicine staff with guidance from the Committee on the Assessment of the US Drug Safety System*

## MOVING TARGET—THE SHIFTING LANDSCAPE OF DRUG SAFETY IN THE UNITED STATES

### Drug Safety Initiatives

Many of the recent changes stem from the 2004 Food and Drug Administration (FDA) Drug Safety Initiative. The purpose of the initiative is to create a culture of openness and to enhance oversight in FDA. To achieve that FDA has established the Drug Safety Oversight Board (DSB), proposed a Drug Watch Web page, and is soliciting public input on how to expand and establish communication channels with the public to increase transparency (FDA, 2005d).

### Drug Safety Oversight Board

The (DSB) was established in February 2005 (FDA, 2005d) to help FDA realize its vision of culture of openness, enhanced oversight, and transparency in decision-making. The DSB is charged with identifying, tracking, and overseeing the management of important drug safety issues in the Center for Drug Evaluation and Research (CDER) (CDER, 2005).  A separate board task is to facilitate timely external communication of drug safety issues. Board members—all appointed by the FDA commissioner—include FDA staff, medical experts in other Department of Health and Human Service agencies, and other government departments, and medical experts and representatives of patient and consumer groups. The DSB has 31 members. It met nine times from its inception through June 2006, and it has generally discussed Patient Information Sheets, Public-Health Advisories distributed by CDER, and ways to strengthen CDER's risk communication efforts.

### Drug Watch

A Drug Watch Web page was proposed as part of FDA's drug safety initiative in February 2005 to improve communication with the public on drug safety issues by putting information out as quickly as possible in an easily accessible format.  The goal of the proposed Drug Watch program is to help patients and health care professionals make informed decisions on the use of prescription drugs. Drug Watch will include emerging data and risk information in a consumer-

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

friendly form ( information sheets) for healthcare professionals and patients regarding drugs for which FDA is actively assessing incoming safety information (FDA, 2005b; FDA, 2005d).

A draft guidance on Drug Watch released in May 2005 (FDA, 2005f) discussed how the inclusion of a drug on Drug Watch would not signify that the drug is dangerous or should not be used; it only means that FDA is investigating emerging safety signals. The information on each drug would vary but could include "factual information about newly observed, serious adverse events associated with the use of a drug that have been reported to FDA"; "information about significant emerging risks that FDA believes may be associated with a drug, but that might be avoided by appropriate patient selection, monitoring, or use of concomitant therapy"; and notice of an important risk minimization procedure that has been put into place by the sponsor to alert healthcare providers and patients that there has been a change in how a drug should be prescribed, dispensed, or used (FDA, 2005f). The DSB role in overseeing the Drug Watch program was described above.

## Structural Changes and Leadership Changes in the Center for Drug Evaluation and Research

In September 2004, CDER announced that it would be restructuring the Office of New Drugs (OND) and has implemented this in phases throughout 2005–2006 (FDA and CDER, 2005). Phase I of the reorganization the involved the elimination of the Office of Drug Evaluation V (ODE V), which began in May 2005 and is now complete. Phase II began in July 2005 with the operation of the new Office of Oncology Drug Products. It also involved the split of the Division of Neuropharmacological Drug Products in ODE I into two new divisions: Neurology and Psychiatry. Phase III began in September 2005 with reassignment of staff in the Division of Therapeutic Biological Internal Medicine Products and the Division of Review Management Policy in ODE VI to other ODEs and divisions in OND, so that ODE VI could be eliminated (FDA and CDER, 2005).

In October 2005, in his "State of CDER" address to center employees, Steven Galson outlined a proposed center reorganization to "better align staff functions with CDER's goals and FDA's public health mission" (FDA, 2005j). According to Dr. Galson, the three goals of the reorganization are to position CDER to be able to participate fully in the Critical Path Initiative (CPI), to increase visibility and a cross-center approach to drug safety, and to centralize risk communication efforts (FDA, 2006).

As of May 15, 2006, the changes that Dr. Galson outlined in 2005 were put into effect (the new organization chart can be seen in Chapter 2 (FDA and CDER, 2005). The reorganization resulted in the lifting of the status (to be at the same level as OND) of the Office of Drug Safety (ODS) whose name was changed to Office of Surveillance and Epidemiology (OSE) and which now reports to the office of the center director. That was done in part to address the perception that drug safety is solely the responsibility of ODS. A new office that reports to the center director and serves as a catalyst for CPI activities was created, with clinical pharmacology and the office of biostatistics reporting to that office. Another change was elevating the Office of Policy and Communication to the office of the center director.

**PREPUBLICATION COPY:   UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

## Leadership Changes in the Food and Drug Administration

Over the course of this study, several changes in leadership have taken place in FDA. When the study began, Lester M. Crawford was the acting commissioner; he was confirmed in July 2005 (FDA, 2005i). Soon after his permanent appointment, Dr. Crawford made several changes in FDA leadership, including appointing a new deputy commissioner for medical and scientific affairs, deputy commissioner for operations and chief operating officer, deputy commissioner for international and special programs, and associate commissioner for legislation (FDA, 2005h).

In September 2005, Dr. Crawford abruptly resigned as FDA commissioner (two months after confirmation). Shortly thereafter, President Bush appointed Andrew C. von Eschenbach as the new acting commissioner, and he is still serving in this capacity. In March 2006, President Bush nominated Dr. von Eschenbach to be the permanent head of the agency; as of June 2006, confirmation hearings have not yet taken place.

In June 2005, FDA announced its search for a new director of drug safety in CDER (FDA, 2005g). In late July 2005, the agency announced that CDER Acting Director Steven Galson would be director. In September 2005, FDA announced that it had selected Douglas Throckmorton as the deputy director of CDER. In October 2005, Gerald Dal Pan was named director of ODS. In April 2006, FDA announced the appointment of Paul Seligman as the CDER associate director for safety policy and communication; this is was a newly created position to provide oversight of drug safety issues and policies in CDER (FDA, 2006b).

During the study process, the committee referred to newly released FDA and CDER guidance documents and reports. FDA made additional important changes and undertook reviews of some of its programs. Those are described below.

## Recent Materials from the Food and Drug Administration

### *Guidance Documents*

In March 2005, FDA released three final guidance documents to help develop new ways to improve methods of assessing and monitoring risks associated with drugs in clinical development:

- *Guidance for Industry: Premarketing Risk Assessment* (FDA et al., 2005). This guidance focuses on what pharmaceutical companies should consider throughout the clinical trial process to improve the assessment and reporting of safety, to assess important safety issues during trial registration and best practices for the use of data from pre-approval safety evaluations, and to build on FDA and International Conference on Harmonisation guidances related to preapproval safety assessments.
- *Guidance for Industry: Development and Use of Risk Minimization Action Plans* (FDA, 2005a). This guidance outlines steps that pharmaceutical companies can take to address goals and objectives related to risk and suggests tools to minimize known risks posed by drugs. These include the consistent use and definition of terms; a framework for ensuring that benefits exceed risks; obtaining input from the public, patients, and healthcare profes-

***PREPUBLICATION COPY:  UNCORRECTED PROOFS***

Copyright © National Academy of Sciences. All rights reserved.

A-4                                                                                          *The Future of Drug Safety*

sionals when deciding to initiate, revise, or end risk minimization plans; and making certain that risk minimization efforts are successful by evaluating RiskMAPs.

- *Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment* (FDA, 2005e). This guidance discusses how to increase postmarketing vigilance to identify safety signals, investigation of the signals, interpreting the signals in terms of risk, and using pharmacovigilance plans to speed the acquisition of safety information with unusual safety signals.

Those guidance documents were issued as part of FDA's effort to minimize risks while preserving the benefits of medical products. FDA stated that the guidance documents are part of the drug safety initiative announced in 2004 (FDA, 2005d) to improve drug safety and the commitment to transparency (FDA News, 2005a).

FDA released a final guidance in January 2006 titled "Guidance for Industry, Investigators, and Reviewers Exploratory IND Studies" (HHS et al., 2006). It was one FDA step to "advance the earliest phases of clinical research in the development of innovative medical treatments" (FDA News, 2006a). The guidance discusses specific steps to be taken when exploratory clinical studies on humans are done under an investigational new drug to make the process more efficient and safe.

### Reports

In November 2005, FDA announced the availability of a white paper titled *Prescription Drug User Fee Act (PDUFA): Adding Resources and Improving Performance in FDA Review of New Drug Applications* (FDA, 2005c). It was released shortly after FDA requested public input on PDUFA provisions for FDA to consider during the renewal process for 2007 (FDA, 2005k). The white paper describes PDUFA goals, how they were implemented or achieved by CDER, and the changes that have resulted from PDUFA, (that is, hiring of more medical reviewers, shorter approval times, greater consistency, and increased workload) (FDA, 2005c).

In February 2006, a report commissioned by FDA, *Evaluation of FDA's First Cycle Review Performance--Retrospective Analysis* was released[1] (FDA News, 2006c). It showed a positive correlation between receiving approval on the first review cycle and pharmaceutical company consultation with FDA before the beginning of the final phase of human testing (the end of phase 2). The commissioner of FDA stated that "these meetings have become one of the most valuable aspects of the drug development process" (FDA News, 2006c). Deficiencies in safety assessment during the IND process were cited in the report as a main cause of multiple review cycles, which potentially could have been avoided if a "milestone meeting" had taken place where CDER staff could have made suggestions for improving the quality of the initial applications (FDA News, 2006c).

---

[1] The report was written by Booz, Allen Hamilton in relation to the Prescription Drug User Fee Amendments of 2002 (PDUFA III)

***PREPUBLICATION COPY:  UNCORRECTED PROOFS***

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety: Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

## Other Relevant Changes at the Food and Drug Administration and the Center for Drug Evaluation and Research

### Labeling

On November 2, 2005, FDA started requiring that drug manufacturers submit prescription drug label information to FDA in a new electronic format. That was intended to allow patients and healthcare providers to obtain information in FDA-approved package inserts ("labels") with greater ease (FDA News, 2006b). Drug manufacturers are now required to provide FDA with accurate and up-to-date product and prescribing information in a structured product labeling that can be electronically managed. These labels will be the main source of information for a new interagency Web site, "DailyMed", a health information clearinghouse, which will provide up-to-date information to consumers and healthcare providers free (National Library of Medicine, 2006).

In January 2006, FDA announced a change in the prescription drug format for the package insert to provide clear and concise information so that healthcare providers can make better use of the drug label to minimize risk and medical errors in their patients (FDA News, 2006b). The final rule was the first revision in 25 years and now requires that prescription information for new and recently approved products meet new criteria. The change was aimed at increasing the readability and accessibility of label information and drawing health professionals and consumers' attention to the most important pieces of drug information before a product is prescribed. The changes include the insertion of a "highlights" section that includes concise information on the risks and benefits related to the drug, a table of contents in the label, the date of initial approval of the drug, a toll-free number, and Internet reporting information.

The labeling rule also established an important change in statutory interpretation: preempting state product liability laws on the basis of FDA's approved label. The preamble to the labeling rule states that state laws and judicial decisions that would have the effect of finding FDA-approved labels inadequate or misleading are preempted by the federal rule (21 CFR Parts 201,314, and 601). That position has partial support in existing case law, and FDA's assertion of federal preemption under the new labeling rule has not yet been tested in court (National Conference of State Legislatures, 2006).

### Program Reviews or Evaluations

### Advisory Committees

In May 2006, CDER announced that it was launching an internal assessment of its Advisory Committee meeting system to establish best practices surrounding that process. The assessment will be led by senior management in CDER and will take a comprehensive look at current practices for nominating committee members, screening for conflicts of interest, choosing expertise for specific meeting topics, and utilizing Special Government Employees.

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*

Copyright © National Academy of Sciences. All rights reserved.

A-6                                                                                      *The Future of Drug Safety*

### Postmarketing Study Commitments

In April 2006, FDA contracted with Booz Allen Hamilton for an evaluation of FDA's postmarket study process (phase IV commitments) for collecting medical information (FDA Press Release, 2006). The evaluation will comment on how FDA can increase consistency in requesting, facilitating, and reviewing postmarketing commitments among centers. Ultimately, this will help FDA to request focused studies that result in the information needed to assess safety postmarket.

### Partnerships

In August 2005, FDA and the Association of American Medical Colleges (AAMC) released the joint report *Drug Development Science Obstacles and Opportunities for Collaborations* which describes an array of opportunities for scientific breakthroughs to be undertaken through collaboration to reach the goals of CPI(2005; The Association of American Medical Colleges (AAMC), 2005).The report states that those partnerships should focus on greater sharing of knowledge, regulatory and legislative relief, earlier evaluation of drugs in humans, and improved education and training for health professionals. Some of the kinds of collaboration outlined in the report are to develop mechanisms to learn from failed drug targets, establish joint models for biomarker validation, set up a consortium to analyze and learn from failed clinical trials, and develop agreements for sharing of information restricted as intellectual property.

In November 2005, FDA, the European Commission, and the European Medicines Agency extended by 5 years a confidentiality agreement that began in September 2003 (DeClaire J, 2005; FDA and EMEA, 2004; FDA et al., 2005). The types of information covered by the agreement are legal and regulatory issues, scientific advice, orphan drug designation, inspection reports, marketing authorization procedures, and post-marketing surveillance. The implementation of the confidentiality agreement was planned to take place in several stages and is described in the implementation plan finalized in September 2004 (FDA and EMEA, 2004).

FDA announced that the agency would partner with the Agency for Healthcare Research and Quality (AHRQ) to launch an effort aimed at increasing research collaboration and to foster communication between the two agencies in December 2005 (FDA News, 2005b). FDA leaders stated that the collaboration will increase their understanding of health outcomes of prescription drugs, which will lead to better information to provide to the public. One component of the collaboration was assignment of a member of senior CDER leadership to a 12 month detail at AHRQ's Center for Outcomes and Evidence as senior adviser in pharmaceutical outcomes research (FDA News, 2005b).

### Critical Path Initiative and Partnerships

In March 2004, FDA released the report entitled *Innovation or Stagnation?—Challenge and Opportunity on the Critical Path to New Medical Products* (the Critical Path Initiative) (FDA, 2004). The report discussed the lack of innovative technologies and science in recent years to help to make drug development less expensive and more efficient. The goal of the CPI is to make safe and effective treatments available to the public quicker by using scientific innova-

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

tions. The three dimensions outlined in the CPI report are safety assessment, evaluation of medical utility, and product industrialization.

FDA called for assistance from the public, academic researchers, funding agencies, and industry to help to reach that goal because it does not believe that it can get there alone. A major objective of the CPI is to encourage new and increased collaborations among a broad array of experts to develop innovative tools.

To reach its goal, FDA has partnered with the World Health Organization, the Bill and Melinda Gates Foundation, biotechnology research firms, American AAMC, and others. After receiving feedback from those and other stakeholders, FDA released *Critical Path Opportunities Report* in March 2006 to identify the initiative's six kinds of priority-targeted research. One related to safety is the use of biomarkers to predict the performance of a product during development and thus reduce uncertainties about safety or effectiveness. If the biomarkers can be identified, validated, and shown to improve health outcomes, FDA believes that these priorities "will increase efficiency, predictability, and productivity of new medical products" (FDA, 2004; 2006).

The main element related to drug safety in the CPI is improving tools for assessing safety to detect drug safety issues as early as possible. Today, safety issues are usually found during clinical trials or when drugs are on the market. Tests for finding safety problems earlier are few and not reliable. The CPI highlights that there are great efforts to be made and that a new safety toolkit would include the ability to predict failures due to safety before human testing in clinical trials and t to demonstrate safety before a drug is on the market. The safety toolkit would lead to better safety standards by helping to predict safety performance efficiently and quickly and will decrease uncertainty.

FDA announced its partnership with the Critical Path Institute (C-Path) in December 2005 to help it to reach the goals of the CPI (FDA, 2006c). C-Path is an independent, publicly funded, nonprofit organization founded by FDA, the University of Arizona, and SRI International. It was created to fulfill the mission of the CPI, which is to "create innovative collaborations in education and research that enable the safe acceleration of the process for developing new medical products" (The Critical Path Institute , ). FDA leaders stated that some of the projects developed by C-Path will help to achieve many of the objectives outlined in the opportunities list discussed above.

In March 2006, shortly after the release of the *Opportunities Report*, FDA announced that it will be taking on an advisory role in the new Predictive Safety Testing Consortium of C-Path and five pharmaceutical companies. The partnership will "share internally developed laboratory methods to predict the safety of new treatments before they are tested in humans" (FDA, 2006a). The collaboration is in line with the public-private partnerships stressed as a major need to improve drug development in the CPI. CDER's J. Woodcock commented that this is a "concrete example of the power of the collaborative nature of the Critical Path Initiative".

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

# REFERENCES

CDER. Manual of Policies and Procedures (MAPP): Drug Safety Oversight Board (DSB). May 4, 2005; accessed June 20, 2005. Web Page. Available at: http://www.fda.gov/cder/mapp/4151-3.pdf.

DeClaire J. Which drugs should health plans cover? September 28, 2005; accessed December 14, 2004. Web Page. Available at: http://www.eurekalert.org/pub_releases/2005-10/ghcc-wds102805.php.

FDA. Innovation Stagnation: Challenge and Opportunity on the Critical Path to New Medical Products. March, 2004; accessed October 10, 2005. Web Page. Available at: http://www.fda.gov/oc/initiatives/criticalpath/whitepaper.html; http://www.fda.gov/oc/initiatives/criticalpath/whitepaper.pdf.

FDA. 2005a. Guidance for Industry: Development and Use of Risk Minimization Action Plans.

FDA. Questions and Answers (Qs & As) Proposed Drug Watch Program. 2005b; accessed May 6, 2005b. Web Page. Available at: http://www.fda.gov/cder/guidance/6657qs&asext5-2.pdf.

FDA. White Paper, Prescription Drug User Fee Act (PDUFA): Adding Resources and Improving Performance in FDA Review of New Drug Applications. 2005c.

FDA. FDA Fact Sheet: FDA Improvement in Drug Safety Monitoring. February 15, 2005d; accessed February 23, 2005d. Web Page. Available at: http://www.fda.gov/oc/factsheets/drugsafety.html.

FDA. Guidance for Industry Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment . March, 2005e; accessed October 13, 2005e. Web Page. Available at: http://www.fda.gov/cder/guidance/6359OCC.htm.

FDA. Guidance FDA's "Drug Watch" for Emerging Drug Safety Information Draft Guidance. May, 2005f; accessed May 6, 2005f. Web Page. Available at: http://www.fda.gov/cder/guidance/6657dft.pdf.

FDA. FDA News: New Leadership for Safer Drugs. June 28, 2005g; accessed July 11, 2005g. Web Page. Available at: http://www.fda.gov/bbs/topics/NEWS/2005/NEW01195.html.

FDA (FDANEWSWIRES@LIST.NIH.GOV). FDA Press Release: FDA Commissioner Announces Important Personnel Changes. E-mail to (FDANEWSWIRES@LIST.NIH.GOV). July 29, 2005h.

FDA (FDANEWSWIRES@LIST.NIH.GOV). FDA Press Release: FDA's Center for Drug Evaluation and Research Gets Permanent Leadership. E-mail to (FDANEWSWIRES@LIST.NIH.GOV). July 29, 2005i.

FDA. FDA NEWS, FDA Names New Director of Drug Safety, Goals for Center for Drug Reorganization Announced. October 19, 2005j; accessed October 20, 2005j. Web Page. Available at: http://www.fda.gov/bbs/topics/news/2005/new01245.html.

FDA. FDA Seeks Public Input on Renewal process for Prescription Drug User Fee Act (PDUFA). November 10, 2005k; accessed June 15, 2006k. Web Page. Available at: http://www.fda.gov/bbs/topics/news/2005/NEW01259.html.

FDA. CDER Reorganization Chart and Description. 2006.

FDA. *Critical Path Opportunities Report*. 2006.

FDA. FDA News: FDA and the Critical Path Institute Announce Predictive Safety Testing Consortium. March 16, 2006a; accessed June 14, 2006a. Web Page. Available at: http://www.fda.gov/bbs/topics/news/2006/NEW01337.html.

FDA. FDA NEWS: FDA Names First Associate Center Director for Safety Policy and Communication in the Center for Drug Evaluation and Research FDA Centralizes Drug Safety Policy and Communication. April 18, 2006b; accessed May 25, 2006b. Web Page. Available at: http://www.fda.gov/bbs/topics/NEWS/2006/NEW01359.html.

FDA. FDA News: FDA Announces Partnership with Critical Path Institute to Conduct Essential Research to Spur Medical Innovation. December 16, 2006c; accessed June 14, 2006c. Web Page. Available at: http://www.fda.gov/bbs/topics/NEWS/2005/NEW01276.html.

FDA and CDER. Office of New Drugs Reorganization. June 21, 2005; accessed June 15, 2006. Web Page. Available at: http://www.fda.gov/cderorg/ond_reorg.htm.

FDA, CDER, CBER. 2005. Guidance for Industry: Premarketing Risk Assessment.

FDA and EMEA. September 16, 2004; accessed June 6, 1915. Web Page. Available at: http://www.emea.eu.int/pdfs/general/direct/internationalcoop/EMEA-FDAconfidentialityimplement%20.pdf.

FDA, EU, and EMEA. FDA and EU (European Commission and EMEA) Extend Confidentiality Arrangements for Five More Years. November 8, 2005; accessed June 6, 1915. Web Page. Available at: http://www.fda.gov/bbs/topics/news/2005/NEW01257.html.

FDA News. FDA Issues Final Risk Management Guidance's . March 24, 2005a. Web Page. Available at: http://www.fda.gov/bbs/topics/news/2005/NEW01169.html.

**PREPUBLICATION COPY: UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

FDA News, FDA. FDA to Strengthen Research and Communication with AHRQ. December 23, 2005b; accessed
   January 3, 2006b. Web Page. Available at: http://www.fda.gov/bbs/topics/news/2005/NEW01286.html.
FDA News. FDA Issues Advice to Make Earliest Stages Of Clinical Drug Development More Efficient . January 12,
   2006a; accessed March 9, 2006a. Web Page. Available at:
   http://www.fda.gov/bbs/topics/news/2006/NEW01296.html.
FDA News. FDA Announces New Prescription Drug Information Format to Improve Patient Safety . January 18,
   2006b; accessed March 9, 2006b. Web Page. Available at:
   http://www.fda.gov/bbs/topics/news/2005/NEW01272.html.
FDA News. Report Demonstrates Benefits of Earlier Meetings with FDA to Make Drug Review Process More Effi-
   cient. February 9, 2006c; accessed June 15, 2006c. Web Page. Available at:
   http://www.fda.gov/bbs/topics/news/2006/NEW01312.html.
FDA Press Release. FDA Awards Contract to Assess Postmarketing Study Commitment Decision-Making Process
   Analysis Will Lead To a More Standardized Approach. April 5, 2006; accessed May 26, 2006. Web Page.
   Available at: http://www.boozallen.com/home/industries_article/2323260?lpid=386491.
Guidance for Industry, Investigators, and Reviewers: Exploratory IND Studies. HHS, FDA, CDER. 2006.
National Conference of State Legislatures. FDA Final Rule on Prescription Drug Labeling. January 19, 2006; ac-
   cessed July 3, 2006. Web Page. Available at: http://www.ncsl.org/statefed/health/FDArule.htm.
National Library of Medicine. 2006. Web Page. Available at: http://dailymed.nlm.nih.gov/dailymed/about.cfm.
The Association of American Medical Colleges , Food and Drug Administration, Center for Drug Development Sci-
   ence atUoCSF. *Drug Development Science Obstacles and Opportunities for Collaboration Among Academia,
   Industry and Government: Report of an Invitational Conference Organized by The Association of American
   Medical Colleges, Food and Drug Administration, Center for Drug Development Science, at the University of
   California, San Francisco*. 2005.
The Association of American Medical Colleges (AAMC). Collaboration Key to Overcoming Obstacles to Drug De-
   velopment. August 15, 2005; accessed June 14, 2006. Web Page. Available at:
   http://www.aamc.org/newsroom/pressrel/2005/050815.htm.
The Critical Path Institute . accessed June 14, 2006. Web Page. Available at: http://www.c-path.org/.

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety: Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

# APPENDIX B

# Acronyms

**AE –** adverse event
**ADR –** adverse drug report
**AER –** adverse event review
**AERS –** Adverse Event Reporting System
**AHRQ –** Agency for Healthcare Research and Quality

**BLA –** biologics license application

**CBER –** Center for Biologics Evaluation and Research
**CDC –** Centers for Disease Control and Prevention
**CDER –** Center for Drug Evaluation and Research
**CDRH –** Center for Devices and Radiological Health
**CERTS –** Center for Education and Research Therapeutics
**CFSAN –** Center for Food Safety and Applied Nutrition
**CGMPs –** Current Good Manufacturing Practices
**CMS –** Centers for Medicare and Medicaid
**CVM –** Center for Veterinary Medicine
**CFR –** Code of Federal Regulations
**COPR –** Council of Public Representatives

**DDMAC –** Division of Drug Marketing, Advertising and Communication
**DDRE –** Division of Drug Risk Evaluation
**DHHS –** Department of Health and Human Services
**DSaRM –** Drug Safety and Risk Management Advisory Committee
**DSB –** Drug Safety Oversight Board
**DTCA –** Direct-to-Consumer Advertising

**ELA –** established license application
**EU –** European Union
**EMEA –** European Medicines Agency

**FAA –** Federal Aviation Administration
**FDA –** Food and Drug Administration
**FDA –** Food and Drug Administration
**FDAMA –** Food and Drug Administration Modernization Act of 1997
**FD&C Act –** Federal Food, Drug and Cosmetic Act
**FTC –** Federal Trade Commission
**FOIA –** Freedom of Information Act
**FTE –** full time equivalent
**FY –** fiscal year

**GAO –** Government Accountability Office
**GPRD –** General Practice Research Database
**GGP –** good guidance practice
**GLP –** good laboratory practice
**GMP –** good manufacturing practice
**GRMP –** good review manufacturing practice

**HIPAA –** Health Insurance Portability and Accountability Act

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

B-1

Copyright © National Academy of Sciences. All rights reserved.

*Appendix B*

**IND** – investigational new drug
**IOM** – Institute of Medicine
**IRB** – institutional review board
**IT** – information technology

**MaPP** – Manual of Policies and Procedures
**MHRA** – Medicines and Healthcare Products Regulatory Agency

**NAS** – National Academy of Sciences
**NASA** – National Aeronautics and Space Administration
**NCTR** – National Center for Toxicological Research
**NDA** – new drug application
**NIH** – National Institutes of Health
**NME** – new molecular entity
**NSAID** – Nonsteroidal anti-inflammatory drug

**ODE** – Office of Drug Evaluation
**ODS** – Office of Drug Safety
**OIG** – Office of Inspector General
**OMB** – Office of Management and Budget
**OMP** – Office of Medical Policy
**OND** – Office of New Drugs
**OPaSS** – Office of Pharmacoepidemiology and Statistical Science
**OP** – Office of Planning
**OSE** – Office of Surveillance and Epidemiology

**PDUFA** – Prescription Drug User Fee Act
**PLA** – product license application

**RiskMAP** – risk minimization action plan

**SRS** – Spontaneous Reporting System

**UK** – United Kingdom
**USDA** – US Department of Agriculture

**VSD** – Vaccine Safety Datalink

**WHO** – World Health Organization

**PREPUBLICATION COPY: UNCORRECTED PROOFS**

B-2

Copyright © National Academy of Sciences. All rights reserved.

# Appendix C

**PDUFA Performance Goals, FY 1993 – FY 1997**

The following list presents by fiscal year the performance measures set forth in the letters referenced in Section 102(3) of the PDUFA. In those letters, the timing of a number of the goals was conditional either (1) on the date (July 2, 1993) upon which a supplemental appropriation was enacted to permit FDA to collect PDUFA user fees, or (2) a specific performance interval (e.g., 6 or 12 months after submission). The following chart lists the 29 goals by fiscal year with appropriate goal measurement dates:

| Interim Goals by Fiscal Year | Timing of Measurement | Measurement Date [1] |
|---|---|---|
| **Interim Goals of FY 93** | | |
| 1. Establish an industry/FDA working group upon initiation of the user fee program. | Supplemental appropriation date | July 2, 1993 |
| 2. Initiate a pilot computer-assisted PLA review (CAPLAR) program during FY 93. | End of FY 93 | Sept. 30, 1993 |
| **Interim Goal of FY 94** | | |
| 1. Review and act upon 55 percent of complete NDA and PLA/ELA submissions received during FY 94 within 12 months after submission date. | 12 months after end of FY 94 | Sept. 30, 1995 |
| 2. Review and act upon 55 percent of efficacy supplements [2] received during FY 94 within 12 months after submission date. | 12 months after end of FY 94 | Sept. 30, 1995 |
| 3. Review and act upon 55 percent of manufacturing supplements [2] received during FY 94 within 6 months after submission date. | 6 months after end of FY 94 | Mar. 31, 1995 |
| 4. Review and act upon 55 percent of manufacturing applications received during FY 94 within 6 months after the resubmission date. | 6 months after end of FY 94 | Mar. 31, 1995 |
| 5. Implement performance tracking and monthly monitoring of CBER performance within 6 months of initial user fee payments. | 6 months after 7/2/93 | July 2, 1994 |
| 6. Implement project management methodology for all NDA reviews within 12 months of the initiation of user fee payments. | 12 months after 7/2/93 | July 2, 1994 |
| **Interim Goals of FY 95** | | |
| 1. Review and act upon 70 percent of complete NDA and PLA/ELA submissions received during FY 95 within 12 months after submission date. | 12 months after end of FY 95 | Sept. 30, 1996 |

***PREPUBLICATION COPY:  UNCORRECTED PROOFS***        C-1

Copyright © National Academy of Sciences. All rights reserved.

| | | |
|---|---|---|
| 2. Review and act upon 70 percent of efficacy supplements received during FY 95 within 12 months after submission date. | 12 months after end of FY 95 | Sept. 30, 1996 |
| 3. Review and act upon 70 percent of manufacturing supplements received during FY 95 within 6 months after submission date. | 6 months after end of FY 95 | Mar. 31, 1996 |
| 4. Review and act upon 70 percent of resubmitted applications received during FY 95 within 6 months after the resubmission date. | 6 months after end of FY 95 | Mar. 31, 1996 |
| 5. Recruit and bring on board 50 percent of FDA incremental review staff by first quarter of FY 95. | 3 months after end of FY 94 | Dec. 31, 1994 |
| 6. Implement project management methodology for all PLA/ELA reviews within 18 months of user fee payments. | 18 months after 7/2/93 | Jan. 2, 1995 |
| 7. Eliminate overdue backlogs of efficacy and manufacturing supplements to NDAs within 18 months of initiation of user fee payments. | 18 months after 7/2/93 | Jan. 2, 1995 |
| 8. Eliminate overdue of NDAs within 24 months of initiation of user fees. | 24 months after 7/2/93 | Jan. 2, 1995 |
| 9. Eliminate overdue backlogs of PLAs, ELAs and PLA/ELA supplements within 24 months of initiation of user fees. | 24 months after 7/2/93 | Jan. 2, 1995 |
| 10. Adopt uniform computer-assisted NDA standards during FY 95. | End of FY 95 | Sept. 30, 1995 |
| **Interim Goals of FY 96** | | |
| 1. Review and act upon 80 percent of complete NDA and PLA/ELA submissions receive during FY 96 within 12 months after submission date. | 12 months after end of FY 96 | Sept. 30, 1997 |
| 2. Review and act upon 80 percent of efficacy supplements received during FY 96 within 12 months after submission date. | 12 months after end of FY 96 | Sept. 30, 1997 |
| 3. Review and act upon 80 percent of manufacturing supplements received during FY 96 within 6 months after submission date. | 6 months after end of FY 96 | Mar. 31, 1997 |
| 4. Review and act upon 80 percent of resubmitted applications received during FY 96 within 6 months after the resubmission date. | 6 months after end of FY 96 | Mar. 31, 1997 |
| **Five-Year Goals of FY 97** | | |
| 1. Review 90 percent of complete PLAs, ELAs, and NDAs for priority applications within 6 months after submission date. | 6 months after end of FY 97 | Mar. 31, 1998 |
| 2. Review 90 percent of complete PLAs, ELAs, and NDAs for standard applications within 12 months after submission date. | 12 months after end of FY 97 | Sept. 30, 1998 |

**PREPUBLICATION COPY: UNCORRECTED PROOFS**   C-2

Copyright © National Academy of Sciences. All rights reserved.

| 3. Review 90 percent of priority supplements to PLAs, ELAs, and NDAs within 6 months after submission date. | 6 months after end of FY 97 | Mar. 31, 1998 |
|---|---|---|
| 4. Review 90 percent of standard supplements to PLAs, ELAs, and NDAs that require review of clinical data (efficacy supplements) within 12 months after submission. | 12 months after end of FY 97 | Sept. 30, 1998 |
| 5. Review 90 percent of supplements to PLAs, ELAs, and NDAs that do not require review of clinical data (manufacturing supplements) within 6 months after submission date. | 6 months after end of FY 97 | Mar. 31, 1998 |
| 6. Review 90 percent of complete applications resubmitted following receipt of a non-approval letter within 6 months after the resubmission date. | 6 months after end of FY 97 | Mar. 31, 1998 |
| 7. Total review staff increment recruited and on board by end of FY 97. | End of FY 97 | Sept. 30, 1997 |

**Footnotes**

1.  The statute allows three additional months for review of original NDA, PLA, or ELA submissions that involve major amendments within the last three months of their usual 6- or 12-month review intervals. In these cases, the measurement dates shown in this Appendix move forward by 3 months.

2.  The term "supplement" applies to both drug and biologic submissions. It includes "amendments" to biologic submissions.

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*     C-3

Copyright © National Academy of Sciences. All rights reserved.

ENCLOSURE
PDUFA REAUTHORIZATION PERFORMANCE GOALS AND PROCEDURES

The performance goals and procedures of the FDA Center for Drug Evaluation and Research (CDER) and the Center for Biologics Evaluation and Research (CBER), as agreed to under the reauthorization of the prescription drug user fee program in the "Food and Drug Administration Modernization Act of 1997," are summarized as follows:

I.   FIVE-YEAR REVIEW PERFORMANCE GOALS

**Fiscal year 1998**

1. Review and act on 90 percent of standard original New Drug Application (NDAs) and Product License Applications (PLAs)/Biologic License Applications (BLAs) filed during fiscal year 1998 within 12 months of receipt.

2. Review and act on 90 percent of priority original NDA and PLA/BLA submissions filed during fiscal year 1998 within 6 months of receipt.

3. Review and act on 90 percent of standard efficacy supplements filed during fiscal year 1992 within 12 months of receipt.

4. Review and act on 90 percent of priority efficacy supplements filed during fiscal year 1998 within 6 months of receipt.

5. Review and act on 90 percent of manufacturing supplements filed during fiscal year 1998 within 6 months of receipt.

6. Review and act on 90 percent of all resubmitted original applications filed during fiscal year 1998 within 6 months of receipt, and review and act on 30 percent of Class1 resubmitted original applications within 2 months of receipt.

**Fiscal year 1999**

1. Review and act on 90 percent of standard original NDA and PLA/BLA submission filed during fiscal year 1999 within 12 months of receipt and review and act on 30 percent within 10 months of receipt.

2. Review and act on 90 percent of priority original NDA and PLA/BLA submission filed during fiscal year 1999 within 6 months of receipt.

3. Review and act on 90 percent of standard efficacy supplements filed during fiscal year 1999 within 12 months of receipt and review and act on 30 percent with in 10 months of receipt.

4. Review and act on 90 percent of priority efficacy supplements filed during fiscal year 1999 within 6 months of receipt.

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*   C-4

Copyright © National Academy of Sciences. All rights reserved.

5. Review and act on 90 percent of manufacturing supplements filed during fiscal year 1999 within 6 months of receipt and review and at on 30 percent of manufacturing supplements requiring prior approval within 4 months of receipt.

6. Review and act on 90 percent of Class 1 resubmitted original applications filed during fiscal year 1999 within 4 months of receipt and review and act on 50 percent within 2 months of receipt.

7. Review and act on 90 percent of Class 2 resubmitted original applications filed during fiscal year 1999 within 6 months of receipt.

**Fiscal year 2000**
1. Review and act on 90 percent of standard original NDA and PLA/BLA submissions filed during fiscal year 2000 within 12 months of receipt and review and act on 50 percent within 10 months of receipt.

2. Review and act on 90 percent of priority original NDA and PLA/BLA submissions filed during fiscal year 2000 within 6 months of receipt.

3. Review and act on 90 percent of standard efficacy supplements filed during fiscal year 2000 within 12 months of receipts and review and act on 50 percent within 10 months of receipt.

4. Review and act on 90 percent of priority efficacy supplements filed during fiscal year 2000 within 6 months of receipt.

5. Review and act on 90 percent of manufacturing supplements filed during fiscal year 2000 within 6 months of receipt and review and act on 50 percent of manufacturing supplements requiring prior approval within 4 months of receipt.

6. Review and act on 90 percent of Class 1 resubmitted original applications filed during fiscal year 2000 within 4 months and review and act on 50 percent within 2 months of receipt.

7. Review and act on90 percent of Class 2 resubmitted original applications filed during fiscal year 2000 within 6 months of receipt.

**Fiscal year 2001**
1.Review and act on 90 percent of standard original NDA and PLA/BLA submissions filed during fiscal year 2001 within 12 months and review and act on 70 percent within 10 months of receipt.

2. Review and act on 90 percent of priority original NDA and PLA/BLA submissions filed during fiscal year 2001 within 6 months of receipt.

3. Review and act on 90 percent of standard efficacy supplements filed during fiscal year 2001 within 12 months and review and act on 70 percent within 10 months of receipt.

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*   C-5

Copyright © National Academy of Sciences. All rights reserved.

4. Review and act o 90 percent of priority efficacy supplements filed during fiscal year 2001 within 6 months of receipt.

5. Review and act on 90 percent of manufacturing supplements filed during fiscal year 2001 within 6 months of receipt and review and at on 70 percent within 2 months of receipt.

6. Review and act on 90 percent of Class 1 resubmitted original applications filed during the fiscal year 2001 within 4 months of receipt and review and act on 70 percent within 2 months of receipt.

7. Review and act on 90 percent of Class 2 resubmitted original applications within 6 months of receipt.

**Fiscal year 2002**
1. Review and act on 90 percent of standard original NDA and PLA/BLA submissions filed during fiscal year 2002 within 10 months of receipt.

2. Review and act on 90 percent of priority original NDA and PLA/BLA submissions filed during fiscal year 2002 within 6 months of receipt.

3. Review and act on 90 percent of standard efficacy supplements filed during fiscal year 2002 within 10 months of receipt.

4. Review and act on 90 percent of priority efficacy supplements file during fiscal year 2002 within 6 months of receipt.

5. Review and act on 90 percent of manufacturing supplements file during fiscal year 2002 within 6 months of receipt and review and act on 90 percent of manufacturing supplements requiring prior approval within 4 months of receipt.

6. Review and act on 90 percent of Class 1 resubmitted original applications filed during fiscal year 2002 within 2 months of receipt.

7. Review and act on 90 percent of Class 2 resubmitted original applications within 6 months of receipt.

These review goals are summarized in the following tables:

**ORIGINAL NDAs/BLAs/PLAs and EFFICACY SUPPLEMENTS:**

| SUBMISSION COHORT | STANDARD | PRIORITY |
|---|---|---|
| FY 98 | 90% IN 12 MO | 90% IN 6 MO |
| FY 99 | 30% IN 10 MO | 90% IN 6 MO |

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*   C-6

Copyright © National Academy of Sciences. All rights reserved.

| | 90% IN 12 MO | |
|---|---|---|
| FY 00 | 50% IN 10 MO<br><br>90% IN 12 MO | 90% IN 6 MO |
| FY 01 | 70% IN 10 MO<br><br>90% IN 12 MO | 90% IN 6 MO |
| FY 02 | 90% IN 10 MO | 90% IN 6 MO |

**MANUFACTURING SUPPLEMENTS:**

| SUBMISSION COHORT | MANUFACTURING SUPPLEMENTS THAT DO NOT REQUIRE PRIOR APPROVAL ("CHANGES BEING EFFECTED" OR "30-DAY SUPPLEMENTS | MANUFACTURING SUPPLEMENTS THAT DO REQUIRE PRIOR APPROVAL |
|---|---|---|
| FY 98 | 90% IN 6 MO | 90% IN 6 MO |
| FY 99 | 90% IN 6 MO | 30% IN 4 MO<br><br>90% IN 6 MO |
| FY 00 | 90% IN 6 MO | 50% IN 4 MO<br><br>90% IN 6 MO |
| FY 01 | 90% IN 6 MO | 70% IN 4 MO<br><br>90% IN 6 MO |
| FY 02 | 90% IN 6 MO | 90% IN 4 MO |

**RESUBMISSION OF ORIGINAL NDAs/BLAs/PLAs:**

| SUBMISSION COHORT | CLASS 1 | CLASS 2 |
|---|---|---|
| FY 98 | 30% IN 2 MO<br><br>90% IN 6 MO | 90% IN 6 MO |
| FY 99 | 50% IN 2 MO | 90% IN 6 MO |

***PREPUBLICATION COPY:  UNCORRECTED PROOFS***   C-7

Copyright © National Academy of Sciences. All rights reserved.

|  | 90% IN 4 MO |  |
|---|---|---|
| FY 00 | 70% IN 2 MO<br><br>90% IN 4 MO | 90% IN 6 MO |
| FY 01 | 90% IN 2 MO | 90% IN 6 MO |
| FY 02 | 90% IN 2 MO | 90% IN 6 MO |

## II. NEW MOLECULAR ENTITY (NME) PERFORMANCE GOALS

The performance goals for standard and priority original NMEs in each submission cohort will be the same as for all of the original NDAs (including NMEs) in each submission cohort but shall be reported separately.

For biological products, for purposes of this performance goal, all original BLAs/PLAs will be considered to be NMEs.

## III. MEETING MANAGEMENT GOALS

A. Responses to Meeting Requests:

1. Procedure: Within 14 calendar days of the Agency's receipt of a request from industry for a formal meeting (i.e., a scheduled face-to-face, teleconference, or videoconference) CBER and CDER should notify the requester in writing (letter or fax) of the date, time and the place for the meeting, as well as expected Center participants.

2. Performance Goal: FDA will provide this notification within 14 days for 70% of requests (based on request receipt cohort year) starting in FY99; 80% in FY00; and 90% in subsequent fiscal years.

B. Scheduling Meetings:

1. Procedure: The meeting date should reflect the next available date on which all applicable Center personnel are available to attend, consistent with the component's other business; however, the meeting should be scheduled consistent with the type of meeting requested. If the requested date for any of these types of meetings is greater than 30, 60, or 75 calendar days (as appropriate) from the date

**PREPUBLICATION COPY: UNCORRECTED PROOFS** C-8

Copyright © National Academy of Sciences. All rights reserved.

the request is received by the Agency, the meeting date should be within 14 calendar days of the date requested.

Type A Meetings should occur within 30 calendar days of the Agency receipt of the meeting request.

Type B Meetings should occur within 60 calendar days of the Agency receipt of the meeting request.

Type C Meetings should occur within 75 calendar days of the Agency receipt of the meeting request.

2. <u>Performance Goal</u>: 70% of meetings are held within the timeframe (based on cohort year of request) starting in FY99; 80% in FY00; and 90% in subsequent fiscal years.

C. Meeting Minutes:

1. <u>Procedure</u>: The Agency will prepare minutes which will be available to the sponsor 30 calendar days after the meeting. The minutes will clearly outline the important agreements, disagreements, issues for further discussion, and action items from the meeting in bulleted form and need not be in great detail.

2. <u>Performance Goal</u>: 70% of minutes are issued within 30 calendar days of date of meeting (based on cohort year of meeting) starting in FY99; 80% in FY00; and 90% in subsequent fiscal years.

D. Conditions:
   For a meeting to qualify for these performance goals:

1. A written request (letter or fax) should be submitted to the review division; and

2. The letter should provide:
   a. A brief statement of the purpose of the meeting;
   b. A listing of the specific objectives/outcomes the requester expects from the meeting;
   c. A proposed agenda, including estimated times needed for each agenda item;
   d. A listing of planned external attendees;
   e. A listing of requested participants/disciplines representative(s) from the Center;
   f. The appropriate time that supporting documentation (i.e., the "backgrounder") for the meeting will be sent to the Center (i.e., "x" weeks prior to the meeting, but should be receive by the Center at least 2 weeks in advance of the scheduled meeting for Type A or C meetings

**PREPUBLICATION COPY: UNCORRECTED PROOFS**   C-9

Copyright © National Academy of Sciences. All rights reserved.

and at least 1 month in advance of the scheduled meeting for Type B meetings); and

3. The Agency concurs that the meeting will serve a useful purpose (i.e., it is not premature or clearly unnecessary). However, requests for a "Type B" meeting will be honored except in the most unusual circumstances.

## IV. CLINICAL HOLDS

A. <u>Procedure</u>: The Center should respond to a sponsor's complete response to a clinical hold within 30 days of the Agency's receipt of the submission of such sponsor response.

B. <u>Performance Goal</u>: 75% of such responses are provided within 30 calendar days of the Agency's receipt of the sponsor's response starting FY98 (cohort of date of receipt) and 90% in subsequent fiscal years.

## V. MAJOR DISPUTE RESOLUTION

A. <u>Procedure</u>: For procedural or scientific matters involving the review of human drug applications and supplements (as defined in PDUFA) that cannot be resolved at the divisional level (including a request for reconsideration by the Division after reviewing any materials that are planned to be forwarded with an appeal to the next level), the response to appeals of decisions will occur within 30 calendar days of the Center's receipt of the written appeal.

B. <u>Performance Goal</u>: 70% of such answers are provided within 30 calendar days of the Center's receipt of the written appeal starting in FY99; 80% in FY00; and 90% in subsequent fiscal years.

C. <u>Conditions</u>:

1. Sponsors should first try to resolve the procedural or scientific issue at the Divisional level. If it cannot be resolved at that level, it should be appealed to the Office Director level (with a copy to the Division Director) and then, if necessary, to the Deputy Center of Center Director (with a copy to the Office Director).

2. Responses should be either verbal (followed by a written confirmation within 14 calendar days of the verbal notification) or written and should ordinarily be to either deny or grant the appeal.

**PREPUBLICATION COPY: UNCORRECTED PROOFS**   C-10

Copyright © National Academy of Sciences. All rights reserved.

3. If the decision is to deny the appeal, the response should include reasons for the denial and any actions the sponsor might take in order to persuade the Agency to reverse its decision.

4. In some cases, further data or further input from others might be needed to reach a decision on the appeal. In these cases, the "response" should be the plan for obtaining that information (e.g., requesting further information from the sponsor, scheduling a meeting with the sponsor, scheduling the issue for discussion at the next scheduled available advisory committee).

5. In these cases, once the required information is received by the Agency (including any advice from an advisory committee), the person to whom the appeal was made, again has 30 calendar days from the receipt of the required information in which to either deny or grant the appeal.

6. Again, if the decision is to deny the appeal, the response should include the reasons for the denial and any actions the sponsor might take in order to persuade the Agency to reverse its decision.

7. N.B. If the Agency decides to present the issue to an advisory committee and there are not 30 days before the next scheduled advisory committee, the issue will be presented at the following scheduled committee meeting in order to allow conformance with advisory committee administrative procedures.


## VI. SPECIAL PROTOCOL QUESTION ASSESSMENT AND AGREEMENT

A. Procedure: Upon specific request by a sponsor (including specific questions that the sponsor desires to be answered), the agency will evaluate certain protocols and issues to assess whether the design is adequate to meet scientific and regulatory requirements identified by the sponsor.

1. The sponsor should submit a limited number of specific questions about the protocol design and the scientific and regulatory requirements for which the sponsor seeks agreement (e.g., is the dose range in the carcinogenicity study adequate, considering the intended clinical dosage; are the clinical endpoints adequate to support a specific efficacy claim).

2. Within 45 days of Agency receipt of the protocol and specific questions, the Agency will provide a written response to the sponsor that includes a succinct assessment of the protocol and answers to the questions posed by the sponsor. If the agency does not agree that the protocol design, execution plans, and data analyses are adequate to achieve the goals of the sponsor, the reasons for the disagreement will be explained in the response.


**PREPUBLICATION COPY:  UNCORRECTED PROOFS**   C-11

Copyright © National Academy of Sciences. All rights reserved.

3. Protocols that qualify for this program include: carcinogenicity protocols, stability protocols, and Phase 3 protocols for clinical trials that will form the primary basis of an efficacy claim. (For such Phase 3 protocols to qualify for this comprehensive protocol assessment, the sponsor must have had an end of Phase 2/pre-Phase 3 meeting with the review division so that the division is aware of the developmental context in which the protocol is being reviewed and the questions being answered).

4. N.B. For products that will be using Subpart E or Subpart H development schemes, the Phase 3 protocols mentioned in this paragraph should be construed to mean those protocols for trials that will form the primary basis of an efficacy claim no matter what phase of drug development in which they happen to be conducted.

5. If a protocol is reviewed under the process outlined above and agreement with the Agency is reached on design, execution, and analyses and if the results of the trial conducted under the protocol substantiate the hypothesis of the protocol, the Agency agrees that the data from the protocol can be used as part of the primary basis for approval of the product. The fundamental agreement here is that having agreed to the design, execution, and analyses proposed in protocols reviewed under this process, the Agency will not later alter its perspective on the issues of design, execution or analyses unless public health concerns unrecognized at the time of protocol assessment under this process are evident.

B. Performance Goal: 60% of special protocols assessments and agreement requests completed and returned to sponsor within timeframes (based on cohort year of request) starting in FY99; 70% in FY00; 80% in FY01; and 90% in FY02.

## VI. ELECTRONIC APPLICATIONS AND SUBMISSIONS

The Agency shall develop and update its information management infrastructure to allow, by fiscal year 2002, the paperless receipt and processing of INDs and human drug applications as defined in PDUFA, and related submissions.

## VII. ADDITIONAL PROCEDURES

A. Simplification of Action Letters:
To simplify regulatory procedures, the CBER and the CDER intend to amend their regulations and processes to provide for the issuance of either an "approval" (AP) or a

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**   C-12

Copyright © National Academy of Sciences. All rights reserved.

"complete response" (CR) action letter at the completion of a review cycle for a marketing application.

B.  Timing of Sponsor Notification of Deficiencies in Applications:
To help expedite the development of drug and biologic products, CBER and CDER intend to submit deficiencies to sponsors in the form of an "information request" (IR) letter when each discipline has finished its initial review of its section of the pending application.

## IX. DEFINITIONS AND EXPLANATION OF TERMS

A.  The term "review and act on" is understood to mean the issuance of a complete action letter after the complete review of a filed complete application. The action letter, if it is not an approval, will set forth in detail the specific deficiencies and, where appropriate, the actions necessary to place the application in condition for approval.

B.  A major amendment to an original application submitted within three months of the goal date extends the goal date by three months.

C.  A resubmitted original application is a complete response to an action letter addressing all identified deficiencies.

D.  Class1 resubmitted applications are applications resubmitted after a complete response letter (or a not approvable or approvable letter) that include the following items only (or combination of these items):

   1.  Final printed labeling
   2.  Draft labeling
   3.  Safety updates submitted in the same format, including tabulations, as the original safety submission with new data and changes highlighted (except when large amounts of new information including important new adverse experiences not previously reported with the product are presented in the resubmission)
   4.  Stability updates to support provisional or final dating periods
   5.  Commitments to perform Phase 4 studies, including proposals for such studies
   6.  Assay validation data
   7.  Final release testing on the last 1-2 lots used to support approval
   8.  A minor reanalysis of data previously submitted to the application (determined by the agency as fitting the Class 1 category)
   9.  Other minor clarifying information (determined by the Agency as fitting the Class 1 category)
   10.  Other specific items may be added later as the Agency gains experience with the scheme and will be communicated via guidance documents to industry.

E.  Class 2 resubmissions that include any other items, including any item that would require presentation to an advisory committee.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**   C-13

Copyright © National Academy of Sciences. All rights reserved.

F.  A Type A Meeting is a meeting which is necessary for an otherwise stalled drug development program to proceed (a "critical path" meeting).

G.  A Type B Meeting is a 1) pre-IND, 2) end of Phase 1(for Subpart E or Subpart H or similar products) or end of Phase 2/pre-Phase 3, or 3) a pre-NDA/PLA/BLA meeting. Each requestor should usually only request 1 each of these Type B meetings for each potential application (NDA/PLA/BLA) (or combination of closely related products, i.e., same active ingredient but different dosage forms being developed concurrently).

H.  A Type C Meeting is any other type of meeting.

I.  The performance goals and procedures also apply to original applications and supplements for human drugs initially marketed on an over-the-counter (OTC) basis through an NDA or switched from prescription to OTC status through an NDA or supplement.

Copyright © National Academy of Sciences. All rights reserved.

# ENCLOSURE
# PDUFA REAUTHORIZATION PERFORMANCE GOALS AND PROCEDURES

The performance goals and procedures of the FDA Center for Drug Evaluation and Research (CDER) and the Center for Biologics Evaluation and Research (CDER), as agreed to under the reauthorization of the prescription drug user fee program in the [cite statute] are summarized as follows:

## I. REVIEW PERFORMANCE GOALS – FISCAL YEAR 2003 THROUGH 2007

**A. NDA/BLA Submissions and Resubmissions:**
   **Review and act on 90 percent of standard original NDA and BLA submissions filed during fiscal year within 10 months of receipt.**

1. Review and act on 90 percent of priority original NDA and BLA submissions filed during fiscal year within 6 months of receipt.
2. Review and act on 90 percent of Class 1 resubmitted original applications filed during fiscal year within 2 months of receipt.
3. Review and act on 90 percent of Class 2 resubmitted original applications filed during fiscal year within 6 months of receipt.

**Original Efficacy Supplements:**

1. Review and act on 90 percent of standard efficacy supplements filed during fiscal year within 10 months of receipt.
2. Review and act on 90 percent of priority efficacy supplements filed during fiscal year within 6 months of receipt.

**Resubmitted Efficacy Supplements:**

**Fiscal Year 2003:**
1. Review and act on 90 percent of Class 1 resubmitted efficacy supplements filed during fiscal year 2003 within 6 months of receipt and review and act on 30 percent within 2 months of receipt.
2. Review and act on 90 percent of Class 2 resubmitted efficacy supplements filed during fiscal year 2003 within 6 months of receipt.

**Fiscal Year 2004:**
1. Review and act on 90 percent of Class 1 resubmitted efficacy supplements filed during fiscal year 2004 within 4 months of receipt and review and act on 50 percent within 2 months of receipt.
2. Review and act on 90 percent of Class 2 resubmitted original applications filed during fiscal year 2004 within 6 months of receipt.

**Fiscal Year 2005:**
1. Review and act on 90 percent of Class 1 resubmitted efficacy supplements filed during fiscal year 2005 within 4 months of receipt and review and act on 50 percent within 2 months of receipt.

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*   C-15

Copyright © National Academy of Sciences. All rights reserved.

   2.  Review and act on 90 percent of Class 2 resubmitted efficacy supplements within 6 months of receipt.

**Fiscal Year 2006**:
1.  Review and act on 90 percent of Class 1 resubmitted efficacy supplements filed during fiscal year 2006 within 4 months of receipt and review and act on 80 percent within 2 months of receipt.
2.  Review and act on 90 percent of Class 2 resubmitted efficacy supplements within 6 months of receipt.

**Fiscal Year 2007**:
1.  Review and act on 90 percent of Class 1 resubmitted efficacy supplements filed during fiscal year 2007 within 2 months of receipt.
2.  Review and act on 90 percent of Class 2 resubmitted efficacy supplements within 6 months of receipt.

**Original Manufacturing Supplements**:
1. Review and act on 90 percent of manufacturing supplements filed during fiscal year within 6 months of receipt and review and act on 90 percent of manufacturing supplements requiring prior approval within 4 months of receipt.

These review goals are summarized in the following tables:

**ORIGINAL AND RESUBMITTED NDAs/BLAs:**

| SUBMISSION COHORT | STANDARD | PRIORITY |
|---|---|---|
| Original Applications | 90% IN 10 MO | 90% IN 6 MO |
| Class 1 Resubmissions | 90% IN 2 MO | 90% IN 2 MO |
| Class 2 Resubmissions | 90% IN 6 MO | 90% IN 6 MO |

**ORIGINAL AND RESUBMITTED EFFICACY SUPPLEMENTS:**

| SUBMISSION COHORT | STANDARD | PRIORITY |
|---|---|---|
| Original Efficacy Supplements | 90% IN 10 MO | 90% IN 6 MO |

**RESUBMITTED EFFICACY SUPPLEMENTS:**

| SUBMISSION COHORT | CLASS 1 | CLASS 2 |
|---|---|---|
| FY 2003 | 90% IN 6 MO | 90% IN 6 MO |

*PREPUBLICATION COPY: UNCORRECTED PROOFS*   C-16

Copyright © National Academy of Sciences. All rights reserved.

|  | 30% IN 2 MO |  |
| --- | --- | --- |
| FY 2004 | 90% IN 4 MO<br><br>50% IN 2 MO | 90% IN 6 MO |
| FY 2005 | 90% IN 4 MO<br><br>70% IN 2 MO | 90% IN 6 MO |
| FY 2006 | 90% IN 4 MO<br><br>80% IN 2 MO | 90% IN 6 MO |
| FY 2007 | 90% IN 2 MO | 90% IN 6 MO |

**MANUFACTURING SUPPLEMENTS:**

| SUBMISSION COHORT | MANUFACTURING SUPPLENTS NO PRIOR APPROVAL ("CHANGES BEING EFFECTED" OR "30-DAY SUPPLEMENTS") | MANUFACTURING SUPPLEMENTS THAT DO REQUIRE PRIOR APPROVAL |
| --- | --- | --- |
| FY 2003 - 2007 | 90% IN 6 MO | 90% IN 4 MO |

## II. NEW MOLECULAR ENTIT (NME) PERFORMANCE GOALS

A. The performance goals for standard and priority original NMEs in each submission cohort will be the same as for all of the original NDAs (including NMEs) in each submission cohort but shall be reported separately.

B. For biological products, for purposes of this performance goal, all original BLAs will be considered to be NMEs.

## III. MEETING MANAGEMENT GOALS

**A. Responses to Meeting Requests**

1. **Procedure**: Within 14 calendar days of the Agency's receipt of a request from industry for a formal meeting (i.e., a scheduled face-to-face, teleconference, or videoconference) CBER and CDER should notify the requester in writing (letter or fax) of the date, time, and place for the meeting, as well as expected Center participants.

2. **Performance Goal**: FDA will provide notification within 14 days for 90% in FY 2003 – 2007.

**B. Scheduling Meetings**

1. Procedure: The meeting date should reflect the next available date on which all applicable Center personnel are available to attend, consistent with the component's other business; however, the meeting should be scheduled consistent with the type of meeting requested. If the requested date for any of these types of meetings is greater than 30, 60, or 75 calendar days (as appropriate) from the

*PREPUBLICATION COPY: UNCORRECTED PROOFS*   C-17

Copyright © National Academy of Sciences. All rights reserved.

date the request is received by the Agency, the meeting date should be within 14 calendar days of the date requested.

Type A Meetings should occur within 30 calendar days of the Agency receipt of the meeting request.

Type B Meetings should occur within 60 calendar days of the Agency receipt of the meeting request.

Type C Meetings should occur within 75 calendar days of the Agency receipt of the meeting request.

2.  Performance goal: 90% of meetings are held within the timeframe (based on cohort year of request) from FY 03 to FY 07.

## C. Meeting Minutes

1.  Procedure: The Agency will prepare minutes which will be available to the sponsor 30 calendar days after the meeting. The minutes will clearly outline the important agreements, disagreements, issues for further discussion, and action items from the meeting in bulleted form and need not be in great detail.
2.  Performance goal: 90% of minutes are issued within 30 calendar days of date of meeting (based on cohort year of meeting) in FY03 to FY07.

## D. Conditions

For a meeting to qualify for these performance goals:

1.  A written request (letter or fax) should be submitted to the review division; and
2.  The letter should provide:

    a.  A brief statement of the purpose of the meeting;
    b.  A listing of the specific objectives/outcomes the requester expects from the meeting;
    c.  A proposed agenda, including estimated times needed for each agenda item;
    d.  A listing of planned external attendees;
    e.  A listing of requested participants/disciplines representative(s) from the Center;
    f.  The approximate time that supporting documentation (i.e., the "backgrounder") for the meeting will be sent to the Center (i.e., "x" weeks prior to the meeting, but should be received by the Center at least 2 weeks in advance of the scheduled meeting for Type A meetings and at least 1 month in advance of the scheduled meeting for Type B and Type C meetings); and
    g.  The Agency concurs that the meeting will serve a useful purpose (i.e., it is not premature or clearly unnecessary). However, requests for a "Type B" meeting will be honored except in the most unusual circumstances.

## IV. CLINICAL HOLDS

A. **Procedure**: The Center should respond to a sponsor's complete response to a clinical hold within 30 days of the Agency's receipt of the submission of such sponsor response.

B. **Performance Goal**: 90% of such responses are provided within 30 calendar days of the Agency's receipt of the sponsor's response in FY03 to FY07 (cohort of date of receipt).

Copyright © National Academy of Sciences. All rights reserved.

## V. MAJOR DISPUTE RESOLUION

A. **Procedure**: The Center should respond to a sponsor's complete response to a clinical hold within 30 days of the Agency's receipt of the submission of such sponsor response.

B. **Performance Goal**: 90% of such answers are provided within 30 calendar days of the Center's receipt of the written appeal in FY03 to FY07.

C. **Conditions**:

1. Sponsors should first try to resolve the procedural or scientific issue at the Division level. If it cannot be resolved at that level, it should be appealed to the Office Director level (with a copy to the Division Director) and then, if necessary, to the Deputy Center Director

2. Responses should be either verbal (followed by a written confirmation within 14 calendar days of the verbal notification) or written and should

3. If the decision is to deny the appeal, the response should include reasons for the denial and any actions the sponsor might take in order

4. In some cases, further data or further input from others might be needed to reach a decision on the appeal. In these cases, the "response" should be the plan for obtaining that information (e.g., requesting further information from the sponsor, scheduling a meeting with the sponsor, scheduling the issue for discussion at the next scheduled available advisory committee).

5. In these cases, once the required information is received by the Agency (including any advice from an advisory committee), the person to whom the appeal was made, again has 30 calendar days from the receipt of the required information in which to either deny or grant the appeal.

6. Again, if the decision is to deny the appeal, the response should include the reasons for the denial and any actions the sponsor might take in order to persuade the Agency to reverse its decision.

7. N.B. If the Agency decides to present the issue to an advisory committee and there are not 30 days before the next scheduled advisory committee, the issue will be presented at the following scheduled committee meeting in order to allow conformance with advisory committee administrative procedures.

## VI. SPECIAL PROTOCOL QUESTION ASSESSMENT AND AGREEMENT

A. **Procedure**: Upon specific request by a sponsor (including specific questions that the sponsor desires to be answered), the agency will evaluate certain protocols and issues to assess whether the design is adequate to meet scientific and regulatory requirements identified by the sponsor.

1. The sponsor should submit a limited number of specific questions about the protocol design and scientific and regulatory requirements for which the sponsor seeks agreement (e.g., is the dose range in the carcinogenicity study adequate, considering the intended clinical dosage; are the clinical endpoints adequate to support a specific efficacy claim).

2. Within 45 days of Agency receipt of the protocol and specific questions, the Agency will provide a written response to the sponsor that includes a succinct assessment of the protocol

***PREPUBLICATION COPY:  UNCORRECTED PROOFS***   C-19

Copyright © National Academy of Sciences. All rights reserved.

and answers to the questions posed by the sponsor. If the agency does not agree that the protocol design, execution plans, and data analyses are adequate to achieve the goals of the sponsor, the reasons for the disagreement will be explained in the response.

3. Protocols that qualify for this program include: carcinogenicity protocols, stability protocols, and Phase 3 protocols for clinical trials that will form the primary basis of an efficacy claim. (For such Phase 3 protocols to qualify for this comprehensive protocol assessment, the sponsor must have had an end of Phase 2/pre-Phase 3 meeting with the review division so that the division is aware of the developmental context in which the protocol is being reviewed and the questions being answered.)

4. N.B. For products that will be using Subpart E or Subpart H development schemes, the Phase 3 protocols mentioned in this paragraph should be construed to mean those protocols for trials that will form the primary basis of an efficacy claim no matter what phase of drug development in which they happen to be conducted.

5. If a protocol is reviewed under the process outlined above and agreement with the Agency is reached on design, execution, and analyses and if the results of the trial conducted under the protocol substantiate the hypothesis of the protocol, the Agency agrees that the data from the protocol can be used as part of the primary basis for approval of the product. The fundamental agreement here is that having agreed to the design, execution, and analyses proposed in protocols reviewed under this process, the Agency will not later alter its perspective on the issues of design, execution, or analyses unless public health concerns unrecognized at the time of protocol assessment under this process are evident.

B. **Performance goal**: 90% of special protocols assessments and agreement requests completed and returned to sponsor within timeframes (based on cohort year of request) from FY 03 to FY 07.

## VII. CONTINOUS MARKETING APPLICATION

To test whether providing early review of selected applications and additional feedback and advice to sponsors during drug development for selected products can further shorten drug development and review times, FDA agrees to conduct the following two pilot programs:

A. **Pilot 1 - Discipline Review Letters for Pre-Submitted "Reviewable Units" of NDAs/BLAs**

1. This pilot applies to drugs and biologics that have been designated to be Fast Track drugs or biologics, pursuant to section 112 of the FDA Modernization Act (21 U.S.C. 506), have been the subject of an End-of-Phase 2 and/or a Pre-NDA/BLA meeting, and have demonstrated significant promise as a therapeutic advance in clinical trials.

2. For drugs and biologics that meet these criteria, FDA may enter into an agreement with the sponsor to accept pre-submission of one or more "reviewable units"of the application in advance of the submission of the complete NDA/BLA.

3. If following an initial review FDA finds a "reviewable unit" to be substantially complete for review (i.e., after a "filing review" similar to that performed on an NDA/BLA), FDA will initiate a review clock for the complete review of the "reviewable unit" of the NDA/BLA. The review clock would start from the date of receipt of the "reviewable unit."

4. To be considered fileable for review under paragraph 3, a "reviewable unit" must be substantially complete when submitted to FDA. Once a "reviewable unit" is "filed" by FDA, except as provided in paragraph 5 below, only minor information amendments submitted in response to FDA inquiries or requests and routine stability and safety updates will be considered during the review cycle.

Copyright © National Academy of Sciences. All rights reserved.

5. Major amendments to the "reviewable unit" are strongly discouraged. However, in rare cases, and with prior agreement, FDA may accept and consider for review a major amendment to a "reviewable unit." To accommodate these rare cases, a major amendment to a "reviewable unit" submitted within the last three months of a 6-month review cycle may, at FDA's discretion, trigger a 3-month extension of the review clock for the "reviewable unit" in question. In no case, however, would a major amendment be accepted for review and the review clock for the "reviewable unit" extended if the extended review clock for the "reviewable unit" exceeded the review clock for the complete NDA/BLA. (See paragraph 10 below).

6. After completion of review of the "reviewable unit" of the NDA/BLA by the appropriate discipline review team, FDA will provide written feedback to the sponsor of the review findings in the form of a discipline review letter (DRL).

7. The DRL will provide feedback on the individual "reviewable unit" from the discipline review team, and not final, definitive decisions relevant to the NDA/BLA.

8. If an application is to be presented to an advisory committee, the final DRL on the "reviewable unit" may be deferred pending completion of the advisory committee meeting and internal review and consideration of the advice received.

9. The following performance goals will apply to review of "reviewable units" of an NDA/BLA for Fast Track drugs and biologics that are submitted in advance of the complete NDA/BLA under this pilot program: a. Discipline review team review of a "reviewable unit" for a Fast Track drug or biologic will be completed and a DRL issued within 6 months of the date of the submission for 30% of "reviewable units" submitted in FY04; b. Discipline review team review of a "reviewable unit" for a Fast Track drug or biologic will be completed and a DRL issued within 6 months of the date of the submission for 50% of "reviewable units" submitted in FY05; c. Discipline review team review of a "reviewable unit" for a Fast Track drug or biologic will be completed and a DRL issued within 6 months of the date of the submission for 70% "reviewable units" submitted in FY06, and d. Discipline review team review of a "reviewable unit: for a Fast Track drug or biologic will be completed and a DRL letter issued within 6 months of the date of the submission for 90% of "reviewable units" submitted in FY07.

10. If the complete NDA/BLA is submitted to FDA while a 6-month review clock for a "reviewable unit" is still open, FDA will adhere to the timelines and performance goals for both the "reviewable unit" and the complete NDA/BLA. For example, if a "reviewable unit" is submitted in January and the complete NDA/BLA is submitted in April, the review goal for the "reviewable unit" will be July and the review goal for the complete NDA/BLA will be October.

11. Any resubmission or amendment of a "reviewable unit" submitted by the sponsor in response to an FDA discipline review letter will not be subject to the review timelines and performance goals proposed above. FDA review of such resubmissions and amendments in advance of submission of the complete NDA/BLA will occur only as resources allow.

12. This pilot program is limited to the initial submission of an NDA/BLA and is not applicable to a resubmission in response to an FDA complete response letter following the complete review of an NDA/BLA.

13. Guidance: FDA will develop and issue a joint CDER/CBER guidance on how it intends to implement this pilot program by September 30, 2003. The guidance will describe the principles, processes, and procedures that will be followed during the pilot program. The guidance also will define what subsections of a complete technical section would be considered an acceptable "reviewable unit" for pre-submission and review and how many individual "reviewable units" from one or more technical sections of an NDA/BLA can be pre-submitted and reviewed subject to separate review clocks under this program at any given

Copyright © National Academy of Sciences. All rights reserved.

time. The pilot program will be implemented in FY 2004, after the final guidance is issued and will continue through FY 2007.

## B. Pilot 2 - Frequent Scientific Feedback and Interactions During Drug Development

1. This pilot applies to drugs and biologics that have been designated to be Fast Track drugs or biologics pursuant to section 112 of the FDA Modernization Act (21 U.S.C. 508), that are intended to treat serious and/or life-threatening diseases, and that have been the subject of an end-of-phase 1 meeting. The pilot program is limited to one Fast Track product in each CDER and CBER review division over the course of the pilot program.

2. For drugs and biologics that meet these criteria, FDA may enter into an agreement with the sponsor to initiate a formal program of frequent scientific feedback and interactions regarding the drug development program. The feedback and interactions may take the form of regular meetings between the division and the sponsor at appropriate points during the development process, written feedback from the division following review of the sponsor's drug development plan, written feedback from the division following review of important new protocols, and written feedback from the division following review of study summaries or complete study reports submitted by the sponsor.

3. Decisions regarding what study reports would be reviewed as summaries and what study reports would be reviewed as complete study reports under this pilot program would be made in advance, following discussions between the division and the sponsor of the proposed drug development program. In making these decisions, the review division will consider the importance of the study to the drug development program, the nature of the study, and the potential value of limited (i.e., based on summaries) versus more thorough division review (i.e., based on complete study reports).

4. Guidance: FDA will develop and issue a joint CDER/CBER guidance on how it intends to implement this pilot program by September 30, 2003. The guidance will describe the principles, processes, and procedures that will be followed during the pilot program. The pilot program will be implemented in FY 2004, after the final guidance is issued and will continue through FY 2007. The full (unredacted) study report will be provided to the FDA Commissioner and a version of the study report redacted to remove confidential commercial information or other information exempt from disclosure, will be made available to the public.

## C. Evaluation of the Pilot Programs

1. In FY 2004, FDA will contract with an outside expert consultant(s) to evaluate both pilot programs.

2. The consultant(s) will develop an evaluation study design that identifies key questions, data requirements, and a data collection plan, and conduct a comprehensive study of the pilot programs to help assess the value, costs, and impact of these programs to the drug development and review process. A preliminary report will be generated by the consultant by the end of FY06.

Copyright © National Academy of Sciences. All rights reserved.

## VIII. PRE- AND PERI-NDA/BLA RISK MANAGEMENT PLAN ACTIVITIES

a. **Submission and Review of pre-NDA/BLA meeting packages:**

A pre-NDA/BLA meeting package may include a summary of relevant safety information and industry questions/discussion points regarding proposed risk management plans and discussion of the need for any post-approval risk management studies. The elements of the proposal may include:

1. assessment of clinical trial limitations and disease epidemiology
2. assessment of risk management tools to be used to address known and potential risks
3. suggestions for phase 4 epidemiology studies, if such studies are warranted
4. proposals for targeted post-approval surveillance (this would include attempts to quantify background rates of risks of concern and thresholds for actions) The pre-NDA/BLA meeting package will be reviewed and discussed by the review divisions as well as the appropriate safety group in CDER or CBER.

b. **Pre-NDA/BLA meeting with industry:** This meeting may include a discussion of the preliminary risk management plans and proposed observational studies, if warranted, as outlined above. Participants in this meeting will include product safety experts from the respective Center. The intent of these discussions will be for FDA to get a better understanding of the safety issues associated with the particular drug/biologic and the proposed risk management plans, and to provide industry with feedback on these proposals so that they can be included in the NDA/BLA submission. It is the intent of this proposal that such risk management plans and the discussions around them would focus on specific issues of concern, either based on already identified safety issues or reasonable potential focused issues of concern.

c. **Review of NDA/BLA:** The NDA/BLA submitted by industry may include the proposed risk management tools and plans, and protocols for observational studies, based on the discussions that began with the pre-NDA/BLA meeting, as described above, and may be amended as appropriate to further refine the proposal. These amendments would not normally be considered major amendments. Both the review division and the appropriate safety group will be involved in the review of the application and will try to communicate comments regarding the risk management plan as early in the review process as practicable, in the form of a discipline review letter. Items to be included in the risk management plan to assure FDA of the safety and efficacy of the drug or biologic are to be addressed prior to approval of an application. The risk management plan may contain additional items that can be used to help refine the risks and actions (e.g., background rates and observational studies) and these items may be further defined and completed after approval in accordance with time frames agreed upon at the time of product approval.

d. **Peri-Approval Submission of Observational Study Reports and Periodic Safety Update Reports (PSURs):** For NDA/BLA applications, and supplements containing clinical data, submitted on or after October 1, 2002, FDA may use user fees to review an applicant's implementation of the risk management plan for a period of up to two years post-approval for most products and for a period of up to three years for products that require risk management beyond standard labeling (e.g., a black box or bolded warning, medication guide, restricted distribution). This period is defined for purposes of the user fee goals as the peri-approval period. Issues that arise during implementation of the risk management plan (e.g., whether the plan is effective) will be reported to FDA either in the form of a

Copyright © National Academy of Sciences. All rights reserved.

PSUR or in a periodic or annual report (21 CFR 314.80 and 314.81) (ICH Guidance E2C, Clinical Safety Data Management: Periodic Safety Update Reports for Marketed Drugs) and addressed during the peri-approval period through discussions between the applicant and FDA. PSURs may be submitted and reviewed semi-annually for the first two or three years post approval to allow adequate time for implementation of risk management plans.

For drugs approved under PDUFA III, FDA may use user fees to independently evaluate product utilization for drugs with important safety concerns, using drug utilization databases, for the first three years post approval. The purpose of such utilization evaluations is to evaluate whether these products are being used in a safe manner and to work pro-actively with companies during the peri-approval period to accomplish this. FDA will allocate $70,900,000 in user fees over 5 years to the activities covered in this section. FDA will track the specific amounts of user fees spent on these activities and will include in its annual report to Congress an accounting of this spending.

e. **Guidance Document Development:** By the end of Fiscal Year 04, CDER and CBER will jointly develop final guidance documents that address good risk assessment, risk management, and pharmacovigilance practices.


# IX. INDEPENDENT CONSULTANTS FOR BIOTECHNOLOGY CLINICAL TRIAL PROTOCOLS

A. **Engagement of Expert Consultant:** During the development period for a biotechnology product, a sponsor may request that FDA engage an independent expert consultant, selected by FDA, to participate in the Agency's review of the protocol for the clinical studies that are expected to serve as the primary basis for a claim.

B. **Conditions**

   1. The product must be a biotechnology product (for example, DNA plasmid products, synthetic peptides of fewer than 40 amino acids, monoclonal antibodies for in vivo use, and recombinant DNA-derived products) that represents a significant advance in the treatment, diagnosis or prevention of a disease or condition, or have the potential to address an unmet medical need;

   2. The product may not have been the subject of a previously granted request under this program;

   3. The sponsor must submit a written request for the use of an independent consultant, describing the reasons why the consultant should be engaged (e.g., as a result of preliminary discussions with the Agency the sponsor expects substantial disagreement over the proposed protocol); and

   4. The request must be designated as a "Request for Appointment of Expert Consultant" and submitted in conjunction with a formal meeting request (for example, during the end-of-Phase II meeting or a Type A, meeting).

C. **Recommendations for Consultants:** The sponsor may submit a list of recommended consultants for consideration by the Agency. The selected consultant will either be a special government employee, or will be retained by FDA under contract. The consultant's role will be advisory to FDA and FDA will remain responsible for making scientific and regulatory decisions regarding the clinical protocol in question.

D. **Denial of Requests**: FDA will grant the request unless the Agency determines that engagement of an expert consultant would not serve a useful purpose (for example it is clearly premature). FDA will engage the services of an independent consultant, of FDA's choosing, as soon as practicable. If the

Copyright © National Academy of Sciences. All rights reserved.

Agency denies the request, it will provide a written rationale to the requester within 14 days of receipt.

E. **Performance Goal Change:** Due to the time required to select and screen the consultant for potential conflicts of interest and to allow the consultant sufficient time to review the scientific issues involved, the performance goals for scheduling the formal meeting (see section III) may be extended for an additional sixty (60) days.

F. **Evaluation:** During FY 2006, FDA will conduct a study to evaluate the costs and benefits of this program for both sponsors and the Agency.

## X. FIRST CYCLE REVIEW PERFORMANCE PROPOSAL

A. **Notification of Issues Identified during the Filing Review**

1. Performance Goal: For original NDA/BLA applications and efficacy supplements, FDA will report substantive deficiencies identified in the initial filing review to the sponsor by letter, telephone conference, facsimile, secure e-mail, or other expedient means.
2. The timeline for such communication will be within 14 calendar days after the 60 day filing date.
3. If no deficiencies were noted, FDA will so notify the sponsor.
4. FDA's filing review represents a preliminary review of the application and is not indicative of deficiencies that may be identified later in the review cycle.
5. FDA will provide the sponsor a notification of deficiencies prior to the goal date for 50% of applications in FY 2003, 70% in FY 2004, and 90% in FY 2005, FY2006, and FY 2007.

B. **Good Review Management Principles Guidance:** FDA will develop a joint CDER-CBER guidance on Good Review Management Principles (GRMPs), and publish final guidance by the end of FY 2003. The Good Review Management Principles will address, among other elements, the following:

1. The filing review process, including communication of issues identified during the filing review that may affect approval of the application.
2. Ongoing communication with the sponsor during the review process (in accordance with 21 CFR 314.102(a)), including emphasis on early communication of easily correctable deficiencies (21 CFR 314.102(b)).
3. Appropriate use of Information Request and Discipline Review letters, as well as other informal methods of communication (phone, fax, e-mail).
4. Anticipating/planning for a potential Advisory Committee meeting.
5. Completing the primary reviews - allowing time for secondary and tertiary reviews prior to the action goal date.
6. Labeling feedback - planning to provide labeling comments and scheduling time for teleconferences with the sponsor in advance of the action goal date

C. **Training**: FDA will develop and implement a program for training all review personnel, including current employees as well as future new hires, on the good review management principles.

D. **Evaluation**: FDA will retain an independent expert consultant to undertake a study to evaluate issues associated with the conduct of first cycle reviews.

1. The study will be designed to assess current performance and changes that occur after the guidance on GRMPs is published. The study will include collection of various types of

Copyright © National Academy of Sciences. All rights reserved.

tracking data regarding actions that occur during the first cycle review, both from an FDA and industry perspective (e.g., IR letters, DR letters, draft labeling comments from FDA to the sponsor, sponsor response to FDA requests for information).

2. The study will also include an assessment of the first cycle review history of all NDAs for NMEs and all BLAs during PDUFA 3. This assessment will include a more detailed evaluation of the events that occurred during the review process with a focus on identifying best practices by FDA and industry that facilitated the review process.

3. The study will also include an assessment of the effectiveness of the training program implemented by FDA.

4. FDA will develop a statement of work for the study and will provide the public an opportunity to review and comment on the statement of work before the study is implemented. The consultant will prepare annual reports of the findings of the study and a final study report at the end of the 5-year study period. The full (un-redacted) study reports will be provided to the FDA Commissioner and a version of the study reports redacted to remove confidential commercial information or other information exempt from disclosure, will be made available to the public.

5. Development and implementation of the study of first cycle review performance will be a component of the Performance Management Plan conducted out of the Office of the Commissioner (see section X).

6. Administrative oversight of the study will rest in the Office of the Commissioner. The Office of the Commissioner will convene a joint CDER/CBER review panel on a quarterly basis as a mechanism for ongoing assessment of the application of Good Review Management Principles to actions taken on original NDA/BLA applications.

## XI. IMPROVING FDA PERFORMANCE MANAGEMENT

A. **Performance Fund:** The Commissioner will use at least $7 million over five years of PDUFA III funds for initiatives targeted to improve the drug review process.

1. Funds would be made available by the Commissioner to the Centers based both on identified areas of greatest need for process improvements as well as on achievement of previously identified objectives.

2. Funds also could be used by the FDA Commissioner to diagnose why objectives are not being met, or to examine areas of concern.

3. The studies conducted under this initiative would be intended to foster:

   a. Development of programs to improve access to internal and external expertise
   b. Reviewer development programs, particularly as they relate to drug review processes,
   c. Advancing science and use of information management tools
   d. Improving both inter- and intra-Center consistency, efficiency, and effectiveness
   e. Improved reporting of management objectives
   f. Increased accountability for use of user fee revenues
   g. Focused investments on improvements in the process of drug review
   h. Improved communication between the FDA and industry

4. In deciding how to spend these funds, the Commissioner would take into consideration how to achieve greater harmonization of capabilities between CDER and CBER.

Copyright © National Academy of Sciences. All rights reserved.

B. **First Two Initiatives:** Two specific initiatives will begin early in PDUFA III and supported from performance management initiative funds 1) evaluation of first cycle review performance, and 2) process review and analysis within the two centers.

1. First Cycle Review Performance See the First Cycle Review Performance (See section X. for details on this proposed study).

2. Process Review and Analysis

   a. In FY 2003, FDA will contract with an outside consultant to conduct a comprehensive process review and analysis within CDER and CBER. This review will involve a thorough analysis of information utilization, review management, and activity cost.

   b. The review is expected to take from 18-24 months, although its duration will depend on the type and amount of complexity of the issues uncovered during the review.

   c. The outcome of this review will be a thorough documentation of the process, a re-map of the process indicating where efficiencies can be gained, activity-based project accounting, optimal use of review tools, and a suggested path for implementing the recommendations.

   d. FDA would anticipate delivery of a report of the consultant's findings and recommendations in FY 2004-2005. The agency would consider these recommendations in planning any redesign or process reengineering to enhance performance.

3. Further Studies

In subsequent years of PDUFA III, FDA may develop other study plans that will focus on further analysis of program design, performance features and costs, to identify potential avenues for further enhancement. Future studies would be likely to include a comprehensive re-analysis of program costs following the implementation of new PDUFA III review initiatives and the adoption of any process changes following the recommendations of the year 1 and 2 studies.

# XII. ELECTRONIC APPLICATIONS AND SUBMISSIONS - GOALS

a. The Agency will centralize the accountability and funding for all PDUFA Information Technology initiatives/activities for CBER, CDER, ORA and OC under the leadership of the FDA CIO. The July 2001 HHS IT 5-year plan states that infrastructure consolidation across the department should be achieved, including standardization. The Agency CIO will be responsible for ensuring that all PDUFA III IT infrastructure and IT investments support the Agency's common IT goals, fit into a common computing environment, and follow good IT management practices.

b. The Agency CIO will chair quarterly briefings on PDUFA IT issues to periodically review and evaluate the progress of IT initiatives against project milestones, discuss alternatives when projects are not progressing, and review proposals for new initiatives. On an annual basis, an assessment will be conducted of progress against PDUFA III IT goals and, established program milestones, including appropriate changes to plans. A documented summary of the assessment will be drafted and forwarded to the Commissioner A version of the study report redacted to remove confidential commercial or security information, or other information exempt from disclosure, will be made

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*  C-27

Copyright © National Academy of Sciences. All rights reserved.

available to the public. The project milestones, assessment and changes will be part of the annual PDUFA III IT report.

c. FDA will implement a common solution in CBER, CDER, ORA and OC for the secure exchange of content including secure e-mail, electronic signatures, and secure submission of, and access to application components.

d. FDA will deliver a single point of entry for the receipt and processing of all electronic submissions in a highly secure environment. This will support CBER, CDER, OC and ORA. The system should automate the current electronic submission processes such as checking the content of electronic submissions for completeness and electronically acknowledging submissions.

e. FDA will provide a specification format for the electronic submission of the Common Technical Document (e-CTD), and provide an electronic review system for this new format that will be used by CBER, CDER and ORA reviewers. Implementation should include training to ensure successful deployment. This project will serve as the foundation for automation of other types of electronic submissions. The review software will be made available to the public. .

f. Within the first 12 months, FDA will conduct an objective analysis and develop a plan for consolidation of PDUFA III IT infrastructure and desktop management services activities that will assess and prioritize the consolidation possibilities among CBER, CDER, ORA and OC to achieve technical efficiencies, target potential savings and realize cost efficiencies. Based upon the results of this analysis, to the extent appropriate, establish common IT infrastructure and architecture components according to specific milestones and dates. A documented summary of the analysis will be forwarded to the Commissioner. A version of the study report redacted to remove confidential commercial or security information, or other information exempt from disclosure, will be made available to the public.

g. FDA will implement Capability Maturity Model (CMM) in CBER, CDER, ORA and OC for PDUFA IT infrastructure and investments, and include other industry best practices to ensure that PDUFA III IT products and projects are of high quality and produced with optimal efficiency and cost effectiveness. This includes development of project plans and schedules, goals, estimates of required resources, issues and risks/mitigation plans for each PDUFA III IT initiative.

h. Where common business needs exist, CBER, CDER, ORA and OC will use the same software applications, such as eCTD software, and COTS solutions.

i. Within six months of authorization, a PDUFA III IT 5-year plan will be developed. Progress will be measured against the milestones described in the plan.

# XIII. ADDITIONAL PROCEDURES

A. Simplification of Action Letters

To simplify regulatory procedures, CBER and CDER intend to amend their regulations and processes to provide for the issuance of either an "approval" (AP) or a "complete response" (CR) action letter at the completion of a review cycle for a marketing application.

B. Timing of Sponsor Notification of Deficiencies in Applications

To help expedite the development of drug and biologic products, CBER and CDER intend to submit deficiencies to sponsors in the form of an "information request" (IR) letter when each discipline has finished its initial review of its section of the pending application.

Copyright © National Academy of Sciences. All rights reserved.

## XIV. DEFINITIONS AND EXPLANATION OF TERMS

A. The term "review and act on" is understood to mean the issuance of a complete action letter after the complete review of a filed complete application. The action letter, if it is not an approval, will set forth in detail the specific deficiencies and, where appropriate, the actions necessary to place the application in condition for approval.

B. A major amendment to an original application, efficacy supplement, or resubmission of any of these applications, submitted within three months of the goal date, extends the goal date by three months. A major amendment to a manufacturing supplement submitted within two months of the goal date extends the goal date by two months.

C. A resubmitted original application is a complete response to an action letter addressing all identified deficiencies.

D. Class 1 resubmitted applications are applications resubmitted after a complete response letter (or a not approvable or approvable letter) that include the following items only (or combinations of these items):

   1. Final printed labeling
   2. Draft labeling
   3. Safety updates submitted in the same format, including tabulations, as the original safety submission with new data and changes highlighted (except when large amounts of new information including important new adverse experiences not previously reported with the product are presented in the resubmission)
   4. Stability updates to support provisional or final dating periods
   5. Commitments to perform Phase 4 studies, including proposals for such studies
   6. Assay validation data
   7. Final release testing on the last 1-2 lots used to support approval
   8. A minor reanalysis of data previously submitted to the application (determined
   9. Other minor clarifying information (determined by the Agency as fitting the Class 1 category)
   10. Other specific items may be added later as the Agency gains experience with the scheme and will be communicated via guidance documents to industry.

E. Class 2 resubmissions are resubmissions that include any other items, including any item that would require presentation to an advisory committee.

F. A Type A Meeting is a meeting which is necessary for an otherwise stalled drug development program to proceed (a "critical path" meeting).

G. A Type B Meeting is a 1) pre-IND, 2) end of Phase 1 (for Subpart E or Subpart H or similar products) or end of Phase 2/pre-Phase 3, or 3) a pre- NDA/BLA meeting. Each requestor should usually only request 1 each of these Type B meetings for each potential application (NDA/BLA) (or combination of closely related products, i.e., same active ingredient but different dosage forms being developed concurrently).

H. A Type C Meeting is any other type of meeting.

I. The performance goals and procedures also apply to original applications and supplements for human drugs initially marketed on an over-the-counter (OTC) basis through an NDA or switched from prescription to OTC status through an NDA or supplement.

Copyright © National Academy of Sciences. All rights reserved.

Copyright © National Academy of Sciences. All rights reserved.

*Appendix D*

# APPENDIX D

## MEETING ONE—AGENDA

The National Academies
Institute of Medicine

Committee on the Assessment of the US Drug Safety System
Meeting One

# AGENDA

## Wednesday, June 8, 2005

**OPEN SESSION**                    **Room 100**

10:00 a.m. -10:05 a.m.     **Welcome and Introductions**

>        *David Blumenthal*
>        *Sheila Burke*
>        Co-Chairs, Committee on the Assessment of the US Drug Safety System

10:05 a.m. – 10:40 a.m.     **Charge to the Committee**

>        *Steven Galson*
>        Acting Director of the Center for Drug Evaluation and Research
>        Food and Drug Administration

>        *Janet Woodcock*
>        Deputy Commissioner of Operations
>        Food and Drug Administration

10:35 – 11:00 a.m.     **Questions from the Committee**

11:00 – 11:45 a.m.     **Perspectives of Pharmaceutical Manufacturers and Payors**

>        *Amit Sachdev*
>        Executive Vice President, Health
>        Biotechnology Industry Organization (BIO)

>        *Christine Simmon*

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**          D-1

Copyright © National Academy of Sciences. All rights reserved.

             Vice President of Public Affairs and Development
             Generic Pharmaceutical Association (GPhA)

             *J. Russell Teagarden*
             Vice President of Clinical Practices & Therapeutics
             Medco Health Solutions, Inc. (on behalf of the Pharmaceutical Care Management Association)

             *Alan Goldhammer*
             Associate Vice President for Regulatory Affairs
             Pharmaceutical Research and Manufacturers of America (PhRMA)

11:45 – 12:00 p.m.      **Questions from the Committee**

12:00 – 12:45 p.m.      **Consumer/Patient and Professional Organizations' Perspectives**

             *David Borenstein*
             Member, Board of Directors
             American College of Rheumatology (ACR)

             *John A. Gans*
             Executive Vice-President and Chief Executive Officer
             American Pharmacists Association (APhA)

             *Bill Vaughan*
             Senior Policy Analyst
             Consumers Union

             *Jeanne Ireland*
             Director of Public Policy
             Elizabeth Glaser Pediatric AIDS Foundation

12:45 – 1:00 p.m.      **Questions from the Committee**

1:00 p.m.             **Adjourn**

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

# MEETING TWO—AGENDA

The National Academies
Institute of Medicine

Committee on the Assessment of the US Drug Safety System
Meeting Two

# AGENDA

*Speakers and Times Subject to Change*

## Tuesday, July 19, 2005

**OPEN SESSION**                        **LECTURE ROOM**

3:00 p.m. – 3:05 p.m.      **Welcome and Introductions**

> *David Blumenthal*
> *Sheila Burke*
> Co-Chairs, Committee on the Assessment of the US Drug Safety System

3:05 p.m. – 6:00 p.m.      **Public Comment**

> *Carla Saxton*
> Professional Affairs Manager
> American Society of Consultant Pharmacists
>
> *Maryann Napoli*
> Center for Medical Consumers
>
> *John J. Pippin*
> Physicians Committee for Responsible Medicine
>
> *Patrick J. Madden*
>
> *Lesley  Maloney*
> American Society of Health-System Pharmacists
>
> *Marc Wheat*
> Chief Counsel and Staff Director
> Subcommittee on Criminal Justice, Drug Policy, and Human Resources

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**      D-3

Copyright © National Academy of Sciences. All rights reserved.

US House of Representatives

*Lindsey Johnson*
Consumer Advocate
U.S. Public Interest Research Group (U.S. PIRG)

*Alison Rein*
Assistant Director
Food & Health Policy National Consumers League

*Beth A. McConnell*
Director
PennPIRG and the PennPIRG Education Fund

*Marion J. Goff*

*Donald Klein*
American College of Neuropsychopharmacology

*Tom Woodward*
Director, Alliance for Human Resource Protection (AHRP)
State Director, International Coalition of Drug Awareness

6:00 p.m.                    **Adjourn**

Copyright © National Academy of Sciences. All rights reserved.

# Wednesday, July 20, 2005

**OPEN SESSION**                    **LECTURE ROOM**

1:00 p.m. -1:05 p.m.    **Welcome and Introductions**

        *David Blumenthal*
        *Sheila Burke*
        Co-Chairs, Committee on the Assessment of the US Drug Safety System

1:05 p.m. – 3:00 p.m.    **Food and Drug Administration's (FDA) Drug Safety Activities**

        **Introduction and Overview**
        *Paul J. Seligman*
        Director, Office of Pharmacoepidemiology and Statistical Science
        Center for Drug Evaluation and Research
        Food and Drug Administration

        **Role of the Office of New Drugs in the Safety Assessment**
        *John K. Jenkins*
        Director of the Office of New Drugs
        Center for Drug Evaluation and Research
        Food and Drug Administration

        **The Post-marketing Safety Assessment and the Office of Drug Safety**
        *Anne E. Trontell*
        Deputy Director, Office of Drug Safety
        FDA Center for Drugs
        Food and Drug Administration

        **Future of Safety Assessment**
        *Paul J. Seligman*

3:00 p.m. – 3:30 p.m.    **Questions from the Committee**

3:30 p.m. – 3:45 p.m.    **Break**

3:45 p.m. – 4:00 p.m.    **The Role of the Agency for Healthcare Research and Quality (AHRQ) in the US Drug Safety System**

**PREPUBLICATION COPY: UNCORRECTED PROOFS**                    D-5

Copyright © National Academy of Sciences. All rights reserved.

*Scott R. Smith*
Center for Outcomes and Evidence
Agency for Healthcare Research and Quality

| | |
|---|---|
| 4:00 p.m. – 4:15 p.m. | **The Role of the Centers for Medicare and Medicaid Services (CMS) in the US Drug Safety System** |

*Speaker TBA*
Centers for Medicare and Medicaid Services

| | |
|---|---|
| 4:15 p.m. – 4:45 p.m. | **Questions from the Committee** |

| | |
|---|---|
| 4:45 p.m. – 5:15 p.m. | **AHRQ-funded Centers for Education and Research on Therapeutics (CERTs)** |

**And**

**Contributions of Academia and the Pharmaceutical Industry to Drug Safety Surveillance**

*Hugh Tilson*
Chair, CERTs Steering Committee

| | |
|---|---|
| 5:15 p.m. – 5:45 p.m. | **Questions from the Committee** |

| | |
|---|---|
| 5:45 p.m. | **Adjourn** |

Copyright © National Academy of Sciences. All rights reserved.

*Appendix D*

# WORKSHOP—AGENDA

The National Academies
Institute of Medicine

Committee on the Assessment of the US Drug Safety System

**Advancing the Methods and Application of Risk-Benefit Assessment of Medicines**

January 17, 2006
The Keck Center, Room 100
500 Fifth Street, NW
Washington, DC  20001

**Purpose of workshop:**

1.  Identify methodological approaches for performing integrated and explicit assessments of risk-benefit of pharmaceuticals throughout a product's life-cycle, including identifying the type of information that would be most useful to decision-makers.

2.  Obtain expert input on the use of new methodological approaches in pre- and post-market risk assessment.

3.  Identify opportunities and barriers in advancing a public health approach to balancing risks and benefits of pharmaceuticals for drug regulation and risk management.

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*        D-7

Copyright © National Academy of Sciences. All rights reserved.

# Agenda

Tuesday, January 17, 2005

8:15 am        **Opening Remarks**

| 8:30 am | **Overview of Pharmacoepidemiology: What is the Evidence Base?** |
|---|---|

*Session 1:* Assessing a product's risk-benefit balance throughout its life-cycle involves the use of a variety of epidemiological resources and methods, including the use of ad hoc data sources, automated data systems, and randomized trials. The choice of specific assessment methods involves a consideration of many factors, including how well it informs decision-making intended to optimize a drug's balance between benefits and risks.

> **Assessing Risks and Benefits of Pharmaceuticals:**
> **Methods and Approaches**
> > Brian Strom, MD, MPH
> > Chair and Professor
> > Department of Biostatistics and Epidemiology
> > University of Pennsylvania
>
> **Pre-Market Assessment of Drug Safety at the FDA**
> > Judith Racoosin, MD, MPH
> > Safety Team Leader
> > Division of Neurology Products
> > Division of Psychiatry Products
> > Center for Drug Evaluation and Research
> > U.S. Food and Drug Administration
>
> **FDA Post-Approval Risk Assessment**
> > Anne Trontell, MD, MPH
> > Senior Advisor on Pharmaceutical Outcomes
> > Center for Outcomes and Evidence
> > Agency for Healthcare Policy and Research
>
> **Risk-Benefit Frameworks: Perspectives from the Field of Environmental Health**
> > Jonathan Samet, MD, MS
> > Professor and Chair
> > Department of Epidemiology
> > Johns Hopkins School of Public Health

9:45 am        **Discussion: Q & A with IOM Committee Members & Audience**

10:30 am        **Break**

| 11:00 am | **Case Studies Involving Risk-Benefit Uncertainties** |
|---|---|

*Session 2.* This session involves the consideration of two case studies of contemporary drug safety issues, each case involving a different risk-benefit dilemma. The case studies are intended to focus the discussion on the type of information that would be most useful to decision-makers, with the case studies selected to address both the pre-approval and the post-approval period. The intent is to model not what is or is not actually done at the FDA and by the industry sponsors, but what could or should be done. The proposed format is that speakers for each case study will briefly present the case study, followed by questions of clarification of fact from the IOM Committee and audience. Following lunch, there will be comments from an invited panel and discussion/questions to be posed by the IOM Committee.

**PREPUBLICATION COPY: UNCORRECTED PROOFS**      D-8

Copyright © National Academy of Sciences. All rights reserved.

**Presentation of the Case Study 1 - Salmeterol**
   Scott T. Weiss, MD
   Professor of Medicine
   Harvard Medical School


**Presentation of the Case Study 2 – Muraglitazar**
   Steve Nissen, MD
   Medical Director, Cardiovascular Coordinating Center
   Cleveland Clinic


**Questions of Clarification of Fact**


12:30        **Lunch**

1:30         **Reconvene:  Panel Discussions**


_Suggested Discussion Points for the Panelists:_  *Having heard the case studies, what tool or tools (existing or to be developed) would have narrowed the uncertainty about the benefit/risk profile for the drugs? At what point during evidence development should this tool have been brought into play?  What would have remained uncertain?  How long would it have taken and what effort would it have taken to reduce that uncertainty? How were the risks and benefits identified, evaluated, and weighted? Where were the flaws in this process? What could have/should have been done differently and why?  What resources are needed for your approach? How would this approach improve the current risk/benefit evaluation?*


**Panel:**

Judith K. Jones, MD, PhD
President, The Degge Group, Ltd

Wayne Ray, PhD
Professor, Department of Preventive Medicine
Director, Pharmacoepidemiology
Vanderbilt University

Michael P. Stern, MD
Professor, Department of Medicine
Chief, Division of Clinical Epidemiology
University of Texas, San Antonio

Robert B. Wallace, MD, MS
Professor of Epidemiology, College of Public Health
University of Iowa

Noel Weiss, MD, PhD
Professor of Epidemiology, School of Public Health and Community Medicine, University of Washington


**PREPUBLICATION COPY:  UNCORRECTED PROOFS**            D-9

Copyright © National Academy of Sciences. All rights reserved.

Discussion: Q & A with IOM Committee Members and Audience

3:00            **Break**

| | |
|---|---|
| 3:30 | **Establishing a framework for risk-benefit methods to reduce uncertainties during a pharmaceutical product's life-cycle** |

*Session 3.* This session is designed to session to reflect on what we learned from the case
Studies and panel discussion and to articulate a framework needed to improve the timing, rigor, transparency of risk-benefit assessments.

Janice K. Bush, MD
VP, Quality, Education & Business Support, Benefit Risk Management

Curt Furberg, MD, PhD
Professor, Wake Forest University

Louis Garrison, PhD
Professor of Pharmacy, University of Washington

Joanna Haas, MD, MS
Vice President, Pharmacovigilance, Genzyme Corporation

Alastair J.J. Wood, MD
Professor, Vanderbilt University Medical Center

**Discussion - All**

5:00            **Adjourn**

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*            D-10

Copyright © National Academy of Sciences. All rights reserved.

*Appendix D*

## MEETING FOUR—AGENDA

The National Academies
Institute of Medicine

Committee on the Assessment of the US Drug Safety System

## AGENDA

## Thursday, January 19, 2006

**OPEN SESSION**                               **Keck 100**

8:15 a.m. – 8:25 a.m.   *Welcome and Introductions*

> Description of Committee's request to invited speakers
>
> Many recommendations for strengthening FDA's role in drug safety have been made in the past several years. We have sent today's speakers three sets of recommendations:
>
> - Ganslaw LS. 2005. Drug Safety: New Legal/Regulatory Approaches. FDLI Update: Food and Drug Law, Regulation, and Education.
> - FDA Task Force on Risk Management. 1999. Managing the Risks from Medical Product Use: Creating a Risk Management Framework. Report to the FDA Commissioner from the Task Force on Risk Management. http://www.fda.gov/oc/tfrm/riskmanagement.pdf
> - CRS/Thaul. 2005. Drug Safety and Effectiveness: Issues and Action Options After FDA Approval. http://www.law.umaryland.edu/marshall/crsreports/crsdocuments/RL327970308 2005.pdf
>
> Reflecting on these (and other recommendations you find relevant) please comment on the following:
> - Which of these or other recommendations are the most important to consider and why?
> - Which of these or other recommendations that have been made would you not support and why?

8:25 a.m. – 8:45 a.m.   Geoffrey Levitt
                        *Wyeth Pharmaceuticals*

8:45 a.m. – 9:05 a.m.   Steven Ryder
                        *Pfizer, Inc.*

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**                               D-11

Copyright © National Academy of Sciences. All rights reserved.

| 9:05 a.m. – 9:25 a.m. | James Kotsanos<br>*Eli Lilly and Company* |
|---|---|
| 9:25 a.m. – 9:45 a.m. | James Nickas<br>*Genentech* |
| 9:45 a.m. – 10:15 a.m. | Questions from the Committee |
| 10:15 a.m. – 10:30 a.m. | Break |
| 10:30 a.m. – 10:50 a.m. | Fran Visco<br>*National Breast Cancer Coalition* |
| 10:50 a.m. – 11:10 a.m. | Sid Wolfe<br>*Public Citizen* |
| 11:10 a.m. – 11:30 a.m. | Frank Burroughs<br>Steve Walker<br>*Abigail Alliance for Better Access to Developmental Drugs* |
| 11:30 a.m. – 11:50 a.m. | David H. Campen<br>*Kaiser Permanente (on behalf of America's Health Insurance Plans)* |
| 11:50 a.m. – 12:20 p.m. | Questions from the Committee |
| 12:20 p.m. – 12:30 p.m. | Closing Remarks |
| 12:30 p.m. | Adjourn |

Copyright © National Academy of Sciences. All rights reserved.

# APPENDIX E

# Identifying and Preventing Medication Errors

# Summary

## ABSTRACT

The use of medications is ubiquitous. In any given week, more than four of five U.S. adults take at least one medication (prescription or over-the-counter [OTC] drug, vitamin/mineral, or herbal supplement), and almost a third take at least five different medications.[1] Errors can occur with any of these products at any point in the medication use process and in any care setting. The frequency of medication errors and preventable medication-related injuries represents a very serious cause for concern.

The Centers for Medicare and Medicaid Services sponsored this study by the Institute of Medicine with the aim of developing a national agenda for reducing medication errors based on estimates of the incidence of such errors and evidence on the efficacy of various prevention strategies. The study focused on the safe, effective, and appropriate use of medications in the major components of the medication use system, addressing the use of prescription drugs, OTC drugs, and complementary and alternative medications, in a wide range of care settings—hospital, long-term, and community.

The committee estimates that on average a hospital patient is subject to at least one medication error per day, with considerable variation in error rates across facilities. The few existing studies of the costs associated with medication errors are limited to the health care costs associated with preventable injuries, and these are substantial.

At least a quarter of all medication-related injuries are preventable. Many efficacious error prevention strategies are available especially for hospital care; examples are electronic prescribing and clinical decision-support systems that check dosages and monitor for harmful drug-drug interactions. This report provides guidance on how to implement error prevention strategies in hospitals, long-term care, and ambulatory care.

Establishing and maintaining a strong provider-patient partnership is a key approach for reducing medication errors. The report outlines how such a partnership can be achieved and what roles providers, patients and third parties must play. For example, consumers should maintain careful records of their medications, providers should review a patient's list of medications at each encounter and at times of transition between care settings (for example, hospital to outpatient care), and the federal government should seek ways to improve the quality of pharmacy leaflets and medication-related information on the Internet for consumers.

Health care providers in all settings should seek to create high-reliability organizations that constantly improve the safety and quality of medication use. To this end, they should implement active internal monitoring programs so that progress toward improved medication safety can be accurately demonstrated. The report offers guidance on appropriate monitoring systems for each major care setting.

---

[1] In this report, the terms "medication" and "drug" are used interchangeably.

Copyright © National Academy of Sciences. All rights reserved.

2                                                                    *PREVENTING MEDICATION ERRORS*

In carrying out this study the IOM committee identified enormous gaps in the knowledge base with regard to medication errors. Current methods for generating and communicating information about medications are inadequate and contribute to the incidence of errors. Likewise, incidence rates of medication errors in many care settings, the costs of such errors, and the efficacy of prevention strategies are not well-understood. The report proposes a research agenda to address these and other knowledge gaps.

## STUDY SCOPE

The Institute of Medicine (IOM) report *To Err Is Human*: *Building a Safer Health System* (IOM, 2000) accelerated existing efforts to prevent medication errors and improve the quality of health care, efforts that are just now gaining acceptance as a discipline requiring investment in individuals who specialize in error prevention and quality improvement. Against this background, at the urging of the Senate Finance Committee, the United States Congress directed the Centers for Medicare and Medicaid Services (CMS) to contract with the IOM for a study to formulate a national agenda for reducing medication errors by developing estimates of the incidence of such errors and determining the efficacy of prevention strategies (see Box S-1).

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*

Copyright © National Academy of Sciences. All rights reserved.

---

**BOX S-1  Scope of the Study**

Congress through the Medicare Modernization Act of 2003 (Section 107(c)), mandated the Centers for Medicare and Medicaid Services to sponsor the Institute of Medicine to carry out a study:

- To develop a fuller understanding of drug safety and quality issues through the conduct of an evidence-based review of the literature, case studies and analysis. This review will consider the nature and causes of medication errors; their impact on patients; and the differences in causation, impact and prevention across multiple dimensions of health care delivery including patient populations, care settings, clinicians, and institutional cultures.
- If possible, to develop estimates of the incidence, severity and costs of medication errors that can be useful in prioritizing resources for national quality improvement efforts and influencing national health care policy.
- To evaluate alternative approaches to reducing medication errors in terms of their efficacy, cost-effectiveness, appropriateness in different settings and circumstances, feasibility, institutional barriers to implementation, associated risk, and quality of evidence supporting the approach.
- To provide guidance to consumers, providers, payers, and other key stakeholders on high-priority strategies to achieve both short-term and long-term drug safety goals, to elucidate the goals and expected results of such initiatives and support the business case for them, and to identify critical success factors and key levers for achieving success.
- To assess opportunities and key impediments to broad nationwide implementation of medication error reductions, and to provide guidance to policy-makers and government agencies in promoting a national agenda for medication error reduction.
- To develop an applied research agenda to evaluate the health and cost impacts of alternative interventions, and to assess collaborative public and private strategies for implementing the research agenda through the Agency for Healthcare Research and Quality and other government agencies.

---

## THE LEVEL AND CONSEQUENCES OF MEDICATION ERRORS ARE UNACCEPTABLE

### Rates of Errors and Preventable Harmful Events Are High

The frequency of medication errors and preventable adverse drug events (ADEs) (defined in Box S-2) is a very serious cause for concern. In hospitals, errors are common during all steps of the medication-use process—procuring the drug, prescribing, dispensing, administering and

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

monitoring the patient's response. In hospitals, they occur most frequently at the prescribing and administration stages.

Published error rates depend on the intensity and specifics of the error detection methods used. In particular, some methods are better suited to certain stages of the medication-use process. Detection methods addressing all stages but not including direct observation of administration found a rate of 0.1 prescribing errors per patient per day in a study of hospital pediatric units (Kaushal et al., 2001) and a rate of 0.3 prescribing errors per patient per day in a study of hospital medical units (Bates et al., 1995a). A major study using direct observation of administration (Barker et al., 2002) carried out at 36 different health care facilities, found an administration error rate of 11 percent, excluding doses administered outside the scheduled time ("wrong-time" errors). Since a hospital patient receives on average at least ten medication doses per day, this figure suggests that on average, a hospital patient is subject to one administration error per day. Further, since prescribing and administration errors account for about three-fourths of medication errors (Leape et al., 1995), the committee conservatively estimates that on average, a hospital patient is subject to at least one medication error per day. Substantial variations in error rates are found, however. For the 36 facilities in the study mentioned above, the administration error rate (excluding wrong-time errors) ranged from 0 to 26 percent, with a median value of 8.3 percent (Barker et al., 2002).

A preventable ADE is a serious type of medication error. ADEs, defined as any injury due to medication (Bates et al., 1995b), are common in hospitals, nursing homes, and the outpatient setting. ADEs associated with a medication error are considered preventable. The committee estimates that at least 1.5 million preventable ADEs occur each year in the United States:

- Hospital care—Classen and colleagues (1997) projected 380,000 preventable ADEs occurring annually and Bates and colleagues (1995b) 450,000. These are likely underestimates given the higher preventable ADE rate of another study using more comprehensive ADE identification methods (Jha et al., 1998).
- Long-term care—Gurwitz and colleagues (2005) projected 800,000 preventable ADEs, again likely an underestimate given the higher ADEs rates of other studies.
- Ambulatory care—Among outpatient Medicare patients alone, Gurwitz and colleagues (2003) projected 530,000 preventable ADEs. Their approach was conservative, however, because it did not involve direct contact with patients, which yields much higher rates (Gandhi et al., 2003).

The above data exclude errors of omission—failure to prescribe medications for which there is an evidence base for the ability to reduce morbidity and morbidity. With respect to such errors, the committee found well-documented evidence of inadequate treatments for acute coronary syndromes, heart failure, chronic coronary disease, and atrial fibrillation, as well as inadequate antibiotic and thrombosis prophylaxis in hospitals.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

---

**BOX S-2  Key Definitions**

**Error:** The failure of a planned action to be completed as intended (error of execution) or the use of a wrong plan to achieve an aim (error of planning). An error may be an act of commission or an act of omission (IOM, 2004).

**Medication error:** Any error occurring in the medication use process (Bates et al., 1995a). Examples include wrong dosage prescribed, wrong dosage administered for a prescribed medication, or failure to give a medication (by the provider) or take (by the patient).

**Adverse drug event:** Any injury due to medication (Bates et al., 1995b). Examples include a wrong dosage leading to injury (e.g. rash, confusion, or loss of function), or an allergic reaction occurring in a patient not known to be allergic to the given medication.

---

### Morbidity Due to Medication Errors Is Costly

Current understanding of the costs of medication errors is highly incomplete. Most of what is known relates to additional health care costs associated with a preventable ADEs, which represent the injuries caused by errors:

For hospital care, there is one estimate of the extra costs of inpatient care for a preventable ADE incurred while in the hospital—$5,857 (Bates et al., 1997). This figure excludes health care costs outside the hospital and was derived from 1993 cost data. Assuming conservatively an annual incidence of 400,000 in-hospital preventable ADEs, each incurring extra hospital costs of $5,857, yields an annual cost of $2.3 billion in 1993 dollars or $3.5 billion in 2006 dollars.

For long-term care, as noted earlier, Gurwitz and colleagues (2005) projected an annual incidence of 800,000 preventable ADEs. However, there is no estimate of the associated health care costs for this group of preventable ADEs.

For ambulatory care, the best estimate derives from a study (Field et al., 2005) that calculateed the annual cost of preventable ADEs for all Medicare enrollees aged 65 and. The cost in 2000per preventable ADE was estimated at $1,983, while national annual costs were estimated at $887 million.

In addition to the likelihood of underestimation, the above estimates are characterized by some important omissions. First, the costs of some highly common medication errors, such as drug use without a medically valid indication and failure to receive drugs that should have been prescribed, were excluded from the Medicare study of ambulatory ADEs, (Field et al., 2005). Moreover, the costs of morbidity and mortality arising from the failure of patients to comply with prescribed medication regimens were not assessed. Second, all the studies omitted some important costs: lost earnings, costs of not being able to carry out household duties (lost household production), and compensation for pain and suffering. Third, few data are available for any setting regarding the costs of medication errors that do not result in harm. While no injury is involved, these errors often create extra work, and the costs involved may be substantial.

### Effective Error Prevention Strategies Are Available

According to most studies, at least a quarter of all harmful ADEs are preventable. Moreover, many efficacious error prevention strategies are available, especially for hospital care. In the hospital setting, there is good evidence for the effectiveness of computerized order entry with

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*

Copyright © National Academy of Sciences. All rights reserved.

clinical decision-support systems (Bates et al., 1998), for clinical decision-support systems themselves (Evans et al., 1994), and for pharmacist participation on hospital rounds (Leape et al., 1999). Barcoding and smart intravenous (IV) pumps show promise for the hospital setting, but their efficacy has not yet been clearly demonstrated.

Interventions consisting of educational visits appear to hold promise for improving prescribing practices and patient outcomes in nursing homes. Involving pharmacists in the management of medications in nursing homes and ambulatory care also shows promise, but requires additional study. This intervention has been most successful to date in populations with certain conditions, such as diabetes.

## IMPROVED PROVIDER–PATIENT COMMUNICATION IS VITAL

Achieving the patient-centered model of care envisioned in the IOM report *Crossing the Quality Chasm: A New Health System for the 21st Century* (IOM, 2001) will require a paradigm shift away from a paternalistic, provider-centric model of care. Consumers (and their surrogates) should be empowered as partners in their care, with appropriate communication, information, and resources in place to support them. For medication safety, consumers and providers (including physicians, nurses, and pharmacists) should know and act on patients' rights; providers should engage in meaningful communication about the safe and effective use of medications and at multiple points along the medication-use process; and government and other participants should improve consumer-oriented written and electronic information resources.

### Patient Rights

Patient rights are the foundation for the safe and ethical use of medications (see Box S-3). Ignoring these rights can have lethal consequences. Millions of Americans take prescription drugs each year without being fully informed by their providers about associated risks, contraindications, and side effects. When clinically significant medication errors do occur, they usually are not disclosed to patients or their surrogates unless injury or death results.

Many but not all of patient rights relating to medical care have been established broadly in the U.S. Constitution (Amendments I and XIV) and articulated by the courts through common law. Certain states have instituted a patient bill of rights relating to particular providers or care settings. One important point not specifically addressed by these laws is the right for a patient to be told when an adverse event occurs. Establishing a comprehensive set of patient rights in one document would facilitate patient and provider understanding and exercise of these rights and improve the safety and quality of medication use.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

---

**BOX S-3  Patient Rights**

Patients have the right to:

- Be the source of control for all medication management decisions that affect them (that is, the right to self-determination).
- Accept or reject medication therapy on the basis of their personal values.
- Be adequately informed about their medication therapy and alternative treatments.
- Ask questions to better understand their medication regimen.
- Receive consultation about their medication regimen in all health settings and at all points along the medication use process.
- Designate a surrogate to assist them with all aspects of their medication management.
- Expect providers to tell them when a clinically significant error has occurred, what the effects of the event on their health (short- and long-term) will be, and what care they will receive to restore their health.
- Ask their provider to report an adverse event and give them information about how they can report the event themselves.

SOURCE: Committee on Identifying and Preventing Medication Errors

---

### Actions for Consumers

For sound medication management, providers and consumers[2] should maintain an up-to-date record of medications being administered, including prescription medications, OTCs, and dietary supplements, as well as all known drug and/or food allergies. Such records are especially important for patients who have chronic conditions, see multiple providers, or take multiple medications.

By becoming more informed and engaged, consumers (and their surrogates) may decrease the probability of experiencing a medication error (Cohen, 2000). Such actions can range from the simple and routine, such as double-checking their prescription when dropping it off and picking it up from the pharmacy, to the more involved, such as forming an active partnership with providers in managing their health care. When using OTC medications, herbal remedies, and dietary supplements, consumers should seek the information they need to make informed decisions. When obtaining medical care, consumers should ask questions and insist on answers from providers to guide their decision making based on their personal values and preferences. They should ensure that their provider explains their medication regimen clearly and speak up if they do not understand. In addition, they should ensure that providers give them written information about their medications, as well as tell them where to obtain information from other sources. Finally, consumers should communicate with their providers if they experience any unexpected changes in the way they feel after initiating a new medication. Some specific actions consumers can take are outlined in Box S-4.

---

[2] In this report, the term "consumers" is often used in referring to patients to emphasize the active role individuals need to take in ensuring the quality of the health care services they are purchasing.

***PREPUBLICATION COPY:  UNCORRECTED PROOFS***

Copyright © National Academy of Sciences. All rights reserved.

---

**BOX S-4  Consumer Actions to Enhance Medication Safety**

Personal/Home

- Maintain a list of the prescription drugs, nonprescription drugs and other products, such as vitamins and minerals, you are taking.
- Take the list with you when you visit any medical practitioner and have him or her review it.
- Be aware of where to find educational material in your local community and at reliable Internet sites.

Ambulatory Care/Outpatient Clinic

- Have the prescriber provide in writing the name of the drug (brand and generic names, if available), what it is for, its dosage, and how often to take it, or provide other written material with this information.
- Have the prescriber explain how to use the drug properly.
- Ask about the side effects of the drug and what to do if you experience a side effect.

Pharmacy

- Make sure the name of the drug (brand or generic) and the directions for use received at the pharmacy are the same as that written down by the prescriber.
- Know that you can review your list of medications with the pharmacist for additional safety.
- Know that you have the right to counseling by the pharmacist if you have any questions; you can ask the pharmacist to explain how to properly take the drug, the side effects of the drug and what to do if you experience them (just as you did with your prescriber)
- Ask for written literature about the drug.

Hospital Inpatient (Patient or Surrogate)

- Ask the doctor or nurse what drugs you are being given at the hospital.
- Do not take a drug without being told the reason for doing so.
- Exercise your right to have a surrogate present whenever you are receiving medication and are unable to monitor the medication-use process yourself.
- Prior to surgery, ask whether there are medications, especially prescription antibiotics, that you should take or any you should stop taking preoperatively.
- Prior to discharge, ask for a list of the medications you should be taking at home, have a provider review them with you, and be sure you understand how the medications should be taken.

SOURCE: Committee on Identifying and Preventing Medication Errors

---

**Actions for Providers**

Providers can take several specific actions to improve medication safety (see Box S-5). First, they can verify the patient's current medication list for appropriateness at each encounter, and at times of transition between care settings, they can ensure that this list is accurate. They can educate their patients about the medication regimen, understanding that patients need different kinds

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

of information at different times and for different purposes. Providers can also respect patients' wishes and inform them of their rights, including the right to have a surrogate present and involved in their medication management whenever they are unable to monitor their own medication use.

---

**BOX S-5  Issues for Discussion with Patients by Providers (includes Physicians, Nurses, and Pharmacists)**

- Review the patient's medication list routinely and during care transitions.
- Review different treatment options.
- Review the name and purpose of the selected medication.
- Discuss when and how to take the medication.
- Discuss important and likely side effects and what to do about them.
- Discuss drug–drug, drug–food, and drug–disease interactions.
- Review the patient's or surrogate's role in achieving appropriate medication use.
- Review the role of medications in the overall context of the patient's health.

---

When communicating about medication errors that occur with the potential for or actual harm, providers can tell patients how the error may affect their health and what is being done to correct it. The vast majority of patients want and expect to be told about errors, particularly those that cause them harm.

### Barriers Experienced by Consumers and Providers

In the current system, however, there are a number of barriers that affect the ability of consumers to engage in safe and effective use of medications and the ability of providers to change their day-to-day practices to support new consumer-oriented activities (Cohen, 2000). These barriers include (1) knowledge deficits, such as, patients lacking sufficient education about their medications, and providers lacking the latest pharmacological knowledge about particular medications; (2) practical barriers, such as patients being unable to pay for their medications, and providers having to operate burdensome prescribing arrangements required by payers; and (3) attitudinal factors, such as the patient and provider having different cultural and belief systems about the use of medications. These barriers often result in errors, such as taking the wrong dose, taking a medication at the wrong time, or taking someone else's medication. Many of these barriers can be overcome by improved consumer-oriented drug information; providers responding to the factors challenging their patients; and health care organizations adopting a culture of safety and more extensive use information technology systems.

**Recommendation 1: To improve the quality and safety of the medication-use process, specific measures should be instituted to strengthen patients' capacities for sound medication self-management. Specifically:**
- **Patients' rights regarding safety and quality in health care and medication use should be formalized at the state and/or federal levels and ensured at every point of care.**

*PREPUBLICATION COPY: UNCORRECTED PROOFS*

Copyright © National Academy of Sciences. All rights reserved.

*PREVENTING MEDICATION ERRORS*

- **Patients (or their surrogates) should maintain an active list of all prescription drugs, over-the-counter (OTC) drugs, and dietary supplements they are taking; the reasons for taking them; and any known drug allergies. Every provider involved in the medication-use process for a patient should have access to this list.**
- **Providers should take definitive action to educate patients (or their surrogates) about the safe and effective use of medications. They should provide information about side effects, contraindications, and how to handle adverse reactions, as well as where to obtain additional objective, high-quality information.**
- **Consultation on their medications should be available to patients at key points along the medication use process (during clinical decision making in ambulatory and inpatient care, at hospital discharge, and at the pharmacy).**

### Actions for Government and Other Stakeholders

Consumers should be able to obtain high-quality information about medications not only from their provider, but also from the pharmacy, Internet resources, and community-based resources. However, these resources need significant improvement in two overarching areas.

First, current materials (e.g., pharmacy information sheets [leaflets], Internet-based information) are inadequately designed to facilitate consumers' ability to read, comprehend, and act on medication information. Pharmacy leaflets are the source of such information most relied upon by consumers. Yet a number of studies have revealed the inadequate quality of pharmacy leaflets, as well as the variability in their quality from one pharmacy to another and from one drug to another (Svarstad and Mount, 2001). Internet-based health information has proliferated over the last decade, providing consumers with immediate access to valuable resources such as medical journals and libraries, but most consumers are unfamiliar with how to access this information since it usually does not figure prominently during online searches. Rather, consumers are directed to a multitude of other sources of information with differing standards for providing content. The federal government should develop mechanisms for improving pharmacy leaflets and the quality of Internet information for consumers.

Second, there is a need for additional resources beyond pharmacy leaflets and Internet information that can be provided on a national scale. In particular, a national drug information telephone helpline and community-based health resource centers should be developed to promote consumer education. Further, communication networks already in place, such as those associated with the public health infrastructure (e.g., the Centers for Disease Control and Prevention's National Center for Health Marketing) and consumer networks should be used for broad dissemination of national medication safety initiatives.

**Recommendation 2: Government agencies (i.e., the Agency for Healthcare Research and Quality [AHRQ], the Centers for Medicare and Medicaid Services [CMS], the Food and Drug Administration [FDA], and the National Library of Medicine [NLM]) should enhance the resource base for consumer-oriented drug information and medication self-management support. Such efforts require standardization of pharmacy medication information leaflets, improvement of online medication resources, establishment of a national drug information telephone helpline, the development of personal health records, and the development of a national medication safety dissemination plan.**

*PREPUBLICATION COPY: UNCORRECTED PROOFS*

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety: Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

- **Pharmacy medication information leaflets should be standardized to a format designed for readability, comprehensibility, and usefulness to consumers. The leaflets should be made available to consumers in a manner that accommodates their individual needs, such as those associated with variations in literacy, language, age, and visual acuity.**
- **NLM should be designated as the chief agency responsible for Internet health information resources for consumers. Drug information should be provided through a consumers' version of the DailyMed program, with links to NLM's Medline Plus program for general health and additional drug information.**
- **FDA, CMS, and NLM working together, should undertake a full evaluation of various methods for building and funding a national network of drug information helplines.**
- **CMS, FDA, and NLM should collaborate to confirm a minimum data set for personal health records and develop requirements for vendor self-certification of compliance. Vendors should take the initiative to improve the use and functionality of personal health records by incorporating basic tools to support consumers' medication self management.**
- **A national plan should be developed for widespread distribution and promotion of medication safety information. Health care provider, community-based, consumer, and government organizations should serve as the foundation for such efforts.**

## ELECTRONIC PRESCRIBING AND MONITORING FOR ERRORS IN ALL CARE SETTINGS ARE ESSENTIAL

Safe medication use requires that clinicians synthesize several types of information, including knowledge of the medication itself, as well as understanding of how the medication may interact with coexisting illnesses and medications and how its use might be monitored. Several electronic supports can help providers absorb and apply the necessary information.

### Access to Automated Point-of-Care Reference Information

The underlying knowledge base is constantly changing, creating a situation in which it is almost impossible for health care providers to have current knowledge of every medication they prescribe. Clinicians therefore need access to critical syntheses of the evidence base. The Cochrane Collaboration (CC, 2005) is one such resource. In addition, many software applications are being developed that provide decision support for prescribing clinicians (Epocrates, 2005). Applications of this type are typically available via the Internet or on personal digital assistants (PDAs). All prescribers should use point-of-care reference information.

### Electronic-Prescribing

Paper-based prescribing is associated with high error rates (Kaushal et al., 2003). Electronic prescribing is safer (Bates et al., 1998) because it eliminates handwriting and ensures that the key fields (for example, drug name, dose, route, and frequency) include meaningful data. More important, as noted above, computerization enables the delivery of clinical decision support (Evans et al., 1998), including checks for allergies, drug–drug interactions, overly high doses, and clini-

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

cal conditions, as well as suggestions for appropriate dosages given the patient's level of renal function and age. Recent studies have identified implementation problems and the unintended occurrence of new types of errors with these computerization strategies (for example, pharmacy inventory displays of available drug doses being mistaken for the usual or minimally effective doses). Avoiding these problems requires addressing business and cultural issues prior to implementation and aggressively fixing technological problems during implementation.

In addition, all pharmacies receiving prescriptions electronically will lead to fewer errors than occur with current paper or oral approaches (Bates, 2001). A number of issues must be addressed, however, many of which are regulatory, for electronic transmission of prescriptions to be practical.

### Effective Use of Well-Designed Technologies

To deliver safe drug care, health care organizations should make effective use of well-designed technologies, which will vary by setting. Although the evidence for this assertion is strongest in the inpatient setting (AHRQ, 2005), the use of technology will undoubtedly lead to major improvements in all settings. In acute care, the technology should target prescribing by including computerized provider order entry with clinical decision support. Administration is also an especially vulnerable stage in the process, and several technologies are likely to be especially important. These include electronic medication administration records which can improve documentation regarding which medications have been given and when, and will likely also include machine-readable identification, such as bar coding, and smart IV infusion pumps. All these technologies should be electronically linked.

In nursing homes, computerized prescribing with decision support will likely be important, although there has been little research on its efficacy (Gurwitz et al., 2005). Moreover, implementation of computerized prescribing in this setting will be challenging since most nursing homes have very limited resources.

Limited evidence suggests that computerized prescribing will be important in the outpatient setting as well (Gandhi et al., 2003), although it may not result in significant safety benefit without added decision support. Equally important are likely to be approaches that improve communication between patients and providers.

### Communication of Patient-Specific Medication-Related Information

The delivery of care often involves moving the locus of care among sites and providers. These "handoffs" are fraught with errors. One strategy for reducing errors during these care transitions is to reconcile medication orders between transition points, especially between care settings such as the hospital and outpatient setting, but also between points within organizations, such as the intensive care unit and a general care unit. This reconciliation involves comparing what a patient is taking in one setting with what is being provided in another to avoid errors of transcription, omission, duplication of therapy, and drug–drug and drug–disease interactions. This process typically reveals many discrepancies (Pronovost et al., 2003).

Reconciliation is facilitated when medication data are transmitted electronically among providers, with confirmation by the patient. Three important steps are required. First, a complete and accurate medication list must be compiled. Second, the data must be structured into components such as the medication name, dose, route, frequency, duration, start date, and so on. Third, these data must be formated in a way that allows disparate computer systems to understand both their structure and the content.

### PREPUBLICATION COPY:  UNCORRECTED PROOFS

Copyright © National Academy of Sciences. All rights reserved.

The power of interoperable health care data was demonstrated after the devastation of Hurricane Katrina. Pharmacy chains were able to make patients' medication lists available quickly to care providers, and states with immunizations registries were able to retrieve immunization records, enabling the enrollment of children in new schools.

## Monitoring for Errors

All health care provider groups should seek to be high-reliability organizations preoccupied with the possibility of failure (Reason, 2000). They should implement active internal monitoring programs so that progress toward improved medication safety can be accurately demonstrated. Voluntary internal reporting systems have recognized limitations for evaluating the true frequency of medication errors and ADEs (Flynn et al., 2002). Error detection methods that complement such systems should be used in all care settings. These include computerized detection of ADEs, observation of medication passes in hospitals to assess administration errors, and audits of filled prescriptions in community pharmacies to monitor dispensing errors.

Many external programs exist to which patients and providers can report a medication error or hazardous situation (IOM, 2004). Voluntary practitioner reporting to an external program will continue to be important, as it is often the only way practitioners can effect change outside their organization. Errors need to be reported and analyzed if improvements in care are to be achieved.

## Adopting a Safety Culture

Patient safety can best be achieved through the adoption of a culture of safety – organizational commitment to continually seeking to improve safety. To achieve high levels of safety culture senior management of health care organizations must devote sufficient attention to safety and also make sufficient resources available for quality improvement and safety teams (IOM, 2004). Senior management must also authorize the investment of resources in technologies that have been demonstrated to be effective but are not yet widely implemented in most organizations, such as computerized provider order entry systems and electronic health records. It has become increasingly clear that the introduction of any of these technologies requires close attention to business processes and ongoing maintenance. As noted above, studies have shown that these tools can have unintended and adverse consequences, and that avoiding these consequences requires addressing both business and cultural issues.

**Recommendation 3: All health care organizations should immediately make complete patient-information and decision-support tools available to clinicians and patients. Health care systems should capture information on medication safety and use this information to improve the safety of their care delivery systems. Health care organizations should implement the appropriate systems to enable providers to:**
  • **Have access to comprehensive reference information concerning medications and related health data.**
  • **Communicate patient-specific medication-related information in an interoperable format.**
  • **Assess the safety of medication use through active monitoring and use these monitoring data to inform the implementation of prevention strategies.**
  • **Write prescriptions electronically by 2010 and all pharmacies to be able to receive them electronically, also by 2010. All prescribers should have plans in place by 2008 to implement electronic prescribing.**

## *PREPUBLICATION COPY:  UNCORRECTED PROOFS*

Copyright © National Academy of Sciences. All rights reserved.

14                                                                PREVENTING MEDICATION ERRORS

- **Subject prescriptions to evidence-based, current clinical decision support.**
- **Have the appropriate competencies for each step of the medication use process.**
- **Make effective use of well-designed technologies, which will vary by setting.**

## ENORMOUS KNOWLEDGE DEFICITS MUST BE ADDRESSED

Current methods for generating and communicating information about medications are inadequate and contribute to a growing rate of medication errors. Likewise, error incidence rates, costs to the health system, and prevention strategies are not well understood. As a result, there are enormous gaps in the knowledge required to implement a safe medication-use system.

### Risk/Benefit Information for Prescription Drugs

Being able to determine whether a medication error has been made depends on knowing the correct dose of the drug for that patient at that time and whether the indication for that drug is correct in comparison with alternative approaches to treatment. Over the past several decades, however, drug evaluations have not been sufficiently comprehensive. As a result, the balance of risk and benefit for a drug often is not known for a given population. Such gaps in therapeutic knowledge often result in devastating effects on clinical practice and patient health, as exemplified by adverse events involving hormone replacement therapy, cyclooxygenase-2 (COX-2) inhibitors, and non-steroidal anti-inflammatory drugs that resulted in increased morbidity and mortality.

These issues are magnified in specific patient populations. For example, the majority of prescriptions written for children are off label, not based on empirical demonstration of safety and efficacy. Among those over 80 years old, the fastest-growing segment of the population, almost nothing is known about the balance of risks and benefits. Patients with renal dysfunction are another large and growing group for whom more comprehensive studies are needed. And patients with multiple comorbidities are typically excluded from premarketing clinical trials, yet many of the major problems with drug toxicity have occurred in those taking multiple medications because of multiple diseases. Thus the numbers and types of patients for whom clinical outcomes are measured must be greatly increased to elucidate the proper dosing of drugs in individuals and within subgroups.

Of critical concern is the need for transparency through the publication of clinical studies in a national repository to advance medication safety, error prevention, and public knowledge. The studies that should be published in such a repository include postmarket studies. The goal of postmarket studies is to generate new data about a drug's effects in the population; often, however, these studies give insufficient emphasis to safety information. There is a need for comprehensive redesign and expansion of the mechanisms for undertaking clinical studies to improve understanding of the risks and benefits of drug therapies, prevent errors and ADEs, and meet the health needs of the population.

### Communication of Drug Information

How information about a drug is communicated to providers and consumers can directly affect the frequency of medication errors and ADEs (see Box S-6). Drug information is communicated through labeling and packaging, marketing practices, and advertisements. Poorly designed materials and inadequate representation of the risks and benefits to providers and consumers

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety: Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

have led to many errors, including inappropriate prescribing; confusion among products, affecting dispensing and administration; and compromised ability to monitor the effects of drugs adequately.

---

**BOX S-6  Drug Naming, Labeling, and Packaging Problems**

- Brand names and generic names that look or sound alike
- Different formulations of the same brand or generic drug
- Multiple abbreviations to represent the same concept
- Confusing word derivatives, abbreviations, and symbols
- Unclear dose concentration/strength designations
- Cluttered labeling—small fonts, poor typefaces, no background contrast, overemphasis on company logos
- Inadequate prominence of warnings and reminders
- Lack of standardized terminology

---

In particular, drug names that look or sound alike increase the risk of medication errors. Abbreviations, acronyms, certain dose designations, and other symbols used for labeling also have caused errors. Even the layout and presentation of drug information on the drug container or package label can be visually confusing, particularly if it is designed for marketing rather than clinical purposes.

Unit-of-use packaging – containers that provide enough medication for a particular period, for example, blister packs containing 30 individually wrapped doses – is not widely used in the United States but is extensively used elsewhere. This form of packaging brings important safety and usage benefits. The committee believes that the expanded implementation of unit-of-use packaging in the United States warrants further investigation.

Free samples of prescription drugs are widely distributed to patients by prescribers to start patients quickly on their medications, to adjust prescribed doses before the full prescription is filled, and to offset medication costs for indigent and underinsured patients. However, there has been growing unease among providers about the way free samples are distributed – particularly, the resulting lack of documentation of medication use, and the bypassing of the standard prescribing and dispensing services which incorporate drug-interaction checking and pharmacy counseling services. More investigation is needed on the impact of differing free sample distribution methods on medication safety.

**Recommendation 4: Enhancing the safety and quality of the medication-use process and reducing errors requires improved methods for labeling drug products and communicating medication information to providers and consumers. For such improvements to occur, materials should be designed according to designated standards to meet the needs of the end user. Industry, AHRQ, the FDA, and others as appropriate (e.g., U.S. Pharmacopeia, Institute for Safe Medication Practices) should work together to undertake the following actions to address labeling, packaging, and the distribution of free samples:**

**• The FDA should develop two guidance documents for industry: one for drug naming and another for labeling and packaging. The FDA and industry should collaborate to develop (1) a common drug nomenclature that standardizes abbrevia-**

---

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*

Copyright © National Academy of Sciences. All rights reserved.

tions, acronyms, and terms to the extent possible, and (2) methods of applying failure modes and effects analysis to labeling and packaging.

• **Additional study of optimum designs for all drug labeling and information sheets to reflect human and cognitive factors should be undertaken. Methods for testing and measuring the effect of the materials on providers and consumers should also be established including methods to field test materials. The FDA, NLM, and industry should work with consumer and patient safety organizations to improve the nomenclature used in consumer materials.**

• **The FDA, the pharmaceutical industry, and other stakeholders should collaborate to develop a strategy for expansion of unit-of-use packaging for consumers to new therapeutic areas. Studies should be undertaken to evaluate different methods of presenting unit-of-use packaging and designs that best support different consumer groups in their medication self management**

• **The Agency for Health Care Research and Quality should fund studies that evaluate the impact of free samples on overall patient safety, provider prescribing practices, and consumer behavior (for example, adherence), as well as alternative methods of distribution that can improve safety, quality, and effectiveness.**

### Health Information Technology

Realization of the full benefits of many health information technologies (such as decision-support systems, smart IV pumps, bar-code administration systems, and pharmacy database systems) is hampered by the lack of common data standards for system integration and well-designed interfaces for end users.

Problems with data standards for drug information are threefold. First, there is no complete, standardized set of terms, concepts, and codes to represent drug information. Second, there is no standardized method for presenting safety alerts according to severity and/or clinical importance. Instead, providers are sometimes inundated with too many alerts, which can result in "alert fatigue". Third, many systems lack intelligent mechanisms for relating patient-specific data to allowable overrides, such as those associated with a particular patient and drug allergy alert or duplicate therapy request.

The ability of clinicians to use health information technologies successfully depends on how well the technologies have been designed at the level of human–machine interaction (i.e., user interface). Displaying information in a cluttered, illogical, or confusing manner leads to decreased user performance and satisfaction. Moreover, a poorly designed user interface can contribute to medication errors. Addressing user interface issues requires greater attention to the cognitive and social factors influencing clinicians in their daily workflow and interaction with technologies (van Bemmel and Musen, 1997).

**Recommendation 5: Industry and government should collaborate to establish standards affecting drug-related health information technologies, specifically:**

• **The NLM should take the lead in developing a common drug nomenclature for use in all clinical information technology systems based on the standards for the national health information infrastructure.**

• **AHRQ should take the lead in organizing safety alert mechanisms by severity, frequency, and clinical importance to improve clinical value and acceptance.**

### *PREPUBLICATION COPY: UNCORRECTED PROOFS*

Copyright © National Academy of Sciences. All rights reserved.

- **AHRQ should take the lead in developing intelligent prompting mechanisms specific to a patient's unique characteristics and needs; provider prescribing, ordering, and error patterns; and evidence-based best-practice guidelines.**
- **AHRQ should take the lead in developing user interface designs based on the principles of cognitive and human factors and the context of the clinical environment.**
- **AHRQ should support additional research to determine specifications for alert mechanisms and intelligent prompting, and optimum designs for user interfaces.**

### Research on Medication Errors: Incidence Rates, Costs, and Prevention Strategies

In reviewing the research literature, the committee concluded that large gaps exist in our understanding of medication error incidence rates, costs, and prevention strategies. The committee believes the nation should invest annually about $100 million in the research proposed below.

The primary focus of research on medication errors in the next decade should be prevention strategies, recognizing that to plan an error prevention study, it is essential to be able to measure the baseline rate of errors. Evidence on the efficacy of prevention strategies for improving medication safety is badly needed in a number of settings, including care transitions, ambulatory care (particularly home care, self-care, and medication use in schools), pediatric care, psychiatric care, and the use of OTC and complementary and alternative medications. For hospitals, key areas are further investigation of some prevention strategies (particularly bar coding and smart pumps) and how to integrate electronic health records with computerized provider order entry, clinical decision support, bar coding, and smart pumps.

Overall, most data about medication error incidence rates come from the inpatient setting, but the magnitude of the problem is likely to be greater outside the hospital. Areas of priority for research on medication error and ADE incidence rates are care transitions, specialty ambulatory clinics, psychiatric care, the administering of medications in schools, and the use of OTC and complementary and alternative medications. Much more research is needed as well on the patient's role in the prevention of errors, specifically, what systems provide the most cost-effective support for safe and effective medication self-management or for surrogate participation in medication use when a patient is unable to self-manage.

Most studies of the costs of medication errors relate to hospitals, and some report data more than 10 years old (Bates et al., 1997). A better understanding of the costs and consequences of medication errors in all care settings is needed to help inform decisions about investing in medication error prevention strategies.

**Recommendation 6: Congress should allocate the necessary funds and AHRQ should take the lead, working with other government agencies such as CMS, FDA and NLM, in coordinating for a broad research agenda on the safe and appropriate use of medications across all care settings, covering research methodologies, incidence rates by type and severity, costs of medication errors, reporting systems, and in particular, further testing of error prevention strategies.**

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*

Copyright © National Academy of Sciences. All rights reserved.

18                                                         *PREVENTING MEDICATION ERRORS*

## OVERSIGHT, REGULATION AND PAYMENT

Improving medication safety will require key changes in oversight, regulation, and payment. Accordingly, the following recommendation is addressed to the stakeholders that shape the environment in which care is delivered, including legislators, regulators, accreditors, payers, and patient safety organizations.[3]

> **Recommendation 7: Oversight and regulatory organizations and payers should use legislation, regulation, accreditation, and payment mechanisms and the media to motivate the adoption of practices and technologies that can reduce medication errors, and to ensure that that professionals have the competencies required to deliver medications safely.**
>
> • **Payers and purchasers should continue to motivate improvement in the medication-use process through explicit financial incentives.**
>
> • **CMS should evaluate a variety of strategies for delivering medication therapy management.**
>
> • **Regulators, accreditors, and legislators should set minimum functionality standards for error prevention technologies.**
>
> • **States should enact legislation consistent with and complementary to the Medicare Modernization Act's e-prescribing provisions and remove existing barriers to e-prescribing.**
>
> • **All state boards of pharmacy should undertake quality improvement initiatives related to community pharmacy practice.**
>
> • **Medication error reporting should be promoted more aggressively by all stakeholders (with a single national taxonomy used for data storage and analysis).**
>
> • **Accreditation bodies responsible for the oversight of professional education should require more training in improving medication management practices and clinical pharmacology.**

## MOVING FORWARD

The American people expect safe medication care. In this report, the committee proposes an ambitious agenda for making the use of medications safer. This agenda requires that all stakeholders—patients, care providers, payers, industry, and government, working together—commit to preventing medication errors. Given that a large proportion of injurious drug events are preventable, this proposed agenda should deliver early and measurable benefits.

## REFERENCES

AHRQ (Agency for Healthcare Research and Quality). 2005. *Advances in Patient Safety: From Research to Implementation*. Vols. 1–4. Rockville, MD: AHRQ.

Barker KN, Flynn EA, Pepper GA, Bates DW, Mikeal RL. 2002b. Medication errors observed in 36 health care facilities. *Archives of Internal Medicine* 162(16):1897–1903.

---

[3] Patient safety organizations are regulated through the Patient Safety and Quality Improvement Act of 2005 (P.L. 109-41). Broadly, they are organizations separate from health care providers that collect, manage, and analyze patient safety data, and advocate safety improvements on the basis of analysis of the patient safety data they receive.

***PREPUBLICATION COPY:  UNCORRECTED PROOFS***

Copyright © National Academy of Sciences. All rights reserved.

Bates DW. 2001. A 40-year-old woman who noticed a medication error. *Journal of the American Medical Association* 285(24):3134–3140.

Bates DW, Boyle DL, Vander Vliet MB, Schneider J, Leape L. 1995a. Relationship between medication errors and adverse drug events. *Journal of General Internal Medicine* 10(4):100–205.

Bates DW, Cullen DJ, Laird N, Petersen LA, Small SD, Servi D, Laffel G, Sweitzer BJ, Shea BF, Hallisey R, Vander Vliet M, Nemeskal R, Leape LL. 1995b. Incidence of adverse drug events and potential adverse drug events. Implications for prevention. ADE Prevention Study Group. *Journal of the American Medical Association* 274:29–34.

Bates DW, Spell N, Cullen DJ, Burdick E, Laird N, Petersen LA, Small SD, Sweitzer BJ, Leape L. 1997. The costs of adverse drug events in hospitalized patients. Adverse Drug Events Prevention Study Group. *Journal of the American Medical Association* 277(4):307–311.

Bates DW, Leape LL, Cullen DJ, Laird N, Petersen LA, Teich JM, Burdick E, Hickey M , Kleefield S, Shea B, Vander Vliet M. 1998. Effect of computerized physician order entry and a team intervention on prevention of serious medication errors. *Journal of the American Medical Association* 280(15):1311–1316.

CC (Cochrane Collaboration). 2005. *What is The Cochrane Collaboration?* [Online]. Available: http://www.cochrane.org/docs/descrip.htm [accessed October 6, 2005].

Classen DC, Pestotnik SL, Evans RS, Lloyd JF, Burke JP. 1997. Adverse drug events in hospitalized patients. Excess length of stay, extra costs, and attributable mortality. *Journal of the American Medical Association* 277(4):301–306.

Cohen MR. 2000. *Medication Errors: Causes, Prevention, and Risk Management*. Sudbury, MA: Jones and Bartlett Publishers.

Epocrates. 2005. *All-One-Guide to Drugs, Diseases and Diagnostics*. [Online]. Available: http://www2.epocrates.com [accessed October 6, 2005].

Evans RS, Classen DC, Pestotnik SL, Lundsgaarde HP, Burke JP. 1994. Improving empiric antibiotic selection using computer decision support. *Archives of Internal Medicine* 154(8):878–884.

Evans RS, Pestotnik SL, Classen DC, Clemmer TP, Weaver LK, Orme JF, Lloyd JF, Burke JP. 1998. A computer-assisted management program for antibiotics and other antiinfective agents. *New England Journal of Medicine* 338(4):232–238.

Field TS, Gilman BH, Subramanian S, Fuller JC, Bates DW, Gurwitz JH. 2005. The costs associated with adverse drug events among older adults in the ambulatory setting. *Medical Care* 43(12):1171–1176.

Flynn EA, Barker KN, Pepper GA, Bates DW, Mikeal RL. 2002. Comparison of methods for detecting medication errors in 36 hospitals and skilled-nursing facilities. *American Journal of Health-System Pharmacy* 59(5):436–446.

Gandhi TK, Weingart SN, Borus J, Seger AC, Peterson J, Burdick E, Seger DL, Shu K, Federico F, Leape LL, Bates DW. 2003. Adverse drug events in ambulatory care. *New England Journal of Medicine* 348(16):1556–1564.

Gurwitz JH, Field TS, Harrold LR, Rothschild J, Debellis K, Seger AC, Cadoret C, Garber L, Fish LS, Kelleher M, Bates DW. 2003. Incidence and preventability of adverse drug events among older person in the ambulatory setting. *Journal of the American Medical Association* 289(94):1107–1116.

Gurwitz JH, Field TS, Judge J, Rochon P, Harrold LR, Cadoret C, Lee M, White K, LaPrino J, Mainard JF, DeFlorio M, Gavendo L, Auger J, Bates DW. 2005. The incidence of adverse

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

20                                                                    *PREVENTING MEDICATION ERRORS*

drug events in two large academic long-term care facilities. *American Journal of Medicine* 118(3):251–258.

IOM (Institute of Medicine). 2000. *To Err Is Human: Building a Safer Health System.* Washington, DC: National Academy Press.

IOM. 2001. *Crossing the Quality Chasm: A New Health System for the 21st Century.* Washington, DC: National Academy Press.

IOM. 2004. *Patient Safety: Achieving a New Standard for Care.* Washington, DC: The National Academy Press.

Jha AK, Kuperman GJ, Teich JM, Leape L, Shea B, Rittenberg E, Burdick E, Seger DL, Vander Vliet M, Bates DW. 1998. Identifying adverse drug events: Development of a computer-based monitor and comparison with chart review and stimulated voluntary report. *Journal of the American Medical Informatics Association* 5(3):305–314.

Kaushal R, Bates DW, Landrigan C, McKenna KJ, Clapp MD, Federico F, Goldmann DA. 2001. Medication errors and adverse drug events in pediatric inpatients. *Journal of the American Medical Association* 285(16):2114–2120.

Kaushal R, Shojania KG, Bates DW. 2003. Effects of computerized physician order entry and clinical decision support systems on medication safety: A systematic review. *Archives of Internal Medicine* 163(12):1409–1416.

Leape LL, Cullen DJ, Clapp MD, Burdick E, Demonaco HJ, Erickson JI, Bates DW. 1999. Pharmacists participation on physician rounds and adverse drug events in the intensive care unit. *Journal of the American Medical Association* 282(3):267–270.

Leape LL, Bates DW, Cullen DJ, Cooper J, Demonaco HJ, Gallivan T, Hallisey R, Ives J, Laird N, Laffel G, Nemeskal R, Petersen L, Porter K, Servi D, Shea B, Small S, weitzer B, Thompson B, Vander Vleit M. 1995. Systems analysis of adverse drug events. Journal of the American Medical Association 274(1): 35-43.

Pronovost P, Weast B, Schwarz M, Wyskiel RM, Prow D, Milanovich SN, Berenholtz S, Dorman T, Lipsett P. 2003. Medication reconciliation: A practical tool to reduce the risk of medication errors. *American Journal of Critical Care* 18(4):201–205.

Reason J. 2000. Human error: Models of management. *British Medical Journal* 320(7237):768–770.

Svarstad BL, Mount JK. 2001. *Evaluation of Written Prescription Information Provided in Community Pharmacies, 2001.* Rockville, MD: U.S. FDA.

van Bemmel JH, Musen MA. 1997. *Handbook of Medical Informatics*. Heidelberg, Germany: Springer-Verlag.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

# APPENDIX F

## Committee Biographies

## Committee on the Assessment of the US Drug Safety System

### Sheila Burke (Chair)

Sheila P. Burke, MPA., RN, is deputy secretary and chief operating officer of the Smithsonian Institution. Ms. Burke is also the vice chair of the Robert Wood Johnson Health Policy Fellowships Board. She is a member of the Medicare Payment Advisory Commission and serves as chair of the Kaiser Family Foundation, the Kaiser Commission on the Future of Medicaid and the Uninsured, WellPoint Health Networks, Chubb Corporation, and the University of San Francisco. She is an adjunct lecturer in public policy at the Kennedy School of Government, Harvard University. She previously was executive dean and a lecturer in public policy at Harvard University's John F. Kennedy School of Government. From 1986 to 1996, Ms. Burke was chief of staff to Senate Majority Leader Robert Dole. In 1995, she was also elected to serve as secretary of the Senate. Before joining Senator Dole's personal office, she served the Senate Committee on Finance as a professional staff member and as deputy staff director. Early in her career, she worked as a staff nurse in Berkeley, California, and was director of program and field services for the National Student Nurses Association in New York. She received her MPA from Harvard University and her BS in nursing from the University of San Francisco. Ms. Burke is a member of the Institute of Medicine.

### David Blumenthal

David Blumenthal, MD, MPP, is the Samuel O. Thier Professor of Medicine and Professor of Health Care Policy at Harvard Medical School and director of the Institute for Health Policy at Massachusetts General Hospital and Partners HealthCare System.. Dr. Blumenthal is also the director of the Harvard University Interfaculty Program for Health Systems Improvement. Harvard University receives about $1 million per year from the Merck Foundation to support the research and convening activities of the Program for Health System Improvement. Dr. Blumenthal serves on several editorial boards, including those of the *American Journal of Medicine* and the *Journal of Health Politics,Policy and Law*. He is a national correspondent for the *New England Journal of Medicine*. Dr. Blumenthal was the founding chairman of AcademyHealth (formerly the Academy for Health Services Research and Health Policy), the national organization of health services researchers, and is a member of its board of directors. During the late 1970s, he was a professional staff member on Senator Edward Kennedy's Subcommittee on Health and Scientific Research. Dr. Blumenthal previously was the chair of the Institute of Medicine (IOM) Committee on Department of Veterans Affairs Pharmacy Formulary Analysis. His research interests include academic-industrial relationships in the life sciences, quality management in health care, the role and influence of health information technology, determinants of physician behavior, and access to health services. He received his MD and his MPP from Harvard University. Dr. Blumenthal is a member of the IOM.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*Appendix F*

**Sir Alasdair Breckenridge**
Sir Alasdair Breckenridge, CBE, is chairman of the UK Medicines and Healthcare
Products Regulatory Agency (MHRA). MHRA is the executive agency of the UK
Department of Health that is responsible for protecting and promoting public health and
patient safety by ensuring that medicines, healthcare products, and medical equipment
meet appropriate standards of safety, quality, performance, and effectiveness and are used
safely. In 2004, he was awarded a knighthood for his service to medicine in recognition
of his role in ensuring that British patients receive safe medical treatment. Prof.
Breckenridge has played a leading role in monitoring the safety of medicines for many
years. He previously was the chairman of the UK Committee on the Safety of Medicines
(CSM) and was a member of the CSM Adverse Reactions Group and the Subcommittee
on Adverse Reactions to Vaccines and Immunisation. He is a former professor of clinical
pharmacology at the University of Liverpool and headed its Department of Pharmacology
and Therapeutics for 26 years. Prof. Breckenridge has been both a member and chairman
of a regional health authority and a member of a local health authority.  His research
interests include the pharmacology of HIV drugs.

**R. Alta Charo**
R. Alta Charo, JD, is the Warren P. Knowles Professor of Law and Bioethics at the
University of Wisconsin Law School and its Medical School's Department of Medical
History & Bioethics. She teaches in the areas of Food and Drug Administration law,
biotechnology law, bioethics, and reproductive rights.  In addition, she has served on the
UW Hospital clinical-ethics committee, the UW institutional review board for the
protection of human subjects in medical research, and the UW Bioethics Advisory
Committee. Prof. Charo is the author of nearly 100 articles, book chapters and
government reports on such topics as voting rights, environmental law, medical-genetics
law, reproductive rights law, science policy and bioethics. She is a member of the board
of directors of the Alan Guttmacher Institute and the program board of the American
Foundation for AIDS Research (amfAR). She serves on several expert advisory boards of
organizations with an interest in stem-cell research, including WiCell and the California
Institute for Regenerative Medicine. She has served as a consultant to the Institute of
Medicine (IOM) and the National Institutes of Health (NIH) former Office of Protection
from Research Risks. In 1994, Prof. Charo served on the NIH Human Embryo Research
Panel, and from 1996-2001, on the presidential National Bioethics Advisory Commission
where she participated in drafting its reports on such topics as cloning, stem cell research,
and research ethics. She is a member of the NRC Board on Life Sciences and the IOM
Board on Population Health and Public Health Practices. She currently co-chairs the
NRC-IOM Human Embryonic Stem Cell Research Advisory Committee.

**Susan Edgman-Levitan**
Susan Edgman-Levitan, PA, is executive director of the John D. Stoeckle Center for
Primary Care Innovation at Massachusetts General Hospital (MGH). She is a lecturer in
the Department of Medicine of Massachusetts General Hospital and an associate in health
policy at Harvard Medical School. Before going to MGH, Ms. Edgman-Levitan was the

Copyright © National Academy of Sciences. All rights reserved.

*Appendix F*

founding president of the Picker Institute. She has been the coprincipal investigator on the Harvard Consumer Assessment of Health Plans Study (CAHPS) from 1995 to the present, which is funded by the Agency for Healthcare Research and Quality. She has served as chair of the Institute for Healthcare Improvement (IHI) Breakthrough Series Collaborative on Improving Service Quality and is the IHI fellow for patient and family-centered care. She is an editor of <u>Through the Patient's Eyes</u> (a book on creating and sustaining patient centered care), <u>The CAHPS Improvement Guide</u> and has written many papers and other publications on patient-centered care. She serves on several boards, including those of the National Patient Safety Foundation (NPSF), the Center for Information Therapy, the Foundation for Informed Medical Decision Making, Planetree, and the American Academy on Physician and Patient. She has cochaired the annual NPSF congress on patient safety since 2002. She received the Distinguished Alumni Award from the Duke Physician Assistant Program and was inducted into the Duke University Medical Center Hall of Fame in 2004. She received her PA degree from Duke University.

### Susan Ellenberg

Susan Ellenberg, PhD, is professor of biostatistics and associate dean for clinical research at the University of Pennsylvania School of Medicine. Previously, Dr. Ellenberg was director of the Office of Biostatistics and Epidemiology at the Center for Biologics Evaluation and Research (CBER) of the Food and Drug Administration (FDA), chief of the Biostatistics Research Branch in the Division of AIDS of the National Institute of Allergy and Infectious Diseases, and mathematical statistician in the Biometrics Research Branch of the Cancer Therapy Evaluation Program at the National Cancer Institute. Before her federal government service, she had positions at the EMMES Corporation and the George Washington University. She serves as associate editor of *Clinical Trials* and of the *Journal of the National Cancer Institute.* Dr. Ellenberg is a fellow of the American Statistical Association and the American Association for the Advancement of Science and an elected member of the International Statistical Institute. Her recent book on clinical trials data monitoring committees,of which Thomas Fleming (University of Washington) and David DeMets (University of Wisconsin) were coauthors, was named WileyEurope Statistics Book of the Year for 2002. Dr. Ellenberg's research interests include issues in the design and analysis of clinical trials and assessment of medical product safety, particularly focusing on efficient trial designs, interim monitoring and the operation of data monitoring committees, evaluation of surrogate endpoints, ethical issues in clinical research, and special issues in trials of cancer and AIDS therapies and of vaccines. She serves on two National Institutes of Health-sponsored data monitoring committees, and one for Curagen. She received her PhD in mathematical statistics from George Washington University.

### Robert D. Gibbons

Robert D. Gibbons, PhD, is a professor of biostatistics and psychiatry and director of the Center for Health Statistics at the University of Illinois at Chicago. He received his doctorate in statistics and psychometrics from the University of Chicago in 1981. He

***PREPUBLICATION COPY:  UNCORRECTED PROOFS***

Copyright © National Academy of Sciences. All rights reserved.

*Appendix F*

received a Young Scientist Award from the Office of Naval Research (1981), a Career Scientist Award from the National Institutes of Health (NIH) (1995), and numerous other NIH grants. His research spans medical, biologic, and environmental statistics, with emphasis on statistical problems in mental health, health services research, longitudinal data analysis, and environmental regulatory statistics. Dr. Gibbons is a fellow of the American Statistical Association and received two the Youden Prizes for statistical contributions to chemistry and the Harvard Award for contributions to psychiatric epidemiology and biostatistics. Dr. Gibbons has served on several Institute of Medicine (IOM) committees, including the Committee on Halcion and the Committee on Organ Procurement and Transplantation, and served on the IOM Board on Health Sciences Policy. He has written over 150 peer-reviewed papers and four books. Dr. Gibbons recently has conducted statistical work focusing on the reanalysis of data on selective serotonin reuptake inhibitors and suicide. Dr. Gibbons is a member of the IOM.

### George Hripcsak

George Hripcsak, MD, MS, is professor and vice chair of Columbia University's Department of Biomedical Informatics, associate director of medical informatics services for New York-Presbyterian Hospital, and senior informatics advisor at the New York City Department of Health and Mental Hygiene. He led the effort to create the Arden Syntax, a language for representing health knowledge that has become a national standard. His Applied Informatics project- funded by the US Department of Commerce to link the medical center, a home care agency, and the New York City Department of Health to improve inner-city tuberculosis care-won the National Information Infrastructure award. Dr. Hripcsak's current research focus is on the clinical information stored in electronic medical records. Using data mining techniques, such as machine learning and natural language processing, he is developing the methods necessary to support clinical research and patient safety initiatives. Dr. Hripcsak was a elected fellow of the American College of Medical Informatics in 1995 and served on the Board of Directors of the American Medical Informatics Association (AMIA). As chair of the AMIA Standards Committee, he coordinated the medical-informatics community response to the Department of Health and Human Services for the health-informatics standards rules under the Health Insurance Portability and Accountability Act of 1996. He chaired the Biomedical Library and Informatics Review Committee of the National Library of Medicine through 2005. He is associate editor of the Journal of the American Medical Informatics Association and of Computers in Biology and Medicine, and he is an editorial board member of the Journal of Biomedical Informatics. He received his MD and his MS in biostatistics from Columbia University.

### David Korn

David Korn, MD, is senior vice president for biomedical and health sciences research at the Association of American Medical Colleges.  He served as Carl and Elizabeth Naumann Professor and dean of the Stanford University School of Medicine from 1984 to 1995, and as vice president of Stanford University from 1986 to 1995. Earlier, he had served as professor and chairman of the Department of Pathology at Stanford from 1968.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*Appendix F*

Dr. Korn was appointed by President Ronald Reagan as chairman of the National Cancer Advisory Board from 1984 to 1991. He has been chairman of the Stanford University Committee on Research, president of the American Association of Pathologists (now the American Society for Investigative Pathology), president of the Association of Pathology Chairmen; member of the Board of Directors and the Executive Committee of the Federation of American Societies for Experimental Biology, and member of the Board of Directors of the Association of Academic Health Centers. He was also a founder of the California Transplant Donor Network, the Clinical Research Roundtable of the Institute of Medicine (IOM), and the Association for the Accreditation of Human Research Protection Programs. Dr. Korn has been a member of the editorial boards of the *American Journal of Pathology*, *The Journal of Biological Chemistry*, and *Human Pathology*, and for many years he was an associate editor of the latter. He received his MD from Harvard University. Dr. Korn is a member of the IOM.

### David O. Meltzer

David O. Meltzer, MD, PhD, is associate professor of medicine and affiliated faculty of the Department of Economics and Graduate School of Public Policy at the University of Chicago. He is director of the Center for Health and Social Sciences and the Centers for Disease Control and Prevention's Chicago Center of Excellence in Health Promotion Economics at the University of Chicago. He is codirector of the Section of General Internal Medicine research program, the Robert Wood Johnson Clinical Scholars Program, and the MD/PhD Program in the Social Sciences at the University of Chicago. Dr. Meltzer is a faculty research fellow for the National Bureau of Economic Research. His awards include the Lee Lusted Prize of the Society for Medical Decision Making, the Health Care Research Award of the National Institute for Health Care Management, the Young Investigator Award of the Society for Hospital Medicine, the Robert Wood Johnson Generalist Physician Award, the Eugene Garfield Economic Impact Award from Research America, and the Leaders in General Medicine Award from the Midwest Society for General Internal Medicine. Dr. Meltzer's research interests include the theoretical foundations of medical cost-effectiveness analysis, the effects of medical specialization and prospective payment systems on the cost and quality of care, and the effects of Food and Drug Administration regulation on innovation in the pharmaceutical industry. He is completing work on a small grant from TAP Pharmaceuticals on risk factors for gastrointestinal bleeding and on a small grant from a consortium of pharmaceutical companies on methods to assess the cost effectiveness of treatment for diabetes. The Center for Health and the Social Sciences at the University of Chicago received about $25,000 from the Merck Foundation last year for general support. Dr. Meltzer received his MD and PhD in economics from the University of Chicago.

### Woodrow A. Myers, Jr.

Woodrow A. Myers, Jr., MD, MBA, is the former executive vice president and chief medical officer of WellPoint Health Networks. Dr. Myers managed WellPoint's Healthcare Quality Assurance Division, including medical policy, clinical affairs, and health services operations. He was also responsible for strategic initiatives designed to

F-5       **PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*Appendix F*

enhance the healthcare experience for the company's members and to simplify administration and improve communications with physicians and other healthcare professionals. Before joining WellPoint, he was director of healthcare management at Ford Motor Company. Dr. Myers also served as the corporate medical director for Anthem Blue Cross Blue Shield, commissioner of health for the state of Indiana, and commissioner of health for New York City.  During the time Dr. Myers served as the commissioner of health in the State of Indiana, he advocated on behalf of Ryan White, a young boy afflicted with HIV who wanted to attend school. After a laborious process, Dr. Myers helped to change the law so that Indiana became the sole determiner of who attended school, thereby setting an important legal precedent. Earlier in his career, he was an assistant professor of medicine at the University of California San Francisco and a fellow in critical care medicine at the Stanford University Medical Center. Dr. Myers has received numerous medical and community-service awards and has published extensively on medical issues important to public health. He has served on the Board of Directors of the Stanford Hospital and is a former university trustee. He served as a member of the Harvard University Board of Overseers. He received his MD from Harvard University and his MBA from Stanford University.  Dr. Myers is a member of the Institute of Medicine.

### *Mary K. Olson*

Mary K. Olson, PhD, is an associate professor of economics and political economy at Tulane University. Before working at Tulane University, she was associate professor of health policy and administration in the Yale University School of Medicine Department of Epidemiology and Public Health. Dr. Olson has expertise on Food and Drug Administration (FDA) regulation. She has published articles that examine new-drug approval policies, FDA enforcement strategies, FDA advisory committees, the effects of prescription drug user fees on FDA, the effects of faster drug reviews on the safety of new medicines, and the risks associated with novel and less novel drugs. Her research interests include pharmaceutical regulation and new drug safety, and gender-related risks among newly approved drugs. Dr. Olson is completing work on a small grant from the Agency for Healthcare Research and Quality for a project to examine the association between the length of FDA review times and adverse drug reaction counts among the 1990 - 1998 new-drug approvals. Dr. Olson received her PhD in political economics from Stanford University.

### *Bruce M. Psaty*

Bruce M. Psaty, MD, PhD, is a professor of medicine, epidemiology, and health services, and co-director of the Cardiovascular Health Research Unit, University of Washington, Seattle, and an affiliate investigator in the Center for Health Studies at Group Health, Seattle, WA.  He is the principal investigator on four large epidemiologic studies and has had a major roles in National Institutes of Health (NIH)-funded multi-center studies, including the Cardiovascular Health Study, the Multi-Ethnic Study of Atherosclerosis, and the Women's Health Initiative.  He is the chair of the NIH Cardiovascular Disease and Sleep Epidemiology Study Section and chair of the Group Health Research Committee.  Earlier in his career, he was a Robert Wood Johnson

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*Appendix F*

Clinical Scholar at the University of Washington. Dr. Psaty is a member of the American Epidemiological Society as well as the American Heart Association Council on Epidemiology and Prevention. In 2005, he received the University of Washington Outstanding Public Service award. He publishes regularly in peer-reviewed journals, including many articles and editorials on the risks and benefits of a variety of drug therapies. Dr. Psaty's research interests include cardiovascular epidemiology, drug safety, hypertension, epidemiologic methods, pharmacogenetics, and pharmacoepidemiology. He has served on three NIH-funded data monitoring committees. He received his MD and PhD from Indiana University and his MPH from the University of Washington.

### Christopher H. Schroeder

Christopher H. Schroeder, MDiv, JD, is Charles S. Murphy Professor of Law and Public Policy Studies and Director of the Program in Public Law at Duke University Law School. He has served as acting assistant attorney general in the Office of Legal Counsel in the US Department of Justice, and as Chief Counsel to the Senate Judiciary Committee. He teaches environmental law; government, business, and public policy; environmental litigation; toxic-substances regulation; and philosophy of environmental protection. He has written on the philosophic foundations of risk regulation and liability, the regulation of toxic substances, American environmental policy, and a variety of topics in public law and theory. He is coauthor of a leading environmental-law casebook (5th edition, f 2006), *Environmental Regulation: Law, Science, and Public Policy.* His most recent book is *A New Progressive Agenda for the Public Health and the Environment* (2005), coedited with Rena Steinzor. His research interests include risk regulation, democratic theory, legislative institutions and separation of powers. Mr. Schroeder received his BA from Princeton University, his MDiv from Yale University and his JD from the University of California, Berkeley.


### Andy Stergachis

Andy Stergachis, PhD, MS, RPh, is professor of epidemiology, adjunct professor of pharmacy and the former interim chairman of the Department of Pathobiology in the School of Public Health and Community Medicine, University of Washington. He was chairman of the University's Department of Pharmacy and director of the Program in Pharmaceutical Outcomes Research and Policy. He is affiliated with the University's Northwest Center for Public Health Practice . Dr. Stergachis has served on the National Institutes of Health Epidemiology and Disease Control Study Section, the Agency for Healthcare Research and Quality Health Systems Research Study Section, committees of the National Committee on Quality Assurance, and the Institute of Medicine's Committee on Poison Prevention and Control and Committee to Study the Interactions of Drugs, Biologics, and Chemicals in the US Military. He held several positions with Group Health Cooperative of Puget Sound and served on its Pharmacy and Therapeutics Committee and the board of the Group Health Community Foundation. In 1998, he joined *drugstore.com* and served as vice president and chief pharmacist; now serves as pharmacy adviser. He cofounded and served as principal of Formulary Resources and serves as a consultant on managed care pharmacy for that company. Dr. Stergachis was

Copyright © National Academy of Sciences. All rights reserved.

*Appendix F*

consultant to United HealthCare for its pharmacoepidemiology cooperative agreement with the Food and Drug Administration.  He was the 1990 American College of Preventive Medicine/Burroughs Wellcome Scholar in Pharmacoepidemiology. The American Association of Pharmaceutical Research Scientists awarded Dr. Stergachis the 1994 Research Achievement Award in Economic, Marketing and Management Sciences. In 1999, he was selected as one of the 50 Most Influential Pharmacists in the United States by *American Druggist*.  He was awarded the 2002 Pinnacle Award by the American Pharmaceutical Association Foundation. He serves as board member of the American Pharmacists Association Foundation and he is a fellow in the International Society for Pharmacoepidemiology.  He received his PhD and MS from the University of Minnesota and his BPharm from Washington State University.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.