**EDITORIAL**

# Coxibs, Science, and the Public Trust

MERCK & CO (WEST POINT, PA) withdrew rofecoxib (Vioxx) from the market on September 30, 2004, based on unpublished data from their own APPROVe trial (2004), a randomized placebo-controlled study of 2600 patients (mean age, 60 years) with a history of adenomatous polyps who were taking 25 mg of rofecoxib daily. Only a minority of these patients had a known history of coronary artery disease. In fact, those with ischemic events in the prior year were excluded from the study. Patients randomized to rofecoxib were found to have an approximately 2-fold increase in the rate of cardiovascular events compared with those randomized to placebo. Merck reported that this difference did not become statistically significant until 18 months after study inception.

*See also pages 161, 171, 181, and 189*

The dramatic withdrawal of such a widely used and widely promoted drug 5 years after it was introduced to the market raises many questions concerning drug policy, scientific evidence, and treatment alternatives. Several of these questions are raised by articles in this issue of the ARCHIVES.[1,2] A more thoughtful approach to these issues by regulators, industry, clinicians, and researchers could help avoid similar episodes in the future.

### DRUG POLICY: WHAT ROLE FOR POSTMARKETING SURVEILLANCE?

To hasten the approval of potentially life-saving drugs, the US Food and Drug Administration (FDA) revamped its review process in the mid 1990s to accept fees from drug manufacturers in return for a shorter approval time. Some form of postmarketing surveillance (phase 4) has long been requested for some drugs by the FDA, but the agency's capacity to demand that such studies be done in a timely way has been far weaker than its authority over preapproval requirements.[3] Since the mid 1990s, the proportion of drugs for which the FDA has called for postmarketing surveillance has grown to one third of all new approvals. However, a 2003 report by the agency of its portfolio of active postmarketing safety studies reveals that about half have not yet been started.[4] The removal of rofecoxib 5 years and many studies after its introduction to market raises grave concerns that the FDA's approach to postmarketing safety surveillance is not working adequately.

Data from a recent cumulative meta-analysis[5] demonstrate that evidence of the cardiovascular risks of rofecoxib was apparent at least as early as 2000, the year after the drug's approval. The VIGOR [Vioxx Gastrointestinal Outcomes Research Study] trial,[6] published in 2000, demonstrated a 4-fold increased risk of acute myocardial infarction with once-daily 50-mg doses of rofecoxib compared with twice-daily 500-mg doses of naproxen among patients with rheumatoid arthritis. While naproxen's potential cardiovascular protection might have accounted for some of this risk difference,[7-9] this possibility was speculative and clearly did not exonerate rofecoxib. Yet Merck aggressively championed the cardioprotective effect of naproxen as a sufficient explanation for the higher myocardial infarction rate seen in the VIGOR participants randomized to rofecoxib[6]; the FDA rebuked Merck for this campaign in a warning letter issued in 2001 (letter to Merck Chief Executive Officer Raymond V. Gilmartin, September 17, 2001).

In 2002, the FDA raised concerns about rofecoxib's cardiovascular safety, but the only action taken was the addition of a statement to the package insert that "caution should be exercised when VIOXX is used in patients with a medical history of ischemic heart disease."[10] However, it was not known that the presumed cardiovascular risk of rofecoxib was limited to patients with a risk of cardiovascular disease. Yet by placing this warning on a list of several cautions and not in a black box, the FDA almost assured that the caution would have little influence on clinical practice. The absence of a black-box warning also allowed Merck to continue its enormous direct-to-consumer advertising campaign.

The absence of a more effective regulatory response by the FDA, despite the emergence of troubling data from the VIGOR trial[6] and a number of observational studies,[11-13] points to a serious problem in the FDA's approach to postmarketing surveillance. Even if the initial signal of increased cardiovascular risk seen in VIGOR may not have warranted immediate curtailment of the drug's use, it surely warranted aggressive and timely follow-up by both the FDA and Merck, including new clinical trials specifically targeting this question as well as immediate pharmacoepidemiologic investigation of the relationship. This was not done.

### SCIENTIFIC EVIDENCE: WHAT ROLE FOR OBSERVATIONAL STUDIES OF DRUG SAFETY?

Classically, data from randomized controlled trials have been considered the highest form of evidence for cau-

Downloaded from www.archinternmed.com, on August 27, 2005
©2005 American Medical Association. All rights reserved.

PLAINTIFF'S EXHIBIT H

sality, while results of observational studies have been viewed with greater caution. The experimental design of a randomized controlled trial offers important advantages over observational data when assessing a drug's benefit. However, such trials are rarely of adequate size or duration to detect uncommon but potentially clinically important adverse events. Moreover, such trials typically underrepresent the elderly and exclude patients with multiple comorbid illnesses or those taking many medications, precisely the type of patient at risk for the highest rates of adverse events. Thus, once drugs are out in the pharmacy, "unexpected" adverse events are common. Unless trials are redesigned with enough statistical power to detect an important range of adverse events, we should not expect that premarketing trials will yield complete safety data.

Do observational studies reflect true relationships between drugs and adverse events? The results from small case series, patient registries, or spontaneous reporting systems (such as the FDA's MedWatch) are subject to considerable bias and may not reflect true associations. Data from such studies help raise important safety concerns by demonstrating a "signal," but the lack of such a signal does not assure a drug's safety. Until adequate randomized controlled trials are performed (and with many drugs, this is never done), we will have to rely on well-performed observational studies. Carefully designed and executed, such studies can yield estimates of a drug's safety that are closer to the true relationships observed in typical practice than many randomized controlled trials. Others have demonstrated that small randomized controlled trials in patient populations that may differ from typical practice can be misleading.[14]

We participated with our colleagues in a large observational study of rofecoxib sponsored by Merck.[15] Epidemiologists from Merck helped work out several details of the study protocol and signed off on all aspects of the study design. However, when our results demonstrated an elevated risk of acute myocardial infarction with rofecoxib, Merck required a coauthor who was an employee of the company to remove her name from the article immediately prior to publication. Even after funding and agreeing with the design of the study, Merck publicly discredited our findings in May 2003 because of "serious limitations to the analysis."[16]

## CLINICAL ISSUES: ARE OTHER COXIBS SAFE?

Many assume a class effect when assessing a drug's safety, ie, that all members of a therapeutic class will demonstrate similar safety profiles. This is a dangerous assumption, as illustrated by the fate of 3 notable examples: cerivstatin (Baycol; Bayer AG, Leverkusen, Germany), troglitazone (Rezulin; Parke-Davis/Warner-Lambert [now Pfizer, New York, NY]), and bromfenac (Duract; Wyeth-Ayerst, Madison, NJ). Each of these drugs was withdrawn from the market not long after approval, in the latter 2 cases because of liver toxicity. Other members of their therapeutic classes (statins, glitazone hypoglycemic agents, and nonsteroidal anti-inflammatory drugs) do not demonstrate the same level of risk and remain important therapeutic choices.

If the mechanism for rofecoxib-associated cardiovascular risk were known, the risk of using other coxibs (celecoxib, etoricoxib, lamuricoxib, and valdecoxib) would be easier to assess. However, many credible mechanistic explanations of rofecoxib-associated cardiovascular events exist, including an increase in hypertension, thrombosis, and reduced vascular reactivity.[1,17] All of these mechanisms, as well as others yet to be articulated, may prove to contribute to the risk observed with rofecoxib. Until these issues are worked out, and while other coxibs remain available, reasonable physicians and patients may chart different courses.

On the one hand, some patients and physicians will decide that any coxib-associated risk is too great when clear and safer alternatives exist. As demonstrated in the analysis of Dai and colleagues[2] in this issue of ARCHIVES, and in earlier work,[18] many patients taking coxibs are at low risk for the gastrointestinal toxic effects associated with the use of nonsteroidal anti-inflammatory drugs (NSAIDs) and can take a nonselective NSAID with only minimal risk. Those with moderate to high risk of NSAID-related gastrointestinal toxic effects can also be offered many evidence-based noncoxib alternatives, including traditional NSAIDs with a proton pump inhibitor or misoprostol or other analgesics. These options are particularly attractive given the scanty evidence of long-term gastroprotection afforded by the remaining widely used coxibs, celecoxib and valdecoxib.

On the other hand, when physicians and patients see no alternative to a coxib, they can take some comfort in the apparent safety record of celecoxib thus far. Numerous randomized controlled trials and observational studies have found no elevated risk of cardiovascular events with this agent. By contrast, the safety record of valdecoxib, the other coxib marketed in the United States, is much less clear. There has been 1 small published study in patients undergoing coronary artery bypass grafting that demonstrated an increased risk of thrombotic events in patients taking valdecoxib (or parecoxib, the intravenous form of valdecoxib).[19] Several other unpublished studies also suggest a risk with valdecoxib (unpublished data, 2004). In addition, a black-box warning has recently been added to valdecoxib regarding Stevens-Johnson syndrome. The safety records of etoricoxib and lamuricoxib, 2 agents under review at the FDA, are much less clear at this point.

## CONCLUSIONS: HOW CAN THE PUBLIC'S TRUST BE REGAINED?

Several lessons can be learned from the 5-year experience and eventual withdrawal of rofecoxib from the market. First, the current postmarketing surveillance system does not work. If the FDA is to continue to approve drugs rapidly, we should not expect that all safety issues will be understood prior to a drug's approval. The agency will need to be more effective in requiring specially designed premarketing clinical safety trials when phase II or small phase III trials suggest reason for specific concerns. Such a system should be rapidly responsive and objective, and safeguards to protect this agenda against industry influence must be put in place.

Downloaded from www.archinternmed.com, on August 27, 2005
©2005 American Medical Association. All rights reserved.

Equally important will be an improved system of postmarketing surveillance, which could take many forms. Mandated postmarketing observational studies should be rigorous and timely for drugs to remain on the market; this could be accomplished by provisional approvals after phase III testing that would become final only after such assessments. Some have suggested that the oversight authority for postmarketing surveillance should be outside the FDA for organizational and political reasons, a view that seems more appealing in light of the agency's recent poor performance concerning Vioxx and the selective serotonin reuptake inhibitors.[20]

While postapproval randomized trials will have to be part of future drug safety assessments, rigorous techniques for pooling available trial data and for valid observational assessments can provide a second pillar of postmarketing surveillance. Important advances in meta-analytic techniques and observational studies should contribute to the design of any postmarketing surveillance system. Methods in pharmacoepidemiology are rapidly advancing, and data from such studies must be given proper weight in postmarketing regulatory decisions. While such studies may not "prove" causal relationships, they can raise important safety concerns that need to be immediately addressed for drugs to remain on the market.

Clinicians, regulators, and patients all must currently make clinical decisions about the remaining coxibs without perfect information. Mounting data have called the safety of valdecoxib into question, an issue that must be evaluated promptly. Fortunately, many patients taking coxibs can be switched to other equally effective and evidence-based analgesic regimens. Some with degenerative arthritis may obviate the need for analgesics by pursuing total joint arthroplasty, an underused and very effective treatment option. New safety studies of the other coxibs, including targeted randomized controlled trials, must be pursued with clear time lines and plans for action.

The market withdrawal of rofecoxib has brought to the forefront concerns about the drug safety system that have been raised before. These issues must be addressed now if we are to restore the public's confidence in the safety of our pharmacologic armementarium and provide physicians and patients with the data we all need to prescribe drugs safely.

*Daniel H. Solomon, MD, MPH*
*Jerry Avorn, MD*

Financial Disclosure: No specific support was provided for this article, but Drs Solomon and Avorn have received research grant support from Merck and Pfizer, manufacturers of coxibs.

Correspondence: Dr Solomon, Division of Pharmacoepidemiology, Brigham and Women's Hospital, 1620 Tremont St, Suite 3030, Boston, MA 02120 (dhsolomon@partners.org).

Funding/Support: There was no specific support for this article, but Dr Solomon's work is supported by grants AR-48616, AR-48264, and DA-15507 from the National Institutes of Health, Bethesda, Md, as well as funding from the Arthritis Foundation, Atlanta, Ga, and the Engalitcheff Arthritis Outcomes Initiative, Baltimore, Md.

**REFERENCES**

1. Sowers JR, White WB, Pitt B, et al; Celecoxib Rofecoxib Efficacy and Safety in Comorbidities Evaluation Trial (CRESCENT) Investigators. The effects of cyclooxygenase-2 inhibitors and nonsteroidal anti-inflammatory therapy on 24-hour blood pressure in patients with hypertension, osteoarthritis, and type 2 diabetes mellitus. *Arch Intern Med.* 2005;165:161-168.
2. Dai C, Stafford RS, Alexander GC. National trends in cyclooxygenase-2 inhibitor use since market release: nonselective diffusion of a selectively cost-effective innovation. *Arch Intern Med.* 2005;165:171-177.
3. Avorn J. Pulling the facts together. In: Avorn J. *Powerful Medicines: The Benefits, Risks, and Costs of Prescription Drugs.* New York, NY: Alfred A. Knopf; 2004:370-380.
4. Report on the performance of drugs and biologics firms in conducting postmarketing commitment studies. *Fed Regist.* 2003;May 21, 2003:27822-27823.
5. Juni P, Nartey L, Reichenback S, Sterchi R, Dieppe PA, Egger M. Risk of cardiovascular events and rofecoxib: cumulative meta-analysis. *Lancet Online.* November 5, 2004.
6. Bombardier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. *N Engl J Med.* 2000;343:1520-1528.
7. Solomon DH, Glynn RJ, Levin R, Avorn J. Nonsteroidal anti-inflammatory drug use and acute myocardial infarction. *Arch Intern Med.* 2002;162:1099-1104.
8. Rahme E, Pilote L, LeLorier J. Association between naproxen use and protection against acute myocardial infarction. *Arch Intern Med.* 2002;162:1111-1115.
9. Watson DJ, Rhodes T, Cai B, Guess HA. Lower risk of thromboembolic cardiovascular events with naproxen among patients with rheumatoid arthritis. *Arch Intern Med.* 2002;162:1105-1110.
10. Vioxx [package insert] West Point, Pa: Merck & Co; 2004.
11. Mukherjee D, Nissen SE, Topol EJ. Risk of cardiovascular events associated with selective COX-2 inhibitors. *JAMA.* 2001;286:954-959.
12. Ray WA, Stein CM, Daugherty JR, Hall K, Arbogast PG, Griffin MR. COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease. *Lancet.* 2002;360:1071-1073.
13. Solomon DH, Schneeweiss S, Glynn RJ, et al. Relationship between selective COX-2 inhibitors and acute myocardial infarction. *Circulation.* 2004;109:2068-2073.
14. Concato J, Shah N, Horwitz RI. Randomized, controlled trials, observational studies, and the hierarchy of research designs. *N Engl J Med.* 2000;342:1887-1892.
15. Solomon DH, Schneeweiss S, Glynn RJ, et al. Relationship between selective COX-2 inhibitors and acute myocardial infarction. *Circulation.* 2004;109:2068-2073.
16. Burton TM. Merck takes author's name off Vioxx study. *The Wall Street Journal.* May 18, 2004;B1.
17. FitzGerald GA, Patrono C. The coxibs, selective inhibitors of cyclooxygenase-2. *N Engl J Med.* 2001;345:433-442.
18. Solomon DH, Schneeweiss S, Glynn RJ, Levin R, Avorn J. Patterns of selective COX-2 inhibitor use: are patient or physician characteristics more important? *Am J Med.* 2003;115:715-720.
19. Ott E, Nussmeier NA, Duke PC, et al. Efficacy and safety of the cyclooxygenase 2 inhibitors parecoxib and valdecoxib in patients undergoing coronary artery bypass surgery. *J Thorac Cardiovasc Surg.* 2003;125:1481-1490.
20. Wood AJ, Stein CM, Woosley R. Making medicines safer: the need for an independent drug safety board. *N Engl J Med.* 1998;339:1851-1854.

Downloaded from www.archinternmed.com , on August 27, 2005
©2005 American Medical Association. All rights reserved.