IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Vioxx<br>PRODUCTS LIABILITY LITIGATION | MDL DOCKET NO. 1657 |
| | Section L |
| THIS DOCUMENT RELATES TO:<br>Case No. 2:06cv810 | |
| | Judge Fallon |
| CHARLES LARON MASON v.<br>MERCK & CO., INC. | Mag. Judge Knowles |

**OPPOSITION OF PLAINTIFF CHARLES LARON MASON TO DEFENDANT'S
MOTION TO EXCLUDE TESTIMONY OF
JOHN L. GUERIGUIAN, M.D.**

(Defendant's Expert Challenge No. 6)

**TO THE HONORABLE JUDGE ELDON FALLON:**

Plaintiff Charles Laron Mason, by and through his undersigned counsel, asks this Court to deny Defendant, Merck & Co., Inc.'s Motion to Exclude Testimony of John L. Gueriguian, M.D. As outlined below, Dr. Gueriguian is qualified to offer the applicable opinions challenged in Merck's motion, and his testimony is both reliable and relevant.

**I.
INTRODUCTION**

Plaintiff may call Dr. Gueriguian as a rebuttal expert to Janet Arrowsmith-Lowe. Dr. Gueriguian is a physician with specialty training in internal medicine, endocrinology, and pharmacology. From 1978 to 1998 he worked at the FDA in the Division of Endocrine and Metabolic Drug Products. While at the FDA, Dr. Gueriguian reviewed drugs for safety and efficacy; applied FDA regulations regarding labeling, post-marketing surveillance, and approval

of drugs; and was involved in the drafting of those regulations.[1]

Plaintiff does not intend to solicit testimony from Dr. Gueriguian regarding Vioxx or Merck specific issues. For that reason, Plaintiff produced with its expert designation the September 23, 2005 <u>13-page</u> Expert Report and Declaration of Dr. Gueriguian, which is attached hereto as Exhibit A. The report that is repeatedly cited by Merck in its Motion is Dr. Gueriguian's <u>43-page</u> March 16, 2006 report, which is attached to Merck's Motion as Exhibit B. This significantly more voluminous report contains numerous opinions that are not contained in his September 23, 2005 report and Plaintiff does not intend to solicit those opinions at trial. Therefore, the majority of Merck's Motion is inapplicable to this case.

In it Motion, Merck challenges Dr. Gueriguian's opinions and testimony on the following topics:

1. Adequacy of Merck's warnings and whether Merck acted as a "reasonable and prudent" pharmaceutical company (Merck's Motion, pp. 2-7);

2. The "Vioxx Story" and Merck's state of mind or motive (Merck's Motion, pp. 7-11);

3. Merck's interactions with the FDA and the FDA's decisions (Merck's Motion, pp. 12-14);

4. General causation and the cardiovascular effects of Vioxx (Merck Motion, pp. 15-16); and

5. 2002 Vioxx label implementation (Merck Motion, p. 16).

For purposes of this case, Plaintiff does <u>not</u> intend to solicit the opinions or testimony from Dr. Gueriguian that Merck addresses in Nos. 2, 3, 4 or 5 above. Rather, Plaintiff intends to solicit Dr. Gueriguian's opinions on the *general* topics of new drug evaluation, drug testing, drug approval, product labeling and post marketing requirements as described more fully below.

---

[1] *See* Exhibit A, Expert Report and Declaration of Dr. Gueriguian, at pp. 1-3; Curriculum Vitae of John L. Gueriguian, attached hereto as Exhibit B.

## II.
## LEGAL STANDARD

The legal standard for the admission of expert testimony in federal court is set forth at pages 4-6 of the Memorandum in Support of the Motion To Exclude Argument Or Opinion Testimony That An Increased Risk Of Heart Attack Exists Only After 18 Months Of Vioxx Use, filed concurrently herewith and incorporated herein by reference.

## III.
## DISCUSSION

A.   DR. GUERIGUIAN'S QUALIFICATIONS

Dr. Gueriguian's qualifications are extensive. He obtained his medical degree from the School of Medicine, University of Paris in 1965.[2] His internship and residency were completed at the Community Hospital of Mantes-la-Jolie, a fully accredited medical facility with the School of Medicine, University of Paris.[3] He was a Research Fellow at the Harvard Medical School while continuing his academic pursuits as a Staff Attendant in Endocrinology at the Brigham Hospital in Boston.[4] In 1969, Dr. Gueriguian accepted a position as an Assistant Professor of Pharmacology at the University of North Carolina, Chapel Hill.[5] In 1973, he was invited to become an Associate Professor of Pharmacology at the University of Minnesota, School of Medicine.[6] While there, he obtained a tenured position teaching pharmacology and conducting endocrinological research and published in the areas of prostaglandins.[7]

From 1978 to 1998, Dr. Gueriguian served as a group leader in the Division of Endocrine

---

[2] *See* Exhibit A, ¶1.
[3] *See id.*
[4] *See id.* at ¶2.
[5] *See id.* at ¶3.
[6] *See id.*
[7] *See id.*

and Metabolic Drug Products of the FDA.[8] As a Medical Officer of the FDA, Dr. Gueriguian reviewed hundreds of drugs for their safety and efficacy and worked with industry scientists and academic clinical investigators in the evaluation of new drugs.[9] In addition to his research activities, Dr. Gueriguian organized international conferences to discuss and obtain global expert consensus regarding the development of new drugs as well as evaluation existing drugs on the market for safety and efficacy.[10] Dr. Gueriguian served on FDA task groups on NDA (New Drug Application) and IND (Investigational New Drug Application) regulations.[11] He is widely published in this area.[12] He has spoken publicly on the topics of "FDA-Industry Interactions" and "New Trends in Regulatory Affairs on Medical Products for Human Use," among other speaking engagements.[13]

Dr. Gueriguian has also served as a consultant to pharmaceutical companies including Bristol-Myers, Johnson & Johnson and Glaxo-SmithKline.[14] Furthermore, Dr. Gueriguian is a prolific author, publishing numerous scientific volumes which have caused him to become familiar with the requirements for drug approval, post-marketing requirements, and product labeling.[15] His a sampling of his publications is set forth in detail in his curriculum vitae, which is attached hereto as Exhibit B. Dr. Gueriguian's qualifications are simply unassailable.

### B. DR. GUERIGUIAN'S OPINIONS

Dr. Gueriguian summarizes his opinions as follows:

- My opinions are expected to address my expertise as a drug safety expert, FDA medical officer and pharmacologist working with industry and academic investigators in the

---

[8] *See* Exhibit A, at ¶4.
[9] *See id.*
[10] *See* Exhibit A, pp. 2-3.
[11] *See* Exhibit B.
[12] *See id.*
[13] *See id.*
[14] *See id.*
[15] *See* Exhibit A, p. 3.

4

evaluation of new drugs, drug testing, drug approval, product labeling and post marketing requirements. In my role as a former FDA medical officer and drug safety expert, I will also opine on the responsibilities and requirements of drug manufacturers and the FDA, for pre and post market drug approval, drug testing and data analysis, data presentations, pre and post marketing risk assessment and post marketing surveillance.

- It is my opinion that FDA regulations, to the extent that they govern the testing, development and labeling of drugs are minimum standards.

- The FDA does not decide what drugs to develop and test. It does not tell the drug company how to test and research the drugs submitted for approval. It does not perform preclinical or clinical testing of drugs. It does not design studies. It does not tell the sponsor when to file an IND, NDA or SNDA. It is the drug sponsor or drug sponsor's agent that performs these functions.

- During the pre and post approval process, the drug sponsor, not the FDA, is primarily responsible for the content of the labeling. The sponsor, not the FDA, is responsible for initializing, preparing and drafting the original label and is expected to draft all additional or supplemental labels including revised warnings. The regulations expressly state that labeling shall be revised to include a warning as soon as the is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proven. 21 C.F.R. 201.57(e) "Reasonable association" can be provided by evidence of a variety of sources including: a) in vivo and in vitro evidence collected during the preclinical period; b) well documents single case report (particularly, where there is evidence of challenge or rechallenge); c) a case series; d) adverse event analysis; e) epidemiological studies (including observational studies); and f) clinical trials. The collection and assessment of evidence at any point in time, of safety signals associating the use of a product with an adverse event or toxicity, should be assessed during the entire pre-marketing and post-marketing phase of the drug. When those signals are suggestive of a reasonable association between drug exposure and adverse event, it is the responsibility of the drug sponsor to take an initiative, beginning with labeling changes. Such labeling changes can be unilaterally initiated by the drug sponsor through a mechanism known as "Changes being Affected" (CBE).

- Once the drug is approved, the FDA and the manufacturer must decide on labeling for the product. In my experience, the process usually involved negotiations between the FDA and the drug manufacturer. Prior to approval of a drug, the FDA has the power to condition its drug approval process by requiring the drug sponsor to conduct additional testing and research on the drug and/or require particular language in the accompanying label. This process gives a de facto advantage to the FDA. Following the drug's approval it is exceedingly difficult for the FDA to mandate drug testing research and to influence the content of the label or the studies to be conducted. Such "hostile" label changes are rarely, if ever, done because a sponsor can appeal or challenge the FDA decision, delaying indefinitely the process. This explains why many promised Phase IV studies are never completed and why the label change, post approval is protracted or

nonexistent.[16]

### C. DR. GUERIGUIAN IS QUALIFIED TO OFFER OPINIONS ON WARNING LABELS AND STANDARDS TO WHICH A PHARMACEUTICAL COMPANY SHOULD BE HELD.

In formulating his opinions, Dr. Gueriguian relied on his training and experience as a medical doctor, pharmacologist and medical review officer with 20 years of experience with the FDA. His opinions are based on his knowledge of the requirements applicable to pharmaceutical manufacturers under the Federal Food, Drug, and Cosmetic Act and federal regulations pursuant to the Act, and his knowledge of general FDA policies, procedures, and industry practices through his FDA experience, and his knowledge of practices in the pharmaceutical industry involving the development of new drugs.

Merck argues that Dr. Gueriguian does not have the requisite "scientific, technical, or other specialized experience" to opine on warning labels and the standards to which pharmaceutical companies should be held because, during his tenure at the FDA, he did not have authority for final approval of labels. (Merck Motion at 2). Not having "final approval of labels" does not render Dr. Gueriguian unqualified to offer opinions regarding federal regulations, FDA policies and industry standards pertaining to the preparation and supplementation of labels. This Court has previously held that Merck's regulatory expert, Janet-Arrowsmith-Lowe, who was employed by the FDA for 12 years, was qualified to render her opinions despite a similar argument asserted by the plaintiff in *Plunkett v. Merck & Co., Inc. See Plunkett v. Merck & Co. (In re Vioxx Prods. Liab. Litig.)*, 401 F.Supp. 2d 565, 578 (E.D. La. 2005) ("although she was never in charge of reviewing a new drug application or supplemental new drug application, [Arrowsmith-Lowe] has substantial experience reviewing them and is knowledgeable of the applicable regulations."). Similarly, as an FDA medical officer with 20 years of experience (8

---

[16] Exhibit A, pp. 12-13.

*more* years than Arrowsmith-Lowe), Dr. Gueriguian is more than qualified to offer opinions on warning labels and the standards to which pharmaceutical companies should be held. Indeed, other courts have held Dr. Gueriguian to be qualified in this area. *See Reeves v. Wyeth (In re Prempro Prods. Liab. Litig.)*, 2006 U.S. Dist. LEXIS 59049, *21-*26 (E.D. Ark. 2006) (permitting Dr. Gueriguian to testify on a variety of subjects including warnings and labels and what a reasonable drug company would do); *In re Diet Drugs Prods. Liab. Litig.*, 2001 U.S. Dist. LEXIS 1174, 56-57 (E.D. Pa. 2001) ("to the extent that Dr. Gueriguian opines about how information should be communicated to the FDA and what information should be reflected in labels, as mandated by applicable regulations, he is undoubtedly qualified to do so in light of his experience as an FDA officer").

Merck provides a number of opinions from Dr. Gueriguian's March 16, 2006 report that address the Vioxx label specifically. Again, Dr. Gueriguian will not opine specifically on the Vioxx label in this case. Rather, Dr Gueriguian will opine on labeling requirements generally. As Dr. Gueriguian is exceedingly qualified to render such opinions, Merck's request to exclude this testimony should be denied.

**D.   DR. GUERIGUIAN'S OPINIONS ON NORMATIVE STANDARDS CONCERNING THE FEDERAL REGULATIONS AND THE PHARMACEUTICAL INDUSTRY ARE RELEVANT AND RELIABLE.**

Merck mischaracterizes Dr. Gueriguian's expert opinions as "personal opinions". (Merck Motion at 4). In fact, Dr. Gueriguian's opinions in this case are not personal, but rather are based on his training and experience as a medical doctor, pharmacologist and medical review officer with the FDA. For example, Dr. Gueriguian's opinion that federal "regulations governing pharmaceuticals are minimal standards" which "can and should be exceeded where it is responsible and prudent to do so" are based on his experience with the FDA's limited resources

7

and the FDA's reliance on the drug manufactures to assist in protecting the public from dangerous side effects of their products:

> To the extent possible, given its finite and limited resources, the FDA is responsible for monitoring whether the pharmaceutical industry is undertaking the necessary steps to insure the safety of the manufacturer's product. In carrying out this function, however, the FDA is dependent upon the drug manufacturer to provide complete, accurate, timely, truthful information about the drug.[17]

Merck's suggestion that Dr. Gueriguian's opinion on this subject matter is unreliable is absurd. In his report, Dr. Gueriguian describes labeling procedures and cites specific federal regulations governing those procedures. For example, Dr. Gueriguian explains:

> Once the drug is approved, the FDA and the manufacturer decide on labeling for the product. In my experience, this process usually involves negotiations between the FDA and the drug's manufacturer. FDA regulation regarding labeling states that the "warning" section of the product's label shall describe serious adverse events and potential safety hazards ... " 21 C.F.R. 201 57(e). This section also provides that "the labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a hazard with a drug; a causal relationship need not be proved." . . . Particularly when there are safety concerns, raised concerning the drug, drug companies can choose to initiate a warning addition or change a label without prior prompting or approval by the FDA through a process known as a "special supplement changes being effected." (CBE).[18]

Merck is entitled to dispute Dr. Gueriguian's opinions through the testimony of it's regulation experts; however, Merck's disagreement with those opinions is not a proper subject for a *Daubert* challenge.

Again, with respect to Merck's challenge to Dr. Gueriguian's opinions regarding what a reasonable pharmaceutical company would do, Dr. Gueriguian is amply qualified to render such opinions based on his extensive medical background, experience with the FDA, and the FDA's interaction with pharmaceutical companies. Not only is Dr. Gueriguian qualified to offer his opinions, his testimony meets the other requirements of Federal Rule of Evidence 702. His

---

[17] Exhibit A, ¶9.
[18] Exhibit A, ¶18.

8

opinions are based upon sufficient facts and data, is the product of reliable principles and methods, and has been applied reliably to the issues involved in this case. *See* FED. R. EVID. 702. With respect to what "Merck could or should have done differently" (Merck Motion p. 7), again, Plaintiff has not designated Dr. Gueriguian to provide such opinions.

To the extent Merck intends to call its regulatory expert, Janet Arrowsmith-Lowe, to trial in this matter, Plaintiff is entitled to put on the rebuttal testimony by Dr. Gueriguian. Furthermore, if Janet-Arrowsmith Lowe intends to offer the opinion that Merck acted in compliance with FDA regulations and in accordance with industry standards with respect to drug testing, product labeling and post marketing requirements, Dr. Gueriguian should be entitled to offer his opinions on those same issues.

## IV.
## CONCLUSION

For these reasons, Plaintiff respectfully requests that Merck's Motion to Exclude Testimony of John L. Gueriguian, M.D. be denied.

Dated:  October 3, 2006

Respectfully submitted,

_____
Edward Blizzard (TBN 02495000)
Scott Nabers (TBN 14769250)
Rebecca Briggs King (TBN 24027110)
Holly M. Wheeler (TBN: 24006035)
BLIZZARD, MCCARTHY & NABERS, L.L.P.
440 Louisiana, Suite 1710
Houston, Texas 77002
(713) 844-3750
(713) 844-3755 (fax)

**ATTORNEYS FOR PLAINTIFF
CHARLES LARON MASON**

| Andy D. Birchfield, Esq.<br>P. O. Box 4160<br>234 Commerce Street<br>Montgomery, AL  36103-4160<br>PH:  (800) 898-2034<br>FAX:  (334) 954-7555 | Christopher Seeger, Esq.<br>One William Street<br>New York, NY  10004<br>PH:  (212) 584-0700<br>FAX:  (212) 584-0799 |
| --- | --- |
| Leonard Davis<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA  70013<br>PH:  (504) 581-4892<br>FAX:  (504) 561-6024 | Russ M. Herman<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA  70013<br>PH:  (504) 581-4892<br>FAX:  (504) 561-6024 |

**PLAINTIFFS' STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Opposition has been served on Liaison Counsel Russ Herman and Phillip Wittmann, Shayna S. Cook and Richard Krumholz by U.S. Mail, facsimile and/or e-mail; and e-mail upon all parties by electronically uploading the same to Lexis-Nexis File and Serve Advanced, in accordance with Pretrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of the Court of the Untied States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 3rd day of October, 2006.

_____
Holly M. Wheeler