# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | | |
|---|---|---|---|
| IN RE: | VIOXX | : | MDL NO. 1657 |
| | PRODUCTS LIABILITY LITIGATION | : | SECTION: L |
| | | : | |
| | | : | JUDGE FALLON |
| | | : | MAG. JUDGE KNOWLES |
| THIS DOCUMENT RELATES TO ALL CASES | | : | |
| | | : | |

**EXPERT WITNESS REPORT AND DECLARATION OF JOHN L. GUERIGUIAN, M.D.**

**I.      INTRODUCTION AND QUALIFICATIONS**

I, John Leo Gueriguian, M.D., hereby declare that the following are true to the best of my knowledge, information and belief.

1. In 1965, I graduated from the School of Medicine, University of Paris. I also obtained at the Arts & Sciences University of Paris, a Licence-es Sciences (equivalent to a "fortified" Bachelors of Science) in Biology, and Masters in Chemistry (with a minor in Endocrinology). While at this institution, I performed research on the diagnosis and treatment on chorio-epitheliomas, developing a method to assess the prognosis of testicular cancer. This research culminated in a Doctoral Thesis demonstrating that a simple blood test could result in early and specific diagnosis of the more malignant types of this class of tumors. I also became a Teaching Assistant in medical biochemistry and laboratory examinations. I spent several years in clinical practice during the numerous externships in various Parisian hospitals. Finally, I had my internship and residency training at the Community Hospital of Mantes-la-Jolie, a fully accredited medical facility affiliated with the School of Medicine, University of Paris

2. In 1965, I came to the United States as a Research Fellow at the Harvard Medical School While at Harvard, I co-discovered the sex hormone-binding globulin. At that time, I continued my academic pursuits as a Staff Attendant in Endocrinology at the Brigham Hospital in Boston. In 1967, I returned to France and accepted the position of Laboratory Chief , in the Biochemistry Department, School of Medicine, University of Paris. I was also a research associate at INSERM. INSERM is the French equivalent to our National Institute of Health (NIH). While there I published in the areas of steroid hormone transportation and metabolism.

3 In 1969, I returned to the United States to accept a position as an Assistant Professor of Pharmacology at the University of North Carolina, Chapel Hill. In 1973, I was invited to become an Associate Professor of Pharmacology at the University of Minnesota, School of Medicine in Duluth. While there, I obtained a tenured position teaching pharmacology and conducting endocrinological research in the human species There, I discovered a method to measure minute amounts of albumin in urine, thus providing the ability to detect early kidney damage in the diabetic patient. I also published in the area of prostaglandins , whose metabolism is affected by NSAIDs and Cox-2 inhibitors.

4. In 1978, I was invited to join the Food and Drug Administration (FDA) as a group leader in the Division of Endocrine and Metabolic Drug Products I served in that position for exactly twenty years until I retired in 1998. During my tenure as a Medical Officer at the FDA, I reviewed several hundred drugs for their safety and efficacy. In this capacity, I worked with industry scientists and academic clinical investigators in the evaluation of new drugs. I was personally instrumental in introducing new anti-diabetic drugs in the United States, particularly metformin and first and second generation sulfonylureas In addition to my research activities, I organized several

2

international conferences to discuss and obtain global expert consensus regarding the development of new drugs as well as evaluating existing drugs on the market for safety and efficacy.

5. My literary works include numerous scientific volumes. In this capacity, I have become familiar with the requirements for drug approval, post-marketing requirements, and product labeling. I have also become familiar with the interrelationship between the Food and Drug Administration and the pharmaceutical industry with respect to the development, testing, approval and marketing of drugs in the United States.

6. In September of 1998, I retired from the FDA and founded a scientific consulting think tank known as PharmaGenesis, Inc. My company seeks to provide the pharmaceutical industry with expertise regarding new drug development and the safety of marketed drugs. A copy of my Curriculum Vitae is attached to this report as Gueriguian as Exhibit 1.

7. The opinions expressed in this declaration are based on my education, experience and training in the fields of chemistry, pharmacology and regulatory compliance. I have also reviewed relevant medical, scientific and regulatory materials as well as relevant documents produced during the discovery of this litigation. See Exhibit 2. A statement of my prior expert testimony is attached hereto as Exhibit 3. I hold the opinions expressed in this declaration to a reasonable degree of medical and scientific certainty.

## II.   BACKGROUND OF THE FDA

A.   The FDA and Regulation of the Pharmaceutical Drug Industry

8. It is the intent of the FDA to protect the public health and welfare in a number of medical and therapeutic areas including xenobiotic and biological drugs, medical devices, foods and cosmetics. Its statutory mandate is to take appropriate steps within its regulatory confines to see that

3

drugs are approved only after they have been shown to be safe and effective. In addition, the FDA is empowered to exert pharmacovigilance after the approval and marketing of new drugs to ensure continued safety of drugs used by the very large patient population.

9. To the extent possible, given its finite and limited resources, the FDA is responsible for monitoring whether the pharmaceutical industry is undertaking the necessary steps to insure the safety of the manufacturer's product. In carrying out this function, however, the FDA is dependent upon the drug manufacturer to provide complete, accurate, timely and truthful information about its drug. Thus, the FDA's decisions and actions regarding an eventual approval of a new drug are directly dependent on the manufacturer fully testing the drug and disclosing, in a truthful, coherent, timely and accurate manner, all material information concerning that drug. Similarly, the FDA's decisions with respect to marketed drugs depends on the manufacturer's disclosure of timely, accurate, and relevant information concerning the safety of the drug, its use by the public and effectiveness in treating disease. The manufacturer's obligations to the FDA and to the public are continuing in nature; both pre-approval and post approval of the drug.

10. In my opinion, communications with the FDA must be timely, concise, accurate, complete and forthcoming and in a manner consistent with the regulations governing drug safety and efficacy. In my opinion, federal regulations governing pharmaceuticals are minimal standards 21 C.F.R. 314.70. It is my opinion that these regulations can and should be exceeded where it is responsible and prudent to do so

B    The Investigational New Drug Application (IND)

11. The Code of Federal Regulations, 21 C.F.R. 312, defines the procedures and requirements for submitting an application for an investigational new drug ("IND") These

4

procedures generally govern the early investigation of the safety and efficacy of potential new drugs in humans. Phase 1 trials are closely monitored studies which are designed to "determine the metabolism and pharmacologic actions of the drug in humans, the side effects associated with increasing doses, and, if possible to gain early evidence on effectiveness." 21 C.F.R. 312.21(a). Following Phase I studies, the sponsor will generally conduct Phase 2 studies which are "controlled clinical studies conducted to evaluate the effectiveness of the drug for a particular indication…in patients with the disease or condition under study and to determine the common short-term side effects associated with the drug." (Ibid). Phase 3 studies are "expanded controlled and uncontrolled trials'…performed after preliminary evidence suggesting effectiveness of the drug has been obtained, and are intended to gather additional information that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling." 21 C.F.R. 312.21(c).

12. IND regulations require the FDA to monitor clinical studies conducted under its administrative purview. This monitoring function is critical to the overall mission of the FDA to ensure "that the quality of the scientific evaluation of drugs is adequate to permit an evaluation of the drug's effectiveness and safety," 21 C.F.R. 312.22(a). The FDA's ability to monitor and evaluate these studies, given the limited resources of the FDA, is wholly dependent on the company's truthful, thorough, timely and balanced compliance with the regulations and disclosure of relevant information. In my position as a Medical Reviewer for the FDA, I can state that we relied heavily on a manufacturer's truthfulness, timeliness and honesty

13. The FDA will accept foreign clinical studies that are not conducted under the IND "provided that they are well designed, well conducted, performed by qualified investigators, and

5

conducted in accordance with ethical principles acceptable to the world community." 21 C.F.R. 312.120(a). In the event that foreign studies are submitted with an IND, the FDA requires that the manufacturer provide specific information. This information includes "a description of (each) investigator's qualifications; [a] description of the research facilities; a detailed summary of the protocol and the results of the study...[finally providing that] the study is adequate and well controlled under paragraph 314.126." As I stated, the regulatory system, which permits the FDA to approve drugs, depends on the quality, correctness, completeness, timeliness and integrity of the information provided by the drug manufacturer.

14. In the case of studies not conducted pursuant to an IND, but instead submitted in a New Drug Application (NDA) for new drug approval by the FDA, it is clearly the drug company's responsibility to:

- Ensure that the studies submitted either meet all the FDA's minimal criteria as described above for safety and effectiveness, with sufficient reliable data permitting an overall risk-benefit analysis of the drug;

- Or, if the foreign studies do not meet the criteria, to conduct new studies, which comply with the minimal criteria outlined in the regulations.

C       The New Drug Application (NDA)

15. A drug sponsor takes the initiative to send a New Drug Application (NDA) to the FDA when it has adequately investigated the safety and efficacy of the new drug for the indicated medical condition. It is the responsibility of the drug sponsor to provide the FDA with relevant safety information and to highlight any safety concerns the drug sponsors may have regarding the drug. Upon receipt of the NDA, the FDA submits the NDA to its specialized reviewers. These reviewers review the information provided by industry and transmit their report and recommendations to their

respective supervisors. These supervisors have the right to accept or reject the reviewer's findings. Under the stewardship of a project manager the entire NDA is submitted to the appropriate Division Director or the Office Director. At the conclusion of the first level of review, the NDA application is either approved, or not approved or receives a non-approvable letter. If the NDA is not approved, the FDA delineates the deficiencies allowing the company under some circumstances to correct the deficiencies in the form of a supplement.

16. During this process, a Divisional Advisory Committee comprised of independent experts are selected based upon their expertise to sit in an advisory capacity to assess the information provided to it by the manufacturer. Their ultimate purpose is to assess a drug's safety and efficacy as well as post-marketing concerns where applicable. In my experience, the FDA accords great weight to the recommendations of its Advisory Committees and has rarely rejected the recommendation of its Advisory Committees.

17. The FDA approves a new drug if, in its judgment, based upon the information provided by the sponsor and after receiving the recommendations of a separate Advisory Committee, the benefits in the indicated population and the disease or condition to be treated outweigh the risks. It is the company's obligation to furnish the FDA (prior to approval of the drug) updated documentation regarding safety as well as information suggesting potential toxicity associated with the drug. Such information enables the FDA to require post-marketing Phase IV studies to further assess the drug's safety after its introduction into the marketplace and permitting the FDA to:

    A.      Require additional safety studies before approval; or
    B.      Approve the drug on the condition of post-marketing Phase IV studies; or
    C.      Not approve the drug

D.    Labeling Issues And Procedures

18.  Once the drug is approved, the FDA and the manufacturer must decide on labeling for the product. In my experience, this process usually involves negotiations between the FDA and the drug's manufacturer. FDA regulation regarding labeling states that the "warning" section of the product label shall describe serious adverse events and potential safety hazards..."21 C.F.R. 201 57(e). This section also provides that "the labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a casual relationship need not have been proved." (Ibid.) This section further provides for a "boxed warning" for "special problems, particularly those that may lead to death or serious injury." (Ibid.) Particularly when there are safety concerns, raised concerning the drug, drug companies can choose to initiate a warning addition or change a label without prior prompting or approval by the FDA through a process known as a "special supplement changes being effected." (CBE).

19.  Information contained in the "precautions section" of a label is not a "warning". A "warning" of a serious adverse event associated with a drug must be placed in the "warning" section of the label and, if serious enough, in a black box prominently displayed.

20.  Information contained in the "contraindication section" of a label shall describe those situations in which the drug should not be used because the risk of use clearly outweighs any possible benefit. These situations include administration of the drug to patients known to have a hypersensitivity to it; use of the drug in patients who, because of their particular age, sex, concomitant therapy, disease state, or other condition, have a substantial risk of being harmed by it; or continued use of the drug in the face of an unacceptably hazardous adverse reaction. Known hazards and not theoretical possibilities shall be listed, e.g., if hypersensitivity to the drug has not

8

been demonstrated, it should not be listed as a contraindication  If no contraindications are known, this section of the labeling shall state "None known "  21 C F R  201 57(d)

21   The frequency of serious adverse events and other pertinent information "shall" be provided under the "adverse reaction" section of the label.  21 C F.R  at 201.57(g)  That section of the label "shall list the adverse reactions that occur with the drugs in the same pharmacologically active and chemically related class." (Ibid.)

E.      POST-MARKETING ADVERSE DRUG EVENT (ADE) REPORTING

22.  Following FDA approval, a drug continues to be governed by post-marketing regulations requiring, among other things, the reporting of adverse drug events (ADE's)  An ADE is defined as "any adverse event associated with the use of a drug in humans, whether or not considered drug related," 21 C.F.R. 314.80(a)  There are varying degrees of severity for an ADE from mid to moderate to serious to severe.  A serious ADE is "an adverse experience that is fatal or life threatening, is permanently disabling, [or] requires inpatient hospitalization."  In turn, an "unexpected event" is one that is "not listed in the current labeling [though] it may be symptomatically and pathophysiologically related to an event listed in the labeling, but differs from the event because of greater severity or specificity." (Ibid.) The regulations place the burden on the company to "promptly review all adverse drug experience information obtained or otherwise received by the (company) from any source, foreign or domestic, including information derived from commercial clinical investigations, post-marketing clinical investigations, post-marketing epidemiological/surveillance studies, reports in the scientific literature, and in published scientific papers " 21 C.F R. 314.80(b).

23 Federal regulations  require  that  a drug manufacturer  submit to the FDA all ADE

9

reports that are serious and unexpected regardless of the source within 15 business days of their having been received by the company. 21 C.F.R. 314 80(c) (i) This regulation further requires the manufacturer to "promptly investigate" all "15 day reports" and submit follow up reports to the FDA. Among the reasons for these requirements is to determine new adverse reactions which may be associated with the drug so that decisions can be made to change labeling or restrict the use of the drug. The FDA depends on the manufacturer to correctly identify an adverse event as "serious and unexpected" and to inform the FDA of same in a timely manner, particularly when such information may impact the public health.

24. Federal Regulations also  expressly mandate the additional requirement that the manufacturer submit periodic reports to the FDA. 21 C.F.R 314  These reports are to include serious and "expected," i e. labeled events and shall report any "significant increase in frequency." The purpose of this requirement is to enable the manufacturer and the FDA to determine whether additional labeling needs to be added or to determine whether the product should be withdrawn and/or restricted. Again, the FDA relies on the drug manufacturer to truthfully and accurately report these events in a timely and accurate fashion, particularly when such information may impact the public health.

25. Compliance with these post-marketing regulations is the responsibility of the company and is mandated by the federal regulations  It is also the company's responsibility to fulfill Phase IV studies, to comply with the regulations that govern promotional materials, and the reportability of adverse events (ADES) ,and actions designed to govern continued drug safety. Upon approval, the drug monitoring process shifts to the company  It is the company's responsibility to continue to inform the FDA of safety issues concerning its drug  It is my opinion that reasonable and prudent

10

drug companies will exceed these regulatory requirements when reasonably necessary to protect the public health and well being

26. It is my opinion that a reasonable and prudent pharmaceutical manufacturer has the continuing duty to monitor its drugs in the marketplace. Among other things, a reasonably prudent drug company has the obligation to continually monitor and investigate how its products are used, the efficacy of its drugs (and chemically related drugs) and the risks of its drugs (and chemically related drugs). The company has a further duty to inform the FDA in a timely fashion of material changes in the safety and risks of its drugs and to update its product label when it becomes apparent that the label is misleading and inaccurate regarding risks and benefits associated with its use.

27. It is my opinion that any representation, communication, and advertising to physicians and /or the general public, must project a message consistent with the information known or knowable regarding the drugs safety and efficacy profile. It is important not to minimize the dangers of the drug, nor overstate its advantages. Important adverse events should be communicated in a timely an accurate fashion.

## III    SUMMARY OF OPINIONS

28. My opinions are expected to address my expertise as a drug safety expert, FDA medical officer and pharmacologist working with industry and academic investigators in the evaluation of new drugs, drug testing, drug approval, product labeling and post marketing requirements. In my role as a former FDA medical officer and drug safety expert, I will also opine on the responsibilities and requirements of drug manufacturers and the FDA, for pre and post market drug approval, drug testing and data analysis, data presentation, pre and post marketing risk assessment and post marketing surveillance

11

29. It is my opinion that FDA regulations, to the extent that they govern the testing, development and labeling of drugs are minimum standards.

30. The FDA does not decide what drugs to develop and test. It does not tell the drug company how to test and research the drugs submitted for approval. It does not perform preclinical or clinical testing of drugs. It does not design studies. It does not tell the sponsor when to file an IND, NDA or SNDA. It is the drug sponsor or drug sponsor's agent that performs these functions.

31. During the pre and post approval process, the drug sponsor, not the FDA, is primarily responsible for the content of the labeling. The sponsor, not the FDA, is responsible for initializing, preparing and drafting the original label and is expected to draft all additional or supplemental labels including revised warnings. The regulations expressly state that labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved. 21C.F.R. 201.57(e) "Reasonable association" can be provided by evidence of a variety of sources including:  a) in vivo and in vitro evidence collected during the preclinical period; b) well documented single case report (particularly, where there is evidence of challenge or rechallenge); c)  a case series;  d) adverse event analysis; e) epidemiological studies (including observational studies); and f) clinical trials. The collection and assessment of evidence at any point in time, of safety signals associating the use of a product with an adverse event or toxicity, should be assessed during the entire pre-marketing and post-marketing phase of the drug. When those signals are suggestive of a reasonable association between drug exposure and adverse event, it is the responsibility of the drug sponsor to take an initiative, beginning with labeling changes. Such labeling changes can be unilaterally initiated by the drug sponsor through a mechanism known as "Changes being Affected"(CBE)

12

32. Once the drug is approved , the FDA and the manufacturer must decide on labeling for the product. In my experience , this process usually involves negotiations between the FDA and the drug manufacturer. Prior to approval of a drug, the FDA has the power to condition its drug approval process by requiring the drug sponsor to conduct additional testing and research on the drug and/or require particular language in the accompanying label. This process gives a de facto advantage to the FDA. Following the drug's approval it is exceedingly difficult for the FDA to mandate drug testing research and to influence the content of the label or the studies to be conducted. Such "hostile" label changes are rarely, if ever, done because a sponsor can appeal or challenge the FDA decision, delaying indefinitely the process. This explains why many promised Phase IV studies are never completed and why the label change, post approval is protracted or nonexistent

## CONCLUSION

The opinions expressed are based upon my training ,research and expertise in the fields of pharmacology and drug safety, my review of peer reviewed medical, scientific and regulatory literature and relevant documents and testimony produced during the discovery process. I will continue my education throughout the discovery process and I am not limiting my opinions to the above. I may supplement this report if necessary based upon additional receipt of information received during the discovery of the litigation  My consulting fee is $400 00 per hour for review and consultation and $4,000.00 half-day minimum for deposition and trial testimony.

13

On this ___23 rd___ day of September, 2005.

By: _____

John L. Gueriguian, M.D.