**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In Re: Vioxx | **MDL DOCKET NO. 1657** |
| **PRODUCTS LIABILITY LITIGATION** | |
| | Section L |
| THIS DOCUMENT RELATES TO: | |
| Case No. 2:06cv810 | |
| | Judge Fallon |
| CHARLES LARON MASON v. | Mag. Judge Knowles |
| MERCK & CO., INC. | |

**OPPOSITION OF PLAINTIFF CHARLES LARON MASON TO DEFENDANT'S**
**MOTION TO EXCLUDE TESTIMONY OF**
**CORNELIA PECHMANN, PH.D.**

**(Defendant's Expert Challenge No. 11)**

**TO THE HONORABLE JUDGE ELDON FALLON:**

Plaintiff Charles Laron Mason, by and through his undersigned counsel, asks this Court to deny Defendant, Merck & Co., Inc.'s Motion to Exclude the Testimony of Cornelia Pechmann, Ph.D. As outlined below, Dr. Pechmann is qualified to offer each of the opinions challenged in Merck's motion, and her testimony is both reliable and relevant.

**I.**
**INTRODUCTION**

As the Court is already aware, Dr. Pechmann is a professor of marketing at the Paul Merage School of Business at the University of California, Irvine. Her specialty is in integrated marketing communications campaigns, which are comprehensive and sophisticated marketing programs intended to convey a seamless integration of discrete marketing messages. She has worked in this area for over 20 years, published over 50 articles on this subject, and has been retained by

–1–

government agencies and businesses as a consultant and advisor on large integrated marketing communications campaigns.[1]

Merck does not appear to challenge Dr. Pechmann's qualifications or methodology. Indeed, the Court has already concluded that Dr. Pechmann "is very qualified" and that her methodology is appropriate.[2]   Rather, Merck appears to be asking the Court to further limit Dr. Pechmann's testimony.  Plaintiff will address each proposed limitation in turn.

The Court has already recognized that expert testimony on the subject of integrated marketing campaigns will benefit the jury.[3]   However, the Court has placed some limitations on Dr. Pechmann's testimony.  Specifically the Court has indicated that Dr. Pechmann cannot offer testimony regarding whether specific doctors were misled by Merck's advertising campaign. Plaintiff disagrees with Merck that the Court has definitively ruled that Dr. Pechmann cannot testify that Merck's campaign was not *generally* misleading.  In the event Plaintiff is incorrect, Plaintiff respectfully requests the Court reconsider its decision.

## II.
## LEGAL STANDARD

The legal standard for the admission of expert testimony in federal court is set forth at pages 4-6 of the Memorandum in Support of the Motion To Exclude Argument Or Opinion Testimony That An Increased Risk Of Heart Attack Exists Only After 18 Months Of Vioxx Use, filed concurrently herewith and incorporated herein by reference.

Rule 702 and the factors set forth in *Daubert* have been applied by courts to admit and

---

[1] *See* August 10, 2006 Report of Cornelia Pechmann, Ph.D. ("Pechmann Rep."), attached hereto as Exhibit A.
[2] *See* June 7, 2006 Transcript, *Barnett v. Merck & Co., Inc.*, 47:6; 52:5-53:10.
[3] *See id.* at 52:21-53:9.

uphold testimony of marketing experts in complex litigation matters.  For example, in *Schwab v. Philip Morris USA, Inc.,* 2005 WL 2401647 (E.D.N.Y. 2005), the plaintiffs proffered a marketing expert to testify that defendant cigarette manufacturers intentionally marketed and advertised low tar and light cigarettes in a manner that conveyed they had a health benefit over regular, full flavor cigarettes and "that defendants 'knew' that smokers switched to low tar brands for 'health' reasons, and that 'successful advertising had to allay consumers' fears about company documents and thereby identifying seven 'lights are safer' cues that defendants allegedly employed in low tar advertising." *Id.*  The district court noted that the plaintiffs' expert was a "Professor Emeritus of Marketing with adequate credentials in his field."  *Id.*  The district court denied the defendants' motion to exclude testimony, stating:

> The charge of fraud makes relevant both what defendants knew and intended and how their activities were designed to influence the beliefs and activities of consumers.  It can be assumed that the tobacco companies' advertising budgets and programs affected consumer reactions.  Dr. Pollay's experience, analytical techniques and reports meet all the elements of *Daubert* and Rule 702's requirements.  His report could be reliable and helpful to the jury.  It is not excludable under Rule 403 of the Federal Rules of Evidence.  Advertising methodologies are esoteric; the average juror could be helped by an explanation of how they work and were used by defendants. *Id.*

Other courts similarly have upheld the admission of testimony by marketing experts or reversed trial courts for failing to allow such testimony under Rule 702 and *Daubert* or similar evidentiary rules.  *See, e.g., Novartis Corp. v. Fed. Trade Commission,* 223 F.3d 783, 787-88 (holding that expert testimony admissible as to whether "advertising played a 'substantial role' in creating or reinforcing a false belief" in a drug product's efficacy); *Blue Cross and Blue Shield of New Jersey v. Philip Morris, Inc.,* WL 1738338 (E.D.N.Y. 2000) (also upholding expert testimony with regard to marketing low tar and light cigarettes); *Edina Realty v. TheMLSonline.com,* WL

737064 (D.Minn.2006) (allowing marketing expert testimony in trademark infringement); *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134 (9th Cir. 1997) (reversing district court's exclusion of testimony of plaintiff's marketing research expert in false advertising Lanham Act action concerning how defendants' advertisements mislead the consuming public); *Nestle Food Co., v. Abbott Laboratories,* WL 8578 (9th Cir. 1997) (allowing expert in consumer psychology to testify as to defendants' motivations concerning direct to consumer marketing to reduce breast feeding and promote use of infant formula); *Tyus v. Urban Search Management,* 102 F.3d 256, 264 (7th Cir 1996) (holding that district court abused discretion in refusing to allow psychologist to testify concerning how an advertising campaign sends message to its target market, and stating that materials on which expert relied and methodology used "were well within the range contemplated by *Daubert* for expert scientific testimony"); *Betterbox Communications v. BB Technologies,* 300F.3D 325 (E.D. Pa. 2002) (allowing expert testimony of marketing expert on trademark confusion based on 20 years marketing expertise).

## III.
## DISCUSSION

**A.**     **MERCK ASKS THIS COURT TO IMPOSE UNREASONABLE LIMITATIONS ON DR. PECHMANN'S TESTIMONY.**

> **(1)**     **Dr. Pechmann Is Entitled To Rely on Depositions And Her Conversation With Plaintiff's Prescriber, Nurse Olson-Fields**

Dr. Pechmann will not offer testimony about whether Dr. Vogeler or Nurse Olson-Fields specifically were misled by Merck's marketing campaign. As Merck points out, Dr. Vogeler will testify via video and Nurse Olson-Fields will provide this testimony in person at trial. Merck has asked this Court to exclude *all* reference by Dr. Pechmann to her review of Dr. Vogeler's or Nurse

Olson-Fields' depositions and her telephone conversation with Nurse Olson-Fields because, Merck

claims, "[t]hese are not proper materials on which Professor Pechmann can rely" (Merck's Motion,

4). As discussed in her deposition, Dr. Pechmann contacted Nurse Olson-Fields to learn more about

the messages she received from Merck regarding the safety and efficacy of Vioxx in order to

determine whether those messages were consistent with Merck's marketing campaign. This is

demonstrated by the following testimony by Dr. Pechmann:

> Q.   So [Nurse Olson-Fields] doesn't remember what specific brochures she saw?
>
> A.   I didn't ask her anything in detail.  I really just wanted to know what were the messages that she remembered hearing.[4]

* * *

> Q.   Your assumption when you spoke with Nurse Olson is that the rumors that she heard about Vioxx came from the warning letters she received from the competition?
> A.   No.  I didn't assume anything.  I just asked her what marketing messages she heard and what information she heard.[5]

* * *

> Q.   What made you decide to contact Nurse Olson?
> A.   I read her first deposition, and I felt that it didn't have enough information about marketing issues. So I asked Ed Blizzard if she was going to be deposed again so that we could ask her about marketing brochures and so on, marketing messages.  And he said initially that she was, and then he said she wasn't being deposed again and was going to appear at trial.  Then I said well, I still have these questions.  And he suggested that I call her or that I give her my phone number and she could call me at her convenience, which is what she ended up doing.

* * *

> Q.   Did your conversation with Nurse Olson impact your opinions in this case?
> A.   No, not in any fundamental way.  Essentially, I learned that she wasn't an outlier, that her experience was consistent with what the research shows was the experience of

---

[4] Sept. 14, 2006 Deposition of Cornelia Pechmann, Ph.D. ("Pechmann 9/14/06 Dep."), 15:6-10, attached hereto as Exhibit B.
[5] *Id*. at 18:8-13.

other physicians.[6]

\* \* \*

Q.     So other than what might have been discussed in Nurse Olson's deposition, you're not aware of any literature about Vioxx that she reviewed?

A.     Let's see.  She talked about messages she received over the phone with me and some of which she discussed in her deposition as well.[7]

Dr. Pechmann is entitled to testify generally about her conversation with Nurse Olson-Fields, as well as the depositions of Nurse Olson-Fields and Dr. Vogeler and her conversations with former Merck sales representatives, all of which provide the basis for her opinion that the messages Merck was sending out into the medical community were consistent with its integrated marketing campaign. This Court has *never* concluded that such sources of information were improperly considered by an expert when formulating his or her opinions.  In fact, the Court has previously observed that Dr. Pechmann's review of such materials was proper:

> As I understand [Dr. Pechmann's] methodology, she says that she's reviewed, she says, thousands, if not tens of thousands of papers and documents, ***including depositions***, exhibits, custodial files, associated with Merck's marketing sales, public relations people, ***she's interviewed and she's interviewed or discussed with various sales representatives from Merck***, she says she's applied her knowledge and experience with marketing constructs, marketing research tools, marketing and advertising, metrics and pharmacological marketing metrics to formulate her opinion.[8]

The Court has also indicated that Dr. Pechmann is entitled to offer testimony regarding what Merck did in order to neutralize concerns about the potential risks of Vioxx:

> . . . [Dr. Pechmann] can, in order to discern what the integrated marketing approach is, has to understand what the problems, what will proceed that the integrated marketing was devised to deal with.  And without exquisite detail, I think the witness

---

[6] Pechmann 9/14/06 Dep., 30:12-17.

[7] *Id.* at 106:4-9.

[8] June 7, 2006 Transcript, *Barnett v. Merck & Co., Inc.*, 52:5-13 (emphasis added).

can explain or postulate or conclude that because of VIGOR or whatever it is that there was some information that cardiovascular risks existed for taking Vioxx. **And then she concludes that, as I read it, that Merck saw this as an obstacle or a challenge and devised a marketing technique to neutralize physicians and the public concerns about Vioxx and its potential risks.** *And discuss what that marketing technique was and explain it and how they went about it and what they did and how they did it.*[9]

Consistent with the Court's reasoning, Dr. Pechmann should be allowed to testify about the actions taken by Merck in executing its marketing campaign. Among these actions was the inundation of the medical community, through sales calls and written communications, with the message that Vioxx was safe from a cardiovascular standpoint. In order to formulate an informed opinion in this case, Dr. Pechmann was required to educate herself on the messages received by the medical community. As demonstrated by their testimony, Dr. Vogeler and Nurse Olson-Fields received those messages. When Dr. Pechmann discovered that Nurse Olson-Field's deposition did not provide enough information, Dr. Pechmann contacted Nurse Olson-Field for the exclusive purpose of gaining a better understanding of the messages. The depositions and her conversation with Nurse Olson-Fields provide the basis for Dr. Pechmann's opinion that Merck's messages to the medical community were consistent with its integrated marketing campaign.

Merck argues, without basis or support, that Dr. Pechmann "freely admits" the subject deposition and conversation with Nurse Olson-Fields, which she utilized in formulating her opinions, "were not conducted in accordance with 'standard marketing research practices.'" (Merck Motion, 4). Merck's interpretation of Dr. Pechmann's report and testimony is not accurate. For example, Merck references a paragraph of Dr. Pechmann's report which provides in part:

When Merck's attorney questioned Dr. Olson about [the PIR letter] at her deposition,

---

[9] June 7, 2006 Transcript, *Barnett v. Merck & Co., Inc.*, 53:21-54:9 (emphasis added).

Dr. Olson opined that the information in this letter was clear.  However, Merck's own marketing research (discussed later in this report) suggests otherwise.  Also, standard marketing research practices dictate that people be asked to review marketing materials under normal viewing circumstances to measure their responses validity, and Dr. Olson did not view this letter under normal viewing circumstances at her deposition.[10]

This excerpt describes one of Dr. Pechmann's opinions regarding the circumstances under which *Nurse Olson-Fields* was asked to review one of Merck's marketing materials.  This paragraph has absolutely nothing to do with the appropriate materials a *marketing expert* reviews when formulating opinions in litigation regarding a misleading integrated marketing campaign.  Further, Merck's quote from Dr. Pechmann's deposition testimony about her conversation with Nurse Olson-Fields (Dr. Pechmann "wasn't treating [her telephone conversation with Nurse Olson-Fields] like a marketing research project") again has nothing to do with the methodology by which Dr. Pechmann formed her opinion in this case.  Dr. Pechmann has never suggested that she has undertaken a traditional marketing research project with respect to Vioxx.  Rather, she was retained in this litigation to offer an opinion on the misleading nature of *Merck's* integrated marketing campaign.  Merck's argument that Dr. Pechmann admits an inappropriate reliance on these sources is simply nonsensical.

**(2)      Dr. Pechmann's Testimony Is Not Duplicative.**

With respect to Merck's concern regarding Dr. Pechmann "parroting" the testimony of Dr. Vogeler or Nurse Olson-Fields, Plaintiff has already addressed this issue.  Dr. Pechmann will not provide testimony regarding whether Dr. Vogeler or Nurse Olson-Fields specifically were misled by Merck's marketing campaign.  Rather, Dr. Pechmann will testify generally about the messages Merck was sending to the medical community about the cardiovascular safety of Vioxx and whether

---

[10] Pechmann Rep., ¶23(d).

those messages were consistent with Merck's marketing campaign.  No other expert has been offered by Plaintiff to provide such an opinion.

      **(3)**      **Merck Has Not Been Unfairly Prejudiced.**

Merck also argues that it has been unfairly prejudiced by Dr. Pechmann's contact with Nurse Olson-Fields because Merck and its experts are not allowed to have direct contact with individual prescribers.  Nurse Olson-Fields spent only 45 minutes talking with Nurse Olson-Fields on the telephone.[11]  Merck questioned Dr. Pechmann at length and in detail about her conversation with Nurse Olson-Fields.[12]  Merck suggests that its experts "have not had a similar opportunity to explore Nurse Olson's Fields' recollections regarding the communications she received from Merck." (Merck Motion, 5).  First, Merck has not designated a marketing expert; therefore, Merck does not have an expert who is qualified to speak with Nurse Olson-Fields about this subject matter.  Second, Merck spent four (4) hours deposing Nurse Olson-Fields and will have another opportunity to examine her when she appears in person at trial.  As such, Merck has, and will have, ample opportunity to "explore Nurse Olson's Fields' recollections regarding the communications she received from Merck."  Merck cannot demonstrate prejudice.

**B.**     **DR. PECHMANN IS QUALIFIED AND UTILIZED THE PROPER METHODOLOGY IN FORMULATING HER OPINION THAT MERCK'S MARKETING CAMPAIGN WAS GENERALLY MISLEADING.**

As noted above, it is not entirely clear whether the Court has definitively ruled that Dr. Pechmann cannot testify that Merck's marketing campaign was misleading in general.  At a minimum, Plaintiff contends that such testimony requires context.  Courts frequently allow

---

[11] *See* Pechmann 9/14/06 Dep., 13:12-19.
[12] *See* Pechmann 9/14/06 Dep., pp 13-30, 92, 97-98, 104-108, 116, 139-140.

marketing experts to testify in similar contexts. *See, e.g. Schwab v. Philip Morris, supra,* 2005 WL 2401647 (finding that "the charge of fraud makes relevant both what defendants knew and intended and how their activities were designed to influence the beliefs and activities of consumers;" *Novartis Corp. v. Fed. Trade Commission, supra,* 223 F.3d 783 (holding that expert testimony admissible as to whether advertising played a substantial role in creating or reinforcing a false belief about the efficacy of defendant's product).

Dr. Pechmann is amply qualified to testify about integrated marketing campaigns, and specifically, about misleading marketing campaigns. Dr. Pechmann has drawn from her own research and articles and has reviewed articles on campaigns utilized by the pharmaceutical industry to formulate her opinions and conclusions. Dr. Pechmann a full tenured professor of marketing at the University of California, Irvine School of Business.[13] She has approximately 50 refereed publications in academic journals, books and conference proceedings on topics relating to integrated marketing communications campaigns.[14] Her 2002 article in the *Journal of Consumer Research* about cigarette advertising and adolescents won that journal's "best paper in 2002" award.[15] A recent scientific study to determine the top 50 marketing scholars based on a citation index (i.e. impact of work on academia) included Dr. Pechmann.[16] Dr. Pechmann has been a member of the editorial boards of three of the top marketing journals, including the *Journal of Consumer Research.*[17]

Additionally, Dr. Pechmann has substantial practical experience in designing, implementing

---

[13] *See* Pechmann Rep., p. 1; *see also* Dr. Pechmann's May 26, 2006 deposition ("Pechmann 5/26/06 Dep.), 288:14-17, attached hereto as Exhibit C.
[14] *See* Pechmann Rep., p. 4; *see also* Pechmann 5/26/06 Dep., 288:18-20.
[15] *See* Pechmann Rep., p. 4.
[16] *See* Pechmann 5/26/06 Dep., 290:5-16.

and advising on integrated marketing communications campaigns.  For example, Dr. Pechmann was retained by the United States Office of National Drug Control Policy to develop an anti-drug integrated marketing communications campaign over a five year period from 1998 to 2004.[18]  This was the largest integrated social marketing communications campaign in U.S. history.[19]  She was one of six members of the behavioral change expert panel and was chosen to oversee research conducted for the campaign.  This involved copy testing and tracking of reactions to the campaign.[20]  Dr. Pechmann developed strategy (core messages); reviewed focus group work before filming; tested storyboards and preliminary ads; reviewed tracking research after ads run (designed research and analyzed data); reviewed findings and statistical analyses of the data; and adjusted the campaign based on the results.[21]   Dr. Pechmann worked with an affiliate of the same marketing communications campaign, and during the same time period at issue here.

Based on Dr. Pechmann's qualifications, she is an expert in integrated marketing campaigns,[22] *misleading advertising*,[23] the role of the U.S. federal and state governments in identifying and preventing misleading advertising, particularly the FTC (she published peer-reviewed articles regarding the FTC's role in identifying and preventing misleading advertising) and the FDA (she assisted in the American Psychological Association's response to the FDA's proposed regulations restricting tobacco products to children),[24] and experimental and quasi-experimental

---

[17] *See* Pechmann 5/26/06 Dep., 289:6-290:1.
[18] *See* Pechmann Rep., p. 1.
[19] *Id.*
[20] *See* Pechmann 5/26/06 Dep., 8:10-11:11.
[21] *See* Pechmann Rep., pp. 1-2; Pechmann 5/26/06 Dep., 293:21-294:7.
[22] *See* Pechmann Rep., p. 1; Pechmann 5/26/06 Dep., 288:21-23.
[23] *See* Pechmann Rep., p. 3; Pechmann 5/26/06 Dep., 157:2-7.
[24] *See* Pechmann Rep., p. 3.

research and designs and statistics in marketing.[25]  Dr. Pechmann's numerous other qualifications in the marketing field and especially in the sub-field of integrated marketing communications are set forth in her expert report and attached curriculum vitae.[26]  Indeed, Merck cannot and does not challenge Dr. Pechmann's expertise in these areas.

As the Court is already aware, Dr. Pechmann spent approximately 250 hours reviewing Merck's documents, meeting with counsel and preparing her expert report prior to her *initial* deposition by Merck on May 26, 2006.[27]  She spent substantial additional time reviewing documents and preparing for a further deposition by Merck on June 15, 2006 and preparing further documentation memorializing those matters to which she testified in her initial deposition.[28]

Dr. Pechmann spent approximately half of her time reviewing Merck's marketing studies.[29]  In preparation for her initial deposition she reviewed several boxes documents regarding Merck's integrated marketing communications campaign, and focused in particular on the various research studies employed by Merck, the methods used, the findings and the validity of that research.  In preparation for her second deposition she reviewed, among other things, the literature which discusses, describes or critiques the integrated marketing campaign of pharmaceutical companies.[30]  She also reviewed key textbooks on consumer behavior and marketing management regarding marketing analysis and confirming the scientific bases for integrated marketing communications plans.[31]

---

[25] *See* Pechmann Rep., p. 3.
[26] *See* Pechmann Rep., pp. 1-5, and Exhibit 2 to Report.
[27] *See* Pechmann 5/26/06 Dep., Exhibit 3.
[28] *See* June 15, 2006 Deposition of Cornelia Pechmann, Ph.D. ("Pechmann 6/15/06 Dep."), 18:16-21:3.
[29] *See* Pechmann 5/26/06 Dep., 327:2-7.
[30] *See* Pechmann 6/15/06 Dep., 44:5-47:11; 64:25-65:19.
[31] *See id.* at 45:10-46:1.

−12−

Based upon her review and analysis of Merck's integrated marketing communications campaign, Dr. Pechmann will testify as to Merck's marketing goals and objectives concerning Merck's campaign, namely, to neutralize doctor concerns about Vioxx's cardiovascular risks and to convince doctors to prescribe Vioxx regardless of their patients' cardiovascular risk profile.[32]

In the past, the Court has questioned whether Dr. Pechmann can provide such testimony because she is not a physician.  However, Plaintiff does not intend to solicit testimony from Dr. Pechmann regarding her interpretation of the scientific data pertaining to Vioxx, such as the VIGOR data, beyond her understanding of the general outcome.  Dr. Pechmann is certainly capable of understanding, for example, that the VIGOR data showed a five-fold increase in cardiovascular events in the Vioxx groups when compared to naproxen.  Such a general understanding does not require an extensive medical or science background.  Dr. Pechmann is qualified to apply this general understanding to Merck's marketing campaign to determine whether the campaign was generally misleading as that term is defined in the advertising/marketing community.  As Dr. Pechmann explains in her report, "misleading" is a term of art that is defined as follows:

> A higher standard of truth than avoiding explicit lies, is providing full information so that the audience can fully understand the limitations of the claim.  Failure to provide full information could lead to an understanding that runs contrary to fact.  A misleading claim is one that by omission or choice of words suggests a meaning that contradicts fact.[33]

Particularly with respect to the FDA Warning Letters to Merck regarding the VIGOR data, Merck's press releases, Merck's "obstacle" handling and other training materials, as well as related materials, Dr. Pechmann is amply qualified to analyze these documents and opine that Merck's

---

[32] *See* Pechmann 5/26/06 Dep., 340:11-22.
[33] Pechmann Rep., pp. 8-9 (citation omitted).

marketing campaign was designed to downplay the cardiovascular risk associated with Vioxx and to withhold the full truth about the drug's cardiovascular toxicity.  Merck's disseminated materials meet the definition of "misleading" as that term is used by experts in Dr. Pechmann's field.

Moreover, Dr. Pechmann is qualified and well-prepared to generally discuss the "messages" Merck was relating to the medical community regarding the efficacy and safety of Vioxx.  She has reviewed the depositions of Dr. Vogeler and Nurse Olson-Fields, as well as the depositions of other treaters and prescribers in other Vioxx cases, has spoken personally with Nurse Olson-Fields.  Dr. Pechmann has thorough understanding of the "Vioxx message."  Consequently, she should be allowed to testify that the message was not only consistent with Merck's marketing plan, but also was generally misleading based on the extensive materials she has reviewed.

In sum, Dr. Pechmann's testimony is based on sufficient facts and data (Merck's own data and her own body of knowledge in this area), her analysis is based on widely accepted and reliable principles and methods and she has applied those methods satisfactorily to the facts of this case.  Therefore, Plaintiff respectfully requests that the Court allow Dr. Pechmann to testify about the misleading nature of Merck's integrated marketing campaign.

## C.  MERCK'S KNOWLEDGE OF THE CARDIOVASCULAR RISKS ASSOCIATED WITH VIOXX IS NECESSARY FOR THE JURY TO UNDERSTAND WHAT PROMPTED MERCK'S MARKETING CAMPAIGN.

As a component of her opinion on marketing matters, Dr. Pechmann determined from the documents that Merck was aware of a potential cardiovascular risk associated with Vioxx.[34] Dr. Pechmann testified as to the importance of this awareness to her opinion:

[The] internal documents and statements [made] by the Merck executives... are part

---

[34] *See* Pechmann 5/26/06 Dep., 294:16-20.

of the whole picture.  You have to understand what was the objective of the campaign and then you test the hypothesis that that objective has met.  And the answer to that hypothesis test based on all of the research is, yes, they obtained the objective that they sought, which was to neutralize the CV risks.[35]

In order to understand what prompted the integrated marketing campaign and the goals and objectives of that campaign, the internal documents and the knowledge of the executives at Merck regarding the risks must be understood and incorporated into the opinion.  But such knowledge is not the primary opinion.  Rather it is the catalyst that explains the whole misleading campaign to neutralize the cardiovascular risks in the minds of the doctors and patients.  Also, since Merck specifically designed an entire campaign to neutralize doctor and patient perceptions of the cardiovascular risk, it must have been aware of the existence of the risk and that it threatened the product.

Merck argues that Dr. Pechmann cannot testify as to "what Merck knew or when Merck knew it." (Merck Motion, 3)  Dr. Pechmann is not offering such testimony concerning Merck's intent or motives as Merck has regularly asserted.  It is a fact as to what Merck knew or did not know and it is undisputed from the documents that Merck knew of this potential risk.  And such fact provides a context and a basis for Dr. Pechmann's opinion as to the objective of Merck's marketing campaign - to make sure that doctors and patients will not have the same knowledge that Merck had concerning Vioxx's risks.  Further, the Court has already addressed this issue:

> And without exquisite detail, I think [Dr. Pechmann] can explain or postulate or conclude that because of VIGOR or whatever it is that there was some information that cardiovascular risks existed for taking Vioxx.  **And then she concludes that, as I read it, *that Merck saw this as an obstacle or a challenge* and devised a marketing technique to neutralize physicians and the public concerns about Vioxx and its potential risks. And discuss what that marketing technique was**

---

[35] Pechmann 5/26/06 Dep., 329:4-18.

> **and explain it and how they went about it and what they did and how they did it.**[36]

Indeed, Dr. Pechmann cannot explain to the jury the purpose behind Merck's marketing campaign without discussing what Merck knew at the time the campaign was being developed and executed. Therefore, Dr. Pechmann should be allowed to testify about what Merck knew and when Merck knew it.

**D.    DR. PECHMANN SHOULD BE ALLOWED TO TESTIFY ABOUT THE AMOUNT OF MONEY SPENT BY MERCK ON MARKETING.**

Merck further argues that Dr. Pechmann should not testify as to how much Merck spent on its marketing and its Vioxx revenue.  (Merck Motion, 3)  These amounts, however, will assist in understanding the sheer scope of Merck's marketing efforts.  Merck has previously admitted the information will come in anyway through their own witnesses, so there does not seem to be any harm.  Merck has also complained that Dr. Pechmann relies on hearsay evidence.  Experts however, most often rely on some hearsay evidence and this is allowed explicitly by Evidence Rule 703 (stating "If a type reasonably relied upon by experts in the particular field in forming opinions or interferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted").  Therefore, Merck's request that such testimony be excluded should be denied.

**E.    DR. PECHMANN IS QUALIFIED TO OPINE ON MERCK'S VIOLATION OF FDA REGULATIONS CONCERNING IMPERMISSIBLE MARKETING AND ADVERTISING REGARDING PHARMACEUTICAL DRUGS.**

Merck seeks to exclude any opinion by Dr. Pechmann regarding regulatory matters.  These include regulations Dr. Pechmann reviewed concerning impermissible marketing and advertising

---

[36] *See* June 7, 2006 Transcript, *Barnett v. Merck & Co., Inc.,* 53:21-54:9 (emphasis added).

regarding pharmaceutical drugs.  Such regulations provide Dr. Pechmann with the framework and guidelines within which Merck was to operate in its marketing efforts, and Dr. Pechmann found that they were in line with overall marketing guidelines that preclude misleading advertising.  Dr. Pechmann is qualified to review these regulations and incorporate them into her testimony, since she not only has expertise in marketing matters ,but specifically with regard to the application of FTC and FDA regulations to marketing campaigns.[37]  Indeed, much marketing is governed by regulations and it is not surprising that experts like Dr. Pechmann have sufficient expertise to be able to apply those regulations to marketing efforts.

F.    TESTIMONY REGARDING MERCK'S MARKETING RESEARCH IS RELEVANT.

Merck argues that Dr. Pechmann should be precluded from testifying about the results of internal marketing research conducted on behalf of Merck because such studies are inadmissible hearsay, irrelevant and highly prejudicial.  In addition to testifying about Merck's overall campaign, Dr. Pechmann will focus on six specific areas of the campaign, namely: (1) copy testing by Merck of detail pieces with doctors; (2) doctor tracking and doctor promotional message recall; (3) doctor behavioral and prescription tracking; (4) doctor attribute tracking; (5) Merck's awareness and action or chronic pain consumer tracking study; and (6) consumer ad copy testing.[38]  For each area, Dr. Pechmann explains the objectives of the studies, the methodology of the studies, the consultants used to conduct the studies, the results of the studies and how the studies fit into Merck's overall integrated marketing communications campaign both in guiding Merck's marketing efforts and cross-checking the results of those efforts to determine whether they accomplished Merck's

---

[37] Pechmann Rep., p. 3.
[38] *See* Pechmann Rep., Abstract re Exhibit 5; Pechmann 5/26/06 Dep., 295:12-326:1.

marketing goals.[39]  Dr. Pechmann will testify as to the quality of the studies and that they were done

in a manner that accomplished Merck's marketing goals and objectives.[40]

Dr. Pechmann concludes that doctors had a misunderstanding about the cardiovascular risks

associated with Vioxx based on Merck's integrated marketing communications campaign, and that

the detail pieces and other information provided to doctors in the campaign about Vioxx and its

safety continued to mislead them regarding the potential risk.[41]  In addition, consumers were

reassured by Merck's safety messages about Vioxx and those perceptions remained stable throughout

the campaign.  In other words, consumers did not get the message that their use of Vioxx exposed

them to unnecessary cardiovascular risk.[42]

Merck acknowledges that Federal Rule of Evidence 703 permits an expert to rely on evidence

that would not otherwise be admissible if the evidence is of the type reasonably relied upon by

experts in the particular field in forming opinions or inferences upon the subject. (Merck Motion, 4)

FED.R.EVID. 703.  Merck does not argue that the studies, sales data, copy testing of promotional

materials are *not* of the type relied upon by experts in Dr. Pechmann's field.  Merck simply argues

that Dr. Pechmann is not qualified to say what medical personnel understood.  However, the

materials about which Merck complains do not necessarily pertain to what medical personnel

understood.  Rather these studies track the success and/or failure of Merck's marketing campaign

and are relevant to Dr. Pechmann's opinion that Merck's marketing directors purchased such

extensive marketing research to ensure that their marketing campaign for Vioxx was effective at

---

[39] *See* Pechmann Rep., Abstract re Exhibit 5.
[40] *See* Pechmann 5/26/06 Dep., 327:8-15.
[41] *See* June 15, 2006 Deposition of Cornelia Pechmann, Ph.D. ("Pechmann 6/15/06 Dep."), 64:19-65:6.
[42] *See* Pechmann 6/15/06 Dep., 143:1-144:23.

neutralizing physician concerns about the safety of Vioxx.[43]   As such, they are relevant and appropriate for consideration by Dr. Pechmann.

**G.     DR. PECHMANN'S TESTIMONY ABOUT MARKETING OR WHAT PHYSICIANS KNEW BEFORE THE APRIL 2002 LABEL IS RELEVANT.**

Merck asks the Court to exclude any testimony offered by Dr. Pechmann regarding Merck's marketing of the state of physicians; knowledge prior to the April 2002 label because this is a post-label case.   Plaintiff will address this issue in his opposition to Merck's Motion to Exclude the Testimony or Argument that Merck: (1) Could or Should Have Unilaterally Changed the Vioxx Label to Include the VIGOR Data; or (2) "Dragged its Feet" to Prevent the VIGOR Data form Being Added to the Vioxx Label, which Plaintiff incorporates herein.   The Court denied Merck's motion in *Smith v. Merck & Co., Inc*[44] and held that Federal Rule of Evidence 401 is satisfied.[45]   With respect to Dr. Pechmann, this information is vital to her opinions regarding the development and execution of Merck's marketing campaign which began prior to April 2002.   As such, Merck's request to limit Dr. Pechmann's testimony should be denied.

**IV.**
**CONCLUSION**

For these reasons, Plaintiff respectfully requests that Merck's Motion to Exclude Testimony of Cornelia Pechmann, Ph.D. be denied.

---

[43] *See* Pechmann Rep., pp. 15, 53-54.
[44] *See* Sept. 6, 2006 Order, *Smith v. Merck & Co., Inc.* (Rec. Doc. 6721).
[45] *See* Sept. 6, 2006 Transcript, *Smith v. Merck & Co., Inc.*, 43:20-48:17.

Dated:  October 3, 2006

Respectfully submitted,

_H. Wheeler_

Edward Blizzard (TBN 02495000)
Scott Nabers (TBN 14769250)
Rebecca Briggs King (TBN 24027110)
Holly M. Wheeler (TBN: 24006035)
BLIZZARD, MCCARTHY & NABERS, L.L.P.
440 Louisiana, Suite 1710
Houston, Texas 77002
(713) 844-3750
(713) 844-3755 (fax)

**ATTORNEYS FOR PLAINTIFF
CHARLES LARON MASON**

| | |
|---|---|
| Andy D. Birchfield, Esq.<br>P. O. Box 4160<br>234 Commerce Street<br>Montgomery, AL  36103-4160<br>PH:  (800) 898-2034<br>FAX:  (334) 954-7555 | Christopher Seeger, Esq.<br>One William Street<br>New York, NY  10004<br>PH:  (212) 584-0700<br>FAX:  (212) 584-0799 |
| Leonard Davis<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA  70013<br>PH:  (504) 581-4892<br>FAX:  (504) 561-6024 | Russ M. Herman<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA  70013<br>PH:  (504) 581-4892<br>FAX:  (504) 561-6024 |

**PLAINTIFFS' STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Opposition has been served on Liaison Counsel Russ Herman and Phillip Wittmann, Shayna S. Cook and Richard Krumholz by U.S. Mail, facsimile and/or e-mail; and e-mail upon all parties by electronically uploading the same to Lexis-Nexis File and Serve Advanced, in accordance with Pretrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of the Court of the Untied States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 3rd day of October, 2006.

_____
Holly M. Wheeler