# Exhibit D

```
                                0001
 1    SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2         FOR THE COUNTY OF LOS ANGELES
 3
 4    ----------------------------------
 5    COORDINATION PROCEEDING          )
 6    SPECIAL TITLE (Rule 1550(b))     ) No. JCCP 4247
 7                                     ) VOLUME I
 8    This Document Applies to All     )
 9    Vioxx Cases                      )
10    ----------------------------------
11
12
13        Deposition of CONNIE PECHMANN, Ph.D.,
14        at 660 Newport Center Drive, Newport
15        Beach, California, commencing at 9:51 A.M.,
16        Thursday, June 15, 2006, before Judith A.
17        Mango, CSR No. 5584.
18
19
20
21
22
23
24
25    PAGES 1 - 166
```

```
0018
 1  Everything else is correct but she answered questions in
 2  your e-mails and you have those.  Other than that, yes.
 3  Does that make sense?
 4        MR. CAMPILLO:  No.  I thought I had it.
 5        MR. SKIKOS:  Her opinions are limited to what's
 6  in Barnett, her deposition -- that she expressed in her
 7  deposition.  And you sent an e-mail asking certain
 8  questions and she prepared documents to speed the
 9  response to those answers to the questions.  And those
10  are the documents that we provided to you prior to the
11  deposition (indicating).
12        THE WITNESS:  And the call notes and call visits
13  that are specific to this case would also be discussed in
14  this case.
15  BY MR. CAMPILLO:
16     Q.  Okay.  How much time have you spent in total
17  reviewing any of the materials that we have already
18  identified on the record since the conclusion of the
```

19  deposition in the Barnett case?
20     A.  I should have brought my bill with me.  Let's
21  see.  Well, I know I spent all day yesterday.  Well,
22  let's see.  All of this week, basically, working on it.
23  Let me think.  Did I work on it last Friday?
24        Well, several days.  I would say five, six
25  eight-hour days.  But I could tell you exactly if I had

0019
1  my billing with me, which I didn't bring.
2     Q.  I'll make a request on the record for your
3  billing since the deposition to the present time to be
4  provided to Mr. Skikos.
5        Is that agreeable?
6        MR. SKIKOS:  Yes.
7        THE WITNESS:  I should have brought it.
8  BY MR. CAMPILLO:
9     Q.  Because I think there has been a pretty clear
10  identification of your activities through the time of
11  your deposition.  I just want to update it from the
12  conclusion to the present time.
13        MR. SKIKOS:  No problem.
14  BY MR. CAMPILLO:
15     Q.  Has all of the time that you have spent since
16  the conclusion of your deposition been involved either
17  preparing the responses to the list of questions that I
18  intended to address today and/or reviewing the materials
19  that pertain to the call notes and listing of doctor
20  visits in the Arrigale and Grossberg situations?
21     A.  Yes.
22     Q.  Anything else that you have done in that interim
23  time that pertains to the Vioxx litigation?
24     A.  Not that I recall.
25     Q.  Is it fair to say, and I know I'm jumping to a

0020
1  conclusion here, but a lot of the time you spent this
2  week was trying to find the materials that you produced
3  that will be identified in a few minutes that are in
4  response to the list of issues that I had identified?
5     A.  I spent Monday doing that.  Just Monday.
6     Q.  So Monday you spent looking for the literature?
7     A.  Yes.  That would address your Issue 7.
8     Q.  So Monday was for Issue 7 literature.  And you
9  said you spent five to six hours that day, roughly?
10     A.  Yeah.  Up to eight.

```
11    Q.  Okay.
12    A.  Six to eight.
13    Q.  Let's say four to eight.
14    A.  Six to eight.
15    Q.  Six to eight.  All right.  And then what
16  activity did you engage in on Tuesday that had to do with
17  the preparation of your deposition for these cases?
18    A.  I prepared the response about Exhibit 5.  And
19  yesterday I continued to work on the response to Exhibit
20  5 and also read my other deposition, my deposition
21  transcript.
22    Q.  And is it fair to say that both Tuesday and
23  Wednesday, you spent six to eight hours each of those two
24  days?
25    A.  Yes.  And also this morning.

0021
1     Q.  Okay.  What did you do this morning?
2     A.  Reviewed all of the materials.  Everything,
3   basically.
4     Q.  Just kind of refresh your memory on what you
5   worked on so far.
6     A.  Right, and answered some questions in my own
7   mind.  I took some notes, which are right here
8   (indicating).
9     Q.  Now, in terms of meetings with counsel or
10  discussions with counsel, have you had any such events
11  since the conclusion of your deposition in Barnett?
12    A.  Yes.
13    Q.  Okay.  Could you identify those for me, please.
14    A.  Yes.  Last Thursday I met with Steve Skikos from
15  4:00 to 6:00 P.M. and he explained that this depo was
16  going to take place.  He showed me the list of the seven
17  questions.  We discussed briefly how I would approach
18  each of these questions.  I gave suggestions.  He mostly
19  agreed with what I said.  I think he did agree with
20  everything I said.  And we took care of scheduling and
21  that sort of thing.
22    Q.  Okay.  Now, let me ask you this.  Since the
23  conclusion of your deposition in the Barnett case and
24  your meeting with Mr. Skikos last Thursday, have you had
25  any discussions of substance other than scheduling or

0044
1     Q.  Because you were asked some questions about
2   studies but no studies were identified during the Barnett
```

3  deposition?
4     A.  Correct.
5     Q.  So these are the studies that at least you
6  believe were responsive to those questions and you have
7  now had the opportunity to look for, identify and
8  provide?
9     A.  Correct.
10        MR. CAMPILLO:  So we will have this entire set
11  and the summary sheet which is two-sided marked as
12  Exhibit No. 7.
13        (Deposition Exhibit 7 was marked for
14         identification and is annexed hereto.)
15  BY MR. CAMPILLO:
16    Q.  A couple of more questions about Exhibit 7,
17  Dr. Pechmann.  The summary, the two-sided or two-page
18  summary, is that something you prepared yourself?
19    A.  Yes.
20    Q.  Did anyone help you with the searching and
21  identification of these articles or is this something you
22  did personally?
23    A.  I did it personally.
24    Q.  Okay.  And just in very general terms how did
25  you go about conducting the research that identified

0045
1  these articles?
2     A.  I went to the Harvard cases, Stanford cases and
3  Ivy cases that are available online to professors and I
4  identified ones that dealt with pharmaceutical marketing
5  and integrated marketing communications.  The only thing
6  I did get help with was my account had expired, so my
7  Ph.D. student, Dip, actually bought them for me.  And
8  then I --
9         MR. SKIKOS:  He dipped into his own account.
10        THE WITNESS:  I also looked at two textbooks,
11  one in "Consumer Behavior" and one in "Marketing
12  Management," because they talk about marketing being a
13  science and the different types of science that are
14  involved specifically.
15        I did that because it reinforces my point that
16  integrated marketing communications are based on science.
17  That are well-known techniques, validated texts for
18  studying these campaigns and their effects.
19        And the next case from Harvard shows that Merck
20  employed this science, that they changed their approach
21  from a non-science-based to a very marketing

22  science-based approach, to integrated marketing
23  communications.
24        And then after that I just show examples of how
25  these types of research are used in other pharmaceutical

0046
1   contexts.
2     Q.  Okay.  Dr. Pechmann, had you read any of the
3   materials or articles that are included within Exhibit 7
4   prior to your locating them this week?
5     A.  Some of them, yes.
6     Q.  Which ones had you read before locating them
7   this week?
8     A.  1, 2, 4, 8, 10, 11.
9     Q.  And any others?
10    A.  Not that I recall, no.
11    Q.  I assume you had read those particular items
12  other than in connection with your work in the Barnett
13  case or the cases we are here on today?
14    A.  Yes.  I would like to point out that the last
15  one is about the link between pharmaceutical marketing
16  and tobacco marketing, which was specifically asked for
17  at my last deposition.
18    Q.  Do any of these materials, which obviously I
19  don't have the time to read at the moment, mention Vioxx
20  or marketing of Vioxx specifically?
21    A.  Yes.
22    Q.  Which one or ones?
23    A.  10.
24    Q.  That's one of the ones you had read before?
25    A.  Yes.

0047
1     Q.  And just in very brief fashion what does that
2   item tell you about Vioxx and the marketing of Vioxx?
3     A.  It gives statistics about Vioxx's advertising
4   expenditures relative to other consumer goods like Pepsi
5   and indicates that the expenditures are very high, say
6   double that compared to what was spent on Campbell's Soup
7   and 50 percent higher than Pepsi.  That sort of thing.
8     Q.  Any other references to Vioxx in any of the
9   materials contained within Exhibit 7 that you can think
10  of?
11    A.  Not that I recall.
12    Q.  And you also provided me with a document
13  entitled "Information About Pechmann Deposition Exhibit

14  No. 5." To be honest with you, I'm not sure I understand
15  what this is. Can you try to explain that for me.
16    A.  Sure. When I was preparing for the first
17  deposition the issue arose as to whether I would meet the
18  standards of an expert, of which I know nothing about
19  because I'm not a lawyer. But Steve Skikos talked to me
20  the day before and said that -- something to the effect
21  that there has to be a scientific basis for the opinions.
22       And I said that half of what I looked at were
23  these studies, that there was extensive research, which
24  is why initially I said I was interested in the case
25  because I knew that there would be a lot of research and

0064
1    Q.  Where did you hear there may be such a case on
2  Vioxx in Europe?
3    A.  I looked it up online.
4    Q.  So you found some kind of identification of such
5  a thing and you are trying to get your hands on it?
6    A.  Correct.
7    Q.  Can you tell us what it is you identified, the
8  name of it or title or whatever description you have been
9  able to locate?
10    A.  I could provide that off of my computer later.
11  Basically it's a case if you go to the European business
12  case clearing house, it's the case on Vioxx.
13       MR. CAMPILLO: I will make a request.
14  Mr. Skikos, if you can give us that information, it would
15  be helpful.
16       MR. SKIKOS: And you'll let it into evidence at
17  trial?
18       MR. CAMPILLO: I don't think I can make that
19  stipulation today. It's under advisement.
20       MR. SKIKOS: You'll think about it.
21       MR. CAMPILLO: Yes.
22    Q.  Dr. Pechmann, you obviously have not located it
23  yet so you don't know what it says, correct?
24    A.  Correct.
25    Q.  Other than possibly that document, have you seen

0065
1  anything else published anywhere to date that purports to
2  be some kind of a critique of the Vioxx integrated
3  marketing campaign of Merck or by Merck?
4    A.  There are some articles that discuss aspects of
5  the case that use Vioxx as an example of excessive

```
 6  spending or something like that.
 7     Q.  Those are the ones in Exhibit -- that would be
 8  the one you reference in what is Exhibit No. 7 to the
 9  deposition?
10     A.  I didn't include those, but they are in the
11  boxes.
12     Q.  Those have been identified before?  I mean, they
13  were in the boxes you produced in the Barnett case?
14     A.  Correct.
15     Q.  Okay.  Anything that comes to mind other than
16  the items you just described on the record that in your
17  mind or in your judgment appear to be a critique of the
18  Vioxx integrated marketing campaign by Merck?
19     A.  Not that I can think of.
20     Q.  Do you have any knowledge of what the case on
21  Vioxx from Europe deals with, what the topic is or
22  anything more than what you saw on your hit, I guess?
23     A.  No.  I didn't even know this clearing house
24  existed until I went to France a couple of months ago,
25  and they said, "Oh, we have a couple of cases that are in
```