FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 SEP 28  PM 3:16

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JEFFREY RADICKE and DONDI RADICKE :
            PLAINTIFFS :
                                 :
v.                               :    Cause: **06-6321**
                                 :
MERCK AND CO., INC.             :    JUDGE FALLON
            DEFENDANT     :    MAG. JUDGE KNOWLES

.................................................................

THIS DOCUMENT RELATES TO: IN RE: VIOXX PRODUCTS LIABILITY
LITIGATION; MDL NO. 1657; SECTION L

## PLAINTIFFS' FIRST AMENDED COMPLAINT

      COME NOW, Jeffrey Radicke and Dondi Radicke ("Plaintiffs"), by and through

their attorneys, before the filing of any responsive pleadings, and for cause of action

against Defendant Merck & Co., Inc. ("Merck"), state as follows:

### I.      The Parties

      1.01    Plaintiffs Jeffrey Radicke and Dondi Radicke were citizens of the State of

Texas at the time the instant cause of action arose and are citizens of the State of Texas at

the time of filing this action.  Plaintiffs reside in Carthage, Panola County, Texas.

      1.02    Defendant, MERCK & CO., INC. (Merck) at all times relevant herein,

was and is an American pharmaceutical company incorporated under the laws of the

State of New Jersey with its principal place of business at One Merck Drive, P. O. Box

100, Whitehouse Station, New Jersey.  Merck may be served with process in accordance

Fee_____
Process_____
X  Dktd_____  1
CtRmDep_____
Doc. No._____

with Pretrial Order #15 by e-mailing this Complaint and Rule 4(d) notice to MDL@wcsr.com.  Merck was and is in the business of profiting from the design, manufacture, marketing, distribution and/or sales of the brand-name prescription drug Vioxx (rofecoxib).

## II.      Jurisdiction and Venue

2.01    Jurisdiction is proper in this court pursuant to 28 USC §1332 for the reason that there is complete diversity of citizenship between Plaintiffs and Defendant and the matter in controversy greatly exceeds the sum of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

2.02    Venue is proper in this judicial district pursuant to Pretrial Order #11.

## III.      Capacity

3.01    Merck may be liable in one or more of a number of capacities including, but not limited to, the following:

(1)      Manufacturer.  A manufacturer is a person or entity who is in the business of manufacturing a product for placement into trade or commerce. Manufacturing a product means producing, making, fabricating, constructing, designing, remanufacturing, reconditioning, or refurbishing a product.

(2)      Retailer, wholesaler, or distributor of the product at issue in this lawsuit including without limitation by sampling programs.

(3)      Licensee.  A Licensee defendant is one who has manufactured, marketed, or distributed into the stream of commerce the product at issue in this lawsuit.

(4)     Parent corporation.  A parent corporation may be liable for the tortious conduct of its subsidiary corporation when the legal distinctions between the parent corporation and subsidiary corporation are fictitious or should be otherwise disregarded.  Additionally, any defendant named as a parent corporation may be individually liable for its own tortious conduct.

(5)     Successors in interest to another corporation.  Successors in interest to another corporation may be liable for that corporation's debts and obligations for many reasons including, but not limited to, express or implied assumption or continuation of the predecessor corporation.

## IV.     Factual Allegations

4.01     This action arises from the sales and efficacy of Vioxx, a rofecoxib-containing prescription drug in the class of non-steroidal inflammatory drugs known as Cox-2 inhibitors.

4.02     In November of 1998, Merck submitted an Application to Market a New Drug for Human Use ("NDA") to the United States Food and Drug Administration ("FDA") for rofecoxib.

4.03     After a fast-track, 6-month approval process, Defendant Merck obtained approval from the FDA for rofecoxib in approximately May of 1999 for treatment of osteoarthritic pain, acute pain and menstrual pain.  Vioxx is a brand name used by Merck to market and distribute rofecoxib.

4.04     Merck launched an aggressive marketing campaign for Vioxx immediately after its approval in May of 1999.  This campaign included extensive direct to consumer advertising.

4.05    Defendant Merck manufactured, marketed, distributed and sold Vioxx to consumers such as Plaintiff Jeffrey Radicke.  Mr. Radicke was prescribed Vioxx for pain. Plaintiff ingested the Vioxx as prescribed when Plaintiff was struck by a cardiovascular event; namely, a myocardial infarction (MI), commonly known as a heart attack.  Prior to the heart attack, Plaintiff was, but is no longer, an extremely active individual.

4.06    Despite knowledge from its clinical trials, post-marketing reports, and studies relating to cardiovascular-related adverse health effects, Merck failed to disclose all relevant information to the FDA and promoted and marketed Vioxx as safe and effective for persons such as Jeffrey Radicke.

4.07    Defendant Merck concealed the serious cardiovascular risks associated with Vioxx because a successful launch of Vioxx was viewed as critical for Merck, and safety concerns over hypertension, edema and/or cardiovascular events would have drastically damaged Merck's positioning in the market and its profits as compared to the competition drug, Celebrex (celecoxib) which was placed into the market by Merck's competitors Pharmacia and Pfizer some three (3) months before Vioxx.

4.08    Merck knowingly chose to subject its consumers to these and other adverse health risks despite its knowledge at product launch and from post-marketing data thereafter that use of Vioxx carried significant risk factors.  These adverse effects were realized in adverse event reports, in clinical trials where such events were adjudicated by primary investigators with Merck's assistance, and in one or more studies shortly after market launch, which showed statistically significant increases in adverse cardiovascular events among Vioxx users including heart attacks and strokes.

4.09    Based on a study known as the VIGOR study (Vioxx GI Outcomes Research), conducted between January 6, 1999 and March 17, 2000, Merck submitted a Supplemental New Drug Application ("sNDA") to the FDA.  Through this sNDA, Merck hoped to establish a gastrointestinal safety claim for rofecoxib.

4.10    However, the VIGOR study revealed problems.  By November 18, 1999, the Data and Safety Monitoring Board of the VIGOR study, a committee independent from Merck (the sponsor), had become concerned over the "excess deaths and cardiovascular events experiences in Group A [Vioxx] compared to Group B [naproxen]." This, according to an FDA report of February 1, 2000 written by Shari L. Targum, M.D., a Project Manager for the FDA's Division of Anti-Inflammatory Drug Products.

4.11    Merck submitted results from the VIGOR study to the *New England Journal of Medicine* (NEJM) in the form of an article entitled "Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis VIGOR Study Group," which was published in the November 23, 2000 edition of the NEJM.  This article had several co-authors, including Alise Reicin, Merck's Vice President of Clinical Research.  The lead author, Toronto rheumatologist Claire Bombardier, M.D., had then, and has since had, various relationships with Merck, including serving as the chief investigator for the VIGOR study.

4.12    The conclusions reached in the Bombardier/Reicin NEJM article do not mention an increase in cardiovascular risks from Vioxx.  The only mention of adverse cardiovascular event data states: "[t]he incidence of myocardial infarction was lower among patients in the naproxen group than among those in the rofecoxib group (0.1

percent vs. 0.4 percent; relative risk; 0.2; 95 percent confidence interval, 0.1 to 0.7); the overall mortality rate and the rate of death from cardiovascular causes were similar in the two groups."

4.13    In industry sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization of which Merck is a member and corporate sponsor, in June of 2000, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and myocardial infarction.  Merck did nothing to further accurately distribute this information, and in fact, Merck specifically denied hypertension problems in the official publication of the American Pharmaceutical Association, *Pharmacy Today*, "Spin War Aside, Lessons Emerge From COX-2 Trials," in August 2000, page 3.

4.14    In response to growing public expressions of concern over the cardiovascular safety profile of Vioxx, Merck issued a press release dated May 22, 2001 entitled "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx." The FDA would later admonish Merck that:

> Your claim in the press release that Vioxx has a "favorable cardiovascular profile" is simply incomprehensible, given the rate of MI [myocardial infarction] and serious cardiovascular events compared to naproxen.   The implication that Vioxx's cardiovascular profile is superior to other NSAIDs is misleading; in fact, serious cardiovascular events were twice as frequent in the Vioxx treatment group . . . as in the naproxen treatment group . . . in the VIGOR study.

4.15    Merck continued to deny the ill health effects associated with Vioxx while at the same time reaping the profits obtained through its conscious concealment of and deliberate failure to disclose the truth about Vioxx.  Merck engaged in a massive marketing program which involved financial incentives to sales teams, infusion of some

700 new sales representatives, and a massive advertising and sampling program. As a result, Merck continued to gain market share, which enhanced its financial stability to the detriment of its consumers. The resultant effect to Merck in concealing and failing to reveal and warn of the risks was a more than $2 billion profit in 2000 alone to Merck and an approximately 23 percent share of the market.

4.16   On or about August 29, 2001, the *Journal of the American Medical Association* (JAMA) published a peer-reviewed human epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukherjee, et al., showing more of what Merck had concealed - the relative risk of developing a confirmed adjudicated thrombotic cardiovascular event (defined in the article as myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks) among Vioxx users in Merck trials at a 95% confidence interval ranged from 2.2. for event-free survival analysis, 2.38 compared to naproxen users, and 4.89 for developing serious cardiovascular events among aspirin-indicated patients. *See* Mukherjee, D., et al, "Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors." *JAMA* 286:8, 954-959, Aug. 22/29, 2001.

4.17   In the JAMA study, the authors theorized that by decreasing PGI 2 production I [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and anti-thrombotic PGI2, potentially leading to an increase in thrombotic cardiovascular events. *Id.* at 957. [In a follow-up peer-reviewed study reported in the *Journal of the American College of Cardiology* on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the Cox-2 inhibitor A tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular and

thrombotic events.  Bing, R., & Lomnicka, M., "Why Do Cyclo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?" *J.A.C.C.*, 39:3, Feb. 6, 2002.]

4.18    In response, Merck's Dr. Alise Reicin and others authored an article in defense of Vioxx's cardiovascular risk profile titled "Cardiovascular thrombotic events in controlled, clinical trials of rofecoxib," published in the November 6, 2001 edition of the journal *Circulation.*  In summary, their "analysis provides no evidence for an excess of CV [cardiovascular] events for rofecoxib [Vioxx] relative to either placebo or the non-naproxen NSAIDs that were studied.  Differences observed between rofecoxib and naproxen are likely the result of the antiplatelet effects of the latter agent."

4.19    Merck's naproxen theory was debunked in approximately January of 2002, by a Vanderbilt University School of Medicine human epidemiologic peer-reviewed study published in *The Lancet* concluding that there is an absence of a protective effect of naproxen or other non-aspirin non-steroidal anti-inflammatory drugs on risk of coronary heart disease.  Ray, W., et al., "Non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease: an observational cohort study." *The Lancet*, 359: 118-123, Jan. 12, 2002.

4.20    Dr. Reicin continued her defense of Vioxx in an article entitled "Selective COX-2 inhibition and cardiovascular effects: a review of the rofecoxib development program," which was published in the October 1, 2003 edition of the *American Heart Journal.*  Dr. Reicin and her colleagues stated that "[r]ofecoxib [Vioxx] was not associated with excess CV [cardiovascular] thrombotic events compared with either placebo or nonnaproxen NSAIDs.  Again, naproxen appeared to be the outlier, suggesting a cardioprotective benefit of naproxen."

4.21    However, Merck's "spin" continued to unravel.  An article by Solomon and others at the Harvard Medical School, entitled "Relationship Between Selective Cyclooxygenase-2 Inhibitors and Acute Myocardial Infarction in Older Adults," was published in the April 2004 edition of the journal *Circulation*.  The Harvard authors concluded the following from their study:

> "... rofecoxib [Vioxx] use was associated with an elevated relative risk of AMI [acute myocardial infarction] compared with celecoxib [Celebrex] use and no NSAID use.  Dosages of rofecoxib [greater than] 25 mg were associated with a higher risk than dosages [less than or equal to] 25 mg."

4.22    An article by H.K. Choi in the May 1, 2004 edition of the *American Journal of Medicine*, entitled "Effects of rofecoxib and naproxen on life expectancy among patients with rheumatoid arthritis: a decision analysis," concluded the following:

> "Our analysis suggests a longer life expectancy with naproxen than rofecoxib [Vioxx] . . . except in those at low risk of myocardial infarction or at a high risk of upper gastrointestinal toxicity."

4.23    The FDA's David Graham, M.D. made a poster presentation entitled "Risk of Acute Myocardial Infarction and Sudden Cardiac Death with Use of COX-2 Selective and Non-Selective NSAIDs" at the 20th International Conference on Pharmacoepidemiology and Therapeutic Risk Management, held from August 22-25, 2004, in Bordeaux, France.  The data for the presentation was taken from a study done by Kaiser Permanente under a contract funded by the FDA.  The study indicated that Vioxx taken at more than 25 mg per day increased the risk of heart attack and sudden cardiac death by 300% in those enrolled in the study.

4.24    On August 26, 2004, Peter Kim, President of Merck Research Laboratories, issued a press release stating the following:

"Merck strongly disagrees with the conclusions of an observational analysis by Graham, et al., presented at an international medical meeting this week. . ."

"Merck stands behind the efficacy and safety, including cardiovascular safety, of VIOXX."

4.25    On September 27, 2004, Merck informed the FDA that the Data Safety Monitoring Board for an ongoing long-term study of Vioxx, known as the APPROVe study, had recommended that the study be stopped early for safety reasons.

4.26    The APPROVe study was not intended to be a cardiovascular risk assessment study.  It was commissioned by Merck to look at the effect of Vioxx in people at risk for developing recurrent colon polyps.

4.27    The APPROVe study demonstrated an increased risk of cardiovascular adverse events, including heart attacks and strokes, for the Vioxx population relative to the placebo population in the study, particularly for people taking Vioxx for more than 18 months.

4.28    Merck representatives informed the FDA in a September 28, 2004 meeting that Merck would withdraw Vioxx from the United States market.

4.29    Merck and the FDA each announced the withdrawal of Vioxx from the United States market on September 30, 2004.  Merck also announced worldwide withdrawal the same day.

4.30    An FDA analysis, based on data from the Kaiser Permanente study, projects that 27,785 heart attacks and sudden cardiac deaths "would have been avoided" had Celebrex been used instead of Vioxx.

4.31    Approximately 20 million people in the United States took Vioxx between its introduction in 1999 and its withdrawal in 2004.

4.32   Vioxx gained its significant market share by suppressing information and/or making false representations regarding Vioxx's superiority and efficacy.

4.33   If Defendant had not engaged in this conduct, consumers, including Plaintiff, would have switched from Vioxx to safer products or refrained wholly from its use.

4.34   Plaintiffs allege that the suppression of this information constituted a common scheme by Defendant to conceal material information from Plaintiffs and from the health care industry.

4.35   Plaintiffs allege that Defendant's marketing strategies, including without limitation the detail and sampling programs and direct-to-consumer advertising, targeted Plaintiffs to induce them to purchase Vioxx.   At the time the Defendant distributed, manufactured and marketed Vioxx, Defendant intended that Plaintiffs would rely on the marketing, advertisements and product information propounded by Defendant.

## V.   Claims Against Defendant

### A.   Negligence

5.01   Plaintiffs restate each and every preceding allegation of this Petition and incorporate each by reference as though set forth in full herein.

5.02   Defendant Merck, owed a duty to the general public and specifically to the Jeffrey Radicke family to exercise reasonable care in the design, manufacture and marketing of its prescription medications, including the Vioxx at issue in this lawsuit. Merck failed to exercise reasonable care in the design of Vioxx because as designed, it was capable of causing death and serious personal injuries such as those suffered by Plaintiffs during foreseeable use.   Merck also failed to exercise reasonable care in the

marketing of Vioxx because it failed to warn that, as designed, Vioxx was capable of causing death and serious personal injuries such as those suffered by Plaintiffs during foreseeable use.

5.03   Defendant Merck breached its duty and was negligent in its actions, misrepresentations, and omissions toward Plaintiffs in that Defendant:

a.   Failed to include adequate warnings with the medications that would alert Plaintiffs and other consumers to the potential risks and serious thrombotic and cardiovascular side effects of Vioxx ingestion;

b.   Failed to include adequate information or warnings with the medication that would alert Plaintiffs and the health care community to refrain from use of Vioxx without first prescribing traditional NSAIDS such as naproxen or ibuprofen;

c.   Failed to adequately and properly test Vioxx before and after placing it on the market;

d.   Failed to conduct sufficient testing on Vioxx which, if properly performed, would have shown that Vioxx had serious side effects, including, but not limited to the cardiovascular events described above;

e.   Failed to adequately warn Plaintiff and his health care providers that use of Vioxx carried a risk of cardiovascular events and death; among other serious side effects;

f.   Failed to provide adequate post-marketing warnings or instructions after the Defendant knew or should have known of the significant risks of

personal injury and death as identified herein among other serious side effects from the use of Vioxx;

g.      *Failed to adequately warn Plaintiffs that Vioxx should not be used in conjunction with any risk factors for these adverse effects such as hypertension;*

h.      Failed to adequately disclose and warn Plaintiff that he undertook the risk of adverse events and death as described herein; and

i.      Failed to adequately and timely inform the health care industry of the risks of serious personal injury and death from Vioxx ingestion as described herein.

5.04    Plaintiffs are unable to more specifically allege the acts of negligence in the design and/or marketing of the Vioxx because such facts peculiarly are within the knowledge of Merck.  Alternatively, if Plaintiffs are unable to prove specific acts of negligent design and/or marketing by Merck, they invoke the doctrine of Res Ipsa Loquitur.  The character of the occurrence giving rise to this action is such that it ordinarily would not have happened in the absence of negligence.  The design and/or marketing of Vioxx was in the exclusive control of Merck at the time that the negligence occurred, and the explanation of Vioxx's ability to cause death and serious personal injuries such as those suffered by Plaintiffs is more accessible to Merck than to Plaintiffs.  Specifically, Plaintiffs have no means of ascertaining the method or manner in which Vioxx was designed and manufactured.  The Vioxx was in substantially the same condition when it was ingested by Plaintiff as it was in when it left the control of Merck.

Vioxx's capability to cause death and serious personal injuries such as those suffered by Plaintiffs was not due to any voluntary action or contributory negligence of Plaintiffs.

5.05    Merck's failure to exercise reasonable care in the design and/or marketing of Vioxx was a proximate cause of Plaintiffs' injuries and damages.

**B.**    **Strict Liability**

5.06    Plaintiffs restate each and every preceding allegation of this Petition and incorporate each by reference as though set forth in full herein.

5.07    Plaintiffs claim that Defendant Merck is liable to Plaintiffs under the theory of strict products liability. Defendant Merck was at all times relevant to this suit, and now is, engaged in the business of designing, manufacturing, testing, marketing, and placing into the stream of commerce pharmaceuticals for sale to, and use by, members of the public, including the Vioxx at issue in this lawsuit. The Vioxx manufactured by Defendant Merck reached Plaintiffs without substantial change. The Vioxx was defective and unreasonably dangerous when it entered into the stream of commerce and when used by Plaintiff Jeffrey Radicke.

5.08    Vioxx was unreasonably defective in design, considering the utility of the product and the risk involved in its use, because, as designed, Vioxx could cause death and injuries such as those suffered by Plaintiffs during foreseeable use. This fact was known to Merck at the time Vioxx was placed into the stream of commerce. Nonetheless, Merck failed to warn that Vioxx as designed was capable of causing death and serious personal injuries such as those suffered by Plaintiffs during foreseeable use. Such a failure to warn rendered the Vioxx unreasonably dangerously defective as marketed.

5.09    The defective and unreasonably dangerous nature of Vioxx was a producing cause of Plaintiffs' injuries and damages.   Under strict products liability theories set forth in Restatement (Second) of Torts adopted by the Texas Supreme Court, Merck is liable to Plaintiffs for all damages claimed in this case, including punitive damages.

**C.      Misrepresentation and Suppression of Evidence**

5.10    Plaintiffs re-allege and incorporate herein the foregoing allegations of this Petition.

5.11    *Defendant Merck misrepresented to the FDA, Plaintiffs, and the health* care industry, the safety and effectiveness of Vioxx and/or fraudulently, intentionally and/or negligently concealed material information, including adverse information regarding the safety and effectiveness of Vioxx.

5.12    Defendant Merck made these misrepresentations and actively concealed adverse information at a time when the Defendant knew, or should have known, that Vioxx had defects, dangers, and characteristics that were other than what Defendant Merck had represented to Plaintiffs and the health care industry generally.   Specifically, Defendant misrepresented to and/or actively concealed from Plaintiffs and the health care industry and consuming public that:

     a.       Vioxx had statistically significant increases in cardiovascular side effects, including myocardial infarction, stroke and sudden onset death, as identified herein which could result in serious injury or death;

     b.       There had been insufficient and/or company-spun studies regarding the safety and efficacy of Vioxx before and after its product launch;

c.      Vioxx was not fully and adequately tested for cardiovascular side effects;

d.      Other testing and studies showed the risk of or actual serious adverse risks; and/or

e.      There was a greatly increased risk of such cardiovascular events and death, and there was a confirmed mechanism by which these thrombotic or cardiovascular events occurred as reported in the scientific literature.

5.13    The misrepresentations of and/or active concealment alleged were perpetuated directly and/or indirectly by Defendant. Defendant Merck knew or should have known that these representations were false and made the representations with the intent or purpose that Plaintiffs would rely on them, leading to the use of Vioxx. At the time of Defendant's fraudulent misrepresentations, Plaintiffs were unaware of the falsity of the statements being made and believed them to be true. Plaintiffs had no knowledge of the information concealed and/or suppressed by Defendant. Plaintiffs justifiably relied on and/or was induced by the misrepresentations and/or active concealment and relied on the absence of safety information, which Defendant did suppress, conceal or failed to disclose to Plaintiffs' detriment.

5.14    Defendant had a post-sale duty to warn Plaintiffs and the public about the potential risks and complications associated with Vioxx in a timely manner. The misrepresentations and active fraudulent concealment by the Defendant constitute a continuing tort against Plaintiff, who ingested Vioxx. Defendant made the misrepresentations and actively concealed information about the defects and dangers of Vioxx with the intention and specific desire that Plaintiffs, health care professionals and

the consuming public would rely on such or the absence of information in selecting Vioxx as treatment.

5.15   As a direct and proximate result of the fraudulent acts and omissions, suppression and misrepresentation of Defendant, Plaintiffs suffered significant and ongoing injuries and damages.

**D.       Breach of Warranty - Merchantability**

5.16   Plaintiffs restate each and every preceding allegation of this Petition and incorporate each by reference as though set forth in full herein.

5.17   Defendant Merck was at the time of the acts forming the basis of this lawsuit, and now is, a merchant with respect to the Vioxx at issue in this lawsuit.  Merck has impliedly warranted to the public generally and specifically to the Jeffrey Radicke family that Vioxx was merchantable and fit for safe use as a pain reliever, the purpose for which Merck marketed Vioxx.  Vioxx was not merchantable as warranted because, as designed, Vioxx was capable of causing death and serious personal injuries such as those suffered by Plaintiffs during foreseeable use.  Therefore, Merck has breached the implied warranty of merchantability with respect to Vioxx.

5.18   As a direct and proximate result of Defendant's breach of the warranty of merchantability, Plaintiffs sustained serious and permanent injuries.

**E.       Breach of Warranty – Fitness for a Particular Purpose**

5.19   Plaintiffs restate each and every preceding allegation of this Petition and incorporate each by reference as though set forth in full herein.

5.20   Defendant Merck knew that consumers such as Jeffrey Radicke would require Vioxx for safe use as a pain reliever, and that consumers would rely on Merck's

skill and judgment to select suitable medications.   Merck provided such skill and judgment by marketing and selling Vioxx for that purpose.  Plaintiffs relied on Merck's skill and judgment when selecting and purchasing the Vioxx at issue.   The Vioxx purchased and used by Plaintiffs was not fit for its particular purpose because, as designed, Vioxx was capable of causing death and serious personal injuries such as those suffered by Plaintiffs during foreseeable use.  Therefore, Merck has breached the implied warranty of fitness for a particular purpose with respect to Vioxx.

5.21   As a direct and proximate result of Defendant's breach of the warranty of fitness for a particular purpose, Plaintiffs sustained serious and permanent injuries.

**F.     Actual and Constructive Fraud**

5.22   Plaintiffs restate each and every preceding allegation of this Petition and incorporate each by reference as though set forth in full herein.

5.23   Defendant Merck committed acts of actual fraud by making material representations, which were false, knowing that such representations were false and/or with reckless disregard for the truth or falsity of such representations, with the intent that Plaintiffs rely on such material representations; Plaintiffs acted in actual and justifiable reliance on such material misrepresentations and was injured as a result.

5.24   In addition, and in the alternative if necessary, Defendant knowingly omitted material information, which omission constitutes a positive misrepresentation of material fact, with the intent that Plaintiffs rely on Defendant's misrepresentations; Plaintiffs acted in actual and justifiable reliance on Defendant's representations and was injured as a result.

5.25    Defendant committed constructive fraud by breaching one or more legal or equitable duties owed to Plaintiffs relating to the Vioxx at issue in this lawsuit, said breach or breaches constituting fraud because of their propensity to deceive others or constitute an injury to public interests or public policy.

5.26    As a direct and proximate result of Defendant's acts constituting fraud, Plaintiff sustained serious and permanent injuries.

## G.    Exemplary Damages

5.27    Plaintiffs restate each and every preceding allegation of this Petition and incorporate each by reference as though set forth in full herein.

5.28    Each of the above and foregoing *acts or omissions of Defendant* was more than momentary thoughtlessness, inadvertence, or error of judgment.   Such acts or omissions, when viewed objectively from the standpoint of Merck, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Furthermore, Merck had actual, subjective awareness of the risk involved in its acts and omissions as set forth above, yet nevertheless proceeded with conscious indifference to the rights, safety and welfare of others, including Plaintiffs.  *Trans. Ins. Co. v. Moriel*, 879 S.W. 2d 10 (Tex. 1994), citing TEX. CIV. PRAC. & REM. CODE ANN. 41.001(5) Vernon Supp. 1994.   Therefore, Plaintiffs are entitled to recover judgment against Defendant for exemplary damages.

## VI.    Damages

6.01    As a producing and proximate result of the above-described acts and omissions of Defendant Merck, Plaintiffs Jeffrey Radicke and Dondi Radicke have suffered and will continue to suffer significant economic losses and other injuries

resulting in the following actual damages in an amount greatly exceeding the minimal jurisdictional limits of this Court:

**Jeffrey Radicke**

     (1)    Reasonable and necessary medical expenses incurred in the past;

     (2)    Reasonable and necessary medical expenses reasonably likely to be incurred in the future;

     (3)    Conscious physical pain and suffering experienced in the past;

     (4)    Conscious physical pain and suffering reasonably likely to be experienced in the future;

     (5)    Mental anguish in the past;

     (6)    Mental anguish likely to be experienced in the future;

     (7)    Physical disfigurement in the past;

     (8)    Physical disfigurement likely to be experienced in the future;

     (9)    Physical impairment in the past;

     (10)    Physical impairment likely to be experienced in the future;

     (11)    Pre and post-judgment interest at the lawful rate;

     (12)    Punitive damages; and

     (13)    Such other applicable damages as the Court deems appropriate.

**Dondi Radicke**

     (1)    Mental anguish in the past;

     (2)    Mental anguish likely to be experienced in the future;

     (3)    Loss of consortium in the past;

     (4)    Loss of consortium likely to be experienced in the future;

(5)     Loss of household services in the past;

(6)     Loss of household services likely to be experienced in the future;

(7)     Pre and post-judgment interest at the lawful rate;

(8)     Exemplary damages; and

(9)     Such other applicable damages as the Court deems appropriate.

### VII.     Discovery Rule

7.01     Plaintiffs brings this suit within two (2) years of discovering their Vioxx-related conditions, or the existence of any Vioxx-related *causes of action*.

### VIII.     Prayer For Relief

WHEREFORE, Plaintiffs Jeffrey Radicke and Dondi Radicke pray Defendant Merck be cited according to law to appear and answer herein, and that after final trial for judgment as follows:

That Plaintiffs have and recover from Defendant Merck judgment for their general and special damages described above and in the full amount allowed by law and punitive damages; that Plaintiffs recover their costs of suit; that Plaintiffs receive pre-judgment and post-judgment interest at the highest rate allowed by law; and that Plaintiffs receive such other and further relief, at law or *in equity, to which they may* show themselves justly entitled.

Respectfully submitted,

**MILLER CURTIS & WEISBROD, L.L.P.**

By:   *Alexandra S. Boone*

**LES WEISBROD**
Texas State Bar No. 21104900
**ALEXANDRA V. BOONE**
Texas State Bar No. 00795259
11551 Forest Central Drive
Suite 300
Dallas, Texas 75243
Phone: (214) 987-0005
Fax: (214) 739-4732

**ATTORNEYS FOR THE PLAINTIFFS**

**JURY DEMAND**

Plaintiffs demand that all issues of fact in this case be tried to a properly impaneled jury.