M. Rothkopf Depositon Excerpts


• Mason - Expert Challenge 6 (Rothkopf)


[1:] - [1:24]            9/20/2006     Rothkopf, Michael
                         page 1
                            0001
                         1                    UNITED STATES DISTRICT COURT
                                              EASTERN DISTRICT OF LOUISIANA
                         2
                             IN RE: VIOXX           :  MDL DOCKET NO.
                         3   LITIGATION PRODUCTS   :  1657
                             LIABILITY LITIGATION  :  SECTION L
                         4                          :
                             THIS DOCUMENT RELATES :  JUDGE FALLON
                         5   TO                    :
                             CHARLES LARON MASON   :  MAGISTRATE JUDGE
                         6        V.                :  KNOWLES
                             MERCK & CO., INC.     :
                         7
                         8
                         9                     - - -
                         10           September 20th, 2006
                         11                    - - -
                         12
                         13
                         14           Oral deposition of MICHAEL
                         15   ROTHKOPF, M.D., held at the offices of the
                         16   witness, 1320 Greenway, Suite 200, Irving,
                         17   Texas, commencing at 1:58 p.m., on the above
                         18   date, before Daniel J. Skur, Certified
                         19   Shorthand Reporter and Notary Public.
                         20                    - - -
                         21
                                      GOLKOW LITIGATION TECHNOLOGIES
                         22              Four Penn Center
                                      1600 John F. Kennedy Boulevard
                         23                 Suite 1210
                                      Philadelphia, Pennsylvania 19103
                         24              877.DEPS.USA
                         page 2
                         1    A P P E A R A N C E S:
                         2
                         3         BLIZZARD, McCARTHY & NABERS, L.L.P.
                                   By:  J. SCOTT NABERS, ESQ.

[33:18] - [34:7]         9/20/2006     Rothkopf, Michael
                         page 33
                         14       Q.      Then if we look at the
                         15   Testimony section, who gave you that
                         16   information?
                         17       A.      Fulbright & Jaworski.
                         18       Q.      And if we look at the
                         19   Literature section, which is pretty much the
                         20   rest of the document, who gave you the
                         21   literature?
                         22       A.      The bulk of it was given to me
                         23   by Fulbright & Jaworski.  I have -- you'll
                         24   see it.  I've brought it with me.  I did my
                         page 34
                         1    own literature search on Pub Med, and, quite
                         2    honestly, the literature they gave me was so
                         3    exhaustive that there were few additional
                         4    things I pulled, but I think I pulled a
                         5    couple of additional articles on my own and
                         6    some abstracts on my own, and those are at
                         7    the bottom of the box.
                         8        Q.      Okay.
                         9        A.      They should be on that list, I
                         10   presume.
                         11       Q.      All right.  With regard to the

M. Rothkopf Depositon Excerpts

**• Mason - Expert Challenge 6 (Rothkopf)**

[101:18] - [102:4]     9/20/2006     Rothkopf, Michael

```
page 101
14  the only way, you know, to really be able to
15  do that, I believe, is through your
16  experience in taking care of these kinds of
17  situations.
18       Q.    All right.  If we separate out
19  your clinical education, your clinical
20  training, and your clinical experience and we
21  just talk about Vioxx for a minute, just
22  generally Vioxx, have you done anything else
23  on Vioxx besides just reading medical
24  literature?
page 102
1              MR. KRUMHOLZ:  Objection, form.
2        A.    If you call spending almost --
3   you know, over a hundred hours reading the
4   medical literature "just," I would say yes.
5        Q.    (BY MR. NABERS)  Right.  I
6   don't mean to belittle that in any way.  I'm
7   just trying to figure out if you've done
8   anything else specific to Vioxx besides spent
```

[109:7] - [109:12]     9/20/2006     Rothkopf, Michael

```
page 109
3   interventionalist like somebody who only
4   stays in the cath lab all day long.  So, you
5   know, I'm board certified in interventional
6   medicine.
7        Q.    Right.  And do you perform
8   stent placements?
9        A.    Yes.
10       Q.    And you do balloon
11  angioplasties?
12       A.    Yes.
13       Q.    And you've indicated that you
14  do take care of patients with heart attacks,
15  correct?
16       A.    Yes.
```

[137:21] - [144:2]     9/20/2006     Rothkopf, Michael

```
page 137
17  by the body mass index, but in my own
18  personal opinion, you know, you would have to
19  be a lot heavier than that for me to say you
20  were massively obese.
21       Q.    Okay.  And then you indicate
22  that a positive family history.
23       A.    Right.
24       Q.    So what have you seen in
page 138
1   connection with Mr. Mason's familiar history
2   that would suggest to you that he has a --
3   that's a risk factor for coronary artery
4   disease for him?
5        A.    Well, I've seen a death
6   certificate of his sister, which apparently
7   she was 55 and died a sudden death.
8        Q.    And whenever you practice
9   medicine, do you try to follow the HIPPA
10  laws?
11       A.    Yes.
12       Q.    Okay.  Did you know that was
13  obtained without a HIPPA authorization?
14             MR. KRUMHOLZ:  Objection, form.
15       A.    No.
16       Q.    (BY MR. NABERS)  You would
17  agree that wouldn't be a good thing, right?
```

M. Rothkopf Depositon Excerpts

- **Mason - Expert Challenge 6 (Rothkopf)**

```
18           MR. KRUMHOLZ:  Objection, form.
19      Q.   (BY MR. NABERS)  If it was
20  obtained in violation of the HIPPA laws?
21           MR. KRUMHOLZ:  Same objection.
22      A.   Well, I mean, if you really
23  think that that was the case, then you should
24  go to the authorities and --
page 139
1       Q.   (BY MR. NABERS)  I have.
2       A.   But I'm not going to, you know,
3   speculate on that one way or the other
4   because I really don't know anything about it
5   except --
6       Q.   Okay.
7       A.   -- that I've seen the death
8   certificate.
9       Q.   All right.  And what was
10  significant to you from the death
11  certificate?
12      A.   Just that the patient died a
13  sudden -- sudden death is my understanding.
14      Q.   Okay.  And did it indicate that
15  the patient had phenylpropanolamine toxicity?
16      A.   I don't recall that.
17      Q.   That would be important,
18  wouldn't it?
19      A.   Yes.
20      Q.   And why would that be
21  important?
22      A.   Because that has been
23  associated in the literature with sudden
24  death.
page 140
1       Q.   Okay.  And wouldn't that change
2   your opinion on whether or not he had a
3   family history that was a risk factor for
4   coronary artery disease if you were aware his
5   sister died as a result of
6   phenylpropanolamine toxicity?
7            MR. KRUMHOLZ:  Objection, form.
8       A.   Probably not, because, again,
9   in medical probabilities, statistically, if
10  you have sudden death, by far and away, it's
11  because you have underlying undiagnosed
12  coronary artery disease whether you're a male
13  or female, and the mechanism of sudden death
14  with phenylpropanolamine toxicity could
15  certainly be an arrhythmia because the
16  patient had underlying coronary artery
17  disease, and, basically, the physiologic
18  effects of the phenylpropanolamine basically
19  exposed the patient to the risk of sudden
20  death because you had coronary disease.
21           So I think, again, in medical
22  probability you would have to say that the
23  patient probably -- you know, it's reasonable
24  to say that she died and had coronary artery
page 141
1   disease.
2       Q.   You've never seen an autopsy.
3       A.   No.
4       Q.   You don't know whether she had
5   coronary artery disease or not, right?
6            MR. KRUMHOLZ:  Objection, form.
7       A.   That's correct.
8       Q.   (BY MR. NABERS)  Never seen any
9   objective evidence to suggest to you that she
10  had coronary artery disease.
11           MR. KRUMHOLZ:  Objection, form.
12      A.   That's correct.
13      Q.   (BY MR. NABERS)  Okay.  And
14  didn't I read somewhere that you either
```

M. Rothkopf Depositon Excerpts

**• Mason - Expert Challenge 6 (Rothkopf)**

```
15  testified or wrote that you need to have more
16  than one member of your family have coronary
17  artery disease in order for it to be a risk
18  factor?
19          MR. KRUMHOLZ:  Objection, form.
20      A.  I could have testified to that.
21  I don't know, but that may be.
22      Q.  (BY MR. NABERS)  In your
23  report.  Do you know if you said that in your
24  report?
page 142
1           MR. KRUMHOLZ:  Objection, form.
2       A.  I don't remember saying that in
3   my report.
4       Q.  (BY MR. NABERS)  Okay.  Is that
5   true?
6       A.  Some doctors might say that,
7   but, again, I think the balance of doctors
8   would agree that one would qualify.
9       Q.  And for you in this case, what
10  you know about his sister from that one-page
11  death certificate is enough for you to make
12  it a risk factor for coronary artery disease
13  for Mr. Mason?
14      A.  Personally, I think it should
15  be considered as one.  Again, I would agree
16  with you that if you wanted to argue about
17  that, you can argue about it.  Certainly all
18  his treating physicians agreed to that.
19      Q.  Is it a minor or major risk
20  factor for you?
21      A.  I would have to call it
22  significant.  Family history is generally
23  considered major.  But, personally, I would
24  say that -- personally, I would say to me,
page 143
1   it's more minor because I'm not -- you know,
2   it was only one family member.
3       Q.  All right.  And --
4       A.  So I would say it's a risk
5   factor.  If you're asking me if I want to
6   qualify it, I would qualify it as a minor
7   one.
8       Q.  Okay.  And you said that his
9   other treating physicians had acknowledged
10  that that was -- his family history was a
11  factor for coronary artery disease.  I'm not
12  aware of one.  Who are you aware of?
13          MR. KRUMHOLZ:  Objection, form.
14      A.  I thought in the depositions,
15  but I would have to find that.
16      Q.  (BY MR. NABERS)  Okay.  You --
17      A.  That was brought out in the
18  depositions of some of the treaters, and they
19  agreed with that.
20      Q.  As you sit here, you don't know
21  which ones.
22          MR. KRUMHOLZ:  Objection, form.
23      A.  I might have to specifically
24  look at that, but I'm fairly confident that
page 144
1   was brought out, that at least one or two of
2   the physicians did agree with that.
3       Q.  (BY MR. NABERS)  Okay.  Sleep
4   apnea.
5       A.  Yes.
6       Q.  Do you consider that a risk
```

M. Rothkopf Depositon Excerpts

**• Mason - Expert Challenge 6 (Rothkopf)**
[154:15] - [155:14]         9/20/2006     Rothkopf, Michael

```
page 154
11  atherosclerosis prior to ever receiving
12  Vioxx.  That's one you hold.  We've talked
13  about that, right?
14       A.    Yes.
15       Q.    And what do you base that
16  opinion on, that he had coronary artery
17  disease prior to taking Vioxx?
18       A.    There's two reasons that I
19  would say that.
20       Q.    Okay.
21       A.    The first reason is he had
22  fairly extensive disease in one distribution
23  in addition to plaques and other vessels, and
24  the natural history of coronary artery
page 155
1   disease is that it takes probably many years
2   to get to that point, meaning it would be
3   unusual to have no coronary artery disease
4   and then have that degree of coronary artery
5   disease a year later unless there were some
6   extenuating circumstances, which I don't
7   think there are here.
8             So what I know of the natural
9   history of the progression of coronary artery
10  disease and the time it usually takes to get
11  to high-grade stenosis in two vessels in
12  addition to more mild stenosis in two other
13  areas would lead me to believe that this
14  would take longer than a year.
15       Q.    All right.  Do you have any
16  objective evidence that suggests that he had
17  coronary artery disease prior to Vioxx?
18       A.    The objective evidence, which I
```

[155:15] - [157:2]         9/20/2006     Rothkopf, Michael

```
page 155
11  to high-grade stenosis in two vessels in
12  addition to more mild stenosis in two other
13  areas would lead me to believe that this
14  would take longer than a year.
15       Q.    All right.  Do you have any
16  objective evidence that suggests that he had
17  coronary artery disease prior to Vioxx?
18       A.    The objective evidence, which I
19  referred to in the report, is that he did
20  actually have changes on his stress test
21  which are considered nondiagnostic, meaning
22  if you had no other stress test to compare
23  to, either before or after, you would have to
24  say that on the basis of the stress test, you
page 156
1   cannot diagnose coronary artery disease; but
2   then a year later, after his problem was
3   corrected, his stress test was essentially
4   cold normal, so that indicates to me that
5   there was a difference in his coronary
6   circulation on September 2002 versus I
7   believe it was October 2003 when he had the
8   second stress test.
9             So in other words, if he was
10  the type of person who had a nondiagnostic
11  stress test, basically -- and did not have
12  coronary artery disease, basically when he
13  repeated the stress test, you would expect it
14  to remain nondiagnostic or unchanged.  But in
15  this case, probably that nondiagnostic stress
16  test was an indication that there was some
```

M. Rothkopf Depositon Excerpts

• **Mason - Expert Challenge 6 (Rothkopf)**

```
                    17  coronary artery disease that was significant
                    18  already, and that once that was corrected,
                    19  he -- his next stress test was fully normal.
                    20           So, again, in that respect, he
                    21  serves to me as his own control because we
                    22  have a before and an after, so I believe
                    23  that's the -- we have the natural history
                    24  which we -- you know, has been well
                  page 157
                    1   described, and then we have this objective
                    2   evidence, so those are the two things.
                    3        Q.   So would you say that his
                    4   stress test prior to taking Vioxx was
                    5   abnormal?
                    6        A.   No.  I would say it was
```

[179:18] - [180:17]    9/20/2006    Rothkopf, Michael

```
                  page 179
                    14  there a possibility, though, that Vioxx
                    15  played a role in his heart attack.
                    16           MR. KRUMHOLZ:  Objection, form.
                    17       A.   In medical probability, no.
                    18       Q.   (BY MR. NABERS)  Okay.  So
                    19  you've excluded Vioxx as a contributing cause
                    20  of his heart attack to a hundred percent.
                    21       A.   No, in medical probability.
                    22       Q.   Well, medical probability, what
                    23  does that mean to you?  51 percent or
                    24  greater?
                  page 180
                    1            MR. KRUMHOLZ:  Objection, form.
                    2        A.   Well, no, to me, it doesn't
                    3   necessarily mean 51 percent or greater.  To
                    4   me, it means that it would be -- you know,
                    5   unless it was one of these scenarios where
                    6   anything is possible -- or should we say
                    7   anything is -- one of these scenarios where
                    8   anything is possible, I would say, no, it's
                    9   not a risk factor.
                    10           You know, I'm very confident
                    11  from looking at the literature and looking at
                    12  this patient's clinical presentation and his
                    13  angiogram that, you know, this should not be
                    14  viewed as a heart attack that was caused by
                    15  Vioxx.  And in my mind, it's much more than
                    16  51 percent.  I mean, I'm not going to give
                    17  you a percentage.
                    18       Q.   Okay.
                    19       A.   I'm just going to say --
                    20       Q.   You'll just agree that there's
                    21  a possibility Vioxx played a role in this
```

[237:19] - [237:24]    9/20/2006    Rothkopf, Michael

```
                  page 237
                    15       Q.   Prior to prescribing Vioxx for
                    16  the first time, did you read the label or the
                    17  Physician's Desk Reference on it?
                    18       A.   I can't remember.
                    19       Q.   Did you do anything to educate
                    20  yourself on Vioxx before prescribing it for
                    21  the first time?
                    22       A.   Typically, I'll be reading
                    23  about these things in the literature, so I'm
                    24  sure I was well aware of it.
                  page 238
                    1        Q.   Okay.
                    2        A.   And I'm sure there was a lot of
                    3   literature about it that had come out.  You
                    4   know, whether I read the label or not, I
```

M. Rothkopf Depositon Excerpts

**• Mason - Expert Challenge 6 (Rothkopf)**

[375:5] - [378:16]          9/20/2006     Rothkopf, Michael

```
page 375
 1  of irreversible cell death, but I'm just
 2  emphasizing to you that the ejection fraction
 3  is very normal, and the area that we're
 4  talking about is very small.
 5       Q.   So your position is that that
 6  area of tissue that's dead in his left
 7  ventricle isn't affecting his ejection
 8  fraction.
 9       A.   No.
10       Q.   You believe his ejection
11  fraction to be normal?
12       A.   Yes.
13       Q.   And you don't believe that that
14  area of dead heart muscle is affecting his
15  left ventricular function?
16       A.   Well, technically, you would
17  have to say if I wanted to say 1 or 2
18  percent, that it could be affecting his
19  function by 1 or 2 percent, but, I mean, you
20  can have people function, for example,
21  with -- normally and at a pretty good level
22  with ejection fractions of 35 percent, so if
23  you want a technical answer, you could say
24  technically if there's any dead tissue at
page 376
 1  all, it has to affect it, but practically
 2  speaking, no, it doesn't really affect it.
 3       Q.   Okay.
 4       A.   The cardiac output is going to
 5  be normal.
 6       Q.   All right.
 7       A.   And the cardiac reserve is
 8  going to be normal.
 9       Q.   I think what you said is that
10  you wouldn't put him on any restrictions.
11  You would agree that his other -- with his
12  treating physician in this regard?
13       A.   Yes.
14       Q.   But it's fair to say that in
15  terms of what he feels like he can do on a
16  daily basis, you don't know what that would
17  be because you haven't talked to him about
18  that, right?
19            MR. KRUMHOLZ:  Objection, form.
20       A.   Yeah, whatever he feels like he
21  can do on a daily basis is what he can do on
22  a daily basis.  If he feels something, then
23  that's what it is.
24       Q.   (BY MR. NABERS)  Okay.  Well,
page 377
 1  is it reasonable for him to have concern
 2  about going off out into the wild hunting elk
 3  as a result of having a prior heart attack?
 4            MR. KRUMHOLZ:  Objection, form.
 5       Q.   (BY MR. NABERS)  To have some
 6  anxiety about that?
 7            MR. KRUMHOLZ:  Same objection.
 8       A.   Yes, it's reasonable.
 9       Q.   (BY MR. NABERS)  Is it
10  reasonable for him to have some anxiety over
11  having another future heart attack?
12            MR. KRUMHOLZ:  Objection, form.
13       A.   Well, again, I'm not going to
14  be critical of him at all.  If that's how he
15  feels, I'm not going to say it's
16  unreasonable.
17            What I would say is he may need
18  to go back to his cardiologist and have -- I
19  think just judging from the deposition of him
```

M. Rothkopf Depositon Excerpts

**• Mason - Expert Challenge 6 (Rothkopf)**

```
                     20  and his wife, I think there is some
                     21  misunderstanding about what his doctors think
                     22  his heart attack means and what he thinks it
                     23  means.
                     24       Q.   (BY MR. NABERS)  Uh-huh.
                   page 378
                     1        A.   So that's not -- it's not
                     2   unreasonable for him to feel any way he does.
                     3   Although to some degree, I'm not sure that
                     4   the way he feels has, you know, anything to
                     5   do with the reality of his medical state, and
                     6   if he understood that better, he probably
                     7   would feel a lot better.  Right now I think
                     8   he feels like he's a victim.
                     9        Q.   Okay.
                     10       A.   And he should actually feel
                     11  that he's lucky that his problem was
                     12  identified and treated very effectively and
                     13  that his prognosis is excellent, so a lot of
                     14  that would strictly be if he had a different
                     15  attitude, he probably would be able to do a
                     16  lot more and feel more comfortable.
                     17       Q.   So your opinion is it was a
                     18  good thing that he had Vioxx because he had a
                     19  heart attack and that he got in to have good
                     20  medical treatment?
```

[399:1] - [399:20]        9/20/2006    Rothkopf, Michael

```
                   page 398
                     21
                     22
                     23
                     24
                   page 399
                     1             C E R T I F I C A T E
                     2
                     3            I, DANIEL J. SKUR, a Notary
                         Public and Certified Shorthand Reporter, do
                     4   hereby certify that prior to the commencement
                         of the examination, MICHAEL ROTHKOPF, M.D.
                     5   was duly sworn by me to testify to the truth,
                         the whole truth and nothing but the truth.
                     6
                                  I DO FURTHER CERTIFY that the
                     7   foregoing is a verbatim transcript of the
                         testimony as taken stenographically by and
                     8   before me at the time, place and on the date
                         hereinbefore set forth, to the best of my
                     9   ability.
                     10           I DO FURTHER CERTIFY that I am
                         neither a relative nor employee nor attorney
                     11  nor counsel of any of the parties to this
                         action, and that I am neither a relative nor
                     12  employee of such attorney or counsel, and
                         that I am not financially interested in the
                     13  action.
                     14
                     15
                     16
                     17           Daniel J. Skur
                                  Notary Public, State of Texas
                     18           My Commission Expires 7/10/2010
                                  Dated:  9/22/06
                     19
                     20
                     21
                     22
                     23
                     24
```