## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Vioxx | MDL DOCKET NO. 1657 |
| **PRODUCTS LIABILITY LITIGATION** | |
| | Section L |
| THIS DOCUMENT RELATES TO: | |
| Case No. 2:06cv810 | |
| | Judge Fallon |
| CHARLES LARON MASON v. | Mag. Judge Knowles |
| MERCK & CO., INC. | |

## OPPOSITION OF PLAINTIFF CHARLES LARON MASON TO DEFENDANT'S OMNIBUS MOTION FOR ORDER EXCLUDING EVIDENCE AND TESTIMONY RAISED BY MOTIONS PREVIOUSLY DENIED BY THE COURT

### (Defendant's Motion in Limine No. 7)

**TO THE HONORABLE JUDGE ELDON FALLON:**

Plaintiff Charles Laron Mason, by and through his undersigned counsel, asks this Court to deny Defendant, Merck & Co., Inc.'s Omnibus Motion For Order Excluding Evidence And Testimony Raised By Motions Previously Denied By The Court.

## I.
## INTRODUCTION

Merck provides this Court with no new reason for it to change any of its prior adverse rulings on Merck's motions to exclude (1) all "Warning Letters" and other informal "Untitled Letters" (collectively "informal FDA letters") from the FDA; (2) evidence relating to the *New England Journal of Medicine's* (NEJM) December 2005 "Expression of Concern;" (3) marketing and promotional materials; (4) evidence of Adverse Event Reports and case reports; (5) "unreliable and irrelevant" medical and scientific evidence; and (6) the testimony of Eric J.

Topol, M.D.  Nevertheless, Plaintiff will address each topic in turn.

## II
## DISCUSSION

Merck's attempt to exclude broad categories of evidence in this case is inappropriate. Merck has essentially requested that the Court exclude any and all relevant evidence that even contradicts the theories of Merck's defense.  This is not the purpose of the motion to exclude or in limine.  *See United States v. Feola*, 651 F.Supp. 1068, 1129 9S.D.N.Y. 1987) ("it would be improper for this court to speculate as to the circumstances that might surround the introduction of this evidence at trial, specifically, the adequacy of the foundation . . . the probative value weighed against the potential prejudicial impact in light of the evidence presented, and the purpose for which such a statement will be introduced at the time."), *aff'd*, 875 F.2d 857 (2nd Cir. 1989).

The Fifth Circuit has noted: "[w]hen evidence is challenged solely on the ground that it is irrelevant, it is inadmissible only if it fails to meet the definition of Rule 401 – it must be without probative value as to *any* fact of consequence to the determination of the action.  If it is relevant as to any issue, it is relevant to the action and is not inadmissible under Rule 402." *See Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F.Supp. 587, 599 (E.D.La. 1993)(quoting *Lubbock Feed lots, Inc. v. Iowa Beef Processors*, 630 F.2d 250, 167 (5th Cir. 1980)(emphasis in original).  Thus, Merck must establish that the evidence it seeks to have be excluded on relevancy grounds is *not* relevant to *any* issue in the case, not simply the issues it thinks are important. It has not done so.

### A.    INFORMAL FDA LETTERS

Such evidence, which was admitted in the *Plunkett*, *Barnett* and *Smith* trials, is highly relevant, and is properly admissible for multiple purposes including: (1) demonstrating that

2

Merck's warnings were inadequate and that Merck was on notice that its promotional activities contributed to this inadequacy; (2) rebutting claims of good character; (3) rebutting claims of efficacy or safety of Vioxx based on the FDA's "approval" or blessing; (4) impeachment purposes; (5) showing Defendant's intent and/or state of mind; (6) demonstrating a routine business practice; and (7) pattern of misconduct for purposes of punitive damages.  The Court denied Merck's motion on this issue in *Smith* and *Barnett*.[1]  In *Barnett*, the Court indicated that this evidence "has relevance to Merck's knowledge . . . [and] may have relevance to its advertisements, Dear Dr. letters and its duty regarding its sales force . . . 401 and 402, 607, 803(3)."[2]

In essence, these are precisely the messages that Plaintiff contends Merck was making to doctors and the public about Vioxx and cardiovascular safety, including using the manufactured "naproxen theory" to explain away the five to one risk for heart attack shown in the VIGOR results.  This subject documents are, therefore, relevant and admissible to show that Merck knew that its Vioxx message minimized serious cardiovascular risks, was inappropriate and misleading, and violated the FDCA.

1.    **Relevant Facts**

In its prior briefing, which Merck has incorporated, Merck primarily argues for the exclusion of the September 17, 2001 warning letter issued by Dr. Thomas W. Abrams, R.Ph., MDA, then acting Director of the Division of Drub Marketing, Advertising and Communications for the FDA, to Merck President and CEO, Raymond V. Gilmartin.  In the letter Dr. Abrams admonished Merck to cease and remediate promotional activities dating back to June of 2000

---

[1] *See* Order, *Barnett v. Merck & Co., Inc.* (June 28, 2006); Order, *Smith v. Merck & Co., Inc.* (Sept. 6, 2006) (Rec. Doc. 6721).

[2] Order, *Barnett v. Merck & Co., Inc.* (June 28, 2006).

that the FDA found misleading in regards to Vioxx.[3]   Merck acknowledges that this letter was admitted by the Court in *Plunkett*, *Barnett* and *Smith* on the ground it was relevant to the plaintiffs' contention that Merck rushed Vioxx to the market.   That same contention is made by Plaintiff here, and the Court's reasoning is equally applicable.

Plaintiff alleges that Merck designed and initiated a marketing campaign that would impact physicians and consumers both directly and indirectly.   Merck's marketing campaign, which included the hiring of its national speaker, Dr. Peter Holt, was designed to create a "buzz" among the public and medical community by which Vioxx's alleged benefits were promoted while simultaneously minimizing concerns and negative data relevant to its cardiovascular risks sufficient to establish, increase and maintain a multi-billion dollar market share at the expense of, and irrespective of, human safety and life.

Dr. Abrams' September 17, 2001 warning letter and other FDA communications generically referenced in Merck's Motion in Limine No. 7 are directly relevant to establish Merck's efforts to foist a dangerous drug onto the market at the expense of patient safety, including the safety of Mr. Mason, by failing to properly and adequately warn of the risks associated with Vioxx, a drug which, but for Merck's failure to warn, would never have been prescribed by Plaintiff's nurse practitioner, nor ingested by Mr. Mason.   Moreover, such evidence goes directly to issues relating to the adequacy of Merck's warning and is further relevant and admissible: to rebut claims of good character and/or drug efficacy or safety; for

---

[3] As the Court is aware, In the September 17, 2001 warning letter, the FDA advised Merck of its finding that Merck had engaged in misrepresentation regarding the risks associated with Vioxx during six (6) audio- conferences (led by its national speaker, Dr. Peter Holt), one (1) press release ("Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx"), and in three (3) oral presentations made by Merck sales representatives (one at the Annual Meeting of the Maryland Pharmacists Association and two at the Annual Meeting of the American Society of Health-Systems Pharmacists).

impeachment purposes; for showing Defendant's motive, intent, and/or state of mind; and for
showing a pattern and practice of misconduct for purposes of punitive damages.

### 2. Relevance of FDA Warning Letters Addressing Merck's Marketing Scheme for Vioxx

Plaintiff asserts that Merck failed to adequately warn (and in so doing, affirmatively
misled) consumers, physicians and other members of the medical community, including Plaintiff,
regarding the safety and efficacy of Vioxx. First, Merck spent millions of dollars on direct-to-
consumer advertising to generate a "buzz" about Vioxx and to insure that patients would request
Vioxx prescriptions from their physicians. Second, Merck promoted the drug directly to
physicians fought on four fronts: (1) Merck sought out highly respected physicians - who had
influence in the medical community and with the FDA - to advocate the drug as part of its
medical education program; (2) Merck sought to use the financial gain and prestige associated
with its medical programs to influence individual physicians' opinions and prescribing habits
with respect to the drug; (3) Merck disseminated misleading sales and promotional materials -
including its product labeling and product information circulars - directly to individual
physicians; and (4) Merck disseminated misleading safety and efficacy information through
"press releases" and other communications to the medical community. The September 17, 2001
FDA warning letter along with other FDA communications directly support Plaintiff's claims
that Merck failed to provide adequate warnings, and refute Merck's arguments or defenses that it
acted appropriately.

Merck attempts to assert several arguments in support of its contention that evidence
regarding Dr. Abrams' warning letter and other FDA communications regarding Merck's
marketing or promotional activities are somehow irrelevant. Merck has not satisfied its burden

of establishing that evidence of the FDA communications regarding Merck's acts and omissions are "without probative value as to any fact of consequence to the determination of the action." *See Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F.Supp. 587, 599 (E.D.La. 1993).

**B.     EVIDENCE RELATING TO THE NEJM'S DECEMBER 2005 "EXPRESSION OF CONCERN"**

Merck argues that the NEJM "Expression of Concern" is not relevant to the questions at issue in this case, is hearsay and prejudicial.   Merck's arguments are without merit.   In the *Barnett* case, he Court reserved its ruling on Merck's motion regarding this issue, indicating the evidence "may go to credibility and also have some relevance as to what Merck knew and when . . . [b]ut its relevance is in rebuttal or cross."[4]   In the *Smith* case, the Court deferred its ruling on this issue, indicating the evidence is "probably admissible because of influence and effect of original article on giving treating physicians comfort in prescribing Vioxx."[5]

**1.     The "Expression of Concern" Is Admissible Under Rule 803(6).**

Federal Rule of Evidence 803(18) provides:

> (18) **Learned treatises.**   To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice.   If admitted, the statements may be read into evidence but may not be received as exhibits.

In accordance with Rule 803(18), it is understood that the article itself should not be admitted into evidence.   Testimony regarding the "Expression of Concern," however, should be allowed. In addition, in conjunction with that testimony, Plaintiff should be allowed to publish the document to the jury.

---

[4] Order, *Barnett v. Merck & Co., Inc.* (June 28, 2006).
[5] Order, *Smith v. Merck & Co., Inc.* (Sept. 6, 2006) (Rec. Doc. 6721).

There is no question that the NEJM is a reliable authority.  It is one of the premier medical periodicals in the world.  Numerous experts in this case have testified to that fact.  *See Carroll v. Morgan*, 17 F.3d 787, 790 (5th Cir. 1994).  In fact, the Court may take judicial notice that the NEJM is a reliable authority in the medical field.  Testimony regarding other articles published the NEJM has been allowed during previous trials.  The "Expression of Concern" is a statement made in a periodical of reliable authority and is authoritative.  The "Expression of Concern" was written by Dr. Gregory Curfman, Dr. Stephen Morrissey, and Dr. Jeffrey Drazen, all editors of the NEJM, and was peer-reviewed.[6]  Plaintiff's experts have relied on the "Expression of Concern."  Therefore, testimony relating to the "Expression of Concern" should be allowed as the Court has done in previous trials, including the recent *Smith* trial.[7]

### 2.      The "Expression of Concern" is Relevant in Plaintiff's Case in Chief

In March 2000, after receiving the VIGOR results, Merck became aware that the VIGOR trial showed that those patients taking Vioxx experienced five times more heart attacks than those taking Naproxen.  Merck was put on notice (though 090 and other studies should have done this already) that there were serious cardiovascular safety concerns associated with Vioxx.

In November 2000, the VIGOR results were published in the NEJM, and Merck's witness, Dr. Alise Reicin, was one of the co-authors of the study.  The "Expression of Concern" and Dr. Gregory Curfman's testimony show that the actual results of the VIGOR study were significantly misstated; that is, the authors understated the number of heart attacks experienced by patients taking Vioxx by three.  Thus, "the fact that these three myocardial infarctions were

---

[6] *See* Deposition of Dr. Gregory Curfman, at 77-78 (Jan. 24, 2006), attached as Exhibit A.
[7] *See* Sept. 21, 2006 Trial Transcript, *Smith v. Merck & Co., Inc.*, 2421:24-2423:2; 2474:1-18.

not included made certain calculations and conclusions in the article incorrect."[8]

Dr. Reicin has testified at most of the Vioxx trials thus far.  She is Merck's corporate face and Vioxx's staunchest defender.  Evidence relating to the validity and honesty of her work is directly relevant to her credibility and professional competence or that of any Merck witness who sponsored the study or championed its results.  When Dr. Reicin or any similar Merck witness takes the stand, or when any Plaintiff's witness is cross examined about her article or the idea that Merck was open and honest about disclosing the risks of Vioxx, this matter becomes relevant and admissible under Rule 402.  *See also* FED.R.EVID. 106 (optional completeness).  This is true despite Merck's argument that Dr. Vogeler, ***who did not prescribe Vioxx to Mr. Mason***, knew Vioxx carried a cardiovascular risk five times greater than Naprosyn at the time Mr. Mason was taking Vioxx.  Any testimony from Dr. Vogeler on whether he would prescribe Vioxx to Mr. Mason today if it were still on the market has not relevance to this issue whatsoever, particularly since Dr. Vogeler *never* prescribed Vioxx to Mr. Mason.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  *Campbell v. Keystone Aerial Surveys, Inc.*, 138 F.3d 996, 1004 (5th Cir. 1998); *U.S. v. Chavful*, 100 Fed.Appx. 226, 231 (5th Cir. 2004); FEDR.EVID. 401.  "Thus, if probative of *any* fact that is of consequence to the determination of the action, evidence is relevant within the meaning of the Federal Rules, and is therefore admissible."  *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 267 (5th Cir. 1980)(internal quotation omitted)(emphasis added).  To say that evidence is irrelevant in the sense that it lacks probative

---

[8] Gregory D. Curfman, et al., *Expression of Concern: Bombardier, et al, "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis, N. Engl. J. Med. 2000; 343:1520-8,"* N. ENGL. J. MED. 2005; 353:2813-4, at 2813, attached as Exhibit B.

value therefore means that it does not justify *any* reasonable inference as to the fact in question. *See* McCormick on Evidence, § 185 at 544 (3rd dd. 1984)(emphasis added).   Conversely, if evidence does support the existence of a specific fact, even obliquely, it is relevant.

The VIGOR article misrepresented vital safety data to physicians and the healthcare community.   Merck and Dr. Reicin championed that lie and continue to do so to this day.   As the result, such evidence cannot be unduly prejudicial.   Instead, Merck richly deserves all the prejudice that properly flows from deceiving to the scientific community about a dangerous drug.

### 3.   Admission of Evidence Relating to the "Expression of Concern" Would Not Cause Undue Prejudice, Confusion, or Waste Time

Merck's alternative argument that evidence of the "expression of concern" should be excluded under Rule 403, should also be rejected. Unfair prejudice within the context of Rule 403 "means an undue tendency to suggest (a) decision on an improper basis, commonly, though not necessarily, an emotional one."   Notes of the Advisory Committee on Proposed Federal Rules of Evidence, Rule 403 at 102.   *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979).

In relevant part, Federal Rule of Evidence 403 directs that relevant evidence is inadmissible if its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.   Fed. R. Evid. 403.   The careful use of "substantially" demonstrates the emphasis placed on this balancing test.   "Rule 403 is an extraordinary remedy that should be used sparingly because it allows the court to exclude admittedly probative evidence."   *United States v. Ross*, 33 F.3d 1507, 1524 (11th Cir. 1994).   As this court has noted, "Rule 403 rulings are best made at the time of trial when the court may balance relevant factors before it."   *Minshew v. Brown*, NO. 95-2507, 1996 WL 601436 (E.D.La. 1996) (Fallon, J.).

9

Evidence relating to the "Expression of Concern" is clearly relevant to Plaintiff's failure to warn and defect claims because it shows Merck's continuing attempt to downplay the risks of Vioxx which continued even *after* references to cardiovascular risks were included on its label. Such evidence will not result in confusion to the jury. Moreover, the documents and evidence is clearly related to Dr. Reicin's credibility and Merck's central defense that it fully disclosed the dangers, if any, of Vioxx to the public.

## C.   MARKETING AND PROMOTIONAL MATERIALS

Merck designed and initiated a marketing campaign that impacted physicians and consumers both directly and indirectly. Merck spent hundreds of millions of dollars assuring the medical community and the public that Vioxx was safe, while simultaneously minimizing concerns and negative data relevant to its cardiovascular risks. In doing so, Merck created widespread awareness of the drug in the medical community and among the public as well as knowledge of the characteristics in its advertising.

### 1.   Merck's Marketing Scheme For Vioxx

In addition to other claims, Plaintiff asserts that Merck failed to adequately warn (and in so doing, affirmatively misled) consumers, physicians and other members of the medical community regarding the safety and efficacy for Vioxx. This goal was accomplished chiefly in two ways. First, Merck spent millions of dollars on direct-to-consumer advertising to generate a "buzz" about Vioxx and to insure that patients would request Vioxx prescriptions from their physicians.

Second, Merck promoted the drug directly to physicians. This campaign was fought on three fronts. On one front, Merck sought out highly respected physicians--who had influence in

the medical community and with the FDA—to advocate the drug as part of its medical education program. On another front, Merck sought to use the financial gain and prestige associated with its medical programs, to influence individual physicians' opinions and prescribing habits with respect to the drug. Finally, Merck disseminated misleading sales and promotional material—including its product labeling and product information circulars—directly to individual physicians.

Inherent to this scheme is the understanding that physicians do not develop their opinions about the safety and efficacy of drugs in a vacuum. Although information received directly from the manufacturer's labeling, promotional, and educational programs are clearly factors, physicians also rely on a dialogue and an exchange of ideas and experience with other doctors to formulate their opinions about a particular drug. Merck understood this and relied upon their knowledge to develop their marketing scheme.

With respect to sales and promotional materials used by Merck detailers or that were disseminated directly to physicians, Merck's approach to dealing with individual physicians was uniform. The information provided to all physicians—whether national thought leaders or local doctors—and Merck's attempts to influence opinions and prescribing habits of individual physicians, are central to Merck's overall scheme to inform and control the dialogue in the medical community about the cardiovascular safety of Vioxx. Evidence relating to this marketing plan is central to Plaintiff's allegations; particularly his failure to warn claims.

## 2.    <u>The Specific Documents Merck Seeks To Exclude Are Relevant</u>

Each of these specific categories of evidentiary items is relevant and probative of Plaintiff's case and should be admitted at trial. Plaintiff treats each category in turn.

### (i)  Internal Marketing Communications

Merck suggests that Mr. Mason's "prescribers" (Mr. Mason, in fact, had only one prescriber – Nurse Olson-Fields) were not exposed to these communications and, therefore, they are not relevant.  The Court previously denied Merck's motion in limine on this very issue in the *Smith* case.[9]  The *jury* should decide whether these documents are innocuous or whether they are (as indeed they are) probative of Merck's reckless approach to the promotion of Vioxx despite its knowledge of the drug's dangers.  The evidence speaks for itself.

Again, Merck inadequately identifies these documents by exhibit number.  Based on Merck's prior briefing, Plaintiff assumes Merck complains about the following: (1) a memo in which Merck executive Susan Baumgartner identified physicians Merck should "neutralize" with respect to the cardiovascular risks of Vioxx as well as "related communications"; (2) a memo in which key Vioxx player David Anstice sought to "rally the troops" at Vioxx's market launch; (3) a memo from Louis Sherwood to David Anstice pertaining to Merck's widely-publicized efforts to intimidate academics who dared to publicly suggest the cardiovascular risks of Vioxx; and (4) a detailed memo from Ms. Baumgartner to Louis Sherwood that serves as a virtual dossier on Gurikpal Singh, M.D., a doctor critical of Merck's approach to the cardiovascular problems associated with Vioxx.

As with the marketing materials discussed generally above, these specific documents are relevant first as a backdrop—corporate character and "state of mind" evidence (and Merck's "state of mind" undisputedly is at issue with respect to plaintiff's negligence and fraud-bases claims.)   More specifically these are core documents revealing Merck's reaction to any suggestion that Vioxx carried cardiovascular risks.  As such, the documents serve a number of

---

[9] Order, *Smith v. Merck & Co., Inc.* (Sept. 6, 2006) (Rec. Doc. 6721).

relevant purposes.  First they suggest the existence of cardiovascular risks.  They release Merck's knowledge of those cardiovascular risks by virtue of its attempts to thwart all discussion of the subject.  And the communications reveals Merck's highest-level corporate policy of callous, reckless, fraudulent, and grossly negligent efforts to cover up the known cardiovascular risks.  And to the extent these efforts succeeded, they are relevant to demonstrating why Nurse Olson-Fields (as well as the medical community at large and general consumer population) knew little or nothing of the cardiovascular risks associates with Vioxx.  Nurse Olson-Fields testified in his deposition that she was not aware of cardiovascular risks associates with Vioxx.[10]

### (ii)   Internal Training Materials

This section addresses a few specific materials used to train Merck drug representatives.  As with the documents discussed in the preceding section, Merck asks this Court to declare that the documents have only one possible interpretation—that offered by Merck—and that the documents are irrelevant as interpreted.  But it is the function of a jury to interpret the significance of documentary evidence unless Merck can establish that under any possible interpretation the documents are irrelevant or so prejudicial that their relevance is nullified.  Merck has not and cannot make such a showing.

These documents demonstrate the uniformity of Merck's message to the medical community, the emphasis placed upon and sophistication of its delivery system, and specific techniques that sales representatives were trained to employ in order to keep "on message."  The bulletin, for example, reveals Merck's favored method of "obstacle handling"—a euphemism for avoiding tough questions posed by prescribing physicians while returning to Merck's "core

---

[10] *See* Deposition of Karen Olson-Fields, 95:4-96:17, attached hereto as Exhibit C.

message" of efficacy.   This particular bulletin addresses cardiovascular safety concerns in the wake of the VIGOR study.  Fully aware that the study would raise concerns about cardiovascular safety, Merck chose to downplay those concerns and this bulletin spells out exactly how its reps were to handle "obstacles" to sales such as safety issues raised by doctors.

For example, the "Dodge Ball" training technique was a variation on this theme, instructing sales reps in how best to skirt safety issues while emphasizing efficacy.  Likewise, the training manual is probative by the very fact that it is, in Merck's words, "generic."  Merck demanded absolute obedience to its technique and messages.

In short, Merck chose to handle the cardiovascular safety concerns about Vioxx in this way.  These and other documents addressed in Merck's motion and this response portray a profit-driven company willfully ignorant of obvious safety concerns.

### (iii)   **Promotional Materials**

Merck seeks to exclude: (1) three internal marketing communications, and (2) two internal documents "suggesting responses to questions posed by doctors" in the field.  The first marketing document portrays, as the other marketing materials discussed throughout this response, Merck's corporate focus in the face of known cardiovascular risks attending Vioxx use.  The document is a management committee briefing that depicts market "opportunities" based upon Vioxx's efficacy, while treating cardiovascular risks as a "threat" to sales, suggesting that Merck must "break {the} link to CV outcomes."  In addition to demonstrating Merck's sophistication (suggesting its ability to learn of, and then manipulate the perception of, cardiovascular risks), this document, like so many others, proves that at its highest level, Merck was actually aware of cardiovascular risk, perceived it as more of a threat to profits than to

patient safety, and acted accordingly to minimize perceptions of the risk.  This does not suggest Merck's response to physician questions.  Rather, it directs sales representatives on specifically how they are to answer anticipated questions by physicians, including directly relevant and misleading admonitions such as "VIOXX has no effect on platelet aggregation."

Again, in addition to providing general context for the jury, these materials not only demonstrate Merck's overarching principle of "sales over safety" but they specifically target the central issue in this action: the cardiovascular risks associated with Vioxx ingestion.

### 3.      All Evidence is Relevant to Plaintiff's Claim for Punitive Damages.

Plaintiff seeks punitive damages in this action.   Rather than inform the medical community and those ingesting the drug, Merck taught their sales representatives how to "dodge" questions regarding cardiovascular risks, spent millions in direct-to-consumer advertising, all the while never warning those who might be injured by the drug.  The marketing documents at issue in this motion are evidence that Merck intentionally took steps to cover up danger associated with Vioxx in order to continue marketing it.

### 4.      Marketing And Promotional Evidence Should Not Be Excluded Under Rule 403.

Merck's alternative argument, that this marketing evidence should be excluded under Rule 403, should also be rejected.  Virtually all evidence is prejudicial or is not material.  The prejudicial must be "unfair."  *Dollar v. Long Manufacturing, N.C., Inc.,* 561 F.2d 613, 618 (5th Cir. 1977).  Unfair prejudice within the context of Rule 403 "means an undue tendency to suggest (a) decision on an improper basis, commonly, though not necessarily, an emotional one." Notes of the advisory Committee on Proposed Federal Rules of Evidence, Rule 403 at 102.  Just

because the evidence is damaging or prejudicial to Defendant's case does not mean that the evidence should be excluded. *United States v. McRae,* 593 F.2d 700, 707 (5th Cir. 1979).

In relevant part, Federal Rule of Evidence 403 directs that relevant evidence is inadmissible if its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of issues, misleading of jury, or needless presentation of cumulative evidence. FED. R. EVID. 403. The careful use of "substantially" demonstrated the emphasis placed on this balancing test, and "Rule 403 is an extraordinary remedy that should be used sparingly because it allows the court to exclude admittedly probative evidence." *United States v. Ross,* 33 F.3d 1507, 1524 (11th Cir. 1994). Moreover, slight prejudice is insufficient to warrant granting a motion *in limine*. *Gross v. Black & Decker (U.S.), Inc.,* 695 F.2d 858, 863 (5th Cir. 1983) (quoting, *United Stated v. Hearod,* 499 F.2d 1003 (5th Cir. 1974)). Given this weight, it is difficult to make a pre-trial determination on these evidentiary issues without a substantive background. *See Hines v. Consolidated Railroad Corporation,* 926 F 2d 262, 274 (3d Cir. 1991) ("Excluding evidence under Fed. R. Evid. 403 at the pretrial stage is an extreme measure.").

Plaintiff asserts that evidence of marketing is admissible under Rule 403. It is premature to determine the importance of much of the evidence Merck seeks to exclude in this motion in limine.

D.    **EVIDENCE OF ADVERSE EVENT REPORTS AND CASE REPORTS**

Merck also argues that adverse event reports ("AERs") be excluded on the basis of relevancy, hearsay and Federal Rule of Evidence 403. The Court recently denied Merck's motion in limine on this issue in the Smith case.[11] This contention may be attacked on many of the same grounds as that of the previous section.

---

[11] Order, *Smith v. Merck & Co., Inc.* (Sept. 6, 2006) (Rec. Doc. 6721).

Two primary issues in this case are Merck's notice of adverse events associated with Vioxx and, in light of its knowledge, Merck's failure to properly warn about the dangerous side effects associated with Vioxx.   The role of AER, including reports made by clinical investigators, are central to the issues in this case, namely, notice to the company of adverse events and Merck's continuing duty to monitor and warn about these events.   Clinical trial adverse event investigation and post-marketing surveillance are critical components of all pharmaceutical companies' duties in maintaining a safety profile of a specific drug for meeting the company's responsibilities to physicians and patients as well as reporting to the FDA.

1.      **Evidence of Adverse Event Reports are Admissible**

AERs and clinical trial investigator reports do not fall within the definition of hearsay under Rule 801 to the extent that they are not being offered to prove the truth of the matter asserted.   Primarily, Plaintiff intends to offer AERs and investigator data reports to prove notice and Merck's failure to warn to properly investigate, evaluate, and resolve cardiovascular safety risk.

Merck's suggestion that the FDA has cautioned about the reliability of AERs and other anecdotal reports does not negate the fact that Merck had knowledge of such AERs, similar to the injury suffered by Mr. Mason which resulted in his injury, and failed to exercise its duty to investigate such claims.   Furthermore, Merck's assertions that AERs or investigator data are scientifically unreliable and inadmissible, and that opinion testimony based on such reports should also be inadmissible, is unfounded.   Merck proceeds in its motion to string cite cases that ostensibly stand for this proposition.   However, its effort, as with the animal studies, is dubious at best.

In the cases cited by Merck, AERs or case reports were excluded as evidence where the

AERs or case reports were scant in number or were the sole support for the expert's testimony. Neither situation is at issue in the present case because there are countless AERs and/or case reports on point.   Case reports have long-standing use as evidenced by publication of such reports in peer-reviewed scientific journals.  *Reference Manual on Scientific Evidence*, supra, at 469.  *See also Caraker v. Sandoz Pharmaceuticals Corp.*, 172 F.Supp.2d 1046, 1050 (S.D.Ill. 2001)(where the court declined to allow an expert to rely solely on a scant number of case reports, but acknowledge that an overwhelming amount of case reports, [without additional support] showing a temporal proximity between a very specific drug and a very specific adverse event might be enough to make a general causation conclusion sufficiently reliable).

Moreover, the AERs and Clinical Investigator data kept by Merck are also admissible under the business records exception to the hearsay rule and as admissions by a party.  *See generally Martinkovic v. Bangash*, 1987 WL 28400 (explaining that receipt of adverse event reports and records maintained of them are admissible against defendants as either records of regularly conducted business under FED.R.EVID. 703(6) or as defendant's admissions under FED.R.EVID. 801(d)(2)).  For purposes of notice, the reports in Merck's database are sufficiently trustworthy to fall within the exceptions to the hearsay rule.

Additionally, AERs are admissible as an exception to the hearsay rule for statements made for purposes of medical diagnosis or treatment, because an important purpose of the AER program or clinical investigator reports is to identify whether the cause of an adverse reaction is due to the ingestion of a drug.  FED.R.EVID. 803(4).

2.   **Adverse Event Reports are Admissible When They Involve Incidents Sufficiently Similar to Place Defendant on Notice of Danger.**

The requirement of similarity of circumstances is relaxed where evidence, such as AERs

or clinical investigator reports, is offered to show that a defendant had notice of a danger rather than where the prior incidents are directed at proving actual negligence.  *Kehm v. Procter & Gamble Manufacturing Co.*, 724 F.2d 613, 626 (8th Cir. 1983)(explaining how it is up to the jury to decide what weight to give complaints from other customers).  Further, "[u]nder Fed.R.Evid. 401, evidence of similar occurrences 'might be relevant to the defendant's notice, magnitude of the danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, [or] the standard of care, and causation.'" *Ramos v. Liberty Mut. Ins. Co.*, 615 F.2d 334, 338-39 (5th Cir. 1980), *cert. denied*, 449 U.S. 1112 (1981)).  To the extent experts rely on the numbers of AERs, the Defendant will have ample opportunity to counter this evidence and explain dissimilarities.

### 3.    Adverse Event Reports Are More Probative Than Prejudicial

Given the fact that AERs including investigator reports are being presented by Plaintiff as admissible non-hearsay, as well as hearsay that falls within the exceptions above, AERs are relevant evidence a jury should be permitted to consider in determining the issue of notice. Merck is free to offer testimony regarding the importance and underlying procedure involved with AERs or with their self-proclaimed "adjudication process" begun 1998.  *See Bendi v. McNeil-P.P.C., Inc.*, 6 F.3d 1378, 1385 (4th Cir. 1995) (explaining how the probative value of these reports was not outweighed by the danger of unfair prejudice, because the reports were highly probative on the issue of notice and defendant was free to offer testimony rebutting their significance).  Similarly, Plaintiff will be able to show that the 1998 adjudication program, was not a method for assessing causation, but instead was part of Merck's pattern of failing to properly investigate cardiovascular risk and disregarding such evidence of risk.  This evidence is directly relevant and admissible to support Plaintiff's challenge of Merck's adjudication process

19

and how it handled the early signals of the cardiovascular risk

Merck argues that a jury may afford more weight to AERs simply because they are collected by a federal agency and might confuse the jury by placing Merck in a bad light.  As noted above, there is a relaxed standard for admitting AERs and other anecdotal evidence, including testimony based on such evidence when sued to show notice on behalf of the defendant rather than to prove negligence.  To the extent the evidence may be considered by the jury for one purpose but not another, the issuance of a limiting instruction at trial can resolve any potential concern of prejudice or confusion.  *See O.L. Maudlin v. Upjohn Co.*, 697 F.2d 664, 648 (5th Cir. 1983)(explaining how a limiting instruction by the Court as to the use of AERs in determining notice, prevented possible jury confusion and/or prejudice with regard to AERs which report injuries other than the one at issue).  Further, the time and testimony that would be necessary for Merck to deny notice of voluminous AERs would be minimal, at best, and not meet the level of undue delay under Rule 403.  The fact that Merck received and kept records of investigator reports and AERs relating the ingestion of Vioxx goes directly to the issue of awareness of the dangerous propensities of its prescription drug.

### 4.      AERs and Investigator Reports Are Relevant to Show Merck's Course of Conduct and Conscious Disregard for the Safety of the Consumer

This Court should allow AERs and Investigator data received by Merck in to evidence, at least up to the date of Mr. Mason's injury.  Events up to this date show Merck's awareness and continuing failure to warn doctors and consumers about the injuries suffered by Mr. Mason. AERs not only serve as a monitoring function for the pharmaceutical manufacturer, but proper notation and forwarding of the information found in the AERs serves as a tool for doctors in determining when to prescribe and how to monitor the prescription drug in question.  The fact

that all of the AERs do not relate to Mr. Mason's injury does not negate the fact that every AER, especially those related to cardiovascular injuries and stroke, could and would be used in a doctor's analysis as related to the prescribing and monitoring of those ingesting the drug.  And the investigator data is relevant to many issues including Merck's duty to investigate, Merck's duty to warn in its initial product labeling, and Merck's motive to manipulate other trials.

Furthermore, AERs relating to Vioxx are relevant to Merck's course of conduct and conscious disregard of the safety of the consumer.  Where punitive damages are sought, evidence of events occurring subsequent to the incident in question is highly probative on the issue of conscious disregard for the safety of others.  Despite the fact that a defendant's conduct may not have had a possible effect on the particular plaintiff, evidence of related conduct by the defendant, which amounted to a conscious disregard for the safety of others is entirely relevant to the issue of punitive damages.

E.     "UNRELIABLE AND IRRELEVANT" MEDICAL AND SCIENTIFIC EVIDENCE

Beyond reference to multiple exhibit numbers that do not provide a description of the document, Merck does not specify what falls into the categories of "statistically insignificant data" and "investigator-reported data."  Plaintiff assumes this is why the Court has previously commented that Merck's motion on this issue is "too broad and vague."  Merck has not revised its arguments on this issue and Plaintiff cannot respond to such a vague and sweeping request. For this reason alone, Merck's request should be denied as the Court as done on previous occasions.

1.   **Testimony Regarding the Studies and Data at Issue Should Not Be Precluded; Particularly Where, As Here, Plaintiff's Experts Have Relied on Such Studies in Forming Their Opinions**

The Federal Rules of Evidence control the admission of expert testimony in this case. *Doddy v. Osy USA, Inc.*, 101 F.3d 448, 459 (5th Cir. 1996). Rule 702 governs the admission of expert testimony and provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods and (3) the witness has applied the principles and methods reliably to the facts of the case." FED.R.EVID. 702.

The expert testimony must be relevant, not simply in the sense that all testimony must be relevant, FED.R.EVID. 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue. *Bocanegra v. Vicmar Services, Inc.*, 320 F.3d 581 (5th Cir. 2003) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 506 U.S. 579, 591-92, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Rule 702 "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 584.

The Supreme Court has provided five, non-exclusive factors to consider when assessing whether a methodology is scientifically reliable. These factors are "(a) whether the expert's theory can be or had been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community." *Id.* at 584-85

(citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1193)); *Mathis v. Exxon Corp.*, 302 F.3d 448 (5th Cir. 2002); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998)(en banc).

As the *Bocanegra* court stated, "the test for determining reliability is flexible and can adapt to the particular circumstances underlying the testimony at issue." *Id.* (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct 1167, 143 L.Ed.2d 238 (1999)). The party seeking to have the district court admit expert testimony must demonstrate that the expert's finding and conclusions are reliable, but need not show that the expert's findings and conclusions are correct. *Id.* at 585.

The Fifth Circuit has noted that "the *Daubert* analysis should not supplant trial on the merits." *Mathis*, 302 F.3d at 461 (quoting *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002)). "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786).

In addition, "whether an expert's testimony is reliable is a fact-specific inquiry." *See Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 583-584 (5th Cir. 2004)(citing *Skidmore v. Precision Printing & Pkg., Inc.*, 188 F.3d 606, 617-18 (5th Cir. 1999)). The broad generalization made by Merck in the motions in limine make such required factual inquiry impossible until trial, where the context and facts related to the evidence sought to be introduced may be analyzed by the Court.

The types of material that Merck seeks to exclude, published studies, clinical study data, and adverse event reports, are of the type that is regularly relied upon by experts and clearly admissible under Federal law. *See id.* Plaintiff submits that the Court should permit his experts

23

to testify and consider, in the overall context of their testimony, whether they have established that any test, article, clinical data or adverse event report that they rely on is "reliable." Without testimony establishing whether the evidence at issue is representative of that which experts in the field typically rely on, a ruling on whether this, or any other evidence should be excluded is premature.

**F.     TESTIMONY OF ERIC J. TOPOL, M.D.**

As Merck has provided this Court with no new reason to change its rulings denying Merck's motions to exclude, it need not discuss them here. Moreover, Merck does not include in its actual motion any reference to the objections this Court allegedly sustained in *Barnett*. For these reasons and those set forth in Plaintiff's Memorandum on Opposition to Motion of Merck & Co., Inc. to Exclude Testimony of Eric. J. Topol, M.D, filed in *Gerald Barnett v. Merck & Co.*, Case No. 02:06CV00485, In re: Vioxx Products Liability Litigation, MDL Docket No. 1657, U.S. District Court, Eastern District of Louisiana, and attached and incorporated herein as Exhibit D, Merck's motion should be denied.

## IV.
## CONCLUSION

For these reasons, Plaintiff respectfully requests that Merck's Omnibus Motion For Order Excluding Evidence And Testimony Raised By Motions Previously Denied By The Court be denied.

Dated:  October 4, 2006

Respectfully submitted,

_____

Edward Blizzard (TBN 02495000)
Scott Nabers (TBN 14769250)
Rebecca Briggs King (TBN 24027110)
Holly M. Wheeler (TBN: 24006035)
BLIZZARD, MCCARTHY & NABERS, L.L.P.
440 Louisiana, Suite 1710
Houston, Texas 77002
(713) 844-3750
(713) 844-3755 (fax)

**ATTORNEYS FOR PLAINTIFF
CHARLES LARON MASON**

| | |
|---|---|
| Andy D. Birchfield, Esq.<br>P. O. Box 4160<br>234 Commerce Street<br>Montgomery, AL  36103-4160<br>PH:  (800) 898-2034<br>FAX:  (334) 954-7555 | Christopher Seeger, Esq.<br>One William Street<br>New York, NY  10004<br>PH:  (212) 584-0700<br>FAX:  (212) 584-0799 |
| Leonard Davis<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA  70013<br>PH:  (504) 581-4892<br>FAX:  (504) 561-6024 | Russ M. Herman<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA  70013<br>PH:  (504) 581-4892<br>FAX:  (504) 561-6024 |

**PLAINTIFFS' STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Opposition has been served on Liaison Counsel Russ Herman and Phillip Wittmann, Shayna S. Cook and Richard Krumholz by U.S. Mail, facsimile and/or e-mail; and e-mail upon all parties by electronically uploading the same to Lexis-Nexis File and Serve Advanced, in accordance with Pretrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of the Court of the Untied States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 4th day of October, 2006.

_____
Holly M. Wheeler