# EXHIBIT D



Jun 26 2006
7:31PM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| | * | |
| Gerald Barnett v. Merck & Co, Inc. | * | CASE NO. 02:06CV00485 |

**MEMORANDUM IN OPPOSITION TO MOTION OF MERCK & CO. INC.
TO EXCLUDE TESTIMONY OF ERIC J. TOPOL, M.D.**
(Motion *in Limine* No. 5)

Plaintiff Gerald Barnett hereby opposes Merck's motion to exclude the portions of the deposition testimony of Eric J. Topol, M.D. Merck filed a one-page, cursory motion on June 9, 2006, the deadline set by the Court for motions in limine. Merck did not file a memorandum in support of its motion until June 19, 2006.

Merck asserts two primary grounds for its motion: 1) the Court should exclude testimony that "pertains to events that took place and documents that were created *after* the relevant period" or after Mr. Barnett's heart attack in September 2002 (Merck's Mot. at 3); and 2) the Court should "preclude plaintiff from offering any testimony that exceeds the bounds of Dr. Topol's purported 'expertise.'" *Id.*

Merck's motion is due to be denied. The Court has already considered and overruled many of the same objections not once—but twice -- once in *Irvin I* and once in *Irvin II*. Plaintiff's designations of Dr. Topol's deposition testimony in the present case are largely the

1

same as those ruled admissible by the Court and actually played for the jury in *Irvin I* and *Irvin II*.

## STATEMENT OF FACTS

Mr. Barnett was approximately 56 years old when he was prescribed Vioxx by his physician in December 1999, and he had been taking the drug for approximately 32 months at the time of his heart attack on September 6, 2002. Plaintiff contends that his heart attack was caused by a clot in one of his coronary arteries which resulted from a plaque rupture as well as the acceleration of atherogenesis due to Vioxx use. Mr. Barnett continued to take the drug even after his heart attack, until a few weeks before it was removed from the market on September 30, 2004.

Dr. Eric Topol is Chairman of the Department of Cardiovascular Medicine at Cleveland Clinic. Dr. Topol is one of the premier cardiologists in the world. See Dr. Eric J. Topol dep. at 9-11. (Ex. A). The Cleveland Clinic has been the number one cardiology center in the world for the last eleven years. See Dr. Eric J. Topol dep. at 12. Dr. Topol, a Merck consultant, recognized early on that Vioxx was capable of causing cardiovascular injury and death in patients who took it.

As a result of this recognition, Dr. Topol valiantly attempted to work with Merck to perform appropriate studies and to warn doctors and patients of the risk. Unfortunately, Dr. Topol's efforts were met with resistance from Merck and Merck sought to discredit him and his colleagues at the Cleveland Clinic. Between 2001 and 2005, Dr. Topol and his colleagues at the Cleveland Clinic wrote no less that nine (9) articles and editorials in the peer-reviewed literature on the topic.

2

As a Merck consultant throughout the time Vioxx was on the market and as a leading cardiologist with the Cleveland Clinic, Dr. Topol's actions are central to the story of this case. At Dr. Topol's deposition, Plaintiff's counsel sought to obtain fact testimony from Dr. Topol, including his contacts with Merck concerning Vioxx and the publications that he has written about the state of scientific and medical knowledge at the time of events that are key to this litigation. Dr. Topol further testified that certain of Merck's scientific theories are unscientific and not supported by the studies that he has personally performed. These include the so-called "Naproxen Hypothesis" and the so-called "18-month hypothesis" that this Court is aware of.

## ARGUMENT

### I.  DR. TOPOL'S TESTIMONY SHOULD NOT BE LIMITED

#### A.  Dr. Topol's Testimony Should Not Be Limited By Time

Merck's overarching argument is that testimony concerning events and documents that post-date Mr. Barnett's heart attack should be excluded. Merck's argument should be rejected.

Mr. Barnett began taking Vioxx in January 2000. While taking the drug, Mr. Barnett suffered a heart attack on September 6, 2002, some 32 months after he began taking Vioxx. Mr. Barnett continued to take the drug until just weeks before its withdrawal on September 30, 2004.

Plaintiff contends that his heart attack was caused by a clot in one of his coronary arteries which resulted from a plaque rupture as well as the acceleration of atherogenesis due to Vioxx use. Mr. Barnett's damages are multifaceted. As a result of the heart attack and 5-way bypass surgery at the early age of 58, Mr. Barnett suffers from permanent damage to his heart, which has reduced his life expectancy. In addition, he is now at a much greater risk of

3

suffering another heart attack, and the bypass surgery has placed him at a greater risk for heart failure.

Specifically, Merck argues that testimony concerning Topol Exhibit 2, an email from Dr. Topol to Dr. David Graham which is dated November 22, 2004, should not be allowed because the date of the email postdates Mr. Barnett's heart attack and the withdrawal of Vioxx from the market. (See Topol Dep. Ex. 2 (attached as Ex. B to this Memorandum). Plaintiff designates a very small portion of testimony relating to Exhibit 2. As the Court will see, Dr. Topol testifies that the document reflects his opinions regarding Merck's "conduct of its scientific studies and its marketing of the drug Vioxx."

> Topol_PD_046.23-047.06   46:23-47:6
>
> 46:23   Q.  Does this e-mail reflect
> 46:24 some of the opinions and conclusions that
> 47: Page 47
> 47: 1 you reached relating to Merck's conduct
> 47: 2 of its scientific studies and its
> 47: 3 marketing of the drug Vioxx over the past
> 47: 4 four years since you have become involved
> 47: 5 in the matter?
> 47: 6   A.  Yes.
>
> . . . . .
>
> 49:23 BY MR. KLINE:
> 49:24   Q.  Okay.
> 50: Page 50
> 50: 1        Sir, I'm looking at the part
> 50: 2 where you say, "I am bothered." Do you
> 50: 3 see where you say to David Graham -- is
> 50: 4 Graham a physician?
> 50: 5   A.  Yes.
> 50: 6   Q.  So, you're saying to Dr.
> 50: 7 Graham, "I am bothered." Would you read
>
> Topol_PD_050.17-051.02   50:17-51:2
>
> 50:17   A.  "I am also upset that the
> 50:18 story of their scientific misconduct for
> 50:19 the VIGOR paper in" the New England
> 50:20 Journal of Medicine, that's "NEJM, with
> 50:21 errors of omission (deaths), erroneous
> 50:22 data (MIs)," or heart attacks, "and
> 50:23 incomplete data (more than 1/2 of the

4

```
        50:24 thrombotic events) has not received any
        51: Page 51
        51: 1 attention whatsoever."
        51: 2      Q.   Okay. Did you believe --

Topol_PD_051.08-051.24    51:8-51:24

        51: 8      Q.   Did you believe what you
        51: 9 wrote in that e-mail to Dr. Graham?
        51:10      A.   Yes, I did believe this.
        51:11           MR. GOLDMAN: Same
        51:12      objection.
        51:13           THE WITNESS: I was
        51:14      privately expressing it to Dr.
        51:15      Graham, but I certainly stand by
        51:16      that and believe it, yes.
        51:17 BY MR. KLINE:
        51:18      Q.   Okay.
        51:19           You believed it then, and do
        51:20 you believe it now?
        51:21           MR. GOLDMAN: Same
        51:22      objection.
        51:23           THE WITNESS: Yes, I
        51:24      certainly do.
```

The email refers to events that took place prior to Merck withdrawing Vioxx from the market, such as the failure of the FDA to analyze study 090 in 1999, the scientific misconduct associated with the publication of VIGOR which took place in 2000, the Juni meta-analysis in 2001, and correspondence from an FDA official in January 2002. As the Court ruled in *Irvin*, events that took place before an email was written are admissible even though the document post-dates an injury. All events that took place while Mr. Barnett was on the drug are relevant to his claim because his injury was continuing throughout the time he was on the drug. Dr. Topol's email to Dr. Graham discussed facts and events that took place before withdrawal. Testimony related to this email as well as the document itself are relevant to Plaintiff's claim and should be admitted. This portion of Dr. Topol's testimony was played in both *Irvin I* and *Irvin II*. The testimony should also be allowed in the present case.

5

Second, Merck argues that Dr. Topol's deposition testimony concerning Topol Exhibit 20 should not be admitted into evidence. (See Topol Dep. Ex. 20 (attached as Ex. C to this Memorandum). The testimony listed by Merck is as follows:

244:14-246:3

```
244:14      THE WITNESS: She told me in
244:15   a phone conversation in October of
244:16   '04 that she was very distraught
244:17   about the fact that she had done
244:18   extensive work with the team in
244:19   Boston, at Harvard, and that at
244:20   the last minute, after having been
244:21   on the paper, manuscript
244:22   submission, she had to have her
244:23   name taken off at the request of
244:24   Merck, because they did not agree
245: Page 245
245: 1   with the conclusions of the study.
245: 2 BY MR. KLINE:
245: 3   Q.  Okay.
245: 4       I want to show you an e-mail
245: 5 that you had between yourself and David
245: 6 Graham.  We covered this way earlier, but
245: 7 I want to make sure that whoever hears
245: 8 this knows who Graham was.  Please.  Who
245: 9 is Graham?
245:10   A.  David Graham is a safety
245:11 officer at the FDA.
245:12              - - -
245:13       (Whereupon, Deposition
245:14   Exhibit Topol-20, E-mails, TOPOLE
245:15   0000458, was marked for
245:16   identification.)
245:17              - - -
245:18 BY MR. KLINE:
245:19   Q.  I'm marking this as Exhibit
245:20 Number 20.  It's an e-mail between
245:21 yourself and Graham, and you say in yours
245:22 on the bottom, it's an e-mail dated
245:23 November 15, 2004, you say, "David, I
245:24 attach my analysis of the 2 trials
246: Page 246
246: 1 submitted to FDA as part of Supplement
246: 2 007."
246: 3       What are you referring to?
```

246:5-246:18

```
246: 5      THE WITNESS: That's the FDA
246: 6   supplement of the three trials,
246: 7   090, 085 and VIGOR.
246: 8 BY MR. KLINE:
```

6

246: 9     Q.   One never published, that
246:10 referring to 090?
246:11     A.   090 never published.
246:12     Q.   "I'd be interested in your
246:13 thoughts as I think this, along with the
246:14 Juni paper, nails this down as to when
246:15 there was confirmatory evidence that
246:16 rofecoxib was," to use your words, "a
246:17 dangerous drug."
   247:4-247:19

247: 4     Q.   "A dangerous drug," you say.
247: 5 It nails down "when there was
247: 6 confirmatory evidence." So, I have to
247: 7 ask you, what is that date that you can
247: 8 nail down, your private words to David
247: 9 Graham, safety officer of the FDA, when
247:10 can you nail down when there was
247:11 confirmatory evidence that Vioxx was a
247:12 dangerous drug?
247:13     A.   The paper that I reviewed
247:14 earlier, the Juni paper that shows that
247:15 time cumulative analysis, shows in 2000,
247:16 when VIGOR and 090 are put together,
247:17 that's when you cross the line of
247:18 statistical significance, and that's the
247:19 definition of a dangerous drug.


   248:1-248:17

248: 1     Q.   If you look at David
248: 2 Graham's response, he says to you in the
248: 3 second paragraph, "Each day the issue
248: 4 gets more and more complicated and fishy
248: 5 smelling. Apparently, Merck was heavily
248: 6 lobbying the members of the Finance
248: 7 Committee to cancel the hearing today,
248: 8 and our acting center director, Dr.
248: 9 Galson, has reportedly refused to appear
248:10 before the Committee."
248:11          Skipping down a little bit.
248:12 Anyone who wants to fill in later, may.
248:13          "But it does make you
248:14 wonder, why is everyone afraid and what
248:15 are they trying to hide?"
248:16          That was his response to
248:17 you.


   248:20-249:2

248:20     Q.   Did you receive that
248:21 response?
248:22     A.   Yes.
248:23     Q.   And did you recognize that
248:24 it was coming from a safety officer at
249: Page 249

7

```
249: 1 the FDA?
249: 2     A.   Certainly.

249:7-249:10

249: 7     Q.   Did you share his
249: 8 sentiments?
249: 9     A.   I shared Dr. Graham's
249:10 sentiments in this regard.
```

The email in question relates to Dr. Topol's analysis of studies 090 and 085, both of which were completed in 1999. Because the underlying events took place prior to the time Mr. Barnett discontinuing his use of Vioxx, this document and the testimony related to it are relevant and should be admitted into evidence in this case.

Third, Merck complains that testimony regarding an article written by Dr. Topol entitled, "The sad story of Vioxx" should not be admitted. The testimony, as shown below, deals with pre-approval studies of Vioxx excluding patients with heart disease. The events that form the basis of the testimony and in large part, the article, took place before Mr. Barnett stopped taking Vioxx and as a result, are relevant to the issues in this case.

```
Topol_PD_053.23-054.14   53:23-54:14

53:23     Q.   Let me show you an article
53:24 which was in the Cleveland Clinic Journal
54: Page 54
54: 1 in December of 2004. December of 2004,
54: 2 there's an article which was written,
54: 3 you'll have it in your hands in a moment,
54: 4 called "The sad story of Vioxx, and what
54: 5 we should learn from it." Did you
54: 6 co-author that article?
54: 7     A.   Yes, I did.
54: 8     Q.   What is the Cleveland Clinic
54: 9 Journal of Medicine?
54:10     A.   That's the medical journal
54:11 of this institution, which is widely
54:12 circulated, has a circulation of nearly
54:13 100,000 physicians and paraprofessional
54:14 staff.


Topol_PD_056.22-057.15   56:22-57:15

56:22          THE WITNESS: -- in May, the
```

8

56:23   FDA approved Vioxx for commercial
56:24   use, so, that is an important
57: Page 57
57: 1   time, timeline. That was also at
57: 2   the time when the FDA had a formal
57: 3   review of the medicine, where the
57: 4   primary reviewer already had
57: 5   expressed in her document, Dr.
57: 6   Villalba, that there was a concern
57: 7   regarding clotting events with
57: 8   Vioxx even at the time of approval
57: 9   in May 1999.
57:10 BY MR. KLINE:
57:11     Q.   You write here that, "The
57:12 approval was based on data from trials
57:13 lasting 3 to 6 months and involving
57:14 patients at low risk for cardiovascular
57:15 illness." Do you see that?

Topol_PD_057.18-058.12    57:18-58:12

57:18        THE WITNESS: That's right.
57:19 BY MR. KLINE:
57:20     Q.   What is the significance of
57:21 that fact?
57:22        MR. GOLDMAN: Object to the
57:23     form.
57:24        THE WITNESS: Well, this is
58: Page 58
58: 1   one of the most significant parts
58: 2   of the whole clinical development
58: 3   of the Vioxx medicine, and that is
58: 4   that patients with heart disease
58: 5   were not tested in any meaningful
58: 6   way, and we know from multiple
58: 7   databases and surveys that at
58: 8   least 40 to 50 percent of the
58: 9   patients who actually took this
58:10   medicine when it was in clinical
58:11   use actually did have known heart
58:12   disease.

Topol_PD_058.20-058.21    58:20-58:21

58:20     Q.   Why, as you view it, is that
58:21 an important fact?

Topol_PD_058.24-059.13    58:24-59:13

58:24        THE WITNESS: Well, it's
59: Page 59
59: 1   important because if the medicine
59: 2   has a clotting risk in arteries
59: 3   such that it could induce heart
59: 4   attacks, strokes or death, the
59: 5   patients who are most liable to

9

```
59: 6    suffer as a consequence of that
59: 7    would be patients with preexisting
59: 8    or known atherosclerotic artery
59: 9    disease.
59:10 BY MR. KLINE:
59:11    Q.   And did this medicine or
59:12 does this medicine, in your opinion, have
59:13 such a risk?
```

Topol_PD_059.16-059.23    59:16-59:23

```
59:16    THE WITNESS:  There isn't
59:17    any question about the medicine's
59:18    risk in this regard.
```

This testimony was played during both *Irvin I* and *Irvin II*. The testimony should also be allowed in the present case.

Fourth, Merck argues that testimony concerning Topol Exhibit 22, handwritten notes by Dr. Topol entitled "what/when Merck knew" should also not be allowed because it "pre-dates" Mr. Barnett's injuries. (See Topol Dep. Ex. 22 (attached as Ex. D to this Memorandum). According to Merck, "These *post hoc* observations on what Merck allegedly knew prior to the withdrawal of Vioxx are necessarily informed by events that took place afterwards." (Def.'s Mot. at 5). The Court has previously stated that, "I think the relevance of his testimony is what Merck knew, when Merck know it, what they did, and what they didn't do." *Irvin I v. Merck & Co.*, transcript at 11 (Ex. E).

Clearly an outline of the events taking place in the development of Vioxx as it relates to clinical trials, Merck's theories to explain away the cardiotoxic effect of Vioxx, Merck's scientific misconduct, and the lack of independence of members of its DSMBs for Vioxx are all relevant to Plaintiff's failure to warn claim. Moreover, Dr. Topol's notes may have been composed after Mr. Barnett discontinued his use of Vioxx, but the events took place well before.

### B. Plaintiff's Designations Related to Merck's Unsolicited Edits to Dr. Topol's JAMA Article Are Relevant

Merck further argues that the testimony related to Merck's unsolicited edits and suggested changes to Dr. Topol's *Journal of American Medical Association* article are not relevant. Merck argues that because the edits were not seen by Dr. Topol until his deposition, they are not relevant to Plaintiff's claims in this case. Lastly, Merck argues that the testimony is unduly prejudicial.

Merck's efforts to "soften" the conclusion of Dr. Topol's article that Vioxx is a dangerous drug are clearly relevant to Plaintiff's failure to warn claim. Merck's arguments were rejected by the Court in both *Irvin I* and *Irvin II*. The testimony was played at both trials.

## II. Dr. Topol Is Qualified To Give All Opinions Contained in Plaintiff's Designations

### A. Dr. Topol Is Qualified To Testify That Vioxx's Label Failed To Adequately Convey the Cardiovascular Risks Associated with the Drug

Merck asserts that Dr. Topol should not be allowed to testify as to the adequacy of Vioxx's label. In support, Merck lists two areas of testimony: 1) Dr. Topol's testimony that the "original label and then the revision in April of 2002 did not show adequate safety concerns about heart attacks"; and 2) Dr. Topol's testimony that "the extraordinary amount of evidence... was really quite excessive in my opinion, and that's why the black box warning was long overdue." In support, Merck suggests that Dr. Topol is not an expert on regulatory issues.

In the testimony cited by Merck, Dr. Topol is not offering expert opinion dealing with regulatory affairs. Rather, as a leading cardiologist, he is testifying to his opinion that the Vioxx label failed to adequately convey to physicians the cardiovascular risks associated with

11

Vioxx. He is testifying as a physician who regularly reads labels. This testimony was allowed in both *Irvin I* and *Irvin II*. It should be allowed again in this case.

### B. Dr. Topol Is Qualified To Testify That Vioxx's Marketing Message Misrepresented the CV Risks Associated with the Drug

Lastly, Merck argues that Dr. Topol is not qualified to give expert opinion as to Merck's marketing of Vioxx. In support, Merck points to testimony in which Dr. Topol addresses the accuracy of the statements contained in the Cardiovascular Card (CV Card):

272:19-273:12

```
272:19    Q.  "Marketing and sales." What
272:20 did you mean there?
272:21    A.  Well, the marketing and
272:22 sales has been very much demonstrated in
272:23 the Waxman report, the Congressional
272:24 report of the cardiovascular card. This
273: Page 273
273: 1 is where it was a card that was
273: 2 distributed by the sales team throughout
273: 3 the country, 3,000, I believe, sales reps
273: 4 for Merck that had a card that showed
273: 5 that there was somehow an eight to
273: 6 ten-fold protection of Vioxx compared to
273: 7 other non-steroidals.
273: 8         So, this was quite
273: 9 extraordinary, these sorts of sales
273:10 tactics that were going on by the
273:11 specially-trained Merck sales reps.
```

273:20-274:2

```
273:20    Q.  Assuming that the drug
273:21 was -- assuming what you said -- what you
273:22 just told us was being said about the
273:23 cardioprotective effects, are you with me
273:24 so far, that would not only be, I forget
274: Page 274
274: 1 the word you used, extraordinary, that
274: 2 would just be plain false; correct?
```

274:4-274:7

```
274: 4         THE WITNESS: If you look at
274: 5    the cardiovascular card, it's very
274: 6    clear that the data that are being
274: 7    presented are highly misleading.
```

12

Then, Merck suggests that the following testimony regarding Merck's full-page advertisements should also be excluded from evidence:

> 50: 9   A.   "I am bothered by the
> 50:10 continued outrageous lies of Merck with
> 50:11 their fullpage multiple ads that 'they
> 50:12 published everything' and that they never
> 50:13 had a trial which showed any harm of
> 50:14 Vioxx until APPROVe, when, in fact, there
> 50:15 were two by May 2000."
> 50:16   Q.   Continue.
> 50:17   A.   "I am also upset that the
> 50:18 story of their scientific misconduct for
> 50:19 the VIGOR paper in" the New England
> 50:20 Journal of Medicine, that's "NEJM, with
> 50:21 errors of omission (deaths), erroneous
> 50:22 data (MIs)," or heart attacks, "and
> 50:23 incomplete data (more than 1/2 of the
> 50:24 thrombotic events) has not received any
> 51: Page 51
> 51: 1 attention whatsoever."

(Eric Topol dep. at 50:9-51:1).

In each instance, Dr. Topol is testifying that the message contained in either the CV Card or the advertisement is not an accurate statement of the cardiovascular risks associated with the use of Vioxx as shown by VIGOR, study 090 and other clinical trials. Dr. Topol is not offering an opinion about marketing, but rather that the statements contained in the marketing pieces were not accurate from a scientific standpoint. As a premier cardiologist and the eighth most cited medical researcher in the world, Dr. Topol is clearly qualified to offer opinions as to the cardiovascular risks associated with the use of Vioxx.

13

Case 2:05-md-01657-EEF-DEK   Document 7728-4   Filed 10/04/06   Page 15 of 18

## CONCLUSION

For the reasons outlined above, Plaintiff urges the Court to deny Merck's motion.

Respectfully submitted,

By _/s/ P. Leigh O'Dell_
Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama 36103-4160
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

Mark P. Robinson, Jr.
Kevin F. Calcagnie
Carlos A. Prietto, III
Ted B. Wacker
Lexi W. Myer
ROBINSON, CALCAGNIE
& ROBINSON
620 Newport Center Dr., 7th Floor
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Donald C. Arbitblit
LIEFF, CABRASER, HEIMANN and
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, California 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

**Counsel for Plaintiff**

Russ M. Herman
Leonard A. Davis
Stephen J. Herman
HERMAN HERMAN KATZ
& COTLER, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70013
Telephone: (504) 581-4892
Facsimile: (504) 561-6024

**PLAINTIFFS' LIAISON COUNSEL**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
& WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Christopher A. Seeger
SEEGER WEISS
One William Street
New York, New York 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799
**Co-Lead Counsel**

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337) 494-7171 (telephone)
(337) 494-7218 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs' Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 20th day of June, 2006.

P. Leigh O'Dell
Attorney for Plaintiff
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.