Page 58

1  one of the most significant parts
2  of the whole clinical development
3  of the Vioxx medicine, and that is
4  that patients with heart disease
5  were not tested in any meaningful
6  way, and we know from multiple
7  databases and surveys that at
8  least 40 to 50 percent of the
9  patients who actually took this
10 medicine when it was in clinical
11 use actually did have known heart
12 disease.
13       MR. GOLDMAN: Move to strike
14    as nonresponsive --
15 BY MR. KLINE:
16    Q. Why --
17       MR. GOLDMAN: -- and calls
18    for opinion testimony.
19 BY MR. KLINE:
20    Q. Why, as you view it, is that
21 an important fact?
22       MR. GOLDMAN: Objection,
23    calls for opinion testimony.
24       THE WITNESS: Well, it's

Page 59

1  important because if the medicine
2  has a clotting risk in arteries
3  such that it could induce heart
4  attacks, strokes or death, the
5  patients who are most liable to
6  suffer as a consequence of that
7  would be patients with preexisting
8  or known atherosclerotic artery
9  disease.
10 BY MR. KLINE:
11    Q. And did this medicine or
12 does this medicine, in your opinion, have
13 such a risk?
14       MR. GOLDMAN: Objection,
15    calls for opinion testimony.
16       THE WITNESS: There isn't
17    any question about the medicine's
18    risk in this regard.
19 BY MR. KLINE:
20    Q. When you say there's no
21 question, sir, can you give us broadly,
22 and then I'll get into details with you
23 later, broadly why you say that?
24       MR. GOLDMAN: Objection,

Page 60

1    opinion testimony.
2       THE WITNESS: Well, the
3    medicine's risk, Vioxx's risk, has
4    been evident since trials
5    conducted in 1999 and all the way
6    through the time of withdrawal in
7    September 30, 2004.
8  BY MR. KLINE:
9     Q. Have there been multiple
10 tests and multiple studies that have, in
11 your opinion, proven that fact?
12       MR. GOLDMAN: Objection,
13    calls for opinion testimony.
14       THE WITNESS: There's been
15    replication of untoward
16    significant excess of events of
17    heart attack, death and stroke in
18    multiple trials. That's right.
19 BY MR. KLINE:
20    Q. Okay.
21       Do you have any doubt about
22 this in your mind, sir?
23       MR. GOLDMAN: Object to the
24    form, calls for opinion testimony.

Page 61

1       THE WITNESS: There isn't
2    any question in my mind about
3    that.
4  BY MR. KLINE:
5     Q. I didn't say in the
6  beginning of this deposition. You were
7  subpoenaed for this deposition; is that
8  correct, sir?
9     A. That's correct.
10    Q. And you have not been -- you
11 are not serving here as an expert witness
12 for any party; is that correct?
13    A. No, I'm not.
14    Q. And I'm going to continue to
15 ask you all day long about things that
16 are in your writings.
17       The things that you're
18 telling us today, tell me if there's
19 something that hasn't been said in your
20 writings, because I'm going to ask you
21 about things at least that I found in
22 your writings. Okay?
23       MR. GOLDMAN: Objection to
24    form.

Page 62

1    THE WITNESS: Yes.
2  BY MR. KLINE:
3    Q. Now, there was a study
4  called VIGOR; is that correct?
5    A. Yes.
6    Q. And you eventually became
7  familiar with this study called VIGOR;
8  correct?
9    A. Yes.
10   Q. Did you participate in it?
11   A. No, not at all.
12   Q. Who did that study?
13   A. This study was done by
14  rheumatologists, the doctors looking
15  after patients with rheumatoid arthritis.
16  It was a large trial by a network of
17  rheumatologists and patients, about 8,000
18  patients with rheumatoid arthritis.
19   Q. Who funded the study?
20   A. Merck.
21   Q. Who conducted the study?
22   A. Merck.
23   Q. By the way, back to 1999 for
24  a moment. Before the drug was even

Page 63

1  studied clinically in patients, were
2  there, to your knowledge, signals and
3  issues relating to the drug from a
4  pharmacological perspective that would
5  indicate that the drug had any
6  significant cardiovascular risks of any
7  kind? Yes or no?
8       MR. GOLDMAN: Objection,
9       opinion testimony and form.
10      THE WITNESS: There have
11      been published papers, for
12      example, by Dr. Garret FitzGerald,
13      antedating the trials, which
14      raised a concern regarding
15      suppression of prostacyclin,
16      which, of course, could be linked
17      to the risk of heart attack, but
18      it had not been demonstrated in a
19      definitive way in clinical trials
20      at the time of the approval in May
21      1999.
22      But what was interesting is
23      that in May 1999, there already
24      was the VIGOR trial, the very

Page 64

1  largest -- the largest trial of
2  Vioxx that was ongoing and heading
3  towards completion, but
4  nonetheless, the drug had been
5  approved in May 1999, knowing that
6  this trial would be forthcoming in
7  a matter of months.
8  BY MR. KLINE:
9    Q. Let me jump ahead for a
10  moment.
11      There came a point in time
12  -- did there come a point in time where
13  you published a study in the Journal of
14  the American Medical Association?
15   A. Yes.
16   Q. Okay.
17      And what did that study
18  involve briefly? I'm going to explore it
19  a lot later, but I want to put it in
20  context right now.
21   A. Well, the JAMA paper was the
22  first published work to call out that
23  there was indeed a significant risk of
24  heart attack in the VIGOR trial and that

Page 65

1  this needed a whole reset of our thinking
2  of the safety of not just Vioxx, but also
3  this whole class of COX-2 medicines. We
4  also had the data for Celebrex to analyze
5  from their so-called CLASS trial and all
6  the studies that had been recently
7  completed.
8       And so the main conclusion
9  was that we were concerned about risk and
10  that patients with heart disease needed
11  to be appropriately studied.
12   Q. In order to --
13      MR. GOLDMAN: Objection,
14      calls for opinion testimony.
15  BY MR. KLINE:
16   Q. In order to look at -- in
17  order to write that article -- and you
18  were a co-author; correct?
19   A. Yes.
20   Q. -- did you need at that
21  point in time in 2001, which would
22  obviously be true today, to learn and
23  understand the mechanism of action of the
24  drug as well as the clinical trials, as

Page 66

1  well as the animal and in vivo studies
2  that were done?
3       MR. GOLDMAN: Object to
4    form, opinion testimony.
5       THE WITNESS: Well, in order
6    to write the article, and I was a
7    senior author, so, I was the
8    person held responsible for the
9    article, I had to be familiar with
10   all those points, that is, the
11   experimental animal data, the
12   pharmacokinetics, the pharmacology
13   of the drug, the background of the
14   drug and, of course, what clinical
15   data were available. It mostly,
16   of course, centered around the
17   VIGOR trial.
18 BY MR. KLINE:
19   Q.  And how did you educate
20 yourself on that, sir?
21   A.  Well, Dr. Mukherjee, who was
22 our fellow at the time, was pulling all
23 the studies together. I was also
24 reviewing the literature, as well as Dr.

Page 67

1  Nissen. So, the three of us worked
2  together to put this analysis and then
3  subsequently the paper together.
4    Q.  Okay.
5       Following our broad outline
6  in the article that you wrote in the
7  Cleveland Clinic Journal of Medicine in
8  December of 2004, you indicate that
9  "VIGOR's strong evidence that rofecoxib"
10 -- that's the name for Vioxx?
11   A.  Yes.
12   Q.  -- "increases the risk of
13 MIs," and it came out of that study;
14 correct?
15   A.  That's right.
16      MR. GOLDMAN: Object to the
17   form.
18 BY MR. KLINE:
19   Q.  You also say that "The
20 incidence of MIs was higher in the
21 rofecoxib group than in the naproxen
22 group." Is that correct?
23      MR. GOLDMAN: Object to the
24   form.

Page 68

1       THE WITNESS: That's
2    correct.
3  BY MR. KLINE:
4    Q.  All right.
5       Now, also -- well, let's
6  look at the -- let's talk some more.
7  Let's talk about VIGOR now.
8    A.  Yes.
9    Q.  VIGOR was, I think you
10 described, I don't think it's as
11 controversial, is the first -- let me
12 step back.
13      VIGOR, the study, when did
14 you become familiar with it?
15   A.  Well, I only became aware of
16 it, not when it was published in November
17 of 2000, although going back, I reviewed
18 that publication. But I only became
19 aware of it in February 2001 at the time
20 of the FDA special Advisory Committee to
21 review the data from the VIGOR trial with
22 respect to concerns on cardiovascular
23 risk.
24   Q.  What did the VIGOR trial

Page 69

1  say? What did Merck say that the VIGOR
2  trial showed relating to cardiovascular
3  risks?
4       MR. GOLDMAN: Object to the
5    form.
6       THE WITNESS: Right. Well,
7    I remember it very well, because
8    the day that that panel had
9    reviewed all the data, and one of
10   the panelists was my colleague,
11   Dr. Steven Nissen, I read -- I was
12   actually at the medical college of
13   Georgia, I was a visiting
14   professor, I was reading the USA
15   Today that morning, and it said
16   that this was due to naproxen,
17   that the VIGOR problems of heart
18   attack was an issue of naproxen
19   being beneficial rather than Vioxx
20   being detrimental.
21      So, I was a little puzzled
22   by that, but I didn't think too
23   much of it until I got back to
24   Cleveland, and the next day met

Page 70

1  with Dr. Nissen and Dr. Mukherjee
2  about the FDA proceedings. And
3  Dr. Nissen explained he didn't
4  think it was just so simple as the
5  naproxen hypothesis, as we later
6  termed it, and we started to drill
7  down on the data and concluded
8  that it was quite concerning.
9       MR. GOLDMAN: Objection.
10      Move to strike, nonresponsive.
11 BY MR. KLINE:
12   Q.  Okay.
13       What did you find was
14 concerning about the VIGOR data?
15   A.  Yes. Well, there were
16 several things that were particularly
17 bothersome. Number one, that if naproxen
18 was protective, it had not ever been
19 proven, that is, it didn't -- we didn't
20 know for sure it had an aspirin-like
21 effect. And so even if we could give --
22 assign naproxen the same magnitude of
23 protection as aspirin, that would be at
24 maximum a 25 percent reduction in heart

Page 71

1  attacks, which has been very carefully
2  studied for aspirin.
3       So, if naproxen was as good
4  as aspirin, that could be 25 percent
5  reduction. But on the other hand, in
6  VIGOR, we saw a 500 percent, that is, a
7  20-fold increase in heart attacks. So,
8  the order of magnitude was greatly in
9  excess of anything that aspirin could do.
10      Furthermore, the second
11 point, in that if you have a randomized
12 trial and you have an experimental arm,
13 which is a new drug which hasn't been
14 studied extensively, still a lot of
15 things that need to be discovered about
16 it, and you have an anchor drug,
17 naproxen, that had been available for 20
18 years, and if you then do a comparison
19 and you say, there's more than five-fold
20 heart attacks and two-fold excess of
21 cardiovascular serious events, how could
22 you possibly conclude that it was the
23 naproxen being beneficial? The only
24 appropriate conclusion from that would be

Page 72

1  that there's a problem with the
2  experimental drug Vioxx.
3       And beyond those concerns
4  was that this trial was done in patients
5  with rheumatoid arthritis without heart
6  disease, and so whatever was being seen
7  in the VIGOR trial could be far worse in
8  patients with heart disease.
9       MR. GOLDMAN: Move to strike
10      as nonresponsive, opinion
11      testimony.
12 BY MR. KLINE:
13   Q.  Now, what you've described
14 to us in the previous answer, is that
15 something that -- is that a capsule of
16 what you were thinking, you and your
17 colleagues were thinking, but you in
18 particular, when you saw the VIGOR trial
19 published in the New England Journal?
20      MR. GOLDMAN: Object to the
21      form.
22      THE WITNESS: Well, I didn't
23      even take notice of the VIGOR
24      trial when it was in the New

Page 73

1       England Journal. It wasn't on my
2       radar screen, and it didn't really
3       catch, I believe, the cardiology
4       community, because the heart
5       attack part of that publication
6       was not -- it was not featured, it
7       was the protection from the
8       gastrointestinal side effects that
9       was the main conclusion, but only
10      looked back at that paper after
11      the FDA review of the VIGOR data
12      and also of the celecoxib data.
13      There were two days of FDA
14      reviews. One day was devoted to
15      Celebrex, and one day was
16      dedicated to Vioxx.
17 BY MR. KLINE:
18   Q.  To put it in context, the
19 VIGOR trial was published sometime in the
20 year 2000; correct?
21      MR. GOLDMAN: Objection,
22      opinion testimony.
23      THE WITNESS: VIGOR was
24      published November, I believe,

Page 74

1  November 22nd, 2000.
2  BY MR. KLINE:
3    Q. And then the FDA hearings
4  were early next year in February of '01?
5         MR. GOLDMAN: Objection,
6    opinion testimony.
7         THE WITNESS: February 8,
8    2001.
9  BY MR. KLINE:
10   Q. And it was after the
11 hearings in '01 where this, would it be
12 fair to say -- I hope there's not an
13 objection -- got on your radar screen?
14   A. Yes. It was only after the
15 FDA hearing and Dr. Nissen coming back
16 and Dr. Mukherjee going through the data,
17 getting it all collated and three of us
18 meeting, did this become something of an
19 area of interest. It certainly was
20 nothing in medicine that I had any
21 interest in. It wasn't in my field of
22 research up until that point in time.
23   Q. Was it an area of concern?
24         MR. GOLDMAN: Objection to

Page 75

1    form.
2  BY MR. KLINE:
3    Q. Was it something that
4  concerned you?
5         MR. GOLDMAN: Objection to
6    form.
7         THE WITNESS: As soon as we
8    looked at -- well, as soon as I
9    read about the FDA panel, as I
10   said, that morning, in the
11   newspaper, I was concerned. But
12   that concern was magnified after
13   starting to review the data with
14   my colleagues at the Cleveland
15   Clinic.
16 BY MR. KLINE:
17   Q. Okay.
18       Were you alarmed?
19       MR. GOLDMAN: Object to
20   form.
21       THE WITNESS: I don't
22   know --
23       MR. GOLDMAN: Opinion
24   testimony.

Page 76

1         THE WITNESS: -- if I would
2    use the word "alarmed," but I was
3    significantly concerned that there
4    was a medicine that was gaining
5    increased wide scale use. There
6    already was, of course, extensive
7    advertisements and popularity of
8    the medicine, and could something
9    be wrong. That was a concern. I
10   would say it was a significant
11   concern.
12 BY MR. KLINE:
13   Q. Okay.
14       What did you decide to do?
15   A. So, we decided we would put
16 together a manuscript to pull all the
17 data that we could together, because
18 there had not yet been one, there had not
19 yet been a registration in the medical
20 literature to the medical community that
21 this was potentially a big deal.
22   Q. Is that the kind of thing
23 that you do as an independent academic
24 physician and scientist?

Page 77

1         MR. GOLDMAN: Object to the
2    form.
3         THE WITNESS: That's an
4    obligation that we have, is to
5    process data that's out there, try
6    to make it available to our
7    colleagues in the medical
8    community, and in the interest of
9    patients and caring for patients
10   in the optimal way. This is the
11   sort of thing that is critical.
12 BY MR. KLINE:
13   Q. Did you undertake what you
14 did with any axe to grind towards Merck
15 or towards the drug Vioxx?
16       MR. GOLDMAN: Object to the
17   form.
18       THE WITNESS: I had
19   absolutely no axe to grind. I had
20   an excellent relationship with
21   Merck. I had done clinical trials
22   with Merck. In fact, I had just
23   completed a very large trial
24   called TARGET of over 6,000

Page 78

1  patients published in the New
2  England Journal of Medicine. And
3  so I actually, for many years,
4  enjoyed a very good relationship
5  with Merck. So, I do not believe
6  there was any axe to grind
7  whatsoever.
8  BY MR. KLINE:
9     Q.  Do I hear you correctly that
10 you actually were a clinical researcher
11 who had done a major clinical trial for
12 Merck?
13    A.  Yes. We had collaborated
14 with Merck to do a trial in patients with
15 coronary intervention, that is, getting
16 stents or balloon angioplasty, and we
17 were testing a medicine that they made
18 called Aggrastat and comparing it with
19 another medicine called Abciximab, and it
20 was a very large trial.
21    Q.  So, you and your colleagues
22 went about the project that you've just
23 described to me, which is collecting
24 essentially everything you could find

Page 79

1  about the drug Vioxx that was in clinical
2  trials?
3        MR. GOLDMAN: Object to
4     form.
5        THE WITNESS: Yes. All that
6     we could find, which was in the
7     FDA database, as well as whatever
8     publications were available.
9  BY MR. KLINE:
10    Q.  All right.
11       Tell me what you did then.
12 I mean, what process did you follow,
13 briefly?
14    A.  Well, we culled all the data
15 together, which did appear in the JAMA.
16 It didn't have much in the way of changes
17 from our initial submission to the actual
18 publication in August. But the one
19 concern that came up along the way was
20 that the data were different in the New
21 England Journal of Medicine paper
22 published in November 2000 and the FDA
23 database that was available in February
24 2001.

Page 80

1        So, at that point, while we
2  were ready to submit and did submit the
3  paper to JAMA for consideration, I sent
4  the paper to Merck, my colleague, Dr.
5  Laura Demopoulos, who I had worked on
6  this so-called TARGET trial, to see why
7  there were discrepancies in the data
8  between the published paper and the FDA
9  database.
10    Q.  Now, it appears --
11       MR. GOLDMAN: Move to
12    strike, opinion testimony.
13 BY MR. KLINE:
14    Q.  You actually went through
15 the process of getting the information
16 together and then drafting the paper; is
17 that correct?
18    A.  That's correct.
19    Q.  And did the papers represent
20 largely your findings and your
21 conclusions?
22    A.  Yes.
23    Q.  And were those findings and
24 conclusions critical of the VIGOR trial,

Page 81

1  as well as raising some concerns relating
2  to the drug Vioxx?
3        MR. GOLDMAN: Object to the
4     form, opinion testimony.
5        THE WITNESS: There is no
6     question they were critical of the
7     concern about the safety. But I
8     think the most important statement
9     that we made, which appears in the
10    article, was about how there's a
11    mandate to do the appropriate
12    clinical trials which had not been
13    done and wrote, "definitive
14    evidence of such an adverse effect
15    will require a prospective
16    randomized clinical trial." "It
17    is mandatory to conduct a trial
18    specifically assessing
19    cardiovascular risk and benefit of
20    these agents. Until then, we urge
21    caution in prescribing these
22    agents to patients at risk for
23    cardiovascular morbidity."
24 BY MR. KLINE:

Page 82

1  Q. Okay.
2  And I'm going to mark a copy
3  of your JAMA article as the next exhibit
4  number. While it's being marked, let me
5  save time so we can keep the ball
6  rolling. I'll mark it.
7          - - -
8      (Whereupon, Deposition
9      Exhibit Topol-4, "Risk of
10     Cardiovascular Events Associated
11     with Selective COX-2 Inhibitors,"
12     (Mukherjee, et al), JAMA, August
13     22/29, 2001 Vol 286, No. 8,
14     954-959, was marked for
15     identification.)
16         - - -
17 BY MR. KLINE:
18  Q. Before it -- you've read to
19 me from your published article; correct?
20  A. Yes.
21  Q. It was published in the
22 Journal of the American Medical
23 Association; correct?
24  A. Yes.

Page 83

1  Q. It underwent peer review?
2  A. Absolutely.
3  Q. And it was published and
4 then out there for the world to see; is
5 that correct?
6  A. Yes, yes.
7  Q. Now, along the way, I want
8 to go through with you a couple of steps
9 along the way. I don't want to spend a
10 lot of time on it, but I do want to get
11 the process. Before you published it,
12 you said to me, and I'm just recapping,
13 that you talked to Dr. Demopoulos?
14     MR. GOLDMAN: Object to
15   form.
16     THE WITNESS: Yes.
17 BY MR. KLINE:
18  Q. You actually -- and I have a
19 copy of this. You actually sent to her
20 the manuscript; correct?
21  A. Yes.
22  Q. In advance?
23  A. Yes.
24  Q. And what was the purpose of

Page 84

1 sending her the manuscript, as you viewed
2 it?
3  A. The main purpose was to
4 reconcile the differences in data that
5 had been published in the New England
6 Journal of Medicine and what was
7 appearing in the FDA database. There
8 were some significant discrepancies.
9  Q. The FDA database was made
10 available after the February 2001 hearing
11 to the public; is that correct?
12  A. That's right.
13  Q. Posted on the website?
14  A. Posted on their website.
15  Q. Available to anyone to see?
16  A. Absolutely.
17  Q. And Merck, did you have
18 access to their internal data?
19  A. No, we did not.
20  Q. Did you want to get it?
21  A. Well, that's one of the
22 reasons that I tried to reach out to Dr.
23 Demopoulos. Since I had worked with her,
24 we had a very good relationship in our

Page 85

1 other trial that we had done, I know she
2 did not do research in this area of COX-2
3 inhibitors, but I thought she could be
4 helpful to get these concerns about data
5 inconsistencies straightened out.
6  Q. Was the data forthcoming?
7  A. We --
8     MR. GOLDMAN: I'm sorry.
9   Objection, move to strike as
10  nonresponsive.
11    THE WITNESS: We never
12  received any revisions from anyone
13  from Merck. That was never sent
14  to us, any suggestions, changes of
15  data. There was never anything
16  sent back to me or to my
17  colleagues.
18 BY MR. KLINE:
19  Q. Was there any suggestions of
20 the changes in the -- to be made in the
21 manuscript?
22  A. No, there were no changes.
23 The only thing was that there was a visit
24 of the Merck researchers to Cleveland

Page 86

1 Clinic, but there was nothing sent.
2 Q. I want to talk to you about
3 that. You say they came and saw you at
4 the Cleveland Clinic?
5 A. Yes. On April 14, 2001.
6 Q. Let me hold that. April 14,
7 2001?
8 A. That's right.
9 Q. The JAMA article was
10 published when?
11 A. August 22nd, 2001.
12 Q. And did they come to see you
13 after you sent them the draft transcript?
14 A. Yes. It was a manuscript.
15 We don't call it a transcript, but yes.
16 Q. I'm sorry. I live in the
17 world of transcripts.
18 A. That's okay.
19 Q. We actually occasionally
20 have a manuscript. There's probably a
21 couple of them on the Vioxx story being
22 written right now.
23 What I'd like to ask you is,
24 at some point in time did someone from

Page 87

1 Merck ask you for an electronic copy of
2 the -- of your document?
3 A. I don't recall if I sent an
4 electronic copy. It's possible, but I
5 just don't recall.
6 Q. I'm going to show you an
7 e-mail. I will mark it as the next
8 exhibit number. I'm going to put it in
9 the record, it's brief, to save some --
10 you know what, I can put it right in
11 front of you. Exhibit Number 5.
12      - - -
13      (Whereupon, Deposition
14      Exhibit Topol-5, E-mails,
15      MRK-ABA0009274, was marked for
16      identification.)
17      - - -
18 BY MR. KLINE:
19 Q. You'll see here it says, "It
20 was great to have the opportunity to meet
21 you in person." This was after you met
22 with them. "We appreciate the time you
23 took," and it is a request from a woman
24 by the name of Alise Reicin. Do you know

Page 88

1 who Alise Reicin was?
2 A. She was one of the people
3 who visited me. I had not met her
4 previous to this.
5 Q. Did you know that her
6 brother was an investment fellow at
7 Morgan Stanley?
8      MR. GOLDMAN: Object to the
9      form. Lacks foundation.
10      THE WITNESS: No, I had no
11      idea of that.
12 BY MR. KLINE:
13 Q. Have you ever heard that?
14 A. No.
15      MR. GOLDMAN: Same
16      objection.
17 BY MR. KLINE:
18 Q. Okay.
19 The story is, or what
20 happens here is she says -- she wants you
21 to send an electronic copy of the paper.
22 It appears from documents that I have
23 that that was done. Do you recall doing
24 it?

Page 89

1 A. After reading this e-mail, I
2 now think, yes, I must have sent a paper
3 copy to Dr. Demopoulos, which prompted
4 their visit, but then subsequently I
5 probably complied and sent an electronic
6 version.
7 Q. I just have a few questions
8 about the electronic version. I'm going
9 to mark an exhibit. It's an internal
10 Merck document. I don't think you're
11 familiar, would be familiar with it, but
12 I want to ask you just a couple of
13 questions about it.
14      MR. GOLDMAN: You can ask,
15      but I'll object, lacks foundation.
16      MR. KLINE: Go ahead.
17      - - -
18      (Whereupon, Deposition
19      Exhibit Topol-6, E-mail 4-26-01,
20      with attachment, "Selective COX-2
21      Inhibitors are Associated with An
22      Increased Risk of Cardiovascular
23      Events," (Mukherjee, et al) draft
24      manuscript, MRK-AAZ0001561 -

Page 90

1  MRK-AAZ0001593, was marked for
2  identification.)
3  - - -
4  BY MR. KLINE:
5    Q.  Now, it's a copy of -- I
6  would like you to identify it, the front
7  page of it. There's an e-mail that says
8  it's from Alise Reicin to Laura
9  Demopoulos. It says, "Did this in the
10 middle of the night -- not sure it makes
11 sense."
12    By the way, are you aware of
13 the fact, Dr. Topol, that the Merck
14 higher-ups did a lot of work at night on
15 Vioxx?
16    MR. GOLDMAN: Object to
17    form, lacks foundation.
18    THE WITNESS: No.
19 BY MR. KLINE:
20   Q.  Oh, okay. Well, they did.
21      And it says here, it
22 basically transmits back Alise Reicin's
23 markup, electronic markup of your
24 document. Are you familiar with it?

Page 91

1    MR. GOLDMAN: Objection,
2    lacks foundation.
3    THE WITNESS: I've never
4    seen this.
5  BY MR. KLINE:
6    Q.  Okay.
7      I want you to turn to Page
8  8, sir. I want to find out if this is
9  something that was ever suggested to you.
10     If you'd look at the front
11 page, please, first. Front page.
12   A.  Oh, yes.
13   Q.  Sorry.
14   A.  Yes.
15   Q.  If anyone who listens to
16 this or sees this some day feels that I'm
17 rushing, it's because I have a lot to
18 cover in a short time under a time frame.
19 I want to try to get as much as I can
20 out.
21     "Selective COX-2 Inhibitors
22 Are Associated With an Increased Risk of
23 Cardiovascular Events."
24    MR. GOLDMAN: Where are you

Page 92

1  reading from?
2    MR. KLINE: I'm reading from
3    the cover page.
4    MR. HAMELINE: Second page.
5    MR. KLINE: The first page
6    of the document, underneath the
7    Reicin to Demopoulos markup. It
8    is Merck -- MRK AAZ0001562.
9  BY MR. KLINE:
10   Q.  Do you see it?
11   A.  Yes.
12   Q.  Okay.
13      Wait till you see this one.
14      Under "Results" --
15    MR. GOLDMAN: Object to the
16    form, sidebar.
17 BY MR. KLINE:
18   Q.  This is your paper; correct?
19   A.  Yes. Well, I mean, this was
20 the one that apparently was worked over.
21   Q.  Correct.
22   A.  This is not our paper.
23   Q.  Were you aware of the fact
24 that Merck was working over your paper?

Page 93

1    MR. GOLDMAN: Object to the
2    form, lacks foundation.
3    THE WITNESS: I had no idea
4    until this very moment.
5  BY MR. KLINE:
6    Q.  Look under "Results" on Page
7  8. Do you see -- I'd like you to look at
8  the -- don't look at the underlined
9  sentence yet. Look at the last -- the
10 sentence that begins, "The results of the
11 event-free survival analysis on the 66
12 cases showed that the relative risk of
13 developing a cardiovascular event in
14 rofecoxib treatment arm was 2.37"
15 percent.
16      That's something you
17 eventually told people in your JAMA
18 paper; correct?
19   A.  Yes.
20   Q.  Did you know or did they
21 suggest it directly to you that according
22 to Dr. Reicin, "we prefer to flip the
23 data and say it was reduced on naproxen"?
24    MR. GOLDMAN: Object to the

24 (Pages 90 to 93)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 94

1  form.
2         THE WITNESS: It's amazing.
3     Yes, I see it here, but it's
4     amazing. It certainly didn't
5     appear in our manuscript.
6  BY MR. KLINE:
7     Q.  Are you, sir -- have you
8  ever heard of a medical researcher
9  flipping data?
10        MR. GOLDMAN: Object to the
11    form.
12        THE WITNESS: No. I mean,
13    you don't -- research and flipping
14    data, that doesn't -- no.
15 BY MR. KLINE:
16    Q.  But the naproxen hypothesis,
17 sir --
18    A.  Yes.
19    Q.  -- wasn't that really a way
20 that Merck, the way Dr. Reicin says here,
21 flipped the data?
22        MR. GOLDMAN: Object to
23    form.
24        THE WITNESS: Well, I do

Page 95

1     believe there was no basis for the
2     naproxen hypothesis, and that was
3     one of the really significant
4     problems in what happened from
5     VIGOR, all the way through from,
6     you know, 2000, when that paper
7     was published, all the way through
8     to the drug's withdrawal.
9  BY MR. KLINE:
10    Q.  Sir, your JAMA article --
11        MR. GOLDMAN: Move to strike
12    as nonresponsive, opinion
13    testimony.
14 BY MR. KLINE:
15    Q.  Sir, your JAMA article, I
16 think you read to me that your conclusion
17 was to call for a full large-scale study;
18 correct?
19    A.  That's right.
20    Q.  Did you want a primary
21 cardiovascular endpoint study performed?
22    A.  Not only did it need to have
23 cardiovascular endpoints, but it had to
24 have cardiovascular patients. Patients

Page 96

1  had been excluded essentially from all of
2  these studies, and so that was a patient
3  group that we were most worried about,
4  because they would have the highest
5  predisposition to life-threatening
6  events.
7     Q.  Why was it important to
8  study patients who were at high risk for
9  cardiovascular events when taking the
10 drug Vioxx and COX-2s generally?
11    A.  Well, we already knew that a
12 large proportion of patients who have
13 heart disease have concomitant arthritis.
14 And, in fact, in my practice, the vast
15 majority of patients who have come to see
16 me with heart disease, they also have
17 arthritis. But there was the Ray paper
18 in Lancet, the Tennessee Medicaid
19 database, there was the other papers that
20 I have referred to where 45, 50 percent
21 or higher percent of patients taking
22 Vioxx or other medicines in this class
23 had established known coronary heart
24 disease. So, these patients were

Page 97

1  essentially the highest risk for having a
2  life-threatening event.
3         MR. GOLDMAN: Move to strike
4     as nonresponsive, opinion
5     testimony.
6  BY MR. KLINE:
7     Q.  So, did your study, what you
8  were proposing, was it to study the drug
9  in those people who were the logical
10 people who were going to take the drug?
11    A.  Yes. The only way we could
12 get to the answer here, was it safe for
13 people with heart disease who have
14 arthritis to take the medicine, was to do
15 a trial in these particular patients who
16 had been completely neglected in the
17 development of Vioxx.
18    Q.  What did you think --
19        MR. GOLDMAN: Object to the
20    form. Move to strike the
21    nonresponsive opinion testimony.
22 BY MR. KLINE:
23    Q.  -- when you got into this
24 sir, in 2001, what did you think of

Page 98

1 Merck's failure to study patients, the
2 very patients in whom the drug was going
3 to be taken?
4     MR. GOLDMAN: Objection,
5     opinion testimony.
6     THE WITNESS: Well, there're
7     a couple of possible explanations,
8     but one is that they didn't want
9     to know or they didn't want to do
10    the trials that were obviously, as
11    we said, mandated. They didn't
12    want to do the trials.
13 BY MR. KLINE:
14   Q.  Did you believe that they
15 should have?
16    MR. GOLDMAN: Objection.
17    THE WITNESS: Absolutely.
18    And both, not just Merck, but also
19    Pfizer, and any manufacturer of a
20    COX-2 inhibitor. It wasn't just
21    about a Merck problem, although
22    clearly the VIGOR trial was the
23    one that was most concerning.
24 BY MR. KLINE:

Page 99

1   Q.  If you'd look at the last
2 sentence of the paper on Page 18, there's
3 more, but I don't have time to go through
4 it all. Maybe we can furnish you a copy,
5 and you can see how they were marking
6 your paper up, sir. I've provided a copy
7 to your counsel. Would you at some
8 point, after this deposition, like to see
9 how they marked up your paper internally?
10    MR. GOLDMAN: Objection to
11    the foundation.
12    THE WITNESS: No. I am just
13    reading some, and it's very
14    disturbing, but, yes.
15 BY MR. KLINE:
16   Q.  Look at Page 18.
17   A.  Yes.
18   Q.  "Until then," and this ended
19 up in your paper, "we urge caution in
20 prescribing these agents to patients at
21 risk for cardiovascular morbidity." Your
22 words?
23   A.  That's the words that's here
24 in the paper that are published, yes.

Page 100

1   Q.  The underlined words are Dr.
2 Reicin's, according to her e-mail which
3 she wrote. Did you see what she said?
4   A.  Yes.
5   Q.  "Conclusion needs to be
6 toned down."
7     MR. GOLDMAN: Objection,
8     lacks foundation.
9 BY MR. KLINE:
10   Q.  By the way, you met with Dr.
11 Reicin; correct?
12   A.  Yes.
13   Q.  She came out to see you?
14   A.  Yes. With Dr. Demopoulos.
15   Q.  I see.
16     You knew Dr. Demopoulos
17 before; correct?
18   A.  Yes.
19   Q.  Did you know Dr. Reicin?
20   A.  No, I'd never met her
21 before.
22   Q.  Did anyone introduce or did
23 you know, sir, at the time that her
24 personnel file, her actual personnel file

Page 101

1 described her as the "tenacious defender
2 of the Vioxx franchise"? Did you know
3 that fact?
4     MR. GOLDMAN: Object to the
5     form, lacks foundation.
6     THE WITNESS: Well, it has
7     become -- I didn't know that, but
8     certainly over time, that's become
9     increasingly and abundantly clear.
10 BY MR. KLINE:
11   Q.  Is she even a cardiologist,
12 sir?
13     MR. GOLDMAN: Objection,
14     lacks foundation.
15     THE WITNESS: I don't
16     believe so, no.
17 BY MR. KLINE:
18   Q.  And when she came to see
19 you, sir, did you believe that one of the
20 purposes was to neutralize you and your
21 opinion?
22     MR. GOLDMAN: Object to the
23     form, lacks foundation.
24     THE WITNESS: Well,

Page 102

1 certainly. The comments she made
2 at that meeting would go along
3 with that. I mean, she basically
4 said that -- I remember the
5 conversation. It actually was
6 supposed to be three people coming
7 to visit, which was unusual, to
8 discuss a manuscript, but because
9 of our prior relationship with
10 Merck and Dr. Demopoulos and Dr.
11 DiBattiste, I had reluctantly
12 agreed to this meeting. But Dr.
13 DiBattiste didn't show up, it was
14 supposed to be the three of them,
15 and the meeting started out with
16 that we got it wrong, that we
17 would be embarrassed.
18 BY MR. KLINE:
19   Q.   "We" meaning?
20   A.   Dr. Nissen, Dr. Mukherjee
21 and I.
22   Q.   Three physicians at the
23 Cleveland Clinic?
24   A.   Right.

Page 103

1   Q.   Got it wrong?
2   A.   Got it wrong, that we would
3 be embarrassed if we published this
4 paper.
5   Q.   Her word?
6   A.   That's the word. The word
7 is "embarrassed." And I thought that was
8 harsh. And she came across as kind of
9 arrogant, I thought. But we talked it
10 through, and I explained to her that, you
11 know, we don't feel that way at all, and
12 we will stand by our data. We only
13 wanted the input on inconsistencies of
14 data. We did not ask to them -- for Dr.
15 Reicin or colleagues to opine about our
16 perspective.
17       But the discussion ended up
18 okay. You know, she came about the
19 naproxen hypothesis, which I dismissed as
20 the explanation. She came with the
21 rheumatoid arthritis -- that patients
22 with rheumatoid arthritis, you know, Dr.
23 Topol, have much higher rates of heart
24 attack. And I said, well, that doesn't

Page 104

1 explain it, because all the patients had
2 rheumatoid arthritis. So, if there's a
3 gradient of heart attack, it can't just
4 be from that explanation.
5       She also came with the
6 notion that there were lots of data that
7 we didn't know about, Dr. Nissen, Dr.
8 Mukherjee and I, that was in the Merck
9 files that the FDA had, but we didn't
10 have access. And I said, well, we can't
11 comment on data we don't have access to,
12 and I'm sorry.
13       So, the meeting probably
14 went on about an hour-and-a-half. It
15 ended cordially. And at times she said
16 that Merck was considering doing a trial
17 in heart patients, and if we had any
18 ideas, she welcomed us to forward a
19 proposal, protocol, and that seemed to
20 be -- I got the sense it was a gesture.
21 I didn't really think that Dr. Reicin was
22 serious about it, but nonetheless, I
23 thought that we probably should at least
24 send some type of protocol sketch if they

Page 105

1 would like to see what our ideas were for
2 pursuing this question.
3       MR. GOLDMAN: Move to strike
4   the nonresponsive testimony.
5 BY MR. KLINE:
6   Q.   Let me use a
7 characterization, and you can agree or
8 disagree.
9       Did you think that her
10 attempts were to intimidate you?
11   A.   I don't know if I would at
12 that point use the word "intimidation,"
13 but she was quite strong. In some
14 respects, I would even consider her
15 comment brazen. But she didn't say, if
16 you publish this, we're going to do such
17 and such. You know, it was nothing like
18 that.
19       I think she knew when she
20 left that we were going to publish this
21 paper without any change in the types of
22 things that she was interested in. There
23 was no quid pro quo.
24   Q.   There appears to have been

27 (Pages 102 to 105)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 106

1  -- there appears to have been some
2  revisions that were made to the draft
3  after it was submitted to JAMA; is that
4  correct?
5      A.  Well, the reviewers of the
6  paper certainly had some revisions
7  requested, but I don't believe anything
8  substantive was changed in the review
9  process.  The process was already -- had
10 started when that visit in April had
11 occurred, and that independent review was
12 something that we had to attend to, of
13 course.
14     Q.  Let me just briefly show you
15 another document.  It's a Merck document,
16 Exhibit Number 7.
17             - - -
18         (Whereupon, Deposition
19      Exhibit Topol-7, E-mails, with
20      attachment, "Selective COX-2
21      Inhibitors are Associated with An
22      Increased Risk of Cardiovascular
23      Events," (Mukherjee, et al) draft
24      manuscript, MRK-ABA0009661 -

Page 107

1      MRK-ABA0009693, was marked for
2      identification.)
3             - - -
4  BY MR. KLINE:
5      Q.  Very briefly.  And, again, I
6  don't have the time to have you sit and
7  read the whole thing, but I want you to
8  look at the front page.
9          Apparently the manuscript
10 was further worked on internally at
11 Merck.  Are you aware of that fact?
12     A.  No.
13         MR. GOLDMAN:  Objection to
14     the characterization.
15         THE WITNESS:  I had no
16     knowledge of that.
17 BY MR. KLINE:
18     Q.  And there's an e-mail from
19 Dr. Demopoulos to a number of people,
20 including Alise Reicin.  And they took a
21 crack at revising it, and if you look at
22 the last sentence of the e-mail, "We
23 recognize that the revised" transcript
24 "does not completely neutralize the

Page 108

1  potential negative impact of the
2  publication, but...it is substantially
3  removed from the original.  We" feel
4  "that revising it further to more
5  completely present a Merck perspective
6  might alienate the authors and" thus
7  "jeopardize our opportunity to contribute
8  at all."
9          Did you know that's what was
10 going on?
11         MR. GOLDMAN:  Objection, and
12     object --
13         THE WITNESS:  This is
14     remarkable.  I didn't know --
15         MR. GOLDMAN:  -- to the use
16     of the document.
17         THE WITNESS:  -- this was
18     going on at all.
19         MR. GOLDMAN:  Dr. Topol, let
20     me just insert an objection.
21         Lacks foundation, and can I
22     have a standing objection to your
23     use of documents that Dr. Topol's
24     never seen?

Page 109

1  BY MR. KLINE:
2      Q.  Dr. Topol --
3          MR. GOLDMAN:  Can I have
4      that, Mr. Kline?
5          MR. KLINE:  Yes.
6  BY MR. KLINE:
7      Q.  You've now seen it.  What do
8  you think of that kind of conduct?
9          MR. GOLDMAN:  Object to the
10     form, opinion testimony.
11         THE WITNESS:  I'm actually
12     appalled by this.  Yes, to say
13     that, you know, this was trying to
14     "neutralize the potential negative
15     impact" and "jeopardize our"
16     "ability to contribute."  We
17     didn't ask them to contribute.  We
18     asked them to reconcile the data
19     inconsistencies.
20 BY MR. KLINE:
21     Q.  Is part of the academic
22 process -- you've worked --
23         You've done studies for
24 large pharmaceutical companies, Merck?

28 (Pages 106 to 109)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 110

1  A.  Yes.
2  Q.  Is part of the process to
3  get the scientific facts in the medical
4  literature, or is the real objective, or
5  is part of the objective to get the,
6  quote, drug company perspective?
7       MR. GOLDMAN:  Objection.
8       THE WITNESS:  Well, you
9    know, I had been trying to have an
10   intellectually fulfilling and
11   collaborative relationship with
12   people at Merck, and that was
13   something that I think we enjoyed
14   up until this sort of thing, which
15   is obviously a departure from
16   that, but --
17 BY MR. KLINE:
18  Q.  Is it --
19  A.  -- it's unfortunate.
20  Q.  Is it a departure --
21       MR. GOLDMAN:  Move to strike
22   as nonresponsive.
23 BY MR. KLINE:
24  Q.  -- from sound academic and

Page 111

1  scientific practice to attempt to
2  neutralize papers and try to inject a
3  particular perspective, rather than what
4  is the down the middle truth?
5       MR. GOLDMAN:  Objection,
6    lacks foundation, opinion
7    testimony.
8       THE WITNESS:  Yes.  I mean,
9    I think that the role of academic
10   medicine is to publish a highly
11   objective independent processing
12   of data and perspective, and
13   anything to try to warp that or
14   twist it is unacceptable.
15 BY MR. KLINE:
16  Q.  Is that how you view these
17 e-mails that I've just shown you --
18       MR. GOLDMAN:  Move to strike
19   the nonresponsive portion.
20 BY MR. KLINE:
21  Q.  -- for the first time?
22       MR. GOLDMAN:  Objection,
23   lacks foundation, opinion
24   testimony.

Page 112

1       THE WITNESS:  Yes, I'm quite
2    bothered by this.
3  BY MR. KLINE:
4   Q.  Those e-mails, sir, clearly
5  do relate to you and your paper, and they
6  have attached your paper; correct?
7   A.  Yes.
8   Q.  And they're markups of your
9  paper; correct?
10  A.  Yes.
11  Q.  Which did not make their way
12 into the New England Journal; correct?
13  A.  No, JAMA.
14  Q.  I'm sorry.
15  A.  They didn't even make their
16 way to me.  I've never -- I've not seen
17 these.
18  Q.  Okay.
19       Now, let's move to your JAMA
20 article itself.
21  A.  Yes.
22  Q.  I think we're moving along,
23 I hope.
24       I want to stop at this point

Page 113

1 and say I've now covered that pre-JAMA
2 period.  Is there anything in your mind
3 significant that's been missed in the
4 story leading up to the publication of
5 the JAMA article?  If so, I'd like to
6 know.
7       MR. GOLDMAN:  Object to the
8    form, opinion testimony.
9       THE WITNESS:  Well, I think
10   there were --
11      MR. KLINE:  It can't be an
12   opinion.  I just asked him to tell
13   me what he knows, please.
14      THE WITNESS:
15   Chronologically, if we were to
16   look at the VIGOR trial, there are
17   some concerning things that were
18   not incorporated in JAMA that I
19   only tuned in to later.  I don't
20   know if you would like to get into
21   that now from the Targum FDA
22   report or whether you'd like to
23   get into that subsequently.  But
24   it's about the VIGOR trial in

Page 114

1  December and November of 1999.
2  BY MR. KLINE:
3     Q.  Please tell us.
4         MR. GOLDMAN: That's why I
5     objected on opinion testimony
6     grounds. Move to strike, opinion
7     testimony.
8         THE WITNESS: If I could get
9     the Targum report. It was in the
10    document submitted, but I have a
11    copy that I brought.
12 BY MR. KLINE:
13    Q.  You actually -- I think I've
14 seen in your file, you have the Targum
15 memo in your file produced us, and you
16 marked it up?
17    A.  Yes. I marked it up, but I
18 have a clean copy here that I wanted to
19 refer to. Here it is. Because this was
20 while the VIGOR trial was being
21 conducted. And this is an independent
22 FDA review of the data from VIGOR. It
23 also, in this report, includes the data
24 from two other trials, VIGOR -- trial 090

Page 115

1  and trial 085.
2         - - -
3         (Whereupon, Deposition
4     Exhibit Topol-8, Memo 2-1-01,
5     "Consultation NDA 21-042, S-007
6     Review of cardiovascular safety
7     database (Targum) (37 pages), was
8     marked for identification.)
9         - - -
10 BY MR. KLINE:
11    Q.  I'm marking, and those who
12 see this will be familiar with this, the
13 February 1, 2001 memo of Shari L. Targum
14 of the Division of Cardiorenal Drug
15 Products at the FDA --
16    A.  Yes --
17    Q.  -- correct?
18    A.  Yes.
19        MR. GOLDMAN: Exhibit number
20    8?
21        MR. KLINE: Exhibit number
22    8.
23 BY MR. KLINE:
24    Q.  You've interacted with Dr.

Page 116

1  Targum?
2     A.  Yes. I know Dr. Targum.
3     Q.  Okay.
4         Please tell us the
5  significance to you.
6     A.  Well, this --
7     Q.  You did not have this at the
8  time that you published the JAMA article
9  or you did?
10    A.  No. Well, Dr. Mukherjee
11 had, I think, reviewed this online, but I
12 had not. I only had reviewed the data
13 that he presented to Dr. Nissen and I,
14 but I went back to this report and found
15 many things that still had not even yet
16 surfaced that are quite concerning.
17    Q.  Which are?
18        MR. GOLDMAN: Objection,
19    move to strike the opinion
20    testimony.
21 BY MR. KLINE:
22    Q.  What are the concerning
23 parts to you that were known and flagged
24 in the Targum report dated February 1,

Page 117

1  2001?
2         MR. GOLDMAN: Object to
3     form, opinion testimony.
4         THE WITNESS: On Page 5 it
5     talks about the DSMB, which is the
6     data and safety monitoring board.
7         MR. GOLDMAN: I'm sorry,
8     what page?
9         THE WITNESS: Page 5.
10 BY MR. KLINE:
11    Q.  Yes.
12    A.  And the first thing it says
13 is during -- this is at the bottom of the
14 page, the last paragraph, "During the
15 November 18, 1999 meeting, discussion and
16 focus on the 'excess deaths and
17 cardiovascular adverse experiences in
18 group A compared to group B'...In this
19 report, there were 40 and 17 patients
20 that discontinued the study because of
21 cardiovascular adverse events," and then
22 there's a blood pressure. And it's
23 pretty easy to tell which is group A and
24 group B.