Page 118

1          This is November 18, 1999.
2    This is highly concerning, that there's
3    excess deaths in a trial and the DSMB is
4    noting in the course of the VIGOR trial.
5        Q.   You said November 18, 1999?
6            MR. GOLDMAN: Object to the
7        form opinion testimony.
8            THE WITNESS: Yes. This
9        would be a time when any concerns
10       about the drug, and, of course,
11       now already the 090 trial, which I
12       presume we'll get into, that
13       already was known in May of 1999.
14           So, now we have the largest
15       trial ever of the drug, and it's
16       causing, in the midst of the
17       trial, excess deaths and serious
18       cardiovascular events. So, this
19       did not apparently lead to the
20       alert that I would have thought in
21       the course of a large scale trial
22       of 8,000 patients.
23           MR. GOLDMAN: Move to strike
24       opinion testimony, nonresponsive.

Page 119

1    BY MR. KLINE:
2        Q.   What are you saying to us?
3    Are you saying that in the period by the
4    year 2001 that there were a series of
5    things that were known to Merck?
6            MR. GOLDMAN: Object to the
7        form, opinion testimony, lacks
8        foundation.
9            THE WITNESS: Well, what's
10       evident here is it calls out the
11       53 versus 29 serious excess deaths
12       in cardiovascular events as early
13       as November of 1999. In the wake
14       of another trial, they had a 760
15       percent excess of heart attacks.
16   BY MR. KLINE:
17       Q.   What study was the 53
18   deaths, for instance?
19       A.   That's the VIGOR trial.
20       Q.   The VIGOR trial?
21       A.   At this juncture, at this
22   interim analysis by the safety and
23   monitoring board.
24       Q.   That's what I wanted to

Page 120

1    establish.
2        A.   And it actually then goes on
3    in this document by Dr. Targum, and it's
4    highly concerning because it says on Page
5    6, it says that, "The DSMB recommended
6    development of a separate analysis plan
7    for adjudicated events," this is in the
8    first full paragraph. "One concludes" --
9    this is the last sentence of that
10   paragraph. "One concludes from this
11   statement that the DSMB," the Data Safety
12   Monitoring Board, "received unadjudicated
13   adverse event data," and that there had
14   been -- further along, the last sentence
15   of this, "At the time," this is now the
16   next interim analysis, December of 1999,
17   "no cardiovascular analysis plan was in
18   place" for this trial, which is quite
19   concerning, to say the least.
20           MR. GOLDMAN: Move to strike
21       nonresponsive opinion testimony.
22   BY MR. KLINE:
23       Q.   Is what you're saying that
24   the Targum memo, to put it in

Page 121

1    perspective --
2            Is what you're saying is
3    that the VIGOR -- you learned from seeing
4    this document that the VIGOR data had
5    been analyzed, as you would expect, going
6    along at various stages?
7        A.   Yes.
8        Q.   And that at various stages,
9    were there red flags that you can see in
10   this data?
11       A.   Exactly.
12           MR. GOLDMAN: Object to the
13       form, opinion testimony.
14           THE WITNESS: Exactly. And
15       the point is, is that later we're
16       told that the first time they ever
17       knew about any problem was well
18       into 2000, which couldn't possibly
19       be true. Someone of the sponsor
20       had to be alerted by this DSMB
21       concern of excess deaths and
22       serious cardiovascular events.
23           MR. GOLDMAN: Move to
24       strike, nonresponsive, lacks

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 122

1    foundation.
2  BY MR. KLINE:
3      Q.   Now, let's talk about VIGOR,
4  because that was some focus of what you
5  were doing when you retrospectively
6  looked at VIGOR and also a number of
7  other studies including 090.
8      A.   Yes.
9      Q.   Okay.
10         You looked at, I think, a
11  study called 085, 090, VIGOR. Any other?
12     A.   Those are the principal
13  ones. I think all the studies, but those
14  are the ones that we focused on the most.
15         MR. GOLDMAN: Can you set a
16     time frame for this, please?
17         MR. KLINE: Yes. For the
18     JAMA article of 2001. That's what
19     I'm back to and referring to.
20         THE WITNESS: Right.
21     That --
22  BY MR. KLINE:
23     Q.   I think while we've jumped
24  around a little bit, we've done a pretty

Page 123

1  good job of keeping things straight so
2  far.
3      A.   Well, we tried --
4      Q.   But the beauty will be in
5  the eyes of beholder of somebody who sees
6  this.
7      A.   Right. I was just trying
8  to, while commenting on VIGOR, trying to
9  incorporate that there were problems in
10  the conduct during the trial, which have
11  not really surfaced, as far as I know.
12         But regarding the JAMA
13  paper, the August 2001 --
14     Q.   You mean not surfaced to
15  this date?
16     A.   To this date.
17         MR. GOLDMAN: Objection,
18     most to strike, nonresponsive,
19     opinion testimony, lacks
20     foundation.
21         THE WITNESS: I'm not aware
22     that this concern regarding the
23     data and safety monitoring board
24     has been registered. I've been

Page 124

1  concerned about it, but I have not
2  -- and I've discussed it with the
3  FDA, but I've not gotten an
4  adequate response.
5         MR. GOLDMAN: Same
6     objections.
7  BY MR. KLINE:
8      Q.   I see. Okay.
9         Go ahead.
10     A.   Back to the JAMA paper,
11  though --
12     Q.   Yes.
13     A.   -- we really zoomed in on
14  three trials of Vioxx, study 085, study
15  090 and VIGOR.
16     Q.   Okay.
17         You looked at the VIGOR
18  trial, and you made some determinations
19  there; correct?
20     A.   That's right.
21     Q.   Okay.
22         What did you -- I would like
23  you to list out sequentially. If you've
24  covered it already, list it so we have it

Page 125

1  in a list.
2         What were your major
3  findings as you looked independently back
4  at the VIGOR trial?
5         MR. GOLDMAN: Objection,
6     lack of foundation.
7         THE WITNESS: I think the
8     most important finding is
9     summarized in Figure 1 of that
10    paper, which comes right from the
11    FDA Targum report. And basically
12    what that figure, first time now
13    published to the medical
14    community, it shows that there's a
15    divergence of the heart attack and
16    serious event curves. The event
17    curves is Figure 1, whereby
18    starting at four to six weeks
19    after the start of the medicine,
20    Vioxx compared to naproxen, there
21    is an over two-fold risk of
22    serious events.
23  BY MR. KLINE:
24     Q.   That Kaplan-Meier curve,

32  (Pages 122 to 125)

Page 126

1   which will be marked -- we don't have to
2   display it right now, but I want to mark
3   it so that it's part of an exhibit to be
4   displayed as part of this transcript. We
5   will put a number 9 on table -- on Figure
6   1 of the Topol JAMA article.
7                    - - -
8            (Whereupon, Deposition
9        Exhibit Topol-9, Excerpt from
10       "Risk of Cardiovascular Events
11       Associated with Selective COX-2
12       Inhibitors," (Mukherjee, et al),
13       JAMA, August 22/29, 2001 Vol 286,
14       No. 8, 956, was marked for
15       identification.)
16                   - - -
17           MR. GOLDMAN:  Haven't you
18       already marked the JAMA article?
19           MR. KLINE:  I did, but I
20       want to mark Figure 1 as a
21       separate exhibit.
22   BY MR. KLINE:
23       Q.   That Figure 1, which is the
24   Kaplan-Meier curve showing the time to

Page 127

1   cardiovascular adverse events, the line
2   separated how many days?
3       A.   Between four and six weeks
4   these curves diverge.
5           MR. GOLDMAN:  Move to strike
6       the opinion testimony.
7   BY MR. KLINE:
8       Q.   Is this, by the way,
9   something that has been replicated in
10  other studies?
11          MR. GOLDMAN:  Objection,
12      move to strike.
13          THE WITNESS:  It's been
14      replicated in four randomized
15      trials.
16  BY MR. KLINE:
17      Q.   That it separates at an
18  early time?
19          MR. GOLDMAN:  Objection.
20          THE WITNESS:  That's right.
21  BY MR. KLINE:
22      Q.   Okay.
23          And what are those studies?
24      A.   Study 090, which was a

Page 128

1   six-week trial, which had a 760 percent
2   excess within the six weeks.
3       Q.   Yes.
4       A.   The VIGOR trial I just
5   mentioned.
6       Q.   Yes.
7       A.   The ADVANTAGE trial, which
8   was a 12-week trial that showed a
9   significant excess in the 12-week time
10  frame.
11          And the VICTOR trial, which
12  has not yet been published, which is a
13  colon cancer trial of 2,300 patients
14  coordinated out of Oxford, which has been
15  at least commented on by the
16  investigators having immediate excess in
17  heart attack risk.
18      Q.   What then, sir --
19          MR. GOLDMAN:  Objection,
20      move to strike nonresponsive
21      opinion testimony, lacks
22      foundation.
23  BY MR. KLINE:
24      Q.   What, then, sir, opinion and

Page 129

1   conclusion have you reached -- let me
2   strike it and start again.
3           What conclusion have you
4   reached, Dr. Topol, relating to the
5   increased risk of cardiovascular events,
6   heart attacks and strokes relating to
7   short-term usage of the drug?
8           MR. GOLDMAN:  Objection,
9       opinion testimony.
10          THE WITNESS:  Well, there is
11      -- I should also add the four
12      randomized trials, there's the
13      cumulative analysis by Dr. Juni
14      published in the Lancet which
15      shows no relationship between
16      duration of therapy and heart
17      attack excess.
18          But interestingly, all four
19      of these trials, and the
20      cumulative Juni analysis, was on
21      patients without heart disease.
22      So, the risk of it being immediate
23      and early could actually be much
24      more exaggerated in patients with

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 130

1    heart disease.
2    BY MR. KLINE:
3        Q.    Any doubt --
4            MR. GOLDMAN: Objection,
5        move to strike the nonresponsive
6        testimony.
7    BY MR. KLINE:
8        Q.    -- about it in your mind?
9        A.    There isn't any question
10   about this.  To see it replicated across
11   four trials in patients who don't even
12   have heart disease is quite an important
13   finding.
14           MR. GOLDMAN: Objection to
15       opinion testimony in the last
16       question.
17   BY MR. KLINE:
18       Q.    In this particular
19   Kaplan-Meier curve for the VIGOR trial,
20   that was not published in the New England
21   Journal of Medicine; is that correct?
22       A.    No.  As I mentioned earlier,
23   the New England Journal of Medicine paper
24   featured the gastrointestinal side

Page 131

1    effects and benefit, but it did not show
2    in any graphic form, and there are other
3    irregularities of this paper, but it
4    certainly did not highlight the heart
5    attack problems.
6        Q.    Okay.
7            Now, I want to do findings.
8    Then I want to go to what you've
9    described as irregularities --
10           MR. GOLDMAN: Move to strike
11       as nonresponsive.
12   BY MR. KLINE:
13       Q.    -- because you have a
14   perspective on both of those issues;
15   correct?
16       A.    Yes.
17       Q.    Okay.
18           Let's talk about the
19   findings.
20           You mentioned already that
21   there was an increased risk of
22   cardiovascular events starting at the
23   six-week period in this study; correct?
24       A.    Yes.

Page 132

1        Q.    Replicated by other studies
2    we now know later?
3            MR. GOLDMAN: Objection to
4        the opinion testimony.
5            THE WITNESS: Three other
6        randomized trials.
7    BY MR. KLINE:
8        Q.    Yes.
9        A.    Yes.
10       Q.    And by the way, I'm going to
11   get to naproxen.  On this naproxen
12   theory, has there ever been a randomized
13   clinical trial demonstrating that
14   naproxen is cardioprotective?
15       A.    There is no -- there are no
16   data that I am aware of to show that
17   naproxen in any randomized trial is
18   cardioprotective.
19       Q.    Do you think that if there
20   were such a study, you would know about
21   it?
22       A.    I would think so.
23           MR. GOLDMAN: Objection.
24   BY MR. KLINE:

Page 133

1        Q.    So, what do you think of
2    this naproxen hypothesis that was put
3    forward by Merck to justify the results
4    in VIGOR?
5            MR. GOLDMAN: Objection,
6        opinion testimony.
7            THE WITNESS: It doesn't
8        justify -- I mean, as I mentioned
9        earlier, the problem is you have
10       an experimental drug which is not
11       fully defined, and you compare it
12       to a drug that's been known for 20
13       years.  To all of a sudden to
14       ascribe some type of magical
15       protective effect without any
16       basis is not acceptable.
17   BY MR. KLINE:
18       Q.    I don't have the document in
19   front of me, but I think I've read in the
20   many documents that I've had in front of
21   me a comment by you to the effect that if
22   Merck's view were true, it would be the
23   wonder drug of wonder drugs or something
24   like that.  Did you say something like

34  (Pages 130 to 133)

**Page 134**

1 that at some point?
2 MR. GOLDMAN: Object to the
3 form, opinion testimony.
4 THE WITNESS: I don't think
5 I did, but probably some other
6 person who astutely made that
7 statement, but that wasn't me.
8 BY MR. KLINE:
9 Q. Would that be a correct
10 statement?
11 MR. GOLDMAN: Time out.
12 Object to the form, lacks
13 foundation. You're now asking him
14 to comment about a statement that
15 somebody else might have made.
16 BY MR. KLINE:
17 Q. Would it be a correct
18 statement that naproxen would be the
19 wonder drug of wonder drugs if the Alise
20 Reicin/Merck hypothesis were true?
21 MR. GOLDMAN: Object to the
22 form, opinion testimony, lacks
23 foundation.
24 THE WITNESS: Well, as I

**Page 135**

1 mentioned earlier, to have a
2 20-fold benefit over aspirin,
3 which is a very important part of
4 our armamentarium for preventing
5 heart attacks, to be 20-fold
6 better than that, that would be
7 quite remarkable.
8 MR. GOLDMAN: Move to
9 strike, nonresponsive.
10 BY MR. KLINE:
11 Q. Okay.
12 So, your opinion formed in
13 the context of reviewing this Merck data
14 and Merck study in VIGOR, was that the
15 naproxen hypothesis was tenable or
16 untenable?
17 MR. GOLDMAN: Objection,
18 opinion testimony.
19 THE WITNESS: Well, in the
20 manuscript, back in 2001, we tried
21 to present that that's a possible
22 explanation. We actually pointed
23 that out in a couple of points in
24 the paper. But at the end, our

**Page 136**

1 cautionary statement was because
2 we didn't believe that this was an
3 acceptable explanation.
4 BY MR. KLINE:
5 Q. Tell me, Dr. Topol, as you
6 wrote it in JAMA and as you believed it
7 then and today, the significance of 090,
8 the study 090. What was that study?
9 When was it performed? Just tell me what
10 it was and what its significance was to
11 you.
12 MR. GOLDMAN: Objection,
13 opinion testimony.
14 THE WITNESS: To me, that
15 study has been overlooked. It
16 has, in many ways, extraordinary
17 significance in the clinical
18 development of Vioxx. And the
19 reason is is that this study had
20 978 patients. And within the 978
21 patients, they were randomly
22 assigned, they had the typical
23 arthritis, osteoarthritis
24 so-called, they were randomly

**Page 137**

1 assigned to Vioxx, a medicine
2 called nabumetone or known as
3 Relafen, which isn't used very
4 much, or placebo.
5 And so what they had were
6 these three arms tested with only
7 12-and-a-half milligrams of Vioxx.
8 So, it's a very low dose of Vioxx
9 relative to these other trials
10 that we've been discussing.
11 BY MR. KLINE:
12 Q. 090 being a 12.5 milligram,
13 as opposed to VIGOR, which was 50?
14 A. That's right.
15 Q. Okay.
16 A. And what is so striking
17 about this trial is that it has, at the
18 end of six weeks of therapy, a
19 statistically significant 760 percent
20 excess of heart attacks. Now, it's not
21 quite 1,000 patient trial, but certainly
22 that can't be minimized. And the point
23 being is that if you see that trial in
24 replication with the problems with VIGOR,

Page 138

1   you have a very serious problem.
2         But moreover, what is the
3   misleading statements that have been
4   made, is that there have been no trials
5   ever done with Vioxx, before APPROVe,
6   comparing the drug except for naproxen,
7   in which there was a risk. In fact,
8   there was study 090, which compared to
9   placebo or nabumetone, which showed a
10  highly significant excess risk.
11        MR. GOLDMAN: Move to strike
12        nonresponsive opinion testimony.
13  BY MR. KLINE:
14     Q.   Was there a public -- the
15  Merck lawyer keeps objecting as
16  nonresponsive. He just simply doesn't
17  like what he hears.
18        MR. GOLDMAN: Object to the
19        sidebar.
20  BY MR. KLINE:
21     Q.   Was there, as you view this
22  and as you viewed it back then in 2001, a
23  real public health threat out there in
24  the form of the drug Vioxx?

Page 139

1         MR. GOLDMAN: Objection,
2         opinion testimony.
3         THE WITNESS: Yes. When we
4         published our article in August
5         2001, there was an accompanying
6         article in the Wall Street
7         Journal, an A1 article, in which I
8         stated just precisely that, that
9         we're staring a public health -- I
10        don't know if I used the word
11        "disaster," but it was a
12        significant word, that this is a
13        major public health issue, yes.
14  BY MR. KLINE:
15     Q.   Why did you state it in
16  those blunt terms, sir?
17     A.   Because it obviously was a
18  public --
19        MR. GOLDMAN: Objection,
20        opinion testimony.
21        THE WITNESS: Here you have
22        a possible five-fold increase in
23        heart attacks in patients without
24        heart disease; you have a drug

Page 140

1         that's being given to -- tens of
2         millions of prescriptions,
3         millions of people are taking it,
4         and it could be much worse in
5         patients with heart disease; we've
6         got direct-to-consumer advertising
7         unleashed with the most successful
8         launch of prescription medicines
9         in the history of pharmaceutical
10        development; we have a major
11        significant jeopardy, yes.
12  BY MR. KLINE:
13     Q.   And at that point in time --
14        MR. GOLDMAN: Move to strike
15        as nonresponsive.
16  BY MR. KLINE:
17     Q.   At that point in time, all
18  you're asking Merck to do was what?
19     A.   All --
20        MR. GOLDMAN: At what point
21        in time?
22        MR. KLINE: 2001.
23        THE WITNESS: All we
24        wanted --

Page 141

1   BY MR. KLINE:
2      Q.   I'll rephrase the question.
3   As of -- give me the date of your article
4   again. It would be August 22, 2001.
5         As of August 22, 2001, all
6   you were asking Merck to do was what?
7      A.   To do an appropriate trial,
8   to acknowledge that there may be risks,
9   and that didn't occur, but to also do an
10  appropriate trial in patients with heart
11  disease.
12     Q.   You made a big point in your
13  paper about the fact that the trials that
14  were done, I think you already told us,
15  weren't done in patients who were at risk
16  for cardiovascular disease. Correct so
17  far?
18     A.   Yes.
19     Q.   Those would be the real
20  patients you'd have to really worry
21  about; correct?
22        MR. GOLDMAN: Object to the
23        form.
24        THE WITNESS: Exactly. The

Page 142

1     patients with heart disease had
2     been completely excluded from
3     these trials.
4         MR. GOLDMAN: Opinion
5     testimony.
6 BY MR. KLINE:
7     Q.   You needed to study them;
8 correct?
9         MR. GOLDMAN: Object to the
10     form.
11         THE WITNESS: That's
12     correct.
13 BY MR. KLINE:
14     Q.   And you also say in your
15 paper that you needed to do an evaluation
16 of endpoints which were specific.  We
17 have two minutes left on this video
18 before we go to the second video.
19         Tell me why that was so
20 important, to do specific cardiovascular
21 endpoints.  First of all, had that study
22 ever been done by Merck?
23         MR. GOLDMAN: Objection,
24     opinion testimony, lacks

Page 143

1     foundation.
2 BY MR. KLINE:
3     Q.   Had that study ever been
4 done by Merck up until this point?
5         MR. GOLDMAN: Same
6     objection.
7         THE WITNESS: As far as I
8     know, there had not been a
9     trial -- as I reviewed from the
10     Targum report, there had not been
11     a trial with a cardiovascular
12     analysis plan with an external
13     review, adjudication of the
14     events.  No, it had not been done.
15 BY MR. KLINE:
16     Q.   Had anything that is called
17 a prespecified cardiovascular endpoint
18 study, has it ever been done by Merck?
19     A.   It has never been done in my
20 mind to this day.
21     Q.   Did it need to be done?
22         MR. GOLDMAN: Objection,
23     opinion testimony.
24         THE WITNESS: Absolutely.

Page 144

1         And we called for it innumerable
2     times.
3 BY MR. KLINE:
4     Q.   And here's the question.
5 Why?  And why is that different than what
6 we've heard -- we hear from Merck that,
7 well, we studied, and we went back and we
8 looked at the end points.  Why, sir --
9 you can tell us, why?
10         MR. GOLDMAN: Objection to
11     form.
12         THE WITNESS: Well, as I put
13     you to the letter in the New
14     England Journal, which responded
15     to that point.
16 BY MR. KLINE:
17     Q.   Or just tell us, if you can.
18     A.   Yeah.  The main thing is
19 that Merck was saying that they were
20 doing trials to look at cardiovascular
21 endpoints like APPROVe, like VICTOR and a
22 prostate cancer trial.  These were not
23 being done for a cardiovascular endpoint.
24 They were done in patients without heart

Page 145

1 disease.
2         These were trials being done
3 to extend the indications for the drug to
4 new areas, such as prevention of colon
5 polyps or prevention of prostate cancer.
6 They had nothing to do with assuring
7 safety from a cardiovascular standpoint.
8 That could only be done in trials of
9 patients with heart disease.
10     Q.   Any doubt about that, sir?
11         MR. GOLDMAN: Move to strike
12     as nonresponsive.
13         THE WITNESS: There is no
14     doubt whatsoever about that
15     statement.
16         MR. GOLDMAN: Objection,
17     opinion testimony.
18 BY MR. KLINE:
19     Q.   Did they do what they should
20 have done here?
21         MR. GOLDMAN: Objection,
22     opinion testimony.
23         THE WITNESS: They did not
24     do what was needed to be done,

37  (Pages 142 to 145)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 146

1  which we called for in our JAMA
2  paper.
3       MR. KLINE: Okay.
4       We'll move to the next
5  videotape, and we will take a
6  two-minute break to do it.
7       THE VIDEOTAPE TECHNICIAN:
8  Off the record, 11:05.
9       - - -
10      (Whereupon, a recess was
11  taken from 11:05 a.m. until
12  11:17 a.m.)
13      - - -
14      THE VIDEOTAPE TECHNICIAN:
15  Back on the record, 11:17 a.m.
16  Tape Number 2.
17 BY MR. KLINE:
18      Q.  Dr. Topol, in the believe it
19 or not category, I want to pick up speed.
20 I want to try to go through a lot of
21 things that you've said and done, and
22 we're using time up quickly.
23      You mentioned -- first of
24 all, what you've told us so far are the

Page 147

1  various conclusions that you reached,
2  those which you formed during the process
3  of gathering information, learning about
4  this drug and researching this matter.
5       MR. GOLDMAN: Object to the
6  form.
7       THE WITNESS: Yes.
8  BY MR. KLINE:
9       Q.  Okay.
10      Now, let me go.
11      After your study came out in
12 JAMA, did it raise a public health
13 concern in the lay press?
14      MR. GOLDMAN: Object to the
15 form.
16      THE WITNESS: I believe
17  there was a concern that was
18  brought out by the paper and then
19  many subsequent studies as well.
20      MR. GOLDMAN: Move to
21  strike, nonresponsive.
22 BY MR. KLINE:
23      Q.  Okay.
24      First of all, in The Wall

Page 148

1  Street Journal there's a quotation
2  attributed to you.  You said, "Either
3  they are moving at glacial speed,"
4  referring to Merck or, "they are waiting
5  to see what the fallout will be from this
6  and other reports.  We're staring at a
7  major public health issue."
8       A.  Yes.
9       Q.  Is that a quote that could
10 be attributed to you?
11      MR. GOLDMAN: Object to
12  form, opinion testimony.
13      THE WITNESS: That certainly
14  was, and that was the one I was
15  referring to a little earlier
16  about this public health concern,
17  yes.
18 BY MR. KLINE:
19      Q.  It says that "Merck sought
20 to downplay the cardiac issue."  Is that
21 true?
22      A.  That's what the reporter
23 said.
24      MR. GOLDMAN: Object to the

Page 149

1  form.
2       THE WITNESS: But I do
3  believe that's true, because that
4  was, I think, the ulterior purpose
5  of the visit in April.
6  BY MR. KLINE:
7       Q.  Apparently at some point,
8  Merck, according to the published report
9  here says, that they asked Dr. DeAngelis
10 at JAMA -- who is he?
11      A.  It's a woman.
12      Q.  I'm sorry, I apologize.
13      A.  Cathy DeAngelis, and she's
14 the editor-in-chief of JAMA.
15      Q.  And that they wanted to have
16 a rebuttal right to your article when it
17 was published?
18      MR. GOLDMAN: Object to the
19  form.
20      THE WITNESS: Yeah, this was
21  quite extraordinary.  I had not
22  heard of something like this
23  before.  This was because we had
24  been, I think, decent and

38 (Pages 146 to 149)

Page 150

1    collegial to let Merck know about
2    the paper, now they wanted to
3    publish their own paper at the
4    same time and an editorial as a
5    simultaneous publication in JAMA.
6    BY MR. KLINE:
7        Q.   Why was --
8            MR. GOLDMAN: Move to
9    strike, nonresponsive.
10   BY MR. KLINE:
11       Q.   -- as you saw it, the
12   incremental risk of increased risk of
13   heart attacks and strokes so important,
14   and how did it relate to the numbers of
15   people who were taking it?
16           MR. GOLDMAN: Object to the
17   form, opinion testimony.
18           THE WITNESS: Well, if one
19   thinks about the risk here, if
20   it's -- if we use the APPROVe data
21   in colon cancer patients without
22   heart disease, it's 16 per
23   thousand patients, and you can
24   just do the math about -- if you

Page 151

1    have millions of people, 16 per
2    thousand having a heart attack,
3    that's an extraordinary risk for
4    the population.
5            MR. GOLDMAN: Move to strike
6    as nonresponsive.
7    BY MR. KLINE:
8        Q.   Okay.
9            Merck took after you, sir?
10           MR. GOLDMAN: Object to the
11   form, leading.
12           THE WITNESS: The problems
13   that occurred after August 22nd,
14   2001 were quite profound in many
15   respects.  So, not only did they
16   have consultants that they
17   communicated to the media, like
18   Dr. Konstam and Dr. FitzGerald,
19   accusing us of having tortured the
20   data and manipulated the data, but
21   they also sent out an overnight
22   mail to every healthcare provider
23   in the country that was commented
24   on -- Dr. Sherwood, he was the

Page 152

1    doctor who sent it, and it was in
2    the JAMA letter correspondence
3    about our article, that one of the
4    doctors was complaining, having
5    received this overnight with the
6    five-page taking on the
7    Mukherjee/JAMA paper, and so it
8    certainly unleashed a very robust
9    response from Merck and its
10   consultants.
11           MR. GOLDMAN: Objection,
12   move to strike as nonresponsive.
13   BY MR. KLINE:
14       Q.   Did you ever hear of them
15   refer to Dr. Sherwood as the enforcer?
16       A.   I hadn't heard that, but he
17   certainly --
18           MR. GOLDMAN: Object to the
19   form --
20           THE WITNESS: -- was the
21   person --
22           MR. GOLDMAN: -- lack of
23   foundation.
24           THE WITNESS: -- whose

Page 153

1    signature is attached to the
2    letter that went out to, I don't
3    know how many, apparently tens of
4    thousands of doctors following our
5    article.
6    BY MR. KLINE:
7        Q.   Okay.
8            Did you believe the attacks
9    were ad hominem?
10           MR. GOLDMAN: Object to
11   form, lacks foundation --
12           THE WITNESS: I don't
13   believe --
14           MR. GOLDMAN: -- opinion
15   testimony.
16           THE WITNESS: -- that they
17   were directed personally.  I don't
18   think that Merck wanted to accept
19   that there was a cardiovascular
20   risk.  They also said there was no
21   need to do any trial because there
22   was no cardiovascular risk.
23           That, to us, was
24   unthinkable, but I don't believe

Page 154

1    it was a personal directed --
2    anyone who wrote the paper would
3    have probably had the same type of
4    response, I imagine.
5        MR. GOLDMAN: Move to strike
6    as nonresponsive.
7    BY MR. KLINE:
8        Q.   Did you keep your scientific
9    focus, sir?
10       A.   Without any question, we
11   stayed on point regarding the need to
12   press on the clinical science and the
13   research.
14       Q.   In a reply to a series of
15   letters written by folks associated with
16   Merck, did you say, "Since publication of
17   our meta-analysis" -- was your study a
18   meta-analysis?
19       MR. GOLDMAN: Object to
20   form.
21       THE WITNESS: Well, it's one
22   form of meta-analysis. That's a
23   term that's very loose. Any time
24   you're pooling data and looking at

Page 155

1    multiple trials, you can term it a
2    meta-analysis. But yes, that was
3    basically the best we could do
4    with the data that were available
5    at that time.
6    BY MR. KLINE:
7        Q.   You said, "Several basic
8    research studies have supported the
9    potential thrombotic effect of COX-2
10   inhibitors," and you cited various
11   studies; correct?
12       MR. GOLDMAN: Object to the
13   form, lacks foundation, opinion
14   testimony.
15       THE WITNESS: Yes.
16   BY MR. KLINE:
17       Q.   And you were speaking there
18   not only of COX-2s generally, but a
19   thinking of -- were you thinking of Vioxx
20   in particular, sir?
21       MR. GOLDMAN: Same
22   objection.
23       THE WITNESS: Vioxx appeared
24   in the continuum to be the one

Page 156

1    associated with the highest risk
2    as an outlier.
3        MR. GOLDMAN: Same objection
4    as before.
5        THE WITNESS: But it
6    certainly, as we raised in the
7    JAMA paper, could have easily been
8    ascribed as a concern with
9    Celebrex as well.
10   BY MR. KLINE:
11       Q.   Now, there was a label --
12       MR. GOLDMAN: Objection,
13   move to strike as nonresponsive.
14   BY MR. KLINE:
15       Q.   -- on Vioxx at the time;
16   correct?
17       A.   Yes, there was a package
18   insert, yes, and a label.
19       Q.   Right.
20       And the label which would be
21   in the PDR as well as in the package
22   insert, did it in any way warn of the
23   cardiovascular risks which were, as I
24   think your testimony could be fairly

Page 157

1    described, obvious to you?
2        MR. GOLDMAN: Objection to
3    the opinion testimony.
4        MR. HAMELINE: Again, if you
5    need to look at the document, let
6    us know. If you have memorized
7    it...
8    BY MR. KLINE:
9        Q.   You know generally the
10   label?
11       MR. GOLDMAN: Object to
12   form.
13       THE WITNESS: Yeah, I'm
14   familiar with the two different --
15   the initial and then the April
16   2002, I'm familiar with them. At
17   least I couldn't recite it, but
18   I've reviewed them in the past.
19       The initial label, package
20   insert, did not mention any
21   cardiovascular risk. And only in
22   April 2002, which is considerably
23   long after the FDA panel requested
24   that there be a label change, was

Page 158

1     there an insertion about the risk
2     and some of the data, but it is
3     certainly not prominently featured
4     in the new label. It's actually
5     in a very small print and, in my
6     mind, not adequately highlighting
7     the risk for patients and for the
8     medical community.
9         MR. GOLDMAN: Objection,
10    move to strike, nonresponsive
11    opinion testimony.
12 BY MR. KLINE:
13    Q. So, in your opinion, the
14   label, as you now understood the data as
15   it pertained to the '99 label when you
16   learned about this in 2001 and as you
17   understand it today based on the '99 and
18   2002 labels --
19    A. Yes.
20    Q. -- those labels, did they
21   provide adequate warnings and information
22   relating to the real risk of patients
23   taking Vioxx?
24         MR. GOLDMAN: Objection,

Page 159

1    opinion testimony.
2         MR. HAMELINE: Wait for his
3   objections.
4         THE WITNESS: I'm sorry.
5         MR. KLINE: Yes. For those
6   who hear the constant stream of
7   talking, it's Merck's lawyer
8   objecting the entire deposition.
9         MR. GOLDMAN: Mr. Kline, I'm
10  whispering, as the court reporter
11  can confirm. I'm intentionally
12  whispering into the microphone so
13  she can hear me. I'm not trying
14  to interrupt the deposition at
15  all. You're asking him for clear
16  opinion testimony, and that's my
17  objection.
18         MR. KLINE: I don't know why
19  we can't simply agree that you
20  have a standing objection to form
21  and opinion, and I'm willing to do
22  it.
23         MR. GOLDMAN: And I told you
24  before, sir, that's not --

Page 160

1         MR. KLINE: Let's go off the
2   record. I don't want to take any
3   time on this.
4         THE VIDEOTAPE TECHNICIAN:
5   Off the record, 11:25.
6       - - -
7     (A discussion off the record
8   occurred.)
9       - - -
10        MR. KLINE: I, again, invite
11  counsel to make any objection to
12  form or opinion testimony, which I
13  believe 90 percent of them are,
14  and now I can't even hear the
15  objections because they're just
16  being whispered, so, I don't have
17  a chance to correct anything that
18  might be to the form because I
19  haven't heard the ones that are
20  being whispered.
21     I invite them to give Mrs.
22  Golkow at the end of the
23  deposition all of the bases of the
24  objections so I don't have to hear

Page 161

1   them. They object to everything
2   Merck says. It's as clear as it
3   can be. Or everything that Dr.
4   Topol says. Let's go back.
5         MR. GOLDMAN: Mr. Kline, to
6   be clear, I'm saying the
7   objections loud enough for you to
8   hear and if for some reason if you
9   want me to say them louder, I'm
10  happy to do that.
11        MR. KLINE: Yes.
12        MR. GOLDMAN: But don't say
13  later on that you did not hear my
14  objections.
15        MR. KLINE: What you want to
16  do -- what you clearly want to do,
17  and I didn't want to get to this
18  point today, Andy, but what you
19  clearly want to do is object to
20  every single question. I don't
21  understand how it's not preserved
22  if I say to you I agree on behalf
23  of all of the parties taking the
24  deposition in this case, the

Page 162

1    thousands of people who have sued
2    Merck in this litigation in the
3    MDL, that I will agree that for
4    that purpose you can go back and
5    fill it in. I'm sure if we call
6    Judge Fallon, which I don't want
7    to do, that's what he would say.
8    It's as clear as can be. You have
9    the objection.
10        MR. STEIN: I make that
11   agreement for the people in
12   California, the state cases in
13   California that I represent. You
14   can have a standing objection.
15        MR. GOLDMAN: Are there any
16   other cross notices in this
17   deposition?
18        MR. KLINE: No.
19        MR. GOLDMAN: Well, with all
20   due respect, I don't know how the
21   judge is going to rule on that
22   later, and I can't just preserve
23   my objection, Mr. Kline. I will
24   do my best to do it in a

Page 163

1    non-disruptive way. I've tried to
2    do that.
3        I don't want to hear later
4    that you couldn't hear my
5    objections, because that's not
6    true.
7        MR. KLINE: I couldn't.
8        MR. GOLDMAN: And if Dr.
9    Topol just gives me a second to
10   make the objection, then we
11   wouldn't have the problem.
12        MR. KLINE: But then we're
13   still going to end up with a
14   transcript that is this and that.
15   But you know what, some day we'll
16   play it, and I'll ask for an
17   instruction from the judge that
18   this is what Merck was doing
19   during the deposition because they
20   didn't want to hear what Dr. Topol
21   said.
22        Let's go.
23        THE COURT REPORTER: I just
24   have one quick question or

Page 164

1    suggestion. Can you just say
2    objection, period? Do you have to
3    state the basis each time?
4        MR. KLINE: I asked that,
5    too.
6        MR. GOLDMAN: You want to me
7    to say objection period, and then
8    later I can go in and put in what
9    the objection is?
10        MR. KLINE: Yes. If it is
11   to form or opinion, you can go
12   back in and Linda can fill it in.
13        MR. GOLDMAN: Fine. I will
14   do that. That is fair.
15        Just for the record, I will
16   object just by saying "objection,"
17   and after the deposition I will
18   contact Linda and tell her what
19   the basis for that objection is.
20        MR. KLINE: You have to say
21   any other objection out loud. If
22   it is form or opinion, which 99
23   percent of this is, I'm fine. If
24   it's something else, you've got to

Page 165

1    let me know.
2        MR. GOLDMAN: Like what?
3        MR. KLINE: I don't know.
4        MR. GOLDMAN: What objection
5    would you like me to make now?
6        MR. HAMELINE: Foundation is
7    the only other objection you've
8    been making, so, let's keep that
9    in the three.
10        MR. KLINE: We'll keep that
11   in the three. Foundation is in
12   the three.
13        If there's anything other
14   than those three, state it.
15        MR. GOLDMAN: Sounds good.
16        MR. KLINE: Let's go.
17        THE VIDEOTAPE TECHNICIAN:
18   Back on the record at 11:30.
19        MR. KLINE: Okay.
20        We're back on the record;
21   correct?
22        THE COURT REPORTER: Yes.
23   BY MR. KLINE:
24        Q.   We have the warning labels,

Page 166

1   and I ask you about them and there were
2   objections and I'm not sure what came
3   through or not, so, I'm going to do it
4   again to be sure.
5        The warnings on this drug,
6   were there adequate warnings on this
7   drug, sir, in the '99 and 2002 labels?
8        MR. GOLDMAN: Objection.
9   BY MR. KLINE:
10       Q.   As to cardiovascular risks?
11       THE WITNESS: In my opinion,
12       both the original label and then
13       the revision in April 2002 did not
14       show adequate safety concerns
15       about heart attacks, strokes and
16       death that could occur from the
17       medicine. So, it wasn't present
18       at all in the first iteration in
19       1999, and it certainly was not
20       adequately flagged in the 2002
21       revision.
22       MR. GOLDMAN: Move to
23       strike, nonresponsive.
24   BY MR. KLINE:

Page 167

1        Q.   You, sir, online at the
2   Cleveland Clinic Heart Center, you
3   apparently have online for your patients;
4   correct? There's an online service
5   called Cleveland Clinic Heart Center, and
6   there was something in the winter '01 was
7   actually posted on the website, what I
8   see, "Raising a Cautionary Flag About
9   COX-2 Use in High-Risk Heart Patients."
10       A.   Yes.
11       Q.   Do you see that, sir?
12       A.   Yes, I do.
13       Q.   I've marked it as an
14   exhibit. I'll get you a copy, counsel
15   for Merck. We'll mark it as the next
16   exhibit number.
17            - - -
18            (Whereupon, Deposition
19       Exhibit Topol-10, "Raising a
20       Cautionary Flag about COX-2 Use
21       in High-Risk Heart Patients,"
22       Cleveland Clinic Heart Center (2
23       pages), was marked for
24       identification.)

Page 168

1            - - -
2   BY MR. KLINE:
3        Q.   And I'm going to ask you to
4   identify it.
5        A.   Yes. This is from the
6   Cleveland Clinic Heart Center website.
7        Q.   Right.
8        Having said what you've just
9   told us, that there weren't adequate
10  warnings on the drug, were you at least
11  going to tell your patients certain
12  things about the drug?
13       MR. GOLDMAN: Objection.
14       THE WITNESS: Yes.
15  BY MR. KLINE:
16       Q.   As you understood it?
17       MR. GOLDMAN: Objection.
18       THE WITNESS: Well, this
19       could be for patients or it could
20       be for physicians, anyone who
21       comes to the website. It's a
22       public access website. So, it was
23       anyone who wanted to go to the
24       Cleveland Clinic Heart Center

Page 169

1        website would see our take and our
2        further recommendations from the
3        recent JAMA paper.
4   BY MR. KLINE:
5        Q.   Is the information that's
6   contained here, including, "Both
7   researchers call for prudent use of COX-2
8   inhibitors among coronary patients until
9   the potential risk can be fully addressed
10  in prospective randomized multicenter
11  trials," was that your advice to anyone
12  who came to the website to read it?
13       MR. GOLDMAN: Objection.
14       THE WITNESS: Yes.
15  BY MR. KLINE:
16       Q.   Was that being told to
17  people by Merck in their label?
18       A.   No.
19       MR. GOLDMAN: Objection.
20  BY MR. KLINE:
21       Q.   "We'd like to see a study of
22  patients at the highest cardiovascular
23  risks in which they get either a
24  combination of one of the coxibs and

43 (Pages 166 to 169)

Page 170

1  aspirin or aspirin alone, says Dr.
2  Topol."
3       Is that a statement that's
4  yours and fairly attributed to you?
5       MR. GOLDMAN: Objection.
6       THE WITNESS: Yes, it is.
7  BY MR. KLINE:
8    Q.  "We think the aspirin and
9  coxib combination would provide
10 anti-platelet protection, and it may be
11 even more protective than aspirin alone.
12 But it could be worse, and that's what we
13 need to find out."  That's what you were
14 telling people posted on the website of
15 the Cleveland Clinic?
16      MR. GOLDMAN: Objection.
17      THE WITNESS: That's
18      correct.
19 BY MR. KLINE:
20   Q.  Dr. Nissen, your colleague,
21 added, "It wouldn't be a hard trial to
22 do."  We can get "a study of 6,000
23 patients, and reach enrollment goals in
24 as little as six months."

Page 171

1       Did Merck do that study?
2    A.  No.  That trial was not
3  done.
4    Q.  Should it have been done?
5       MR. GOLDMAN: Objection.
6       THE WITNESS: Any trial
7       would have been helpful, but no
8       trial was done.
9  BY MR. KLINE:
10   Q.  Did you have to take it upon
11 yourself to warn patients yourself
12 without the adequate warnings that were
13 being given by Merck, sir?
14      MR. GOLDMAN: Objection.
15      THE WITNESS: The website
16      was one way in which we put our
17      concerns out there beyond what was
18      published in the medical
19      literature.
20 BY MR. KLINE:
21   Q.  I'd like to move in the
22 period from -- move forward into the year
23 2002/2003/2004.
24      You wrote an editorial which

Page 172

1  was published in the Archives of Internal
2  Medicine, December of '02, and apparently
3  there were three or so articles that were
4  funded by Merck -- I think you'll put
5  this in context -- that were funded by
6  Merck which were attempting to show the
7  cardioprotective effects of naproxen.
8       If I've stated that wrong,
9  I'm just trying to get through a lot with
10 one simple concept.  Is that what was
11 going on and what you were responding to?
12      MR. GOLDMAN: Objection.
13      THE WITNESS: I'm not sure
14      what you're referring to.  Is it
15      one of the publications that I've
16      written?
17 BY MR. KLINE:
18   Q.  Let me withdraw this and
19 I'll go back.
20      I'm looking for a document,
21 which I'll show you, which was December
22 of '02, "Lack of Cardioprotective Effect
23 of Naproxen," written by you.
24   A.  Okay.  Yes, yes.

Page 173

1    Q.  (Handing over document.)
2       Put it in context.  Now I
3  won't get an objection to the question if
4  I just say put this in context, sir.
5    A.  Yes.
6       (Witness reviewing
7       document.)
8       MR. KLINE: I've marked it
9       as Exhibit Number 11.
10      - - -
11      (Whereupon, Deposition
12      Exhibit Topol-11, "Lack of
13      Cardioprotective Effect of
14      Naproxen," Arch Intern Med/Vol
15      162, Dec 9/23, 2002 2637, was
16      marked for identification.)
17      - - -
18 BY MR. KLINE:
19   Q.  It says, "In summary, there
20 remains currently no definitive evidence
21 that naproxen has a cardioprotective
22 effect."  What were you responding to
23 there?
24   A.  So, there were three studies

Page 174

1  in the archives that were published and
2  an editorial.  We were responding to
3  that, that still there was no adequate
4  data to show that naproxen has any
5  cardioprotective effect, and that still
6  remains the case today.
7        MR. GOLDMAN:  Objection.
8  BY MR. KLINE:
9        Q.   Sir, in the VIGOR study --
10       MR. GOLDMAN:  Move to
11  strike.
12 BY MR. KLINE:
13       Q.   One thing I have not -- I
14 haven't testified to --
15       MR. KLINE:  Mr. Goldman, if
16 you would just state your --
17       MR. GOLDMAN:  Objection.
18 Move to strike as nonresponsive.
19       MR. KLINE:  Say it out loud
20 anymore, because that way I can
21 hear it.  No sense hiding it.
22       MR. GOLDMAN:  I'm not hiding
23 it, Mr. Kline.  I really don't
24 want you to argue to the judge

Page 175

1  that you couldn't hear my
2  objections.  Okay?
3        MR. KLINE:  I'm not going to
4  argue that up until this point,
5  but now I want to hear it, because
6  I want to know what's said at this
7  point.
8        What I find disruptive,
9  honestly, is the talking, the
10 whispering.  I just find it
11 disruptive.  I'm not -- I'm just
12 saying it is.
13 BY MR. KLINE:
14       Q.   Now, let's move -- I lost my
15 train of thought, so bear with me.
16       We were talking about
17 naproxen and this whole thing, its
18 cardioprotective effect.  In VIGOR, Merck
19 had made the point, as you well know,
20 that they had no long-term randomized
21 clinical trial to show that naproxen was
22 cardioprotective.  We've covered that
23 point; correct?
24       MR. GOLDMAN:  Objection.

Page 176

1        THE WITNESS:  Yes, yes.
2  BY MR. KLINE:
3        Q.   I'm just putting it in
4  context.
5        A.   No.  There are no data to
6  support in any definitive fashion or
7  meaningful way that naproxen has a
8  cardioprotective effect.
9        Q.   And what they did in the
10 VIGOR paper was they went to comparing it
11 to a flurbiprofen article which was done
12 in some post-CABG patients, I believe, if
13 you recall.  How did you view that?
14       A.   Well, there were several
15 things that were done to try to make a
16 case for a cardioprotective effect.
17       MR. GOLDMAN:  Objection.
18 BY MR. KLINE:
19       Q.   Tell me what things Merck
20 tried to do to make a case for
21 cardioprotective effect of naproxen.
22       MR. GOLDMAN:  Objection.
23       THE WITNESS:  Quoting the
24 platelet biology effects of

Page 177

1  naproxen compared with other
2  nonsteroidal anti-inflammatory
3  drugs, other comparisons, but
4  these were not randomized trials
5  with clinical cardiovascular
6  endpoints.  So, there's no way to
7  ascertain whether there's any
8  cardioprotective effect with
9  naproxen.
10 BY MR. KLINE:
11       Q.   And, therefore, when you
12 were writing here that "lack of
13 cardioprotective effect of naproxen,"
14 were you saying that there was definitely
15 no at all cardioprotective effect, or
16 were you saying that a cardioprotective
17 effect of naproxen could not explain the
18 results in VIGOR?
19       MR. GOLDMAN:  Objection.
20 BY MR. KLINE:
21       Q.   Or something else?
22       MR. GOLDMAN:  Objection.
23       THE WITNESS:  No.  It was
24 the latter.  That if there was a

45 (Pages 174 to 177)