Page 178

cardioprotective effect, it was modest at best, and it could not explain the five-fold increase in heart attacks in the VIGOR trial.

BY MR. KLINE:

Q. Okay.

Now came the year 2003. What was roughly going on?

A. Well --

MR. GOLDMAN: Objection. I'm sorry, Dr. Topol. Objection.

THE WITNESS: By 2003, now we had several of these so-called epidemiologic or observational studies. These were case-control studies, multiple studies in large populations published in various journals. And in these studies, there were, by 2003, I think probably five of them, four of which showed very concerning evidence of -- confirming our initial paper in JAMA, but not in a randomized trial like VIGOR,

Page 179

but, rather, in these population studies, twofold or greater risk of Vioxx compared with other agents to be used for arthritis.

MR. GOLDMAN: Objection, move to strike as nonresponsive.

BY MR. KLINE:

Q. And by the fall of that year, actually, you have a paper that was received September '02; revisions, October '03; accepted '04 and published October 28, '02, so, it's late '02.

You actually wrote an article which said, "Where are we in 2003?" You actually -- it was an October 2002 publication that's projecting forward to 2003; correct?

MR. GOLDMAN: Objection.

THE WITNESS: Right.

BY MR. KLINE:

Q. Correct?

A. Right.

Q. So, if it would really be technically described, it would be, where

Page 180

are we as of October 28, 2002?

A. That's correct.

Q. You already had New Year's planned for apparently; correct?

A. That's correct.

Q. And I want to look at that article with you so that you can tell the members of the jury where you saw this Vioxx situation as of that time.

A. Yes.

Q. And by the way, while we're getting the paper out and marked, we're marking it as the next exhibit number, which is Number 12, were you still concerned?

MR. GOLDMAN: Objection.

THE WITNESS: Our concern never went away, so, yes, just as in 2001 -- it actually got reinforced over time because of the other studies that I mentioned.

BY MR. KLINE:

Q. Now, what you --

Page 181

\- - -

(Whereupon, Deposition Exhibit Topol-12, "Cyclooxygenase-2: Where are we in 2003? Cardiovascular risk and COX-2 inhibitors," (Mukherjee et al), Arthritis Research and Therapy 2003, Vol. 5, 8-11, was marked for identification.)

\- - -

MR. GOLDMAN: Mr. Kline, I didn't get a chance to insert my objection because the document was being handed to me. So, objection to the last question.

BY MR. KLINE:

Q. What you we stated here is in the second paragraph, "Given the results of several large clinical trials of COX-2 inhibitors, it is clear that theoretical concern for a prothrombotic effect is now transformed to a clinical reality."

A. Yes.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 182

MR. GOLDMAN: Where are you?
BY MR. KLINE:
Q. We are under "Conclusions," in the first sentence of the second paragraph saying, "Given the results of several large clinical trials of COX-2 inhibitors, it is clear that the theoretical concern for a prothrombotic effect is now transformed to a clinical reality."
Indeed it was; correct?
MR. GOLDMAN: Objection.
THE WITNESS: There is no question that we, at this point -- we had had adequate replication through multiple studies, and so this is a reality, yes.
BY MR. KLINE:
Q. You said, "The apparent hazard does not appear to be large and, in absolute terms, may be a fraction of 1 percent excess and may be confined to patients with an as yet undefined, specific genetic susceptibility. With

Page 183

such an exceptionally large patient population at risk, however, it is imperative to determine the precise extent of the risk and the methods to avoid risk."
That's what you were after; is that correct?
MR. GOLDMAN: Objection.
THE WITNESS: Yeah, we -- this is exactly the theme for multiple years. In fact, we were underestimating the risk of less than 1 percent. It turned out, of course, it was more than 1 percent, but this is what -- we were trying to come up with the best way to process the data as of that point in time.
MR. GOLDMAN: Objection, move to strike as nonresponsive.
BY MR. KLINE:
Q. You then wrote, "The importance of the public health issue cannot be overstated. The class of

Page 184

drugs...yet to be assessed in a single trial of patients with known atherosclerotic disease, who stand to be at the highest risk of adverse events."
Is that the nub of the problem?
MR. GOLDMAN: Objection.
THE WITNESS: That's a big --
MR. GOLDMAN: Dr. Topol, just give me one minute. Objection.
BY MR. KLINE:
Q. Please, sir.
A. I'm sorry.
That's a big part of it, because it already is a significant risk in people without heart disease. What's going to happen if you have heart disease? So, all the problems that have been registered and replicated are potentially magnified in a higher risk population.
Q. Now, you became interested

Page 185

in something that I'm going to get into in the next article and wrote on in the medical literature, which is that you state here, "Ironically, the manufacturers of the first generation COX-2 inhibitors" -- that includes Merck; correct?
MR. GOLDMAN: Are you looking at a particular document?
MR. KLINE: I'm looking at the last sentence on the bottom of the first column of page -- of the last page of the exhibit.
BY MR. KLINE:
Q. "Ironically, the manufacturers of the first generation COX-2 inhibitors spent over $265 million in 2001 for direct-to-consumer advertising to promote their drugs, but have failed to conduct a prospective trial of COX-2 inhibitors in patients with cardiovascular disease." We have not -- "We will not have advanced in any meaningful way in 2003 unless such a

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 186

trial is undertaken."

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Couple of questions.

Are those words that you wrote?

MR. GOLDMAN: Objection.

THE WITNESS: They're absolutely words that I wrote, yes.

BY MR. KLINE:

Q. And did you take the time to actually look and find out what the manufacturers, including Merck, were spending advertising the drug?

MR. GOLDMAN: Objection, lacks foundation.

THE WITNESS: Yes, we did research the data for how much the direct-to-consumer advertising was costing for both Celebrex and Vioxx.

BY MR. KLINE:

Q. And were you asking for the

Page 187

same thing, for Merck to do a cardiovascular endpoint study?

A. Yes, we were.

Q. And was it done?

A. No, it was not.

Q. And should it have been done?

MR. GOLDMAN: Objection.

THE WITNESS: Absolutely it should have been done.

BY MR. KLINE:

Q. Now, I want -- you actually wrote later an article called, "Pharmaceutical advertising versus research spending: Are profits more important than patients?" Did you write that?

A. Yes.

Q. Were you becoming increasingly more frustrated, Dr. Topol?

MR. GOLDMAN: Objection.

- - -

(Whereupon, Deposition Exhibit Topol-13, "Pharmaceutical

Page 188

advertising versus research spending: Are profits more important than patients? (Mukherjee et al) American Heart Journal, October 2003, 563-564, was marked for identification.)

- - -

BY MR. KLINE:

Q. Exhibit 13.

A. The frustration level was clearly rising over time, yes.

Q. And in this particular editorial, which you published -- where did you publish it, sir?

A. American Heart Journal.

Q. American Heart Journal.

Is that a major journal, peer-reviewed journal?

A. It's one of the four leading heart journals in the United States.

Q. You state here, sir, "We would like to call on the leaders" -- I'm in the last paragraph of the article.

"We would like to call on

Page 189

the leaders of the medical community to voice their concern regarding the adverse effects of direct-to-consumer advertising, whose sole aim is to sell drugs without other considerations."

Did you write that?

MR. GOLDMAN: Objection, and lacks --

THE WITNESS: Yes, sir, I did write that.

BY MR. KLINE:

Q. Were you thinking of Vioxx and Merck when you stated that?

MR. GOLDMAN: Objection.

THE WITNESS: There isn't any question. In fact, in the figure of that article, we showed how Vioxx had $160 million of advertising in the year compared to Budweiser, 140 odd and Pepsi, 125 million, and Nike, 70 million.

So, in fact, Vioxx exceeded all these consumer products in that very year that we looked at.

Page 190

MR. GOLDMAN: Objection, move to strike as nonresponsive.

BY MR. KLINE:

Q. You're referring to Figure 1, which will be displayed, where you compare the amount of money that was being spent by Vioxx -- by Merck to do this.

You're an academic cardiologist. Let me understand this. What takes you to the -- what takes you to analyze something like this? Why are you doing it and why are you saying this to your colleagues?

A. Well --

MR. GOLDMAN: Objection.

THE WITNESS: -- there's many reasons. Firstly, our patients come in, my patients come and see me and they say, Doctor, I saw the commercial on the Vioxx or the Celebrex, I would like that medicine. That looks like a good medicine.

Page 191

Or I watch television sometimes, and I might see the advertisement and say, that's concerning, because here we have registered our concerns about heart attack risk, and there's nothing on television to transmit that.

And beyond all those, it's the idea that we are responsible for public health. I mean, that's what medical research is about, is to improve public health, and here we're trying to prevent heart attacks and we've got this countercurrent, this stream of marked promotion, aggressive promotion of a medicine with an unsure safety profile.

In fact, we've moved -- migrated from unsure to pretty darn sure that it's unsafe, at least in some patients. So, that is a recipe for trouble.

Page 192

BY MR. KLINE:

Q. Were you, sir --

MR. GOLDMAN: Objection, move to strike as nonresponsive.

BY MR. KLINE:

Q. Were you, sir, back here, sitting here in the position as the chairman of the department of cardiovascular medicine of the Cleveland Clinic and the Provost of the Cleveland Clinic and the chief academic officer here, were you here saying to yourself or worried that direct-to-consumer advertising was having an effect on the health and safety of patients when they were taking the drug Vioxx?

MR. GOLDMAN: Objection.

THE WITNESS: Yes. That back in '97 was when the laws were changed to allow for direct-to-consumer advertising, and so essentially the COX-2 era, the COX-2 inhibitor era, these new medicines, Celebrex and Vioxx,

Page 193

were really the first medicines launched in the direct-to-consumer advertising new era.

And the concern there is how many millions of people could rapidly take a medicine without an adequately established safety profile.

BY MR. KLINE:

Q. You said here, "Editors of major cardiology journals." That at one time was you; correct? Have you been an editor of a major cardiology journal?

A. Not one of the top journals.

Q. I see.

So, you were saying, "Editors of major cardiology journals also need to be more cognizant of the effects of publishing biased literature, since this may significantly influence the prescribing habits of practicing physicians."

Did you make that statement?

MR. GOLDMAN: Objection.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 194

THE WITNESS: Yes.
MR. GOLDMAN: Objection.
BY MR. KLINE:
Q. Was the literature published, in particular, the Vioxx VIGOR trial as published by Merck, biased literature?
MR. GOLDMAN: Objection.
THE WITNESS: I believe there was considerable biased literature that was published with authors either for Merck or consultants of Merck.
BY MR. KLINE:
Q. Finally moving ahead, there is a comment that you had in the Lancet. Lancet is a British journal?
A. Yes.
Q. And of the highest caliber; correct?
A. Yes. It's one of the top three medical journals, the New England Journal, JAMA and the Lancet, yes.
Q. Those are the three?

Page 195

A. Yes.
Q. And you wrote an article called, "A coxib a day won't keep the doctor away"?
A. Yes.
MR. KLINE: I marked it as Exhibit Number 14.
\- - -
(Whereupon, Deposition Exhibit Topol-14, "A coxib a day won't keep the doctor away," (Topol, et al), The Lancet Vol 364, August 21, 2004, 639-640, was marked for identification.)
\- - -
THE WITNESS: Yes.
BY MR. KLINE:
Q. I want to look on Page 2. There's a lot here, but I want to particularly talk about Page 2, all the way at the bottom of the column, after footnote 18 where you reach a conclusion. And you say, "The continued commercial availability of rofecoxib, without a

Page 196

black-box warning for cardiovascular patients is indeed troubling. The coxib debate will not go away until safety and efficacy questions are answered; if only a small fraction of the direct-to-consumer advertising costs or revenue were appropriately channeled for clinical trials, we might be able to have an enhanced perspective and make sound recommendations for our patients."
MR. GOLDMAN: Objection.
BY MR. KLINE:
Q. Did you write that?
MR. GOLDMAN: Objection.
THE WITNESS: Yes, absolutely I wrote that. I wrote that with Dr. Gary Falk, who is here as a colleague at Cleveland Clinic.
BY MR. KLINE:
Q. Okay.
Sir, when you did that, were you talking about Merck and their conduct in particular on the drug Vioxx?

Page 197

MR. GOLDMAN: Objection.
THE WITNESS: Yes.
BY MR. KLINE:
Q. And you did believe at that time that the drug needed a black box warning; correct?
MR. GOLDMAN: Objection.
THE WITNESS: Yes. We're now in August of 2004 publishing this.
BY MR. KLINE:
Q. Yes, sir.
A. And the extraordinary amount of evidence, not just from VIGOR, but from various other trials and studies, was really quite excessive in my opinion, and that's why the black box warning was long overdue in August 2004.
Q. Do you have a sense of when it was due by?
MR. GOLDMAN: Objection.
THE WITNESS: It could have easily been imposed as of February 2001, or if we go back to the Juni

Page 198

analysis in the Lancet, also published in the Lancet, it could have been back in year 2000. So, somewhere between 2000 and 2001 there was more than adequate confirmation.

Essentially all you need is VIGOR and study 090 together, and I could take you through the Juni analysis in the Lancet, but that basically crosses the line for proven hazard of heart attacks.

BY MR. KLINE:

Q. Did you observe any pattern of conduct by Merck every time or any time an investigator like yourself or Juni did a critical analysis and questioned the safety of the drug Vioxx?

MR. GOLDMAN: Objection.

THE WITNESS: Each time we published a paper or a study was also published by other investigators questioning the safety of Vioxx, there would be

Page 199

immediately a PR attack on the report. Merck would refute the findings and/or they would have consultants of theirs refute the findings. So, there was a published and then anti force that would occur without any question.

BY MR. KLINE:

Q. Juni article, when it was published, first of all, where was it published?

A. The Juni article was published in November of 2004 in the Lancet.

Q. And who was Juni?

A. Juni, I don't know him, I've never met him, but he's a very highly regarded investigator in Europe out of Switzerland, Peter Juni and colleagues, and they published, I think, quite an important cumulative meta-analysis, where they just looked at the data as it was coming out. And I think that's a very important figure to go at, to look at. I

Page 200

believe it's Figure 2 or Figure 3 in that paper, if we can.

Q. Yes. I actually was trying to get it in front of us. I didn't have my copy handy, but let's see if we can find it.

MR. KLINE: Let's go off the record for a minute.

THE VIDEOTAPE TECHNICIAN: Off the record, 11:55.

- - -

(Whereupon, a recess was taken from 11:55 a.m. until 11:58 a.m.)

- - -

THE VIDEOTAPE TECHNICIAN: Back on the record, 11:58.

BY MR. KLINE:

Q. I wanted to find out what you believed was significant about the Juni article. You pointed us to --

MR. GOLDMAN: I'm sorry, are we on the record? Start over.

MR. KLINE: Are we back on

Page 201

the record?

THE VIDEOTAPE TECHNICIAN: Yes.

- - -

(Whereupon, Deposition Exhibit Topol-15, "Risk of cardiovascular events and rofecoxib: Cumulative meta-analysis," (Juni, et al) The Lancet, Vol. 364, December 4, 2004, 2021-2029, was marked for identification.)

- - -

BY MR. KLINE:

Q. I referred you to the Juni article as part of our continuing discussion. You mentioned that the Juni article contained a figure which is worthy of discussion, given the fact that that's what you believe is significant or part of the significant findings.

I assume you are referring to the figure which shows the relative risks of myocardial infarction based upon

many studies that had been done of the drug, clinical trials; is that correct?

MR. GOLDMAN: Objection.

THE WITNESS: I'm referring to Figure 3, which is the so-called cumulative meta-analysis, and what this does is each study as it's done, and these are all studies in patients with arthritis, each study as it's done is put in, and then as the next one comes in, it adds to that, adds to that. So, you have basically the readout of all the data cumulatively as it's being accrued in the various randomized trials of Vioxx. And what's interesting here is that up until 2000 in the first entry, there's 5,193 patients, which is about what was in at the time of the May '99 approval.

Then comes the VIGOR trial, which jumps from 5,193 patients to

13,269 patients. And you can see what happens here is that we're almost at a statistically significant two-fold excess of heart attacks and events.

But what is interesting is, the next addition is the 978 patients. That's study 090. And what happens with study 090 is that now we have truly statistically crossed the line, and now no longer are the confidence limits spanning or crossing the line of identity.

So, now, if one were to ask when should the drug have not been either on the market or should have been a black box warning because of definitive risks, the Juni meta-analysis answers that, because once you have VIGOR and 090, statistically it's proven, without any question, from this analysis.

MR. GOLDMAN: Objection, move to strike, nonresponsive opinion testimony.

BY MR. KLINE:

Q. Now, this was published in the Lancet?

A. Yes, in November of 2004.

Q. So, not only could physicians see it, but Merck could see it as well; correct?

A. Yes.

Q. Okay.

Did they go about trashing Juni?

MR. GOLDMAN: Objection.

THE WITNESS: As I mentioned earlier, every time a study was published, there was a vehement response to that to try to provide an antidote or a negation of the results, whether it was our study or whether it was other reports.

This would have been -- in this case, they said that Dr. Juni

and his colleagues didn't include the right trials, and they had all sorts of criticism that I believe was largely unfounded, and there was quite a bit of correspondence in the Lancet that followed this up subsequently.

BY MR. KLINE:

Q. I guess one thing that comes to mind, was Juni --

MR. GOLDMAN: Objection, move to strike, nonresponsive.

BY MR. KLINE:

Q. Was Juni independent of Merck, from what you knew?

A. Juni was, as best I know, fully independent of Merck.

Q. Now, the drug -- one day you woke up and found that Merck took the drug off the market; correct?

A. Yes. I think it'd be helpful to review that morning what happened.

Q. Tell me.

Page 206

MR. GOLDMAN: Objection.
BY MR. KLINE:
Q. What happened the morning that you got up that Merck took the drug off the market?
MR. GOLDMAN: Objection.
THE WITNESS: On September 30, 2004, just over a year ago, I came into work here at the clinic and, oh, somewhere about 8:30 in the morning, later after being here for a while, I got a call from Dr. Richard Pasternak. Dr. Pasternak, who I knew as a cardiologist and only recently had joined Merck, in fact, I didn't even know he joined Merck until that morning, was calling me somewhere between 8:30 and 9:00 to say that Merck is going to withdraw Vioxx from the market and that we, that is, the Cleveland Clinic team, was right.
And I said, well, Richard,

Page 207

can you tell me what were the data? What was the incidence of the APPROVe trial, which I didn't know much about APPROVe, the colon cancer, colon polyp trial, what were the data? And he did explain to me that it was 3.5 percent of heart attacks in the Vioxx arm and 2.6 -- let's see. I'm trying to remember the numbers now. Excuse me. It was 1.6 excess. So, it was 1.9 and 3.5. So, 1.9 percent heart attacks in the placebo arm and 3.5 percent heart attacks in the APPROVe Vioxx arm.
And he said, we decided to take the drug off the market and that our work had been prescient, that is, work back three, four years ago.
BY MR. KLINE:
Q. This is someone from Merck?
A. Yes. I hadn't heard from anyone from Merck in quite a long time.

Page 208

So, that morning I got a phone call from Dr. Pasternak.
Q. And did I hear your words that he said to you that the Cleveland Clinic was right and Merck was wrong?
MR. GOLDMAN: Objection.
THE WITNESS: He didn't say that Merck was wrong. He said, you got it right or you were right, something like that. He was being supportive. And he had been an acquaintance and friend for some time, and I believe he only, at that point, had only, within weeks or very recently had joined Merck.
BY MR. KLINE:
Q. What was your next involvement? Tell me the story as it progressed through your eyes.
MR. GOLDMAN: Objection.
THE WITNESS: Well, as the day unfolded, in some ways it was kind of like a nightmare coming

Page 209

true. Who would want to be right about this? Why would we want to be right that the heart attacks were being engendered by a medicine? All we wanted were trials to be done and get to the definitive story here. We didn't want there to be -- this type of thing to occur, not by any means. But what then started to happen was, the same type of what I viewed as unacceptable publicity about Vioxx was now being disseminated, and this was quite disconcerting, to say the least.
BY MR. KLINE:
Q. What are you referring to, sir?
MR. GOLDMAN: Objection, move to strike nonresponsive opinion testimony.
BY MR. KLINE:
Q. Dr. Topol, what are you referring to?

Page 210

A. Well, what was being done here is to say, number one, that this was the first time that the company was ever aware of the heart attack risk.

Q. You're referring to Merck's press release?

A. Yes. That, in fact, that the problems with this drug had never been seen against placebo --

MR. GOLDMAN: Objection to last question.

THE WITNESS: -- or other non-steroidals, only naproxen, which is untrue.

BY MR. KLINE:

Q. Sir, I didn't focus, and I apologize.

What was the second thing you said?

A. The second point was that they made the claims on that day of withdrawal and subsequently that they had never seen a problem with Vioxx in any trial except against naproxen.

Page 211

And that was not true, because in study 090, which was never published, as I've already reviewed, there was a significant 760 percent excess, which somehow or another has been forgotten about.

Now, beyond that, they also used numbers that were not being communicated adequately to the public. So, instead of saying 3. -- 1. -- what's the number? 1.5 percent and 3. -- let's see, 1.9 and 3.5 percent, that is -- I can't write it down because I'm not allowed to have any numbers here in front of me. But instead of saying what the numbers really were in APPROVe, so that the public would know there was a 1.6 per 100 or 16 per thousand, no, no, the numbers that were communicated, like in the New York Times that day, were .75 and 1.5 per thousand patient years.

And reporters, journalists, could not understand those numbers and thought the excess was a fraction of what

Page 212

it really was.

Q. Did that disturb you?

A. Yes, it disturbed me, because I spoke to the journalist that day. Virtually all of them called of the major newspapers, Gina Colata -- Barbara Martinez of the Wall Street Journal, Gina Colata of the New York Times and various others, and they said well, there's not very much difference. I said, wait a minute, I talked to Dr. Pasternak. Because they said, well, where did you get your information? This morning. And the numbers I have suggest a 1.6 per hundred or 16 per thousand excess of heart attacks, which is very different.

MR. GOLDMAN: I tried to make an objection before. I object to that last answer as nonresponsive. It calls for opinion testimony, and the previous answer, too.

Okay, Tom?

MR. KLINE: Yes. Not that

Page 213

you -- just to the fact that you have objected, and they're preserved.

BY MR. KLINE:

Q. Are you saying that the effect here was to distort the data so that it would be both difficult to understand and it would lessen the true impact and nature of the problem?

MR. GOLDMAN: Objection.

THE WITNESS: That's an adequate summary of how I felt that day, yes.

MR. KLINE: All right.

Let's take just a brief break, like two to three minutes.

THE VIDEOTAPE TECHNICIAN: Off the record at 12:08.

\- - -

(Whereupon, a recess was taken from 12:08 p.m. until 12:18 p.m.)

\- - -

THE VIDEOTAPE TECHNICIAN:

Page 214

Back on the record at 12:18. Tape Number 3.

BY MR. KLINE:

Q. Dr. Topol, thanks for hanging in there. We're now in the third hour of examination on the subject.

One thing that Merck said from the APPROVe study was that there was an increased risk after 18 months. Do you recall that claim?

A. Yes.

Q. How did you see that in the context of the full picture of the articles?

MR. GOLDMAN: Objection.

THE WITNESS: This was another extremely concerning part of that dissemination on the day of withdrawal, that it took 18 months for there to be any risk, because that's not true.

In fact, as I reviewed earlier in this deposition, there were four trials that showed that

Page 215

the timeline for that was considerably quicker. In VIGOR, with four to six weeks, there was separation. In ADVANTAGE, within 12 weeks. In VICTOR, this was immediate. And in study 090, within six weeks.

And in all of these trials, there were no heart disease patients. So, it could have been much worse than -- in the days or weeks. And beyond all that, there's the issue of a problem of statistical power, that is, you have to do a very large trial if you're not expecting adequate number of events, and so none of the trials were adequately powered from a time perspective.

But, given all those things, that is, statistical power, lack of cardiovascular patients, and four randomized trials, in addition to the Juni analysis,

Page 216

there's a pretty strong case that the risk of Vioxx for heart attacks can occur at any time after the initiation of the medicine.

MR. GOLDMAN: Objection, move to strike, nonresponsive, opinion.

BY MR. KLINE:

Q. What you've stated to us is your conclusion, based on your review of all of the information which you cited; is that correct?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. By that time or by the time -- by today, by today there were studies done by -- let's see, there was a study done by Ray, correct, in Lancet, in '02, the Ray study?

A. Yes.

Q. I'm talking epidemiology studies.

Page 217

A. There were two Ray studies in the Lancet.

Q. Did that show an increased risk of heart attacks?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. There was a study by Solomon in Circulation in 2004. I'm talking just the epidemiological studies. Did that show an increased risk of heart attacks?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. There was a study by Graham in Lancet in 2005, which we'll get to. Did that show an increased risk of heart attacks?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. There was a study by Kimmel in the Annals of Internal Medicine published, I'm not sure when. Did that

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 218

show an increased risk of heart attacks?
MR. GOLDMAN: Objection.
THE WITNESS: Yes.
BY MR. KLINE:
Q. There was a study by Levesque, L-E-V-E-S-Q-U-E. Did that show an increased risk of heart attacks?
MR. GOLDMAN: Objection.
THE WITNESS: Yes.
BY MR. KLINE:
Q. Now, I'd like to go back to VIGOR because I didn't cover this, and I think it's essential.
In VIGOR, you have a series of criticisms of VIGOR about the data and about -- and I had that in the memo that you wrote to Graham originally. You cited scientific misconduct in the VIGOR trial, and I think I glossed over this, and I don't want to miss it.
You said there were errors of omissions --
MR. GOLDMAN: Do you have a document?

Page 219

MR. KLINE: I'm back to the Graham thing, which is Exhibit 2.
BY MR. KLINE:
Q. You said there were "errors of omission (deaths)." Please explain. You're talking about what Merck did that constituted scientific misconduct. That's the point I'm at.
MR. GOLDMAN: Objection, and can I have the same standing objection about this document that I had before?
MR. KLINE: Yes.
BY MR. KLINE:
Q. Scientific misconduct in VIGOR by Merck. First of all, you said there were "errors of omission." Please explain concisely.
MR. GOLDMAN: Objection.
THE WITNESS: I summarized this in the letter in the New England Journal, which goes through the VIGOR correct data, as compared to the data that was in

Page 220

the manuscript from November of 2000.
BY MR. KLINE:
Q. Is that a good place to go to find it?
MR. GOLDMAN: Objection.
THE WITNESS: I really believe you should get this document to look at --
BY MR. KLINE:
Q. Let's.
A. -- because together we can take you through this quickly.
Q. Fine.
Let's look at the New England Journal of Medicine editorial.
A. No, letter.
Q. I'm sorry, letter.
A. December 30, 2004.
Q. December 30, 2004.
A. Right. It's a correspondence based on the editorial.
Q. Okay.
Let me get that in my hand.

Page 221

We have it.
A. Good.
Q. How many articles and editorials have you published in the medical literature, Dr. Topol, relating to the Vioxx and the COX-2s?
A. There have been 16 articles and editorials published.
Q. And what you've done in those is to put your views out in front of the medical world at large to let them know what you're thinking?
MR. GOLDMAN: Objection.
THE WITNESS: Yes. And a few of those were actually directed to the lay public.
BY MR. KLINE:
Q. Okay.
Do you have the reply in front of you?
A. Yes.
Q. All right.
Now, my purpose is to go through your criticisms of the VIGOR

Page 222

trial and what you think Merck did that constitutes scientific misconduct. Can you do so, sir?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. Please.

MR. GOLDMAN: Objection.

THE WITNESS: Okay.

So, what I cited here in this correspondence is how the article in the New England Journal -- this goes back to what we discussed earlier today, which is when the paper was published in November 2000 as compared to the FDA documents that we have a chance to review in February of 2001, there was -- there were gross discrepancies, which is why we had contacted Merck in the first place about this manuscript.

Then, finally, we had the ability to work with the New

Page 223

England Journal of Medicine editors, Dr. Curfman, Dr. Drazen, and to figure out what was going on.

Now, as it turns out, in the VIGOR manuscript, in the New England Journal in 2000, in three times in the paper, this is first authored by Bombardier, and three times it says that the mortality was the same between naproxen and Vioxx. And that was untrue.

In fact, there was a 46 percent difference. There were 22 deaths in the Vioxx arm versus 15 deaths in the naproxen arm. And so instead of presenting the deaths as they should, the authors only used percentages, rounded them off, but moreover, they asserted strongly in three different places that the mortality was the same. So, that's issue number one.

Page 224

Issue number two with that manuscript --

BY MR. KLINE:

Q. Before you get to issue number two, if you remember, how do you view that conduct? What word would you use to describe it?

MR. GOLDMAN: Objection.

THE WITNESS: We're talking about deaths, and we're talking about false assurances that the mortality was the same in three prominent places in the manuscript.

BY MR. KLINE:

Q. Outrageous?

MR. GOLDMAN: Objection.

THE WITNESS: I believe it's highly misleading.

BY MR. KLINE:

Q. Go ahead.

A. The second issue was the false data regarding heart attacks. So, instead of a five-fold increase, which we

Page 225

know is true at the bare minimum, because there wasn't the right adjudication in this trial as we learned and I reviewed earlier from the Targum report, but now we're talking about that the authors knew the correct number of heart attacks.

They could have fixed the galley proofs, and this is told to me by the editors of the New England Journal, but they decided to give the correct numbers in the published New England Journal paper. So, they had a four-fold increase in heart attacks rather than a five-fold increase in heart attacks.

And that is erroneous, and that appears to be, best I can reconstruct with the New England Journal editors, an error of commission.

MR. GOLDMAN: Objection, move to strike as nonresponsive.

BY MR. KLINE:

Q. And the third?

A. The third is, rather than report any of the other clotting events,

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

like strokes, like transient ischemic attacks, like unstable angina, like peripheral arterial thrombosis, like venous thrombosis, like pulmonary embolism, none of these were reported in the New England Journal of Medicine paper.

Q. You also state on the top of a column on Page 2878 of your correspondence, which is now marked as exhibit --

MR. HAMELINE: 16.

- - -

(Whereupon, Deposition Exhibit Topol-16, "Rofecoxib, Merck, and the FDA," (Kim et al), N Engl J Med 351;27 December 30, 2004, 2875 - 2878, was marked for identification.)

- - -

BY MR. KLINE:

Q. -- 16, thank you.

You state here, something we talked about earlier, which is, "We

indeed" -- top of the second column, 2878.

"We indeed acknowledged that naproxen may have a cardioprotective effect, but the magnitude of the effect would be unlikely to exceed that of aspirin, at a 25 percent reduction of heart attacks. Instead, in the VIGOR trial, there was a 500 percent increase in heart attacks. This makes any 'naproxen hypothesis' of cardioprotection mathematically indefensible." Correct? Your words?

MR. GOLDMAN: Objection and, Tom, I didn't get the chance to object to the previous answer.

MR. KLINE: You have the objection.

THE WITNESS: I wrote this. These are my words, absolutely.

BY MR. KLINE:

Q. And you said in this article or this correspondence, putting out there for the public, for the medical

community, a little further down, "There were no differences in the rate of perforation (0.1 percent in...rofecoxib and naproxen groups)."

Your words, "It is hard to imagine that the small protection from gastric or duodenal ulcers in the VIGOR trial is an acceptable trade-off as compared with twice the incidence of death, heart attacks, and strokes."

Did you write those words?

MR. GOLDMAN: Objection.

THE WITNESS: Yes, I certainly did.

BY MR. KLINE:

Q. And were you doing a risk/benefit analysis there in your mind?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. And were you weighing the risk of pain medication versus the risk of dying from a disease that -- let me start again.

Were you weighing the risk of pain relief versus death?

MR. GOLDMAN: Objection.

THE WITNESS: We were weighing -- I was weighing, when I wrote that statement, the risk of heart attacks principally versus the small protection from significant stomach complications.

BY MR. KLINE:

Q. Okay.

Let me move on. So much to cover.

The drug is withdrawn September 30th of 2004. You told me what happened when you knew then. You put paper to pen and you did an op/ed piece for the New York Times; correct?

A. That's correct.

Q. Couple of sentences. Why?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Why did you do that?

A. I was extremely upset by the

Page 230

way this was being handled and the misinformation that was in the first 24 hours of the Vioxx withdrawal.

Q. Was it a reaction to Merck's public statements, which you've described and critiqued for the jury already?

A. Yes.

MR. GOLDMAN: Objection.

THE WITNESS: Yes, that, in fact, the word that this was the first time they had ever known that this was a problem and that the incidence not be reported in a responsible -- for the public fashion that they could understand and all the other things that we had already reviewed.

- - -

(Whereupon, Deposition Exhibit Topol-17, "Good Riddance to a Bad Drug," (Topol) New York Times Reprint, October 2, 2004, (2 pages), was marked for identification.)

Page 231

- - -

BY MR. KLINE:

Q. While you're testifying, we'll show this to the jury. It's a document which is entitled, "Good Riddance to a Bad Drug."

Let me start with this, sir, because I've seen this in your writings.

Was Vioxx and is Vioxx a dangerous drug?

MR. GOLDMAN: Objection.

THE WITNESS: Let me first start off by saying I didn't title this, New York Times op/ed. I learned, since this was the first op/ed I had in the New York Times, that you don't get a right to pick your title.

My title was "Vioxx Vanquished," but the editor of the New York Times of the op/ed picked this one, and I didn't know it until it was actually published.

BY MR. KLINE:

Page 232

Q. Did you approve it?

MR. GOLDMAN: Objection. I'm sorry. Objection, nonresponsive.

THE WITNESS: It was probably different than what I was trying to convey, because what I'm trying to convey in this op/ed is that Vioxx had a risk that had never been adequately defined, that overall it was unacceptable, that the whole class of COX-2 inhibitors was suspect, and that we can't tolerate this sort of situation where a medicine is being mass marketed, and it could induce tens of thousands of heart attacks and without the appropriate studies. So, the FDA is involved in this as well, in this op/ed.

So, there are many things, but alerting the public who read the New York Times about that it

Page 233

is not safe necessarily for any COX-2 inhibitor, which is in here, about naproxen and Aleve, Motrin, all these other possible alternatives, and some of the lessons that we need to learn from this, and most importantly was the statement that our two most common deadly diseases should not be caused by a drug.

MR. GOLDMAN: Objection, move to strike as nonresponsive.

BY MR. KLINE:

Q. Is that what you were trying to convey, what you just said?

A. Yes.

Q. And when you conveyed it, on the second page you listed two points and you say, "Second, and what may be more alarming, is that despite studies showing the magnitude of the public health problem, for several years Merck did nothing to investigate."

Is that the message you

Page 234

wanted to convey as well?

MR. GOLDMAN: Objection.

THE WITNESS: That was a critical message that probably was conveyed innumerable times over these last five years.

BY MR. KLINE:

Q. You stated, "This surely represents a conflict between the interests of the public and the interests of a company with a blockbuster drug that had sales of 2.5 billion in 2003."

Did you write that in the -- for the New York Times?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. You stated, "At the same time, Merck spent at least $100 million a year for direct-to-consumer Vioxx advertising, while the company's employees and their consultants published several papers in medical journals rebutting studies reporting Vioxx's heart

Page 235

attack risk."

Did I read that correctly?

MR. GOLDMAN: Objection.

THE WITNESS: Yes, you did.

BY MR. KLINE:

Q. And you describe this as "the Vioxx debacle." Were those your words?

MR. GOLDMAN: Objection.

THE WITNESS: That is my phrase, "As the Vioxx debacle shows," yes.

BY MR. KLINE:

Q. You, later in 2004 in that Cleveland Clinic article, and I'm trying to put it in front of me, described this whole thing as the rofecoxib debacle, same language; correct?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. Now, let's move on.

You then move to publishing an editorial in the New England Journal

Page 236

of Medicine; correct?

A. Yes.

Q. Now, you've stated what you believe for the lay consumption. Now you're stating it in the medical literature; correct?

MR. GOLDMAN: Objection.

THE WITNESS: Yes. The New England Journal editors read my op/ed in the New York Times and called me that weekend on that Saturday.

BY MR. KLINE:

Q. They called you?

A. They called me at home and said, would you be kind enough to write an editorial for the medical community now that you've written one for the public? And I said I'd be happy to do that.

MR. GOLDMAN: I'll try to insert an objection to the last question.

MR. KLINE: Preserved.

Page 237

BY MR. KLINE:

Q. Continue.

Do you have anything else on that?

A. So, by the invitation of the New England Journal, I wrote this editorial that was posted on their website in early October, just days after the op/ed.

- - -

(Whereupon, Deposition Exhibit Topol-18, "Failing the Public Health - Rofecoxib, Merck, and the FDA (Topol) N Engl J Med 351;17 October 21, 2004, 1707-1709, was marked for identification.)

- - -

BY MR. KLINE:

Q. I want to run through a number of things. Let's try to tick them off as points. I just have to cover so much.

You talked about the fact

405d92cd-4d0a-489f-87d2-231e3a1c3f6f