Page 238

1  that a trial was never done; correct?
2       MR. GOLDMAN: Objection.
3       THE WITNESS: Yes.
4       MR. GOLDMAN: Doctor, if you
5  would please.
6       THE WITNESS: I'm sorry.
7  BY MR. KLINE:
8    Q.  Meaning a large scale
9  randomized study; correct?
10      MR. GOLDMAN: Objection.
11      THE WITNESS: Yes.
12 BY MR. KLINE:
13   Q.  Just wait for him, he'll
14 undoubtedly object, you'll then get to
15 give your answer.
16      You then got to talk about
17 the Merck message and how Merck conveyed
18 a message that the drug was safe;
19 correct?
20      MR. GOLDMAN: Objection.
21      THE WITNESS: Yes.
22 BY MR. KLINE:
23   Q.  And you disapproved of that;
24 correct?

Page 239

1       MR. GOLDMAN: Objection.
2       THE WITNESS: Yes.
3  BY MR. KLINE:
4    Q.  On Page 1708 of the article,
5  in the first full paragraph, you say, and
6  we've covered this in a different form,
7  you actually say it in print here, "Each
8  time a study was presented or published,
9  there was a predictable and repetitive
10 response" by "Merck, which claimed that
11 the study was flawed and that only
12 randomized, controlled trials were
13 suitable for determining whether there
14 was any risk.  But if Merck would not
15 initiate an appropriate trial and the FDA
16 did not ask them to do so, how would the
17 truth ever be known?"
18      Was that your --
19      MR. GOLDMAN: Objection.
20 BY MR. KLINE:
21   Q.  Was that your thinking at
22 that point in time?
23   A.  Yes.
24      MR. GOLDMAN: Objection.

Page 240

1  BY MR. KLINE:
2    Q.  Is that still your thinking
3  today?
4       MR. GOLDMAN: Objection.
5       THE WITNESS:
6  Unquestionably.
7            - - -
8       (Whereupon, Deposition
9  Exhibit Topol-19, "Risk of acute
10 myocardial infarction and sudden
11 cardiac death in patients treated
12 with cyclo-oxygenase 2 selective
13 and non-selective non-steroidal
14 anti-inflammatory drugs..."
15 (Graham, et al), The Lancet, Vol.
16 365, February 5, 2005, 475-481,
17 was marked for identification.)
18            - - -
19 BY MR. KLINE:
20   Q.  You then cited the Graham
21 study.  Now, I started this deposition by
22 some discussion that you had with David
23 Graham, who was at the FDA; correct?
24   A.  Yes.

Page 241

1       MR. KLINE:  Whoa, we had a
2  question without an objection.
3  Hallelujah.
4  BY MR. KLINE:
5    Q.  And what did Graham
6  conclude?
7       MR. GOLDMAN: Objection.
8       THE WITNESS: He concluded
9  from a very large population study
10 done with the Kaiser Foundation
11 that there was a very high risk of
12 heart attacks with Vioxx,
13 especially in higher doses, but
14 across the board compared to the
15 other conventional nonsteroidal
16 agents.
17 BY MR. KLINE:
18   Q.  Were you in contact with
19 Graham in the period of time in late
20 2004?
21   A.  Yes.  I had some phone
22 discussions and a couple of e-mails back
23 and forth in that time frame.
24   Q.  From what you learned in

Page 242

1  e-mails and phone discussions, was he
2  under pressure not to publish his
3  results?
4          MR. GOLDMAN: Objection.
5          THE WITNESS: He conveyed
6      that to me aptly.
7  BY MR. KLINE:
8      Q.   What did you learn, sir?
9          MR. GOLDMAN: Objection.
10         THE WITNESS: I learned that
11     the FDA, his superiors, did not
12     want him to publish that
13     particular paper, which eventually
14     appeared in Lancet, and according
15     to him and according to the
16     reports about this, and according
17     to the editor at Lancet, FDA tried
18     to suppress that publication.
19 BY MR. KLINE:
20     Q.   It was published by Lancet?
21         Was it published by Lancet?
22     A.   Yes.
23     Q.   And was it one more piece of
24 evidence that you were -- that was now in

Page 243

1  your knowledge bank?
2          MR. GOLDMAN: Objection.
3          THE WITNESS: It was one of
4      seven epidemiologic studies
5      published to this point in time,
6      and all but one of them showing a
7      very significant excess of heart
8      attacks with Vioxx.
9  BY MR. KLINE:
10     Q.   Was everyone --
11         MR. GOLDMAN: Objection,
12     move to strike as nonresponsive.
13 BY MR. KLINE:
14     Q.   And was every one of those
15 seven studies done by someone who was not
16 affiliated with Merck?
17         MR. GOLDMAN: Objection.
18 BY MR. KLINE:
19     Q.   Those epidemiological
20 studies?
21     A.   Well, some of the authors
22 could have been affiliated with Merck.
23 Like, for example, the Solomon paper,
24 there had been a Merck statistician,

Page 244

1  epidemiologist, Carolyn Cannuscio, who
2  was involved, but then she was deleted at
3  the request of Merck, and I spoke about
4  that with Carolyn, but she had to have
5  her name taken off the paper in
6  Circulation, which was one of the
7  epidemiologic studies.
8          MR. GOLDMAN: Objection,
9      move to strike, nonresponsive.
10 BY MR. KLINE:
11     Q.   What did she tell you, if
12 anything, about why her name was removed?
13         MR. GOLDMAN: Objection.
14         THE WITNESS: She told me in
15     a phone conversation in October of
16     '04 that she was very distraught
17     about the fact that she had done
18     extensive work with the team in
19     Boston, at Harvard, and that at
20     the last minute, after having been
21     on the paper, manuscript
22     submission, she had to have her
23     name taken off at the request of
24     Merck, because they did not agree

Page 245

1      with the conclusions of the study.
2  BY MR. KLINE:
3      Q.   Okay.
4          I want to show you an e-mail
5  that you had between yourself and David
6  Graham. We covered this way earlier, but
7  I want to make sure that whoever hears
8  this knows who Graham was. Please. Who
9  is Graham?
10     A.   David Graham is a safety
11 officer at the FDA.
12             - - -
13         (Whereupon, Deposition
14     Exhibit Topol-20, E-mails, TOPOLE
15     0000458, was marked for
16     identification.)
17             - - -
18 BY MR. KLINE:
19     Q.   I'm marking this as Exhibit
20 Number 20. It's an e-mail between
21 yourself and Graham, and you say in yours
22 on the bottom, it's an e-mail dated
23 November 15, 2004, you say, "David, I
24 attach my analysis of the 2 trials

Page 246

1  submitted to FDA as part of Supplement
2  007."
3        What are you referring to?
4        MR. GOLDMAN:  Objection.
5        THE WITNESS:  That's the FDA
6    supplement of the three trials,
7    090, 085 and VIGOR.
8  BY MR. KLINE:
9      Q.   One never published, that
10 referring to 090?
11     A.   090 never published.
12     Q.   "I'd be interested in your
13 thoughts as I think this, along with the
14 Juni paper, nails this down as to when
15 there was confirmatory evidence that
16 rofecoxib was," to use your words, "a
17 dangerous drug."
18        Did you write that?
19        MR. GOLDMAN:  Objection.
20    Can I have a standing objection to
21    the use of this document and the
22    testimony about it?
23        MR. KLINE:  Yes.  You can
24    have a standing objection.

Page 247

1        Whether it be successful is
2    another story.
3  BY MR. KLINE:
4      Q.   "A dangerous drug," you say.
5  It nails down "when there was
6  confirmatory evidence."  So, I have to
7  ask you, what is that date that you can
8  nail down, your private words to David
9  Graham, safety officer of the FDA, when
10 can you nail down when there was
11 confirmatory evidence that Vioxx was a
12 dangerous drug?
13     A.   The paper that I reviewed
14 earlier, the Juni paper that shows that
15 time cumulative analysis, shows in 2000,
16 when VIGOR and 090 are put together,
17 that's when you cross the line of
18 statistical significance, and that's the
19 definition of a dangerous drug.
20     Q.   Now --
21        MR. GOLDMAN:  I'm sorry.
22    Objection, move to strike as
23    nonresponsive.
24 BY MR. KLINE:

Page 248

1      Q.   If you look at David
2  Graham's response, he says to you in the
3  second paragraph, "Each day the issue
4  gets more and more complicated and fishy
5  smelling.  Apparently, Merck was heavily
6  lobbying the members of the Finance
7  Committee to cancel the hearing today,
8  and our acting center director, Dr.
9  Galson, has reportedly refused to appear
10 before the Committee."
11       Skipping down a little bit.
12 Anyone who wants to fill in later, may.
13       "But it does make you
14 wonder, why is everyone afraid and what
15 are they trying to hide?"
16       That was his response to
17 you.
18       MR. GOLDMAN:  Objection.
19 BY MR. KLINE:
20     Q.   Did you receive that
21 response?
22     A.   Yes.
23     Q.   And did you recognize that
24 it was coming from a safety officer at

Page 249

1  the FDA?
2      A.   Certainly.
3      Q.   And did you essentially have
4  those same sentiments?
5        MR. GOLDMAN:  Objection.
6  BY MR. KLINE:
7      Q.   Did you share his
8  sentiments?
9      A.   I shared Dr. Graham's
10 sentiments in this regard.
11     Q.   David Graham had written to
12 you that -- and I'm showing you another
13 document, which is marked as 000333,
14 which I will mark, but it's a sentence or
15 two, so, I'll read to keep this thing
16 going.
17       He says -- there was some
18 thought that he would go on 60 Minutes,
19 and you were aware of that fact; correct?
20     A.   Yes.
21     Q.   You ended up -- did you end
22 up publicly speaking on 60 Minutes?
23     A.   Yes.
24     Q.   Did you consider it was

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 250

1  important to participate in public
2  information to the general public
3  regarding the drug Vioxx?
4          MR. GOLDMAN: Objection.
5          THE WITNESS: Yes. Just as
6  in writing the New York Times
7  op/ed, it was the same thing about
8  getting the public fully informed,
9  appropriately informed.
10         MR. KLINE: Can I have 0333?
11         MS. DAGOSTINO: I just gave
12  it to you.
13          - - -
14         (Whereupon, Deposition
15  Exhibit Topol-21, E-mails, TOPOLE
16  0000333, was marked for
17  identification.)
18          - - -
19  BY MR. KLINE:
20     Q.   That's marked now as Exhibit
21  Number 21.
22         He writes to you, "Eric, My
23  perspective and resolve are unchanged.
24  If I went public on 60 Minutes, I think

Page 251

1  the retaliation I would experience would
2  be blistering."
3         Skipping down below.
4  "Internally, the last 2 weeks have been
5  absolute hell."
6         By the way, sir, if I can
7  pause for a minute. Has Merck made life
8  absolute hell for people who criticize
9  them?
10         MR. GOLDMAN: Objection, and
11  can I have a standing objection to
12  the use of this document?
13         MR. KLINE: Yes.
14         THE WITNESS: I believe that
15  is the case, that is, there have
16  been retaliation and actions taken
17  to make life extremely difficult
18  for people who have objected to
19  their work, to their studies or to
20  the lack of studies.
21  BY MR. KLINE:
22     Q.   Now, let me switch gears and
23  talk to you about what you did in
24  connection with 60 Minutes.

Page 252

1          MR. KLINE: Can someone tell
2  me about how much time is left?
3  About a half an hour?
4          THE VIDEOTAPE TECHNICIAN:
5  About half an hour.
6          MR. KLINE: Okay, good.
7  BY MR. KLINE:
8     Q.   Now, let me move ahead.
9         There were Senate hearings;
10  correct?
11         MR. GOLDMAN: Objection.
12         THE WITNESS: The 60 Minutes
13  was before the Senate hearings.
14  BY MR. KLINE:
15     Q.   60 minutes was before --
16     A.   It was a Sunday --
17         MR. KLINE: So, that only
18  goes to show you, the objection
19  was to being a leading question,
20  and I had the leading question
21  wrong.
22         MR. GOLDMAN: There were
23  several bases for the objection.
24  BY MR. KLINE:

Page 253

1     Q.   Go ahead.
2     A.   Sunday, the 14th, was the 60
3  Minutes segment, and Thursday, the 18th,
4  it was coordinated between the Senator
5  Grassley staffers and the 60 Minutes.
6     Q.   I see.
7         And you appeared on 60
8  Minutes, as we know; correct?
9     A.   Yes.
10         MR. KLINE: I'm asking Lisa,
11  how difficult is it to show the
12  clip?
13         MS. DAGOSTINO: Not
14  difficult. Can we switch over?
15  Give me a second, please.
16         MR. KLINE: We're going to
17  need to do a little bit of a
18  switch, and then I want to talk to
19  you about what you said.
20         Do you want to pause the
21  tape until we get set up?
22         THE VIDEOTAPE TECHNICIAN:
23  Off the record at 12:47.
24          - - -

Page 254

1    (Whereupon, a recess was
2    taken from 12:47 p.m. until
3    12:48 p.m.)
4        - - -
5        THE VIDEOTAPE TECHNICIAN:
6    Back on the record at 12:48.
7    BY MR. KLINE:
8    Q.   Okay.
9        You were both filmed in your
10   duties at the Cleveland Clinic. I
11   believe there's some footage of you
12   actually in the capacity of doing
13   clinical work, and then you were
14   interviewed in New York; is that correct?
15   A.   That's right.
16   Q.   Okay.
17       Let me show you clip number
18   1.
19       (Whereupon the following was
20   played:
21       "MR. BRADLEY: Dr. Eric
22   Topol, chief of cardiovascular
23   medicine of the Cleveland Clinic
24   was Merck's first and most

Page 255

1    persistent critic. In 2001, he
2    conducted a statistical analysis
3    of all the available data about
4    Vioxx. His study was published in
5    the Journal of the American
6    Medical Association.
7        "And specifically, your
8    study that came out after the
9    VIGOR study found what?
10       "DR. TOPOL: That study
11   which looked at all the data
12   available for both the medicines
13   of these COX-2 inhibitors and all
14   other medicines, including
15   aspirin, that were available,
16   showed a very substantial worry
17   risk of heart attacks and strokes
18   across the board from the VIGOR
19   trial and about Vioxx."
20   BY MR. KLINE:
21   Q.   Confirm for me that you made
22   those statements and that that appears --
23   and that that is an accurate
24   representation of what you said to

Page 256

1    millions of people. Is that correct?
2        MR. GOLDMAN: Can I have a
3    standing objection to the use of
4    the 60 Minutes --
5        MR. KLINE: Yes. I'll
6    rephrase the question.
7        MR. GOLDMAN: -- and any
8    questions about it?
9    BY MR. KLINE:
10   Q.   Is that what you said on 60
11   Minutes, sir?
12   A.   It certainly was.
13   Q.   And did you mean it then?
14       MR. GOLDMAN: Objection.
15       THE WITNESS: I stand by the
16   statement.
17   BY MR. KLINE:
18   Q.   And did you feel it
19   necessary to be on that show and to tell
20   the public what you thought?
21       MR. GOLDMAN: Objection.
22       THE WITNESS: Without any
23   question.
24       MR. KLINE: Next clip.

Page 257

1        (Whereupon the following was
2    played:
3        "DR. TOPOL: Merck took on
4    any study that questioned the
5    safety of Vioxx with respect to
6    the heart attacks and strokes, any
7    study.
8        "MR. BRADLEY: But can't
9    they say, on the other hand, okay,
10   there are always dissenters, we've
11   got these other studies that say
12   the drug is fine?
13       "DR. TOPOL: Whenever you
14   find a problem and you're thinking
15   maybe it's not a problem, you want
16   to see if there's independent
17   replication. So, if you have
18   study 090 and you want to discount
19   that somehow, then you have VIGOR,
20   you've got two trials now, you
21   have essentially lightning
22   striking twice. That's
23   independent replication. That's
24   really serious confirmation. This

Page 258

```
 1      is unequivocal.  This is a
 2   problem.
 3          "MR. BRADLEY:  Did you ever
 4      talk to Merck officials about
 5      that?
 6          "DR. TOPOL:  I tried.  I
 7      called Mr. Gilmartin, the CEO, and
 8      the director of research, Dr.
 9      Peter Kim, on multiple occasions
10      asking to discuss this, but the
11      calls were never returned."
12   BY MR. KLINE:
13      Q.   Did you make those
14   statements on 60 Minutes as well?
15      A.   I certainly did.
16      Q.   Dr. Gilmartin and Dr. Kim,
17   tell me about that.
18          I'm sorry.
19          Mr. Gilmartin, the M.B.A.,
20   and Dr. Kim, the Ph.D., did you call --
21   neither are medical doctors, I might add.
22          Did you talk to -- in fact,
23   I think Dr. Kim started medical school
24   but didn't finish.  A little side point.
```

Page 259

```
 1          Here's the question.
 2          Did Dr. --
 3          Tell me about when you
 4   called Dr. Kim and Mr. Gilmartin.
 5          MR. GOLDMAN:  Objection.
 6          THE WITNESS:  So, in 2001,
 7      when we started to get very
 8      uncomfortable about the data, I
 9      started attempting to reach either
10      Mr. Gilmartin or, at the time, it
11      was Dr. Scolnick, and then later
12      he was replaced by Dr. Kim as the
13      chief scientific officer, and I
14      did not get any responses.
15          I worked with a friend at
16      Merck named Durga Bobba, who I
17      knew very well from this clinical
18      trial we had done, and also I
19      talked with other researchers like
20      Dr. Demopoulos, Dr. DiBattiste,
21      but I never could get any
22      communication established.  No
23      calls were responded -- would be
24      returned from Merck.
```

Page 260

```
 1   BY MR. KLINE:
 2      Q.   Why were you, a head person
 3   at the Cleveland Clinic, not received by
 4   either Mr. Gilmartin or by the top Merck
 5   researcher, Dr. Kim, and do you think --
 6   would the ordinary course of who you were
 7   and who they were have necessitated them
 8   to take your call?
 9          MR. GOLDMAN:  Objection.
10   BY MR. KLINE:
11      Q.   Go ahead.
12      A.   I don't know any
13   pharmaceutical company CEO that wouldn't
14   return my call, this was unprecedented,
15   no less the chief scientific officer.  I
16   know most of the large pharma and device
17   company CEOs, they know me, and they
18   would return my calls as a courtesy.
19   Maybe not within minutes, but certainly
20   within hours or a day or two.
21          MR. KLINE:  Let's play the
22      third clip, and then I have a
23      number of things to cover.
24          (Whereupon the following was
```

Page 261

```
 1      played:)
 2          "DR. TOPOL.  I'm trying for
 3      now two decades in my career to
 4      try to prevent heart attacks and
 5      treat heart attacks.  To have a
 6      medicine that's causing heart
 7      attacks and strokes is something
 8      that can't be tolerated.  These
 9      are the two biggest, most
10      important killers in our society,
11      and then it's important that we
12      never have something like this
13      happen again."
14   BY MR. KLINE:
15      Q.   On all three clips that I
16   showed, Dr. Topol, for evidentiary
17   purposes, would you simply confirm and
18   authenticate that that is you, and you
19   made those statements on that day?
20      A.   It's authentic.
21      Q.   And it's what you believed
22   then?
23          MR. GOLDMAN:  Objection.
24          THE WITNESS:  I still
```

Page 262

1    believe today, yes.
2  BY MR. KLINE:
3    Q.   Now, there is an e-mail --
4  let's switch gears.
5       I want to talk about some
6  notes that you made, because I think it
7  provides a road map to discuss some
8  things. Topol Bates Number 0000469 and
9  504 are what I'm looking for. I'll start
10 with 469.
11      While we're getting those,
12 maybe I can talk about the study called
13 ADVANTAGE. Did you come into possession
14 of information regarding a study called
15 ADVANTAGE that was performed by Merck?
16     A.   I didn't come into anything
17 special. I just read the New York Times
18 article when it came out about that
19 trial.
20     Q.   What did you learn?
21         MR. GOLDMAN: Objection.
22         THE WITNESS: That there had
23     been misclassification of events
24     and that the FDA had records that

Page 263

1    there was, by their tally, a
2  significant excess of events, but
3  in the manuscript published by
4  Lisse and colleagues, the New York
5  Times demonstrated that it was
6  ghostwritten, that he had never
7  participated in the writing of the
8  article or the trial, and that he
9  had somehow been made the first
10 author of the paper and that the
11 events were misclassified, and
12 they had e-mails in the article
13 which showed, amazingly enough,
14 how a death, a sudden death was
15 classified as a hypertensive
16 event, which is quite
17 extraordinary.
18 BY MR. KLINE:
19     Q.   I want you to assume that
20 all of the things that you just said that
21 were reported are things that could be
22 independently established and confirmed
23 from firsthand sources. How, then, would
24 you view that type of conduct?

Page 264

1         MR. GOLDMAN: Objection.
2         THE WITNESS: The conduct is
3     totally in continuum with the
4     other concerns that I registered
5     earlier, like the suppression of
6     090, like the erroneous issues
7     about VIGOR and now with
8     misclassifications of deaths and
9     events in ADVANTAGE. These are
10    all very similar types of things.
11 BY MR. KLINE:
12     Q.   Is this serious business,
13 Dr. Topol?
14         MR. GOLDMAN: Objection.
15         THE WITNESS: This is
16    totally inadequate and highly
17    misleading clinical science.
18 BY MR. KLINE:
19     Q.   Does it amount to serious
20 scientific misconduct by Merck?
21         MR. GOLDMAN: Objection.
22         THE WITNESS: I think that
23    if this were to be adjudicated by
24    an academic medical center in an

Page 265

1    unblinded way for whether there
2    was scientific misconduct, this
3    would fulfill the definition of
4    scientific misconduct.
5  BY MR. KLINE:
6    Q.   Now, sir, I want to look at
7  your notes, which relate to -- let me
8  show you an exhibit marked Topol-22.
9         - - -
10    (Whereupon, Deposition
11    Exhibit Topol-22, Handwritten
12    notes, TOPOLE 0000469, was marked
13    for identification.)
14         - - -
15 BY MR. KLINE:
16    Q.   Topol-22 appear to be
17 handwritten notes. Are they in your
18 handwriting, sir?
19    A.   This is my handwriting.
20    Q.   And when were these notes
21 made?
22    A.   These notes were made in
23 October 2004, you know, shortly after the
24 withdrawal, my op/ed, and at the time

Page 266

1  when I was putting together the New
2  England Journal and talking to the
3  producer at 60 Minutes.
4      Q.   What do they represent in
5  terms of what you have down on this
6  paper?
7          MR. GOLDMAN:  Objection,
8      and, Tom, can I have a standing
9      objection to the use of this
10     document and testimony about it?
11         MR. KLINE:  You have a
12     standing objection.
13         THE WITNESS:  These are the
14     salient points that I've reviewed
15     in this deposition, the data
16     safety monitoring board, the study
17     090, the Juni paper, the naproxen
18     that was untenable, and then the
19     suppression issues of what
20     appeared to be deception and
21     falsifying.  All these things are
22     enumerated here.
23 BY MR. KLINE:
24     Q.   And it's being displayed or

Page 267

1  will be displayed and incorporated in a
2  final package so everyone sees it, but
3  you start off by saying, "'What,' 'when'
4  Merck knew."
5          Have you discussed with us
6  today to your satisfaction what and when
7  Merck knew things?
8          MR. GOLDMAN:  Objection.
9  BY MR. KLINE:
10     Q.   If not, I want to have an
11 opportunity to expand.  That's one of my
12 purposes of this line of questioning.
13         MR. GOLDMAN:  Objection.
14         THE WITNESS:  I did touch on
15     this earlier, that is, study 090
16     was completed in May 1999, and the
17     VIGOR trial data and safety
18     monitoring board alert was in
19     November 1999.  So, already by
20     1999 there were very significant
21     issues, and this should have been
22     widely known to the senior
23     management at Merck.
24         MR. GOLDMAN:  Objection,

Page 268

1      nonresponsive, move to strike.
2  BY MR. KLINE:
3      Q.   You then say, "Study 090,"
4  you've discussed that at length with us;
5  correct?  The "DSMB November 18, 1999."
6  We've discussed that at length; correct?
7      A.   (Witness nods.)
8      Q.   I need an audible answer.
9      A.   Yes.
10     Q.   Thank you.
11         And for study 090, have we
12 discussed that at length to your
13 satisfaction in terms of telling what you
14 know or what you think someone should
15 know about it?
16         MR. GOLDMAN:  Objection.
17         THE WITNESS:  Yes.
18 BY MR. KLINE:
19     Q.   Okay.
20         I'm using this as a wrapup.
21         "Lancet," you mentioned the
22 Juni paper, and we've discussed that at
23 length; correct?
24     A.   Yes.

Page 269

1      Q.   "Position, 'naproxen,'" you
2  wrote the word in your handwriting,
3  "Untenable."  You've told us about that
4  today; correct?
5      A.   Yes.
6      Q.   Now, in the middle of the
7  page, or more or less in the middle of
8  the page, you write three words,
9  "Deception/Falsifying/Suppression of
10 Data."  Do they apply -- do all three of
11 those words apply to Merck?
12         MR. GOLDMAN:  Objection.
13         THE WITNESS:  I have
14     reviewed elements of each in this
15     deposition that fulfill those
16     terms.
17 BY MR. KLINE:
18     Q.   As they apply to Merck;
19 correct?
20     A.   As they apply to the studies
21 and the data of Vioxx.
22     Q.   Those would be words,
23 filling in the details from what you've
24 told us earlier, that would describe

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 270

1  Merck's conduct; correct?
2          MR. GOLDMAN: Objection.
3          THE WITNESS: That's
4      correct.
5  BY MR. KLINE:
6      Q.   And then you list underneath
7  this the sort of laundry list of things
8  that fit in the category of deception,
9  falsifying and suppression of data;
10 correct?
11     A.   Yes. The only thing I
12 hadn't mentioned was the symposia that
13 would be done at each of the national
14 meetings, where they would have these
15 Merck consultants giving lectures, taking
16 apart our data, like the JAMA paper, and
17 assuring the medical community like
18 cardiologists or internists, doctors,
19 that there was nothing wrong with the
20 safety of Vioxx, that it was an illusion
21 of the Cleveland Clinic authors of the
22 JAMA paper.
23         MR. GOLDMAN: Objection,
24     move to strike as nonresponsive.

Page 271

1  BY MR. KLINE:
2      Q.   Did you believe, sir,
3  looking at your list, that no publication
4  of 090, which we've discussed, the
5  Bombardier paper, which is the VIGOR
6  paper, where there were deaths and
7  incomplete information, the multiple
8  publications by Reicin and Konstam --
9  what does that refer to?
10     A.   The Merck people, whether
11 they were Dr. Reicin or Dr. Konstam, who
12 was a consultant, published multiple
13 articles, and Dr. Konstam published an
14 article in Circulation just a few months
15 after our JAMA paper to challenge it with
16 a so-called meta-analysis of their data
17 which had considerable issues, did not
18 provide the results per trial. It did,
19 in fact, show a statistically significant
20 excess of heart attacks compared to
21 naproxen.
22         So, the Konstam paper was
23 out there. There were multiple papers
24 that Merck authored in different journals

Page 272

1  to take the data that we published on as
2  well as other case-control studies that I
3  had touched on earlier.
4          MR. GOLDMAN: Objection,
5      move to strike, nonresponsive.
6  BY MR. KLINE:
7      Q.   What you're suggesting is
8  that they would assault any publication
9  that was against the safety of the drug
10 Vioxx prior to the time that they
11 withdrew it from the market; correct?
12         MR. GOLDMAN: Objection.
13         THE WITNESS: Yes.
14 BY MR. KLINE:
15     Q.   And even today; correct?
16         MR. GOLDMAN: Objection.
17         THE WITNESS: Yes.
18 BY MR. KLINE:
19     Q.   "Marketing and sales." What
20 did you mean there?
21     A.   Well, the marketing and
22 sales has been very much demonstrated in
23 the Waxman report, the Congressional
24 report of the cardiovascular card. This

Page 273

1  is where it was a card that was
2  distributed by the sales team throughout
3  the country, 3,000, I believe, sales reps
4  for Merck that had a card that showed
5  that there was somehow an eight to
6  ten-fold protection of Vioxx compared to
7  other non-steroidals.
8          So, this was quite
9  extraordinary, these sorts of sales
10 tactics that were going on by the
11 specially-trained Merck sales reps.
12     Q.   Well, assuming --
13         MR. GOLDMAN: I'm sorry,
14     objection, move to strike. And,
15     again, Tom, I can go fill in, as
16     you said before, the nature of
17     these objections?
18         MR. KLINE: Yes.
19 BY MR. KLINE:
20     Q.   Assuming that the drug
21 was -- assuming what you said -- what you
22 just told us was being said about the
23 cardioprotective effects, are you with me
24 so far, that would not only be, I forget

Page 274

1  the word you used, extraordinary, that
2  would just be plain false; correct?
3          MR. GOLDMAN: Objection.
4          THE WITNESS: If you look at
5  the cardiovascular card, it's very
6  clear that the data that are being
7  presented are highly misleading.
8  BY MR. KLINE:
9      Q.  You've seen it?
10         MR. GOLDMAN: Objection.
11         THE WITNESS: Yes.
12         MR. KLINE: I don't want to
13  take the time to do it. We'll
14  simply mark it and we'll put it up
15  when we incorporate it in the
16  exhibit. We'll reserve number 25
17  for it.
18          - - -
19         (Whereupon, Deposition
20  Exhibit Topol-25, "Cardiovascular
21  System Clinical Profile in
22  Osteoarthritis Studies,"
23  Cardiovascular Card,
24  MRK-ABW00000243 - MRK-ABW0000248

Page 275

1  MRK-ADB0009039 - MRK-ADB0009042;
2  MRK-ACW0008375; MRK-ACZ0072955 -
3  MRK-ACZ0072956, was marked for
4  identification.)
5          - - -
6  BY MR. KLINE:
7      Q.  You said, "Did not do" an
8  "appropriate trial." We know what that
9  means. And they made the claim of 18
10  months post and they paid consultants.
11         Tell me about this thing,
12  "paid consultants on 'Independent DSMB.'"
13  How does that fit in the deception,
14  falsifying and suppression of data
15  category?
16         MR. GOLDMAN: Objection.
17         THE WITNESS: Well, I mean,
18  Dr. Konstam, for example, who is a
19  consultant for Merck, has been for
20  many years, he is the cardiologist
21  on the APPROVe trial, DSMB, Data
22  and Safety Monitoring Board. And
23  he's also an author of the paper.
24         So, he's an author, he's on

Page 276

1  the so-called independent data and
2  safety monitoring board, but he's
3  a consultant. So, it's hard to be
4  independent when you're being paid
5  by the sponsor of the trial in a
6  separate way, and this is quite
7  irregular.
8          Normally to do clinical
9  trials, which I've been engaged in
10  for a couple of decades, you would
11  not have a person on your data and
12  safety monitoring committee who
13  was a consultant for the company.
14  BY MR. KLINE:
15     Q.  Kind of like having one of
16  the coaches from the sidelines put on a
17  striped shirt?
18         MR. GOLDMAN: Objection.
19  BY MR. KLINE:
20     Q.  Yes?
21     A.  I have no comment.
22     Q.  I want you to look at Number
23  504. Let's mark it as the next exhibit
24  number. I have about 10 or 15 minutes

Page 277

1  left. I want to use them.
2          - - -
3         (Whereupon, Deposition
4  Exhibit Topol-23, Handwritten
5  notes, TOPOLE 0000504, was marked
6  for identification.)
7          - - -
8  BY MR. KLINE:
9      Q.  There is a document which
10  we're displaying which, again, is your
11  notes, part of your 60 Minutes notes.
12  These are also your notes. I want
13  to go through it quickly. I think anyone
14  who sees this now will know what you're
15  saying. "Compelling evidence of
16  Merck/Vioxx knowledge of serious risk."
17  Was this part of the notes that you made
18  in preparation, sir?
19         MR. GOLDMAN: Objection.
20  Can I have a standing objection to
21  this document?
22         MR. KLINE: Yes. You have a
23  standing objection to this one and
24  the next handwritten one I used as

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 278

1   well.
2        THE WITNESS:  These notes
3   were later, because it was only
4   later that I learned about the
5   VALOR trial in February 2005, and
6   this was -- these were notes by
7   me, but they were done at a later
8   point in time.
9   BY MR. KLINE:
10       Q.   You have a list of
11  "Compelling evidence of Merck/Vioxx
12  knowledge of serious risks."  Here's the
13  compelling evidence:  1.  Study 090,
14  seven times risk of MIs and strokes.
15  Correct?
16       A.   Yes.
17       Q.   VIGOR:  Two times to five
18  times.  What's the two times number?
19       A.   The two times corresponds to
20  overall cardiovascular events, and the
21  five-fold is the heart attack excess.
22       Q.   And then ADVANTAGE trial,
23  which is mis -- you said, "ADVANTAGE
24  trial, misclassifications of deaths,"

Page 279

1   that's all stuff that we've talked about;
2   correct?
3        MR. GOLDMAN:  Objection.
4   BY MR. KLINE:
5        Q.   Yes?
6        A.   Yes.
7        Q.   "APPROVe trial, heart
8   failure" in "30 days."
9        Have we discussed that?
10       MR. GOLDMAN:  Objection.
11       THE WITNESS:  No.  We had
12   been discussing heart attacks in
13   the first days, but the trials
14   like APPROVe and others also
15   demonstrate things like heart
16   failure in the first 30 days, but
17   that's not necessarily the same as
18   a heart attack, of course.
19  BY MR. KLINE:
20       Q.   By the way, there was -- and
21  last thing is VALOR study 2002 was
22  cancelled.
23       What was the VALOR study?
24       MR. GOLDMAN:  Objection,

Page 280

1   lacks foundation.
2        THE WITNESS:  I only learned
3   about that trial through the New
4   York Times, but Bryan Myers, the
5   reporter, called Dr. Bhatt, who
6   actually had authored a protocol.
7   That was the one, remember when
8   Dr. Reicin and Dr. Demopoulos
9   visited in April of 2001?
10  BY MR. KLINE:
11       Q.   Yes.
12       A.   And she said, well, why
13  don't you send us a protocol?
14       Q.   Yes.
15       A.   So, I spoke to my colleague,
16  Dr. Bhatt, and just a couple of weeks
17  later, around the 2nd of May, we
18  submitted a protocol, actually Dr. Bhatt
19  did, to Dr. Reicin and Dr. Demopoulos.
20       That protocol was testing in
21  patients with so-called acute coronary
22  syndrome, unstable angina, or heart
23  attack, who had abnormal inflammation
24  blood protein markers to test a study of

Page 281

1   Vioxx versus placebo on top of the other
2   normal medicines.  So, that was a
3   proposal.  It was a mini proposal, but
4   that was sent.
5        And then what we found out
6   later was that there was a trial called
7   VALOR reported in the New York Times, a
8   70-page protocol, had extensive network
9   development, and somewhere along the
10  line, the trial that we initially had
11  proposed, apparently, didn't get very
12  far, we never heard back about that, but
13  that trial was, indeed, being planned by
14  Merck, and at some point the plug was
15  pulled, and that's what that New York
16  Times article was about.
17       Q.   You proposed to them to do a
18  study in the people that were high risk
19  patients who had cardiovascular disease
20  who were susceptible.  Do I have it
21  right?
22       A.   Yes.
23       Q.   And your point was to try to
24  see if these people -- look at those

Page 282

1  people with a specified endpoint to see
2  if those people were going to fall victim
3  to Vioxx; is that correct?
4        MR. GOLDMAN: Objection.
5        THE WITNESS: No. No. The
6  trial that we had proposed, and it
7  was Dr. Bhatt who wrote this and
8  sent it to Merck at their request,
9  it was a trial looking at people
10  who had abnormal artery
11  inflammation.
12        So, they had to have high
13  C-reactive protein, which is a
14  blood test. They could derive
15  benefit from Vioxx or COX-2
16  inhibitors, just as they could
17  potentially be exposed to risk.
18  So, here we were looking at
19  trade-offs, could we reduce
20  subsequent heart attacks or could
21  we potentially exacerbate the
22  course of patients?
23        So, this was a very
24  reasonable way to study the

Page 283

1  problem. And VALOR was a very
2  reasonable construct for a trial.
3        MR. GOLDMAN: Objection,
4  move to strike as nonresponsive.
5  BY MR. KLINE:
6     Q.   But it wasn't done?
7     A.   It wasn't done.
8     Q.   And it should have been
9  done?
10        MR. GOLDMAN: Objection.
11  BY MR. KLINE:
12     Q.   Should it have been done?
13     A.   Any trial to establish the
14  risk in patients with heart disease
15  should have been done.
16     Q.   Was it an adequate
17  substitute to look at cardiovascular
18  endpoints in the studies that weren't
19  designed by Merck to assess
20  cardiovascular risk?
21        MR. GOLDMAN: Objection.
22        THE WITNESS: This was
23  another part of the concern at the
24  point of the withdrawal, saying

Page 284

1        that the trials that had been done
2        for colon polyps were indeed to
3        assess heart risk. That could not
4        have been further from the truth.
5        In fact, they were to establish
6        new indications for the drug.
7  BY MR. KLINE:
8     Q.   Okay.
9        Now, was it an adequate
10  substitute to look at CV events in
11  studies to which the primary endpoint was
12  something else?
13        MR. GOLDMAN: Objection.
14        THE WITNESS: It's more the
15        population of patients. It's about
16        the population of patients who
17        had colon polyps with no heart
18        disease. It's about the
19        population of patients who have
20        one of the most common diseases of
21        American society, which is
22        coronary disease, established
23        coronary disease. That's where
24        there was a gap, that's where 40

Page 285

1        to 50 percent of patients taking
2        the drug of the 20 million
3        estimated had never been studied
4        as to what would happen, would
5        they derive a benefit, or would
6        they incur harm? Unknown.
7  BY MR. KLINE:
8     Q.   Switching gears, Dr. Topol.
9        Before we switch gears, I
10  have asked you a lot of questions today.
11        MR. GOLDMAN: I'm sorry, I
12        meant to introduce an objection to
13        the last answer as nonresponsive.
14        Start over, Tom.
15        MR. KLINE: Would you at the
16        end of the deposition -- I will
17        gladly pay Golkow Litigation
18        Technologies for this. Would you
19        at the end of the day count up and
20        put in the transcript the number
21        of times that Merck, through its
22        lawyer, objected to this testimony
23        today so that I don't have to do
24        the counting up? It's

72 (Pages 282 to 285)

Page 286

1 extraordinary. Astonishing.
2 THE WITNESS: I also would
3 like to say it's very hard to
4 answer the questions and have to
5 be in rhythm with the objections.
6 It's disruptive for my train of
7 thought.
8 MR. KLINE: That's a good
9 question, Doctor. Thank you for
10 suggesting it to me.
11 MR. GOLDMAN: Well --
12 MR. KLINE: Stop it.
13 BY MR. KLINE:
14 Q. Was it disruptive for you,
15 sir, to, for almost every question that
16 was asked today, have an objection
17 interposed, and how, if at all, did that
18 affect your train of thought?
19 MR. GOLDMAN: Objection.
20 THE WITNESS: It has
21 affected my train of thought many
22 times along the way.
23 MR. GOLDMAN: Because you
24 just made that statement, Mr.

Page 287

1 Kline, I'm going to be forced to
2 ask Dr. Topol's lawyer, who spoke
3 with me at a break, to see if Dr.
4 Topol's lawyer thinks that I've
5 been intrusive and my objections
6 have been in any way an effort to
7 affect the deposition here today.
8 MR. KLINE: Okay. Let's go
9 on.
10 MR. GOLDMAN: Can you
11 represent, sir, that --
12 MR. KLINE: We're going to
13 just simply take his deposition.
14 I'll tell you what. You can --
15 MR. HAMELINE: Let me just
16 say this --
17 MR. KLINE: You can take his
18 deposition --
19 MR. HAMELINE: Let me just
20 say this. I'm not here to talk
21 for Dr. Topol and whether Dr.
22 Topol was inconvenienced. I
23 recognize that what you've done is
24 try to be as accommodating as

Page 288

1 possible in terms of the level and
2 tone of your objections. The
3 repetitiveness of them, et cetera,
4 is none of my truck in this case.
5 MR. GOLDMAN: Right.
6 MR. KLINE: That sounds like
7 a no comment to me.
8 BY MR. KLINE:
9 Q. Now, a couple of things and
10 we'll finish up. Switch gears.
11 I don't want to switch
12 gears. I have got to cover one more
13 thing.
14 - - -
15 (Whereupon, Deposition
16 Exhibit Topol-24, Handwritten
17 notes, TOPOLE 0000463, was marked
18 for identification.)
19 - - -
20 BY MR. KLINE:
21 Q. Here's some more notes.
22 They're now put on the screen. Tell me
23 when those notes were written, if you
24 would, sir.

Page 289

1 A. These notes were done in
2 concert with the discussion with Michael
3 Radutsky, the producer at 60 Minutes.
4 Q. Okay.
5 You were taking --
6 MR. GOLDMAN: Tom, this is
7 the handwritten document which you
8 said I can have a standing
9 objection to?
10 MR. KLINE: It is.
11 MR. GOLDMAN: And there's
12 testimony about?
13 MR. KLINE: Yes. We've
14 already agreed that you can have a
15 standing objection to these three
16 documents.
17 BY MR. KLINE:
18 Q. First of all, you talk about
19 Merck suppression of 090, and you talk
20 about FDA's suppression. Correct, as to
21 both of them, sir?
22 A. Yes.
23 Q. And you talk about
24 deceptive, falsifying data, and we've

73 (Pages 286 to 289)
405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 290

1  discussed that as well; is that correct?
2      A.   Yes.
3      Q.   Okay.
4          Now, a couple of things I
5  want to switch gears on to finish up.
6          I think somewhere along the
7  way I saw in documents that you were
8  involved as an advisor to some kind of a
9  stock or bond fund.  Is that correct,
10 sir?
11     A.   It was an investment fund
12 known as Great Point Partners.
13     Q.   What did that involve, and
14 how does that affect anything that either
15 you've said here today or your views, if
16 at all?
17         MR. GOLDMAN: Objection.
18         THE WITNESS: I do not
19     believe it has any effect on what
20     I've said, but it has, in an
21     article in Fortune, in a contrived
22     way, been made to give a
23     perception of a conflict of
24     interest, which did not exist.

Page 291

1  BY MR. KLINE:
2      Q.   Did you ever have a conflict
3  of interest when you stated your views
4  publicly either back when you published
5  the JAMA article or up to today when you
6  testified under oath?
7          MR. GOLDMAN: Objection.
8          THE WITNESS: I do not
9      believe I've had any conflict of
10     interest whatsoever in all the
11     articles that we've written or
12     even the matter cited regarding
13     this investment fund serving as a
14     medical adviser.
15 BY MR. KLINE:
16     Q.   Now, a couple of additional
17 points here and there.
18         You mentioned that you
19 couldn't get ahold of Dr. Gilmartin.
20 That raised in my mind the question, did
21 Merck or anyone -- let me start it this
22 way.
23         Merck -- does Merck -- let
24 me start again.

Page 292

1          You mentioned that you had
2  done a study for Merck; correct?
3      A.   With Merck, yes, the TARGET
4  trial, yes.
5      Q.   Yes.
6          And what drug was that, by
7  the way?
8      A.   That was a drug, the
9  commercial name is known as Aggrastat,
10 tirofiban.
11     Q.   Were you actually paid by
12 Merck?
13     A.   No.  I was not paid. I did
14 do the trial.
15     Q.   Was there funding provided
16 to the institution here, the Cleveland
17 Clinic, by Merck?
18     A.   There was funding to the
19 Cleveland Clinic and to the 60 sites that
20 participated in the trial, yes.
21     Q.   Did the Cleveland -- it
22 raises the question that, has anyone from
23 Merck, to your knowledge, either
24 contacted anyone at the Cleveland Clinic

Page 293

1  or your colleagues or anyone relating to
2  your writings or your public statements
3  relating to Vioxx in any way?  And if so,
4  what is it, if anything?
5          MR. GOLDMAN: Objection.
6          THE WITNESS: I was told by
7      a colleague here at the clinic on
8      October 14th, the chairman of the
9      board of trustees, Mr. Mal Mixon,
10     was contacted.
11 BY MR. KLINE:
12     Q.   His name is?
13     A.   Mal, Malachi Mixon, chairman
14 of our board of trustees.
15     Q.   Current?
16     A.   Yes, of the Cleveland
17 Clinic.  That he was contacted directly
18 by Raymond Gilmartin in October of 2004,
19 and that Mr. Gilmartin said to Mr. Mixon,
20 what has Merck ever done to the Cleveland
21 Clinic to warrant this?  And this was
22 relayed by a colleague who spoke to Mr.
23 Mixon.
24     Q.   Who was that colleague, sir.

Page 294

```
1         MR. GOLDMAN: Objection,
2    move to strike as nonresponsive.
3         THE WITNESS: His name is
4    Richard Rudick.
5    BY MR. KLINE:
6    Q.    Who is he?
7    A.    He is the director of
8    clinical research.
9    Q.    Rudick was told by Mixon
10   that Mixon was contacted by Gilmartin.
11   Is that what you're telling me?
12        MR. GOLDMAN: Objection.
13        THE WITNESS: Yes. That he
14        was further told that Mr.
15        Gilmartin and Mr. Mixon were
16        colleagues together at Harvard
17        M.B.A. school, they were old
18        friends, and that Mr. Mixon
19        understood that Mr. Gilmartin was
20        very upset when he called in
21        October '04.
22        This was relayed on October
23        14th to Dr. Rudick. I don't know
24        exactly what date. I believe it
```

Page 295

```
1    was the day prior, October 13th,
2    but I can't know for sure.
3         MR. GOLDMAN: Objection,
4    lacks foundation.
5    BY MR. KLINE:
6    Q.    And where does October 14
7    fit on our chronology? What event does
8    that relate to?
9    A.    That was eight days after
10   the New England Journal paper, of my
11   editorial, and about 13 or 12 days after
12   the New York Times op/ed.
13   Q.    And from your perspective,
14   assuming we pin all of that down that
15   that, indeed, happened -- first of all,
16   you believe that if called to testify,
17   that's what Dr. Rudick would tell us? Is
18   that what you're saying?
19        MR. GOLDMAN: Objection.
20        THE WITNESS: Yes. I've
21        confirmed this with Dr. Rudick,
22        yes.
23   BY MR. KLINE:
24   Q.    And what -- how do you view
```

Page 296

```
1    all of this?
2         MR. GOLDMAN: Objection.
3    BY MR. KLINE:
4    Q.    How do you view this event
5    that you've just described for me?
6         MR. GOLDMAN: Same
7         objection.
8         THE WITNESS: I find it
9         entirely repulsive.
10   BY MR. KLINE:
11   Q.    Do you know what was said by
12   -- is it Dr. Mixon?
13   A.    No, Mr. Mixon.
14   Q.    No. He's an M.B.A. like
15   Gilmartin?
16   A.    That's correct.
17   Q.    Have you talked to Dr. --
18   Mr. Mixon about it?
19   A.    He's never told me about it
20   directly, and I've not questioned him
21   about it.
22        MR. KLINE: Let's take a
23        very brief break.
24        THE VIDEOTAPE TECHNICIAN:
```

Page 297

```
1    Off the record at 1:22.
2         - - -
3         (Whereupon, there was a
4    luncheon recess from 1:22 p.m.
5    until 2:18 p.m.)
6         - - -
7         THE VIDEOTAPE TECHNICIAN:
8    Back on the record at 2:18. Tape
9    Number 4.
10   BY MR. KLINE:
11   Q.    Dr. Topol, a few more
12   questions from me, and I'll conclude my
13   examination.
14        In the VIGOR trial, we had
15   mentioned the DSMB earlier. Do you know
16   if there was any cardiologist on the
17   DSMB?
18   A.    I'm not aware --
19        MR. GOLDMAN: Objection,
20        lacks foundation.
21        THE WITNESS: I'm not aware
22        of any -- who the members of that
23        safety monitoring board were, so,
24        I don't know.
```

75 (Pages 294 to 297)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f