Page 298

BY MR. KLINE:
Q. Would it make a difference in your mind if you knew that there was no cardiologist on the DSMB that was addressing any cardiovascular safety issues and what would you have expected?
    MR. GOLDMAN: Objection.
    THE WITNESS: It's much easier to see you.
    Yes, I would be concerned if no cardiologist was on the committee and they were adjudicating -- remember that point I made earlier about November 19, 1999 when they had excess deaths and serious cardiovascular events, and that does need a cardiologist trained in clinical trials to help interpret that signal.
BY MR. KLINE:
Q. And when Dr. Reicin came to visit you, did she identify herself as an internist who was actually an infectious

Page 299

disease doctor, rather than a cardiologist?
    MR. GOLDMAN: Objection.
    THE WITNESS: Dr. Reicin didn't describe her background. She just told us or told me when she came that she was the director of the Vioxx and the COX-2 inhibitor program. That's all I knew.
BY MR. KLINE:
Q. Did you know that the director of the COX-2 program at Merck was an infectious disease doctor who had limited experience prior to coming to Merck just a few years earlier?
    MR. GOLDMAN: Objection.
    THE WITNESS: I did not know that.
BY MR. KLINE:
Q. Does that surprise you hearing that today?
    MR. GOLDMAN: Objection.
    THE WITNESS: I would have

Page 300

thought rheumatologists would have worked in that space, but, you know, I can't really comment beyond that.
BY MR. KLINE:
Q. The next thing I'd like to show you is an exhibit which was Bates stamped 462, and I'd like to have it marked and handed to you, if I can.
    Instead of going to 462 because it doesn't matter the order, I'm going to go to 465, which was -- which will be the next exhibit, the next exhibit number being --
    MR. KLINE: Are we at 26?
    THE COURT REPORTER: Yes.
    MR. KLINE: That's what it says, 26.
        - - -
    (Whereupon, Deposition Exhibit Topol-26, "Preliminary Questions - 60 Minutes," TOPOLE 0000465 and EJT 000334, was marked for identification.)

Page 301

        - - -
BY MR. KLINE:
Q. Let me hand it to you, your counsel, Merck's counsel.
    Apparently there were preliminary questions from 60 Minutes. Would you tell me how this document came about very briefly?
    MR. GOLDMAN: Objection. Can I have a standing objection to this document and any testimony about it?
    MR. KLINE: Yes. For those who are viewing this, there's a little bit different configuration in the room. That's why Dr. Topol now may be looking over to me while we finish this examination.
    THE WITNESS: So, this was a list of questions that Michael Radutsky, the producer of CBS 60 Minutes, was providing me. He basically gave me these questions over the phone, and then my

Page 302

1  assistant typed them up.
2  BY MR. KLINE:
3      Q.  You only wrote in your
4  handwriting one word on that document;
5  correct?
6      A.  Yes.
7      Q.  What is the one word that
8  you wrote on the document?
9      A.  The word is "deception."
10     Q.  What did you mean, sir?
11         MR. GOLDMAN:  Objection.
12         THE WITNESS:  I think that
13     this was about the conversation I
14     had with Michael Radutsky at CBS
15     and what he was particularly cued
16     into regarding concern about
17     deception of Merck.
18 BY MR. KLINE:
19     Q.  Did you, sir, believe there
20 was deception?
21         MR. GOLDMAN:  Objection.
22         THE WITNESS:  As I reviewed
23     throughout this deposition, I
24     thought there were many points of

Page 303

1      highly misleading errors of
2      omission and what could be
3      considered the false conveyance of
4      data and findings.
5  BY MR. KLINE:
6      Q.  And would those things that
7  you just described fall under the
8  category of deception?
9          MR. GOLDMAN:  Objection.
10         THE WITNESS:  I think that
11     that's certainly a term that could
12     be used to apply to this pattern,
13     yes.
14             - - -
15         (Whereupon, Deposition
16     Exhibit Topol-27, Letter 10-7-04
17     with handwritten notes, TOPOLE
18     0000462, was marked for
19     identification.)
20            - - -
21 BY MR. KLINE:
22     Q.  All right.  I'm showing you
23 Exhibit 27, hand it to you, your counsel
24 and Merck's counsel.

Page 304

1          I'm only concerned with the
2  handwriting on the document.  It happens
3  to be made on a note of -- with the Bill
4  Moyers show.  It's dated October 7, 2004.
5  Sir, you have key points.  Are these the
6  points that you were raising regarding
7  the November 18 findings of the
8  preliminary data that was coming out on
9  the VIGOR trial?
10         MR. GOLDMAN:  Objection.
11         THE WITNESS:  This is the
12     points that I put after -- this
13     fellow, Bryan Myers and Bill
14     Moyers forwarded me the Targum
15     report, which I had never
16     reviewed.  Once I reviewed it,
17     these were the summary points that
18     I made because then I was asked to
19     contact Mr. Myers and Bill Moyers
20     to convey what I thought were the
21     principal findings.
22 BY MR. KLINE:
23     Q.  The principal findings from
24 what?

Page 305

1      A.  The VIGOR and -- well, that
2  whole supplement.  I forgot the number of
3  it, but it's the combination of VIGOR,
4  090 and 085, which I've been calling the
5  Targum report.
6      Q.  I understand.  If you can
7  summarize in two or three words, what was
8  your bottom line from all this data that
9  you have handwritten there?
10         MR. GOLDMAN:  Object to
11     form.
12 BY MR. KLINE:
13     Q.  Please.
14     A.  The more I reviewed this
15 particular supplement or Targum report,
16 the more disturbing it became.  I had not
17 ever delved into it as I did at that
18 point in time, and this is, of course,
19 after the drug withdrawal.
20            - - -
21         (Whereupon, Deposition
22     Exhibit Topol-28, Memo 10-17-04,
23     TOPOLE 0000474, was marked for
24     identification.)

Page 306

BY MR. KLINE:
Q. Sir, I previously marked an exhibit -- I believe I marked this.
MS. DAGOSTINO: You did not mark it yet.
MR. KLINE: I did not?
BY MR. KLINE:
Q. I'm showing you -- I guess I did not -- 474, Bates Number 474, which I will mark as Exhibit Number 28 which covers a lot of territory. It's an e-mail from you to Mike Radutsky from 60 Minutes. I would like to ask you to confirm for me that some of these things were said.
You say, "I was asked to review a paper for the Lancet written by well regarded, independent researchers from Europe." Did I read it correctly?
A. Yes.
Q. Indeed, was it important to you that these folks were independent?
MR. GOLDMAN: Objection.

Page 307

THE WITNESS: Yes.
BY MR. KLINE:
Q. "Their study proves," and you used the word "unequivocally that the data on Vioxx had 'crossed the line' by 2001 for heart attack risk." What I've read to you, is that a correct statement --
MR. GOLDMAN: Objection.
BY MR. KLINE
Q. -- that you made in this e-mail?
A. Yes, and I reviewed what that line meant earlier today, yes.
Q. That's what I wanted to know as well.
Finally you go on to say in the middle of this paragraph, "We can now confirm that the famous study '090'" -- you used the word "famous," but would you tell me in other correspondence you actually refer to it as "infamous."
A. Yes. What I'm referring to is, it's buried, that is, "famous" was

Page 308

being somewhat sarcastic. It never got to the light of day. It only could be found in the Targum report. It was never published, and the only abstract about it, it was presented by Dr. Geba at a geriatrics meeting, and it only presented the -- he only presented the efficacy side on arthritis. He did not present the cardiovascular events.
Q. You say that -- let me just find it here with my eyes.
"We now can confirm that the famous...'090' of Merck was NEVER published, that it was part of the FDA pivotal registration packet leading to the May 1999 approval."
Do you see that?
A. Yes.
Q. You then say "and" -- that's not what I want to ask you about.
I want to ask you about this: "And that it showed a striking risk of heart attack and stroke before the drug ever got commercialized."

Page 309

Is that a correct statement?
A. Well, as it turns out, the dates were wrong because they were not provided in the Targum report. As it turned out, that data, I guess, was -- May 1999 was when it was finalized, and so already the drug had been approved. So, I was mistaken that study 090 was available before approval. That data must have been available coincident, right around the time of approval.
BY MR. KLINE:
Q. I see.
A. But I can't say for sure because I don't have all the 090 documents to back that up.
Q. You say, "The cumulative meta-analysis of 21,432 patients also proves that the heart toxicity was not at all dose or duration related." Correct?
MR. GOLDMAN: Objection.
BY MR. KLINE:
Q. That's what you said.
A. That's citing the Juni

Page 310

1  paper, which was a systematic cumulative
2  meta-analysis.
3      Q.  If you look at 3, you say
4  "One more angle," number 3, your writing,
5  "the former CEO of Merck, Dr. Roy
6  Vagelos, an honorable, capable man. He
7  hates Gilmartin and thinks he is an idiot
8  (may be accurate). He would be a good
9  person for you to call - Gilmartin
10 replaced him. Vagelos is incredibly well
11 respected in the medical and business
12 community, of the highest integrity and
13 ethical standards. I think he might open
14 up and say - 'Merck should have done the
15 right thing immediately in 1998 when
16 study 090 showed a more than 6-fold heart
17 attack risk at low dose (12.5 milligrams)
18 of Vioxx."
19     Did you make that statement
20 in that document back in October 17 of
21 2004?
22     MR. GOLDMAN: Objection.
23     THE WITNESS: I made that
24 statement. By happenstance, I

Page 311

1  happened to have had dinner with
2  Dr. Vagelos just a couple of days
3  before the Vioxx withdrawal, and I
4  actually -- we spoke, it was such
5  a coincidence, about the whole
6  Vioxx issue, about his
7  relationship with Ray Gilmartin,
8  and it was actually quite an
9  extraordinary coincidence just a
10 couple of days later to have this
11 whole drug withdrawal and that
12 dinner discussion that evening
13 come back.
14     MR. GOLDMAN: Objection,
15 move to strike as nonresponsive.
16 BY MR. KLINE:
17     Q.  Couple more points.
18     In your editorial, your
19 op/ed piece, you wrote, there's only a
20 sentence, I won't put it in front of you,
21 "Vioxx has repeatedly carried a far
22 greater risk of heart attack and stroke,"
23 you're saying, I'm reading through it,
24 "than the other COX-2 inhibitors?"

Page 312

1      A.  (Witness nods.)
2      Q.  Do I have your opinion or
3  your views, your conclusions basically
4  correct when I state that?
5      MR. GOLDMAN: Objection.
6      THE WITNESS: The point here
7  is that all the COX inhibitors
8  have to be implicated, the class,
9  but within that class there
10 appears to be a gradient where
11 Vioxx appears to be worse,
12 consistently worse than Celebrex,
13 and somewhere in between perhaps
14 or perhaps closer to Vioxx is
15 Bextra, and there are other agents
16 in this class as well.
17 BY MR. KLINE:
18     Q.  That's what I wanted to --
19     MR. GOLDMAN: Move to strike
20 the nonresponsive portion.
21 BY MR. KLINE:
22     Q.  That's what I wanted to
23 know. That's what I wanted to find out.
24     MR. KLINE: Dr. Topol, thank

Page 313

1  you for answering my questions. I
2  may have more questions after
3  Merck counsel examines you.
4      THE VIDEOTAPE TECHNICIAN:
5  Off the record at 2:31.
6      MR. LEVENSTEN: I'm here on
7  behalf of the Pennsylvania cases.
8  Our Discovery Order Number 1
9  permits me to examine the witness
10 today. I've informed Mr. Goldman
11 that I intend to conduct an
12 examination of the witness today.
13 I've offered to do it at the
14 conclusion of Mr. Kline's direct
15 examination. Mr. Goldman's
16 position is that I cannot go
17 forward with -- well, I'll allow
18 him to state his. I don't want to
19 misstate his position. Go ahead.
20     MR. GOLDMAN: I'm not taking
21 any position at all, Mr.
22 Levensten, on whether you can ask
23 questions. I understand that the
24 MDL plaintiffs' lawyers think that

79 (Pages 310 to 313)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 314

1  the seven-hour rule applies in the
2  MDL and that we should be
3  splitting our time. So, if you
4  want to coordinate with the
5  plaintiffs' lawyers, that's fine.
6  But I don't take a position one
7  way or the other.
8       MR. LEVENSTEN: Well, then,
9  can I go forward now?
10      MR. GOLDMAN: Let's go off
11 the record for a second.
12           - - -
13      (A discussion off the record
14 occurred.)
15           - - -
16      MR. WEINKOWITZ: While we're
17 on a break, can I enter my
18 appearance?
19      Mike Weinkowitz,
20 W-E-I-N-K-O-W-I-T-Z, from Levin
21 Fishbein Sedran & Berman here in
22 Philadelphia.
23      MR. GOLDMAN: Mr. Levensten
24 has spoken with Mr. Kline, and

Page 315

1  they're going to talk about what
2  questions they might want to ask.
3  I do want to make clear that I
4  don't know whether this deposition
5  has been cross-noticed in New
6  Jersey, and so the record will
7  speak -- or Pennsylvania. The
8  record will speak for itself on
9  that.
10      MR. LEVENSTEN: Just so I'm
11 clear on that record, we have a
12 discovery order entered that says
13 that this deposition is deemed
14 taken in Pennsylvania. The order
15 also talks about how we're allowed
16 to ask questions that aren't
17 duplicative at depositions, and I
18 just need to protect my record
19 today. Whether or not it's
20 cross-noticed, I don't even know
21 that it's relevant considering the
22 discovery order.
23      THE VIDEOTAPE TECHNICIAN:
24 On the record at 2:39.

Page 316

1           - - -
2         EXAMINATION
3           - - -
4  BY MR. GOLDMAN:
5     Q.  Good afternoon, Dr. Topol.
6     A.  Good afternoon.
7     Q.  I want to talk for a few
8  seconds about cardiovascular disease. Is
9  it the leading cause of death in the
10 United States?
11    A.  Yes, it is.
12    Q.  Is cardiovascular disease
13 the leading cause of death by far?
14    A.  Well, it's significantly
15 greater than the second leading cause of
16 cancer, so, yes.
17    Q.  Is cardiovascular disease
18 the number one killer in the United
19 States and has it been since 1900?
20    A.  Yes.
21    Q.  Do you know that
22 approximately every 34 seconds somebody
23 dies of heart disease in this country?
24    A.  That's, I think, from the

Page 317

1  American Heart Association, and I can't
2  vouch for the calculation, but that's out
3  there, yes.
4     Q.  You also note, Dr. Topol,
5  that every 45 seconds somebody dies of a
6  stroke in the United States?
7     A.  Again, I think that's an AHA
8  fact, but I can't -- I was not involved
9  at all with the calculation, but I've
10 seen that written, yes.
11    Q.  Have you also seen that
12 700,000 Americans will die of a stroke in
13 2005?
14    A.  That number would correspond
15 to heart attacks, 700,000. Stroke number
16 is not that high.
17    Q.  Do you know that
18 approximately 700,000 Americans will have
19 a stroke in 2005?
20    A.  That may well be the case,
21 but they wouldn't die from the stroke.
22 The number would be too high.
23    Q.  Is it true, Dr. Topol, that
24 every year 400,000 -- 460,000 people die

Page 318

1  of heart disease in the emergency room or
2  before even getting to the hospital?
3      A.  That number may be about
4  right. There's a lot of out of hospital
5  sudden death, yes.
6      Q.  Did you take Vioxx, Dr.
7  Topol?
8      A.  Yes, I took Vioxx.
9      Q.  You took Vioxx for years,
10 didn't you?
11     A.  I took it occasionally. I
12 have knee arthritis. I've had multiple
13 knee surgeries, so, I would take it on
14 demand, you know, whether it be every --
15 once, a couple, every few weeks, that
16 sort of thing.
17     Q.  The reason you took Vioxx is
18 because you had serious knee pain, and
19 traditional NSAIDs were bothering your
20 stomach. Is that true?
21     A.  I think the medicines that I
22 had taken actually didn't bother my
23 stomach. I haven't had any things that
24 really bothered my stomach very much, but

Page 319

1  I can't recall that so much as I thought
2  I had better relief of my arthritis than
3  by taking a Motrin or some other
4  over-the-counter preparation.
5      Q.  Vioxx helped relieve your
6  knee pain better than the traditional
7  NSAIDs. Is that fair?
8      A.  The ones that I had tried,
9  yes.
10         - - -
11         (Whereupon, Deposition
12     Exhibit Topol-29, New York Daily
13     News Reprint (3 pages), was
14     marked for identification.)
15         - - -
16 BY MR. GOLDMAN:
17     Q.  Let me show you what I'll
18 mark as the next exhibit. Let's see if I
19 can refresh your recollection on whether
20 you suffered any stomach problems on
21 traditional NSAIDs. This is Exhibit 29,
22 and it is an excerpt from the New York
23 Daily News. Directing your attention,
24 Dr. Topol, to the paragraph, do you see

Page 320

1  it highlighted there?
2      A.  No. What page are you on?
3      Q.  Let me have it back, sir.
4      A.  (Handing over document.)
5      Q.  On the third page, I'll read
6  it to you, and you tell me if it's
7  accurate. This is quoting you: "Vioxx
8  and Celebrex are 'great medicines,' adds
9  the Queens born cardiologist who is 47.
10 He takes them for knees wrecked playing
11 college basketball. 'I used to have a
12 lot of stomach problems and I don't
13 challenge the stomach benefit,' says
14 Topol."
15     A.  Well, I haven't seen the
16 thing, and it'd be nice if I could see
17 it.
18         MS. DAGOSTINO: Where is the
19     quote? I'm sorry.
20         MR. GOLDMAN: It's on Page
21     3, the third column to the right,
22     second full paragraph.
23         THE WITNESS: (Witness
24     reviewing document.)

Page 321

1      Okay.
2  BY MR. GOLDMAN:
3      Q.  Is that correct or not?
4      A.  I don't remember ever saying
5  I used to have a lot of stomach problems,
6  so, I don't believe that's correct.
7      Q.  Is it true, Dr. Topol, that
8  newspapers sometimes report things that
9  aren't true?
10     A.  I would assume that not
11 everything in the newspaper is absolutely
12 correct, yes.
13         MR. HAMELINE: Can we get a
14     copy of that?
15         MR. GOLDMAN: Sure.
16         (Handing over document.)
17 BY MR. GOLDMAN:
18     Q.  You have pointed out on
19 several occasions on your direct
20 examination that you read newspaper
21 articles, and you formed opinions in this
22 case based on what you've read in
23 newspaper articles. Is that true, sir?
24     A.  There are only two newspaper

Page 322

1  articles that I mentioned today that were
2  not substantiated by medical literature
3  that was peer reviewed. One was the
4  ADVANTAGE trial which was supplementary
5  to the Annals of Internal Medicine paper
6  by Lisse et al. The other was the VALOR
7  trial which, of course, has not been
8  published, it never was done. Otherwise,
9  all my comments were derived from the
10 literature that was published in medicine
11 in leading peer-reviewed journals.
12     Q.  Let's talk about the VIGOR
13 study. When did you first learn about
14 the VIGOR results, Dr. Topol?
15     A.  The VIGOR trial, to my --
16 really learning about it was not until,
17 as I mentioned this morning, February
18 2001.
19     Q.  Was the VIGOR trial
20 published in the New England Journal of
21 Medicine?
22     A.  Yes. As I mentioned, the
23 November 22nd, 2000.
24     Q.  Is the New England Journal

Page 323

1  of Medicine a top medical journal?
2      A.  It's the leading impact
3  journal in biomedicine today.
4      Q.  Do you read it regularly?
5      A.  I read articles -- it's
6  impossible to keep up with all the
7  medical literature, but I read all
8  articles that are pertinent to my
9  specialty, which is coronary artery
10 disease, which is -- with the primary
11 focus on the heart, yes.
12     Q.  Is the New England Journal
13 of Medicine a peer-reviewed journal?
14     A.  Yes.
15     Q.  That means that before the
16 New England Journal of Medicine will
17 publish an article, doctors who are
18 knowledgeable in the field that's being
19 described in the article review the
20 article for accuracy.
21     A.  "Peer review" means that the
22 data are reviewed, and certainly the
23 conclusions are -- yes, that's what peer
24 review is all about.

Page 324

1      Q.  Peer reviewed is a standard
2  process that medical journals use to
3  ensure the quality of the articles that
4  they publish; correct?
5      A.  Correct.
6      Q.  I want to talk briefly about
7  how the VIGOR trial was conducted, and
8  then we'll discuss the results. Okay?
9      A.  Yes.
10     Q.  Do you know that VIGOR
11 tested whether Vioxx was safe at treating
12 pain suffered by patients who had
13 rheumatoid arthritis?
14     A.  Yes. I mentioned that
15 earlier today.
16     Q.  And one of the things that
17 the VIGOR trial sought to test was
18 whether the patients who had rheumatoid
19 arthritis could have relief from their
20 pain without causing them as many stomach
21 problems as naproxen; correct?
22     A.  The primary, I think,
23 endpoint of the study was the relief of
24 gastrointestinal complications. That

Page 325

1  was, I think, why the sample size and the
2  power of the trial was set up, to detect
3  whether or not rofecoxib/Vioxx would have
4  an advantage over naproxen in that
5  regard.
6      Q.  Are patients with rheumatoid
7  arthritis at higher risk of heart
8  attacks?
9      A.  As I mentioned this morning,
10 yes, patients with RA, rheumatoid
11 arthritis, do have higher event rates for
12 heart attacks.
13     Q.  In the VIGOR trial, patients
14 who participated either used Vioxx 50
15 milligrams once a day or naproxen, 500
16 milligrams twice per day. Is that right?
17     A.  That's correct.
18     Q.  The dosage for Vioxx that
19 was used is actually twice the highest
20 recommended dose in the label for Vioxx,
21 correct, sir?
22     A.  That's correct, although I
23 must say it was an 8,000 patient trial,
24 so, it was a very large trial, and that's

Page 326

1  the dose that was picked by the trialist
2  and the sponsor, yes.
3      Q.  The dose that was picked was
4  also approved by the FDA; correct, sir?
5      A.  The dose approved by the FDA
6  at the time was not approved for
7  rheumatoid arthritis. It was approved
8  for osteoarthritis, and I believe the
9  doses were 12-and-a-half milligrams to 25
10 milligrams or up to 50 milligrams.
11     Q.  I wasn't clear, sir.
12         The 50 milligram dose that
13 was used in the VIGOR trial was approved
14 by the FDA to be used in the VIGOR trial,
15 correct, sir?
16     A.  Well, that's not the way it
17 works. You don't get doses approved by
18 the FDA to use in a trial. There's an
19 approval mechanism for a drug now that's
20 on the market. The VIGOR trial, I
21 believe, had started long before the drug
22 was approved. So, what would be here
23 would be a protocol that would be
24 reviewed by the FDA. If that's what the

Page 327

1  sponsor wants to use as a dose, then
2  certainly the FDA isn't going to take
3  issue with that.
4      Q.  Does the FDA approve
5  protocols before clinical trials can be
6  conducted, sir?
7      A.  The FDA reviews the
8  protocols, and in general, unless there's
9  something that's particularly an outlier
10 regarding the design, the FDA will go
11 along with what the sponsor's wishes are
12 as long as there's no concern regarding
13 overt safety and ethical issues. The
14 sponsor is the one that would be
15 responsible for picking the appropriate
16 dose.
17     Q.  You're not critical, Dr.
18 Topol, of Merck's decision to use
19 naproxen as the drug to compare Vioxx to,
20 are you, sir?
21     A.  No. I think naproxen, being
22 a widely used nonsteroidal agent for
23 arthritis, all types of arthritis, was a
24 very suitable comparator.

Page 328

1      Q.  None of the patients in the
2  VIGOR trial used placebo, did they?
3      A.  The VIGOR trial did not test
4  placebo. It was a so-called active
5  comparison, that is, comparing one active
6  anti-inflammatory versus another.
7      Q.  A placebo is another word
8  for a sugar pill. Is that right?
9      A.  That would be an inactive
10 drug, yes.
11     Q.  You agree, sir, that it
12 would have been unethical and
13 inappropriate to conduct a study on
14 patients with rheumatoid arthritis and
15 give half of the group Vioxx and the
16 other half a sugar pill?
17     A.  No, I don't agree with that
18 whatsoever. That is, you could do a
19 trial, as long as you had some pain
20 medicine, anti-inflammatory, that all the
21 patients were getting to relieve their
22 symptoms. And then on top of that, you
23 could do Vioxx versus placebo on top of
24 that. So, no, I don't agree with that.

Page 329

1      Q.  Would it be ethical, Dr.
2  Topol, if half of the patients in the
3  VIGOR study who had rheumatoid arthritis
4  only took a placebo?
5      A.  If they had no other relief
6  for their rheumatoid arthritis symptoms?
7      Q.  Yes.
8      A.  No, that would not be
9  proper.
10     Q.  The VIGOR trial showed that
11 Vioxx was an effective treatment for
12 pain; correct?
13     A.  The VIGOR trial showed there
14 was no difference in pain relief between
15 naproxen and Vioxx.
16     Q.  That wasn't my question, Dr.
17 Topol.
18         I asked you whether Vioxx
19 was shown in the VIGOR trial to be an
20 effective treatment for pain.
21     A.  Effective compared with
22 what, Mr. Goldman?
23     Q.  Effective, period, sir.
24     A.  No. You can't make --

Case 2:05-md-01657-EEF-DEK   Document 7728-10   Filed 10/04/06   Page 9 of 15

Page 330

1  effective, you have to have a reference.
2  Here the reference was naproxen. It was
3  shown to be no more effective than
4  naproxen. So then you could say it's
5  equally effective to naproxen, then I
6  would say yes, for pain relief.
7      Q.  Do you agree then, sir, that
8  Vioxx worked to reduce pain that
9  rheumatoid arthritis patients were
10 experiencing in the VIGOR trial?
11     A.  It reduced pain, as far as I
12 understand from the data, equally, as
13 well as naproxen at the doses that were
14 administered with the 50 milligrams of
15 Vioxx, yes.
16     Q.  The results of VIGOR also
17 showed that Vioxx significantly reduced
18 the risk of stomach bleeds compared to
19 naproxen; correct?
20     A.  Yes. As reviewed earlier
21 today, the risk of reduction of stomach
22 bleeds was small, but statistically
23 significant, and it was very much in
24 keeping with the magnitude of the excess

Page 331

1  of heart attacks and strokes.
2      Q.  Dr. Topol, if you could try
3  to just answer my questions directly --
4      MR. KLINE: Objection.
5  BY MR. GOLDMAN:
6      Q.  -- and not add anything on
7  to them, that would be helpful. My only
8  question, sir --
9      MR. KLINE: Does the same
10     rule apply to Merck? Let's redact
11     Alise Reicin's deposition.
12     You should answer the
13     questions fully and completely.
14 BY MR. GOLDMAN:
15     Q.  Dr. Topol, did Vioxx
16 significantly reduce the risk of stomach
17 bleeds compared to naproxen in the VIGOR
18 trial?
19     A.  I believe I answered that
20 question to the best of my ability.
21     Q.  Is the answer yes?
22     A.  As I had previously answered
23 the question in context.
24     Q.  Is the answer yes?

Page 332

1      MR. HAMELINE: I think he's
2      already answered the question. If
3      you don't like the answer, that's
4      a different issue.
5  BY MR. GOLDMAN:
6      Q.  Dr. Topol, I'm asking you a
7  very simple question.
8      Did Vioxx in the VIGOR trial
9  substantially reduce or significantly
10 reduce the risk of stomach bleeds
11 compared to naproxen?
12     MR. KLINE: Objection, asked
13     and answered.
14     THE WITNESS: Can you read
15     my answer back, my initial answer,
16     please.
17     - - -
18     (Whereupon, the court
19     reporter read the pertinent part
20     of the record.)
21     - - -
22 BY MR. GOLDMAN:
23     Q.  Was there a 54 percent
24 reduction in the risk of perforations,

Page 333

1  ulcers and bleeds in the Vioxx group
2  compared to the naproxen group, sir?
3      A.  I had to go back to the
4  paper and put that in. I have to look at
5  the data if you'd like me to answer that.
6  I don't memorize statistics about the
7  gastrointestinal bleeding. That's not my
8  field of expertise.
9      Q.  Do you want to take a minute
10 to look at it?
11     A.  I don't have the VIGOR
12 paper. If you'd like to produce it.
13     Q.  What I'll do, Dr. Topol, is
14 show this to you at a break so that you
15 can read it for me rather than do it on
16 the record. Is that okay?
17     A.  Whatever you would like.
18     MR. HAMELINE: Let me just
19     note that Dr. Topol is here for
20     one day of deposition. And we've
21     taken this morning, and I know
22     that it's not your issue, but this
23     morning we've gone off the record
24     repeatedly and not counted that or

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 334

1  at least the argument is not
2  counted that against his running
3  time. If you're going to ask him
4  questions about an exhibit, why
5  don't you show it to him. We'll
6  try to cooperate off the record if
7  we can, but I don't want this to
8  be an off-the-record issue which
9  prolongs this day unduly.
10       MR. KLINE: I would like him
11  to look at it now, rather than at
12  some break.
13  BY MR. GOLDMAN:
14     Q.  Let's talk about the
15  cardiovascular results of VIGOR. Okay,
16  Doctor?
17       We saw in the VIGOR trial
18  that there were more cardiovascular
19  events in the Vioxx group than in
20  naproxen; correct?
21     A.  That's correct. And I did
22  review that this morning. I'll be happy
23  to review it again if you'd like.
24     Q.  So, you reviewed the data

Page 335

1  about the cardiovascular events in VIGOR
2  this morning, but you didn't review the
3  data about the reduction in stomach
4  bleeds.
5     A.  No. I did review in my
6  letter of December 30, 2004
7  correspondence in the New England
8  Journal. I commented about the
9  gastrointestinal complications, as well
10  as, but I did not cite the particular
11  bleeding figure, percentage that you just
12  asked me about.
13     Q.  Was the difference in
14  cardiovascular events in the Vioxx group
15  mostly due to a five times difference in
16  heart attacks compared to the naproxen
17  group?
18     A.  Well, let me just be very
19  clear about that. Okay? There were 22
20  deaths in the Vioxx group and 15 deaths,
21  as I reviewed, in the naproxen group.
22  There were 20 heart attacks versus -- in
23  the Vioxx group versus 4. So, there was
24  an excess of deaths. That was a 46

Page 336

1  percent excess of deaths, which is
2  similar, if your number is right, with
3  respect to the bleeding complications.
4  If we're talking about percentages, 46
5  percent increase in death and 46 percent
6  increase in bleeding complication, if
7  that's correct. We have a five fold, 500
8  percent increase in heart attack. And
9  then we have also an increase in stroke,
10  11 versus 9.
11       So, according to the correct
12  data, which was not published in the New
13  England Journal paper by Bombardier in
14  November 22, 2000, there was 53 of these
15  events, death, heart attack or stroke
16  versus 28. The largest portion of those
17  in terms of numerical were heart attack,
18  but there was a consistent excess across
19  each, death, heart attack and stroke.
20       MR. GOLDMAN: Move to strike
21  as nonresponsive.
22  BY MR. GOLDMAN:
23     Q.  Dr. Topol, first of all, the
24  deaths that you just described, the 22

Page 337

1  versus 15, those weren't all heart attack
2  deaths or cardiovascular deaths, were
3  they, sir?
4     A.  Predominantly they were,
5  yes, as reported in the study report in
6  the FDA, yes.
7     Q.  Is it your testimony under
8  oath, Dr. Topol, that the majority of the
9  22 deaths and the majority of the 15
10  deaths reported in VIGOR were heart
11  attacks?
12     A.  Not heart attacks, but they
13  were cardiovascular deaths, and I'd be
14  happy to go to the Targum report where
15  they're enumerated in tables if you would
16  like.
17     Q.  My question actually was not
18  about the deaths, Dr. Topol. My question
19  was about whether or not in VIGOR the
20  difference in cardiovascular events was
21  attributed mostly because there was a
22  five times more -- five times greater
23  difference in heart attacks versus
24  naproxen.

Page 338

1   MR. KLINE: Objection to the
2   introduction.
3   BY MR. GOLDMAN:
4   Q. Dr. Topol, was there a five
5   times difference in heart attacks in the
6   Vioxx group versus the naproxen group in
7   the VIGOR study?
8   MR. HAMELINE: So, can I
9   just interject a comment here.
10  You're asking him very specific
11  questions about the data in the
12  VIGOR study without putting the
13  VIGOR study in front of him. To
14  the extent that Dr. Topol has
15  memorized all of this or put it
16  into subsequent articles, that's
17  fine. I'm just trying to make
18  sure that the answers are fair and
19  complete.
20  THE WITNESS: Okay.
21  BY MR. GOLDMAN:
22  Q. Let me back up, Dr. Topol.
23  I think you said in one of your previous
24  answers that there were 20 heart attacks

Page 339

1   seen in the Vioxx group and 4 heart
2   attacks seen in the naproxen group.
3   Right?
4   A. That's correct.
5   Q. That's a five times
6   difference; right?
7   A. That's correct.
8   Q. What percentage of the
9   patients in the Vioxx group had heart
10  attacks?
11  A. That would be 20 of 4,047.
12  So, that would be approximately -- I
13  don't have a calculator, but it would be
14  approximately .5 percent.
15  Q. One half of one percent?
16  A. One half of one percent.
17  Q. Do you know what the
18  percentage of heart attacks in the
19  naproxen group was?
20  A. Well, that was 4 out of
21  4,029, which is less than .1 percent.
22  Q. Or less than one-tenth of
23  one percent?
24  A. That's correct.

Page 340

1   Q. Because there was no placebo
2   group in the VIGOR study. If you only
3   looked at the VIGOR study without looking
4   at any other data, you wouldn't be able
5   to tell the reason for the difference in
6   heart attacks in the Vioxx group versus
7   naproxen; is that right?
8   A. I'm not sure that I
9   understand that question.
10  Q. If you just look at the
11  VIGOR study --
12  A. Yes.
13  Q. -- at the time that it was
14  done and you don't consider any data
15  outside of the VIGOR study --
16  A. Yes.
17  Q. -- you don't know whether
18  the difference in heart attacks between
19  Vioxx and naproxen was due to Vioxx --
20  A. Oh, I see.
21  Q. -- naproxen or chance.
22  A. Now I understand your
23  question. Okay. So, first --
24  Q. Is that right?

Page 341

1   A. Yes, you do know. That is,
2   I reviewed this this morning, but just to
3   recap. When you're doing clinical trials
4   with an experimental drug, in this case,
5   it's Vioxx, versus a drug that's been
6   around for 20 years, in this case,
7   naproxen, which is considered the control
8   arm, not a placebo, but a control arm,
9   and if you have an untoward event crop up
10  like occurred in the VIGOR trial, one has
11  to assume that it's the experimental drug
12  excess that's the problem rather than
13  what was introduced by Merck, which is
14  substantiated in the Targum report and
15  other places, which is that it was a
16  protective effect of naproxen which was
17  not documented. The only appropriate
18  conclusion would have been that there was
19  a problem with the experimental drug,
20  which in this case was Vioxx.
21  Q. Is it your testimony, Dr.
22  Topol, that when you reviewed the VIGOR
23  study, it was your conclusion that Vioxx
24  caused the difference in heart attacks

Page 342

1  and not naproxen and not chance?
2      A.   Yes.  That was our
3  conclusion, but we did not at that time
4  have the replication that was needed to
5  say that this drug should be taken off
6  the market or something drastic.  What we
7  did say, as we wrote in the JAMA paper,
8  as you well know and I reviewed earlier,
9  is that more data were needed, and
10 specific significant caution must be
11 exercised in using this medicine because
12 of the heart attack risk.
13     Q.   Did the Food & Drug
14 Administration hold a special Advisory
15 Committee meeting in February of 2001 to
16 discuss the question of whether COX-2
17 inhibitors cause heart problems?
18     A.   Yes.  They had, as I
19 mentioned this morning, a two-day
20 conference, one for each of the drugs,
21 Celebrex and Vioxx.
22     Q.   What is an FDA Advisory
23 Committee briefly, sir?
24     A.   Well, a panel of experts are

Page 343

1  brought in, and the data are reviewed,
2  and there's recommendations by the panel
3  to give to the FDA staff, and the FDA
4  staff can either accept or reject those
5  recommendations.  But this is a panel of
6  experts.  In this particular case, it was
7  predominantly rheumatologists.  There
8  were only two cardiologists who were
9  invited to the panel to review Vioxx and
10 Celebrex.
11     Q.   One of the cardiologists who
12 was on the Advisory Committee was your
13 colleague, Dr. Steven Nissen; is that
14 right?
15     A.   Yes.
16     Q.   He is a well-respected
17 cardiologist, correct, sir?
18     A.   Yes.
19     Q.   The FDA Advisory Committee
20 meetings that are held, those are open to
21 the public, aren't they, Dr. Topol?
22     A.   Yes.
23     Q.   The transcripts from the
24 Advisory Committee meetings are available

Page 344

1  on the FDA website; right?
2      A.   Yes.  And I have even
3  reviewed the transcript of this meeting
4  in depth, yes, in the past.
5      Q.   You also know then that the
6  presentations that are made during the
7  Advisory Committee meeting are also
8  available on the FDA website; right?
9      A.   That's correct.  And I've
10 reviewed the presentations as well.
11     Q.   During the Advisory
12 Committee meeting that your colleague,
13 Dr. Nissen, attended, Merck gave a
14 presentation; right?
15     A.   Merck gave a substantial
16 presentation, that's right.
17     Q.   Pfizer gave a presentation
18 about Celebrex; correct?
19     A.   That was on a different day,
20 yes.
21     Q.   The FDA made a presentation
22 as well; correct?
23     A.   Yes.
24     Q.   The FDA also prepared

Page 345

1  background materials for the Advisory
2  Committee, analyzing the clinical trials
3  that had been done on Vioxx and Celebrex;
4  correct, sir?
5      A.   That's correct.
6      Q.   After the presentations were
7  made, the Advisory Committee discussed
8  the issues, including the risk of --
9  cardiovascular risk that was potentially
10 associated with COX-2 inhibitors; right?
11     A.   In reviewing that,
12 transcripts and the presentations and
13 also discussing this with Dr. Targum, who
14 had the most important data, that is,
15 VIGOR, 085 and 090, she was given less
16 than five minutes to present her
17 findings, which were only really
18 understood by reviewing the report in
19 depth.  Her slides are on the FDA website
20 still.  They do not adequately convey the
21 concerns that she registered, and I'll be
22 happy to review some of the statements
23 that are in her report which are highly
24 disturbing and concerning.  So, in

Page 346

1  effect, Dr. Targum, who did the most
2  thorough review, cardiologist at the FDA,
3  never had her chance to express her views
4  at least as she's conveyed to me and
5  certainly as conveyed by reviewing the
6  FDA slides and her -- and the transcript
7  of that day.
8       Q.   Is it your testimony, Dr.
9  Topol, that Shari Targum of the FDA was
10 not permitted by the FDA to get up and
11 give a full presentation of what she
12 thought about the risks, if any,
13 associated with COX-2 inhibitors?
14      A.   She conveyed that to me in a
15 telephone conversation, exactly the sense
16 that she did not -- she was not able to
17 evoke enough concern among the two
18 cardiologists on the panel, even though
19 they recommended strong changes in the
20 language of the package insert and the
21 label of the drug.
22      Q.   Your colleague, Dr. Nissen,
23 was sitting through the presentation that
24 Miss Targum gave, correct, sir?

Page 347

1       A.   The brief presentation.
2  Approximately three minutes as he relayed
3  to me.
4       Q.   If Dr. Nissen wanted to hear
5  more from Shari Targum of the FDA, he
6  would have said to Ms. Targum, can you
7  tell me more, correct, sir?
8       A.   He didn't know there was
9  anything there to add. Only later, after
10 the review of the data and the review of
11 her report on the website would it become
12 more evident that there were significant
13 concerns.
14      Q.   The Targum report that you
15 keep referring to is a report that was
16 actually presented to the Advisory
17 Committee members, correct, sir?
18      A.   She wrote it February 1st.
19 I don't know whether it was distributed
20 to the Advisory Committee before that
21 meeting. I don't know that. You'd have
22 to ask Dr. Nissen that.
23      Q.   Shari Targum prepared a set
24 of materials for the benefit of the

Page 348

1  Advisory Committee; right, sir?
2       A.   I believe that's what -- she
3  did it for that advisory panel, but I
4  don't know -- what you're asking is, was
5  it distributed to the panelists in
6  advance? I don't know that. I wasn't
7  there. This was Dr. Nissen's first FDA
8  panel.
9       Q.   Did Dr. Nissen give a slide
10 presentation during the February 2001
11 Advisory Committee meeting?
12      A.   I'm not aware of that.
13      Q.   I thought you said a minute
14 ago you reviewed the transcript?
15      A.   I reviewed the transcripts
16 of the relevant sections. I did not go
17 through every slide presentation, and
18 it's been quite a while. I mean, it's
19 been probably at least a year or a year
20 and a half since I reviewed that, but I
21 don't recall seeing a presentation by Dr.
22 Nissen on VIGOR.
23      Q.   Do you remember, Dr. Topol,
24 that Dr. Nissen had actually made a

Page 349

1  presentation to the other members of the
2  Advisory Committee specifically
3  addressing VIGOR, addressing the CLASS
4  trial or the Celebrex trial and
5  addressing an analysis he did of four
6  different aspirin trials? Do you
7  remember that?
8       A.   That -- now, okay, you're
9  talking about a whole different FDA
10 panel. This is not February of 2001.
11 Because the aspirin comparison was an
12 idea I had after he got back. So, you
13 have the wrong FDA panel.
14      Q.   Dr. Topol, did Dr. Nissen
15 make a presentation at the Advisory
16 Committee meeting in February of 2001
17 where he discussed VIGOR, where he
18 discussed the CLASS trial, which was
19 Celebrex's outcome trial, and a trial
20 called the Primary Prevention Project?
21           MR. HAMELINE: So, can I
22      just interject a comment here.
23      Dr. Nissen -- Dr. Topol has said
24      several times he was not at the

**Page 350**

1  meeting. He's --
2      MR. GOLDMAN: I'm asking if
3  he knows.
4      MR. HAMELINE: He's reviewed
5  the website. If it's on the
6  website, why don't you show it to
7  him. You can ask him if he knows.
8  But I think he's already testified
9  that he doesn't.
10     THE WITNESS: You just
11 changed your question.
12 BY MR. GOLDMAN:
13     Q. Dr. Topol, are you aware one
14 way or the other whether Dr. Nissen made
15 a presentation where he talked about
16 VIGOR, CLASS and a trial called the
17 Primary Prevention Project?
18     A. That is possible, but
19 certainly not the four trials that you
20 just asked about previously. That's not
21 possible.
22     Q. Let me show you, sir, an
23 excerpt from the FDA Advisory Committee
24 meeting.

**Page 351**

1      MR. GOLDMAN: We'll mark
2  this as the next exhibit, 30.
3      - - -
4      (Whereupon, Deposition
5  Exhibit Topol-30, "Arthritis
6  Advisory Committee NDA #
7  21-042/S007, Vioxx (Rofecoxib,
8  Merck) " 2-8-01, 1-3; 210, was
9  marked for identification.)
10     - - -
11 BY MR. GOLDMAN:
12     Q. Dr. Topol, do you see on
13 page 210 of the transcript that Dr.
14 Nissen is making comments during the
15 Advisory Committee meeting on February
16 8th?
17     A. Yes. I'm familiar with this
18 comment. I reviewed this -- I remember
19 this -- I mean, it's just the one comment
20 on this one page, 210, but I do remember
21 it, yes.
22     Q. Do you see that Dr. Nissen
23 was being asked about the label for Vioxx
24 and what it should say about any

**Page 352**

1  potential cardiovascular risks?
2      MR. HAMELINE: Objection. I
3  don't think he's being asked.
4  He's making a comment.
5  BY MR. GOLDMAN:
6      Q. Dr. Topol, does Dr.
7  Nissen --
8      MR. KLINE: Objection.
9  BY MR. GOLDMAN:
10     Q. -- make the following
11 statement to the Advisory Committee?
12 "Briefly, I think what I would say in the
13 label is that there was an excess of
14 cardiovascular events in comparison to
15 naproxen, that it remains uncertain
16 whether this was due to beneficial
17 cardioprotective effects of naproxen or
18 prothrombotic effects of the agent, and
19 leave it at that, that basically we don't
20 know the reason"?
21     MR. KLINE: Objection.
22 BY MR. GOLDMAN:
23     Q. Do you see that, sir?
24     MR. KLINE: Objection,

**Page 353**

1  multiple reasons I'll fill in
2  later.
3  BY MR. GOLDMAN:
4      Q. Do you see that?
5      A. Yeah, I see it, and I
6  understand that completely. As of
7  February 8, 2001, which I believe was the
8  date of this -- and I also understand
9  that the consensus of the panel was like
10 this, that there needed to be a change in
11 the label about the cardiovascular risk.
12 So, this is consistent with that.
13     Q. Did you agree with Dr. Topol
14 in February -- I'm sorry, withdrawn.
15     Did you agree with Dr.
16 Nissen in February of 2001 that it
17 remains uncertain whether the excess of
18 cardiovascular events compared to
19 naproxen was due to the beneficial
20 cardioprotective effects of naproxen or
21 prothrombotic effects of Vioxx?
22     MR. KLINE: Same objection.
23     THE WITNESS: We expressed
24 the same question in our JAMA

Page 354

1 paper that came out later in the
2 year, and the point being is that
3 we, after much more careful review
4 of the data, it was not at all
5 apparent that this could be
6 attributed to naproxen benefit.
7 At the time in February 8th of
8 2001 before we had a chance to
9 rake over the data, there was less
10 certainty. It was more ambiguous.
11 Over time, as we had a chance to
12 review things, and certainly as
13 more studies came out beyond ours,
14 it became increasingly clear. And
15 that's why in the JAMA paper Dr.
16 Nissen and I and Dr. Mukherjee
17 concluded about the cautionary use
18 of this drug.
19 BY MR. GOLDMAN:
20   Q. Dr. Topol, I didn't ask you
21 anything about your opinion.
22       MR. KLINE: Objection.
23 BY MR. GOLDMAN:
24   Q. My question is whether --

Page 355

1       MR. KLINE: Move to strike.
2 BY MR. GOLDMAN:
3   Q. -- in February of 2001 you
4 agreed with Dr. Nissen that it was
5 uncertain whether the difference in heart
6 attacks that was seen between Vioxx and
7 naproxen was due to Vioxx, was due to
8 naproxen or chance?
9   A. I did not see Dr. Nissen on
10 February 8th, 2001. I saw him on
11 February 9th, 2001 when we both were back
12 in Cleveland, I was in Georgia, he was at
13 the FDA. And he came to me and said I'm
14 quite concerned. So, his concern wasn't
15 reflected by this statement.
16   Q. I'll ask one more time, sir.
17       MR. KLINE: Objection.
18 BY MR. GOLDMAN:
19   Q. Did you agree in February of
20 2001 with Dr. Nissen that it was
21 uncertain whether the difference in
22 cardiovascular events seen between Vioxx
23 and naproxen was due to Vioxx, was due to
24 naproxen or chance?

Page 356

1   A. I've answered that several
2 times earlier today, that it's in the
3 manuscript. We didn't know for sure at
4 that point, and that is pointed out in
5 our JAMA paper on several, at least two,
6 if not three times in that manuscript.
7   Q. Is the answer to my question
8 yes, Doctor?
9       MR. KLINE: Objection.
10      THE WITNESS: With the one
11 trial of VIGOR and the very
12 staunch defense of this naproxen
13 hypothesis offered by Merck
14 without independent replication,
15 without any other studies, one
16 could not make definitive -- and
17 we said that in the JAMA paper,
18 not make definitive conclusions.
19 That's true.
20 BY MR. GOLDMAN:
21   Q. You said on direct
22 examination, Dr. Topol, that a black box
23 warning could easily have been imposed by
24 February of 2001. Do you remember

Page 357

1 testifying to that?
2   A. Yes.
3   Q. Did anybody at the Advisory
4 Committee meeting suggest that a black
5 box warning be put on the Vioxx label?
6   A. No. And that's because the
7 correct data for study 090 were not
8 presented.
9   Q. We're going to talk a lot
10 about 090, Dr. Topol.
11   A. Good. I'll be happy to.
12 Look forward to it.
13   Q. Dr. Topol, my question is
14 whether anybody at the Advisory Committee
15 meeting in February of 2001, including
16 your colleague, Dr. Nissen, suggested
17 that a black box warning be added to the
18 Vioxx label?
19   A. I don't know the answer to
20 that. I don't recall the transcript
21 enough to be able to say whether anyone
22 registered that concern. I know there
23 are only two cardiologists there, so,
24 that's one issue. But I don't know.