Page 358

1   Q.  Do you see in the excerpt
2   that I provided to you that Dr. Nissen
3   doesn't say anything about a black box
4   warning?  Correct, sir?
5   A.  You provided one page of a
6   1,000 page transcript.  That's not -- I
7   mean, that's not a full disclosure here.
8   It's not very comprehensive, so, I can't
9   say.
10  Q.  Based on the excerpt that I
11  did provide you, do you see that in that
12  answer Dr. Nissen is not saying anything
13  about a black box warning on Vioxx?
14  A.  I certainly don't see that
15  in that excerpt, no.
16  Q.  You talked a lot about your
17  proposed cardiovascular outcome study;
18  correct?
19  A.  I discussed that we were
20  invited by Dr. Reicin --
21  Q.  No.
22  A.  That's what you're talking
23  about.
24  Q.  That's not what I was

Page 359

1   talking about.
2       On direct examination, Dr.
3   Topol, you were asked a bunch of
4   questions about your cardiovascular
5   outcomes study; correct?
6   A.  I addressed that earlier
7   today, yes.
8   Q.  You proposed a
9   cardiovascular outcomes study to both
10  Merck and Pfizer; true?
11  A.  I did not propose any
12  cardiovascular outcome trial to Pfizer,
13  and Dr. Bhatt is the one who picked up
14  the ball and proposed this to Merck.  And
15  I knew about it.  I told them about it,
16  but I wasn't the one that made any
17  proposal to either company.
18  Q.  Do you think, Dr. Topol,
19  back at the time that you were suggesting
20  that both Merck conduct a cardiovascular
21  outcome trial and Pfizer conduct one?
22  A.  I thought that would be
23  appropriate given the uncertainty about
24  this heart attack risk, yes.

Page 360

1   Q.  Do you agree, Dr. Topol,
2   that your suggested approach, the
3   cardiovascular outcomes study, was not
4   the only way to address the question of
5   whether there was a potential
6   cardiovascular risk associated with COX-2
7   inhibitors?
8   A.  I had stated earlier today
9   that the only way to get the answer
10  definitively in patients who have heart
11  disease is to do a trial in patients with
12  heart disease.
13  Q.  You testified before that
14  the clinical trials that were done on
15  Vioxx did not involve patients who either
16  had heart disease or were at risk of
17  heart disease.  Was that your testimony?
18  A.  No.  My testimony was with
19  heart disease.
20  Q.  Dr. Topol, you do know that
21  in the clinical trials for Vioxx, there
22  were people who actually were at risk of
23  heart disease?
24      MR. HAMELINE:  Objection.

Page 361

1   Are you talking about all the
2   clinical trials?
3       THE WITNESS:  "At risk" is
4   not the same as having heart
5   disease.  The number of patients
6   with actual bona fide documented
7   heart disease is vanishingly
8   small, almost nonexistent in these
9   trials.  They were almost
10  systematically excluded.  There's
11  a different matter about whether
12  someone has risk for heart
13  disease, a number of risk factors,
14  but I'm talking about documented
15  coronary artery disease.
16  BY MR. GOLDMAN:
17  Q.  Dr. Topol, you do know that
18  there were patients who participated in
19  Vioxx's clinical trials who did have
20  documented cardiovascular disease; right?
21  A.  As I just said, the numbers
22  of those patients are vanishingly small,
23  perhaps as low as one percent and in some
24  trials, zero.

91 (Pages 358 to 361)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 362

1  Q. Do you believe, Dr. Topol,
2  that your proposed study, your proposed
3  cardiovascular outcomes study was the
4  only way to -- withdrawn.
5      Do you believe, Dr. Topol,
6  that your proposed cardiovascular
7  outcomes study was the only reasonable
8  way to address the potential risk
9  associated with Vioxx and Celebrex
10 concerning cardiovascular disease?
11     A. First of all, I would go
12 back to our JAMA paper.
13     Q. I'm not asking about the
14 JAMA paper. I'm asking you --
15     A. But you're asking about the
16 cardiovascular trial.
17     Q. Dr. Topol, I'm asking you,
18 as you sit here today, do you believe
19 that your proposed cardiovascular outcome
20 trial was the only way to assess the
21 potential for cardiovascular risk in
22 patients who took Vioxx and Celebrex?
23     A. I answered your question
24 earlier. In patients -- if we wanted to

Page 363

1  know about patients with coronary artery
2  disease, and as I reviewed this morning,
3  40 to 50 percent of the patients, of the
4  20 million taking Vioxx or by various
5  registries and surveys, had established
6  coronary artery disease, the only way to
7  find out about those patients and their
8  quantifiable risk is in a study, a trial
9  dedicated to only enter patients with
10 established coronary artery disease, and
11 there's no other way to do that, no.
12 That's the only way to do such a trial.
13     Q. Do you agree, Dr. Topol,
14 that all clinical trials must offer
15 potential benefits to patients?
16     A. One can never do a trial
17 with just testing the side effects
18 without at least a putative equal or
19 better benefit.
20     Q. Is the answer to my question
21 yes, all clinical trials must offer
22 potential benefit to patients?
23     MR. HAMELINE: I think he
24     just answered your question. He's

Page 364

1  given you a fulsome, complete
2  response.
3      THE WITNESS: Can you read
4  back my answer, please.
5  BY MR. GOLDMAN:
6  Q. I'm not interested in your
7  answer. I'm asking you a separate
8  question.
9  A. I want to see if I answered
10 the question adequately because you
11 challenged that I didn't.
12 Q. Dr. Topol, can you answer
13 this question yes or no?
14     Do all clinical trials have
15 to have some potential benefit offered to
16 patients?
17 A. All clinical trials should
18 have a therapeutic potential, yes, a
19 benefit, yes.
20 Q. You can't give patients
21 medicine in a clinical trial just to see
22 if they get sick; right?
23     MR. HAMELINE: Can I just
24     read what's in the order for the

Page 365

1  MDL, which is that "Once the
2  witness has fully answered a
3  question, that same or
4  substantially the same question
5  should not be asked again." I
6  think this has been violated for
7  the fourth -- I know you want to
8  get at concrete issues here, but I
9  do think that he's answering and
10 answered that question fully the
11 first time.
12 BY MR. GOLDMAN:
13 Q. Dr. Topol --
14     MR. KLINE: Can we adopt Mr.
15     Goldman's rule for the Merck
16     witnesses as his approach to --
17     MR. GOLDMAN: I'd really not
18     have a speech on the record, Mr.
19     Kline. If you have an objection,
20     please state it.
21     MR. KLINE: We would be
22     really advanced in this
23     litigation.
24 BY MR. GOLDMAN:

Page 366

1   Q. Dr. Topol --
2   A. Yes.
3   Q. -- you can't give patients
4   medicine just to see if they have a heart
5   attack or die, correct, sir?
6   A. I would never be involved in
7   a clinical trial or advocate doing a
8   trial where there was just testing for
9   harm. You have to have -- you don't put
10  patients -- experiment on patients unless
11  you're looking at benefit and also, of
12  course, always assaying the risk as well.
13  Q. You sent a copy of your
14  proposed protocol to Merck in May of
15  2001; correct?
16  A. That's incorrect. I did not
17  send anything to Merck.
18  Q. Did --
19  A. Dr. Bhatt sent a proposal to
20  Merck, and I was only relaying Merck's
21  interest to Dr. Bhatt.
22  Q. Does Dr. Bhatt work at the
23  Cleveland Clinic, sir?
24  A. Yes, he does. He works in

Page 367

1   my department, but I did not send this
2   protocol to Merck.
3           - - -
4       (Whereupon, Deposition
5       Exhibit Topol-31, E-mails,
6       MRK-AAZ0001594, was marked for
7       identification.)
8           - - -
9       (Whereupon, Deposition
10      Exhibit Topol-32, "Rofecoxib in
11      the Prevention of Ischemic Events
12      in Patients with Acute Coronary
13      Syndromes and Elevated Markers of
14      Inflammation," (Bhatt, et al)
15      MRK-ABA0003235 - MRK-ABA0003244
16      was marked for identification.)
17          - - -
18  BY MR. GOLDMAN:
19  Q. I've marked as Exhibit 31
20  and 32 two documents. The first is Bates
21  stamped -- this is 31, MRK-AAZ0001594.
22  Exhibit 32 is MRK-ABA0003235 to 3244.
23      Do you see, Dr. Topol, on
24  the first exhibit, Exhibit 31 on May 2nd,

Page 368

1   2001 -- is it Dr. Bhatt?
2   A. Dr. Bhatt, Deepak Bhatt.
3   Q. Dr. Bhatt is sending an
4   e-mail to Dr. Reicin and says, "Hello.
5   As Dr. Topol promised, here is our
6   protocol regarding the use of Vioxx in
7   acute coronary syndromes." Do you see
8   that?
9   A. I see that, and I already
10  discussed that this morning. And what I
11  said, if I can go back --
12  Q. My question was just, do you
13  see that?
14  A. I see that, yes.
15  Q. The protocol that Dr. Bhatt
16  sent to Merck is Exhibit 32, isn't it?
17  A. That's what you just gave
18  me, yes.
19  Q. Do you see on the second
20  page, top left corner, there's a date,
21  May 2nd, 2001? Do you see that, sir?
22  A. Yes. This was two weeks
23  after it was requested from Dr. Reicin
24  when she visited Cleveland Clinic.

Page 369

1   Q. I want to talk about the
2   specifics of your proposed outcomes
3   study. Okay?
4   A. Dr. Bhatt authored this
5   study. You probably should talk to him.
6   Q. This is a study, Dr. Topol,
7   that you, on the first page, and Dr.
8   Bhatt put together; is that right?
9   A. Well, he put it together.
10  He put my name on it. And he sent it to
11  Merck. But I did not go over the study.
12  This was a request by Merck. I didn't
13  have any particular interest in doing
14  this trial, and I asked Dr. Bhatt if he
15  was interested and he followed up on it.
16  Q. It's your testimony, Dr.
17  Topol, that you were not interested in
18  conducting the cardiovascular outcomes
19  study that you suggested be done?
20  A. I wasn't interested in doing
21  the trial per se. I had been outspoken
22  about the need to do a trial. I didn't
23  think it would be appropriate if I did
24  the trial per se.

Page 370

1  Q. Well, you -- withdrawn.
2  The protocol for your trial,
3  by "your," I mean the Cleveland Clinic --
4  A. Right.
5  Q. -- includes Dr. Bhatt's
6  name and your name; correct?
7  A. He put my name on it, but
8  that doesn't mean that I was involved in
9  this. This is a protocol sketch, and I
10 guess he was looking for feedback from
11 Merck. But I did not go over this in
12 terms of, did I think this was the
13 appropriate design. This was a brief
14 conversation I had with Dr. Bhatt, and I
15 don't recall all the details. It's back
16 four years ago in May 2001, but I did not
17 author this protocol, and my name was
18 loosely attached to it. I was not
19 interested in running a trial personally
20 on this because I didn't feel that was
21 appropriate. I thought it should be
22 done, but I should not necessarily be
23 involved with it.
24 Q. Dr. Topol, did the Cleveland

Page 371

1  Clinic send a protocol to Merck outlining
2  what the Cleveland Clinic believed would
3  be an appropriate cardiovascular outcomes
4  study for Vioxx?
5  A. Dr. Bhatt did, yes.
6  Q. How many patients did you
7  believe should participate in a
8  cardiovascular outcomes study?
9  A. Do I believe or did Dr.
10 Bhatt put in the protocol? I'm not sure
11 if I understand your question.
12 Q. The question was, do you
13 believe that -- withdrawn.
14 Dr. Topol, did the Cleveland
15 Clinic, when it sent this protocol to
16 Merck, believe that it was the
17 appropriate cardiovascular outcomes study
18 to conduct?
19 A. I don't -- I would have to
20 read the protocol now if you'd like me
21 to.
22 Q. Sure.
23 A. (Witness reviewing
24 document.)

Page 372

1  MR. GOLDMAN: We can go off
2  the video while Dr. Topol is doing
3  that.
4  MR. HAMELINE: Again, I
5  don't mean to take this out on
6  your time, but if you want to ask
7  him questions about particular
8  issues, this is going to be a very
9  long day for Dr. Topol. And so
10 he's going to read through this
11 quickly and will try to answer
12 your questions directly. So, I
13 don't think it's fair that we go
14 off the record and not count time.
15 MR. GOLDMAN: We've gone off
16 the record several times for the
17 plaintiffs and not counted the
18 time --
19 MR. KLINE: Not to review --
20 MR. GOLDMAN: -- so, I would
21 appreciate the same courtesy.
22 MR. KLINE: Not to review
23 documents. Not to sit and review
24 documents. I provided no

Page 373

1  documents where the witness was
2  then asked off the record to sit
3  and review them.
4  MR. HAMELINE: I want to be
5  fair to both sides. We're just
6  trying to get through this. I
7  recognize this. You know, if Dr.
8  Topol can review it quickly, let's
9  just move on.
10 (Witness reviewing
11 document.)
12 BY MR. GOLDMAN:
13 Q. Did you review now, Dr.
14 Topol, the protocol that has your name on
15 it and that was sent to Merck on May 2nd
16 of 2001?
17 A. I've had a chance to breeze
18 through this. I would hardly call this a
19 protocol. This is a concept sheet.
20 There's nothing about sample size.
21 There's nothing about event rates. This
22 is as minimal as one could ever imagine.
23 I would not call this a protocol. This
24 is a concept. There's not even the most

Page 374

1  important salient features of a true
2  clinical trial in this document.
3      Q.   Do you agree with the
4  concept that's being expressed in Exhibit
5  32 which has your name on it?
6      A.   The concept of studying
7  Vioxx in patients with acute coronary
8  syndromes who have elevated C-reactive
9  protein is a concept that I discussed
10 with Dr. Reicin and Dr. Demopoulos when
11 they visited Cleveland just two weeks
12 prior to this point on April 14, I
13 believe, of the same year.
14      MR. GOLDMAN: Objection,
15 move to strike, nonresponsive.
16 BY MR. GOLDMAN:
17     Q.   Dr. Topol, if you'd turn to
18 Page 6 of the concept that Cleveland
19 Clinic sent to Merck, do you see on the
20 top, the criteria for inclusion in this
21 proposed study was that participants be
22 male or female, 18 years or older? Do
23 you see that?
24     A.   Uh-huh.

Page 375

1      Q.   And then point 2, "Being
2  admitted for acute coronary syndrome.
3  The patient was admitted to an inpatient
4  facility with an acute coronary syndrome
5  defined as: Ischemic discomfort at rest
6  lasting at least five minutes." Do you
7  see that, sir?
8      A.   Yes.
9      Q.   Can you briefly, sir,
10 describe what acute coronary syndrome is?
11     A.   It's either a threatened or
12 actual heart attack, that is,
13 inflammation in the arteries that are
14 leading to a crack in the artery wall
15 with a blood clot potentially, and these
16 are patients who could have a small or a
17 threatened heart attack.
18     Q.   So, the concept that
19 Cleveland Clinic was proposing to Merck
20 involved taking patients who were
21 threatened with a heart attack or who had
22 a heart attack to participate in this
23 study; correct?
24     MR. HAMELINE: Could I just

Page 376

1  note a continuing objection that
2  this is not the Cleveland Clinic's
3  concept, it's Dr. Bhatt's, and I
4  think we've made that abundantly
5  clear.
6  BY MR. GOLDMAN:
7      Q.   Dr. Topol, the concept that
8  has your name and Dr. Bhatt's name on it
9  describes these criteria for inclusion,
10 and as you described acute coronary
11 syndrome, the concept was that patients
12 who either were threatened with a heart
13 attack or who had a heart attack would
14 participate in the study. Is that right?
15     A.   That's correct. But you're
16 leaving out one important element. And
17 as in the title of this concept sheet,
18 "Elevated Markers of Inflammation," and
19 in the inclusion criteria on Page 6 that
20 we are now reviewing, you see Item Number
21 3, it says, "AND Item Number 3, elevated
22 high-sensitivity C-reactive protein"
23 known as CRP "greater than .2." So, they
24 had to have arterial inflammation, and

Page 377

1  that was the whole point of the concept,
2  was that rofecoxib, as well as celecoxib,
3  have been shown to reduce inflammation.
4  So, in fact, it could be a benefit to
5  these patients to suppress subsequent
6  heart attacks.
7      Q.   I want to talk about that in
8  one minute, Dr. Topol.
9          Do you see, sir, that the
10 concept that you were proposing to Merck
11 calls for the study to last a minimum of
12 one year?
13     A.   Where is that?
14     Q.   If you look on Page 5 under
15 study design, it says, "This study is a
16 multicenter double blind randomized" and
17 it continues "comparing the effects of"
18 Vioxx "versus placebo administered in
19 conjunction with standard therapy
20 (including aspirin...) for a minimum of
21 one year to patients who have suffered an
22 episode of an acute coronary syndrome,"
23 and it goes on.
24     A.   Again, this is a concept

95 (Pages 374 to 377)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 378

1  sheet. This is not a protocol. This
2  does not have anything about events rates
3  that are anticipated. It doesn't have
4  anything about sample size. It doesn't
5  have the number of triggered events to
6  stop a trial. One year is just a very
7  loose term, that it has to have some
8  long-term followup. So, I see it, but,
9  again, it reinforces how sketchy -- this
10 could not be called a protocol. This is
11 a very early rudimentary design concept
12 sheet.
13      Q.  The concept that you were
14 proposing to Merck, you and Dr. Bhatt --
15         MR. HAMELINE: Again,
16      objection. It's Dr. Bhatt's
17      concept sheet.
18 BY MR. GOLDMAN:
19      Q.  Dr. Topol, the concept sheet
20 that has your name on it and Dr. Bhatt's
21 name on it calls for a study that would
22 last a minimum of one year; correct?
23      A.  Very loosely defined, yes.
24      Q.  The concept sheet that has

Page 379

1  your name on it and Dr. Bhatt's name on
2  it also calls for patients to be followed
3  up for a minimum of one year. Do you see
4  that, sir?
5       A.  That's what it says.
6       Q.  The concept sheet also
7  refers on Page 7, sir, to certain
8  criteria for exclusion. Do you see that?
9       A.  Yes.
10      Q.  This is another way of
11 saying these are the type of patients who
12 will not be allowed to participate in the
13 study according to this concept sheet;
14 correct?
15      A.  That's correct.
16      Q.  If you look at Number 4, do
17 you see that the concept that Dr. Bhatt
18 was proposing to Merck says that, under
19 4, "Any need for COX-2 inhibitors." So,
20 if a patient wanted to participate in
21 this study, they couldn't do so if they
22 actually needed COX-2 inhibitors; is that
23 right?
24      A.  You'll have to ask Dr. Bhatt

Page 380

1  about this since he wrote it, but my
2  interpretation is if they didn't have any
3  other relief of their problem without a
4  COX-2 inhibitor, that they couldn't be --
5  that is, they would have to be willing to
6  be randomized. So, yes, if they had to
7  take a COX-2 inhibitor for some reason,
8  they obviously wouldn't be a suitable
9  candidate for the trial, the way he's
10 written this up.
11      Q.  So, anybody who needed a
12 COX-2 inhibitor like Vioxx could not
13 participate in this concept study that
14 Dr. Bhatt proposed to Merck; correct?
15         MR. KLINE: Objection.
16      Repetitive and misstates and
17      mischaracterizes.
18         MR. HAMELINE: Again, this
19      is the same statement that I just
20      read in the MDL which is "Once the
21      witness has fully answered a
22      question, that same or
23      substantially same question --
24         MR. GOLDMAN: He's not

Page 381

1  answering the question --
2          MR. HAMELINE: -- shall not
3       be asked again." That is exactly
4       the same question.
5          MR. GOLDMAN: He's not
6       answering --
7          THE WITNESS: If this was a
8       real protocol, you would define
9       what is a need for a COX-2
10      inhibitor particularly since the
11      whole issue about this was we
12      don't know if it's safe and we
13      don't know if it's beneficial.
14      That's why this is so rudimentary.
15      It doesn't define these things
16      adequately. Any need for a COX-2
17      inhibitor has to have objective
18      criteria laid out, and they're not
19      there.
20 BY MR. GOLDMAN:
21      Q.  Does the rudimentary concept
22 that Dr. Bhatt sent to Merck say that
23 patients who need COX-2 inhibitors would
24 need to be excluded from the proposed

Page 382

1  study?
2      A.  It says that in the very,
3  what I would consider, loose language
4  without adequate definition. Because
5  it's a circular reasoning in a sense.
6  That is, the trial is trying to
7  understand this safety and need, and then
8  you're putting it in as exclusion
9  criteria. It wouldn't be suitable unless
10 it was much more rigidly defined.
11     Q.  On the first page of this
12 concept, Dr. Topol --
13     A.  It only has seven pages.
14 The rest is references. So, it isn't
15 particularly -- there's not a whole lot
16 here.
17     Q.  On Page 2 of this
18 rudimentary concept, do you see the first
19 sentence under the introduction
20 "Inflammatory cells play a significant
21 role in atherosclerosis"?
22     A.  I agree with that. I see
23 it, and I agree with it.
24     Q.  In the next paragraph, the

Page 383

1  concept sheet says, "Aspirin, by virtue
2  of its preferential COX-1 inhibitory
3  effect, provides minimal
4  anti-inflammatory action." Do you see
5  that?
6      A.  I see that.
7      Q.  And then further down in
8  that second paragraph -- in that second
9  paragraph, the concept sheet says, "The
10 administration of" Vioxx "may provide a
11 direct approach to reduce coronary
12 inflammation resulting in fewer
13 cardiovascular recurrent ischemic events
14 in patients presenting with acute
15 coronary syndromes." Do you see that?
16     A.  Yes.
17         MR. KLINE: What page are
18     you on?
19         MR. GOLDMAN: 2.
20         MR. KLINE: Thank you.
21 BY MR. GOLDMAN:
22     Q.  Can you explain how it is
23 that Vioxx could actually prevent
24 recurrent ischemic events?

Page 384

1      A.  Right. So, there have been
2  several studies now with the different
3  COX-2 inhibitors in patients to look at
4  whether C-reactive protein is reduced,
5  whether endothelial function, which is
6  the lining of the artery cells, that
7  whether or not that critical layer of the
8  artery wall functions better and whether
9  the inflammation is reduced. And indeed
10 these mechanistic studies have supported
11 the concept that there could be an
12 improvement in this process by
13 suppressing inflammation with COX-2
14 inhibitors.
15     Q.  So, the theory that you had,
16 Dr. Topol, when you were suggesting a
17 cardiovascular outcomes study was that if
18 Vioxx was given to patients, it might
19 actually help their heart?
20     A.  It could, and that's put in
21 the JAMA paper. In all the papers -- I
22 can go through my publications, but that
23 concept is laced throughout, that there's
24 a possible -- there's a putative benefit

Page 385

1  here that can't be summarily dismissed
2  whatsoever.
3      Q.  In May of 2001 you believed
4  that Vioxx could actually help prevent
5  heart attacks; correct?
6      A.  I felt that that was an
7  important mechanism, inflammation of the
8  artery wall, and this is a potent class
9  of anti-inflammatories, and certainly
10 there was that possibility. And other
11 studies suggested that potential.
12     Q.  You would never have
13 suggested a cardiovascular outcomes study
14 for patients at high risk of
15 cardiovascular disease if you thought
16 that Vioxx would actually cause them
17 heart attacks or worse, cause them to
18 die, correct, sir?
19     A.  You just asked about high
20 risk. I assume you're not talking about
21 patients with coronary artery disease
22 proven. Is that correct?
23     Q.  Dr. Topol, the study that
24 you were suggesting in May of 2001 to

Page 386

1  Merck was suggested because you thought
2  Vioxx might provide a benefit to patients
3  at risk of heart failure -- withdrawn.
4      Am I right, Dr. Topol, that
5  in the concept sheet that Dr. Bhatt sent
6  to Merck in May of 2001, anticipated that
7  Vioxx would actually prevent heart
8  attacks and not cause them?
9      A.   In patients who had active
10 inflammatory coronary disease.
11     Q.   Did you agree with Dr. Bhatt
12 that in May of 2001, patients who had
13 active inflammatory coronary disease
14 might be benefited by taking Vioxx
15 because it could help their heart?
16     A.   I already answered that
17 question affirmatively.
18     Q.   Other scientists shared that
19 view, Dr. Topol, that COX-2 inhibitors
20 could be beneficial to patients who have
21 cardiovascular disease; is that right?
22          MR. KLINE: Objection,
23     misstatement.
24          THE WITNESS: I already

Page 387

1      mentioned that there were several
2      studies published, and I've cited
3      them in my work, that that indeed
4      was a potential benefit of COX-2
5      inhibitors in patients with
6      arterial disease.
7  BY MR. GOLDMAN:
8      Q.   And those were the patients
9  you were suggesting be studied; correct?
10     A.   Patients with inflammatory
11 proven artery disease, yes.
12          - - -
13          (Whereupon, Deposition
14     Exhibit Topol-33, "Selective
15     COX-2 Inhibition Improves
16     Endothelial Function in Coronary
17     Artery Disease," (Chenevard, et
18     al) Circulation, January 28,
19     2003, 405-409, was marked for
20     identification.)
21          - - -
22 BY MR. GOLDMAN:
23     Q.   I've handed you Exhibit 33,
24 which is an article titled "Selective

Page 388

1  COX-2 Inhibition Improves Endothelial
2  Function in Coronary Artery Disease."
3  And it was published in Circulation in
4  2003. Do you see that, sir?
5      A.   Yes.
6      Q.   The author is Remy
7  Chenevard?
8      A.   Chenevard. I'm familiar
9  with this study. I've cited it many
10 times in my work.
11     Q.   Do you see in the conclusion
12 of the abstract, Dr. Topol, that the
13 paper says, "This is the first study to
14 demonstrate that selective COX-2
15 inhibition improves endothelium-dependent
16 vasodilation and reduces low-grade
17 chronic inflammation and oxidative stress
18 in coronary artery disease." Do you see
19 that?
20     A.   Yes, I do.
21     Q.   The next sentence I think is
22 even clearer when it says, "Thus,
23 selective COX-2 inhibition holds the
24 potential to beneficially impact outcome

Page 389

1  in patients with cardiovascular disease."
2  Do you see that?
3      A.   Yes. And to put it in
4  context, this is a very small study of 26
5  total patients, and it's with celecoxib
6  versus placebo. But I believe that their
7  findings and the way they made their
8  conclusions based on that data is very
9  reasonable.
10     Q.   Because you've actually
11 cited this article?
12     A.   Yes, and others like it.
13 They're small studies, they're with both
14 of the coxibs, and there is evidence of
15 some salutary effect.
16     Q.   From May of 2001 through the
17 time that Vioxx was withdrawn in
18 September of 2004, you continued to
19 suggest that Merck or Pfizer conduct a
20 cardiovascular outcomes study; right?
21     A.   That's right.
22     Q.   During that entire time
23 period --
24          MR. HAMELINE: Can you allow

Page 390

1  him to answer the question in the
2  way that he feels is appropriate
3  and complete?
4       THE WITNESS: I would like
5  to make a comment.
6  BY MR. GOLDMAN:
7  Q. Sure.
8  A. Because there are other
9  reasons besides just this to continue to
10 advance that notion.
11 Q. Dr. Topol --
12 A. If you'd allow me to make
13 the comment.
14 Q. I'll allow you to make the
15 comment in one minute. If you could just
16 answer my questions, and then you can
17 certainly comment. Okay?
18 A. Okay.
19 Q. From May of 2001 through the
20 time that Vioxx was withdrawn in
21 September 2004, you continue to suggest
22 that Merck and/or Pfizer conduct your
23 cardiovascular outcomes study; correct?
24 A. Not ours, but a. And I do

Page 391

1  have it in the public statements and
2  newspapers that it didn't matter who did
3  the trial, it just should be done. It
4  wasn't our trial. And this is a concept
5  sheet. It isn't a trial. I would never
6  try to pass this thing off that you've
7  been reviewing as a trial.
8       MR. KLINE: You now told him
9  you were going to let him finish
10 the last concept.
11      MR. GOLDMAN: Let me finish
12 --
13      MR. KLINE: Are you going to
14 ask him a question and then let
15 him finish? Now you're telling
16 him he can't do it.
17      MR. GOLDMAN: Move to strike
18 the last answer as nonresponsive.
19      MR. KLINE: You said you
20 would give him a chance to finish.
21 BY MR. GOLDMAN:
22 Q. Dr. Topol, I'm not asking
23 whether it was your cardiovascular study
24 or some other person's. Okay?

Page 392

1  A. A cardiovascular.
2  Q. Am I right, Dr. Topol --
3       MR. KLINE: Now, does he get
4  a chance to finish the answer?
5  You said you were going to ask one
6  question and let him finish and
7  now you've asked two.
8       MR. GOLDMAN: Tom, I'll let
9  him finish in a minute.
10 BY MR. GOLDMAN:
11 Q. Dr. Topol, am I right that
12 from May of 2001 through the time that
13 Vioxx was withdrawn in September of 2004
14 you were suggesting that either Merck or
15 Pfizer conduct a cardiovascular outcomes
16 study; correct?
17 A. Yes.
18 Q. During that entire time
19 period, you believed that Vioxx or
20 Celebrex might actually prevent heart
21 attacks or other cardiovascular events.
22 Is that right?
23 A. That's one issue that was
24 pertinent, yes. But there's another one

Page 393

1  I would like to get into if you give me
2  an opportunity.
3  Q. Why don't you go ahead and
4  tell me what you want to tell me.
5  A. Well, this goes along with
6  an e-mail exchange with Alastair Wood
7  that's in the documents that you have. I
8  can retrieve it if you'd like.
9       Alastair Wood is probably
10 one of the most highly regarded
11 pharmacologists and physicians. He's at
12 the Vanderbilt University, and he's
13 frequently chairing the FDA advisory
14 panels. So one of the things that we
15 exchanged our views on was the fact that
16 if you have half the people in the United
17 States with established coronary disease
18 taking rofecoxib or celecoxib, that means
19 that there's a lot of people out there
20 that is a complete random exposure to a
21 drug, millions and millions of people
22 taking a drug without knowledge of
23 whether it's providing a harm, no less a
24 benefit. So, the point being I'm trying

Page 394

1  to get to is this issue of equipoise.
2  That is, if you have a drug that's so
3  widely used in the population in half the
4  people, and we don't know -- that is, you
5  can justify a cardiovascular trial even
6  without the putative mechanism of
7  benefit, and I'd be happy to draw -- Dr.
8  Wood.
9      Q.  Dr. Topol, I've let you
10 answer now for some time. Are you
11 finished now?
12     A.  Well, if I've gotten my
13 point across.
14     Q.  Okay.
15         From May of 2001 through the
16 time that Vioxx was withdrawn in
17 September of 2004, you believed that if a
18 cardiovascular outcomes study were done,
19 it could show that Vioxx and Celebrex
20 actually helped protect the heart;
21 correct?
22     A.  That's one possibility, yes.
23     Q.  Do you know Dr. Lucchesi?
24     A.  Yes, I do I was at the

Page 395

1  University of Michigan previous to coming
2  to Cleveland Clinic, and he was on the
3  faculty there.
4      Q.  Are you aware that Dr.
5  Lucchesi has been retained as an expert
6  witness for the plaintiffs in some of the
7  Vioxx cases?
8      A.  I saw that in the newspaper.
9  I've not spoken to him, but I saw that,
10 yes.
11     Q.  I'll mark as -- actually,
12 I'm not going to mark this as an exhibit,
13 but I'm going to show you a portion of
14 Dr. Lucchesi's deposition testimony and
15 ask you a question about it. Okay?
16        MR. KLINE: Objection, off
17 the record.
18        THE VIDEOTAPE TECHNICIAN:
19 Off the record at 3:44.
20        MR. GOLDMAN: I --
21        MR. KLINE: How long are we
22 on the record on cross?
23        THE VIDEOTAPE TECHNICIAN:
24 An hour and five minutes.

Page 396

1         MR. KLINE: You are on the
2  record an hour and five minutes on
3  cross. I haven't --
4         MR. GOLDMAN: Go ahead.
5         MR. KLINE: Now I'm asking
6  off the video record.
7         What the witness is being
8  asked to do now is comment --
9         MR. GOLDMAN: I do not want
10 you talking in front of the
11 witness.
12        MR. KLINE: Then have him go
13 out of the room. I'm just going
14 to state an objection, which is, I
15 object to the witness being shown
16 another expert's -- let me start
17 again.
18        He's not designated as an
19 expert. Merck has said he's not
20 an expert. And even if he were an
21 expert, under the federal rules he
22 would not be allowed to be shown
23 one person's opinion testimony and
24 be asked to comment on it. So,

Page 397

1  it's all objectionable. Having
2  said that, it may be withdrawn
3  after Dr. Topol looks at it and
4  answers.
5         You can go back on the video
6  record.
7         THE VIDEOTAPE TECHNICIAN:
8  Back on the record at 3:45, Tape
9  Number 5.
10 BY MR. GOLDMAN:
11     Q.  This is an excerpt from
12 testimony that Dr. Lucchesi gave in a
13 trial in New Jersey. Directing your
14 attention to Page 909, line 23, do you
15 see that he's being asked questions about
16 your proposed study concerning acute
17 coronary syndrome?
18        MR. HAMELINE: Again, feel
19 free to read as much as you need
20 for context, and while you're
21 doing that, let me just note that
22 Dr. Topol, again, here is coming
23 to this deposition as a very busy
24 academic, as a very busy person in

100 (Pages 394 to 397)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 398

1  the institution and with patients
2  that he has to treat. It's fine
3  to ask him any opinions that he
4  has about what he put in his
5  record in his own documents, et
6  cetera. I think it's
7  inappropriate to ask him about
8  third-party experts.
9  BY MR. GOLDMAN:
10     Q.  Dr. Topol, do you see that
11  --
12         MR. KLINE: And I would also
13  object. You are asking a witness
14  to comment on the comments that
15  somebody else made about what he
16  did.
17  BY MR. GOLDMAN:
18     Q.  Do you see that Dr. Lucchesi
19  in his testimony thought that the study
20  that you were proposing for acute
21  coronary syndrome would be a bad idea?
22     A.  I see that, and I have a
23  couple of comments I can offer here --
24     Q.  Do you see that --

Page 399

1     A.  -- if you'll allow me to.
2     Q.  Do you see that Dr. Lucchesi
3  actually compliments Merck on its
4  decision not to do the study you were
5  suggesting?
6     A.  I saw that. Can I make my
7  further remark about that?
8     Q.  Actually, I'd rather you do
9  that when Mr. Kline asks you questions.
10        MR. HAMELINE: Let me note
11  very vehemently my objection to
12  putting a document in front of Dr.
13  Topol, showing it to him, reading
14  it to him about someone who is not
15  present. Dr. Topol is not here as
16  an expert. He's not trying to
17  take sides in the litigation, and
18  you're showing this to him and not
19  asking a question about it.
20  That's just inappropriate.
21        THE WITNESS: Well, it's
22  also extraordinary that Dr.
23  Lucchesi is not a clinical
24  trialist. He's a pharmacologist,

Page 400

1  and he hasn't worked on patients
2  in probably the last 20 or 30
3  years. He also doesn't know that
4  the protocol that was never
5  written up that talks about a
6  concept sheet, and it was about
7  inflammatory arterial markers.
8  None of that is in that -- so,
9  you're about -- you're asking Dr.
10  Lucchesi in this deposition about
11  things that are just completely
12  foreign to him to make comment.
13  It's quite remarkable, actually.
14  BY MR. GOLDMAN:
15     Q.  Do you think that Dr.
16  Lucchesi is not competent to be
17  testifying about cardiovascular disease
18  associated with Vioxx, sir?
19        MR. KLINE: Objection.
20        MR. HAMELINE: Again, coming
21  very close to --
22        MR. GOLDMAN: Withdrawn.
23  I'll ask another question.
24  BY MR. GOLDMAN:

Page 401

1     Q.  Are you familiar with the
2  drug Reopro?
3     A.  Yes, I am familiar with
4  Reopro, abciximab, yes.
5     Q.  Did Dr. Lucchesi play a role
6  with you in the development of Reopro?
7     A.  He did some experiments with
8  a colleague of mine, Dr. Bates, when I
9  was at University of Michigan in dogs.
10  Most of his work has been experimental
11  models in dogs.
12     Q.  Would you credit Dr.
13  Lucchesi with the development of Reopro?
14     A.  No. I would not credit him.
15  He did some contributory work. No, there
16  were many people, and he was just one of
17  the investigators that worked in this
18  field.
19     Q.  I want to talk to you, Dr.
20  Topol, about your JAMA article that you
21  published in August of 2001. Okay.
22     A.  Sure.
23     Q.  You said on direct
24  examination that you sent the manuscript

101 (Pages 398 to 401)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 402

1  or the draft of the JAMA article to Merck
2  to see where there were discrepancies in
3  the data between the published paper that
4  you were publishing and the FDA database.
5  Do you remember that?
6      A.  That's correct. I sent the
7  paper to Dr. Demopoulos, and we already
8  went through about, whether it was a
9  paper version, and then Dr. Reicin
10 requested an electronic version. We went
11 through that this morning.
12     MR. HAMELINE: Can I just
13     note, I think you said that this
14     discrepancy is between the
15     published version, which is not
16     Dr. Topol's article, but the
17     published version and the FDA.
18     You're talking about three
19     different articles here.
20     THE WITNESS: The New
21     England Journal --
22 BY MR. GOLDMAN:
23     Q.  Dr. Topol, you met with
24 Merck employees in April of 2001;

Page 403

1  correct?
2      A.  That was a meeting I
3  referred to when they came to Cleveland.
4      Q.  Is that the meeting where
5  you said Dr. Reicin came on quite strong,
6  and that you would consider her comments
7  to be brazen?
8      A.  I considered her remarks
9  about how we would be embarrassed if we
10 published it to be inappropriate, yes.
11     Q.  Did Dr. Reicin or Dr.
12 Demopoulos ever exert any pressure or
13 influence on you during that meeting?
14     A.  Well, it's Dr. Demopoulos,
15 and as I conveyed -- I mean, we
16 summarized this morning, but there were
17 some definite difficult issues that were
18 confronted, and there was no quid pro quo
19 in terms of intimidation. They didn't
20 say, if you don't pull this paper out and
21 not take it out of its submission phase,
22 such and such would happen. But it was
23 not what I would consider a pleasant
24 discussion.

Page 404

1      Q.  Actually, isn't it true, Dr.
2  Topol, that you enjoyed meeting with Dr.
3  Reicin and Dr. Demopoulos?
4      A.  Dr. Demopoulos and I are
5  colleagues, and we worked on a trial
6  together, and I had no problem with Dr.
7  Demopoulos.
8          I did have a problem with
9  Dr. Reicin, who I had not met before, who
10 used Dr. Demopoulos as an access point,
11 who came to visit, and as I said, told me
12 that we would regret publishing the paper
13 because we did not have the data that
14 Merck had, that we didn't understand that
15 rheumatoid arthritis patients had more
16 heart attacks, and that we would -- we
17 were making a mistake. Those were
18 comments that I did not find enjoyable
19 whatsoever.
20     Q.  Do you have Exhibit 5 in
21 front of you that the plaintiffs used?
22     MR. HAMELINE: We will.
23 BY MR. GOLDMAN:
24     Q.  Do you see Exhibit 5, sir?

Page 405

1      A.  Yes.
2      Q.  This is an exhibit that the
3  plaintiffs used and didn't ask you about
4  the e-mail dated April 20 of 2001 from
5  you to Dr. Reicin. Do you see that in
6  the middle of the page?
7      A.  Yes, I do.
8      Q.  Do you tell Dr. Reicin on
9  April 20: "I enjoyed the meeting with you
10 and Laura and will have my assistant,
11 Donna Bressan, forward you an electronic
12 copy of the JAMA paper."
13     A.  Yes. I certainly said that,
14 and I was trying to be politically
15 correct and smooth over the difficulties
16 we had during the meeting.
17     Q.  Was it true what you wrote,
18 Dr. Topol, that you enjoyed the meeting
19 with Laura and Dr. Demopoulos?
20     MR. KLINE: Objection,
21     violation of Judge Fallon's order.
22     THE WITNESS: To be exact, I
23     did not enjoy some of the
24     interactions, but I tried to be

Page 406

1  correct about keeping things on an
2  upbeat -- when I wrote that, it
3  was definitely to convey a sense
4  of, let's not have any bad
5  feelings, and I tried to convey an
6  upbeat sense. That's what that
7  is.
8  BY MR. GOLDMAN:
9      Q.  On direct examination, Mr.
10 Kline read to you a quote from a Wall
11 Street Journal article that came out when
12 you published your article in JAMA. Do
13 you remember that, sir?
14     A.  Yes, I do, August 22nd.
15     Q.  And the quote that Mr. Kline
16 read to you was the following:
17         "Merck sought to downplay
18 the cardiac issue."
19         Do you remember that?
20     A.  Yes. That's what the
21 reporter wrote, Tom Burton and Gardiner
22 Harris. The reporters wrote "Merck
23 sought to downplay."
24     Q.  You said in response to Mr.

Page 407

1  Kline's question that "I do believe
2  that's true because" of the "ulterior
3  purpose of the visit." Do you remember
4  testifying to that on direct examination?
5      A.  Let me be perfectly clear,
6  Mr. Goldman. It is unquestionable in my
7  mind that the reason why Dr. Reicin came
8  to Cleveland was to downplay the cardiac
9  risks of Vioxx and try to get this
10 manuscript to be toned down. There isn't
11 any question about that.
12         MR. GOLDMAN: Move to strike
13     as nonresponsive.
14 BY MR. GOLDMAN:
15     Q.  Dr. Topol --
16         MR. HAMELINE: He can move
17     to strike. It doesn't mean it's
18     going to be stricken.
19 BY MR. GOLDMAN:
20     Q.  Dr. Topol, what the Wall
21 Street Journal said about Merck trying to
22 downplay the cardiac issue was not
23 accurate, correct, sir?
24     A.  It was entirely accurate in

Page 408

1  my view. In fact, Mr. Goldman, Thomas
2  Burton, who interviewed me for that
3  article, asked me what was going on that
4  day in April 2001 when Dr. Reicin and Dr.
5  Demopoulos visited me. And he asked me,
6  were there any quid pro quos,
7  intimidations. And I said, well, it was
8  obvious why she came to Cleveland. I
9  never had met her before. I had
10 forwarded the manuscript in advance, and
11 it was obvious what the purpose of that
12 trip was. And it's obvious that the
13 reporter, Thomas Burton, accurately
14 reported what I told him.
15     Q.  It's your testimony, sir,
16 that Merck actually pressured you or
17 tried to influence you about your JAMA
18 article?
19     A.  I wouldn't call it pressure.
20 I would call it, you don't know about the
21 other data, you don't know about the
22 Alzheimer trial patients, you're going to
23 be embarrassed if you publish it. You
24 know, I can deal with all of these

Page 409

1  things. I don't consider that -- the
2  word you used was what?
3      Q.  Did either Dr. Reicin or Dr.
4  Demopoulos --
5      A.  Demopoulos.
6      Q.  Yes. I'm sorry.
7         -- ever put any pressure or
8  influence on you when they met with you
9  in April of 2001?
10        MR. HAMELINE: Again, it's
11    the same question you keep coming
12    back with. Is there some
13    different take that you've given
14    here? He's already answered the
15    question.
16        THE WITNESS: I believe that
17    -- pressure -- you know, it's an
18    ambiguous term, but it was very
19    obvious why they met with me, and
20    they subsequently met with Dr.
21    Nissen for the same purpose, which
22    is to reduce the claims that we
23    had, the worries that we had
24    regarding the cardiac risk of

Page 410

1  Vioxx.
2     MR. GOLDMAN: I want to mark
3  the next exhibit.
4        - - -
5     (Whereupon, Deposition
6  Exhibit Topol-34, E-mails,
7  MRK-ABA0011062, was marked for
8  identification.)
9        - - -
10 BY MR. GOLDMAN:
11    Q.  Dr. Topol, do you see that
12 Exhibit 34 is an e-mail on the top from
13 you to, is it Peter DiBattiste?
14    A.  Yes, Dr. DiBattiste.
15    Q.  Of Merck?
16    A.  Yes.
17    Q.  And this is August 30 of
18 2001; right?
19    A.  Yes. So, it's after these
20 articles have come out, yes, the JAMA and
21 the Wall Street Journal, yes.
22    Q.  So, you're writing to Merck
23 after the Wall Street Journal comes out,
24 the one that said that Merck tried to

Page 411

1  downplay the cardiac issue; correct?
2     A.  That's right. I'm writing
3  to Peter DiBattiste. I'm not writing to
4  Merck in general, yes.
5     Q.  You wrote, sir, "I'd like to
6  talk to you about the COX-2 post-mortem
7  to straighten out any issues. I hope you
8  know that I never mentioned your name,
9  Laura's or anyone else and never felt a
10 sense of pressure or influence." Do you
11 see that, sir?
12    A.  Yes, I do.
13    Q.  Was that true?
14    A.  Well, as we just discussed,
15 there was no overt pressure and
16 intimidation, but there certainly was an
17 obvious motive of this trip to come to
18 Cleveland, yes. There's a difference
19 here, and it's a matter of semantics.
20    Q.  Is the statement that you
21 wrote to Dr. DiBattiste true?
22    A.  I think -- well, I wrote it
23 to Peter, who I viewed as a colleague
24 like Laura Demopoulos, and I certainly

Page 412

1  felt -- we had a relationship that
2  extended over years doing clinical trials
3  together, and I was trying to be
4  appropriate and accurate. Yes, I believe
5  that I'm conveying what I felt at that
6  time.
7     Q.  If you skip down to the
8  sentence that starts, "Unfortunately, a
9  co-author of the paper had a different
10 perspective and used names and painted a
11 very different picture. I pleaded with
12 Burton, the reporter, that this wasn't
13 the case but you can see how much that
14 influenced his story." Do you see that,
15 sir?
16    A.  Yes. I see that. I also
17 remember having a phone discussion with
18 Dr. Demopoulos in advance of this, and I
19 knew that both she and he were very
20 upset. I also know that they were very
21 upset about the COX-2 inhibitor program
22 at Merck, as they conveyed to me, but,
23 yes, I certainly see this.
24    MR. GOLDMAN: Move to strike

Page 413

1  as nonresponsive after yes.
2  BY MR. GOLDMAN:
3     Q.  Dr. Topol, you actually
4  thought that it would be great to get
5  Merck's input on the JAMA article;
6  correct?
7     A.  I didn't think it would be
8  great. I thought it would be -- because
9  of being colleagues with Merck, because
10 of having a relationship with Drs.
11 DiBattiste and Demopoulos in another
12 trial, I thought it was appropriate that
13 we give them an opportunity to review the
14 manuscript and the data.
15    MR. HAMELINE: So, we're
16 done with Exhibit 34?
17    MR. GOLDMAN: Yes.
18    MR. HAMELINE: Can we go off
19 the record and take a short break.
20    MR. GOLDMAN: After we
21 finish this document, yes.
22        - - -
23    (Whereupon, Deposition
24 Exhibit Topol-35, E-mails,

```
                                    Page 414
 1       TOP1PRO0000282 - TOP1PRO0000283
 2       was marked for identification.)
 3       - - -
 4   BY MR. GOLDMAN:
 5       Q.  Dr. Topol, I've handed you
 6   Exhibit 35, which is a series of e-mails
 7   starting at the bottom. It's Laura
 8   Demopoulos is writing to you, Dr. Topol,
 9   on April 28, 2001. Do you see that, sir?
10       A.  Yes.
11       Q.  She writes to you "Hi, just
12   wanted to let you know that Pete and I"
13   -- that's Pete DiBattiste -- "will be
14   working with Alise to try to incorporate
15   some of the data we discussed during our
16   visit into the JAMA manuscript." Do you
17   see that, sir?
18       A.  Yes. I see it. I can read
19   it very well, yes.
20       Q.  You wrote back to Laura on
21   April 28 and you said, "Hi, Laura. That
22   will be great to get your input." Do you
23   see that, sir?
24       A.  Yes. But don't cut off the
```

```
                                    Page 415
 1   sentence, "we haven't heard from JAMA
 2   yet." That is, the paper was already
 3   under review at JAMA. Okay? So, the
 4   input was, and I told this to Laura on
 5   the phone, and it's not conveyed in the
 6   e-mail, the input was about data on the
 7   manuscript and the discrepancies that
 8   we're concerned about. And I want to be,
 9   again, perfectly clear. We never
10   received any manuscript recommendations,
11   data changes from Merck, from Dr.
12   Demopoulos, Dr. DiBattiste or Dr. Reicin.
13       Q.  We'll talk about that issue
14   in a minute.
15       A.  Yes.
16       Q.  Dr. Topol, was it true what
17   you wrote to Laura Demopoulos, that you
18   thought it would be great to get her
19   input on your manuscript?
20       A.  I was the one who offered
21   the manuscript to get the input, of
22   course.
23       Q.  You actually found some of
24   Merck's comments to be insightful, and
```

```
                                    Page 416
 1   you wanted to incorporate them. Isn't
 2   that right, sir?
 3       A.  No. I didn't get any
 4   comments. We never got any comments.
 5           MR. HAMELINE: So --
 6           THE WITNESS: The
 7   manuscript --
 8           MR. GOLDMAN: We can take a
 9   break now.
10           MR. HAMELINE: That's fine.
11           THE VIDEOTAPE TECHNICIAN:
12   Off the record at 4:02.
13           - - -
14           (Whereupon, a recess was
15   taken from 4:02 p.m. until
16   4:15 p.m.)
17           - - -
18           THE VIDEOTAPE TECHNICIAN:
19   Back on the record at 4:15.
20   BY MR. GOLDMAN:
21       Q.  Dr. Topol, did Merck ever
22   provide comments to you on your JAMA
23   paper that you subsequently published in
24   August of 2001?
```

```
                                    Page 417
 1       A.  I'm not aware of any
 2   comments.
 3       Q.  You actually said on direct
 4   examination that Merck "never sent...us
 5   any suggestions, changes of data. There
 6   was never anything sent back to me
 7   or...my colleagues. Was that your
 8   testimony?
 9       A.  I referred to the documents
10   that were presented to me this morning
11   when I never saw those before. These
12   revised manuscripts from internal --
13   I've never seen those before.
14       Q.  Did Merck send you any
15   revised comments about your manuscript?
16       A.  I don't recall ever getting
17   any revised comments.
18           - - -
19           (Whereupon, Deposition
20   Exhibit Topol-36, E-mail 6-20-01,
21   with attachment, "Risk of
22   Cardiovascular Events Associated
23   with Selective COX-2 Inhibitors,"
24   (Mukherjee, et al) Draft
```