Page 538

1  website.
2      Q.  Do you know, Dr. Topol, that
3  the FDA -- withdrawn.
4          MR. GOLDMAN:  Let me show
5      you two documents, sir.  Let's go
6      off the record while I get these
7      if that's okay.
8          THE VIDEOTAPE TECHNICIAN:
9      Off the record at 5:56.
10             - - -
11         (Whereupon, a recess was
12     taken from 5:56 p.m. until
13     5:57 p.m.)
14             - - -
15         THE VIDEOTAPE TECHNICIAN:
16     Back on the record at 5:57.
17             - - -
18         (Whereupon, Deposition
19     Exhibit Topol-46, E-mails,
20     FDACDER 023057 - FDACDER 023058,
21     was marked for identification.)
22             - - -
23  BY MR. GOLDMAN:
24      Q.  Dr. Topol, I've handed you

Page 539

1  Exhibit 46, which is an e-mail exchange
2  within the FDA.  And I want to point your
3  attention to November 1st, 2004.  Do you
4  know who the author is?
5      A.  Dr. Villalba, yes, primary
6  reviewer of this application.
7      Q.  Dr. Villalba of the FDA
8  writes "Study 090 was conducted between
9  September 1998 and May 1999.  This one
10 showed more CV thrombotic events on Vioxx
11 than nabumetone or placebo.  Topol was
12 not interested in study 085 which had
13 identical design and duration (6 weeks)
14 and approximately same size, but showed,"
15 and he underlines this, "no differences
16 in CV thrombotic events."  Do you see
17 that, sir?
18     A.  I see it, and I want to
19 point out that a clinical trial is for 20
20 years.
21     Q.  Doctor --
22     A.  You look for signals and you
23 don't disregard certain trials and look
24 at certain trials.

Page 540

1          MR. GOLDMAN:  Move to strike
2      as not nonresponsive.
3  BY MR. GOLDMAN:
4      Q.  In the next e-mail on
5  November 8 of 2004, Doctor --
6          MR. HAMELINE:  Let me note
7      my objection here.  Again, you are
8      putting in front of him documents
9      that someone else has authored to
10     another third party.  You're
11     asking him to agree or disagree
12     with statements that they are
13     making and not allowing him to
14     concern.  If you have a question
15     for Dr. Topol about these
16     documents, ask him.  But he's not
17     here to simply be a parrot about
18     what other people have said.
19         THE WITNESS:  Yes, I mean --
20         MR. GOLDMAN:  Dr. Topol, I'm
21     not going to use up my time
22     getting into arguments.  I have a
23     few more questions.  Let me ask
24     them.

Page 541

1          THE WITNESS:  Well, it's
2      funny how you don't have the
3      statements about what they said
4      about why Merck should have
5      submitted these data earlier,
6      attributing it to me, but --
7  BY MR. GOLDMAN:
8      Q.  Dr. Topol, you see that Dr.
9  Villalba of the FDA writes on November 8
10 of 2004, "Merck might have submitted
11 study 090 results to the Agency sometime
12 earlier than June 2000, but I do not
13 think we would have done anything with
14 it, since the number of events was small
15 and there was a twin study (085) with
16 identical size and duration, conducted at
17 approximately the same time, that showed
18 no difference in CV thrombotic events as
19 compared to placebo and nabumetone."  Do
20 you see that, sir?
21     A.  I see that.
22     Q.  This was written after the
23 drug was withdrawn; correct?
24     A.  Yes.  And still I was not

Page 542

1  informed of these dates.
2      Q. Dr. Topol, I have a few more
3  questions.
4      A. And the other issues as
5  well.
6      Q. Dr. Topol, you talked about
7  the warning label for Vioxx; correct?
8      A. Yes.
9      Q. You're not an expert in
10 warnings and labeling under the Food &
11 Drug Administration guidelines, are you,
12 sir?
13     A. Well, I'm certainly familiar
14 with them. I wouldn't call myself an
15 expert, no.
16     Q. You said that the warning
17 label that was approved by the FDA in
18 April of 2002 was inadequate. Is that
19 your testimony?
20     A. I not only said it was
21 inadequate, but I also wrote in my New
22 England Journal of Medicine invited
23 editorial that it was unacceptable about
24 the delay from the time the committee

Page 543

1  met, FDA, in February 2001 with the
2  consensus recommendation that the label
3  be changed until April of 2002, a delay
4  unacceptable of 14 months for the label
5  to have a minimal change.
6      Q. Merck sent you the label
7  that was approved by the FDA in April of
8  2002, didn't they, sir?
9      A. Yes.
10        - - -
11        (Whereupon, Deposition
12     Exhibit Topol-47, Letter 4-11-02,
13     with attached label, EJT 000044;
14     EJT 000050 - EJT 000065, was
15     marked for identification.)
16        - - -
17 BY MR. GOLDMAN:
18     Q. I'm marking Exhibit 47 for
19 identification, and this is a letter from
20 Tracy Mills of Merck to you, April 11,
21 2002. "Dear Dr. Topol: As an advisor
22 and consultant to Merck we wanted to
23 bring to your attention the revised
24 Prescribing Information for Vioxx" and

Page 544

1  then encloses the revised label.
2  Correct, sir?
3      A. Yes.
4      Q. Did you ever write back to
5  Merck and say you thought this label was
6  inadequate back in April of 2002?
7      A. Well, the first point I just
8  made is the time delay was not
9  appropriate, and it's too late at that
10 point.
11        Secondly --
12     Q. Did you --
13        MR. STEIN: Let him finish.
14        THE WITNESS: We're talking
15     about the package insert?
16 BY MR. GOLDMAN:
17     Q. My question, Dr. Topol, was
18 very simple. It was, did you ever call
19 Merck in April of 2002 to tell them that
20 you thought the label was inadequate?
21 Yes or no?
22        MR. KLINE: Please finish
23     the answer that you are being cut
24     off from, sir.

Page 545

1  BY MR. GOLDMAN:
2      Q. Can you answer that
3  question?
4      A. Are we talking about the
5  package insert or this?
6      Q. The package insert. Did you
7  ever write to Merck --
8      A. I did not write to Merck.
9      Q. Did you ever write to the
10 FDA and say, I think that the package
11 insert that you just approved for Vioxx
12 was inadequate in April of 2002?
13     A. I discussed it with the FDA,
14 and I believe it's in some of my writings
15 as well. And it may be even in
16 correspondence to the FDA, yes.
17     Q. I would like you to find,
18 Dr. Topol, because you just said that you
19 wrote to the FDA, I'd like you to find
20 for me where you wrote them in April of
21 2002 or any time in 2002 or any time in
22 2003 or any time in 2004 before the
23 withdrawal where you told the FDA you
24 thought that the warning label that they

Page 546

1  approved was inadequate?
2      A.  I said -- firstly, I would
3  go back to my statement. I discussed
4  this with the FDA. I don't recall for
5  sure whether I sent correspondence.
6  Certainly I didn't send a separate
7  letter, but I did discuss it with them
8  that I thought that by not -- the
9  gastrointestinal benefits were
10 highlighted in the new package insert.
11 But the cardiovascular toxicity, although
12 in the package insert, was way down, it
13 was in small print, it wasn't
14 highlighted, not in bold face. It was
15 certainly not a flag for the consumer and
16 for the physician.
17     MR. GOLDMAN: Move to strike
18     as nonresponsive.
19 BY MR. GOLDMAN:
20     Q.  Did you ever write any
21 article, Dr. Topol, in any journal in
22 April of 2002 after you saw the
23 FDA-approved label to say, I think this
24 label is inadequate and should be

Page 547

1  changed?
2      A.  I wrote about the timing
3  being adequate in the peer-reviewed
4  literature. I did not write -- I do not
5  recall writing in any medical literature
6  that the package insert was inadequate.
7      MR. GOLDMAN: Two more
8      questions, and I'll reserve
9      whatever time I have, if I have
10     any.
11     MR. KLINE: You have none.
12 BY MR. GOLDMAN:
13     Q.  Dr. Topol, you referenced
14 the Juni article. Do you remember that?
15     A.  Yes, certainly.
16     Q.  The Juni article shows that
17 there's no increased risk associated with
18 Vioxx at the 25 milligram dose, correct,
19 sir?
20     A.  No. No. That's not at all
21 an appropriate interpretation of that
22 study.
23     Q.  Do you want to look at the
24 table with me?

Page 548

1      A.  Yes. I'm happy to, because
2  that's a subgroup analysis, which is
3  unacceptable if you're trying to make
4  that. What they show is lack of
5  differences between the doses. It
6  doesn't mean that one dose is not
7  significant. Here it is right here. And
8  for you to be able to interpret that
9  is --
10     MR. HAMELINE: Identify the
11     table.
12     THE WITNESS: -- is absurd.
13 Table 2 in the Juni paper in the
14 Lancet. What it says is that the
15 risk of 12 and a half milligrams
16 was 271 percent. And that wasn't
17 quite statistically significant,
18 although close. The 50 milligrams
19 was indeed statistically
20 significant at 2.83 or 283 percent
21 increase. And then what you're
22 trying to say is that 25
23 milligrams was not statistically
24 significant because it was 1.37.

Page 549

1  Well, you can't make those
2  conclusions. The analysis is done
3  on the drug. There's no --
4  BY MR. GOLDMAN:
5      Q.  Dr. Topol --
6      A.  There's no interaction. The
7  p-value for the interaction of the dose
8  is not significant.
9      Q.  Dr. Topol, does Table 2 of
10 the Juni article show that there's no
11 increased risk associated with Vioxx at
12 25 milligrams versus placebo?
13     A.  It absolutely does not
14 convey that.
15     Q.  Can I see the article for a
16 second?
17     A.  Yes, certainly.
18     (Handing over document.)
19     Q.  Do you see, Dr. Topol, that
20 in Table 2, under "Daily dose," 25
21 milligrams has a relative risk of 1.37
22 and a confidence interval of .52 to 3.61,
23 so the number 1 falls within the
24 confidence interval, and there's no

Page 550

1  statistically significant difference in
2  cardiovascular risk associated with the
3  25 milligram dose.
4      A.  You missed on the most
5  important next part of that same --
6      Q.  Can you say whether that's
7  true or false and then you can --
8          MR. HAMELINE: Well, you
9      have the table.
10         THE WITNESS: The p-value
11     for the interaction, that is, is
12     .69. So, you can't say anything
13     about statistical significance
14     about any of the doses. You can't
15     say anything about it.
16 BY MR. GOLDMAN:
17     Q.  Doctor --
18     A.  It's an overall conclusion.
19     Q.  Dr. Topol --
20     A.  You're making an
21 illegitimate subgroup, and you can't look
22 at the confidence interval and interpret
23 that.
24     Q.  Dr. Topol, when you look at

Page 551

1  the 25 milligram dose for Vioxx in Table
2  2, do you see the confidence interval
3  covers 1, which means that the 25
4  milligram dose, there's no statistically
5  significant difference in -- withdrawn.
6          Do you see, Dr. Topol, that
7  in Table 2 of Juni's article with the 25
8  milligram dose that the difference in
9  cardiovascular events -- I'm tired. I'm
10 sorry.
11     A.  If you read the paper, it
12 will --
13     Q.  I don't want to read the
14 paper. I want to look at the data.
15         Dr. Topol --
16     A.  I'm with you, Mr. Goldman.
17     Q.  Dr. Topol, if you look at
18 table 2 at the 25 milligram dose, do you
19 agree that because the confidence
20 interval covers 1, there's no
21 statistically significant difference in
22 cardiovascular risk between Vioxx and
23 placebo?
24     A.  If there was a significant

Page 552

1  interaction on dose, you could make that
2  assertion, but with a p-value that's
3  insignificant for interaction, you cannot
4  make that conclusion.
5      Q.  Do you also see, Dr. Topol,
6  that in trial duration, do you see that
7  in less than six months there's no
8  statistically significant difference in
9  increased cardiovascular risk in the Juni
10 study?
11     A.  I'm afraid the problem is
12 that you're not interpreting these data
13 properly because the concept -- and I can
14 explain it if you'd like, about
15 heterogeneity and interaction. What this
16 table shows, and the most important
17 aspect of the table is this column for P
18 for interaction. And what this shows is
19 that the duration, there's no difference.
20 217 percent excess for less than six
21 months. 233 percent excess for heart
22 attack for greater than six months. The
23 same thing for dose. Only if there's a
24 p-value for interaction. And the only

Page 553

1  one there was, interestingly, was on the
2  external endpoint committee, which is a
3  topic I would have loved to address with
4  you. But that is the only one that was
5  significant. And that's the only thing
6  you can say about this table.
7      Q.  Let me ask one more time.
8      A.  Yes.
9      Q.  Without looking at the
10 p-value that you just looked at, do you
11 agree that Table 2 of the Juni study
12 shows that there's no statistically
13 significant difference in cardiovascular
14 risk associated with the Vioxx 25
15 milligram dose?
16     A.  It does not show that there
17 is no statistically significant
18 difference, that there's no statistically
19 significant -- there's nothing you can
20 say about any of the doses higher or
21 lower based on this analysis and the
22 data.
23         MR. GOLDMAN: I don't have
24     any more questions right now, Dr.

Page 554

1  Topol.
2      Can we take a break?
3      MR. HAMELINE: We can. Off
4  the record.
5      THE VIDEOTAPE TECHNICIAN:
6  Off the record at 6:07.
7      - - -
8      (Whereupon, a recess was
9  taken from 6:07 p.m. until 6:24
10 p.m.)
11     - - -
12     THE VIDEOTAPE TECHNICIAN:
13 Back on the record at 6:24.
14     MR. GOLDMAN: Tom, to be
15 clear for the record, when I just
16 say objection, I can work out
17 exactly what the basis for the
18 objection is and tell Linda, the
19 court reporter, after the
20 deposition?
21     MR. KLINE: Yes. With the
22 presumption that it's a few words,
23 not a paragraph, which I assume it
24 will be.

Page 555

1      MR. GOLDMAN: It is not
2  going to be a paragraph. It's
3  going to be either lack of
4  foundation or opinion --
5      MR. KLINE: You --
6      MR. GOLDMAN: -- testimony or
7  form.
8      MR. KLINE: You and I are
9  together. Say objection, say it
10 loud and clear so we hear it.
11     - - -
12        E X A M I N A T I O N
13     - - -
14 BY MR. KLINE:
15     Q.   Dr. Topol, nice to see you
16 again.
17     A.   Yes.
18     Q.   And I want to ask you a
19 couple of questions that the Merck lawyer
20 may not have -- in fact, I know didn't
21 ask you.
22        First of all, I didn't know
23 that he was making a chart of the CV
24 event analysis. Apparently he was

Page 556

1  writing numbers. Do you recall when he
2  was writing numbers and you were
3  disagreeing that those numbers were
4  comparing apples and apples?
5      MR. GOLDMAN: Objection.
6      THE WITNESS: Yes.
7  BY MR. KLINE:
8      Q.   Well, no, he was
9  disagreeing, that it was comparing apples
10 and apples. You are saying it was like
11 comparing two different fruits?
12     MR. GOLDMAN: Objection.
13     THE WITNESS: Yes.
14 BY MR. KLINE:
15     Q.   All right.
16        I see here that he prepared
17 and marked something called Exhibit 48,
18 and what he says here, I'll put it in
19 front of us, that in August of '01, JAMA,
20 he says Vioxx -- help me with that.
21     A.   Nabumetone.
22     Q.   -- nabumetone, placebo.
23     A.   Right.
24     Q.   And he has August, '91,

Page 557

1  JAMA, 6, 2, 1?
2      A.   Right.
3      Q.   Vioxx, nabumetone, placebo
4  for October 25th, 7, 1, 1?
5      A.   Those are Dr. Targum's
6  numbers, but the basis of them was
7  uncertain. So, that's what we were going
8  on, until we could zoom in on each and
9  every patient and figure out whether they
10 had a heart attack, a death or a stroke.
11     Q.   Understood.
12        And then in November 12,
13 it's 5, 1, 0?
14     A.   That was after the final
15 review of each patient's detailed
16 clinical history.
17     Q.   This is 090; correct?
18     A.   That's 090.
19     Q.   That study for Merck was
20 bad; correct?
21     MR. GOLDMAN: Objection.
22     THE WITNESS: Well, let's
23 put it this way. I only learned,
24 you know, back in November of '04

## Page 558

1  that it was finished in 1999. So,
2  now it's 2005, it's six years
3  later, it hasn't been published,
4  and as far as I know, it's the
5  only significant large trial in
6  nearly 1,000 patients that has not
7  been published in the Vioxx trial.
8  BY MR. KLINE:
9      Q.   Do you recall the
10 questioning when the Merck lawyer showed
11 you an e-mail, and he suggested to you
12 that somebody suggested, so, therefore,
13 he, the Merck lawyer, was suggesting that
14 you weren't interested in 085?
15          MR. GOLDMAN: Objection.
16          THE WITNESS: Right, yeah.
17      And that is a really important
18      point, because when you are
19      reviewing a profile of a drug or a
20      device or a biotechnology product,
21      you can't ignore a signal from any
22      given trial. Each trial in itself
23      is a compartment. So, if you have
24      a significant excess of events,

## Page 559

1       serious events, we're talking here
2       about death, heart attack and
3       stroke, and you see it in two
4       independent compartments, that's
5       the whole story. It's right
6       there.
7           It doesn't mean that you had
8       another trial that was very
9       similar, in this case, 085, it
10      doesn't mean that that trial is
11      wrong or right or -- the important
12      point here, and this is a critical
13      thing for interpretation of
14      clinical trials in a field, is
15      signals. And once you have
16      replication in two compartments,
17      two independent trials, that's the
18      story. That's basically what I
19      was communicating at the time of
20      the 60 Minutes interview.
21          MR. GOLDMAN: Objection,
22      move to strike, nonresponsive.
23 BY MR. KLINE:
24     Q.   If there were one of the two

## Page 560

1  studies -- Merck published 085; correct?
2      A.   Yes.
3      Q.   Good for them; correct?
4           MR. GOLDMAN: Objection.
5           THE WITNESS: Well, it --
6  BY MR. KLINE:
7      Q.   Good, at least it appeared
8  to be good as far as cardiovascular risks
9  were concerned; correct?
10          MR. GOLDMAN: Objection.
11          THE WITNESS: It didn't
12      have, as best I can tell, any
13      heart attack and death and stroke,
14      but it took a long time. It got
15      published in 2004 by Kivitz and
16      colleagues, as we saw, but that's
17      a very long time lag. I don't
18      know when that trial was
19      completed, but I assume it was
20      sometime in '99, and that's still
21      a very long time lag.
22 BY MR. KLINE:
23     Q.   Putting aside the time lag,
24 they published 085, which has some good

## Page 561

1  data in them, and they did not publish
2  090, which is bad for them; correct?
3           MR. GOLDMAN: Objection.
4           THE WITNESS: That was why
5       090 became a source of increasing
6       concern over time, the fact that
7       it didn't show up, the fact that
8       when Dr. Juni and his colleagues
9       did their analysis, as I reviewed
10      with you, Mr. Kline, this morning.
11 BY MR. KLINE:
12     Q.   Yes, sir.
13     A.   It was that 090 that took
14 VIGOR across the line and made it what
15 they considered a drug that was suitable
16 for withdrawal. So, this study 090
17 becomes much more important, the fact
18 that it wasn't published, but also the
19 fact that it was a replication of VIGOR.
20     Q.   Is that why you were
21 interested --
22          MR. GOLDMAN: Objection,
23      move to strike, nonresponsive.
24 BY MR. KLINE:

Page 562

1   Q.  Do you consider yourself to
2   be in this whole Vioxx affair a -- strike
3   that, I'm going to start again.
4         Do you consider in looking
5   at the Vioxx safety, do you consider
6   yourself to be independent, sir?
7         MR. GOLDMAN: Objection.
8         THE WITNESS: I don't know
9   how I could be more independent.
10  I certainly wasn't involved in the
11  trials, but on the other hand, I'm
12  looking at it as a seasoned
13  clinical trialist, so, yes, I
14  believe I'm an independent viewer.
15  BY MR. KLINE:
16  Q.  Which of the two studies, if
17  they had to pick one, should have been
18  published, and why?
19        MR. GOLDMAN: Objection.
20        THE WITNESS: Well, study
21  090 should have been published as
22  soon as possible, and that was the
23  concern that I registered. And,
24  of course, that was that Mr.

Page 563

1   Goldman's e-mail that I first saw,
2   internal FDA, they talked about,
3   should they have done something
4   with that data much earlier. But
5   that one was the one of concern.
6   And just because there's another
7   trial of similar size and design
8   that doesn't show the problem,
9   doesn't negate, it doesn't make
10  you in any way not seriously
11  concerned about 090.
12  BY MR. KLINE:
13  Q.  These data, even looking at
14  them the way he compares them, 6 Vioxx to
15  3 when you combined nabumetone and
16  placebo, or 7 versus 2 or 5 versus 1, are
17  any of those numbers, sir, reassuring
18  that Vioxx is safe?
19        MR. GOLDMAN: Objection.
20        THE WITNESS: They're not at
21  all reassuring. We're running on
22  a relatively low event, but they
23  are an imbalance of events no
24  matter how you look at study 090.

Page 564

1   And then in the wake of VIGOR, or,
2   actually, it preceded VIGOR by
3   many months, but when you put the
4   two together, you have a large
5   trial of 8,000 patients, you have
6   a trial of 1,000 patients, which
7   is a respectable number, it's not
8   so small, you see the same problem
9   in both trials, that's when you
10  have to make a conclusion that
11  there's a significant problem.
12        MR. GOLDMAN: Objection,
13  move to strike, nonresponsive.
14  BY MR. KLINE:
15  Q.  Now, when you were running
16  the statistical significance and you were
17  going to your statistician, was that a
18  statistician at Cleveland Clinic?
19  A.  Yes.
20  Q.  Okay.
21       Were you trying to be
22  accurate and correct, sir?
23  A.  Yes. I mean, I've been
24  doing this for a long time, and I don't

Page 565

1   ever want to put my name associated with
2   data -- with the wrong data. And I
3   regret that we could not, back in 2001,
4   get to the right data for 090, because we
5   could have found -- we could have
6   identified this problem a lot earlier.
7   Q.  Now, let's go to that point,
8   if I may.
9         MR. GOLDMAN: Objection,
10  move to strike, nonresponsive.
11  BY MR. KLINE:
12  Q.  Bear with me. I've got to
13  find some notes that I had, which I've
14  got here.
15        Okay. Let's move to that
16  data.
17        You looked to the Targum
18  memo from the FDA to find out information
19  that you couldn't find publicly. Is that
20  the gist of what you were telling us?
21  A.  Yes.
22        MR. GOLDMAN: Objection.
23  BY MR. KLINE:
24  Q.  And the fact of the matter

Page 566

1  is, when you looked at that information,
2  did you find things that were troubling?
3  Is that the nub of it?
4        MR. GOLDMAN: Objection,
5    foundation.
6        THE WITNESS: Without any
7    question, yes.
8  BY MR. KLINE:
9    Q.   And I think you said maybe
10 three times, four times, five times, that
11 you wanted to look at Page 32 and give an
12 explanation. Is that correct?
13   A.   Yes, I did.
14   Q.   Okay.
15   A.   Because 32 is the beginning
16 of where the problem lies. Because on
17 Page 32, there's --
18   Q.   Let me just put it in
19 context, because the jury and whoever is
20 looking at this now, juries in
21 particular, are going to be looking at --
22 let me start again.
23        Jurors will be looking at
24 this for quite a while at this point in

Page 567

1  the day.
2        This is the Targum memo by
3  an FDA reviewer, and the memorandum is
4  dated February 1, 2001; correct?
5    A.   Yes.
6    Q.   But the information is about
7  a study that was done two years earlier;
8  correct?
9    A.   That's correct.
10   Q.   And you now, two years
11 later, are looking at that data as an
12 independent eye and saying, what was
13 really in that study; correct?
14        MR. GOLDMAN: Objection.
15        THE WITNESS: Right. Three
16   years later.
17 BY MR. KLINE:
18   Q.   Three years later.
19        And that study hadn't been
20 published yet?
21        MR. GOLDMAN: Objection.
22        THE WITNESS: That's right.
23 BY MR. KLINE:
24   Q.   And you're saying to

Page 568

1  yourself, what does this show me against
2  this problem that was in VIGOR, which now
3  has a lot of attention in the medical
4  community; correct?
5        MR. GOLDMAN: Objection.
6        THE WITNESS: That's
7    correct. And moreover, there's
8    APPROVe in colon polyp patients,
9    not heart patients. There's also
10   ADVANTAGE in osteoarthritis for 12
11   weeks. There's other trials now
12   that we have access to and you
13   say, well, wait a minute, where
14   was the signal really there?
15   That's what this is about. Where
16   was the first signal really there?
17   Why didn't we get the right data,
18   the drilled down data on the study
19   090?
20        MR. GOLDMAN: Objection,
21   move to strike, nonresponsive.
22 BY MR. KLINE:
23   Q.   Now, recognizing -- I'll put
24 it in a different form to make sure we

Page 569

1  get it.
2        Were you looking for the
3  drilled down data, what you call drilled
4  down data?
5    A.   Yes.
6    Q.   What is -- I've heard that
7  term today.
8        What is drilled down data?
9    A.   Well, basically this table
10 is the bare bones. It says coronary
11 artery conclusion for the placebo patient
12 on Page 32.
13   Q.   Look at the table.
14   A.   Yes.
15   Q.   Recognize that I have 20
16 other areas I want to cover in less than
17 40 minutes.
18   A.   Okay.
19   Q.   Would you tell the members
20 of the jury with this displayed in front
21 of them what it is that you wanted to
22 communicate to them when you were
23 answering questions by Merck's counsel
24 when he was challenging you, like Merck

Page 570

1 challenges everyone, please?
2     MR. GOLDMAN: Objection.
3     THE WITNESS: The point
4   being, I gave this example, but
5   the coronary artery occlusion,
6   without having any details, the
7   table just says placebo, coronary
8   artery occlusion. Dr. Targum
9   concluded that was a heart attack
10  when, in fact, it wasn't a heart
11  attack when we reviewed the
12  details of this 48-year-old
13  gentleman. He didn't have any
14  heart attack.
15 BY MR. KLINE:
16  Q. You adjudicated the
17 individuals yourselves?
18    MR. GOLDMAN: Objection.
19    THE WITNESS: We had all the
20  information, we had the
21  electrocardiogram, we had the
22  angiogram. We had all the
23  information that isn't displayed
24  in this report, and then we knew

Page 571

1   that it was never -- this patient
2   never had a heart attack. So, he
3   was miscategorized. And that's
4   just one example.
5 BY MR. KLINE:
6  Q. But if you look at it no
7 matter which way it comes out displaying
8 48, does this study demonstrate anything
9 different in terms of a signal when it's
10 combined with the VIGOR study?
11    MR. GOLDMAN: Objection.
12    THE WITNESS: The point
13  about this is, if one is looking
14  at this with an open mind and
15  wanting the best for patients,
16  looking at the data and trying to
17  look at, is there a signal here of
18  worry, you would be worried if you
19  were the manufacturer of this drug
20  or you were the clinical trialist
21  doing this drug. You would be
22  worried. And that's data that's
23  available in mid-'99.
24    And you would be even more

Page 572

1   worried later in 1999 when you
2   have a trial where you have an
3   excess of deaths and serious
4   cardiovascular events.
5     And, finally, when the VIGOR
6   trial is cracked in March 2000, if
7   you looked at these data
8   objectively, you would say, we've
9   got two trials, one 1,000
10  patients, one 8,000 patients, we
11  don't need any more trials, we
12  have a problem, we need to have
13  restriction of the use of this
14  drug, particularly in patients
15  with known heart disease, and we
16  need to do the right trials to get
17  this drug, which works well for
18  arthritis, but it's got this
19  noxious side effect problem, and
20  we've got to do something about
21  it.
22    MR. GOLDMAN: Objection,
23  move to strike, nonresponsive.
24 BY MR. KLINE:

Page 573

1  Q. So, what we're displaying to
2 this jury in terms of this exhibit, Page
3 32 of the Targum memo, what that really
4 is is, you're showing us that there were
5 a series of patients, for example,
6 patient 2695, a 63-year-old with
7 myocardial infarction, you then looked at
8 each individual --
9  A. Yes.
10 Q. -- made your own
11 determination and then calculated the
12 numbers yourself?
13    MR. GOLDMAN: Objection.
14    THE WITNESS: This was a
15  bona fide heart attack, but the
16  patient that was listed for 2683
17  with atrial fibrillation. That
18  was not a thrombotic event. So,
19  each one of them required a very
20  careful review, which we only were
21  able to get that data, you know,
22  of course, late October/early
23  November of '04.
24 BY MR. KLINE:

Page 574

1  Q. Now, I want to ask you a
2 question because it was suggested three
3 times in the testimony.
4      Were you doing this or any
5 of your other activities to get Merck?
6      MR. GOLDMAN: Objection.
7 BY MR. KLINE:
8  Q. That's what they suggested
9 to you.
10     MR. GOLDMAN: Objection.
11     THE WITNESS: I find that
12 highly objectionable, because I
13 worked very closely with Merck. I
14 did the courtesy of sending the
15 manuscript to Merck for input,
16 meeting with Merck, which I didn't
17 have to do, with Dr. Reicin and
18 Dr. Demopoulos. I did everything
19 I could, bent over backwards to be
20 collaborative, and it's really
21 extraordinary to suggest that I
22 was trying to have an objective to
23 come at Merck in any way.
24     I was just trying to do the

Page 575

1 best, what we can with this data
2 and for patients, and I think our
3 work was ultimately validated
4 exceptionally well.
5     MR. GOLDMAN: Objection,
6 move to strike the nonresponsive
7 portion.
8 BY MR. KLINE:
9  Q. What was your work a piece
10 of in this process? What ultimately was
11 the result here of down the road of what
12 you started, sir?
13     MR. GOLDMAN: Objection.
14     THE WITNESS: When we
15 published that first paper in JAMA
16 in August of 2001, we certainly --
17 that was the first demonstration
18 in man, in patients, that there
19 was a significant problem that was
20 requiring further study. So, that
21 started the concern.
22     But, unfortunately, it was
23 met with deaf ears at Merck and
24 with Pfizer with respect to their

Page 576

1 unwillingness to do the right
2 trials, and although their data
3 weren't as worrisome, there
4 certainly were some data that were
5 concerning.
6     But the manufacturers of
7 these drugs, and particularly
8 Merck, where the data was most
9 concerning, did not do the right
10 thing for patients, and that's the
11 concern.
12     MR. GOLDMAN: Objection,
13 move to strike, nonresponsive.
14     MR. KLINE: I think it was
15 exactly responsive.
16 BY MR. KLINE:
17  Q. Next question. Got a bunch
18 of stuff I've got to get through with
19 you.
20     In the Juni article you went
21 back and forth. First of all, Juni, you
22 pointed out to the Merck lawyer, the Juni
23 article cited the 085 study; correct?
24     MR. GOLDMAN: Objection.

Page 577

1     THE WITNESS: Yes, it did.
2 BY MR. KLINE:
3  Q. It didn't cite the 090 study
4 because it wasn't published?
5  A. Interestingly, and this was
6 --
7     MR. GOLDMAN: Objection.
8     THE WITNESS: We didn't
9 mention this before, but the study
10 090 was cited in the FDA report
11 and the Geba abstract, the one
12 where he only presented the
13 efficacy with no safety data at an
14 American Geriatrics Society. So,
15 there was no paper to reference.
16 So, he referenced the Targum
17 report and the abstract.
18 BY MR. KLINE:
19  Q. Now, remember when you were
20 back and forth with the Merck lawyer
21 about when you were telling him that you
22 couldn't show that there was no dose
23 relation?
24  A. Yes.

145 (Pages 574 to 577)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 578

1  Q. And I think that's what the
2  points were that were being made;
3  correct?
4  A. Yes.
5  Q. And that it's not dose or
6  duration dependent, the gist of what you
7  were saying was that Vioxx is a problem
8  at various doses at various durations?
9      MR. GOLDMAN: Objection.
10     THE WITNESS: Well --
11 BY MR. KLINE:
12 Q. And that it was confirmed by
13 Juni?
14     MR. GOLDMAN: Objection.
15     THE WITNESS: Yeah. Not
16    only did Dr. Juni say in the paper
17    that there's no dose relationship,
18    no duration relationship, but
19    going back to the importance of
20    study 090, remember, that was at a
21    dose of 12-and-a-half milligrams
22    to see the over seven-fold excess
23    of heart attack. So, dose does
24    not appear to be a vital aspect of

Page 579

1    the cardiotoxicity.
2  BY MR. KLINE:
3  Q. And as you told us earlier,
4  nor does duration?
5      MR. GOLDMAN: Objection.
6  BY MR. KLINE:
7  Q. It could be short or long?
8      MR. GOLDMAN: Objection.
9      THE WITNESS: We reviewed
10    the duration aspects many times
11    earlier.
12 BY MR. KLINE:
13 Q. Now, the Juni article, I
14 believe it has a number which it was
15 given. I have underlined what Juni's --
16 you went back and forth with the Merck
17 lawyer, but I want to highlight the first
18 and underline in red. I have it for you
19 here, you can read it to the jury. The
20 first line of the "Interpretation,"
21 that's the bottom line; correct?
22 A. Yes. That would be the
23 conclusion of the abstract.
24    "Our findings indicate that

Page 580

1  rofecoxib should have been withdrawn
2  several years earlier."
3  Q. True statement?
4      MR. GOLDMAN: Objection.
5      THE WITNESS: They make -- I
6    cited that in the New England
7    Journal correspondence. I
8    certainly agree with their
9    systematic analysis. That was the
10    appropriate conclusion.
11 BY MR. KLINE:
12 Q. Okay.
13    Now, let's move right along.
14    Let's talk about statistical
15 analysis.
16    As far as your statistical
17 analysis is concerned, did you at all
18 times, sir, conduct a statistical
19 analysis consistent with good and sound
20 scientific practice?
21 A. That's the only way I would
22 know how to do, is to do the best we can
23 with the data and the statistics and the
24 analysis, yes.

Page 581

1  Q. Okay.
2    Was that also Merck's
3  obligation, to do the same thing?
4      MR. GOLDMAN: Objection.
5      THE WITNESS: Any medical
6    research should be done in that
7    way, yes.
8  BY MR. KLINE:
9  Q. Okay.
10    Now, have you had a chance
11 now to explain adequately what you wanted
12 explained to the jury about the Targum
13 memo and what you did in terms of
14 drilling down the data and what you were
15 after?
16 A. I believe so.
17 Q. Anything else that you think
18 has to be covered to get the full import
19 of it out?
20     MR. GOLDMAN: Objection.
21     THE WITNESS: Well, I mean,
22    I think the other points that Dr.
23    Targum made in her conclusion of
24    her report about the fact that

Page 582

1    the --
2    BY MR. KLINE:
3        Q.   Page?
4        A.   Page 34, "The sponsor claims
5    that the difference in heart attacks
6    between the groups is primarily due to
7    the anti-platelet effects of naproxen."
8        Q.   Yes.
9        A.   I've already discussed that,
10   that that was an untenable conclusion.
11       Q.   Well, wait. But what does
12   she say?
13            MR. GOLDMAN: Objection,
14       nonresponsive.
15   BY MR. KLINE:
16       Q.   Does she say something that
17   disagrees with you?
18       A.   Yes. She says, "The
19   hypothesis is not supported by any
20   prospective placebo-controlled trials
21   with naproxen."
22       Q.   It's the same thing you told
23   us earlier?
24       A.   That's right.

Page 583

1        Q.   And she says here, and you
2    highlighted this next point or put an
3    asterisk next to it, "The sponsor claims
4    that the majority of cardiovascular
5    events in the VIGOR study occurred in
6    those patients who should have been on
7    aspirin for cardioprotection."
8             And what does she say?
9             MR. GOLDMAN: Objection.
10            THE WITNESS: Well, this
11       claim has not convinced this
12       medical reviewer, it certainly did
13       not convince me, and so this is
14       not a reasonable conclusion from
15       the data.
16   BY MR. KLINE:
17       Q.   She notes that "The sponsor
18   claims that the patients with rheumatoid
19   arthritis are at increased risk for
20   cardiovascular events."
21            What does she say?
22            MR. GOLDMAN: Objection.
23            THE WITNESS: Well, there's
24       some literature. She agrees with

Page 584

1        it, I agree with it, there's some
2        literature, but it is actually a
3        very modest amount of literature.
4        And actually, the most recent data
5        from 2005, which we didn't have
6        back then, would suggest that
7        there is an increased incidence of
8        heart attacks, but it's not
9        particularly striking.
10            MR. GOLDMAN: Objection,
11       move to strike the nonresponsive
12       portion.
13   BY MR. KLINE:
14       Q.   And does it explain, does
15   that point explain the results of VIGOR?
16       A.   Not in any way.
17       Q.   VIGOR, when combined with
18   090, combined now with all the
19   epidemiologic studies, where does VIGOR
20   fit into the scheme of things?
21            MR. GOLDMAN: Objection.
22            THE WITNESS: The VIGOR was
23       in many ways the front runner.
24       That one is the one that really

Page 585

1        predicted what was going to
2        happen, not only in the
3        epidemiologic studies, but, of
4        course, in the subsequent
5        randomized trials.
6             There was one last point in
7        this report that I think deserves
8        to be underscored, and it says,
9        "The sponsor recommends use of
10       low-dose aspirin in conjunction
11       with rofecoxib in those at risk
12       for cardiovascular events."
13            There are no data whatsoever
14       to substantiate that. Dr. Targum
15       agrees with that and, again, we're
16       talking about millions of patients
17       in the United States and beyond,
18       and to recommend taking aspirin
19       without having any proof of that,
20       without any data, without any
21       meaningful trial, is really, I
22       believe, unacceptable.
23   BY MR. KLINE:
24       Q.   Moving along.

Page 586

1  MR. GOLDMAN: Objection,
2  move to strike.
3  BY MR. KLINE:
4  Q. You were asked questions
5  about the article that you wrote where
6  you said the findings were unexpected?
7  A. Yes.
8  Q. Okay.
9  Now, did you have access to
10 the Merck e-mails and the Merck internal
11 thinking?
12 A. Not at all. In fact, in the
13 October 2004 New England Journal of
14 Medicine editorial, I asked for
15 congressional review so we could get out
16 that stuff that we could never get to.
17 MR. GOLDMAN: Objection,
18 move to strike. Hold on, Tom.
19 Objection, move to strike,
20 nonresponsive.
21 BY MR. KLINE:
22 Q. Did you presume that the --
23 Was that a presumption on
24 your part, that the findings were

Page 587

1 unexpected?
2 MR. GOLDMAN: Objection.
3 THE WITNESS: I don't really
4 know. In retrospect, as you try
5 to reconstruct this, you wonder
6 how unexpected it was. Because if
7 you go back to 1999 with Dr.
8 Villalba's express concern in the
9 FDA documents that there appears
10 to be an excess of clotting
11 events, you wonder how unexpected
12 it really was.
13 BY MR. KLINE:
14 Q. Did you know at the time you
15 wrote that whether at the highest levels
16 of Merck they were worried that it was a
17 mechanism-based problem when they got the
18 VIGOR result?
19 MR. GOLDMAN: Objection.
20 BY MR. KLINE:
21 Q. Did you know that at the
22 time you wrote your article?
23 A. I certainly did not know
24 that.

Page 588

1  - - -
2  (Whereupon, Deposition
3  Exhibit Topol-48, "Dr. Topol's
4  Analysis CV Events in Study 090,"
5  Chart (1 page), was marked for
6  identification.)
7  - - -
8  BY MR. KLINE:
9  Q. Okay.
10 Let me show you an exhibit.
11 MR. GOLDMAN: Tom, you are
12 not going to be using documents
13 you didn't use before.
14 MR. KLINE: Well, sure I am.
15 You've challenged -- it has
16 nothing to do with documents.
17 MR. GOLDMAN: Tom, you are
18 supposed to limit your redirect to
19 the scope of the cross --
20 MR. KLINE: I am.
21 MR. GOLDMAN: -- not
22 introduce new --
23 MR. KLINE: I am limiting to
24 show -- you cross-examined him on

Page 589

1 whether it was unexpected. I'm
2 now asking him whether this would
3 change his opinion as to whether
4 it was unexpected.
5 BY MR. KLINE:
6 Q. I want you to look, sir,
7 very briefly, I have two documents --
8  - - -
9  (Whereupon, Deposition
10 Exhibit Topol-49, E-mail 3-9-00,
11 MRK-ABH0016219, was marked for
12 identification.)
13  - - -
14 BY MR. KLINE:
15 Q. I want you to look, sir,
16 very briefly. I have two documents --
17 MR. GOLDMAN: I --
18 MR. KLINE: You can have an
19 objection to save time.
20 MR. GOLDMAN: I'll object --
21 MR. KLINE: You can have an
22 objection, you can fill it in.
23 BY MR. KLINE:
24 Q. Sir --

Page 590

1      MR. GOLDMAN: I'll object to
2   this --
3  BY MR. KLINE:
4     Q.  Sir, this says Edward
5  Scolnick.
6      MR. GOLDMAN: I'll object to
7   this as opinion testimony and
8   beyond the scope.
9  BY MR. KLINE:
10    Q.  Did you know him?
11    A.  I had known Dr. Scolnick,
12  yes.
13    Q.  Okay.
14      He's been described, sir, by
15  his own colleagues as unsteady. Did you
16  ever hear that?
17      MR. GOLDMAN: Objection.
18      THE WITNESS: I heard that
19   from his colleagues, yes.
20  BY MR. KLINE:
21    Q.  And in the middle paragraph,
22  I'm going to put a red marker on here,
23  put your eyes to this, and I'll hand it
24  to you.

Page 591

1     A.  Yes.
2     Q.  "It's a shame," this is
3  after VIGOR and they had the results, and
4  he wrote, "It's a shame, but it's low
5  incidence and it's mechanism based as we
6  worried it was."
7      Did you know when you said,
8  well, it was unexpected to these folks
9  that there were actually documents in
10  their own things that they acknowledged
11  that they worried about it before?
12      MR. GOLDMAN: Objection.
13      THE WITNESS: I didn't know
14   that.
15  BY MR. KLINE:
16    Q.  Incredible, isn't it --
17      MR. GOLDMAN: Objection.
18  BY MR. KLINE:
19    Q.  -- seeing that document?
20    A.  It --
21    Q.  For a person in your
22  position?
23      MR. GOLDMAN: Objection.
24      THE WITNESS: Well, that's

Page 592

1   about the discussion I earlier
2   pointed out, about open mindedness
3   and looking at the data in an
4   objective way and not turning
5   back -- you know, turning your
6   back on the data of the trial.
7          - - -
8      (Whereupon, Deposition
9   Exhibit Topol-50, E-mails,
10   MRK-ABC0033809, was marked for
11   identification.)
12          - - -
13  BY MR. KLINE:
14    Q.  Another document, 50, very
15  quickly, sir.
16      Again, focusing on Mr.
17  Goldman's questions about when you wrote,
18  well, it was unexpected and, oh, it was
19  unexpected, you didn't expect to see it
20  and nobody expected to see it. Were you
21  privy to this document, sir, out of the
22  Merck files from Edward M. Scolnick to
23  Alise Reicin? You know who both of those
24  folks are, don't you?

Page 593

1      MR. GOLDMAN: Objection.
2      THE WITNESS: Yes, I do.
3  BY MR. KLINE:
4     Q.  And right here he says --
5  and do you know what was going on on
6  April 12, 2000? That was right after the
7  VIGOR results were known.
8      MR. GOLDMAN: Objection.
9   Can I have a standing objection to
10   your use of documents that you
11   didn't use before --
12      MR. KLINE: There's only
13   two, and they go directly, so I
14   have a record --
15      MR. GOLDMAN: I'm sorry.
16      -- and that the witness has
17   never seen before.
18      MR. KLINE: -- they go
19   directly to this.
20  BY MR. KLINE:
21    Q.  You've never seen these,
22  have you?
23    A.  I've not seen these, no.
24    Q.  I'm going to ask you if you

149 (Pages 590 to 593)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 594

1  would have written that it was unexpected
2  in your New England Journal if Edward
3  Scolnick, Alise Reicin or Merck had shown
4  you what was really on their minds? If
5  you want to -- if you think you had an
6  opinion about scientific misconduct
7  before, wait till you see this one.
8        MR. GOLDMAN: Objection.
9  BY MR. KLINE:
10     Q.  And here it goes. It says
11  here, right here, I'm on the "Hi Alise"
12  thing.
13     A.  Okay.
14     Q.  10:42 at night. They were
15  working late those nights.
16        It says here, "I will tell
17  you," now, remember, this is after they
18  told everyone that it was the naproxen
19  hypothesis.
20     A.  Right.
21     Q.  Naproxen explains it.
22     A.  Right.
23     Q.  Did you know, sir --
24        MR. GOLDMAN: Objection.

Page 595

1  BY MR. KLINE:
2     Q.  -- that Edward Scolnick was
3  telling Alise Reicin at 11:00 at night
4  that he was in "minor agony" and that his
5  "worry quotient is high"? Did you know
6  that when you wrote the article, sir?
7        MR. GOLDMAN: Objection.
8        THE WITNESS: No, I surely
9     didn't.
10 BY MR. KLINE:
11     Q.  And look what he said, sir.
12 He said, "What I really want to do is a
13 10,000 versus 10,000 patient study in
14 mild, moderate OA Tylenol versus Vioxx
15 with PRN low dose ASA for those judged
16 who need it. Safety first, primary
17 endpoint and efficacy second or
18 co-primary." All caps. "WE WILL NOT
19 KNOW FOR SURE WHAT IS GOING ON UNTIL WE
20 DO THIS STUDY. PLEASE THINK HARD ABOUT
21 THE DESIGN BEFORE THE PAC MEETING."
22        MR. GOLDMAN: Objection.
23 BY MR. KLINE:
24     Q.  Did you have access to that

Page 596

1  document when you said it was unexpected?
2     A.  I certainly had no access.
3     Q.  Do you think you would have
4  written that it was unexpected had you
5  seen that?
6     A.  It wouldn't have been
7  unexpected any longer --
8        MR. GOLDMAN: Objection.
9        THE WITNESS: -- and you
10    wonder why the trials to follow up
11    like Dr. Scolnick is suggesting
12    weren't mounted immediately.
13       MR. GOLDMAN: Belated
14    objection, and objection, move to
15    strike, nonresponsive.
16 BY MR. KLINE:
17    Q.  Were these studies that you
18 were suggesting, sir?
19    A.  Well, this would have
20 helped. In April 2000, to do a trial
21 like he's suggesting certainly would have
22 illuminated a lot of the problems that
23 were around then.
24       MR. GOLDMAN: Objection,

Page 597

1     move to strike as nonresponsive.
2  BY MR. KLINE:
3     Q.  They asked you questions
4  about whether you, sir, took Vioxx?
5     A.  Yes.
6     Q.  First of all, did you take
7  Vioxx regularly or did you just take it
8  intermittently?
9     A.  I took it once a week or
10 every couple, few weeks. It was very
11 sporadic. A single dose as needed for
12 knee pain.
13    Q.  Did you have any special
14 circumstances that you thought that you
15 could tolerate the risk?
16    A.  Well, I mean, I started
17 taking it when I was -- in '99, so, that
18 was -- I was 45. I had had an exercise
19 stress test. I had no risk factors for
20 coronary disease or heart disease. I'm
21 fit, so, I didn't think that,
22 particularly as we learned more about the
23 risk profile of the drug, that I was one
24 of the people who would, I think, be