Page 598

worried about the risk of the drug relative to an older person with any risk factors for heart disease.

MR. GOLDMAN: Objection, move to strike as nonresponsive.

BY MR. KLINE:

Q. By the way, does Merck recommend that you get a stress test before you take the drug?

MR. GOLDMAN: Objection.

THE WITNESS: No, no, not at all.

BY MR. KLINE:

Q. Are the common users of the drug the chief of the cardiovascular division at the number one institute for hearts in America?

MR. GOLDMAN: Objection.

THE WITNESS: Well, there's no recommendations because the drug isn't available now, but, no.

BY MR. KLINE:

Q. Okay, next.

I want to talk to you about,

Page 599

there was a mention in the testimony, it was pointed out to you by the Merck lawyer, that you suggested that it was -- that Vioxx, in your JAMA paper, could have an anti-inflammatory effect for patients who had known heart disease. Do you remember that?

A. Yes.

Q. I want to talk to you about apples and oranges here for a minute because I think you guys may have been talking by each other.

Is there a difference when you suggest that it has known -- that it could be anti-inflammatory as opposed to having these prothrombotic qualities which really cause the problems, and would you explain that whole concept directly and simply, sir?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Please.

A. So, the problem here, there's this very important equilibrium

Page 600

between so-called prostacyclin and thromboxane. And we've known about this for 40 years in medicine. And if you tip that balance and you inhibit thromboxane, you can inhibit clotting, or you rev up thromboxane, you can have more clotting. On the other hand, if you tip prostacyclin production or expression, you could have just the opposite with inflammation. So, this is this balance. And the question is, where would one of those COX-2 inhibitors in a trial of patients with heart disease, where would that balance be? Would it be that in some patients there would be a prevention of heart attack, and in others there would be a promotion of heart attack? This is what we didn't know.

But we also knew, and I tried to make this point earlier but I was suppressed, that millions of people with established heart disease were taking Vioxx and were taking Celebrex every day. We had this information from

Page 601

the Ray paper in Lancet, we had it from other papers that I've cited in my writings, and the important point is that if we have millions of people taking a drug, it's already out there and it is being done in a random way, so, we need to study this, and we need to get that information as quickly as possible.

MR. GOLDMAN: Objection, move to strike, nonresponsive.

BY MR. KLINE:

Q. Okay. Now, and, in fact, in that regard, you were asked about --

MR. KLINE: How much time?

THE VIDEOTAPE TECHNICIAN: A little under 15 minutes.

MR. KLINE: Okay.

I've got to hustle here.

- - -

(Whereupon, Deposition Exhibit Topol-51, E-mails, TOPOLE 000149 - TOPOLE 000150, was marked for identification.)

- - -

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 602

BY MR. KLINE:

Q. You were asked about this Alastair Wood memo?

A. Yes, yes.

Q. Again, I've got about a dozen things to cover here. Each one is going to get a minute. That's just the way the rules break down.

A. Fine.

Q. There is this Alastair Wood thing, and let me just put my hand on what I want to point out to you. You may know other stuff.

What was the discussion you were having with defense counsel about, as you understood it?

MR. GOLDMAN: Objection.

THE WITNESS: Yeah, I wanted to bring out the point that one of the highest regarded trialists, and in this field in particular, Dr. Wood, probably the most revered pharmacologist and trialists in the country, he

Page 603

completely agreed and said that -- about the fact that we needed a trial and the fact that his statement he had was really quite perfect.

Basically he's saying it was unethical not to do a trial, and the statement here, he says, "Such a study would have been undoable because of the size and time requirements." This is what Merck has been saying. And "I am surprised that gets repeated so frequently without challenge from the data." And he basically in this back and forth e-mail agrees that there's so many patients that are getting the therapy today, Vioxx, with heart disease, that we have to resolve this problem.

MR. GOLDMAN: Objection.

THE WITNESS: And it was only -- the irony is that it's only ethical to do the trial, not

Page 604

to back off from not doing it.

MR. GOLDMAN: Objection, move to strike as nonresponsive. Can I have a standing objection --

BY MR. KLINE:

Q. Back to the point --

MR. GOLDMAN: Tom, let me just make an objection? Can I have a standing objection?

MR. KLINE: Not on my time on the record.

Yes, you have a standing objection. Yes, sir.

MR. GOLDMAN: Standing objection to using documents you haven't used before?

MR. KLINE: Yes, sir, you do.

BY MR. KLINE:

Q. The fact of the matter is, that if I can go back to the -- with Wood, you and he were back and forth having a discussion, a scientific discussion; is that correct?

Page 605

A. That's right.

Q. Anything sinister going on, anything critical going on that was putting you down or anything bad going on?

MR. GOLDMAN: Objection.

THE WITNESS: Not at all. Not at all. We were in total agreement about what should be done here.

BY MR. KLINE:

Q. Now, Wood chaired the Advisory Committee in 2005, I believe, the FDA Advisory Committee?

A. That's right. He's chaired all the over-the-counter, anti-inflammatory, aspirin panels. He's chaired most of the FDA panels related to this topic.

MR. GOLDMAN: Objection, move to strike as nonresponsive.

BY MR. KLINE:

Q. Did the anti-inflammatory effects which you described and wrote

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 606

about at length in the article, picking that out, Merck's lawyer picking that out, how does that -- is that an explanation to say -- were you saying to the world, I think Vioxx is safe?

MR. GOLDMAN: Objection.

THE WITNESS: No, no, no. What we were saying is that there was a good rationale to do the trial. There were, you know, millions of people taking Vioxx with arthritis and heart disease, and there was potential benefit that should have been studied, and there was, of course, this worry, significant worry about potential harm. All of these things factored into the call, the mandate for a trial.

BY MR. KLINE:

Q. Next.

Labeling.

You've told us the label is inadequate; correct?

Page 607

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. I think you had a question about whether you were a, quote, labeling expert. So, you're a practicing cardiologist; correct?

A. That's correct.

Q. As a practicing cardiologist, and as a clinician and a researcher, have you learned and determined what the facts are about Vioxx?

MR. GOLDMAN: Objection.

THE WITNESS: I certainly have.

BY MR. KLINE:

Q. And have you made a determination as to whether the words contained in the document that is given to physicians who prescribe it called a label, whether those words are inadequate?

MR. GOLDMAN: Objection.

Page 608

THE WITNESS: I -- they didn't have any heart risk in '99, and then in 2002, when the label was revised, the package insert revised, it was not adequately incorporated.

BY MR. KLINE:

Q. Do you have the expertise and background to make that determination? I would think you would, and if so, would you tell us?

MR. GOLDMAN: Objection.

THE WITNESS: Well, I don't know. There is a group at the FDA, the label group, package insert group, but outside of that small sphere, I don't know that there's anybody who is better equipped to review this sort of information than the actual practicing physician.

BY MR. KLINE:

Q. Who do they go to, the, quote labeling group, who do they ask,

Page 609

who do they consult with?

MR. GOLDMAN: Objection.

THE WITNESS: They do talk to physicians. And, you know, I don't think that there's any differentiation in the medical community.

BY MR. KLINE:

Q. People like yourself?

MR. GOLDMAN: Objection.

THE WITNESS: I would think so, yes.

BY MR. KLINE:

Q. All right.

Now, you told me Demopoulos was concerned about the COX-2 program. Do you remember?

A. Yes, yes.

Q. She was an important person at Merck, and she told you she was concerned about the COX-2 program at Merck. Briefly, do it in a minute, because then I can save more time.

MR. GOLDMAN: Objection.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 610

THE WITNESS: Well, she left Merck. She went back to the University of Pennsylvania. She was very upset about how this whole thing was handled, and she told me that.

Dr. DiBattiste also left Merck, he was also concerned about how all this was handled with the COX-2 Vioxx program.

So, both of them related to me in conversations that they were not pleased about this whole clinical development of Vioxx.

BY MR. KLINE:

Q. You were asked repeatedly --

MR. GOLDMAN: Objection, move to strike.

BY MR. KLINE:

Q. You were asked repeatedly what you knew, what you saw, what you didn't have access to. Was your problem you were having, pure and simply, you never had full and complete access to the

Page 611

data?

MR. GOLDMAN: Objection.

THE WITNESS: That's right.

BY MR. KLINE:

Q. Did you ask for it?

A. Well, I certainly did. But, you know, we only were smart enough to ask for it at times like -- for example, when we wrote the JAMA paper, I wish we had been smart enough to get all the data on study 090 at that time. But we just didn't know what was lurking in there.

Q. Next, the Konstam paper.

You told the Merck lawyer that you could review the Konstam paper, you didn't get to talk about it. I have it here. Is there a minute or two way through it?

A. Yeah. Well, this --

MR. GOLDMAN: Objection.

THE WITNESS: This paper, the actual reprint I have, this has very significant problems in trying to interpret it. So, for

Page 612

example, here, study 090, the data are included in this amalgamation --

MR. KLINE: I've marked it as the next exhibit. Number? What is it?

MR. HAMELINE: 52, 52.

MR. KLINE: 52.

- - -

(Whereupon, Deposition Exhibit Topol-52, "Cardiovascular Thrombotic Events in Controlled, Clinical Trials of Rofecoxib," (Konstam, et al), Circulation 2001;104:r15-r23, was marked for identification.)

- - -

THE WITNESS: Yes. This was published shortly after our -- there's a lot of interesting things about this paper. It was received on October 2nd and accepted the next day and published very rapidly. But the

Page 613

paper includes the trials of Vioxx that were available, and what it does is it never reports the actual individualized data of the trial.

So, for example, here's a chance that since Merck hadn't published the data for study 090, why not present it here.

MR. GOLDMAN: Objection, move to strike.

BY MR. KLINE:

Q. They're his consultant, he's their consultant; right?

MR. GOLDMAN: I'm sorry. Objection, move to strike, nonresponsive.

THE WITNESS: All the other doctors are Merck employees on the paper except for Dr. Konstam, who is a consultant. But the important thing is, they don't present the individual trial data. And this is the thing that's

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 614

grossly overlooked.
They present, just as Mr. Goldman reviewed earlier, that 1.69 risk, that's 169 percent, comparing Vioxx with naproxen. So, what's striking here is that they show statistical significance, they basically confirm the VIGOR paper, they confirm study 090, and they basically are then trying to conclude that there isn't a problem, when it's statistically significant, 169 percent excess of risk.
BY MR. KLINE:
Q. How do you do that? How do you do tat?
MR. GOLDMAN: Objection.
BY MR. KLINE:
Q. How do you get to that result?
MR. GOLDMAN: Objection.
THE WITNESS: I just can't

Page 615

imagine.
BY MR. KLINE:
Q. And this is the same Dr. Konstam who was an independent consultant and -- I'm sorry, Dr. Konstam, who was a consultant, and a member of the DSMB, which is supposed to be neutral?
MR. GOLDMAN: Objection.
THE WITNESS: That's correct. On the approved DSMB.
BY MR. KLINE:
Q. How can that be?
MR. GOLDMAN: Objection.
THE WITNESS: I don't know.
BY MR. KLINE:
Q. Is that, once again, like the coach from one team wearing the striped shirt?
MR. GOLDMAN: Objection.
THE WITNESS: It's certainly in my mind irregular.
BY MR. KLINE:
Q. Sir, I want to again --
MR. KLINE: How much time do

Page 616

I have, sir?
THE VIDEOTAPE TECHNICIAN: Four minutes.
MR. KLINE: Four minutes. Anyone who is watching this will be happy to know that, probably Dr. Topol the most, who is not watching, but participating.
BY MR. KLINE:
Q. I want to do something quick.
This whole issue about they gave you, whether you received or remembered getting comments from Merck, and it appears that you now do now that you were shown a document from four years ago. Does that change anything here, sir?
MR. GOLDMAN: Objection.
THE WITNESS: Well, I mean, I think the important thing is the reason I had forgotten ever getting the comments was because it was after we had already

Page 617

finalized the paper and the galley proofs, and so I just never factored any of that in. And so I forgot it because I probably never even opened up the e-mail, the attachment, frankly.
BY MR. KLINE:
Q. Does it change your opinions or your views?
MR. GOLDMAN: Objection, move to strike, nonresponsive.
THE WITNESS: It doesn't change my views whatsoever. That is completely immaterial.
BY MR. KLINE:
Q. Did they come out to see you anyway, met you face-to-face? Did you give them an audience?
A. I certainly gave them --
Q. Did you get an audience with Ray Gilmartin when you asked for one?
A. No. Mr. Gilmartin never returned the calls.
Q. But you gave them an

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 618

audience?

A. I even offered to go to Whitehouse Station and meet with Mr. Gilmartin, meet with Dr. Kim. They wouldn't even allow me to go visit.

Q. Maybe they were busy.

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Do you think so?

A. I don't know. They didn't want to talk about it.

Q. Two more areas, and they are going to both be about two minutes, I promised counsel.

The first one is Temple.

A. Yes.

Q. They showed you one letter, that letter that the editor -- where Temple was critical of you. Do you remember?

A. Yes.

Q. All right.

First of all, that letter was submitted to JAMA; correct?

Page 619

A. And it was rejected by JAMA.

Q. It wasn't even an article?

MR. GOLDMAN: Objection, move to strike, nonresponsive.

BY MR. KLINE:

Q. It was a letter; correct?

A. That's right.

- - -

(Whereupon, Deposition Exhibit Topol-53, Letter 12-17-01, TOPOLE 0000511, was marked for identification.)

- - -

BY MR. KLINE:

Q. He sends a letter to JAMA, and JAMA sends him back a polite letter saying no thanks; correct?

A. That's right.

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. It takes a lot to get an article published in a medical journal like JAMA; correct?

A. That's correct.

Page 620

Q. It takes much less to get a letter published; correct?

A. Less, but it's still not easy, yes.

Q. They didn't publish his letter?

A. That's right.

Q. Now, what you weren't shown by Merck -- by the way, have you ever heard the term, sir, "cherry picking data"?

MR. GOLDMAN: Objection.

THE WITNESS: Yes, I certainly have.

BY MR. KLINE:

Q. And "cherry picking documents"?

A. Yes.

Q. When you were examined here today, sir, did you see some of that right before your eyes?

MR. GOLDMAN: Objection.

THE WITNESS: Some of the best examples I've seen in my

Page 621

career were today, yes.

BY MR. KLINE:

Q. When you were asked questions by Merck; correct?

A. That's correct.

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Was that exemplar of the kind of conduct that you also saw with them in their clinical trials, sir?

MR. GOLDMAN: Objection.

THE WITNESS: Well, what it is is an ice pick view of the data and not looking at the texture and the whole pattern. That's what being an open minded, objective clinical trialist and clinical development is all about.

BY MR. KLINE:

Q. And in fact, early on, sir, were you about as tepid and about as -- tepid is the wrong word.

Were you about as open minded as you can be when you wrote that

Page 622

JAMA article in 2001?

A. Basically we tried to tone it down. We didn't want to engender any scare. We just basically wanted to register the concern. And we actually thought, because in the prior year of Merck they had been quite diligent, we thought they would follow up and do the right trial and do the right thing.

MR. GOLDMAN: Objection, move to strike, nonresponsive.

BY MR. KLINE:

Q. Temple wrote to you -- I have this, and I have one more document and I'm done.

- - -

(Whereupon, Deposition Exhibit Topol-54, Letter 1-7-02, TOPOLE 0000456 - TOPOLE 0000457 was marked for identification.)

- - -

BY MR. KLINE:

Q. Temple wrote to you a letter, correspondence, and you wrote

Page 623

back to him?

A. Yes.

Q. You had a good relationship with Temple?

A. An excellent relationship with Dr. Temple.

Q. Do you still?

A. I haven't talked to him in a while, but I hope so, yes.

Q. Did you have a healthy, constructive-type, scientific dialogue with him?

A. Yes, we did.

Q. And was it an open dialogue?

A. Yes, it was.

MR. GOLDMAN: Tom, can I have a standing objection to the use --

MR. KLINE: Yes.

MR. GOLDMAN: I'm sorry. -- to the use of a document that you never used before.

MR. KLINE: Yes. But it's the document that he asked to see

Page 624

when you -- in his testimony, and you wouldn't show it to him, but you have an objection.

BY MR. KLINE:

Q. Yes, sir.

Tell us what this document said and what the gist of this was --

A. Well, I was --

Q. -- what I call the full story?

A. Right. I had tried to introduce this earlier, because it was that ice picked view, if you want to talk about cherry picking one letter or one sentence. But here was a letter of my response to Dr. Temple addressing all of his concerns. And then he responded to me yet again.

Q. Oh, yeah.

MR. GOLDMAN: Objection.

THE WITNESS: And this was a very important short letter that he sent me.

BY MR. KLINE:

Page 625

Q. Is that the letter where he said, "Dear Eric," Exhibit Number --

MS. DAGOSTINO: 55.

- - -

(Whereupon, Deposition Exhibit Topol-55, Letter 2-5-02, TOPOLE 0000452, was marked for identification.)

- - -

BY MR. KLINE:

Q. -- 55. "Thanks for the note. I assure you I am not a devotee of the 'naproxen is good, we're not bad' hypothesis. But as a card-carrying empiricist, I am not prepared to guarantee that all COX-2 selective agents are the same, any more than all non-selective NSAIDs are. I just thought using the meta-analytic placebo data was beyond 'strained' and inappropriate. I still do."

So, you and he have a difference of agreement?

A. Yes.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

And he goes on to say, "You're correct, of course, about the Merck study," which is the VIGOR trial we wrote about.

And Dr. Temple has said to me before he wrote this letter, since this letter, that he was very worried about the VIGOR trial, and I had expressed to him I was surprised that the FDA didn't do more, knowing their concerns.

MR. GOLDMAN: Objection, move to strike, nonresponsive.

BY MR. KLINE:

Q. Hang on a second. He said -- put that right back in front of you. It's now up in front of the jury.

He said two things to you. He is "not a devotee of the 'naproxen is good, we're not bad'" thing. That's one thing he told you; correct?

MR. GOLDMAN: Objection.

THE WITNESS: That is basically like I was saying, the

naproxen hypotheses is untenable.

BY MR. KLINE:

Q. Right. Is it a correct position to be a devotee of the naproxen hypothesis, sir?

MR. GOLDMAN: Objection.

THE WITNESS: I was surprised by the term.

BY MR. KLINE:

Q. Would those people be somewhere in the -- if you're a devotee, would that be someone who is looking in the wrong direction for the answer?

MR. GOLDMAN: Objection.

THE WITNESS: Well, I mean, that's certainly one interpretation.

BY MR. KLINE:

Q. And he says here, "You're correct...about the Merck study." The bottom line of the bottom line of the answer back to you is, "You're correct... about the Merck study." Correct?

MR. GOLDMAN: Objection.

THE WITNESS: Right. And I was --

BY MR. KLINE:

Q. And your bottom line was, "Only more data will get the answer," and that was his bottom line?

MR. GOLDMAN: Objection.

THE WITNESS: That's right. But he had more of a way to push for it than I did.

BY MR. KLINE:

Q. Yes, because he's in the FDA?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. You're sitting out here in Cleveland?

A. Right. And we have no authority, and we did the best we could.

Q. Right. Voice in the wilderness?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Correct?

A. That's correct.

Q. Voice in the wilderness.

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Last point, very last point. This is the last thing, I promise. It's four, five, six questions, and I go over a half a minute, and here it goes.

You talked about Pasternak, you were cross-examined about Pasternak. Remember that?

MR. GOLDMAN: No, he wasn't.

MR. KLINE: Yeah. It came up during the examination.

MR. GOLDMAN: No, it didn't.

MS. DAGOSTINO: He mentioned it during direct. It took --

MR. GOLDMAN: You mentioned it, I didn't.

MS. DAGOSTINO: We could not get this document.

THE VIDEOTAPE TECHNICIAN: I need to change the tape.

Page 630

MR. KLINE: Oh, this is the document we couldn't get. This is the document we couldn't get.

Yes, change the tape, please.

THE VIDEOTAPE TECHNICIAN: Off the record at 7:09.

- - -

(Whereupon, a recess was taken from 7:09 p.m. until 7:11 p.m.)

- - -

THE VIDEOTAPE TECHNICIAN: Back on the record at 7:11.

MR. KLINE: Here we go. We'll give it to you in a second. We'll give it to you like when Merck would give it to you. Same thing.

BY MR. KLINE:

Q. Sir, do you remember that you testified -- this is my last area of questioning. I've heard cheers.

You testified on direct

Page 631

examination, and we couldn't find this document, that on the day of the withdrawal of the drug, September 30, '04, you received a call from Richard Pasternak at Merck, and he said to you, you were right.

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Do you remember?

A. I remember it very well.

Q. Okay.

Did you know whether there was actually confirmation of what he told you in Merck documents?

MR. GOLDMAN: Objection.

THE WITNESS: I would never have known that. I wouldn't have any access to Merck documents.

BY MR. KLINE:

Q. Okay.

Now, your editorial in the New York Times, sir, was forwarded around at Merck. Did you know that?

A. I had no idea of that.

Page 632

Q. It wouldn't surprise you, would it?

MR. GOLDMAN: Objection.

THE WITNESS: I guess not.

BY MR. KLINE:

Q. And you got the attention of everyone from Ken Frazier, the legal counsel, to Peter Kim, the chief of the Merck Laboratories. See, they were reading. How about that?

A. (Witness nods.)

MR. GOLDMAN: Objection.

- - -

(Whereupon, Deposition Exhibit Topol-56, E-mails, MRK-AAC0152575 - MRK-AAC0152576, was marked for identification.)

- - -

BY MR. KLINE:

Q. And then there was an e-mail to -- an e-mail from a woman, Elizabeth Stoner, to Pasternak, and then from Pasternak back to Stoner.

MR. KLINE: We can give it

Page 633

to you, and we'll give it to the Merck lawyer.

MR. GOLDMAN: Can I have an objection to you using a document that was never used before?

MR. KLINE: No. It was used on direct, and we had said and agreed that it was part of the Pasternak thing. We couldn't get it printed or found.

MR. GOLDMAN: During your direct, not on my direct.

MR. KLINE: Yes, I agree with you. I will take my changes that a judge will --

MS. DAGOSTINO: You brought the name up during direct.

MR. KLINE: I did. We couldn't find the document then. It's one document.

BY MR. KLINE:

Q. Here goes, sir.

The e-mail says -- this is a couple of days after you talked to him.

Page 634

"The wrath" --

By the way, the e-mails, Dr. Topol, are very colorful at Merck. They pride themselves on colorful e-mails.

MR. GOLDMAN: Tom --

BY MR. KLINE:

Q. And --

MR. GOLDMAN: Tom --

MR. KLINE: Yes, sir.

MR. GOLDMAN: Let me interrupt you. You are six minutes over.

MR. KLINE: Yes.

MR. GOLDMAN: And are you going to do me the courtesy of allowing me to ask some followup questions?

MR. KLINE: No, sir.

MR. GOLDMAN: What?

MR. KLINE: No.

MR. GOLDMAN: Then you are not going to ask any questions --

BY MR. KLINE:

Q. "The wrath of a lover" --

Page 635

MR. GOLDMAN: Your time is up.

BY MR. KLINE:

Q. "The wrath of a lover" scorned.

MR. GOLDMAN: Tom, your time is up. It's six minutes over.

BY MR. KLINE:

Q. "The wrath of a lover" scorned. "Instead of starting at baseline (with Eric), I'll have to start in the basement. Nevertheless, I think it is worth starting again with him for two reasons: (1) people listen to him." That's you?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. "(2) we," Merck, "have something to learn."

A. Uh-huh.

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Did you know that existed?

A. I had no idea. It's

Page 636

gratifying to see that at least one person at Merck was positive and open-minded.

MR. GOLDMAN: Objection, move to strike.

BY MR. KLINE:

Q. They didn't listen to you before the drug was withdrawn, did they?

MR. GOLDMAN: Tom, you are over.

THE WITNESS: They didn't listen to our concerns for years.

MR. KLINE: Thank you, sir. Thank you --

MR. GOLDMAN: Objection, move to strike as nonresponsive.

MR. KLINE: Thank you for being of assistance.

MR. GOLDMAN: Because Mr. Kline asked questions about documents and brought up issues that were not brought up on my cross, I do have some questions about Mr. Kline's additional

Page 637

areas. Can I ask --

MR. KLINE: The only area that I brought up that you didn't cover was this area with Pasternak, and you are correct, that you have -- that at least in my view, I don't know what Merck's counsel's view is, you have a right to cross-examine there. Everything else was within right square in the scope of redirect.

But I do agree on the Pasternak memo, the lover scorned memo, the "you were right memo," that you have a right to question if you'd like to.

MR. GOLDMAN: Is that the only area you're going to allow me to --

MR. KLINE: Yes, absolutely.

MR. GOLDMAN: -- ask some questions about?

MR. KLINE: Yes, absolutely.

MR. GOLDMAN: Is that true

Page 638

for Dr. Topol's counsel too?
MR. HAMELINE: We're here because we were subpoenaed. We're not part and parcel of the rules and regulations in the MDL. If you want to go ahead and ask about Exhibit 56, why don't you go ahead. Let's get those questions on the record, and then we'll take a break and talk about whatever else you want to ask about. But it is 7:15. It's been a very long day.
MR. GOLDMAN: I'm not going to talk about Exhibit 57 or whatever the --
MR. HAMELINE: 56.
MR. GOLDMAN: 56. But there are several other documents and several other things that Dr. Topol said that I would like to get into, and we can raise this with the judge later, but I'm going to object to most of Mr.

Page 639

Kline's examination as beyond the scope, and until I have an opportunity to do recross, and that may have to happen at a later time, so, I'm going to leave the deposition open.
MR. KLINE: I'll take my chances with the judge. Everything is within the fair scope of cross-examination -- redirect. We're done.
MR. HAMELINE: Do you want to make a proffer as to what documents you would ask about or what topics they are?
MS. VANCE: Let's have a list of what the --
MR. GOLDMAN: Each of the exhibits that Mr. Kline used in his redirect that he did not use in his direct examination.
MR. KLINE: Those exhibits were clearly --
MR. HAMELINE: Let him

Page 640

finish.
MR. KLINE: I'm sorry. I thought you were done, Andy. I apologize.
MR. GOLDMAN: No. And testimony about those.
MR. KLINE: Those exhibits were merely redirect of areas which were left wide open, and each occasion I basically said, Dr. Topol, you were shown this but you weren't shown that.
In the case of the Temple letter, he himself said, may I show you the Temple letter.
In the case of the Targum memo, he said, I want to talk about the Targum memo.
In the case of -- you made a big point that he, himself, conceded that they were unexpected, and the fact of the matter is, that they were documents that Merck had that he

Page 641

had never seen, which, frankly, I had to impeach him on and change his opinion that he would have known -- he only wishes he knew differently.
So, I respectfully, Andy, disagree with you. In my view, we're done. If you think you can convince a judge to the contrary, I guess it will be on my dime to come back to Cleveland. But I'm done.
Dr. Topol, thank you, sir.
MS. VANCE: Is there anything else, Andy?
MR. GOLDMAN: Nothing else.
MR. HAMELINE: Again, we're here because we were subpoenaed. We're a third party. I don't want to be involved in the dispute over timing and issues. I see what's in the court order, and I guess it's an issue of whether the judge is going to let the additional

redirect in or not. That's the way I look at this. So, therefore, I think we're done. It's been a very long day.

MR. KLINE: Thank you, sir.

MR. HAMELINE: Thank you very much.

MR. KLINE: Thank you for your cooperation. Dr. Topol, thank you.

We're off the video record.

THE VIDEOTAPE TECHNICIAN: Off the record at 7:18.

\- - -

(Whereupon, the deposition concluded at 7:18 p.m.)

\- - -

CERTIFICATE

I, LINDA L. GOLKOW, a Notary Public and Certified Shorthand Reporter of the State of New Jersey, do hereby certify that prior to the commencement of the examination, ERIC J. TOPOL, M.D. was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

____________________________

LINDA L. GOLKOW, CSR
Notary Number: 1060147
Notary Expiration: 1-2-08
CSR Number: 30XI176200

ACKNOWLEDGMENT OF DEPONENT

I,______________________, do hereby certify that I have read the foregoing pages, 1 - 642, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

____________________________________

ERIC J. TOPOL, M.D. DATE

Subscribed and sworn to before me this day of , 20 .

My commission expires:

Notary Public

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 646

- - - - - - -

ERRATA

- - - - - - -

PAGE LINE CHANGE

Page 647

LAWYER'S NOTES

PAGE LINE

163 (Pages 646 to 647)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f