IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Vioxx<br>PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>Case No. 2:06cv810<br><br>CHARLES LARON MASON v.<br>MERCK & CO., INC. | MDL DOCKET NO. 1657<br><br>Section L<br><br>Judge Fallon<br>Mag. Judge Knowles |

OPPOSITION OF PLAINTIFF CHARLES LARON MASON TO DEFENDANT'S
MOTION TO EXCLUDE EVIDENCE OR ARGUMENT ABOUT DR. GRAHAM'S
"EXCESS EVENTS" CALCULATION

(Defendant's Motion in Limine No. 3)

TO THE HONORABLE JUDGE ELDON FALLON:

Plaintiff Charles Laron Mason, by and through his undersigned counsel, asks this Court to deny Defendant, Merck & Co., Inc.'s Motion To Exclude Evidence Or Argument About Dr. Graham's "Excess Events" Calculation.

I.
INTRODUCTION

Merck asks the Court to exclude testimony by David Graham regarding the number of cases of serious coronary heart disease occurred over the market life of Vioxx. The Court has addressed this issue and previously denied Merck's request.[1] For the reasons discussed below, the Court should do the same in this case.

---

1 *See* Sept. 6, 2006 Order, *Smith v. Merck & Co., Inc.* (Rec. Doc. 6721).

## II.
## DISCUSSION

A. **DR. GRAHAM'S ESTIMATES ARE RELIABLE AND RELEVANT.**

Merck again seeks to exclude evidence relating to or referencing findings from a retrospective nested case-control study conducted by Dr. David Graham, an FDA scientist, and other (hereinafter "Graham Study"), in which Dr. Graham found an in creased risk of heart attacks and sudden death associated with the use of Vioxx as compared to Celebrex, even where such evidence has been relied upon by Plaintiff's experts, including Dr. Wayne Ray and Dr. Benedict R. Lucchesi. *See* P.2.0050 (Exhibit A). This study was published in a peer-reviewed, medical journal. *See id.* Using the relative risks from randomized clinical trials and the background rates seen in NSAID risk studies, Dr. Graham suggests that an estimated 88,000 to 140,000 excess cases of serious coronary heart disease occurred over the market life of Vioxx. *See id.* Dr. Graham observes that the United States national estimate of case-fatality rate (fatal acute myocardial infarction plus sudden cardiac death) was 44%, and extrapolates from this that many of the above mentioned excess cases attributable to Vioxx use were fatal. *See id.* at 6.

Merck has asked this Court to exclude all testimony and evidence related to Dr. Graham's estimates of excess heart attacks and sudden cardiac death ("Graham's Estimates"), because Merck claims that such evidence relies on clinically insignificant data. Such a request is improperly overbroad because Dr. Graham's study, in its entirely, has its own independent basis for admissibility. Additionally, information as early as November, 1999 suggested that there was an increased risk of serious cardiovascular events occurring in patients taking Vioxx compared to naproxen. The Graham Estimates bring forward the result of Merck's failure to properly warn

against the adverse reactions attributable to the ingestion of Vioxx. The Graham Estimates are derived from sound, well-founded methodology and, as indicated by the Defendants in their motion, supported by several experts in the field that have relied to some extent on his findings. Thus, the Graham Study is sufficiently reliable under the Federal law and is admissible.

Merck suggests that the Graham Estimates are irrelevant because Merck claims that the Graham Study did not show a statistically significant association between 25 mg Vioxx and the risk of serious coronary heart disease. This narrow-viewed approach to the important data found in Dr. Graham's Study is a perfect example of the myopic view taken by Merck in analyzing all study data related to Vioxx and cardiovascular risk. The Graham Study data exemplify the total potential impact of Merck's failure to warn, which denied Mr. Mason of his right to given informed consent. Also, the data is relevant to Merck's duty, level of conscious disregard for the safety of the consumer, and the unreasonableness of Merck's conduct when presented with such data. Merck had a continuing duty to warn about all adverse events, including death. If the true extend of the risks had been disclosed, doctors would not have continued to prescribe these drugs in such rapid numbers and Mr. Mason would have had knowledge of his increased risk for myocardial infarction or death. Moreover, if Merck had disclosed its knowledge sooner, the Graham Study would not have been supplied with the data sufficient to generate the damning estimates Merck now seeks to avoid. Finally, listings of death suggest the fact that Merck was inaccurate in its measurement of the rate of MI with Vioxx.

Merck argues that the Graham estimates are flatly inconsistent with the findings of APPROVe and VIGOR, and, therefore, are irrelevant. This assumption is incorrect. First, Dr. Graham clearly relies on additional data and studies in reaching his conclusion. As stated on page

six of his study, his estimates evolved from the total estimated number of Vioxx prescriptions dispensed in the USA, indicated by IMS Health, combined with the use of relative risks generated in the APPROVe and VIGOR clinical trials, together with the background rates seen NSAID risk studies.

Merck argues that the Graham Study found no statistically significant increased risk of heart attacks or deaths associated with Vioxx use at the 25 mg dose. From this, Merck alleges that the Graham Study data is inconsistent and pure chance. To support its argument, Merck cites the fact that some Texas courts have held that epidemiological data must demonstrate an odds ratio of 2.0 or greater to be reliable. Merck is incorrect in its assertion that this Court is bound by or should even find persuasive Texas Substantive law on the question of reliability. To the extent that the matter is one of substantive, rather than procedural law, Florida law should apply. As stated above, Dr. Graham considers several bases for his estimates and any suggestion by Merck that his estimates are inconsistent with his data should not be determinative for the admissibility of this evidence. The Graham Study is supported by sound methodology and expert support, and admissible under Federal law.

It is well-settled that there are at least ten kinds of evidence that can support a causal connection between a drug and its adverse reactions. These lines of evidence include, but are not limited to, case reports in series, adverse event reports, animal studies, case reports that are published in peer reviewed medical literature, chemical structure, studies based on pharmacological classes similar to the drug at issue, textbooks, and literature on similar drugs of the same class that have the same mechanisms of action. *See In Re: Phenylpropanolamine (PPA)*, 2003 WL 22417238* 26 (N.J.Super. 2003). For this reason, and all those stated above, Defendant's final argument to exclude

the Graham Study data is also unpersuasive.

This evidence is relevant to Plaintiff's claims that Merck had notice of the adverse risks associated with Vioxx and failed to adequately study and test the drug before selling it on the market. If Merck had responded appropriately to earlier findings, and had taken into consideration the material analyzed by Dr. Graham, the vast injuries suffered by many people, including Mr. Mason, could have been avoided. Instead, Merck delayed and postponed studies until the true consequences of the ingestion of this drug could no longer be concealed.

**B.   ESTIMATES OF EXCESS NUMBER OF HEART ATTACKS OR DEATH HAS SUBSTANTIAL PROBATIVE VALUE WHICH IS NOT SUBSTANTIALLY OUTWEIGHED BY ANY POTENTIAL PREJUDICE TO MERCK, NOR WILL SUCH EVIDENCE CONFUSE OR MISLEAD THE JURY.**

The probative value of the Graham Study data is clearly shown in the previous section. Any prejudicial effect felt by Merck hardly reaches the level of "unfair." Direct proof of a claim does not create the *unfair* prejudice that Rule 403 intended to avoid. The touchstone for excluding evidence under Rule 403 is not prejudice, but *unfair* prejudice, which must substantially outweigh the probative value of the evidence. This Court does not view Rule 403 as a tool designed to permit the trial court to "even out" the weight of the evidence. "Instead, there is a place in the courtroom where the skill and acumen of professional trial lawyers should be brought to bear. Indeed, the motion practice presaging the subject jury trial admits that the trial lawyers in this case are keenly aware of the points of contest, and quite capable of fairly evening out the score at trial on the merits and paring down any inaccuracy or exaggeration, such that it more closely comports with the truth." *Soll v. Provident Life & Acc. Ins. Co.*, 2002 WL 1461891 at 6 (E.D.La. July 5, 2002).

The Fifth Circuit in *United States v. Pace*, 10 F.3d 1006 (5th Cir. 1993), *cert. denied*, 511 U.S. 1149, 114 S.Ct. 2180, 128 L.Ed.2d 899 (1994) observed that the exclusion of evidence under

Rule 403 should occur only sparingly. *Id.* Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. "Unless trials are to conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Id.* "As to such, Rule 403 is meant to relax the iron rule of relevance. It is not designed to permit the court to 'even out' the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none." *Id.* at 1115-16 (quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.), *cert denied*, 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979)).

Relevant evidence may be excluded under Rule 403 if its probative value is substantially outweighed by the risk of undue prejudice. *United States v. Adair*, 2005 WL 2990586 (5th Cir. 2005). Once evidence has been established as being relevant, the burden is on the party urging exclusion of evidence to convince the court that Rule 403 considerations should control. *State v. Jones*, 891 So.2d 760, 767 (La.App. 4 Cir. 2004). It should be emphasized, however, that exclusion of relevant evidence pursuant to Rule 403 "is an extraordinary measure that should be used sparingly." *Campbell v. Keystone Aerial Surveys, Inc.*, 138 F.3d 996, 1004 (5th Cir. 1998).

Merck seeks to exclude evidence relating to or referencing findings from a retrospective nested case-control study conducted by Dr. David Graham, an FDA scientist, and others (hereafter "Graham Study"). The Graham Study authors found an increased risk of heart attacks and sudden death associated with the use of Vioxx as compared to Celebrex. This study was published in a peer-reviewed, medical journal. *See id.* Using the relative risks from randomized clinical trials and the

background rates seen in NSAID risk studies, Dr. Graham suggests that an estimated 88,000 to 140,000 excess cases of serious coronary heart disease occurred over the market life of Vioxx. *See id.* Dr. Graham observes that the United States national estimate of case-fatality rate (fatal acute myocardial infarction plus sudden cardiac death) was 44%, and extrapolates from this that many of the above mentioned excess cases attributable to Vioxx use were fatal. *See id.* at 6.

Merck has asked this Court to exclude all testimony and evidence related to Dr. Graham's study and estimates of excess heart attacks and sudden cardiac death ("Graham's Estimates"). Merck claims that such evidence relies on clinically insignificant data. Such a request is improperly overbroad because Dr. Graham's study, in its entirety, has its own independent basis for admissibility. Additionally, information as early as November 1999 suggested that there was an increased risk of serious cardiovascular events occurring in patients taking Vioxx compared to naproxen. The Graham Estimates bring forward the result of Merck's failure to properly warn against the adverse reactions attributable to the ingestion of Vioxx. The Graham Estimates are derived from sound, well-founded methodology and, as indicated by the Defendants in their motion, supported by several experts in the field that have relied to some extent on his findings. Thus, the Graham Study is sufficiently reliable under the Federal law and is admissible.

Merck suggests that the Graham Estimates are irrelevant because, it contends, the Graham Study did not show a statistically significant association between 25 mg Vioxx and the risk of serious coronary heart disease. This narrow-viewed approach to the important data found in Dr. Graham's Study is a perfect example of the myopic view taken by Merck in analyzing all study data related to Vioxx and cardiovascular risk. The Graham Study data exemplify the total potential impact of Merck's failure to warn. Also, the data is relevant to Merck's duty, level of conscious

disregard for the safety of the consumer, and the unreasonableness and reprehensibility of Merck's conduct when presented with such data. Merck had a continuing duty to warn about all adverse events, including death. If the true extent of the risks had been disclosed, doctors would not have continued to prescribe these drugs in such large numbers and Mr. Mason would have had knowledge of his increased risk for myocardial infarction or death. Moreover, if Merck had disclosed its knowledge sooner, the Graham Study would not have been supplied with the data sufficient to generate the damning estimates Merck now seeks to avoid. Finally, listings of death suggest the fact that Merck was inaccurate in its measurement of the rate of MI with Vioxx.

Merck argues that the Graham Estimates are inconsistent with the findings of APPROVe and VIGOR, and, therefore, are irrelevant. This assumption is incorrect. First, Dr. Graham relies on additional data and studies in reaching his conclusion. As stated on page six of his study, his estimates evolved from the total estimated number of Vioxx prescriptions dispensed in the U.S., indicated by IMS Health, the relative risks generated in the APPROVe and VIGOR clinical trials, and the background rates seen NSAID risk studies.

Merck has previously argued that the Graham Study found no statistically significant increased risk of heart attacks or deaths associated with Vioxx use at the 25 mg dose. From this, Merck alleges that the Graham Study data is inconsistent and pure chance. Merck's argument is not based in fact or law. Federal courts throughout the country have held that epidemiological evidence involving odds ratios below 2.0 is admissible and consistent with a plaintiff's recovery at trial. The Second Circuit has held that a "qualified expert may view the epidemiological studies and factor out other known risks . . . which might enhance the remaining recognized risks, even though the risk in the study fell short of the 2.0 correlation." *In re Joint E. & S. District Asbestos Litig.*, 964 F.2d 92,

97 (2d Cir. 1992). The court found further that, where plaintiff's experts use epidemiological studies as *one* basis for an expert opinion but do not rely solely on epidemiological evidence, epidemiological evidence of a certain magnitude need not be provided because the expert does not rely on those studies along. *Id.* As stated above, Dr. Graham considers several bases for his estimates and any suggestion by Merck that his estimates are inconsistent with his data should not be determinative for the admissibility of this evidence. The Graham Study is supported by sound methodology and expert support, and admissible under Federal law.

It is well-settled that there are at least ten kinds of evidence that can support a causal connection between a drug and its adverse reactions. These lines of evidence include, but are not limited to, case reports in series, adverse event reports, animal studies, case reports that are published in peer-reviewed medical literature, chemical structure, studies based on pharmacological classes similar to the drug at issue, textbooks, and literature on similar drugs of the same class that have the same mechanisms of action. *See In Re: Phenylpropanolamine (PPA)*, 2003 WL 22417238* 26 (N.J.Super. 2003). For this reason, and all those stated above, Defendant's final argument to exclude the Graham Study data is also unpersuasive.

This evidence is relevant to Plaintiff's claims that Merck had notice of the adverse risks associated with Vioxx and failed to adequately study and test the drug before selling it on the market. If Merck had responded appropriately to earlier findings, and had taken into consideration the material analyzed by Dr. Graham, the vast injuries suffered by many people, including Mr. Mason, could have been avoided. Instead, Merck delayed and postponed studies until the true consequences of the ingestion of this drug could no longer be concealed.

## III.
## CONCLUSION

For these reasons, Plaintiff respectfully requests that Merck's Motion To Exclude Evidence Or Argument About Dr. Graham's "Excess Events" Calculation be denied.

Dated: October 4, 2006

Respectfully submitted,

*/s/ H. Wheeler*

Edward Blizzard (TBN 02495000)
Scott Nabers (TBN 14769250)
Rebecca Briggs King (TBN 24027110)
Holly M. Wheeler (TBN: 24006035)
BLIZZARD, MCCARTHY & NABERS, L.L.P.
440 Louisiana, Suite 1710
Houston, Texas 77002
(713) 844-3750
(713) 844-3755 (fax)

**ATTORNEYS FOR PLAINTIFF
CHARLES LARON MASON**

| | |
|---|---|
| Andy D. Birchfield, Esq.<br>P. O. Box 4160<br>234 Commerce Street<br>Montgomery, AL 36103-4160<br>PH: (800) 898-2034<br>FAX: (334) 954-7555 | Christopher Seeger, Esq.<br>One William Street<br>New York, NY 10004<br>PH: (212) 584-0700<br>FAX: (212) 584-0799 |
| Leonard Davis<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA 70013<br>PH: (504) 581-4892<br>FAX: (504) 561-6024 | Russ M. Herman<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA 70013<br>PH: (504) 581-4892<br>FAX: (504) 561-6024 |

**PLAINTIFFS' STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 4th day of October, 2006.

_____
Holly M. Wheeler