# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 06-0485 | * | |
| | * | MAGISTRATE JUDGE |
| GERALD D. BARNETT, | * | KNOWLES |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## REPLY BRIEF IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") FOR ORDER EXCLUDING TESTIMONY OF JERRY AVORN, M.D.

### (EXPERT CHALLENGE NO. 2)

In opposition to Merck's motion to preclude Dr. Jerry Avorn from testifying on matters outside his area of expertise and about which he has no personal knowledge, plaintiff spends pages and pages detailing Dr. Avorn's expertise in pharmacoepidemiology – which has absolutely no import for purposes of Merck's motion. Merck agrees that Dr. Avorn is qualified to testify about the alleged cardiovascular risks associated with Vioxx and other COX-2 inhibitors. It thus does not matter that Dr. Avorn is a "widely published" professor of pharmacoepidemiology, "one of the world's leading authorities" in his field, or "exceptionally well-qualified to testify regarding the risks of [NSAIDs]." (Pl.'s Opp'n at 2-3; Pl.'s Suppl.

819672v.1

M007C05657

Opp'n at 7; *see also* Pl.'s Opp'n at 4-18 ("The Qualifications of Jerome Avorn, M.D.").)  These qualifications are not relevant to the opinions targeted in Merck's motion.

Dr. Avorn's expertise in pharmacoepidemiology notwithstanding, he is not qualified to provide subjective commentary – under the guise of "expert" testimony – on the subjects identified in Merck's motion: (i) the Vioxx "story"; (ii) what Merck knew or should have known about the risks allegedly associated with Vioxx; (iii) Merck's alleged suppression of information about Vioxx; and (iv) regulatory issues, including Merck's negotiations with the FDA over Vioxx labeling.  Plaintiff offers two arguments in response.  First, plaintiff asserts that much of Dr. Avorn's testimony is "fact" testimony to which the *Daubert* requirements do not apply.[1]  Not so.  A close look at the designated portions of his testimony reveals that much of it is purported expert testimony – on Merck's marketing, conduct, and state of knowledge – based on internal documents about which Dr. Avorn had no personal knowledge prior to this litigation.  That Dr. Avorn had interactions with Merck while Vioxx was on the market does not transform all of his opinions about the underlying facts of this case into admissible "fact" testimony.

Second, plaintiff attempts to expand the definition of "pharmacoepidemiology" to cover all of Dr. Avorn's proffered testimony, including his opinions on issues such "the fair and accurate communication of risks and benefits to medical providers and to consumers."  (Pl.'s Suppl. Opp'n at 5.)  But, by plaintiff's own admission – and, indeed, according to Dr. Avorn himself – pharmacoepidemiology is the study of the "beneficial and adverse effects of drugs." (Pl.'s Supp. Opp'n at 5-6.)  It has nothing to do with the communication of those effects.  It thus

---

[1] According to plaintiff, "Dr. Avorn's 'fact' testimony starts at page 108 of his trial preservation deposition . . . and continues through page 256. . . .  The only portion of Dr. Avorn's testimony that implicates *Daubert* is his expert testimony, which begins at page 256 of his trial deposition." (Pl.'s Suppl. Opp'n at 2.)  As explained above, this is a simplistic and inaccurate characterization of Dr. Avorn's trial preservation testimony.

819672v.1

M007C05658

does not follow that, simply because Dr. Avorn is a qualified pharmacoepidemiologist, he is also qualified to testify about "the accuracy (or inaccuracy) of Merck's *description* of the risks and benefits of Vioxx." (*Id.* at 9 (emphasis in original).)

Accordingly, the Court should exclude Dr. Avorn's opinions about the matters addressed in Merck's underlying motion. These are issues that are far afield of Dr. Avorn's purported area of expertise and not the proper subject of expert testimony in any case. The Court should also exclude Dr. Avorn's opinions on Protocol 078 and 091 – as explained in Merck's supplemental brief in support of its motion – since that testimony is based on nothing more than the opinions of two of plaintiff's other experts, Professor Richard Kronmal and Dr. Wayne Ray.

## I.   THE COURT SHOULD EXCLUDE DR. AVORN'S OPINIONS ON ISSUES THAT HAVE NO CONNECTION TO HIS AREA OF EXPERTISE, PHARMACOEPIDEMIOLOGY.

For a number of reasons, the Court should preclude Dr. Avorn from providing opinions on what Dr. Avorn's expert report calls "the methods by which Merck evaluated and managed [the issue of the alleged risks associated with Vioxx] throughout the development and marketing of Vioxx." (Avorn Rpt. at 2.) Dr. Avorn is not qualified to opine on this subject. And the testimony goes to Merck's state of mind and intent, which plaintiff concedes is an improper subject for expert testimony. (*See* Pl.'s Suppl. Opp'n at 14.) Moreover, the testimony is based on Dr. Avorn's review and interpretation of internal Merck documents and the reasonableness of Merck's conduct – which is the proper subject of lawyer's argument, not expert testimony, and must be left to the jury's determination.

Indeed, Courts routinely preclude experts from proffering testimony of the kind that is at issue in this motion. In fact, of the four subjects at issue here – (i) the Vioxx "story"; (ii) what Merck knew or should have known about the risks allegedly associated with Vioxx; (iii) Merck's alleged suppression of information about Vioxx; and (iv) regulatory issues – Dr. Avorn's

3

M007C05659

testimony on *each of the last three* has been excluded by other federal courts.[2]  *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 549-50 (S.D.N.Y. 2004) (excluding Dr. Avorn's testimony on the accuracy of a pharmaceutical company's disclosures to the FDA and finding Dr. Avorn "not qualified to render opinions describing or interpreting FDA regulations, or commenting on [the defendant's] adherence to those regulations"); *In re Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, 2000 U.S. Dist. LEXIS 9037, at *29-30, 36 (E.D. Pa. June 20, 2000) (excluding Dr. Avorn's opinions on the "corporate intent" of the defendant and finding Dr. Avorn not qualified "to speak as experts in the field of the requirements of the federal regulations regarding labeling and warnings for FDA approved drugs").  And the first subject is so often excluded as to be beyond controversy.  *E.g.*, *In re Rezulin*, 309 F. Supp. 2d at 551 (excluding expert's "historical commentary of what happened").

For these reasons, the Court should exclude Dr. Avorn's testimony on matters about which he has neither expertise nor personal knowledge.

### A. Dr. Avorn's Recounting Of The Vioxx "Story" Is Improper Expert Testimony That Must Be Excluded.

Plaintiff attempts to recast Dr. Avorn's "spin" on the facts of this case as "Dr. Avorn's factual knowledge with respect to the scientific testing and marketing of Vioxx."  (Pl.'s Opp'n at 2; *see also* Pl.'s Suppl. Opp'n at 2.)  But the truth remains that a great deal of Dr. Avorn's testimony is nothing more than his own subjective "narrative of the case."  *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 551.  This is a narrative that, as the *In re Rezulin* court noted, "does no more than counsel for plaintiff will do in argument, *i.e.*, propound a particular

---

[2] In light of these *Daubert* rulings excluding Dr. Avorn's testimony on the very same subjects at issue here, it is curious that plaintiff insists that Merck's motion is "not a proper *Daubert* challenge at all."  (Pl.'s Opp'n at 10.)

819672v.1

M007C05660

interpretation of [Merck's] conduct." *Id.* (citation omitted) (excluding expert's "historical commentary of what happened"). Moreover, as Dr. Avorn admitted at his discovery deposition, he has no personal knowledge of the facts that make up the Vioxx "story":

> Q:      Am I right, sir, that you don't have any personal knowledge of the facts described in [internal Merck documents]; you're just relying on those documents, true?
>
> A:      Correct.

(*See, e.g.*, June 16, 2006 Deposition of Jerry Avorn, M.D. ("6/16/06 Avorn Dep.") at 453:12-23, attached hereto as Ex. A.)  Nor did Dr. Avorn have any personal knowledge about these internal Merck documents before they were provided to him by plaintiff's counsel. (*See, e.g.*, June 30, 2006 Deposition of Jerry Avorn, M.D. ("6/30/06 Avorn Dep.") at 449:2-11, attached hereto as Ex. B.)[3]  Further, as explained in Merck's underlying motion, it is for plaintiff's counsel to introduce the relevant facts into evidence, and for the jury to put these facts into context. *In re Rezulin*, 309 F. Supp. 2d at 551.  Neither role is appropriately ceded to a retained expert such as Dr. Avorn.

The Court should accordingly exclude Dr. Avorn's commentary on the foundational facts of this case.  It is inapposite that Dr. Avorn conducted research on the effects of Vioxx.  (Pl.'s Opp'n at 21.)   The bulk of Dr. Avorn's "expert" opinions on the facts surrounding the development, testing, approval, and marketing of Vioxx – which take up pages *two to twenty-one*

---

[3] On the issue of Dr. Avorn's reliance on these many documents, plaintiff mischaracterizes the ruling of the *In re Diet Drugs* court – indicating that the court "reject[ed] the manufacturer's so-called '*Daubert* challenge' on the use of documents," when in fact the MDL Court reserved ruling, noting that "[w]hether a particular document can be introduced through a witness as a basis for his expert opinion will, of course, be left to the trial judge in the transferor court." *In re Diet Drugs*, 2000 U.S. Dist. LEXIS 9037, at *27.

819672v.1

M007005661

of Dr. Avorn's expert report – have nothing to do with his own study.   These opinions are

improper.  The include Dr. Avorn's designated testimony about, among other things:

- *Merck's negotiations with the FDA over the post-VIGOR label.*  (*See, e.g.,* June 29, 2006 Deposition of Jerry Avorn, M.D. ("6/29/06 Avorn Dep.") at 173:2-178:18, attached hereto as Ex. C.)  Dr. Avorn admitted he has no personal knowledge about these negotiations, and that his testimony is based only on internal Merck documents shown to him by plaintiff's counsel.  In spite of his lack of personal knowledge, he testified about "what [these documents] say" – clearly not the proper subject of expert testimony.[4]

- *Merck's "investigation of the potential of Vioxx to cause heart attacks and their management of that issue."*  (*See, e.g.,* 6/29/06 Avorn Dep. at 302:9-303:15, 303:21-304:7, 304:13-309:17, 376:18-378:12.)  Again, Dr. Avorn's testimony on this subject is based on internal documents, from both Merck and the FDA.   The stated purpose of his testimony is to ascertain "what was known" about the risks allegedly associated with Vioxx at various points in time.  This is simply Dr. Avorn's commentary on documents about which he has no personal knowledge.  Moreover, "what was known" is a matter the jury is perfectly capable of inferring for itself.

- *The FDA's understanding of the risks allegedly associated with Vioxx.*  (*See, e.g.,* 6/29/06 Avorn Dep. at 353:11-356:24, 358:4-359:9.)  Here, Dr. Avorn simply read portions of the Targum memo into the record.  To the extent any of this information is relevant, plaintiff may offer the document itself into evidence.   Expert testimony on the subject is both unnecessary and inappropriate.

Each of these subjects is beyond both Dr. Avorn's expertise and his personal knowledge.

To permit testimony about these matters would only confuse and prolong the presentation of

evidence at trial.  FED. R. EVID. 403.  Therefore, Dr. Avorn's testimony on the Vioxx "story" –

which is nothing more than his improper "historical commentary of what happened," *In re*

*Rezulin,* 309 F. Supp. 2d at 551 – must be excluded.

---

[4] Dr. Avorn further testified that he is "indignant" and "upset" about what's communicated in these documents – and that they "distort" the medical evidence.   (6/29/06 Avorn Dep. at 176:24-178:2.)  This is lawyer argument, pure and simple.  To allow Dr. Avorn to so testify would be highly prejudicial to Merck and improper.

819672v.1

M007C05662

**B.**     **The Court Should Exclude Dr. Avorn's Opinions On What Merck Knew Or Should Have Known About The Risks Allegedly Associated With Vioxx.**

As this Court has noted and as plaintiff now concedes, Merck's state of mind or intent is not a proper subject for expert testimony. *See Plunkett v. Merck & Co., Inc. (In re Vioxx Prods. Liab. Litig.)*, 401 F. Supp. 2d 565, 595 (E.D. La. 2005) ("Lastly, regarding Merck's state of mind, Dr. Kapit may not testify as to what Merck was thinking."); *see also In re Diet Drugs*, 2000 U.S. Dist. LEXIS 9037, at *29-30 (ruling that Dr. Avorn lacked the requisite qualifications to opine on the "corporate intent" of the defendant and that such testimony was unreliable in any case). Further, as Dr. Avorn himself admits, he is not an expert on the "state of mind" of a pharmaceutical company and has no idea "what people believed or didn't believe." (June 15, 2006 Deposition of Jerry Avorn, M.D. ("6/15/06 Avorn Dep.") at 56:22-57:1; 279:6-15, attached hereto as Ex. D.) Nor is his testimony on what Merck should have known or done based on any reliable methodology – given that he admits that there are "no standards" by which once can measure the intent of a pharmaceutical company and no "statistical test for reasonable behavior."[5]  (*Id.* at 59:13-60:12; 191:7-15 ("Q: What statistics have you applied to demonstrate that Merck's conduct concerning Vioxx was unreasonable?  A:  Well, it's not like there's a statistical test for reasonable behavior.").)

In light of these admissions, plaintiff again tries to move the ball – arguing that the testimony in question is not about "corporate intent" at all, but rather about "what was known or knowable at particular points in time and what a reasonable and prudent response to that

---

[5] Plaintiff's citation to the *Smith* case in support of Dr. Avorn's methodology is a red herring. (*See* Pl.'s Suppl. Opp'n at 18 (citing *Smith v. Wyeth-Ayerst Labs. Co.*, 278 F. Supp. 2d 684, 701 (W.D.N.C. 2003).)  The issue is not whether Dr. Avorn has reviewed the relevant documents in forming his opinions – which he may have done – but rather whether he has applied objective and identifiable standards in evaluating Merck's conduct – which, by his own admission, he has not.

M007C05663

knowledge would be." (Pl.'s Opp'n at 22-23.) But for Dr. Avorn to testify about what a "reasonable and prudent company" should have known (*see* Pl.'s Opp'n at 18) – especially when he admits there are no applicable standards – improperly invades the province of the jury. It is for the finder of fact to decide what is "reasonable," in light of the facts and arguments presented by counsel and the instructions given by the Court. Indeed, Dr. Avorn concedes that much of his testimony about what Merck "knew or should have known" is within the understanding of laypeople, and thus improper "expert" opinion testimony under Rule 702. (6/15/06 Avorn Dep. at 192:17-193:17 (admitting that, in assessing whether Merck's conduct was reasonable, there are issues "which any person with common sense can interpret" and "a juror could handle on their own").) For these reasons, Dr. Avorn's testimony on this subject should be excluded – as it was by the *In re Diet Drugs* court. *See In re Diet Drugs*, 2000 U.S. Dist. LEXIS 9037, at \*29-30. It is not "fact" testimony, and plaintiff suggests. Rather, is based on what Dr. Avorn calls "smoking guns" – internal documents about which he has no personal knowledge – and, for the reasons stated above, does not qualify as expert testimony. (*See, e.g.*, 6/29/06 Avorn Dep. at 313:21-314:7, 315:2-318:8, 329:18-24, 331:19-332:16.)

C.   **Testimony About Merck's Alleged Suppression Of Information Is Inadmissible.**

Nor does Dr. Avorn's testimony about the ways in which Merck communicated the risks allegedly associated with Vioxx qualify as "fact" testimony. Dr. Avorn opines that "Merck's conduct over the research program and analysis of its data and communication of those data to physicians, to patients, even to FDA, was inadequate in that it failed to truthfully represent what was known to Merck at the time about the risks of its drug in relation to the cardiovascular symptoms." (6/29/06 Avorn Dep. at 112:4-113:10.) Although he calls himself an "expert in the factors that go into physicians prescribing practices" (*id.* at 382:10-12), the fact is that Dr. Avorn

8

has no specific knowledge of what any of the individual physicians involved in this litigation knew about Vioxx, or what factors went into their decisions to prescribe the drug. (6/15/06 Avorn Dep. at 164:20-165:4 ("I can't get into the head of a given doctor that I've never met").) He also has not done any research on the subject. (6/16/06 Avorn Dep. at 758:13-759:7.) And he admitted that he does not know anything about any of the specific plaintiffs in the upcoming trials or what factors influenced their decisions to take Vioxx. (6/30/06 Avorn Dep. at 826:15-834:4.) In short, Dr. Avorn has no foundation for his opinions about whether "the information revealed about Vioxx'[s] risks and benefits to the medical community was scientifically incomplete and inaccurate." (Pl.'s Opp'n at 25.) Whether the information was "incomplete and inaccurate" in the abstract, his testimony is unmoored from the facts of this case and thus of minimal probative value. FED. R. EVID. 401. The Court should thus preclude Dr. Avorn from testifying about the general "means" by which a company conveys its message (6/29/06 Avorn Dep. at 382:24-384:10) as well as the specific ways in which Merck communicated with the public (*id.* at 423:1-424:15.) In particular, the Court should exclude all testimony about Merck's detailing of physicians and its sales representatives' training – matters about which Dr. Avorn has neither personal knowledge nor expertise. (*See, e.g., id.* at 424:17-425:2, 425:21-427:9.)

Further, to the extent this testimony has any impact on the issues to be decided in this case, it "constitutes lay matter that the fact-finder can understand without the assistance of experts" and should be excluded on that ground. *See In re Rezulin*, 309 F. Supp. 2d at 549-50. Plaintiff will presumably present evidence at trial regarding the adequacy and accuracy of Merck's disclosure of Vioxx-related safety information. And the jury will be asked to determine whether Merck acted reasonably, in light of all of the information available at the time. As noted above, Dr. Avorn has conceded that, in assessing whether Merck's conduct was reasonable, there

819672v.1

M007C05665

are issues "which any person with common sense can interpret" and "a juror could handle on their own." (6/15/06 Avorn Dep." at 192:17-193:17.) This is precisely one of those issues. The jury is capable of deciding, based on the admissible evidence, whether Merck's disclosures were adequate. Expert testimony on the subject is unnecessary and should be excluded.

**D.      Dr. Avorn Is Not Qualified To Opine On Merck's Negotiations With The FDA Over Vioxx Labeling And Promotion.**

Finally, Dr. Avorn is not qualified to testify about regulatory issues. He has never been employed by the FDA and has never prepared or approved a pharmaceutical product's labeling. (6/15/06 Avorn Dep. at 326:23-327:2; 6/16/06 Avorn Dep. at 678:5-10.) Nor does he have any personal knowledge about Merck's labeling decisions concerning Vioxx. (*E.g.,* 6/16/06 Avorn Dep. at 696:8-18.) Other courts have precluded him from interpreting or explaining FDA regulations. *See In re Rezulin*, 309 F. Supp. 2d at 549 (finding Dr. Avorn "not qualified to render opinions describing or interpreting FDA regulations, or commenting on [the defendant's] adherence to those regulations"); *In re Diet Drugs*, 2000 U.S. Dist. LEXIS 9037, at *36 (finding that, although Dr. Avorn is "fully qualified" in his specialty, "that does not qualify [him] to speak as experts in the field of the requirements of the federal regulations regarding labeling and warnings for FDA approved drugs"). That he now considers himself an expert on the topic (Pl.'s Opp'n at 28-29) does not make him one.

In an attempt to shoehorn Dr. Avorn's regulatory testimony into an admissible form, plaintiff describes it as: "Dr. Avorn's opinions that the information provided by Merck to the FDA about Vioxx, and the format in which it was provided, were inadequate and misleading, and that Merck possessed important information regarding cardiovascular risk that it did not reveal in a complete and timely manner to the FDA, nor to prescribing physicians of Vioxx, nor to the consuming public at large." (Pl.'s Opp'n at 26.) If this is the case, the testimony should be

819672v.1

M007C05666

excluded for the same reasons Dr. Avorn's testimony about Merck's alleged suppression of data

has no place at trial. As the *In re Rezulin* court explained, in excluding Dr. Avorn's testimony:

> To the extent that the challenged testimony relates, as plaintiffs contend, to the factual accuracy of [defendant's] clinical data submissions to the FDA, it constitutes lay matter that the fact-finder can understand without the assistance of experts, regardless of [how] much experience these witnesses have with clinical trials. Dr. Avorn's testimony illustrates the point. His view that [defendant] failed to disclose information to the FDA boils down to a contention that [defendant] "buried" certain lab results in an Appendix to the Rezulin NDA. This opinion does not implicate Dr. Avorn's expertise in pharmacoepidemiology. It is a simple inference drawn from his review of two documents – the primary Rezulin NDA and its Appendix – which, if admissible, plaintiffs' counsel may present directly to the fact-finder while arguing his or her view as to their significance. Expert testimony interpreting [defendant's] conduct in disclosing information to the FDA therefore will not assist the fact-finder in these cases.

*In re Rezulin*, 309 F. Supp. 2d at 549-50 (footnote omitted). So, too, in this case. This Court

should thus prohibit Dr. Avorn from providing testimony interpreting FDA regulations,

commenting on Merck's compliance with those regulations, or describing the facts surrounding

Merck's interactions with the FDA.

## II     THE COURT SHOULD PRECLUDE DR. AVORN FROM RELATING THE CONCLUSIONS OF DR. RAY AND PROFESSOR KRONMAL ABOUT THE ELEVATED RISK OF CARDIOVASCULAR EVENTS ASSOCIATED WITH VIOXX ALLEGEDLY SHOWN IN THE CLINICAL TRIALS INVOLVING PATIENTS WITH ALZHEIMER'S DISEASE.

For the reasons articulated in Merck's supplemental brief in support of its motion to

exclude Dr. Avorn's testimony, the Court should exclude Dr. Avorn's testimony about Professor

Kronmal's and Dr. Ray's analysis of the Alzheimer's data. Plaintiff makes no real argument in

response – all but conceding the point – except to baldly assert that Dr. Avorn did more than just

rely on these experts' analyses for his opinion. (Pl.'s Opp'n at 24 n.7 (citing Avorn Rpt. at 15-

16.) But Dr. Avorn made it clear at his discovery deposition that he relies solely on Professor

Kronmal's and Dr. Ray's reports for his opinion on this topic. (6/15/06 Avorn Dep. at 31:8-21;

819672v.1

M007C05667

6/16/06 Avorn Dep. at 454:10-455:4.)  Plaintiff's assertions to the contrary do not prove otherwise.

## III.  CONCLUSION.

For the reasons stated above and in Merck's underlying motion and supplemental brief, Merck respectfully requests that the Court exclude Dr. Avorn's testimony on: (i) the Vioxx "story"; (ii) what Merck knew or should have known about the risks allegedly associated with Vioxx; (iii) Merck's alleged suppression of information about Vioxx; (iv) regulatory issues, including Merck's negotiations with the FDA over Vioxx labeling; and (v) Professor Kronmal's and Dr. Ray's analysis of the Alzheimer's data.

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005

819672v.1

M007C05668

Phone:  202-434-5000
Fax:     202-434-5029

And

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

Attorneys for Merck & Co., Inc.

819672v.1

M007C05669

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Reply Brief in Support of Motion of Merck & Co., Inc. For Order Excluding Testimony of Jerry Avorn, M.D. has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 17th day of July, 2006.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

14

819672v.1

M007C05670

Exhibit A - June 16, 2006 Avorn Deposition Excerpts

• Avorn Reply

[433:1] - [433:23]       6/16/2006    Avorn, Jerry (Barnett)

```
page 433
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2                    MDL DOCKET NUMBER:  1657
                             SECTION L
3
        In re:  VIOXX PRODUCTS LIABILITY LITIGATION
4       GERALD BARNETT AND CORRINE BARNETT,
5                    Plaintiffs,
6             VS                       CIVIL ACTION NUMBER:
                                       2:06cv485
7       MERCK & CO., INC.,
8                    Defendant.
        ----------------------------------
9
                          CONTINUING DEPOSITION OF
10
                          JERRY AVORN, M.D.
11
                             VOLUME II
12
                           June 16, 2006
13                           8:38 a.m.
14                      Sheraton Boston Hotel
                           39 Dalton Street
15                       Boston, Massachusetts
16      Laurie J. Driggers, Notary Public, Certified Shorthand Reporter, Realtime
        Professional Reporter
17      and Certified Realtime Reporter within and for the Commonwealth of Massachusetts
18
19
20
21
22
23
```

[453:12] - [453:23]       6/16/2006    Avorn, Jerry (Barnett)

```
page 453
12   Q.   Dr. Avorn, you remember yesterday
13   we were talking about a number of
14   documents written by Dr. Scolnick or Dr.
15   Musliner or Dr. Reicin, internal Merck
16   documents that you're relying on for your
17   opinions, right?
18   A.   Yes.
19   Q.   Am I right, sir, that you don't
20   have any personal knowledge of the facts
21   described in those documents; you're just
22   relying on those documents, true?
23   A.   Correct.
```

[454:10] - [455:4]       6/16/2006    Avorn, Jerry (Barnett)

```
page 454
10   A.   I have, indeed, read Dr. Ray's
11   report --
12   Q.   Mm-hmm.
13   A.   -- and been impressed by it.  And
14   I believe that my awareness of Dr.
15   Kronmal's analysis of the Alzheimer's data
16   was as it was reported in Dr. Ray's
17   report, as well as -- I think that was my
18   primary awareness of Dr. Kronmal's data.
19        So, yes, I did read it.  I did
20   take it seriously, and it did inform me
21   about the Kronmal evaluation of the
```



EXHIBIT
A

1

M007C05671

Exhibit A - June 16, 2006 Avorn Deposition Excerpts

• Avorn Reply

22  Alzheimer data.
23  Q.   As I understand your testimony, Dr.
24  Avorn, you are relying on a portion of Dr.
page 455
1   Ray's expert report where he describes an
2   analysis that was conducted by another
3   plaintiff's expert witness, Dr. Kronmal?
4   A.   That's correct.

[678:5] - [678:10]    6/16/2006    Avorn, Jerry (Barnett)

page 678
5   Q.   Have you ever approved a label as
6   an FDA employee, sir?
7   A.   No.
8   Q.   Have you ever prepared a label as
9   an employee of a pharmaceutical company?
10  A.   No.  Thank goodness.

[696:8] - [696:18]    6/16/2006    Avorn, Jerry (Barnett)

page 696
8   Q.   And you don't know the
9   circumstances about why Merck decided that
10  the cardiovascular information is more
11  properly in the precaution section, right?
12  A.   Do I know why Merck made a given
13  decision?
14  Q.   Mm-hmm.
15  A.   I have my opinion about that, but I
16  do not have personal experience from
17  having been in the company when the
18  decision was made.

[758:13] - [759:7]    6/16/2006    Avorn, Jerry (Barnett)

page 758
13  Q.   Have you done any research studying
14  the reasons why doctors who prescribe
15  Vioxx made a decision to prescribe it?
16  A.   No.
17  Q.   And you can't say, sir, for any
18  given doctor in any of the Vioxx cases in
19  which your deposition might be played
20  whether the doctors who prescribed the
21  plaintiffs Vioxx did so because of
22  interactions they had with sales
23  representatives or advertisements that
24  Merck prepared, true?
page 759
1   A.   I have done research and published
2   a paper on doctors' influences in terms of
3   scientific versus commercial influences,
4   and demonstrated that commercial influences
5   are important drivers of what doctors
6   prescribe.  It did not involve Vioxx as a
7   drug.

[771:1] - [771:24]    6/16/2006    Avorn, Jerry (Barnett)

page 771
1            COMMONWEALTH OF MASSACHUSETTS
2
3   I, LAURIE J. DRIGGERS, a Certified
4   Shorthand Reporter and Notary Public in
5   and for the Commonwealth of Massachusetts,
6   do hereby certify that the witness whose
7   deposition is hereinbefore set forth, was
8   duly sworn and that such deposition is a
9   true record of the testimony given by the

M007C05672

Exhibit A – June 16, 2006 Avorn Deposition Excerpts

• Avorn Reply

10  witness.
11    I further certify that I am neither
12  related to or employed by any of the
13  parties in or counsel to this action, nor
14  am I financially interested in the outcome
15  of this action.
16    In witness whereof, I have hereunto set
17  my hand and seal this    day of
18  2006.
19
20
21
22    Laurie J. Driggers, CSR, RPR, CRR
23  Notary Public
24  My commission expires October 16, 2009

M007C05673

Exhibit B – June 30, 2006 Avorn Deposition Excerpts

• Avorn Reply

[437:] - [437:24]    6/30/2006    Avorn, Jerry (Barnett) - Preservation Depo v.2

page 437
     0437
1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
2                    - - -
     IN RE:  VIOXX        :  MDL DOCKET NO.
3    LITIGATION           :  1657
4    ─────────────────────────────────────
            SUPERIOR COURT OF NEW JERSEY
5           LAW DIVISION - ATLANTIC COUNTY
                     - - -
6
     IN RE: VIOXX
7    LITIGATION           :  CASE NO. 619

8              CAUSE NO. 05-59499
9    IN RE:               :  IN THE DISTRICT
                          :  COURT
10   VIOXX LITIGATION     :  157TH JUDICIAL
                          :  DISTRICT
11   APPLIES TO ALL CASES :  HARRIS COUNTY,
                          :  TEXAS
12   ─────────────────────────────────────
     SUPERIOR COURT OF THE STATE OF CALIFORNIA
13          COUNTY OF LOS ANGELES
             CENTRAL CIVIL WEST
14
     VIOXX CASES          :  JCCP NO. 4247
15                        :  ASSIGNED TO HON
                          :  VICTORIA CHANEY
16                    - - -
               CONFIDENTIAL
17        SUBJECT TO PROTECTIVE ORDER
                     - - -
18             June 30, 2006
                     - - -
19
            Continued videotape deposition of
20   JEROME L. AVORN, M.D.
21
22                    - - -
          GOLKOW LITIGATION TECHNOLOGIES
23        1600 John F. Kennedy Boulevard
                  Suite 1210
24        Philadelphia, Pennsylvania 19103
                  877.DEPS.USA

[449:2] - [449:11]    6/30/2006    Avorn, Jerry (Barnett) - Preservation Depo v.2

page 449
2         Q.    Did all of the documents
3    that you reviewed, the internal Merck
4    documents, in reaching your opinion, come
5    from the plaintiffs' lawyers?
6              MR. BUCHANAN:  Same
7    objection.
8              MR. TISI:  Same objection.
9              THE WITNESS:  Same question.
10        Yes.  That's the only way I could
11   get internal documents.

[826:15] - [834:4]    6/30/2006    Avorn, Jerry (Barnett) - Preservation Depo v.2

page 826
15             MR. BECK:  I'm going to go
16   through a series of names and ask
17   questions of whether he knows


EXHIBIT
B

1

M007C05674

Exhibit B - June 30, 2006 Avorn Deposition Excerpts

• Avorn Reply

```
18      whether this individual saw any
19      direct-to-consumer ads, and I'm
20      going to ask whether he knows
21      whether that person's doctor —
22      what information the doctors
23      looked at when prescribing —
24              MR. ZISI:  I will
page 827
1       stipulate —
2               MR. BECK:  And I need the
3       questions and answers because we
4       may want to play them in these
5       trials, but -
6               MR. ZISI:  So, a stipulation
7       from counsel is not sufficient —
8               MR. BECK:  No.
9               MR. ZISI:  -- where you say
10      it is stipulated that Dr. Avorn
11      does not know X, Y and Z?  That's
12      not good enough?
13              MR. BECK:  No.  I want Dr.
14      Avorn's testimony.  What I'm
15      saying is that you can certainly
16      have a continuing objection to all
17      those questions for the same
18      ground that you just had so we can
19      get through it quicker.
20              THE WITNESS:  Could I just
21      state that I don't know any of the
22      plaintiffs or any of their
23      circumstances and will not testify
24      about any of that for any
page 828
1       plaintiff?
2               MR. BECK:  Here's the
3       problem.  We'll off go the record.
4               THE VIDEOTAPE TECHNICIAN:
5       The time is 4:49.  We're off the
6       record.
7                   -  -  -
8               (Whereupon, a recess was
9       taken from 4:49 p.m. until
10      4:50 p.m.)
11                  -  -  -
12              THE VIDEOTAPE TECHNICIAN:
13      We're back on the record.  Time is
14      10 minutes to 5:00.
15              MR. BECK:  While we were off
16      the record, what I explained to
17      counsel and the witness is what
18      I'm about to do is ask the witness
19      a couple of questions on a series
20      of individuals who are plaintiffs,
21      asking about whether he has any
22      information about whether the
23      plaintiff saw any
24      direct-to-consumer advertisement,
page 829
1       and any information about what
2       materials were reviewed by the
3       prescribing physician.
4               He's already indicated that
5       he doesn't have any such
6       information, and I've explained to
7       the witness and counsel that I
8       want to do this plaintiff by
9       plaintiff because I think that in
10      some courts I'll be allowed to
11      play that testimony.  Mr. Tisi has
12      an objection, and I agree that he
13      can have a continuing objection
14      and won't have to restate it as to
```

M007C05675

Exhibit B - June 30, 2006 Avorn Deposition Excerpts

• Avorn Reply

15   each plaintiff and each
16   prescriber.
17         Mr. Tisi and anybody else,
18   would you like to state your
19   objection now so it can be done
20   once?
21         MR. BUCHANAN:  We join in
22   the objection, and we want to have
23   a continuing objection.
24         MS. SHAPIRO:  We join in the
page 830
1    objection.
2          MR. BECK:  And I will
3    stipulate that every plaintiffs'
4    lawyer in every Vioxx case
5    anywhere joins in Mr. Tisi's
6    objection.
7          MR. TISI:  I will also state
8    it's beyond the scope.  We clearly
9    did not designate him as anything
10   but a generic expert.  So, for
11   that additional reason, I would
12   state my objection.  But go ahead.
13   If you feel that compelled, Phil,
14   I can't stop you.  Go ahead.
15 BY MR. BECK:
16   Q.   Do you know —
17        Do you have any information
18   about whether Mr. Grossberg in California
19   saw any direct-to-consumer advertisements
20   concerning Vioxx?
21   A.   No.
22   Q.   Do you have any information
23   about what materials were considered by
24   the doctors who prescribed Vioxx for Mr.
page 831
1    Grossberg?
2    A.   No.
3    Q.   Do you have any information
4    about whether Mr. Gerald Barnett reviewed
5    any direct-to-consumer advertisements?
6    A.   No.
7    Q.   Do you have any information
8    about the materials that were considered
9    by the physicians who prescribed Vioxx
10   for Mr. Barnett?
11   A.   No.
12   Q.   Do you have any information
13   about whether Robert Smith ever saw any
14   direct-to-consumer advertisements?
15   A.   No.
16   Q.   Do you have any information
17   about the information that was taken into
18   account by the doctors who prescribed
19   Vioxx for Robert Smith?
20   A.   No.
21   Q.   Do you have any information
22   about whether Charles Mason ever saw any
23   direct-to-consumer advertisements?
24   A.   No.
page 832
1    Q.   Do you have any information
2    about what materials were considered by
3    the doctors who prescribed Vioxx for
4    Charles Mason?
5    A.   No.
6    Q.   Do you have any information
7    about whether Anthony Dedrick saw any
8    direct-to-consumer advertisements?
9    A.   No.
10   Q.   Do you have any information
11   about the materials considered by the

M007C05676

Exhibit B - June 30, 2006 Avorn Deposition Excerpts

• Avorn Reply

```
12  doctors who prescribed Vioxx for Anthony
13  Dedrick?
14       A.     No.
15       Q.     Do you have any information
16  about whether a Steven Hatch ever saw any
17  direct-to-consumer advertisements?
18       A.     No.
19       Q.     Do you have any information
20  about what materials were considered by
21  the doctors who prescribed Vioxx for
22  Steven Hatch?
23       A.     No.
24       Q.     Do you have any information
page 833
1   about whether Robert McFarland saw any
2   direct-to-consumer advertisements?
3        A.     No.
4        Q.     Do you have any information
5   about the information — about the
6   materials considered by the doctors who
7   prescribed Vioxx for Robert McFarland?
8        A.     No.
9        Q.     Do you have any information
10  about whether James Miller ever saw any
11  direct-to-consumer advertising?
12       A.     No.
13       Q.     Do you have any information
14  concerning the materials that were
15  considered by the doctors who prescribed
16  Vioxx for James Miller?
17       A.     No.
18       Q.     Do you have any information
19  about whether Sharon Rigby ever saw any
20  direct-to-consumer advertisements?
21       A.     No.
22       Q.     Do you have any information
23  about the materials considered by the
24  doctors who prescribed Vioxx to Sharon
page 834
1   Rigby?
2        A.     No.
3               MR. BECK:   That's all the
4        questions I have.
```

[985:1] - [985:23]   6/30/2006   Avorn, Jerry (Barnett) - Preservation Depo v.2

```
page 985
1         C E R T I F I C A T E
2
3        I, LINDA L. GOLKOW, a Notary
     Public and Certified Shorthand Reporter
4    of the State of New Jersey, do hereby
     certify that prior to the commencement of
5    the examination, JEROME L. AVORN, M.D.
     was duly sworn by me to testify to the
6    truth, the whole truth and nothing but
     the truth.
7
8        I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
9    testimony as taken stenographically by
     and before me at the time, place and on
10   the date hereinbefore set forth, to the
     best of my ability.
11
12       I DO FURTHER CERTIFY that I am
     neither a relative nor employee nor
13   attorney nor counsel of any of the
     parties to this action, and that I am
14   neither a relative nor employee of such
     attorney or counsel, and that I am not
```

M007C05677

Exhibit B - June 30, 2006 Avorn Deposition Excerpts

• Avorn Reply

15   financially interested in the action.
16
17
18
19
     _____
     LINDA L. GOLKOW, CSR
20   Notary Number:  1060147
     Notary Expiration:  1-2-08
21   CSR Number:  30XI176200
     Dated:  July 6, 2006
22
23

M007C05678

**Exhibit C - June 29, 2006 Avorn Deposition Excerpts**

• **Avorn Reply**

[1:] - [1:24]          6/29/2006   Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 1
    0001
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF LOUISIANA
                      - - -
 3      IN RE: VIOXX         :  MDL DOCKET NO.
        LITIGATION           :  1657
 4      ------------------------------------
 5         SUPERIOR COURT OF NEW JERSEY
           LAW DIVISION - ATLANTIC COUNTY
 6                    - - -
 7      IN RE: VIOXX
        LITIGATION           :  CASE NO. 619
 8      ------------------------------------
                   CAUSE NO. 05-59499
 9      IN RE:                :  IN THE DISTRICT
                              :  COURT
10      VIOXX LITIGATION      :  157TH JUDICIAL
                              :  DISTRICT
11      APPLIES TO ALL CASES  :  HARRIS COUNTY,
                              :  TEXAS
12      ------------------------------------
13      SUPERIOR COURT OF THE STATE OF CALIFORNIA
              COUNTY OF LOS ANGELES
14             CENTRAL CIVIL WEST

        VIOXX CASES           :  JCCP NO. 4247
15                            :  ASSIGNED TO HON
                              :  VICTORIA CHEYNEY
16                    - - -
                   CONFIDENTIAL
17         SUBJECT TO PROTECTIVE ORDER
                      - - -
18              June 29, 2006
                      - - -
19
              Videotaped deposition of JEROME L.
20      AVORN, M.D.
21                    - - -
22           GOLKOW LITIGATION TECHNOLOGIES
             1600 John F. Kennedy Boulevard
23                    Suite 1210
             Philadelphia, Pennsylvania 19103
24                  877.DEPS.USA
```

[112:4] - [113:10]      6/29/2006   Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 112
 4      Q.      And do you have an opinion
 5   that you hold to a reasonable degree of
 6   medical certainty as to whether or not
 7   Merck accurately conveyed through all of
 8   its activities, publications, detailing,
 9   direct-to-consumer advertising, labeling,
10   "Dear Doctor" letters, et cetera,
11   effectively communicated the risks and
12   benefits so doctors can make
13   evidence-based prescribing decisions?
14           MR. BECK:  Objection,
15      improper subject for expert
16      testimony, lack of foundation and
17      hearsay.
18           THE WITNESS:  Yes, I have
19      such an opinion.
20   BY MR. TISI:
21      Q.      Okay.
22              And what is that opinion?
```



EXHIBIT
C

1

M007C05679

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

• Avorn Reply

```
23              MR. BECK:  Same objections.
24              THE WITNESS:  That Merck's
page 113
1       conduct over the research program
2       and analysis of its data and
3       communication of those data to
4       physicians, to patients, even to
5       FDA, was inadequate in that it
6       failed to truthfully represent
7       what was known to Merck at the
8       time about the risks of its drug
9       in relation to the cardiovascular
10      symptoms.
```

[173:2] - [178:18]        6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 173
2       Q.   Okay.
3            Doctor, at about the time
4   that you were involved with the
5   discussions with Dr. Cannuscio, were you
6   aware that the company was in discussions
7   with the Food & Drug Administration about
8   what would go into the label on the
9   results of VIGOR?
10      A.   No.
11      Q.   Doctor, I did provide you
12  material that was sent to the Food & Drug
13  Administration.  Have I showed you this
14  before today's deposition?
15      A.   Yes.
16      Q.   Have you had an opportunity
17  to take a look at it?
18      A.   Yes.
19      Q.   Is this a letter that was
20  sent to the -- appear to be a letter sent
21  to the Food & Drug Administration in part
22  referring to your study results on the
23  naproxen study?
24      A.   Yes.  It was sent by Merck
page 174
1   by Dr. Silverman, I believe.
2       Q.   Okay.
3            Can you turn to Page 3 of
4   that cover letter that was sent to the
5   Food & Drug Administration.
6       A.   (Witness complies.)
7       Q.   And the top part of it
8   refers to "Thrombotic Cardiovascular
9   Data," and has some discussion about the
10  VIGOR study.  Do you see that, Doctor?
11      A.   Yes.
12      Q.   Okay.
13           If you'd go down to the
14  second full paragraph --
15      A.   Yes.
16      Q.   -- is there a reference to
17  your study?
18      A.   Yes, there is.
19      Q.   Okay.
20           Would you tell us where that
21  is, Doctor?
22      A.   Yes.  That would be
23  beginning on line 4, the last word of the
24  line, "The."  Okay.
page 175
1            Shall I read it?
2       Q.   Yes.  Sure.
3       A.   "The concept that there are
4   differences among NSAIDs is supported by
5   external epidemiologic data from three
```

M007C05680

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

• Avorn Reply

6    separate studies that utilized different
7    clinical databases, indicating that the
8    use of naproxen, but not other NSAIDs, is
9    cardioprotective." And then it is
10   references 2, 3 and 4, and ours is
11   reference 4.
12            "Among these studies, is a
13   U.S. study of over 22,000 patients in New
14   Jersey by a Boston academic group
15   unaffiliated with industry." And that's
16   us.
17        Q.    Doctor, having read this
18   document, do you have any impression
19   about what was being conveyed to the FDA
20   about your study?
21            MR. BECK:  Objection.
22            THE WITNESS:  Well, it's not
23        an impression.  It's what they
24        say.  What they say is that our
page 176
1        study shows that naproxen protects
2        the heart.  And in the context of
3        what is on the rest of the page,
4        it is justification for the notion
5        that Vioxx does not cause heart
6        attacks, naproxen prevents them.
7    BY MR. TISI:
8        Q.    Did they specifically single
9    out your study as being, quota,
10   independent?
11       A.    Yes.
12       Q.    Doctor, were you aware at
13   the time that Merck was using your study
14   results that were presented to Dr. Guess
15   in August of 2001 to suggest that the
16   results of VIGOR were the result of the
17   cardioprotective effect of naproxen?
18       A.    No, I was not aware of that
19   at the time.
20       Q.    If you had been aware of
21   that, what would your reaction have been?
22            MR. BECK:  Objection,
23        speculation.
24            THE WITNESS:  Well, I can
page 177
1        tell you what my reaction is right
2        now, which is I'm indignant that
3        they took a finding of ours that
4        was very clearly communicated,
5        that is, the very modest effect of
6        protection of the hearts that we
7        found with naproxen, which we
8        explicitly said was not enough to
9        explain the increase in heart
10       attacks in the naproxen/Vioxx
11       comparison in VIGOR, that Dr.
12       Guess was in the room when we
13       presented that, and I now
14       understand, even wrote down, that
15       we hypothesized that what really
16       was probably going on was an
17       increased risk from the selective
18       COX-2, or Vioxx, as an explanation
19       of the VIGOR study.
20            I am upset right now, and I
21       was the first time I saw that, to
22       know that they were essentially
23       distorting our scientific findings
24       to justify exactly the opposite
page 178
1        position from what we have said
2        both in writing and in public.

M007C05681

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

• Avorn Reply

3   BY MR. TISI:
4        Q.     Let's talk about what you —
5             MR. BECK:  Move to strike
6     that answer as speculation
7     concerning others' state of mind
8     and also irrelevant concerning
9     this witness' emotional reaction.
10  BY MR. TISI:
11       Q.     Doctor, was that a fair —
12            Looking at that document, is
13  that a fair and accurate representation
14  of the science that you presented to Dr.
15  Guess at the ISPE meeting in August of
16  2001?
17       A.     No, it's a distortion of
18  what was presented.

[176:24] - [178:2]        6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

page 176
24            THE WITNESS:  Well, I can
page 177
1     tell you what my reaction is right
2     now, which is I'm indignant that
3     they took a finding of ours that
4     was very clearly communicated,
5     that is, the very modest effect of
6     protection of the hearts that we
7     found with naproxen, which we
8     explicitly said was not enough to
9     explain the increase in heart
10    attacks in the naproxen/Vioxx
11    comparison in VIGOR, that Dr.
12    Guess was in the room when we
13    presented that, and I now
14    understand, even wrote down, that
15    we hypothesized that what really
16    was probably going on was an
17    increased risk from the selective
18    COX-2, or Vioxx, as an explanation
19    of the VIGOR study.
20         I am upset right now, and I
21    was the first time I saw this, to
22    know that they were essentially
23    distorting our scientific findings
24    to justify exactly the opposite
page 178
1     position from what we have said
2     both in writing and in public.

[302:9] - [303:15]        6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

page 302
9        Q.     Let's go to the next
10  question that we asked you to address,
11  which is Merck's investigation and
12  management of — investigation of the
13  potential of Vioxx to cause heart attacks
14  and their management of that issue, the
15  studies, the communications, et cetera.
16  Okay?
17            First of all, have you
18  reviewed documents that were before the
19  new drug application was filed for Vioxx?
20       A.     Yes.  There were some
21  initial reports of clinical trials that
22  had been conducted.
23       Q.     What is the term "signal,"
24  Doctor?  First of all, is the term
page 303
1     "signal" something that is commonly used

4

M007C05682

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

• Avorn Reply

```
2   in your field of pharmacoepidemiology?
3        A.    Yes.
4        Q.    Would you please explain to
5   the jury what a "signal" is?
6        A.    Yes.  I think a good regular
7   language word would be "clue."  That if
8   there may be some evidence that comes up
9   that is not in itself a slam dunk proof
10  that there's a problem, but something
11  that might be called a smoking gun,
12  something that sure looks suspicious and
13  warrants followup, even though in itself
14  it does not absolutely wrap up the
15  certainty that there's a problem.
```

[303:21] - [304:7]     6/29/2006   Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 303
21  BY MR. TISI:
22       Q.    Okay.
23              Doctor, do you have an
24  opinion as to whether or not Merck should
page 304
1   have recognized -- a reasonable and
2   prudent company with the knowledge that
3   Merck had before the drug was on the
4   market should have recognized that there
5   was the potential for cardiovascular
6   disease in patients who took Vioxx?
7        A.    Yes.
```

[304:13] - [309:17]    6/29/2006   Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 304
13              THE WITNESS:  Okay.
14              If one looks at the totality
15  of the information that was
16  available as of the time that the
17  new drug application was
18  submitted, there were a number of
19  pieces of information from
20  clinical trial data, as well as
21  from other sources, that certainly
22  raised a question as to whether or
23  not this was a problem.  And I'm
24  not saying that they were slam
page 305
1   dunk, to use a phrase from the
2   current administration, slam dunk
3   evidence that there was a problem,
4   but that certainly were very
5   suspicious worries.
6              -   -   -
7              [Whereupon, Deposition
8   Exhibit Avorn-31, Research
9   Management Committee 4-10-96
10  MRK-ABC0048699 - MRK-ABC0048706,
11  was marked for identification.)
12              -   -   -
13  BY MR. TISI:
14       Q.    I'm going to hand you what I
15  have had marked as Exhibit Number 31.
16  And for the record, this is a Research
17  Management Committee document dated
18  October 10, 1996, MRK-ABC0048699.
19              Have you seen this document
20  before?
21       A.    Yes, I have.
22       Q.    Is this a document you
23  relied on in supporting your opinion that
24  there was a, quota, signal of potential
```

M007C05683

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

• **Avorn Reply**

page 306
1  cardiotoxicity for Vioxx prior to filing
2  of the new drug application?
3       A.    In part.
4       Q.    Okay.
5             Would you please go to Page
6  8.
7       A.    Yes.
8       Q.    First of all, what is
9  MK-966?
10      A.    That was the working name
11 for Vioxx before it was called Vioxx.
12      Q.    And is this a document that
13 is a Merck document?
14      A.    Yes.
15      Q.    In Section 3, it indicates a
16 section that says "Adverse Events."  Do
17 you see that?
18      A.    Yes.
19      Q.    Okay.
20            Would you tell us what, if
21 anything, was significant in your review
22 of this document which supports your
23 opinions?
24      A.    Sure.  In fairness, I should
page 307
1  point out that these were very, very big
2  doses of Vioxx.  This was before they
3  really knew what the right dose would be,
4  and so these doses were 125 to 175
5  milligrams.  I think that's part of the
6  picture here.
7       A.    Sure.
8       A.    Having said that, the second
9  paragraph -- and the other important
10 point was that this study lasted only six
11 weeks.  And so it was a really remarkably
12 short period of time in which you really
13 would not expect to see a cardiovascular
14 risk because it was only a
15 month-and-a-half long.
16            And the second paragraph
17 reads, "Adverse events of most concern
18 were in the cardiovascular system (e.g.,
19 MI" or heart attack, "unstable angina"
20 which is increasing chest pain from heart
21 disease, "rapid fall in hemoglobin and
22 hematocrit in some subjects, and a small
23 increase in blood pressure."
24      Q.    And this is October of 1996?
page 308
1       A.    Correct.
2             And then the next sentence
3  which I think is also relevant, "We plan
4  to evaluate MK-966" or Vioxx "in a study
5  where subjects are also given low-dose
6  aspirin."
7       Q.    Was that study ever done?
8       A.    It was not until the VIGOR
9  data came out in 2000 that Merck began to
10 advocate using aspirin in people taking
11 Vioxx, and so that would have been, oh,
12 four years later.
13      Q.    All right.
14            Now, Doctor, did you also
15 review the medical officer reviews for
16 Vioxx, the FDA medical officer review for
17 Vioxx when the drug was approved?
18      A.    Yes.
19      Q.    And did you consider the
20 views of the medical officer when forming
21 your opinions?

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

▪ Avorn Reply

22      A.    Yes.  Because that was what
23  was known at the time.
24      Q.    What, if any, significance,
page 309
1   and I'm going to try to go through these
2   fairly quickly, what, if any,
3   significance was there in the
4   cardiovascular section of the medical
5   officer review for the Vioxx clinical
6   trial program that assisted you in
7   formulating your opinions?
8       A.    Well, a number of the FDA
9   staff that were evaluating Vioxx, and I'm
10  thinking of Dr. Fulayo, Dr. Villalba and
11  Dr. Targum, were struck with and noticed
12  and wrote about the fact that there
13  appeared to be an excess of
14  cardiovascular disease in patients who
15  were given Vioxx in the clinical trials
16  that were submitted by Merck to FDA in
17  the late '90s.

[313:21] - [314:7]      6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

page 313
21      Q.    Doctor, putting all the kind
22  of evidence that we've been talking about
23  together, do you have an opinion as to
24  whether or not there was evidence prior
page 314
1   to Vioxx being on the market that a
2   reasonable and prudent company reviewing
3   the safety profile of this drug would
4   have considered in terms of designing
5   their clinical trial program and
6   investigating this signal?
7       A.    Yes.

[315:2] - [318:8]      6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

page 315
2           THE WITNESS:  In developing
3   a drug or looking at drug risks
4   and benefits, it is necessary to
5   look not just at what is found in
6   a particular study, but also what
7   is all the evidence about what
8   might work and what might not
9   work.  And, in fact, what might
10  work can be very useful in
11  planning the development of the
12  drug.
13          And when I teach in a course
14  at Tufts Medical School for drug
15  company executives about thinking
16  about risks and benefits in drug
17  development, one of the points I
18  mention is that it's key to pull
19  together everything that's known
20  so that you can plan your clinical
21  development program, whether it's
22  animal studies or human studies or
23  followup epidemiologic studies so
24  as to follow up on signals.  Some
page 316
1   signals may be good signals, like
2   here is a potential really good
3   effect of this drug that we want
4   to find out more about, as well as
5   the bad signals.
6           And looking at it all

M007C05685

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

• Avorn Reply

```
7     together, there is the evidence
8     from Merck's own pharmacology
9     advisors saying here's some
10    problems that you guys need to
11    keep an eye out for because,
12    specifically, 1, 2, 3, here are
13    ways in which this drug might
14    cause heart attacks.  Nobody knew
15    specifically at the time that it
16    would, but they were told, watch
17    out for this.  I think there was
18    some phrase in here that they
19    should be actively pursued or
20    something to that effect.
21          There were the earlier
22    clinical trials that Merck had
23    performed in which whatever the
24    dose, if you have a drug that
page 317
1     increases heart attacks in a
2     six-week study, that's an
3     important signal to worry about.
4          There were the animal
5     studies and other pharmacologic
6     studies that say, gee, you know,
7     maybe blocking COX-2 selectively
8     is not a totally good idea, maybe
9     there are some important good
10    things a COX-2 does that you don't
11    want to block totally.  And that
12    was in the literature before the
13    drug was on the market.
14          And so combining the advice
15    from their scientific advisors,
16    the evidence from the animal
17    studies, from the pharmacologic
18    literature and the evidence from
19    their own clinical trial
20    suggesting an increase in events,
21    I'm not saying they should have
22    not marketed the drug, I'm not
23    saying they should have pulled it
24    off the market the day it was
page 318
1     approved, but I am saying that
2     these were some smoking guns that
3     a reasonable company would have
4     said, as we market this drug,
5     let's make sure that we're also
6     keeping an eye on this potential
7     problem that we've been warned
8     about from multiple sources.
```

[329:18] - [329:24]      6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 329
18          Dr. Avorn, do you have an
19    opinion that you hold to a reasonable
20    degree of medical certainty as to when
21    there was reasonable evidence of an
22    association between Vioxx and heart
23    attacks?
24    A.    Yes.
```

[331:19] - [332:16]      6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 331
19          That said, I have such an
20    opinion, and it is that by the
21    time the data from the VIGOR study
22    were available to Merck, which
```

M007C05686

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

• Avorn Reply

```
23    would have been the spring of
24    2000, combining the VIGOR data
page 332
1     with the evidence from the other
2     clinical trials, all of which
3     Merck had conducted itself,
4     coupled with the guidance that
5     Merck had sought and received from
6     its own Board of Scientific
7     Advisors, coupled with the
8     pharmacologic evidence that was
9     out there in the literature prior
10    to that point, by the spring of
11    2000, the burden of evidence was
12    enough to suggest that there was
13    indeed a reason for concern that
14    Vioxx was associated with heart
15    attack and other cardiovascular
16    disease in humans.
```

[353:11] - [356:24]        6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 353
11              This is the report of Dr.
12    Targum at the cardiorenal division,
13    correct?
14        A.    Yes.
15        Q.    Okay.
16              February 1st, 2004 --
17        A.    2001.
18        Q.    -- 2001, excuse me.
19        A.    Right.
20        Q.    Okay.
21              If you'd go to page --
22    actually 36 -- 34.
23        A.    Got it.
24        Q.    Do you see the Section 4 at
page 354
1     the bottom of the page there, it talks
2     about "Assessment of the sponsor's claim
3     of CV risk"?
4         A.    Yes.
5         Q.    First of all, the sponsor's
6     claim there that the "Sponsor claims that
7     the difference in myocardial infarctions
8     between the two groups is primarily due
9     to the anti-platelet effects of
10    naproxen."
11        A.    Yes, I reviewed that
12    section.
13        Q.    Is that what they said in
14    the VIGOR paper that we reviewed earlier
15    today?
16        A.    Yes.
17        Q.    Okay.
18              Is that what they were
19    telling you and your people at Harvard?
20        A.    That's what Dr. Sherwood
21    told me.
22        Q.    Okay.
23              Is that what was being said
24    by Merck publicly in your experience in
page 355
1     2000 and 2001?
2         A.    Correct.
3         Q.    Okay.
4               What does Dr. Targum say
5     about the, quote, naproxen hypothesis?
6         A.    I'll just read her words.
7     "The sponsor claims that the difference
8     in myocardial infarctions between the two
```

M007C05687

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

• Avorn Reply

```
 9    groups is primarily due to the
10    anti-platelet affects" or the protective
11    affects "of naproxen."
12            And then she goes on to say,
13    "This hypothesis is not supported by any
14    prospective placebo-controlled trials
15    with naproxen. One can further argue
16    that, no matter what the attribution, the
17    results (from the cardiovascular
18    standpoint) are favorable for naproxen."
19        Q.   Do you agree with that?
20        A.   Yes.
21        Q.   Is that what you testified
22    to earlier?
23        A.   Yes.
24        Q.   Next one, next bullet point
page 356
 1    on the next page. "The sponsor claims
 2    that the majority of the cardiovascular
 3    events in the VIGOR study occurred in
 4    those patients who should have been
 5    taking aspirin for cardioprotection."
 6        A.   Yes.
 7        Q.   Is that the issue that we
 8    talked about before that had to be
 9    corrected in the New England Journal of
10    Medicine?
11        A.   That's right.
12        Q.   And that was corrected in
13    2005?
14        A.   That's correct.
15        Q.   Okay.
16            Do you agree with Dr. Targum
17    as to the significance of that fact?
18        A.   Yes. As she states it in
19    her own words, "This claim has not
20    convinced this medical reviewer," and she
21    goes on to say that there are increased
22    events, heart attacks in the Vioxx group
23    even in patients who did not fall into
24    the aspirin-indicated subgroup.
```

[358:4] - [359:9]          6/29/2006   Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 358
 4        Q.   Could you turn to Page 36,
 5    please?
 6        A.   Yes.
 7        Q.   At the bottom of the page
 8    there.
 9        A.   Yes.
10        Q.   The very bottom it says,
11    "Suggested labeling."
12        A.   Yes.
13        Q.   Do you see that there?
14        A.   Yes.
15        Q.   Would you read what she says
16    about that?
17        A.   Yes.
18        Q.   Well, actually, go to the
19    second sentence, if you don't mind.
20        A.   All right.
21            In bold it suggests labeling
22    that would properly address CV risks.
23        Q.   In the last sentence there?
24        A.   "It would be difficult to
page 359
 1    imagine inclusion of VIGOR results in the
 2    rofecoxib" or Vioxx "labeling without
 3    mentioning cardiovascular safety results
 4    in the study description as well as the
```

M007C05688

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

• Avorn Reply

```
5    Warnings section."
6         Q.    Okay.
7               Do you agree with Dr.
8    Targum?
9         A.    Yes.
```

[376:18] - [378:12]        6/29/2006   Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 376
18        Q.    I'm going to show you what I
19   have had marked as Exhibit Number 36.  Is
20   this the document to which you refer?
21        A.    I think so.
22        Q.    Okay.
23               And when you look at the
24   e-mail from Dr. Scolnick dated April 12,
page 377
1    2000, and this would have been right
2    after the VIGOR study, the VIGOR on our
3    timeline --
4         A.    Right.
5         Q.    -- right after VIGOR was
6    unblinded and the data became available?
7         A.    Correct.
8         Q.    Okay.
9               Would you read what Dr.
10   Scolnick has to say?
11        A.    Yes.  This is to Dr. Reicin.
12   "Hi, Alise.  I have been trading e-mails
13   with Doug Greene in realtime.  We are all
14   online too late.  I will tell you my
15   worry quotient is high.  I actually am in
16   minor agony.  What I really want to do is
17   a 10,000 versus 10,000 patient study in
18   mild to moderate osteoarthritis Tylenol
19   versus Vioxx with PRN," which means as
20   needed, "low-dose ASA," which is aspirin,
21   "for those judged to need it.  Safety," I
22   guess he means would be the "first
23   primary endpoint and efficacy secondary
24   or co-primary.  WE WILL NOT" now this is
page 378
1    in capital letters, "WE WILL NOT KNOW FOR
2    SURE WHAT IS GOING ON UNTIL WE DO THIS
3    STUDY.  PLEASE THINK HARD ABOUT THE
4    DESIGN BEFORE THE PAC MEETING.  Thanks,
5    Ed."
6         Q.    As somebody who conducts
7    clinical trials and conducts
8    epidemiologic studies and looks at these
9    kinds of issues, would this have been an
10   ethical study to do?
11        A.    Yeah.  I think he got it
12   exactly right.
```

[382:10] - [382:12]        6/29/2006   Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 382
10        Q.    Doctor, you testified that
11   you're an expert in the factors that go
12   into physician prescribing practices.
```

[382:24] - [384:10]        6/29/2006   Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 382
24        Q.    What are the sources in
page 383
1    which a pharmaceutical company
2    communicates with doctors about their
3    products?
```

M007C05689

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

• Avorn Reply

4       A.    Well, the legal governing
5   document that is probably central because
6   it determines what the company is allowed
7   to say in all of its promotional material
8   and all of its sales presentations is
9   what FDA calls the labeling or sometimes
10  it's called the package insert.  But it's
11  a lengthy document, usually in small
12  print, that describes everything about a
13  drug, what it's used for, what its
14  benefits are, what its risks are, what
15  its dose is and so forth.
16      Q.    Are there any other methods
17  by which a pharmaceutical company
18  communicates with doctors that you're
19  familiar with?
20      A.    Sure.  They will also, of
21  course, send out sales reps to doctors'
22  offices to talk to us about the
23  attributes of their drug, and, of course,
24  they will take out ads in medical
page 384
1   journals.  They will also take out ads or
2   put commercials on TV for patients.  And
3   they will sponsor continuing education
4   programs for physicians.
5       Q.    What about publication of
6   medical articles?
7       A.    Very often companies are
8   heavily involved, as we've learned, in
9   the publication of articles in the
10  medical literature.

[423:1] - [424:15]       6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

page 423
1       Q.    Doctor, we talked about
2   another method of Merck communicating the
3   risks, accurate information about the
4   risks.  You do understand that there was
5   direct-to-consumer advertising for
6   patients -- directly to patients, and
7   you've written about that, correct?
8       A.    Yes.
9       Q.    Do you have an opinion as to
10  a reasonable degree of medical certainty
11  as to whether or not the
12  direct-to-consumer advertising conducted
13  by Merck played a role in what's a fair
14  and accurate depiction of the risks and
15  benefits associated with Vioxx?
16      MR. BECK:  Can I just say
17  the same objection that I have had
18  for the last ten minutes?
19      MR. TISI:  Yes.  I'll give
20  you a continuing objection on all
21  those bases.
22      THE WITNESS:  Yes.  As I
23  said in my Health Affairs article
24  about direct-to-consumer
page 424
1   advertising a couple of years ago,
2   it's vital that patients be able
3   to get a reasonable depiction of
4   both the good news and the bad
5   news about a drug.  And given what
6   we now understand was available to
7   Merck at the time that all -- that
8   those $100 million a year of
9   commercials and ads were being
10  run, I think it is absolutely

M007C05690

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

▪ Avorn Reply

```
11        correct to say that they provided
12        all the good news about the drug
13        and did an inadequate job of
14        presenting the bad news about the
15        drug to patients.
```

[424:17] - [425:2]    6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 424
17        Q.    Now, Doctor, let me turn to
18   the one last topic I would ask you about
19   here, and that is the detailing of the
20   doctors, which is another method in which
21   companies will communicate with doctors.
22              Have you reviewed any of the
23   detailing information that was provided
24   to doctors?
page 425
1         A.    Yes, as well as the training
2    of the sales reps, which is part of that.
```

[425:21] - [427:9]    6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 425
21        Q.    Did you see any information
22   about how to respond to doctors'
23   inquiries about cardiovascular events in
24   your review of the documents?
page 426
1         A.    Yes.
2         Q.    What did you see?
3         A.    Well, the most memorable was
4    the dodge ball game that was apparently
5    developed as a training tool for their
6    sales reps to be able to respond to
7    doctors' questions about the
8    cardiovascular risks of Vioxx
9    particularly after the APPROVe study
10   findings had come out.  And I was
11   struck —
12        Q.    You meant VIGOR, right?
13        A.    I'm sorry.  That's what I
14   meant to say.
15        Q.    All right.  Okay.
16        A.    And I was struck by the fact
17   that the purpose is pretty much summed up
18   in the name, that it was to dodge
19   questions about this very important risk
20   of the company's drug.
21              Merck's training materials
22   to their sales reps explicitly tell them,
23   do not raise or do not initiate any
24   discussion of our paper or of other
page 427
1    papers related to cardiovascular risk.
2    And there were a number of completely
3    evasive answers that were being fed to
4    the sales reps for them to give as
5    responses to doctors who asked about
6    whether or not this drug could cause
7    heart attacks.  And that did not seem to
8    me to be a reasonable or scientifically
9    accurate presentation of the data.
```

[436:1] - [436:24]    6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 436
1         C E R T I F I C A T E
2
3              I, LINDA L. COLMOR, a Notary
```

M007C05691

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

• Avorn Reply

4    Public and Certified Shorthand
     Reporter of the State of New
5    Jersey, do hereby certify that
     prior to the commencement of the
6    examination, JEROME L. AVORN, M.D.
     was duly sworn by me to testify to
7    the truth, the whole truth and
     nothing but the truth.
8
9        I DO FURTHER CERTIFY that
     the foregoing is a verbatim
10   transcript of the testimony as
     taken stenographically by and
11   before me at the time, place and
     on the date hereinbefore set
12   forth, to the best of my ability.
13       I DO FURTHER CERTIFY that I
     am neither a relative nor employee
14   nor attorney nor counsel of any of
     the parties to this action, and
15   that I am neither a relative nor
     employee of such attorney or
16   counsel, and that I am not
     financially interested in the
17   action.
18
19
20   _____
     LINDA L. GOLKOW, CSR, RDR
21   Notary Number:  1060147
     Notary Expiration:  1.2.08
22   CSR Number:  30XI00176200
     Dated:  July 3, 2006
23
24

M007C05692

Exhibit D – June 15, 2006 Avorn Deposition Excerpts

▪ Avorn Reply

[1:] - [1:24]          6/15/2006     Avorn, Jerry (Barnett)

page 1
    0001
1                              UNITED STATES DISTRICT COURT
                               EASTERN DISTRICT OF LOUISIANA
2                              MDL DOCKET NUMBER:  1657
                                    SECTION L
3
             In re:  VIOXX PRODUCTS LIABILITY LITIGATION
4            GERALD BARNETT AND CORRINE BARNETT,
5                         Plaintiffs,
6                VS.                        CIVIL ACTION NUMBER:
                                                 2:06cv485
7            MERCK & CO., INC.,
8                         Defendant.
             -------------------------------------
9
                                    DEPOSITION OF
10
                               JERRY AVORN, M.D.
11
                               June 15, 2006
12                                 8:36 a.m.
13                            Sheraton Boston Hotel
                                 39 Dalton Street
14                          Boston, Massachusetts 02199
15       Susan A. Romano, Notary Public, Register Merit Reporter and Certified
             Realtime Reporter within and for the Commonwealth of Massachusetts
    15
16
17
18
19
20
21
22
23
24

[31:8] - [31:21]       6/15/2006     Avorn, Jerry (Barnett)

page 31
8    Q.   What material of Dr. Kronmal's did
9  you review?
10   A.   Analyses of data, as I recall,
11 particularly related to the Alzheimer's
12 study, in terms of the outcomes in that
13 trial -- in those trials.
14   Q.   Are you relying on anything Dr.
15 Kronmal prepared in your opinions?
16   A.   Yes.
17   Q.   What are you relying on?
18   A.   The analyses.  And they were the
19 most -- they were reflected in Dr. Ray's
20 expert opinion as well of Dr. Kronmal's
21 analyses of the Alzheimer's data.

[56:22] - [57:1]       6/15/2006     Avorn, Jerry (Barnett)

page 56
22   Q.   You wouldn't consider yourself to
23 be an expert in the state of mind of a
24 pharmaceutical company, right?
page 57
1    A.   Right.


EXHIBIT
D

1

Exhibit D - June 15, 2006 Avorn Deposition Excerpts

• Avorn Reply
[59:13] - [60:12]    6/15/2006    Avorn, Jerry (Barnett)

page 59
13  Q.   So I take that to mean you don't
14  consider yourself an expert in determining
15  pharmaceutical companies' intent?
16  A.   Well, I think that's a very
17  problematic question for a lot of ways.
18  One is there are no standards for
19  determining expertise, and it's not like
20  you're board certified in pharmaceutical
21  company intent.
22        Secondly, the concept of intent
23  implies knowing something about the
24  intrapsychic processes of a company, and
page 60
1  companies don't have intrapsychic
2  processes.
3        So I think one can look at
4  behaviors of individuals in companies, and
5  one can make very plausible conclusions
6  about the goals that those behaviors were
7  designed to achieve.
8        But the way you phrased it, since
9  nobody can get inside the head of a
10  company, since companies don't have heads,
11  no one can be an expert in that, the way
12  you phrased the question.


[164:20] - [165:4]    6/15/2006    Avorn, Jerry (Barnett)

page 164
20  Q.   Can you say, sir, under oath, that
21  you are aware of what the doctors who are
22  treating -- were treating the patients in
23  the Vioxx litigation knew, actually knew,
24  about the potential cardiovascular effects
page 165
1  of Vioxx?
2        MR. TISI:  Objection.
3  A.   Of course I can't get into the head
4  of a given doctor that I've never met.


[191:7] - [191:15]    6/15/2006    Avorn, Jerry (Barnett)

page 191
7  Q.   What statistics have you applied to
8  demonstrate that Merck's conduct concerning
9  Vioxx was unreasonable?
10  A.   Well, it's not like there's a
11  statistical test for reasonable behavior.
12  But what I mean is that there -- in
13  looking at study results, one needs to
14  know enough statistics to be able to
15  interpret the importance of the findings.


[192:17] - [193:17]    6/15/2006    Avorn, Jerry (Barnett)

page 192
17  Q.   Do you believe that jurors are
18  capable of evaluating Merck's conduct in
19  coming to a conclusion about whether
20  Merck's conduct was reasonable or
21  unreasonable?
22  A.   In some ways yes and in some ways
23  no, and let me explain.  They would not
24  be able to understand what acceptable
page 193
1  standards of behavior in the medical
2  community are because they're not doctors,

M007C05694

**Exhibit D - June 15, 2006 Avorn Deposition Excerpts**

• Avorn Reply

```
3   or about interpreting the meaning of
4   certain findings because they're not
5   pharmacoepidemiologists.  So there are some
6   important technical things which a juror,
7   on his or her own, could not be able to
8   interpret.
9        And then there are other things
10  which any person with common sense can
11  interpret, as in if you saw a particular
12  signal of a problem what would a
13  reasonable company do.  So there's —
14  There's the two kinds.
15       And the latter I think a juror
16  could handle on their own.  The former, I
17  think, requires some expert interpretation.
```

[279:6] - [279:15]       6/15/2006    Avorn, Jerry (Barnett)

```
page 279
6    Q.   Is it your testimony that when
7    Vioxx was on the market, the marketing
8    people believed that Vioxx causes heart
9    attacks?
10   A.   I can't indicate what people
11   believed or didn't believe.  What I can
12   indicate is that there was information
13   available to Merck, because Merck generated
14   most of it, indicating a higher risk of
15   heart attacks in people taking its drug.
```

[326:23] - [327:2]       6/15/2006    Avorn, Jerry (Barnett)

```
page 326
23   Q.   Have you ever worked for the FDA as
24   an employee?
page 327
1    A.   I've been on advisory committees,
2    but I've not been an employee.
```

[428:1] - [429:1]       6/15/2006    Avorn, Jerry (Barnett)

```
page 428
1              CERTIFICATE
2    COMMONWEALTH OF MASSACHUSETTS
3              SUFFOLK SS.
4    I, SUSAN A. ROMANO, Certified Shorthand
5    Reporter No. 115393, Registered Merit
6    Reporter and Notary Public in and for the
7    Commonwealth of Massachusetts, do hereby
8    certify that the witness whose deposition
9    is hereinbefore set forth, was duly sworn
10   and that such deposition is a true record
11   of the testimony given by the witness.
12   I further certify that I am neither
13   related to or employed by any of the
14   parties in or counsel to this action, nor
15   am I financially interested in the outcome
16   of this action.
17   In witness whereof, I have hereunto set
18   my hand and seal this 19TH day of June
19   2006.
20   .
21   .
22
23
24   Susan A. Romano, Notary Public
page 429
1        My commission expires April 21, 2006
```

M007C05695