IN THE COURT OF COMMON PLEAS
CIVIL DIVISION
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| WILLIAM JEFFRIES<br>625 Carver NW<br>Massillon, Ohio 44647 | ) ) ) | Case No._____<br>Judge _____ |
| and | ) ) | |
| SHIRLEY JEFFRIES<br>625 Carver NW<br>Massillon, Ohio 44647 | ) ) ) ) | |
| PLAINTIFFS | ) ) | |
| v. | ) ) | **COMPLAINT**<br>**(Jury Trial Requested)** |
| MERCK AND CO., INC.<br>c/o CT Corporation System<br>1300 East Ninth Street<br>Cleveland, Ohio 44114 | ) ) ) ) ) ) | |
| and | ) ) | |
| LOKENDRA B. SAHGAL, M.D.<br>3223 Edinburg Avenue NW<br>Canton, Ohio 44708-1160 | ) ) ) ) | |
| and | ) ) | |
| MASSILLON COMMUNITY HOSPITAL<br>875 8th Street NE<br>Massillon, Ohio 44646 | ) ) ) ) | |
| and | ) ) | |
| RUDY P. ZARATE, M.D.<br>2037 Wales Avenue NW 130<br>Massillon, Ohio 44646 | ) ) ) ) | |
| DEFENDANTS | ) ) | |



COME NOW, William Jeffries and Shirley Jeffries ("Plaintiffs"), by and through their attorneys, and for cause of action against Defendants Merck & Co., Inc. ("Merck"), Lokendra B. Sahgal, M.D., Massillon Community Hospital, and Rudy P. Zarate, M.D. and state as follows:

## I.    The Parties

1.01    Plaintiffs William Jeffries and Shirley Jeffries were citizens of the State of Ohio at the time the instant cause of action arose and are citizens of the State of Ohio at the time of filing this action. Plaintiffs reside at 625 Carver NW, Massillon, Stark County, Ohio 44647.

1.02    Defendant, MERCK & CO., INC. (Merck) at all times relevant herein, was and is an American pharmaceutical company incorporated under the laws of the State of New Jersey with its principal place of business at One Merck Drive, P. O. Box 100, Whitehouse Station, New Jersey. Merck may be served with process by serving its registered agent for service of process: CT Corporation System, 1300 East Ninth Street, Cleveland, Ohio 44114. Merck was and is in the business of profiting from the design, manufacture, marketing, distribution and/or sales of the brand-name prescription drug Vioxx (rofecoxib).

1.03    Defendant, LOKENDRA B. SAHGAL, M.D. (Sahgal), at all times relevant herein, was and is a physician licensed in the State of Ohio and practicing in Stark County, Ohio. This defendant may be served with process at his residence: 3223 Edinburg Avenue NW, Canton, Ohio 44708-1160. At all times relevant herein, Defendant Zarate in the business of prescribing, distributing and/or promoting the brand-name prescription drug Vioxx (rofecoxib).

1.04    Defendant, MASSILLON COMMUNITY HOSPITAL (Massillon), at all times relevant herein, is a hospital organized and existing under the laws of the State of Ohio. This defendant may be served with process by and through its registered agent: Massillon Community Hospital, 875 8th Street NE, Massillon, Ohio 44646. Defendant was at times relevant to this suit the employer of Lokendra B. Sahgal, M.D.

1.05    Defendant, RUDY P. ZARATE, M.D. (Zarate), at all times relevant herein, was and is a physician licensed in the State of Ohio and practicing in Stark County, Ohio. This defendant may be served with process at his primary practice site: 2037 Wales Avenue NW 130, Massillon, Ohio 44646. At all times relevant herein, Defendant Zarate in the business of prescribing, distributing and/or promoting the brand-name prescription drug Vioxx (rofecoxib).

## II.    Jurisdiction and Venue

2.01    Under the general venue rule, Cuyahoga County is a county of proper venue because defendant Merck maintains its Ohio statutory agent in Cuyahoga County. Further, defendant Merck & Co., Inc. has done and continues to do business in Ohio, has committed a tort, in whole or in part, in Ohio, has continuing contacts in Ohio and is amenable to service by an Ohio Court. Certain acts or omissions, which gave rise to Plaintiffs' claims for relief arose in Cuyahoga County, Ohio.

2.02    This Court has subject matter jurisdiction over the controversy because the damages are within the jurisdictional limits of the Court.

## III.    Capacity

3.01    Defendants may be liable in one or more of a number of capacities including, but not limited to, the following:

1)     Manufacturer.   A manufacturer is a person engaged in a business to design, formulate, create, make, construct, assemble, or rebuild a product.

(2)     Retailer, wholesaler, or distributor of the product at issue in this lawsuit including without limitation by sampling programs.

(3)     Licensee.   A Licensee defendant is one who has manufactured, marketed, or distributed into the stream of commerce the product at issue in this lawsuit.

(4)     Parent corporation.   A parent corporation may be liable for the tortious conduct of its subsidiary corporation when the legal distinctions between the parent corporation and subsidiary corporation are fictitious or should be otherwise disregarded.   Additionally, any defendant named as a parent corporation may be individually liable for its own tortious conduct.

(5)     Successors in interest to another corporation.   Successors in interest to another corporation may be liable for that corporation's debts and obligations for many reasons including, but not limited to, express or implied assumption or continuation of the predecessor corporation.

(6)     Agency.   Where one or more defendants, and their employees, officers and/or representatives were at all times acting as the authorized agent of another defendant which, as the principal with knowledge of the acts of its agents, is responsible and liable for all the tortious acts of the agent relating to the product at issue in this suit.  Defendant Lokendra B. Sahgal, M.D. was at all material times acting as an employee, representative, agent and/or ostensible agent of Massillon Community Hospital, which is liable

under the doctrine of *respondeat superior*, ostensible agency, and/or other agency principles.

### IV.   Factual Allegations

4.01   This action arises from the sales and efficacy of Vioxx, a rofecoxib-containing prescription drug in the class of non-steroidal inflammatory drugs known as Cox-2 inhibitors.

4.02   In November of 1998, Merck submitted an Application to Market a New Drug for Human Use ("NDA") to the United States Food and Drug Administration ("FDA") for rofecoxib.

4.03   After a fast-track, 6-month approval process, Defendant Merck obtained approval from the FDA for rofecoxib in approximately May of 1999 for treatment of osteoarthritic pain, acute pain and menstrual pain. Vioxx is a brand name used by Merck to market and distribute rofecoxib.

4.04   Merck launched an aggressive marketing campaign for Vioxx immediately after its approval in May of 1999. This campaign included extensive direct to consumer advertising.

4.05   Defendant Merck manufactured, marketed, distributed and sold Vioxx to consumers such as Plaintiff William Jeffries. Mr. Jeffries was prescribed Vioxx for pain. Plaintiff ingested the Vioxx as prescribed when Plaintiff was struck by a cardiovascular event; namely, a myocardial infarction (MI), or heart attack. Prior to the heart attack, Plaintiff was, but is no longer, an extremely active individual.

4.06   Despite knowledge from its clinical trials, post-marketing reports, and studies relating to cardiovascular-related adverse health effects, Merck failed to disclose

all relevant information to the FDA and promoted and marketed Vioxx as safe and effective for persons such as William Jeffries.

4.07   Defendant Merck concealed the serious cardiovascular risks associated with Vioxx because a successful launch of Vioxx was viewed as critical for Merck, and safety concerns over hypertension, edema and/or cardiovascular events would have drastically damaged Merck's positioning in the market and its profits as compared to the competition drug, Celebrex (celecoxib) which was placed into the market by Merck's competitors Pharmacia and Pfizer some three (3) months before Vioxx.

4.08   Merck knowingly chose to subject its consumers to these and other adverse health risks despite its knowledge at product launch and from post-marketing data thereafter that use of Vioxx carried significant risk factors.  These adverse effects were realized in adverse event reports, in clinical trials where such events were adjudicated by primary investigators with Merck's assistance, and in one or more studies shortly after market launch, which showed statistically significant increases in adverse cardiovascular events among Vioxx users including heart attacks and strokes.

4.09   Based on a study known as the VIGOR study (Vioxx GI Outcomes Research), conducted between January 6, 1999 and March 17, 2000, Merck submitted a Supplemental New Drug Application ("sNDA") to the FDA.  Through this sNDA, Merck hoped to establish a gastrointestinal safety claim for rofecoxib.

4.10   However, the VIGOR study revealed problems.  By November 18, 1999, the Data and Safety Monitoring Board of the VIGOR study, a committee independent from Merck (the sponsor), had become concerned over the "excess deaths and cardiovascular events experiences in Group A [Vioxx] compared to Group B

[naproxen]." This, according to an FDA report of February 1, 2000 written by Shari L. Targum, M.D., a Project Manager for the FDA's Division of Anti-Inflammatory Drug Products.

4.11    Merck submitted results from the VIGOR study to the *New England Journal of Medicine* (NEJM) in the form of an article entitled "Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis VIGOR Study Group," which was published in the November 23, 2000 edition of the NEJM.    This article had several co-authors, including Alise Reicin, Merck's Vice President of Clinical Research.    The lead author, Toronto rheumatologist Claire Bombardier, M.D., had then, and has since had, various relationships with Merck, including serving as the chief investigator for the VIGOR study.

4.12    The conclusions reached in the Bombardier/Reicin NEJM article do not mention an increase in cardiovascular risks from Vioxx.   The only mention of adverse cardiovascular event data states: "[t]he incidence of myocardial infarction was lower among patients in the naproxen group than among those in the rofecoxib group (0.1 percent vs. 0.4 percent; relative risk; 0.2; 95 percent confidence interval, 0.1 to 0.7); the overall mortality rate and the rate of death from cardiovascular causes were similar in the two groups."

4.13    In industry sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization of which Merck is a member and corporate sponsor, in June of 2000, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and myocardial infarction.   Merck did nothing to further accurately distribute this information, and in fact, Merck specifically denied

hypertension problems in the official publication of the American Pharmaceutical Association, *Pharmacy Today*, "Spin War Aside, Lessons Emerge From COX-2 Trials;" in August 2000, page 3.

4.14   In response to growing public expressions of concern over the cardiovascular safety profile of Vioxx, Merck issued a press release dated May 22, 2001 entitled "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx." The FDA would later admonish Merck that:

> Your claim in the press release that Vioxx has a "favorable cardiovascular profile" is simply incomprehensible, given the rate of MI [myocardial infarction] and serious cardiovascular events compared to naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDs is misleading; in fact, serious cardiovascular events were twice as frequent in the Vioxx treatment group . . . as in the naproxen treatment group . . . in the VIGOR study.

4.15   Merck continued to deny the ill health effects associated with Vioxx while at the same time reaping the profits obtained through its conscious concealment of and deliberate failure to disclose the truth about Vioxx. Merck engaged in a massive marketing program which involved financial incentives to sales teams, infusion of some 700 new sales representatives, and a massive advertising and sampling program. As a result, Merck continued to gain market share, which enhanced its financial stability to the detriment of its consumers. The resultant effect to Merck in concealing and failing to reveal and warn of the risks was a more than $2 billion profit in 2000 alone to Merck and an approximately 23 percent share of the market.

4.16   On or about August 29, 2001, the *Journal of the American Medical Association* (JAMA) published a peer-reviewed human epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukherjee, et al., showing more of

what Merck had concealed - the relative risk of developing a confirmed adjudicated thrombotic cardiovascular event (defined in the article as myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks) among Vioxx users in Merck trials at a 95% confidence interval ranged from 2.2. for event-free survival analysis, 2.38 compared to naproxen users, and 4.89 for developing serious cardiovascular events among aspirin-indicated patients. *See* Mukherjee, D., et al, "Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors." *JAMA* 286:8, 954-959, Aug. 22/29, 2001.

4.17   In the JAMA study, the authors theorized that by decreasing PGI 2 production I [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and anti-thrombotic PGI2, potentially leading to an increase in thrombotic cardiovascular events. *Id.* at 957. [In a follow-up peer-reviewed study reported in the *Journal of the American College of Cardiology* on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the Cox-2 inhibitor A tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular and thrombotic events. Bing, R., & Lomnicka, M., "Why Do Cyclo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?" *J.A.C.C.*, 39:3, Feb. 6, 2002.]

4.18   In response, Merck's Dr. Alise Reicin and others authored an article in defense of Vioxx's cardiovascular risk profile titled "Cardiovascular thrombotic events in controlled, clinical trials of rofecoxib," published in the November 6, 2001 edition of the journal *Circulation*. In summary, his "analysis provides no evidence for an excess of CV [cardiovascular] events for rofecoxib [Vioxx] relative to either placebo or the non-

naproxen NSAIDs that were studied. Differences observed between rofecoxib and naproxen are likely the result of the antiplatelet effects of the latter agent."

4.19   Merck's naproxen theory was debunked in approximately January of 2002, by a Vanderbilt University School of Medicine human epidemiologic peer-reviewed study published in *The Lancet* concluding that there is an absence of a protective effect of naproxen or other non-aspirin non-steroidal anti-inflammatory drugs on risk of coronary heart disease. Ray, W., et al., "Non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease: an observational cohort study." *The Lancet*, 359: 118-123, Jan. 12, 2002.

4.20   On or about April of 2002, Defendant Merck sent out a letter to physicians, including Defendants Sahgal, Massillon and Zarate wherein Merck disclosed the results of the VIGOR study which demonstrated an increased risk for cardiovascular thrombotic events associated with the chronic ingestion of 50 mg dosage per day of Vioxx when compared to Naproxen.

4.21   Defendants, Lokendra B. Sahgal, M.D. and Rudy P. Zarate, M.D., individuals, were at all times relevant to this suit licensed physicians practicing in the State of Ohio. Defendants Sahgal and Zarate, were in positions to make representations about the safety and efficacy of Vioxx to Plaintiff William Jeffries. Defendant Lokendra B. Sahgal, M.D. undertook these acts as an employee and agent of Defendant Massillon Community Hospital

4.22   Lokendra B. Sahgal, M.D. began prescribing and/or dispensing Vioxx to Plaintiff around May of 2000. The original dosage was 25 milligrams. However, the dosage was subsequently increased to 50 milligrams in December of 2000. Defendant

Sahgal continued to prescribe the daily 50 milligram dose until early 2003, when Rudy P. Zarate, M.D. began prescribing a daily 50 milligram dose. Defendant Zarate continued prescribing such dosage until approximately August of 2004. Despite receiving the April 2002 letter from Merck, Defendants Sahgal and Zarate did not inform Plaintiff William Jeffries of an increased risk of thrombotic events associated with the use of Vioxx, advise him to discontinue use, and/or reduce the dosage of Vioxx which they prescribed to Plaintiff.

4.23   Consequently, Plaintiff William Jeffries continued to use Vioxx as prescribed by Defendants Sahgal and Zarate and on or about January 25, 2003 Plaintiff William Jeffries suffered a myocardial infarction and was forced to undergo a triple bypass surgery.

4.24   On behalf of Merck, Dr. Reicin continued her defense of Vioxx in an article entitled "Selective COX-2 inhibition and cardiovascular effects: a review of the rofecoxib development program," which was published in the October 1, 2003 edition of the *American Heart Journal*. Dr. Reicin and her colleagues stated that "[r]ofecoxib [Vioxx] was not associated with excess CV [cardiovascular] thrombotic events compared with either placebo or nonnaproxen NSAIDs. Again, naproxen appeared to be the outlier, suggesting a cardioprotective benefit of naproxen."

4.25   However, Merck's "spin" continued to unravel. An article by Solomon and others at the Harvard Medical School, entitled "Relationship Between Selective Cyclooxygenase-2 Inhibitors and Acute Myocardial Infarction in Older Adults," was published in the April 2004 edition of the journal *Circulation*. The Harvard authors concluded the following from his study:

"... rofecoxib [Vioxx] use was associated with an elevated relative risk of AMI [acute myocardial infarction] compared with celecoxib [Celebrex] use and no NSAID use. Dosages of rofecoxib [greater than] 25 mg were associated with a higher risk than dosages [less than or equal to] 25 mg."

4.26    An article by H.K. Choi in the May 1, 2004 edition of the *American Journal of Medicine*, entitled "Effects of rofecoxib and naproxen on life expectancy among patients with rheumatoid arthritis: a decision analysis," concluded the following:

"Our analysis suggests a longer life expectancy with naproxen than rofecoxib [Vioxx] . . . except in those at low risk of myocardial infarction or at a high risk of upper gastrointestinal toxicity."

4.27    The FDA's David Graham, M.D. made a poster presentation entitled "Risk of Acute Myocardial Infarction and Sudden Cardiac Death with Use of COX-2 Selective and Non-Selective NSAIDs" at the 20th International Conference on Pharmacoepidemiology and Therapeutic Risk Management, held from August 22-25, 2004, in Bordeaux, France. The data for the presentation was taken from a study done by Kaiser Permanente under a contract funded by the FDA. The study indicated that Vioxx taken at more than 25 mg per day increased the risk of heart attack and sudden cardiac death by 300% in those enrolled in the study.

4.28    On August 26, 2004, Peter Kim, President of Merck Research Laboratories, issued a press release stating the following:

"Merck strongly disagrees with the conclusions of an observational analysis by Graham, et al., presented at an international medical meeting this week. . ."

"Merck stands behind the efficacy and safety, including cardiovascular safety, of VIOXX."

4.29    On September 27, 2004, Merck informed the FDA that the Data Safety Monitoring Board for an ongoing long-term study of Vioxx, known as the APPROVe

study, had recommended that the study be stopped early for safety reasons.

4.30    The APPROVe study was not intended to be a cardiovascular risk assessment study. It was commissioned by Merck to look at the effect of Vioxx in people at risk for developing recurrent colon polyps.

4.31    The APPROVe study demonstrated an increased risk of cardiovascular adverse events, including heart attacks and strokes, for the Vioxx population relative to the placebo population in the study, particularly for people taking Vioxx for more than 18 months.

4.33    Merck representatives informed the FDA in a September 28, 2004 meeting that Merck would withdraw Vioxx from the United States market.

4.33    Merck and the FDA each announced the withdrawal of Vioxx from the United States market on September 30 2004.    Merck also announced worldwide withdrawal the same day.

4.34    An FDA analysis, based on data from the Kaiser Permanente study, projects that 27,785 heart attacks and sudden cardiac deaths "would have been avoided" had Celebrex been used instead of Vioxx.

4.35    Approximately 20 million people in the United States took Vioxx between its introduction in 1999 and its withdrawal in 2004.

4.36    Vioxx gained its significant market share by suppressing information and/or making false representations regarding Vioxx's superiority and efficacy.

4.37    If Defendants had not engaged in this conduct, consumers, including Plaintiffs, would have switched from Vioxx to safer products or refrained wholly from its use.

4.38    Plaintiffs allege that the suppression of this information constituted a common scheme by Defendants to conceal material information from Plaintiffs and from the health care industry.

4.39    Plaintiffs allege that Defendants' marketing strategies, including without limitation the detail and sampling programs and direct-to-consumer advertising, targeted Plaintiffs to induce them to purchase Vioxx.  At the time the Defendants prescribed, distributed, manufactured and marketed Vioxx, Defendants intended that Plaintiffs would rely on the marketing, advertisements and product information propounded by Defendants.

## V.    Claims Against Defendants

**A.    Strict Liability – Defect in Manufacture or Construction – Merck**

5.01    Plaintiffs restate each and every preceding allegation of this Complaint and incorporate each by reference as though set forth in full herein.

5.02    At the time Vioxx left the control of Defendant Merck, the manufacturer, and was placed into the stream of commerce, Vioxx was defective in manufacture or construction.

5.03    Merck marketed Vioxx as safe for its intended use as a pain reliever. However, Merck knew, or should have known, that there were serious and significant side effects from ingesting Vioxx.  Therefore, Vioxx differed and/or deviated in a material and significant way from performance standards that Merck set for Vioxx and represented to the Plaintiffs, health care providers, and the public at large.

5.04    Due to the defective condition of Vioxx, the Plaintiffs have suffered serious physical injuries, substantial emotional distress and other damages.

**B.**     **Strict Liability - Inadequate Warning and Instructions - Merck**

5.05     Plaintiffs restate each and every preceding allegation of this Complaint and incorporate each by reference as though set forth in full herein.

5.06     When Merck, as the manufacturer, placed Vioxx into the stream of commerce, it knew, or with reasonable care should have known, of the risk of serious and potentially deadly side effects associated with Vioxx.

5.07     Merck failed to provide the warnings and/or instructions that a manufacturer exercising reasonable care would have provided when it failed to inform and/or warn Plaintiffs or health care providers regarding the serious side effects associated with Vioxx.  In light of the seriousness of the potential harm, a reasonable manufacturer would have warned consumers of the risks.

5.08     In addition, Merck failed to provide post-marketing warnings and/or instructions after Merck knew or should have known in the exercise of reasonable care that the Vioxx created substantial risks to the health of Plaintiff and other consumers of Vioxx.

5.09     Merck was aware of the studies that demonstrated the increased risk for potentially deadly side effects and misrepresented and or concealed such information from Plaintiffs, health care providers, and the public at large.  A reasonable manufacturer with knowledge, such as Merck possessed, regarding the side effects would have warned consumers in light of the seriousness of the risk associated with continued use.

5.10     Due to the failure of Merck to warn and/or instruct Plaintiffs, both before and after marketing, of the potentially serious and deadly side effects of Vioxx, Plaintiffs have suffered serious physical injuries, substantial emotional distress and other damages.

**C.    Negligence - Merck**

5.11    Plaintiffs restate each and every preceding allegation of this Complaint and incorporate each by reference as though set forth in full herein.

5.12    The injuries of Plaintiffs are a direct and proximate result of the negligence of Defendant Merck, who manufactured and/or placed Vioxx, an unreasonably dangerous product, into the stream of commerce.  Defendant knew or should have known with the exercise of ordinary care that the product was highly harmful to the health and well-being of the Plaintiff when it left the Defendant's control.  Merck owed a duty to the general public and specifically to the William Jeffries family to exercise such ordinary care in the marketing of Vioxx.  Merck failed to exercise ordinary care when it failed to warn that, as designed, Vioxx was capable of causing death and serious personal injuries such as those suffered by Plaintiff during foreseeable use.

5.13    Defendant Merck breached its duty and was negligent in its actions, misrepresentations, and omissions toward Plaintiffs in that Defendant:

a.    Failed to include adequate warnings with the medications that would alert Plaintiffs and other consumers to the potential risks and serious thrombotic and cardiovascular side effects of Vioxx ingestion;

b.    Failed to include adequate information or warnings with the medication that would alert Plaintiffs and the health care community to refrain from use of Vioxx without first prescribing traditional NSAIDs such as naproxen or ibuprofen or other pain relievers;

c.    Failed to adequately and properly test Vioxx before and after placing it on the market in order to provide adequate warnings;

d.  Failed to conduct sufficient testing on Vioxx which, if properly performed, would have shown that Vioxx had serious side effects, including, but not limited to the cardiovascular events described above, that could have been included in warnings or instructions to the Plaintiff or his health care providers;

e.  Failed to adequately warn Plaintiff and his health care providers that use of Vioxx carried a risk of cardiovascular events and death; among other serious side effects;

f.  Failed to provide adequate post-marketing warnings or instructions after Merck knew or should have known of the significant risks of personal injury and death as identified herein among other serious side effects from the use of Vioxx;

g.  Failed to adequately warn Plaintiff that Vioxx should not be used if any risk factors for these adverse effects, such as hypertension, existed;

h.  Failed to adequately disclose and warn Plaintiff that he undertook the risk of adverse events and death as described herein; and

i.  Failed to adequately and timely inform the health care industry of the risks of serious personal injury and death from Vioxx ingestion as described herein.

j.  Plaintiff is unable now to more specifically state the acts of negligence of Merck regarding the unreasonably dangerous nature of Vioxx because at this time, this information is peculiarly within the knowledge of Defendant Merck.  Plaintiffs have no means, other than through discovery, of

ascertaining the method or manner in which Vioxx was designed, tested, manufactured and/or marketed by Merck. Plaintiffs specifically reserve the right to more particularly state acts of negligence as more information is developed from Merck.

5.14   Merck's failure to exercise reasonable care in the design and/or marketing of Vioxx was a proximate cause of Plaintiffs' injuries and damages.

**D.   Breach of Express Warranty - Merck**

5.15   Plaintiffs restate each and every preceding allegation of this Complaint and incorporate each by reference as though set forth in full herein.

5.16   Defendant Merck sold and/or provided Vioxx to Plaintiff and/or Plaintiff's health care providers. Plaintiffs purchased and/or received Vioxx based upon positive affirmations from Merck regarding the safety and effectiveness of Vioxx.

5.17   Defendant Merck made these misrepresentations about Vioxx at a time when the Defendant knew, or should have known, that Vioxx had defects, dangers, and characteristics that were other than what Defendant Merck had represented to Plaintiff and the health care industry generally. Specifically, Merck represented to Plaintiffs, the health care industry and consuming public that:

    a.   Vioxx did not have statistically significant increases in cardiovascular side effects, including myocardial infarction, stroke and sudden onset death, as identified herein which could result in serious injury or death;

    b.   There had been sufficient studies regarding the safety and efficacy of Vioxx before and after its product launch;

    c.   Vioxx was fully and adequately tested for the cardiovascular side effects;

d.       Other testing and studies did not show the risk of serious adverse risks; and/or

e.       There was not a greatly increased risk of such cardiovascular events and death; and there was not a confirmed mechanism by which these thrombotic or cardiovascular events occurred as reported in the scientific literature.

5.18    The representations alleged were perpetuated directly and/or indirectly by Defendant. Defendant Merck knew or should have known that these representations were false and made the representations with the intent or purpose that Plaintiffs and the health care industry would rely on them, leading to the use of Vioxx. At the time of Defendant's fraudulent misrepresentations, Plaintiffs and the health care industry were unaware of the falsity of the statements being made and believed them to be true. Plaintiffs had no knowledge of the information concealed and/or misrepresented by Merck. Plaintiffs justifiably relied on and/or were induced by the representations and relied on the assurances of safety, which Defendant Merck continued to communicate to the public even after Vioxx was shown to have serious and potentially deadly side effects. Plaintiffs reasonably relied on the representations to their detriment.

5.19    As a direct and proximate result of the misrepresentations of Defendant, Plaintiffs suffered significant and ongoing injuries and damages.

E.       **Breach of Warranty – Merchantability – Merck**

5.20    Plaintiffs restate each and every preceding allegation of this Complaint and incorporate each by reference as though set forth in full herein.

5.21    Defendant Merck, at the time of the acts forming the basis of this lawsuit, sold the Vioxx which is at issue in this lawsuit. Merck impliedly warranted to the public generally and specifically to the William Jeffries family that Vioxx was merchantable and fit for safe use as a pain reliever, the purpose for which Merck marketed Vioxx. Vioxx was not merchantable or fit for safe use as a pain reliever as warranted because, as designed, Vioxx was capable of causing death and serious personal injuries such as those suffered by Plaintiff during foreseeable use. The ingestion of Vioxx by William Jeffries was a proximate cause of his injuries and Plaintiffs' damages. Therefore, Merck has breached the implied warranty of merchantability with respect to Vioxx.

5.22    As a direct and proximate result of Defendant's breach of the warranty of merchantability, Plaintiffs sustained serious and permanent injuries.

**F.    Breach of Warranty – Fitness for a Particular Purpose - Merck**

5.23    Plaintiffs restate each and every preceding allegation of this Complaint and incorporate each by reference as though set forth in full herein.

5.24    Defendant Merck knew that consumers such as the William Jeffries family would require Vioxx for safe use as a pain reliever, and that consumers would rely on Merck's skill and judgment to provide suitable medications. Merck provided such skill and judgment by marketing and selling Vioxx for that purpose. The William Jeffries family relied on Merck's skill and judgment when selecting and purchasing the Vioxx at issue. The Vioxx purchased and used by William Jeffries was not fit for its particular purpose because, as designed, Vioxx was capable of causing death and serious personal injuries such as those suffered by Plaintiff during foreseeable use. Therefore, Merck has breached the implied warranty of fitness for a particular purpose with respect to Vioxx.

5.25    As a direct and proximate result of Defendant's breach of the warranty of fitness for a particular purpose, Plaintiffs sustained serious and permanent injuries.

**G.     Common Law Breach of Implied Warranty - Merck**

5.26    Plaintiffs restate each and every preceding allegation of this Complaint and incorporate each by reference as though set forth in full herein.

5.27    Defendant Merck, at the time of the acts forming the basis of this lawsuit, manufactured and sold the Vioxx which is at issue in this lawsuit.  Merck impliedly warranted to the public generally and specifically to the William Jeffries family that Vioxx was of good and merchantable quality and fitness for safe use as a pain reliever, the purpose for which Merck marketed Vioxx.  Vioxx was not merchantable or fit for safe use as a pain reliever as warranted because at the time it left Merck's control, Vioxx was capable of causing death and serious personal injuries such as those suffered by Plaintiff during foreseeable use.  The ingestion of Vioxx by William Jeffries was a proximate cause of Plaintiffs' injuries and damages.  Therefore, Merck has breached the common law implied warranty with respect to Vioxx.

5.28    As a direct and proximate result of Defendant's breach of the common law implied warranty, Plaintiffs sustained serious and permanent injuries.

**H.     Fraud - Merck**

5.29    Plaintiffs restate each and every preceding allegation of this Complaint and incorporate each by reference as though set forth in full herein.

5.30    Defendant Merck misrepresented to the FDA, Plaintiffs, and the health care industry, the safety and effectiveness of Vioxx and/or fraudulently, intentionally

and/or negligently concealed material information, including adverse information regarding the safety and effectiveness of Vioxx.

5.31   Defendant Merck made these misrepresentations and actively concealed adverse information about Vioxx at a time when the Defendant knew, or should have known, that Vioxx had defects, dangers, and characteristics that were other than what Defendant Merck had represented to Plaintiffs and the health care industry generally. Specifically, Merck misrepresented to and/or actively concealed from Plaintiffs and the health care industry and consuming public that:

a.   Vioxx had statistically significant increases in cardiovascular side effects, including myocardial infarction, stroke and sudden onset death, as identified herein which could result in serious injury or death;

b.   There had been insufficient and/or company-spun studies regarding the safety and efficacy of Vioxx before and after its product launch;

c.   Vioxx was not fully and adequately tested for the cardiovascular side effects;

d.   Other testing and studies showed the risk of or actual serious adverse risks; and/or

e.   There was a greatly increased risk of such cardiovascular events and death; and there was a confirmed mechanism by which these thrombotic or cardiovascular events occurred as reported in the scientific literature.

5.32   The misrepresentations and/or active concealment alleged were perpetuated directly and/or indirectly by Defendant. Defendant Merck knew or should have known that these representations were false and made the representations with the

intent or purpose that Plaintiffs and the health care industry would rely on them, leading to the use of Vioxx. At the time of Defendant's fraudulent misrepresentations, Plaintiffs and the health care industry were unaware of the falsity of the statements being made and believed them to be true. Plaintiffs had no knowledge of the information concealed and/or suppressed by Merck. Plaintiffs justifiably relied on and/or were induced by the misrepresentations and/or active concealment and relied on the absence of safety information, which Defendant Merck did suppress, conceal or failed to disclose to Plaintiffs' detriment.

5.33   Defendant Merck had a post-sale duty to warn Plaintiffs and the public about the potential risks and complications associated with Vioxx in a timely manner. The misrepresentations and active fraudulent concealment by the Defendant constitutes a continuing tort against Plaintiff, who ingested Vioxx. Defendant made the misrepresentations and actively concealed information about the defects and dangers of Vioxx with the intention and specific desire that Plaintiffs, health care professionals and the consuming public would rely on such or the absence of information in selecting Vioxx as treatment.

5.34   As a direct and proximate result of the fraudulent acts and omissions, suppression and misrepresentation of Defendant, Plaintiffs suffered significant and ongoing injuries and damages.

I.   **Res Ipsa Loquitur - Merck**

5.35   Plaintiffs restate each and every preceding allegation of this Complaint and incorporate each by reference as though set forth in full herein.

5.36   Merck owed a duty to Plaintiffs to exercise due care in the design, testing and/or marketing of Vioxx.  The design, testing and/or marketing of Vioxx was in the exclusive control of Merck at the time of the injuries complained of herein.  There was no opportunity for the character of the Vioxx in question to have been changed after leaving Merck's possession.  The character of the occurrence giving rise to Plaintiffs' injuries and this action are such that they, in the ordinary course of events, would not have occurred had Merck used proper care in the design, testing and/or marketing of Vioxx.  Defendant Merck's failure to use proper care as stated herein was the proximate cause of Plaintiffs' injuries and damages.

**J.    Negligence – Lokendra B. Sahgal, M.D./Massillon Community Hospital and Rudy P. Zarate, M.D.**

5.37   Plaintiffs restate each and every preceding allegation of this Complaint and incorporate each by reference as though set forth in full herein.

5.38   Defendants Lokendra B. Sahgal, M.D., individually and as an employee of Massillon Community Hospital, and Rudy P. Zarate, M.D. owed a duty to Plaintiffs to exercise reasonable care in the distribution and prescription of Vioxx.  Defendants failed to exercise reasonable care in distributing and prescribing a chronic daily dose of 50 mg of Vioxx after April of 2002 because as prescribed, it was capable of causing serious personal injuries and damages such as those suffered by Plaintiffs during foreseeable use. Defendants were warned of the risk of harm not only directly from Merck, but also from readily available medical literature and Defendants Sahgal, Massillon and Zarate failed to understand the inherent danger of prescribing Vioxx for such a prolonged period of time as such a high dose.

5.39   Defendants Lokendra B. Sahgal, M.D., Massillon Community Hospital and Rudy P. Zarate were negligent in their actions, misrepresentations and omissions toward Plaintiffs in that Defendants:

        a.    Prescribed daily doses of 50 mg of Vioxx after Merck's April 2002 letter;

        b.    Failed to disclose and warn Plaintiff William Jeffries that Vioxx should not be used in doses over 25 mg for long periods;

        c.    Failed to disclose and warn Plaintiff William Jeffries that use of Vioxx carried a risk of cardiovascular thrombotic events and death.

5.40   Defendants' failure to exercise reasonable care in the distribution and prescription of Vioxx was a proximate cause of Plaintiffs' injuries and damages.

**K.   Fraud – Lokendra B. Sahgal, M.D./Massillon Community Hospital and Rudy P. Zarate, M.D.**

5.41   Plaintiffs restate each and every preceding allegation of this Complaint and incorporate each by reference as though set forth in full herein.

5.42   Defendants Lokendra B. Sahgal, M.D., Massillon Community Hospital and Rudy P. Zarate, M.D. committed fraud by misrepresenting to the Plaintiffs the safety and/or effectiveness of Vioxx and/or fraudulently, intentionally, and/or negligently concealing material information, including adverse information regarding the safety and effectiveness of Vioxx.

5.43   Specifically, Defendants Sahgal, Massillon and Zarate misrepresented to Plaintiffs the safety and effectiveness of a chronic daily 50 mg dose of Vioxx. This misrepresentation was made with knowledge, at least after April of 2002, that it was false or was made recklessly without knowledge that it was true and was made as a positive

assertion. This misrepresentation was made with the intent that Plaintiffs act upon it and rely on the doctors' advice without seeking alternate treatment modes. Plaintiffs had no knowledge of the information concealed and/or suppressed by Defendants. Plaintiffs justifiably relied on and/or were induced by the misrepresentations and/or active concealment and relied on the absence of safety information, which Defendants did suppress, conceal or failed to disclose to Plaintiffs' detriment.

5.44    As a direct and proximate result of the fraudulent acts and omissions, suppression and misrepresentation of Defendants, Plaintiffs suffered significant and ongoing injuries and damages.

**L.      Punitive Damages**

5.45    Plaintiffs restate each and every preceding allegation of this Complaint and incorporate each by reference as though set forth in full herein.

5.46    Merck, Sahgal, Massillon and Zarate knew or ought to have known, in the light of the surrounding circumstances, that their conduct would naturally and probably result in serious harm and that they continued the conduct with flagrant disregard for the safety of persons such as the Plaintiffs. Additionally, Defendants Merck, Sahgal, Massillon and Zarate fraudulently and maliciously pursued a course of conduct for the purpose of injury and damage in order to benefit financially and gain a larger market share. Therefore, Plaintiffs are entitled to recover judgment against Defendants for punitive damages.

5.47    As a direct and proximate result of Defendants' acts and omissions as set out herein, Plaintiffs sustained serious and permanent injuries.

## VI.    Damages

6.01    As a producing and proximate result of the above-described acts and omissions of Defendant Merck, Lokendra B. Sahgal, M.D., Massillon Community Hospital and Rudy P. Zarate, M.D., Plaintiffs William Jeffries and Shirley Jeffries have suffered and will continue to suffer significant economic losses and other injuries resulting in the following actual damages in an amount greatly exceeding the minimal jurisdictional limits of this Court:

**William Jeffries**

(1)    Reasonable and necessary medical expenses incurred in the past;

(2)    Reasonable and necessary medical expenses reasonably likely to be incurred in the future;

(3)    Conscious physical pain and suffering experienced in the past;

(4)    Conscious physical pain and suffering reasonably likely to be experienced in the future;

(5)    Mental anguish in the past;

(6)    Mental anguish likely to be experienced in the future;

(7)    Physical disfigurement in the past;

(8)    Physical disfigurement likely to be experienced in the future;

(9)    Physical impairment in the past;

(10)    Physical impairment likely to be experienced in the future;

(11)    Pre and post-judgment interest at the lawful rate;

(12)    Punitive damages;

(13)    Attorney fees;

(14)  Reimbursement for the sale price of the product;

(15)  Inconvenience associated with filing suit; and

(16)  Such other applicable damages as the Court deems appropriate.

**Shirley Jeffries**

(1)  Mental anguish in the past;

(2)  Mental anguish likely to be experienced in the future;

(3)  Loss of consortium in the past;

(4)  Loss of consortium likely to be experienced in the future;

(5)  Pre and post-judgment interest at the lawful rate;

(6)  Punitive damages;

(7)  Attorney fees;

(8)  Reimbursement for the sale price of the product;

(9)  Inconvenience associated with filing suit; and

(10)  Such other applicable damages as the Court deems appropriate.

## VII.   Discovery Rule

7.01   Plaintiffs brings this suit within one (1) year of discovering their Vioxx-related conditions, or the existence of any Vioxx-related causes of action.

## VIII.   Prayer For Relief

WHEREFORE, Plaintiffs William Jeffries and Shirley Jeffries pray Defendants Merck, Lokendra B. Sahgal, M.D., Massillon Community Hospital and Rudy P. Zarate, M.D. be cited according to law to appear and answer herein, and that after final trial for judgment as follows:

That Plaintiffs have and recover from Defendants judgment for their general and special damages described above and in the full amount allowed by law and punitive damages; that Plaintiffs recover their costs of suit; that Plaintiffs receive pre-judgment and post-judgment interest at the highest rate allowed by law; and that Plaintiffs receive such other and further relief, at law or in equity, to which they may show themselves justly entitled.

Respectfully submitted,

LANCIONE & LANCIONE, P.L.L.
JOHN A. LANCIONE, #0040202
200 Public Square, Suite 2945
Cleveland, Ohio 44114
Phone: (216) 623-4949
Fax: (216) 623-3975
Email: jal@lancionelaw.com

MORGAN & WEISBROD, L.L.P.
LES WEISBROD
Texas State Bar No. 21104900
ALEXANDRA V. BOONE
Texas State Bar No. 00795259
11551 Forest Central Drive, Suite 300
Dallas, Texas 75243
Phone: (214) 373-3761
Fax: (214) 739-4732

**ATTORNEYS FOR THE PLAINTIFFS**

**JURY DEMAND**

Plaintiff demands that all issues of fact in this case be tried to a properly impaneled jury.

**Plaintiffs' Original Petition**
186248

**Page 29**

STATE OF OHIO

WILLIAM JEFFRIES AND SHIRLEY   :
JEFFRIES
            PLAINTIFFS      :

                       :

v.                        :     Cause:_____

                       :

MERCK AND CO., INC.; LOKENDRA B.   :
SAHGAL, M.D. AND RUDY P. ZARATE, M.D.  :
            DEFENDANTS      :
...........................................................................:

## AFFIDAVIT OF MERIT

I, Richard Townsend, M.D., having been first sworn on oath depose and state as follows:

    1.    I have reviewed all the medical records reasonably available to the Plaintiffs concerning the allegations complained of in the complaint. Specifically this includes the records of Dr. Sahgal, Dr. Zarate, Caremark, Aultman Hospital and Masilion Community Hospital.

    2.    I am familiar with the applicable standard of care as it applies to the Defendants Lokendra B. Sahgal, M.D. and Rudy P. Zarate, M.D., in the above-captioned case. I am a physician specializing in family medicine and am a Fellow of the American Academy of Family Physicians. I was first licensed to practice medicine in 1972 in Ontario, Canada and became licensed to practice medicine in the State of Texas in 1978. I have been actively practicing in the State of Texas since that time and during all times pertinent to the care of William Jeffries. I regularly care for patients similar to Mr. Jeffries and am familiar with the standards of care applicable to caring for such patients

during all times relevant to this case. I am also familiar with the standard of care applicable to physicians practicing in family medicine during all times relevant to this case.

3.    It is my opinion the standard of care was breached by the Defendants Lokendra B. Sahgal, M.D. and Rudy P. Zarate, M.D. in this case and the breach caused injury to Mr. Jeffries. Specifically, the standard of care required that 50 mg Vioxx not be prescribed on a long-term basis due to an elevated risk of serious cardiovascular thrombotic events such as myocardial infarction. Based on a review of the medical records and the correspondence released by Merck & Co., Inc., Drs. Lokendra B. Sahgal and Rudy P. Zarate were negligent and deviated from the accepted standard of care when they respectively repeatedly prescribed 50 mg Vioxx to Mr. Jeffries after the release of information from the drug's manufacturer advising against this dosage level. Mr. Jeffries suffered from a myocardial infarction which is precisely the type of injury warned against. In my opinion, based on a reasonable degree of medical certainty, Drs. Sahgal and Zarate clearly deviated from the accepted standard of care by continuing to prescribe 50 mg of Vioxx daily and that this deviation from the standard of care was a proximate cause of the myocardial infarction suffered by William Jeffries.

Further Affiant sayeth not.

_____
Richard Townsend, M.D.

**STATE OF TEXAS**

**COUNTY OF DALLAS**

Subscribed and sworn to before me on this the _26th_ day of September, 2005

_____
Notary Public, State of Texas

DANA L. MANNING
Notary Public, State of Texas
My Commission Expires
AUGUST 19, 2007

**Affidavit of Merit**
186681

**Page 3**