UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | JUDGE FALLON |
| This document relates to<br>Case No. 06-0810 | * | |
| CHARLES L. MASON, | * | MAGISTRATE JUDGE<br>KNOWLES |
| Plaintiff, | * | |
| v. | * | |
| MERCK & CO., INC., | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### OPPOSITION OF MERCK & CO., INC. ("MERCK") TO PLAINTIFF'S MOTION TO EXCLUDE OR, IN THE ALTERNATIVE, MOTION IN *LIMINE* RE: THE APRIL 6, 2005 FDA MEMORANDUM

**(MOTION IN *LIMINE* NO. 7)**

The FDA has concluded, based on a careful review of all of the existing data concerning all NSAIDs – including COX-2 inhibitors such as Vioxx® – that those data are best interpreted as being consistent with a "class effect" of a long-term increased risk of adverse cardiovascular events for *all* NSAIDs.  That conclusion is scientifically reliable, and it is relevant to this case. Plaintiff nonetheless "urges the Court to exclude the FDA's April 6, 2005 Memorandum as well as all evidence and/or argument that the FDA has concluded that there is a 'class effect' of increased cardiovascular risks for all NSAIDs." (Pl.'s Mot. at 8.)  As the Court has already found on several occasions, the FDA's conclusion is scientifically reliable and relevant to this case.  The only "new" argument that plaintiff makes in this motion is that recent scientific

articles "disprove" the class effect theory. (*Id*. at 6-8.) These articles, however, do not support plaintiff's position. For the reasons stated below, the Court should deny plaintiff's request for reconsideration and should admit this evidence as it did in *Plunkett I*, *Plunkett II*, *Barnett,* and *Smith*.

I.  THE APRIL 6, 2005 FDA MEMORANDUM, INCLUDING ITS CONCLUSIONS ABOUT A "CLASS EFFECT" OF ALL NSAIDS, IS RELEVANT, RELIABLE, AND ADMISSIBLE FOR ITS TRUTH.

   A.  Plaintiff Concedes that the FDA Memorandum is Admissible by Failing to Challenge a Majority of its Relevant Conclusions.

The April 6, 2005 FDA Memorandum contains relevant and reliable conclusions other than the *one* conclusion plaintiff challenges. It more broadly contains all of the FDA's conclusions based on a "thorough review of the available data . . . regarding currently approved COX-2 selective and non-selective non-steroidal anti-inflammatory drugs (NSAIDs) and the risk of adverse cardiovascular (CV) events." (April 6, 2005 FDA Memorandum ("FDA Memorandum" or "Memorandum") at 1, attached hereto as Ex. A.) The Memorandum is the FDA's analysis of the best available science on NSAIDs, including selective COX-2 inhibitors. It was issued after the FDA convened a three-day Advisory Committee hearing in which outside experts in the fields of rheumatology, cardiology, epidemiology, pharmacology, ethics, risk-benefit analysis, drug safety, and biostatistics, among others, heard and considered scientific presentations and clinical trial data on COX-2 inhibitors and nonselective NSAIDs.

The FDA Memorandum contains many conclusions, only one of which plaintiff challenges in his motion. To take only some examples, the Memorandum concludes that:

- There is a "class effect" for all NSAIDs. (FDA Memorandum at 1 ("Data from large long-term controlled clinical trials that have included a comparison of COX-2 selective and non-selective NSAIDs do not clearly demonstrate that the COX-2 selective agents confer a greater risk of serious adverse CV events than non-selective NSAIDs"); *id*. at 2 ("the available data are *best interpreted* as being consistent with a class effect of an increased risk of serious adverse

2

CV events for COX-2 selective and non-selective NSAIDs" (emphasis added)); *id.* at 10 (listing studies); *id.* ("We also believe that it is not possible to conclude at this point that the COX-2 selective drugs confer *an increased risk* over non-selective NSAIDs in chronic use.").)

- *All* prescription NSAIDs should require "black box" CV warnings. (FDA Memorandum at 2 ("The professional labeling for all prescription NSAIDs should be revised to include a boxed warning highlighting the potential increased risk of serious adverse CV events.").)

- There are "serious questions" about the FitzGerald hypothesis. (FDA Memorandum at 8 ("Taken together, these observations raise serious questions about the so-called 'COX-2 hypothesis,' which suggests that COX-2 selectivity contributes to increased CV risk.").)

- Short-term ingestion of Vioxx does not increase a patient's risk of having a heart attack. (FDA Memorandum at 2 ("Short-term use of NSAIDs to relieve acute pain, particularly at low doses, does not appear to confer an increased risk of serious adverse CV events (with the exception of valdecoxib in hospitalized patients immediately post-operative from coronary bypass (CABG) surgery)"); *id.* at 13 ("Further, with the exception of the parecoxib/valdecoxib CABG studies, the increased risk of serious adverse CV events in the controlled clinical trials described above have only become apparent after months to years of treatment.").)

- Vioxx, and Vioxx alone, has been shown to have clinically significant GI benefits. (FDA Memorandum at 2 ("The three approved COX-2 selective drugs reduce the incidence of GI ulcers visualized at endoscopy compared to certain non-selective NSAIDs. Only rofecoxib has been shown to reduce the risk of serious GI bleeding compared to a non-selective NSAID (naproxen) following chronic use."); *id.* at 11-12 ("Improved GI tolerability of NSAIDs is an important issue from an individual patient and public health perspective and is, at least in part, a valid rationale for maintaining a range of options in the NSAID class from which physicians and patients may choose.").)

Plaintiff does not expressly challenge the admissibility of *any* of the FDA Memorandum's conclusions other than the first one. For obvious reasons, the Memorandum's other conclusions are relevant at trial. There is, therefore, no question whether the document is itself admissible. Rather, the only question is whether the FDA's conclusion concerning the "class effect" of all NSAIDs is admissible. For many reasons, it is.

3

B.      The "Class Effect" Conclusion is Relevant.

Plaintiff is wrong to suggest that the FDA Memorandum is irrelevant. (Pl.'s Mot. at 2.) The comparative safety of Vioxx to other NSAIDs is directly relevant to his claim that Vioxx was defectively designed. Merck is entitled to respond to plaintiff's allegation that Vioxx increased his risk of an adverse event compared to other NSAIDs, including by introducing evidence that plaintiff's claim is diametrically opposed to the analysis and findings of the FDA.

The FDA Memorandum is also relevant to issues of medical causation. The FDA has concluded that there are "serious questions" about the "FitzGerald hypothesis" that selective COX-2 inhibition contributes to cardiovascular risk. (FDA Memorandum at 8.) Plaintiff's experts have opined that Vioxx increased Mr. Mason's risk of experiencing a cardiovascular event by selectively inhibiting COX-2, and they have speculated that the "COX-2" or "FitzGerald" hypothesis is the biological mechanism by which that may have occurred. The FDA Memorandum directly undercuts that speculation, as it observes that the available data – which has failed to detect a difference in cardiovascular risk between selective and non-selective NSAIDs, and has not shown a reduced risk when COX-2s are combined with low-dose aspirin – "raise serious questions about the so called 'COX-2 hypothesis.'" (*Id.*)

Finally, the FDA's conclusion from the scientific data that there may be a "class effect" common to all NSAIDs and that warning labels should be modified accordingly is also relevant to whether Mr. Mason's physicians would have prescribed something other than Vioxx given his need for pain relief. The existence of a possible "class effect" means that a cardiovascular risk warning for Vioxx may not have differed materially from the warning the FDA now believes should have appeared on alternative pain medications. This evidence seriously undermines

plaintiff's suggestion that his prescribing physician would not have prescribed Vioxx had it carried a different warning.

        **C.**       **The "Class Effect" Conclusion is Evident and Reliable.**

Plaintiff's two contentions are that the FDA Memorandum does not, in fact, conclude that there is a class effect, and that, even if it did, that conclusion would be unreliable and hence inadmissible under Rule 403 of the Federal Rules of Evidence.

Plaintiff's first contention is demonstrably false. Although the FDA Memorandum does indicate the need for further study – including the need for long-term clinical trials concerning NSAIDs other than Vioxx – it unambiguously concludes that:

> Data from large long-term controlled clinical trials that have included a comparison of COX-2 selective and non-selective NSAIDs do not clearly demonstrate that the COX-2 selective agents confer a greater risk of serious adverse CV events than non-selective NSAIDs.
>
> and
>
> Pending the availability of additional long-term controlled clinical trial data, *the available data are best interpreted as being consistent with a class effect of an increased risk of serious adverse CV events for COX-2 selective and non-selective NSAIDs.*

(FDA Memorandum at 1-2 (emphasis added).) That is without any serious question the conclusion of the Memorandum.

In any event, plaintiff's argument about what the actual "conclusions" of the FDA Memorandum are goes to the weight, not the admissibility, of the document. Plaintiff is free to argue at trial that language elsewhere in the FDA Memorandum somehow qualifies its conclusion about the "best interpret[ation]" of the "available data," but he offers no persuasive grounds for excluding the document itself on the basis of that purportedly qualifying language.

5

Plaintiff's more sustained argument is that, in any event, the FDA Memorandum's conclusions about a "class effect" are not sufficiently reliable. Plaintiff's view is that the Memorandum acknowledges that the "FDA lacks data" to draw that conclusion, and that the FDA was under "intense public and government scrutiny" at the time it created the document. (Pl.'s Mot. at 2.) Plaintiff argues that, for those reasons, the FDA Memorandum should be excluded under Rule 403 of the Federal Rules of Evidence. (*Id.* at 6-7.) Plaintiff is wrong.

The relevant rule of evidence governing the admissibility of the FDA Memorandum, which plaintiff barely mentions, is Rule 803(8). That rule provides that "public records or reports" of a public agency are admissible for their truth if, *inter alia*, they set forth "(A) the activities of the office or agency, or . . . (C) in civil actions and proceedings . . ., factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." FED. R. EVID. 803(8).

The FDA Memorandum is clearly a "public record" under Rule 803(8). It was written by Dr. John Jenkins, the Director of the FDA's Office of New Drugs, and Dr. Paul Seligman, the Director of the FDA's Office of Pharmacoepidemiology and Statistical Science. It was released through the Acting Director of the FDA's Center for Drug Evaluation and Research ("CDER"), Dr. Steven Galson. CDER is charged with carrying out the FDA's mandate to decide the safety and efficacy of prescription drugs.[1] Staff from the following FDA entities participated in the CDER decision-making process: the Office of New Drugs, the Office of Drug Safety, the Office of Pharmacoepidemiology and Statistical Science, the Office of Medical Policy,

---

[1] *See* FDA, *Improving Public Health: Promoting Safe and Effective Drug Use*, http://www.fda.gov/opacom/factsheets/justthefacts/3cder.html (last visited Oct. 3, 2006); *see generally* 21 U.S.C. § 393(b) (2006).

6

the Office of Regulatory Policy, and the Office of the Center Director. (*See* FDA Memorandum at 3.)

Moreover, the FDA has taken steps to make certain that the contents of the Memorandum are widely disseminated. The document is posted as a "Decision Memo" on the FDA's website. *See* http://www.fda.gov/cder/drug/infopage/COX2/NSAIDdecisionMemo.pdf. On April 7, 2005, the FDA issued a press release summarizing the recommendations made and actions taken in accordance with the Memorandum. *See* FDA News, dated April 7, 2005, http//www.fda.gov/bbs/topics/news/2005/NEW01171.html. The FDA also issued a Public Health Advisory, reiterating in abbreviated fashion the recommendations of the Decision Memorandum. *See* http://www.fda.gov/cder/drug/advisory/COX2.htm. In accordance with the FDA Memorandum, the FDA has sent letters to sponsors of all NSAIDs, both prescription and non-prescription, requesting that they make labeling changes designed to provide more specific cardiovascular warnings and information about their products.

Courts have routinely admitted as "public records" FDA or other public agency documents with the attributes of the FDA Memorandum. In *Sabel v. Mead Johnson & Co.*, 737 F. Supp. 135 (D.C. Mass. 1990), for example, the court determined that a letter to a manufacturer from the Director of the FDA's Division of Neuropharmacological Drug Products that recommended inclusion of a boxed warning in a drug's labeling qualified as a public record under Federal Rule of Evidence 803(c)(8). *Sabel*, 737 F. Supp. at 141. The district court noted that "it [made] no difference that the underlying data was collected by and received from an

7

outside party, as long as the information was reliable." *Id.* at 142.  The court also relied on the fact that the recommendation was a final opinion of the FDA rather than a tentative conclusion of the letter's author alone. *Id.*[2]  Similarly, in *Kehm v. Procter & Gamble Mfg. Co.,* 724 F.2d 613 (8th Cir. 1983), the Court of Appeals held that a Center for Disease Control report concerning studies of toxic shock syndrome was properly admitted as a public record despite the fact that the findings of that report "tend[ed] towards the conclusory rather than the factual end." *Id.* at 618-20; *see also Coates v. AC & S, Inc.,* 844 F. Supp. 1126, 1133-34 (E.D. La. 1994) (admitting as public records OSHA and EPA reports setting forth findings on effects of asbestos exposure; finding agencies had no interest in the litigation and were charged by law with responsibility of monitoring toxic substances); *In re Orthopedic Bone Screw Prods. Liab. Litig.,* No. MDL 1014, 1998 WL 964495, at *2 (E.D. Pa. Nov. 3, 1998) (suggesting that FDA review of orthopedic Cohort Study would be public record).

Because the FDA Memorandum qualifies as a public record, it is presumptively admissible unless plaintiff can establish that it is untrustworthy.  This is so even for reports, such as the Decision Memorandum, which "evaluat[e]" facts to draw a conclusion. *See, e.g., Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1305 (5th Cir. 1991) (because "[t]he Advisory

---

[2] By contrast, informal, unofficial or preliminary statements by FDA employees that do not qualify as public records include FDA Warning Letters or Untitled Letters.  The FDA's own procedures manual recognizes these letters as informal and advisory. *See* Regulatory Procedures Manual, Chapter 4, Advisory Actions, Section 4-1-1, *available at* http://www.fda.gov/ora/compliance_ref/rpm/pdf/ch4.pdf.  Moreover, courts have acknowledged that they do not constitute final agency action. *See Summit Tech., Inc. v. High-Line Med. Instruments Co.*, 933 F. Supp. 918, 934 n.9 (C.D. Cal. 1996) ("FDA regulatory warning letters do not constitute final agency action" and therefore do not reflect a final conclusion of wrongdoing).  Additionally, any internal communication between agency employees, initial reports by agency employees, or statements made by employees outside the scope of their employment do not rise to the level of an official communication of the agency.  All of these examples are in contrast to the official, formal FDA Memorandum.

Committee assumes admissibility of 803(8)(C) reports in the first instance . . . evaluative reports are presumed not to be excluded under the hearsay rule"). Here, plaintiff's only argument is that the FDA Memorandum is untrustworthy because its conclusion is based on a "logical fallacy." (Pl.'s Mot. at 8.) Based on this argument, plaintiff cannot overcome the presumption of admissibility.

First, a challenge to the *conclusion* of a public record is *not*, under any circumstances, a valid basis for excluding that record on the grounds that the record is not "trustworthy." *See Moss*, 933 F.2d at 1307-08 (reversing magistrate's exclusion of public record in case in which magistrate disagreed with conclusions of the report). To the contrary, the Fifth Circuit Court of Appeals has made clear that challenges to the conclusions of a public record go to the weight, not the admissibility, of the evidence. *See id.* (holding that, because "reliability is not a matter of [the] credibility" of a conclusion, "courts should not focus on questions regarding the *accuracy or completeness of the document's conclusions*" (emphasis added)). For that reason, plaintiff cannot even make the threshold showing required to invoke the "trustworthiness" language of Rule 803(8)(C).[3]

Second, even if plaintiff's disagreement with the Memorandum's conclusions were a valid basis for invoking Rule 803(8)(C) – which it is not – plaintiff is wrong that the FDA "erred" in reaching its conclusions. The Memorandum is based on a *"thorough review of the available data* . . . regarding currently approved COX-2 selective and non-selective non-steroidal

---

[3] Indeed, plaintiff is simply wrong to argue that, because the data are in some ways inconclusive, the FDA's conclusions must be incorrect. The jury is entitled to hear the FDA's conclusions and make its own judgments about them. Without question, the Memorandum notes the need for additional clinical trials assessing the risks posed by NSAIDs. But that simply does not mean that the conclusions it reaches – "following a thorough review of the available data," (FDA Memorandum at 1) – lack sufficient reliability to be admissible.

9

anti-inflammatory drugs (NSAIDs) and the risk of adverse cardiovascular (CV) events." (FDA Memorandum at 1 (emphasis added).) It describes the large body of data the expert advisory panel reviewed in reaching its conclusions. For example, the Memorandum states that "new data prompted the agency to conduct a comprehensive review of the available data," and that "CDER [the FDA's Center for Drug Evaluation and Research] conducted a thorough internal review of the available data regarding cardiovascular (CV) safety issues for COX-2 selective and non-selective non-steroidal anti-inflammatory drugs (NSAIDs)." (*Id.* at 3.) The participants in the CDER review included staff from the Division of Anti-Inflammatory Analgesic and Ophthalmologic Drug Products, the Division of Over-the Counter Drug Products, the Offices of Drug Evaluation II and V, the Office of New Drugs, the Office of Drug Safety, the Office of Biostatistics, the Office of Pharmacoepidemiology and Statistical Science, the Office of Medical Policy, the Office of Regulatory Policy, and the Office of the Center Director. (*Id.*) This group's comprehensive review drew on materials from a wide range of sources:

> [T]he regulatory histories and the NDA [New Drug Application] and postmarketing databases of the various NSAIDs, FDA and sponsor background documents prepared for the Advisory Committee meeting, all materials and data submitted by other stakeholders to the Advisory Committee meeting, presentations made at the Advisory Committee meeting, the discussions held by the Committee members during the meeting, and the specific votes and recommendations made by the joint Committee.

(*Id.* at 3-4.) The Memorandum itself analyzes the results of numerous clinical trials and epidemiological studies concerning various NSAIDs that the Advisory Committee reviewed in reaching its conclusion regarding a "class effect." For example, the Advisory Committee reviewed data from a placebo-controlled clinical trial designed to determine whether Celebrex® (celecoxib), another COX-2 inhibitor, could prevent colorectal adenoma. The study, which also examined cardiovascular endpoints in over 2,000 patients, found that persons on a long-term

10

regimen of 400 milligrams Celebrex twice daily had a statistically significant increased risk of death from cardiovascular causes compared to placebo.[4]  Notably, however, the Kaplan-Meier curve for composite cardiovascular deaths did not separate from placebo, much less become statistically significant, until well after six months of use.[5]

In addition to the comprehensive review of the scientific data evident from the document itself, the facts surrounding the creation, purpose, and use of the FDA Memorandum provide additional assurance of its scientific reliability.  Dr. Lisa Rarick, an expert in regulatory affairs who spent 15 years at the FDA before retiring in 2003, testified in another Vioxx matter that the FDA Memorandum's findings were created, reviewed, and agreed to by the pertinent regulators at the Agency and that, based on those findings, the FDA took several regulatory actions.  Dr. Rarick noted that the two authors of the FDA Memorandum, Dr. Jenkins (Director of the Office of New Drugs) and Dr. Seligman (Director of the Office of Pharmacoepidemiology and Statistical Science), are responsible for the approval of new drugs and post-marketing monitoring of safety concerns, respectively.  (Oct. 21, 2005 Tr. in *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed Aug. 19, 2003) ("Rarick *Humeston* Test.") at 5026:15-5027:5, attached hereto as Ex. B.)  Additionally, the Memorandum was published through their supervisor, Dr. Steven Galson, the Acting Director of the Center for Drug Evaluation and Research, who had to review and endorse its findings.  (FDA Memorandum at 1; Rarick *Humeston* Test. at 5028:3-13.)  Nor is there any doubt that the Memorandum represented a final decision setting forth the FDA's official position on these issues.  (Rarick *Humeston* Test. at 5040:22-5041:8, 5054:4-7.)  As

---

[4] *See* Solomon et al., *Cardiovascular Risk Associated With Celecoxib in a Clinical Trial for Colorectal Adenoma Prevention,* N. ENGL. J. MED. 2005:352:1-10; FDA Memorandum at 4.

[5] Solomon *et al.*, at 7.

11

noted above, the FDA's own website, where the FDA published the Memorandum shortly after issuing it, refers to it as a "Decision Memo." *See* http://www.fda.gov/cder/drug/infopage/cox2/.

It also bears noting that the FDA believed the findings and conclusions described in its Memorandum were sufficiently reliable to warrant significant regulatory action. As the FDA website describes, in the wake of the Advisory Committee meeting and Memorandum:

> The Food and Drug Administration (FDA) has issued supplemental request letters to sponsors of all non-steroidal anti-inflammatory drugs (NSAID) requesting that they make labeling changes to their products. These letters include recommended proposed labeling for both the prescription and over-the-counter (OTC) NSAIDs and a medication guide for the entire class of prescription products.
> . . . .
> Manufacturers of **non-prescription** (over-the-counter) NSAIDs are being asked to revise their labeling to provide more specific information about the potential CV and GI risks of their individual products and remind patients of the limited dose and duration of treatment of these products in accordance with the package instructions.

*See* FDA, *COX-2 Selective (includes Bextra, Celebrex, and Vioxx) and Non-Selective Non-Steroidal Anti-Inflammatory Drugs (NSAIDs)*, http://www.fda.gov/cder/drug/infopage/cox2 (emphasis in original) (last visited Oct. 3, 2006); (*see also* Rarick *Humeston* Test. at 5038:21-5039:20.) The FDA would not have taken these actions on *all NSAIDs* if it did not believe that its analysis, findings, and conclusions were based on reliable scientific evidence. Indeed, the Medication Guide that the FDA created to accompany prescription NSAIDs, which was based on the Advisory Committee's work, is required by law to be "scientifically accurate." *See* 21 C.F.R. § 208.20(a)(2) (2006); (Rarick *Humeston* Test. at 5057:13-16, 5099:16-5100:2.)

Plaintiff cites no precedent holding that a finding or conclusion by a government agency charged by Congress with making that assessment is inadmissible or unreliable because it is not absolute or is based only on "available" data. (*See* Pl.'s Mot. at 3-5.) Indeed, any such argument would defy common sense, as all properly-derived scientific conclusions are based on currently

known facts. Here, the FDA has published its conclusion that the best available interpretation of the scientific data is that a "class effect" exists both among COX-2 inhibitors and between COX-2 inhibitors and NSAIDs generally, and that this conclusion is sufficiently reliable to institute significant regulatory change.

Finally, plaintiff's assertion that the document is inadmissible because the FDA was under "enormous pressure" at the time is equally misplaced. (Pl.'s Mot. at 5.) Public agencies are often under "enormous pressure" when they create public records. But that does not mean that a "public record" within the meaning of Rule 803(8) becomes something else whenever a private party in litigation asserts that the pertinent agency was under political pressure to create it. Indeed, plaintiff's argument to that effect is literally unprecedented – there is no case cited in plaintiff's papers (nor is Merck aware of any such case) holding that the mere allegation of "pressure" calls into question the "public record" status of a document otherwise falling within the scope of the exception. *See* FED. R. EVID. 803(8). In any event, as noted above, the Memorandum is the result of rigorous review of all the relevant data by scores of scientists, and its conclusions cannot be ignored simply because plaintiff believes the FDA was under political pressure to reach them.

      **D.**      **The Two Recent *JAMA* Articles Plaintiff Cites Do Not "Disprove" The "Class Effect" Hypothesis Or Otherwise Support Plaintiff's Position.**

Plaintiff misrepresents both the relevance and the import of two articles regarding NSAIDs published recently in the *Journal of the American Medical Association* (*JAMA*). Contrary to plaintiff's claim that these articles "disprove" the theory that NSAIDs have a class effect, nothing in these articles supports that conclusion. (Pl.'s Mot. at 6.) Even if these articles did support that conclusion, the exclusion of the FDA's careful analysis of the issue is not warranted.

The McGettigan article adds virtually nothing to the analysis; it does not present new research, new science, or new experiments.[6] In fact, it is nothing more than a review of existing observational studies by two authors who admit that they did not agree on their conclusions but instead resolved any "disagreements" between them "by consensus."[7] As the Court is aware, observational studies themselves have many inherent limitations not found, for example, in clinical trials. Moreover, the McGettigan article does not, as plaintiff claims, "clearly reject[] the class effect hypothesis." (Pl.'s Mot. at 7.) The article reported significant increased risks associated with the nonselective NSAIDs indomethacin and diclofenac at a level similar to that of Vioxx and an increased risk for the category "any/other NSAIDs."[8] This is *consistent* with a "class effect" for all NSAIDs.

The second article plaintiff points to, the Zhang article,[9] also does not support his position. In fact, the article has *no* relevance to this case because it is limited to an evaluation of the effects of COX-2 inhibitors on renal events and arrhythmias. Thus, the article sheds no light on the effect of COX-2 inhibitors on thrombotic cardiovascular events – the only cardiac event at issue in this case. Even if it were relevant, however, the Zhang article does not support plaintiff's argument that the FDA Memorandum should be excluded, because the article's conclusions are skewed by improper method. For example, it did not analyze data for the 25

---

[6] *See*, McGettigan, P., Henry, D., *Cardiovascular Risks and Inhibition of Cyclooxygenase: A Systematic Review of the Observational Studies and Nonselective Inhibitors of Cyclooxygenase 2*, *JAMA* 2006; 296:13.

[7] *Id.*

[8] *Id.*

[9] *See*, Zhang et al., *Adverse Effects of Cyclooxygenase 2 Inhibitors on Renal and Arrhythmia Events: Meta-analysis of Randomized Trials*, *JAMA* 2006; 296:13.

milligram dose, the only dose at issue in this case, independently.[10] Instead, the authors only state that, because Vioxx studies involved 50, 25, and 12.5 milligram doses, the median dose, *i.e.* the dose in the middle, is 25 milligrams. By combining data at different doses, the authors violate the first rule of toxicology, that exposure – *i.e.*, dose and duration – is paramount.[11] Moreover, when analyzing the duration of the various studies, the authors use median duration, *i.e.* the duration in which half the studies were longer and half the studies were shorter, rather than the average duration of the trials.[12] The skewed result is that, even though the Vioxx studies included six trials that lasted one year or more (as compared to the other groups, none of which had more than a single study lasting a year or more), the authors reported the median duration of Vioxx studies as six weeks.[13] Their conclusions are similarly skewed by the fact that the study populations "varied in their age and sex distributions."[14]

Simply put, this meta-analysis did *not* control for exposure to COX-2 inhibition or the exposed population and cannot single-handedly disprove the body of literature reviewed by the FDA. The Zhang publication represents only one way of looking at the data presented, and thus leaves many open questions as to the reliability of its conclusions – questions that the jury should decide with the benefit of all available information, including the FDA Memorandum. To exclude the agency's relevant and reliable conclusions simply because the authors of one article interpreted a set of information in a certain way and reached a certain conclusion – particularly

---

[10] *Id.*

[11] Michael J. Saks et al., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE ("Reference Manual on Scientific Evidence") at 559 (2d ed. 2005-2006).

[12] *Id.*

[13] *Id.*

[14] *Id.*

when that conclusion has nothing to do with the thrombotic cardiovascular event at issue in this case – would be to deprive the jury of the totality of information, impede the jury's truth-finding function, and unduly prejudice Merck. The Court should deny plaintiff's invitation to do so.

## II.     CONCLUSION.

For the reasons stated above, the Court should deny plaintiff's Motion to Exclude or, in the Alternative, Motion in *Limine* Re: the April 6, 2005 FDA Memorandum.


Dated: October 4, 2006                                              Respectfully submitted,


*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Tarek Ismail
Shayna Cook
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

And

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:     202-434-5029

Attorneys for Merck & Co., Inc.

17

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Motion to Exclude or, in the Alternative, Motion in *Limine* Re: the April 6, 2005 FDA Memorandum has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 4th day of October, 2006.

>  */s/ Dorothy H. Wimberly*
> Dorothy H. Wimberly, 18509
> STONE PIGMAN WALTHER
> WITTMANN L.L.C.
> 546 Carondelet Street
> New Orleans, Louisiana  70130
> Phone:  504-581-3200
> Fax:     504-581-3361
> dwimberly@stonepigman.com
>
> Defendants' Liaison Counsel