Lemuel A. Moye, M.D.

1    Q.   And at the time, was that
2  the common understanding of the medical
3  community based on your best opinion?
4    A.   Yes.
5    Q.   Otherwise, you wouldn't have
6  chosen it as a control group, right?
7    A.   That's right.
8    Q.   Any other study that you've
9  been involved with that's involved the
10 use of NSAIDs in any way?
11   A.   No.
12   Q.   Have you published on the
13 subject of COX-2 biochemistry?
14   A.   I have not.
15   Q.   Have you published on the
16 subject of the benefits of nonsteroidal
17 anti-inflammatory drugs?
18   A.   No.
19   Q.   Have you published anything
20 about the risks of nonsteroidal
21 anti-inflammatory drugs?
22   A.   No.
23   Q.   Have you had discussions
24 with any person who was the author of an

1  epidemiological study involving NSAIDs
2  about the subject of NSAIDs?
3    A.   No, I have not.
4    Q.   Do you know Dr. Wayne Ray?
5    A.   I do.
6    Q.   Are you aware that Dr. Wayne
7  Ray has published extensively on the
8  gastrointestinal risks of NSAIDs?
9    A.   Yes.  Actually, I think I
10 referred to one of his manuscripts in my
11 affidavit, Exhibit 1.
12   Q.   Have you read Dr. Ray's
13 deposition testimony?
14   A.   No, sir.
15   Q.   Have you read Dr. Ray's
16 trial testimony?
17   A.   Yes.
18   Q.   Do you know he testified
19 twice?
20   A.   I only read one.
21   Q.   Do you know which one you
22 read?
23   A.   No, sir.  I think the answer
24 might be in here.  (Indicating).

1    Q.   Okay.
2         It would be reflected in
3  Exhibit 2?
4    A.   Yes, sir.
5    Q.   So, you haven't had any
6  discussions with Wayne Ray about any
7  aspect of this case?
8    A.   That's true.
9    Q.   What about Jerry Avorn, have
10 you had any discussions with Jerry Avorn?
11   A.   No, sir.
12   Q.   Do you know David Graham?
13   A.   Not personally.  We've never
14 met.
15   Q.   Have you had any discussions
16 with him on the phone or otherwise about
17 any aspect of this case?
18   A.   No, sir.
19   Q.   What about Eric Topol?
20   A.   Not about this case, no.
21   Q.   Have you had any discussions
22 with Eric Topol about any aspect of COX-2
23 inhibitors?
24   A.   No, sir.

1    Q.   Do you know Dr. Curfman?
2    A.   Not personally, no.
3    Q.   Do you know any of the
4  editors?  Do you know Dr. Drazen?
5    A.   No, I don't.
6    Q.   Do you know any of the
7  editors who were involved in a review of
8  the VIGOR manuscript?
9    A.   No, I don't.
10   Q.   Have you had any discussion
11 with any editors about the VIGOR
12 manuscript personally?
13   A.   No.
14   Q.   Is it fair to say that you
15 do not have any knowledge, experience,
16 training, skill or education in
17 pharmaceutical product marketing?  Is
18 that correct?
19        MR. WACKER:  Object to form.
20        MR. SIZEMORE:  Objection.
21        THE WITNESS:  I don't think
22   I could agree with that.
23 BY MR. PIORKOWSKI:
24   Q.   You don't think you could

Lemuel A. Moye, M.D.

Page 102

1  agree with that?
2      A.  No, sir.
3      Q.  Have you ever worked for
4  DDMAC?
5      A.  No, sir.
6      Q.  Have you ever worked, been a
7  consultant to DDMAC?
8      A.  No.
9      Q.  Do you remember giving
10  testimony in the Rocha case in Jim Wells
11  County Texas back in 1999?
12      A.  Yes.
13      Q.  In fact, I think I was the
14  person that was examining you?
15      A.  I think you were.
16          MR. PIORKOWSKI:  Paul, I've
17      got one copy of this, but I'll let
18      you take a look at the transcript.
19          MR. SIZEMORE:  I'd like him
20      to see it before he comments.
21  BY MR. PIORKOWSKI:
22      Q.  Do you recall being asked
23  this question and giving this answer?
24          "Question:  Okay.  Now, you

Page 103

1  have no knowledge, experience, training
2  or education in pharmaceutical product
3  marketing, do you?
4          "Answer:  I think that's
5  true.  Yes."
6          MR. PIORKOWSKI:  (Handing
7      over document.)
8          MR. SIZEMORE:  Is this from
9      the trial?
10          MR. PIORKOWSKI:  Yes
11      (Witness reviewing
12      document.)
13          THE WITNESS:  I understand.
14      Sure.  I recall that's what I
15      said.  I certainly meant then and
16      mean today that I'm not an expert
17      in marketing.  There's no question
18      of that.  I'm not an expert.  But
19      I think any physician who's had
20      marketers come in their office and
21      speak with them about products
22      understands good and bad marketing
23      techniques.
24  BY MR. PIORKOWSKI:

Page 104

1      Q.  All right.
2      A.  So, that was the basis for
3  my answer to your question.
4      Q.  Okay.
5          You've never worked for any
6  company or given advice to any
7  pharmaceutical company about any aspect
8  of pharmaceutical product marketing; is
9  that correct?
10      A.  That's right.
11      Q.  Your report discusses your
12  involvement on the Advisory Committee and
13  actually has some discussion generally
14  about Advisory Committees, is that right?
15      A.  Yes, it does.
16      Q.  Is it correct that an
17  Advisory Committee is an official body
18  under the Code of Federal Regulations?
19      A.  Yes.
20      Q.  And the purpose of an
21  Advisory Committee is to provide
22  independent advice to FDA?
23      A.  Yes.
24      Q.  And the rules of disclosure

Page 105

1  concerning Advisory Committee members are
2  designed to ensure that Advisory
3  Committee members are independent, right?
4      A.  Yes.
5      Q.  In other words, to make sure
6  that they don't have any personal stake
7  in the outcome of the Advisory
8  Committee's decision?
9      A.  I would disagree with you
10  about that.  I think the rules are not to
11  ensure that there is none, but to reveal
12  what there is so that people can view the
13  comments of the advisors in the
14  appropriate context.
15      Q.  Well, there's certainly a
16  threshold beyond which a potential
17  interest in the outcome of a decision is
18  too much as far as the FDA is concerned,
19  right?
20      A.  Right.  I couldn't tell you
21  what that threshold is, but --
22      Q.  But your interpretation of
23  the rules is that at a minimum, wherever
24  that point is, that the disclosure rules

27 (Pages 102 to 105)

Lemuel A. Moye, M.D.

1   require that any potential interest be
2   out on the table?
3       A.   Yes.
4       Q.   So that people can evaluate
5   whether, in fact, these individual
6   Advisory Committee members are or are not
7   independent?
8       A.   Yes.
9       Q.   Okay.
10          Advisory Committees
11  generally are made up of scientists in
12  the field in which the drug is expected
13  to be effective, right?
14      A.   Generally.  They also
15  include patients sometimes, and
16  occasionally they will include a
17  representative from the pharmacy industry
18  itself.  But in general, it's composed of
19  scientists.
20      Q.   The lion's share of the
21  voting members on an Advisory Committee
22  are generally scientists who have a
23  medical specialty in the area in which
24  the drug is expected to be effective; is

1   that right?
2       A.   Yes.
3       Q.   In your case, the Advisory
4   Committee that you served on was the
5   cardiorenal Advisory Committee?
6       A.   That was the first of two,
7   yes.
8       Q.   That's the one you were on
9   for a period of --
10      A.   Four years.
11      Q.   -- four years?
12      A.   Yes, sir.
13      Q.   Is the pharmaceutical
14  committee that you're on, is that also an
15  Advisory Committee?
16      A.   Pharmacy science is.  I'm
17  not on it now.  I rotated off.  That was
18  a committee that focused on issues
19  involving generic drugs.  It used to be
20  called the generic Advisory Committee,
21  but they changed that.
22      Q.   So, because that has a
23  cross-section of different disciplines,
24  that draws on a number of people from

1   different specialties?
2       A.   Yes.
3       Q.   But there are different
4   Advisory Committees for different types
5   of drugs, right?
6       A.   Yes.
7       Q.   And where a drug is expected
8   to have a cardiac effect, that's the
9   cardiorenal Advisory Committee that would
10  do that drug?
11      A.   In general, yes.  Of course
12  drugs have multiple effects, and
13  sometimes Advisory Committees meet
14  together.  Sometimes one group will
15  borrow from another, but in general, what
16  you say is true.
17      Q.   Advisory Committees also
18  include biostatisticians, correct?
19      A.   Yes.
20      Q.   And even though you were on
21  the cardiorenal Advisory Committee,
22  you're not an expert in cardiology or
23  nephrology, right?
24      A.   I would disagree with you

1   about that.  I certainly am not a
2   cardiologist, but I have extensive
3   training and experience carrying out
4   cardiovascular clinical trials.
5       Q.   Were you chosen for the
6   committee as a result of your cardiology
7   experience or as a result of your
8   biostatistics experience?
9       A.   I believe it was both.
10      Q.   The way an Advisory
11  Committee works is there's a meeting date
12  that's set, right?
13      A.   Yes, sir.
14      Q.   And prior to the meeting
15  date, the Advisory Committee members
16  receive information from the FDA, right?
17      A.   That's one source of
18  information.
19      Q.   I'm getting there.  That's
20  one source of information.
21          So, the FDA reviewers who
22  are looking at, let's say, whether to
23  approve a product, they have their own
24  ways of input into the Advisory

Lemuel A. Moye, M.D.

Page 110

1   Committee, right?
2       A.   Yes, sir.
3       Q.   Additionally, the sponsor
4   whose product is before the Advisory
5   Committee, they also have an opportunity
6   to provide the Advisory Committee members
7   with briefing documents, right?
8       A.   Yes.
9       Q.   Such as we already discussed
10  with Merck?
11      A.   Yes.
12      Q.   Now, from your report, you
13  mention that sponsors often spend months
14  preparing these briefing packets; is that
15  right?
16      A.   Yes, sir.
17      Q.   And you'd agree with me that
18  that makes sense because the sponsor
19  doesn't want to make a presentation and
20  then have something be found to be
21  inaccurate at the presentation?
22      A.   I would say this.  The
23  sponsors want things to go correctly for
24  them, and they work very hard to try to

Page 111

1   bring that event about.
2       Q.   And you make reference in
3   your report to saying that they conduct
4   intense preparation sessions, right?
5       A.   Yes, sir.
6       Q.   There's nothing wrong with
7   that, right?
8       A.   That's right.
9       Q.   And in fact, it's important
10  to be fully prepared for an Advisory
11  Committee meeting?
12      A.   Yes.
13      Q.   It's a serious proceeding?
14      A.   Yes.
15      Q.   Okay.
16          Now, the way this works is
17  that FDA asks the committee members
18  specific questions about a particular
19  drug, right?
20      A.   Yes.
21      Q.   And the role of the Advisory
22  Committee members is to answer the
23  questions that the FDA puts to them?
24      A.   Yes.

Page 112

1       Q.   And the Advisory Committee
2   has no actual legal authority to approve
3   or to disapprove a drug, right?
4       A.   That's true.
5       Q.   The committee provides its
6   input to the FDA, and the FDA considers
7   it and makes it own decision?
8       A.   Yes.  It provides critical
9   input.
10      Q.   The types of questions that
11  the Advisory Committee is asked are
12  things like, does the scientific evidence
13  support that a particular drug is safe
14  and effective when used as labeled?
15      A.   Actually not.  The questions
16  are nowhere near that refined.  The
17  questions are, what are the benefits of
18  this drug?  What are the adverse -- what
19  are the adverse experiences of this drug?
20  Do the benefits outweigh the risks?  What
21  should be in the label?  To whom should
22  the drug be marketed?  Should the drug be
23  approved?
24      Q.   Well, the question of should

Page 113

1   the drug be approved is essentially based
2   on the FDA's standards, right?
3           MR. SIZEMORE:  Object to
4       form.
5           MR. PIORKOWSKI:  Let me back
6       up.  I'll withdraw the question.
7   BY MR. PIORKOWSKI:
8       Q.   The Advisory Committee is
9   not at liberty to sort of make up its own
10  rules about what should or shouldn't
11  constitute approval.  It's applying the
12  set of standards that the FDA has given
13  them, right?
14      A.   No, sir.  Advisory
15  Committees are not so well behaved.
16  Advisory Committees will commonly
17  disagree with what the FDA's rules are.
18  I shouldn't say "commonly."  They will
19  occasionally disagree with what the FDA's
20  rules are.  They will suggest
21  alternatives.  They will even discard the
22  FDA's questions and come up with their
23  own questions.  And so Advisory
24  Committees can be prickly and

29 (Pages 110 to 113)

Lemuel A. Moye, M.D.

Page 114

1 independent.
2    Q.    All right.
3        If the Advisory Committee
4 disregards the questions that the FDA put
5 to it, that has no binding effect on
6 anybody, right?
7    A.    Binding effect, I don't
8 know. It certainly conveys to the FDA
9 what the Advisory Committee's concerns
10 are. And --
11    Q.    Okay. I'm sorry. Go ahead.
12 I didn't mean to cut you off.
13    A.    And that is one of the most
14 important functions that the Advisory
15 Committee carries out. It lets the FDA
16 know through the conversations during the
17 day, through the questions and through
18 the conversations around the questions
19 either posed by the FDA or posed by the
20 committee members what the Advisory
21 Committee's concerns are. So, it's not
22 just the answers to the questions that
23 the FDA responds to, it's the entire
24 gestalt, it's the entire flavor of the

Page 115

1 conversations that took place.
2    Q.    Is it correct that most of
3 the Advisory Committee meetings that you
4 have attended on cardiorenal drugs have
5 ended with a bottom line question about
6 whether a particular drug should be
7 approved as -- should be approved for
8 marketing in the United States?
9        That's the question.
10    A.    Certainly I would agree.
11 Certainly one of the questions is that.
12 Commonly the question is more complicated
13 than that because it has to be because we
14 on the Advisory Committee don't have a
15 label yet. And there's lots of
16 discussion about label. And depending on
17 whether the drug should be approved or
18 not, it really depends on what the label
19 is going to say many times. So, it's
20 really a little more complicated a
21 question that we have to deal with.
22    Q.    So, your testimony is that
23 the FDA Advisory Committee does not have
24 a draft label available to them at the

Page 116

1 time they make a decision as to whether a
2 drug should be approved for marketing?
3    A.    No. Many times we do have a
4 draft label, but the draft label's
5 tenability may be questioned at the
6 Advisory Committee meeting. Then when we
7 ask a question about approval, then it
8 has to be clear in what context the
9 approval is going to be gained.
10    Q.    That's an important
11 question. Let's talk about that for a
12 second.
13        When the FDA approves a
14 drug, it doesn't just approve it in a
15 vacuum, right?
16    A.    That's true.
17    Q.    The FDA approves a drug for
18 a specific indication or specific
19 indications, right?
20    A.    Yes, sir.
21    Q.    With specific dosages,
22 right?
23    A.    Yes, sir.
24    Q.    Sometimes with certain

Page 117

1 duration of use requirements, right?
2    A.    Yes.
3    Q.    And it's always approved --
4 every FDA approval is always approved as
5 used in the approved label, right?
6    A.    Not Advisory Committee,
7 every FDA approval, yes.
8    Q.    Every FDA approval
9 ultimately approves a drug for use as
10 labeled, right?
11    A.    Yes.
12    Q.    Okay.
13        Now, what the proposed
14 labeled indications are and what the
15 proposed doses are, that information is
16 available and is the subject of
17 discussion at Advisory Committee
18 meetings?
19    A.    Those and many other things,
20 yes.
21    Q.    But that's not a secret.
22 The Advisory Committee is not in the dark
23 about what the proposed dosage is going
24 to be?

30 (Pages 114 to 117)

Lemuel A. Moye, M.D.

Page 118

1    A.    That's right.
2    Q.    They know what's on the
3  table as far as -- I mean, as an Advisory
4  Committee member, you couldn't make a
5  determination about whether a drug should
6  or shouldn't be approved in the absence
7  of specific indications or specific dose
8  information?
9    A.    I agree.  My point is that
10  there is disagreement at the Advisory
11  Committee about what the indications are
12  or about what the adverse event complex
13  really is.  And so the question for
14  approval really hinges on what the
15  understanding is about those.
16    Q.    Okay.
17          And the truth of the matter
18  is that Advisory Committee members can
19  have different points of view about, for
20  example, whether the scientific evidence
21  on a drug shows that it's efficacious,
22  right?
23    A.    Yes.
24          MR. SIZEMORE:  Before you do

Page 119

1  that, there's a interruption --
2  distraction.
3              - - -
4          (Whereupon, a recess was
5  taken from 11:32 a.m. until 11:41
6  a.m.)
7              - - -
8  BY MR. PIORKOWSKI:
9    Q.    Before we took our break, we
10  were talking about Advisory Committees,
11  and I believe you were telling me that
12  the questions that are presented to the
13  Advisory Committee are often difficult
14  questions?
15    A.    Yes.  Difficult and
16  complicated questions which spawn
17  unpredictable answers, which lead to
18  changing the question.  So, it's a very
19  dynamic process.
20    Q.    The questions that they're
21  considering usually are some variant of
22  whether the drug is effective and whether
23  the drug is safe.  Those are really the
24  primary considerations?

Page 120

1    A.    That's a fair statement.
2  The conversations ultimately are about
3  whether the drug can be used safely and
4  effectively.
5    Q.    It may involve at what doses
6  or with what limitations, but those tend
7  to be the central issues.  Fair enough?
8    A.    Yes.
9    Q.    And fair to say that
10  Advisory Committee members often have
11  different points of view with respect to
12  these issues of safety and efficacy with
13  respect to a particular drug?
14    A.    Certainly.
15    Q.    And often one or more
16  Advisory Committee member dissents from
17  the majority view?
18    A.    Yes.
19    Q.    Because the decisions often
20  involve questions of medical judgment.
21  Fair to say?
22    A.    Yes.  Individual medical
23  judgment, yes.
24    Q.    And reasonable minds can

Page 121

1  often differ on these questions.  Would
2  you agree?
3    A.    Yes.  There are some tough
4  questions.
5    Q.    And in fact, if we were to
6  look at your own voting record on the
7  cardiorenal Advisory Committee, more
8  often than not you were in the minority,
9  right?
10    A.    That's true.
11    Q.    You voted against approving
12  the vast majority of drugs that came
13  before the Advisory Committee, true?
14          MR. SIZEMORE:  Object to the
15  form.
16          THE WITNESS:  Yes.  That's
17  true.
18  BY MR. PIORKOWSKI:
19    Q.    And one of the drugs you
20  voted against is a drug called Plavix,
21  right?
22    A.    Yes.
23    Q.    Which today is the second
24  most commonly prescribed drug in the

31 (Pages 118 to 121)

Lemuel A. Moye, M.D.

Page 122

1  world, right?
2      A.   I accept your representation
3  of that.
4      Q.   Okay.
5           Now, to bring us back to
6  Vioxx, at the point after the FDA
7  reviewed the new drug application for
8  Vioxx and before FDA issued its approval,
9  there was an Advisory Committee convened
10  to review Vioxx in 1999, right?
11      A.   Yes.
12      Q.   Just so everybody is clear,
13  you were not a member of that Advisory
14  Committee?
15      A.   That's correct.
16      Q.   That was the arthritis
17  Advisory Committee, not the cardiorenal
18  Advisory Committee that considered Vioxx?
19      A.   That's true.
20      Q.   And have you spoken with
21  anyone who was on that Advisory
22  Committee?
23      A.   No. Certainly not about
24  Vioxx. I don't know who was on the

Page 123

1  committee, but I've not spoken to any
2  Advisory Committee member about Vioxx.
3      Q.   Well, you do know who was on
4  the committee by virtue of having read
5  the transcripts?
6      A.   I don't know today, but I
7  can look it up to see, sure.
8      Q.   The same thing is true for
9  the 2001 Advisory Committee, you were not
10  a member of that committee, right?
11      A.   That's true.
12      Q.   And you've not spoken to
13  anyone who is on that committee?
14      A.   That's true. Again, about
15  Vioxx.
16      Q.   About Vioxx.
17      A.   Right.
18      Q.   You've never done any work
19  for Merck, is that right?
20      A.   That's true. I've not done
21  any work for Merck.
22      Q.   Have you spoken to any
23  employee of Merck about any aspect of
24  this case?

Page 124

1      A.   No, I have not.
2      Q.   Do you have any
3  recollections of having met with sales
4  representatives of Merck about Vioxx?
5      A.   No, I haven't. It was
6  approved well after I was out of
7  practice, so, no.
8      Q.   I assume that you would
9  really have no occasion to meet with
10  sales reps for any reason now that you're
11  not in active practice?
12      A.   That's true. Again, just to
13  be clear, there were many people in the
14  pharmaceutical industry who were at the
15  Astrodome in Katrina who really helped us
16  quite a bit, and so I had lots of
17  conversations with them, but it wasn't
18  about any of the matter we're talking
19  today.
20      Q.   Was there anyone at Merck
21  involved in that?
22      A.   I presume there were, but I
23  don't recall where they were.
24      Q.   On the Advisory Committees

Page 125

1  that you've served on, is it correct that
2  you have never been involved in any
3  aspect of reviewing any COX-2 drug?
4      A.   That's certainly true for
5  cardiorenal. I can't recall -- well,
6  it's true for both of them because
7  pharmacy science, we didn't talk about
8  any drug in particular. So, it's true
9  for both.
10      Q.   On the cardiorenal Advisory
11  Committee, you were never involved in the
12  consideration of any issue concerning
13  nonsteroidal anti-inflammatories, right?
14      A.   The main focus of the
15  conversation was never about nonsteroidal
16  anti-inflammatories, that's right.
17      Q.   Was there ever a
18  nonsteroidal anti-inflammatory issue
19  presented to the pharmacy sciences
20  Advisory Committee?
21      A.   Right. That's the right
22  committee. No, there has not been.
23      Q.   So, fair to say that none of
24  your Advisory Committee experience has

32 (Pages 122 to 125)

Lemuel A. Moye, M.D.

Page 126

1    involved reviewing any aspect of
2    nonsteroidal anti-inflammatory drugs?
3        A.    That's true.
4        Q.    Okay.
5            Have you ever spoken to any
6    FDA official or former FDA official who
7    was involved in Vioxx about their
8    experience?
9        A.    About their experience with?
10       Q.    With Vioxx.
11       A.    No.
12       Q.    Or about any aspect of
13   Vioxx?
14       A.    No.
15       Q.    Now, on Paragraph 10 of your
16   report, you make reference to having been
17   a consultant to various drug companies?
18       A.    Yes, sir.
19       Q.    Have you ever been a
20   consultant to any pharmaceutical company
21   with respect to any nonsteroidal
22   anti-inflammatory drug?
23       A.    I need a moment.
24           (Witness reviewing

Page 127

1    document.)
2            No.
3        Q.    Have you ever been a
4    consultant to any pharmaceutical company
5    with respect to any drug used for the
6    treatment of arthritis?
7        A.    No.
8        Q.    Have you ever been a
9    consultant to any pharmaceutical company
10   with respect to any drug that had as its
11   purpose pain relief or analgesia?
12       A.    No.
13       Q.    With respect to Paragraph
14   10, what was the earliest of these
15   consultations?  Are these in
16   chronological order on here, or are these
17   just kind of in a random order?
18       A.    They're not in chronological
19   order.  I don't know what order they're
20   in.  They might very well be random, but
21   what's your question?
22       Q.    What's the earliest of your
23   consultancies of these things that are
24   listed in 10?  Is it Marion Merrill-Dow?

Page 128

1        A.    Goodness.  Let's see.
2            Either Marion Merrill-Dow or
3    Key Pharmaceuticals.
4        Q.    Marion Merrill-Dow, you
5    consulted with them with respect to the
6    drug Seldane, correct?
7        A.    Right.
8        Q.    Which you referred to
9    earlier?
10       A.    Yes, sir.
11       Q.    Any other drugs you
12   consulted with them on?
13       A.    I don't think so.
14       Q.    What about Key
15   Pharmaceuticals, what did you consult
16   with them on?
17       A.    Nitro-Dur.
18       Q.    Is that a nitroglycerin
19   product?
20       A.    Yes.  Long acting.
21       Q.    I'm sorry.  Go ahead.
22       A.    Long acting nitroglycerin
23   paste.
24       Q.    Was that before or after you

Page 129

1    were on the Advisory Committee for
2    cardiorenal?
3        A.    I think it was before.
4        Q.    Did you design clinical
5    trials?
6        A.    Yes.
7        Q.    Is that what your role was?
8        A.    Yes, sir.
9        Q.    Phase III clinical trials?
10       A.    Yes.
11       Q.    All right.
12           What about Berlex, what was
13   your involvement with them?
14       A.    Berlex was -- involved
15   development of viral therapy for angina
16   pectoris.
17       Q.    Viral therapy?
18       A.    Yes.
19       Q.    You give a virus to stop
20   their ischemia?
21       A.    The idea is you alter the
22   virus' DNA and provide intercoronary
23   virus so that it perfuses to the
24   myocardium, changes the myocardium,

33 (Pages 126 to 129)

Lemuel A. Moye, M.D.

Page 130

1   develops stronger heart and muscle and
2   more blood vessels.
3       Q.   Is that under the "what
4   doesn't kill you makes you stronger"
5   heading?
6       A.   We had some interesting
7   meetings.
8       Q.   What did you do in their
9   case?  Did you design clinical trials?
10      A.   No.  I was on the data
11  monitoring committee for them.
12      Q.   Okay.
13           Are those still in clinical
14  trials today?
15      A.   No.  Those have ended.
16      Q.   Did the data monitoring
17  committee end the clinical trials
18  prematurely?
19      A.   I think we may have ended it
20  barely prematurely, just a few months
21  before its scheduled end.
22      Q.   Because of unforeseen side
23  effects?
24      A.   No.  Just no effects at all.

Page 131

1       Q.   No beneficial effects?
2       A.   No beneficial or adverse
3   effects.
4       Q.   Any other involvement with
5   Berlex?
6       A.   I think so.  I had an
7   earlier involvement with them.  It had to
8   do with designing a monitoring rule for
9   the early termination of studies.  It was
10  a statistical consultation.  That was in
11  1996.
12      Q.   "A monitoring rule," meaning
13  under what circumstances would you
14  terminate a study early?
15      A.   Yes.  Under what statistical
16  criteria would you use that would trigger
17  the conversations that might lead to
18  early termination.
19      Q.   Was that in your capacity as
20  a member of the data safety monitoring
21  board?
22      A.   No.  I was not on the DMC
23  there.  I was just an advisor to Berlex
24  in helping them construct a rule.

Page 132

1       Q.   Was it the same product?
2       A.   No.  It was a different
3   product.
4       Q.   What product was that?
5       A.   I don't remember.
6       Q.   What about Proctor & Gamble?
7       A.   Proctor & Gamble was a
8   consultation about an antipsychotic
9   medication.
10      Q.   Was it in your capacity as a
11  biostatistician?
12      A.   Yes, it was, and also my
13  expertise in cardiology because there was
14  concern about the occurrence of
15  arrhythmias.
16      Q.   Did you design a study?
17      A.   No, sir.  I beg your pardon.
18  Yes.  I didn't execute it or analyze it,
19  but I helped design it.
20      Q.   Was the study you helped
21  design carried out?
22      A.   I believe so, yes.
23      Q.   At what stage was the
24  product when you were involved?  Was it

Page 133

1   already approved?
2       A.   Preapproval.
3       Q.   Was the study that you
4   designed completed prior to approval?
5       A.   Yes.
6       Q.   I'm sorry.  What was the
7   name of the product?
8       A.   I'm trying to remember.  I
9   don't remember what it was.  It was one
10  of the newer generation anti-psychotics,
11  anti-schizophrenic, but I don't remember
12  the name.
13      Q.   All right.
14           Is it on the market today?
15      A.   I don't think so.
16      Q.   You don't think so?
17      A.   I don't think so.
18      Q.   Because it's still under
19  review or because it's been withdrawn?
20      A.   No.  It's been a long time.
21  It may have been -- the company may have
22  decided to withdraw the NDA.  I don't
23  know.  If I'm right that it's not on the
24  market, and I may be wrong about that,

Lemuel A. Moye, M.D.

Page 134

1  but if I'm right, it's because it just
2  didn't finish going through the approval
3  process.
4      Q.    Roughly what time frame are
5  we talking about, year-wise?
6      A.    Early 190s, I think.
7      Q.    Anything else for Proctor &
8  Gamble?
9      A.    No.
10     Q.    Nothing else for Marion
11 Merrill-Dow besides Seldane?
12     A.    That's right.
13     Q.    How about Pfizer?
14     A.    Pfizer, any psychotic
15 medication for them I was involved in
16 analyzing the results of the clinical
17 study. Same type of newer generation
18 anti-schizophrenic medication that they
19 feared was associated with arrhythmias.
20     Q.    Is this by virtue of your
21 work in the Seldane litigation that these
22 came into you?
23     A.    I don't know. It certainly
24 makes sense, because the kind of

Page 135

1  arrhythmia we were concerned about in
2  Seldane was related to the arrhythmias
3  that were associated with these newer
4  anti-psychotics.
5      Q.    Okay.
6          Did you design a clinical
7  trial or was that just a one-time
8  consultation?
9      A.    I think it was just a short
10 consultation evaluation of their Phase
11 III clinical -- of their Phase III safety
12 program. So, it's preapproval.
13     Q.    While it was still going on?
14     A.    You mean while the trial was
15 still going on?
16     Q.    Yes.
17     A.    I think while the trial --
18 yes, yes, and afterwards, yes.
19     Q.    Okay.
20          Any other work for Pfizer?
21     A.    I've given some lectures at
22 Pfizer, but not consulted on a drug.
23     Q.    What lectures have you
24 given?

Page 136

1      A.    I gave three lectures to
2  Pfizer, November 2004. Do you want the
3  topics?
4      Q.    Sure.
5      A.    Okay.
6      Q.    Would they be on your CV?
7      A.    Yes, they would.
8      Q.    Let me give you that if that
9  helps.
10          - - -
11          (Whereupon, Deposition
12     Exhibit Moye MDL 3, Curriculum
13     Vitae of Lemuel A. Moye, M.D.,
14     Ph.D. (22 pages), was marked for
15     identification.)
16          - - -
17 BY MR. PIORKOWSKI:
18     Q.    I'm going to give you what I
19 marked as Exhibit 3, which is your CV.
20     A.    (Witness reviewing
21 document.)
22          Yes. Here they are. Items
23 56, 57 and 58. One was a discussion of
24 dependence in subgroup analyses. The

Page 137

1  other was hyperdependence in clinical
2  trial analyses.
3      Q.    I'm sorry, what page are you
4  on?
5      A.    I'm on Page 15.
6      Q.    56, 57 and 58?
7      A.    56, 57 and 58. So,
8  dependence in subgroup analyses,
9  hyperdependence in clinical trial
10 analyses, and professionalism in science.
11     Q.    Okay.
12          Anything else for Pfizer?
13     A.    No.
14     Q.    What about -- how do you say
15 that, Hoechst --
16     A.    Hoechst Roussel. Yeah, they
17 were interested -- again, this was a
18 consultation to oversee a clinical trial,
19 evaluating the possible arrhythmogenic
20 effects of an antibiotic. That was circa
21 1996.
22     Q.    Putting aside Seldane,
23 that's three companies that you consulted
24 with in terms of evaluating through

35 (Pages 134 to 137)

Lemuel A. Moye, M.D.

Page 138

1    clinical trials the antiarrhythmic
2    effects of different products?
3        A.    Yes.
4        Q.    What's the name of the
5    product with Hoechst Roussel?
6        A.    I don't remember.  It was an
7    antibiotic.  I don't remember the name of
8    it.
9        Q.    Do you remember what
10   category of antibiotic?  Was it
11   cephalosporin?
12       A.    Cephalosporin.
13       Q.    Third generation?
14       A.    Yes.
15       Q.    Do you know if it's on the
16   market today?
17       A.    I don't know.
18       Q.    Okay.
19             How about Aventis?
20       A.    Aventis was interested in
21   developing an ARB receptor blocker for
22   the treatment of heart failure.  And I
23   was engaged as a consultant to help
24   design a Phase III clinical study.

Page 139

1        Q.    So, the study was designed
2    to look at heart failure as the efficacy
3    endpoint?
4        A.    Actually not.  The study was
5    primarily focused on the occurrence of
6    adverse events.  The concern was for the
7    appearance of angioedema.  So it's
8    primarily a safety study.
9        Q.    Was it a Phase III study?
10       A.    No.  Actually, I call it a
11   Phase II/III study.
12       Q.    Was the study done?
13       A.    No, it was not.  They
14   terminated it because -- well, they
15   terminated it.
16       Q.    They terminated it?
17       A.    They terminated it.
18       Q.    So, the product died on the
19   vine, as they say?
20       A.    Yes.
21       Q.    Do you know what the name of
22   the product was?
23       A.    No.
24       Q.    Any other things for

Page 140

1    Aventis?
2        A.    No.
3        Q.    What was the time frame on
4    that?
5        A.    2001 I think, early 2001.
6        Q.    How about Coromed?
7        A.    Coromed, I was asked to
8    serve as a member of a mock Advisory
9    Committee.
10       Q.    In your report you make
11   reference to the Board of Scientific
12   Advisors?
13       A.    Yes.
14       Q.    That was in place in Merck
15   that you make various references to.  Do
16   you recall that?
17       A.    Yes, I do.
18       Q.    Is this consultancy similar
19   to that?
20       A.    No.  It was as a member of a
21   mock Advisory Committee for rehearsal.
22   The Coromed's group were planning to
23   present before an FDA Advisory Committee.
24   As part of their rehearsals, they called

Page 141

1    together a group of scientists who could
2    pose as Advisory Committee members.
3        Q.    So, you weren't on the
4    Advisory Committee at the time?
5        A.    That's correct.  I was not.
6        Q.    So, based on your experience
7    of having been on that, they thought
8    you'd be a useful person as far as
9    answering questions and so forth?
10       A.    Yes.
11       Q.    Was that a one-time
12   participation?
13       A.    Yes.
14       Q.    What was the product that
15   was at issue?
16       A.    I don't remember.
17       Q.    Do you remember what the
18   nature of the product was?
19       A.    No, I don't.
20       Q.    When was this roughly?
21       A.    This was September 2001.
22       Q.    How about DuPont?
23       A.    DuPont -- before they became
24   part of Bristol-Myers Squibb, I was head

36 (Pages 138 to 141)

Lemuel A. Moye, M.D.

Page 142

1  of a DSMB that reviewed the -- oversaw
2  the conduct of a study that compared
3  medical versus surgical intervention for
4  patients with a class of angina pectoris.
5      Q.   We've had a couple
6  references to DSMB.  Is it my
7  understanding that what you described as,
8  I guess you call it a data monitoring
9  committee, DMC or DSMB, are they
10  interchangeable?
11      A.   Actually, DMC is what I
12  should be using.  It's the accepted
13  contemporary term for it, right.
14      Q.   DMC is a body that is made
15  up of independent scientists who are not
16  employed by the company that's funding
17  the study?
18          MR. SIZEMORE:  Object to
19      form.
20          THE WITNESS:  Yes.
21          MR. SIZEMORE:  I'm sorry.
22          THE WITNESS:  Yes.  A small
23      group of distinguished
24      professionals who are independent

Page 143

1      of the sponsor and of the
2      investigators and who oversee the
3      conduct of the study on a regular
4      basis.
5  BY MR. PIORKOWSKI:
6      Q.   So, they're paid by the
7  company?
8      A.   Yes, that's right.
9      Q.   But they're not employees of
10  the company, right?
11      A.   That's correct.
12      Q.   And they're not involved in
13  the clinical trial itself?
14      A.   That's right.
15      Q.   And their primary goal is to
16  ensure that patients in the clinical
17  trial are safe?
18      A.   Yes.
19      Q.   That's their only goal?
20      A.   Well, I think you said it
21  right at first, the primary goal.  The
22  modern DMCs have broadened their
23  portfolio.  So, they also look at the
24  underlying assumptions on which the trial

Page 144

1  was designed.  They have taken on some
2  ancillary responsibilities, but the
3  primary goal is to ensure the safety of
4  the participants.
5      Q.   Okay.
6          Are the DMCs that you've
7  served on the same type of body as the
8  DSMB that was monitoring the VIGOR study?
9      A.   I don't know much about the
10  monitoring of the VIGOR study, but if it
11  was a classic DMC, that is, as we have
12  laid out in the parameters, independent
13  and providing -- after complete review of
14  all the data that neither the sponsor nor
15  the investigators have access to, make
16  recommendations to the sponsors and to
17  the steering committee, the group of
18  investigators, as to whether the trial
19  should continue or not.
20      Q.   Have you, as a part of the
21  documents you've reviewed, the internal
22  company documents, have you reviewed the
23  meeting minutes of the VIGOR DSMB?
24      A.   I have not.

Page 145

1      Q.   Have you reviewed the
2  meeting minutes of the APPROVe, I think
3  it was called an ESMB, but an external
4  safety monitoring board?
5      A.   I have not.
6      Q.   Have you reviewed any
7  correspondence or e-mail exchanges
8  between Merck employees and members of
9  those boards either before or after the
10  blind was broken?
11      A.   No.
12      Q.   What's the status of the
13  Bristol-Myers -- your service on the
14  Bristol-Myers matter right now?
15      A.   Oh, the DSMB?
16      Q.   Yes.
17      A.   I'm sorry.  DMC.  The study
18  ended about 18 months ago.
19      Q.   What was the name of the
20  product?
21      A.   Well, actually, it was
22  curious.  The study was designed to
23  really assess the ability of a
24  radionuclide to differentiate between

Golkow Litigation Technologies - 1.877.DEPS.USA

Lemuel A. Moye, M.D.

Page 146

1   patients with different degrees of left
2   ventricular dysfunction.  That was the
3   product.  The clinical aspect of it was
4   to demonstrate that patients could be
5   safely -- could have their anginal status
6   safely classified so that appropriate
7   therapy could be targeted for.  So, the
8   product really was a radionuclide
9   procedure.
10      Q.   But it still had to be FDA
11  approved, right?
12      A.   Yes.
13      Q.   Was it?
14      A.   Yes.
15      Q.   Do you know the name of the
16  product?
17      A.   I don't.
18      Q.   Is there a product marketed
19  by Bristol-Myers Squibb that is in the
20  form of the radionuclide?
21      A.   I think so.
22      Q.   Was that study terminated
23  early?
24      A.   No.

Page 147

1       Q.   Were there any unusual
2   problems that came up during the study?
3       A.   No.  I assume unusual
4   adverse events for patients?
5       Q.   Yes.
6       A.   No, there were not.
7       Q.   Okay.
8            Now, is that the same
9   product that you started off talking
10  about, DuPont, or is that a different
11  DMC?
12      A.   DMC, same product.
13      Q.   Anything else that you've
14  been involved with for Bristol-Myers
15  Squibb?
16      A.   Well, I've done a lot of
17  work for Bristol-Myers Squibb in
18  designing and executing clinical trials.
19  And to answer your first question,
20  probably Bristol-Myers Squibb is the
21  first.  We looked at these
22  chronologically.
23      Q.   When did you first consult
24  with them?

Page 148

1       A.   1987.  Actually, it wasn't
2   so much as a consultation as it was a
3   grant, that I helped design, execute,
4   analyze a study looking at the effect of
5   Captopril in reducing mortality in
6   patients with LV -- left ventricular
7   dysfunction.
8       Q.   What kind of drug is
9   Captopril?
10      A.   Captopril was an ACE
11  inhibitor, one of the first ACE
12  inhibitors.
13      Q.   Was Captopril approved and
14  on the market at the time you were
15  consulted?
16      A.   Yes, but not for heart
17  failure treatment, for the control of
18  elevated blood pressure.
19      Q.   Any other consultations
20  you've done with Bristol-Myers Squibb?
21      A.   Yes.  I helped design,
22  execute and analyze CARE, which was a
23  4100 patient study that evaluated the
24  effect of pravastatin in patients who had

Page 149

1   established positive cardiovascular
2   disease history for reducing the
3   incidence of fatal and nonfatal
4   myocardial infarction.
5       Q.   Pravastatin is a statin
6   drug?
7       A.   Yes, sir.
8       Q.   Lowers lipids?
9       A.   Yes.
10      Q.   Bristol-Myers Squibb was the
11  manufacturer of pravastatin?
12      A.   Yes.
13      Q.   Were you paid --
14      A.   I don't want a nuance here.
15  I don't think so.  I think Sankyo was in
16  Japan, and the licensing agreement led to
17  BMS in the United States.  I think that's
18  right.
19      Q.   Let me rephrase.  The people
20  that were selling pravastatin in the
21  United States, to the best of your
22  understanding, was Bristol-Myers Squibb?
23      A.   Yes.
24      Q.   Now, were you involved in

38 (Pages 146 to 149)

Lemuel A. Moye, M.D.

Page 150

1  the design of the CARE study?
2      A.    I was.
3      Q.    Were you the primary
4  designer of the CARE study?
5      A.    No.  I was not the principal
6  investigator of the CARE study, no.  I
7  was one of the investigators who helped
8  design the study.
9      Q.    As I understand
10  investigators, investigators are the
11  people who are actually conducting the
12  clinical study generally?
13      A.    You have to change your
14  understanding.  Certainly there are a
15  class of investigators who are
16  responsible for seeing patients.  But
17  investigators is a broader -- I mean,
18  it's a broader -- those are, let's say --
19  clinical investigators are what those
20  are.  Investigators of the study are
21  scientists who are involved in the
22  design, execution or analysis of the
23  study.  So, for example, an
24  epidemiologist who is designing an aspect

Page 151

1  of the CARE study that looks at quality
2  of life would be considered an
3  investigator, even though the
4  epidemiologist doesn't see any of the
5  patients.
6      Q.    Okay.
7          Regardless of whether you
8  see patients, though, does your funding
9  come directly from the company?
10      A.    No.  Funding went to the
11  university.  Essentially BMS gave the
12  university a grant or a contract, I don't
13  know which, and I worked through the
14  university's grants.
15      Q.    But the money came from
16  Bristol-Myers Squibb is what I'm trying
17  to pin down?
18      A.    Yes.  Correct.
19      Q.    Was the CARE study
20  published?
21      A.    Yes.
22      Q.    Were you listed as an
23  author?
24      A.    Yes.

Page 152

1      Q.    Did you agree with all the
2  findings?
3      A.    Yes.
4      Q.    Have any of the findings
5  been changed since the publication?
6      A.    No.
7      Q.    Who else was involved in the
8  design of that study?
9      A.    Eugene Braunwald, Frank
10  Sacks, Mark Pfeffer.  I mean, if we had
11  the manuscript here, we could see the
12  masthead, and that would give us a more
13  complete list.
14          MR. SIZEMORE:  Is it listed
15      in your CV?  Would that help?
16          THE WITNESS:  I don't know.
17      Perhaps all the authors are
18      listed.
19  BY MR. PIORKOWSKI:
20      Q.    I can check it.
21      A.    Okay.
22      Q.    Were you pressured at all by
23  Bristol-Myers Squibb concerning your
24  reporting of the results of the CARE

Page 153

1  study?
2          MR. SIZEMORE:  Object to
3      form.
4          THE WITNESS:  No.  I would
5      say, no, I wasn't pressured.
6  BY MR. PIORKOWSKI:
7      Q.    Since we just marked it, is
8  Exhibit 3 a current copy of your
9  curriculum vitae?
10      A.    Yes, it is.
11      Q.    Is there anything that needs
12  to be added or changed to make it up to
13  date?
14      A.    No.
15      Q.    What was your involvement in
16  working -- I'm sorry.  Back to
17  Bristol-Myers Squibb.  Were there any
18  other consultancies besides those two or
19  three things we talked about?
20      A.    As I sit here now, I can't
21  remember any others.
22      Q.    Are you continuing to do any
23  work for Bristol-Myers Squibb today?
24      A.    No.

39 (Pages 150 to 153)

Lemuel A. Moye, M.D.

Page 154

1    Q.    Has it been your experience
2  that they've always behaved as a
3  responsible company?
4        MR. WACKER:  Objection.
5        MR. SIZEMORE:  Same
6    objection.
7  BY MR. PIORKOWSKI:
8    Q.    Let me narrow it down.  On
9  matters with which you have been involved
10  with them, has it been your view that
11  they've always behaved as a responsible
12  company?
13    A.    Yes.
14    Q.    Novartis.  What was your
15  involvement with them?
16    A.    Oh, I don't remember.
17    Q.    I don't mean to be grilling.
18  If you need to look at your CV or
19  anything else to refresh your memory,
20  please feel free to do that.
21    A.    Let's come back to that.
22  Right now I don't remember.
23    Q.    How about Medtronics?
24    A.    Medtronics, I was involved

Page 155

1  in designing a study that would look at
2  the effectiveness of one of their cardiac
3  defibrillators.
4    Q.    How do you do that?
5    A.    Oh, you design a study.  You
6  decide --
7    Q.    No.  I'm sorry.  Let me
8  rephrase it.
9        I meant, given that cardiac
10  defibrillation under the best of
11  circumstances tends to be like a ten
12  percent success, how do you design a
13  study to evaluate whether a defibrillator
14  is effective?
15    A.    Oh, because you look at it
16  in a population in which you expect to
17  have a high mortality rate.  If you can
18  produce -- if you can demonstrate a
19  reduction from the untreated group's high
20  mortality rate, then you've demonstrated
21  the efficacy, let's say, of the device.
22    Q.    Okay.  What was the name of
23  the product you were designing?
24    A.    Maybe it's a product number.

Page 156

1  I don't remember what it was.
2    Q.    Was it an AED, automatic
3  external defibrillator?
4    A.    No.  It was implantable.
5    Q.    An implantable
6  defibrillator?
7    A.    Right.  I'm sorry.  Maybe I
8  wasn't clear about that.  An implantable
9  defibrillator.
10    Q.    So, you're talking about for
11  patients who had chronic arrhythmias that
12  could potentially deteriorate, you
13  designed a study using an implantable
14  defibrillator and compared that with
15  what, medical therapy?
16    A.    Compared that with the
17  standard therapy, which was medical
18  therapy, right.
19    Q.    Okay.
20        When was that study done?
21    A.    That was done in the late
22  1990s perhaps.
23    Q.    Do you know if the product
24  was approved?

Page 157

1    A.    I think the product was
2  already on the market actually.
3    Q.    Was your study that you were
4  designing to approve it for a new
5  indication?
6    A.    Yes.
7    Q.    What was the new indication?
8    A.    I don't remember.
9    Q.    Any other involvement for
10  Medtronic?
11    A.    No.
12    Q.    AstraZeneca?
13    A.    AstraZeneca, I was asked to
14  help them respond to an FDA concern
15  involving one of the beta agonists for
16  the treatment of heart failure.
17  Metoprolol, M-E-T-O-P-R-O-L-O-L, I think.
18    Q.    What was the issue with
19  metoprolol?
20    A.    The issue with metropolol
21  was the interpretation of subgroup
22  analyses.  And they were involved in
23  discussions and negotiations with the FDA
24  about that.  And we drafted a response

Golkow Litigation Technologies - 1.877.DEPS.USA

Lemuel A. Moye, M.D.

Page 158

1   and actually wrote a label that we
2   thought would meet the FDA's concerns.
3        Q.   What was the subgroup
4   analysis issue that was at issue there?
5        A.   It was that -- I forget the
6   name of the study, but it was an
7   international study designed to compare
8   metoprolol versus control therapy in
9   patients who have heart failure, the idea
10  being that metoprolol would reduce the
11  incidence of mortality.  The overall
12  findings were positive.  That is to say,
13  the single omnibus analysis demonstrated
14  that metoprolol was associated with lives
15  saved.  But the FDA did a subgroup
16  analysis and found all the lives saved --
17  let me put it another way.  The positive
18  effect was only seen in non-US countries.
19  The effect in the U.S. was neutral or
20  perhaps slightly harmful.
21       Q.   Was there a rationale?  Did
22  the FDA offer a rationale why patients in
23  the United States would be different?
24       A.   Oh, I understand what you're

Page 159

1   saying.  There were many explanations
2   offered as to why this might be the case,
3   but the bottom line is nobody knew.  I
4   mean, there were concerns about perhaps
5   the concomitant care is different in
6   Europe, perhaps European patients have
7   different referral mechanism, but in the
8   end, nobody knew.
9        Q.   What was the effect on
10  metoprolol?
11       A.   You mean regulatory effect?
12       Q.   Let me back up.  Was this in
13  the context of a supplemental new drug
14  application to approve metoprolol for
15  treatment of heart failure?
16       A.   Either an sNDA or an NDA.  I
17  don't remember which.
18       Q.   Was metoprolol approved?
19       A.   Yes.
20       Q.   Was it approved across the
21  board or were there restrictions?
22       A.   As I sit here now, I'd say,
23  no, there were restrictions.  They did
24  not get -- excuse me.  I don't think they

Page 160

1   got the total mortality indication that
2   they were looking for, but they did get
3   an indication for a secondary finding.  I
4   don't remember what that is right now.
5   It might be -- I just don't remember what
6   it was.
7        Q.   What's the timing of this
8   consultancy with AstraZeneca?
9        A.   Maybe 2002.  Maybe earlier
10  than that.  I don't remember.
11       Q.   Was there -- I'm sorry.
12  2002 or maybe earlier?
13       A.   Maybe earlier.
14       Q.   Was there an Advisory
15  Committee meeting conducted on this
16  issue?
17       A.   Oh, there was no FDA
18  Advisory Committee meeting.
19       Q.   Was there any other Advisory
20  Committee meeting by any other regulatory
21  body that you're aware of?
22       A.   No.
23       Q.   Anything else for
24  AstraZeneca?

Page 161

1        A.   That's it.
2        Q.   CryoCor?
3        A.   CryoCor asked me to help
4   them design a study that would reduce the
5   incidence of -- reduce the prevalence of
6   chronic atrial fibrillation.  It was an
7   ablation procedure where they would
8   freeze part of the electrical conducting
9   system of the heart that they felt was
10  pathogenically -- or pathologically
11  producing these abnormal electrical
12  impulses.
13       Q.   Was this a
14  placebo-controlled study?
15       A.   I would say --
16       Q.   Let me withdraw that.
17            Was this a study that was
18  comparing ablation to conventional
19  medical therapy for chronic atrial
20  fibrillation?
21       A.   Yes, sir.
22       Q.   Was the product approved?
23       A.   I don't remember.
24       Q.   What time frame was this?

41 (Pages 158 to 161)

Lemuel A. Moye, M.D.

Page 162

1    A.    I think approximately 1998
2  to 2000.
3    Q.    How about Vasogen?
4    A.    Vasogen I am working with
5  now.
6          MR. SIZEMORE:  You might
7    want to be careful.  Is this a
8    drug that's out on the market or
9    are you working with them on an
10   investigational drug?
11         THE WITNESS:  An
12   investigational drug.  I was going
13   to be very careful.
14         MR. SIZEMORE:  Okay.  You
15   need to be careful when you
16   answer.
17 BY MR. PIORKOWSKI:
18   Q.    Does it have anything to do
19 with the issues in this case?
20   A.    Only that it's a drug that
21 involves cardiology and the occurrence of
22 myocardial infarction, but it doesn't
23 involve this drug or any -- or this class
24 of drugs.

Page 163

1    Q.    Keep this as general as you
2  need to, but does it involve an
3  investigation of myocardial infarction as
4  an endpoint with the use of a certain
5  drug?
6    A.    With use of a certain
7  treatment, yes.
8    Q.    Did you design the study?
9    A.    I helped design it, yes.
10   Q.    Is the study underway?
11   A.    Yes, sir.
12   Q.    Anything else for Vasogen?
13   A.    No.
14   Q.    Any recollection on
15 Novartis?
16   A.    I'm still working on it.
17         MR. SIZEMORE:  Joe, is this
18   a good time to take a lunch break?
19         MR. PIORKOWSKI:  Sure.
20         MS. SNAPKA:  I have not said
21   anything prior.  I'm assuming you
22   don't want this muddled up by too
23   many -- that an objection by them
24   is good for mine as well?

Page 164

1          MR. PIORKOWSKI:  Yes.
2          MS. SNAPKA:  That's fine.
3          MR. SIZEMORE:  We had talked
4    about that, too.
5          MS. SNAPKA:  I didn't hear
6    it, I didn't know, and I just
7    wanted to make sure that that was
8    on the record that I didn't have
9    to object.
10         MR. SIZEMORE:  Objection for
11   one is good for all.
12              - - -
13         (Whereupon, a recess was
14    taken from 12:26 p.m. until 1:16
15    p.m.)
16              - - -
17 BY MR. PIORKOWSKI:
18   Q.    Doctor, have you ever
19 consulted for a company called Power
20 Three General?
21   A.    Power Three Medical.
22   Q.    I didn't see it on your
23 list.
24   A.    Yeah.  Actually, I should

Page 165

1  have put that there.  That's a local
2  biopharm group.
3    Q.    What have you done for them?
4    A.    We're in the process of
5  studying different combinations of
6  proteins, serum proteins as predictors
7  for Alzheimer's disease, Parkinson's
8  disease.
9    Q.    What's your role with that?
10   A.    To develop the stat models,
11 to develop the statistical models for
12 this.
13   Q.    For the clinical trials?
14   A.    No, it is not a clinical
15 trial at all, actually.  I would call
16 this kind of Phase II, just trying to get
17 sensitivity and specificity parameters
18 for the different tests we have.
19   Q.    Is this a current
20 consultancy?
21   A.    No.
22   Q.    Let me go back for a minute
23 to, I think you mentioned two or three
24 trials that you designed to evaluate

42 (Pages 162 to 165)

Lemuel A. Moye, M.D.

Page 166

1  arrhythmic effects?
2      A.   Yes.
3      Q.   Was the purpose of those
4  trials to evaluate the potential for
5  arrhythmias specifically as a primary
6  endpoint?
7      A.   Yes.
8      Q.   Is it fair to say that
9  arrhythmia generally is a fairly rare
10  side effect?
11      A.   I guess I wouldn't say that.
12  Let me back up a second.  There are
13  several -- I'm involved in several
14  arrhythmia studies, some of them looking
15  at chronic atrial fib.  Unfortunately
16  that's not rare at all.  That's common.
17  But there are some arrhythmias such as
18  torsades and ventricular tachycardia
19  which are very rare.
20      Q.   Okay.
21           And assuming that
22  arrhythmias -- well, is it correct that
23  the arrhythmias that you were looking at
24  specifically with respect to the

Page 167

1  antibiotic product and the antipsychotic
2  product, were those torsade and
3  ventricular fibrillation?
4      A.   Yes.
5      Q.   So, the side effects you
6  were evaluating were rare?
7      A.   Yes.
8      Q.   Okay.
9           And were you evaluating them
10  using prospectively designed clinical
11  trials?
12      A.   Yes.
13      Q.   How many patients did you
14  need to study those?
15      A.   We used, again, it's been a
16  long time, essentially less than 1,000
17  patients.  However, the endpoints of
18  those studies were not the torsades or
19  the v tach, which are very rare.  The
20  endpoints of those studies were
21  prolongation of the electrocardiogram.
22  And those we could measure fairly
23  precisely with a relatively small number
24  of subjects.  And so we were using that

Page 168

1  as a surrogate for the propensity for
2  torsade de pointes and v tach.
3      Q.   So, you didn't actually
4  measure Torsades and v tach or v fib?
5      A.   That's correct.  As I said,
6  anybody who had it, of course, we
7  accepted that, but it wasn't the endpoint
8  of the study.
9      Q.   Were there discussions about
10  the possibility of designing a study to
11  evaluate the actual endpoints of torsade
12  and v tach?
13      A.   Yes.
14      Q.   Was there a decision made
15  not to pursue those?
16      A.   Oh, yes.  Because in order
17  to have enough patients to evaluate the
18  effect of a therapy on torsade, you would
19  have to recruit the entire Eurasian
20  continent.  I mean, it is a fairly rare
21  disorder, and so you would need tens of
22  -- hundreds of millions patients in the
23  study to be able to detect that
24  particular endpoint.

Page 169

1      Q.   Okay.
2           Was that the same issue in
3  both of those products?  I know we've
4  been talking about them together, but the
5  antibiotic product and the antipsychotic
6  product was the same issue?
7      A.   Yes.
8      Q.   All right.
9           You also mention in
10  Paragraph 12 of your report, you talk
11  about the data monitoring committees, and
12  I think we already talked about the
13  Bristol-Myers Squibb data monitoring
14  committee.  When we were talking about
15  Key Pharmaceuticals, you mentioned
16  Nitro-Dur?
17      A.   Right.
18      Q.   I don't remember you
19  mentioning a monitoring board for Key
20  Pharmaceuticals.
21      A.   Right.  I served as one of
22  three members on the monitoring board for
23  a Nitro-Dur study.
24      Q.   Okay.

43 (Pages 166 to 169)

Lemuel A. Moye, M.D.

Page 170

1      I thought you told me
2  originally you designed the clinical
3  trials for that?
4      A.    That's true.
5      Q.    Okay.
6          So, you designed the trials
7  and you were on the monitoring board?
8      A.    That's correct.
9      Q.    Were you participating in
10  the clinical trials as an investigator at
11  the time you were on the board?
12      A.    Not as a clinical
13  investigator, but as the investigator
14  whose primary responsibility is to
15  collect the data and produce the reports
16  that would be analyzed by others.
17      Q.    Okay.
18          Is that past tense, that
19  monitoring board is completed?
20      A.    Yes.  It ended about --
21  well, maybe five, six years ago.
22      Q.    Was that clinical trial
23  terminated prematurely?
24      A.    No.

Page 171

1      Q.    Were there any unexpected
2  adverse events that arose in the course
3  of that clinical trial?
4      A.    I don't know how to answer
5  that actually.  I mean, I don't know what
6  happened to every patient.  There may
7  have been a small number of adverse
8  events that were serious, not
9  anticipated.
10      Q.    Were there any adverse event
11  report trends that were appreciated by
12  the data monitoring committee in that
13  clinical trial?
14      A.    No, there were not.
15      Q.    You also indicate that you
16  are currently on three DMCs.  I think you
17  told us about one already; is that right?
18      A.    Right.
19      Q.    What are the other two?
20      A.    Actually, there may be more
21  than that.  I'm on one that's looking at
22  the protocols to identify new useful
23  therapies for sickle cell disease.  And
24  that comes out of NHLBI, National Heart,

Page 172

1  Lung & Blood Institute.
2          I'm also on one that is,
3  again, underwritten by NHLBI that is
4  looking at the effect of exercise in
5  heart failure.
6      Q.    Now, are these clinical
7  studies?
8      A.    Yes.  These are both --
9  well, let me back up.  The sickle cell
10  program is an early -- is a collection of
11  Phase II/small Phase III programs.  And
12  so the DMC really is functioning as a
13  protocol review committee.  As much as it
14  is the review of adverse events and what
15  occurs to patients, it really has an
16  expanded role there.  So, that's a little
17  unusual in the traditional DMC paradigm.
18      Q.    Okay.
19      A.    HF action is the clinical
20  trial that the action DMC is overseeing.
21  It is one large multicenter,
22  multinational clinical program that's
23  assessing the effect of exercise in
24  patients with heart failure.

Page 173

1      Q.    In patients with?
2      A.    I'm sorry.  In patients with
3  heart failure.
4      Q.    Okay.
5          Is there any medication
6  involved in that?
7      A.    The medication -- the
8  inter --
9      Q.    Let me withdraw the question
10  and rephrase it.
11          Apart from medications that
12  the patient may be taking as a part of
13  their regular medical therapy, is that
14  clinical trial attempting to evaluate the
15  efficacy or safety of any particular
16  medical therapy?
17      A.    No.
18      Q.    Okay.
19          So, does that cover all of
20  the DMCs that you are on right now?
21      A.    No.  I'm on another one.
22  It's -- actually, I'm on two other ones.
23  One is looking at the effect of beta
24  blockade in helping patients who have

44 (Pages 170 to 173)

Lemuel A. Moye, M.D.

Page 174

1  pulmonary surgery to determine the
2  positive and negative effects of beta
3  blockers in this type of patient.  This
4  is funded now by NIH.
5      Q.   Okay.
6      A.   And there's one I just
7  joined that is assessing the effect of a
8  new therapy, whose name I don't remember
9  right now, on patients with scleroderma.
10     Q.   For what kind of drug?
11     A.   Anti-inflammatory -- no, no.
12 It is a drug related to steroids that
13 they believe might be useful in treating
14 patients with scleroderma.
15     Q.   Steroid-based compound?
16     A.   I believe so, yes.
17     Q.   Have you ever been on a data
18 monitoring committee for any COX-2
19 inhibitor or any nonselective NSAID?
20     A.   No.
21     Q.   Any other data monitoring
22 committees?
23     A.   That I'm currently on?
24     Q.   That you currently are on or

Page 175

1  that you have been on in the past.
2      A.   Yes.  There was one other
3  that I was on, and that was a trial that
4  was looking at the effect of blood
5  transfusions in patients with sickle cell
6  disease.
7      Q.   When was that?
8      A.   Oh, that was -- it ended in
9  2000.
10     Q.   Who was the sponsor of that?
11     A.   NHLBI.
12     Q.   All right.
13          Does that complete that
14 list?
15     A.   Yes.
16     Q.   You indicated in Paragraph
17 13 that you've appeared before the FDA on
18 behalf of sponsors on several occasions?
19     A.   Yes.
20     Q.   Which specific occasions or
21 which specific sponsors?
22     A.   Bristol-Myers Squibb.
23     Q.   What product?
24     A.   Captopril.

Page 176

1      Q.   Okay.
2      A.   Pfizer.  The name of the
3  product I think was ziprasidone,
4  Z-I-P-R-A-S-I-D-O-N-E.  Marion
5  Merrill-Dow and Seldane.  That's it.
6      Q.   That's it?
7           What was your role for
8  Bristol-Myers Squibb before the FDA?
9      A.   As --
10     Q.   You were hired by
11 Bristol-Myers Squibb to appear before the
12 FDA on their behalf?
13     A.   In the context of our
14 previous discussion about my work in SAE,
15 we had produced a new type of statistical
16 analysis that the FDA was not familiar
17 with, and I gave, I think, one lecture to
18 the FDA officials about the development
19 of this measure.
20     Q.   Okay.
21          So, you were not serving as
22 an advocate for the product, you were
23 just explaining the statistical method?
24     A.   That's correct.

Page 177

1      Q.   All right.
2           And is that your only
3  involvement before the FDA with
4  Bristol-Myers Squibb?
5      A.   Yes.
6      Q.   Was that an advisory
7  committee or a private meeting of FDA
8  officials?
9      A.   Private meeting with FDA
10 officials.
11     Q.   What about with respect to
12 Pfizer?
13     A.   Pfizer, I appeared before
14 the FDA in discussions involving
15 ziprasidone and the design of the study
16 that would look at the arrhythmogenic
17 potential of this new antipsychotic.
18     Q.   And was your role explaining
19 why the study was designed the way it was
20 designed?
21     A.   Yes.
22     Q.   And that's the discussion we
23 just had about the surrogate marker?
24     A.   Yes, sir.

45 (Pages 174 to 177)

Lemuel A. Moye, M.D.

Page 178

1    Q.   Okay.
2         Were you involved in
3    explaining the data from the clinical
4    trials to the FDA?
5    A.   No.
6    Q.   Just limited to the design
7    of the study?
8    A.   Yes.
9    Q.   With respect to Marion
10   Merrill-Dow -- actually, let me back up.
11        On the Pfizer front, was
12   that an Advisory Committee meeting or was
13   that a private meeting with FDA
14   officials?
15   A.   Private meeting.
16   Q.   With respect to Marion
17   Merrill-Dow, what was your involvement?
18   A.   I explained the result of
19   the study that we had carried out that
20   used ibuprofen as a comparator, and
21   looking at the incidence of -- well,
22   actually, prevalence of ventricular
23   tachycardia in torsade for terfenadine
24   versus control.

Page 179

1    Q.   That's the study we talked
2    about earlier?
3    A.   Yes.
4    Q.   Okay.
5         We didn't have your CV out
6    before.  Can you identify which one that
7    is in it?
8    A.   Sure, yes.  There's a fourth
9    one I should tell you about I just
10   remembered.
11   Q.   Sure.  We can come back to
12   that.
13   A.   What are we looking for now?
14   Q.   The study.
15   A.   The manuscript?
16   Q.   Right.
17   A.   38 on Page 5.
18   Q.   Okay.
19        Pratt is the first author?
20   A.   Yes.  And actually 37, too.
21   Both of them.
22   Q.   I'm sorry, 35 and 37?
23   A.   No, I'm sorry.  37 and 38.
24   Q.   37 and 38.

Page 180

1    A.   Right.
2    Q.   All right.
3         Craig Pratt is a colleague
4    of yours, right?
5    A.   Sure is.
6    Q.   And a personal friend?
7    A.   And a good friend.
8    Q.   Has he served on the FDA
9    cardiorenal advisory committee with you?
10   A.   Not with me, before me.
11   Q.   Before you, okay.
12   A.   Right.  I think he was chair
13   before I started.
14   Q.   I saw on the list of
15   reliance materials that you had reviewed
16   his testimony; is that right?
17   A.   Yes.
18   Q.   Did you rely on his
19   testimony in any way in reaching your
20   conclusions?
21   A.   No.  I read it.  I didn't
22   rely on it.
23        MR. SIZEMORE:  Which
24        testimony was that, just for the

Page 181

1         record?
2         MR. PIORKOWSKI:  Craig
3         Pratt's testimony in the Ernst
4         case.
5         THE WITNESS:  Yeah.
6    BY MR. PIORKOWSKI:
7    Q.   And that's the only one I
8    see on there.
9    A.   Right.
10        Excuse me.  I owe you a
11   fourth presentation before I forget.
12   Q.   Yes.
13   A.   It was actually just last
14   year.  It was May of 2005, and I
15   presented before the FDA on the use of
16   orthogonal discriminate analysis in
17   developing mixtures of proteomic tests to
18   predict Alzheimer's disease and
19   Parkinson's disease.
20   Q.   On whose behalf was that
21   presentation?
22   A.   Power Three Medical.
23   Q.   Was it in association with a
24   particular product?

Lemuel A. Moye, M.D.

Page 182

1    A.   Yes, it was.  The product
2  would be a test kit.
3    Q.   Did it have a product name
4  you were aware of?
5    A.   I would say not yet.  It
6  wasn't even that far.
7    Q.   All right.
8       Is it fair to say that that
9  presentation was also about the use of a
10  particular statistical technique?
11    A.   Yes, that's right.
12    Q.   And was that also to -- was
13  that a private meeting with FDA officials
14  as opposed to a public meeting?
15    A.   Private meeting.
16    Q.   Okay.
17       Have you ever spoken on
18  behalf of a pharmaceutical company
19  sponsor at a public meeting?
20    A.   No, sir.
21    Q.   Okay.
22       You've never made a
23  presentation, for example, at an Advisory
24  Committee meeting?

Page 183

1    A.   That's correct.
2    Q.   In Paragraph 14 of your
3  report, you talk about the fact that as a
4  part of your role as an Advisory
5  Committee member that you've reviewed
6  over 20 clinical trial programs of
7  private sponsors and commented in public
8  testimony that is part of the Federal
9  Registry.  Do you see that?
10    A.   Yes.
11    Q.   Are you referring there to
12  your service on the cardiorenal Advisory
13  Committee at cardiorenal Advisory
14  Committee meetings?
15    A.   Yes.  The only reason I
16  hesitated is that sometimes I was farmed
17  out to other Advisory Committee meetings,
18  like blood products, and so I think that
19  would have to be included in this.
20    Q.   Let me just ask it a little
21  differently.
22       You are aware that there are
23  transcripts on the FDA's website of
24  Advisory Committee meetings, right?

Page 184

1    A.   Well, from 1996 on.  At
2  least I can't find them earlier.
3    Q.   Okay.
4       But that's true regardless
5  of which Advisory Committee we're talking
6  about, whether it's the arthritis
7  Advisory Committee or the cardiorenal
8  Advisory Committee, from 1996 on, all of
9  those transcripts are on the FDA's
10  website, right?
11    A.   I believe so, yes.
12    Q.   Okay.
13       The commentary that you are
14  talking about in public testimony, to the
15  extent it's been since 1996, would all of
16  that be captured on a transcript on the
17  FDA's website?
18    A.   Yes, sir.
19    Q.   We don't have to look
20  anywhere else, in other words, to find
21  what you are referring to in Paragraph
22  14?
23    A.   That's correct.
24    Q.   Okay.

Page 185

1       Let's talk a little bit
2  about the development of Vioxx.
3       Is it correct that the
4  development started back in the
5  mid-1990s?
6    A.   That's my understanding.
7    Q.   That's your understanding?
8    A.   Yes.
9    Q.   And it followed the
10  discovery that the COX enzyme had two
11  different subcomponents?
12    A.   Yes.
13    Q.   The process started with
14  Merck filing an investigational new drug
15  application, right?
16    A.   Yes.
17    Q.   Doing preliminary tests in
18  animals?
19    A.   Yes.
20    Q.   And then seeking approval
21  for testing in humans, right?
22    A.   Yes.
23    Q.   The way human testing works
24  pursuant to FDA regulations is, it is

47 (Pages 182 to 185)

Page 186

1    done in three phases, right?
2        A.    Traditionally, yes.
3        Q.    Traditionally, and also I
4    mean that prior to the initial approval.
5    There's sometimes what's call it Phase IV
6    after an approval, right?
7        A.    Right.  The only reason I
8    quibble with that, the distinction
9    between Phase I, Phase II and Phase III
10   has gotten very blurred recently.  But I
11   think in the mid-1990s it was still the
12   traditional.
13       Q.    Phase I at least at that
14   time was generally testing in healthy
15   volunteers?
16       A.    Yes.  Well, it is tested in
17   people that have the affliction that the
18   investigators believe the drug would be
19   most effective in
20       Q.    In your review of FDA
21   materials and Merck internal documents,
22   did you see Merck had meetings with the
23   FDA at the end of Phase II?
24       A.    Yes.

Page 187

1        Q.    There were multiple
2    meetings; is that right?
3        A.    Yes.
4        Q.    Do you understand what the
5    purpose of end of Phase II meetings is
6    between a sponsor and the FDA?
7        A.    Yes, I do.
8        Q.    What is the that?
9        A.    The purpose is to, number
10   one, make sure that the sponsor and the
11   FDA understand each others' positions
12   about what's been demonstrated about the
13   drug, particularly dose-specific efficacy
14   and dose-specific hazard.
15       Q.    And is it fair to say --
16       A.    One thing.  I'm sorry.
17            And then to begin the
18   delicate stage of discussions about what
19   caliber of Phase III studies or what
20   collection of Phase III studies would be
21   most useful in gaining approval.
22       Q.    Part of the reasoning
23   underlying having an end of Phase II
24   meeting is it doesn't make a lot of sense

Page 188

1    for a sponsor to invest extensively in
2    conducting Phase III studies that the FDA
3    is going to find unacceptable on their
4    face?
5        A.    Right.
6        Q.    Is that fair to say?
7        A.    Sure.
8        Q.    Okay.
9            Now, at this end of Phase II
10   meeting, does the FDA have an opportunity
11   to comment on the study design of the
12   Phase III clinical trials?
13       A.    Certainly.  That's one of
14   the --
15            MR. WACKER:  I --
16            THE WITNESS:  Sorry.
17            MR. WACKER:  I was just
18       going to say objection.
19            THE WITNESS:  That's one of
20       the reasons to have these end of
21       Phase II discussions.
22   BY MR. PIORKOWSKI:
23       Q.    Among the things the FDA has
24   an opportunity to comment on are the

Page 189

1    number of patients, right?
2        A.    Yes, sir.
3        Q.    The type of patients?
4        A.    Yes.
5        Q.    The subgroups that might be
6    considered being analyzed as a part of
7    the patient population?
8        A.    Sure.
9        Q.    The dosages of medication to
10   be tested?
11       A.    Yes.
12       Q.    The length of time for which
13   those dosages need to be tested?
14       A.    Yes.
15       Q.    Okay.
16            The endpoints that the
17   company should be attentive to during the
18   Phase III clinical studies?
19       A.    That's part of it as well.
20       Q.    Okay.
21            Any other aspects that I
22   didn't mention specifically?
23       A.    The performance of the data
24   monitoring committee.  The creation of

Lemuel A. Moye, M.D.

Page 190

1    appropriate monitoring rules, document
2    rules, notion of multiplicity of testing,
3    triaging primary versus secondary
4    endpoint analyses, how exploratory
5    analyses would be considered, what trials
6    are being carried out by other sponsors
7    looking at related compounds. I think as
8    I sit here now, that's all I can think
9    of.
10        Q.    But those would all be areas
11   that the FDA would have an opportunity to
12   comment on at these end of Phase II
13   meetings?
14        A.    Yes.
15        Q.    Okay.
16           And from your review of the
17   records in Vioxx, did the FDA actually
18   have an opportunity to comment on those
19   with respect to Merck, with respect to
20   Vioxx?
21           MR. WACKER: Object to form.
22           THE WITNESS: They had the
23   opportunity.
24   BY MR. PIORKOWSKI:

Page 191

1        Q.    Is it your understanding
2    that the FDA gave Merck input on issues
3    like the number of patients that need to
4    be studied, the types of patients that
5    need to be studied, the dosages that need
6    to be studied, et cetera?
7        A.    I don't recall the specific
8    details, but they did have input on
9    important matters in trial design.
10        Q.    When Merck undertook its
11   Phase III studies, is it your
12   understanding that the biggest group of
13   patients were osteoarthritis patients?
14        A.    Yes.
15        Q.    Let me digress for a minute
16   and ask you some questions related to
17   aspirin and stroke, because you have a
18   discussion in your report about stroke,
19   right?
20        A.    Yes, sir.
21        Q.    Am I correct that there are
22   two different kinds of stroke that are
23   commonly recognized?
24        A.    Yes, sir.

Page 192

1        Q.    One type of stroke is what's
2    called a thrombotic or sometimes it is
3    called an ischemic stroke?
4        A.    Yes, sir.
5        Q.    That's related to a blood
6    clot basically?
7        A.    Yes.
8        Q.    Okay.
9           The other kind of stroke is
10   referred to as a hemorrhagic stroke?
11        A.    Yes, sir.
12        Q.    That is different in how it
13   occurs. That tends to be more related to
14   a bleeding episode?
15           MR. SIZEMORE: Object to
16   form.
17           THE WITNESS: It is not
18   quite as easy as that. A
19   hemorrhagic stroke is a stroke in
20   which an immediate product is the
21   rupture of a blood vessel. It
22   doesn't mean a thrombus didn't
23   cause it. But the result, the
24   rupture of the blood vessel is

Page 193

1           what characterized it as
2           hemorrhagic.
3    BY MR. PIORKOWSKI:
4        Q.    But they are recognized as
5    different events. Fair to say?
6        A.    Certainly different
7    pathology, yes.
8        Q.    Different pathology,
9    different endpoints when they are
10   considered in clinical trials?
11        A.    Potentially, yes.
12        Q.    Okay.
13           And I want to bring this
14   back to the context of aspirin, but one
15   thing we know about drugs in general is
16   that there are almost no drugs that are
17   all good or all bad. They all have some
18   helpful effects and some not so helpful
19   effects. Is that a fair statement?
20        A.    Well, I would say that every
21   drug has -- is associated with a
22   collection of adverse events.
23        Q.    Sometimes, though, the
24   effect, the physiological effect that's

Lemuel A. Moye, M.D.

Page 194

1  causing the drug to be helpful may also
2  cause an adverse event, right?
3      A.   Yes.
4      Q.   That's exactly the case in
5  aspirin, right?
6      A.   Yes.
7      Q.   Aspirin is well known to
8  prevent the clotting type of strokes,
9  right?
10     A.   Yes.
11     Q.   And on the other hand,
12 aspirin is known to cause the bleeding
13 kind of strokes?
14     A.   Well, I would say this.
15         Aspirin has been strongly --
16 associated with the bleeding types of
17 strokes.  I don't know that I can sit
18 here and say the literature says that
19 aspirin causes hemorrhagic stroke.  I do
20 know it has been associated with it.  But
21 the preponderance of the literature lines
22 up nicely with your first statement, and
23 that is, aspirin prevents ischemic
24 nonbleeding strokes.

Page 195

1      Q.   Well, it's fair to say that
2  there's been controversy for many years
3  about whether aspirin should just be
4  given to everybody or not, right?
5      A.   Yes.
6      Q.   The reason that we don't all
7  take aspirin every day is because there
8  is a risk of hemorrhagic stroke?
9      A.   That's one of the reasons,
10 yes.
11     Q.   Okay.
12         That's the reason that the
13 recommendation is only to give aspirin to
14 people who are at a higher risk, right?
15     A.   Right.
16         MR. SIZEMORE:  Object to
17     form.  I'm sorry.
18         THE WITNESS:  There are
19     several reasons why it is
20     restricted to patients who are at
21     higher risk.  One reason, perhaps
22     the most important, is that that's
23     been the group that has been
24     studied the most intensively and

Page 196

1  we have the most information on.
2         We have no information among
3  aspirin use, prophylactic aspirin
4  use for teenagers or people in
5  their 20s.  We just don't have
6  information about that.  So, the
7  main reason that we have the
8  limitation is because we studied a
9  large number in this cohort.
10 BY MR. PIORKOWSKI:
11     Q.   Also, aspirin has
12 gastrointestinal side effects as well as
13 potential cardiovascular side effects,
14 right?
15     A.   Well, it certainly has
16 gastrointestinal side effects, that's
17 right.
18     Q.   Now, the way aspirin works
19 in terms of -- let me back up.
20         Do I understand you to say
21 that there's pretty solid scientific
22 evidence that aspirin prevents the
23 clotting type of stroke?
24     A.   Yes.

Page 197

1      Q.   And the way aspirin does
2  that is it blocks an enzyme known as
3  thromboxane, right?
4      A.   Right.
5      Q.   Thromboxane, the word
6  "thrombo" means clot, right?
7      A.   Yes.
8      Q.   And thromboxane is an enzyme
9  that kind of causes the blood to tend to
10 clot, right?
11     A.   Excuse me.  Everything else
12 being equal.  I mean, we have to admit
13 that the entire clotting mechanism is a
14 delicate balance that involves a whole
15 panoply of enzymes, proenzymes that
16 govern it.  So, everything else being
17 equal, the addition of aspirin tends
18 to -- well, excuse me, thromboxane tends
19 to produce clotting, as we're talking
20 about it.
21     Q.   So, comparing a patient who
22 is the same patient, a patient who is not
23 taking aspirin and a patient who is
24 taking aspirin, the patient who is taking

Lemuel A. Moye, M.D.

Page 198

1  aspirin will have thromboxane inhibited
2  by the aspirin, right?
3      A.   Yes.
4      Q.   The way aspirin works is it
5  blocks thromboxane irreversibly, right?
6      A.   Yes, that's right.  For the
7  life of the platelet.
8      Q.   For the life of the
9  platelet?
10     A.   Yes.
11     Q.   Okay.
12         What that means as a
13 practical matter, your platelets
14 regenerate themselves, right?
15     A.   Yes.
16     Q.   So, within a couple of days,
17 you have new platelets that are not
18 inhibited?
19     A.   Unless you continue to take
20 aspirin.
21     Q.   Unless you continue to take
22 aspirin, in which case aspirin
23 irreversibly inhibits the new ones,
24 right?

Page 199

1      A.   Yes.
2      Q.   Aspirin has that effect of
3  irreversibly inhibiting thromboxane even
4  at fairly low doses, right?
5      A.   Yes.
6      Q.   At 81 milligrams a day?
7      A.   Yes.
8      Q.   Now, I want to just talk
9  briefly about the myocardial infarction
10 process.  Are you familiar with that from
11 your work in cardiology drugs?
12     A.   Yes.
13     Q.   Typically when a myocardial
14 infarction occurs, the process starts
15 with some degree of plaque buildup in the
16 artery; is that right?
17     A.   Yes.
18     Q.   And the initiating event
19 most often is what's referred to as a
20 plaque rupture or a plaque fissure?
21         MR. SIZEMORE:  Object to
22     form.
23         THE WITNESS:  That's one
24     possible initiating event, that's

Page 200

1      correct.
2  BY MR. PIORKOWSKI:
3      Q.   It is what's regarded as the
4  most common initiating event, right?
5         MR. SIZEMORE:  Object to
6     form.
7         THE WITNESS:  Well, I would
8     say that the thrombus is what
9     really -- maybe we're having a
10    little discussion about
11    terminology.  The thrombus is what
12    initiates the actual heart attack.
13 BY MR. PIORKOWSKI:
14     Q.   I just want to walk through
15 the process, and correct me if I'm wrong.
16     A.   Okay.
17     Q.   It all has to start with a
18 beginning point?
19     A.   Right.
20     Q.   A thrombus doesn't just
21 spontaneously form in the absence of a
22 plaque rupture?
23         MR. SIZEMORE:  Object to
24     form.

Page 201

1         THE WITNESS:  Unless you've
2     thrown an embolus.
3  BY MR. PIORKOWSKI:
4      Q.   Unless you've thrown an
5  embolus, right.
6      A.   Right.
7      Q.   But, I mean, under normal
8  circumstances, unless you've thrown an
9  embolus, a clot just doesn't form in your
10 artery spontaneously?
11     A.   That's right.
12     Q.   Typically, what happens with
13 a myocardial infarction is the process
14 starts with a plaque rupture or fissure,
15 right?
16     A.   Well, I guess typically it
17 starts with the development of this
18 atherogenic gruel over time that narrows
19 the artery.
20     Q.   All right.
21         That's a good point.  Let's
22 back up and start there.
23         What plaque represents is a
24 buildup of, as you called it,

51 (Pages 198 to 201)