Lemuel A. Moye, M.D.

Page 258

1  events because of the patient
2  populations, right?
3      A.   Yes, right.
4      Q.   They are talking about
5  cardiovascular events?
6      A.   Yes. I assume they are
7  talking about CV events, yes.
8      Q.   All right.
9           And the reason there's an
10 increased risk of those events in the
11 Alzheimer's population is because the
12 Alzheimer's population by definition is
13 an older population, right?
14     A.   Right.
15     Q.   The rheumatoid arthritis
16 population has an increased probability
17 because rheumatoid arthritis patients
18 have an increased risk of cardiovascular
19 events. Correct?
20     A.   Right.
21     Q.   Now, do you see at the very
22 bottom it goes on to say, "Such data
23 would address whether the net effect of
24 these COX-2 inhibitors on coronary

Page 259

1  ischemic events and stroke are favorable
2  or adverse"?
3      A.   I'm sorry. I'm not with
4  you. What page are you on?
5      Q.   I'm on Page 14.
6      A.   Okay. Thank you.
7      Q.   Did I read that correctly?
8      A.   Yes. I'm sorry.
9      Q.   And so the Board of
10 Scientific Advisors is entertaining both
11 possibilities, that Vioxx may have a
12 favorable effect on cardiovascular
13 disease and the possibility that Vioxx
14 may have an adverse effect on
15 cardiovascular disease, true?
16     A.   That's right. But both
17 possibilities are posed here.
18     Q.   Okay.
19          They go on in the next
20 sentence to say, "Knowledge that this
21 plan is in place should be reassuring to
22 the FDA as they consider the prostacyclin
23 biosynthesis question." Right?
24     A.   They say that.

Page 260

1      Q.   Do you know if the FDA did
2  consider the prostacyclin biosynthesis
3  question?
4      A.   I don't know if they
5  considered it. I also don't know if they
6  were reassured.
7      Q.   All right.
8           Do you know whether Merck
9  actually did implement the procedure that
10 the scientific advisors recommended?
11     A.   I believe they did, yes.
12     Q.   Was that procedure known as
13 the cardiovascular standard operating
14 procedure?
15     A.   Yes.
16     Q.   Okay.
17          Do you have any criticisms
18 of their having implemented this
19 cardiovascular standard operating
20 procedure?
21     A.   The criticisms I have of
22 this -- how about we say CSOP?
23     Q.   CVSOP?
24     A.   CVSOP. Okay.

Page 261

1           The criticisms I have of the
2  CVSOP are twofold. One, because you are
3  trying to apply it to trials that are
4  already in place, it is going to be
5  difficult to produce the kind of
6  standardization that you and I have
7  discussed.
8           Secondly, the CVSOP cannot
9  suck all of the air out of the room, that
10 is to say, it can't be the only mechanism
11 by which Merck decides to assess the
12 tenability of this CV -- of the
13 rofecoxib/CV relationship, CV adverse
14 event relationship.
15          There are many ways to
16 detect a signal. This is one of them.
17 There's no guarantee it will work, and it
18 is unreasonable to rely on this and only
19 on this.
20     Q.   But you don't know if they
21 did rely on this and only this because
22 you're not sure what other studies they
23 did?
24     A.   Well, I know -- well, I do

66 (Pages 258 to 261)

Page 262

1  know, I would say I think do know the
2  answer to that, because when they -- this
3  is all, as you and I have discussed, this
4  is all theory. I mean, what we're
5  talking about here in 1998, the Advisory
6  Committee is saying very nicely that we
7  don't know what the effect is. It may be
8  beneficial, it may be harmful.
9      So, we have to pay -- so,
10 their recommendation to Merck, again, to
11 be brief, is to be vigilant. But we do
12 know, at least I believe I know, that
13 Merck was not vigilant, because when they
14 had data that allowed them to put the
15 elegant theory aside and look at the cold
16 hard fact of the matter, in fact, they
17 did not pay attention to that, and
18 perhaps one of the reasons is they were
19 so invested in this CVSOP, maybe not, but
20 they didn't pay attention to the
21 information when it became available.
22     Q.  What data are you referring
23 to?
24     A.  What data? The Watson

Page 263

1  report.
2      Q.  Okay.
3          Is there any other data that
4  you believe Merck had that showed CV risk
5  at that time?
6      A.  No. I mean, primarily it is
7  the Watson data.
8      Q.  Okay.
9          You would agree with me that
10 if what you are trying to do -- strike
11 that.
12         You described two options
13 for trying to apply uniform criteria,
14 right?
15     A.  Yes.
16     Q.  One option is to have an
17 outside adjudication committee who
18 reviews each case, makes a determination
19 according to the standard uniform set of
20 criteria?
21     A.  Yes.
22     Q.  The other option is to equip
23 the investigators with these uniform set
24 of criteria and rely on them to adhere to

Page 264

1  those?
2      A.  Yes.
3      Q.  One of the problems that you
4  just identified is that they were trying
5  to apply this in part to studies that
6  were already ongoing, right?
7      A.  Right.
8      Q.  When you're trying to apply
9  those two options to studies that are
10 already ongoing, the option of an
11 independent adjudication committee is
12 really the only viable option, right?
13     A.  Except I think you
14 underestimate the diluting effect of the
15 consensus process. If one considers that
16 the worst thing that happens with these
17 external committees is they adjudicate
18 out important signals to reach a
19 consensus, then I would disagree.
20         Certainly having
21 investigators make their own
22 determination when you have post hoc
23 criteria is problematic. I am not going
24 to deny that. That's kind of

Page 265

1  self-evident. But it might be worth it
2  to do that and accept that degradation in
3  signal rather than rely on an expert
4  committee which may dilute the signal by
5  coming to a consensus.
6      Q.  Have you looked at any
7  documents that talked about how many
8  events there was a dispute about on any
9  of the adjudication committees?
10     A.  Not in this matter, no. But
11 I have experience in my own experience,
12 but I don't know what the adjudication
13 rate is in any of the clinical trials
14 involving Vioxx.
15     Q.  But apart from the
16 adjudication rate, I'm talking about the
17 agreement among the members of the
18 adjudication committee.
19     A.  I'm sorry. That's what I
20 meant to imply. The agreement rate is a
21 better term. Right.
22     Q.  All right.
23         Is it your understanding
24 that Merck had one adjudication committee

Page 266

1  or multiple adjudication committees?
2      A.   I don't know.
3          MR. PIORKOWSKI:  Why don't
4  we take five minutes.
5          - - -
6          (Whereupon, a recess was
7  taken from 3:01 p.m. until 3:15
8  p.m.)
9          - - -
10 BY MR. PIORKOWSKI:
11     Q.   Dr. Moye, the data that you
12 indicated that the FDA did not have and
13 that the Advisory Committee did not have
14 was set forth in the Watson memo, right?
15     A.   That the Advisory Committee
16 did not have is in the Watson memo,
17 that's right.
18     Q.   Do you know whether the FDA
19 did or didn't have that?
20     A.   The FDA gets a wealth of
21 material from Merck.  I can't tell you,
22 I've gone through the thousands of pages
23 to see if the Merck -- this data was in
24 it, but I do know that the Advisory

Page 267

1  Committee didn't get it.
2      Q.   You know that because it
3  wasn't in the background package and
4  because it wasn't in the FDA's package?
5      A.   And it wasn't discussed at
6  the meeting.
7      Q.   So, your assumption is if it
8  was provided, then it would have been
9  discussed at the meeting?
10         MR. WACKER:  Objection to
11 the form.
12         THE WITNESS:  Well, no.  My
13 assumption is, if it wasn't in the
14 FDA packet and it wasn't in the
15 background packet and it wasn't
16 discussed in the meeting, then the
17 Advisory Committee did not get it.
18         - - -
19         (Whereupon, Deposition
20 Exhibit Moye MDL 7, "Final Results
21 of an Analysis of the Incidence of
22 Cardiovascular SAEs in the Phase
23 IIb/III Vioxx Osteoarthritis
24 Clinical Trials" 2-2-98 (Watson)

Page 268

1  MRK-AAD0046029 - MRK-AAD0046052,
2  was marked for identification.)
3          - - -
4  BY MR. PIORKOWSKI:
5      Q.   Now, let me hand you what
6  I've marked as Exhibit 7 and ask you if
7  that is the Watson memo that you're
8  referring to, the Watson analysis,
9  rather.
10     A.   Yes, it is.
11     Q.   Okay.
12         Your understanding of this
13 is that it was done in early 1998, right?
14     A.   Yes, sir.
15     Q.   And that it showed, I think
16 the words you used in your report is a
17 clear signal of increased cardiovascular
18 risk associated with rofecoxib therapy,
19 right?
20     A.   Yes, sir.
21     Q.   That's Vioxx?
22     A.   Yes.
23     Q.   All right.
24         Now, do you understand the

Page 269

1  study design for the Watson analysis?
2      A.   Yes, I think so.  It is a
3  little complicated, but I believe I
4  understand it.
5      Q.   Okay.
6          What's your -- can you give
7  me your basic understanding of what the
8  design was?
9          MR. WACKER:  Object to form.
10         THE WITNESS:  Sure.  What
11 they wanted to do was to get some
12 sense of the adverse events
13 associated with Vioxx versus what
14 a reasonable background rate would
15 be.  They had several trials that
16 were placebo controlled that also
17 involved other drugs -- that
18 involved drugs in these other
19 trials, including Fosamax.
20         And so what they did was
21 combine groups to try to get a
22 sense for whether the adverse
23 event rate, I should say
24 cardiovascular adverse event rate

Page 270

1  here for patients who were on
2  Vioxx was different than the
3  adverse event rate, cardiovascular
4  adverse event rate seen by
5  patients in other studies.
6  BY MR. PIORKOWSKI:
7     Q.  So, your understanding is
8  the comparison was between patients
9  taking Vioxx and the placebo group from
10 the Fosamax study?
11    A.  And also I think Proscar.
12    Q.  And the placebo group from
13 the Proscar study?
14    A.  Right.
15    Q.  But that was the basic
16 comparison?
17    A.  Yes.
18    Q.  Okay.
19       And your understanding is
20 that that comparison showed an increased
21 risk of cardiovascular events?
22    A.  Yes.
23    Q.  Okay.
24       Now, do you see in the very

Page 271

1  first page of Dr. Watson's analysis, I
2  guess it's page letter i, small letter i?
3     A.  Yes.
4     Q.  The analysis that he
5  conducted was based on the incidence of
6  thrombotic cardiovascular serious adverse
7  events among patients in the Vioxx Phase
8  IIb and III osteoarthritis trials and
9  their extensions, right?
10    A.  Yes.
11    Q.  Okay.
12       Now, is it your
13 understanding that all of the data from
14 Phase IIb and III osteoarthritis studies
15 that were completed at the time of the
16 approval had been submitted to the FDA
17 for their consideration?
18    A.  I believe that that's true,
19 yes. I think I would expect that to be
20 part of the NDA.
21    Q.  You would expect an
22 evaluation of all of the Phase II and III
23 OA trials to be part of the NDA?
24    A.  Yes.

Page 272

1     Q.  And you would expect that
2  any serious adverse events including
3  cardiovascular serious adverse events
4  would be included and analyzed as a part
5  of that, right?
6     A.  I would hope they would be
7  included and hope that they would be
8  analyzed and hope that it would appear
9  prominent.
10    Q.  You said you reviewed
11 something called the integrated summary
12 of safety, right?
13    A.  Yes.
14    Q.  The integrated summary of
15 safety is just that, it's a summary of
16 data on a variety of different safety
17 endpoints of the clinical trial data that
18 were done in Phase III, right?
19    A.  Yes.
20    Q.  When you reviewed the
21 integrated summary of safety, was there
22 any indication that in the Phase IIb and
23 III OA trials that there was an increased
24 risk of serious cardiovascular events?

Page 273

1     A.  When I reviewed the ISS?
2     Q.  Yes.
3     A.  I don't think I was. And I
4  think I was struck by the relatively
5  small number of patients, but I don't
6  think there was any acknowledgment of an
7  increased cardiovascular risk in the IND.
8        MR. WACKER: Let's not make
9     this a memory test if you need to
10    go to the document.
11 BY MR. PIORKOWSKI:
12    Q.  Actually, hang on a minute.
13 You said you were struck by the small
14 number of patients. Is that what you
15 said?
16    A.  Yes.
17    Q.  You mean you were struck by
18 the small number of patients that were
19 studied as part of the Phase III studies?
20    A.  Yes.
21    Q.  What products have you sat
22 on the Advisory Committee for that have
23 had more patients studied in Phase III
24 that have been approved than Vioxx did?

Lemuel A. Moye, M.D.

Page 274

1  A.  Sitting here, I can't
2  remember.
3  Q.  Do you know, do you have a
4  sense of -- are you familiar with the ICH
5  guidelines --
6  A.  Yes.
7  Q.  -- for patients?
8  A.  Yes.
9  Q.  The ICH guidelines are
10 followed by the FDA, is that right?
11 A.  Right.
12 Q.  Do you know how many times
13 greater than the ICH guidelines the Vioxx
14 population of clinical trial patients
15 was?
16 A.  No, I don't.
17 Q.  When we started talking
18 about the Watson analysis, you said one
19 of the things that they were trying to do
20 is get a rough understanding of how what
21 was seen in Vioxx compared with the
22 general population?
23 A.  With what they thought would
24 be an appreciable, a fair representation

Page 275

1  of the background rate.
2  Q.  Okay.
3      In concept, is that a fair
4  thing to do, to try to get an
5  appreciation of whether to do a
6  comparison against what you think the
7  background rate would be?
8      MR. WACKER:  Object to form.
9      THE WITNESS:  It's
10 acceptable.  Obviously the best
11 thing to do is to have a large
12 trial that within one study
13 compares patients in the active
14 group and the control group for CV
15 adverse event.  And if you can't
16 do that, then what was attempted
17 here is a reasonable step.  I
18 mean, it has epidemiologic
19 validity.
20 BY MR. PIORKOWSKI:
21 Q.  Do you understand that when
22 the Watson analysis was undertaken that
23 there were some studies that were already
24 unblinded?

Page 276

1  A.  Yes.
2  Q.  And the studies that were
3  already unblinded did not show an
4  increased risk compared to NSAID
5  comparators?
6  A.  I would have to look at
7  those to see myself.
8  Q.  Do you know one way or the
9  other?
10 A.  Excuse me?
11 Q.  Do you know one way or the
12 other?
13 A.  I would have to look to see.
14 No, I don't.
15 Q.  Okay.
16     Where would you need to
17 look?
18 A.  I need to look at the
19 results of those studies.
20 Q.  Do you understand that the
21 Watson analysis was based on the patients
22 that were unblinded -- I'm sorry, the
23 patients that were still blinded?
24 A.  Still blinded, yes.

Page 277

1  Q.  Do you understand that?
2  A.  Yes.
3  Q.  And if they were still
4  blinded, that meant that you couldn't
5  tell whether they were taking Vioxx or
6  not, right?
7  A.  Right.
8  Q.  I mean, if patients in a
9  clinical study are blinded, you don't
10 know what treatment medication they're
11 taking, right?
12 A.  That's right.
13 Q.  That's what blinded means?
14 A.  That's right.
15 Q.  Now, do you see on Page 3
16 where it talks about study populations?
17 A.  Yes, I do.
18 Q.  The two study populations
19 that they talk about, they essentially
20 give the definitions.  They talk about
21 Vioxx patients?
22 A.  Right.
23 Q.  And they talk about Proscar
24 and Fosamax placebo patients, right?

Lemuel A. Moye, M.D.

Page 278

1   A.   Right.
2   Q.   Okay.
3        And those are the groups
4   that you just told me that you understood
5   were compared?
6   A.   Yes, that's right.
7   Q.   Okay.
8        Do you see under Vioxx
9   patients where it says that "All
10  treatment groups from the Vioxx studies
11  were combined"?
12  A.   Yes.
13  Q.   "All patients receiving at
14  least one day of study drug (placebo,
15  active NSAID comparator, or Vioxx) in
16  double blind, placebo controlled trials
17  of Vioxx were included in the analysis."
18  A.   Right.
19  Q.   So, that means that some of
20  the people in the analysis were Vioxx
21  patients?
22  A.   Right.
23  Q.   Other people in the analysis
24  may have been diclofenac patients or

Page 279

1   ibuprofen patients?
2   A.   Okay.
3   Q.   And other people may have
4   been placebo patients?
5   A.   Right.
6   Q.   And regardless of what they
7   received for purposes of this analysis,
8   they were treated as, quote, Vioxx
9   patients?
10  A.   Right.
11  Q.   So, we're not dealing with
12  just patients taking Vioxx here?
13  A.   Right.
14  Q.   We're talking about the
15  result for all patients who are in the
16  Vioxx clinical trial program regardless
17  of whether they were receiving Vioxx,
18  placebo or a comparator, right?
19  A.   Yes. Right.
20  Q.   So, if there's an increased
21  risk even for the sake of discussion, we
22  don't know if that increased risk is
23  related to Vioxx or not?
24  A.   Actually, it is even worse

Page 280

1   than that.  There is an increased risk,
2   and, in fact, the increased risk is seen
3   in patients who are either on Vioxx or
4   not on Vioxx.  Which means when you
5   combine these groups, and let's presume
6   for a second that patients in the placebo
7   group aren't going to have an increased
8   risk and there's no reason to suspect
9   that patients on other active NSAIDs are
10  going to have an increased risk, so,
11  you've got a group whose risk you don't
12  know, the Vioxx group, to be fair, a
13  group whose risk you don't know, Vioxx,
14  versus combined with a group whose risk
15  you do know, and you wind up with a risk
16  that's elevated above -- a rate that's
17  elevated above placebo, that makes me
18  think that what we've got here is a bias
19  to the null.
20       And, in fact, if you had
21  excluded the group that you pointed out
22  that were on placebo or on diclofenac or
23  something else, excluded those patients
24  since they don't have an elevated risk,

Page 281

1   the risk we see here, the risk that we
2   would see in that comparison would be far
3   greater.  So, this is an underestimate of
4   the effect.
5   Q.   Doctor, what you've got here
6   is you've got an analysis that's done on
7   blinded patients that puts together Vioxx
8   users, other NSAID users and placebo
9   users, right?
10  A.   Right.
11  Q.   And compares that to the
12  placebo group from another study, right?
13  A.   Right.
14  Q.   These data are later
15  unblinded, right?
16  A.   Yes.
17  Q.   Those unblinded data are
18  analyzed, right?
19  A.   Yes.
20  Q.   Those unblinded data are
21  reported, and the CV event rates are
22  analyzed, right?
23  A.   You mean where?
24  Q.   In the new drug application.

Page 282

1   A.   In the NDA.  Somewhere in
2  the NDA.  Okay.
3   Q.   Well, in the integrated
4  safety summary.
5   A.   Okay.
6   Q.   Do you dispute that these
7  data are set forth in the integrated
8  safety summary?
9   A.   I don't know as I sit here
10 whether Table 6 appears in the ISS.
11  Q.   As an epidemiologist, if you
12 have the same data unblinded completed
13 study, analyzed in accordance with the
14 original study protocol, is that more
15 meaningful than an analysis that is
16 conducted that groups patients together
17 and compares it against a historical
18 placebo group?
19  A.   If I'm looking for efficacy,
20 then I take your point.  If I am looking
21 for signal of harm, which requires me to
22 be vigilant and really turn over, open
23 all the closets to find it, then the
24 answer is no.  This epidemiologic

Page 283

1  evaluation as presented here carries
2  important weight in demonstrating a
3  signal associated with Vioxx use.  In
4  fact, this Table 6 and 7 underestimated
5  the strength of association between Vioxx
6  and CV adverse events.
7   Q.   How can you say that when
8  you've got the results of the Phase III
9  clinical studies after they have been
10 unblinded and analyzed in comparison with
11 the original study protocol?
12  A.   Well, for a couple of
13 reasons.  Number one, smaller numbers.
14 Those studies that you just described
15 were not designed to look for CV events.
16 They are underpowered.  Now we're in an
17 environment which may not be -- may not
18 have exceedingly high power, but has more
19 power.  And, in fact, when we have more
20 power, a signal emerges.
21  Q.   Where does that come from?
22  A.   Well, we've got more
23 patients here.
24  Q.   Doctor, did you read the

Page 284

1  Konstam article?
2   A.   Yes.
3   Q.   Konstam did a meta-analysis
4  of all of the OA studies after the VIGOR
5  study came out.  Do you recall that?
6   A.   Right.
7   Q.   There was no increased CV
8  risk.
9       MR. WACKER:  Object to form.
10 BY MR. PIORKOWSKI:
11  Q.   Is that true?
12  A.   Marv found no CV risks.
13  Q.   What's that?
14  A.   Marv Konstam found no
15 elevated CV risks.  However, that was
16 after VIGOR came out.  This is 1998.  And
17 in February 1998, the information that
18 was in Merck's possession, which we now
19 know to be right, is that there is
20 increased cardiovascular risk associated
21 with Vioxx.
22  Q.   Doctor, the data that Marv
23 Konstam analyzed is the same data that
24 Watson did his analysis on, isn't it?

Page 285

1   A.   Well, I don't know.  I think
2  that there might be some differences.
3  Well, I have to look and see, not so much
4  the data, but the definitions they use.
5       But nevertheless, in 1998,
6  they didn't have the Konstam
7  meta-analysis, they had this in the
8  presence of -- well, they had this, and
9  this information to me reveals that there
10 is increased CV risk associated with
11 Vioxx.
12  Q.   One analysis of unblinded
13 patients that may or may not have been
14 using Vioxx compared to two clinical
15 trial historical placebo groups, that's
16 the basis of your saying that Merck
17 withheld information?
18  A.   Well, I would say the best
19 epidemiologic information you had based
20 on a combination of studies which
21 increased power and was subject to a bias
22 to the null demonstrates an increased
23 risk in most all demographic subgroups
24 when they were warned there might be one

Page 286

1  there.
2      Q.   When you say "bias to the
3  null," what's your understanding of what
4  the rate of serious cardiovascular
5  adverse events is in the general
6  population or in the placebo group?
7      A.   I'd have to look it up.  I
8  don't know.  I didn't come prepared to
9  answer that.
10     Q.   Do you have any notion?
11     A.   I wouldn't speculate.  It
12 depends on risk factors.  It depends on
13 lots of things.
14     Q.   Okay.
15          You said today we know that
16 there's no increased risk associated with
17 other NSAIDs.  What's your basis for
18 saying that?
19     A.   I'm saying -- what I'm
20 saying is that there was no increased
21 risk at the time anticipated for placebo
22 group, Fosamax or Proscar.
23     Q.   Come again.
24     A.   Sure.  It was anticipated

Page 287

1  that there was no increased risk of
2  cardiovascular events associated with the
3  placebo group in Proscar or Fosamax
4  studies.  We're comparing -- the control
5  group for this study are the placebo
6  groups from those two studies.
7      Q.   That's why they're doing the
8  study?
9      A.   Right.
10     Q.   Okay.  So --
11     A.   Maybe I didn't get your
12 question right.
13     Q.   You said that there's a bias
14 to the null.  Is that what you said?
15     A.   Yes.
16     Q.   And your reason for saying
17 that is because you're assuming there's
18 no increased risk with the placebo group,
19 right?
20     A.   Right.
21     Q.   And you're assuming there's
22 no increased risk with comparator NSAIDs?
23     A.   Right.
24     Q.   Is your latter assumption

Page 288

1  that there's no increased risk with
2  comparator NSAIDs, is that true?
3      A.   I believe so.  And excuse
4  me.  Number one, not only do I believe
5  that that's true, but I believe a
6  reasonable and prudent drug company would
7  have assumed that was true when they are
8  trying to assess the CV risk of their own
9  product.
10     Q.   Was the Watson analysis
11 results shared with the Board of
12 Scientific Advisors?
13     A.   Actually, I don't know.
14 This report appeared in February of 1998,
15 and the Watson committee met in May of
16 1998.  I think that's right.
17     Q.   The scientific advisory
18 committee?
19     A.   Right.  That's what I meant
20 to say.  The Advisory Committee.
21          The Scientific Advisory
22 Committee met in May of 1998.  So, I
23 don't know if it was shared or not.  It
24 is certainly possible that it could have

Page 289

1  been shared.  I don't know what they
2  looked at.
3      Q.   Did Watson find what he
4  considered to be an increased risk?
5      A.   Watson's conclusions, I
6  think, were wrong.
7      Q.   Well, his conclusion,
8  whether you think it was right or wrong,
9  was that he did not feel there was an
10 increased risk, right?
11     A.   Right.
12     Q.   In Paragraph 24 of your
13 report, you talked about two mechanisms
14 by which you believe Vioxx produces
15 cardiovascular disease?
16         MR. WACKER:  Which
17 paragraph, 24?
18         THE WITNESS:  Back up for
19 just a second.  What Dr. Watson
20 said, "In summary, CV SAE
21 incidence rates in patients
22 enrolled in Vioxx trials appears
23 to be roughly consistent with what
24 would be expected in the general

Page 290

1    population, and there was no clear
2    evidence of consistently elevated
3    adjusted risk compared to placebo
4    controls from Proscar and
5    Fosamax." That's not a vigilance
6    statement. That's a protective
7    statement.
8  BY MR. PIORKOWSKI:
9    Q.  This statement --
10   A.  So, certainly it is his
11 statement and he's responsible for it.
12 But, I mean, to me it just belies the
13 attitude that was used to review the
14 data.
15       MR. JOSEPHSON: Objection to
16   responsiveness.
17 BY MR. PIORKOWSKI:
18   Q.  You originally said that the
19 purpose of this was to do a rough look,
20 right?
21   A.  Right.
22   Q.  That's exactly what it is
23 when you do a comparison to a historical
24 placebo group, is a rough look, right?

Page 291

1    A.  Absolutely.
2    Q.  And Dr. Watson's conclusion
3  that there was not an increased CV risk,
4  if that was taken in isolation and
5  nothing further was done, then that's a
6  different thing than having the board of
7  scientific advisors meet and discuss the
8  results of his analysis and reach a
9  conclusion that they are going to
10 implement the CVSOP. Do you agree with
11 that?
12   A.  Well, not necessarily on the
13 one. Maybe I missed it. But I didn't
14 see anywhere in the Scientific Advisory
15 meeting minutes that we discussed when
16 they said they looked at the Watson
17 report and how they factored it. I
18 didn't see anything in here about that.
19       Number two, this is a
20 vigilant evaluation, which means you look
21 for reason, you look for evidence that
22 something is there and not look for a
23 reason to explain away what is there.
24       And certainly I would agree

Page 292

1  with you, in a coarse look, somebody who
2  didn't want to find an elevated CV risk
3  could come up with lots of reasons why
4  the results could be discarded. But
5  that's not the proper conduct for a
6  reasonable and prudent company looking
7  for a signal when they have been told
8  that one might very well be there.
9    Q.  At the time of Vioxx's
10 initial approval, there was no controlled
11 study that showed an increased risk in
12 Vioxx users compared to placebo users or
13 any other comparator; is that right?
14       MR. WACKER: Object to form.
15       THE WITNESS: At the time of
16   the approval?
17 BY MR. PIORKOWSKI:
18   Q.  At the time of Vioxx's
19 initial approval, there was no clinical
20 study that showed an increased
21 cardiovascular risk with Vioxx compared
22 to NSAID comparators or placebo?
23   A.  Oh, I would say this. Of
24 course. But that carries no weight

Page 293

1  because none of these studies were
2  powered to look for this, so, there's no
3  surprise that a single study is not going
4  to demonstrate an increased risk of CV
5  events in Vioxx group, even though we now
6  know it was in the population. That's
7  why you turn to, what we say, coarse
8  advisories and coarse methodology like
9  this.
10       MR. PIORKOWSKI: Object to
11   the nonresponsive portion.
12 BY MR. PIORKOWSKI:
13   Q.  Did any combination of
14 analyses that was submitted to the FDA --
15 when a sponsor submits their Phase III
16 studies to the FDA, they don't simply
17 submit a collection of individual study
18 results, they analyze the data
19 collectively, right?
20       MR. WACKER: Object to form.
21       THE WITNESS: I have seen
22   that happen commonly. It doesn't
23   happen all the time. I've seen it
24   happen commonly.

Page 294

BY MR. PIORKOWSKI:
Q. Did you see it happen in the ISS for Vioxx?
A. Yes.
Q. Okay.
And when those data were analyzed collectively, there was no indication of an increased risk of serious cardiovascular events, correct?
MR. WACKER: Object to form.
THE WITNESS: In the analysis that they did, which did not include the Watson analysis.
BY MR. PIORKOWSKI:
Q. Right.
And in the analysis of the controlled clinical trials that were the trials that were discussed with the FDA at the end of Phase II meeting, none of those studies or any combination of those studies showed an increased risk of serious cardiovascular events?
A. Well, they didn't show this combination.

Page 295

Q. They didn't. They didn't show the study that included Vioxx users and users of several other drugs compared to a historical placebo group. That's true. That was not --
A. Right. They didn't show that. And that showed a signal.
Q. But my question is not whether this rough look showed a signal. My question is whether any individual clinical trial or any combination of data from the clinical trials showed an increased risk at the time of the initial approval?
A. Maybe I don't understand your question. When you say "combination," I think Watson. Do you want to exclude that?
Q. Watson is not a study of just Vioxx users.
A. Watson is a study of combined results from Merck's own program development using Merck's own data analyzed by Merck's own people. I mean,

Page 296

I think it is relevant.
Q. But it is not Vioxx patients?
A. It is Vioxx patients.
Q. It is Vioxx patients and a lot of other patients.
A. So it's Vioxx patients, and it's Vioxx patients combined with other Merck patients which had no increased risk of CV disease and, in fact, shows an increased risk. The study is biased to the null. It is very relevant, certainly when it is positive.
Q. On Page 11 of your report, Paragraph 24, you describe that there are two mechanisms by which you believe Vioxx produces cardiovascular disease. Do you see that?
A. Yes.
Q. The first is elevation in blood pressure, right?
A. Right.
Q. And is it your opinion that because Vioxx can elevate blood pressure

Page 297

that it "adds to the force of atherosclerotic disease development"?
A. Yes.
MR. WACKER: Object to form.
THE WITNESS: Sorry.
MR. PIORKOWSKI: That's his language.
BY MR. PIORKOWSKI:
Q. That's your verbatim language out of your report, right?
A. Yes.
Q. Okay.
And by "adds to the force of atherosclerotic disease development," does that mean it causes atherosclerosis?
A. It is a factor in the generation of atherosclerosis.
Q. Okay.
The second point you make is that Vioxx affects the blood's clotting balance, which you say causes angina pectoris, heart attacks and sudden death, right?
A. Right.