UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: VIOXX** | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| | * | |
| **This document relates to** | * | **MAGISTRATE JUDGE** |
| | * | **KNOWLES** |
| | * | |
| | * | |
| **Charles Larson Mason v.** | * | |
| **Merck & Co, Inc.** | * | **CASE NO. 02:06cv810** |

PLAINTIFF'S OPPOSITION TO MERCK'S MOTION
FOR ORDER EXCLUDING TESTIMONY OF LEMUEL MOYÉ, M.D., PH. D.

Plaintiff, by and through his attorneys, files this brief in opposition to *Merck's Motion to Exclude the Opinion Testimony of Lemuel Moyé, M.D., Ph.D.* As outlined below, Dr. Lemuel Moyé is qualified to proffer each of the opinions challenged in Merck's motion. Indeed, this Court has already allowed him to testify before it in *Barnett v. Merck* and *Smith v. Merck.*

## I.   STATEMENT OF THE FACTS

This action for personal injuries arises from Plaintiff Charles Mason's use of Vioxx, which he alleges caused his heart attack, and further damage to his heart therefrom. Mr. Mason's prescribing professional testified she would not have prescribed Vioxx for Plaintiff had Merck disclosed to her the true nature and scope of Vioxx's risks for all patients, and Mr. Mason in particular. As a result of his heart attack, Mr. Mason has suffered permanent damage and is at a much greater risk of suffering another heart attack.

## II.    DR. MOYÉ'S QUALIFICATIONS AND OPINION SUMMARY

### A.    Summary of Dr. Moyé's Qualifications

Dr. Moyé is a Professor of Biostatistics at the University of Texas School of Public Health in Houston.  *See* COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D. ("Moyé Rpt.") at ¶ 2, attached hereto as Ex. A.  Dr. Moyé, a medical doctor and Ph.D. in Biostatistics, actively practiced medicine from 1979-1992, and continues to hold active licenses in Texas and Indiana.  *Id.*  Dr. Moyé has carried out cardiovascular research, and designed, executed, and analyzed clinical trials for over nineteen years, and continues to do so today.  *Id.* at ¶ 3.  Dr. Moyé has been the Principal Investigator of numerous clinical trials including one that involved over 4,159 patients who were followed for five years.  *Id.*  As a Principal Investigator of a trial, Dr. Moyé has been responsible for collecting and reporting adverse events to the sponsor as well as the FDA.  *Id.*  In his capacity as a Principal Investigator of clinical trials, Dr. Moyé has had instruction in FDA regulations.

Dr. Moyé's work has resulted in over 120 articles being published in numerous scientific journals, including *The New England Journal of Medicine* and *The Journal of the American Medical Association.*  *Id.*  Dr. Moyé has authored six books, such as *Statistical Reasoning in Medicine – The Intuitive P value Primer* (2000), *Difference Equations with Public Health Applications* (2000), *Multiple Analysis in Clinical Trials: Fundamental for Investigators* (2003), among others.  Moyé Rpt. ¶ 6.

Dr. Moyé serves as the statistician/epidemiologist on the FDA's Cardiovascular and Renal Drug Advisory Committee.  *Id.* at ¶ 17.  In addition, Dr. Moyé serves as a statistical

consultant for the FDA, and most recently completed a two-year term on the FDA's Pharmacy Sciences Advisory Committee. *Id.* ¶¶ 14 & 18.

In relation to this case, Dr. Moyé has devoted approximately 250 hours to reviewing the scientifically relevant literature on Vioxx and other NSAIDs. *See* June 2, 2006 Deposition of Lemuel A. Moyé ("Moyé Dep."), at 35:2-20, attached hereto as Ex. B. Dr. Moyé's report includes a list of 63 of these publications, studies, reports and other documents. Moyé Rpt., ¶¶ 106-118, 123-153. These materials include, but are not limited to, the following: (1) VIGOR (Moyé Dep., 373:4-9; *see also* Moyé Rpt., ¶¶ 109-118); (2) Protocol 090 (Moyé Dep., 373:14-374:4; *see also* Moyé Rpt., ¶¶ 29, 41); (3) ADVANTAGE (Moyé Rpt., ¶¶ 44, 55, 123; (4) meta-analysis by Dr. Deborah Shapiro (October 18, 2000) (evaluating the effect of Vioxx verses NSAIDS) (Moyé Rpt., ¶¶ 40, 53); (5) VIP study (Moyé Rpt., ¶¶ 54, 125); (6) VICTOR (Moyé Rpt., ¶ 57, 124); (7) Alzheimer's studies (Moyé Rpt., ¶ 126); and (8) APPROVe (Moyé Rpt., ¶¶ 127-144); and (9) the Solomon study (Moyé Rpt., ¶¶ 145-149). Dr. Moyé's report exceeds 100 pages and provides a detailed analysis of the various studies addressing the cardiovascular effects associated with Vioxx and other NSAIDs.

## B.   Summary of Dr. Moyé's Opinions

Based on his education, training, research, experience and review of peer-reviewed medical literature, Dr. Moyé expects to offer the following opinions:

- Vioxx, designed to reduce pain while avoiding gastrointestinal effects, was a therapy with a foreseeable design defect, and whose risks exceeded its benefits. Studies, before and after approval, indicated that the drug demonstrated no better analgesic effect than commonly used, inexpensive NSAIDs and that the harmful gastrointestinal effects of Vioxx exceeded placebo. Moyé Rpt. ¶ 23.

- Vioxx produces cardiovascular disease through: 1) elevations in blood pressure adds to the force of atherosclerotic disease development; and 2) the selective inhibition of the Cox-2 prostanoid synthesis destabilizes the blood's delicate clotting balance, producing

3

catastrophic thrombotic events in the heart, and other end organ vasculature.  Moyé Rpt. ¶ 24.

- Vioxx is unsafe at any dose/duration combination in any patient regardless of the underlying risk for cardiovascular disease.  Moyé Rpt. ¶ 25.

- The use of Vioxx is unjustified in patients who suffer from chronic pain of rheumatoid arthritis or osteoarthritis.  The use of a medication that causes death through its combined thrombotic, hypertensive effects is unjustified in patients who suffer from painful, chronic, but non-lethal illnesses.   These patients because of their age and high background risk of atherosclerotic cardiovascular illness are at greater risk of vessel-occlusive attack by this drug.  During the appearance of study after study, which confirmed the pre-approval suspicions that Vioxx would be dangerous for the cardiovascular system, Merck continued to defend the drug and market the drug with no additional warnings for its profound cardiovascular effects.  Moyé Rpt. ¶ 26.

- There was and is no justifiable basis for Merck to suggest that the difference in CV events between the two test groups in VIGOR could be explained by same cardioprotective effect of Naproxen.  Moyé Rpt. ¶ 119-122.

## III.    ARGUMENT

### A.    Legal Standard

*Daubert v. Merrell Dow Pharmaceuticals,* 113 S.Ct. 2786 (1993) and its progeny[1] provides that the district judge is the "gatekeeper who must pass on the reliability and relevance of proffered evidence pursuant to Federal Rule of Evidence 702."[2] Rule 702 reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experiences, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

[1] *General Electric Co. v. Joiner,* 118 S. Ct. 512, 517-519 (1997), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999).
[2] MANUAL FOR COMPLEX LITIGATION § 472 (4th ed. 2004).

4

FED. R. EVID. 702. The Rule "not only requires that the testimony be relevant, but also that it be based on sufficient facts or data, that it be the product of reliable principles and methods, and that the witness applied those principles and methods reliably to the facts of the case."[3]

Daubert sets forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. Id. Whether some or all these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony. Kumho Tire, 526 U.S. at 138. Additional factors the trial court may consider include: (1) whether the expert's opinion is based on incomplete or inaccurate dosage or duration data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5) whether the expert proposes to testify about matters growing directly out of research he or she has conducted independent of the litigation. Black v. Food Lion, Inc., 171 F.3d 308, 312-313 (5th Cir. 1999); Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1114 (5th Cir. 1991); Newton v. Roche Labs., Inc., 243 F.Supp.2d 672, 678 (W.D. Tex. 2002),.

## B.    Dr. Moyé Is Qualified To Offer Opinions That Vioxx is Unsafe at Any Dose.

Merck argues Dr. Moyé cannot testify that Vioxx is unsafe at any dose because he has no personal knowledge in prescribing Vioxx. Merck Memo., p. 4. In essence, Merck argues that

---

[3] MANUAL FOR COMPLEX LITIGATION § 484 (4th ed. 2004).

Dr. Moyé is unqualified to testify about Vioxx's risks versus its benefits because he has not prescribed the drug for patients. This argument misses the point of Dr. Moyé's testimony on this issue.

Dr. Moyé opines that Vioxx's risks outweigh any potential benefits, is unsafe, at any dose from an epidemiologic perspective. The upshot of Dr. Moyé's testimony is that the available Vioxx studies and data reveals that the purported improvement over other pain relievers in terms of decreased gastrointestinal side effects is not so great to justify exposing patients to the significant increase in cardiovascular risks. Moyé Report ¶¶ 23, 25, 27-60, 166-173. Moreover, stomach problems are not nearly as great a concern for patients as a heart attack or stroke. *Id.* at ¶¶ 171-72. And Dr. Moyé is well-qualified to render these opinions.

As Dr. Moyé explains in paragraph 16 of his report, he has taken part in both observational and experimental research studies where he was an investigator for the pharmaceutical industry. In that role, he participated in discussions assessing the safety and effectiveness of the medication at issue, with an emphasis on whether the balancing of the health advantages and disadvantages warranted its use. *Id.* at ¶ 16. In addition, Dr. Moyé has published in this area.

In addition to that, at paragraph 17 of his report, Dr. Moyé explains how, during his work as part of the Cardio-Renal Advisory Committee to the F.D.A., he, along with other members, were asked to weigh the advantages and disadvantages of medications presented to the committee for approval for marketing in the United States. Dr. Moyé walked through this analysis and the attributable risk (a statistical and epidemiologic standard) as part of the Risk-Benefit Analysis portion of his opinions at paragraphs 27 through 38. For the reasons cited above, Dr. Moyé is qualified to offer these opinions and furthermore, brings to this

6

epidemiologic foundation the perspective of a currently licensed physician and doctor who performs risk analysis with his colleagues in his assignments for the F.D.A.

C.    **Dr. Moyé is Qualified to Offer Opinions as to the Mechanism By Which Vioxx Causes Injury, and His Opinion is Based on Reliable Scientific Methodology**

Merck argues that Dr. Moyé is unqualified to render opinions about the mechanism by which Vioxx causes heart attacks and similar events, and that this opinion thereon is based on an unreliable methodology. The facts, however, wholly belie this contention.

Dr. Moyé is currently a full time Professor in biostatistics and epidemiology at the University of Texas School of Public Health. Dr. Moyé's qualifications and expertise are similar to that of Dr. Wayne Ray, previously qualified by this Court in the area of epidemiology, clinical study risk analysis, and general causation. *See Plunkett v. Merck & Co., Inc.*, 401 F.Supp.2d 565 (E.D. La 2005).

Dr. Moyé is both an epidemiologist and a medical doctor. He received a Ph.D. in biostatistics from the University of Texas, an M.S. in statistics from Purdue, an M.D. from Indiana University, and a B.S. in mathematical sciences from Johns Hopkins. Moyé Rpt., ¶ 19. Dr. Moyé has some 19 years of experience in cardiovascular research. *Id.* at ¶ 3. He has extensive experience in consulting for pharmaceutical entities, the FDA and National Institute of Neurology Disorders and Strokes. *Id.* ¶¶ 3-4. Dr. Moyé is a co-researcher on a government-funded grant on atherosclerotic disease. *Id.* ¶ 4.

Like Dr. Wayne Ray in *Plunkett*, Dr. Moyé's career has involved pharmacoepidemiologic and epidemiologic investigations that concern the risk of cardiovascular events, neurological events and atherosclerotic events. *See generally* Moyé Curriculum Vitae; *Plunkett,* 401 F.Supp.

7

2d at 41-44.[4]   More specifically, Dr. Moyé's career has been based around investigations that concern the adverse and beneficial effects of medication.

It is with this expertise, knowledge and experience that Dr. Moyé presented his analysis of Vioxx in his report and deposition testimony.  In both, Dr. Moyé made clear that he reviewed and analyzed the scientifically relevant literature surrounding Vioxx, and that a general theme running the data was that Vioxx can cause adverse cardiovascular effects.  Dr. Moyé's reliance on existing medical data for his opinions is noteworthy because Merck does not challenge his expertise in statistical interpretation of medical data.  Merck Memorandum, p. 1.  Merck also acknowledges Dr. Moyé is a Professor of Biostatistics and Epidemiology, and is experienced in designing and conducting clinical trials.  *Id.*  And of course, this Court recognizes that reliance on relevant scientific data and studies is a proper methodology for arriving at causation opinions. *Plunkett*, 401 F.Supp.2d at 593.

Moreover, Dr. Moyé's mechanism of injury and general causation opinion is also based in large part on the so-called Fitzgerald hypothesis, of which this Court is well-versed.  The Court noted in *Plunkett* that "the Fitzgerald hypothesis [] has been supported by numerous articles as well as recognized medical journals.  Although Merck may disagree with the conclusions reached in the Fitzgerald hypothesis and supporting literature, a disagreement does not amount to improper methodology or scientifically unreliable data." *Plunkett*, 401 F.Supp.2d at 587.  Thus, Merck's assertion that his opinions regarding causation lack scientific basis are meritless.

---

[4]  The only limitation in the Court's November 18, 2005 Order as to Dr. Ray was that he not opine as a medical doctor, since he was not an M.D.  Indeed, Dr. Ray offered no medical opinions.  The distinction here falls in favor of Dr. Moyé, who is an M.D. and was an invited member of the FDA's Cardio-Renal Advisory Committee at the time the coxibs, Celebrex and Vioxx, were applied for and approved for marketing beginning in the first half of 1999.

Nonetheless, Merck asserts that Dr. Moyé is unqualified to render opinions on causation and mechanism of injury because he is not a board certified cardiologist or pharmacologist. Again, Merck expressly admitted Dr. Moyé is qualified as an epidemiologist to discuss clinical study design, relative and attributable risk issues, and interpretation of medical data. The assertion that he must be a cardiologist or pharmacologist to testify that the data shows Vioxx can cause adverse cardiovascular events is nonsensical. This Court has rejected any such contention in allowing Dr. Ray to testify on this very issue. In any event, Dr. Moyé has been a duly licensed medical doctor in both the States of Texas and Indiana for 27 years, and spent 13 years as a treating physician before focusing on research and academia. He is also a diplomat of the national Board of Medical Examiners. Moyé Report ¶ 2.

Dr. Moyé also has 19 years experience in clinical trials that have dealt with cardiovascular events. He has been an investigator in this area and responsible for the collection of adverse events and adverse event reporting in clinical trials. He has written and lectured in the area. He has served as a member of the FDA's Cardiovascular Renal Advisory Committee. He is a Professor of epidemiology and biostatistics. He has published peer-reviewed papers in this area. He has authored books that deal with clinical trial design and assessment. Most significantly, he has consulted for and been hired by pharmaceutical companies in this area. As Merck knows, Dr. Moyé has extensive training and experience carrying out cardiovascular trials.

**D.   Dr. Moyé is Qualified to Offer Opinions About Vioxx As Compared to Other Cox-2 Inhibitors**

Merck contends that Dr. Moyé is not qualified to offer opinions about Vioxx as compared to other COX-2 inhibitors, and even goes so far as to represent that he "admitted" he was not so

9

qualified. Merck Memo., p. 9. What Merck contends and represents, however, are at odds with the facts.

The thrust of Merck's argument is that because Dr. Moyé does not "rank order" the other COX-2 inhibitors versus Vioxx, in terms of potential CV risk, he has no basis to opine Vioxx has the greatest CV risk. As such, Merck argues, Dr. Moyé's should be precluded from disagreeing with the FDA's inability, as stated in a 2005 FDA memorandum, to "rank order" the COX-2's. This, yet again, misses the point: Dr. Moyé need not rank, for example, Celebrex number 2, and Bextra number 3, but only needs a sufficient basis to opine that Vioxx is the worst of all. And he makes abundantly clear in his deposition that he reviewed all the relevant scientific literature, and relied on his own knowledge and experience to opine that Vioxx is the worst of all:

> Q.  Okay. You also mentioned here today that while you haven't reviewed every NDA or every study concerning Bextra or Celebrex, you've looked at those generally with respect to their relationship with Vioxx?
>
> A.  Yes. And having reviewed all the FDA, the 2005 Advisory Committee meeting, I certainly read about -- I read their discussion of the data.
>
> Q.  And we know that Celebrex remains on the market, right?
>
> A.  Yes.
>
> Q.  And Bextra has been removed from the market?
>
> A.  That's correct.
>
> Q.  And Vioxx has been removed from the market?
>
> A.  Yes.
>
> Q.  Would it be fair to say that based upon the studies that you have reviewed, looking at those drugs, that Vioxx was the worst of those COX-2 inhibitors?

> A.   I would say not just based on those studies, but based on my understanding of the role of the – the differential role of COX-1, COX-2, that Vioxx is the worst.   That's my understanding as I sit here today.

Moyé Deposition, p. 393:1-394:18.[5]

Merck's position on "rank order" of COX-2s and the 2005 FDA memorandum is also hypocritical.[6]  Dr. Moyé has reviewed the same material Merck's experts reviewed but reached a different conclusion.  This Court repeatedly emphasizes that Merck may disagree with Dr. Moyé's conclusions, but mere disagreement does not render his methodology unreliable. *Plunkett*, 401 F.Supp.2d at 587.

Merck further argues that because Dr. Moyé is not a pharmacologist, he cannot compare Vioxx with other COX-2 inhibitors.  Merck Memo, pp. 12-13.  This Court, however, already addressed this issue in connection with expert challenges made by the plaintiff and Merck prior to the *Irvin I* trial.  For example, with respect to the plaintiff's challenge to one of Merck's experts, Dr. David Silver, the Court stated: "[Dr. Silver] has reviewed all the relevant literature and studies.  If the Plaintiff wishes to attack Dr. Silver because he is not a cardiologist, pharmacologist, biostatistician, neurologist, regulatory expert, hematologist/clot expert, or pharmacoepidemiologist, she will be allowed to do so on cross-examination." *Plunkett,* 401 F.Supp.2d at 582.  If Merck contends that Dr. Moyé does not understand or cannot compare the cardiovascular effects of Vioxx and other COX-2 inhibitors due to an alleged lack of practical

---

[5] Dr. Moyé also opines Vioxx poses a greater CV compared to all other NSAIDs.  Moyé Dep., 368:22-369:9; 371:22-372:2; 372:17-373:3; 394:4-18.

[6] As the Court is aware, it is the Plaintiff's contention that the FDA Memorandum lacks scientific reliability due in part to the significant analytical gap between the data relied on by the FDA and the FDA's conclusions. *Joiner,* 522 U.S. at 146.  The FDA acknowledges in its Memorandum that it lacks data to draw final conclusions regarding the cardiovascular risks of NSAIDs.  The reasoning and methodology underlying the conclusions in the Memorandum have not been tested, peer-reviewed, published, or generally accepted in the scientific community. *Daubert,* 509 U.S. at 593-95.

experience with COX-2 inhibitors, Merck will be able to address those concerns on cross-examination. *Plunkett*, 401 F.Supp.2d at 584 ("To the extent that Merck asserts that [Winston Gandy, Jr., M.D.] does not understand Vioxx and its alleged effects, Merck will be able to attack Dr. Gandy at cross-examination much like it did at his deposition.").

In any event, Merck forgets Dr. Moyé spent 250 hours reviewing the relevant scientific literature on Vioxx and other NSAIDs.  Moyé Dep., 35:2-20.  Dr. Moyé's report includes a list of 63 of these publications, studies, reports and other documents.  Moyé Rpt., pp. 106-110.  Dr. Moyé's report exceeds 100 pages and provides a detailed analysis of the various studies addressing the cardiovascular effects associated with Vioxx and other NSAIDs.  He specifically describes the data that supports his conclusions and provides a detailed analysis of the COX system, demonstrating his clear understanding of COX-2 inhibitors.  Moyé Rpt., ¶¶ 70-82.

Furthermore, in formulating his opinion that Vioxx poses a greater cardiovascular risk as compared to other COX-2 inhibitors, Dr. Moyé relied upon his own training, knowledge, and experience in the areas of biostatistics and epidemiology.  There is no question that Dr. Moyé possesses the qualifications to testify as an expert in these areas.  Furthermore, Dr. Moyé's vast experience with clinical trials qualifies him to testify regarding the various trials which have addressed the adverse and beneficial effects of NSAIDs.[7]  This experience includes post approval marketing safety surveillance, data safety monitoring, the drug approval process, and interpretation of adverse drug effects.  His experience with determining drug risks and benefits includes his work on multiple DSMBs (data safety monitoring boards), consulting with pharmaceutical companies, his experience as a practicing physician, his work with the FDA

---

[7] Dr. Moyé has acted as an investigator in large clinical trials in which one of his primary responsibilities was collecting adverse events that occurred in patients who were taking drugs in post marketing studies (the SAVE study, 1987-1992, and the CARE study, 1989-1996). Moyé Curriculum Vitae, p. 22.

Cardiovascular Renal Advisory Committee,[8] and epidemiologic lectures at the University of Texas School of Public Health.

### E. Studies 085 and 090 Are Proper Evidence to Support Dr. Moyé's Opinions of A Signal of Cardiovascular Risks Associated with Vioxx and General Causation.

Merck contends that Dr. Moyé has offered an opinion that statistical significance does not matter.  Merck Memo p. 3.  Yet, Dr. Moyé has not offered such an opinion.  Instead, Dr. Moyé relies upon such studies to show a signal to Merck that its drug causes cardiovascular side effects and to further support his opinion, based upon other statistically significant data, that Vioxx does cause cardiovascular events.  For instance, in his report, Dr. Moyé, while stating that Protocol 090 portrayed the cardiovascular damage of Vioxx, writes that these results were "a clear warning" that Vioxx increases the cardiac disease even rate.  Moyé Report at ¶41.  Dr. Moyé then goes on to explain that statistical significance in "these assessments" are irrelevant because the study was not powered to show statistical significance.  *Id.* at ¶42.  In other words, Merck should have clued into a problem with its drug after reviewing the 090 results, even if those results are not statistically significant.  Dr. Moyé further explains this concept later in his report when he states:

> Typically, underpowered studies that produce non-statistically significant results are termed 'non-informative.'  However, while this is a reasonable approach for findings that produce efficacy, it is not helpful for findings that identify harm.  This is because the medical community typically cannot afford to wait for the ideal study to e done in a large number of patients with appropriate protection against type I and type II statistical errors, in the meantime exposing patients to risk needlessly.  Thus, small signals of harm while not statistically significant, must be taken seriously by the investigator and the sponsor.

---

[8] Dr. Moyé's service on the Cardiovascular Renal Advisory Committee involved discussion and voting on whether the contemplated drugs were safe and effective.  This necessarily involved risk-benefit assessment.

Further, in his discussion of the cardiovascular dangers associated with Vioxx, Dr. Moyé does not simply rely upon statistically insignificant data as Merck implies. Dr. Moyé discusses in details numerous studies, including Vigor and Approve which show at least a doubling of the risk of cardiovascular events associated with Vioxx. Dr. Moyé then goes on to discuss other studies, such as Protocol 090, that show a similar trend. This trend supports Dr. Moyé's general causation opinion even if the study was not powered to be statistically significant.

**F. Dr. Moyé's Testimony Regarding Merck's Knowledge Of The Cardio-vascular Risks Posed By Vioxx Is Admissible As It Addresses Issues Of Notice, Not Corporate Intent Or State Of Mind.**

Merck seeks an order from the Court precluding the introduction of "motive and intent" testimony through Dr. Moyé. Plaintiff does not intend to solicit testimony from Dr. Moyé regarding the motive and intent behind Merck's actions or inactions. However, in preparing his report, Dr. Moyé examined numerous documents produced by Merck during discovery, including internal studies, reports, e-mails and other communications that address Vioxx's cardiovascular risks. Dr. Moyé's extensive knowledge and expertise of FDA procedures, regulations, and regulatory guidelines, as well as his first hand knowledge of a pharmaceutical company's obligations regarding disclosure regarding their drugs, qualify him to explain to the jury what Merck knew or should have known about the risks associated with Vioxx based on these documents.

The Court previously ruled that experts can testify regarding "what information was available, what studies were available, what was known in the medical community, what Merck knew, studies they conducted, reports they prepared, e-mails indicating what they knew about this situation may be germane, what Merck did, whether it was consistent with the

14

pharmaceutical and medical community, what was given to the FDA, what should have been given to the FDA." Transcript of November 16, 2005 Hearing, pp. 29-30. Furthermore, the Court ruled that Dr. Richard M. Kapit and Dr. Janet Arrowsmith-Lowe could offer guidance to the jury regarding the meaning and significance of the voluminous materials, including Merck's internal communications, which demonstrate Merck's knowledge of the cardiovascular risks associated with Vioxx. *Plunkett*, 401 F.Supp.2d at 578, 595. Given his undeniable qualifications and extensive review of the relevant documents, Dr. Moyé is entitled to do the same. The sheer complexity and volume of these materials necessitates the testimony of Dr. Moyé, whose specialized knowledge and expertise will undoubtedly assist the jury in understanding the issues.

In addition to Dr. Moyé being qualified to render opinion testimony regarding what was known and knowable by Merck during the time that Vioxx was being developed and marketed, such testimony is crucial to assist the jury on this critical issue. Not only is this testimony relevant and material to Plaintiff's claim, but also is valid impeachment testimony. Without the assistance of a qualified expert it would be difficult for a jury to sift through the enormous technical, scientific literature and documentary evidence and seine out what was known and knowable at the relevant time. Therefore, such testimony is valid to impeach Merck's claim that the cardiovascular risk of Vioxx was unknown and unknowable, and Dr. Moyé is qualified to provide this testimony.

Merck's objections to Dr. Moyé's testimony are also premature. In order to judge the appropriateness of Dr. Moyé's testimony regarding Merck's knowledge, the testimony needs to be placed in the proper context. The Court previously deferred its ruling on Merck's challenge to Professor Wayne Ray's qualifications to testify as to what Merck should have done or as to Merck's state of mind. *Plunkett*, 401 F.Supp.2d at 587. At a minimum, the Court should do the

15

same with respect to Dr. Moyé's opinions regarding what Merck knew or should have known about the cardiovascular risks associated with Vioxx.

###### G.      Dr. Moyé's Opinions That Merck Misled The FDA Are Not Preempted.

Merck argues that any testimony that Merck misled the FDA is preempted by *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001). This Court has already addressed this issue and ruled that *Buckman* is not applicable under these circumstances. *Plunkett*, 401 F.Supp.2d at 587, 595 ("*Buckman* is not applicable to this case  . . . at all."). During the November 15, 2005 *Daubert* hearing in *Irvin*, the Court stated as follows: "I see *Buckman* as a different case, frankly. That was a direct fraud on the FDA. I don't get any help from *Buckman* in this particular case." Transcript of November 15, 2005 Hearing, p. 34. As in *Irvin*, there is not a claim of fraud on the FDA in the present case. The Court's prior ruling on this issue is applicable.

#### IV.      **CONCLUSION**

For these reasons, Plaintiff urges the Court to deny Merck's motion for an order excluding the testimony of Lemuel A. Moyé, M.D., Ph. D.

Dated:  October 19, 2006

Respectfully submitted,

Edward Blizzard (TBN 02495000)
Scott Nabers (TBN 147692500
Rebecca Briggs King (TBN 24027110)
Holly M. Wheeler (TBN 24006035)
BLIZZARD, MCCARTHY & NABERS, L.L.P.
440 Louisiana, Suite 1710
Houston, Texas 77002
(713) 844-3750
(713) 844-3755 (fax)

**ATTORNEYS FOR PLAINTIFF
CHARLES LARSON MASON**

Andy D. Birchfield, Esq.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034
fax (334) 954-7555

Christopher Seeger, Esq.
One William Street
New York, NY 10004
(212) 584-0700
fax (212) 584-0799

Leonard Davis
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Avenue
New Orleans, LA 70013
(504) 581-4892
fax (504) 561-6024

Russ M. Herman
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Avenue
New Orleans, LA 70013
(504) 581-4892
fax (504) 561-6024

17

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, Shayna S. Cook and Richard Krumholz by U.S. Mail, facsimile and/or e-mail; and e-mail upon all parties by electronically uploading the same to Lexis-Nexis File and Serve Advanced, in accordance with Pretrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 19th day of October, 2006.

Holly M. Wheeler