growing consensus that these drugs would be beneficial in blocking the progression of dysrhythmia from mild heart arrhythmias to more serious rhythm disturbances.

216   Only after the drugs were approved and on the market was a study carried out that incorporated a control group and the use of randomization. This trial, called CAST{ XE "The CAST Trial" } (Cardiac Arrhythmia Suppression Trial), demonstrated that, not only did the new therapies not save lives, but their use caused excess mortality [42]. The findings from CAST, demonstrated the lethality of medications whose safety had been "demonstrated" by case series.

### Appendix C : Detecting Adverse Events:

217  **Detecting Adverse Events: Complication in Safety Monitoring**: The ethical concern for

safety introduces a new complexity into the interpretation of interim monitoring results.

Essentially, the primacy of the admonition, "First, do no harm," complicates the interpre-

tation of exploratory analyzes. Recall that confirmatory analyzes, themselves the product

of prospectively declared plans, are most easily generalizable. They produce reliable es-

timates of effect sizes, effect size variability, and type I error rates. In addition, prospec-

tive consideration of the type and number of statistical hypotheses to be tested leads to

tight control of the family wise error rate. Exploratory analyzes, on the other hand, hold

none of these features. These latter analyzes that are suggested by the data rather than by

prospective planning produce inaccurate estimators and must be repeate{ XE "safety:and

confirmatory monitoring" }d (or confirmed) before they can be generalized.[*]

218  With this dis{ XE "estimators:efficacy versus safety" }tinction in place, the evaluation of

efficacy examinations in clinical research is clear and straightforward at both the conclu-

sion of the study and during an interim examination. Consider a hypothetical clinical trial

designed to determine the effect of an intervention on patients who have suffered a

stroke. The primary analysis for this clinical trial is the effect of therapy on the total mor-

tality rate. If the study's design and execution has been (1) carefully considered with a

precise, prospectively declared protocol, (2) executed in accordance with that protocol,[†]

and (3) produces a type I error rate below the a priori declared threshold for a clinically

significant level of efficacy, its results on the primary endpoint would be heralded as

---

[*] The reasons for the different interpretations of exploratory versus confirmatory analyzes are discussed eariler in this report
Two.
[†] This is defined as concordant execution.

positive. However, assume in that same study, that the therapy was observed to produce a reduction in the myocardial infarction rate. Because the therapy's effect on the myocardial infarction rate was not prospectively declared, and its results would be seen as exploratory[*], requiring confirmation before they can be generalized.

219   However, in the reverse setting, where both the findings for mortality and the myocardial infarction rate indicate harm and not benefit, the ability to interpret the situation is complicated. Again, the prospective nature of the research design that is focused on mortality permits the investigators to conclude that the study produces a confirmatory evidence of harm. However, the identification of an early harmful effect of the intervention on the cumulative myocardial infarction rate is problematic. Clearly, the finding of an increased risk of myocardial infarction associated with the therapy is crippled by the exploratory nature of the analysis. However, the occurrence of this finding for harm in all likelihood would not, and could not, be reproduced. The ethics of protecting subjects from known and suspected dangers precludes the initiation of a new confirmatory research effort in order to demonstrate that the intervention excites the production of myocardial infarctions.[†]

220   Thus, although confirmatory findings of harm carry the same weight as those of efficacy, exploratory findings of harm commonly carry more weight than exploratory findings of efficacy. This places a greater burden on investigators, who must balance the ethical re-

---

[*] Because both the effect of therapy on the total mortality rate and the effect of therapy on the myocardial infarction rate appear to be equally reliable to the observer, both being produced from the same database, concluding that only the myocardial infarction finding be discounted may appear capricious. However, because the trial was not designed to examine the myocardial infarction issue, the ability of the study to ensure that (1) it had an appropriate sample size for the evaluation of the effect of therapy on heart attacks, and (2) the investigators collected all of the cases of heart attacks (including silent myocardial infarctions) even though they never said that they would must be questioned. Secondly, the "positive" finding of therapy on the myocardial infarction rate was based on an unplanned interrogation of the database. This inquiry rose to prominence solely because of its unanticipated and surprising finding. Allowing the data to suggest answers in this fashion introduces a new sampling error component into the analysis that undermines the traditional estimates of effect size, precision, p-values and power.

[†] Other information may become available that would allow the evaluation of the possibility of harm produced by the intervention. Additional concurrent studies, case control, and historical cohort studies may provide some illumination of this issue.

quirement to adequately warn about adverse events with the scientific need to avoid mis-direction about the risks of an intervention. This is a challenge to healthcare research in general and interim monitoring in particular. Because, confirmatory analyzes for harm will be the most persuasive, investigators make their strongest possible case when they execute as many confirmatory analyzes as possible.

221  Although two strategies to address this issue of multiple safety measures are reviewed, the best strategy begins with good a priori knowledge. During the design phase, investigators can strengthen the interim analyzes that they have in mind for the safety monitoring by carrying out an in-depth review of the evidence of adverse effects produced by the intervention that they plan to study. This will allow them to put prospective monitoring rules in place that provide rigor in detecting the early occurrence of several different adverse events.

222  With foreknowledge of the adverse event profile of the intervention, and some appreciation of the frequency at which these adve{ XE "safety:exploratory monitoring" }rse events appeared, the researcher is able to place prospectively declared rules in place.

223  However, many times adverse events occur that were completely unsuspected during the course of a clinical research effort, which catch the researcher by surprise. The occurrence of de novo breast cancer in women exposed to lipid lowering agents during the course of a cardiovascular clinical experiment, the occurrence of dangerous new arrhythmias generated by an intervention that suppresses other rhythm disturbances, and the production of liver failure in medications designed to reduce insulin sensitivity are but a few examples of unanticipated adverse effects that can be produced by a new intervention.

224   This illustration suggests that although monitoring procedures can provide clear warning that a treatment signal has been detected, the presence of this signal does not provide prima facie evidence for drawing a conclusion and terminating the research effort. That decision is more complex, requiring thoughtful consideration of both the efficacy and the safety of the compound. Ultimately, the decision to discontinue a study is not a mathematical one, but a clinical and ethical decision.

225   Statistical monitoring rules do not provide much guidance in this scenario. The absence of prospective identification, in concert with the large probability of a type I error generated by multiple interrogations of the adverse event data confound any attempt to apply statistical rigor to the evaluations executed on behalf of the patients. This is the conundrum of safety-based monitoring. The predomination of ethical considerations requires the researcher to sometimes set aside statistical precepts in order to be assured that patients are not being harmed in the research effort or in the population. This is unacceptable when one is building an argument for efficacy, but is required in the examination of safety. The asymmetry of this circumstance finds its genesis more in an oath than in science. The following are other useful tools in assessing the validity of an unanticipated adverse event finding.

226   ***Strategy 1: Monitor Widely***: Researchers m { XE "adverse events:need to monitor widely" }ust lead diligent adverse event report evaluations. Just as physicians cannot diagnose diseases of which they have never heard, researchers cannot ethically weigh the implications of serious adverse events that they are not measuring. Thus, the researchers must cast a wide net in order to capture the occurrence of all adverse events. The investigators in post marketing clinical trials were able to successfully carry out this strategy.

227 ***Strategy 2: Assessing Unanticipated Adverse Events***: Clinical trials have been executed
for only sixty years. This is a relatively short period of time in the history of clinical in-
vestigation. However, the assessment of whether the occurrence of the event is related to
a treatment has been a cerebral process that has evolved for hundreds of years. Useful
skills have been amassed by scientists in the implementation of no statistical evaluations
of the relationship between an event (be it either adverse or salubrious) and an exposure.
In the setting of exploratory endpoint analyzes, where statistical assessments are not quite
so reliable, these other no statistical assessments rise to new prominence.

228 The occurrence of an exposure and an adverse event occurring in the same patient (or
group of patients) begs the question of whether the relationship between the two is asso-
ciative or causal. An associative relationship is merely that the exposure and the disease
occurred coincidentally in the same patients, for example, the occurrence of breast cancer
in women taking HMG-Coal reductase inhibitor (i.e., statin) therapy for elevated lipid
levels. It is a passive relationship. On the other hand, a causal relationship, as discussed
earlier, is active. An exposure causes a event if the exposure excites the production of the
event. It is an active relationship, a relationship with directionality. An example is the
causal relationship between liver hepatotoxicity and thiazolidienedione therapy for diabe-
tes mellitus.

229 When statistical tools are less useful, other tools of observation become more valuable. In
1965, Hill [43] described the nine criteria for causality arguments in healthcare. These
nine rules or tenets are remarkably and refreshingly devoid of complex mathematical ar-
guments, relying instead on natural honest intuition and common sense for the inquiry
into the true nature of a risk factor–disease relationship. The questions Dr. Hill suggested

should be posed by the investigators in their assessment of the true nature of the exposure–disease relationship.

230   The evaluation begins with a simple assessment of numbers. Are there many more adverse event cases when the intervention is present, and fewer disease cases when the intervention is absent? If this question has been affirmatively answered, other questions follow. Does a greater exposure to the risk factor produce a greater extent of disease? Other questions asked by Hill explore the "believability" of the relationship. Some of these are: is there a discernible mechanism by which the risk factor produces the disease? Have other researchers also shown this relationship? Are there other such relationships whose demonstration helps us to understand the current risk factor– disease relationship?

231   Consistency requires that the findings of one study be replicated in other studies. The persuasive argument for causality is much more clearly built on a collection of studies involving different patients and different protocols, each of which identifies the same relationship between exposure to the risk factor and its consequent effect. There are numerous examples of collections of studies with different designs and patient populations, but that nevertheless successfully identify the same hazardous relationship between an exposure and disease. Identification of case series involving different series of patients in different countries and different cultures—yet each series producing the disease after the exposure would satisfy these criteria. Because research findings become more convincing when they are replicated in different populations, different studies that examine the same exposure–disease relationship and find similar results add to the weight of causal inference.

232  The specificity of a disease is directly related to the number of known causes of the disease. The greater the number of causes of a disease, the more nonspecific the disease is, and the more difficult it is to demonstrate a new causal agent is involved in the production of the disease. The presence of specificity is considered supportive but not necessary, and researchers no longer require that the effect of exposure to an agent such as a drug be specific for a single disease.

233  Exposure must occur before the disease develops for it to cause that disease. A temporal relationship must exist in order to convincingly demonstrate causation.[*] This criterion can be clearly satisfied by a case report that accurately documents that the exposure occurred before the disease.

234  An evaluation of a relationship between occurrences of the adverse events and either the dose or duration of the intervention is also useful. The observation that a more intense exposure produces a greater frequency or severity of adverse events adds new strength to the notion that the relationship between the intervention and the adverse event is a causal one. In addition there should be some b{ XE "Hill, Bradford:causality and safety" }asis in the scientific theory that supports the relationship between the supposed "cause" and the effect. However, observations have been made in epidemiological studies that were not considered biologically plausible at the time but subsequently were shown to be correct.

235  It is important to note in the application of these tenets that satisfaction of all nine is not required to establish to the satisfaction of the medical community that a causative relationship exists between the exposure and the disease. Hill himself stated [43]:

---

[*] Protopathic bias, or the result of drawing a conclusion about causation when the disease process precedes the risk factor in occurrence can result without appropriate attention to the condition.

236   None of my nine viewpoints can bring indisputable evidence for or against the cause–and–effect hypothesis, and none can be required as a *sine qua non*.

237   However, these tenets are invaluable in the assessment of intervention-adverse event relationships.

## Appendix D. Subgroup Analyses

238   A subgroup analyses in a clinical research effort is the evaluation of the effect of the randomly allocated intervention within a fraction of the recruited subjects. The analysis of subgroups is a popular, necessary, and controversial component of the complete evaluation of a controlled clinical trial. Indeed, it is difficult to find a manuscript that reports the results of a clinical trial that does not report findings within selected subgroups.

239   Subgroup analyses as currently utilized in clinical trials are tantalizing and controversial. There may be no better maxim for guiding the interpretation of subgroup analyses in this setting than "Look, but don't touch," The results from subgroup assessments have traditionally been used to augment the persuasive power of a clinical trial's overall results by demonstrating the uniform effect of the therapy in patients with different demographic and risk factor profiles. This uniformity leads to the development of easily understood and implemented rules to guide the use of therapy[*]. Some clinical trials report these results both in the manuscript announcing the trial's overall results [44, 45, 46,47] and separately [48, 49, 50]. Such subgroup analyses potentially provide new information about an unanticipated benefit (or hazard) of the clinical trial's randomly allocated intervention.

240   However useful and provocative these results can be, it is well established that subgroup analyses are often misleading [51, 52, 53, 54]. Assmann et al. [55] has demonstrated how commonly subgroup analyses are misused, while others point out the dangers of accepting subgroup analyses as confirmatory [56]. For example, the Amlodipine controversy in

---

[*] The finding that a particular lipid lowering drug works better in women than in men can complicate the already complex decisions that practitioners must make as the number of available compounds increase.

the PRAISE trials discussed earlier in this report were based on a subgroup analysis. Nevertheless, the medical community continues to be tantalized by spectacular subgroup findings from clinical trials. A recent example is the subgroup analysis-based suggestion that medication efficacy is a function of race; this has appeared in both peer-reviewed journals [57, 58] and the lay press [59]. In this section, we will review the definitions, concepts, and limitations of subgroup utilization in clinical trials.

241  **Subgroups: Definitions and Basic Concepts** While the concept of subgroup analyses is straightforward, the terminology can sometimes be confusing. This report will therefore devote some attention to defining nine and classifying subgroup analyses.

242  **Subgroups Versus Subgroup Strata**: A subgroup is the description of{ XE "subgroups:definition" } patient based characteristic, e.g., gender that can be subdivided into categories. These different categories are described as strata, one stratum level for each category. For example, if an investigator is interested in creating a gender subgroup, patients are classified according to their sexual characteristics; the resultant gender subgroup consists of two strata—male and female.

243  The classic subgroup analysis itself is an evaluation of the effect of therapy within each of the subgroup strata. In this example of a gender-based subgroup, the subgroup analysis consists of an evaluation of the effect of therapy for males and an evaluation of the effect of therapy for females. Thus each stratum analysis produces an effect size with its standard error, a confidence interval, and a *p*-value.

244  The characteristics that form the basis of these subsets are chosen by the investigators. However, over time, a commonly evaluated set of subgroup evaluations has emerged. Although there are differences from one medical subspecialty to another, the most common

of these subgroups are based on demographic criteria e.g., gender, ethnicity, and age. Frequently used sociologic determinants are marital status, education, and acculturation.[*] In addition, there are subgroups that are based on lifestyle choices. Some examples of these are alcohol use, tobacco use, dietary intake, and exercise. Of course findings from medical histories (e.g., history of cancer, history of CHF, history of endocrine disorders) and physical examination (e.g., body mass index or DBP) are among commonly appearing subgroups in clinical trials as well.

245   The definition of a subgroup can be more complicated than a first glance would suggest. Consider the marriage status subgroup. One might think that this is easy to define. Is the patient married or not? Phrased this way, this suggests that the marriage subgroup should have two strata. However, the choices can be much more complex than this. The patient could be married now, or have been married in the past and is single now. The patient could be separated, divorced, or remarried. These alternative classifications can either be useful, or merely distractions depending on the purpose for which the evaluation will take place. For example, in some research, which is not primarily sociologic, these additional classifications may be unnecessary. However, in other research efforts, the intricate differentiation of marriage history details is very important. Thus, one must know how the subgroup analysis will be used so that the most useful strata membership criteria can be developed. Once each of the subgroup strata have been identified, the clinical trial workers will know what data to collect that will be the most useful.[†]

246   ***Subgroups: Interpretation Difficulties***: The illustrations of the previous sections have demonstrated that there are many possible ways to subgroup patients. However, we must

---

[*] Acculturation is the degree to which a community composed primarily of immigrants accepts with approval and is involved in the activities of the surrounding society.
[†] Another subgroup that has grown in complexity is that for race/ethnicity.

keep in mind that, in a collection of subgroup analyses, it is the same patien{ XE "sub-groups:interpretation difficulties" }ts that are being stratified in different ways. This observation can complicate the interpretation of a subgroup evaluation.

247  For example, consider a randomized, controlled clinical trial, which is in its analysis phase. At this time, all of its patients are classified by gender, grouping patients into male and female sub-cohorts. Once the stratum membership assignment is finished, the effect of the randomly allocated intervention is assessed in each of the two gender strata. It is seen that the effect of therapy appears to depend on gender, with males experiencing a different effect than females.

248  When completed, these same patients are then re-aggregated based not on gender, but on age. Subjects are placed into one of the following three age strata: (1) less than 40 years of age, (2) between 40 and 60 years of age, and (3) greater than 60 years of age. When the subgroup analysis is carried out for the age strata, it appears that the effect of therapy is the same in each of the age groups.

249  The results from these two subgroup analyses essentially demonstrate that the same patients when characterized one way (by gender) provide a different result than when characterized another way (by age). Was it really gender that modified the effect of therapy or was it the chance collection of patients that made it appear that gender was an influence? Since we can expect that the effect of treatment within a subgroup stratum depends on the patients within that stratum, then the value of the subgroup analysis must be tightly linked to the ability to demonstrate that it is the stratum characteristic that is producing the interesting effect and not just the random aggregation and re-aggregation of patients.

250   *Random Subgroups*. Investigators work to identify subgroup classifications that are meaningful. When examination of the therapy effect within a subgroup appears, it is only natural for the investigator to believe the rationale for the choice of the subgroup was jus- tified. Furthermore, the scientist may think that the stratum specific therapy effect is due to some effect-mediation ability produced by the subgroup trait. However, the very fact that patients are classified and divided can induce a subgroup effect.

251   Consider the following simple experiment. A courtroom chosen at random has a capacity of seating 60 observers. These 60 seats are divided by a central aisle, with 30 seats on each of the left-hand and right-hand side of the courtroom. Sixty people seat themselves as they choose, distributing themselves in an unrestricted manner among the seats on each side of the courtroom. When all are seated, we measure the height of each person, finding that the average height is exactly 67 inches. Does that mean that the average height of those seated on the left-hand side of the courtroom will be 67 inches? No. The average height of those seated on the left-hand side of the courtroom will be either less than 67 inches or greater than 67 inches, but it will not be exactly 67 inches (because the average is based on only thirty of the sixty people). If the average height on the left-hand side of the courtroom is less than 67 inches, then those seated on the right-hand side will have an average height greater than 67 inches[*]. Is it fair to conclude that those who sit on the right- hand side of the courtroom are in general taller than those who sit on the left-hand side?

252   The simple, random aggregation and sub-aggregation of the observations has induced a subgroup effect that is based only on the play of chance. This random subgroup effect

_____

[*] If the average height of all in the courtroom is 67 inches, and the average height on the left side is less than 67 inches, then the average height on the right hand side must be greater than 67 inches

appears in all subgroup analyses, and we will have to integrate it into our interpretation of any subgroup effect that we see. Some interesting findings of random subgroup analyses are available [60]. These occurrences help to justify the admonition that the best descriptor of the effect in a subgroup is the finding that is observed in the overall cohort.

253   *Proper Versus Improper Subgroups*: A critical preliminary task that clearly must be completed before a subgroup analysis proceeds is the classification of each patient into a subgroup stratum. This is the process by which the subgroup membership f{ XE "subgroups:proper vs improper" }or each patient in the study is determined. Although membership determination may appear to be a trivial task, there are circumstances in which this classification is problematic. These concerns revolve around the timing of the subgroup membership determination.

254   There are two important possibilities for determination of the timing of subgroup membership. The first is the classification of patients into the correct subgroup stratum when the patients are randomized. The second choice is to classify patients into subgroup strata at some time during the execution of the trial. While each has advantages, the determination of subgroup membership at the beginning of the study is preferred.

255   Determining subgroup membership at the beginning of the trial requires that, not only must the subgroup be defined at the beginning of the study, but also subgroup strata membership should be defined prospectively as well. This is a straightforward procedure to apply to the gender subgroup with its two strata. However, for other subgroups of clinical interest, the process can be complex.

256   *Intention-to-Treat" Versus "As Treated" Subgroup Analyses*: Consider a clinical trial in which patients are randomized to receive an intervention to reduce the total mortality

rate from chronic cirrhosis of the liver. At the inception of the study, patients are random-
ized to receive either control group therapy or the intervention. At the conclusion of the
study, the investigators will compare the cumulative mortality rates of patients in each of
the two { XE "intention to treat:vs. \"as treated\"" }treatment groups. However, at the end
of the study, how will the investigators decide what patients should be considered active
group patients and which patients should be counted as in the control group? The com-
monly used approach is to assign treatment group membership simply as the group to
which the patient was randomized. This is the "intention to treat" principle.

257   The "intention-to-treat" principle of analysis is the standard analysis procedure for the
evaluation of clinical trial results. Undoubtedly, this analysis tends to be a conservative
one, since not every patient is treated as they were "intended." For example, some pa-
tients randomized to the active group may not take their medication. These patients, al-
though randomized to the active group, will have the control group experience and pro-
duce endpoints at rates similar to that of the control group. However, they would be in-
cluded in the active group since they were randomized to and "intended to be treated"
like active group patients. The inclusion of these patients in the active group for analysis
purposes tends to make the active group experience look more like the control group ex-
perience, increasing the overall active group event rate.[*]

258   Similarly, patients who are randomized to the control group may nevertheless be exposed
to active group medication (e.g., from their personal physician who is not an investigator
in the study). These patients will experience event rates similar to the rates of the active

---

[*] There are occasional complications in an "intention-to-treat" analysis. In some cases, a patient is tested and randomized, but
then, subsequent to the randomization the test result reveals that the patient is not eligible for the trial for a prospectively stated
reason. In this case, there was no "intent" to randomize this patient when the test result was known, and the patient is removed
from the study.

group, but since they are considered as part of the control group, the inclusion of these patients will produce an event rate for the control group that is closer to that of the active group. Thus the control group rate will approach that of the active group, while the cumulative event rate in the active group will be closer to that of the control group (described in the previous paragraph). This effect of these combined rate alterations reduces the magnitude of the treatment effect, thereby diminishing the power of the clinical trial.[*]

259   An alternative analysis to the "intent to treat" principle is one that analyzes the endpoint results using an "as-treated" analysis. In this case, although patients are still randomized to receive either placebo or active therapy, they are classified for analysis purposes based on whether they actually took their medication or not. Since this is determined after the patient was randomized to the medication, and the effect (both perceived beneficial effects, and adverse effects) of the medication may determine whether the patient takes the medication, the "as-treated" evaluation is a confounded analysis. A clearly detailed examination of this issue is available [61].

260   **_Effect Domination Principle_**: I have stated previously that, in the absence of confirmatory subgroup evaluations, the best estimate of the effect of randomly allocated therapy within a subgroup strata is the effect of that therapy on the overall cohort. We will call this the principle of _effect domination_— the effect of therapy averaged over all randomized patients dominates the effect seen in the individual subgroup strata.

261   The effect domination principle was the basis { XE "subgroups:effect domination prinicple" } of our decision to overturn the results of several of the subgroup evaluations that were provided previously. Although there are many clinical trials designed to pro-

---

[*] The effect of the magnitude of the treatment effect on the power of a study for fixed sample size is discussed in Appendix D.

vide confirmatory evaluations of their primary analyses, there are far fewer confirmatory evaluations that occur in the assessments of subgroups. Therefore, the effect domination principle is much more frequently required in the interpretation of the results of clinical trials.

262   Since subgroup analyses have and will, in all likelihood, continue to engender the interest of the medical community, it is logical to ask why there aren't more confirmatory analyses involving subgroup evaluations. This is an especially interesting question since there are clear circumstances in which subgroup evaluations can produce confirmatory results of the therapy effect within (or across) subgroup strata. When executed, these confirmatory results stand on their own, separate and apart from the result of the effect of therapy in the overall cohort. The criteria for these evaluations were clearly characterized by Yusuf et al. [62] and are coincident with our development of confirmatory analyses in this text.

263   The first of these criteria for the development of confirmatory analyses in clinical trials is that the subgroup analysis must be prospectively designed and proper. This structure is required so that (1) the therapy effect size estimators that the subgroup analysis produces are trustworthy; and (2) that the effect of therapy to be evaluated in a subgroup is not confounded by (i.e., bound up with) post-randomization events as discussed previously. In general, there has been no difficulty with meeting this requirement of confirmatory subgroup analyses. Many clinical trials make statements in their protocols describing the plans of investigators to evaluate the effect of therapy within their subgroups of interest. These subgroups are, by and large, proper subgroups, e.g., demographic traits, or the presence of risk characteristics at baseline.

264   However, the final requirement for a confirmatory subgroup analysis is the prospective allocation of type I and type II error rates. This last criterion has proved to be especially vexing because of the severe sample size constraints this places on subgroup analyses. As we have pointed out earlier, the allocation of type I error rates for confirmatory testing must be such that the FWER, $\xi$, is conserved. This requires that statistical testing at the level of subgroup analyses will be governed by test-specific $\alpha$ error rates that are generally less than 0.05.

265   The difficulty of executing subgroup analyses in the presence of type I error rate control and adequate statistical power is not difficult to understand. In fact, resources are generally strained to the breaking point for the analysis of the effect of therapy in the overall cohort. This overall analysis is typically carried out with the minimum acceptable power (80%) because of either financial constraints or patient recruitment difficulties. By definition, subgroup analyses (and certainly within-stratum subgroup analyses) will involve a smaller number of patients; it is a daunting task to prospectively allocate type I and type II error rates at acceptable levels in a smaller number of patients, although the methodology for the accurate computation of sample size is available [63]. Thus, the growth of the use of subgroups as confirmatory tools has, to some extent, been stunted by the difficulty of constructing a prospective clinical trial with an embedded, prospectively defined proper subgroup for which tight statistical control is provided for type I and type II statistical errors.

266   *Manuscript Interpretation* The purpose of a published manuscript is to identify the contribution the research effort has made. Specifically, this general evaluation reduces to three questions that should be answered. (1) What was the purpose of the research? (2)

Do the methods used allow the researcher to answer the question? and, (3) If so, then what is the answer?

267   The motivation for the research is determined from a careful study of the introductory section of the manuscript. Commonly replete with citations, this section should clearly delineates the research question that was raised by the investigators. Whether the investigators are able to answer the research question they asked is determined in the methods section. Your review of this section of the manuscript should be careful and thorough. Was the instrumentation sufficient to provide the measures with the precision that the authors require? If laboratory samples are involved were they preserved using the appropriate environmental conditions?

268   If the research involves subjects, other questions must be adequately addressed in this critical section of the manuscript that describes the methodology used by the authors. Were there an adequate number of subjects? Is the analysis carried our prospectively delineated, leading to trustworthy estimates of effect sizes, standard errors, confidence intervals, and p-values, or were the analyses exploratory, requiring an additional, confirmatory study to sustain the findings.

269   If the methodology empowers the investigators to answer their prospectively asked question, then proceed to read the results section, fully planning to integrate the main findings of the research into your fund of knowledge. However, if the methods reveal that the findings from the study are exploratory and not generalizable, then the results are not generalizable, and cannot really be accepted as reflective of the population. However, considerable care must be given if the manuscript has identified a harmful effect,

270   The reviewer must avoid the temptation to "study count". "Study counting" is the process of simply counting the number of studies that address an issue and deciding if there "are enough" studies to support the result of interest. Some who are involved in study counting argue that there must be more than one study. Others say that the number of "positive" studies must outnumber the number of "negative" studies. Instead, the scientific reasoning process assesses in detail each of the available studies, carefully dissecting the methodology, sifting through the methodology, and carefully considering the conclusions. Study counting represents the wholesale abandonment of the intellectual principles of careful review.

271   The specific problem with "study counting" is the implicit ceteris paribus (all other things being equal) assumption, i.e. that all of the studies that are being included in the count are equal in methodology, equal in the thoroughness of their design, equal in the rigor of their execution, and equal in the discipline of their analyses and interpretation. This fallacious assumption is far from the truth of scientific discovery. Studies have different strengths and different weaknesses. Different investigators with their own non-uniform standards of discipline execute the research efforts. Some studies give precise results, while others are rife with imprecision. The panoply of studies is known not for its homogeneity, but for the heterogeneity of designs and interpretations.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                    8/10/2006

I certify that the foregoing statements made by me are true and correct.  Executed this

_10 th_ day of _August_ 2006 at Houston, Texas


_(signature)_

Lemuel Moye, M.D., Ph.D.


STATE OF TEXAS    )

                                       Subscribed and sworn to me

                      ) ss.            Before this _10 th_ day of _August_ 2006

COUNTY OF HARRIS

                                       _(signature)_

                                       Signature of Notary Public

```
APRIL K THOMSON
My Commission Expires
September 30, 2009
```

                                       My Commission Expires _9/30/2009_

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                                8/10/2006

## References

1 . Hippisley-Cox, J, Couplan C, Logan, R. (2006). Risk of adverse gastrointestinal outcomes in patients taking cycl-oxygenase-2 inhibitgors or conventional non-steroidal anti-inflamatory drugs: population based nested case-control analysis. British Medical Journal. 331:1310-1316.

2 . Cole ZP, MacMahon B.(1971) Atrtirbutable risk percent in case-control studies. Bri. J. prev. Sco. Med 25:242-244.

3 . Miettinen OS. (1974). Proportion of disease caused or prevented by a given exposure, trait or intervention. American Journal of Epidemiology:99:325-332.

4 . Wilson PWF, D'Agostino RD, Levy D,  Belander AM, Silbershatz H, Kannel WB.(1998) Prediction of Coronary Heart Disease Using Risk Factor Categories. Circulation 97:1837-1847.

5 American Heart Association. Stroke Statistics. In: 2001 *Heart and Stroke Statistical Update*. Dallas: American Heart Association, 2000.

6 American Heart Association. *2001 Heart and Stroke Facts*, Dallas: American Heart Association, 2000.

7 Hennan JK< Huang J, Barrett TD et al. (2001). Effects of selective cyclooxygenase-2 inhibition on vasuclar responses and thrombosis in canine coronary arteries. Circulation 104:820-825.

8. Linder JD, Mondeullier KE, Davis JV, et. al. Cyclooxgyenase-2 (COX-2) inhibitor celecoxib; a possible cause of gastropopaqthy and hyperprothrombinemia *South Med J*; 93:930-2.

9 Crofford LJ, Oates JC, McCune WT. et al. Thrombosis in paients with connective tissue diseases treated with specific cyclooxyenase-2 (COX-2) inhibitors; a reposr of four ases . Arthritis Rheu;43:1891-1896.

10 Bombadier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med. 2000;343:1520-1528.

11 Food and Drug Adminsitration Adviosry Committee. Cardivascular saftety revie of rofecoxib. Available from URL: http://www.fda.gove/ohrms/dockets/ac/01/briefing/3677b2_06-cardio.pdf.

12 . Curfman GD, Morissey S, Drazen JM (2005). Expression of concern; Bombardier et al., "Comparison of upper gastroentestinal toxcity of rofecoxib and naproxen in patients with

rheumatoid arthritis *N Engl J Med* 2000;353:1520-8. *New England Journal of Medicine* 353:2813-2814.

13. Juni P, Rutjes AW, Dieppe PA.Are selective COX-2 inhibitors superior to traditional non steroidal anti-inflamatory drugs? BMJ 2002.324:1287-8).

14. Konstam MA, Weir MR, Reicin A, et al. Cardiovascular thrombotic events in controlled clinical trials of rofecoxib. Circulation 2001. 104:2280-8.

15 Garcia Rodriguez LA. The effect of nonsteroidal anti-inflammatory drugs (NSAIDS) on the risk of coronary heart disease:fusion of clinical pharmacology and pharmacoepidemiolic data. Clin Exp Rheumatol 2001:19 (6 Suppl. 25):S41-4.

16 Ray WA, Stein CM, Hall K, et al. Non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease; an observational cohort study. Lancet 2002:359 118-23.

17 Breaslier RS, Sandler RS, Quan H, Bolognese JA, Qxenius B, Horgan K, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med 2005: 352:

18. FitzGerald GA. Coxibs and Cardiovascular Disease. New England Journal of Medicine.351: 1709- 1711.

19. Solomon DH, Schneeweiss S, Glynn RJ, Kiyota Y, Leven R, Mogun H, Avorn J. Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults. *Circulation* 2004:109:2068-2073.

20 Banewoarth B. Treves R, Euller-Ziegler L, et al. Adverse events associated with rofecoxib therapy; results of a large study in community-derived osteoarthritic patients. Drug Safety; 2003; 26: 49-54

21 Reicia AD, Shapiro D, Sperling R.S. et al. Comparison of cardiovascular thrombotic events in patients with osteoarthritis treated with rofecoxib versus nonselective nonsteroidal anti-inflammatory drugs (ibuprofen, diclofenac, and nebumtone). American J Cardiology 2002 89:204-9.

22 Weir MR, Sperling RS, Relcin A, e. al. Selective cyclooxygenase-2 (COX-2) inhibition and cardiovascular effects; a review of the rofecoxib development program. American Heart Journal (2003):146:591-604.

23 Ray W, Stein C, Daugherty J, et al. COX-2 selective nonsteroidal anti-inflamatory drugs and the risk of serious coronary heart disease. Lancet 2002. 360:1071-1073.

24 Mandani M, Rochon P, Juorlink DN, et al. Effect of selective cyclooxygenase 2 inhibitors and naproxen on short-lived risk of acute myocardial infarction in the elderly. Archives Internal Medicine 2004:163 481-6.

25 Layton D, Heeley E, Hughes K, et al. Comparison of the incidence rates of thromboembolic events reported for patients prescribed rofecoxib and meloxican in general practice in England using prescription-event monitor in (PEM) data. Rheumatology (Oxford) 2003; 42:1342-53.

26 Layton D, Hughtes K, Harsris S, et. Al. Comparisons of the incidence rates of thromboembolic events reported for patients prescribed celecoxib and meloxican in general practice in England using prescription-event monitoring (PEM) data. Rheumatology (Oxford) 2003;42:1354-1365

27 Zhao SZ, Reynold NW, Lejkowth J, et al. A comparison of renal-related adverse drug reactions between rofecoxib and celecoxib based on the World Health Organization/Uppsala Monitoring Centre safety database. Clin Ther 2001;23 1478-91.

28 Vu D, Murty M, McMorran M, Selective COX-2 inhibitors: suspected cardiovascular/cerebrovascular adverse reactions. Can Adv Reaction News 2002:12:1-3.

29 Mukherjee D, Nissen SE, Topol EJ.  Risk of cardiovascular events associated with selected cyclooygenase-2 (COX-2) inhibitors. JAMA (2001):286:954-9

30. Fisher LD, Moyé LA.  Carvedilol and the Food and Drug Administration Approval Process: An Introduction.  Controlled Clin Trials 1999,20:1-15.

31. Moyé LA P-Value Interpretation in Clinical Trials. The Case for Discipline. Controlled Clin Trials 1999;20:40-49.

32. Bull JP. (1959) Historical development of clinical therapeutic trials. *Journal of Chronic Disease* **10**:218–248.

33. Malgaigne LF. (1947) *Weuvres Completes d'Ambrosise Paré*, vol. 2. Paris, p. 127.

34. Connolly HM, Crary JL, McGoon MD, et al. (1997) Valvular heart disease associated with fenfluramine-Phentermine. *New England Journal of Medicine* **337**:581–588.

35. Clark C. (1997) *Radium Girls: Women and Industrial Health Reform, 1910–1935* Chapel Hill, University of North Carolina Press.

36. Gehan EA, Lemak NA. (1994) *Statistics in Medical Research: Developments in Clinical Trials*. New York, Plenum Medical Book Company.

37. Hill B. (1953) Observation and experiment. *New England Journal of Medicine* **248**:995–1001.

38.  Kleinbaum DG, Kupper LL, Morgenstern H. (1982) *Epidemiologic Research: Principles and Quantitative Methods*. New York, Van Nostrand Reinhold Company.

39.  Pepall J. (1997) *Methyl Mercury Poisoning: The Minamata Bay Disaster*. Copyright © International Development Research Centre, Ottawa, Canada .

40.  Lenz W. (1962) Thalidomide and congenital abnormalities. *Lancet* **1**:45.

41.  Moore T{ XE "*Thomas Moore*" }{ XE "Moore, Thomas" }. (1995) *Deadly Medicine*. New York, Simon and Schuster.

42.  The CAST Investigators. (1989) Preliminary Report: Effect of encainide and flecainide on mortality in a randomized trial of arrhythmia suppression after MI. *New England Journal of Medicine* **212**:406–412.

43.  Hill B. (1953) Observation and experiment. *New England Journal of Medicine* **248**:995–1001.

44.  Pfeffer, M.A., Braunwald, E., Moyé, L.A. et al. (1992). Effect of captopril on mortality and morbidity in patients with left ventricular dysfunction after myocardial infarction–results of the Survival and Ventricular Enlargement Trial. *New England Journal of Medicine* **327**:669–677.

45. Sacks F.M. Pfeffer M.A., Moyé, L.A. (1996). The effect of pravastatin on coronary events after myocardial infarction in patients with average cholesterol levels. *New England Journal of Medicine* **335**:1001–1009.

46  The SHEP Cooperative Research Group (1991) Prevention of stroke by antihypertensive drug therapy in older persons with isolated systolic hypertension: final results of the systolic hypertension in the elderly program (SHEP). *Journal of the American Medical Association* **265**:3255–3264

47.  The Long-Term Intervention with Pravastatin in Ischemic Disease (LIPID) Study Group. (1998). Prevention of cardiovascular events and death with pravastatin in patients with CAD and a broad range of initial cholesterol levels. *New England Journal of Medicine* **339**:1349–1357.

48.  Moyé, L.A., Pfeffer, M.A., Wun, C.C., et. al (1994). Uniformity of captopril benefit in the post infarction population: Subgroup analysis in SAVE. *European Heart Journal.***15**: Supplement B:2–8.

49.  Lewis, S.J., Moyé, L.A., Sacks, F.M., et. al (1998). Effect of pravastatin on cardiovascular events in older patients with myocardial infarction and cholesterol levels in the average

range. Results of the Cholesterol and Recurrent Events (CARE) trial. *Annals of Internal Medicine* **129**:681–689.

50. Lewis, S.J., Sacks, F.M., Mitchell, J.S., et. al (1998). Effect of pravastatin on cardiovascular events in women after myocardial infarction: the cholesterol and recurrent events (CARE) trial. *Journal of the American College of Cardiology* **32**:140–146.

51. Peto, R., Collins, R., Gray, R. (1995). Large-scale randomized evidence: Large, simple trials and overviews of trials. *Journal of Clinical Epidemiology* **48**:23–40.

52. MRFIT Investigators. (1982). Multiple risk factor intervention trial. Journal *of the American Medical Association* **248**:1465–77.

53. ISIS-1 Collaborative Group (1986) Randomized trial of intravenous atenolol among 16027 cases of suspected acute myocardial infarction–ISIS–1. *Lancet* **ii**;57–66.

54. Lee, K.L., McNeer, F., Starmer, C.F., Harris, P.J., Rosari, R.A. (1980). Clinical judgment and statistics. Lessons from a simulated randomized trial in coronary artery disease. *Circulation* **61**:508–515.

55. Assmann, S., Pocock, S., Enos, L., Kasten, L. (2000), Subgroup analysis and other (mis)uses of baseline data in clinical trials. *Lancet* **355**:1064–69

56. Bulpitt, C. (1988). Subgroup Analysis. *Lancet*: 31–34.

57. Exner, D.V., Dreis, D.L., Domanski, M.J., Cohn, J.N. (2001), Lesser response to angiotensin–converting enzyme inhibitor therapy in black as compared to white patients with left ventricular dysfunction. *New England Journal of Medicine* 334:1351–7

58. Yancy, C.W., Fowler, M.B., Colucci, W.S., Gilber, E.M., Brsitow, M.R., Cohn, J.N., Luka, M.A., Young, S.T., Packer, M. for the US Carvedilol Heart Failure Study Group. 2001.Race and response to adrenergic blockade with carvedilol in patients with chronic heart failure. *New England Journal of Medicine* **334**:1358–65.

59. Stolberg S.G. Should a pill be colorblind? *New York Times*. Week in Review. May 13, 2001.p 1.

60. Moyé, L. (2000) *Statistical Reasoning in Medicine: The Intuitive P-Value Primer*. New York. Springer.

61. Peduzzi, P.,Wittes, J., Deter, K., Holford, T. Analysis as-randomized and the problem of non-adherence; an example from the veterans affairs randomized trial of coronary artery bypass surgery. (1993). *Statistics in Medicine* **12**:1185–1195.

62. Yusuf, S, Wittes J., Probstfield, J., Tyroler, H.A. (1991). Analysis and interpretation of treatment effects in subgroups of patients in randomized clinical trials. *Journal of the American Medical Associatio* **266**:93–8.

63. Peterson, B., George, S.L. (1993). Sample size requirements and length of study for testing interaction in a 1 x $k$ factorial design when time-to-failure is the outcome. *Controlled Clinical Trials* **14**:511–522.

64. Solomon DH. Cardiovascular outcomes in new users of coxibs and nonsteroidal anti-inflammatory drugs: high-risk subgroups and time course of risk. Arthritis Rheum. 2006 May;54(5):1378-89.