Lemuel A. Moye, M.D.

Page 54

1  was not available to the FDA or the
2  Advisory Committee?
3       A.   What I list in my report,
4  and that is -- let me just look at this
5  specifically.
6            The September -- I'm on item
7  84, Paragraph 84 on Page 32.
8       Q.   Page 32?
9       A.   Yes, sir.
10      Q.   Paragraph what?
11      A.   84, the very last one on
12 that page.
13           Beginning with that
14 Paragraph 84, the September 12, 1996
15 memo; Paragraph 85, the October 10th,
16 '96; Paragraph 86, November 11, 1996.
17      Q.   Right.
18      A.   And this litany of material
19 was available, but had not been presented
20 at the Advisory Committee. So, that's
21 the basis of my answer to the question.
22      Q.   Okay.
23           The materials you're talking
24 about in Paragraph 84, you're talking

Page 55

1  about an internal memorandum, right?
2       A.   Yes, sir.
3       Q.   And the internal memorandum
4  deals with a case of unstable angina that
5  was reported in an RA study, correct?
6       A.   Yes, sir.
7       Q.   Do you know whether that
8  case was reported to the FDA in
9  accordance with the procedures by which
10 it's supposed to be reported the FDA?
11      A.   I don't know if it was
12 reported to the FDA or not.
13      Q.   Paragraph 85 deals with also
14 an internal memorandum. Is that right?
15      A.   Yes, sir.
16      Q.   Do you know whether the data
17 that were the subject of that memorandum
18 were or were not reported to the FDA?
19      A.   I don't know.
20      Q.   In Paragraph 86, there's a
21 discussion about a memo authored by a Dr.
22 Musliner, right?
23      A.   Yes.
24      Q.   That talks about an

Page 56

1  anticipation of greater adverse
2  cardiovascular events in rofecoxib
3  compared with comparator NSAIDs, right?
4       A.   Yes.
5       Q.   That was not a study. That
6  was a memo, right?
7       A.   Yes.
8       Q.   Actually, further on in your
9  report on Page 71, you discuss the Watson
10 analysis, correct? 70 and 71?
11      A.   Yes.
12      Q.   In this discussion you say
13 that Merck misled the FDA, right?
14      A.   Yes. I also discussed it in
15 90 and 91 as well.
16      Q.   90 and 91?
17      A.   Paragraph 90 and 91, top of
18 Page 35.
19      Q.   Yes. I understand. I'm not
20 suggesting that's the only place you talk
21 about it. I'm just saying in your
22 discussion about misleading the FDA on
23 Page 70 and 71, the first part of your
24 discussion starts with the proposition

Page 57

1  that Merck misled the FDA and the FDA
2  Advisory Committee because at the time of
3  the original Advisory Committee meeting,
4  they did not disclose the Watson
5  analysis. Right?
6       A.   Yes, sir.
7       Q.   And it's your understanding
8  that the Watson analysis showed a clear
9  signal of an increased cardiovascular
10 risk associated with rofecoxib therapy?
11      A.   Yes, sir.
12      Q.   To your understanding, were
13 the data upon which the Watson analysis
14 was based disclosed to the FDA?
15      A.   I don't know whether the
16 data in any way, shape or form was
17 disclosed to the FDA in the IND or any
18 supplemental information, but it was not
19 disclosed to the Advisory Committee.
20      Q.   You know that because you've
21 reviewed the Advisory Committee
22 transcript?
23      A.   The transcript and also the
24 background dossier provided by Merck for

15 (Pages 54 to 57)

Lemuel A. Moye, M.D.

Page 58

1  the Advisory Committee to review.
2      Q.  Prior to the original 1999
3  Advisory Committee meeting?
4      A.  Yes, sir.
5      Q.  Now, is there any other data
6  besides the data contained in the Watson
7  analysis that you believe that Merck did
8  not disclose to the FDA or to the FDA
9  Advisory Committee prior to the 1999
10 meeting?
11     A.  No.  That's the only data I
12 believe I point out in my affidavit for
13 the 1999 Advisory Committee.
14     Q.  Did you look at a file that
15 contained -- well, let me back up.
16         You just alluded to the
17 documents that Merck provided to the
18 Advisory Committee members.  There're
19 referred to as briefing documents?
20     A.  Yes, sir.
21     Q.  Right?
22         Did you look at those on
23 line?
24     A.  I don't think I looked at

Page 59

1  those on line, no.
2      Q.  Those are --
3      A.  I'm sorry.
4      Q.  Were they provided by
5  Scientific Evidence?
6      A.  Yes.
7      Q.  Did you look at all of
8  Merck's briefing documents before all of
9  the Advisory Committees?
10     A.  Yes.
11     Q.  Including the 2005?
12     A.  Yes.
13     Q.  Did you review as a part of
14 your review a correspondence file between
15 Merck and the FDA concerning Vioxx?
16     A.  I reviewed some
17 correspondence between the FDA and Merck.
18 I can't say I reviewed one large complete
19 correspondence file.
20     Q.  How was the correspondence
21 that you reviewed selected?
22         MR. SIZEMORE:  Object to
23     form.
24 BY MR. PIORKOWSKI:

Page 60

1      Q.  Let me withdraw the
2  question.
3          If you reviewed some letters
4  but not all the letters, there had to be
5  some selection process in deciding what
6  you saw?
7      A.  Yes.
8      Q.  Fair?
9          Were you involved in that
10 selection process, was that a decision
11 made by Scientific Evidence, or was that
12 a decision made by the lawyers with whom
13 you were working?
14     A.  No.  I would say it was a
15 joint decision.  At this point in my
16 review, you're talking now about April or
17 May of this year, and I would meet with
18 attorneys, some of whom I mentioned
19 earlier, and we would talk about what
20 information would be most useful, and I
21 would ask for material, as well as have
22 material supplied unvolunteered --
23 supplied, volunteered by others, not by
24 me.

Page 61

1      Q.  Did you give the lawyers
2  directions about what you wanted to see
3  in terms of correspondence?
4      A.  Well, yes.  Not just
5  correspondence, but other documents as
6  well, yes.
7      Q.  Let's talk first about
8  correspondence.  What directions or
9  guidance did you give them about what you
10 wanted to see?
11     A.  Well, it depended on the
12 topic we were talking about.  For
13 example, when we're talking about
14 preparations for Advisory Committee
15 meetings, then any material that
16 corresponded between FDA and the --
17 excuse me -- between FDA and Merck
18 involving the Advisory Committee, I
19 wanted to see.  And that included, but
20 wasn't limited to, background documents.
21     Q.  Okay.  Anything else?
22     A.  That's the clearest example
23 I can think of as I sit here now.
24     Q.  Have you reviewed all of the

Lemuel A. Moye, M.D.

Page 62

1  correspondence dealing with label changes
2  or proposed label changes between Merck
3  and the FDA?
4      A.   I have not, no.
5      Q.   Have you reviewed any of the
6  correspondence concerning label changes
7  or proposed label changes between Merck
8  and the FDA?
9      A.   I don't think so, no.
10     Q.   Have you reviewed
11 correspondence between Merck and the FDA
12 with respect to warning letters?
13     A.   Warning letters? Yes, I
14 have.
15     Q.   Your report makes reference
16 to a warning letter in September of 2001,
17 correct?
18     A.   Yes, sir.
19     Q.   Is that the only letter
20 concerning any DDMAC-related issues that
21 you saw?
22     A.   No, it's not.
23     Q.   Were you provided with
24 Merck's response to that warning letter?

Page 63

1      A.   I believe so, yes.
2      Q.   Were you provided with the
3  FDA's response to Merck's response?
4      A.   That I don't remember.
5      Q.   You said you gave the
6  lawyers guidance not only with respect to
7  correspondence, but with respect to
8  documents generally that you wanted to
9  see?
10     A.   Yes.
11     Q.   What guidance did you give
12 them?
13     A.   Any correspondence relating
14 to communication -- any correspondence
15 involving or centered on the VIGOR
16 manuscript and the -- actually, any and
17 all published manuscripts. So,
18 correspondence between editors and
19 authors involving reviewers,
20 correspondence involving reviewers. I
21 wanted to see all of that material in
22 addition to whatever internal
23 documentation that they had -- I'm sorry,
24 documentation internal to Merck involving

Page 64

1  these studies, as well as the studies
2  themselves.
3      Q.   So, first of all, you wanted
4  to see any correspondence between Merck
5  employees and editors of journals?
6      A.   Let me rephrase. No.
7      Q.   Okay.
8      A.   Between the authors of
9  Merck's -- Merck-funded manuscripts and
10 editors.
11     Q.   Okay.
12     A.   Including reviews,
13 summaries, cover letters and so on.
14     Q.   Do you believe you were
15 provided with that?
16     A.   Yes.
17     Q.   Is that included in the
18 materials in the disk?
19     A.   Yes.
20     Q.   Any other -- let me back up.
21          I'm sure you did review
22 internal company documents, right?
23     A.   Yes, sir.
24     Q.   How were the internal

Page 65

1  documents selected that you reviewed?
2      A.   They were -- during
3  conversations, face-to-face
4  conversations, there were discussions,
5  and they would say that there were -- the
6  statement would be made that there is an
7  e-mail that is responsive to this issue.
8  Let's just say -- I'll give you a
9  specific example. The evaluation of the
10 design of VIGOR. And then my response
11 was, I'd like to see that and all related
12 material involving the design of VIGOR
13 that was available that they had.
14     Q.   So your understanding is
15 that you received that, all materials
16 relating, let's say, to the design of
17 VIGOR?
18     A.   That they had, yes.
19     Q.   That the lawyers had?
20     A.   Yes.
21     Q.   Okay.
22          Anything else besides the
23 design of VIGOR specifically as it
24 applies to internal company documents?

17 (Pages 62 to 65)

Lemuel A. Moye, M.D.

Page 66

1  A. Well, I actually -- the
2  tenor of the conversation was precisely
3  that. So, it was about the design of
4  VIGOR, about concern, early concerns
5  about the possibility of a relationship
6  between Vioxx and cardiothrombolic
7  agents. If there was any correspondence
8  about that, I wanted to see, not just the
9  correspondence that was in hand, but any
10 and all correspondence related to that.
11     Q. Including the followup?
12     A. Yes.
13     Q. And to your understanding,
14 you've seen that?
15     A. Yes, sir.
16     Q. Okay.
17        Anything else that you asked
18 to see?
19     A. Actually, that's quite a
20 bit.
21     Q. And I want to focus on
22 internal company documents for this line
23 of discussion. Any other internal
24 company documents that you specifically

Page 67

1  asked to see?
2      A. Let me go through my
3  affidavit to see because I think there's
4  probably some others.
5      Q. Sure.
6         MR. SIZEMORE: Can we take a
7  break?
8         MR. PIORKOWSKI: Sure.
9         (Witness reviewing
10         document.)
11          - - -
12        (Whereupon, a recess was
13        taken from 10:30 until 10:44 a.m.)
14          - - -
15        THE WITNESS: Two other
16 areas. One was the notion of the
17 naproxen protective effect, and
18 the second broad area was any
19 information that was available
20 about study protocols. I'll give
21 you an example, the Alzheimer
22 studies. Another example would be
23 VIP. Another example would be
24 VICTOR. I'm not trying to be

Page 68

1  exhaustive here, but that's
2  examples. If there was a little
3  bit of material I was exposed to,
4  I wanted to see all of the
5  material that was available.
6  BY MR. PIORKOWSKI:
7      Q. With respect to study
8  protocols?
9      A. Yes.
10     Q. For the clinical trials?
11     A. Yes.
12     Q. Well, let me ask you, when
13 you looked at the new drug application,
14 did you look at any of the study
15 protocols for the osteoarthritis trials
16 that were submitted as a part of the
17 Phase III studies?
18     A. Yes.
19     Q. You looked at that as part
20 of the new drug application?
21     A. Yes.
22     Q. But then the later studies
23 that came down the pike like VIP and
24 APPROVe and VICTOR, you asked to see

Page 69

1  those protocols?
2      A. Yes. Actually, any and all
3  internal documents related to, be it
4  protocols, internal analyses or
5  meta-analyses or interim reviews, I asked
6  to see.
7      Q. Okay.
8      A. And I need to add one other
9  thing. Kathy Snapka is an attorney who
10 designated me. I didn't mention that
11 before. That was my fault. I want to
12 correct that.
13     Q. Fair enough.
14        We'll add her to the list.
15 Let me follow up on that.
16     A. Sure.
17     Q. Have you met with Kathy
18 separate from the other lawyers?
19     A. No, I have not.
20     Q. Has Kathy participated in
21 meetings you've had with other lawyers?
22     A. Yes.
23     Q. Are you specifically
24 designated in a case that Kathy has set

18 (Pages 66 to 69)

Lemuel A. Moye, M.D.

Page 70

1  for trial?
2    A.   I believe so.
3    Q.   Have you set aside a date on
4  your calendar for a case Kathy has set
5  for trial?
6    A.   I don't think so.
7    Q.   Any other corrections we
8  need to make from round one?
9    A.   As I sit here now, no.  If I
10 get some more, I'll let you know.
11   Q.   While we're cleaning up some
12 things, I asked you about whether the
13 opinions you intended to render in the
14 MDL trial in New Orleans were set forth
15 in your report.  My colleague reminded me
16 that I need to ask the same question with
17 respect to California.  Are the opinions
18 you intend to render at trial in
19 California also set forth in your report
20 subject to new information becoming
21 available?
22   A.   Yes, sir.
23   Q.   As a part of your review,
24 did you review the various labels that

Page 71

1  were in force with respect to Vioxx?
2    A.   Yes, sir.
3    Q.   Did you review all of them?
4    A.   Yes, I did.
5    Q.   Did you review all of the
6  draft labels?
7    A.   I don't think so, no.
8            - - -
9         (Whereupon, Deposition
10   Exhibit Moye MDL 2, "Documents
11   Reviewed by Dr. Lemuel A. Moye,"
12   (88 pages), was marked for
13   identification.)
14           - - -
15 BY MR. PIORKOWSKI:
16   Q.   We were provided with a
17 document which I've marked as Exhibit 2.
18        MR. PIORKOWSKI:  I think I
19   gave you a copy there, Paul.
20 BY MR. PIORKOWSKI:
21   Q.   I ask you to identify what
22 Exhibit 2 is.
23   A.   (Witness reviewing
24 document.)

Page 72

1         It is a compendium of the
2  material that I have been provided to
3  review related to the Vioxx litigation.
4    Q.   Is it your understanding
5  that all of the material that's contained
6  in Exhibit 2 is on the CDs that we've
7  been provided?
8    A.   Yes, sir.
9    Q.   Now, you haven't read all of
10 this stuff; is that right?
11   A.   I think in fairness I can
12 say, yes, I have, but I don't remember
13 all of it.
14   Q.   To the best of your
15 knowledge, you've read everything that's
16 listed on this document?
17   A.   Yes, sir.
18   Q.   For example, on Page 2 of
19 88, second -- third line from the bottom,
20 it has, "Carol Ernst...versus Merck -
21 hearing regarding Dr. Araneta's
22 testimony."  Do you see that?
23        MR. SIZEMORE:  Where is it?
24 BY MR. PIORKOWSKI:

Page 73

1    Q.   Page 2 of 8, third entry
2  from the bottom.
3    A.   Oh.  Third entry from the
4  bottom.  Yes.
5    Q.   Do you know why that was
6  provided to you?
7    A.   No, I don't.
8    Q.   Do you remember reading it?
9    A.   No, I don't remember the
10 details of it.
11   Q.   You remember anything about
12 it?
13   A.   No.
14   Q.   Or, for example, the one,
15 the entry right above it, "Hearing on
16 Exhibits"?
17   A.   Yes.
18   Q.   That's a transcript of a
19 court trial?
20   A.   That's right.  That's right.
21   Q.   Do you know why that would
22 have been of interest to you?
23   A.   No.  For that, what I did
24 was look at it to see first, cursorily,

Lemuel A. Moye, M.D.

Page 74

1  to see if it was going to be directly
2  relevant. And if it wasn't going to be
3  relevant to my opinions, then I put it
4  down and moved on to something else.
5       Q.   How much of the roughly 250
6  hours that you've spent were spent
7  reviewing documents versus preparing your
8  report versus meetings with lawyers?
9       A.   I'll answer the easy part
10 first. A small amount of time, I'd say
11 less than one percent, less than a half
12 of one percent, was spent meeting with
13 attorneys. Maybe 70 percent of the time
14 was spent reviewing documents, and 30
15 percent of the time was preparing an
16 affidavit. It's just a rough ballpark.
17      Q.   On Page 4, for example, of
18 this document, it appears the entire
19 trial transcript from the Ernst trial,
20 which was four weeks long, was sent to
21 you?
22      A.   Yes.
23      Q.   Did you read all of that?
24      A.   I went through it all, yes.

Page 75

1  I confess to you, I did not spend hours
2  on parts that I thought were irrelevant
3  for me --
4       Q.   Right.
5       A.   -- but I did go through it
6  all.
7       Q.   Do you remember reading the
8  deposition of Alan Nies?
9       A.   No. I don't remember
10 anything particularly relevant from that.
11      Q.   Or do you remember reading
12 his trial testimony?
13      A.   I remember looking at it,
14 yes.
15      Q.   How about depositions or
16 trial testimony of Dr. Alise Reicin?
17      A.   Yes.
18      Q.   You read that?
19      A.   Yes.
20      Q.   How about Briggs Morrison?
21      A.   I don't remember.
22      Q.   Deposition testimony of Dr.
23 Ed Scolnick?
24      A.   Yes.

Page 76

1       Q.   David Anstice?
2       A.   I don't remember that one.
3       Q.   Deborah Shapiro?
4       A.   Yes.
5       Q.   Did you read the depositions
6  of any of the regulatory affairs
7  individuals at Merck?
8       A.   I don't remember who they
9  were.
10      Q.   Do you remember reading the
11 deposition of any sales and marketing
12 personnel other than Dr. Anstice?
13      A.   I've gone through them, but
14 I don't recall any of the details.
15           MR. BLIZZARD: Object to
16      form. Sorry, a little late.
17 BY MR. PIORKOWSKI:
18      Q.   Who prepared Exhibit 2?
19      A.   Scientific Evidence did.
20      Q.   Okay.
21           When was it prepared?
22      A.   I don't know. I think
23 recently, but I don't when.
24      Q.   Was it prepared in

Page 77

1  anticipation of filing your report?
2       A.   Well, I think they knew they
3  had to have that when I filed my report,
4  but that's all I know.
5       Q.   Did you look at any Merck
6  standard operating procedures?
7       A.   No, sir.
8       Q.   You know from your own
9  clinical trial experience what a SAS file
10 is?
11      A.   Yes, sir.
12      Q.   Did you look at any of the
13 original SAS files on any of the data
14 from the Vioxx clinical trials?
15      A.   I answer your question as I
16 have begun to do that. I am nowhere
17 near -- I'm only in the introductory
18 phase of it.
19      Q.   When did you begin to do
20 that?
21      A.   Last weekend. Actually,
22 about a week ago.
23      Q.   Since you filed your report?
24      A.   Yes.

20 (Pages 74 to 77)

Lemuel A. Moye, M.D.

Page 78

1  Q.  What was the purpose of
2 looking at the SAS files from your
3 perspective?
4  A.  This file -- excuse me.
5 These files were files that were made
6 available, I believe, of the APPROVe
7 followup -- the followup component of the
8 APPROVe clinical trial.
9  Q.  And you have no opinions on
10 that at this point?
11  A.  I have no opinions on the
12 SAS data set content.
13  Q.  How long do you anticipate
14 that's going to take you to complete that
15 review?
16  A.  I don't know.  I believe
17 it's going to be a long process to get it
18 right.  So, at this point I can't even
19 reasonably estimate the number of hours.
20  Q.  Let me ask you, in coming to
21 your opinions in this case, did you look
22 at the new drug application -- any part
23 of the new drug application for Celebrex
24 or Bextra?

Page 79

1  A.  No, sir.
2  Q.  Did you took at any part of
3 the new drug application for any other
4 nonsteroidal anti-inflammatory drug?
5  A.  No, sir.
6  Q.  Did you look at the medical
7 officer review or summary basis of
8 approval for Celebrex or Bextra?
9  A.  No, sir.
10  Q.  Did you look at the medical
11 officer review or summary basis of
12 approval for any other nonsteroidal
13 anti-inflammatory drug?
14  A.  No.
15  Q.  Did you review the labeling
16 for Celebrex or Bextra in connection with
17 your opinions?
18  A.  No.
19  Q.  Did you review the labeling
20 for naproxen?
21  A.  No.
22  Q.  Did you review the labeling
23 for any other nonsteroidal
24 anti-inflammatory drug?

Page 80

1  A.  No, sir.
2  Q.  Did you do any specific
3 medical literature review concerning
4 Celebrex as a part of your review of this
5 case?
6  A.  No, sir.
7  Q.  How about with respect to
8 Bextra?
9  A.  No, sir.
10  Q.  Did you do a medical
11 literature review on the issue of
12 naproxen?
13  A.  I think I have to say yes
14 insofar as it was related to the
15 possibility of an anticardiothrombotic
16 effect associated with Naprosyn.
17  Q.  Okay.
18      What specific literature
19 search did you do?
20  A.  Well, it's the literature
21 that's in my affidavit.
22  Q.  Just for keeping the record
23 straight, when you are referring to your
24 affidavit, you're referring to Exhibit 1,

Page 81

1 your report?
2  A.  Yes, that's right.
3  Q.  That's fine.  Call it what
4 you want.  I just want to make sure we're
5 clear.
6      So, to the extent that
7 you've reviewed literature on naproxen,
8 that would be listed in your references?
9  A.  Yes, sir.
10  Q.  Okay.
11      Did you do a medical
12 literature review on any other
13 non-selective NSAID other than naproxen?
14  A.  I need to add one thing.  In
15 the literature and also what's on this
16 index because I perhaps didn't include
17 everything in my references.
18  Q.  That was with respect to
19 naproxen?
20  A.  Yes.
21  Q.  Okay.
22      Did you do a specific
23 medical literature review for any other
24 nonselective NSAID?

Page 82

1   A.   No, sir.
2   Q.   Did you review the
3   deposition testimony of Dr. Eric Topol?
4   A.   No, I did not review that.
5   Q.   Did you review the
6   deposition testimony of Dr. Curfman?
7   A.   Yes.
8   Q.   What was the purpose of
9   reviewing his testimony?
10  A.   The Dr. Curfman I'm thinking
11  of is the editor-in-chief of the New
12  England Journal.
13  Q.   Actually, he's not the
14  editor-in-chief, but he's an editor.
15  A.   Actually, you're right.
16  Q.   Same question.
17  A.   That's right, an editor of
18  the New England Journal. I reviewed that
19  because I thought it was related to the
20  reporting of the VIGOR results. So, I
21  thought it was relevant to VIGOR.
22  Q.   Okay.
23       Did you read both of his
24  depositions?

Page 83

1   A.   Yes, sir.
2   Q.   Did you look at the
3   exhibits?
4   A.   Yes.
5   Q.   Did you review the
6   deposition of Dr. David Graham?
7   A.   No, I did not.
8   Q.   In connection with your
9   opinions in California and the MDL, do
10  you intend to offer any opinions about
11  Merck's motives or intent with respect to
12  Vioxx?
13       MR. WACKER:  Object to form.
14       MR. SIZEMORE:  Object to
15  form.
16       THE WITNESS:  I'm not sure I
17  know how to answer that. As I
18  read the internal documents and
19  tried to put together in my mind
20  what was going on here, I think it
21  became clear to me what they
22  weren't doing, so, I suppose I am
23  going to speak to some degree
24  about the motives.

Page 84

1   BY MR. PIORKOWSKI:
2   Q.   Let me rephrase it like
3   this: You understand that there are
4   things that one believes should be done
5   and they don't get done, that that can
6   either be the result of a deliberate
7   process or it can be the result of lack
8   of awareness or negligence or a variety
9   of other reasons. Fair enough?
10  A.   Yes, I understand that.
11       MR. WACKER:  I'm sorry. Let
12  me just object to form.
13  BY MR. PIORKOWSKI:
14  Q.   My question is, you're
15  looking at the records, and in a variety
16  of respects you're saying, I think
17  certain things should have been done and
18  I don't think Merck did them. Fair
19  enough?
20  A.   Yes.
21  Q.   Okay.
22       Are you offering any
23  opinions that Merck intended to hurt
24  patients or intended to mislead the FDA?

Page 85

1        MR. SIZEMORE:  Object to
2   form.
3        THE WITNESS:  I think I am.
4   BY MR. PIORKOWSKI:
5   Q.   What expertise do you have
6   in determining corporate intent?
7   A.   My expertise with working
8   with the drug companies in the past and
9   my expertise in designing, executing and
10  analyzing clinical trials.
11  Q.   Okay.
12       What specific -- I'd like to
13  have you just tell me as far as specific
14  issues are concerned, what specific
15  issues are you intending to offer
16  opinions about with respect to either
17  Merck's intent or Merck's motives?
18  A.   I think I can probably speak
19  most clearly about Merck's intent. And I
20  believe Merck's intent was not to provide
21  a fair, clear assessment of the
22  relationship between Vioxx and
23  cardiovascular events -- cardiovascular
24  serious adverse events.

22 (Pages 82 to 85)

Lemuel A. Moye, M.D.

Page 86

1   Q.   At a particular point in
2   time?
3   A.   I have examples at
4   particular points in time, yes.
5   Q.   Well, let's break it down
6   like this.  Are you offering any opinions
7   along that line about an intent not to
8   provide a fair and clear assessment
9   between Vioxx and cardiovascular events
10  prior to the initial approval?
11       MR. SIZEMORE:  Object to
12       form.
13       THE WITNESS:  Yes.
14  BY MR. PIORKOWSKI:
15  Q.   Are you offering opinions
16  between the time of the initial approval
17  and the April 2002 label change?
18  A.   Yes.
19  Q.   And are you offering
20  opinions about Merck's intent following
21  the April 2002 label change?
22  A.   I think not so much.
23  Q.   Not so much as in no?
24  A.   I mean no, sorry.  No.

Page 87

1   Q.   All right.
2        Any other aspects of Merck's
3   motives or intent that you plan to offer
4   opinions about?
5        MR. SIZEMORE:  Object to
6        form.
7        THE WITNESS:  As I sit here
8        now, I think my answer is no.
9   BY MR. PIORKOWSKI:
10  Q.   In terms of your background,
11  Dr. Moye, you've completed a medical
12  internship; is that right?
13  A.   That's right.
14  Q.   But you've never completed
15  residency training, right?
16  A.   Never entered residency
17  training.  That's right.
18  Q.   You are not fellowship
19  trained in cardiology, correct?
20  A.   That's true.  I'm not
21  fellowship trained.
22  Q.   You're not board certified
23  in cardiology?
24  A.   I'm not board certified.

Page 88

1   Q.   You don't hold yourself out
2   as a cardiologist, right?
3   A.   That's right.
4   Q.   You're not fellowship
5   trained in hematology; is that right?
6   A.   That's right.
7   Q.   You're not board certified
8   in hematology?
9   A.   That's correct.
10  Q.   You don't hold yourself out
11  as a hematologist?
12  A.   That's right.
13  Q.   You're not fellowship
14  trained in rheumatology, right?
15  A.   Right.
16  Q.   You are not board certified
17  in rheumatology?
18  A.   Right.
19  Q.   You don't hold yourself out
20  as an expert in rheumatology, correct?
21  A.   That's correct.
22  Q.   You don't hold yourself out
23  as an expert in pharmacology, either,
24  right?

Page 89

1   A.   That's correct.
2   Q.   Am I correct you've not seen
3   a patient since March of 1992?
4   A.   That's not true.  Certainly,
5   I have not been in practice since March
6   of 1992, but I've seen patients, and the
7   biggest -- I saw many patients during the
8   Katrina debacle, but I've certainly not
9   been in practice since March 1992.
10  Q.   By "not in practice," that
11  means you didn't have regular office
12  hours?
13  A.   That's true.
14  Q.   Is that what that means?
15  A.   That's right.
16  Q.   All right.
17       In what capacity have you
18  seen patients since March of 1992?
19  A.   Actually, more as courtesy
20  than anything else.  And also the
21  emergency care that first responders
22  provided at the Astro Arena last
23  September.
24  Q.   Do you currently keep a

23 (Pages 86 to 89)

Page 90

1  valid medical license?
2      A.   I do.
3      Q.   In Texas?
4      A.   Yes.
5      Q.   Anywhere else?
6      A.   No.
7      Q.   What was your involvement in
8  the medical arena in Katrina?
9      A.   Providing emergency care and
10 then family practice general medicine
11 responder to the myriad difficulties that
12 the Katrina survivors had.
13     Q.   Did you take off from work
14 to do that, or what were the
15 circumstances?
16     A.   Well, it was off of work,
17 off of weekends. It was --
18     Q.   Is that something that the
19 University of Texas sort of allows you
20 time off to go do, or did you have to
21 take vacation time to do that?
22     A.   No. Actually, they made an
23 allowance for us to do that. They made
24 an administrative time allowance for us

Page 91

1  to do that.
2      Q.   To sort of contribute to the
3  effort?
4      A.   Yes, sir.
5      Q.   Have you ever prescribed
6  Vioxx?
7      A.   No.
8      Q.   Have you ever counseled a
9  patient about Vioxx?
10     A.   No.
11     Q.   Did you ever read the
12 product label for Vioxx while Vioxx was
13 on the market?
14     A.   No.
15     Q.   Have you ever prescribed any
16 COX-2 inhibitor drug?
17     A.   No.
18     Q.   Do you have any personal
19 experience with Vioxx?
20     A.   No.
21     Q.   Are there any physicians
22 that you know who prescribed Vioxx with
23 whom you've discussed their experience?
24     A.   No.

Page 92

1      Q.   Are there any patients you
2  know who've used Vioxx with whom you've
3  discussed their experience?
4      A.   No.
5      Q.   When you were practicing
6  medicine regularly, did you prescribe
7  nonselective nonsteroidal
8  anti-inflammatory drugs?
9      A.   Frequently, yes.
10     Q.   Frequently?
11     A.   Yes.
12     Q.   For what types of problems?
13     A.   Acute injuries, some chronic
14 problems, but primarily acute injuries.
15     Q.   Which nonsteroidal
16 anti-inflammatory drugs did you use?
17     A.   Primarily ibuprofen, also
18 naproxen.
19     Q.   Any others?
20     A.   Those are the only ones that
21 come to mind now. I'm sorry. Parafon
22 Forte. But I'm not sure if that's an
23 NSAID.
24     Q.   I don't think that's an

Page 93

1  NSAID.
2      A.   Okay.
3      Q.   In any event, you prescribed
4  Parafon Forte --
5      A.   Yes.
6      Q.   -- for musculoskeletal pain?
7      A.   Yes.
8      Q.   Was it your practice when
9  you were involved in active regular
10 medical practice to inform patients of
11 the potential risks of medications you
12 prescribed?
13     A.   Yes.
14     Q.   Did you inform patients when
15 you prescribed nonsteroidal
16 anti-inflammatory medications to them
17 that there were potentially serious
18 gastrointestinal risks?
19     A.   Yes.
20     Q.   Did you consider at the time
21 nonsteroidal anti-inflammatory drugs to
22 be unsafe because they had
23 gastrointestinal risks?
24     A.   Not when used as directed.

Lemuel A. Moye, M.D.

Page 94

1  Q. How did you direct people to
2  use them?
3  A. For a fairly short period of
4  time, no more than five to seven days.
5  Q. Did you ever use
6  nonsteroidal anti-inflammatory drugs for
7  more than five to seven days?
8  A. No.
9  Q. Did you take care of any
10 arthritis patients?
11 A. Osteoarthritic patients,
12 yes. Very rarely did I care for a
13 rheumatoid arthritic patient chronically,
14 but several osteoarthritic patients.
15 Q. What medications did you use
16 to control pain and inflammation in
17 osteoarthritis patients?
18 A. Actually, I didn't use --
19 well, to answer your question directly,
20 Tylenol. An acute bout -- an acute bolus
21 I would say, five to seven days of a
22 nonsteroidal anti-inflammatory, but
23 primarily it was a combination of rest
24 and exercise and warm water baths.

Page 95

1  Q. Did you conduct at any point
2  in your career any original laboratory
3  research on COX-2 inhibitors?
4  A. No, sir.
5  Q. Did you conduct any original
6  laboratory research on the effects of
7  nonsteroidal anti-inflammatory drugs?
8  A. No.
9  Q. Were you the author of any
10 original epidemiological studies on Vioxx
11 or any other COX-2 inhibitor?
12 A. No.
13 Q. Are you the author of any
14 original epidemiological studies on the
15 effects of NSAIDs?
16    MR. SIZEMORE: Did you get
17    that question?
18    THE WITNESS: I did. Let me
19    answer this way. I was not
20    involved in an epidemiologic study
21    that focused on the effect of
22    NSAIDs. That's true.
23 BY MR. PIORKOWSKI:
24 Q. Were you involved in a study

Page 96

1  that focused on the efficacy of NSAIDs?
2  A. No.
3  Q. Were you involved in a study
4  that focused on the safety of NSAIDs?
5  A. Yes. We used NSAIDs as a
6  control. We used actually ibuprofen as a
7  control in an epidemiologic study that we
8  carried out in the 1980s.
9  Q. Is that a published
10 manuscript?
11 A. Yes, it is.
12 Q. Can you direct me to --
13 actually, let me see what I've got here.
14    Do you have your CV with
15 you?
16 A. I don't, no.
17 Q. I'll get it on a break.
18    Is it listed in your CV?
19 A. Yes, it is.
20 Q. Can you describe for me
21 briefly what the study was?
22 A. Sure. It was a study that
23 attempted to evaluate the cardiovascular
24 effects of terfenadine. And we used

Page 97

1  ibuprofen as a control.
2  Q. Terfenadine is the drug
3  Seldane?
4  A. Yes.
5  Q. And you were a consultant to
6  Marion Merrill-Dow with respect to
7  Seldane, is that right?
8  A. That's right.
9  Q. Were you a consultant at the
10 time you were the author of the study?
11 A. Yes.
12 Q. And was the study intended
13 to evaluate the potential cardiovascular
14 adverse effects of Seldane?
15 A. Yes.
16 Q. And what you're saying is
17 that ibuprofen was used as the control
18 group for your study?
19 A. Yes.
20 Q. And is the assumption of
21 your study that ibuprofen does not have
22 any adverse cardiovascular effects?
23 A. At the time, that was the
24 understanding, yes.

25 (Pages 94 to 97)