Lemuel A. Moye, M.D.

Page 198

1   aspirin will have thromboxane inhibited
2   by the aspirin, right?
3       A.   Yes.
4       Q.   The way aspirin works is it
5   blocks thromboxane irreversibly, right?
6       A.   Yes, that's right. For the
7   life of the platelet.
8       Q.   For the life of the
9   platelet?
10      A.   Yes.
11      Q.   Okay.
12           What that means as a
13  practical matter, your platelets
14  regenerate themselves, right?
15      A.   Yes.
16      Q.   So, within a couple of days,
17  you have new platelets that are not
18  inhibited?
19      A.   Unless you continue to take
20  aspirin.
21      Q.   Unless you continue to take
22  aspirin, in which case aspirin
23  irreversibly inhibits the new ones,
24  right?

Page 199

1       A.   Yes.
2       Q.   Aspirin has that effect of
3   irreversibly inhibiting thromboxane even
4   at fairly low doses, right?
5       A.   Yes.
6       Q.   At 81 milligrams a day?
7       A.   Yes.
8       Q.   Now, I want to just talk
9   briefly about the myocardial infarction
10  process. Are you familiar with that from
11  your work in cardiology drugs?
12      A.   Yes.
13      Q.   Typically when a myocardial
14  infarction occurs, the process starts
15  with some degree of plaque buildup in the
16  artery; is that right?
17      A.   Yes.
18      Q.   And the initiating event
19  most often is what's referred to as a
20  plaque rupture or a plaque fissure?
21           MR. SIZEMORE:  Object to
22      form.
23           THE WITNESS:  That's one
24      possible initiating event, that's

Page 200

1       correct.
2   BY MR. PIORKOWSKI:
3       Q.   It is what's regarded as the
4   most common initiating event, right?
5           MR. SIZEMORE:  Object to
6       form.
7           THE WITNESS:  Well, I would
8       say that the thrombus is what
9       really -- maybe we're having a
10      little discussion about
11      terminology.  The thrombus is what
12      initiates the actual heart attack.
13  BY MR. PIORKOWSKI:
14      Q.   I just want to walk through
15  the process, and correct me if I'm wrong.
16      A.   Okay.
17      Q.   It all has to start with a
18  beginning point?
19      A.   Right.
20      Q.   A thrombus doesn't just
21  spontaneously form in the absence of a
22  plaque rupture?
23           MR. SIZEMORE:  Object to
24      form.

Page 201

1           THE WITNESS:  Unless you've
2       thrown an embolus.
3   BY MR. PIORKOWSKI:
4       Q.   Unless you've thrown an
5   embolus, right.
6       A.   Right.
7       Q.   But, I mean, under normal
8   circumstances, unless you've thrown an
9   embolus, a clot just doesn't form in your
10  artery spontaneously?
11      A.   That's right.
12      Q.   Typically, what happens with
13  a myocardial infarction is the process
14  starts with a plaque rupture or fissure,
15  right?
16      A.   Well, I guess typically it
17  starts with the development of this
18  atherogenic gruel over time that narrows
19  the artery.
20      Q.   All right.
21           That's a good point.  Let's
22  back up and start there.
23           What plaque represents is a
24  buildup of, as you called it,

Lemuel A. Moye, M.D.

Page 202

1  atherosclerotic gruel, is that --
2       A.   Atherogenic gruel.
3       Q.   Atherogenic gruel.
4            And what that means is
5  essentially a buildup of cholesterol and
6  other fibrous deposits?
7       A.   Right. Fibrin, lipid laden
8  macrophages die and deposit their
9  material, and over time the volume of
10  this grows.
11      Q.   What happens is if you think
12  of it as the garden hose, on the inside
13  of the garden hose there's a buildup of
14  essentially layers of this gruel that
15  you're referring to, right?
16      A.   Yes.
17      Q.   That's the beginning of the
18  process?
19      A.   Yes.
20      Q.   If you don't have gruel,
21  then there's no plaque to rupture?
22      A.   Right.
23      Q.   Okay.
24           Then once a person has

Page 203

1  plaque on their artery, if the plaque
2  ruptures or there's a breakoff of a piece
3  of the plaque, that initiates a process,
4  right?
5       A.   Yes.
6       Q.   The body's natural response
7  to that process is to treat that broken
8  off plaque as foreign material, right?
9       A.   Yes.
10      Q.   And the body tries to wall
11  that material off, right?
12      A.   Yes.
13      Q.   And what it does is it forms
14  a clot around the material, right?
15      A.   Yes.
16      Q.   And the problem is that the
17  clot, as it continues, gets bigger and
18  bigger?
19      A.   Yes.
20      Q.   Right?
21      A.   Yes.
22      Q.   Much like a snowball rolling
23  down a hill?
24      A.   Okay. Possible that just

Page 204

1  the presence -- it's possible that the
2  clot could be -- the gruel could be large
3  enough, just the formation of the clot
4  itself is enough to narrow the lumen
5  sufficiently.
6       Q.   Fair enough.
7       A.   And we also can't ignore the
8  chronic effect of conditions such as
9  diabetes or hypertension which would tend
10  to accelerate this process.
11      Q.   Okay.
12           But to come back to the
13  point you were originally making, what
14  ends up happening is eventually either
15  the clot grows so large or the
16  combination of the plaque material in the
17  clot grows so large that it blocks the
18  blood flow through the artery; is that
19  right?
20      A.   Right. And, of course,
21  there also could be a little spasm of the
22  coronary artery itself. Since it has got
23  muscle, that muscle can reflexively
24  contract and cause a further reduction in

Page 205

1  the lumen.
2       Q.   So, in addition to having
3  the clot block the vessel, you can also
4  have spasm of the vessel itself or
5  sometimes called vasospasm, right?
6       A.   Yes.
7       Q.   All right.
8            Now, to come back to
9  aspirin, the way aspirin works is if
10  thromboxane has been inhibited, then when
11  the plaque breaks off, then the clot is
12  not as likely to form; is that right?
13      A.   Right.
14      Q.   Now, in addition to aspirin,
15  there's a number of other nonsteroidal
16  anti-inflammatory drugs that are also
17  known to block thromboxane to various
18  degrees; is that right?
19      A.   Yes.
20      Q.   In fact, when you used to
21  prescribe nonsteroidal anti-inflammatory
22  drugs to your patients, did you typically
23  tell them to stop taking those drugs a
24  few days before having surgery?

52 (Pages 202 to 205)

Lemuel A. Moye, M.D.

Page 206

1    A.   Well, when I prescribed
2  these nonsteroidal anti-inflammatory
3  agents, they were not going to have
4  surgery during the time period that we
5  were prescribing them.  So, it was not a
6  chronic prescription that was achieved.
7    Q.   Okay.
8       Are you familiar with the
9  practice among physicians of instructing
10 patients who are taking nonsteroidal
11 anti-inflammatory drugs on a long-term
12 basis to stop taking them before surgery?
13   A.   Yes.
14   Q.   It is common medical
15 practice?
16   A.   Yes.
17   Q.   Something you learned in
18 medical school?
19   A.   Yes.
20   Q.   Now, one of the things that
21 was known about the COX-2 inhibitors
22 early on in the mid-'90s is they did not
23 have an effect on thromboxane, correct?
24   A.   It depends on which ones

Page 207

1  we're talking about.
2    Q.   Okay.
3       Let's talk about Vioxx.
4    A.   Okay.
5       Vioxx is primarily a COX-2
6  inhibitor.  And so being primarily a
7  COX-2, I can't say exclusively, but
8  primarily a COX-2 inhibitor, it did not
9  have this effect on thromboxane.
10   Q.   Okay.
11      And the same is true for
12 other COX-2 inhibitors like Celebrex,
13 right?
14   A.   Celebrex, I don't quite
15 agree with that with Celebrex, because my
16 understanding of Celebrex is that it has
17 more COX-1, anti-COX-1 activity than
18 Vioxx does.  So, to the degree that it
19 has more anti-COX-1 activity is the
20 degree to which it might inhibit
21 thromboxane.
22   Q.   Have you looked at any
23 literature that discusses the effect of
24 Celebrex on thromboxane or not?

Page 208

1    A.   I have not looked at any
2  particular literature, no.
3    Q.   There's nothing you've seen
4  that tells you one way or the other?
5    A.   I haven't looked to answer
6  the question.
7    Q.   Okay.
8       Is it fair to say then that
9  you would not expect Vioxx to have an
10 aspirin-like effect on platelets?
11   A.   Yes.  Insofar that it is not
12 a COX-1 inhibitor.
13   Q.   Okay.
14      With respect to thromboxane,
15 the effect you would expect it to have is
16 no effect or a neutral effect on
17 thromboxane?
18   A.   I don't know.  I would just
19 say it is not like aspirin.
20   Q.   Well, would you expect it to
21 have any effect on thromboxane at all?
22   A.   If we accept the premise
23 that it completely ignores COX-1, then
24 you wouldn't expect it to have any effect

Page 209

1  on thromboxane.
2    Q.   Have you seen any data to
3  suggest that Vioxx does, in fact, have
4  any effect on inhibiting thromboxane?
5    A.   I haven't seen anything in
6  particular.  I guess I would say it would
7  be useful to have seen that in Merck's
8  testing program, and if that's available,
9  I would like to see it, but I haven't
10 seen it.
11   Q.   You would like to see in
12 Merck's testing program whether it was
13 evaluated with respect to its effect on
14 thromboxane?
15   A.   Yes.
16   Q.   Okay.
17      Now, a couple of years into
18 the Phase III studies, there was a study
19 called 023 that was done, right?
20   A.   Yes.
21   Q.   You're familiar with that
22 because it is in your report, right?
23   A.   Yes.
24   Q.   One of the incidental

53 (Pages 206 to 209)

Golkow Litigation Technologies - 1.877.DEPS.USA

Lemuel A. Moye, M.D.

Page 210

1  findings of study 023 was that they found
2  urinary prostacyclin levels that were
3  lower in Vioxx users, right?
4     A.   I'd have to see my report.
5        MR. SIZEMORE:  Can we take a
6  break?
7        MR. PIORKOWSKI:  Sure.
8              - - -
9        (Whereupon, a recess was
10  taken from 1:58 p.m. until 2:10
11  p.m.)
12             - - -
13       MR. PIORKOWSKI:  Paul needs
14  to catch a flight, so we need to
15  put on the record the notices of
16  deposition and the documents that
17  have been produced in response.
18       Paul, it's my understanding
19  that the CDs that you've produced
20  today, the 14 CDs, represent all
21  available documents responsive to
22  the duces tecum portions of the
23  notice of deposition in both the
24  MDL and California cases; is that

Page 211

1  right?
2        MR. SIZEMORE:  That's
3  correct.
4        Shayna, if there's an issue
5  with that, will you folks contact
6  me?
7        Just for the record, to Ted
8  Wacker, who is here for the MDL
9  and is going to assume the
10  California duties, any objections
11  that he makes would be applicable
12  among the different cases?  Is
13  that fine?
14       MR. PIORKOWSKI:  Fair
15  enough.
16       MR. WACKER:  Just so that
17  everything is clear, I think we
18  agreed during the break that if
19  any attorney makes an objection,
20  it is equally applicable to all
21  the cases.
22       MR. PIORKOWSKI:  So
23  stipulated.
24             - - -

Page 212

1        (Whereupon, Deposition
2  Exhibit Moye MDL 5, Invoices (9
3  pages), was marked for
4  identification.)
5              - - -
6  BY MR. PIORKOWSKI:
7     Q.   Before I get back to my
8  question on study 023, let me do some
9  housekeeping things.
10    A.   Sure.
11    Q.   I've marked as Exhibit 5,
12  and I think you've already got a copy,
13  Ted, documents that have been produced to
14  us that are represented as your time
15  records; is that right?
16    A.   Yes.
17    Q.   Does it appear to be an
18  accurate copy?
19    A.   Yes.
20    Q.   Let me just ask you, the
21  2/26 is the first involvement in Vioxx,
22  right?
23    A.   Right.
24    Q.   Where it says "FDA

Page 213

1  transcript review," that's the Advisory
2  Committee meetings you talked about?
3     A.   Yes, sir.
4     Q.   Okay.
5        You read all three of those
6  transcripts?
7     A.   I don't remember how many I
8  read.  Well, the 26th -- now, wait a
9  second.  26th was actually before, was it
10  not, the third Advisory Committee
11  meeting, was it not?  I'm just trying --
12    Q.   The third Advisory Committee
13  meeting was sometime in --
14    A.   March?
15    Q.   -- February of 2005.  I
16  don't remember which date.
17    A.   Okay.  All right.
18       I certainly read the first
19  two.  I don't know if I read the third
20  one.  I don't know if the third one was
21  available yet.  I certainly read the
22  first two.
23    Q.   All right.
24       And then you have -- on the

54 (Pages 210 to 213)

Lemuel A. Moye, M.D.

Page 214

1  next page it says, "Vioxx Review 2 Hour",
2  "Vioxx Review 3 Hour," and then there's a
3  meeting on March 4th.
4        A.    Right.
5        Q.    Okay.
6              What was the Vioxx review
7  two hours and three hours?  Any
8  indication what that is?
9        A.    Well, I would tell you that
10  the only -- what I would have had
11  available to review were published
12  manuscripts.
13        Q.    Okay.
14              So, other than published
15  manuscripts and what was on the FDA's
16  website, that really would have been the
17  limitations of your review at that time?
18        A.    Yes, sir.
19        Q.    And then the meeting we
20  talked about is the next entry, right?
21        A.    Right.
22        Q.    Then it says on the next
23  page -- well, let me be clear.
24              Did you not do anything

Page 215

1  between March 4th and then May 11th of
2  2005?
3        A.    Did lots of things, nothing
4  to do with Vioxx.
5        Q.    All right.
6              It says, "Vioxx Prep 2
7  Hours," "Vioxx Prep 2 Hours," on the 11th
8  and the 29th.  What does "Vioxx prep"
9  mean as opposed to "Vioxx review"?
10        A.    Just synonymous.  So, I'm
11  still reviewing published literature.
12        Q.    All right.
13              Then it goes from May 30,
14  2005 up to July 10, 2005?
15        A.    Yes.
16        Q.    Did you do anything related
17  to Vioxx in between those dates?
18        A.    No, sir.
19        Q.    Then it starts and it says,
20  "Affidavit Prep."
21        A.    Yes.
22        Q.    And then really until we get
23  down to the bottom of September, which is
24  September the 9th, all of the entries

Page 216

1  there refer to affidavit prep, right?
2        A.    Right.
3        Q.    Now, does that mean that you
4  started writing the report on July 10,
5  2005?
6        A.    Yes.
7        Q.    Okay.
8              And all of these affidavit
9  prep entries are all related to the
10  writing of your report?
11        A.    Yes.
12        Q.    And then there's a break.
13  Did you issue -- let me back up.
14              Between September 9, 2005
15  and December 9, 2005, did you do any work
16  related to Vioxx?
17        A.    No, sir.
18        Q.    Now, you have discussion
19  with one hour.  Is that a meeting with an
20  attorney?
21        A.    Yes.
22        Q.    Vioxx prep is just a review
23  of materials?
24        A.    Yes.

Page 217

1        Q.    "Review Biochemistry," what
2  does that mean?
3        A.    It just means review the
4  published biochemistry.
5        Q.    "Clinical Trial Review," you
6  have that broken out as a separate entry?
7        A.    Right.
8        Q.    What does that mean?
9        A.    Just means review of the
10  clinical trial manuscripts.
11        Q.    What about "Epi Review"?
12        A.    Epi review is a review of
13  the epidemiology underlies and the
14  epidemiologic -- underlies the
15  observational studies and the
16  observational studies themselves that
17  relate to Vioxx -- that relate to the
18  NSAIDs and COX-2 and cardiovascular
19  disease.
20        Q.    That's the only entry I see
21  on epi review three hours; is that right?
22        A.    That's the only one I see,
23  too.
24        Q.    "Manuscript Review," what

Lemuel A. Moye, M.D.

Page 218

1  does that mean?
2       A.    It just means I am reviewing
3  the manuscripts that are published.
4       Q.    Articles?
5       A.    Yes.
6       Q.    And then we're back to
7  affidavit prep.  That's more preparing
8  your report?
9       A.    Yes.
10      Q.    Then "Document Review,"
11  "Review of Materials," is that the same
12  thing?
13      A.    No.  Now, this is -- this is
14  now -- let's see.  I didn't do anything
15  on Vioxx from the end of 2005 until April
16  2006, April 8th.  At this point now I'm
17  reviewing other types of material.  I'm
18  reviewing material that's on the CDs.
19  I'm reviewing internal documents,
20  memoranda, internal reports.
21           So, the material now that
22  I'm reviewing is separate and apart from
23  the articles that I've been reviewing up
24  to this point.

Page 219

1       Q.    Do you know what materials
2  you were reviewing on April 9th and 10th?
3       A.    No.
4       Q.    How about the 11th through
5  the 13th?
6       A.    No.
7       Q.    "Meeting at Dave Matthews 2
8  Hours" on the 14th.  That's a meeting
9  here?
10      A.    Yes, sir.
11      Q.    Do you know who was in
12  attendance at that?
13      A.    Dave Matthews.  I think
14  there was another attorney who I don't
15  remember.
16      Q.    "Document Review," what
17  documents were those?
18      A.    Similar kinds of documents.
19  I think what happens typically is we have
20  a meeting and I express other documents
21  I'd like to review, and they get sent to
22  me.  Commonly they are there waiting by
23  the time I get home.  And I review those
24  subsequent to the meeting.  So, this

Page 220

1  cycle that we've got is a reflection of
2  that work pattern.
3       Q.    "Study Review," what does
4  that mean, 4/18?
5       A.    4/18.  Same thing as a
6  protocol review that's coming up.
7  Looking at some of the clinical studies.
8       Q.    "Curfman Depo Review," I
9  assume that means that's when you read
10  the depositions and the exhibits?
11      A.    Yes, sir.
12      Q.    "Approve New England Journal
13  Review 2 Hours."  What does that mean?
14      A.    I'm sorry, you skipped down.
15  Okay.  APPROVe New England Journal
16  manuscript review and also additional
17  documents related to APPROVe.
18      Q.    Okay.
19           Then it says, "Document
20  Review" from May 2000 -- May 5th down to
21  May 10th?
22      A.    Yes.
23      Q.    "Meeting With Attorneys" on
24  May 11?

Page 221

1       A.    That's what that's supposed
2  to say.  Yes.
3       Q.    What is that?  Do you
4  remember who you met with then?
5       A.    Actually, Ted was here, Paul
6  was here.  I don't remember who else was
7  in attendance, but it was continued
8  discussions about my opinions and my
9  relating to them what additional material
10  I would need to review.
11      Q.    What about 5/18?
12      A.    5/18?  Same thing.  Same
13  kind of pattern.  Same attorneys were
14  here and the same agenda for the meeting.
15      Q.    Okay.
16           Now, I see on 5/22 through
17  5/29, or actually through 5/31, you still
18  have a lot of document reviews.  What
19  were those documents?
20      A.    These are documents now,
21  these are e-mails, these are information
22  like Watson's report, review material
23  from reviewers to authors about
24  Vioxx-related manuscripts.

56 (Pages 218 to 221)

Lemuel A. Moye, M.D.

Page 222

1    Q.    What about the meeting on
2  5/31, was that to prepare for the
3  deposition?
4    A.    Yes.
5    Q.    Who was at that meeting?
6    A.    Paul was on the phone, I
7  think. Ted was here. One or two other
8  attorneys were here whose names I don't
9  remember.
10    Q.    Now, I don't see anything on
11  here about SAS file review.
12    A.    I haven't talked anything
13  about SAS file review.
14    Q.    Okay.
15        So, you've started to look
16  at it, but you haven't charged anything?
17    A.    What I have done, and the
18  modus operandi I wanted to use, I didn't
19  want to spend a lot of my time, spend a
20  lot of somebody else's money for an
21  unproductive review. So, I did a cursory
22  examination and realized it was going to
23  be very complicated. So, I reported
24  that, didn't charge for that, and had put

Page 223

1  it down for the time being.
2    Q.    Okay.
3        Now, when we talked about
4  your review of these documents in -- I
5  can't remember what exhibit it is, 2? Is
6  that Exhibit 2?
7    A.    Yes.
8    Q.    Where on your time sheets
9  would all of this review be? For
10  example, you have the depositions of
11  David Anstice and Briggs Morrison and
12  Eliav Barr and Barry Gertz?
13    A.    Yes.
14    Q.    Where would all of the
15  review of those materials be listed?
16    A.    It would start in April.
17    Q.    April of 2005?
18    A.    2006.
19    Q.    2006? Okay.
20        So, prior to April of 2006,
21  you had not reviewed internal company
22  documents?
23    A.    Correct.
24    Q.    You had not reviewed company

Page 224

1  witness depositions?
2    A.    Correct.
3    Q.    You had not reviewed Dr.
4  Curfman's deposition?
5    A.    That also is correct.
6    Q.    You had not reviewed the
7  study protocols?
8    A.    That's correct. The
9  unpublished study protocols, the
10  unpublished FDA reports I had not
11  reviewed, that's right.
12        - - -
13        (Whereupon, Deposition
14  Exhibit Moye MDL 4, "Testimony of
15  Lemuel A. Moye, MD, PhD" (2
16  pages), was marked for
17  identification.)
18        - - -
19  BY MR. PIORKOWSKI:
20    Q.    Okay.
21        I've also marked as Exhibit
22  4 a document that was produced to us and
23  represented to be a summary of your
24  testimony.

Page 225

1    A.    Okay.
2    Q.    Is this a document that you
3  prepared?
4    A.    It is not.
5    Q.    Do you know who prepared it?
6    A.    I think Scientific Evidence
7  prepared this.
8    Q.    Okay.
9        Does Scientific Evidence
10  track your testimony?
11    A.    I think they do. Actually,
12  yes, they do.
13    Q.    Have you reviewed this to
14  see if it's accurate?
15    A.    I have not until this time.
16  I can look at it for a moment and see if
17  it is accurate.
18    Q.    Sure.
19    A.    (Witness reviewing
20  document.)
21        This is an accurate
22  reflection of my testimony.
23    Q.    All right.
24        Let's go back to where we

Golkow Litigation Technologies - 1.877.DEPS.USA

Lemuel A. Moye, M.D.

Page 226

1    were before the last break.  I was asking
2    you about study 023.  Do you remember
3    that?
4        A.    Yes.
5        Q.    I had asked whether an
6    incidental finding of the study was that
7    urinary prostacyclin levels were lower in
8    Vioxx users?
9        A.    Yes.
10        MR. SIZEMORE:  Object to
11    form.
12        THE WITNESS:  I'm sorry,
13    yes.
14        MR. PIORKOWSKI:  I'm sorry.
15    What's the basis, Ted?
16        MR. WACKER:  You are calling
17    it an incidental finding.
18        MR. PIORKOWSKI:  That's
19    fair.
20    BY MR. PIORKOWSKI:
21        Q.    Okay.
22            By "incidental finding," is
23    it your understanding an incidental
24    finding is a finding that's an

Page 227

1    observation during a study that was not
2    sort of the intended endpoint of the
3    study?
4        A.    I would say this.  That it
5    is -- I would say an exploratory finding.
6    It is a finding on an endpoint that was
7    not prospectively declared.
8        Q.    Is it fair in scientific
9    parlance to refer to it as an incidental
10    finding?
11        A.    I think the two are
12    synonymous, yes.
13        Q.    All right.
14            The finding was that, so
15    we're all clear, urinary prostacyclin
16    levels were lower in Vioxx users?
17        A.    Yes.
18        Q.    All right.
19            Based on the documents you
20    reviewed, there was lots of discussion
21    among the people at Merck about what that
22    finding meant and what that finding
23    didn't mean, right?
24        A.    Yes.

Page 228

1        Q.    One of the things that Merck
2    did was they discussed that finding with
3    their Board of Scientific Advisors,
4    right?
5        A.    Yes, sir.
6        Q.    Okay.
7            Now, let me just ask you, is
8    it your understanding that the study
9    results became known in late 1997?
10        A.    I think so, yes.
11        Q.    Prior to 1997, are you aware
12    of anything that suggested that Vioxx had
13    any effect on the prostacyclin levels?
14        A.    Let me look in my report for
15    a second.
16        Q.    Certainly.
17        A.    (Witness reviewing
18    document.)
19            Not on the prostacyclin
20    levels, no.  I'm not aware of any.
21        Q.    Okay.  All right.
22            - - -
23            (Whereupon, Deposition
24    Exhibit Moye MDL 6, "Scientific

Page 229

1    Advisors' Meeting May 3-May 6,
2    1998 Programmatic Review Vioxx
3    Program" MRK-AEI0002734 -
4    MRK-AEI0002746, was marked for
5    identification.)
6            - - -
7    BY MR. PIORKOWSKI:
8        Q.    Let me hand you what I've
9    marked as Exhibit 6, and this is one of
10    the documents that you've looked at as a
11    part of your review, right?
12        A.    Yes, sir.
13        Q.    In fact, you specifically
14    reference this document in your report,
15    right?
16        A.    I do.
17        Q.    First of all, the title of
18    this document is "Scientific Advisors
19    Meeting," right?
20        A.    Yes, sir.
21        Q.    What's your understanding of
22    what the Board of Scientific Advisors
23    was?
24        A.    I believe it was a group of

58 (Pages 226 to 229)

Lemuel A. Moye, M.D.

Page 230

1   experts, primarily outside experts whose
2   job it was to examine the progress of the
3   Vioxx development program at Merck.
4          Q.    Were these experts, any of
5   them, company employees?
6          A.    That I don't know.
7          Q.    What was the purpose in
8   having them?
9          A.    Well, in a complicated
10  development program, not just Vioxx, but
11  any complicated program, people who work
12  on the program continuously sometimes
13  lose the appropriate perspective on their
14  work.  And it's useful to have an outside
15  group of experts come in and provide
16  their own point of view.
17         Q.    Okay.
18               So, is it your understanding
19  that Exhibit 6 reflects a summary of a
20  meeting of the scientific advisors
21  concerning Vioxx that was held between
22  May 6 -- I'm sorry, May 3rd and May 6th,
23  1998?
24         A.    Yes.

Page 231

1          Q.    Were the results of study
2   023, by the way, published in the
3   peer-reviewed medical literature?
4          A.    I think so, but I'm not
5   sure.  Actually, I'm pretty sure they
6   were published.  I think I saw them
7   referenced in another manuscript I read.
8   So, they were published.
9          Q.    Now, on the third page of
10  this document -- well, let's put this
11  back up a minute.
12               What this document talks
13  about, this is at a point in time when
14  the Phase III studies are still ongoing,
15  right?
16         A.    Yes, sir.
17         Q.    And they are at a point in
18  time where they are coming up on the end
19  of the middle to the end of Phase III,
20  right?
21         A.    Yes.
22         Q.    New drug application hasn't
23  been submitted yet, but it is probably a
24  few months away?

Page 232

1          A.    Yes, sir.
2          Q.    Is that the appropriate
3   point in time?
4          A.    That's the time when this
5   group was meeting.
6          Q.    What this particular
7   document reviews is it reviews various
8   aspects of the Vioxx development program
9   and issues that have arisen, right?
10         A.    Yes.
11         Q.    And it starts off, for
12  example, talking about gastrointestinal
13  effects, right?
14         A.    Yes.
15         Q.    On the third page, there's a
16  discussion of cardiovascular
17  pathophysiology, right?
18         A.    Yes.
19               MR. WACKER:  The third page,
20         which is Page 11 of the document.
21               MR. PIORKOWSKI:  Fair
22         enough.
23  BY MR. PIORKOWSKI:
24         Q.    Now, if we were going to

Page 233

1   fairly describe what this document said,
2   there's a description by the scientific
3   advisors that talks about the possible
4   effects of COX-2 inhibition on three
5   separate components of the process
6   leading to coronary ischemic events,
7   right?
8          A.    Yes.
9          Q.    And you recognize just
10  conceptually that a drug can have
11  different effects on different parts of
12  the process of coronary artery disease,
13  right?
14         A.    Well, yes.  In fact -- yes,
15  I am.
16         Q.    I mean, that's sort of what
17  we talked about with aspirin, right?
18         A.    Yes.
19         Q.    Now, one of the things that
20  the board is raising here is they're
21  raising three possible effects, and the
22  first two possible effects that they're
23  talking about are actually beneficial
24  effects, right?

59 (Pages 230 to 233)

Lemuel A. Moye, M.D.

Page 234

1       MR. SIZEMORE:  Object to
2   form.
3       THE WITNESS:  If we're on
4   Page 11, I disagree with you.  I
5   mean, development of lipid rich
6   coronary plaques is not
7   beneficial.  Destabilization is
8   certainly not beneficial.
9   BY MR. PIORKOWSKI:
10      Q.   They are not beneficial
11  processes, but what this is saying is
12  that there's evidence that Vioxx may
13  actually be beneficial, because the
14  development of lipid rich plaques is an
15  inflammatory disease that's associated
16  with the release of cytokines and COX-2
17  expression, and COX-2 inhibition would be
18  beneficial for this.
19      MR. WACKER:  Object to form.
20      THE WITNESS:  I think I
21  understand what you are saying.
22      Certainly the second -- the
23  bottom two-thirds, let's say, of
24  Page 11, provides a rationale by

Page 235

1   which COX-2 might be expected to
2   be beneficial.  However, they also
3   say up above that there are either
4   benefits or adverse consequences
5   on coronary heart disease.  So,
6   agreed, here this paragraph is
7   talking about how it might be
8   helpful.
9   BY MR. PIORKOWSKI:
10      Q.   Let me back up, because
11  there are three subsections under this
12  cardiovascular pathophysiology, right?
13      A.   Yes.
14      Q.   The first section is the
15  development of lipid rich coronary
16  plaques, right?
17      A.   Yes.
18      Q.   Second section is
19  destabilization of the cap of an
20  atheromatous plaque, right?
21      A.   Yes.
22      Q.   The third section is events
23  following a plaque rupture?
24      A.   Yes.

Page 236

1       Q.   The purpose of this section
2   is to discuss all of the effective COX-2
3   inhibition on all potential coronary
4   ischemic events, whether beneficial or
5   harmful?
6       A.   It is a broad based
7   discussion of possibilities.
8       Q.   Right.
9       A.   Yes.
10      Q.   Okay.
11      And possibility number one
12  that they discuss in the development of
13  lipid rich coronary plaques is suggesting
14  that one possible effect of COX-2
15  inhibition would be to decrease the
16  process of plaque formation?
17      MR. WACKER:  Object to form.
18      THE WITNESS:  This
19  speculative paragraph says one
20  possibility is this, right.
21  BY MR. PIORKOWSKI:
22      Q.   Okay.
23      That's what the Board of
24  Scientific Advisors is discussing, right?

Page 237

1       A.   Yes.
2       Q.   And under the second
3   paragraph, under "Destabilization," it
4   says that "Recent evidence indicates that
5   inflammatory cells are present in the
6   thinned-out cap that covers the
7   atheromatous plaques, and it is thought
8   that these inflammatory cells contribute
9   to thinning the plaque at its margin that
10  is the frequent site of plaque rupture.
11  As the critical cells in this process are
12  inflammatory cells, the possibility
13  exists that the products of COX-2 could
14  regulate thinning of the caps of plaques
15  and render them rupture-prone."  Right?
16      A.   Right.
17      Q.   So, what it's saying here is
18  that there's some scientific evidence
19  that COX-2 actually promotes plaque
20  destabilization?
21      A.   Yes.
22      Q.   And so inhibiting COX-2
23  would actually promote stabilization?
24      A.   I think that is possible,

60 (Pages 234 to 237)

Lemuel A. Moye, M.D.

Page 238

1    yes.
2        Q.    Are you familiar, Dr.
3    Moye -- have you come across in your
4    studies discussion about matrix
5    metalloproteinase inhibitors?  Are you
6    familiar with those?
7        A.    Yes, yes.
8        Q.    MMP-2 and MMP-9?
9        A.    Well, I didn't know about
10   MMP-2 and P-9, but I know about MMP a
11   little bit.
12       Q.    Okay.
13           But MMPs are thought to
14   contribute to plaque destabilization,
15   right?
16       A.    Yes.
17       Q.    And MMPs are induced by
18   COX-2, right?
19       A.    Yes.
20       Q.    Does that make sense that
21   that is the same scientific understanding
22   to which they are referring?
23       A.    Well, they don't talk about
24   MMPs here.

Page 239

1        Q.    I understand.
2        A.    But it does fit with the
3    thought process that would go again to
4    the speculative statement.
5        Q.    Okay.
6           Now, the third section talks
7    about events following plaque rupture,
8    right?
9        A.    Yes.
10       Q.    This is where it talks about
11   prostacyclin being a potent endogenous
12   inhibitor of platelet aggregation, right?
13       A.    Yes.
14       Q.    Is that consistent with what
15   you know about prostacyclin?
16       A.    Yes.
17       Q.    Okay.
18           And then it says it also
19   potentially inhibits the development of
20   ischemic ventricular fibrillation in
21   dogs, right?
22       A.    Right.
23       Q.    Now, do you understand that
24   this discussion on Page 12 and 13 of

Page 240

1    Exhibit 6 is a discussion that arises
2    from the finding that was found in study
3    023?
4        A.    Yes.
5        Q.    Okay.
6           In other words, this is the
7    scientific advisors following up on the
8    results of study 023?
9        A.    Well, speculating on its
10   implications.
11       Q.    Speculating on its
12   implications.
13           And, in fact, it talks about
14   -- on Page 13, it says, "On this
15   background of information regarding the
16   anti-platelet and anti-fibrillatory
17   effects of prostacyclin and its vascular
18   localization, it has been found that
19   Vioxx reduces the urinary excretion of
20   the prostacyclin metabolite,
21   2,3-dinor-6-keto-PGF alpha."
22       A.    Right.
23       Q.    Right?
24           And then the next sentence

Page 241

1    is, "This is important data but it is not
2    a basis for any conclusion."
3        A.    Sure.
4        Q.    So, again, they are saying
5    that this is still somewhat speculative,
6    right?
7        A.    Right.  I mean, to me this
8    clearly says we don't know.
9        Q.    We don't know.
10           Then in the next paragraph
11   it offers a couple of alternative
12   explanations for this finding of
13   decreased prostacyclin in the urine,
14   right?
15       A.    Right.
16       Q.    The first hypothesis it
17   gives is that "the excretion of the
18   prostacyclin metabolite...does not
19   reflect systemic/vascular prostacyclin
20   biosynthesis."  Right?
21       A.    Right.
22       Q.    Just so we're clear, when we
23   talk about an imbalance between
24   thromboxane and prostacyclin, we're

61 (Pages 238 to 241)

Lemuel A. Moye, M.D.

Page 242

1  talking about that at the level of the
2  endothelium, right?
3      A.   Absolutely.
4      Q.   And endothelium is the
5  lining of the coronary artery?
6      A.   The inner lining.
7      Q.   The inner lining.
8          And what is going on in the
9  endothelium may or may not be reflective
10  of what's going on systemically with
11  prostacyclin?
12      A.   In fact, it probably isn't,
13  because it is just a micro environment.
14      Q.   Right.
15          And are there multiple
16  organs in the body that produce
17  prostacyclin?
18      A.   Yes, sir.
19      Q.   What are the organs?
20      A.   Prostacyclin -- kidney.
21      Q.   Kidney.
22      A.   That's the only one that
23  comes to mind right now.
24      Q.   Is it produced in the lung?

Page 243

1      A.   I don't know about that.
2      Q.   How about the ovary?
3      A.   I don't know about that.
4      Q.   You just don't know one way
5  or the other?
6      A.   Right.
7      Q.   And then you see the second
8  part of that second paragraph on Page 13,
9  it says, "An alternative hypothesis is
10  that prostacyclin biosynthesis in the
11  vasculature is inhibited by Vioxx
12  (without blocking the production of
13  thromboxane A1 by the platelet)."
14      A.   Right.
15      Q.   And it says, "By removing
16  this potent inhibitor of platelet
17  aggregation, the probability that a
18  coronary plaque rupture would lead to
19  myocardial infarction or ischemic
20  ventricular fibrillation is enhanced."
21      A.   Right.
22      Q.   Right?
23          So, it is giving two
24  possible explanations for what this

Page 244

1  finding could mean of decreased urinary
2  prostacyclin, right?
3      A.   I would say it's engaging in
4  speculation.
5      Q.   Okay.
6          But it's important to think
7  this issue through, given where they are
8  in the development of the product, right?
9      A.   Yes.
10      Q.   I mean, no question about
11  that?
12      A.   Right.
13      Q.   Do you know what studies or
14  what tests Merck did to evaluate whether
15  or not Vioxx affected prostacyclin at the
16  level of the endothelium?
17      A.   No, I don't.
18      Q.   Do you know whether they
19  made any effort to determine whether or
20  not the prostacyclin that was decreased
21  in the urine came from the kidney?
22      A.   Just one second, please.
23      Q.   Sure.
24      A.   (Witness reviewing

Page 245

1  document.)
2          I know that recommendations
3  were made to do that by Dr. Oates
4  specifically, and that Merck decided not
5  to go with those specific
6  recommendations.
7      Q.   Who is Dr. Oates?
8      A.   Well, Dr. Oates was an
9  external consultant for Merck.
10      Q.   Do you know what his role
11  was in the Board of Scientific Advisors?
12      A.   I don't, no.
13      Q.   Do you know what was the
14  basis for your saying that Dr. Oates made
15  recommendations?
16      A.   October 27, 1997 letter.
17      Q.   That's one of the internal
18  documents that you were provided?
19      A.   Yes, sir.
20      Q.   Let's go back to Exhibit 6
21  for a minute.
22      A.   Sure.
23      Q.   At the end of this
24  discussion about the two speculative

62 (Pages 242 to 245)

Lemuel A. Moye, M.D.

Page 246

1    benefits and the speculative harm that
2    could be related to Vioxx use, the
3    scientific advisors make some specific
4    recommendations, right?
5         A.   Yes.
6         Q.   The recommendations, the
7    first thing they point out is they say,
8    "It is unlikely that any of the
9    individual trials with Vioxx will have
10   sufficient power to determine whether
11   coronary events are increased or
12   decreased by COX-2 inhibition."  Right?
13        A.   Yes.
14        Q.   Now, as someone who has
15   designed clinical trials on rare events,
16   do you agree with that statement?
17        A.   Yes.
18        Q.   I mean, that's a fair
19   statement.  Do you agree with it?
20        A.   It's called a truism.
21        Q.   I'm sorry?
22        A.   A truism.
23        Q.   A truism.  All right.
24             So, they say, "It is

Page 247

1    therefore proposed that coronary events
2    be predetermined endpoints in all future
3    controlled trials with Vioxx and the
4    'back-up' COX-2 inhibitors."  Right?
5         A.   Yes.
6         Q.   Okay.
7              Now, do you think that
8    recommendation was an appropriate
9    recommendation?
10        A.   I think, yes, it was.
11   However, that's not to say that it
12   overshadows the responsibility of any
13   investigator to look at each trial to see
14   if, in fact, there isn't a signal being
15   produced by the trial, be the trial
16   underpowered or not.
17        Q.   Well, certainly nobody is --
18   the board certainly isn't suggesting that
19   they just blow off looking at the data
20   from the clinical trials individually?
21        A.   Right.  They just wanted to
22   make sure that it wasn't construed that
23   that was my suggestion either.
24        Q.   Okay.

Page 248

1              What they're saying is that
2    because these events are very rare, you
3    need to study a lot of people to really
4    get any meaningful data, right?
5         A.   That's their sense of it.
6         Q.   That's the layman's version?
7         A.   Right.
8         Q.   And so what they are saying
9    is that the best chance of getting a good
10   answer to this question is to take all of
11   our data at least on a going forward
12   basis and to try to analyze it in a
13   careful and systematic way?
14        A.   Right.  I would say maybe
15   not the best chance, but a good chance.
16        Q.   Okay.
17             And one of the things that
18   they advise is that there be endpoints
19   developed that are assessed by a uniform
20   set of criteria so that a meta-analysis
21   of coronary and cerebrovascular events
22   from all of those trials can be
23   performed, right?
24        A.   Yes.

Page 249

1         Q.   Now, as a biostatistician
2    and epidemiologist, was that a smart
3    thing to do?
4         A.   Not necessarily.  I would
5    say it was a popular thing to do and even
6    a defensible thing to do.  But -- and in
7    order for meta-analyses to be carried
8    out in a way that is most illuminatory,
9    you have to have endpoints that reflect
10   the effect of the therapy, which they
11   really didn't know just yet.  I mean, the
12   possible adverse events of therapy, they
13   really didn't know.  For example, should
14   they include strokes or not, hemorraghic
15   strokes?  They didn't know that yet.
16             And they have to be laid out
17   in a way that they are measured the same
18   way from trial to trial.  That's when a
19   meta-analysis is its most productive.
20        Q.   Let's stop and talk about
21   that for a second.
22             The first point you made
23   there in your answer was it is not clear,
24   when we talk about endpoints, it is not

63 (Pages 246 to 249)

Lemuel A. Moye, M.D.

Page 250

1  clear what endpoints we're talking about?
2      A.   Right.
3      Q.   So, if we're going to be
4  prudent about it, the prudent way to
5  proceed would be to cast a wide net and
6  look at a lot of different endpoints
7  which we can either analyze individually
8  or collectively?
9          Is that a fair statement?
10     A.   Well --
11     Q.   Let me withdraw the
12 question.
13     A.   Okay.
14     Q.   You just pointed out that
15 you didn't know, for example, if strokes
16 were included or not in this issue?
17     A.   Right.
18     Q.   So, to be prudent, you would
19 include strokes?
20     A.   You would certainly want to
21 include strokes in your evaluation
22 program.
23     Q.   You would want to include
24 strokes because arguably if there's a

Page 252

1  design something on a going forward basis
2  to give me as many answers as possible,
3  you're going to tell me to include
4  stroke, right?
5      A.   I want to measure stroke,
6  right.
7      Q.   You want to measure stroke.
8          You want to measure
9  pulmonary embolism?
10     A.   Right.
11     Q.   You want to measure
12 myocardial infarction?
13     A.   Right.
14     Q.   You want to measure sudden
15 cardiac death?
16     A.   Yes.
17     Q.   You want to measure angina
18 pectoris?
19     A.   Sure.
20     Q.   You want to measure --
21     A.   Venous.
22     Q.   Venous thrombotic events,
23 like deep vein thrombosis?
24     A.   Right.

Page 251

1  clotting problem, that could implicate a
2  stroke?
3      A.   Right.
4      Q.   Right?
5          And, in fact, the same
6  reasoning could apply for pulmonary
7  embolism, right?
8      A.   I don't know.  If you're
9  saying that we really don't know, and it
10 is possible that this could produce a
11 large thrombus like a PE, then, yes.
12         But just so we're clear,
13 we're not talking about a combined
14 endpoint at this point, we're just
15 talking about an endpoint collection
16 mechanism?
17     Q.   I understand.
18     A.   Okay.
19     Q.   Okay.
20         But what I'm saying is, if I
21 hire you and you're giving me advice and
22 I say I want to be prudent, I'm in this
23 position that the scientific advisors
24 were in in May of 1999, and I want to

Page 253

1      Q.   And that would be the
2  prudent way to go forward, is looking at
3  all of those events?
4      A.   Just so we're clear, that
5  would be one mechanism that might produce
6  an answer.  It is not the only mechanism,
7  but it is one mechanism.
8      Q.   But it is certainly more
9  responsible than going forward and not
10 looking at strokes?
11     A.   Sure, sure.
12     Q.   Right?  No question about
13 that?
14     A.   Right.
15     Q.   All right.
16         Now, the other issue that I
17 think you alluded to is it is important
18 if you are going to be looking at
19 different studies to make sure that you
20 are using the same definition for the
21 same endpoint from one study to the next
22 study?
23     A.   For this particular
24 analysis, that would be an important

Golkow Litigation Technologies - 1.877.DEPS.USA

Lemuel A. Moye, M.D.

Page 254

1    methodologic consideration that I would
2    insist on.
3         Q.    One of the reasons you'd
4    insist on it is because when you have a
5    situation where you have rare events, one
6    event one way or the other can greatly
7    affect the results, right?
8         A.    I guess I would say that we
9    want to be sure that events are being
10   captured the same way and we don't
11   inappropriately include or exclude events
12   from one trial because they weren't
13   captured the same way as others were.
14        Q.    And one of the expressions
15   that epidemiologists use for making sure
16   that the comparisons are valid is they
17   say you want to make sure you are
18   comparing apples to apples and oranges to
19   oranges, right?
20        A.    That's true.
21        Q.    And that's exactly what
22   we're talking about right here, right?
23        A.    That's what you and I are
24   talking about and also what I think the

Page 255

1    Board of Scientific Advisors had in mind.
2         Q.    Okay.
3              Now, if you were setting up
4    a program, one of the things that I think
5    I heard you say is that you'd want to
6    have definitions for each of these events
7    that could be applied from study to
8    study, right?
9         A.    Yes.
10        Q.    One of the mechanisms -- it
11   talks about applying the uniform set of
12   criteria. One of the things that you
13   could do is you could actually have the
14   cases that were potential cases sent off
15   to an independent group of scientists who
16   were specialists in the area to
17   adjudicate those cases, right?
18        A.    That's one thing to do.
19        Q.    Okay.
20        A.    It may not be the best thing
21   to do, because at this point in time, in
22   fact, contemporaneously, there was
23   discussion, public discussion at the FDA
24   about the appropriateness of this

Page 256

1    procedure, the procedure of having
2    endpoints go out to be reviewed by an
3    endpoint review committee. An endpoint
4    committee, they call it. It gained a lot
5    of interest in the 1980s and 1990s and
6    was one common modality.
7              The difficulty was, is that
8    commonly endpoint determinations made by
9    the individual investigators on the spot,
10   if you will, might be overturned by the
11   endpoint committee. Some would argue
12   that that would be a good thing. Others
13   have argued that since in the end we're
14   concerned about what happens in the
15   community, then perhaps we need to go by
16   what the investigators in the community
17   say.
18              So, I don't know at this
19   point whether the notion of going to an
20   endpoints committee was the best thing to
21   do.
22        Q.    Well, if you are going to
23   be -- if you are not going to use an
24   endpoint committee, then it is important

Page 257

1    to put into place some measure that
2    ensures that the investigators themselves
3    are applying the uniform definitions from
4    one case to the next case, right?
5         A.    They would have a common set
6    of criteria, yes. By that I mean, for
7    example, that require the same
8    documentation, for example. But that
9    there would not be a discussion among
10   reviewers sitting at a table like we are
11   today where they reach a consensus about
12   an endpoint. That's the part that
13   perhaps should be subtracted, the
14   downside of having the endpoint review
15   committee, the need to come to a
16   consensus.
17        Q.    Now, they go on to say that
18   they are aware here that there are trials
19   anticipated or ongoing for both
20   rheumatoid arthritis and Alzheimer's
21   disease patients, right?
22        A.    Yes.
23        Q.    And they recognize that
24   there's an increased probability of those

65 (Pages 254 to 257)