**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **ESTHER C. BREUER** | § | **CASE NO.: 2:05-cv-04117** |
| | § | **Related to: MDL Case No. 1657** |
| | § | **United States District Court for** |
| | § | **the Eastern District of Louisiana,** |
| **PLAINTIFF,** | § | **Section: L** |
| | § | |
| **vs.** | § | |
| | § | **JUDGE FALLON** |
| | § | **MAG. JUDGE KNOWLES** |
| | § | |
| **MERCK & CO., INC.** | § | |
| | § | |
| | § | **Jury Demand Endorsed** |
| **DEFENDANT.** | § | **Hereon** |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff, ESTHER C. BREUER, files this Complaint, based upon information and belief as well as his attorneys' investigation as to the acts of Defendant, and alleges:

**A.  THE PARTIES**

1.        Plaintiff, ESTHER C. BREUER, is a resident of Missouri.  Plaintiff suffered an ischemic stroke as a result of ingestion of and exposure to Defendant's drug product.

2.         Defendant, Merck & Company, Inc., is a New Jersey corporation with its principal place of business at One Merck Drive, Whitehouse Station, New Jersey, 08889-0100. Merck & Company, Inc., is registered as a foreign corporation to do business in the State of Louisiana and maintains an office and/or other facilities within this Judicial District. Merck & Company, Inc., conducts business in the United States and Canada as Merck & Company, Inc. Merck manufactured, tested, distributed, marketed, and/or sold the drug rofecoxib under the

brand name Vioxx for the treatment of pain associated with osteoarthritis, rheumatoid arthritis, acute pain and menstrual pain. It may be served with process through its registered agent, The C.T. Corporation System, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

## B.  JURISDICTION AND VENUE

3.         This Court has jurisdiction pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds $75,000 exclusive of interest and costs.

4.         This case was filed directly into MDL-1657 pursuant to Pretrial Order Number 11. Pursuant to 28 U.S.C. § 1404(a) and Pretrial Order No. 11, upon completion of all pretrial proceedings, this Court should transfer this case to the federal district court of proper venue, the Western District of Missouri, as defined in 28 U.S.C. § 1391.  Venue is proper in the Western District of Missouri because that is where the substantial part of the claim occurred; Plaintiff resides, was prescribed, purchased, and ingested Vioxx, consequently injured as a result thereof, all in the Western District of Missouri.  Further, venue is proper in the Western District of Missouri because that is where Defendant Merck resides; Defendant Merck manufactured, sold and marketed the products at issue in this case with the expectation they would be purchased and used in the Western District of Missouri.

## C.  INTRODUCTION

5.         This action arises from the sale and distribution of Vioxx (rofecoxib).  Vioxx is the brand name used by Merck to market and distribute rofecoxib.  Vioxx has been proven to cause adverse cardiovascular effects including, but not limited to, heart attack and stroke.

6.         Defendant during all the times mentioned herein engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing,

processing, inspecting, distributing, marketing, labeling, promoting, packaging and advertising of the prescription drug known as Vioxx for ingestion by consumers.  Merck manufactured, sold, designed, supplied, prescribed, distributed, marketed and processed Vioxx, and was at all times acting through its servants, employees, representatives and agents, who placed Vioxx in the market to be purchased and used by the public.

7.      Defendant participated in, authorized and directed the production and promotion of Vioxx when it knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of Vioxx and thereby actively participated in the tortious conduct which resulted in the injuries suffered by the Plaintiff.

8.      Vioxx is a member of a class of drugs known as "NSAIDs" (non-steroidal anti-inflammatory drug), but more specifically contains cyclooxygenase 2 ("COX-2") inhibitory properties.  Generally, NSAIDs prevent the formation of fatty acid cyclooxygenases, of which there are two known types ("COX-1 and "COX-2").  In general, Vioxx is different than typical NSAIDs in that it is solely a COX-2 inhibitor.  The rationale being that if the COX-1 enzyme is unaltered, the patient will experience fewer gastrointestinal complications commonly associated with NSAIDs.  Merck marketed, sold, distributed, advertised, and promoted Vioxx for the relief of short term pain contending the drug is safer for the gastrointestinal system than typical anti-inflammatory drugs (NSAIDs) such as ibuprofen.

9.      Merck obtained FDA approval for Vioxx on May 20, 1999, for treatment of dysmenorrhea  (painful menstrual cramps), management of acute pain in adults, and relief for the symptoms of osteoarthritis.  Merck obtained Vioxx's FDA approval for marketing, sale, and distribution based on inaccurate, false, and misleading information, contained in the New Drug

Application, which was on a "fast-track," 6-month approval process to the FDA.  Subsequent to this FDA approval, Defendant advertised and marketed Vioxx as safe and effective pain relief medication throughout the United States.

10.     Plaintiff, ESTHER C. BREUER, received a prescription for Vioxx and took the drug as prescribed by a medical professional.  Plaintiff suffered an ischemic stroke and Plaintiff's use of Vioxx was the direct, producing and proximate cause of the occurrence in question and the injuries at issue.

11.      At all relevant times, Plaintiff was ignorant of the dangerous nature of Vioxx and the adverse cardiovascular effects that could occur because of consumption of and exposure to Vioxx.

12.     Through industry and medical studies, unknown to Plaintiff, Merck knew or should have known the adverse cardiovascular effects inherent in Vioxx.  Merck ignored or deliberately and fraudulently concealed the increased cardiovascular risk in order to sell Vioxx, avoid the costs of safety precautions, and avoid litigation by people injured by Vioxx.  Merck's conduct constitutes gross negligence and demonstrates a reckless disregard for the rights and safety of others, justifying punitive damages against Merck.

### D.  FACTS – VIOXX'S PRE-APPROVAL

13.      In the mid to late 1990's, Merck faced the loss of patent protection of its top selling and most profitable drugs.  In 1996, Merck proposed a study to prove Vioxx was gentler on the stomach than older painkillers.

14.     In need of a new blockbuster drug, Merck pushed forward with plans for the study and ignored a November 1996 memo from a top Merck official that stated, "there is a

substantial chance that significantly higher rates" of cardiovascular problems would result from Vioxx.  Further, Merck concealed or ignored a February 1997 e-mail regarding the study from another Merck official that revealed, "you will get more thrombotic events" or blood clots unless the Vioxx receiving patients in the study also got aspirin.

15.       In response to the February 1997 e-mail, Merck Vice President for Clinical Research, Elise Reicin, M.D., wrote, "the possibility of increased cardiovascular risk (from Vioxx) is of great concern."  To remedy this problem and further conceal Vioxx's adverse cardiovascular effects, Dr. Reicin proposed that people with risk of cardiovascular problems be excluded from the study so the adverse cardiovascular effects would not be evident. Despite its internal knowledge and information relating to cardiovascular-related adverse health effects, Merck forged ahead, aggressively promoting and marketing Vioxx as safe and effective for persons such as Plaintiff in efforts to obtain FDA approval.

16.       While it is not clear what became of this 1996-97 proposed study, it is clear that Merck concealed its knowledge of the serious cardiovascular risks associated with Vioxx because a successful launch of Vioxx was viewed as financially critical for Merck to retain its current market share, and to sustain stock value.  Pharmacia and Pfizer placed Vioxx's chief competing drug, Celebrex, into the market three months prior to the launch of Vioxx.  As such, Merck's disclosure of the safety concerns over hypertension, thrombosis, edema and/or cardiovascular events would have impacted Merck's positioning in the market drastically.

### E.  FACTS – VIOXX'S POST-APPROVAL

17.       Merck intentionally and knowingly chose to market Vioxx, despite its pre-FDA-approval knowledge, its knowledge at product launch, and its post-FDA-approval data that

the use of Vioxx carried significant risk factors.  Moreover, these adverse effects were realized in adverse event reports, in clinical trials where such events were adjudicated by primary investigators with Merck's assistance, and in numerous studies shortly after market launch which showed statistically significant increases in adverse cardiovascular events among Vioxx users.

18.     In early 1999, Merck started the 8,000 person VIGOR (Vioxx Gastrointestinal Outcomes Research study) to prove the drug's gastrointestinal safety benefits. The March 2000 VIGOR results revealed precisely what the above discussed internal Merck documents anticipated - a significant increase in the number of blood-clot related problems among Vioxx users.  The heart attack rate in the Vioxx group was five times that of the other group taking naproxen.

19.     Merck research chief, Ed Scolnick, M.D., confessed that there was an inherent risk in Vioxx and stated in an internal March 9, 2000 e-mail that cardiovascular events are "clearly there" and called it a "shame" that it is mechanism (Vioxx) based.  Dr. Scolnick recognized that the cardiovascular effects could not have come from naproxen's protective effect. Merck's research chief wrote that, like all Merck's big selling drugs, Vioxx too had side effects but assured Merck that they would "do well."

20.     In March of 2000, however, Merck issued a news release that the cardiovascular findings of the study were "consistent with" naproxen's favorable effects.  To date, and not surprisingly, the only studies to report a protective cardiovascular effect with naproxen are ones funded and assisted by Merck.  A number of independent studies have reported no reduction in risk with naproxen use.  In fact, an FDA researcher recently published a report that blatantly contradicts Merck's position and concludes naproxen is not protective

against coronary heart disease and, if anything, actually confers an increase in risk.  Merck intentionally and knowingly made false assertions relating to the VIGOR trial with a blatant disregard for the public welfare all in an effort to conceal Vioxx's adverse cardiovascular effects to profit, maintain and/or gain market position.

21.     Merck repeatedly and purposefully downplayed, understated, and concealed the health hazards of Vioxx evident in the VIGOR study.  In April of 2000, Merck issued its response to the VIGOR results in a news release headlined, "Merck confirms favorable cardiovascular safety profile of Vioxx."  This and other similar Merck-generated news releases were strategically designed and calculated to deceive and mislead the public about Vioxx's serious adverse effects.

22.     In June of 2000, industry sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, showed that Vioxx use resulted in a statistically significant increase in hypertension and myocardial infarction.  Merck did nothing to publish these studies, which were again reported and denied by Merck as to the hypertension problems in the official publication of the American Pharmaceutical Association, Pharmacy Today, Spin War Aside, Lessons Emerge From COX-2 Trials, in August 2000, page 3.

23.     Merck continuously and systematically denied the adverse health effects associated with Vioxx while at the same time reaping the profits obtained through the non-disclosure.  Merck engaged in an aggressive and expansive advertising and sampling program and gained continued increases in market share. In 2000, Merck spent over $160 million on direct-to-consumer television advertising on Vioxx.  The resultant effect of this multi-million

dollar advertising blitz, combined with Merck's continued concealment and failure to reveal and warn of the risks, was more than $2 billion in profits in the year 2000 alone and an approximate twenty-three percent (23%) market share for Merck.

24.     Merck's multi-million dollar advertising campaign created the image, impression and belief that the use of Vioxx was safe for adults and that Vioxx had fewer side effects and adverse reactions than other pain relief medications and would not interfere with daily life, even though Merck knew these representations to be false. These advertisements, combined with its other promotional literature, audio conferences, professional meetings, and press releases deceived potential consumers by relaying positive information, including testimonials from satisfied consumers, and manipulated the statistics to suggest widespread acceptability and safety of the product, while intentionally understating the known adverse and serious risks associated with the use of Vioxx. Merck's advertising and marketing campaign conveyed the false impression that Vioxx was a drug of first choice when it should not have been.

25.     In the fall of 2000, Merck again sunk to new levels in its efforts to conceal information and employed a barrage of ruthless intimidation and retaliation tactics against those who spoke out regarding Vioxx's adverse effects. In October of that year, Merck official Louis Sherwood contacted James Fries, M.D., a Stanford University Medical Professor, and informed him that if his "irresponsibly anti-Merck and specifically anti-Vioxx" lectures didn't stop, that he would "flame out." Dr. Fries responded in a letter to Merck's Chief Executive Gilmartin stating, "that Merck had crossed (an ethical) line, that you can't go across." Dr. Fries also explained that

several other top medical schools complained of "a consistent pattern of intimidation by Merck" on Vioxx.

26.  Lee Simon, M.D., a rheumatologist at Beth Israel Deaconess Medical Center in Boston, reported being the victim of similar type Merck intimidation tactics when he publicly mentioned data that Vioxx might be associated with a risk of high blood pressure and swelling. Dr. Simon was "shocked that a phone call was made" to his superior to complain that Dr. Simon's lectures were slanted against Vioxx; Dr. Simon rightfully believed that Merck was "attempting to suppress discussion about this data."

27.  In November of 2000, Merck caused the publication of a study in the New England Journal of Medicine and knowingly downplayed and/or withheld from this publication the severity of cardiovascular risks associated with Vioxx consumption over naproxen consumption.  In fact, the article failed to provide critical information about Vioxx related cardiovascular complications such as stroke or blood clots.

28.  The year 2001 proved to be more of the same; Merck concealed Vioxx's adverse effects from the public and, in turn, reaped huge profits.  In 2001, Merck spent $135 million to promote the drug in the United States alone; Merck was rewarded with $2.6 billion in revenue making Vioxx the world's tenth biggest selling medicine.

29.  In February of 2001, when the FDA received the results of the VIGOR study, the FDA wanted Merck to highlight the cardiovascular risk prominently on Vioxx's label. Putting profits over safety, Merck resisted and campaigned to maintain its warning/caution free label.  As a result of Merck's efforts, the label remained unchanged until April 2002 when Merck and the FDA reached a compromise.  Merck's relentless and aggressive efforts to keep the public

uninformed of the risk of Vioxx enabled it to maintain market position and profits for yet another year, all at the expense of persons such as Plaintiff.

30.     On or about August 29, 2001, JAMA, the Journal of the American Medical Association, published a peer-reviewed human epidemiologic study conducted by the Cleveland Clinic Foundation that showed Merck had concealed the risk of a thrombotic cardiovascular event or myocardial infarctions among Vioxx users in Merck's trials at a 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to naproxen users, and 4.89 for developing serious cardiovascular events among aspirin patients. *See Mukherjee, D., et al., Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors*, JAMA.  286:8, 954-959, Aug. 22/29, 2001.  In addition, the annualized myocardial infarction rates for Vioxx users compared to placebo users revealed a statistically significant increase among Vioxx users. *Id.*

31.     In the JAMA study, the authors set forth the theory that "by decreasing PG12 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PG12, potentially leading to an increase in thrombotic events." *Id*. at 957.  In a follow-up peer-reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the COX-2 inhibitor "tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular thrombotic events."  Bing, R., & Lomnicka, M., *Why Do Cylo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?*, J.A.C.C., 39:3, Feb. 6, 2002.  Studies completed at the University of Pennsylvania further supported the biological plausibility.  Cheng,

Y., et al., *Role of Prostacyclin in the Cardiovascular Response to Thromboxane A2*, Journal of Science, V. 296: 539-541, Apr. 19, 2002.

32.     The JAMA study's release was followed by a relentless series of publications and peer-reviewed literature by Merck employees and consultants that naproxen had antithrombotic effects which accounted for the appearance of cardiovascular risk among Vioxx users.  Again, these Merck funded and assisted studies are the only ones to make this assertion. This theory has been debunked by numerous respected medical journals and the FDA recently stated that this theory could not be further from the truth.

33.     In mid-September, 2001, Merck received a third warning letter from the FDA stating, in part, that Defendant's promotional activities are "false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations."  The FDA stated that Merck's promotional campaign "minimizes the potentially serious cardiovascular findings" from a Vioxx study and "misrepresents the safety profile on Vioxx."  As to a May 22, 2001 press release, issued by Merck, the FDA wrote "your claim in the press release that Vioxx has a 'favorable safety profile' is simply incomprehensible, given the rate of MI [myocardial infarction] and serious cardiovascular events compared to naproxen.  The implication that Vioxx's cardiovascular profile is superior to other NSAIDs is misleading; in fact, serious cardiovascular events were twice as frequent in the Vioxx group… as in the naproxen treatment group…"

34.     Further, the FDA warning letter reprimanded Merck for setting forth this false theory relating to the VIGOR study that naproxen had anti-thrombotic effects and further stated, "it is also possible that Vioxx has pro-thrombotic effects."

35.      Nevertheless, Merck continued its aggressive marketing of Vioxx, primarily through direct-to-consumer advertising.

36.      In the midst of this adverse publicity, Merck took an offensive approach to marketing, and provided all Vioxx field personnel with an "obstacle handling guide" designed to overcome doctors' objections to Vioxx and its cardiovascular problems.  The training document was appropriately titled "Dodge Ball Vioxx."  Merck's massive Vioxx sales force was instructed to avoid and "DODGE" serious, life threatening concerns of both health care professionals and the general public.  Merck's corporate philosophy became one of "RUN" and "DODGE" as opposed to being that of "HONEST" and "TRUTHFUL."

37.      In April 2002, the FDA required Merck to place information about cardiovascular implications on its Vioxx labeling based on the results of the VIGOR study.  In addition, Merck was required to place new label information that Vioxx 50 mg per day is not recommended for chronic use.  These warnings were based on information that had been in Merck's possession by approximately January of 2000 at the latest and, as such, Merck did not meet its obligation to provide adequate "direction or warnings" as to the use of Vioxx within the meaning of Section 402 of the Restatement (Second) of Torts or otherwise.  Additionally, Merck did not fulfill its duty to warn prescribing health care providers of these risks.

38.      Merck's internal documents reveal that Merck was set to begin a major cardiovascular study of Vioxx in 2002, but company officials abruptly dropped the project just before it was set to start.  This proposed study, which became known as the VALOR trial, was set to begin in June of 2002.  On March 13, 2002, however, Merck sent an e-mail to its employees worldwide that the trial was being put on hold but did not cite any details leading to

the decision.  Although Merck officials have publicly denied it, it is far more than a coincidence that its decision to cancel the trial fell amidst Merck's negotiations with the FDA over the April 2002 cardiovascular warnings mentioned above.  Merck's decision to cancel the VALOR trial is in concert with its corporate strategy to conceal information relating to Vioxx's adverse cardiovascular effects.

39.      In the summer of 2002, Merck conducted its most inflammatory and aggressive measures via its intimidation and retaliation tactics to suppress and conceal speech and publicity relating to the adverse cardiovascular effects of Vioxx.  Dr. Joan-Ramon Laporte of the Catalan Institute of Pharmacology in Barcelona, Spain, had published his criticisms of Merck's handling of Vioxx.  Merck then had the audacity to send him a "rectification" that they insisted Dr. Laporte publish, which Dr. Laporte refused.  Merck then filed suit against the doctor in Spanish Court demanding a public correction.  In early 2004, the judge ruled that the publication accurately reflected the cardiovascular safety (or lack thereof) of Vioxx and ordered Merck to pay all court costs.

40.      In October of 2002, the prestigious British medical journal Lancet published a study that analyzed the medical data of approximately 300,000 people and determined that people who take Vioxx are almost twice at risk of developing heart disease, including heart attack.  The study also concluded that there was no anti-thrombotic or protective effect of naproxen, again effectively discounting Merck's theory.  Notwithstanding this new data, Merck did not publicize or warn of these findings, and maintained its same story for another two years.  Merck continued to spend more than $100 million annually in direct-to-consumer advertising and expanded its distribution of Vioxx to more than eighty countries.

41.     At a medical conference on August 25, 2004, FDA researcher David Graham, M.D., presented the results of a database analysis of 1.4 million patients that concluded Vioxx users are more likely to suffer a heart attack or sudden cardiac death than patients taking Celebrex.  In fact, the report indicated there is a 3.7-fold increase in risk compared with those taking Celebrex.  With 92,791,000 prescriptions for Vioxx filled between 1999 and 2003, the FDA conservatively estimates an excess of 27,785 cases of AMI (Acute Myocardial Infarction) and SCD (Sudden Cardiac Death) for those years alone.

42.     In its relentless pursuit of profits, Merck did not concede the truth.  On August 26, 2004, true to form, Merck minimized and downplayed the adverse findings and authorized a press release refuting Dr. Graham's study entitled, "Merck stands behind the efficacy and overall safety and cardiovascular safety of Vioxx."

43.     On September 23, 2004, Merck claimed it had an epiphany.  Merck had sponsored a 2600 patient study (APPROVe) to gain FDA approval for Vioxx to treat the recurrence of colon polyps.  The Data and Safety Monitoring Board stopped the APPROVe study after the investigators found that after eighteen months of treatment, patients taking Vioxx had twice the risk of a myocardial infarction compared with those receiving placebo.  Merck alleges that this small study was not intended to test for Vioxx's overall safety and triggered the collapse of its previous defenses.  The results of the APPROVe study and mounting pressure from the FDA finally compelled Merck to acknowledge Vioxx's dangerous propensities.  Merck then opted to back out rather than be forced out.

44.     On September 30, 2004, Merck withdrew Vioxx from the United States and the more than eighty countries around the world.  Unfortunately, the largest prescription drug

withdrawal in history came too late - an estimated 80 million patients had taken Vioxx. Fortunately for Merck, sales of Vioxx had topped $2.5 billion annually.

## F.  SUMMARY

45.      Critics have described the rise and fall of Vioxx as a cautionary tale of masterful public relations and aggressive marketing.  At all times relevant to this litigation, Merck had a significant market share based upon claims of Vioxx's efficacy, a very aggressive marketing program which included financial incentives to sales teams, infusion of some 700 new sales representatives, and a massive direct-to-consumer advertising and physician sampling program.

46.      As a result of such marketing, Vioxx gained a significant market share in competition with Celebrex that Merck would not have gained if Merck had not suppressed and concealed information about Vioxx and/or made false representations of Vioxx's superiority and efficacy.

47.      If Defendant had not engaged in this conduct, prescribers like Plaintiff's would not have prescribed Vioxx and patients, like Plaintiff, would have switched from Vioxx to safer products or would have refrained wholly from any use of Vioxx.

48.      From approximately 1999 through September 30, 2004, Defendant engaged in a common scheme in marketing, distributing and/or selling Vioxx under the guise that it was safe and efficacious for persons such as Plaintiff before, during and after Plaintiff suffered an ischemic stroke.

49.      Plaintiff alleges that Merck's marketing strategies, including without limitation the detail and sampling programs and direct-to-consumer advertising, targeted and

induced Plaintiff to purchase Vioxx.  At the time the Defendant distributed, manufactured and marketed Vioxx, Defendant intended that Plaintiff, and Plaintiff's health care professional would rely on the marketing, advertisements and product information propounded by Defendant.

50.      The actions of Defendant, in failing to warn of the clear and present danger posed to others by the use of its drug Vioxx, in suppressing evidence relating to this danger, and in making deliberate and misleading misrepresentations of fact to minimize the danger or to mislead prescribers and patients as to the true risk, are the direct and proximate cause of Plaintiff's injuries.  Plaintiff seeks compensation for the damages he has sustained relating to his past, present, and future pecuniary loss, loss of companionship, and mental anguish.  Plaintiff seeks compensation for past and future pain and mental anguish, past and future medical expenses, and loss of earnings and earning capacity.  Additionally, Defendant's conduct constitutes gross negligence and a reckless disregard for the lives of others and warrants the imposition of punitive damages against Defendant.

## G.  COUNT 1 – NEGLIGENCE

51.      Plaintiff re-alleges and incorporates the foregoing allegations.

52.      Plaintiff further alleges that at all times material hereto, the manufacture, sale, design, supply, distribution, or prescription of Vioxx with which Plaintiff came in contact, was under the exclusive control of the Defendant, its agents, servants and employees, and that had Defendant not been guilty of negligence, the Plaintiff would not have sustained his injuries. Accordingly, Plaintiff is entitled to recover under the doctrine of *res ipsa loquitur*.

53.      The law imposed a duty on the Defendant, as a manufacturer and marketer of pharmaceutical drugs, to exercise reasonable care.  Defendant knew, or in the exercise of

ordinary or reasonable care ought to have known, that the Vioxx it manufactured, sold, designed, supplied, distributed, promoted, or marketed was dangerous, unsafe,  and highly harmful to Plaintiff's health, notwithstanding which:

a.   Defendant negligently failed to design a reasonably safe product;

b.   Defendant negligently placed Vioxx into the market;

c.   Defendant negligently failed to remove Vioxx from the market;

d.   Defendant negligently failed to fund and conduct medical and scientific studies to determine the risks of the overall safety of Vioxx, in the alternative, failed to heed the warnings and risks of Vioxx;

e.   Defendant negligently failed to conduct sufficient testing on Vioxx that would have shown Vioxx had serious side effects, including, but not limited to the cardiovascular events described above;

f.   Defendant negligently failed to conduct adequate post-marketing surveillance to determine the overall safety of Vioxx;

g.   Defendant negligently failed to accurately disclose the results of its post-marketing surveillance to advise the Plaintiff, consumers, and the medical community of the aforementioned risks to individuals when the drugs were ingested;

h.   Defendant negligently failed to investigate the adverse event reports relating to Vioxx;

i.   Defendant negligently marketed its products;

j.   Defendant negligently failed to provide Plaintiff with visible, understandable warnings that were adequate to convey and alert Plaintiff of the severity of the risks and serious thrombotic cardiovascular side effects of Vioxx ingestion;

k.   Defendant negligently failed to take any reasonable precautions or exercise reasonable care to warn Plaintiff of the potential risks and serious thrombotic and cardiovascular side effects of Vioxx ingestion;

l.    Defendant negligently failed to take any reasonable precautions or exercise reasonable care to warn Plaintiff's health care providers of the potential risks and serious thrombotic and cardiovascular side effects of Vioxx ingestion;

m.    Defendant negligently failed to take any reasonable precautions or exercise reasonable care to warn the health care industry of the potential risks and serious thrombotic and cardiovascular side effects of Vioxx ingestion;

n.    Defendant negligently failed to provide adequate post-marketing warnings or instructions after the Defendant knew or should have known of the significant risks of personal injury and death as identified herein among other serious side effects from the use of Vioxx;

o.    Defendant negligently failed to warn Plaintiff that Vioxx should not be used in conjunction with any risk factors for these adverse events such as a family history of ischemic heart disease, or risk factors for ischemic cardiovascular disease; and,

p.    Defendant negligently failed to warn Plaintiff that he undertook the risk of adverse events and death relating to Vioxx as described herein.

54.    Defendant had the duty, as a product seller, to exercise reasonable care for the safety of the Plaintiff.

55.    These duties included the responsibility for the following safety and health matters relating to Vioxx:

a.    the investigation of the health risks;

b.    writing and publishing adequate and timely precautionary product labels and other health and safety information;

c.    writing and publishing adequate and timely specifications and standards about the true risks of injury associated with the products;

d.    writing and publishing adequate and timely specifications and standards about the symptoms of such injuries;

e.      writing and publishing adequate and timely specifications and standards about the scope of such injuries; or

f.      writing and publishing adequate and timely specifications and standards about the severity of the known risks associated with these products.

56.      Defendant knew, or in the exercise of reasonable care should have known, that Vioxx would cause adverse cardiovascular effects to its consumers like the Plaintiff.

57.      Defendant breached its duty of reasonable care to the Plaintiff and was negligent, without regard to whether the acts were intentional, knowing, malicious or reckless.

58.      Defendant's negligent acts and omissions were the direct and proximate causes of the occurrence in question and Plaintiff's injuries and damages.

### H.  COUNT 2 – GROSS NEGLIGENCE

59.      Plaintiff re-alleges and incorporates the foregoing allegations.

60.      Merck failed to provide warnings that would have dissuaded medical providers from prescribing Vioxx and failed to provide adequate and accurate information in its advertising, promotions and marketing campaign, thus depriving medical providers and consumers from weighing the true risks against the benefit of prescribing and/or purchasing and consuming Vioxx.

61.      Defendant's conduct constitutes gross negligence and a reckless disregard for the lives of others and warrants the imposition of punitive damages against Defendant.

62.      Defendant's conduct was more than momentary thoughtlessness, inadvertence, or error of judgment.  Such acts or omissions constituted such entire want of care as to establish that the acts or omissions were the result of actual conscious indifference to the

rights, safety, or welfare of the person or persons affected.  Plaintiff is entitled to recover judgment against Defendant for exemplary damages.

## I.  COUNT 3 – COMMON LAW FRAUD – FAILURE TO DISCLOSE

63.        Plaintiff re-alleges and incorporates the foregoing allegations.

64.        Defendant committed common law fraud against the Plaintiff.

65.        Defendant had a duty to disclose the risks associated with the use of Vioxx.

66.        Defendant made numerous material misrepresentations about the safety and efficacy of Vioxx, with full knowledge of the falsity of these representations and/or made these misrepresentations with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred.

67.        Further, Defendant failed to disclose and concealed material facts within its knowledge.

68.        Defendant knew that the Plaintiff was ignorant of the facts and did not have an equal opportunity to discovery the truth about the dangers presented by Defendant's products.

69.        Defendant intended to induce consumers such as Plaintiff to take some action, among other things, to buy and ingest Vioxx, by failing to disclose these facts.

70.        Plaintiff justifiably relied on Defendant's material misrepresentations to his detriment; but for Defendant's fraud, Plaintiff would not have been exposed to Vioxx and suffered the resulting injuries.

## J.  COUNT 4 – COMMON LAW STRICT LIABILITY

71.        Plaintiff re-alleges and incorporates the foregoing allegations.

72.        Plaintiff pleads the doctrine of strict liability.  Defendant is strictly liable to Plaintiff under Section 402A, Restatement (Second) of Torts, for the defective design of the Vioxx.  At the time Vioxx was designed, manufactured and sold by said Defendant, safer alternative designs existed, which included designs other than those actually used, that had they been selected by said Defendant, would have prevented or significantly reduced the likelihood of Plaintiff's injuries, and such designs were both economically and technologically feasible at the time these products left the possession of said Defendant, and had they been used, would have not have impaired the utility of the product.  Defendant's defectively designed drug was a producing cause of the occurrence in question and Plaintiff's injuries.

73.        Additionally or in the alternative, Defendant is strictly liable to Plaintiff under Section 402A, Restatement (Second) of Torts, for the defective marketing of Vioxx. Defendant failed to provide adequate warnings and instructions for safe use of Vioxx. Defendant's defectively marketed drug was a producing cause of the occurrence in question and Plaintiff's injuries.

74.        Additionally or in the alternative, Defendant is strictly liable to Plaintiff under Section 402B of the Restatement (Second) of Torts in misrepresenting to the public that its product was safe and without defect, which statement and representation was false and involved a material fact concerning the character of quality of the product in question, and upon which representations the consumer constructively relied, and which constituted a producing cause of the injury at issue.

75.        Further, each of the above and foregoing acts or omissions of Defendant were more than momentary thoughtlessness, inadvertence, or error of judgment.  Such acts or

omissions constituted such entire want of care as to establish that the acts or omissions were the result of actual conscious indifference to the rights, safety, or welfare of the person or persons affected.  Plaintiff is entitled to recover judgment against Defendant for exemplary damages.

### K.  COUNT 5 – BREACH OF WARRANTIES (EXPRESS and IMPLIED)

76.      Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein

77.      Merck, through descriptions, affirmations of fact, and promises relating to Vioxx to the FDA, prescribing physicians, and the general public, including the Plaintiff, expressly warranted that Vioxx was both safe and efficacious for its intended use.

78.      These warranties came in the form of:

a.      Publicly made written and oral assurances of the safety and efficacy of Vioxx by Merck;

b.      Press releases, interviews and dissemination via the media of promotional information, for the sole purpose of which was to create an increased demand for Vioxx, which failed to warn of the risks inherent to the ingestion of Vioxx;

c.      Verbal assurances made by Merck regarding Vioxx and the downplaying of any risks associated with the drug;

d.      False and misleading written information, supplied by Merck, and published in the Physician's Desk Reference on an annual basis, upon which physicians were forced to rely in prescribing Vioxx during the period of Plaintiff's ingestion of Vioxx including, but not limited to, information relating the recommended duration of the use of the drugs;

e.      Promotional pamphlets and brochures published and distributed by Merck and marketed directly to consumers, which contradicted the information that was set forth in the package insert and the Physician's Desk Reference; and

f.      Advertisements, including but not limited to direct to consumer advertising.

79.     The documents referred to above were created by and at the direction of Defendant.

80.     At the time of these express warranties, Merck had knowledge of the purpose for which Vioxx was to be used and warranted it to be in all aspects safe, effective and proper for such purpose, when indeed it was not.

81.     Merck knew and had reason to know that Vioxx did not conform to these express representations in that Vioxx is neither safe nor as effective as represented, and that Vioxx produces serious adverse side effects.

82.     As such, Merck's products were neither in conformity to the promises, descriptions or affirmations of fact made about Vioxx nor adequately contained, packaged, labeled or fit for the ordinary purpose for which these goods were sold and used.

83.     Merck breached these express warranties to Plaintiff and violated the applicable provisions of the Uniform Commercial Code by:

   a.     manufacturing, marketing, packaging, labeling and selling Vioxx to Plaintiff in such a way that misstated the risks of injury, without warning or disclosure thereof by package or label of such risks to the Plaintiff, or the prescribing physicians or pharmacist, and without modifying or excluding such express warranties;

   b.     manufacturing, marketing, packaging, labeling, advertising and selling Vioxx to Plaintiff, which failed to counteract the negative health effects and increased risks in a safe and permanent manner; and

   c.     manufacturing, marketing, packaging, labeling, advertising, promoting and selling Vioxx to Plaintiff, thereby causing the increased risk of serious physical injury and death, pain and suffering.

84.      Merck possessed or should have possessed evidence demonstrating that Vioxx causes serious side effects.  Nevertheless, Merck continued to market Vioxx and provided false and misleading information without regard to the safety and efficacy of Vioxx.

85.      Merck willfully, intentionally and recklessly disregarded the rights of Plaintiff and the public.

## L.  ACTUAL DAMAGES

86.      Plaintiff seeks compensation for the damages he has sustained relating to his past, present, and future pecuniary loss, and mental anguish.  Plaintiff seeks compensation for his past and future pain and mental anguish, past and future medical expenses, and past and future loss of earnings.

## M. PUNITIVE DAMAGES

87.      Plaintiff re-alleges and incorporates the foregoing allegations.

88.      Plaintiff is entitled to punitive damages because Merck's failure to warn was reckless and without regard for the public safety and welfare.  Merck misled the medical community and the public at large, including Plaintiff, by making false representations about the safety of Vioxx.  Merck concealed, downplayed, understated and/or disregarded its knowledge of the serious and permanent side effects associated with the use of Vioxx, despite available information demonstrating that Vioxx was likely to cause fatal side effects to users.

89.      Merck, its agents, representatives and employees possessed or should have possessed evidence demonstrating that its products cause serious cardiovascular side effects. Nevertheless, Merck continued to market and advertise Vioxx aggressively by providing false and misleading information regarding its safety and comparative efficacy.

90.     Merck failed to provide warnings that would have dissuaded medical providers from prescribing Vioxx and failed to provide adequate and accurate information in its advertising, promotions and marketing campaign, thus depriving medical providers and consumers from weighing the true risks against the benefit of prescribing and/or purchasing and consuming Vioxx.

91.     Merck's conduct was grossly negligent, malicious, and constitutes an egregious fraud.  Further, Merck recklessly disregarded the safety of Plaintiff and others, justifying the imposition of punitive damages.  Plaintiff is entitled to punitive damages because of the Defendant's maliciousness and reckless disregard of the Plaintiff's safety.

### N.  FRAUDULENT CONCEALMENT AND TOLLING OF APPLICABLE STATUTES OF LIMITATION

92.     Merck fraudulently concealed its wrongful conduct as alleged above and, as such, Plaintiff, using reasonable diligence, could not and did not discover the existence of a cause of action until very recently.  Merck is therefore estopped from asserting any and all potentially applicable statutes of limitations, if any.

93.     Additionally, or in the alternative, Merck's affirmative and intentional acts of fraudulent conduct, concealment, and misrepresentation toll any and all potentially applicable statutes of limitations.  Such acts include but are not limited to intentionally covering up and refusing to disclose the material risks associated with the use of Vioxx.

94.     Additionally, or in the alternative, Merck is estopped from relying on any statutes of limitation because of its fraudulent concealment and misrepresentation alleged above.  Merck had a duty to disclose the risks of adverse cardiovascular events associated with the use of Vioxx because this is nonpublic information over which it had exclusive control,

because Defendant knew this information was not readily available to Plaintiff, and because this information was relevant to Plaintiff in deciding whether to use Vioxx.

95.      Until very recently, Plaintiff had no knowledge of Merck's wrongdoing alleged herein.  Because of Merck's fraudulent and active concealment of its wrongdoing, including but not limited to deliberate efforts to give Plaintiff the materially false impression that Merck undertook all feasible safety precautions to reduce the risk of adverse cardiac events, Plaintiff could not have recently discovered the wrongdoing any time prior to this time, nor could Plaintiff have, as a practical matter, taken legally effective action given the unavailability, until very recently, of the internal memoranda and other documents (as generally described herein) as evidence in support of Plaintiff's claims.

## O.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against the Defendant and in favor of the Plaintiff, and award the following relief:

    a.     General damages in the sum in excess of the jurisdictional minimum of this Court;

    b.     Compensatory damages;

    c.     Consequential Damages;

    d.     Punitive and exemplary damages;

    e.     Pre-judgment and post-judgment interest as provided by law;

    f.     Costs including, but not limited to, discretionary Court costs of this cause, and those costs available under the law, as well as expert fees and attorney fees and expenses, and costs of this action; and,

g.      Such other relief as the Court deems just and proper.

## **P.  JURY DEMAND**

Plaintiff demands a trial by jury.


****** **REMAINDER OF PAGE LEFT INTENTIONALLY BLANK** ******

Dated: October 24, 2006

Respectfully submitted,

WALTER UMPHREY                        JOHN EDDIE WILLIAMS, JR.
Texas State Bar No. 20380000          Texas State Bar No. 21600300
PROVOST UMPHREY LAW FIRM, L.L.P.      WILLIAMS BAILEY LAW FIRM, L.L.P.
490 Park                              8441 Gulf Freeway, Suite 600
Beaumont, Texas 77701                 Houston, Texas 77017


MIKAL WATTS                           DREW RANIER
Texas State Bar No. 20981820          Louisiana State Bar No.8320
THE WATTS LAW FIRM, L.L.P.            RANIER, GAYLE & ELLIOT, L.L.C.
Tower II Building, 14th Floor          1419 Ryan Street
555 North Carancahua Street           Lake Charles, LA 70601
Corpus Christi, Texas 78478



                                      /s/  Grant Kaiser
                                      GRANT KAISER
                                      Texas State Bar No. 11078900
                                      THE KAISER FIRM, L.L.P.
                                      8441 Gulf Freeway, Suite 600
                                      Houston, Texas 77017-5001


**ATTORNEYS FOR PLAINTIFF**

**7671**