# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In Re: Vioxx**<br>**PRODUCTS LIABILITY LITIGATION** | **MDL DOCKET NO. 1657** |
| THIS DOCUMENT RELATES TO:<br>Case No. 2:06cv810 | Section L |
| CHARLES LARON MASON v.<br>MERCK & CO., INC. | Judge Fallon<br>Mag. Judge Knowles |

COX-2 Inhibitor Report of
**Lemuel A. Moyé, M.D., Ph.D.**
August 10, 2006

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                     8/10/2006

## Table of Contents

PERSONAL VITA

    PERSONAL VITA ........................................................................................................ 5

    DEGREES ................................................................................................................... 5

    RESEARCH EXPERIENCE .......................................................................................... 5

    CURRENT ACTIVITIES ............................................................................................... 6

    MANUSCRIPTS ......................................................................................................... 6

    BOOKS ...................................................................................................................... 6

    PRESENTATIONS ...................................................................................................... 7

    TEACHING ................................................................................................................. 7

    INVITED LECTURES .................................................................................................. 7

    CONSULTATIONS ..................................................................................................... 7

    GRANT REVIEW ........................................................................................................ 8

    MONITORING BOARDS ............................................................................................. 8

    FDA APPEARANCES FOR SPONSORS ....................................................................... 8

    FDA SERVICE ............................................................................................................ 8

    RECENT PUBLICATIONS ........................................................................................... 9

    RISK BENEFIT EXPERIENCE .................................................................................... 9

    CARDIORENAL COMMITTEE MEETINGS.................................................................. 9

    FDA SERVICE .......................................................................................................... 10

    EDUCATION............................................................................................................. 10

    BASIS OF OPINIONS ............................................................................................... 10

    FEES ....................................................................................................................... 10

    PREVIOUS TESTIMONY .......................................................................................... 10

  SUMMARY OF OPINIONS ............................................................................................ 11

  RISK-BENEFIT ANALYSIS ........................................................................................... 13

  ADVERSE EFFECTS ..................................................................................................... 17

    CARDIOVASCULAR TOXICITY ................................................................................ 17

    ROFECOXIB AND STROKE ...................................................................................... 20

    HYPERTENSION...................................................................................................... 24

    BACKGROUND BIOCHEMISTRY ............................................................................. 24

    BIOCHEMISTRY OF COX-2 INHIBITION ................................................................. 24

    THE ROLE OF ENZYMES ......................................................................................... 25

THE PROSTAGLANDIN SYSTEM ........................................................................... 26

COX-1 AND COX-2 ............................................................................................ 28

INADEQUATE TESTING ............................................................................................ 33

CLINICAL STUDIES ............................................................................................ 40

THE VIGOR TRIAL ............................................................................................. 41

POSSIBLE PROTECTIVE EFFECT OF NAPROXEN ........................................... 45

ADVANTAGE ..................................................................................................... 46

VICTOR .............................................................................................................. 47

VIP ..................................................................................................................... 47

ALZHEIMER STUDIES ....................................................................................... 48

APPROVE ........................................................................................................... 48

FAILURE TO WARN ................................................................................................ 64

FDA EXPERTISE ................................................................................................. 64

ROLE OF FDA .................................................................................................... 64

MODERIZATION ACT ........................................................................................ 65

COLLABORATION .............................................................................................. 65

ADVISORY COMMITTEES ................................................................................. 66

DECISION PROCESSES ....................................................................................... 67

MATERIAL INFORMATION ................................................................................ 68

ADVERSE EVENTS ............................................................................................. 68

LABELING .......................................................................................................... 68

MISLEADING THE FDA .......................................................................................... 73

APPENDIX A: STATISTICAL REASONING IN MEDICINE ...................................... 77

SAMPLING ERROR AND SIGNIFICANCE TESTING ........................................... 78

STATISTICAL POWER ........................................................................................ 80

SAMPLE SIZE COMPUTATIONS ........................................................................ 81

APPENDIX B: DETERMING CAUSALITY IN MEDICINE ....................................... 82

LIMITATIONS OF CASE REPORTS .................................................................... 85

APPENDIX C: DETECTING ADVERSE EVENTS ..................................................... 88

DETECTING ADVERSE EVENTS: COMPLICATION IN SAFETY MONITORING ......... 88

STRATEGY 1: MONITOR WIDELY ..................................................................... 91

STRATEGY 2: ASSESSING UNANTICIPATED ADVERSE EVENTS ..................... 92

APPENDIX D: SUBGROUP ANALYSES ................................................................... 96

SUBGROUPS: DEFINITIONS AND BASIC CONCEPTS ........................................ 97

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                    8/10/2006

SUBGROUPS VERSUS SUBGROUP STRATA .................................................................. 97

SUBGROUPS: INTERPRETATION DIFFICULTIES ........................................................... 98

RANDOM SUBGROUPS ..................................................................................................... 100

PROPER VERSUS IMPROPER SUBGROUPS ................................................................... 101

INTENTION-TO-TREAT" VERSUS "AS TREATED" SUBGROUP ANALYSES............... 101

EFFECT DOMINATION PRINCIPLE .................................................................................. 103

MANUSCRIPT INTERPRETATION ................................................................................... 105

REFERENCES ............................................................................................................................ 109

# Personal Vita

1.  ***Personal Vita***: My name is Lemuel A. Moyé. I am over twenty-one years of age, am of
    sound mind, am not a party to this action, have never been convicted of a felony, and am
    otherwise competent to make this affidavit. I have personal knowledge of all factual
    statements contained herein, and all such factual statements are true and correct to the
    best of my knowledge.

2.  ***Degrees***: I have a M.D. and a Ph.D. degree in Community Sciences - Biostatistics. I am a
    licensed physician in the states of Texas and Indiana, and I have actively practiced medi-
    cine from 1979-1992. I am a diplomat of the National Board of Medical Examiners. My
    formal training has included many courses in mathematical statistics, epidemiology, and
    biostatistics. I am currently a Professor of Biostatistics at the University of Texas School
    of Public Health in Houston, where I hold a full time faculty position in biostatistics.

3.  ***Research Experience***: I have carried out cardiovascular research for nineteen years and
    continue to be involved in the design, execution and analysis of clinical trials. I have been
    Principal Investigator on a grant from Schering-Plough and have been Co-Principal In-
    vestigator on two grants from Bristol Myers-Squibb. In these studies, I was responsible
    for the design, execution, and analysis of these experiments. In one case, the experiment
    involved over 2000 patients who were followed for 3.5 years, and in the other case, 4159
    patients were followed for five years. In each of these enterprises, an important compo-
    nent of my responsibility was the reporting of adverse events from physicians. In one of
    these trials, I supervised the collection of adverse events that were reported to both the
    Sponsor and to the Federal Food and Drug Administration (F.D.A.). Each of these clini-

cal trials has resulted in several articles that were published in the Journal of the Medical Association and The New England Journal of Medicine, as well as other journals in the peer reviewed medical literature.

4.  **Current Activities**: I am currently Principle Investigator and in charge of the biostatistics group that is carrying out research on the treatment of strokes, funded by the National Institute of Neurologic Disorders and Strokes. I am also a co researcher on a federally funded grant that is examining the influence of behavioral modification of risk factors for atherosclerotic disease.

5.  **Manuscripts**: I have published over one hundred and twenty manuscripts in peer-reviewed literature that reflect my experience in the design, execution and analysis of clinical trials. Included among these manuscripts are papers that provide the mathematical development of tools that improve both the design and the execution of large-scale clinical trials

6.  **Books**: I am the author of six books. I am the sole author of the book *Statistical Reasoning in Medicine—The Intuitive P value Primer*, published by Springer-Verlag in 2000. Marcel-Dekker published a second book, entitled *Difference Equations with Public Health Applications*, co-authored with a colleague, in October 2000.  A third book of which I am sole author, entitled *Multiple Analysis in Clinical Trials: Fundamentals for Investigators*, was published by Springer-Verlag and appeared in the summer 2003.  A fourth book titled *Finding Your Way in Science* was published in August 2004. A fifth book entitled *Mathematical Statistics with Applications* appeared in 2005. A sixth book entitled *Statistical Monitoring of Clinical Trials: Fundamentals for Investigators*; was released in the Fall, 2005. The second edition of *Statistical Reasoning in Medicine—The In-*

*tuitive P value Primer* will appear in the summer of 2006. I have completed a book entitled *Face to Face with Katrina Survivors: A First Responder's Tribute*, which will appear in November 2006. I am currently writing a book *Elementary Bayesian Biostatistics* to be published by Taylor and Francis, to appear during the summer of 2007. In addition I have authored invited book chapters and contributed articles to scientific encyclopedias.

7.  *Presentations:* I have been an Investigator on four grants from the National Institutes of Health, involving the design, execution, and analysis of clinical trials and epidemiologic studies. Each of these has led to publications in the peer-reviewed literature. I have presented results of clinical research at over twenty different professional meetings, including a presentation in 2001 to the Drug Information Agency and a separate presentation at the International Joint Statistical Meetings. I have presented results at the International Joint Statistical Meetings in 2003, 2004, and 2005.

8.  *Teaching*: I have consistently taught courses in biostatistics since my full-time appointment as a faculty member in 1987 at the University of Texas School of Public Health. In these courses, I have taught experimental design in clinical research studies, the statistical methodology that supports these design principles, the statistical analysis of clinical research programs, and the role of epidemiology in interpreting the conclusions from these clinical research programs. For 18 years, I have been a supervisory professor for students training in epidemiology, biostatistics, and other areas of public health.

9.  *Invited Lectures*: I have given over thirty invited guest lectures on research methodology topics.

10. *Consultations*: I have served as a clinical trial consultant to Berlex, Proctor and Gamble, Marion Merrill Dow, Pfizer, Hoerst Roussel, Aventis, Key Pharmaceuticals, Coromed,

Dupont, Bristol Myers-Squibb, Novartis, Medtronics, Astra-Zeneca, Power3 Medical, CryoCor, and Vasogen.

11. ***Grant Review***: I have reviewed grants and/or data on over fifty different occasions on behalf of government research programs.

12. ***Monitoring Boards***: I have served on three Data Monitoring Committees (DMC) that oversee the conduct of clinical trials, and most recently have been the chairman of a Data, Safety, and Monitoring Committee of a study sponsored by Bristol-Meyer-Squibb and Key Pharmaceuticals. I currently serve on three DMC's, one privately sponsored and two on NIH sponsored studies.

13. ***FDA Appearances for Sponsors***: I have appeared before the F.D.A. on behalf of sponsors on several occasions.

14. ***FDA Service***: In addition to serving as a consultant with the pharmaceutical industry for seventeen years, I have also directly and overtly supported the F.D.A. I have served as a statistician/epidemiologist for four years on the Cardiovascular and Renal Drug Advisory Committee to the Food and Drug Administration. In this capacity, I have reviewed the data provided by pharmaceutical companies and an analysis of that data by the FDA to render opinions about the safety and effectiveness of these medical interventions being considered for FDA approval.  In this capacity, I have formally reviewed over twenty clinical trial programs of private sponsors and commented in public testimony that is part of the Federal Registry. In some instances, a component of this review was direct evaluation, criticism and comment on the proposed product label by the Sponsor. I currently serve as a statistical consultant to the F.D.A., and most recently have been to a two-year term on the F.D.A. Pharmacy Sciences Advisory Committee.

15. ***Recent Publications***:  I have published manuscripts as the sole author in *Controlled Clinical Trials*, and *Statistics in Medicine*. This work has promulgated the philosophy (while advancing the supporting mathematics) that clinical research interpretation must be disciplined and must explicitly hold the highest regard for community protection from dangerous, false, and misleading results from clinical research. I have been featured in health care articles in both *Money* magazine (December 1998) and *US News and World Report* (January 11, 1999). In 2000, an article, on which I am the sole author, appeared in *Statistics in Medicine*, and it has generated important published commentary in the peer-reviewed literature.

16. ***Risk Benefit Experience***: I have taken part in research studies that have been both observational and experimental. In each of these studies, functioning as an investigator, I have participated in discussions assessing the safety and effectiveness of the medication. This assessment has not been based on complicated economic arguments, but instead places emphasis on balancing the health advantages the therapy offers against the disadvantages its use produces. I have published an article that computed the effectiveness and safety of various strategies in the treatment of essential hypertension.

17. ***CardioRenal Committee Meetings***: During the thrice-yearly meetings of the Cardio-Renal Advisory Committee to the F.D.A., I, along with the other committee members, have been asked to weigh the advantages and disadvantages of the medications presented to us for approval. This assessment was not economic but a collective appraisal by physicians and health care researchers of the relative clinical strengths and clinical weaknesses of the intervention.

18. **FDA Service:** My service on the F.D.A. Advisory Committees, as well as my service to drug manufacturers, has given me specialized knowledge and experience concerning the F.D.A. policies, procedures and regulations as well as the corresponding duties of a reasonable and prudent drug manufacturer. In my service on behalf of sponsors to the F.D.A., and my service to the F.D.A. at Advisory Committee meetings, I have developed expertise, knowledge, education, training and experience in F.D.A. matters.

19. **Education**: My education consists of the following:

| Year | Degree | School |
|------|--------|--------|
| 1987 | Ph.D. Community Sciences -Biometry | University of Texas |
| 1981 | M.S.  Statistics | Purdue University |
| 1978 | M.D. | Indiana University |
| 1974 | B.A. Mathematical Sciences | Johns Hopkins |

20. **Basis of Opinions**: I have gained scientific, technical, and specialized knowledge of biostatistics, epidemiology, and risk/benefit assessment. The basis for my opinions is derived from my education, training, research, experience, expertise, and review of the peer-reviewed medical literature.

21. **Fees**: My fees are $400 per hour for review of literature, documents, and $500 for depositions and trial testimonies.

22. **Previous testimony**: A list of previous testimony is attached as Appendix E.

## Summary of Opinions:

23. The Cox-2 inhibitor rofecoxib, designed to reduce pain while avoiding gastrointestinal effects, was a therapy with a foreseeable design defect, and whose risks exceeded its benefits. Several studies carried out both before and after rofecoxib was approved by the FDA demonstrated that rofecoxib's analgesic effect was no better than commonly used, inexpensive nonsteroidal anti-inflammatory drugs. In addition, other studies demonstrated the harmful gastrointestinal effects of rofecoxib produced more gastrointestinal disease then placebo therapy. Thus, when released, Cox-2 inhibitors were not superior to commonly used pain relievers for analgesia, nor were they free of gastrointestinal adverse effects. Thus there was minimal benefit of these agents above and beyond the available, inexpensive alternatives.

24. Rofecoxib excites the production of cardiovascular disease. It produces this disease through two mechanisms. First, rofecoxib's propensity to produce elevations in blood pressure adds to the force of atherosclerotic disease development. In addition, its mechanism of action, i.e., the selective inhibition of the Cox-2 prostanoid synthesis destabilizes the blood's delicate clotting balance, producing catastrophic thrombotic events in the heart, and other end organ vasculature. This adverse effect causes angina pectoris, nonfatal heart attacks, fatal heart attacks, and the fatal syndrome known as sudden death.

25. Rofecoxib is unsafe at any dose/duration combination in any patient regardless of their underlying risk for cardiovascular disease. The harmful cardiovascular effects of rofecoxib have been demonstrated repeated. These dangerous adverse consequences occur in patients on both low dose and high dose rofecoxib. They occur in short durations of ther-

apy, as well as in patients exposed for many months to the drug. In addition, these cardiovascular side effects occur in patients who are at low risk for cardiovascular disease, as well as in patients who are at high risk for cardiovascular disease. Rofecoxib is a defective product. In addition, based on the data, it is more reasonable than not that rofecoxib causes cerebrovascular accidents or strokes.

26.   The use of rofecoxib is unjustified in patients who suffer from the chronic paint of rheumatoid arthritis or osteoarthritis. Although each of these chronic conditions produce substantial pain, they are not deadly. The use of a medication that causes death through its combined thrombotic, hypertensive effects is unjustified in patients who suffer from the painful, chronic, but non-lethal illnesses which are the drug's indications. These patients, because of their age and high background risk of atherosclerotic cardiovascular illness are at greater risk of vessel-occlusive attack by this drug. Merck Laboratories was aware of a signal of its cardiotoxic effects of rofecoxib in 1998, a year before the drug was approved. In the presence of increased numbers of adverse cardiovascular effects, Merck allowed the FDA to approve a product that it knew was cardiotoxic. During the appearance of study after study, which confirmed pre-approval suspicions that rofecoxib would be dangerous for the cardiovascular system, Merck continued to defend the drug's use with a scientifically incredulous argument, with no additional warnings for its profound cardiovascular effects.

## Risk-Benefit Analysis

27.  All medication have risks that must be 1) balanced by the benefits to the population to re-
     ceive the therapy, and 2) promulgated to physicians, pharmacists, and patients, so that
     these prescriber, dispensers, and users can exercise their independent right to determine if
     the therapy's benefits outweigh its risks. A fair assessment of the contribution of rofe-
     coxib to the public health requires a fair assessment of its benefits and risks.

28.  Benefits of COX inhibition: The *raison dêtre* of COX-2 inhibition is that selective block-
     ing of the COX-2 pathway blocks pain generation while permitting continued gastrointes-
     tinal protection. Thus, the medical community expected superior analgesia to be deliv-
     ered while the safety of the stomach's protective mucosal lining was preserved.

29.  However, rofecoxib-generated analgesia was quite ordinary, demonstrated to be of no
     greater magnitude than medications currently on the market. A striking example was the
     comparison of rofecoxib to nabumeton in Protocol 090. In this study, 12.5 mg rofecoxib
     was compared to 1000 mg of nabumeton, Merck's own scientists anticipated that pain re-
     lief (as measured by the Patient Global Assessment Response to Therapy (PGART) was
     anticipated to be 15 percentage points greater than that of the comparator drug nabume-
     ton, a well established, commonly used NSAID. However, rofecoxib did not reach this
     prospectively determined goal. In fact, the difference between the two therapies was not
     15 points, but 7-8 points (50.4% versus 43.3%). Thus rofecoxib was not more effective
     than commonly used, already available pain medications, according to the criteria set by
     Merck's own scientists.

30.  In addition, rofecoxib produces clinically significant gastrointestinal distress. In the Hip-
     pisley-Cox study [1] a nested case-control analysis involving almost 100,000 participants,

the relationship between gastrointestinal disease and the use of Cox-2 inhibitors was evaluated. This examination revealed that rofecoxib was associated with an elevated risk of adverse gastrointestinal event, with a relative risk of 1.56 (95% confidence interval of 1.30-1.87) for patients with recent exposure to rofecoxib. These findings reflect a 56% increase in gastrointestinal adverse events in patients exposed to rofecoxib versus placebo drug use. Rofecoxib was no more effective then standard, inexpensive NSAIDS, and itself was associated with increased gastrointestinal adverse effects when compared to placebo. However, evidence suggests that both minor symptoms of GI disease (e.g. dyspepsia) and endoscopically detected lesions are not good predictors of future, complicated GI disease.

31. Also, while it is clear that non-selected NSAIDS produce gastrointestinal disease, it is unclear which component of COX-1 inhibition (anti-aggregatory propensity or absence of GI protection) produces the serious GI complications associated with these therapies (e.g., perforations, bleedings, and obstructions). In fact, it was quite possible that the COX-1 inhibition produced by the nonselective NSAIDS was not related to gastric protection, but generated by some other mechanism, e.g., direct gastric mucosal injury. It the latter was the case, then it was unlikely that COX-2 inhibitors would provide any gastrointestinal protection. Thus, it was necessary to carry out large-scale clinical studies comparing NSAIDS with COX-2 inhibitor therapy.

32. Balancing Benefit and Risk: All medication have risks that must be 1) balanced by the benefits to the population to receive the therapy, and 2) must be promulgated to physicians, pharmacists, and patients, so that these prescriber, dispensers, and users can exercise their independent right to determine if the therapy's benefits outweigh its risks.

When a drug's benefit is large, it is reasonable to accept a larger risk for the use of the drug. Examples may be found in oncology, where the combined use of the cancer chemo-therapeutic agents, bleomycin, cisplatin, and vinblastine produced cardiac toxicity. How-ever, their use is tolerated because they prolong the lives of patients who would soon die from their cancer. The greater the benefit, the more willing is the medical community to accept harmful side effects.

33. Alternatively, therapies associated with reduced benefits, must be accompanied by mini-mal level of adverse effects to be accepted by the medical community. However, the benefits of rofecoxib are no better than well-established, low-cost alternatives, and the GI protection offered by rofecoxib does not make it a safe drug. Therefore the adverse ef-fects caused by rofecoxib must be minimal for it to be acceptable to the medical commu-nity. However, rofecoxib's dangerous effects dramatically exceed this low threshold.

34. Rofecoxib causes thrombotic events by mechanisms discussed by Merck in 1998, before the therapy was approved. The measure of the adverse effects of the drug is measured by an odds ratio, and the ARE.

35. Relative risks and odds ratios measure the strength of association between an exposure and an illness. The computations are based on the fundamental principle that is an expo-sure causes a disease, and that one would naturally expect there to be greater disease in the exposed group then the unexposed group. Relative risks measure the occurrence of disease in the exposed group to the control group over a period of time, and is used when one follows patients in the exposed and unexposed group forward in time to compute the occurrence of disease in each of the two groups. Odds ratios are used in circumstances when the ability to follow patients is impaired by the study design (for example, the in-

vestigator takes an epidemiologic snapshot of a cohort, measuring the extent of exposure in a collection of people, and comparing the extent of disease in the exposed and unexposed groups. A relative risk (or odds ratio) of one indicates an equal extent of disease in each group. The larger the relative risk (or odds ratio) the greater the extent of disease.

36. The attributable risk exposed (*ARE*) is the excess risk of disease produced by an exposure. Developed in the 1970's [2, 3] the *ARE* is a useful quantity that calculates the fraction of events that are attributable to one causative agent when several possible explanations may be available. It is computed as

$$ARE = \frac{OR-1}{OR}.$$

where *ARE* is the attributable risk exposed and *OR* is the odds ratio. It may also be computed as

$$ARE = \frac{RR-1}{RR}.$$

where *RR* is the relative risk.

37. Risk of Coronary Artery Disease: The concept of odds ratios and ARE can be applied to established risk factors for coronary artery disease (Table 1).

Table 1. Odds Ratios for Coronary Heart Disease Relative Risk[4]

| Risk Factor | Odds Ratio (Men) | Attributable Risk Exposed |
|---|---|---|
| Age | 1.05 | 4.7% |
| High Normal BP | 1.32 | 24.2% |
| Hypertension Stage 1 | 1.73 | 42.2% |
| Hypertension Stage 2 | 1.84 | 45.6% |
| Cigarette Smoking | 1.68 | 40.5% |
| Diabetes(Yes/No) | 1.50 | 33.3% |
| Severe LDL Elevation | 1.74 | 42.5% |
| Very Low HDL | 1.46 | 31.5% |

These are the odds ratio for the risk of developing coronary heart disease in ten years.

38.   The attributable risk exposed reveals the excess risk for coronary heart disease attribut-able to each of these risk factors. For example, cigarette smoking produces 40.5% excess risk of coronary heart disease, i.e., after all other risks are considered, the risk is 40.5% greater on top of that baseline risk in subjects who smoke cigarettes.  These risks will be compared to the rofecoxib's risk of cardiac toxicity.

## Adverse Effects

39.   ***Cardiovascular Toxicity.*** The overall risk of cardiovascular events is the VIGOR trial data (discussed later in this affidavit) as reported to the FDA, with a relative risk of 5.0, a risk which translate to a ARE of 80%. This holds for short term and long-term use. This is a greater risk of atherosclerotic disease than any of the known risk factors.

40.   A succinct summary of cardiotoxicity provided by Merck reveals the cardiovascular dan-
      gers posed by rofecoxib. The report VIOXX Preliminary Cardiovascular Meta-Analysis
      by Dr. Deborah Shapiro provides a crisp summary of the findings from several of
      Merck's sponsored trials. In the table entitled MI Endpoints, rofecoxib vs. NSAIDS the
      following data is depicted.

| Study | Relative Risk of Myocardial Infarction |
|---|---|
| Overall | 2.02 |
| ViGOR | 5.0 |
| Advantage | 2.95 |
| RA | 1.82 |
| nonRA | 1.68 |
| OA-069 | 0.55 |

A similar table entitled MI endpoint- rofecoxib versus placebo, shows an overall hazard
for rofecoxib as well. Since there is no established, credible scientific body of evidence
suggesting that NSAIDS are cardioprotective, it is no surprise that the two tables convey
the same clear message.

41.   The cardiovascular damage produced by rofecoxib in low doses was clearly portrayed in
      Protocol 090. Table 37 of that report demonstrates a relative risk of 3.0 and an ARE of
      66%. . Thus, in this study, excess cardiotoxicity was reported in the presence of reduced
      efficacy (using the investigator's definition of efficacy), a clear warning that the therapy
      could be no more effective than standard pain therapy, but increase the cardiac disease
      event rate.

42.  Statistical significance in these assessments is irrelevant. These studies were not designed
to detect myocardial infarction with precision (i.e., the studies did not include patients
who were at higher risk of developing myocardial infarction and therefore did not have
enough of these events) and did have statistical significance established as a prospective
metric for the assessment of the relationship between rofecoxib exposure and myocardial
infarction. Therefore the cardiovascular results of these studies should not have statistical
significance used as the metric to judge the strength or persuasive power of their results.

43.  Rofecoxib's harmful effect in short duration of therapy was demonstrated in Protocol 201
(VIP study).  Patients were followed for a median period of only four months. The rofe-
coxib dose evaluated in this study was 25 mg.  From Table 1-6 (from the P201 Clinical
Study Report), focusing on drug related adverse events, there were 13 cardiac disorders
(9 in the rofecoxib group, and 4 in the placebo group). There were four episodes of coro-
nary artery occlusion, myocardial infarction, and myocardial ischemia in the rofecoxib
group and none in the placebo group. When the classification is broadened to examine
specific serious clinical adverse events, there were 30 seen in the rofecoxib group and 23
in the placebo group. There were 13 myocardial infarctions in VIP that met this classifi-
cation, 7 in the rofecoxib group, six in the placebo group (Table 1-7).

44.  In addition, the Advantage study following patients treated with either rofecoxib (25 mg)
or naproxen for osteoarthritis for only three months. The medical reviewer's report
(MRK-AFV0341732) revealed that total mortality was higher in the rofecoxib group ($n =$
5) then in the placebo group ($n = 4$) (Page 21). Significantly, three of the five deaths in
the rofecoxib group were sudden death. There were no cardiovascular deaths in the
naproxen group. There were five myocardial infarctions, two anginal events, and three

sudden deaths in the rofecoxib group and one MI and two anginal events (no sudden deaths) in the placebo group (page 10). In addition, more patients (40 versus 21) discontinued rofecoxib then naproxen therapy for cardiovascular related adverse events (page 10). Finally, there were 15 versus 7 patients discontinued for hypertension related events, and 19 versus 12 patients discontinued therapy for edema related events. The increase in number of cardiovascular events is particularly striking since the study was only a twelve-week trial and 25 mg of rofecoxib (half the dose used in VIGOR) was used. The FDA Reviewer stated (page 12) "the CV findings are of concern…"

## Rofecoxib and Stroke

45. Cerebrovascular accidents (CVA's or strokes) are abrupt interruptions of blood flow to the brain. These interruptions lead to massive brain cell death, producing paralysis, loss of cognitive function, and, in extreme cases, coma and death.

46. Stroke is the number one cause of adult disability in the United States and the third leading cause of death. In the United States, stroke mortality fell by 15.1% from 1988 to 1998, but the actual number of stroke deaths rose 5.3% [5,6]. Approximately 600,000 people have a new or recurrent stroke each year in the US. Of these 500,000 are first attacks, and 100,000 are recurrent attacks. More men than women have strokes [5].

47. In many respects, strokes are similar to heart attacks. Atherosclerosis, the pathological process underling the majority of strokes, occurs throughout the arterial blood system. It can produce loss of function in the heart, peripheral vascular system, or kidneys as well as in the central nervous system.

48. Both strokes and heart attacks commonly have the same mechanism of production, i.e., the initiation and development of atherosclerotic plaques in major arteries that supply

these two end organs (the brain and the heart) with nutrient and oxygen rich blood. The atheromatous gruel grows over time, fed by lipid rich macrophages, aggravated by high vascular pressures, and the vasoactive affects of smoking. The creation of a fissure in the plaque can activate the intricate collection of clotting mechanisms that leads to the rapid development of a thrombus, further narrowing the lumen of the blood vessels, leading to death of the supplied tissue.

49.    The risk factors for stroke (older age, hypertension, unfavorable lipid panels, smoking) are closely related to those of heart attacks. In addition, treatment is the same. The first treatment, prevention, requires the modulation of risk factor levels. A second is the identification of major blood vessels that are at risk (carotid vessels for the brain, coronary arteries for the heart) including bypassing the lesions or end-arterectomy. Finally, acute treatment for each includes the use of clot lysis therapy including tissue plasminogen activator or tPA. In each case, the lysis therapy must begin as quickly as possible after the onset of the heart attack or stroke. Thus, stroke and heart attacks and sister symptomatic manifestations of the same underlying disease – atherosclerosis.

50.    Thus the introduction of new risk factor for the development of thromboembolic disease would naturally suggest the risk factor would affect not just the occurrence of heart attacks, but the occurrence of strokes as well. Because of the same underlying pathophysiology, the warnings received by Merck outlining the potential dangers of rofecoxib applied to the occurrence of stroke as well.

51.    The epidemiology of risk factor identification and stroke is complicated by the relatively small number of strokes. Therefore, when a priori warning about cardiovascular adverse events associated with rofecoxib was sounded by Fitzgerald, Oakes, and Patrono,

the search for stroke adverse events must be especially sensitive and diligent since the occurrence of strokes are themselves not common.

52. In the 1998 Watson report. Table 1 of that report reveals that cerebral infarction, and cerebral vascular accident, were included as cardiovascular serious adverse events. In the words of the report (Page 3; C: Cardiovascular Serious Adverse Events). The SAE's chosen were felt to have a high likelihood of representing acute thrombotic events. Table 6 and 7 of that report demonstrate a greater incidence of CV SAE cases in men (relative risk 1.28) and women (relative risk 2.16). Appendix C of that report reveals that there was at least one patient who had a CVA.

53. Preliminary rofecoxib meta-analysis by Dr. Deborah Shapiro (October 18, 2000) noted there were 8 cerebral accidents in the rofecoxib group and 9 in the control group (including one hemorrhagic and one lacunar stroke).  However, in that same report, an evaluation of the effect of rofecoxib versus NSAIDS, there were 23 CVA's in the rofecoxib group (11 CVA, 2 hemorrhagic strokes, 9 cerebral vascular strokes, and 1 lacunar stroke) versus only 9 in the NSAIDS group. (7 CVA, 1 hemorrhagic stroke, and 8 ischemic cerebrovascular strokes). This is a remarkably strong signal of rofecoxib-stroke hazard, given the paucity of stroke events.

54. IN VIP (Table 1.12 of the Clinical Study Synopsis), There were five strokes on treatment or within 14 days of study drug discontinuation. However, Table 1.6 which lists events believed to be related to the drug, there was only one infarction (lacunar) in the rofecoxib group and none in the placebo group. This is unquestionably a small number of events, but it is enhanced sensitivity to these rare events that the sponsor is obligated to pay when there has been adequate *a priori* warning.

55. The Advantage study produced more stroke events in the control group than the rofe-coxib group. However, this finding does not "cancel out" the findings of rofecoxib-stroke hazard in the other studies. The evidence for hazard includes the mechanism by which many strokes are produced, and the greater number of studies that demonstrate rofecoxib stroke-excess. These powerful findings are not nullified by the observation that not every single study doesn't demonstrate this harmless effect.

56. In the Alzheimer studies (protocol 091, 078, and 126), three fatal strokes occur, versus one in the placebo groups. (Table 2, FDA Cardiovascular data in Alzheimer's studies). This occurred in relatively short term studies, again manifesting a small but clear in-creased stroke hazard in patients taking rofecoxib.

57. In the Victor protocol, as stated in the Overview of Cardiovascular Events in the VICTOR Study (Table 1 Summary of Confirmed Thrombotic Cardiovascular Serious AE's by Class of Terms Rofecoxib 25 mg vs. Placebo). There were four ischemic cardio-vascular strokes observed, 3 in the rofecoxib, and 1 on placebo. The combined endpoint analysis including ATPC events revealed the same division (3 in the rofecoxib group and 1 in the placebo group) again, an excess number of strokes attributable to rofecoxib ther-apy.

58. The published APPROVe study, revealed 22 cerebrovascular events (Table 2, Incidence of Adjudicated Thrombotic Adverse Events). Of these 22 CVA's 15 were in the rofe-coxib group, and 7 in the placebo group (hazard ratio 2.32: 95% CI 0.89 – 6.74). The no-tion of statistical significance means little in this underpowered environment. The only fatal stroke occurred in the patients receiving rofecoxib.

59.  While the identification of excess risk can be complex when the number of events are small, a review of the available data reveals consistent excess risk from several Merck sponsored studies. Given the similarities between the pathophysiology of stroke and CVA, a review of the data, consistent with well established epidemiologic principles reveals that it is more reasonable than not that rofecoxib causes strokes.

*Hypertension*

60.  The rofecoxib group had a greater proportion of patients with hypertension-related and edema-related events, with early separation of the curves. The relative risk of these events was 4.61 with a 95% confidence interval of 1.50 to 18.83. The risk for hypertension was 2.02 (95% confidence interval 1.71 to 2.38) and for edema was 1.57 (1.17 to 2.10). In the ADVANTAGE study, there were more 15 patients versus 7 patients who discontinued therapy for ischemia hypertension-related adverse events, and 19 versus 12 patients discontinued therapy for edema related events. In addition, in the APPROVe clinical trial, the rofecoxib group had a greater proportion of patients with hypertension related and edema-related events, with early separation of the curves. The relative risk of these events was 4.61 with a 95% confidence interval of 1.50 to 18.83. The risk for hypertension was 2.02 (95% confidence interval 1.71 to 2.38) and for edema was 1.57 (1.17 to 2.10).

# Background Biochemistry

61.  *Biochemistry of COX-2 inhibition*: COX stands for cyclooxygenase. It is an enzyme system that expedites, and accelerates a particular type of chemical reaction in the body. Many chemical actions and reactions in the body must be facilitated in order to proceed. Before we can discuss the role of COX inhibition, we must first understand what en-

zymes do, and specifically, the remarkable degree of control their presence gives the organism.

62. ***The Role of Enzymes***: While people and governments conduct the affairs of business using money, the body conducts its affairs of living through chemistry. Chemical reactions permit it to feed itself, to grow, to move, to defend itself, and to reproduce. This chemistry is intense and complex.

63. Just as fiscal flow, critical in societal interaction, must be carefully balanced and regulated, so too the intricate chemistry of life must be controlled and monitored. The fact is that chemical reactions, left to their own, would quickly consume all reagents and generate products in unproductive amounts at unhelpful times. Frequently, chemical reactions necessary for life would not take place at all because the chemical environment in the cell or tissue where the reaction is to take place is wrong. (e.g., too little reagent, or not enough acid). In order to bring order to this chemical chaos, the body, over tens of thousands of years, has developed reaction-facilitators. These facilitators are called enzymes. Specifically, an enzyme is a complex molecule that expedites a chemical reaction. The enzyme is neither consumed nor produced by the reaction. The reaction is facilitated by the mere presence and interaction of the enzyme.

64. The human body has tens of thousands (and perhaps many more) of such enzyme complexes. Many of these systems have been studied for generations, e.g., the Kreb cycle, which is the process by which glucose (sugar) is converted in the presence of oxygen to chemical energy, with water and carbon dioxide as byproducts. There are over ten differ-

ent chemical reactions that must take place and each of them is facilitated by enzyme sys-
tem.[*] Without it, organized energy production in living tissue would fail.

65. ***The Prostaglandin System***: A prostaglandin is a molecule. Specifically, it is a collection
of fatty acids (approximately twenty of them) attached to a five-member ring. Their main
function (as best understood at this time) is to function as messengers; their presence ini-
tiates a series of other chemical reactions. For example, one signal that prostaglandins
send is the need for an inflammatory response. The injured body part notifies its constitu-
ency that a self-protective, inflammatory reaction is necessary by synthesizing pros-
taglandins. Inflammation is commonly and most productively a protective response of the
organism, commonly producing increased blood flow to the site of inflammation, an im-
mune response, and pain.

66. A second function of prostaglandins is to mediate the propensity of blood to clot. The
tendency of blood to clot must be carefully balanced. Blood that does not clot loses the
ability to repair damaged blood vessels that are commonly injured or worn down in the
process of daily living.[†] Blood that does not clot quickly enough leads to a painfully de-
bilitating and short life, as revealed by the natural history of patients with untreated he-
mophilia. Alternatively, blood that is too likely to clot (i.e., it exists in a hypercoagulable
state) leads to blood clots forming where they are neither required nor helpful. Such clots
can break off, be carried though the blood stream, and lodge in small (and sometimes
large) vessels. The blockage of blood flow leads to death of the tissue that relies on the
blood flow, now impeded by the clot. The results of these clots are pulmonary embolisms

---

[*] Some of these enzymes are hexokinase, aldolase, dihydrolipoyl dehydrogenase, pyruvate kinase, and dihydrolipoyl
transacetylase.
[†] The body has over 100,00 miles of blood vessels, most of them too small to see. There are frequently hourly tears
in these blood vessels that must be immediately repaired.

(if the arteries to the lungs are blocked), and heart attacks (if a coronary artery, a vessel supplying the cardiac muscles own blood supply is blocked) or strokes (if the blood supply to the brain is blocked). Platelet aggregation is one of the precipitating mechanisms in producing a myocardial infarction by producing a blood clot in a vessel that directly supplies the heart with oxygen. This pro-clotting process can trigger the cascade of events that produces a heart attack.

67.   The mechanism by which blood clots is one of most studied and complex biochemical mechanisms known, and a detailed discussion of this complicated system, involving literally hundreds of reagents, enzymes, and coenzymes is beyond the scope of this report. The relevant component here is the compound thromboxane $A_2$. One effect of prostaglandins are that they stimulate hemostasis through up-regulation of thromboxane $A_2$, increasing platelet adhesion and aggregation. Thus the production of prostaglandin, according to this theory, increases the coagulability of the blood.

68.   In addition, prostaglandins control the protection of the sensitive stomach lining from an attack on it by the acids and caustic digestive juices produced by the stomach needed to digest food. Prostaglandins are involved in the regulation of these systems (and most likely, many, many more).

69.   Prostaglandin production is controlled in part by the cyclooxygenase, (COX) enzyme system. By stimulating COX, *ceteris paribus*[*] prostaglandin synthesis is increased. By repressing or inhibiting COX, prostaglandin synthesis is decreased.[†] We might then expect that a COX inhibitor, by down regulating COX and thereby reducing prostaglandin syn-

---

[*] This is a critical insertion. In a complicated biochemical system, any assertion about the response of a system when a component is changes assumes everything else in the system is constant.
[†] Aspirin controls pain and inflammation because it blocks prostaglandin synthesis. With a reduction in prostaglandin synthesis, the inflammation signal is not sent, and the production of pain is reduced.

thesis would 1) decrease pain and inflammation, 2) reduce blood coagulability (since prostaglandins up regulate thromboxane $A_2$), and 3) decrease the ability of the stomach to protect itself. This is precisely what the traditional non-steroidal inflammatory agents (NSAIDS) do.

70.   These NSAIDS, (e.g. ibuprofen and naproxen) are general or nonselective COX inhibitors[*] and have been available for approximately thirty years. They have well known clinical characteristics. While widely accepted as having generally effective analgesia, or pain control. However, since the mechanism of pain control is based on inhibiting COX, and thereby reducing prostaglandin synthesis, they reduce gastric mucosal protection. This reduction is associated with the production of gastric ulcers, gastric obstruction, and gastrointestinal bleeding, all symptoms of erosion of the gastric mucosa. It has been estimated (MK-966 Cox-2 inhibitor product development plan stage 0 review MRK-NJ0220388 page 8, Introduction and Program hypothesis ) 76,000 patients are hospitalized each year, and that over 7,600 patients die each year in the United States alone as a result of NSAID associated gastrointestinal events.

71.   However, there is a huge population of patients who have been exposed to the traditional NSAIDS for over thirty-five years. The number of patients with severe gastrointestinal illnesses and deaths is actually a relatively small proportion of patients taking traditional NSAIDS.

72.   **COX-1 and COX-2**: Continued research on the COX system lead to the identification of a bifurcated system. It is now believed that there is not one but two COX systems regulating the production of prostaglandins, identified as COX-1 and COX-2. Each metabolize

---

[*] We will see later that even these broad COX inhibitors have different abilities to repress different aspects of the COX system.

arachidonic acid to prostaglandin $PGH_2$, with is the intermediate step in the synthesis of prostaglandins and related compounds known as prostanoids.

73. It is important to understand the role of these two COX systems to appreciate the advantage and difficulties produced by differential COX inhibition. The currently accepted view is that the COX-1 system is a constitutive system, i.e., it is always active, with the enzyme present in high concentrations within tissues including platelets, vascular endothelium (the special cells that make up the inner layer of blood vessels), gastric epithelial cells, and cells in the kidney (renal parenchyma). The prostanoids produced by the COX-1 system increase stomach-lining protection, and increase the coagulability of the blood.

74. Alternatively, the COX-2 system is not always active, but is induced by inflammation. It produces the prostaglandin that sends the inflammatory signal, thereby inducing the cycle of increase blood flow, immune response and pain. It has also been learned that COX-2 also produces prostacyclin $PGI_2$ that is an anti-aggregator and a vasodilator.

75. Thus, it was believed, that just as NSAIDS were developed to block all COX activity, that further refinement of medical therapy could produce a COX-2 inhibitor. Such a therapy, it was felt, would reduce the inflammatory response, while leaving vascular coagulability unchanged and the protective gastrointestinal lining in tact.

76. Early Investigation of the COX-2 inhibitors: The true effects of a therapy emerge over time, where the speed at which knowledge is gained is related to the experience of the medical community with the therapy. Preapproval studies of the COX-2 inhibitors revealed definite efficacy, but minimal benefit above and beyond the medications that were already available. However, when evidence of harm emerges, however inconsistently, regardless of whether it appears in either the pre-marketing or post-marketing environment,

the burden of proof shifts. Specifically, the appearance of harm requires that the sponsor 1) look for definitive evidence of harm in an ethical way and 2) acknowledge that the risk-benefit balance is beginning to change as evidence of new risk emerges. This requires greater efficacy to offset the greater risk. The threshold of significance for harmful effects is much less extreme than that for determining efficacy.

77. Undoubtedly, exploratory analyses demonstrating harm may not be generalizable. However, the ethical credo of "First, do no harm," requires a patient protective response to this potential new hazard. An appropriate response includes but is not limited to 1) additional analyses that can, in an ethical fashion, determine if the initial finding represents a result that can be generalized to the population at large, and 2) an immediate recalibration of the risk-benefit balance, tipping this balance in the direction of greater harm.

78. The requirement of these ethical responses neutralize the assertion that exploratory analyses demonstrating harm can be ignored. The need to protect populations from harmful effects must not be blocked by concerns for statistical significance.

79. What is most convincing is the consistency of findings across the breath of studies involving rofecoxib. The repeated findings of elevations of cardiovascular thrombotic events associated with rofecoxib use, regardless of dose or duration of use strengthen the argument that rofecoxib causes these serious adverse events.

80. The identification of compounds that have an increased differential inhibition of COX-2 was heralded as a major step forward in pain control, allowing the patient to obtain effective analgesia while avoiding the difficulties long known to be associated with COX-1 inhibition. However, it was also recognized early in the development of COX-2 inhibitors that, by not inhibiting the COX-1 system, a pro-aggregatory effect might be produced.

Even though, early in vitro studies showed that the COX-2 inhibitor rofecoxib did not in-
hibit platelet aggregation or prolong bleeding time when administered to health volun-
teers, the 1998 Scientific Advisory Committee served notice to Merck that the effect of
Cox-2 inhibitors on the cardiovascular system might be harmful. Findings supported the
idea that the COX-2 inhibitors were not necessarily thrombogenic.

81. However, although 800 mg of celecoxib (a COX-2 inhibitor), did not alter levels of either
serum $TXA_2$ or its urinary metabolites, a modest reduction in serum $TXB_2$ (a metabolite
of $TXA_2$) was observed, suggesting that COX-2's might engender a coagulable state (i.e.,
make the blood more likely to clot). The balance between TXA2 (a platelet aggregator
promoted by COX-1) and $PGI_2$ (which counteracts platelet aggregation, modulated by
COX-2) requires attention at this point. The difference can be elucidated by the effect of
aspirin. COX-1 is selectively inhibited by low-dose aspirin in activated platelets.[*] How-
ever, since COX-2 activity is preserved in the presence of aspirin, and the produced $PGI_2$
decreases blood coagulability, the effect of aspirin is to shift the haemostatic balance to
an antithrombotic state.

82. Thus, inhibition of COX 2 suppresses $PGI_2$ formation, blocking the anti-aggregatory ef-
fect of $PGI_2$, making the blood more coagulable. This effect should attenuate the anti-
aggregatory effect of aspirin. In mechanistic animal studies, the beneficial effect of aspi-
rin was blocked by celecoxib. In addition, the vasodilator effect of $PGI_2$ derived from the
endothelium of the coronary vessel and vasodilatory response to application of arachi-
donic acid was reduced significantly when compared to controls [7]. Because of these re-
sults, the authors expressed concern regarding the possibility of an increased risk of acute

[*] This occurs by acetylation of the hydroxyl group of a serine residue near the COX active site. Aspirin's COX-1
inhibitory action persists for the lifetime of the platelet. Recovery of the effect is strictly a function of platelet turn-
over.

vascular events in patients receiving COX-2 inhibitors, especially in individuals with un-

derling inflammatory disorders, including coronary artery disease. This bolstered the

theoretical argument that COX-2 inhibitors might increase the likelihood of serious

thrombotic adverse events.

83. The scientific motivation for this prescient concern is clear. COX-2 inhibition would re-

duce the anti-thrombotic effect of PGI2. By not suppressing COX-1, the thromboxane $A_2$

activity would proceed, tipping the hemostatic balance to a procoagulation state. How-

ever, the interaction between the COX enzyme system and hemostasis is complicated by

the different potencies that the COX-2 inhibitory agents have on COX- inhibition, i.e.,

COX-2 inhibitors can also be COX-1 inhibitors. In one study, the COX inhibitors were

directly evaluated for their differential COX-1/COX-2 inhibitory activity. The main aim

of this investigation was to clarify the possible effect that various COX-2 inhibitors might

have on the aggregatory propensity of blood. The researchers found that the COX-2 in-

hibitors had widely variable selectivity for COX-1 inhibition. Rofecoxib as well as the

newer agent etoricoxib have the smallest effect against COX-1. Hence they are closer to

"pure COX-2 inhibitors". Alternatively, celecoxib had more COX-1 inhibitory activity,

and is a less pure COX-2 inhibitor.

84. In addition an effect of platelet aggregation with possible clinical significance was sug-

gested by observations of elevated prothrombin times and bleeding episodes with con-

comitant use of celecoxib and warfarin in a patient with pre-exiting cardiovascular dis-

ease [8]. In addition, there were reports of patients with connective tissue disorder who

developed arterial thrombosis after initiation of celecoxib therapy [9]. An FDA assess-

ment of the preapproval data led to their acknowledgement that there was a possibility

that COX-2 inhibitors could cause thromboembolic disease. The conclusions from these pharmacological studies and other experimental evidence lent credence to the view that selective COX-2 inhibition reduces synthesis of $PGI_2$ and may promote a pro-aggregatory state before rofecoxib was approved.

## Inadequate Testing

85. The potential cardiovascular risks of Vioxx were apparent well before the drug was approved, and Merck was aware of these dangers. Their testing program was inadequate.

86. On September 12, 1996, before rofecoxib was approved, a memo from Dr. Randall to the Cox-2 Team, on page 6 stated, "Another SAE (severe adverse event) of unstable angina was reported in extension to RA (rheumatoid arthritis) study. The vascular AE's are expected since COX-1 is not inhibited". This memo demonstrates that Merck appreciated not just that cardiovascular serious adverse events could be anticipated with rofecoxib, but that they understood the mechanism by which they would be produced. They accepted the causal link between rofecoxib and cardiothrombotic adverse events before the drug was approved.

87. On Thursday, October 10, 1996, before rofecoxib was approved, a review of protocol 017 was described (MRK-ABC0048706). In this review the following statement appears "Adverse events of most concern were in the cardiovascular system (e.g., MI, unstable angina, rapid fall in hemoglobin and hematocrit in some subjects, and a small increase in blood pressure), documenting the potential for cardiovascular adverse effects caused by rofecoxib.

88. On November 11, 1996, before rofecoxib was approved, Dr. Musliner anticipated that there would be 25% more adverse cardiovascular events with rofecoxib (Memo: Subject-

Anticipated consequences of NSAID anti-platelet effects on cardiovascular events and effects of excluding low-dose aspirin use in the Cox-2 GI Outcomes Megatrial – Page 5.). Dr, Musliner also stated the rofecoxib-induced increased cardiovascular event rate might be expected "due to the absence of anti-platelet effect for the selective Cox-2 inhibitor," and "would create a negative aspect to the results and leave open the question (reasonable or unreasonable) whether the drug might in some other way be contributing to such events." The concern about an increased cardiovascular adverse event profile was well established years before the drug was approved, requiring adequate testing.

89. However, rather than design a clinical trial that was designed to fully elaborate the risks and benefits of rofecoxib, Merck designed VIGOR to underestimate the true risk rofecoxib for increasing cardiovascular events. A concern about possibility of rofecoxib caused an increase in CV events and "you will get more thrombotic events and kill drug." a prescient concern that time demonstrated was the fact of the matter. Dr. Reicin in a later email that day provided an unethical solution, actively considering "the idea of excluding high risk cardiovascular patients, i.e., those that have already had an MI, CABG, and PTCA. This may decrease the CV event rate so that a difference between the two groups would not be evident" This was a deliberate attempt to confuse the medical community about the potential cardiovascular risk associated with rofecoxib. The only concern about this unethical thought process was not that the medical community would be mislead, but "would we be able to recruit any patients?" A following email from Brian Daniels (February 26, 1997) stated "It is clear to me that the program will be severely hurt if a megatrial shows a win in PUB's and a loss in MI/CVA." Thus VIGOR was designed not to demonstrate the true benefits and risks of the therapy, but to understate the risks while

magnifying the benefits. VIGOR's configuration was crippled, designed to deceive the medical community.

90. On October 24, 1997, before rofecoxib was approved, Dr. Fitzgerald emailed Dr. Nies, in which Dr. Fitzgerald made specific recommendations for further cardiovascular studies based on the concerns for the effects of Cox-2 inhibitor therapy.

91. On October 27, 1997, in a letter from Dr Oates to Dr. Nies, Dr. Oates warned of the mechanism by which Vioxx could produce adverse events and proposed additional testing. Specifically, Dr. Oats made suggestions on how to study the effects of rofecoxib on prostacyclin biosynthesis in order to determine whether an imbalance is created between prostacyclin and thromboxane-A2.

92. On February 2, 1998, before rofecoxib was approved, Dr. Watson's final results on the analysis of cardiovascular SAE's in the Phase IIb/III Vioxx osteoarthritis clinical trials was received. This was a detailed analysis demonstrating that rofecoxib produced more cardiovascular events in the VIOXX program This analysis demonstrated that the incidence ratio of cardiovascular serious adverse events was 19.4/1000 in men and 15.5/1000 in women. The overall incidence rate for women was elevated when compared to FOSAMAX controls with a relative risk of 2.16 and a 95% confidence interval of 1.14 – 3.94. On page 2, the description of the results of protocol 023 states, "These findings raised concern about the potential for VIOXX to predispose to thrombotic cardiovascular (CV events) page 2. In fact, risk for cardiovascular events was elevated for two of the three age groups in men and three of the four age groups in women (Table 6). The report states that the VIOXX 125 mg and 25 mg treatment groups also had more clinical cardiovascular AE's then the placebo group in protocol 010 (page 1 following executive sum-

mary). The next sentence which states there is no evidence of an increased incidence of such events ignores the findings from Table 6. This analysis revealed a signal to Merck that the thromboembolic events whose occurrence was anticipated by the understanding by which rofecoxib worked. Given the *a priori* concern about the relationship between rofecoxib and cardiovascular events, this was clear signal that Merck missed.

93.   The inappropriate interpretation of the Watson report reveals a substantial, persistent inconsistency in Merck's philosophy toward rofecoxib-induced cardiovascular events. From 1996-98, there were well documented points at which Merck received advice about the likelihood that rofecoxib produces cardiovascular events. Clearly Merck absorbed this message because it was repeated by key Merck personnel. Merck's understanding of this threat to rofecoxib was complete enough for them to distort the design of VIGOR, excluding patients who were at high risk of cardiovascular events. However, when the threat becomes reality, as in the Watson report, where almost all age-gender groups manifest excess cardiovascular serious adverse events in patients taking rofecoxib, revealing the relationship that Merck has been educated to fear, its scientists turn a blind eye to the results. It is this reaction that governs Merck's perspective on the rofecoxib-CV event relationship.

94.   From May 3 – May 6, 1998, the Science Advisory Committee to Merck reviewed the Vioxx program. They wrote that there were significant safety risks with Vioxx. On page 11, they stated that the possible harmful effects of Cox-2 inhibition could be produced by a combination of three mechanisms 1) development of lipid-rich plaques in the coronary arteries, 2) plaque cap destabilization, making them rupture prone, and 3) thrombotic occlusion of the vessel at the rupture site. They further warned Merck, before rofecoxib was

approved, that more information is needed to address these questions related to the possible influences of a COX-2 inhibitor on coronary morbidity and mortality.

95.   On May 20, 1998, before rofecoxib was approved, Dr. Watson convened a meeting of the Cox-2 cardiovascular SAE Surveillance Task Force. During the introduction to the meeting, he states, "these findings raised concern about the potential for VIOXX to predispose to thrombotic cardiovascular (CV events).

96.   On September 9, 1998, before rofecoxib was approved, Dr. Patrono wrote a letter to Dr. Laurenzi at Merck, in which Dr. Patrono warned of potential CV issues with rofecoxib, suggesting that more tests are required. Specifically, he said (page 1), speaking about Cox-2 inhibitor effect, "I would like to emphasize that this is likely to be but one of several facets of the potential cardiovascular implications of Cox-2 expression and inhibition." In addition, he said (page 2), "Because companies making non-selective Cox-2 inhibitors are likely to emphasize the cardiovascular implications of specific Cox-2 inhibitors, I would suggest that it would be in the best interest of Merck to look into these issues as quickly and thoroughly as possible."

97.   On September 29, 1998, before rofecoxib was approved, Dr. Nies penned a handwritten note in which he tells Dr. Oates and Dr. Patrono that Merck will not do the kinds of studies that the two experts have proposed to explore the cardiovascular risks of rofecoxib. He anticipated that the drugs would become available without the need for the safety testing Drs. Oates and Patrono warned were so necessary.

98.   This body of information demonstrates that before rofecoxib was approved, the mechanism by which it produced harmful cardiovascular events had been elucidated, and sig-

nals of cardiovascular events had occurred. Merck's pre approval testing program was incomplete.

99. On May 20, 1999, the month Vioxx was approved, the FDA Medical Officer Review reflected concern about rofecoxib's cardiovascular risk. He noted that the cardiovascular trends and that a larger databases was needed to assess CV safety. He also commented on the relatively small number of patients that Merck exposed to Vioxx prior to approval.

100. The role of statistical errors. The Appendices to this report lay out the basis of statistical errors in clinical research. Essentially, since researchers in health care cannot study entire populations but only samples from those populations, they must acknowledge that the occurrence of misleading samples can skew their research results. For example, it is possible that a population in which there is no relationship between exposure and disease can produce a sample in which a relationship exists. In this case, the positive sample results mislead the medical community. Similarly, populations in which there is no relationship between the exposure and the disease can, just through the play of chance, produce a sample in which there is a relationship. Thus, researchers must understand that sampling error, or the variability of results from the population to the sample can provide misleading results.

101. Well-designed, well-executed studies tailored to produce effects for desired endpoints must therefore have adequate protection against the first error (populations with negative results producing positive findings in samples, a type I error). This protection is statistical significance. In addition, there must be protection of samples from populations which have negative results producing positive results in samples (a type II error) – this projection is provided by the statistical power of the research. Research protocols typically are designed to produce low levels of type I error (traditionally p values less than 0.05, or

high levels of statistical significance) and high values of power (typically greater than 0.80).

102. For example Protocol 090 was designed to have adequate protection against these statistical errors, but only for the pain relief component. It was not designed to be adequately powered for the cardiovascular effects. Therefore, since the study was not designed to have this adequate statistical protection, we can take no assurance from the absence of statistical significance of its findings for myocardial infarction. The relative risk of 3.0 for cardiovascular events, demonstrating increased risk of Vioxx, does not required statistical significance since the study was not designed to demonstrate this effect with statistical significance (i.e., it lacked adequate power).

103. Typically, underpowered studies that produce non-statistically significant results are termed "non-informative." However, while this is a reasonable approach for findings that produce efficacy, it is not helpful for findings that identify harm. This is because the medical community typically cannot afford to wait for the ideal study to be done in a large number of patients with appropriate protection against type I and type II statistical errors, in the meantime exposing patients to risk needlessly. Thus, small signals of harm while not statistically significant, must be taken seriously by the investigator and the sponsor.

104. In addition, statistically insignificant signals of harm in small samples can have terrible consequences for the community of patients at large. The identification of four cases of myocardial infarction in the exposed group when compared to one case in the control group out of total of less than 100 patients may be statistically insignificant. However, this four fold increase in risk when transmitted to hundreds of thousands of patients tak-

ing the drug would be a public health catastrophe. Thus, statistically insignificant signals of harm in small studies must be taken seriously.

105. In the presence of statistically insignificant signals of harm, studies with reverse findings from each other do not commit fratricide – they do not cancel each other out. The presence of sample-to-sample variability blocks our natural tendency to insist that all studies show the same result. Thus the identification of a harmful effect of Vioxx on cardiovascular findings in Protocol 090 is not negated by the presence of the reverse effect in its sister study 085. The mechanism of action by which Vioxx produced heart attacks remains the same in the two studies, however, sample to sample variability produced the reverse findings in 085. This is also the explanation for the absence of a harmful effect of Vioxx on the occurrence of strokes in the Advantage study. The epidemiologic assertion of consistency does not require that all studies show the same result – only that a number of them, carried out in different patients using different methodologies produce similar results.

## Clinical Studies

106. Clinical Studies: When considering the evidence to support or disprove a hypothesis, one must consider the quality of evidence available on the subject matter. Randomized controlled trials are generally accepted as the gold standard for assessing efficacy of medicines, a justifiable conclusion assuming that the clinical trials were well conducted and executed according to their prospective plan However, not all hazards can be identified from these types of studies, or from studies conducted before the compound receives final regulatory approval.

107. Rofecoxib was approved by the FDA based on several pivotal, short-term studies. These short-term studies followed patients for three to six months. Furthermore, these studies did not study definitive clinical endpoints (gastric ulceration that was visualized using endoscope.) Additionally, these short-term studies made no important contribution to the understanding of the long-term hazards of these drugs. In the absence of this information, large post marketing efficacy studies have become the foundation of the assessment of the long-term hazard produced by COX-2 inhibition.

108. The concern that increased cardiovascular risk may be associated with use of COX-2 inhibitors arose from two sources; case reports of patients with connective tissue disease who developed arterial thrombi after starting celecoxib, and a small clinical study (Protocol 090) which confirmed the suspicions of the 1998 Merck Scientific Advisory Panel. The presaging comments of the Scientific Advisory Panel are critical. Presence of cardiotoxic effects that appears in subsequent clinical trials carries greater weight in the presence of the prospective statement that the risk may be present. The *a priori* concerns about the possibility of risk does not permit the researcher do discard the result as a random, non-meaningful, and non-generalizable one based only on sampling error.

109. *The VIGOR Trial*: The VIGOR trial was designed to evaluate the effect of rofecoxib versus the competing NSAID naproxen on the event rate of serious gastrointestinal disease. In the manuscript describing its results [10], the investigators examined just over 8000 patients with rheumatoid arthritis who were assigned to either of these two agents randomly. The primary endpoint for the principal analysis of the study was the combined endpoint of perforation, obstruction and severe upper gastrointestinal bleeding.

110.  The evaluation of this endpoint demonstrated 121 confirmed upper gastrointestinal events in the naproxen group (3.0%) and 56 (1.4%) in the rofecoxib group, reflecting a 50% reduction, with a $p$-value $< 0.001$. This trial demonstrated using acceptable methodology that the COX-2 inhibitor rofecoxib could reduce the incidence of upper gastrointestinal events compared to a nonselective COX inhibitor.

111.  The rate of myocardial infarction was greater in the rofecoxib group then in the naproxen group (0.4 percent to 0.1 percent, relative risk 0.2, 95 percent confidence interval 0.1 to 0.7). This bald reversal in the computation of the relative risk[*] fails to hide the fact that rofecoxib was associated with a substantially greater incidence of myocardial infarction. Additionally, thirty eight percent of these patients should have been taking aspirin based on clinical indications; this subset of patients was an increased risk of having a myocardial infarction.[†]

112.  Fortunately, a separate analysis of adjudicated cardiovascular events from the VIGOR study [11] provided a detailed evaluation of the overall serious adverse events data (death, hospitalization or extension of hospitalization, and/or any life-threatening events or serious disability). This evaluation revealed that the majority of the thrombotic events were myocardial infarctions (MI) (rofecoxib 20, versus naproxen 4). This produces a relative risk of 5. Of the serious vascular adverse events meeting criteria for adjudication,

---

[*] At this juncture, it must be pointed out that the reporting of these adverse event results in VIGOR was unusually insipid. The benefit of therapy was stated in a way that was beneficial to the sponsor (i.e. relative risk for GI injury is less than 1, illustrating a benefit of rofecoxib), yet the harmful effect of rofecoxib on the myocardial infarction rate is stated not as an elevated relative risk, but again as a relative risk less than one. This is inconsistent, misleading, and produces unnecessary and predictable confusion if one tries to weigh risk vs. benefit of rofecoxib in this population. In addition, the numbers of patients with heart attacks are not reported, a frankly glaring and shocking omission in a manuscript purporting to make a contribution to the modern clinical literature. The investigators were supported by Merck (as stated on page 1527 of the manuscript) and all parties must share responsibility for this singularly misleading and meretricious description of cardiovascular adverse events.
[†] Patients were permitted to take low dose aspirin when this result was revealed at the end of the study.

twice as many cases were reported for rofecoxib than for naproxen (n=65 1.6% versus 33 (0.8%).  Stratification according to aspirin (indicated or not indicated) and use of the standard APTC combined endpoint revealed a higher risk of MI in the rofecoxib group when compared to naproxen (the use of combined endpoints in clinical trials is expatiated in the Appendix). Additionally, the risk of serious thrombotic events was greater in the rofecoxib group than the naproxen group. The examination of time to event was particularly revealing, demonstrating a clear divergence of the survival curves after starting treatment (within 2 months), persisting during the remainder of the study period (log rank test result not reported).

113. The conclusion of the adjudication for the VIGOR study was that a significant difference was seen in the comparison of stroke, MI and cardiac death that was unfavorable for rofecoxib vs. naproxen. The VIGOR study was designed to illuminate the relationship between the use of rofecoxib and the incidence of gastrointestinal illness, and was not planned to be a definitive evaluation of the relationship between rofecoxib and myocardial infarction. However, the demonstration of a potential public health hazard for the millions of patients taking COX-2 inhibitor therapy cannot be lightly dismissed. Thus the findings of VIGOR confirmed the findings of Protocol 90, demonstrating and computing the magnitude of the risk associated with rofecoxib.

114. It should be noted that the drug was approved in 1999 on the basis of data submitted to the FDA, the results of VIGOR were not published until November 2000, one and a half years after commercial approval had been granted. In addition, the cardiovascular data reported in that article were incomplete.

115. A clearer evaluation of the VIGOR cardiovascular results is provided in the Merck cardiovascular update from VIGOR from Deborah Shapiro to Drs. Alise Reicin, Eliav Barr, and Dennis Erb on July 5, 2000. In addition, Figure 1 of this document demonstrates a clear separation in the Kaplan- Meier time to event curves for confirmed thromboembolic cardiovascular serious adverse events in VIGOR demonstrating the increased risk of thromboembolic events on VIGOR when compared to Naproxen occurred early in follow-up (less than two months of follow-up time). Table 3 demonstrated 47 thrombotic events in 4047 patients takes rofecoxib (1.2%) versus 20 thrombotic events in 4029 patients (0.5%), excess risk associated with rofecoxib. A review of adjudicated cardiovascular events (Table 4, revealed 45 events in 4047 patients (1.67 per 100 patient years) in patients treated with rofecoxib, 19 in 4029 patients on naproxen (0.70 per 100 patient years. The relative risk of events in rofecoxib group to those in the naproxen group is $1/0.42 = 2.38$ and 95% CI is $1/0.72 - 1/0.25$. or 1.39 to 4.00, based on the Cox analysis results from Table 4.

116. Neither the VIGOR authors nor the sponsors updated the data in the article that appeared in the New *England Journal of Medicine* in November 2000 with the new safety data, a critical ethical omission. Even if one accepts that the occurrence of the three additional heart attacks did not occur before a prespecified data cut-off date, the three events were known in August 2000, several months before the appearance of the manuscript in the New England Journal of Medicine in November 23, 2000. It would have been easy for the investigators to add a statement in this manuscript, acknowledging the three additional cardiovascular adverse events, and in addition, providing additional computations for the updated risk of cardiovascular events caused by rofecoxib. *The New England*

*Journal of Medicine* was concerned enough about this omission that they published an Expression of Concern [12].

117. Since it is unethical to deliberately expose patients to risk without a clear and overwhelming expectation of benefit, other studies have to be examined for evidence of harm. The best evidence for a harmful effect must come from reproducibility, i.e. consistency of the finding. This is particularly compelling if the mechanism of harm has been clearly elucidated, as has been clearly elaborated in the preapproval evaluations of the COX-2 inhibitors.

118. The overall conclusion from this FDA report was that there was an increased risk of thromboembolic events particularly MI in patients exposed to rofecoxib compared with naproxen. Unfortunately, the absence of a placebo group precluded an assessment of the absolute risk of rofecoxib. Although only the MI result was published in the main paper, the FDA report clearly showed a higher risk of serious thrombotic cardiovascular events for rofecoxib in both aspirin indicated and non-indicated patients when compared with naproxen [13]. It is surprising that the coded cardiovascular analysis was not published in the VIGOR main paper, especially since the coding necessary for cardiovascular adjudication was available to the sponsor before VIGOR was published [14].

119. ***Possible Protective Effect of Naproxen***: One possible explanation for the findings of the VIGOR trial was that undue attention was paid to the relationship between rofecoxib and cardiovascular disease. The proponents of this thesis argue that it is not that exposure to rofecoxib increases the risk of cardiovascular disease, but that the control therapy naproxen decreases the risk of this class of illnesses.

120. However, this idea was not accepted before VIGOR in the many years during which this drug was on the market. Specifically, while data from randomized controlled trials have documented that aspirin is an effective antithrombotic agent for primary as well as secondary prevention of thromboembolic events, trials evaluating the effects of nonselective NSAIDS on the occurrence of cardiovascular disease have not affirmed there own purported benefit; the findings are inconclusive. In these trials on nonselective NSAIDS, the question of whether the degree of COX-1 selectivity (known to vary from drug to drug) translated into clinically detectable cardiovascular protection (as is achieved by aspirin with its characteristic irreversible inhibition of COX-1) have not been addressed.

121. A review of four epidemiologic studies with different designs and populations suggesting no overall effect of nonselective NSAIDS including naproxen [15]. The results of this review included prepublication material from Ray which itself was subsequently published in full [16]. The authors concluded that none of the NSAIDS included in the study should be used for cardioprotection.

122. Even though Merck argued that the cardiovascular effect in VIGOR could be explained by the beneficial effect of naproxen, and email from Dr. Reicin to Dr. Scolnick revealed that Dr. Scolnick was in "minor agony" over the issue, and that he wanted a cardiovascular study. Dr. Scolnick was not convinced that naproxen "benefits" explained the VIGOR findings. However, even after outside consultants advised Merck to do a CV study (in an email from DiBasttiste to Exposito on March 9, 2002), the study was not carried out.

123. *ADVANTAGE* : This clinical trial compared the use of rofecoxib 25 mg to naproxen 500 mg bid in patients with osteoarthritis. This twelve week controlled study recruited 2700 patients to each arm of the trial. The study showed no safety advantage of rofecoxib over

naproxen, and demonstrated a trend of excess serious cardiac thrombotic events in the ro-fecoxib group. There were five myocardial infarctions, two anginal events, and three sudden deaths in the rofecoxib group and one MI and two anginal events in the naproxen group. In addition, more patients (40 versus 21) discontinued rofecoxib then naproxen therapy for cardiovascular related adverse events. Finally, 15 versus 7 patients discontin-ued for hypertension related events, and 19 versus 12 patients discontinued therapy for edema related events. The striking increase in number of cardiovascular events is particu-larly striking since the study was only a twelve-week trial and 25 mg of rofecoxib (half the dose used in VIGOR) was used. (Villalba ML. Food and Drug Administration – Divi-sion of Anti-inflammatory, Analgesic, and Ophthalmic Drug Products HFD-550. Medical Officer Review End of Review Date 11-18-2001.

124. *VICTOR*: The VICTOR Study (Protocol 145), a study designed to determine whether ro-fecoxib could help prevent the recurrence of colon cancer, recruited and reported on 1217 patients in each of the placebo and rofecoxib groups. In Table 1 of the Overview of the Cardiovascular Events in the VICTOR Study (Reports Received by Merck as of 31-May-2005), there were 14 patients who had confirmed cardiovascular serious adverse events in the rofecoxib group and 4 patients in the placebo group. In Table 2 of the same report, when patients were classified by the occurrence of the APTC endpoint, there were 9 pa-tients who reached the APTC endpoint, and 3 in the placebo group.  Most importantly, the Kaplan-Meier curves demonstrated an early separation between the event rates of these events between the two groups.

125. *VIP*: VIP- Protocol 201 was designed to determine if rofecoxib 25 mg could help prevent prostate cancer. The study recruited 4741 patients of the anticipated 15,000-sample size.

The study was approved on May 4, 2004, but was terminated prematurely due rofe-coxib's withdrawal from the market. There were 13 myocardial infarctions in this study 7 in the rofecoxib group, six in the placebo group. There were 26 vascular disorders in the rofecoxib group and 10 in the placebo group, and 19 patients in the rofecoxib group and 2 in the placebo group. When the analysis is restricted to specific drug related clinical ad-verse experiences (incidence $\geq 0.0\%$ in one or more treatment groups, there were 9 in the rofecoxib group and 4 in the placebo group. Five cases of coronary artery occlu-sion/myocardial infarction/ischemia/silent myocardial infarction occurred in the rofe-coxib group. There were none in the placebo group. There were nine ATPC events in the placebo group and eight in the rofecoxib group, respectively

126. *Alzheimer studies*: The Alzheimer studies (Protocols 078, 091, and 126) revealed excess deaths in patients on rofecoxib when compared to placebo. In 078, there were 13 deaths in rofecoxib compared to 7 on placebo. (8 versus 2 cardiovascular deaths on/off drug). In protocol 091, there were 9 rofecoxib deaths to 2 placebo (6 versus 4 cardiovascular deaths on/off drug), and in protocol 126 there were 3 rofecoxib deaths versus 3 placebo (2 rofecoxib cardiovascular deaths, versus 2 placebo on/off drug).

127. *APPROVe*: The APPROVe study [17] must be set apart from VIGOR and CLASS in that the evaluation of COX-2 inhibitor exposure and cardiovascular disease was prospectively declared and the analysis prospectively planned. APPROVe was designed to provide a confirmatory and therefore more definitive evaluation of COX-2 use and cardiovascular disease.

128. The principal goal of the Adenomatous Polyp Prevention on Vioxx (APPROVe - Proto-col 122) Trial was to determine the effect of a 36 month course of rofecoxib therapy on

the risk of recurrent adenomatous polyps in patients at risk of colorectal adenomas. Men and women at least 40 years of age were eligible if they had one large bowel adenoma and were not anticipated to need long-term NSAID therapy including aspirin (thus patients taking aspirin were excluded from the study). However, patients recruited after VIGOR's findings were announced were permitted to take low dose aspirin for cardiovascular protection.

129. Patient with 1) hypertension, 2) history of a myocardial infarction, 3) coronary angiography, 4) recent history of congestive heart failure (CHF), 5) bypass surgery within the previous year, or 6) stroke or TIA within the previous two years were excluded, thereby excluding patients who were at higher risk of myocardial infarction or other thromboembolic phenomena. These exclusion criteria served in the long run to protect patients from the potential thrombogenic effects of COX-2 inhibitors, but it also reduced the number of events in the study, under-powering any determination of the relationship between COX inhibition and thrombotic cardiovascular disease. The inclusion of a six-week run-in period permitted physicians to assess patient compliance with therapy. During the randomization period, 1287 patients were assigned to rofecoxib 25 mg/day, and 1299 assigned to placebo. The trial was terminated two months before its scheduled end.

130. The evaluation of the relationship between COX inhibitor therapy and thrombotic events was a prospectively declared evaluation of the study. Thrombotic events included fatal and nonfatal myocardial infarction, unstable angina, sudden death from cardiac causes, fatal and nonfatal ischemic stroke, transient ischemic attack, peripheral arterial thrombosis, peripheral venous thrombosis, and pulmonary embolus were measured. However, the endpoint used was the APTC combined endpoint (i.e., death from cardiovascular, hemor-

rhagic, and unknown causes, nonfatal myocardial infraction, and nonfatal ischemic or hemorrhagic stroke. Monitoring and analysis were prospectively declared.

131. During the trial, there were more patients discontinued from rofecoxib then placebo due to adverse events. When the trial ended, patients in the rofecoxib group had an increase risk of confirmed thrombotic events. Specifically, there were 46 patients in the rofecoxib group that had confirmed thrombotic events, versus 26 patients in the placebo group. (RR 1.92, 95% confidence interval 1.19 – 3.11, $p$ =0.008). The risk for cardiac events (RR 2.80 95% CI 1.44-5.45) and cerebrovascular events (RR 2.80, 95% CI 1.44 – 5.45) was substantially higher. Representing substantial risk

132. Even though the increased risk was seen throughout the duration of follow-up in AP-PROVe, some have posited that the harmful thromboembolic does not emerge until after patients have been followed for longer than 18 months.

133. This conclusion is epidemiologically unsound for several reasons. First, the evaluation of the putative 18-month effect is the result of a subgroup analysis. Subgroup analyses i.e., the process by which an effect in the overall cohort is adumbrated by effects in subsets of the patient has been shown to be unreliable. The findings in the ELITE trials demonstrate the misleading conclusion drawn from subgroup analyses (discussed in the Appendix of this report).

134. The "eighteen month analysis is based on an improper subgroup. A proper subgroup is a subgroup whose membership cannot be ascertained at baseline. These analyses have been debunked by Yusuf [62].

135. In addition, analyses based on a sub-cohort have a small number of events. The absence of cardiac events makes it difficult to identify an isolated effect with statistical regularity.

Thus the absence of statistical significance is not due to the lack of an effect, only due to the inability to have enough events to identify the effect. This is the heart of the admonition "the absence of evidence is not evidence of absence."

136. Third, there is no plausible explanation in the literature to explain why an effect whose mechanism (differential effect on prostanoid synthesis), an effect that is observed within several half-lives of Cox-2 inhibitors should require eighteen months to manifest itself. It does not take eighteen months to observe the analgesic activity it is not biologically plausible that eighteen months would be required to observe the cardiovascular toxicity, and the idea is epidemiologically incoherent.

137. Finally, the suggestion that the harmful cardiovascular effect requires eighteen months of exposure is inconsistent from the Sponsor's own data. The VIP trial, assessing the effect of rofecoxib in patients with prostate cancer demonstrated cardiovascular toxicity that emerged in less than one month of exposure.

138. In addition, the examination of investigator reported events demonstrates early separation of the cardiac event rates at approximately three months of follow-up (MRK-AHK0075759)

139. In addition, deeper analysis of the APPROVe data demonstrates that cardiovascular toxicity emerges early in patients who are at higher risk of cardiovascular disease. The relative risk in the rofecoxib group compared to placebo was 9.59 (95% confidence interval 1.26 to 416 for patients with a history of cardiovascular disease. It was also elevated among diabetics (6.10: 95% confidence interval 1.36 to 56.1). An evaluation of the APPROVe cardiovascular safety data revealed that there was early separation of the event

curves when investigator reported cardiovascular events were considered. Thus, the most robust conclusion from APPROVe is that cardiotoxicity is apparent, and appears early.

140. In addition, the rofecoxib group had a greater proportion of patients with hypertension related and edema-related events, with early separation of the curves. The relative risk of these events was 4.61 with a 95% confidence interval of 1.50 to 18.83. The risk for hypertension was 2.02 (95% confidence interval 1.71 to 2.38) and for edema was 1.57 (1.17 to 2.10). In 1998, one of the fears voiced by the Merck Scientific Advisory Panel was that Cox-2 inhibitors could accelerate atherosclerosis. This would occur by fostering the development of lipid rich plaque or the destabilization of the plaque's fibrous cap. In 2004, Dr. FitzGerald wrote an article entitled "Coxibs and Cardiovascular Disease" [18]. On page 1711 of that manuscript, he stated. "Patients in the APPROVe study should continue to be followed. This will allow some estimate of how quickly the developed risk may dissipate. Give the relatively short half-lives of these compounds, such a dissipation may occur rapidly. On the other hand, if treatment has accelerated atherosclerosis the offset of risk may be more gradual." Dr. FitzGerald stated an a priori hypothesis, recognizing that the continued follow-up of the APPROVe patients would answer the salient question he posed.

141. An initial evaluation of the follow-up analysis that Dr. FitzGerald called for became available in 2006. The follow-up analysis of the APPROVe data provided by Merck demonstrated that when patients were followed for approximately one year after the conclusion of the blinded component, the increased risk of serious cardiovascular adverse events persisted. Table E1 and E2 of the APPROVe follow-up reveals that when followed through Week 210, the relative risk of fatal/nonfatal myocardial infarction was

2.22 (95% CI 0.67-7.36) demonstrating excessive hazard associated with rofecoxib. When the censoring date was October 31, 2005, the relative risk of fatal/nonfatal myocardial infarction was 2.04 (95% CI 0.75 – 5.52).

142. This observation of prolonged elevated risk clearly answers the prospective question raised by Dr. FitzGerald and persuasively confirms the fears of the 1998 Merck Scientific Advisory Panel. Specifically, the elevated risk of cardiovascular disease seen in the AP-PROVe follow-up more likely than not stands for the proposition that rofecoxib accelerates atherosclerosis.

143. The follow-up analysis of the APPROVe data demonstrated that when patients were followed for approximately one year after the conclusion of the blinded component, the increased risk of serious cardiovascular adverse events persisted. Table E1 and E2 of the APPROVe follow-up report reveals that when followed through Week 210, the relative risk of fatal/nonfatal myocardial infarction was 2.22 (95% CI 0.67-7.36) demonstrating excessive hazard associated with rofecoxib. When the censoring date was October 31, 2005, the relative risk of fatal/nonfatal myocardial infarction was 2.04 (95% CI 0.75 – 5.52). This prolonged elevated risk might be explained by the findings of the Merck Scientific Advisory Board, which stated that COX-2 inhibitors could produce increased thrombosis, as well as accelerated atherogenesis. This, in combination with the blood pressure elevation associated with rofecoxib could explain the prolonged increased risk of fatal/nonfatal myocardial infarction. .

144. Epidemiologic studies are not the most persuasive evidence; however they do help to extend the context in which the effect of the study can be anticipated. Several observational studies were carried out to examine the effect of COX -2 inhibitor therapy on the occur-

rence of cardiovascular disease. It is difficult to draw firm conclusions from epidemi-
ologic studies in many circumstances because 1) the inability to select patient exposure
confuses the effect of the exposure with the reasons patients exposed themselves, 2) the
requirement that many epidemiologic studies reason backward from disease to exposure,
rather than reason forward from exposure to disease weakens their conclusion, and 3) the
occurrence of well established biased e.g., ascertainment bias. Epidemiologic studies are
the most useful when they measure a signal of effect (e.g., with an odds ratio) of the
value of 3.0 or greater.

145. Solomon [19] carried out an observational study utilizing the Medicare beneficiaries who
received prescription medications through the Pennsylvania Pharmaceutical Assistance
Contract for the Elderly or the New Jersey Pharmaceutical Association Program for the
Aged and Disabled during 1998, 1999, and 2000. Patients with a life threatening illness
such as HIV/AIDS, malignance, or coagulopathy were excluded, as were patients with an
AMI that was not the principal discharge diagnosis.

146. Cases were defined as acute myocardial infarction (AMI) if this diagnosis was listed as
one of the first three top diagnoses in a hospitalization that was between three days and
180 days. To increase the stability of the estimate of cardiac events in the control group,
four control patients were matched to each case. Date of hospitalization was the index
date for each case. Controls had to have the same (or nearly the same) age, and have the
same gender and month of the index date as the case to which they were matched.

147. Once cases and controls were identified, their antecedent exposure to COX-2 inhibitor
therapy was ascertained.  Exposure was based on celecoxib or rofecoxib on the index
date. Dose and duration categories were defined for each exposure. Covariates were

demographic and morbidity measures. Mean age of all patients was over eighty years. Thus, any findings of this study face difficulty in generalizing to younger cohorts. In addition, even after matching, patients in the COX-2 inhibitor groups older than the control cohort, an effect who potential for effect size perturbation can be modulated through statistical adjustment.

148. Rofecoxib had slightly greater risk 1.14 (95% CI:1.00-1.31) when referent group was no current use. Patients in the rofecoxib group were more likely to have an MI when compared to celecoxib 1.24 (1.05-1.46, p.=0.011). In addition, rofecoxib > 25 mg was associated with higher adjusted relative risk to AMI then rofecoxib < 25 mg (1.70, 95% CI 1.07-2.71). Risk was elevated during the first 90 days of exposure, but not thereafter. This is directionally the reverse of the finding in the APPROVe study, and is most likely attributable to the random aggregation of patients within subgroups and therefore should hold no real persuasive power. The deleterious cardiovascular effects of COX-2 inhibition are most likely seen for the duration of therapy.

149. Overall, the Solomon study confirms the concept that the Cox-2 inhibitor rofecoxib is cardiotoxic.

150. Three additional retrospective studies have been carried out that examine the relationship between rofecoxib and cardiovascular events. Baneworth [20] reported on the safety profile of patients included in an open-label study conducted to evaluate the influence of non-pharmacological interventions on the outcomes of osteoarthritis in patients receiving rofecoxib. However, the authors acknowledge the highly selective nature of the cohort with its limited definition of cardiovascular risk, the absence of a control group, and the difficulties of comparing incidence rates of studies with different designs.

151. A second retrospective analysis examined investigator-reported cardiovascular adverse event data held within the osteoarthritis safety database. This was collected from several pre-marketing randomized controlled trials assessing the efficacy of rofecoxib [21]. However, the authors themselves acknowledge that the combined sample size of each treatment group, together with the low number of serious thromboembolic events reduces any illumination this study might shine on the exposure-disease relationship of interest. This is the classic underpowered environment, which forces us to discount the findings of no relationship between COX-2 inhibitor use and cardio-embolic disease in this study. Its null findings are merely uninformative.

152. The third evaluation also investigated this topic, but assessed thromboembolic events across 23 randomized controlled trials in over 28,000 patients with any of osteoarthritis, rheumatoid arthritis, Alzheimer's disease, or chronic back pain. The researchers concluded that the risk of a cardiovascular thromboembolic events was similar between rofecoxib and placebo cohorts and the non-naproxen NSIAD groups, but were significantly higher when compared to the naproxen cohort. They argue that these results support the cardioprotective effect of naproxen.

153. This cohort, completed in September 2000 has been followed and a resulting manuscript appeared describing the publication of the additional adjudicated data by Weil et. al. [22]. The pooled analyses when repeated with the new data were unchanged.

154. Population based pharmacoepidemiologic studies aim to identify and quantify adverse events from the treatment experiences of the population and examine that population for characteristic features in order to learn and inform from these experiences. Such studies usually include far more patients than randomized controlled trials, but suffer from bias

and confounding. They do not alter with the prescribing practice of the physician, nor do they require strict inclusion and exclusion criteria. Therefore they are more representative of the experience of the population. They may contribute useful information about the possible relationship between any NSAID use and the risk of TE events in patients with concurrent medical problems and or using concomitant medication.

155. The strongest evidence for a relationship between cardiovascular thromboembolic events and COX-2 inhibitor therapy comes from Ray[23]. The conclusion was that high-dose (> 25 mg rofecoxib) could be associated with an increased risk of serious CHD, whereas rofecoxib <25 mg, celecoxib, naproxen, and ibuprofen were not. However, in contrast to the randomized controlled trials presented earlier, this study did not examine all serious cardiovascular thromboembolic events or report on the proportion of patients who were prescribed aspirin use

156. Another epidemiologic study that assessed the role of Cox-2 inhibitors and cardiovascular events was the study by David Grahram. A nested case-control study was conducted at the Kaiser-Permanente clinic system in California. Appropriate covariate control was exerted, and the analysis was proper. The study demonstrated that rofecoxib increases the risk of acute myocardial infarction and sudden cardiac death above patients taking Celecoxib. The overall increase in risk was 1.59 (95% confidence interval 1.10 − 2.32, $p$ = 0.015). The risk was greater for high dose rofecoxib (3.58 fold increase) then lower dose (1.47 fold increase) when compared to celecoxib use. In addition, this study failed to reveal any cardio-protective effect of naproxen.

157. Another observational studied was conduced using administrative healthcare data from Canada [24]. The authors determined that no significant difference was observed in acute