Lemuel A. Moye, M.D.

Page 1

```
 1        UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF LOUISIANA
 2
     IN RE: VIOXX            :  MDL DOCKET NO.
 3   LITIGATION PRODUCTS     :  1657
     LIABILITY LITIGATION    :  SECTION L
 4                           :
     This document relates:     JUDGE FALLON
 5   To                      :
     GERALD BARNETT AND      :  MAGISTRATE JUDGE
 6   CORRINE BARNETT         :  KNOWLES
             V.              :
 7   MERCK & CO., INC.       :
                             :
 8   Civil Action No.        :
     2:06cv485               :
 9                  -  -  -

10               June 2, 2006

11                  -  -  -

12        Oral deposition of LEMUEL A. MOYE,

13   M.D., Ph.D., held in the offices of

14   Abraham, Watkins, Nichols, Sorrels,

15   Matthew & Friend, 800 Commerce, Houston,

16   Texas, commencing at 9:30 a.m., on the

17   above date, before Linda L. Golkow, a

18   Federally-Approved Registered Diplomate

19   Reporter and Certified Shorthand

20   Reporter.
                    -  -  -
21        GOLKOW LITIGATION TECHNOLOGIES
                Four Penn Center
22       1600 John F. Kennedy Boulevard
                  Suite 1210
23       Philadelphia, Pennsylvania 19103
                  877.DEPS.USA
24
```

Lemuel A. Moye, M.D.

Page 2

1  APPEARANCES:
2
3     BEASLEY, ALLEN, CROW, METHVIN,
      PORTIS & MILES
4     BY: J. PAUL SIZEMORE, ESQUIRE
      218 Commerce Street
5     Montgomery, Alabama 36103-4160
      (334) 269-2343
6     Counsel for Plaintiffs
7
8     SNAPKA TURMAN & WATERHOUSE
      BY: KATHRYN A. SNAPKA, ESQUIRE
9         and
          RICK WATERHOUSE, JR., ESQUIRE
10    Suite 1511 - 606 North Carancahua
      Corpus Christi, Texas 78476
11    (361) 888-7676
      rwaterhouse@snapkaturman.com
12    Counsel for Plaintiffs
13
14    BLIZZARD MCCARTHY & NABERS
      BY: EDWARD BLIZZARD, ESQUIRE
15    440 Louisiana - Suite 1710
      Houston, Texas 77024
16    (713) 844-3750
      Counsel for MDL Plaintiffs
17    Steering Committee
18
19
      FIBICH HAMPTON LEEBRON & GARTH,
20    LLP
      BY: TOMMY FIBICH, ESQUIRE
21    Suite 1800, Five Houston Center
      1401 McKinney Street
22    Houston, Texas 77010-9998
      (713) 751-0025
23    Counsel for Plaintiffs
24         - - -

Page 3

1  APPEARANCES: (CONTINUED)
2
3     WATTS LAW FIRM
      BY: T. CHRISTOPHER PINEDO, ESQ.
4     14th Floor, Tower II Building
      555 North Carancahua Street
5     Corpus Christi, Texas 78478
      (361) 887-0500
6      epinedo@wattslawfirm.com
      Counsel for Plaintiffs
7
8     O'QUINN LAW FIRM
      BY: JENNIFER J.J. LEACH, ESQUIRE
9     2300 Lyric Centre Building
      440 Louisiana
10    Houston, Texas 77002
      (713) 223-1000
11    Counsel for Plaintiffs
12
      WILLIAMS BAILEY
13    BY: AMY M. CARTER, ESQUIRE
      Suite 600
14    8441 Gulf Freeway
      Houston, Texas 77017
15    Counsel for Plaintiffs
16
17    JOSEPH D. PIORKOWSKI, JR., ESQUIRE
      Suite 800
18    910 17th Street, N.W.
      Washington, DC 20006
19    (202) 223-5535
      jpiorkowski@lawdoc1.com
20    Counsel for Merck & Co., Inc.
21
22          - - -
23
24

Page 4

1  APPEARANCES: (CONTINUED)
2
3     FULBRIGHT & JAWORSKI LLP
      BY: DAVID WALLACE, ESQUIRE
4     Suite 2800 - 2200 Ross Avenue
      Dallas, Texas 75201
5     (214) 855-8184
      dawallace@fulbright.com
6     Counsel for Merck & Company, Inc.
7
8     BAKER BOTTS LLP
      BY: RICHARD L. JOSEPHSON, ESQUIRE
9     One Shell Plaza
      910 Louisiana Street
10    Houston, Texas 77002
      (713) 229-1460
11    richard.josephson@bakerbotts.com
      Counsel for Merck & Co., Inc.
12
13
      BARTLIT BECK HERMAN
14    BY: SHAYNA COOK, ESQUIRE
      Courthouse Place
15    54 West Hubbard Street
      Chicago, Illinois 60610
16    (312) 494-4451
      Counsel for Merck & Co., Inc.
17
18
      CRUSE, SCOTT, HENDERSON & ALLEN,
19    LLP
      BY: PEGI S. BLOCK, ESQUIRE
20        and
          VICTORIA A. FILIPPOV, ESQUIRE
21    7th Floor - 2777 Allen Parkway
      Houston, Texas 77019-2133
22    (713) 650-6600
      Counsel for Texas physicians
23
24         - - -

Page 5

1           - - -
2           I N D E X
3  WITNESS                        PAGE NO.
4  LEMUEL A. MOYE, M.D., Ph.D.
5
6     By Mr. Piorkowski          10
7     By Mr. Wacker              392
8
9           - - -
10          E X H I B I T S
11
   NO.        DESCRIPTION        PAGE NO.
12
13 Moye MDL 1    "COX-2 Inhibitor      38
                 Report of Lemuel A.
14               Moye, M.D., Ph.D."
                 5-22-06
15               (110 pages)
16
   Moye MDL 2    "Documents Reviewed   71
17               by Dr. Lemuel A.
                 Moye"
18               (88 pages)
19
   Moye MDL 3    Curriculum Vitae of  136
20               Lemuel A. Moye,
                 M.D., Ph.D.
21               (22 pages)
22
   Moye MDL 4    "Testimony of        224
23               Lemuel A. Moye, MD,
                 PhD"
24               (2 pages)

Golkow Litigation Technologies - 1.877.DEPS.USA

Lemuel A. Moye, M.D.

Page 6

| | | |
|---|---|---|
| Moye MDL 5 | Invoices (9 pages) | 211 |
| Moye MDL 6 | "Scientific Advisors' Meeting May 3-May 6, 1998 Programmatic Review Vioxx Program" MRK-AEI0002734 - MRK-AEI0002746 | 228 |
| Moye MDL 7 | "Final Results of an Analysis of the Incidence of Cardiovascular SAEs in the Phase IIb/III Vioxx Osteoarthritis Clinical Trials" 2-2-98 (Watson) MRK-AAD0046029 - MRK-AAD0046052 | 267 |
| Moye MDL 8 | Vioxx May 1999 Label MRK-LBL0000027 - MRK-LBL0000030 | 317 |
| Moye MDL 9 | Memo 4-6-05 "Analysis and recommendations for Agency action regarding nonsteroidal and anti-inflammatory drugs and cardiovascular risk" (19 pages) | 360 |

Page 7

DEPOSITION SUPPORT INDEX

Direction to Witness Not To Answer
Page Line  Page Line
(None)

Request For Production of Documents
Page Line  Page Line
(None)

Stipulations
Page Line  Page Line
(None)

Questions Marked
Page Line  Page Line
(None)

Page 8

- - -
MR. PIORKOWSKI: Is anybody here who is in New Jersey?
MR. SIZEMORE: I don't think so. Nobody in New Jersey is here.
MR. PIORKOWSKI: Let me just state that we received a cross notice of this deposition for the New Jersey litigation. A letter was filed on behalf of Merck with Judge Higbee objecting to that. Apparently there's no counsel from New Jersey here present. It's my understanding that Dr. Moye has not been designated as an expert at this time in any New Jersey case.
Paul, any other preliminary stuff we need to talk about as far as --
MR. SIZEMORE: I can't think of anything.
MR. JOSEPHSON: Let me just say this on the record. Richard

Page 9

Josephson for Merck in the State of Texas MDL.
Because of a hearing we had a few days ago which Paul is familiar with, I did not originally intend to be here since it was a California case. That's the position I took. The judge has recognized some of the cross notices from Texas that were filed in this case, and, therefore, I'm here representing Merck in this case. So, to the extent that I feel the need to use our objection form or objection responsiveness, and Mr. Piorkowski doesn't make that connection, then you may hear me make that objection. I don't want to disrupt the proceedings because I, frankly, didn't want to be here.
MR. SIZEMORE: That's fair. I won't pitch a fit like everyone else has done.

Lemuel A. Moye, M.D.
Page 10

```
 1        MR. PIORKOWSKI:  Anything
 2   else preliminary?
 3        (No response.)
 4            - - -
 5        LEMUEL A. MOYE, M.D., Ph.D.,
 6   after having been duly sworn, was
 7   examined and testified as follows:
 8            - - -
 9            EXAMINATION
10            - - -
11   BY MR. PIORKOWSKI:
12        Q.   Would you state your full
13   name, Doctor.
14        A.   Sure.  Lemuel, L-E-M-U-E-L,
15   Moye, M-O-Y-E.
16        Q.   How are you today, sir?
17        A.   I'm doing fine.  How are
18   you?
19        Q.   Are you prepared to give
20   your deposition?  This is the first Vioxx
21   case in which you've been deposed; is
22   that right?
23        A.   That's right, yes.
24        Q.   You've been deposed a number
```

Page 11

```
 1   of times in other matters, true?
 2        A.   Yes, I have.
 3        Q.   Okay.
 4             Let's just talk real briefly
 5   about the ground rules.  I'm going to ask
 6   a series of questions.  If you don't
 7   understand my question, will you ask me
 8   to rephrase it?
 9        A.   Yes.  I understand that.
10        Q.   If you go ahead and answer
11   the question, I'll assume you understood
12   it.
13             Is that fair?
14        A.   Yes.
15        Q.   If you need a break at any
16   time, just let us know, and we can
17   accommodate you.
18             All right?
19        A.   Okay.
20        Q.   As far as objections, there
21   may be objections by counsel at any point
22   in time to a question.  In the event of
23   an objection, you understand you proceed
24   to answer the question?
```

Page 12

```
 1        A.   Yes.
 2        Q.   I may from time to time
 3   object to your answer or part of your
 4   answer as nonresponsive if I feel like
 5   you're not answering my question.
 6             Do you understand that?
 7        A.   I do.
 8        Q.   That's not intended to be a
 9   show of disrespect to you.  It's just
10   something we're doing to preserve the
11   record.
12        A.   I appreciate that.
13        Q.   Do you understand?
14        A.   Yes.
15        Q.   Can you tell us first how
16   did you get involved in the Vioxx
17   litigation?
18        A.   I have worked with -- well,
19   a couple things.  Number one, I have been
20   following, as most physicians have, I
21   think, the whole development of concerns
22   involving Vioxx and had been asked to
23   consider being part of this litigation
24   process actually by both plaintiffs and
```

Page 13

```
 1   defendants and gave it careful
 2   consideration, began to review the
 3   literature.  Again, this was now, just to
 4   put a time frame on this, this was in
 5   maybe 2005, and have been reviewing
 6   literature during this time.  And had
 7   finally been decided that my beliefs
 8   served the plaintiffs and offered myself
 9   as an expert witness, available expert
10   witness for plaintiffs.
11        Q.   Who was the first person to
12   contact you to ask you to be an expert
13   witness on behalf of the plaintiffs?
14        A.   I think it was through
15   Scientific Evidence.  I'm a consultant
16   for that company.
17        Q.   Is that still run by Dr.
18   Jean Hoepfel?
19        A.   It is, yes.
20        Q.   Is Dr. Hoepfel the person
21   that called you?
22        A.   Yes.
23        Q.   Who is the first lawyer
24   representing a plaintiff that you talked
```

Lemuel A. Moye, M.D.

Page 14

```
 1  to in connection with the litigation?
 2      A.  I don't remember.
 3      Q.  You said that you were asked
 4  by defendants to become involved in the
 5  litigation.  Is that what I heard you
 6  say?
 7      A.  Yes.
 8      Q.  What defense lawyer asked
 9  you to become involved in the litigation?
10      A.  It's -- I don't know.  I got
11  a phone call at the University from a
12  group of lawyers who represented the
13  defendants and asked me to consider
14  working on Vioxx.  I told them that I
15  would, that I hadn't made my mind up and
16  let it go at that.  They never called
17  back.  Never any followup conversation.
18      Q.  Do you have the name of the
19  lawyer?
20      A.  I don't.
21      Q.  Did you ever meet with that
22  lawyer?
23      A.  No, sir.
24      Q.  Was there ever a phone call
```

Page 15

```
 1  following up that conversation after that
 2  phone call with that lawyer?
 3      A.  No.
 4      Q.  Do you know whether that
 5  lawyer was based in Texas?
 6      A.  I don't remember.
 7      Q.  Was it a male or a female?
 8      A.  Male, I believe.
 9      Q.  Do you remember any other
10  identifying information about that
11  lawyer?
12      A.  No.
13      Q.  When was that phone call?
14      A.  Maybe late 2004, early 2005.
15      Q.  Is that the only contact you
16  had where an attorney asked you to become
17  involved on behalf of Merck?
18      A.  Yes.
19      Q.  Who's the first attorney you
20  met who represented the plaintiff in this
21  case?
22      A.  I don't know.  That is to
23  say, let me answer this way.  I don't
24  think I met with a single attorney.  I
```

Page 16

```
 1  think I met with a group of attorneys.
 2      Q.  Let me back up a minute.
 3  And I apologize.  I'm working off of your
 4  -- we've been provided for the record
 5  with, what is it, 14 disks?
 6          MS. COOK:  12.  Yes, 14.
 7  BY MR. PIORKOWSKI:
 8      Q.  There's a total of 14 disks,
 9  I believe, by Mr. Sizemore.  One of them
10  is entitled Vioxx billing, I think, which
11  I'm assuming that contains your billing
12  records to date?
13      A.  Yes, sir.
14      Q.  Is that your understanding?
15      A.  Yes, it is.
16      Q.  Then there are 12 disks that
17  are marked as "Vioxx documents reviewed
18  by Dr. Moye" 1 through 12 of 12?
19      A.  Yes.
20      Q.  Right?  And then there's
21  another independent disk that's entitled
22  "Vioxx documents reviewed by Dr. Moye
23  ,"right?
24      A.  Yes.
```

Page 17

```
 1      Q.  We'll come back to what
 2  those are in a moment.  I apologize, I
 3  don't have this in hard copy.  I'm just
 4  getting it off the disk.
 5          Am I correct that your
 6  records reflect that the first time you
 7  billed any time on Vioxx was in February
 8  of 2005?
 9      A.  I believe that's right, yes.
10      Q.  If your records reflect it
11  was February 26, 2005, is that consistent
12  with your recollection?
13      A.  If that's in the record,
14  then I'm willing to stand by that, yes.
15      Q.  And there's a meeting with
16  the lawyers that appears to be on March
17  4th of 2005?
18      A.  Then I accept that, yes.
19      Q.  Now, to come back to what
20  you said, you said you first met with
21  lawyers, that was your first contact with
22  several lawyers?
23      A.  Yes.
24      Q.  Where was that meeting?
```

5 (Pages 14 to 17)

Lemuel A. Moye, M.D.

Page 18

1  A. I don't remember.
2  Q. Was it in Texas?
3  A. Yes, it was.
4  Q. Do you know if it was in
5  Houston?
6  A. I'm sorry. It was in
7  Houston, Texas. I don't know what
8  office.
9  Q. Some law office in Houston,
10 Texas?
11 A. Yes.
12 Q. Who attended the meeting?
13 A. I don't remember.
14 Q. Can you remember anybody who
15 attended the meeting?
16 A. No.
17 Q. Are any of the attorneys who
18 are present in the room today in
19 attendance at the meeting?
20 A. I've had subsequent meetings
21 in which they've been in attendance. I
22 don't remember who was at the -- in
23 attendance at the March 4 meeting.
24 Q. At the original meeting. Do

Page 19

1  you know whether that would be contained
2  in your documents anywhere?
3  A. I don't think so.
4  Q. Do you know what law firm
5  the lawyers were with who originally
6  represented you?
7  A. No. At this meeting, no, I
8  don't.
9  Q. How long was the meeting on
10 March 4?
11 A. That's going to be in the
12 record. I would imagine it was no more
13 than two hours, but that would be in the
14 billing record.
15 Q. And can you tell me what
16 happened at the meeting?
17 A. I don't have any particular
18 recollection of it. I believe it was
19 just about the developing litigation and
20 my willingness to participate in this.
21 Q. Had it been decided before
22 you attended the meeting that you would
23 serve as an expert on behalf of
24 plaintiffs, or was that the purpose of

Page 20

1  the meeting, to kind of get acquainted?
2  A. I think the purpose of the
3  meeting was to let me know that they were
4  interested in moving forward and would be
5  interested in my participation. At that
6  point I guess I wasn't sufficiently
7  informed about the facts of the case to
8  provide an assertion one way or the
9  other. But I believe I did say that I
10 would begin an investigation.
11 Q. Now, at the time that you
12 say you weren't sufficiently informed
13 about the facts of the case, what had you
14 looked at at that point in time? Prior
15 to the meeting I'm talking about.
16 A. I don't remember. Let me
17 answer this way. In the capacity as a
18 physician and a public health worker, I
19 was aware there were several manuscripts
20 out, several controversial manuscripts
21 out that were examining the relationship
22 between Vioxx and serious adverse events,
23 and I had looked at those.
24 Q. And by "manuscripts," are

Page 21

1  you referring to articles in the
2  published medical literature?
3  A. Yes.
4  Q. Had you looked at anything
5  else other than articles in the published
6  medical literature at that point?
7  A. I don't believe so, no.
8  Q. Had you attended the 2005
9  Advisory Committee meeting?
10 A. No.
11 Q. Had you read newspaper
12 accounts of what was going on in the
13 Vioxx litigation?
14 A. Well, I have to say yes, I
15 think I did. I mean, I read the
16 newspaper, and certainly Vioxx was in the
17 newspapers. I will say about the
18 Advisory Committee meeting, I was not in
19 attendance, but a good portion of it --
20 well, a portion of it was actually
21 televised on C-Span. And I did watch
22 that. Also there were, of course, other
23 hearings that were also televised that I
24 watched as well.

Lemuel A. Moye, M.D.

Page 22

1  Q. What else did you watch?
2  A. David Graham's testimony,
3  Dr. Gilmartin's testimony. I recall
4  those. They may have been before a
5  Congressional committee. I don't
6  remember the exact forum.
7  Q. So, you watched David Graham
8  and Dr. Gilmartin's testimony on C-Span?
9  A. Yes.
10    MR. SIZEMORE: Object to
11   form.
12    THE WITNESS: Yes, I did. I
13   didn't mean to cut you off. Yes,
14   I did.
15 BY MR. PIORKOWSKI:
16  Q. Anything else you remember
17 having reviewed prior to the initial
18 meeting on March 4th?
19  A. As I sit here now, no.
20  Q. During this meeting, did the
21 lawyers who were in attendance present
22 what they thought the facts of the case
23 showed to you?
24  A. I don't remember in detail.

Page 23

1 I think probably just the broad strokes
2 and nothing that anybody who was
3 conversant with the information that was
4 available in the public domain wouldn't
5 already know.
6  Q. Were you shown specific
7 documents at that meeting?
8  A. I don't think so. I don't
9 remember.
10  Q. Was there anyone who was not
11 a lawyer in attendance at the meeting?
12  A. I think there was probably a
13 representative from Scientific Evidence
14 at the meeting, but I don't remember.
15  Q. Do you know who that was?
16  A. No, I don't remember.
17  Q. Do you know if it was Dr.
18 Hoepfel?
19  A. I don't remember.
20  Q. Who else works with you from
21 Scientific Evidence besides Dr. Hoepfel?
22  A. Well, the only support
23 Scientific Evidence provides to me is
24 logistical support. So, they collect

Page 24

1 information for me. And they will
2 collect information on CDs, for example,
3 and prepare the CDs that we have today.
4 But to answer your question, April
5 Thompson has been my chief contact person
6 at Scientific Evidence, and her role for
7 me has been administrative.
8  Q. Did you say before when we
9 were off the record that Dr. Hoepfel is
10 on some sort of a sabbatical?
11  A. Well, I know she's traveling
12 a lot.
13  Q. But in terms of this
14 litigation -- let me back up.
15    You've worked with Dr.
16 Hoepfel on other litigations, right?
17  A. Yes.
18  Q. In this litigation, have you
19 worked with her?
20  A. No.
21  Q. Is there anybody else at
22 Scientific Evidence besides April
23 Thompson with whom you've worked?
24  A. No.

Page 25

1  Q. So, if anyone attended the
2 meeting, it most likely would have been
3 April Thompson?
4  A. I think so, yes.
5  Q. How was it left at the end
6 of the meeting on March 4th?
7  A. I think I left it open, that
8 I had no real opinions about Vioxx or
9 Merck's conduct one way or the other and
10 that I would begin to look into it.
11  Q. What was the plan for you to
12 begin to look into it?
13  A. As time would allow. I
14 mean, I really didn't put a time schedule
15 on it, but as time would allow, I would
16 begin to evaluate the information that
17 was available to me in the public domain.
18  Q. Did you agree at that time
19 to serve as an expert, or did you just
20 agree at that time to review the
21 material?
22  A. I think I agreed only to
23 review the material.
24  Q. When did you agree to serve

Lemuel A. Moye, M.D.

Page 26

1  as an expert witness?
2      A.   That was much later, but I
3  don't have a particular date in mind
4  where I say that I agreed to be an expert
5  witness for Vioxx.
6      Q.   It would have certainly been
7  before the 22nd of May?
8      A.   22nd of May, 2006.
9      Q.   Right.
10     A.   Yes.
11     Q.   That's when you signed your
12 report?
13     A.   That's correct.  Yes.
14     Q.   Do you know whether it was
15 within a month or two of the meeting?
16     A.   Maybe closer to earlier this
17 year.
18     Q.   Early 2006?
19     A.   Early 2006, yes.
20     Q.   When you agreed to serve as
21 an expert, did you agree to serve as an
22 expert for certain attorneys, or did you
23 agree to serve as an expert for anybody
24 who wanted to hire you?

Page 27

1      A.   Let me back up for one
2  second.  Let me amend my answer.
3           I believe I signed an
4  agreement with Scientific Evidence in the
5  fall of '05 to serve as an expert.  I
6  don't have the date specifically in mind,
7  but I think it was a few months earlier
8  than I earlier testified today.
9      Q.   Would a copy of that signed
10 agreement be included on the disks that
11 are provided?
12     A.   I don't know.
13     Q.   Are you in possession of a
14 copy of the agreement?
15     A.   I should say this.  I should
16 be.  I don't know if I have it or not.
17         MR. PIORKOWSKI:  Paul, we
18     would like to receive it if it's
19     not on the CD if that's agreeable.
20         MR. SIZEMORE:  Okay.
21 BY MR. PIORKOWSKI:
22     Q.   Okay.
23          Can you tell me what's the
24 first lawyer who you can remember having

Page 28

1  had a contact with?
2      A.   I think it would have
3  been -- again, I can't be specifically
4  sure whether this is the first attorney,
5  but I certainly met with Dave Matthews
6  several times this year.
7      Q.   Who is here at this firm
8  where we're taking the deposition?
9      A.   Yes.
10     Q.   All right.
11          Any other lawyers who you
12 specifically remember meeting with
13 multiple times?
14     A.   Oh, sure.  Ted, Tom
15 Sizemore.
16     Q.   Let's just use full names
17 just since we're on the record.
18         MR. SIZEMORE:  Paul
19     Sizemore.
20         THE WITNESS: Thanks.  Paul
21     Sizemore.
22         MR. SIZEMORE:  I've been
23     called worse.  Thanks.
24         MR. WACKER:  Ted Wacker.

Page 29

1  BY MR. PIORKOWSKI:
2      Q.   Anybody else?
3      A.   Tommy Fibich.  I had
4  conversations with Mark Robinson.
5  Conversation with Ed Blizzard.  That's
6  all I remember now.
7      Q.   Have you had any contact
8  with Chris Seeger or Dave Buchanan?
9      A.   If I did, I don't remember.
10     Q.   Have you had any contact
11 with Mark Lanier?
12     A.   I don't remember.
13     Q.   Do you know as you sit here
14 today whether you've had contact with
15 anybody who represents plaintiffs in New
16 Jersey?
17     A.   Back up a minute.  I know
18 who Mark Lanier is.  I have had no
19 contact with him.  I just realized that.
20     Q.   All right.  Thanks for the
21 clarification.
22     A.   I'm sorry.  Go ahead.
23     Q.   Have you agreed to be
24 retained by any lawyers who you know to

Lemuel A. Moye, M.D.

Page 30

1  be representing plaintiffs who have cases
2  pending in New Jersey?
3      A.  To my knowledge, no.
4      Q.  Is the list that you just
5  gave me the list of all of the lawyers by
6  whom you've been retained to date to the
7  best of your knowledge?
8      A.  I would say I think so. I
9  don't know, but I think so.
10     Q.  Any other lawyers that we
11 didn't mention by whom you believe you've
12 been retained?
13     A.  I don't remember any. If I
14 do during the proceedings, I will
15 certainly mention them.
16     Q.  How about Tommy Pirtle?
17     A.  I don't think so. No, not
18 for Vioxx, no.
19     Q.  Tommy Jackson?
20     A.  The name doesn't ring a
21 bell.
22     Q.  Okay.
23         Have you agreed to testify
24 in California as an expert witness?

Page 31

1      A.  I have.
2      Q.  Have you set aside a date to
3  go out there?
4      A.  What month is it?
5          MR. SIZEMORE: Trial?
6          THE WITNESS: Yes.
7          MR. SIZEMORE: In June.
8          THE WITNESS: Then I have.
9  BY MR. PIORKOWSKI:
10     Q.  Have you agreed to testify
11 in the MDL trial that's pending in New
12 Orleans in July?
13     A.  Yes.
14     Q.  Are there any other specific
15 trials that you've agreed to testify in?
16     A.  I guess I don't know how to
17 answer that.
18     Q.  Let me reword it. That's a
19 bad question.
20         I understand that you've
21 been retained in a number of cases by the
22 lawyers we already reviewed. Apart from
23 the California case and the MDL, which
24 are the cases we're primarily here taking

Page 32

1  this deposition in today, are there any
2  other cases where you have a date on your
3  calendar blocked off to go to trial and
4  testify?
5      A.  No.
6      Q.  How do you track your time
7  for purposes of expert witness work?
8      A.  I track it on -- each day I
9  track it, and I log the number of hours I
10 work and to whom it's billed and the
11 amount.
12     Q.  And do you do that on
13 computer, do you do it by hand, how do
14 you do it?
15     A.  I do it by computer.
16     Q.  Okay.
17         Is it on a computer software
18 program or how do you keep track?
19     A.  I can generate reports from
20 it using a software program.
21     Q.  To whom is your time billed?
22 Is there one primary lawyer that you bill
23 your time to for purposes of Vioxx, or is
24 it split between a number of different

Page 33

1  lawyers?
2      A.  I can answer the first part
3  of your question. I think I bill it to
4  something called Vioxx group or group
5  Vioxx.
6      Q.  Group Vioxx?
7      A.  Yes.
8      Q.  Do you know who the bill is
9  actually sent to?
10     A.  I do not.
11     Q.  Your billing is not done
12 through Scientific Evidence?
13     A.  It is. I send my bill to
14 Scientific Evidence. I don't know what
15 they do after that.
16     Q.  Okay.
17         But all of your Vioxx
18 matters have been on general Vioxx
19 matters as opposed to individual
20 plaintiff-specific things?
21         MR. SIZEMORE: Object to
22     form.
23         MR. PIORKOWSKI: Let me
24     rephrase it.

Lemuel A. Moye, M.D.

Page 34

1  BY MR. PIORKOWSKI:
2      Q.   Apart from group Vioxx work,
3  have you billed any matters to matters
4  involving individual plaintiffs like the
5  Barnett plaintiff, for example?
6      A.   I have not billed to
7  plaintiffs, no. I think, though, that
8  when I started billing in 2005, I didn't
9  start with group Vioxx. It might have
10 been for particular attorneys.
11     Q.   Is it your understanding
12 that the invoices that we have which are
13 approximately $98,800 represents all of
14 your billing in Vioxx to date?
15     A.   That sounds -- the amount
16 sounds correct. Yes. I don't know how
17 inclusive the dates are.
18     Q.   Okay.
19          You don't know when that
20 would go up through?
21     A.   That's true.
22     Q.   In terms of the month of
23 May, what work have you done since the
24 completion of your MDL report, which was

Page 35

1  dated the 22nd?
2      A.   I've reviewed -- the
3  literature -- the material is voluminous,
4  and reading this material one time just
5  hasn't been sufficient for me. So, I've
6  spent some time reviewing material that I
7  have already read.
8      Q.   Okay.
9          Your rate for billing is how
10 much now?
11     A.   $400 an hour.
12     Q.   For reviewing materials?
13     A.   Yes.
14     Q.   Okay.
15          So, if we were going to
16 figure out how much time you spent, it
17 would be roughly 100,000 divided by 400?
18     A.   Right.
19     Q.   So, what's that, 250 hours?
20     A.   250 hours, right.
21     Q.   Your MDL report does not
22 have any specific opinions about the
23 plaintiff in that case, is that correct?
24     A.   Yes, sir.

Page 36

1      Q.   Do you know anything about
2  the plaintiff in the MDL case?
3      A.   No, sir.
4      Q.   You don't intend to offer
5  any opinions at trial about the plaintiff
6  specifically?
7      A.   I intend to offer no such
8  opinions.
9      Q.   Is the same true with
10 respect to the California cases?
11     A.   Yes, sir.
12     Q.   Is there any case in which
13 you've been designated or filed a
14 report -- let me back up.
15          Other than the MDL report,
16 have you filed any other reports in any
17 other Vioxx cases?
18     A.   No, sir. No, sir.
19     Q.   Are you aware that you were
20 designated in a couple Texas cases as an
21 expert witness?
22     A.   I believe that, yes. I
23 haven't seen the designation, I don't
24 think, but, yes.

Page 37

1      Q.   Are you familiar with what a
2  designation is as opposed to a report?
3      A.   I am.
4      Q.   It's a written description
5  prepared by the attorneys, right?
6          MR. SIZEMORE: Object to
7      form.
8          THE WITNESS: Yes.
9  BY MR. PIORKOWSKI:
10     Q.   That's your understanding?
11     A.   Yes.
12     Q.   Okay.
13          And there were actually two
14 of them prepared in Texas. Do you
15 understand that?
16     A.   Yes.
17     Q.   Did you review those before
18 they were filed?
19     A.   I reviewed several
20 designations in May. I don't remember to
21 which cases they applied.
22     Q.   Is there any case, as we sit
23 here today, as to which you intend to
24 offer an opinion about a specific

Lemuel A. Moye, M.D.

Page 38

1  plaintiff?
2      A.   There is no such case.
3           - - -
4           (Whereupon, Deposition
5  Exhibit Moye MDL 1, "COX-2
6  Inhibitor Report of Lemuel A.
7  Moye, M.D., Ph.D." 5-22-06 (110
8  pages) was marked for
9  identification.)
10          - - -
11 BY MR. PIORKOWSKI:
12     Q.   Doctor, can you identify
13 what I've marked as Exhibit 1?
14     A.   Yes. This is my COX-2
15 inhibitor report.
16     Q.   Okay.
17          COX-2 inhibitors are a class
18 of drugs that include Vioxx and Celebrex,
19 right?
20     A.   Yes, sir.
21     Q.   Have you been retained to
22 offer any opinions regarding Celebrex?
23     A.   I have not.
24     Q.   How was this report

Page 39

1  prepared?
2      A.   I reviewed the material and
3  wrote the report.
4      Q.   Did you dictate it or did
5  you type it yourself?
6      A.   I typed it myself.
7      Q.   Did you have a template from
8  other cases that you were involved with
9  that you used?
10     A.   I had no template, but, of
11 course, I've written expert reports in
12 other litigation. So, I used that
13 experience to write this, but I had no
14 formal template, no formal word
15 processing format to follow.
16     Q.   Okay.
17          Did you use any cut and
18 pastes from old reports in connection
19 with this report?
20     A.   No.
21     Q.   Did you review this report
22 carefully before signing it?
23     A.   I did.
24     Q.   Did you check it for

Page 40

1  accuracy?
2      A.   I did.
3      Q.   Did you check it for errors?
4      A.   As best I could. There's
5  always the grammatical error that gets by
6  me, but yes.
7      Q.   When is the last time you
8  reviewed the report?
9      A.   Earlier this week.
10     Q.   As you sit here today, are
11 there any corrections that need to be
12 made to it?
13     A.   I don't think so, no.
14     Q.   Are there any changes that
15 need to be made to it?
16     A.   No.
17     Q.   Does the report set forth
18 the opinions that you intend to offer at
19 trial in the MDL?
20     A.   I would say this. Based on
21 the review of the information I had done
22 at the time -- I had reviewed up to the
23 time of preparing the report, it does. I
24 am aware that there's always new material

Page 41

1  that's available. And I will read that
2  material as it becomes available. I'm
3  also aware of my obligation to announce
4  that I'm looking at new material.
5      Q.   Fair enough.
6           As you sit here today, are
7  there other opinions -- today is June
8  2nd, is that right?
9      A.   Yes, sir.
10     Q.   And the report was on May
11 22nd?
12     A.   Yes.
13     Q.   Are there any opinions that
14 you've formed since May 22nd that need to
15 be added to your report or that are
16 beyond the scope of what's in your report
17 that you're aware of as you sit here
18 today?
19     A.   No, sir.
20     Q.   Are you waiting for any
21 additional information or documents at
22 this time?
23     A.   I am not waiting for any
24 particular document. However, I am aware

Lemuel A. Moye, M.D.

Page 42

1  that, waiting or not, documents continue
2  to be produced.
3      Q.    But as we sit here today,
4  you've not asked to see certain documents
5  that you're still waiting for
6  specifically?
7      A.    That's true, yes.
8      Q.    You're referring to a
9  situation where something new may be
10 produced in the context of the litigation
11 and be forwarded to you?
12     A.    Yes, sir.
13     Q.    Okay.
14          Do the opinions that are set
15 forth in your report represent your final
16 opinions subject to additional
17 information that may become available?
18     A.    Yes, sir.
19     Q.    When you first became
20 involved in the litigation, how did you
21 approach your review?  What I'm trying to
22 understand is, were you sent certain
23 materials by the plaintiffs, did you ask
24 the plaintiffs to send you certain

Page 43

1  materials, did you start with a medical
2  literature search?  How did the process
3  start?
4      A.    Well, I began by not asking
5  anybody for information, but just
6  gathering information as best I could.
7  There's a voluminous amount of published
8  material that I have access to.  Of
9  course, the third FDA Advisory Committee
10 on Vioxx met in late winter/early spring
11 of 2005, and I reviewed that transcript
12 when it became available, as well as the
13 other transcripts which were already
14 actually available on the FDA site.  So,
15 much of my early review involved material
16 that I was able to get on my own.
17          Just to finish up here.
18 There were manuscripts that were sent to
19 me through Scientific Evidence that --
20 again, by "manuscripts," information that
21 was published in the peer-reviewed
22 literature that supplemented my review.
23     Q.    We'll talk about the details
24 of these Advisory Committee meetings

Page 44

1  later, but you're referring to there were
2  three Advisory Committee meetings that
3  dealt in part or in whole with Vioxx,
4  right?
5      A.    Yes, sir.
6      Q.    One was in 1999, one was in
7  2001, and one was in 2005?
8      A.    Yes, sir.
9      Q.    And you read the full
10 transcripts of each of those meetings?
11     A.    Yes, sir.
12     Q.    Okay.
13          The 2001 meeting was a
14 two-day meeting.  Do you recall that?
15     A.    Yes, sir.
16     Q.    First day was a day that
17 dealt with Celebrex?
18     A.    Yes.
19     Q.    Did you read the day that
20 dealt with Celebrex?
21     A.    I did not.
22     Q.    In terms of the published
23 medical literature, did you do your own
24 literature search, or did you ask

Page 45

1  Scientific Evidence to do a specific
2  literature search for you?
3      A.    No.  I'm sorry.  I did my
4  own literature searches first.
5      Q.    What was your literature
6  search that you did?
7      A.    By that you mean what
8  literature did I read based on that?
9      Q.    What search terms did you
10 use, or how did you go about your search
11 for relevant medical articles?
12     A.    Oh, I don't remember.  I
13 would tell you it was primarily
14 Internet-based search, but I don't
15 remember what search terms I used.
16     Q.    You have in your report at
17 the end on Pages 106 through 110, you
18 have a list of references.  Do you see
19 that?
20     A.    Yes, sir.
21     Q.    Are all of the published
22 medical articles that you've reviewed
23 listed in these references?
24     A.    I hesitate to say that all

Lemuel A. Moye, M.D.

Page 46

1  of them are listed here. I mean, I think
2  all of them would be on the CDs that you
3  have, but I don't want to suggest that
4  every single medical reference, reference
5  in the medical literature that I based my
6  opinion on is listed in the references.
7  I mean, I wish that were the case, but
8  there may have been a couple that got
9  away.
10      Q.   Okay.
11           It's fair to say that while
12  you may have missed one or two, your
13  intent was to list all of the medical
14  articles that you reviewed or that you
15  thought were important in your
16  references?
17      A.   Yes, sir.
18      Q.   And if there's an article
19  that you looked at that's not in the
20  references, it would be on the CDs that
21  we referred to?
22      A.   I would say if there's an
23  article that I looked at and relied upon
24  and incorporated its ideas in any way,

Page 47

1  shape or form in my report, then it
2  should have been listed in the
3  references.
4      Q.   Okay.
5           Now, did you review the
6  investigational new drug application?
7      A.   Yes, sir, I did.
8      Q.   How did you get access to
9  that?
10      A.   Scientific Evidence sent
11  that to me.
12      Q.   Did you review it in its
13  entirety or did you look at certain parts
14  of it?
15      A.   Well, I only looked at
16  certain parts. It is a voluminous
17  document, of course, so, I looked at what
18  I believe were the relevant sections.
19      Q.   What did you believe were
20  the relevant sections at the time you
21  looked at them?
22      A.   The integrated review of
23  efficacy, the integrated review of
24  safety, integrated summary of safety.

Page 48

1      Q.   Are you talking about the
2  IND or the NDA?
3      A.   I'm talking about the NDA.
4      Q.   The NDA?
5      A.   The NDA. I'm sorry. Did
6  you not ask me about that?
7      Q.   I think I said IND, but I
8  shouldn't -- let's back up and start
9  over.
10      A.   Okay.
11      Q.   Did you look at the
12  investigational new drug application?
13      A.   I did not.
14      Q.   You did look at certain
15  sections of the new drug application?
16      A.   I looked at the new drug
17  application. That's right.
18      Q.   The original new drug
19  application?
20      A.   Yes, sir.
21      Q.   When you said you looked at
22  certain sections, the sections you looked
23  at were the integrated summary of
24  efficacy, the integrated summary of

Page 49

1  safety?
2      A.   Yes, sir.
3      Q.   And what else?
4      A.   If there was an overall
5  summary, I looked at that. I also looked
6  at the statistical reviewer's comments.
7  The medical reviewer's comments really
8  were part of, I thought, the ISS and ISE.
9      Q.   So, you did look at the
10  medical officer reviewer's comments?
11      A.   Yes.
12      Q.   But am I understanding you
13  to say you thought her comments were
14  already included in what was presented in
15  the integrated summary of safety?
16      A.   By and large, yes.
17      Q.   Are you familiar with the
18  summary basis of approval?
19      A.   I am.
20      Q.   Was there any summary basis
21  of approval document related to Vioxx?
22      A.   I don't remember.
23      Q.   Did you look at any of the
24  supplemental new drug applications?

13 (Pages 46 to 49)

Lemuel A. Moye, M.D.

Page 50

1  A. Not in their entirety, no.
2  Q. Is there any section of the
3  supplemental new drug applications that
4  you can remember reviewing?
5  A. I reviewed several reviews
6  of supplemental material -- reviews by
7  the FDA of supplemental materials
8  submitted by Merck.
9  Q. Like, for example, the
10 medical officer's review of the
11 supplemental new drug application?
12 A. Yes, sir.
13 Q. That's what you're talking
14 about?
15 A. Yes.
16 Q. Did you review -- you're
17 aware that there was a cardiorenal
18 adviser who looked at information in
19 early 2001 named Shari Targum. Do you
20 recall that?
21 A. Yes.
22 Q. Did you read her review?
23 A. Yes, sir.
24 Q. Anything else that you can

Page 51

1  remember in terms of FDA reviews of the
2  supplemental new drug applications?
3  A. No, sir.
4  Q. Did you look at the periodic
5  safety updates that were submitted by
6  Merck?
7  A. I did not.
8  Q. Did you review any kind of
9  post-marketing analyses that were
10 conducted by FDA?
11 A. Nothing separate and apart
12 from what was provided to Advisory
13 Committees or provided in the --
14 discussed in the supplemental new drug
15 applications.
16 Q. Okay.
17     So, you had available to you
18 essentially the same information that was
19 available to the members of the Advisory
20 Committees in 1999 and 2001 respectively?
21 A. I'm not sure what time frame
22 we're talking about. I actually believe
23 as I sit here now, I've looked at much
24 more information than they've had, but

Page 52

1  maybe I'm not addressing your question.
2  Q. Okay.
3     In terms of FDA materials,
4  in terms of materials that Merck
5  submitted to the FDA or medical officer
6  reviews of the FDA, you looked at the
7  same materials that the Advisory
8  Committee members looked at. Is that
9  your understanding?
10 A. Again, I think I probably
11 looked at much more than the Advisory
12 Committees would have looked at.
13 Q. All right.
14    What other things have you
15 looked at other than what the Advisory
16 Committee looked at?
17 A. Wait.
18    MR. SIZEMORE: Can you
19 specify which one, Joe?
20    MR. PIORKOWSKI: Yes.
21 BY MR. PIORKOWSKI:
22 Q. Let's back up a minute.
23    Let's start with the 1999
24 Advisory Committee. What materials do

Page 53

1  you believe that you've looked at that
2  were available at the time that the
3  Advisory Committee members in 1999 did
4  not look at?
5  A. Just so I can be clear, you
6  mean materials that were provided by the
7  FDA or materials in general?
8  Q. Well, I'm assuming -- let's
9  just say materials in general.
10 A. Okay.
11    Reports -- excuse me.
12 Reports within Merck that suggest the
13 appearance -- suggest the possibility,
14 I'll say, of a link between Vioxx use and
15 severe cardiac events and also data
16 within Merck that demonstrates a link
17 between Vioxx and severe cardiovascular
18 embolic events.
19 Q. Are you referring to what
20 you call in your report the "Watson
21 analysis"?
22 A. That's one thing, yes.
23 Q. What other materials are you
24 aware of that was available in 1999 that

14 (Pages 50 to 53)

Lemuel A. Moye, M.D.

Page 54

1  was not available to the FDA or the
2  Advisory Committee?
3      A.   What I list in my report,
4  and that is -- let me just look at this
5  specifically.
6           The September -- I'm on item
7  84, Paragraph 84 on Page 32.
8      Q.   Page 32?
9      A.   Yes, sir.
10     Q.   Paragraph what?
11     A.   84, the very last one on
12 that page.
13          Beginning with that
14 Paragraph 84, the September 12, 1996
15 memo; Paragraph 85, the October 10th,
16 '96; Paragraph 86, November 11, 1996.
17     Q.   Right.
18     A.   And this litany of material
19 was available, but had not been presented
20 at the Advisory Committee.  So, that's
21 the basis of my answer to the question.
22     Q.   Okay.
23          The materials you're talking
24 about in Paragraph 84, you're talking

Page 55

1  about an internal memorandum, right?
2      A.   Yes, sir.
3      Q.   And the internal memorandum
4  deals with a case of unstable angina that
5  was reported in an RA study, correct?
6      A.   Yes, sir.
7      Q.   Do you know whether that
8  case was reported to the FDA in
9  accordance with the procedures by which
10 it's supposed to be reported the FDA?
11     A.   I don't know if it was
12 reported to the FDA or not.
13     Q.   Paragraph 85 deals with also
14 an internal memorandum.  Is that right?
15     A.   Yes, sir.
16     Q.   Do you know whether the data
17 that were the subject of that memorandum
18 were or were not reported to the FDA?
19     A.   I don't know.
20     Q.   In Paragraph 86, there's a
21 discussion about a memo authored by a Dr.
22 Musliner, right?
23     A.   Yes.
24     Q.   That talks about an

Page 56

1  anticipation of greater adverse
2  cardiovascular events in rofecoxib
3  compared with comparator NSAIDs, right?
4      A.   Yes.
5      Q.   That was not a study.  That
6  was a memo, right?
7      A.   Yes.
8      Q.   Actually, further on in your
9  report on Page 71, you discuss the Watson
10 analysis, correct?  70 and 71?
11     A.   Yes.
12     Q.   In this discussion you say
13 that Merck misled the FDA, right?
14     A.   Yes.  I also discussed it in
15 90 and 91 as well.
16     Q.   90 and 91?
17     A.   Paragraph 90 and 91, top of
18 Page 35.
19     Q.   Yes.  I understand.  I'm not
20 suggesting that's the only place you talk
21 about it.  I'm just saying in your
22 discussion about misleading the FDA on
23 Page 70 and 71, the first part of your
24 discussion starts with the proposition

Page 57

1  that Merck misled the FDA and the FDA
2  Advisory Committee because at the time of
3  the original Advisory Committee meeting,
4  they did not disclose the Watson
5  analysis.  Right?
6      A.   Yes, sir.
7      Q.   And it's your understanding
8  that the Watson analysis showed a clear
9  signal of an increased cardiovascular
10 risk associated with rofecoxib therapy?
11     A.   Yes, sir.
12     Q.   To your understanding, were
13 the data upon which the Watson analysis
14 was based disclosed to the FDA?
15     A.   I don't know whether the
16 data in any way, shape or form was
17 disclosed to the FDA in the IND or any
18 supplemental information, but it was not
19 disclosed to the Advisory Committee.
20     Q.   You know that because you've
21 reviewed the Advisory Committee
22 transcript?
23     A.   The transcript and also the
24 background dossier provided by Merck for