UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL DOCKET No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L - DIVISION 3 |
| | * | |
| This document relates to | * | JUDGE FALLON |
| CASE NO. 2:05CV2524 | * | |
| | * | |
| ANTHONY WAYNE DEDRICK, | * | MAG. JUDGE KNOWLES |
| an Individual, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |

Motion in Limine No. 10

PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EVIDENCE, TESTIMONY OR
ARGUMENT THAT VIOXX IS A POTENTIAL CURE FOR CANCER

COMES NOW, Plaintiff Anthony Dedrick, by and through his undersigned counsel, and files this Motion in Limine to preclude any evidence, testimony or argument to the effect that Vioxx is a potential cure for cancer. Any such testimony would be irrelevant, unsupported by expert testimony, outside the scope of this litigation and a waste of time.

During the retrial of *Irvin v. Merck*, on February 14, 2006, Plaintiff sought a ruling that Merck witness Dr. Briggs Morrison be precluded from testifying that Vioxx was potentially a cure for cancer,

on the grounds that there is no scientific basis for such testimony. This Court overruled the objection, but stated, however:

> It's a question of fact to some extent. There has been testimony that cancer for some people associated with some of the inflammation, that this drug may have some effect over the use of inflammation, therefore may have some effect on cancer, but it's early stage and I'll let you go on cross-examination. It is somewhat irrelevant in this situation. So let's not spend a lot of time on it.

*Irvin 2 v. Merck & Co.*, trial transcript at 1605 (Feb. 14, 2006) (Ex. "A").

This Court was correct with respect to the irrelevance of Vioxx's effect on cancer. This case does not involve claims that Vioxx failed to cure cancer, that Vioxx caused cancer, or that Vioxx exacerbated cancer. To Plaintiff's knowledge, physicians did not prescribe Vioxx as a cancer therapy, nor tellingly, did Merck market, promote or even seek FDA approval for Vioxx as a cancer therapy. Therefore, Vioxx's purported effect on cancer, for good or ill, is irrelevant to, and outside the scope, of this case. Any testimony to this effect would simply confuse and distract the jury. This Court has demonstrated an interest in streamlining trial proceedings, in order to retain a focus on the real claims and defenses, to conserve the resources of the parties and the court, to respect the jurors and to minimize the potential for real or perceived error. Simply put, this Court need not, and should not, waste precious trial time on irrelevant matters outside its scope.

This Court's initial assessment of Dr. Morrison's testimony regarding cancer as "somewhat irrelevant in this situation" – an observation that preceded the testimony itself – has been borne out as correct. The testimony given was, in fact, utterly irrelevant to the *Irvin* trial, where allowed irrelevant to the *Barnett* and *Smith* trials and will be equally irrelevant to the trial in this case. It should be excluded in its entirety.

As this Court correctly observed, Dr. Morrison was not testifying – and will not be testifying – for Merck as an expert witness on Vioxx and cancer. There is no need for, or relevance to, such testimony because cancer claims are not at issue. The Vioxx-cancer issue is, at best, a potentially interesting sideshow–but not one with any bearing on trial issues here. No time should be wasted on it as the Federal Rules of Evidence discourage such irrelevant testimony.

The "cancer" testimony of Dr. Briggs Morrison flunks the most basic test of Rule 401's definition of "Relevant Evidence."[1] Vioxx's purported and tangential impact on cancer – which itself is unproven – is not a fact of any consequence to the determination of the trials in these proceedings. Vioxx's supposed impact on cancer–even were it supported by competent expert testimony (as it is not here) – does nothing to make the determination of whether Vioxx was a substantial factor in Plaintiff's heart attack more probable or less probable than it would be without such "evidence."

Moreover, even if this evidence were marginally relevant, it would still be properly excluded under Rule 403 on grounds of prejudice, confusion or waste of time.[2] As this Court has already observed in *Irvin* 2, of the Briggs Morrison cancer testimony: "It is somewhat irrelevant in this situation. So let's not spend a lot of time." Rule 403 backstops the Court in the decision to exclude this evidence, even if it were "somewhat relevant," rather than "somewhat irrelevant," on precisely the grounds this Court identified: "waste of time."

This Court has broad discretion in assessing admissibility under Rule 403. See *U.S. v. Morris*, 79 F.3d 409, 412 (5th Cir. 1996). In order to exclude the Morrison cancer testimony, this Court need not conclude that it would be unfairly prejudicial, nor need it engage its own time in attempting to craft a limiting jury instruction that might (or might not) enable an otherwise confused or distracted jury to

---

1    Fed. R. Evid. 401 states: "Relevant Evidence" means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

focus on more relevant testimony, or to disregard it as tangential. As the Fifth Circuit indicated in *U.S. v. Morris*, a decision affirming a district court's determination to exclude testimony regarding other offenses or incidents, Rule 403 enables district courts to exercise their broad discretion to exclude "waste of time" testimony or evidence without further compounding that "waste of time" through the crafting of limited jury instructions or other damage control. *Morris*, 79 F.3d at 412. It is far better to exclude such extraneous testimony in the first instance to guarantee a correctly focused trial.

Even the atmospheric suggestion that Vioxx could cure cancer is highly prejudicial. The word "cancer" itself is uniquely charged with fear, misunderstanding, and foreboding. Any jury may include – as the *Irvin 2* jury did – persons in cancer remission, as well as those whose family members may be battling, or have lost the battle with, one of cancer's many forms. The suggestion that Plaintiff has, somehow, foreclosed the promise of a new cancer therapy is unquestionably distracting and prejudicial – all the more so for being raised in passing. Ironically, the more time is spent on cross-examination debunking the issue, the greater the potential for distraction, while minimizing the focus on it may nonetheless leave a subliminal impression that scars and distorts jury deliberations. In this case, the best remedy is exclusion.

Other courts have noted the ability of otherwise tangential cancer-related testimony to overwhelm other directly relevant evidence in a case, out of all proportion to any purported probative value, because of "the unfortunate ubiquity of genuine suffering from cancer, a dreaded and serious disease . . ." and the deep personal "anger felt toward the disease." *U. S. v. Brooke*, 4 F.3d 1480, 1487 (9th Cir. 1993). In *Brooke*, the criminal defendant, charged with complicity in a pipe bomb assault, apparently also lied about having cancer to gain sympathy and money from acquaintances. The cancer issue so pervaded the case, and threatened to overwhelm the evidence relating to the actual crimes at issue, that the appellate court was compelled to reverse the convictions ("we must reverse") on the trial

court's error in admitting any evidence that defendant falsely claimed to have cancer, because the probative value of the cancer evidence was substantially outweighed by its prejudicial effect. *Brooke,* 4 F.3d at 1488-1489.[3]

Here, as in *U.S. v. Brooke*, regardless of the far different context in which the cancer issue arises, the references to are equally "likely to have a visceral impact that far exceeds its probative value." *Id.* at 1487.

Wherefore, for the foregoing reasons, Plaintiff urges the Court to grant Plaintiff's Motion to exclude any evidence, testimony or argument that Vioxx is a potential cure for cancer.

Date: October 27, 2006                                      Respectfully submitted,

By _____
Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama  36103-4160
Telephone:  (334) 269-2343
Facsimile: (334) 954-7555

Counsel for Plaintiff

---

3   "We hesitate to use the obvious, but nevertheless apt, metaphor. Like an evidentiary cancer, the erroneously-admitted evidence infected the testimony of nearly every witness. Brooke is entitled to a trial cured of such a pervasive defect." *Id.* at 1488.

**Russ M. Herman** (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
**Plaintiffs' Liaison Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
& WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

**Christopher A. Seeger**, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337) 494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiff's Motion in Limine to Exclude Evidence, Testimony or Argument that Vioxx is a Potential Cure for Cancer has been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail or by hand delivery and e-mail, on Merck's Counsel, Douglas R. Marvin and Philip S. Beck, by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 27th day of October, 2006.

                                                _/s/ P. Leigh O'Dell_
                                                P. Leigh O'Dell
                                                Attorney for Plaintiff
                                                Beasley, Allen, Crow,
                                                Methvin, Portis & Miles, P.C.

### Page 1605

1  ALL THAT AND HE'S FAMILIAR WITH IT AS AN ONCOLOGIST.
2      THE COURT: IT'S A QUESTION OF FACT TO SOME EXTENT.
3  THERE HAS BEEN SOME TESTIMONY THAT CANCER FOR SOME PEOPLE
4  ASSOCIATED WITH SOME OF THE INFORMATION, THAT THIS DRUG MAY
5  HAVE SOME EFFECT OVER THE USE OF INFLAMMATION, THEREFORE MAY
6  HAVE SOME EFFECT ON CANCER, BUT IT'S AN EARLY STAGE AND I'LL
7  LET YOU GO ON CROSS-EXAMINATION. IT IS SOMEWHAT IRRELEVANT IN
8  THIS SITUATION. SO LET'S NOT SPEND A LOT OF TIME.
9      MR. RAFFERTY: THANK YOU, YOUR HONOR.
10 BY MR. ISMAIL:
11 Q. DOCTOR YOU DESCRIBED YOUR BACKGROUND AS AN ONCOLOGIST, HOW
12 DID YOU, WHEN YOU CAME TO MERCK, END UP ON THE VIOXX TEAM WITH
13 YOUR BACKGROUND?
14 A. SO WE TALKED ABOUT WHEN I WENT TO MEDICAL SCHOOL, WE ONLY
15 THOUGHT THERE WAS ONE CYCLOOXYGENASE, AND EVENTUALLY WE FOUND
16 OUT THERE WERE TWO. WELL, ONE OF THE SCIENTISTS WHO WAS ONE OF
17 THE FIRST ONES TO IDENTIFY THIS SECOND FORM WAS A CANCER
18 RESEARCHER. AND WHAT THE CANCER RESEARCHER WAS TRYING TO
19 FIGURE OUT WAS ARE -- IS THERE ANYTHING AT ALL IN A CANCER CELL
20 THAT'S NOT IN A NORMAL CELL. AND HIS LOGIC WAS, IF THERE IS A
21 SPECIFIC MACHINERY IN A CANCER CELL THAT'S NOT IN A NORMAL
22 CELL, MAYBE I CAN MAKE A DRUG AGAINST THAT, AND THAT WOULD
23 TREAT CANCER WITHOUT DAMAGING NORMAL CELLS. AND WHEN HE WENT
24 LOOKING FOR THINGS THAT ARE IN CANCER CELLS BUT NOT NORMAL
25 CELLS HE FOUND COX-2.

### Page 1606

1  SO AT THE VERY BEGINNING OF THE DISCOVERY OF COX-2,
2  THERE WERE PEOPLE WHO THOUGHT THAT COX-2 ACTUALLY HAD SOMETHING
3  TO DO WITH THE FORMATION OF CANCER. AND THERE WERE RESEARCH
4  SCIENTISTS AT MERCK WORKING ON THIS. THERE WERE RESEARCH
5  SCIENTISTS ALL OVER THE WORLD WORKING ON THIS. A COLLEAGUE OF
6  MINE AND I EVENTUALLY FILED A PATENT AND OBTAINED THE PATENT
7  FOR THE USE OF VIOXX TO PREVENT PROSTATE CANCER.
8      AND WHEN I CAME TO MERCK, I REMEMBER MY INTERVIEW
9  WITH ALAN NIES, WHO SAID TO ME, THERE IS THIS WHOLE IDEA THAT
10 THESE THINGS MIGHT WORK IN CANCER. AS PART OF YOUR ASSIGNMENT
11 HERE, WE WOULD LIKE YOU TO, YOU KNOW, LOOK INTO THAT AND HELP
12 US THINK ABOUT HOW WE MIGHT BE ABLE EITHER PROVE THAT'S TRUE OR
13 NOT TRUE.
14 Q. AND DID YOU WORK DESIGNING CLINICAL TRIALS THAT WOULD
15 HOPEFULLY ADDRESS THAT QUESTION?
16 A. YES.
17 Q. AND WHAT TRIAL WAS THAT?
18 A. THE BIGGEST ONE THAT I WORKED ON WAS A TRIAL CALLED
19 VICTOR. AND VICTOR WAS A TRIAL THAT WE WORKED WITH A GROUP IN
20 ENGLAND TO SET UP. AND THE TRIAL WAS, AGAIN, ONE OF THESE
21 OUTCOMES TRIALS. WHAT IT WAS PEOPLE WHO HAD COLON CANCER, THEY
22 WOULD HAVE SURGERY, THEY WOULD RECEIVE CHEMOTHERAPY, WHATEVER
23 THE STANDARD OF CARE WAS IN ENGLAND AT THE TIME, AND THEN THEY
24 WOULD BE RANDOMIZED TO VIOXX VERSUS PLACEBO. AND THE QUESTION
25 WAS, COULD VIOXX PREVENT THEM FROM HAVING THEIR CANCER COME

### Page 1607

1  BACK?
2  Q. IN YOUR WORK WITH THE RESEARCHERS IN ENGLAND, WHAT WAS THE
3  HOPED-FOR PROMISE WITH THAT THERAPY?
4  A. PEOPLE WERE PRETTY EXCITED ABOUT COX-2'S, COX-2 INHIBITORS
5  AS A POTENTIAL EFFECTIVE CANCER THERAPY, AND CERTAINLY FROM A
6  SAFETY POINT OF VIEW, COMPARED TO THE TRADITIONAL CANCER
7  MEDICINES, THEY HAVE A LOT OF SIDE EFFECTS, IF THIS WERE TRUE
8  THAT THIS COULD PREVENT OR TREAT CANCER, PEOPLE WERE VERY
9  EXCITED IT.
10 Q. AND ULTIMATELY WERE YOU ABLE TO GET AN ANSWER TO THAT
11 QUESTION IN THE VICTOR TRIAL?
12 A. NO, THE VICTOR TRIAL WAS STOPPED EARLY WHEN THE DRUG WAS
13 TAKEN OFF THE MARKET.
14     MR. ISMAIL: YOUR HONOR, NO FURTHER QUESTIONS.
15     THE COURT: ANY CROSS?
16     MR. RAFFERTY: YES, YOUR HONOR.
17         CROSS-EXAMINATION
18 BY MR. RAFFERTY:
19 Q. DOCTOR, GOOD MORNING.
20 A. HI, HOW ARE YOU?
21 Q. I'M TROY RAFFERTY. I'M GOING TO BE ASKING YOU SOME
22 QUESTIONS HERE FOR A LITTLE WHILE TO FOLLOW UP WITH YOUR
23 TESTIMONY.
24     FIRST OF ALL, WITH REGARDS TO THE VICTOR STUDY THAT
25 MR. ISMAIL WAS JUST TALKING TO YOU ABOUT, THE VICTOR STUDY,

### Page 1608

1  OBVIOUSLY WAS, IT WAS STOPPED WHEN VIOXX WAS PULLED FROM THE
2  MARKET, BECAUSE OF THE CARDIOVASCULAR RISKS? CORRECT?
3  A. IT WAS STOPPED WHEN VIOXX WAS TAKEN OFF THE MARKET, YES.
4  Q. AND THE FDA, THE DRUG VIOXX HAD NEVER BEEN APPROVED TO BE
5  MARKETED AS ANYTHING IN TERMS OF CURE FOR CANCER; IS THAT
6  CORRECT?
7  A. THAT'S CORRECT.
8  Q. THE ENTIRE TIME IT WAS ON THE MARKET, AND I THINK ON YOUR
9  TIME LINE HERE, YOU HAVE 1991, ALL THE WAY TO 2005, AND AT NO
10 TIME WAS IT EVER APPROVED FOR THE USE OR THE TREATMENT OF
11 CANCER; IS THAT CORRECT?
12 A. THAT'S CORRECT.
13 Q. YOU TALKED A LITTLE BIT ON DIRECT EXAMINATION ABOUT YOUR
14 BACKGROUND. I WANT TO MAKE SURE I'M CLEAR ON ALL OF THAT.
15 BEFORE STARTING WITH MERCK IN 1995, YOU HAD NEVER CONDUCTED ANY
16 RESEARCH ON A COX-2 INHIBITOR, CORRECT?
17 A. THAT'S CORRECT.
18 Q. AND YOU HAD NEVER, PRIOR TO 1995, OR COMING TO MERCK, YOU
19 HAD NEVER CONDUCTED ANY RESEARCH ON PROSTAGLANDIN OR
20 PROSTACYCLIN SYNTHESIS; IS THAT RIGHT?
21 A. THAT'S RIGHT.
22 Q. WHEN WE TALK ABOUT PROSTACYCLIN AND PROSTAGLANDINS, WE'RE
23 REALLY TALKING ABOUT PHARMACOLOGY, AREN'T WE? ISN'T THAT
24 BASICALLY SOME PHARMACOLOGY?
25 A. IT'S A DESCRIPTION OF SOME OF THE CHEMICALS THAT WORK IN

EXHIBIT A

0 (Pages 1605 to 1608)