71 FR 3922-01                                                              Page 14
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

physicians, pharmacists, and consumers; and others.

A. *General Comments on the Proposed Rule*

Most comments expressed broad agreement that prescription drug labeling could be more effective in communicating drug information to health care practitioners and overwhelming support for the agency's goal of improving the content and format of prescription drug labeling to make information easier for health care practitioners to access, read, and use.

Many comments expressed approval of all the major features of the proposal, indicating that the proposed changes represent an important improvement in the organization, clarity, and overall usefulness of prescription drug labeling. For example, there was near universal support for the proposal to place at the front of labeling those sections that practitioners refer to most frequently and consider most important, although some comments recommended sequences slightly different from those proposed by FDA (see section VI.G of this document). There was also broad support for restructuring the old "Precautions" section into new sections devoted to use in specific populations, drug interactions, and patient counseling information and for combining the remainder of the "Precautions" section with the "Warnings" section.

Comments from manufacturers, while strongly supportive of the agency's efforts to improve the content and format of labeling, generally expressed concerns about some of the major elements of the proposal. In particular, as discussed in greater detail in sections VI.C and VI.D of this document, many manufacturers were concerned about the inclusion of Highlights. Manufacturers also expressed concern about the proposed requirements to re-evaluate, within 1 year of the effective *3930 date of the final rule, all prescription drug labeling to identify and remove any claims for indications and dosing regimens that are not supported by substantial evidence and to remove in vitro data that are not supported by clinical data.

Specific issues raised by the comments and the agency's responses follow.

B. *Comments on the Process for Development of the Proposed Rule*

As discussed in detail in the preamble to the proposed rule, FDA relied on focus group testing of physicians, a national physician survey, and a public meeting held in 1995 to develop the labeling prototype that was used as the basis for the proposal (65 FR 81082 at 81083 through 81085).

(Comment 1) Several comments questioned the process that FDA used to develop the proposed rule. A number of comments expressed concern that health care practitioners other than physicians were not surveyed or otherwise consulted. Two comments indicated that a majority of pharmacists refer to prescription drug labeling at least once a day. The comments cited a survey finding that the sections most frequently referred to by pharmacists are, in descending order, "Dosage and Administration," "Adverse Reactions," "Contraindications," "Indications and Usage," "Warnings and Precautions," and "How Supplied/Storage and Handling." The comments urged FDA to consult with all relevant audiences to revise prescription drug labeling and labels.

FDA recognizes the important roles that health care practitioners other than physicians play in the health care delivery system and recognizes that prescription drug information is relied upon by health care practitioners other than physicians. The agency focused its research efforts on how physicians use labeling, because they are the principal intended audience (i.e., they use labeling for prescribing decisions). The agency also sought input from all interested parties in the development of the proposed rule, especially those whose use of labeling could be expected to impact patient safety. Panelists and participants in the 1995 public meeting included nurse practitioners, pharmacists, and physician assistants. Their comments and observations directly contributed to refining the third version of FDA's prototype into the version that was the basis for the proposed rule. Moreover, the agency has carefully reviewed and considered all comments received on the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proposed rule, which included comments from a broad range of health care practitioners that rely on prescription drug labeling, and has determined the optimal ordering for labeling sections, as reflected in this final rule.

FDA notes that the sections most commonly referred to by pharmacists in the cited survey are the same as those most commonly referred to by physicians, although in a somewhat different rank order. FDA believes that, although the rank order of the sections is not identical for the two groups, the formatting improvements required by this final rule make the information in these sections readily accessible to all health care practitioners who use prescription drug labeling.

*C. Highlights of Prescribing Information--General Comments*

FDA proposed to require that prescription drug labeling for products described in proposed § 201.56(b)(1) (i.e., new and more recently approved prescription drug products) contain introductory prescribing information entitled "Highlights of Prescribing Information" (proposed § § 201.56(d) and 201.57(a)).

(Comment 2) Comments expressed different opinions about the utility and patient care implications of Highlights. Physicians, pharmacists, other health care practitioners, health care advocacy groups, and professional societies and organizations representing health care practitioners expressed unequivocal enthusiasm about and uniform support for Highlights. Manufacturers, with some exceptions, were opposed, or strongly opposed, to the inclusion of Highlights.

Comments supporting Highlights stated that it would be an excellent vehicle for drawing attention to the most important information about a product, a useful and convenient source for quick reminder information in routine prescribing situations, and a useful vehicle to efficiently direct practitioners to the more detailed information in the FPI. Several comments stated that Highlights is probably the most important innovation in the proposed rule. One comment stated that Highlights is the element of the proposal that will most enhance the clinical utility of prescription drug labeling. Several comments stated that by making prescription drug labeling easier to navigate, Highlights would help to make labeling easier for patients and health care practitioners to understand.

Several comments endorsed the Highlights format as a means of making labeling information more accessible. Some comments stated that the proposed format for Highlights is a good design because it makes use of multiple formats (e.g., text, tables, bulleted lists) and bolded headings, which make the labeling information more accessible. One comment noted that, because Highlights contains pointers to the location of more detailed information in the FPI, the pointers will increase the likelihood that health care practitioners will refer to the FPI. The comment also stated that the user-friendly Highlights format would be likely to increase the frequency with which health care practitioners consult the labeling for drug information and would enhance their ability to use the information.

Comments opposing inclusion of Highlights stated that manufacturers would be forced to pick certain important warnings listed in the FPI for inclusion in Highlights and, because of space limitations, exclude other important information. These comments maintained that, by extracting from the FPI only selected portions of the information needed for safe and effective use, Highlights would omit important information and lack detail and context, and might, therefore, be misleading. They contended that these shortcomings might outweigh any convenience derived from condensing information into Highlights. One comment maintained that the FPI is itself a condensation of a complex body of information and that it is problematic and illogical to try to further condense the information from the FPI into Highlights.

Several comments from manufacturers stated that the limited content of Highlights is of concern because practitioners would have a tendency to rely only on the information in Highlights when making prescribing decisions, even though that information alone would not be an adequate basis for making such decisions. Some of these comments maintained that there is a lack of evidence to support the premise

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                                          Page 16
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)
```

that Highlights will facilitate practitioners' access to more detailed information in the FPI. They asserted that there is a high likelihood that Highlights would be the only part of the labeling read by practitioners.

Another comment stated that, rather than requiring inclusion of Highlights in labeling, the agency and manufacturers should work together to make the FPI better.

FDA has determined that the Highlights provisions of the final rule are an essential element of the agency's efforts to improve the accessibility, readability, and usefulness of information in prescription drug labeling and reduce the number of *3931 adverse reactions resulting from medication errors due to misunderstood or incorrectly applied drug information. By means of focus group testing, a nationwide physician survey, and a public meeting, the agency carefully evaluated the drug information needs of physicians and ways to best address those needs in prescription drug labeling. Some of the principal findings were that: (1) The relative importance of information in labeling varies, (2) physicians typically refer to labeling to answer a specific question, (3) physicians have considerable difficulty locating the information they need to make prescribing decisions, and (4) physicians strongly prefer to have a separate introductory summary of the most important information contained in the full prescribing information, located at the beginning of labeling, to make it easier to find the information necessary to prescribe the drug safely and effectively (65 FR 81082 at 81083 through 81085; see also Ref. 11). Many of the comments submitted in response to the proposed rule concur with these findings, particularly those from health care practitioners and their organizations.

This preference for highlighting the most important information that is part of a larger body of information is consistent with good risk communication practices and with well-established cognitive principles. The agency employed these principles in designing Highlights.

For example, cognitive research has shown that, because there is a limit to the amount of information that an individual can hold in memory at one time, individuals tend to organize similar information into "chunks" to: (1) Increase the amount of available space in memory and (2) facilitate retrieval of information (Refs. 1 through 3). "Chunking" complex information into smaller, more manageable units makes it easier to remember and process information efficiently and effectively (decreases "cognitive load").

FDA research conducted during development of new rules for OTC drug labeling demonstrated that "chunking" information in a standardized format with graphic emphasis on the most important information helped individuals make correct product use decisions, decreased reading time, and increased the individuals' confidence in their ability to use that information (Ref. 4). This research supports the approach adopted in this final rule for prescription drug labeling.

In designing Highlights, the agency employed established techniques to enhance effective communication of large amounts of complex information. Highlights summarizes the information from the FPI that is most important for prescribing the drug safely and effectively and organizes it into logical groups, or "chunks," to enhance accessibility, retention, and access to the more detailed information. This design, combined with the use of multiple formats (e.g., tables, bulleted lists) and graphic emphasis (e.g., bolded text), improves visual and cognitive access to the information so that practitioners can more easily find information, and improves recall of the information.

Importantly, Highlights must include identifying numbers indicating where in the FPI to find details of the information that is cited or concisely summarized in Highlights. In the final rule, FDA has revised proposed § 201.57(a)(17) (§ 201.56(d)(3) in the final rule) to require that any information referenced in Highlights, not just subheadings, be accompanied by the identifying number corresponding to the location of the information in the FPI. The agency believes that these identifying numbers will facilitate access to the detailed information in the FPI.

                © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                              Page 17
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

The Highlights design--a broad array of important information in a discrete, visually accessible location--also increases the variety of information that a practitioner is exposed to in a typical labeling referral. That is, the Highlights design increases the likelihood that practitioners will be exposed to and retain critical information about a drug in addition to the information that the practitioner sought in referring to the labeling, such as the recommended dose. The practitioner therefore is likely to know more about a drug after exposure to labeling with Highlights than after exposure to labeling without Highlights. In addition, by making labeling easier to use and an overall better source of drug information, the Highlights design is likely to increase the frequency with which practitioners rely on labeling for prescription drug information. In a survey regarding labeling for vaccines, 71 percent of physicians surveyed indicated that they would increase their use of labeling if a summary of prescribing information were included in labeling (65 FR 81082 at 81084). Highlights should result in health care practitioners being better informed about prescription drugs. Therefore, the agency concludes that prescription drug labeling with Highlights more effectively communicates drug information to prescribers than labeling without Highlights.

(Comment 3) Some comments stated that FDA should do additional testing to determine whether Highlights is necessary to accomplish FDA's goal of making information in prescription drug labeling more useful and accessible or whether the other proposed format changes, without Highlights (i.e., an index, reordering of the sections of the FPI, and enhanced formatting) would be adequate to accomplish the agency's goal. One comment requested that FDA evaluate whether simply reordering the sections of the prescribing information would be adequate to accomplish the agency's goal. Some comments stated that the agency should test whether the proposed format would change prescriber behavior as intended and lead to a reduction in medication errors.

The agency believes it is unnecessary to compare the prototype labeling with Highlights to the prototype labeling without Highlights (i.e., a version with a table of contents, reordered sections in the FPI, and enhanced graphics, or a version with only reordered sections and enhanced graphics). The requirements of this final rule are built on extensive testing conducted by FDA, established principles of cognitive processing, previous research conducted by FDA for OTC drug labeling, and evaluation of comments submitted in response to this proposal. FDA has determined that Highlights, because it will efficiently and effectively convey information about a drug product and will help to facilitate the transition to electronic labeling, is a vital component of the efforts to reduce the numbers of adverse reactions from medication errors due to misunderstood or incorrectly applied drug information.

(Comment 4) In the proposed rule, FDA specifically sought comment on whether, and under what circumstances, it might be inappropriate to include the proposed Highlights in the labeling of a particular drug or drug class.

The vast majority of comments supported Highlights for all products or no products. One comment stated that if the agency retains the requirement to include Highlights, all products required to have the new format should be required to have Highlights. One comment stated it would not be useful to include Highlights if the entire labeling is very short (e.g., one page).

The agency concludes that there should be no exceptions to the Highlights requirement for drugs subject to the new content and format requirements at § § 201.56(d) and 201.57. The agency acknowledges that prescription drug labeling for some drugs may be very short and that this *3932 may result in short Highlights. However, as discussed previously, the agency has determined that Highlights improves the usefulness, readability, and accessibility of information in prescription drug labeling and is consistent with good risk communication practices.

(Comment 5) Several comments stated that there should be more specific criteria for selecting information for inclusion in Highlights to ensure consistency for all drug products. These comments stated that, without specific criteria, the information in Highlights for different drugs within the same drug class may be different, and these differences could be used to the competitive advantage or disadvantage of some

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                              Page 18
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

products. Some comments stated that the agency should designate the precise information that must be included in Highlights. One comment said that, for products with class labeling, FDA must designate which class labeling statements must be included in Highlights to ensure consistency among drugs in the class. Another comment stated that the relative importance of drug information, and, as a result, the basis for selecting information for inclusion in the section, can vary depending on a drug's indication. The comment maintained that Highlights would have to provide for differences in safety profiles for drugs with multiple indications and those that are used in different populations.

The agency believes that these concerns are not unique to Highlights. The agency agrees that, for a given drug, if there are significant differences in safety profiles or dosing considerations for different indications or populations, Highlights must reflect these differences. The agency also agrees that it is critical to ensure accuracy and consistency in the information included in Highlights because it contains a summary of the most important information for prescribing the drug safely and effectively.

In general, however, the agency believes that it would not be appropriate, or possible, to specify in the final rule the precise content of Highlights. Judgment will continue to be necessary to determine what information from the broad range of information necessary for the safe and effective use of the prescription drug appearing in the FPI must also appear in Highlights (e.g., differences in safety profiles or dosing considerations for differing indications or populations). However, because Highlights is a summary of the most important information for prescribing decisions and some comments expressed concerns about the difficulty involved in summarizing the complex and often lengthy information in the FPI (see e.g., comments 16, 23 and 27), the agency believes that it is essential for FDA to review and approve most proposed changes to the information in Highlights. Accordingly, the agency is revising its regulations on supplements and other changes to an approved application. Under § § 314.70(b)(2)(v)(C) and (c)(6)(iii), and 601.12(f)(1) and (f)(2)(i), applicants are required to obtain prior approval of any labeling changes to Highlights, except for editorial or similar minor changes, including removal of a listed section(s) from "Recent Major Changes" or a change to the most recent revision date of the labeling. Sections 314.70(d)(2)(x) and 601.12(f)(3)(i)(D) allow these editorial and similar minor changes in the labeling to be reported in an annual report.

In addition, as noted, the agency is making available guidance to assist manufacturers and FDA reviewers in developing prescription drug labeling. This guidance addresses, among other things, how to select information for inclusion in Highlights (section IV of this document).

In some instances, a statement for a drug or class of drugs is currently required by regulation to be included in a specific section of prescription drug labeling (e.g., § 201.21). In these cases, when converting labeling to the new format, the statements must be included in the corresponding section in the new format (e.g., a statement required to be included in the "Boxed Warning" section in the old format must be included in the "Boxed Warning" section in the new format). However, some statements are currently required to be included in labeling sections that have been altered or eliminated by this final rule. In these instances, the statements must be located in the FPI as outlined in table 6.

Table 6.--Location of Statements Required To Be Included in Labeling

| Location--Old Format | Location--New Format |
| --- | --- |
| Warnings | Warnings and Precautions |
| Precautions (General) | Warnings and Precautions |
| Precautions (Drug interactions) | Drug Interactions |
| Precautions (Specific Populations) | Use in Specific Populations |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
Precautions (Information for patients) .. Patient Counseling Information
How Supplied (or after How Supplied) .... How Supplied/Storage and Handling
```
---

Where statements are required in labeling but not in a specific labeling section, the agency may specify the location in the FPI for the statements for the drug or class of drugs to ensure consistency within drug classes. Whether a specific statement required by regulation must appear in Highlights will be determined by the agency.

(Comment 6) Several comments stated that Highlights should mention the drug's therapeutic or pharmacologic class. They maintained that this information is informative to practitioners when the drug is a member of an established class because it puts the drug in a context with other therapies and helps prevent duplicative therapy.

The agency agrees that information about a drug's therapeutic or pharmacologic class is important and appropriate for inclusion in Highlights. If a drug is a member of an established therapeutic or pharmacologic class, the identity of that class can provide a practitioner with important information about what to expect from that product and how it relates to other therapeutic options. The agency also agrees with the comment that making the identity of a drug's class more prominent could reduce the likelihood of prescribers placing a patient on more than one therapy within the same class when such use would not be appropriate.

The agency believes that information about drug class is an important supplement to the information contained in a drug's "Indications and Usage" section and should be placed under that heading in Highlights. Accordingly, the agency has revised proposed § 201.57(a)(6) to require that when a drug is a member of an established pharmacologic class, the class must be identified in the "Indications and Usage" section in Highlights.

(Comment 7) One comment stated that Highlights should also include information about managing drug *3933 overdose (recommended a new section entitled "Toxicity and Overdose") and characteristics by which a tablet can be identified (color, markings, shape, etc.).

The agency acknowledges the importance of information about managing drug overdose and characteristics by which a tablet can be identified and took care to make this information prominent in the FPI. However, space for Highlights is limited and the agency has made judgments about which information is most important for safe and effective use and thus must appear in Highlights. The agency has concluded that information about managing overdose or product identification characteristics (except scoring) will not be required in Highlights. The agency has retained scoring in Highlights because this information is needed to appropriately tailor a dose for some patients (e.g., a patient is unable to take two tablets of a drug because of a particular side effect, but is able to take one-and-one-half tablets).

(Comment 8) One comment stated that the information presented in Highlights should be in bulleted format to the extent possible to avoid redundancy with the information in the FPI.

FDA agrees that information presented in Highlights, not otherwise required to be bulleted under § 201.57(d)(4), should be succinctly summarized and in a format (e.g., bulleted) that calls attention, and provides easy access, to the more detailed information in the FPI. Highlights is not a verbatim repetition of selected information contained in the FPI.

(Comment 9) One comment requested that the sections in Highlights be reordered to lend more prominence to risk information. The comment stated that all risk information, including contraindications and drug interactions, should be placed before the "Dosage and Administration" and "How Supplied" sections.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                                         Page 20
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)
```

The order of the sections in Highlights tracks the order of the corresponding sections in the FPI. The agency believes the order of information in Highlights must be consistent with the FPI so that practitioners can efficiently navigate from Highlights to the corresponding section of the FPI. As discussed in more detail in the preamble to the proposed rule (65 FR 81082 at 81084), the revised order of the sections in the FPI was based on extensive focus group testing and surveys of physicians to determine which sections they believe are most important to prescribing decisions and which sections they reference most frequently.

The agency believes that the order of information in Highlights required by the final rule gives sufficient prominence to risk information. The agency also believes that the formatting requirements, the one-half page length restriction for Highlights (excluding space for a boxed warning, if one is required) (§ 201.57(d)(8)), and the limitations on the amount of information that can be included in Highlights will ensure that all the information in Highlights has adequate prominence and is visually accessible.

(Comment 10) One comment expressed concern about the implications of Highlights for FDA's initiative to improve pregnancy labeling. The comment stated that the preliminary format FDA has discussed in public meetings (which would replace the pregnancy category designations) could not be readily condensed into an informative single sentence in Highlights. The comment suggested that electronic labeling could potentially solve this problem by linking to additional information about prescribing in specific patient populations and by linking to pregnancy registry databases and tertiary specialty texts as well.

The agency anticipates that the planned revisions to the requirements for the "Pregnancy" subsection of labeling are unlikely to affect the information in Highlights about use of drugs during pregnancy. The agency agrees that the electronic labeling initiative holds great promise for providing rapid access to related information of varying levels of complexity and detail, including information about drug exposure during pregnancy.

(Comment 11) Several comments recommended that there be an educational campaign in conjunction with the publication of the final rule to ensure that practitioners understand that Highlights contains only limited information and should not be relied on without reference to the FPI.

The agency agrees that there should be, and it plans to initiate, an educational campaign to familiarize health care practitioners with the new labeling format. The agency also agrees that an important component of the educational message should be that Highlights alone does not contain all the information FDA has determined is needed to use a drug safely and effectively.

*D. Comments on Product Liability Implications of the Proposed Rule*

In the proposal, FDA requested comments on the product liability implications of revising the labeling for prescription drugs.

(Comment 12) In comments, some manufacturers expressed concerns that, by highlighting selected information from the FPI to the exclusion of information not highlighted, they make themselves more vulnerable to product liability claims. Some of these comments also stated that the Highlights limitation statement, which states that Highlights does not contain all the information needed to prescribe a drug safely and effectively and that practitioners should also refer to the FPI, would not constitute an adequate legal defense in a case alleging failure to provide adequate warning of a drug's risks.

Based on the agency's research and analysis in developing the prototype labeling that was the basis for the proposed rule (see comment 2), the agency has concluded that a labeling format that includes Highlights is more effective than a format that omits Highlights. In response to the comments and as discussed in the response to comment 35, FDA has taken steps to enhance the prominence of the Highlights

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

limitation statement. FDA believes the statement will be effective in reminding prescribers that the information in the Highlights should not be relied on exclusively in making prescribing decisions and that it is important to consult the more detailed information in the FPI. We also believe that this limitation statement will help to ensure that the labeling will be considered in its entirety in any product liability action. FDA acknowledges the comment's concerns and, as discussed more fully in response to comment 13, believes that under existing preemption principles such product liability claims would be preempted.

(Comment 13) Some comments stated that the new format requirements might have product liability implications for drugs that are not subject to the new requirements. These comments expressed concern that labeling in the old format might be characterized by plaintiffs as inferior to labeling in the new format and, as a result, could be used as evidence that a manufacturer did not provide adequate warnings. They requested that the agency state in the final rule that FDA approval of labeling, whether it be in the old or new format, preempts conflicting or contrary State law, regulations, or decisions of a *3934 court of law for purposes of product liability litigation.

FDA believes that under existing preemption principles, FDA approval of labeling under the act, whether it be in the old or new format, preempts conflicting or contrary State law. Indeed, the Department of Justice (DOJ), on behalf of FDA, has filed a number of amicus briefs making this very point. In order to more fully address the comments expressing concern about the product liability implications of revising the labeling for prescription drugs, we believe it would be useful to set forth in some detail the arguments made in those amicus briefs. The discussion that follows, therefore, represents the government's long standing views on preemption, with a particular emphasis on how that doctrine applies to State laws that would require labeling that conflicts with or is contrary to FDA-approved labeling.

Under the act, FDA is the expert Federal public health agency charged by Congress with ensuring that drugs are safe and effective, and that their labeling adequately informs users of the risks and benefits of the product and is truthful and not misleading. Under the act and FDA regulations, the agency makes approval decisions based not on an abstract estimation of its safety and effectiveness, but rather on a comprehensive scientific evaluation of the product's risks and benefits under the conditions of use prescribed, recommended, or suggested in the labeling (21 U.S.C. 355(d)). FDA considers not only complex clinical issues related to the use of the product in study populations, but also important and practical public health issues pertaining to the use of the product in day-to-day clinical practice, such as the nature of the disease or condition for which the product will be indicated, and the need for risk management measures to help assure in clinical practice that the product maintains its favorable benefit-risk balance. The centerpiece of risk management for prescription drugs generally is the labeling which reflects thorough FDA review of the pertinent scientific evidence and communicates to health care practitioners the agency's formal, authoritative conclusions regarding the conditions under which the product can be used safely and effectively. FDA carefully controls the content of labeling for a prescription drug, because such labeling is FDA's principal tool for educating health care professionals about the risks and benefits of the approved product to help ensure safe and effective use. FDA continuously works to evaluate the latest available scientific information to monitor the safety of products and to incorporate information into the product's labeling when appropriate.

Changes to labeling typically are initiated by the sponsor, subject to FDA review, but are sometimes initiated by FDA. Under FDA regulations, to change labeling (except for editorial and other minor revisions), the sponsor must submit a supplemental application fully explaining the basis for the change (§ § 314.70 and 601.12(f) (21 CFR 314.70 and 601.12(f))). FDA permits two kinds of labeling supplements: (1) Prior approval supplements, which require FDA approval before a change is made (§ § 314.70(b) and 601.12(f)(1)); and (2) "changes being effected" (CBE) supplements, which may be implemented before FDA approval, but after FDA notification (§ § 314.70(c) and 601.12(f)(2)). While a sponsor is permitted to add risk information to the FPI without first obtaining FDA approval via a CBE

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                                  Page 22
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

supplement, FDA reviews all such submissions and may later deny approval of the supplement, and the labeling remains subject to enforcement action if the added information makes the labeling false or misleading under section 502(a) of the act (21 U.S.C. 352). Thus, in practice, manufacturers typically consult with FDA prior to adding risk information to labeling. As noted in response to comment 5, however, a sponsor may not use a CBE supplement to make most changes to Highlights.

Since the proposed rule was published, FDA has learned of several instances in which product liability lawsuits have directly threatened the agency's ability to regulate manufacturer dissemination of risk information for prescription drugs in accordance with the act. In one case, for example, an individual plaintiff claimed that a drug manufacturer had a duty under California State law to label its products with specific warnings that FDA had specifically considered and rejected as scientifically unsubstantiated. [FN4] In some of these cases, the court determined that the State law claim could not proceed, on the ground that the claim was preempted by Federal law, [FN5] or was not properly before the court by operation of the doctrine of primary jurisdiction. [FN6] In some cases, however, the court has permitted the claim to proceed. [FN7]

FN4 Dowhal v. SmithKline Beecham Consumer Healthcare, 2002 Cal. App. LEXIS 4384 (Cal. Ct. App. 2002), reversed, 2004 Cal. LEXIS 3040 (Cal. April 15, 2004).

FN5 E.g., Ehlis v. Shire Richwood, Inc., 233 F. Supp. 2d 1189, 1198 (D.N.D. 2002), aff'd on other grounds, 367 F.3d 1013 (8th Cir. 2004).

FN6 E.g., Bernhardt v. Pfizer, Inc., 2000 U.S. Dist. LEXIS 16963 (S.D.N.Y. Nov. 16, 2000). This doctrine allows a court to refer a matter to an administrative agency for an initial determination where the matter involves technical questions of fact and policy within the agency's jurisdiction. If a court finds that the agency has primary jurisdiction, the court stays the matter and instructs the plaintiff to initiate an action with the agency. See, e.g., Israel v. Baxter Labs., Inc., 466 F.2d 272, 283 (D.C. Cir. 1972); see also 21 CFR 10.60.

FN7 Dowhal v. SmithKline Beecham Consumer Healthcare, 2002 Cal. App. LEXIS 4384 (Cal. Ct. App. 2002), reversed, 2004 Cal. LEXIS 3040 (Cal. April 15, 2004); Bernhardt v. Pfizer, Inc., 2000 U.S. Dist. LEXIS 16963 (S.D.N.Y. November 16, 2000); Motus v. Pfizer, Inc., 127 F. Supp. 2d 1085 (C.D. Cal. 2000), summary judgment granted, 196 F. Supp. 2d 984, 986 (C.D. Cal. 2001), aff'd, 2004 U.S. App. LEXIS 1944 (9th Cir. February 9, 2004); In re Paxil Litigation, 2002 U.S. Dist. LEXIS 16221 (C.D. Cal. August 16, 2002), transferred, 296 F. Supp. 2d 1374 (J.P.M.L. 2003).

State law actions can rely on and propagate interpretations of the act and FDA regulations that conflict with the agency's own interpretations and frustrate the agency's implementation of its statutory mandate. For example, courts have rejected preemption in State law failure-to-warn cases on the ground that a manufacturer has latitude under FDA regulations to revise labeling by adding or strengthening warning statements without first obtaining permission from FDA. (See, e.g., Eve v. Sandoz Pharm. Corp., 2002 U.S. Dist. LEXIS 23965 (S.D. In. Jan. 28, 2002); Ohler v. Purdue Pharma, L.P., 2002 U.S. Dist. LEXIS 2368 (E.D. La. Jan. 22, 2002); Motus v. Pfizer Inc., 127 F. Supp. 2d 1085 (C.D. Cal. 2000); Bansemer v. Smith Labs., Inc., 1988 U.S. Dist. LEXIS 16208 (E.D. Wis. Sept. 12, 1988); McEwen v. Ortho Pharm Corp., 528 P.2d 522 (Ore. 1974).) In fact, the determination whether labeling revisions are necessary is, in the end, squarely and solely FDA's under the act. A manufacturer may, under FDA regulations, strengthen a labeling warning, but in practice manufacturers typically consult with FDA before doing so to avoid implementing labeling changes with which the agency ultimately might disagree (and that therefore might subject the manufacturer to enforcement action).

Another misunderstanding of the act encouraged by State law actions is that FDA labeling requirements represent a minimum safety standard. According to many courts, State law serves as an appropriate source of supplementary safety regulation for drugs by encouraging or requiring manufacturers to disseminate risk information beyond that required by FDA under the act. (See, e.g., Brochu v. Ortho Pharm. Corp., 642 F.2d 652 (1st Cir. 1981); Salmon v. Parke-Davis and Co., 520 F.2d 1359 (4th Cir.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                          Page 23
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

1975); *3935Caraker v. Sandoz Pharm. Corp., 172 F. Supp. 2d 1018 (S.D. Ill. 2001); Mazur v. Merck & Co., Inc., 742 F. Supp. 239 (E.D. Pa. 1990); In re Tetracycline Cases, 747 F. Supp. 543 (W.D. Mo. 1989).) In fact, FDA interprets the act to establish both a "floor" and a "ceiling," such that additional disclosures of risk information can expose a manufacturer to liability under the act if the additional statement is unsubstantiated or otherwise false or misleading. Given the comprehensiveness of FDA regulation of drug safety, effectiveness, and labeling under the act, additional requirements for the disclosure of risk information are not necessarily more protective of patients. Instead, they can erode and disrupt the careful and truthful representation of benefits and risks that prescribers need to make appropriate judgments about drug use. Exaggeration of risk could discourage appropriate use of a beneficial drug.

  State law requirements can undermine safe and effective use in other ways. In the preamble accompanying the proposal, FDA noted that liability concerns were creating pressure on manufacturers to expand labeling warnings to include speculative risks and, thus, to limit physician appreciation of potentially far more significant contraindications and side effects (65 FR 81082 at 81083). FDA has previously found that labeling that includes theoretical hazards not well-grounded in scientific evidence can cause meaningful risk information to "lose its significance" (44 FR 37434 at 37447, June 26, 1979). Overwarning, just like underwarning, can similarly have a negative effect on patient safety and public health. (See section X of this document.) Similarly, State-law attempts to impose additional warnings can lead to labeling that does not accurately portray a product's risks, thereby potentially discouraging safe and effective use of approved products or encouraging inappropriate use and undermining the objectives of the act. (See, e.g., Dowhal v. SmithKline Beecham Consumer Healthcare, 2002 Cal. App. LEXIS 4384 (Cal. Ct. App. 2002) (allowing to proceed a lawsuit involving a California State law requiring warnings in the labeling of nicotine replacement therapy products that FDA had specifically found would misbrand the products under the act), reversed, 2004 Cal. LEXIS 3040 (Cal. April 15, 2004).)

  State law actions also threaten FDA's statutorily prescribed role as the expert Federal agency responsible for evaluating and regulating drugs. State actions are not characterized by centralized expert evaluation of drug regulatory issues. Instead, they encourage, and in fact require, lay judges and juries to second-guess the assessment of benefits versus risks of a specific drug to the general public-- the central role of FDA--sometimes on behalf of a single individual or group of individuals. That individualized reevaluation of the benefits and risks of a product can result in relief--including the threat of significant damage awards or penalties--that creates pressure on manufacturers to attempt to add warnings that FDA has neither approved nor found to be scientifically required. This could encourage manufacturers to propose "defensive labeling" to avoid State liability, which, if implemented, could result in scientifically unsubstantiated warnings and underutilization of beneficial treatments.

  FDA has previously preempted State law requirements relating to drugs in rulemaking proceedings. For example:

 • In 1982, FDA issued regulations requiring tamper-resistant packaging for OTC drugs. In the preamble accompanying the regulations, FDA stated its intention that the regulations preempt any State or local requirements that were "not identical to * * * [the rule] in all respects" (47 FR 50442 at 50447, November 5, 1982).

 • In 1986, FDA issued regulations requiring aspirin manufacturers to include in labeling a warning against use in treating chicken pox or flu symptoms in children due to the risk of Reye's Syndrome. In the accompanying preamble, FDA said the regulations preempted "State and local packaging requirements that are not identical to it with respect to OTC aspirin-containing products for human use" (51 FR 8180 at 8181, March 7, 1986).

 • In 1994, FDA amended 21 CFR 20.63 to preempt State requirements for the disclosure of adverse event-related information treated as confidential under FDA regulations (59 FR 3944, January 27, 1994). (See also 47 FR 54750, December 3, 1982)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01  
71 FR 3922-01, 2006 WL 160271 (F.R.)  
**(Cite as: 71 FR 3922)**

Page 24

("FDA believes that differing State OTC drug pregnancy-nursing warning requirements would prevent accomplishment of the full purpose and objectives of the agency in issuing the regulation and that, under the doctrine of implied preemption, these State requirements are preempted by the regulation as a matter of law.")

As noted previously, DOJ has made submissions to courts in a number of cases in which private litigants asserted a State law basis for challenging the adequacy of risk information provided by manufacturers for drugs in accordance with FDA requirements under the act. In each case, DOJ argued that the doctrine of preemption precluded the plaintiff's claim from proceeding. [FN8] The practice of addressing conflicting State requirements through participation in litigation (including product liability cases) in which the Government is not a party is not new. For example, DOJ participated on FDA's behalf in favor of pre-emption in Jones v. Rath Packing Company, 430 U.S. 519 (1977), Grocery Manufacturers of America, Inc. v. Gerace, 755 F.2d 993 (2d Cir. 1985), Eli Lilly & Co., Inc. v. Marshall, 850 S.W.2d 155 (Tex. 1993), and Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 352-53 (2001). FDA believes that State laws conflict with and stand as an obstacle to achievement of the full objectives and purposes of Federal law when they purport to compel a firm to include in labeling or advertising a statement that FDA has considered and found scientifically unsubstantiated. In such cases, including the statement in labeling or advertising would render the drug misbranded under the act (21 U.S.C. 352(a) and (f)). The agency believes that State law conflicts with and stands as an obstacle to achievement of the full objectives and purposes of Federal law if it purports to preclude a firm from including in labeling or advertising a statement that is included in prescription drug labeling. By complying with the State law in such a case and removing the statement from labeling, the firm would be omitting a statement required under § 201.100(c)(1) as a condition on the exemption from the requirement of adequate directions for use, and the omission would misbrand the drug under 21 U.S.C. 352(f)(1). The drug might also be misbranded on the ground that the omission is material within the meaning of 21 U.S.C. 321(n) and makes the labeling or advertising misleading under 21 U.S.C. 352(a) or (n).

FN8 The DOJ submissions in these cases relied on the doctrine of implied preemption or primary jurisdiction. Although the act itself contains no general express pre-emption provision for drugs, a provision of legislation amending the drug provisions addresses the relationship of the legislation to State law. Section 202 of the Drug Amendments of 1962 (Public Law 87-781, Title II, section 202, 76 Stat. 793 (October 10, 1962)) provides: "Nothing in the amendments made by this Act to the Federal Food, Drug, and Cosmetic Act shall be construed as invalidating any provision of State law which would be valid in the absence of such amendments unless there is a direct and positive conflict between such amendments and such provision of State law." The existence of a legislative provision addressing pre-emption does not bar the operation of ordinary principles of implied preemption (Geier v. American Honda Motor Co., Inc., 529 U.S. 861, 869 (2000)).

Consistent with its court submissions and existing preemption principles, FDA believes that at least the following *3936 claims would be preempted by its regulation of prescription drug labeling: (1) Claims that a drug sponsor breached an obligation to warn by failing to put in Highlights or otherwise emphasize any information the substance of which appears anywhere in the labeling; (2) claims that a drug sponsor breached an obligation to warn by failing to include in an advertisement any information the substance of which appears anywhere in the labeling, in those cases where a drug's sponsor has used Highlights consistently with FDA draft guidance regarding the "brief summary" in direct-to-consumer advertising ("Brief Summary: Disclosing Risk Information in Consumer-Directed Print Advertisements," 69 FR 6308 (February 2004)) (see comment 112); (3) claims that a sponsor breached an obligation to warn by failing to include contraindications or warnings that are not supported by evidence that meets the standards set forth in this rule, including § 201.57(c)(5) (requiring that contraindications reflect "[k]nown hazards and not theoretical possibilities") and (c)(7); (4) claims that a drug sponsor breached an obligation to warn by failing to include a statement in labeling or in advertising, the substance of which had been proposed to FDA for inclusion in labeling, if that statement was not required by FDA at the time plaintiff claims the sponsor had an obligation to warn (unless FDA has made a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                          Page 25
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

finding that the sponsor withheld material information relating to the proposed warning before plaintiff claims the sponsor had the obligation to warn); (5) claims that a drug sponsor breached an obligation to warn by failing to include in labeling or in advertising a statement the substance of which FDA has prohibited in labeling or advertising; and (6) claims that a drug's sponsor breached an obligation to plaintiff by making statements that FDA approved for inclusion in the drug's label (unless FDA has made a finding that the sponsor withheld material information relating to the statement). Preemption would include not only claims against manufacturers as described above, but also against health care practitioners for claims related to dissemination of risk information to patients beyond what is included in the labeling. (See, e.g., Bowman v. Songer, 820 P.2d 1110 (Col. 1991).)

FDA recognizes that FDA's regulation of drug labeling will not preempt all State law actions. The Supreme Court has held that certain State law requirements that parallel FDA requirements may not be preempted (Medtronic, Inc. v. Lohr, 518 U.S. 470, 495 (1996) (holding that the presence of a State law damages remedy for violations of FDA requirements does not impose an additional requirement upon medical device manufacturers but "merely provides another reason for manufacturers to comply with * * * federal law"); id. at 513 (O'Connor, J., concurring in part and dissenting in part); id)). But see Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 352-53 (2001) (holding that "fraud on the FDA" claims are preempted by Federal law); 21 U.S.C. 337(a) (restricting the act enforcement to suits by the United States); In re Orthopedic Bone Screw Prods. Liability Litig., 159 F.3d 817, 824 (3d Cir. 1998) ("Congress has not created an express or implied private cause of action for violations of the FDCA or the MDA [Medical Device Amendments]").

*E. Highlights--Comments on Specific Provisions*

The agency received comments on the following provisions of the proposed rule relating to the content of Highlights:

• Drug names, dosage form, route of administration, and controlled substance symbol (proposed § 201.57(a)(1))

In proposed § 201.57(a)(1), FDA specified the information concerning the identity of the product that would be included at the beginning of Highlights.

(Comment 14) One comment recommended that this information be moved above the title "Highlights of Prescribing Information" in Highlights.

The agency does not agree that the information required by § 201.57(a)(1) should be placed above the title "Highlights of Prescribing Information." The agency believes that the title of each of the three major portions of prescription drug labeling ("Highlights of Prescribing Information," "Full Prescribing Information: Contents," and "Full Prescribing Information") should be placed at the beginning of the corresponding information so that the title is readily apparent to users.

• Inverted black triangle (proposed § 201.57(a)(2))

FDA proposed to require that products that contain a new molecular entity, new biological product, or new combination of active ingredients have in their labeling an inverted black triangle to indicate that the drug or drug combination had been approved in the United States for less than 3 years (proposed § 201.57(a)(2)). This proposal also applied to marketed products approved for a new indication, for use by a new route of administration, or with a novel drug delivery system.

(Comment 15) Several comments opposed, or expressed reservations about, the use of an inverted black triangle to identify a product, indication, or dosage form that has been approved for less than 3 years. There were concerns that the symbol is not universally understood and could therefore be confusing to practitioners. One comment stated that use of icons to convey public health information has historically been unsuccessful. Some of the comments stated that if the inverted black triangle were retained, the agency would need to conduct an extensive educational campaign to educate practitioners about its meaning and purpose. Some

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:05-md-01657-EEF-DEK   Document 8293-1   Filed 10/27/06   Page 13 of 20

comments also expressed the concern that labeling containing the symbol could be in circulation much longer than 3 years after approval, which would undermine the significance of the symbol. One comment stated that the symbol implies, without basis, that newer drugs are inherently less safe than older drugs. Some comments stated that the criteria for when a new indication would extend the time for which a product must have the inverted black triangle are not clear.

Two comments stated that a bold approval date might be more informative than the inverted black triangle. Another comment recommended using the designation "New-Rx" to identify a product that has been approved for less than 3 years.

Other comments expressed strong support for the inverted black triangle as a mechanism to prompt practitioners to more carefully scrutinize the labeling of newer products and more diligently report adverse events. The comments maintained that use of the inverted black triangle could lead to earlier detection of rare, serious adverse reactions and, thus, could potentially save lives. One comment suggested extending the time that the inverted black triangle would be required to 5 years.

The agency has reconsidered its proposal to require use of the inverted black triangle to identify products that have been marketed for less than 3 years. The agency continues to believe strongly in the goals of the inverted black triangle--to help ensure that prescribers use a product with particular care during its initial years of marketing and to make prescribers more diligent in reporting suspected adverse reactions for newer products. However, the agency agrees with comments that, in prescription drug labeling, the inverted black triangle is not universally *3937 understood, could be confusing to the prescriber (even with a concerted educational effort) and therefore may not serve its intended purpose. The agency acknowledges that the recommended "New-Rx" designation may be more informative than the inverted black triangle, but is concerned that the "New-Rx" designation might also be confusing because practitioners are not familiar with it.

The agency agrees with comments that use of the initial date of approval in the United States would be a better mechanism than the inverted black triangle to call attention to the relative newness of a product. Therefore, the final rule requires that Highlights include the year in which a drug was initially approved in the United States. Highlights must contain the phrase "Initial U.S. Approval" followed by the four-digit year of initial approval in bold face type (§ 201.57(a)(3) and (d)(5)). Because this statement takes up more space than the proposed inverted black triangle, the final rule requires that the statement be placed on its own line directly below the established name of the product (proper name of the product for biological products) rather than on the same line as the proprietary name (§ 201.57(a)(3)).

In contrast to the proposed rule, the final rule does not require identification of the initial date of U.S. approval of a new indication for a new population, new route of administration, or novel delivery system. The agency agrees with comments that expressed concerns that also requiring the inverted black triangle for new indications, routes of administration, and novel delivery systems could diminish the significance of the inverted black triangle and could be confusing to practitioners. Similarly, the agency believes that referring to multiple dates, including the date of initial approval of a new indication, new route of administration, or a novel delivery system for a drug would be confusing and would diminish the significance of these references. The agency is, therefore, limiting identification of the initial date of U.S. approval to new molecular entities, new biological products, or new combinations of active ingredients because this is sufficient to accomplish the goals of increasing prescriber vigilance and reporting of suspected adverse reactions when using newer products.

The agency believes the date of initial U.S. approval will continue to be informative throughout a product's life cycle. Although the agency does not subscribe to the view that newer drugs are inherently less safe, it does believe that alerting a practitioner to the fact that a drug has been marketed for an extended period could provide some added assurance about the drug's safety margin based on cumulative, safe experience with the product. Therefore, the requirement to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                           Page 27
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

include the initial date of U.S. approval in Highlights will not lapse 3 years after approval of the product for marketing.

* Boxed warnings or contraindications (proposed § 201.57(a)(4))

FDA proposed to require that the full text of boxed warning(s) or contraindication(s) required by proposed § 201.57(c)(1) be included in Highlights unless the boxed warning was longer than 20 lines, in which case a summary of the contents of the boxed warning would be required (proposed § 201.57(a)(4)). The agency specifically sought comment on whether the full text of a boxed warning should be included in Highlights, regardless of length.

(Comment 16) Some comments supported the proposed 20-line limitation on the length of a boxed warning in Highlights. Other comments recommended that the boxed warning in Highlights always be a summarized version of the boxed warning in the FPI. Others expressed concern that summarizing boxed warnings might result in the omission of key information or lead to misinterpretations of the warning. They stated that the boxed warning is already succinct and the language is carefully negotiated with FDA and, therefore, that the boxed warning should always be included in its entirety in Highlights.

The agency has retained the 20-line length limitation on boxed warnings in Highlights. The agency believes that 20 lines is sufficient space to alert practitioners to the critical risk information contained in a boxed warning and to refer them to more detailed information in the FPI (complete boxed warning and other sections in the FPI).

The agency agrees with the comments that stated that manufacturers should always be required to present summarized boxed warning information in Highlights. The agency has determined that information from boxed warnings can readily be condensed without omitting critical risk information. The agency believes a summarized boxed warning in Highlights, with references to more detailed information in the FPI, is the most effective way to communicate critical risk information to practitioners. The agency has revised proposed § 201.57(a)(4) to require that boxed warnings be summarized concisely in Highlights.

(Comment 17) Several comments stated that inclusion of the full boxed warning in Highlights and in the FPI was needlessly duplicative and recommended that the boxed warning be included in only one location. One comment maintained the boxed warning should appear only in the "Warnings and Precautions" section in the FPI.

As discussed in the response to the previous comment, the boxed warning in Highlights is required to be a summary of the complete boxed warning in the FPI. Thus, the boxed warning in Highlights will not duplicate the boxed warning in the FPI. The agency believes that a summarized boxed warning must be included in Highlights to ensure that practitioners are exposed to critical information at the beginning of prescription drug labeling and that the complete boxed warning is needed to expand on the summary in Highlights.

The agency does not agree that the complete boxed warning in the FPI should be placed in the "Warnings and Precautions" section rather than at the beginning of the FPI. Placement of the complete boxed warning at the beginning of the FPI, where it can be easily located, is consistent with good risk communication practices, as well as health care practitioner preferences articulated in public comments and FDA's physician surveys and focus group research.

* Recent labeling changes (proposed § 201.57(a)(5))

FDA proposed to require in Highlights a heading entitled "Recent Labeling Changes" that identifies the sections in the FPI that contain recent FDA-approved or authorized substantive labeling changes (proposed § 201.57(a)(5)).

(Comment 18) In general, comments supported the addition of a "Recent Labeling Changes" heading to labeling and many comments thought the information would be very

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

useful to practitioners. However, one comment recommended that the proposed heading "Recent Labeling Changes" be changed to "Sections Revised" to accommodate changes that, although no longer truly recent, would be important to call to the attention of practitioners for an extended period of time (e.g., through multiple labeling revisions). Another comment recommended that the heading be changed to "Last Labeling Revisions" to accommodate changes that could no longer reasonably be considered recent (e.g., a situation in which years elapse between labeling changes).

*3938 The agency agrees that the proposed heading should be changed to better reflect the function of including the information. Thus, the final rule requires the heading "Recent Major Changes" (§ 201.57(a)(5)). FDA believes that it is important to characterize the changes listed under the heading as both "recent" and "major" to draw attention to the relative newness of the changes and to let practitioners know that identified changes are significant to clinical use of the drug (i.e., substantive), and not merely editorial.

(Comment 19) In the proposal, the agency specifically sought comment on whether there should be a time limit by which information under the proposed heading (now "Recent Major Changes") must be removed. Some comments supported a 1-year time limit for inclusion of information under the proposed heading. Other comments stated that there should be no fixed time limit for removal of information identified as a recent labeling change. These comments expressed concern that requiring labeling to be revised for the sole purpose of removing information from under the heading would lead to unnecessary expense, and that such information be removed at the next substantive labeling revision. Other comments stated that no time limit should be imposed for removal, but that removal should occur at the first convenient opportunity after 1 year from the date of the labeling change. Another comment stated that information should remain under the "Recent Major Changes" heading for 1 to 3 years after the change to keep practitioners up-to-date on labeling changes.

The agency agrees that, although there should not be a rigid time limit for removal of information from "Recent Major Changes," the information should not remain in Highlights indefinitely. The purpose of the heading is to alert practitioners to recent substantive labeling changes. The agency is concerned that the information might be ignored by practitioners if it often identifies changes that are no longer recent. The agency will, therefore, require that labeling changes identified under this heading be deleted at the first reprinting of the labeling after the change has been in labeling for 1 year. This requirement should ensure that labeling changes identified under the "Recent Major Changes" heading are current without imposing unnecessary costs on industry by requiring labeling revisions solely for the purpose of removing the information.

(Comment 20) Because there could be multiple changes to labeling in a calendar year, some comments recommended that each change appearing under "Recent Major Changes" be dated in a month/year format so that practitioners can readily identify the most recent changes.

The agency agrees that it would be useful to date the labeling changes identified under this heading. The agency has, therefore, revised proposed § 201.57(a)(5) to require that sections of prescription drug labeling listed under "Recent Major Changes" be followed by the month and year in which the change was incorporated in the labeling.

(Comment 21) One comment recommended that the rule specify that changes should be listed chronologically beginning with most recent.

The agency does not agree. Where there are multiple recent changes and those changes appear in more than one section, to avoid confusion, the order in which the sections are listed under "Recent Major Changes" should be consistent with the order of the sections in the FPI. FDA has revised proposed § 201.57(a)(5) accordingly.

(Comment 22) Some comments requested that the agency clarify how it will determine whether a labeling change is substantive and thus required to be included under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                                          Page 29
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)
```

"Recent Major Changes."

The agency recognizes that a product may have a large number of labeling changes ranging from inclusion of very important new risk information to typographical or editorial changes. Identifying all these changes under "Recent Major Changes" would obscure the most significant changes and would not be informative for practitioners. Therefore, the agency has revised proposed § 201.57(a)(5) to require that only substantive labeling changes in the "Boxed Warning," "Indications and Usage," "Dosage and Administration," "Contraindications," and "Warnings and Precautions" sections be included under "Recent Major Changes." These would include only those changes that are significant to the clinical use of the drug and, therefore, have significant clinical implications for practitioners (i.e., substantive changes). Thus, "Recent Major Changes" would not include any changes in the sections subject to this requirement that are typographical or editorial.

- Indications and usage (proposed § 201.57(a)(6))

FDA proposed to require that Highlights include an "Indications and Usage" heading that contains a concise statement of each of the product's indications, as specified in proposed § 201.57(c)(2), with any appropriate subheadings (proposed § 201.57(a)(6)). This information would include major limitations of use (e.g., particular subsets of the populations, second line therapy status). The agency specifically sought comment on whether the information required under the "Indications and Usage" heading of Highlights should be presented verbatim from the FPI or summarized in a bulleted format.

(Comment 23) Several comments stated that it was important to reproduce the "Indications and Usage" section verbatim to prevent confusion or misinterpretations. Other comments maintained that there should be flexibility to reproduce the information in the "Indications and Usage" section verbatim or summarize it in a bulleted format, depending on factors such as the amount of information in the "Indications and Usage" section and whether the information can be summarized and still effectively communicate what a practitioner should know about a drug's indications. Other comments recommended that there be bulleted summaries of the indications in all cases. One of these comments suggested that each bullet be preceded by an index number that corresponds with the index number of the full description of the indication in the FPI.

The agency has determined that the amount of information that must be included in Highlights from the "Indications and Usage" section of the FPI will vary. In most cases, the "Indications and Usage" section can be readily condensed (e.g., bulleted format) to provide prescribers with an accurate and informative summary, even if there is space available in Highlights to reproduce the "Indications and Usage" section from the FPI in its entirety (i.e., the one-half page limit requirement would not be exceeded).

The agency recognizes that for some products with many indications, it may not be possible to limit Highlights to one-half page in length (§ 201.57(d)(8)), even using a summarized version of the "Indications and Usage" section. In such cases, FDA may waive the one-half page requirement and approve the labeling with slightly longer Highlights (see comment 104).

- Dosage and administration (proposed § 201.57(a)(7))

FDA proposed that Highlights include, under a "Dosage and Administration" heading, the most important information in the "Dosage and Administration" section of the FPI (proposed § 201.57(a)(7)).

(Comment 24) One comment recommended that "Dosage and Administration" in Highlights include, *3939 in addition to the usual recommended doses, a range of doses known to be effective, and in particular, doses lower than the usual recommended doses. The comment stated that 76.2 percent of all adverse reactions are dose-related and many patients respond to lower doses than those recommended in labeling. Therefore, the comment suggested, lower doses may prevent adverse reactions.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                           Page 30
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

FDA agrees that it is important to include in labeling the full range of doses that FDA has concluded are effective. The agency has revised proposed § 201.57(a)(7) to clarify the range of doses to be included under the "Dosage and Administration" heading in Highlights.

(Comment 25) Several comments supported tabular presentation of dosage and administration information in Highlights. One comment proposed the use of a titration dose column (a visual tool to depict a drug's titration regimen) in Highlights for drugs for which titration is relevant. One comment maintained that the dosage adjustment statement in the prototype that accompanied the proposed rule should be highlighted and enlarged.

FDA agrees with the comment that supported use of a tabular format for "Dosage and Administration" in Highlights. However, because a tabular format or a titration dose column may not be appropriate for all drug products, FDA is not requiring use of these formats under the "Dosage and Administration" heading.

With respect to highlighting and enlarging the dosage adjustment statement in the prototype, FDA believes that bolded type is sufficient to draw attention to particularly important dosage adjustment statements and that enlarging the statement is not necessary. Enlarging only dosage adjustment information in Highlights would make this information appear more significant than other information in Highlights, which would not be appropriate. Therefore, FDA is not requiring that dosage adjustment statements in Highlights be in larger font than other information in Highlights.

(Comment 26) One comment requested that when the labeling states that there may be a need for dosage adjustments in patients with renal or hepatic impairment, it also specify how to adjust the dose or dosing interval.

Highlights identifies important information about the need for dosage adjustments in specific populations and refers to the section of the FPI where more detailed information about how to adjust doses can be obtained. FDA believes that complete information about how to adjust dosages for various specific populations would in many cases require a great deal of space. Therefore, FDA is not requiring that such information be included in Highlights.

• Warnings and precautions (proposed § 201.57(a)(10))

FDA proposed to require that Highlights include, under a "Warnings and Precautions" heading, a concise summary of the most clinically significant aspects of the "Warnings and Precautions" section of the FPI (proposed § 201.57(a)(7)). The information chosen from the FPI would include those warnings and precautions that affect prescribing because of their severity and consequent influence on the decision to use the drug, because monitoring of them is critical to safe use of the drug, or because measures can be taken to prevent or mitigate harm.

(Comment 27) Some comments requested clarification of the scope of information to be included in Highlights under the "Warnings and Precautions" heading. Comments expressed concern that summarizing selected safety information from the "Warnings and Precautions" section of the FPI might cause some important safety information to be omitted from Highlights.

"Warnings and Precautions" in Highlights serves to: (1) Identify the most clinically significant risks discussed in the "Warnings and Precautions" section in the FPI, (2) concisely summarize the salient features of those risks, and (3) direct the practitioner to the more detailed discussion of risks in the FPI. Information under the "Warnings and Precautions" heading in Highlights will typically include those risks that: (1) Affect decisions about whether to prescribe a drug, (2) require monitoring of patients to ensure safe use of the drug, or (3) require that measures be taken to prevent or mitigate harm. The agency has revised § 201.57(a)(10) to make clear the scope of information to include under this heading.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                                          Page 31
71 FR 3922-01, 2006 WL 160271 (F.R.)
```
**(Cite as: 71 FR 3922)**

Because the risks identified under the "Warnings and Precautions" heading in Highlights will refer the prescriber to the full discussion in the "Warnings and Precautions" section of the FPI, the agency believes that important risk information will not be overlooked by practitioners.

(Comment 28) One comment stated that it would be misleading to include the most common adverse reactions under "Warnings and Precautions" in Highlights because the most common adverse reactions are not likely to be discussed in the "Warnings and Precautions" section of the FPI. Rather, they are more likely to be discussed in the "Adverse Reactions" section of the FPI. The comment recommended that the most common adverse reactions be listed under a separate section in Highlights immediately following the contact information for reporting suspected serious adverse reactions.

The agency agrees that it may be confusing to include under the "Warnings and Precautions" heading in Highlights information that is derived from both the "Warnings and Precautions" and "Adverse Reactions" sections of the FPI. The agency is, therefore, revising proposed § 201.57(a) by adding to Highlights a heading entitled "Adverse Reactions" (§ 201.57(a)(11)) that is required to follow the "Warnings and Precautions" section. Information under the "Adverse Reactions" heading must include: (1) A listing of the most frequently occurring adverse reactions identified in the "Adverse Reactions" section in the FPI and (2) contact information for reporting suspected adverse reactions. The sequence in which the information is presented in Highlights-- the most frequently occurring adverse reactions followed by contact information for reporting suspected adverse reactions--is unchanged from the proposed rule.

(Comment 29) One comment requested clarification about whether only information that is supported by clinical data would be appropriate for inclusion in Highlights.

In most cases, the risk information in Highlights would be based on clinical data. However, risk information derived from animal data could be appropriate for inclusion in Highlights. For example, warnings about a drug's risks in pregnancy could be based entirely on animal data and might be appropriate for inclusion in Highlights. In such cases, Highlights must present only the clinically significant conclusions about risk in pregnancy (e.g., significant teratogen) and not include a discussion of the animal data that are the basis for the risk information presented.

- ADR reporting contacts (proposed § 201.57(a)(11))

FDA proposed (proposed § 201.57(a)(11)) to require that Highlights include, for drug products other than vaccines, a statement following the information under the "Warnings and Precautions" heading: "To report SUSPECTED SERIOUS ADRs, call (insert name of manufacturer) at (insert manufacturer's phone number) or FDA's MedWatch at (insert the current FDA MedWatch number)." For vaccines, the following statement would be required: "To report *3940 SUSPECTED SERIOUS ADRs, call (insert name of manufacturer) at (insert manufacturer's phone number) or VAERS at (insert the current VAERS number)." The agency specifically requested comment on whether it is necessary to include a contact number for reporting suspected adverse reactions in both Highlights and the "Warnings and Precautions" section of the FPI.

(Comment 30) Some comments stated that the contact information should be in both Highlights and FPI to make it more convenient to access and increase the likelihood that practitioners will be prompted to report suspected adverse reactions. Other comments stated that it would not be necessary to include contact information in both places because prominent placement of the information in Highlights alone would be sufficient to encourage practitioners to report adverse reactions. Some comments agreed that one location would be sufficient, but because those comments also opposed inclusion of Highlights in labeling, they recommended including the contact information in the FPI. Other comments suggested locating the contact information at the beginning of the labeling or in a "box" to increase its prominence. One comment recommended that the information be included only once and in close proximity to the name and address of the manufacturer in the FPI. The comment maintained that it is not intuitive to look for adverse reaction reporting contact information under "Warnings and Precautions." One comment objected to inclusion of any adverse

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                                       Page 32
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)
```

reaction reporting contact information in labeling. That comment maintained that contact information is not prescribing information and thus not appropriate for inclusion in labeling and, moreover, that there is no evidence that inclusion of such information in labeling will facilitate reporting of adverse reactions.

The agency agrees with the comments that support inclusion of contact information for reporting adverse reactions only in Highlights. Because the contact information is featured prominently in Highlights--bolded and set apart from other information--the agency believes that this is sufficient to make practitioners aware of the appropriate contacts to report adverse reactions and to encourage them to report suspected adverse reactions. The agency also believes that as prescribers become familiar with the content of Highlights, they will become increasingly aware of and familiar with the location of the adverse reaction reporting contact information. The agency does not believe that also including contact information in the FPI, even if moved to the beginning of the FPI, would result in meaningfully expanding the number of practitioners who become aware of the contact information. Therefore repeating the contact information in the FPI would not have a meaningful effect on the extent to which practitioners report adverse events. The agency also does not believe that placing the contact information for reporting suspected adverse reactions only in the FPI would afford the information adequate prominence. Accordingly, the final rule was revised to delete the proposed requirement at § 201.57(c)(6)(v) that contact information for adverse reaction reporting be included in the "Warnings and Precautions" section in the FPI. The agency believes it is unnecessary to further increase the prominence of the adverse reaction reporting contact information. Its current location--immediately following the listing of the most common adverse reactions--is the appropriate location, and the bolding and use of capitalization are sufficient to call attention to the information and distinguish it from adjacent information.

The agency does not agree that the adverse reaction reporting contact information should be omitted from labeling because it is not considered prescribing information. Including adverse reaction reporting contact information in labeling enables practitioners to report adverse reactions to FDA promptly. The agency monitors these reports and analyzes the adverse reactions data to determine whether labeling revisions are necessary for safe and effective use.

(Comment 31) Some comments recommended that only the manufacturer's phone number be included in prescription drug labeling, while others agreed that including the MedWatch phone number is important because manufacturers' phone numbers are subject to change. One comment requested that a telephone number for the relevant FDA review division also be included. Two comments recommended including the manufacturer's Web site in the reporting contact information.

The agency agrees that it is important to include both the manufacturer's phone number and FDA's phone number for voluntary reporting of adverse reactions. The agency believes that providing practitioners two options for reporting adverse reactions will help ensure that they always have someone to contact about an adverse reaction. The agency believes it is not appropriate to also include the phone number of the FDA review division that approved the drug. FDA review divisions are not the initial point of contact for postmarketing adverse reaction reports; therefore, manufacturers and practitioners should not send these reports to the review divisions for processing. It is critical that these reports be directed to the location(s) in FDA that are responsible for receiving and processing these reports so that they are evaluated and analyzed in an appropriate manner.

The agency agrees with comments recommending that, in addition to their phone number, manufacturers include the direct link to the section of their Web site for voluntary reporting of adverse reactions. The agency has revised proposed § 201.57(a)(11) to require the address of the Web site, if one is available. The agency will not require that manufacturers create a Web site to meet this requirement.

The agency has also decided to require that the adverse reaction reporting contact information include the FDA Web site address for voluntary reporting of adverse

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reactions (currently, http://www.fda.gov/medwatch for drug products except vaccines and http://www.fda.gov/vaers for vaccines). This Web site has become an increasingly important source of adverse reaction reports. The agency has concluded that providing practitioners with the convenience of being able to submit an adverse reaction report electronically may encourage reporting of adverse reactions that might not otherwise be reported. Thus, the agency believes it is very important to require identification of this Web site address in labeling, in addition to the FDA telephone number.

(Comment 32) Two comments stated that all adverse reactions should be reported, and not just serious adverse reactions.

The agency agrees that practitioners should not be discouraged from reporting adverse reactions that might not be considered serious. Certain adverse reactions that are not considered serious can be clinically significant. Moreover, practitioners may not always be able to determine whether an adverse reaction meets the regulatory definition of serious (21 CFR 310.305(b), 21 CFR 312.32(a), 21 CFR 314.80(a), and 21 CFR 600.80(a)). Also, there are limitations on the extent to which a drug's risks (serious and nonserious adverse reactions) can be delineated before marketing. The agency, therefore, believes that practitioners should be encouraged to submit all suspected adverse reactions to the manufacturer or FDA, without regard to the seriousness *3941 of the reaction, to facilitate faster and more accurate characterization of a drug's risk profile. Accordingly, FDA has revised proposed § 201.57(a)(11) to require that the statement for adverse reaction reporting contact information refer to all suspected adverse reactions, not just serious ones.

- Drug interactions (proposed § 201.57(a)(12))

FDA proposed to require that Highlights contain a "Drug Interactions" heading that would include, with any appropriate subheadings, a concise summary of the drug interaction information in the FPI (i.e., prescription or over-the-counter drugs or foods that interact in clinically significant ways with the product) (proposed § 201.57(a)(12)).

(Comment 33) Several comments strongly supported inclusion of "Drug Interactions" as a separate heading in Highlights. One comment recommended requiring separate subheadings for drug-drug, drug-food, drug-laboratory, and possibly drug-herbal interactions.

FDA will not require that "Drug Interactions" in Highlights include specific subheadings depending on whether the interaction is a drug-drug, drug-food, drug-herbal, or drug-laboratory interaction. Use of these subheadings is typically most appropriate when a drug has a large number of interactions in each of these categories. In other cases, it is unlikely to provide additional clarification sufficient to justify use of space for the subheadings.

- Use in specific populations (proposed § 201.57(a)(13))

FDA proposed to require that Highlights contain a "Use in Specific Populations" heading (proposed § 201.57(a)(13)). The agency proposed that this heading include, with any appropriate subheadings, a concise summary of information from this section of the FPI on any clinically important differences in response or use of the drug in specific populations.

(Comment 34) One comment requested that the agency specify that the pregnancy category designation be included under the "Use in Specific Populations" heading in Highlights because the pregnancy category quickly communicates whether use of a drug is appropriate during pregnancy.

The agency does not agree that pregnancy category designations are appropriate for inclusion in Highlights or that they are effective in quickly communicating whether use of a drug is appropriate during pregnancy. The agency believes the pregnancy category, in isolation, tends to oversimplify the risks of drugs in pregnancy and, as a result, may be confusing. Decisions about use of a drug in pregnancy should be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.