based on careful consideration of available data, not simply on a reference to the
pregnancy category.

• Highlights limitation statement (proposed § 201.57(a)(15))

FDA proposed (proposed § 201.57(a)(15)) to require that Highlights include the
statement: "These highlights do not include all the information needed to prescribe
(insert name of drug product) safely and effectively. See (insert name of drug
product)'s comprehensive prescribing information provided below."

(Comment 35) Several comments recommended that the Highlights limitation statement
be made more prominent by moving the statement to the beginning of Highlights. In
addition, several comments recommended revisions to the language of the statement,
such as including that practitioners "must" consult the comprehensive prescribing
information, in addition to Highlights, to use a drug safely and effectively.

The agency agrees that it is important to emphasize to prescribers that Highlights
does not include all the information needed to use a drug safely and effectively and
that placement of the statement at the beginning of Highlights increases the
prominence of this message. Therefore, FDA has revised proposed § 201.57(a)(15) to
require that the statement appear at the beginning of Highlights (§ 201.57(a)(1)).

The agency does not agree, however, that it is necessary to revise the language of
the Highlights limitations statement. Recognizing that FDA cannot require
practitioners to consult the FPI, the agency believes that the language in this
statement, with two minor editorial changes, very clearly states the limitations of
Highlights.

F. Comments on the Index (Proposed § 201.57(b))

FDA proposed to require that prescription drug labeling for products described in
proposed § 201.56(b)(1) (i.e., new and more recently approved prescription drug
products) contain an index entitled "Comprehensive Prescribing Information: Index"
(proposed § 201.56(b)). The index would list the subheadings required under
proposed § 201.56(d)(1), if not omitted under proposed § 201.56(d)(3), and each
optional subheading included in the FPI under proposed § 201.56(d)(5). Each
subheading would be required to be preceded by its corresponding index number or
identifier.

In the proposal, the agency specifically sought comment on whether it is necessary
to require both an index and Highlights. As discussed in section II of this
document, the agency has decided, on its own initiative, to change the title (now
"Full Prescribing Information: Contents") to better reflect the function of this
portion of the labeling.

(Comment 36) Most comments supported inclusion of an index (hereafter Contents).
They maintained that Highlights alone cannot be relied upon to help locate all drug
information in the FPI because Highlights is not comprehensive (Highlights includes
information from only certain sections of the FPI). They stated that a table of
contents is necessary to quickly and easily direct the reader to sections of the FPI
that are not referred to in Highlights. Other comments stated that, despite the
distinct purposes served by Highlights and Contents, the agency should consider
consolidating them to save space. Some comments stated that there need not be both
because they have similar functions and recommended that Contents be deleted if
Highlights is retained. One comment recommended that prescription drug labeling
include neither Contents nor Highlights. The comment stated that the reordered and
reformatted FPI itself is adequate to facilitate practitioners' access to
information in labeling.

FDA continues to believe that Highlights and Contents serve different purposes and
has determined that both should be retained. Highlights presents a succinct summary
of the information in the FPI that is most crucial for safe and effective use, with
cross-references to direct prescribers to more details in the FPI. In contrast,
Contents serves as a navigational tool that references all the sections and

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

subsections in the FPI, some of which will not be referenced in Highlights. Therefore, the agency believes Contents has a unique and meaningful function in making information in the FPI accessible to practitioners.

In addition, Highlights and Contents both figure prominently in FDA's plans to convert prescription drug labeling to an electronic format (see section V of this document). The Contents will provide hyperlinks to all sections and subsections of the FPI, enabling practitioners to navigate the labeling more easily. Highlights will provide hyperlinks to the most frequently referenced and, typically, most important prescribing information, allowing rapid access to more detailed information on these critical topics.

(Comment 37) One comment recommended that, for sections of labeling that are omitted from the FPI *3942 because they are not applicable, the agency consider including the section number and heading in Contents followed by the statement "not applicable," rather than omitting the section number and heading. The comment noted that the prototype labeling in the proposed rule omitted a section and also omitted the listing of the section heading in Contents, and that this omission might confuse practitioners.

The purpose of Contents is to set forth the sections and subsections included in the FPI. For many drug products, some sections and subsections are not applicable (e.g., "Drug Abuse and Dependence," "References"). Currently, these sections are, in most cases, simply omitted from the labeling without discussion in accordance with former § 201.56(d)(3). The agency believes that this practice should continue, but recognizes that because identifying numbers are now required to be used for labeling of new and recently approved products, this practice may initially be confusing for some. The agency considered the comment's suggestion that the section identifying number and heading be included in Contents followed by the statement "not applicable" for labeling that omits a required section or subsection, but believes that this is not the best approach because of space considerations. Instead, to minimize any potential confusion regarding omitted sections, the agency has revised proposed § 201.56(d)(3) (designated in this final rule as § 201.56(d)(4)) to require in these cases that the Contents heading be followed by an asterisk and that the following statement be included at the end of Contents: "* Sections or subsections omitted from the full prescribing information are not listed."

In addition, for legal clarity, FDA revised proposed § 201.56(d)(3) and (e)(3) (§ 201.56(d)(4) and (e)(3) in this final rule) to make clear that clearly inapplicable sections, subsections, or specific information are omitted from labeling.

*G. Full Prescribing Information--Comments on the Reorganization*

FDA proposed to revise, for products described in proposed § 201.56(b)(1) (new and more recently approved prescription drug products), the content and format requirements of prescription drug labeling at then-current § § 201.56(d) and 201.57(c). These revisions included, in proposed § § 201.56(d) and 201.57(c), reordering the information in the FPI to make more prominent those sections that the agency identified (based on the physician surveys, focus groups, public comments, and its own experience) to be most important to, and most commonly referenced by, health care practitioners. For example, proposed § 201.57(c)(1) would require that any boxed warning(s) be the first substantive information to appear in the FPI, proposed § 201.57(c)(2) would require that the "Indications and Usage" section follow any boxed warnings in the FPI, and proposed § 201.57(c)(3) would require that the "Dosage and Administration" section follow the "Indications and Usage" section in the FPI.

(Comment 38) Virtually all the comments supported the proposed reordering of the FPI to give greater prominence to the sections that practitioners consider most important and refer to most often. Many comments agreed that the reordering, by better reflecting the way the information in the FPI is used, would make the FPI more useful and accessible to practitioners. Some comments, while supportive of the reordering generally, recommended certain changes to the sequence of the sections. One comment requested that the "Adverse Reactions" section be moved from its present

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

location following the "Use in Specific Populations" section and be placed
immediately after the "Warnings and Precautions" section. The comment also
recommended that the "Use in Specific Populations" section be moved from its
location following the "Drug Interactions" section and be placed immediately after
the "Dosage and Administration" section. The comment maintained that use in specific
populations frequently involves modifications to dose or dosage regimen, so it would
be logical to place the section in close proximity to the "Dosage and
Administration" section.

 The agency agrees that it would be advantageous to group together the two major
risk information sections--the "Warnings and Precautions" and "Adverse Reactions"
sections. Placing the two sections sequentially consolidates risk information in one
location and helps put in context the relative seriousness of the adverse reactions
discussed in labeling. Thus, FDA has revised proposed § 201.57(c) to require that
the "Adverse Reactions" section follow the "Warnings and Precautions" section.

 The agency does not agree with the recommendation to place the "Use in Specific
Populations" section immediately after the "Dosage and Administration" section.
Although some of the information in the "Use in Specific Populations" section will
have implications for dosing, most of the information in the section will be related
to risk. The section is, therefore, more appropriately placed among the other
labeling sections related to risk. In addition, the agency believes that all dosing
information should be consolidated in a single section. If there are specific
recommendations for dosage regimen modifications for use in specific populations,
those modifications must be described in the "Dosage and Administration" section
(see § 201.57(c)(3)).

 (Comment 39) One comment requested that the agency require a "Product Title"
section at the beginning of the FPI. The comment maintained that the title is short
and repeating it would be useful to practitioners to avoid confusion.

 The option to include a "Product Title" section is a vestige of the prescription
drug labeling rule finalized in 1979 (44 FR 37434, June 26, 1979). The optional
"Product Title" section was incorporated in the labeling regulations at that time in
response to a comment to the proposed rule that was the basis for the 1979 final
rule (44 FR 37440). The comment stated that the proposed labeling requirements did
not require identification of the product at the beginning of labeling. Instead, the
first required element in the proposed labeling regulations was the "Description"
section. The comment recommended, and the agency agreed, that certain sections of
the "Description" section could be pulled out of that section and used as a "Product
Title" section at the beginning of labeling.

 Under this final rule, a "Product Title" section is not needed for labeling subject
to the requirements of new § 201.57, because under final § 201.57(a)(2),
Highlights includes the name of the drug, dosage form, and route of administration
and, for controlled substances, the controlled substance symbol. Because this
information will appear at the beginning of labeling and is similar to the
information required under the "Product Title" section, the agency believes it is
not necessary or useful to provide the option to include a "Product Title" section
at the beginning of the FPI. Accordingly, the agency has deleted proposed §
201.56(d)(4) from the requirements for products described in § 201.57(b)(1) (new
and more recently approved drug products). This revision does not have any effect on
the "Product Title" provision in current regulations (§ 201.56(e)(4)), which this
final rule retains for products subject to § 201.80.

 (Comment 40) One comment stated that, if the agency retains the *3943 requirement
for the boxed warning in both Highlights and the FPI, the boxed warning in the FPI
should be placed in the "Warnings and Precautions" section rather than at the
beginning of the FPI.

 The agency disagrees. The agency believes that the summary sections in Highlights
should appear in the same order as the corresponding sections in the FPI to
facilitate access to the more detailed information contained in the corresponding
sections in the FPI. The risk information presented in a boxed warning is of such

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

importance that it warrants placement in the most prominent locations.

(Comment 41) Some comments recommended that the "How Supplied/Storage and Handling" section be kept at the end of the FPI, rather than moved toward the front of the FPI, as proposed. The comments expressed concern that, because of the variable length of the three labeling sections that precede the "How Supplied/Storage and Handling" section, it would not be in a consistent location; therefore, practitioners would have more difficulty locating the section than if it were always at the end of the FPI. One comment stated that pharmacists frequently access this section for information about storage conditions and that it would be more appropriate to place the section just before the "Patient Counseling Information" near the end of the labeling, where pharmacists are accustomed to finding it.

The proposed placement of the "How Supplied/Storage and Handling" section following the "Dosage and Administration" section was based on input from physicians who were surveyed about which information in labeling is most important and frequently referenced. Physicians indicated that their use of the "Dosage and Administration" section and the "How Supplied/Storage and Handling" section is linked. Physicians commonly refer to the "Dosage and Administration" section for dosing information and then to the "How Supplied/Storage and Handling" section for available dosage strengths and dosage forms. For this reason, the agency believes that keeping dosing and dosage forms and strengths information together in the labeling is important.

However, the agency recognizes that, under proposed § 201.57(c)(4), the "How Supplied/Storage and Handling" section would often have contained lengthy lists of available packaging and product identification information that may distract prescribers from other important information. For this reason, and in view of the comments received, the agency has decided to move this section toward the end of the labeling (§ 201.57(c)(17)). (See comments 55 and 107 for discussion of revisions (i.e., addition of imprinting as an example of an identifying characteristic, and deletion of proposed § 201.57(c)(4)(v)).) FDA also has decided to require that information identified by prescribers as frequently referenced (i.e., dosage forms and strengths and some product identification information) be included in a section entitled "Dosage Forms and Strengths" (§ 201.57(c)(4)) following the "Dosage and Administration" section.

The agency believes that moving the "How Supplied/Storage and Handling" section toward the end of labeling will make it easier for pharmacists to locate product identification, packaging, and storage information. Retaining critical prescribing information in the "Dosage Forms and Strengths" section will continue to meet the needs of prescribers by keeping available dosage forms and strengths information together with information about dosage and administration. Under this final rule, some product identification information (e.g., shape, color, coating, scoring, and imprinting) may be required to appear in both the "Dosage Forms and Strengths" and "How Supplied/Storage and Handling" sections. FDA believes that the product identification information should be included in both sections to preserve the integrity and comprehensibility of each section.

(Comment 42) One comment requested that the agency clarify the conditions under which it would be appropriate, when amending existing labeling to the new labeling format, to move certain information from a section in old labeling to a different section in new labeling. For example, the comment asked what criteria would be used to determine whether information on use in specific populations, currently contained in the "Clinical Pharmacology" section, should be moved to the new "Use in Specific Populations" section.

The agency expects that, in many cases, amending labeling to meet new § 201.57(c) will involve rearranging large segments (sections and subsections) of information in existing labeling without substantially changing the content. In some cases, however, it will be necessary to parse information from several parts of the existing labeling into a new section. When information is to be consolidated into a new section, or when information is required in several places, there may be uncertainty about how the information should be divided into portions for clarity and to avoid redundancy. The agency recognizes the complexity of these issues and,

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

therefore, is making available the new labeling format guidance to assist in
determining how to reorganize existing labeling information into the new format (see
section IV of this document).

*H. Full Prescribing Information--Comments on Specific Provisions*

As noted previously, for products described in proposed § 201.56(b)(1) (new and
more recently approved prescription drug products), FDA proposed to revise the
content and format requirements at then-current § 201.57 (proposed § 201.57(c)). A
discussion of the comments pertaining to these provisions and the agency's responses
follow.

• Boxed warning (proposed § 201.57(c)(1))

FDA proposed to require that a boxed warning in the FPI be preceded by an
exclamation point (!) for indexing purposes (proposed § 201.57(c)(1)). The agency
specifically requested comment on the different types of icons that could be used to
signal the boxed warning and on the costs and benefits of different icon types.

(Comment 43) Several comments stated that an icon is unnecessary because
practitioners are familiar with the meaning of a boxed warning and the box itself is
sufficient to call attention to the warning. Some comments observed that the
exclamation point was not a sufficiently distinct symbol because it could be
confused with the numeral 1 and might be particularly difficult to recognize in
small font. Some comments expressed concern about using any icon that is not
universally understood. One comment recommended that a stop sign be used as it has a
universally recognized meaning. Other comments expressed concern about added
printing and software costs associated with any icon requirement.

FDA has reconsidered requiring an exclamation point, or any other icon, to identify
a boxed warning. FDA agrees that the single black line box around the warning
information is understood by practitioners in the United States and is sufficient to
draw attention to the warning information. Therefore, the agency is not requiring an
exclamation point or any other icon preceding the boxed warning in the FPI. Sections
201.56(d)(1), 201.57(a)(4), and (c)(1) of the final rule have been revised to remove
the requirement.

• Indications and usage (proposed § 201.57(c)(2)(i))

FDA proposed to require that the "Indications and Usage" section of the *3944 FPI
(proposed § 201.57(c)(2)(i)) contain the same information as required at then-
current § 201.57(c)(1) except that outdated examples of indications were removed.

(Comment 44) One comment recommended that the "Indications and Usage" section be
retitled "Food and Drug Administration--Approved Uses." The comment stated that the
phrase "indications and usage" is regulatory jargon that is not meaningful to
practitioners or patients.

The agency does not believe it would be worthwhile to change the title of the
section in the manner recommended by the comment. The agency does not agree that
"indications and usage" is jargon and not meaningful to practitioners. FDA believes
practitioners are familiar with the section heading and understand that the uses
described in this section are those for which FDA has found to be safe and
effective.

(Comment 45) One comment stated that the "Indications and Usage" section should
include approved uses in pregnancy.

The agency agrees, in part. Uses that have been specifically studied for conditions
unique to pregnancy and for which a drug has been demonstrated to be safe and
effective (e.g., to induce labor) would be appropriate for inclusion in the
"Indications and Usage" section. Ordinarily, however, special considerations about
the use of a drug in pregnancy for indications that do not differ from the general
population would be placed in the "Use in Specific Populations" section.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

• Indications and usage--scope of information (proposed §  201.57(c)(2)(iv)(A))

  FDA proposed to revise the requirement at then-current §  201.57(c)(3)(i) to state
that if evidence is available to support the safety and effectiveness of the drug
only in selected subgroups of the larger population with the disease or condition
(e.g., patients with mild disease or patients in a special age group) or if evidence
to support the indication is based on surrogate endpoints, then the available
evidence and the limitations on the usefulness of the drug (or in the case of
surrogate endpoints, the limitations of the supporting efficacy data) must be
described succinctly in the "Indications and Usage" section (proposed §
201.57(c)(2)(iv)(A)). FDA proposed, further, to require reference to the "Clinical
Studies" section of the FPI (proposed §  201.57(c)(15)) for a detailed discussion of
the methodology and results of clinical studies relevant to such limitation(s). FDA
also proposed to require that this section of the FPI identify specific tests needed
for selection or monitoring of the patients who need the drug and describe, if
available, information on the approximate kind, degree, and duration of improvement
to be anticipated.

  (Comment 46) One comment requested that the "Indications and Usage" section specify
the type of clinical trial that has been conducted to support each indication (e.g.,
placebo-controlled, active-controlled).

  The agency believes that the "Clinical Studies" section is the appropriate section
of labeling to discuss the details (e.g., trial design, outcome) of clinical trials,
not the "Indications and Usage" section. The agency has concluded that greater
clarity about the scope of the information to be included in the "Indications and
Usage" section is warranted and has revised proposed §  201.57(c)(2) accordingly.
This revision is consistent with having, as stated in the preamble to the proposed
rule, a more focused "Indications and Usage" section (65 FR 81082 at 81091).

  (Comment 47) FDA received one comment that strongly supported the proposed
modification of the "Indications and Usage" section to require that limitations in
usefulness or in data supporting approval be specified. One comment stated that the
requirement should be modified to specifically require discussion of differential
drug effects in subpopulations with varying genetic characteristics.

  FDA agrees that the "Indications and Usage" section must discuss differences in
drug effectiveness in subgroups for which there is substantial evidence for such
differences. The proposed language was not intended to limit the scope of the
requirement to particular subgroups. The provision applies to any identifiable
subgroup with a clearly different response to a drug. The agency believes the
language in final §  201.57(c)(2)(i)(B) and (c)(2)(i)(D) makes clear that the
section must discuss differential drug effects for all types of patient subgroups
for which there is substantial evidence establishing differences in effects. If
dosage modification is necessary based on genetic characteristics, this must be
described in the "Dosage and Administration" section. FDA has revised proposed §
201.57(c)(3) accordingly (see §  201.57(c)(3)(i)(H) of final rule).

  (Comment 48) One comment requested that FDA make clear when the  "Indications and
Usage" section must include specific tests needed for selection and monitoring of
patients who need a drug (e.g., microbe susceptibility testing). The comment stated
that it is not practical to recommend specific microbial susceptibility testing when
empirical diagnosis is common.

  Specific tests for selecting and monitoring patients would be described when they
are necessary for safe and effective use. Therefore, the requirement in final §
201.57(c)(2)(i)(C) that the "Indications and Usage" section identify specific tests
needed for selecting and monitoring patients does not require that the "Indications
and Usage" section routinely state that microbial susceptibility testing must be
done. The requirement addresses situations in which a drug is indicated for a
specific therapeutic niche that can be identified by microbe susceptibility testing.
For example, the "Indications and Usage" section might specify that a drug is
indicated to treat penicillin-resistant pneumococci. The description of the drug's

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

activity provides critical prescribing information.

• Indications and usage--lack of evidence statement (proposed §
201.57(c)(2)(iv)(D))

  FDA proposed to revise then-current § 201.57(c)(3)(iv), which provided that in
situations where there is a common belief that a drug may be effective for a certain
use or condition or the drug is commonly used for that condition but the
preponderance of the evidence shows the drug is ineffective, the "Indications and
Usage" section must state that the drug is ineffective (proposed §
201.57(c)(2)(iv)(D)). The revision proposed to expand this requirement to situations
in which a drug may be effective for a use but the preponderance of the evidence
shows that the therapeutic benefits of the product do not generally outweigh its
risks. In such situations, under sections 201(n) (21 U.S.C. 321) and 502(a) of the
act, the agency can require that the "Indications and Usage" section state that
there is a lack of evidence that the drug is effective or safe for that use.

  (Comment 49) One comment requested that the agency provide examples to clarify what
it intends by this new requirement.

  Anti-arrhythmia drugs are an example of a category of drugs to which the new
requirement in final § 201.57(c)(2)(ii) could apply. They are typically effective
in restoring or maintaining normal sinus rhythm for a variety of types of rhythm
disturbances, but because of the potential for pro-arrhythmic effects, they are
typically indicated for only the more serious clinical situations in which their
benefits outweigh their risks. For example, an anti-arrhythmic *3945 drug may be
indicated for sustained ventricular arrhythmia, but specifically not indicated for
premature ventricular contractions.

• Dosage and administration (proposed § 201.57(c)(3))

  FDA proposed to require that the "Dosage and Administration" section of the FPI
(proposed § 201.57(c)(3)) contain the same information as required in then-current
§ 201.57(j), except that the section must include efficacious or toxic drug or
metabolite concentration ranges and therapeutic concentration windows for drug or
metabolite(s) where established and when clinically important. FDA proposed to
require information on therapeutic drug concentration monitoring (TDM), when
clinically necessary. The proposed provision also specified that dosing regimens
must not be implied or suggested in other sections of labeling if not included in
this section. FDA has retained this provision in the final rule with some editorial
revisions (§ 201.57(c)(3)).

  (Comment 50) One comment asked the agency to clarify whether the language in
proposed § 201.57(c)(3), "upper limit beyond which safety and effectiveness have
not been established," is referring to maximum tolerated dose.

  The language does not refer to the maximum tolerated dose. The upper limit beyond
which safety and effectiveness have not been established would ordinarily refer to:
(1) The largest dose demonstrated to be safe and effective in controlled clinical
trials, (2) the largest dose evaluated that showed an increase in effectiveness
(i.e., where studied larger doses provided no additional benefit), or (3) the
largest dose beyond which safety has not been established or an unacceptable risk
has been demonstrated.

  (Comment 51) One comment requested that the agency make it clear that any dosage
adjustments discussed in the "Drug Interactions" section should also be presented in
the "Dosage and Administration" section.

  The agency agrees that when there is specific information about how to adjust
dosage because of a drug interaction, this information must be included in the
"Dosage and Administration" section. The "Dosage and Administration" section should
also refer the reader to the more detailed discussion of the drug interaction in the
"Drug Interactions" and "Clinical Pharmacology" sections. In response to this
comment, FDA has modified proposed § 201.57(c)(3) to require that information on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

dosage adjustments needed because of a drug interaction be included in the "Dosage
and Administration" section.

(Comment 52) One comment requested that all intravenous dosing regimens in labeling
be expressed in rates of milligrams per hour. The comment pointed out that rates are
expressed in milligrams per minute and milligrams per hour. The comment maintained
that expressing all such rates in milligrams per hour would avoid the need to
recalculate rates and thus reduce the likelihood of medication errors.

The agency does not agree that always requiring rates of administration for
intravenous medications to be expressed in milligrams per hour would avoid the need
to recalculate rates of infusion and thus reduce medication errors. The agency
believes that these rates should be expressed per time unit that is most appropriate
to the interval over which a medication is to be administered. This approach will
eliminate, to the extent possible, the need to recalculate rates and should,
therefore, minimize error.

(Comment 53) One comment stated that, with respect to clinically important
effectiveness and/or toxic drug and/or metabolite concentration ranges and
therapeutic concentration windows in the "Dosage and Administration" section,
effectiveness information other than information on TDM would more appropriately be
placed in the "Clinical Pharmacology" section. The comment further stated that, if
the concentration range concerned safety, it would more appropriately be included in
the "Warnings and Precautions" section.

The "Dosage and Administration" section must identify efficacious or toxic
concentration windows of the drug or its metabolites, if established and clinically
significant, and information on TDM, when TDM is necessary. Clinically relevant
background information supporting the need for TDM could appear in other sections of
labeling as appropriate (e.g., "Clinical Pharmacology," "Clinical Studies," "Adverse
Reactions").

(Comment 54) Two comments recommended including instructions on the appropriate
time of day to take a drug and other dosing conditions (e.g., take with food, take
on an empty stomach) in the "Dosage and Administration" section of the labeling. One
comment requested that the labeling include a section concerning the importance of
compliance with the dosage regimen and instructions on what to do about missed doses
and noncompliance in general. The comment requested that, in the absence of data to
support instructions on what to do about noncompliance, the labeling include a
statement indicating that there is no such information.

The agency agrees that information about appropriate time of day to take a
medication or other dosing considerations must be included in the "Dosage and
Administration" section if this information is necessary for safe and effective use
(e.g., if a significant amount of a therapeutic effect is lost if the drug is not
taken on an empty stomach). Therefore, the agency has revised proposed §
201.57(c)(3) to require that clinically significant dosing information (e.g.,
clinically significant food effects) be included in the "Dosage and Administration"
section. Similarly, the agency has revised proposed § 201.57(c)(13)(i)(B) of the
"Clinical Pharmacology" section to clarify that certain recommendations regarding
pharmacodynamic effects included in other sections of labeling, such as the "Dosage
and Administration" section, must not be repeated in the "Clinical Pharmacology"
section.

The agency agrees that rigid compliance with the dosage regimen can be critical to
safe and effective drug therapy and information about how to manage noncompliance is
important for practitioners. Therefore, FDA has revised proposed § 201.57(c)(3) to
make clear that important considerations concerning compliance with the dosage
regimen must be included.

The agency believes that the labeling should not include a separate section devoted
to the importance of compliance with a drug's dosage regimen or information on what
to do about missed doses, because this information is most appropriately contained
in other sections of the labeling (e.g., "Dosage and Administration," "Clinical

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Pharmacology," "Patient Counseling Information"). The agency believes that it would not be useful to include a statement in the labeling indicating that there is no information available about management of noncompliance (e.g., missed doses).

• How supplied/storage and handling (proposed § 201.57(c)(4))

FDA proposed to require that the "How Supplied/Storage and Handling" section of the FPI (proposed § 201.57(c)(4)) contain the same information as required at then-current § 201.57(k), except that a new provision was added at proposed § 201.57(c)(4)(v). Proposed § 201.57(c)(4)(v) would require a statement specifying the type of container to be used by pharmacists in dispensing the product. Comments pertaining to proposed § 201.57(c)(4)(v) are addressed in section VI.J of this document ("Comments on Revisions to *3946 Container Labels"; see comments 106 through 110). Comment 41 addresses relocation of the "How Supplied/Storage and Handling" section to § 201.57(c)(17) and the retention of critical prescribing information in the "Dosage Forms and Strengths" section at § 201.57(c)(4). A comment pertaining to the format for and type of information contained in these sections is discussed here.

(Comment 55) One comment recommended including product identity markings in this section. The comment also recommended bulleted or tabular presentation of product identity markings, color, flavor, package sizes, strengths, storage conditions, etc., to make such information more accessible.

FDA agrees with the comment that product identity markings are useful for practitioners and, therefore, now includes imprinting as an example of an identifying characteristic in both the "Dosage Forms and Strengths" and the "How Supplied/Storage and Handling" sections of the final rule. FDA also agrees that presenting information about product identity markings, color, flavor, package sizes, strengths, storage conditions, and other identifying information in a bulleted or table format will make the information more accessible, particularly where the product has many dosage forms and strengths. However, because the amount and content of information can vary significantly from product to product, FDA is not requiring a specific format.

• Warnings and precautions (proposed § 201.57(c)(6))

FDA proposed to revise the content of the "Warnings" and "Precautions" sections. First, FDA proposed to require that information on drug interactions, information on specific populations (i.e., pregnancy, labor and delivery, nursing mothers, pediatric, and geriatric use information), and information for patients be moved from the "Precautions" section to three new sections (described in proposed § 201.57(c)(7), (c)(8), and (c)(17) respectively). Second, FDA proposed to require that the remainder of the information in the "Precautions" section, with the information from the "Warnings" section, be combined into a new section entitled "Warnings and Precautions" (proposed § 201.57(c)(6)).

FDA also proposed to require that the "Warnings and Precautions" section include information on contacts for adverse reaction reporting (proposed § 201.57(c)(6)(v)). See comment 30 regarding deletion of proposed § 201.57(c)(6)(v).

Several comments supported reorganizing the "Warnings and Precautions" section. The comments agreed with FDA's findings, based on physician surveys and focus testing, that the distinction between warnings and precautions is not meaningful to practitioners who use labeling. The comments stated that the combined section would make the discussion of risk information in labeling less repetitive, less confusing, and more accessible.

(Comment 56) In the proposal, the agency specifically sought comment on whether there should be standardized headings for categories of adverse reactions in the proposed "Warnings and Precautions" section and, if there should be, what standardized headings would be appropriate.

Comments uniformly opposed standardized headings to categorize adverse reactions in

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the "Warnings and Precautions" section. Comments expressed concern that standardized headings would not provide sufficient flexibility to accommodate the diversity of risk information that might be appropriate for inclusion in the "Warnings and Precautions" section.

FDA agrees that standardized headings should not be required in the "Warnings and Precautions" section because a requirement to place risk information under prescribed headings could make the information less clear or more difficult to find.

(Comment 57) One comment requested clarification of the requirement in proposed § 201.57(c)(6)(iii) that the "Warnings and Precautions" section identify any laboratory tests that "may be helpful" in following a patient's response or identifying possible adverse reactions. The comment maintained that the language "may be helpful" is too vague and recommended that the language be changed to specify that only laboratory tests that "have been shown to be helpful" be required in the "Warnings and Precautions" section.

The agency is concerned that limiting the scope of laboratory testing recommendations identified in labeling to only those tests that have been "shown to be helpful" in monitoring patients could exclude sensible and potentially important laboratory testing recommendations. The agency agrees, however, that "may be helpful" is a vague standard and, therefore, has amended the provision to require identifying any laboratory tests "helpful" in following a patient's response or identifying possible adverse reactions.

(Comment 58) Several comments expressed concern about the proposal to change the criteria for inclusion of adverse reactions in the "Warnings and Precautions" section from "serious" to "clinically significant" adverse reactions. There was concern that the significance of the adverse reactions discussed in the "Warnings and Precautions" section would be diluted by the inclusion of less serious adverse reactions in the section, thus undermining the value of the section. Other comments expressed concern that "clinically significant" is subject to interpretation and could, in application, result in inconsistency across labeling for different products.

As discussed in the preamble accompanying the proposed rule (65 FR 81082 at 81092), "serious" was changed to "clinically significant" to expand the scope of the "Warnings and Precautions" section to allow for inclusion of adverse reactions that may not meet the regulatory definition of "serious" (§ 312.32(a)), but nonetheless have a significant impact on clinical use of the drug. The agency believes that information on both types of adverse reactions is necessary for practitioners to prescribe products safely and effectively and must, therefore, be included in the "Warnings and Precautions" section. The agency acknowledges that inclusion of less serious but clinically significant adverse reactions may add to the overall length of the "Warnings and Precautions" section of labeling for certain drugs. The agency does not agree, however, that the effect will be to dilute or deemphasize the importance of serious adverse reactions contained in the section. The agency believes that limiting inclusion of nonserious adverse reactions to only those that have significant impact on therapeutic decisionmaking (e.g., may reduce compliance with drug therapy) ensures that the intended scope of the "Warnings and Precautions" section is preserved.

(Comment 59) One comment recommended that the agency describe parameters upon which to base decisions about the sequence in which adverse reactions are presented in the "Warnings and Precautions" section.

There are multiple factors that could influence the sequence in which adverse reactions should be presented in the "Warnings and Precautions" section. The most significant include the relative seriousness of the adverse reaction, the ability to prevent or mitigate the adverse reaction, the likelihood the adverse reaction will occur, and the size of the population affected. In general, the sequence of the adverse reactions should reflect the relative public health significance, and the seriousness of the adverse reaction *3947 should weigh more heavily than the likelihood of occurrence or the size of the affected population. The agency has

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                              Page 44
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)

added clarifying language to this requirement to assist in selecting and organizing information in this section. The agency is also making available guidance on the "Warnings and Precautions" section, which provides recommendations on sequencing of adverse reactions (see section IV of this document).

In addition, the final rule (§ 201.57(c)(6)(i)) states that FDA may require labeling to include a specific warning relating to a use that is not provided for under the "Indications and Usage" section if the drug is commonly prescribed for a disease or condition and such usage is associated with clinically significant risk or hazard. FDA deleted language from proposed § 201.57(c)(6)(i), (i.e., "and there is a lack of substantial evidence of effectiveness for that disease or condition") because the requirement for a warning is based on an assessment of risk. In addition, FDA also clarified that its authority under this provision must be exercised in accordance with sections 201(n) and 502(a) of the act.

• Drug interactions (proposed § 201.57(c)(7))

FDA proposed to require a "Drug Interactions" section (proposed § 201.57(c)(7)) containing the same information as required by the "Drug interactions" subsection of the "Precautions" section at then-current § 201.57(f)(4).

(Comment 60) Most comments supported creation of a distinct section for drug interactions. These comments maintained that the new section would improve the safety of drugs for patients on multiple medications. One comment asked FDA to clarify whether discussions of drug interaction pharmacokinetic studies should be repeated in the "Clinical Pharmacology" section.

How to divide information on drug interactions between the "Clinical Pharmacology" and "Drug Interactions" sections is a matter of judgment. Manufacturers must not include a detailed discussion of drug interaction pharmacokinetic studies in both the "Drug Interactions" and the "Clinical Pharmacology" sections. Ordinarily, clinically significant results and conclusions of such studies must appear in the "Drug Interactions" section and clinically significant information on dosing modifications in the "Dosage and Administration" section. If additional details about the design or conduct of the studies are relevant to the clinical use of the drug, the information must be included in the "Clinical Pharmacology" section. Thus, the agency has revised proposed § 201.57(c)(7)(i) and (c)(13)(i)(D) to provide this clarification (see § 201.57(c)(8)(i) and (c)(13)(i)(C)).

(Comment 61) One comment stated that the labeling example published with the proposed rule included recommended dosage adjustments for drug interactions that are not based on clinical experience and requested clarification about whether the manufacturer must include speculative interactions and dosage adjustments in this section. The comment also asked to what extent sponsors would be required to develop clinical data to support dosage adjustments for drug interactions.

Manufacturers must not speculate in labeling. Information from clinical experience is clearly the most persuasive, but other relevant data, such as pharmacokinetic data, in vitro data, and data from other drug products in the same pharmacologic or chemical class, may reliably predict the likelihood of an interaction with the drug or provide a basis for a dosage adjustment recommendation. Therefore, it would not be appropriate to limit the scope of the drug interactions and dosage adjustment information in labeling to only those interactions or dosage adjustments for which there are clinical data.

(Comment 62) One comment stated that including discussions of dosage adjustments to address drug interactions in both the "Drug Interactions" and "Dosage and Administration" sections would add unnecessarily to the length of the labeling.

FDA does not agree that discussing dosage adjustments for drug interactions in both the "Drug Interactions" section and the "Dosage and Administration" section would be unnecessary or repetitive because the purposes of the sections are distinct (see comment 51). The "Drug Interactions" section alerts the prescriber to the existence of interactions and provides a place for substantive discussion of the nature of the

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

identified interactions, including practical advice about preventing or limiting
interactions. The "Dosing and Administration" section provides specific information
about how to modify the dose to minimize the risk of drug interactions when such
information is available, but does not provide the details that are discussed in the
"Drug Interactions" section.

(Comment 63) One comment recommended revising the "Drug Interactions" section to
require the presentation of drug interaction data ranked by order of the strength of
the data supporting the existence of an interaction.

FDA believes that relative clinical significance of the drug interaction would
ordinarily be the most reasonable basis for determining the order of presentation of
drug interactions. Because, for certain products, this section can be lengthy and
complex, the agency will not designate a specific order in the regulations.

(Comment 64) One comment recommended that, in the following language from the
proposed provision for the "Drug Interactions" section, the word "patients" be
replaced with the word "humans": "Information in this section must be limited to
that pertaining to clinical use of the drug in patients." The comment maintained
that drug interaction studies often involve healthy volunteers, rather than
patients, and the language in the regulation should reflect the nature of the study
participants.

The agency has revised final § 201.57(c)(8)(i) to clarify the scope of the
information to be included in this section and this sentence was deleted.

(Comment 65) One comment requested that the agency clarify the requirement in the
proposed "Drug Interactions" section to briefly describe the mechanism of
interaction for drugs and drug classes that interact with a drug in vivo. The
comment maintained that the mechanism is not always understood and requested that
the rule specify that the requirement to describe the mechanism applies only if the
mechanism is understood.

The agency agrees. Proposed § 201.57(c)(7) (§ 201.57(c)(8)(i) in this final rule)
has been revised to state that the mechanism of an interaction must be briefly
described, if it is known.

• Use in specific populations (proposed § 201.57(c)(8))

FDA proposed to require a new section entitled "Use in Specific Populations"
(proposed § 201.57(c)(8)) to include the information on specific populations
required in the "Pregnancy," "Labor and delivery," "Nursing mothers," "Pediatric
use," and "Geriatric use" subsections of the "Precautions" section at then-current §
201.57(f)(6) through (f)(10). The agency also proposed to revise certain required
warning language in the labeling of drugs in pregnancy categories D and X (proposed
§ 201.57(c)(8)(i)(A)(4) and (c)(8)(i)(A)(5)). The proposal would have replaced the
following language from then-current § 201.57(f)(6)(i)(d) and (f)(6)(i)(e): "If
this drug is used during pregnancy, or if the patient becomes *3948 pregnant while
taking this drug, the patient should be apprised of the potential hazard to the
fetus." The proposed alternative language, which was intended to address the concern
that any woman with reproductive potential should be apprised of the risk associated
with taking the category D and X drugs during pregnancy, read: "If this drug is
administered to a woman with reproductive potential, the patient should be apprised
of the potential hazard to a fetus."

FDA also proposed some changes in terminology to the "Nursing mothers" subsection
(proposed § 201.57(c)(8)(iii)). For example, FDA proposed to change the term
"nursing mothers" to "lactating women." Other proposed changes included making
assessments based on "clinically significant adverse reactions" rather than "serious
adverse reactions."

(Comment 66) Several comments supported creation of a section devoted to
information about use in specific populations. The comments indicated that placing
all the information on specific populations in one labeling section would make the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)

information much easier to locate. However, one comment stated that the revised warning statement for drugs in pregnancy categories D and X no longer makes clear that a pregnant woman receiving the drug should be apprised of the potential hazard to the fetus. The comment expressed concern that the phrase "women with reproductive potential" could be interpreted as referring only to women with the potential to become pregnant and not to those who actually are pregnant.

The agency is developing a proposal that would revise the requirements for the "Pregnancy," "Labor and delivery," and "Nursing mothers" subsections of prescription drug labeling. For this reason, the agency has reconsidered the need to make minor, interim changes to the warning statements for pregnancy categories D and X in this final rule and has decided to retain the language at former § 201.57(f)(6)(i)(d) and (f)(6)(i)(e). This language clearly addresses use of the drug by pregnant women and obviates the need for the changes advocated by the comment.

FDA also decided not to make interim changes to the "Nursing mothers" subsection of the labeling and will retain the language at former § 201.57(f)(8) for this subsection. The agency believes that it is best to address all changes to the content of these subsections at one time.

(Comment 67) One comment requested that the agency combine the initiative to revise the requirements for the pregnancy labeling with this rulemaking to revise the requirements of prescription drug labeling generally. The comment maintained that the pregnancy labeling requirements need to be changed expeditiously to require that the labeling address the likelihood of harm to the fetus based on timing of exposure, pharmacokinetic changes in pregnant women, and the relevance of animal data to humans.

The agency does not agree that the two initiatives should be combined. The pregnancy labeling initiative focuses exclusively on revising the content requirements for the pregnancy subsection of labeling to meaningfully describe the risks associated with fetal and maternal exposure to a drug and the clinical implications of those risks. In contrast, this final rule is focused on revising the format and content of labeling to increase its usefulness for health care practitioners.

• Adverse reactions--definition of adverse reaction (proposed § 201.57(c)(9))

FDA proposed to revise the definition of "adverse reaction" to mean a "noxious and unintended response to any dose of a product for which there is a reasonable possibility that the product caused the response, i.e., the relationship cannot be ruled out" (proposed § 201.57(c)(9)).

(Comment 68) Several comments objected to the revised definition of an adverse reaction in proposed § 201.57(c)(9). The comments maintained that this definition would be too restrictive and could result in omission of important information. Comments expressed particular concern that the terms "noxious" and "unintended" could be applied to exclude important adverse reactions. They also stated that important information could be excluded from the "Adverse Reactions" section because manufacturers could narrowly construe whether the drug caused the event. Comments maintained, for example, that an adverse reaction that affects compliance could be considered clinically meaningful and thus merit discussion in the "Warnings and Precautions" section, but be excluded from the "Adverse Reactions" section because it is not considered noxious or unintended. Some comments requested clarification of elements of the definition--in particular "noxious," "unintended," and "injurious to health." One comment recommended that "unintended" be changed to "unexpected," stating that "unexpected" may more accurately reflect the intent of the definition. One comment requested that FDA issue guidance to clarify these concepts and conduct an educational campaign to explain the meaning and significance of the new definition. Several comments maintained that the definition of an adverse reaction in then-current § 201.57(g) is a more accurate description of the events that should be included in labeling.

One comment expressed concern that the proposed definition of adverse reaction

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

could result in excluding adverse events that should be included in the labeling
because there is a lack of guidance for determining "reasonable causality" to
identify which adverse reactions to list. The comment said that it is commonly known
that prescription drug labeling lists all adverse reactions that occurred in trials,
with definite, probable, possible, and remote causality. The comment recommended
that significant adverse reactions be listed in Highlights and reinforced in the
full prescribing information. The comment also stated that all other events that
occurred should still be listed, perhaps last in the comprehensive "Adverse
Reactions" section, because the loss of a comprehensive listing of all reported
events could be detrimental to patient safety.

  Some comments stated that the proposed new definition for an adverse reaction was a
marked improvement because it would narrow the scope of the "Adverse Reactions"
section. These comments contended that narrowing the scope of events considered
adverse reactions for purposes of the "Adverse Reactions" section would help address
long-standing practitioner concerns that the section is not very informative because
it contains excessively long lists of reactions, many of which are not relevant to
clinical use of the drug.

  The agency has reconsidered the proposed definition of an adverse reaction, which
was intended to conform to the definition of adverse drug reaction for safety
reporting in the International Conference on Harmonisation of Technical Requirements
for Registration of Pharmaceuticals for Human Use (ICH) guidance "E2A Clinical
Safety Data Management: Definitions and Standards for Expedited Reporting" (60 FR
11284 at 11285, March 1, 1995).

  Upon consideration of the comments submitted in response to this proposal, the
agency concluded that it should not require use of a new definition of adverse
reaction for labeling of new and recently approved products. The agency believes
that the language in the definition of adverse reaction at former § 201.57(g)
(designated in the final rule *3949 as § 201.57(c)(7)), in particular "an
undesirable effect, reasonably associated with use of a drug, that may occur as part
of the pharmacological action of the drug or may be unpredictable in its occurrence"
is appropriate for labeling, but that it requires clarification, as described in the
next paragraph, to minimize including information in labeling that does not help
prescribers use the drug safely and effectively (i.e., adverse events that are not
related to use of the drug), and that may result in diluting the usefulness of
clinically meaningful information. Thus, FDA will, as recommended by several
comments, continue to use its existing definition for adverse reaction.

  The agency believes, as previously indicated, that the definition of adverse
reaction at former § 201.57(g) requires clarification. For this purpose, FDA has
revised this definition to make clear that it is specific to prescription drug
labeling and does not include all adverse events observed during use of a drug, but
only those adverse events for which there is some basis to believe there is a causal
relationship between the drug and the occurrence of the adverse event. There are
many factors to consider in assessing the association between a drug and a reported
adverse event and determining whether a reported event is an adverse reaction that
should be included in labeling. The agency has included clarifying language in this
final rule to assist in selecting and organizing reactions. To further assist
manufacturers and reviewers, FDA is making available the "Adverse Reactions" section
guidance (see section IV of this document).

  (Comment 69) One comment expressed concern that inclusion of an adverse reaction in
the "Adverse Reactions" section under the proposed definition would be tantamount to
an admission that the event was caused by a drug for product liability purposes.
Another comment stated that having two definitions for adverse reactions (i.e., the
definition in proposed § 201.57(c)(9) for new and recently approved drugs and the
definition in redesignated § 201.80(g) for older drugs) may have implications for
product liability. One comment stated that application of the proposed adverse
reactions definition to drugs that have to revise their labeling to implement the
new format would require reevaluation of clinical data and a new safety review by
the agency. One comment requested the agency clarify whether manufacturers would now
have to reclassify or otherwise reassess adverse reactions profiles of products with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

existing labeling.

The concerns expressed in these comments are based on the proposed adverse reaction definition. Because the agency is not adopting this definition for the purposes of labeling, FDA believes that the concerns expressed in these comments are no longer applicable.

• Adverse reactions--characterization of adverse reactions (proposed § 201.57(c)(9)(ii))

FDA proposed to retain the language from then-current § 201.57(g)(2) in proposed § 201.57(c)(9)(ii):

In this listing, adverse reactions may be categorized by organ system, by severity of the reaction, by frequency, or by toxicological mechanism, or by a combination of these, as appropriate. If frequency information from adequate clinical studies is available, the categories and the adverse reactions within each category must be listed in decreasing order of frequency. An adverse reaction that is significantly more severe than the other reactions listed in a category, however, must be listed before those reactions, regardless of its frequency. If frequency information from adequate clinical studies is not available, the categories and adverse reactions within each category must be listed in decreasing order of severity.* * *

(Comment 70) One comment requested that the agency reconcile apparent inconsistencies between the draft of the "Adverse Reactions" section guidance in development and the language in the "Adverse Reactions" section of the proposed rule. The comment maintained that the recommended organization in the draft "Adverse Reactions" section guidance is not consistent with the organization of the "Adverse Reactions" section in the proposed rule. This comment advocated that important points regarding adverse reactions be discussed in both the proposed rule and the "Adverse Reactions" section guidance, with extensive detail provided in the guidance document.

Based on this comment and on comments received on the draft "Adverse Reactions" section guidance, the agency has revised the regulation on the "Adverse Reactions" section at proposed § 201.57(c)(9) (designated in this final rule as § 201.57(c)(7)) to clarify the scope of information for this section of labeling. See comments 71 through 75.

The agency recognizes that the "Adverse Reactions" section has evolved over time to a point where it now typically contains several different components (e.g., information from controlled clinical trials, uncontrolled clinical trials, and postmarketing experience). The agency also recognizes that there exists considerable inconsistency in how information in this section is organized and presented across different drug products. To address this problem, the agency recommends, in the "Adverse Reactions" section guidance, an organization for the typical components of the "Adverse Reactions" section.

Thus, FDA continues, as recommended by the comment, to provide general requirements in regulation and detailed recommendations in guidance. The "Adverse Reactions" section guidance provides recommendations for how to select information for inclusion in this section, how to characterize the information, and how to further organize it (see section IV of this document).

(Comment 71) One comment recommended that manufacturers be required to specify in the "Adverse Reactions" section what categorization scheme was employed for listing of the adverse reactions.

The agency believes that, in most cases, the basis for the categorization of "Adverse Reactions" section will be readily apparent to readers. In rare instances in which the basis for categorization is not apparent, it would be appropriate to identify the categorization scheme employed. The agency has, therefore, determined that it is not necessary to require in regulation that the basis for categorization of adverse reactions be identified for all labeling.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The agency has revised, for the reasons described in the response to comment 70, proposed § 201.57(c)(9)(ii) (designated in this final rule as § 201.57(c)(7)(ii)) to provide clarification for this part of the "Adverse Reactions" section. The agency changed the term "organ system" to "body system." Although the two terms have been used interchangeably, currently, the term "body system" is used most often.

In addition, the agency deleted the option to categorize adverse reactions by toxicological mechanism. After reviewing the 1975 proposed and 1979 final rules, the agency concluded that the term is not clear; therefore, categorization by toxicological mechanism is not an appropriate option for the "Adverse Reactions" section.

The agency also made clear that, however categorized, adverse reactions must be listed in order of decreasing frequency.

FDA also removed the requirement that significantly more severe reactions be listed before other reactions regardless of frequency. In most cases, frequency information is paramount, but in other cases, severity information may be more important or a combination of *3950 the two may be the best approach. The categorization scheme selected for the "Adverse Reactions" section should be appropriate to the drug's safety database and reflect the relative public health importance of the information.

The agency also clarified that if data are available and important for adverse reactions with significant clinical implications, details about the nature, frequency, and severity of the reaction must be included. This provision makes clear that, in many cases, in addition to lists of adverse reactions, descriptive information is appropriate for inclusion in the "Adverse Reactions" section.

(Comment 72) One comment requested that the agency require that adverse reactions identified from postmarketing experience be listed separately from adverse reactions identified from clinical trials.

The agency agrees that adverse reactions identified from domestic and foreign spontaneous reports after a drug is marketed should be listed separately from adverse reactions identified in clinical trials. Adverse reaction data from clinical trials and spontaneous reports communicate different information to practitioners. In clinical trials, subjects are specifically queried about and evaluated for occurrence of adverse events and clinical investigators have requirements for identifying and reporting such events (21 CFR 312.64(b)). Data from clinical trials inform practitioners about the range of adverse reactions that may occur. In addition, because there is typically a comparison to a control group, these data provide an estimate of the incidence and the ability to identify events that, because they are likely to be causally related, represent adverse reactions.

Postmarketing experience with a drug permits observation of suspected adverse reactions in a larger, often more diverse, patient population. This experience may provide an opportunity to identify low frequency reactions and reactions not previously observed because the susceptible population was either excluded from the controlled trials or only included in small numbers. But, to interpret this information accurately, a practitioner must be mindful that postmarketing experience, although more closely reflective of clinical practice, lacks the structure of a clinical trial setting that permits increased precision. For postmarketing reporting, the impetus for reporting, the frequency with which a suspected adverse reaction is reported, and the number of exposures to the drug compared to the number of suspected reactions reported are unknown, making estimation of incidence calculations difficult.

Because these differences significantly affect the interpretation of these complementary sets of data, the agency believes it is important to separate in labeling adverse reactions identified in clinical trials from adverse reactions identified from domestic and foreign spontaneous reports. For precisely these reasons, in the draft "Adverse Reactions" section guidance, FDA suggested

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

segregating adverse reactions from spontaneous reports in this section of the
labeling. Thus, the agency has revised proposed § 201.57(c)(9)(ii) (§ 201.57(c)(7)
in this final rule) by creating a separate listing for each set of adverse reactions
within the "Adverse Reactions" section.

The agency clarifies that this distinction is between adverse reactions identified
in clinical trials and those identified from domestic and foreign spontaneous
reports after a drug is marketed. Adverse reactions that are identified in clinical
trials conducted after a drug is marketed would be listed under adverse reactions
identified from clinical trials.

(Comment 73) One comment requested that, for drugs with multiple doses or
indications, the "Adverse Reactions" section have a separate presentation of adverse
reactions for each dose or indication.

The agency agrees that it is important for the "Adverse Reactions" section to call
attention to adverse reactions for which there are clinically significant dose-
response relationships.

Thus, the agency has revised proposed § 201.57(c)(9) (designated in this final
rule as § 201.57(c)(7)) to require manufacturers to include details about the
relationship of adverse reactions to drug dose where sufficient data are available
and necessary to prescribe the drug safely and effectively. The agency does not
believe, however, that it needs to require that separate presentations of adverse
reactions always be included for different doses. If there are important differences
in adverse reaction rates for different doses, the section can include a single
table that directly compares the adverse reactions rates for different doses.
Presenting rates for different doses side by side in a table, for example, is an
effective way to make a dose-response relationship apparent.

The agency also does not believe that it needs to require a separate presentation
of adverse reactions for each indication. Such information could be appropriate for
a drug with multiple indications, however, when the adverse reaction profile differs
substantially from one indication or population to another, the differences are drug
related, and the data have important clinical implications. On the other hand, where
differences are relatively minor and not clinically meaningful, separate
presentations for multiple indications would not be informative and would detract
from more important information.

(Comment 74) One comment requested that the "Adverse Reactions" section discuss
differences in adverse reaction rates among different demographic subgroups (e.g.,
men, women, blacks, renally-impaired).

The agency agrees that the "Adverse Reactions" section must include information on
differences in adverse reactions among demographic subgroups where sufficient data
are available and important. Thus, the agency has revised proposed § 201.57(c)(9)
(designated in this final rule as § 201.57(c)(7)) to require such information in
the "Adverse Reactions" section.

• Adverse reactions--frequency information (proposed § 201.57(c)(9)(ii))

FDA proposed to retain the language from then-current § 201.57(g)(2) in proposed §
201.57(c)(9)(ii):

The approximate frequency of each adverse reaction must be expressed in rough
estimates or orders of magnitude essentially as follows:

The most frequent adverse reaction(s) to (name of drug) is (are) (list reactions).
This (these) occur(s) in about (e.g., one-third of patients; one in 30 patients;
less than one-tenth of patients). Less frequent adverse reactions are (list
reactions), which occur in approximately (e.g., one in 100 patients). Other adverse
reactions, which occur rarely, in approximately (e.g., one in 1,000 patients), are
(list reactions).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Percent figures may not ordinarily be used unless they are documented by adequate and well-controlled studies as defined in §  314.126(b) of this chapter (except for biological products), they are shown to reflect general experience, and they do not falsely imply a greater degree of accuracy than actually exists.

For biological products, such figures must be supported by substantial evidence.

(Comment 75) One comment asked the agency to clarify an apparent inconsistency between the proposed rule and the draft "Adverse Reactions" section guidance concerning how to characterize the incidence of adverse reactions. The comment pointed out that the proposed rule (which used the same language as in the 1979 final rule) recommended grouping adverse reactions by rough orders of magnitude and encouraged use of the terms "frequent," "infrequent," and "rare" in conjunction with orders of magnitude *3951 appropriate for a given drug's safety database. The comment observed that agency guidance discouraged use of these terms when grouping by rough orders of magnitude.

The agency agrees that clarification is needed regarding presentation of incidence information for adverse reactions. The language in the proposed rule is not sufficiently precise to accurately reflect current practices in characterizing the incidence of adverse reactions associated with the use of a drug product. The preamble to the 1975 proposed rule indicates that precise percent figures would be appropriate if there is scientific evidence from well-controlled trials substantiating such figures and when inclusion of percent figures does not falsely imply a greater degree of accuracy than actually exists (40 FR 15392 at 15393, April 7, 1975). The science of clinical trials has progressed so substantially over time that ascertaining such rates is typically part of virtually all drug development programs.

Under current labeling practices, rates of incidence for most adverse reactions identified in controlled clinical trials are expressed as percentages. Current labeling also typically includes percentage rates for comparison groups in clinical trials (e.g., placebo group) where inclusion of such rates would not be misleading. Broader frequency ranges are used only when meaningful percentage rates cannot be determined. Therefore, the agency has revised proposed §  201.57(c)(9) (designated in this final rule as §  201.57(c)(7)) to make it clear that when meaningful adverse reaction rates can be derived (for drug treatment group and comparison groups) and presentation of comparator rates would not be misleading, they must be included in labeling.

The agency also believes it is inappropriate to use nonspecific terms such as "frequent," "infrequent," and "rare" when presenting adverse reaction information. The agency believes the science of clinical trials has evolved such that use of those terms in the manner recommended by the 1979 rule is confusing because the terms do not necessarily refer to the same frequency range across different drug products. For example, for product A, "rare" might mean an incidence of less than 1/500, but for product B, "rare" might mean an incidence of less than 1/1000. Moreover, the terms are imprecise and, even if precise meanings were defined, would reinforce the misconception that frequency is synonymous with seriousness.

The agency believes that identifying the numerical frequency range alone is a clearer way to communicate rough rates of incidence for a group of adverse reactions. Therefore, the agency has revised proposed §  201.57(c)(9) to require that adverse reactions for which meaningful percentage rates cannot be reliably determined (e.g., adverse reactions were observed only in the uncontrolled trial portion of the overall safety database), be grouped within specified frequency ranges as appropriate to the safety database of the drug (e.g., adverse reactions occurring at a rate of less than 1/100, adverse reactions occurring at a rate of less than 1/500) or descriptively identified, if frequency ranges cannot be determined.

(Comment 76) One comment requested clarification on how percentages should be used to characterize the frequency of adverse reactions when percentages are derived from studies that evaluated greater doses than the approved dose. The comment asked

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                     Page 52
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

whether, in this circumstance, rates of adverse reactions should be omitted from the "Adverse Reactions" section.

The agency will determine, during review of an application, whether adverse reaction rates derived from doses greater than recommended doses would be informative for practitioners and not misleading, and thus appropriate for inclusion in labeling. Where there are adverse reaction data from studies using different doses, including doses greater than recommended doses, the agency will evaluate whether pooling or otherwise combining adverse reaction data would more accurately describe the frequency of adverse reactions.

(Comment 77) One comment requested clarification on whether manufacturers are required to identify the total number of patients enrolled in clinical trials in the "Adverse Reactions" section.

FDA has revised proposed 201.57(c)(9)(i) (designated in this final rule as 201.57(c)(7)(i)) to clarify that the total number of subjects or patients exposed to the drug, and the extent of exposure, must be identified in the "Adverse Reactions" section, so that practitioners can interpret the significance of the data in this section. The "Adverse Reactions" section guidance provides recommendations on how to describe the database from which the adverse reaction data in this section are derived (see section IV of this document).

- Clinical pharmacology (proposed § 201.57(c)(13))

FDA proposed to require that the "Clinical Pharmacology" section (proposed § 201.57(c)(13)) contain three subsections--"Mechanism of action," "Pharmacodynamics," and "Pharmacokinetics." Proposed § 201.57(c)(13) also provided for an optional subsection for incorporation of other clinical pharmacology information that does not fit into one of the specified subsections.

(Comment 78) One comment recommended that the "Clinical Pharmacology" section be revised to require discussion of a drug's elimination half-life, indicate differences in elimination half-life as a function of age or other subpopulation, and specify the enzyme involved in metabolism (e.g., CYP450).

Under the final rule, elimination half-life of drugs and differences in the elimination half-life as a function of specific populations (including age-related populations) must be reported in the "Pharmacokinetics" subsection of the "Clinical Pharmacology" section of the labeling (§ 201.57(c)(13)(i)(C)). In addition, if there are clinically significant differences in elimination half-lives among specific populations and those differences require special monitoring or alternate dosing regimens, such information must be included in other sections, such as "Use in Specific Populations," "Warnings and Precautions," and "Dosage and Administration." Information about drug metabolism, including metabolic pathways and the enzyme systems involved, is also required in the "Pharmacokinetics" subsection of the "Clinical Pharmacology" section.

(Comment 79) One comment requested that FDA clarify the statement in proposed § 201.57(c)(13)(i)(B): "If pharmacokinetic/pharmacodynamic relationships are not demonstrated or are unknown, the labeling must contain a statement about the lack of information." The comment asked that FDA clarify whether the provision is referring to concentration versus response relationships generally.

In response to this comment, the agency has rephrased this provision, as follows: "Exposure-response relationships (e.g., concentration-response, dose-response) and time course of pharmacodynamic response (including short-term clinical response) must be included if known." (See final § 201.57(c)(13)(i)(B).)

(Comment 80) One comment stated that the three new subsections in the "Clinical Pharmacology" section will make it easier to find information in the section.

One comment requested that in vitro data supporting the "Mechanism of action" subsection in the "Clinical Pharmacology" section be permitted to *3952 be included

©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                        Page 53
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

in the subsection because such information is helpful in understanding a drug's
physiologic activity and in differentiating a drug from other therapeutic agents.

 The agency agrees that the three new subsections should make information easier to
find. Because 201.56(d)(2) (proposed 201.56(d)(5)) permits additional nonstandard
subsections, FDA deleted "12.4 other clinical pharmacology information" (proposed
201.57(c)(13)(i)(D)) from the final rule.

 The "Mechanism of action" subsection must include information based on in vitro
data if the information is essential to a description of the established mechanism
of action and the information is clinically relevant. Where in vitro information
about mechanism of action is included, the information must not be used as the basis
for a clinical comparison (i.e., to differentiate the drug from other therapeutic
agents).

 (Comment 81) Many comments opposed the proposal (proposed § 201.57(c)(13)(ii) to
revise the current "Clinical Pharmacology" section to require that in vitro data
related to the activity or effectiveness of an anti-infective drug be included in
the section only if a waiver is granted under § 201.58 or § 314.126(c) (21 CFR
314.126(c)). While comments conceded that in vitro data have their limitations, the
comments maintained that in vitro data for anti-infective agents can be an important
component of the total information available for making prescribing decisions in
some situations, including: (1) In the absence of susceptibility testing, (2) in
treating drug resistant pathogens (e.g., drug-resistant pneumococci), and (3) in
treating rare infections. Some comments stated that preventing inclusion of in vitro
data that indicate a drug is inactive against a microorganism could result in
selection of inappropriate antibiotics and poor clinical outcomes. One comment
maintained that some physician organizations effectively endorse use of in vitro
data by having guidelines that recommend use of in vitro data as an adjunct to
making educated empirical judgments about appropriate anti-infective therapy.
Several comments stated that the absence of in vitro data will make it difficult for
practitioners to identify appropriate broad spectrum agents when broad coverage is
needed. One comment requested that in the event the agency decides to go forward and
exclude in vitro data related to effectiveness unless a waiver has been granted, the
agency explain in detail the process by which a waiver could be granted.

 Several comments expressed concern about the implications of removing in vitro data
for devising susceptibility tests for new anti-infective drugs. They stated that
these data are relied on by FDA (the Center for Devices and Radiological Health) and
by manufacturers of in vitro susceptibility tests in selecting appropriate organisms
for which to devise tests. In addition, comments stated the data are used to develop
quality control mechanisms for, and to help develop criteria for use in the review
and clearance of, susceptibility test devices. Some comments maintained that removal
of in vitro data would cause manufacturers not to develop susceptibility tests for
organisms for which such tests would be desirable.

 One comment supported exclusion of in vitro data from labeling. The comment stated
that exclusion of in vitro data that are not adequate to support therapeutic
decisionmaking will improve anti-infective therapy and help prevent inappropriate
use of antibiotics.

 The agency has reconsidered its proposal to exclude from the "Clinical
Pharmacology" section in vitro data for anti-infectives that are not supported by
clinical data. The agency is considering a broad range of issues concerning the
development and labeling of anti-infective products, including the types of data
that should be obtained to support indications, the way that indications and anti-
infectives data should be presented in labeling, and ways to meaningfully address
resistance to anti-infective drugs. The agency believes a comprehensive and
coordinated approach is needed to address these issues. Thus, FDA is deferring any
action on the in vitro data proposals in the "Clinical Pharmacology" section of
labeling at § § 201.57(c)(13)(ii) and 201.80(b)(2) until the agency has developed a
comprehensive plan. At that time, the agency may repropose changes to the way in
which in vitro data are presented in labeling.

        ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.