(Comment 82) Several comments maintained that the algorithm in the agency's current guidance for industry ("Clinical Development and Labeling of Anti-Infective Drug Products," 1992) for determining when it is appropriate to include in labeling in vitro data not supported by clinical data contains adequate safeguards and should continue to be used for determining when to include such data. One comment suggested that labeling users be educated about the criteria for inclusion in labeling of in vitro data not supported by clinical data and how to use such data in making prescribing decisions.

At this time, the agency will continue to rely on the algorithm in its current guidance on clinical development and labeling of anti-infectives for determining when to include in vitro data in the "Clinical Pharmacology" section of labeling. As part of the comprehensive evaluation of the way in which anti-infective therapies are currently developed and labeled (see response to comment 81), the agency may reconsider use of the algorithm and make any changes that may be needed. For this reason, the agency will not at this time undertake an educational campaign to educate prescribers about the basis for inclusion of in vitro data in labeling.

(Comment 83) Several comments recommended retaining in vitro data for anti-infective drugs in the "Clinical Pharmacology" section and strengthening the current in vitro disclaimer statement that indicates that the clinical significance of the in vitro data is unknown.

Until FDA has developed a comprehensive plan to address the broad range of issues confronting development and labeling of anti-infective products, the agency will defer any decisions about the content of the disclaimer that accompanies in vitro data indicating that the clinical significance of the data is unknown.

(Comment 84) One comment requested that the agency clarify the scope of the proposed exclusion of in vitro data to make clear that it does not encompass in vitro data with clinical substantiation. The comment maintained that in vitro susceptibility data from large scale clinical trials would provide some basis for making an informed decision about possible effectiveness in the absence of susceptibility testing (e.g., while awaiting such testing) and that this information is especially important for antiviral drugs.

In vitro data that are supported by clinical data have certain problems in common with in vitro data not supported by clinical data (e.g., antimicrobial susceptibilities are constantly changing and vary by location). In vitro and animal data not supported by clinical data were the focus of the agency's proposal to exclude in vitro and animal data from the "Clinical Pharmacology" section (§ 201.57(c)(13)(ii)). As discussed previously, the agency has reconsidered its proposal to exclude such data from *3953 labeling and will defer any action until it has developed a comprehensive plan.

(Comment 85) Several comments recommended that in vitro susceptibility data for anti-infectives be retained in labeling and be placed in a new labeling section entitled "Clinical Microbiology."

The agency believes that a labeling section devoted specifically to clinical microbiology data is not needed at this time. As a result of its ongoing comprehensive evaluation of anti-infectives drug development and labeling practices, the agency may reconsider the need for a separate section on clinical microbiology.

- Nonclinical toxicology (proposed § 201.57(c)(14))

FDA proposed to require a new section in the FPI entitled "Nonclinical Toxicology" (proposed § 201.57(c)(14)) to contain information from then-current § 201.57(f)(5) (the "Carcinogenesis, mutagenesis, impairment of fertility" subsection) and then-current § 201.57(l) (the "Animal Pharmacology and/or Animal Toxicology" section).

(Comment 86) One comment requested that FDA provide guidance clarifying when it would be appropriate to omit the "Nonclinical Toxicology" section.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                           Page 55
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

Although the final rule provides that any section of labeling would be omitted if it is clearly inapplicable (see § 201.56(d)(4)), it is unlikely that the "Nonclinical Toxicology" section, in its entirety, would ever be inapplicable. Animal data are often the only practical and ethical means to understand a product's potential for certain kinds of toxicity (e.g., carcinogenicity, mutagenicity, reproductive and developmental toxicity). In addition, even if carcinogenicity data are not available, the labeling must state that these studies were not done (§ 201.57(c)(14)(i)). The final rule provides, however, that the "Animal toxicology and/or pharmacology" subsection must include certain data that do not appear elsewhere in the labeling. This means that this subsection would be omitted if all the required information appears in one or more of the other labeling sections (§ 201.57(c)(14)(ii)).

- Clinical studies (proposed § 201.57(c)(15))

FDA proposed to require a section in the FPI entitled "Clinical Studies" (proposed § 201.57(c)(15)). The section would be required to contain a discussion of clinical studies that are important to a prescriber's understanding of the basis for approval of the drug product, including the extent and limitation of the product's benefits, how the drug was used in clinical trials, who was studied, and critical parameters that were monitored.

(Comment 87) One comment requested that the agency clarify the extent to which secondary endpoint data, quality of life data, and pharmacoeconomic data would be permitted in the "Clinical Studies" section.

The "Clinical Studies" section must describe those studies that facilitate an understanding of how to use a drug safely and effectively. Generally, this means those studies that were essential to establishing the drug's effectiveness for the purpose of obtaining marketing approval.

If studies were appropriately designed to evaluate secondary endpoints, it may be appropriate to include a discussion of these secondary endpoints in the section.

The agency would evaluate the appropriateness of including quality of life and pharmacoeconomic data according to the same standard. The data could be appropriate for inclusion in the section if all of the following apply: (1) The data are from adequate and well-controlled trials that incorporated quality of life or pharmacoeconomic endpoints in their design and carried out appropriate analyses, (2) for pharmacoeconomic studies, the findings are reasonably generalizable to most clinical environments, not just the ones studied, and (3) the information would be important to a practitioner's understanding of how to use the drug in a clinical setting. The "Clinical Studies" section guidance contains FDA's recommendations on what studies are appropriate for inclusion in the "Clinical Studies" section (see section IV of this document).

(Comment 88) Some comments requested that the agency reconsider its proposal to bar, in the "Clinical Studies" section, inclusion of data concerning indications and doses that are not consistent with the approved indications and dosing regimens. Comments maintained that such information can be important to a practitioner's understanding of a product's clinical and safety profile, as well as to an understanding of the approved indication. Some comments stated that all studies that are scientifically sound and provide medically relevant information should be included in the "Clinical Studies" section. One comment stated that practitioners understand that data presented in the "Clinical Studies" section, as opposed to the "Indications and Usage" or "Dosage and Administration" sections, are intended for informational purposes only (i.e., not to suggest claims).

One comment asked that the agency make clear that the limitation on inclusion of information in labeling about unapproved doses and regimens would not preclude discussion of a dose ranging study that supports approval and includes dosage regimens that were not approved for use.

One comment agreed with the proposed revision to exclude from the "Clinical

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Studies" section data and information concerning indications and dosing that are not consistent with the information in the "Indications and Usage" and "Dosage and Administration" sections. The comment maintained that inconsistent information about indications and dosing creates confusion and contributes to uncertainty and distrust of information in the labeling.

 Some comments stated that if the agency has concerns about the implications of labeling on product promotion, these can be addressed through its existing legal authority and should be addressed as a separate issue.

 The agency requires that claims in any section of labeling, expressed or implied, be supported by substantial evidence (§ 201.56(a)(3)). This requirement would not preclude discussing in labeling an adequate and well-controlled clinical study, including a dose ranging study that has treatment arms with dosing regimens that are not recommended, if the data for the use of such regimens are important to a practitioner's understanding of how to use the drug safely and effectively. For instance, it might be important to include such data if the data indicate that a particular dosage regimen is not effective, is minimally active, provides no benefit compared to lower doses, or is associated with an unacceptable level of toxicity. If data that include dosage regimens other than recommended regimens are discussed in the "Clinical Studies" section, the data must be accompanied by a statement appropriately qualifying the data and indicating that those dosage regimens have not been found safe and effective by FDA, if such a statement is necessary for the labeling to be truthful and not misleading.

 The agency agrees that advertising and promotional labeling regulations address product promotion issues and that this final rule is not an appropriate context for discussion of these issues.

 • References (proposed § 201.57(c)(16))

 *3954 FDA proposed to permit references to be included in labeling in place of a detailed discussion of a subject that is of limited interest, but nonetheless important (proposed § 201.57(c)(16)). The proposed provision stated that the reference must be based on an adequate and well-controlled clinical investigation under § 314.126(b) or, for a biological product, upon substantial evidence of effectiveness.

 (Comment 89) One comment maintained that requiring that all information contained in the "References" section be based on adequate and well-controlled trials will result in omission of important references for many anti-infective products, including references for standardized test methodology in in vitro studies.

 The agency believes that inclusion of a reference to clinical data will be unusual. Any clinical data that are important to a prescriber's understanding of the safe and effective use of the drug must be summarized in the "Clinical Studies" section, rather than referenced in the "References" section. The "References" section may cite an authoritative scientific body, standardized methodology, scale, technique, or similar material important to prescribing decisions that are mentioned in another section of labeling, but cannot readily be summarized. The agency has revised proposed § § 201.57(c)(16) and 201.80(l) to make this clear and to delete the requirement that limits the "References" section to references to adequate and well-controlled clinical studies.

 (Comment 90) One comment noted that, even though the conditions for including references in the proposed rule are essentially the same as in the requirements for old labeling, there are substantial differences in the way these conditions are applied across new drug reviewing divisions.

 As discussed in the response to the previous comment, in this final rule, the agency has clarified the conditions under which it is appropriate to include a reference in prescription drug labeling. The agency appreciates the comment's concern about inconsistent application of the criteria for inclusion of references across different new drug review divisions. As part of its internal efforts to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                                Page 57
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

implement this final rule and related labeling initiatives, the agency intends to make considerable efforts to ensure consistent application of the requirements.

- Patient counseling information (proposed § 201.57(c)(17))

FDA proposed that the "Information for patients" subsection of the "Precautions" section (required under then-current § 201.57(f)(2)) be made a separate section entitled "Patient Counseling Information" (proposed § 201.57(c)(17)). The section would be placed at the end of the FPI.

The agency also proposed to require in proposed § 201.57(c)(17) that any approved printed patient information or Medication Guide be referenced in the "Patient Counseling Information" section and that the full text of the approved printed patient information or Medication Guide be reprinted immediately following the section.

(Comment 91) One comment supported the proposal to put information for patients in its own section and change the name from "Information for patients" to "Patient Counseling Information." The comment stated that the name change is important because it emphasizes the need to counsel patients on their medications and not just provide printed materials.

As described in the proposed rule, FDA determined to change the heading of the information required under then-current § 201.57(f)(2) from "Information for patients" to "Patient Counseling Information" to clarify that the information under this section is not intended to be distributed to patients, but is intended to help practitioners communicate important drug information to patients.

(Comment 92) Some comments requested that the agency clarify the meaning of "any approved printed patient information." One comment also asked that the agency clarify "Medication Guide."

FDA has revised the terminology in the final rule to clarify the meaning of "any approved printed patient information" and "Medication Guide." The term "FDA-approved patient labeling" refers to any labeling that has been reviewed and approved by the agency that provides information for patients and is for distribution to patients who are prescribed a drug. This term includes approved printed patient information specifically required by regulation (e.g., for oral contraceptives (21 CFR 310.501) and estrogens (21 CFR 310.515)) and patient labeling that is submitted voluntarily to FDA by manufacturers and approved by the agency. FDA-approved patient labeling may have different functions reflected in the type of information conveyed to patients. For example, some FDA-approved patient labeling contains risk information, and some contains only detailed instructions about how to administer a drug product.

Medication Guides are a specific category of FDA-approved patient labeling. Under part 208 (21 CFR part 208), FDA can require a Medication Guide for a prescription drug product that FDA determines poses a serious and significant public health concern requiring distribution of FDA-approved patient information (§ 208.1(a)). Medication Guides are subject to specific content and format requirements (§ 208.20).

(Comment 93) Some comments supported the proposed requirement to reprint FDA-approved patient labeling at the end of the "Patient Counseling Information" section so that this information is readily accessible for healthcare practitioners. Other comments requested that the agency reconsider the proposal to require that FDA-approved patient labeling be printed at the end of the FPI. Some comments asked whether attaching prescription drug labeling without FDA-approved patient labeling to trade packaging and attaching the FDA-approved patient labeling separately would satisfy the requirement. Some comments expressed concern that prescription drug labeling with the FDA-approved patient labeling reprinted at the end may make it more difficult for patients to find and read the patient information. One comment stated that patient information typically uses larger fonts and may use color and illustrations, making it difficult and costly to reprint in the prescription drug labeling. Some comments also expressed concern that inclusion of FDA-approved

©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                                          Page 58
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)
```

patient labeling would make the labeling too long and impose additional costs because it could necessitate redesign and enlarging of trade packaging. One comment asked whether it would be sufficient to provide only a reference to FDA-approved patient labeling in the "Patient Counseling Information" section instead of reprinting the information in the section.

FDA believes that it is crucial that prescribers have ready access to FDA-approved patient labeling so that they are aware that the information exists, can familiarize themselves with the content of that information, and can explain the information to their patients. The agency believes this objective can best be accomplished by requiring that this information be reprinted at the end of prescription drug labeling. Thus, it would be insufficient to provide only a reference to FDA-approved patient labeling in the "Patient Counseling Information" section.

However, the agency is persuaded that reprinting the FDA-approved patient labeling at the end of the *3955 labeling is not the only approach that would successfully address the need to familiarize prescribers with this information. Therefore, the agency has revised the requirements at §§ 201.57(c)(18) and 201.80(f)(2) to require that FDA-approved patient labeling either accompany the prescription drug labeling or be reprinted at the end of such labeling (i.e., immediately following the "Patient Counseling Information" section of the FPI for products subject to § 201.57(c)(18) or after the last section of labeling for products subject to § 201.80(f)(2)).

The agency acknowledges that, in cases for which FDA-approved patient labeling is included with prescription drug labeling, additional costs will be incurred by the manufacturer. To help minimize the added cost, FDA has revised proposed § 201.57(c)(18) to specify that the same type size requirements that apply to prescription drug labeling (§ 201.57(d)(6)) also apply to FDA-approved patient labeling that is printed at the end of the labeling or accompanies labeling, unless a Medication Guide is to be distributed to patients in compliance with § 208.24 (see table 7 of this document). In most cases, this will be a minimum type size of 8 points. For trade labeling, this will be a minimum type size of 6 points (see response to comment 102 for discussion of 6-point minimum type size for trade labeling for products subject to § 201.57). For Medication Guides to be distributed to patients, the type size requirements set forth at § 208.20 apply. With regard to the labeling for products subject to § 201.80, the agency clarifies at § 201.80(f)(2) that the font size requirement for Medication Guides in § 208.20 does not apply to a Medication Guide that is printed in prescription drug labeling unless it is intended to comply with § 208.24 (i.e., the requirement to distribute Medication Guides to patients). Thus, for these products, there is no minimum font size requirement for FDA-approved patient labeling that is included with labeling but not for distribution to patients (see table 7).

Table 7.--Type Size Requirements for Labeling and FDA-Approved Patient Labeling Included with Labeling

| Labeling | Type Size Requirements for Labeling | FDA-Approved Patient Labeling Included with Labeling | Type Size Requirements for FDA-Approved Patient Labeling |
|---|---|---|---|
| New Format (§ 201.57) Trade Labeling (i.e., labeling on or within the package from which the drug | | | |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                                           Page 59
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)

  is to be
  dispensed) .... Minimum 6-point
                  type .......... FDA-approved patient
                                    labeling that is not
                                    for distribution to
                                    patients .............. Minimum 6-point
                                                            type
                                  Any FDA-approved patient
                                    labeling except a
                                    Medication Guide that
                                    is for distribution to
                                    patients .............. Minimum 6-point
                                                            type
                                  Medication Guide that is
                                    for distribution to
                                    patients .............. Minimum 10-point
                                                            type
Other Labeling
  (e.g.,
  labeling
  accompanying
  promotional
  materials) .... Minimum 8-point
                  type .......... FDA-approved patient
                                    labeling that is not
                                    for distribution to
                                    patients .............. Minimum 8-point
                                                            type
                                  Any FDA-approved patient
                                    labeling except a
                                    Medication Guide that
                                    is for distribution to
                                    patients .............. Minimum 8-point
                                                            type
                                  Medication Guide that is
                                    for distribution to
                                    patients .............. Minimum 10-point
                                                            type
Old Format (§
  201.80)
Trade Labeling
  and Other
  Labeling ...... No minimum
                  requirement ... FDA-approved patient
                                    labeling that is not
                                    for distribution to
                                    patients .............. No minimum
                                                            requirement
                                  Any FDA-approved patient
                                    labeling except a
                                    Medication Guide that
                                    is for distribution to
                                    patients .............. No minimum
                                                            requirement
                                  Medication Guide that is
                                    for distribution to
                                    patients .............. Minimum 10-point
                                                            type
-------------------------------------------------------------------------------
```

 (Comment 94) One comment asked whether the agency meant for the prescription drug
labeling with the FDA-approved patient labeling reprinted at the end to replace the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                              Page 60
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

stand-alone FDA-approved patient labeling required to be distributed to patients. The comment asked if the combined document would satisfy the requirement to distribute the FDA-approved patient labeling to patients who have been prescribed the drug. Other comments asked whether FDA-approved patient labeling attached to prescription drug labeling in a way that would facilitate it being torn off (e.g., along a perforation line) would satisfy these requirements. One comment noted that if the FDA-approved patient labeling is appended to the prescription drug labeling as a perforated attachment, it might be more difficult for the patient to receive information at the pharmacy because the pharmacist would have to separate the patient information from the prescription drug labeling.

  The agency does not mean for prescription drug labeling with the FDA-approved patient labeling reprinted at the end to replace the stand-alone FDA-approved patient labeling required to be distributed to patients. FDA has long stressed the importance of providing such information to consumers.

  However, if the FDA-approved patient labeling is appended to the prescription drug labeling (e.g., as a perforated attachment that can be torn off and given to patients) and is formatted as *3956 required for distribution to patients (§ 208.20), it would meet the requirement to provide information to patients. For example, for a product subject to § 201.57 with a Medication Guide, trade labeling for the product would be required to be in at least 6- point type (see comment 102 of this document), while the Medication Guide, if reprinted as a perforated attachment to the labeling for distribution to patients, would be required to be in a minimum 10-point type (see table 7). For products subject to § 201.80 with a Medication Guide, there is no minimum font size requirement for the labeling, while the Medication Guide, if reprinted as a perforated attachment to the labeling for distribution to patients, would be required to be in a minimum 10-point type (see table 7). The agency does not agree that distributing prescription drug labeling with the FDA-approved patient labeling appended as a perforated attachment will make it more difficult for the patient to receive information at the pharmacy because the pharmacists would have to detach the patient information.

  (Comment 95) One comment sought clarification of what information should be included in the "Patient Counseling Information" section. The comment expressed concern about how the information in this section is to be communicated to patients.

  The "Patient Counseling Information" section contains information that the practitioner may decide to convey to the patient at the time of prescribing for the drug to be used safely and effectively (e.g., warnings about driving if the product causes drowsiness, or the concomitant use of other substances that may have harmful additive effects). The information in this section will vary depending on the safety and efficacy characteristics of the product and how it is taken.

  FDA believes that requiring a separate "Patient Counseling Information" section and a reminder message in Highlights directing practitioners to this section will make patient counseling information in labeling more accessible to health care practitioners. These requirements will increase the accessibility of the section and should reinforce the need for practitioners to counsel their patients, thereby fostering communication between practitioners and patients about prescribed drugs.

  (Comment 96) One comment asked whether including the FDA-approved patient labeling in the "Patient Counseling Information" section would be sufficient to meet the content requirements for the section.

  Including only the FDA-approved patient labeling in the "Patient Counseling Information" section is not sufficient to meet the requirements of this section. This section, like the other sections of prescription drug labeling, is specifically written for health care practitioners. Its purpose is to inform practitioners about what information is important to convey to the patient at the time of prescribing for the drug to be used safely and effectively. FDA-approved patient labeling, in contrast, is specifically written for a lay audience and is intended to be read by patients.

              ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                                Page 61
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

The agency emphasizes how important it is that prescribers be informed about what they should communicate to their patients. On the basis of a series of national telephone surveys conducted by FDA to assess how patients receive information about their prescription medicines, the agency determined that the prescribing physician is the primary source of drug information for patients (Ref. 5). The most recent survey, conducted in 1998, showed that more patients received verbal prescription medicine information at their physician's office (69 percent) than at the pharmacy (43 percent) (Ref. 5). In addition, although 74 percent of patients reported receiving written information at the pharmacy, of those who received written information at the pharmacy, 85 percent received instruction sheets and 83 percent received stickers on the medicine container, but only 38 percent received brochures about the medicine. These results indicate that most consumers who receive product information, other than instructions for use or the sticker information, receive it orally from their physicians during an office visit.

(Comment 97) One comment asked whether products with existing labeling that will be required to convert to the new labeling format will be required to have a "Patient Counseling Information" section if the product's existing labeling does not contain an "Information for patients" subsection in its "Precautions" section.

If a product that does not have an "Information for patients" subsection becomes subject to the new content and format requirements at § 201.57, the product's manufacturer would be required to develop a "Patient Counseling Information" section for the product's prescription drug labeling unless a "Patient Counseling Information" section would be clearly inapplicable (see § 201.56(d)(4)) and thus not required. The agency anticipates that few products would qualify for such an exception. The agency believes that the vast majority of products that will be required to have a "Patient Counseling Information" section will already have an "Information for patients" subsection in their existing labeling on which to base the "Patient Counseling Information" section. Thus, this new requirement is anticipated to impose minimal burdens on manufacturers.

*I. Comments on the Format Requirements (Proposed § 201.57(d))*

FDA proposed new format requirements for prescription drug labeling (proposed § 201.57(d)). The proposed provisions set forth minimum standards and requirements for many of the key graphic elements of labeling (e.g., type size, letter and line spacing, and contrast).

(Comment 98) Some comments recommended implementation of the proposed changes solely or primarily as part of the electronic labeling initiative. Some comments requested that the new format requirements not be implemented for prescription drug labeling required to be distributed with a drug in trade packaging. They pointed out that using an electronic format would permit use of larger print size, hypertext linking to all sections of labeling, links to newly revised sections of labeling, key word searches, and links to patient information without affecting the size of trade packaging. The comments maintained that larger trade packaging will be required to accommodate larger labeling that will result from the new format requirements.

The agency agrees that use of the required format in conjunction with an electronic medium may have benefits over paper labeling. As discussed in section V of this document, the agency believes that, in the future, the Internet and other electronic sources for labeling will most likely be the primary means for delivering drug information to practitioners. At the present time, however, some practitioners may not have the requisite computer equipment or skills to access prescription drug labeling in an electronic format. The agency anticipates that it will be several years before the phase-out of paper labeling as the major source of prescribing information can begin. Therefore, the agency believes that it is important to establish minimum format requirements for paper labeling.

(Comment 99) One comment recommended the use of more blank space among sections of Highlights. The comment expressed concern that, because Highlights contains a significant amount of information in a constrained space and uses a variety of *3957

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                          Page 62
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

formatting techniques, the overall effect would be confusing. One comment stated that the placement of the "Patient Counseling Information Statement" above the "Highlights Limitation Statement" in Highlights is not ideal because it appears that the "Patient Counseling Information Statement" is the title of the limitation statement. The comment also requested that the FPI be required to be in a two-column format because such a format enables users to stay better aware of the overall information structure, as well as read individual sections more easily.

 The agency believes that use of more blank space in Highlights would not be feasible because additional blank space would increase the length of Highlights and of labeling generally. The one-half page length limitation for Highlights is based on the strong preferences of physicians surveyed in developing the prototype for the new labeling format in the proposed rule. Physicians reacted negatively to prototype Highlights that were one or one and one-half pages long. They indicated that the utility of Highlights decreased significantly as its length increased. In addition, there was significant concern from manufacturers about the costs associated with adding to the length of labeling.

 The agency also believes that the formatting techniques used in Highlights help make the information accessible, notwithstanding the density of the section. Therefore, the agency does not believe that it is necessary to include more blank space in Highlights.

 The agency agrees that the formatting and placement of the "Patient Counseling Information Statement" and the "Highlights Limitation Statement" in Highlights could be improved to better communicate the discrete information provided by each statement. For this reason, and in response to comments recommending greater prominence for the "Highlights Limitation Statement," the agency moved this statement to appear at the beginning of Highlights (see comment 35). The agency also removed the requirement at proposed § 201.57(d)(3) that the "Patient Counseling Information Statement" be presented in the center of a horizontal line, so that it does not appear to be a section title.

 The agency agrees that a two-column format is effective, but believes other formats may be equally effective in conveying prescription drug information and, therefore, is not requiring a two-column format for the FPI.

 • Bolding (Proposed § 201.57(d)(5))

 In the proposal, the agency specifically sought comment on whether the requirement in proposed § 201.57(d)(5) to bold the information required by proposed § 201.57(a)(1) through (a)(4), (a)(11), and (a)(15) (i.e., the following information in Highlights: Drug names, dosage form, route of administration, and controlled substance symbol; the inverted black triangle symbol; the prescription drug symbol; boxed warnings or contraindications; adverse reaction reporting contacts; and Highlights limitation statement) would ensure the visual prominence of the bolded information or whether different highlighting methods would be more effective.

 (Comment 100) Most comments expressed satisfaction that bolding was adequate to ensure the visual prominence of the specified information. Some comments stated that capitalization, italics, and underlining, also effective methods of ensuring prominence and flexibility, should be maintained. Some comments expressed concern that possible alternative methods of ensuring visual prominence (e.g., color printing) would add unnecessary costs. One comment requested that, if color is required, specific Pantone colors be assigned to specific types of information to ensure consistency in all product labeling.

 The agency recognizes that use of different methods to ensure prominence may decrease their impact and significance. Therefore, FDA concludes that bolding alone is adequate to achieve visual prominence for the specified information in Highlights. The agency also agrees that color printing would add cost and impose an additional burden on manufacturers that would not be offset by meaningful improvement in visual prominence. Therefore, § 201.57(d)(5) requires the following Highlights information to be in bold type: Highlights limitation statement; drug

                  © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

names, dosage form, route of administration, and controlled substance symbol; the initial U.S. approval statement and year of this approval; boxed warnings; adverse reaction reporting contacts; and the patient counseling information statement.

  (Comment 101) One comment requested that the agency revise the format of Contents to make it easier to read and use. The comment stated that the information in Contents is not as accessible as it could be because it uses straight columns, which make it hard to distinguish the major labeling sections (e.g., "Use in Specific Populations") from subsections (e.g., "Pregnancy"). The comment recommended use of contrasting font types and sizes for the section titles and subheadings in each section, underlining section titles, indenting subheadings under each section title, and providing more blank space between each section. Another comment also recommended indenting the subheadings under the major sections to more readily distinguish between the major sections and the subheadings within the sections.

  The agency agrees that all the recommended revisions to the format of Contents could make the information easier to read and use. Because of cost and space constraints, however, the agency believes that it is impractical to implement all of the recommended changes. FDA has revised the format requirements at proposed § 201.57(d) to now require that the subheadings under each section heading in Contents be indented (§ 201.57(d)(10). In addition, the final rule now requires that only the headings in Contents be bolded, not the subheadings (§ 201.57(d)(10)). The agency believes these changes make the Contents easier to read and use without increasing its length or attendant costs.

  (Comment 102) In the proposal, the agency specifically sought comment on whether the proposed requirement (proposed § 201.57(d)(6)) for a minimum type size of 8 points for all typeface information in labeling is sufficient or whether a minimum type size of 10 points would be more appropriate. Currently, prescribing information is usually printed in 6- or 7-point type.

  One manufacturer stated that 6-point type was generally adequate for prescribing information, and another manufacturer stated that it typically uses 4- to 6-point type. Some manufacturers were concerned that a minimum 8-point type would increase the length of labeling to such an extent that trade packaging would have to increase in size to accommodate the longer labeling and the increase in size would impose substantial costs. One comment recommended that prescribing information that accompanies trade packaging not be subject to the 8-point type minimum, while prescribing information that is distributed in other contexts, where it is more likely to be referenced by the prescriber (e.g., prescribing information in electronic format, prescribing information accompanying promotional materials and product samples), be required to be in at least 8-point type. Some manufacturers stated that 8-point type was adequate for prescribing information included in trade packaging, but that a minimum 10- point type would increase the length of labeling to such an extent that trade packaging would have to increase in *3958 size to accommodate the larger prescribing information.

  Some consumers and health care advocacy organizations requested that the agency reconsider whether the increase to an 8-point minimum type size was sufficient to achieve the agency's goal of improving the readability of the prescribing information. They stated that, to improve readability, labeling should be printed in a type size larger than 8 points and with more white space. They urged the agency to test prototypes to compare the relative readability of 8-point versus 10-point type. Some comments advocated that the minimum type size should be at least 10 points, and preferably 12 points, for all patient information.

  In the preamble accompanying the proposed rule, FDA summarized studies that demonstrated the importance of type size in evaluating readability of written information and its effect on visibility and reading speed (see 65 FR 81082 at 81096 and Refs. 6 through 9). Type size combined with other graphical elements (e.g., letter and line spacing, contrast, print and background color, and type style) also affect readability (Ref. 10).

  The agency carefully considered the literature, the comments submitted in response

              ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                                          Page 64
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)
```

to the font size proposal, and the estimated costs of using various font sizes for labeling, and has determined that permitting different font sizes for trade labeling (i.e., labeling on or within the package from which the drug is to be dispensed) and labeling disseminated in other settings (e.g., labeling that accompanies prescription drug promotional materials) best achieves the agency's objective of ensuring an acceptable base level of readability for prescription drug labeling while, at the same time, minimizing costs to manufacturers. Even though a larger font size may improve readability, the agency believes that an 8-point minimum type size, combined with other required graphical elements (e.g., bold type, bullets, demarcation lines), is adequate for prescription drug labeling disseminated in settings where it is likely to be referred to by prescribers (e.g., labeling that accompanies drug promotional materials). The agency believes that the 8-point minimum type size reasonably balances the agency's objective of improving the readability of labeling with the costs associated with the resultant increase in the length of the labeling.

The agency also agrees with the comments requesting that there be an exception for trade labeling. FDA believes that a minimum 6-point type size requirement is satisfactory for such labeling. FDA's telephone survey of office-based physicians showed that the prescribing information in trade labeling is referred to by physicians substantially less frequently than other sources of prescribing information (Ref. 11, p. 30). Because manufacturers could incur substantial costs in converting trade labeling to 8-point type and the public health benefits of such conversion may not justify these costs, the agency believes it is reasonable to allow a 6-point minimum type size for trade labeling (see comment 124). Thus, proposed § 201.57(d)(6) was revised to permit a 6-point minimum type size for trade labeling.

The agency disagrees with the comment that recommended use of type sizes smaller than 6 points because such labeling would not be sufficiently readable. The final rule on OTC drug labeling requirements summarized research on smaller font sizes, noting that a significant portion of the adult population is not able to read OTC drug product labeling with 4.5-point type size (see 64 FR 13254 at 13264 and 13265, March 17, 1999).

The agency acknowledges those comments that urge even larger minimum type sizes to further increase readability. The agency agrees that, absent any cost or space constraints, a 10- or 12-point minimum type size would be preferable to 8-point. However, the agency believes that the 8-point minimum type size requirement for all labeling except trade labeling and the variety of formatting techniques incorporated into the new labeling format will substantially improve the readability of labeling without imposing unreasonable costs on manufacturers. Moreover, this final rule establishes minimum type sizes, but does not prevent manufacturers from printing labeling in larger type sizes.

(Comment 103) One comment requested that the agency require Roman typeface in labeling for optimal legibility. The comment stated that Roman is a major improvement over currently used sans serif, and that sans serif is only appropriate in applications where appearance is more important than legibility (e.g., advertising).

The agency does not agree that FDA should require a specific typeface for all prescription drug labeling. The agency believes that any typeface that is clear and legible should be acceptable in labeling.

(Comment 104) In the proposal, the agency specifically sought comment on whether the requirement in proposed § 201.57(d)(8) for a one-half page limit on Highlights is adequate or whether there are alternatives that would be more appropriate and under what circumstances such alternatives should be considered.

Some comments stated that the one-half page length restriction should be required for all products (i.e., there are no circumstances in which the limitation should be waived). Other comments maintained that it might be difficult to consistently accommodate the information required to be in Highlights within one-half page. These

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

comments stated that the final rule should allow for some flexibility in the length of Highlights in those cases where one-half page may not be practical or possible. These comments indicated that some manufacturers had done mockups of Highlights and had been unable to get the required information on one-half page. Some comments stated that the length restriction should be flexible enough to accommodate as many disclaimers and qualifying messages as are necessary to guide the physician to the more detailed discussion of the desired information in the FPI. These comments maintained that the limitation on length could result in increased medication errors because important information would be too compressed or might be excluded from Highlights.

The agency believes that a one-half page Highlights is adequate for the vast majority of products. As discussed previously, Highlights provides introductory information to the more detailed FPI. The agency does not agree that multiple disclaimers or qualifying statements would be useful or appropriate.

The agency acknowledges, however, that there may be situations in which it may not be possible to accommodate all the information that should go into Highlights within one-half page. In such cases, the agency may waive the one-half page requirement and approve the labeling with slightly longer Highlights. Accordingly, FDA has revised § 201.58 in this final rule to make clear that FDA can waive any of the requirements under § 201.56 or § 201.57.

The agency strongly believes that limiting the length of Highlights is critical to preserving its usefulness. In the physician surveys relied on by the agency in developing and refining the new labeling format, 80 percent of physicians indicated that a summary or highlights section should be no more than one-half page. The surveys found that the perceived usefulness of Highlights declined considerably with increasing length. Accordingly, the labeling format was designed to accommodate, on a single page, a one-*3959 half page Highlights and a one-half page Contents. To test the feasibility of limiting Highlights to one-half of a page, the agency did numerous mockups of Highlights for a wide range of products and found that the one-half page limit provided adequate space in each case. Thus, the agency anticipates that the length restriction will be feasible in the vast majority of cases.

(Comment 105) In the proposal, the agency specifically sought comment on whether there are means other than a vertical line that would facilitate access to, and identification of, new labeling information in the FPI.

Some comments agreed that it was highly desirable to call attention to new information in the FPI and that the vertical line is adequate to identify the new information. Other comments stated that it was desirable to call attention to new information, but that a vertical line in the FPI might not be the best mechanism because it might not be understood as a revision mark by practitioners. Some comments maintained that use of a vertical line would make the printing and graphics process for labeling more complex and costly. One comment recommended italicizing new or revised text in the FPI. One comment recommended use of an asterisk to identify changes, along with a footnote explaining what was changed. Some comments maintained that identifying recent changes in narrative in a section of the FPI devoted to labeling changes or in the proposed "Recent Labeling Changes" section in Highlights (now called "Recent Major Changes") would alone be adequate to call attention to changes in the FPI. Some comments stated that the vertical line will call unnecessary attention to minor changes. Some comments stated that, by stressing labeling changes, the identification of changes in the FPI could dilute the significance of unmarked text.

The agency has retained the proposed requirement at § 201.57(d)(9) to mark major changes in the FPI with a vertical line in the left margin. The agency agrees that it is highly desirable to call attention to new information in the FPI and that the vertical line is adequate to identify the new information. The agency considered bolding, underlining, and italicizing as means to emphasize changes. These formatting techniques are all currently used in labeling to add emphasis for purposes other than identifying new information, so they would not be readily understood as identifying labeling changes. Asterisks are also used in labeling for

```
71 FR 3922-01                                                         Page 66
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)
```

purposes other than identifying labeling changes. The agency believes that use of an explanatory footnote with the asterisk would not overcome the confusion arising from use of an asterisk for multiple purposes in labeling.

The agency acknowledges that a vertical line in the margin might not be universally understood as an indication that the text adjacent to the mark has been changed. The agency believes, however, that a significant percentage of practitioners have had some experience with commercial word processing software and thus some exposure to revision marks, including the use of the vertical line to identify changed text. The agency also intends to develop for practitioners a comprehensive educational campaign to accompany the introduction of the revised labeling format. This educational campaign will address, among other issues, the significance of the vertical line in the margin.

The agency does not believe the vertical line will unnecessarily call attention to minor changes in labeling. The vertical line will be applied only to substantive changes that are identified in the "Recent Major Changes" ("Recent Labeling Changes" in the proposed rule) section in Highlights. In response to comments requesting that the agency clarify what is meant by substantive changes, the agency specified in the final rule that only significant changes in the "Boxed Warning," "Indications and Usage," "Dosage and Administration," "Contraindications," and "Warnings and Precautions" sections of the FPI be listed in the "Recent Major Changes" section. Nonsubstantive changes such as typographical or editorial changes should not be identified. The agency believes that focusing on substantive changes in only these sections will avoid calling unnecessary attention to minor changes and will ensure that the significance of unmarked text is not diluted.

The agency believes that it would not be adequate to identify labeling changes only in a section of the labeling devoted to changes. The agency believes it is important to also identify the specific text that has been changed so that practitioners will be able to locate changes and access the complete text.

*J. Comments on Revisions to Container Labels*

In addition to revising its regulations governing the content and format of labeling for prescription drugs, the agency also proposed certain revisions to the information required to appear on prescription drug product labels (proposed § 201.100). The proposed revisions were intended to lessen overcrowding on prescription drug labels by removing certain information from the container label.

Current § 201.100(b)(2) requires that the label on a prescription drug container bear a statement of the recommended or usual dosage. Where it is not possible to present an informative or useful statement about the recommended or usual dosage in the space available on the container label, current § 201.55 states that the requirements of § 201.100(b)(2) may be met by including the statement "See package insert for dosage information." The agency proposed to eliminate § 201.55. The agency also proposed to eliminate the requirement in § 201.100(b)(5) that the label of a prescription drug for other than oral use must bear the names of all inactive ingredients. The agency proposed to eliminate the requirement in § 201.100(b)(7) that the container label bear a statement directed to the pharmacist specifying the type of container to be used in dispensing the product to maintain its identity, strength, quality, and purity. The agency proposed to require instead that these instructions be placed in the "How Supplied/Storage and Handling" section of prescription drug labeling (proposed § 201.57(c)(4)(v)).

(Comment 106) Several comments opposed the proposal to eliminate the requirement that the label of a prescription drug product for other than oral use bear the name of all inactive ingredients. The comments stated that identification of inactive ingredients is important because of their potential to be allergens. Some comments maintained that manufacturers should be able to list on product labels selected inactive ingredients (e.g., ingredients that are known allergens or are associated with adverse reactions). One comment recommended listing the diluent that should be used for admixture or those diluents that are contraindicated. Two comments supported eliminating the list of inactive ingredients from the container label of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                              Page 67
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)

products for other than oral use. They agreed that the presence of such information in the "Description" section of prescription drug labeling would be sufficient and that eliminating the information from the container label could make other information on the label more accessible and legible.

  Several comments also opposed the proposal to eliminate the requirement that the label of a prescription drug product bear a statement directed to the pharmacist specifying the type of container to be used in dispensing the product to maintain its identity, *3960 strength, quality, and purity. The comments maintained that eliminating dispensing information from the container label, and placing it in prescription drug labeling, would make the information less accessible to pharmacists and would thus be inefficient and frustrating for pharmacists. The comments were concerned that making information on storage and handling less accessible could lead to inappropriate storage and handling. Some comments urged that the label at least be required to state any special or unusual conditions for storage. One comment recommended mandatory use of a symbol that signifies when a product requires special handling. Two comments supported removal of information on storage and handling from product labels, agreeing that less information on the container label could make other information on the label more accessible and legible.

  One comment maintained that manufacturers should be able to remove from the label the statement referring practitioners to the full prescribing information for dosage information before the manufacturer is required to revise its label in accordance with this final rule.

  The agency has reconsidered its proposals to eliminate from container labels:  (1) The list of inactive ingredients for products other than for oral use, (2) the statement directed to the pharmacist concerning the type of container in which a product should be dispensed, and (3) the statement referring practitioners to the package insert for dosage information in situations in which it is not possible to include information about the recommended or usual dose on the label. The agency decided to withdraw these proposed revisions to container labels. The agency believes that what is appropriate content for product container labels and how to make that information as accessible as possible need to be further evaluated. The agency intends to conduct a comprehensive evaluation of information required to be included on container labels and, if necessary, will propose changes to these requirements at that time.

  At this time, the agency will not require placement of a symbol on the container label indicating that the product has special storage and handling requirements. The agency will consider this possibility during its evaluation of the content of product labels. It would be premature to adopt such a symbol at this time.

  (Comment 107) One comment requested that the proposed requirement to specify in the "How Supplied/Storage and Handling" section the type of container to be used in dispensing a product to maintain a product's identity, strength, quality, and purity (information formerly presented on the product label) should apply only if the product cannot be dispensed in the standard amber vial. The comment maintains that limiting the scope of the requirement to situations in which exceptional storage conditions are required would serve to highlight the need for special considerations when dispensing.

  As discussed in the previous comment, the agency has reconsidered its proposed changes to the container label, including the proposal to remove from the container label information directed at the pharmacist concerning the appropriate container in which to dispense a product. The agency will continue to require that dispensing instructions appear on the container label. Accordingly, proposed § 201.57(c)(4)(v) was deleted from the final rule. Storage and special handling conditions have to be specified in labeling consistent with the requirements of § 201.57(c)(17)(iv) of this final rule.

  (Comment 108) One comment requested that the container label also be required to disclose when the container or some component of the container contains latex or

                      ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                          Page 68
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

polyvinyl chloride (PVCs).

 As discussed in the response to comment 106, the agency intends to conduct a comprehensive evaluation of the product label and may repropose changes in the content of the product label at a later time, including changes concerning the presence of latex and PVCs in drug containers.

 (Comment 109) One comment urged that there be a mandatory location for the "Rx Only" symbol on the main part of the label and that there be a specified minimum font size for the symbol.

 In rulemaking (initiated under section 126 of the Food and Drug Administration Modernization Act of 1997), the agency amended its regulation requiring that container labels contain the statement "Caution: Federal law prohibits dispensing without prescription" by replacing the statement with the symbol "Rx Only" (67 FR 4904, February 1, 2002). Comments submitted to the agency in response to this proposed change requested that FDA specify the font size and the location of the symbol on the container label. The agency declined this request in the final rule of February 1, 2002, and declines it again in this final rule. As discussed in the preamble to the February 2002 final rule, existing statutory (section 502(c) of the act) and regulatory provisions (§ 201.15) requiring that information on product labels be prominent and conspicuous so as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use provide the agency adequate authority to ensure that the symbol is visually accessible. The agency does not believe it is necessary to specify the location of the symbol or its font size to ensure that the symbol achieves adequate prominence.

 (Comment 110) One comment expressed concern about the proliferation of artwork on label containers and the potential for that artwork to make the label more difficult to read and cause medication errors.

 The agency acknowledges the potential for artwork to obscure important information on the label. The agency believes, however, that its existing authority under 502(c) of the act and § 201.15 is adequate to ensure that artwork does not compromise the prominence and conspicuousness of information required to be on the label.

*K. Miscellaneous Comments*

 (Comment 111) One comment requested that the agency clarify how the content and format of the brief summary required to accompany prescription drug advertising under § 202.1 would be affected by the proposed revisions to prescription drug labeling. Another comment suggested that the agency entertain the idea that Highlights could serve as an alternative to the brief summary because the agency has noted that Highlights contains the most important information about drug-related risks.

 The proposed regulations were not designed to affect either the content or the format of the brief summary of prescribing information required to accompany prescription drug advertisements under § 202.1 (21 U.S.C. 352(n)). As discussed in the proposed rule (65 FR 81082 at 81087), statements made in promotional labeling and advertisements must be consistent with all information included in labeling under proposed § 201.57(c) to comply with current § § 201.100(d)(1) and 202.1(e). [FN9] The agency does believe, however, that Highlights communicates important information about a drug. The agency therefore will explore further, in conjunction with other prescription drug advertising initiatives, the concept *3961 that Highlights could serve as a brief summary (see also FDA's response to comment 112 about the brief summary for consumer directed advertisements).

  FN9 This requirement at proposed § 201.57(a) has been removed because it is not pertinent to the contents of § 201.57 and is redundant with provisions at § § 202.1 and 201.100.

 (Comment 112) Some comments stated that prescription drug labeling should be written in language that a lay audience can comprehend. The comments noted that

              ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                                Page 69
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

consumers need to be able to read and understand the labeling because it accompanies the product, and because it is often used to provide information for direct-to-consumer (DTC) advertisements.

The purpose of prescription drug labeling is to provide health care practitioners information necessary for safe and effective use. The agency believes that use of medical and scientific terminology is necessary to effectively communicate to practitioners information about a product's risks and benefits as required under 21 U.S.C. 352(n) and § 201.100. Requiring that language used in prescription drug labeling be tailored to a lay audience would result in a loss of the clarity and precision needed to effectively communicate to practitioners a product's benefits and risks. For example, if a drug is associated with a risk of a specific type of blood disorder, the disorder must be identified by its technical name (e.g., thrombotic thrombocytopenic purpura) so the practitioner can more quickly diagnose and treat the disorder when symptoms present. Scientific terminology may help to identify types of patients that might be at increased risk or otherwise manage the risk of that blood disorder. If the risk can only be described in terms that a lay audience can comprehend (e.g., blood disorder), the labeling would lack the precision needed to communicate the specific risk to prescribers.

For many products, the final rule will improve the usefulness of the brief summary to consumers and health care practitioners by improving the usefulness of the prescription drug labeling, on which the brief summary is based. To this end, FDA has issued a draft guidance document entitled "Brief Summary: Disclosing Risk Information in Consumer-Directed Print Advertisements" that describes various options for presenting this information in DTC print advertisements (69 FR 6308, February 10, 2004). By providing recommendations on use of alternatives to prescription drug labeling to fulfill the brief summary requirement, FDA is encouraging manufacturers to develop brief summaries for use in consumer-directed advertisements using language they can understand.

*L. Comments on the Proposed Implementation Plan*

For new and more recently approved drugs, FDA proposed a staggered implementation schedule for the labeling requirements, with revised labeling required for newer products first (proposed § 201.56(c)). The schedule is being finalized as proposed (see table 5 in section III of this document). Revised labeling for ANDA products depends on the labeling for the reference listed drug. The agency proposed to implement no later than 1 year after the effective date of the final rule the revised content requirements regarding unsubstantiated claims in labeling for newer and older drugs. The agency also proposed to implement by 1 year after the effective date of the final rule the requirement that any FDA-approved patient labeling be reprinted immediately following the "Patient Counseling Information" section of the FPI for newer products or immediately following the last section of the labeling for older products. The agency also proposed to implement by 1 year after the effective date of the final rule the requirement that in vitro or animal data related to activity or efficacy of a drug that have not been shown by adequate and well-controlled studies to be pertinent to clinical use be removed from the labeling unless a waiver is granted.

In the proposal, the agency specifically sought comment on whether the revised content and format requirements should be applied, as proposed, to drug products with an NDA, BLA, or efficacy supplement that is pending at the effective date of the final rule, that was submitted on or after the effective date of the final rule, or that has been approved from 0 up to and including 5 years prior to the effective date of the final rule, or whether alternative application criteria should be used.

(Comment 113) Several comments agreed with the categories of prescription drugs that would be subject to the new labeling content and format requirements in the agency's proposed implementation plan. Other comments expressed concern that the proposed implementation plan is too narrow. These comments maintained that the new format is superior to the old format and the scope of the proposed implementation of the new format would leave large numbers of products with inferior labeling. Some comments requested that the revised content and format requirements eventually be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                          Page 70
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)

applied to all marketed prescription drugs. One comment recommended that the
implementation plan also apply to all drugs that are among the 150 most frequently
prescribed drugs that would not otherwise be covered by the implementation plan. The
comment maintained that under the proposed implementation plan only 1 of the current
top 15 drugs used in the elderly would be required to implement the revised content
and format.

  Some comments expressed concern that having different labeling formats would be
confusing to physicians. One comment expressed concern that having two different
formats might impact prescribing behavior, arguing that prescribers might favor
newer, more expensive drugs. Some comments maintained that a single standard format
is needed to facilitate access to labeling in electronic formats. One comment also
questioned FDA's underlying assumption that there is a lesser need for improved
labeling for older products because practitioners are more familiar with older
products and refer to older product labeling less frequently than newer product
labeling. The comment maintained that newer practitioners would need to refer to the
labeling of older drugs to the same extent as for newer drugs. One comment suggested
that manufacturers be given the option to revise labeling for older products.

  Some comments from manufacturers maintained that it would be most practical to
apply the new format requirements only to products whose applications are submitted
on or after the effective date of the final rule. They stated that broader
implementation would place a substantial burden on FDA resources and could interfere
with review of new drugs. One comment stated that the new format should apply only
to drugs that are not a member of an existing drug class (i.e., products that would
be considered the original member of a drug class) or that are a new and novel
member of an existing drug class and whose applications are submitted on or after
the effective date of the final rule. The comment maintained that having different
labeling formats for similar drugs within the same drug class would be a competitive
disadvantage for one format or the other.

  The agency believes the implementation plan as proposed for new and more recently
approved drug products is the best option for implementing the new format
requirements. The agency agrees that it is desirable for all prescription drugs to
be subject to the same labeling rules. However, the agency has carefully considered
the costs and benefits of implementing the revised labeling *3962 format and
determined that requiring broader implementation (e.g., to all prescription drugs)
of the new format requirements would be an excessive regulatory burden.

  This initiative will require substantial resource allocation by the agency and
industry for a period of several years. The agency's proposed implementation plan,
which is being finalized in this rule as proposed, is intended to make the best use
of these resources. As discussed in the preamble to the proposed rule (65 FR 81082
at 81098), the plan targets newer products because practitioners are more likely to
refer to the labeling for newer products. In FDA's survey of physicians, newness of
the product was a reason rated by 87 percent of physicians as very likely to trigger
a labeling referral for a drug (Ref. 11, p. 35). In addition, the labeling for newer
products is typically longer and more complex and, thus, more likely to benefit from
a new format that makes the information more accessible. The implementation plan
will also capture many older products that would not otherwise be covered by the
plan when manufacturers seek new indications for their products (i.e., submit an
efficacy supplement). For these reasons, the agency believes the implementation as
proposed is the most reasonable approach to maximizing the public health benefit and
best utilizing available resources in requiring the new content and format for
labeling. In addition, manufacturers of older products not covered by the
implementation plan may voluntarily revise, and submit for review, labeling for
their products in the new format at any time.

  The agency does not believe that an implementation plan based on volume of
prescriptions would be prudent. Prescription volume can fluctuate considerably over
time, and the agency is not aware that there are standardized prescription volume
data that are generally accepted as accurate. Thus, the agency believes it would be
very difficult to fairly implement and enforce an implementation plan based on
prescription volume.

                © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                         Page 71
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

   The agency also acknowledges that the existence of two different labeling formats may lead to some frustration among practitioners. The agency believes, however, that any potential confusion can be minimized. Practitioners are already aware of the content and format of existing labeling. The agency intends to engage in a comprehensive educational campaign to educate practitioners about the major features of the new format and why the implementation plan did not encompass all prescription drugs.

   FDA is cognizant that the presence of two labeling formats will present important challenges when implementing electronic labeling but is confident that these challenges can be successfully addressed. For example, the ways in which information will be formatted, tagged, and stored in the contemplated electronic format will permit access to labeling information in both the old and new labeling formats.

   The agency does not agree that the new format should be applied only prospectively or that it should be optional for the currently approved drugs that would be subject to the new format requirements under the proposed implementation plan. This narrower application of the new format requirements would fail to reach a significant number of products whose labeling is frequently referenced and could benefit from the new format requirements.

   (Comment 114) Several comments objected to the proposed requirement that, within 1 year of the effective date of the final rule, manufacturers review all existing labeling and remove any express or implied unsubstantiated claims from the "Indications and Usage," "Dosage and Administration," "Clinical Pharmacology," and "Clinical Studies" sections. Some comments maintained that this requirement would be very burdensome for industry and the agency. They disagreed with the agency's contention in the preamble to the proposed rule that the labeling changes to remove unsubstantiated claims could usually be accomplished without prior approval by the agency (i.e., with a "Changes Being Effected" labeling supplement). They stated that these changes would more often than not require prior approval and extensive negotiations between the agency and a manufacturer. Some comments maintained that there would be a substantial number of requests for waivers under § 201.58 or § 314.126(c) and these requests would also be a burden on the agency. Some comments agreed with the requirement to remove unsubstantiated claims from existing labeling, but stated that 1 year was not enough time for manufacturers to accomplish the task. One comment maintained that the burden on the agency would compromise the drug approval process. One comment requested that the agency clarify what types of statements would have to be removed.

   The agency has reconsidered the proposed requirement to have manufacturers scrutinize all existing labeling for unsubstantiated claims and remove all such claims from labeling within 1 year of the effective date of the final rule. The agency agrees that a requirement to scrutinize all existing labeling within that timeframe would place substantial burdens on manufacturers and the agency and that such burdens might not be justified. In the preamble to the proposed rule, the agency estimated that no more than 25 percent of labeling for drugs other than antibiotics might contain unsubstantiated claims. Based on a recent review of a sample of prescription drug labeling, however, the agency believes the percentage of products whose labeling might contain such claims is considerably lower than 25 percent and not high enough to justify a requirement that manufacturers scrutinize all existing labeling to identify those claims, particularly in a short timeframe.

   The agency is eliminating only the requirement that manufacturers scrutinize all labeling for the presence of unsubstantiated claims within 1 year of the effective date of the final rule. The language in proposed § 201.57(c)(2), (c)(3), and (c)(15) and § 201.80(c)(2), (j), and (m)(1) remains in the final rule, requiring that the "Indications and Usage," "Dosage and Administration," and "Clinical Studies" sections must not imply or suggest uses not supported by substantial evidence and/or dosing regimens not included in the "Dosage and Administration" section. This language accurately reflects the existing regulatory standard for claims presented in prescription drug labeling.

              ©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                                         Page 72
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)
```

  While the agency will not require a systematic evaluation of all existing labeling to identify unsubstantiated claims within 1 year of the effective date of the final rule, the agency wishes to make it clear that manufacturers have an ongoing obligation to ensure that claims in labeling have adequate substantiation and are not false or misleading. When new information comes to light that causes information in labeling to become inaccurate, manufacturers must act to change the content of their labeling, in accordance with § § 314.70 and 601.12 (21 CFR 314.70 and 21 CFR 601.12). To clarify this obligation, the agency has revised § 201.56 to specify that manufacturers must act to correct labeling that, in light of new information, has become inaccurate (see § 201.56(a)(2)).

  (Comment 115) One comment recommended an implementation period of 3 years, rather than 1 year as proposed, to append any FDA-approved patient labeling to the end of the labeling for trade packages. The *3963 comment maintained that additional time was needed for reconfiguration and replacement of packaging equipment.

  The agency believes that the proposed implementation plan is appropriate and in the best interest of public health. Including the FDA-approved patient labeling in prescription drug labeling ensures that this information is available to health care practitioners to reinforce the discussions they have with their patients concerning the risks and benefits of prescription drugs. The agency considers improving physician-patient communication crucial for public health. Furthermore, the agency believes that this requirement should not place an undue burden on manufacturers because of the approximately 200 products that would be affected by this provision of the final rule, the labeling of more than 60 percent of them already conform with the requirement (see section XI.C.1 of this document).

  (Comment 116) Manufacturers of products subject to an ANDA (generic products) expressed concern that NDA holders will use the rule's implementation provisions as a mechanism to delay approval of generics. The specific concern was that NDA holders will obtain approval for a new indication near the end of their marketing exclusivity for their drug's original indication, revise the labeling for the drug to the new format, and receive 3 years' marketing exclusivity for the new indication. The comments asked FDA to make it clear that, in such situations, manufacturers of generic products would be permitted to base their labeling on the old format until the marketing exclusivity for the new indication has expired.

  The agency wishes to make clear that the requirement to revise the labeling of a reference listed drug in the new format does not have any impact on the duration of exclusivity for the drug and, therefore, does not prevent a manufacturer of a generic product from using the revised labeling of the reference listed drug. Under section 505(j)(2)(A)(v) of the act (21 U.S.C. 355(j)(2)(A)(v)) and § § 314.94(a)(8) and 314.127(a)(7) (21 CFR 314.127(a)(7)) of the agency's regulations, the labeling of a drug product submitted for approval under an ANDA must be the same as the labeling of the listed drug referenced in the ANDA, except for changes required because of differences approved under a suitability petition (§ 314.93), because the generic drug product and the reference listed drug are produced or distributed by different manufacturers, or because aspects of the listed drug's labeling are protected by patent or exclusivity. This final rule does not change the requirement to exclude any condition of use or indication from the labeling of a generic product when necessary (e.g., when the reference listed drug has patent protection or market exclusivity for an indication), nor does it prevent, as described at § 314.127(a)(7), approval of an ANDA when the reference listed drug has protected labeling.

  In the scenario described, the reference listed drug and the generic product would both be required to use the new labeling format. The NDA holder could not prevent the manufacturer of the generic product from using the new labeling format of the reference listed drug, but the NDA holder would still have exclusivity for the new indication.

  (Comment 117) One comment recommended that all generic drugs pending approval or approved on or after the effective date of the final rule be required to submit labeling based on the new format. The comment maintained that the content of

              © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

labeling is not significantly changed, just reordered, so this requirement would not be burdensome for manufacturers of generic products and the information in the labeling of the reference listed drug product and the generic product would still be essentially the same.

The agency does not believe that manufacturers of generic products should be required to provide labeling in the new format when seeking approval for their product if the reference listed drug product is not required to have its labeling in the new format. As discussed in the response to comment 115, the act and regulations currently require that a generic product have the same labeling as the reference listed drug product. Moreover, the agency believes that, to avoid confusion, the labeling of a generic product should be in the same format as the labeling of the reference listed drug.

(Comment 118) One comment urged FDA to compile a list of products that would be subject to the new format requirements and make the list publicly available.

FDA does not believe that it is necessary to compile such a list. Manufacturers can readily determine whether their products are subject to these requirements by referring to the implementation plan and the effective date of the rule (see section III of this document).

(Comment 119) Some comments requested that the agency clarify whether this final rule has implications for labeling that is distributed with prescription drug samples. One comment requested that the agency amend the rule to include labeling that is distributed with prescription drug samples. The comment maintained that free prescription drug samples do not contain adequate information in their packaging to keep consumers safe from harm.

FDA has often emphasized the importance of providing patients with useful written prescription drug information (e.g., FDA-approved patient labeling) in a variety of settings (see e.g., 63 FR 66378, December 1, 1998; 68 FR 33724, June 5, 2003). Prescription drug samples must be accompanied by trade labeling (§ 201.100(c)), which is subject to this final rule. If FDA-approved patient labeling for a product is required to be distributed to the patient, the manufacturer or distributor of that product must provide it with the samples.

*M. Comments on Environmental Impact*

(Comment 120) One comment maintained that FDA failed to adequately consider the environmental impact of the additional paper that will be required for labeling and the increase in size of packaging and shipping containers.

As stated in section IX of the proposed rule (65 FR 81082 at 81103), the agency determined that it is not required to do an environmental assessment or an environmental impact statement. This is an action excluded under § 25.30(h) and (k) (21 CFR 25.30(h) and (k)) (i.e., does not individually or cumulatively have a significant effect on the human environment). The changes made to the proposal in this final rule do not change this conclusion. Therefore, neither an environmental assessment nor environmental impact statement is required.

VII. Legal Authority

In this rule, FDA is addressing legal issues relating to the agency's action to revise the regulations prescribing content and format requirements for prescription drug labeling.

*A. Statutory Authority*

FDA's revisions to the content and format requirements for prescription drug labeling are authorized by the act and by the Public Health Service Act (the PHS Act). Section 502(a) of the act deems a drug to be misbranded if its labeling is false or misleading "in any particular." Under section 201(n) of the act, labeling is misleading if it fails to reveal facts that are material with respect to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.