consequences which may result from the use of the drug under the *3964 conditions of use prescribed in the labeling or under customary or usual conditions of use. Section 502(f) of the act deems a drug to be misbranded if its labeling lacks adequate directions for use and adequate warnings against use in those pathological conditions where its use may be dangerous to health, as well as adequate warnings against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users. Section 502(j) of the act deems a drug to be misbranded if it is dangerous to health when used in the dosage or manner, or with the frequency or duration, prescribed, recommended, or suggested in its labeling.

In addition, the premarket approval provisions of the act authorize FDA to require that prescription drug labeling provide the practitioner with adequate information to permit safe and effective use of the drug product. Under section 505 of the act, FDA will approve an NDA only if the drug is shown to be both safe and effective for use under the conditions set forth in the drug's labeling. Section 701(a) of the act (21 U.S.C. 371(a)) authorizes FDA to issue regulations for the efficient enforcement of the act.

Under 21 CFR 314.125, FDA will not approve an NDA unless, among other things, there is adequate safety and effectiveness information for the labeled uses and the product labeling complies with the requirements of part 201. Under § 201.100(d) of FDA's regulations, prescription drug products must bear labeling that contains adequate information under which licensed practitioners can use the drug safely for their intended uses. This final rule amends the regulations specifying the format and content for such labeling.

Section 351 of the PHS Act (42 U.S.C. 262) provides legal authority for the agency to regulate the labeling and shipment of biological products. Licenses for biological products are to be issued only upon a showing that they meet standards "designed to insure the continued safety, purity, and potency of such products" prescribed in regulations (section 351(d) of the PHS Act). The "potency" of a biological product includes its effectiveness (21 CFR 600.3(s)). Section 351(b) of the PHS Act prohibits false labeling of a biological product. FDA's regulations in part 201 apply to all prescription drug products, including biological products.

*B. First Amendment*

FDA's requirements for the content and format of prescription drug labeling are constitutionally permissible because they are reasonably related to the government's interest in ensuring the safe and effective use of prescription drug products and because they do not impose "unjustified or unduly burdensome" disclosure requirements. (See Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 651 (1985); see also Ibanez v. Florida Dep't of Bus. and Prof'l Regulation, 512 U.S. 136, 146 (1994).) The information required by the final rule to appear in labeling is the information necessary to provide facts that are material with respect to consequences which may result from the use of the drug under the conditions of use prescribed in the labeling or under customary or usual conditions of use (sections 201(n) and 502(a) of the act); adequate directions for use and adequate warnings (section 502(f) of the act); and information on the conditions of use in which the product would be dangerous (section 502(j) of the act). In addition, pursuant to section 505 of the act, the labeling sets forth information on the conditions in which the product is safe and effective. By its terms, the final rule requires disclosure of the essential scientific information necessary for safe and effective use of the labeled drug product. Consequently, FDA believes the final rule passes muster under the First Amendment.

In Central Hudson Gas & Electric Corporation v. Public Service Commission 447 U.S. 557 (1980), the Supreme Court established a four-step analysis for assessing the constitutionality of government restrictions on the content of commercial speech.

[First,] we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. [Second,] we ask whether the asserted

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

governmental interest is substantial. If both inquiries yield positive answers, we must determine [third] whether the regulation directly advances the government interest asserted, and [fourth,] whether it is not more extensive than is necessary to serve that interest.

This rule also survives scrutiny under the four-part test in Central Hudson. FDA believes that much information required to appear in prescription drug labeling is necessary for labeling to be nonmisleading. The risk information contained in such labeling, for example, constitutes material facts within the meaning of sections 201(n) and 502(a) of the act. Risk information can also qualify as warnings compelled by section 502(f) and (j) of the act. Other information, such as information on indications for the product, dosage and administration information, and how supplied information, is necessary because it provides adequate directions for use. Because not all of the information required in labeling clearly is necessary to prevent the labeling from being false or misleading, it is necessary for FDA to apply the remaining parts of the Central Hudson analysis.

FDA's interest in protecting the public health has been previously upheld as a substantial government interest under Central Hudson. (See Pearson v. Shalala, 164 F.3d 650, 656 (D.C. Cir. 1999) (citing Rubin v. Coors Brewing Co., 514 U.S. 476, 484-85 (1995).) The final rule's labeling requirements directly advance this interest, thereby satisfying the third part of Central Hudson, because by requiring disclosure of complete information on the conditions under which a product can be used safely and effectively, the requirements help to ensure that prescription drug products will be prescribed properly by health care practitioners and will be used safely and effectively by patients.

Finally, under the fourth part of the Central Hudson test, there are not numerous and obvious alternatives (in fact, there are no reasonable alternatives) (Cincinnati v. Discovery Network, 507 U.S. 410, 418 n.13 (1993)) to the content and format requirements of this final rule that directly advance the government's interest but are less burdensome to speech. Health care practitioners are accustomed to looking to the prescription drug labeling as their primary source of information about a product, and patients rely for their drug information primarily on practitioners. Neither a public education campaign, nor encouraging sponsors to provide information on the risks and benefits of drugs but not requiring such information, would ensure that practitioners have the information they need about the conditions in which prescription drugs can be used safely and effectively. Requiring disclosures meets the fourth part of the test.

Accordingly, the agency believes it has complied with its burdens under the First Amendment to support the content and format requirements for prescription drug labeling.

VIII. Paperwork Reduction Act of 1995

The final rule contains information collection provisions that are subject to review by the OMB under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501-3520). The title, description and respondent description of the information collection provisions are shown below with an estimate of the reporting burdens. Included in the estimate is the time for reviewing *3965 instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing each collection of information. The OMB and FDA received no comments concerning the information collection provisions of the proposed rule.

Title: Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products

Description: The final rule amends FDA's regulations governing the format and content of labeling for human prescription drug products. It revises current regulations to require that the labeling of new and recently approved products contain highlights of prescribing information, a table of contents for prescribing information, reordering of certain sections, minor content changes, and minimum graphical requirements. The final rule does not subject older drugs to the revised

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                             Page 76
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

labeling requirements. However, it does require, as for new and recently approved products, that FDA-approved patient labeling accompany or be reprinted immediately following the last section of prescription drug labeling.

 As discussed in section VII of this document, FDA's legal authority to amend its regulations governing the content and format of labeling for human prescription drugs derives from sections 201, 301, 502, 503, 505, and 701 of the act and from section 351 of the PHS Act.

*A. Summary of Prescription Drug Labeling Content and Format Requirements in this Final Rule That Contain Collections of Information*

 Section 201.56 requires that prescription drug labeling contain certain information in the format specified in either § 201.57 or § 201.80, depending on when the drug was approved for marketing. Section 201.56(a) sets forth general labeling requirements applicable to all prescription drugs. Section 201.56(b) specifies the categories of new and more recently approved prescription drugs subject to the revised content and format requirements in § § 201.56(d) and 201.57. Section 201.56(c) sets forth the schedule for implementing these revised content and format requirements. Section 201.56(e) specifies the sections and subsections, required and optional, for the labeling of older prescription drugs not subject to the revised format and content requirements.

 Section 201.57(a) requires that prescription drug labeling for new and more recently approved prescription drug products include "Highlights of Prescribing Information." Highlights provides a concise extract of the most important information required under § 201.57(c) (the FPI), as well as certain additional information important to prescribers. Section 201.57(b) requires a table of contents to prescribing information, entitled "Full Prescribing Information: Contents," consisting of a list of each heading and subheading along with its identifying number to facilitate health care practitioners' use of labeling information. Section 201.57(c) specifies the contents of the FPI. The final rule reorders information required at former § 201.57, makes minor content changes, and provides standardized identifying numbers for the required information. Section 201.57(d) mandates new minimum specifications for the format of prescription drug labeling and establishes minimum requirements for key graphic elements such as bold type, bullet points, type size, and spacing.

 In accordance with the final rule, older drugs not subject to the revised labeling content and format requirements in § 201.57 remain subject to labeling requirements at former § 201.57, which is redesignated as § 201.80 by this final rule. Section 201.80 contains minor clarifications. In addition, § 201.80(f)(2) requires that within 1 year, any FDA-approved patient labeling be referenced in the "Precautions" section of the labeling of older products and either accompany or be reprinted immediately following the labeling.

*B. Estimates of Reporting Burden*

1. The Reporting Burdens for the General Requirements (§ 201.56)

 The reporting burdens for the general requirements in § 201.56(a) are the same as those for former § 201.56(a) through (c) and are estimated in tables 8a and 8b as part of the burdens associated with § 201.57. Section 201.56(b) and (c) sets forth the categories of affected drugs and their implementation schedule, generating no reporting burdens. Section 201.56(d) sets forth the required sections and subsections associated with the revised format in § 201.57; therefore, its associated reporting burdens are estimated in tables 8a and 8b under the requirements at § 201.57. Sections 201.56(e) and 201.80 codify former labeling requirements at § § 201.56(d) and (e) and 201.57, with minor clarifications, for older prescription drugs. The requirements in these sections impose no new reporting burdens (except those accounted for in section VIII.B.6 of this document), as they were previously incurred to produce existing labeling.

2. Annual Burden for Labeling Design, Testing, and Submitting to FDA for NDAs

              © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                                Page 77
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

Submitted on or After the Effective Date of the Final Rule (§ § 201.56 and 201.57)

 New drug product applicants must: (1) Design and create prescription drug labeling containing Highlights, Contents, and FPI, (2) test the designed labeling (e.g., to ensure that the designed labeling fits into carton-enclosed products), and (3) submit it to FDA for approval.

 Based on information received from the pharmaceutical industry, FDA estimated that it took applicants approximately 3,200 hours to design, test, and submit prescription drug labeling to FDA as part of an NDA or BLA under former labeling requirements (see row 1 of table 8a). FDA estimates that it will take an additional 149 hours to generate Highlights and Contents and otherwise comply with the additional requirements of the final rule (see row 2 of table 8a). Therefore, it will take a total of approximately 3,349 hours to design, test, and submit new labeling. Approximately 85 applicants would submit approximately 107 new applications (NDAs and BLAs) to FDA per year, totaling 358,343 hours (see Total of table 8a).

 3. Burden Associated with Labeling Supplements for Applications Approved Within 5 Years Prior to the Effective Date of the Rule (§ 201.57)

 The final rule requires that prescription drug applications approved during the 5 years before, or pending on, the effective date conform to format and content requirements at § 201.57. For these products, applicants must redesign and negotiate the labeling, including Highlights and Contents, test the redesigned labeling, and prepare and submit that labeling to FDA for approval. Based on information provided in the "Analysis of Economic Impacts" (economic analysis) (see section XI.D.2.a of this document), labeling supplements for a total of approximately 344 innovator products would be submitted to the FDA over a 5-year period (beginning in year 3 and ending in year 7 after the effective date of the rule). Approximately 172 applicants would submit these labeling supplements. The time required for redesigning, testing, and submitting the labeling to FDA is estimated to be approximately 196 hours per application, totaling 67,424 hours (see row 1 of table 8b).

 *3966 4. Burden Associated with Revised Labeling Efficacy Supplements Submitted on or After the Effective Date of the Rule (§ § 201.56(d) and 201.57)

 Efficacy supplemental applications for older drugs submitted on or after the effective date of the final rule are subject to the content and format requirements at § § 201.56(d) and 201.57. To meet these requirements, applicants must revise the existing labeling for these products. Each year an increasing number of innovator drug labeling will have been revised, and over time, very few efficacy supplements independently will generate labeling revisions as a result of this final rule. According to information in the economic analysis, the total number of affected efficacy supplements over 10 years is estimated at 324, with a decreasing number each year over the 10-year period (see section XI.D.2.a. of this document). For purposes of this analysis, the total burden for efficacy supplements is summarized in row 2 of table 8b. Over 10 years, approximately 172 applicants will trigger approximately 324 efficacy supplements, each one requiring approximately 196 hours to revise the labeling in the application, totaling 63,504 hours. In addition to this burden, a minimal annual reporting burden, probably even lower than the 7 per year estimated in year 10 of table 13 of this document, will continue indefinitely.

 5. Burden Associated with Revised Labeling for Efficacy Supplements for Generic Drug Products (§ 201.57)

 The reporting burden for generic products subject to the requirements of the final rule has only been estimated for those products requiring revisions to their existing labeling. Reporting burdens for generating newly approved labeling for generic products (§ 314.94(8)) is already approved under OMB control number 0910-0001. According to the data in the economic analysis, beginning in year 3 and continuing throughout the 10-year period analyzed, approximately 42 generic applications per year must submit labeling supplements to comply with the final rule

                    © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(see section XI.D.2.a of this document). For purposes of this analysis, approximately 336 already approved generic drug applications must submit labeling supplements over the 10-year period after the effective date of the rule (see section XI.D.2.a of this document). The time required to revise and submit this labeling to FDA would be approximately 27 hours per application, totaling 9,072 hours (see row 3 of table 8b). In addition to this burden, a minimal reporting burden associated with a very small number of generic applications referencing older drugs may continue indefinitely.

6. Requirement That FDA-Approved Patient Labeling Accompany Prescription Drug Labeling Within 1 Year (§ §  201.57 and 201.80)

 Within 1 year, all FDA-approved patient labeling must either accompany or be reprinted immediately following the prescription drug labeling (§ §  201.57(c)(18) and 201.80(f)(2)). As indicated in the economic analysis (section XI.D.1 of this document), an estimated 80 products will need to revise labeling as a result of this requirement. Approximately 18 applicants would be subject to this requirement. The agency estimates approximately 38 hours per product as a one-time labeling revision, totaling 3,040 hours (see row 4 of table 8b).

C. *Capital Costs*

 A small number of carton-enclosed products may require new packaging to accommodate longer inserts (see section XI.D.2.c and comment 124 of this document). As described in more detail in the economic analysis (section XI.D.2.c.ii), up to 5 percent of the existing products affected by the rule (i.e., products with new efficacy supplements, products approved in the 5 years prior to the effective date of the rule, and affected ANDAs) may require equipment changes at an estimated cost of $200,000 each product. As shown in table 17, the estimated value of equipment changes totals $7.2 million and $8.7 million over 10 years discounted at 7 and 3 percent, respectively.

 Description of Respondents: Persons and businesses, including small businesses and manufacturers.


[Note:  The following TABLE/FORM is too wide to be displayed on one screen.  You must print it for a meaningful review of its contents.  The table has been divided into multiple pieces with each piece containing information to help you assemble a printout of the table.  The information for each piece includes: (1) a three line message preceding the tabular data showing by line # and character # the position of the upper left-hand corner of the piece and the position of the piece within the entire table; and (2) a numeric scale following the tabular data displaying the character positions.]




©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                                          Page 79
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)
```

***********************************************************************
******** This is piece 1. -- It begins at character 1 of table line 1. ********
***********************************************************************

             Table 8a.--Estimated Reporting Burden for
----------------------------------------------------
Category (21 CFR      Number of         Number of
    section)         Respondents        Responses
                                           per
                                        Respondent
----------------------------------------------------
Annual burden
  associated
  with former
  labeling
  requirements
  (former
  201.56(d) and
  201.57) ..................... 85 .......... 1.26 .
Additional
  annual burden
  associated
  with
  requirements
  of this final
  rule
  (201.56(d) and
  201.57) ..................... 85 .......... 1.26 .
Total ............................  ................
1....+...10....+...20....+...30....+...40....+...50..

                © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                                          Page 80
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)


*************************************************************************
******* This is piece 2. -- It begins at character 53 of table line 1. ********
*************************************************************************

 New Drug Applications [FN1]
---------------------------------------
    Total          Hours per       Total
   Responses       Response        Hours


---------------------------------------




.......... 107 ....... 3,200 .. 342,400







.......... 107 ......... 149 ... 15,943
.................... 3,349 .. 358,343
53....60....+...70....+...80....+...90.
```

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                           Page 81
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

```
**********************************************************************
******* This is piece 3. -- It begins at character 1 of table line 26. ********
**********************************************************************
```

FN1 There are no capital costs or operating and maintenance costs associated
  collection of information.
--------------------------------------------------------------------------
1...+...10....+...20....+...30....+...40....+...50....+...60....+...70....+.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                                    Page 82
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)


**************************************************************************
******* This is piece 4. -- It begins at character 77 of table line 26. *******
**************************************************************************

 with this

 ---------------
 77......+...90.
```

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                           Page 83
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

[Note: The following TABLE/FORM is too wide to be displayed on one screen. You must print it for a meaningful review of its contents. The table has been divided into multiple pieces with each piece containing information to help you assemble a printout of the table. The information for each piece includes: (1) a three line message preceding the tabular data showing by line # and character # the position of the upper left-hand corner of the piece and the position of the piece within the entire table; and (2) a numeric scale following the tabular data displaying the character positions.]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                                         Page 84
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)


***********************************************************************
******** This is piece 1. -- It begins at character 1 of table line 1. ********
***********************************************************************


            Table 8b.--Estimated Reporting Burdens for
------------------------------------------------------
  Category (21 CFR     Year(s) In       Number of
      section)           Which          Respondents
                        Burdens
                         Occur
                       Following
                        Rule's
                       Effective
                         Date
------------------------------------------------------
Burden associated
 with revised
 labeling for
 applications
 approved within
 5 years prior to
 the rule's
 effective date
 (201.57) ........ Beginning
                    year 3,
                    ending year
                    7 ...................... 172

Burden associated
 with revised
 labeling for
 efficacy
 supplements
 submitted on or
 after the rule's
 effective date
 (201.56(d) and
 201.57) ......... Beginning
                    year 1,
                    diminishing
                    over time .............. 172

Burden associated
 with revised
 labeling for
 efficacy
 supplements for
 generic drug
 products
 (201.57) ........ Beginning
                    year 3,
                    continuing
                    annually
                    thereafter ............. 42


Burden as a result
 of having
 FDA-approved
 patient labeling
 accompany drug
 labeling within
 1 year
```

                © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                                      Page 85
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)


  (201.57(c)(18)
  and
  201.80(f)(2)) ... Year 1 only ................ 18
Total ............................  ................


1...+...10....+...20....+...30....+...40....+...50..
```

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                                      Page 86
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)
```

```
*************************************************************************
******* This is piece 2. -- It begins at character 53 of table line 1. ********
*************************************************************************
```

 Labeling Revisions to Already-Approved Drug Products [FN1]

| Number of Responses per Respondent | Total Responses | Hours per Response | Total Hours | Total Capital Costs |
|---|---|---|---|---|
| 2.0 | 344 | 196 | 67,424 | $3.3 million |
| 1.88 | 324 | 196 | 63,504 | $2.5 million |
| 8 | 336 (for years | | | |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                                         Page 87
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)

               1-10) ................. 27 .... 9,072    $2.5
                                                        million




.......... 4.44 ............ 80 .......... 38 .... 3,040 .. $400,000
................  ............................... 143,040  Up to $8.7
                                                            million
                                                            (see
                                                            table 17)
53....60....+...70....+...80....+...90....+....0....+...10....+...20.
```

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                                         Page 88
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)


****************************************************************************
******* This is piece 3. -- It begins at character 1 of table line 67. ********
****************************************************************************

FN1 There are no operating and maintenance costs associated with this
----------------------------------------------------------------------
1...+...10....+...20....+...30....+...40....+...50....+...60....+...7
```

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                                    Page 89
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)


***********************************************************************
******* This is piece 4. -- It begins at character 70 of table line 67. *******
***********************************************************************

 collection of information.
-----------------------------------------------------
70..+...80....+...90....+....0....+...10....+...20..
```

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                              Page 90
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**


  **\*3967** The information collection provisions in this final rule have been approved under OMB control number 0910-0572. This approval expires December 31, 2008. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

IX. Environmental Impact

  The agency has determined under 21 CFR 25.30(h) and (k) that this action is of a type that does not individually or cumulatively have a significant effect on the human environment. Therefore, neither an environmental assessment nor an environmental impact statement is required.

X. Executive Order 13132: Federalism

  We have analyzed this final rule in accordance with the principles set forth in Executive Order 13132. Section 4(a) of the Executive order requires agencies to "construe * * * a Federal statute to preempt State law only where the statute contains an express preemption provision or there is some other clear evidence that the Congress intended preemption of State law, or where the exercise of State authority conflicts with the exercise of Federal authority under the Federal statute." [FN10] Here, FDA has determined that the exercise of State authority conflicts with the exercise of Federal authority under the act.

  FN10 Because we have determined that the act preempts State law because the exercise of State authority conflicts with the exercise of Federal authority under that statute, we need not construe our statutory rulemaking authority as required by section 4(b) of the Executive order.

  The act gives FDA comprehensive authority over drug safety, effectiveness, and labeling. FDA is the expert Federal agency charged by Congress with ensuring that drugs are safe and effective and that product labeling is truthful and not misleading (sections 505(d) and 903(b)(2)(B) of the act (21 U.S.C. 393(b)(2)(B))). According to the act, a manufacturer of a drug must submit an NDA containing "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use" (section 505(b)(1)(A) of the act; see also 21 CFR 314.50; see also United States v. Rutherford, 442 U.S. 544, 555 (1979) ("Few if any drugs are completely safe in the sense that they may be taken by all persons in all circumstances without risk. Thus, the Commissioner generally considers a drug safe when the expected therapeutic gain justifies the risk entailed by its use" (citations omitted))).

  An NDA must include the "proposed text of the labeling," together with "annotations to the information in the summary and technical sections of the application that support the inclusion of each statement in the labeling * * *" (21 CFR 314.50(c)(2)(i)). The proposed labeling must also provide "adequate directions for use" (section 502(f) of the act). FDA by regulation has defined this to mean "directions under which the layman can use a drug safely * * *" (21 CFR 201.5). Because a prescription drug, by definition, cannot be used safely by a layperson without professional supervision, FDA regulations afford an exemption from the statutory requirement of adequate directions for use for a prescription drug whose labeling includes "any relevant hazards, contraindications, side effects, and precautions under which practitioners licensed by law to administer the drug can use the drug safely and for the purposes for which it is intended * * *" (§ 201.100(c)(1)). If labeling lacks this information, or is otherwise false or misleading in any particular, FDA is authorized to refuse to approve the NDA (section 505(d) of the act; 21 CFR 314.125(b)(6) and (b)(8)).

  The FDA review process for an NDA is thorough and scientifically rigorous. An NDA must contain proposed labeling and all information about the **\*3968** drug (whether favorable or unfavorable) that is pertinent to evaluating the application and that is received or otherwise obtained by the applicant from any source (21 CFR 314.50

                © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                          Page 91
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

and 601.2(a)). FDA scientists evaluate this information, and may request additional information as necessary to provide a complete and accurate picture of the product. FDA may supplement the expertise of its in-house scientific personnel with advice from scientific advisory committees of outside experts (21 CFR 14.171).

Under the act and FDA regulations, the agency determines that a drug is approvable based not on an abstract estimation of its safety and effectiveness, but rather on a comprehensive scientific evaluation of the product's benefits and risks under the conditions of use prescribed, recommended, or suggested in the labeling (section 505(d) of the act). FDA considers not only complex clinical issues related to the use of the product in study populations, but also important and practical public health issues pertaining to use of the product in day-to-day clinical practice, such as the nature of the disease or condition for which the product will be indicated, and the need for risk management measures to help assure in clinical practice that the product maintains its favorable benefit-risk balance. The centerpiece of risk management for prescription drugs generally is the labeling, which reflects thorough FDA review of the pertinent scientific evidence and communicates to health care practitioners the agency's formal, authoritative conclusions regarding the conditions under which the product can be used safely and effectively in accordance with the act.

FDA carefully controls the content of prescription drug labeling, because such labeling is FDA's principal tool for educating health care practitioners about the risks and benefits of the approved product to help ensure safe and effective use. As FDA noted in the preamble accompanying the December 2000 proposed rule amending the 1979 physician labeling regulations:

The part of a prescription drug product's approved labeling directed to health care practitioners * * * is the primary mechanism through which FDA and drug manufacturers communicate essential, science-based prescribing information to health care professionals. This part of approved labeling is a compilation of information based on a thorough analysis of the new drug application (NDA) or biologics license application (BLA) submitted by the applicant * * * . [T]he primary purpose of prescription drug labeling is to provide practitioners with the essential information they need to prescribe the drug safely and effectively for the care of patients.

(65 FR 81082 at 81082 and 81083). What distinguishes the prescription drug labeling from other information available to practitioners about a prescription drug is that the prescription drug labeling "is intended to provide physicians with a clear and concise statement of the data and information necessary for the safe and effective use of the drug." Moreover, the act "permits labeling statements with respect to safety only if they are supported by scientific evidence and are not false or misleading in any particular" (44 FR 37434 at 37435 and 37441).

Under this final rule, risk information must appear in different sections of the prescription drug labeling in a particular order and must be based on data derived from human experience whenever possible. For example, information included in the contraindications section of prescription drug labeling must include only "[k]nown hazards and not theoretical possibilities" (§ 201.57(c)(5)). The adverse reactions section must include those adverse events for which there is some basis to believe there is a causal relationship between the event and the drug (§ 201.57(c)(7)).

The act and FDA regulations prescribe several procedures to ensure that FDA receives information about risks that become apparent after approval. Because clinical trials involve time-limited administration of the investigational product to a relatively small and homogeneous population of study subjects, adverse events that were not observed during clinical trials may be recognized or identified following approval. The act provides that a manufacturer must establish and maintain such records, and make such reports, as FDA may require by regulation (section 505(k) of the act). To implement this provision, FDA has issued regulations requiring prompt reports of serious, unexpected drug experiences and periodic reports of all information relating to the safety and effectiveness of the drug (21 CFR 314.80 and 314.81). Manufacturers may also commit to conduct additional safety

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                        Page 92
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

and effectiveness studies following approval and submit data from these studies to the agency. (See section 506B of the act (21 U.S.C. 356b).)

The statutory and regulatory requirements for the submission of information to FDA are accompanied by statutory provisions addressing the failure of a sponsor to comply with these requirements. A manufacturer that introduces a new drug into interstate commerce without having submitted the required premarket information has violated the act (section 505(a) of the act) and is subject to FDA enforcement action. Similarly, if a manufacturer fails to submit information required by 21 CFR 314.80 and 314.81, it is subject to enforcement action under 21 U.S.C. 331(e). FDA is authorized to investigate suspected fraud using its general statutory investigative authority (section 702 of the act (21 U.S.C. 372)). The agency is also empowered to address fraud by seeking injunctive relief and civil penalties (21 U.S.C. 332, 333(g)(1)(A)), and has authority to invoke the general federal prohibition on making false statements to the Federal Government (18 U.S.C. 1001). In sum, FDA has a variety of enforcement options that allow it to make a calibrated response to suspected violations of the act's information submission requirements.

The agency carefully reviews all the information submitted by a sponsor in a marketing application to make its statutorily required judgment as to whether the product is safe and effective and otherwise in compliance with the act. It also reviews adverse event information submitted after marketing approval and determines what action, if any, should be taken. In rare cases, FDA finds that the information supports a determination to withdraw the product from the market (section 505(e) of the act; 21 CFR 601.5(b)(1)). In other instances, FDA uses other risk management techniques. One such technique is incorporating additional risk information into, or otherwise modifying, the prescription drug labeling (§ 201.57(e)). In many cases, review of the submitted reports does not lead to any change, e.g., because FDA determines that the event reported is not causally related to the product.

Changes to prescription drug labeling typically are initiated by the sponsor, subject to FDA review, but are sometimes initiated by FDA. Under FDA regulations, to change prescription drug labeling (except for editorial and other minor revisions), the sponsor must submit a supplemental application fully explaining the basis for the change (§ § 314.70 and 601.12(f)). FDA permits two kinds of labeling supplements: (1) Prior approval supplements, which require FDA approval before a change is made (§ § 314.70(b) and 601.12(f)(1)), and (2) CBE supplements, which may be implemented before FDA approval, but after FDA notification (§ § 314.70(c) and 601.12(f)(2)). Labeling changes to the FPI to add or strengthen a warning, precaution, contraindication, or adverse reaction statement are within the **\*3969** category of changes for which CBE supplements are required by FDA regulations (§ § 314.70(c)(6)(iii) and 601.12(f)(2)(i)) (see comment 5). While a sponsor is permitted to add risk information to the FPI without first obtaining FDA approval via a CBE supplement, FDA reviews all such submissions and may later deny approval of the supplement, and the labeling remains subject to enforcement action if the added information makes the labeling false or misleading under section 502(a) of the act. To mitigate this risk, manufacturers often consult with FDA before adding risk information to labeling. As noted in response to comment 5, however, a sponsor may not use a CBE supplement to make most changes to Highlights.

As FDA has long recognized, its role is not to regulate medical practice. The agency's actions nevertheless affect medical practice in a variety of ways. For example, FDA approval decisions affect the availability of drugs and medical devices. Also, FDA decisions as to the content and format of prescription drug labeling affect health care practitioners' communications with patients, to the extent such labeling is relied upon by such practitioners to guide their discussions of risk with patients. FDA strongly believes that health care practitioners should be able to rely on prescription drug labeling for authoritative risk information and that health care practitioners should not be required to convey risk information to patients that is not included in the labeling.

If State authorities, including judges and juries applying State law, were permitted to reach conclusions about the safety and effectiveness information disseminated with respect to drugs for which FDA has already made a series of

71 FR 3922-01                                                           Page 93
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)

regulatory determinations based on its considerable institutional expertise and comprehensive statutory authority, the federal system for regulation of drugs would be disrupted. Where a drug has not been reviewed by FDA and decisions with respect to safety, effectiveness, and labeling have not been made by the agency, expert determinations would not yet have been made by FDA, and such disruption would not occur.

Section 4(c) of Executive Order 13132 instructs us to restrict any Federal preemption of State law to the "minimum level necessary to achieve the objectives of the statute pursuant to which the regulations are promulgated." This final rule meets the preceding requirement because, as discussed in more detail above, it preempts state law only to the extent required to preserve Federal interests. Section 4(d) of Executive Order 13132 states that when an agency foresees the possibility of a conflict between State law and federally protected interests within the agency's area of regulatory responsibility, the agency "shall consult, to the extent practicable, with appropriate State and local officials in an effort to avoid such a conflict." Section 4(e) of Executive Order 13132 adds that, when an agency proposes to act through adjudication or rulemaking to preempt State law, the agency "shall provide all affected State and local officials notice and an opportunity for appropriate participation in the proceedings."

FDA sought input from all stakeholders on new requirements for the content and format of prescription drug labeling through publication of the proposed rule in the Federal Register. Although the proposed rule did not propose to preempt state law, it did solicit comment on product liability issues. FDA received no comments on the proposed rule from State and local governmental entities.

Officials at FDA consulted with a number of organizations representing the interests of state and local governments and officials about the interaction between FDA regulation of prescription drug labeling (including this rule) and state law.

In conclusion, the agency believes that it has complied with all of the applicable requirements under Executive Order 13132 and has determined that this final rule is consistent with the Executive order.

XI. Analysis of Economic Impacts

FDA has examined the impacts of the final rule under Executive Order 12866, the Regulatory Flexibility Act (5 U.S.C. 601-612), and the Unfunded Mandates Reform Act of 1995 (Public Law 104-4). Executive Order 12866 directs agencies to assess all costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity). Under the Regulatory Flexibility Act, unless the agency certifies that the rule is not expected to have significant economic impact on a substantial number of small entities, an agency must consider alternatives that would minimize any significant impact of the rule on small entities.

Section 202(a) of the Unfunded Mandates Reform Act of 1995 requires that agencies prepare a written statement of anticipated costs and benefits before proposing any rule that may result in an expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million in any one year (adjusted annually for inflation).

The agency believes that this rule is consistent with the regulatory philosophy and principles identified in Executive Order 12866 and in these two statutes. The final rule would amend current requirements for the format and content of human prescription drug product labeling. Although the effectiveness of the revised labeling in achieving time savings and reductions in adverse reactions is uncertain, based on the following analysis as summarized in table 9, FDA projects that the present value of the quantifiable benefits of the final rule over 10 years range from $330 million to $380 million and from $420 million to $480 million at a 7 and 3 percent discount rate, respectively. Direct costs of the final rule are projected to range from approximately $7 million to $17 million in any one year, for a total

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.