71 FR 3922-01                                                              Page 94
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)

present value of approximately $90 million and $120 million over 10 years at a 7 and
3 percent discount rate, respectively. The agency thus concludes that the benefits
of this final rule outweigh the costs. Furthermore, the agency has determined that
the final rule is not an economically significant rule as described in the Executive
order, because annual impacts on the economy are substantially below $100 million.
Because the rule does not impose any mandates on State, local or tribal governments,
or the private sector that will result in an expenditure in any one year of $100
million or more, FDA is not required to perform a cost-benefit analysis according to
the Unfunded Mandates Reform Act. The current inflation-adjusted statutory threshold
is about $115 million.

   The agency believes that this rule would not have a significant impact on most
small entities. However, it is possible that some small firms that produce several
affected drugs, or small firms that might be required to undertake packaging
modifications, may be significantly affected by this rule. Therefore, the following
analysis, in conjunction with the preamble, constitutes the agency's final
regulatory flexibility analysis as required by the Regulatory Flexibility Act.


   Table 9.--Summary of Projected Quantifiable Benefits and Costs over 10 Years
                                     [FN1]

|  | Total ($ million) | Present Value ($ million) | |
| --- | --- | --- | --- |
|  |  | 3 percent | 7 percent |
| Benefits: .......................................... | ............ | | |
| Health Care Practitioner Time Saved ........... | 150 | 120 | 90 |
| Cost of Adverse Drug Events Avoided .. | 360 to 430 | 300 to 360 | 240 to 290 |
| Total Potential Benefits ............. | 510 to 580 | 420 to 480 | 330 to 380 |
| Costs: ............................................ | ............ | | |
| Design and Produce Trade Labeling; | | | |
|   Modify Packaging Equipment ................... | 42 | 36 | 29 |
| Reformat and Produce Labeling Not | | | |
|   Accompanying Drug Products ................... | 36 | 30 | 25 |
| Print Longer PDR ............................... | 59 | 49 | 39 |
| Total Costs ................................... | 140 | 120 | 90 |
| FN1 Numbers may not sum due to rounding. | | | |


*3970 A. Purpose of the Final Rule

   The purpose of the final rule is to make it easier for health care practitioners to
find and read information important for the safe and effective use of prescription
drugs. As described elsewhere in this preamble, the agency has found that the
current format of prescription drug labeling can be improved to more optimally
communicate important drug information (see section I of this document). Enhanced
communication of drug information to physicians should make them better informed
prescribers. The final rule is designed to achieve these objectives by amending the
current content and format of the labeling for certain human prescription drug
products to, among other things, highlight frequently accessed and new information,
include a table of contents for the detailed information in labeling, and reorder
this detailed information.

B. Comments on the Economic Impact Analysis

   Most comments on the economic analysis of the proposed rule came from
pharmaceutical manufacturers. Although many manufacturers expressed concerns that
the agency had significantly underestimated the costs to industry, especially the
additional packaging costs that would be necessary with labeling printed in 8
points, only a few provided detailed information about the potential burden they
expected the rule to impose. The agency welcomes these comments and, whenever

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

possible, has incorporated data from these examples in the final analysis of
economic impacts.

(Comment 121) Several comments argued that manufacturers would incur significant
administrative costs when negotiating the content of Highlights with FDA.

Although our analysis did not separate administrative costs from other labeling
design costs, the agency anticipated that manufacturers would require some "detailed
discussions and drug-specific decisions" during the design phase of labeling (e.g.,
regarding exactly which adverse reactions should be listed in Highlights) (65 FR
81082 at 81106). Currently, manufacturers submitting new applications (i.e., NDAs
and BLAs) and efficacy supplements have to negotiate the content of labeling as part
of the review process. Because any information in Highlights is also in the FPI, the
agency does not agree that negotiating the content of Highlights will impose
significant administrative costs beyond what is currently incurred by these
manufacturers. As noted, to facilitate this process, the agency is making available
guidance to assist manufacturers in selecting information for inclusion in
Highlights (section IV of this document).

On the other hand, manufacturers of recently approved innovator drugs (i.e.,
approved within 5 years prior to the effective date of the final rule) will incur
costs to: (1) Prepare and submit their redesigned labeling to FDA for approval,
which may include negotiations concerning the content of Highlights, and (2) replace
existing labeling with redesigned labeling. To account for these additional actions,
the one-time design costs for labeling of recently approved products are estimated
to be about 50 percent higher than for labeling of new products (see section XI.D.2
of this document).

(Comment 122) The agency sought specific comment on whether the potential impact of
the proposed rule on small entities has been accurately estimated by the agency, and
whether small business concerns have been adequately addressed. One comment stated
that because the proposal has the potential to substantially affect larger companies
(could double the length of labeling and require extensive re-engineering and re-
design of packaging lines and ancillary equipment), its impact would be even greater
on smaller companies.

Although the agency had requested input from small companies that might be affected
by the rule, all comments on this question came from large companies. FDA believes
it is difficult to predict the effect of the rule on small firms. While small firms
may have lower sales volume over which to spread the fixed costs of compliance, some
industry consultants have found that small pharmaceutical firms have less
organizational layers and incur lower costs for the same activity than large
pharmaceutical firms (Ref. 12). Table 22 in section XI.E.2 of this document
illustrates the potential impact that the final rule might have on small firms.

(Comment 123) One comment maintained that there is no support for FDA's identified
benefit of reducing the time it takes a prescriber to use labeling by 15 seconds.
The comment argued that Highlights, because it contains incomplete information,
would actually increase physician reading time and asserts that FDA's assumption
would be true only if physicians read just Highlights.

The agency acknowledges that there is not direct empirical support for the estimate
of 15 seconds time savings, but is persuaded based on consultation with physicians
that the labeling changes would save time. The agency consulted physicians in a
national survey, focus groups, and a public meeting to design labeling that provides
easier and faster access to the most important and commonly referenced prescribing
*3971 information (65 FR 81082 at 81083 through 81085; see also Ref. 11). Using a
standard format with frequently accessed sections at the beginning of labeling will
help physicians find important information quickly and retain that information.
Inclusion of Contents and references in Highlights to the full prescribing
information that is cited or concisely summarized will speed access to detailed
information in the FPI. In the absence of quantitative evidence suggesting a
different estimate of time savings, the agency is retaining 15 seconds as a
conservative estimate of the amount of time health care practitioners can save when

©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                                    Page 96
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

seeking drug product information in labeling.

(Comment 124) Some comments argued that FDA's estimate significantly underestimates increased costs for trade packaging, shipping containers, and new packaging and shipping equipment to accommodate the larger labeling that will result from the new format. Some comments argued that the agency's initial estimate of $200,000 to adjust or retool existing packaging equipment underestimates the impact on industry by almost fourfold. Moreover, one comment stated it could cost large manufacturers with many product lines up to $40 million to change all packaging lines. Several comments stated that increases of this magnitude will require retooling or replacing existing equipment, increasing containers to accommodate longer outserts, or, in some cases, adding a carton. Comments also stated that longer labeling would increase administrative costs.

FDA allows each manufacturer some flexibility to determine the size and shape of a product's trade labeling and packaging. A survey of labeling printed in the Physicians' Desk Reference (PDR) for 200 products showed that, on average, labeling requires 200 square inches of surface area when printed in 6.5-point type size. Since prescription drug labeling is printed on both sides of the paper, these findings suggest that current trade labeling averages 100 square inches. From this baseline, the agency calculates that about an additional 92.6 square inches of paper would be needed to print labeling in 8-point type size and to add Highlights and Contents to the labeling.

To reduce the burden on industry, the final rule requires that trade labeling be printed in at least 6-point type size (see comment 102), similar to the size of the baseline case used in the original analysis and a size generally supported by industry comments on the proposed rule. Even though some trade labeling is currently printed in a size as small as 4 points, on average, trade labeling is in 6 points, and thus requiring a minimum type size of 6-point will not increase the size of most trade labeling. However for the few products currently printed in 4 points, labeling will require approximately 33 percent more paper to conform with the 6-point minimum size requirement at § 201.57(d)(6). The agency believes that the additional resources associated with longer labeling are warranted by the ease of use and speed of comprehension by having labeling printed in 6 rather than 4 points.

Highlights and Contents will increase trade labeling by approximately 40 square inches, requiring an additional 20 square inches of paper. Manufacturers submitting NDAs and BLAs have not yet designed product labeling or packaging. Thus, the agency does not agree that the final rule will impose additional packaging costs on these manufacturers. In contrast, manufacturers submitting efficacy supplements or having existing labeling for drug products affected by the final rule will need to determine if their redesigned trade labeling fits on or within existing packaging.

The final rule will affect less than 15 percent of existing products in the United States. [FN11] The agency agrees that some packaging lines of these products will require adjustment to accommodate longer trade labeling, but disagrees that this will be necessary for all packaging lines. Based on an analysis of ophthalmic products, the agency increased the proportion of existing products expected to incur one-time production costs from 1 to 5 percent (see section XI.D.2.c.ii of this document).

FN11 Data derived from information in "Approved Drug Products with Therapeutic Equivalence Evaluations," December 2001.

(Comment 125) One comment insisted that FDA's estimate of 92.6 square inches of additional labeling space is not sufficient to accommodate the proposed new labeling sections, increase in white space, increase in type size, and inclusion of patient information in the FPI. The comment suggested that FDA's presentation of how much additional labeling space would be needed was confusing.

The implementation schedule to add FDA-approved patient labeling to prescription drug labeling differs from the implementation schedule for the formatting and content changes affecting labeling for new and recently approved products (i.e.,

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

approved within 5 years of the effective date of the final rule). Consequently, the agency analyzed the impact of each of these requirements separately.

Within 1 year of the effective date of the final rule, any FDA-approved patient labeling must either be reprinted immediately following the end of labeling or accompany the labeling (§ § 201.57(c)(18) and 201.80(f)(2)). An estimated 150-square inches of surface area would be needed to print this information, adding an additional 75-square inches to the size of the labeling (65 FR 81082 at 81109). The agency identified up to 200 products with some form of FDA-approved patient labeling that will be affected by the final rule. A sample of these affected products shows that the labeling of more than 60 percent already conforms to this provision of the final rule. For the final analysis, the agency increased the estimate of the number of affected products from 50 to 80, thus increasing the incremental printing costs for this provision of the final rule to $0.4 million annually (see section XI.D.1 of this document).

More space will be needed to print longer trade labeling and labeling distributed with promotional materials for new and recently approved products. The length will depend on the minimum type size requirements for the labeling. For trade labeling printed in a minimum of 6 points, an estimated 20 square inches of paper is necessary to accommodate Highlights and Contents. In contrast, product labeling distributed with promotional materials must be printed in a minimum 8-point type size, requiring about 93 square inches of paper (65 FR 81082 at 81107). Furthermore, for labeling with FDA-approved patient labeling which is not currently appended to the product labeling, after all provisions of the final rule are implemented, product labeling will be approximately 168 square inches or 65 square inches longer when printed in 8- point or 6-point type, respectively.

(Comment 126) One comment asked the agency to consider the impact of the increased number of calls on companies, and possible increases in personnel to process calls, as a result of requiring companies to include their phone number in the package inserts. Another comment raised concerns that requiring corporate telephone numbers for reporting of serious adverse reactions in Highlights would require companies to change their labeling with each change of their corporate telephone number.

The agency believes that health care practitioners have varied access to company information via the Internet and other sources, thus including the phone number is unlikely to overly burden a company's ability to handle *3972 incoming calls. The agency believes that changes in corporate phone numbers are an ordinary business expense.

*C. Benefits of Regulation*

The expected economic benefits of this final rule are the sum of the present .values of: (1) The reduced time needed by health care practitioners to seek desired information in prescription drug labeling; (2) the increased effectiveness of drug treatment; and (3) the avoided costs of treating drug-related errors due to misunderstood or incorrectly applied drug information.

We acknowledge that the information to estimate the benefits of this rule is quite limited. In particular, we do not have direct estimates of how much time practitioners might save by using the new labeling, or how the new labeling might improve doctors' understanding of risks of prescription drugs. There is no formal study that tested how alternative labeling formats affect physicians' speed or quality of comprehension of information related to potential adverse effects of drugs.

1. Decreased Health Care Practitioner Time

Prescription drug labeling is a major source of information about the risks and benefits of prescription drugs. Each year health care practitioners spend considerable time seeking medical knowledge about the therapeutic risks and benefits of the drugs prescribed to treat patients. However, only a few studies have focused on the information-seeking behavior of health care practitioners. Four studies using

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

family practice physicians reported that the PDR, a compilation of prescription drug labeling, was the most frequently used reference book in a clinical setting (Refs. 13 through 16). In one study published in 1990, physicians reported using the PDR almost daily (Ref. 13). In addition to the PDR, physicians receive prescription drug labeling directly from drug manufacturers and their representatives.

A 1994 FDA survey of physicians found that 42 percent referred to prescription drug labeling at least once a day, 33 percent less often than once a day but more often than once a week, and 25 percent once a week or less (Ref. 11, pp. 30-31). These findings suggest that a physician seeks drug information from prescription drug labeling on average 212 times each year. [FN12] Moreover, comments from a pharmacy association, submitted in response to the proposed rule, reported that a recent informal survey of pharmacists found that 30 percent refer to prescription drug labeling several times each day, 36 percent refer at least once per day, and 34 percent refer at least once per week. If representative, these findings suggest that the average pharmacist in the United States seeks information from prescription drug labeling at least 257 times each year. [FN13] To put this estimate in perspective, approximately 2.85 billion prescriptions were dispensed by retail pharmacies in 2001 (Ref. 17). About 60 percent of the 212,660 pharmacists in the United States work in retail pharmacies (Refs. 18 and 19) and cumulatively seek information from prescription drug labeling about 32.8 million times each year (212,660 pharmacists x 0.6 x 257 labeling consultations per year), approximately 12 times for every 1,000 prescriptions dispensed.

FN12 On average, physicians work 47 weeks per year and consult prescription drug labeling 4.51 times each week [(7 consultations per week x 42 percent) + (4 consultations per week x 33 percent) + (1 consultation per week x 25 percent)] (65 FR 81082 at 81104 through 81105).

FN13 On average, it is assumed that pharmacists work 50 weeks per year and consult labeling 5.14 times per week [(10 consultations per week x 30 percent) + (5 consultations per week x 36 percent) + (1 consultation per week x 34 percent)].

For the analysis of the proposed rule, FDA was aware of no data estimating the total time physicians spend reading prescription drug labeling. It also had no estimates of how much time savings might result from possible changes in drug labeling. It therefore conservatively assumed that physicians could save an average of 15 seconds each time they refer to prescription drug labeling in the new format (65 FR 81082 at 81104). One comment from a pharmaceutical manufacturing organization requested justification for this assumption (see comment 123). The comment stated that rather than save time, the new format with Highlights would lengthen the time practitioners spend looking for information.

The agency disagrees it will take health care practitioners more time to find information with the new format compared to the old format. As described elsewhere in the preamble, the agency solicited input from health care practitioners to develop a format that presents complex drug information in a manner that will enable them to find information more rapidly, improving the communication of the risks and benefits of the drug (see section I of this document). In comments on the proposed rule, organizations representing health care practitioners and consumer groups strongly supported the new format as being easier and quicker to use (see comment 2). Comments from many drug manufacturers agreed that including a comprehensive table of contents and reordering of the detailed information would improve clarity of the labeling and quickly direct the reader to the appropriate section of the FPI, but expressed reservations about the utility of Highlights (see comment 2).

Comments, including one by an expert in human cognition, supported Highlights as a way to improve the accessibility of the most heavily used information (see comment 2). Moreover, by including references in Highlights to specific sections of the FPI, Highlights will also enhance the effective use of the information in the detailed sections of the labeling. Therefore, based on comments from health care practitioners, professional organizations and consumer groups, the agency believes that the new format will reduce the time physicians, pharmacists, and other practitioners must spend seeking specific information in prescription drug labeling

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

and increase the extent they rely on labeling for drug information.

A recent study in Oregon found that primary care physicians on average will consult two sources of information, one of which is usually the PDR, and spend an average of 12 minutes seeking information to answer patient questions (Ref. 16). Another study in Finland logged the time physicians spent searching a computerized set of guidelines, the "Physicians' Desk Reference and Database," and found the average time needed to find and read an article was 4.9 minutes (Ref. 20).

Although these studies may not be representative of the average practitioner in the United States, they suggest that the agency's estimate of a 15-second time savings with the new format (once drug labeling is at hand) is plausible and conservative in that it is only a small improvement relative to time currently spent for most labeling referrals. If the new format were implemented for all prescription drug products, the nation's 625,100 physicians active in patient care (Ref. 21) could save a total of about 552,100 hours per year (625,100 physicians x 212 labeling consultations per year x 15 seconds saved per labeling consultation/ 3600 seconds per hour). Likewise, pharmacists could save an additional 227,700 hours per year (212,660 pharmacists x 257 labeling consultations per year x 15 seconds saved per labeling consultation/ 3,600 seconds per hour).

The final rule only applies to new and recently approved products. Moreover, implementation for recently approved products is phased in over several years. *3973 Thus, the final rule will initially apply only to a small percentage of prescription drug labeling. The rule's focus on newer products includes the prescription drug labeling that health care practitioners consult most frequently. In FDA's survey of physicians, newness of the product was the factor most often rated by physicians as "very likely" to trigger referral to prescription drug labeling (Ref. 11, p. 35). Similarly, the pharmacy association's survey found that pharmacists were most likely to consult labeling if the drug was recently approved (48 percent).

Although the average practitioner regularly prescribes from 40 to 100 pharmaceutical products (Ref. 24), the proportion of these that are new drugs is unknown. Because the agency received no comments and has no other information on the percentage of reformatted labeling that practitioners will consult, the initial assumptions remain unchanged (65 FR 81082 at 81104). This analysis, therefore, assumes that the rule will begin affecting the length of time needed for prescription drug labeling consultations in the second year of implementation, only affecting 5 percent of all consultations in that year. The percentage of reformatted prescription drug labeling consulted by physicians is assumed to increase to 10, 15, and 25 percent in years 3, 4, and 5 respectively. Thereafter, it is assumed to increase an additional 5 percent each year, reaching 50 percent in year 10. Thus, in year 10, the time savings for physicians and pharmacists is projected to equal about 276,000 and 113,900 hours, respectively. FDA has not attempted to project impacts beyond 10 years, due to the uncertainty of the longer term technological changes that would affect these estimates (see section V of this document).

To estimate the monetary value of the time saved, an hourly loaded wage for physicians is calculated using data from the American Medical Association (AMA) on the average net annual income of all non-Federal physicians (excluding residents), the average weekly workload, average number of weeks worked per year and benefits adjusted by the proportion of self-employed physicians (Refs. 22 and 23). The loaded wage for pharmacists is calculated from Bureau of Labor Statistics data (Ref. 18). At $88.16 per hour for physicians ([$194,400 x (1 + 0.2)] / [47 weeks x 56.3 hours / week]) and $46.75 per hour for pharmacists ($33.39 / hour x (1 + 0.4)), table 10 shows the annual monetary value of time saved and indicates that the present value over 10 years equals approximately $90 million or $120 million using a 7 or 3 percent discount rate, respectively.

Table 10.--Value of Health Care Practitioner Time Saved [FN1]

| Year | Current Value ($ million) | Present Value ($ million) |
|------|---------------------------|---------------------------|

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                          Page 100
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)

|     | Physicians | Pharmacists | Total | Total Discounted at 3 percent | Total Discounted at 7 percent |
|-----|-----------|-------------|-------|-------------------------------|-------------------------------|
| 1   | 0 | 0 | 0 | 0 | 0 |
| 2   | 2 | 1 | 3 | 3 | 3 |
| 3   | 5 | 1 | 6 | 5 | 5 |
| 4   | 7 | 2 | 9 | 8 | 7 |
| 5   | 12 | 3 | 15 | 13 | 11 |
| 6   | 15 | 3 | 18 | 15 | 12 |
| 7   | 17 | 4 | 21 | 17 | 13 |
| 8   | 19 | 4 | 24 | 19 | 14 |
| 9   | 22 | 5 | 27 | 20 | 15 |
| 10  | 24 | 5 | 30 | 22 | 15 |
| Total | 120 | 30 | 150 | 120 | 90 |

FN1 Numbers may not sum due to rounding.

## 2. Improved Effectiveness of Treatment

The final rule will improve prescription drug labeling to make it easier to find and use information about the product. More effective communication of drug information will better inform practitioners about the risks and benefits of drugs prescribed to patients. Prescription drug labeling can contain hundreds of facts about a drug, increasing the time needed to find specific information, relative to simpler labeling. For example, labeling of the drug cisapride contains over 470 facts (Ref. 24). Under the final rule, Highlights would emphasize those characteristics of drugs that physicians report are the most important for decisionmaking. With the Contents and references to the FPI in Highlights, practitioners can more quickly find all relevant facts about the drug that are specific to their patients. Each format change required by the final rule is intended, therefore, to present the complex drug information contained in labeling in a way that will improve the ability of practitioners to select and prescribe drugs to their patients safely and effectively.

The initial U.S. approval date will alert practitioners to newer products that should be used with greater vigilance. There are over 100 NDAs, including about 30 new molecular entities, approved every year in the United States. Initial approval is based on data from clinical trials conducted to determine the safety and effectiveness of a product. These trials typically include only enough subjects to detect 1 adverse reaction in every 300 to 500 patients (Ref. 25). It is not uncommon for drugs to have significant adverse effects that occur at lower frequencies than can be *3974 detected in premarketing clinical trials. Adding contact information where practitioners can report suspected adverse reactions will facilitate the collection of drug safety information and make it easier for the agency and manufacturers to identify significant safety concerns that can emerge after a drug is marketed and a much larger population is exposed to the product. Moreover, by identifying those sections of the labeling in which there have been important recent changes, the new format will also alert practitioners to significant new safety concerns and other significant changes to labeling once a product has been approved.

In addition, any FDA-approved patient labeling must be printed at the end of the labeling, or accompany the labeling, regardless of when the product was approved. Including patient information enhances the likelihood that physicians will communicate important information to patients, improving patient understanding and adherence to treatment recommendations. FDA is unable to quantify the magnitude of these expected improvements in treatment effectiveness and health outcomes, but the agency believes they could be significant.

## 3. Decrease in Costs to Treat Avoidable Adverse Reactions

Although there are multiple causes of adverse reactions, some are potentially

©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                             Page 101
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

preventable and can result from misunderstood or incorrectly applied drug
information (e.g., prescribing too high a dose for a patient with poor kidney
function, or prescribing a drug to a patient with known contraindications).
According to a 2000 GAO report on adverse drug events, standardized packaging is one
of many approaches that can be adopted to reduce medication errors (Ref. 26).
Requiring that prescription drug labeling follow a standardized format will better
inform health care practitioners about the drugs that are prescribed to patients,
improve the effectiveness of treatment, and reduce the number of preventable adverse
reactions experienced by patients.

No national study on the incidence or associated costs of adverse reactions has
been conducted. Furthermore, it is difficult to compare published studies because
they are either too limited in scope or differ in methodology. Nevertheless, studies
of hospitalized patients suggest that the rate of preventable adverse events that
occur during hospitalization is approximately 1.2 to 1.8 adverse events per 100
patients admitted (Refs. 27 through 29). Moreover, 1 of these studies conducted in
the early 1990s in the northeastern United States found that a majority of
preventable adverse events (about 1 adverse event per 100 hospital admissions) were
related to errors or miscalculations in physician ordering, the stage most likely to
be affected by improved prescription drug labeling information (Ref. 28). A more
recent study conducted in the southwestern United States reported 4.2 adverse events
per 100 patients, of which only 15 percent where deemed preventable (Ref. 29). Given
the approximately 36 million annual hospitalizations in the United States (Ref. 30),
these data suggest that between 229,000 and 364,000 adverse reactions among
hospitalized patients are potentially preventable each year.

A number of studies show that the occurrence of an adverse event in a hospitalized
patient increases the costs of caring for the patient by an average of between
$2,162 and $2,595 (Refs. 28, 29, and 31). Costs associated with preventable adverse
events were even higher, averaging about $4,685 per patient (Ref. 31), or $6,075 in
2000 dollars. If all hospitals incur similar costs for preventable adverse events,
the potentially preventable annual costs from this source could total from between
$1.4 billion to $2.2 billion nationally (in 2000 dollars).

Few studies on adverse reactions in outpatient or long-term care settings have been
conducted. A report from a multidisciplinary conference held in 2000 to discuss a
national research agenda for ambulatory patient safety described a diverse and
complex outpatient system that was prone to the same types of errors observed in
hospital studies (Ref. 32). In 1995, FDA estimated that hospitalizations associated
with outpatient adverse reactions cost $4.4 billion per year (60 FR 44182 at 44232;
August 24, 1995), equaling $5.2 billion in 2000 dollars. If the causes of errors in
the outpatient setting are similar to the causes in hospitals, half of these costs
are related to physician ordering errors. Thus, about $2.6 billion (in 2000 dollars)
per year in additional hospital costs result from errors likely to be influenced by
improved prescribing information.

FDA lacks data to estimate the actual proportion of the adverse reaction costs that
would be prevented under the final rule. Combining the projected hospital costs
attributable to preventable in-hospital and outpatient adverse reactions, from $4.0
billion to $4.8 billion per year may be potentially avoided through measures that
provide better information to doctors, such as prescription drug labeling. If the
final rule reduced these costs by even 1 percent, between $40 million and $48
million of the costs of hospitalization could be prevented each year. Over 10 years,
the present value of these avoided costs would total from $240 million to $290
million with a 7 percent discount rate, and from $300 to $360 with a 3 percent
discount rate (table 11).

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                          Page 102
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)

Table 11.--Annual Avoided Health Care Costs of Treating Patients for Preventable Adverse Drug Events [1,2]

| Year | Current Value ($ mil) | | | | | Present Value ($ mil) | | | |
| | Outpatient ADEs | In-Hospital ADEs | | Total | | Total Discounted at 3 percent | | Total Discounted at 7 percent | |
| | | From: | To: | From: | To: | From: | To: | From: | To: |
| 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2 | 26 | 14 | 22 | 40 | 48 | 38 | 45 | 35 | 42 |
| 3 | 26 | 14 | 22 | 40 | 48 | 37 | 44 | 33 | 39 |
| 4 | 26 | 14 | 22 | 40 | 48 | 35 | 43 | 30 | 37 |
| 5 | 26 | 14 | 22 | 40 | 48 | 34 | 42 | 28 | 34 |
| 6 | 26 | 14 | 22 | 40 | 48 | 33 | 40 | 27 | 32 |
| 7 | 26 | 14 | 22 | 40 | 48 | 32 | 39 | 25 | 30 |
| 8 | 26 | 14 | 22 | 40 | 48 | 32 | 38 | 23 | 28 |
| 9 | 26 | 14 | 22 | 40 | 48 | 31 | 37 | 22 | 26 |
| 10 | 26 | 14 | 22 | 40 | 48 | 30 | 36 | 20 | 24 |
| Total | 230 | 130 | 200 | 360 | 430 | 300 | 360 | 240 | 290 |

[1] Numbers may not sum due to rounding.
[2] Assumes the rule will avoid 1 percent of the preventable hospitalization costs from in-hospital and outpatient adverse drug events.
*3975 As illustrated in table 12, the magnitude of the potential benefits of the final rule will be sensitive to the assumed level of effectiveness. At 0.4 percent, the total present value of avoided hospital costs for preventable in-hospital and outpatient adverse drug events will exceed the total present value of the compliance costs for the final rule at both 3 and 7 percent discount rates.


Table 12.--Impact of Different Effectiveness Levels on the Total Present Value of Avoided Hospital Costs to Treat Preventable Adverse Drug Events [FN1]
-------------------------------------------------------------------------
| Effectiveness Estimate (percent) | Discounted at 3 percent ($ million) | | Discounted at 7 percent ($ million) | |
| | From: | To: | From: | To: |
-------------------------------------------------------------------------
| 0.1 | 30 | 36 | 24 | 29 |
| 0.4 [FN2] | 120 | 140 | 97 | 120 |
| 0.5 | 150 | 180 | 120 | 150 |
| 1.0 | 300 | 360 | 240 | 290 |
| 5.0 | 1,500 | 1,800 | 1,200 | 1,500 |

FN1 Numbers may not sum due to rounding.
FN2 Corresponds to the breakeven point where over 10 years, the total present value of hospital costs avoided exceeds the total present value of the compliance costs of the final rule.
-------------------------------------------------------------------------


When compared with other published studies, the agency's estimate of the cost of

©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                                Page 103
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)

adverse reactions is likely less than the total social cost of such events. In particular, FDA's estimates include only hospital costs, and exclude the willingness to pay of patients to reduce these risks. Because these risks include fatality risks, the willingness to pay may be quite large. Using a restrictive definition of adverse events and including direct and indirect costs, a large study of hospital discharge records conducted by Thomas and others in Utah and Colorado was published in 1999 and estimated that preventable adverse events cost society at least $17 billion (in 1996 dollars) each year (Ref. 33). In contrast, a 2001 revision of the 1995 Johnson and Bootman cost-of-illness model used current costs whenever possible and predicted that drug-related illness occurring in ambulatory care settings cost about $177.4 billion each year, or more than 40 times the estimate of avoided costs that was used in the rest of this analysis *3976 (Refs. 34 and 35). While we acknowledge that we have no direct evidence about how the rule would reduce preventable adverse reactions, if the final rule avoided at least one-tenth of a percent of the costs predicted by the Thomas study, annual benefits of the rule would approximately equal annual costs.

*D. Costs of Regulation*

 Except as noted below, the methods used to estimate costs for the proposed rule remain the same for the final impact analysis (65 FR 81082 at 81103 through 81112). When possible, unit costs have been updated.

 The proposed rule would have required two broad types of changes to the labeling of prescription drug products. First, labeling of approximately one-third of products already approved for marketing would have been revised to delete or add information within 1 year. Several comments argued that these changes would be quite costly relative to the limited benefits that would be derived and difficult to accomplish in the proposed implementation period (see comment 114). In response to these comments, the agency removed the requirements to delete certain information from all existing prescription drug labeling. Only those products with existing labeling that have FDA-approved patient labeling will be required to revise the labeling within 1 year.

 Second, the proposed rule would have revised the content and established format requirements for labeling of new and recently approved applications. Although the agency modified some specific content and format requirements, the staggered implementation schedule and most provisions were retained for the final rule. Therefore, direct costs incurred to change prescription drug labeling include the costs of: (1) Designing or revising prescription drug labeling and submitting the new labeling to FDA, (2) producing longer trade labeling including any equipment adjustments, (3) layout and artwork for labeling not accompanying drug products, (4) producing longer labeling for labeling not accompanying drug products, and (5) printing longer labeling in the PDR.

1. Labeling Changes for All Approved Prescription Drug Products

 a. Affected products. The agency will require that FDA-approved patient labeling accompany the prescription drug labeling, or be printed following the last section of the prescription drug labeling within 1 year after the effective date of the final rule. The agency identified up to 200 products with some form of FDA-approved patient labeling that will be affected by the final rule. A sample of these affected products shows that the labeling of more than 60 percent already conforms to this provision of the final rule. Therefore, the labeling of an estimated 80 products will need to be revised.

 b. Prescription drug labeling design costs. On average, prescription drug manufacturers will incur about $2,220 per product in design and implementation costs to append FDA-approved patient labeling to existing prescription drug labeling. Because changes must be made within 1 year of the effective date of the final rule, not all firms will have sufficient time to deplete their inventories of existing prescription drug labeling. With a 12-month implementation period, FDA consultants estimate per product inventory losses of approximately $630. Thus, including excess inventory losses, the cost to change prescription drug labeling is estimated at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                           Page 104
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

$2,850 per product (65 FR 81082 at 81109; and 68 FR 6062 at 6074, reflecting updated
costs). As shown in table 13, in the first year firms may incur one-time costs of
$0.2 million to add FDA-approved patient labeling to the labeling of the affected
products.

   c. Incremental printing costs for prescription drug labeling. Printed patient
information would add an estimated 2 pages or about 75-square inches to the length
of trade labeling when printed on two sides (65 FR 81082 at 81109). Updating the
unit printing costs for inflation, this additional length would increase the
incremental printing costs by approximately $6.84 for 1,000 pieces of labeling (75-
square inches per piece x $0.0000912 per square inch x 1,000 pieces) (68 FR 6062 at
6074). For the final analysis, FDA estimates that for affected products, up to
650,000 pieces of trade labeling would be distributed each year (section XI.D.2.c.i
of this document). For each of the affected products, manufacturers will incur
annual incremental costs averaging about $4,440 to print the longer trade labeling
(650,000 pieces per product per year x $6.84 per 1,000 pieces). For all 80 affected
products, annual incremental printing costs for trade labeling will increase by $0.4
million. Furthermore, manufacturers distributing longer prescription drug labeling
with promotional materials and samples will spend up to an additional $5,125 in
annual incremental printing costs each year for 3 years (750,000 pieces per year x
$6.84 per 1,000 pieces (approximation based on information in footnote 17 in section
XI.D.2.e of this document)). Therefore, industry will incur additional printing
costs with a present value of approximately $3.6 million or $4.2 million over 10
years at a 7 or 3 percent discount rate, respectively (table 13).

   d. Physicians' Desk Reference (PDR) Costs. The agency estimates that 75 percent of
prescription drug products have labeling already printed in the PDR. In 2002, an
additional page in the PDR costs manufacturers $9,750. [FN14] Thus, the per product
annual cost to print two additional pages is about $19,500 ($9,750 x 2). For the
estimated 60 affected products (80 products x 0.75), the annual PDR costs would
increase by $1.2 million ($19,500 x 60), equaling a present value of approximately
$8.2 million or $10.0 million over 10 years with a 7 or 3-percent discount rate,
respectively (table 13).

   FN14 Not all of these costs to manufacturers are social costs, as the PDR
publisher is presumably selling additional pages at more than its true opportunity
cost. The excess is a transfer, but we do not know its magnitude.

   Table 13.--Costs to Include FDA-approved patient labeling With Labeling of
             Existing Prescription Products [FN1, 2]

| Year | One-Time Labeling Revision Costs ($ million) | Annual Incremental Printing Costs ($ million) | Annual PDR Costs ($ million) | Total Costs ($ million) |
|---|---|---|---|---|
| 1 | 0.2 | 0.8 | 1.2 | 2.2 |
| 2 | 0.0 | 0.8 | 1.2 | 1.9 |
| 3 | 0.0 | 0.8 | 1.2 | 1.9 |
| 4 | 0.0 | 0.4 | 1.2 | 1.5 |
| 5 | 0.0 | 0.4 | 1.2 | 1.5 |
| 6 | 0.0 | 0.4 | 1.2 | 1.5 |
| 7 | 0.0 | 0.4 | 1.2 | 1.5 |
| 8 | 0.0 | 0.4 | 1.2 | 1.5 |
| 9 | 0.0 | 0.4 | 1.2 | 1.5 |
| 10 | 0.0 | 0.4 | 1.2 | 1.5 |
| Total Cost | 0.2 | 4.8 | 11.7 | 16.7 |
| Present Value of Total Discounted at 3 percent | 0.2 | 4.2 | 10.0 | 14.4 |

          ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Present Value of
  Total
  Discounted at 7
  percent .................. 0.2 ........... 3.6 .......... 8.2 ........ 12.0
FN1 Numbers may not sum due to rounding.
FN2 This estimate assumes that products with Medication Guides already conform
  to this requirement of the final rule.

------------------------------------------------------------------------------

*3977 2. Labeling Changes for New and Recently Approved Prescription Drug Products

   a. Affected products. The final rule would require that prescription drug labeling
conform to format and content requirements for three categories of products: (1) All
NDAs, BLAs, and efficacy supplements submitted to FDA on or after the effective
date, (2) NDAs, BLAs, and efficacy supplements approved over the 5 years preceding
the effective date or pending on the effective date of the final rule, and (3) any
ANDA that references a listed drug with labeling conforming to the requirements of
the final rule. For the first category of products, the prescription drug labeling
requirements would apply when a sponsor files an NDA, BLA or efficacy supplement.
Products in the second category must file supplemental applications within 3 to 7
years of the issuance of the rule, according to the implementation plan described in
the preamble (see Table 5). For ANDA products (generic products), the implementation
schedule for the affected reference listed drug applies. This rule does not cover
labeling for OTC products (including those approved under an NDA).

   Estimates of the number of new applications that would be affected by the rule are
updated and based on application approvals since 1997. During this period, an
average of 97 NDAs and 10 BLAs were approved each year. FDA assumes that this
average rate will continue. The number of affected products approved within 5 years
before the effective date are estimated as the number of NDAs approved during the 5-
year period from 1997 through 2001 without subsequent efficacy supplements.

   Most efficacy supplements are filed and approved within 5 years of the approval
date of their original application. Over time, prescription drug labeling of most
products affected by the final rule will already conform to the requirements of the
final rule when an efficacy supplement is submitted. Beginning in year 3, therefore,
the number of labeling revisions as a result of an efficacy supplement will decline
over time.

   The initial analysis of impacts did not include estimates of the number of generic
products that would be affected because the period of exclusivity for most innovator
products covered by the rule would extend beyond the 10-year horizon. However, a
subsequent analysis of data from "Approved Drug Products with Therapeutic
Equivalence Evaluations" (the Orange Book) found that some older innovator products
with generic equivalents have recent approvals of efficacy supplements or NDAs for
new dosage strengths that could trigger revision of the labeling of some reference
listed drugs. Although the overall number of older innovator products affected by
the final rule is anticipated to be small, normally there are multiple generic
products for each reference listed drug. Therefore, beginning in year 3, the final
rule is estimated to affect an average of 42 generic products annually. Table 14
shows the number of products projected to be affected by the final rule during the
10-year period following the effective date.

   Table 14.--Estimated Number of Affected Products by Application Type

------------------------------------------------------------------------------

| Year | New NDAs and BLAs | Efficacy Supplements | Approvals 5 Years Prior to Effective Date | ANDAs | Total |
|------|-------------------|----------------------|-------------------------------------------|-------|-------|
| 1    | 107               | 69                   | 0                                         | 0     | 176   |
| 2    | 107               | 69                   | 0                                         | 0     | 176   |

          ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
3 .................. 107 .............. 52 .............. 69 ...... 42 .... 270
4 .................. 107 .............. 39 .............. 69 ...... 42 .... 257
5 .................. 107 .............. 29 .............. 68 ...... 42 .... 246
6 .................. 107 .............. 22 .............. 69 ...... 42 .... 240
7 .................. 107 .............. 16 .............. 69 ...... 42 .... 234
8 .................. 107 .............. 12 .............. 0 ...... 42 .... 161
9 .................. 107 .............. 9 .............. 0 ...... 42 .... 158
10 ................. 107 .............. 7 .............. 0 ...... 42 .... 156
Total ............ 1,070 ............. 324 ............. 344 ..... 336 .. 2,074
```

--------------------------------------------------------------------------

*3978 b. Prescription drug labeling design costs. The cost of designing
prescription drug labeling that conforms to the final format and content
requirements will depend heavily on when, during a product's life cycle, labeling
design occurs. Costs will be highest for products already marketed with approved
prescription drug labeling that otherwise would not be changed. Conversely, design
costs will be lowest for products that are closely related to a prior product
application that has already had its prescription drug labeling changed to the new
format or for generic drug labeling. Costs for currently marketed products that
would be undergoing relabeling for other reasons (e.g., related to an efficacy
supplement) will be in between these extremes.

FDA has previously estimated that it takes about 2 months of full-time effort to
design a novel patient information guide (for the first prescription drug in a
therapeutic class), but less than 1 week to redesign a guide following a previously
approved prototype (i.e., innovator drugs in the same therapeutic class for which
patient information was already developed) (60 FR 44232). The final rule requires
reordering of the detailed information in the prescription drug labeling and
addition of Highlights and Contents. Although FDA designates the new order, detailed
discussion and drug-specific decisions (e.g., regarding exactly what should be
listed in Highlights) may be necessary. Because negotiation of labeling is a routine
part of the review process, including Highlights and Contents does not increase this
time burden on manufacturers or the agency. Therefore, the time required to revise
labeling conforming to the requirements of the final rule will fall between the time
required to design a novel patient information guide and time required to redesign a
guide. Although sponsors of new applications and efficacy supplements would incur
many of the same design costs as sponsors of existing innovator products, they would
experience no additional testing, preparation, and application costs. For the
initial analysis, it was anticipated that manufacturers would incur one-time costs
up to $5,000 for each new product and $7,500 for each existing product to conform to
the format and content provisions of the rule (65 FR 81082 at 81106 through 81107).
These one-time per product costs are updated to $6,190 and $8,700, respectively.
Modifying prescription drug labeling for ANDAs is anticipated to cost generic drug
manufacturers about $1,300 per product, including $830 in labor costs and $470 in
material costs for artwork and scrap (68 FR 6062 at 6074).

Once product labeling contains Highlights, any substantive revisions of key
sections of the labeling must be listed in the recent major changes section along
with the month and year the revision was incorporated. However, the final rule also
requires that after 1 year, the information about recent major changes must be
removed the next time the labeling is reprinted. Manufacturers voluntarily change
drug product labeling frequently during the first 5 years a product is marketed.
During this period, the agency anticipates that manufacturers would remove recent
major changes from Highlights at the same time they voluntarily change labeling and,
thus, would incur no additional costs. After 5 years on the market, however, some
manufacturers would incur additional costs to remove recent major changes in the
timeframe specified by the final rule. The earliest this might occur is in year 7
after the initial redesign of the labeling. [FN15] Based on the agency's experience
with products that have been on the market for more than 5 years, up to 10 percent
of the products affected by the final rule might be required to remove recent major
changes in year 7 or later, at a per product cost of approximately $1,600. Over 10
years, the present value of these costs could equal about $0.1 million with either a

©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                              Page 107
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)

7 percent or 3 percent discount rate.

   FN15 Recent major changes must remain in the Highlights for at least 1 year. Any
major change after year 5 would therefore remain on the labeling through year 6 or
later.

   As shown in table 15, the total first-year costs would amount to $1.1 million.
Costs increase to a high of $1.6 million in years 3 and 4. After the seventh year,
when all products approved within 5 years prior to the rule's effective date or
pending on the effective date have redesigned prescription drug labeling, the costs
decline to about $0.8 million per year. As a result, the estimated total present
value of the costs of redesigning prescription drug labeling over 10 years is about
$8.8 million and $10.5 million with a 7 and 3 percent discount rate, respectively.


[Note:  The following TABLE/FORM is too wide to be displayed on one screen.
You must print it for a meaningful review of its contents.  The table has been
divided into multiple pieces with each piece containing information to help you
assemble a printout of the table.  The information for each piece includes: (1)
a three line message preceding the tabular data showing by line # and
character # the position of the upper left-hand corner of the piece and the
position of the piece within the entire table; and (2) a numeric scale
following the tabular data displaying the character positions.]

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                          Page 108
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)

**********************************************************************
******** This is piece 1. -- It begins at character 1 of table line 1. ********
**********************************************************************

              Table 15.--Estimated Prescription Drug Labeling Design
-----------------------------------------------------------------
 Year                        Current Value ($ million)


1...+...10....+...20....+...30....+...40....+...50....+...60....+...7
```

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
*************************************************************************
******* This is piece 2. -- It begins at character 70 of table line 1. ********
*************************************************************************

 Costs [FN1]
--------------------------
 Present
 Value (
 million)
70..+...80....+...90....+..
```

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                      Page 110
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)

```
************************************************************************
******* This is piece 3. -- It begins at character 1 of table line 6. ********
************************************************************************
```

| | NDAs and BLAs | Efficacy Supplements | Approvals 5 Years Prior to Effective Date | ANDAs | Total |
|---|---|---|---|---|---|
| 1 | 0.7 | 0.4 | 0.0 | 0.0 | 1.1 |
| 2 | 0.7 | 0.4 | 0.0 | 0.0 | 1.1 |
| 3 | 0.7 | 0.3 | 0.6 | 0.1 | 1.6 |
| 4 | 0.7 | 0.2 | 0.6 | 0.1 | 1.6 |
| 5 | 0.7 | 0.2 | 0.6 | 0.1 | 1.5 |
| 6 | 0.7 | 0.1 | 0.6 | 0.1 | 1.5 |
| 7 | 0.7 | 0.1 | 0.6 | 0.1 | 1.5 |
| 8 | 0.7 | 0.1 | 0.0 | 0.1 | 0.8 |
| 9 | 0.7 | 0.1 | 0.0 | 0.1 | 0.8 |
| 10 | 0.7 | 0.0 | 0.0 | 0.1 | 0.8 |
| Total | 6.7 | 2.0 | 3.0 | 0.4 | 12.2 |

FN1 Numbers may not sum due to rounding.

```
1...+...10....+...20....+...30....+...40....+...50....+...60....+..
```

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
71 FR 3922-01                                              Page 111
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)


*************************************************************************
******* This is piece 4. -- It begins at character 68 of table line 6. ********
*************************************************************************
         Total            Total
      Discounted       Discounted
     at 3 percent     at 7 percent


    ---------------------------------
    ..........  1.1  ...........  1.0
    ..........  1.0  ...........  1.0
    ..........  1.5  ...........  1.3
    ..........  1.4  ...........  1.2
    ..........  1.3  ...........  1.1
    ..........  1.2  ...........  1.0
    ..........  1.2  ...........  0.9
    ..........  0.7  ...........  0.5
    ..........  0.6  ...........  0.4
    ..........  0.6  ...........  0.4
    ........ 10.5  ...........  8.8


    ---------------------------------
    68.....+...80....+...90....+.
```

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*3979 c. Costs associated with producing longer labeling accompanying drug products and drug samples (trade labeling). The proposed rule would have required that trade labeling be printed in 8-point minimum type size, almost doubling the current average length for the labeling. Several comments from pharmaceutical manufacturers stated that the agency had underestimated the retooling and packaging line costs that would be incurred to include this longer trade labeling (see comment 124). A few large firms estimated that new equipment would cost between $135,000 and $700,000 per packaging line and could total up to $40 million for a large firm if trade labeling of all products were affected. As discussed in section XI.F of this document ("Alternatives Considered"), the agency recognized that including all products in the final rule would substantially increase costs to industry and, therefore, limited the final rule to new and recently approved products (see section XI.F.3 of this document). Furthermore, approximately half of the affected products shown in table 14 will be new approvals that have not yet established packaging. Nevertheless, based on the potential economic impact the larger type size might have on pharmaceutical manufacturers, for the final rule the agency reduced the minimum size requirement for trade labeling to 6 points, a size generally-reported as acceptable in comments from manufacturers (see comment 102). Thus, the new format and content requirements of the final rule will lengthen trade labeling by approximately 20 square inches when printed on two sides. Longer prescription drug labeling increases the cost of paper, ink, and other ongoing incremental printing costs. As discussed below, even in 6 points, a small number of products are still expected to incur some equipment costs (e.g., different insert-folding machinery).

i. Incremental printing costs for trade labeling. U.S. retail pharmacies dispense about 3.3 billion prescriptions per year, of which an estimated 790 million are for unit-of-use products that include prescription drug labeling within the package (65 FR 81082 at 81107, updated using IMS data at http:// www.ims-health.com). If the non-unit-of-use prescriptions average one piece of labeling per 3.3 prescriptions, the total number of labelings accompanying retail products equals roughly 1.5 billion. Further, adding hospital pharmaceutical volume, estimated at approximately 54 percent of retail volume, yields an annual total of 2.4 billion pieces of trade labeling accompanying prescribed products. Allowing 10 percent for wastage indicates that manufacturers distribute roughly 2.6 billion pieces of labeling with prescribed products each year. Since 60 percent of all prescriptions are for branded products, about 1.6 billion pieces of labeling are currently included with about 2,440 branded products and about 1.0 billion pieces are included with 2,900 generic products. [FN16] Using 650,000 pieces per innovator product and 370,000 pieces per generic product, at a cost of $0.18 and $0.19 per 100 pieces, respectively, yields annual per product cost estimates of $1,165 and $700, respectively. Table 16 shows the estimated number of revised labelings and annual incremental printing costs over 10 years.

FN16 Derived from "Approved Drug Products with Therapeutic Equivalence Evaluations," CDER, FDA, 2001. The estimate is a count of all branded products marketed under an NDA and differentiated by active ingredient, therapeutic equivalence, dosage form, or manufacturer, not including multiple dosage strengths. Although not counted, adding biologicals would not significantly alter results.

Trade labeling must also accompany drug product samples. However, the number of samples distributed for a specific product depends on a manufacturer's marketing strategy and may vary from year to year. Although IMS Health (IMS) reported that the volume of samples distributed in the United States between 1997 and 2000 ranged from 860 million to 920 million (Ref. 36), sales representatives normally leave one piece of labeling for every 10 samples they distribute. Even though new products are sampled more often than older products, some manufacturers continue to distribute samples throughout the life cycle of their product. While the actual number of samples including reformatted trade labeling is uncertain, we anticipate that manufacturers may spend up to $0.2 *3980 million annually to print longer trade labeling to accompany drug samples (table 16).

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                      Page 113
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)

Table 16.--Incremental Annual Printing Costs for Longer Trade
Labeling in 6-Point Minimum Type Size[1]

| Year | Number by Type (million) | | | Current Value ($ mil) | | | | Present Value ($ mil) | |
| | NDA, BLA, and ES | ANDA | Samples | NDA, BLA, and ES | ANDA | Samples | Total | Total Discounted at 3 Percent | Total Discounted at 7 Percent |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 110 | 0 | 90 | 0.2 | 0.0 | 0.2 | 0.4 | 0.4 | 0.3 |
| 2 | 230 | 0 | 90 | 0.4 | 0.0 | 0.2 | 0.6 | 0.5 | 0.5 |
| 3 | 380 | 16 | 90 | 0.7 | 0.0 | 0.2 | 0.9 | 0.8 | 0.7 |
| 4 | 520 | 31 | 90 | 0.9 | 0.1 | 0.2 | 1.1 | 1.0 | 0.9 |
| 5 | 650 | 47 | 90 | 1.2 | 0.1 | 0.2 | 1.4 | 1.2 | 1.0 |
| 6 | 780 | 62 | 90 | 1.4 | 0.1 | 0.2 | 1.7 | 1.4 | 1.1 |
| 7 | 900 | 78 | 90 | 1.6 | 0.1 | 0.2 | 1.9 | 1.6 | 1.2 |
| 8 | 980 | 93 | 90 | 1.8 | 0.2 | 0.2 | 2.1 | 1.7 | 1.2 |
| 9 | 1,100 | 110 | 90 | 1.9 | 0.2 | 0.2 | 2.3 | 1.7 | 1.2 |
| 10 | 1,100 | 120 | 90 | 2.0 | 0.2 | 0.2 | 2.4 | 1.8 | 1.2 |
| Total | 6,750 | 560 | 900 | 12.1 | 1.1 | 1.6 | 14.7 | 12.1 | 9.4 |

[1] Numbers may not sum due to rounding.

ii. Equipment costs. The original analysis estimated that 1 percent of affected
existing products would be required to adjust packaging equipment with trade
labeling printed in 8 points. According to several comments, trade labeling is
currently printed in type sizes of 4.5 points and larger (see comment 102). Thus, it
is unlikely that the minimum type size requirement of the final rule (i.e., 6 points
for trade labeling) will require firms to purchase new packaging equipment. However,
in a few cases where existing labeling is printed in type sizes between 4.5 points
and 6 points, firms may need to adjust packaging lines for longer labeling. Since
the labeling of many ophthalmic drug products is printed in type sizes smaller than
6 points, the proportion of recent approvals for ophthalmic products was used as a
proxy for the proportion of affected products that will incur some equipment costs.
For the final analysis, 5 percent of existing products affected by the rule (i.e.,
products with new efficacy supplements, products approved in the 5 years prior to
the effective date of the rule, and affected ANDAs) will incur costs of $200,000
each product. As shown in table 17, the estimated present value of equipment changes
totals $7.2 million and $8.7 million over 10 years discounted at 7 and 3 percent
respectively.

Table 17.--Cost of Adjustments to Packaging Lines to Accommodate Longer Trade
Labeling [FN1, 2]

| Year | Estimated Number of Affected Products | Total Cost ($ million) | Present Value ($ million) | |
| | | | Total Discounted at 3 Percent | Total Discounted at 7 Percent |
|---|---|---|---|---|
| 1 | 3 | 0.7 | 0.7 | 0.6 |
| 2 | 3 | 0.7 | 0.7 | 0.6 |
| 3 | 8 | 1.6 | 1.5 | 1.3 |
| 4 | 8 | 1.5 | 1.3 | 1.1 |
| 5 | 7 | 1.4 | 1.2 | 1.0 |
| 6 | 7 | 1.3 | 1.1 | 0.9 |
| 7 | 6 | 1.3 | 1.0 | 0.8 |
| 8 | 3 | 0.5 | 0.4 | 0.3 |

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                    Page 114
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

| 9 ...................... 3 ........... 0.5 ............. 0.4  0.3 |
|---|
| 10 ..................... 2 ........... 0.5 ............. 0.4  0.2 |
| Total ................. 50 .......... 10.0 ............. 8.7 ............ 7.2 |

FN1 Numbers may not sum due to rounding.
FN2 For products with labeling printed in type sizes smaller than 6 points, the
   final rule may require that some packaging lines be retooled. Based on NDA,
   ANDA or efficacy supplements approvals for ophthalmic drug products between
   1997 and 2001, an estimated 5 percent of the existing products affected by
   the rule will require some change to packaging equipment at an average cost
   of $200,000 per product.

------------------------------------------------------------------------

  *3981 d. Layout and design costs for prescription drug labeling not accompanying
drug products. The final rule specifies a minimum type size of 6 points for trade
labeling and 8 points for all other prescription drug labeling distributed by a
manufacturer (e.g., labeling required to be distributed with promotional materials
or in promotional settings). Firms choosing to print all prescription drug labeling
for a product in the same type size (8 points or larger) will incur no additional
design costs. However, if trade labeling is printed in a type size smaller than 8
points, a firm will incur additional costs of $810 per product to change and proof
read the layout, and to prepare artwork for the labeling not accompanying the drug
product. It is uncertain how many firms will print labeling in different type sizes.
However, if all new and recently approved innovator products are affected, the total
present value of the additional design costs is approximately $1.0 million or $1.2
million over 10 years discounted at 7 or 3 percent respectively (table 18).

       Table 18.--Estimated One-Time Layout and Design Costs for Labeling Not
                  Accompanying Drug Products [FN1,2]
--------------------------------------------------------------------------

| Year | Number of Affected Products | Total Costs ($ million) | Present Value ($ million) | |
|---|---|---|---|---|
| | | | Total Discounted at 3 Percent | Total Discounted at 7 Percent |
| 1 ................. 176 ........... 0.1 ............. 0.1  0.1 | | | | |
| 2 ................. 176 ........... 0.1 ............. 0.1  0.1 | | | | |
| 3 ................. 228 ........... 0.2 ............. 0.2  0.2 | | | | |
| 4 ................. 215 ........... 0.2 ............. 0.2  0.1 | | | | |
| 5 ................. 204 ........... 0.2 ............. 0.1  0.1 | | | | |
| 6 ................. 198 ........... 0.2 ............. 0.1  0.1 | | | | |
| 7 ................. 192 ........... 0.2 ............. 0.1  0.1 | | | | |
| 8 ................. 119 ........... 0.1 ............. 0.1  0.1 | | | | |
| 9 ................. 116 ........... 0.1 ............. 0.1  0.1 | | | | |
| 10 ................ 114 ........... 0.1 ............. 0.1  0.0 | | | | |
| Total ........... 1,738 ........... 1.4 ............. 1.2 ............ 1.0 | | | | |

FN1 Firms are expected to only print this type of labeling for 3 years after
   the launch of a new innovator drug product.
FN2 Numbers may not sum due to rounding.
--------------------------------------------------------------------------

  e. Costs associated with producing longer prescription drug labeling not
accompanying drug products. In contrast to trade labeling, with the new content and
format requirements the length of current labeling will increase an average of about
93 percent when printed in 8-point type size. At this length, the incremental
printing costs will increase by $0.85 per 100 pieces. To calculate the annual cost
to print prescription drug labeling not accompanying drug products, FDA estimated
that pharmaceutical representatives detailing drug products would distribute
approximately 50 million pieces of prescription drug labeling annually. Because most
detailing involves relatively new products, the products most affected by this rule,

                ©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                    Page 115
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)

FDA assumed that manufacturers would incur additional printing costs for all of this
labeling, amounting to about $0.4 million annually.

  Finally, FDA estimated that about 730,000 pieces of prescription drug labeling per
approval would be distributed each year by mail or at conferences to physicians,
other health care practitioners, consumers, retail pharmacy outlets, and hospital
pharmacies for 3 years following approval of a new drug. [FN17] As shown in table
19, annual total costs peak at $4.4 million in year 5. Over 10 years with a 7 or 3
percent discount rate, the present value of the incremental printing costs *3982 for
longer prescription drug labeling not accompanying drug products would be about $24
million or $29 million, respectively.

  FN17 For each approval, it was assumed that all physicians involved in primary
care and 25 percent of physicians practicing a medical specialty would receive two
mailings per year, or an estimated 646,150 pieces (i.e., (222,400 x 2) + (0.25 x
402,700 x 2)), for 3 years following product launch. An additional 10 percent or
64,615 pieces are estimated to be distributed annually for 3 years to other health
care practitioners or consumers. Furthermore, FDA assumes that 55,581 retail
pharmacy outlets and 8,020 hospital pharmacies would receive 1 mailing to announce
the launch of a new innovator product in the year of approval (65 FR 81082 at 81108,
updated).

Table 19.--Annual Incremental Printing Costs for Longer
Prescription Drug Labeling Not Accompanying Drug Products Printed
in 8-Point Minimum Type Size[1]

| Year | Number of Affected Innovator Products | Number of Pieces and Type of Delivery (million) | | Current Value of Costs ($ mil) | | | Present Value ($ mil) | |
|---|---|---|---|---|---|---|---|---|
| | | In-Person | Mailed | In-Person | Mailed | Total Cost | Total Discounted at 3 Percent | Total Discounted at 7 Percent |
| 1 | 176 | 50 | 140 | 0.4 | 1.2 | 1.6 | 1.5 | 1.5 |
| 2 | 176 | 50 | 260 | 0.4 | 2.2 | 2.6 | 2.5 | 2.3 |
| 3 | 228 | 50 | 430 | 0.4 | 3.6 | 4.0 | 3.7 | 3.3 |
| 4 | 215 | 50 | 450 | 0.4 | 3.8 | 4.3 | 3.8 | 3.3 |
| 5 | 204 | 50 | 470 | 0.4 | 4.0 | 4.4 | 3.8 | 3.2 |
| 6 | 198 | 50 | 450 | 0.4 | 3.8 | 4.2 | 3.6 | 2.8 |
| 7 | 192 | 50 | 430 | 0.4 | 3.7 | 4.1 | 3.3 | 2.6 |
| 8 | 119 | 50 | 370 | 0.4 | 3.1 | 3.6 | 2.8 | 2.1 |
| 9 | 116 | 50 | 310 | 0.4 | 2.6 | 3.1 | 2.3 | 1.7 |
| 10 | 114 | 50 | 260 | 0.4 | 2.2 | 2.6 | 1.9 | 1.3 |
| Total | 1,738 | 500 | 3,600 | 4.0 | 30.2 | 34.5 | 29.3 | 23.9 |

[1] Numbers may not sum due to rounding.
  f. Physicians' Desk Reference (PDR) Costs. FDA estimates that the new Highlights,
including any boxed warnings, and Contents would add about a half page to the PDR
labeling of each affected prescription drug product. Based on conversations with
Medical Economics (the publisher of the PDR) on the cost per printed page, FDA
estimates that the annual publishing costs of the extra space required for printing
the expanded prescription drug labeling would be about $5,550 for each affected

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                              Page 116
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

product, plus an additional cost if the product was included in one of two annual
supplements. FDA assumed that these costs would be incurred by the pharmaceutical
industry via publishing fees paid to Medical Economics. The agency assumed that 75
percent of the new drugs and efficacy supplements would be published in the PDR
(some smaller firms decline to publish labeling in the PDR). FDA also assumed that
90 percent of the new drugs published would be included in the PDR supplements and
33 percent of the published efficacy supplements would be included in the PDR
supplements (about half are actually included, but only two-thirds of these include
full prescription drug labeling; the remainder include only the added indication).
FDA also assumed that the prescription drug labeling changes made as a result of the
5-year rule (applications approved in the 5 years preceding the effective date of
the final rule) would not be included in the PDR supplements. Based on these
assumptions, the estimated cost of publishing the extended prescription drug
labeling in the PDR would be about $1.2 million for year 1. These costs would
continue to increase over time as all drug approvals after the effective date of the
rule would have longer PDR listings. The estimated annual and total costs of
printing longer PDR listings are shown in table 20.

Table 20.--Cost To Print Longer Listings in the PDR [FN1, 2]

| Year | Current Value ($ million) | | | Present Value ($ million) | |
| | PDR Bound | PDR Supplement | Total Costs | Total Discounted at 3 Percent | Total Discounted at 7 Percent |
|---|---|---|---|---|---|
| 1 | 0.7 | 0.5 | 1.2 | 1.2 | 1.1 |
| 2 | 1.5 | 0.5 | 2.0 | 1.8 | 1.7 |
| 3 | 2.4 | 0.5 | 2.9 | 2.6 | 2.4 |
| 4 | 3.3 | 0.5 | 3.8 | 3.3 | 2.9 |
| 5 | 4.2 | 0.4 | 4.6 | 4.0 | 3.3 |
| 6 | 5.0 | 0.4 | 5.4 | 4.5 | 3.6 |
| 7 | 5.8 | 0.4 | 6.2 | 5.0 | 3.9 |
| 8 | 6.3 | 0.4 | 6.7 | 5.3 | 3.9 |
| 9 | 6.8 | 0.4 | 7.2 | 5.5 | 3.9 |
| 10 | 7.2 | 0.4 | 7.6 | 5.7 | 3.9 |
| Total | 43.1 | 4.5 | 47.6 | 39.1 | 30.5 |

FN1 Numbers may not sum due to rounding.
FN2 Printed in 6.5-point type size at an average per page cost of $9,755.

**\*3983** Table 21 summarizes the estimated compliance costs for the three major cost
categories over a 10-year period.

Table 21.--Compliance Costs Over 10-Year Period [FN1]

| Year | Cost Category ($ million) | | | Total Costs ($ million) |
| | Design and Producing Trade Labeling; Modify Packaging Equipment | Reformat and Producing Labeling Not Accompanying Drug Products | Printing PDR | |
|---|---|---|---|---|
| 1 | 3.1 | 1.7 | 2.4 | 7.3 |
| 2 | 3.1 | 2.8 | 3.1 | 9.0 |
| 3 | 4.9 | 4.2 | 4.1 | 13.2 |
| 4 | 4.6 | 4.4 | 4.9 | 13.9 |

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                        Page 117
71 FR 3922-01, 2006 WL 160271 (F.R.)
**(Cite as: 71 FR 3922)**

| | | | | |
|---|---|---|---|---|
| 5 | 4.6 | 4.6 | 5.8 | 15.0 |
| 6 | 4.8 | 4.4 | 6.6 | 15.8 |
| 7 | 5.0 | 4.3 | 7.4 | 16.6 |
| 8 | 3.8 | 3.6 | 7.9 | 15.3 |
| 9 | 4.0 | 3.1 | 8.3 | 15.5 |
| 10 | 4.0 | 2.7 | 8.8 | 15.5 |
| Total Current Value | 42.0 | 35.9 | 59.3 | 137.2 |
| Total Present Value Discounted at 3 Percent | 35.7 | 30.5 | 49.0 | 115.3 |
| Total Present Value Discounted at 7 Percent | 29.2 | 24.9 | 38.8 | 92.9 |

FN1 Numbers may not sum due to rounding.
------------------------------------------------------------------------

*E. Impacts on Small Entities*

1. The Need for and the Objective of the Rule

 Developments in recent years have contributed to an increase in the length and
complexity of prescription drug labeling, making it more difficult for health care
practitioners to quickly find specific information about a drug. Therefore,
practitioners expend time that could be spent with patients and may miss critical
information about the safe and effective use of prescription drug products. The
objective of the requirements is to improve prescription drug labeling by making it
easier for health care practitioners to access, read, and use labeling information
about prescription drug products. The agency believes that having better access to
critical information will improve the use of prescription drugs and lead to a
decrease in the number of preventable adverse reactions that occur in the United
States each year.

**\*3984** 2. Description and Estimate of the Number of Small Entities Affected

 This final rule would affect all small entities required to design their
prescription drug labeling to comply with this rule. The Small Business
Administration (SBA) considers Pharmaceutical Preparation Manufacturing firms (NAICS
325412) and Biological Product Manufacturing firms (NAICS 325414) with fewer than
750 and 500 employees, respectively, to be small. U.S. Census reports in 1999 there
were 265 biological product manufacturing firms (Ref. 37) and 749 pharmaceutical
preparation manufacturing firms (Ref. 38). However, employment size classes for
pharmaceutical preparation manufacturing do not correspond to SBA size categories.
Nevertheless, 1999 Census data suggest that approximately 94 percent of biological
product manufacturing firms and at least 87 percent of the pharmaceutical
preparation manufacturing firms could be considered small. Despite the large number
of small manufacturers, large companies manufacture most prescription drug products.
Although the agency cannot predict the number of new approvals granted to small
entities, the following estimates are based on 5 years of recent submissions (65 FR
81082 at 81110, updated for 1997-2001). On average, 17 small entities will receive
product approvals each year. In addition, about 64 small entities will be affected
during years 3 to 7 of the rule, when applicants with products approved 5 years
prior to the effective date of the final rule must submit reformatted prescription
drug labeling for approval. Only six firms will have more than two existing products
affected by the rule. Of these six, four firms will have two products affected in
the same year and one firm will have three products affected in a single year.

 The compliance requirements for small entities under this final rule are the same
as those described above for other affected entities. Compliance primarily involves:
(1) designing prescription drug labeling that conforms to the content and format

          ©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 FR 3922-01                                                             Page 118
71 FR 3922-01, 2006 WL 160271 (F.R.)
(Cite as: 71 FR 3922)

requirements, and (2) once the labeling is approved by FDA, ensuring that all future
printed prescription drug labeling is in the new format with the required minimum
type size. Because manufacturers already submit labeling with NDAs, BLAs and
efficacy supplements to FDA, no additional skills will be required to comply with
the final rule.

 The group of small entities likely to bear the highest total costs under this final
rule are those firms that have: (1) Existing products with prescription drug
labeling that must be revised in the first year or (2) more than one affected high-
volume product per year, such as a small firm with two or three recently approved,
high-volume products that must undergo prescription drug labeling reformatting
simultaneously in the same year. However, the high-cost small entities are also the
small firms with the highest sales of affected product; thus, their incremental cost
per unit sold is likely to be relatively low. In contrast, small firms with a
single, low-volume product would have lower costs of compliance, but the incremental
cost per unit sold would be higher.

 Although the agency solicited comment on the initial regulatory flexibility
analysis from small entities, the only comments submitted specifically about the
impact on small entities were from large firms (see comment 122). The following
examples illustrate possible impacts on small entities with different production
volumes. Prescription drug labeling costs are estimated for a small firm with a
single carton-enclosed product (marketed under an NDA) that must: (1) Have its
labeling reformatted in year 3 of the rule and (2) add patient information in year
1. Table 22 outlines the projected per-unit and total costs to the firm with 3
different levels of production: 1,000, 10,000, and 100,000 units produced per year.

 In addition to the costs identified in table 22, a very small number of small firms
might incur equipment costs to include longer prescription drug labeling in carton-
enclosed products. It is likely, however, that this one-time capital cost (estimated
at $200,000) will affect a total of no more than two or three small firms in the 10
years following implementation of the rule. Based on this analysis, FDA believes
that the final rule would not have a significant impact on most small entities in
this industry, but it is possible that a few small firms may be significantly
affected by the final rule.


 Table 22.--Estimated Costs for Hypothetical Small Firm with a Single Product,
           Under Three Alternative Levels of Production [FN1]

| Cost Category | Number of Units Produced and Sold Each Year | | |
|---|---|---|---|
| | 100,000 | 10,000 | 1,000 |
| Example 1--Revise labeling of product approved less than 1 year prior to effective date: | | | |
| Prescription drug labeling redesign/application | $8,700 | $8,700 | $8,700 |
| Printing trade labeling [FN2] | $200 | $20 | $2 |
| Printing prescription drug labeling not accompanying drug products [FN3] | $1,050 | $105 | $10 |
| Total | $9,950 | $8,825 | $8,712 |
| Additional cost per unit sold | $0.10 | $0.88 | $8.71 |
| Example 2--Add printed patient information to existing labeling for a product: | | | |
| Prescription drug labeling redesign | $2,850 | $2,850 | $2,850 |
| Printing trade labeling [FN4] | $750 | $75 | $8 |
| Printing longer PDR [FN5] | $19,500 | $19,500 | N/A |
| Total | $23,100 | $22,425 | $2,858 |

         ©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.