UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL DOCKET No. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L - DIVISION 3 |
| This document relates to<br>CASE NO. 2:05CV2524 | * | JUDGE FALLON |
| ANTHONY WAYNE DEDRICK,<br>an Individual, | * | MAG. JUDGE KNOWLES |
| Plaintiff, | * | |
| v. | * | |
| MERCK & CO., INC., | * | |
| Defendant. | * | |

### Motion in Limine No. 6

### PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE MERCK FROM ARGUING THAT FDA REGULATIONS PROHIBITED THE COMPANY FROM MAKING LABEL CHANGES WITHOUT PRIOR AGENCY APPROVAL

Plaintiff Anthony Dedrick anticipates that Merck & Co. will offer testimony and argument at trial that it could not have changed the Vioxx label to include warnings of cardiovascular risks or reports of cardiovascular and other adverse events without prior approval of the FDA. Such testimony or argument is both false and misleading. Though subject to FDA oversight, Merck was responsible for ensuring that adequate warnings appeared in the Vioxx label at all times. Therefore, Plaintiff respectfully requests entry of an order prohibiting Merck from eliciting such testimony or making such argument.

1

I. **Federal Regulations Required Merck to Warn of Known Hazards Associated With the Use of Vioxx.**

Any suggestion that Merck could not have changed the Vioxx label without prior FDA approval is false and misleading. The Food, Drug and Cosmetic Act (the "Act") *expressly* requires a drug manufacturer to immediately inform the public of newly discovered dangers rather than waiting for the FDA to act. See *McEwen v. Ortho Pharm. Corp.*, 528 P.2d 522, 534-535 (Or. 1974); see also *Labeling and Prescription Drug Advertising; Content and Format for Labeling for Human Prescription Drugs*, 44 Fed. Reg. 37434, 37447 (1979). It is the legal obligation of a drug manufacturer to promptly take steps to strengthen its warnings to physicians and consumers of newly discovered dangers and risks of an approved product. 21 C.F.R. §201.57(e).

The intention of the Act is "to protect consumers from dangerous products." *United States v. Sullivan*, 332 U.S. 689, 696 (1948); see *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000). Consistent with its purpose, the FDA and its regulations explicitly permit a manufacturer to unilaterally strengthen a warning label at any time without regulatory approval, 21 C.F.R. § 314.70(c)(6)(iii)(A), to allow the drug manufacturer to quickly strengthen warnings when evidence of side effects, risks, or dangers are discovered. See 30 Fed. Reg. 993 (Jan. 30, 1965).

In the recent case of *McNellis v. Pfizer, Inc.*, No. 05-1286-JBS, 2005 WL 3752269 (D. N.J. Dec. 29, 2005), the district court after outlining 21 C.F.R. § 314.70(c)(6) acknowledged a manufacturer's unilateral duty to warn:

> If the manufacturer desires to make changes to the labeling after a drug is approved, it must generally submit a Supplemental NDA to the FDA pursuant to 21 C.F.R. § 314.70(b)(2)(v)(A). Although most labeling changes require a Supplemental NDA, a number of

2

> exceptions have been enumerated in 21 C.F.R. § 314.70(c)(6)(iii), which provides in pertinent part:
>
> (6) The agency may designate a category of changes for the purpose of providing that, in the case of a change in such category, the holder of an approved application may commence distribution of the drug product involved upon receipt by the agency of a supplement for the change. These changes include, but are not limited to:
>
> * * *
>
> (I) Changes in the labeling to accomplish any of the following:
>
> (A) To add or strengthen a contraindication, warning, precaution or adverse reaction;
> (B) To add or strengthen a statement about drug abuse, dependence, psychological effect, or over dosage;
> (C) To add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product;
> (D) To delete false, misleading, or unsupported indications for use or claims for effectiveness; or
> (E) Any labeling change normally requiring a supplement submission and approval prior to distribution of the drug product that FDA specifically requests be submitted under this provision.
>
> 21 C.F.R. § 314.70(c)(6)(iii). <u>Thus, it is apparent that prior FDA approval need not be obtained, nor will a product be deemed mislabeled, if the manufacturer voluntarily or even unilaterally strengthens the approved warnings</u>, precautions or potential adverse reactions upon the label pursuant to 21 C.F.R. § 314.70(c)(6)(iii)(A).

*McNellis*, 2005 WL 3752269, at 4-5.

Moreover, "Section 201.57 delineates the 'specific requirements on content and format of labeling for human prescription drugs' and subsection (e) specifically governs 'warnings.'" *Motus v. Pfizer, Inc.*, 127 F.Supp.2d 1085, 1095 (C.D. Ca. 2000). 21 C.F.R. § 201.57(e) states: "labeling shall be revised to include a warning *as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved.*

3

(emphasis added). Also, 21 C.F.R. § 314.70(c) is explicit that labeling changes to "add or strengthen a contraindication, warning, precaution, or adverse reaction" do not require FDA's prior approval.

In fact, when promulgating these regulations the FDA Commissioner invited companies to strengthen the warnings contained in their drug labels.

> [D]rug labeling does not always contain the most current information and opinion available to physicians about a drug because advances in medical knowledge and practice inevitably precede formal submission of proposed new labeling by the manufacturer and approval by FDA. . . . [L]abeling regulations do not prohibit a manufacturer . . . from warning health care professionals wherever possibly harmful adverse effects associated with the use of a drug are discovered. The addition to labeling and advertising of additional warnings . . . is not prohibited by these regulations. . . . [P]racticing physicians will welcome such information so they can make their best informed medical judgments in the care of their patients.

44 Fed. Reg. at 37,434 (emphasis added).

Without question, Merck was permitted to add a warning for cardiovascular risks to the Vioxx label *at any time after the results of the VIGOR study were known* without advance approval by the FDA. *Id. See also* 30 Fed. Reg. 993 (Jan. 30, 1965) (encouraging drug manufacturers to strengthen its warnings "in the interest of drug safety" at any time without FDA pre-approval to enable adoption of new warnings as soon as possible). Any argument or testimony that Merck was required to obtain prior approval from the FDA before changing the Vioxx label to include warnings or information concerning serious cardiovascular adverse events is simply false.

Federal regulations dictate that Merck, without prior approval by the FDA, had a duty to add a warning to the Vioxx label and alert physicians and patients of the increased risk of cardiovascular events when taking Vioxx.

4

## II.  Courts Recognize That Drug Manufacturers Have a Duty to Warn of Known Hazards Regardless of Prior FDA Approval.

Federal and state courts have concluded that current FDA regulations do not impose any restrictions on a drug manufacturer's ability to add warnings or precautions regarding newly-discovered risks and dangers but dictate that a warning of known risks be added to a label prior to FDA approval.

In *Witczak v. Pfizer, Inc.*, the district court found that FDA regulations explicitly permit pharmaceutical companies to unilaterally strengthen its warning label at any time without regulatory pre-approval. *Witczak v. Pfizer, Inc.* 377 F.Supp.2d 726 (D. Minn. 2005) (citing 21 C.F.R. § 314.70(c)(6)(iii)(A)). The *Witczak* court noted that the "particular regulation was promulgated precisely to allow drug-makers to quickly strengthen label warnings when evidence of new side effects are discovered". *Witczak*, 377 F.Supp.2d at 726 (citing 30 Fed.Reg. 993 (Jan. 30, 1965)). FDA regulation "permits the addition to the drug's labeling or advertising of information about a hazard without advance approval" by the FDA. *Id.*

Judge Steger of the United States District Court for the Eastern District of Texas recently provided an in-depth analysis of the FDCA's applicability to state law claims against pharmaceutical companies, and the issue of preemption. See *Cartwright v. Pfizer, Inc.*, 369 F.Supp.2d 876 (E.D. Tex. 2005). In the *Cartwright* case, the defendant claimed that plaintiff's state law failure to warn claims were preempted because under the Food, Drug and Cosmetic Act, the manufacturer was required to obtain FDA approval before revising the product labeling. *Id.* The District Court specifically rejected this argument:

> Since 1965, the FDA's regulations permit a manufacturer "[t]o add or strengthen a contraindication, warning, precaution, or adverse reaction," without prior approval by the FDA...." *Id.* (*citing* 21

5

> C.F.R. § 314.70(c)(6)(iii)(A) and finding that the Act sets minimum standards that "expressly do not prohibit a manufacturer from 'add[ing to] or strengthen[ing] a contraindication, warning, precaution or adverse reaction.'").... "Thus, FDA's position regarding stronger warnings by drug manufacturers, as expressed through its own regulations, is that a manufacturer could, and should, provide stronger warnings as soon as such a warning is warranted."

*Id.* (emphasis added).

The *Cartwright* court further pointed out that under the regulations a manufacturer should issue a warning whenever there is "reasonable evidence of an association of a serious hazard with a drug; *a causal relationship need not have been proved.*" *Id.* (*citing* 21 C.F.R. § 201.57(e)).[1] The *Cartwright* court concluded "it is clear to this Court that manufacturers must act quickly to warn regarding possibly deadly side effect associated with a drug because the FDA only sets forth minimum standards for labeling and safety of drugs." *Id.*

In *Madden v. Wyeth*, 2005 WL 2278081 (N.D. Tex. Sept 14, 2005), the defendant claimed its warning label was adequate in support of a summary judgment motion. The District Court rejected "defendant's argues that its warning label is adequate because it was approved by the FDA. Federal regulations do not prohibit a manufacturer from "add[ing to] or strengthen[ing] a contraindication, warning, precaution, or adverse reaction." *Id.* (*citing* 21 C.F.R. § 314.70(c)(6)(iii)(A)).

In *Caraker v. Sandoz Pharmaceuticals Corp.*, 172 F.Supp.2d 1018 (S.D. Ill. 2001), the district court found that the manufacturer was explicitly authorized by the FDA's regulations to add or strengthen its warnings without prior FDA approval. *Id.* at 1033-34. The *Caraker* court cited the FDA commissioner's statement that "labeling regulations do not prohibit a

---

[1] As the *Cartwright* court noted, this same regulation requires that "black box" warnings be added to the label of drugs "that may lead to death or serious injury," *Id.*

manufacturer, packer, relabeler, or distributor from warning health care professionals whenever possibly harmful adverse effects associated with the use of the drug are discovered." *Id.* at 1034 (*citing* 44 Fed.Reg. 37,434 & 37,447 (1979)); see *Jamison v. Purdue Pharma Company*, 251 F.Supp.2d 1315 (S.D. Miss. 2003) (listing situations where company may amend labeling without prior approval, including "adding or strengthening "(I) a contraindication, warning, precaution, or adverse reaction").

Lastly, the court in *Ohler v. Purdue Pharma, L.P.*, 2002 WL 88945 (E.D.La. 2002), addressed a similar issue in the context of a motion to remand, where removal was partially based on preemption grounds. In rejecting the defendants' arguments, this Court noted that the "applicable regulation states that changes in labeling that 'add or strengthen a contraindication, warning, precaution, or adverse reaction" fall within the category of adjustments that "may be made before FDA approval.'" *Id.* See also *Kurer v. Parke, Davis & Co.*, 272 Wis.2d 390, 679 N.W.2d 867 (Wis.App. 2004).

In *Cona/McDarby v. Merck & Co.*, a product liability action which was tried before Judge Carol Higbee in the New Jersey consolidated litigation, Merck employee, Mr. David Anstice, testified that the company could not have added a warning to the label without prior FDA approval. Adhering to the principles outlined in the cases above, Judge Higbee interrupted the testimony of Mr. Anstice to give a curative instruction. The court informed the jury that the manufacturer was <u>not</u> limited by FDA regulations to add to the warning label at any point in time. The curative instruction was reported to be:

> "I just wanted to advise you that the law under FDA regulations does allow a company to change their warnings, to warn consumers and physicians about dangers they find out about after the label is approved," Higbee told the panel. "<u>They're allowed to make those changes through a special procedure, without prior FDA approval</u>."

Brennan, *Judge Interrupts Vioxx Testimony to Instruct Jury on Label Warnings*, The Legal Intelligencer, March 20, 2006, at 3 (emphasis added) (Ex. "A").

The overwhelming majority of federal and state courts have concluded and recognized that a manufacturer not only may, but should add or strengthen warnings related to a pharmaceutical drug, without waiting for FDA approval. Federal regulations require that Merck should have strengthened the precautions and/or warnings contained in the Vioxx label as soon as it had actual or constructive knowledge of the increase risk of cardiovascular risks associated with the ingestion of the drug.

The Court should enter an order precluding Merck from arguing or offering testimony that it could not amend the Vioxx label to include warnings or precautions concerning cardiovascular risks without prior FDA approval. Such testimony or argument would be false, contrary to well-settled law, and misleading to the jury.

Date: October 27, 2006

Respectfully submitted,

By _____
Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama 36103-4160
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

Counsel for Plaintiff

**Russ M. Herman** (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
**Plaintiffs' Liaison Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID, MEUNIER & WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL, ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

**Christopher A. Seeger**, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337) 494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiff's Motion in Limine to Preclude Merck from Arguing that FDA Regulations Prohibited the Company from Making Label Changes without Prior Agency Approval has been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail or by hand delivery and e-mail, on Merck's Counsel, Douglas R. Marvin and Philip S. Beck, by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 27th day of October, 2006.

P. Leigh O'Dell
Attorney for Plaintiff
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.

 

# LAW.COM

Select **'Print'** in your browser menu to print this document.

**Copyright 2006 ALM Properties, Inc. All rights reserved.**

Page printed from: http://www.law.com

Back to Article

**Judge Interrupts Vioxx Testimony to Instruct Jury on Label Warnings**

By Lisa Brennan
New Jersey Law Journal
03-16-2006

Eight hours into his testimony at the Vioxx trial in Atlantic City, N.J., last week, the plaintiffs' first witness got a jolt.

The judge interrupted Merck sales and marketing executive David Anstice and gave jurors a curative instruction: Merck could have issued a safety warning at any time after it learned of the painkiller's cardiovascular risks in March 2000.

Superior Court Judge Carol Higbee said she was acting to allay possible confusion over Anstice's testimony that Merck marketed Vioxx responsibly and could not have added a warning about heart risks without approval from the Food and Drug Administration.

In contradiction, Higbee told the jury that FDA regulations would have permitted the company to add a warning label at any point.

"I just wanted to advise you that the law under FDA regulations does allow a company to change their warnings, to warn consumers and physicians about dangers they find out about after the label is approved," Higbee told the panel. "They're allowed to make those changes through a special procedure, without prior FDA approval."

She prefaced her intervention by saying, "It's up to you to make decisions on facts, and you alone decide the facts... . I tell you what the law is, usually at the end, but sometimes during the case, so you're not confused."



Your top online resource for identifying minority attorneys just got a lot better!

New search features

Identify minority attorneys at law firms, corporations and government agencies

Create and update your legal department or law firms listing

MinorityLawJournal

YOU DON'T PULL UP OUR WEBSITE.
YOU EXTRADITE IT.

SUBSCRIBE NOW » 

Merck attorneys objected to the curative instruction at a later sidebar, and Higbee noted the objection the next day.

EXHIBIT A

It was not an altogether new element in the case. Before trial, Higbee had ruled that Merck could not argue it needed FDA approval to change the warning, says Merck spokesman Charles Harrell, a partner in the Memphis, Tenn., office of Butler, Snow, O'Mara, Stevens & Cannada.

Nonetheless, the instruction surprised lawyers, doctors and executives following the trial. "It's highly unusual for a judge to instruct jurors on the law in the middle of a trial," says a New Jersey mass-torts defense lawyer not involved in Vioxx litigation.

Lead plaintiffs lawyer W. Mark Lanier of Houston and New York was so pleased with the instruction that he decided against calling former Merck chief executive officer Raymond Gilmartin as a witness, say three lawyers familiar with the case. Gilmartin has not testified in any of the three Vioxx trials to date. Merck has won two and lost one.

**KNOWING THE RISKS**

The case on trial is the first test of Merck's liability in long-term exposure cases. Thomas Cona, 59, of Cherry Hill, N.J., and John McDarby, 74, of Park Ridge, N.J., allege the heart attacks they suffered were brought on by taking Vioxx for 22 months and four years, respectively.

Merck did not warn of the risk of heart problems until April 2002, and it withdrew the painkiller in September 2004 when a study showed it doubled the risk of heart attacks after 18 months of use.

In his opening statement, Lanier, who won a $253 million verdict from an Angleton, Texas, jury last summer, flaunted the plaintiffs' risk factors and said Vioxx was the ultimate factor that led to the heart attacks. He promised to show that Merck failed to provide critical safety information that would have warned patients like Cona and McDarby to stay away from Vioxx.

"We have a right to know all the risks, so that we can make intelligent decisions," said Lanier, who showed a slide of a man near a cliff with a bottle of Vioxx pills pushing him closer to the edge. "When you're taking Vioxx, you're getting that extra shove."

McDarby's attorney, Robert Gordon of Weitz & Luxenberg in Cherry Hill and New York, said his client's diabetes made it critical that he be informed of heart attack risks.

Gordon said McDarby's doctor, John Braun, who testified by videotape on March 9, was visited 220 times by Merck sales representatives in five years.

"If [Dr. Braun] knew Vioxx was on the list of risk factors for heart attacks, he never would have put [McDarby] on the drug," Gordon said.

Last fall, in the trial that ended in a defense win, the plaintiff had used Vioxx for four months and his lawyers admitted his risk factors only reluctantly. In the current trial, the plaintiffs' lawyers are embracing their clients' risks and invoking the theme that Merck had an obligation to tell everything about Vioxx's dangers.

Lanier has been trying to chisel away at Merck's credibility with the jury. He had Anstice describe the company's $1 million launch party for Vioxx in the spring of 1999 on an island in San Francisco Bay and questioned Anstice on his advertising budget, by which Anstice spent as much on consumer ads in one year as Pepsi and Budweiser combined.

"We spent a lot of money on direct-to-consumer advertising," said Anstice, adding that the ads "presented a very balanced picture."

For two hours, Lanier grilled Anstice on Merck's waiting 15 months, after getting results from its own scientific study of Vioxx showing an increased likelihood of cardiovascular problems, before adding a safety warning.

During that process, Lanier showed, Merck softened the proposed warning's language and lobbied the FDA to place it in the secondary warnings section of the label. Lanier referred to an e-mail exchange between Anstice and a top Merck scientist that referred to FDA officials as "bastards" for the proposed warnings they wanted to require in light of a possible link to heart attacks.

"[T]he truth of the matter is back in 2001, through your office, Merck made projections" about how much a mild

warning versus an actual warning would cost the company in sales, Lanier said.

Anstice replied, "We make all kinds of projections. We do it as a routine business practice; we forecast events."

On March 8, Merck attorney Robert Brock of Montgomery, Ala.'s Rushton, Stakely, Johnston & Garrett sought to undo some of the damage during cross-examination.

"Was Merck cutting corners and compromising patient safety?" Brock asked.

"No," Anstice answered. "All medications come with benefits and associated risks."

Lead Merck attorney Christy Jones of Butler Snow in Jackson, Miss., focused her opening statement on causation. Cona had high cholesterol and heart disease, and was overweight, and McDarby had diabetes, she said.

The bottom line, she continued, was that "Merck and Merck scientists and doctors acted reasonably and responsibly in the development and testing of Vioxx." And the company withdrew the product in 2004, when the potential risk became known.