**Mason v. Merck & Co., Inc.**
**Deposition Designations for Graham**

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

33:23  -  34:1    Graham, David 2006-05-09
     33 23          BY MR. KLINE:
     33 24          Q: Dr. Graham, good morning.
     34  1          A: Good morning.

35:13  -  38:1    Graham, David 2006-05-09
     35 13          I would like to know who you
     35 14          are, sir. What is your current title and
     35 15          position at the FDA?
     35 16          A: I'm a medical officer and
     35 17          the associate director for science and
     35 18          medicine in the Office of Drug Safety.
     35 19          Q: What does that job involve,
     35 20          sir?
     35 21          A: I'm the senior scientific
     35 22          adviser for the office. I mentor the
     35 23          scientific staff. I advise the office
     35 24          director on all scientific and medical
     36  1          matters. I oversee intramural and
     36  2          extramural research programs within the
     36  3          office and serve as a resource to the
     36  4          center, the Center For Drug Evaluation on
     36  5          epidemiologic matters as well.
     36  6          Q: You are an epidemiologist,
     36  7          sir?
     36  8          A: Yes, I am.
     36  9          Q: And you're also a physician?
     36 10          A: That's correct.
     36 11          Q: So, you hold an M.D. degree
     36 12          as well; is that correct?
     36 13          A: Yes.
     36 14          Q: And you're a long-time
     36 15          employee of the FDA?
     36 16          A: Yes.
     36 17          Q: How many years, sir?
     36 18          A: About 22.
     36 19          Q: This deposition is about
     36 20          many of your public statements.
     36 21          One you made on November 18,
     36 22          2004 to the United States Senate Finance
     36 23          Committee. You said, to quote you,
     36 24          Vioxx is a terrible tragedy and a
     37  1          profound regulatory failure. I would
     37  2          argue that the FDA as currently
     37  3          configured is incapable of protecting
     37  4          America against another Vioxx. We are
     37  5          virtually defenseless.' Did you make
     37  6          that statement?
     37  7          A: Yes, I did.
     37  8          Q: You also made a statement on
     37  9          November 18 before the United States
     37 10          Senate where you said, 'Vioxx is the

Re: [37:8-37:17]
Def Obj 403; Extremely
Prejudicial

| | | | **Objections/Responses In Mason** | **Rulings in Smith/Barnett** |
|---|---|---|---|---|

37 11   single greatest drug safety catastrophe
37 12   in the history of this country.' Did you
37 13   make that statement, sir?
37 14   A: Yes, I did.
37 15   Q: Do you stick by that
37 16   statement, sir?
37 17   A: I do.
37 18   Q: You also said, 'The FDA, its          **Re: [37:18-38:1]**
37 19   Center for Drug Evaluation and Research,  **Def Obj** 403; Criticism of
37 20   are broken.' Did you make that           the FDA is inappropriate
37 21   statement, sir?                          (see Motion in Limine)
37 22   A: Yes, I did.
37 23   Q: Do you believe that and do
37 24   you stick to it today?
38  1   A: Yes, I do.

39:8   -   40:2   Graham, David 2006-05-09
39  8   Sir, within the FDA, to what
39  9   have you devoted your entire professional
39 10   activities and professional life?
39 11   A: Post-marketing drug safety
39 12   and public health.
39 13   Q: What is post-marketing
39 14   safety, sir?
39 15   A: It's examining the safety of
39 16   drug products once they've been approved
39 17   for marketing.
39 18   Q: Do you have any interest of
39 19   any kind in the Vioxx litigation, sir?
39 20   A: No.
39 21   Q: Do you have any financial
39 22   interest in any drug company or any other
39 23   kind of conflict that you can think of
39 24   that you would disclose here?
40  1   A: I have none that I can think
40  2   of.

40:3   -   40:11   Graham, David 2006-05-09
40  3   Q: Today, sir, are you here on
40  4   behalf of the FDA as an FDA
40  5   representative or are you expressing your
40  6   own opinions?
40  7   A: Well, I've been -- I
40  8   honestly don't know the answer. I've
40  9   been subpoenaed as an FDA employee, but
40 10   undoubtedly some of my opinions will not
40 11   represent those of the agency.

40:20   -   41:13   Graham, David 2006-05-09
40 20   You have a Bachelor's Degree
40 21   from Johns Hopkins; is that correct?
40 22   A: Yes.
40 23   Q: In what year, sir?
40 24   A: 1976.
41  1   Q: You graduated Phi Beta
41  2   Kappa?
41  3   A: Correct.

*[Handwritten ruling in right column:]* Overruled. The FDA approved the drug. This goes to relevancy of value of such action. E.

|  | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|

```
      41   4        Q:  Meaning?
      41   5        A:  That's a scholastic honorary
      41   6        society that's awarded to people who
      41   7        graduate in the top of their class.
      41   8        Q:  Then you went to medical
      41   9        school where, sir?
      41  10        A:  Johns Hopkins University.
      41  11        Q:  You graduated second in your
      41  12        class?
      41  13        A:  That's correct.

41:18    -    41:21    Graham, David 2006-05-09
      41  18        Q:  You then went on to get a
      41  19        Master's Degree in public health, is that
      41  20        correct?
      41  21        A:  Yes.

42:17    -    43:1     Graham, David 2006-05-09
      42  17        Q:  You're a career FDA person
      42  18        then?
      42  19        A:  Yes.
      42  20        Q:  You did an internship and
      42  21        residency at Yale first; is that correct?
      42  22        A:  Yes.
      42  23        Q:  Then you did a residency in
      42  24        neurology?
      43   1        A:  Correct.

43:12    -    44:22    Graham, David 2006-05-09
      43  12        Q:  A second residency?
      43  13        A:  Yes.
      43  14        Q:  That second residency being
      43  15        at the University of Pennsylvania?
      43  16        A:  Correct.
      43  17        Q:  So, you have an internship
      43  18        at Yale, residency at Penn in neurology
      43  19        and then your training in epidemiology?
      43  20        A:  Right.
      43  21        Q:  Your epidemiology training
      43  22        was three years?
      43  23        A:  Three years.
      43  24        Q:  What is the -- and if you
      44   1        could be precise, what is the study of
      44   2        epidemiology?
      44   3        A:  Epidemiology, I think, is
      44   4        the study of the causes and distribution
      44   5        of diseases in populations. And in the
      44   6        area of drug epidemiology, it is looking
      44   7        at the distribution and causes of
      44   8        drug-induced injuries, but you could also
      44   9        be looking for the patterns of the way
      44  10        drug products are used in the population.
      44  11        Q:  Okay.
      44  12        How have you used
      44  13        epidemiology during your entire
      44  14        professional life?
      44  15        A:  It's been in the practice of
```

3

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

| | |
|---|---|
| 44 16 | pharmacoepidemiology or drug safety. |
| 44 17 | Q: And what is |
| 44 18 | pharmacoepidemiology, sir? |
| 44 19 | A: It's a fancy word for drug |
| 44 20 | safety epidemiology, 'pharmaco' referring |
| 44 21 | to drugs, 'epidemiology,' study of the |
| 44 22 | distribution and causes of disease. |

| | |
|---|---|
| 47:8    -   47:19 | Graham, David 2006-05-09 |
| 47  8 | Q: Along the way, sir, in your |
| 47  9 | career at the FDA, have you received many |
| 47 10 | different awards? |
| 47 11 | A: Yes, I have. |
| 47 12 | Q: As well as honors? I think |
| 47 13 | it's called in your curriculum vitae |
| 47 14 | honors and awards; is that correct? |
| 47 15 | A: Correct. |
| 47 16 | MR. KLINE: I'm going to |
| 47 17 | mark your curriculum vitae as |
| 47 18 | Exhibit 1 so we have it as part of |
| 47 19 | this record. |

| | |
|---|---|
| 48:9    -   48:11 | Graham, David 2006-05-09 |
| 48  9 | Would you confirm that |
| 48 10 | indeed that's your curriculum vitae? |
| 48 11 | A: Yes, it is. |

| | |
|---|---|
| 6●    -   60:13 | Graham, David 2006-05-09 |
| 60  9 | BY MR. KLINE: |
| 60 10 | Q: I would ask you, sir, do you |
| 60 11 | consider yourself an expert in drug |
| 60 12 | safety? |
| 60 13 | A: Yes, I do. |

| | |
|---|---|
| 61:5    -   62:22 | Graham, David 2006-05-09 |
| 61  5 | BY MR. KLINE: |
| 61  6 | Q: In what areas of FDA do you |
| 61  7 | consider yourself expert? |
| 61  8 | A: I am an expert in areas of |
| 61  9 | post-marketing drug safety. I am an |
| 61 10 | expert in areas of interaction between |
| 61 11 | the reviewing divisions, the preapproval |
| 61 12 | side of FDA and the postapproval side of |
| 61 13 | FDA. I'm an expert on the culture of |
| 61 14 | FDA, on the ways that science is used |
| 61 15 | within FDA for -- as it relates to drug |
| 61 16 | safety in particular, but also as it |
| 61 17 | relates to efficacy. I'm an expert in |
| 61 18 | the personnel practices of FDA in the |
| 61 19 | ways that it treats its medical officers, |
| 61 20 | and there's probably a host of other |
| 61 21 | areas that relate to life working within |
| 61 22 | FDA that I've become expert in. |
| 61 23 | Q: You're a lifer there? |
| 61 24 | A: Thus far, yes. |
| 62  1 | Q: Let me -- do you have any |
| 62  2 | current intention of leaving the FDA? |

| | | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|
| 62 | 3 | A: No, not unless I'm forced to | | |
| 62 | 4 | leave. I love the work that I do. | | |
| 62 | 5 | Q: Let me ask you some | | |
| 62 | 6 | questions about your public statements. | | |
| 62 | 7 | You testified before the | | |
| 62 | 8 | United States Senate, Senate Finance | | |
| 62 | 9 | Committee Hearing on drug safety and the | | |
| 62 | 10 | worldwide withdrawal of Merck & Company, | | |
| 62 | 11 | Inc. of Vioxx, November 18, '04; is that | | |
| 62 | 12 | correct? | | |
| 62 | 13 | A: Yes. | | |
| 62 | 14 | Q: You appeared on 60 Minutes · | | |
| 62 | 15 | on February 16, '05; is that correct? | | |
| 62 | 16 | A: Yes. | | |
| 62 | 17 | Q: You appeared on February 17, | | |
| 62 | 18 | 05 before the joint meeting of the | | |
| 62 | 19 | Arthritis Advisory Committee of the Drug | | |
| 62 | 20 | Safety and Risk Management Advisory | | |
| 62 | 21 | Committee of the FDA; is that correct? | | |
| 62 | 22 | A: Yes. | | |

63:19   -   64:1        Graham, David 2006-05-09

| | | | | |
|---|---|---|---|---|
| 63 | 19 | Q: And in many other forums | | |
| 63 | 20 | relating to Vioxx, the withdrawal of | | |
| 63 | 21 | Vioxx; is that correct? | | |
| 63 | 22 | A: Yes. | | |
| 63 | 23 | Q: Do you believe Vioxx is an | | |
| 63 | 24 | unsafe drug, sir? | | |
| 64 | 1 | A: Yes I, do. | | |

64:5   -   64:16        Graham, David 2006-05-09

| | | | | |
|---|---|---|---|---|
| 64 | 5 | Q: Should it ever have been on | Re: [64:5-64:16] Def Obj 403; Inappropriate second-guessing of FDA's decision to approve Vioxx (see Motion in Limine). Also, Graham is not an expert in the approval of drugs (see 84:11-19) | Overruled |
| 64 | 6 | the market in the first place? | | |
| 64 | 7 | A: It is my professional | | |
| 64 | 8 | opinion, based on the evidence that I've | | |
| 64 | 9 | looked at, that Vioxx should not have | | |
| 64 | 10 | been approved at the time that it was | | |
| 64 | 11 | approved, that there were substantial | | |
| 64 | 12 | areas of concern relating to | | |
| 64 | 13 | cardiovascular safety that should have | | |
| 64 | 14 | been explored more fully and more | | |
| 64 | 15 | thoroughly prior to consideration of an | | |
| 64 | 16 | approval. | | |

70:11   -   70:14        Graham, David 2006-05-09

| | | | | |
|---|---|---|---|---|
| 70 | 11 | Q: Is it your mission, sir, to | Re: [70:11-70:14] Def Obj 401, 402; (Objection was sustained in Barnett) | Sustained 401 |
| 70 | 12 | help the public? Is that your view of | | |
| 70 | 13 | it? | | |
| 70 | 14 | A: Yes. | | |

77:24   -   78:8        Graham, David 2006-05-09

| | | | | |
|---|---|---|---|---|
| 77 | 24 | From what you've heard, my | | |
| 78 | 1 | questions and your answers, would a | | |
| 78 | 2 | layperson have an understanding of the | | |
| 78 | 3 | overall mechanism of the FDA, CDER and | | |
| 78 | 4 | then the Office of New Drugs and Office | | |

| | | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|
| | 78 | 5 | of Drug Safety and where they fit in? | |
| | 78 | 6 | Would there be something to add here so | |
| | 78 | 7 | that we understood it any better in broad | |
| | 78 | 8 | brush terms? | |
| 78:13 | - | 79:10 | Graham, David 2006-05-09 | |
| | 78 | 13 | A:  I think it would be | |
| | 78 | 14 | important for people to understand that | |
| | 78 | 15 | in addition to the Office of New Drugs, | |
| | 78 | 16 | there are a number of other offices | |
| | 78 | 17 | within CDER whose purpose is to actually | |
| | 78 | 18 | assist in the review and approval of new | |
| | 78 | 19 | drugs. So, you have the Office of New | |
| | 78 | 20 | Drugs, and that may have 7 or 800 people, | |
| | 78 | 21 | but you have these other offices, as | |
| | 78 | 22 | well, whose primary function is to work | |
| | 78 | 23 | on the premarketing, the preapproval side | |
| | 78 | 24 | of FDA's house, and without them, the | |
| | 79 | 1 | drug couldn't be approved. And when you | |
| | 79 | 2 | take those all together, you end up with | |
| | 79 | 3 | like about 13 or 1400 people whose focus | |
| | 79 | 4 | is getting drugs on the market; if you | |
| | 79 | 5 | compare that to the Office of Drug | |
| | 79 | 6 | Safety, where we have maybe in the | |
| | 79 | 7 | neighborhood of 100 or 110 people | |
| | 79 | 8 | responsible for the safety and monitoring | |
| | 79 | 9 | of the safety of all drug products in the | |
| | 79 | 10 | country. | |
| 82:18 | - | 82:22 | Graham, David 2006-05-09 | |
| | 82 | 18 | Q:  What does OND largely rely | |
| | 82 | 19 | upon in approval of drugs? | |
| | 82 | 20 | A:  It relies on documents | |
| | 82 | 21 | supplied to it by a drug company seeking | |
| | 82 | 22 | approval of its drug. | |
| 129:14 | - | 129:22 | Graham, David 2006-05-09 | |
| | 129 | 14 | Did you find that to be the | Re: [129:14-129:22] |
| | 129 | 15 | case in your experience when you had | Pltf Obj Offered solely |
| | 129 | 16 | something to say about Vioxx in mid to | to bootstrap the cross. |
| | 129 | 17 | late 2004? | If included, needs to |
| | 129 | 18 | A:  Yes. I experienced threats, | also include 123:24- |
| | 129 | 19 | intimidation and actually what in my view | 124:10 and 125:1- |
| | 129 | 20 | appears to have been a very organized and | 128:13 |
| | 129 | 21 | orchestrated campaign to smear and | |
| | 129 | 22 | discredit me. | |
| 133:12 | - | 133:19 | Graham, David 2006-05-09 | |
| | 133 | 12 | THE WITNESS:  In my view, | Re: [133:12-133:15] |
| | 133 | 13 | that is an alarming circumstance, | Def Obj Answer without |
| | 133 | 14 | one that demands intensive | a question |
| | 133 | 15 | scrutiny and attention. | |
| | 133 | 16 | BY MR. KLINE: | |
| | 133 | 17 | Q:  Did that happen here in the | |
| | 133 | 18 | Vioxx story? | |
| | 133 | 19 | A:  Yes, it did. | |

*Rulings (handwritten):* Overruled goes to credibility

*Ruling (handwritten):* Sustained

| | | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|
| 134:3 | - | 137:23 | Graham, David 2006-05-09 | |

| | | | |
|---|---|---|---|
| 134 | 3 | BY MR. KLINE: | |
| 134 | 4 | Q:  Now, I want to do a topic, | |
| 134 | 5 | efficacy versus benefit. I'd like you to | |
| 134 | 6 | explain to the members of the jury in | |
| 134 | 7 | brief terms why efficacy, which is what | |
| 134 | 8 | we sometimes hear, a drug is efficacious, | |
| 134 | 9 | is different than benefit, and how those | |
| 134 | 10 | two either equate, in your opinion, or | |
| 134 | 11 | don't equate and what the significance | |
| 134 | 12 | is, please. | |
| 134 | 13 | A:  Okay. Efficacy is, does the | |
| 134 | 14 | drug have a biological effect. So, if | |
| 134 | 15 | the drug is supposed to treat high blood | |
| 134 | 16 | pressure, the efficacy will be, does it | |
| 134 | 17 | reduce your blood pressure. So, it's | |
| 134 | 18 | reducing a body measurement. That's the | |
| 134 | 19 | effect. And if it does that, we say that | |
| 134 | 20 | it has efficacy. | |
| 134 | 21 | Effectiveness is whether or | |
| 134 | 22 | not that drug taken on a regular basis | |
| 134 | 23 | will actually give you a health benefit | |
| 134 | 24 | long-term. If the drug lowers your blood | |
| 135 | 1 | pressure, but doesn't prevent you from | |
| 135 | 2 | having heart attacks, strokes, kidney | |
| 135 | 3 | failure or dying at a young age, well, | |
| 135 | 4 | then, you've spent a lot of money to have | |
| 135 | 5 | a lower blood pressure number, but have | |
| 135 | 6 | derived no benefit from it. So, what you | |
| 135 | 7 | want is, really, when you talk about | |
| 135 | 8 | benefit/risk, is you want to look at what | |
| 135 | 9 | is sort of the health benefits, the real | |
| 135 | 10 | certifiable health benefit that you're | |
| 135 | 11 | deriving from a drug versus what are the | |
| 135 | 12 | real risks. | |
| 135 | 13 | But what FDA frequently | Re: [135:13-137:23] |
| 135 | 14 | does, almost always does, is it takes the | Def Obj 403; |
| 135 | 15 | efficacy -- when it says benefits exceed | Inappropriate second- |
| 135 | 16 | the risks, what it's really saying is in | guessing of FDA's |
| 135 | 17 | our estimation, the FDA's estimation, the | risk/benefit analysis of |
| 135 | 18 | efficacy should lead to a benefit, and we | Vioxx (see Motion in |
| 135 | 19 | say that benefit exceeds the risk. But | Limine). Lacks |
| 135 | 20 | FDA has never done a formal benefit | foundation. Graham |
| 135 | 21 | analysis on any drug product to my | was not involved in |
| 135 | 22 | knowledge. It certainly did not do one | FDA's decision to |
| 135 | 23 | with Vioxx when it said that the benefits | approve Vioxx. |
| 135 | 24 | exceeded the risks. | |
| 136 | 1 | Q:  Why is it important in the | |
| 136 | 2 | Vioxx story to understand that the FDA | |
| 136 | 3 | did no risk/benefit analysis as you've | |
| 136 | 4 | just said? | |
| 136 | 5 | A:  It's because I think if you | |
| 136 | 6 | look at the VIGOR study, you're | |
| 136 | 7 | confronted with what at least in my read | |
| 136 | 8 | is a startling revelation that for every | |
| 136 | 9 | complicated perforated ulcer or bleed | |
| 136 | 10 | that Vioxx prevented, there were almost | |

Overruled,
Has been w/
FDA for 22 yrs
He is scientist
(senior) advisor
Both an MD &
epidemiologist
assoc director
of drug safety

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|
| 136 11  two thrombotic cardiovascular events that | | |
| 136 12  were caused by the drug. And so if | | |
| 136 13  you're talking about benefits and risks, | | |
| 136 14  here we have a ratio of almost two to one | | |
| 136 15  where the risks exceed the benefits. | | |
| 136 16  Now, let's look at what the | | |
| 136 17  case fatality rates are. Nationally, | | |
| 136 18  about five percent of people with GI | | |
| 136 19  bleeds die. And I learned that by going | | |
| 136 20  to the National Centers For Health | | |
| 136 21  Statistics and looking at death | | |
| 136 22  certificate data and then going to the | | |
| 136 23  National Hospital Discharge Survey and | | |
| 136 24  looking at how many hospitalizations | | |
| 137  1  there are for GI bleed. So, you have a | | |
| 137  2  five percent death rate from GI bleeding. | | |
| 137  3  In other words, you can have a GI bleed, | | |
| 137  4  that's a pretty serious thing, you get | | |
| 137  5  hospitalized for it, but most of the time | | |
| 137  6  you're not going to die. With heart | | |
| 137  7  attack, it's about a 40 percent chance | | |
| 137  8  that you're going to die. So, if what | | |
| 137  9  we're really interested in is sort of | | |
| 137 10  benefit/risk, and let's take it to what's | | |
| 137 11  the most important thing, and that's do I | | |
| 137 12  live or do I die, in my view, the scales | | |
| 137 13  are tilted greatly against Vioxx in terms | | |
| 137 14  of safety versus benefit. | | |
| 137 15  Q:  Okay. | | |
| 137 16  That risk/benefit analysis | | |
| 137 17  was or was not done by FDA? | | |
| 137 18  A:  It was not done by FDA. | | |
| 137 19  Q:  In your opinion, had it been | | |
| 137 20  done, it would have come out the way you | | |
| 137 21  suggested if it had been correctly and | | |
| 137 22  diligently and honestly done? | | |
| 137 23  A:  Yes. | | |
| | | |
| 138:3    -    141:6    Graham, David 2006-05-09 | | |
| 138  3  BY MR. KLINE: | | |
| 138  4  Q:  I'm reminded to ask, was | | |
| 138  5  that risk/benefit done by the company, by | | |
| 138  6  Merck? | | |
| 138  7  A:  To my knowledge, it was not. | | |
| 138  8  And I could cite as evidence of that the | | |
| 138  9  VIGOR study. And in the VIGOR study, | | |
| 138 10  there's no real mention of weighing the | | |
| 138 11  benefits and the risks in that study. | | |
| 138 12  It's kind of implied that the benefits | | |
| 138 13  exceed the risks, but there's no formal | | |
| 138 14  analysis of it. | | |
| 138 15  And it's also very curious | | |
| 138 16  that in that paper, the most likely | | |
| 138 17  explanation for the finding wasn't | | |
| 138 18  addressed, which is the effect of Vioxx | | |
| 138 19  on prostacyclin, which is the chemical | | |
| 138 20  made by the body that causes blood | | |

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

138 21 vessels to dilate and keeps platelets
138 22 from clotting. And what Vioxx does is,
138 23 it blocks the production of prostacyclin
138 24 and makes it more likely that a heart
139 1 attack can happen. And in that VIGOR
139 2 study, which was published in the New
139 3 England Journal of Medicine and got a lot
139 4 of press, there's not a single word or
139 5 mention or reference to this
139 6 pharmacologic fact that was well known
139 7 throughout the medical community by this
139 8 time and was published in the literature.
139 9 And it was well known to the FDA medical
139 10 officer in her NDA review which preceded
139 11 the publication of the VIGOR study.
139 12 Q: Was it all the more
139 13 significant as to Vioxx, and I know
139 14 you've talked about this, sir, the fact
139 15 that there were, I think it's in your
139 16 article, the fact that there were 106
139 17 million prescriptions of Vioxx during the
139 18 lifetime of Vioxx from '99 to '04?
139 19 A: In the United States,
139 20 correct.
139 21 Q: What is the significance --
139 22 and used by how many people to your
139 23 understanding?
139 24 A: Estimates that I've seen
140 1 range to about 20 million in the United
140 2 States.
140 3 Q: What is the significance of
140 4 this story -- in this story, we're going
140 5 to go into this in detail in a moment.
140 6 What's the significance in terms of all
140 7 of that usage, both premarketing and then
140 8 after the drug was marketed, the fact
140 9 that it was going to be used by --
140 10 A: Well --
140 11 Q: -- literally over a hundred
140 12 million prescriptions?
140 13 A: Right. The fact that the
140 14 drug was going to be used widely and that
140 15 it was used widely means that the
140 16 exposure to potential harm was very large
140 17 at a population level. So, at a
140 18 population level, if we were saying, oh,
140 19 only 1,000 people or 10,000 people got
140 20 this drug, well, the number of people who
140 21 could be injured as a result, that
140 22 absolute number, would be relatively
140 23 small. But when you give a drug to 20
140 24 million people, you multiply the numbers
141 1 of people who can be affected. So,
141 2 that's -- from a public health
141 3 perspective, that is why I considered
141 4 this to be a public health catastrophe.
141 5 Q: Was it indeed -- was Vioxx

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|
| 141  6   indeed a public health catastrophe? | | |

**— 143:2**    Graham, David 2006-05-09

| | | |
|---|---|---|
| 141  8   THE WITNESS:  Yes. | | |
| 141  9   BY MR. KLINE: | | |
| 141  10   Q:  Why, sir? | | |
| 141  11   A:  Vioxx, in my opinion, was a | | |
| 141  12   public health catastrophe because, A, it | | |
| 141  13   was a toxic drug that had severe | | |
| 141  14   cardiovascular effects raising -- | | |
| 141  15   increasing the risk of heart attack. | | |
| 141  16   Two, heart attack is like | | |
| 141  17   one of the leading causes of death in the | | |
| 141  18   United States, so, the rate of it is | | |
| 141  19   pretty high. If I have a drug that | | |
| 141  20   increases the rate of something that | | |
| 141  21   already happens at a high rate, I'm | | |
| 141  22   multiplying two high numbers by each | | |
| 141  23   other, and that's going to mean that lots | | |
| 141  24   of people will probably have heart | | |
| 142  1   attacks. | | |
| 142  2   Three, the typical person | | |
| 142  3   with osteoarthritis or rheumatoid | | |
| 142  4   arthritis who was going to get Vioxx is | | |
| 142  5   somebody who is older. And older people | | |
| 142  6   have other risk factors for heart | | |
| 142  7   disease. If your typical Vioxx user is | | |
| 142  8   somebody in their 60s, well, if they are | | |
| 142  9   male, they've got their gender is a risk | | |
| 142  10   factor for heart attack, their age is a | | |
| 142  11   risk factor for heart attack, and if you | | |
| 142  12   look nationally at statistics on health | | |
| 142  13   of Americans, they will also have at | | |
| 142  14   least one of the following: they'll have | | |
| 142  15   high blood pressure, high cholesterol, | | |
| 142  16   diabetes or they'll smoke. So, right off | | |
| 142  17   the bat, this drug is going to be | | |
| 142  18   marketed -- your typical patient that is | | |
| 142  19   getting this drug is going to be somebody | | |
| 142  20   who has two or three risk factors for | | |
| 142  21   heart disease already. So, you put all | | |
| 142  22   these things together and then you | | |
| 142  23   multiply it by the fact that I'm giving | | |
| 142  24   it to 20 million people, and it's just | | |
| 143  1   simple mathematics that you've got a | | |
| 143  2   formula for disaster. | | |

**158:7    -    159:8**    Graham, David 2006-05-09

| | | |
|---|---|---|
| 158  7   Q:  Would you give us your | | |
| 158  8   overview and your understanding of the | | |
| 158  9   Vioxx story? | | |
| 158  10   A:  Well, Vioxx was approved in | | |
| 158  11   1999. In November 2000, a study was | | |
| 158  12   published in the New England Journal of | | |
| 158  13   Medicine called VIGOR, which was a study | | |
| 158  14   performed by Merck showing that Vioxx | | |

| | Objections/Responses in Mason | Rulings In Smith/Barnett |
|---|---|---|

158 15  reduced the occurrence of perforations,
158 16  ulcers and bleeds in the gastrointestinal
158 17  tract compared to naproxen therapy, but
158 18  also that it increased the risk of heart
158 19  attack by about a factor of five compared
158 20  to naproxen.
158 21  At that point then, the
158 22  article that got published in the New
158 23  England Journal of Medicine, rather than
158 24  talking about Vioxx increasing the risk
159  1  of heart attack, it actually changed the
159  2  way it did the analysis. And I thought
159  3  that this was really a misleading aspect
159  4  of the way they went about things.
159  5  When you do a scientific
159  6  study --
159  7  Q:  'They' being?
159  8  A:  'They' being Merck.

160:8  -  168:1  Graham, David 2006-05-09
160  8  Whenever you do a clinical
160  9  trial or a study, you have what's called
160 10  a reference group or a control group.
160 11  Frequently in a clinical trial, that will
160 12  be a placebo, which is a sugar pill. In
160 13  the VIGOR study, it was naproxen, which
160 14  is another pain reliever. When you have
160 15  a comparator and you have an experimental
160 16  treatment, in this case, Vioxx was the
160 17  experimental treatment, when you do your
160 18  analysis, you are supposed to put the
160 19  results for the experimental treatment,
160 20  in this case, Vioxx, in the numerator of
160 21  a ratio, and your reference, naproxen, in
160 22  the denominator. When the evidence was
160 23  presented on perforations, ulcers and
160 24  bleeds, that's the way the information
161  1  was presented. It was presented in the
161  2  classically accepted way, and it showed
161  3  that the risk of ulcers, et cetera, was
161  4  about one half, about .5, 50 percent that
161  5  of naproxen.
161  6  When it came to presenting
161  7  the heart attack risks, it flipped it
161  8  around.
161  9  Q:  'It' being who?
161 10  A:  The company, Merck. They
161 11  flipped it around, and they put -- and
161 12  now in talking about heart attacks, they
161 13  put the risk of heart attack in naproxen
161 14  patients, which is the comparator, the
161 15  reference group, they put that in the
161 16  numerator, and they put Vioxx in the
161 17  denominator, and it should have been the
161 18  other way around. But by doing this,
161 19  then the number that you get is .2. So,
161 20  what they could say was, oh, the heart

| | Objections/Responses In Mason | Rulings in Smith/Barnett |
|---|---|---|

161 21 attack risk with naproxen is 20 percent
161 22 that of Vioxx, rather than having to say
161 23 the risk of heart attack with Vioxx is
161 24 five times higher than it was with
162  1 naproxen.
162  2 It may seem like a minor
162  3 point, but it's really, I think,
162  4 fundamental, at least in my
162  5 understanding, of the study, because by
162  6 misrepresenting that information, it then
162  7 flows into what I would call the naproxen
162  8 hypothesis. And in the VIGOR study, what
162  9 Merck proposed was that naproxen
162 10 protected against heart attack. Even
162 11 though Vioxx had five times higher rate
162 12 of heart attack than naproxen, what they
162 13 said was, is here's Vioxx, here's
162 14 naproxen, what they said is, well, Vioxx
162 15 is normal, there's no increased risk
162 16 here, what it is is naproxen protects
162 17 against heart attack. And they cited one
162 18 reference to support that, and it was a
162 19 study that Merck itself had done in 22
162 20 patients where they had given them
162 21 naproxen, taken blood samples from them,
162 22 and then did experiments in test tubes to
162 23 see what effect it had on the way their
162 24 platelets worked.
163  1 Well, this information,
163  2 subsequently the FDA basically said that
163  3 doesn't prove anything because there are
163  4 no controlled clinical trials to show
163  5 that naproxen protects against heart
163  6 attack. But the argument was that
163  7 naproxen protects against heart attack.
163  8 And that was the argument in VIGOR.
163  9 To me, what was -- when I
163 10 read that, there were two things that
163 11 really sort of struck me. One was that a
163 12 five-fold difference in heart attack risk
163 13 is something quite high and something
163 14 that you really have to pay attention to
163 15 because heart attack is such a serious
163 16 disorder, and it's so very common.
163 17 The second thing was that
163 18 just on the face of it, this notion of
163 19 naproxen being protective, I was highly
163 20 skeptical of it, and as a matter of fact,
163 21 so were my office leadership, including
163 22 Peter Honig, who is now at Merck, but was
163 23 my office director then, and Marty
163 24 Himmel, who is now at Merck, but was his
164  1 deputy office director. We were
164  2 skeptical of the naproxen hypothesis. We
164  3 were skeptical for the following reasons
164  4 -- I was skeptical for the following
164  5 reasons:

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

| | | |
|---|---|---|
| 164  6 | 1. Naproxen has been on the | |
| 164  7 | market for over 30 years. | |
| 164  8 | 2. Naproxen had been used | |
| 164  9 | in many, many, many clinical trials, and | |
| 164 10 | nobody had ever reported this phenomenal | |
| 164 11 | heart-protecting effect before. | |
| 164 12 | 3. There were -- and we | |
| 164 13 | talk about 100 million prescriptions or | |
| 164 14 | 106 million prescriptions for Vioxx. | |
| 164 15 | There were probably way, way more of that | |
| 164 16 | of naproxen over the 30 years that it's | |
| 164 17 | been on the market, so, there's | |
| 164 18 | widespread use. | |
| 164 19 | And then, finally, if | |
| 164 20 | naproxen had had that kind of protective | |
| 164 21 | effect that Merck was claiming in the | |
| 164 22 | VIGOR study, it would have had to have | |
| 164 23 | been about three times better than | |
| 164 24 | aspirin at preventing heart attacks. And | |
| 165  1 | aspirin has been well studied in clinical | |
| 165  2 | trials. It reduces heart attack risks | |
| 165  3 | probably on average about 25 percent, and | |
| 165  4 | that's viewed pretty much as sort of a | |
| 165  5 | wonder drug. Aspirin is a wonder drug. | |
| 165  6 | Well, here Merck comes with | |
| 165  7 | the VIGOR study and says naproxen is | |
| 165  8 | three times better than the wonder drug | |
| 165  9 | aspirin. And to me it just failed the | |
| 165 10 | straight face test and so -- | |
| 165 11 | Q:  The straight face test? | |
| 165 12 | A:  Yes. Does it have sort of | |
| 165 13 | face validity? Can you believe it on its | |
| 165 14 | face. And on the face, to me as the | |
| 165 15 | experienced drug safety scientist, I was | |
| 165 16 | just highly skeptical of that. | |
| 165 17 | Plus you have the underlying | |
| 165 18 | biology of how Vioxx works that would | |
| 165 19 | lead one to expect that it might increase | |
| 165 20 | the risk of heart attack. And, in fact, | |
| 165 21 | it's really funny how the VIGOR study | |
| 165 22 | words this. You know, the argument that | |
| 165 23 | is sort of commonly in the literature | |
| 165 24 | talking about heart attack risk with the | |
| 166  1 | COX-2 inhibitors talks about prostacyclin | |
| 166  2 | being decreased by drugs like Vioxx, | |
| 166  3 | leaving thromboxane, which causes | |
| 166  4 | clotting, unopposed. So, there's an | |
| 166  5 | excess of it. There's sort of a balance, | |
| 166  6 | and now there's too much thromboxane. | |
| 166  7 | In VIGOR, Merck said, well, | |
| 166  8 | we were interested in cardiovascular | |
| 166  9 | risk, but their argument was because | |
| 166 10 | naproxen -- because Vioxx wouldn't affect | |
| 166 11 | platelet clotting and so -- but naproxen | |
| 166 12 | would. And so we thought there might be | |
| 166 13 | a difference. So, they sort of took the | |
| 166 14 | converse of what was sort of like | |

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

166 15   obviously on everybody -- this was
166 16   something that everybody was talking
166 17   about, at least in the literature. And
166 18   subsequently it became sort of a real
166 19   focus of research.
166 20   In any event, it was based
166 21   on reading that study and being highly
166 22   skeptical of it and recognizing that if
166 23   the high doses caused heart attack at a
166 24   five-fold increase, well, this thing
167  1   called dose response, well, there's a 25
167  2   milligram dose and a 12-and-a-half
167  3   milligram dose. 25 milligram dose is the
167  4   most commonly used dose. With dose
167  5   response, if you get an effect with a
167  6   high dose, what dose response says is,
167  7   well, you might also have an effect with
167  8   the lower dose. It won't be as big an
167  9   effect. So, the question is, is there a
167 10   heart attack risk with lower dose. And
167 11   that was something that wasn't even
167 12   addressed in the VIGOR study in the
167 13   discussion. In the discussion, it was
167 14   something that one could have brought up,
167 15   but it wasn't brought up. In my view,
167 16   the discussion was unbalanced.
167 17   In any event, taking all
167 18   those things together, I thought that it
167 19   was important that we try to do another
167 20   study to examine the heart attack risks
167 21   with Vioxx.
167 22   Q:  And that's how you got
167 23   involved?
167 24   A:  And that's how I got
168  1   involved.

169:16  -  171:23   Graham, David 2006-05-09
169 16   BY MR. KLINE:
169 17   Q:  So, you made -- you
169 18   presented this PowerPoint at numerous
169 19   professional meetings, correct --
169 20   A:  Right. This is from --
169 21   Q:  -- including the ISPE
169 22   conference in 2005; is that correct?
169 23   A:  That's correct.
169 24   Q:  That's the International
170  1   Society of Pharmacoepidemiologists?
170  2   A:  Correct.
170  3   Q:  A worldwide organization; is
170  4   that correct?
170  5   A:  Yes.
170  6   Q:  And by the way, you've been
170  7   asked to publicly appear at conferences
170  8   like that in your professional capacity,
170  9   correct?
170 10   A:  Yes, I have.
170 11   Q:  A group of your colleagues,

| | Objections/Responses in Mason | Rulings In Smith/Barnett |
|---|---|---|

170 12     international epidemiologists from all
170 13     over the world, would hear your views
170 14     that you're telling this jury, correct?
170 15     A: Correct.
170 16     Q: All right.
170 17     Now, the theoretical
170 18     concern. What have you publicly said
170 19     about that before?
170 20     A: The theoretical concern was
170 21     that Vioxx would reduce or inhibit
170 22     prostacyclin and lead to an excess of
170 23     thromboxane, which would result in a
170 24     tendency for blood clots and
171 1     theoretically cardiovascular events such
171 2     as heart attack or stroke.
171 3     Q: Known to Merck back in 1999?
171 4     A: I would assume that it had
171 5     to have been. If it's known to the
171 6     medical officer who did this review, it
171 7     most certainly would have had to have
171 8     been known to Merck.
171 9     Q: And you looked at the
171 10     review, and once you got into -- you
171 11     looked into the history of it once you
171 12     got interested in the subject based on
171 13     naproxen, correct?
171 14     A: Actually, this particular
171 15     slide that we're looking at -- actually,
171 16     I began looking at this subsequent. At
171 17     the time that we were planning our study,
171 18     this wasn't something that I had focused
171 19     on.
171 20     Q: In the early period, did the
171 21     FDA know and appreciate that there were
171 22     high-risk patients that were excluded
171 23     from the study?

172:2   -   172:3    Graham, David 2006-05-09
172 2     BY MR. KLINE:
172 3     Q: Did Merck understand that?

172:6   -   173:8    Graham, David 2006-05-09
172 6     THE WITNESS: It is clear
172 7     from the way the studies are
172 8     described that patients at high
172 9     risk of experiencing
172 10     cardiovascular events were
172 11     excluded from the study, and since
172 12     that's written in the VIGOR study,
172 13     I have to assume that Merck was
172 14     fully aware and that it was
172 15     intentional.
172 16     - - -
172 17     (Whereupon, Deposition
172 18     Exhibit Graham-3, 'Rofecoxib
172 19     Diagnosis and Treatment: What

|  | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

| | |
|---|---|
| 172 20 | went wrong? Can we avoid?' |
| 172 21 | (Graham)  PowerPoint Slides, |
| 172 22 | DG000014 - DG000034, was marked |
| 172 23 | for identification.) |
| 172 24 | - - - |
| 173  1 | BY MR. KLINE: |
| 173  2 | Q:  I'm going to mark another |
| 173  3 | Powerpoint which you presented to the |
| 173  4 | International Society of |
| 173  5 | Pharmacoepidemiologists. They had their |
| 173  6 | conference in 2005 in Nashville, |
| 173  7 | Tennessee, correct? |
| 173  8 | A:  Yes. |

174:11  -  174:20    Graham, David 2006-05-09

| | |
|---|---|
| 174 11 | Q:  And were Merck -- are Merck |
| 174 12 | representatives always at the |
| 174 13 | International Society of |
| 174 14 | Pharmacoepidemiology? |
| 174 15 | A:  Well, I know that at this |
| 174 16 | particular meeting, several people from |
| 174 17 | Merck were there because they're |
| 174 18 | professional colleagues. So, we had |
| 174 19 | conversations during the meeting, and I |
| 174 20 | know that they attended this session. |

175:1  -  176:24    Graham, David 2006-05-09

| | |
|---|---|
| 175  1 | Q:  Now, in it, and I just want |
| 175  2 | to focus you on the slide that's entitled |
| 175  3 | VIGOR:  deja vu all over again,' what |
| 175  4 | were you telling your fellow members of |
| 175  5 | the International Society of |
| 175  6 | Pharmacoepidemiologists? |
| 175  7 | A:  Which slide number are you |
| 175  8 | on? |
| 175  9 | Q:  Number 24. |
| 175 10 | A:  Oh, here what I was talking |
| 175 11 | about was trying to make a little joke |
| 175 12 | about Yogi Berra and deja vu, but what I |
| 175 13 | was trying to talk about here is the |
| 175 14 | evidence that was accruing on Vioxx and |
| 175 15 | heart attack risks and FDA's response, |
| 175 16 | which in my experience has been to |
| 175 17 | downplay or ignore those risks and to let |
| 175 18 | things get worse in a sense to, let the |
| 175 19 | problem continue unabated. So, that's |
| 175 20 | basically what I was, I think, trying to |
| 175 21 | convey there. |
| 175 22 | Q:  Understood. |
| 175 23 | Now, if you'd go to slide |
| 175 24 | number 29, this is something I'd like to |
| 176  1 | display. And regardless of whether the |
| 176  2 | display is there or not, the fact of the |
| 176  3 | matter is that you have used and you've |
| 176  4 | given this jury an explanation of the |
| 176  5 | naproxen and whether it was a plausible |
| 176  6 | explanation for the VIGOR results. That |

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

176  7    is what you've done so far, correct?
176  8    A:  Correct.
176  9    Q:  What did you call it
176 10    publicly, sir, the naproxen --
176 11    A:  I called it an alibi.
176 12    Q:  What is an alibi, sir?
176 13    A:  Well, I'm not a lawyer, but
176 14    what I meant was, it's sort of an excuse
176 15    to explain away an uncomfortable
176 16    situation.
176 17    Q:  What did you mean when you
176 18    described -- and I assume you're talking
176 19    about Merck's explanation later published
176 20    in the New England Journal that naproxen
176 21    was cardioprotective and thereby
176 22    explained the results of the VIGOR trial.
176 23    Is that what you were talking about?
176 24    A:  That is correct.

177:5   -   178:3   Graham, David 2006-05-09
177  5    My question is, what in that
177  6    context did you mean by the 'naproxen
177  7    alibi,' sir?
177  8    A:  What I meant was that there
177  9    was -- it was much more likely based on
177 10    the available evidence at the time that
177 11    Vioxx was increasing the risk of heart
177 12    attack than that naproxen was protecting
177 13    against heart attack, but that pointing
177 14    to naproxen saying it protects against
177 15    heart attacks is an alibi. It's
177 16    basically to say it's not Vioxx that's
177 17    causing the heart attacks, it's naproxen
177 18    that's protecting against heart attacks.
177 19    What I also said at this
177 20    meeting was that it resulted in a
177 21    two-year wild goose chase as people in
177 22    their research focused on addressing
177 23    naproxen and whether it affects the risk
177 24    of heart attack, rather than focusing on
178  1    Vioxx and on lower-dose Vioxx, which was
178  2    being used by increasing numbers of
178  3    patients.

**Re: [177:19-178:3]**
**Def Obj 403;**
Inappropriate second-guessing of FDA's labeling procedures.

Overruled (See ruling reasons on 135:13)

178:4   -   178:7   Graham, David 2006-05-09
178  4    Q:  That two-year wild goose
178  5    chase occurred roughly in what calendar
178  6    year?
178  7    A:   2001/2002.

178:13   -   178:21   Graham, David 2006-05-09
178 13    BY MR. KLINE:
178 14    Q:  What was going on with
178 15    labeling in that same period of time,
178 16    sir?
178 17    A:  Nothing was happening with
178 18    labeling, at least nothing visible.

**Re: [178:14-178:21]**
**Def Obj 403;**
Inappropriate second-guessing of FDA's labeling procedures.

Overruled

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|
| | | | |

178 19    Q: Was it your words when you
178 20    described it, those two years, as a wild
178 21    goose chase?

178:23 - 179:6    Graham, David 2006-05-09
178 23    THE WITNESS: My reference
178 24    to wild goose chase was to the
179 1    efforts by the scientific
179 2    community to investigate what has
179 3    subsequently been shown, I think,
179 4    unequivocally to be an untruth,
179 5    which is that naproxen does not
179 6    protect against heart attack.

**Re: [178:23-179:6]**
**Def Obj** 403;
Inappropriate second-
guessing of FDA's
labeling procedures.

*Overruled*

179:7 - 179:13    Graham, David 2006-05-09
179 7    There are now, I think, 18 or 19
179 8    published observational studies
179 9    that have looked at this. And
179 10    four of them say that naproxen is
179 11    protective. Four of them say it
179 12    increases the risk. And the
179 13    others say there's no difference.

**Re: [179:7-179:13]**
**Pltf Obj** Incomplete
answer

*Overruled*

182:6 - 182:13    Graham, David 2006-05-09
182 6    BY MR. KLINE:
182 7    Q: What is the bottom line,
182 8    bottom, bottom line on the science of
182 9    whether naproxen is cardioprotective and
182 10    whether this was an alibi?
182 11    A: Naproxen is not
182 12    cardioprotective, never was, and it
182 13    isn't.

222:11 - 222:14    Graham, David 2006-05-09
222 11    BY MR. KLINE:
222 12    Q: In your view, did the
222 13    benefits clearly exceed the risk or
222 14    exceed them at all?

**Re: [222:12-222:14]**
**Def Obj** 403; Second-
guessing FDA's decision
to approve Vioxx and
failure to demand
withdrawal after VIGOR
(see Motion in Limine).

*Overruled*

222:16 - 222:20    Graham, David 2006-05-09
222 16    THE WITNESS: No. The
222 17    benefits did not exceed the risks.
222 18    BY MR. KLINE:
222 19    Q: In fact, was it the
222 20    opposite?

**Re: [222:16-222:20]**
**Def Obj** 403; Second-
guessing FDA's decision
to approve Vioxx and
failure to demand
withdrawal after VIGOR
(see Motion in Limine).

[222:19-224:1]
Overruled

*Overruled*

222:22 - 224:5    Graham, David 2006-05-09
222 22    THE WITNESS: This drug was
222 23    risky. And the benefits that one
222 24    gained at a population level for
223 1    the risks just weren't worth it.
223 2    The juice wasn't worth the
223 3    squeeze, and in my view, as I said
223 4    before, I think that Vioxx was
223 5    approved prematurely, and clearly
223 6    if more work had been done,

**Re: [222:22-224:5]**
**Def Obj** 403; Second-
guessing FDA's decision
to approve Vioxx and
failure to demand
withdrawal after VIGOR
(see Motion in Limine).

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

223  7   certainly the high dose shouldn't
223  8   have been approved. And if it had
223  9   been approved, it should have been
223 10   withdrawn with the VIGOR study.
223 11   And at that point, intensive study
223 12   at the lower doses should have
223 13   been enacted with a very large
223 14   clinical trial done in a very
223 15   short space of time to nail down
223 16   the question. And I'm not talking
223 17   about an APPROVe-like study that
223 18   takes four or five years to do and
223 19   has only five or six heart attacks
223 20   in six months. I'm talking about
223 21   a really huge study that gives you
223 22   the opportunity, the power, to
223 23   answer the question definitively.
223 24   And that was not done.
224  1   BY MR. KLINE:
224  2   Q: Everything of what you just
224  3   said, sir, was it within the resources
224  4   and capability of Merck & Company?
224  5   A: Yes, it was.

[224:2-224:5]
Overruled

Overruled

227:8   -   227:13   Graham, David 2006-05-09
227  8   Q: Dr. Graham, you talked a
227  9   little bit on direct examination about
227 10   your medical training as well as your
227 11   training as an epidemiologist. Do you
227 12   practice medicine now?
227 13   A: No, I do not.

228:16   -   228:21   Graham, David 2006-05-09
228 16   Q: So, for the last 15 years,
228 17   you have been focusing pretty much
228 18   exclusively on epidemiology and drug
228 19   safety rather than practicing medicine;
228 20   is that correct?
228 21   A: Correct.

251:14   -   251:24   Graham, David 2006-05-09
251 14   Q: Another subject that you
251 15   discussed on direct examination is what
251 16   you call the naproxen myth. Do you
251 17   remember that?
251 18   A: Uh-huh.
251 19   Q: And that's a phrase that you
251 20   used in a couple of these PowerPoints
251 21   that were dated from 2005, right?
251 22   A: It's possible. I mean, I
251 23   don't have them in front of me, but it's
251 24   certainly possible.

252:1   -   252:24   Graham, David 2006-05-09
252  1   Q: Well, you had one of them in
252  2   front of you before --
252  3   A: That said 'alibi,' not myth.

|  |  | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

| 252 | 4 | Q: Oh, I'm sorry, naproxen |
| 252 | 5 | alibi. I stand corrected there. |
| 252 | 6 | Now, when you were writing |
| 252 | 7 | scientific articles in 2003 and 2004 and |
| 252 | 8 | you discussed this hypothesis of naproxen |
| 252 | 9 | being cardioprotective, you didn't call |
| 252 | 10 | it an alibi then, did you? |
| 252 | 11 | A: No. It's a different |
| 252 | 12 | audience. |
| 252 | 13 | Q: In fact, well, the audience |
| 252 | 14 | that you are writing for in scientific |
| 252 | 15 | publications are other scientists and |
| 252 | 16 | doctors, right? |
| 252 | 17 | A: Correct. |
| 252 | 18 | Q: And when you were writing in |
| 252 | 19 | scientific publications for other |
| 252 | 20 | scientists and doctors, what you said was |
| 252 | 21 | that the naproxen hypothesis was one of |
| 252 | 22 | the possible explanations for the |
| 252 | 23 | difference that was seen in the VIGOR |
| 252 | 24 | trial between Vioxx and naproxen |

253:1    -    253:5    Graham, David 2006-05-09
| 253 | 1 | patients, isn't that right, sir? |
| 253 | 2 | A: A very low possibility. |
| 253 | 3 | Q: Let's look at what you |
| 253 | 4 | actually said. |
| 253 | 5 | - - - |

253:18    -    253:24    Graham, David 2006-05-09
| 253 | 18 | Is Exhibit 8 a 2003 |
| 253 | 19 | publication? |
| 253 | 20 | A: Yes, based on a talk from |
| 253 | 21 |  | 2002 |
| 253 | 22 | Q: And the first named author |
| 253 | 23 | on here is Wayne Ray. Do you see that? |
| 253 | 24 | A: Yes. |

254:1    -    254:8    Graham, David 2006-05-09
| 254 | 1 | Q: He, I think, was the person |
| 254 | 2 | that you said you recruited to help on |
| 254 | 3 | the Kaiser Permanente study that you |
| 254 | 4 | headed up, right? |
| 254 | 5 | A: Yes. |
| 254 | 6 | Q: And then also you're listed |
| 254 | 7 | as an author; is that right? |
| 254 | 8 | A: Correct. |

254:15    -    254:24    Graham, David 2006-05-09
| 254 | 15 | In this 2003 article of |
| 254 | 16 | yours and Dr. Ray's and the others, I see |
| 254 | 17 | you say that 'The VIGOR trial enrolled |
| 254 | 18 | 8076 patients with rheumatoid arthritis, |
| 254 | 19 | who were randomly assigned to rofecoxib' |
| 254 | 20 | -- that's Vioxx, right? |
| 254 | 21 | A: Uh-huh. |
| 254 | 22 | Q: -- '(50 milligrams...) or |

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

254 23    naproxen, an established non-selective
254 24    NSAID.' And then do you say, 'MI' --

255:1  -  255:24    Graham, David 2006-05-09
255  1    now, first of all, what does MI stand
255  2    for?
255  3    A:  That's myocardial
255  4    infarction.
255  5    Q:  Is that the same thing as a
255  6    heart attack in common language?
255  7    A:  Correct. Yes.
255  8    Q:  Okay.
255  9    So, a heart attack 'occurred
255 10    in .4 percent of patients receiving
255 11    rofecoxib compared to .1 percent of
255 12    patients receiving naproxen. These data
255 13    may reflect an increased risk of' heart
255 14    attack 'associated with rofecoxib;' being
255 15    Vioxx, 'a decreased risk associated with
255 16    naproxen; or a combination of both
255 17    effects.'
255 18    Do you see that?
255 19    A:  Uh-huh.
255 20    Q:  And then did you go on to
255 21    say that there were two recent published
255 22    studies that looked at 'whether naproxen
255 23    has a protective effect on the risk of
255 24    coronary heart disease'?

256:1  -  256:24    Graham, David 2006-05-09
256  1    A:  Uh-huh.
256  2    Q:  And this thing that you
256  3    called an alibi today, back in 2003, did
256  4    you report that both of those studies
256  5    that you referred to there actually
256  6    reported a reduction in the risk of heart
256  7    attacks for people who were using
256  8    naproxen?
256  9    A:  Well, a couple of things.
256 10    Q:  Did you say that or not,
256 11    sir?
256 12    A:  That is not what I said.
256 13    This paper represented a combined
256 14    distillation of, I guess it was four
256 15    different talks presented at a symposium.
256 16    And they frequently -- what they do is
256 17    they have one session and they condense
256 18    them into a single paper, and then they
256 19    list everybody as an author. And this
256 20    material was from someone other than me
256 21    in the section that I was presenting on.
256 22    Q:  Who was it from?
256 23    A:  I'd have to go back to the
256 24    topic headings of what the different

257:1  -  257:24    Graham, David 2006-05-09
257  1    people, the four different speakers had,

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

257  2   what their speaking assignment was. My
257  3   speaking assignment at this meeting was
257  4   to talk about the association of
257  5   high-dose rofecoxib and hypertension.
257  6   Q:  Let me ask, when your name
257  7   is listed as an author on an article like
257  8   this, do you have a chance to review the
257  9   whole article and decide whether you want
257 10   to be associated with the comments that
257 11   are made in there?
257 12   A:  You get copies of articles
257 13   like this. When I got it, I only really
257 14   read the section that was my purview, and
257 15   I really didn't read the other sections.
257 16   Q:  Is this the first time that
257 17   you understood or knew that your name was
257 18   on a scientific article that said that
257 19   heart attacks may reflect a decreased
257 20   risk associated with naproxen?
257 21   A:  Well, I mean, I knew my name
257 22   was on the paper. I hadn't read that
257 23   closely. The studies that are referenced
257 24   are studies that I talked about during

258:1   -   258:7   Graham, David 2006-05-09
258  1   the previous part of the deposition that
258  2   are analyzed incorrectly and so really
258  3   don't show reductions in cardiovascular
258  4   risk with naproxen, but in any event.
258  5   Q:  Did you ever ask that your
258  6   name be removed from this article?
258  7   A:  No, I did not.

258:20   -   258:24   Graham, David 2006-05-09
258 20   Q:  Please take a look at what
258 21   we've marked as Exhibit 9. Is Exhibit 9
258 22   a copy of a scientific article that has
258 23   your name on it as one of the authors?
258 24   A:  Yes.

259:1   -   259:24   Graham, David 2006-05-09
259  1   Q:  Now, before we get into
259  2   Exhibit 9, is this one -- well, Dr. Ray
259  3   is on this one also, right?
259  4   A:  Correct.
259  5   Q:  So, a bunch of other authors
259  6   and you and Dr. Ray. Is this one where
259  7   everybody just gave speeches and you
259  8   didn't read it closely?
259  9   A:  No, no. No. This was a
259 10   real study.
259 11   Q:  This was a real study?
259 12   A:  Yes.
259 13   Q:  Okay.
259 14   Well, looking down then at
259 15   the first page of -- I'm sorry, we'll go
259 16   over to the fourth page of what you

Re: [259:5-259:8]
**Pltf Obj** Argumentative

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

259 17    called the real study that you and Dr.
259 18    Ray were both authors on.
259 19    This language that I've
259 20    blown up here from the right-hand column
259 21    at the bottom, did you and Dr. Ray say,
259 22    The cause of the excess of serious
259 23    cardiovascular events in the VIGOR trial
259 24    is still a matter of debate'? Is that

260:1    -    260:24    Graham, David 2006-05-09
260  1    what you said in the scientific study in
260  2    2004?
260  3    A:  Yes.
260  4    Q:  And it says, 'A recent
260  5    observational study reported a higher
260  6    rate of cardiovascular events in
260  7    high-dose rofecoxib users.' That would
260  8    be the 50 milligrams; is that right?
260  9    A:  That's what -- well, I'm
260 10    just looking at the reference for that,
260 11    and that would be, I think, any dose that
260 12    was over 25 milligrams. So, there are
260 13    people who take 37-and-a-half milligrams.
260 14    Q:  Okay.
260 15    Are there very many people
260 16    who take that?
260 17    A:  I don't know. I don't know
260 18    the number.
260 19    Q:  Okay.
260 20    Anyway, over 25.
260 21    It says, 'A recent
260 22    observational study recorded a higher
260 23    rate of cardiovascular events in
260 24    high-dose rofecoxib users compared to

261:1    -    261:24    Graham, David 2006-05-09
261  1    users of other NSAIDs and users of lower
261  2    doses of rofecoxib.' It says 'To date,
261  3    lower doses' -- that's talking about
261  4    Vioxx, right?
261  5    A:  Uh-huh.
261  6    Q:  'To date,' you and Dr. Ray
261  7    say, 'lower doses' of Vioxx 'have not
261  8    been associated with a statistically
261  9    significant excess of these types of
261 10    serious events.'
261 11    Is that what you said to the
261 12    scientific and medical community in 2004?
261 13    A:  It's based on the published
261 14    literature, yes.
261 15    Q:  And then you go on to say,
261 16    Since the 50 milligram dose has
261 17    clinically significant undesirable
261 18    effects and has not been shown to be more
261 19    effective than lower doses' -- that's
261 20    more effective than lower doses of Vioxx,
261 21    right?

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

```
261 22        A:  Uh-huh.
261 23        Q:  -- 'chronic use of high-dose
261 24        rofecoxib should be discouraged.'

262:1   -   262:24   Graham, David 2006-05-09
262  1        Do you see that?
262  2        A:  Uh-huh.
262  3        Q:  Now, today what you said was
262  4        that back in 2004, you were clamoring
262  5        that 50 milligrams should be withdrawn
262  6        from the market. Do you remember that?
262  7        A:  I don't remember using the
262  8        word 'clamoring,' but...
262  9        Q:  No. That was my word.
262 10        You said you were urging
262 11        that 50 milligrams -- what you said today
262 12        was that back in 2004, Dr. Graham was
262 13        urging that 50 milligrams should be
262 14        withdrawn from the market, right?
262 15        A:  I don't think I used the
262 16        word 'urge,' but I thought that the
262 17        50-milligram strength should come off the
262 18        market, yes.
262 19        Q:  But in the actual scientific
262 20        publication that you and Dr. Ray authored
262 21        in 2004, what you said, all you said
262 22        about 50 milligrams was that chronic use
262 23        of high-dose Vioxx should be discouraged,
262 24        right?

263:1   -   263:21   Graham, David 2006-05-09
263  1        A:  Well, yes, but a couple
263  2        things. One, the paper was published
263  3        online in July of 2003; and, two, that
263  4        the paper was submitted in November of
263  5        2002. And basically -- and then the
263  6        third thing is, is I'm not the senior
263  7        author, and so for things like this, I
263  8        certainly couldn't disagree with the
263  9        statement that chronic use of high-dose
263 10        should be discouraged. I would take it a
263 11        step further.
263 12        Back in 2002, I think that
263 13        the VIGOR study provided enough evidence
263 14        to seriously question Vioxx remaining on
263 15        the market.
263 16        Q:  But that's not what you said
263 17        in the article that you published two
263 18        years later in print and a year later
263 19        online, is it, sir?
263 20        A:  No, but I'm not the first
263 21        author.

267:2   -   267:19   Graham, David 2006-05-09
267  2        Q:  And on the Ray article, were
267  3        you an author of the Ray article as well,
267  4        just not the first author?
```

Re: [262:3-262:9]
Pltf Obj Argumentative

overruled
(under cross)

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

267  5    A:  No. I was not a co-author
267  6    on that article.
267  7    Q:  Okay.
267  8    So, your colleague, Dr. Ray,
267  9    who you later worked with on the Kaiser
267 10    study, he had done an epidemiological
267 11    study looking at the effects of taking
267 12    Vioxx, right?
267 13    A:  Uh-huh.
267 14    Q:  And focusing on the 25
267 15    milligrams and less, basically what he
267 16    found, when it's 1.02, a 1 would mean
267 17    that's just the same as not taking any
267 18    medicine at all, right?
267 19    A:  Right.

268:8   -   268:24    Graham, David 2006-05-09
268  8    This confidence interval is
268  9    the thing that is in the parenthesis
268 10    here, right?
268 11    A:  Correct.
268 12    Q:  And I hope that at trial
268 13    somebody else will describe confidence
268 14    interval because I'm not going to take
268 15    the time to do it with you today. But
268 16    you say it's consistent with being as
268 17    high as 1.37?
268 18    A:  Right.
268 19    Or as low as .76.
268 20    Q:  Or as low as .76.
268 21    So that this confidence
268 22    interval says that Vioxx 25 milligram, it
268 23    might be better than not taking any
268 24    medicine at all when it comes to heart

269:1   -   270:3    Graham, David 2006-05-09
269  1    attacks, or it might be a little worse
269  2    than not taking any medicine at all.
269  3    But, basically, the best analysis is,
269  4    it's the same thing as not taking any
269  5    medicine at all, right?
269  6    A:  That's the appropriate
269  7    interpretation of that study for that
269  8    dose.
269  9    Q:  And then in your study, the
269 10    Graham study, what year was this from?
269 11    A:  It was published in 2005,
269 12    but it was completed in 2004.
269 13    Q:  So, this is the Kaiser
269 14    Permanente study?
269 15    A:  This is the Kaiser
269 16    Permanente study.
269 17    Q:  And here you found a
269 18    relative risk of 1.23, and then this
269 19    confidence interval of going below 1,
269 20    which would make it better than no
269 21    medicine at all, up to 1.71. And from a

Re: [269:1-270:3]
Pltf Obj (End with "Yes")
Incomplete answer;
continue to 271:19

Overrule

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

269 22 statistical point of view, what this says
269 23 is that there is not a statistically
269 24 significant difference between a 25
270 1 milligram dose and not taking any
270 2 medicine at all, correct?
270 3 A: Yes. But the maximum

270:23 - 270:24 Graham, David 2006-05-09
270 23 Q: You mentioned before that
270 24 you wrote a chapter in a book on -- what

271:1 - 271:24 Graham, David 2006-05-09
271 1 was the subject of the book?
271 2 A: Well, it's called
271 3 Pharmacoepidemiology.
271 4 Q: Yeah.
271 5 And do you know that in that
271 6 book on pharmacoepidemiology, it is
271 7 stated that if you have a relative risk
271 8 of less than 2.0, that's a relatively
271 9 weak relationship?
271 10 A: It's a view that I don't
271 11 subscribe to.
271 12 Q: Do you know that that's the
271 13 view that's expressed in a book that you
271 14 wrote a chapter in?
271 15 A: A, I haven't read a chapter
271 16 where that view is expressed; and, B,
271 17 that's one chapter written by one author
271 18 in a textbook where the editor pretty
271 19 much lets you write what your point of
271 20 view is.
271 21 Q: Do you know whether your
271 22 colleague, Dr. Ray, has said under oath
271 23 that if the relative risk is less than 2,
271 24 then it's less likely than not for any

272:1 - 272:19 Graham, David 2006-05-09
272 1 particular person that Vioxx would have
272 2 contributed to a heart attack?
272 3 A: I'm not aware of anything
272 4 that Dr. Ray has said under oath.
272 5 Q: You spent a little bit of
272 6 time on direct examination concerning the
272 7 approval of Vioxx, as well as a
272 8 subsequent label change. And I just
272 9 wanted to make sure that we were clear on
272 10 this.
272 11 Did you have any personal
272 12 role whatsoever in the FDA's review of
272 13 the application that led to the approval
272 14 of Vioxx?
272 15 A: No.
272 16 Q: And did you have any role
272 17 whatsoever in reviewing proposed label
272 18 changes for Vioxx?

**Objections/Responses In Mason:**

Re: [271:21-272:4]
Pltf Obj Rule 801 and
802-Hearsay

Re: [272:1-272:19]
Pltf Obj Beyond the
scope; Plaintiff offered
no testimony about
Kaiser study or any
presentation or
publication of the results

**Rulings In Smith/Barnett:**

Sustained

Overruled

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

272 19  A: No.

2__8 - 277:19 Graham, David 2006-05-09
277 6 Q: I want to move now to the
277 7 Kaiser study. I think you described that
277 8 this is an epidemiological study, not a
277 9 clinical trial, right?
277 10 A: Correct.
277 11 Q: And what that means is that
277 12 you and your colleagues examined the
277 13 medical records from thousands or even
277 14 more patients from the HMO, and you could
277 15 see what medicines they were prescribed
277 16 and you could see what problems they had
277 17 or didn't have in their healthcare; is
277 18 that right?
277 19 A: That's correct.

287:24 - 288:9 Graham, David 2006-05-09
287 24 And I've prepared a chart,
288 1 and what I want to do is talk with you
288 2 about different statements that you made
288 3 in different publications about the
288 4 significance of 25 milligrams or below,
288 5 whether that poses a statistically
288 6 significant increase for heart attacks,
288 7 whether -- and whether above 25 does.
288 8 Are you with me?
288 9 A: Uh-huh.

290:16 - 290:24 Graham, David 2006-05-09
290 16 Q: Dr. Graham, what I want to
290 17 do now is fill in these blanks on the
290 18 chart I have on the screen for the
290 19 relative risk and confidence intervals in
290 20 these different categories.
290 21 So, with the May 2004 ACR
290 22 abstract, do I have that correct that the
290 23 relative risk that was reported was 1.02
290 24 for 25 milligrams or less, with the

**Re: [290:16-290:24]**
**Pltf Obj** Beyond the scope; Plaintiff offered no testimony about Kaiser study or any presentation or publication of the results

*Overruled (credibility issue)*

291:1 - 291:6 Graham, David 2006-05-09
291 1 confidence intervals as I've indicated up
291 2 there?
291 3 A: Yes, that's correct.
291 4 Q: And that is not
291 5 statistically significant, correct?
291 6 A: That's correct.

**Re: [291:1-291:6]**
**Pltf Obj** Beyond the scope; Plaintiff offered no testimony about Kaiser study or any presentation or publication of the results

291:23 - 291:24 Graham, David 2006-05-09

**Re: [291:23-291:24]**
**Pltf Obj** Beyond the scope; Plaintiff offered no testimony about Kaiser study or any presentation or publication of the results

*Overruled (goes too credibility)*

291 23 Q: Okay.
291 24 Now, after this May 2004

| | | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|

292:1 - 292:20    Graham, David 2006-05-09

| 292 | 1 | abstract, you went back and reclassified |
|---|---|---|
| 292 | 2 | some of the patients from the Kaiser |
| 292 | 3 | study who had been classified as low-dose |
| 292 | 4 | patients for the purposes of the analysis |
| 292 | 5 | that's shown in the abstract. I think my |
| 292 | 6 | hand just snuck across the screen. |
| 292 | 7 | Excuse me. |
| 292 | 8 | You reclassified some |
| 292 | 9 | patients who had been counted as low-dose |
| 292 | 10 | patients, and then you counted them |
| 292 | 11 | instead as high-dose patients; is that |
| 292 | 12 | right? |
| 292 | 13 | A: Yes. And high-dose patients |
| 292 | 14 | who are reclassified as low dose. |
| 292 | 15 | - - - |
| 292 | 16 | (Whereupon, Deposition |
| 292 | 17 | Exhibit Graham-12, E-mail 5-25-04 |
| 292 | 18 | KP002153, was marked for |
| 292 | 19 | identification.) |
| 292 | 20 | - - - |

**Re: [292:1-292:20]**
**Pltf Obj** Beyond the scope; Plaintiff offered no testimony about Kaiser study or any presentation or publication of the results

Overruled

293:3 - 294:4    Graham, David 2006-05-09

| 293 | 3 | Oh, it is also from May. Up at the top |
|---|---|---|
| 293 | 4 | you will see your e-mail is May 25th, |
| 293 | 5 | 2004? |
| 293 | 6 | A: Uh-huh. |
| 293 | 7 | Q: And then you report new |
| 293 | 8 | relative risks and confidence intervals |
| 293 | 9 | based on the reclassifications, right? |
| 293 | 10 | A: Yes. |
| 293 | 11 | Q: Okay. |
| 293 | 12 | And tell me if I have it |
| 293 | 13 | right up here. The relative risk that |
| 293 | 14 | you reported after reclassifying people |
| 293 | 15 | for the 25 milligrams or less was .98, |
| 293 | 16 | correct? |
| 293 | 17 | A: Yes. |
| 293 | 18 | Q: With the confidence |
| 293 | 19 | intervals as I've indicated there, right? |
| 293 | 20 | A: Yes. |
| 293 | 21 | Q: And that is not |
| 293 | 22 | statistically significant, correct? |
| 293 | 23 | A: Correct. |
| 293 | 24 | Q: And we're talking here about |
| 294 | 1 | Vioxx 25 milligrams or less compared to |
| 294 | 2 | people who are not taking pain |
| 294 | 3 | medication, no difference in risk, right? |
| 294 | 4 | A: Right. |

**Re: [293:3-294:4]**
**Pltf Obj** Beyond the scope; Plaintiff offered no testimony about Kaiser study or any presentation or publication of the results

Overruled

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

294:18  -  294:24     Graham, David 2006-05-09

● 294 18          Q: The most likely thing is --
294 19          and when we say .98, that's actually a
294 20          little bit lower risk than someone who's
294 21          not taking any medicine at all. I mean,
294 22          it doesn't -- it's so little that it
294 23          doesn't make any difference, but we're
294 24          talking about Vioxx 25 milligrams is

*Re: [294:18-294:24]* **Pltf Obj** Beyond the scope; Plaintiff offered no testimony about Kaiser study or any presentation or publication of the results

295:1  -  295:19     Graham, David 2006-05-09

295  1          basically indistinguishable from not
295  2          taking any medicine at all when it comes
295  3          to cardiovascular risk, right?
295  4          A: Yes.
295  5          Q: Okay.
295  6          And then after this
295  7          reclassification, the risk that you
295  8          reported, the relative risk for higher
295  9          dose goes up substantially, and then it
295 10          is statistically significant, correct?
295 11          A: Yes.
295 12          Q: Now, after the e-mail, did
295 13          you -- I think you said you did something
295 14          called a poster, you wrote up a poster?
295 15          A: Right. That was in August.
● 295 16          Q: August of --
295 17          A: Of 2004.
295 18          Q: Of 2004?
295 19          A: Correct.

*Re: [295:1-295:19]* **Pltf Obj** Beyond the scope; Plaintiff offered no testimony about Kaiser study or any presentation or publication of the results

295:24  -  296:13     Graham, David 2006-05-09

295 24          (Whereupon, Deposition
296  1          Exhibit Graham-13, 'Risk of Acute
296  2          Myocardial Infarction and Sudden
296  3          Cardiac Death with Use of COX-2
296  4          Selective and Non-Selective
296  5          NSAIDs' (Graham, et al) KP001521
296  6          - KP001526, was marked for
296  7          identification.)
296  8          - - -
296  9          BY MR. BECK:
296 10          Q: And I think I got it right.
296 11          Is it the ISPE poster that you talked
296 12          about on direct examination?
296 13          A: Yes.

*Re: [295:24-296:13]* **Pltf Obj** Beyond the scope; Plaintiff offered no testimony about Kaiser study or any presentation or publication of the results

298:5  -  298:24     Graham, David 2006-05-09

298  5          Q: And all I want you to do is
298  6          confirm for me, sir, after you
298  7          reclassified people and then changed the
298  8          regression analysis, is this the relative
● 298  9          risk that you recorded for 25 milligrams
298 10          or less?
298 11          A: Yes, it is.
298 12          Q: And that is under
298 13          traditional approach not statistically

*Re: [298:5-298:24]* **Pltf Obj** Beyond the scope; Plaintiff offered no testimony about Kaiser study or any presentation or publication of the results

|  | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

298 14   significant, correct?
298 15   A:  It's elevated, that's
298 16   correct.
298 17   Q:  Correct that it's not
298 18   statistically significant?
298 19   A:  Yes, but -- yes.
298 20   Q:  And then the high dose
298 21   numbers came down somewhat, but still
298 22   elevated. And after the reclassification
298 23   and change in methodology, they remained
298 24   statistically significant, right?

299:1   -   299:5   Graham, David 2006-05-09
299 1   A:  Yes.
299 2   Q:  Now, finally you reported
299 3   these results in The Lancet article that
299 4   you testified about, right?
299 5   A:  Yes.

**Re: [299:1-299:5]**
**Pltf Obj** Beyond the
scope; Plaintiff offered
no testimony about
Kaiser study or any
presentation or
publication of the results

300:18   -   300:24   Graham, David 2006-05-09
300 18   So, after the
300 19   reclassification in May and the change in
300 20   methodology in August, and then the
300 21   quality control in 2005, your final
300 22   result for 25 milligrams and below was a
300 23   relative risk of 1.23 with a confidence
300 24   interval from below 1 to above 1, right?

**Re: [300:18-300:24]**
**Pltf Obj** Beyond the
scope; Plaintiff offered
no testimony about
Kaiser study or any
presentation or
publication of the results

301:1   -   301:24   Graham, David 2006-05-09
301 1   A:  Yes.
301 2   Q:  And under traditional
301 3   approach, that is not statistically
301 4   significant, correct?
301 5   A:  Correct.
301 6   Q:  And then the final numbers
301 7   for the high dose that you had were 3
301 8   with the confidence interval as
301 9   indicated, right?
301 10   A:  Yes.
301 11   Q:  And that under this analysis
301 12   remains statistically significant; is
301 13   that right?
301 14   A:  Yes.
301 15   Q:  So, just sort of a summary
301 16   question that in all four of your reports
301 17   as to the outcome of your study, the 25
301 18   milligrams and below, the relative risk
301 19   at all times remained under traditional
301 20   views as to statistical significance; is
301 21   that right?
301 22   A:  Compared to remote use, but
301 23   not compared to -- well, compared to
301 24   remote use.

**Re: [301:1-301:24]**
**Pltf Obj** Beyond the
scope; Plaintiff offered
no testimony about
Kaiser study or any
presentation or
publication of the results

302:1   -   302:24   Graham, David 2006-05-09
302 1   Q:  Yeah. I'm asking about

**Re: [302:1-302:24]**

*Overrule*

| | | | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|---|---|
| 302 | 2 | comparing it to remote use, which is -- | **Pltf Obj** Beyond the scope; Plaintiff offered no testimony about Kaiser study or any presentation or publication of the results | |
| 302 | 3 | A: Basically nonuse. | | |
| 302 | 4 | Q: Right. | | |
| 302 | 5 | So, in all four at 25 | | |
| 302 | 6 | milligrams or below, there was no | | |
| 302 | 7 | statistically significant difference | | |
| 302 | 8 | between taking that dose of Vioxx and not | | |
| 302 | 9 | taking any medicine at all, right? | | |
| 302 | 10 | A: Yes. | | |
| 302 | 11 | Q: I want to focus a bit on, a | | |
| 302 | 12 | little bit more on how these changes came | | |
| 302 | 13 | about from the abstract to the poster and | | |
| 302 | 14 | also what people within the FDA were | | |
| 302 | 15 | saying about your analysis, because I | | |
| 302 | 16 | think you testified about that this | | |
| 302 | 17 | morning. Do you remember that? | | |
| 302 | 18 | A: Uh-huh. | | |
| 302 | 19 | Q: The abstract itself, did you | | |
| 302 | 20 | have that reviewed by anybody from the | | |
| 302 | 21 | FDA before the abstract was published? | | |
| 302 | 22 | A: What are we referring to? | | |
| 302 | 23 | Q: We're referring to back up | | |
| 302 | 24 | on the screen, May of 2004 -- | | |

| 303:1 | - | 303:24 | Graham, David 2006-05-09 | |
|---|---|---|---|---|
| 303 | 1 | A: The ACR abstract. | **Re: [303:1-303:24]**<br>**Pltf Obj** Beyond the scope; Plaintiff offered no testimony about Kaiser study or any presentation or publication of the results | |
| 303 | 2 | Q: -- ACR abstract. | | |
| 303 | 3 | A: What happened with the ACR | | |
| 303 | 4 | abstract is that David Campen at Kaiser | | |
| 303 | 5 | was the first author, and I sent him the | | |
| 303 | 6 | quick analysis that we had done, and he | | |
| 303 | 7 | submitted the abstract, and I did not put | | |
| 303 | 8 | it through FDA clearance, and that was an | | |
| 303 | 9 | oversight on my part. | | |
| 303 | 10 | Q: And then because there is a | | |
| 303 | 11 | procedure that you are supposed to follow | | |
| 303 | 12 | at FDA to show them studies and articles | | |
| 303 | 13 | and abstracts and posters that you intend | | |
| 303 | 14 | to have your name on, whether you're the | | |
| 303 | 15 | first author or second, third, fourth or | | |
| 303 | 16 | fifth, right? | | |
| 303 | 17 | A: Yes. | | |
| 303 | 18 | Q: Okay. | | |
| 303 | 19 | And then when it came to the | | |
| 303 | 20 | poster in August of 2004, after you've | | |
| 303 | 21 | reclassified people and changed the | | |
| 303 | 22 | methodology, did you submit that for | | |
| 303 | 23 | review by folks from the FDA? | | |
| 303 | 24 | A: Yes, I did. | | |

| 304:1 | - | 304:24 | Graham, David 2006-05-09 | |
|---|---|---|---|---|
| 304 | 1 | Q: And I think you indicated | **Re: [304:1-304:24]**<br>**Pltf Obj** Beyond the scope; Plaintiff offered no testimony about Kaiser study or any presentation or | |
| 304 | 2 | that your supervisor reviewed that | | |
| 304 | 3 | poster; is that right? | | |
| 304 | 4 | A: Yes. | | |
| 304 | 5 | Q: And what was his name? | | |
| 304 | 6 | A: Paul Seligman. | | |

|  |  |  | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|
| 304 | 7 | Q: And at the time, was he the | publication of the results | |
| 304 | 8 | acting head of the Office of the Drug | | |
| 304 | 9 | Safety? | | |
| 304 | 10 | A: I think so, yes. | | |
| 304 | 11 | Q: And you said something about | | |
| 304 | 12 | how he suggested a change in the | | |
| 304 | 13 | conclusion. Was your -- did your initial | | |
| 304 | 14 | draft of the poster have a conclusion | | |
| 304 | 15 | that the high dose of Vioxx, the 50 | | |
| 304 | 16 | milligram dose should not be prescribed | | |
| 304 | 17 | or used? | | |
| 304 | 18 | A: Let me see what this one | | |
| 304 | 19 | says and then I can answer you. | | |
| 304 | 20 | (Witness reviewing | | |
| 304 | 21 | document.) | | |
| 304 | 22 | Yes. | | |
| 304 | 23 | Q: Okay. | | |
| 304 | 24 | And then I think you said | | |

305:1 - 305:6    Graham, David 2006-05-09

| 305 | 1 | that Dr. Seligman did not agree with that |
| 305 | 2 | conclusion and said that you should take |
| 305 | 3 | out the conclusion that high dose 50 |
| 305 | 4 | milligrams should not be prescribed or |
| 305 | 5 | used; is that right? |
| 305 | 6 | A: Correct. |

**Re: [305:1-305:6]**
**Pltf Obj** Beyond the scope; Plaintiff offered no testimony about Kaiser study or any presentation or publication of the results

305:10 - 305:16    Graham, David 2006-05-09

| 305 | 10 | (Whereupon, Deposition |
| 305 | 11 | Exhibit Graham-14, E-mails with |
| 305 | 12 | attachment 'Comments on ISPE |
| 305 | 13 | Paper' FDACDER006048 - |
| 305 | 14 | FDACDER006049, was marked for |
| 305 | 15 | identification.) |
| 305 | 16 | - - - |

**Re: [305:10-305:16]**
**Pltf Obj** Beyond the scope; Plaintiff offered no testimony about Kaiser study or any presentation or publication of the results

305:19 - 305:24    Graham, David 2006-05-09

| 305 | 19 | BY MR. BECK: |
| 305 | 20 | Q: Do you recognize Exhibit 14? |
| 305 | 21 | A: Yes, I do. |
| 305 | 22 | Q: What is Exhibit 14? |
| 305 | 23 | A: It's an e-mail from Dr. |
| 305 | 24 | Seligman to me with his comments on the |

**Re: [305:19-305:24]**
**Pltf Obj** Beyond the scope; Plaintiff offered no testimony about Kaiser study or any presentation or publication of the results

306:1 - 306:11    Graham, David 2006-05-09

| 306 | 1 | poster. |
| 306 | 2 | Q: All right. |
| 306 | 3 | And then the next page are |
| 306 | 4 | his comments, right? |
| 306 | 5 | A: Right. |
| 306 | 6 | Q: Was Mr. -- is it Dr. |
| 306 | 7 | Seligman? |
| 306 | 8 | A: Dr. Seligman. |
| 306 | 9 | Q: Dr. Seligman, is he one of |
| 306 | 10 | the people that you think was out to get |
| 306 | 11 | you at the FDA? |

**Re: [306:1-306:11]**
**Pltf Obj** Beyond the scope; Plaintiff offered no testimony about Kaiser study or any presentation or publication of the results

Overrule

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|
| **306:14 - 306:24** Graham, David 2006-05-09 | | overruled |
| 306 14  THE WITNESS: Let's put it | **Re: [306:14-306:24]** | |
| 306 15  this way. Dr. Seligman ordered an | **Pltf Obj** Beyond the | |
| 306 16  illegal criminal investigation in | scope; Plaintiff offered | |
| 306 17  early 2004 to identify the person | no testimony about | |
| 306 18  or persons who spoke to the media | Kaiser study or any | |
| 306 19  about the fact that Dr. Andrew | presentation or | |
| 306 20  Mossholder, an FDA medical officer | publication of the results | |
| 306 21  who had done a study looking at | | |
| 306 22  SSRI antidepressants and | | |
| 306 23  suicidality in children, that that | | |
| 306 24  had been suppressed. | | |
| | | |
| **307:1 - 307:24** Graham, David 2006-05-09 | | |
| 307 1  Dr. Seligman, under oath | **Re: [307:1-307:24]** | |
| 307 2  before the House subcommittee on | **Pltf Obj** Beyond the | |
| 307 3  investigations and oversight for | scope; Plaintiff offered | |
| 307 4  FDA, admitted under oath that he | no testimony about | |
| 307 5  had ordered that illegal criminal | Kaiser study or any | |
| 307 6  investigation to identify the | presentation or | |
| 307 7  source of the leak and that he had | publication of the results | |
| 307 8  named me as a suspect, although he | | |
| 307 9  had no grounds to do so, except | | |
| 307 10  that he thought that this is the | | |
| 307 11  kind of thing that I would do. | | |
| 307 12  And so there is that past history | | |
| 307 13  with Dr. Seligman to keep in mind. | | |
| 307 14  At this point, I wasn't | | |
| 307 15  interpreting his comments in that | | |
| 307 16  regard except that the reason why | | |
| 307 17  I hadn't said in the original | | |
| 307 18  version was that high dose | | |
| 307 19  rofecoxib should be removed from | | |
| 307 20  the market was because I knew the | | |
| 307 21  type of reaction it would get, and | | |
| 307 22  toning it down a little bit still | | |
| 307 23  elicited pretty much the same | | |
| 307 24  response, and that's expressed | | |
| | | |
| **308:1 - 308:6** Graham, David 2006-05-09 | | |
| 308 1  here. | **Re: [308:1-308:6]** | |
| 308 2  BY MR. BECK: | **Pltf Obj** Beyond the | |
| 308 3  Q: Well, this morning, didn't | scope. No testimony is | |
| 308 4  you testify, in effect, that there were | designated to this effect. | |
| 308 5  several people at the FDA who were out to | | |
| 308 6  get you? | | |
| | | |
| **308:10 - 308:18** Graham, David 2006-05-09 | | |
| 308 10  THE WITNESS: No, I never | **Re: [308:10-308:18]** | |
| 308 11  used those, but I can -- | **Pltf Obj** Beyond the | |
| 308 12  BY MR. BECK: | scope. No testimony is | |
| 308 13  Q: No. The terms you used were | designated to this effect. | |
| 308 14  that there was an 'organized and | | |
| 308 15  orchestrated campaign to smear and | | |
| 308 16  discredit me.' Do you remember that | | |

| | | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|

| | | |
|---|---|---|
| 308 17 | phrase? | |
| 308 18 | A: Yes. | |
| | | |
| 308:21 - 308:24 | Graham, David 2006-05-09 | **Re: [308:21-308:24]** |
| 308 21 | THE WITNESS: And we can | **Pltf Obj** Beyond the |
| 308 22 | talk about that in detail if you | scope. No testimony is |
| 308 23 | would like. | designated to this effect. |
| 308 24 | BY MR. BECK: | |
| | | |
| 309:1 - 309:24 | Graham, David 2006-05-09 | |
| 309 1 | Q: Okay. | **Re: [309:1-309:24]** |
| 309 2 | My question right now is a | **Pltf Obj** Beyond the |
| 309 3 | narrow one. Is Dr. Seligman one of the | scope. No testimony is |
| 309 4 | people that you were referring to this | designated to this effect. |
| 309 5 | morning as part of this organized and | |
| 309 6 | orchestrated campaign that you thought | |
| 309 7 | existed to smear and discredit you? | |
| 309 8 | A: Yes. He would be part of | |
| 309 9 | that group. | **Re: [309:11-309:24]** |
| 309 10 | Q: Okay. | **Pltf Obj** Beyond the |
| 309 11 | So, let's look at what Dr. | scope; Plaintiff offered |
| 309 12 | Seligman said when you submitted the | no testimony about |
| 309 13 | poster to him. He said, 'In general an | Kaiser study or any |
| 309 14 | excellent study and analysis of a complex | presentation or |
| | | publication of the results |
| 309 15 | topic.' | |
| 309 16 | Do you see that? | |
| 309 17 | A: Yes. | |
| 309 18 | Q: And then he says, 'As you | |
| 309 19 | might expect, my only comment has to do | |
| 309 20 | with the conclusion that 'higher-dose | |
| 309 21 | rofecoxib should not be prescribed or | |
| 309 22 | used." | |
| 309 23 | That's the conclusion that | |
| 309 24 | you and I were talking about a few | |
| | | |
| 310:1 - 310:24 | Graham, David 2006-05-09 | |
| 310 1 | minutes ago, right? | **Re: [310:1-310:24]** |
| 310 2 | A: Right. | **Pltf Obj** Beyond the |
| 310 3 | Q: Then he went on to explain | scope; Plaintiff offered |
| 310 4 | why he was concerned with having a | no testimony about |
| 310 5 | conclusion like that, didn't he? | Kaiser study or any |
| 310 6 | A: Yes. | presentation or |
| 310 7 | Q: And then he said, 'My | publication of the results |
| 310 8 | concern is based both on the small number | |
| 310 9 | of cases (10) and the lack of information | |
| 310 10 | inherent in such a study regarding the | |
| 310 11 | time-to-event." | |
| 310 12 | Now, small number of cases | |
| 310 13 | being ten, does that mean that there were | |
| 310 14 | only ten cases in your study of thousands | |
| 310 15 | and thousands of patients where somebody | |
| 310 16 | taking high-dose Vioxx had either a heart | |
| 310 17 | attack or sudden cardiac death? | |

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

| | |
|---|---|
| 310 18   A: We had ten patients who were | |
| 310 19   currently exposed to high-dose rofecoxib | |
| 310 20   Vioxx at the time of their heart attack | |
| 310 21   or sudden death. | |
| 310 22   Q: And the concern expressed by | |
| 310 23   Dr. Seligman, whether you believe him | |
| 310 24   today or not, was that that number is | **Re: [311:1-311:5]** |
| | **Pltf Obj** Beyond the |
| 311:1   -   311:5   Graham, David 2006-05-09 | scope; Plaintiff offered |
| 311  1   just too small to draw a meaningful | no testimony about |
| 311  2   conclusion from, correct? | Kaiser study or any |
| 311  3   A: That's what I think he's | presentation or |
| 311  4   driving at here, but that's what a | publication of the results |
| 311  5   confidence interval is for. | |
| | |
| 312:2   -   312:24   Graham, David 2006-05-09 | **Re: [312:2-312:24]** |
| 312  2   Q: But in any event, Dr. | **Pltf Obj** Beyond the |
| 312  3   Seligman disagreed and said the number of | scope; Plaintiff offered |
| 312  4   cases is just so small that you cannot | no testimony about |
| 312  5   legitimately draw such a conclusion, | Kaiser study or any |
| 312  6   correct? | presentation or |
| 312  7   A: Yes. But he's not referring | publication of the results |
| 312  8   to the confidence intervals, and, you | |
| 312  9   know, if you ask him the same questions | |
| 312 10   you're asking me, he'd have to say that | |
| 312 11   the confidence intervals permit it. | |
| 312 12   Q: Well, did others in the FDA | **Re: [312:12-312:17]** |
| 312 13   express similar concerns that Dr. | **Pltf Obj** Rules 801 and |
| 312 14   Seligman expressed about whether you | 802-hearsay |
| 312 15   could draw conclusions from such a small | |
| 312 16   number -- | |
| 312 17   A: Yes, they did. | |
| 312 18   Q: -- of people who used the | |
| 312 19   high-dose Vioxx? | |
| 312 20   A: Yes, they did. | |
| 312 21   Q: Who is Dr. John Jenkins? | |
| 312 22   A: He's the director of the | |
| 312 23   Office of New Drugs. | |
| 312 24   Q: And is Dr. Jenkins another | |
| | |
| 313:1   -   313:9   Graham, David 2006-05-09 | **Re: [313:1-313:9]** |
| 313  1   one of the FDA people that you think was | **Pltf Obj** Beyond the |
| 313  2   out to get you? | scope; No such |
| 313  3   A: No. | testimony designated |
| 313  4   - - - | |
| 313  5   (Whereupon, Deposition | |
| 313  6   Exhibit Graham-15, E-mails | |
| 313  7   FDACDER011048 - FDACDER011049, | |
| 313  8   was marked for identification.) | |
| 313  9   - - - | |
| | |
| 313:14   -   313:22   Graham, David 2006-05-09 | **Re: [313:14-313:22]** |
| 313 14   Q: Exhibit 15 is an e-mail | **Pltf Obj** Rules 801 and |
| 313 15   string. The last one appears to be dated | 802-hearsay; Beyond |
| 313 16   August 11, 2004. They're all around that | |

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|
| 313 17 | time frame. | | |
| 313 18 | Do you see that the middle | | |
| 313 19 | e-mail on Page 1 is from Dr. Jenkins? | the scope; Study and its presentation and publication are not included in Plaintiff's Affirmative Designations | |
| 313 20 | A:  Yes, I see it. I've never | | |
| 313 21 | seen this e-mail before, the best I can | | |
| 313 22 | recollect. | | |

315:4   -   315:24   Graham, David 2006-05-09

| | | | |
|---|---|---|---|
| 315  4 | Q:  So, Dr. Jenkins here, he | **Re: [315:4-315:24]** | |
| 315  5 | says -- I put the little red marker where | **Pltf Obj** Rules 801 and | |
| 315  6 | I'm going to begin reading. Second | 802-hearsay | |
| 315  7 | paragraph, 'I would also note that I find | | |
| 315  8 | the conclusions reached in the poster to | | |
| 315  9 | be far in excess of the available data. | | |
| 315 10 | For example, 'Rofecoxib use at a dose | | |
| 315 11 | over 25 milligrams increases the risk of | | |
| 315 12 | AMI or SCD' is the primary conclusion of | | |
| 315 13 | the poster. This is a far too definitive | | |
| 315 14 | conclusion based on the data. Similar | | |
| 315 15 | language appears in other parts of the | | |
| 315 16 | poster and implies that a causal | | |
| 315 17 | relationship has been confirmed.' | | |
| 315 18 | Now, just stopping there. | | |
| 315 19 | Did you know back in 2004 that Dr. | | |
| 315 20 | Jenkins was of the same view that Dr. | | |
| 315 21 | Seligman expressed to you? | | |
| 315 22 | A:  There was one e-mail from | | |
| 315 23 | sometime after this date, but in the | | |
| 315 24 | teens of August, it was like a two-line | | |

316:1   -   316:24   Graham, David 2006-05-09

| | | | |
|---|---|---|---|
| 316  1 | e-mail in which Dr. Jenkins suggested | **Re: [316:1-316:24]** | |
| 316  2 | what he thought different wording for our | **Pltf Obj** Rules 801 and | |
| 316  3 | conclusions would be acceptable to him | 802-hearsay | |
| 316  4 | were, and that's pretty much the extent | | |
| 316  5 | of what my knowledge of what Dr. Jenkins | | *Sustained* |
| 316  6 | thought. | | |
| 316  7 | Q:  Do you see where he goes on | | |
| 316  8 | to say: 'This is misleading at best and | | |
| 316  9 | deceptive at worst, since what has been | | |
| 316 10 | demonstrated as an association between | | |
| 316 11 | the use of the drug and the events in | | |
| 316 12 | question. Yes, we have some priors and | | |
| 316 13 | randomized controlled clinical trials | | |
| 316 14 | that suggest rofecoxib may be associated | | |
| 316 15 | with an increased risk of MI, but those | | |
| 316 16 | priors do not support reaching such a | | |
| 316 17 | definitive conclusion about the findings | | |
| 316 18 | in the study'? | | |
| 316 19 | Were you aware that Dr. | | |
| 316 20 | Jenkins was expressing the view that the | | |
| 316 21 | conclusion that you had in your draft | | |
| 316 22 | poster was misleading at best and | | |
| 316 23 | deceptive at worst? | | |
| 316 24 | A:  Nope. No idea. | | |

317:1   -   317:24   Graham, David 2006-05-09

| | | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|
| 317 | 1 | Q: And then he goes on to say, | **Re: [317:1-317:24]** | |
| 317 | 2 | These types of overstated conclusions | **Pltf Obj** Rules 801 and | |
| 317 | 3 | are typical of David's writing' -- David | 802-hearsay | Sustained |
| 317 | 4 | is you, correct? | | |
| 317 | 5 | A: Correct. | | |
| 317 | 6 | Q: -- 'and only serve to | | Says he has |
| 317 | 7 | undermine his credibility as an objective | | no idea of this |
| 317 | 8 | evaluator of the data at hand.' | | statement (see 316:24) |
| 317 | 9 | And then he says, 'It is | | 801 802 |
| 317 | 10 | even more ridiculous for him to make | | 602 |
| 317 | 11 | broad recommendations about not using the | | |
| 317 | 12 | drug based on the data from this study, | | |
| 317 | 13 | and such sweeping clinical/regulatory | | |
| 317 | 14 | conclusions represent the primary reason | | |
| 317 | 15 | for difficulties in the interactions | | |
| 317 | 16 | between David and staff in OND.' | | |
| 317 | 17 | That would be Office of New | | |
| 317 | 18 | Drugs, right? | | |
| 317 | 19 | A: Correct. | | |
| 317 | 20 | Q: Then before I get to the | | Sustained |
| 317 | 21 | last couple of sentences, when you write | | This would |
| 317 | 22 | articles like you talked about this | | be admissible |
| 317 | 23 | morning and including this poster, do you | | if Dr. Jenkins |
| 317 | 24 | typically have a disclaimer on there that | | were called but |
| 318:1 | - 318:24 | Graham, David 2006-05-09 | | to show or |
| 318 | 1 | says these are not necessarily the views | **Re: [318:1-318:24]** | introduce a |
| 318 | 2 | of the FDA, they're just the views of the | **Pltf Obj** Rules 801 and | document |
| 318 | 3 | author, David Graham? | 802-hearsay | which witness |
| 318 | 4 | A: Oh, we're pretty much | | has no knowledge |
| 318 | 5 | required to have that disclaimer. | | of has not seen |
| 318 | 6 | Q: And do you see here where | | it has not |
| 318 | 7 | Dr. Jenkins says, 'Perhaps the disclaimer | | before doesn't |
| 318 | 8 | should read that 'The views expressed are | | pass muster |
| 318 | 9 | those of the author and DO NOT reflect | | |
| 318 | 10 | the views of the FDA." And 'Also, | | |
| 318 | 11 | perhaps, the COI statement' -- what's a | | |
| 318 | 12 | COI statement? | | |
| 318 | 13 | A: I think that's probably | | |
| 318 | 14 | conflict of interest. | | |
| 318 | 15 | Q: Okay. | | |
| 318 | 16 | And I think this morning you | | |
| 318 | 17 | said in response to questions from | | |
| 318 | 18 | counsel that you didn't have any | | |
| 318 | 19 | conflicts of interest. | | |
| 318 | 20 | Do you see where Dr. Jenkins | | |
| 318 | 21 | says that 'perhaps the conflict of | | |
| 318 | 22 | interest statement should say 'Dr. Graham | | |
| 318 | 23 | has no FINANCIAL conflicts of interest, | | |
| 318 | 24 | but' systemic 'bias in his viewpoints | | |
| 319:1 | - 319:7 | Graham, David 2006-05-09 | | |
| 319 | 1 | cannot be excluded.' | **Re: [319:1-319:7]** | |
| 319 | 2 | Were you aware that that was | **Pltf Obj** Rules 801 and | |
| 319 | 3 | Dr. Jenkins' views as to the merits of | 802-hearsay | |
| 319 | 4 | the poster conclusion? | | |

| | | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|---|

319 5    A: Dr. Jenkins is entitled to
319 6    his opinions. I wasn't aware of them.
319 7    The same could be said of the FDA.

*Sustained*

320:22 - 320:24   Graham, David 2006-05-09
320 22    BY MR. BECK:
320 23    Q: Who is Sharon Hertz?
320 24    A: I think she's a deputy

321:1 - 321:24   Graham, David 2006-05-09
321 1    division director for the analgesic and
321 2    anti-inflammatory reviewing division, and
321 3    that would be the reviewing division
321 4    responsible for NSAID drugs, both
321 5    naproxen and drugs like Vioxx.
321 6    - - -
321 7    (Whereupon, Deposition
321 8    Exhibit Graham-16, E-mails
321 9    FDACDER006056 - FDACDER006058,
321 10    was marked for identification.)
321 11    - - -
321 12    BY MR. BECK:
321 13    Q: I'm handing you what we've
321 14    marked as Exhibit 16, which I will put up
321 15    on the screen. This is a document that
321 16    you've seen before, correct?
321 17    A: That is correct.
321 18    Q: And it's from Sharon Hertz.
321 19    Is it Dr. Hertz?
321 20    A: Yes, it is.
321 21    Q: And Dr. Hertz, and it's to
321 22    you and your boss, Dr. Seligman, right?
321 23    A: Correct.
321 24    Q: And it copies Dr. Bull, who

**Re: [321:1-321:24]**
**Pltf Obj** Beyond the
scope

322:1 - 322:24   Graham, David 2006-05-09
322 1    we just read an e-mail from, as well as
322 2    Dr. Jenkins and some others, right?
322 3    A: Yes.
322 4    Q: Did Dr. Hertz say to you
322 5    that 'There is information to suggest
322 6    that use of aspirin may mitigate possible
322 7    CV risk associated with COX-2
322 8    inhibitors,' and go on to ask 'why would
322 9    you choose to study CV risk from a
322 10    database that does not collect
322 11    information on something as relevant as
322 12    aspirin use'?
322 13    A: She said it, but she didn't
322 14    understand the study, the methods, or why
322 15    her question actually is not pertinent to
322 16    the analysis that we did because we
322 17    showed that aspirin is not a confounder
322 18    of any association between NSAID use and
322 19    heart attack risk. And because she
322 20    doesn't understand epidemiology, she
322 21    wrote this, but this is a statement

**Re: [322:1-322:24]**
**Pltf Obj** Beyond the
scope

*Overruled*
*goes to*
*credibility*

| | | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|
| 322 | 22 | | that's coming from her lack of | |
| 322 | 23 | | understanding of epidemiology. | |
| 322 | 24 | | Q:  And she also referred to | |
| | | | | |
| 323:1 | - | 323:24 | Graham, David 2006-05-09 | |
| 323 | 1 | | your conclusion concerning high-dose | Re: [323:1-323:24] |
| 323 | 2 | | Vioxx and the fact that that represented | Pltf Obj Beyond the |
| 323 | 3 | | a very small subgroup of a large | scope |
| 323 | 4 | | population,' correct? | |
| 323 | 5 | | A:  She says that, but high-dose | |
| 323 | 6 | | Vioxx represented 18 percent of all the | |
| 323 | 7 | | Vioxx use in the country. So, it has | |
| 323 | 8 | | public health importance. | |
| 323 | 9 | | Q:  And did she tell you that | |
| 323 | 10 | | drawing conclusions about this subgroup | |
| 323 | 11 | | at all is inappropriate because of the | |
| 323 | 12 | | small size of it? | |
| 323 | 13 | | A:  She says that, but her | |
| 323 | 14 | | statement is incorrect, because the | |
| 323 | 15 | | confidence intervals permit that. And it | |
| 323 | 16 | | was stated a priori at the beginning of | |
| 323 | 17 | | our study that we would do that analysis, | |
| 323 | 18 | | that we would take a look as best we | |
| 323 | 19 | | could at the effect of dose of rofecoxib, | |
| 323 | 20 | | of Vioxx, on heart attack risk. So, she | |
| 323 | 21 | | can use words like it's inappropriate for | |
| 323 | 22 | | us to do that but the fact is that, she's | |
| 323 | 23 | | mistaken. There's nothing inappropriate | |
| 323 | 24 | | about it. | |
| | | | | |
| 324:1 | - | 324:24 | Graham, David 2006-05-09 | |
| 324 | 1 | | Q:  And you'll see at the bottom | Re: [324:1-324:24] |
| 324 | 2 | | of the paragraph she said, 'This is | Pltf Obj Beyond the |
| 324 | 3 | | simply bad science.' | scope |
| 324 | 4 | | A:  She's entitled to her | |
| 324 | 5 | | opinion. | |
| 324 | 6 | | Q:  I forgot to ask you. Is | Re: [324:6-324:10] |
| 324 | 7 | | Dr. Hertz one of the people at the FDA | Pltf Obj Rules 801 and |
| 324 | 8 | | that you think was out to get you? | 802-hearsay; harassing; |
| 324 | 9 | | A:  I didn't use those terms, | beyond the scope |
| 324 | 10 | | but, no, she is not one of those people. | |
| 324 | 11 | | Q:  Is she one of the people, | |
| 324 | 12 | | who, to use your terms, was part of the | |
| 324 | 13 | | very organized and orchestrated campaign | |
| 324 | 14 | | to smear and discredit you? | |
| 324 | 15 | | A:  She is not a member of that | |
| 324 | 16 | | group. | |
| 324 | 17 | | Q:  She just disagreed with you | |
| 324 | 18 | | and thought you were using bad science, | |
| 324 | 19 | | right? | |
| 324 | 20 | | A:  That's what she says here. | |
| 324 | 21 | | But she's not an epidemiologist, and I'm | |
| 324 | 22 | | not sure that she would recognize good | |
| 324 | 23 | | epidemiology if she saw it. | |
| 324 | 24 | | Q:  And Dr. Jenkins, who we | |

*Handwritten in Rulings column for [323:1-323:24]:* Overruled

*Handwritten in Rulings column for [324:1-324:24]:* Overruled

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

325:1   -   325:24     Graham, David 2006-05-09
325   1     talked about a minute ago, who commented
325   2     on what he thought was the invalidity of
325   3     your analysis, do you think he knows what
325   4     he's talking about when it comes to
325   5     epidemiology?
325   6     A: I think that Dr. Jenkins is
325   7     not an epidemiologist. He's a
325   8     pulmonologist. I think that he has broad
325   9     responsibilities for the approval of
325   10     drugs, and that it's his office, Office
325   11     of New Drugs, that approved Vioxx, and
325   12     that going back to the conflict of
325   13     interest that we talked about before,
325   14     that FDA has a vested interest in
325   15     maintaining the decisions that it's made
325   16     previously. And that their biggest
325   17     concern here was that they had, in
325   18     quotes, done a labeling change in 2002,
325   19     and that solved the problem. But I
325   20     contend that it didn't really accomplish
325   21     very much at all.
325   22     - - -
325   23     (Whereupon, Deposition
325   24     Exhibit Graham-17, E-mails

326:1   -   326:4     Graham, David 2006-05-09
326   1     FDACDER021810 - FDACDER021811,
326   2     was marked for identification.)
326   3     - - -
326   4     BY MR. BECK:

326:5   -   326:9     Graham, David 2006-05-09
326   5     Q: I'm going to hand you what
326   6     we've marked as Exhibit 17. Have you
326   7     seen Exhibit 17 before?
326   8     A: No. I have never seen this
326   9     before.

326:17   -   326:24     Graham, David 2006-05-09
326   17     Q: Lourdes Villalba. Who is
326   18     Lourdes Villalba?
326   19     A: She was the medical officer
326   20     who was responsible for Vioxx. She may
326   21     have been the medical officer who
326   22     reviewed the original Vioxx NDA, but that
326   23     I'm not absolutely certain about, but she
326   24     had responsibility for it as the primary

327:1   -   327:24     Graham, David 2006-05-09
327   1     medical officer in the reviewing division
327   2     of the Office of New Drugs at this time.
327   3     So, she's the one who would
327   4     review -- well, actually, she did the
327   5     original review that we showed on the
327   6     slide. So, any supplements or any
327   7     submissions from Merck regarding Vioxx,

*Handwritten note in right column:* Sustained, witness has not seen E-mail, was not addressed to him or sent to him, out of court statement

*Handwritten:* 801

| | | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|---|
| 327   8 | they would come to her desk. | | |
| 327   9 | Q:  Was she one of the people | **Re: [327:9-327:14]** | |
| 327 10 | that was part of the organized and | **Pltf Obj** Harassing | |
| 327 11 | orchestrated campaign to smear and | | |
| 327 12 | discredit you that you think existed at | | |
| 327 13 | the FDA? | | |
| 327 14 | A:  No, she was not. | | |
| 327 15 | Q:  At the bottom of this e-mail | **Re: [327:15-327:24]** | |
| 327 16 | string, Lourdes writes, 'I learned of | **Pltf Obj** Rules 801 and | |
| 327 17 | this study a couple of weeks ago when | 802-hearsay; beyond the | |
| 327 18 | Jonca requested my opinion about the | scope | |
| 327 19 | abstract that was going to be presented | | |
| 327 20 | in France. This study is not a good | | |
| 327 21 | study to address the cardiovascular | | |
| 327 22 | question. The conclusions are not well | | Sustained |
| 327 23 | supported by the data.' | | |
| 327 24 | Did you learn back in 2004 | | |
| 328:1   -   328:20 | Graham, David 2006-05-09 | | |
| 328   1 | that Lourdes Villalba felt that your | | |
| 328   2 | conclusions were not supported? | | |
| 328   3 | A:  No. I was never told that, | | |
| 328   4 | but I'm not surprised. This is the | | |
| 328   5 | typical response of people in the Office | | |
| 328   6 | of New Drugs to studies that are done in | | |
| 328   7 | the Office of Drug Safety that we talked | | |
| 328   8 | about earlier where -- and that would | | |
| 328   9 | lead Dr. Galson to say that our office | | |
| 328 10 | doesn't add value to the center | | |
| 328 11 | Q:  Who is Anne Trontell? | | |
| 328 12 | A:  Dr. Trontell is the deputy | | |
| 328 13 | director for the Office of Drug Safety. | | |
| 328 14 | Q:  And is Dr. Trontell one of | | |
| 328 15 | the people that you were referring to | | |
| 328 16 | this morning when you said that within | | |
| 328 17 | the FDA there was a very organized and | | |
| 328 18 | orchestrated campaign to smear and | | |
| 328 19 | discredit you? | | |
| 328 20 | A:  Yes. | | |
| 329:4   -   329:5 | Graham, David 2006-05-09 | | |
| 329   4 | Q:  Please take a look at | | |
| 329   5 | Exhibit 18. | | |
| 330:4   -   330:24 | Graham, David 2006-05-09 | | |
| 330   4 | Q:  Do you see that Dr. Trontell | **Re: [330:4-330:24]** | Overruled |
| 330   5 | is writing to Dr. Seligman in the e-mail | **Pltf Obj** Rules 801 and | goes to credibility |
| 330   6 | on the top? | 802-hearsay; beyond the | + witness knows |
| 330   7 | A:  Yes. | scope | something |
| 330   8 | Q:  Starting with the second | | (@ comment) |
| 330   9 | paragraph, she says, 'I understand John's | | (see 330: dd) |
| 330 10 | consternation, but let us all acknowledge | | |
| 330 11 | the problem arose when David Graham | | |
| 330 12 | overstepped the bounds of what anyone can | | |
| 330 13 | conclude from a brief poster of a complex | | |
| 330 14 | study. He ignored advice from multiple | | |

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

330 15      FDA sources by making a strong conclusion
330 16      without giving enough information or time
330 17      to others in FDA to evaluate it
330 18      rigorously.'
330 19      Did Dr. Trontell communicate
330 20      those views to you even though you didn't
330 21      see this particular e-mail?
330 22      A:  She communicated views
330 23      similar to this. She never said that I
330 24      overstepped my bounds, and she didn't use

**331:1   -   331:24   Graham, David 2006-05-09**

331  1      words like I ignored advice. And at the
331  2      end of the day, the poster was cleared by
331  3      FDA, so that they can complain all they
331  4      want, but I didn't -- I stuck to what I
331  5      believed based on the data, and they
331  6      cleared it at the end of the day. So, we
331  7      had honest disagreements about the data
331  8      and how to interpret it.
331  9      Q:  And as part of that
331 10      disagreement, do you see here where she
331 11      says that you 'subverted FDA review as
331 12      well as the normal standards of peer
331 13      review by stating an
331 14      inadequately-supported conclusion based
331 15      upon the limited data' you 'made
331 16      available for review'? Again, did she
331 17      express those views to you in substance?
331 18      A:  No. And that statement
331 19      actually makes absolutely no sense to me
331 20      as it's stated. If she's talking about
331 21      the differences between the ACR abstract
331 22      and the ISPE abstract, those things I
331 23      described to both Dr. Seligman and Dr.
331 24      Trontell between the end of May and

*Objection (In Mason column):*
**Re: [331:1-331:24]**
**Pltf Obj** Rules 801 and
802-hearsay; beyond the
scope

**332:1   -   332:24   Graham, David 2006-05-09**

332  1      August, as we came upon each of the
332  2      problems and had to deal with them. And
332  3      she doesn't recall that.
332  4      We had many, many
332  5      conversations. And I had them with Dr.
332  6      Seligman as well. And so looking at
332  7      this, that's the only thing that I can
332  8      guess she is -- she's saying from that,
332  9      but that's just a guess.
332 10      Q:  She says here, 'To publicize
332 11      findings that have not been fully vetted
332 12      is irresponsible and professionally
332 13      suspect.'
332 14      A:  Where are you?
332 15      Q:  If you look up on the
332 16      screen, i'm in the middle of the next
332 17      paragraph.
332 18      A:  Uh-huh.
332 19      Q:  Did she communicate those

*Objection (In Mason column):*
**Re: [332:1-332:24]**
**Pltf Obj** Rules 801 and
802-hearsay; beyond the
scope

*Handwritten ruling (Smith/Barnett column):* This is a close call but it does go to credibility + witness has some knowledge of comments of. So I will overrule objection + admit this testimony

|  | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

```
332 20        views to you?
332 21        A:  No. But the fact is, is
332 22        that I didn't communicate anything to the
332 23        public that hadn't been cleared by FDA.
332 24        So, this statement really, in my mind, is

333:1  -  333:6    Graham, David 2006-05-09
  333  1        inaccurate and, you know, she's using a
  333  2        lot of pejorative terms towards me, so,
  333  3        she can be very critical of me, but the
  333  4        fact is, is that the document was
  333  5        cleared, and I have the signed clearance
  333  6        form, and so she can have her opinion.

337:6  -  337:20   Graham, David 2006-05-09
  337  6        - - -
  337  7        (Whereupon, Deposition
  337  8        Exhibit Graham-19, Memo 10-29-04
  337  9        Review of reports of FDA/Kaiser
  337 10        Vioxx study: Questions about
  337 11        Inconsistencies and Bias,'
  337 12        FDACDER022462 - FDACDER022470,
  337 13        was marked for identification.)
  337 14        - - -
  337 15        BY MR. BECK:
  337 16        Q:  I'm going to hand you
  337 17        Exhibit 19 here, which is a memorandum
  337 18        from Dr. Trontell to Dr. Seligman. Have
  337 19        you seen this document before?
  337 20        A:  Yes, I have.

339:4  -  339:23   Graham, David 2006-05-09
  339  4        Q:  Does Dr. Trontell in this
  339  5        memorandum raise concerns with the
  339  6        methodology used in the study that you
  339  7        had done?
  339  8        A:  She raises a number of
  339  9        questions which we've actually discussed
  339 10        and have the answers to, yes.
  339 11        Q:  Over on Page 2 in the last
  339 12        paragraph of the executive summary, did
  339 13        Dr. Trontell state: 'My review notes
  339 14        several unexplained inconsistencies in
  339 15        the conduct of the study and the
  339 16        reporting of results. Before the
  339 17        findings and conclusions of the study
  339 18        report can be accepted, the authors must
  339 19        address all inconsistencies with adequate
  339 20        documentation that clearly explains how
  339 21        they occurred, in order to address the
  339 22        potential appearance of data manipulation
  339 23        and post hoc analyses.'

340:14  -  340:24   Graham, David 2006-05-09
```

Re: [333:1-333:6]
Pltf Obj Rules 801 and 802-hearsay; beyond the scope

Re: [337:6-337:20]
Pltf Obj Rules 801 and 802-hearsay; beyond the scope

Re: [339:4-339:23]
Pltf Obj Rules 801 and 802-hearsay; beyond the scope

Overruled

Overruled

goes to credibility 607

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

BY MR. BECK:
340 14
340 15　Q: Is a post hoc analysis where
340 16　somebody, after a study is conducted,
340 17　goes back and changes the rules of the
340 18　study, and the concern then is that the
340 19　results are invalid? I'm not asking
340 20　whether you did it. I'm asking whether
340 21　that's what the post hoc analysis is.
340 22　A: When people talk about a
340 23　post hoc analysis, what they mean is
340 24　they're referring to an analysis that

**Re: [340:14-340:24]**
**Pltf Obj** Beyond the scope

341:1 - 341:24　Graham, David 2006-05-09
341　1　wasn't prespecified before the study
341　2　began or before the analysis began.
341　3　So, for example, in our
341　4　study, I know that Dr. Trontell kept
341　5　insisting that our comparison of Vioxx to
341　6　Celebrex was a post hoc analysis. But it
341　7　was there from the beginning of our
341　8　protocol. And so -- and I had explained
341　9　that to her multiple times. But that's
341　10　what a post hoc analysis is.
341　11　Q: And data manipulation,
341　12　again, not focusing on her concerns about
341　13　you, but what data manipulation is
341　14　generally is basically rigging the
341　15　numbers to come out the way you want
341　16　them?
341　17　A: It's scientific misconduct.
341　18　Q: And please turn over two
341　19　more pages. Under, at the bottom,
341　20　Recommendations,' do you see where Dr.
341　21　Trontell says, 'The authors should
341　22　document their methods in detail and
341　23　respond to questions raised in this
341　24　review in particular the noted

**Re: [341:1-341:24]**
**Pltf Obj** Rules 801 and 802-hearsay; beyond the scope

342:1 - 342:24　Graham, David 2006-05-09
342　1　inconsistencies in the study objectives,
342　2　results and statistical findings of
342　3　significance of their published ACR
342　4　abstract and the August 2004 ISPE
342　5　poster.' So, do you see there where
342　6　she's expressing concern that you've come
342　7　up with different conclusions and
342　8　different methodologies between that
342　9　original ACR abstract, and then your
342　10　later poster, like we saw in the chart
342　11　that I showed on the screen? Is that the
342　12　subject that's being addressed here?
342　13　A: Uh-huh. Yes.
342　14　Q: And, in particular, what
342　15　she's saying is that before you submit
342　16　this article for publication, that you
342　17　should address these issues and explain

**Re: [342:1-342:24]**
**Pltf Obj** Rules 801 and 802-hearsay; beyond the scope

Overruled



| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

342 18     them, right?
342 19     A: Dr. Trontell is saying that,
342 20     but Dr. Trontell is not my supervisor.
342 21     She wrote this to Dr. Seligman. Dr.
342 22     Seligman, I believe, e-mailed it to me
342 23     with basically no instructions. And so
342 24     Dr. Trontell can have her opinions about

343:1 - 343:24     Graham, David 2006-05-09
343 1     what it is I should do, but she's not my
343 2     supervisor, and, in fact, has never been
343 3     someone who reviews any of the work that
343 4     I do.
343 5     Q: In any event, you submitted
343 6     the article to the Lancet without making
343 7     the responses that Dr. Trontell said you
343 8     should make, right?
343 9     A: The responses were actually
343 10     included in the manuscript, A; B, we
343 11     submitted the manuscript with the
343 12     approval of my supervisors. Because I
343 13     sent multiple e-mails to Dr. Seligman and
343 14     to Dr. Trontell giving them my
343 15     interpretation of FDA's clearance
343 16     policies and asking them to instruct me
343 17     if I had misinterpreted them in any way,
343 18     because I was anxious to -- I wanted to
343 19     be sure that I followed all of FDA's
343 20     rules and procedures. And that if they
343 21     didn't get back to me, then I would
343 22     assume that I had interpreted them
343 23     correctly and that it is all right for me
343 24     to submit it.

**Re: [343:1-343:24]**
**Pltf Obj** Rules 801 and 802-hearsay; beyond the scope

344:1 - 344:24     Graham, David 2006-05-09
344 1     Dr. Trontell consulted with
344 2     the head lawyer for the Center for Drug
344 3     Evaluation and Research, Jane Axelrod,
344 4     who basically said to Dr. Trontell by way
344 5     of e-mail that it was fine, that I could
344 6     submit it. And so Anne did not have a
344 7     written response to these questions, but
344 8     I had -- my understanding was I had the
344 9     permission of FDA to submit the paper.
344 10     And it was never my understanding, quite
344 11     honestly, that I was required to give
344 12     written responses to these questions, and
344 13     I tried to express that in an e-mail to
344 14     Dr. Paul Seligman somewhere around
344 15     November 10th or 9th or somewhere in that
344 16     neighborhood, because I was about to go
344 17     on a four-day weekend, because Veterans'
344 18     Day, which is November 11th, is a Federal
344 19     holiday, and I was going to take off the
344 20     12th and then I would have a four-day
344 21     weekend.
344 22     And on the 9th, Dr. Seligman

**Re: [344:1-344:24]**
**Pltf Obj** Rules 801 and 802-hearsay; beyond the scope

Overrule [handwritten]

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

344 23     said that I could take leave on Friday,
344 24     but before I left, he needed written

345:1   -   345:16    Graham, David 2006-05-09
345  1     responses to these questions. And I
345  2     e-mailed back that I hadn't understood
345  3     that that's what he wanted. And he never
345  4     came back. He had an entire day,
345  5     November 10th, Wednesday, the entire day
345  6     he had to disabuse me of my understanding
345  7     if he wanted to, and he never said to me
345  8     that, no, I misunderstood, I really do
345  9     want you to give a written response. And
345 10     so I think that I acted reasonably and
345 11     tried to get management to communicate
345 12     with me, and management, in this case,
345 13     did not answer my e-mails, did not come
345 14     back to me to communicate with me in
345 15     clear, unambiguous instructions about
345 16     what it is that they wanted me to do.

**Re: [345:1-345:16]**
**Pltf Obj** Rules 801 and 802-hearsay; beyond the scope

*Overrule* (handwritten)

353:2   -   353:18    Graham, David 2006-05-09
353  2     Q:  And who is Dr. Steven
353  3     Galson?
353  4     A:  He is the Center director
353  5     for CEDR.
353  6     Q:  And I think you described
353  7     this morning that CDER, both the Office
353  8     of New Drugs and the Office For Drug
353  9     Safety are underneath CDER, which is the
353 10     Center for Drug Evaluation and Research,
353 11     right?
353 12     A:  Right.
353 13     Q:  And is Dr. Galson one of the
353 14     people that you think is part of this
353 15     very organized and orchestrated campaign
353 16     to smear and discredit you?
353 17     A:  Yes, he was. He may have
353 18     been an unwitting participant.

361:23   -   361:24    Graham, David 2006-05-09
361 23     (Whereupon, Deposition
361 24     Exhibit Graham-23, E-mails,

362:1   -   362:24    Graham, David 2006-05-09
362  1     TOPOLE0000333, was marked for
362  2     identification.)
362  3     - - -
362  4     BY MR. BECK:
362  5     Q:  What's Exhibit 23?
362  6     A:  It looks like an e-mail
362  7     dated November 1st from me to Dr. Eric
362  8     Topol at the Cleveland Clinic. And it's
362  9     -- it looks like it's kind of like in
362 10     response to an e-mail that he had sent to
362 11     me. And there are several other e-mails
362 12     that went back and forth between Dr.

|  | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

362 13   Topol and myself, dating back, I think,
362 14   to like the end of October when he first
362 15   telephoned me to ask if I knew who was in
362 16   FDA he could talk to about COX-2 pain
362 17   relievers and heart attack risk. And I
362 18   referred him to Shari Targum, whose
362 19   review I spoke about earlier.
362 20   Q:  You referred to Dr. Topol as
362 21   at the Cleveland Clinic. Is he still at
362 22   the Cleveland Clinic?
362 23   A:  My understanding is that
362 24   he's now at Case Western, but I'm not

**Re: [362:20-363:2]**
**Pltf Obj** Rule 401-
relevance; beyond the
scope

*overruled*

363:1   -   363:2      Graham, David 2006-05-09
363  1   really -- it's basically what I read in
363  2   the newspaper.

367:19   -   367:24      Graham, David 2006-05-09
367 19   Now, are you saying here
367 20   that you thought that Merck decided to
367 21   withdraw Vioxx on September 30 because
367 22   people at FDA management gave them a
367 23   heads up that your article was going to
367 24   be published, and Merck said we'd better

368:1   -   368:15      Graham, David 2006-05-09
368  1   get Vioxx off the market before that
368  2   article was published?
368  3   A:  No. I was just pointing to
368  4   the coincidence of the dates.
368  5   Q:  Well, you said it wasn't a
368  6   coincidence, didn't you?
368  7   A:  Well, I don't think it was a
368  8   coincidence, but...
368  9   Q:  So, that's my question.
368 10   Do you think that Merck's
368 11   withdrawal on September 30 was timed
368 12   because people at the FDA told Merck that
368 13   Dr. Graham is going to publish an
368 14   article, and so Merck said we'd better
368 15   get this drug off the market?

368:17   -   368:24      Graham, David 2006-05-09
368 17   THE WITNESS:  No, I don't.
368 18   BY MR. BECK:
368 19   Q:  That's what you told Dr.
368 20   Horton --
368 21   A:  I know that.
368 22   Q:  -- though, isn't it?
368 23   A:  That's what I -- and at the
368 24   time, I think under the duress that I was

369:  -   369:1      Graham, David 2006-05-09
369  1   under, that is what I believed.

369:11   -   369:20      Graham, David 2006-05-09
369 11   Q:  That was kind of a wild and

|  |  | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|
| 369 | 12 | crazy charge you made to the editor of | | |
| 369 | 13 | Lancet concerning -- | | |
| 369 | 14 | A: No. | | |
| 369 | 15 | Q: -- FDA management, don't you | | |
| 369 | 16 | agree? | | |
| 369 | 17 | A: It's not wild and crazy. If | | |
| 369 | 18 | you experienced what I experienced, you | | |
| 369 | 19 | would understand -- you would understand | | |
| 369 | 20 | better. | | |

370:14 - 370:24   Graham, David 2006-05-09

| 370 | 14 | Q: Dr. Graham, as an |
|---|---|---|
| 370 | 15 | epidemiologist, do you deal with the |
| 370 | 16 | concept of incidence rates? |
| 370 | 17 | A: Yes, I do. |
| 370 | 18 | Q: And in a sentence or two, |
| 370 | 19 | can you describe what an incidence rate |
| 370 | 20 | is? |
| 370 | 21 | A: It's the occurrence of an |
| 370 | 22 | outcome, a disease, in a defined |
| 370 | 23 | population over a specified period of |
| 370 | 24 | time. So, you might express something as |

371:1 - 371:24   Graham, David 2006-05-09

| 371 | 1 | 10 per 100,000 per year would be an | **Re: [371:1-371:24]** | Overruled |
|---|---|---|---|---|
| 371 | 2 | incidence rate. | **Pltf Obj** Beyond the | |
| 371 | 3 | Q: I have created a chart that | scope | |
| 371 | 4 | I want to go over with you, and I want to | | |
| 371 | 5 | look at some numbers from the Kaiser | | |
| 371 | 6 | study that you did, and I understand that | | |
| 371 | 7 | an adjustment was applied for a | | |
| 371 | 8 | cardiovascular risk score that I'll get | | |
| 371 | 9 | to later in the examination, but I want | | |
| 371 | 10 | to look at the kind of raw numbers about | | |
| 371 | 11 | incidence rates of heart attacks and | | |
| 371 | 12 | sudden cardiac death for Vioxx and | | |
| 371 | 13 | Celebrex as you saw them in your study. | | |
| 371 | 14 | Okay? | | |
| 371 | 15 | So, if you will take out | | |
| 371 | 16 | Exhibit 4, which is your 2005 Lancet | | |
| 371 | 17 | publication, and if you'll look over at | | |
| 371 | 18 | the third page in the right column under | | |
| 371 | 19 | Results,' tell me if the numbers I | | |
| 371 | 20 | filled in on the screen there for number | | |
| 371 | 21 | of users for Vioxx of something over | | |
| 371 | 22 | 26,000, and then for Celebrex, something | | |
| 371 | 23 | over 40,000, are those accurate numbers | | |
| 371 | 24 | -- | | |

372:1 - 372:24   Graham, David 2006-05-09

| 372 | 1 | A: Yes. | **Re: [372:1-372:24]** |
|---|---|---|---|
| 372 | 2 | Q: -- from your study? | **Pltf Obj** Beyond the |
| 372 | 3 | A: Yes. | scope |
| 372 | 4 | Q: And then if you'll look at | |
| 372 | 5 | Table 3 on that same page or is -- Table | |
| 372 | 6 | 3, I guess it's the next page. If you'll | |
| 372 | 7 | look at Table 3, do I have it right that | |

|  | | | Objections/Responses in Mason | Rulings in Smith/Barnett |
|---|---|---|---|---|

372  8   the number of heart attacks and sudden
372  9   cardiac deaths. Vioxx was 68 and for
372 10   Celebrex was 126?
372 11   A:  Yes.
372 12   Q:  And when we're talking about
372 13   Vioxx here, that includes both low dose
372 14   and high dose, right?
372 15   A:  Correct.
372 16   Q:  And so just taking the
372 17   numbers that you report before the
372 18   adjustments are made, is this correct
372 19   that the incidence rate of heart attacks
372 20   and sudden cardiac deaths for Vioxx would
372 21   be about .25 percent, whereas for
372 22   Celebrex, it would actually be a little
372 23   higher, .31 percent?
372 24   A:  No. That's not an incidence

373:1  -  373:24   Graham, David 2006-05-09
373  1   rate. That is a proportion. An
373  2   incidence rate would take into account
373  3   the amount of time that each of the users
373  4   was on the drug, and so then what you'd
373  5   end up having is years of exposure to
373  6   Vioxx in the denominator and number of
373  7   cases in the numerator and the same for
373  8   Celebrex. So, these are proportions, but
373  9   they are not incidence rates.
373 10   Q:  Okay.
373 11   So, proportions.
373 12   And the proportions of
373 13   Celebrex users who experienced heart
373 14   attacks or sudden cardiac deaths was
373 15   actually slightly higher than the
373 16   proportion of Vioxx users, correct?
373 17   A:  That is correct.
373 18   Q:  And you said that in order
373 19   to do an incidence rate, you'd want to
373 20   know how long they were using the drugs,
373 21   so you'd take into account patient years;
373 22   is that right?
373 23   A:  Correct.
373 24   MR. BECK:  Let me mark for

**Re: [373:1-373:24]**
**Pltf Obj** Beyond the scope

374:1  -  374:21   Graham, David 2006-05-09
374  1   you, please, Exhibit 25.
374  2   - - -
374  3   (Whereupon, Deposition
374  4   Exhibit Graham-25, Chart
374  5   FDACDER005940, was marked for
374  6   identification.)
374  7   - - -
374  8   BY MR. BECK:
374  9   Q:  And this Exhibit 25, do you
374 10   recognize this as a document or a page of
374 11   a longer document that was created as
374 12   part of your study?

**Re: [374:1-374:21]**
**Pltf Obj** Beyond the scope

Overruled

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

374 13    A:  Yes. I don't recall,
374 14    though, at what stage in the study that
374 15    this run was done, and so I don't know if
374 16    it included sort of the modifications
374 17    that we had to make because of
374 18    eligibility problems and the like. But
374 19    it is from our study. I'm not able here
374 20    to read the column on the right-hand side
374 21    because of it being smudged.

375:5  -  375:24   Graham, David 2006-05-09
375  5    In the right-hand column,
375  6    while we may have to struggle with the
375  7    exact numbers, it does say, does it not,
375  8    incidence rate per 1,000 patient years'?
375  9    A:  That's what it looks like it
375 10    says to me, yes.
375 11    Q:  Okay.
375 12    I mean, there's no doubt it
375 13    says this?
375 14    A:  Right, no. This table is
375 15    set up to calculate incidence rates, so,
375 16    there's no question about that.
375 17    Q:  Okay.
375 18    So, and then if we look down
375 19    at rofecoxib, that's Vioxx as we know,
375 20    correct?
375 21    A:  Right.
375 22    Q:  And then the rofecoxib
375 23    number is 7. something, right?
375 24    A:  Right.

Re: [375:5-375:24]
Pltf Obj Beyond the scope

376:1  -  376:24   Graham, David 2006-05-09
376  1    Q:  Again, we'll just blow it
376  2    up. And does that look like 7.49 to you
376  3    once it's been blown up?
376  4    A:  Yes. When I was looking at
376  5    this (indicating), I would have said
376  6    7.48, but it looks like 7.49 there
376  7    (indicating).
376  8    Q:  Okay.
376  9    Well, close enough for
376 10    government work. It's 7.48 or 7.49,
376 11    right?
376 12    A:  Right.
376 13    Q:  And then if we look up at
376 14    Celebrex, celecoxib, it is like 7.8
376 15    something?
376 16    A:  Yes. It looks like 7.84 to
376 17    me, but...
376 18    Q:  Okay.
376 19    Whatever it is, it's
376 20    actually the incidence rate taking into
376 21    account the patient years, as you said,
376 22    the incidence rate for heart attacks and
376 23    sudden cardiac death for Celebrex is
376 24    actually higher than the incidence rate

Re: [376:1-376:24]
Pltf Obj Beyond the scope

| | | | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|---|

377:1 - 377:24   Graham, David 2006-05-09

| 377 | 1 | for sudden cardiac death in heart attacks |
| 377 | 2 | for Vioxx, correct? |
| 377 | 3 | A:  It's a crude incidence rate, |
| 377 | 4 | and the number is higher. They're |
| 377 | 5 | probably at this point with crude rates |
| 377 | 6 | not statistically different, but Celebrex |
| 377 | 7 | rate is higher than the rofecoxib or |
| 377 | 8 | Vioxx rate. |
| 377 | 9 | Q:  Yeah. And I didn't mean to |
| 377 | 10 | suggest that there was a statistically |
| 377 | 11 | significant difference, but the Lancet |
| 377 | 12 | article, one of the conclusions is that |
| 377 | 13 | there is a statistically significant |
| 377 | 14 | difference between Vioxx and Celebrex and |
| 377 | 15 | that Vioxx has a statistically |
| 377 | 16 | significant higher risk of serious |
| 377 | 17 | coronary heart disease, right? |
| 377 | 18 | A:  Right. And that's based on |
| 377 | 19 | odds ratios as opposed to incidence |
| 377 | 20 | rates. |
| 377 | 21 | Q:  But the incidence rates |
| 377 | 22 | would be basically the same? |
| 377 | 23 | A:  Yes. The incidence rates |
| 377 | 24 | form the base of the data, but this is |

**Re: [377:1-377:24]**
**Pltf Obj** Beyond the scope

Overruled

378:1 - 378:24   Graham, David 2006-05-09

| 378 | 1 | before adjustments have been done for the |
| 378 | 2 | types of patients that are given these |
| 378 | 3 | different drugs. |
| 378 | 4 | Q:  And that's what I want to |
| 378 | 5 | get to now. |
| 378 | 6 | So, you start out with |
| 378 | 7 | actual numbers of users and how long they |
| 378 | 8 | use the drug and how many of them had |
| 378 | 9 | heart attacks, and Vioxx and Celebrex |
| 378 | 10 | look basically identical. And then in |
| 378 | 11 | your analysis, you applied adjustments to |
| 378 | 12 | the Vioxx users and Celebrex users, and |
| 378 | 13 | the end result of those adjustments was |
| 378 | 14 | that Vioxx ended up appearing to have a |
| 378 | 15 | higher risk, right? |
| 378 | 16 | A:  Yes. |
| 378 | 17 | Q:  And the person who -- first |
| 378 | 18 | of all, these adjustments, at least one, |
| 378 | 19 | a significant one is called a cardiac |
| 378 | 20 | risk score, cardiovascular risk score, |
| 378 | 21 | right? |
| 378 | 22 | A:  Right. |
| 378 | 23 | Q:  Is that the main adjustment |
| 378 | 24 | that was applied? |

**Re: [378:1-378:24]**
**Pltf Obj** Beyond the scope

379:1 - 379:24   Graham, David 2006-05-09

| 379 | 1 | A:  That was the main |
| 379 | 2 | adjustment, and it represented basically |

**Re: [379:1-379:24]**
**Pltf Obj** Beyond the

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

| | | |
|---|---|---|
| 379 3 | a collapsing of 25 or 30 other variables | scope |
| 379 4 | into a single measure. | |
| 379 5 | Q: And the cardiovascular risk | |
| 379 6 | score, basically that says, well, people | |
| 379 7 | who take one type of medicine might have | |
| 379 8 | a whole bunch of other factors that make | |
| 379 9 | them prone to have heart attacks more | |
| 379 10 | than people who take a different | |
| 379 11 | medicine, and we want to take that into | |
| 379 12 | account? | |
| 379 13 | A: Right. They have to be | |
| 379 14 | differential distribution of risk | |
| 379 15 | factors. | |
| 379 16 | Q: And the person who developed | |
| 379 17 | the methodology to come up with the | |
| 379 18 | cardiovascular risk scores for Celebrex | |
| 379 19 | and Vioxx in your study was Dr. Wayne | |
| 379 20 | Ray, who you mentioned before, right? | |
| 379 21 | A: Well, actually, we reference | |
| 379 22 | him as having used it, but the use of | |
| 379 23 | this -- it's basically -- it's a | |
| 379 24 | confounder's score. The use of a | |

**380:1 - 380:24   Graham, David 2006-05-09**

| | | |
|---|---|---|
| 380 1 | confounder's score in case control | Re: [380:1-380:24] |
| 380 2 | studies has been well described by Jim | Pltf Obj Beyond the |
| 380 3 | Schlesselman in his textbook on case | scope |
| 380 4 | control studies and then by Norman | |
| 380 5 | Breslow in his textbook on case control | |
| 380 6 | studies. And so this is a technique | |
| 380 7 | that's been described before. It's a | |
| 380 8 | technique that Dr. Ray has used, but he's | |
| 380 9 | not the person who created it, developed | |
| 380 10 | it. | |
| 380 11 | Q: Well, he didn't invent the | |
| 380 12 | idea of a cardiovascular risk score, but | |
| 380 13 | he's the one who came up with the formula | |
| 380 14 | to account for all of these variables, | |
| 380 15 | and he's the one who did the statistical | |
| 380 16 | heavy lifting in order to implement that | |
| 380 17 | idea in this case, right? | |
| 380 18 | A: In this case, he taught me | |
| 380 19 | how to do it. I was the one who did it, | |
| 380 20 | working with him by telecon. | |
| 380 21 | Q: And Dr. Ray and you ended up | |
| 380 22 | assigning a higher cardiovascular risk | |
| 380 23 | score to the Celebrex users to the Vioxx | |
| 380 24 | users, correct? | |

**381:1 - 381:24   Graham, David 2006-05-09**

| | | |
|---|---|---|
| 381 1 | A: That's correct. | Re: [381:1-381:24] |
| 381 2 | Q: And the result of that then | Pltf Obj Beyond the |
| 381 3 | was that even though the incidence rate | scope |
| 381 4 | was the same -- | |
| 381 5 | A: The crude incidence rate. | |
| 381 6 | Q: -- when you applied the | |
| 381 7 | cardiovascular risk score that the two of | |

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|
| 381 8 | you came up with, that's what accounts | | |
| 381 9 | for the difference in your paper between | | |
| 381 10 | risks of Vioxx and risks of Celebrex, | | |
| 381 11 | right? | | |
| 381 12 | A: It's not just the | | |
| 381 13 | cardiovascular risk score. It's | | |
| 381 14 | adjusting for these risk factors. And in | | |
| 381 15 | our paper, we showed that using all of | | |
| 381 16 | the variables, all of the risk factors in | | |
| 381 17 | our study to adjust for cardiovascular | | |
| 381 18 | risk or using the cardiovascular risk | | |
| 381 19 | score gave us virtually identical | | |
| 381 20 | answers. But use of this confounder's | | |
| 381 21 | score was a more efficient, statistically | | |
| 381 22 | efficient way to deal with the data. | | |
| 381 23 | Q: And, of course, Dr. Ray was | | |
| 381 24 | involved heavily in the confounder's | | |
| | | | overruled |
| 382:1 - 382:24 | Graham, David 2006-05-09 | | |
| 382 1 | score also, right? | Re: [382:1-382:24] | |
| 382 2 | A: He was the person who worked | Pltf Obj Beyond the | |
| 382 3 | with me in showing me how to derive that | scope | |
| 382 4 | score. | | |
| 382 5 | Q: Okay. | | |
| 382 6 | And here I've put up on the | | |
| 382 7 | screen a copy of the article, the Lancet | | |
| 382 8 | article that's already been marked as an | | |
| 382 9 | exhibit. | | |
| 382 10 | When people write articles | | |
| 382 11 | in scientific journals, are they supposed | | |
| 382 12 | to disclose any financial conflicts of | | |
| 382 13 | interest that they have? | | |
| 382 14 | A: They should, and I believe | | |
| 382 15 | that Dr. Ray did. | | |
| 382 16 | Q: Okay. | | |
| 382 17 | Let's take a look at that. | | |
| 382 18 | If you'd go to Page 6. The person who | | |
| 382 19 | came, who taught you how to make these | | |
| 382 20 | adjustments that resulted in Vioxx | | |
| 382 21 | looking like it had a higher risk than | | |
| 382 22 | Celebrex, he had two significant | | |
| 382 23 | conflicts of interest, didn't he? | | |
| 382 24 | A: Well, he has two potential | | |
| 383:1 - 383:24 | Graham, David 2006-05-09 | | |
| 383 1 | conflicts of interest, and I was unaware | Re: [383:1-383:24] | |
| 383 2 | of these when I invited him to | Pltf Obj Beyond the | |
| 383 3 | participate in our study, and I was | scope | |
| 383 4 | actually unaware of them until it came | | |
| 383 5 | time to do our poster, at which time then | | |
| 383 6 | you need to put on it, you know, the | | |
| 383 7 | conflict of interest statement, and it | | |
| 383 8 | had never crossed my mind to ask people | | |
| 383 9 | about it. So, that was when I learned | | |
| 383 10 | about it. And -- | | |
| 383 11 | Q: And I want you to complete | | |
| 383 12 | this, but before you do, this 'WAR,' this | | |

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

383 13    thing I have up on the screen, that's
383 14    Wayne A. Ray, right?
383 15    A:  Yes.
383 16    Q:  And he's a consultant to
383 17    Pfizer, it says in this disclosure,
383 18    correct?
383 19    A:  Yes.
383 20    Q:  Who is it that makes
383 21    Celebrex?
383 22    A:  Pfizer.
383 23    Q:  And so he's got a financial
383 24    interest in making Celebrex look good,

384:1  -  384:24    Graham, David 2006-05-09
384  1    right?
384  2    A:  You could argue that he
384  3    does, but that didn't operate in our
384  4    study.
384  5    Q:  And then he's also -- under
384  6    the conflict of interest, they say that
384  7    he's a consultant to plaintiffs'
384  8    attorneys regarding Vioxx, right?
384  9    A:  Yes.
384 10    Q:  And did you know that he's
384 11    actually served as an expert witness in
384 12    Vioxx trials?
384 13    A:  I learned about that only
384 14    like within the last month or so, but I
384 15    didn't know that beforehand.
384 16    Q:  So, anyway, here is Dr. Ray
384 17    teaching you how to make these
384 18    adjustments, and these adjustments were
384 19    made by the time your poster was
384 20    published, right?
384 21    A:  Yes.
384 22    Q:  And it wasn't until after he
384 23    taught you how to make the adjustments
384 24    and all the adjustments were made that

385:1  -  385:24    Graham, David 2006-05-09
385  1    you even found out that he was a paid
385  2    consultant to the maker of Celebrex and
385  3    was being paid by plaintiffs' lawyers who
385  4    were suing Merck in Vioxx cases? Is that
385  5    right?
385  6    A:  Yes. But that didn't impact
385  7    the methodology that was used to derive
385  8    this adjustment, this confounder's score.
385  9    This is a way of adjusting for a
385 10    difference in distribution of risk
385 11    factors across exposure groups. And so
385 12    he may have these associations, but that
385 13    doesn't --
385 14    Q:  'May have,' what do you mean
385 15    may have'?
385 16    A:  Well, he has those
385 17    associations. They don't affect the way

**Re: [384:1-384:24]**
**Pltf Obj** Beyond the scope

**Re: [385:1-385:24]**
**Pltf Obj** Beyond the scope

| | | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|

385 18   statistics work. They don't affect the
385 19   way, the methods of how one derives a
385 20   confounder's score. They don't affect
385 21   the way one does a regression model and
385 22   what happens after the computer program
385 23   spits out the results.
385 24   Q: Is there a book you can go

386:1   -   386:13   Graham, David 2006-05-09
386  1   to or an article that says, here's the
386  2   formula, here's the exact way to
386  3   implement this idea of a confounder's
386  4   score in your study, or did it require
386  5   some judgment by Dr. Ray as to how he was
386  6   going to implement this idea when coming
386  7   up with a confounder's score and the
386  8   cardiovascular risk score?
386  9   A: It's described in
386 10   Schlesselman's textbook and in Breslow's
386 11   textbook. I don't recall that all the
386 12   methods are described there, but the
386 13   notion of how to do this is.

**Re: [386:1-386:13] Pltf Obj** Beyond the scope

388:14   -   388:23   Graham, David 2006-05-09
388 14   Q: And you did say that the
388 15   fellow who taught you how to do it was
388 16   Dr. Ray, the guy with the two conflicts,
388 17   right?
388 18   A: Yes, that is correct.
388 19   Q: And I think you said this
388 20   morning that there are 'lies, damned lies
388 21   and statistics,' right?
388 22   A: I said that, too. It
388 23   doesn't apply here, but I did say that.

**Re: [388:14-388:23] Pltf Obj** Beyond the scope

**Re: [388:19-388:23] Pltf Obj** Argumentative; beyond the scope

389:2   -   389:24   Graham, David 2006-05-09
389  2   We talked about how from the
389  3   original abstract to the poster, the
389  4   number of high-dose patients changed. Do
389  5   you remember that?
389  6   A: Uh-huh.
389  7   Q: So, you had a smaller number
389  8   of high-dose patients in the abstract
389  9   when you said there was no statistically
389 10   significant difference between high-dose
389 11   Vioxx and basically no use of medicine.
389 12   And then some people got changed, and the
389 13   net result was that there was a larger
389 14   number of high-dose patients when it came
389 15   time to write up the poster. Do you
389 16   remember that?
389 17   A: Yes.
389 18   Q: And we looked at Dr.
389 19   Trontell's memo where she expressed
389 20   concern about that. Do you recall that?
389 21   A: Yes.

**Re: [389:2-389:24] Pltf Obj** Beyond the scope

Overruled

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

389 22   Q: To try to save time, because
389 23   you may remember the numbers, I suspect
389 24   you do, in the abstract when you were

390:1   -   390:24   Graham, David 2006-05-09

390  1   talking about high-dose people, am I          Re: [390:1-390:24]
390  2   right that you had five people who had        Pltf Obj Beyond the
390  3   experienced -- five so-called cases and              scope
390  4   seven so-called controls?
390  5   A: Correct.
390  6   Q: And in one sentence, what is
390  7   a case and what's a control?
390  8   A: A case is someone who had a
390  9   heart attack or sudden death. And a
390 10   control was someone who was randomly
390 11   selected to compare to that person, who
390 12   on that date had not, as of that date,
390 13   had a heart attack or sudden death.
390 14   Q: Okay.
390 15   And then sort of going
390 16   forward to by the time your article was
390 17   published in The Lancet, instead of five
390 18   cases with the same population group
390 19   after the reclassification, you now have
390 20   ten cases, right?
390 21   A: Yes.
390 22   Q: So, the number of heart
390 23   attacks and sudden cardiac deaths that
390 24   you were ascribing to the high-dose Vioxx

391:1   -   391:10   Graham, David 2006-05-09

391  1   users doubled from when you did the           Re: [391:1-391:10]
391  2   abstract to when you did the article,         Pltf Obj Beyond the
391  3   right?                                               scope
391  4   A: Correct.
391  5   Q: And then you also, instead
391  6   of seven controls, you had eight
391  7   controls, right?
391  8   A: Correct.
391  9   Q: And was it your idea to do
391 10   this reclassification?

391:18   -   391:24   Graham, David 2006-05-09

391 18   A: Yes.                                        Re: [391:18-391:24]
391 19   Q: And then before -- I think                  Pltf Obj Beyond the
391 20   this is clear, but I want to make sure.              scope
391 21   Before you did the
391 22   reclassification, even the high-dose
391 23   Vioxx users, the difference in risk
391 24   between them and people who didn't use

392:1   -   392:24   Graham, David 2006-05-09

392  1   any medicine was not statistically             Re: [392:1-392:24]
392  2   significant, and then after you did the        Pltf Obj Beyond the
392  3   reclassification, then it became                     scope
392  4   statistically significant, right?

*overruled*

56

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

392  5    A:  That's correct.
392  6    Q:  Now, did any of the authors,
392  7    your co-authors, express concern about
392  8    whether this reclassification was proper?
392  9    A:  Dr. Craig Cheetham from
392 10    Kaiser did express reservations about the
392 11    reclassification. His concern was
392 12    primarily that it be adequately
392 13    described, and that eventually was done
392 14    to his satisfaction, and he was a
392 15    co-author on the published paper.
392 16    - - -
392 17    (Whereupon, Deposition
392 18    Exhibit Graham-26, E-mail
392 19    10-23-04 KP002315, was marked for
392 20    identification.)
392 21    - - -
392 22    BY MR. BECK:
392 23    Q:  Please take a look at
392 24    Exhibit 26. Have you seen Exhibit 26

393:1  -  393:24    Graham, David 2006-05-09
393  1    before?
393  2    A:  Yes, I have.
393  3    Q:  And this is a -- is this an
393  4    e-mail from doctor -- how do you
393  5    pronounce his last name?
393  6    A:  Cheetham.
393  7    Q:  -- Cheetham to you and other
393  8    co-authors in the study?
393  9    A:  Yes, it is.
393 10    Q:  Does Dr. Cheetham say here
393 11    in the first paragraph, 'I have never
393 12    been comfortable with the recoding of
393 13    Vioxx patients into the high dose
393 14    category. However, it was done with the
393 15    full participation of five investigators.
393 16    The process by which this was done needs
393 17    to be fully disclosed in the methods
393 18    section. Therefore, the methods section
393 19    needs to be clear on three points.' And
393 20    then his first point is the coding 'was
393 21    done post hoc.' Do you see that?
393 22    A:  Uh-huh.
393 23    Q:  And that 'post hoc,' did you
393 24    understand that to mean that that was

**Re: [393:1-393:24]**
**Pltf Obj** Beyond the scope

394:1  -  394:24    Graham, David 2006-05-09
394  1    after the fact?
394  2    A:  The fact that I think he's
394  3    talking about here is, is that we hadn't
394  4    planned on doing this at the start of the
394  5    study.
394  6    Q:  Okay.
394  7    So, this was something that
394  8    was not part of the original study plan,
394  9    but then the reclassification took place

**Re: [394:1-394:24]**
**Pltf Obj** Beyond the scope

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

394 10   after -- in fact, it was after you
394 11   learned of the results reported in the
394 12   abstract of no statistically significant
394 13   difference, right?
394 14   A:  That coincidence in timing
394 15   is correct.
394 16   Q:  Okay.
394 17   So, you learned no
394 18   statistically significant difference
394 19   based on the planned classification, and
394 20   then you changed the plan and
394 21   reclassified, right?
394 22   A:  We did that, and for a good
394 23   reason, because we had misclassification
394 24   of the exposure. And to leave that

395:1   -   395:24   Graham, David 2006-05-09
395  1   misclassification of exposure in the
395  2   study would be to misrepresent the study,
395  3   and so it became necessary -- we were
395  4   trying to use a computerized algorithm to
395  5   classify dose. And what we discovered
395  6   was that just because somebody was
395  7   getting a 50-milligram tablet didn't mean
395  8   they were taking 50 milligrams a day.
395  9   Sometimes it was cheaper for patients to
395 10   take the 50 milligram tablet and break it
395 11   in half and actually take 25 milligrams a
395 12   day or to take two 25s instead of 50.
395 13   So, we were obligated to correct that
395 14   misclassification once we discovered that
395 15   it was present.
395 16   Q:  And the second point he
395 17   makes is, 'All five investigators
395 18   participated.' And then he has the
395 19   initials of the five investigators,
395 20   including 'DG,' and that's David Graham,
395 21   you, right?
395 22   A:  That's right. And I was
395 23   part of the call that this took place in,
395 24   but I was not a voting member whose votes

Re: [395:1-395:24]
Pltf Obj Beyond the scope

396:1   -   396:24   Graham, David 2006-05-09
396  1   would determine whether or not
396  2   reclassification occurred. For
396  3   reclassification to occur, these other
396  4   four people had to agree that based on
396  5   the evidence that they saw about how
396  6   Vioxx was being used, that the patients
396  7   should be reclassified.
396  8   Q:  And then his third point
396  9   was, 'David Graham was not blinded to
396 10   cases and controls when the recoding was
396 11   done.'
396 12   Now, you talked about cases
396 13   being -- that's where somebody had a
396 14   heart attack and controls being somebody

Re: [396:1-396:24]
Pltf Obj Beyond the scope

Overruled

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

396 15  did not have a heart attack. And when he
396 16  says that you were 'not blinded to cases
396 17  and controls,' does that mean that at the
396 18  time that individual patients were
396 19  reclassified from short-term users to
396 20  long-term users, you had access to the
396 21  information that would tell you whether,
396 22  in fact, patient A had a heart attack or
396 23  did not have a heart attack?
396 24  A:  That's correct, and that's

397:1   -   397:24   Graham, David 2006-05-09
397  1  why I wasn't a voting member.
397  2  Q:  So, what Dr. Cheetham said
397  3  was that, fine, we made these
397  4  adjustments, but our article needs to set
397  5  forth what we did and how we did it and
397  6  needs to say that it was not part of the
397  7  original plan, that all five
397  8  investigators, including Dr. Graham,
397  9  participated, and when Dr. Graham was
397 10  participating, he knew which patients had
397 11  heart attacks and which ones didn't.
397 12  That's what he wanted to be put forth in
397 13  the article as published in Lancet,
397 14  right?
397 15  A:  That's what he says in this
397 16  e-mail.
397 17  Q:  And, you didn't do -- in
397 18  fact, he says at the bottom of this
397 19  e-mail, 'From my perspective this issue
397 20  is not negotiable,' right?
397 21  A:  Yes.
397 22  Q:  But you did not make the
397 23  disclosure that Dr. Cheetham felt was
397 24  necessary, and, in fact, not even

**Re: [397:1-397:24]**
**Pltf Obj Beyond the**
**scope**

398:1   -   398:24   Graham, David 2006-05-09
398  1  negotiable, did you?
398  2  A:  We placed in the methods,
398  3  had a description of the process that we
398  4  used to reclassify these cases. It
398  5  didn't meet with Dr. Cheetham's -- his
398  6  personal requirements, but the other
398  7  co-authors were quite comfortable, and
398  8  there's a lot of e-mail traffic about
398  9  that.
398 10  I will add that after this,
398 11  I had a conversation, after we submitted
398 12  the paper to the Lancet, with the editor
398 13  of the Lancet, Dr. Horton, in which I
398 14  described in detail all of these things.
398 15  And Dr. Horton had no problem with the
398 16  way that we had conducted this, and when
398 17  Dr. Cheetham learned that, his
398 18  reservations went away.
398 19  Q:  Well, when you say that it

**Re: [398:1-398:24]**
**Pltf Obj Beyond the**
**scope**

Overruled

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

398 20    wasn't done exactly the way he said it
398 21    should be done, the way that it was
398 22    actually done, the disclosures that were
398 23    made in the Lancet, they left you out
398 24    when it described who did the recoding,

399:1   -   399:24   Graham, David 2006-05-09
399  1    isn't that true?
399  2    A:  Because I didn't vote on the
399  3    recoding. The recoding required the
399  4    unanimous vote to change of the four
399  5    people listed, and if even one of them
399  6    said that the case should not be recoded,
399  7    it wasn't recoded. And --
399  8    Q:  Did the Lancet article
399  9    disclose that you were the one who
399 10    suggested the reclassification after you
399 11    already knew which patients had heart
399 12    attacks and which ones didn't?
399 13    A:  No. But that wasn't -- the
399 14    editor didn't feel that that was
399 15    necessary.
399 16    Q:  Did the Lancet article
399 17    disclose that even though you say you
399 18    didn't have a vote, you wrote memos to
399 19    the other authors saying here's the
399 20    people I think ought to be reclassified?
399 21    A:  I did send a list of patient
399 22    IDs that I thought that there was a
399 23    question about the reclassification, and
399 24    each of the members of the study team

**Re: [399:1-399:24]**
**Pltf Obj** Beyond the scope

400:1   -   400:18   Graham, David 2006-05-09
400  1    were asked to come up with a similar
400  2    list. And then that composite list was
400  3    what the group voted on together, and
400  4    there were 29 or 30 patients in that
400  5    group that the four participants voted
400  6    upon.
400  7    Q:  Did the Lancet article
400  8    disclose that even though you didn't have
400  9    a vote, that you, knowing who had heart
400 10    attacks and who didn't, came up with a
400 11    list of people that you wanted the others
400 12    to look at and you suggested should be
400 13    reclassified? Did the Lancet article
400 14    disclose that?
400 15    A:  No, it didn't. But the
400 16    editor was fully aware of it and believed
400 17    that the process, the voting process was
400 18    sufficient and stringent enough.

**Re: [400:1-400:18]**
**Pltf Obj** Beyond the scope

440 20   -   440:24   Graham, David 2006-05-09
440 20    You talked about how you
440 21    made a presentation in February of 2005
440 22    to the FDA Advisory Committee. Do you
440 23    remember that?

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

440 24       A: Yes, I do.

4██ - 441:24    Graham, David 2006-05-09
441 7      Q: Then the Advisory Committee
441 8      made recommendations to the FDA, and the
441 9      FDA, in turn, reached some conclusions
441 10     concerning the safety of COX-2
441 11     inhibitors; is that correct?
441 12     A: I believe it is.
441 13     MR. BECK: We'll mark as
441 14     Exhibit 32 the April 6, 2005
441 15     memorandum.
441 16     - - -
441 17     (Whereupon, Deposition
441 18     Exhibit Graham-32, Memo 4-6-05
441 19     Analysis and recommendations for
441 20     Agency action regarding
441 21     non-steroidal anti-inflammatory
441 22     drugs and cardiovascular risk,'
441 23     (19 pages),   was marked for
441 24     identification.)

442:1 - 442:2    Graham, David 2006-05-09
442 1      - - -
442 2      BY MR. BECK:

442:15 - 442:24   Graham, David 2006-05-09
442 15     Is this the memorandum we've
442 16     been talking about?
442 17     A: Yes, it is.
442 18     Q: Okay.
442 19     And then on the.bottom of
442 20     Page 3 where it lists the different
442 21     offices, did the division of
442 22     anti-inflammatories participate in this
442 23     review?
442 24     A: Yes, it did.

443:1 - 443:24   Graham, David 2006-05-09
443 1      Q: Did the --
443 2      A: They were probably the major
443 3      participant, because they are the ones
443 4      who ultimately regulate these products.
443 5      Q: Anti-inflammatories includes
443 6      NSAIDs and COX-2 inhibitors, right?
443 7      A: Correct.
443 8      Q: And the Division of
443 9      Over-the-Counter Drug Products also
443 10     participated, correct?
443 11     A: Yes, because they're
443 12     over-the-counter NSAIDs.
443 13     Q: And the Office of Drug
443 14     Evaluation II and V participated, right?
443 15     A: Right. Those are the parent
443 16     organizations of these other divisions.
443 17     Q: And the Office of New Drugs
443 18     participated?

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

443 19      A: Right. That's the super
443 20      office over them.
443 21      Q: Office of Drug Safety,
443 22      that's your office, right?
443 23      A: Correct.
443 24      Q: Office of Biostatistics.

444:1  -  444:24    Graham, David 2006-05-09
444 1      Does that include epidemiologists?
444 2      A: No. Epidemiologists are in
444 3      the Office of Drug Safety. The Office of
444 4      Biostatistics is exclusively
444 5      statisticians.
444 6      Q: And the Office of
444 7      Pharmacoepidemiology and Statistical
444 8      Science participated, right?
444 9      A: Right. That's the office
444 10      that contains both drug safety and
444 11      statistics.
444 12      Q: The Office of Medical Policy
444 13      participated?
444 14      A: Right, yes.
444 15      Q: And the Office of Regulatory
444 16      Policy?
444 17      A: Yes.
444 18      Q: And the Office of the Center
444 19      Director, right?
444 20      A: Correct.
444 21      Q: And they looked at all kinds
444 22      of materials, including your PowerPoint
444 23      and your, I don't know if it's testimony
444 24      or remarks that were delivered to the

445:1  -  445:24    Graham, David 2006-05-09
445 1      Advisory Committee, correct?
445 2      A: Presumably. I wasn't part
445 3      of the internal decision-making, but
445 4      presumably that was part of what they
445 5      considered.
445 6      Q: Then focusing on the first
445 7      page here, in terms of who authored this
445 8      memorandum from the FDA, I think you've
445 9      already identified John Jenkins, Dr. John
445 10      Jenkins, of the Office of New Drugs,
445 11      right?
445 12      A: Correct.
445 13      Q: And then also you've
445 14      identified your boss, Paul Seligman,
445 15      right?
445 16      A: Correct.
445 17      Q: And then it says 'Through:
445 18      Steven Galson.' What does it mean when
445 19      it is from Drs. Jenkins and Seligman
445 20      through Dr. Galson?
445 21      A: What it typically means is,
445 22      is the 'froms' have written the report.
445 23      It goes to the 'through' person, who can

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

445 24       edit it and ask for modifications and the

**445:1  -  446:24    Graham, David 2006-05-09**
446  1    like. And then after they've signed off
446  2    on it, it is sent off to whomever the
446  3    to' is.
446  4    Q:  All right.
446  5    And the 'to' is the NDA
446  6    files and has all these numbers, right?
446  7    A:  Correct.
446  8    Q:  So, if I understand it
446  9    correctly, they got input from all these
446 10    different groups, and then the head of
446 11    the Office of New Drugs and the director
446 12    of the Office of Pharmacoepidemiology and
446 13    Statistical Science got together and
446 14    wrote a draft that then was approved by
446 15    the director of the entire Center for
446 16    Drug Evaluation and Research, right?
446 17    A:  Correct.
446 18    Q:  Then I just want to go
446 19    through with you the first five bullet
446 20    points, and then I'll be done.
446 21    In the executive summary
446 22    here, do you see where the FDA says that
446 23    Following a thorough review of the
446 24    available data we have reached the

**447:1  -  447:24    Graham, David 2006-05-09**
447  1    following conclusions regarding currently
447  2    approved COX-2 selective and
447  3    non-selective non-steroidal
447  4    anti-inflammatory drugs and the risk of
447  5    adverse cardiovascular events.' So
447  6    that's their setup.
447  7    Then the first point they
447  8    make is: 'The three approved COX-2
447  9    selective NSAIDS (i.e. celebrex,' Vioxx,
447 10    and what's the third one, 'valdecoxib'?
447 11    A:    That would be Bextra.
447 12    Q:    So, they say that three
447 13    COX-2 selective NSAIDs 'are associated
447 14    with an increased risk of serious adverse
447 15    CV events compared to placebo. The
447 16    available data do not permit a rank
447 17    ordering of these drugs with regard to CV
447 18    risk.' Now, what they're saying here is
447 19    that any one of these COX-2 inhibitors
447 20    can increase CV risk, but there's no
447 21    basis on which to say that one is riskier
447 22    than another, right?
447 23    A:  What they're saying is, is
447 24    that the absence of evidence is evidence

**448:1  -  448:1    Graham, David 2006-05-09**
448  1    of absence. They're basing --

**Re: [448:1-448:1]**
**Pltf Obj** Cuts off answer

| | Objections/Responses In Mason which continues 448:6-449:8 | Rulings In Smith/Barnett |
|---|---|---|

449:14   -   449:21      Graham, David 2006-05-09
449 14      Does it mean that the people
449 15      who wrote this memo and the person who
449 16      approved it, whether you agree with them
449 17      or not, what they're saying is that you
449 18      cannot draw a distinction between the
449 19      cardiovascular risks of Vioxx versus
449 20      Celebrex versus Bextra?
449 21      A:  That's what they are saying.

450:16   -   450:24      Graham, David 2006-05-09
450 16      Q:  Your article, one of its          **Re: [450:16-450:24]**
450 17      core conclusions, is that there is a    **Pltf Obj** Beyond the
450 18      difference, statistically significant   scope to 451:2
450 19      difference between the risk of using
450 20      Vioxx versus Celebrex, correct?
450 21      A:  Correct.
450 22      Q:  And they disagree with you,
450 23      right?
450 24      A:  They're saying there are no

451:1   -   451:24      Graham, David 2006-05-09
451 1      clinical trials to show that, and so they   **Re: [451:1-451:2]**
451 2      disagree.                                    **Pltf Obj** Beyond the
451 3      Q:  Then the next point says,                 scope to 451:2
451 4      Data from large long-term controlled
451 5      clinical trials that have included a
451 6      comparison of COX-2 selective and
451 7      non-selective NSAIDs do not clearly
451 8      demonstrate that the COX-2 selective
451 9      agents confer a greater risk of serious
451 10      adverse...events than non-selective
451 11      NSAIDs.'
451 12      Now, again, whether you
451 13      disagree or agree with them, are they
451 14      saying here that according to the
451 15      long-term controlled clinical trials, we
451 16      cannot say that COX-2 inhibitors have any
451 17      different risk than traditional NSAIDs?
451 18      A:  They're saying based on the
451 19      evidence they have from clinical trials
451 20      that they can't distinguish the two.
451 21      What one should recognize, however, is
451 22      that there's virtual absence of real
451 23      long-term data. There's relatively very
451 24      small numbers for any of these things,

452:1   -   452:24      Graham, David 2006-05-09
452 1      and so if you have low power, you're not
452 2      going to be able to show things. That's
452 3      why observational data is needed to
452 4      complement what is inadequate about
452 5      controlled clinical trials.
452 6      Q:  And then on the next page,
452 7      do they say on this first bullet,
452 8      Long-term placebo controlled clinical

| | | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|---|
| 452 9 | trial data are not available to | | |
| 452 10 | adequately assess the potential for the | | |
| 452 11 | non-selective NSAIDs to increase the risk | | |
| 452 12 | of serious adverse CV events.' Is that | | |
| 452 13 | the point you just made? | | |
| 452 14 | A: Yes. | | |
| 452 15 | Q: So, they recognized that, | | |
| 452 16 | didn't they? | | |
| 452 17 | A: Yes, they did. | | |
| 452 18 | Q: The next point they say, | | |
| 452 19 | Pending the availability of the | | |
| 452 20 | additional long-term controlled clinical | | |
| 452 21 | trial data, the available data are best | | |
| 452 22 | interpreted as being consistent with a | | |
| 452 23 | class effect of an increased risk of | | |
| 452 24 | serious...cardiovascular events for COX-2 | | |

453:1 - 453:17 Graham, David 2006-05-09

| | | Re: [453:1-453:17]<br>Pltf Obj Cuts off answer<br>which continues to<br>454:21 | |
|---|---|---|---|
| 453 1 | selective and non- selective NSAIDs.' | | |
| 453 2 | Now, does that mean that, | | |
| 453 3 | again, whether you agree or disagree, | | |
| 453 4 | that they're saying that the best | | |
| 453 5 | conclusion you can draw based on the data | | |
| 453 6 | that's available now is that all of these | | |
| 453 7 | medications, whether it's Vioxx, Celebrex | | |
| 453 8 | or the nonselective NSAIDs, all have the | | |
| 453 9 | same basic cardiovascular risk? | | |
| 453 10 | A: They're saying that, and | | |
| 453 11 | they're also saying that observational | | |
| 453 12 | data is not something they're -- that | | |
| 453 13 | they're willing to consider. | | |
| 453 14 | Q: Where do they say that? | | |
| 453 15 | A: Because there is a plethora | | |
| 453 16 | of existing observational data that | | |
| 453 17 | show -- | | |

454:22 - 454:24 Graham, David 2006-05-09

| | |
|---|---|
| 454 22 | Q: You're aware, aren't you, |
| 454 23 | that there are six published |
| 454 24 | epidemiological studies that find no |

455:1 - 455:5 Graham, David 2006-05-09

| | |
|---|---|
| 455 1 | difference between Celebrex and Vioxx? |
| 455 2 | A: No. I mean, you could show |
| 455 3 | me the articles and I'm sure I'm familiar |
| 455 4 | with the articles, but I have not thought |
| 455 5 | about them in that way. |

455:14 - 455:24 Graham, David 2006-05-09

| | |
|---|---|
| 455 14 | MR. BECK: Last point. |
| 455 15 | BY MR. BECK: |
| 455 16 | Q: 'Short-term use of NSAIDs to |
| 455 17 | relieve acute pain, particularly at low |
| 455 18 | doses, does not appear to confer an |
| 455 19 | increased risk of serious adverse CV |
| 455 20 | events (with the exception of' -- what |
| 455 21 | was that one again? |

*Put in rest of answer*

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

455 22    A:   That's 'valdecoxib,' that's
455 23    Bextra.
455 24    Q:  -- Bextra.

456:1  -  456:24    Graham, David 2006-05-09
456  1    So, what the authors of this
456  2    paper and the reviewer concluded was that
456  3    Short-term use of NSAIDs' including
456  4    Vioxx 'particularly at low doses, does
456  5    not appear to confer an increased risk of
456  6    serious adverse CV events.' Isn't that
456  7    correct?
456  8    A:  That's what they're saying.
456  9    But once again, they have zero
456 10    statistical power to actually make this
456 11    statement. What they really have is, is
456 12    uncertainty, because they haven't
456 13    adequately studied it.
456 14    Q:  I think you said that these
456 15    senior people from the FDA who wrote and
456 16    reviewed this consulted with lots and
456 17    lots of people from the FDA, but they
456 18    didn't consult with you, right?
456 19    A:  No. That's not what I'm --
456 20    I wasn't part of the discussions that
456 21    happened internally. What I would note
456 22    is, is that people from the Office of New
456 23    Drugs approved these drug products. And
456 24    that if you look at the organizations

457:1  -  457:19    Graham, David 2006-05-09
457  1    that you have represented here, most of
457  2    them fall into the amoeba that I
457  3    described earlier and that are part of
457  4    the review and approval process and that
457  5    our own management in drug safety answers
457  6    to the people in the Center for Drug
457  7    Evaluation who have the controlling
457  8    power. So, the Office of New Drugs is
457  9    the gorilla in the room. So, in any
457 10    event, I'm not saying that at all. I'm
457 11    not saying that I wasn't hurt. What I'm
457 12    saying is that in constructing this
457 13    report, what FDA has done is, has said
457 14    that because we don't have data from
457 15    control trials, we can't be forced to say
457 16    that the drugs are different, even though
457 17    there's observational data that would
457 18    suggest that there are some differences
457 19    that can be made.

458:17  -  458:24    Graham, David 2006-05-09
458 17    Q:  My question is the senior
458 18    people at the FDA, when they asked for
458 19    input from all of those groups that we
458 20    saw on Page 3, including drug safety
458 21    people, right, one person they didn't ask

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|
| 458 22 | for input from was Dr. David Graham. Is | | |
| 458 23 | that true or false? | | |
| 458 24 | A: They're listing offices | | |
| | | | |
| 459:1 - 459:22 | Graham, David 2006-05-09 | | |
| 459 1 | here. I can't tell you who the | | |
| 459 2 | individuals are that they asked for input | | |
| 459 3 | in this. I was a participant in an open | | |
| 459 4 | public Advisory Committee meeting, and so | | |
| 459 5 | presumably that material is part of the | | |
| 459 6 | record. I wrote an FDA report that I'm | | |
| 459 7 | sure is part of the record. So, I would | | |
| 459 8 | imagine that the work that I did was | | |
| 459 9 | under consideration there. But in the | | |
| 459 10 | actual writing of this memorandum, I | | |
| 459 11 | can't tell you who actually was consulted | | |
| 459 12 | to write it except John Jenkins and Paul | | |
| 459 13 | Seligman because they're the only -- oh, | | |
| 459 14 | and Steven Galson, because those are the | | |
| 459 15 | only names that appear. | | |
| 459 16 | Q: Lastly, I just can't | Re: [459:16-459:22] | |
| 459 17 | remember, are all three of those | Pltf Obj Argumentative | |
| 459 18 | individuals included in the group that | | |
| 459 19 | you think was conspiring to smear your | | |
| 459 20 | name? | | |
| 459 21 | A: No. Dr. Jenkins was not | | |
| 459 22 | part of that group. | | Overrule |