## Zebrack, James 2006-08-30

4:

PROCEEDINGS

THE VIDEOGRAPHER: Today is the 30th day of August, 2006. It's 24 minutes after 2:00, and we're on the record.

JAMES S. ZEBRACK, M.D.,

called as a witness on behalf of the plaintiffs, being duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. NABERS:

**Q: Could you please state your name for the record.**

**A: James Zebrack.**

**Q: Dr. Zebrack, my name is Scott Nabers and I represent Charles Mason in a case that he has brought against the manufacturer of Vioxx, which is Merck. Do you understand it's in connection with that case that you're here today to give deposition testimony?**

**A: Yes.**

**Q: All right. And you and I have had an opportunity to meet prior to today; is that correct?**

**A: Yes.**

**Q: And did we have an opportunity to discuss your care and treatment of Mr. Mason?**

**A: Yes.**

5:

**Q: All right. And when we had our discussion with regard to your care and treatment of Mr. Mason, did I show you any documents?**

**A: You had some of his hospital -- his hospital records.**

**Q: All right. And, really, what I'm trying to get at is for the most part the discussions that we had concerning Mr. Mason, did they really concern your care and treatment of him at LDS Hospital?**

**A: Yes.**

**Q: And in particular, it was your care and treatment when he was admitted to the hospital as a result of having a myocardial infarction?**

**A: Yes.**

**Q: Okay. Now, today I'm going to be asking you some questions specifically about cardiology, coronary artery disease, and in particular questions about your care and treatment of Mr. Mason. And for purposes of this deposition, can we just agree that you'll answer my questions based on a reasonable medical probability?**

**A: Yes.**

**Q: And I know your secretary is currently in the process of getting a copy of your resume; is that correct?**

Pl. 4:20-5:14
Def obj: 403; Irrelevant

6:
A: Correct.
Q: And what we'll do for purposes of this deposition is we'll mark your resume as Deposition Exhibit No. 1 when it gets here, but let me just ask you if you could summarize for us your educational background, beginning with college.
A: Okay. I received a bachelor of arts at the University of Colorado in Boulder in 1990. I went to medical school at the University of Nevada in 1991 through 1995. I then did an internship in internal medicine at University of Nevada for one year while I was waiting for my wife to finish medical school. Then we couple matched at the University of Utah for an internal medicine residency and I stayed at the University of Utah for a cardiology fellowship.
Q: Okay. So you completed your internal medicine residency in Nevada?
A: I did one year in Nevada. I did another year in Utah.
Q: Okay. Then I think you also indicated you did a fellowship in cardiology, correct?
A: Correct.
Q: Can you just tell us what a fellowship in cardiology is?
A: It's an additional three or four years of

7:
specialized training in cardiovascular medicine.
Q: Now, are you board certified in any areas of medicine?
A: In internal medicine, cardiovascular diseases and echocardiography.
Q: Okay. And what does it take to become board certified in those areas of medicine?
A: After completing a residency or fellowship, you then have to take an exam which is typically an all-day exam, and requires some additional studying and review prior to taking the test.
Q: But you have passed those board certification exams with regard to all three, internal medicine, cardiology and echocardiography?
A: Correct.
Q: Okay. And as a part of your cardiology practice, which we'll talk about in a minute, do you also do some interventional cardiology work?
A: I don't.
Q: Okay. Now, let me ask you specifically about your practice. I take it you have a cardiology office?
A: Yes.
Q: Where is it located?
A: I have one office at St. Mark's Hospital and

## Zebrack, James 2006-08-30

8:
one office adjacent to Salt Lake Regional Hospital.
Q: And what is your position within those two cardiology offices?
A: I'm a member of a large group, a partner, and consider myself a private practitioner.
Q: Okay. Do you also have privileges at different hospitals in and around Salt Lake?
A: I do.
Q: And where do you currently have hospital privileges?
A: St. Mark's Hospital, Salt Lake Regional Hospital, LDS Hospital, and I have courtesy privileges at Jordan Valley Hospital. I think I have active privileges at the University of Utah.
Q: Okay. And from time to time you will see patients in the hospital setting at those various hospitals?
A: Yes.
Q: Okay. Now, focusing back for a minute on your cardiology practice, do you see patients in either one or both of your offices on a daily basis?
A: Yes.
Q: Okay. And do you diagnose and care for patients who have a wide range of cardiologic conditions?

9:
A: Yes.
Q: All right. For example, you practice general cardiology, meaning you see patients who come in with a lot of different types of cardiologic problems?
A: Correct.
Q: Do you treat patients who have coronary artery disease?
A: Yes.
Q: Do you treat patients who have hypertension?
A: Yes.
Q: Do you treat patients who have heart attacks or what's sometimes called myocardial infarctions?
A: Yes.
Q: And I take it that you feel qualified based on your education, training and experience, to care for all of those different types of patients?
A: Yes.
Q: All right. Let me focus for a minute, if I can, on coronary artery disease and just get you to give us a general explanation of what that is.
A: That's a very common disease in the United States and the rest of the world. It involves buildup of cholesterol into the arteries of the heart, which can happen in the other arteries in the body as well, and as that cholesterol builds up it can obstruct

# Zebrack, James 2006-08-30

10:

blood flow, which prevents oxygen from reaching the heart muscle, and that can create symptoms of angina. The other thing it can do is rupture and blood clots can form within those arteries and cause a heart attack, which is sudden loss of blood flow to the heart, and lack of oxygen to the heart muscle will result in necrosis or death of the heart muscle cells and will create a scar there, permanent damage.

Q: And I take it that you have cared for and treated patients who have varying degrees of coronary artery disease?

A: Yes.

Q: And can you tell the ladies and gentlemen of the jury what is meant by the term ischemia?

A: Ischemia is lack of oxygen to an area of tissue, typically the heart, as we discussed earlier.

Q: What happens when the heart muscle is deprived of oxygen or becomes ischemic for a period of time?

A: The cell goes through changes. It depends on how much oxygen it receives. It may have some damage to the cell and leak enzymes into the bloodstream and then recover afterwards or it may -- some of the cells may die, not recover at all.

Q: Okay. When a section of heart muscle dies,

11:

is that damage to the heart permanent, generally?

MR. KRUMHOLZ: Objection, form.

A: Generally, yeah, it's permanent.

Q: (By Mr. Nabers) All right. And when we talk about myocardial infarction -- and sometimes in the LDS Hospital records we see just the letters MI. That normally would just stand for myocardial infarction, correct?

A: Correct.

Q: When we talk about myocardial infarction, what is that?

A: It's a term that describes death of the heart muscle cells, and we define that as an elevation of the enzymes of the blood that have been released from the cells that have died.

Q: Sometimes commonly we hear the term heart attack. Is a myocardial infarction synonymous with a heart attack?

MR. KRUMHOLZ: Objection, form.

A: It is.

Q: (By Mr. Nabers) Okay. What I would like to do is mark as Deposition Exhibit No. 2 all of the medical records that we received in connection with Mr. Mason from LDL -- LDS Hospital.

(Exhibit No. 2 marked.)

## Zebrack, James 2006-08-30

12:

Q. (By Mr. Nabers) Let me just hand you what I've marked as Deposition Exhibit No. 2, and just thumb through that and see if you can verify what that is for me.
A: These are the records from his hospitalization when I saw him at LDS Hospital.
Q: Okay. And these would be medical records, it looks like, from LDS Hospital that pertain specifically to Mr. Mason?
A: Yes.
Q: Okay. And would it contain the records with regard to your care and treatment, and Dr. Ganellen's care and treatment when he came to LDS Hospital?
A: Yes.
Q: Now, have you had an opportunity to review the medical records pertaining to Mr. Mason from July 25th of 2003 when he was hospitalized at LDS Hospital?
A: Yes.
Q: Let me show you what I want to mark as the next exhibit, which will be Deposition Exhibit No. 3.
(Exhibit No. 3 marked.)
Q. (By Mr. Nabers) Let me just ask if you can identify that for the record.
A: This is the history and physical on Charles Mason's admission to the hospital on July 25th, 2003.

13:

Q: Okay. And were you one of the cardiologists who cared for and treated Mr. Mason in this July 2003 time frame when he presented to LDS Hospital?
A: I took care of him, I believe, on the 26th and 27th and Dr. Ganellen took care of him on the 25th, although my name was on the record because initially the E.R. physician called me to admit the patient and the resident did the dictation and put me down as the attending.
Q: Okay. So when we look at Deposition Exhibit No. 3, that would have been the history and physical that was done on Mr. Mason by the resident?
A: Correct.
Q: Okay. And that would have been whenever he first got into LDS Hospital when he was admitted through the emergency room?
A: Yes.
Q: Okay. And the date of that was 7/25/2003?
A: Yes.
Q: And would you have just reviewed the note prepared by the resident and that's why your name appears on page 2?
A: Correct.
Q: Do you know if you actually saw him on this day, Mr. Mason?

14:

A: I did not.
Q: Okay.
MR. KRUMHOLZ: I'm sorry?
THE WITNESS: I did not see him on the 25th.
Q: (By Mr. Nabers) Have you had an opportunity to look at this history and physical on Mr. Mason?
A: Yes.
Q: Okay. Were you, though, in fact, the admitting physician whenever he came into LDS Hospital on July 25th, 2003?
A: I was the attending of record, although it should have been Dr. Ganellen because he saw the patient and admitted him that day. But we're partners and it's not worth changing the record specifically for that purpose.
Q: All right. And do you have an understanding of why Mr. Mason came to be a patient of yours and Dr. Ganellen's at LDS Hospital during that time frame?
MR. KRUMHOLZ: Objection, form.
A: He presented to Alta View emergency room with symptoms and findings consistent with myocardial infarction.
Q: (By Mr. Nabers) Okay. Was he transferred to your facility at LDS Hospital from Alta View Hospital?
A: Yes.

15:

Q: Okay. Do you have an understanding of why he was transferred from Alta View over to LDS?
A: They don't have a cath lab at Alta View and generally patients with heart attacks need to have an angiogram, and that's the reason for his transfer.
Q: Okay. When we look at the history and physical exam from July 25th of '03 on Mr. Mason, does it indicate that, in fact, he was having an acute myocardial infarction?
MR. KRUMHOLZ: Objection, form.
A: We generally define acute myocardial infarction as ST elevation. He had a myocardial infarction which we would term a non-Q wave with an elevation of cardiac enzymes but without specific changes on the EKG.
Q: (By Mr. Nabers) But it was important for him to get to LDS Hospital because of the fact that y'all had the emergency interventional procedures to take care of his heart attack?
A: Yes.
Q: Okay. And was his heart attack, for lack of a better term, underway whenever he presented to LDS on July 25th of 2003?
MR. KRUMHOLZ: Objection, form.
A: Yes.

16:

Q: (By Mr. Nabers) Now, if we look at Deposition Exhibit No. 3, the history section, does, I guess, either you or the attending physician note that Mr. Mason had no prior cardiac pathology?
MR. KRUMHOLZ: Objection, form.
A: This is the note from the resident who took the history. This is his dictation. That's what he noted. Dr. Ganellen and I both talked to the patient as well and corroborated that history, although the dictation on this paper is specifically from that of the resident.
Q: (By Mr. Nabers) Okay. When the resident makes the note 'He has no prior cardiac pathology,' what does that mean?
MR. KRUMHOLZ: Objection, form.
A: That he has not been diagnosed with coronary heart disease or atherosclerosis previously.
Q: (By Mr. Nabers) Did you concur with that opinion by the resident whenever he listed that in the history on this July 25, '03 note?
A: Yes.
MR. KRUMHOLZ: Objection, form.
Q: (By Mr. Nabers) Now, when we talk about heart attacks, I guess generally you agree that heart attacks can be serious and life-threatening medical

17:

conditions, correct?
A: Certainly.
Q: Okay. They are very significant to the patient who's having the heart attack, correct?
A: Yes.
Q: All right. Can a heart attack result in permanent damage to the actual heart muscle?
A: Yes.
Q: During a heart attack, can that damage to the heart muscle cause the patient to experience symptoms?
A: Yes. Yes.
Q: What are the type of symptoms that a patient may experience when they are having a heart attack or a myocardial infarction?
A: Various characteristics of chest pain or arm pain, neck pain, back pain, stomach pain or symptoms of shortness of breath, light-headedness or sometimes just rhythm problems from the heart. Some people don't experience much pain at all.
Q: Based upon your review of the history on Mr. Mason from July 25th of '03, was he having any symptoms that you would attribute to having a heart attack or myocardial infarction?
A: Yes. He apparently had had chest pain for about a week before he came in, which was probably the

## Zebrack, James 2006-08-30

18:
precursor to his heart attack, and then when he was in the hospital he had some sharp pain directly underneath the sternum, which was all likely related to his heart attack.
Q: Can a heart attack also cause arrhythmias or irregular heartbeats?
MR. KRUMHOLZ: Objection, form.
A: Yes.
Q: (By Mr. Nabers) Can a heart attack cause a patient to have congestive heart failure?
A: Yes.
Q: What is congestive heart failure?
A: It's abnormal fluid balance in the body with excessive fluid that can back up into the lungs or cause ankle swelling and cause symptoms of shortness of breath and tiredness, and it can be related to weakening of the heart or a stiffening of the heart.
Q: I take it a heart attack can also result in death, correct?
MR. KRUMHOLZ: Objection, form.
A: Correct.
Q: (By Mr. Nabers) And you've seen that in patients that have presented to the hospital before, correct?
A: Correct.

Sustained 401

Pg: 18:9-25
Def obj: Irrelevant; 403; no claim of congestive heart failure has been made in this case.

19:
Q: And let me ask you, when a patient like Mr. Mason is having an myocardial infarction or heart attack, I take it they do require hospitalization immediately?
A: Yes.
Q: Okay. And when he came in, I noticed in the history section of the July 25, '03 note that it indicates his troponins were noted to be at 9.2 in the field and 15 on arrival. Do you see that?
A: Yes.
Q: And what are troponins?
A: Troponin is a cardiac enzyme that we measure that represents some disruption of the cardiac -- specifically the cardiac muscle cell that indicates -- generally indicates a myocardial infarction.
Q: And whenever we talk about his levels of troponin when he came in on July 25th of '03, were they abnormal or elevated?
A: Yes.
Q: Okay. Does that help confirm the fact that he was having a myocardial infarction?
A: Yes.
Q: Okay. If you have elevated troponin levels, does that mean that you would have heart muscle damage?

20:
MR. KRUMHOLZ: Objection, form.
**A: Yes.**
**Q: (By Mr. Nabers) Does it also indicate that you would have actual heart muscle cell death?**
MR. KRUMHOLZ: Objection, form.
**A: It depends a little bit on the elevation of the troponin. It's possible that very mild elevations may represent injury without complete death, but elevations in this range are consistent with some cell death.**
MR. KRUMHOLZ: I think we're going to need to stop and --
MS. GRAINGER: Let them finish their code drill.
MR. KRUMHOLZ: Do you mind saying that again?
MR. NABERS: Do you want to just read the question back and then you'll answer. You can answer it again.
(The question was read as follows:
'QUESTION: Does it also indicate that you would have actual heart muscle cell death?")
MR. KRUMHOLZ: Objection, form.
A: It depends a little bit upon the degree of elevation of troponin. There are cases with very mild elevations of troponin which may indicate just some injury, but it's generally thought that any significant elevation of troponin is associated with cell death.

21:
**Q: (By Mr. Nabers) How would you have characterized Mr. Mason's troponin levels in terms of their being abnormal at the time of this July 25th, '03 when they were drawn?**
**A: They are significantly elevated to the point that would be consistent with myocardial infarction and some cell death.**
**Q: Okay. So when you have abnormal troponin, just so I'm clear, that would equal the same thing as having heart muscle injury?**
**A: Yes.**
**Q: And if you had elevated or abnormal troponin, that would also indicate heart muscle injury or damage?**
**A: Yes.**
MR. KRUMHOLZ: Objection, form.
**Q: (By Mr. Nabers) Now, if a patient has a heart attack, does that put them at increased risk for having another heart attack in the future?**
**MR. KRUMHOLZ: Objection, form.**
**A: Patients who have had a heart attack are at increased risk, not necessarily because they had a**

22:
heart attack, but because they have the underlying disease that predisposes them to having a heart attack.

Q: (By Mr. Nabers) Okay. And for your patients that you take care of, whether it be in your office or in the hospital, who have had a heart attack, are there emotional consequences to those patients who have the heart attack?

MR. KRUMHOLZ: Objection, form.

A: Yes.

Q: (By Mr. Nabers) What are those emotional consequences?

MR. KRUMHOLZ: Same objection.

A: You know, it can be a life-altering event because, you know, heart disease and heart attacks is -- it's -- you know, it's a common problem. People often know people who have had heart disease and have died from it, so patients have, you know, a change in their outlook on life and perspective and they may become anxious and worried about it. They may need to make some alterations in their diet and activity level. So it can create some anxiety and lifestyle changes.

Q: (By Mr. Nabers) So I take it it's not uncommon whenever you see patients who have had a heart attack, that they may experience fear and

23:
anxiety after such an event?

MR. KRUMHOLZ: Objection, leading.

A: Yes.

Q: (By Mr. Nabers) Now, if we turn to page 2 of the history and physical of LDS on July 25th of '03, I take it that it was determined that as a result of Mr. Mason's heart attack, some intervention was needed?

A: It's the standard of care in the United States if a cath lab is available and someone has had a heart attack, we generally take them to the cath lab to look for blocked arteries and treat it.

Q: Right. I want to talk about what's involved in a cath in just a minute, but let me ask you, I also noted that at the time that he came in, he was started on Aggrastat, correct?

A: Correct.

Q: What is Aggrastat?

A: Aggrastat is a type of drug called a glycoprotein 2B-3A inhibitor that blocks platelet function similar to aspirin but stronger than aspirin.

Q: Okay. And I also saw that he was the -- the patient, Mr. Mason, was begun on a beta blocker and aspirin. And what were those prescribed for?

Sustained

Pe: 22:24 - 23:2
Def Obj: Leading

Pe: 23:4
Def Obj: Leading

24:
A: For his heart attack.
Q: All right. Now, what is the goal of treatment for someone like Mr. Mason who presents with a heart attack?
A: Where possible, we take patients for coronary angiogram to evaluate their arteries and look for the cholesterol buildup and blockage and treat that with an intervention called angioplasty, and we also put them on medications to prevent further heart damage and heart enlargement after a heart attack, as well as prevent rhythm problems, and we put them on preventative medications like aspirin and cholesterol medications to help prevent additional heart attacks.
Q: Okay. Let me show you what I want to mark as Deposition Exhibit No. 4.
(Exhibit No. 4 marked.)
Q. (By Mr. Nabers) I'll give you a chance to look at that and then just ask if you can identify what that is, that document.
A: This is the E.R. note.
Q: And would this have been the E.R. note from Alta View?
A: That's what I'm trying to sort out. It looks like it's from LDS Hospital.
Q: I see. Because you're looking down at the

25:
bottom right-hand column?
A: Yes.
Q: And if we look up in the upper left-hand column, the date on this is 7/25, correct, 8:20 in the morning?
A: Yes.
Q: It says, 'Chief complaint: Chest pain'?
A: Yes.
Q: Would that be characteristic of someone who is having a heart attack, for that to be their chief complaint?
A: Yes.
Q: Then it also indicates on this medical record that one of the current medications that he was on was Vioxx, correct?
A: Yes.
Q: And does it note here in this that Mr. Mason was experiencing symptoms that you would attribute to someone who was having a heart attack?
A: There's lots of patients that present with chest pain that don't have a heart attack, but certainly that's consistent with a heart attack.
Q: And then it indicated he had some slight pressure and slight nausea, correct, under the assessment section?

26:

A: Yes.
Q: All right. And so he was transferred from Alta View over to LDS where y'all could take care of him, right?
A: Yes.
Q: Then let me show you what I want to mark as Deposition Exhibit No. 5 --
(Exhibit No. 5 marked.)
Q. (By Mr. Nabers) -- and ask if you can just identify that for the record.
A: This is his blood test taken at 9:32 in the morning on July 25th.
Q: And what type of blood tests were taken then?
A: This is his cardiac enzymes, which is a troponin level and a CK level.
Q: And what was the purpose of those blood tests being taken?
A: This is to evaluate for myocardial infarction.
Q: Okay. And do those tests that were done at Alta View, those enzyme tests, do they indicate that he was having a myocardial infarction?
A: Yes.
(Exhibit No. 6 marked.)
Q: (By Mr. Nabers) Let me show you what I've

27:

marked as Deposition Exhibit No. 6, and ask if you can just identify that for the record.
A: This is a summary of his lab work from July 25th through July 27th. It is part of a hospital note done by the resident. It was generated by the computer that has a summary of his lab findings.
Q: And, again, were there blood tests done to look for cardiac enzymes?
A: Yes. We typically will repeat the blood tests six or eight hours apart for usually about three times to measure the rise and fall in enzymes to assess the amount of heart damage.
Q: Okay. For example, on Deposition Exhibit No. 6, one of the tests or blood tests that was done was the CKMB, correct?
A: Correct.
Q: Is that a specific marker for damage to the heart muscle?
A: It is.
Q: Okay. And on Deposition Exhibit No. 6 for Mr. Mason, was his CKMB enzymes abnormal?
A: Yes.
Q: And did that indicate to you that he was having a myocardial infarction?
A: Yes.

28:

Q: And also were troponin blood tests looked at on Deposition Exhibit No. 6?
A: Yes.
Q: And, again, is troponin also a specific marker for damage to the heart muscle?
A: Yes.
Q: Again, it's another enzyme test?
A: Correct.
Q: And we talked about it a little bit a minute ago, but did it again confirm an abnormal result that would have suggested to you Mr. Mason was having a heart attack?
A: Yes.
Q: And do these cardiac enzyme tests, both the CKMB and the troponin, do the results of those confirm that some portion of Mr. Mason's heart muscle tissue died on July 25th, 2003?
MR. KRUMHOLZ: Objection, form.
A: Yes.
Q: (By Mr. Nabers) All right. Now, you also indicated that as a part of the intervention for Mr. Mason, because of his heart attack, he had a cath -- catherization procedure, correct?
A: Correct.
Q: All right. And that catherization procedure

29:

was done here at LDS Hospital?
A: Correct.
Q: And who was it performed by?
A: Dr. Ganellen.
Q: Okay. Let me show you what I'll mark as the next exhibit, which is Deposition Exhibit No. 7.
(Exhibit No. 7 marked.)
Q. (By Mr. Nabers) I'll just ask you if you can identify that for me.
A: This is the cath report from LDS Hospital on Charles Mason, which was done on July 25th, although there's a diagram that typically goes with this that's not here.
Q: Okay.
MR. KRUMHOLZ: I'll object because I believe it's incomplete by a few pages.
Q: (By Mr. Nabers) Let me ask you, Dr. Zebrack, what is a heart catherization for those of us who don't know?
A: That's a procedure where we take a small tube and place it in the aorta, which is the main artery in the body, back up to near the heart where the coronary arteries rise off of the aorta, put that little tube into those arteries and put dye in to take pictures of the blood flow down the arteries, and that will tell

30:
us if there's some narrowing or abnormal flow in those arteries and we can identify if there's cholesterol buildup. The angiogram is simply the pictures taken for that procedure.
Q: This cardiac catherization was performed on Mr. Mason because he was having a heart attack?
A: Correct.
Q: All right. And the cardiologist who performed the catherization on him was whom?
A: Dr. Ganellen.
Q: And is he one of your partners?
A: He is.
Q: Is he an interventional cardiologist?
A: He is.
Q: When we talk about an interventional cardiologist, what is that? What do they do?
A: They've often received additional training or board certification in interventional procedures, which is angioplasty and a few other procedures. Angioplasty is a procedure where you put a balloon inside the artery, inflate the balloon to push the cholesterol out of the way, and then we often leave a metal stent scaffolding to help keep that area open.
Q: All right. Is Dr. Ganellen certainly qualified to perform heart catherizations?

31:
A: Yes.
Q: He's well respected in the community?
A: Yes.
Q: Do you have confidence in his abilities as a cardiologist?
A: Yes.
Q: All right. Before we talk further about the cardiac catherization that was performed on Mr. Mason, let me just hand you two more pages, which I believe go with Deposition Exhibit No. 7, but let me ask you if that looks to be the diagrams you were talking about.
A: Yes.
Q: Okay. Can we just attach those to the back of Deposition Exhibit No. 7? Does that look like it would be a complete copy now?
A: Yes.
MR. KRUMHOLZ: Just so you know, it's not. I don't mind you switching and putting more in --
MS. GRAINGER: That's the report. I think he said it's the report.
MR. KRUMHOLZ: There's one that's signed, page 3 and 4, and it's the exact same report. I may have it right here.
Q: (By Mr. Nabers) In any event, does

32:
Deposition Exhibit No. 7 now look like the heart catherization report done by Dr. Ganellen?
A: Yes.
Q: Does it contain the diagrams of Mr. Mason's heart in terms of the coronary arteries that were blocked also?
A: Yes.
Q: Let me just hand you what I have been handed, which is also pages 99 and 100 of LDS Hospital, which is the actual two other pages of the report and it's got the signature by Dr. Ganellen. Do you see that?
A: Yes.
Q: Okay. Does that look like now we have a complete and full medical record?
A: Yes.
Q: At least in terms of the heart catherization, correct?
A: Correct.
Q: All right. If we look at the cath report for a minute, what did Dr. Ganellen find when he started the procedure?
A: He found coronary artery disease, which is atherosclerosis, creating a 90-percent blockage in the LAD artery, which is the main artery down the front of the heart, and a branch of that artery called a

33:
diagonal also had disease, which was 70-percent blocked.
Q: Okay. And does Dr. Ganellen note in the report anything about thrombus?
A: It says, 'Thrombus present before procedure.'
Q: What is your understanding of that?
A: Well, what creates a heart attack is thrombus on top of cholesterol, and sometimes you can see it, sometimes you can't. But he was able to see some haziness or abnormal blood flow in that area that was consistent with a clot.
Q: All right. And when we talk about thrombus, in your mind is that synonymous with a clot?
A: Yes, a blood clot.
Q: When we talk about clots, what actually is a clot that would occlude a coronary artery?
A: Well, in the same way if you cut yourself and you bleed, you have to clot your blood for the bleeding to stop. The same process can go on inside the body. What triggers that typically is some disruption of the cholesterol that's there creating a rough surface or a crack in the cholesterol that triggers the clotting cascade. A clot forms in an area where we want to have blood flow and not clot, and that clot blocks additional blood flow and that

## Zebrack, James 2006-08-30

34:

**creates the heart attack.**
Q: I take it this catherization that was performed on Mr. Mason was done on an emergent basis or emergency basis?
MR. KRUMHOLZ: Objection, form.
A: He didn't have ST elevation and he was -- it sounded like he was essentially pain free, so we would consider it urgent but not emergent.
Q: (By Mr. Nabers) Do you think it was likely that he was pain free at the time because of the morphine they had given him at the time in the ambulance?
MR. KRUMHOLZ: Objection, form.
A: He received several medicines to help with his pain, which included the blood thinners and the nitroglycerin. So it's hard to tell what resolved his pain. The important thing was his pain resolved.
**Q: (By Mr. Nabers) Okay. Most patients who have heart attacks like Mr. Mason, they will have pain and suffering that goes along with the heart attack, right?**
MR. KRUMHOLZ: Objection, form.
**A: Heart attacks can be very painful. It depends on the degree of -- size of the heart attack. Some patients have very little pain at all.**

35:

**Q: (By Mr. Nabers) Okay. Now, when Dr. Ganellen got in there, he found a 90-percent blockage of the distal LAD, or the lateral -- what is the LAD?**
**A: LAD is left anterior descending artery, and it was the mid portion of that artery.**
**Q: And he found -- when Dr. Ganellen -- when Dr. Ganellen was doing the heart catherization, how much stenosis did he find of the LAD, coronary artery?**
**A: 90 percent.**
**Q: All right. And is that a significant blockage?**
**A: Yes.**
**Q: Is that something that needs intervention?**
**A: Yes.**
**Q: Is that something that's a serious medical condition?**
**A: Yes.**
**Q: And with regard to the proximal first diagonal, did he also find some occlusion there?**
**A: Yes.**
**Q: All right. And how much stenosis did Dr. Ganellen find when he did the cath in that area of the heart?**
**A: 70 percent.**

## Zebrack, James 2006-08-30

36:

**Q: Is that -- how would you characterize that level of that blockage?**
**A: It's a significant degree of blockage. Diagonal vessel tends to be smaller so it's less important, but it certainly can contribute to chest pain or heart attack risk in the future if it's left untreated.**
**Q: Okay. It was something that, I take it, needed intervention?**
**A: It doesn't say on this report how large the artery was, so the fact that Dr. Ganellen intervened on it, I would say yes, it did need intervention, but I haven't looked at the films myself.**
Q: All right. And did he -- what finding did he make, if any, with regard to thrombus on the proximal first diagonal?
MR. KRUMHOLZ: Objection, form.
A: These reports are a little difficult to interpret. Are you saying --
**Q: (By Mr. Nabers) Yeah, if you look at -- on page 2, does it indicate whether Dr. Ganellen found any thrombus in the proximal first diagonal?**
MR. KRUMHOLZ: Objection, form.
**A: He did. It says, 'Thrombus present before procedure.'**

37:

Q: (By Mr. Nabers) So, again, I guess, based upon the film, the CAT film, he would have seen what he thought was evidence of a clot?
A: Yes.
MR. KRUMHOLZ: Objection, form.
**Q: (By Mr. Nabers) Ultimately, in order to cure the blockage of the LAD coronary artery, what did he do, Dr. Ganellen?**
**A: He placed a balloon in there to push the plaque and thrombus out of the way, and then left a stent in the artery to help keep it open.**
**Q: All right. And what did he do in connection with the 70-percent blockage of the proximal first diagonal coronary artery in Mr. Mason?**
**A: He simply put a balloon there because the artery was probably too small to place a stent.**
**Q: And do you believe that Mr. Mason had a good result from the procedures performed by Dr. Ganellen?**
**A: Yes.**
**Q: And is it important for cardiologists such as yourself to continue to follow patients after they've had a heart attack?**
**A: Yes.**
**Q: And why is that important?**
**A: To prevent another heart attack, adjust their**

# Zebrack, James 2006-08-30

38:
medications and give them counseling on diet and exercise and lifestyle factors such as smoking.
Q: Okay. And, for example, do patients, after heart attacks or myocardial infarctions, do they need to be medically monitored by a cardiologist?
A: Yes.
Q: And how often, in your practice, will you have a patient come back to see you after having a myocardial infarction?
A: All the time.
Q: Okay. But, I mean, I guess what I'm asking is do they come back quarterly, every six months or annually? What's your practice?
A: I typically see them within the first month after a heart attack, and then, depending on what problems they have and adjustments in medications, they'll generally come back every six months or so.
Q: All right. So, for example, someone who has a myocardial infarction like Mr. Mason, if he was in your practice, would you also perform diagnostic tests to help monitor his condition?
A: Yeah, depending on his symptoms. He may need a follow-up stress test every few years.
Q: Will he need serial EKGs?
A: Yeah.

39:
Q: All right. Would it be good for him to have any type of nuclear testing on an annual basis to monitor his condition, his heart?
A: If he has no symptoms and he's active, he wouldn't necessarily need one every year, but -- and this is an area of a little bit of controversy and different doctors practice differently, but most patients with heart disease will have a stress test periodically, perhaps every few years.
Q: All right. How about with regard to any heart catherizations, would he need that in the future as a result of his myocardial infarction?
A: Only if he developed new symptoms to suggest new blockages.
Q: Now, he was prescribed some medications as a result of his heart attack upon leaving LDS, correct?
A: Yes.
Q: Will he need to stay on those medications?
A: Yes.
Q: What medications should he stay on as a result of his heart attack?
A: Aspirin for the rest of his life, generally cholesterol medications, a beta blocker, and possibly an ACE inhibitor.
Q: And is it important for patients like

## Zebrack, James 2006-08-30

40:

Mr. Mason who have a heart attack, after the heart attack for them to have some cardiac rehab?
A: Yes.
Q: And what is involved in the cardiac rehab?
A: They get additional education on diet and exercise, and, you know, a rehab person to do exercises with them to help them get the confidence back and activity and build up their stamina to reduce their risk of future heart attacks.
Q: Were you aware that Mr. Mason had completed a cardiac rehab program after his myocardial infarction?
A: I was not.
Q: Okay. Now, you are aware that we're here as a result of a lawsuit that Mr. Mason has filed claiming that Vioxx had something to do with his heart attack? Are you aware of that?
MR. KRUMHOLZ: Objection, form.
A: Yes.
(Exhibit No. 8 marked.)
Q: (By Mr. Nabers) Let me ask you -- or show you what I've marked as Deposition Exhibit No. 8, and tell you that this was Merck's announcement of their voluntary worldwide withdrawal of Vioxx. Have you ever seen that previously?
A: Yes.

41:

Q: Were you actually aware that Vioxx was withdrawn from the market by Merck?
A: Yes.
Q: And do you have an understanding of why Vioxx was withdrawn from the market by Merck?
MR. KRUMHOLZ: Objection, form.
A: Yes.
Q: (By Mr. Nabers) What is your understanding in that regard?
MR. KRUMHOLZ: Objection, form.
A: It became more clear from additional trials that Vioxx was associated with an increased risk of heart attacks.
Q: (By Mr. Nabers) Now, as a part of your cardiology practice, do you try to keep up with different journals that have papers or scientific articles pertaining to cardiology?
A: Yes.
Q: All right. And I noticed that you brought with you today some medical articles that pertain particularly to Vioxx and cardiovascular events, correct?
A: Yes.
Q: What I would like to do is mark just as a full set Deposition Exhibit No. 9, and we're certainly

Overruled. He is a treater. Should be able to say what he knows as a drug used by his patient.

Re: 41:4-5
Def Obj: Foundation; No Personal Knowledge

Re: 41:7-9
Def Obj: Same as above

Re: 41:11-18
Def Obj: Same as above

42:

**going to give these back to you.**

**A: Okay.**

**Q: Can I stick a sticker on them?**

**A: Yes.**

**(Exhibit No. 9 marked.)**

**Q: (By Mr. Nabers) Let me show you what we've marked as Deposition Exhibit No. 9, and let me just see if you can identify what the collection of documents is that represents Exhibit No. 9.**

A: This is a series of articles that I could locate in our medical library related to the side effects of Vioxx in relationship to the risk of heart attacks.

Q: Okay. And is it fair to say that during the time that Vioxx was on the market, and even after it being subsequently --

(Interruption.)

**Q. (By Mr. Nabers) Let me try again. Is it fair to say that even while Vioxx was on the market and then once it was withdrawn from the market, that you tried to keep up with the literature surrounding it and cardiovascular events?**

**A: Yes.**

**Q: For example, the first article that we see, the lead author is a fellow by the name of Frank**

43:

**Andersohn, and this article is entitled Use of First and Second Generation Cyclooxygenase-2 Selective Nonsteroidal Anti-Inflammatory Drugs and the Risk of Acute Myocardial Infarction. Did I read that right?**

**A: Yes.**

**Q: And that appeared in Circulation 2006?**

**A: Yes.**

**Q: All right. And that was an article that you went and got on your own with regard to informing yourself about Vioxx and the risk of cardiovascular disease?**

**A: Right.**

**Q: And is the conclusion of this study that our study supports the hypothesis that the elevated risk of acute myocardial infarction is a class effect of COX-2 inhibitors?**

**A: That was a conclusion in the study, yes.**

**Q: Now, the next article that you have also looks like an article pulled off of PubMed; is that correct?**

**A: Correct.**

**Q: And is PubMed just a Web site that you can go to to specifically look for medical literature or scientific articles?**

**A: Yes.**

overruled what he knew to be relevant to his diagnosis + ~~treatment~~ + basis of his diagnosis etc.

Pe: 42:24-44:6
Def Obj: Irrelevant to his treatment of the Plaintiff since this article is dated years after his treatment

Overruled

44:

**Q: Okay. You pulled this one on your own?**
**A: Yes.**
**Q: And this one is entitled Rofecoxib Increases Susceptibility of Human LDL and Membrane Lipids to Oxidative Damage: A Mechanism of Cardiotoxicity, correct?**
MR. KRUMHOLZ: Objection, leading.
**A: Correct.**
**Q: (By Mr. Nabers) And this was -- the lead author was Preston Mason; is that correct?**
**A: Correct.**
**Q: And you've had a chance to review this article as well?**
**A: I reviewed the abstract. I couldn't actually find the whole article in our library.**

Re: 44:8-15
Def Obj: Same as above

Q: Okay. The next one that we see is from the New England Journal of Medicine and it's dated March 16th of 2006, correct?
A: Correct.
Q: And is this one the Response to the Expression of Concern Regarding the VIGOR Study?
MR. KRUMHOLZ: Objection, leading.
A: Yes.
Q: (By Mr. Nabers) And you've previously read the VIGOR study that appeared in the New England

45:

Journal of Medicine in November of 2000, correct?
MR. KRUMHOLZ: Objection, leading.
A: Yes.
Q: (By Mr. Nabers) Okay. Have you read the article that appeared in the New England Journal of Medicine known as the VIGOR article in November of 2000?
A: Yes.
Q: And are you familiar with the fact that the New England Journal editors wrote an expression of concern about that study?
A: Yes.
Q: Had you ever seen an expression of concern prior to that one?
A: There may have been one or two others, but I can't remember.
Q: All right. Is, generally, an expression of concern in the New England Journal of Medicine a rare event?
A: Yes.
MR. KRUMHOLZ: Objection, leading, form.
Q: (By Mr. Nabers) What is your understanding of what transpired with regard to that expression of concern in the VIGOR study?
MR. KRUMHOLZ: Objection, form.

## Zebrack, James 2006-08-30

46:

A: It's somewhat a complicated story, but it relates to one of the other lawsuits and concerns about the data and the way it was presented in the study, and this is the response to that from the authors of the study.

Q: (By Mr. Nabers) Did you come to understand from reading the VIGOR article, the original publication and the subsequent expressions of concern, that the editors for the New England Journal of Medicine thought that the authors of the VIGOR study left out some critical data on myocardial infarctions?

MR. KRUMHOLZ: Objection, form and leading.

A: Yes.

Q: (By Mr. Nabers) Okay. The next article that we see is also from the New England Journal of Medicine dated December 29th of 2005; is that correct?

A: Correct.

Q: And the title of this article is Expression of Concern: Bombardier et al., 'Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis.' Did I read that right?

A: Yes.

Q: All right. And this one is -- the lead author is Dr. Curfman, the editor of the New England Journal of Medicine, correct?

47:

A: Correct.

Q: All right. And is this where they pointed out that the authors of the VIGOR study left out some important data with regard to myocardial infarction?

MR. KRUMHOLZ: Objection, form and leading.

A: That initiated some of the controversy, yeah, and that's where they pointed out their concerns.

Q: (By Mr. Nabers) All right. In order to cure the objection, and I apologize, what is your understanding of Dr. Curfman's expression of concern as it appeared in the New England Journal of Medicine?

A: He had concerns with the data that was presented that possibly was not complete and wanted clarification on that.

Overruled

**Q: Okay. The next article is an editorial that appeared in Circulation; is that correct, in 2006?**

**A: Yes.**

**Q: All right. And the title of this one is Evaluating Drug Effects in the Post Vioxx World. There Must Be a Better Way. Is that by Jerry Avorn?**

**MR. KRUMHOLZ: Objection, form, leading.**

**A: Yes.**

**Q: (By Mr. Nabers) Have you had an opportunity to review that?**

Re: 47:16-48:18
Def obj: Same objection as 42:24-44:15

## Zebrack, James 2006-08-30

48:

A: Yes.
Q: Okay. The next one that we see is an article that appeared in the Lancet, December 4th of 2004; is that correct?
A: Correct.
Q: And the title of this article is Risks of Cardiovascular Events and Rofecoxib Cumulative Meta-analysis?
A: Yes.
Q: And this was -- the lead author here was Peter Juni, correct?
A: Correct.
Q: And have you had an opportunity to review this article.
A: Yes.
Q: Do you consider the Lancet to be an authoritative journal?
A: Yes.
Q: And did the authors in this article find that there was an increased risk of cardiac events, more specifically myocardial infarctions, in patients taking Vioxx?
MR. KRUMHOLZ: Objection, form and leading.
A: Yes.
Q: (By Mr. Nabers) Let me ask it again, then.

49:

What is your understanding from the Juni article of their finding of cardiovascular events in Vioxx?
A: There's an increased risk associated in patients taking Vioxx compared to patients either not on anti-inflammatory medications or on Naprosyn or on other anti-inflammatory medications.
Q: All right. And did they also comment on whether or not they thought Naprosyn had a cardioprotective effect?
MR. KRUMHOLZ: Objection, form, leading.
A: They felt that Naprosyn had a small cardioprotective effect.
Q: (By Mr. Nabers) But did they also say that they did not believe that the Naprosyn's small cardioprotective effect could have explained the finding in the VIGOR trial?
MR. KRUMHOLZ: Objection, form and leading.
A: No, it was their belief.
Q: (By Mr. Nabers) The next one I see is an article from the Lancet, January 1, 2005 with regard to the discontinuation of Vioxx?
A: Yes.
Q: Have you had an opportunity to review that?
A: Yes.
Q: Okay. Did you also have an opportunity to

Sustained

Overruled

Re: 48:25-49:6
Def Obj: Same objection as 42:24-44:15; witness was not qualified as an expert not designated as an expert on the CV safety of Vioxx

Overruled

Re: 49:19-50:3
Def Obj: Same objection as 42:24-44:15

## Zebrack, James 2006-08-30

review an article in the New England Journal of Medicine, October 21st, 2004, entitled Failing the Public Health, Rofecoxib, Merck and the FDA?
MR. KRUMHOLZ: Objection, form, leading.
A: Yes.
Q: (By Mr. Nabers) And this article was written by whom?
A: Eric Topol.
Q: All right. Do you know of Dr. Topol's reputation in the cardiology community?
A: Yes.
Q: And what is it?
MR. KRUMHOLZ: Objection, form.
Q: (By Mr. Nabers) If you need to take that, we can take a break.
A: He has a very good reputation.
Q: And you've had a chance to review that article?
A: Yes.
Q: Okay. The next one is an article that appeared in Circulation, October 15th of 2001; is that correct?
A: Correct.
Q: And the title of this article was Cardiovascular Thrombotic Events in Controlled Clinical Trials of Rofecoxib, and the lead author there was Konstam; is that correct?
A: Correct.
Q: Have you had a chance to review this article?
A: Yes.
Q: The next article is from the European Heart Journal, May 26th of 2006; is that correct?
A: Correct.
Q: And is the article entitled NSAID Use and The Risk of Hospitalization For First Myocardial Infarction in the General Population, a Nationwide Case-Control Study from Finland?
A: Yes.
MR. KRUMHOLZ: Objection, form.
A: Yes.
Q: (By Mr. Nabers) And you've reviewed that?
A: Yes.
Q: Is the next one an article that appeared in Circulation on January 19th, 2006 entitled Risk of Death For Reinfarction Associated With the Use of Selective Cyclooxygenase-2 Inhibitors and Nonselective Nonsteroidal Anti-Inflammatory Drugs After Acute Myocardial Infarction?
A: Yes.
Q: Have you reviewed that one?

Overruled

Pe: 50:5-50:12
Def obj: same objection as 42:24-44:15

Pe: 50:16-51:13
Def obj: same objection as 42:24-44:15

Pe: 51:15-53:7
Def obj: same objection as 42:24-44:15

**Zebrack, James 2006-08-30**

52:
A: I reviewed the abstract.
Q: Is the next one that we see from PubMed entitled The Patient's Perspective on the Recall of Vioxx?
A: Yes.
Q: Have you had a chance to review that?
A: I reviewed the abstract.
Q: Okay. Is the next one that you reviewed dated March of 2006 entitled Nonsteroidal Anti-inflammatory Drugs and the Risk of Acute Myocardial Infarction?
A: Yes.
Q: And you've had a chance to review that?
A: I reviewed the abstract.
Q: Okay. Is the next one an article by Dr. Huang from 2006 entitled Cardiovascular Events Associated With Long-term Use of Celecoxib, Rofecoxib and Meloxicam in Taiwan, an Observational Study?
A: Yes.
Q: And you had a chance to review that?
A: I reviewed the abstract.
Q: Then the last one is Effects of Rofecoxib and Naproxen on Life Expectancy Among Patients With Rheumatoid Arthritis: A Decision Analysis?
A: Yes.

53:
Q: And you've had a chance to review that abstract?
A: Yes.
Q: And are you also familiar with the APPROVe study that appeared in the New England Journal of Medicine?
A: Yes.
Q: Okay. So you've spent some time looking at the medical and scientific literature concerning Vioxx and the risk of cardiovascular disease, correct?
MR. KRUMHOLZ: Objection, form and leading.
A: Correct.
Q: (By Mr. Nabers) And do you believe that generally the medical and scientific literature supports the proposition that Vioxx increases the risk of myocardial infarction in some patients?
MR. KRUMHOLZ: Objection, form and leading.
A: Yes.
Q: (By Mr. Nabers) All right. In your own patient population, have you had patients who took Vioxx who had myocardial infarctions?
MR. KRUMHOLZ: Objection, form, leading.
A: Yes.
Q: (By Mr. Nabers) And in some of the articles that we just looked at, there's also some information

Def Obj: Same as above

Overrule

Re: 53:8-10
Def Obj: Witness was not qualified or designated as an expert on the CV safety of Vioxx

Re: 53:12-16
Def Obj: Same as above

Re: 53:18-21
Def Obj: Same as above

Re: 53:23
Def Obj: Same as above

# Zebrack, James 2006-08-30

54:

with regard to whether or not Vioxx causes atherogenesis. Are you familiar with that?
A: Yes.
Q: What is atherogenesis?
A: That's the buildup of cholesterol in the arteries.
Q: Are you familiar with the medical and scientific literature surrounding whether or not Vioxx promotes atherogenesis?
A: There's less scientific evidence in that regard, but there is some.
Q: All right. Do you have an opinion on whether or not Vioxx can increase atherogenesis in patients?
MR. KRUMHOLZ: Objection to form.
A: I certainly believe it's possible, but it's hard to say how likely.
Q: (By Mr. Nabers) All right. Have you seen medical or scientific literature that would suggest that is a plausible biological hypothesis?
MR. KRUMHOLZ: Objection, form and leading.
A: Yes.
Q: (By Mr. Nabers) All right. Have you also seen medical and scientific literature to suggest that Vioxx can accelerate atherosclerosis in patients who take the drug?

55:

MR. KRUMHOLZ: Objection, form and leading.
A: Can you repeat that?
Q: (By Mr. Nabers) Sure. Have you also seen medical and scientific literature that would suggest that Vioxx is capable of accelerating atherosclerosis in patients who take the drug?
MR. KRUMHOLZ: Objection, form and leading.
A: Yes, it's certainly capable, but not proven.
Q: (By Mr. Nabers) Okay.
MR. KRUMHOLZ: Objection, nonresponsive.
Q: (By Mr. Nabers) In your patient who had the myocardial infarction who was taking Vioxx, did you include Vioxx as a part of your differential diagnosis as a cause of their heart attack?
MR. KRUMHOLZ: Objection, form.
A: In other patients? Is that what you're asking?
Q: (By Mr. Nabers) In your clinical patient, yes.
MR. KRUMHOLZ: Same objection.
**Q: (By Mr. Nabers) Let me try and start again. What I'm trying to figure out is in your patient who took Vioxx and experienced a myocardial infarction, did you include the fact that they took Vioxx in your differential diagnosis as a potential cause of their**

Overruled

Re: 55:21-56:1
Def Obj: Irrelevant; 403, question & answer do not deal with Plaintiff

Overruled

## Zebrack, James 2006-08-30

56:

**heart attack?**

MR. KRUMHOLZ: Objection, form.

**A: The differential diagnosis to me implies one cause and only one cause, and this is a very multifactorial disease. Certainly we consider it as a contributing factor.**

Re 56:3-6
Def Obj: Same as above

MR. KRUMHOLZ: Object, nonresponsive.

**Q: (By Mr. Nabers) In that case of your clinical patient, you considered it to be a contributing factor of their myocardial infarction?**

**A: Yes.**

Re: 56:9-11
Def obj: Same as above

**Q: Okay. And you're aware that Mr. Mason was taking Vioxx at the time that he presented to LDS having a myocardial infarction?**

Re: 56:12-14
Def Obj: Leading

MR. KRUMHOLZ: Objection, form.

**A: Correct.**

Q: (By Mr. Nabers) Are you familiar as you sit here today based upon what you've seen in the LDS medical records with what Mr. Mason's cardiac risk factors would have been for a heart attack?

MR. KRUMHOLZ: I'm sorry, could you repeat the question?

(The question was read as follows:

**'QUESTION: Are you familiar as you sit here today based upon what you've seen in the LDS Medical**

57:

**records with what Mr. Mason's cardiac risk factors would have been for a heart attack?')**

MR. KRUMHOLZ: Objection, form.

**A: Yes.**

**Q: (By Mr. Nabers) Okay. And based upon what you know about his medical history and your care and treatment of him at LDS Hospital, would you include Vioxx in the differential diagnosis as a contributing cause of his heart attack?**

MR. KRUMHOLZ: Objection, form and leading.

**A: I would -- I would consider it as a contributing factor towards his heart attack.**

Re: 56:24-57:21
Def Obj: The Witness did not diagnose Vioxx as a contributing factor pursuant to his treatment of the Plaintiff, Witness was not designated an expert on specific cause; Witness did not follow an accepted methodology since he did not review all the relevant medical records.
If objection is overruled, need to add 72:7-21 and 73:22-74:1 for completeness

MR. KRUMHOLZ: Objection, nonresponsive.

**Q: (By Mr. Nabers) And it's fair to say that you wouldn't be able to exclude his use of Vioxx as a contributing factor in his myocardial infarction?**

MR. KRUMHOLZ: Objection, form, leading.

**A: Correct.**

**Q: (By Mr. Nabers) And were you aware that he took Vioxx for 10 months?**

**A: No.**

If objection to 56:24-57:4 is overruled, need to add 60:19-60:23 for completeness.

add this

Q: Okay. Based upon your reading and your review of the medical and scientific literature on Vioxx --

(Interruption.)

106

Sustained

## Zebrack, James 2006-08-30

58:

Q. (By Mr. Nabers) Let me start again. Based upon your reading and review of the medical and scientific literature that pertains to Vioxx and cardiovascular disease -- I don't even know where I'm going anymore. Hang on one second. It will come back to me.
Oh, I know, we were talking about how long he took it. I think I asked you if you were aware that he took Vioxx for 10 months, and I think your answer was --
A: No.
Q: -- no. Okay. But based upon your review and reading of the medical and scientific literature, is it your understanding that the longer you take Vioxx, the more of an increase in the risk of an event like myocardial infarction there is?
MR. KRUMHOLZ: Objection, form and leading.
A: That is probably true.
MR. KRUMHOLZ: Objection, nonresponsive.
**Q: (By Mr. Nabers) And do you have an opinion one way or the other whether or not 10 months' use of Vioxx is long enough to be a contributing factor in a person's myocardial infarction?**
MR. KRUMHOLZ: Objection, form and leading.
**A: Yes.**

59:

**Q: (By Mr. Nabers) And your opinion in that regard would be what?**
MR. KRUMHOLZ: Same objection.
**A: That would be long enough to increase your risk for a heart attack.**
MR. NABERS: Okay. I think that's all the questions I have. Thanks.
EXAMINATION
BY MR. KRUMHOLZ:
Q: Doctor, my name is Richard Krumholz and we've never met before today; is that right?
A: Correct.
Q: You have met with Mr. Nabers before, true, Mr. Nabers being the person to your left, the plaintiff's counsel?
A: Yes.
Q: Mr. Mason's counsel?
A: Yes.
Q: And have you met with anyone else who represents the plaintiff?
A: No.
Q: Was Glenda present at any of the meetings? When I say Glenda, I'm talking about the nice lady to the left of Mr. Nabers.
A: Yes. She was there also.

Re: 58:20-23
Def obj: Witness was not qualified or designated as an expert on the CV safety of Vioxx.

Re: 58:25-59:2
Def obj: same as above

Re: 59:4-5
Def obj: same as above

Overruled

60:
Q: Okay. Other than meeting with Mr. Nabers and Glenda, have you met with anyone else in connection with this case of Mr. Mason or Vioxx?
A: No.
Q: And how many times did you meet with Mr. Nabers or Glenda?
A: Once.
Q: And when was that?
A: Approximately two months ago.
Q: And did they provide you with any information or documents during that meeting?
A: They had some medical records on Mr. Mason.
Q: Any -- are you talking about the LDS records?
A: Correct.
Q: Did they provide you with Dr. Vogeler's records, that is, the records of the family practitioner for Mr. Mason?
A: No. No.
Q: And so when you talked about, a moment ago, about Mr. Mason's risk factors, that was without any information from his records from his family practitioner?
A: Correct.
Q: And would records from Mr. Mason's family practitioner or patients of family practitioners

61:
generally be important to determine to what extent he had risk factors for cardiovascular disease or heart attacks?
A: With a good history and physical, I can generally assess what his risk factors are, assuming he's forthright and honest with his past history. In that case, I would not need his past records.
Q: For example, did you note whether or not Mr. Mason was obese?
A: I did not.
Q: Okay. Have you looked at that even today?
A: He's not followed back up with me.
Q: Have you looked at that in terms of what the records indicate that you received from the plaintiff's counsel?
A: He should have a weight in the medical record here.
Q: Can you take a look at it and let us know what his height and weight is and whether or not you would deem that of any import?
A: I know they gave him 100 milligrams of Lovenox so his weight was 100 kilograms.
**Q: Let me ask a different question. Assume for me that Dr. Vogeler, Mr. Mason's treating family practitioner, has testified that Mr. Mason was**

Overruled

Plaintiff's OBJection 61:23-25 Improper; Hypothetical; misstates facts

Def's response: Plaintiff designated cumulative testimony from this witness about cause of plaintiff's MI and his risk factors. These questions make clear this witness had very limited involvement with plaintiff and little understanding of his risk factors (response applies to objections through page 65)

Overruled

**Zebrack, James 2006-08-30**

62:

chronically obese since 1999, and that Mr. Mason has indicated that for over a decade he has weighed between 225 pounds and 235 pounds, and that he's somewhere between five nine and five 10. Would that be someone who is significantly overweight?
A: Yes.
Q: And that would -- would that cause you concern as a cardiologist, for a patient?
A: Yes.
Q: And why would that cause you a concern?
A: That will increase his risk for heart attack.
Q: And, likewise, there are other risk factors that you consider as a cardiologist in determining whether someone is at risk for a heart attack?
A: Yes.
Q: And what are those -- well, let me ask you this. Would family history be a significant factor in determining whether or not someone is at risk for heart attack?
A: Yes.
Q: Assume with me that Mr. Mason's sister died at age 63 of atherosclerosis. Would that be significant?
MR. NABERS: Objection to the form, misstates the evidence.

63:

A: That would be significant towards his risk factor and count as a family history, which would increase his risk as well.
Q: (By Mr. Krumholz) If Mr. Mason's sister died at age 55 of atherosclerosis, cardiovascular disease, would that be a significant risk factor in terms of an increased risk for heart attack?
A: Yes.
MR. NABERS: Objection to the form, misstates the evidence.
A: Yes
Q: (By Mr. Krumholz) What was your answer?
A: Yes.
Q: And would you also like to see his history of cholesterol levels?
A: Yes.
Q: And would it concern you if he had a history of elevated cholesterol within the past year?
MR. NABERS: Objection to the form, misstates the evidence.
A: Yes.
Q: (By Mr. Krumholz) Would it concern you if his nurse practitioner, who was helping his family practitioner treat Mr. Mason, diagnosed him with high cholesterol?

Plaintiff's Objection Re: 62:1-5 Assumes facts not in evidence; Rules 801 + 802 Hearsay

Re: 62:16-19. Plaintiff's Objection Rule 401 - Relevance; Rules 801 + 802 - Hearsay; no foundation; assumes facts not in evidence

Plaintiff's Objection Re: 62:21-23 Rule 401 - Relevance Rule 403; Rules 801 + 802 Hearsay; No foundation; assumes facts not in evidence

Def agrees to add

Plaintiff's Objection Re: 63:1-3 and 63:17-18 Rule 401 - Relevance Rule 403 Rules 801 + 802 Hearsay No foundation; assumes facts not in evidence

Overruled

## Zebrack, James 2006-08-30

64:

MR. NABERS: Objection to the form.
A: Yes.
Q: (By Mr. Krumholz) Would it concern you if Mr. Mason had been diagnosed with sleep apnea?
A: Yes.
Q: Has that been known to be a risk factor for – or a marker for cardiovascular disease?
A: Yes.
Q: And pose an increased risk of myocardial infarction or heart attack?
A: Yes.
MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) And would it concern you if Mr. Mason had been long diagnosed with depression?
A: Yes.
Q: Has depression been indicated as a marker or a risk factor for atherosclerosis and cardiovascular disease?
A: Yes.
Q: Does it put him at a greater risk for having a myocardial infarction or heart attack?
A: Yes.
Q: Before assessing whether or not Vioxx was a contributing factor or not or should be on a differential diagnosis or not for Mr. Mason, you would

65:

want to see those records and assess his history, true?
A: No, because regardless of what his other risk factors are, Vioxx remains a risk factor.
Q: Well, sir, the truth of the matter is that, first of all, you have not been asked to look at the totality of the evidence and all of the studies that have been done and all of the clinical trials that have been done on Vioxx, true?
MR. NABERS: Objection to the form.
A: I have not been asked to that do that.
Q: (By Mr. Krumholz) And you have not done that?
A: I have not looked at every published or unpublished piece of data on Vioxx.
Q: Have you looked at the new drug application that was submitted by Merck which attached all of the results of the clinical trials that had been performed prior to approval by the FDA?
A: I looked at a reference to, but I did not look at the data.
Q: Did you look at the post marketing clinical trials that have been done on Alzheimer's patients?
A: I looked at the data on it.
Q: But you did not look at the studies

Plaintiff's Objection Re: 64:1-22 64:22-25 Rule 401 - Relevance Rule 403 Rules 801+802 Hearsay No foundation; witness is not an expert on this topic; misstates the evidence; speculation

Plaintiff's Objection Re: 65:5-15 Leading; Argumentative

Def's response: With respect to leading this was cross examination. With respect to anything else, this question and answer demonstrates why all of plaintiffs questions about the CV risks of Vioxx were improper. This witness has not followed an appropriate methodology to provide opinions about Vioxx

Overruled

## Zebrack, James 2006-08-30

66:

**themselves?**

**A: No.**

**Q: And do you believe that others are in a better position to determine or assess whether or not there is, indeed, an increased risk of heart attacks with respect to Vioxx?**

MR. NABERS: Objection to the form.

**A: There certainly are other people that are more of an expert in that area than I am.**

Plaintiff's objection re: 66:3-9 Leading

Def's response: cross examination

**Q: (By Mr. Krumholz) You don't hold yourself out as an expert on COX-2 inhibitors, true?**

MR. NABERS: Objection, form.

**A: No.**

**Q: (By Mr. Krumholz) You're not an expert on COX-2 inhibitors, true?**

**A: No.**

**Q: You don't hold yourself out as an expert on the impact of COX-2 inhibitors on the cardiovascular system?**

**A: No.**

**Q: Or on the heart?**

**A: No.**

**Q: And you're not an expert in those areas, true?**

**A: Correct.**

67:

Q: So you would defer to others in connection with those issues, true --

MR. NABERS: Objection to the form.

Q: (By Mr. Krumholz) -- who do hold themselves out as experts and are experts in those fields?

A: I would certainly respect their opinion, but I always am entitled to my own opinion on --

Q: I understand, but you would defer to those who have made it their life study, true?

MR. NABERS: Objection to the form, mischaracterizes his answer.

A: Defer to them in which way?

Q: (By Mr. Krumholz) Defer to them in terms of assessing the totality of the evidence already and making an assessment of whether there's sufficient evidence to determine whether or not Vioxx poses an increased risk of cardiovascular events.

MR. NABERS: Objection to the form.

A: I would certainly respect and listen to their opinion, but I -- and that may persuade my own opinion, but I will still make up my own opinion based on the articles and data that I review and different opinions from different people, because certainly the -- even the experts themselves won't agree on a final answer.

Overruled

## Zebrack, James 2006-08-30

68:
Q: (By Mr. Krumholz) And when you say that, there are many experts out there on COX-2 inhibitors, true?
A: True.
Q: And on the effects of COX-2 inhibitors or the potential effects of COX-2 inhibitors on the cardiovascular system, true?
A: True.
Q: And what you're saying is there's been a scientific debate as to whether or not there's an increase in cardiovascular risk for a while now, true?
A: True.
MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) And reasonable minds can differ on that subject, true?
A: True.
Q: There are very qualified experts who have the opinion that it does not increase the risk of cardiovascular -- of CV events, true?
A: True.
Q: And there are experts, people who call themselves experts, on the other side of that equation as well?
A: Correct.
Q: And -- but you're not one of those experts?

69:
A: No.
Q: And you've never held yourself out as such?
A: No.
Q: Now, in connection with Mr. Mason -- first of all, cardiovascular disease is the number one cause of death in the United States, true?
A: True.
Q: And that's been the case for decades, right?
A: True.
Q: In fact, it's been the case for almost 100 years, right?
A: I don't know how far back.
Q: Okay. But it was true well before Vioxx was on the market?
A: True.
Q: And it was true while Vioxx was on the market?
A: True.
Q: And it was true -- it's been true after Vioxx has been on the market?
A: True.
Q: So what is important in connection with any particular case is to look at the individual equation, because you know that people who may be taking Vioxx can have heart attacks without having it caused by

Plaintiff's Objection re: 68:1-25, 69:1-21
Witness is not an expert on this topic; vague; speculating; cumulative

Def's response: Merck agrees this witness is not an expert which means none of his testimony about Vioxx is admissible

## Zebrack, James 2006-08-30

70:
Vioxx, true?
A: True.
Q: In other words, it may not be a contributing factor just because someone was taking it, true?
A: It's not necessarily a factor in each individual case, because -- well --
Q: Well, let me see if we can get on the same page here. You know and understand the difference between association and causation?
A: True.
Q: In other words, folks can be on a particular medication and have an event occur, and just because they happen together at the same time, they may be associated, right?
A: Correct.
Q: That's what association means?
A: Right.
Q: In other words, when somebody says that somebody was taking aspirin and they had a heart attack, that aspirin would be associated with that heart attack, true?
A: True.
Q: And with that patient at the time of his heart attack?
A: Correct.

71:
Q: So just because there's an association doesn't mean that there's causation, right?
A: Correct.
Q: And so what you would have to do is scrub off the facts of any particular case to determine whether indeed Vioxx, for example, or any other medication caused any particular untoward result, right?
A: Correct.
Q: And what you have not done is gone back and looked at all of Mr. Mason's records to determine if it was likely that his traditional risk factors and other factors were the likely cause of his event? You haven't done that?
A: I know what his risk factors are based on the history that we obtained.
Q: That's not what I asked, though. I asked have you gone back and looked at his history and his prior medical records from before that hospital visit --
A: I have not looked at his previous medical records.
Q: And before assessing whether or not Mr. Mason's heart attack was in any way caused or contributed to by Vioxx, you would at least want to look at those records, would you not?

Overruled ✓

Re: 71:22-25
Def Obj: Witness was not qualified or designated as an expert (this answer demonstrates he did not follow an accepted methodology when speculating about the CV effects of Vioxx. If objection is overruled need to add 74:19-24 for completeness.

overruled

## Zebrack, James 2006-08-30

72:

MR. NABERS: Objection to the form, asked and answered.

**A: No. As I said before, if clinical studies show that Vioxx increases the risk of a heart attack and someone has a heart attack, Vioxx can be a factor towards that, regardless of the other risk factors.**

Re 72:3-6
Def Obj: Same as above

Q: (By Mr. Nabers) What you're saying is it may or may not have, true?

MR. NABERS: Objection to the form, mischaracterizes his testimony.

A: True. There's no way to know on an individual basis whether it has or not.

Q: (By Mr. Krumholz) And it's not your opinion that it did cause or contribute to his heart attack, it's simply your opinion that it may have?

A: Correct.

MR. NABERS: Objection to the form, mischaracterizes his testimony.

Q: (By Mr. Krumholz) True?

A: It may have contributed. I don't know whether it did or not.

Q: And you, without reviewing all of the records, you can't state with reasonable medical probability whether it actually did or not?

MR. NABERS: Objection to the form, asked and answered.

73:

A: I don't know how anyone could say with medical probability whether one factor out of a dozen was the contributing factor. I guess percentage-wise and --

Q: So just to be --

MR. NABERS: No, no, let him finish.

Q: (By Mr. Krumholz) I thought you were. Go ahead. Are you finished?

A: Yes.

**Q: And just so to be clear, you can't state with reasonable medical probability as you sit here today that Vioxx was a contributing cause of Mr. Mason's heart attack. You can simply say that it may have been?**

**MR. NABERS: Objection to the form.**

**Q: (By Mr. Krumholz) True?**

**A: That's somewhat of a semantics on if it's a contributing factor or not. It may be a contributing factor or -- a contributing factor, what's -- you know, I don't understand the difference there.**

Re: 73:11-21
Def obj: same objection as 71:22-25. If objection is overruled, need to add 73:22-74:1 for completeness

add, 106

Q: Well, I mean, there are lots of things that might be able to cause a result that may have not in any particular situation, true?

MR. NABERS: Objection to the form.



74:

A: True.

Q: (By Mr. Krumholz) So your child may be able to cause some event to occur, but he may not have done it, right?

A: Right.

**Q: And so if, applying that analogy here, likewise, even if you're right and that Vioxx can cause an increased risk and was a factor or may be a factor, you can't state with reasonable medical probability as you sit here today that it was the probable cause or a probable contributing factor as to Mr. Mason's heart attack?**

MR. NABERS: Objection to the form, asked and answered.

Q: (By Mr. Krumholz) True?

**A: I can't say that it caused the heart attack, but I can say that it's a contributing factor if scientific studies show that there's an association.**

Q: But you don't know if that factor actually played any role in this heart attack, true?

MR. NABERS: Objection to the form, asked and answered.

A: I don't know if it actually caused the heart attack or played a role in this particular case.

**Q: (By Mr. Krumholz) You can't state with**

75:

**reasonable medical probability that this contributing factor, as you've called it, that is, Vioxx, played any role, actual role, in connection with Mr. Mason's heart attack, true?**

MR. NABERS: Objection to the form, asked and answered.

**A: It certainly can play a role, but I can't say how much or what the probability of that is in this particular case.**

Q: (By Mr. Krumholz) In fact, you can't state with medical probability that it was a contributing factor in terms of its role in this heart attack?

MR. NABERS: Objection to the form, asked and answered.

Q: (By Mr. Krumholz) Maybe we are just playing semantics. I think we're on the same page.

A: Right.

**Q: I hope we are, because I want to make sure we are all intellectually above the table here. Hypothetically, you believe that Vioxx somehow increases the risk of cardiovascular events?**

**A: Correct.**

**Q: You don't believe that that happens with respect to each and every patient who takes Vioxx, true?**

Re: 74:6-12 Def Obj: Same objection as 71:22-72:6. If objection is overruled, need to add 74:19-24 for completeness

Overruled

add for completeness (106)

Re: 74:16-18 Def obj: Same as above.

Re: 74:25-75:4 Def obj: Same objection as 71:22-72:6

Re: 75:7-9 Def obj: Same as above

Re: 75:18-76:24 Def obj: Same as above

## Zebrack, James 2006-08-30

76:
A: I believe it increases everyone's risk.
Q: No, but you don't believe that it actually causes cardiovascular events with respect to each and every patient who takes Vioxx, true?
A: It doesn't cause a heart attack in everyone, but it just increases their risk.
Q: Okay. I'll object as nonresponsive. What I'm asking is that you're not suggesting -- let me ask it this way. You would agree that just because Vioxx in your mind may be a contributing factor, like other risk factors, that doesn't necessarily mean that particular factor was the probable cause or contributing cause of Mr. Mason's heart attack, true?
MR. NABERS: Objection to the form.
A: I can't say that it's the probable cause in the sense that it's only one factor in many and you can't single out a cause when there are multiple causes. So in that sense, when you say probable -- that implies the major cause.
Q: (By Mr. Krumholz) And the truth is you can't even testify, based upon reasonable medical probability, that here it actually played a role in Mr. Mason's heart attack, true?
MR. NABERS: Objection to the form, asked and

77:
answered.
Q: (By Mr. Krumholz) That is, that --
A: In this particular case, I can't say for sure whether it was involved or not. It's just one of the potential factors.
Q: For example, you indicated that you believe that there was a clot in this case?
A: Yes.
Q: Okay. You don't know whether or not Vioxx caused that clot or not?
A: If Vioxx increases the risk of a heart attack, heart attacks are caused by clots, then Vioxx then predisposes to cholesterol rupture and clots.
Q: Let me ask you a different question. You believe that his angina, Mr. Mason's angina, started a week or so before he presented on July 25th?
A: Yes.
Q: And do you believe that there was a rupture at that point when --
A: Yes.
Q: So there was likely a rupture a week or so before his heart attack?
A: Correct.
Q: And that would cause what to happen in terms of clot formation?

overruled

Pl: 77:2-13
Def Obj: Same as above

78:

A: It would cause some instability in the cholesterol plaque that's in the artery, causing it to lift up and create a more severe blockage than was there before.
Q: But he didn't have an actual event until July 25th; is that right?
A: Not that we know of.
Q: Now, as I understood your testimony, you never really -- did you actually treat Mr. Mason?
A: I saw him on Saturday and Sunday when he was in the hospital. He was admitted on Friday.
Q: Did you actually do anything for Mr. Mason in terms of intervention?
A: No.
Q: Did you do anything in terms of prescribing medications for him?
A: Yes.
Q: Anything else?
A: Counseling.
Q: Did you actually perform a history and physical on him?
A: I did not perform the original history and physical. I talked to him about his risk factors and lifestyle and such before he went home.
Q: And did you perform any sort of physical on

79:

Mr. Mason?
A: Yes.
Q: So you performed a history and physical, but it may not have been reflected by -- I believe it was Exhibit 3; is that right?
A: Correct.
Q: Now, if you were going to try to determine the extent of damage or problems that Mr. Mason might have had in connection with this event, what sort of diagnostic testing would you do?
A: The blood test, cardiac enzymes that he had, indicates the degree of heart damage that he had. Other things we can do are imaging to look at the function of the heart.
Q: Can you also -- you obviously can do cardiac catherization?
A: Yes.
Q: And that will show you at least what the arteries look like in connection with Mr. Mason, right?
A: Right.
Q: And also will it show you the ejection fraction?
A: A left ventriculogram will, which is generally performed with an angiogram.

80:

Q: And that actually was performed on Mr. Mason by Dr. Ganellen, true?
A: I believe it was.
Q: And what would you hope -- what would you look for in terms of an ejection fraction calculation for Mr. Mason?
A: Normal range would be 55 to 70 percent.
Q: And what was Mr. Mason's ejection fraction?
A: 60 percent.
Q: And so he had a normal left ventricular ejection fraction at that time?
A: Yes.
Q: Would that have been after his procedure?
A: That was during the angiogram procedure.
Q: Would that be a good sign for Mr. Mason?
A: Yes.
Q: Why?
A: It indicates that he did not have a large heart attack and his overall heart function was preserved, and he has a better prognosis in the future and a lower risk of developing heart failure.
Q: Do some patients who have had an acute event or, if not an acute effect, some sort of myocardial infarction have an ejection fraction in the 30 to 45 range?

81:

A: Yes.
Q: And that would be much more significant and severe?
A: There would be more heart damage, yes.
Q: And the prognosis for patients like that would be much more negative than in someone like Mr. Mason?
A: The risk of dying or developing heart failure would be higher, yes.
Q: But for people like Mr. Mason, it was a very good sign that he had an ejection fraction of 60 percent?
A: Yes.
Q: Actually, overall function of the heart, that means it was normal, true?
A: True.
Q: And that is a very good sign for Mr. Mason?
A: Yes.
MR. KRUMHOLZ: What number of exhibit are we on?
MR. NABERS: 10.
(Exhibit No. 10 marked.)
Q: (By Mr. Krumholz) Let me hand you what has been marked as Deposition Exhibit 10. Have you seen that record before?

Overruled

Plaintiff's Objection re: 81:23-24, 82:1-25, 83:1-19 Cumulative

(through 83:19) Def's response: Plaintiffs asked this witness to speculate about plaintiff's atherosclerosis and prognosis after the MI. These questions are appropriate cross-examination if plaintiff's questions are allowed

## Zebrack, James 2006-08-30

82:

A: Yes.
Q: And that is a repeat catherization that was performed on Mr. Mason by Dr. Gary Symkoviak; is that right?
A: Yes.
Q: And of import in connection with this cardiac catherization, is that -- the successful procedure that was performed on Mr. Mason on July 25th is confirmed by this report, true?
A: Correct.
Q: In other words, the left anterior descending artery of Mr. Mason that was 90-percent blocked is still wide open?
A: Yes.
Q: And the blood is free flowing to the heart, true?
A: True.
Q: And that's a very good sign for Mr. Mason?
A: Yes.
Q: And likewise, the diagonal off the left anterior descending artery is likewise wide open for purposes of blood reaching the heart?
A: Yes.
Q: And that was a very good sign for Mr. Mason?
A: Yes.

83:

Q: So as of August 13 of 2003 -- which is the date of this cardiac catherization, true?
A: Yes.
Q: -- we can say that the good result obtained by your partner, Dr. Ganellen, was still a good result and was still working for Mr. Mason?
A: Yes.
Q: And that is exactly what you would hope for for a patient like Mr. Mason, true?
A: Yes.
Q: And the summary indicates that there are no major stenotic lesions seen. Do you see that?
A: Yes.
Q: And that's a good sign for Mr. Mason?
A: Yes.
Q: And it says, 'A patent stent in the diagonal vessel,' and that means the stent is still in place, correct?
A: The stent is wide open, yes.
Can we take a break for a minute?
MR. KRUMHOLZ: Absolutely.
THE VIDEOGRAPHER: It's 51 minutes after 2:00. We're going off the record. This is the end of tape No. 1.
(Recess from 3:31 p.m. to 3:57 p.m.)

## Zebrack, James 2006-08-30

84:
THE VIDEOGRAPHER: It's 57 minutes after 3:00. This is the beginning of tape No. 2. We're back on the record.
Q: (By Mr. Krumholz) What is hypokineses?
A: It's a weakness of the heart muscle.
Q: Is it lack of wall -- indicated by lack of wall motion from time to time?
A: Lack of wall thickening.
Q: And on a cardiac catherization, can you actually see whether there's any hypokineses from time to time?
A: Yes.
Q: And I assume there is mild hypokinesis on one end?
A: Uh-huh (affirmative).
Q: Is that right?
A: Yes.
Q: And on the other end there may be severe hypokineses, correct?
A: Correct.
Q: And, obviously, it's much better to have mild hypokinesis, right?
A: It's better than moderate or severe.
Q: And why is that?
A: It indicates less damage or dysfunction of the heart muscle.

85:
Q: Does it -- is it an indication that, to the extent there was a myocardial infarction or heart attack, that it was a relatively mild one?
A: If the hypokinesis is from a heart attack, it indicates that it's not through and through the wall and generally that's a less severe, mild -- it could be mild or moderate, but it's not as severe.
Q: So it's a good thing if a heart attack does cause some damage, that there would be mild hypokinesis present as to opposed to moderate or severe?
MR. NABERS: Objection to the form.
A: Well, a heart attack, if it's small enough, may not have any visible damage at all. So mild would be worse than that, but better than moderate or severe.
Q: (By Mr. Krumholz) Okay. And if you look at Exhibit 10 again -- which was the cardiac catherization performed by Dr. Symkoviak?
A: Yes.
Q: It says, 'There was a very small anterior hypokinetic segment, but the overall ejection fraction was normal at 69 percent.' Do you see that?
A: Yes.

86:

Q: How do you interpret that in terms of significance to Mr. Mason?
A: This patient has had a small heart attack in that part of the heart and that part of the heart is damaged and it's a little weak but it's not bad.
Q: Okay. And why is it important to say 'but the overall ejection fraction was normal at 69 percent'?
A: Well, someone can have actually a moderate-sized heart attack with significant decreased function and still have a preserved ejection fraction, which means that the overall efficiency of the heart and how much blood is sent out with each beat remains normal. In this -- in this -- in that case, when it says the overall ejection fraction is preserved, that's more important than it being weak in that the efficiency of the heart is good and the heart attack damage is smaller.
Q: Okay. So this indicates that he had a very small damage to his heart and that his overall function, left ventricular function, remained normal, true?
A: Yes.
Q: And that was a very good sign for Mr. Mason?
A: A very good sign would be completely normal without wall motion abnormalities, but it's a good sign.

87:

Q: What would you tell a patient who had those findings in terms of the severity of their heart attack?
A: That they had had a small heart attack.
(Exhibit No. 11 marked.)
Q: (By Mr. Krumholz) I'm going to hand you what has been marked as Exhibit No. 11. Have you seen that document before?
A: Yes.
Q: Is a perfusion study or a Cardiolite nuclear perfusion study an important tool to cardiologists?
A: Yes.
Q: Why?
A: It gives prognosis as to the risk for future death and heart attack.
Q: What would you look for to determine whether -- how a patient is doing and what their prognosis is generally, without particular -- without referencing necessarily Exhibit 11, what would you look for?
A: How far they can exercise on the treadmill, what their ejection fraction is and whether there's any evidence of ischemia or infarction on the

Overruled (goes to credibility or knowledge of leads themselves)

Plaintiff's Objection re: 87: 8-25, 88: 1-25, 89: 1-25, 90: 1-22. Unrelated to Doctor's care and treatment; cumulative; witness is not an expert on this topic

Def's response: Plaintiffs asked this witness to comment upon prognosis and damage and these questions are appropriate cross-examination if plaintiffs questions are allowed (response applies through page 90)

## Zebrack, James 2006-08-30

88:

perfusion from the scan.
Q: And Exhibit No. 11 is a perfusion study that was performed by Dr. Keep. Do you see that?
A: Yes.
Q: Do you know Dr. Keep?
A: Yes.
Q: Is he a well-respect cardiologist?
A: I don't know him well, but, yes.
Q: Okay. Do you think he is reliable in terms of how he performs testing?
A: Yes.
Q: And this perfusion study was performed on Mr. Mason on October 22 of 2003, approximately three months post his hospitalization where he saw you, true?
A: Yes.
Q: And if you go through this, you mentioned that his ability to perform on a stress test, that was one of the factors that you would want to look at, right?
A: Right.
Q: It indicates at peak exercise -- well, I apologize. I was reading the wrong line. First of all, it says the EKG was within normal limits. Do you see that?

89:

A: Yes.
Q: Is that a good sign?
A: Yes.
Q: Why?
A: Well, if you have blocked arteries, it will create EKG changes and -- which is what we're looking for on the stress test that would indicate a need for additional procedures.
Q: So there was no sign that there was any sort of blocked arteries as of October of 2003?
A: Correct.
Q: And that was a good sign for Mr. Mason?
A: Yes.
Q: And then it says -- and I think this is where the exercise test that you mentioned comes into play. It says, 'The patient exercised 11 minutes and zero seconds on a Bruce protocol.' Do you see that?
A: Yes.
Q: It says, 'The normal exercise time for this age is eight minutes and 20 seconds.' Did I read that accurately?
A: Yes.
Q: Then it indicates that he actually performed 30 percent better than what you would expect for a man of his age, right?

Overruled

90:

A: Yes.
Q: That's what the negative 30-percent functional aerobic impairment means?
A: Yes.
Q: That means that's a good sign for Mr. Mason. That means that he actually performed 30 percent better than expected on the stress test?
A: Yes.
Q: And so in terms of functional workload, Mr. Mason's prognosis was good, just as to that one factor?
A: Yes.
Q: Then if we go to the next item in the report it says, 'The test was stopped because of fatigue.' Do you see that?
A: Yes.
Q: And that's normal. That's how all of the tests are stopped, right?
A: Correct.
Q: You go until the person is too fatigued to go on, true?
A: Yes.
Q: Do you use nuclear perfusion stress tests?
A: Yes.
Q: Are they more reliable than stress tests that

91:

are not Cardiolite or nuclear perfusion testing?
A: The sensitivity is -- of a nuclear test is better than that of a stress echo.
Q: When you say the sensitivity is better, is it more likely that there would be a false negative in connection with a regular Bruce protocol stress test as opposed to a nuclear perfusion stress test?
A: Yes.
Q: What is a false negative?
A: A false negative means that the test was negative, but in reality they had disease and the test missed it.
Q: And that occurs from time to time in connection with stress testing?
A: Yes.
Q: That is not Bruce protocol testing -- I mean, that's not nuclear perfusion testing?
A: It happens with nuclear testing as well, it's just less likely.
Q: That's what I meant to say. I didn't mean to suggest that it never happened with this one. But it's just more accurate and reliable, this kind of test?
A: It is.
Q: The one represented by Exhibit No. 11?

Overruled

## Zebrack, James 2006-08-30

92:
A: Right.
Q: Okay. Anyway, the EKG had no ST changes to suggest ischemia, and I think we've talked about that, right?
A: Right.
Q: That just meant that there was no indication of any sign of ischemia or blockage that would concern you in terms of ability of blood flow to flow to the heart?
A: Yes.
Q: And then it says, 'The blood pressure response during exercise was normal.' Is that important?
A: Yes.
Q: Is that a good sign for Mr. Mason?
A: Yes.
Q: Was it also a good sign that he had no ST changes that suggested any narrowing of the arteries --
A: Yes.
Q: -- or ischemia? Is the answer yes?
A: Yes.
Q: Then it says, 'The rhythm during exercise was normal.' Do you see that?
A: Yes.

93:
Q: What does that mean?
A: He was in normal sinus rhythm.
Q: And why is that important?
A: Certain rhythm problems can develop during exercise which could cause symptoms or indicate blocked arteries.
Q: Then it says, 'The patient had no chest pain during the exercise.' Do you see that?
A: Yes.
Q: And that was a very good sign?
A: Yes.
Q: Because that means that he's not suffering from any sort of angina that you would be concerned about?
A: Correct.
Q: And, of course, angina happens when plaque starts to build up in the arteries or in the artery walls and there's restricted blood flow, true?
A: True.
Q: And as a result, it may cause chest pain from time to time?
A: Yes.
Q: But there was no indication that Mr. Mason was exhibiting any sort of chest pain relating to his heart, true?

Plaintiff's Objection Re: 92:1-25 93:1-25 94:1-25 95:1-25 96:1-8

Unrelated to Doctor's care and treatment; cumulative; witness is not an expert on this topic

94:
A: True.
Q: And then it says in the interpretation, 'Stress and rest tomographic images in multiple orthogonal planes demonstrate no significant perfusion deficits.' What does that mean, perfusion deficits, no perfusion deficits?
A: The Cardiolite is a radioactive substance that we inject in the blood and it gives us an indication where blood is going, and perfusion is another term for blood flow to the heart, and a deficit would indicate a lack of blood flow. So in this case there was normal blood flow to the heart.
Q: And that's significant in terms of determining prognosis as well, right?
A: Yes.
Q: And then it indicates his ejection fraction is 55 percent, and that's normal on a nuclear perfusion test, true?
A: Yes.
Q: So that, again, was a very good sign for Mr. Mason?
A: Yes.
Q: And that's one of the things you specifically indicated you would look for in terms of determining his prognosis?

95:
A: Yes.
Q: And then it says 'normal' in the summary. It says, 'Normal stress myocardial perfusion study.' That means this test was completely normal, right?
A: Yes.
Q: It says, 'Normal global and regional LV function.' So what does this indicate to you as a cardiologist as to Mr. Mason's condition as of October 22 of 2003?
A: His stress test was normal.
Q: It was an excellent result for Mr. Mason, true?
A: It's a normal result. It's a good result.
Q: Okay. And in terms of his functional workload, that was better than normal, right?
A: Yes.
Q: And his ejection fraction was normal, right?
A: Yes.
Q: And his ischemia that you identified as a factor, he didn't have any ischemia or restrictive blood flow according to this testing?
A: He did not.
Q: And there wasn't any sign of any possible or actual infarct, right?
A: No.

**Zebrack, James 2006-08-30**

96:

Q: That is correct?
A: That is correct. There's no evidence of that.
Q: And as a result, how would you -- what would you tell a patient about his prognosis given this nuclear perfusion testing?
A: His risk of a heart attack in the next year is less than or equal to one percent.
Q: Based upon this testing, would you have restricted Mr. Mason in terms of his activities in any way?
A: No.
Q: Could he golf?
A: Yes.
Q: Could he hunt?
A: That would have no limits on activities specifically, although in someone who has had a previous heart attack, I would caution him to overexert himself with real strenuous activities. And although hunting is generally not strenuous, if he lifted heavy objects up a mountain at a high elevation, that could be considered excessive. Same thing with doing marathons or other strenuous activities that he wasn't properly conditioned for.
Q: In other words, he can do anything as long as

97:

he conditions himself for it, gets in better shape and becomes more -- I'm losing appropriate words, but is able -- as long as he builds up to it, he can do just about anything; is that fair?
MR. NABERS: Objection to the form.
A: He can do just about anything. I may caution him against real strenuous activities even if he is conditioned, but he can do just about anything.
Q: (By Mr. Krumholz) Do you see any evidence of what you've seen so far that Mr. Mason could not bike?
A: I don't see any evidence of that.
Q: Or fish?
A: No.
Q: Or golf?
A: No.
Q: Or play with his grandkids?
A: No.
Q: Or participate in sexual activity?
A: No.
Q: Or have sexual relations?
A: You know, again, this is a stress test of his heart and those -- that would require, you know, a clinic visit to discuss his symptoms and everything else that's going on. The stress test would not indicate any limitations there.

Overruled (cross-examination)

Plaintiff's Objection Re: 96:25 Vague; speculation; Argumentative.

Plaintiff's Objection Re: 97:1-4 unrelated doctor's care and treatment; cumulative; witness is not an expert on this topic

Plaintiff Objection Re: 97:9-25 98:1-5 No foundation; speculation

Def's response: Plaintiff raised with this witness the issue of damage and this is appropriate cross-examination (through 98:5)

98:
**Q: You wouldn't place him on any limitations based upon the records you've seen so far?**
**A: No.**
**Q: Correct?**
**A: Correct.**
Q: As a result of the fact that chest pain can be indicative of angina -- is it AN-gina or an-GINA (phonetic)?
A: Depends on who you talk to.
Q: Regardless, is it important to monitor a person's chest pain or chest discomfort?
A: It is.
Q: And can that be a marker or sign of atherosclerosis?
A: Yes.
**Q: Do you believe that it's likely given Mr. Mason's 90-percent occlusion on July 25th of 2003 that he likely had underlying atherosclerosis over a year earlier?**
MR. NABERS: Objection to the form.
**A: Yes.**
Q: (By Mr. Krumholz) In the left anterior descending artery?
MR. NABERS: Objection to the form.
A: If you do an ultrasound on healthy people, the majority of people at his age would have atherosclerosis. It's just a relative term as to how much is there when it creates a problem. If you had done an angiogram on him a month before or a year before, you may not have seen any significant blockages, you may have. It's hard to know for sure.

99:
**Q: (By Mr. Krumholz) If you had seen Mr. Mason the month before his heart attack in June of 2003 and had done a cardiac catheterization on him and you realized that he had a 90-percent blockage in his LAD and a 70-percent blockage in his first diagonal, would you have wanted to place a stent and perform an angioplasty --**
**A: Yes.**
**Q: -- on those vessels?**
**A: Yes.**
**Q: It's not unusual for patients with multiple risk factors to have heart attacks; is that true?**
MR. NABERS: Objection to the form.
**A: No.**
**Q: (By Mr. Krumholz) It is true?**
**A: It is true.**
**Q: And, in fact, you see that in your practice every day or every week, true?**
**A: True.**

Overruled

Plaintiff objection Re: 98:16-19 no foundation, speculation

Def's response: Basic cardiology

Plaintiff's objection Re: 99:7-13 No foundation, speculation, incomplete hypothesis

# Zebrack, James 2006-08-30

100:

**Q: And, in fact, people can have no signs or symptoms and have a heart attack, true?**
**A: True.**
Q: And how can that happen?
A: The nerves in the heart don't work correctly for one reason or another and patients don't feel symptoms that they attribute to a heart attack. They often will feel tired or other vague symptoms and not realize they're having a heart attack.
Q: So people can actually not have any signs or symptoms in the year before or months before a heart attack and still have one without regard to whether or not they've taken a COX-2 or Vioxx, true?
A: True.
Q: And that happens -- you see that happen in your practice, true?
A: True.
Q: It's not unusual, true?
A: True.
Q: In fact, what percentage of heart attacks are silent heart attacks or without signs or symptoms?
A: Approximately one in three.
Q: So a third of the heart attacks fit in that category?
A: Yes.

101:

Q: It would not be unusual for someone who is obese to have a heart attack, true?
A: I guess it depends on how you define unusual.
**Q: Well, it's not surprising when someone is obese and has a heart attack?**
**A: It's not surprising.**
**Q: It's not surprising when someone has a family history of atherosclerosis and heart attacks to have a heart attack, true?**
**A: It's not surprising.**
**Q: That's why they are considered risk factors, correct?**
**A: Correct.**
**Q: You were asked questions about whether or not Vioxx -- whether there are studies that indicate or suggest that Vioxx can -- I think the phrase was progress atherosclerosis or cause atherosclerosis progression. Do you recall that?**
**A: Yes.**
**Q: And there have been no human studies in that regard, to your knowledge, have there?**
**A: No.**
**Q: Is that accurate?**
**A: I'm not aware of any.**
**Q: Okay. So all of them have been on mice or**

Overruled

## Zebrack, James 2006-08-30

Zebrack PA PC DA DC on 10-3

Def's response: The witness should not be allowed to comment on his view of the Vioxx CV literature which include plaintiff's designations on this topic. But if plaintiff's questions are allowed, then these questions are appropriate cross-examination (through 106:2)

102:

other laboratory animals?
A: Yes.
Q: And there have been a significant number of studies that indicate just the opposite, that indeed Vioxx inhibits the progression --
MR. NABERS: Objection.
Q: (By Mr. Krumholz) -- of atherosclerosis. Have you seen those?
MR. NABERS: Objection to the form.
A: I have not seen those.
Q: (By Mr. Krumholz) You haven't seen any of those?
A: No.

Plaintiff's Objection re: 102:3-13 leading; foundation; assumes facts not in evidence

Q: Okay. Before forming an opinion as to whether Vioxx can accelerate the progression of atherosclerosis, you would want to see all of the literature in that regard, would you not?
MR. NABERS: Objection to the form, asked and answered.
A: Before forming an opinion on whether it occurs or not, yes, but whether it could occur or not, I don't need to see all the literature to say whether it's possible.
Q: (By Mr. Krumholz) Well, to assess what the best literature or the most reliable studies are in

103:

connection with that question, you would first just simply want to review all of the studies that have been done in that regard, true?
A: True, although it's always impossible to review all of the studies, because there's --
Q: How many do you think there are?
A: Well, that's the thing, there are studies that are unpublished and you have no way of reviewing those studies.

Plaintiff's Objection re: 102:14 - 103:9 optimal completeness

Q: Well, I'll limit my question to published studies. You would want to see all the published studies assessing the extent to which Vioxx or other COX-2s can accelerate the progression of atherosclerosis before deciding to opine about that subject, true?

Plaintiff's Objection re: 103:10-15 leading ← This is cross OK leading in cross 611(c)

MR. NABERS: Objection to the form.
A: Before deciding --
Q: (By Mr. Krumholz) To draw conclusions about that subject.
A: Before drawing conclusions on whether that's likely or not, yes.
Q: Or whether it can happen? Just because it happens in one setting doesn't necessarily mean that that was -- I mean, that could have just been an association, not a causation, right?

Plaintiff's Objection re: ~~103:17~~ 103:17 - 104:13 leading; cumulative

104:

A: Right, but --
Q: You're not a statistician, are you?
A: No.
Q: You didn't do any sort of statistical significance analysis to determine whether or not those particular studies you saw were such that they couldn't be refuted, did you?
A: No.
Q: Okay. You would -- I think this is just a basic question. You would want to see all of the published literature on that subject before deciding whether it can happen, whether it's been proven that it can occur?
MR. NABERS: Objection to the form, asked and answered.
Q: (By Mr. Krumholz) True?
A: As a general answer to your question, yes, I would like to see all the literature before forming an opinion, but, again, I stick to my original statement that if I'm going to form an opinion on whether something is possible, reviewing the majority or some of the literature can be adequate.
Q: Do you know whether or not you've reviewed the majority?
A: I don't.

105:

Q: You would at least want to know that, right?
A: Yeah.
Q: You would at least want to know what's out there before making an opinion as to whether or not it can happen?
MR. NABERS: Objection to the form.
A: Yes.
Q: (By Mr. Krumholz) Okay. And you've not done that?
MR. NABERS: Objection to the form.
A: I have reviewed PubMed to find all articles that I could on the subject, and I think I have the majority or a number of the articles, but there's no way to know without going to an expert in the field as to what all the other articles are, because it's difficult to search and get a full list of every article.
Q: (By Mr. Krumholz) And you're not an expert in that field?
A: No.
Q: That is, in the field of determining whether or not COX-2 inhibitors or Vioxx, particularly, accelerates progression of plaque or atherosclerosis?
MR. NABERS: Objection to the form.
A: I'm not an expert in the field.

Overruled

PLAINTIFF'S OBJECTION RE: 104:16 - 105:5 hearsay; cumulative

OK

PLAINTIFF'S OBJECTION RE: 105:18 - 106:4 cumulative; hearsay

## Zebrack, James 2006-08-30

106:

**Q: (By Mr. Krumholz) And you've never held yourself out as such?**

MR. NABERS: Objection to the form.

**A: No.**

**Q: (By Mr. Krumholz) And you also don't hold yourself out as an expert as to whether or not COX-2 inhibitors or Vioxx particularly cause plaque ruptures?**

**A: No.**

**Q: And you also don't hold yourself out as an expert on the subject of whether or not COX-2 inhibitors or Vioxx specifically can cause plaque formation -- I mean, clot formation?**

**A: No.**

**Q: You've never held yourself out as an expert on any of those subjects?**

**A: No.**

**Q: And you don't consider yourself an expert on any of those subjects?**

**A: No.**

**Q: Is that true?**

**A: That's true.**

Q: What we do know about Mr. Mason is that he had significant coronary artery disease just prior to his MI, true?

107:

A: He had it at the time of his MI, yes.

Q: And you believe he likely had it just prior to his MI, true?

MR. NABERS: Objection to the form.

A: Could you define just prior to?

Q: (By Mr. Krumholz) Within the week or two.

A: He certainly had disease then because he had symptoms of heart disease at the time, yes.

Q: Within the two weeks prior -- before his symptoms but just prior to his symptoms, you would agree that he likely had significant atherosclerosis in the left anterior descending artery and the first diagonal, true?

A: I would say that it's more likely than not, but there are case reports of people with normal looking arteries that can develop significant blockages within a few days or a week.

**Q: And you believe that Mr. Mason had a non-Q wave myocardial infarction?**

**A: Yes.**

**Q: It was not a transmural myocardial infarction, true?**

**A: Correct.**

Q: Both of which can have much more significant or worse problems associated with it? That is, the

## Zebrack, James 2006-08-30

108:
non-Q wave and the transmural heart attacks can be more severe?
A: A non-Q wave is not a transmural --
Q: I'm sorry, I apologize. I misspoke, and I appreciate that. He did not have a Q wave MI?
A: He did not.
Q: And he didn't have a transmural MI?
A: No.
Q: And that was a good thing for Mr. Mason that he didn't have either one of the those?
A: Yes.
Q: Why?
A: He had less heart damage.
Q: And the extent of his coronary artery disease was undiagnosed until his cardiac cath was done on July 25th, true?
A: True.
Q: If Mr. Mason did not have an MI but you knew the extent of his coronary artery disease in June of 2003, you would have recommended a stent and angioplasty, true?
A: True.
Q: And as a result of coming into the hospital and having a cardiac cath, he was able to get that stent and angioplasty that he very much needed, true?

109:
A: True.
Q: And that was a very successful procedure, that is, the cardiac cath performed on July 25th?
A: It was.
Q: It opened up his left anterior descending artery, true?
A: True.
Q: Completely?
A: True.
Q: And it opened up his first diagonal as well?
A: True.
Q: To the point where there was full blood flow to the heart?
A: True.
Q: And those were all good things for Mr. Mason?
A: Yes.
Q: And the perfusion testing -- and there was a follow-up cardiac cath performed after that, some two weeks after, true?
A: True.
Q: Which confirmed those good results?
A: Yes.
Q: And those were -- those were very good things for Mr. Mason?
A: Yes.

## Zebrack, James 2006-08-30

110:

Q: And as a result, he has a good prognosis --
well, let me ask it a different way. He had a nuclear perfusion test, true?
A: Yes.
Q: And it was a normal nuclear perfusion test?
A: Yes.
Q: Every single factor that you would want to look to to determine whether or not he had a good prognosis, he indicated that he did, in fact, have a good prognosis, true?
A: True.
Q: And that was a very good thing for Mr. Mason?
A: Yes.
Q: And as a result, you would not place any significant restrictions on what Mr. Mason can or can't do as a result of his heart attack, true?
A: True.
MR. KRUMHOLZ: I'll pass the witness.
FURTHER EXAMINATION
BY MR. NABERS:
Q: Doctor, just a couple of questions by way of follow-up. You've heard the phrase --
THE VIDEOGRAPHER: Sorry, would you put on the microphone?
Q: (By Mr. Nabers) Let's see if we can start

111:

over. Just a couple of quick questions by way of follow-up. You've heard the phrase serious as a heart attack?
A: Yes.
Q: A heart attack to the patient is serious, right?
A: Yes.
Q: Okay. And if a patient has a heart attack, that's a significant medical condition to that patient, correct?
A: Yes.
Q: Okay. And we looked at Deposition Exhibit No. 10. I believe you have it right there, correct?
A: Yes.
Q: All right. And this was the catherization from Cottonwood Hospital, correct?
A: Correct.
Q: And it's dated August 13th, 2003. It was a couple of months after Dr. Ganellen's cath?
A: Yes.
Q: And if we look at -- right before the summary section, you were asked earlier about the fact that there was a very small anterior hypokinetic segment. Do you see that?
A: Yes.

Overruled

Plaintiff's objection re: 110:14-16 no foundation; speculation; witness is not an expert on this topic

Def's response: none needed

## Zebrack, James 2006-08-30

112:

**Q: All right. Now, that anterior hypokinetic segment in Mr. Mason's heart, that is an abnormal finding, correct?**
**A: Yes.**
Q: That is not normal. He does not have a normal heart with that finding, correct?
MR. KRUMHOLZ: Objection, form.
A: There's evidence that he's had a small amount of heart damage, so, yes, that's not normal.
Q: (By Mr. Nabers) Okay. It would be better for him if he didn't have that finding, wouldn't it?
MR. KRUMHOLZ: Objection, form.
A: It's such a small amount of damage, it's hard to know that he would really have any symptoms related to that, but I guess in the general view of things, yeah, it would be better if it wasn't there.
Q: (By Mr. Nabers) It would be better for Mr. Mason if he didn't have a heart attack too, right?
A: Yes.
**Q: Okay. When you look at that anterior hypokinetic segment, what that tells you is that there's evidence of a scar from the heart attack, right?**
**A: Yes.**
**Q: All right. It also tells you that there's evidence of heart muscle damage, correct?**

113:

**A: Correct.**
**Q: It also tells you that there's evidence of dead heart tissue, correct?**
**A: Yes.**
MR. KRUMHOLZ: Objection, form.
Q: It also tells you that there's evidence of damage to Mr. Mason's heart wall, correct?
MR. KRUMHOLZ: Objection, leading.
A: Yes.
Q: (By Mr. Nabers) And it also tells you that Mr. Mason's heart has been injured, correct?
MR. KRUMHOLZ: Objection, leading.
A: Yes.
Q: (By Mr. Nabers) And none of those things are good for Mr. Mason's heart, correct?
MR. KRUMHOLZ: Objection, leading.
Q: (By Mr. Nabers) Well, okay. Are those things good for Mr. Mason's heart?
MR. KRUMHOLZ: Objection, form and leading.
A: No.
Q: (By Mr. Nabers) It would be better if he didn't have that damage to his heart, correct?
MR. KRUMHOLZ: Objection, leading.
A: It depends again on the size of the damage.

# Zebrack, James 2006-08-30

114:

Sometimes patients have small heart attacks and have no residual side effects or symptoms from it, but we care about not always what is at the molecular level, every single cell, is it damaged or not, but how the patient does clinically, and it just depends on if that's enough to cause him any symptoms or long-term side effects. It's a pretty small segment of damage.
Q: (By Mr. Nabers) Okay. But if you have an anterior hypokinetic segment, that part of the heart is not functioning well?
MR. KRUMHOLZ: Objection, leading and form.
A: Correct.
Q: (By Mr. Nabers) Okay. Now, you were shown a Cardiolite test from October of '03, correct?
A: Yes.
Q: And, remember, you were asked a little bit about, you know, whether or not tests of this nature can have false results?
MR. KRUMHOLZ: Objection, form.
A: Yes.
Q: (By Mr. Nabers) All right. And this was -- it was pointed out on this study that there wasn't a mention in the 2003 Cardiolite of any defect in the heart mentioned, correct?
A: Correct.

115:

MR. KRUMHOLZ: Objection, leading.
Q: (By Mr. Nabers) Was there any defect of the heart mentioned in the 2003 Cardiolite? Was there any defect mentioned?
A: No.
Q: Okay. And you were asked whether or not that was good for Mr. Mason's heart. Do you recall that?
A: Yes.
Q: But do you agree with me that that test may not have shown a defect in Mr. Mason's heart, could have missed it?
MR. KRUMHOLZ: Objection, leading.
A: Probably did.
Q: (By Mr. Nabers) And why do you say it probably did?
A: Because the left ventriculogram which he had two months earlier showed that the wall motion was hypokinetic, and that's a little more sensitive evaluation of the wall motion of the heart. You get a very good picture of the wall motion whereas the perfusion scan is sort of a general overview of the heart function without quite the detail.
Q: Okay. So just because the Cardiolite in 2003 doesn't say there was a defect to the heart, that could have been an error?

116:
MR. KRUMHOLZ: Objection, leading, form.
A: I wouldn't call it an error in that the scan has limitations that it cannot detect an abnormality that small, but the test was performed correctly and interpreted correctly, I believe.
(Exhibit No. 13 marked.)
Q: (By Mr. Nabers) Okay. Well, let me show you Deposition Exhibit No. 13, and this was the Cardiolite from 2005. Do you see that?
A: Yes.
Q: It says April 12th of 2005 up there, correct?
A: Yes, correct.
Q: And if we look under the EKG report, do you see No. 1 it says, 'The baseline EKG showed normal sinus rhythm with a poor R wave progression'? Do you see that?
A: Yes.
Q: If you have poor R wave progression, can't that be evidence of an old myocardial infarction?
MR. KRUMHOLZ: Objection, form.
A: Yes.
Q: (By Mr. Nabers) Poor R wave progression is an abnormal finding in this EKG of April of 2005; is that correct?
MR. KRUMHOLZ: Objection, form.

117:
A: It is.
Q: (By Mr. Nabers) And if we look down a little bit further in the interpretation section, do you see where it says 'qualitative analysis'?
A: Yes.
Q: It says under No. 1 -- I mean, No. 2, it says, 'Equivocal fixed apical defect.' Do you see that?
A: Yes.
Q: All right. And would a fixed apical defect, would that be consistent with what we looked at earlier in Deposition Exhibit No. 10 that showed the anterior hypokinetic segment?
MR. KRUMHOLZ: Objection, form, leading.
A: The apex and the anterior wall are in a little different location, but it is consistent with someone who's had a previous anterior infarct or LAD infarct.
Q: (By Mr. Nabers) All right. So this --
MR. KRUMHOLZ: Objection, nonresponsive.
Q: (By Mr. Nabers) This Cardiolite in 2005 does show there's a defect in Mr. Mason's heart, correct?
A: Correct.
MR. KRUMHOLZ: Objection, form.
Q: (By Mr. Nabers) All right. And so that,

# Zebrack, James 2006-08-30

118:
again, would be evidence of a scar?
MR. KRUMHOLZ: Objection, leading.
Q: (By Mr. Nabers) Correct?
MR. KRUMHOLZ: And form.
A: Again, it says possible, but it is consistent with a small scar.
Q: (By Mr. Nabers) Okay. And, actually, if we flip over to the next page of that exhibit, do you see there's a second page that talks about preliminary report?
A: Yes.
Q: And under Findings it says, 'Equivocal old apical infarct.' Do you see that?
A: Yes.
Q: And that would be consistent with the area of injury from July of '03 that Dr. Ganellen found on the cath, right?
MR. KRUMHOLZ: Objection, form and leading.
A: Dr. Ganellen, in his report, noted anterior lateral hypokineses, I believe, and did not comment on the apex, but it's generally the same territory, the same artery that was abnormal when he had his heart attack and it's consistent with the same abnormality.
Q: (By Mr. Nabers) Okay. I mean, the 2005 Cardiolite, does it suggest to you that Mr. Mason --

119:
that there's still some damage seen in his heart?
MR. KRUMHOLZ: Objection, form, leading.
A: I believe he has a small amount of damage in that part of the heart related to his heart attack in 2003.
Q: (By Mr. Nabers) Okay. And it's still --
MR. KRUMHOLZ: Objection, nonresponsive.
Q: (By Mr. Nabers) And is that defect in his heart, according to this Cardiolite, still present in April of '05?
MR. KRUMHOLZ: Objection, form and leading.
A: Yes.
Q: (By Mr. Nabers) Okay. And then let me just ask you a couple of questions just to kind of wrap it up. Do you agree that Vioxx, based upon the medical and scientific literature that you've seen, increases the risk of myocardial infarction or heart attack?
MR. KRUMHOLZ: Objection, form and leading.
A: Yes, I believe that.
Q: (By Mr. Nabers) All right. And I want to show you a document dated April 6th, 2005. Do you see it says, 'Subject: Analysis and Recommendation for Agency Action Regarding Nonsteroidal Anti-inflammatory Drugs and Cardiovascular Risk'?
A: Yes.

120:

Q: All right. And this is a document put out by the FDA and it's an executive summary and it says, 'Following a thorough review of the available data, we have reached the following conclusions regarding currently improved COX-2 selective and nonselective nonsteroidal anti-inflammatory drugs and the risks of adverse cardiovascular events.' Do you see where I read that?
A: Yes.
Q: All right. And bullet point No. 1, does it indicate that the three approved COX-2 selective NSAIDs, celecoxib and rofecoxib -- which is Vioxx, correct?
A: Correct.
Q: -- and valdecoxib, are associated with an increased risk of serious adverse cardiovascular events compared to placebo. Do you see where I've read that?
A: Yes.
Q: Okay. So that would indicate that the FDA would agree with you that there is an increased risk of serious cardiovascular events with rofecoxib or Vioxx compared to the placebo, correct?
MR. KRUMHOLZ: Objection, form and leading.
A: Correct.

121:

Q: (By Mr. Nabers) And that's an opinion that you as well hold, correct?
A: Correct.
MR. KRUMHOLZ: Objection, form and leading.
Q: (By Mr. Nabers) And your opinion in that regard is based upon your training, education, experience and review of the medical literature; is that true?
MR. KRUMHOLZ: Objection, form and leading.
A: Correct.
Q: (By Mr. Nabers) And are you also aware, based on your review of the medical and scientific literature, whether or not Vioxx increases blood pressure?
MR. KRUMHOLZ: Objection, form and leading.
A: I have seen an article or two about increasing the blood pressure, but I'm not very familiar with that and haven't drawn a firm conclusion about it.
Q: (By Mr. Nabers) Okay. If Vioxx increased blood pressure, could that lead to increased cardiovascular events?
MR. KRUMHOLZ: Objection, form and leading.
A: Yes.
Q: (By Mr. Nabers) All right. Have you seen

# Zebrack, James 2006-08-30

122:

medical and scientific literature that indicated to you that Vioxx increased the risk of cardiovascular deaths in certain patients?

MR. KRUMHOLZ: Objection, form and leading.

A: Not statistically so. As a separate end point, I don't recall that.

Q: (By Mr. Nabers) Okay. And you were asked some questions about risk factors of Mr. Mason. Do you recall that?

A: What --

Q: Cardiovascular risk factors?

A: Yes.

Q: All right. If a patient has some cardiovascular risk factors and then takes Vioxx, does that put them at even more increased risk of myocardial infarction --

MR. KRUMHOLZ: Objection, form, leading.

Q: (By Mr. Nabers) -- because they had those underlying risk factors?

MR. KRUMHOLZ: Objection, form and leading.

A: Yes.

Q: (By Mr. Nabers) Okay. Have you also seen medical and scientific literature that would indicate one way or the other whether or not Vioxx is pro-thrombotic?

123:

MR. KRUMHOLZ: Objection, form and leading.

A: Yes.

Q: (By Mr. Nabers) And do you have an opinion as to whether or not Vioxx is pro-thrombotic based upon your review of the medical literature?

MR. KRUMHOLZ: Objection, form, leading.

A: I believe that it is probable that it does, that it is pro-thrombotic.

Q: (By Mr. Nabers) And what does it mean if Vioxx is pro-thrombotic?

MR. KRUMHOLZ: Objection, form.

A: It increases your risk of clotting.

Q: (By Mr. Nabers) All right. And we talked about the catherization that Dr. Ganellen did on Mr. Mason earlier, correct?

A: Correct.

Q: And we discussed the fact that indeed when Dr. Ganellen did the cath, he found clots in the coronary arteries of Mr. Mason, correct?

A: Correct.

MR. KRUMHOLZ: Objection, leading.

Q: (By Mr. Nabers) Okay. We know that Mr. Mason at the time of his heart attack was on Vioxx, according to the emergency note, correct?

MR. KRUMHOLZ: Objection, leading.

124:
A: Correct.
Q: (By Mr. Nabers) All right. And based upon your review of the medical and scientific literature, do you agree that Vioxx makes it more likely than not for myocardial infarctions to occur?
MR. KRUMHOLZ: Objection, form.
A: I believe that, yes.
MR. NABERS: Okay. That's all the questions I have.
FURTHER EXAMINATION
BY MR. KRUMHOLZ:
Q: Mr. Nabers asked you questions about this April 12th, 2005 Cardiolite study. Do you recall that?
A: Yes.
Q: And he talked about the R wave progression?
A: Yes.
Q: One way to -- first of all, do you know what lead misplacement is?
A: Yes.
Q: What is lead misplacement?
A: The leads that are placed on the chest during an EKG are not always placed in exactly the same location.
Q: And as a result, it can cause there to be

125:
some sort of change or delay appear to be present when, in fact, it's not present or it's not indicative of any heart problem?
A: That can happen, yes.
Q: You've seen that happen?
A: Yes.
Q: That's not unusual, actually, for that to happen, true?
A: No.
MR. NABERS: Objection, form.
Q: (By Mr. Krumholz) Is that correct?
A: Correct.
Q: Are you aware that Dr. Keep, the person who performed that study, has testified that it's likely that's indeed what happened here in connection with the R wave issue?
A: I'm not aware of that.
Q: Would that be important to you?
A: No.
Q: Let me ask you this: Would you have expected to see -- do you believe that it was likely due to lead misplacement?
A: No.
Q: Let me ask you, what would we want to look to to confirm or to determine that it was not due to lead

126:
misplacement?
A: Repeat the EKG.
Q: And if there is an October 14, 2005 repeat EKG that indicates that he has normal R wave progression, then that would suggest that it's -- this result was likely due to lead misplacement, true?
A: Or that the October 2005 had lead misplacement. I mean, it can go both ways.
Q: And would you have expected to see this R wave problem in the August 2003 cardiac cath report? Do you think that would show up at that time?
A: If he had poor progression, I would expect it to show up in the report, yes.
Q: So -- and it did not show up in the August 13, 2003 cardiac catherization report?
A: No.
Q: Would you have expected to see it in connection with Dr. Ganellen's cardiac catherization report if it was present in connection with the July 2003 heart attack?
A: His catherization report wouldn't comment on the EKG.
Q: So what we have is an August 2003 cardiac catherization that doesn't indicate any R wave progression problem and a repeat EKG in October of

127:
2005 that doesn't indicate any R wave progression problem. Under those circumstances, would you then believe it would be likely that the April 2005 EKG was due to lead misplacement?
MR. NABERS: Objection to the form.
A: Probability-wise, two were normal, one was abnormal. That's certainly possible, but I also know the clinical history in someone who has had an anterior infarct. I think it's very possible that he really does have poor R wave progression.
Q: (By Mr. Krumholz) If there is a normal EKG of October 2005 and if indeed you have a normal EKG as reflected by Dr. Symkoviak's October 2003 report, you would believe that it's most probable that there is no R wave progression problem with respect to Mr. Mason as it relates to his July 2003 event?
MR. NABERS: Objection to the form, mischaracterizes his --
Q: (By Mr. Krumholz) True?
MR. NABERS: -- testimony and he's asked and answered it already.
A: I can't say that. And part of the reason is that there's variations in the way people interpret the EKGs, there's variations on the same patient day to day on exactly what the R wave progression is, and

## Zebrack, James 2006-08-30

128:

I would want to see the EKGs myself before I made a conclusion about that.

Q: (By Mr. Krumholz) Fair enough. You can't state with any degree of medical probability whether or not Mr. Mason has poor R wave progression based upon what we've just discussed?

MR. NABERS: Objection to the form, asked and answered.

Q: (By Mr. Krumholz) True?

A: I can't say with certainty, but I can -- can I state my opinion in that area is that someone with an anterior infarct who has an EKG that's interpreted as a poor R wave progression probably has that. Lead misplacement is not as common in men as it is in women, because the breasts don't get in the way. So I have to believe that someone who I know has had an anterior infarct and it says poor R wave progression on the EKG, that he probably had it.

Q: What about the October 2003 perfusion test, would you have expected to see a poor R wave progression on that as well?

A: I would expect to.

Q: Okay. So if we -- we have at least two tests before that -- EKGs that indicate that there was no R wave progression delays some two weeks post event or

129:

three weeks post event and then three months post event, right?

A: Yes.

Q: We know that?

A: Right.

Q: In other words, you have two normal EKGs, one on August 13, 2003, one on October 22nd of 2003, right?

MR. NABERS: Objection to the form.

Q: (By Mr. Krumholz) According to the reports?

MR. NABERS: Objection to the form.

A: According to the reports, yes.

Q: (By Mr. Krumholz) And we also -- assume with me that we have an October 14, 2005 normal EKG which you indicated you would want, that is, a follow-up EKG. Would you have seen a poor R wave progression in the hospital in connection with these EKGs?

MR. NABERS: Objection to the form.

Q: (By Mr. Krumholz) If you're right that it was actually there?

A: Right. I would expect that he had poor R wave progression when he was in the hospital.

Q: Why don't you look and see.

A: There's an EKG here on July 25th and July 26th and neither one show poor R wave progression.

Overruled

## Zebrack, James 2006-08-30

Zebrack PA PC DA DC on 10-3

130:

**Q: (By Mr. Krumholz) Given this weight of the evidence, don't you believe now that this R wave progression delay that is indicated in April of 2005 is likely lead misplacement and not indicative of any heart damage at all?**

MR. NABERS: Objection to the form.

**A: Probably.**

**Q: (By Mr. Krumholz) Okay. So you've changed your opinion on that?**

MR. NABERS: Objection to the form.

**A: Yes.**

Q: (By Mr. Krumholz) Okay. And as to the apical defect, it does say a possible apical defect, correct, to be fair?

MR. NABERS: No, it doesn't say possible. It says equivocal.

**Q: (By Mr. Krumholz) Let me see if I read this right, Doctor. 'Possible small apical defect infarct,' is that what it says?**

**A: Yes.**

**Q: So it does use the word possible?**

**A: Yes.**

**Q: Then the second page says equivocal?**

**A: Yes.**

**Q: Which means, again, it's just possible?**

131:

**A: Correct.**

**Q: Okay. So that's consistent.**

**Now, have you ever heard of an attenuation defect?**

**A: Yes.**

**Q: What is an attenuation defect?**

**A: It's blockage of the counts that come out of the heart by soft tissue, for example, someone who's overweight or particularly in women with breast tissue.**

**Q: So -- just so that laypeople understand and I understand, I'll try to summarize it and see if I get there. If I don't, please correct me. Okay? But attenuation defects can occur when you do -- what kind of study indicated this possible defect?**

**A: This was a nuclear study on April 2005.**

**Q: So it would be the nuclear imaging that would have indicated this, or possibility, right?**

**A: Right.**

**Q: So the possible apical infarct, small apical infarct, indicated on the report could be due to an attenuation defect, true?**

**A: It could be.**

**Q: And an attenuation defect, just so that we're all on the same page, is kind of like a false**

PLAINTIFF'S objection RE: 130:1-5. no foundation; speculation

Def's response: Plaintiff designated the witness' prior answers on this same EKG and in these questions he agrees he was wrong earlier.

PLAINTIFF'S OBJection RE: 131:6-25 132:1-25 CUMULATIVE; speculation; no foundation

Def's response: Plaintiff designated testimony from this witness about this same stress test (through 134:5)

132:

negative -- or false positive, excuse me, true?
A: True.
Q: And a false positive meaning that the imaging was not reliable enough to give you an accurate picture of what was going on in the apex area of the heart; is that fair?
A: Fair.
Q: Okay. So that is a possibility with respect to Mr. Mason, right?
A: It is possible.
Q: In fact, he is obese, true?
A: Yes.
Q: And so it's particularly a concern in obese people or women who may have large breasts?
A: Yes.
Q: Because the likelihood of an attenuation defect can increase?
A: Yes.
Q: And that's sometimes called shadowing, right?
A: Yes.
Q: And sometimes what a doctor can do is turn the patient and get a better image, right?
A: Yes.
Q: And if Dr. Keep has testified that he did that and he's looking at the films and it's likely

133:

shadowing and likely an attenuation defect due to the fact that this man is large, would you have any reason to disagree with him?
A: No.
Q: Would you defer to Dr. Keep in that regard?
A: Yes.
Q: And so if you take away this R wave progression and this possible small apical defect, the April 12, 2005 nuclear perfusion study would be normal, right?
A: Yes.
Q: And, in fact, you would have substantially the same result as you had in October of 2003, right?
A: Yes.
Q: And you would have normal functional workload, right?
A: Yes.
Q: No signs of ischemia, right?
A: Right.
Q: No evidence of infarct, right?
A: Right.
Q: And you would not have any EKG issues at all, right?
A: Right.
Q: And so he would have a very good prognosis as

Overruled

Plaintiff's Objection Re: 133:6-25 134:1-5 Cumulative, speculation; no foundation

## Zebrack, James 2006-08-30

Zebrack PA PC DA DC on 10-3

134:

of April 12th, 2005 if what you have concluded as to the R wave progression is true and what Dr. Keep has concluded as to the possible or equivocal small apical defect or infarct is true, correct?
A: Yes. Correct.
Q: Given his April 2005 and October 2003 nuclear perfusion studies as well as the catherizations that were performed, if Mr. Mason controls his traditional risk factors, do you believe he could very well have a full life?
MR. NABERS: Objection to the form.
A: In the sense that he would have a normal life expectancy?
Q: (By Mr. Krumholz) Yes. And maybe what -- I want to tell you what I'm thinking here. You mentioned earlier that the underlying atherosclerosis is really the issue in terms of a risk of a second heart attack or repeat heart attack, true?
A: Yes, in a sense. It's not always the amount of atherosclerosis, but the instability of it or inflammation prone to rupture that leads to his risk of a heart attack.
Q: Okay. So that we're on the same page, it's the underlying disease process at this point, not --
A: Yes.

135:

Q: -- Vioxx and not his heart attack that have anything to do with another -- any additional risk of having a heart attack?
A: Correct.
Q: And that underlying disease process to some extent can be controlled?
A: Yes.
Q: Through diet and exercise?
A: Yes.
Q: And through getting his weight down?
A: Correct.
Q: And through watching his cholesterol, through medications and diet and exercise again?
A: Yes.
Q: And doing what his cardiologists think he should do in connection with taking care of himself?
A: Yes.
Q: And if he does those things, there's no reason to believe that Mr. Mason will have another heart attack except to the extent that he would have had anyone anyway --
MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) -- because of his underlying disease process?
A: Can you rephrase that question?

Overruled

PLAINTIFF'S OBJECTION RE: 134:14-18 misstates evidence; argumentative

Def's response: none needed

PLAINTIFF'S OBJECTION RE: 134:23-25 vague; ambiguous; speculative; no foundation

Printed: 10/3/2006 9:11:11AM

136:
Q: You think it was circular? I'm not sure I can.
Now, plaintiffs's counsel asked you about is a heart attack ever a good thing. I think we can agree that, generally speaking, heart attacks are bad, right?
A: Yes.
Q: But in certain circumstances a patient can be lucky that a situation is found out about rather than leading to more serious consequences?
A: Sure.
Q: I mean, in other words, with a patient like Mr. Mason who had 90-percent occlusion of -- is the LAD his widow maker?
A: Yes.
**Q: So in a patient like Mr. Mason with a 90-percent occlusion of his left anterior descending artery and a 70-percent occlusion of his first diagonal, if he didn't come in on July 25th and get a stent and an angioplasty but he didn't have a small heart attack, would there be a significant risk of more significant problems?**
MR. NABERS: Objection to the form.
**A: With the disease that he had, he was at risk for a heart attack and he would certainly have one at**

137:
**some point.**
**Q: (By Mr. Krumholz) He could have had a sudden death?**
**A: He could have.**
**Q: Instead, he got the stent and angioplasty he needed?**
**A: Right.**
**Q: And his arteries are free flowing?**
**A: Right.**
**Q: And he is able to complete stress tests, nuclear perfusion tests and otherwise, which allow him or are indicative of someone who can participate in really just about any activities he would want to participate in?**
**A: Yes.**
Q: You indicated that -- let me ask you this.
**What is stunning?**
**A: Stunning is a term where the heart is weak from a heart attack or not enough blood flow that is not scarred so much but it is impaired and will recover function.**
**Q: So something seen early on at the time when a person is hospitalized with a myocardial infarction may not be seen later because stunning has occurred and it has resolved?**

Overruled ✓

PLAINTIFF'S OBJECTION RE: 136:16-21 VAGUE; AMBIGUOUS; CUMULATIVE; SPECULATION; MISSTATES THE EVIDENCE; IMPROPER QUESTION; ARGUMENTATIVE

Def's response: none needed

Overruled

138:

**A: Yes.**
**Q: And that includes an anterior hypokinesis on occasion?**
**A: Yes.**
**Q: In other words, you could have an anterior hypokinesis that shows up on the day that he presents in the hospital as it did according to Dr. Ganellen, true? Are you following me?**
**A: Yes.**
**Q: And then two or three weeks later have a cardiac catherization and/or a -- excuse me, three months later have a nuclear perfusion test and not have any hypokineses?**
**A: That's possible.**
**Q: Anterior or otherwise, and it could just be due to stunning?**
**A: Correct.**
**Q: And that's known in cardiology to occur?**
**A: Yes.**
**Q: That's a known syndrome?**
**A: Yes.**
**Q: And it would not be surprising to happen?**
**A: No.**
**Q: With Mr. Mason or otherwise?**
MR. NABERS: Objection to the form.

139:

**Q: (By Mr. Krumholz) True?**
**A: True.**
Q: What was the last exhibit, 13?
A: Yes.
(Exhibit No. 14 marked.)
Q: (By Mr. Krumholz) I'll hand you what has been marked as Exhibit 14. I think it is the same April 6th, 2005 FDA memo that plaintiff's counsel showed you. Have you seen this before today?
A: I have seen it in a different form.
Q: So you're aware that the FDA has concluded that to the extent there is an increased risk of serious CV events with respect to COX-2s and NSAIDs, that that is a class effect across traditional NSAIDs and COX-2s?
MR. NABERS: Objection to the form.
A: Yes.
**Q: (By Mr. Krumholz) And you do believe that NSAIDs and COX-2s are important drugs for purposes of treating acute pain and inflammation, right?**
**A: Yes.**
**Q: And the COX-2s, you understood, provided potential extra benefit of lowering the risk of GI issues, true?**
**A: True.**

PLAINTIFF'S OBJECTION re: 138:5-8 no foundation; speculation; improper hypothesis; vague

Def's response: Appropriate cross-examination to plaintiff's questioning

140:
Q: In fact, the bigger study indicated that Vioxx actually lowers the risk as compared to Naproxen, right?
A: Correct.
Q: And so if all NSAIDs have this cardiovascular risk, if that is true, this increased cardiovascular risk, do you believe that they are safe to prescribe to patients?
MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) That Vioxx would be safe to prescribe to patients, that that is true, that conclusion by the FDA?
MR. NABERS: Objection to the form.
A: Safe is a relative term. On an individual case it would depend on their risk factors and extent of heart disease, and also which individual NSAIDs we're discussing. Risk may not be equal across all anti-imflammatory medications.
Q: (By Mr. Krumholz) Actually, the FDA memo that Mr. Nabers presented you with indicates that they can't rank them, true?
A: Right.
Q: And as a result, they've indicated that, in fact. It's a class effect, true?
A: True.

141:
Q: And that would mean that if they have all equal safety profiles, all the traditional NSAIDs and the COX-2s, do you have an opinion as to whether they should still be on the market, other COX-2s?
MR. NABERS: Objection to the form.
A: I don't believe they all have an equal risk. Therefore --
Q: (By Mr. Krumholz) You just don't know; is that right?
MR. NABERS: Objection to the form. You can finish your answer before he asks you another one, if you would like. That was rude.
A: I don't know for certain, but I believe that certain NSAIDs have higher risks than others.
Q: (By Mr. Krumholz) But according to the FDA, they have not concluded that?
MR. NABERS: Objection to the form.
A: They have not concluded whether certain ones have higher risks than others.
MR. KRUMHOLZ: Pass the witness.
FURTHER EXAMINATION
BY MR. NABERS:
Q: Is it your opinion that Mr. Mason had an infarct?
A: Yes.

## Zebrack, James 2006-08-30

142:

Q: What is an infarct?
A: It's damage -- in this particular case, myocardial infarction damage to the heart muscle which some of the cells died and scar has been left.
Q: And do we have objective evidence in terms of cardiac enzyme testing to prove that?
A: Yes.
Q: And those would be in the form of the CKMB test?
A: Yes.
Q: And in the form of troponin?
A: Yes.
Q: Whenever those blood tests were done at your hospital, LDS Hospital, they were abnormal, right?
MR. KRUMHOLZ: Objection, form and leading.
Q: (By Mr. Nabers) And they are evidence of the fact that Mr. Mason had an actual myocardial infarction?
MR. KRUMHOLZ: Objection, form.
A: He did.
Q: (By Mr. Nabers) There's no doubt about that, right?
A: No doubt.
MR. NABERS: That's all I have.
//

143:

FURTHER EXAMINATION
BY MR. KRUMHOLZ:
Q: Just to be clear, in connection with Mr. Nabers' last question you were talking about an infarct that occurred in July of 2003 and not any supposed infarct that may have -- or that Dr. Keep has indicated did not occur or isn't reflected by the April 2005 study, true?
MR. NABERS: Objection to the form.
A: I was referring to the myocardial infarction he had in July of 2003.
**Q: (By Mr. Krumholz) And you do believe that, however, that the -- his function, that is, his heart function, is normal today?**
**A: Yes.**
**Q: According to the testing that's been done?**
**A: The global LV function is normal.**
MR. KRUMHOLZ: Reserve the rest of our questions.
MR. NABERS: Okay. We're done.
THE VIDEOGRAPHER: It's 59 minutes after 4:00. This concludes the deposition.
(The deposition concluded at 4:59 p.m.)
(Exhibit No. 1 marked.)

## Zebrack, James 2006-08-30

144:

CERTIFICATE

STATE OF UTAH )

COUNTY OF SALT LAKE )

THIS IS TO CERTIFY that the deposition of deposition named, was taken before me, Sharon Morgan, for the State of Utah, residing in Salt Lake City. That the said witness was by me, before truth, and nothing but the truth in said cause. That the testimony of said witness was by me transcribed into typewriting, and that a full, true, and transcribed is set forth in the foregoing pages, deposed and said as in the foregoing annexed

transcript of the same was delivered to Mr. Nabers, Notary Public.

I further certify that I am not of kin or cause of action, and that I am not interested in the

Lake City, Utah, this 31st day of August, 2006.

My Commission Expires: