# Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3

4

| | | |
|---|---|---|
| 4: | 1 | July 25, 2006          11:42 a.m. |
| | 2 | P R O C E E D I N G S |
| | 3 | EDWARD W. GANELLEN, M.D., |
| | 4 | called as a witness, by and on behalf of the |
| | 5 | plaintiff, having been first duly sworn, was |
| | 6 | examined and testified as follows: |
| | 7 | THE VIDEOGRAPHER:  Today is the 25th of |
| | 8 | July, 2006. It's 42 minutes after 11 o'clock and |
| | 9 | we're on the record. |
| | 10 | EXAMINATION |
| | 11 | BY MR. NABERS: |
| | 12 | Q:  Good morning, Mr. Ganellen, how are you |
| | 13 | today? |
| | 14 | A:  Good. |
| | 15 | Q:  Could you please state your name for the |
| | 16 | record? |
| | 17 | A:  Uh-huh. Edward W. Ganellen. |
| | 18 | Q:  And, Dr. Ganellan, my name is Scott Nabers |
| | 19 | and I represent a fellow by the name of Charles |
| | 20 | Mason who has a case that involves the drug VIOXX. |
| | 21 | Do you understand it's in connection with that |
| | 22 | case that you're here today to give deposition |
| | 23 | testimony? |
| | 24 | A:  I do. |
| | 25 | MR. KRUMHOLZ:  Scott, for the record, I |
| 5: | 1 | just want to make sure it's the same agreements |
| | 2 | we've had as to you only need to assert objections |
| | 3 | as to form and responsiveness, otherwise, they're |
| | 4 | reserved till the time of trial. |
| | 5 | MR. NABERS:  That would be absolutely |
| | 6 | fine. |
| | 7 | A:  I'm sorry, can I get this page? |
| | 8 | Q:  Absolutely. |
| | 9 | THE VIDEOGRAPHER:  It's 42 minutes after |
| | 10 | 11 o'clock. We're going off the record. |
| | 11 | (Recess taken from 11:42 a.m. to 11:45 |
| | 12 | a.m.) |
| | 13 | THE VIDEOGRAPHER:  It's 45 minutes after |
| | 14 | 11 o'clock. We're back on the record. |
| | 15 | Q:   (By Mr. Nabers)  Dr. Ganellen, I'll be |
| | 16 | asking you some questions today about cardiology |
| | 17 | and about your care and treatment of Mr. Mason. |
| | 18 | And can you agree that you can answer my questions |
| | 19 | today based on reasonable medical probability? |
| | 20 | A:  Yes. |
| | 21 | (Deposition Exhibit No. 1 was marked.) |
| | 22 | Q:  Okay. Let me show you what I've marked |
| | 23 | as Deposition Exhibit No. 1. And this is just a |
| | 24 | copy of the deposition notice for you to be here |
| | 25 | today. I think you've had a chance to see that |

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3      **6**

| 6: | 1 | before. Is that true? |
|---|---|---|
| | 2 | A: Yes. |
| | 3 | Q: And one of the things that it just asks |
| | 4 | you to bring with you today is a resume. And I |
| | 5 | didn't know if you had had a chance to get a |
| | 6 | resume or not. |
| | 7 | A: You know, I never remembered to do that. |
| | 8 | Q: All right. Do you have one? |
| | 9 | A: We do somewhere. |
| | 10 | Q: Okay. So could we maybe just put that in |
| | 11 | at a break? |
| | 12 | A: Yes. |
| | 13 | Q: What we'll do is we'll mark your resume |
| | 14 | as Deposition Exhibit No. 2, and then I'll just |
| | 15 | ask you in a little bit some questions about it, |
| | 16 | okay? |
| | 17 | A: Uh-huh. |
| | 18 | Q: Have you ever given a deposition before? |
| | 19 | A: I have. |
| | 20 | Q: Okay. And so you're familiar with what |
| | 21 | we'll be doing today in terms of questions and |
| | 22 | answers? |
| | 23 | A: Yes. |
| | 24 | Q: The only thing that I would ask is that, |
| | 25 | let me finish my question, and sometimes there may |
| 7: | 1 | be an objection by counsel. And if there is, if |
| | 2 | you'll just wait and let the objection finish |
| | 3 | before giving your answer, it makes it a lot |
| | 4 | easier for the court reporter to take it down, |
| | 5 | okay? |
| | 6 | A: And my understanding is that even if |
| | 7 | there's an objection, I'm still supposed to answer |
| | 8 | the question. Is that -- |
| | 9 | Q: Correct. And the only other thing I would |
| | 10 | tell you is if I ask you a poorly worded question |
| | 11 | or something that you don't understand, if you'll |
| | 12 | just ask me to rephrase it, I'll be happy to do |
| | 13 | so, okay? |
| | 14 | A: Okay. |
| | 15 | Q: Now, you and I have had an opportunity to |
| | 16 | meet previously; correct? |
| | 17 | A: Yes. |
| | 18 | Q: And we met specifically in regards to Mr. |
| | 19 | Mason's case; is that correct? |
| | 20 | A: Yes. |
| | 21 | Q: And at that meeting -- I think we met at |
| | 22 | your office; is that true? |
| | 23 | A: At Salt Lake Regional, I believe. |
| | 24 | Q: At the hospital? |
| | 25 | A: Yes. |

Printed: 10/3/2006   8:47:35AM

*Overruled*

Re: 7:15 - 8:19
DEF Obj: 403

Plaintiff's Resp:
Lays a proper foundation for
the deposition and how the doctor
is involved in the case. Questions
merely state the facts as
they occurred.

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                          8

8:   1   Q: Okay. We met in a conference room next to
     2   the cath lab?
     3   A: Correct.
     4   Q: And at that meeting, did I show you any
     5   internal documents that dealt with VIOXX or
     6   anything?
     7   A: I'm not sure what you mean.
     8   Q: Did I show you any documents at that
     9   meeting?
   10   A: I think just the hospital records.
   11   Q: Right. And so is it fair to say that
   12   primarily what you and I focused on in that
   13   meeting was Mr. Mason's medical history as it
   14   applied to you?
   15   A: Yes.
   16   Q: Okay. And also with regard to your care
   17   and treatment of Mr. Mason when he was in the
   18   hospital there; correct?
   19   A: Yes.
   20   Q: All right. Now, Mr. Mason was a patient
   21   of yours in the hospital in July of 2003; is that
   22   correct?
   23   A: Yes.
   24   Q: All right. And you're here today because
   25   you are a medical doctor; right?
9:   1   A: Yes.
     2   Q: And where do you practice medicine?
     3   A: I'm privileged at a number of hospitals
     4   in Salt Lake, including LDS, Salt Lake Regional,
     5   St. Mark's. I guess I do a little bit at the
     6   University.
     7   Q: Today we're taking your deposition
     8   actually in your professional office; correct?
     9   A: Yes.
   10   Q: And what is the address of your office
   11   here?
   12   A: I should know that, shouldn't I? 1160
   13   East 3900 South, Suite 2000.
   14   Q: And is that where you see patients on a
   15   routine basis?
   16   A: It's one of the places, yes.
   17   Q: Do you have other offices in and around
   18   the Salt Lake area besides this one?
   19   A: Yes.
   20   Q: And where else do you have offices?
   21   A: We have an office just outside of Salt
   22   Lake Regional.
   23   Q: And do you also see patients there?
   24   A: I do.
   25   Q: Can you just briefly describe for us your

## Ganellen, Edward 2006-07-25

10:
1  medical education and training?
2  A: I went to medical school '81 through '85
3  at University of Illinois in Chicago. I did a
4  medical residency for three years at Michael Reese
5  from '85 to '88, and then did a three year
6  cardiology fellowship at Emory University from '88
7  to '91.
8  Q: Now you mentioned that you performed an
9  internship. Can you just tell us what an
10 internship is that you did?
11 A: An internship is the first year of your
12 medical residency.
13 Q: And you also indicated that you performed
14 a residency as well; correct?
15 A: Correct.
16 Q: And what is a residency?
17 A: The residency is the complete three years
18 of training for internal medicine.
19 Q: Where did you do that residency?
20 A: At Michael Reese.
21 Q: You also performed a fellowship in
22 cardiology?
23 A: Yes.
24 Q: And what is a fellowship in cardiology?
25 A: A fellowship is subspecializing in an area

11:
1  of internal medicine.
2  Q: Now are you also board certified in any
3  areas of medicine?
4  A: I'm board certified in internal medicine
5  and cardiovascular diseases.
6  Q: And what does it take to become board
7  certified in internal medicine, first of all?
8  A: You need to complete a three-year
9  residency and pass an examination.
10 Q: And you've completed those requirements;
11 correct?
12 A: I have.
13 Q: And then what does it take to become board
14 certified in cardiovascular disease?
15 A: You need to be board certified in internal
16 medicine, have completed a cardiology residency --
17 excuse me, cardiology fellowship, and then pass an
18 examination.
19 Q: Now, can you briefly describe for us your
20 cardiology practice here in the office today where
21 we're taking your deposition?
22 A: What I do in my job?
23 Q: Right.
24 A: I'm an interventional cardiologist. I
25 typically spend a week in the office seeing

## Ganellen, Edward 2006-07-25

12: 1 patients and then generally about a week in the
2 hospital taking care of in-patients and doing
3 procedures. I read echoes and nuclear scans for
4 stress testing, for nuclear scans. I do the
5 cardiac catheterizations, place stents or do
6 ballooning angioplasty, and I close PFOs as well.
7 Q: I take it that you see patients with a
8 wide range of different cardiologic conditions?
9 A: Fairly.
10 Q: As a part of that, do you diagnose, care
11 for and treat patients who either are having or
12 have had heart attacks?
13 A: Yes.
14 Q: Now, you said you were an interventiona-
15 list. Can you just describe for us what it means
16 to be an interventionalist?
17 A: An intervention — an interventionalist --
18 an interventional cardiology cardiologist fixes
19 blockages in arteries usually with stents.
20 Q: And we refer to those procedures as
21 interventional procedures; correct?
22 A: Correct.
23 Q: I wanted to also ask you as a part of your
24 cardiology practice, you do see patients who have
25 coronary artery disease?

13: 1 A: Yes.
2 Q: And you diagnose those patients and care
3 for those patients and treat those patients;
4 correct?
5 A: Yes.
6 Q: Now, can you just tell us briefly what
7 coronary artery disease is?
8 A: Coronary artery disease refers generally
9 to atherosclerosis where you have blockage in the
10 arteries going to the heart which restricts blood
11 flow to the heart muscle.
12 Q: If a coronary artery gets blocked by a
13 clot or plaque, can that cause the heart to be
14 deprived of oxygen?
15 A: Yes.
16 Q: And what can that result in if that is to
17 occur?
18 A: If the artery is completely occluded, it
19 generally results in a heart attack, which is part
20 of the heart muscle dying.
21 Q: When we talk about heart attacks, and
22 more specifically about ischemia, what is
23 ischemia?
24 A: Ischemia is a mismatch of blood flow
25 versus tissue demand for blood flow.

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                                    14

14:   1    Q: All right. If you have a blocked artery
      2    and thereby are depriving oxygen to the blood,
      3    can that result in permanent damage to the heart?
      4    MR. KRUMHOLZ: Objection, form.
      5    A: If you completely occlude the artery, you
      6    can cause damage to the heart muscle, yes.
      7    Q: And what is the term myocardial
      8    infarction?
      9    A: Myocardial infarction is I think the
     10    technical term for a heart attack.
     11    Q: Sometimes we refer to myocardial
     12    infarctions, or doctors do, as MIs; correct?
     13    A: Correct.
     14    Q: And sometimes you see MI listed in
     15    patients' medical charts such as Mr. Mason's, and
     16    that just stands for myocardial infarction?
     17    A: Yes.
     18    Q: And is a myocardial infarction, is that
     19    kind of synonymous or the same thing as being a
     20    heart attack?
     21    A: Yes.
     22    Q: And what actually happens when a person
     23    has a heart attack, generally?
     24    A: Clinically or --
     25    Q: Clinically.

15:   1    A: I mean generally the patients will present
      2    with prolonged chest pain. There are typically
      3    EKG changes or blood test abnormalities that would
      4    confirm the diagnosis. And generally part of the
      5    heart muscle is damaged.
      6    Q: Let's talk specifically about Mr. Mason if
      7    we can for a minute, all right? Now, he was a
      8    patient of yours when you were actually working at
      9    LDS Hospital; correct?
     10    A: Yes.
     11    Q: And do you have an understanding of how he
     12    became a patient of yours at LDS Hospital in July
     13    of 2003?
     14    A: I think he was admitted under my partner,
     15    Jim Zebrack, and I was called to perform the
     16    intervention.
     17    Q: And the reason that you were called to
     18    perform the intervention was -- what medical
     19    condition did he have at that point?
     20    A: He presented with a heart attack.
     21    Q: Let me show you what I want to mark as
     22    the next exhibit, which will be Deposition Exhibit
     23    No. 3.
     24    (Deposition Exhibit No. 3 was marked.)
     25    Q. Let me just ask you, Doctor, now that

Printed: 10/3/2006   8:47:35AM

## Ganellen, Edward 2006-07-25

16:  1    you've gotten a copy of Deposition Exhibit No. 3,
     2    can you just identify what that is?
     3    A: This is a history and physical dictated by
     4    Dr. Zebrack.
     5    Q: And are these medical records that pertain
     6    to Charles Mason from LDS Hospital?
     7    A: Yes.
     8    Q: You know, and -- do you guys have a
     9    problem just stipulating to the records that are
    10    his being business records and the fact that
    11    they're authentic?
    12    MR. KRUMHOLZ: I think they've already
    13    been proven in the medical records affidavit, so I
    14    have no problem with it.
    15    MR. NABERS: Okay. That's fine. I didn't
    16    have the affidavit, or I didn't know if they were
    17    subpoenaed. That's great.
    18    MR. KRUMHOLZ: When we say the medical
    19    records that are his, let's just go one by one. I
    20    have no problem with Exhibit 3.
    21    Q: Okay, sounds good.
    22    And let me ask you, Dr. Ganellen, have you
    23    had an opportunity to review Deposition Exhibit
    24    No. 3 prior to today's deposition?
    25    A: Yes.

17:  1    Q: And I want to come back to this one in
     2    just a minute but let me also mark Deposition
     3    Exhibit No. 4.
     4    (Deposition Exhibit No. 4 was marked.)
     5    Q. Actually, before we go to Exhibit 4,
     6    Doctor, let me ask you specifically about
     7    Deposition Exhibit No. 3. I think you indicated
     8    that based upon the medical records that you'd
     9    seen, that it was Dr. Zebrack that actually
    10    admitted Mr. Mason to the hospital?
    11    A: Yep.
    12    Q: At LDS, July of 2003?
    13    A: Yes.
    14    Q: Okay. And how is it that you came to see
    15    him on that day instead of Dr. Zebrack?
    16    A: Well, Dr. Zebrack I believe admitted him,
    17    and I did his intervention.
    18    Q: So you were at the hospital on call when
    19    he presented with having a heart attack?
    20    A: Yes. Probably. I don't know about being
    21    on call.
    22    Q: Do you have any understanding of the fact
    23    that he actually went to Alta View Hospital first
    24    prior to being transported over to LDS Hospital?
    25    A: Yes.

## Ganellen, Edward 2006-07-25

18:
1   Q: And let me ask you, do you have an
2   understanding of why he was transported from Alta
3   View to your hospital, LDS?
4   A: Because of the level of care he needed, he
5   was transferred. Alta View does not have
6   facilities for cardiac catheterization.
7   Q: But the hospital where you were
8   practicing, LDS, does see patients who are having
9   heart attacks and can do interventional
10   procedures?
11   A: Yes.
12   Q: So, not all hospitals are equipped to deal
13   with patients who are having heart attacks; is
14   that fair to say?
15   A: Yes.
16   Q: If a patient is having an acute heart
17   attack and is not near a hospital that can do
18   emergency interventions like what was done -- or
19   that you did at LDS, are they at higher risk of
20   dying?
21   MR. KRUMHOLZ: Objection to form.
22   A: Could you repeat that?
23   Q: Sure. What I'm trying to get at is the
24   fact that he first presented at Alta View, they
25   just didn't have the facilities available to take

19:
1   care of his heart attack condition; correct?
2   A: Yes.
3   Q: So he came to LDS because your hospital
4   where you were working did have the interventional
5   procedures that he needed as a result of having a
6   heart attack?
7   A: Correct.
8   Q: Let me ask you, based on your care and
9   treatment of Mr. Mason and your review of the
10   medical records, whenever he came into LDS
11   Hospital in July of 2003, was he having a heart
12   attack?
13   A: Based on his enzyme test, yes.
14   Q: Okay. I mean, as we sit here today, is
15   there any doubt in your mind that he did have a
16   heart attack in July of 2003?
17   A: There's no doubt in my mind.
18   Q: Okay. And you would agree that a heart
19   attack is a serious and life threatening
20   condition; correct?
21   MR. KRUMHOLZ: Objection, form.
22   A: Yes.
23   Q: Can a heart attack be a traumatic event to
24   the patient?
25   A: Yes.

*Handwritten note:* Re: 18:16 - 18:20
Def Obj: No answer to question; question withdrawn.
Plaintiff's Response: Plaintiff withdraws question.

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                    20

| 20: | |
|---|---|
| | 1 Q: Can a heart attack be debilitating to the |
| | 2 patient? |
| | 3 A: Yes. |
| | 4 Q: Can the patient have pain associated with |
| | 5 having a heart attack? |
| | 6 A: Yes. |
| | 7 Q: And what types of pains do patients have |
| | 8 or present with when they're having a heart |
| | 9 attack? |
| | 10 A: Classically it's described as chest |
| | 11 pressure, often radiating into the arm or the neck |
| | 12 or the jaw, often associated with shortness of |
| | 13 breath, nausea or diaphoresis, sweating. |
| | 14 Q: If a person has a heart attack, can that |
| | 15 result in permanent damage to the heart muscle? |
| | 16 A: Yes. |
| | 17 Q: Can a heart attack also cause heart muscle |
| | 18 tissue to actually die? |
| | 19 A: Yes. |
| | 20 Q: Are there any diagnostic tests that can be |
| | 21 done to determine if a patient is having a heart |
| | 22 attack while they're having it? |
| | 23 A: Yes. |
| | 24 Q: And what are those diagnostic tests that |
| | 25 you look to for determining if a patient is having |
| 21: | 1 a heart attack? |
| | 2 A: Generally the noninvasive tests that are |
| | 3 performed on presentation would be an EKG and then |
| | 4 serial cardiac enzymes. |
| | 5 Q: And when we talk about the cardiac |
| | 6 enzymes, primarily which ones do you look to? |
| | 7 A: Generally we look at a CPK and MB fraction |
| | 8 and a troponin. |
| | 9 Q: I want to focus on the cardiac enzymes for |
| | 10 just a minute. What is the CPK? |
| | 11 A: CPK is an enzyme in muscle which is |
| | 12 released with muscle damage. |
| | 13 Q: And you actually -- is the CPK -- that's a |
| | 14 blood test? |
| | 15 A: Yes. |
| | 16 Q: And you're looking for enzymes in the |
| | 17 blood? |
| | 18 A: Yes. |
| | 19 Q: And if you have an elevated CPK, what is |
| | 20 that indicative of? |
| | 21 A: Indicative of muscle damage. |
| | 22 Q: Now you also referred to a cardiac enzyme |
| | 23 test called the MB fraction; correct? |
| | 24 A: Yes. |
| | 25 Q: And again, is that another blood test? |

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                                              22

22:   1    A: Yes.
      2    Q: And what does the MB fraction test tell
      3    you if there are abnormal levels?
      4    A: It tells you whether the muscle damage is
      5    coming from the heart or other tissue.
      6    Q: I think the third cardiac enzyme test that
      7    you look at to determine if patients are having a
      8    heart attack was the troponin level?
      9    A: Yes.
     10    Q: And what is troponin?
     11    A: Basically the same idea.
     12    Q: So if you have an abnormal troponin level,
     13    that helps confirm that a person has the enzymes
     14    that could be due to a heart attack?
     15    A: Yes.
     16    Q: Are enzymes released into the bloodstream
     17    when the heart muscle damage actually occurs?
     18    A: Yes.
     19    Q: Now, are you familiar with the American
     20    Heart Association? Correct?
     21    A: I've heard of it.
     22    Q: And from time to time, do they post
     23    recommendations and guidelines in the area of
     24    cardiology?
     25    A: They do.
23:   1    Q: And do you pay attention to those as a
      2    practicing cardiologist?
      3    A: Yes.
      4    Q: And do you agree -- if the American Heart
      5    Association says that cardiac enzymes are markers
      6    for heart damage, do you agree with that
      7    statement?
      8    A: Yes.
      9    Q: Let me show you what I'm going to mark as
     10    Deposition Exhibit No. 4. We've marked No. 4.
     11    And let me just ask you, Doctor, if you can tell
     12    me what Deposition Exhibit No. 4 is?
     13    A: These are blood test results from Alta
     14    View Hospital on Charles Mason.
     15    Q: And so it looks like on page 1, we see the
     16    date of 7-25-2003 in the upper left-hand column;
     17    correct?
     18    A: Yes.
     19    Q: And that was the day that Mr. Mason had
     20    his heart attack; correct?
     21    A: Yes.
     22    Q: And the very first page, it looks like, is
     23    the lab values for a blood test and they're
     24    looking at troponin levels; correct?
     25    A: Yes.

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                    24

| 24: | 1 | Q: And was it abnormal? |
|---|---|---|
| | 2 | A: Yes. |
| | 3 | Q: And if we flip over to the next page of |
| | 4 | the Alta View Hospital, again, this is another |
| | 5 | blood test where they were looking at the cardiac |
| | 6 | enzymes you referred to awhile ago, the CK MB? |
| | 7 | A: Correct. |
| | 8 | Q: And was this also an abnormal level of CK |
| | 9 | MB on this lab result? |
| | 10 | A: Yes. |
| | 11 | Q: Let me show you what I want to mark as |
| | 12 | Deposition Exhibit No. 5. |
| | 13 | (Deposition Exhibit No. 5 was marked.) |
| | 14 | Q. And what I'll do, Dr. Ganellen, is just |
| | 15 | ask you if you can identify for us what Deposition |
| | 16 | Exhibit No. 5 is? |
| | 17 | A: These are blood test results on Charles |
| | 18 | Mason, I believe from LDS Hospital. |
| | 19 | Q: Okay. And you're able to look at this and |
| | 20 | tell that this is -- |
| | 21 | A: Oh, actually -- |
| | 22 | Q: -- cardiac enzymes done at LDS Hospital? |
| | 23 | A: Yeah. This is part of a computer |
| | 24 | generated progress note that has the lab results |
| | 25 | from LDS Hospital. |
| 25: | 1 | Q: But in any event, Deposition Exhibit No. 5 |
| | 2 | pertains to Mr. Mason; correct? |
| | 3 | A: Yes. |
| | 4 | Q: And again these were blood tests done at |
| | 5 | the time that he was having his heart attack? |
| | 6 | A: Yes. |
| | 7 | Q: And did we see -- is there a CPK noted |
| | 8 | here on this result? |
| | 9 | A: It's -- CK is how they abbreviate. |
| | 10 | Q: And what was -- was the CK laboratory |
| | 11 | values here in the abnormal range? |
| | 12 | A: Yes. |
| | 13 | Q: Was there also MB fractions looked at in |
| | 14 | connection with this MB test? |
| | 15 | A: Yes. |
| | 16 | Q: And were those abnormal as well? |
| | 17 | A: Yes. |
| | 18 | Q: And is Deposition Exhibit No. 5, did that |
| | 19 | help you come to the conclusion that he actually |
| | 20 | was having a heart attack based upon the cardiac |
| | 21 | enzymes that were seen in the lab results? |
| | 22 | MR. KRUMHOLZ: Objection, form. |
| | 23 | A: Yes. |
| | 24 | MR. KRUMHOLZ: Scott, just for |
| | 25 | clarification -- do you mind? |

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                                    26

| 26: | 1 | Q: No. |
|---|---|---|
| | 2 | MR. KRUMHOLZ: I think these were labs |
| | 3 | from after the event. I don't have a problem with |
| | 4 | the testimony in that regard, but if you want to |
| | 5 | clean it up, fine; if not, I can do it later. |
| | 6 | Q: Okay. Let me just ask you, Dr. Ganellen, |
| | 7 | these lab values that we've been talking about on |
| | 8 | Deposition Exhibit No. 5 were drawn on what day? |
| | 9 | A: They range from the 25th to the 27th. |
| | 10 | Q: Okay. And so some of them were done -- |
| | 11 | the labs were drawn on the day that he was having |
| | 12 | the heart attack; correct? |
| | 13 | A: Yes. |
| | 14 | Q: And some of the labs were drawn after the |
| | 15 | fact; correct? |
| | 16 | A: Yes. |
| | 17 | Q: And then also, was there some laboratory |
| | 18 | values looked at with regard to troponin? |
| | 19 | A: Yes. |
| | 20 | Q: In fact there was a laboratory for |
| | 21 | troponin looked at on July 26th; correct? |
| | 22 | A: Yes. |
| | 23 | Q: And was it abnormal? |
| | 24 | A: Yes. |
| | 25 | Q: Was there also another one, or two |
| 27: | 1 | earlier ones drawn on July 25th with regard to |
| | 2 | troponin? |
| | 3 | A: Yes. |
| | 4 | Q: And were those also abnormal values? |
| | 5 | A: Yes. |
| | 6 | Q: How long typically will you continue to |
| | 7 | look at the cardiac enzymes after a person has |
| | 8 | their heart attack? |
| | 9 | A: Roughly 24 hours. |
| | 10 | Q: And how long will the enzyme actually stay |
| | 11 | in the blood after the heart attack? |
| | 12 | A: The troponins will stay elevated for |
| | 13 | several days. CPKs, probably a couple of days. |
| | 14 | Q: And I take it that these cardiac enzymes |
| | 15 | that we've looked at on Deposition Exhibit No. 5, |
| | 16 | they were drawn as a part of Mr. Mason's |
| | 17 | evaluation for his heart attack at LDS Hospital; |
| | 18 | correct? |
| | 19 | A: Yes. |
| | 20 | Q: Do these cardiac enzyme test results |
| | 21 | confirm that some portion of Mr. Mason's heart |
| | 22 | muscle tissue died at the time of his heart attack |
| | 23 | on July 25th, 2004? |
| | 24 | MR. KRUMHOLZ: Objection, form. |
| | 25 | A: Yes. |

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                          28

28: 1   Q: And is it fair to say that once heart
2   muscle tissue dies, that it becomes a permanent
3   injury and it's not something that can be
4   corrected?
5   MR. KRUMHOLZ: Objection, form.
6   A: Yes.
7   Q: What happens, Doctor, when heart muscle
8   tissue dies as a result of a heart attack?
9   A: Well, I guess it depends. If you damage
10   enough heart muscle, you can weaken the heart's
11   ability to pump blood to the body and cause heart
12   failure. You can leave scar tissue behind, even
13   with relatively small amounts of heart damage that
14   could contribute to arrhythmias.
15   Q: Once heart muscle tissue dies, is that a
16   permanent injury?
17   A: Yes.
18   Q: All right. Once heart muscle tissue dies
19   within the heart, is it gone forever, that heart
20   muscle tissue?
21   MR. KRUMHOLZ: Objection, form.
22   A: Yes.
23   Q: All right. Let me show you what I'm going
24   to mark as Deposition Exhibit No. 7 — 6, I'm
25   sorry.

29: 1   (Deposition Exhibit No. 6 was marked.)
2   Q. We've handed you, Dr. Ganellen, Deposition
3   Exhibit No. 6. And could I just ask you if you
4   could identify what this report is?
5   A: This is a cardiac catheterization report
6   on Charles Mason.
7   Q: And where was this cardiac catheterization
8   report performed?
9   A: At LDS Hospital.
10   Q: And would this have been a cardiac
11   catheterization report on Mr. Mason that you
12   actually put together?
13   A: Yes.
14   Q: And it's fair to say that you were the
15   one that performed the cardiac cath on Mr. Mason
16   on that day when he was having his heart attack;
17   correct?
18   A: Yes.
19   Q: And can you just give the ladies and
20   gentlemen of the jury an idea of what actually a
21   heart cath is?
22   A: We place a tube through an artery in the
23   leg, thread it up to the heart, and inject dye
24   into the arteries going to the heart to take
25   pictures of the arteries, see if there are any

## Ganellen, Edward 2006-07-25

| | | |
|---|---|---|
| 30: | 1 | blockages. |
| | 2 | We generally put a catheter into the heart |
| | 3 | muscle as well and take a picture of the heart |
| | 4 | muscle pumping. |
| | 5 | Q: And were those things that were done as a |
| | 6 | part of the heart catheterization that Mr. Mason |
| | 7 | had? |
| | 8 | A: Yes. |
| | 9 | Q: If you look at page 3 -- |
| | 10 | A: I didn't get a page 3. |
| | 11 | Q: Oh, if we look at page 2, I'm sorry -- |
| | 12 | what I'm looking for, is there like a clinical |
| | 13 | history as a part of it? Just a brief one as a |
| | 14 | part of the cath report? |
| | 15 | MR. KRUMHOLZ: I'll just object because I |
| | 16 | do think there's a page 3, and I don't mind |
| | 17 | replacing it if you all want to but I'd rather |
| | 18 | have a full exhibit. |
| | 19 | MR. NABERS: I know. Just a second, |
| | 20 | Doctor. Let me see if we can find a copy of page |
| | 21 | 3. |
| | 22 | MR. KRUMHOLZ: I'm going to use it -- |
| | 23 | four pages actually. You can use that one if you |
| | 24 | want. |
| | 25 | Q: All right. I'm going to -- I want to -- |
| 31: | 1 | let's remark the cath exhibit that we did before. |
| | 2 | (Deposition Exhibit No. 6 was remarked.) |
| | 3 | A: Do you want me to grab a resume while |
| | 4 | you're doing that? |
| | 5 | Q: Sure. Let's take a quick break while you |
| | 6 | do that. |
| | 7 | THE VIDEOGRAPHER: It's nine minutes after |
| | 8 | twelve o'clock. We're going off the record. |
| | 9 | (Recess taken from 12:09 p.m. to 12:13 |
| | 10 | p.m.) |
| | 11 | (Deposition Exhibit No. 2 was marked.) |
| | 12 | THE VIDEOGRAPHER: It's 13 minutes after |
| | 13 | twelve o'clock. We're back on the record. |
| | 14 | Q: (By Mr. Nabers) Dr. Ganellen, we're back |
| | 15 | from a short break and you provided us with a copy |
| | 16 | of your resume which is Deposition Exhibit No. 2; |
| | 17 | correct? |
| | 18 | A: Yes. |
| | 19 | Q: And to the best of your knowledge, does |
| | 20 | Deposition Exhibit No. 2, is the information |
| | 21 | within it true and accurate? |
| | 22 | A: I hope so. |
| | 23 | Q: Does it fairly and accurately represent |
| | 24 | your education, training and experience? |
| | 25 | A: Yes. |

## Ganellen, Edward 2006-07-25

| | | |
|---|---|---|
| 32: | 1 | Q: And is the information, to the best of |
| | 2 | your knowledge, current? |
| | 3 | A: I think so. |
| | 4 | Q: Is there anything that you would like to |
| | 5 | add that you're aware of at this point? |
| | 6 | A: Probably not. |
| | 7 | Q: Now, before the break, we were talking |
| | 8 | about Deposition Exhibit No. 6. And I think we |
| | 9 | all agreed that there were actually three pages |
| | 10 | to the cath report. And so now I have all four |
| | 11 | pages to the cath report, so let me hand that to |
| | 12 | you. |
| | 13 | And so, again, does that now, Deposition |
| | 14 | Exhibit 6, does it look like the full cath report |
| | 15 | that you would have done on Mr. Mason? |
| | 16 | A: Boy, I hate to tell you this. There's |
| | 17 | probably a page or two that are missing that are |
| | 18 | just clinical diagrams. |
| | 19 | Q: Okay. |
| | 20 | A: That -- yeah, uh-huh. |
| | 21 | (Deposition Exhibit No. 7 was marked.) |
| | 22 | Q: Okay. And let me show you -- Dr. |
| | 23 | Ganellen, while we're talking about that, I've |
| | 24 | also marked as Deposition Exhibit No. 7 all of the |
| | 25 | medical records on Mr. Mason that we got from LDS |
| 33: | 1 | Hospital. |
| | 2 | A: Okay. |
| | 3 | Q: And let me hand you these because I think |
| | 4 | it contains the two diagrams that you're looking |
| | 5 | for. |
| | 6 | A: Right. Uh-huh. |
| | 7 | Q: And at the bottom does it indicate in |
| | 8 | Deposition Exhibit No. 7 what pages those diagrams |
| | 9 | are on? |
| | 10 | A: You mean page 92? Is that the number you |
| | 11 | want? |
| | 12 | Q: Right. |
| | 13 | A: Yeah, 92 and 93. |
| | 14 | Q: So there's actually two diagrams that are |
| | 15 | contained within Deposition Exhibit No. 7 on those |
| | 16 | pages; correct? |
| | 17 | A: Yes. |
| | 18 | Q: And I want to talk to you about those in |
| | 19 | just a minute, so if you'll just kind of hold |
| | 20 | those right there. |
| | 21 | A: Okay. |
| | 22 | Q: But going back to Deposition Exhibit 6, |
| | 23 | which is the cath report, do you have that in |
| | 24 | front of you? |
| | 25 | A: Yes. |

### Ganellen, Edward 2006-07-25

34:
1   Q: On page 3 of your cath report, is there a
2   brief history in connection with Mr. Mason?
3   A: Yes.
4   Q: And I think there it indicates in the
5   first sentence that Charles L. Mason is a 61-year-
6   old male with a history of smoking, correct?
7   A: Yes.
8   Q: And who actually would have taken the
9   history whenever this cath was done on him?
10  A: Typically a history would be available
11  before he came to the cath lab unless it was
12  emergent. So this was probably from Dr. Zebrack's
13  history.
14  Q: Did you ever talk to Mr. Mason that you
15  recall in terms of getting a history from him?
16  A: I couldn't tell you, to be honest.
17  Q: Do you remember him telling you anything
18  about his smoking history?
19  A: No.
20  Q: If you just -- if I represent to you that
21  he quit smoking in 1977, which would have been
22  about 26 years before his heart attack, are you
23  familiar that the American Heart Association has
24  indicated that a smoker who quits five years
25  before has the same risk for heart disease as a

35:
1   nonsmoker? Have you heard that before?
2   MR. KRUMHOLZ: Objection, form.
3   A: Yes.
4   Q: Do you generally agree with that statement
5   of the American Heart Association?
6   A: Probably.
7   Q: I mean, is it significant that he would
8   have quit smoking 26 years before his heart attack
9   in terms of whether or not his smoking was a risk
10  factor in your mind for his heart attack?
11  A: I would think if he quit 26 years prior to
12  his heart attack, it was unlikely to contribute to
13  his heart attack.
14  Q: Now the next sentence says, 'Myocardial
15  infarction was ruled in July 25th at Alta View.'
16  Do you see that?
17  A: Yes.
18  Q: What does that indicate to you?
19  A: That means either his blood tests were
20  abnormal or that his EKG -- or it could mean that
21  his EKG was abnormal. In this case, it was
22  because of his blood tests.
23  Q: Then the next note says 'He experienced an
24  MI;' correct?
25  A: Yes.

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                        36

| 36: | 1 | Q: And MI refers to a myocardial infarction |
|---|---|---|
| | 2 | or a heart attack? |
| | 3 | A: Yes. |
| | 4 | Q: All right. Then if we look at the reason |
| | 5 | for the catheterization, what was the reason that |
| | 6 | he had the interventional procedure? |
| | 7 | A: It's listed as progressive angina and an |
| | 8 | acute MI. |
| | 9 | Q: And can you tell us what it means, |
| | 10 | progressive angina? |
| | 11 | A: It means that his chest pain was getting |
| | 12 | worse. |
| | 13 | Q: And when we talk about an acute MI, what |
| | 14 | does that indicate, or what does that mean? Just |
| | 15 | that he's having a heart attack? |
| | 16 | A: It generally means it's in the last |
| | 17 | probably 24 hours. |
| | 18 | Q: All right. If we look under the patient |
| | 19 | assessment category there, do you see where it |
| | 20 | says stable and urgent? |
| | 21 | A: Uh-huh, yes. |
| | 22 | Q: And can you tell us what that means when |
| | 23 | it says stable and urgent? |
| | 24 | A: Stable would mean that his heart rhythm |
| | 25 | and blood pressure clinical course has been |
| 37: | 1 | relatively, I guess benign. And urgent meaning |
| | 2 | that we thought he was in the middle of having a |
| | 3 | heart attack, so we wanted to get him done more |
| | 4 | quickly. |
| | 5 | Q: And then if we look at initial vitals, |
| | 6 | his blood pressure there is listed as 114 over |
| | 7 | 69. |
| | 8 | A: Yes. |
| | 9 | Q: And is that a normal blood pressure? |
| | 10 | A: Yes. |
| | 11 | Q: Does it also indicate here on the cath |
| | 12 | report what his heart rate and rhythm was? |
| | 13 | A: Yes. |
| | 14 | Q: And it notes 55? |
| | 15 | A: Yes. |
| | 16 | Q: And is that normal? |
| | 17 | A: It's a little slow, but not very |
| | 18 | concerning. |
| | 19 | Q: Now, as a part of your care and treatment |
| | 20 | of him, I notice in the LDS records that it |
| | 21 | indicates that Mr. Mason was given Aggrastat. Do |
| | 22 | you recall that? |
| | 23 | A: It says that he was, yes. |
| | 24 | Q: And what is Aggrastat? |
| | 25 | A: Aggrastat is a -- an agent that interferes |

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                        38

| | | |
|---|---|---|
| 38: | 1 | with platelet action. So it's a blood thinner. |
| | 2 | Q: And why would Mr. Mason, why was he given |
| | 3 | the Aggrastat when he came in having his heart |
| | 4 | attack? |
| | 5 | A: Aggrastat was used both as part of the |
| | 6 | treatment of the heart attack and to help prevent |
| | 7 | clotting of a stent or other intervention. |
| | 8 | Q: And I understand it's a medication but |
| | 9 | what generally does it do for the patient in terms |
| | 10 | of — who's having the heart attack? |
| | 11 | A: Well, again, it's a blood thinner that |
| | 12 | specifically acts on platelets which are generally |
| | 13 | the triggering mechanism -- platelet aggregation |
| | 14 | or platelets clotting are what causes heart |
| | 15 | attacks. |
| | 16 | Q: Okay. Does Aggrastat, does it help |
| | 17 | dissolve clots? |
| | 18 | A: Not so much. Maybe a little bit. |
| | 19 | Q: Would you give Aggrastat to someone who |
| | 20 | you think has a clot that's causing a heart |
| | 21 | attack? |
| | 22 | A: There are probably -- there are two |
| | 23 | classes of medications that you might use. So |
| | 24 | there are thrombolytics, which can be used to |
| | 25 | dissolve clot. With a normal EKG, he would not |
| 39: | 1 | meet criteria for thrombolytics. |
| | 2 | So, with a normal EKG but continued chest |
| | 3 | pain and abnormal enzymes, Aggrastat would be |
| | 4 | considered pretty reasonable therapy. |
| | 5 | Q: Ultimately, whenever you did the cath, you |
| | 6 | found that Mr. Mason had some clots; correct? |
| | 7 | A: We said he did, yes. |
| | 8 | Q: Right. And is the clots one of the reason |
| | 9 | why he was given the Aggrastat? |
| | 10 | A: Well the presumed mechanism of heart |
| | 11 | attack is always thrombus. There's always clot. |
| | 12 | Q: All right. So the Aggrastat was designed |
| | 13 | to help that thrombus? |
| | 14 | A: Yes. |
| | 15 | Q: And when we talk about clots, what |
| | 16 | actually are clots? |
| | 17 | A: Boy, that's a tough question. Clots |
| | 18 | are — well, at least for heart attacks, clots |
| | 19 | begin with platelets clumping together and |
| | 20 | blocking off the arteries. As clots progress, |
| | 21 | they become more complicated than that. |
| | 22 | Q: And it's the clot that blocks off the |
| | 23 | artery that can lead to a heart attack; is that |
| | 24 | true? |
| | 25 | A: Yes. |

### Ganellen, Edward 2006-07-25

40:
1  Q: Now, what were your findings regarding the
2  coronary arteries whenever you cathed Mr. Mason
3  July 25th of 2003?
4  A: We said that he had about a 90 percent
5  blockage in his left anterior descending coronary
6  artery right where it split off with a branch
7  called the diagonal, which also involved about a
8  70 percent blockage.
9  Q: Now we marked awhile ago Deposition
10 Exhibit No. 7 which was all of the LDS records.
11 And you actually referenced that there were two
12 diagrams that should have gone with the heart cath
13 report; correct?
14 A: Yes.
15 Q: And the first diagram I think is on what
16 page in Deposition Exhibit No. 7?
17 A: Page 92.
18 Q: And what is that actually a diagram of?
19 A: That's a computer simulation of his
20 coronary artery.
21 Q: And whenever we look at this diagram, what
22 we see is like some little black bands actually
23 on one of the descending coronary arteries;
24 correct?
25 A: Yes.

41:
1  Q: And those bands that we see placed on
2  there, what coronary artery are they in?
3  A: The main artery is called the left
4  anterior descending, which has the 90 percent
5  blockage. And the branch right next to it is
6  called the diagonal branch.
7  Q: And whenever this drawing was done, what
8  is being represented by the darker shades where
9  we've highlighted?
10 A: We're trying to show where the blockage
11 is.
12 Q: Is it fair to say this would be a fairly
13 accurate representation of where you believe the
14 blockages were in Mr. Mason?
15 A: Yes.
16 Q: And I think what you indicated was that
17 there was a 90 percent stenosis of that left
18 anterior descending artery and that there was
19 thrombus present; correct?
20 A: Yes.
21 Q: And then what did you note in connection
22 with the other artery that you found that had some
23 blockage on the cath?
24 A: We said the diagonal branch had about a 70
25 percent block.

## Ganellen, Edward 2006-07-25

42: 1    Q: And do you also note there that it had
2    thrombus present as well?
3    A: I think we said yes. Yes, we did.
4    Q: And when we talk about thrombus, I mean,
5    is that synonymous or does it generally mean the
6    same thing as a clot? What we talked about
7    earlier?
8    A: Yes.
9    Q: And after the cath or during the cath,
10   what treatment did you determine Mr. Mason needed
11   to address the clogged blockages that you found
12   after the diagnostic cath?
13   A: We placed a stent into the LAD, or left
14   anterior descending, and did a balloon through the
15   struts of the stent into the diagonal branch.
16   Q: And was the procedure done on Mr. Mason
17   kind of on an emergency type basis?
18   A: Say more urgency than emergency.
19   Q: And what was the goal of the
20   interventional procedure, the heart cath that you
21   performed on Mr. Mason?
22   A: The goal was to restore blood flow and
23   minimize the amount of damage to the heart
24   muscle.
25   Q: Now, you said that as a part of the heart
43: 1    cath, what you actually did was you placed a stent
2    on one of the arteries; correct?
3    A: Yes.
4    Q: And the stent that you placed was on which
5    artery?
6    A: The left anterior descending.
7    Q: All right. And can you tell us what it is
8    — what a stent is?
9    A: A stent is like a cylindrical wire mesh
10   that's used as kind of a scaffold for the artery
11   so that the artery -- we can open the artery up
12   and it doesn't collapse back down.
13   Q: So, tell us how you, or describe for us
14   how you went about placing the stent in Mr.
15   Mason's left anterior descending coronary artery.
16   A: We would place what's called a guide
17   catheter into the mouth of the main artery. We
18   would slide a very thin wire down past the
19   blockage. We generally put -- I don't know if we
20   predilated or not. I don't think we did. We
21   generally place a stent on a balloon before it's
22   opened up into the blockage, blow the balloon up
23   to open the stent up, and then take the balloon
24   back out.
25   Q: Now, during this interventional procedure,

## Ganellen, Edward 2006-07-25

44:  1  did you also do, I think what you referred to
     2  earlier was an angioplasty?
     3  A: Yes.
     4  Q: And can you describe for us what an
     5  angioplasty is?
     6  A: Angioplasty is a balloon without a stent.
     7  Q: All right. And so how do you go about
     8  doing -- how did you go about doing an angioplasty
     9  on Mr. Mason?
    10  A: I believe we -- I took the same wire back,
    11  put it through one of the holes in the chain link
    12  fence of the stent, and then advanced a balloon
    13  through that and blew the balloon up into the
    14  diagonal.
    15  Q: And what is the goal of doing the
    16  angioplasty?
    17  A: Same thing, to restore blood flow.
    18  Q: By doing the stent and the balloon
    19  angioplasty on Mr. Mason, is that also a part of
    20  stopping the heart attack that he was having?
    21  MR. KRUMHOLZ: Objection, form.
    22  A: Probably.
    23  Q: And I guess the other goal of doing the
    24  stent and the angioplasty was to stop the damage
    25  that had been occurring to his heart?

45:  1  MR. KRUMHOLZ: Objection, form.
     2  A: Yes.
     3  Q: Now, after the heart cath procedure, did
     4  you feel that Mr. Mason had a good result?
     5  A: From the stent, the angioplasty?
     6  Q: Yes.
     7  A: Yes.
     8  Q: And when we talk about a good result, what
     9  is it that you're hoping to see whenever you do
    10  those procedures?
    11  A: Well, with a stent, we'd like to see no
    12  significant blockage left. Or actually we'd like
    13  to see no blockage left over. With an
    14  angioplasty, we usually think anything better
    15  than a 50 percent blockage is considered
    16  reasonable, but we'd like to do better than
    17  that.
    18  MR. KRUMHOLZ: Did you say anything better
    19  than a 50 percent?
    20  A: Yeah.
    21  Q: Now if we look at your cath report where
    22  it says under the left ventricular results
    23  section -- do you see that?
    24  A: Uh-huh.
    25  Q: I think what's noted there is 'Mild

## Ganellen, Edward 2006-07-25

46:
1  anterolateral hypokinesis present.' Do you see
2  that?
3  A: Yes.
4  Q: What does mild anterolateral hypokinesis
5  present, what does that mean?
6  A: It means that when we inject x-ray dye and
7  watch the heart muscle contracting, we can see in
8  the area kind of the front and top side of the
9  heart not pumping quite as vigorously.
10  Q: Okay. What does that indicate to you?
11  A: Some damage to the heart muscle.
12  Q: And is it likely that that damage to Mr.
13  Mason's heart muscle would have been caused by his
14  heart attack?
15  A: Yes.
16  Q: Okay. And how do you go about -- how did
17  you go about determining that he had this damage
18  to his heart muscle? Was it a part of the cath
19  procedure?
20  A: The anterolateral hypokinesis?
21  Q: Yes.
22  A: Yes.
23  Q: And what do you actually do that allows
24  you to determine that he had that damage to his
25  heart?

47:
1  A: We put a catheter into the pumping chamber
2  of the heart muscle, inject x-ray dye, and watch
3  the heart muscle contract.
4  Q: Would you consider a heart with an area of
5  hypokinesis of the left ventricle to be a
6  completely normal heart?
7  A: No.
8  Q: Is it fair to say that the left ventricle
9  is the primary pumping chamber of the heart?
10  A: Yes.
11  Q: And so Mr. Mason has some damage to that
12  area, the left ventricle area of his heart, as a
13  result of the heart attack; correct?
14  A: Yes.
15  Q: Now, there's also something called an
16  ejection fraction. Can you tell us what an
17  ejection fraction is?
18  A: The ejection fraction is the percentage
19  of blood that the heart pumps out with each beat.
20  Q: And when we talk about ejection fractions,
21  is that kind of just a measure of the overall
22  pumping function of the heart?
23  A: Yes.
24  Q: Ejection fraction is completely different
25  than hypokinesis; right?

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                    48

| 48: | 1 | A: Correct. |
|---|---|---|
| | 2 | Q: And hypokinesis refers to what? |
| | 3 | A: Hypokinesis is a weakening of |
| | 4 | contractility. |
| | 5 | Q: As far as Mr. Mason's ejection fraction |
| | 6 | goes, he had a good ejection fraction; correct? |
| | 7 | A: His ejection fraction is normal. |
| | 8 | Q: Okay. But does having a normal ejection |
| | 9 | fracture in and of itself mean that the heart is |
| | 10 | completely normal? |
| | 11 | A: No. |
| | 12 | Q: So, in Mr. Mason's case, was his heart |
| | 13 | completely normal after the heart attack? |
| | 14 | A: No. |
| | 15 | Q: Did he have residual or permanent damage? |
| | 16 | MR. KRUMHOLZ: Objection, form. |
| | 17 | A: Probably some mild. |
| | 18 | MR. KRUMHOLZ: What was the answer? |
| | 19 | A: Probably some mild damage. |
| | 20 | Q: And is it fair to say that the damage that |
| | 21 | you saw whenever you did the cath, that |
| | 22 | anterolateral -- what did we call it? |
| | 23 | A: Anterolateral. |
| | 24 | Q: Right. That is still there -- was still |
| | 25 | there after the heart catheterization procedure |
| 49: | 1 | that you performed? |
| | 2 | MR. KRUMHOLZ: Objection, form. |
| | 3 | A: It was there during the heart |
| | 4 | catheterization. |
| | 5 | Q: Do you have any reason to believe that it |
| | 6 | would go away, that damage to his heart? |
| | 7 | A: It can. |
| | 8 | Q: Okay. And have you seen that as a part of |
| | 9 | your clinical practice? |
| | 10 | A: I don't think I've seen him since his |
| | 11 | hospitalization. |
| | 12 | Q: So, after the heart cath procedure that |
| | 13 | you performed on Mr. Mason in the hospital, did |
| | 14 | you ever see him again? |
| | 15 | A: I don't believe so. |
| | 16 | Q: Do you know anything about his current |
| | 17 | medical condition today? |
| | 18 | A: No. |
| | 19 | Q: If he had a Cardiolite study done in 2005 |
| | 20 | -- and you have an understanding -- what is a |
| | 21 | Cardiolite study? |
| | 22 | A: Cardiolite is a nuclear isotope that is |
| | 23 | injected to assess the amount of blood going to |
| | 24 | different areas of the heart. You can also use |
| | 25 | it to do what's called a gaited study that lets |

*(handwritten) — overruled*

*(handwritten) 48:18-19*
*Pl's Obj:*
*cumulative*

*Overruled*

### Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                              50

| 50: | 1 | us look at the pumping function of the heart as |
| | 2 | well. |
| | 3 | Q: If Mr. Mason had a Cardiolite study in |
| | 4 | 2005 that showed apical hypokinesis, would that be |
| | 5 | consistent with the area of injury that you saw on |
| | 6 | the heart cath in July of 2003? |
| | 7 | A: Probably. |
| | 8 | Q: Can a heart attack also cause arrhythmias |
| | 9 | or irregular heartbeats in patients? |
| | 10 | A: Yes. |
| | 11 | Q: Can a heart attack cause the patient to |
| | 12 | have congestive heart failure? |
| | 13 | A: Yes. |
| | 14 | Q: And a heart attack can actually result in |
| | 15 | death to some patients? |
| | 16 | A: Yes. |
| | 17 | Q: Does an acute MI or heart attack require |
| | 18 | hospitalization to prevent the death or disability |
| | 19 | of a patient? |
| | 20 | A: Yes. |
| | 21 | Q: Are patients who -- |
| | 22 | A: To lower the probability. |
| | 23 | Q: Are patients like Mr. Mason who have had |
| | 24 | one heart attack, are they at increased risk of |
| | 25 | having another heart attack in the future? |
| 51: | 1 | MR. KRUMHOLZ: Objection, form. |
| | 2 | A: Yes. |
| | 3 | Q: And what do you base that opinion on? |
| | 4 | A: I'm sorry? |
| | 5 | Q: That a patient that you see who has a |
| | 6 | heart attack, what do you base the opinion on that |
| | 7 | that person who has a heart attack is at more |
| | 8 | increased risk in the future for having another |
| | 9 | one? |
| | 10 | A: Generally if you've had one heart attack, |
| | 11 | you have an underlying substrate or disease |
| | 12 | process that would lead you to have more heart |
| | 13 | attacks. |
| | 14 | Q: Now, you see patients as a part of your |
| | 15 | clinical practice who have had heart attacks; |
| | 16 | correct? |
| | 17 | A: Yes. |
| | 18 | Q: And are there emotional consequences to |
| | 19 | the patients who have heart attacks? |
| | 20 | A: Yes. |
| | 21 | Q: And do you help your patients who have |
| | 22 | had heart attacks deal with those emotional or |
| | 23 | those anxious moments that they have about having |
| | 24 | a heart attack? |
| | 25 | A: We try. |

Re: 50: 3-50 r 7
Def Obj: speculative
Pl Rj Response:
Not speculative as
the witness saw
the same defect on
the heart catherization
he performed in July
2003. Merely confirms
what Dr. Ganellen saw
was consistent with
Plaintiff's later cardiolite
study in 2005.

Printed: 10/3/2006   8:47:35AM

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                                   52

| 52: | 1 | Q: And is it important after a person has a |
|---|---|---|
| | 2 | heart attack to medically monitor them for |
| | 3 | anything that might come subsequent to the heart |
| | 4 | attack? |
| | 5 | A: Yes. |
| | 6 | Q: And when we -- how do you medically |
| | 7 | monitor your patients who have had a heart attack? |
| | 8 | What do you do? |
| | 9 | A: We would generally try to modify risk |
| | 10 | factors if they're present, or treat hypertension, |
| | 11 | diabetes, high cholesterol, smoking cessation. We |
| | 12 | usually recommend the patients participate in a |
| | 13 | cardiac rehab program, exercise program, just to |
| | 14 | get them back doing things. We monitor vital |
| | 15 | signs, monitor symptoms. |
| | 16 | Q: For example, after a person has a heart |
| | 17 | attack during the first year, how often will they |
| | 18 | come back to see you? |
| | 19 | A: Probably -- if they're doing really well, |
| | 20 | probably about three times the first year. |
| | 21 | Q: And will you perform any diagnostic tests |
| | 22 | on them after the heart attack? |
| | 23 | A: I generally don't. Well, I would do |
| | 24 | bloodwork. I generally don't do a stress test |
| | 25 | routinely. |
| 53: | 1 | Q: Do you ever perform serial EKGs on your |
| | 2 | patients after they've had a heart attack? |
| | 3 | A: Not after they've left the hospital, not |
| | 4 | usually. |
| | 5 | Q: Do you do any nuclear testing on any of |
| | 6 | your patients after they've had a heart attack? |
| | 7 | A: If they're symptomatic, I do. |
| | 8 | Q: And for patients who have had heart |
| | 9 | attacks, do they typically need medications after |
| | 10 | the heart attack? |
| | 11 | A: Yes. |
| | 12 | Q: And what types of medications will they |
| | 13 | need? |
| | 14 | A: With a stent, you would need Plavix for -- |
| | 15 | the time keeps varying, but at least for a certain |
| | 16 | period of time. They should be on aspirin |
| | 17 | forever. Most people will put heart attack |
| | 18 | patients on a beta blocker and probably an ACE |
| | 19 | inhibitor. And then if they're -- you know, |
| | 20 | treatment for their high cholesterol or diabetes. |
| | 21 | Q: Now, are you familiar with the drug |
| | 22 | VIOXX? |
| | 23 | A: I am. |
| | 24 | Q: Did you ever prescribe the drug VIOXX? |
| | 25 | A: I'm sure I did. |

*[Handwritten top margin:]* Overruled This is a treating as He is able to testify to the meds. his patient is taking & if passor to the meds. to testify what he knows is plain what these meds. + about of his diagnosis of treatment and prognosis

### Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3

| 54: | 1 | Q: Are you aware that VIOXX was withdrawn |
| | 2 | from the market on September of 2004? |
| | 3 | A: Yes. |
| | 4 | Q: And do you have an understanding of why it |
| | 5 | was withdrawn from the market? |
| | 6 | A: Because of an increased risk of -- |
| | 7 | MR. KRUMHOLZ: Objection, form. |
| | 8 | A: -- heart attack. |
| | 9 | MR. KRUMHOLZ: I apologize. |
| | 10 | Q: Yeah, let me ask it again, then he's going |
| | 11 | to object, then you can answer. |
| | 12 | A: Okay. |
| | 13 | Q: What is your understanding of why VIOXX |
| | 14 | was withdrawn from the market? |
| | 15 | MR. KRUMHOLZ: Objection, form. |
| | 16 | A: I believe it was withdrawn because of an |
| | 17 | increased risk of heart attack. |
| | 18 | Q: And how did you come to that |
| | 19 | understanding? |
| | 20 | A: Because -- |
| | 21 | MR. KRUMHOLZ: Objection, form. |
| | 22 | A: Because of articles published both in the |
| | 23 | medical and lay prints. |
| | 24 | Q: Have you reviewed articles and scientific |
| 55: | 1 | journals that looked at whether VIOXX can cause |
| | 2 | cardiovascular events in patients taking the |
| | 3 | drug? |
| | 4 | A: Yes. |
| | 5 | Q: And did you do that as a part of being a |
| | 6 | practicing cardiologist? |
| | 7 | A: Yes. |
| | 8 | Q: And do you believe that the literature |
| | 9 | that you have reviewed has demonstrated an |
| | 10 | association between the use of VIOXX and heart |
| | 11 | attacks in some of the patients who take that |
| | 12 | drug? |
| | 13 | MR. KRUMHOLZ: Objection, form. |
| | 14 | A: Yes. |
| | 15 | Q: Is that literature that you've reviewed |
| | 16 | the type that cardiologists in your community rely |
| | 17 | on in forming their opinions about disease and |
| | 18 | disease process? |
| | 19 | MR. KRUMHOLZ: Objection to form. |
| | 20 | Q: Were you aware that Mr. Mason took VIOXX? |
| | 21 | A: I'm not sure I was aware during his |
| | 22 | hospitalization but I'm sure I'm aware now. |
| | 23 | Q: Subsequently, at some point you became |
| | 24 | aware that he had taken VIOXX? |
| | 25 | MR. KRUMHOLZ: Objection, form. |

Printed: 10/3/2006   8:47:35AM

*[Handwritten right margin annotations:]*

Re: 54:4 - 54:5
Def Obj: Foundation; no personal knowledge; hearsay reference to articles about the withdrawal.
Plaintiff's Response: Witness testified he kept up with the medical literature on Vioxx as a practicing cardiologist. He read and personally reviewed the medical + scientific articles published on Vioxx and its withdrawal.

Re: 54:13 - 54:19
Def Obj: Foundation; No personal knowledge; hearsay; reference to articles about the withdrawal.
Plaintiff's Response: Same as above

Re: 54:22 - 54:23
Def Obj: Foundation; No personal knowledge; hearsay; reference to articles about the withdrawal.
Plaintiff's Response: Same as above

① Re: 55:7 - 55:11
Def Obj: calls for expert testimony and this witness was not designated nor qualified as an expert.

② Re: 55:13 - 55:17
Def Obj: Calls for expert testimony and this witness was not designated nor qualified as an expert.

③ Re: 55:19 - 55:19
Def Obj: calls for expert testimony and this witness was not designated nor qualified as an expert.

*[Handwritten left margin bottom annotation:]*
Plaintiffs Response to ① ② ③:
This Cardiologist reviewed + continues to review the medical literature re Vioxx & its relationship to heart attacks, because he treats those types of patients every day, which included Mr. Mason. Dr. Ganellen is and was designated as a treating expert as a result of his training, education, experience and triple board certification. It is clear from his testimony that he knows the Vioxx medical literature.

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3

56

| 56: | |
|---|---|

**Plaintiff's Response to ① + ②:** Witness is P's treating Cardiologist at the time of P's heart attack. As a part of standard of care, he developed a differential diagnosis as to the cause of P's heart attack. He knows P's medical history. He performed a physical exam, He reviewed P's blood work + diagnosed P's heart attack. He then performed the interventional procedure that saved P's life. He is qualified to give this testimony based on his knowledge of P's med. condition + review of Vioxx med. literature. This is proper + essential testimony to P's case.

```
1   A: Yes.
2   Q: And were you aware that he had taken VIOXX
3   on the very day of his heart attack?
4   MR. KRUMHOLZ: Objection, form.
5   A: Yes.
6   Q: Knowing that he had taken VIOXX on the day
7   of his heart attack, would you include VIOXX in
8   your differential diagnosis as a potential cause
9   of his heart attack?
10  MR. KRUMHOLZ: Objection, form.
11  A: Yes.
12  Q: Is there any way to rule VIOXX out as a
13  potential cause of his heart attack?
14  MR. KRUMHOLZ: Objection, form.
15  A: No.
16  Q: Let me just ask you also in regards to
17  VIOXX, did you ever have any sales reps from Merck
18  call on you with regard to your prescribing habits
19  for VIOXX?
20  A: I'm sure I did, but I couldn't tell you
21  for sure.
22  Q: Okay. Do you ever remember any sales rep
23  from Merck coming in and telling you that their
24  drug VIOXX had been shown to be associated with
25  heart attacks?
```

```
1   MR. KRUMHOLZ: Objection, form.
2   A: No.
3   Q: Did you ever receive anything from the
4   company while VIOXX was on the market that
5   suggested to you that VIOXX might have been
6   associated with causing heart attacks?
7   MR. KRUMHOLZ: Objection, form.
8   A: No.
9   Q: When is the first time that you became
10  aware that VIOXX had been associated with causing
11  heart attacks?
12  MR. KRUMHOLZ: Objection, form.
13  A: Well, probably the first time for sure is
14  when it was withdrawn from the market.
15  Q: And I take it that once a drug was
16  withdrawn from the market, I guess you stopped
17  prescribing; correct?
18  A: Yes, I hope.
19  Q: If there had been an association between
20  heart attacks and VIOXX prior to the drug getting
21  withdrawn from the market, is that something that
22  you would have wanted to know as a prescriber?
23  MR. KRUMHOLZ: Objection, form.
24  A: Yes.
25  Q: And why would you have wanted to know
```

① Re: 56:6 - 56:9
Def Obj: Witness didn't make this diagnosis as part of his treatment of the plaintiff. Asking him to form this opinion after the fact calls for expert testimony.

② Re: 56:11 - 56:15
Def Obj: Witness did not make this diagnosis as part of his treatment of the plaintiff. Asking him to form this opinion after the fact calls for expert testimony.

③ Re: 56:22 - 56:25
Def Obj: Irrelevant; 403

④ Re: 57:2 - 57:6
Def Obj: Irrelevant; 403

⑤ Re: 57:8 - 57:11
Def Obj: Irrelevant; 403

⑥ Re: 57:13 - 57:14
Def Obj: Irrelevant; 403

**Plaintiff's Response to ③, ④, ⑤ + ⑥:** Witness is a physician who prescribed Vioxx to his patients. His meetings with Merck sales reps and information he was provided by Merck on Vioxx are directly relevant to the case and Plaintiff's failure to warn claim. This testimony is very probative for the jury + the questions they will be asked.

## Ganellen, Edward 2006-07-25

| 58: | 1 | about that heart attack risk? |
| --- | --- | --- |
| | 2 | MR. KRUMHOLZ:  Same objection. |
| | 3 | A:  If there were alternative treatments that |
| | 4 | were safer, we would have used those. |
| | 5 | Q:  I mean certainly a heart attack is a |
| | 6 | serious enough event that if the drug company was |
| | 7 | aware that heart attacks had been associated with |
| | 8 | its drug VIOXX, that's information as a prescriber |
| | 9 | you would have wanted to know; correct? |
| | 10 | A:  Yes. |
| | 11 | Q:  That's all the questions I have.  Thank |
| | 12 | you, Doctor. |
| | 13 | MR. KRUMHOLZ:  We're going to take just |
| | 14 | a few minutes to gather ourselves and switch |
| | 15 | sides. |
| | 16 | A:  Okay. |
| | 17 | MR. KRUMHOLZ:  And we will take a short |
| | 18 | break while we do so. |
| | 19 | THE VIDEOGRAPHER:  It's 40 minutes after |
| | 20 | twelve o'clock. We're going off the record. |
| | 21 | (Recess taken from 12:40 p.m. to 12:44 |
| | 22 | p.m.) |
| | 23 | THE VIDEOGRAPHER:  It's 44 minutes after |
| | 24 | twelve o'clock. We're back on the record. |
| | 25 | *** |
| 59: | 1 | EXAMINATION |
| | 2 | BY MR. KRUMHOLZ: |
| | 3 | Q:  Doctor, my name is Richard Krumholz. And |
| | 4 | we've never met before today; is that right? |
| | 5 | A:  That's correct. |
| | 6 | Q:  You did meet with the plaintiff's |
| | 7 | attorneys awhile back, I guess? |
| | 8 | A:  Yes. |
| | 9 | Q:  And for how long was that meeting? |
| | 10 | A:  I think about a half hour. |
| | 11 | Q:  And was that the only time you met or |
| | 12 | talked with anybody from Mr. Nabers' law firm? |
| | 13 | A:  Yes. |
| | 14 | Q:  And you all talked about various records, |
| | 15 | I think you testified. Is Exhibit 7 all of the |
| | 16 | records -- does it represent all of the records |
| | 17 | that you discussed in connection with Mr. Mason |
| | 18 | and in connection with VIOXX? |
| | 19 | A:  Yes. |
| | 20 | Q:  And you weren't shown any other records? |
| | 21 | A:  No. |
| | 22 | Q:  Okay. You're a treating cardiologist; is |
| | 23 | that correct? You treat patients for cardiology |
| | 24 | issues? |
| | 25 | A:  Yes. |

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3

60

| 60: | | |
|---|---|---|
| | 1 | Q: And how many of your patients have |
| | 2 | coronary artery disease? |
| | 3 | A: A large percentage. 80 percent. |
| | 4 | Q: 80 percent of your patients have some form |
| | 5 | of cardiovascular disease or coronary artery |
| | 6 | disease? |
| | 7 | A: I would guess that all of my patients have |
| | 8 | some form of cardiovascular disease, but probably |
| | 9 | about 80 percent have coronary disease. |
| | 10 | Q: And that occurs in folks all the time who |
| | 11 | are not taking any sort of medication that causes |
| | 12 | it; true? |
| | 13 | A: Yes. |
| | 14 | Q: That has occurred in the medical |
| | 15 | profession and it is known that that occurs in |
| | 16 | patients without regard to medication? |
| | 17 | A: Yes. |
| | 18 | Q: And you understand that cardiovascular |
| | 19 | disease and coronary artery disease is the No. 1 |
| | 20 | cause of death in the United States? |
| | 21 | A: Yes. |
| | 22 | Q: That's been true for, I've read, somewhere |
| | 23 | -- a hundred years; is that right? |
| | 24 | A: Probably. |
| | 25 | Q: And it's true today? |
| 61: | 1 | A: Yes. |
| | 2 | Q: And it was true before VIOXX was on the |
| | 3 | market? |
| | 4 | A: Yes. |
| | 5 | Q: It was true during VIOXX was on the |
| | 6 | market? |
| | 7 | A: Yes. |
| | 8 | Q: And it's been true since VIOXX was |
| | 9 | withdrawn from the market? |
| | 10 | A: Yes. |
| | 11 | Q: Now, you were asked a lot of questions |
| | 12 | today about -- towards the end about VIOXX. And I |
| | 13 | just want to make sure I'm clear. You're an |
| | 14 | expert in cardiology; is that right? |
| | 15 | A: I hope so. |
| | 16 | Q: Of course. But you don't hold yourself |
| | 17 | out as an expert with respect to VIOXX; true? |
| | 18 | A: True. |
| | 19 | Q: Or the effects that VIOXX has on the |
| | 20 | cardiovascular system? |
| | 21 | A: True. |
| | 22 | Q: You have not done a full scale study of |
| | 23 | that? |
| | 24 | A: I have not. |
| | 25 | Q: You have not looked at the clinical |

*Overruled*

61:11 - 65:14

Pl's obj:
no answer
designated;
Cumulative

Def's response: none
needed

Overruled

**Ganellen, Edward 2006-07-25**

Ganellen PA PC DA DC on 10-3                                        62

| 62: | | |
|---|---|---|
| | 1 | research that Merck did and that others have done |
| | 2 | in connection with VIOXX; true? |
| | 3 | A: With -- I think I've seen some of the |
| | 4 | clinical trials that were published. |
| | 5 | Q: Let me ask it to you a different way. Has |
| | 6 | the plaintiff or anyone else in connection with |
| | 7 | this litigation asked you to figure out whether or |
| | 8 | not VIOXX can cause an increased risk of |
| | 9 | cardiovascular problems? |
| | 10 | A: No. |
| | 11 | Q: And you've never done that? |
| | 12 | A: I have not. |
| | 13 | Q: And to do that, you would want to look at |
| | 14 | the totality of the evidence, I assume, if someone |
| | 15 | were to ask you to do that? |
| | 16 | A: Yes. |
| | 17 | Q: You would want to look at all of the |
| | 18 | clinical trials, for example? |
| | 19 | A: Yes. |
| | 20 | Q: You would want to look at what the FDA |
| | 21 | considered, for example? |
| | 22 | A: Yes. |
| | 23 | Q: You would want to look at statistical |
| | 24 | models that have been conducted? |
| | 25 | A: Yes. |
| 63: | 1 | Q: You would want to look at all of the |
| | 2 | literature that you could that you thought was |
| | 3 | reliable in order to determine whether in fact |
| | 4 | that was the case? |
| | 5 | A: Correct. |
| | 6 | Q: And do you understand the difference |
| | 7 | between association versus causation? |
| | 8 | A: I do. |
| | 9 | Q: And Mr. Nabers used the word association, |
| | 10 | but just so the jury understands, an association |
| | 11 | simply means that while somebody was taking a |
| | 12 | particular drug or doing some activity, that an |
| | 13 | event occurred; true? |
| | 14 | MR. NABERS: Objection to the form. |
| | 15 | A: True. |
| | 16 | Q: In other words, let's just say for |
| | 17 | example, when I'm on an airplane -- and I know |
| | 18 | this is a simple example, I'm not saying it |
| | 19 | particularly applys here, but just so that the |
| | 20 | jury understands the difference between |
| | 21 | association versus causation. When I'm on the |
| | 22 | airplane, sometimes that seat belt light flashes. |
| | 23 | You know what I'm talking about? |
| | 24 | A: Yes. |
| | 25 | Q: And when that happens, sometimes there's |

Pl's obj con't
61:11-65:14
Cumulative;
no answer

Def's response: none
needed

Overruled

**Ganellen, Edward 2006-07-25**

Ganellen PA PC DA DC on 10-3

64

61:11 - 65:14

Pl's Obj Con't:
Cumulative; no answer

Def's response: none needed

| 64: | | |
|---|---|---|
| | 1 | turbulence right after that. Have you noticed |
| | 2 | that before? |
| | 3 | A: Yes. |
| | 4 | Q: And so there would be an association |
| | 5 | between the seat light coming on and turbulence |
| | 6 | when you fly on occasion; is that right? |
| | 7 | A: Yes. |
| | 8 | Q: But that doesn't obviously mean that the |
| | 9 | seat belt light caused the turbulence; right? |
| | 10 | A: Correct. |
| | 11 | Q: To understand how that process worked, |
| | 12 | we'd have to scrub off the facts, so-to-speak, |
| | 13 | look behind just the surface facts and get a |
| | 14 | little -- get your hands dirty to figure out |
| | 15 | whether or not it causes any particular problem? |
| | 16 | MR. NABERS: Objection to form. |
| | 17 | Q: Right? |
| | 18 | A: Correct. |
| | 19 | Q: So with respect to VIOXX, what you would |
| | 20 | want to do before rendering any opinions about |
| | 21 | causation is to review the totality of the |
| | 22 | evidence and try to determine if it's possible |
| | 23 | to come up with a scientifically reliable |
| | 24 | conclusion? |
| | 25 | A: Yes. |
| 65: | 1 | Q: And Mr. Nabers did not ask you to do |
| | 2 | that? |
| | 3 | A: That's correct. |
| | 4 | Q: And you have not done that? |
| | 5 | A: I have not. |
| | 6 | Q: And if anyone were to suggest that your |
| | 7 | testimony today is that you have done sufficient |
| | 8 | analysis and research to say that VIOXX caused |
| | 9 | Mr. Mason's heart attack or did not, you simply |
| | 10 | haven't done the sort of analysis that you would |
| | 11 | need to do to determine that? |
| | 12 | A: Correct. |
| | 13 | Q: Is that true? |
| | 14 | A: That's true. |
| | 15 | Q: Now, Mr. Nabers talked to you about |
| | 16 | coronary artery disease generally. Do you recall |
| | 17 | that? |
| | 18 | A: Yes. |
| | 19 | Q: And I hope you don't mind, I saw this |
| | 20 | model sitting over on the desk over here and I'm |
| | 21 | hoping that you won't mind if I use one of the |
| | 22 | pieces of paper off of it. |
| | 23 | A: No, that's fine. |
| | 24 | Q: I'm putting up on the screen -- and let's |
| | 25 | see if I can widen that view a little bit so we |

## Ganellen, Edward 2006-07-25

| 66: | 1 | can see it a little better. Is this cross-section |
| | 2 | of an artery with atherosclerosis an accurate |
| | 3 | depiction of the disease process we've been |
| | 4 | talking about today? |
| | 5 | A: It's a schematic representation. |
| | 6 | Q: I mean this is – do you use these sorts |
| | 7 | of diagrams to explain to patients from time to |
| | 8 | time what atherosclerosis is? |
| | 9 | A: Yes. |
| | 10 | Q: If you could, walk us through this chart |
| | 11 | so that the jury and I and everyone here can |
| | 12 | understand exactly what atherosclerosis is. |
| | 13 | A: So, starting on the left side of the |
| | 14 | screen, trying to show a normal artery that has |
| | 15 | three different layers. And the inner side, the |
| | 16 | endothelium is smooth. There's no real blockage. |
| | 17 | As we progress into the middle, you start |
| | 18 | seeing this little yellow streak or plaque, which |
| | 19 | is supposed to represent the beginning of |
| | 20 | blockages. |
| | 21 | And as we progress over to the right side |
| | 22 | of the screen, we see a big lump of yellow stuff, |
| | 23 | which is supposed to be more severe |
| | 24 | atherosclerosis that is enough to narrow the inner |
| | 25 | diameter of the pipe. |
| 67: | 1 | Q: And where do you find atherosclerosis? I |
| | 2 | mean, is it in the wall of the artery? Is it |
| | 3 | inside the artery? Where do you find it? |
| | 4 | A: It's in the wall of the artery. |
| | 5 | Q: And is that sometimes called plaque? |
| | 6 | A: Yes. |
| | 7 | Q: Is one of the fears that if you have |
| | 8 | plaque build-up or atherosclerosis, that it will |
| | 9 | restrict blood flow? |
| | 10 | A: Yes. |
| | 11 | Q: And in how many of your patients do you |
| | 12 | see that? That is, sort of a restriction of blood |
| | 13 | flow as a result of atherosclerosis? |
| | 14 | A: Most of my patients, I guess. |
| | 15 | Q: How many patients do you have in any given |
| | 16 | year, approximately? |
| | 17 | A: I have no idea. |
| | 18 | Q: Are we talking hundreds? |
| | 19 | A: Yes. |
| | 20 | Q: Thousands? |
| | 21 | A: Maybe. Maybe a couple of thousand. |
| | 22 | Q: Okay. So, between hundreds and a couple |
| | 23 | thousand, most of those patients have the disease |
| | 24 | process that you've just described? |
| | 25 | A: Yes. |

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                    68

```
68:    1    Q:  That actually restricts blood flow to the
       2    heart?
       3    A:  Yes.
       4    Q:  And as a result of that, they're at a
       5    significant increased risk for heart attack?
       6    A:  Yes.
       7    Q:  And most of your patients will -- did
       8    those statistics that you just described, does
       9    that describe your patients today, the percentage
      10    of your patients today, that actually are
      11    suffering from this disease process?
      12    A:  Roughly.
      13    Q:  Okay. So, most of your patients today
      14    have atherosclerosis to the degree that it
      15    restricts blood flow to the heart?
      16    A:  Most of my patients have had
      17    atherosclerosis at some point that restricts blood
      18    flow. Most my patients have atherosclerosis, and
      19    hopefully we've treated them.
      20    Q:  Fair enough. Let me clarify that because
      21    I should have thought through that before I asked
      22    you that question. Your patients -- you're an
      23    interventionalist; true?
      24    A:  Yes.
      25    Q:  As a result, you hope your treatment of
69:    1    your patients actually has opened up the arteries
       2    and has prevented the sort of restriction that's
       3    depicted in this illustration?
       4    A:  Yes.
       5    Q:  But at one time, most of your patients --
       6    at one time or another, most of your patients have
       7    had this sort of disease process caused by
       8    atherosclerosis that restricts blood flow?
       9    A:  Yes.
      10    Q:  And I assume since VIOXX has not been on
      11    the market, that it's still the case and it had
      12    nothing to do with VIOXX?
      13    MR. NABERS:  Objection to the form.
      14    Q:  And let me rephrase that. You indicated
      15    that most of your patients at one time or another
      16    had atherosclerosis to the degree that it
      17    restricted blood flow; true?
      18    A:  Yes.
      19    Q:  And those patients were not on VIOXX,
      20    those ones that you've treated for that this year;
      21    true?
      22    A:  Yes.
      23    Q:  And that's been the case since 2004?
      24    A:  Yes.
      25    Q:  Have you seen any sort of reduction in the
```

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3

*Overruled*

| 70: | | |
|---|---|---|
| | 1 | number of patients with atherosclerotic build-up |
| | 2 | since VIOXX was withdrawn? |
| | 3 | A: No. |
| | 4 | Q: In your practice, it's been most of your |
| | 5 | patients that have suffered from that problem |
| | 6 | before, during and after VIOXX was on the market? |
| | 7 | A: Yes. |
| | 8 | Q: Now, do many people have this plaque or |
| | 9 | atherosclerosis and not know it? |
| | 10 | MR. NABERS: Objection to the form. |
| | 11 | A: You can be asymptomatic, yes. |
| | 12 | Q: Have you actually had patients who were |
| | 13 | asymptomatic before they had an event? |
| | 14 | A: Yes. |
| | 15 | Q: You see that routinely in your practice? |
| | 16 | A: Yes. |
| | 17 | Q: And how can that be? Why can that happen? |
| | 18 | A: Pretty amazing. I mean, I think part of |
| | 19 | the answer is we don't know why some -- I mean |
| | 20 | some people don't feel it because they have damage |
| | 21 | to the nerves. |
| | 22 | Some people, we believe have blockages |
| | 23 | that are not bad enough to restrict flow until |
| | 24 | something happens to make them progress. |
| | 25 | Q: For example, do many of your patients, or |
| 71: | 1 | the American public, have 50 percent narrowing or |
| | 2 | blockages and simply not know it? |
| | 3 | MR. NABERS: Objection to the form. |
| | 4 | A: Yes. |
| | 5 | Q: What is considered to be a severe |
| | 6 | blockage? |
| | 7 | A: A blockage that would -- a blockage that |
| | 8 | would restrict flow is generally thought to be at |
| | 9 | least 70 percent. 50 to 70 percent is considered |
| | 10 | kind of a gray area in humans. |
| | 11 | Q: And what is the danger when you get into |
| | 12 | the 50 to 70 percent range? |
| | 13 | A: It turns out that blockages that are more |
| | 14 | moderate in severity are probably more likely to |
| | 15 | rupture and more likely to cause heart attacks. |
| | 16 | Q: So, given what you found in your cardiac |
| | 17 | catheterization that you performed on Mr. Mason |
| | 18 | in July of 2003, that is, the 90 percent blockage |
| | 19 | and the 70 percent blockage, was it surprising to |
| | 20 | you that he had a heart attack? |
| | 21 | A: No. |
| | 22 | Q: You see people all the time with those |
| | 23 | sorts of blockages who have heart attacks? |
| | 24 | A: Yes. |
| | 25 | Q: Is there any doubt in your mind that the |

Handwritten annotations:

70:8-9
Pl's objection:
Speculation

Def's response: Information
well within witness' general
understanding of cardiology

70:25-71:2
Pl's obj:
Speculation

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                                72

| 72: | 1 | atherosclerosis is what caused Mr. Mason's heart |
| | 2 | attack? |
| | 3 | MR. NABERS:  Objection to the form. |
| | 4 | A:  I guess I would rephrase that and say that |
| | 5 | I believe that atherosclerosis was the primary |
| | 6 | cause, although I can't tell you that VIOXX didn't |
| | 7 | contribute or thrombosis didn't contribute. |
| | 8 | Q:  Okay. So what you're saying is there's a |
| | 9 | whole host of possibilities out there that you may |
| | 10 | not be able to rule out? |
| | 11 | MR. NABERS:  Objection to the form. |
| | 12 | Q:  For example, you would have to look at |
| | 13 | Mr. Mason's risk factors? |
| | 14 | A:  Correct. |
| | 15 | Q:  You would have to look at whether or not |
| | 16 | he is obese and was obese at the time? |
| | 17 | A:  Correct. |
| | 18 | Q:  And for how long he may have been obese? |
| | 19 | A:  Yes. |
| | 20 | Q:  You would have to look at his family |
| | 21 | history? |
| | 22 | A:  Yes. |
| | 23 | Q:  To look at whether or not his sisters, his |
| | 24 | brothers or his mom or his dad had premature heart |
| | 25 | attacks? |
| 73: | 1 | MR. NABERS:  Objection to the form. |
| | 2 | A:  Yes. |
| | 3 | Q:  You would want to look at his cholesterol |
| | 4 | levels? |
| | 5 | A:  Yes. |
| | 6 | Q:  You would want to look at his blood |
| | 7 | pressure readings? |
| | 8 | A:  Yes. |
| | 9 | Q:  You would want to look at his smoking to |
| | 10 | the extent that he smoked recently in the last |
| | 11 | five years? |
| | 12 | A:  Yes. |
| | 13 | Q:  Those are all of the sorts of things that |
| | 14 | you would want to look at in determining what |
| | 15 | Mr. Mason looked like just prior to his heart |
| | 16 | attack? |
| | 17 | A:  Yes. |
| | 18 | Q:  Before you could ever determine or give a |
| | 19 | reliable opinion about what may or may not have |
| | 20 | contributed to his heart attack? |
| | 21 | MR. NABERS:  Objection to the form. |
| | 22 | Q:  True? |
| | 23 | A:  True. |
| | 24 | Q:  And you've not done that? |
| | 25 | A:  I've not. |

### Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3

74

| 74: | 1 | Q: Mr. Nabers did not provide you with Mr. |
| | 2 | Mason's medical records from Dr. Vogeler, for |
| | 3 | example, his family practitioner? |
| | 4 | MR. NABERS: Objection to the form. |
| | 5 | Q: True? |
| | 6 | A: He did not. |
| | 7 | Q: He did not show you any of his medical |
| | 8 | history from prior to July of 2003; true? |
| | 9 | A: That's correct. |
| | 10 | Q: And until you look at those sorts of |
| | 11 | records, you really can't provide a reliable |
| | 12 | opinion about what may or may not have caused his |
| | 13 | heart attack; true? |
| | 14 | A: I mean, we hopefully did assess some of |
| | 15 | those things in his hospitalization, but... |
| | 16 | Q: You would want to look at his prior |
| | 17 | medical records to confirm, for example, whether |
| | 18 | or not he had a family history? |
| | 19 | A: Sure. |
| | 20 | Q: Whether or not he had these other risk |
| | 21 | factors that we've discussed? |
| | 22 | MR. NABERS: Objection to the form. |
| | 23 | A: Yes. |
| | 24 | Q: Now, you mentioned that atherosclerosis or |
| | 25 | plaque build-up can also cause chest pain? |
| 75: | 1 | A: Yes. |
| | 2 | Q: Is it important to monitor chest pain or |
| | 3 | chest tightness in a patient? |
| | 4 | A: Yes. |
| | 5 | Q: And why is that? |
| | 6 | A: Patients who have chest discomfort |
| | 7 | typically with exertion often have underlying |
| | 8 | atherosclerosis. |
| | 9 | Q: And it may indicate that they have plaque |
| | 10 | build-up? |
| | 11 | A: Yes. |
| | 12 | Q: And so you would want to likewise look at |
| | 13 | medical records that may indicate whether or not |
| | 14 | Mr. Mason had prior chest discomfort, chest |
| | 15 | tightness, chest pain prior to his ever taking |
| | 16 | VIOXX to determine whether or not he had |
| | 17 | atherosclerosis build-up already? |
| | 18 | MR. NABERS: Object to the form. |
| | 19 | A: True. |
| | 20 | Q: Now you mentioned that plaque sometimes |
| | 21 | ruptures? |
| | 22 | A: Yes. |
| | 23 | Q: Could you describe for the record what |
| | 24 | plaque rupture means in lay terms, if you can? |
| | 25 | A: Sure. Make it challenging. The plaques |

*Overruled (credibility)*

*75:12-17*
*Pl's Obj:*
*Speculation;*
*Vague*
*Def's response: This is*
*basic cardiology information*

### Ganellen, Edward 2006-07-25



76:
1  are generally covered by some kind of fibrous cap.
2  And when those caps burst, they expose all of the
3  substances underneath that plaque to the
4  bloodstream, and the bloodstream is — monitors
5  that, looks at it just as if you had cut yourself.
6  When you cut yourself, the way to keep
7  from bleeding is to form a clot. When you rupture
8  plaque in a heart artery and form a clot, you
9  cause a heart attack.
10  Q: And I assume that happens to your patients
11  routinely, unfortunately?
12  A: Not because of me.
13  Q: Yeah. And let's rephrase that. You see
14  that in your practice every day?
15  A: Yes.
16  Q: Is that the most common form of heart
17  attack, that is, the clot formation, the plaque
18  rupture and clot formation?
19  MR. NABERS: Object to form.
20  A: That's what we believe.
21  Q: And what percent — what is it believed
22  in terms of the medical community, the cardiology
23  community, in terms of what percent of patients
24  have their heart attacks caused by that plaque
25  rupturing and clotting mechanism you've

77:
1  described?
2  A: I would think most people would say
3  upwards of 95 percent of heart attacks are caused
4  by plaque ruptures.
5  Q: And that happens and you see it in your
6  practice in patients who have never taken VIOXX?
7  A: Yes.
8  Q: And who have never taken any sort of Cox-2
9  inhibitors?
10  A: Yes.
11  Q: Now, plaque formation actually in terms of
12  rate of plaque formation, varies from patient to
13  patient; is that true?
14  A: Yes.
15  Q: You can't really predict in which patient
16  plaque is going to progress quickly and in which
17  patient it might not progress so quickly?
18  A: That's true.
19  Q: There are risk factors you can look to
20  that you know tend to accelerate progression of
21  plaque formation; true?
22  A: Yes.
23  Q: But outside of that, there's some
24  guesswork involved; is that fair?
25  A: Yes.

Printed: 10/3/2006   8:47:35AM

*Handwritten annotations:*

Overruled

76:16-18
Pl's Objection:
Speculation; Vague;
Compound; Cumulative

Def's response: This information
is basic cardiology

77:5-10
Pl's Objection:
Speculation; Vague;
Compound; Cumulative

# Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3

78:

1  Q: And in some patients coronary artery
2  disease or atherosclerosis can develop rapidly, in
3  others, it develops more slowly?
4  A: Yes.
5  Q: Now, you've seen rapid progression of
6  atherosclerosis in your patients, have you not?
7  A: Yes.
8  Q: And you've seen that in people who are not
9  taking Cox-2 inhibitors?
10  A: Yes.
11  Q: Or VIOXX?
12  A: Yes.
13  Q: And who have never done so?
14  A: Yes.
15  Q: Have you seen patients with 40 to 60
16  percent blockage in an artery in one year show up
17  in the next year with a 90 percent blockage?
18  A: Probably, yes.
19  Q: That would not surprise you?
20  A: No.
21  Q: And those patients likewise, you've seen
22  that without ever having taken VIOXX?
23  A: Yes.
24  Q: Or any other Cox-2 inhibitor?
25  A: Yes.

79:

1  Q: And we know that coronary artery disease
2  or atherosclerosis gets worse over time?
3  A: Generally.
4  Q: And that's especially true when a patient
5  is obese or has a family history or other risk
6  factors?
7  MR. NABERS:  Objection to the form.
8  A: Yes.
9  Q: It's known in the scientific community.
10  There's no uncertainty about it that, for example,
11  a family history of heart disease generally
12  accelerates the promotion of atherosclerosis;
13  true?
14  A: I would rephrase it to say that a family
15  history increases the risk of progression of
16  atherosclerosis.
17  Q: And that's known in the scientific
18  community?
19  A: Yes.
20  Q: And, likewise, obesity increases the risk
21  of rapid progression of atherosclerosis?
22  A: Yes.
23  Q: And high cholesterol increases the risk of
24  atherosclerosis progression?
25  A: Yes.

*Handwritten annotations:*

Overruled

78

78:8-14
Pl's objection:
Speculation; vague;
Compound; cumulative

Def's response: none
needed

Printed: 10/3/2006   8:47:35AM

**Ganellen, Edward 2006-07-25**

Ganellen PA PC DA DC on 10-3

80

```
80:  1    Q:  And high blood pressure increases the risk
     2    of rapid progression of atherosclerosis?
     3    A:  Yes.
     4    Q:  And do you know whether or not depression
     5    does?
     6    A:  I'm not aware of depression.
     7    Q:  Do you know whether or not -- and I hate
     8    to talk about these issues in this setting -- but
     9    erectile dysfunction, do you know if it does?
    10    A:  Well, I think erectile dysfunction is
    11    considered to be an indirect marker for
    12    atherosclerosis. So, my understanding is that
    13    the mechanism for erectile dysfunction is
    14    atherosclerosis. And so if you have erectile
    15    dysfunction, you likely have blockages other
    16    places.
    17    Q:  And these are all risk factors that the
    18    scientific community has accepted for many years?
    19    A:  Yes.
    20    Q:  And known about for many years?
    21    A:  Yes.
    22    Q:  There's no uncertainty about the risks of
    23    those conditions?
    24    A:  No.
    25    Q:  Now, to understand how a patient who has
81:  1    had a heart attack is doing when he shows up at
     2    LDS Hospital or another facility, what diagnostic
     3    tests can you do or can you perform other than
     4    enzyme tests? What -- to get images of the heart
     5    or to understand how the heart is functioning?
     6    A:  This is when he presents with his heart
     7    attack or in follow-up?
     8    Q:  Yes.
     9    A:  When he presents with his heart --
    10    Q:  Both. Let's say both. When a patient has
    11    had a heart attack, what sort of diagnostic tests
    12    are available to you as a cardiologist?
    13    A:  Well, cardiocatheterization, which we've
    14    already discussed. We can do an echocardiogram,
    15    which is an ultrasound of the heart, which would
    16    show us how his heart muscle is functioning. We
    17    can do nuclear medicine tests like the Cardiolite
    18    scan, which could assess both perfusion or blood
    19    flow to his heart as well as his heart function.
    20    And we -- during the acute presentation,
    21    we would monitor the enzyme blood test. We would
    22    monitor the EKG. Monitor his heart rhythm.
    23    Monitor his vital signs. Listen to his lungs.
    24    Q:  In terms of -- you've mentioned a cardiac
    25    catheterization. And you discussed it a little
```

*Handwritten notes (right margin):*

80:7-16
Pl's objection:
Rule 401 - relevance;
Subject of π's MIL #1

Def's response: Witness'
answer provides the well
understood link between ED
and atherosclerosis

Printed: 10/3/2006   8:47:35AM

## Ganellen, Edward 2006-07-25

82:
1   bit in connection with Mr. Nabers' questioning.
2   That's what you performed on Mr. Mason on July 24
3   of 2003; true?
4   A: Yes.
5   Q: And I think that what you indicated was
6   that you performed it to -- let me get the right
7   -- restore blood flow and minimize damage to the
8   heart?
9   A: Correct.
10  Q: And that is not only the catheterization
11  but the placement of the stent and the angioplasty
12  that you performed?
13  A: Yes.
14  Q: The whole goal of those procedures was to
15  restore blood flow and minimize damage to the
16  heart?
17  A: Yes.
18  Q: And do you feel like you were successful
19  in that regard?
20  A: Yes.
21  Q: Have you seen any follow-up records which
22  may provide you an indication as to whether Mr.
23  Mason continued to have a good prognosis?
24  A: I have not.
25  Q: I want to -- you mentioned echocardiogram

83:
1   as one of the methods to diagnose what's going on
2   with the heart?
3   A: Yes.
4   Q: Under what circumstances would you
5   normally perform an echocardiogram after a patient
6   has had a heart attack?
7   A: We do echoes fairly routinely. It's a
8   noninvasive test that has, you know, very little
9   risk and is a nice way to assess the heart
10  function in a way that we can follow that
11  serially.
12  So it's -- you don't want to do an
13  angiogram every six months to see how people are
14  doing. So, I mean, I would probably say more of
15  my patients have echoes than don't after a heart
16  attack.
17  Q: Within the first week to month, let's
18  say, after a heart attack, would there be any
19  particular reason not to do an echocardiogram?
20  A: There's no real reason necessarily not to
21  do one. If we already know what his heart muscle
22  looks like by his angiogram, I don't know that I
23  would necessarily do it.
24  Q: What are the likely circumstances where
25  you wouldn't do an echocardiogram on a patient who

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                                        84

| 84: | 1 | has had a heart attack? |
|---|---|---|
| | 2 | A: Probably if we had another -- so if you |
| | 3 | have no concerns about his heart valves and you |
| | 4 | already have another measurement of heart |
| | 5 | function, you might not do an echo. |
| | 6 | Q: You mentioned a nuclear perfusion |
| | 7 | testing -- |
| | 8 | A: Yes. |
| | 9 | Q: -- as one of the diagnostic studies? |
| | 10 | A: Yes. |
| | 11 | Q: As I understand it, that's done while a |
| | 12 | patient is actually exercising; is that right? |
| | 13 | A: There's typically a rest study and then a |
| | 14 | stress study. |
| | 15 | Q: And so that gives you a baseline, |
| | 16 | so-to-speak, when you do the rest study? |
| | 17 | A: Correct. |
| | 18 | Q: And then when he exercises, then you can |
| | 19 | compare that against the baseline? |
| | 20 | A: Yes. |
| | 21 | Q: And can you describe for us in, again lay |
| | 22 | terms if you can, how that testing is performed? |
| | 23 | A: Well, we place an IV. So we put a |
| | 24 | catheter into a vein, generally in the arm. I |
| | 25 | think the way we do it here, we use Cardiolite, |
| 85: | 1 | which is a nuclear isotope. It gives off energy |
| | 2 | that we can measure. |
| | 3 | We generally do the resting study first, |
| | 4 | so we inject a certain amount of Cardiolite into |
| | 5 | the vein, wait a little while. The patient lays |
| | 6 | on a table. There's a big disc that rotates |
| | 7 | around them that measures the amount of energy |
| | 8 | given off. |
| | 9 | We can use a computer to give us a |
| | 10 | computer picture of how much blood goes to |
| | 11 | different areas of the heart. So that would be |
| | 12 | the resting image. We do the stress image after |
| | 13 | that, either with exercise or with a medication, |
| | 14 | inject the same Cardiolite again, or the same |
| | 15 | substance again so that it measures the blood |
| | 16 | flow to the heart. Then we can compare the |
| | 17 | resting pictures to the stress pictures and see |
| | 18 | if there's any difference between blood flow at |
| | 19 | rest versus blood flow with stress. |
| | 20 | Q: Is that the primary thing that the nuclear |
| | 21 | perfusion study measures, the blood flow of the |
| | 22 | heart? |
| | 23 | A: It's relative blood flow, yes. |
| | 24 | Q: What does that mean? |
| | 25 | A: Relative blood flow? |

## Ganellen, Edward 2006-07-25

86:
1   Q: Yes.
2   A: We don't actually measure the -- you know,
3   I can't tell you that there's ten cc's of blood
4   going to the heart but I can tell you that one
5   area of the heart gets -- what you would hope to
6   see is that one area of the heart gets the same
7   amount of blood as any other area of the heart.
8   And the supposition is that if all the
9   heart gets the same amount of blood, there's no
10   blockage that is restricting flow.
11   If part of the heart doesn't get as much
12   Cardiolite we assume it's because there's
13   restriction of flow from a blockage.
14   Q: If you had a Cardiolite stress test or a
15   nuclear perfusion stress test as you've described
16   it, what would you look for if you were trying to
17   figure out if the patient is doing quite well?
18   A: We'd look at probably a totality of
19   things. So we would look -- if we do exercise, we
20   would look at how well and how long the exercise
21   is. We would look at his EKG for changes.
22   We'd -- with the Cardiolite, we can measure his
23   heart function, and we can look at any new areas
24   of blockage or any new areas of ischemia.
25   We can get an idea if he's had a heart

87:
1   attack, how big the heart attack, how much of the
2   heart muscle was involved, what was involved.
3   Q: Okay. I'd like to take a -- break that
4   down if you don't mind. So part of this nuclear
5   perfusion study or Cardiolite study that you do is
6   trying to determine how long the individual can
7   exercise?
8   A: Correct.
9   Q: And in that regard, I've heard the term
10   functional workload.
11   A: Yes.
12   Q: What does that mean?
13   A: We have a pretty good idea of how much --
14   because stress tests are done in a routine
15   fashion, we have a pretty good idea of how hard
16   somebody works based on how long they went on a
17   stress test.
18   Q: And so you compare what is expected of an
19   individual of that age in terms of how long they
20   can exercise against what they actually could
21   perform?
22   A: Right.
23   Q: And that's an important factor in
24   determining how well that patient is doing right
25   then and there?

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                                88

| | | |
|---|---|---|
| 88: | 1 | A: Right. Yes. |
| | 2 | Q: And it also can be indicative of his |
| | 3 | prognosis? |
| | 4 | A: It can have some -- you know, some |
| | 5 | determination. |
| | 6 | Q: It can be a part of the equation of the |
| | 7 | totality of the evidence, as you put it, in |
| | 8 | determining his prognosis? |
| | 9 | A: Yes. |
| | 10 | Q: Another part of that exercise you |
| | 11 | indicated is the EKG. And can you tell us what |
| | 12 | you're looking for in that regard? |
| | 13 | A: We monitor the heart tracing during |
| | 14 | exercise and look for changes, either heart |
| | 15 | rhythm changes or what are called ST segment |
| | 16 | changes that would suggest that part of the heart |
| | 17 | muscle is not getting blood. |
| | 18 | Q: And so on a nuclear perfusion report you |
| | 19 | would look to see whether the EKG was normal or |
| | 20 | not? |
| | 21 | A: Correct. |
| | 22 | Q: And if it was normal, that would be a good |
| | 23 | sign? |
| | 24 | A: Yes. |
| | 25 | Q: And that would be another indication that |
| 89: | 1 | right then and there, the patient was doing well? |
| | 2 | A: Yes. |
| | 3 | Q: And it would also be an indication as part |
| | 4 | of the evidence as to whether or not that patient |
| | 5 | has a good prognosis? |
| | 6 | A: Yes. |
| | 7 | Q: And then you mentioned heart function. |
| | 8 | What were you referring to there if we were going |
| | 9 | to look at a report of some sort of a Cardiolite |
| | 10 | study? |
| | 11 | A: We would typically measure the ejection |
| | 12 | fraction, the percentage of blood pumped with each |
| | 13 | beat. And we would be able to look, at least to |
| | 14 | some extent, for wall motion abnormalities, parts |
| | 15 | of the heart that aren't working. |
| | 16 | Q: And you mentioned ejection fraction is |
| | 17 | what you would look to if you were looking at |
| | 18 | heart function? |
| | 19 | A: That's a measure of total heart function. |
| | 20 | Q: And just so I'm understanding it, Mr. |
| | 21 | Nabers asked you some questions about whether or |
| | 22 | not when you have a heart attack, the heart is |
| | 23 | permanently damaged. Do you recall that line of |
| | 24 | questions? |
| | 25 | A: Yes. |

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3

90:
1  Q: You can have a very small amount of damage
2  to the heart and have a completely functioning --
3  normally functioning heart?
4  A: Yes.
5  Q: And the ejection fraction is one way that
6  cardiologists measure the function of the heart?
7  A: Yes.
8  Q: To determine whether it's functioning
9  normally or not?
10  A: Yes.
11  Q: And it can function normally even though
12  someone has had a heart attack and has some small
13  damage?
14  A: Yes.
15  Q: On the other hand, the ejection fraction
16  can show significant damage or lack of function?
17  A: Absolutely.
18  Q: You could have a 20 or 30 percent ejection
19  fraction then?
20  A: Yes.
21  Q: And what would that represent?
22  A: That would be significantly decreased
23  pumping function of the heart.
24  Q: And would that be a bad thing for a
25  patient?

91:
1  A: It would be a very bad thing.
2  Q: And why would that be a bad thing just to
3  put it in lay terms?
4  A: Their risk of dying with an ejection
5  fraction of 23 percent is significantly higher
6  than with a normal ejection fracture.
7  Q: And what is a normal ejection fraction in
8  connection with cardiac catheterization like the
9  one you performed?
10  A: Most people would say 55 percent or
11  greater.
12  Q: And what was Mr. Mason's on the day that
13  you took it?
14  A: I believe 60 percent.
15  Q: And so that indicated to you that his
16  heart overall was functioning normally?
17  A: Yes.
18  Q: Despite the fact that he had had a heart
19  attack?
20  A: Yes.
21  Q: And again we were talking -- and what is a
22  normal ejection fraction in connection with a
23  nuclear perfusion study?
24  A: Probably 50 percent.
25  Q: So that's again one of the elements you

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3

92

92:
1  would look to to determine if Mr. Mason or some
2  other patient was doing well on that day?
3  A: Yes.
4  Q: And had a good outlook and prognosis?
5  A: Yes.
6  Q: Long-term?
7  A: Yes.
8  Q: Then you indicated you would look for new
9  areas of blockage or ischemia?
10  A: Yes.
11  Q: You indicated that this nuclear perfusion
12  study that's available to cardiologists looks at
13  blood flow?
14  A: Yes.
15  Q: And therefore if there was some sort of
16  blockage or plaque that was impacting or
17  restricting blood flow, you would expect that that
18  would show up in the nuclear perfusion study?
19  A: Yes.
20  Q: And if it didn't show any areas of
21  blockage or ischemia, restriction of blood flow,
22  that would be a good thing?
23  A: Yes.
24  Q: And that would be an indication that the
25  patient was doing well on that day?

93:
1  A: Yes.
2  Q: And that he had a good prognosis?
3  A: Yes, I think with a normal perfusion
4  study, the risk for heart attack is like one
5  percent in the next year.
6  Q: And if you have a study that shows that
7  the functional workload -- in other words, he's
8  able to exercise longer than expected -- a normal
9  EKG, an ejection fraction well over 50 percent, in
10  the 55 percent range, say, and no new areas of
11  blockage or ischemia, that would indicate a very
12  good prognosis?
13  MR. NABERS: Objection to the form.
14  A: Yes.
15  Q: That's the gold standard in determining
16  prognosis? True?
17  MR. NABERS: Objection to the form.
18  A: It's one of them, yes.
19  Q: That's one of the things that you rely on
20  each and every day to determine how well your
21  patient is doing?
22  A: Yes.
23  Q: And how well you expect that patient to do
24  long-term?
25  A: Again, I mean the stress tests have a life

*Overruled*

93:6-12
Plaintiff's Obj.:
Ambiguous; complex;
compound;

Def's response:
This information
is basic
cardiology

93:15-16
Pl's Obj.:
Ambiguous; complex;
compound

93:19-21
Pl's Obj.:
Rule 401- Relevance

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                              94

| 94: | 1 | expectancy. So just because your brakes are |
|---|---|---|
| | 2 | working when you take them into the garage, that |
| | 3 | doesn't mean they're going to last forever, but |
| | 4 | for the foreseeable future, yes. |
| | 5 | Q: And go ahead and define foreseeable future |
| | 6 | for us given all of those results. |
| | 7 | MR. NABERS: Objection to the form. |
| | 8 | A: I think the best data for the stress test |
| | 9 | is for the year following the stress test. |
| | 10 | Q: And if you had a follow-up stress test, |
| | 11 | that would be true for the next year? |
| | 12 | A: Yes. |
| | 13 | Q: Okay. What is the most accurate test to |
| | 14 | determine how well the heart is functioning? |
| | 15 | A: For the injection fraction or for the -- |
| | 16 | Q: That's what I'm kind of asking. I mean, |
| | 17 | are you saying that you would want to look to the |
| | 18 | ejection fraction or calculate the ejection |
| | 19 | fraction in order to come up with the most |
| | 20 | accurate measurement of how well the heart is |
| | 21 | functioning? |
| | 22 | A: So if the question is, what's the most |
| | 23 | accurate way to get an ejection fraction -- |
| | 24 | Q: That's not my question. I'm saying -- |
| | 25 | back up a step. Understanding I'm not a |
| 95: | 1 | cardiologist, what tests would you want to do in |
| | 2 | order to accurately determine how well the heart |
| | 3 | is functioning? If it's the ejection fraction, |
| | 4 | that's fine. I just don't want to put words in |
| | 5 | your mouth. |
| | 6 | A: No, I think different tests have different |
| | 7 | strengths and weaknesses. So, I mean, if you want |
| | 8 | to know about the valves, probably the |
| | 9 | echocardiogram is the best way to look at the |
| | 10 | valves. If you want to know about the arteries |
| | 11 | going to the heart, then the angiogram is probably |
| | 12 | the best way to know about the arteries. |
| | 13 | There's a fair amount of pretty good data |
| | 14 | for prognostic follow-up after a Cardiolite scan. |
| | 15 | So, again, with a normal Cardiolite scan, a chance |
| | 16 | of heart attack in the next few years is thought |
| | 17 | to be under one percent, which is pretty darn |
| | 18 | good. |
| | 19 | **Q: What is the importance of an ejection** |
| | 20 | **fraction?** |
| | 21 | **A: Again, if you have a -- if you have** |
| | 22 | **decreased ejection fraction, your chance for** |
| | 23 | **sudden death or heart failure are both increased.** |
| | 24 | **Q: Say that again.** |
| | 25 | **A: If you have a decreased ejection fraction** |

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                           96

| 96: | | |
|---|---|---|
| | 1 | less than 40 percent, your chance of sudden death |
| | 2 | from heart failure is significantly increased. |
| | 3 | Q: Stated differently, if you have a normal |
| | 4 | ejection fraction, what does it indicate to you as |
| | 5 | a cardiologist? |
| | 6 | A: It means your chance for sudden death is |
| | 7 | relatively low. |
| | 8 | Q: And does it measure left ventricular |
| | 9 | function? |
| | 10 | A: Yes. |
| | 11 | Q: Is that the most important part of the |
| | 12 | heart function? I know that we don't want to get |
| | 13 | into -- |
| | 14 | A: Yes. |
| | 15 | Q: I'm not suggesting the other parts aren't |
| | 16 | important but is that the most important ones? |
| | 17 | A: You don't need the other ones. Yes, it's |
| | 18 | most important. |
| | 19 | Q: Is it the main pump for the heart? |
| | 20 | A: Yes. |
| | 21 | Q: Is that what you look to to measure the |
| | 22 | ability of the heart to pump blood and oxygen to |
| | 23 | the rest of the body? |
| | 24 | A: Yes. |
| | 25 | Q: Is it a way to determine how severe a |
| 97: | 1 | heart attack is? |
| | 2 | A: Yes. |
| | 3 | Q: Or has been? |
| | 4 | A: Yes. |
| | 5 | Q: Now, in connection with the stress test -- |
| | 6 | and let's assume that this is in connection with |
| | 7 | the perfusion study -- do you ever calculate |
| | 8 | what's called mets? |
| | 9 | A: We can, yeah. |
| | 10 | Q: Is that something that your office does |
| | 11 | routinely? |
| | 12 | A: I don't think we report that. |
| | 13 | Q: Is it indicated in your records when |
| | 14 | somebody performs a stress test? |
| | 15 | A: We have it in our chart. |
| | 16 | Q: Do you have it in your chart? |
| | 17 | A: Yeah, we have a chart of mets based on |
| | 18 | the -- based on level of stress, the level of the |
| | 19 | Bruce protocol completely, they can tell you how |
| | 20 | many mets they have done. |
| | 21 | Q: And just so the jury understands, the |
| | 22 | Bruce protocol is what you call the stress test; |
| | 23 | right? |
| | 24 | A: It's the standard stress test that most |
| | 25 | cardiologists use. |

*overruled* (handwritten)

97: 5 - 25
Pl's Obj:
Rule 401- relevance.

Def's response: Plaintiff
performed above average
on his post- MI stress
test which is relevant
to damages (applies to
98: 1- 4)

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                      98

98:1-4
PI's obj:
Rule 401 - relevance

Overruled

| 98: | | |
|---|---|---|
| | 1 | Q:  What is a patient required to do in |
| | 2 | connection with the Bruce protocol? |
| | 3 | A:  They walk on a treadmill with varying |
| | 4 | levels of speed and inclination of the treadmill. |
| | 5 | Q:  I recently had one. I think it would be |
| | 6 | helpful for the jury to really understand the |
| | 7 | speed and the levels that it goes through. Can |
| | 8 | you describe that or is your technician the best |
| | 9 | person to ask about that? |
| | 10 | A:  To give you really accurate numbers, I'd |
| | 11 | probably have to go back and look at a chart. But |
| | 12 | we start out at a very slow pace and a very mild |
| | 13 | incline, and every three minutes, it increases |
| | 14 | both pace and incline. |
| | 15 | Q:  Do you know what the various stages are, |
| | 16 | generally speaking? |
| | 17 | A:  You know, I'd probably be inaccurate. |
| | 18 | Q:  Is there a booklet or a pamphlet that |
| | 19 | describes that for the patients? |
| | 20 | A:  Sure. |
| | 21 | Q:  Can we get that at a break? |
| | 22 | A:  Sure. |
| | 23 | Q:  Now, what's -- I've heard the term Q-wave |
| | 24 | MI or heart attack versus a non Q-wave heart |
| | 25 | attack. |
| 99: | 1 | A:  The Q-wave refers to an EKG abnormality |
| | 2 | that is seen after heart attacks. |
| | 3 | Q:  And which one is worse in terms of |
| | 4 | severity of heart damage? |
| | 5 | MR. NABERS:  Objection to the form. |
| | 6 | Q:  Let me ask it a different way. |
| | 7 | A:  Yeah. |
| | 8 | Q:  I may be able to clean it up. |
| | 9 | A:  I mean, I think people have -- |
| | 10 | historically people have thought of Q-wave MIs as |
| | 11 | being larger. |
| | 12 | Q:  What does Q-wave MI mean? |
| | 13 | A:  The Q-wave again is an abnormal finding on |
| | 14 | an EKG. |
| | 15 | Q:  Is that another way of saying transmural |
| | 16 | heart attack? |
| | 17 | A:  Well, that's the whole problem is that we |
| | 18 | used to believe that Q-waves corresponded to |
| | 19 | transmural. And that does not -- that has not |
| | 20 | been confirmed on autopsy studies. So we got away |
| | 21 | from the transmural and started just describing |
| | 22 | what the EKG looks like. |
| | 23 | Q:  Okay. And what do you look at on an EKG |
| | 24 | to determine that? |
| | 25 | A:  If you looked at an EKG, you would see |

## Ganellen, Edward 2006-07-25

100:
1   that most of the, what are called the QRS
2   complexes go up rather than down. If you saw a
3   big down before they started going up, that's a
4   Q-wave.
5   Q: I see. You explained generally what
6   hypokinesis is. As I understand it, it's
7   diminished wall motion; is that right?
8   A: Yeah, decreased, like thickening wall
9   motion.
10   Q: And it is evidence of some damage?
11   A: Yes.
12   Q: But it can be compensated for by the
13   heart; true?
14   A: Yes.
15   Q: And you have to look at the severity of
16   it to determine if that's something that can
17   happen?
18   MR. NABERS: Objection to form.
19   Q: For any particular patient?
20   A: Well, I mean, a lot of it depends on what
21   the rest of the heart looks like, acts like.
22   Q: In other words, whether it's functioning
23   normally or not?
24   A: Well, if you have normal heart muscle
25   everywhere else and normal perfusion, you may be

101:
1   able to compensate. If you have bad blockages in
2   all your arteries, you probably won't be able to.
3   Q: For someone like Mr. Mason, you would
4   expect that he would be able to compensate for
5   it?
6   MR. NABERS: Objection to the form.
7   Q: True?
8   A: Probably.
9   Q: And if you looked at -- you would want to
10   look at follow-up studies, I would assume, to
11   confirm that?
12   A: Yes.
13   Q: And there are degrees of hypokinesis;
14   true?
15   A: Yes.
16   Q: There are mild, moderate and severe?
17   A: Yes.
18   Q: And the mild is indicative of little
19   damage; true?
20   A: Probably.
21   Q: And that's what you noted on your cardiac
22   catheterization of Mr. Mason on the day of his
23   heart attack?
24   A: Yes.
25   Q: And you can have a normally functioning

Printed: 10/3/2006   8:47:35AM

## Ganellen, Edward 2006-07-25

102:

1  heart with mild hypokinesis; true?
2  A: Yeah, particularly if it's a small area,
3  yes.
4  Q: And that's what you found in connection
5  with Mr. Mason?
6  A: Yes.
7  Q: And, likewise, you could have moderate or
8  severe damage?
9  A: Yes.
10  Q: And you would note that on the chart if
11  that was the case?
12  A: Yes.
13  Q: And you would expect more significant
14  issues for that patient if that were the case?
15  MR. NABERS: Objection to the form.
16  A: Yes.
17  Q: And what I mean by more significant
18  issues, I mean more significant health problems.
19  A: Yes.
20  Q: More significant heart problems?
21  A: Yes.
22  Q: As compared to people like Mr. Mason?
23  MR. NABERS: Objection to the form.
24  A: Yes.
25  Q: And that's why you noted the hypokinesis

103:

1  or damage to the heart as mild on the angiogram
2  that you prepared?
3  A: Yes.
4  Q: The report that you prepared?
5  A: Yes.
6  Q: Let's take a short break. And if you
7  could, get us one of those pamphlets if you don't
8  mind.
9  THE VIDEOGRAPHER: It's 27 minutes after
10  one o'clock. We're going off the record. This is
11  the end of tape No. 1.
12  (Recess taken from 1:27 to 1:34 p.m.)
13  (Deposition Exhibit No. 8 was marked.)
14  THE VIDEOGRAPHER: It's 34 minutes after
15  one o'clock. This is the beginning of tape No. 2.
16  We're back on the record.
17  Q: Doctor, Exhibit 8 I've marked, it's this
18  cross-section of the artery with atherosclerosis.
19  Do you recall talking about that?
20  A: Yes.
21  Q: Can you confirm that I've marked that as
22  Exhibit 8? You can look on the back of it.
23  A: I trust you, yes.
24  Q: And — just for the record. And is that
25  a true and accurate depiction that you use in

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3      104

104:
1 your office to describe atherosclerosis in
2 patients?
3 A: It's a schematic that we would use for
4 educational purposes, yes.
5 Q: And it's reliable for that purpose?
6 A: Yes.
7 Q: And for the purpose that we've used it for
8 in this deposition?
9 A: Yes.
10 Q: Now, if you could look at Exhibit 6, I
11 wanted to ask you some more specific questions
12 about your cardiac catheterization or angiogram.
13 And, by the way, cardiac catheterization is the
14 same thing as an angiogram? Or not?
15 A: Cardiac catheterization would be a subset
16 of angiogram.
17 Q: Okay.
18 A: So, you could do an angiogram in any
19 vessel. A cardiac catheterization is an angiogram
20 of the heart.
21 Q: And so this is an angiogram of the heart?
22 A: Yes.
23 Q: Exhibit 6?
24 A: Yes.
25 Q: Or — that's the report of the angiogram

105:
1 of the heart?
2 A: Yes.
3 Q: And how many have you performed in your
4 practice? Are we talking thousands or hundreds?
5 A: Yeah, about — I guess several thousand.
6 Q: Several thousand cardiac catheterizations?
7 A: Yes.
8 Q: And when do you perform cardiac
9 catheterizations, generally?
10 A: You mean on which patients or --
11 Q: For what reason, yeah.
12 A: Probably the most common reason would be
13 for patients with atherosclerosis, coronary
14 disease.
15 Q: And when you do those, do you find the
16 sorts of blockages that you see in Mr. Mason?
17 A: Yes.
18 Q: Is that something you routinely see in
19 your practice?
20 A: Yes.
21 Q: It's something that's not surprising?
22 A: No.
23 Q: You see that in patients who have never
24 taken VIOXX?
25 A: Yes.

Printed: 10/3/2006   8:47:35AM

*[handwritten annotations:]* Overruled

105: 23-24
Pl's obj:
cumulative

Def's response: none needed

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                    106

| 106: | 1 | Q: Routinely? |
|---|---|---|
| | 2 | A: Yes. |
| | 3 | Q: And you likewise see those sorts of |
| | 4 | blockages rupture and form a clot? |
| | 5 | A: Yes. |
| | 6 | Q: And as a result, result in a heart |
| | 7 | attack? |
| | 8 | A: Yes. |
| | 9 | Q: And, likewise, that occurs all the time |
| | 10 | in patients who are not taking VIOXX? |
| | 11 | MR. NABERS:  Objection to form. |
| | 12 | Q: You understand when I say all the time, it |
| | 13 | happens routinely in your practice? |
| | 14 | A: Yes. |
| | 15 | Q: How did Mr. Mason come to you? |
| | 16 | A: Bad luck, I think. |
| | 17 | Q: I mean, how was he referred to you? |
| | 18 | A: Well, I believe he was admitted to my |
| | 19 | partner, Dr. Zebrack, who I assume was on call. |
| | 20 | And then I was asked to do the angiogram as an |
| | 21 | interventionalist. |
| | 22 | Q: So is Dr. Zebrack an interventionalist? |
| | 23 | A: He is an invasive cardiologist but does |
| | 24 | not do intervention. So he does angiograms but |
| | 25 | doesn't place stents or balloons. |
| 107: | 1 | Q: And how long has he been a part of your |
| | 2 | practice? |
| | 3 | A: About four or five years. |
| | 4 | Q: And where did he — was he with another |
| | 5 | practice? |
| | 6 | A: He finished his training at the University |
| | 7 | of Utah and joined us after that. |
| | 8 | Q: Shortly thereafter? |
| | 9 | A: Yes. |
| | 10 | Q: Is he someone who has written a lot on |
| | 11 | cardiovascular issues? |
| | 12 | A: I believe he's published some papers but |
| | 13 | if you mean a lot, probably no. |
| | 14 | Q: Does he actually perform studies in |
| | 15 | connection with those papers, to your knowledge? |
| | 16 | A: He's involved in some clinical research, |
| | 17 | so I guess, yes. But he's primarily a practicing |
| | 18 | cardiologist rather than a research cardiologist. |
| | 19 | Q: Is he a well-respected cardiologist? |
| | 20 | A: Yes. |
| | 21 | Q: A reliable cardiologist? |
| | 22 | A: Yes. |
| | 23 | Q: As you are, I assume? |
| | 24 | A: I hope so. |
| | 25 | Q: I've seen your resume and it's quite |

*overruled*

106:9-10
Pl's obj:
cumulative

Def's response: none
needed

Printed: 10/3/2006   8:47:35AM

**Ganellen, Edward 2006-07-25**

108:
1 credentialed. You attended the University of
2 Michigan; is that right?
3 A: I did.
4 Q: And graduated in 1981?
5 A: I did.
6 Q: And you graduated with honors; is that
7 true?
8 A: Yes.
9 Q: Then your undergraduate degree is actually
10 in biology and psychology?
11 A: Yes.
12 Q: And then you went to the University of
13 Exeter, England?
14 A: That was part of my college experience.
15 Q: Okay. And what was that in connection
16 with?
17 A: That was my junior year of college.
18 Q: And your graduate education, you went to
19 the University of Illinois, Abraham Lincoln School
20 of Medicine; is that right?
21 A: Yes.
22 Q: And graduated in 1985?
23 A: Yes.
24 Q: And you completed your residency in 1988?
25 A: Yes.

109:
1 Q: And was that -- your residency in internal
2 medicine or cardiology?
3 A: That was internal medicine.
4 Q: And then is Michael Reese Medical Center
5 in Chicago?
6 A: It is.
7 Q: And is that where you grew up?
8 A: In Chicago, yes.
9 Q: And then you went to Emory University; is
10 that right?
11 A: Yes.
12 Q: And concluded your fellowship in
13 cardiology in 1991; is that right?
14 A: Yes.
15 Q: It says — your resume, Exhibit 2,
16 indicates, 'Including twelve months of cath, eight
17 months of echo and three months of transplant
18 service.' What does that mean?
19 A: You have different rotations or
20 responsibilities during your fellowship. So that
21 lists some of the things I did.
22 Q: And when you said twelve months of cath,
23 you mean twelve months of doing just the sort of
24 angiograms that you performed on Mr. Mason?
25 A: Yes.

## Ganellen, Edward 2006-07-25

110:
1  Q: And then you were also an assistant
2  professor of medicine at Emory University?
3  A: I was.
4  Q: For how long?
5  A: About a year.
6  Q: And you have hospital privileges at four
7  different hospitals in the Salt Lake City area?
8  A: It's probably more than that at this
9  point, but yes.
10 Q: At least that many?
11 A: Yes.
12 Q: It makes you a very busy man, I assume?
13 A: I don't go to most of them, but I have
14 privileges to go there if I need to.
15 Q: But in terms of the cardiac
16 catheterization that you did, first of all, you
17 recorded an ejection fraction percentage. What
18 was that on July 25th of 2003?
19 A: What was the number or what is the
20 ejection fraction?
21 Q: What was the percentage?
22 A: 60 percent.
23 Q: So that would indicate a normally
24 functioning heart, an overall normally functioning
25 heart in Mr. Mason on that date?

111:
1  A: Yes.
2  Q: And that's the kind of good finding that
3  you described earlier today in connection with
4  ejection fractions and cardiac catheterizations
5  that you would like to see?
6  A: Yes.
7  Q: You were happy to see that it was above 55
8  percent?
9  A: Yes.
10 Q: And I believe I asked you this, but is it
11 the gold standard to determine whether the heart
12 is functioning normally, that is, the ejection
13 fraction percentage?
14 A: That's an easily understandable number
15 that we can communicate between ourselves, so yes.
16 Q: And it's something you rely on in
17 communicating a patient's status or how well that
18 patient is doing when you're talking to
19 cardiologists?
20 A: Yes.
21 Q: And you rely on those sorts of numbers
22 each and every day --
23 A: Yes.
24 Q: -- in determining how well the heart is
25 functioning?

## Ganellen, Edward 2006-07-25

112: 1   A: Yes.
2   Q: And on that day, Mr. Mason's heart was
3   functioning normally?
4   A: Yes.
5   Q: And is that percentage before or after the
6   procedure?
7   A: After the stent, you mean?
8   Q: Yes.
9   A: I would guess before but I —
10   Q: I'm going to hand you another document.
11   A: It was before the stent.
12   Q: So, before you ever placed the stent that
13   opened up Mr. Mason's artery and before you
14   performed the angioplasty, his heart was
15   functioning normally?
16   A: Yes.
17   Q: Would you have also done or measured his
18   ejection fraction after that procedure?
19   A: We might or might not during his
20   hospitalization?
21   Q: I'm going to hand you what's been marked
22   as Exhibit 9 to your deposition.
23   (Deposition Exhibit No. 9 was marked.)
24   Q. And I'll give you a chance to review that
25   document. Can you tell the jury what that is?
113: 1   A: This is a flow sheet from his angiogram
2   and stent placement.
3   Q: If you turn to the second page of that
4   document -- and by the way, is this another report
5   describing the cardiac catheterization that you
6   did on July 25 of 2003?
7   A: This is more a procedure log than a
8   report.
9   Q: Okay. And do you see on the second page
10   in the upper right-hand corner, it says 77
11   percent?
12   A: Yeah. Yes.
13   Q: What does that represent?
14   A: I don't know.
15   Q: Is that -- it's under --
16   A: It's under EF.
17   Q: And just so the jury understands what
18   we're talking about, on Exhibit 9, which is
19   another description of the cardiac catheterization
20   or progress report -- I don't want to call it the
21   wrong thing -- of the procedure you performed, on
22   the second page, it says that the LV, or left
23   ventricular ejection fraction percentage is 77
24   percent. Is that right?
25   A: That's what it says, yes.

## Ganellen, Edward 2006-07-25

114:
1   Q:  And would that be his ejection fraction
2   after the procedure?
3   A:  I -- it's unusual for us to do two left
4   ventriculargrams in the same setting. So I would
5   think that would not be the case.
6   Q:  You believe that your report that you
7   signed that is Exhibit 6 is reliable for purposes
8   of his ejection fraction on the day that you
9   measured it?
10  A:  Yes.
11  Q:  That is the 60 percent number?
12  A:  Yes.
13  Q:  And you're just not sure -- we would have
14  to go elsewhere to determine what the 77 percent
15  figure is talking about?
16  A:  I mean this is filled out by the cath tech
17  so I'm not sure where that came from.
18  Q:  That's something that we would have to ask
19  that person who filled it out?
20  A:  Yes.
21  Q:  You can't speak to that today?
22  A:  I can't.
23  **Q:  And you noted mild anterolateral**
24  **hypokinesis present. Do you see that?**
25  **A:  Yes.**

115:
1   Q:  On Exhibit 6?
2   A:  On Exhibit 6, yes.
3   **Q:  And those are your words?**
4   **A:  Yes.**
5   **Q:  So you found a small -- or hypokinesis**
6   **present?**
7   MR. NABERS:  Objection to the form.
8   **Q:  Mild hypokinesis present?**
9   **A:  Mild, yes.**
10  Q:  And when I -- I said small, and I don't
11  want to mince words, but that's what I understood
12  you to describe that as.
13  MR. NABERS:  Objection to the form.
14  Q:  A small area of hypokinesis?
15  MR. NABERS:  Same objection.
16  A:  That's not necessarily true. So you could
17  have a large area that has mild hypokinesis or you
18  could have a small area that has severe
19  hypokinesis.
20  Q:  That makes more sense. Let me reask my
21  **question in light of that. It was a good thing**
22  **that the hypokinesis that you found in connection**
23  **with Mr. Mason's heart was mild?**
24  MR. NABERS:  Objection to the form.
25  **A:  Yes.**

### Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                                116

| 116: | | |
|---|---|---|
| | 1 | Q: Because as we indicated earlier, it could |
| | 2 | have been moderate or severe? |
| | 3 | A: Yes. |
| | 4 | Q: And it was mild together with a normal |
| | 5 | ejection fraction; true? |
| | 6 | A: Yes. |
| | 7 | Q: And that was a very good sign? |
| | 8 | MR. NABERS: Objection to form. |
| | 9 | A: Yes. Yes. |
| | 10 | Q: And why was that a very good sign? |
| | 11 | A: Again, prognostically, a normal ejection |
| | 12 | fraction is much more favorable. |
| | 13 | Q: Now, the blockage that you found and that |
| | 14 | you discussed with plaintiff's counsel was — one |
| | 15 | of the blockages was in the left anterior |
| | 16 | descending artery; is that right? |
| | 17 | A: Yes. |
| | 18 | Q: Could you describe for the jury where the |
| | 19 | left anterior descending artery is? |
| | 20 | A: The left anterior descending is the artery |
| | 21 | that runs right down the front of the heart. |
| | 22 | Q: Is it a significant artery? |
| | 23 | A: They're all significant. |
| | 24 | Q: Is it -- fair enough. Is it one of the |
| | 25 | more significant arteries? |
| 117: | 1 | A: Yes. |
| | 2 | Q: I've heard it described as the widow |
| | 3 | maker. Have you heard that? |
| | 4 | A: Typically a widow maker is a blockage in |
| | 5 | the left anterior descending before any of the |
| | 6 | major branches. |
| | 7 | Q: Is that what he had? |
| | 8 | A: It was kind of right at the major branch. |
| | 9 | Q: But, regardless, it's a significant artery |
| | 10 | where he had a 90 percent blockage? |
| | 11 | A: Yes. |
| | 12 | Q: And, likewise, you noted a 70 percent |
| | 13 | blockage on a branch of that same artery? |
| | 14 | A: Yes. |
| | 15 | Q: And it's called a diagonal branch? |
| | 16 | A: Yes. |
| | 17 | Q: And you performed a stent on the left |
| | 18 | anterior descending; true? |
| | 19 | A: Yes. |
| | 20 | Q: You placed a stent; is that right? |
| | 21 | A: Yes. |
| | 22 | Q: And the goal was to open up the vessel; is |
| | 23 | that right? |
| | 24 | A: Yes. |
| | 25 | Q: So blood could flow freely? |

### Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                    118

118:  1  A: Yes.
      2  Q: And that's exactly what happened?
      3  A: Yes.
      4  Q: And in connection with the angioplasty,
      5  the goal was to expand the arteries so that blood
      6  could flow freely?
      7  A: Yes.
      8  Q: And that's exactly what happened?
      9  A: Yes.
     10  Q: So, at the conclusion of your cardiac
     11  catheterization, stent placement and angioplasty,
     12  Mr. Mason's arteries were wide open and able to
     13  allow blood to flow freely?
     14  A: Yes.
     15  Q: And that's exactly what you hoped for?
     16  A: Yes.
     17  Q: Now, you mentioned that thrombus was
     18  present before the procedure. Do you recall that?
     19  A: That's what we said, yes.
     20  Q: Was that a presumption or did you actually
     21  see it?
     22  A: When I reviewed his angiogram most
     23  recently, I have to admit, I was less impressed
     24  with thrombus than I was before, from what I said
     25  on the report. So I --
119:  1  Q: Let me ask it a different way.
      2  A: Sometimes --
      3  Q: My understanding -- go ahead.
      4  A: Sometimes we can see what seems to be
      5  pretty clearly thrombus. I don't know that we saw
      6  that as clearly as I described.
      7  Q: You believed that Mr. Mason's heart attack
      8  was in all likelihood caused by thrombus --
      9  (Interference from P.A. system.)
     10  Q. Start over after this is over.
     11  Is it fair to say that you believe that
     12  Mr. Mason's heart attack was caused by a thrombus
     13  or clot in one or both of the left anterior
     14  descending, or the diagonal branch, you believe
     15  that's the most likely cause, but you didn't see
     16  it on the angiogram; is that fair?
     17  A: Well, I said I saw it the first time. The
     18  second time, I don't think I saw it as clearly.
     19  Q: So you may have seen it at the time but
     20  have trouble seeing it now?
     21  A: Yeah. I mean, maybe it was -- I mean,
     22  maybe it was seeing it on a little computer
     23  instead of seeing it on the screen, too.
     24  Q: I see. Okay. So, you're fairly certain
     25  that there was a thrombus at one or both of the

*Overruled*

119:11-18
Pl's obj:
Ambiguous;
multifactorial
question.

Def's response:
none needed

### Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                                                 120

| 120: | 1 | left anterior descending and the diagonal branch? |
|---|---|---|
| | 2 | A: Fairly certain. |
| | 3 | Q: Okay. And -- meaning a clot? |
| | 4 | A: Yes. |
| | 5 | Q: And that was not something that was |
| | 6 | unusual in terms of what you see in other -- in |
| | 7 | other typical patients? |
| | 8 | MR. NABERS: Objection to the form. |
| | 9 | A: Not with a heart attack. |
| | 10 | Q: Presenting with conditions like Mr. Mason? |
| | 11 | A: Correct. |
| | 12 | Q: Let me rephrase it just because it was |
| | 13 | poorly worded. You didn't find it unusual to see |
| | 14 | a thrombus or a clot or the blockages that we've |
| | 15 | discussed in a patient like Mr. Mason who had |
| | 16 | presented with a heart attack? |
| | 17 | A: I did not. |
| | 18 | Q: This was not an unusual patient for you? |
| | 19 | A: No. |
| | 20 | Q: There were no markers of any sort that |
| | 21 | you saw that indicated or suggested that VIOXX |
| | 22. | had anything to do with Mr. Mason's heart attack? |
| | 23 | A: That's correct. |
| | 24 | Q: You didn't write in the chart that you |
| | 25 | thought that VIOXX caused Mr. Mason's heart |
| 121: | 1 | attack; true? |
| | 2 | MR. NABERS: Objection to form. |
| | 3 | A: That is true. |
| | 4 | Q: Have you ever heard of adverse event |
| | 5 | reports? |
| | 6 | A: Yes. |
| | 7 | Q: Those are reports or calls that you can |
| | 8 | make to pharmaceutical companies to let them know |
| | 9 | of any concerns that you may or may not have; |
| | 10 | true? |
| | 11 | A: Yes. |
| | 12 | Q: And you did not call Merck in connection |
| | 13 | with Mr. Mason? |
| | 14 | A: I did not. |
| | 15 | Q: You did not call them and indicate or |
| | 16 | suggest to them that his heart attack had anything |
| | 17 | to do with VIOXX; true? |
| | 18 | A: That is true. |
| | 19 | Q: If you thought that, you would have made |
| | 20 | that call? |
| | 21 | MR. NABERS: Objection to the form. |
| | 22 | A: Yes. |
| | 23 | Q: And you did not? |
| | 24 | A: I did not. |
| | 25 | MR. NABERS: Objection to the form. |

Overruled

120:20-25
Pl's obj:
Ambiguous;
Multi-factorial
question.

Def's response: Testimony
reflects witness' assessment
during the time he
treated plaintiff

121:19-20
Pl's obj:
Speculation

121:23-24
Pl's obj: Speculation

Printed: 10/3/2006   8:47:35AM

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3     122

| 122: | 1 | A: I did not. |
|---|---|---|
| | 2 | Q: Do you consider the stenosis or blockages |
| | 3 | found in connection with the angiogram that you |
| | 4 | performed reflected by Exhibit 6 to be severe |
| | 5 | coronary artery disease? |
| | 6 | A: Yes. |
| | 7 | Q: Now, in looking through the chart, I think |
| | 8 | that Mr. Mason was discharged on July 27th; is |
| | 9 | that correct? |
| | 10 | A: What if I take your word for it? There |
| | 11 | should be a discharge summary in here. |
| | 12 | A. Yeah, it looks like he went home on the |
| | 13 | 12th. |
| | 14 | Q: That was only two days after he presented; |
| | 15 | true? |
| | 16 | A: Yes. |
| | 17 | Q: That means that two days after he came to |
| | 18 | the hospital? |
| | 19 | A: Yes. |
| | 20 | Q: And so he was treated in a manner that |
| | 21 | allowed him to go home fairly shortly after his |
| | 22 | heart attack? |
| | 23 | A: Yes. |
| | 24 | Q: And that's not always true, is it? |
| | 25 | A: No. |
| 123: | 1 | Q: For moderate heart attacks even, as |
| | 2 | opposed to mild, the hospital course can be |
| | 3 | longer? |
| | 4 | MR. NABERS: Objection to the form. |
| | 5 | A: Yes. |
| | 6 | Q: But this was a mild heart attack; true? |
| | 7 | MR. NABERS: Objection to the form. |
| | 8 | A: Yes. |
| | 9 | Q: What was the answer? I'm sorry. |
| | 10 | A: Yes. |
| | 11 | Q: And he recovered to the point where he |
| | 12 | could go home two days later? |
| | 13 | A: Yes. |
| | 14 | Q: And you didn't place him on any |
| | 15 | restrictions in connection with his getting |
| | 16 | released from the hospital; is that right? |
| | 17 | A: I don't think I discharged him. |
| | 18 | Q: So, we'd have to ask somebody else that |
| | 19 | question? |
| | 20 | A: Yes. I mean, we generally would not just |
| | 21 | let somebody resume all activities right after a |
| | 22 | heart attack. |
| | 23 | Q: But, regardless, we might see that in his |
| | 24 | medical records if there were restrictions? |
| | 25 | A: Yeah, should be on his discharge. |

Printed: 10/3/2006   8:47:35AM

**Ganellen, Edward 2006-07-25**

Ganellen PA PC DA DC on 10-3                                    124

| 124: | | |
|---|---|---|
| | 1 | Q: That's something you would expect the |
| | 2 | hospital to note if there are any restrictions? |
| | 3 | A: Yes. |
| | 4 | Q: And I'm not — you don't need to do our |
| | 5 | research for us, but that's something we can look |
| | 6 | at and determine from the records; true? |
| | 7 | A: Yeah, it should be on his discharge paper |
| | 8 | what his activity was. |
| | 9 | Q: I'm going to move along here so that we |
| | 10 | don't — I know that you may have some time |
| | 11 | limitations today, so — or at least somebody has |
| | 12 | indicated that. |
| | 13 | A: I have a very short attention span. |
| | 14 | Q: That, I don't believe. |
| | 15 | (Deposition Exhibit No. 10 was marked.) |
| | 16 | **Q. I'm going to hand you what's been marked** |
| | 17 | **as Exhibit 10.** |
| | 18 | **Is this the — first of all, have you seen** |
| | 19 | **this record before?** |
| | 20 | **A: I have not.** |
| | 21 | Q: I'll represent to you that this was a |
| | 22 | nuclear perfusion study performed by Dr. Symkoviak |
| | 23 | on Mr. Mason on August 13 of 2003. Could you take |
| | 24 | a moment just to review it? |
| | 25 | A: You gave me an angiogram. |
| 125: | 1 | Q: I'm sorry. Let me strike that and |
| | 2 | **rephrase it. I'll represent to you that this is** |
| | 3 | **a report from an angiogram performed by Dr.** |
| | 4 | **Symkoviak on August 13 of 2003 on Mr. Mason,** |
| | 5 | **which would be like two weeks after you saw him;** |
| | 6 | **true?** |
| | 7 | **A: Yes. Uh-huh.** |
| | 8 | **Q: And could you go ahead and read that? Not** |
| | 9 | **in the record but just to yourself just to** |
| | 10 | **familiarize yourself with it.** |
| | 11 | **A: Uh-huh. Okay.** |
| | 12 | **Q: Okay. So, this is a repeat angiogram on** |
| | 13 | **Mr. Mason; true?** |
| | 14 | **A: Yes.** |
| | 15 | **Q: And it indicates that there was an** |
| | 16 | **ejection fraction at the time of 69 percent;** |
| | 17 | **true?** |
| | 18 | **A: Yes.** |
| | 19 | **Q: And again that would be a perfectly normal** |
| | 20 | **heart in terms of function according to the** |
| | 21 | **ejection fraction?** |
| | 22 | MR. NABERS: Objection to the form. |
| | 23 | **A: Globally, yes.** |
| | 24 | **Q: When we say global normal, that's what you** |
| | 25 | **would hope for in looking at the ejection** |

Printed: 10/3/2006   8:47:35AM

*(handwritten notes in right margin:)*

overrule

124:16-20
Pl's Obj:
Rule 401 - relevance;
foundation; cumulative

125:2-25
Pl's objection:
Rule 401 - relevance;
cumulative; foundation

Def's response: witness
performed the interventional
procedures in July 2003
that opened plaintiff's
clogged arteries and these
questions establish the
ongoing success of those
procedures (response
applies to objections
through page 140)

**Ganellen, Edward 2006-07-25**

126:

| | |
|---|---|
| 1 | fraction? |
| 2 | A: Yes. |
| 3 | Q: That's a good sign that it's at 69 |
| 4 | percent? |
| 5 | A: Yes. |
| 6 | Q: And you see where it says 'There was a |
| 7 | very small anterior hypokinetic segment but the |
| 8 | overall ejection fraction was normal at 69 |
| 9 | percent'? |
| 10 | A: Yes. |
| 11 | Q: Did I read that correctly? |
| 12 | A: Yes. |
| 13 | Q: Why is it important for cardiologists to |
| 14 | view those two things in that nature? |
| 15 | A: I think the small anterior hypokinetic |
| 16 | area says that he has some damage but that again |
| 17 | globally, his heart function is still normal. |
| 18 | Q: And that's what you would hope for? |
| 19 | A: Right. |
| 20 | Q: And would you agree that this -- that what |
| 21 | you saw was a small hypokinetic feature in the |
| 22 | hospital? |
| 23 | A: I mean, I'd have to see his -- I'd have to |
| 24 | see my angiogram to tell you for sure. Our |
| 25 | computer doesn't tell us small or -- it just -- |

127:

| | |
|---|---|
| 1 | Q: Mild? |
| 2 | A: Mild, moderate or severe. |
| 3 | Q: I see what you're saying. Okay, so -- |
| 4 | A: Our computer report. Let me rephrase |
| 5 | that. |
| 6 | Q: So what you're saying is that you reported |
| 7 | mild and you're confident that it was mild? |
| 8 | A: Yes. |
| 9 | Q: That is, the hypokinesis or the damage |
| 10 | that you saw? |
| 11 | A: Yes. |
| 12 | Q: And here another cardiologist is saying, |
| 13 | not only is it mild but it's small? |
| 14 | A: Yes. |
| 15 | Q: And is this the type of record, Exhibit 9, |
| 16 | that you rely on routinely in your practice? |
| 17 | A: Yes. |
| 18 | Q: Do you know Dr. Symkoviak? |
| 19 | A: I do. |
| 20 | Q: Have you relied on his reports previously? |
| 21 | A: Yes. |
| 22 | Q: So would you conclude that this mild |
| 23 | hypokinesis was in fact a small feature in |
| 24 | connection with this angiogram done on August |
| 25 | 13th? |

*Handwritten annotations:*

126:1-19
Pl's obj:
Rule 401 - relevance;
foundation; cumulative

Overruled

127:6-25
Pl's obj:
Rule 401 - relevance;
cumulative;
foundation.

**Ganellen, Edward 2006-07-25**

Ganellen PA PC DA DC on 10-3

128

| 128: | | |
|---|---|---|
| | 1 | MR. NABERS: Objection to the form. |
| | 2 | A: Yes. |
| | 3 | Q: You can answer. |
| | 4 | A: Yes. |
| | 5 | Q: Do you feel like that's a reliable |
| | 6 | opinion? |
| | 7 | A: Yes. |
| | 8 | Q: And it says that there's no major stenotic |
| | 9 | lesions seen. Do you see that? |
| | 10 | A: Yes. |
| | 11 | Q: There's a stent in one vessel, it |
| | 12 | indicates, does it not? |
| | 13 | A: He says in the diagonal. |
| | 14 | Q: That's not accurate, I guess, is it? |
| | 15 | A: I don't think so. |
| | 16 | Q: But, regardless, there is a stent in one |
| | 17 | vessel? |
| | 18 | A: Yes. |
| | 19 | Q: And this is just the sort of repeat |
| | 20 | angiogram that you would hope for in a patient |
| | 21 | like Mr. Mason? |
| | 22 | A: I would hope they didn't have a repeat |
| | 23 | angio, but if he had one, this would be nice. |
| | 24 | Q: Yeah. I mean if you could look inside the |
| | 25 | man's heart two weeks later, this is what you |
| 129: | 1 | would hope to find? |
| | 2 | A: Yes. |
| | 3 | Q: Because it means the vessels are wide |
| | 4 | open; true? |
| | 5 | A: Yes. |
| | 6 | Q: And freely flowing? |
| | 7 | A: Yes. |
| | 8 | Q: And the ejection fraction is better than |
| | 9 | it was when you measured it? |
| | 10 | A: Yeah. I mean there's probably some |
| | 11 | variability in measuring, too, but -- |
| | 12 | Q: So it could be 60 to 69 percent? |
| | 13 | A: Certainly no worse, yeah. |
| | 14 | Q: And it would indicate a normally |
| | 15 | functioning heart? |
| | 16 | A: Yes. |
| | 17 | Q: And we will mark this as Exhibit 11. |
| | 18 | (Deposition Exhibit No. 11 was marked.) |
| | 19 | Q. And I'll give you a chance to review that. |
| | 20 | Okay? |
| | 21 | A: Okay. |
| | 22 | Q: I notice you looked curious about it, |
| | 23 | about something. What -- |
| | 24 | A: No, I -- it sounds like we did a good job. |
| | 25 | Q: Why do you say that? |

*Handwritten annotations:*

128:2-7
Pl's obj:
Rule 401 – relevance;
foundation; cumulative

Overruled

128:19 – 130:24
Rule 401 – relevance;
cumulative; foundation

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                    130

130:

| | |
|---|---|
| 1 | A: Based on their report, he had -- they |
| 2 | could not even see any damage. They saw normal |
| 3 | wall motion, no ejection fraction. |
| 4 | Q: So -- and this is a -- just to make sure |
| 5 | the jury understands what you're looking at, |
| 6 | you're looking at Exhibit 11? |
| 7 | A: Yes. |
| 8 | Q: Which is a Cardiolite Perfusion Stress |
| 9 | Test; true? |
| 10 | A: Yes. |
| 11 | Q: That was performed by Dr. Keep? |
| 12 | A: Yes. |
| 13 | Q: Another cardiologist in Dr. Symkoviak's |
| 14 | practice? |
| 15 | A: Yes. |
| 16 | Q: You're familiar with Dr. Keep? |
| 17 | A: I am. |
| 18 | Q: Do you find him to be a reliable |
| 19 | cardiologist? |
| 20 | A: Yes. |
| 21 | Q: He's respected in this area? |
| 22 | A: Yes. |
| 23 | Q: In the Utah area? |
| 24 | A: Yes. |
| 25 | Q: And I assume otherwise? Or maybe -- |

131:

| | |
|---|---|
| 1 | A: We're probably not nationally known. |
| 2 | Q: But, regardless, he's a well-respected |
| 3 | Utah cardiologist? |
| 4 | A: Yes. |
| 5 | Q: And it indicates, this perfusion study, |
| 6 | there were a number of things that you talked |
| 7 | about earlier about what you would want to see in |
| 8 | a perfusion study. Do you recall that? |
| 9 | A: Yes. |
| 10 | Q: You talked about first, I believe, how |
| 11 | long the patient is able to exercise. |
| 12 | A: Correct. |
| 13 | Q: I think we talked about that in terms of |
| 14 | functional workload. |
| 15 | A: Yes. |
| 16 | Q: Do you see that the patient exercised -- |
| 17 | that is, Mr. Mason exercised for eleven minutes on |
| 18 | the Bruce protocol? |
| 19 | A: Yes. |
| 20 | Q: And do you see the next sentence where it |
| 21 | says 'The normal exercise time for this age is |
| 22 | eight minutes and 20 seconds'? |
| 23 | A: Yes. |
| 24 | Q: So he actually exercised some two minutes |
| 25 | and 40 seconds longer than expected? |

*Handwritten annotations:*

130:1-24
Pl's objection:
Rule 401 - relevance;
cumulative; foundation

Overruled

131:5-25
Pl's obj:
Rule 401 - relevance;
cumulative; foundation

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                          132

132:
1   A: Yes.
2   Q: That's a very good result?
3   A: Yes.
4   Q: Is that a very good result?
5   A: Yes.
6   Q: And it says, 'The patient had a negative
7   30 percent functional aerobic impairment.' That
8   means it's 30 percent better than expected; true?
9   A: Yes.
10  Q: That's a very good result; true?
11  A: Yes.
12  Q: Then it says, 'The EKG,' which is another
13  indication you thought was important to look at in
14  terms of prognosis --
15  A: Yes.
16  Q: -- it says, 'The EKG had no ST changes,'
17  which is what you referenced in connection with
18  the EKG, I think.
19  A: Yes.
20  Q: It says 'Had no ST changes to suggest
21  ischemia.' Did I read that correctly?
22  A: Yes.
23  Q: And that's a very good thing?
24  MR. NABERS: Objection to the form.
25  A: Yes.

133:
1   Q: Is that a good thing for Mr. Mason?
2   A: Yes.
3   Q: Is that a positive outcome for Mr. Mason?
4   A: Yes.
5   Q: Is that exactly what you would hope for in
6   a patient like Mr. Mason?
7   A: Yes.
8   Q: And then it says, 'The blood pressure
9   response during exercise was normal.' Do you see
10  that?
11  A: Yes.
12  Q: And that is a good thing for Mr. Mason?
13  A: Yes.
14  Q: It's a positive outcome?
15  A: Yes.
16  Q: Indicative of a good prognosis?
17  A: Yes.
18  Q: All of these things; true?
19  A: Yes.
20  MR. NABERS: I need to object to that last
21  question. Sorry.
22  Q: All of the items we've discussed in
23  connection with Exhibit 11 have been positive for
24  purposes -- in terms of outcome for Mr. Mason;
25  true?

132:1-25
Pl's Obj:
Rule 401 - relevance, cumulative,
foundation

Overrule

133:1-17
Pl's Obj:
Rule 401; cumulative;
foundation

133:22-25
Pl's Obj:
Rule 401; cumulative;
foundation

Printed: 10/3/2006   8:47:35AM

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                    134

| 134: | | |
|---|---|---|
| | 1 | A: Yes. |
| | 2 | Q: The rhythm during exercise was normal. |
| | 3 | That was something you indicated you would look |
| | 4 | at, I believe. |
| | 5 | A: Yes. |
| | 6 | Q: And that's positive? |
| | 7 | A: Yes. |
| | 8 | Q: And the patient had no chest pain during |
| | 9 | exercise; true? |
| | 10 | A: True. |
| | 11 | Q: According to this report? |
| | 12 | A: Right. |
| | 13 | Q: And that's very positive? |
| | 14 | A: Yes. |
| | 15 | Q: That means that there were no signs of |
| | 16 | angina or other chest pain? |
| | 17 | A: Correct. |
| | 18 | Q: And that would otherwise be indicative |
| | 19 | possibly of atherosclerosis or plaque build-up? |
| | 20 | A: Correct. |
| | 21 | Q: And then it indicates an ejection |
| | 22 | fraction, 55 percent. And I think you indicated |
| | 23 | on nuclear perfusion studies that 50 percent |
| | 24 | was -- and higher -- was normal; correct? |
| | 25 | A: Yes. |
| 135: | 1 | Q: So again we had a normal ejection fraction |
| | 2 | number? |
| | 3 | A: Yes. |
| | 4 | Q: Meaning a normal overall function of the |
| | 5 | heart? |
| | 6 | A: Yes. |
| | 7 | Q: And then it says, 'EKG summary: |
| | 8 | Non-ischemic ECG changes.' Do you see that? |
| | 9 | A: Yes. |
| | 10 | Q: What does that mean? |
| | 11 | A: Again, no -- none of the ST changes after |
| | 12 | exercise or with exercise. |
| | 13 | Q: And then it says, 'Stress Cardiolite |
| | 14 | summary: Normal stress myocardial perfusion |
| | 15 | study.' Did I read that correctly? |
| | 16 | A: Yes. |
| | 17 | Q: So this was a normal study? |
| | 18 | A: Yes. |
| | 19 | Q: In every way? |
| | 20 | A: That's what it said. |
| | 21 | Q: And it says 'Normal global and regional LV |
| | 22 | function.' Do you see that? |
| | 23 | A: Yes. |
| | 24 | Q: They're not even noting any sort of |
| | 25 | hypokinesis at this stage? |

Printed: 10/3/2006   8:47:35AM

134:1-25
P's objection:
Rule 401; foundation;
Cumulative

Overruled

135:1-23
P's Obj:
Rule 401; cumulative;
foundation

## Ganellen, Edward 2006-07-25

136:  1    MR. NABERS:  Objection to the form.
      2    Q:  True?
      3    A:  True.
      4    Q:  Well, just to be clear, if there were
      5    hypokinesis of any sort that were noted by Dr.
      6    Keep, it should be reflected in this report,
      7    true?
      8    A:  It should be, yes.
      9    Q:  And do you see any indication or
      10   suggestion that he found any hypokinesis?
      11   A:  No.
      12   Q:  Or any problems with the heart in terms of
      13   functioning or otherwise?
      14   A:  No.
      15   Q:  Or any indication that -- let me ask a
      16   different question. You earlier indicated that
      17   the heart can compensate at times when it's been
      18   damaged?
      19   A:  Yes.
      20   Q:  And could you explain again to the jury
      21   what you meant by that? I think you said it could
      22   completely compensate in certain patients, but if
      23   I'm wrong, tell me where I'm wrong and just tell
      24   us what you meant by that.
      25   A:  Well, I don't remember exactly what we

137:  1    were talking about before, but some people will
      2    have different areas of the heart muscle work
      3    harder to make up for an area of the heart muscle
      4    that is not working.
      5    Some people, if they have a very small
      6    heart attack and it has not become a transmural,
      7    meaning a full thickness of the heart muscle, some
      8    of -- if it is not transmural, there is still
      9    living heart muscle in the distribution of the
      10   heart, and that heart muscle may improve over
      11   time.
      12   So, according to this, it says that his
      13   heart muscle -- that the area of damaged heart
      14   muscle has recovered.
      15   Q:  Fully recovered?
      16   A:  That's what they say.
      17   Q:  What would that mean in a patient like
      18   Mr. Mason?
      19   A:  It means he had a pretty small heart
      20   attack.
      21   Q:  Is that consistent with your findings on
      22   the angiogram?
      23   A:  Yeah. Yes.
      24   Q:  Is that consistent with the repeat
      25   angiogram that was performed two weeks later?

136:4-25
Pl's obj:
Rule 401; Cumulative;
foundation

Overruled

137:1-25
Pl's obj:
Rule 401; Cumulative;
foundation

Printed: 10/3/2006   8:47:35AM

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                    138

| 138: | | |
|---|---|---|
| | 1 | A: Yes. |
| | 2 | Q: Is it consistent with Exhibit 11, the |
| | 3 | perfusion study, that was performed some four and |
| | 4 | a half months post event? |
| | 5 | A: Yes. |
| | 6 | Q: Have you seen any indication that it was |
| | 7 | anything other than a mild heart attack? |
| | 8 | A: No. |
| | 9 | Q: Have you seen any indication that he |
| | 10 | hasn't fully recovered so far? |
| | 11 | A: No. |
| | 12 | Q: Would you expect the best of prognoses for |
| | 13 | Mr. Mason given what you've seen? |
| | 14 | MR. NABERS: Objection to form. |
| | 15 | A: I mean -- |
| | 16 | Q: Given that he had a small heart attack? |
| | 17 | A: I mean his prognosis is not as good as |
| | 18 | someone who's never had trouble with their heart, |
| | 19 | but for someone who's had a heart attack, his |
| | 20 | prognosis is pretty good. |
| | 21 | Q: It's as good as you could possibly have in |
| | 22 | a patient who's had a small heart attack?? |
| | 23 | A: Probably as good as it gets. |
| | 24 | Q: Would you place Mr. Mason on any |
| | 25 | restrictions at all based upon what you've seen |
| 139: | | today? |
| | 1 | A: Based on his last stress test results, |
| | 2 | no. |
| | 3 | Q: And you would expect his mets, that is, |
| | 4 | the measurement that is performed on a heart |
| | 5 | attack patient, to be quite high in Mr. Mason |
| | 6 | given what be performed in October of 2003? |
| | 7 | MR. NABERS: Objection to the form. |
| | 8 | A: Yes, at that time. |
| | 9 | Q: Would you -- do you see any reason at all |
| | 10 | that Mr. Mason can't hike? |
| | 11 | MR. NABERS: Objection to the form. |
| | 12 | Q: With what you've seen? |
| | 13 | A: Not based on his stress test. |
| | 14 | Q: Do you see anything at all in the records |
| | 15 | which indicates or suggests he can't golf? |
| | 16 | MR. NABERS: Objection to the form. |
| | 17 | A: Now, golfing is a different matter. |
| | 18 | Q: I didn't say well. |
| | 19 | A: Okay. No, I don't. I'm sorry. |
| | 20 | Q: I can't golf well either. But do you see |
| | 21 | anything in the records that indicates or suggests |
| | 22 | that he can't participate in golfing? |
| | 23 | A: No. |
| | 24 | Q: Or in going out and playing 18 holes when |

Handwritten annotations:

138:1-5
Pl's obj:
Rule 401; cumulative;
foundation

Overruled

139:4-7
Pl's objection:
No foundation; Rule 401;
Speculation

## Ganellen, Edward 2006-07-25

140:
1   he wants to?
2   A: No.
3   Q: Do you see anything in the record that
4   indicates or suggests that he can't play with his
5   grandkids as much as he would like?
6   A: No.
7   Q: Do you see anything in the record that
8   indicates or suggests that he can't have normal
9   sexual relations?
10  MR. NABERS: Objection to the form.
11  A: No.
12  Q: Do you see any indication in the record
13  which indicates or suggests that he can't hunt?
14  MR. NABERS: Objection to the form.
15  A: No.
16  Q: Or that he can't walk long distances?
17  MR. NABERS: Objection to the form.
18  A: No.
19  Q: Or that he can't hike or walk in the
20  mountains?
21  MR. NABERS: Objection to the form.
22  A: No.
23  Q: Now you understand that all medications
24  carry some risks; true?
25  A: Absolutely.

141:
1   Q: Some carry the risk of death; true?
2   A: Yes.
3   Q: I'm not talking about VIOXX, I'm just
4   talking about, there's a lot of medications out
5   there that doctors prescribe every day knowing
6   that there are some significant risks.
7   A: Yes.
8   Q: And the reason is because when you balance
9   the benefits of a medication versus the risks, a
10  doctor has to decide whether those benefits
11  outweigh the risks.
12  A: Yes.
13  Q: And if they do, then even if there's a
14  small chance of a significant bad result, it may
15  be something that the patient needs anyway?
16  A: Yes.
17  Q: For example, the polio vaccine carries
18  risks; true?
19  A: Yes.
20  Q: Birth control pills carry risk?
21  A: Yes.
22  Q: What do birth control -- what sort of
23  risks do birth control pills carry?
24  A: I believe there's a bunch of debate about
25  breast cancer, but probably the most pressing

Handwritten note:
140:1-22
Pl's obj:
No foundation;
Speculation.

Overruled

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                                142

| 142: | | |
|---|---|---|
| | 1 | concern is for increased clot. |
| | 2 | Q: Increased what? |
| | 3 | A: Clot. |
| | 4 | Q: Clotting that leads to heart attacks? |
| | 5 | A: More clotting -- well it can lead to heart |
| | 6 | attacks but more commonly with blood clots in the |
| | 7 | legs or the lungs. |
| | 8 | Q: Did you ever take VIOXX? |
| | 9 | A: No. |
| | 10 | MR. NABERS: Objection to the form. |
| | 11 | A: Actually, I'm not sure about that. I |
| | 12 | don't think so, though. |
| | 13 | Q: Now, I assume that you receive health care |
| | 14 | provider letters from pharmaceutical companies |
| | 15 | routinely? |
| | 16 | A: I do. |
| | 17 | Q: Generally speaking, those are updates |
| | 18 | about safety or efficacy; true? |
| | 19 | A: Yes. |
| | 20 | Q: Those are important documents for you to |
| | 21 | read when you receive them? |
| | 22 | A: Yes. |
| | 23 | Q: It's important that your partners do the |
| | 24 | same? |
| | 25 | MR. NABERS: Objection to the form. |
| 143: | 1 | A: Yes. |
| | 2 | Q: And I know it's been a long time since |
| | 3 | VIOXX was on the market, since '04, 2004, but if |
| | 4 | the records indicate that you did receive |
| | 5 | literature about a study called Vigor, you |
| | 6 | wouldn't -- you don't deny ever having seen any |
| | 7 | sort of information about Vigor, do you? |
| | 8 | MR. NABERS: I need to object to what |
| | 9 | you're asking him to assume and to the form of the |
| | 10 | question. |
| | 11 | Q: Well let me reask it because it's probably |
| | 12 | poorly worded. Mr. Nabers asked you a few minutes |
| | 13 | ago about whether or not Merck ever sent you any |
| | 14 | literature about VIOXX and cardiovascular risk. |
| | 15 | Do you recall that? |
| | 16 | A: I remember the question. |
| | 17 | Q: I think you said, I just don't recall. |
| | 18 | A: I don't think I -- I don't recall having |
| | 19 | seen -- |
| | 20 | Q: You were certain that you had heard about |
| | 21 | some possible risks in connection with the |
| | 22 | withdrawal of the drug; true? |
| | 23 | MR. NABERS: Objection to the form. |
| | 24 | A: I know I heard about risks when it was |
| | 25 | withdrawn. |

Printed: 10/3/2006   8:47:35AM

*Overruled*

142:13-143:1
Pl's obj:
Relevance

Def's response: Plaintiff
designated testimony for
this witness about his
awareness of drug risk. This
is cross-examination

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3

144

| 144: | 1 | Q: What you don't recall one way or the other |
| | 2 | is what you were informed of prior to that time by |
| | 3 | Merck? |
| | 4 | A: I don't recall having been informed prior |
| | 5 | to that. |
| | 6 | Q: And if Merck's records indicate that you |
| | 7 | were provided information in that regard, I assume |
| | 8 | you have no reason to dispute it today? |
| | 9 | MR. NABERS: Objection to the form. |
| | 10 | Q: True? |
| | 11 | A: I don't dispute it. |
| | 12 | Q: And the truth is that Mr. Mason had |
| | 13 | significant coronary artery disease prior to his |
| | 14 | heart attack; true? |
| | 15 | A: Yes. |
| | 16 | Q: And he appears to have -- have had a non- |
| | 17 | transmural heart attack; correct? |
| | 18 | MR. NABERS: Objection to the form. |
| | 19 | A: Probably, yes. |
| | 20 | Q: And it was a minor heart attack from what |
| | 21 | you can tell? |
| | 22 | MR. NABERS: Objection to the form. |
| | 23 | A: Yes. |
| | 24 | Q: It was a small heart attack, as far as you |
| | 25 | can tell? |
| 145: | 1 | MR. NABERS: Objection to the form. |
| | 2 | A: Yes. |
| | 3 | Q: All of the studies that you have seen, the |
| | 4 | objective studies out there that don't rely on |
| | 5 | what Mr. Mason is telling you he can or can't do |
| | 6 | suggest that he can perform in any activity he |
| | 7 | chooses to perform in; true? |
| | 8 | MR. NABERS: Objection to the form. |
| | 9 | A: Yes. |
| | 10 | Q: And let me ask you this question: If you |
| | 11 | had seen Mr. Mason in June of 2003, a month before |
| | 12 | his heart attack, and seen the sort of blockages |
| | 13 | that you found in your cardiac catheterization, |
| | 14 | would you have recommended a stent in his left |
| | 15 | anterior descending artery? |
| | 16 | A: Assuming his blockages look the same, yes. |
| | 17 | Q: And would you have recommended an |
| | 18 | angioplasty in connection with the 70 percent |
| | 19 | blockage? |
| | 20 | A: Yes. |
| | 21 | Q: So, he got the stent that he needed |
| | 22 | regardless of his heart attack? |
| | 23 | A: Yes. |
| | 24 | Q: He got the angioplasty he needed |
| | 25 | regardless of whether he had a heart attack? |

Printed: 10/3/2006   8:47:35AM

---

Handwritten margin notes:

Overruled

response:
Def's witness

144:12-14
Pl's obj:
vague as to time

144: 16-17
Pl's obj:
speculation

This witness performed the angiogram and intervention during the heart attack. His observations are first hand knowledge (applies through page 146)

145: 10-25
Pl's obj:
No foundation; speculation; incomplete hypothesis

## Ganellen, Edward 2006-07-25

146:

1 A: Yes.
2 Q: And there's no evidence that you know of
3 that indicates or suggests that any permanent
4 damage was caused that interferes with his life?
5 True?
6 MR. NABERS: Objection to the form.
7 A: Based on his Cardiolite stress test, his
8 functioning capacity is pretty good.
9 Q: My statement is true?
10 A: Yes.
11 Q: And you think he has an excellent
12 prognosis?
13 MR. NABERS: Objection to the form.
14 A: Yes.
15 Q: Pass the witness.
16 FURTHER EXAMINATION
17 BY MR. NABERS:
18 Q: Doctor, just a couple of questions by way
19 of follow-up. Is the fact that Mr. Mason had a
20 heart attack, is that a good thing?
21 A: No.
22 Q: Is the fact that Mr. Mason has heart
23 muscle damage, is that a good thing?
24 A: No.
25 Q: Is the fact that part of the muscle -- is

147:

1 the fact that part -- should I start over?
2 THE VIDEOGRAPHER: No. I could hear you,
3 it's just clearer when you're miked up.
4 Q: I'll start it again. Let me try to start
5 again, Doctor, since I didn't have my microphone
6 on.
7 Was the fact that Mr. Mason had a heart
8 attack, was that a good thing for him?
9 A: No.
10 Q: Was the fact that Mr. Mason had heart
11 muscle damage, was that a good thing for him?
12 A: No.
13 Q: Was the fact that Mr. Mason had heart
14 muscle tissue that died, was that a good thing for
15 him?
16 A: No.
17 Q: Does Mr. Mason have a permanent damage as
18 a result of his heart muscle --
19 MR. KRUMHOLZ: Objection to form.
20 MR. NABERS: Strike that.
21 MR. KRUMHOLZ: I'd like an answer to that
22 question.
23 MR. NABERS: I'll come back to it.
24 MR. KRUMHOLZ: I'd like an answer to that
25 question.

Printed: 10/3/2006   8:47:35AM

*Handwritten notes:* 146:2-5 Pl's obj: no foundation; speculation. 146:7-14 Pl's obj: no foundation; speculation. Overruled

## Ganellen, Edward 2006-07-25

| | | |
|---|---|---|
| 148: | 1 | MR. NABERS: Well, it doesn't matter what |
| | 2 | you like. |
| | 3 | MR. KRUMHOLZ: No, you -- |
| | 4 | MR. NABERS: You objected to the question |
| | 5 | and now you want him to answer it? |
| | 6 | MR. KRUMHOLZ: I objected to form but I -- |
| | 7 | he's supposed to answer and I expect -- we all |
| | 8 | have a right to the answer. |
| | 9 | MR. NABERS: I'll ask it again then, |
| | 10 | because you've objected to the form of the |
| | 11 | question. |
| | 12 | MR. KRUMHOLZ: I'd like it read back to |
| | 13 | him by the court reporter. |
| | 14 | MR. NABERS: I need to rephrase it. |
| | 15 | MR. KRUMHOLZ: I'd like the court reporter |
| | 16 | to read back the question, Scott. There's nothing |
| | 17 | wrong with allowing the question -- the witness to |
| | 18 | answer the question. |
| | 19 | MR. NABERS: No, no, what is bad is that |
| | 20 | you've misrepresented the facts to the doctor by |
| | 21 | not showing him the most -- |
| | 22 | MR. KRUMHOLZ: I object to the coaching of |
| | 23 | the witness -- |
| | 24 | MR. NABERS: No -- |
| | 25 | MR. KRUMHOLZ: -- and to the -- |
| 149: | 1 | MR. NABERS: No, you didn't show him the |
| | 2 | most recent Cardiolite. You know you didn't. Is |
| | 3 | that a true fact? |
| | 4 | MR. KRUMHOLZ: Show it to him. I'll be |
| | 5 | happy to talk to him about it. |
| | 6 | MR. NABERS: No, but you didn't show it to |
| | 7 | him. You've misrepresented it to him. But I'm |
| | 8 | going to fix it for you. |
| | 9 | MR. KRUMHOLZ: I'll object to your side |
| | 10 | bar -- |
| | 11 | MR. NABERS: Okay. |
| | 12 | MR. KRUMHOLZ: -- and move to strike. |
| | 13 | And, Scott, that is completely out of line. |
| | 14 | MR. NABERS: It's absolutely a true fact |
| | 15 | and you know it. |
| | 16 | MR. KRUMHOLZ: That is -- |
| | 17 | Q:   (By Mr. Nabers) Let me ask you, Doctor, |
| | 18 | about what you've got there in front of you, which |
| | 19 | is Deposition Exhibit No. 11. That's a 2003 |
| | 20 | Cardiolite done on Mr. Mason? |
| | 21 | A: Yes. |
| | 22 | Q: And who showed you that exhibit? |
| | 23 | A: The defense attorney. |
| | 24 | Q: The lawyer representing Merck; right? |
| | 25 | A: Yes. |



*These are P. to P's witness. Qs. asked by P. to P's witness. Improper. The objs. were timely made could have been corrected, were not. Objs. sustained*

### Ganellen, Edward 2006-07-25

Ganellen PA PO DA DC on 10-3

150

| 150: | | |
|---|---|---|
| | 1 | Q: Did he bother to tell you that he had had |
| | | a subsequent Cardiolite? |
| | 3 | A: No. |
| | 4 | Q: And did he bother to tell you that that |
| | 5 | subsequent Cardiolite was done in 2005? |
| | 6 | A: No. |
| | 7 | Q: Did he bother to tell you that that |
| | 8 | subsequent Cardiolite showed heart damage to Mr. |
| | 9 | Mason's heart? |
| | 10 | MR. KRUMHOLZ: Objection, form. |
| | 11 | A: He did not. |
| | 12 | Q: Okay. What he did show you though was a |
| | 13 | 2003 Cardiolite which did not indicate any heart |
| | 14 | muscle damage; correct? |
| | 15 | A: Correct. |
| | 16 | Q: But he didn't bother to come back and |
| | 17 | demonstrate that there had been a later test done |
| | 18 | that showed heart damage; right? |
| | 19 | MR. KRUMHOLZ: Objection, form. |
| | 20 | A: That is correct. |
| | 21 | Q: And so when you answered a lot of these |
| | 22 | questions earlier, you were under the assumption |
| | 23 | that the last Cardiolite that Mr. Mason had was |
| | 24 | the one in 2003; right? |
| | 25 | A: Correct. |
| 151: | 1 | MR. KRUMHOLZ: Objection, form. |
| | 2 | Q: And so you didn't have all the facts in |
| | 3 | front of you when you were answering those |
| | 4 | questions about prognosis and how his life might |
| | 5 | be in the future; correct? |
| | 6 | MR. KRUMHOLZ: Objection, form. |
| | 7 | A: That's correct. |
| | 8 | Q: And you would want to have that 2005 |
| | 9 | Cardiolite that showed heart muscle damage in |
| | 10 | order to answer those questions about what his |
| | 11 | prognosis was in the future; right? |
| | 12 | MR. KRUMHOLZ: Objection, form. |
| | 13 | A: Yes. |
| | 14 | Q: And when he asked you all these questions |
| | 15 | about, he's had an excellent prognosis for the |
| | 16 | future, you didn't have the benefit of that |
| | 17 | earlier Cardiolite in 2005; right? |
| | 18 | MR. KRUMHOLZ: Objection to form. |
| | 19 | A: Later. |
| | 20 | Q: Later, I'm sorry. |
| | 21 | A: Yes, right. |
| | 22 | Q: And so it's fair to say that all of the |
| | 23 | questions that he asked you about how his outcome |
| | 24 | is in the future, you didn't have the benefit of |
| | 25 | having the Cardiolite in 2005; right? |

Plaintiff's Response to D: optional completeness; witness was shown a cardiolite test in 2003 which he had never seen and had no knowledge in order to try to get him to agree with Def that Plf had no permanent damage to his heart. Witness was not shown the cardiolite test in 2005 that showed a defect. Questions were asked in a manner to point out an important piece of evidence was left out and witness had answered questions based upon facts that were unfairly + incompletely presented. These questions are critical for the jury to know the complete set of facts.

① Re: 150:4 - 150:9
Def Obj: Argumentative

Re: 150:7 - 150:9
Def Obj: Assumes facts not in evidence

Re: 150:11 - 150:11
Def Obj: Argumentative. Assumes facts not in evidence.

② Re: 150:16 - 150:18
Def Obj: Leading

③ Re: 150:20 - 150:25
Def Obj: Leading

④ Re: 151:2 - 151:5
Def Obj: Leading

⑤ Re: 151:7 - 151:11
Def Obj: Leading

⑥ Re: 151:13 - 151:17
Def Obj: Leading

⑦ Re: 151:19 - 151:25
Def Obj: Leading

Plaintiff's Resp to ②③④⑤ ⑥ + ⑦:
Rule 611; The questions had to be leading in order to complete the deposition within time frame Dr. Ganellen was available. Rule 611 allows leading questions when they are necessary to develop the testimony which was the case here since witness had no knowledge of these Cardiolite stress tests.



*Sustained : leading*
*lawyer testifying. Is. longer*
*than answer. Clearly improper*
*Sel 611(c)*

**Ganellen, Edward 2006-07-25**

Ganellen PA PC DA DC on 10-3

152

| 152: | 1 | MR. KRUMHOLZ: Objection, form. |
| | 2 | A: Yes. |
| | 3 | Q: But you would like to see the 2005 |
| | 4 | Cardinlite in order to give a better opinion on |
| | 5 | what his life outcome or expectancy would be; |
| | 6 | right? |
| | 7 | MR. KRUMHOLZ: Objection, form. |
| | 8 | A: Yes. I mean you would assume -- I hate to |
| | 9 | open a can of worms, but you would assume if |
| | 10 | there's a big change from 2003 to now, or to 2005, |
| | 11 | that something has happened in the ensuing |
| | 12 | months. |
| | 13 | Q: And the fair thing to say is you just |
| | 14 | haven't been able to review all of his current |
| | 15 | medical records; right? |
| | 16 | MR. KRUMHOLZ: Objection, form. |
| | 17 | A: I've not been asked to, no. |
| | 18 | Q: Right. And so a lot of the questions that |
| | 19 | you were asked about his current medical |
| | 20 | condition, you just haven't reviewed those |
| | 21 | records; right? |
| | 22 | MR. KRUMHOLZ: Objection, form. |
| | 23 | A: That's right. |
| | 24 | Q: Like -- you don't know whether or not as |
| | 25 | you sit here Mr. Mason can hike; correct? |
| 153: | 1 | MR. KRUMHOLZ: Objection, form. |
| | 2 | Q: You haven't looked at the medical records. |
| | 3 | A: That is correct. |
| | 4 | Q: You don't know whether or not he can play |
| | 5 | golf as you sit here today; right? |
| | 6 | A: Right. I do not. |
| | 7 | Q: You don't know if he can play with his |
| | 8 | grandkids as you sit here today? |
| | 9 | A: I do not. |
| | 10 | Q: You don't know if he can have sexual |
| | 11 | relations with his wife as you sit here today? |
| | 12 | A: I do not. |
| | 13 | Q: You don't know if he can walk or run as |
| | 14 | you sit here today? Correct? |
| | 15 | A: Correct. |
| | 16 | Q: You don't know if he can go hunting; |
| | 17 | correct? |
| | 18 | A: Yes. |
| | 19 | Q: I mean, it's fair to say you don't know |
| | 20 | how his heart attack has impacted his life as he |
| | 21 | sits today just because you haven't reviewed those |
| | 22 | medical records; right? |
| | 23 | A: I would rephrase what you said. And |
| | 24 | again, I mean, if we believe the stress test from |
| | 25 | ten of '03, his heart attack did not -- his heart |

Handwritten annotations (right margin):

Re: 152:2 - 152:6
Def Obj: Leading

*Plaintiff's Response:*
*Rule 611;*
*Optional*
*Completeness.*
*See Plaintiff's*
*Responses to*
*Defendant's*
*Objections on*
*page 150-151.*

Re: 152:8 - 152:15
Def Obj: Leading

Re: 152:17 - 152:21
Def Obj: Leading

Re: 152:23 - 152:23
Def Obj: Leading

**Ganellen, Edward 2006-07-25**

Ganellen PA PC DA DC on 10-3                                              154

| 154: | | |
|---|---|---|
| | 1 | attack in July of '03 did not leave him with much |
| | 2 | problems. Now, whether he's had problems after |
| | 3 | that, I mean — you know, I can't answer that. |
| | 4 | Q: All right. Well, and with all due respect |
| | 5 | for you, you haven't had an opportunity to look at |
| | 6 | the underlying data that made up the 2003 |
| | 7 | Cardiolite report; correct? |
| | 8 | MR. KRUMHOLZ: Object to form. |
| | 9 | A: I have not seen the scan itself, that's |
| | 10 | correct. |
| | 11 | Q: But it would be helpful for you to see |
| | 12 | that scan if you were going to comment on whether |
| | 13 | or not there was or was not any damage to his |
| | 14 | heart as on that Cardiolite form? |
| | 15 | MR. KRUMHOLZ: Objection to form. |
| | 16 | A: I think that would be fair, yes. |
| | 17 | Q: You were asked some questions earlier |
| | 18 | about coronary artery disease and how common it |
| | 19 | was in your patients. Do you recall that? |
| | 20 | A: Uh-huh. Yes. |
| | 21 | Q: And that's because you're a cardiologist |
| | 22 | and the patients who come to see you, they all |
| | 23 | have some form of cardiac disease generally, |
| | 24 | right? |
| | 25 | A: I hope so. |
| 155: | 1 | Q: I mean, you certainly couldn't compare |
| | 2 | your patient population who has coronary artery |
| | 3 | disease with the normal patient population because |
| | 4 | your care is specifically for cardiac disease; |
| | 5 | right? |
| | 6 | A: Absolutely. |
| | 7 | Q: Okay. And it's fair to say that you've |
| | 8 | never looked at your patient population in terms |
| | 9 | of their VIOXX usage; correct? |
| | 10 | A: That is correct. |
| | 11 | Q: All right. For example, those patients of |
| | 12 | yours, I think you said that about 80 percent of |
| | 13 | them have coronary artery disease; correct? |
| | 14 | A: Yes. |
| | 15 | Q: You don't have any idea because you |
| | 16 | haven't performed a study on how many took VIOXX; |
| | 17 | right? |
| | 18 | MR. KRUMHOLZ: Objection, form. |
| | 19 | A: That is correct. |
| | 20 | Q: So — and the reason that I ask you that |
| | 21 | is you can't comment on whether or not, in your |
| | 22 | patient population, VIOXX had anything to do with |
| | 23 | those people's coronary artery disease because you |
| | 24 | just haven't made a study of that; right? |
| | 25 | A: That's correct. I don't think I ever |

*Sustained* ✓

Re: 154: 11 – 154: 14
DEF Obj: Leading

Re: 154:16 – 154:16
DEF Obj: Leading

Plaintiffs'
response:
Rule 611 +
optional
completeness.
See Plaintiffs'
responses
to Defendants
Objections
on pages
150 – 151.

*overruled*

**Ganellen, Edward 2006-07-25**

Ganellen PA PC DA DC on 10-3

156

| 156: | | |
|---|---|---|
| | 1 | commented on whether VIOXX caused coronary |
| | 2 | disease. |
| | 3 | Q: Okay. And you've certainly done no study |
| | 4 | of your patient population to look to see which of |
| | 5 | those people with atherosclerosis took VIOXX; |
| | 6 | right? |
| | 7 | A: That's right. |
| | 8 | Q: And in fact with regard to all of the |
| | 9 | patients that you care for who have had heart |
| | 10 | attacks, you've never gone back to look at their |
| | 11 | medical records to see which ones were on VIOXX at |
| | 12 | the time of their heart attacks; right? |
| | 13 | A: That's correct. |
| | 14 | Q: Okay. Now, you were also asked some |
| | 15 | questions about the fact that Mr. Mason had a 90 |
| | 16 | percent stenosis. Do you recall that? |
| | 17 | A: Yes. |
| | 18 | Q: But you do see patients who have 90 |
| | 19 | percent stenosis that do not infarct; correct? |
| | 20 | MR. KRUMHOLZ: Objection, form. |
| | 21 | A: Yes. |
| | 22 | Q: And I take it that you would treat |
| | 23 | patients with that degree of stenosis, that being |
| | 24 | 90 percent stenosis, before the heart is damaged? |
| | 25 | You would want to do that; right? |
| 157: | 1 | MR. KRUMHOLZ: Objection, form. |
| | 2 | A: That would be preferable. |
| | 3 | Q: Okay. I mean, you agree that there are |
| | 4 | many, many patients with coronary artery disease |
| | 5 | who never infarct; correct? |
| | 6 | A: Yes. |
| | 7 | Q: And you were asked some questions about |
| | 8 | chest pain specifically to Mr. Mason. Do you |
| | 9 | recall that? |
| | 10 | A: Yes. |
| | 11 | Q: And that chest pain could be an indicator |
| | 12 | of some kind of cardiovascular condition; right? |
| | 13 | A: Yes. |
| | 14 | Q: But chest pain can also be the result of |
| | 15 | many other causes besides sudden cardiac |
| | 16 | condition; correct? |
| | 17 | A: Yes. |
| | 18 | Q: For example, anxiety can cause chest |
| | 19 | pain? |
| | 20 | A: Yes. |
| | 21 | Q: Reflux can cause chest pain? |
| | 22 | A: Yes. |
| | 23 | Q: You can have muscular chest pain? |
| | 24 | A: Yes. |
| | 25 | Q: So just because you have chest pain |

Handwritten annotations:

Re: 156:3 ~ 156:13
Def Obj: Irrelevant; 403
Plaintiff's Response: It is relevant to establish that witness has not gone back to review his patient charts to see who had these medical conditions on Vioxx. This is in response to Defs questions trying to establish that these medical conditions occur all the time in patients not taking Vioxx. It is probative if Def. Counsel's questions on the issue are allowed.

Re: 156:18 ~ 156:19
Def Obj: leading
Plaintiff's Resp: same as above

Re: 156:21 ~ 156:25
Def Obj: leading
Plaintiff's Resp: same as above.

Re: 157:2 ~ 157:2
Def Obj: leading
Plaintiff's Resp: Same as above.

*Sustained*

*Sustain* — The Question. Mr. Mason
is testifying interspersed w/
long speeches w. a one word response from
witness. This is permitted
Why have the witness

## Ganellen, Edward 2006-07-25

| 158: | | |
|---|---|---|
| | 1 | doesn't always mean it's of a cardiac origin; |
| | 2 | correct? |
| | 3 | A: That's correct. |
| | 4 | Q: And with regard to erectile dysfunction, |
| | 5 | you would agree that if someone takes |
| | 6 | antidepressants, that can certainly have an |
| | 7 | effect? |
| | 8 | A: Yes. |
| | 9 | Q: And so just because somebody has erectile |
| | 10 | dysfunction, that does not always mean it's from a |
| | 11 | cardiac cause; right? |
| | 12 | A: That's true. |
| | 13 | Q: Okay. And whenever you were asked about |
| | 14 | chest pain, and specifically erectile dysfunction |
| | 15 | in connection with Mr. Mason, you weren't trying |
| | 16 | to suggest it was of a cardiac nature; right? |
| | 17 | A: I don't know anything about erectile |
| | 18 | function or dysfunction. |
| | 19 | Q: Okay. And I wanted to ask you about |
| | 20 | Deposition Exhibit No. 11 again. I forgot to ask |
| | 21 | you, but were you aware that whenever Mr. Mason |
| | 22 | was discharged from LDS Hospital, that he was told |
| | 23 | that he needed to go to cardiac rehab? |
| | 24 | MR. KRUMHOLZ: Objection, form. |
| | 25 | A: I don't believe I discharged him, so I |
| 159: | 1 | don't know anything about his discharge. |
| | 2 | Q: Would it surprise you if he was sent for |
| | 3 | cardiac rehab? |
| | 4 | A: No. |
| | 5 | Q: And why would he be sent for cardiac rehab |
| | 6 | after a heart attack? |
| | 7 | A: We -- I mean, I prefer my patients to go |
| | 8 | to cardiac rehab for a variety of reasons, some of |
| | 9 | which are psychological, some of which are |
| | 10 | physical. |
| | 11 | Q: Okay. But do you agree that if Mr. Mason |
| | 12 | went to cardiac rehab after his heart attack and |
| | 13 | did it on a routine basis as was prescribed for |
| | 14 | him that that could have an impact on his exercise |
| | 15 | ability? |
| | 16 | MR. KRUMHOLZ: Objection, form. |
| | 17 | A: Absolutely. You can train people so that |
| | 18 | they exercise better. Lance Armstrong didn't ride |
| | 19 | the Tour de France without training. |
| | 20 | Q: I mean, for example, if he had been at |
| | 21 | cardiac rehab for three months, and on this 2003 |
| | 22 | Cardiolite perfusion scan, the fact that he had |
| | 23 | been to cardiac rehab, that could have certainly |
| | 24 | made his numbers, in terms of how long he could go |
| | 25 | on the treadmill, better; right? |

Re: 158:4 – 158:18

Def Obj: Leading

Plaintiff's Resp: Rule 611 allows for leading questions when necessary to develop witness' testimony. These questions are responsive to Def's questions suggesting that erectile dysfunction would be evidence of π's underlying CHD.

Re: 158:19 – 158:23

Def Obj: Question with no answer.

Plaintiff's Resp: error. Plaintiff withdraws question.

**Ganellen, Edward 2006-07-25**

Ganellen PA PC DA DC on 10-3

160:

160:
1  A: Yes.
2  Q: And, you know, we talked a little bit
3  about ejection fractions and the fact that he does
4  have a good ejection fraction at 55 percent;
5  right?
6  A: Yes.
7  Q: But also he's on medications that would
8  help that ejection fraction; right?
9  A: Actually --
10  MR. NABERS: Objection, form.
11  A: Actually, I'm not sure what medications
12  he's on.
13  Q: All right. Are there medications though
14  that heart attack patients get that can help
15  improve ejection fractions after a heart attack?
16  MR. KRUMHOLZ: Objection, form.
17  A: Some, yes.
18  Q: Well, for example, an ACE inhibitor, would
19  that help with ejection fractions?
20  A: I mean, it probably has fairly minimal
21  effect on the number of the ejection fraction.
22  Q: But we do know that ACE inhibitors help
23  left ventricular function; right?
24  A: They do.
25  Q: And left ventricular function is what you

161:
1  look at when you're determining the ejection
2  fraction?
3  MR. KRUMHOLZ: Objection, form.
4  Q: Right?
5  A: Well it's not -- I wish it were that
6  simple.
7  Q: Okay. Well, let's do it this way then.
8  The ejection fraction --
9  MR. KRUMHOLZ: I would like him to finish
10  his answer, Scott. Can you please let the doctor
11  finish his answers.
12  A: I mean, probably the best medication, the
13  best medication to improve the number for ejection
14  fraction would be Coreg. And Coreg, I think has
15  the greatest effect on left ventricular function
16  in patients with nonischemic cardiomyopathy.
17  Q: Mr. Mason was on Coreg. Were you aware of
18  that?
19  MR. KRUMHOLZ: Objection, form.
20  A: I don't know.
21  Q: If he was on Coreg, could that be one
22  reason why he had a normal ejection fraction?
23  MR. KRUMHOLZ: Objection, form.
24  A: Theoretically, yes.
25  Q: Let me just ask you kind of by way of kind



overruled

Plaintiff's
Response:
Re: 161:21 - 161:22   It's not speculative,
Def Obj: Speculation because it was
discharged
Re: 161:24   from hospital
Def Obj: Speculation after his
heart attack
on Coreg. It
explains why π's ejection
fraction was normal
after his heart
attack in response to
not _____ of no damage.

*Overruled*

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                          162

| 162: | | |
|---|---|---|
| | 1 | of concluding everything -- and I generally just |
| | 2 | want to see if you agree with these statements. |
| | 3 | MR. KRUMHOLZ: Objection, form. |
| | 4 | Q: You would agree that generally a heart |
| | 5 | attack is a big deal to the patient; correct? |
| | 6 | A: Yes. |
| | 7 | Q: I mean, the patient doesn't care whether |
| | 8 | they have a transmural heart attack or not; right? |
| | 9 | A: Well -- |
| | 10 | MR. KRUMHOLZ: Objection, form. |
| | 11 | Q: The patient doesn't really care whether |
| | 12 | it's a Q-wave or a non Q-wave heart attack; right? |
| | 13 | MR. KRUMHOLZ: Objection to form. |
| | 14 | A: That's probably correct. |
| | 15 | Q: We do know though that Mr. Mason had a |
| | 16 | heart attack; correct? |
| | 17 | A: Yes. |
| | 18 | Q: We do know that at the time of his heart |
| | 19 | attack, that he was taking VIOXX; correct? |
| | 20 | A: Yes. |
| | 21 | Q: We do know that from the medical |
| | 22 | literature that you talked about earlier that |
| | 23 | there has been an association demonstrated in that |
| | 24 | medical and scientific literature between the use |
| | 25 | of VIOXX and heart attacks; correct? |
| 163: | 1 | MR. KRUMHOLZ: Objection, form. |
| | 2 | A: Yes. |
| | 3 | Q: We do know that the drug was withdrawn |
| | 4 | from the market; correct? |
| | 5 | A: Yes. |
| | 6 | Q: And it was withdrawn as a result of the |
| | 7 | increased risk of heart attacks seen in patients |
| | 8 | taking those -- |
| | 9 | MR. KRUMHOLZ: Objection, form. |
| | 10 | Q: Taken by those patients; correct? |
| | 11 | MR. KRUMHOLZ: Objection, form. |
| | 12 | A: Yes. |
| | 13 | Q: And I think that as a part of your |
| | 14 | differential diagnosis for Mr. Mason's heart |
| | 15 | attack, you would include his injection of VIOXX; |
| | 16 | correct? |
| | 17 | MR. KRUMHOLZ: Objection, form. |
| | 18 | A: In retrospect, yes. |
| | 19 | Q: And we can't eliminate VIOXX from the |
| | 20 | differential diagnosis; correct? |
| | 21 | MR. KRUMHOLZ: Objection, form. |
| | 22 | A: That's correct. |
| | 23 | Q: And based upon your history and physical |
| | 24 | and your care and treatment of Mr. Mason in the |
| | 25 | hospital, did you find any other risk factors? |

Printed: 10/3/2006   8:47:35AM

162:15 - 162:25
Plaintiffs Resp. to ① : Not
Cumulative per se + necessary
to rebut Defs suggestion
of π never really suffering a
heart attack.

① Re: 162:15 - 162:25
Def Obj: Cumulative of same questions
asked on direct at 54:4 - 54:24

② Re: 162:21 - 162:25
Def Obj: Calls for expert
testimony and this witness was
not designated nor qualified as
an expert.

③ Re: 163:2
Def Obj: Calls for expert testimony and
this witness was not designated nor
qualified as an expert.

④ Re: 163:2 - 163:5
Def Obj: Cumulative of same questions
asked on direct at 54:4 - 54:24

Plaintiffs Response to ② ③ ④:
Witness is more than adequately
qualified and was designated
to give these types of medical
opinions. He is a triple
board certified cardiologist
who has reviewed and knows
the Vioxx medical literature.
He knows π took Vioxx. He knows
π's past medical history. He
performed a phys. exam on π
and saved π's life during
the heart attack. He can
certainly answer these
questions with his
medical opinions.

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                    164

| 164: | | |
|---|---|---|
| | 1 | MR. KRUMHOLZ: Objection, form. |
| | 2 | A: We -- as I recall from the history and |
| | 3 | physical, we did not elicit any other risk |
| | 4 | factors. |
| | 5 | Q: And when Mr. Mason had his heart attack, I |
| | 6 | think we've established that he had heart muscle |
| | 7 | damage; correct? |
| | 8 | MR. KRUMHOLZ: Objection, form. |
| | 9 | A: Yes. |
| | 10 | Q: And that heart muscle damage that you saw |
| | 11 | and that you described earlier in your deposition, |
| | 12 | would you expect that to go away normally over the |
| | 13 | course of a patient's life? |
| | 14 | MR. KRUMHOLZ: Objection, form. |
| | 15 | A: It can, yes. |
| | 16 | Q: Do you believe that Mr. Mason should be |
| | 17 | medically monitored for the rest of his life as a |
| | 18 | result of the heart attack? |
| | 19 | MR. KRUMHOLZ: Objection, form. |
| | 20 | A: Yes. |
| | 21 | Q: And we talked a little bit about the |
| | 22 | fact that there was some thrombus noted in your |
| | 23 | report whenever you did the heart cath; is that |
| | 24 | correct? |
| | 25 | A: Yes. |
| 165: | 1 | Q: And do you have an understanding based |
| | 2 | upon your review of the medical literature that |
| | 3 | VIOXX can cause a prothrombotic state in the |
| | 4 | body? |
| | 5 | MR. KRUMHOLZ: Objection, form. |
| | 6 | A: Yes. |
| | 7 | Q: And what does it mean if VIOXX causes a |
| | 8 | prothrombotic state in the body? |
| | 9 | MR. KRUMHOLZ: Objection, form. |
| | 10 | A: It means you're more likely to have clot |
| | 11 | formation. |
| | 12 | Q: And Mr. Mason had clot formation that led |
| | 13 | to a heart attack; right? |
| | 14 | MR. KRUMHOLZ: Objection, form. |
| | 15 | A: That would be the presumption, yes. |
| | 16 | Q: Okay. Thank you. That's all I have. |
| | 17 | FURTHER EXAMINATION |
| | 18 | BY MR. KRUMHOLZ: |
| | 19 | Q: Doctor, plaintiff's counsel talked to you |
| | 20 | about a perfusion study done in April of 2005. Do |
| | 21 | you recall that? |
| | 22 | A: Yes. |
| | 23 | Q: He suggested that that hadn't been brought |
| | 24 | up today. Do you recall that? |
| | 25 | A: Yes. |

Printed: 10/3/2006   8:47:35AM

Overruled

Re: 165:1 - 165:4
DEF OBJ: Calls for expert testimony
and this witness was not designated
nor qualified as an expert

Re: 165:6 - 165:8
DEF OBJ: Calls for expert testimony
and this witness was not designated
nor qualified as an expert.

Re: 165:10 - 165:11
DEF OBJ: Calls for expert
testimony and this witness was
not designated nor qualified as
an expert.

Plaintiff's Response to ①②+③:
See Plaintiff's Response to
Defendant's objections on pages
162-163; This just further
demonstrates Dr. Ganellen's
knowledge regarding Vioxx
and heart attacks from his
clinical experience and his
reading of the medical literature
on the topic.

165:19-166:8
Pl's Obj.:
Relevance; 403

Overruled

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3

166

| 166: | | |
|---|---|---|
| | 1 | Q: Do you recall him, Mr. Nabers, talking to |
| | 2 | you about the April 2005 perfusion study and the |
| | 3 | apical -- small apical infarct noted? |
| | 4 | A: He mentioned something about it. |
| | 5 | Q: Before? |
| | 6 | A: Yes. |
| | 7 | Q: So that wasn't something that anyone hid |
| | 8 | from you today; true? |
| | 9 | MR. NABERS: Not me. |
| | 10 | Q: Objection to the side bar. You can |
| | 11 | answer. |
| | 12 | A: That's true. |
| | 13 | Q: Now, Doctor, if you were asked to find |
| | 14 | out — you understand that Mr. Nabers over here is |
| | 15 | suggesting VIOXX somehow caused Mr. Mason's heart |
| | 16 | attack? |
| | 17 | A: Yes. |
| | 18 | Q: If you're going to determine whether or |
| | 19 | not that's indeed true, you would have to do a |
| | 20 | host of things that you have not done; true? |
| | 21 | A: I think we would probably — that's true, |
| | 22 | it would be very difficult to tell you for sure |
| | 23 | what caused anyone's heart attack. |
| | 24 | Q: Because you have to look at all the risk |
| | 25 | factors involved; true? |
| 167: | 1 | A: Well, because there's a lot more to heart |
| | 2 | attacks than we know. |
| | 3 | Q: We just don't know for sure what causes |
| | 4 | heart attacks? |
| | 5 | A: Yes. |
| | 6 | Q: In any particular patient? |
| | 7 | A: Yes. |
| | 8 | Q: What you do know is obesity, and then — |
| | 9 | we know for sure that obesity is a significant |
| | 10 | risk factor? |
| | 11 | MR. NABERS: Objection to form. |
| | 12 | A: Yes. |
| | 13 | Q: And can you look in his chart and tell us |
| | 14 | what Mr. Mason's weight is or was at the time of |
| | 15 | his event? |
| | 16 | A: It looks like he's about 220, roughly. |
| | 17 | Q: And how tall is he? |
| | 18 | A: I don't know. It's in centimeters. |
| | 19 | Q: Assume that he's — |
| | 20 | A: A hundred seventy-five. Not very tall. |
| | 21 | Q: Assume five-foot-nine, approximately 230 |
| | 22 | pounds. Would you consider that to be obese? |
| | 23 | MR. NABERS: Objection to the form. |
| | 24 | A: Probably, yes. |
| | 25 | Q: And that would put him at a higher risk |

Handwritten annotations:
165:19–166:8
P's obj:
Relevance, Rule 403

166:12
Pl's obj: Relevance; 403

Def's response:
These questions are conditionally designated in response to plaintiff's questions on pages 150-152 which defendant has objected to

## Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3                                          168

| | | |
|---|---|---|
| 168: | 1 | for heart attack; true? |
| | 2 | MR. NABERS:  Objection to form. |
| | 3 | A:  Higher risk, yes. |
| | 4 | Q:  And as would family history? |
| | 5 | A:  Yes. |
| | 6 | MR. NABERS:  Objection to the form. |
| | 7 | Q:  If a family member had a heart attack |
| | 8 | prior to age 65, a sister, that would place him at |
| | 9 | a higher risk for heart attack? |
| | 10 | MR. NABERS:  Objection to form. |
| | 11 | A:  Yes. |
| | 12 | Q:  I'm sorry? |
| | 13 | A:  Yes. |
| | 14 | Q:  Now, Mr. Nabers also talked to you about |
| | 15 | the perfusion studies that you've seen today and |
| | 16 | other documents and asked you if you'd seen the |
| | 17 | underlying data. Do you recall that? |
| | 18 | A:  Yes. |
| | 19 | Q:  You see records from other doctors who |
| | 20 | specialize in cardiology and other fields of |
| | 21 | medicine all the time; true? |
| | 22 | A:  Yes. |
| | 23 | Q:  Every day? |
| | 24 | A:  Yes. |
| | 25 | Q:  You were able to rely on those without |
| 169: | 1 | looking at the underlying data; true? |
| | 2 | A:  Yes. |
| | 3 | Q:  And in fact you've testified earlier that |
| | 4 | you have indeed relied on records just like this |
| | 5 | from Dr. Keep and his other partners over there to |
| | 6 | diagnose and treat your own patients? |
| | 7 | A:  Yes. |
| | 8 | Q:  That's not something that you would do if |
| | 9 | you didn't find them to be reliable, those |
| | 10 | records? True? |
| | 11 | A:  That's true. |
| | 12 | Q:  Okay. Now, if you wanted to find out how |
| | 13 | bad a heart attack it was, or to the extent Mr. |
| | 14 | Mason was damaged as a result of what Mr. Nabers |
| | 15 | is alleging, or what the plaintiff's are alleging, |
| | 16 | what time period would you want to look to after |
| | 17 | the heart attack to determine that? In other |
| | 18 | words, to figure out to what extent this heart |
| | 19 | attack damaged Mr. Mason? |
| | 20 | A:  Probably the first several months, six |
| | 21 | months, something like that. |
| | 22 | Q:  So, the records that you saw in July and |
| | 23 | in August and October of 2002 -- |
| | 24 | A:  Three. |
| | 25 | Q:  -- would be just the sort -- excuse me, of |

*(handwritten)* Overruled

169:12- 170:8
Pl's objection:
leading;
compound questions

Def's response: cross-
examination

Printed: 10/3/2006   8:47:35AM

### Ganellen, Edward 2006-07-25

Ganellen PA PC DA DC on 10-3

170

**170:**

1    2003 — would be just the sort of records you
2    would want to look at to determine the extent to
3    which Mr. Mason's heart attack resulted in any
4    significant long-term problems?
5    A: Yes.
6    Q: And those records have been shown to you
7    today; true?
8    A: Yes.
9    Q: Let me go off the record for just a few
10   minutes. I want to look over a couple of
11   things.
12   THE VIDEOGRAPHER: 34 minutes after two
13   o'clock. We're going off the record.
14   (Recess taken from 2:34 p.m. to 2:35 p.m.)
15   THE VIDEOGRAPHER: 35 minutes after two
16   o'clock. We're back on the record.
17   Q: Doctor, is it surprising when someone who
18   has multiple risk factors has a heart attack?
19   MR. NABERS: Object to the form.
20   A: No.
21   Q: Is that unusual in your practice?
22   A: For patients with risk factors to have
23   heart attacks?
24   Q: Yes.
25   A: No.

**171:**

1    Q: Do you see people every day with histories
2    of risk factors have heart attacks?
3    A: Yes.
4    Q: Assume with me that Mr. Mason was obese
5    at the time of his heart attack and that he had a
6    family history of heart disease. If that's true,
7    isn't it correct that you cannot rule out any of
8    the risk factors as the probable cause of Mr.
9    Mason's coronary artery disease?
10   MR. NABERS: Objection to the form.
11   Assumes facts not in evidence.
12   A: That's probably true.
13   Q: Likewise, you couldn't rule out any of the
14   risk factors that Mr. Mason has as the probable
15   cause of his heart attack?
16   A: That's correct.
17   Q: How many patients in your practice with
18   severe coronary artery disease who are obese and
19   have family histories of heart disease have gone
20   on to have MIs or heart attacks?
21   MR. NABERS: Objection to the form.
22   Q: Dozens?
23   A: A lot, yeah.
24   Q: When you say a lot, are we talking over
25   ten a year?

Printed: 10/3/2006   8:47:35AM

*Handwritten annotations:*

Def's response:
Basic cardiology
information &
appropriate
cross-examination
to plaintiff's
designations

Overruled

170:17-18
Pl's obj:
vague; speculation

170:21-25
Pl's obj:
speculation; vague; non-responsive

171:4-9
Pl's obj:
No foundation; vague;
incomplete hypothesis;
misrepresents facts;
assumes facts not in evidence.

## Ganellen, Edward 2006-07-25

172:
1    MR. NABERS: Objection, speculation.
2    A: Yes.
3    Q: Over 20 a year?
4    A: Probably.
5    **Q: Based upon the records that you reviewed**
6    **and that have been discussed with you today, do**
7    **you still believe that Mr. Mason has a good**
8    **prognosis?**
9    **A: Based on what I've seen, yes.**
10   Q: Pass the witness.
11   MR. NABERS: No further questions.
12   You're all done, Doctor. Thank you for your
13   time.
14   THE VIDEOGRAPHER:  It's 38 minutes after
15   two o'clock. This concludes the deposition.
16   (The deposition was concluded at 2:38
17   p.m.)
18
19
20
21
22
23
24
25

173:
1    Case Name: Mason vs. Merck
2    Reporter: Rashell Garcia
3    C E R T I F I C A T E
4    STATE OF UTAH          )
5    COUNTY OF SALT LAKE   )
6    THIS IS TO CERTIFY that the deposition of
7    EDWARD W. GANELLEN, MD, the witness in the
8    Rashell Garcia, Certified Shorthand Reporter and
9    residing in Salt Lake City.
10   That the said witness was by me, before
11   whole truth, and nothing but the truth in said
12   That the testimony of said witness was by me
13   reported in Stenotype, and thereafter caused to be
14   true, and correct transcription of said testimony
15   foregoing pages, numbered from 2 to 173 inclusive,
16   foregoing annexed deposition.
17   I further certify that the original
18   envelope and delivered to counsel noticing the
19   witness.
20   I further certify that I am not of kin or
21   said cause of action, and that I am not interested
22
23   Lake City, Utah, this              day
24
25   12-15-2008 Rashell Garcia, RPR

## Ganellen, Edward 2006-07-25

| 174: | | |
|---|---|---|
| | 1 | ACKNOWLEDGMENT OF DEPONENT |
| | 2 | I,      , do |
| | 3 | foregoing pages, 2 - 173 , and that the |
| | 4 | answers given by me to the questions |
| | 5 | corrections or changes in form or |
| | 6 | Errata Sheet. |
| | 7 | |
| | 8 | EDWARD W. GANELLEN, M.D.      DATE |
| | 9 | |
| | 10 | |
| | 11 | Subscribed and sworn |
| | 12 | day of , 20 . |
| | 13 | My commission expires: |
| | 14 | |
| | 15 | Notary Public |

175:
1  - - - - - -
2  E R R A T A
3  PAGE  LINE  CHANGE