## Madsen, Bard 2006-07-12

4:
1 P R O C E E D I N G S
2 (Exhibit Nos. 1 and 2 marked.)
3 THE VIDEOGRAPHER:  Today is the 12th day of
4 July 2006. It's 59 minutes after 2:00 and we're on
5 the record.
6 BARD R. MADSEN, M.D.,
7 called as a witness on behalf of the defendants, being
8 duly sworn, was examined and testified as follows:
9 MR. KRUMHOLZ:  I think we've had an
10 agreement, and I guess it will continue for all the
11 depositions in this case, where all objections except
12 as to form and responsiveness are reserved until the
13 time to object to those for trial.
14 MR. NABERS:  That's our agreement.
15 MR. KRUMHOLZ:  Okay.
16 EXAMINATION
17 BY MR. KRUMHOLZ:
18 Q:  Dr. Madsen, my name is Richard Krumholz and I
19 represent Merck in this case. Do you understand we're
20 here in connection with a lawsuit that's been brought
21 by Charles Mason, who I think is one of your patients,
22 in connection with Vioxx?
23 A:  Depends on how you define patient.
24 Q:  Okay. A former patient, maybe?
25 A:  I was involved in performing a treadmill on

5:
1 him. I never really took care of or treated him or
2 did a history and physical on him.
3 **Q:  Okay. Could you introduce yourself to the**
4 **jury?**
5 **A:  What would you like me to --**
6 **Q:  Just your name, if you could.**
7 **A:  Bard Robert Madsen.**
8 **Q:  And where are we here today?**
9 **A:  We're at our office in Murray, Utah.**
10 **Q:  This is where you practice every day?**
11 **A:  Yes.**
12 **Q:  Are you a cardiologist?**
13 **A:  Yes.**
14 **Q:  And could you briefly describe your**
15 **educational background?**
16 **A:  Starting --**
17 **Q:  With -- let's start with college.**
18 **A:  I went to Brigham Young University and**
19 **graduated in 1972, went to medical school at George**
20 **Washington University for the next four years, did a**
21 **four-year residency in internal medicine at the**
22 **University of Missouri, and then following that a**
23 **two-year fellowship in cardiology at the University of**
24 **Missouri.**
25 **Q:  And do you have any certifications of any**

**Madsen, Bard 2006-07-12**

Madsen PA PC DA DC on 10-3                                                           6

6:  1  sort?
    2  A: In internal medicine.
    3  Q: You're board certified in internal medicine?
    4  A: Yes.
    5  Q: Do you have any other --
    6  A: No.
    7  Q: -- board certifications?
    8  A: No.
    9  Q: Okay. And, Dr. Madsen, just a few
    10  agreements, if we could, before we get started. It's
    11  going to be very important that we communicate well
    12  today because obviously we won't have another
    13  opportunity to come and take your deposition. As a
    14  result, if you don't understand any of my questions,
    15  just let me know and I'll be happy to reask or
    16  rephrase those questions.
    17  A: Sure.
    18  Q: Also, it's going to be important for the
    19  court reporter to take down all my questions and other
    20  questions asked today and all of your answers, so it's
    21  important that I don't step on your answer and it's
    22  also important that you don't step on my question.
    23  Can we have that agreement today?
    24  A: Sure.
    25  Q: Great. And if you could answer verbally

7:  1  instead of a nod of the head or a shake of the head --
    2  A: Yes.
    3  Q: -- that would be great. The court reporter
    4  has a real difficult time getting down nods and shakes
    5  of the head.
    6  A: I understand.
    7  Q: Great. Have you seen Exhibit 1 to your
    8  deposition?
    9  A: I'm not sure that I actually -- is this the
    10  notification?
    11  Q: Yes.
    12  A: Typically we get -- something like this comes
    13  and the secretary who schedules our time and lives,
    14  essentially, tells us we have a deposition. So I'm
    15  not sure I actually looked at that document per se.
    16  Q: Okay. There's some documents that are
    17  requested in the deposition notice at the back. Let
    18  me just ask you this: Have you brought with you today
    19  all of the records that you or your office has in
    20  connection with Charles Mason?
    21  A: As far as I know. Certainly any of the
    22  records that I had to do with are here.
    23  Q: Okay. And you've met with the counsel or the
    24  attorneys for Mr. Mason before, true?
    25  A: That is true.

## Madsen, Bard 2006-07-12

| | | |
|---|---|---|
| 8: | 1 | Q: How many times have you met with them? |
| | 2 | A: Once. |
| | 3 | Q: And for how long was that meeting? |
| | 4 | A: An hour or less. |
| | 5 | Q: Okay. And did they provide you any documents |
| | 6 | during that meeting? |
| | 7 | A: They gave me a binder with some studies in |
| | 8 | them. |
| | 9 | Q: And do you still have that binder? |
| | 10 | A: It's upstairs. |
| | 11 | Q: Okay. At a break, could we go ahead and get |
| | 12 | that binder? |
| | 13 | A: That's fine with me. I didn't read it. |
| | 14 | Q: You never read any of the studies in the |
| | 15 | binder? |
| | 16 | A: Not yet. I read some other things, but not |
| | 17 | that. |
| | 18 | Q: When you say other things, what did you |
| | 19 | review? |
| | 20 | A: Oh, just a simple review article on it. |
| | 21 | Q: A what, I'm sorry? |
| | 22 | A: A simple review article on it. |
| | 23 | Q: What kind of review article was it? |
| | 24 | A: Just a review by someone else. I can't |
| | 25 | remember the author at this point. |
| 9: | 1 | Q: Okay. What publication was it in, if you |
| | 2 | recall? |
| | 3 | A: You know, I don't. It was a Xeroxed one. I |
| | 4 | don't recall. |
| | 5 | Q: What journals do you subscribe to? |
| | 6 | A: New England Journal, Journal of American |
| | 7 | College of Cardiology, and Circulation. |
| | 8 | Q: You also subscribe to Circulation? Is that |
| | 9 | the name of the magazine? |
| | 10 | A: That is. |
| | 11 | Q: Of the journal? |
| | 12 | A: That is. |
| | 13 | Q: Any others? |
| | 14 | A: No. |
| | 15 | Q: Other than that one -- |
| | 16 | A: That's here in the office. |
| | 17 | Q: And did that one review that you reviewed, |
| | 18 | was the topic Vioxx or some other topic? |
| | 19 | A: It was on that. It was not specifically for |
| | 20 | Vioxx but COX-2 inhibitors, and it was just -- it was |
| | 21 | fairly general and it was short. |
| | 22 | Q: When you met with the plaintiffs' attorneys, |
| | 23 | was it Mr. Nabers who you met with? |
| | 24 | A: Yes. |
| | 25 | Q: And was the nice lady next to Mr. Nabers with |

## Madsen, Bard 2006-07-12

10:    1    him as well?
       2    A:  I believe she was.
       3    Q:  And I believe her name is Glenda. Is that
       4    who you met with?
       5    A:  Yes.
       6    Q:  And were there any others present during this
       7    meeting?
       8    A:  Not that I recall.
       9    Q:  Have you met with anybody else in connection
      10    with giving your deposition testimony today?
      11    A:  No.
      12    Q:  So you haven't talked about the matter with
      13    your partners, for example?
      14    A:  Briefly I talked with Dr. Symkoviak, whom
      15    you've also deposed.
      16    Q:  When did you talk to Dr. Symkoviak?
      17    A:  Afterwards.
      18    Q:  Okay. For how long did you talk to him?
      19    A:  I didn't know I needed to make a note, so I
      20    don't know how to answer that. I mean, five minutes.
      21    Q:  So you talked to him for about five minutes?
      22    A:  Something in that order.
      23    Q:  Great. You've never met with anybody from
      24    Merck or any attorneys from Merck; is that true?
      25    A:  Not on this matter.

11:    1    Q:  When you say 'not on this matter,' have you
       2    met with Merck attorneys before this matter?
       3    A:  I don't know.
       4    Q:  Okay. But in terms of this case, you never
       5    met with any Merck attorneys?
       6    A:  That's correct.
       7    Q:  And no Merck attorney was invited to the
       8    meeting with Mr. Nabers; is that fair?
       9    A:  That's fair. None was present. I don't know
      10    if they got invited.
      11    **Q:  How long have you been a practicing**
      12    **cardiologist?**
      13    **A:  About 24 years.**
      14    **Q:  I assume you consider heart disease to be a**
      15    **serious public health problem?**
      16    **A:  Yes.**
      17    **Q:  Do you agree that cardiovascular disease is**
      18    **the leading cause of death in the United States?**
      19    **A:  Yes.**
      20    Q:  And has been pretty much for 100 years; is
      21    that right?
      22    A:  I don't know the answer to that.
      23    Q:  But for many years?
      24    A:  For many years.
      25    **Q:  It was the leading cause of death in the**

Printed: 10/3/2006   8:43:49AM

**Madsen, Bard 2006-07-12**

Madsen PA PC DA DC on 10-3

*Overruled*

12

Plaintiff's Objection
RE: 12:7-9
Speculation

Def's response: Basic
Cardiology information

| 12: | 1 | United States before Vioxx came onto the market, true? |
| | 2 | A: Yes. |
| | 3 | Q: While Vioxx was on the market? |
| | 4 | A: Yes. |
| | 5 | Q: And after Vioxx was on the market? |
| | 6 | A: Yes. I think that's a fair statement. |
| | 7 | Q: Do you understand that coronary artery |
| | 8 | disease accounts for more than one-third of all deaths |
| | 9 | in the United States? |
| | 10 | A: Approximately. |
| | 11 | Q: Approximately? |
| | 12 | A: Yes. |
| | 13 | Q: Is that a statistic that you've heard before? |
| | 14 | A: Yes. |
| | 15 | Q: I would like you to educate -- |
| | 16 | A: May I ask one question? |
| | 17 | Q: Sure. |
| | 18 | A: I know I'm not supposed to ask questions, but |
| | 19 | I am not here as an expert witness. True? |
| | 20 | Q: You're here because you treated Mr. Mason. |
| | 21 | A: That's right. But to offer expert opinion, |
| | 22 | I'm not here for that, in that capacity. |
| | 23 | Q: You may have opinions in connection with |
| | 24 | things that might be relevant to the case, and we may |
| | 25 | get into some of those opinions, but as I understand |
| 13: | 1 | it -- let me ask it this way. Have the plaintiffs' |
| | 2 | attorneys retained you as an expert? |
| | 3 | A: No. |
| | 4 | Q: Okay. You're here because you at one point |
| | 5 | performed a stress test on Mr. Mason? |
| | 6 | A: That's correct. |
| | 7 | Q: Okay. I would like you to educate the jury, |
| | 8 | though, and us generally about cardiovascular disease. |
| | 9 | What is atherosclerosis? |
| | 10 | A: It's formation of plaque and atheroma. |
| | 11 | Q: And where is that? |
| | 12 | A: In the media of an arterial wall. |
| | 13 | Q: And -- |
| | 14 | A: Or -- go ahead. |
| | 15 | Q: I didn't mean to interrupt you. |
| | 16 | A: No, I'm fine. |
| | 17 | Q: And so it's plaque buildup in the wall? |
| | 18 | A: Within the wall. |
| | 19 | Q: Of the artery? |
| | 20 | A: Yes. |
| | 21 | Q: And just so the jury understands, where are |
| | 22 | the arteries? |
| | 23 | A: All over. |
| | 24 | Q: And arteries are all over your body? |
| | 25 | A: Yes. |

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                                    14

14:  1    Q: Do they flow to or from the heart?
     2    A: They flow from the heart.
     3    Q: Okay. And when we see the phrase coronary
     4    artery disease, is that the same thing as
     5    atherosclerosis?
     6    A: It is implied that it is atherosclerosis of
     7    the coronary arteries.
     8    Q: Now, when you have this plaque buildup in the
     9    walls of arteries, does it have the potential to
    10    restrict blood flow?
    11    A: Yes.
    12    Q: And is that something that can be dangerous?
    13    A: Yes.
    14    Q: And why is that dangerous from time to time?
    15    A: Complete occlusion is what a heart attack is,
    16    and that results in lack of blood flow to a section of
    17    heart muscle, and that section of heart muscle starts
    18    to die and form a scar and, therefore, is no longer a
    19    muscle, cannot contract, and so it diminishes the
    20    pumping ability of the heart as a whole.
    21    Q: Do many people have plaque and not know it?
    22    A: That is possible.
    23    Q: Is it probable that many people walk around
    24    all the time and have plaque in their arteries and
    25    just simply not know it?
15:  1    MR. NABERS: Objection to the form.
     2    A: You'll have to define probable.
     3    Q:  (By Mr. Krumholz)  Well, I mean, not everyone
     4    comes into your clinic, for example, in Salt Lake City
     5    and comes in for any sort of cardiac catherization or
     6    any other test that would show that there's some sort
     7    of coronary artery disease, true?
     8    A: I only -- we see mostly the ones who are
     9    symptomatic.
    10    Q: Okay. And are there people -- maybe I need
    11    to rephrase my question. Are there folks who are not
    12    symptomatic that have plaque in their arteries?
    13    MR. NABERS: Objection to form.
    14    A: Yes, there are, the incidence of which I
    15    don't know.
    16    Q:  (By Mr. Krumholz)  But it's commonly known in
    17    the cardiology community that --
    18    A: That happens.
    19    Q: -- that folks have plaque in their arteries
    20    without any signs or symptoms, true?
    21    A: That is true.
    22    Q: Now, how is it that you can have plaque in
    23    your arteries like you've described and not have any
    24    signs or symptoms?
    25    A: It's a matter of whether it restricts blood

Printed: 10/3/2006   8:43:49AM

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                                          16

16:   1   flow or not, and typically it doesn't even begin to
      2   restrict flow until it's encroached upon the diameter
      3   by 50 percent.
      4   Q:  So you could have plaque in an artery of up
      5   to 50 percent and not have any signs or symptoms of
      6   that plaque?
      7   A:  That's a possibility.
      8   Q:  In fact, you've seen that, I assume, with
      9   your patients?
     10   A:  Yes.
     11   Q:  Okay. And what is considered to be severe
     12   blockage?
     13   A:  I don't know. That would be — severe is a
     14   relative term. It means different things to different
     15   people.
     16   Q:  In your mind, what would be severe
     17   coronary --
     18   A:  In my own estimation?
     19   Q:  Yes.
     20   A:  85, 90 percent, maybe.
     21   Q:  Is the fear that these 50-percent blockages
     22   that may be asymptomatic will fairly quickly become
     23   severe blockages and restrict blood flow?
     24   MR. NABERS:  Objection to the form.
     25   A:  I'm sorry, you'll have to ask that again.
17:   1   I'm not sure I understood.
      2   Q:  (By Mr. Krumholz)  You indicated that some
      3   folks don't have any signs or symptoms but have plaque
      4   up to 50 percent --
      5   A:  Yes.
      6   Q:  -- in a particular artery?
      7   A:  Yes.
      8   Q:  Is the fear that those folks in a fairly
      9   quick period of time might have severe blockages in
     10   those same arteries if they don't control certain risk
     11   factors?
     12   MR. NABERS:  Object to the form.
     13   A:  I don't think you have to put in a fairly
     14   quick period of time. That is, the issue of
     15   prevention is identifying people who might be in that
     16   situation without symptoms yet have the beginnings of
     17   atherosclerotic plaque buildup in their arteries.
     18   Q:  (By Mr. Krumholz)  And what happens if it
     19   gets to the point where there's 85 to 90 percent
     20   plaque in any particular artery? What is it that is
     21   most concerning?
     22   A:  Most people would begin to have symptoms --
     23   will have symptoms by then of exertional angina and --
     24   Q:  So it could cause chest pain?
     25   A:  Yes. That's what angina is.

**Madsen, Bard 2006-07-12**

Madsen PA PC DA DC on 10-3                                              18

18:   1   Q: Angina is chest pain from coronary artery
      2   disease?
      3   A: That's correct.
      4   Q: So it's important to monitor chest pain and
      5   tightness in patients who may be at risk for coronary
      6   artery disease; is that fair?
      7   A: That's fair.
      8   Q: Because that can be a sign that there is
      9   heart disease and that plaque buildup may already be
     10   occurring?
     11   A: It can be a symptom, yes.
     12   Q: And that it would be especially true if there
     13   were other risk factors that that patient may or may
     14   not have or may have in connection with coronary
     15   artery disease?
     16   A: Yes.
     17   Q: Now, do these plaques sometimes rupture?
     18   I've heard the term rupture thrown about.
     19   A: Yes.
     20   Q: And could you describe for the jury what
     21   plaque rupture is?
     22   A: It's always difficult in lay terms, but
     23   basically there are three layers to the artery wall.
     24   The inner layer is called the intima, the middle layer
     25   is a muscular layer called the media, which is where
19:   1   the plaque resides, and the outer layer is called the
      2   adventitia. The plaque develops -- there has been --
      3   in order for the plaque to develop at all, there needs
      4   to be a communication between the media and the blood.
      5   That is, there needs to be lack of integrity of the
      6   intima, the inner lining. That's how the plaque gets
      7   started in the first place.
      8   Sometimes when there's a plaque there, it can
      9   destabilize or be an unstable plaque and become more
     10   exposed to blood. That's called rupture. And the
     11   combination of blood to a freshly ruptured, if you
     12   will, plaque causes the clotting cascade to be
     13   initiated and a clot will form at the site --
     14   Q: And --
     15   A: -- and obstruct.
     16   Q: And the fear is that the clot will actually
     17   obstruct blood to the heart and then cause a heart
     18   attack?
     19   A: That's -- will obstruct totally. That's what
     20   a heart attack is, for whatever reason, is when the --
     21   when an artery becomes totally occluded.
     22   Q: Okay. Now, the process you just described,
     23   the atherosclerosis or atherosclerotic process and the
     24   rupture and the clotting, that happens to folks all
     25   the time in everyday life, true?

Printed: 10/3/2006   8 43:49AM

**Madsen, Bard 2006-07-12**

Madsen PA PC DA DC on 10-3                                   20

20:  1  MR. NABERS:  Objection to the form.
     2  Q:   (By Mr. Krumholz)   Maybe that's a poor
     3  question. Let me reword that.
     4  A: All the time is a --
     5  Q: This process that you've just described, that
     6  is, the rupture and the clotting, happens to people
     7  throughout the United States every day, true?
     8  A: Sure.
     9  Q: And that happens even in the absence of any
    10  sort of medication, true?
    11  A: Yes.
    12  Q: It happens in the absence of what are called
    13  COX-2 inhibitors, true?
    14  A: Yes.
    15  Q: It happens in the absence of Vioxx, true?
    16  A: Yes.
    17  Q: You've seen that in your practice?
    18  A: Yes.
    19  Q: Many of your patients have had heart attacks
    20  when they haven't been on Vioxx?
    21  A: Yes.
    22  MR. NABERS: Objection to the form.
    23  Q:   (By Mr. Krumholz)   Now, what percentage of
    24  heart attacks are caused by ruptures and clots, as
    25  you've described them?

21:  1  MR. NABERS: Objection to the form.
     2  A: Most of them have some -- yeah, most of them
     3  have some form of rupture to complete the process of
     4  total obstruction of an artery.
     5  Q:   (By Mr. Krumholz)   Are you aware of the
     6  statistics as to how many people have heart attacks
     7  each year as a result of the process that you've just
     8  described?
     9  A: I think most heart attacks -- as I said, most
    10  heart attacks, I believe, involve rupture of some --
    11  to some degree.
    12  Q: And resultant clotting?
    13  A: Yes.
    14  Q: And so it would literally be hundreds of
    15  thousands of people who have that occur?
    16  MR. NABERS: Objection to the form.
    17  A: Yes.
    18  Q:   (By Mr. Krumholz)   Now, how quickly plaque
    19  builds up in people varies from patient to patient; is
    20  that true?
    21  A: Yes.
    22  Q: And you can't predict how rapidly it will
    23  occur as to any particular patient; is that fair?
    24  A: Not ahead of time, no.
    25  Q: Some patients with coronary artery disease

Overruled

Plaintiff's Objection
RE: 20:19-20
Speculation

Def's response: none
needed

Plaintiff's Objection
RE: 21:14-15
Speculation, Vague

Printed: 10/3/2006   8:43:49AM

**Madsen, Bard 2006-07-12**

Madsen PA PC DA DC on 10-3                                      22

22:  1  develop it rapidly and some people develop it over a
      2  longer period of time?
      3  A:  That's true.
      4  Q:  While we know certain risk factors accelerate
      5  plaque formation, do you agree that why plaque buildup
      6  accelerates in some people remains somewhat of a
      7  medical mystery?
      8  A:  Yes. I mean, we cannot accurately predict
      9  how rapidly it will build up in someone -- in whom we
    10  know all of their risk factors, even.
    11  Q:  You've seen the rapid progression of
    12  atherosclerosis in people who are not taking COX-2
    13  inhibitors, true?
    14  A:  Yes.
    15  MR. NABERS:  Objection to the form.
    16  Q:   (By Mr. Krumholz)  You've seen the rapid
    17  progression of atherosclerosis in people who are not
    18  taking Vioxx?
    19  A:  Yes.
    20  MR. NABERS:  Same objection.
    21  Q:   (By Mr. Krumholz)  You see that routinely in
    22  your practice?
    23  MR. NABERS:  Same objection.
    24  A:  Yes.
    25  Q:   (By Mr. Krumholz)  Have you seen patients who
23:  1  have 40- to 60-percent stenosis in an artery one year
      2  and in a year's time have severe coronary artery
      3  disease?
      4  A:  I'm sure I have.
      5  Q:  Without ever having taken Vioxx?
      6  A:  Yes.
      7  MR. NABERS:  Objection.
      8  Q:   (By Mr. Krumholz)  Have you seen that in
      9  patients, this type of progression, who weren't on any
    10  COX-2 inhibitor?
    11  A:  Yes.
    12  Q:  And we know, do we not, sir, that in people
    13  who have coronary artery disease, plaque buildup
    14  usually gets worse over time; is that fair?
    15  MR. NABERS:  Objection to the form.
    16  A:  Yes. The rate, however, is highly variable.
    17  Q:   (By Mr. Krumholz)  I want to talk to you
    18  about those folks who might have up to 50-percent
    19  plaque in their arteries and not have any signs or
    20  symptoms.
    21  A:  Yes.
    22  Q:  When does that process start, the building up
    23  of the 50 percent or so plaque? Does that start early
    24  in life?
    25  MR. NABERS:  Objection to the form.

Printed: 10/3/2006   8:43:49AM

*[Handwritten annotations:]*

Overruled

Def's response: Basic cardiology information

Plaintiff's Objection RE: 22:11-13 Speculation

Plaintiff's Objection RE: 22:21-22 Speculation

Plaintiffs objection RE: 23:5 Vague, specutation

Plaintiff's Objection RE: 23:22-24 Speculation, vague Witness is not an Expert on this topic.

**Madsen, Bard 2006-07-12**

Madsen PA PC DA DC on 10-3

24

24:

1 A: I don't know that I can give you a year, but
2 in autopsy studies done years ago in otherwise --
3 well, they're autopsy studies so they died from
4 something, but apparently had normal hearts when they
5 died, teenagers, mid to late teens, had the beginnings
6 of an atherosclerotic process going on.
7 Q:  (By Mr. Krumholz)   Was that in connection
8 with the Korean war and Vietnam studies?
9 A:  I don't recall.
10 Q:  Okay. But what you do recall is that --
11 A:  It starts -- it probably starts in the second
12 to third decade of life.
13 Q:  And I've heard the term atherosclerotic
14 lesion. What does that refer to?
15 A:  Lesion is just a general term, plaque
16 buildup, if you will.
17 Q:  So the start of a lesion or plaque buildup,
18 studies have indicated, starts as early as in your
19 teens?
20 MR. NABERS:  Objection to the form.
21 A:  Yes.
22 Q:  (By Mr. Krumholz)   It can start as early as
23 in your teens?
24 A:  It can as I understand it, yes.
25 Q:  And that's based on your own research and

25:

1 analysis from your years in practice, I assume?
2 A:  I haven't had much experience with teenagers
3 and atherosclerosis, but the process apparently can
4 start that early in life.
5 Q:  Okay. And, then, is it believed that it
6 progresses after it starts in the teenage years?
7 MR. NABERS:  Objection to the form.
8 A:  Generally.
9 Q:  (By Mr. Krumholz)   To understand how a
10 patient who has had a heart attack already is doing,
11 what are the diagnostic tests that you as a
12 cardiologist can perform?
13 A:  An assessment of the arterial anatomy with an
14 angiogram, in which also -- during which we also
15 measure left ventricular pressures, which gives us an
16 idea of whether fluid might be building up in the
17 lungs. We can get an idea of how the heart squeezes
18 overall, whether it's, you know, normal, mildly
19 abnormal, moderately or severely abnormal.
20 Echocardiography is used for that as well.
21 Echocardiography also gives us an idea of what the
22 diastolic function is like or what the stiffness of
23 the heart is like when the heart dilates to fill with
24 blood. We use nuclear treadmills or --
25 Q:  Perfusion?

*Overrule* [handwritten]

*Plaintiff's Objection
RE: 24:17-19
Speculation, Vague
Def's response: Basic
Cardiology information* [handwritten]

Printed: 10/3/2006   8:43 49AM

**Madsen, Bard 2006-07-12**

Madsen PA PC DA DC on 10-3

Overrule )26(

26:  1  A: -- perfusion studies to get -- and cardiac
     2  MRI to get an idea of the extent of heart attacks with
     3  regard to myocardium or heart muscle.
     4  Q: Any other testing?
     5  A: Gee. I think basically that's it. Exercise
     6  testing and radiographic modalities.
     7  Q: There are two types of exercise testing, is
     8  that right, one that is nuclear perfusion --
     9  A: Yes.
     10  Q: -- testing and one that is not; is that fair?
     11  A: And there are -- yes, and there are
     12  treadmills associated with echocardiograms as well.
     13  Q: Okay. I would like to go over each one of
     14  those. In connection with the angiogram, you
     15  indicated you can look at left ventricular pressure?
     16  A: Yes.
     17  Q: Why is that important?
     18  A: It gives us a reasonable idea as to whether
     19  fluid would be building up in the air sacs of the
     20  lung.
     21  Q: And what would we look at when we look at an
     22  angiogram report to show us whether or not left
     23  ventricular function or pressure is a problem?
     24  A: I guess I would say I don't know what a
     25  particular doctor would say, but --

27:  1  Q: Generally speaking.
     2  A: -- left ventricular end-diastolic pressure is
     3  blank.
     4  Q: So it actually will say left ventricular
     5  pressure, that language?
     6  A: Yes.
     7  Q: Okay.
     8  A: It needs to be a diastolic pressure.
     9  Q: Diastolic pressure. And then what would you
     10  look for in terms of how well the heart is squeezing?
     11  A: It would be the ejection fraction and the
     12  segmental wall motion status.
     13  Q: And what is the importance of the ejection
     14  fraction number?
     15  A: It's somewhat predictive.
     16  Q: When you say somewhat --
     17  A: Of how people will do. A poor ejection
     18  fraction is associated with a poor prognosis.
     19  Q: And what is a good ejection fraction?
     20  A: Normal one is around 55 percent.
     21  Q: 55 percent?
     22  A: Or better, maybe even a little less than
     23  that.
     24  Q: And what is that indicative of?
     25  A: Normality.

Printed: 10/3/2006  8:43:49AM

*Def's response:*
*The witness is*
*a cardiologist*
*and this is*
*basic cardiology*
*information*
*(response applies*
*to objections*
*through page*
*34)*

*Plaintiff's Objection*
*RE: 26:13-25*
*Cumulative;*
*witness is not an*
*Expert on this*
*topic.*

*Plaintiff's*
*Objection*
*RE: 27:1-25*
*Cumulative;*
*witness is not*
*An Expert on*
*this topic*

*overruled*

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3

28

| 28: | 1 | Q: So if you have a 55-percent or greater |
| | 2 | ejection fraction percentage -- |
| | 3 | A: It's a better prognosis. |
| | 4 | Q: -- it suggests a good prognosis in terms of |
| | 5 | functionality? |
| | 6 | MR. NABERS:  Objection to the form. |
| | 7 | Q:  (By Mr. Krumholz)  True? |
| | 8 | A: Yes. |
| | 9 | Q:  That's the number you rely on most to |
| | 10 | determine whether the left ventricular pumping, so to |
| | 11 | speak, is doing its job? |
| | 12 | A: Yes. That's reasonable. |
| | 13 | Q: And that's the main pump for the heart, isn't |
| | 14 | it? |
| | 15 | A:  The left ventricular ejection fraction is the |
| | 16 | amount of -- the percentage of blood that the left |
| | 17 | ventricle pumps out to the body. It does not include |
| | 18 | the right ventricle, which is pumping blood to the |
| | 19 | lungs. |
| | 20 | Q: And the left ventricle is the main pump for |
| | 21 | the heart? |
| | 22 | A:  They are both very important. |
| | 23 | Q: True. I understand. I'm not trying to |
| | 24 | minimize the right. |
| | 25 | A:  No, no. But as far as the body, excluding |
| 29: | 1 | the lungs, goes, yeah, that's the important one. If |
| | 2 | you're talking -- |
| | 3 | Q: Let me ask it a different way. |
| | 4 | A: And most heart attacks involve the left |
| | 5 | ventricle. |
| | 6 | Q:  And maybe this is the best way to ask it. Is |
| | 7 | the ejection fraction calculation the gold standard, |
| | 8 | so to speak, in determining whether or not the heart |
| | 9 | is pumping appropriately in a person? |
| | 10 | A: Yes. |
| | 11 | Q:  And is it the best predictor in your mind for |
| | 12 | a patient after a heart attack in terms of prognosis? |
| | 13 | A:  Yes. It is a good predictor. It's not the |
| | 14 | only one. |
| | 15 | Q:  Are there any other values you look at in |
| | 16 | connection with an angiogram that are important? I |
| | 17 | assume stenosis would be -- |
| | 18 | A:  Of course the coronary anatomy and what -- I |
| | 19 | mean, that's the main reason, really. |
| | 20 | Q:  So that shows if there's any blockages that |
| | 21 | you need to be aware of? |
| | 22 | A:  That's correct. |
| | 23 | Q:  Or any plaque, as we've described it? |
| | 24 | A:  Yes. |
| | 25 | Q:  Now, you mentioned electrocardiographs. Do |

Plaintiff's Objection RE: 28:1-12 Cumulative; witness is not an expert on this topic

Plaintiff's Objection RE: 29:6-24 Cumulative; witness is not an expert on this topic

**Madsen, Bard 2006-07-12**

30:
1  you call them EKGs or ECGs?
2  A:  Either way.
3  Q:  You said it measures the stiffness of the
4  heart?
5  A:  No, that's the echocardiogram.
6  Q:  Oh, the echocardiogram. I apologize. Could
7  you describe for the jury what an echocardiogram is?
8  A:  It uses ultrasound to give us a visual two-
9  dimensional picture of the heart. We can also use
10  ultrasound to measure flow characteristics. And using
11  those modalities, as well as some tissue Doppler,
12  which gets very technical, but there are some
13  measurements that can be made to give us an estimate
14  of how stiff the heart is when it dilates to fill with
15  blood.
16  Q:  And if I were to look at a report, what would
17  I need to look to --
18  A:  Diastolic function.
19  Q:  So this is all as to diastolic function?
20  A:  Yes, it is.
21  Q:  And what specific measurements would I be
22  looking for?
23  A:  The E wave and the A wave on Doppler
24  echocardiography and the left ventricular inflow
25  track.

31:
1  Q:  Are reports prepared by doctors after
2  echocardiograms are done?
3  A:  Yes.
4  Q:  Dictated reports?
5  A:  Yes.
6  Q:  What is the language that would be used for a
7  normal echocardiogram?
8  MR. NABERS:  Objection to the form.
9  Q:   (By Mr. Krumholz)  The general language that
10  might be used by a doctor to signify that a patient
11  has a normal electrocardiogram?
12  A:  Echocardiogram.
13  Q:  Echocardiogram, excuse me.
14  A:  I don't know that anybody really would say
15  normal echocardiogram and leave it as such, but if
16  they did, they would imply that there was normal
17  systolic function, normal diastolic function and
18  normal valvular function, as well as normal chamber
19  size.
20  **Q:  You also indicated that one test you might**
21  **use to determine how well a patient who had**
22  **experienced a heart attack was doing is a nuclear**
23  **perfusion study?**
24  **A:  Yes.**
25  **Q:  Could you describe for the jury what a**

Printed: 10/3/2006    8:43:49AM

PLAINTIFF'S
OBJECTION
RE: 31:20 - 34:4
Cumulative;
witness is not
an expert on
this topic

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3

32

32:   1   nuclear perfusion study is?
      2   A:  I'll try. The patient is given a dose of
      3   sestamibi or Cardiolite, in our office, anyway --
      4   *that's the one we use -- which is tagged to red blood*
      5   cells and the heart is then imaged. We call it a
      6   camera. It's a scanner that goes over the heart and
      7   images -- it receives radiation from the heart where
      8   blood is flowing. This is picked up in various
      9   angles.
      10   The computer generates a picture of the
      11   heart, if you will, and if there's a section of heart
      12   muscle not getting good blood flow, less radioactivity
      13   will come back at the camera or scanner from that area
      14   and the computer will color it a different color.
      15   That is done at rest and then again right after
      16   exercise.
      17   Q:  Is it done at peak exercise? In other words,
      18   is the isotope --
      19   A:  The isotope actually is injected a minute and
      20   a half to two minutes before the patient stops
      21   exercising.
      22   Q:  I see. And --
      23   A:  But it is, generally speaking, felt to be at
      24   peak exercise.
      25   Q:  Then when you -- do you look at the images on
33:   1   some sort of monitor?
      2   A:  Yes.
      3   Q:  Is that a computer monitor?
      4   A:  Yes.
      5   Q:  And do you keep track of the plaque buildup
      6   that you see in --
      7   A:  No. It does not show plaque buildup.
      8   Q:  Okay.
      9   A:  It shows large areas of heart muscle and the
      10   perfusion of blood to that section. You do not see
      11   arteries. You do not see plaque.
      12   Q:  What is the importance of perfusion?
      13   A:  Perfusion is blood flow. So you like to see
      14   normal blood flow to all segments of the left
      15   ventricle.
      16   Q:  And do you also measure ejection fraction in
      17   connection with nuclear perfusion studies?
      18   A:  We do. I think it is probably less reliable.
      19   That's just a general feeling I have is that it's not
      20   as -- if you're looking for ejection fraction, I think
      21   an echocardiogram or the ejection fraction on an
      22   angiogram is probably more reliable.
      23   Q:  Have you found ejection fractions that are
      24   calculated in connection with angiograms done in this
      25   office to be reliable predictors of outcome?

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                                    34

34:  1   A:  Well, first of all, we don't do the ejection
     2   fractions in this office. They are done in the
     3   hospital, generally speaking, within limits, of
     4   course, yes.
     5   Q:  Someone with an ejection fraction of 60
     6   percent or greater, I think you said 55 percent or
     7   greater in connection with an angiogram would have a
     8   normally functioning heart at the time of that
     9   angiogram?
    10   A:  That's not necessarily true.
    11   Q:  I thought that's what you said.
    12   A:  I said that's a normal ejection fraction.
    13   That doesn't mean -- I mean, because we're talking
    14   about numbers. That doesn't mean the heart is
    15   squeezing normally, necessarily. You can still have a
    16   normal overall global ejection fraction and have a
    17   segment of heart muscle that's not squeezing.
    18   Q:  But what's important is overall function of
    19   the heart, true?
    20   A:  That is important.
    21   Q:  Is that the most important thing in terms of
    22   predicting outcome, the overall function of the heart?
    23   A:  That's how studies have been run thus far.
    24   Q:  And that's what you rely on in predicting
    25   outcome, meaning prognosis, generally?
35:  1   A:  It's not the only thing.
     2   Q:  But that's the primary thing you look to?
     3   A:  If we're talking -- you're talking about
     4   coronary artery disease?
     5   Q:  Yes.
     6   A:  That's not the only thing. I think the
     7   absence or presence of ischemia, which is reduced
     8   blood flow during stress periods, is important as
     9   well. We don't know exactly -- we probably do. The
    10   worse the diastolic function, that also plays a role,
    11   I'm sure. And certainly if somebody has resultant
    12   valvular disease from a coronary artery disease, a
    13   heart attack, that will play a role as well.
    14   It's possible, for example, for someone to
    15   have severe mitral regurgitation from a heart attack
    16   and have a super normal ejection fraction, yet the
    17   prognosis is terrible until you get the valve fixed.
    18   Q:  I understand. So if we were going to look at
    19   a patient to determine whether or not that patient was
    20   going to have a good outcome, a good prognosis going
    21   into the future, you would want to look at ejection
    22   fraction?
    23   A:  Yes.
    24   Q:  True?
    25   A:  True.

Printed: 10/3/2006   8:43:49AM

**Madsen, Bard 2006-07-12**

36:
1  Q:  You would want to look at whether there's any
2  evidence of subsequent ischemia or ischemia after the
3  heart attack, correct?
4  A:  Yes.
5  Q:  And what tests would you look to to determine
6  that?
7  A:  Ischemia?
8  Q:  Yes.
9  A:  A nuclear perfusion scan such as we've just
10  described.
11  Q:  Or an angiogram?
12  A:  Or -- now, an angiogram doesn't tell you
13  about perfusion --
14  Q:  But it tells you --
15  A:  -- to heart muscle, but it tells you -- it
16  tells you the degree of stenosis, the degree of
17  blockage.
18  Q:  Which may be an indication of ischemia?
19  A:  It may be.
20  Q:  But not necessarily conclusive?
21  A:  That's right.
22  Q:  Then diastolic function, where would we look?
23  A:  An echocardiogram.
24  Q:  Anywhere else?
25  A:  No. That's -- typically that's where you
37:
1  would find it.
2  Q:  And then valve --
3  A:  Valvular function.
4  Q:  Valvular function. I can't even read my own
5  handwriting.
6  A:  You get an idea -- you can get some
7  information from an echocardiogram, some from a heart
8  catherization.
9  Q:  An angiogram?
10  A:  Uh-huh (affirmative).
11  Q:  Is that a yes? I'm sorry.
12  A:  I'm sorry, yes, it is.
13  Q:  I'm not fussing at you. I hope you know
14  that.
15  And then you said mitral regurgitation?
16  A:  Yes.
17  Q:  What kind of study could we do to determine
18  that?
19  A:  That's valvular disease.
20  Q:  Meaning --
21  A:  An echocardiogram.
22  Q:  Anything else?
23  A:  An angiogram.
24  Q:  Any of the above?
25  Okay. How do you decide which test to use on

# Madsen, Bard 2006-07-12

38:    1    a particular patient after a heart attack?
       2    A: Which patient?
       3    Q: Well, what diagnostic test to use that will
       4    tell you how the patient is doing, a diagnostic test?
       5    A: The most basic thing is the history and
       6    physical, and then that sort of -- that is supposed to
       7    guide you.
       8    Q: How do you decide whether or not to do an
       9    echocardiogram?
      10    A: I -- personally?
      11    Q: How do cardiologists --
      12    A: I personally -- if someone has had a heart
      13    attack, I look for a reason not to do an angiogram or
      14    an echocardiogram, and usually I can't find one. An
      15    echocardiogram is pretty, you know -- not pretty, it
      16    is noninvasive and is an easy thing to get and gives
      17    us such good information. And so normally I get an
      18    echocardiogram on most patients unless it's been a
      19    very small heart attack in the hospital and we've
      20    reperfused the heart quickly.
      21    Q: What do you mean by reperfused the heart?
      22    A: Opened the artery back up.
      23    Q: So if it's a small heart attack or a minor
      24    heart attack and, for example, a stent is placed and
      25    opens up a vessel quickly, the vessel at issue, then
39:    1    you may not do an echo, and otherwise you would?
       2    A: Maybe not, but I try to remind myself to do
       3    an echo in most of my patients.
       4    Q: And that's -- but the circumstance I just
       5    described is the only circumstance after a heart
       6    attack that you feel you would not do an echo,
       7    routinely?
       8    A: Probably. You can't hold me to that.
       9    Q: I want to go back to the ejection fraction
      10    for a moment. It does measure the ability of the
      11    heart to pump blood and oxygen to the rest of the
      12    body, true?
      13    A: Not necessarily.
      14    Q: And that's because of the regurgitation
      15    problem?
      16    A: Could be that.
      17    Q: Absent a regurgitation or other similar
      18    issue, is it true that it measures the ability of the
      19    heart to pump blood and oxygen to the rest of the
      20    body?
      21    A: If there's nothing else -- nothing else wrong
      22    with the heart, with the pericardium, with the valves,
      23    that's, I would say, without taking a long time to
      24    think of any other sneaky possibilities, yes, that's
      25    true.

## Madsen, Bard 2006-07-12

40:
1  Q:  And many heart attacks result in ejection
2  fractions in the 20- to 30-percent range, for example?
3  A:  A heart attack can result in that, yes.
4  Q:  And that would be very severe, I assume?
5  A:  That would be significant.
6  Q:  It would be indicative of a very significant
7  heart attack?
8  A:  Yes. Yes.
9  Q:  And would reveal that the heart is less able
10  to function properly?
11  A:  Yes.
12  Q:  On the other hand, when you see the patients
13  with 55 percent or greater, generally speaking, as
14  long as you take into consideration these other
15  factors, it would be a good sign?
16  A:  Yes.
17  Q:  It would be a sign that the heart is able to
18  pump blood fairly normally to the rest of the body?
19  MR. NABERS:  Object to the form.
20  A:  Yes.
21  Q:   (By Mr. Krumholz)  Do you agree that the
22  ejection fraction is a powerful tool in measuring
23  long-term prognosis after a heart attack, together
24  with these other factors you've described?
25  A:  Yes.

41:
1  MR. NABERS:  Objection to the form.
2  A:  Yes.
3  Q:   (By Mr. Krumholz)  Is there a different
4  normal ejection fraction percentage in connection with
5  cardiac catheterizations or angiograms as opposed to
6  nuclear perfusion stress tests?  What I mean by that
7  is you indicated that a cardiac cath, maybe 55 percent
8  is the minimum level --
9  A:  Yes.
10  Q:  -- of normality?
11  A:  In our office, for example, I would say at
12  one point that's true. We were getting abnormally low
13  ejection fractions in people who had normal hearts on
14  perfusion studies. The ejection fractions were coming
15  out 45, 48 percent, and yet the patient had a normal
16  heart on echo and on catherization.
17  Q:  So in your office, the nuclear perfusion
18  studies were actually underestimating their ejection
19  fractions?
20  A:  For a while. We've changed software and I
21  think things have switched the other way, maybe.
22  Q:  During what time frame were ejection fraction
23  percentages underestimated in nuclear perfusion
24  studies?
25  A:  That's a general -- you couldn't always say

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                                42

```
42:   1    that for every patient.
      2    Q:  But just generally in your office?
      3    A:  Generally? It's been about a year or so.
      4    Q:  It's been a year from today?
      5    A:  Yeah, from this point, I think, around there.
      6    But, you know, that wasn't for every patient, though.
      7    Q:  I understand. But you found that when it
      8    was --
      9    A:  I just happened to notice, and I didn't keep
     10    track of the numbers one versus another, but there
     11    were several patients who had -- to look at the number
     12    looked abnormal, to look at the -- to look at how the
     13    heart squeezes with more reliable modalities was
     14    normal.
     15    Q:  What is the most accurate test to determine
     16    what activities a patient can perform after a heart
     17    attack?
     18    A:  Treadmill.
     19    Q:  In other words, what a patient can or can't
     20    do?
     21    A:  A treadmill, probably.
     22    Q:  And you indicated at least two, and I think
     23    maybe three, tests that involve the treadmill?
     24    A:  Yes.
     25    Q:  One was just a normal stress test?
43:   1    A:  Yes.
      2    Q:  One was a stress test involving the nuclear
      3    perfusion study?
      4    A:  Yes.
      5    Q:  And I think the third was an echocardiogram?
      6    A:  Yes.
      7    Q:  Okay. And which one is the most sensitive,
      8    so to speak, in determining what a patient can or
      9    can't do?
     10    A:  Probably the nuclear treadmill.
     11    Q:  Okay. Why is that?
     12    A:  Probably -- well, a treadmill of any kind
     13    will tell you how far someone can go before they
     14    become symptomatic. As far as being the most
     15    sensitive in picking up ischemia, lack of blood flow
     16    during exercise, for example, that's probably a
     17    nuclear scan.
     18    Q:  Now, in addition to picking up ischemia and
     19    just how much time a patient can spend on a treadmill
     20    exercising, can you also measure what's called the
     21    functional workload?
     22    A:  It's a calculation, I believe, yes.
     23    Q:  And what does functional workload mean, just
     24    so the jury and I completely understand it?
     25    A:  It's the amount of work someone can do. It's
```

Printed: 10/3/2006   8:43:49AM

**Madsen, Bard 2006-07-12**

44:  1  measured probably in various ways. I think METs is
2  one way.
3  Q:  METs meaning the amount of blood or oxygen
4  that the heart is able to distribute to the body over
5  a particular period of time?
6  A:  It's just the workload that is -- that one
7  has to develop to travel -- to walk at a given speed
8  at a given angle.
9  Q:  And is that an important measure in
10  determining what a patient's ability is to participate
11  in various activities?
12  A:  It's a guide. I've seen people who didn't
13  perform well on a treadmill yet were able to do better
14  than one would have predicted in life. I mean --
15  Q:  But if a patient is able to complete, for
16  example, a stress test and is able to exercise for a
17  period longer than expected for that person's age and
18  gender, that would be a good thing?
19  A:  That's a good sign.
20  Q:  And it's a good sign because the METs, so to
21  speak, would be high in that circumstance?
22  A:  Higher than normal -- than predicted.
23  Q:  And you can relate that -- there are actually
24  studies that you have seen, probably, that relate the
25  number of METs to the physical activities?

45:  1  A:  Yes.
2  MR. NABERS:  Objection to the form.
3  Q:   (By Mr. Nabers)  Have you found those to be
4  reliable?
5  A:  I don't use them.
6  Q:  But do reliable journals publish that sort of
7  information?
8  A:  I believe they probably do.
9  Q:  Now, what is the difference between a Q wave
10  heart attack and a non-Q wave heart attack?
11  A:  The thickness of the heart muscle that is
12  involved. If it's a full thickness heart attack, that
13  usually results in Q wave on the electrocardiogram.
14  Q:  And what about a non-Q wave, what does that
15  mean?
16  A:  Non-Q wave is not a full thickness. It is
17  not a full thickness heart attack. Usually the inner
18  surfaces of the heart muscle have been involved.
19  Q:  Is that the same way of saying one is a
20  transmural heart attack through the wall and one is
21  not?
22  A:  That's also true. Transmural is usually --
23  transmural means full thickness. Nontransmural is not
24  full thickness.
25  Q:  And so the more significant heart attacks are

Printed: 10/3/2006  8:43:49AM

overruled

**Madsen, Bard 2006-07-12**

Madsen PA PC DA DC on 10-3

46

| 46: | 1 | transmural Q wave heart attacks? |
|---|---|---|
| | 2 | A: Generally speaking, yes. |
| | 3 | Q: And non-Q wave heart attacks are, generally |
| | 4 | speaking, less significant? |
| | 5 | A: Yes. |
| | 6 | Q: I've also heard the term hypokineses. Can |
| | 7 | you describe for us what that is? |
| | 8 | A: Let's go back to the previous question. |
| | 9 | Q: Sure. |
| | 10 | A: Less significant, that -- any heart attack is |
| | 11 | significant. |
| | 12 | Q: That's fair enough. |
| | 13 | A: Sometimes a non-Q wave heart attack carries |
| | 14 | more significance in that there has not been a full |
| | 15 | thickness heart attack because the artery is not |
| | 16 | totally occluded and that the -- that there is a |
| | 17 | potential for further damage in that area. |
| | 18 | Q: Thank you for that clarification. Actually, |
| | 19 | I want to make sure I understand. A non-Q wave heart |
| | 20 | attack, generally speaking, is less severe, but there |
| | 21 | are exceptions? |
| | 22 | A: It's -- it is less severe in that less |
| | 23 | myocardium has been involved, but it also carries the |
| | 24 | potential for further damage. |
| | 25 | Q: Because not all of the heart muscle has been |
| 47: | 1 | damaged? |
| | 2 | A: That's right. |
| | 3 | Q: Okay. It's a good thing because -- |
| | 4 | A: It's a good thing on one hand, but it also |
| | 5 | tells me that you ought to look to see if more is |
| | 6 | coming down the road and do something about it ahead |
| | 7 | of time. |
| | 8 | Q: And how would you look and see if more is |
| | 9 | coming down the road? |
| | 10 | A: Probably with an angiogram. |
| | 11 | Q: And you would look at the stenosis? |
| | 12 | A: Yes. |
| | 13 | Q: That is the amount of blockage that is in the |
| | 14 | arteries? |
| | 15 | A: Yes. |
| | 16 | Q: And you would look at the ejection fraction? |
| | 17 | A: You would be mostly concerned with the status |
| | 18 | of the artery. |
| | 19 | Q: Whether it was open? |
| | 20 | A: Open -- well, yes, whether it was open, and |
| | 21 | if so, by how much. |
| | 22 | Q: Then, of course, you could run a nuclear |
| | 23 | perfusion study and figure out blood flow if it was |
| | 24 | open? |
| | 25 | A: You could. |

Re: 46:6-17
Def Obj:
   Non-responsive
The witness is not
PLAINTIFF's
   response
being unresponsive, in
fact, he is just clarifying
and completing a
prior answer. This
is exactly the type of
complete + accurate
testimony he was
able to provide
in this case.

# Madsen, Bard 2006-07-12

48:
1 Q: And that would be helpful in determining or
2 predicting?
3 A: It depends. If I were to see a 90-percent
4 stenosis, I think that would tell me I don't need to
5 do a perfusion scan but to dilate and stent the
6 artery.
7 Q: By the way, what is the minimum percentage of
8 occlusion or blockage where you would recommend that
9 you should go ahead and stent the artery?
10 A: I don't think I have one.
11 Q: What about if it's the left anterior
12 descending artery?
13 A: I don't stent those. Oh, the left anterior
14 descending, I'm sorry.
15 Q: Yes.
16 A: No, it's no different from one artery to the
17 next.
18 Q: If a left anterior descending artery has, for
19 example, 60-percent blockage, would you recommend that
20 that patient have a stent in that location?
21 A: That would depend.
22 Q: On?
23 A: Symptoms and probably scan results.
24 Q: When you say a scan, are we talking about --
25 A: Perfusion scan, nuclear perfusion scan.

49:
1 **Q: If there were 90-percent occlusion in the**
2 **left anterior descending artery, would you recommend a**
3 **stent --**
4 **A: Or circumflex or right coronary artery, I**
5 **would try and stent that.**
6 **Q: No matter what?**
7 **A: Well, never say never.**
8 **Q: But, generally speaking, that's what you**
9 **would do?**
10 **A: Generally speaking, I would.**
11 Q: Okay. We were talking about hypokineses, I
12 think, and I may have interrupted your answer, but --
13 A: Go ahead.
14 **Q: Could you describe for us again what**
15 **hypokineses is?**
16 **A: Hypokineses is referred to as a segment of**
17 **the left ventricle that does not contract well.**
18 **Q: Okay. And it's evidence of some damage; is**
19 **that right?**
20 **A: Yes.**
21 **Q: There are degrees of hypokineses, true?**
22 **A: Sure.**
23 **Q: There are mild cases of hypokineses, true? I**
24 **don't know if cases is the appropriate term, but I've**
25 **seen it described as mild hypokineses?**

### Madsen, Bard 2006-07-12

50:
1  A: It's a continuum of no hypokineses to
2  akineses, which is no movement at all, no thickening
3  when the heart is squeezing at all. So if someone
4  wants to divide it up into mild, moderate and severe
5  and then no or akineses, I'm okay with that.
6  Q: Okay. Yeah, I just want to make sure we all
7  understand that there's varying degrees of kinesis,
8  true?
9  A: Yes.
10  Q: And there's mild, on the one hand?
11  A: And none on the other.
12  Q: And none on the other meaning no motion in
13  the heart wall at that place?
14  A: That's right, no thickening.
15  Q: And obviously there's moderate?
16  A: Somewhere in between.
17  Q: Okay. If you have a normal ejection fraction
18  and mild hypokineses, what does that signify to you?
19  A: That there's been some damage done.
20  Q: What does it signify to you in terms of
21  prognosis?
22  MR. NABERS: Objection to the form.
23  A: Reasonable prognosis still.
24  Q:  (By Mr. Krumholz)  A reasonably good
25  prognosis?

51:
1  A: Yes.
2  MR. NABERS: Object to the form.
3  MR. KRUMHOLZ: Let's take a short break.
4  THE VIDEOGRAPHER: We're going off the
5  record. It's 49 minutes after 3:00.
6  (Recess.)
7  THE VIDEOGRAPHER: It's 4:00 and we're back
8  on the record.
9  (Exhibit Nos. 3 and 4 marked.)
10  Q:  (By Mr. Krumholz)  Doctor, before the break
11  you indicated that the plaintiffs' attorneys had given
12  you various material. Do you recall that?
13  A: Yes.
14  Q: You have now gone up to your office and have
15  gotten all the materials that the plaintiffs'
16  attorneys have forwarded to you --
17  A: Yes.
18  Q: -- in connection with Mr. Mason?
19  A: I don't know what it's in connection to. I
20  haven't read it, but that's what they gave me.
21  Q: Fair enough. It's the only documents or
22  materials that have been provided to you by Mr. Nabers
23  or anyone else with his law firm, to your knowledge?
24  A: That's correct.
25  Q: Okay. And those items have been marked as

## Madsen, Bard 2006-07-12

| | | |
|---|---|---|
| 52: | 1 | Exhibit 3 and Exhibit 4 to your deposition? |
| | 2 | A: Okay. |
| | 3 | Q: Is that true? |
| | 4 | A: Yes. |
| | 5 | Q: Okay. I assume that you would hope that they |
| | 6 | would have provided you all relevant information for |
| | 7 | your purposes today? |
| | 8 | MR. NABERS: Objection to the form. |
| | 9 | A: I don't -- I can't answer that. I don't |
| | 10 | know -- |
| | 11 | Q:  (By Mr. Krumholz)  Your hope would be, |
| | 12 | Doctor, would be that the Blizzard law firm would |
| | 13 | provide you the full picture or all relevant evidence |
| | 14 | that might impact your testimony today and not just |
| | 15 | some of it that may be tainted one way or another? |
| | 16 | MR. NABERS: Objection to the form. |
| | 17 | A: Well, one would hope that. As I recall, I |
| | 18 | asked them for the articles and that's what I thought |
| | 19 | they were giving me, and I have not read them yet. |
| | 20 | Q:  (By Mr. Krumholz)  You first met Mr. Mason in |
| | 21 | September of 2002; is that right? |
| | 22 | A: Yes. |
| | 23 | Q: By the way, did you ask for specific articles |
| | 24 | or just some general literature? |
| | 25 | A: I asked for the articles they had with them. |
| 53: | 1 | Q: Okay. And those were articles that they |
| | 2 | discussed with you while you met with them? |
| | 3 | A: Like I said, I haven't read what's in there. |
| | 4 | Q: But whatever they chose to bring to your |
| | 5 | meeting -- |
| | 6 | A: And I asked them for -- |
| | 7 | Q: You asked for a copy? |
| | 8 | A: A copy. |
| | 9 | Q: Fair enough. |
| | 10 | A: I just haven't read through them yet. |
| | 11 | Q: Back to my original question. You may have |
| | 12 | answered it, but I just want to make sure. |
| | 13 | A: That's fine. |
| | 14 | **Q: You first met Mr. Mason in September of 2002;** |
| | 15 | **is that right?** |
| | 16 | **A: Correct.** |
| | 17 | **Q: And you performed a stress test on Mr. Mason** |
| | 18 | **at that time?** |
| | 19 | **A: I did.** |
| | 20 | Q: Did you understand that Mr. Mason had a non-Q |
| | 21 | wave heart attack in July of 2003? |
| | 22 | MR. NABERS: Objection to the form. |
| | 23 | Q:  (By Mr. Krumholz)  Not did you at the time, |
| | 24 | but -- I assume you understand that now? |
| | 25 | A: I haven't -- all I have reviewed is my -- is |

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                                        54

| 54: | 1 | what I did with him. I haven't reviewed the rest of |
| | 2 | the chart. |
| | 3 | Q: Fair enough. If you could, before looking at |
| | 4 | your record, look at Exhibit -- let's see here, |
| | 5 | Exhibit 13. Do you have that in front of you? |
| | 6 | A: Are they in order? |
| | 7 | Q: They should be pretty close. Do you see |
| | 8 | Exhibit 13? |
| | 9 | A: Cardiac -- LDS Hospital Cardiac Catherization |
| | 10 | Laboratory. |
| | 11 | **Q: Exhibit 13 to Dr. Symkoviak's deposition --** |
| | 12 | **A: That's what I have.** |
| | 13 | **Q: -- is the cardiac catheterization or angiogram** |
| | 14 | **performed --** |
| | 15 | **A: Yes.** |
| | 16 | **Q: -- on July 25 of 2003 on Mr. Mason, true?** |
| | 17 | **A: Yes.** |
| | 18 | Q: And if you look in that angiogram, do you see |
| | 19 | an ejection fraction calculation? |
| | 20 | MR. NABERS: Let me just object to the use of |
| | 21 | the -- |
| | 22 | MR. KRUMHOLZ: I'll object to -- okay. I'm |
| | 23 | sorry. I apologize, Scott. |
| | 24 | MR. NABERS: I just need to object to the use |
| | 25 | of this exhibit, because he's never seen it before. |
| 55: | 1 | He hasn't had a chance to review it and he hasn't seen |
| | 2 | the underlying data that was used to support the |
| | 3 | report. But that's just my objection. |
| | 4 | **Q: (By Mr. Krumholz) And, sir, I would like you** |
| | 5 | **to go ahead and review Exhibit 13, if you would.** |
| | 6 | **A: It will take me a while. Do you want me to** |
| | 7 | **just look at specific parts?** |
| | 8 | **Q: Well, I want you to become comfortable enough** |
| | 9 | **to where you could identify certain measurements that** |
| | 10 | **were --** |
| | 11 | **A: I can identify -- it says 'Calculated** |
| | 12 | **ejection fraction is 60 percent.'** |
| | 13 | **Q: Okay. And is that the calculation performed** |
| | 14 | **by Dr. Ganellen on July 25 as to ejection fraction --** |
| | 15 | MR. NABERS: Objection to the form. |
| | 16 | **Q: (By Mr. Krumholz) -- according to that** |
| | 17 | **report?** |
| | 18 | MR. NABERS: Calls for speculation. |
| | 19 | **A: I don't know if Dr. Ganellen did it himself** |
| | 20 | **or if one of the techs did it.** |
| | 21 | **Q: (By Mr. Krumholz) But regardless -- who was** |
| | 22 | **the doctor who performed the cardiac catherization,** |
| | 23 | **according to Exhibit 13?** |
| | 24 | MR. NABERS: Objection to the form. |
| | 25 | **A: It says Edward Ganellen on here.** |

Printed: 10/3/2006    8:43:49AM

*Handwritten annotations:*

Overruled

PLAINTIFF'S
OBJection
RE: 54:11-17
NO FOUNDATION;
speculation; witness
is not n expert
on this topic

Def's response: witness is
a cardiologist who treated
plaintiff (response applies
to objections through page
86)

PLAINTIFF'S
OBJection
RE: 55:4-25
NO FOUNDATION;
speculation;
witness is not
an expert on
this topic

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3

Overrule

PLAintiff's
Objection
RE: 56:1-25
     57:1-25

No foundation,
Speculation,
witness is
not An
expert on
this topic

| 56: | 1 | Q: (By Mr. Krumholz) Do you know Dr. Ganellen? |
|---|---|---|
|  | 2 | A: Some. |
|  | 3 | Q: Is he a well-respected cardiologist? |
|  | 4 | A: Yes. |
|  | 5 | Q: And is it -- did Dr. Ganellen sign Exhibit |
|  | 6 | 13? |
|  | 7 | A: There appears to be a signature there. It's |
|  | 8 | not legible to me, but -- |
|  | 9 | Q: But it's just next to the name Edward |
|  | 10 | Ganellen, M.D.? |
|  | 11 | A: It is. |
|  | 12 | Q: And if you received this cardiac cath report |
|  | 13 | in July or August of 2003, would you have been able to |
|  | 14 | rely on it in connection with any treatment of |
|  | 15 | Mr. Mason? |
|  | 16 | MR. NABERS: Objection to the form. |
|  | 17 | A: Yes. |
|  | 18 | Q: (By Mr. Krumholz) So you, in the normal |
|  | 19 | course of your practice, would be able to look at a |
|  | 20 | record like Exhibit 13 that is an angiogram from the |
|  | 21 | hospital and be able to read it and interpret it to |
|  | 22 | your satisfaction? |
|  | 23 | A: Yes. |
|  | 24 | Q: And to the extent you had any concerns about |
|  | 25 | being able to read it or interpret it, you could call |
| 57: | 1 | Dr. Ganellen if you were treating Mr. Mason? |
|  | 2 | A: Yes. |
|  | 3 | MR. NABERS: Objection to the form. |
|  | 4 | A: Yes. |
|  | 5 | Q: (By Mr. Krumholz) Now, I want to talk to you |
|  | 6 | about the calculated ejection fraction percentage |
|  | 7 | that's indicated in Exhibit 13. Do you see that? |
|  | 8 | A: I do. |
|  | 9 | Q: And it says it's 60 percent? |
|  | 10 | A: Yes. |
|  | 11 | Q: And that would be the kind of good finding |
|  | 12 | that you described earlier for us, true? |
|  | 13 | MR. NABERS: Objection to the form. |
|  | 14 | A: Yes. |
|  | 15 | Q: (By Mr. Krumholz) If you were to have |
|  | 16 | received this record in your office after this heart |
|  | 17 | attack and saw that Dr. Ganellen's report indicates an |
|  | 18 | ejection fraction percentage of 60 percent, you would |
|  | 19 | have thought, generally speaking, that would be a good |
|  | 20 | sign for Mr. Mason? |
|  | 21 | MR. NABERS: Objection to the form. |
|  | 22 | Q: (By Mr. Krumholz) True? |
|  | 23 | A: In light of what has happened to him, yes. |
|  | 24 | Q: In fact, that would be a normal ejection |
|  | 25 | fraction for anyone who -- even people who had not had |

Printed: 10/3/2006   8:43:49AM

**Madsen, Bard 2006-07-12**

58: 1 a heart attack, true?
2 A: The number would be, yes.
3 Q: Now, you mentioned earlier that these
4 angiograms also calculate the amount of stenosis
5 that's present?
6 A: Yes.
7 Q: And on the first page it says, 'Percentage
8 stenosis.' Do you see that?
9 A: I see where it says —
10 Q: Towards the top on the first page.
11 A: Yes.
12 Q: And do you see where it says LAD?
13 A: Yes.
14 Q: And it says, '90 percent stenosis'?
15 A: Yes.
16 Q: Does that mean that there was an occlusion
17 found in connection with the cardiac cath of 90
18 percent at the left anterior descending artery?
19 A: Yes.
20 Q: And then it says, 'First diagonal.' Do you
21 see that?
22 A: Yes.
23 Q: And does it say '70 percent stenosis' next to
24 the first diagonal?
25 A: It does.

59: 1 Q: Could you describe for the jury where the
2 left anterior descending artery is and where the first
3 diagonal is?
4 A: Left anterior descending artery comes down
5 the front part of the heart and the first diagonal is
6 a branch off of that that generally goes to the
7 lateral or left side of the left ventricle.
8 Q: And what sort of procedure does this record
9 indicate was performed on Mr. Mason as a result of
10 those findings?
11 A: Middle of the page it says, 'Angioplasty
12 lesion results.'
13 Q: And what actually was performed, what
14 procedures, according to this record?
15 A: I don't know. I haven't read it all. It
16 looks like he had an angioplasty and a stent.
17 Q: Was that the appropriate -- I assume you
18 believe that was the appropriate procedure to perform
19 in light of the results of this --
20 A: It's not a fair question without being --
21 without seeing the actual films.
22 Q: Okay. Fair enough. But regardless, in
23 connection with the left anterior descending artery,
24 the 90-percent stenosis, you understand that a stent
25 was placed?

*[Handwritten: overruled]*

*[Handwritten: PLAINTIFF'S OBJECTION RE: 59:1-7 NO FOUNDATION; SPECULATION; WITNESS IS NOT AN EXPERT ON THIS TOPIC]*

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                          60

| | |
|---|---|
| 60: | 1 A: I do. |
| | 2 Q: Have you performed stents on left anterior |
| | 3 descending arteries where the occlusion was 90 |
| | 4 percent? |
| | 5 A: Yes. |
| | 6 Q: With respect to that first diagonal branch |
| | 7 that you mentioned, there was an angioplasty |
| | 8 performed; is that right? |
| | 9 A: Yes. |
| | 10 Q: What is the purpose of an angioplasty in that |
| | 11 context? |
| | 12 A: It is a balloon dilatation of the 70-percent |
| | 13 stenosis of the diagonal branch. |
| | 14 Q: Does this record indicate what the results |
| | 15 were after the stent was placed and after the |
| | 16 angioplasty was performed? |
| | 17 A: Yes. |
| | 18 Q: And what were those results as to each? |
| | 19 A: The stent and the LAD reduced the lesion to |
| | 20 zero percent stenosis. |
| | 21 Q: So that meant after the procedure, there was |
| | 22 zero percent stenosis in the LAD where the stent was |
| | 23 performed, and the same would be true for the first |
| | 24 diagonal branch? |
| | 25 A: There was apparently a residual 10-percent |
| 61: | 1 stenosis, is what it says here. |
| | 2 Q: On the diagonal branch? |
| | 3 A: On the diagonal branch. |
| | 4 Q: But, otherwise, the arteries were wide open, |
| | 5 according to the record? |
| | 6 A: There was no residual stenosis in the LAD and |
| | 7 there was a 10-percent residual stenosis on the |
| | 8 diagonal branch. |
| | 9 Q: I'm trying to use terms that we understand. |
| | 10 How would you describe that to a layperson? |
| | 11 A: Well -- oh, if the diameter were three |
| | 12 millimeters in diameter of the normal vessel and it |
| | 13 was 90-percent stenosed, and when we were done -- when |
| | 14 he was done putting in the stent, it was then -- it |
| | 15 was then three millimeters as opposed to three-tenths |
| | 16 of a millimeter to start with. |
| | 17 Q: In other words, the vessel was open? |
| | 18 A: It was open. |
| | 19 Q: And blood could flow freely through the -- |
| | 20 A: Yes. |
| | 21 Q: -- left anterior descending? |
| | 22 A: Right. And there was a 10-percent residual |
| | 23 on the diagonal. That means they didn't get it quite |
| | 24 back to zero. There was still a 10-percent residual, |
| | 25 but that probably would not restrict blood flow. |

Printed: 10/3/2006   8:43:49AM

PLAINTIFF's
OBJECTION
RE: 60:1-25
NO FOUNDATION;
SPECULATION;
WITNESS IS NOT
AN EXPERT ON
THIS TOPIC

Overruled

PLAINTIFF's
OBJECTION
RE: 61:1-25
NO FOUNDATION;
SPECULATION;
WITNESS IS NOT
AN EXPERT ON
THIS TOPIC

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                    62

62:    1    Q: In other words, after reading this report,
       2    you would think that this was a good result for
       3    Mr. Mason?
       4    MR. NABERS: Objection to the form.
       5    A: I don't know how to say that without seeing
       6    the films.
       7    Q: (By Mr. Krumholz) But based upon
       8    Dr. Ganellen's analysis and report, if a patient
       9    showed up in your office --
      10    A: Yes.
      11    Q: -- with this cardiac cath report, you believe
      12    this would be a good result?
      13    A: Yes.
      14    MR. NABERS: Objection to the form.
      15    Q: (By Mr. Krumholz) And it says that there
      16    were no complications on the last page; is that right?
      17    A: I guess. Let's see. That is correct.
      18    Q: If you had found someone with -- let me
      19    strike that. Given the stenosis that was found on the
      20    cardiac catherization performed on July 25 of 2003,
      21    it's not surprising to you as a cardiologist that
      22    Mr. Mason had a heart attack?
      23    A: I don't think that's a fair question.
      24    Q: Why is that?
      25    A: There are lots of people with 90-percent
63:    1    stenosis that don't have heart attacks.
       2    Q: And there are many that do?
       3    A: Some do.
       4    Q: So it would not be surprising to find someone
       5    with a 90-percent occlusion in the left anterior
       6    descending artery who has a heart attack?
       7    MR. NABERS: Objection to the form.
       8    A: I guess we're talking about semantics. It's
       9    appropriate to say that someone with a 90-percent
      10    stenosis could have had a small -- could have had a
      11    heart attack or could not have.
      12    Q: (By Mr. Krumholz) It could have been major
      13    or it could have been minor, true?
      14    A: Under the right circumstances.
      15    Q: And it doesn't surprise you that Mr. Mason
      16    had a heart attack now that we --
      17    A: I could believe that. I could believe it.
      18    But do you --
      19    Q: You don't find it unusual, maybe that's a
      20    better word, in your practice for people with 90-
      21    percent occlusions in the left anterior descending
      22    artery to have a heart attack? I'm not saying it
      23    happens more often than not, but it's not unusual?
      24    A: Okay.
      25    Q: Is that true?

Printed: 10/3/2006   8:43:49AM

Plaintiff's
Objection
Re: 62:7-17
No foundation;
speculation;
witness is not
An expert on this
topic

overruled

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                      64

| 64: | 1 | A: That's fair. |
|---|---|---|
| | 2 | Q: Okay. You mentioned Dr. Symkoviak's nuclear |
| | 3 | stress test. Do you see that in front of you? Excuse |
| | 4 | me, his cardiac catherization. I misspoke. |
| | 5 | A: Is that Exhibit 1? |
| | 6 | Q: I think it's Exhibit -- it may be Exhibit 11. |
| | 7 | A: Oh, okay. I was thinking that was a |
| | 8 | parentheses. Yes. |
| | 9 | Q: Exhibit 11 to Dr. Symkoviak's deposition -- |
| | 10 | A: August 2003. |
| | 11 | Q: -- is an August 13, 2003 cardiac |
| | 12 | catherization report; is that right? |
| | 13 | A: Yes. |
| | 14 | Q: And this is another one of those types of |
| | 15 | records that if you saw it in one of your patients |
| | 16 | files, you would be able to look at it and understand |
| | 17 | it and make decisions about it? |
| | 18 | A: Yes. |
| | 19 | Q: And if you had any questions, you could, of |
| | 20 | course, go ask Dr. Symkoviak? |
| | 21 | MR. NABERS: Objection to the form. |
| | 22 | A: Yes. |
| | 23 | Q: (By Mr. Krumholz) And this is -- just so |
| | 24 | it's clear, is a repeat angiogram done on Mr. Mason; |
| | 25 | is that right? |
| 65: | 1 | A: Yes. The first one was done in July, right. |
| | 2 | Q: July 25th. |
| | 3 | A: So this would be a repeat, yes. |
| | 4 | Q: And it confirms that the stent and |
| | 5 | angioplasty performed on Mr. Mason on July 25th by |
| | 6 | Dr. Ganellen was still wide open? |
| | 7 | A: Yes. |
| | 8 | Q: And it also confirms that the -- maybe I |
| | 9 | didn't phrase the first question right. The stent |
| | 10 | placed at the LAD or left anterior descending artery |
| | 11 | continued to be wide open on August 13 of 2003 |
| | 12 | according to that record? |
| | 13 | A: Yes. |
| | 14 | Q: And, likewise, the branch off of the left |
| | 15 | anterior descending artery, that is, the first |
| | 16 | diagonal, was likewise wide open? |
| | 17 | A: Yes. |
| | 18 | Q: That's where the angioplasty was performed? |
| | 19 | A: That's correct. |
| | 20 | Q: And those were good things on August 13th? |
| | 21 | A: It was a good result. |
| | 22 | MR. NABERS: Objection to the form. |
| | 23 | Q: (By Mr. Krumholz) You can answer. |
| | 24 | A: A good result. |
| | 25 | Q: And that's because these arteries were wide |

Overrule

Plaintiff's
Objection
Re: 64:9-25
No foundation;
speculation;
witness is not
An Expert on
This topic

Plaintiff's
Objection
Re: 65: 1-25
No foundation;
Speculation;
witness is not
An Expert on
This topic

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                          66

66:   1   open and free flowing at that time?
      2   A: Yes.
      3   Q: It could have showed, hypothetically, a
      4   lesion and that would have been a worse finding? Not
      5   a lesion, but a plaque?
      6   A: A lesion or a plaque. It's all a matter of
      7   degree.
      8   Q: Okay.
      9   A: Okay? And so --
     10   Q: Now, it indicates 'There was a very small
     11   anterior hypokinetic segment, but the overall ejection
     12   fraction was 69 percent.' Do you see that towards --
     13   A: Yes.
     14   Q: -- the bottom?
     15   A: Yes.
     16   Q: And we talked about hypokinetic segments
     17   before. Do you recall that?
     18   A: Yes.
     19   Q: We talked about whether they could be mild,
     20   moderate or severe?
     21   A: Yes.
     22   Q: And this one appears to be mild?
     23   A: According to what's written here, yes.
     24   Q: Okay. Why was it important to say 'but the
     25   overall ejection fraction was 69 percent' --
67:   1   A: I don't know.
      2   Q: -- as you understand it?
      3   MR. NABERS: Objection to the form.
      4   A: I don't know what he meant by that.
      5   Q: (By Mr. Krumholz)  Well, would you want to
      6   look at the ejection fraction if there was some sort
      7   of small anterior hypokinetic segment?
      8   MR. NABERS: Objection to the form.
      9   A: Would I want to look at it? I'm not sure
     10   what you mean.
     11   Q: (By Mr. Krumholz)  Would you want to analyze
     12   the ejection fraction of a patient who had had a heart
     13   attack in the last three weeks if there was a small
     14   anterior hypokinetic segment?
     15   A: Sure. I think it would be useful.
     16   Q: And if the -- and what is the ejection
     17   fraction as calculated by Dr. Symkoviak?
     18   A: 69 percent.
     19   Q: And that's very good?
     20   MR. NABERS: Objection to the form.
     21   A: It's normal.
     22   Q: (By Mr. Krumholz)  And it's better than it
     23   was, according to this record, than it was on the
     24   angiogram?
     25   A: I don't know that you can say that's

Printed: 10/3/2006   8:43:49AM

*[Handwritten annotation:]* PLAINTIFF'S OBJECTION RE: 66:1-2 NO FOUNDATION; SPECULATION; witness is not an expert on this topic

*[Signature]* Grennel

**Madsen, Bard 2006-07-12**

Madsen PA PC DA DC on 10-3                                                     68

68:
1  better. The number is higher, but it's a
2  calculation -- it's a drawing and then calculations
3  are made off the drawing so there is margin for error.
4  My suspicion is, if that's what you're asking, is that
5  it is the same number.
6  Q: So around 60 to 69 percent?
7  A: I think it's normal.
8  Q: And --
9  A: I mean, I think it is a normal -- is in the
10  normal range.
11  Q: And how do you interpret a normal ejection
12  fraction at this stage?
13  MR. NABERS: Objection to the form.
14  A: Within normal.
15  Q: (By Mr. Krumholz)  What does it mean for
16  Mr. Mason at that point?
17  A: I don't know. I didn't take care of him.
18  Q: I know, but as of that record, I'm just
19  asking what would your impression be if a patient came
20  to you with this record?
21  MR. NABERS: Objection to the form.
22  A: That he -- that if he did, indeed, have a
23  heart attack, which I haven't seen anything -- I mean,
24  I don't know that he really did, but if he did, that
25  it appears to be a small one and that the overall
69:
1  squeeze of the heart is still within the normal range.
2  Q: (By Mr. Krumholz)  Now, if you could turn to
3  Exhibit 14.
4  A: Okay.
5  Q: If you could just review it for a moment,
6  I'll ask you some questions about it.
7  A: Okay.
8  Q: Just to bring our frame of reference around,
9  I believe -- well, first of all, Exhibit 14 is a
10  perfusion stress test or study performed by Dr. Keep
11  on October 22 of 2003; is that right?
12  A: Yes.
13  Q: And I believe you indicated that this sort of
14  study or test was a very sensitive test, true?
15  A: Yes.
16  Q: And it was very good for purposes of
17  predicting prognosis, as I recall; is that accurate?
18  MR. NABERS: Objection to the form.
19  A: It is useful in predicting prognosis.
20  Q: (By Mr. Krumholz)  And it's one of the best
21  tests in that regard for those purposes.
22  A: Yes.
23  Q: And in looking at the information contained
24  on Exhibit 14, can we go through it and you tell us
25  what is important in that regard as we go through it?

*[Handwritten notes in right margin:]*

PLAINTIFFS
OBJection
RE: 69-79

no Foundation;
speculation;
witness is
not an
Expert on this
topic

**Madsen, Bard 2006-07-12**

70:  1  What are the first findings that you believe to be
     2  significant?
     3  A: The EKG was normal. He exercised longer than
     4  predicted.
     5  Q: Let's take one by one, if you don't mind.
     6  When you said the -- you're talking about where it
     7  says 'The baseline EKG was within normal limits'?
     8  A: Yes.
     9  Q: And that's what you would want or expect for
    10  a patient like Mr. Mason?
    11  MR. NABERS: Objection to the form.
    12  A: You mentioned Q waves before. It would
    13  appear that the patient did not sustain -- if he did
    14  have a heart attack, that it was not a full thickness
    15  or a transmural or a Q wave heart attack.
    16  Q:  (By Mr. Krumholz)  So this would indicate
    17  that it's a non-Q wave heart attack --
    18  A: Yes.
    19  Q: -- to the extent there was one?
    20  A: Yes.
    21  MR. NABERS: Objection to the form.
    22  Q:  (By Mr. Krumholz)  And then the second one
    23  says, 'The patient exercised 11 minutes and zero
    24  seconds on a BRUCE protocol.' Can you tell the jury
    25  what a BRUCE protocol is?

71:  1  A: It's a treadmill that starts out at a 10-
     2  percent grade and at 1.7 miles per hour, every three
     3  minutes increases the speed and the grade.
     4  Q: So Mr. Mason, according to this record, was
     5  able to exercise for 11 minutes and zero seconds on
     6  that protocol?
     7  A: Yes.
     8  Q: And it says, 'The normal exercise time for
     9  this age is eight minutes and 20 seconds.' Do you see
    10  that?
    11  A: Yes.
    12  Q: So he was able to exercise some two minutes
    13  and 40 seconds longer than someone -- than you would
    14  expect for a man his age?
    15  A: Yes.
    16  Q: And it says, 'The patient had negative 30-
    17  percent functional aerobic impairment.' Do you see
    18  that?
    19  A: Yes.
    20  Q: That actually means that he fared 30-percent
    21  better than expected, true?
    22  A: Yes.
    23  MR. NABERS: Objection to the form.
    24  Q:  (By Mr. Krumholz)  Is that right?
    25  A: Yes.

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                                           72

```
72:   1    Q:  What does negative 30-percent functional
      2    aerobic impairment mean?
      3    A:  It means that he did not have a functional
      4    aerobic impairment.
      5    Q:  Did it mean --
      6    A:  It means that -- it just reflects that he
      7    went further than predicted.
      8    Q:  By 30 percent?
      9    A:  Yes.
     10    Q:  And then it says the test was stopped because
     11    of fatigue. Do you see that?
     12    A:  Yes.
     13    Q:  And that's not unusual?
     14    A:  No.
     15    MR. NABERS:  Objection to the form.
     16    Q:   (By Mr. Krumholz)  The patient -- I mean, is
     17    that how most of these tests stop is because of
     18    fatigue of the patient?
     19    MR. NABERS:  Objection to the form.
     20    A:  That's my experience. I don't know about
     21    Keep's, but that's why I --
     22    Q:   (By Mr. Krumholz)  Then it says, 'The EKG had
     23    no ST changes to suggest ischemia.'
     24    A:  That is correct.
     25    Q:  And that was one of those factors you
73:   1    mentioned a few minutes ago about predicting
      2    prognosis?
      3    A:  Yes.
      4    Q:  That is, the extent to which any ongoing
      5    ischemia may be present?
      6    A:  Yes.
      7    MR. NABERS:  Objection to the form.
      8    Q:   (By Mr. Krumholz)  Does this indicate that
      9    there were no changes to suggest ischemia?
     10    A:  That's what he wrote.
     11    MR. NABERS:  Objection to the form.
     12    Q:   (By Mr. Krumholz)  What does ST changes mean?
     13    A:  I don't know how technical you want me to be.
     14    Q:  Let's be general. Generally what are ST
     15    changes?
     16    A:  There are specific changes in the shape of
     17    the EKG, specifically the ST segment, that we look for
     18    to implicate a section of the heart muscle not
     19    receiving enough blood for the amount of work that
     20    it's doing, that when that exercise is completed, that
     21    the change in the configuration of the EKG returns to
     22    baseline.
     23    Q:  And what is it -- if you could apply that to
     24    what it says here under No. 4.
     25    A:  It would suggest that the patient did not
```

Printed: 10/3/2006   8:43:49AM

## Madsen, Bard 2006-07-12

74: 1   have reduced blood flow to a portion of the heart
2   muscle.
3   Q: And then it says, 'The blood pressure
4   response during exercise was normal.' Do you see
5   that?
6   A: Yes.
7   Q: And that's what you would hope for?
8   A: Yes.
9   Q: Then it says, 'The rhythm during exercise was
10   normal.' Do you see that?
11   A: Yes.
12   Q: What does that mean?
13   A: It means he did not have any early beats,
14   runs of fast heart rhythms or long pauses.
15   Q: Then it says, 'The patient had no chest pain
16   during the exercise.'
17   A: Yes.
18   Q: You indicated a few minutes ago that chest
19   pain is a sign of coronary artery disease?
20   A: It's a symptom of coronary disease, yes.
21   Q: So it's a good thing that Mr. Mason didn't
22   experience chest pain?
23   A: Yes.
24   Q: And then it says, 'Interpretation: Stress
25   and rest tomographic images and multiple
75: 1   orthogonal' --
2   A: Orthogonal.
3   Q: I'm sorry?
4   A: Orthogonal.
5   Q: -- 'orthogonal planes demonstrate no
6   significant perfusion deficits.'
7   A: Correct.
8   Q: Did I read that correctly?
9   A: I -- sure, yes.
10   Q: What does that mean?
11   A: That means that on the scan, that there were
12   no segments of the heart muscle that appeared to not
13   get as good a blood flow during exercise as did
14   neighboring areas.
15   Q: Is that exactly what you would hope for for a
16   patient like Mr. Mason?
17   MR. NABERS: Objection to the form.
18   A: Yes.
19   Q: (By Mr. Krumholz) Then it says, 'Wall motion
20   summary.' Do you see that?
21   A: Yes.
22   Q: It says, 'Normal wall motion.' Is that what
23   you would hope for for Mr. Mason?
24   A: Yes.
25   Q: Then it says, 'Ejection fraction 55 percent.'

**Madsen, Bard 2006-07-12**

Madsen PA PC DA DC on 10-3                                                                76

76:   1    A: Yes.
      2    Q: Is that a normal ejection fraction, given the
      3    equipment you have here --
      4    A: Yes.
      5    Q: -- in this office? And you believe -- I
      6    believe you said in some circumstances in the past
      7    ejection fractions were underestimated; is that true?
      8    Is that what you said?
      9    A: Yes.
      10   Q: And so it may be even better than 55 percent
      11   in this time frame that's reflected on Exhibit 14?
      12   MR. NABERS: Objection to the form.
      13   A: I don't know the answer to that.
      14   Q:  (By Mr. Krumholz)  But regardless, we know
      15   it's at least 55 percent, according to your partner?
      16   A: Yes.
      17   MR. NABERS: Objection to the form.
      18   A: That's what was described there and that's
      19   within normal range.
      20   Q:  (By Mr. Krumholz)  Then it says 'EKG
      21   summary'?
      22   A: Yes.
      23   Q: 'Nonischemic ECG changes'?
      24   A: Yes.
      25   Q: What does that mean?
77:   1    A: That's just what I described earlier with the
      2    ST segments. Different language, same implication.
      3    Q: No problems getting blood to the heart and
      4    flowing --
      5    A: That's what that would suggest.
      6    Q: Then it says, 'Stress Cardiolite summary'?
      7    A: Yes.
      8    Q: What does just that phrase mean?
      9    A: That's the -- what we just described about
      10   the perfusion, the nuclear scanning, which suggests
      11   that there were no segments of heart muscle that got
      12   poorer blood flow during exercise as compared to
      13   neighboring segments.
      14   Q: That's what you would hope for for Mr. Mason?
      15   A: Yes.
      16   MR. NABERS: Objection to the form.
      17   Q:  (By Mr. Krumholz)  Then it says, 'Normal
      18   global and regional LV function.' Do you see that?
      19   A: Yes.
      20   Q: And would that indicate a normal functioning
      21   heart?
      22   MR. NABERS: Objection to the form.
      23   A: That would indicate a normally squeezing
      24   heart.
      25   Q:  (By Mr. Krumholz)  Okay. And, again, that

**Madsen, Bard 2006-07-12**

78:
1   would be what you would hope for?
2   A: Yes.
3   Q: Then it says, 'Recommendation follow-up with
4   Dr. Vogeler'?
5   A: Yes.
6   Q: Is there anything on this exhibit, Exhibit
7   14, that would indicate to you that -- let me strike
8   that. Would you agree that this report suggests that
9   Mr. Mason will have a very good -- had a very good
10   prognosis as of this date?
11   MR. NABERS: Objection to the form.
12   A: Within the bounds of this test, yes.
13   Q: (By Mr. Krumholz) Well, and that's a good
14   point. The perfusion test is very sensitive in that
15   regard?
16   A: For perfusion.
17   Q: And it's very -- and when you take the
18   perfusion outcome together with the functional
19   workload and together with the ejection fractions, all
20   of which were either normal or exceeded normal, that's
21   the gold standard, is it not, sir, for predicting
22   outcome?
23   MR. NABERS: Objection to the form.
24   A: I don't think that the ejection fraction from
25   a perfusion scan is the gold standard.
79:
1   Q: (By Mr. Krumholz) Okay. But if you take --
2   A: But the other -- but the perfusion scan is
3   what most of us use at this point.
4   Q: And is there any evidence to indicate or
5   suggest that this gentleman, Mr. Mason, would not have
6   a very good prognosis going forward given the results
7   in this perfusion study and the cardiac catherization
8   done on July 25th at the hospital?
9   MR. NABERS: Objection to the form.
10   A: I think those things are associated with a
11   good prognosis.
12   Q: (By Mr. Krumholz) You would be optimistic
13   for Mr. Mason --
14   A: Yes.
15   Q: -- as of October 22 of 2003?
16   A: Yes.
17   MR. NABERS: Objection to the form.
18   Q: (By Mr. Krumholz) So far do you see any
19   indication as to -- that Mr. Mason could not live a
20   full life as a result of the event that he may have
21   had in July?
22   MR. NABERS: Objection to the form.
23   A: I don't know how to accurately predict that
24   from this information.
25   Q: (By Mr. Krumholz) But you have no evidence

**Madsen, Bard 2006-07-12**

80:
1  to -- you've seen no evidence to indicate that he
2  would not be able to live a full life?
3  A:  From what you've shown me here, that is
4  correct.
5  Q:  Now, assume with me -- can you calculate
6  METs? Are you able to do that?
7  A:  I don't know how to do it.
8  Q:  Okay. Assume with me that, based upon the
9  perfusion study, Mr. Mason had a METs of 13.3. Are
10  you familiar with whether or not that's good?
11  MR. NABERS:  Objection to the form.
12  Q:   (By Mr. Krumholz)  You can answer.
13  A:  I'm trying to think. Good regarding what?
14  Q:  Does it indicate that he is able to
15  participate in significant activities?
16  A:  Tell me what significant activities are.
17  MR. NABERS:  Objection to the form.
18  (Exhibit No. 5 marked.)
19  Q:   (By Mr. Krumholz)  Fair enough. Let me show
20  you what is Exhibit 5. Remember earlier on in your
21  deposition I asked you if you had seen literature that
22  actually discusses METs in terms of what patients are
23  able to do --
24  A:  Yes.
25  Q:  -- or not do? And is Exhibit 5 -- by the

81:
1  way, who prepared Exhibit 5 according to this paper?
2  MR. NABERS:  Objection to the form.
3  A:  You mean who wrote the paper?
4  Q:   (By Mr. Krumholz)  Yeah, who is the author
5  according to what it says?
6  A:  David Bader, Thomas Maguire and David Balady.
7  Q:  Can you tell from what medical center they
8  come from?
9  A:  Boston Medical Center.
10  Q:  Is that a respected center?
11  MR. NABERS:  Objection to the form.
12  A:  Yes.
13  Q:   (By Mr. Krumholz)  Have you seen -- have you
14  seen this particular article before?
15  A:  I couldn't -- I couldn't tell you if I have
16  or not.
17  Q:  Is this the type of article that --
18  A:  Probably not.
19  Q:  -- you've come --
20  A:  Probably not, but the Table 1 is probably
21  what you're getting at.
22  Q:  Yes. And is Table 1 the type of table that
23  you've seen over time --
24  A:  The type of, yes.
25  Q:  -- that tells you the estimated amount --

PLAINTIFF'S
OBJECTION
RE: 80:19-25
no FOUNDATION;
SPECULATION;
WITNESS IS NOT AN
EXPERT ON THIS TOPIC
RULE 401-RELEVANCE
RULE 403- ASSUMES
FACTS NOT IN EVIDENCE

PLAINTIFF'S
OBJECTION  RE: 81:1-12
no FOUNDATION; SPECULATION
WITNESS IS NOT AN
EXPERT ON THIS TOPIC
RULE 401-RELEVANCE
RULE 403- ASSUMES
FACTS NOT IN EVIDENCE

PLAINTIFF'S Objection
RE: 81:22-25
no FOUNDATION;
SPECULATION; WITNESS
IS NOT AN EXPERT ON
THIS TOPIC; RULE 401-
RELEVANCE; RULE 403-
ASSUMES FACTS NOT IN
EVIDENCE

*overrule*

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3

82

| 82: | 1 | number of METs that a person would be -- have to be |
|---|---|---|
| | 2 | able to attain in order to participate in particular |
| | 3 | activities? |
| | 4 | A: I think it's relating -- the METs required to |
| | 5 | do a particular activity? Is that what you're asking? |
| | 6 | Q: Yes. |
| | 7 | A: Yes. |
| | 8 | Q: Thanks for clarifying that. That's a much |
| | 9 | easier way to say it. |
| | 10 | For example, it takes one MET to eat, dress, |
| | 11 | work -- |
| | 12 | A: Right. |
| | 13 | Q: -- and work at a desk, is what it says? |
| | 14 | A: Yes. |
| | 15 | Q: And it goes on from there; is that right? |
| | 16 | A: Correct. |
| | 17 | Q: Assuming Mr. Mason was able to perform in a |
| | 18 | manner that would give him 13.3 METs back in August of |
| | 19 | 2003, what would that indicate he could do? |
| | 20 | MR. NABERS: Objection to the form. |
| | 21 | A: Run. |
| | 22 | Q: (By Mr. Krumholz)  What is that? |
| | 23 | A: Run at eight miles an hour. |
| | 24 | Q: Would he be able to -- if he were able to do |
| | 25 | that, that is, run eight miles an hour -- |
| 83: | 1 | A: That's what it says here. |
| | 2 | Q: That's what -- excuse me, strike that. |
| | 3 | According to this chart, that's what he would be able |
| | 4 | to do? |
| | 5 | A: Yes. |
| | 6 | Q: If he emotionally felt like he could do it, |
| | 7 | then he could physically do it is what this means? |
| | 8 | MR. NABERS: Objection to the form. |
| | 9 | Q: (By Mr. Krumholz)  True? |
| | 10 | A: It takes eight METs to run at eight miles an |
| | 11 | hour. I mean, I'm sorry, it takes 12 minutes to run |
| | 12 | at eight miles per hour. |
| | 13 | Q: So he could briskly walk, according to this |
| | 14 | chart, true? |
| | 15 | MR. NABERS: Objection to the form. |
| | 16 | A: Let's see, briskly walk -- swim or walk. |
| | 17 | That requires, according to this chart, 10 METs. |
| | 18 | Q: (By Mr. Krumholz)  It says he could move |
| | 19 | heavy furniture, true? |
| | 20 | A: Yes. |
| | 21 | MR. NABERS: Objection to the form. |
| | 22 | Q: (By Mr. Krumholz)  According to this chart, |
| | 23 | he could carry 60 pounds? |
| | 24 | A: Yes. |
| | 25 | MR. NABERS: Objection to the form. |

Printed: 10/3/2006  8:43:49AM

*Plaintiff's objection re: 82:1-7 no foundation; speculation; witness is not an expert on this topic; Rule 401-relevance; Rule 403 Assumes facts not in evidence*

*Plaintiff's objection re: 82:17-23 no foundation; speculation; witness is not an expert on this topic; Rule 401-relevance; Rule 403 - Assumes facts not in evidence*