**Madsen, Bard 2006-07-12**

Madsen PA PC DA DC on 10-3                                              84

| 84: | 1 | Q:  (By Mr. Krumholz)  According to this chart, |
| | 2 | he could play singles tennis? |
| | 3 | MR. NABERS:  Objection to the form. |
| | 4 | A:  Yes. |
| | 5 | Q:   (By Mr. Krumholz)   According to this chart, |
| | 6 | he could perform heavy outdoor work? |
| | 7 | MR. NABERS:  Objection to the form. |
| | 8 | A:  Yes. |
| | 9 | Q:   (By Mr. Krumholz)   According to this chart, |
| | 10 | he could certainly play 18 holes of golf, if he had |
| | 11 | 13.3 METs? |
| | 12 | MR. NABERS:  Objection to the form. |
| | 13 | A:  Yes. |
| | 14 | Q:   (By Mr. Krumholz)   And you understood all |
| | 15 | these questions were assuming that he had 13.3 METs in |
| | 16 | August of 2003? |
| | 17 | A:  Yes. I'm assuming that, correct. |
| | 18 | Q:  In fact, it says he could compete -- excuse |
| | 19 | me, he could participate in competitive activities if |
| | 20 | he was at 13.3 METs? |
| | 21 | A:  Yes. |
| | 22 | Q:  If he had 13.3 METs, given your experience as |
| | 23 | a cardiologist -- and if you want to look at this |
| | 24 | chart, you can -- could Mr. Mason hike? |
| | 25 | MR. NABERS:  Objection to the form. |
| 85: | 1 | A:  Maybe not up Everest. |
| | 2 | Q:   (By Mr. Krumholz)   But he could hike up, for |
| | 3 | example, some hills over here in Utah? |
| | 4 | MR. NABERS:  Objection to the form. |
| | 5 | A:  Some. |
| | 6 | Q:   (By Mr. Krumholz)   If there were paths that |
| | 7 | go up the hill? |
| | 8 | MR. NABERS:  Objection to the form. |
| | 9 | Q:   (By Mr. Krumholz)   True? |
| | 10 | A:  Some, yes. |
| | 11 | Q:  And I think we said he could play golf, based |
| | 12 | upon your experience? |
| | 13 | A:  Yes. |
| | 14 | MR. NABERS:  Objection to the form. |
| | 15 | Q:   (By Mr. Krumholz)   He could play with his |
| | 16 | grandkids, obviously? |
| | 17 | MR. NABERS:  Objection to the form. |
| | 18 | A:  That's not on there, but, yes, I would think |
| | 19 | so. |
| | 20 | Q:   (By Mr. Krumholz)   Could he go above 7500 |
| | 21 | feet? |
| | 22 | MR. NABERS:  Objection to the form. |
| | 23 | A:  I would think so. |
| | 24 | Q:   (By Mr. Krumholz)   I don't know of a good way |
| | 25 | to ask this, but could he participate in sexual |

Printed: 10/3/2006   8:43:49AM

*Overruled* [handwritten]

*Plaintiff's Objection*
*Re: 84:22-24*
*Re: 85: 1-25*
*No Foundation;*
*Speculation;*
*witness is not*
*an expert on*
*this topic;*
*Rule 2401- Relevance*
*Rule 403- Assumes*
*Facts not in*
*evidence* [handwritten]

**Madsen, Bard 2006-07-12**

Madsen PA PC DA DC on 10-3

86

| 86: | 1 | relations? |
| | 2 | MR. NABERS:  Objection to the form. |
| | 3 | A: Yes. |
| | 4 | Q:   (By Mr. Krumholz)  Could he hunt? |
| | 5 | A: Yes. |
| | 6 | Q: Could he walk significant distances? |
| | 7 | A: Tell me what a significant distance is. |
| | 8 | Q: At least five miles. Well, I mean -- |
| | 9 | A: Without stopping? Probably. |
| | 10 | Q: Walk, I would say. |
| | 11 | A: Probably. If his -- if his orthopedic -- if |
| | 12 | he didn't have orthopedic problems that would |
| | 13 | intervene. |
| | 14 | Q: Now, according to Dr. Keep's -- by the way, |
| | 15 | do you consider Dr. Keep to be a reliable source of |
| | 16 | information -- |
| | 17 | A: Yes. |
| | 18 | Q: -- as it comes to cardiology? |
| | 19 | A: Yes. |
| | 20 | Q: Do you trust his report? |
| | 21 | A: Yes. |
| | 22 | Q: And his findings? |
| | 23 | A: Yes. |
| | 24 | Q: Can you confirm that Dr. Keep did not find |
| | 25 | any appreciable lack of blood flow in connection with |
| 87: | 1 | Mr. Mason on August 13? |
| | 2 | MR. NABERS:  Objection to the form. |
| | 3 | A: According to his report of the perfusion |
| | 4 | scan -- which is what you're talking about, right? |
| | 5 | Q:   (By Mr. Krumholz)  Yes. |
| | 6 | A: -- that is correct. |
| | 7 | (Exhibit No. 6 marked.) |
| | 8 | Q:   (By Mr. Krumholz)  I'm handing you what has |
| | 9 | been marked as Exhibit 6 to your deposition. Can you |
| | 10 | tell the jury what Exhibit 6 is? |
| | 11 | MR. NABERS:  Objection to the form. |
| | 12 | A: It is an exercise stress test, an exercise |
| | 13 | EKG stress test. |
| | 14 | MR. NABERS:  I'll withdraw the last |
| | 15 | objection. |
| | 16 | Q:   (By Mr. Krumholz)  And who was that prepared |
| | 17 | by? |
| | 18 | A: Me. |
| | 19 | Q: Who performed the exercise stress test that's |
| | 20 | reflected in Exhibit 6? |
| | 21 | A: Charles Mason. |
| | 22 | Q: And what doctor oversaw that stress test? |
| | 23 | A: I did. |
| | 24 | Q: And it says, 'Indications: Abnormal EKG.' |
| | 25 | Do you see that? |

Handwritten note:

PLAINTIFF'S OBJECTION
RE: 86:1-5
NO FOUNDATION;
SPECULATION; WITNESS
IS NOT AN EXPERT ON
THIS TOPIC; RULE 401-
RELEVANCE; RULE 403-
ASSUMES FACTS NOT
IN EVIDENCE

### Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                                88

| 88: | 1 | A: I do. |
| | 2 | Q: What does that mean? |
| | 3 | A: That means he was sent here with that |
| | 4 | diagnosis. |
| | 5 | Q: By the way, we just saw a stress test |
| | 6 | performed by Dr. Keep, the nuclear perfusion stress |
| | 7 | test? |
| | 8 | A: Yes. |
| | 9 | Q: What is the difference between a nuclear |
| | 10 | perfusion stress test and the kind of stress test that |
| | 11 | you performed in September of 2002 as reflected in |
| | 12 | Exhibit 6? |
| | 13 | A: The patient did not receive any injection of |
| | 14 | nuclear material and a nuclear perfusion scan was not |
| | 15 | performed. So we just used the -- we -- he walked on |
| | 16 | a treadmill while being monitored by an EKG, an |
| | 17 | electrocardiogram. |
| | 18 | Q: Okay. And so as I understand it, you could |
| | 19 | not measure the perfusion of the heart based upon the |
| | 20 | stress test that he received in September of 2002, |
| | 21 | accurately? |
| | 22 | A: We didn't measure a perfusion scan. Could we |
| | 23 | get an idea as to whether he had ischemia or not, |
| | 24 | which is perfusion -- ischemia is lack of blood flow |
| | 25 | to a portion of the heart muscle -- yes, we could, |
| 89: | 1 | perhaps. |
| | 2 | Q: When you say perhaps, what do you mean? |
| | 3 | A: I mean, any test -- any test you do is |
| | 4 | fraught with error. |
| | 5 | Q: Okay. And what sort of errors have you |
| | 6 | encountered in connection with these -- |
| | 7 | A: Well, there are false positives and false |
| | 8 | negatives, as there are with perfusion scans. |
| | 9 | Q: What are -- when you say a false negative, |
| | 10 | what does that mean? |
| | 11 | A: That means the test was negative when it |
| | 12 | should have been positive. |
| | 13 | Q: In other words -- |
| | 14 | A: It was falsely negative. |
| | 15 | Q: So when you say negative, you mean it may |
| | 16 | show no ischemia, for example -- |
| | 17 | A: When there is some. |
| | 18 | Q: -- when there is some? |
| | 19 | A: Yes. |
| | 20 | Q: Have you seen that happen from time to time? |
| | 21 | A: Yes. |
| | 22 | Q: With your patients? |
| | 23 | A: Yes. |
| | 24 | Q: With you performing that sort of procedure? |
| | 25 | A: Yes. |

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3

90

90:
1 Q: And just so we go back, abnormal EKG means
2 what, where it says indications?
3 A: It means that the reason the patient was sent
4 to our office to do this treadmill was because someone
5 felt he had an abnormal EKG.
6 Q: Okay. And that someone would be Douglas
7 Vogeler, according to this record?
8 A: I don't know. He sent -- it was his office
9 that referred him here, but I don't know -- I did not
10 speak with Dr. Vogeler specifically --
11 Q: And --
12 A: -- to see if he read the EKG or not.
13 Q: By the way, is it routine in your medical
14 practice to review records of other doctors and rely
15 upon those in connection with the treatment of those
16 patients?
17 A: Certainly.
18 Q: And in connection with making decisions about
19 those patients?
20 A: Yes.
21 Q: What medications to prescribe?
22 A: Yes.
23 Q: What procedures to perform?
24 A: Yes.
25 Q: What opinions to draw?

91:
1 A: Yes.
2 Q: Okay. Now, it indicates -- by the way, is
3 the nuclear perfusion stress test more or less
4 accurate than this kind of stress test?
5 A: More accurate.
6 Q: So the one done by Dr. Keep in August of 2003
7 would generally be more reliable or accurate than a
8 September 2002 exam, by type?
9 A: Yes.
10 Q: The second interpretation here says, 'The
11 patient exercised seven minutes and nine seconds on
12 the BRUCE protocol.' Do you see that?
13 A: Yes.
14 Q: Did I read that accurately?
15 A: Yes.
16 Q: That's the same BRUCE protocol we talked
17 about previously?
18 A: Yes.
19 Q: Except this time you didn't inject a nuclear
20 isotope to track perfusion?
21 A: That is correct.
22 Q: And it says the normal exercise time for this
23 age is eight minutes and 20 seconds; is that right?
24 A: Yes.
25 Q: So on this test -- and I'll ask you to assume

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                            92

92:   1  that Mr. Mason's heart attack was in July of 2003,
      2  Okay?
      3  A: Okay.
      4  Q: According -- this test that you performed was
      5  before, some 10 months before his heart attack; is
      6  that right?
      7  A: Yes.
      8  Q: So he was unable -- it says the test was
      9  stopped because of fatigue. Do you see that?
     10  A: Yes.
     11  Q: And that was the same reason as was given in
     12  October of 2003?
     13  A: It was.
     14  Q: And it says, 'The patient achieved a heart
     15  rate of 150.' Do you see that?
     16  A: Yes.
     17  Q: But what we know about this, according to
     18  your record, is that he was unable, that is,
     19  Mr. Mason, 10 months before his heart attack was
     20  unable to complete the exercise test -- stress test
     21  that you asked him to perform?
     22  A: Yes. Well, he didn't go as far as one would
     23  predict a man of 60 years old would go.
     24  Q: And how -- how was he limited in that regard?
     25  How much -- he wasn't able to go for how many minutes
93:   1  and seconds less than expected?
      2  A: Well, one minute and 11 seconds.
      3  Q: So a man of his age would -- you would have
      4  predicted would be able to exercise for a minute and
      5  11 seconds longer than he was able to?
      6  A: True.
      7  Q: Then it says, 'The exercise EKG showed minor
      8  ST changes.' Do you see that?
      9  A: Yes.
     10  Q: So it actually showed more ST changes than
     11  his October 2003 test did?
     12  A: No, you're -- no.
     13  Q: Okay. Explain, please.
     14  A: No. It showed some changes in the
     15  configuration of the ST segment, but not the kinds of
     16  changes that one sees with ischemia.
     17  Q: Okay. Which would suggest a low probability
     18  of ischemia?
     19  A: That is correct.
     20  Q: And that's why you put that there?
     21  A: That's right.
     22  Q: Okay. When you say low probability of
     23  ischemia, that's in light of the fact that it could be
     24  a false negative? I mean, obviously even though you
     25  find that, it could be a false negative?

Printed: 10/3/2006   8:43:49AM

*(handwritten annotations:)* Overruled ✓

Plaintiff's Objection re: 93:22-25 Speculation; VAgue

Def's response: none needed

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3

94

94:

1   A: It could be.
2   Q: And you said low probability because there's
3   still a possibility of ischemia?
4   A: That's correct.
5   Q: You've seen stress tests of this nature and
6   relatively soon thereafter someone develops ischemia?
7   MR. NABERS: Objection to the form.
8   A: Yes.
9   Q:  (By Mr. Krumholz)  And has a heart attack?
10  MR. NABERS: Objection to the form.
11  A: Possibly.
12  Q:  (By Mr. Krumholz)  You've seen that in your
13  practice?
14  MR. NABERS: Objection to the form.
15  Q:  (By Mr. Krumholz)  Let me ask it differently.
16  A: I can't think of -- I can't conjure up a
17  specific incident right here.
18  Q: But that doesn't seem unusual to you?
19  MR. NABERS: Objection to the form.
20  A: That's right. That happens.
21  Q:  (By Mr. Krumholz)  Then it says 'High blood
22  pressure' in the stress test summary. Do you see
23  that?
24  A: Yes.
25  Q: Okay. And if you turn the page, I think

95:

1   that's the backup for that comment. Do you see that?
2   A: Yes.
3   Q: And what was his blood pressure at rest
4   before he started exercising, according to your
5   record?
6   A: 145 over 50.
7   Q: Is that high?
8   A: No. Well, that's not a fair statement. I
9   don't think many of us would say high or low on that.
10  High blood pressure for nondiabetics is 140 over 90.
11  However, somebody who is preparing to do a treadmill
12  is anxious and nervous and is hardly at baseline and
13  at rest. So whether that's high or not, I wouldn't
14  want to make the diagnosis of hypertension off of that
15  alone.
16  Q: Right. You may have to have a subsequent or
17  an earlier blood pressure reading?
18  A: I would want to have several different blood
19  pressure recordings.
20  Q: Is the American Heart Association a reliable
21  source of information?
22  A: Sure.
23  (Exhibit No. 7 marked.)
24  Q:  (By Mr. Krumholz)  I've marked as Exhibit 7 a
25  brochure that I was able to find to educate myself

Printed: 10/3/2006   8:43:49AM

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                                    96

96:  1     about some of these issues we were going to talk about
      2     today. Is that the sort of brochure that you found to
      3     be reliable to provide to your patients from time to
      4     time?
      5     A: Sure.
      6     Q: Exhibit 7 is a brochure from the American
      7     Heart Association --
      8     A: It is.
      9     Q: -- that is entitled Controlling Your Risk
     10     Factors, right?
     11     A: Yes.
     12     Q: And if you could turn to pages 4 and 5. I
     13     guess start at 3.
     14     A: Yeah.
     15     Q: Are you there?
     16     A: I am.
     17     Q: And that's where the section on high blood
     18     pressure begins, true?
     19     A: Yes.
     20     Q: Do you see where it says, 'High blood
     21     pressure usually has no symptoms,' three paragraphs
     22     down in bold?
     23     A: Yes.
     24     Q: And it says, 'That's why it's often called
     25     the 'silent killer'?
97:  1     A: Yes.
      2     Q: Do you agree with that statement?
      3     A: Sure. It's a risk factor for coronary
      4     disease.
      5     Q: And if you could turn the page. There's a
      6     chart that says Blood Pressure Category?
      7     A: Yes.
      8     Q: And it says, 'Hypertension, Stage 1, 140 to
      9     159'?
     10     A: Yes.
     11     Q: Systolic, that's the top number, right?
     12     A: Yes.
     13     Q: And then it says 'or 90 to 99 on the
     14     diastolic'?
     15     A: Yes.
     16     Q: So according to the American Heart
     17     Association's brochure, Mr. Mason's resting blood
     18     pressure was high enough to label it as hypertension?
     19     A: I'm not sure that's a resting blood pressure.
     20     MR. NABERS: I need to object to the
     21     question.
     22     A: He was sitting down and not exercising on the
     23     treadmill. But most people, as I stated before, who
     24     are anticipating a treadmill are not at rest.
     25     MR. NABERS: Before you ask another question,

## Madsen, Bard 2006-07-12

98: 1    I also need to object to the use of the document
2    because we haven't identified the date, that we're
3    talking about a date for Mr. Mason that is not
4    corresponding with that chart, and the blood pressure
5    guidelines have changed year to year. But go ahead.
6    A:  So making the diagnosis -- anyway, to make a
7    diagnosis of high blood pressure, I think, off of one
8    blood pressure, number one, and particularly when that
9    is in an anxious patient who knows he's going to have
10    to get on a moving sidewalk going at two miles an hour
11    with an elevation of 10, that's not a resting blood
12    pressure.
13    Q:   (By Mr. Krumholz)  Okay.
14    A:  He's just not -- he's not exercising on the
15    treadmill yet but he's anticipating it.
16    Q:  So you're saying it's resting in the sense
17    that he's not exercising yet, but he may be anxious
18    from an upcoming procedure?
19    A:  That's right.
20    Q:  Okay. And it does say on the second page,
21    'Event, rest' and has that blood pressure we just
22    talked about next to it, according --
23    A:  On --
24    Q:  No, on your report.
25    A:  It says what?

99: 1    Q:  It says 'Rest,' and next to it it says 'blood
2    pressure' --
3    A:  Yes.
4    Q:  -- '145 over 80'?
5    A:  How about before stepping on the treadmill
6    blood pressure?
7    Q:  Okay.
8    A:  How would you like that?
9    Q:  I just want to make sure I'm reading this
10    right. It says 'Rest' -- 'At rest blood pressure 145
11    over 80,' according to your final record?
12    A:  It says that.
13    Q:  Okay. And you're saying that could have been
14    higher than it otherwise would have been if he wasn't
15    about to get on a treadmill?
16    A:  Yes. That's what I'm saying.
17    Q:  I understand. And according -- but if this
18    is an accurate blood pressure reading, that is, if we
19    go back and we see a resting blood pressure very
20    similar to this one in Dr. Vogeler's records, you
21    would -- it would suggest that this blood pressure,
22    according to the American Heart Association chart that
23    I've given you, would be labeled as hypertension?
24    A:  Not necessarily.
25    MR. NABERS:  Objection to the form.

Printed: 10/3/2006  8:43:49AM

### Madsen, Bard 2006-07-12

100:
1  A:  If, as in most offices, the blood pressures
2  are recorded in the following way: They walk -- I
3  don't know, 50 feet at a brisk pace into a room,
4  they're sat down and the blood pressure is immediately
5  taken, I don't think that's a resting blood pressure.
6  And I don't believe -- I'm not sure -- I haven't
7  scanned through that, but they probably don't tell you
8  how to take a blood pressure, when, in fact, patients
9  should be sitting calmly at rest for about five
10  minutes, at least, and then do the blood pressure.
11  Q:  (By Mr. Krumholz)  I guess we can ask
12  Dr. Vogeler --
13  A:  How they did it, right. I know in our
14  office, that's not how it's done.
15  Q:  Okay. So you would have to ask internists or
16  family practitioners how they go about taking blood
17  pressures before you come to a conclusion?
18  A:  Yes. I think that's fair. On borderline
19  pressures, I think that's fair. And, you know, an
20  alternative -- well, you ask me. I'll stop there.
21  Q:  I wanted to ask you a little bit about -- you
22  mentioned cell death earlier in connection with a
23  potential heart attack. If you didn't, somebody did
24  to me some prior date. So I'll just ask you about it
25  now.

101:
1  A:  Sure.
2  **Q:  Can you have cell death in connection with a**
3  **heart attack?**
4  **A:  That's -- a heart attack is not enough blood**
5  **flow flowing to heart muscle cells to sustain life,**
6  **the cell life. That's, strictly speaking, what a**
7  **heart attack is.**
8  **Q:  But I assume you can function normally even**
9  **if you've had some cell death?**
10  **A:  It's all a matter of how much.**
11  **Q:  How much cell death?**
12  **A:  Yes.**
13  **Q:  So my statement is true, you can have some**
14  **cell death and have a fully functioning heart?**
15  **A:  Yes.**
16  **Q:  And you can have some cell death and have**
17  **overall function of the heart be normal?**
18  **A:  Yes.**
19  **Q:  And as a result, have a prognosis of a full**
20  **life, so to speak?**
21  **A:  Everything else being equal, yes.**
22  **Q:  By the way, in a man like Mr. Mason, given**
23  **what you've seen so far, would you characterize the**
24  **probability of a recurring heart attack as low?**
25  MR. NABERS:  Objection to the form.

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                                                   102

| 102: | 1 | A: That is -- low in your sentence is a relative |
|---|---|---|
| | 2 | term. He's at greater risk for having a heart attack |
| | 3 | than he was had he never had one in the first place. |
| | 4 | Q:   (By Mr. Krumholz)  But he has a relatively |
| | 5 | low risk -- |
| | 6 | A: Relative to what? |
| | 7 | Q: Relative to other heart attack patients. |
| | 8 | MR. NABERS: Objection to the form. |
| | 9 | Q:   (By Mr. Krumholz)  He has a relatively low |
| | 10 | risk of a recurring heart attack, true? |
| | 11 | A: Well, you need to compare him to a set of |
| | 12 | patients. Now, if you're comparing him to a set of |
| | 13 | patients who have had non-Q wave, nontransmural, small |
| | 14 | heart attacks that had normal ejection fractions, then |
| | 15 | his prognosis is the same as theirs. |
| | 16 | If you're comparing him to someone who has |
| | 17 | had two major heart attacks with two major occluded |
| | 18 | arteries all the way that never were reperfused and |
| | 19 | his ejection fraction is 20 percent, then his |
| | 20 | prognosis is better. |
| | 21 | But you're saying relative, and as soon as |
| | 22 | you say relative, you've got to have something to |
| | 23 | compare it to. If you're comparing him to the general |
| | 24 | population, his risk is still higher of having a heart |
| | 25 | attack than it is in someone who's never had one, |
| 103: | 1 | everything else being equal. |
| | 2 | Q: What are silent heart attacks? |
| | 3 | A: Without symptoms. |
| | 4 | Q: It's not unusual for people without any known |
| | 5 | risk factors, known risk factors, to have heart |
| | 6 | attacks, true? |
| | 7 | MR. NABERS: Objection to the form. |
| | 8 | A: Again, unusual is a relative term, but it |
| | 9 | happens. |
| | 10 | Q:   (By Mr. Krumholz)  You see it in your |
| | 11 | practice? |
| | 12 | A: Yes. |
| | 13 | Q: You see in your practice patients who have |
| | 14 | the first signs of coronary artery disease or plaque |
| | 15 | buildup to be an actual heart attack? |
| | 16 | A: Yes. |
| | 17 | Q: Thousands of people have heart attacks every |
| | 18 | day who didn't know they had coronary artery disease |
| | 19 | until a heart attack? |
| | 20 | MR. NABERS: Objection to the form. |
| | 21 | A: Okay. Yes, that happens. I'm not sure of |
| | 22 | the exact frequency. |
| | 23 | Q:   (By Mr. Krumholz)  Many people every day? |
| | 24 | A: Yes, it happens. It's well known to happen. |
| | 25 | Q: And is it your experience that even people |

**Madsen, Bard 2006-07-12**

104:    1    who appear to be in great shape and actually take care
        2    of themselves and try to watch their cholesterol also
        3    have heart attacks?
        4    A: Yes.
        5    Q: Obviously if you don't do that, if you don't
        6    stay in shape, if you're overweight, if you don't take
        7    care of yourself, you have a greater chance of having
        8    a heart attack?
        9    A: Yes.
        10   Q: But what science and medicine do know is that
        11   patients who have certain risk factors have a greater
        12   acceleration of atherosclerosis, generally?
        13   A: Yes.
        14   MR. NABERS: Objection to the form.
        15   A: Yes.
        16   Q:   (By Mr. Krumholz)  Do you agree that high
        17   cholesterol can speed up atherosclerosis or plaque
        18   buildup?
        19   A: Yes.
        20   Q: Do you agree that hypertension can speed up
        21   atherosclerosis or plaque buildup?
        22   A: Yes.
        23   Q: Do you agree that obesity can speed up
        24   atherosclerosis or plaque buildup?
        25   A: Yes.
105:    1    Q: Do you believe that a family history of heart
        2    disease or heart attacks can speed up the
        3    atherosclerotic process, can result in that?
        4    A: The genetics -- there is a genetic
        5    predisposition, yes.
        6    Q: And can stress speed up cardiovascular
        7    disease?
        8    A: That's always a hard one to measure.
        9    Q: According to the American Heart
        10   Association --
        11   A: Yes.
        12   Q: -- you understand that they believe --
        13   A: Yes.
        14   Q: -- stress can speed up cardiovascular
        15   disease?
        16   A: Yes.
        17   Q: And that's something well known in the
        18   scientific community?
        19   A: It's well known, but how does one measure
        20   stress? There is no great stressometer, but yes.
        21   Q: This is another one of those questions I
        22   don't like asking, but Mr. Mason has been diagnosed
        23   with erectile dysfunction?
        24   A: Yes.
        25   MR. NABERS: Objection to the form.

Printed: 10/3/2006   8:43:49AM

*Handwritten note:*

PLAINTIFF'S
OBJECTION
RE: 104:10-12
witness is not in
expert in this
topic; speculation

Def's response: witness is
a cardiologist and this is
basic cardiology information.

## Madsen, Bard 2006-07-12

| | | |
|---|---|---|
| 106: | 1 | Q:  (By Mr. Krumholz)  Can that speed up |
| | 2 | atherosclerosis or plaque buildup, according to the |
| | 3 | studies? |
| | 4 | MR. NABERS:  Objection to the form. |
| | 5 | A: I don't know. |
| | 6 | Q:  (By Mr. Krumholz)  Can depression -- |
| | 7 | A: One form of erectile dysfunction is |
| | 8 | atherosclerosis, but I'm not sure that just because |
| | 9 | someone has erectile dysfunction that that predisposes |
| | 10 | him to having an MI -- a heart attack, excuse me. If |
| | 11 | he has erectile dysfunction from an antidepressant |
| | 12 | that he's taking or he's not satisfied with his |
| | 13 | partner -- |
| | 14 | Q: That was going to be my next question. |
| | 15 | A: -- does that mean he's at risk for heart |
| | 16 | attack? I don't know that there's literature on that. |
| | 17 | Q: Okay. So if it's due to -- |
| | 18 | A: If it's due to atherosclerosis, that means -- |
| | 19 | if there's atherosclerosis in one part of the body, |
| | 20 | there could be a greater likelihood of atherosclerosis |
| | 21 | in the coronary arteries. |
| | 22 | Q: So if it's from antidepressants, you don't |
| | 23 | know one way or the other? |
| | 24 | MR. NABERS:  Objection to the form. |
| | 25 | A: I wouldn't. |
| 107: | 1 | Q:  (By Mr. Krumholz)  And age and gender can be |
| | 2 | risk factors? |
| | 3 | A: Yes. Not major. |
| | 4 | Q: What is metabolic syndrome? I've heard it |
| | 5 | described -- |
| | 6 | A: Insensitivity to insulin plus obesity, |
| | 7 | hypertension, and hyperlipidemia, two of the latter |
| | 8 | three. |
| | 9 | Q: According to this chart, Mr. Mason is of the |
| | 10 | age and obviously of the gender that puts him at a |
| | 11 | slightly increased risk when it comes to |
| | 12 | atherosclerosis, true? |
| | 13 | A: According to his age and gender? |
| | 14 | Q: Yes. |
| | 15 | A: Yes. |
| | 16 | Q: As of the time of the heart attack -- which |
| | 17 | assume for me that it was 61 years old. |
| | 18 | A: Yes. |
| | 19 | Q: And what is Mr. Mason's weight and height? |
| | 20 | MR. NABERS:  Objection to the form. |
| | 21 | Q:  (By Mr. Krumholz)  According to his chart? |
| | 22 | A: Let's see. He was 220 pounds or 219 pounds |
| | 23 | when we weighed him. His height was five feet nine |
| | 24 | inches. |
| | 25 | Q: Okay. Assume for me that he's been around |

## Madsen, Bard 2006-07-12

108:
1   that same weight, maybe fluctuating up to 230, for
2   generally the past decade. Okay?
3   A: Uh-huh (affirmative).
4   Q: Is that something that would put him at risk,
5   a greater risk for a heart attack or stroke?
6   MR. NABERS: Objection to the form.
7   Q:   (By Mr. Krumholz)  According to the American
8   Heart Association?
9   MR. NABERS: Same objection.
10  A: Barely.
11  Q:   (By Mr. Krumholz)  Well, you can actually
12  put -- do you have that brochure handy, by chance?
13  A: It's right there.
14  MR. KRUMHOLZ: Scott, can you give it to him,
15  please?
16  A: I assume you're looking at page 15?
17  Q:   (By Mr. Krumholz)  Yes.
18  A: Five nine, over 203 pounds is obese. Barely.
19  Q: It's not barely obese, according to that
20  chart, right?
21  MR. NABERS: Objection to the form.
22  A: No, but there are other -- I mean, other ways
23  that measure the BMI. I think his comes out at 3.3,
24  and three is obese. So that's why I said barely.
25  Q:   (By Mr. Krumholz)  So I see what you're

109:
1   saying. According to the BMI index, he is obese?
2   A: Uh-huh (affirmative).
3   Q: Is that a yes?
4   A: It is.
5   Q: And if you look at that chart on page 15 --
6   A: Yes.
7   Q: -- it puts him at, quote, high risk, true?
8   MR. NABERS: Objection to the form.
9   Q:   (By Mr. Krumholz)  A person five nine and
10  over 203 pounds?
11  A: Yes. It says high risk. It doesn't define
12  what high risk is.
13  Q: It would not be unusual for someone who is
14  obese and who is over 60 years of age to have a heart
15  attack in your experience, true?
16  MR. NABERS: Objection to the form.
17  A: It puts him at greater risk. In other words,
18  again, when you say it would not be unusual, to me it
19  conjures up the idea that he's likely, and I don't
20  think that.
21  Q:   (By Mr. Krumholz)  I'm not saying that he was
22  likely before. I'm just saying it's not unusual in
23  your practice -- you see it from time to time --
24  people who are obese and have -- who are male and over
25  60 years old have heart attacks?

*Overruled*

**Madsen, Bard 2006-07-12**

Madsen PA PC DA DC on 10-3                                    110

| | | |
|---|---|---|
| 110: | 1 | A: Yes. |
| | 2 | MR. NABERS: Objection to the form. |
| | 3 | Q: (By Mr. Krumholz) Without other risk |
| | 4 | factors? |
| | 5 | A: Yes. |
| | 6 | MR. NABERS: Objection to the form. |
| | 7 | A: Yes. |
| | 8 | Q: (By Mr. Krumholz) And it would not be |
| | 9 | unusual for someone who has a family history of heart |
| | 10 | attack before the age of 65 to also have a heart |
| | 11 | attack? |
| | 12 | MR. NABERS: Objection to the form. |
| | 13 | A: We see that, yes. |
| | 14 | Q: (By Mr. Krumholz) And when you say we see |
| | 15 | that, you see that -- these sorts of things, that is, |
| | 16 | heart attacks with folks with these kinds of risk |
| | 17 | factors, whether or not they are taking Vioxx? |
| | 18 | A: Yes. |
| | 19 | MR. NABERS: Objection to the form. |
| | 20 | Q: (By Mr. Krumholz) Regardless of the |
| | 21 | medications they're taking? |
| | 22 | MR. NABERS: Objection. |
| | 23 | A: Yes. |
| | 24 | Q: (By Mr. Krumholz) The same would be true for |
| | 25 | high cholesterol, that it wouldn't be unusual for you |
| 111: | 1 | to see someone with high cholesterol who has had a |
| | 2 | heart attack? |
| | 3 | A: That is true. |
| | 4 | Q: Go on through hypertension. And if you add |
| | 5 | stress to the equation of family history and obesity, |
| | 6 | it wouldn't be unusual for you to see that as well, |
| | 7 | that is, someone have a heart attack? |
| | 8 | MR. NABERS: Objection to the form. |
| | 9 | A: Yes. |
| | 10 | Q: (By Mr. Krumholz) With those risk factors? |
| | 11 | A: That's true. |
| | 12 | Q: And if someone has additionally complained of |
| | 13 | chest pain and tightness for a number of years, that |
| | 14 | would put him at an increased risk of a heart attack? |
| | 15 | A: An increased likelihood, yes. |
| | 16 | Q: And if someone were depressed, do you know if |
| | 17 | that would put them at an increased risk? |
| | 18 | A: I don't know how to monitor -- I don't know |
| | 19 | how to measure that. That's the problem. |
| | 20 | Q: The point is every day people with histories |
| | 21 | of obesity, family history of heart disease or heart |
| | 22 | attack who are not on Vioxx or other COX-2 inhibitors |
| | 23 | have heart attacks? |
| | 24 | A: They do. |
| | 25 | MR. NABERS: Objection to the form. |

Printed: 10/3/2006   8:43:49AM

Def's response: witness is a cardiologist and this is basic cardiology

Plaintiff's objection Re: 110:8-11 no foundation; speculation; argumentative

Plaintiff's objection Re: 110:14-17 vague; no foundation; witness is not an expert on this topic; speculation

Plaintiff's objection Re: 111:4-7 vague; no foundation; assumes facts not in evidence; speculation

Plaintiff's objection Re: 111:12-14 vague; no foundation; assumes facts not in evidence; speculation

Plaintiff's objection Re: 111:20-23 vague; speculation; no foundation; assumes facts not in evidence

**Madsen, Bard 2006-07-12**

112:
1  Q: (By Mr. Krumholz)  You can answer.
2  A: They do.
3  Q: Assume with me that Mr. Mason had risk
4  factors including obesity, family history, high
5  stress, chest pain or discomfort over a period of
6  years. You couldn't rule out those risk factors as
7  the probable cause of Mr. Mason's coronary artery
8  disease, true?
9  MR. NABERS: Objection to the form.
10  A: At least as a possible cause.
11  Q: (By Mr. Krumholz)  It would certainly be in
12  your differential diagnosis?
13  MR. NABERS: Objection to the form.
14  A: Differential diagnosis of?
15  Q: (By Mr. Krumholz)  A heart attack in the
16  manner that I just described.
17  A: Well, the diagnosis is the heart attack, but
18  as to the cause?
19  Q: Yes.
20  A: Those things -- all of those things you
21  mentioned are risk factors for heart attacks.
22  Q: Would you agree that Mr. Mason's heart
23  attack, to the extent he had one, in all likelihood
24  was caused by plaque in the left anterior descending
25  artery or the diagonal branch?

113:
1  MR. NABERS: Objection to the form.
2  A: Is that what caused the heart attack?
3  Q: (By Mr. Krumholz)  Yes.
4  A: Yes. I would assume that.
5  Q: You would agree that plaque is usually caused
6  by the risk factors that we've just discussed, true?
7  MR. NABERS: Objection to the form.
8  A: Those are risk factors for it, yes.
9  Q: (By Mr. Krumholz)  And that's what usually
10  causes plaque to generate, the kinds of risk factors
11  we've discussed?
12  MR. NABERS: Objection to the form.
13  Q: (By Mr. Krumholz)  Age, family history, high
14  cholesterol, hypertension.
15  A: You're saying cause. It's not the age
16  that -- there's a causal relationship.
17  Q: I think I --
18  A: But just because someone is 60 years old does
19  not mean he's going to have a heart attack.
20  Q: I see. Let me rephrase my question, because
21  now that you've explained it to me, I think I can word
22  it better.
23  A: Okay.
24  Q: Do you agree that plaque is usually
25  indicative of someone who has the types of risk

Printed: 10/3/2006  8:43:49AM

*Handwritten annotations:*

*Left margin:* Def's response: witness is a cardiogist who treated plaintiff

*Right side:* Cromwell

*Right margin:* Phamtroff's objection re: 112: 22-25 vague; no foundation; speculation; assumes facts not in evidence; witness is not an expert on this topic; argumentative; misstates the facts

## Madsen, Bard 2006-07-12

| 114: | 1 | **factors that we've discussed?** |
|---|---|---|
| | 2 | MR. NABERS: Objection to the form. |
| | 3 | **A: I think those things are risk factors for** |
| | 4 | **accelerated plaque buildup over the normal.** |
| | 5 | Q:   (By Mr. Krumholz)  Now, I assume that you've |
| | 6 | done -- other than the one review that you said you |
| | 7 | read regarding Vioxx, you haven't done anything else? |
| | 8 | A: Not extensively, no. |
| | 9 | Q: You have not done any research or analysis to |
| | 10 | determine if any -- if Vioxx has any particular side |
| | 11 | effects or causes any particular health problems? |
| | 12 | A: I haven't done any research on that, I |
| | 13 | mean -- |
| | 14 | Q: You're aware -- |
| | 15 | A: -- of warnings and effects on organ systems, |
| | 16 | particularly stomach, endothelium and the like. |
| | 17 | Q: But you have not done any independent |
| | 18 | analysis or research to determine if Vioxx, for |
| | 19 | example, carries an increased risk for CV events? |
| | 20 | A: On my own? |
| | 21 | Q: On your own. |
| | 22 | A: No. |
| | 23 | Q: You could not provide any reliable opinions |
| | 24 | in that regard? Scientifically -- |
| | 25 | A: I'm not an expert in that regard. |
| 115: | 1 | Q: You're not an expert in COX-2s? |
| | 2 | A: No. |
| | 3 | Q: You're not an expert in Vioxx, particularly? |
| | 4 | A: No. |
| | 5 | Q: Or the effects of Vioxx on the body in terms |
| | 6 | of side effects? |
| | 7 | A: Not -- well -- |
| | 8 | Q: Outside of the label? |
| | 9 | A: Outside of -- right. I'm not an expert in |
| | 10 | those, that's correct. |
| | 11 | Q: Have you put pen to paper and done any |
| | 12 | statistical or scientific analysis to determine if |
| | 13 | Vioxx causes plaque buildup? |
| | 14 | A: No. |
| | 15 | Q: Or destabilization of plaque? |
| | 16 | A: No. |
| | 17 | Q: Or plaque rupture? |
| | 18 | A: No. |
| | 19 | Q: And before opining about any of those things, |
| | 20 | you would want to look at, I assume, the totality of |
| | 21 | the information? |
| | 22 | A: That would be useful, yes. |
| | 23 | Q: Including, for example, double blind |
| | 24 | studies -- |
| | 25 | A: Yes. |

## Madsen, Bard 2006-07-12

116:  1    Q: -- clinical studies, the drug application
       2    that attaches various information?
       3    A: Yes.
       4    Q: Things of that nature?
       5    A: Yes.
       6    Q: And you have not done that?
       7    A: Not to an in-depth -- not in an in-depth way,
       8    no.
       9    Q: Do you agree it is important for Mr. Mason to
      10    identify risk factors now after his heart attack?
      11    A: Certainly.
      12    Q: And to control them to the extent possible?
      13    A: Yes.
      14    Q: Including eating right?
      15    A: Yes.
      16    Q: Do you agree that all medications carry some
      17    risks of side effects?
      18    A: Yes.
      19    MR. NABERS: Objection to the form.
      20    Q: (By Mr. Krumholz) As a medical doctor, you
      21    have to be aware of that in order to adequately assess
      22    risks and benefit?
      23    A: Yes.
      24    Q: Now, some medications carry some pretty
      25    significant health risks even according to their
117:  1    label?
       2    A: Yes.
       3    Q: And you have to do a risk-benefit analysis to
       4    determine if, even given those risks, even if it was,
       5    for example, a risk of death, you have to still
       6    balance the risk versus the benefits to determine
       7    whether you should give that patient that medication?
       8    A: Yes.
       9    Q: There are examples where patients sometimes
      10    are willing to take a small risk of a bad result
      11    because of the benefits of the medication?
      12    A: Yes.
      13    Q: Examples, I guess, would be like the polio
      14    vaccine, true?
      15    MR. NABERS: Objection to the form.
      16    A: Yes.
      17    Q: (By Mr. Krumholz) Or chemotherapy?
      18    MR. NABERS: Objection to the form.
      19    A: Yes.
      20    Q: (By Mr. Krumholz) Or birth control pills?
      21    MR. NABERS: Objection to the form.
      22    A: Or birth control.
      23    Q: (By Mr. Krumholz) Are you aware of whether
      24    or not birth control pills, for example, cause --
      25    carry with it any significant risk?

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                                    118

| 118: | 1 | A: Yes. |
|---|---|---|
| | 2 | Q: What sort of risk do they carry, as you |
| | 3 | recall? |
| | 4 | A: An increased risk of thromboembolism. |
| | 5 | Q: Including death from thromboembolism? |
| | 6 | A: Could be. |
| | 7 | MR. KRUMHOLZ: I think we need to change the |
| | 8 | tape. I'm almost done. It gives me some time to go |
| | 9 | over everything and make sure. |
| | 10 | THE VIDEOGRAPHER: It's seven minutes after |
| | 11 | 5:00. We're going off the record. This is the end of |
| | 12 | tape No. 1. |
| | 13 | (Recess.) |
| | 14 | THE VIDEOGRAPHER: It's 12 minutes after |
| | 15 | 5:00. This is the beginning of tape No. 2 and we're |
| | 16 | back on the record. |
| | 17 | Q:   (By Mr. Krumholz)  Doctor, I only have a |
| | 18 | couple of follow-up areas, and it won't take long at |
| | 19 | all. |
| | 20 | **Can you describe your practice for the jury?** |
| | 21 | **A: Our practice is general adult cardiology.** |
| | 22 | **Q: And, generally speaking, what does that** |
| | 23 | **entail?** |
| | 24 | **A: Taking care of adults with heart disease.** |
| | 25 | **Q: Are patients like Mr. Mason the types of** |
| 119: | 1 | **patients that you treat every day?** |
| | 2 | **A: As you've described, he has coronary** |
| | 3 | **artery -- has had coronary artery disease -- has** |
| | 4 | **coronary artery disease, and we see a lot of those** |
| | 5 | **every day, yes.** |
| | 6 | **Q: Okay. And the types of records that we've** |
| | 7 | **shown you today are the types of records that you look** |
| | 8 | **to in your practice each and every day --** |
| | 9 | **A: Yes.** |
| | 10 | **Q: In connection with assessing a patient?** |
| | 11 | **A: Yes.** |
| | 12 | **Q: And in connection with providing opinions to** |
| | 13 | **that patient?** |
| | 14 | **A: Yes.** |
| | 15 | **Q: And in connection with designing a plan for** |
| | 16 | **that patient?** |
| | 17 | **A: Yes.** |
| | 18 | **Q: And deciding medications that should be taken** |
| | 19 | **in connection with any particular patient?** |
| | 20 | **A: Yes.** |
| | 21 | **Q: And in connection with the causes of the** |
| | 22 | **patients' problems, these are the types of records you** |
| | 23 | **rely on each and every day?** |
| | 24 | **A: Yes.** |
| | 25 | MR. KRUMHOLZ: I'll pass the witness. |

### Madsen, Bard 2006-07-12

120:  1  EXAMINATION
      2  BY MR. NABERS:
      3  Q: Dr. Madsen, my name is Scott Nabers and I
      4  represent Charles Mason, and I appreciate your time
      5  here today.
      6  You understand that it's in connection with a
      7  case that he's filed against Merck as a result of his
      8  injection of Vioxx that you've been asked questions
      9  today?
     10  A: Yes.
     11  MR. KRUMHOLZ:  Objection, form.
     12  Q:   (By Mr. Nabers)  You graciously appeared
     13  today to give your time to give this deposition,
     14  correct?
     15  A: I don't know how graciously I did, but I'm
     16  here.
     17  Q: All right. And in connection with that, you
     18  understand that your testimony here today can be used
     19  if there ever is a trial of Mr. Mason's case in front
     20  of the jury?
     21  A: Right.
     22  Q: And you understand that you've been put under
     23  oath by the court reporter?
     24  A: Yes.
     25  Q: All right. And that your testimony here
121:  1  today is just as if you were in the courtroom in front
      2  of a judge and jury?
      3  A: I understand that.
      4  Q: Okay. Let me ask you, you were told earlier
      5  about Mr. Mason having a heart attack July 25th of
      6  2003?
      7  A: Yes.
      8  Q: Did you know that?
      9  A: Did I know it when?
     10  Q: At any point prior to today.
     11  A: No.
     12  Q: Is the first time you learned Mr. Mason ever
     13  had a heart attack in July of 2003 today?
     14  A: Dr. Symkoviak, who was deposed two days ago,
     15  and I discussed this matter briefly, for five minutes
     16  or so, and he may have said that.
     17  Q: All right.
     18  A: And I think when you and I discussed this
     19  about a month ago, you may have said that.
     20  Q: Right. I had a chance to come and sit down
     21  and talk with you --
     22  A: Yes.
     23  Q: -- a couple of weeks ago about Mr. Mason's
     24  case, correct?
     25  A: Yes.

**Madsen, Bard 2006-07-12**

Madsen PA PC DA DC on 10-3

122

| 122: | 1 | Q: But it's fair to say that you have not |
| | 2 | reviewed his past medical history? |
| | 3 | A: I have not. |
| | 4 | Q: Okay. Haven't reviewed his past medical |
| | 5 | records? |
| | 6 | A: No. |
| | 7 | Q: All right. And, in fact, I think you |
| | 8 | indicated that if he walked in today, you wouldn't |
| | 9 | have a personal recollection of him? |
| | 10 | A: I would not. |
| | 11 | Q: All right. Did you know that he took Vioxx |
| | 12 | for 13 months prior to suffering his heart attack? |
| | 13 | MR. KRUMHOLZ: Objection, form. |
| | 14 | Mischaracterizes the evidence. Assumes facts not in |
| | 15 | evidence. |
| | 16 | A: I did not ask him. He was listed -- he |
| | 17 | listed Vioxx -- he listed his medicines, and Vioxx was |
| | 18 | one of them, when we did the treadmill. |
| | 19 | Q: (By Mr. Nabers) Okay. |
| | 20 | A: But I did not know how long he had taken it. |
| | 21 | Q: Did you know that he was on Vioxx at the time |
| | 22 | he had his heart attack? |
| | 23 | A: According to the chart, yes -- |
| | 24 | Q: All right. |
| | 25 | A: -- I would have known that. |
| 123: | 1 | Q: Were you aware that Vioxx was removed from |
| | 2 | the market September 30th of 2004? |
| | 3 | A: Yes. |
| | 4 | Q: And do you have an understanding of why Vioxx |
| | 5 | was removed from the market? |
| | 6 | A: Yes. |
| | 7 | MR. KRUMHOLZ: Objection, form. |
| | 8 | Q: (By Mr. Nabers) What is your understanding |
| | 9 | of why Vioxx was withdrawn from the market? |
| | 10 | MR. KRUMHOLZ: Objection, form. |
| | 11 | A: There's a higher incidence of coronary artery |
| | 12 | disease. |
| | 13 | Q: (By Mr. Nabers) All right. Were you ever |
| | 14 | made aware that Vioxx was withdrawn from the market as |
| | 15 | a result of its increased risk of causing heart |
| | 16 | attacks and strokes? |
| | 17 | A: Yes. |
| | 18 | MR. KRUMHOLZ: Objection, form. |
| | 19 | Q: (By Mr. Nabers) And how did you become aware |
| | 20 | of that? |
| | 21 | MR. KRUMHOLZ: Objection, form. |
| | 22 | A: Articles and in the media. |
| | 23 | Q: (By Mr. Nabers) Was it widespread in the |
| | 24 | cardiology community where you practice that Vioxx |
| | 25 | increased the risk of heart attack? |

Printed: 10/3/2006   8 43:49AM

*Handwritten annotations:*

Overruled ↓

Re: 123:4 – 124:3
DEF Obj: Lack of
foundation; no personal
Knowledge; hearsay,
comments on "articles"
and "media."
PLAINTIFF'S RESPONSE
THIS WITNESS IS A
PRACTING CARDIOLOGIST
WHO READS AND REVIEWES
THE MEDICAL LITERATURE
ON VIOXX. HE COMMENTS
ON 2 SOURCES THE
MEDICAL LITERATURE
AND THE MEDIA. HE
HAS PERSONAL KNOWLEDGE
OF VIOXX'S WITHDRAWAL
AND THE REASONING
BEHIND IT. THESE ARE
PROPER QUESTIONS WITH
ADEQUATE FOUNDATION
ASKED IN A NON-LEADING

manner. This is important and credible
testimony for the PLAINTIFF's CASE.

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                    124

124:
1   MR. KRUMHOLZ: Objection, form.
2   A: When the announcement was made and it
3   appeared in the literature, yes.
4   Q:  (By Mr. Nabers)  Okay.
5   MR. KRUMHOLZ: Objection, nonresponsive.
6   Q:  (By Mr. Nabers)  It's fair to say that you
7   have not really been a treating cardiologist of
8   Mr. Mason's, correct?
9   A: True.
10  Q: I think that your only encounter with
11  Mr. Mason involved one diagnostic test known as a
12  stress test?
13  A: Yes.
14  Q: At the time -- I want to talk to you
15  specifically about Mr. Mason, but let me just ask you
16  generally, is a heart attack a serious thing to a
17  patient?
18  A: Yes.
19  Q: All right. Is a heart attack scary to the
20  patient?
21  MR. KRUMHOLZ: Objection, form.
22  A: You would have to ask the patient, but,
23  generally speaking, patients are concerned when they
24  have something wrong with their -- going on with their
25  heart.

125:
1   Q:  (By Mr. Nabers)  Can a heart attack cause
2   pain to the patient?
3   A: Yes.
4   Q: Can a heart attack cause symptoms to the
5   patient?
6   A: Yes.
7   Q: Can a heart attack cause patients worry and
8   anxiety about their health condition?
9   A: Yes.
10  Q: Have you seen that in your cardiologic
11  practice?
12  A: Yes.
13  Q: Can heart attacks require hospitalization?
14  A: Yes.
15  Q: Can heart attacks require patients to take
16  medications?
17  A: Yes.
18  Q: Can heart attacks change a person's
19  lifestyle, what they're able to do on a daily basis?
20  A: Yes.
21  Q: Can a heart attack disable a person?
22  A: Yes.
23  Q: Can a heart attack change a person -- their
24  work environment, how they interact at work?
25  MR. KRUMHOLZ: Objection to the form.

**Madsen, Bard 2006-07-12**

126:
| | |
|---|---|
| 1 | A: Yes. |
| 2 | Q:   (By Mr. Nabers)  Can a heart attack require |
| 3 | follow-up medical care for the patient? |
| 4 | A: Yes. |
| 5 | Q: Can a heart attack increase a person's |
| 6 | likelihood of having another heart attack in the |
| 7 | future? |
| 8 | A: Yes. |
| 9 | Q: Can a heart attack damage heart muscle? |
| 10 | A: Yes. |
| 11 | Q: Can the damage that a heart attack causes to |
| 12 | the heart be permanent? |
| 13 | A: Yes. |
| 14 | Q: Does the heart attack -- or can a heart |
| 15 | attack cause tissue death in the heart? |
| 16 | A: Yes. |
| 17 | Q: Can a heart attack cause other adverse |
| 18 | consequences to the heart such as congestive heart |
| 19 | failure? |
| 20 | MR. KRUMHOLZ: Objection to the form. |
| 21 | A: Yes. |
| 22 | Q:   (By Mr. Nabers)  Can a heart attack cause |
| 23 | decreased ejection fractions? |
| 24 | A: Yes. |
| 25 | Q: Can a heart attack cause left ventricular |

127:
| | |
|---|---|
| 1 | damage? |
| 2 | A: Yes. |
| 3 | Q: Can a heart attack damage the heart wall |
| 4 | within the heart? |
| 5 | A: Yes. |
| 6 | Q: Can a heart attack cause the heart not to |
| 7 | function properly? |
| 8 | A: Yes. |
| 9 | Q: Now, going back to Mr. Mason specifically for |
| 10 | a minute, we were talking about the fact that you |
| 11 | performed the stress test on him. At the time of the |
| 12 | stress test, you had never performed a history on him, |
| 13 | correct? |
| 14 | A: That is correct. |
| 15 | Q: You had not done a physical exam of him? |
| 16 | A: No. |
| 17 | Q: You had not talked to him about his family |
| 18 | history? |
| 19 | A: No. |
| 20 | Q: You did not know what medications he was on? |
| 21 | A: I did. |
| 22 | Q: Okay. Would you have found out what |
| 23 | medications he was on as a part of doing the stress |
| 24 | test? |
| 25 | A: Yes. He listed them for us. |

Printed: 10/3/2006   8:43:49AM

Overruled

Re: 126:17 - 126:21
Def Obj: 403; Irrelevant;
No claim of congestive heart
failure is made in this case.
PLAINTIFF'S Response
The question is probative b/c
Heart attacks can lead
to congestive heart failure.
Its a known medical fact
and it is one of the reasons
π needs medical monitoring
for the rest of his life.
For these reasons its
directly relevant to the
issues in this case.

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                                            128

128:  1   Q: Did you know anything about his medical
      2   history prior to him coming to you for the stress
      3   test?
      4   A: No, I did not.
      5   Q: My understanding is that it was Dr. Vogeler
      6   who ordered the stress test?
      7   A: Yes.
      8   Q: And he asked that the stress test be
      9   performed here within your office?
     10   A: Yes.
     11   Q: And you were the cardiologist assigned to
     12   read the stress test?
     13   A: To oversee it and read it, yes.
     14   Q: Whenever you performed the stress test, is it
     15   fair to say that you saw no evidence of a previous
     16   myocardial infarction on the 9/17/2002 stress test?
     17   A: Yes.
     18   Q: You did not see any evidence of that?
     19   A: I did not.
     20   Q: When we talk about a myocardial infarction,
     21   we're just talking about a heart attack, correct?
     22   A: Heart attack, which I have described earlier
     23   as being death of a portion of the heart muscle.
     24   Q: Okay. Now, we've talked about the stress
     25   test, but the reason for doing the stress test
129:  1   particularly for Mr. Mason was why?
      2   A: It was listed on the report as an abnormal
      3   EKG.
      4   Q: Did you ever see that EKG?
      5   A: I don't believe I did.
      6   Q: Do you know if that EKG was abnormal?
      7   A: I don't.
      8   Q: But you understand that on the basis of that,
      9   he was sent to have the stress test?
     10   A: Yes.
     11   Q: Now, were you present whenever Mr. Mason had
     12   the stress test?
     13   A: Yes.
     14   Q: But your only encounter with him would have
     15   been during the time that he was performing the stress
     16   test?
     17   A: That's correct.
     18   Q: You've never actually seen him in your office
     19   as a patient?
     20   A: No, not subsequent to this.
     21   Q: Have you ever examined or reviewed any of his
     22   lab results in his prior medical history?
     23   A: No.
     24   Q: Have you ever ordered any diagnostic testing
     25   for him?

**Madsen, Bard 2006-07-12**

| 130: | 1 | A: No. |
|---|---|---|
| | 2 | MR. KRUMHOLZ:  Objection, form. |
| | 3 | Q:   (By Mr. Nabers)   Have you ever reviewed any |
| | 4 | of the diagnostic tests that were performed on him |
| | 5 | other than the stress test you performed? |
| | 6 | A: No. |
| | 7 | Q: Do you know anything about his current |
| | 8 | medical condition? |
| | 9 | A: No, other than what has been told me here in |
| | 10 | this deposition. |
| | 11 | Q: All right. I think that you indicated that |
| | 12 | you were aware that he ingested Vioxx? |
| | 13 | A: Yes. He listed that as one of the medicines |
| | 14 | he was taking. |
| | 15 | Q: Did you ask him specifically if he had taken |
| | 16 | Vioxx? |
| | 17 | A: No. |
| | 18 | Q: He just told you that as a part of the stress |
| | 19 | test? |
| | 20 | A: We wrote it down on his medicine list. |
| | 21 | Q: All right. As you sit here today, do you |
| | 22 | know how long he took Vioxx? |
| | 23 | A: I do not. |
| | 24 | Q: Do you know how often he took Vioxx? |
| | 25 | A: No. |
| 131: | 1 | Q: Do you know what milligram dosage of Vioxx he |
| | 2 | took? |
| | 3 | A: We didn't list that. |
| | 4 | Q: It's fair to say that you have not reviewed |
| | 5 | your own -- strike that. Let's do it again. |
| | 6 | Mr. Mason has seen other cardiologists within your |
| | 7 | practice, true? |
| | 8 | A: Yes. |
| | 9 | Q: All right. And it's fair to say that there |
| | 10 | are medical records that correspond to his care and |
| | 11 | treatment with other cardiologists in your office? |
| | 12 | A: Yes. |
| | 13 | Q: Prior to today's deposition, you didn't have |
| | 14 | an opportunity to review that information, correct? |
| | 15 | A: I did not review it. |
| | 16 | Q: Okay. |
| | 17 | A: Probably had lots of opportunity, but I did |
| | 18 | not. |
| | 19 | Q: Okay. And so that's not uncommon, though, |
| | 20 | for you to have interpreted a test and, even though |
| | 21 | he's the patient of another cardiologist in your |
| | 22 | practice, you just didn't know all of the medical |
| | 23 | information about him, correct? |
| | 24 | MR. KRUMHOLZ:  Objection, form. |
| | 25 | A: That's true. In fact, he came to see us to |

**Madsen, Bard 2006-07-12**

| 132: | 1 | do the stress test that I performed on him. He was |
|---|---|---|
| | 2 | not referred to us to be a patient. It was only |
| | 3 | subsequent to the events in 2003 that he became a |
| | 4 | real -- you know, that he was actually seen in the |
| | 5 | office as a patient. |
| | 6 | Q:  (By Mr. Nabers)  All right. At the time that |
| | 7 | he came to see you for the stress test, he was not a |
| | 8 | current patient of the practice? |
| | 9 | A:  That is correct. |
| | 10 | Q:  Fine. And without knowing about today's |
| | 11 | deposition, would you have known whether or not he was |
| | 12 | a current patient of the practice? |
| | 13 | A:  No, I would not. |
| | 14 | Q:  And that's just because he sees another |
| | 15 | cardiologist within your practice? |
| | 16 | A:  That's right. |
| | 17 | Q:  Now, we were talking about the stress test, |
| | 18 | and I wanted to ask you, it talked about an EKG being |
| | 19 | abnormal as the reason for the stress test? |
| | 20 | A:  Yes. |
| | 21 | Q:  All right. And does the EKG -- does the |
| | 22 | computer sometimes read the strip and give an opinion? |
| | 23 | A:  The EKG machines today will offer -- will |
| | 24 | print out a diagnosis or diagnoses on the EKG of |
| | 25 | what's wrong with it or whether it's normal. |
| 133: | 1 | Q:  Okay. But does a cardiologist typically go |
| | 2 | behind the computer and give the cardiologist's own |
| | 3 | interpretation? |
| | 4 | A:  Yes. |
| | 5 | Q:  And why do cardiologists do that? |
| | 6 | A:  Because the machines are wrong -- or can be |
| | 7 | wrong. |
| | 8 | Q:  Whenever you performed this stress test on |
| | 9 | him, did you find any evidence of ischemia? |
| | 10 | A:  We did not find any electrocardiographic |
| | 11 | evidence of ischemia. |
| | 12 | Q:  What is ischemia? |
| | 13 | A:  Ischemia is when a section of heart muscle |
| | 14 | gets into a situation where the supply of blood is -- |
| | 15 | does not meet the demand. That's what ischemia is. |
| | 16 | It is a reversible situation in that when the |
| | 17 | offending character is removed, the stress is removed, |
| | 18 | that supply then meets demand and ischemia goes away. |
| | 19 | If ischemia persists for a long enough period of time |
| | 20 | to result in heart muscle cell death, then that's an |
| | 21 | infarction. |
| | 22 | Q:  And so it's fair to say that based on the |
| | 23 | stress test that you performed, you did not find any |
| | 24 | evidence of ischemia on Mr. Mason on that date? |
| | 25 | A:  That's -- that is correct. Within the bounds |

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                                      134

| 134: | |
|---|---|
| | 1 | of the test, that is correct. |
| | 2 | Q: And you didn't order any other tests after |
| | 3 | that to look further for ischemia? |
| | 4 | A: I did not. |
| | 5 | Q: Because you didn't feel there was a need to |
| | 6 | do that, right? |
| | 7 | A: That's true. |
| | 8 | MR. KRUMHOLZ: Objection, form. |
| | 9 | Q: (By Mr. Nabers) And you were asked a little |
| | 10 | bit about high blood pressure in connection with the |
| | 11 | stress test. Do you know if Mr. Mason has ever been |
| | 12 | diagnosed as having hypertension or high blood |
| | 13 | pressure? |
| | 14 | A: I do not. His -- the response of his blood |
| | 15 | pressure to exercise was greater than what we normally |
| | 16 | see. |
| | 17 | Q: Okay. And we also talked a little about his |
| | 18 | resting blood pressure prior to the test. Do you |
| | 19 | recall that? |
| | 20 | A: Yes. |
| | 21 | Q: Is there a term called white coat |
| | 22 | hypertension? |
| | 23 | A: Yes. |
| | 24 | MR. KRUMHOLZ: Objection, form. |
| | 25 | Q: (By Mr. Nabers) What is white coat |
| 135: | 1 | hypertension? |
| | 2 | A: Well, it's actually a lay term, but it, I |
| | 3 | believe, refers to patients being anxious and nervous |
| | 4 | about seeing a doctor about their own health, |
| | 5 | resulting in the secretion of certain hormones that |
| | 6 | elevate blood pressure -- |
| | 7 | Q: All right. |
| | 8 | A: -- even at rest. |
| | 9 | Q: The blood pressure that Mr. Mason had when he |
| | 10 | was resting prior to the test, could that be the |
| | 11 | result of white coat hypertension? |
| | 12 | MR. KRUMHOLZ: Objection, form. |
| | 13 | A: It could be. |
| | 14 | Q: (By Mr. Nabers) And it's fair to say that |
| | 15 | you've never done any consistent blood pressure |
| | 16 | readings on Mr. Mason to see if you thought he was |
| | 17 | hypertensive? |
| | 18 | A: I never did. |
| | 19 | Q: You've never diagnosed him with hypertension? |
| | 20 | A: I never did. |
| | 21 | Q: You've never seen any evidence that he has |
| | 22 | hypertension? |
| | 23 | MR. KRUMHOLZ: Objection, form. |
| | 24 | A: I've not seen enough evidence to make that |
| | 25 | determination one way or another. |

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                    **136**

| 136: | 1 | Q:  (By Mr. Nabers)  And you haven't prescribed |
| | 2 | him any medication for hypertension? |
| | 3 | A:  No. He's never been a patient of mine to the |
| | 4 | extent that I would feel comfortable prescribing |
| | 5 | medicine for him. |
| | 6 | Q: Let me ask you some questions specifically |
| | 7 | about Mr. Mason. Have you ever seen him play golf? |
| | 8 | A:  No. |
| | 9 | Q: Do you know if he can play golf? |
| | 10 | A:  No. The only encounter I've had with him is |
| | 11 | when we did the -- on the day we did the treadmill. |
| | 12 | Q: It's fair to say that the answers that you've |
| | 13 | given today, you would not want a jury who listened to |
| | 14 | you to assume that Mr. Mason can play golf based upon |
| | 15 | what you've said, correct? |
| | 16 | MR. KRUMHOLZ:  Objection, form. |
| | 17 | Q:  (By Mr. Nabers)  I mean -- |
| | 18 | MR. KRUMHOLZ:  Objection, lack of foundation. |
| | 19 | A:  The question -- repeat the question. I'm not |
| | 20 | sure I understood. |
| | 21 | Q:  (By Mr. Nabers)  Sure. It's fair to say that |
| | 22 | as you sit here today, you don't know what Mr. Mason's |
| | 23 | current health condition is, correct? |
| | 24 | A:  I do not. |
| | 25 | Q: And, therefore, you can't say whether he |
| 137: | 1 | could or could not go out and play golf? |
| | 2 | A:  That's true. |
| | 3 | Q: And the same thing would be in terms of you |
| | 4 | don't know whether or not he could go hunt today, |
| | 5 | correct? |
| | 6 | A:  I don't know whether he could or could not. |
| | 7 | Q: You don't know whether he could go hike today |
| | 8 | or not? |
| | 9 | A:  I don't know whether he could or could not. |
| | 10 | Q: You don't know whether he could skip today or |
| | 11 | not? |
| | 12 | A:  That's true. |
| | 13 | Q: You don't know whether he could hop or jump |
| | 14 | today or not, correct? |
| | 15 | A:  Correct. |
| | 16 | Q: All right. You don't know if he could -- |
| | 17 | strike that. You don't know if he could do |
| | 18 | competitive activities today or not, correct? |
| | 19 | A:  I don't know if he could perform them or not. |
| | 20 | Q: You don't know if he could lift heavy things |
| | 21 | today, correct? |
| | 22 | A:  Correct. |
| | 23 | Q: You don't know if he could ride a bike today? |
| | 24 | A:  I don't know that. |
| | 25 | Q: You don't know if he could play with his |

Printed: 10/3/2006   8:43:49AM

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                                     138

138:  1    grandkids today?
      2    A: I don't know anything about him.
      3    Q: Okay. Certainly you wouldn't know anything
      4    about his sex life, correct?
      5    A: No.
      6    Q: You don't know if he could walk an
      7    eight-minute mile?
      8    MR. KRUMHOLZ: Today?
      9    Q:  (By Mr. Nabers)  Today.
      10   A: Today, no.
      11   Q: And, really, you haven't known whether or not
      12   he could do any of these things at any point in his
      13   life just because you haven't had an opportunity to do
      14   a history and physical, correct?
      15   MR. KRUMHOLZ: Objection, form.
      16   A: True.
      17   Q:  (By Mr. Nabers)  All right. Now, you were
      18   shown some exhibits today that were some tests, some
      19   that had been done outside your office and some that
      20   had been done within your office, correct?
      21   A: Yes.
      22   Q: You had never seen any of those prior to
      23   today when Merck's counsel showed them to you,
      24   correct?
      25   MR. KRUMHOLZ: Objection, form.
139:  1    A: That's correct.
      2    Q:  (By Mr. Nabers)  For example, one of the
      3    things that you were shown was Deposition No. 11,
      4    which was Dr. Symkoviak's cath at the time that
      5    Mr. Mason came in to see him at Cottonwood Hospital.
      6    You weren't aware of that, correct?
      7    A: Yes, today I was.
      8    Q: Right. Prior to today, you had never
      9    reviewed that report?
      10   A: That is correct.
      11   Q: It's fair to say that you don't have any
      12   personal knowledge about that report?
      13   MR. KRUMHOLZ: Objection, form.
      14   A: No, I don't.
      15   Q:  (By Mr. Nabers)  It's fair to say that you
      16   never saw the underlying films of that cath that was
      17   done on Mr. Mason?
      18   A: That is true.
      19   Q: You don't really even know whether or not the
      20   information in the report is accurate and truthful
      21   because you just weren't there for it, right?
      22   A: That's right.
      23   MR. KRUMHOLZ: Objection, form.
      24   Q:  (By Mr. Nabers)  And it's fair to say that
      25   you don't have any personal knowledge about the cath

**Madsen, Bard 2006-07-12**

Madsen PA PC DA DC on 10-3                                                    **140**

140:   1   that Dr. Symkoviak did?
2   MR. KRUMHOLZ: Objection, form.
3   A: I don't.
4   Q:   (By Mr. Nabers)   And any of the measurements
5   or the findings that were made in that cath, you
6   wouldn't have any personal knowledge of those either,
7   correct?
8   MR. KRUMHOLZ: Objection, form.
9   A: Other than what I've seen on the cath report
10   today.
11   Q:   (By Mr. Nabers)   Right. I mean, other than
12   being shown that today by Merck's counsel, you didn't
13   have any knowledge prior to today?
14   A: No.
15   MR. KRUMHOLZ: Objection, form.
16   Q:   (By Mr. Nabers)   And you hadn't reviewed that
17   prior to today?
18   A: I have not.
19   Q: You were also shown Dr. Ganellen's cardiac
20   cath report whenever Mr. Mason had his heart attack in
21   July of 2003. Do you recall that?
22   A: Yes.
23   Q: Had you ever seen Dr. Ganellen's cath report
24   prior to today?
25   A: No.

141:   1   Q: You hadn't had an opportunity to familiarize
2   yourself with that report prior to today, correct?
3   A: I did not do that.
4   Q: You just didn't have access to it for one
5   thing, right?
6   MR. KRUMHOLZ: Objection, form.
7   A: No, I didn't.
8   Q:   (By Mr. Nabers)   You weren't there whenever
9   the cath was performed on Mr. Mason, correct?
10   A: No, I was not.
11   Q: You never got to see the cath films that made
12   up the report?
13   A: No.
14   Q: And it's fair to say that you just don't have
15   any personal knowledge of that cath report?
16   MR. KRUMHOLZ: Object to the form.
17   A: That's fair to say.
18   Q:   (By Mr. Nabers)   And the findings that were
19   within Dr. Ganellen's cath report, since you didn't
20   see the underlying films and since you weren't there
21   when Mr. Mason was there getting the cath, you would
22   have no opinion as to whether or not they are true and
23   accurate, correct?
24   MR. KRUMHOLZ: Objection, form.
25   A: That is correct.

**Madsen, Bard 2006-07-12**

142

142:
1  Q:   (By Mr. Nabers)  I mean, you can't vouch for
2  the veracity of something that you weren't there or
3  have no knowledge of?
4  A:  That's right.
5  Q:  It did say in that report that his LAD had a
6  90-percent stenosis. You were asked that earlier?
7  A:  Yes.
8  Q:  And do you consider that to be a significant
9  blockage?
10  A:  Yes.
11  Q:  Is that a severe blockage?
12  A:  It is to me.
13  Q:  All right. Is it one that needs to be
14  evaluated by competent cardiologists?
15  A:  In most cases, yes.
16  Q:  Is it one that needs -- is a 90-percent
17  blockage one that needs intervention?
18  A:  More often than not, yes.
19  Q:  I mean, a 90-percent blockage in someone's
20  LAD coronary artery is a significant thing, correct?
21  A:  I think it is.
22  Q:  Okay. You were also shown in that report
23  that his first diagonal had a 70-percent stenosis. Do
24  you recall that?
25  A:  Yes.

143:
1  Q:  Do you consider that to be significant?
2  A:  You'll need to define significant. If you're
3  talking about a 70-percent restriction in the diameter
4  of pipes, yes, that reduces flow. Does it always
5  cause symptoms? Not necessarily.
6  Q:  All right. Is a 70-percent stenosis in the
7  first diagonal something that would require some
8  intervention?
9  MR. KRUMHOLZ:  Objection, form.
10  A:  Sometimes.
11  Q:   (By Mr. Nabers)  Is it something that should
12  be evaluated by a competent cardiologist such as
13  yourself?
14  A:  Yes.
15  Q:  You were also shown Deposition Exhibit
16  No. 14, which was a 2003 Cardiolite performed on
17  Mr. Mason. Do you recall that?
18  A:  Yes.
19  Q:  It's fair to say that you had never reviewed
20  that prior to today?
21  A:  That's true.
22  Q:  You weren't there whenever that Cardiolite
23  was performed?
24  A:  I was not.
25  Q:  You've never looked at the underlying data

Printed: 10/3/2006   8:43:49AM

**Madsen, Bard 2006-07-12**

144:
1  that made up that 2003 Cardiolite report?
2  A: I have not.
3  Q: And, really, your first opportunity to look
4  at it and digest the information within it was while
5  you were being asked questions here at this
6  deposition, correct?
7  A: Yes.
8  Q: And you wouldn't be able, again, to say
9  whether or not the findings in that 2003 Cardiolite
10  are true and accurate, because you just weren't there
11  for that procedure, correct?
12  A: That's fine.
13  Q: And with regard to the cause of Mr. Mason's
14  heart attack that now you've become aware of as a part
15  of this deposition, it's fair to say that as you sit
16  here you don't have an opinion because you haven't had
17  an opportunity to review all of his prior and current
18  medical records?
19  A: I don't have an opinion, that's true.
20  Q: Okay. But do you agree that before you would
21  want to give an opinion about the cause of his heart
22  attack, you would certainly want to review all of his
23  past, present and current medical conditions?
24  A: Yes, and I think it would be important to be
25  able to speak with the patient face-to-face and

145:
1  examine him.
2  Q: Okay. And I think you would want to have an
3  opportunity to go back and look and review the
4  literature that looks into whether or not Vioxx has
5  been associated with increasing the risk of
6  cardiovascular disease?
7  A: Yes, I think that would be useful as well.
8  MR. KRUMHOLZ: Objection, form.
9  Q: (By Mr. Nabers)  Let me ask you, you were
10  asked some questions about Mr. Mason's risk factors,
11  correct?
12  A: Yes.
13  Q: Is it fair to say, though, that since you've
14  never taken a history from him and you've never
15  examined him, that you really wouldn't know what his
16  risk factors are?
17  A: Firsthand, no, I would not.
18  Q: Okay. For example, we've talked about
19  hypertension. You don't know if he's ever been
20  diagnosed with that, correct?
21  A: That's correct.
22  Q: Okay. You don't know whether or not he has a
23  family history of heart disease, correct?
24  A: That is correct.
25  Q: You don't know whether or not he's ever been

**Madsen, Bard 2006-07-12**

146:
1  diagnosed with diabetes?
2  A: I don't know that.
3  Q: You wouldn't know what level of stress he's
4  had or does have currently in his life?
5  A: I don't know that.
6  Q: And the reason you don't know these things is
7  because you just never had a chance to talk to him; is
8  that right?
9  A: That's right.
10  Q: You don't know whether or not he's ever had
11  high cholesterol?
12  A: I don't know what his levels are.
13  Q: You don't know if he's ever had elevated
14  triglycerides?
15  A: I don't know that.
16  Q: You don't know if he's ever had any metabolic
17  syndrome?
18  A: I don't know that.
19  Q: I mean, whenever he came to see you, you
20  didn't see how tall he was, right?
21  A: We measured it. I believe. Yes. we took his
22  height and weight.
23  Q: You took his height and weight?
24  A: Yes.
25  Q: Any other information like that that you

147:
1  would have taken from him prior to the stress test?
2  A: No. We had his height, weight, the fact that
3  he takes -- that he took Vioxx and, I believe, Zoloft.
4  MR. KRUMHOLZ: What was the last? Sorry
5  about that, I didn't hear.
6  THE WITNESS: He takes Vioxx, and I think
7  they've written down Zoloft.
8  MR. KRUMHOLZ: Zoloft?
9  THE WITNESS: Yes.
10  Q:  (By Mr. Nabers)  It's fair to say, though,
11  that as part of that stress test you didn't figure his
12  BMI?
13  A: I did not.
14  Q: You didn't diagnose him at that point as
15  being obese, correct?
16  A: I did not. I didn't make any diagnosis. We
17  were asked --
18  Q: Whether or not he has or doesn't have
19  erectile dysfunction, you don't know?
20  A: I don't know.
21  Q: Whether he does or does not have depression
22  and takes medication for it, you don't know?
23  A: I don't know that.
24  Q: Do you agree that if a patient has a
25  myocardial infarction and has cell death or damage to

**Madsen, Bard 2006-07-12**

Madsen PA PC DA DC on 10-3

| 148: | 1 | the heart, that when that occurs it's not reversible |
| | 2 | and it's a permanent condition? |
| | 3 | MR. KRUMHOLZ: Objection, form. |
| | 4 | A: That is true. If there's been cell death, |
| | 5 | that is true. |
| | 6 | MR. NABERS: I think that's all I have. |
| | 7 | Thanks for your time. |
| | 8 | FURTHER EXAMINATION |
| | 9 | BY MR. KRUMHOLZ: |
| | 10 | Q: Doctor, I just have a few more questions and |
| | 11 | I'll let you go. Have you ever taken Vioxx? |
| | 12 | A: Yes. |
| | 13 | Q: For how many years did you take Vioxx? |
| | 14 | MR. NABERS: Objection to the form, and I |
| | 15 | need to object to the first question too. |
| | 16 | A: How long has it been out? |
| | 17 | Q: (By Mr. Krumholz) It came out on the market, |
| | 18 | I believe, in 1999 and was withdrawn voluntarily in |
| | 19 | 2004. |
| | 20 | A: That's how long I took it. |
| | 21 | Q: You took it the entire time it was on the |
| | 22 | market? |
| | 23 | A: Yes. |
| | 24 | Q: Did you find it to be an efficacious drug? |
| | 25 | MR. NABERS: Objection to the form. |
| 149: | 1 | A: For me personally? |
| | 2 | Q: (By Mr. Krumholz) Yes. |
| | 3 | A: Yes. |
| | 4 | Q: What symptom were you trying to get relief |
| | 5 | from? |
| | 6 | MR. NABERS: Objection to the form. |
| | 7 | A: Knee pain. |
| | 8 | Q: (By Mr. Krumholz) Did it effectively reduce |
| | 9 | your knee pain? |
| | 10 | A: Yes. |
| | 11 | MR. NABERS: Object to the form. |
| | 12 | Q: (By Mr. Krumholz) Did it allow you to do |
| | 13 | things that you would not otherwise be able to do? |
| | 14 | MR. NABERS: Objection to the form. |
| | 15 | A: More easily, yes. |
| | 16 | Q: (By Mr. Krumholz) Without as much pain? |
| | 17 | A: Yes. |
| | 18 | MR. NABERS: Objection to the form. |
| | 19 | A: Yes. |
| | 20 | Q: (By Mr. Krumholz) And inflammation? |
| | 21 | A: Yes. |
| | 22 | MR. NABERS: Objection to the form. |
| | 23 | Q: (By Mr. Krumholz) Had you taken other |
| | 24 | painkillers prior to taking Vioxx? |
| | 25 | A: I had taken other anti-inflammatories, yes. |

Printed: 10/3/2006   8:43:49AM

*[Handwritten notes:]*

Plaintiff's objection Re: 148:10 — 152:14

RULE 403 - Assumes FACTS not in evidence; Relevance

Def's response: Plaintiff raised the issue of this witness' knowledge of the risks and benefits of Vioxx (through page 152)

## Madsen, Bard 2006-07-12

150:
1    MR. NABERS:  Objection to the form.
2    Q:   (By Mr. Krumholz)  And were they as effective
3    as Vioxx?
4    A: No.
5    MR. NABERS:  Objection to the form.
6    Q:   (By Mr. Krumholz)  Did you have any side
7    effects, untoward side effects, in connection with
8    your ingestion of Vioxx that you can recall?
9    MR. NABERS:  Objection to the form.
10   A: Occasionally I got heartburn.
11   Q:   (By Mr. Krumholz)  But you don't know if that
12   was due to Vioxx or not?
13   MR. NABERS:  Objection to the form.
14   A: I would stop taking Vioxx and it would go
15   down.
16   Q:   (By Mr. Krumholz)  When you say heartburn,
17   you're talking about indigestion?
18   A: Indigestion.
19   MR. NABERS:  Objection to the form.
20   Q:   (By Mr. Krumholz)  It had nothing to do with
21   any cardiac activity?
22   A: No.
23   MR. NABERS:  Object to the form.
24   Q:   (By Mr. Krumholz)  Nothing to do with the
25   heart?

151:
1    A: No.
2    MR. NABERS:  Object to the form.
3    Q:   (By Mr. Krumholz)  It just had something to
4    do with your gastrointestinal tract?
5    A: Yes.
6    MR. NABERS:  Objection to the form.
7    Q:   (By Mr. Krumholz)  Was it your understanding
8    that Vioxx was better on the gastrointestinal system
9    than other similar medications?
10   MR. NABERS:  Objection to the form.
11   A: Yes.
12   Q:   (By Mr. Krumholz)  In what sense?
13   A: That it was -- it did not cause the
14   hyperacidity and the damage to the gastric epithelium.
15   Q: Is that sometimes known as ulcers?
16   A: Yes.
17   MR. NABERS:  Objection to the form.
18   A: Yes.
19   Q:   (By Mr. Krumholz)  Is that also known to
20   cause perforations?
21   MR. NABERS:  Objection to the form.
22   A: Ulcers can result in perforations.
23   Q:   (By Mr. Krumholz)  And can those be serious
24   health consequences?
25   A: Sure.

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                           **152**

152: 1   MR. NABERS:  Objection to the form.
2   Q:  (By Mr. Krumholz)  Can it cause you to become
3   hospitalized?
4   MR. NABERS:  Objection to the form.
5   A: Yes.
6   Q:  (By Mr. Nabers)  In fact, it does cause
7   people to become hospitalized each and every year?
8   A: Yes.
9   MR. NABERS:  Objection to the form.
10  Q: Thousands of people?
11  MR. NABERS:  Objection to the form.
12  Q:  (By Mr. Nabers)  Would that surprise you?
13  MR. NABERS:  Objection to the form.
14  A: No.
15  Q:  (By Mr. Krumholz)  Do you know what an
16  adverse event report is?
17  A: Are you talking about something very
18  specific?
19  Q: If you don't know, I probably won't ask you
20  about them.
21  A: The answer is easy, then.
22  Q: Now, plaintiffs' counsel asked you a number
23  of questions about your knowledge of various medical
24  records that we've talked about today. Do you recall
25  that?
153: 1   A: Yes.
2   Q: And whether you had personal knowledge of
3   underlying data. Do you recall that?
4   A: Yes.
5   Q: Now, when you review medical records from
6   folks, many times they contain records from other
7   hospitals or doctors?
8   A: Yes.
9   Q: And you believe you can provide reliable
10  opinions and information based upon those records --
11  A: Yes.
12  Q: -- even though you didn't have personal
13  knowledge of all the underlying data?
14  MR. NABERS:  Objection to the form.
15  Q:  (By Mr. Krumholz)  True?
16  A: True.
17  Q: Any suggestion by anybody at trial that
18  that's not the case wouldn't be accurate, true?
19  MR. NABERS:  Objection to the form.
20  A:  I --
21  Q:  (By Mr. Krumholz)  Any suggestion that it's
22  not true that you could review records of others and
23  form impressions reliably based upon those records,
24  any suggestion like that at trial by anybody wouldn't
25  be accurate, true?

Printed: 10/3/2006   8:43:49AM

## Madsen, Bard 2006-07-12

154:
1   A: I think that's true. We rely and use records
2   generated by other doctors on procedures of which we
3   have no direct contact with. We weren't there when an
4   X-ray was done. We weren't there when a blood test
5   was run. I mean, we do that all the time.
6   Q: You don't have any reason not to trust
7   Dr. Ganellen's records, for example?
8   A: That is correct.
9   Q: You don't have any reason not to trust
10  doctors in your own practice's records?
11  A: I don't have any reason to not trust those.
12  Q: You would rely on those in your everyday
13  practice?
14  A: Yes.
15  **Q: And you believe that your opinions based upon**
16  **those records are reliable?**
17  MR. NABERS: Objection to the form.
18  **A: Yes.**
19  MR. KRUMHOLZ: I'll pass the witness.
20  FURTHER EXAMINATION
21  BY MR. NABERS:
22  Q: The bottom line is other than your one stress
23  report, you know nothing about Mr. Mason's past and
24  future medical condition, right?
25  MR. KRUMHOLZ: Objection, form.

155:
1   A: That's -- other than what we've seen -- what
2   I've seen here today in this deposition, that's true.
3   Q:   (By Mr. Nabers)  Right. Before you became
4   aware of this deposition, the only thing you knew
5   about Mr. Mason was the one sheet of paper which was
6   your stress test?
7   A: Yes.
8   Q: And without that one sheet of paper
9   representing what happened on that stress test,
10  because of the volume of patients that you see, you
11  would have had no memory of Mr. Mason, correct?
12  A: Correct.
13  Q: The only thing that you can say about
14  Mr. Mason is based upon your actual record and his
15  file about the stress test you interpreted on him?
16  A: Yes.
17  Q: Okay. And so all these things that you've
18  been asked about, past and current medical records,
19  whatever you were asked about, you learned it for the
20  first time today sitting in this deposition?
21  MR. KRUMHOLZ: Objection, form.
22  A: Yes.
23  Q:   (By Mr. Nabers)  And you didn't have an
24  opportunity to think about those other medical records
25  that you've seen and how they might correspond with

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3                                      156

156:
1    other things that are in his past and current medical
2    profile?
3    A: I did not take that opportunity, no.
4    Q: Okay. Well, you just didn't have that
5    opportunity, right?
6    A: No. I mean, I --
7    Q: All right. And you were asked about Vioxx
8    and whether or not you took it. Do you recall that?
9    A: Yes.
10   Q: You don't take it today, right?
11   A: I do not.
12   Q: Because it's been withdrawn from the market,
13   right?
14   A: That's correct.
15   Q: You couldn't take it if you wanted to take
16   it, right?
17   A: No.
18   Q: And did you ever prescribe Vioxx?
19   A: Yeah.
20   Q: Okay. To your patients?
21   A: Yes, I did.
22   Q: And whenever you prescribed Vioxx to your
23   patients, did you make a risk-benefit assessment?
24   A: Yes.
25   Q: All right. And did you anticipate and expect

157:
1    that Merck would give you the accurate and truthful
2    information with regard to any cardiovascular events
3    that the drug might cause?
4    A: Yes.
5    Q: And you relied on whatever information they
6    had in that regard, correct?
7    A: Yes. It's fair to say that I also rely on
8    the FDA.
9    Q: Okay.
10   A: And if they pass a drug, you know, we assume
11   that it's --
12   Q: Safe?
13   A: -- safe.
14   Q: Right. But you would have expected that if
15   Merck knew about its drug Vioxx causing heart attacks,
16   that's information that you would want to know as a
17   prescriber, right?
18   MR. KRUMHOLZ: Objection, form. Assumes
19   facts not in evidence and mischaracterizes evidence,
20   lacks foundation.
21   A: Should I answer it now? Yes, I would assume
22   they would.
23   Q:   (By Mr. Nabers)  Okay. I mean, that is the
24   type of information that you would need to have in
25   order to make a good or accurate risk-benefit

*Handwritten annotations:*

Overrule

Re: 156: 18 - 158: 25
DEF OBJ: Re-cross exam
beyond the scope of
re-direct.

Re: 156: 25 - 158: 25
DEF OBJ: Leading; No
foundation for this
witness to comment on
FDA decision-making.

PLAINTIFF's Response
THESE questions are
necessary DUE to the
DEFENDANT COUNSEL'S
questions. This witness
is a Vioxx prescriber
AND SALES CALLS AND
information he
received from Merck
was important to his
prescribing habits.
ONE OF PLAINTIFFS
CLAIMS is A FAILURE to
WARN AND this testimony
is Relevant on that
issue. this testimony
is important as it
highlights the type of
information Available

Sustained

to prescribers about
Vioxx and their doctors
about Vioxx.

**Madsen, Bard 2006-07-12**

Madsen PA PC DA DC on 10-3

158

158:
1  assessment for your patient, right?
2  MR. KRUMHOLZ:  Same objections.
3  A: Yes.
4  Q:   (By Mr. Nabers)  And likewise, if you were
5  going to take Vioxx, which you did, you certainly
6  hoped that you had known what all the risks were that
7  Merck was aware of about that drug, correct?
8  MR. KRUMHOLZ:  Same objection.
9  A: Yes.
10  Q:   (By Mr. Nabers)  And with regard to what you
11  said about the FDA, do you understand that it's the
12  drug company Merck that submits clinical data to the
13  FDA for them to review?
14  A: Yes.
15  Q: The FDA doesn't do any of its independent
16  testing. You understand that, right?
17  MR. KRUMHOLZ:  Objection, form.
18  A: I do.
19  Q:   (By Mr. Nabers)  So the FDA is limited to a
20  certain extent because they have to rely on whatever
21  clinical data that the drug company gives them in
22  support of the drug, correct?
23  MR. KRUMHOLZ:  Objection, form.
24  A: Yes.
25  MR. NABERS:  I think that's all I have.

159:
1  FURTHER EXAMINATION
2  BY MR. KRUMHOLZ:
3  Q: Sir, you're not an expert in FDA protocols or
4  procedures?
5  A: Not at all.
6  Q: Or on what the FDA considers or does not
7  consider in connection with approved drugs?
8  A: Correct.
9  Q: What you do know is that the FDA found that
10  Vioxx was safe and effective when prescribed
11  appropriately?
12  A: When it came out, yes.
13  Q: And as you understand it, Merck voluntarily
14  withdrew the drug?
15  A: That's my understanding.
16  Q: Mr. Nabers talked to you about various
17  medical records you may or may not have seen before
18  today. Do you recall that?
19  A: Yes.
20  Q: Mr. Nabers met with you not long ago?
21  A: Yes.
22  Q: He didn't bother providing you with any other
23  medical records, did he?
24  MR. NABERS:  Objection, form.
25  A: I don't recall.

## Madsen, Bard 2006-07-12

160:
1    Q:  (By Mr. Krumholz)  Or any prior medical
2    records from his family practitioner?
3    A:  I don't recall that.
4    Q:  You don't recall him doing that?
5    A:  No. There may have been --
6    Q:  What he did provide you was a set of
7    literature that he brought with him that day on Vioxx?
8    A:  Yes. I asked -- I asked for it.
9    Q:  When you say asked for it, he brought it,
10   talked to you about it, and you asked for a copy of
11   what he brought?
12   A:  Yes, that's correct.
13   Q:  He didn't bother providing you things about
14   his prior risk factors, for example?
15   MR. NABERS:  Objection to the form, assumes
16   facts not in evidence.
17   A:  Not that I recall today.
18   MR. KRUMHOLZ:  Pass the witness.
19   FURTHER EXAMINATION
20   BY MR. NABERS:
21   Q:  The bottom line to all this is Vioxx is no
22   longer on the market because it was withdrawn by Merck
23   as a result of the increased heart attacks and strokes
24   that it causes. Is that your understanding?
25   MR. KRUMHOLZ:  Objection, form, lacks

161:
1    foundation.
2    A:  That's how -- that's what I understand.
3    MR. NABERS:  Okay. Thanks.
4    FURTHER EXAMINATION
5    BY MR. KRUMHOLZ:
6    Q:  Sir, you don't know whether or not Vioxx
7    causes more heart attacks and strokes, you're basing
8    that last comment on your impression of a limited
9    review of materials and information, true?
10   MR. NABERS:  Objection to the form.
11   A:  Yes, and the fact that the FDA -- well, I
12   should say -- excuse me, that's correct.
13   MR. KRUMHOLZ:  Pass the witness.
14   MR. NABERS:  That's fine.
15   THE VIDEOGRAPHER:  It's 49 minutes after
16   5:00. This concludes the deposition.
17   (The deposition concluded at 5:48 p.m.)
18
19   *  *  *
20
21
22
23
24
25

Printed: 10/3/2006   8:43.49AM

## Madsen, Bard 2006-07-12

Madsen PA PC DA DC on 10-3

162:     1     Case: Mason vs. Merck
         2     Reporter: Sharon Morgan
         3
         4
         5        : ss.
         6
         7     foregoing testimony consisting of 158 pages, numbered
         8     correct transcription of said testimony, with the
         9     giving my reasons therefor.
        10     Page Line Change/Correction Reason
        11
        12
        13
        14
        15
        16
        17
        18
        19
        20
        21     BARD R. MADSEN, M.D.
        22     Subscribed and sworn to at
        23
        24     My commission expires:
        25

163:     1     C E R T I F I C A T E
         2     STATE OF UTAH          )
         3     COUNTY OF SALT LAKE   )
         4     THIS IS TO CERTIFY that the deposition of
         5     deposition named, was taken before me, Sharon Morgan,
         6     for the State of Utah, residing in Salt Lake City.
         7     That the said witness was by me, before
         8     truth, and nothing but the truth in said cause.
         9     That the testimony of said witness was by me
        10     transcribed into typewriting, and that a full, true,
        11     and transcribed is set forth in the foregoing pages,
        12     deposed and said as in the foregoing annexed
        13
        14     the same was delivered to the witness for reading and
        15     returned within 30 days of the date hereon.
        16     I further certify that I am not of kin or
        17     cause of action, and that I am not interested in the
        18
        19     Lake City, Utah, this 15th day of July, 2006.
        20
        21
        22
        23     My Commission Expires:
        24
        25

Printed: 10/3/2006   8:43:49AM