# Symkoviak, Gary 2006-07-10

4:
July 10, 2006 2:09 p.m.
PROCEEDINGS
THE VIDEOGRAPHER: Today is the 10th day of July 2006. It's nine minutes after 2:00 o'clock, and we're on the record.
MR. NABERS: Do you want to make our agreements before we start?
MR. KRUMHOLZ: Sure. All objections except as to form and responsiveness are reserved until the time of trial --
MR. NABERS: That's our agreement.
MR. KRUMHOLZ: -- or I guess reserved until some sort of pretrial --
MR. NABERS: Pretrial.
MR. KRUMHOLZ: -- designation when we're going to object. And other than that, I don't know if we need to make appearances or not given the court's rulings. But just in case, Richard Krumholz for Merck.
MR. NABERS: Okay. Scott Nabers from Blizzard, McCarthy & Nabers in Houston for Mr. Mason, for plaintiff.
GARY SYMKOVIAK, M.D.,
first duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. NABERS:
**Q: Could you please state your name for the record.**

5:
**A: Gary Symkoviak.**
Q: Dr. Symkoviak, my name is Scott Nabers, and we've met before. Is that correct?
A: Yes.
Q: All right. And you understand that I represent Charles Mason in a case that he has brought against Merck as a result of his ingestion of Vioxx?
A: Yes.
MR. KRUMHOLZ: Objection. Leading and form.
Q: (By MR. NABERS) Okay. And do you understand that -- first of all, that you've been placed under oath to give your testimony here today?
A: Yes.
Q: All right. And do you understand that your testimony here today can be played in front of the jury at the time of the trial?
A: Yes.
Q: Okay. And since we're taking your deposition by video, where are we taking it today?
A: Murray, Utah.
Q: Okay. And are we actually in your office today?
A: Yes.
Q: Okay. And I'm going to be asking you some questions today about cardiology, about Vioxx, and particularly about Mr. Mason. And do you understand it's in

# Symkoviak, Gary 2006-07-10

6:

connection with that that you will be giving answers today?
A: Yes.
Q: Okay. And you've done a great job of answering my questions after I've finished asking the question, but let me just say for purposes of the deposition if you have any issues or questions about the way I ask a question, if you'll just please let me know, that will be great, and I will be happy to refrain (sic.). Okay?
A: Yes.
Q: And the court reporter is trying to get down everything that you and I say, so if we don't talk over each other, it makes it much easier for her to take it down. Okay?
A: Yes.
Q: You've done depositions previously. Correct?
A: Yes.
Q: In fact, I think you've done quite a number of depositions in connection with the Phen-Fen litigation.
A: Yes.
Q: And we've met in connection with that previously. Correct?
A: Yes.
Q: All right.
MR. KRUMHOLZ: And just for the record, in light of the last objection which we kind of talked over each

7:

other in connection with your answer, from time to time I may have to object, and so if you could pause just a moment just to see if there might be an objection before you answer, it might be helpful. If you get too fast, it gets pretty difficult.
THE WITNESS: Okay.
**Q: (By MR. NABERS) All right. Now, in the past you have been a treating cardiologist for Mr. Mason. Is that correct?**
**A: Yes.**
**Q: All right. Are you his current cardiologist?**
**A: No.**
**Q: Do you know who his current cardiologist is?**
**A: I assume it's Dr. Keep.**
Q: Okay. And is Dr. Keep a cardiologist within the same practice that you're in?
A: Yes.
Q: All right. So Mr. Mason's medical chart and file would stay within your office as well as Dr. Keep's office?
A: Yes.
(Exhibit No. 1 marked)
Q: (By MR. NABERS) Okay. I know you've graciously agreed to be here for your deposition, but let me go ahead and show you what I've marked as Deposition Exhibit No. 1 which is a copy of the deposition notice submitted in

8:

connection with Mr. Mason's case. Have you had an opportunity to see that before today?
A: Yes.
Q: Okay. And I know in connection with the deposition today you've brought a copy of your resumi or curriculum vitae. Is that correct?
A: Yes.
Q: Could I get that from you and mark that as Deposition Exhibit No. 2.
(Exhibit No. 2 marked)
Q. (By MR. NABERS) And if I could just -- as I mark this as Deposition Exhibit No. 2 if I could just hand it back to you and ask if you can just identify that for the record.
A: Yes, that's my curriculum vitae.
Q: All right. And is the information contained within the Deposition Exhibit No. 2, your resumi, to the best of your knowledge truthful and accurate?
A: Yes.
Q: All right. Do you believe that the information contained within Deposition Exhibit No. 2 is current?
A: Yes.
Q: Is there anything as you sit here that you would like to add to your resumi that it doesn't currently contain?

9:

A: No.
Q: Thank you very much. Now, we've indicated that we're in your office today taking your deposition. You are a medical doctor. Correct?
A: Yes.
Q: And where do you practice medicine?
A: At which hospital?
Q: That would be great.
A: Cottonwood Hospital, St. Mark's Hospital, and Jordan Valley Hospital.
Q: All right. And your practice that we're in today, what's the address for your current cardiology practice?
A: 5979 South Fashion Boulevard, Murray, Utah.
**Q: All right. And could you just briefly describe for the ladies and gentlemen of the jury your education and training beginning with college?**
**A: A B.S., chemistry and minor in physics, Brigham Young University, 1970; medical degree, Louisiana State School of Medicine, New Orleans, 1974; internship LDS Hospital, Salt Lake City, Utah, 1974 to '75; residency, internal medicine, University of Hawaii School of Medicine, 1975 to '76; residency, internal medicine, University of California at Davis/Martinez VA Hospital, 1977-1978; fellowship, cardiology, University of California at Davis/Martinez VA Hospital, 1978 to 1979; fellowship**

10:

**cardiology, University of Utah, 1979 to 1980.**
**Q: All right. And are you also board certified in any areas of medicine?**
**A: Yes.**
**Q: All right. Tell us which areas of medicine that you're board certified in.**
**A: American Board of Internal Medicine and Cardiovascular Disease.**
**Q: Okay. And can you briefly describe for us the type of cardiology practice that you have here in Utah?**
**A: I'm an interventionalist in a general cardiology practice.**
**Q: All right. And when you talk about an interventionalist, what does that mean?**
**A: We do procedures such as stents, pacemakers, coronary angiograms, cardiac catheterizations.**
**Q: And I take it as a part of your general cardiology practice that you see patients who come in with a wide range of cardiologic conditions?**
**A: Yes.**
**Q: Okay. For example, do you care for and treat patients who have had a heart attack or who are having a heart attack?**
**A: Yes.**
Q: Okay. Do you also see patients -- I think that

11:

you've indicated that you see patients in three different hospitals here in Utah?
A: Yes.
Q: All right. And then those three different hospitals, of course, you have privileges. Correct?
A: Yes.
Q: All right. And do you make rounds at all three of those hospitals here in Utah?
A: Yes, if there are patients present.
**Q: Okay. Do you also see patients in your clinical practice who have coronary artery disease?**
**A: Yes.**
**Q: All right. And can you describe for us what coronary artery disease is?**
**A: It's atherosclerosis of the vessels that restricts the blood flow.**
**Q: And when we talk about atherosclerosis, what does that mean from a cardiologic standpoint?**
**A: Plaques in the arteries.**
Q: Okay. If a coronary artery is blocked by a clot or a plaque, can that cause the heart to be deprived of oxygen?
MR. KRUMHOLZ: Objection. Form.
A: Yes.
Q: All right. And what happens if heart muscle

12: tissue is deprived of oxygen?
A: It's damaged.
Q: Okay. And sometimes when we talk about heart attacks, we also talk about myocardial infarctions. Correct?
A: Yes.
Q: And whenever you think of those two terms, heart attack and myocardial infarction, are they synonomous with one other?
A: Well, heart attack is a more lay term, general term, and myocardial infarction is a little more specific.
Q: Okay. So what does a myocardial infarction mean to you as a cardiologist?
A: That would be damage at the cellular level.
Q: Someone who has a myocardial infarction, is it correct to say that they've had a heart attack?
MR. KRUMHOLZ: Objection. Form.
A: Yes.
Q: Okay. And sometimes is a myocardial infarction referred to as an MI?
A: Yes.
Q: Sometimes in the medical records you just see the letters MI, correct, but that stands for myocardial infarction?
A: Yes.
13: Q: Okay. Can a heart attack be a serious and life-threatening medical condition?
A: Yes.
Q: Can a heart attack result in damage to the heart muscle?
A: Yes.
Q: If you have a heart attack, can that damage to the heart muscle cause the patient to experience symptoms?
A: Yes.
Q: For example, in your cardiology practice obviously you see patients who have -- are having a heart attack or who have had a heart attack. Correct?
A: Yes.
Q: What are the typical types of symptoms that you see in patients who are having a heart attack?
A: Chest pain.
Q: Any other symptoms?
A: Well, there can be primary chest pain, and then there can be referred pain which could be referred to the arms or the neck or other places. They may have diaphoresis, shortness of breath, difficulty breathing, blackouts, dizziness.
Q: Okay. Can a heart attack also cause arrhythmias, or irregular heartbeats?
A: Yes.

## Symkoviak, Gary 2006-07-10

14:

Q: And when we talk about arrhythmias, what are those?
A: A means abnormal and rhythm -- rhythm of the heart, so it's an abnormal rhythm of the heart.
Q: All right. Can a heart attack also cause a patient to have what we call congestive heart failure?
A: Yes.
Q: And what is congestive heart failure from a cardiologic standpoint?
A: It's failure of the heart to pump -- to function as a pump, and it causes congestion in the lungs.
Q: All right. And can congestive heart failure also be a serious medical condition?
A: Yes.
Q: Now, can a heart attack also result in death?
A: Yes.
**Q: All right. Now, are you aware that Charles Mason suffered from a myocardial infarction or a heart attack on July the 25th of 2003?**
**A: I've read that record, yes.**
**Q: Okay. You're familiar with that as a result of reviewing his medical chart from your office?**
**A: And the hospital records.**
**Q: Okay. Is it -- does an acute myocardial infarction or heart attack require hospitalization in order**

15:

**to prevent death or disability?**
**MR. KRUMHOLZ: Objection. Form.**
**A: Well, that's the normal procedure. It may be possible to survive without going to a hospital, but there is a high risk of dying during a heart attack.**
Q: All right. What is the primary goal of treatment for a heart attack, to open up the -- to open up the blocked coronary arteries?
MR. KRUMHOLZ: Objection. Form.
Q: (By MR. NABERS) That -- it is. That's a bad question. What is the primary treatment goal for a person having a heart attack?
A: The primary treatment is to open up the plugged vessel.
Q: Okay. If a patient is fortunate enough to get medical treatment in the early phases of a heart attack, can the heart attack be interrupted?
A: Yes.
Q: All right. And has that been something that you have done as a part of being an interventionalist here at your cardiology practice and at the hospitals where you practice?
A: Yes.
Q: Will treatment always stop damage from occurring to the heart muscle?

Re: 15:2 Def Obj: Remove objection

π agrees

## Symkoviak, Gary 2006-07-10

16:
A: Say the question again.
Q: Will treatment, medical treatment, always stop damage from occurring to the heart muscle?
A: Well, usually damage has occurred, so it will limit the damage that's occurred with the heart attack.
Q: From your review of Mr. Mason's medical records pertaining to his heart attack, did he experience any symptoms that you would associate with someone who is having a heart attack?
A: Yes.
Q: And what were those symptoms that Mr. Mason experienced that you reviewed?
A: Chest pain.
Q: Okay. Anything else?
A: Oh, I would have to review the record. Do you want me to look at the record?
Q: But chest pain is what you recall as the primary symptom at the time he was having his heart attack?
A: Yes.
**Q: Okay. Are there any diagnostic tests that can be done to determine if a patient is having a heart attack?**
**A: Blood tests and specific enzyme tests can be done.**
Q: All right. And when we talk about blood tests, are those the same thing as the enzyme tests, or are we talking about two different things?

17:
A: Blood tests as general enzymes would be more specific.
**Q: Okay. And what type of blood test would you want to perform?**
**A: CPK and troponin.**
Q: All right. And what type of enzyme test would you want to do on someone with regard to a heart attack?
A: Those are the enzyme.
Q: Okay. Do you also want to monitor the rhythm of someone's heart if you suspect a heart attack by doing an EKG?
A: Yes.
Q: Okay. Let me ask you -- I take it that you're familiar with the American Heart Association?
A: Yes.
Q: And you're aware from time to time that they publish statements or recommendations or guidelines in the area of cardiology?
A: Yes.
Q: All right. Do you generally find those types of statements that they issue to be authoritative in the field of cardiology?
A: Yes, although they may be behind current practice just due to the nature of their development, and they're only issued every so many years.

## Symkoviak, Gary 2006-07-10

18:
Q: All right. And one of the things I was looking at from the American Heart Association, they issued a statement that indicated that cardiac enzymes are markers for heart damage, and I wanted to see if you agreed with that.
MR. KRUMHOLZ: Objection. Form.
A: In general. There can be a false positive test.
Q: Okay. Do you agree with the American Heart Association that the blood test most commonly used to -- to confirm the existence of heart muscle damage is the CK test?
MR. KRUMHOLZ: Objection. Form.
A: I don't know about commonality. In this area we use two tests. We use the CPK and troponin.
**Q: Okay. And what is the CPK test?**
**A: Creatine phosphokinase, which is an enzyme that's contained in heart muscle, and it's released when there's damage.**
**Q: All right. And I think the other test that you said -- the enzyme test that you'll use is the troponin?**
**A: Yes.**
**Q: All right. And what is troponin?**
**A: It's another cardiac marker enzyme.**
**Q: All right. And both of those enzymes are tested by doing blood tests?**
**A: Yes.**
Q: One of the things I noted from the American Heart Association web page was they indicated that the CK/MB -- do you know what that stands for?

19:
A: Yes.
Q: And what is that?
A: It's an isoenzyme. It's a part of -- there's a total CPK and then there's fractionation because CPK can come from different locations in the body, and the MB is more specific for the heart.
Q: Okay. And the American Heart Association indicates that that test, the CK/MB shows an increase above the normal in a person's blood test about six hours after they start to have a heart attack. Is that generally what your experience is with your patients?
MR. KRUMHOLZ: Objection. Form.
A: Well, in general. That appearance in the blood can be kind of variable, but I think it's generally felt four to six hours is a possibility.
**Q: All right. If a patient's blood tests show elevation of the CPK and of the troponin and of CKMB, is that good evidence that there's been some damage to the heart muscle?**
**A: Yes.**
*(Exhibit No. 3 marked)*
Q: (By MR. NABERS) Okay. Let me show you what I want to mark as the next exhibit which will be Deposition

# Symkoviak, Gary 2006-07-10

20:
Exhibit No. 3, and these actually are the medical records pertaining to Mr. Mason from the Alta View Hospital.
MR. KRUMHOLZ: All of them?
MR. NABERS: Yeah, I'm going to mark them all together.
MR. KRUMHOLZ: Okay.
Q: (By MR. NABERS) Let me give you, Doctor, these -- what I've marked as Deposition Exhibit No. 3 which are the Alta View blood tests done on Mr. Mason.
MR. KRUMHOLZ: Can I just -- do you have an extra copy?
MS. GRAINGER: Yeah.
MR. NABERS: I do.
MR. KRUMHOLZ: And that would -- I assume Exhibit 3 is not all of them, or it is?
MS. GRAINGER: It is.
MR. NABERS: It is all of them.
MR. KRUMHOLZ: I say that --
MR. NABERS: All of the ones from Alta View.
MR. KRUMHOLZ: I don't think that that is all of the records from Alta View.
MS. GRAINGER: It's the enzymes from Alta View.
MR. KRUMHOLZ: All of the enzymes?
MR. NABERS: Right. I'll clarify.
MR. KRUMHOLZ: Okay. Thanks.

21:
Q: (By MR. NABERS) Doctor, what I've handed you as Deposition Exhibit No. 3 is not the entire medical records from Alta View Hospital on Mr. Mason. In actuality it's some of the blood tests and the cardiac enzymes that were taken at the time of his heart attack. Okay?
A: Yes.
Q: All right. If we look at the first page which is marked as Deposition Exhibit No. 3, this is from 7/25 of 2003. Do you see that in the upper left-hand column?
A: Yes.
Q: All right. And this was at the time that Mr. Mason was having his heart attack. Is that your understanding?
A: Yes.
Q: All right. And these, if we look up there, are Alta View Hospital, and they're the laboratory service medical records that pertain to Mr. Mason. Correct?
A: Yes.
Q: All right. One of the things that we see here in these blood tests is the creatine kinase test there at the top. Is that correct?
A: Yes.
Q: All right. And it indicates there that the numerical figure was 287. Is that correct?
A: Yes.

## Symkoviak, Gary 2006-07-10

22:

Q: All right. Is that an abnormal enzyme level?
A: Yes.
Q: All right. And what would that indicate to you as a cardiologist?
A: Well, again, this is the general creatine kinase which is elevated but can be caused from several different -- there are a lot of different causes. But more specific and important would be the next page where it's broken down into the myocardial part -- myocardial band, or MB band, and that number is 23.9 which is significantly elevated over an upper limits of normal of five.
**Q: All right. And we've now turned to page 2 of Deposition Exhibit No. 3, and we're looking at the same laboratory results on Mr. Mason dated July 25th of 2003, and what you've indicated there, Doctor, is the CKMB, and it indicates a numerical figure of 23.9?**
**A: Yes.**
**Q: And that's an abnormal level?**
**A: Yes.**
**Q: And would that correspond with someone who is having a heart attack?**
**A: Yes.**
**Q: Okay. And we see down at the bottom it says the results are consistent with acute myocardial damage. Correct?**

23:

**A: Yes.**
**Q: And would -- do you agree with that?**
**A: Yes.**
Q: Okay. Then let me show you the last page of Deposition Exhibit No. 3. And again this is from Mr. Mason's medical records at Alta View Hospital, and this is another blood test. Is that correct?
A: Yes.
Q: And --
MR. KRUMHOLZ: Is this -- oh, I'm sorry. It's the same exhibit.
MR. NABERS: Yeah.
MR. KRUMHOLZ: Go ahead. I'm sorry.
Q: (By MR. NABERS) And what they're measuring here it looks like is troponin. Is that correct?
A: Troponin I.
Q: Okay. And the numerical figure from the blood test is 9.2. Is that correct?
A: Yes.
Q: All right. Again is that an abnormal level of --
A: Yes.
Q: -- troponin? All right. And would that also correspond with someone who was having a heart attack?
A: Yes.
(Exhibit No. 4 marked)

# Symkoviak, Gary 2006-07-10

24:
Q: (By MR. NABERS) Okay. Now, let me also ask you -- or show you Deposition Exhibit No. 4, and these are some medical records that are very similar to what we just looked at that are the -- some of the blood tests done on Mr. Mason on a July 25th. Let me hand you what I've marked as Deposition Exhibit No. 4. Does that again look like some blood tests that were performed on Mr. Mason?
A: Yes.
Q: Okay. And do these blood tests look like they were performed on Mr. Mason at LDS Hospital?
A: Yes.
Q: All right. And do you understand that that's where he was ultimately sent with regard to his heart attack?
A: Yes.
Q: All right. And is that ultimately the place that you're aware of where he had his interventional procedure as a result of his heart attack?
A: Yes.
Q: Okay. If we focus in the area on this note where it says cardiac markers, do you see that?
A: Yes.
Q: All right. Those would be the tests that we -- that you would look to with regard to someone who's having a heart attack?

25:
A: Yes.
Q: All right. Are each of those tests abnormal?
MR. KRUMHOLZ: Objection. Form.
A: The -- let me just scan the results here. I don't see the normal range for the CK.
Q: All right. Well, let's do it like this. If we look at them -- if we look at the very first one, it's actually taken on July the 26th at 5:25. Is that correct?
A: Yeah. I think the -- I think the total CK is normal but the MB fraction is abnormal.
Q: Okay.
A: Do you see what I mean?
Q: Yes.
A: Because it doesn't have an H marker by it.
Q: All right. Does it indicate here -- does it indicate here that the results again were consistent with an acute myocardial damage?
A: Yes.
Q: All right. And actually if we look down underneath that, we also see one on July 25th, a blood test taken at 20:50 as the time. Do you see that?
A: Yes.
Q: All right. Again those results were abnormal?
A: Yes.
Q: All right. Those results again were consistent

26:
with an acute myocardial damage?
A: Yes.
Q: All right. Then we also see on July the 25th at 14:45 -- we see again those same cardiac enzymes were taken. Correct?
A: Yes.
Q: And again were those results consistent with acute myocardial damage?
A: Yes.
Q: All right. And then also we see on this Deposition Exhibit No. 4, which is the LDS Hospital records, some enzyme levels with regard to troponin. Correct?
A: Yes.
Q: And were all of those troponin levels abnormal?
A: Yes.
Q: All right. And would that be consistent with someone who is having or has had a heart attack?
A: Yes.
Q: All right. Is there any doubt in your mind about whether or not Mr. Mason had a heart attack?
A: No.
Q: He did have a heart attack. Is that your understanding?
A: Yes.
Q: Okay. Now, after a patient has a heart attack, do

27:
you follow them from a medical standpoint as their cardiologist?
A: Yes.
Q: All right. And sometimes in the legal world they refer to that as medical monitoring. How do you monitor your patients who have had a heart attack once the heart attack has stopped?
A: After they're discharged from the hospital?
Q: Yes.
A: They would have office visits of -- periodically to examine them and test them to look at prognosis and treatment and prevention.
Q: All right. How often would you want to see someone in your office the first year after they've had a heart attack?
A: It depends on their complications and other issues that might be going on, so that would vary quite widely depending on how ill they have been with their heart attack but probably at least once every six to 12 months, and for some patients it might be more frequent, maybe weekly or monthly.
Q: Okay. Do you continue to medically monitor your patients with cardiologic visits even after the first year?
A: We would see them at least once a year.
Q: Okay. Now, with regard to diagnostic tests, what

## Symkoviak, Gary 2006-07-10

28:
type of diagnostic tests would you recommend for a patient after they've had a heart attack?
A: Well, they would need blood tests specifically for cholesterol from time to time. They would have a periodic exercise stress test and possibly occasional echocardiograms.
Q: Okay. And what about EKGs?
A: Yes. We usually do those every six months.
Q: How about heart catheterizations?
A: That would be just on an as-needed basis.
Q: All right. How about with regard to nuclear-type testing?
A: We do the nuclear test with each stress test.
Q: Patients like Mr. Mason who've had a heart attack, what types of medications are indicated after that?
A: Well, there are several. Aspirin, usually a statin type of drug to lower cholesterol, ACE inhibitor is indicated, beta blocker is indicated, and -- well, I think that's the main things in his case.
Q: All right. With regard to the medical monitoring after somebody has had a heart attack, does it matter whether the heart attack is caused by Vioxx as opposed to any other cause in terms of how you monitor them?
MR. KRUMHOLZ: Objection. Form.
A: No.

29:
Q: Okay. You would monitor someone who had a heart attack from Vioxx just like you would monitor someone who had a heart attack from some other cause?
MR. KRUMHOLZ: Objection. Assumes facts not in evidence. Form.
A: Yes.
Q: Okay. Once a patient has had a -- one heart attack, are they at higher risk of having another heart attack?
A: Yes.
Q: Okay. Now, you're aware that this case deals primarily with whether or not Vioxx caused a heart attack to Mr. Mason. That's your understanding. Correct?
A: Yes.
Q: All right. And I want to follow up on that a little bit. Have you done any research in connection with specifically looking into Vioxx and its association or ability to cause heart attacks?
A: Well, I wouldn't call it research. I read the literature that comes out periodically in the main journals about that issue.
Q: Okay. And have you kept yourself up to date with regard to Vioxx and whether or not it's been associated with causing heart attacks?
MR. KRUMHOLZ: Objection. Form.

Overruled

Re: 28:20-29:6
Def obj: Assumes facts not in evidence; question is a back door expert opinion on general causation

Pl's Resp
These questions relate to the medical monitoring Mr. Mason needs for the rest of his life. This is one of his treating cardiologists. It doesn't assume facts it exactly what happened in this case. This witness by way of education, training experience and work with heart attack patients including N is qualified to give these opinions. This is exactly what he does everyday in his clinical practice

## Symkoviak, Gary 2006-07-10

A: I've read some articles on that.
Q: Okay. Have you ever published anything with regard to Vioxx and heart attacks?
A: No.
Q: All right. Have you ever lectured on Vioxx and heart attacks?
A: No.
Q: Have you ever taught anything on Vioxx and heart attacks?
A: No.
Q: Have you ever done any just independent study looking specifically into whether or not you believe Vioxx can cause heart attacks?
A: No.
Q: Let me ask you this. Obviously you're an expert in cardiology with regard to treating and caring for patients. Do you consider yourself an expert with regard to Vioxx and whether or not it can cause heart attacks in patients?
MR. KRUMHOLZ: Objection. Form.
A: No.
Q: Okay. But you have reviewed literature that has come out with regard to whether or not Vioxx has the potential to increase the risk of heart attacks in patients who take that drug. Correct?
A: Yes.
Q: All right. Is it fair to say that you would have a general cardiologic understanding with regard to Vioxx and whether or not it can cause heart attacks?
MR. KRUMHOLZ: Objection. Form.
A: Yes.
Q: All right. Have you -- I know you don't normally do this, but do you know off the top of your head what articles that you have reviewed in connection with Vioxx and whether or not it can cause heart attacks?
A: No, I can't state a specific article, although as a clinical cardiologist I read the literature, but I don't memorize titles or dates.
**Q: Some of the articles that appeared with regard to Vioxx and heart attacks appeared in The New England Journal of Medicine. Obviously you're familiar with that journal. Correct?**
**A: Yes.**
**Q: All right. Do you recall reading any articles with regard to Vioxx causing heart attacks in connection with New England Journal of Medicine?**
**MR. KRUMHOLZ: Objection. Form.**
**A: Yes.**
**Q: Okay. Specifically the very first article on Vioxx on its potential to cause heart attacks that appeared**

Overruled

Re 31:14-31:18 Def Obj: Compound
Pl's Resp
It's not compound b/c it asks only 1 proper question.

Re: 31:19-31:23 Def Obj: 403; mis-states the publications
Pl's Resp.
Multiple articles of this nature appeared in the NEJM. This doctor knows of it + reviewed it and is qualified to give opinions on it. It's very relevant with regard to causation in this case

Overruled

## Symkoviak, Gary 2006-07-10

32:
in The New England Journal of Medicine was known as the VIGOR study. Do you recall that?
A: I've read some of that.
Q: Okay. So you've reviewed that article?
A: Not recently, but I've read it, yes.
Q: In the past, okay. And then there was also another article later that came out in The New England Journal of Medicine known as the APPROVe study. Have you reviewed that article?
A: Yes.
Q: Okay. Do you have an opinion one way or the other as to whether or not you feel generally that Vioxx can increase the risk of heart attacks in patients who ingest that drug?
MR. KRUMHOLZ: Objection. Form. Lack of foundation.
A: Yes.
Q: And what is your opinion in that regard?
A: I think that's true.
Q: Okay. Based upon your review of the medical and scientific literature, do you believe that it supports the opinion that Vioxx can increase the risk of heart attacks in patients who ingest that drug?
MR. KRUMHOLZ: Objection. Form. Lack of foundation.

33:
A: Yes.
Q: Now, were you aware that Vioxx was withdrawn from the market on September the 30th of 2004?
A: Yes.
Q: And do you have an understanding of why it was withdrawn from the market?
MR. KRUMHOLZ: Objection. Form.
A: Yes.
Q: And what is your understanding in that regard?
A: Because there was an increased risk of myocardial events in the patient -- patients taking the drug.
Q: And obviously as a cardiologist you prescribe drugs on a daily basis. Correct?
A: Yes.
Q: And prior to prescribing drugs, will you familiarize yourself with the label of a specific drug if like, for example, you're prescribing it for the first time?
A: Yes.
Q: All right. And do you look specifically at what the potential benefits and what the potential risks are whenever you look at a drug for the first time?
A: Yes.
Q: All right. And when deciding whether or not you'll prescribe that drug to your patients, do you formulate a risk/benefit assessment in your mind?

(1) Re: 32:11-33:1
Def Obj: 403; foundation; the witness was not designated nor qualified as an expert
Pl's Resp: Witness is one of π's treating cardiologists. He knows π's med. hist. + he performed diagnostic tests on π. He was desig. as a treating expert + by way of education, training + experience, review of Vioxx literature + knowledge of π is qualified to give this critical opinion testimony.

Re: 33:2-33:11
Def Obj: Foundation; no personal knowledge
Pl's Resp: The witness has already testified he reviewed the Vioxx medical literature. This is a non-leading question and the witness has an opinion he is certainly qualified to give.

## Symkoviak, Gary 2006-07-10

34:

**A: Yes.**
**Q: All right. And do you consider all of the benefits and all of the risks before prescribing that type of drug?**
**A: All the ones I'm aware of.**
**Q: Right. Right. And so whenever you review a label for a particular drug that you're considering giving to one of your patients, do you expect the drug company to give you accurate information with regard to risks?**
**A: Yes.**
**Q: Do you expect them to give you truthful information with regard to the risks?**
**A: Yes.**
**Q: Do you expect that if a drug company is aware of a serious adverse event caused by their drug that they ought to tell you that as a prescribing physician?**
**A: Yes.**
**Q: Okay. Do you rely on the drug company as a prescribing physician to give you the information that you need in order to make an appropriate risk/benefit assessment?**
**A: Yes.**
Q: Okay. Did you ever prescribe Vioxx?
A: Yes.
Q: Do you recall any information that you received

35:

from Merck telling you that Vioxx had been associated with heart attacks?
MR. KRUMHOLZ: Objection. Form.
A: You know, I don't remember.
Q: All right. Do you remember any information or materials that you got from Merck telling you that Vioxx increased the risk in certain patients who took Vioxx of heart attacks?
MR. KRUMHOLZ: Objection. Form.
A: I don't remember.
Q: Do you remember any sales representatives from Merck coming to you and making sales calls on you with regard to Vioxx?
A: Yes.
Q: All right. Do you remember them ever telling you that the drug had an increased risk of causing heart attacks in certain patients?
MR. KRUMHOLZ: Objection. Form.
A: Well, I don't. But you have to understand that there are thousands of sales rep visits and information provided, and it would be very hard to remember what a particular representative said on a particular day.
Q: Okay. Well, let me just ask you this. If Merck was aware that Vioxx was -- strike that.
Let me ask you this. If Merck knew that Vioxx was

**Symkoviak, Gary 2006-07-10**

36:
associated with causing heart attacks, would you have expected them to tell you that?
MR. KRUMHOLZ: Objection. Form.
A: We would want to know that.
Q: Okay. Let me show you what I want to mark as the next exhibit, and this is actually, Doctor, one of the articles that we talked about just a minute ago, the VIGOR study that appeared in The New England Journal of Medicine.
(Exhibit No. 5 marked)
Q. (By MR. NABERS) Let me just hand you what I've marked -- that study as Deposition Exhibit No. 5 and ask you if you'll just look at it briefly for a minute. I want to just see if it jogs your memory about the fact that you have reviewed it in the past.
A: Yes. But it was a long time ago.
Q: Okay. As you look at Deposition Exhibit No. 5, does it look familiar to The New England Journal article that you reviewed known as the VIGOR study?
A: Yes.
Q: Okay. And I'm not going to ask you specifically about the article, but do you generally remember from reading this article that patients taking Vioxx had four times the number of myocardial infarctions as patients taking Naproxen or Naprosyn?
A: That sounds about right.

37:
Q: Okay. And as a cardiologist, would that be important to you?
A: Yes.
Q: And why would that be important to you?
A: Well, it would suggest there's some risks associated with that.
(Exhibit No. 6 marked)
Q: (By MR. NABERS) Okay. Let me also show you what I want to mark as the next exhibit which will be Deposition Exhibit No. 5.
MR. KRUMHOLZ: You mean six.
MR. NABERS: I'm sorry. You're right, six.
MR. KRUMHOLZ: Can I get a copy of five, please?
MR. NABERS: Sure.
MS. GRAINGER: Don't you have --
MR. KRUMHOLZ: I need that one if you don't mind, a clean one.
MR. NABERS: Do we have another one?
MR. KRUMHOLZ: Because I want to use it. Do you have an extra copy?
MS. GRAINGER: Yeah.
MR. KRUMHOLZ: If you don't, it's no big deal.
MS. GRAINGER: You can have it.
MR. NABERS: I figure you've got lots of them.
Q: (By MR. NABERS) Deposition Exhibit No. 6, Doctor,

# Symkoviak, Gary 2006-07-10

38:

let me hand to you. This was an article that appeared in The New England Journal of Medicine, and this article appeared March the 17th of 2005. And this was the article that dealt with the APPROVe study. As you look at this, is this one that you think that you have reviewed in the past?
A: Yes.
Q: Okay. And if we look at the conclusion section of this article, do the authors indicate that among patients with a history of colorectal adenomas, the use of rofecoxib, which was Vioxx -- is that your understanding?
A: Yes.
Q: -- was associated with an increased cardiovascular risk. Do you understand that?
A: Yes.
Q: And do you remember from reading this article that there were an increase of myocardial infarction in patients who took Vioxx in this study?
MR. KRUMHOLZ: Objection. Form.
A: I believe that's correct.
Q: Okay. Let me ask you -- I want to look at -- specifically at some of the medical records from your chart with regard to Mr. Mason. And you've had a chance to review your chart, correct, which you've brought with you today?
A: Yes, I've scanned through it.
**Q: And is it fair to say that you saw Mr. Mason for**

39:

**the first time on August 13, 2003, at Cottonwood Hospital?**
**A: I think that was the first and only time.**
**Q: And is that day the only day that you believe that you ever saw Mr. Mason?**
**A: To my recollection, yes.**
**Q: And that would have been the only day that you would have ever performed any procedures in connection with Mr. Mason?**
**A: Correct.**
**Q: You have not seen him since then?**
**A: I don't believe so.**
**Q: Not done any diagnostic tests on him since then?**
**A: No.**
**Q: Fair to say that you don't know what his medical condition is today?**
**A: Correct.**
(Exhibit No. 7 marked)
Q: (By MR. NABERS) Okay. Let me show you what I want to mark as Deposition Exhibit No. 7 and ask you if you've seen the initial admission note by Dr. Quan.
A: Yes, I have.
Q: Okay. And could you just identify for us who Dr. Quan is?
A: He's a hospitalist.
Q: Okay. And what does -- as a hospitalist what is

## Symkoviak, Gary 2006-07-10

40:
Dr. Quan's responsibility?
A: He admits patients to the hospital with general medical problems.
Q: All right. And what we're looking at, Deposition Exhibit 7, can you just identify what that is or what y'all call that?
MR. KRUMHOLZ: Do you have another copy?
A: It's a history and physical on Charles Mason on the date of 8/13/2003.
Q: And this would be done at the time that he -- Mr. Mason was being admitted to the hospital?
A: That's correct.
Q: Okay. And -- okay. And the chief complaint for this visit was what?
A: Chest pain.
Q: Okay. Is chest pain sometimes known as angina?
MR. KRUMHOLZ: Objection. Form.
A: Well, chest pain is very general. It could be referring to hundreds of things.
Q: All right. What is angina?
A: Angina is usually felt to represent a lack of blood flow to the heart muscle due to some sort of obstruction. Since this admission was done after the angiogram, which was relatively normal, I would not think that this chest pain would refer to angina because there

41:
was -- no significant obstruction was demonstrated in the angiogram.
Q: Whenever we look at this admission note, it has a history of present illness. Correct?
A: Yes.
Q: And is -- would that have been something that Dr. -- Dr. Quan would have done?
A: Yes.
Q: All right. And it indicates there that the patient is 61-year-old male who is approximately one month status post myocardial infarction and primary coronary intervention of a 90 percent left anterior descending and a 70 percent proximal first diagonal lesion?
A: Yes.
Q: Can you just tell us basically what that means kind of in general terms?
A: Well, at the time of the heart attack and intervention at LDS Hospital, they found a blockage in the artery on the front of the heart and one of the branches.
**Q: And so was Mr. Mason basically coming in to Cottonwood Hospital because he had been experiencing some chest pain?**
**A: He had been experiencing chest pain, and he had a prior history of an intervention which was relatively recent, and so our first concern was, of course, whether**

## Symkoviak, Gary 2006-07-10

**this could be the heart causing chest pain again.**
**Q: All right. A little bit further down in the body under the history of present illness it indicates that today he was in for his rehabilitation appointment. He experienced very similar epigastric and lower chest bloating and pressures along the diaphoresis and radiating to the left arm. Do you see that in the body of the note?**
**A: Yes.**
**Q: All right. Let me just ask you. Is it normal for patients to have cardiac rehabilitation after having a heart attack?**
**A: Yes.**
**Q: And is that something that your cardiologic clinic advises people that they ought to do if they have a heart attack?**
**A: Quite frequently.**
**Q: And what would that cardiac rehab consist of?**
**A: It's an exercise program supervised by nurses and monitored by telemetry.**
**Q: And the purpose of the cardiac rehab is to do what?**
**A: Well, there can be several purposes, but it's to increase aerobic function -- or aerobic ability of the heart and to get the patient back into a regular exercise routine to prevent future events.**
**Q: All right. If we look a little further in the note it says that apparently one of his therapists took his blood pressure and he was hypotensive at that point as well and was referred to the emergency room. Do you see where I've read that?**
**A: Yes.**
Q: And one of his therapists would have been one of the people that works with him in the cardiac rehab?
A: Correct.
Q: All right. And when it says hypotensive, what does that mean?
A: It means low blood pressure.
Q: Okay. And would low blood pressure be significant of what after someone has had a heart attack?
MR. KRUMHOLZ: Objection. Form.
A: Well, at this point in time it may or may not be related to heart disease. There are dozens of causes of low blood pressure. In fact, I would say at this point that in view of the findings it was not related to his heart.
**Q: Okay. Those were the reasons that he came to see you in particular at Cottonwood, the hypotension and the chest pain. Correct?**
**MR. KRUMHOLZ: Objection. Form.**
**A: He saw the emergency room doctor who referred the patient to me in the cath lab.**

Re: 43:23 Def obj: Remove objection
π agrees

44:

**Q: All right. And then you took over his care at Cottonwood.**
**A: I did the angiogram, and then I referred him to Dr. Quan.**
**Q: All right. And what is an angiogram?**
**A: That's where we do pictures of the coronary arteries with contrast material.**
**Q: And what's the purpose of doing -- what was the purpose of doing the angiogram on Mr. Mason at this point in August the 13th of 2003?**
**A: Well, he's one month following a heart attack and stent, and the concern would be a restenosis or a thrombus in that stent.**
**Q: And whenever you did the angiogram, did you find any evidence of that?**
**A: No.**
**Q: Okay. And if we look a little further in the note, it indicates that the patient was immediately brought to the catheterization laboratory; however, his coronary anatomy was relatively normal with a patent stent. What does that mean?**
**A: It means that the stent was open.**
**Q: And a normal looking left anterior descending. Did I read that right?**
**A: Yes.**

45:

**Q: And does that just mean that his coronary artery looked like it was open and functioning appropriately?**
**A: Correct.**
**Q: He had good blood flow.**
**A: Yes.**
Q: All right. Okay. And then after you performed the angiogram and had the results, what was the next course for Mr. Mason?
A: He had some -- we would have normally just sent him home, but he had some more chest pain, and so -- but he had a normal EKG, so we felt he should just be admitted for observation to see if there's something else. It could be GI or some other cause of chest pain that would warrant hospitalization, so it was felt he should be watched at least overnight.
**Q: All right. And I didn't ask you this. But whenever you did the angiogram, would that have helped you to see if there had been any other coronary artery disease present?**
**A: Yes.**
**Q: All right. Did you see any of that?**
**A: He did have some minor plaques.**
**Q: All right. Is it fair to say, though, that based on your angiogram that he did not have diffuse coronary artery disease?**

## Symkoviak, Gary 2006-07-10

46:

**A: I would --**
**MR. KRUMHOLZ: Objection. Form.**
**A: -- say he didn't have any significant disease.**
Q: Okay. Then if we flip to page 2 of the admission note, y'all did some laboratory and some blood work on Mr. Mason on this visit. Correct?
A: Yes.
Q: All right. But that blood work came back normal?
A: That's my understanding.
**Q: All right. And the EKG showed some just minor sinus brachycardia abnormality?**
**A: Yes.**
**Q: All right. And so your assessment at the end of the visit at Cottonwood Hospital was that his chest pain was noncardiac in origin?**
**A: That was Dr. Quan's assessment.**
**Q: All right. Did you concur with Dr. Quan's assessment?**
**A: Yes.**
**Q: And did you feel that his stent and the balloon procedure that they had done previously was still adequately functioning in terms of his coronary arteries?**
**A: Yes.**
Q: Okay. Let me show you a couple other notes that were progress notes of yours from August the 13th of 2003.

47:

And during the time that you saw him August the 13th of 2003, would you have performed your own history on him?
A: Yes.
Q: And would you have performed your own physical exam on him?
A: Yes.
(Exhibit No. 8 marked)
**Q: (By MR. NABERS) All right. Let me show you what I'll mark as the next exhibit which is -- what is the next one? I've lost track. Oh, there it is. Let me show you, Doctor, what I'm marking as the next exhibit which is Deposition Exhibit No. 8. And I believe this is a progress note that came out of your chart. Is that correct?**
**A: Yes.**
**Q: All right. And does that look like an actual progress note that you would have taken in connection with Mr. Mason?**
**A: Yes.**
**Q: And again this was from August the 13th of 2003?**
**A: Yes.**
**Q: All right. And if we look under present illness, what did you note there?**
**A: '61-year-old white male with recent myocardial infarction in July with stent placed in the mid ALD and PTCA of the first diagonal.'**

Re: 46:2
Def. Obj: Remove objection

π agrees

48:
Q: And what is PTCA?
A: A balloon angioplasty. 'He now presents with similar chest pain and symptoms.'
Q: Okay. All right. And then you also note what medications that he's on at the time of this visit. Correct?
A: Yes.
Q: All right. The first medication that you note is on Plavix?
A: Yes.
Q: And what is Plavix?
A: It's an antiplatelet drug.
Q: And what does Plavix do?
A: Helps prevent blood clots in the stent.
Q: All right. Is the reason that Mr. Mason was prescribed Plavix as a result of his heart attack?
A: It was as a result of the stent placement. It's not a normal drug you would use just for heart attacks.
Q: All right. The goal of Plavix is to do what with the stent?
A: Keep it open.
Q: Okay. He was also -- what's the next drug he was prescribed?
A: Coreg.
Q: And what is Coreg?

49:
A: It's a beta blocker.
Q: And what does Coreg do?
A: It helps -- it improves the outcome after heart attacks.
Q: All right. Was he prescribed the Coreg as a result of his heart attack?
A: Yes.
Q: All right. What's the next drug that he's prescribed there?
A: Aspirin.
Q: Aspirin. And what is -- why was he prescribed aspirin?
A: That also prevents heart attacks.
Q: Okay. And then down at the bottom we see you make a note about family history. No family history of CAD. Is that correct?
A: Yes.
Q: And what does that mean?
A: Coronary artery disease. There was -- he gave no history of anybody else in his family having that.
Q: Okay. And then also I noted that there was a blood pressure taken on this visit. Correct?
A: Yes.
Q: And what was that blood pressure?
A: 110 over 80.

50:
**Q: And is that a normal blood pressure?**
**A: Yes.**
**Q: It's fair to say he was not hypertensive?**
**A: No.**
Q: Do you have any indication that Mr. Mason suffered from high blood pressure?
MR. KRUMHOLZ: Objection. Form.
A: Ever?
Q: Yes.
A: Yes.
**Q: Okay. Prior to this visit are you aware of him ever suffering from hypertension?**
**A: Yes.**
**Q: Okay. And where did you get that information?**
**A: From his stress test done by Dr. Madsen in the year 2002.**
**Q: Okay. And that stress test showed that he had some elevated blood pressure whenever it was done?**
**A: Yes.**
Q: Okay. It's fair to say, though, that whenever that stress test was done his blood pressure was normal at rest. Correct?
A: Yes.
Q: And his blood pressure only became elevated once that he started the exercise part of the stress test?

51:
A: During exercise.
Q: Okay. His blood pressure only became elevated as a result of the exercise?
MR. KRUMHOLZ: Objection. Form.
A: Yes.
(Exhibit No. 9 marked)
Q: (By MR. NABERS) Okay. Let me show you the next one I want to mark as Deposition Exhibit No. 9. And again this is another note, I believe, of yours dated August the 13th of 2003. Does that look correct to you?
A: Yes.
Q: Okay. And if we look up there, 8/13/2003, could you just read your entry there for us?
A: The first --
Q: -- entry, yes, sir. I'm sorry.
A: '61-year-old white male presents with chest pain and diaphoresis and history of recent myocardial infarction and stent. He is admitted for angiograms.'
Q: Okay. And then underneath there that's your last name: Symkoviak. Is that correct?
A: Yes.
**Q: All right. And then the next entry is also again 8/13/2003?**
**A: Yes.**
**Q: All right. And it says, 'Procedures,' and what**

52:
does it say after that?
A: 'Left heart cath, left ventriculargram, selective coronary angiography.'
Q: Okay. And then what were the findings in connection with those tests?
A: The LAD and stent look -- look normal; diagonal looks normal; circ okay; RCA okay; LV near normal; chest pain noncardiac. Plan to observe until 2:00 p.m., then home, follow up with primary medical doctor.
Q: Okay. And let me just ask you quickly. Whenever you say 'circ okay,' what does that refer to?
A: No significant disease. It's the circumflex artery.
Q: In the heart?
A: Yes.
Q: Okay. And what you're saying is that you didn't see any coronary artery disease in the circumflex artery of the heart?
A: Well, no significant disease.
Q: Okay. And then the next one is the R --
A: Right coronary artery.
Q: Right coronary artery, okay. And I take it it's fair to say that you did not see on this angiogram any significant coronary artery disease in the right coronary artery.

53:
A: Yes.
Q: All right. And I've ask asked a bad question. You did not see significant coronary artery disease in the right coronary artery. Correct?
A: Correct.
Q: All right. And then the LV, you put near normal. Correct?
A: Yes.
Q: And that's referencing the left ventricle?
A: Yes.
Q: Okay. And when you say 'near normal,' what did you mean by that?
A: There was a small abnormality in the apex which would be consistent with his previous heart attack.
Q: All right. So that would be consistent with some damage to his heart as a result of the heart attack?
MR. KRUMHOLZ: Objection. Form.
A: That's correct.
(Exhibit No. 10 marked)
Q: (By MR. NABERS) Let me show you, Doctor, what I want to mark just briefly as the next exhibit to your deposition. This is actually the pharmacy record -- or a part of a pharmacy record in connection with Mr. Mason, and this is actually from Sav-on Pharmacy. Do you see that in the top left-hand corner?

Re: 53:17 Def obj: Remove objection

π agrees

# Symkoviak, Gary 2006-07-10

54:
A: Yes.
Q: And if we look there, does it indicate that Mr. Vioxx -- Mr. Vioxx. That's good, isn't it? Let's start over.
In looking at this Deposition Exhibit No. 10, does it look to you like Mr. Mason would have started on Vioxx according to these pharmacy records September the 11th of 2002?
MR. KRUMHOLZ: Objection. Form.
A: Let's see. Yes, I believe that's correct.
Q: Okay. At least we know from the pharmacy record that as of September the 11th, 2002, he received a prescription for Vioxx. Correct?
A: Yes.
Q: And does it look like he received a prescription for Vioxx every month thereafter down until September the 23rd of 2003 -- I'm sorry, June 23rd of 2003?
A: Yes.
Q: Okay. So if we look at this pharmacy record, there's about 10 months' worth of Vioxx prescriptions. Correct?
A: Yes.
Q: Okay. And all of those Vioxx prescriptions would have been prior to the time of Mr. Mason's heart attack. Correct?
55:
A: Yes.
(Exhibit No. 11 marked)
**Q: (By MR. NABERS) Okay. Let me show you, Doctor, what I'll mark as Deposition Exhibit No. 11. And this would be your -- well, let me just ask you this. Could you identify what I have marked as Deposition Exhibit No. 11?**
**A: That's my dictated heart catheterization report.**
**Q: All right. And if we look at your report for a minute, it says what the procedure performed was, the left heart catheterization, left ventriculargram, and selective coronary angiography there at the top. Correct?**
**A: Yes.**
**Q: And the indication for doing this test had to do with recent myocardial infarction and recurrent chest pain?**
**A: Yes.**
**Q: All right. And I want to look down in the summary section of the note at the bottom. Is the summary section kind of like what the findings were or your impression after the diagnostic test?**
**A: Yes.**
**Q: All right. And with regard to your angiogram and the summary, No. 1, you indicate that it only demonstrated minor coronary artery plaques. Correct?**
**A: Yes.**
**Q: Did No. 2 indicate no major stenotic lesions?**

# Symkoviak, Gary 2006-07-10

A: Yes.
Q: And what are stenotic lesions?
A: That's a narrowing in the artery.
Q: Okay. And then the patient's stent in the diagonal vessel, you were able to visualize that.
A: Patent --
Q: I'm sorry.
A: -- stent in the diagonal vessel.
Q: And what do you mean when you say, 'Patent stent in the diagonal vessel'?
A: Means it's open.
Q: It's functioning properly?
A: Yes.
Q: And then if we look at the sentence right above the summary, do you indicate in your cath note there the left ventricle had recently good contractility throughout?
A: Reasonable --
Q: Okay.
A: -- should have been.
MR. KRUMHOLZ: Can we reread that for the record?
MR. NABERS: Sure.
Q: (By MR. NABERS) Well, let me ask you this. In the sentence right above summary --
A: It's --
Q: -- what did you mean there?
A: It's typed wrong. It should say left ventricle had reasonable good contractility throughout.
Q: Okay. And then the next sentence, if you could read that.
A: 'There was a very small anterior hypokinetic segment, but the overall ejection fraction was normal at 69 percent.'
Q: All right. And what were you identifying there when you said, 'There was a very small anterior hypokinetic segment'?
A: That would be the location of the previous heart attack.
Q: All right. And where would that small anterior hypokinetic segment have been?
A: In the apex.
Q: And what you were seeing is a defect there in that area of the heart?
MR. KRUMHOLZ: Objection. Form.
A: Correct.
Q: All right. And would that defect be damage which was the result of Mr. Mason's heart attack?
MR. KRUMHOLZ: Objection. Form.
A: Yes. Do you have that picture?
Q: No. Do you have that picture?
A: Picture says a thousand words. Right?

Re: 56:20-56:21
Def Obj: Remove Sidebar
π agrees

π agrees
Re: 57:18
Def Obj: Remove objection

Re: 57:20-57:23
Def Obj: Leading
Pl's Resp. → It's not leading and d/n suggest the answer.

Re: 57:24-58:5
Def Obj: Remove Sidebar
π agrees

## Symkoviak, Gary 2006-07-10

58:

**MR. KRUMHOLZ: Objection. Nonresponsive.**
**Q: (By MR. NABERS) I tell you what. Can I mark your picture and then we'll just get another copy of it?**
**A: Yeah. You can't have my original.**
**(Exhibit No. 12 marked)**
**Q: (By MR. NABERS) I won't take yours, I promise. Let me just ask you. We've marked as Deposition Exhibit 12 a picture out of Mr. Mason's medical record. Could you tell us what that depicts?**
**A: That's a picture of the left ventriculargram.**
**Q: And what does it show you as a cardiologist?**
**A: Shows us that the muscle is not functioning at the apex.**
**Q: Okay. Thank you. And that would have pretty much concluded your care and treatment of Mr. Mason, what we've talked about. Correct?**
**A: That's correct.**
Q: All right. If you had to develop a differential diagnosis as -- strike that.
If you had to have -- or develop a differential diagnosis as to the cause of his heart attack, what would your differential diagnosis include?
MR. KRUMHOLZ: Objection. Form. Lack of foundation from the witness's prior testimony.
A: Coronary artery disease from atherosclerosis.

59:

Q: All right. Would your differential diagnosis also include the fact that he used Vioxx for 13 months prior to his heart attack?
MR. KRUMHOLZ: Same objection.
A: That's a possibility.
Q: As you sit here today, you wouldn't be in a position to say whether or not you thought the Vioxx caused his heart attack because you just haven't been able to look at enough information on that topic?
MR. KRUMHOLZ: Objection. Form.
A: Well, I think that's hard to know for certain. He did not have a lot of risk factors, and so the fact that he took Vioxx and it can cause accelerated atherosclerosis and lack of protection for a thrombotic event is a possibility.
MR. KRUMHOLZ: Objection. Form. Objection. Responsiveness.
MR. NABERS: I appreciate your time today, Doctor. Thank you.
MR. KRUMHOLZ: Give us a few minutes off the record and then we'll be ready to go.
MR. NABERS: Okay.
THE VIDEOGRAPHER: It's 59 minutes after 3:00 o'clock. We're going off the record.
(Recess taken)
THE VIDEOGRAPHER: It's eight minutes after

60:
4:00 o'clock. We're back on the record.
EXAMINATION
BY MR. KRUMHOLZ:
Q: Dr. Symkoviak, my name is Richard Krumholz, and we haven't met before today's proceedings. Is that right?
A: Right.
Q: As I understand it, you have met Mr. Nabers before. Is that right?
A: Yes.
Q: Have you met with the plaintiff's attorneys in connection with this case?
A: Yes.
Q: How many times?
A: Once.
Q: And when was that meeting?
A: I don't know the date of that --
Q: How long ago was it --
A: -- maybe a month ago.
Q: -- approximately?
A: Month ago.
Q: I'm sorry?
A: A month ago.
Q: And how long did you meet with -- was it with Mr. Nabers or someone else?
A: It was with him, and it was probably 30 minutes.

61:
Q: And who else was it with?
A: Let's see.
THE WITNESS: You were here too.
Q: (By MR. KRUMHOLZ) So the lady sitting next to Mr. Nabers was also present. Is that right?
A: Yes.
Q: No one from Merck or representing Merck was able to attend that meeting. Is that right?
A: Correct.
Q: No one from Merck, no one who represented Merck was invited to that meeting to your knowledge. Is that right?
A: Correct.
Q: And you've never met with attorneys from Merck. Is that right?
A: Right.
Q: You met with Mr. Nabers and his assistant for 30 minutes, did you say?
A: I would think so.
Q: Did Mr. Nabers show you any documents at all during that meeting?
A: I believe we looked at the chart.
Q: Did he show you any documents that were not contained in your medical records?
A: I don't believe so.



## Symkoviak, Gary 2006-07-10

Symkoviak PA PC DA DC on 10-3

62:

Q: Did he discuss any documents that were not in your medical records?
A: Not that I recall.
Q: Okay. And Mr. Nabers indicated that you are a cardiologist. Is that right?
A: Yes.
Q: And you're board certified?
A: Yes.
Q: Both in internal medicine and in cardiology. Is that right?
A: Yes.
Q: As such you consider heart disease to be a serious health problem. Is that right?
A: Yes.
Q: And you're aware that cardiovascular disease like Mr. Mason's is the leading cause of death in the United States?
A: Yes.
Q: And you've understood that ever since you've been a cardiologist and probably even before that time. Is that right?
A: Yes.
Q: In fact, as I recall, cardiovascular disease accounts for more than one of every three deaths in the United States. Do you recall that?

63:

A: Yes.
Q: Is that true?
A: Somewhere around there. It's about 100,000 per year or something like that.
Q: And you understand that cardiovascular disease claims more lives than the next four causes of death combined.
A: Something like that, yeah.
Q: And that was true long before Vioxx was ever on the market.
A: Correct.
Q: It was true while Vioxx was on the market.
A: Correct.
Q: And it's been true since Vioxx was withdrawn from the market. Is that right?
A: Correct.
Q: Now, long before Vioxx was on the market thousands of Americans each year had heart attacks without ever knowing that they had coronary artery disease. Is that right?
A: That's probably true.
Q: People actually for the first time realize they have coronary artery disease when they have heart attacks from time to time.
A: That could be the first sign.

Overruled

Def's response: Basic cardiology information

Re 62:15-17 Pl's Obj.: No foundation; vague; speculation; Rule 401 relevance; Rule 403; argumentative

Re 62:19-21 Pl's Obj.: No foundation; vague; speculation; Rule 401 relevancy; Rule 403; argumentative

Re 63:5-7 Pl's Obj.: No foundation; vague; speculation; Rule 401 relevancy; Rule 403; argumentative

Re 63:17-20 Pl's Obj.: No foundation; vague; speculation; Rule 401 relevancy; Rule 403; argumentative

Printed: 10/3/2006 8:58:07AM

Overrule

## Symkoviak, Gary 2006-07-10

Def's response: Basic cardiology information

Q: That's not unusual at all in your practice --
A: No.
Q: -- is it?
A: No.
Q: You see that each and every day and each and every month.
A: Yes.
Q: You see that each and every year.
A: Yes.
Q: And that's been true long before Vioxx was on the market and well after Vioxx has left the market.
A: Yes.
Q: Okay.
A: Those patients would usually have risk factors.
Q: Well, even with patients who don't have risk factors heart attacks occur.
A: That would be more rare.
Q: But it happens.
A: It happens.
Q: And you've seen it in your practice.
A: Yes.
Q: As a cardiologist for how many years?
A: Twenty-five years.
Q: Okay. Now, you described what atherosclerosis is earlier. As I understand it, it's the process of cholesterol and other substances building up over time in the artery walls. Is that right?
A: Yes.
Q: And that's called plaque from time to time?
A: Yes.
Q: And plaque can build up and cause reduction in blood supply to the heart. Is that right?
A: Yes.
Q: And that's sometimes known as ischemia, I guess. Is that right?
A: Ischemia is a lack of blood supply to the heart.
Q: And sometimes that causes what's called angina or chest pain. Right?
A: Yes.
Q: It also can cause chest tightness.
A: Yes.
Q: So when patients have chest tightness or chest pain, it's important to look into that issue. Correct?
A: Correct.
Q: Because it could be an indicator of heart disease. Right?
A: Yes.
Q: Now, is it part of the natural atherosclerotic process for the plaque to rupture at some point?
A: It could happen, yes.

Re 64:1
Pl's Obj: No foundation; vague; speculation; Rule 401 relevancy; Rule 403; argumentative

Re 64:10-11
Pl's Obj.: No foundation; vague; speculation; Rule 401 relevancy; Rule 403; argumentative

## Symkoviak, Gary 2006-07-10

66:

**Q: And when that happens, what is the body's response to that usually?**
**A: Creates a blood clot.**
**Q: And what happens -- what's important or significant about it -- a blood clot in that circumstance?**
**A: Well, then the combination of the plaque and the blood clot could occlude the vessel or plug up the vessel.**
**Q: And that can cause what is commonly referred to as a heart attack?**
**A: That's correct.**
**Q: Or a myocardial infarction?**
**A: Yes.**
**Q: Is that the most common cause of heart attacks, the process we've just described?**
**A: Yes.**
**Q: And that happens every day, so to speak, to people all over America and the world.**
**A: Yes.**
**Q: You see that in your practice and have seen it for as long as you've practiced.**
**A: Yes.**
Q: Now, plaque builds up in people in -- by varying rates, so to speak. Is that right?
A: Say that again.
**Q: Sure. That was a poorly worded question. Some patients with cardiovascular disease or coronary artery disease develop it rapidly, and some develop it more slowly. Is that fair?**

67:

**A: Yes.**
**Q: It's something that varies from patient to patient. True?**
**A: Yes.**
**Q: There have been treating cardiologists in this litigation who have said that there could be patients with 40 or 50 percent blockage in one year and just months later have a 90 percent stenosis. Have you seen that in your practice?**
**MR. NABERS: Objection to the form.**
**A: Well, that's possible, but that's pretty rare.**
Q: Have you seen it?
A: Yes.
**Q: Okay. So you've seen patients with 40 to 50 or 60 percent blockage in an artery who in a year's time or less had a 90 percent blockage. True?**
**A: Yes.**
**Q: Okay. You do know that plaque buildup or this atherosclerosis that we're talking about worsens over time. Right?**
**A: Yes --**
MR. NABERS: Objection to the form.

Overruled

Re 66:16-21
Pl's Obj.: vague; speculation
Def's response: none needed

## Symkoviak, Gary 2006-07-10

68:

A: -- unless there's been some intervention.
Q: Now, we talked about earlier that many, many people have myocardial infarctions or heart attacks without any symptoms at all. True?
A: Well, I don't --
Q: Prior symptoms.
A: Yeah, I don't think that's a common scenario. You're talking the exception. Most people would have some warning signs.
Q: But a lot of people don't have those warning signs. Right?
A: I think you should characterize it as some people don't have warning signs, not a lot.
Q: Fair enough. But if they do have risk factors, we know that the likelihood of a heart attack increases.
A: Yes.
Q: The likelihood of accelerated plaque buildup or atherosclerosis increases under those circumstances.
A: Yes.
Q: Okay. Those risk factors include obesity. True?
A: Yes.
Q: Hypertension?
A: Yes.
Q: High cholesterol?
A: Yes.

69:

Q: High triglycerides?
A: Yes.
Q: A family history?
A: Yes.
Q: And we'll get into those risk factors in a few minutes. Now, as I understand it, you first met Mr. Mason on August 13 of 2003. Is that right?
A: Yes.
Q: And you understood at that time that he had had what you believed to be a heart attack. Correct?
A: Previous heart attack, yes.
Q: A previous heart attack.
A: Yes.
Q: And that was -- I think the record said a month earlier, but it was actually July 23rd --
A: Yes.
Q: -- just two to three weeks earlier. Is that right?
A: Yes.
Q: And I saw in the record where there was a non-Q-wave heart attack. Is that right?
A: Yes.
Q: What is a Q-wave heart attack?
A: On the electrocardiogram there is a normal characteristic pattern, and when you have a heart attack, it

# Symkoviak, Gary 2006-07-10

70:
creates what we call a Q-wave, which is a down going wave at the beginning of the R-wave.
Q: And what does that signify, a Q-wave heart attack versus a non-Q-wave heart attack?
A: Well, it has become just a nomenclature for separating heart attacks into two different types. So the AHA and ACC classifies heart attacks as non-Q-wave and Q-wave. Generally it's felt that non-Q-wave is not as big as a Q-wave infarction.
Q: When you say 'not as big,' generally speaking, there's less damage done to the heart with a non-Q-wave infarction or heart attack as opposed to a Q-wave.
A: Correct.
Q: And mr. Mason had a non-Q-wave infarction. Is that right?
A: Correct.
Q: Now, I think you indicated that you performed a cardiac catheterization when you saw him on August 13 --
A: Yes.
Q: -- of 2003.
A: Yes.
Q: Could you explain in more detail what a cardiac catheterization is?
A: Well, it consists of several things, but one is a coronary angiogram. That's where you put contrast material

71:
into the arteries to see if there's a blockage. We measure the pressures inside the heart, and then we fill the left ventricle with contrast to see how well the left ventricle is functioning.
Q: And just to summarize your findings in connection with your repeat cardiac cath -- and what I mean by repeat, it was a repeat from when he initially had a heart attack some three weeks earlier. Is that right?
A: Yes.
Q: It confirmed that the pain that Mr. Mason was feeling and presented with the day you saw him was not related in any way, shape, or form as far as you could tell to the heart.
A: That's what it would suggest.
Q: I'm going to hand you what's been marked as Exhibit 12 and ask you to identify that document.
A: That looks like a cardiac cath report from LDS Hospital.
Q: And is this the cardiac cath report that -- I'm sorry. I think I mislabeled the exhibit. The last exhibit was?
A: Twelve. It would be 13.
(Exhibit No. 13 marked)
Q: (By MR. KRUMHOLZ) Let me clean that up. I previously asked you to identify Exhibit 12. What I meant

**Symkoviak, Gary 2006-07-10**

72:
to say was Exhibit 13. Do you have Exhibit 13 in front of you?
A: Yes.
**Q: And tell us what Exhibit 13 is.**
**A: The cardiac catheterization report from LDS Hospital.**
**Q: And that's the cardiac catheterization or angiogram that was performed on the day that he presented at LDS with what was believed to be a heart attack. Is that right?**
**A: Yes.**
**Q: And it indicates there that the left anterior descending artery, the LAD, had 90 percent stenosis. Do you see that?**
**A: Yes.**
**Q: Stenosis just means blockage or plaque. Correct?**
**A: Narrowing.**
**Q: Narrowing. And then the first diagonal which is a branch off of the left anterior descending had 70 percent stenosis or blockage and, I guess, narrowing.**
**A: That's correct.**
**Q: And as a result of those findings, they decided over at LDS to perform a stent and what's called an angioplasty. Is that right?**
**A: Yes.**

73:
**Q: And what is a stent?**
**A: It's a metal device that's placed on the inside of the artery and on the top of the balloon that's inserted in the artery to help hold the vessel open.**
**Q: And as I understand an angiogram, what happens is that you actually inject a dye of some sort into the patient. Is that right?**
**A: Contrast material.**
**Q: And that's so you can actually visualize the heart. Is that right?**
**A: Visualize the artery.**
**Q: The artery, okay. And how do you visualize it?**
**A: By x-ray. The dye contains iodine which is opaque to the x-rays, and so we get an image which is -- shows us the outline of the vessel -- the interior of the vessel.**
**Q: And do you see that image on a computer screen or some -- on the x-ray itself or how?**
**A: It's on a television screen.**
**Q: So on a monitor you can track the dye, so to speak?**
**A: Yes.**
**Q: And when you track it, do you keep track of the apparent blockages or narrowing?**
**A: It's on the image.**
**Q: Okay. And you can keep track of the various**