## Symkoviak, Gary 2006-07-10

74: 1 arteries that you're looking at. Is that right?
2 A: Yes.
3 Q: And do you estimate the percent blockage or
4 narrowing that you see in connection with each artery?
5 A: Yes.
6 Q: And so what this report, Exhibit 13, means is that
7 the doctor who did this catheterization -- by the way, who
8 was it?
9 A: This was Edward Ganellen.
10 Q: And do you know Dr. Ganellen?
11 A: Yes.
12 Q: Is he considered to be an expert in this field?
13 A: Yes.
14 Q: Well respected in the community?
15 A: Yes.
16 Q: Do you have high regard for Dr. Ganellen?
17 A: Yes.
18 Q: What Dr. Ganellen saw was 90 percent occlusion or
19 blockage in the LAD. Is that right?
20 A: Yes.
21 Q: I've heard from time to time the LAD referred to
22 as the widow maker. What does that mean?
23 A: Well, it's one of the most important major
24 vessels. There's three major vessels: The LAD, the
25 circumflex, and right coronary artery. The LAD is the

75: 1 artery that goes down the front of the heart and supplies
2 the left ventricle with the majority of its blood supply,
3 and that's the most crucial ventricle because it's a high
4 pressure ventricle. So an obstruction in the LAD could be
5 the most dangerous. But any could be dangerous, but that
6 could be more dangerous.
7 Q: Okay. And it indicates an ejection fraction
8 percentage there, does it not?
9 A: Yes.
10 Q: It says calculated ejection fraction, 60 percent.
11 Do you see that?
12 A: Yes.
13 Q: Now, that's an important measurement. Is that
14 right?
15 A: Yes.
16 Q: Is that generally thought of as the gold standard
17 in determining whether the heart is functioning normally?
18 A: The ejection fraction?
19 Q: Yes.
20 A: Yes.
21 Q: And normal is anything over 50 percent. Is that
22 right?
23 A: Well, it depends on the study. I -- you know,
24 left ventriculargram I consider 60 percent and over normal.
25 Q: Okay. So you consider, in looking at this report

*[Handwritten annotations in right margin:]*

Sustained
403

Re: 74:21-75:6
Def Obj: Plaintiff
has moved in
Limine on the term
"widow maker" and
this question would
be covered by his
own motion

Pl's Resp.:
- π's will w/d it
if mtn in limine
is granted.

Re: 75:23-25
Def Obj: Incomplete
Question; need to
Add 75:21-75:22
π agree
OK to Add.

**Symkoviak, Gary 2006-07-10**

76: 1  of Dr. Ganellen, to be normal in terms of the ejection
2  fraction. Is that right?
3  A: Yes. Well, consider that that's the overall
4  summarized ejection fraction, but the report does indicate
5  there are segmental abnormalities.
6  Q: Are you talking about the mild anterolateral
7  hypokinesis?
8  A: That's correct.
9  Q: But together with a normal ejection fraction, that
10  does not have any clinical significance. True?
11  A: That's not true.
12  Q: Is it fair to say that Mr. Mason's heart was
13  functioning normally in terms of pumping out blood to the
14  rest of the body at the time that this ejection fraction was
15  calculated?
16  A: Well, again, the sum of all the segments was
17  normal, but there was a specific segment that was abnormal.
18  Q: Was it a good sign that Mr. Mason had an ejection
19  fraction of 60 percent on July 25th of 2003?
20  MR. NABERS: Objection to the form.
21  A: Well, that was good. It would have been better if
22  the whole heart was normal.
23  Q: Now, it indicates that -- that is, Exhibit 13
24  indicates that there were no complications in connection
25  with this procedure. Is that right? If you look at the
77: 1  last page.
2  A: Last page? Oh, whereabouts?
3  Q: Says, 'Complications, none.' Do you see that?
4  A: I'm trying to find it. Oh, last page. Yes.
5  Q: You see that it says that in connection with this
6  cardiac catheterization that there were no complications.
7  Correct?
8  A: Correct.
9  Q: And as a result of the stent placement, the left
10  anterior descending artery was wide open. True?
11  A: Correct.
12  Q: The blood flow was free. Correct?
13  A: Correct.
14  Q: There were no blockages whatsoever in connection
15  with the left anterior descending artery as far as you can
16  tell from this catheterization.
17  A: No significant blockage is right.
18  Q: And the same can be said in connection with the
19  first diagonal artery that had a 70 percent blockage before.
20  A: Right.
21  Q: So just to be clear, before this procedure there
22  was a 90 percent blockage in the LAD, and after there was no
23  significant blockage. True?
24  A: Correct.
25  Q: And before this procedure there was 70 percent

**Symkoviak, Gary 2006-07-10**

Symkoviak PA PC DA DC on 10-3

*add info*
*106*

78

**78:**

1  blockage in the first diagonal, and after there was none.
2  A: Correct.
3  Q: What this showed Dr. Ganellen and what it shows
4  you now is that Mr. Mason had severe or coronary artery
5  disease at the time he had his heart attack. True?
6  MR. NABERS: Objection to the form.
7  A: Well, just -- I'm not sure about the word severe,
8  but he had coronary disease. I would call severe maybe
9  multivessel. You know, disease in the right coronary
10  artery, circumflex, and LAD is what I would consider severe.
11  So this is kind of one-plus vessel disease. It's not really
12  three-vessel disease.
13  Q: You don't believe that a 90 percent blockage in
14  Mr. Mason's left anterior descending artery represents
15  severe -- severe coronary artery disease?
16  MR. NABERS: Objection to the form.
17  A: In one vessel. But if you compare it to a patient
18  who has a 90 percent in three vessels, it would not be as
19  bad as that guy. Do you see what I'm saying?
20  Q: Mr. Mason, given his coronary artery disease, was
21  at risk for a heart attack --
22  MR. NABERS: Objection to the form.
23  Q: (By MR. KRUMHOLZ) -- true?
24  A: Well, he had had a heart attack. He's now being
25  treated after the heart attack.

*Re: 78:3-25*
*Def Obj: Incomplete*
*Question and Answer;*
*need to add 79:1 -*
*79:3 for completeness*
*Pl's Resp:*
*The question +*
*answers are*
*complete. No*
*reason to add*
*(P. 79 L 1-3).*

**79:**

1  Q: On July -- I'm talking about July 1 of 2003, just
2  before --
3  A: Yes.
4  Q: -- this record. Given the blockages found on
5  Exhibit 13, that is, the cardiac catheterization, what you
6  do know is that there was -- that Mr. Mason was suffering
7  from the kind of coronary artery disease that put him at
8  significant risk for a heart attack. True?
9  A: Yeah, right. Yes.
10  Q: Okay. You see folks with this -- these sort of
11  blockages have heart attacks every day in your practice.
12  True?
13  MR. NABERS: Objection to the form.
14  A: Not every day but we see them frequently in our
15  practice.
16  Q: What do you mean by frequently?
17  A: Well, we're more likely to see this kind of
18  patient when we're on call, and we're typically on call once
19  a week, so we might see one a week.
20  Q: Okay. So in your practice you see someone like
21  Mr. Mason who has a heart attack once a week or so?
22  MR. NABERS: Object to the form.
23  A: Something like that.
24  Q: And that happens in your practice whether or not
25  the patient is taking a medication like Vioxx. True?

Printed: 10/3/2006   8:58:07AM

**Symkoviak, Gary 2006-07-10**

80:
1  A:  Yes.
2  Q:  And that happened -- you saw that once a week or
3  so well before Vioxx was on the market. Correct?
4  A:  Yes.
5  Q:  And that's something you still see today.
6  A:  Yes.
7  Q:  It didn't -- it doesn't surprise you that
8  Mr. Mason had a heart attack given the blockages that are
9  reflected on Exhibit 13, the cardiac catheterization. True?
10  MR. NABERS:  Objection to the form.
11  A:  Those type of blockages would lead themselves to a
12  heart attack.
13  Q:  And as a result, it doesn't surprise you that he
14  had one.
15  A:  Correct.
16  Q:  Now, on August 13 of 2003, you actually performed
17  a repeat angiogram. Is that correct?
18  A:  Yes.
19  Q:  And on that date the left anterior descending was
20  again completely open. Correct?
21  A:  Yes.
22  Q:  Blood flowed freely through that vessel.
23  A:  Yes.
24  Q:  The same can be said for the first diagonal.
25  A:  Yes.

81:
1  Q:  And both of those vessels were the ones that were
2  previously blocked prior to the stent and the angioplasty
3  that we -- angioplasty that we just talked about. True?
4  A:  That's correct.
5  Q:  That's exactly what you would hope for in a
6  patient like Mr. Mason.
7  A:  Correct.
8  Q:  And the ejection fraction at that time was
9  69 percent.
10  A:  Correct.
11  Q:  Was that a good sign at this stage?
12  A:  Yes.
13  Q:  And why was it a good sign?
14  A:  Well, often you will see some stunning right at
15  the time of a heart attack, and with time the muscle will
16  improve in its function. So now that we're three or four
17  weeks later we would expect to see an improvement in
18  function. That would be a normal course.
19  Q:  Would you consider this to be a completely normal
20  functioning heart given the ejection fraction that you
21  calculated that day?
22  MR. NABERS:  Objection to the form.
23  A:  No.
24  Q:  In terms of at least blood flow to the body from
25  the left ventricle.

**Symkoviak, Gary 2006-07-10**

Symkoviak PA PC DA DC on 10-3                                          82

82:
1  A: The overall function would be normal, but again we
2  still saw a segmental abnormality.
3  Q: I assume that after your angiogram you were
4  optimistic that he would do well in the future if he
5  controlled his risk factors.
6  A: Well, yeah. He didn't have very many risk
7  factors, so that -- that would be a potential problem.
8  Well --
9  MR. KRUMHOLZ: I'll object as nonresponsive.
10  Q: (By MR. KRUMHOLZ) Doctor, I think we're like two
11  ships passing in the night. My question probably was
12  problematically worded. Let me just ask the question more
13  specifically.
14  A: Yeah.
15  Q: Were you optimistic that Mr. Mason would do well
16  in the future if he controlled his risk factors, to the
17  extent that they existed?
18  A: Well, if he could identify the risk factors that
19  had led to the atherosclerosis and if he could modify those
20  factors, then his outcome would be improved. But if he
21  couldn't modify those factors, then his outcome would not be
22  improved, and he would have a chance of progression of
23  disease just the same as he had now.
24  Q: Did you feel after you did your repeat angiogram
25  that Mr. Mason had a good chance for -- to live a full life
83:
1  after his heart attack given your findings?
2  MR. NABERS: Objection to the form.
3  A: I think his lifespan would not expected to be
4  normal.
5  Q: And do you have any evidence to support that,
6  literature, medical literature, anything else?
7  A: Yeah, based on the fact people with previous
8  myocardial infarctions -- and if they can't modify any risk
9  factors, then they would not have the same outcome as
10  somebody that had no disease.
11  Q: What risk factors do you believe he cannot modify?
12  A: Well, again, I'm not clear that he has risk
13  factors.
14  Q: So your belief --
15  A: Unless --
16  Q: -- is that he doesn't have risk factors?
17  A: Unless it was Vioxx, and that could be modified
18  because he could eliminate his exposure.
19  MR. KRUMHOLZ: Objection. Nonresponsive.
20  Q: (By MR. KRUMHOLZ) Mr. Mason's current risk factors
21  do not include Vioxx certainly.
22  A: Not now.
23  Q: Okay. So assuming under your hypothetical that
24  was the only possible risk factor before and is the only
25  possible risk factor now, you believe that he could live a

*Re: 83:7-8 Def Obj: Incomplete Answer; need to add 83:9-83:10 for completeness*

*π agrees*

**Symkoviak, Gary 2006-07-10**

Symkoviak PA PC DA DC on 10-3                                                84

| 84: | 1 | full life. |
|---|---|---|
| | 2 | A:  No, I -- well, let me think about that. Ask that |
| | 3 | question again. |
| | 4 | Q:  What risk factors do you believe he has at present |
| | 5 | that would limit his life expectancy? |
| | 6 | A:  I don't see any significant risk factors now which |
| | 7 | concerns me, so there would be one of two possibilities. If |
| | 8 | he had no risk factors and if Vioxx was not a contributor, |
| | 9 | then he's likely to have another event. If the risk factor |
| | 10 | was Vioxx and that exposure has ended, then his prognosis |
| | 11 | would be better. |
| | 12 | Q:  Are you aware of whether or not Mr. Mason had high |
| | 13 | cholesterol prior to his event? |
| | 14 | A:  The labs I saw were not elevated. |
| | 15 | Q:  So is that the labs that you saw from the |
| | 16 | plaintiff's counsel? |
| | 17 | MR. NABERS:  Objection to the form. |
| | 18 | A:  The lab was from the hospital admission. Let's |
| | 19 | see. Let me just look at my chart here. The lab I'm |
| | 20 | referring to would be probably the admission cholesterol. |
| | 21 | Q:  Were you provided by plaintiff -- you were |
| | 22 | provided some medical records by plaintiff's counsel? True? |
| | 23 | A:  Let's see. Who is Blizzard, McCarthy & Nabers? |
| | 24 | Q:  That's the plaintiff's counsel, Mr. Nabers. |
| | 25 | A:  Yes. |
| 85: | 1 | Q:  Did he provide you any records from Dr. Vogeler's |
| | 2 | office, which is his internist? |
| | 3 | A:  No. |
| | 4 | Q:  Would it surprise you to learn that he did indeed |
| | 5 | have high cholesterol according to lab work done by Mr. -- |
| | 6 | by Dr. Vogeler? |
| | 7 | A:  It would in view of the fact that he had a normal |
| | 8 | cholesterol at time of his heart attack. |
| | 9 | Q:  So that would surprise you? |
| | 10 | A:  Yes. |
| | 11 | Q:  Would it surprise you that he had hypertension and |
| | 12 | had been diagnosed with hypertension prior to his heart |
| | 13 | attack by Dr. Vogeler's office? |
| | 14 | MR. NABERS:  Objection to the form. Misstates the |
| | 15 | evidence. |
| | 16 | A:  Yes, I'm not aware of that. The blood pressures |
| | 17 | I've seen at rest were all normal. |
| | 18 | Q:  And -- but you haven't seen the records from |
| | 19 | Dr. Vogeler's office. |
| | 20 | A:  Have not seen those. |
| | 21 | Q:  That's not something Mr. Nabers or the plaintiffs |
| | 22 | have provided you. |
| | 23 | A:  No. |
| | 24 | MR. NABERS:  Objection to form. |
| | 25 | Q:  (By MR. KRUMHOLZ)  True? |

Printed: 10/3/2006   8:58:07AM

---

Handwritten annotations:

Overrule ✓

Re: 84:1-3
Def Obj: Fragment ← Pl's Resp: Answer must stand b/c he answered it and asked that it be repeated. Def. Counsel did not want the answer and did not re-ask the question. The answers say the PT will not live a full life. This is critical testimony on life expectancy & PT's care.

Re: 85:4-17
Def Obj: Incomplete Question and Answer; Need to add 85:1-3 for completeness ← Pl's Resp: OK — It is a complete question + answer and (85:1-3) does not add to the context.

Re: 85:14-85:15
Def Obj: Remove objection on ↑ ← PT agrees

Re: 85:18-86:1
Pl's Obj: Rule 403; leading; relevance

**Symkoviak, Gary 2006-07-10**

Symkoviak PA PC DA DC on 10-3

86

| 86: | | |
|---|---|---|
| | 1 | A: That's correct. |
| | 2 | MR. NABERS: Same objection. |
| | 3 | (Exhibit No. 14 marked) |
| | 4 | Q: (By MR. KRUMHOLZ) I'm going to hand you what's |
| | 5 | been marked as Exhibit 14. Have you seen that document |
| | 6 | before? |
| | 7 | A: Yes. |
| | 8 | Q: What is Exhibit 14? |
| | 9 | A: It's a Cardiolite spect myocardial perfusion scan |
| | 10 | study. |
| | 11 | Q: And what is a cardiac perfusion scan study? |
| | 12 | A: This is a stress test which is enhanced with the |
| | 13 | administration of Cardiolite. |
| | 14 | Q: And who performed that stress test? |
| | 15 | A: Dr. Keep. |
| | 16 | Q: And that's one of your partners? |
| | 17 | A: Yes. |
| | 18 | Q: Would you agree that this is a very sensitive |
| | 19 | test? |
| | 20 | A: The test accuracy is perhaps 90 percent. |
| | 21 | Q: And it's a very good predictor in terms of |
| | 22 | prognosis according to medical literature. Is that |
| | 23 | accurate? |
| | 24 | A: It's a good predictor of prognosis for the |
| | 25 | subsequent two years. It probably cannot extend a lot |
| 87: | 1 | beyond two years. |
| | 2 | Q: According to Dr. Keep's report, that is, |
| | 3 | Exhibit 14, Mr. Mason's EKG was within normal limits on that |
| | 4 | date. Is that correct? |
| | 5 | A: Yes. |
| | 6 | Q: And this is in October of 2003. Is that right? |
| | 7 | A: Correct. |
| | 8 | Q: Two months after your angiogram. Correct? |
| | 9 | A: Correct. |
| | 10 | Q: And it says, 'The patient,' Mr. Mason, 'exercised |
| | 11 | 11 minutes and zero seconds on a Bruce protocol.' Do you |
| | 12 | see that? |
| | 13 | A: Yes. |
| | 14 | Q: It says, 'The normal exercise time for this age is |
| | 15 | eight minutes, 20 seconds.' Do you see that? |
| | 16 | A: Yes. |
| | 17 | Q: And then it says, 'The patient had a negative |
| | 18 | 30 percent functional aerobic impairment.' Do you see that? |
| | 19 | A: Yes. |
| | 20 | Q: That actually means that he performed 30 percent |
| | 21 | better than was expected, that is, Mr. Mason. True? |
| | 22 | A: That's true. That's based on age prediction of |
| | 23 | exercise time. |
| | 24 | Q: But my statement was true, that that is 30 percent |
| | 25 | better than would be expected for a man of Mr. Mason's age. |

Printed: 10/3/2006   8:58:07AM

*Handwritten annotations:*

Overrule

Re 86:4-88:1
Pl's Obj: Cumulative; no foundation

Def's response: Plaintf designated testimony from this witness about prognosis and damage (response applies to objections through page 89)

## Symkoviak, Gary 2006-07-10

Symkoviak PA PC DA DC on 10-3                                      88

88:   1   A: That's correct.
      2   (Exhibit No. 15 marked)
      3   Q:  (By MR. KRUMHOLZ)  I'll hand you what's been --
      4   what I've marked as Exhibit 15. Are you familiar with the
      5   table that is marked as Exhibit 15? I think there are two
      6   tables there.
      7   A: No, I'm not.
      8   Q: You're not -- are you familiar with the term mets?
      9   A: Yes.
     10   Q: Okay. Have you ever seen a table that predicts
     11   the amount of mets for a person's age in connection with a
     12   stress test?
     13   A: You know, I may have years ago but not recently.
     14   It's not something we currently use.
     15   Q: Okay. During this perfusion study -- by the way,
     16   can you describe for us exactly how this sort of perfusion
     17   study is done?
     18   A: Yes. The patient exercises on a treadmill to the
     19   end, and at that point -- excuse me. One to two minutes
     20   before he stops Cardiolite is injected into the vein, and
     21   that circulates through the body and is absorbed by the
     22   heart muscle. And then the patient subsequently is placed
     23   on a scanner that detects the radioactive activity coming
     24   out of the heart and reconstructs the image of the heart.
     25   Q: And what were the results of this report -- or
89:   1   this perfusion study that was done?
      2   A: The summary?
      3   Q: Yes.
      4   A: Says there was some nonischemic EKG changes, and
      5   there was a normal stress myocardial perfusion, normal
      6   global and regional left ventricular function.
      7   Q: Does that mean that the left ventricular function
      8   was normal according to the study performed by Dr. Keep?
      9   A: That's what it says.
     10   Q: And why is the left ventricular function
     11   important?
     12   A: Well, it's an indication of how well the heart's
     13   working.
     14   Q: It's an indication that the heart was working or
     15   functioning normally on this date. True?
     16   A: That's correct.
     17   Q: And that was the opinion of your partner Dr. Keep
     18   in October of 2003. Is that right?
     19   A: That's correct.
     20   Q: Would you agree that the -- a normal perfusion
     21   study, a normal ejection fraction, and a normal functional
     22   impairment rating are sort of the gold standards for
     23   purposes of predicting prognosis?
     24   MR. NABERS: Objection to the form.
     25   A: Those are good predictors.

Overruled!

Re 88:15-89:25
Pl's Obj.: Cumulative; no
foundation

Printed: 10/3/2006   8:58:07AM

*Overrule*

**Symkoviak, Gary 2006-07-10**

Symkoviak PA PC DA DC on 10-3                                    90

| 90: | 1 | Q: And, in fact, all of those were normal as of |
| | 2 | October 2003 from Mr. Mason. True? |
| | 3 | A: That's what this report says. I don't totally |
| | 4 | believe the report. |
| | 5 | Q: But this report was done by your partner Dr. Keep. |
| | 6 | Is that right? |
| | 7 | A: It was done by my partner, but you have to |
| | 8 | remember we have two angiograms proceeding this which are |
| | 9 | abnormal, and there's one Cardiolite after this which is |
| | 10 | abnormal, so I suspect that this is not totally accurate. |
| | 11 | MR. KRUMHOLZ: Objection. Nonresponsive. |
| | 12 | Q: (By MR. KRUMHOLZ) If you knew on July 1 of 2003, |
| | 13 | that Mr. Mason had approximately a 90 percent occluded or |
| | 14 | blocked left anterior descending artery and a 70 percent |
| | 15 | blocked diagonal artery, would you have recommended a stent |
| | 16 | and an angioplasty? |
| | 17 | A: Yes. |
| | 18 | Q: So if fully known, that is, the extent of his |
| | 19 | cardiovascular disease was fully known prior to his heart |
| | 20 | attack, you would have still at that time recommended an |
| | 21 | angioplasty and the stent procedure that was ultimately |
| | 22 | performed. Is that right? |
| | 23 | A: Yes. |
| | 24 | Q: Now, you have not been asked in this case to do |
| | 25 | any sort of significant analysis or research to determine if |
| 91: | 1 | Vioxx can or cannot result in any sort of CV risk. Is that |
| | 2 | true? |
| | 3 | A: That's correct. |
| | 4 | Q: And as I understand it, you have not done any |
| | 5 | actual research into that issue. Correct? |
| | 6 | A: That's correct. |
| | 7 | Q: And you have not done any studies yourself to |
| | 8 | determine if that's true. Correct? |
| | 9 | A: That's correct. |
| | 10 | Q: And you do not hold yourself out as an expert on |
| | 11 | the effect of COX-2 inhibitors on the cardiovascular system. |
| | 12 | True? |
| | 13 | A: That's correct. |
| | 14 | Q: Or on the effect of COX-2s on plaque formation or |
| | 15 | atherosclerosis? |
| | 16 | A: That's correct. |
| | 17 | Q: And you're indeed not an expert in that regard. |
| | 18 | True? |
| | 19 | A: That's correct. |
| | 20 | Q: Can you point to any peer-reviewed literature that |
| | 21 | supports the notion that COX-2s or Vioxx accelerates |
| | 22 | atherosclerosis? |
| | 23 | A: Specifically or in general, yes, there's a number |
| | 24 | of articles in JAMA and The New England Journal stating |
| | 25 | that. |

Re: 90:5 - 90:10
Def obj: Non-responsive
Pl's Resp.:
It is directly
responsive to
the question +
precisely clear.
This is a complete
answer to the
question at
issue + is
critical on the
issue of π's
injuries + DAS
to his heart.

## Symkoviak, Gary 2006-07-10

Symkoviak PA PC DA DC on 10-3                                               92

| 92: | 1 | MR. KRUMHOLZ: I'll object as nonresponsive. |
| | 2 | Q:   (By MR. KRUMHOLZ)  Can you point to any specific |
| | 3 | articles today that state that Vioxx somehow accelerates the |
| | 4 | promotion of atherogenesis? |
| | 5 | MR. NABERS:  Objection to the form. Asked and |
| | 6 | answered. |
| | 7 | A:  I could give you that reference if you let me look |
| | 8 | it up. |
| | 9 | Q:  And what references are you speaking of in JAMA? |
| | 10 | A:  New England Journal. |
| | 11 | Q:  New England Journal? |
| | 12 | A:  Yeah. |
| | 13 | Q:  And JAMA? |
| | 14 | A:  And JAMA. There's some articles in there that |
| | 15 | state that. |
| | 16 | Q:  Are you aware of the articles that indicate |
| | 17 | otherwise -- |
| | 18 | A:  No. |
| | 19 | Q:  -- that actually Vioxx prevents or prohibits |
| | 20 | atherosclerosis? |
| | 21 | A:  I've never seen one of those. |
| | 22 | Q:  Okay. So it would surprise you if there were |
| | 23 | several studies that indicate that Vioxx does not cause |
| | 24 | atherogenesis? |
| | 25 | A:  That would surprise me. |
| 93: | 1 | Q:  And it would surprise you if there were several |
| | 2 | articles that indicate that Vioxx indeed inhibits |
| | 3 | atherogenesis or slows down atherogenesis? |
| | 4 | A:  That would surprise me. |
| | 5 | Q:  And you have not put pen to paper and done any |
| | 6 | statistical or other analysis to determine if what you |
| | 7 | believe is true? |
| | 8 | MR. NABERS: Objection to the form. |
| | 9 | Q:   (By MR. KRUMHOLZ)  That is, that somehow Vioxx |
| | 10 | promotes atherogenesis? |
| | 11 | A:  I've not done that research. |
| | 12 | Q:  And you can't -- haven't done any sort of |
| | 13 | comprehensive analysis of all of the studies that have been |
| | 14 | performed in that regard. |
| | 15 | A:  No, sir. |
| | 16 | Q:  Do you believe that to provide reliable scientific |
| | 17 | opinions about whether or not Vioxx can accelerate |
| | 18 | atherogenesis you would need to do a more comprehensive |
| | 19 | study of the literature and studies that have been done? |
| | 20 | A:  I don't think so because reading the writings of |
| | 21 | Topol, et al., I think their -- I respect their opinion as |
| | 22 | leaders in this area. |
| | 23 | Q:  You actually prescribed Vioxx for your patients. |
| | 24 | Is that true? |
| | 25 | A:  That's correct. |

Printed: 10/3/2006   8:58:07AM

*Handwritten note:*
Re: 93:16-22
Deft Obj; Incomplete
Question and Answer,
need to add 92:16 -
93:15 for completeness
  - Pl's Resp.:
  This is an improper
  objection and
  no testimony needs
  to be added.
    -. The question and
  Specifically the answer are
  directly on point.

Overrule

**Symkoviak, Gary 2006-07-10**

Symkoviak PA PC DA DC on 10-3

94

94:
1  Q: Have you ever taken Vioxx?
2  A: Yes.
3  Q: Did it work well in terms of pain relief and
4  stemming off inflammation?
5  A: Yes.
6  Q: For you and your patients?
7  MR. NABERS: Objection to the form.
8  A: Yes.
9  Q: I'm sorry?
10  A: Yes.
11  Q: Did you find that Vioxx had less GI problems than
12  other NSAIDs or COX-2s?
13  A: I couldn't judge that.
14  Q: You don't have an opinion one way or another?
15  A: No.
16  Q: Would you agree that Vioxx was extremely effective
17  in treating pain?
18  A: I would use the language it's a good treatment for
19  pain.
20  Q: And I know this may sound silly, but given your
21  experience -- I assume that you would rely on your training,
22  education, and experience and not the opinions or statements
23  of a sales rep in determining the best treatment course for
24  your patients. True?
25  A: Well, we use the information that the sales reps

95:
1  provide in determining which patients can use it, and they
2  do serve an educational role in telling us about new drugs
3  as they come on the market before we're able to read about
4  them in the journals and go to the medical meetings, et
5  cetera.
6  Q: I assume you rely on the label for the drug before
7  you prescribe it. True?
8  A: Right.
9  Q: You understand that is what has been approved by
10  the FDA.
11  A: That's correct.
12  MR. NABERS: Objection to the form.
13  Q: (By MR. KRUMHOLZ) And you understand that that --
14  as a medical doctor that's what you must rely upon in
15  determining the best course of treatment for your patients.
16  A: Yes.
17  Q: You've never allowed the judgment of a sales
18  representative to replace your own medical judgment
19  regarding whether to prescribe a medication.
20  A: Correct.
21  MR. KRUMHOLZ: Let's go off the record for a
22  minute.
23  THE VIDEOGRAPHER: We're going off the record.
24  It's 47 minutes after 4:00 o'clock.
25  (Recess taken)

Printed: 10/3/2006  8:58:07AM

Re 94:1-5
Pl's Obj.: Rule 401 relevance; Rule 403

Def's response: Plaintiff raised the issue of this witness' knowledge of the risks and benefits of Vioxx and these questions go to that issue

Re: 95:6-12
Pl's Obj.: leading
Def's response: Leading Objection not preserved for lines 6-8 and 9-11 is not leading

Re: 95:17-20
Pl's Obj.: leading; argumentative; Rule 403
Def's response: Leading Objection not preserved and plaintiff raised the issue of this witness' knowledge of the risks of Vioxx and how he gained that knowledge

**Symkoviak, Gary 2006-07-10**

Symkoviak PA PC DA DC on 10-3                                      96

96:  1      THE VIDEOGRAPHER: It's 56 minutes after
     2      4:00 o'clock. This is the beginning of tape No. 2, and
     3      we're back on the record.
     4      Q:   (By MR. KRUMHOLZ)  Doctor, you indicated a few
     5      moments ago that you had not read any articles indicating
     6      there was no link between Vioxx and atherogenesis.
     7      A:  Correct.
     8      Q:  Are you --
     9      A:  I should state that not only articles but I've
    10      been attending the ACC meetings annually for the last few
    11      years where they've had seminars on these topics.
    12      MR. KRUMHOLZ: I'll object to the nonresponsive
    13      portion of the answer.
    14      Q:   (By MR. KRUMHOLZ)  But regardless, you're not aware
    15      of the medical literature that suggests there's no link
    16      between Vioxx and atherogenesis. True?
    17      MR. NABERS: Objection to the form.
    18      A:  True.
    19      Q:  You're not aware of any such medical literature.
    20      Is that right?
    21      A:  I haven't read any such articles.
    22      Q:  Okay. For example, you have not read an article
    23      by Cipollone in 2001. Is that right?
    24      MR. NABERS: Objection to the form.
    25      A:  What journal was it in?
97:  1      Q:  I don't recall the exact journal, but have -- do
     2      you know who Cipollone is? Do you recall that author?
     3      A:  No.
     4      Q:  Have you read any article where they indicate,
     5      quote, From a practical standpoint these findings raise the
     6      possibility that the selective COX-2 inhibitors now
     7      currently available for clinical use or future PGES
     8      inhibitors might provide a novel form of therapy for plaque
     9      stabilization in patients with atherosclerotic disease and
    10      prevention of acute ischemic syndromes?
    11      MR. NABERS: I need to object to the form, and I
    12      need to object to reading from a document that we don't have
    13      in front of the witness.
    14      Now you may answer.
    15      Q:   (By MR. KRUMHOLZ)  My question, Doctor, is: Do you
    16      recall ever reading any sort of quote like that?
    17      MR. NABERS: Same objections.
    18      A:  I do not, and I have not heard that in the
    19      meetings.
    20      Q:  Have you ready any articles or studies that were
    21      authored by Practico, P-R-A-C-T-I -- P-R-A-C-T-I-C-O?
    22      A:  Which journal is that in?
    23      Q:  I don't have that with me, but I'll tell you in a
    24      minute.
    25      A:  The journal --

Printed: 10/3/2006   8:58:07AM

**Symkoviak, Gary 2006-07-10**

Symkoviak PA PC DA DC on 10-3                                           98

| 98: | | |
|---|---|---|
| | 1 | Q: Are you familiar with that author? |
| | 2 | A: The journal would help because I don't memorize |
| | 3 | authors. |
| | 4 | Q: Well, let me ask you this way. Have you ever read |
| | 5 | an article that states that accelerated progression of |
| | 6 | atherosclerosis is unlikely during chronic intake of |
| | 7 | specific COX-2 inhibitors? |
| | 8 | MR. NABERS: Objection to the form. |
| | 9 | A: I've never read an article like that. |
| | 10 | Q: Do you take the publication called Circulation? |
| | 11 | A: No. |
| | 12 | Q: Do you believe it to be a reliable source of |
| | 13 | information? |
| | 14 | A: Yes. |
| | 15 | Q: What did you say? |
| | 16 | A: Yes. |
| | 17 | Q: Have you ever heard of an author named Burley? |
| | 18 | MR. NABERS: Objection to the form. |
| | 19 | A: Not familiar with that author. |
| | 20 | Q: Did you read any article by Burley in 2002 where |
| | 21 | he stated, 'We present evidence that pharmacological |
| | 22 | inhibition of COX-2 reduces atherosclerosis, and we provide |
| | 23 | genetic evidence indicating that macrophage COX-2 promotes |
| | 24 | early atherogenesis' -- |
| | 25 | MR. NABERS: Object to the form. |

| 99: | | |
|---|---|---|
| | 1 | Q: (By MR. KRUMHOLZ) -- these results -- let me start |
| | 2 | again. In Burley 2002, do you ever recall reading a quote |
| | 3 | where the author states, 'We present evidence that |
| | 4 | pharmacological inhibition of COX-2 reduces atherosclerosis |
| | 5 | in mice, and we provide genetic evidence indicating that |
| | 6 | macrophage COX-2, that is, without inhibition? Is that |
| | 7 | right? |
| | 8 | MR. NABERS: Objection to the form. |
| | 9 | Q: (By MR. KRUMHOLZ) Is that what that means? |
| | 10 | A: Yes. |
| | 11 | Q: Promotes early atherogenesis. Goes on to state, |
| | 12 | 'These results demonstrate the potential of COX-2 inhibitors |
| | 13 | in the treatment of atherosclerosis and support the |
| | 14 | potential of any inflammatory approaches to the prevention |
| | 15 | of coronary heart disease.' Have you ever read any sort of |
| | 16 | article containing an indication of that nature? |
| | 17 | MR. NABERS: Objection to the form and objection |
| | 18 | to the extent there's no article shown to the witness. |
| | 19 | A: Is that from Circulation? |
| | 20 | Q: Yes. |
| | 21 | A: I do not read Circulation. |
| | 22 | Q: Have you ever heard of an article like that? |
| | 23 | A: No. |
| | 24 | Q: Would that be important to you before deciding |
| | 25 | whether or not Vioxx has some sort of link with |

*overruled*

**Symkoviak, Gary 2006-07-10**

Symkoviak PA PC DA DC on 10-3                                    100

| 100: | 1 | atherogenesis? |
|---|---|---|
| | 2 | MR. NABERS:  Objection to the form. |
| | 3 | A:  It would not because mice are not men. We would |
| | 4 | have healthy mice but not healthy humans. |
| | 5 | Q:  Do you know of any specific medical literature |
| | 6 | that indicates or suggests that Vioxx in humans promotes |
| | 7 | atherogenesis? |
| | 8 | A:  I think the studies that we have here on exhibits |
| | 9 | show that. |
| | 10 | Q:  I'm talking about the studies, medical -- the |
| | 11 | medical literature. Do you think that's what APPROVe and |
| | 12 | VIGOR said? |
| | 13 | A:  Yes. |
| | 14 | Q:  Show me in APPROVe or VIGOR where the authors say |
| | 15 | that Vioxx somehow accelerates atherogenesis. |
| | 16 | A:  Well, we're talking about outcomes, and the |
| | 17 | outcomes are worse. I don't care what the author says. |
| | 18 | What we're looking at is outcomes. We base our practice on |
| | 19 | outcomes. |
| | 20 | Q:  Let's take each one of those articles just for a |
| | 21 | moment. The first one you're talking about is the VIGOR |
| | 22 | article. Is that right? |
| | 23 | A:  Right. |
| | 24 | Q:  Do you understand that VIGOR compared Naproxen, |
| | 25 | another NSAID, to Vioxx? |
| 101: | 1 | A:  That's correct. |
| | 2 | Q:  And do you understand there's been a long debate |
| | 3 | in the medical community about whether or not Naproxen is |
| | 4 | cardioprotected? |
| | 5 | MR. NABERS: Objection to the form. |
| | 6 | Q:   (By MR. KRUMHOLZ)  True? |
| | 7 | A: I understand that. |
| | 8 | Q:  That's your understanding of the debate in the |
| | 9 | medical community. Correct? |
| | 10 | A:  That there has been that -- |
| | 11 | Q:  And there is still a widespread belief that |
| | 12 | Naproxen is cardioprotective. True? |
| | 13 | MR. NABERS: Objection to the form. |
| | 14 | A:  I don't believe that's the current feeling. |
| | 15 | Q:  I assume since you're not an expert in these areas |
| | 16 | you don't have an opinion in that regard. |
| | 17 | A:  Well, I rely on the thought leaders and the ACC, |
| | 18 | and that's what I said. I go to all these meetings, and |
| | 19 | that's what I'm getting from the ACC. |
| | 20 | Q:  In terms of VIGOR do you recall that that involved |
| | 21 | a study with 50-milligram Vioxx? |
| | 22 | A:  Yes. |
| | 23 | Q:  And you understand that Mr. Mason never received |
| | 24 | 50-milligram Vioxx. True? |
| | 25 | A:  That's correct. |

Printed: 10/3/2006   8:58:07AM

Re: 100:5 - 101:19

Def Obj: Not a proper counter-designation, witness speculating on pharmacology mechanisms without proper expert foundation, designation or methodology ("I don't care what the author say")

PI's Resp:
Another improper objection where Def. counsel does not let the witness answer. All of these questions by Def. counsel are very argumentative. The witness is qualified and has been designated to give such opinions. This is Def. counsel crossing the witness on critical issues in the case. The witness is very familiar with the literature on these topics and his testimony reflects that - this is important and testimony proper.

**Symkoviak, Gary 2006-07-10**

| 102: | 1 | Q: He only received 25 milligram Vioxx. |
| | 2 | A: Correct. |
| | 3 | Q: And to your knowledge, that's all he ever took, |
| | 4 | that is, 25-milligram Vioxx. |
| | 5 | MR. NABERS:  Objection to the form. |
| | 6 | A: Yes. |
| | 7 | Q: Do you also understand that in VIGOR that was a |
| | 8 | study on rheumatoid arthritis patients? |
| | 9 | A: Yes. |
| | 10 | Q: And Mr. Mason is not a rheumatoid arthritis |
| | 11 | patient to your knowledge. Correct? |
| | 12 | A: Right. |
| | 13 | Q: You do understand that rheumatoid arthritis |
| | 14 | patients carry a greater risk of heart disease? |
| | 15 | A: I haven't seen that in my practice. |
| | 16 | Q: You have no idea whether that's true one way or |
| | 17 | the other? |
| | 18 | MR. NABERS:  Objection to the form. |
| | 19 | A: I have not observed that personally. |
| | 20 | Q: And you haven't looked into that issue in terms of |
| | 21 | the medical literature. True? |
| | 22 | A: We don't regard that as a risk -- significant risk |
| | 23 | factor, no, we don't. |
| | 24 | Q: And the APPROVe study that you referred to and |
| | 25 | that the plaintiff's lawyer discussed with you, you |
| 103: | 1 | indicated was associated with a greater number of |
| | 2 | cardiovascular events. Do you recall that? |
| | 3 | MR. NABERS:  Objection to the form. |
| | 4 | A: Yes. |
| | 5 | Q: The truth -- the truth of the matter is that that |
| | 6 | only occurred after 18 months of continuous use? True? |
| | 7 | MR. NABERS:  Objection to the form. |
| | 8 | A: That could be true, yes. |
| | 9 | Q: I'm sorry? |
| | 10 | A: That could be true. I would have to -- |
| | 11 | Q: Go ahead and look at the article and confirm that |
| | 12 | for me. |
| | 13 | A: Let's see. Which exhibit was that? Do you know |
| | 14 | which Exhibit No. that was? |
| | 15 | Q: I'll try to get that for you. It may have been |
| | 16 | eight, but I'll -- |
| | 17 | A: We have five and six. Let's see. |
| | 18 | Q: It's six. I'm sorry. Could you turn to |
| | 19 | Exhibit 6? |
| | 20 | A: Okay. Let's see here. Increased risk became |
| | 21 | apparent after 18 months, that's correct. |
| | 22 | Q: I'm sorry. What was your response? |
| | 23 | A: Says the relative risk became apparent after 18 |
| | 24 | months of treatment. |
| | 25 | Q: And Mr. Mason, as Mr. Nabers indicated, only took |

## Symkoviak, Gary 2006-07-10

Symkoviak PA PC DA DC on 10-3                                                      104

104:  1    Vioxx for 10 months. Is that true?
      2    MR. NABERS: Objection to the form. Misstates the
      3    evidence.
      4    A: It seems to be in that range, yeah.
      5    Q: That's your belief. True?
      6    A: That's what I understand, yes.
      7    Q: Can you point to any article that suggests that --
      8    A: Let's just clarify this article. There was an
      9    earlier separation at approximately five months between the
      10   groups and the incidence of nonadjudicated investigative
      11   reported congestive heart failure, pulmonary edema, and
      12   cardiac failure.
      13   MR. KRUMHOLZ: Do y'all have a copy of that
      14   exhibit that you used?
      15   MS. GRAINGER: You're looking at it.
      16   MR. KRUMHOLZ: I don't believe this is it.
      17   THE WITNESS: Exhibit 6.
      18   MS. GRAINGER: That's the paper?
      19   MR. KRUMHOLZ: No, I'm talking about APPROVe. I
      20   think we're talking about APPROVe right now.
      21   THE WITNESS: Well, or Exhibit 6, whatever one
      22   you're on.
      23   MS. GRAINGER: APPROVe.
      24   MR. KRUMHOLZ: Do you have a copy of APPROVe?
      25   MS. GRAINGER: Isn't that the one you're looking
105:  1    at?
      2    MR. KRUMHOLZ: No. That's what I keep saying.
      3    MS. GRAINGER: I have the one he's marked. I mean
      4    I have his copy that's marked.
      5    MR. NABERS: We don't have another one. That's
      6    the problem.
      7    MR. KRUMHOLZ: Okay.
      8    Q: (By MR. KRUMHOLZ) In the ACC conventions or
      9    seminars that you've gone to, isn't it true that the -- when
      10   talking about the APPROVe study that's marked as Exhibit 6,
      11   it's widely believed that this study represents -- the study
      12   that represents the notion that the risk only increases
      13   after 18 months with use of Vioxx, that is, the
      14   cardiovascular risk. Is that not your understanding?
      15   MR. NABERS: Objection to form.
      16   A: That's not my understanding, and I don't think
      17   that's what it says.
      18   Q: Do you know the number of events on Vioxx versus
      19   placebo up to 18 months?
      20   A: I don't know those specific numbers without
      21   referring to the article.
      22   Q: You can refer to the article. It's in front of
      23   you.
      24   A: Prior to 18 months? I don't know how easy that's
      25   going to be to dig out or if it gives us those specific

Printed: 10/3/2006   8:58:07AM

## Symkoviak, Gary 2006-07-10

Symkoviak PA PC DA DC on 10-3                                      106

| 106: | 1 | numbers. |
|------|---|----------|

106: 1 numbers.
2 Q: It would surprise you to know that the authors of
3 APPROVe indicated that there was no statistically
4 significant difference in cardiovascular risks prior to 18
5 months use of Vioxx?
6 MR. NABERS: Objection to the form.
7 A: Well, I guess it depends on what you call
8 significant. It says 95 percent confidence interval 1.5 to
9 18.3, and, you know, you would have to get your
10 statisticians to argue that significance.
11 Q: So you would defer to statisticians and other
12 experts in that regard.
13 A: Right. I mean, that's what it says the confidence
14 interval is.
15 Q: You're not aware that through 18 months of use in
16 that study there were 22 events on Vioxx and 20 events on
17 placebo?
18 MR. NABERS: Objection to the form.
19 A: I would have to look at the specific numbers. Do
20 you have a page to refer to?
21 Q: Were you aware of that is all I'm asking.
22 A: No, just -- I'm not aware of the specific numbers,
23 no.
24 Q: Doctor, you see patients like Mr. Mason in your
25 practice every year who have not taken Vioxx and who have

107: 1 heart attacks. True?
2 MR. NABERS: Objection to the form.
3 A: Well, I would say we on rare occasions see a
4 patient like him.
5 Q: Every year you see patients like Mr. Mason who are
6 not taking Vioxx and who have heart attacks. True?
7 A: With no risk factors.
8 MR. NABERS: Objection to the form.
9 Q: (By MR. KRUMHOLZ) Characterize them however you
10 please in that regard.
11 A: I may not -- may not even see a patient in a year
12 that doesn't have any risk factors. I mean, generally we
13 identify risk factors with our patients.
14 Q: So you believe that a patient -- it would be
15 highly unusual for a patient like Mr. Mason to have a heart
16 attack. Is that your testimony?
17 A: Yes, I think that's unusual.
18 Q: And it's your testimony that he had no risk
19 factors -- traditional risk factors for a heart attack?
20 A: That I'm aware of.
21 MR. KRUMHOLZ: Pass the witness.
22 EXAMINATION
23 BY MR. NABERS:
24 Q: Doctor, just a couple --
25 THE VIDEOGRAPHER: I'm sorry. Mr. Nabers, if you

Printed: 10/3/2006   8:58:07AM

Re: 106:24-107:20
Dft Obj: Not a
proper counter-
designation;
if objection is
overruled, NEED TO
ADD 117:12 - 122:4
for completeness
Pl's Resp.:
Very argumentative
questioning as
evident on the
Video. This is
proper + important
testimony directly
related to the
medical issues
involved in this
case. Nothing needs
to be added to this
line of questioning

**Symkoviak, Gary 2006-07-10**

| | | |
|---|---|---|
| 108: | 1 | would take a microphone. |
| | 2 | MR. KRUMHOLZ: There's one right there. |
| | 3 | MR. NABERS: Let's just switch right quick. |
| | 4 | MR. KRUMHOLZ: Let's just go off the record. I've |
| | 5 | got to clean up. |
| | 6 | MR. NABERS: Okay. |
| | 7 | THE VIDEOGRAPHER: It's 10 minutes after |
| | 8 | 5:00 o'clock. We're going off the record. |
| | 9 | (Brief pause) |
| | 10 | THE VIDEOGRAPHER: It's 11 minutes after |
| | 11 | 5:00 o'clock. We're back on the record. |
| | 12 | Q: (By MR. NABERS) Dr. Symkoviak, just a few |
| | 13 | questions by way of follow-up after the Merck attorney's |
| | 14 | questions. You were just at the end of the testimony asked |
| | 15 | about the APPROVe study that appeared in The New England |
| | 16 | Journal of Medicine. |
| | 17 | A: Yes. |
| | 18 | Q: And that appeared March 17th of 2005. Correct? |
| | 19 | A: Yes. |
| | 20 | Q: And I just wanted to ask you if you were aware |
| | 21 | of -- if we actually turn in the article to page 1100, and |
| | 22 | I'll give you a chance to get to page 1100. Do you have |
| | 23 | that there in front of you? |
| | 24 | A: Yes. |
| | 25 | Q: And do you see that this article, the APPROVe |
| 109: | 1 | article, was funded by Merck Research Laboratories, the |
| | 2 | manufacturer of Vioxx? |
| | 3 | A: That's what it says. |
| | 4 | Q: And do you see that all of the authors who were |
| | 5 | listed on this paper as being a part of the publication were |
| | 6 | also funded by Merck Research Laboratories, the manufacturer |
| | 7 | of Merck? |
| | 8 | A: Yes -- |
| | 9 | MR. KRUMHOLZ: Objection. Leading. |
| | 10 | A: -- I see that. |
| | 11 | Q: And you were asked about statistics. Did you know |
| | 12 | that the person that did the statistics for this study was |
| | 13 | actually in-house at Merck Research Laboratories? |
| | 14 | MR. KRUMHOLZ: Objection. Form. Leading. |
| | 15 | Assumes facts not in evidence. |
| | 16 | A: I did not know that. |
| | 17 | Q: Okay. Do you ever take into consideration funding |
| | 18 | bias when you read articles that are supporting a certain |
| | 19 | position that are funded by drug companies? |
| | 20 | A: I did not until just recently. |
| | 21 | Q: Okay. And why would you consider that now to be |
| | 22 | important? |
| | 23 | A: Well, there was a recent article in New England |
| | 24 | Journal where they looked at outcomes based on funding, and |
| | 25 | they showed that there was a significant difference in |

**Symkoviak, Gary 2006-07-10**

110:
1    outcomes based on funding.
2    Q:  All right. Then let me also ask you. You know,
3    you were asked from this APPROVe trial, which was Deposition
4    Exhibit No. 6 -- you were asked about whether or not the
5    risk of a cardiovascular event occurred only after 18
6    months. Do you recall that?
7    A:  Yes.
8    Q:  All right. And let me just ask you, have you
9    seen -- you're certainly familiar with The New York Times.
10   Correct?
11   A:  I'm familiar with the paper. I do not read it.
12   Q:  All right. Well, were you aware recently that
13   Merck admitted that they committed a data error with regard
14   to the Vioxx APPROVe study?
15   MR. KRUMHOLZ:  Objection. Form.
16   A:  I was not aware of that.
17   Q:  All right. If we look at this article, it says,
18   'In an admission that could undermine one of its core
19   defenses in Vioxx-related lawsuits, Merck said yesterday
20   that it had erred when it reported in early 2005 that a
21   crucial statistical test showed that Vioxx caused heart
22   problems only after 18 months of continuous use.' Do you
23   see where I read that?
24   A:  Yes.
25   Q:  Then it goes on to say, 'That statistical analysis
111:
1    test does not support Merck's 18-month theory about Vioxx,
2    the company acknowledged yesterday.' Do you see that?
3    A:  Yes.
4    Q:  All right. So in this article does it look to you
5    like Merck is acknowledging that this 18-month theory about
6    cardiovascular events is now wrong?
7    MR. KRUMHOLZ:  Objection. Form.
8    A:  It sounds like it.
9    Q:  And, of course, that was what you were just asked
10   in this deposition, if you were aware of that. Correct?
11   A:  Correct.
12   Q:  All right. In fact, if we turn over to the
13   bottom, does The New York Times indicate that in the APPROVe
14   study twice as many patients taking Vioxx suffered heart
15   attacks or strokes as those taking placebo or sugar pill?
16   Do you see that?
17   A:  Yes.
18   Q:  All right. And is that significant to you?
19   MR. KRUMHOLZ:  Objection. Form.
20   A:  Yes.
21   Q:  Okay. And it says -- if we look on the second
22   page a little bit further down, 'Dr. Kim' -- and I'll tell
23   you that he's from Merck -- 'said yesterday that Merck found
24   its mistake only last week and immediately told the FDA and
25   the non-Merck researchers who had taken part in the APPROVe

**Symkoviak, Gary 2006-07-10**

Symkoviak PA PC DA DC on 10-3                                                112

112:  1    study which was published in the March 17, 2005 issue of The
      2    New England Journal of Medicine.' It goes on to say, 'We
      3    came forth quickly to let the study authors know about the
      4    error and to let regulatory agencies know about the error,
      5    Dr. Kim said.' Were you aware of that?
      6    MR. KRUMHOLZ: Objection. Form.
      7    A: I was not aware of that.
      8    Q: And you certainly weren't shown that today, were
      9    you?
      10   A: No.
      11   Q: In fact, you were asked today if that 18-month
      12   theory still held true even though Merck had admitted it
      13   hadn't. Right?
      14   MR. KRUMHOLZ: Objection. Form. Assumes facts
      15   not in evidence and mischaracterizes the evidence.
      16   Q:  (By MR. NABERS)  Correct?
      17   A: Correct.
      18   (Exhibit No. 16 marked)
      19   Q:  (By MR. NABERS)  All right. The last thing I want
      20   to show which I've marked as Deposition Exhibit 16 is
      21   actually a test that came again from your clinic. Correct?
      22   A: Yes.
      23   Q: And the date of this test is April the 12th of
      24   2005?
      25   A: Yes.
113:  1    Q: And what type of test is this report reflecting?
      2    A: That's a Cardiolite stress test.
      3    Q: Okay. And we talked a lot about left ventricular
      4    function and ejection fractions. Correct?
      5    A: Yes.
      6    Q: And that's one of the ways that you measure how
      7    well that the heart is functioning?
      8    A: Yes.
      9    Q: And it's also a predictor of what may happen in
      10   terms of progression of disease in the future for patients
      11   who have heart attacks. Right?
      12   A: Yes.
      13   Q: And here in this test the ejection fraction was
      14   what?
      15   A: Fifty-five percent.
      16   Q: And is that an ejection fraction that's less than
      17   what we looked at previously?
      18   A: It is, but this is a different test than the left
      19   ventriculargram. On a nuclear study, the number may be a
      20   little bit lower. So perhaps down to 50 percent would be
      21   normal on a nuclear study because they're not exactly
      22   equivalent.
      23   Q: All right. But if we also look under the stress
      24   Cardiolite summary section, it indicates borderline stress
      25   myocardial perfusion study with possible small apical

Printed: 10/3/2006   8:58:07AM

*Overruled*

Re: 113:23 - 114:8
Def Obj: Leading,
foundation
          Pts.Resp.:
Rule 611

allows for leading
when necessary to develop
the witness testimony which
was proper here. The question is not
really new leading

**Symkoviak, Gary 2006-07-10**

| 114: | 1 | infarct, and that's actually the damage that you were |
| | 2 | talking about at the apex of the left ventricle. Correct? |
| | 3 | MR. KRUMHOLZ: Objection. Form. |
| | 4 | A: That's correct. That's what we've seen on |
| | 5 | previous studies. |
| | 6 | Q: And that defect or damage to Mr. Mason's heart |
| | 7 | still exists as of the time of this test in April of 2005? |
| | 8 | A: That's true. |
| | 9 | Q: And do you believe in reasonable medical |
| | 10 | probability it still exists in him today? |
| | 11 | A: Yes. |
| | 12 | Q: Okay. And it's not something that's likely to go |
| | 13 | away, is it? |
| | 14 | A: Once you have a myocardial infarction and damage |
| | 15 | the muscle it never recovers function -- the dead cells |
| | 16 | never recover. It's dead and it becomes scar, and that's |
| | 17 | permanent. |
| | 18 | Q: All right. It is – it is a nonfunctioning part |
| | 19 | at the apex of his left ventricle. |
| | 20 | A: That's – |
| | 21 | MR. KRUMHOLZ: Objection. Form. |
| | 22 | A: That is correct. |
| | 23 | Q: All right. And do you believe it's in reasonable |
| | 24 | medical probability likely that Mr. Mason will have |
| | 25 | progression of disease as a result of this finding? |
| 115: | 1 | MR. KRUMHOLZ: Objection. Form. |
| | 2 | A: I don't again know the answer to that. Depends |
| | 3 | again on these preexisting risk factors and what we've |
| | 4 | modified and what we can modify. If he had none except for |
| | 5 | Vioxx and we've stopped that, then that's good. If he had |
| | 6 | none and not Vioxx, then we've changed nothing. If they |
| | 7 | have some factors and we can modify them, that's good. So |
| | 8 | depends on what his real risk factors were and have we |
| | 9 | changed any. |
| | 10 | Q: Do we agree -- |
| | 11 | MR. KRUMHOLZ: Objection. Nonresponsive. |
| | 12 | Q: (By MR. NABERS)  Do we agree that his heart |
| | 13 | condition, though, is one that needs to be medically |
| | 14 | monitored over the course of his life? |
| | 15 | A: Yes. |
| | 16 | MR. NABERS: Thank you. That's all I have. |
| | 17 | EXAMINATION |
| | 18 | BY MR. KRUMHOLZ: |
| | 19 | Q: Doctor, I only have a few follow-up questions. |
| | 20 | First of all, after a heart attack, a heart can function |
| | 21 | normally. True? |
| | 22 | A: As far as certain measurements, it may look |
| | 23 | normal. There may be segments that do not work. |
| | 24 | Q: But in terms of blood flow which is the most |
| | 25 | important aspect of the function of the heart, it can |

Overrule

Re: 114:18-114:22
Def Obj: Leading,
foundation
(Same as prior)

**Symkovlak, Gary 2006-07-10**

Symkovlak PA PC DA DC on 10-3                                    116

| 116: | 1 | function normally after a heart attack -- |
| | 2 | A:  If we're talking -- |
| | 3 | Q:  -- true? |
| | 4 | A:  If we're talking about cardiac output, you could |
| | 5 | have a normal cardiac output with a damaged heart, that's |
| | 6 | correct. |
| | 7 | Q:  And, in fact, you can have normal cardiac output |
| | 8 | all the way through a normal life expectancy after a heart |
| | 9 | attack. True? |
| | 10 | A:  That's a possibility. You would certainly be at |
| | 11 | risk of future events, though. |
| | 12 | Q:  But certain -- |
| | 13 | THE VIDEOGRAPHER:  Excuse me. Something is |
| | 14 | buzzing. |
| | 15 | THE WITNESS:  Maybe that's me. Is that me? It's |
| | 16 | me. How do I turn this thing off? |
| | 17 | Q:   (By MR. KRUMHOLZ)  And, Doctor, you've seen |
| | 18 | patients in your practice have a full life all the way up to |
| | 19 | their life expectancy after a heart attack. True? |
| | 20 | A:  I have seen some do that. |
| | 21 | Q:  And, in fact, the perfusion studies that we've |
| | 22 | seen with respect to Mr. Mason give him a good chance of |
| | 23 | having just that type of outcome. |
| | 24 | A:  These studies are only really predictive for two |
| | 25 | years. |
| 117: | 1 | Q:  But regardless, those were good outcomes in terms |
| | 2 | of perfusion studies. |
| | 3 | A:  It would give us a good prognosis for the next two |
| | 4 | years. There's no warranty beyond that time. |
| | 5 | Q:  And you were -- are hopeful, given those studies, |
| | 6 | that his prognosis will continue to improve or continue to |
| | 7 | be good. |
| | 8 | A:  Continue to be good we would hope, yes. |
| | 9 | Q:  In terms of life expectancy and quality of life. |
| | 10 | True? |
| | 11 | A:  That's correct. |
| | 12 | Q:  Okay. Can we agree that high cholesterol is a |
| | 13 | risk factor in the acceleration of atherogenesis? |
| | 14 | A:  That's correct. |
| | 15 | Q:  That is well accepted in the community. |
| | 16 | A:  Yes. |
| | 17 | Q:  You've seen no records that indicate that |
| | 18 | Mr. Mason did indeed have high cholesterol? |
| | 19 | A:  I have not seen any records. |
| | 20 | Q:  Are you aware that he is own Zocor? |
| | 21 | A:  He may be now. I don't know that he was before. |
| | 22 | Q:  And Zocor is a cholesterol-lowering drug. Is that |
| | 23 | right? |
| | 24 | A:  It is. |
| | 25 | Q:  But regardless, the plaintiff's attorneys have not |

*Handwritten annotation:*
Re: 116:13- 116:16
Def Obj: Remove
Sidebar

π agrees

Printed: 10/3/2006   8:58:07AM

**Symkoviak, Gary 2006-07-10**

Symkoviak PA PC DA DC on 10-3                                        118

| | | |
|---|---|---|
| 118: | 1 | shown you any records that indicate -- or lab results that |
| | 2 | indicate that indeed he had high cholesterol prior to his |
| | 3 | myocardial infarction or heart attack -- |
| | 4 | MR. NABERS: Objection to the form. |
| | 5 | Q: (By MR. KRUMHOLZ) -- true? |
| | 6 | A: I have not seen any records. |
| | 7 | Q: If they exist, they have not provided that |
| | 8 | information to you. |
| | 9 | A: I have not seen any. |
| | 10 | MR. NABERS: Objection to the form. |
| | 11 | Q: (By MR. KRUMHOLZ) And that would be important for |
| | 12 | you to know if you were going to assess whether or not |
| | 13 | Mr. Mason was at risk for a heart attack prior to July of |
| | 14 | 2003. True? |
| | 15 | MR. NABERS: Objection to the form. |
| | 16 | A: Yes. |
| | 17 | Q: That would be information that you would want to |
| | 18 | know. |
| | 19 | A: Yes. |
| | 20 | Q: Likewise, can we agree that high blood pressure |
| | 21 | can accelerate the formation of atherosclerosis? |
| | 22 | A: Yes. |
| | 23 | Q: That is well known in the medical community. |
| | 24 | A: Yes. |
| | 25 | Q: That is not subject to debate in the medical |
| 119: | 1 | community. |
| | 2 | A: No. |
| | 3 | Q: And you have not been provided by the plaintiff's |
| | 4 | lawyers or otherwise any records that show prior to his |
| | 5 | heart attack that he had high blood pressure. |
| | 6 | A: That's correct. |
| | 7 | MR. NABERS: Objection to the form. |
| | 8 | Q: (By MR. KRUMHOLZ) That is, Mr. Mason had high |
| | 9 | blood pressure. You haven't been shown those documents. |
| | 10 | MR. NABERS: Objection to the form. |
| | 11 | A: Well, let me maybe clarify. I've reviewed the |
| | 12 | histories that have been taken on him, and that -- those |
| | 13 | things were not mentioned in any histories. |
| | 14 | Q: You've not seen the records of Dr. Vogeler. True? |
| | 15 | A: No. |
| | 16 | Q: You understand that is his internist. |
| | 17 | A: I -- well, I think he's a family doctor. |
| | 18 | Q: Or family practitioner, fair enough. You have not |
| | 19 | seen -- |
| | 20 | A: I have not seen -- |
| | 21 | Q: -- his family practitioner's records. True? |
| | 22 | A: I have not. |
| | 23 | Q: And that -- a family practitioner is generally the |
| | 24 | doctor who sees a patient on an ongoing basis. True? |
| | 25 | A: Correct. |

## Symkoviak, Gary 2006-07-10

120:
1  Q: But regardless, you have not been shown any
2  records from Mr. Mason's past medical history that indicate
3  that he had hypertension.
4  A: No, I have not.
5  Q: And if he has hypertension, that would be
6  important for you to know if you were going to assess his
7  risk factors.
8  MR. NABERS:  Objection to the form.
9  A: That would be a risk factor that we would want to
10  know.
11  Q: And before you were going to decide whether or not
12  he was significantly at risk for a heart attack, that's
13  something you would want to know.
14  MR. NABERS:  Objection to the form.
15  A: Yes.
16  Q: But regardless, you have not been shown those by
17  Mr. Nabers.
18  MR. NABERS:  Objection to the form.
19  A: That's correct.
20  Q: True?
21  A: That's correct.
22  MR. NABERS:  Same objection.
23  Q:  (By MR. KRUMHOLZ)  Now, you do know that Mr. Mason
24  is overweight, and you can check your records.
25  A: Yes.

121:
1  Q: What is his height and weight?
2  A: We have him as 5'9' and 220.
3  Q: Would it surprise you to know that Mr. Mason has
4  testified that for the past decade he has been about 5'9',
5  5'10', obviously, but weighed between 225 and 235 pounds?
6  MR. NABERS:  Objection to the form.
7  A: Yeah, I don't have any information on that.
8  Q: Regardless, based upon your own records, would you
9  considered Mr. Mason to be obese?
10  A: Yes.
11  Q: And obesity is likewise a significant risk factor
12  for heart disease.
13  MR. NABERS:  Objection to the form.
14  A: That is a risk factor, yes.
15  Q: And that is something you have to consider in
16  determining whether somebody is at risk for a heart attack.
17  A: Yes.
18  Q: And it's your understanding that he was obese long
19  before he ever took Vioxx. True?
20  A: Well, I don't have that information.
21  Q: But, regardless, you're not trying to suggest that
22  his obesity has anything to do with Vioxx. Right?
23  A: No.
24  Q: Is that correct?
25  A: That's correct.

**Symkoviak, Gary 2006-07-10**

| | | |
|---|---|---|
| 122: | 1 | Q: Okay. And that's information you would need to |
| | 2 | assess in determining whether or not someone was at risk for |
| | 3 | a heart attack. |
| | 4 | A: That would be one of many factors, yes. |
| | 5 | Q: Including high cholesterol and hypertension or |
| | 6 | high blood pressure as we've discussed. |
| | 7 | A: That's correct. |
| | 8 | Q: In addition, depression has been associated with |
| | 9 | the development of cardiovascular disease. True? |
| | 10 | A: Well, I wouldn't agree with that. |
| | 11 | Q: Have you looked at studies in that regard? |
| | 12 | A: Yes, I've seen those, and I don't think that -- |
| | 13 | you see, there are significant risk factors, and then there |
| | 14 | are minor risk factors, and personally, and I think in our |
| | 15 | practice, we don't think the minor ones are that important. |
| | 16 | Q: What is metabolic syndrome? |
| | 17 | A: Well, it's a syndrome of obesity and glucose |
| | 18 | intolerance and a big waist and it has -- |
| | 19 | Q: The factors for metabolic syndrome, sir, are high |
| | 20 | triglycerides. True? |
| | 21 | A: Uh-huh. |
| | 22 | MR. NABERS: Objection to the form. |
| | 23 | Q: (By MR. KRUMHOLZ) Is that yes? |
| | 24 | A: Correct. |
| | 25 | Q: Together with obesity. True? |
| 123: | 1 | A: Yes. |
| | 2 | MR. NABERS: Objection to the form. |
| | 3 | A: Yes. |
| | 4 | Q: And what are the other factors? |
| | 5 | A: Well, large waist and glucose intolerance. |
| | 6 | Q: Okay. And do you know whether or not Mr. Mason |
| | 7 | fits that description? |
| | 8 | A: I do not. |
| | 9 | Q: Okay. That would be important for you to know |
| | 10 | before deciding what caused his heart attack. True? |
| | 11 | MR. NABERS: Objection to the form. |
| | 12 | A: Well, I have the lipid profile at the time of his |
| | 13 | admission, and I don't believe his triglycerides were |
| | 14 | elevated at that time. |
| | 15 | Q: But, again, you were not provided any labs from, |
| | 16 | for example, Dr. Vogeler's records that indicate that his |
| | 17 | triglycerides were increased. |
| | 18 | MR. NABERS: Objection to the form. |
| | 19 | A: My testimony is based only on the medical records |
| | 20 | in the hospitals. |
| | 21 | Q: And it would surprise you if there are labs that |
| | 22 | indicate his triglycerides are increased. True? |
| | 23 | MR. NABERS: Objection. Form. |
| | 24 | A: It wouldn't surprise me. It's just that I have |
| | 25 | not seen any records to suggest that, and the patient never |

**Symkoviak, Gary 2006-07-10**

124: 1   provided any history to the doctors in the hospital about
2   that.
3   (Exhibit No. 17 marked)
4   Q:   (By MR. KRUMHOLZ)   Doctor, I'm going to hand you
5   what's been marked as Exhibit No. 17. Did the plaintiff's
6   attorneys brother to provide you with those labs?
7   MR. NABERS:  Objection to the form.
8   A:  I have not seen this lab.
9   Q:  Did the plaintiff's attorneys provide you with
10   those -- that document?
11   A: No.
12   MR. NABERS:  Objection to the form.
13   Q:   (By MR. KRUMHOLZ)   What was the answer?
14   A: No.
15   Q:  If you could turn to the second page, it says,
16   'Values outside reference ranges.' It indicates, does it
17   not, that he had a high serum cholesterol? True?
18   A:  Well --
19   Q:  Mr. Mason.
20   A:  Yeah, I see what you're looking at. It says --
21   Q:  Does it not indicate that he has a high serum
22   cholesterol?
23   MR. NABERS:  Objection to the form.
24   A:  Well, that's what the lab test suggests.
25   Q:  Does it also state that he has low HDL?

125: 1   A:  Yeah. But as a clinician I don't think this is
2   significant.
3   Q:  Do you know whether or not he had a history of low
4   HDL?
5   A:  I only have the history in the charts.
6   Q:  And is it a bad thing to have consistent readings
7   of low HDL?
8   A:  Thirty-nine would not concern me.
9   Q:  Would it concern you if historically his HDL was
10   low and -- 39 and lower?
11   MR. NABERS:  Objection to the form.
12   A:  Lower would be more concerning, like in the 20s
13   would be more concerning. Thirty-nine is borderline because
14   normal is 40, so we're almost normal. Cholesterol of 201 is
15   one over normal, and an LDL of 124 is not significantly
16   elevated either.
17   Q:  Well, actually normal is 100, true, for LDL?
18   A:  No, it's not.
19   Q:  That's not what you consider optimal?
20   A:  No. That's not the national guidelines.
21   Q:  And that's not what you as a cardiologist believe
22   is optimal LDL --
23   A:  No --
24   Q:  -- or bad cholesterol?
25   A:  -- national guidelines say it's 130.

## Symkoviak, Gary 2006-07-10

126: 1   Q: Now, you indicated earlier that you did not
2   believe Mr. Mason had a family history suggestive of a risk
3   factor. Is that right?
4   A: That's what the record --
5   MR. NABERS: Objection to the form.
6   A: That's what the records say.
7   Q: That's according to Mr. Mason and the hospital
8   records. Is that right?
9   A: That's correct.
10   MR. NABERS: Objection to the form.
11   Q: (By MR. KRUMHOLZ) Were you aware that according to
12   his own writing his sister had a heart attack in her 60s?
13   A: No --
14   MR. NABERS: Objection to the form.
15   A: -- that's not what the hospital records say.
16   Q: So that would surprise you.
17   A: That would surprise me.
18   Q: But regardless, that would be an additional
19   factor. True?
20   MR. NABERS: Objection to the form.
21   A: That would be a risk factor.
22   Q: That would be something important for you to
23   assess in determining whether Mr. Mason was at risk for a
24   heart attack.
25   MR. NABERS: Objection to the form.
127: 1   A: That's correct.
2   Q: And it would be something you would need to know
3   before deciding what caused Mr. Mason's heart attack.
4   MR. NABERS: Objection to the form.
5   A: Correct.
6   Q: Stress can also be a significant risk factor in
7   connection with heart disease. True?
8   MR. NABERS: Objection to the form.
9   A: No.
10   Q: It can -- it is a risk factor. True?
11   A: It's a risk factor, but it's not a significant
12   risk factor.
13   Q: Okay. But you do agree that the medical experts
14   such as you believe that stress can accelerate
15   atherogenesis.
16   A: It's a very minor risk factor, and we personally
17   don't think it's a significant risk factor.
18   Q: Do you know if sleep apnea has any effect on risk
19   factors for heart disease?
20   MR. NABERS: Objection to the form.
21   A: Heart disease is a bit vague. Sleep apnea results
22   in cardiac arrhythmias and can result in congestive heart
23   failure. I'm not aware of any connection to
24   atherosclerosis.
25   Q: Is it unusual for folks with hypertension, high

Printed: 10/3/2006   8:58:07AM

## Symkoviak, Gary 2006-07-10

128:
| | |
|---|---|
| 1 | cholesterol, who are obese and with a family history to have |
| 2 | heart attacks? |
| 3 | A: Well, those would -- |
| 4 | MR. NABERS: Objection to the form. |
| 5 | A: Those things you mentioned are the stronger risk |
| 6 | factors. |
| 7 | Q: And so, therefore, it's not unusual for patients |
| 8 | who have those risk factors to indeed have heart attacks -- |
| 9 | MR. NABERS: Objection to the form. |
| 10 | Q: (By MR. KRUMHOLZ) -- true? |
| 11 | A: That's correct. |
| 12 | Q: In fact, it would not be surprising for someone |
| 13 | with those risk factors to have a heart attack. Correct? |
| 14 | MR. NABERS: Objection to the form. |
| 15 | A: Correct. |
| 16 | Q: And you see that all the time in your practice. |
| 17 | Is that right? |
| 18 | MR. NABERS: Objection to the form. |
| 19 | A: Yes. Yes. |
| 20 | Q: Frequently? |
| 21 | A: People I see with heart attacks have those type of |
| 22 | risk factors, yes. |
| 23 | MR. KRUMHOLZ: Pass the witness. |
| 24 | (Exhibit No. 18 marked) |
| 25 | EXAMINATION |

129:
| | |
|---|---|
| 1 | BY MR. NABERS: |
| 2 | Q: Doctor, I apologize. I just have one more exhibit |
| 3 | that I want to mark as Deposition Exhibit No. 18. |
| 4 | THE VIDEOGRAPHER: Mr. Nabers. |
| 5 | MR. NABERS: Okay. I'm sorry, Mr. Getz. Is that |
| 6 | better? |
| 7 | THE VIDEOGRAPHER: Thank you. |
| 8 | Q: (By MR. NABERS) Doctor, I've marked as Deposition |
| 9 | Exhibit No. 18 a Framingham risk assessment that came off |
| 10 | the International Task Force for the Prevention of Coronary |
| 11 | Heart Disease. Do you see that? |
| 12 | A: Yes. |
| 13 | Q: All right. And are you familiar with that entity? |
| 14 | A: I've seen these risk things before, yes. |
| 15 | Q: And you're aware that the Framingham Heart Study |
| 16 | is a long-term nationally recognized heart study? |
| 17 | A: Yes. |
| 18 | Q: All right. It's been published in many different |
| 19 | peer-reviewed journals. Correct? |
| 20 | A: Yes. |
| 21 | Q: All right. And in looking at this, this at the |
| 22 | top says, 'Framingham risk assessment.' Do you see that? |
| 23 | A: Yes. |
| 24 | Q: And it says, 'Your risk of developing a heart |
| 25 | attack or dying from coronary heart disease,' and it says, |

**Symkoviak, Gary 2006-07-10**

130:
1  'The next 10 years.' Do you see that?
2  A: Yes.
3  Q: It says, 'This program estimates your risk of
4  developing a heart attack or dying from coronary heart
5  disease within 10 years. This formula is based on a score
6  developed in the Framingham Heart Study USA.' Did I read
7  that right?
8  A: Yes.
9  Q: Are you familiar with this?
10  A: Yes.
11  Q: All right. And this one I actually did for
12  Mr. Mason.
13  MR. KRUMHOLZ: Objection. Form and to the use in
14  light of the fact that it was created by Mr. Nabers.
15  Q:   (By MR. NABERS)  And he was 61 at the time of his
16  heart attack. Do you see where it says age?
17  A: Yes.
18  Q: And sex I put male. Do you see that?
19  A: Yes.
20  Q: And for age at 61 he gets a 10 in terms of his
21  risk factor score. Do you see that?
22  A: Yes.
23  Q: And then for cholesterol we actually used the
24  number that was shown to you in the prior exhibit from
25  Dr. Vogeler. Do you see that?

131:
1  A: Yes.
2  Q: And it was -- we listed 201, and that just gave
3  him a risk numerical figure of one. Do you see that?
4  A: Yes.
5  Q: And then we also used the HDL cholesterol number
6  of 39 from Dr. Vogeler's records. Do you see that?
7  A: Yes.
8  Q: That gave him a numerical risk factor score of
9  two.
10  A: Yes.
11  Q: Under systolic blood pressure we used the one when
12  he came to see you. He had a normal blood pressure then.
13  Correct?
14  MR. KRUMHOLZ: Objection. Form. Can I have a
15  running objection to this exhibit and these questions?
16  MR. NABERS: No. You can just object.
17  Q:   (By MR. NABERS)  In any event, the 114 would be a
18  normal systolic blood pressure. Correct?
19  A: Yes.
20  Q: All right. Tablets for high blood pressure, he
21  wasn't taking any. Are you aware of him ever taking any --
22  MR. KRUMHOLZ: Objection. Form.
23  Q: -- high blood pressure medications prior to his
24  heart attack?
25  A: The histories do not reflect that.

**Symkoviak, Gary 2006-07-10**

| | | |
|---|---|---|
| 132: | 1 | Q: All right. |
| | 2 | MR. KRUMHOLZ: Objection. Nonresponsive. |
| | 3 | Q:   (By MR. NABERS)  He hadn't stopped smoking — |
| | 4 | strike that. |
| | 5 | He had not smoked within the last year, so |
| | 6 | cigarette smoking I put no. Do you see that? |
| | 7 | MR. KRUMHOLZ: Objection. Form. |
| | 8 | A: Yes. |
| | 9 | Q: Okay. And then his total score there turned out |
| | 10 | to be 13. Is that correct? |
| | 11 | MR. KRUMHOLZ: Objection. Form. |
| | 12 | A: Yes. |
| | 13 | Q: And it says underneath that, 'Your risk of |
| | 14 | developing a heart attack or dying from coronary heart |
| | 15 | disease in the next year is 12 percent.' Do you see that? |
| | 16 | MR. KRUMHOLZ: Objection. Form. |
| | 17 | A: Yes. |
| | 18 | Q: And then it says, 'A risk above 20 percent in 10 |
| | 19 | years is regarded as high.' Do you see where I read that? |
| | 20 | MR. KRUMHOLZ: Objection. Form. |
| | 21 | A: Yes. |
| | 22 | Q: So he had a very low risk index according to the |
| | 23 | Framingham Heart Study. Correct? |
| | 24 | MR. KRUMHOLZ: Objection. Form. |
| | 25 | A: Well, I don't see that it says low, but it says it |
| 133: | 1 | would indicate it's not high. |
| | 2 | Q: Okay. But that's essentially what you've been |
| | 3 | trying to testify to in this deposition. Correct? |
| | 4 | MR. KRUMHOLZ: Objection. Form. |
| | 5 | A: Yes. |
| | 6 | MR. NABERS: Okay. That's all I have. Thank you. |
| | 7 | EXAMINATION |
| | 8 | BY MR. KRUMHOLZ: |
| | 9 | Q: Can I see that last exhibit? Doctor, Exhibit 18 |
| | 10 | was something prepared by Mr. Nabers according to |
| | 11 | Mr. Nabers. True? |
| | 12 | A: That's what he said, yes. |
| | 13 | Q: You have no idea of the reliability of the numbers |
| | 14 | that he decided to put into the Framingham analysis. True? |
| | 15 | A: Well, that's not correct. We've seen the numbers |
| | 16 | from Exhibit 17 that he plugged in here. |
| | 17 | Q: You don't know whether or not his high blood |
| | 18 | pressure was no, true, or was only 114, do you? |
| | 19 | A: We know from record that on the time I saw him it |
| | 20 | was 114. |
| | 21 | Q: This record makes an assumption that he did not |
| | 22 | have hypertension prior to his heart attack. True? |
| | 23 | MR. NABERS: He didn't. |
| | 24 | MR. KRUMHOLZ: Objection to sidebar. |
| | 25 | MR. NABERS: It wasn't loud enough to be heard. |

**Symkoviak, Gary 2006-07-10**

Symkoviak PA PC DA DC on 10-3                                    134

| 134: | |
|---|---|
| | 1   MR. KRUMHOLZ: Objection to sidebar. |
| | 2   MR. NABERS: It wasn't loud enough to be heard. |
| | 3   MR. KRUMHOLZ: Objection to coaching. |
| | 4   A: It doesn't ask that question. It asks the blood |
| | 5   pressure at the time that he was seen and whether he was |
| | 6   taking medicine for high blood pressure. That's what the |
| | 7   test asks. |
| | 8   MR. KRUMHOLZ: Objection. Nonresponsive. |
| | 9   Q:  (By MR. KRUMHOLZ)  Do you -- was this Framingham |
| | 10   analysis performed with information after his heart attack? |
| | 11   A: Yes. |
| | 12   Q: So this is an indication of any risk of future |
| | 13   heart attack? True? |
| | 14   A: This -- let's see. |
| | 15   Q: Not from prior to his heart attack -- |
| | 16   A: The information as far as -- |
| | 17   Q: -- as far as you understand? |
| | 18   A: Let's clarify it. The information from Exhibit 17 |
| | 19   came before his heart attack. It's dated 2002. |
| | 20   Q: Do you know if all of the information that is |
| | 21   contained on Exhibit 18 came from information prior to his |
| | 22   heart attack? Do you know? |
| | 23   A: Did not all come prior. |
| | 24   Q: You did not do -- it did not all come from prior. |
| | 25   True? |

| 135: | |
|---|---|
| | 1   A: That's correct. |
| | 2   Q: You did not perform this analysis? |
| | 3   A: I did not. |
| | 4   Q: You have not confirmed whether Mr. Nabers has done |
| | 5   the appropriate calculation in that regard. True? |
| | 6   A: I've not done that. |
| | 7   Q: And so you cannot stand behind this percentage or |
| | 8   any of these conclusions that are reached by Mr. Nabers in |
| | 9   Exhibit 18. True? |
| | 10   A: I have to assume that the data entry was correct. |
| | 11   Q: And you have not done any confirmation of that -- |
| | 12   A: I have not -- |
| | 13   Q: -- at this stage? |
| | 14   A: I have not done that. |
| | 15   Q: It's true that Mr. Mason had significant coronary |
| | 16   artery disease prior to his heart attack. |
| | 17   A: He would have had to have had it prior to his |
| | 18   heart attack -- |
| | 19   Q: And it's your opinion that that was the cause of |
| | 20   Mr. Mason's heart attack -- |
| | 21   MR. NABERS: Objection. |
| | 22   Q:  (By MR. KRUMHOLZ)  -- the coronary artery disease? |
| | 23   MR. NABERS: Objection to the form -- |
| | 24   A: Correct. |
| | 25   MR. NABERS: -- misstates the evidence. |

Printed: 10/3/2006   8:58:07AM

*Overruled*

Re 135: 19-22
Pl's Obj.: Vague, ambiguous,
argumentative, speculation

Def's response: none
needed

**Symkoviak, Gary 2006-07-10**

Symkoviak PA PC DA DC on 10-3                                                          136

136:    1    A:  Correct.
        2    Q:  And the extent of his coronary artery disease was
        3    undiagnosed until his cardiac catheterization on July 25th
        4    of 2003. True?
        5    A:  Correct.
        6    Q:  And if Mr. Mason had not had a heart attack in
        7    July of 2003 and you understood the extent of his
        8    atherosclerosis, you would have recommended a stent and
        9    angioplasty just as he had done in July of 2003.
        10   MR. NABERS:  Objection to the form. Asked and
        11   answered.
        12   Q:   (By MR. KRUMHOLZ)  True?
        13   A:  Can we back up to the previous question?
        14   Q:  I want to get an answer to this one first.
        15   A:  Okay. Ask me the second one because I'm still
        16   thinking about the previous once.
        17   Q:  If Mr. Mason did not have a myocardial infarction
        18   or heart attack in July of 2003 but you knew the extent of
        19   his coronary artery disease, via heart scan or otherwise,
        20   you would have recommended that he have a stent placed and
        21   an angioplasty of his left anterior descending and the
        22   diagonal artery.
        23   MR. NABERS:  Objection to the form.
        24   A:  If we had known that before his heart attack.
        25   Q:  Yes.
137:    1    A:  You realize that we have a test from 2002 which
        2    was normal.
        3    MR. KRUMHOLZ:  I'll object as nonresponsive.
        4    Q:   (By MR. KRUMHOLZ)  If you knew just prior to his
        5    heart attack that he had the extent of coronary artery
        6    disease that was present that you now know he had, you would
        7    have recommended a stent in his left anterior descending and
        8    an angioplasty of his diagonal artery. True?
        9    MR. NABERS:  Objection to the form.
        10   A:  Just prior, yes, that's correct.
        11   Q:  And he got the stent that he really needed in that
        12   regard. True?
        13   A:  Well --
        14   Q:  That's just a medical fact. Right?
        15   MR. NABERS:  Objection to the form.
        16   A:  Well, it was too late.
        17   MR. KRUMHOLZ:  I'll object as nonresponsive.
        18   A:  He's already --
        19   Q:  Doctor --
        20   MR. NABERS:  Hey, he can finish his answer. Come
        21   on.
        22   MR. KRUMHOLZ:  He can answer my question.
        23   A:  He's already had damage.
        24   MR. KRUMHOLZ:  Objection. Nonresponsive.
        25   Q:   (By MR. KRUMHOLZ)  He got the stent that he needed

## Symkoviak, Gary 2006-07-10

138:
1   even prior to his heart attack. True?
2   MR. NABERS: Objection to the form.
3   A: You said that he got the stent that he needed
4   prior to his heart attack --
5   Q: Well --
6   A: -- that's not true.
7   Q: It was a poorly worded question. He ultimately
8   got the stent that he needed. True?
9   A: After the heart attack.
10  Q: Right.
11  A: But that didn't prevent the damage.
12  Q: And there's no evidence that the heart attack has
13  caused permanent damage from a perspective of a normal
14  functioning heart.
15  MR. NABERS: Objection to the form.
16  A: Well, that's not true. There is segmental wall
17  damage which has been well demonstrated. The overall
18  function is normal, but there's still segmental wall damage.
19  That's not a normal heart.
20  MR. KRUMHOLZ: Pass the witness.
21  MR. NABERS: I don't have anything further,
22  Doctor. Thanks for your time.
23  THE VIDEOGRAPHER: It's 40 minutes after
24  5:00 o'clock. This concludes the deposition.
25  (The proceeding was adjourned at 5:40 p.m.)

139:
1   C E R T I F I C A T E
2   STATE OF UTAH      )
3   COUNTY OF SALT LAKE )
4   THIS IS TO CERTIFY that the sworn testimony of GARY
5   Registered Professional Reporter, and Notary Public in and
6
7   duly sworn to testify the truth in said cause.
8   That said testimony was reported by me and thereafter
9   correct transcription of said testimony is set forth in the
10
11  nor deponent having requested on the record the right to
12  sealed and returned to the attorney noticing the deposition.
13  I further certify that I am not of kin or otherwise
14  and that I am not interested in the event thereof.
15  WITNESS MY HAND and official seal at Salt Lake City,
16
17
18
19  Diane W. Flanagan
20
21  My notary commission expires:
22
23
24
25