**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3

4

4:  1   No. 21    Comparison of Upper            109
    2   Gastrointestinal Toxicity of
    3   Rofecoxib and Naproxen in
    4   Patients with Rheumatoid
    5   Arthritis
    6   No. 22    3/13/00 E-mail to Scolnick and    125
    7   Nies from Reicin
    8   No. 23    E-mail Chain            131
    9   No. 24    4/28/00 Merck News Release       133
   10   No. 25    Warning Letter          140
   11   No. 26    5/22/01 Merck News Release       146
   12   No. 27    10/29/90 Office Visit       153
   13   No. 28    9/17/02 Exercise Stress Test       168
   14   No. 29    Second Amended Cross-Notice of    177
   15   Oral and Videotaped Deposition
   16   and Subpoena Duces Tecum of
   17   Douglas M. Vogeler, M.D.
   18   No. 30    Binder Provided to Dr. Vogeler       179
   19   by Mr. Nabers
   20   No. 31    Celebrex Package Insert      206
   21   No. 32    4/6/05 Memo from Dr. Jenkins and    212
   22   Dr. Seligman
   23
   24
   25

5:  1       PROCEEDINGS
    2       THE VIDEOGRAPHER: Today is the 26th day of
    3       July 2006. It's 17 minutes after 8:00 a.m. and we're
    4       on the record.
    5       EXAMINATION
    6       BY MR. NABERS:
    7    Q.  Good morning, Dr. Vogeler.
    8    A.  Good morning.
    9    Q.  Could you please state your name for the
   10       record.
   11    A.  Douglas Malcolm Vogeler.
   12    Q.  Dr. Vogeler, my name is Scott Nabers and I'm
   13       a lawyer from Houston, Texas and I represent Charles
   14       Mason in a case that he has against the manufacturer
   15       of Vioxx.
   16       Do you understand it's in connection with
   17       that case of Mr. Mason that you're here today to give
   18       deposition testimony?
   19    A.  Yes.
   20    Q.  Okay. Do you understand that today's
   21       testimony can be used in the court in front of a jury
   22       just as if you were going to be testifying live
   23       wherever this trial is held? Are you aware of that?
   24    A.  Yes.
   25    Q.  Okay. I'm going to be asking you questions

**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3

6

| 6: | 1 | today about Mr. Mason, about your diagnosis, care and |
| | 2 | treatment of him, as well as general questions about |
| | 3 | your practice here in the state of Utah. Let me just |
| | 4 | begin by asking you, first of all, where are we today |
| | 5 | taking your deposition? |
| | 6 | A. We're in Sandy, Utah. |
| | 7 | Q. All right. And your office address is what? |
| | 8 | A. 9600 South 1300 East, Suite 303, again, |
| | 9 | Sandy, area code 84094. |
| | 10 | Q. Okay. And the way this process works -- let |
| | 11 | me just ask you, have you ever been deposed before? |
| | 12 | A. Yes. |
| | 13 | Q. Okay. Have you been deposed recently? |
| | 14 | A. Maybe six months ago. |
| | 15 | Q. Okay. So you have a general understanding of |
| | 16 | what we're going to be doing here today? |
| | 17 | A. Yes. |
| | 18 | Q. The only thing that I would ask of you is if |
| | 19 | I ask you a question that you don't understand or that |
| | 20 | you would like for me to rephrase, if you'll just |
| | 21 | please ask me to do so, I'll be happy to do that. |
| | 22 | Okay? |
| | 23 | A. Okay. |
| | 24 | Q. If you go ahead and answer the question, I'm |
| | 25 | going to just assume that you've just given me your |
| 7: | 1 | best answer to the question that I've asked. Okay? |
| | 2 | A. Okay. |
| | 3 | Q. If we could refrain from talking over each |
| | 4 | other while the court reporter is trying to take |
| | 5 | everything down, it makes it a lot easier for her. |
| | 6 | Likewise, what you may want to do is, after my |
| | 7 | question, pause just a second before you give your |
| | 8 | answer because sometimes the lawyers will have an |
| | 9 | objection. That's for a later hearing with the judge |
| | 10 | and for purposes of the record, but that way we won't |
| | 11 | talk over each other as we go forward. Okay? |
| | 12 | A. Okay. |
| | 13 | Q. All right. Feel free to take a break any |
| | 14 | time that you would like, if you need to answer a |
| | 15 | page, if you need to answer a phone call. You're not |
| | 16 | our prisoner here and we appreciate your time here |
| | 17 | today. Okay? |
| | 18 | A. Thank you. |
| | 19 | MR. KRUMHOLZ: Scott, all objections except |
| | 20 | as to form and responsiveness will be reserved until |
| | 21 | trial? |
| | 22 | MR. NABERS: That's been our agreement and |
| | 23 | will stay the same. |
| | 24 | Q. (By Mr. Nabers) Now, Dr. Vogeler, you and I |
| | 25 | have had an opportunity to meet each other previously, |

*[handwritten: Overruled]*

*[handwritten: Re: 7:24-8:6 Def Obj: 403 pg resp: This is just laying a foundation for the witness's testimony. Its in no way prejudicial]*

**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3                                                    8

| 8: | 1 | correct? |
|---|---|---|
| | 2 | A. Yes. |
| | 3 | Q. All right. And we had an opportunity to |
| | 4 | discuss your care and treatment of Mr. Mason; is that |
| | 5 | correct? |
| | 6 | A. Yes. |
| | 7 | Q. Have you had an opportunity to meet with |
| | 8 | anyone else regarding Mr. Mason's case? |
| | 9 | A. No. |
| | 10 | Q. All right. For example, nobody, or lawyers |
| | 11 | from Merck, have ever called you to ask if they could |
| | 12 | meet with you, correct? |
| | 13 | A. No. |
| | 14 | Q. And you've certainly not ever told the |
| | 15 | lawyers from Merck that you wouldn't meet with them, |
| | 16 | correct? |
| | 17 | MR. KRUMHOLZ: Objection, form. |
| | 18 | A. Can I answer now? |
| | 19 | MR. KRUMHOLZ: You know we're not allowed to |
| | 20 | meet with the doctors. |
| | 21 | Q. (By Mr. Nabers) You can answer. |
| | 22 | A. No. |
| | 23 | Q. All right. And I have never told you that |
| | 24 | you could not meet with the lawyers for Merck, |
| | 25 | correct? |
| 9: | 1 | MR. KRUMHOLZ: Same objection. |
| | 2 | A. No. |
| | 3 | Q. (By Mr. Nabers) All right. Now, let me show |
| | 4 | you what I want to mark today as Deposition Exhibit |
| | 5 | No. 1, which is actually just a copy of your |
| | 6 | deposition notice for today. |
| | 7 | (Exhibit No. 1 marked.) |
| | 8 | Q. (By Mr. Nabers) Have you had an opportunity |
| | 9 | to see that previously? |
| | 10 | A. I believe so. |
| | 11 | Q. All right. In any event, you agree to be |
| | 12 | present today at the current time to give this |
| | 13 | deposition in Mr. Mason's case, correct? |
| | 14 | A. Correct. |
| | 15 | Q. All right. Now, one of the things that we |
| | 16 | wanted to see if we could get from you is a copy of |
| | 17 | your resume, and I think your office is trying to do |
| | 18 | that now; is that correct? |
| | 19 | A. They are making it right now. |
| | 20 | Q. Okay. So we'll come back and visit about |
| | 21 | that in just a second. |
| | 22 | But in any event, you have been a treating |
| | 23 | physician for Mr. Charles Mason; is that correct? |
| | 24 | A. Correct. |
| | 25 | Q. How long have you been a treating physician |

## Vogeler D 20060726.ctx

24:
1   occasionally on Medicare patients, maybe.
2   Q. All right. And so Ms. Olson or Nurse Olson,
3      she can see patients just as you can?
4   A. Yes.
5   Q. She can diagnose medical conditions just like
6      you?
7   A. Yes.
8   Q. She can make treatment recommendations for
9      patients just like you?
10  A. Yes.
11  Q. All right. Are you required in the state of
12     Utah to review and sign her medical charts?
13  A. No.
14  Q. Do you have any type of supervisory role over
15     her?
16  A. Yes. She works for me.
17  Q. I understand, but in terms of the way the
18     state of Utah looks at it from a medical regulation
19     perspective, is she free and independent or do you
20     need to supervise her for her to continue doing what
21     she does?
22     MR. KRUMHOLZ: Objection, form.
23  A. No, she can be free and independent. She
24     just contracts with me.
25  Q. (By Mr. Nabers) Okay. So it's fair to say

25:
1      that you do not have to supervise and review her
2      charts as a part of kind of the legal standard for
3      Utah?
4      MR. KRUMHOLZ: Objection, form.
5   A. Correct.
6   Q. (By Mr. Nabers) You only do that because she
7      works for you on a contract basis at the clinic?
8   A. Correct.
9   Q. Okay. So when she prescribes a drug to a
10     patient like Vioxx, does that mean that you're
11     involved in the prescription or does that just mean
12     she wrote the prescription on her own?
13  A. She wrote it on her own.
14  Q. Okay. With regard to Mr. Mason getting
15     prescriptions of Vioxx, he was your patient as well,
16     correct?
17  A. Correct.
18  Q. All right. Do you guys ever talk about
19     treatment recommendations for patients that I guess
20     you both see at some point in time?
21  A. Sure.
22  Q. Okay. Like for Mr. Mason, you're his family
23     physician and you see him in the office a lot,
24     correct?
25  A. Correct.

Re: 25:4
DerObj: Remove Objection
(π agree)

**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3

34

| | | |
|---|---|---|
| 34: | 1 | A. Correct. |
| | 2 | Q. And that label will contain things like |
| | 3 | indications and contraindications and precautions and |
| | 4 | warnings and the such, correct? |
| | 5 | A. Yes. |
| | 6 | Q. So it's a quick ready reference for |
| | 7 | physicians to go and look if they want to look up |
| | 8 | specifically something about a risk or benefit of a |
| | 9 | drug they may prescribe, correct? |
| | 10 | A. Correct. |
| | 11 | Q. All right. Prior to Vioxx coming on the |
| | 12 | market in 1999, obviously you became aware of the |
| | 13 | label for the drug, correct? |
| | 14 | A. Yes. |
| | 15 | Q. Would you have reviewed that label that |
| | 16 | contained those risks and benefits before prescribing |
| | 17 | it to whoever your first patient was that got Vioxx? |
| | 18 | A. I don't read the whole insert, but usually I |
| | 19 | read the literature that comes out along with it, |
| | 20 | either in the medical literature or whatever the drug |
| | 21 | reps present to me in terms of data and studies that |
| | 22 | have been done to support their claims of what the |
| | 23 | drug can do. |
| | 24 | Q. Okay. And did you understand that kind of |
| | 25 | one of the major benefits or why Vioxx was out there |
| 35: | 1 | was because the idea was that it would help reduce GI |
| | 2 | bleeds and those associated complications of patients |
| | 3 | taking that drug? |
| | 4 | A. Yes. |
| | 5 | Q. Okay. Now, at some point, though, in the |
| | 6 | spectrum of -- did you come to understand that Vioxx |
| | 7 | was withdrawn from the market? |
| | 8 | A. Yes. |
| | 9 | Q. All right. And did you come to have an |
| | 10 | understanding of why Vioxx was withdrawn from the |
| | 11 | market? |
| | 12 | A. Yes. |
| | 13 | Q. And what is your understanding of why Vioxx |
| | 14 | was withdrawn from the market in September of 2004? |
| | 15 | MR. KRUMHOLZ: Objection, form. |
| | 16 | A. An increased cardiovascular risk of MIs. |
| | 17 | Q. (By Mr. Nabers) Okay. And do you know when |
| | 18 | it was that you first learned about the risk of MIs, |
| | 19 | myocardial infarctions, associated with Vioxx, when |
| | 20 | that information first came to you? |
| | 21 | MR. KRUMHOLZ: Objection, form. |
| | 22 | A. When was it withdrawn, about September? |
| | 23 | Q. (By Mr. Nabers) Uh-huh (affirmative). |
| | 24 | A. I would say in the late spring. I think |
| | 25 | there was a study from Kaiser Permanente that showed |

Printed: 10/3/2006   9:03:26AM

Overrule

① Re: 35:9-14
Def Obj: FOUNDATION; (1-2).
NO PROPER PREDICATE
This witness is a high
prescriber of Vioxx who
Merch sales rep's called
on hundreds of times.
He has reviewed the Vioxx
② Re: 35:16
Def Obj: Nonresponsive
literature; FOUNDATION med. literature
and was well
aware of why
Vioxx was taken
from the market. In fact
he had to inform his patients
of why Vioxx was
withdrawn so he
has good foundation for
such testimony.



*[Handwritten annotations at top:]* Try to be reasonable by it. + give attys. some leeway, to + leading Qs. to sophisticated witnesses. can But this does not mean attys. testify for witness. Particularly true on significant + disputed issues

Vogeler D 20060726.ctx

Vogeler PA PC DA DC on 10-3

46:
1  Q.  And do you remember what they told you around
2      that time frame about the withdrawal of the drug?
3  A.  I don't recall specifically what was said.
4      Usually they'll just come and say it's being
5      withdrawn. They'll give us information maybe that we
6      can send out to patients who were on it. I think I
7      had a little sheet about that. They give us
8      instructions on sending back samples. I think they
9      had a program that they were going to credit people
10     for -- who had leftover Vioxx tablets if they wanted
11     to get credit for their remaining medications.
12 Q.  All right. If we look at this press release
13     that's there in front of you, in the second paragraph
14     the second sentence starts, "In this study" -- and
15     they are specifically talking about the APPROVe study,
16     and that was actually a study that Merck had for
17     adenomatous polyp prevention on Vioxx. Are you
18     familiar with that study, the APPROVe study?
19 A.  You know, only the summary. I knew what they
20     were trying to do. They were trying to show that
21     anti-inflammatories decrease the incidence of
22     colorectal polyps or adenomas.
23 Q.  Do you know if you've ever had an opportunity
24     to review the APPROVe study as it was published?
25 A.  Not that I recall.

47:
1  Q.  Okay. In any event, the press release says
2      that "In this study," and they are referencing the
3      APPROVe study, "there was an increased relative risk
4      for confirmed cardiovascular events, such as heart
5      attack and stroke." Do you see where I've read that?
6  A.  Yes.
7  Q.  All right. And did any of the sales reps
8      from Merck when they came to see you around September
9      of 2004, did they ever tell you that that was the
10     reason the drugs were being withdrawn from the market?
11     MR. KRUMHOLZ: Objection, form.
12 A.  You mean because of the results from the
13     APPROVe study?
14 Q.  (By Mr. Nabers) Right.
15 A.  I'm sure they said something to that effect.
16     Vioxx was the one -- Merck was the one who withdrew
17     it, and so they would have come around and said, hey,
18     the results of this study showed some increased risk
19     and so Merck was withdrawing the drug.
20 Q.  Okay. Do you remember, though, that the
21     reason for the drug being withdrawn in September of
22     2004 was because of the relative risk for a confirmed
23     cardiovascular event such as heart attack and stroke?
24     Was that your understanding?
25 A.  Yes.

Printed: 10/3/2006   9:03:26AM

*[Handwritten annotations right side:]* Sustained

Re: 47:20-25 Def. Obj: Leading; Foundation; no personal knowledge

Same as prvd (R. 34)

Rule 611 allows for leading questions when necessary to develop a witnesses testimony.

## Vogeler D 20060726.ctx

54: 1    going to give me their biased opinions.
2   Q. Okay.  And you've heard the term fair
3      balance?
4   A. Yes.
5   Q. All right.  Do you believe that when sales
6      reps would come to call on you about Merck, that you
7      would get fair balance, that is, that they would tell
8      you about the risks and they would tell you about the
9      benefits or did they just focus more on promoting the
10     product?
11     MR. KRUMHOLZ: Objection, form.
12  A. I think they are fairly obligated to present
13     a fair balance of what they're allowed to promote from
14     the information they are given.
15  Q. (By Mr. Nabers)  And you would certainly
16     expect them not only to tell you about the benefits,
17     but about any serious risks that they're aware of with
18     the drugs, correct?
19  A. Yes.
20  Q. All right.  Would you also expect that the
21     promotional material that they left behind about their
22     drugs like Vioxx, would you expect that information to
23     be truthful and accurate in the information it
24     provides on risks and benefits?
25  A. Sure.

55: 1   Q. Okay.  I take it you wouldn't expect for the
2      information that Merck leaves, whether it be in the
3      form of promotional material or otherwise, you
4      wouldn't expect that information to be false or
5      misleading with regard to risk or benefit information,
6      correct?
7   A. Correct.
8   Q. All right.  Let me show you what I want to
9      mark as the next exhibit, which is Deposition Exhibit
10     No. 10.
11     (Exhibit No. 10 marked.)
12  Q. (By Mr. Nabers)  And let me ask you if you're
13     familiar — within the FDA there's a regulatory
14     department called the Division of Drug Marketing,
15     Advertising and Communications at the FDA.  Are you
16     familiar with that group?
17  A. No.
18  Q. That group is responsible for monitoring
19     promotional pieces put out by specific drug companies
20     on individual drugs.  Have you ever heard of that
21     before?
22     MR. KRUMHOLZ: Objection, form.
23  A. I haven't heard of that particular
24     organization.. I know they monitor them and I know
25     there's certain requirements about advertising of

Printed: 10/3/2006   9:03:26AM

[Handwritten annotations:]

Sustained
Witness doesn't
know

Pl's Resp to ①②+
③ - witness
familiar with
each drug +
prescribed a
majority of them.
Documents show
Merck's pattern
+ how Merck promoted
drugs including
Vioxx which is
highly relevant to
this Case. Probative value outweighs
any possible prejudicial
effect.

① Re: 55:12-16
  Def Obj: Missing Answer
  Re: 55:12-16
  Def Obj: 403 Questioning
  witness highly vague
  when re other Merck
  products that has nothing
  to do w/ Vioxx. Witness has
  Never said that Merck generally
  since there is no foundation
  for the questioning.
② Re: 55:18-21
  Def Obj: Same as 55:12-16
③ Re: 55:23-51:22
  Def Obj: Same as 55:12-16

## Vogeler D 20060726.ctx

Vogeler PA PC DA DC on 10-3                                                   56

| | | |
|---|---|---|
| 56: | 1 | medications. |
| | 2 | Q. (By Mr. Nabers)  All right.  And do you |
| | 3 | generally have an understanding that there are federal |
| | 4 | rules, laws and regulations governing how a drug |
| | 5 | company can market or promote particular products? |
| | 6 | A. Yes. |
| | 7 | Q. All right.  Let me show you what I've marked |
| | 8 | as Deposition Exhibit No. 10.  If we look at |
| | 9 | Deposition Exhibit No. 10, do you see up there in the |
| | 10 | right-hand corner it says Food & Drug Administration, |
| | 11 | Rockville, Maryland? |
| | 12 | A. Yes. |
| | 13 | Q. All right.  And what's the date of Deposition |
| | 14 | Exhibit No. 10? |
| | 15 | A. June 16th, 1998. |
| | 16 | Q. All right.  And do you see that this letter |
| | 17 | from the FDA is written to a fellow by the name of |
| | 18 | David Anstice, who it says is president of the U.S. |
| | 19 | Human Health Division at Merck? |
| | 20 | A. Yes. |
| | 21 | Q. All right.  And we see there that it says |
| | 22 | Warning Letter, correct? |
| | 23 | A. Correct. |
| | 24 | Q. And you're familiar with the drug Pepcid, |
| | 25 | right? |
| 57: | 1 | A. Right. |
| | 2 | Q. Are you familiar with the drug Indocin? |
| | 3 | A. Yes. |
| | 4 | Q. Are you familiar with the drug Cozaar? |
| | 5 | A. Yes. |
| | 6 | Q. Are you familiar with the drug Hyzaar? |
| | 7 | A. Yes. |
| | 8 | Q. And you're familiar with the drug Primaxin? |
| | 9 | A. Less so. |
| | 10 | Q. Okay.  If we look at this letter, it |
| | 11 | indicates there in the first paragraph, "This warning |
| | 12 | letter addresses Merck & Co.'s dissemination of select |
| | 13 | promotional materials for its products, Pepcid, |
| | 14 | Indocin, Cozaar, Hyzaar and Primaxin."  Do you see |
| | 15 | where I've read that? |
| | 16 | A. Yes. |
| | 17 | Q. All right.  And if we look at the third |
| | 18 | sentence it says, "DDMAC has concluded that Merck's |
| | 19 | promotional material cited below are misleading and |
| | 20 | lacking in fair balance in violation of the Federal |
| | 21 | Food, Drug and Cosmetic Act."  Do you see where I've |
| | 22 | read that? |
| | 23 | MR. KRUMHOLZ: Objection. |
| | 24 | A. Yes. |
| | 25 | Q. (By Mr. Nabers)  All right.  Then they go on |

Printed: 10/3/2006   9:03:26AM

Re: 55:23-57:22
Def Obj: Same As
55:12-16

Sustained

Re: 57:24
Def Obj: Same As
55:12-16

**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3

58

| 58: | 1 | in the same paragraph to say, "Despite numerous |
| | 2 | interactions between DDMAC and Merck, DDMAC has reason |
| | 3 | to believe that Merck has engaged in and continues to |
| | 4 | engage in the dissemination of promotional materials |
| | 5 | that lack fair balance and thus violate the Act." Do |
| | 6 | you see that? |
| | 7 | A. Yes. |
| | 8 | MR. KRUMHOLZ: I want to note for the record |
| | 9 | that I object to the use of documents, A, out of |
| | 10 | context, B, unrelated to Vioxx, and C, without full |
| | 11 | context for the doctor. That's a running objection. |
| | 12 | MR. NABERS: And since you're going to have |
| | 13 | an objection to the next 15, do you want to just -- |
| | 14 | I'll just let you have that running objection so you |
| | 15 | don't have to do it every time. |
| | 16 | MR. KRUMHOLZ: No, let's do it one by one. |
| | 17 | Q. (By Mr. Nabers) Okay. I mean, when we talk |
| | 18 | about fair balance, Doctor, what we're talking about |
| | 19 | is that's where the drug information is presented with |
| | 20 | both the benefits and the risks, correct? |
| | 21 | MR. KRUMHOLZ: Same objections. |
| | 22 | A. Correct. |
| | 23 | Q. (By Mr. Nabers) All right. And I think it |
| | 24 | was your testimony that when you receive promotional |
| | 25 | information from drug companies, you expect that |
| 59: | 1 | information to be true and accurate, correct? |
| | 2 | A. Yes. |
| | 3 | Q. And you don't expect it to be false or |
| | 4 | misleading, correct? |
| | 5 | A. Well, I know they're going to paint them in |
| | 6 | as positive a light as they can, so -- but not |
| | 7 | misleading. |
| | 8 | Q. Okay. And not false, correct? |
| | 9 | A. Or false. |
| | 10 | Q. All right. Let me show you what I want to |
| | 11 | mark as the next exhibit to your deposition. |
| | 12 | And while I'm getting the next exhibit, are |
| | 13 | many of those drugs that we just looked at on that |
| | 14 | warning letter, are those drugs that you prescribe? |
| | 15 | A. Yes. |
| | 16 | MR. KRUMHOLZ: Objection, form. |
| | 17 | Q. (By Mr. Nabers) Are those drugs that Merck |
| | 18 | sales reps have come and talked to you about in the |
| | 19 | past? |
| | 20 | A. Yes. |
| | 21 | MR. KRUMHOLZ: Objection, form. |
| | 22 | Q. (By Mr. Nabers) Are those drugs that you |
| | 23 | prescribe that Merck's sales reps would have left |
| | 24 | promotional materials on in the past? |
| | 25 | MR. KRUMHOLZ: Objection, form. |

*Handwritten annotations:*

Re: 58:1-7
Def Obj: Same as 55:12-16
P's Response: same as 55:12-16

P's Resp: This is laying a proper foundation for the questions to come and putting the issue in the proper context.

Re: 58:17-20
Def Obj: Leading; Cumulative of 53:17-55:17

Re: 58:22-59:9
Def Obj: Leading; Cumulative of 53:17-55:17
(Same)

Overruled

Re: 59:10-15
Def Obj: Same as 55:12-16
P's Resp: Same as 55:12-16

Re: 59:17-20
Def Obj: Same as 55:12-16
P's Resp: Same as 55:12-16

Re: 59:22-24
Def Obj: Same as 55:12-16
P's Resp: Same as 55:12-16

## Vogeler D 20060726.ctx

Vogeler PA PC DA DC on 10-3                                        60

60:
```
 1    A.  Yes.
 2    Q.  (By Mr. Nabers)  Let me ask you one other
 3         thing about Exhibit 10 there in front of you.  Do you
 4         see the bottom subparagraph where it says Background?
 5    A.  Yes.
 6    Q.  It says, "Issues concerning reasonably
 7         comparable presentations of fair balance information
 8         are not new issues relating to Merck's promotional
 9         materials.  To the contrary, such issues have been
10         raised in regard to promotional materials for a
11         variety of products and suggest a corporate policy
12         towards minimizing the presentation of such
13         disclosures."  Do you see that?
14    A.  Yes.
15    Q.  All right.  Do you expect, though, that drug
16         companies, when they come and talk to you about
17         specific drugs like Vioxx or some of these listed in
18         the letter, do you expect that the information you get
19         is going to minimize the risk?
20         MR. KRUMHOLZ:  Objection, form.
21    A.  Yeah, I expect them to minimize the risk.
22    Q.  (By Mr. Nabers)  Does that cause you concern?
23         MR. KRUMHOLZ:  Objection, form.
24    A.  No.  I just take it into account, you know.
25    Q.  (By Mr. Nabers)  And why do you expect that
```

61:
```
 1         the information you get from the drug company is going
 2         to minimize the risk?
 3         MR. KRUMHOLZ:  Objection, form.
 4    A.  Because they are trying to promote the drug.
 5    Q.  (By Mr. Nabers)  Right.  But as the
 6         prescriber, that risk is important to you, correct?
 7    A.  Correct.
 8    Q.  And do you agree that for your patient, that
 9         risk is important to your patient?
10    A.  Correct.
11    Q.  All right.  And isn't it best for you to have
12         as much information that you can about risk in order
13         for you to make the best risk-benefit assessment for
14         your patient?
15    A.  Yes.
16    Q.  Okay.  Let me show you —
17    A.  I kind of take that into account.  I know
18         when the pharmaceutical rep comes in to talk about a
19         product, they're going to paint it in as positive a
20         light as they can.
21    Q.  Okay.  All right.
22         Let me show you what I want to mark as the
23         next one, which will be Deposition Exhibit No. 11.
24         (Exhibit No. 11 marked.)
25    Q.  (By Mr. Nabers)  Again, Doctor, this is
```

Printed: 10/3/2006   9:03:26AM

Re: 60:1-14
Def Obj: Same
As 55:12-16

P's Resp:
Same as
55:12-16

Sustained

Re: 61:4-15
Def Obj: Leading   P's Resp:
These questions are
not leading but Rule
611 allows for leading
when its necessary to
develop the testimony
or where the witness
is adverse.  Both apply
here.  Dr. Vogeler has
concern that his practice
could be implicated in
this case.

Re: 61:24-62:4
Def Obj: Same
As 55:12-16

P's Resp:
Same as
55:12-16

Sustained

**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3                                                     62

| | |
|---|---|
| 62: | 1 |

```
 1    another letter from the FDA, specifically the Division
 2    of Drug Marketing and Advertising, with regard to
 3    Merck's promotion of Trusopt. Are you familiar that
 4    that's an ophthalmic solution?
 5    MR. KRUMHOLZ: I'll again object to the use
 6    of the document. It has nothing to do with Vioxx.
 7    It's taken out of context. It does not show what the
 8    ultimate resolution with the FDA was in connection
 9    with this document. It has nothing to do with this
10    doctor's care and treatment of the patient in question
11    and is taken completely out of context.
12    Q.  (By Mr. Nabers)  Do you see this letter from
13         the FDA to Merck is about Trusopt?
14    A.  Yes.
15    Q.  And if we look at the first paragraph, do you
16         see it indicates in the third sentence that "The
17         Division of Drug Marketing, Advertising and
18         Communications (DDMAC) regards the promotional
19         material to be false and/or misleading under the
20         Federal Food, Drug and Cosmetic Act"?  Do you see
21         where I've read that?
22    A.  Yes.
23    Q.  This kind of goes along with what we have
24         been talking about.  I mean, if there are federal laws
25         that regulate the promotion of drugs, you would
```

63:
```
 1    certainly expect Merck to be in compliance with that,
 2    correct?
 3    A.  Yes.
 4    Q.  Again, for promotional pieces that come to
 5         physicians such as yourself who are prescribing drugs,
 6         you would not expect them to be false or misleading
 7         with regard to the risk information or the benefit
 8         information, correct?
 9    A.  Correct.
10    Q.  Let me show you what I want to mark as the
11         next exhibit to your deposition, which is Deposition
12         Exhibit No. 12.
13         (Exhibit No. 12 marked.)
14    Q.  (By Mr. Nabers)  Again, Deposition Exhibit
15         No. 12 is another letter from the FDA to Merck dated
16         March 14th, 1997. Let me hand you that.
17    MR. KRUMHOLZ: Objection, form. Objection to
18    the use of a document that is unrelated to this
19    physician's treatment of the patient in question, is
20    taken out of context, is irrelevant for any purposes
21    and tells only a piece of the story with respect to
22    the subject matter contained in it.
23    Q.  (By Mr. Nabers)  All right.  Doctor, as we
24         look at this deposition exhibit, do you see where
25         re is?  It's regarding Prinivil.
```

Printed: 10/3/2006   9:03:26AM

*Handwritten annotations:*

Sustained

Re: 62:13-63:12
Def·Obj: Same
As 55:12-16

P's Resp:
same as
55: 12-16

Sustained

Re: 63:14-16
Def·Obj: Same
As 55:12-16

P's Resp:
same as
55: 12-16

Re: 63:23-65:12
Def·Obj: Same
As 55:12-16

P's Resp:
same as
55: 12-16

Sustained

**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3                                                    64

| 64: | 1 | A. | Yes. |
|---|---|---|---|
| | 2 | Q. | All right.  And you understand what Prinivil |
| | 3 | | is, right? |
| | 4 | A. | Yes. |
| | 5 | Q. | And you've prescribed Prinivil in the past? |
| | 6 | A. | Tons. |
| | 7 | Q. | What does Prinivil do? |
| | 8 | A. | It's a blood pressure medicine, ACE |
| | 9 | | inhibitor. |
| | 10 | Q. | Why do you prescribe that to patients? |
| | 11 | A. | To control blood pressure. |
| | 12 | Q. | So would sales reps from Merck have come and |
| | 13 | | called on you about Prinivil? |
| | 14 | A. | Yes. |
| | 15 | Q. | Would they have left promotional materials |
| | 16 | | behind about Prinivil? |
| | 17 | A. | Yes. |
| | 18 | Q. | Okay.  Do you happen to recall any |
| | 19 | | promotional material with regard to Prinivil and the |
| | 20 | | fact that Merck used Cal Ripken to help sponsor or |
| | 21 | | promote the drug? |
| | 22 | A. | Yes. |
| | 23 | Q. | It says in the third paragraph, specifically |
| | 24 | | talking about the Cal Ripken promotional pieces, that |
| | 25 | | "These promotional materials are false and/or |
| 65: | 1 | | misleading because of the presentation of Cal Ripken, |
| | 2 | | Jr. in association with Prinivil."  Do you see where |
| | 3 | | I've read that? |
| | 4 | A. | Yes. |
| | 5 | Q. | It says in the next sentence, "In these |
| | 6 | | promotional materials, it appears that Mr. Ripken is |
| | 7 | | endorsing Prinivil.  However, Mr. Ripken does not take |
| | 8 | | Prinivil and does not have hypertension."  Do you see |
| | 9 | | where I've read that? |
| | 10 | A. | Yes. |
| | 11 | Q. | Were you ever made aware of that? |
| | 12 | A. | No, not that I know of. |
| | 13 | Q. | Again, though, as a prescriber of a drug like |
| | 14 | | Prinivil, you wouldn't expect Merck to mislead or |
| | 15 | | misrepresent or provide false information with regard |
| | 16 | | to the promotional materials for Prinivil, correct? |
| | 17 | | MR. KRUMHOLZ: Objection, form. |
| | 18 | A. | Well, I can tell you I never prescribed |
| | 19 | | Prinivil because Ripken took it. |
| | 20 | Q. | (By Mr. Nabers)  I understand.  But you would |
| | 21 | | agree with me that patients could see the commercial |
| | 22 | | with regard to Cal Ripken, correct? |
| | 23 | A. | Correct. |
| | 24 | Q. | And patients might want to come in and ask |
| | 25 | | you if Prinivil would be good for them because the |

Re: 63:23-65:12          P's Resp:
Def Obj: Same as        Same as
55:12-16                 55:12-16
(?)

Sustained



*Sustained*

### Vogeler D 20060726.ctx

Vogeler PA PC DA DC on 10-3

66:

1  greatest baseball player, Cal Ripken, is on it, right?
2  MR. KRUMHOLZ: Object to the form.
3  A. Correct.
4  Q. (By Mr. Nabers) All right. Let me show you
5     what I want to mark as the next exhibit, which is
6     Deposition Exhibit No. 13.
7     (Exhibit No. 13 marked.)
8  Q. (By Mr. Nabers) Deposition Exhibit No. 13 is
9     another letter to Merck from the FDA, specifically the
10    DDMAC division, and this one is dated April 14th,
11    1997.
12    MR. KRUMHOLZ: I'll object again on the basis
13    that this witness has no personal knowledge of
14    anything contained in any of these documents. They
15    are taken out of context. They don't talk about
16    follow-up or resolution, and they certainly don't
17    discuss Vioxx as a treatment that this physician had
18    in connection with Mr. Mason or the issues in dispute.
19 Q. (By Mr. Nabers) This letter from the FDA to
20    Merck is dated what, Dr. Vogeler?
21 A. I see a stamp on it that says April 14th,
22    1997. I don't see any other date.
23 Q. Do you see it was written to a senior
24    director at Merck?
25 A. Yes.

67:

1  Q. All right. And do you see that it's
2     concerning the drug Fosamax?
3  A. Correct.
4  Q. Do you know what Fosamax is?
5  A. Yes.
6  Q. Do you ever prescribe Fosamax?
7  A. Yes.
8  Q. Have sales reps been in to talk to you about
9     Fosamax?
10 A. Yes.
11 Q. Have they left promotional material about
12    Fosamax?
13 A. Yes.
14 Q. It says here in the second paragraph of this
15    letter, it says, "The Division of Drug Marketing,
16    Advertising and Communications (DDMAC) has reviewed
17    this flashcard," which pertains to Fosamax, "and finds
18    that it is misleading and in violation of the Federal
19    Food, Drug and Cosmetic Act." Do you see where I've
20    read that?
21    MR. KRUMHOLZ: Objection, form.
22 A. Yes.
23 Q. (By Mr. Nabers) All right. And a flashcard
24    would be an example of a promotional piece left behind
25    for a drug, right?

Printed: 10/3/2006    9:03:26AM

Re: 66:4-6
Def Obj: Same
As 55:12-16

P's Resp:
Same as
55:12-16

Re: 66:8-11
Def Obj: Same
As 55:12-16

P's Resp:
Same as
55:12-16

Re: 66:19-67:20
Def Obj: Same
As 55:12-16

P's Resp:
Same as 55:12-16

*Sustained*

Re: 67:22-68:10
Def Obj: Same
As 55:12-16

P's Resp:
Same as
55:12-16

**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3                                    68



68:  1        MR. KRUMHOLZ:  Same objection.
     2   A.   Yes.
     3   Q.   (By Mr. Nabers)  And do you see that fairly
     4        routinely in your practice?
     5   A.   Yes.
     6   Q.   All right.  It says under Risk Information,
     7        the subheading there, it says, "The flashcard is
     8        misleading because it fails to present important risk
     9        information for Fosamax and thus lacks fair balance."
    10        Do you see that?
    11        MR. KRUMHOLZ:  Objection, form.
    12   A.   Yes.
    13   Q.   (By Mr. Nabers)  All right.  And, again, I
    14        take it that with regard to Fosamax, you would not
    15        have normally expected Merck to provide information in
    16        the way by promotion where the risk information was
    17        misleading, correct?
    18        MR. KRUMHOLZ:  Objection, form.
    19   A.   As I said, they tend to promote themselves.
    20        You just have to read the fine print.
    21   Q.   (By Mr. Nabers)  Let me show you what I want
    22        to mark as the next exhibit, which will be Deposition
    23        Exhibit No. 14.
    24        (Exhibit No. 14 marked.)
    25   Q.   (By Mr. Nabers)  And, again, this is another
    69:  1        letter —
     2        MR. KRUMHOLZ:  Before you start, can I just
     3        see it?
     4        MR. NABERS:  Sure.
     5   Q.   (By Mr. Nabers)  This is another letter from
     6        the FDA —
     7        MR. KRUMHOLZ:  Just one second.  Again, I'll
     8        object to this exhibit as it has nothing to do with
     9        Vioxx, this witness's treatment of Mr. Mason.  He has
    10        no personal knowledge of it, doesn't know the ultimate
    11        resolution with the FDA or the circumstances
    12        surrounding how the FDA deals with drug companies in
    13        connection with their promotional pieces.
    14   Q.   (By Mr. Nabers)  All right.  So let's see if
    15        I can start again now that we've got all the
    16        objections out.
    17        MR. KRUMHOLZ:  Objection, form.
    18   Q.   (By Mr. Nabers)  Deposition Exhibit No. 14,
    19        Dr. Vogeler, is dated July 2nd, 1997, and, again, it's
    20        another letter from the FDA to Merck concerning
    21        promotional materials.  Let me hand that to you.
    22        Do you see that this letter from the FDA is
    23        again written to the senior director at Merck?
    24        MR. KRUMHOLZ:  Objection, form.
    25   A.   Yes.

Printed: 10/3/2006   9:03:26AM

## Vogeler D 20060726.ctx

Vogeler PA PC DA DC on 10-3                                    70

```
70:   1    Q.  (By Mr. Nabers)  And this actually concerns
      2        the drug Zocor, correct?
      3    A.  Correct.
      4    Q.  Are you familiar with the drug Zocor?
      5    A.  Yes.
      6    Q.  Have you ever prescribed the drug Zocor?
      7    A.  Yes.
      8    Q.  And have sales reps from Merck come to talk
      9        to you about Zocor?
     10    A.  Yes.
     11    Q.  Would they have left promotional materials
     12        about Zocor?
     13    A.  Yes.
     14    Q.  Zocor is a popular drug, right?
     15    A.  Yes.
     16    Q.  What do you use it for?
     17    A.  Lowering cholesterol.
     18    Q.  All right.  And if we look at the first
     19        paragraph it says, "The Division of Drug Marketing,
     20        Advertising and Communications (DDMAC) has reviewed
     21        these flashcards and finds them in violation of the
     22        Federal Food, Drug and Cosmetic Act."  Do you see
     23        where I've read that?
     24    A.  Yes.
     25    Q.  All right.  Do you recall flashcards
71:   1        specifically about Zocor that would have been left
      2        behind by Merck sales reps?
      3        MR. KRUMHOLZ:  Objection, form.
      4    A.  I recall they have been left.  I don't recall
      5        the specific cards.
      6    Q.  (By Mr. Nabers)  Okay.  And if we look over
      7        at the third little bullet point on page 2, it says,
      8        "The claim that Zocor has been proven to reduce
      9        LDL-C to NCEP goal in a majority of patients
     10        juxtapositioned with the graphic showing that 92
     11        percent of patients require a less than 40 percent
     12        reduction is misleading because it overstates Zocor's
     13        efficacy by implying that Zocor brings most of the 92
     14        percent of patients to goal."
     15        Do you see where I've read that?
     16    A.  Yes.
     17    Q.  All right.  Do you, whenever sales reps come
     18        and talk to you or leave promotional materials, do you
     19        expect that the drug company is going to mislead you
     20        with regard to the efficacy of a particular drug like
     21        Zocor?
     22        MR. KRUMHOLZ:  Objection, form.
     23    A.  I just know they're going to present it in as
     24        positive a light as they can and with statistics you
     25        can prove about anything.  So I always have to take
```

Printed: 10/3/2006   9:03:26AM

Sustained

Re: 71:4-21
Det Obj: Same
As 55:12-16

P's Resp
Same as
55:12-16

Re: 71:23-72:13
Det Obj: Same
As 55:12-16

P's Resp.
55:12-16

**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3

72

72:
1  that into account whenever anybody is promoting a
2  material -- or promoting a medication. But, yes, I
3  would expect them to be fair, but I don't -- from an
4  ethics point of view, I expect them to be fair. From
5  a reality point of view, I don't. I expect them to
6  present it in as positive a light as they can. That
7  may mean highlight more of the positive stuff and put
8  in the small print the negative stuff.
9  Q. (By Mr. Nabers) Do you generally agree,
10  though, with the proposition that it's not good for
11  drug companies to mislead prescribing physicians such
12  as yourself about the risks or benefits of a drug you
13  may have prescribed?
14  MR. KRUMHOLZ: Objection, form.

15  A. Sure.
16  Q. (By Mr. Nabers) Okay. And it says in the
17  next little bullet point, it's talking about the
18  comparison between Lipitor, which is another drug like
19  Zocor, correct?
20  A. Correct.
21  Q. And it says, "These comparisons are
22  misleading because they imply that Zocor is safer and
23  more effective than Lipitor without adequate
24  supporting evidence." Do you do you see where I've
25  read that?

73:
1  A. Yes.
2  Q. Okay. Is that the kind of thing that you're
3  talking about is they kind of promote their drug in
4  the most favorable light so that maybe you'll use
5  their drug as compared to another competitor's drug?
6  MR. KRUMHOLZ: Objection, form.

7  A. Sure.
8  Q. (By Mr. Nabers) And do you see that all the
9  time in your practice?
10  A. Pretty frequently.
11  Q. Okay.
12  MR. KRUMHOLZ: I'll object to the last
13  question, form.
14  Q. (By Mr. Nabers) Do you think that it's
15  appropriate for a drug company to make unfounded
16  claims when there's not adequate supporting evidence
17  for the claims that they're making?
18  MR. KRUMHOLZ: Objection, form.
19  A. What was the question?
20  MR. NABERS: Do you mind reading it back?
21  "QUESTION: Do you think that it's
22  appropriate for a drug company to make unfounded
23  claims when there's not adequate supporting evidence
24  for the claims that they're making?"
25  A. No.

Printed: 10/3/2006   9:03:26AM

*Handwritten annotations in right margin:*

*Sustained*

*Re: 72:15-73:6*
*Def Obj: Same*
*As 55:12-16*
*(67)*

*P's Resp:*
*same as*
*55:12-16*

*Re: 73:7*
*Def Obj: Same*
*As 55:12-16*

*P's Resp:*
*same as*
*55:12-16*

*Re: 73:21-25*
*Def Obj: Same*
*As 55:12-16*

*P's Resp:*
*same as*
*55:12-16*

**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3

74

| | | |
|---|---|---|
| 74: | 1 | (Exhibit No. 15 marked.) |
| | 2 | Q. (By Mr. Nabers) Let me show you what I want |
| | 3 | to mark as the next exhibit, which is Deposition |
| | 4 | Exhibit No. 15. Let me hand this one to you. This is |
| | 5 | a letter -- |
| | 6 | MR. KRUMHOLZ: If you could wait until I have |
| | 7 | a chance to review it before you ask any questions. |
| | 8 | MR. NABERS: Well, I figured they all came |
| | 9 | from you, that you knew of them, but I'll wait. |
| | 10 | MR. KRUMHOLZ: I'll object to the use -- is |
| | 11 | this Exhibit 15? |
| | 12 | MR. NABERS: This is -- is this one 15, |
| | 13 | Doctor? |
| | 14 | THE WITNESS: Yes. |
| | 15 | MR. KRUMHOLZ: Object to Exhibit 15 because |
| | 16 | it is about a drug that has nothing to do with this |
| | 17 | lawsuit. It doesn't give full context as to |
| | 18 | discussions between the FDA and Merck and between -- |
| | 19 | and with Merck regarding how this was ultimately |
| | 20 | resolved. It hasn't laid the proper foundation as to |
| | 21 | the context of when letters like these are used by the |
| | 22 | FDA, what the appropriate responses were, and has |
| | 23 | nothing to do with this case or this witness's |
| | 24 | treatment of Mr. Mason. I also object because he |
| | 25 | doesn't have personal knowledge of it. |
| 75: | 1 | Q. (By Mr. Nabers) All right. Doctor, we've |
| | 2 | marked as Deposition Exhibit No. 15 another letter |
| | 3 | from the FDA to Merck dated October 20th, 1997, |
| | 4 | correct? |
| | 5 | A. Correct. |
| | 6 | Q. All right. And when we look at the re with |
| | 7 | regard to this letter to Merck, it's talking about the |
| | 8 | drugs Cozaar and Hyzaar, correct? |
| | 9 | A. Correct. |
| | 10 | Q. And you're familiar with those drugs? |
| | 11 | A. Yes. |
| | 12 | Q. You've prescribed those drugs? |
| | 13 | A. Yes. |
| | 14 | Q. Merck sales reps have come to see you about |
| | 15 | those drugs? |
| | 16 | A. Yes. |
| | 17 | Q. They would have left promotional pieces about |
| | 18 | those drugs? |
| | 19 | A. Yes. |
| | 20 | Q. And what are those drugs used for? Why do |
| | 21 | you prescribe them? |
| | 22 | A. High blood pressure. |
| | 23 | Q. All right. And if we look at this letter |
| | 24 | from the FDA, in the first sentence it says, "As part |
| | 25 | of its routine monitoring program, the Division of |

*Handwritten annotations in right margin:*

Sustained ✓

Re: 75:1 - 77:1
Dct Obj: Same
As 55:12-16
(ST)

P's Resp:
Same as
55:12-16

Printed: 10/3/2006   9:03:26AM

**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3

76



76:
1      Drug Marketing, Advertising and Communications (DDMAC)
2      has become aware of promotional materials for Cozaar
3      tablets and Hyzaar tablets by Merck & Co. that violate
4      the Federal Food, Drug and Cosmetic Act and its
5      regulations."  Do you see where I've read that?
6 A.   Yes.
7 Q.   Then a little further down it says, "DDMAC
8      has reviewed these promotional materials and
9      determined that they promote Cozaar and Hyzaar in a
10      manner which is considered false and/or misleading
11      because they are lacking in fair balance, or otherwise
12      misleading."  Do you see that?
13 A.   Yes.
14 Q.   Okay.  And, again, Merck sales reps would
15      have come and talked to you about those two drugs,
16      correct?
17 A.   Yes.
18 Q.   But, again, with regard to those two drugs,
19      the promotional materials that you would have
20      received, you didn't expect that they would be false,
21      correct --
22      MR. KRUMHOLZ:  Objection, form.
23 Q.   (By Mr. Nabers) — with regard to the
24      information they provided you?
25      MR. KRUMHOLZ:  Same objection.

77:
1 A.   Yes.
2 Q.   (By Mr. Nabers)  And do you agree from an
3      ethical standpoint that promotional materials
4      generally should not be false or misleading?
5      MR. KRUMHOLZ:  Objection, form.
6 A.   Yes.
7 Q.   (By Mr. Nabers)  I mean, it's hard for you to
8      rely on something and make a proper risk-benefit
9      assessment if it's false and misleading, correct?
10      MR. KRUMHOLZ:  Objection, form.
11 A.   Correct.
12 Q.   (By Mr. Nabers)  Let me show you what I want
13      to mark as the next exhibit, which will be Deposition
14      Exhibit No. 16.
15      (Exhibit No. 16 marked.)
16      MR. KRUMHOLZ:  I'll object to Deposition
17      Exhibit 16 because this witness has no personal
18      knowledge of the contents, it has nothing to do with
19      his treatment of Mr. Mason, it's irrelevant for
20      purposes of this lawsuit, it doesn't give context in
21      connection with the subject matter, doesn't talk about
22      the extent to which the issues discussed were worked
23      out with Merck or what the final resolution was.
24 Q.   (By Mr. Nabers)  Doctor, each of these
25      letters that we've looked at have dealt with

*Handwritten margin notes:*

Sustained

Re: 77:2-9
Def Obj:
Cumulative of
53:17 - 55:5

P's Resp:
Same as 55:12-16
This is not cumulative
b/c its place the issue in the
proper context

Re: 77:11
Def Obj: Cumulative of 53:17 - 55:5

Same

**Vogeler D 20060726.ctx**

78

Vogeler PA PC DA DC on 10-3

78: 1  particular drugs that you've prescribed over time,
2  correct?
3  A. Yes.
4  Q. And they've also dealt with drugs that you
5  prescribe that the Merck sales reps have come to call
6  on you for, correct?
7  A. Correct.
8  Q. And, also, all of these drugs have been
9  things that Merck sales reps have left behind
10  promotional pieces for, correct?
11  A. Correct.
12  Q. Some of them you even said you specifically
13  remember like the Cal Ripken, correct?
14  A. Yes.
15  Q. Let's talk about this one that we've marked
16  as the next exhibit. This one, again, is another
17  letter written to Merck dated January 26th, 1998,
18  correct?
19  A. Correct.
20  Q. And, again, this one looks like it's on
21  Zocor?
22  A. Yes.
23  Q. All right. And it indicates in this one that
24  "DDMAC has reviewed this material and has determined
25  that it is misleading in violation of the Federal
79: 1  Food, Drug and Cosmetic Act for the following
2  reasons." And we see right up there that what it's
3  talking about is a new indication card for the drug
4  Zocor. Do you see that?
5  A. Yes.
6  Q. It says, "The detail aid is misleading
7  because the risk information on the front side of the
8  card is not presented in a manner that is reasonably
9  comparable to the presentation of efficacy
10  information." Do you see where I've read that?
11  A. Yes.
12  Q. All right. I think we've established that
13  the fact is that promotional materials, we agree that
14  it's not good for them to be misleading if prescribing
15  physicians are going to review that information,
16  correct?
17  MR. KRUMHOLZ: Objection, form.
18  A. Yes.
19  Q. (By Mr. Nabers) All right. But in all of
20  these different letters that I've seen you -- that
21  I've showed you from the FDA, does it seem to be that
22  there is a pattern that Merck has of being false and
23  misleading with regard to the promotional pieces for
24  different drugs that you've prescribed?
25  MR. KRUMHOLZ: Objection, form. And I'll

*[Handwritten annotations in right margin:]*
Re: 78:15-79:16
Dft Obj: Same
As 55:12-16
P's Keep:
Same as
55:12-16

Sustained

Re: 79:18
Def Obj: Same
As 55:12-16
P's Resp:
Same as
55:12-16

**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3

(Handwritten, top right:) Objections on these pages are Sustained

| 80: | | |
|---|---|---|
| | 1 | object to that question because it doesn't give the |
| | 2 | witness the totality of the evidence or the |
| | 3 | circumstances, lacks foundation as to his |
| | 4 | understanding of when and why and how the FDA delivers |
| | 5 | letters and what's appropriate under the |
| | 6 | circumstances. Object to form. |
| | 7 | A. I don't know if I would go to the extreme of |
| | 8 | saying false and misleading. I would say that they |
| | 9 | are promotional pieces that want to promote the pluses |
| | 10 | over the minuses. Like I said, you have to look at |
| | 11 | the fine print usually to find the minuses. |
| | 12 | Q. (By Mr. Nabers) But if the FDA says that's a |
| | 13 | violation of the Act, that's not good, right? |
| | 14 | MR. KRUMHOLZ: Objection, form. |
| | 15 | A. Correct. |
| | 16 | Q. (By Mr. Nabers) Let me ask, I mean, you |
| | 17 | don't expect that the FDA ought to have to tell a drug |
| | 18 | company they need to be honest, right? |
| | 19 | MR. KRUMHOLZ: Objection, form. |
| | 20 | A. No, I would not expect that. |
| | 21 | Q. (By Mr. Nabers) You wouldn't expect the FDA |
| | 22 | to tell a drug company they need to be truthful with |
| | 23 | regard to risks and benefits they tell physicians like |
| | 24 | yourself about, right? |
| | 25 | MR. KRUMHOLZ: Objection, form. |
| 81: | 1 | A. Correct. |
| | 2 | Q. (By Mr. Nabers) And you wouldn't expect the |
| | 3 | FDA to tell companies like Merck that, hey, you need |
| | 4 | to be accurate with regard to the information you tell |
| | 5 | physicians about risks and benefits, correct? |
| | 6 | MR. KRUMHOLZ: Objection, form. |
| | 7 | A. Correct. |
| | 8 | Q. (By Mr. Nabers) Isn't the goal of all of |
| | 9 | this for prescribing physicians to have all of the |
| | 10 | accurate and current information so that they can make |
| | 11 | the best informed decision for their patients? |
| | 12 | A. Yes. |
| | 13 | Q. I mean, as a physician, isn't that what you |
| | 14 | want to do? |
| | 15 | A. Yes. |
| | 16 | Q. All right. I mean, because the goal here is |
| | 17 | to take care of the patient, correct? |
| | 18 | A. Correct. |
| | 19 | Q. All of these drugs that different drug |
| | 20 | companies like Merck puts out, the goal is there to |
| | 21 | ultimately help the patient by way of treatment, |
| | 22 | right? |
| | 23 | A. Yes. |
| | 24 | Q. Okay. The goal should not be to promote and |
| | 25 | sell more drugs, should it? |

Printed: 10/3/2006   9:03:28AM

(Handwritten right margin:)
Re: 80:16-18
Def Obj: Leading;
Argumentative

Re: 80:20-24
Def Obj: Leading;
Argumentative

Re: 81:1-6
Def Obj: Leading;
Argumentative

Re: 81:7-25
Def Obj: Leading;
Argumentative

P's response to (1)(2)(3)(4)
Question is not argumentative per 611(a) Since it seeks a real answer to the question. Questions are necessary to counter-act a misconception regarding P's counsel's notebook of documents provided to the witness. Questions are probative and not beyond the scope.

P would withdraw these questions if Δ withdraws their questions. P is just responding to accusations that P's counsel did something unseemly or wrong; Rule 611.

*Sustained*

**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3

82

```
82:  1              MR. KRUMHOLZ:  Objection, form.
     2    A. No.
     3    Q. (By Mr. Nabers)  All right.  And safety would
     4       be the most important thing in terms of the patient
     5       when you're evaluating whether you will or won't use a
     6       drug for a particular patient; is that correct?
     7    A. It's not the most important, it's just one of
     8       the things that we look at.  Efficacy would be another
     9       issue.  Some things aren't safe.  Chemotherapy agents
    10       aren't safe to take, but they get rid of cancer so you
    11       have to weigh the risks versus the benefits.
    12    Q. And you would do the same for Vioxx.  You
    13       need to weigh what the benefit of that drug is
    14       compared to what the risk of that drug is?
    15    A. Correct.
    16    Q. Okay.  Let me show you what I want to mark as
    17       the next exhibit, which is Deposition Exhibit No. 17.
    18       (Exhibit No. 17 marked.)
    19    Q. (By Mr. Nabers)  Again, this is another
    20       letter from the FDA to Merck dated June 4th, 1998.
    21       MR. KRUMHOLZ:  Before you ask any questions,
    22       can I get a copy?
    23       I'll object to the document as it does not
    24       represent the totality of the evidence, what happened
    25       with respect to the correspondence between Merck and
83:  1       the FDA concerning these other drugs that don't
     2       involve Vioxx, it's unrelated to this physician's
     3       treatment of Mr. Mason, is unrelated to Vioxx.  This
     4       physician doesn't have any knowledge, personal
     5       knowledge of the contents.  Lack of foundation.
     6    Q. (By Mr. Nabers)  All right, Doctor.  Again,
     7       this is another letter written from the FDA to Merck,
     8       correct?
     9    A. Correct.
    10    Q. Again, it's on those two drugs we talked
    11       about earlier, Cozaar and Hyzaar, right?
    12    A. Yes.
    13    Q. And we've seen other letters that the FDA has
    14       written specifically to Merck about these two drugs,
    15       right?
    16    A. Yes.
    17    Q. So the letters are continuing about these two
    18       drugs, correct?
    19    A. I'm unsure of the date on the other one, but
    20       I'll assume you're correct.
    21    Q. Right.  It says that "As part of its routine
    22       monitoring program, the Division of Drug Marketing,
    23       Advertising and Communications has become aware of
    24       promotional materials for Cozaar tablets and Hyzaar
    25       tablets by Merck & Co. that violate the Federal Food,
```

Printed: 10/3/2006   9:03:26AM

Re: 82:2
Def Obj: Leading;
Argumentative
(Same as P. 80)
P's Resp:
Same as Page 80 - 81

Re: 82:16 - 17
Def Obj: Same
As 55:12-16
(GT)

P's Resp:
Same as
55:12-16

Re: 83:16 - 84:16
Def Obj: Same
As 55:12-16
(GT)

P's Resp:
Same as
55:12-16

**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3

84

| 84: | | |
|---|---|---|
| | 1 | Drug and Cosmetic Act and its implementing |
| | 2 | regulations." Do you see that? |
| | 3 | A. Yes. |
| | 4 | Q. And specifically here they're talking about a |
| | 5 | journal ad, a slim jim, which is a promotional piece, |
| | 6 | that pertained to these two drugs. Do you see that in |
| | 7 | the middle body of the letter? |
| | 8 | A. Yes. |
| | 9 | MR. KRUMHOLZ: Objection, form. |
| | 10 | Q. (By Mr. Nabers) It says, "DDMAC has reviewed |
| | 11 | these promotional materials and determined that they |
| | 12 | promote Cozaar and Hyzaar in a manner which is |
| | 13 | considered false or misleading because they contain |
| | 14 | unsubstantiated patient compliance claims." |
| | 15 | Do you see where I've read that? |
| | 16 | A. Yes. |
| | 17 | Q. Again, do you think it would be appropriate |
| | 18 | for Merck to make claims about their drugs that are |
| | 19 | unsubstantiated? |
| | 20 | MR. KRUMHOLZ: Objection, form. |
| | 21 | A. What was the question? |
| | 22 | Q. (By Mr. Nabers) Do you think it is |
| | 23 | appropriate for drug companies like Merck to make |
| | 24 | claims about particular drugs -- here they are talking |
| | 25 | about Hyzaar and Cozaar -- when the claims that they |
| 85: | 1 | make have been unsubstantiated? |
| | 2 | MR. KRUMHOLZ: Objection, form. |
| | 3 | A. Yes. |
| | 4 | Q. (By Mr. Nabers) They shouldn't do that, |
| | 5 | right? |
| | 6 | A. Yes. It's inappropriate. |
| | 7 | Q. Okay. I think I asked you this a while ago |
| | 8 | and I apologize, I think I didn't ask a good question, |
| | 9 | but does all of these different letters that I've |
| | 10 | shown you from the FDA to Merck, does it look like |
| | 11 | there's a pattern with regard to Merck's promotional |
| | 12 | pieces, that they present them in a false and |
| | 13 | misleading way, at least according to DDMAC at the |
| | 14 | FDA? |
| | 15 | MR. KRUMHOLZ: Objection, form, lack of |
| | 16 | foundation. It does not give the witness adequate |
| | 17 | context or the circumstances surrounding these letters |
| | 18 | or their communications to and from Merck or to the |
| | 19 | FDA in connection with these very issues. It's an |
| | 20 | unfair question. |
| | 21 | A. Yes, it seems like a pattern to me, but I |
| | 22 | don't know. This may be business as usual. I mean, |
| | 23 | this maybe goes on with all the drug companies. All |
| | 24 | the drug companies may be trying to promote their |
| | 25 | materials and the FDA is trying to rein them in. So I |

Sustained

Re: 84:22-85:16
Det Obj: Same
as 55:12-16
(G7)

Ps resp:
same as
55:12-16

**Vogeler D 20060726.ctx**

86:   1   don't know -- like I said, I don't have the context to
      2   give you a balanced answer. So I need the fair and
      3   balanced presentation too.
      4   Q. (By Mr. Nabers)  Okay.  Precisely my point.
      5       Do you think, as a prescribing physician of these
      6   different drugs we have been talking about, that it
      7   would be best for drug companies like Merck to give
      8   you a fair and balanced pitch with regard to the risks
      9   and benefits of the drug you may prescribe?
     10       MR. KRUMHOLZ:  Objection, form.
     11   A. Yes.
     12   Q. (By Mr. Nabers)  Would you like them to do
     13   that?
     14   A. Yes.
     15   Q. Do you generally expect them to do that?
     16   A. No.
     17   Q. Okay.  And is the reason that you say no is
     18   because you think their overriding goal is to sell
     19   more product?
     20       MR. KRUMHOLZ:  Objection, form.
     21   A. Yes.  I don't know if I would say overriding,
     22   but I would say it's an important -- I think that the
     23   drug reps believe in their products too.  I mean, you
     24   know, there are benefits to these medications.  Even
     25   though they may present them in a positive light
87:   1   that's more positive than is there, the drugs still
      2   have benefit for people.  And I think if I were a drug
      3   rep, I would have to believe in the product enough to
      4   present it or promote it.
      5   Q. (By Mr. Nabers)  All right.  All right.  I
      6   want to get our focus back on Vioxx for a minute.  I
      7   think I asked you this and I think your answer was
      8   clear, but there were Merck representatives who came
      9   and specifically called on you about the drug Vioxx,
     10   correct?
     11   A. Yes.
     12   Q. And did they begin to do that, that is, the
     13   sales reps coming to call on you for Vioxx, as soon as
     14   the drug hit the market in the first quarter of 1999?
     15   A. Yes.
     16   Q. Did you know that Merck targeted you as a
     17   high prescriber of Vioxx?
     18       MR. KRUMHOLZ:  Objection.
     19   A. Yes.
     20   Q. (By Mr. Nabers)  And how did you become aware
     21   of that?
     22   A. I'm a high prescriber of everything because I
     23   have a busy practice.
     24   Q. And were you aware that when all of those
     25   different sales reps would come to call on you

*Overruled*

Re: 87:16-17
Def Obj: Leading

Re: 87:19
Def Obj: Leading

P's Resp:
see pages 80-81

*Sustained*

**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3                                    92

| 92: | 1 | at that and see if it looks like it for you. |
|---|---|---|
| | 2 | A. Yes. |
| | 3 | MR. KRUMHOLZ: Objection, form. |
| | 4 | Q. (By Mr. Nabers)  And it looks like, Doctor, |
| | 5 | as I've thumbed through this, that within this |
| | 6 | exhibit, Deposition Exhibit No. 18, it looks like the |
| | 7 | Merck sales force came and called on you about 260 |
| | 8 | times from March of '99 to November of 2002.  You'll |
| | 9 | just have to accept me on that.  But at least we can |
| | 10 | see that there are numerous pages with regard to call |
| | 11 | notes for Vioxx, correct? |
| | 12 | MR. KRUMHOLZ: Objection, form. |
| | 13 | A.  Correct. |
| | 14 | Q.  (By Mr. Nabers)  And during any of these |
| | 15 | sales calls from March of '99 through November of |
| | 16 | 2002, do you recall any Merck sales rep ever saying to |
| | 17 | you, hey, Vioxx, you need to watch your prescriptions |
| | 18 | for Vioxx because it could cause heart attacks in your |
| | 19 | patients? |
| | 20 | MR. KRUMHOLZ: Objection, form. |
| | 21 | Q.  (By Mr. Nabers)  Did they ever tell you that? |
| | 22 | A.  Not the way you stated it. |
| | 23 | Q.  Did they ever tell you that you needed to be |
| | 24 | concerned when you prescribed Vioxx to your patients |
| | 25 | because it could cause strokes in your patients? |
| 93: | 1 | MR. KRUMHOLZ: Objection, form. |
| | 2 | A.  We're talking about at any time before it was |
| | 3 | withdrawn or in the beginning? |
| | 4 | Q.  (By Mr. Nabers)  Well, we're actually talking |
| | 5 | about the time frame from March of '99 through |
| | 6 | November of 2002, which is all of the different call |
| | 7 | notes reflected on Deposition Exhibit No. 18. |
| | 8 | MR. KRUMHOLZ: Objection, form. |
| | 9 | A.  I don't recall that warning. |
| | 10 | Q.  (By Mr. Nabers)  What generally was the |
| | 11 | message that you got from the sales reps regarding |
| | 12 | whether or not Vioxx was safe? |
| | 13 | A.  That it had a good safety profile and |
| | 14 | tolerability profile, and the literature was reporting |
| | 15 | the increased risk of cardiovascular, possible |
| | 16 | cerebrovascular incidents.  That wasn't something they |
| | 17 | were particularly bringing up, but if I brought it up, |
| | 18 | they would either refer me to a scientist, you know, |
| | 19 | which they do, because they are not prepared to |
| | 20 | discuss the finer details of that. |
| | 21 | So they would either send me something, or |
| | 22 | then someone would send me out material, or they |
| | 23 | explained it as, again, a difference between a COX-2 |
| | 24 | and other NSAIDs that have blood thinning capabilities |
| | 25 | and that the difference, they said, was attributed to |

Re: 92:4-11
Def Obj: Leading;
Lawyer testifying

P's Resp:
see pages
80-81

Re: 92:13
Def Obj: Leading;
Lawyer testifying

P's Resp
pages 80-81

Printed: 10/3/2006  9:03:26AM

## Vogeler D 20060726.ctx

94:
1    the others having blood thinning abilities that
2    lowered the risk of heart attack in a placebo group
3    compared to a Vioxx group, not that Vioxx increased
4    the risk. So that was pretty much how that was
5    explained to me.
6  Q. There was a study called the VIGOR where
7    there was a clinical trial that looked at patients
8    taking Naproxen and patients taking Vioxx. You're
9    familiar with that?
10  A. To a degree.
11  Q. Right. And you're aware that that study
12    actually showed a four to fivefold increase in
13    patients who got Vioxx in terms of their risk of heart
14    attack as compared to the Naproxen group? You're
15    aware of that?
16    MR. KRUMHOLZ: Objection, form.
17  A. I'm not quite sure what the increased
18    percentage was. I know it was increased.
19  Q. (By Mr. Nabers) Okay. You know generally
20    that the Vioxx group had more heart attacks in it than
21    the Naproxen group?
22  A. Yes.
23  Q. And I think what you were trying to tell me a
24    while ago is that your understanding from the sales
25    reps was that it's not that Vioxx causes more heart
95:
1    attacks, it's just that Naproxen is more
2    cardioprotective?
3    MR. KRUMHOLZ: Objection, form.
4  A. Correct.
5  Q. (By Mr. Nabers) That's the way the sales
6    reps presented the information to you about the heart
7    attack risk associated with Vioxx?
8    MR. KRUMHOLZ: Objection, form.
9  A. Correct.
10  Q. (By Mr. Nabers) All right. It wasn't as if
11    Vioxx caused more heart attacks or was associated with
12    more heart attacks, it's just that Naproxen had less
13    because of its anti-platelet properties?
14    MR. KRUMHOLZ: Objection, form.
15  A. Correct. Not that I believed them, but
16    that's what they promoted.
17  Q. (By Mr. Nabers) I understand.
18  A. So I kind of kept my ear out whenever I saw
19    another article come out about it.
20  Q. But I think that you said to me that when the
21    sales reps from Merck would come to call on you, they
22    didn't specifically bring up heart attacks or strokes,
23    correct?
24  A. No.
25  Q. Would you say that basically that their sales

*Sustained* [handwritten]

Re: 94:22-95:2
Def Obj: Leading
PS Resp
pgs 80-81
Rule 611

Re: 95:4-7
Def Obj: Leading
PS Resp:
Same as
pgs 80-81
Rule 611

Re: 95:9
Def Obj: Leading
PS Resp:
pgs 80-81
Rule 611

## Vogeler D 20060726.ctx

```
96:  1          pitch focused more on the efficacy side, that being
     2          the benefits of Vioxx?
     3          MR. KRUMHOLZ: Objection, form.
     4    A.    Sure.
     5    Q.    (By Mr. Nabers)  Okay.  And did any of the
     6          sales reps ever talk to you about the deaths that had
     7          been reported with Vioxx as a result of cardiovascular
     8          events?
     9          MR. KRUMHOLZ: Objection, form.
    10    A.    Not that I recall.
    11    Q.    (By Mr. Nabers)  Okay.  In the 260 or so
    12          times which are represented in Deposition No. 18 from
    13          March of '99 through November of 2002, do you ever
    14          recall any sales rep coming to you and specifically
    15          talking to you and saying that you needed to be
    16          careful when you prescribed Vioxx because of the
    17          increased risk of heart attacks or strokes?
    18          MR. KRUMHOLZ: Objection, form.
    19    A.    No, I don't recall ever hearing that.
    20          (Exhibit No. 19 marked.)
    21    Q.    (By Mr. Nabers)  Okay.  Let me ask you or
    22          show you what is Deposition Exhibit No. 19.  Are you
    23          doing okay?  Do you want to take a break?
    24    A.    No.
    25    Q.    You're fine?
97:  1    A.    Yeah.
     2    Q.    Doctor, what I'm going to mark as Deposition
     3          Exhibit No. 19 --
     4          MR. KRUMHOLZ: I'll object to the document as
     5          it does not appear to be Bates numbered or that it was
     6          produced in this particular form.  If I later find out
     7          that it was, then I'll withdraw those objections.
     8    Q.    (By Mr. Nabers)  Doctor, what I've marked as
     9          Deposition Exhibit No. 19, I'll hand to you and let
    10          you -- I'll represent to you that this was given to me
    11          by Merck in connection with Mr. Mason's case.  And if
    12          we look down in the lower left-hand corner, do you see
    13          where it says Vogeler-Olson Meded Programs?
    14    A.    Yes.
    15          MR. KRUMHOLZ: Objection, form.
    16    Q.    (By Mr. Nabers)  All right.  What I wanted to
    17          ask you about this is this document is actually three
    18          pages and it looks at or references different medical
    19          education programs that you would have attended that
    20          were sponsored by Merck.  Do you see that?
    21    A.    Yes.
    22    Q.    And did Merck sponsor medical education
    23          programs that you attended?
    24    A.    Yes.
    25    Q.    And were those programs geared toward or did
```

*Handwritten annotations:*

Overrule

Re: 96:11-17
Def Obj: Assumes facts not in evidence

P's Resp:
The exhibit was marked and identified for the record. The questions deal with the sales calls made on Dr. Vogeler. He can certainly use the document to refresh his recollection.

Re: 96:19
Def Obj: Assumes facts not in evidence
(same)

**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3        106

| | | |
|---|---|---|
| 106: | 1 | Q. (By Mr. Nabers)  Does it look like any of the |
| | 2 | talk titles focused on Vioxx and the risk of stroke? |
| | 3 | MR. KRUMHOLZ:  Objection, form. |
| | 4 | A.  No. |
| | 5 | Q.  (By Mr. Nabers)  Does it look like any of |
| | 6 | those talk titles looked at Vioxx and the risk of |
| | 7 | death from cardiac events? |
| | 8 | MR. KRUMHOLZ:  Objection, form. |
| | 9 | A.  No. |
| | 10 | Q.  (By Mr. Nabers)  If we turn to page 2, do we |
| | 11 | again see a listing of different types of programs for |
| | 12 | Vioxx? |
| | 13 | A.  Yes. |
| | 14 | Q.  Does it look like any of those focused on the |
| | 15 | fact that Vioxx increased the relative risk of heart |
| | 16 | attacks? |
| | 17 | MR. KRUMHOLZ:  Objection, form. |
| | 18 | A.  No, I don't see any. |
| | 19 | Q.  (By Mr. Nabers)  Any mention, as we look out |
| | 20 | there, of Vioxx and the risk of stroke? |
| | 21 | MR. KRUMHOLZ:  Objection, form. |
| | 22 | A.  No. |
| | 23 | Q.  (By Mr. Nabers)  Any mention out there of the |
| | 24 | risk of Vioxx and death? |
| | 25 | MR. KRUMHOLZ:  Objection, form. |
| 107: | 1 | A.  No. |
| | 2 | Q.  (By Mr. Nabers)  If we turn to page 3 of the |
| | 3 | document, that one actually looks like it pertains to |
| | 4 | Ms. Olson for all of them, correct? |
| | 5 | A.  Yes. |
| | 6 | Q.  It doesn't look like any of those pertain to |
| | 7 | you? |
| | 8 | A.  No. |
| | 9 | Q.  But even if -- as we look at Ms. Olson, it |
| | 10 | doesn't look like any of the sessions that dealt with |
| | 11 | Vioxx dealt with any information about heart attacks, |
| | 12 | stroke or death, correct? |
| | 13 | MR. KRUMHOLZ:  Objection, form. |
| | 14 | A.  Correct. |
| | 15 | Q.  (By Mr. Nabers)  I mean, did you ever attend |
| | 16 | a specific lecture, forum, symposium, lunch and learn |
| | 17 | or dinner where they talked specifically about the |
| | 18 | increased risk of heart attacks for Vioxx? |
| | 19 | MR. KRUMHOLZ:  Objection, form. |
| | 20 | A.  It certainly wasn't the main topic.  Whether |
| | 21 | someone might have brought it up as a possibility, |
| | 22 | that could have happened.  I don't recall |
| | 23 | specifically. |
| | 24 | Q.  (By Mr. Nabers)  Okay.  The primary focus for |
| | 25 | all of these programs that you would have attended |

Printed: 10/3/2006    9:03:26AM

*Sustained*

Re: 107:9-12
Def.Obj: Leading;
Foundation

Re: 107: 14
Def.Obj: Leading;
Foundation

P's Resp:
The questioning
revalues against the
specific sales call
document. The document
refreshes the witness
memory and therefore
the question is not
really suggestive
of an answer, see
pgs 80-81
Rule 611

**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3                                                110

| 110: | 1 | A. | Well, just that it was kind of a landmark |
| | 2 | | article in support of COX-2 inhibitors decreasing the |
| | 3 | | risk of GI bleeding compared to the traditional |
| | 4 | | NSAIDs. Naprosyn, in this case. |
| | 5 | Q. | Do you think that in the past you have |
| | 6 | | reviewed this article at some point? |
| | 7 | A. | I know I've read the abstracts on it. I |
| | 8 | | don't know that I've -- I doubt I've read the text of |
| | 9 | | it. |
| | 10 | Q. | Okay. Do you have any idea when you would |
| | 11 | | have seen it for the first time? |
| | 12 | A. | I'm sure as soon as it came out, because the |
| | 13 | | drug reps would have been in my office telling me |
| | 14 | | about it. They frequently will leave me a copy. I'll |
| | 15 | | say, well, give me a copy of that article. That's |
| | 16 | | why, like I said, I don't subscribe to the journal, |
| | 17 | | but I frequently get articles, original articles |
| | 18 | | handed to me. |
| | 19 | | MR. NABERS: Let's stop for just a minute. |
| | 20 | | THE VIDEOGRAPHER: It's 10 minutes after |
| | 21 | | 10:00. We're going off the record. This is the end |
| | 22 | | of tape No. 1. |
| | 23 | | (Recess.) |
| | 24 | | THE VIDEOGRAPHER: It's 22 minutes after |
| | 25 | | 10:00. This is the beginning of tape No. 2. We're |
| 111: | 1 | | back on the record. |
| | 2 | Q. | (By Mr. Nabers) Doctor, we're back after a |
| | 3 | | short break, and it sounds like we've got a generator |
| | 4 | | running outside so it's going to be kind of hard, I |
| | 5 | | think, for everybody here, but can you hear me okay? |
| | 6 | A. | Yes. |
| | 7 | Q. | Okay. Before we took our break, I had marked |
| | 8 | | as the next exhibit Deposition Exhibit No. 21, which |
| | 9 | | was the VIGOR study that appeared in the New England |
| | 10 | | Journal of Medicine. Do you have that there in front |
| | 11 | | of you? |
| | 12 | A. | Yes. |
| | 13 | Q. | What I was asking you specifically about this |
| | 14 | | is what you recalled about this article, but is |
| | 15 | | primarily what you recalled was that Vioxx was helpful |
| | 16 | | for patients and it helped lower the risk of GI bleed |
| | 17 | | in patients using Vioxx? |
| | 18 | A. | Yes. |
| | 19 | Q. | I mean, was that kind of the overriding |
| | 20 | | message that you got whenever you reviewed this VIGOR |
| | 21 | | article? |
| | 22 | A. | Yes. |
| | 23 | Q. | And this article that appeared in the New |
| | 24 | | England Journal of Medicine, do you see up there at |
| | 25 | | the top that there's quite a number of authors? |

Printed: 10/3/2006   9:03:26AM

Re.:110:23 - 111:6
Dft Obj: Remove
Sidebar
P's response:
D agrees

**Vogeler D 20060726.ctx**

134:

1     actually a press release from Merck with regard to
2     Vioxx that I've handed you.  And do you see that the
3     title of this press release says, "Merck confirms
4     favorable cardiovascular safety profile of Vioxx"?  Do
5     you see that at the top?
6 A.  Yes.
7 Q.  All right.  And the date of this one is April
8     28th of 2000, correct?  Do you see that there at the
9     beginning?
10 A.  Yes.  Oh, yeah, sure.
11 Q.  All right.  And they say here that, Merck
12     does, "In response to speculative news reports, Merck
13     & Company, Inc. today confirmed the favorable
14     cardiovascular safety profile of Vioxx, its medicine
15     that selectively inhibits COX-2."  Do you see that?
16 A.  Yes.
17 Q.  Then if we look down in the third paragraph
18     it says, "In preliminary findings from Merck's large
19     gastrointestinal outcome study that compared Vioxx
20     with Naproxen in patients with rheumatoid arthritis,
21     significantly fewer heart attacks were observed in
22     patients taking Naproxen compared to taking Vioxx."
23     It says 0.15 to 0.5 percent.  Do you see where I'm
24     reading that?
25 A.  Yes.

135:

1 Q.  It says, "The result is consistent with
2     Naproxen's ability to block platelet aggregation."  It
3     says, "This is the first time these effects of
4     Naproxen to reduce these events have been demonstrated
5     in a clinical study."  And that's the information that
6     you were aware of at that time, correct?
7 A.  Correct.
8 Q.  And that's the information you believe to be
9     true, correct?
10 A.  Yes.
11 Q.  And that was the information that was told to
12     you by the Merck sales reps about Vioxx, correct?
13 A.  Yes.
14 Q.  Okay.  All right, Dr. Vogeler.  I want to go
15     back to Deposition Exhibit No. 16 for just a second.
16     Can you see it on the screen too, if you don't want to
17     have to look back at it?  Can you see it okay?
18 A.  Yes.
19 Q.  Okay.  If we go over to the column to the
20     other side, do you see where it says -- it has your
21     name there, Douglas M. Vogeler, then 8/13/2001?
22 A.  Yes.
23     MR. KRUMHOLZ: I don't think that's Exhibit
24     16.
25     MR. NABERS: I think it is, but maybe it's

*Overrule*

Pl:135:11-13
Def Obj: leading

P's Resp
see pgs 80-81;
Rule
611

**Vogeler D 20060726.ctx**

| 140: | | |
|---|---|---|
| | 1 | that for you to make your own risk-benefit assessment |
| | 2 | to decide personally whether or not you're going to |
| | 3 | take Vioxx, you would have wanted to know about the |
| | 4 | risk of heart attack, right? |
| | 5 | A. Yes. |
| | 6 | MR. KRUMHOLZ: Objection, form. |
| | 7 | A. And I still took that into account. |
| | 8 | Q. (By Mr. Nabers) Okay. Well, but what you |
| | 9 | thought was, when you took that risk into account, was |
| | 10 | you thought that Naproxen was cardioprotective, right? |
| | 11 | A. Yes. |
| | 12 | Q. And you didn't think that there was a real |
| | 13 | risk of Vioxx from the VIGOR study because you thought |
| | 14 | the difference in the risk of heart attacks was |
| | 15 | explained by the cardioprotective effects of Naprosyn? |
| | 16 | A. Yes, and that that risk was still small if I |
| | 17 | was wrong. |
| | 18 | Q. Okay. I understand. Let me show you what I |
| | 19 | want to mark as the next exhibit, which is 25. |
| | 20 | (Exhibit No. 25 marked.) |
| | 21 | Q. (By Mr. Nabers) This is another one of those |
| | 22 | letters from the FDA to Merck. Do you see this one is |
| | 23 | actually written to Raymond Gilmartin, president and |
| | 24 | CEO of Merck? |
| | 25 | A. Yes. |
| 141: | 1 | Q. And, again, this one is on Vioxx, correct? |
| | 2 | A. Yes. |
| | 3 | Q. And then -- |
| | 4 | MR. KRUMHOLZ: I'll just object to the use of |
| | 5 | Exhibit 25 without the use of the other letters that |
| | 6 | showed the results with the FDA. |
| | 7 | Q. (By Mr. Nabers) And this one actually has a |
| | 8 | big Warning Letter printed in bold at the beginning of |
| | 9 | it, right? |
| | 10 | A. Yes. |
| | 11 | Q. All right. And it says in the letter to |
| | 12 | Merck from the FDA, "This warning letter concerns |
| | 13 | Merck & Co.'s promotional activities and materials for |
| | 14 | the marketing of Vioxx tablets. Specifically, we |
| | 15 | refer to promotional audio conferences given on behalf |
| | 16 | of Merck by Peter Holt, M.D., a press release, and |
| | 17 | oral representations made by Merck sales |
| | 18 | representatives to promote Vioxx". Do you see where |
| | 19 | I've read that? |
| | 20 | A. Yes. |
| | 21 | Q. Do you remember seeing any audio conferences |
| | 22 | or -- actually, you would have heard the audio |
| | 23 | conferences by Dr. Peter Holt? |
| | 24 | A. I don't recall. |
| | 25 | Q. Do you recall ever hearing any audio |

Printed: 10/3/2006   9:03:26AM

*[Handwritten annotations: "Sustained"; "Re: 140:18-141:2 Def Obj: Foundation, Witness has never SEEN this letter before thus no foundation for asking any questions about it"; "Ps Resp: ①② Foundation was laid previously; Rule 611 allows leading when necessary to develop the witness' testimony + when witness is adverse. Both are the case here. Witness was a prescriber of Vioxx."; "② Re: 141:8-143:10 Def Obj: Same as NOTB-141:12 Exhibit is a warning letter from FDA about Vioxx. This is important info prescribers needed + it is highly relevant to Plaintiffs' claims of inadequate warning."]*