# Vogeler, Douglas 2006-08-30

260:

Q: And so it's important to note that when trying to assess the extent to which any particular medication may pose any particular risk?
A: Well, I believe the control group also had rheumatoid arthritis.
Q: Actually, VIGOR was not a placebo controlled study. Did you know that?
MR. NABERS: Objection to the form.
A: Yes. It's two active drugs.
Q: (By Mr. Krumholz) So as a result, there wasn't that control group that would provide you with that sort of information, true?
A: Yeah, true, but the FDA won't allow those studies that much anymore. I mean, if there's somebody that has a disease state and there's a known, well-established treatment for it, you're not going to withhold treatment. You're going to compare the new drug to the standard of care treatment, which they did, which was Vioxx versus Naproxen.
Q: You understood that one of the goals of the VIGOR study was to determine whether or not Vioxx had a better profile, safety profile, with respect to gastrointestinal issues as compared with Naproxen, which was a traditional NSAID?
A: Yes.

261:

Q: So it wasn't meant to determine necessarily or to focus on the cardiovascular issues?
A: Yes.
Q: But those cardiovascular events surfaced in connection with the VIGOR study, true?
A: Yes.
Q: And as a result, what a prudent manufacturer would do is to publish those, true?
A: Depends on whether they wanted to sell their product more or not. I don't think they would publish it unless they had to.
Q: Well, the reality is Merck did publish the results of VIGOR, true?
A: I presume they did. I'm not sure who published it.
Q: And you can look at Exhibit 21, if you would, and we can just confirm that. You recognize that as --
A: Yeah, that's the Bombardier article.
Q: That's the Bombardier article that was referenced in Exhibit 33, that is, The Medical Letter article that you talked about?
A: Yes.
Q: And, you know, plaintiff's counsel, I think, talked about various authors and their affiliations

## Vogeler, Douglas 2006-08-30

with Merck. Do you recall that?
A: I do.
Q: So these folks who performed this analysis and wrote this report published the VIGOR results, true?
A: Yes.
Q: And, in fact --
MR. NABERS: There's not (inaudible).
MR. KRUMHOLZ: I'll object to the sidebar.
Q: (By Mr. Krumholz) In fact, Doctor, if you'll look at The Medical Letter, they published it so that independent objective third parties like The Medical Letter could go back and analyze that information, right?
A: Yes. Well --
Q: And that's what you --
A: I guess they published the information. The Medical Letter chose to analyze the data. I don't know if they published it so that other people could analyze the data. My guess is if it were promoted from the drug company, they would hope no one else would notice the other part of the data.
**Q: Actually, you indicated that drug reps came to you when the VIGOR study came out and talked to you about those results, right?**
**A: Yes.**
MR. NABERS: Objection to the form.
**Q: (By Mr. Krumholz) And, in fact, regardless of the motives of Merck for publishing that data, it allowed folks who published The Medical Letter, such as the people who wrote Exhibit 33, to do an objective, unbiased analysis, true?**
**A: Yes. I'm sure they got -- went into the data a little more than maybe was just in that article, but, yes.**
**Q: Now, you testified that you gave more weight to medical literature like The Medical Letter when it came to prescription medications. Do you recall that?**
**A: Yes.**
**Q: And I believe you also testified that you put more weight on what's in a label or package insert for any particular medication that you're prescribing as well?**
**A: Yes.**
**Q: Between the label for medications and the publications that you review and rely upon, do you feel that you and Nurse Olson are able to safely prescribe medications?**
**A: Sure.**
**Q: And did you feel that way the entire time**

Overruled

262:23-263:1
P's obj:
misstates prior testimony; argumentative; vague

263:3-7
P's obj:
speculation; vague; argumentative; atty is testifying.

263:20-23
P's obj:
speculation; vague; 401

263:25
P's obj:
speculation, vague

[D]ef's response:
Appropriate cross-examination on the very topics plaintiff raised (through 264:5)

Granted

# Vogeler, Douglas 2006-08-30

264:
that Vioxx was on the market?
MR. NABERS: Objection to the form.
A: Yes.
Q: (By Mr. Krumholz) Did you feel that way as to Vioxx while Vioxx was on the market?
A: Yes.
Q: And I assume that you expect Nurse Olson to keep up with the medical literature in connection with medications --
A: Yes.
Q: -- so that she can make good prescribing decisions with respect to her patients?
MR. NABERS: Objection to the form.
A: Yes.
Q: (By Mr. Krumholz) In fact, your office had the very Medical Letter with the discussion of cardiovascular safety of COX-2 inhibitors available for her to review --
A: Yes.
Q: -- to the extent she chose to review it?
A: Correct.
Q: And you had discussions with her about that?
MR. NABERS: Objection to the form.
A: I don't know if I had discussions with her. I know we did when the drug rep came for lunch and we

265:
talked about it.
Q: (By Mr. Krumholz) We being Ms. Olson, the drug rep and you?
A: Yes. At that time we would have discussions. I'm not sure if I had discussions with her individually before that.
Q: But you had discussions with Nurse Olson with or without a pharmaceutical rep about Exhibit 33 and the issue of cardiovascular safety and COX-2 inhibitors?
A: Yes, as far as I know.
Q: In late 2001, in that time frame?
A: Yes.
(Exhibit No. 34 marked.)
Q: (By Mr. Krumholz) I'm going to hand you what has been marked as Deposition Exhibit 34. You'll see that Exhibit 34 is a letter -- it's a copy of an envelope, together with a letter, together with a copy of the label for Vioxx. Do you see that?
A: Would you state that again?
Q: Yes. Exhibit 34, the first page is a copy of an envelope, together with a copy of a letter dated April 2002 that attaches a new label for Vioxx. Do you see that?
A: Yes.

264:4-5 P's obj: speculation; vague

264:15-25 P's obj: cumulative; repetitive; speculation

Def's response: witness is testifying from his personal knowledge

265:7-10 P's obj: speculation

265:12 P's obj: same as above

## Vogeler, Douglas 2006-08-30

Vogeler PA PC DA DC on 10-3

266:

**Q: And -- first of all, do you recall receiving Exhibit 34 in or about April of 2002?**
**A: It looks familiar, but I don't recall specifically.**
**Q: Do you recall receiving a new label for Vioxx from Merck in or about April of 2002 that included the VIGOR information or discussed the VIGOR information?**
MR. NABERS: Objection to the form.
**A: Not specifically. I mean, it looks familiar, but I can't recall. I get these all the time.**
**Q: (By Mr. Krumholz) Are you confident that you at some point reviewed the new Vioxx label that came out in April of 2002 and contained the VIGOR information?**
MR. NABERS: Objection to the form.
**A: I would say I probably had.**
**Q: (By Mr. Krumholz) If you knew there was a label -- a new package insert or label that came out with important safety information like that that was described in the VIGOR study, you would have reviewed it?**
**A: Yes.**
**Q: And so you're confident that you reviewed this label when it was published?**
MR. NABERS: Objection to the form.

267:

**A: Yes, I probably have. Like I said, I just don't specifically recall it.**
Q: (By Mr. Krumholz) I understand. And I'll represent to you that Merck's records indicate that this particular letter was sent to you and other doctors, obviously, in April of 2002. Do you have any reason to dispute that?
MR. NABERS: I need to object to the form. If he has one with your name on it, you can ask to see it.
Q: (By Mr. Krumholz) You can answer.
A: I can't even remember the question now. Do I object --
Q: Yeah, Merck -- I'll just represent to you -- and the judge won't allow this in if I don't have the evidence, but I'll just represent to you that Merck's records indicate that they sent Exhibit 34 to you in April of 2002. Do you have any reason to dispute that if that's the case?
A: No.
MR. NABERS: I need to object to the form. He showed you nothing to say what he just said.
MR. KRUMHOLZ: I'll object to the sidebar and the coaching. It's an inappropriate talking objection.

266: 11-14 P's obj: speculation; vague

Def's response: none needed

266: 23-24 P's obj: misstates prior testimony; speculation; vague

## Vogeler, Douglas 2006-08-30

Vogeler PA PC DA DC on 10-3



268:

MR. NABERS: It's an inappropriate question. You have no evidence of it --
MR. KRUMHOLZ: You know what's going on, Scott.
MR. NABERS: You've got nothing. Show it to him.
MR. KRUMHOLZ: You know you're not telling the truth. Why do you do that?
MR. NABERS: Why don't you show it to him. I'd like to see it.
MR. KRUMHOLZ: Because I didn't think that anyone, and certainly not you --
MR. NABERS: You don't got it. Move on. Keep going. You don't got it.
**Q: (By Mr. Krumholz) So do you have any reason to dispute that you received Exhibit 34 if Merck's records do indeed show that they sent it to you?**
MR. NABERS: Objection to the form.
**A: I have no reason to dispute it.**
**Q: (By Mr. Krumholz) On the very front of the envelope of this letter that was sent, it says, 'Important prescribing information.' Do you see that?**
**A: Yes.**
**Q: And so it calls your attention -- a doctor's attention or nurse practitioner's attention to the**

269:

**fact that the envelope actually contains important prescribing information, right?**
**A: Yes.**
Q: This would certainly catch your attention if you had received it?
MR. NABERS: Objection to the form.
A: I get a lot of these, and so it just depends on how busy I was at the time. I usually open them and briefly read them. If it had as many pages as this on it, I don't know. I may not have finished reading it.
Q: (By Mr. Krumholz) In fact, because it contains the label, there was a letter that actually summarizes the changes in the label. Do you see that?
MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) The second page. Let's start over.
A: No, I don't see a summary.
**Q: First of all, it does say 'Important prescribing information' on the front of Exhibit 34, true?**
**A: Yes.**
**Q: Then the second page of Exhibit 34 is a letter dated April 2002, right, the second page?**
**A: Well, it's my first page. Oh, is there**

Def's response: The "facts" referred to (and presumably objected to) are on the face of the document

268:15-17 Pl's obj: argumentative; Atty testimony; misstates evidence; assumes facts not in evidence. obj to Ex. 34: 401; 403; assumes facts not in evidence

Overruled

P's general obj to pp. 269-284: Rule 401; Rule 403; Assumes facts not in evidence.

269:24 P's obj: Rule 401; 403

# Vogeler, Douglas 2006-08-30

270:

another page? Oh, yes.
Q: So the second page --
A: Yes.
Q: -- is a letter dated April 2002, and it's again entitled 'Important prescribing information,' right?
A: Right.
Q: And in the second paragraph it says -- well, first paragraph it says, 'Merck & Co. would like to bring to your attention recent changes to the current prescribing information and patient product information for Vioxx.' Do you see that?
A: Yes.
Q: And then it goes down and in the second paragraph says, 'The prescribing information has been revised to reflect the results of the Vioxx Gastrointestinal Outcome Research study and the FDA approval for Vioxx for relief of the signs and symptoms of rheumatoid arthritis in adults.' Do you see that?
A: Yes.
Q: So you would have understood when you received this that this letter and the attached label was an update to the prescribing information?
A: Yes.

271:

Q: And it was an update concerning the VIGOR study that we have been talking about, right?
A: Yes.
Q: And, in fact, it goes down and it discusses the VIGOR study, does it not?
A: Yes.
Q: On page 2 under Gastrointestinal Safety in VIGOR -- do you see that, page 2 of the letter?
A: Yes.
Q: -- it said, 'The VIGOR study showed a significant reduction in the risk of development of PUBs, including complicated PUBs in patients taking Vioxx compared to Naproxen.' Do you see that?
A: Yes.
Q: And it references that table. Do you see that?
A: Yes.
Q: And PUBs are perforations, ulcers and bleeds, correct?
A: Yes.
Q: That was consistent with your understanding of the VIGOR results, correct?
A: Yes.
Q: That is, that it actually showed a reduction in the number of perforations, ulcers and bleeds as



272:

compared to Naproxen?
A: Yes.
Q: And that was an important finding to you as a prescribing physician?
A: Yes.
Q: Because your patients needed pain and inflammation relief in connection with arthritis and acute pain?
A: Yes.
Q: And you wanted COX-2s to be an alternative in that regard that may be less -- or more tolerable, I should say, when it came to stomach issues?
A: Yes.
Q: And that was consistent with your experience with your patients, that is, they experienced fewer GI issues or stomach issues when they took Vioxx as compared with other NSAIDs?
MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) True?
A: Yes.
Q: And that was one of the significant reasons why you wanted to prescribe Vioxx for your patients?
A: Yes.
Q: And other COX-2s?
A: Yes.

273:

Q: And then it says, 'Other safety findings: Cardiovascular safety' at the bottom of page 2 of that letter. Do you see that?
A: Yes.
Q: It says, 'The VIGOR study showed a higher incidence of adjudicated serious cardiovascular thrombotic events in patients treated with Vioxx, 50 milligrams, once daily as compared to patients treated with Naproxen, 500 milligrams, twice daily.' Do you see that?
A: Yes.
Q: It actually references you to a table that confirms those numbers. Do you see that on the next page, the table?
A: Yes.
Q: And so not only was Merck, through Exhibit 34, informing health care providers like you and Nurse Olson of the benefits that were shown by the VIGOR study, they were also outlining in a letter and the attached label exactly what cardiovascular safety issues arose in connection with that study, right?
MR. NABERS: Objection to the form.
A: Yes.
Q: (By Mr. Krumholz) In fact, if you had read this in or about April of 2002, you would have

Overruled

272:14-17
P's obj:
Vague; speculation
Def's response: none needed

273:16-21
P's obj:
ambiguous; speculation; Rule 401 - relevance; misstates the evidence
Def's response: Appropriate cross-examination to the issues plaintiff has raised.

## Vogeler, Douglas 2006-08-30

Vogeler PA PC DA DC on 10-3

274:

understood that there was a difference between the number of events that occurred in connection with Vioxx as compared to the number of events that occurred with respect to Naproxen?
A: I already knew that.
Q: You already knew that in November of 2001?
A: Right.
Q: So by April of 2002, while you received -- likely received Exhibit 34, you already knew exactly what it was telling you as to cardiovascular safety --
MR. NABERS: Objection to the form.
A: Right.
Q: (By Mr. Krumholz) -- by simply reading The Medical Letter which was available to the medical community and your office in particular?
A: Right. And also in the Bomb -- Bombardier -- or whatever his name is, her name is -- article, at the time it was explained that that was a difference between having a COX-2 versus COX-1 inhibition. So it just reconfirmed, well, these aren't going to thin anybody's blood, so don't count on them to do that. That was the explanation I had.
Q: At this stage, you were looking for explanations, right?
A: Right.

275:

MR. NABERS: Objection, form.
Q: (By Mr. Krumholz) But the state of the scientific information that you had seen was that there was a debate, a question in the scientific community as to why there was a difference?
A: Right.
Q: And because it wasn't a placebo controlled study, it could have been for a host of reasons?
A: Correct.
Q: In other words, it could have been by chance, on the one hand?
MR. NABERS: Objection to the form.
A: Yeah, I don't know what the statistical significance was on it.
Q: (By Mr. Krumholz) On the other hand, it could have been as a result of Naproxen, that is, the cardioprotective theory --
A: Right.
Q: -- or it could have been because of the class effect with respect to COX-2s --
A: Correct.
Q: -- or it could have been an effect in connection with Vioxx?
A: Correct.
Q: And the reality was that the scientific

Overruled

274:23-24
P's obj: vague; speculation; 401
Def's response: none needed

275:10-24
P's obj: Speculation; Rule 401; witness is not an expert on this topic.
Def's response: Plaintiff asks this witness about his understanding of VIGOR

276:

community and the medical communities just didn't know at that point?

A: Yes.

Q: It didn't have sufficient medical evidence to demonstrate that the clinical trials were in any way wrong in connection with the safety profile of Vioxx?

A: Correct.

Q: In other words, you still had to rely on the clinical trials that were done for approval purposes until there was sufficient evidence to suggest otherwise?

MR. NABERS: Objection to the form.

Q: (By Mr. Krumholz) That was your understanding?

A: Yes.

Q: And that was the information available to you and your office?

MR. NABERS: Objection to the form.

A: Yes.

Q: (By Mr. Krumholz) And you mentioned that you had already known this information as of April 2002, right?

A: Yes.

Q: But it was important or good for Merck to provide this information about the new label that had been approved by the FDA?

277:

A: Sure.

Q: It was important because, as you put it, this was information that the FDA had screened and approved?

MR. NABERS: Objection to the form.

A: I don't know if approved, but --

Q: (By Mr. Krumholz) You know that all labels and package inserts for medications are first approved by the FDA?

MR. NABERS: Objection to the form.

A: Yes.

Q: (By Mr. Krumholz) You have that understanding as a medical doctor?

A: Yes.

MR. NABERS: Objection to the form.

Q: (By Mr. Krumholz) So it was important for you to see the label and the changes to the package insert in April of 2002 to understand what the FDA believed should be communicated to medical doctors?

A: Correct.

Q: And in that regard, it was important in connection with this cardiovascular safety profile at the bottom of page 2 of this letter for Merck to state what the actual safety data was in connection with

Def's response: Appropriate cross-examination to the issues plaintiff has raised

276:8-14 P's obj: vague; speculation; 401; witness is not an expert on this topic.

276:20-23 P's obj: same as above.

277:8-10 P's obj: same as above

277:17-20 P's obj: same as above

277:22-25 P's obj: same as above.

# Vogeler, Douglas 2006-08-30

278:

VIGOR?
A: Yes.
Q: And then it says in the second sentence of that paragraph, 'This finding was largely due to the difference in the incidence of myocardial infarction between the groups.' Do you see that?
A: Where are we now?
Q: The difference –
A: What page are we on?
Q: I'm sorry, page 2 at the bottom of -- page 2 of the letter, which is page 3 of the exhibit.
A: Yes.
Q: So if you look at the second paragraph -- first paragraph under Cardiovascular Safety, the last sentence, it says, 'This finding,' that is, the higher incidence we talked about of CV events, 'was largely due to a difference in the incidence of myocardial infarction between the groups.' Did I read that accurately?
A: Yes.
Q: And so what doctors and health care providers like Nurse Olson would have known if they had read this is that the difference largely appeared in connection with patients who had myocardial infarctions?

279:

MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) True?
A: Yes.
Q: And heart attacks -- which is the same thing as heart attacks, as you understand it?
A: Yes.
Q: You use those terms interchangeably?
A: Yes.
Q: Then it goes down and says, 'Adjudicated serious cardiovascular events.' Do you recall plaintiff's counsel asking you whether it was important to communicate the serious adverse events that occurred while people may have been taking Vioxx?
MR. NABERS: Objection to the form.
A: Do I remember him asking me if I warned patients about it?
Q: (By Mr. Krumholz) No, no, no. Do you recall that plaintiff's counsel asked you questions about the importance of drug companies telling doctors about serious adverse events that may have occurred while people were taking their drug?
A: Yes.
Q: And you responded that, indeed, that was required to be put in the package insert. Do you recall that?

Overruled

278:21-25
P's obj:
Same; vague; speculation; misstates evidence; assumes facts not in evidence; attorney testifying; argumentative

Def's response: Appropriate cross-examination

Overruled

## Vogeler, Douglas 2006-08-30

Vogeler PA PC DA DC on 10-3

280:

A: Yes.
Q: In fact, on page 2 of the letter, it specifically states that 'Adjudicated serious cardiovascular events confirmed by a blinded adjudication committee included,' and it states 'sudden death,' true?
A: Yes.
Q: 'Myocardial infarction' or heart attacks, true?
A: Yes.
Q: 'Unstable angina'?
A: Yes.
Q: 'Ischemic stroke'?
A: Yes.
Q: 'Transient ischemic attack and peripheral venous and arterial thromboses'?
A: Yes.
Q: Did I read all those correctly?
A: Uh-huh (affirmative.)
Q: Is that a yes?
A: Yes.
Q: And as a result, you would have known and any health care provider who read this would know that, indeed, those events occurred while people were taking Vioxx?

281:

MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) True?
A: True.
MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) Now, do you understand that there's a difference between an association with a drug versus causation? Have you heard that before?
A: Yes. Sure.
Q: In other words, just because an event happens while somebody is taking a medication doesn't necessarily mean that that medication caused that event, right?
A: Right.
Q: And for anyone, whether it's plaintiff's counsel or Merck's counsel, to stand up and say there's an association between an event and any particular medication, including Vioxx, that would be wrong to suggest that that means that there necessarily was a causative relationship, right?
MR. NABERS: Objection to the form.
A: Yes.
Q: (By Mr. Krumholz) To determine if there's a causative relationship, you have to do much more than just determine if somebody was taking a medication while they had a particular event, right?

Def's response: Appropriate cross-examination to the issues plaintiff has raised

280:1-25
P's obj:
Vague; speculation; misstates evidence; assumes facts not in evidence; argumentative; attorney testifying

280:22-25:
P's obj:
same as above; Rule 401

281:14-19
P's obj:
Argumentative; Rule 401; Vague; speculation; witness is not an expert on this topic.

Overruled

# Vogeler, Douglas 2006-08-30

282:
A: Yes.
Q: In other words, a host of folks in your practice take medications each and every day, right?
A: Sure.
Q: And they have sinus infections, heart disease, back problems, a whole host of issues that they confront, right?
A: Yes.
Q: And you don't -- and while there is an association between any particular patient and the medications they are taking, that is, with the diseases that they confront and the medications they are taking, it doesn't mean that the medications are causing those problems or diseases, right?
A: Right.
Q: To really analyze that and to get to the truth of the matter for the jury, what one would have to do is analyze all of the evidence and do a scientifically reliable analysis, true?
A: Or a study that would prove it.
Q: Or a study that may or may not prove it?
A: Correct.
Q: You've not done that kind of study?
A: No.
Q: And you've not been retained by any counsel

283:
in this case or asked to analyze all those studies or to do a study?
A: No.
Q: And so you can't comment on the extent to which, for example, Vioxx causes increased risk of CV events. That would best be left to those folks who have done those sorts of studies and analyses?
A: Yes.
Q: But, regardless, despite the fact that an association doesn't necessarily mean that it was caused, it was prudent for Merck to go ahead and tell doctors the types of cardiovascular events that occurred while people happened to be taking their drug?
A: Correct.
Q: That was a prudent thing for the pharmaceutical company to do?
A: Yes.
Q: That's a good thing?
A: Yes.
Q: Now, it also directs the folks who read this letter and received it to the precaution section of cardiovascular effects. Do you see that?
A: Where are we looking now?
Q: The same paragraph at the bottom. It just

282:1-25
P's obj: Rule 401; speculation; witness is not an expert on this topic.
Def's response: Plaintiff asked about this witness' understanding of drug risks

283:9-14
P's obj: Assumes facts not in evidence
Def's response: none needed

Overruled

284:

**says, 'See precautions, Cardiovascular Effects.' Do you see that? At the end of that paragraph.**

**A: Oh, yes.**

**Q: So it refers you to the actual precaution section contained in the label, right?**

**A: Yes.**

**Q: And, of course, it's prudent for health care providers to review the precautions section to determine important prescribing information or safety issues --**

**A: Yes.**

**Q: -- or to review information like what's contained in The Medical Letter to become aware of what's in the precautions section, true?**

**A: Yes.**

**Q: And, likewise, you would want to look at the warning section as well, correct?**

**A: Yes.**

Q: By the way, Doctor, I want to replace Exhibit 34 with this one. I think I gave you the wrong one. Thank you.

A: You gave me the one with all your notes on it.

Q: It had some comments on it, I think.

**But, regardless, Exhibit 34, the one I have**

285:

**just given you, is a true and correct copy of what we have been talking about in connection with the April 2002 letter to health care providers and the attached label, right?**

**A: Yes.**

**Q: And it's what contains the description of the changes to the April 2002 label and package insert for Vioxx --**

**A: Yes.**

**Q: -- that we have been discussing for the last few minutes?**

**A: Yes.**

**Q: Now, if you had received Exhibit 34, is this the kind of important safety and prescribing information that you would have shared with Nurse Olson?**

MR. NABERS: Objection to the form.

**A: Possibly. There's a lot of information in this, and so if it's not summarized in something relatively brief or if it's not something that jumps out at me as a major warning, I don't know if I would have read this article in as much detail as you're bringing it out now. To me it would have confirmed what I had already known for The Medical Letter, which to me was just more detailed information from what I**

284:7-10
P's obj:
vague; speculation; Rule 401; assumes facts not in evidence; Misstates the evidence

P's objection to pages 284-293:
Plaintiff objects to exhibit 34; Assumes facts not in evidence; Rule 401; Rule 403; speculation; best evidence.

Def's response: none needed

285:13-16
P's objection:
Vague; speculation; Rule 401; repetitive; cumulative

Overruled

# Vogeler, Douglas 2006-08-30

Vogeler PA PC DA DC on 10-3

286:

was already aware of. I would have probably looked at it and said, yeah, yeah, same stuff, and moved on.
Q: (By Mr. Krumholz) Let me see if I make sure I understand this. You would have looked at Exhibit 34 when you received it to determine what sort of information it contained?
A: Right.
MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) True?
A: Yes.
Q: And you would have determined if it was information that you believed you had already become aware of in connection with Vioxx, true?
A: Yes. Yes.
Q: And you -- and given what we've talked about that's contained in Exhibit 34, you would have realized quickly that the same information was contained in The Medical Letter that is Exhibit 33 that you had already reviewed?
A: Yes.
MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) And other information in medical information concerning VIGOR and Vioxx?
A: Yeah. Well, like I said, I would have looked at it and said, yeah, okay, I know what they're

287:

talking about. Now the FDA is involved so now there's an official response.
Q: In fact, since you had already discussed The Medical Letter, Exhibit 33, with Nurse Olson and the pharmaceutical representative, you may not have seen a reason to discuss Exhibit 34 with her?
A: Correct.
Q: But, regardless, if you did not feel that Nurse Olson had appreciated the VIGOR study as of April of 2002, you would have shared Exhibit 34?
A: Yes.
Q: And, in fact, you mentioned summary form. Do you recall that, that it would be easier --
A: Yes, to summarize it.
Q: And that's, you understand, what was attempted to be done in connection with this April 2002 letter, that is, to summarize the results of VIGOR and what's been incorporated into the label?
A: There's still a lot of information in there.
Q: Then in the attachment, the attachment is actually highlighted. Do you see that? When I'm talking about the attachment, I'm talking about the patient information sheet.
A: Uh-huh (affirmative).
Q: And the label is actually highlighted to

286:3-6 P's obj: speculation; assumes facts not in evidence; misstates testimony

287:8-10 P's obj: same as above

286:15-20 P's obj: speculation

Def's response: None needed

# Vogeler, Douglas 2006-08-30

288:
highlight the changes that have been made to the label. Do you see that?
A: Yes.
MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) I'm sorry? I didn't hear.
A: Yes, I'm sorry.
Q: And that's what you would want a pharmaceutical company to do, to highlight any important changes that have been made to the label, true?
A: Yes.
Q: And if we look at the label itself, it talks about Vioxx and that it's been approved for rheumatoid arthritis. Do you see that at the top?
A: Yes.
Q: Then in the next -- in the first column it talks about 'Tell your doctor if you have a history of angina,' which is chest pain indicative of heart problems, right?
A: Yes.
Q: 'Heart attack or a blocked artery in your heart.' Do you see that?
A: Yes.
Q: It says, 'Serious stomach problems such as ulcer or bleeding symptoms are things that you should

289:
also tell your doctor about,' true?
A: Yes.
Q: Then it goes on -- and in the middle of the page it says, 'Heart attacks and similar serious events have been reported in patients taking Vioxx.' It says that in that highlighted passage in the middle of the page. Do you see that?
A: Yes.
Q: So that was something that was being reported to physicians and health care providers who read the label and the package insert, true?
A: Yes.
Q: And then if you go on to the second page and the right-hand column, second page of the package insert, do you see the right-hand column contains a lot of highlighting?
A: Yes.
Q: And it talks about the VIGOR study in detail, in a manner that's more detailed, than the summary that was provided in a letter that precedes the label. Do you see that?
A: Yes.
Q: And that's what you would want a pharmaceutical company to do, to include the results in the label itself so that people like yourself can

Overruled

## Vogeler, Douglas 2006-08-30

290:

read it?
MR. NABERS: Objection to the form.
A: Yes.
Q: (By Mr. Krumholz) And that's what you would want the FDA to require of a drug company as well?
A: Yes.
Q: And it goes on and talks about the cardiovascular data that we've talked about already, right?
A: Yes.
Q: And it talks about what the -- that the finding was largely due to a difference in MI's or heart attacks. Do you see that?
A: Yes.
Q: And then on the next page that's Bates numbered 11437 -- do you see that?
A: Yes.
Q: In the middle it says, 'Fluid retention, edema and hypertension' under Precautions. Do you see that? It's highlighted in the middle of the third column, 'Fluid retention, edema and hypertension'?
A: Yes.
Q: And it says, 'Fluid retention, edema and hypertension have been reported in some patients taking Vioxx.' Do you see that?

291:

A: Yes.
Q: So they were informing doctors and health care providers that that indeed had been seen in clinical trials, true?
A: Yes.
Q: It says, 'In clinical trials with Vioxx at daily doses of 12.5 and 25 milligrams in patients with osteoarthritis have shown effects on hypertension and edema similar to those observed with other comparator NSAIDs.' Do you see that?
A: Yes.
Q: So that was saying, essentially, the safety profile as to hypertension, fluid retention and edema, that is, high blood pressure and fluid retention and edema, appeared to be the same sort of results that had surfaced in connection with other NSAIDs, traditional NSAIDs?
A: Yes.
Q: And that was important for you to note because to the extent that Vioxx was as safe as other NSAIDs or other COX-2s, it provided an important safety benefit in the form of gastrointestinal protection --
A: Yes.
Q: -- that you observed not only with your

Def's response: Appropriate cross-examination to issues plaintiff has raised, including this witness' understanding of CV risks (applies through 293:14)

290:1-25 P's obj: cumulative; repetitive

290:4-5; P's obj: speculation; witness is not an expert on this topic.

291:1-25 P's obj: speculation; 4/o; leading; repetitive; cumulative; assumes facts not in evidence.

Overruled

# Vogeler, Douglas 2006-08-30

Vogeler PA PC DA DC on 10-3

292:

patients, but in connection with your own taking of Vioxx?
A: Yes.
Q: So you would agree that via Exhibit 34, this letter and the new package insert or label, Merck communicated both good news regarding gastrointestinal benefits and the CV risks or findings that were found in VIGOR, true?
MR. NABERS: Objection to the form.
A: Yes.
Q: (By Mr. Krumholz) And if you read that information, you would have understood the results of the VIGOR study?
A: Yes.
Q: And that's exactly the sort of thing or the sorts of things that you would want a company like Merck to disclose to prescribing physicians and nurse practitioners?
A: Yes.
Q: Now, I assume that you, as a person who allows Nurse Olson to treat your patients, would expect Nurse Olson to review whatever information was necessary to gain the information that's contained in Exhibit 34?
MR. NABERS: Objection to the form.

292:1-25
P's objection:
same as above

293:

Q: (By Mr. Krumholz) True?
A: Ideally, yes.
Q: You would want her to do it either through review of medical literature or reviewing the actual label itself?
A: Yes.
Q: And that's what you expect of her in your practice?
A: Yes.
Q: And that's what you expect of yourself?
A: Yes.
Q: And that's what you expect of all physicians who treat patients who prescribe medications?
MR. NABERS: Objection to the form.
A: Yes.
Q: (By Mr. Krumholz) Now, if you could pull out Exhibit 21 for a minute, the New England Journal of Medicine article.
A: Yes.
Q: You recall the plaintiff's attorneys asking you a lot of questions about that article in the prior deposition?
A: I don't really recall.
Q: Okay. But you recall that article generally?
A: Yes.

293:1-15
P's obj:
same as above

**Vogeler, Douglas 2006-08-30**

Vogeler PA PC DA DC on 10-3

294:

**Q: And, actually, you recall reviewing either summaries of that article or that article itself back in November of 2001, true?**
**A: Yes. I don't think I reviewed the actual article. I think I just referenced it from my Medical Letter review.**
**Q: Now, plaintiff's attorney asked you during your prior deposition whether you knew Merck funded this study. Do you recall that question generally?**
**A: Yes.**
**Q: Let me ask you this: Are you familiar with how studies generally are funded from time to time? Do you pay attention to that from time to time?**
**A: I know drug companies fund studies.**
**Q: Is that unusual in the medical community for drug companies to fund studies?**
MR. NABERS: Objection to the form.
**A: No, that's fairly common.**
**Q: (By Mr. Krumholz) Is that a good thing?**
**A: Somebody's got to pay for it.**
**Q: Is it a good thing to perform studies on medications to determine benefits and risks?**
**A: Yes.**
**Q: So would you consider that to be a prudent thing for drug companies to do?**

295:

**A: Yes.**
Q: Is that something --
A: It carries biases, but in this country the government doesn't pay for a lot of studies like this. They leave it up to the drug companies to pay for it. In England and other places, the governments pay for it more often, I think.
Q: You're saying it's a good thing, but there may be biases one way or another? That's what you're suggesting?
A: Yes.
Q: You don't know that to be the case, but it may be the case?
A: Correct.
**Q: And as a result, you want those studies and the data from those studies to be reported to the FDA?**
**A: Correct.**
**Q: And you want the FDA to be the filter or screener of what should be communicated to the physicians?**
**A: Yes.**
**Q: And likewise, you would want the journals that they are published in to also be a filter?**
**A: Yes.**
**Q: And as a result, you go to journals that you**

Overruled

Def's response: Appropriate cross examination to the issues plaintiff has raised

295:15-16 P's obj: speculation; vague; 401

295:18-20 P's obj: same

295:22-23 P's obj: same

296:

**respect like The Medical Letter so that you can gain what you believe is objective, unbiased information?**
**A: Yes.**
**Q: And you believe you did that with respect to VIGOR?**
**A: Yes. Well, yes.**
**Q: And you believe you did that in a manner that allowed you to safely prescribe Vioxx in 2001 and 2002?**
**A: Yes.**
**Q: And you feel that Nurse Olson and everyone else in your practice did the same thing in that regard?**
MR. NABERS: Objection to the form.
**A: Yes.**
**Q: (By Mr. Krumholz) You would be disappointed if they didn't do that?**
**A: Yes.**
**Q: Now, another topic that was discussed in connection with Exhibit 21, or the VIGOR article, was whether or not the CV data was prominently displayed. Do you recall that generally about whether it was contained in the conclusion of the abstract?**
**A: I don't recall.**
**Q: But do you see that there's -- regardless, do**

297:

**you see that there's an abstract in the left-hand column of Exhibit 21?**
**A: Yes.**
**Q: And an abstract is actually a summary, right?**
**A: Yes.**
**Q: It's a summary so that doctors like you or nurses can go to it and quickly look at what was studied, how it was studied, the results of the study, correct?**
**A: Correct.**
**Q: And it's not very long, is it?**
**A: No.**
**Q: In fact, it's less than a full column on that particular article, right?**
**A: Yes.**
**Q: And so if you were reviewing it, if a medical doctor or nurse practitioner were reviewing that article, it would be prudent to look at the whole summary and not just a portion of it?**
**A: Yes.**
Q: Do you recall that Mr. Nabers asked you whether or not the CV data was included in the conclusion section of the abstract?
A: I don't recall.
Q: But regardless, I think you said one sentence

Overruled

296:11-17
P's obj: vague; spec; Rule 401
Def's response: witness testifying about his office's practices, particularly as Ms. Olson's supervisor

## Vogeler, Douglas 2006-08-30

298:

before that it is included. Do you recall that?
MR. NABERS: Objection to the form.
A: Well, I can see that.
Q: (By Mr. Krumholz) Can you read the sentence preceding the cardio -- the conclusion section of Exhibit 21, the VIGOR article?
A: You want me to read the conclusion section or the results?
**Q: No, just -- I just want you to read that sentence that you were talking about, the last sentence regarding the CV events in VIGOR.**
**A: That was in the results section.**
**Q: Right.**
**A: It says, 'The incidence of myocardial infarction was lower among patients in the Naproxen group than among those in the rofecoxib group (.1 percent versus .4 percent; relative risk .2; 95 percent confidence interval, .1 to .7); the overall mortality rate and the rate of death from the cardiovascular causes were similar in the two groups.'**
**Q: So if a medical professional, a nurse or a doctor, were reading the abstract, the short summary of this article, they would be able to determine that, indeed, in the VIGOR arm of the study, there was an approximate fourfold increase in the number of heart**

299

**attacks as compared to the Naproxen arm, true?**
**A: Yeah, other than the next sentence kind of nullifies that a little bit.**
**Q: Well, that's in connection with mortality. That's death, not heart attacks, right?**
**A: Not incidents, right.**
**Q: So it doesn't nullify it at all. It just simply says that the mortality rate was the same, but, in fact, there was approximately a fourfold increase in MI's, right?**
MR. NABERS: Objection, argumentative.
**Q: (By Mr. Krumholz) True?**
**MR. NABERS: Same objection.**
**A: Yes.**
**Q: (By Mr. Krumholz) And that's exactly what you have discerned from that summary when you -- if it had been presented to you and you read it back in 2000 or 2001?**
**A: Yes.**
**Q: And from a medical doctor's perspective, do you think that this data regarding the CV risk is prominent enough for a medical doctor to read and understand?**
MR. NABERS: Objection to the form.
**A: Yes.**

Overruled

298:21-25
P's obj:
Rule 401;
vague; speculation

299:7-10
P's obj:
argumentative;
vague; speculation;
Rule 401

299:20-23
P's obj:
argumentative;
vague; speculation;
Rule 401

Def's response:
Appropriate cross examination on issues plaintiff has raised, including the witness' understanding of this article

Overruled

## Vogeler, Douglas 2006-08-30

Vogeler PA PC DA DC on 10-3

300:

Q: (By Mr. Krumholz) Now, counsel also talked to you about whether this article stated that Naproxen is cardioprotective. Do you recall that generally? If you could turn to page 1526.
A: Okay.
Q: I'm going to come around. I apologize if I have to read over your shoulder, but I don't have another copy of that. Plaintiff's counsel read -- at the bottom of page 1526 it says, 'Thus, our results are consistent with the theory that Naproxen has a coronary protective effect and highlight the fact that rofecoxib does not provide this type of protection owing to its selective inhibition of COX-2 at its therapeutic dose and at higher doses.' Did I read that correctly?
A: Yes.
Q: But the very next sentence that plaintiff's counsel didn't read states, 'The finding that Naproxen therapy was associated with a lower rate of myocardial infarction needs further confirmation and larger studies.' Did I read that right?
A: Yes.
Q: So what this was telling you was that while -- first of all, I believe you indicated in your last deposition, and I'll pull out your testimony if

301:

you need it, but that this Naproxen theory, that Naproxen and other NSAIDs may be cardioprotective was not a new theory, right?
A: Yes.
Q: That was something that you knew about long before Vioxx was even on the market, right?
MR. NABERS: Objection to the form.
A: Sure.
Q: (By Mr. Krumholz) This was not something that Merck imagined and came up with, right?
A: Correct.
Q: This was something that medical doctors had talked about and the scientific community had debated for years?
A: Yes.
Q: So all this was saying was that these results were consistent with that notion that it may be cardioprotective, but further analysis is needed; is that right?
MR. NABERS: Objection to the form.
A: Yes.
Q: (By Mr. Krumholz) And that was your understanding at the time that this study came out?
MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) True?

300:1-25
P's obj:
Vague; spec; assumes facts not in evidence; Rule 401; misstates prior testimony; repetitive; cumulative

Def's response:
Appropriate cross-examination

# Vogeler, Douglas 2006-08-30

302:

**A: Yes.**
**Q: And that was your understanding -- and that was what the medical community understood in that time frame?**
MR. NABERS: Objection to the form, calls for speculation.
**Q: (By Mr. Krumholz) As you understood it?**
**A: Yes. As I understood it, yes.**
MR. KRUMHOLZ: Object to the question.
**Q: (By Mr. Krumholz) In other words, there was a scientific debate out there over what was the reason for the VIGOR results, right --**
MR. NABERS: Objection to the form.
**Q: (By Mr. Krumholz) -- as we've talked about?**
**A: Yes.**
**Q: As we said, it could have been because of chance or because of COX-2s generally or Vioxx or Naproxen, right?**
**A: Yes.**
**Q: And there was simply a scientific debate out there as to whether there was sufficient medical evidence or scientific evidence to establish -- to establish with certainty a link as to any of those reasons --**
**A: Yes.**

303:

**Q: -- or a combination of those reasons?**
**A: Yes.**
Q: And that was clearly communicated by the Bombardier article that is Exhibit 21, true?
MR. NABERS: Objection to the form.
A: I don't know if it was clearly communicated. The question was raised, yes.
**Q: (By Mr. Krumholz) Well, if you had read this article, you would have understood that, A, the results are consistent with the Naproxen theory regarding cardioprotection, right?**
**A: Yes.**
MR. NABERS: Objection to form.
**Q: (By Mr. Krumholz) And, two, that that had not been confirmed and further study was needed, true?**
**A: Yes.**
**Q: And that's exactly what The Medical Letter, Exhibit 33, concluded was that the question hasn't been answered yet and it would be, quote, premature to conclude that rofecoxib or celecoxib, that is, Vioxx or Celebrex, increases the risk of thrombotic cardiovascular disease, right?**
**A: Right.**
**Q: So the experts that reviewed the results of the VIGOR study understood that that was the**

**Vogeler, Douglas 2006-08-30**

Vogeler PA PC DA DC on 10-3



304:

scientific debate that was out there and that's what was communicated?
A: Yes.
Q: It would be misleading to suggest that this article definitively states that Naproxen is cardioprotective, right?
A: Yes.
Q: Given what you have reviewed today of what was out there and available to you and Nurse Olson, that is, the April 2002 letter and new label, The Medical Letter that's Exhibit 33 that we've discussed, do you believe that the medical community was adequately informed about Vioxx and the results of VIGOR to make good prescribing decisions for their patients?
MR. NABERS: Objection to the form, calls for him to speculate.
A: Yes.
Q: (By Mr. Krumholz) And that's because, for one reason, Merck put VIGOR in the label, right?
A: Yes.
Q: Merck sent doctors like you Exhibit 34, that is, the new label and the letter describing the changes, right?
A: Yes.

305:

Q: Merck performed a study that actually raised the issue in the first place, right?
MR. NABERS: Objection to the form.
A: Yes.
Q: (By Mr. Krumholz) Do you believe that Merck, based on what we've just discussed, attempted to hide this information?
MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) Do you have any reason to believe they did?
A: No.
MR. KRUMHOLZ: Let's go off the record.
THE VIDEOGRAPHER: It's 34 minutes after 9:00. We're going off the record.
(Recess from 9:34 a.m. to 9:45 a.m.)
THE VIDEOGRAPHER: It's 46 minutes after 9:00 a.m. This is the beginning of tape No. 2. We're back on the record.
Q: (By Mr. Krumholz) I want to direct your attention back to Exhibit 33, quickly, which is The Medical Letter. First of all, can you confirm that this is a true and correct copy of the cardiovascular safety of COX-2 inhibitors analysis that you read in November of 2001?
A: Yes.

Overruled

304:8-15
P's obj:
vague; spec; assumes facts not in evidence; 401; 403; cumulative; best evidence

304:19-20
P's obj:
same

304:22-24
P's obj:
same.

305:1-11
P's obj:
same

Def's response:
Plaintiff raised the issue of the witness' understanding (and his office's practice) regarding CV risk

## Vogeler, Douglas 2006-08-30

306:
Q: Then just above -- do you find this to be a reliable source of information?
A: Yes.
Q: Is it known to be a reliable source of information --
A: Yes.
Q: -- in the medical community?
A: Yes.
Q: If you could look at the second page of this exhibit, it says, 'A second recent review of 23 studies found no evidence of an excess of cardiovascular events with rofecoxib,' which is Vioxx, 'compared to various NSAIDs or placebo.' Do you see that?
A: Yes.
Q: Was that compelling that a review of 23 studies that involved placebo controls was done by Konstam and others and it had found that there was no evidence of an excess of CV events with Vioxx?
A: Yes.
Q: Now, in connection with Exhibit 34, we talked about your receipt of this document, but I want to direct your attention to Exhibit 18, the call notes again. I'm sorry you're having to switch back and forth between documents.

307:
A: Yes.
Q: And if you could turn to page 16 of 18. Do you see in the middle of the page where, in the entry next to your name, Douglas M. Vogeler, April 22, 2002, Robert Fisher called on you? Do you see that?
A: Yes.
Q: And it actually discusses another visit that Mr. Fisher had with you in connection with Vioxx, true?
A: Yes.
Q: And it says, quote, 'We went over changes to PI' -- which is package insert, right?
A: Right.
Q: -- 'for Vioxx in depth.' Do you see that?
A: Right.
Q: Does that refresh your recollection that the label that's contained in Exhibit 34 was reviewed by you in depth in and around that time frame?
MR. NABERS: Objection to the form.
A: It would certainly imply that it was. I don't specifically recall, but Robert is a pretty thorough guy so I'm sure we did.
Q: (By Mr. Krumholz) You found Robert Fisher, the Merck representative, to be thorough?
A: Oh, yes.

## Vogeler, Douglas 2006-08-30

308:

Q: And reliable?
A: Yes.
Q: And he provided balanced information as far as you can tell, true?
A: Well, I'm sure he presented Merck's point of view, but he always presents in a lot of detail.
Q: And he went over the package insert according to this entry that we just went over that's Exhibit 34, right?
A: Yes.
Q: And you have no reason to believe that that didn't happen given how thorough Mr. Fisher is?
MR. NABERS: Objection to the form.
A: Correct.
Q: (By Mr. Krumholz) What was the answer?
A: Correct.
Q: And you believe him to be an honest and trustworthy person?
A: Robert?
Q: Yes.
A: Yes.
Q: Now, is your expectation that you and Nurse Olson would rely on Exhibits 33 and 34 and information like that, that is, package inserts and medical literature, as opposed to relying upon what

309:

representatives from various pharmaceutical companies tell you?
MR. NABERS: Objection to the form.
A: Yes.
Q: (By Mr. Krumholz) That's your expectation in your office?
MR. NABERS: Objection to the form.
A: We put them all together, yes. It's not that I ignore what the reps tell me, because they still have to present data that's collected. It's just that I know it's going to be whatever paints them in a favorable light or more favorable light.
Q: (By Mr. Krumholz) What you expect, though, is for you and Nurse Olson and whoever is involved with your practice to stay abreast of the labels or the literature that describes what's in the label so that they can make good prescribing decisions?
MR. NABERS: Objection to the form.
A: Yes.
Q: (By Mr. Krumholz) Regardless of what the sales reps say?
A: Yes.
Q: And independent of what they say?
A: Yes.
Q: Now, you started seeing Mr. Mason back in the

[Handwritten annotations:]
Overruled
308:22-309:2 P's obj: vague; speculation; assumes facts not in evidence; 401; 403; best evidence
Def's response: ~~Plaintiff~~ raised the issue of sales reps; appropriate cross-examination
309:13-23 P's obj: same

# Vogeler, Douglas 2006-08-30

310:

**early 1990s, as I understand it; is that right?**
**A: Yes.**
**Q: And you understand that he was prescribed Vioxx by Nurse Olson in September of 2002, right?**
**A: Yes.**
Q: I would like to talk to you about the condition, his health condition, at the time he began taking Vioxx. The truth is that Mr. Mason faced a number of significant health issues as of September of 2002, true?
MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) I think Exhibit 6 or the summary page that you prepared in terms of chronic problems may refresh your recollection about that. He faced a number of chronic problems, health conditions, in September of 2002, right?
MR. NABERS: Same objection.
A: I don't see anything that's that significant. He had a lot of little problems, some sleep apnea, some history of depression.
Q: (By Mr. Krumholz) Just to get --
A: Reflux.
**Q: Just so that we, in our mind's eye, can get a picture of Mr. Mason back in September of 2002, let's talk about his health condition for a moment. He had been obese since 1999, and that was a chronic problem, according to your chart, right?**

311:

MR. NABERS: Objection to the form.
**Q: (By Mr. Krumholz) According to your summary page, it says that, does it not?**
MR. NABERS: Objection to the form.
**A: What summary page are you referring to?**
**Q: (By Mr. Krumholz) The list of chronic problems and when it's dated.**
**A: Oh, yeah.**
**Q: It indicates that he had been obese since 1999, right?**
**A: Yes.**
**Q: So that was a chronic problem he faced, true?**
MR. NABERS: Objection to the form.
**A: Yes.**
**Q: (By Mr. Krumholz) He had had tremors, right?**
**A: Yes.**
**Q: And you had not determined the cause of those tremors, right?**
**A: Well, I put familial tremors, the type that run in families, you know, you can't really treat.**
**Q: Or whether there was any disease process that could be debilitating in any way in that regard, you hadn't diagnosed him with anything like that?**

Overruled

310:23-311:2
P's obj:
Vague; ambiguous
Def's response: none needed

# Vogeler, Douglas 2006-08-30

322:

MR. NABERS: Objection to the form.
**Q: (By Mr. Krumholz) Ongoing problems in terms of his ability to have a good quality of life, true?**
**A: Yes.**
**Q: And that's why Naprosyn, for example, was prescribed by your office?**
**A: Sure.**
**Q: And ultimately that's why, as you understand it, Vioxx was prescribed by Nurse Olson?**
MR. NABERS: Objection to the form.
**A: Yes.**
Q: (By Mr. Krumholz) Just so the record is clean --
What is the next exhibit?
MR. NABERS: 37.
MR. KRUMHOLZ: Thanks.
(Exhibit No. 37 marked.)
**Q: (By Mr. Krumholz) Exhibit 37 is a true and correct copy of the April 1998 history and physical that we were talking about, and that indicates back pain had been recurrent since 1972, true?**
**A: Yes.**
**Q: And so when Nurse Olson prescribed Vioxx, you felt like that was an appropriate medication for her to prescribe?**

323:

**A: Yes.**
**Q: And you knew at the time generally that she was prescribing Vioxx to your patients as necessary?**
**A: Generally, yes.**
**Q: Although you didn't have a specific recollection of Mr. Mason receiving it?**
**A: Correct.**
**Q: But you would not have objected to Mr. Mason receiving it?**
**A: No.**
**Q: Even given all the information that you've seen in connection with your deposition and otherwise, you still don't have an objection to him having received Vioxx and been prescribed Vioxx in 1992?**
**A: Correct. If you look at her physical on '90 -- in 2001, she's got that IBS or irritable bowel syndrome, possible GERD, was given samples of Protonix to protect against the GERD. So it would have been appropriate to use a COX-2 in someone you're already concerned about having a problem that may be aggravated by NSAIDs.**
**Q: Given Mr. Mason's GERD or his gastrointestinal issues, it was important to have Vioxx as an alternative to relieve pain and reduce inflammation while having a better tolerability with**

Overruled

323:11-14
P's obj:
Misstates the evidence

Def's response:
None needed

# Vogeler, Douglas 2006-08-30

324:

respect to these GI issues?
A: Yes. I think it's appropriate.
Q: And if you go back to the September 10, 2002 history and physical, one of the problems Mr. Mason was facing was high cholesterol. In fact, Ms. Olson diagnosed him as having high cholesterol, true?
A: She's got a note there on the chemistry.
Q: And I wanted to talk to you specifically about that diagnosis and the entry right next to it, which says HO. Do you see the --
A: HO is history -- where are you talking about?
Q: It says 'high cholesterol' in the diagnosis section of the history and physical, right, on September 10?
A: Right, the elevated, yeah.
Q: And then right next to it I think that's 'Handout on low cholesterol diet.' Is that what that means, as you understand?
A: Yes, handout, yes.
Q: And it says 'to increase exercise,' right?
A: Yes.
Q: And why is it important for a man like Mr. Mason, who is obese and who has been diagnosed as having high cholesterol, to have a low cholesterol diet and to increase his exercise?

325:

A: To decrease his risk of heart attack.
MR. NABERS: I needed to object to the form of that.
Q: (By Mr. Krumholz) So that was a concern for you and Ms. Olson as reflected by this exhibit, this September 10, 2002 record, true?
MR. NABERS: Objection to the form.
A: Yes, that's how it's documented in the chart.
Q: (By Mr. Krumholz) In other words, how you document concerns about a patient's health care is through the diagnosis and treatment plan, right?
A: Yes.
Q: And the diagnosis here was high cholesterol and --
A: Treatment was diet and exercise.
Q: -- and the treatment was a handout educating him about diet and exercise?
A: Right.
Q: And a recommendation that he follow that diet and exercise program, right?
A: Right.
Q: And it was important for him to lower his weight, right?
A: Yes.
Q: And it was important because obesity is a

Overruled

324:22-25
P's obj:
Vague; speculation; argumentative; misstates the evidence

Def's response: Witness is plaintiff's primary doctor. This is basic information

325:25-26:2
P's obj:
same as above, witness is not an expert on this topic

# Vogeler, Douglas 2006-08-30

326:
**significant risk factor for cardiovascular disease, right?**
MR. NABERS: Objection to the form.
**A: Yes.**
**Q: (By Mr. Krumholz) In fact, it's been associated with an increase in myocardial infarctions?**
MR. NABERS: Objection to the form.
**A: Yes. I don't know if it was at the time. I don't know if it was documented at the time.**
Q: (By Mr. Krumholz) Now, in fairness, the cholesterol readings were high but not incredibly high, right?
MR. NABERS: Objection to the form.
A: No. I'm looking at them. They are actually average risk, and that's why she recommended diet and exercise as opposed to adding a medication. It wasn't that serious.
Q: (By Mr. Krumholz) You indicated you treated patients for cardiology issues at one time in your practice; is that right? Maybe I misread that or misheard that.
A: I --
Q: But regardless --
A: These kind of issues I treat patients for all the time.

327:
Q: Okay. Is it fair to say that, whether or not cholesterol is a risk factor for starting atherosclerosis or heart disease in Mr. Mason given his lipid profile, it was a risk for acceleration of any existing atherosclerosis?
MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) Do you agree with that?
A: Well, at the time, and I'm looking at his readings, his ratio and his risk average is average.
Q: But that only takes into account his chemistry, true?
A: Correct. I mean -- I thought that's what you were asking me about was cholesterol.
**Q: Let's throw in a couple other factors. Okay? You have a man who's obese, true?**
**A: Yes.**
**Q: And who has been obese since 1999, right?**
**A: Yes.**
**Q: And, therefore, puts himself at greater risk for heart attacks, right?**
MR. NABERS: Objection to the form.
**A: Yes.**
**Q: (By Mr. Krumholz) What was your answer?**
**A: Yes.**
MR. NABERS: Objection to the form.

# Vogeler, Douglas 2006-08-30

328:

Q: (By Mr. Krumholz) Can you answer so the objection is not over you? Go ahead.
A: Yes.
Q: Thanks.
**And then you have a man who's obviously by age, as of 2002/2003, and gender poses additional risk for Mr. Mason, right?**
**A: Yes.**
**Q: Male over 60?**
**A: Male over 45.**
**Q: Male over 45. So those are additional risk factors, right?**
**A: Yes.**
**Q: And assume with me that he has a sister who died of cardiovascular disease at age 55. Okay? Can you assume that with me?**
**A: Yes. That would be a risk factor.**
Q: Based on that history and those risk factors together with his lipid profile, would you agree that while the cholesterol readings may not be the kind of readings you would believe would start a lesion or a plaque to develop, would be expected to accelerate the existing plaque?
MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) Or would you defer to cardiologists in that regard?

329:

A: No, I think you're asking for too much information from the amount of data that you have here, talking about plaques and accelerating plaques.
Q: Let me ask a different question.
A: We all have plaques. We have plaques from our teenage years and beyond. So -- but I'm looking back in his chart, and in May of '99 his cholesterol was 173, his good cholesterol was 44, his LDL was 106. That puts him below average risk.
Q: Can you look back at his good cholesterol over time and tell us how many readings are below what you would want for a man like Mr. Mason?
A: Well, in '99 he was below average risk. His HDL was 44.
**Q: Just talking in terms of the HDL -- because there's HDL, which is good cholesterol, and LDL, which is bad cholesterol, right?**
**A: Right.**
**Q: And it's important to have low LDL and high HDL?**
**A: Yes.**
**Q: And they establish these limits for a reason, right?**
**A: Yes.**

Overruled

328:14-16
P's obj:
Assumes facts not in evidence; subj of MIL.

Def's response: none needed