**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3

142:

conferences about Vioxx, period?
A. I don't recall.
Q. Okay. It says -- goes on to say that "DDMAC has reviewed your promotional activities and materials and has concluded that they are false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug and Cosmetic Act and applicable regulations." Do you see where I read that?
A. Correct.
Q. But I think your testimony earlier was that the sales reps for Merck did come and call on you about Vioxx, correct?
A. Uh-huh (affirmative.)
Q. And they did leave promotional material about Vioxx, correct?
A. Uh-huh (affirmative).
Q. All right. And as a prescriber of Vioxx, did you anticipate that those promotional pieces would not be false or misleading?
A. Yes.
Q. And then if we look in the next paragraph, the FDA writes Merck and says, "You have engaged in a promotional campaign for Vioxx that minimizes the potential serious cardiovascular findings that were observed in the Vioxx gastrointestinal outcome research study." And that's that study that we have been talking about in the New England Journal of Medicine, right?

143:

A. Yes.
Q. It says, "And thus misrepresents the safety profile of Vioxx." Do you see where I read that?
A. Yes.
Q. All right. Fair to say that you did not expect Merck to misrepresent the safety profile of Vioxx for a prescriber such as yourself, correct?
MR. KRUMHOLZ: Objection, form.
A. Yes.
Q. (By Mr. Nabers) I mean, you would have expected that they would have been truthful and accurate with regard to the safety profile for Vioxx, right?
A. Yes.
Q. I mean, if Merck does not give you accurate safety information about Vioxx, you cannot make a good risk-benefit assessment for your patients, can you?
MR. KRUMHOLZ: Objection.
A. Well, it just means that I would have to dig further on my own to get that information.
Q. (By Mr. Nabers) Okay. It says -- goes on to say, "Specifically, your promotional campaign

Re: 142:17-143:10 Def Obj: leading; Cumulative — P's Resp: Same as pgs 140-141 — Overruled; obj not made timely so waived

Sustained; leading + obj made timely

Re: 143:12-17 Def Obj: Same As 140:18-141:12 — Re: 143:12-17 Def Obj: Leading; Cumulative — P's Resp: Same as pp. 140-141

obj overruled

Sustained

Re: 143:24-145:10 Def Obj: Same As 140:18-141:12 — P's Resp: Same as pp 140-141

Sustained

144:

discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to fivefold increase in myocardial infarctions" -- is that heart attacks?
A. Uh-huh (affirmative).
Q. Yes?
A. Yes.
Q. -- "compared to patients on the comparator nonsteroidal anti-inflammatory drug Naprosyn." Did I read that right?
A. Yes.
Q. Then if we look at the next paragraph, which is the third paragraph, and we focus specifically on the second sentence, it says, "You assert that Vioxx did not increase the risk of myocardial infarctions and that the VIGOR finding is consistent with Naproxen's ability to block platelet aggregation like aspirin." That's what we talked about earlier when we talked about the VIGOR study, right?
MR. KRUMHOLZ: Objection, form.
A. Yes.
Q. (By Mr. Nabers) It goes on to say that "That is a possible explanation, but you fail to disclose that your explanation is hypothetical."
Did anybody from Merck ever come to tell you

145:

that Naproxen's cardioprotective effects was hypothetical? Did they ever tell you that?
A. No, not that I recall.
Q. They go on to say that "This explanation about Naproxen's cardioprotective benefits has not been demonstrated by substantial evidence and that there is another reasonable explanation that Vioxx may have pro-thrombotic properties." Did I read that right?
A. Yes.
Q. Okay. So the FDA is telling Merck that they have no basis to be saying that Naproxen's cardioprotective effects is the reason why there were less cardiovascular events in that group as compared to Vioxx, correct?
MR. KRUMHOLZ: Objection, form.
A. Correct.
Q. (By Mr. Nabers) And, actually, what the FDA is saying is that Vioxx may have pro-thrombotic properties, right?
MR. KRUMHOLZ: Objection, form.
A. It's a possibility, yes.
Q. (By Mr. Nabers) And what does that mean, if Vioxx --
A. Pro-thrombotic means it promotes clot

Sustained

146:

formation.
Q. Which would promote heart attacks, right?
A. It could.
Q. And then on page 2, if we look at the second paragraph, the FDA writes to Merck and says, "Your minimizing these potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns." Do you see where I read that?
A. Yes.
Q. "Your misrepresentation of the safety profile for Vioxx is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresent Vioxx's safety profile." Do you see where I read that?
A. Yes.
Q. All right. At the time that you were prescribing Vioxx, did you have any indication that Merck was misrepresenting the safety profile of Vioxx?
A. No.
Q. Doctor, let me show you what I will mark as Deposition Exhibit No. 26.
(Exhibit No. 26 marked.)
Q. (By Mr. Nabers) This is another press release from Merck dated May 22nd, 2001. Do you see that in front of you?

147:

A. Yes.
Q. Will you hold that other exhibit that you were looking at, that warning letter, side by side? I'm not through with them. I want to show you. And what we're looking at is page 6 of Deposition Exhibit No. 25. Do you see where it says Press Release at the bottom of page 6?
A. Yes.
Q. All right. And it says, "We have identified a Merck press release entitled 'Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx' dated May 22nd, 2001." Do you see that?
A. Yes.
Q. And what I've marked as Deposition Exhibit No. 26 is that press release. Do you see it?
A. Yes.
Q. All right. And that's the title of the press release, isn't it, that Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx, right?
A. Yes.
Q. It says in the first paragraph there, and it's dated May 22nd, 2001, "In response to news and analyst reports of the data the company first released

Pl: 146:4-148:5
Def Obj: Same as 140:18-141:12

P's Resp
Same as 140-141

Sustained

Sustained

# Vogeler D 20060726.ctx

Vogeler PA PC DA DC on 10-3

148:

a year ago, Merck & Co. today reconfirmed the favorable cardiovascular safety profile of Vioxx, its medicine that selectively inhibits COX-2." That was the information Merck was putting out about Vioxx, right?
MR. KRUMHOLZ: Objection, form.
A. Right.
Q. (By Mr. Nabers) And that was information that you were aware of about Vioxx, correct?
A. Yes.
Q. And you thought, as of this date, May 22nd, 2001, that Vioxx was still okay to prescribe to your patients, right?
A. Yes.
Q. And Merck is actually telling you in a press release that it is okay. They're confirming the safety profile of Vioxx, correct?
MR. KRUMHOLZ: Objection, form.
A. Correct.
Q. (By Mr. Nabers) All right. Then let's look back at 25 what the FDA says about this press release. It says, "We have identified a Merck press release entitled 'Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx' dated May 22nd, 2001 that is also false or misleading for similar reasons stated above."

149:

Do you see they're saying that this press release that we just looked at confirming the cardiovascular safety profile of Vioxx is false and misleading?
A. Yes.
Q. And they says, "Additionally, your claim in the press that Vioxx has a favorable cardiovascular safety profile is simply incomprehensible." Do you see that?
A. Yes.
Q. Anybody ever make you aware of that?
A. No.
Q. That's coming straight from the FDA, according to this letter, isn't it?
A. Yes.
Q. And yet that's the information that's out there for prescribers like you to get with regard to the safety profile of Vioxx, correct?
A. Correct.
Q. Then it goes on to say, "The implication that Vioxx cardiovascular profile is superior to other NSAIDs is misleading. In fact, serious cardiovascular events were twice as frequent in the Vioxx treatment group as in the Naproxen treatment group in the VIGOR

Overruled no timely objection

Re: 148:8-148:17
Def Obj: leading

PS Resp: Same as pgs 140-141

Sustained

Re: 148:19
Def Obj: leading

Re: 148:20-150:5
Def Obj: Same as 140:18-141:12

PS Resp: Same as pgs 140-141

Sustained

# Vogeler D 20060726.ctx

150:

**study." Do you see where I read that?**
**A. Yes.**
**Q. And that is not information that you were ever made aware of, correct, this letter from the FDA?**
**A. Not that I recall.**
Q. Okay. If we turn over to page 7 of that document, Doctor, do you see where it says, on page 7, Conclusions and Requested Action?
A. Yes.
Q. And if we look at paragraph two, do you see the FDA writes to Merck and says, "Due to the seriousness of these violations and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this warning letter on or before October 1st, 2001." Do you see that?
A. Yes.
Q. All right. So based upon that information that the FDA writes to Merck, does it look like Merck had a propensity to put out information about its drug that was misleading?
MR. KRUMHOLZ: Objection, form.
Q. (By Mr. Nabers) At least according to what the FDA says?

151:

MR. KRUMHOLZ: Same objection.
A. Yes.
**Q. (By Mr. Nabers) I want to talk specifically about Mr. Mason now for a second, and specifically if you want to pull your medical chart and keep it there in front of you, I want to ask you specifically kind of about your care and treatment about him. But before we talk about his medical conditions and histories and physical exams and things, it's fair to say you never prescribed Vioxx to Mr. Mason?**
**A. Yes.**
**Q. It was Nurse Olson who prescribed Vioxx to Mr. Mason?**
**A. Yes.**
Q. And at the time she prescribed Vioxx to Mr. Mason, you, Dr. Vogeler, and Nurse Olson, y'all had never talked about prescribing Vioxx to Mr. Mason?
A. No.
Q. You had no interaction in the prescription of Vioxx to Mr. Mason?
A. No.
Q. I better do that again. You had no interaction with the -- no interaction -- strike it. I have been doing this, I think, too long. Let me see

# Vogeler D 20060726.ctx

158:

Q. That was a good thing for his health?
A. That's excellent, yes.
Q. And cholesterol levels, if they are elevated, can be a risk factor for coronary artery disease, correct?
A. Correct.
Q. It can also be a risk factor for cardiovascular disease?
A. Correct.
Q. All right. But he didn't have any of those risk factors when you started seeing him in 1990, correct?
A. Correct.
Q. All right. Up until July of 2003, did he ever have cholesterol levels that would put him at risk for cardiovascular disease?
MR. KRUMHOLZ: Objection, form.
A. In 1998 he -- his cholesterol started coming up as he got older.
Q. (By Mr. Nabers) Is that normal?
A. Yes.
MR. KRUMHOLZ: Objection, form.
A. Yes.
Q. (By Mr. Nabers) Okay.
A. His total cholesterol on April 14th of '98

159:

was 189, which is still under the recommended 200. His good cholesterol, his HDL, however, is still low at 36. His bad cholesterol is now at 123, which at the time was still considered okay. And the triglycerides were 147, which we like under 150 currently. So those were okay. But he's gone from half the average risk to average risk.
Q. So as of --
A. By 1998.
Q. So by 1998, he just has the average risk based upon his lipid levels for cardiovascular disease?
A. Yes. Now, in 2001, cholesterol came back a little better. Maybe he was watching his diet better or lost some weight. His cholesterol was back down to 161. Good cholesterol, HDL, was up to 39. Bad cholesterol was back under 100 at 88, and that put him back at below average risk again.
Q. And what year was that?
A. That was July of 2001.
Q. All right. So as of July 2001, his risk of cardiovascular disease as a result of his lipid levels was below average?
A. Was below average again.
Q. Okay.

Overruled

Re: 159:21-24
Def Obj: Incomplete Answer
P's Resp.
Question and answer were complete.

# Vogeler D 20060726.ctx

164:
medications, can that affect erectile dysfunction?
A. Yes.
Q. Okay. And is that, taking depression medications, known to sometimes cause erectile dysfunction in certain individuals?
A. Yes.
**Q. Okay. During the time that your office saw him from 1990 up until the time of his heart attack in July of 2003, was there anything that you noted in the chart that would indicate that he was at risk for cardiovascular disease or heart attack?**
MR. KRUMHOLZ: Objection, form.
**A. Not at high risk.**
**Q. (By Mr. Nabers) Okay. Well, let me ask it a different way, then. Based upon his -- the time frame from 1990 up until 2003 in July when he had his heart attack, what risk factors do you believe that he had for heart attack, based upon your medical chart?**
**A. Male and age.**
**Q. Is that the only two?**
MR. KRUMHOLZ: Objection, form.
**A. He was overweight.**
**Q. (By Mr. Nabers) Okay. Anything else?**
MR. KRUMHOLZ: Objection, form.
**A. No.**

165:
**Q. (By Mr. Nabers) Okay. Do you know when -- let me ask you this: Did you ever diagnose him with high blood pressure or hypertension?**
**A. No.**
MR. KRUMHOLZ: Objection, form.
Q. (By Mr. Nabers) Have you ever treated him for that condition?
MR. KRUMHOLZ: Objection, form.
A. He's on antihypertensive now, but not because of the high blood pressure.
Q. (By Mr. Nabers) What's he on the antihypertensive now for?
A. For cardioprotective benefits.
Q. And you're helping managing that now?
A. Yes. The cardiologist started those.
**Q. All right. You're aware that he had his heart attack in July of 2003, correct?**
**A. Yes.**
**Q. And we've talked about Vioxx. When you think about a differential diagnosis for the cause of his heart attack, what do you include in your differential diagnosis?**
MR. KRUMHOLZ: Objection, form.
**A. For causes?**
**Q. (By Mr. Nabers) For potential causes of his**

Overruled

Re: 165:19 Def Obj: Improper Sidebar ("And we've talked about Vioxx")

P's Resp: This is a preamble to the question which helps frame the issue for the doctor to discuss.

166:

heart attack.

A. Anything that -- all the risk factors we talked about, hypertension, hypercholesterolemia, obesity. In terms of him specifically?

Q. Specifically, yes.

A. Well, he was a male over 50 -- a male over 45, and he was overweight. His HDL was always a little low. I don't know what his exercise regimen was. He probably didn't exercise well enough. I don't -- he was a smoker in the past, but he stopped like 20 years ago. So I don't know when I wrote this -- probably in '99, so he probably stopped smoking in '79. But usually cardiovascular risks decreases after like five or 10 years or sooner for a lot of it. So probably that's not as big an issue right now.

Q. All right. Would you include --

A. Sleep apnea would be another option -- I mean, another risk factor.

Q. All right. Would you include Vioxx in your differential as a potential cause of his heart attack?

MR. KRUMHOLZ: Objection, form.

A. Yes.

Q. (By Mr. Nabers) All right. Is there any way to exclude it as a potential cause?

MR. KRUMHOLZ: Same objection.

167:

A. No.

Q. (By Mr. Nabers) As far as being male and as far as being age, he just happens to be in that group, I guess, that has a risk for a heart attack, correct?

A. Yes.

Q. Okay. With regard to his sleep apnea being controlled on CPAP, does that lessen the potential for it to be a cause of the heart attack?

A. I don't know the answer to that. I presume it does, but I don't know if the studies have shown the benefit. We know it's a risk. I don't know if they've done studies that show that if you treated sleep apnea with CPAP, you then decrease your risk of heart attack. I'm not aware of those studies.

Q. At the time Ms. Olson or Nurse Olson prescribed Vioxx to Mr. Mason, from a cardiac standpoint he was a good candidate for getting Vioxx, correct?

A. Yes. He was low risk.

Q. There wasn't any cardiovascular concerns you had about him getting Viox?

A. Correct.

Q. Let me show you what I want to mark as the next exhibit, which would be a stress test done by

Overruled

Re: 166:20-21 Def Obj: Calls for expert opinion without designation or qualification; witness did not diagnose Vioxx as a potential cause as part of his treatment

Re: 166:23-25 Def Obj: Same as 166:20-21

Re: 167:2 Def Obj: Same as Re 166:20-21

P's Resp.: The doctor is π's primary care physician and has been such for longer than a decade. He is well aware of π's complete medical history and is a part of π's medical monitoring as a result of π's heart attack. He still sees, diagnoses, treats + care for the med. conditions of π. By way of education, training, experience, and review of literature he is qualified and was designated to render such medical testimony. It would be redundant to say he can DX, treat, medically monitor + care for π as a result of his heart attack and not let him comment on Vioxx.

## Vogeler D 20060726.ctx

172:

**heart attack. They put him on Altace and Norvasc, and Altace has been shown to decrease the risk of a second heart attack, I think, as a secondary prevention, and Norvasc prevents spasm of the coronary arteries. So sometimes a heart attack can be the result of spasm, and, also, he was having some symptoms of chest pain for which he was on nitroglycerin, so Norvasc is a calcium channel blocker and it would help prevent that.**

**So I presume that's why they put him on both of those. And if they thought he had some hypertension while he was in the hospital, it would have been -- those would have been a reasonable choice to put him on for that. But by the time I saw him in October, his blood pressure was still nice and low at 110 over 72.**

Q. Okay. So would you agree that Mr. Mason had an average risk for a heart attack prior to his ingestion of Vioxx?

MR. KRUMHOLZ: Objection, form.

A. Yes.

Q. (By Mr. Nabers) I mean, he was not at high risk of a heart attack prior to taking Vioxx for a heart attack, correct?

MR. KRUMHOLZ: Objection, form.

173:

A. No.

Q. (By Mr. Nabers) And you've cared for patients, obviously, after they've had a heart attack, correct?

A. Yes.

**Q. Is a heart attack a -- strike that. When a patient has a heart attack, is that something that causes them anxious or concern about their health?**

**A. Sure.**

**Q. Okay. Heart attack is obviously a big deal to someone who's had it, right?**

**A. Sure.**

**Q. It doesn't matter to the patient what type of heart attack they've had, correct?**

**MR. KRUMHOLZ: Objection, form.**

**A. No, I would say it does matter. I mean, some people think they had a little heart attack. They are more reassured than someone who has had a massive heart attack, and we have to explain those differences to the patients and their outcomes are different.**

Q. (By Mr. Nabers) And you do do that, correct?

A. Cardiologists do. I may reinforce something that the cardiologist told them.

**Q. All right. And heart attacks can cause pain, correct, to the patient while they are having it?**

Overruled

173:13-20:
P's obj: Speculation; foundation; improper opinion

Def's response: This answer completes the testimony plaintiff designated at 173:6-12

174:

A. Yes.
Q. Heart attacks can cause symptoms while they are having a heart attack, correct?
A. Yes.
Q. It can cause symptoms after they have a heart attack, correct?
A. Yes, and it can cause no symptoms. A third of them are silent.
Q. All right. Once a patient has a heart attack, many times they need to have medications afterwards for that, correct?
A. Correct.
Q. All right. And once you have a heart attack, are you at increased risk of having another heart attack in the future?
MR. KRUMHOLZ: Objection, form.
A. Yes.
Q. (By Mr. Nabers) And based upon what you know from your medical chart and your care and treatment of Mr. Mason, since July 2003 you're not aware of him having a second heart attack, correct?
A. Correct.
Q. But you do believe that he should continue to be medically monitored as a result of his heart attack?

175:

A. Yes.
MR. NABERS: Okay. I think that's all I have. Appreciate your time.
MR. KRUMHOLZ: I'm going to need a few minutes to kind of organize and to switch sides.
THE VIDEOGRAPHER: It's 32 minutes after 11:00. We're going off the record. This is the end of tape No. 2.
(Recess.)
THE VIDEOGRAPHER: It's 45 minutes after 11:00. This is the beginning of tape No. 3 and we're back on the record.
EXAMINATION
BY MR. KRUMHOLZ:
Q. Dr. Vogeler, my name is Richard Krumholz and I represent Merck in this case. We've never met before today; is that right?
A. Correct.
Q. You have met with Mr. Nabers?
A. Yes.
Q. How many times have you met with Mr. Nabers?
A. I think this is the third.
Q. You've met with Mr. Nabers three times prior to today?
A. I think twice prior to today.

Re: 174:23-175:1
Def Obj: leading
P's Resp: Not a leading question
Sustained

# Vogeler D 20060726.ctx

194:

traditional NSAIDs?
A. Right. If you had those problems, then -- first of all, you would be at a higher risk of GI bleeding or symptoms of it. And if you didn't and they weren't on something like a proton pump inhibitor like Nexium or Aciphex, you would have to add that to the regimen to protect their stomach or you would be liable. So it was a problem.
Q. So it was important for you to have a different treatment option than the traditional NSAIDs to prevent just the sort of concerns you just described?
A. Yes.
Q. In other words, to prevent the GI problems that people, for example, with GERD have?
A. Correct.
Q. And, in fact, Mr. Mason has GERD, true?
A. Correct.
Q. So it was important for people like Mr. Mason to have treatment options other than traditional NSAIDs?
A. Yes.
Q. And when we talk about these perforations, ulcers and bleeds that are a risk for traditional NSAIDs, those medications you used to prescribe to

195:

patients like Mr. Mason, they can be fairly serious issues, can they not?
A. I think somewhere around 75,000 deaths a year in the country are from PUBs from NSAIDs, is the number I've heard, 50 to 75,000 a year.
Q. It's commonly known in the medical profession that literally tens of thousands of folks are hospitalized each year as a result of the kind of GI problems that traditional NSAIDs can cause?
MR. NABERS: Objection to the form.
Q. (By Mr. Krumholz) True?
A. Yes.
Q. Likewise, it's commonly known in the medical community, in the scientific literature, that -- how many people did you say actually die as a result of these sort of issues?
A. 50 to 75,000. I don't know whether that's deaths or hospital admissions. I think it's deaths.
Q. And some portion of those, it's your understanding, die as a result of those GI complications?
A. Yes.
Q. So you were happy to have on the market COX-2s when they showed up at your doorstep, so to speak?

Overruled

195:6-9
P's obj: Calls for speculation; Witness is not an expert on this topic.
Def's response: Basic knowledge to a physician who prescribes NSAIDs

## Vogeler D 20060726.ctx

200:

**A. Yes.**
**Q. Do you feel like that's well established in the medical literature?**
**A. Yes.**
MR. NABERS: Objection to the form.
**Q. (By Mr. Krumholz) Do you keep up with medical literature -- outside of what drug companies may or may not be telling you, do you keep up with scientific literature regarding the gastrointestinal benefits of COX-2s?**
**A. To a degree, yes, as it shows up in a journal that I read.**
**Q. And you have seen those types of articles, true?**
**A. Yes.**
**Q. And that scientific literature that you rely on indicates that the COX-2s reduce that risk of GI issues?**
**A. Yes.**
**Q. And that's important to you and your patients?**
**A. Yes.**
Q. Do you currently take any COX-2?
A. Yes.
Q. And what do you take?

201:

A. Celebrex.
Q. Do you actually prescribe Celebrex to your patients?
A. Yes.
Q. Do you know if Nurse Olson prescribes Celebrex to her patients?
A. Yes.
Q. Today?
A. Yes.
**Q. I want to talk, first of all, about your own use. It's my understanding you have taken Vioxx because of a surgery that you had as well as osteoarthritis; is that right?**
**A. Yes.**
MR. NABERS: Objection to the form.
**Q. (By Mr. Krumholz) Is that true?**
**A. Yes.**
MR. NABERS: Objection to the form.
**Q. (By Mr. Krumholz) Was it effective?**
**A. Yes.**
MR. NABERS: Objection to the form.
**Q. (By Mr. Krumholz) Tell us how it was effective.**
MR. NABERS: Objection to the form.
**A. It didn't upset my stomach and it got rid of**

[Handwritten notes:]

I allow personal use testimony for treater because it is relevant to what they know of drug & why they prescribed it

overruled ✓

201:10-14
P's obj:
Rule 401; Rule 403; No foundation
Def's response: Plaintiff raised the issue of this witness' understanding of the risks and benefits of Vioxx (applies through 203:23)



This goes too far into it. While relevant it presents 403 problems. Going too far into personal use crosses over the boundaries of 403.
Sustained
202:1-25
P's obj:
Rule 401; Rule 403; No foundation
203:1-23
P's objection:
Rule 401; Rule 403; no foundation

202:

my pain.

Q. (By Mr. Krumholz) Up until the time that you took Vioxx, was it the best pain relief that you had obtained in connection with your osteoarthritis?

MR. NABERS: Objection to the form.

A. It was comparable to pain. I used to take Naprosyn. I've taken Motrin. I've taken Tylenol. It was comparable to Naprosyn. Naprosyn was better than the others.

Q. (By Mr. Krumholz) So it was -- it was able to reduce your pain or eliminate your pain as well as Naprosyn was able to eliminate it?

A. Yes.

MR. NABERS: Objection to the form.

Q. (By Mr. Krumholz) Is that true?

A. Yes.

MR. NABERS: Objection to the form.

A. I just developed more stomach problems as I got older and I couldn't tolerate the Naprosyn after a few years.

Q. (By Mr. Krumholz) So were COX-2s your only alternatives in terms of reducing your pain in your mind given your GI issues with the traditional NSAIDs?

MR. NABERS: Objection to the form.

A. I can take them for a limited amount of time

203:

as long as I'm taking -- I take Aciphex for my stomach. So as long as I'm protecting my stomach, I can do it for a short period of time.

Q. (By Mr. Krumholz) Did you find Vioxx to be a safe drug for you?

A. Yes.

MR. NABERS: Objection to the form.

Q. (By Mr. Krumholz) Did you have any untoward side effects?

MR. NABERS: Objection to the form.

A. No.

Q. (By Mr. Krumholz) Were you happy with the results you obtained in connection with your use of Vioxx?

MR. NABERS: Object to the form.

A. Yes.

Q. (By Mr. Krumholz) And you found it to be an effective pain reliever?

MR. NABERS: Objection to the form.

A. Yes.

Q. (By Mr. Krumholz) Did you find it to be effective in terms of reducing inflammation?

A. Yes.

MR. NABERS: Objection to the form.

Q. (By Mr. Krumholz) In connection with your

Sustained

204:

**patients, did you find it to be an effective pain reliever?**

**A. Yes.**

**Q. Did you find Vioxx to be a safe drug for your patients?**

**A. Generally, yes.**

**Q. Did you find that your patients could tolerate Vioxx better than the traditional NSAIDs --**

**A. Yes.**

**Q. -- from a GI perspective?**

**A. Yes.**

**Q. Did you notice that your patients had fewer GI-related issues when they took COX-2 inhibitors, and particularly Vioxx, as opposed to the traditional NSAIDs?**

**A. Yes.**

**Q. And that was -- was that important to you?**

**A. Yes.**

**Q. Was that important to your patients?**

**A. Yes.**

**Q. Is it still important to your patients?**

**A. Yes.**

Can I take two minutes to wolf this sandwich down?

MR. KRUMHOLZ: Yeah, let's go off the record.

205:

THE VIDEOGRAPHER: It's 16 minutes after 12:00. We're going off the record.

(Recess.)

THE VIDEOGRAPHER: It's 22 minutes after 12:00. We're back on the record.

Q. (By Mr. Krumholz) Doctor, we were talking about the fact that you still prescribe COX-2s today; is that right?

A. Yes.

Q. Specifically you prescribe Celebrex; is that right?

A. It's the only one left.

Q. You indicated in response to Mr. Nabers' questions that you thought it was appropriate for Nurse Olson to prescribe Vioxx for Mr. Mason given his presentation. Do you recall that?

A. Yes.

Q. Do you believe -- let me rephrase that. For patients who present with substantially the same health issues that Mr. Mason faced in the fall of 2002, would Celebrex be an appropriate medication today?

A. Yes.

Q. So you would have no problem prescribing Celebrex for Mr. Mason in 2002 before his heart

Overruled

# Vogeler D 20060726.ctx

206:
attack; is that right?
A. Correct.
Q. If he presented with the same issues that he presented with back in September of 2002?
MR. NABERS: Object to the form.
A. Yes.
Q. (By Mr. Krumholz) Is that right?
A. Yes. I would give it to him today.
Q. Let me ask you a different question. If Vioxx were still on the market, would you have -- would you still be prescribing it?
MR. NABERS: Objection to the form.
A. Yes. Yes.
Q. (By Mr. Krumholz) You still believe it to be a safe and effective drug --
MR. NABERS: Objection to the form.
Q. (By Mr. Krumholz) -- for appropriate patients?
MR. NABERS: Same objection.
A. Yes.
(Exhibit No. 31 marked.)
Q. (By Mr. Krumholz) I'm going to hand you what has been marked as Exhibit 31. I assume you recognize Exhibit 31 as a Celebrex package insert or label?
A. Yes.

207:
Q. It's something that you've seen before, I assume --
A. Yes.
Q. -- in connection with your prescription of Celebrex to your patients; is that right?
A. Yes.
Q. And if you look at page 25 of Exhibit 31, what date does it indicate this particular label was revised?
A. 25?
Q. Yes.
A. July 2005.
Q. Okay. So do you believe that you became aware of this label on or about July of 2005?
MR. NABERS: Objection to the form.
A. The actual label? I mean, the information about increased risk of heart disease was certainly out before that.
Q. (By Mr. Krumholz) So you understood, for example, the information contained in the black box on the first page of Exhibit 31, that is, the Celebrex label, before July of 2005; is that right?
A. Yes.
Q. And I assume that those -- that's the sort of information that you and Nurse Olson discussed from

Plaintiffs' General obj: 206-211: General objection to questions about Celebrex or other NSAIDS. Rule 401; Rule 403; Subject of Plaintiffs MIL.

206:9-20
P's obj: Rule 401; Rule 403; vague; speculation

Def's response: Plaintiff raised the issue of the witness understanding of the risks of Vioxx. Plaintiff also raised the issue of whether certain information would have affected this witness' practice. This testimony establishes no proximate cause between allegedly defective warning and plaintiff's MI

Sustained 401 & 403

207:24-25
P's obj: vague; speculation.

Def's response: Directly rebuts plaintiff's theory that Ms. Olson knew nothing about CV risks



Sustained

# Vogeler D 20060726.ctx

Vogeler PA PC DA DC on 10-3

208:

time to time?
A. Yes.
Q. When there are significant safety issues that arise in connection with medications your office prescribes, is it routine for you and Nurse Olson to discuss those issues?
A. Yes.
Q. And long before this label came out that's Exhibit 31, you and Nurse Olson discussed Celebrex's safety factors?
MR. NABERS: Objection.
A. Yes.
Q. (By Mr. Krumholz) Including the cardiovascular risks that are contained in the black box on the first page of Exhibit 31?
MR. NABERS: Objection to the form.
A. Yes.
Q. (By Mr. Krumholz) Now, let's go through the first page of this, if you don't mind.
MR. NABERS: Let me just go ahead and object to the use of the documents as it has nothing to do with this case, but go ahead.
Q. (By Mr. Krumholz) Under Cardiovascular Risk -- first of all, are you aware of what a black box warning is?

209:

A. Yes.
Q. Do you understand it to be the most significant warning that's required by the FDA?
A. I don't know if it was the most significant, but I know it's an important warning that's usually brought about by something that's an adverse reaction that's come out in the course of a medication --
Q. It's usually something --
A. -- or maybe already known when the medication comes out.
Q. What it usually signifies is something prominent that the FDA thinks is necessary for a particular drug, true?
A. Yes.
Q. And so you know to pay particular attention to it?
A. Yes.
Q. And one of the things that it talks about in the black box warning for Celebrex that's in this label is cardiovascular risk, correct?
A. Yes.
Q. It says, "Celebrex may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction and stroke, which can be fatal." Did I read that correctly?

Def's response: Directly rebuts plaintiff's theory that Ms. Olson was unaware of CV risks.

208:3-6 P's obj: Vague; speculation

208:8-10 P's objection: Vague; ambiguous; speculation; Rule 401; Rule 403

208:13-15 P's obj: Vague; ambiguous; speculation; Rule 401; Rule 403

208:18-19 P's obj: Objection to Ex 31; Rule 401; Rule 403; foundation.

Sustained 401 + 403

Sustained

# Vogeler D 20060726.ctx

Vogeler PA PC DA DC on 10-3

210:

A. Yes.
Q. It says, "All NSAIDs may have a similar risk." Did I read that correctly?
A. Yes.
Q. "This risk may increase with duration of use." Did I read that correctly?
A. Yes.
Q. Is it known in the scientific community that all NSAIDs have a similar risk in this category?
MR. NABERS: Objection to the form. Vague as to time.
A. I don't think that's been answered yet.
Q. (By Mr. Krumholz) Is it still the subject of debate today?
A. Yes.
Q. But regardless, it is known in the scientific community that all NSAIDs carry -- all traditional NSAIDs carry some risk?
A. Cardiovascular risk?
Q. Yes.
A. I don't know that that's been answered. It's a question that's being investigated, it's definitely being raised, and it's something I have to inform a patient about.
Q. And regardless, you knew of this risk or you know of this risk in connection with treating your patients today?

211:

MR. NABERS: Objection to the form.
A. Yes.
Q. (By Mr. Krumholz) With Celebrex?
A. Yes, but with Celebrex it tends to be dose response related, and Celebrex 200 milligrams, as far as I know, isn't associated with increased cardiovascular risk.
Q. (By Mr. Krumholz) That's not what this label says, though, true?
A. That's not what that says right there.
Q. Okay.
A. So that's the only dose I'll prescribe now. Before I used higher dose.
Q. Regardless, when you prescribe Celebrex, you weigh the benefits and the risks for any particular patient, true?
A. Sure.
Q. And you weigh the risks of a cardiovascular problem to the extent that risk exists?
A. Yes, versus a GI bleed.
Q. And you discuss those risks with the patient?
A. Yes.
Q. And your patients generally follow your

210:8-9 Vague; Rule 401; Rule 403
Def's response: none needed

210:25-211:2
P's Obj: Vague; Rule 401; Rule 403

Re: 211:5-9
Def Obj: Incomplete question and answer; NEED TO ADD 211:10-211:15 for completeness
P's Resp: This question + answer are clear and need nothing further for context purposes. The question + answer are complete.

Sustained 401 + 403

Overruled

**Vogeler D 20060726.ctx**

Vogeler PA PC DA DC on 10-3

226:

Q. Does that seem to invite Merck to submit additional documentation so it can go back on the market?
MR. NABERS: Objection to the form.
A. That would be the implication.
**Q. (By Mr. Krumholz) To be clear, if Vioxx was still on the market, you would prescribe it today to someone with the same conditions that Mr. Mason presented with in September of 2002?**
MR. NABERS: Objection to the form.
**A. Yes.**
MR. KRUMHOLZ: There's some documents I have to get out. I need to go off the record just for a short time.
THE VIDEOGRAPHER: It's 46 minutes after 12:00. We're going off the record.
(Off-the-record discussion.)
MR. KRUMHOLZ: Just back on the record after a break. Unfortunately, given the doctor's schedule and the length of the deposition, it's going to be impossible to complete the deposition, and as a result the doctor has been nice enough to offer up August 30th at 8:00 a.m. for the continuation of this deposition, and we're going to go ahead and try and do it on that date. I guess at this same location?

227:

THE WITNESS: Yes.
MR. KRUMHOLZ: Is that agreeable, Scott?
MR. NABERS: Yes, that would be fine.
(The deposition adjourned at 12:56 p.m.)

226:6-9
P's objection: Vague; speculation; Rule 401; Rule 403

Def's response: Plaintiff raised the issues of this witness' knowledge of CV risks and whether certain information would have changed his prescribing practices. This testimony makes clear that the allegedly defective warning did not proximately cause the alleged injury since the witness would still prescribe the medicine today.

232:

PROCEEDINGS
THE VIDEOGRAPHER: Today is the 30th day of August, 2006 at 17 minutes after 8:00 a.m. We're on the record.
DOUGLAS M. VOGELER, M.D.,
called as a witness on behalf of the plaintiffs, being duly sworn, was examined and testified as follows:
EXAMINATION (Continued)
BY MR. KRUMHOLZ:
Q: Dr. Vogeler, as you recall, we met during the first part of your deposition a few weeks ago, and it shouldn't be too long today but we'll try to get through it efficiently.
As you'll recall, we were talking about different sources of information you had about particular medications, and one source that we talked about was the package insert or label for a particular medication. Do you recall that, generally?
A: Generally, yes.
Q: And we went over, I think, the Celebrex label. Do you recall that?
A: Okay.
**Q: Now, I want to talk to you a little bit more about all of the sources of information that are available to a family practitioner such as yourself**

233:

**when you're prescribing medications, and I'm talking about those medications that you prescribe. I believe you indicated that the package inserts or labels are important to you because they are screened by the FDA. Do you recall that?**
**A: Yes.**
MR. NABERS: Objection to the form.
**Q: (By Mr. Krumholz) Can you tell us why the package inserts or labels for medications are important to you?**
**A: Well, like I said, they have to be approved by the FDA. The wording and the claims and the studies that are included in those are screened by the FDA, so it's not just a select group of studies that the pharmaceutical rep may want to present to me which might show their products in a better light.**
**Usually, the competition points out what the FDA -- or what their insert has allowed them to say as opposed to what a competing drug rep might claim from another study that their product can do. And so it's kind of like the backup, you know, bible in terms of what's the truth and what, you know, is a more balanced representation of what the products can do.**
**Q: Do you find them to be an objective source of information about medications?**

Overruled

232:23-233:6
P's obj:
speculation; vague; 401; misstates prior testimony
Def's response: none needed

## Vogeler, Douglas 2006-08-30

Vogeler PA PC DA DC on 10-3

Overruled

234:

A: Yes.
Q: And as a result, you rely on package inserts and labels for medications?
A: I don't read them a lot unless I have to, unless someone has some untoward reaction or, like I said, a drug company or representative is making a claim and I want to see if it's supported by what they are allowed to say in the package insert or, again, when competing drug companies refer to it, I'm curious then to read it. But in general I don't read the PDR. It would be a little tough reading.
Q: As a result, it's important if an issue arises, for example, to go to the label or package insert to see what the FDA says about that?
A: Yes.
Q: And that's something you routinely do when an issue arises?
A: Yes.
Q: And that's something you would expect Nurse Olson to do as well, I assume?
MR. NABERS: Objection to the form.
A: Yes.
Q: (By Mr. Krumholz) And one of the reasons why the package inserts or labels for medications would be important is because it's your understanding that the

235:

FDA can decide or require a company to take certain information out if it deems appropriate?
MR. NABERS: Objection to the form.
A: Yes.
Q: (By Mr. Krumholz) Is it also your understanding that they can require that other information be inserted into the package insert if required or necessary?
A: Yes.
Q: Or if appropriate for safety or efficacy reasons?
A: Sure.
Q: That gives you a comfort level about the labels and package inserts for medications?
A: Yes.
Q: Another source of information that you talked about in your last deposition was information from pharmaceutical companies, generally. Do you recall that?
A: Yes.
Q: And one of the pieces of information that you get from time to time, as I understand it, are dear doctor letters or dear health care provider letters. Have you received those before?
A: From drug companies on their products?

234:12-14 P's Obj: Assumes facts not in evidence; vague; ambiguous; argumentative

234:19-20 P's obj: Speculation; cumulative

234:22-235:2 P's obj: speculation; vague; no foundation; not an FDA expert on this topic

Def's response: Plaintiff raised the issue of how this witness learns about drug risk

# Vogeler, Douglas 2006-08-30

Overruled

236:

Q: Yes.
A: All the time.
Q: And when those contain important safety information, I assume that you review them to make sure that you're up to date as to what the pharmaceutical companies and what the FDA thinks are important?
A: Yes.
Q: And I assume that's the sort of information that you would likewise share with Nurse Olson if it contained important safety information?
A: Yes.
MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) And I assume one of the reasons why you do that is because Nurse Olson, in fact, treats many of your patients?
A: Sure.
Q: I believe you indicated that if, for example, a patient of yours can't come in for several weeks or months because you have a busy schedule, then they have an option to go see Nurse Olson?
A: Yes.
Q: And so you have reason to make sure that to the extent you're made aware of important safety information, that Nurse Olson also is made aware of

237:

that information in terms of the medication she prescribes?
A: Yes.
Q: And you're generally familiar with the medications Nurse Olson prescribes?
A: Yes.
Q: And the types of indications that are necessary for her to prescribe any particular medication?
A: Uh-huh (affirmative), yes.
Q: Now, another source of information to medical doctors such as yourself is medical literature?
A: Correct.
Q: Is that right? And you rely heavily on that?
A: Yes.
Q: And I believe you indicated that you place more weight with medical literature than what a, for example, pharmaceutical representative might tell you?
A: Yes.
Q: And why is that?
A: Well, pharmaceutical reps always try to paint their product in the best light they can so they're going to pick and choose studies that look -- make them look more favorable, of course.
Q: Is one of the reasons because pharmaceutical

236:9-11
P's obj: vague; speculation

Def's response: none needed

# Vogeler, Douglas 2006-08-30

242:

with plaintiff's counsel in your prior deposition?
A: Yeah, I remember articles, you know, raising a question about cardiovascular risks.
Q: And that was a significant safety issue for you in your practice?
A: Yes.
Q: Because COX-2s were important to your patients?
A: Yes. I used a lot of them.
Q: And so you wanted to figure out whether indeed there was any cardiovascular risk and, to the extent there was, what that risk might be so you could weigh the benefits versus the risks of COX-2s?
A: Yes.
Q: And was that the kind of information that you would routinely discuss and provide to Nurse Olson?
A: Yes.
Q: So you had discussions with Nurse Olson in that time frame about COX-2s and the extent to which they may or may not see an increased risk of cardiovascular events?
MR. NABERS: Objection to the form.
A: It's hard for me to remember specifically, but I believe I remember having a conversation over -- after having read The Medical Letter, raising that

243:

issue, and then when the pharmaceutical rep was in the office, raising the issue with them. And Karen was there, so, again, it was kind of -- the response was maybe it's just the absence of a COX-1 effect because it's a purely COX-2, so just take a baby aspirin with it and you'll have the benefit of both, was kind of the conclusion.
Q: (By Mr. Krumholz) I've placed a stack of exhibits in front of you that were used in your prior deposition. Can you take that rubber band off, and if you could turn to -- I believe that it's Exhibit No. 8. They're just kind of in order, if you want to just place --
A: Okay. Prescription Table Contents?
Q: Actually, let me come around and try to help you. It'll go quicker.
A: 9 is Merck Product News.
Q: Let me see if I can find it quickly.
18.
A: Close.
Q: Yeah. Doctor, do you have Exhibit 18 in front of you?
A: Yes, I do.
Q: And you recall that plaintiff's counsel indicated to you that this was a copy of some call

Overruled

242:15-16
P's obj:
vague; speculation

242:18-21
P's obj:
vague; speculation

Def's response:
Plaintiff raised this issue and this is appropriate cross-examination

## Vogeler, Douglas 2006-08-30

244:

**notes that were produced in this litigation?**
**A: Okay.**
**Q: If you could turn to page 15 of 18.**
**A: Okay.**
**Q: Do you see the entry that's dated December 4th of 2001 where it says --**
**A: Yes.**
**Q: -- Dr. Douglas Vogeler --**
**A: Right.**
**Q: -- and it indicates that Nancy Nielsen visited with you on that date. Do you see that?**
**A: Yes.**
**Q: And Nancy Nielsen is a Merck representative; is that right?**
**A: Yes.**
**Q: And that's someone who you know from your years practicing?**
**A: Yes.**
Q: Have you found her to be a reliable source of information?
A: Well, she's a reliable drug rep. She's a reliable source of information for the products that she represents. I don't know if she represents them in an objective fashion, but, yes. I'm not sure what your question is.

245:

**Q: Well, you found her to be professional?**
**A: Yes.**
**Q: And courteous?**
**A: Yes.**
**Q: And would provide you information when you requested it?**
**A: Sure.**
**Q: And it indicates here -- and I think this refers to what you were talking about with respect to The Medical Letter regarding COX-2s and it says MI's. That means heart attacks, right?**
**A: Right.**
**Q: And do you recall a conversation with Nancy Nielsen where you gave her a copy of The Medical Letter regarding COX-2s and heart attacks?**
**A: I don't recall that particular meeting, but it represents my recollection that I had read The Medical Letter, they had raised the issue of increased risk of heart attack and clotting factors, and I was asking them to explain that. So she wanted to see a copy of my Medical Letter that that came from, and it looks like I gave her one.**
**Q: Okay. And that was the same information and topic that -- well, first of all, that's consistent with your recollection of a meeting with Nancy**

245:13-15
Ps obj:
401; vague; speculation
Def's response: none needed

Overruled

## Vogeler, Douglas 2006-08-30

246:

Nielsen, true?
A: Well, not for her specifically, but it was some drug reps. I'm sure I brought it up with more than just Nancy.
Q: But you recall bringing this issue and this article up with Merck representatives?
A: Yes.
Q: And this is sort of -- this record is consistent with that recollection --
A: Yes.
Q: -- that you had read The Medical Letter and indeed had provided them a copy and discussed it with them?
A: Yes.
Q: And this was the same information that you recall discussing with Nurse Olson in that same time frame?
A: Yes.
Q: And that same time frame would have been in and around December of 2001; is that right?
A: Apparently, and probably the month or so before.
(Exhibit No. 33 marked.)
Q: (By Mr. Krumholz) Doctor, I'm handing you what has been marked as Exhibit 33 to your deposition.

247:

A: What was that?
Q: Exhibit 33 to your deposition. Do you have that in front of you?
A: Yes.
Q: Is Exhibit 33 a copy of an article from The Medical Letter entitled Cardiovascular Safety of COX-2 Inhibitors?
A: Yes.
Q: And it's dated November 12 of 2001; is that right?
A: Correct.
Q: And you indicated that, when we were talking about your discussion with Nancy Nielsen, that indeed you thought that discussion or your review of that letter and discussion with Nurse Olson would have occurred somewhere in November of 2001; is that right?
A: Correct.
Q: So is this, that is, Exhibit 33, The Medical Letter article that you reviewed in November of 2001?
A: It appears to be.
Q: If you could review it and just confirm that for us.
A: Well, it certainly is an article that came out at that time frame that I would have raised issues about more. I don't know if there were earlier

246:15-17
P's obj: speculation; cumulative

246:19-20
P's obj: speculation; cumulative

Def's response: witness' first-hand knowledge rebuts plaintiff's warnings claim

Overruled

## Vogeler, Douglas 2006-08-30

248:
articles that also raised the issue.
Q: So what you're saying is --
A: This certainly was one of them.
Q: -- you definitely saw Exhibit 33?
A: Yes, and this is, I'm sure, what I made a copy of for her, for Nancy Nielsen.
Q: And this is what you would have discussed with Nurse Olson as well?
MR. NABERS: Objection to the form.
A: Yes.
Q: (By Mr. Krumholz) If you look in the first paragraph of this article it says, 'Increasing use of rofecoxib (Vioxx) and celecoxib (Celebrex), both selective inhibitors of COX-2 for treatment of arthritis, has been accompanied by concerns that they may increase the risk of thrombotic cardiovascular events.' Did I read that accurately?
A: Yes.
Q: And what it's saying there, as you understood it, is that there was a concern out there that there may be an increased risk of thrombotic cardiovascular events in connection with the use of Celebrex and Vioxx, right?
A: Yes.
Q: And that would include heart attacks and

249:
strokes, possibly?
A: Yes.
Q: And so it was known in the medical community that there were concerns that there was a potential for that risk during this time frame?
A: Yes.
Q: And you understood that concern in that time frame?
A: Yes.
Q: And Nurse Olson, per your discussions with her, also understood those concerns at that time?
A: Yes.
Q: Do you see where this Medical Letter article actually discusses VIGOR in the evidence section?
A: Yes.
Q: And it says, 'A recent safety study raised concerns that selective COX-2 inhibitors may increase the risk of thrombotic cardiovascular events.'
So, again, that was something that was well known to the medical community at the time?
A: It was becoming known. It wasn't well known.
Q: Well, it was known by the time this came out?
MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) True?
A: I don't remember specifically in terms of the

Handwritten annotations:
Overruled
248:25-249:1 P's obj: speculation; misstates the evidence
249:3-5 P's obj: Vague; speculation; misstates evidence
249:10-11 P's obj: same as above; best evidence
249:22 P's obj: argumentative; vague
Def's response: None needed

## Vogeler, Douglas 2006-08-30

250:

**time line how knowledgeable it was, but I think it was more in the spring that it got to be pretty common knowledge.**

Q: Okay. So between now --

A: So it was a little early on it.

Q: -- and the spring of 2002, you're talking about?

A: Yeah. I think before there was a question about it, but it was -- the common answer was, again, it was, well, that's what happens with a selective COX-2. You're not getting the benefit of the COX-1 platelet inhibition and all of that. So up until something like this came out, we had an explanation for it, and so if we were worried about somebody, we would add a baby aspirin to thin the blood. But once this came out, this was different. This was like a -- there's a potential pro-thrombotic problem here that's not explained by the lack of COX-1 inhibition. And so when this came out, it kind of changed the, you know, the perception out there about the safety of it. But it wasn't, I don't think, until the spring or late spring that the study from Kaiser came out showing in reality it was increasing the risk of heart attacks in their practice. That's when it got to be common knowledge and it wasn't long after

251:

that before they withdrew it. That is my recollection in terms of timing.

MR. KRUMHOLZ: I'll object to the nonresponsive portion.

Q: (By Mr. Krumholz) Understand I'm not fussing at you. Just from time to time we have to assert objections.

The Kaiser Permanente study that you referred to, I believe, was done in 2005. Is that inconsistent with your recollection?

A: Was it that long later? I don't remember. Has it only been that short of time?

**Q: We can go back and confirm that, but, regardless, just focusing on the VIGOR study back in November of 2001, you received The Medical Letter that described the VIGOR results, true?**

**A: Yes.**

**Q: And the reason for the article, according to this Exhibit 33, was that there was a concern at that time that COX-2s, both Celebrex and Vioxx, may increase the risk of thrombotic cardiovascular events?**

**A: Yes.**

**Q: And after this Medical Letter came out, certainly the medical community was becoming aware of that very issue that there may be a risk, true?**

Overruled

251:13-252:1
P's Obj: vague; spec.; no foundation

Def's response: witness testifying as to his own contemporaneous review of medical literature

# Vogeler, Douglas 2006-08-30

Vogeler PA PC DA DC on 10-3

252:

A: Yes.
MR. NABERS: Objection to the form.
Q: (By Mr. Krumholz) And you understood in this time frame that there was a scientific question or debate as to whether that was true or not, that is, whether there was any increased risk?
A: Right.
Q: And this particular Medical Letter goes through and specifically talks about the type of study that VIGOR was, true?
A: Yes.
Q: And it says that one arm of the study received 50 milligrams of Vioxx daily. Do you see that under The Evidence?
A: Yes.
Q: Then another arm of the study received 500 milligrams of Naproxen twice daily. Do you see that?
A: Yes.
Q: Then it indicates 'With a median follow-up of nine months.' Do you see that?
A: Yes.
Q: Then it cites the Bombardier article that plaintiff's counsel talked to you about earlier?
A: Yes.
Q: Do you recall talking about that as well?

253:

A: Vaguely.
Q: Okay. But, regardless, if you go down a couple of sentences, it says, 'Serious thrombotic cardiovascular events occurred in 45 of 4047 patients, which is 1.11 percent, who took rofecoxib,' or Vioxx, 'and in 19 of 4029 patients or .47 percent taking Naproxen.' Do you see that?
A: Yes.
Q: What this meant to you as a family practitioner was that there was an increase in the rate of thrombotic events in the arm with patients taking Vioxx versus the arm with patients taking Naproxen?
A: Yes, but still small.
Q: And when you say small, what do you mean? Can you tell us what -- you said that in your prior deposition.
A: Well, one percent -- I mean, it's still talking about one percent of patients that -- actually, you're talking about half of that, so you're talking about 19 out of 45. So you're still looking at 26 patients out of 4,000 increased cardiovascular events, which is probably half a percent, which is a fairly --
Q: This study had over 8,000 patients; is that

Overruled

253:15-17
P's obj:
vague; spec.; no foundation
Def's response: none needed

## Vogeler, Douglas 2006-08-30

Vogeler PA PC DA DC on 10-3

254:

right?
A: Yes.
Q: And what this study told you, that is, the VIGOR study, was that 26 more out of those 8,000 patients had CV events on Vioxx as opposed to Naproxen?
MR. NABERS: Objection to the form.
A: Correct.
Q: (By Mr. Krumholz) Is that right?
MR. NABERS: Objection to the form.
A: Yes.
Q: (By Mr. Krumholz) But, regardless, to anyone reading The Medical Letter, that was information that was available to you in this time frame, true?
A: I'm sorry, what did you say?
Q: To anyone who subscribed to The Medical Letter, and other like journals -- I mean, it wasn't the only journal that was out there that was talking about these results, right?
A: Right.
Q: This was well-known information in the medical community within just a few months of November of 2001, right?
MR. NABERS: Objection to the form.
A: Well, yeah, the articles they are citing is the New England Journal of Medicine 2000.

255:

Q: (By Mr. Krumholz) And, in fact, that was the article that you discussed with plaintiff's counsel in your prior deposition several weeks ago. Do you recall that?
A: I don't recall the discussion, but --
Q: Okay.
A: -- I trust you.
Q: We'll get to that in a few minutes.
A: Okay.
Q: But by this time frame, it was well known in the medical community that in VIGOR there was a higher rate of thrombotic cardiovascular events in the Vioxx arm as opposed to the Naproxen arm, true?
MR. NABERS: Objection to the form.
A: True.
Q: (By Mr. Krumholz) And so anyone keeping up with the medical literature in that time would have known that information, that is, anyone who is a medical doctor or nurse practitioner?
MR. NABERS: Objection to the form, calls for speculation.
A: Yes.
Q: (By Mr. Krumholz) Okay.
A: Again, at that stage of the information,

[Handwritten: Overruled]

[Handwritten: 254:21-23 P's obj: vague; speculation; argumentative; misstates facts in evidence]

[Handwritten: Def's response: plaintiff raised the issue of this witness' knowledge of CV risks]

[Handwritten: 255:11-14 P's obj: vague; speculation; cumulative]

[Handwritten: 255:17-20 P's obj: same as above]

256:

**those people weren't on a baby aspirin, so the question was whether you could explain it based on their lack of taking an aspirin.**
Q: (By Mr. Krumholz) And if you go to the second page of Exhibit 33, this November 2001 article, it has the conclusion section, right?
A: Correct.
Q: And it talks about 'taking aspirin with a selective COX-2 inhibitor could protect against any possible pro-thrombotic effect.' Do you see that?
A: Yes.
Q: But it concludes 'Until more prospective studies with and without low-dose aspirin are available, it would be premature to conclude that rofecoxib or celecoxib,' that is Vioxx or Celebrex, 'increased the risk of thrombotic cardiovascular disease.' Did I read that right?
A: Yes.
**Q: So the state of the scientific knowledge at the time, even given all of the VIGOR results, was that there was a question, not a conclusion yet, but a question as to whether or not COX-2s increased the risk of thrombotic cardiovascular events, including heart attacks, right?**
MR. NABERS: Objection to the form.

257:

**A: Yes.**
**Q: (By Mr. Krumholz) So you and Nurse Olson, based upon your discussions, knew it was a concern, but the state of the medical evidence was that it was insufficient to conclude that Vioxx increased the risk of heart attacks?**
MR. NABERS: Objection to the form.
**Q: (By Mr. Krumholz) True?**
**A: Yes.**
**Q: And, indeed, that's why you were comfortable still prescribing Vioxx?**
**A: Yes.**
**Q: And that's why you were comfortable with Nurse Olson still prescribing Vioxx?**
MR. NABERS: Objection to the form.
**A: Yes.**
**Q: (By Mr. Krumholz) True?**
**A: True.**
**Q: And if you weren't comfortable with Nurse Olson prescribing Vioxx, you would have told her?**
**A: Yes.**
**Q: And you wouldn't have allowed that with respect to your patients?**
**A: Correct.**
**Q: But you felt like that you were aware of the**

[Handwritten annotations:]
Overruled
256:19-24 P's obj: vague; speculation
257:2-6 P's obj: same as above; misstates prior testimony
Def's response: Question does not purport to state prior testimony let alone misstate it. Goes to witness' understanding of CV risk at the time his patient received Vioxx

## Vogeler, Douglas 2006-08-30

258:
VIGOR study and had unbiased, independent analyses of the VIGOR study that gave you an understanding of the state of the literature and the scientific analyses that had been done --
A: Yes.
Q: -- that provided you with the medical evidence as opposed to conjecture as to what was really going on with respect to COX-2s at the time?
MR. NABERS: Objection to the form.
A: Yes.
Q: (By Mr. Krumholz) Now, counsel talked to you about VIGOR generally, but it was a 50-milligram test with respect to Vioxx, true?
A: Yes.
Q: And dose is, of course, important with respect to medications, right?
A: Yes.
Q: In other words, a high dose of one particular medication may have an impact on patients that a lower dose does not have?
A: Yes.
Q: That's well known and documented in the medical community?
A: Yes.
Q: That's understood by physicians like you who prescribe medications?

259:
A: Certainly.
Q: And I think you'll probably remember this, but if you don't, you can go back to your medical record. Mr. Mason was prescribed 25-milligram Vioxx, true?
A: Yes.
Q: And he never received 50-milligram Vioxx, according to your chart --
A: Correct.
Q: -- or according to the prescription records that plaintiff's counsel showed you last time?
A: Yes.
Q: And you have no reason to believe that he ever took 50-milligram Vioxx, as you sit here today?
A: Yes.
Q: And it also indicates in this Medical Letter and in the VIGOR study that we talked about previously that this study was done on rheumatoid arthritis patients?
A: Yes.
Q: And, of course, various disease processes like rheumatoid arthritis may have an impact on how a medication affects a patient?
A: Yes.

Overruled ✓

259: 22-24
P's obj: speculation; vague
Def's response: none needed