UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX | * MDL DOCKET No. 1657 |
| PRODUCTS LIABILITY LITIGATION | * SECTION L - DIVISION 3 |
| This document relates to<br>CASE NO. 2:05CV2524 | * JUDGE FALLON |
| ANTHONY WAYNE DEDRICK,<br>an Individual, | * MAG. JUDGE KNOWLES |
| Plaintiff, | * |
| v. | * |
| MERCK & CO., INC., | * |
| Defendant. | * |

Motion in Limine No. 8

**PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE MERCK WITNESSES FROM TESTIFYING ABOUT THE ANNUAL NUMBER OF DEATHS ATTRIBUTABLE TO NSAID GASTROINTESTINAL TOXICITY WITHOUT APPROPRIATE QUALIFICATIONS AND SCIENTIFIC SUPPORT**

In previous Vioxx trials, Merck witnesses have offered opinion testimony about the number of deaths annually attributed to the gastrointestinal ("GI") toxicity of nonsteroidal anti-inflammatory drugs ("NSAIDS"). Merck offers this "evidence" to support its claim that Vioxx, which was designed to be safer for the GI tract than non-selective NSAIDS, offered a benefit to patients. The numbers cited by Merck bear little relation to current medical and scientific literature. Indeed, these estimates are typically offered without any support or citation whatsoever. Rather, a speculative number of events-- the larger the better--is bandied about in an attempt to inflate the perceived benefit provided by Vioxx.

1

A notable example of this practice occurred in the trial of *Frederick Humeston, et al., v. Merck & Co., Inc., et al.*, (ATL-L-2272-03MT ), when Merck employee Dr. Briggs Morrison volunteered on direct examination that:

> ...it was understood that that side effect [GI toxicity] was common to all the NSAIDs, and it was estimated that somewhere between two and 4 percent of patients who take these medications on a chronic basis would suffer one of these events. And it was estimated that probably in the United States alone on the order of 20,000 people a year -- between 10 and 20,000 people a year die from this complication of NSAIDs.

See Transcript of *Humeston v. Merck & Co.* trial transcript at 3184 (Oct. 6, 2005) (Ex. "A").

While Merck offered this testimony as evidence of Vioxx's benefit, Dr. Morrison failed to share with the jury and the Court the basis of this wide-ranging estimate. He likewise failed to clarify precisely *when* it was "estimated" that 20,000 people died annually in the U.S. because of GI toxicity. He cited to no medical or scientific literature as support for this opinion and counsel for Merck made no attempt to lay any foundation. Still, the number--<u>20,000 deaths annually</u>--came tripping off Dr. Morrison's tongue as lightly as if he was reporting his address.

In truth, along the continuum between fantasy and reality, Dr. Morrison's estimate rests closer to the category of "wild guess" than to "reasoned hypothesis." This should come as no surprise. Dr. Morrison is an oncologist by training. He is neither a gastroenterologist nor an epidemiologist. If he has any training in biostatistics, he has kept that a secret from Plaintiff. His opinion about deaths secondary to NSAID gastropathy was in keeping with Merck's general practice of bootlegging expert opinion through unqualified fact witnesses.

In the trial of this matter, Merck may once again seek to offer an inflated estimate regarding the number of deaths reported annually in association with NSAID GI-toxicity. To the extent that this number is offered--as it has been in the past--without any support from medical or scientific literature,

and by a witness who lacks the necessary skill, training, experience and education to render such an opinion, it should be excluded by the Court.

### I. Merck Intentionally Overestimates the Number of Annual Deaths Attributed to NSAID Gastropathy in Order to Bolster the Image of Vioxx.

Dr. Morrison's previous testimony about NSAID gastropathy deaths portrays a blissful and, frankly, convenient ignorance of recent medical literature. It is possible that this ignorance is responsible for the profound divergence between his opinion about the rate of deaths and the estimates of actual experts in the field of NSAID gastropathy. For example, in 1997 it was estimated that the annual number of GI deaths attributed to NSAIDS in the United States was 7,600 (about a third of Dr. Morrison's highest guess). See Tamblyn R, Berkson L, Dauphinee WD, Gayton D, Grad R, Huang A, Isaac L, McLeod P, Snell L. (1997) Unnecessary prescribing of NSAIDs and the management of NSAID-related gastropathy in medical practice. *Ann Intern Med.* 127(6):429-38 (Ex. "B"). Notably, this estimate predates Vioxx's introduction to the U.S. market. Thus, if Dr. Morrison's conjecture about 20,000 annual deaths is accurate and current, then apparently Vioxx has contributed to a nearly three-fold *increase* in the number of deaths associated with NSAID gastropathy.

Dr. Morrison is similarly, and regrettably, unfamiliar with the work of Dr. James Fries of Stanford University, who studied the Arthritis, Rheumatism, and Aging Medical Information System database specifically to determine how the rates of hospitalizations secondary to NSAID gastropathy have changed in the past two decades.[1] See Fries JF, Murtagh KN, Bennett M, Zatarain E, Lingala B, Bruce B. (2004) The rise and decline of nonsteroidal anti-inflammatory drug-associated gastropathy in rheumatoid arthritis. *Arthritis Rheum.* 50(8):2433-40 (Ex. "D").

---

[1] This is the same Dr. Fries who, in 2001, wrote to Merck's CEO, Ray Gilmartin, detailing eight reports of "Merck damage control by intimidation" and noting that Merck has "not been forthcoming with data" concerning the "unusual side effect pattern of Vioxx." See P1.0176 (the "Fries Letter") (Ex. "C").

3

Dr. Fries and his colleagues followed 5,598 consecutively enrolled rheumatoid arthritis patients for nearly two decades, using systematic outcome assessment protocols. *Id.* at 2433. They sought to examine trends in the incidence of NSAID gastropathy over time. *Id.* at 2434. Dr. Fries observed that the rate of GI-related hospitalizations first increased from 0.6% per year in 1981 to a peak of 1.5% in 1992, and then decreased to 0.5% in 2000. *Id.* These trends, over the period of rise and the period of decline, were highly statistically significant. *Id.*

Critically, Dr. Fries' results show that the percentage of patients with GI hospitalizations <u>fell 80% from 1992 to 1998</u>, a period of time when Vioxx was not even on the market. *Id.* at 2435. This would suggest that the 1997 estimate of 7,600 annual GI deaths related to NSAIDS decreased as well. Interestingly, the incidence of GI hospitalizations actually increased following the introduction of Vioxx. *Id.* at 2435. Dr. Fries and his colleagues attribute the decrease in NSAID related GI hospitalizations to a number of factors, most of which had nothing to do with the advent of Vioxx, including: 1) decreased doses of aspirin and ibuprofen; 2) increased use of less GI-toxic NSAIDS, like nabumetone, etodolac and Arthrotec; and 3) the increased use of proton-pump inhibitors.[2] *Id.* at 2438. The unmistakable intent of offering an inflated estimate about NSAID-related deaths is to convince the jury that Vioxx was designed and marketed specifically to address an epidemic. But not even Merck's own experts support Dr. Morrison's conjecture about the number of deaths.

Following the completion of the VIGOR trial, Merck produced a series of "video news releases" about the study. These short clips amount to little more than tightly controlled "interviews" of Merck employees and paid experts where the "interviewee" touts the drug's alleged GI-protective effect with no mention of cardiovascular risk. During one remarkable exchange, Merck expert and investigator Dr. Loren Laine, a gastroenterologist and author of the VIGOR study, is encouraged to gloss over the fact that Merck's GI death estimate is an exaggeration.

4

When Dr. Laine reads through his script initially, he balks at perpetuating the Merck charade, telling the company's representative that "...those numbers, by the way, are totally incorrect and they're based on just extreme totally incorrect data. Everybody uses them because they sound good. They sound good, but it's the same person that keeps putting them out." See Transcript of Video News Release Outtakes (P1.1889), at 41:2-8 (Ex. "F"). Of course, the importance of making such an inflated claim is not lost on the good doctor, who observes: "There's about five different reasons why those numbers are totally bogus, but I agree. It's out there in the common realm and everybody uses those numbers. I know, because it's a very impressive sound byte." Id. at 41:16-21

Undaunted, the Merck representative wondered aloud whether the clever wording in the script would protect Dr. Laine from being patently untruthful, asking: "Does it help that we're using the word associated with NSAIDs; does that sort of water it down a little bit?" Id. at 41:22-42:2. But this does not entirely soothe his conscience. "No. I mean because the issue is -- part of the issue is the -- you just don't have an idea. I'm not saying it's actually wrong. The death rate is probably wrong. The hospitalizations may be right. Just the death rate is probably wrong, but anyway..." Id. at 42:3-11.

Eventually, though, Dr. Laine relents and agrees to finesse the delivery so as to lend support to a number he clearly knows is wrong because--as he himself has noted--"it's a very impressive sound byte." "As long as we say it's estimated or reported, it's not me saying it," Dr. Laine rationalizes. Id. at 42:14-16.

Compounding Merck's quasi-scientific fraud is the fact that whatever the number of GI-related NSAID deaths, a sizeable portion are attributable to the use of aspirin for cardiovascular prophylaxis. In a recent study of hospitals serving more than seven million patients, researchers concluded that as many as one third of all NSAID/aspirin related GI deaths are associated with the use of *low-dose aspirin*. See Lanas A, Perez-Aisa MA, Feu F, Ponce J, Saperas E, Santolaria S, Rodrigo L, Balanzo J, Bajador E,

Almela P, Navarro JM, Carballo F, Castro M, Quintero E. (2005). A nationwide study of mortality associated with hospital admission due to severe gastrointestinal events and those associated with nonsteroidal anti-inflammatory drug use. *Am J Gastroenterol*. 100(8):1685-93). Plainly, Vioxx would have no effect on these events as it is not a substitute for low-dose aspirin.

Lastly, Dr. Morrison's carefree guess elides the controversy surrounding estimates of GI-related NSAID fatalities. See Tsokos M, Schmoldt A. (2001) Contribution of nonsteroidal anti-inflammatory drugs to deaths associated with peptic ulcer disease: a prospective toxicological analysis of autopsy blood samples. *Arch Pathol Lab Med*. 125(12):1572-4 (acknowledging that "controversy exists about the number of death resulting from peptic ulcers that are attributable to the use of NSAIDS".

In light of the foregoing, it is disingenuous for Merck to throw out an inflated number of GI-related deaths, suggest that Vioxx was safer, and then hope for the jury to conclude that Vioxx was a necessary, life-saving drug in the fight against fatal NSAID gastropathy. In truth, the numbers likely were never as high as Dr. Morrison suggested, and they were decreasing significantly before Vioxx was introduced because of cheaper and safer alternatives in pain management. If Merck wished to present evidence about an epidemic of NSAID related fatalities, and Vioxx's benefit as an alternative to non-selective NSAIDS, it should have identified a qualified expert and provided disclosure about any opinions to be offered. Merck has done that in this case. But Merck should not be permitted to parade before the jury the conjecture of an unqualified fact witness to support claims about their product.

II. **Merck Should Be Precluded from Offering Opinion Testimony about Annual Estimates of Deaths Attributed to NSAID Gastropathy Unless it Has Previously Disclosed this Opinion to Plaintiff and Unless the Opinion Is Admissible under F.R.E. 702 and Daubert**

Dr. Morrison is obviously unqualified to opine about the number of deaths reported annually in association with NSAID gastropathy. But Merck should be cautioned that *no* witness will be permitted

Almela P, Navarro JM, Carballo F, Castro M, Quintero E. (2005). A nationwide study of mortality associated with hospital admission due to severe gastrointestinal events and those associated with nonsteroidal anti-inflammatory drug use. *Am J Gastroenterol*. 100(8):1685-93). Plainly, Vioxx would have no effect on these events as it is not a substitute for low-dose aspirin.

Lastly, Dr. Morrison's carefree guess elides the controversy surrounding estimates of GI-related NSAID fatalities. See Tsokos M, Schmoldt A. (2001) Contribution of nonsteroidal anti-inflammatory drugs to deaths associated with peptic ulcer disease: a prospective toxicological analysis of autopsy blood samples. *Arch Pathol Lab Med*. 125(12):1572-4 (acknowledging that "controversy exists about the number of death resulting from peptic ulcers that are attributable to the use of NSAIDS".

In light of the foregoing, it is disingenuous for Merck to throw out an inflated number of GI-related deaths, suggest that Vioxx was safer, and then hope for the jury to conclude that Vioxx was a necessary, life-saving drug in the fight against fatal NSAID gastropathy. In truth, the numbers likely were never as high as Dr. Morrison suggested, and they were decreasing significantly before Vioxx was introduced because of cheaper and safer alternatives in pain management. If Merck wished to present evidence about an epidemic of NSAID related fatalities, and Vioxx's benefit as an alternative to non-selective NSAIDS, it should have identified a qualified expert and provided disclosure about any opinions to be offered. Merck has done that in this case. But Merck should not be permitted to parade before the jury the conjecture of an unqualified fact witness to support claims about their product.

II. **Merck Should Be Precluded from Offering Opinion Testimony about Annual Estimates of Deaths Attributed to NSAID Gastropathy Unless it Has Previously Disclosed this Opinion to Plaintiff and Unless the Opinion Is Admissible under F.R.E. 702 and Daubert**

Dr. Morrison is obviously unqualified to opine about the number of deaths reported annually in association with NSAID gastropathy. But Merck should be cautioned that *no* witness will be permitted

to spitball about annual estimates of deaths unless he or she is qualified to offer an opinion and unless this opinion has previously been disclosed to the Plaintiff.

The opinion of an expert witness is only admissible if: 1) it is based upon sufficient facts or data; 2) it is the product of reliable principles and methods; and 3) the expert has applied the principles and methods reliably to the facts of the case. *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1057 (8th. Cir 2005) (citing Fed.R.Evid. 702).

The Supreme Court has construed Rule 702 as imposing on the district court a "gate-keeping" responsibility which must be performed before admitting expert scientific testimony. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993). The Court performs this function in order to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* Thus, before considering whether the testimony "will assist the trier of fact to understand or determine a fact in issue," a district court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 592-93.

The gate-keeping requirement imposed by *Daubert* is critically important. As the Supreme Court observed in *Kumho Tire*: "[T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). The district court's gate-keeping role is particularly significant because the expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595. "Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible hearsay..." *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

7

For reasons discussed above, Merck's assertion that there were 20,000 deaths annually attributable to NSAID GI gastropathy is both powerful and misleading. It prompts the jury to conclude that before Vioxx was marketed, there was an epidemic of NSAID-related fatalities that Merck's new wonder drug was going to cure. It is precisely this kind of opinion testimony that Rule 702 was designed to exclude. In previous trials, Merck has offered this opinion without support and without first disclosing it to Plaintiff. This practice contravenes Federal rules of admissibility and evidence, and is not in keeping with the orders of this Court, which require prior notice of all expert opinions. As such, Merck should be precluded from offering any such opinion without first showing that it is admissible under F.R.E. 702 and *Daubert*.

## Conclusion

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an order precluding Merck from offering any expert testimony regarding estimates of annual deaths attributable to NSAID gastropathy from witnesses who lack the necessary expertise, where these opinions have not previously been disclosed to Plaintiff, and where they lack adequate support under the Federal Rules of Evidence and appropriate case law.

Date: October 27, 2006

Respectfully submitted,

By ___P. Leigh O'Dell___
Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama 36103-4160
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

Counsel for Plaintiff

8

**Russ M. Herman** (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
**Plaintiffs' Liaison Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
& WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

**Christopher A. Seeger**, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiff's Motion in Limine to Preclude Merck Witnesses from Testifying About the Annual Number of Deaths Attributable to NSAID Gastrointestinal Toxicity without Appropriate Qualifications and Scientific Support has been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail or by hand delivery and e-mail, on Merck's Counsel, Douglas R. Marvin and Philip S. Beck, by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 27th day of October, 2006.

*P. Leigh O'Dell*
P. Leigh O'Dell
Attorney for Plaintiff
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.

3159

```
            SUPERIOR COURT OF NEW JERSEY
            ATLANTIC COUNTY/CIVIL DIVISION
            DOCKET NO. ATL-L-2272-03MT
----------------------------x
FREDERICK HUMESTON, et al.,

        PLAINTIFFS,

    VS.         STENOGRAPHIC TRANSCRIPT
                      OF:
MERCK & CO.,INC.,
                   - TRIAL -
            DEFENDANT.
----------------------------x
        PLACE: ATLANTIC COUNTY CIVIL COURTHOUSE
            1201 BACHARACH BOULEVARD
            ATLANTIC CITY, NJ 08401

        DATE:   OCTOBER 6, 2005
```

B E F O R E:

  THE HONORABLE CAROL E. HIGBEE, P.J.Cv.

TRANSCRIPT ORDERED BY:
  DIANE P. SULLIVAN, ESQUIRE
  DAVID R. BUCHANAN, ESQUIRE

A P P E A R A N C E S:

  DAVID R. BUCHANAN, ESQUIRE
  CHRISTOPHER SEEGER, ESQUIRE
  SEEGER, WEISS, LLC
    ATTORNEYS FOR THE PLAINTIFFS

  DIANE P. SULLIVAN, ESQUIRE
  DECHERT, LLP
  STEPHEN D. RABER, ESQUIRE
  WILLIAMS AND CONNOLLY, LLP
  CHRISTY D. JONES, ESQUIRE
  BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
    ATTORNEYS FOR THE DEFENDANT

        *   *   *   *   *   *
        REGINA A. TELL, CSR-CRR-RPR
        OFFICIAL COURT REPORTER
        1201 BACHARACH BOULEVARD
        ATLANTIC CITY, NJ  08401



3184
Morrison - Direct

1  can actually put a hole completely through the stomach
2  wall, and, so, now the acid pours out into your
3  abdominal contents, and it was understood that that
4  side effect was common to all the NSAIDs, and it was
5  estimated that somewhere between two and 4 percent of
6  patients who take these medications on a chronic basis
7  would suffer one of these events. And it was estimated
8  that probably in the United States alone on the order
9  of 20,000 people a year -- between 10 and 20,000 people
10 a year die from this complication of NSAIDs.
11         Based upon the biology, which we'll talk more
12 about later, we were excited that VIOXX would not do
13 this, so that side effect of the NSAIDs would not be
14 something that VIOXX did.
15         The second side effect of NSAIDs that we were
16 excited about that VIOXX would not have is that NSAIDs
17 affect your platelets, so it was understood that all
18 NSAIDs effect platelet function and increases your risk
19 of bleeding. Now, there are certain clinical
20 situations where that risk is particularly harmful for
21 patients, so you can imagine patients who are already
22 at risk of bleeding if you now give them a nonsteroidal
23 anti-inflammatory drug which raises their risk even
24 higher that would be particularly bad for those
25 patients. So those kinds of patients are patients who

# Annals of Internal Medicine

Established in 1927 by the American College of Physicians

Home | Current Issue | Past Issues | Search | Collections | CME | PDA Services | Subscribe | Contact Us | Help

Search Annals:

Advanced sear

ARTICLE

# Unnecessary Prescribing of NSAIDs and the Management of NSAID-Related Gastropathy in Medical Practice

Robyn **Tamblyn**, PhD; Laeora Berkson, MD, MHPE, FRCPC; W. Dale Dauphinee, MD, FRCPC; David Gayton, MD, PhD, FRCPC; Roland Grad, MD, MSc; Allen Huang, MD, FRCPC; Lisa Isaac, PhD; Peter McLeod, MD, FRCPC; and Linda Snell, MD, MHPE, FRCPC

15 September 1997 | Volume 127 Issue 6 | Pages 429-438

**Background:** Use of nonsteroidal anti-inflammatory drugs (NSAIDs) increases the risk for hospitalization and death from gastrointestinal bleeding and perforation.

**Objectives:** To 1) estimate the extent to which NSAIDs are prescribed unnecessarily and NSAID-related side effects are inaccurately diagnosed and inappropriately managed and 2) identify the physician and visit characteristics associated with suboptimal use of NSAIDs.

**Design:** Prospective cohort study.

**Setting:** Montreal, Canada.

**Participants:** 112 physicians representing academically affiliated general practitioners, community-based general practitioners, and residents in family medicine and internal medicine.

**Interventions:** Blinded, office-based assessment of the management of two clinical cases (chronic hip pain due to early osteoarthritis and NSAID-related gastropathy) using elderly standardized patients.

**Measurements:** Quality of drug management and potential predictors of suboptimal drug management.

**Results:** Unnecessary prescriptions for NSAIDs or other drugs were written during 41.7% of visits. Gastropathy related to NSAID use was correctly diagnosed in 93.4% of visits and was acceptably managed in 77.4% of visits. The risk for an unnecessary NSAID prescription was greater when the contraindications to NSAID therapy were incompletely assessed (odds ratio, 2.3 [95% CI, 1.0 to 5.2]) and when the case was managed by residents in internal medicine (odds ratio, 4.1 [CI, 1.2 to 14.7]). The risk for suboptimal management of NSAID-related side effects was increased by incorrect diagnosis (odds ratio, 16.6 [CI, 3.6 to 76.5]) and shorter visits.

**Conclusions:** Unnecessary NSAID prescribing and suboptimal management of NSAID-related side effects were sufficiently common to raise questions about the appropriateness of NSAID use in the general population. If these results reflect current practice, prescribing patterns may contribute to avoidable gastrointestinal morbidity in elderly persons.

EXHIBIT B

Each year, 70 million prescriptions for nonsteroidal anti-inflammatory drugs (NSAIDs) are dispensed in the United States [1], 20 million are dispensed in Great Britain [2], and 10 million are dispensed in Canada [3]. The widespread use of NSAIDs has raised concerns because these drugs have substantial gastrointestinal side effects. Studies done in Canada, the United States, Australia, and Great Britain have shown that NSAID use increases the risk for hospitalization and death from gastrointestinal bleeding and perforation [4-16]. Each year, use of NSAIDs accounts for an estimated 7600 deaths and 76 000 hospitalizations in the United States [17] and 365 deaths and 3897 hospitalizations in Canada [12, 18, 19]. One percent to 3% of NSAID users will have gastrointestinal bleeding [20], and 26% will be prescribed antiulcer therapy [11, 21]. Treatment of NSAID-related gastrointestinal side effects accounts for one third of the cost of arthritis therapy [11]. Older age, history of peptic ulcer disease, higher NSAID dose, and concurrent use of corticosteroids and anticoagulants increase the risk for serious gastrointestinal side effects [5]. Almost all deaths from NSAID-related gastrointestinal side effects occur in elderly persons [2]; elderly women seem particularly susceptible [10, 12, 13].

In the mid-1980s, physicians were advised to avoid prescribing NSAIDs to elderly persons and patients with a history of peptic ulcer disease and to use low-dose NSAIDs only when other treatments had failed [2, 6]. In 1990, however, an estimated 58% of women and 53% of men 65 years of age and older in Quebec were prescribed NSAIDs [22]; in Alberta, NSAIDs accounted for 47% of prescriptions for antiulcer therapy in elderly persons [21].

The prevalence of the use of NSAIDs and antiulcer therapy raises questions about whether elderly persons are receiving NSAIDs unnecessarily and whether NSAID-related side effects are recognized and adequately managed. This question is of particular interest in elderly women because they are twice as likely as men to experience adverse NSAID-related gastrointestinal events [12]. In addition, women have been noted to be more likely than men to be prescribed therapy for the same condition [23] and to receive inappropriate therapy [24]. Physician surveys conducted in the United States and Great Britain indicate that 4% to 42% of physicians are unaware of the side effects of these drugs [25], that NSAIDs are frequently chosen as first-line treatment for osteoarthritis [25-27], and that treatment approaches to NSAID gastropathy vary greatly [25, 28]. Less extensive drug knowledge and higher rates of inappropriate prescribing are more common among physicians who have been in practice longer [29, 30] and among general practitioners [30, 31], possibly because of the challenges of keeping up to date on drug therapy [32]. Practice style also seems to influence drug prescribing: Shorter visits are associated with higher prescribing rates [33] and more inappropriate prescribing [34]. Moreover, a controversial Canadian study [35-39] found that general practitioners who saw more patients per day and billed for more services per patient were more likely to prescribe NSAIDs and other drugs [35] and that higher rates of NSAID prescribing were associated with higher rates of hospitalization and death [36]. These researchers speculated that physicians who prescribed more medication spent less time with their patients and delivered worse quality of care; as a result, their patients were sicker.

Although the level of NSAID use in the population may be a cause for concern, it is difficult to determine whether elderly patients are actually receiving unnecessary prescriptions or whether NSAID-related problems are being adequately diagnosed. Indications for therapy are rarely documented in sufficient detail to permit retrospective evaluation of the appropriateness of drug treatment decisions [40], and responses to questionnaires that describe cases do not accurately reflect what physicians do in actual practice [41-43]. A physician's ability to diagnose drug-related side effects cannot be ascertained by clinical studies. Only problems that are diagnosed can be assessed; those that go unrecognized or are misdiagnosed cannot [44, 45].

In this study, we attempted to overcome these limitations by using standardized patients [43, 46, 47]. This allowed us to select cases that could be used to evaluate particular aspects of NSAID use and to conduct blinded evaluation of decision making for the same patient in physicians' usual practice environment. Our objectives were to estimate how often NSAIDs were unnecessarily prescribed; whether side effects from NSAID therapy were accurately diagnosed and managed; and whether NSAID treatment decisions were influenced by patient, physician, and visit characteristics. We hypothesized that inadequate recognition and management of NSAID-related problems and unnecessary NSAID prescriptions in elderly persons would be more likely to occur

with shorter visits, female patients, and incomplete assessment of relative contraindications. We also thought that these problems would occur more often with community-based general practitioners than with academically affiliated general practitioners and postgraduate trainees.

# Methods

## Design and Population

- Top
- Methods
- Results
- Discussion
- Author & Article Info
- References

Management decisions for elderly patients with arthritis were assessed in a prospective follow-up study of 112 physicians. Each consenting physician saw two to four standardized elderly patients in his or her practice over a 6- to 8-month period. All physicians were blinded to the identity of the patient, the time of entry, and the nature of the problem being studied. Practices for NSAID prescribing were assessed in four populations of Canadian physicians: academically affiliated general practitioners, residents in family medicine, residents in internal medicine, and community-based general practitioners. To obtain representatives of all four groups, we invited the following to participate in our study: all general practitioners ($n = 34$) in one hospital-based family medicine residency program, all family medicine residents ($n = 32$) in a second hospital-based program at McGill University (Montreal, Quebec), all general internal medicine residents in the two hospital-based teaching programs at McGill University ($n = 29$), and a random sample of Montreal general practitioners listed in the College of Physicians registry ($n = 82$).

## Assessment of Medical Management

To assess physician management decisions for patients with arthritis, we selected two common clinical problems (Appendix). The first case was used to assess unnecessary NSAID prescribing for a patient with a recent exacerbation of chronic hip pain. In this case, the most likely diagnosis was osteoarthritis (not radiologically confirmed) and the treatment options were lifestyle modification, physiotherapy, and medication. The second case was used to assess the recognition and treatment of NSAID-related side effects in a patient with epigastric pain secondary to NSAID use. In both cases, the patients were 67 years of age, had a history of peptic ulcer disease, and had been prescribed medications for coexistent hypertension and type 2 diabetes mellitus.

Standardized patients were recruited from community-based senior citizen groups and screened for suitability by one of the geriatrician investigators. Eight elderly persons were selected, and two men and two women were trained for each case. In 7 to 15 two-hour sessions, standardized patients were trained to present the essential features of the case (history, physical findings, affect) and to record visit time and actions taken by the physician during the visit by using a structured questionnaire for visit documentation [48]. The accuracy of standardized patient presentation and recording was pretested and monitored thereafter by biweekly videotaped investigator-standardized patient visits as quality control assessments. We previously reported that the accuracy of the standardized patients' presentations in double-blinded visit assessments was 96.4% and that the accuracy of visit documentation recording was 77% ($\kappa = 0.71$ [95% CI, 0.56 to 0.85]) [48]. The provincial health board gave the standardized patients temporary health insurance cards so that they could remain anonymous to participating physicians and so that costs of the study visits could be billed to the research office. Standardized patients arranged visit appointments with the study physicians according to prearranged schedules that allowed approximately one visit per physician per month. After each visit, the standardized patient completed the structured questionnaire to record actions taken by the physician during the visit and returned the completed checklist, prescriptions, referrals, and test requisitions to the research office. To detect unblinding of standardized patients during the study period, we gave participating physicians postcards that were to be returned to the research office if the physicians suspected that a patient was a study patient. At the end of the study period, we retrieved medical charts for all standardized patient visits from physicians' offices.

Each physician was scheduled to see one standardized patient for each of the two cases. Academically affiliated and community-based general practitioners saw a male and a female patient for each case (four visits per physician), whereas residents saw one standardized patient per case (two visits per physician). Residents were randomly assigned to a visit from either a male or a female patient for each case. At the time of our study, clinical recommendations for NSAID use had been published [2, 6, 49-52], but no consensus guidelines had been produced. Thus, a consensus panel of eight academically affiliated physicians, representing the fields of rheumatology, geriatrics, clinical pharmacology, internal medicine, and family medicine, enumerated and classified drug management decisions for each case into four mutually exclusive categories: optimal, acceptable, suboptimal, and unsafe (Table 1). The panel also identified relative contraindications to NSAID therapy that should be assessed, including history of peptic ulcer disease [5, 12, 20, 53] and hypertension [54, 55]. The physicians' actions during the visits were ascertained by reviewing and coding the documentation questionnaires completed after each standardized patient visit, prescriptions, referrals and test requisitions, and the medical chart. Requisitions for investigations, consultations, drug prescriptions, the follow-up appointment card, and the standardized patients' reports of drug therapy that was stopped were used to document management decisions made during the visit. The diagnosis for the visit was determined from the medical chart. The physician's assessment of relative contraindications was determined from the visit documentation questionnaire.

View this table:
[in this window]
[in a new window]

Table 1. **Academic Panel Classification of Management Decisions for Standardized Patient Cases***

## Statistical Analysis

The frequency of diagnostic and drug treatment decisions was calculated for each visit. Hypotheses about the relation between patient, physician, and visit characteristics and prescribing decisions were assessed by fitting multivariable logistic regression models using generalized estimating equations [56, 57]. Dependencies in observations of visits to the same physician were considered by specifying, a priori, an exchangeable correlation structure for multiple visits for each physician. In these models, drug treatment decisions were collapsed into two groups (optimal/acceptable and suboptimal/unsafe). The association between physician and visit characteristics and the risk for suboptimal management was estimated for both cases combined and for each case individually. The analysis was done by using SAS version 6.11 with the SAS macro GEE (version 1.25) [58].

# Results

## Study Sample

- Top
- Methods
- Results
- Discussion
- Author & Article Info
- References

One hundred twelve (63%) of the 177 physicians who were approached agreed to participate. Participation rates varied by cohort: Thirty-three of 82 (40%) community-based general practitioners, 24 of 34 (71%) academically affiliated general practitioners, 32 of 32 (100%) family medicine residents, and 23 of 29 (79%) internal medicine residents participated. General practitioners who participated were, on average, 4 years younger than nonparticipants, and male academic general practitioners were more likely to participate than their female counterparts (26% of participants and 36% of nonparticipants were female). No demographic differences were seen between residents who participated and those who did not.

The mean age (±SD) of the general practitioners was 47 ± 13.2 years, and the mean duration of practice was 20 ± 13.4 years. Until recently, Canadian training programs for primary care consisted of a 1-year internship or

a 2-year family medicine training program. Specialists in internal medicine are required to complete a 4-year program, and 3 years of general internal medicine training is required for many medical subspecialties. In our study sample, 42.6% of general practitioners had completed a 2-year family medicine residency training program and were certified by the Canadian College of Family Physicians, 46.8% had completed a 1-year rotating internship, and 10.6% had postgraduate training in internal medicine or pediatrics but were not certified in these specialties. Most general practitioners (76%) worked in two or more settings (usually a hospital and private office), and 63% were in group practice. The most common health problems seen by general practitioners were chronic disease (particularly hypertension, asthma, ischemic heart disease, and diabetes), upper respiratory infections, and depression and anxiety [59]. All general practitioners were paid by the universal health insurance plan on a fee-for-service basis, a system in which the physician determines the number of patients seen per day. Physicians reported scheduling an average of 4.3 patients per hour (range, 2 to 9 per hour) and, on average, scheduled 35 minutes for a new patient (range, 15 to 90 minutes). Family medicine and internal medicine residents were in their first or second year of postgraduate training.

## Unblinding

During the 312 visits conducted, physicians detected the standardized patient 36 times (11.5%); on two occasions, a real patient was suspected of being a standardized patient. Unblinding tended to occur in office practices that accepted few new patients. Optimal treatment decisions were more likely to be made in unblinded visits (50%) than in blinded visits (35%). Although the differences were not statistically significant, unblinding seemed to systematically influence performance; unblinded visits were therefore excluded from further analysis.

## Management of Chronic Hip Pain

For the case of chronic hip pain, 139 blinded visits were completed. The average visit length was 27 ± 14.3 minutes. Osteoarthritis was the most common diagnosis for the hip pain (90.6% of visits), followed by trochanteric bursitis (9.4% of visits). Histories of peptic ulcer disease and hypertension were elicited in 67.6% and 62.6% of visits, respectively, and a history of both risk factors was elicited in 44.6% of visits. Management decisions were optimal or acceptable in 58.3% of visits, suboptimal in 19.4%, and unsafe in 22.3% (Table 2). Unnecessary NSAID prescriptions were written in 52 (37.4%) visits. The four most commonly prescribed NSAIDs were naproxen (25% of NSAID prescriptions), diclofenac (20.8%), ketoprofen (16.7%), and tiaprofenic acid (12.5%). Most patients (68.5%) who were prescribed NSAID therapy were prescribed 75% to 100% of the maximum recommended adult dose [60]. Slightly more than half of patients (51.9%) who were prescribed an NSAID were not prescribed gastroprotective therapy, despite the history of peptic ulcer disease and intolerance of acetylsalicylic acid.

View this table:
[in this window]
[in a new window]

Table 2. **Physicians' Treatment Decisions in 139 Blinded Visits with Standardized Patients-Case 1: Chronic Hip Pain***

In four visits, physicians prescribed other medications (such as steroids and benzodiazepines) that were judged inappropriate by the academic panel. Nonpharmacologic therapy was recommended in 34.5% of visits; the most commonly recommended therapies were physiotherapy and non-weight-bearing exercise. Nonpharmacologic therapy was less likely to be recommended in visits during which an NSAID was prescribed (nondrug therapy was recommended in 21% of visits) than in visits during which either acetaminophen (nondrug therapy was recommended in 48.9% of visits) or no drug (nondrug therapy was recommended in 33.3% of visits) was prescribed ($P = 0.02$; chi-square test). In 24 visits, no treatment was recommended. In all of these visits, the physician requested investigations or consultations.

## Management of NSAID-Related Gastropathy

A total of 137 blinded visits were completed for the case of NSAID-related gastropathy. The average visit length was 33 ± 16.1 minutes. In 128 visits (93.4%), NSAID-related gastropathy was correctly diagnosed. Histories of peptic ulcer disease and hypertension were elicited in 87.6% and 65.7% of visits, respectively, and a history of both risk factors was elicited in 57.7% of visits. Management was optimal in 11.7% of visits, acceptable in 65.7%, suboptimal in 13.1%, and unsafe in 9.5% (Table 3). Antiulcer therapy was prescribed in 82.5% of visits. A total of 133 prescriptions for antiulcer drugs were written in the 117 visits during which antiulcer therapy was prescribed. Histamine-2 antagonists were the most frequently prescribed class of antiulcer therapy (51.2% of all prescriptions), followed by antacids (24.8%) and misoprostol (15.5%). In the 16 visits during which two antiulcer drugs were prescribed, the most common combination was an antacid plus another class of gastroprotective therapy (14 visits).

View this table:
[in this window]
[in a new window]
Table 3. **Physicians' Treatment Decisions in 137 Blinded Standardized Patient Visits-Case 2: NSAID-Related Gastropathy***

## Predictors of Suboptimal Management

The analysis of all visits showed that suboptimal management occurred more frequently for the standardized patients with chronic hip pain. When NSAID-related gastrointestinal side effects occurred, there was a greater risk that NSAID therapy would be started unnecessarily (chronic hip pain case) than that it would be stopped or modified (NSAID-related gastropathy case) (odds ratio [OR], 2.2 [CI, 1.2 to 3.9]) (Table 4). Certain physician and visit characteristics were associated with the risk for suboptimal management; however, except for the assessment of relative contraindications, these associations seemed to be case specific.

View this table:
[in this window]
[in a new window]
Table 4. **Physician and Visit Characteristics Associated with Quality of Drug Management Decisions: Adjusted Odds Ratios Estimated by Multivariable Logistic Regression***

For the chronic hip pain case, unnecessary prescriptions for NSAIDs were more likely when the physicians did not elicit histories of hypertension and peptic ulcer disease (OR, 2.3 [CI, 1.0 to 5.2]) and when an internal medicine resident (in comparison to an academic general practitioner) saw the main difference between academic general practitioners and internal medicine residents was in the likelihood that they would prescribe an NSAID (residents, 58% of visits; academic physicians, 25% of visits), not in whether they would prescribe gastroprotective therapy with an NSAID. Community-based general practitioners were also more likely to prescribe NSAIDs (OR, 2.1 [CI, 0.8 to 6.5]) than were academic general practitioners, but these differences were not statistically significant. Neither patient sex nor visit length was associated with risk for suboptimal management. However, visit length was related to the likelihood that contraindications to NSAID therapy would be assessed. Visits during which the physician elicited histories of peptic ulcer and hypertension were, on average, 9 minutes longer than visits during which the physician did not elicit these histories. The likelihood of obtaining a relevant history was increased by threefold to fourfold during visits that lasted longer than 15 minutes (visit length, 16 to 30 minutes: OR, 3.7 [$P = 0.01$]; 31 to 45 minutes: OR, 4.5 [$P = 0.01$]; >45 minutes: OR, 2.8 [$P = 0.15$]).

In the case of NSAID-related gastropathy, incorrect diagnosis was the strongest predictor of suboptimal or unsafe management (OR, 16.6 [CI, 3.6 to 76.5]). Gastropathy related to NSAID use was diagnosed in only 6

(46.2%) of the 13 visits in which therapy with both NSAIDs was continued; the correct diagnosis was made in 122 (98.4%) of the 124 visits in which NSAID therapy was modified. The risk for suboptimal management was also reduced when the visit lasted longer than 15 minutes and when the patient's history of hypertension or peptic ulcer disease had been elicited; the latter difference, however, was not statistically significant ($P = 0.10$). Longer visits were associated with a greater likelihood that relative contraindications would be assessed, but significant differences were seen only for visits that lasted longer than 30 minutes compared with visits that lasted 15 minutes or less (visit length, 31 to 45 minutes: OR, 3.9 [$P = 0.01$]; >45 minutes: OR, 3.9 [$P = 0.05$]). Physician group and the sex of the patient and physician were not significantly associated with the risk for suboptimal management of NSAID-related gastropathy.

## Discussion

Using blinded assessment with known standardized cases, we found that unnecessary NSAID prescriptions were written in more than one third of visits. Contrary to recommended guidelines [20, 53], NSAIDs were prescribed even when patients were elderly and had relative contraindications to NSAID therapy. Persons who are the age of our standardized patients (60 to 69 years) have a threefold increase in the relative risk for serious gastrointestinal side effects relative to persons 25 to 49 years of age; those with a history of peptic ulcer disease have a sixfold increase in risk [61]. Furthermore, therapy with most NSAIDs was started at or close to the maximum adult dose. Low doses have been recommended because the relative risk for serious gastrointestinal side effects increases from 2.8 with half the standard dose to 8.0 with the highest dose [12].

- Top
- Methods
- Results
- Discussion
- Author & Article Info
- References

The existing evidence suggests that when NSAID therapy is required for patients with a history of peptic ulcer disease, misoprostol should be prescribed simultaneously [1, 50, 51, 62, 63]. Nonetheless, gastroprotective therapy was prescribed in only 48% of the visits during which NSAIDs were prescribed; misoprostol was prescribed in only 12% of visits. Although the cost-effectiveness of using misoprostol as preventive therapy for NSAID-related gastropathy in unselected populations has recently been debated [1, 49, 64], it seems to be agreed that misoprostol should be used in the higher-risk populations that were represented by our standardized patients (elderly persons and patients with a history of peptic ulcer disease) [1, 49, 64].

We explored possible reasons why NSAIDs may be prescribed unnecessarily. Although other researchers have found that shorter visits and higher practice volume were associated with greater prescribing rates [33, 35, 65], we observed that visit length played an indirect role in NSAID prescribing. Relative contraindications to NSAID therapy were less likely to be assessed during shorter visits, and the failure to assess contraindications was associated with unnecessary NSAID prescribing. The observation that risk factors were assessed in only 19 of the 57 visits during which NSAIDs were prescribed is in itself disturbing. Physicians may have failed to assess contraindications for NSAID use because they lacked knowledge of the relevant risks, underestimated the importance of these risks for NSAID treatment, or simply forgot to assess these risks. In a previously reported investigation (done in a subset of the general practitioners included in the present study), we found no association between knowledge of NSAID therapy and suboptimal management [66]. Differences in knowledge of relative contraindications may explain the differences in NSAID prescribing between physician groups. However, residents in internal medicine, who were at greatest risk for prescribing unnecessary NSAIDs, elicited relative contraindications to NSAID therapy in more visits (63%) than any other physician group (other groups, 42%). A more likely explanation is that physicians differ in their perceptions of the importance of treatment risks or in the expected benefits of drug therapy [67]. This possibility should be studied because it may explain some of the variation seen in prescribing patterns [33, 68, 69]. Finally, the link between visit length and risk assessment suggests that time constraints may play an important role in suboptimal prescribing. Computerized reminders and therapy guidelines may be one practical way to handle this problem [70]. At a more basic level, some contend that the root of the problem is the fee-for-service system, which creates incentives for high patient volume, short visits, and suboptimal care [35, 36]. However, the reimbursement method does not explain the variation in visit lengths in our study because all general practitioners were paid by fee-for-service.

Neither does it explain why similar problems are reported in settings in which physicians are paid on a capitation or salaried basis [33, 71]. Alternate explanations need to be pursued.

Antiulcer therapy among NSAID users is costly [6, 49], and it was unclear whether excess costs were being created by inaccurate diagnosis and management of NSAID gastropathy. We found that NSAID gastropathy was correctly diagnosed in almost all visits; when it was not, however, the risk for suboptimal management was considerable. In contrast, optimal management, which was defined as stopping therapy with both NSAIDs, was seen in only 11.7% of visits. This finding primarily occurred because in most visits, some form of antiulcer therapy was prescribed. Our findings probably reflect the absence of consensus on the appropriate treatment of NSAID-related gastrointestinal side effects [51, 62, 72]. Thus, our classification of optimal versus acceptable treatment could be debated. What is evident from our findings is the tendency for the side effects of one medication to be treated with another medication, even when therapy with the problematic medication is stopped. This "cascade effect," in which side effects of one treatment lead to another treatment, has been seen in other areas of medical practice [73-75]. The possibility that cascade effects exist in drug treatment needs to be investigated because these effects are relevant to the assessment of the cost of drug treatment and possibly to the problem of polypharmacy in elderly patients.

Appropriate management of adverse drug effects in elderly persons takes time. This was evidenced by the difference in average visit length between the two cases (the average visit for the NSAID-related gastropathy case lasted 5.4 minutes longer than the average visit for the case of chronic hip pain) and in the association between visit length and risk for suboptimal management. Management of drug-related problems may be particularly time-consuming in older patients because physicians must rule out competing causes related to coexisting disease for the patient's symptoms. Physicians must also take the time to counsel the patient on changes needed in therapy. Giving physicians adequate remuneration for the time taken to manage drug-related problems may be an important policy issue that must be addressed to reduce the risk for drug-related illness in elderly patients.

Our study had several limitations that could affect the interpretation of our findings. First, high rates of nonparticipation in community-based and academic physicians may have biased our estimate of management practices. Our results probably underestimate the extent of unnecessary NSAID prescribing because physicians who refuse to participate in studies of medical practice have been shown to have lower examination scores than those who agree to participate [76], and lower examination scores have been linked to higher rates of NSAID prescribing [77]. Second, residents included in our study were from a single university program in one country, and the number of visits conducted for residents in internal medicine was small. Caution should be exercised in drawing conclusions about practices in countries other than Canada and about internal medicine compared with family practice on the basis of the data presented. Third, physician performance was studied for only two cases, and our results may or may not be generalizable to other aspects of the management of osteoarthritis and NSAID-related side-effects.

We conclude that unnecessary NSAID prescribing and suboptimal management of NSAID-related side effects were sufficiently common in our study to raise questions about the appropriateness of NSAID use in the general population. Moreover, shorter visits and inaccurate diagnosis seem to compromise physician performance. If these results reflect current practice, prescribing patterns may be contributing to avoidable gastrointestinal morbidity in elderly persons. The implementation of computerized reminders and decision-making support for drug therapy decisions in practice may provide a short-term practical solution to forgetfulness or lack of knowledge. Policies that would provide adequate reimbursement for drug management in elderly patients must be considered. In the long term, better methods of providing education on drug management in training programs need to be developed and evaluated, and the health care system and physician-related factors that contribute to suboptimal prescribing in practice should be further elucidated.

# Appendix