UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL DOCKET No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L - DIVISION 3 |
| | * | |
| This document relates to | * | JUDGE FALLON |
| CASE NO. 2:05CV2524 | * | |
| | * | |
| ANTHONY WAYNE DEDRICK, | * | MAG. JUDGE KNOWLES |
| an Individual, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |

---

## Motion in Limine No. 5

### PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE TESTIMONY BY MERCK EMPLOYEES REGARDING THEIR PERSONAL USE OF VIOXX

---

Plaintiff Anthony Dedrick, by and through his counsel, moves the Court for an order excluding any evidence, discussion or argument that Merck employees, former employees, or family members of Merck employees took Vioxx prior to the drug's withdrawal from the market on September 30, 2004. Such evidence is irrelevant and unfairly prejudicial, and should not be allowed at trial.

In the first and second trials of *Evelyn Irvin Plunkett v. Merck & Co.*,[1] the Court allowed Dr. Alise Reicin and Dr. Edward Scolnick to testify that they took Vioxx and believed that the drug was safe and effective to treat their arthritis pain.  Though not offered in the *Irvin* trials, other Merck employees

1

and former employees have testified by deposition that they or a family member took Vioxx.  Former Merck CEO Raymond Gilmartin; former president of Merck U.S. Human Health, David Anstice; and current president of Merck Research Laboratories, Peter Kim, have testified that they or a family member took Vioxx prior to the drug's withdrawal from market on September 30, 2004.

In the *Barnett* trial, Dr. Alise Reicin and Dr. Edward Scolnick were prevented from testifying that they took Vioxx and believed that the drug was safe and effective to treat arthritis pain.  During the trial, the Court made the following comments before ruling that Dr. Reicin could not testify about her personal use of Vioxx:

> I'm really concerned about personal use because, as I mentioned to you before, the way I see it, I think it's relevant.  I think it's a 401 relevancy.  I think the fact that somebody took Vioxx is relevant to whether or not they feel it is safe.
>
> The problem with it, with personal use, as I see it, is really a 403 question.  And in 403 provides that, although relevant, evidence may be excluded if its probative [value] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading to the jury.  It's the area of misleading to the jury more than confusion; although, there are some seepage in [to] confusion.
>
> So I allowed it in the case with treaters because, as I saw it, the question was, why did you give Vioxx?  And this was part of the reason that they gave Vioxx.  And it was for full disclosure and it also had some relevance.  And I weighed the 403 and I felt it was appropriate for treaters who had Vioxx to at least say, "Well, I took Vioxx, and I gave it to the other patients, and because I gave it to other patients, and because even I took it, I thought it was good for this individual."  So I allowed it.
>
> I'm having problems with other people testifying as to their personal use of Vioxx and using that to bolster, and I'm rethinking in the last two hours or thereabouts, I've rethought the position with Dr. Reicin.  This is the way I see it.  Although it's relevant to her, I think that 403 predominates in favor of not allowing her to do it.  Her age is different.  Her sex is different.  Her stress level is different.  Her cholesterol is different.  The amount of heart disease is different for her.  Therefore, I think it's confusing and also I think it's misleading to the jury to say, "Well, I used it; therefore, it's good."

---

[1] The Court originally, and Plaintiff believes correctly, ruled that evidence of employee use of Vioxx was irrelevant and inadmissible pursuant to Rule 401.  The Court reversed the decision during *Irvin I.*

> But in addition to that, this particular case is a warning case. This particular case, the Plaintiff says, "I didn't know it. My doctor didn't know it or my doctor didn't tell me. Had I known it, I wouldn't have done it." Now, Dr. Reicin is probably more knowledgeable on Vioxx, its effects, its potential, its good balance, its bad value, its risks or whatever. So warning to her is of no relevance. I mean, the fact that she used it knowing what she knew about the drug, knowing about what she knows about her own doncitions, it has no benefit to her from the warning aspect, and I think from the standpoint of her situation, her age, her sex, her stress level, all other factors which she can evaluate are different than the factors that the Plaintiff is facing.
>
> So I'm sorry if I am causing any problem with you all, but I reevaluated it and I ask that we not go into that.

*Barnett v. Merck & Co.*, No. 06-CV-485-L, trial transcript at 2274-2276 (August 14, 2006) (Ex. "A").

In *Smith v. Merck & Co.*, the Court allowed Dr. Reicin to testify that she took Vioxx. See *Smith v. Merck & Co.*, No. 05-CV-4379-L, trial transcript at 2505-2507 (September 21, 2006) (Ex. "B").

Plaintiff expects Merck to offer similar testimony from Dr. Reicin, Dr. Scolnick and potentially other former Merck employees during the upcoming trial in this case. With this evidence, as the Court is well aware, Merck intends to bolster its assertions that Vioxx is safe and that prior to receiving data from APPROVe, it had no knowledge of the increased cardiovascular risks associated with the use of Vioxx.

Such testimony is not relevant to Plaintiff's claims that Vioxx is defective and that Merck failed to warn physicians and patients of the increased risk of cardiovascular events associated with the use of the drug. Moreover, the probative value of the evidence is substantially outweighed by its prejudicial effect. Plaintiff respectfully moves the Court for an order excluding such evidence.

**1.  The Alleged Use of Vioxx by Merck Employees or
    <u>Their Family Members is Irrelevant to Plaintiff's Claims.</u>**

Anecdotal evidence that Merck employees or their family members took Vioxx is irrelevant to

Plaintiff's claims of defective product and failure to warn.[2]

First, such evidence, testimony, or discussion is irrelevant to prove or disprove that Vioxx is

unreasonably dangerous.  Arguably, those who have testified they took Vioxx had substantial

information about the safety profile of the drug.  It can be argued that they were well aware of the

cardiovascular risks associated with taking Vioxx.  Unlike physicians who prescribing the drug to

millions of patients, these executives and their family members would have been privy to data drawing

into question the safety of Vioxx.  These employees and their family members or their physicians would

have had opportunity to perform a different risk-benefit analysis prior to taking the drug than a physician

on behalf of an average person.

Plaintiff has not been given medical records on the employees and family members in question

(with the exception of the limited medical records of Dr. Alise Reicin provided during *Irvin II* and

*Barnett*).  Plaintiff has not had opportunity to depose their treating physicians.  It is unknown what these

persons medical conditions were or what other medications were being taken along with Vioxx.

It might be that Merck executives, having knowledge of the drugs prothrombotic nature, would

have also taken a blood thinning agent to minimize the risk of a thrombotic event.  Or the individual had

few risk factors for cardiovascular disease that would elevate the risk of an adverse event.  Or possibly

their arthritic pain was so extreme that the individual made a decision to take Vioxx regardless of the

---

[2] All such testimony to date has not been supported by any evidence with the exception of Dr. Reicin.  Medical records of Dr. Scolnick, Mr. Anstice, Dr. Kim, or Mrs. Gilmartin establishing that they were in fact prescribed and took Vioxx have not been produced by Merck.  Merck witnesses should not be allowed to testify that they or their family member took Vioxx without producing medical records sufficient to allow meaningful cross examination.

cardiovascular risk. Lastly, they may have simply taken the drug without any consideration or care, having total disregard for their safety or welfare.

This issue has been considered by Judge Carol E. Higbee in New Jersey. In *Humeston, et al v. Merck & Co.*, the court made the following finding directed at the inadmissibility of such evidence based on the fact that evidence regarding the ingesting of Vioxx by a non-party Merck employee or Merck family member was irrelevant as involving a factual analysis unrelated to the plaintiff:

> The individual decision made by a person in consultation with their doctor to take a drug is a personal decision which can be made for many reasons. People are willing to take different risks. Some people, depending on their medical condition, may have been willing to gamble on the cardiovascular risks even if they knew of the risk. The exploration at trial of each employee's personal decision would be prejudicial, confusing and time consuming.

*See* Memorandum of Decision on Motion, *Humeston v. Merck & Co.*, No. ATL-L-2272-03-MT, slip op. at 3 (N.J. Super., Atlantic Cty. September 9, 2005) (Ex. "C").

These individual choices cannot be extrapolated across the entire population of those taking Vioxx and judged as evidence that Vioxx is safe as labeled. Such testimony does not prove that the drug is not unreasonably dangerous. It is irrelevant.

One of Plaintiff's primary claims is that Merck knew of the cardiovascular dangers associated with the use of Vioxx but <u>failed to warn the physicians</u> and their patients. Testimony regarding Merck executives and their family members using Vioxx is immaterial and irrelevant to this claim. Merck executives and their family members had the benefit of internal safety data that was not available to the public. Clearly, any decisions they made to take Vioxx are irrelevant to Plaintiff's claim that he and his treating physician, Dr. Herrera, were not adequately warned of the risks associated with the drug. Rather, at best, such evidence is merely confusing. As Judge Higbee found in *Humeston*, "[s]uch

evidence does not have any probative value in answering the ultimate issues in the failure to warn aspect of this litigation." *Id.* Defendant should therefore be precluded from introducing such evidence.

2.  **The Probative Value of Evidence that Merck Employees or Their Family Members Took Vioxx is Substantiality Outweighed By Its Prejudicial Effect.**

Plaintiff contends that testimony and evidence that Merck employees and their family members took Vioxx is not relevant. If the Court disagrees, however, Plaintiff urges the Court to follow its ruling in *Barnett* and find that the probative value of evidence that Merck employees and their family members took Vioxx is clearly outweighed by its prejudicial effect.

As the Court is well aware, Federal Rule of Evidence Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

The probative value of the testimony at issue is minimal and pales in comparison to the prejudicial effect of the testimony. Testimony that a witness' relative took Vioxx could mislead a jury into believing that Vioxx was safe and effective, since—as Merck will undoubtedly argue—no witness would have allowed his or her relative to take a drug that was known to be dangerous. This implication, however, is not necessarily the case. As demonstrated above, Merck employees may have taken and allowed their relatives to take Vioxx knowing its dangerous condition for numerous reasons – it was taken in addition to a blood thinning agent (something a physician without knowledge of the drug's prothrombotic effect would not have known to add to a patient's therapy), the risk in the case of extreme pain was outweighed by the benefit, or the family member was just a risk-taker.

Moreover, similar to the facts in *Barnett,* Plaintiff's cardiovascular condition is unique and different from the physical conditions of these employees and former employees. Focusing on Dr.

Reicin specifically, Mr. Dedrick's condition is different from her cardiovascular condition. Her age is different. Her sex is different. Her stress level is different. Her cholesterol is different. Her blood pressure is different. She is not diabetic. The amount of heart disease is different for her. As the Court concluded previously, the diversity of these circumstances are such that the Court clearly should exclude evidence of Dr. Reicin's Vioxx use, as well as evidence that other Merck employees or family members used Vioxx, is inadmissible.

In proposing this testimony, Merck essentially attempts to put forward a "trump" card – if we took it, the drug must be safe. This flies in the face of other scientific evidence. Allowing such testimony would only confuse the jury and encourage the jury to overlook the scientific evidence that has passed through *Daubert's* gates during the course of the trial.

Moreover, allowing the testimony is counter to the Court's expressed desire to streamline the trial process. If allowed, Plaintiff will be forced to seek the medical records of those offering such testimony and will have to spend considerable time exposing the underlying health condition and risk-benefit analysis undertaken for each witness. This will result in a mini-trial in the midst of a trial, a considerable investment of the Court's time, but essential in order that Plaintiff be given opportunity to adequately answer this evidence.

Judge Higbee, after briefing and oral argument on the same issues presented herein, correctly ruled:

> The court finds that evidence that Merck employees or their family members took VIOXX is substantially more prejudicial than probative and must be excluded during trial. Such evidence does not have any probative value in answering the ultimate issues in the failure to warn aspect of this litigation. Allowing Merck employees to testify that they or their family members took VIOXX would be highly prejudicial to plaintiffs' claims and would not demonstrate with any reliability that VIOXX was more or less safer than was being represented by Merck to the public. *Id.*, slip op. at 3.

Judge Higbee has continued to follow this ruling in the *McDarby/Cona* trial.  Plaintiff urges the Court to follow the rule it established in *Barnett*.

For the foregoing reasons, Plaintiff respectfully requests that this Court enter an order excluding any evidence or discussion that Merck employees, former employees or their family members used Vioxx.

Date:  October 27, 2006

Respectfully submitted,

By _P. Leigh O'Dell_____

Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama  36103-4160
Telephone:  (334) 269-2343
Facsimile: (334) 954-7555

Counsel for Plaintiff

**Russ M. Herman** (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
 **Plaintiffs' Liaison Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
& WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

**Christopher A. Seeger**, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiff's Motion in Limine to Preclude Testimony by Merck Employees Regarding Their Personal Use of Vioxx has been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail or by hand delivery and e-mail, on Merck's Counsel, Douglas R. Marvin and Philip S. Beck,  by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this  27th  day of October, 2006.

P. Leigh O'Dell
Attorney for Plaintiff
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.

1   TRIAL WAS THAT VIOXX MIGHT BE CAUSING THE HEART ATTACKS, NOT

2   NAPROXEN PREVENTING THEM?

3   A.   THAT'S CORRECT.   THAT WAS WHAT HIS FIRST REACTION WAS AND,

4   AS I SAID -- THAT WAS WHAT MY FIRST REACTION WAS.

5   Q.   AND AFTER WE TAKE A BREAK, DR. REICIN, I'M GOING TO ASK

6   YOU ABOUT WHETHER, BASED ON ALL OF THE DATA THAT YOU REVIEWED,

7   WHETHER DR. SCOLNICK CONTINUED TO HOLD THAT VIEW AFTER YOU

8   PRESENTED THE DATA TO HIM.   OKAY?

9           THE COURT:   WE'LL TAKE A 15-MINUTE BREAK AT THIS

10   TIME.   THE COURT WILL STAND IN RECESS.

11           (WHEREUPON, THE JURY EXITED THE COURTROOM.)

12           THE COURT:   LET ME SEE COUNSEL AT THE BENCH.

13           (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

14   THE BENCH.)

15           THE COURT:   I WANT TO VISIT WITH YOU AGAIN ON THE

16   QUESTION OF PERSONAL USE, AND LET ME GIVE YOU MY VIEW ON THIS

17   SO EVERYBODY IS CLEAR ON IT.   WE TALKED ABOUT IT BRIEFLY THIS

18   MORNING ABOUT PERSONAL USE WITH REGARD TO DR. REICIN, AND I

19   TOLD YOU AT THAT TIME THAT MY INITIAL FEELING AND MY FEELING

20   WAS THAT I WOULD ALLOW THAT TO COME OUT.

21               I'M REALLY CONCERNED ABOUT PERSONAL USE BECAUSE,

22   AS I MENTIONED TO YOU BEFORE, THE WAY I SEE IT, I THINK IT'S

23   RELEVANT.   I THINK IT'S A 401 RELEVANCY.   I THINK THE FACT THAT

24   SOMEBODY TOOK VIOXX IS RELEVANT TO WHETHER OR NOT THEY FEEL

25   IT'S SAFE.



EXHIBIT

A

Page 2275

1      THE PROBLEM WITH IT, WITH PERSONAL USE, AS I SEE

2  IT, IS REALLY A 403 QUESTION.  AND IN 403 PROVIDES THAT,

3  ALTHOUGH RELEVANT, EVIDENCE MAY BE EXCLUDED IF ITS PROBATIVE IS

4  SUBSTANTIALLY OUTWEIGHED BY THE DANGER OF UNFAIR PREJUDICE,

5  CONFUSION OF THE ISSUES, OR MISLEADING TO THE JURY.  IT'S THE

6  AREA OF MISLEADING TO THE JURY MORE THAN CONFUSION; ALTHOUGH,

7  THERE ARE SOME SEEPAGE IN CONFUSION.

8      SO I ALLOWED IT IN THE CASE WITH TREATERS

9  BECAUSE, AS I SAW IT, THE QUESTION WAS, WHY DID YOU GIVE VIOXX?

10  AND THIS WAS PART OF THE REASON THAT THEY GAVE VIOXX.  AND IT

11  WAS FOR FULL DISCLOSURE AND IT ALSO HAD SOME RELEVANCE.  AND I

12  WEIGHED THE 403 AND I FELT IT WAS APPROPRIATE FOR TREATERS WHO

13  HAD VIOXX TO AT LEAST SAY, "WELL, I TOOK VIOXX, AND I GAVE IT

14  TO OTHER PATIENTS, AND BECAUSE I GAVE IT TO OTHER PATIENTS, AND

15  BECAUSE EVEN I TOOK IT, I THOUGHT IT WAS GOOD FOR THIS

16  INDIVIDUAL."  SO I ALLOWED IT.

17      I'M HAVING PROBLEMS WITH OTHER PEOPLE TESTIFYING

18  AS TO THEIR PERSONAL USE OF VIOXX AND USING THAT TO BOLSTER.

19  AND I'M RETHINKING IN THE LAST TWO HOURS OR THEREABOUTS, I'VE

20  RETHOUGHT THE POSITION WITH DR. REICIN.  THIS IS THE WAY I SEE

21  IT.  ALTHOUGH IT'S RELEVANT TO HER, I THINK THAT 403

22  PREDOMINATES IN FAVOR OF NOT ALLOWING HER TO DO IT.  HER AGE IS

23  DIFFERENT.  HER SEX IS DIFFERENT.  HER STRESS LEVEL IS

24  DIFFERENT.  HER CHOLESTEROL IS DIFFERENT.  THE AMOUNT OF HEART

25  DISEASE IS DIFFERENT FOR HER.  THEREFORE, I THINK IT'S

DAILY COPY

Page 2276

1   CONFUSING AND ALSO I THINK IT'S MISLEADING TO THE JURY TO SAY,

2   "WELL, I USED IT; THEREFORE, IT'S GOOD."

3                 BUT IN ADDITION TO THAT, THIS PARTICULAR CASE IS

4   A WARNING CASE.  THIS PARTICULAR CASE, THE PLAINTIFF SAYS, "I

5   DIDN'T KNOW IT.  MY DOCTOR DIDN'T KNOW IT OR MY DOCTOR DIDN'T

6   TELL ME.  HAD I KNOWN IT, I WOULDN'T HAVE DONE IT."  NOW,

7   DR. REICIN IS PROBABLY MORE KNOWLEDGEABLE ON VIOXX, ITS

8   EFFECTS, ITS POTENTIAL, ITS GOOD BALANCE, ITS BAD VALUE, ITS

9   RISKS OR WHATEVER.  SO WARNING TO HER IS OF NO RELEVANCE.  I

10  MEAN, THE FACT THAT SHE USED IT KNOWING WHAT SHE KNEW ABOUT THE

11  DRUG, KNOWING WHAT SHE KNOWS ABOUT HER OWN CONDITIONS, IT HAS

12  NO BENEFIT TO HER FROM THE WARNING ASPECT, AND I THINK FROM THE

13  STANDPOINT OF HER SITUATION, HER AGE, HER SEX, HER STRESS

14  LEVEL, ALL OTHER FACTORS WHICH SHE CAN EVALUATE ARE DIFFERENT

15  THAN THE FACTORS THAT THE PLAINTIFF IS FACING.

16                SO I'M SORRY IF I AM CAUSING ANY PROBLEM WITH

17  YOU ALL, BUT I REEVALUATED IT AND I ASK THAT WE NOT GO INTO

18  THAT.  AND I ASK THAT YOU TELL THE DOCTOR.

19                MR. BECK:  I WAS JUST GOING TO ASK IF ANDY COULD HAVE

20  PERMISSION TO MAKE SURE THAT SHE DOESN'T JUST SAY IT.  SO ANDY

21  WILL GO AHEAD AND TAKE CARE OF THAT.

22                I WOULD LIKE SIMPLY FOR THE RECORD TO MAKE AN

23  OFFER OF PROOF, AND I HOPE THIS WILL BE ADEQUATE AS FAR AS THE

24  PLAINTIFFS ARE CONCERNED, THAT IF ASKED, DR. REICIN WOULD

25  TESTIFY THAT SHE HERSELF TOOK VIOXX BECAUSE SHE CONSIDERED IT

c809ffef-511f-4799-8e69-0b8f578e8533

1  SAFE AND EFFECTIVE, AND ALSO MAKE THE SAME OFFER OF PROOF FOR

2  DR. SCOLNICK, THAT IF WE WERE TO PLAY THE PORTION OF HIS

3  DEPOSITION THAT YOUR HONOR EXCLUDED, THAT WE WOULD SAY THAT HE

4  TOOK VIOXX.  AND SO I WOULD MAKE THOSE OFFERS OF PROOF.

5          THE COURT:  I'LL ACCEPT THAT.  AND ALSO, AS I RECALL,

6  THE REASON THAT DR. REICIN TOOK IT WAS SHE HAD SOME

7  MUSCULOSKELETAL PAIN THAT WAS GIVING HER DIFFICULTY, AND SHE

8  FELT VIOXX WAS HELPFUL, SHE TOOK IT, AND INDEED IT WAS HELPFUL

9  AND INDEED IT DIDN'T CAUSE HER ANY PROBLEM AT ALL.

10          MR. BECK:  YES.

11          MR. BICHFIELD:  AND SHE TOOK IT INTERMITTENTLY.

12          MR. ROBINSON:  COUNSEL IS GOING TO INSTRUCT HER NOT

13  TO BLURT IT OUT OR SOMETHING.

14          MR. BECK:  THAT'S WHAT ANDY IS GOING TO DO.  THAT'S

15  WHY I WANTED TO HAVE PERMISSION.

16          (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

17

18          THE DEPUTY CLERK:  ALL RISE.

19          THE COURT:  BE SEATED, PLEASE.

20  BY MR. GOLDMAN:

21  Q.  DR. REICIN, WOULD YOU PLEASE TURN TO DEFENSE EXHIBIT 186,

22  WHICH IS IN EVIDENCE.  THIS IS AN E-MAIL, THE BOTTOM ONE, IS AN

23  E-MAIL FROM DR. SCOLNICK TO YOU AND OTHERS, AND THE SUBJECT IS

24  "A WORD OF PRAISE."  "ALAN AND ALISE AND HARRY (NOT A NEW TITLE

25  FOR A WOODY ALLEN MOVIE)."  AND THEN IT GOES ON.  AND HE TALKS

## Page 2521

1  BY MR. GOLDMAN:
2  Q.  SO HERE WE HAVE A FAX.  IS THIS FROM THE FDA, BARBARA
3  GOULD, TO MERCK?
4  A.  YES.
5  Q.  DOES IT SAY "DRAFT LABEL PROPOSAL" HERE?
6  A.  YES, IT DOES.
7  Q.  IF WE TURN TO THE 14TH PAGE OF THE DOCUMENT, DO YOU SEE AT
8  THE BOTTOM THERE'S A SECTION CALLED "PRECAUTIONS."  THIS IS
9  WITHIN THE LABEL.
10  A.  TELL ME WHAT PAGE I'M GOING TO.
11  Q.  IT'S ACTUALLY PAGE 14 OF THE LETTER?
12  A.  YES, I SEE IT.
13  Q.  THEN IF YOU LOOK AT THE NEXT PAGE UNDER PRECAUTIONS, WHAT
14  DOES THE FDA SAY IN THE PROPOSED LABEL SHOULD GO IN THE
15  PRECAUTIONS SECTION?
16  A.  THEY SAY THAT THE VIGOR CARDIOVASCULAR DATA SHOULD BE HERE
17  IN THE PRECAUTIONS SECTION.
18  Q.  DID THEY ULTIMATELY AGREE THAT THE PROPER PLACE FOR THE
19  VIGOR DATA WAS IN THE PRECAUTIONS SECTION OF THE LABEL?
20  A.  THE ULTIMATE DECISION ABOUT LABELS IS THE FDA, AND THEY
21  FELT IT WAS MOST APPROPRIATE IN THE PRECAUTIONS SECTION, THAT
22  IS CORRECT.
23  Q.  THE LAST THING I WANT TO ASK YOU ABOUT, DR. REICIN, IS
24  THIS E-MAIL THAT DR. KONSTAM WROTE.  YOU MAY STILL HAVE IT UP
25  THERE.  LET ME HAND IT TO YOU IN CASE YOU DON'T.  NO.  YOU KNOW

## Page 2522

1  WHAT?  I'LL JUST PUT IT ON THE ELMO.
2      NOW, THIS WAS THE E-MAIL MR. WATTS ASKED YOU ABOUT,
3  AND I JUST HAVE SOME FOLLOW-UP QUESTIONS.  IT'S OCTOBER 8,
4  2004.  WHAT'S THE SUBJECT LINE SAY?
5  A.  "AIRPLANE CONVERSATION."
6  Q.  IT'S FROM DR. KONSTAM.  IS HE A CONSULTANT FROM TUFTS?
7  A.  YES, HE -- HE IS, YES.  DR. KONSTAM IS A CONSULTANT FROM
8  TUFTS.
9  Q.  HE SAYS TO YOU:  "FYI, I RAN INTO STEVE NISSEN ON AN
10  AIRPLANE TODAY."  WHO IS STEVE NISSEN AGAIN?
11  A.  STEVE NISSEN IS A CARDIOLOGIST FROM THE CLEVELAND CLINIC
12  WHO WORKS -- WORKED WITH ERIC TOPOL AT THE CLEVELAND CLINIC.
13  Q.  DID DR. NISSEN AND DR. TOPOL ACTUALLY WORK IN THE SAME
14  CARDIOLOGY GROUP AT THE CLINIC?
15  A.  YES.
16  Q.  DOES IT SAY THAT HE SPONTANEOUSLY VOLUNTEERED -- NOW,
17  "HE," DOES THAT REFER TO DR. NISSEN?
18  A.  YES.
19  Q.  THAT HE FEARS THAT "ERIC" -- WHO IS ERIC?
20  A.  HE WAS REFERRING TO ERIC TOPOL.
21  Q.  -- "HAS GONE OFF THE DEEP END.  I TOLD HIM THAT FOR
22  HIS" -- ERIC'S -- "OWN INTEREST, HE SHOULD TRY TO CALM DOWN.
23  HE TOLD ME HE'S TRIED, BUT IT'S VERY HARD FOR ANYONE TO TALK TO
24  ERIC."
25      NOW, IS THIS YOU OR MERCK SAYING THAT DR. TOPOL HAS

## Page 2523

1  GONE OFF THE DEEP END?
2  A.  ABSOLUTELY NOT.
3  Q.  WHETHER OR NOT YOU THINK HE HAS, WHO IS SAYING THAT HE
4  WENT OFF THE DEEP END HERE?
5  A.  DR. NISSEN HAS SAID THIS.
6  Q.  IS THIS THE SAME DR. NISSEN WHO WAS AT THE FDA ADVISORY
7  COMMITTEE MEETING IN FEBRUARY 2001?
8  A.  THAT'S CORRECT.
9      MR. GOLDMAN:  THOSE ARE ALL THE QUESTIONS I HAVE.
10      MR. WATTS:  I DON'T HAVE ANY QUESTIONS.
11      (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT
12  THE BENCH.)
13      THE COURT:  AS YOU ALL KNOW, I HAD RULED THAT
14  PERSONAL USE COULD NOT BE GONE INTO, BUT I SAW IT AS A 403
15  QUESTION.  THE LAST SEVERAL QUESTIONS, FROM THE DEFENDANT'S
16  STANDPOINT, FELT LIKE PERSONAL ATTACKS ON THE PERSON, AND SO I
17  ALLOWED A QUESTION REGARDING PERSONAL USE.  I ALSO, UNDER 611,
18  WOULD OPEN IT FOR RECROSS ON PERSONAL USE IF THE PLAINTIFF
19  WISHES TO DO SO.
20      MR. WATTS:  JUDGE, I APPRECIATE THE OFFER.  I'M NOT
21  PREPARED TO CROSS-EXAMINE HER.  WELL, I'M GOING TO PASS ON THE
22  OFFER, BUT I UNDERSTAND WHAT YOU'RE DOING AND I APPRECIATE IT.
23      THE COURT:  WE'LL TAKE A BREAK HERE.
24      (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN
25  OPEN COURT.)

## Page 2524

1      THE COURT:  YOU'RE EXCUSED.  THANK YOU.  WE'LL TAKE A
2  BREAK FOR 15 MINUTES.
3      THE DEPUTY CLERK:  EVERYONE RISE.
4      (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)
5      THE DEPUTY CLERK:  EVERYONE RISE.
6      THE COURT:  BE SEATED.  PLEASE CALL YOUR NEXT WITNESS
7  PLEASE.
8      MR. BECK:  MERCK CALLS AS OUR NEXT WITNESS DR. JANET
9  ARROWSMITH-LOWE, AND SHE WILL BE EXAMINED BY CARRIE JABLONSKI
10  FROM MY FIRM.
11      (WHEREUPON, JANET ARROWSMITH-LOWE, HAVING BEEN DULY
12  SWORN, TESTIFIED AS FOLLOWS.)
13      THE DEPUTY CLERK:  PLEASE STATE YOUR FULL NAME AND
14  CORRECT SPELLING FOR THE RECORD.
15      THE WITNESS:  MY NAME IS JANET ARROWSMITH-LOWE.
16          VOIR DIRE
17  BY MS. JABLONSKI:
18  Q.  GOOD AFTERNOON, DOCTOR.
19  A.  HI.  HOW ARE YOU?
20  Q.  I'M GREAT.  WOULD YOU PLEASE INTRODUCE YOURSELF FOR THE
21  JURY.
22  A.  SURE.  MY NAME IS JANET ARROWSMITH-LOWE.  I LIVE IN
23  NEW MEXICO.  I GREW UP HERE, BUT I LIVE WITH MY HUSBAND AND TWO
24  KIDS IN A LITTLE TOWN IN NEW MEXICO.
25  Q.  BRIEFLY, SO WE ALL KNOW WHAT YOU'RE HERE TO TALK ABOUT

**EXHIBIT B** (tabbies)

66 (Pages 2521 to 2524)

228a8378-defb-4fc8-8501-6d92ae340827

## Page 2505

1    MR. WATTS: YES.

2       MR. GOLDMAN: JUDGE, WE OBJECT ON RELEVANCE GROUNDS

3  AFTER WITHDRAWAL. JUST OBJECT ON RELEVANCE GROUNDS AND 403.

4       MR. WATTS: SLICING AND --

5       THE COURT: WAIT JUST A MINUTE. I OVERRULE THE

6  OBJECTION AND I'LL ALLOW IT.

7  BY MR. WATTS:

8  Q.  INSIDE OF MERCK -- AGAIN, THERE'S A LOT OF FUNNY E-MAILS.

9  OVERALL, THIS IS REALLY GOOD. "DINNER IS DEFINITELY IN ORDER.

10  WE'LL HAVE SLICED AND GRILLED GRAHAM." WHICH YOU RESPOND,

11  "REALLY GOOD. I MUST BE CRAZY TO SAY YES." IS THAT RIGHT?

12  A.  THAT IS WHAT I WROTE.

13     MR. WATTS: DR. REICIN, I'M OUT OF TIME. THANK YOU

14  VERY MUCH. IT'S GOOD TO MEET YOU.

15     MR. GOLDMAN: YOUR HONOR, CAN WE APPROACH? I ALSO

16  NEED A MINUTE TO SET UP, BUT I CAN BE READY IN A MINUTE.

17     THE COURT: OKAY.

18     (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

19  THE BENCH.)

20     MR. BECK: YOUR HONOR, IN LIGHT OF THE

21  CROSS-EXAMINATION OF DR. REICIN, WE ASK THAT WE BE ALLOWED TO

22  ASK WHETHER SHE TOOK VIOXX FOR PERSONAL USE. WE THINK IT

23  IS RELEVANT TO HER CREDIBILITY. THERE'S BEEN A DIRECT ATTACK

24  ON HER CREDIBILITY. IN FACT, MOST OF IT HAS BEEN AN ATTACK ON

25  CREDIBILITY. SO WE ASK TO BE ALLOWED TO ASK HER IF SHE TOOK

## Page 2506

1  VIOXX.

2       MR. WATTS: JUDGE, NUMBER 1, YOU RULED ON THIS IN

3  PRETRIAL, AND WE WILL RELY UPON THAT RULING. NUMBER 2, WE DID

4  NOT COME CLOSE TO APPROACHING THIS ISSUE.

5       MR. BECK: I DIDN'T SAY --

6       MR. WATTS: THE FATHER AND THE FACT SHE DOESN'T TAKE

7  ASPIRIN, WE APPROACHED THE BENCH AND STAYED AWAY FROM IT.

8       MR. BECK: I DIDN'T ARGUE. HE OPENED THE DOOR. I

9  SAID HE ATTACKED THE CREDIBILITY, AND THE REASON I'M

10  APPROACHING NOW IS BECAUSE YOU DID RULE ON IT BEFORE, AND

11  THAT'S WHAT THE MOTION IN LIMINE IS. I CAN'T RAISE IT UNLESS I

12  ASK.

13     MR. WATTS: MY CROSS IS NOW OVER, NUMBER 1, AND I DID

14  CROSS IN A CERTAIN WAY SO IT WOULD NOT COME UP. NUMBER 2, IT

15  SHOULDN'T BE ALLOWED TO COME UP FOR THE FIRST TIME NOW BECAUSE

16  IT PREJUDICES ME AND THE WAY -- I HAVE COMPLETED CROSS ON THIS.

17  IF I HAD KNOWN ABOUT IT --

18     MR. BECK: JUDGE, WE HAVE BEEN TALKING ABOUT IT SINCE

19  BEFORE THE CASE, AND THE MOTION IN LIMINE SAYS WE CAN'T RAISE

20  IT UNLESS WE COME UP. YOUR HONOR SAID THAT'S A CREDIBILITY

21  ISSUE AND I HAVE TO WAIT UNTIL AFTER THE CROSS. THIS IS AFTER

22  THE CROSS.

23     MR. WATTS: THE CROSS DIDN'T COME CLOSE TO IT.

24     THE COURT: I UNDERSTAND THE ISSUE. I'LL ALLOW A

25  COUPLE QUESTIONS ON THAT.

## Page 2507

1       MR. WATTS: DO I GET TO CROSS-EXAMINE HER ABOUT IT?

2       THE COURT: NO. THAT'S IT.

3       (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

4  OPEN COURT.)

5       THE COURT: RECROSS ON ONE ISSUE, AND I WOULD LIKE IT

6  TO BE DONE IN A QUESTION OR TWO.

7       MR. GOLDMAN: YES. REDIRECT.

8       THE COURT: I'M SORRY. REDIRECT.

9           REDIRECT EXAMINATION

10  BY MR. GOLDMAN:

11  Q.  DR. REICIN, DID YOU USE VIOXX YOURSELF?

12  A.  YES, I DID; OFTEN FOR PROLONGED PERIODS OF TIME.

13  Q.  DR. REICIN, I WANT TO START OFF TOWARD THE END OF

14  MR. WATTS' EXAMINATION ON THIS WITHDRAWAL AND THE ESMB ISSUE.

15  CAN YOU EXPLAIN HOW THE WITHDRAWAL HAPPENED AND WHAT, IF ANY,

16  RELEVANCE THE ESMB AND THE FDA COMMUNICATIONS HAD TO THAT?

17  A.  WELL, THE FDA COMMUNICATION HAD NO RELEVANCE. AS YOU

18  COULD SEE THIS MORNING, I DIDN'T EVEN REMEMBER THAT REQUEST

19  FROM THEM. BASICALLY WHAT HAPPENED IS THE ESMB MET. THEY SAW

20  THAT THERE WAS AN INCREASED RISK OF CARDIOVASCULAR EVENTS ON

21  VIOXX COMPARED WITH PLACEBO IN THE APPROVE STUDY BEGINNING

22  AFTER 18 MONTHS. IT'S MY UNDERSTANDING THEY REACHED OUT TO THE

23  ADMINISTRATIVE COMMITTEE, WHICH IS LIKE THE STEERING COMMITTEE

24  THAT OVERSEES THE STUDY. THEY SHARED THE DATA WITH THEM. THEY

25  RECOMMENDED THAT THE STUDY BE PREMATURELY TERMINATED. THE ESMB

## Page 2508

1  AGREED WITH THAT RECOMMENDATION AND CONTACTED THE MEDICAL

2  MONITOR AT MERCK, KEVIN CORGAN (PH.) AND TOLD HIM ABOUT THE

3  DATA AND THEIR RECOMMENDATION.

4  Q.  DR. REICIN, I'M GOING TO TRY TO NOW TOUCH ON SOME OF THE

5  TOPICS THAT MR. WATTS TOUCHED ON. THE FIRST WAS ABOUT THE

6  VICTOR MEETING THAT WAS HELD IN 2005. DO YOU REMEMBER THAT?

7  A.  YES, I DO.

8  Q.  HE ASKED YOU ABOUT WHETHER THERE WAS A VOTE CONCERNING THE

9  POTENTIAL CARDIOVASCULAR RISKS ASSOCIATED WITH VIOXX AND

10  CELEBREX. DO YOU REMEMBER THAT?

11  A.  I BELIEVE HE ASKED ABOUT VIOXX, BUT IT WAS A VOTE ON

12  CELEBREX, AS WELL.

13  Q.  WHAT WAS THAT VOTE?

14  A.  I CAN'T REMEMBER WHAT THE EXACT NUMBERS WERE, BUT THE

15  MAJORITY VOTED THAT CELEBREX WAS ALSO ASSOCIATED WITH AN

16  INCREASED RISK BASED ON THE DATA PRESENTED.

17  Q.  DID THE ADVISORY COMMITTEE IN 2005 AFTER VIOXX HAD ALREADY

18  BEEN WITHDRAWN VOTE ON WHETHER THE BENEFITS OUTWEIGHED THE

19  RISKS FOR VIOXX?

20  A.  YES, THEY DID.

21  Q.  WHAT DID THE MAJORITY SAY?

22  A.  THE MAJORITY SAID THE BENEFITS DID OUTWEIGH THE RISKS. I

23  CAN'T REMEMBER EXACTLY WHAT THE EXACT WORDS OF THAT QUESTION

24  WERE.

25  Q.  YOU WERE ASKED QUESTIONS ABOUT THE FACT THAT VIOXX HAS

52 (Pages 2505 to 2508)

DAILY COPY

228a8378-defb-4fc8-8501-6d92ae340827

## Page 2509

1  BEEN WITHDRAWN NOT ONLY IN THE UNITED STATES BUT ALSO
2  WORLDWIDE.  DO YOU REMEMBER THAT?
3  A.  YES, I DO.
4  Q.  DO YOU KNOW, DR. REICIN, WHETHER, AFTER THE WITHDRAWAL,
5  THE HEALTH CANADIAN EXPERT ADVISORY PANEL VOTED ON WHETHER THE
6  BENEFITS OF VIOXX OUTWEIGH THE RISKS?
7  A.  YES, THEY DID.
8  Q.  WHAT WAS THE WROTE?
9  A.  THAT THE BENEFITS OUTWEIGHED THE RISKS FOR VIOXX.
10  Q.  MR. WATTS ASKED YOU ABOUT DR. RAY.  DO YOU REMEMBER
11  QUESTIONS ABOUT DR. RAY?
12  A.  YES, I DO.
13  Q.  HE ASKED YOU ABOUT A LANCET ARTICLE CONCERNING NAPROXEN;
14  RIGHT?
15  A.  THAT'S CORRECT.
16  Q.  I'M GOING TO MARK FOR IDENTIFICATION PURPOSES ON EXHIBIT
17  628, WHICH IS AN ARTICLE THAT DR. RAY WROTE.  LET'S SEE WHAT HE
18  SAID ABOUT VIOXX.  THIS WAS IN WHAT YEAR?
19  A.  THIS WAS IN 2002.
20  Q.  DID HE DO SOME TYPE OF AN EPIDEMIOLOGICAL STUDY?
21  A.  THAT'S CORRECT.  ONE OF THE DATABASE STUDIES.
22  Q.  WHAT DOES DR. RAY AND OTHERS SAY HERE IN THE LAST
23  SENTENCE?  STARTING WITH "BY CONTRAST..."
24  A.  DID YOU WANT ME TO READ IT?
25  Q.  YES, PLEASE.

## Page 2510

1  A.  "BY CONTRAST, THERE WAS NO EVIDENCE OF RAISED RISK OF
2  CORONARY HEART DISEASE AMONG USERS OF ROFECOXIB AT DOSES OF 25
3  MILLIGRAMS OR LESS OR AMONG USERS OF OTHER NSAIDS."
4  Q.  DOES THAT INDICATE THAT, ACCORDING TO DR. RAY IN 2002,
5  THERE WAS NO INCREASED RISK ASSOCIATED WITH THE 25 MILLIGRAMS
6  DOSE OF VIOXX?
7  A.  THAT IS CORRECT IN THIS STUDY.
8  Q.  DO YOU KNOW WHETHER DR. RAY WAS ALSO GIVING LECTURES AND
9  TALKS AT MEDICAL GATHERINGS IN THAT TIME FRAME SAYING THAT
10  VIOXX AT THE 25-MILLIGRAM DOSE, MR. SMITH'S DOSE, WAS SAFE?
11  A.  I DON'T KNOW.  IT'S POSSIBLE.  I JUST CAN'T CONFIRM OR
12  DENY THAT.
13  Q.  YOU WERE ASKED QUESTIONS ABOUT THE WARNING LETTER THAT
14  MERCK RECEIVED IN SEPTEMBER OF 2001.  DO YOU REMEMBER THAT?
15  A.  YES, I DO.
16  Q.  DID MERCK RESPOND TO THAT LETTER?
17  A.  YES, WE DID.  WE TAKE THOSE LETTERS VERY, VERY SERIOUSLY.
18  Q.  I'M SHOWING YOU WHAT'S BEEN MARKED AS DEFENSE EXHIBIT 236.
19  DO YOU RECOGNIZE THIS AS A LETTER MERCK WROTE TO THE FDA
20  OCTOBER 1, 2001?
21  A.  YES, I DO.
22      MR. GOLDMAN:  WE OFFER DEFENSE EXHIBIT 236.
23      MR. WATTS:  NO OBJECTION.
24      THE COURT:  LET IT BE ADMITTED.
25

## Page 2511

1  BY MR. GOLDMAN:
2  Q.  SO THIS IS THE LETTER, OCTOBER 1, 2001, THAT MERCK IS
3  WRITING TO THE FDA; IS THAT RIGHT?
4  A.  THAT'S CORRECT.
5  Q.  DO YOU REMEMBER MR. WATTS ASKED YOU ABOUT THIS PRESS
6  RELEASE IN PARTICULAR; RIGHT?
7  A.  YES, HE DID.
8  Q.  IF WE TURN TO THE FOURTH PAGE OF THIS RESPONSE LETTER BY
9  MERCK, DO YOU SEE THERE'S AN ENTIRE SECTION TALKING ABOUT THE
10  PRESS RELEASE?
11  A.  YES, I DO SEE THAT.
12  Q.  WHAT DOES MERCK SAY IN THE FIRST SENTENCE?
13  A.  "MERCK STRONGLY DISAGREES WITH DDMAC'S COMMENTS REGARDING
14  THE MAY 22, 2001, PRESS RELEASE FOR SEVERAL REASONS."
15  Q.  DDMAC, WHAT IS THAT, WITHOUT SPELLING OUT WHAT IT MEANS?
16  A.  THAT IS THE DIVISION OF THE FDA THAT OVERSEES MARKETING
17  AND ADVERTISING ACTIVITIES AS THEY RELATE TO DRUGS.
18  Q.  DID MERCK THEN GO ON AND EXPLAIN THE CIRCUMSTANCES AROUND
19  THE PRESS RELEASE? I WON'T DO THAT NOW, BUT IN THE NEXT THREE
20  PAGES OR SO THAT FOLLOW IN THIS LETTER.
21  A.  EXACTLY WE WERE EXPLAINING THE CONTEXT AND WHY THIS PRESS
22  RELEASE WAS PUT OUT AND WHAT IT WAS RESPONDING TO.
23  Q.  DID THE FDA SEND A FOLLOW-UP LETTER TO MERCK AFTER
24  RECEIVING THE RESPONSE THAT MERCK WROTE?
25  A.  YES, THEY DID.

## Page 2512

1  Q.  THIS IS DEFENSE EXHIBIT 359.  IS THIS THE LETTER FROM THE
2  FDA TO MERCK?
3  A.  YES, IT IS.
4      MR. GOLDMAN:  WE OFFER DEFENSE EXHIBIT 359.
5      MR. WATTS:  NO OBJECTION.
6      THE COURT:  LET IT BE ADMITTED.
7  BY MR. GOLDMAN:
8  Q.  SO HERE, THIS IS THE FDA?  DOWN AT THE BOTTOM RIGHT, THE
9  DIVISION OF DRUG MARKETING, ADVERTISING, AND COMMUNICATIONS,
10  THAT'S THE DIVISION OF THE FDA; RIGHT?
11  A.  THAT IS CORRECT.
12  Q.  THEN IT SAYS, "THIS LETTER RESPONDS TO YOUR LETTER";
13  RIGHT?  MEANING TO MERCK'S LETTER?
14  A.  RIGHT, THE ONE WE JUST REVIEWED.
15  Q.  JUST FOCUSING ON THE SECOND PARAGRAPH, WHAT DOES THE FDA
16  TELL MERCK, THE DDMAC DIVISION, TELL MERCK ABOUT THIS ISSUE IN
17  THE WARNING LETTER?
18  A.  THAT THEY HAVE REVIEWED OUR CORRECTIVE ACTIONS OF THAT
19  LETTER, AND BASED ON THE INFORMATION PROVIDED IN THAT LETTER
20  THEY CONCLUDED THAT MATTER WAS RESOLVED AND CONSIDERED CLOSED.
21  Q.  DID THE DDMAC DIVISION OF FDA REQUIRE MERCK TO SEND
22  ANYTHING OUT CONCERNING THIS PRESS RELEASE?
23  A.  NO, THEY DID NOT.
24  Q.  DID MERCK EVER RECEIVE ANY OTHER LETTERS FROM THE DDMAC
25  DIVISION FROM FDA AFTER SEPTEMBER OF 2001 ALL THE WAY THROUGH

53  (Pages 2509 to 2512)

DAILY COPY

228a8378-defb-4fc8-8501-6d92ae340827

## Page 2513

1 THE TIME THAT VIOXX WAS WITHDRAWN FROM THE MARKET IN 2004?

2 A.  WE NEVER RECEIVED ANY OTHER LETTERS FROM DDMAC ABOUT

3 ADVERTISING ACTIVITIES OR COMMERCIAL ACTIVITIES RELATED TO

4 VIOXX. THIS WAS THE ONLY ONE.

5 Q.  YOU WERE ASKED QUESTIONS ABOUT STEROIDS IN THE VIGOR TRIAL

6 AND YOU MENTIONED THAT THERE WAS A REASON WHY YOU WOULD ALLOW

7 40-YEAR-OLDS WHO WERE ON STEROIDS IN THE VIOXX VIGOR TRIAL;

8 WHEREAS, YOU HAD TO BE 50 YEARS OLD IF YOU WERE NOT TAKING

9 STEROIDS. I'M NOT SURE I GOT THAT EXACTLY RIGHT. BUT YOU

10 SAID, "I CAN EXPLAIN THAT IF YOU WANT." CAN YOU EXPLAIN WHAT

11 THE REASON WAS FOR THAT?

12 A.  WELL, IN ORDER TO -- SIMILAR TO THAT CV OUTCOMES STUDY

13 PROTOCOL 203 WHERE I SAID YOU NEED 635 CARDIOVASCULAR EVENTS IN

14 ORDER TO INITIATE YOUR ANALYSES, FOR VIGOR ALSO WE HAD A

15 PRESPECIFIED NUMBERED OF GI EVENTS THAT WOULD HAVE BEEN NEEDED.

16 SO YOU WERE -- YOU KNOW, HAVE YOU DONE THE STUDY IN 20-YEAR-OLD

17 PATIENTS WHO AREN'T AT RISK OF GI EVENTS. IT'S UNLIKELY WE

18 WOULD HAVE EVER COMPLETED THAT STUDY.

19           YOU TRY TO GO THE PATIENT POPULATION WHO IS LIKELY TO

20 HAVE THOSE EVENTS. AS I SAID, THERE WAS THIS POTENTIAL

21 LITERATURE ABOUT STEROIDS AND NSAIDS; AND THEREFORE, WE ALLOWED

22 THE PATIENTS' YEARS TO BE A LITTLE BIT LOWER IN THOSE TAKING

23 STEROIDS.

24 Q.  REMEMBER YOU WERE ASKED QUESTIONS ABOUT THIS ARTICLE ON

25 FLURBIPROFEN, AND I'LL BE REAL BRIEF ON THIS, DR. REICIN. THIS

## Page 2514

1 WAS THE FLURBIPROFEN ARTICLE, AND ON PAGE 5, TABLE 4, DO YOU

2 REMEMBER THAT YOU WERE SHOWN THE REOCCLUSION RATE? DO YOU

3 REMEMBER THAT?

4 A.  THAT'S CORRECT.

5 Q.  NOW, I THINK YOU MENTION THAT THERE WAS ANOTHER FIGURE,

6 MAYBE RE-INFARCTION RATE IN HERE, THAT WAS RELEVANT TO YOU.

7 A.  WELL, THERE WERE -- FIRST THINGS. HE POINTED ONLY TO ONE

8 GROUP OF PATIENTS, THE REOCCLUSION RATE. THOSE WERE THOSE

9 PATIENTS WHO DIDN'T HAVE INITIAL ANGIOPLASTY. THERE WERE OTHER

10 PLACES -- FOR INSTANCE, INITIAL ANGIOPLASTY ALONE, THE

11 SIX-MONTH REOCCLUSION PLATE WAS ZERO ON FLURBIPROFEN AND 3 UPON

12 PLACEBO.

13 Q.  OH. HERE. SO YOU'RE SAYING, IF YOU LOOK AT PEOPLE WHO

14 JUST HAD ONE STENT --

15 A.  CORRECT.

16 Q.  -- AND YOU LOOK AT THE SIX-MONTH REOCCLUSION -- AND

17 REOCCLUSION MEANS WHAT? PLAQUE BUILDUP AGAIN?

18 A.  THAT THE VESSEL -- I THINK I MISSPOKE BEFORE, THAT THE

19 VESSEL REOCCLUDED. THAT COULD BE A BLOOD CLOT OR IT COULD JUST

20 BE CHOLESTEROL BUILDUP, AS WELL.

21 Q.  SO IF YOU LOOK AT THE --

22 A.  IT KIND OF DEPENDS HOW THAT -- THE CONTEXT OF THAT IS

23 BEING USED. IN THIS PARTICULAR ARTICLE, IT WOULD NOT HAVE BEEN

24 BLOOD CLOTS; IT WOULD HAVE BEEN CHOLESTEROL BUILDUP.

25 Q.  NOW, LET'S JUST LOOK AT THE BOTTOM, WHICH WAS ONE LINE

## Page 2515

1 ABOVE WHAT MR. WATTS SHOWED YOU, FOR REINFARCTION. WHAT IS

2 THAT? THAT'S A SECOND HEART ATTACK?

3 A.  SECOND HEART ATTACK.

4 Q.  WHAT ARE THE RESULTS IN THIS FLURBIPROFEN SHOW ABOUT THE

5 NUMBER OF PATIENTS WHO WERE ON FLURBIPROFEN, OR THE PERCENT,

6 COMPARED WITH THOSE ON PLACEBO?

7 A.  AGAIN, IN THIS SUBGROUP, THERE ARE 2 ON FLURBIPROFEN

8 VERSUS 15 ON PLACEBO.

9 Q.  THAT'S 1.8 PERCENT?

10 A.  CORRECT.

11 Q.  VERSUS 13.4 PERCENT ON PLACEBO?

12 A.  THAT'S CORRECT.

13 Q.  YOU WERE ASKED QUESTIONS, DR. REICIN, ABOUT THE ADVANTAGE

14 STUDY, AND YOU WERE REFERRING TO CVA? DO YOU REMEMBER?

15 A.  OH, DID I SAY CVA?

16 Q.  NO.  THAT'S WHAT THE E-MAIL SAYS.

17 A.  YES.  "CEREBROVASCULAR ACCIDENT," WHICH IS A MEDICAL TERM

18 FOR STROKE.

19 Q.  MR. WATTS SAID, "I'M HERE IN A HEART ATTACK CASE, NOT A

20 STROKE CASE." WE HEARD FROM MR. MOYE ALREADY ON THIS, BUT IS

21 STROKE DATA, OR THE RESULTS FOR STROKES, IMPORTANT TO TAKE INTO

22 ACCOUNT WHEN ASSESSING WHETHER VIOXX CAUSES CARDIOVASCULAR

23 PROBLEMS?

24 A.  WELL, CERTAINLY, WE LOOK AT ALL THE CARDIOVASCULAR DATA,

25 BOTH THE HEART ATTACK DATA AND THE STROKE DATA.

## Page 2516

1 Q.  IF YOU'RE LOOKING AT THROMBOTIC EVENTS --

2 A.  YES.

3 Q.  -- WHETHER VIOXX CAUSES CLOTTING, WOULD YOU CONSIDER JUST

4 HEART ATTACKS OR WOULD YOU ALSO CONSIDER STROKES?

5 A.  WE WOULD LOOK AT BOTH.

6 Q.  WHY IS THAT?

7 A.  WELL, PRESUMABLY, YOU MIGHT THINK THAT THERE ARE SIMILAR

8 MECHANISMS IF IT WAS BLOOD CLOTTING. IF YOU SAW AN INCREASE IN

9 HEART ATTACKS DUE TO BLOOD CLOTTING, YOU MIGHT EXPECT TO SEE AN

10 INCREASE IN STROKES DUE TO BLOOD CLOTTING, AS WELL.

11 Q.  IN TALKING ABOUT THE APPROVE STUDY NOW, YOU MENTIONED

12 SOMETHING -- I'M GOING TO SHOW YOU EXHIBIT 686 -- ABOUT A

13 PLACEBO CURVE FLATTENING OUT. FOR IDENTIFICATION PURPOSES

14 ONLY, I JUST WANT TO PUT UP THE APPROVE STUDY AND ASK YOU WHAT

15 YOU MEANT BY THAT. IS THIS THE PUBLICATION OF THE APPROVE

16 STUDY, "CARDIOVASCULAR EVENTS ASSOCIATED WITH VIOXX IN A

17 COLORECTAL ADENOMA CHEMO PREVENTION TRIAL"?

18 A.  THIS IS THE THREE-YEAR DATA, YES.

19 Q.  IF YOU LOOK AT THE SIXTH PAGE, YOU WERE ASKED ABOUT

20 KAPLAN-MEIER CURVES; RIGHT?

21 A.  THAT'S CORRECT.

22 Q.  NOW, ON FIGURE 2, IS THIS A KAPLAN-MEIER CURVE FOR

23 CONFIRMED SERIOUS THROMBOTIC EVENTS?

24 A.  YES. THIS IS THE KAPLAN-MEIER FOR CONFIRMED SERIOUS

25 THROMBOTIC EVENTS THAT OCCURRED WITHIN 14 DAYS OF A PATIENT --

54  (Pages 2513 to 2516)

228a8378-defb-4fc8-8501-6d92ae340827

## Page 2517

1  Q. IF YOU FOLLOW HERE, DO YOU SEE THERE'S A PLACEBO LINE
2  RIGHT AND THEN THERE'S A VIOXX LINE; RIGHT?
3  A. THAT'S CORRECT.
4  Q. WHAT ARE THE LINES -- SORRY. I BLACKED IT OUT, BUT THAT'S
5  VIOXX. ON THE BOTTOM, THERE'S "MONTH." THEN WHAT'S ON THE
6  OTHER AXIS? "CUMULATIVE INCIDENCE." WHAT DOES THAT MEAN?
7  A. THE CUMULATIVE NUMBER OF CONFIRMED THROMBOTIC EVENTS THAT
8  HAPPENED OVER TIME.
9  Q. SO, IF YOU FOLLOW THIS ALONG -- AND LET'S LOOK AT JUST THE
10 FIRST 18 MONTHS OF USE OF IN THIS STUDY. WHAT ARE THE NUMBER
11 OF EVENTS LOOK LIKE BETWEEN PLACEBO AND VIOXX UP UNTIL 18
12 MONTHS?
13 A. THEY ARE SIMILAR.
14 Q. SO RIGHT HERE, THIS IS THE 18-MONTH POINT; RIGHT?
15 A. THAT'S CORRECT.
16 Q. SO THAT'S WHERE YOU START SEEING THE LINES DIVERGE?
17 A. YOU START TO SEE THE LINES DIVERGE AT 18 MONTHS, THAT'S
18 CORRECT.
19 Q. THEN YOU SAID SOMETHING ABOUT THE PLACEBO LINE SORT OF
20 FLATTENING OUT.
21 A. YES.
22 Q. CAN YOU EXPLAIN THAT?
23 A. YES. IF YOU TOOK 0 TO 18 MONTHS ON PLACEBO AND YOU
24 CONTINUED THAT LINE AT THE SAME SLOPE, YOU COULD SEE THAT THAT
25 LINE WOULD END UP BEING SOMEWHERE IN BETWEEN VIOXX AND PLACEBO.

## Page 2518

1  IN ESSENCE, THE PLACEBO ARM WENT LIKE THIS AND THEN WENT LIKE
2  THIS. IT STARTED TO FLATTEN OUT THERE. THERE WERE FEWER
3  EVENTS DURING THAT TIME PERIOD.
4       IF ANYTHING, PATIENTS ARE GETTING OLDER, SO YOU WOULD
5  EXPECT THE INCIDENCE RATE TO CONTINUE AT THE SAME RATE OR MAYBE
6  EVEN GO UP A LITTLE BIT. IT WAS AN ODDITY. AND I MUST TELL
7  YOU, I HEARD FROM MANY RHEUMATOLOGISTS THAT THEY WERE ALMOST
8  SURPRISED THAT WE TOOK VIOXX OFF THE MARKET GIVEN THAT MAYBE
9  THIS WAS A FLUKE AT THE TIME. MAYBE YOU JUST HAD SOMETHING
10 UNUSUAL WITH THE DATA.
11 Q. IS THAT BECAUSE IT LOOKS LIKE THE PLACEBO, PEOPLE ON
12 PLACEBO, ARE HAVING THROMBOTIC EVENTS TO 18 MONTHS, AND THEN
13 ALL OF THE SUDDEN IT SORT OF JUST KIND OF FLATTENS OUT AND THEY
14 STOP HAVING THEM?
15 A. YOU GET FAR FEWER OF THEM, THAT IS CORRECT. AND THAT'S
16 ACCOUNTING FOR SOME BUT NOT ALL OF THE DIFFERENCE THAT YOU'RE
17 SEEING BETWEEN VIOXX AND PLACEBO.
18 Q. YOU WERE SHOWN A CSR OR ONE OF THESE CLINICAL STUDY
19 REPORTS FOR THE VIP TRIAL. YOU WERE ASKED ABOUT HYPERTENSION
20 IN THAT TRIAL; RIGHT?
21 A. THAT'S CORRECT.
22 Q. LET ME JUST SHOW THIS FOR A MINUTE. THIS IS THE VIP
23 TRIAL. IF WE LOOK AT THE TOP, REFERENCE P201, IS THAT THE
24 STUDY NUMBER?
25 A. THAT'S CORRECT.

## Page 2519

1  Q. WHAT DOES THIS PARTICULAR CHART OR TABLE SHOW? WHAT IS
2  THE NAME OF THE TABLE, "TCVSA"?
3  A. THOSE ARE CONFIRMED THROMBOTIC, CARDIOVASCULAR, SAE'S THAT
4  ARE OCCURRING EITHER ON TREATMENT OR WITHIN 14 DAYS AFTER
5  DISCONTINUING STUDY THERAPY.
6  Q. I'M JUST TRYING TO MAKE THIS A LITTLE BIT LARGER TO MAKE
7  IT EASIER TO SEE. SO IF WE LOOK HERE AT THE TOTAL NUMBER OF
8  EVENTS WITH THIS THROMBOTIC EVENT ENDPOINT --
9  A. CORRECT.
10 Q. -- HOW MANY PATIENTS IN THE PLACEBO GROUP -- WHICH IS THIS
11 RIGHT HERE; RIGHT? HOW MANY PATIENTS HAD THROMBOTIC EVENTS IN
12 THE VIP STUDY?
13 A. 15.
14 Q. HOW MANY ON THE 25-MILLIGRAM DOSE OF VIOXX?
15 A. 14.
16 Q. 14 AND THEN 15. IF YOU JUST LOOK AT ACUTE MYOCARDIAL
17 INFARCTION DOWN HERE, HOW MANY EVENTS ON THE VIOXX -- I'M
18 SORRY, THE PLACEBO GROUP?
19 A. FOUR.
20 Q. HOW MANY ON THE VIOXX GROUP?
21 A. FIVE.
22 Q. THEN FATAL ACUTE HEART ATTACKS: ONE ON PLACEBO AND HOW
23 MANY ON VIOXX 25 MILLIGRAMS?
24 A. ONE.
25 Q. JUST TWO MORE AREAS. YOU WERE ASKED QUESTIONS ABOUT THE

## Page 2520

1  LABEL CHANGE. REMEMBER THE APRIL 2002 LABEL THAT WAS APPROVED
2  BY THE FDA? MR. WATTS WAS ASKING YOU ABOUT HOW THE FDA
3  ORIGINALLY PROPOSED THAT THE VIGOR DATA BE IN THE WARNINGS
4  SECTION AND MERCK THOUGHT IT WOULD BE MORE APPROPRIATE TO BE IN
5  THE PRECAUTIONS SECTION. DO YOU REMEMBER THAT?
6  A. THAT'S CORRECT, BASED ON WHAT WE HAD HEARD AT THE FDA
7  ADVISORY COMMITTEE.
8  Q. YOU MENTIONED THAT THE FDA ACTUALLY SENT THE LETTER TO
9  MERCK IN DECEMBER OF 2001 WITH THE VIGOR CARDIOVASCULAR DATA IN
10 THE PRECAUTIONS SECTION.
11 A. THAT IS CORRECT. AFTER WE SENT A RESPONSE BACK EXPLAINING
12 WHY WE THOUGHT THE MORE APPROPRIATE PLACE FOR IT WAS IN THE
13 PRECAUTIONS SECTION. BASED ON THE TOTALITY OF DATA, NO
14 INCREASE IN PHASE IIB/III STUDIES, NO INCREASE IN THE
15 ALZHEIMER'S STUDIES, CLINICAL SIGNIFICANCE UNKNOWN, WE THOUGHT
16 THAT WAS MORE APPROPRIATE IN THE PRECAUTIONS SECTION.
17 Q. LET ME HAND YOU DEFENSE EXHIBIT 2174. IS THIS THE LETTER
18 THAT THE FDA SENT TO MERCK DECEMBER 21, 2001, ENCLOSING A
19 PROPOSED LABEL?
20 A. THAT'S CORRECT. I THINK THIS WAS IN RESPONSE TO -- OUR
21 RESPONSE TO THEIR OCTOBER LABEL. THEY THEN REVISED THE LABEL
22 AND SENT US THIS RESPONSE.
23      MR. GOLDMAN: WE OFFER DEFENSE EXHIBIT 2174.
24      MR. WATTS: NO OBJECTION.
25      THE COURT: ADMITTED.

55  (Pages 2517 to 2520)

DAILY COPY

228a8378-defb-4fc8-8501-6d92ae340827



**FILED**

SEP 02 2005

CAROL E. HIGBEE, J.S.C.

<u>NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE COMMITTEE ON
OPINIONS</u>

## SUPERIOR COURT OF NEW JERSEY
### COUNTIES OF
### ATLANTIC AND CAPE MAY

CAROL E. HIGBEE, J.S.C.

1201 Bacharach Boulevard
Atlantic City, NJ 08401-4527
(609) 343-2190

<u>MEMORANDUM OF DECISION ON MOTION</u>
<u>Pursuant to Rule 1:6-2(f)</u>

| | |
|---|---|
| *CASE:* | **Humeston, et al v. Merck & Co., Inc.** |
| *DOCKET #:* | **ATL-L-2272-03-MT** |
| *RETURN DATE:* | **September 9, 2005** |
| *MOTION:* | **Exclude Evidence of Prejudicial Issues** |
| *ATTORNEYS:* | **Diane P. Sullivan – Defendant** |
| | **Stephen D. Raber – Defendant** |
| | **Christy Jones – Defendant** |
| | **David R. Buchanan – Plaintiff** |
| | **Christopher A. Seeger – Plaintiff** |

Having carefully reviewed the papers submitted and any response filed, I have ruled on
the above Motion as follows:

Both parties have brought numerous motions *in limine* in order to obtain a preliminary
ruling regarding certain evidentiary issues that are likely to arise during the trial of this matter
which is presently scheduled to commence on September 12, 2005. Defendant Merck & Co.,
Inc. ("Merck") has brought thirteen different motions *in limine* and plaintiffs Frederick
Humeston & Mary Jackson Humeston have brought seven. The motions have been fully briefed
and oral arguments have been heard. Decisions on most of the motions were issued from the
bench, on the record at the conclusion of each oral argument. This memorandum of decision will

*"The Judiciary of New Jersey is an equal Opportunity/Affirmative Action Employer"*

**EXHIBIT**

**C**

address two particular issues. Specifically, the court will address plaintiffs' motion to exclude evidence that Merck employees or family members of Merck employees took VIOXX® and Merck's motion to exclude evidence relating to the assets and profitability of Merck or to the compensation and financial decisions of its employees.

N.J.R.E. 403 holds that: "except as otherwise provided by these rules or other law, relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." The party seeking to exclude the evidence has the burden of establishing that this rule should be applied. Rosenblit v. Zimmerman, 166 N.J. 391, 410 (2001). Evidence should only be excluded under this rule where the probative value of the evidence "is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation" of the basic issues of the case. State v. Thompson, 59 N.J. 396, 421 (1971). It is the duty of the trial judge to perform the weighing process of whether to exclude evidence under N.J.R.E. 403 and the judge is given broad discretion in exercising this duty. State v. Sands, 76 N.J. 127, 144 (1978). Under N.J.R.E. 403, the "more attenuated and the less probative the evidence, the more appropriate it is for a judge to exclude it." State v. Medina, 201 N.J. Super. 565, 580 (App. Div.), certif. den. 102 N.J. 298 (1985).

**I. Plaintiff's Motion to Exclude Evidence that Merck Employees or Family Members of Merck Employees Took VIOXX®**

Plaintiffs assert that allowing evidence that Merck employees or family members of Merck employees ingested VIOXX® is irrelevant and unduly prejudicial, especially because plaintiffs do not have the ability to verify if such people actually consumed the drug or to

2

determine the circumstances surrounding the alleged consumption. Merck acknowledges it cannot obtain its employees or their families' personal medical records. Merck argues that this information is both highly relevant and probative to show that Merck employees did not believe the risk of taking VIOXX® was as great as plaintiffs claim it to be. Merck is essentially arguing that their employees' actions spoke louder than their words because they would not have consumed the drug, or let their family, if they believed it had the cardiovascular risks the plaintiff claims it had. The individual decision made by a person in consultation with their doctor to take a drug is a personal decision which can be made for many reasons. People are willing to take different risks. Some people, depending on their medical condition, may have been willing to gamble on the cardiovascular risks even if they knew of the risk. The exploration at trial of each employee's personal decision would be prejudicial, confusing and time consuming.

The court finds that evidence that Merck employees or their family members took VIOXX® is substantially more prejudicial than probative and must be excluded during trial. Such evidence does not have any probative value in answering the ultimate issues in the failure to warn aspect of this litigation. Allowing Merck employees to testify that they or their family members took VIOXX® would be highly prejudicial to plaintiffs' claims and would not demonstrate with any reliability that VIOXX® was more or less safer than was being represented by Merck to the public.

**II. Merck's Motion to Exclude Evidence Relating to the Compensation and Financial Decisions of Merck Employees**

Merck seeks to exclude evidence that certain officials within the company exercised Merck stock options after studies revealing negative information about VIOXX® became known but prior to their release to the public. Plaintiffs claim that this information is highly probative as

3

to what Merck officials knew about VIOXX® and demonstrates that corporate officials were more interested in generating a profit than providing a safe and effective drug. In a role reversal from the previous issue discussed, here, plaintiffs' are essentially arguing that the actions of Merck employees spoke louder than their words because they would not have sold the stock if they truly believed VIOXX® did not pose any increased adverse health risks.

The court finds that evidence relating to the sale of Merck stock by Merck employees is substantially more prejudicial than probative. This information does not go to answering any of the essential issues in this litigation mentioned above. First, plaintiffs are indicating that Merck employees engaged in insider trading, a criminal activity that would be extremely prejudicial to defendant. These stock sales are not "company actions." They are personal to each employee and are based on personal decisions. Next, it has very little, if any, probative value. The stock options could have been exercised for a multitude of reasons that would not have any bearing on this litigation. In order to explain their personal choices the official would have to testify to their personal financial information. Such evidence would require considerable inquiry from both parties into the reasons and motives for such activity and would ultimately be a time consuming distraction to the claims at issue in this litigation. The prejudice far outweighs the probative value.

### Conclusion

For the foregoing reasons, the court has determined that the evidence discussed would be inappropriate at trial. During the course of trial information may emerge that would alter the circumstances for this decision and render such evidence appropriate for a jury to see. If, such an event occurs, counsel for the parties should renew these arguments with the court, outside of

4

the presence of the jury.  Under no circumstances should this evidence be presented to the jury without first requesting permission of the court.

_____
CAROL E. HIGBEE, P.J.Cv.