# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: **VIOXX** | * | **MDL DOCKET No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L - DIVISION 3** |
| | * | |
| **This document relates to** | * | **JUDGE FALLON** |
| **CASE NO. 2:05CV2524** | * | |
| | * | |
| **ANTHONY WAYNE DEDRICK,** | * | **MAG. JUDGE KNOWLES** |
| an Individual, | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| v. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| **Defendant.** | * | |

---

### Plaintiff's Objections to Defendant's
### Designations of Deposition Testimony of William Coltharp, M.D.

---

Plaintiff, Anthony Wayne Dedrick, by and through his attorneys, hereby submits the following deposition testimony for the Court's consideration and pre-trial rulings:

1.  Plaintiff's Objections to Defendant's Affirmative Designations of Deposition Testimony of William Coltharp, M.D. (Ex. "A").

Plaintiff reserves the right to supplement or amend his objections based upon any ruling of the Court or any other court decisions that affect the scope of evidence in this trial, including rulings on its motions *in limine*. Plaintiff makes no counter designations at this time but reserves the right to do so in the future. Plaintiff reserves the right to also counter-designate any testimony designated by Defendant in the event it is not offered by Defendant.

Plaintiff reserves the right to make additional completeness designations upon receipt of any of Merck's final designations or counter-designations.

Respectfully submitted this 27ᵗʰ day of October, 2006.

*P. Leigh O'Dell*

**ANDY BIRCHFIELD**
P. LEIGH O'DELL
Attorney for Plaintiff
*BEASLEY, ALLEN, CROW,*
*METHVIN, PORTIS & MILES, P.C.*
234 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103
(334) 269-2343 telephone
(334) 954-7555 facsimile

**Russ M. Herman** (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
**Plaintiffs' Liaison Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
& WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

**Christopher A. Seeger**, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiff's Objections and Counter-Designations to Defendant's Designations of Deposition Testimony of William Coltharp, M.D. has been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail or by hand delivery and e-mail, on Merck's Counsel, Douglas R. Marvin and Philip S. Beck,  by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this __27th__ day of October, 2006.

P. Leigh O'Dell
Attorney for Plaintiff
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.

**Dedrick v. Merck Co., Inc.**
**Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| [5:16] - [6:7] 10/24/2006 Coltharp, William 9-13-2006<br><br>\* Defendant's Affirmative Depo Designations<br><br>page 5<br>16    Q.    Doctor, my name is Richard Krumholz, and<br>17 I represent Merck.  We've never met before today; is<br>18 that right?<br>19    A.    That's right.<br>20    Q.    And could you go ahead and tell us your<br>21 full name?<br>22    A.    William Hubert Coltharp.<br>23    Q.    And we're here in your offices in<br>24 Nashville, Tennessee; is that right?<br>25    A.    That's right.<br>page 6<br>1    Q.    And you practice medicine here?<br>2    A.    Cardiac surgery.<br>3    Q.    You're a cardiovascular surgeon?<br>4    A.    Yes.<br>5    Q.    Have you ever had your deposition taken<br>6 before?<br>7    A.    Yes.<br><br><br>[6:17] - [9:3] 10/24/2006 Coltharp, William 9-13-2006<br><br>\* Defendant's Affirmative Depo Designations<br><br>page 6<br>17            (Defendant's Exhibit number 1<br>18            was marked for identification.)<br>19    Q.    I'm going to hand you what's been marked<br>20 as Exhibit 1 to your deposition.  And that's a<br>21 deposition notice for today.  Have you seen that?<br>22    A.    I saw a copy of it.<br>23    Q.    There's documents that are requested in<br>24 connection with that deposition notice.  Have you<br>25 brought all of your records relating to Mr. Dedrick?<br>page 7<br>1    A.    Yes.  I have the clinical records in his<br>2 file -- our office file.<br>3    Q.    And you would have had, I guess, other<br>4 records to review as well when you were at the<br>5 hospital treating Mr. Dedrick; is that right?<br>6    A.    When he was in the hospital, there would<br>7 have been a hospital chart that I would have<br>8 reviewed.  But I have not reviewed that hospital<br>9 chart before this deposition.<br>10    Q.    I understand.  But when you were treating | |

**Dedrick v. Merck Co., Inc.**
**Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 11 him in the hospital, that was something you had<br>12 access to?<br>13   A.   Yes.<br>14   Q.   And would have reviewed before you<br>15 consulted with him and then treated him?<br>16   A.   Yes.<br>17   Q.   Okay.  Could you briefly describe your<br>18 background, that is, your education and training?<br>19   A.   Yes, I went to public high school in<br>20 Mississippi in a small town, went to Mississippi<br>21 State University undergraduate, went to University of<br>22 Mississippi Medical School and then did seven years<br>23 of postgraduate training at the University of<br>24 Mississippi.<br>25   Q.   Where did you do your residencies?<br>page 8<br>1   A.   At the University of Mississippi Medical<br>2 Center in Jackson, Mississippi.<br>3   Q.   Did you also go through fellowships?<br>4   A.   Yes.  Back then it was called general<br>5 surgery residency.  And then if you wanted to do<br>6 cardiovascular surgery, you did a cardiac<br>7 fellowship.  And that's what I did.<br>8   Q.   Could you describe for us what a<br>9 residency and what a fellowship is?<br>10   A.   Well, they're training programs --<br>11 specialized training programs in whatever area<br>12 they -- they're concerned with.  And the general<br>13 surgery program is a five-year program, and the<br>14 cardiac program is a two-year program.<br>15       So it's a total of seven years of<br>16 residency and fellowship.<br>17   Q.   And do you then have an opportunity to<br>18 become board certified in that particular specialty?<br>19   A.   Yes.<br>20   Q.   Are you board certified?<br>21   A.   Yes.<br>22   Q.   In what areas?<br>23   A.   In -- I'm board certified in thoracic<br>24 surgery.  When I finished in general surgery, I got<br>25 my general surgery boards.  But I have not renewed my<br>page 9<br>1 general surgery boards.<br>2   Q.   But you've renewed your thoracic surgery?<br>3   A.   Yes.<br><br><br>[9:13] - [13:6] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 9 | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 13   Q.   Do you surgically treat patients with 14 coronary artery disease?<br>15   A.   Yes.<br>16   Q.   What percentage of your patients have 17 coronary artery disease?<br>18   A.   Upwards -- probably in my practice, 90 19 percent. Probably 90 percent.<br>20   Q.   And how many years have you treated 21 patients with coronary artery disease?<br>22   A.   Well, I finished my training in 1988 and 23 came to Nashville then. So I've been here since 24 1988. That's 18 years. And then during my 25 residency, of course, we treated patients as well.<br>page 10<br>1          (Defendant's Exhibit Number 2<br>2          was marked for identification.)<br>3   Q.   You were nice enough to bring with you 4 your resume or curriculum vitae. Is Exhibit 2 a true 5 and accurate copy of your resume?<br>6   A.   Yes.<br>7   Q.   Is it up to date?<br>8   A.   I believe it is, yes.<br>9   Q.   Does it fairly and accurately describe 10 your medical education and training?<br>11   A.   Yes.<br>12   Q.   Now, I assume as a thoracic surgeon or a 13 cardiovascular surgeon that you consider coronary 14 vascular disease or cardiovascular disease a serious 15 health concern?<br>16   A.   Yes.<br>17   Q.   And I've heard that cardiovascular 18 disease is actually the leading cause of death in the 19 United States. Is that your understanding?<br>20   A.   Yes.<br>21   Q.   Has that been true for decades?<br>22   A.   Yes.<br>23   Q.   And was that true before Vioxx was on the 24 market?<br>25   A.   I don't know when Vioxx came on the<br>page 11<br>1 market, but I would say yes.<br>2   Q.   Assume with me that it was in the late 3 '90s?<br>4   A.   Yes.<br>5   Q.   So it was well before Vioxx was ever on 6 the market?<br>7   A.   Yes.<br>8   Q.   And it was certainly true while it was on 9 the market and it's true today; is that right?<br>10   A.   Yes.<br>11   Q.   And so it's important for cardiologists 12 and cardiovascular surgeons, such as yourself, to | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 13  understand that disease given the serious concerns<br>14  about that disease in the United States; is that<br>15  fair?<br>16      A.    Yes.<br>17      Q.    Now, I'd like to talk a little bit about<br>18  the process of atherosclerosis. Could you describe<br>19  for us what atherosclerosis is?<br>20      A.    Well, atherosclerosis is the process that<br>21  causes blockages in the coronary arteries<br>22  specifically and other arteries as well.<br>23          It's a process that's started --<br>24  initiated usually with an intimal, that is inside<br>25  lining of the heart, damage of some kind. And from<br>page 12<br>1  that, these atherosclerotic plaques emerge. And if<br>2  they progress, they end up blocking blood flow<br>3  through the arteries.<br>4      Q.    And when we're talking about coronary<br>5  arteries, could you tell us a little bit where those<br>6  are found?<br>7      A.    Those are the arteries that take blood to<br>8  the heart. They're on the surface of the<br>9  the heart, and send branches into the muscle of the<br>10  heart.<br>11      Q.    So atherosclerosis is actually plaque<br>12  build-up that builds up within the walls of the<br>13  artery?<br>14      A.    Yes.<br>15      Q.    And that can happen to one or more<br>16  arteries I guess?<br>17      A.    Yes.<br>18      Q.    And what are the dangers of having<br>19  atherosclerosis? What can happen?<br>20      A.    Well, the dangers are based on a couple<br>21  of different things. One is as those blockages<br>22  progress, blood flow is limited. And depending on<br>23  which artery it is, you're going to have a limitation<br>24  of blood flow to some vital organ.<br>25          Other -- other complications of<br>page 13<br>1  atherosclerosis include aneurysm formation. Those<br>2  are the two primary ones. But the limitation of<br>3  blood flow is the primary one actually.<br>4      Q.    And when you have this limitation of<br>5  blood flow, is that called ischemia?<br>6      A.    Yes.<br><br><br>[14:5] - [18:10] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations | |

Dedrick v. Merck Co., Inc.
**Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections**
Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| page 14<br>5    Q.    And we've also heard the term rupture<br>6 used in this case.  What does the term rupture mean<br>7 in the context of coronary artery disease?<br>8    A.    Well, rupture is in the coronary -- in<br>9 any arterial disease, rupture is where blood leaks<br>10 out of the artery.  The artery tears somehow and<br>11 blood leaks out of the artery.  And that may occur<br>12 around calcified plaque.  And it also occurs in<br>13 atherosclerosis where aneurysms exist.<br>14        Aneurysms cause a weakening of the wall,<br>15 and that leads to further dilation and further<br>16 weakening and those can rupture.<br>17    Q.    And when there's a rupture that takes<br>18 place in a coronary artery, can a clot form?<br>19    A.    Yes.<br>20    Q.    And can you describe for us generally --<br>21 I know it can get quite technical -- but generally<br>22 how that occurs?<br>23    A.    Okay.  I think the rupture -- let me --<br>24 let me go back to rupture just a second.  There's --<br>25 if you think about the artery, the coronary artery,<br>page 15<br>1 the inside lining of the coronary artery is called<br>2 the intima.  And you can --<br>3        And when I was describing<br>4 atherosclerosis, the process previously, I mentioned<br>5 an injury or damage to the inside lining of the<br>6 artery.  And that's the rupture that you may be<br>7 referring to.<br>8        And when that happens, that causes<br>9 platelets and aggregates of certain cells to come to<br>10 that rupture site.  And those platelets can cause --<br>11 platelets are part of the blood that are sticky and<br>12 cause clot formation, and that can cause the clot<br>13 formation that you're talking about.<br>14    Q.    And if there's a clot formation, can that<br>15 further restrict blood flow?<br>16    A.    Yes.  Yes.<br>17    Q.    And can it cause ischemia?<br>18    A.    Yes.<br>19    Q.    And can it cause angina or chest pain?<br>20    A.    Yes.<br>21    Q.    And can it lead to a heart attack?<br>22    A.    Yes.<br>23    Q.    In this process that we've just<br>24 discussed, in how many patients who have heart<br>25 attacks or myocardial infarctions do ruptures and<br>page 16<br>1 clots take place in?<br>2    A.    I don't know honestly how many it is<br>3 where there's an actual clot.  The vast majority -- |  |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 4  the initial treatment of an acute heart attack<br>5  includes with -- when certain criteria are met,<br>6  includes lytic therapy, which is clot dissolving drug<br>7  therapy.  So it's not every one of them, but it's<br>8  close.<br>9      Q.    So the vast majority of folks who have<br>10  heart attacks have this process we've described; that<br>11  is, atherosclerosis build-up and then a rupture and<br>12  then a clot formation?<br>13    A.    Yes.<br>14    Q.    And then would be treated with you said<br>15  lytic or lytic medication?<br>16    A.    In the acute phase, they're treated -- if<br>17  they meet certain criteria, and the cardiologists are<br>18  the ones who do this treatment, but they could be<br>19  treated with lytic therapy.<br>20    Q.    I guess you routinely see patients who<br>21  have atherosclerosis rupture and clot formation and<br>22  then go on to have a heart attack?<br>23    A.    Yes.<br>24    Q.    And that's not unusual in your practice<br>25  to see patients like that who you --<br>page 17<br>1    A.    It's not.<br>2    Q.    Who you are asked to treat?<br>3    A.    It's not unusual.<br>4    Q.    And that happens in the absence of COX-2<br>5  inhibitors, true?<br>6    A.    Yes.<br>7    Q.    And it certainly happens in the absence<br>8  of the Vioxx, true?<br>9    A.    Yes.<br>10    Q.    You see that each and every day?<br>11    A.    Yes.<br>12    Q.    Now, I've also heard that you can<br>13  actually have signs or symptoms of -- have no signs<br>14  or symptoms, excuse me, of coronary artery disease<br>15  but actually have it; that is, this plaque build-up<br>16  that we've been talking about.  Is that true?<br>17    A.    That's true.<br>18    Q.    And how could that be the case, that you<br>19  wouldn't know it?<br>20    A.    Well, there are a couple of ways.  One is<br>21  these plaques may not be flow limiting.  So that<br>22  until you have actual ischemia, you won't have any<br>23  symptoms.<br>24        Another is, there's a -- it's more common<br>25  in diabetics, but there's a substantial fraction of<br>page 18<br>1  people that for one reason or another don't suffer<br>2  chest pain with -- with myocardial ischemia.  And<br>3  their warning system -- there's what we call a | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
| --- | --- |
| 4 defective warning system.  It's more common in<br>5 diabetics, but they may have complete heart attacks<br>6 without ever having any chest pain.<br>7   Q.     So in other words, people could actually<br>8 have a heart attack in the past and not even know<br>9 they had a heart attack at the time?<br>10   A.    That's true.<br><br><br>[20:7] - [24:2] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 20<br>7   Q.     Have you found or is it well known in the<br>8 medical and scientific community that people can have<br>9 no known risk factors even and have heart attacks?<br>10   A.     Yes.<br>11   Q.     In fact, that's not uncommon, right?<br>12   A.     Let me ask you to explain exactly what<br>13 you mean by no known risk factors.<br>14   Q.     There are traditional risk factors that<br>15 cardiovascular surgeons, such as yourself, and<br>16 cardiologists look to to determine whether somebody's<br>17 at risk for coronary artery disease; is that right?<br>18   A.     Right.<br>19   Q.     And sometimes patients and doctors don't<br>20 know of risk factors?<br>21   A.     Yes.<br>22   Q.     Those kind of risk factors, such as, you<br>23 know, hypercholesterolemia, hypertension, family<br>24 history, smoking, things of that nature.<br>25        From time to time, you have patients who<br>page 21<br>1 have no known risk factors who have heart attacks?<br>2   A.    That's right.<br>3   Q.     And whether it's because they don't know<br>4 that they have a family history or whatever the<br>5 reason might be, true?<br>6   A.    Yes.<br>7   Q.     But one thing you do know is that as<br>8 we've discussed, if they do have traditional risk<br>9 factors, then that's significant to you?<br>10   A.    It's -- yes.<br>11   Q.    And significant to the patient?<br>12   A.    Yes.<br>13   Q.     And that's something you ask the patient<br>14 about and quiz the patient about to make sure that<br>15 you understand the full picture of the patient you're<br>16 dealing with?<br>17   A.    Yes.<br>18   Q.     And what are the more significant risk | |

Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 19 factors -- traditional risk factors that you look to<br>20 to determine or assess a patient's safety profile in<br>21 terms of whether they're at risk for a heart attack<br>22 or coronary artery disease?<br>23    A.    Male gender, obesity, hypertension,<br>24 hyperlipidemia, smoking history, diabetes.  Those are<br>25 the classic ones, I think.<br>page 22<br>1    Q.    Excuse me for the pause, but I'm just<br>2 writing these down.  And age and gender are ones that<br>3 frankly the patient can't control; is that right?<br>4    A.    Right.<br>5    Q.    And there's also another one, family<br>6 history; is that right?<br>7    A.    Family history, yes.<br>8    Q.    And that can be fairly significant, true?<br>9    A.    Yes.<br>10    Q.    If there's a strong family history of<br>11 coronary artery disease -- and that can be a<br>12 significant risk factor?<br>13    A.    Yes.<br>14    Q.    If there's a strong family history of<br>15 premature heart attacks, that can be a significant<br>16 risk factor?<br>17    A.    Yes.<br>18    Q.    Those are not things people can control<br>19 though, right?<br>20    A.    Right.<br>21    Q.    And so in treating patients who are<br>22 cardiac patients or people who may have coronary<br>23 artery disease, it's important to know which ones<br>24 they may be able to control, true?<br>25    A.    Yes.<br>page 23<br>1    Q.    And why is that?<br>2    A.    Well, you want to -- in any patient<br>3 that's at risk for heart disease, you'd like to<br>4 institute lifestyle changes that would reduce the<br>5 risk factor level in their life.<br>6    Q.    And do you work with the patient, so to<br>7 speak, to try to accomplish that?<br>8    A.    Yes.<br>9    Q.    For example, you mentioned smoking.  What<br>10 are the dangers of smoking?<br>11    A.    Well, smoking is a risk factor for<br>12 atherosclerosis.  Other dangers, of course, include<br>13 chronic lung disease, lung cancer.<br>14    Q.    So smoking is one of those controllable<br>15 risk factors?<br>16    A.    Yes.<br>17    Q.    And so when your patients -- I guess<br>18 especially in Tennessee -- Tennessee is a high | |

Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 19 smoking state I guess.  Have you heard that?<br>20    A.    Yes.<br>21    Q.    And as a result, it has a high incidence<br>22 of coronary artery disease; is that right?  Is that<br>23 true -- as compared to other states?<br>24    A.    There's a high incidence of coronary<br>25 artery disease and smoking both in Tennessee.<br>page 24<br>1    Q.    Independent of each other and together I<br>2 guess is what you're saying?<br><br><br>[24:4] - [35:20] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 24 | |
| 4    A.    Yes. | PI's obj.:  R. 602. Lack of |
| 5    Q.    Let me rephrase that.  There's a high<br>6 incidence of coronary artery disease in Tennessee,<br>7 true? | foundation. R. 611 - Leading. |
| 8    A.    Yes.<br>9    Q.    And there's a high incidence of smoking?<br>10 There's a lot of people that smoke here in Tennessee?<br>11    A.    Yes.<br>12    Q.    And it's thought to be the case that<br>13 smoking contributes significantly to the coronary<br>14 artery disease that you find in Tennessee?<br>15    A.    Yes.<br>16    Q.    And it's not any secret that smoking is a<br>17 significant risk factor for coronary artery disease<br>18 and myocardial infarctions, true?<br>19    A.    It's a well established risk factor.<br>20    Q.    And myocardial infarctions -- just so<br>21 we're clear -- and we use that term, but that's --<br>22 that's a heart attack, right?<br>23    A.    Right.<br>24    Q.    That's what is commonly referred to as a<br>25 heart attack; is that true?<br>page 25<br>1    A.    Yes.<br>2    Q.    And we see MI in the records, and MI<br>3 stands for myocardial infarction when it relates to a<br>4 cardiac patient?<br>5    A.    Yes.<br>6    Q.    Okay.  You also mentioned diabetes.  And<br>7 you -- I think you indicated that in diabetic<br>8 patients, people are particularly at risk for having<br>9 a silent MI; that is, a heart attack that they don't<br>10 know about.  Is that right?<br>11    A.    That's right.<br>12    Q.    But in addition to that, it's an | |

**Dedrick v. Merck Co., Inc.**
**Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 13  independent risk factor for coronary artery disease;<br>14  is that right?<br>15    A.    That's right.<br>16    Q.    And it's also an independent risk factor<br>17  for heart attacks, true?<br>18    A.    That's right.<br>19    Q.    And can you tell us why diabetes is an<br>20  independent risk factor?<br>21    A.    Well, diabetes is -- diabetes promotes<br>22  atherosclerosis, promotes the blockages and plaque<br>23  build-up that we were talking about earlier that lead<br>24  to limitation of blood flow.<br>25    Q.    And so if a patient has diabetes and at<br>page 26<br>1  times it's controlled and at times it's uncontrolled,<br>2  that's a significant risk factor?<br>3    A.    Yes.<br>4    Q.    And if you combine someone who has -- who<br>5  smokes and who is diabetic, that would significantly<br>6  increase their risk?<br>7    A.    Yes.<br>8    Q.    And you mentioned hypertension.  What --<br>9  what is it about high blood pressure or hypertension<br>10  that makes it a risk factor for coronary artery<br>11  disease and heart attacks?<br>12    A.    Well, one of the -- one of the things<br>13  that hypertension does is that the high blood<br>14  pressure within the artery itself can damage the<br>15  intimal layer or the inside layer that causes that<br>16  initial rupture that can lead to platelet aggregation<br>17  and clot formation or build up of plaque.<br>18    Q.    So what I heard you say is that<br>19  hypertension can, A, lead to additional<br>20  atherosclerosis; is that right?<br>21    A.    Yes.<br>22    Q.    In other words, acceleration of this<br>23  plaque build-up that we've been talking about?<br>24    A.    Yes.<br>25    Q.    And in addition to that, hypertension can<br>page 27<br>1  actually cause a rupture is what you're saying?<br>2    A.    Cause an intimal rupture or intimal<br>3  injury that -- yes.<br>4    Q.    And those ruptures, as we've said, and<br>5  clots that might form thereafter are the cause of the<br>6  vast majority of the heart attacks, true?<br>7    A.    Yes.<br>8    Q.    So as a result, hypertension is a<br>9  significant risk factor?<br>10    A.    Yes.<br>11    Q.    And if you have diabetes and you smoke<br>12  and you have significant hypertension or hypertension | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 13  that is controlled at times or uncontrolled at times, | |
| 14  then you're even at greater risk than just somebody | |
| 15  who smoked or somebody who smoked and who had | |
| 16  diabetes? | |
| 17    A.    I think that's right. | |
| 18    Q.    And if you -- you mentioned | |
| 19  hyperlipidemia I think.  What is hyperlipidemia? | |
| 20    A.    It's an elevated level of blood lipids, | |
| 21  cholesterols or triglycerides, different fractions of | |
| 22  cholesterol. | |
| 23    Q.    Could it also be not enough HDL or good | |
| 24  cholesterol? | |
| 25    A.    Yes. | |
| page 28 | |
| 1    Q.    I guess that would be called | |
| 2  dyslipidemia? | |
| 3    A.    Yes.  Right. | |
| 4    Q.    And just so we're clear, I think that the | |
| 5  general population understands that, you know, high | |
| 6  cholesterol is what we're referring to.  But that | |
| 7  sometimes refers to a number of different things | |
| 8  within that category; is that right? | |
| 9    A.    Well, I think the accurate term is | |
| 10  dyslipidemia. | |
| 11    Q.    I'd like to talk about HDL.  And that's | |
| 12  measured by measuring LDL on the one hand; is that | |
| 13  right? | |
| 14    A.    Well, when you're talking about -- | |
| 15    Q.    Not dyslipidemia, but high cholesterol? | |
| 16    A.    Yes. | |
| 17    Q.    And I didn't mean to interrupt you, but I | |
| 18  could tell that I didn't ask a very good question. | |
| 19        So high cholesterol, the way you measure | |
| 20  that is through LDL? | |
| 21    A.    Yes. | |
| 22    Q.    And LDL is bad cholesterol so to speak; | |
| 23  is that right? | |
| 24    A.    Yes. | |
| 25    Q.    And what does that mean? | |
| page 29 | |
| 1    A.    Well, there are two fractions, low | |
| 2  density and high density.  And the low density is | |
| 3  what contributes to the plaque.  And the high density | |
| 4  actually has a protective effect. | |
| 5    Q.    So is the goal to have low -- low density | |
| 6  cholesterol, that is the LDL? | |
| 7    A.    Yes. | |
| 8    Q.    And is the goal likewise to have high HDL | |
| 9  or high density -- | |
| 10    A.    Yes. | |
| 11    Q.    -- cholesterol?  And then you mentioned | |
| 12  triglycerides.  How do they play a role in the lipid | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 13 profile? | |

13 profile?
14    A.    Well, triglycerides are lipids, and
15 they're a little bit different from cholesterol.
16 They're just a different chemical substance.
17         But elevated levels of triglycerides can
18 accelerate atherosclerosis just as elevated levels of
19 bad cholesterol can.
20    Q.    And if you had high cholesterol, high LDL
21 and high triglycerides, that would put someone at
22 significant risk for cardiovascular disease and
23 coronary artery disease; true?
24    A.    Yes.
25    Q.    And it would put them at greater risk for
page 30
1 heart attacks?
2    A.    Yes.
3    Q.    And strokes for that matter?
4    A.    Yes.
5    Q.    And that would be true for each one of
6 those?  In other words, if someone -- if a patient
7 had high triglycerides, it would put him at a
8 significant increased risk?
9    A.    Those risk factors that we talked about
10 were risk factors for atherosclerosis, which is a
11 process that goes on all through the body, not only
12 in the coronary arteries, but in the carotids and
13 renals.
14         So they're not only risk factors for
15 heart attack; they're risk factors for other organ
16 damage.
17    Q.    And so if you just had triglycerides that
18 were high, your triglycerides were high, that would
19 be an independent risk factor for coronary artery
20 disease?
21    A.    Yes.
22    Q.    And other cardiovascular disease?
23    A.    Yes.
24    Q.    And if you had in addition to that high
25 LDL or low density cholesterol, that would
page 31
1 independently be a high -- make your risk level
2 higher --
3    A.    Yes.
4    Q.    -- significantly higher for coronary
5 artery disease and heart attacks?
6    A.    Yes.
7    Q.    And if you had both, it would even be
8 higher?
9    A.    Yes.
10    Q.    And if you had both of those and you
11 added in smoking and diabetes and hypertension, then
12 you're getting into the very high risk category for

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
| --- | --- |
| 13  coronary artery disease? | |

13  coronary artery disease?
14    A.    Yes.
15    Q.    At that point, you'd be talking about
16  you're at the highest risk category, true?
17    A.    You would be at the high end of the
18  scale.  I guess family history thrown in there, you
19  would bump it up a little more.
20    Q.    Fair enough.  So what is it about the
21  family history has medicine and scientists found in
22  terms of significantly impacting your risk profile?
23    A.    Well, people that have parents or
24  relatives, blood relatives who have myocardial events
25  at -- now it's thought to be younger than 60 years of
page 32
1  age have an increased risk of cardiovascular disease,
2  coronary artery disease.
3    Q.    And so genetics may play a part?
4    A.    Yes.
5    Q.    And so if you have a strong family
6  history of coronary artery disease together with
7  diabetes, smoking, hypertension, and hyperlipidemia,
8  this patient, this hypothetical patient, would be at
9  extremely high risk for coronary artery disease?
10    A.    They would be at high risk.
11    Q.    And they would be at extremely high risk
12  for heart attacks as a result relatively speaking?
13    A.    Yes.
14    Q.    You mentioned obesity as a significant
15  risk factor.  And is there such a thing as -- what do
16  you call it when your waist is particularly obese?
17    A.    Well, you -- there are two different
18  types of obesity that are recognized.  One is
19  abdominal obesity where your waist is greater than
20  your hip circumference, your waist circumference is
21  greater than your hip circumference.
22        Peripheral or -- obesity is where the
23  obesity is all over your body.  You have fat legs and
24  fat arms and everything.  But abdominal obesity is
25  primarily concentrated to the abdomen.
page 33
1    Q.    And are both risk factors for coronary
2  artery disease and heart attacks?
3    A.    I believe so.  I can tell you -- that's a
4  good question.  I believe so, but I can't be sure.
5        The -- the reason I'm waffling on this,
6  I'm interested in this research in abdominal obesity
7  that affects insulin resistance.  And the two
8  different types of obesity have a completely
9  different effect on insulin resistance in diabetics.
10  But yes, I would say that both of them put you at
11  risk.
12    Q.    Even if you're -- you have peripheral

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 13  obesity, you're putting yourself at risk for coronary<br>14  artery disease?<br>15     A.     Yes.<br>16     Q.     And it would be something that -- it<br>17  wouldn't be a good idea to eat, for example, a high<br>18  fat diet if you are already obese or if -- for that<br>19  matter if you're not obese?<br>20     A.     I agree with that.<br>21     Q.     Diet and exercise are important here,<br>22  true?<br>23     A.     Yes.<br>24     Q.     And for someone who has known risk<br>25  factors, smoking, all of the ones we've talked about,<br>page 34<br>1  it would be especially important to not eat a high<br>2  fat diet?<br>3     A.     I agree.<br>4     Q.     And if -- I want to talk to you more<br>5  about abdominal obesity because it sounds like you<br>6  have a particular interest in that and it sounds like<br>7  you may have particular knowledge that others in your<br>8  field don't.  Tell us about abdominal obesity if you<br>9  don't mind.<br>10     A.     Well, abdominal obesity is just obesity<br>11  that -- it's central obesity in the -- concentrated<br>12  in the abdomen.  And it's in -- located in the<br>13  omentum, organ called the omentum, and in the<br>14  mesentery, which is the base of the bowel.  And --<br>15          And what was the rest of your question?<br>16     Q.     It was really just asking you to describe<br>17  what abdominal obesity is generally.  And so that<br>18  describes where it is.<br>19          And how is that -- what kinds of patients<br>20  does that occur in?<br>21     A.     Well, abdominal obesity is one of the<br>22  diagnostic criteria for metabolic syndrome.  And<br>23  metabolic syndrome is a syndrome that includes<br>24  abdominal obesity, diabetes, coronary artery disease,<br>25  hypertension.<br>page 35<br>1          And so some people interested in<br>2  metabolic syndrome efforts or one of the targets of<br>3  their efforts in prevention of heart disease is<br>4  reducing abdominal obesity.<br>5     Q.     And so if somebody has metabolic<br>6  syndrome, what does it mean for them in terms of<br>7  their cardiovascular health?<br>8     A.     It's a -- it means they're at high risk<br>9  for -- coronary artery disease is one of the criteria<br>10  for diagnosing it.  So they've already got that.  It<br>11  means they're at risk for other complications, renal<br>12  failure. | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 13   Q.    Heart attacks? | |
| 14   A.    Heart attacks. | |
| 15   Q.    So it's yet another risk factor that, if | |
| 16  someone had, would again put them on the very upper | |
| 17  end of the high risk category? | |
| 18   A.    Uh-huh. | |
| 19   Q.    Is that true? | |
| 20   A.    Yes. | |
| | |
| [37:12] - [41:19] 10/24/2006 Coltharp, William 9-13-2006 | |
| | |
| * Defendant's Affirmative Depo Designations | |
| Page 37 | |
| 12   Q.    Can you confirm that Exhibit 3 to your | |
| 13  deposition, Dr. Coltharp, is a January 8, 2003, | **Pl.'s obj.:**  No answer |
| 14  admission, history and physical examination? | designated. |
| 15   A.    Yes. | |
| 16   Q.    And that's from St. Thomas Hospital? | |
| 17   A.    Yes. | |
| 18   Q.    And it indicates, I believe, that a | |
| 19  Dr. McPherson actually performed this admission, | |
| 20  history and physical examination; is that right? | |
| 21   A.    Yes. | |
| 22   Q.    And before you had seen Mr. Dedrick, you | |
| 23  would have had access to his hospital records from | |
| 24  St. Thomas; is that right? | |
| 25   A.    Yes. | |
| page 38 | |
| 1   Q.    So this was a document that you would | |
| 2  have reviewed before consulting with the patient, the | |
| 3  doctors who were treating the patient and deciding | |
| 4  what to do for Mr. Dedrick? | |
| 5   A.    Probably the one caveat is if I saw him | |
| 6  before this was transcribed and on the chart.  And in | |
| 7  that case -- | |
| 8   Q.    It could have been -- | |
| 9   A.    My consultation record would just be | |
| 10  from -- strictly from the history that I got from the | |
| 11  patient. | |
| 12   Q.    And from the doctors? | |
| 13   A.    And from the doctors, yes. | |
| 14   Q.    So generally speaking, either you would | |
| 15  have read Exhibit 3, that is this admission, history | |
| 16  and physical examination, or you would have talked to | |
| 17  the doctor about what he had found to date with | |
| 18  respect to Mr. Dedrick, including the information | |
| 19  contained in Exhibit 3? | |
| 20   A.    Yes. | |
| 21   Q.    And then if you could turn to the -- I | |
| 22  guess just look at the first page.  It says past | |
| 23  medical history.  Do you see that? | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
| --- | --- |
| 24    A.    Yes.<br>25    Q.    And what is a medical history in terms of<br>page 39<br>1  a patient like Mr. Dedrick or any patient that comes<br>2  to a doctor?<br>3     A.    Well, it's the history of any medical<br>4  problems that they've had.<br>5     Q.    And is that important in terms of<br>6  diagnosing and treating whatever condition they<br>7  present with?<br>8    A.    Yes.<br>9     Q.    Is it important for patients to provide<br>10  you and other doctors with full and accurate<br>11  information?<br>12    A.    Yes.<br>13    Q.    When you go through a history with the<br>14  patient, do you ask him questions, particular<br>15  questions, eliciting answers about, for example, risk<br>16  factors?<br>17    A.    Yes.<br>18    Q.    Is it important for cardiologists and<br>19  cardiovascular surgeons to sort of get a risk profile<br>20  together in their own mind so they understand who<br>21  they're dealing with as a patient?<br>22    A.    Yes.<br>23    Q.    And was that done here according to<br>24  Exhibit 3?<br>25    A.    I'd say so.<br>page 40<br>1    Q.    And in fact, it's notable for several<br>2  cardiac risk factors, true?<br>3    A.    Yes.<br>4    Q.    It says multiple cardiac risk factors --<br>5  notable for multiple cardiac risk factors; is that<br>6  right?<br>7    A.    Yes.<br>8    Q.    And it talks about tobacco use.  Do you<br>9  see that?<br>10    A.    Yes.<br>11    Q.    And I guess you would normally ask what<br>12  kind of tobacco use that was referring to; is that<br>13  true?<br>14    A.    Yes.<br>15    Q.    And down below, do you see his social<br>16  history?<br>17    A.    Yes.<br>18    Q.    What does it say there in that regard?<br>19    A.    The patient lives with his mother in<br>20  Waynesboro, smokes one and a half packs of cigarettes<br>21  per day.<br>22    Q.    And is that the kind of smoking habit<br>23  that would be concerning to you as a -- as a thoracic | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 24 surgeon?<br>25   A.   Yes.<br>page 41<br>1   Q.   And why is that?<br>2   A.   It's a risk factor for coronary artery<br>3 disease.<br>4   Q.   And if you -- assume with me that<br>5 Mr. Dedrick has smoked cigarettes, a pack to two  .<br>6 packs a day for over 25 years.  Is that the sort of<br>7 history that would suggest that this gentleman would<br>8 have coronary artery disease?<br>9   A.   Well, it -- what it does is, it tells you<br>10 that he definitely has one of the major risk factors<br>11 for it and that coronary artery disease should be<br>12 considered in considering symptoms that might relate<br>13 to it.<br>14   Q.   So what would you tell a patient like<br>15 this in that regard?<br>16   A.   At what time -- in what context?<br>17   Q.   I mean, would you tell him ultimately to<br>18 stop smoking, for example?<br>19   A.   Yes.<br><br><br>[41:23] - [56:18] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 41<br>23   Q.   And if some were to -- if someone were to<br>24 go ahead and continue to smoke -- and we all<br>25 understand that it's addictive.  Would you say that<br>page 42<br>1 it's life-threatening to the patient?<br>2   A.   If they continue to smoke after I operate<br>3 on them, yes.<br>4   Q.   Do you actually tell them that?<br>5   A.   What I tell them is that if you look at<br>6 patients that have heart surgery -- this is after I<br>7 operate on a patient for coronary artery disease.<br>8 But if you look at patients that come back with<br>9 cardiac events after heart surgery, the two common<br>10 denominators are diabetes and a continued smoking<br>11 habit.<br>12   Q.   So if someone continues to smoke after<br>13 having the type of surgery that you did in this case,<br>14 that would be very concerning?<br>15   A.   Yes.<br>16   Q.   Because it is one of the two important<br>17 risk factors in determining whether somebody is going<br>18 to have complications and a subsequent heart attack<br>19 or other complications? | |

**Dedrick v. Merck Co., Inc.**
**Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 20   A.   Or a need for subsequent surgery.<br>21   Q.   Okay.  And so you tell them that -- do<br>22  you tell them that it's a life-threatening situation<br>23  or make it clear to them in that regard?<br>24   A.   Yes.<br>25   Q.   And then it also says after tobacco use<br>page 43<br>1  that he has diabetes; is that right?<br>2   A.   Yes.<br>3   Q.   And so that's another one of those<br>4  significant risk factors that we talked about that<br>5  puts people at such risk when it comes to coronary<br>6  artery disease and heart attacks?<br>7   A.   Yes.<br>8   Q.   And then it says hypertension, another<br>9  significant traditional risk factor, true?<br>10   A.   It does.<br>11   Q.   And then it says he also has<br>12  hypercholesterolemia?<br>13   A.   It does.<br>14   Q.   Now, down in social history, it says<br>15  that -- family history, excuse me.  It says notable,<br>16  a younger brother with premature coronary artery<br>17  disease.  Do you see that?<br>18   A.   Yes.<br>19   Q.   Is that significant?<br>20   A.   Yes.<br>21   Q.   How old was Mr. Dedrick on January 8th of<br>22  2003?<br>23   A.   He was 47, according to the history and<br>24  physical.<br>25   Q.   What significance would it have that a<br>page 44<br>1  younger brother of his had coronary artery disease,<br>2  had already been diagnosed with that?<br>3   A.   Well, when you consider that 47 is a<br>4  young age to be diagnosed with coronary artery<br>5  disease and yet another younger sibling, it means<br>6  there's a genetic predisposition to it in their<br>7  family.<br>8   Q.   Is that the kind of family history that<br>9  would put you at significant risk for coronary artery<br>10  disease?<br>11   A.   Yes.<br>12   Q.   And heart attack?<br>13   A.   Yes.<br>14   Q.   And so that would sort of check off that<br>15  risk factor so to speak that we were talking about<br>16  earlier?<br>17   A.   Yes.<br>18   Q.   I know you don't know his weight as<br>19  demonstrated by this exhibit, but other than obesity, | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 20 does Mr. -- did Mr. Dedrick in January of 2003<br>21 exhibit all of the significant risk factors that you<br>22 would be concerned about?<br>23    A.    Yes.<br>24    Q.    And so this would put him at the highest<br>25 level of risk for coronary artery disease and heart<br>page 45<br>1 attacks?<br>2    A.    Yes.<br>3    Q.    Now, then it goes on and talks about the<br>4 reason for admission.  Do you see that, at the top?<br>5    A.    Yes.<br>6    Q.    And it says his referring physician is<br>7 Dr. Esmeraldo Herrara in Waynesboro.  Do you see<br>8 that?<br>9    A.    Yes.<br>10    Q.    By the way, do you know Dr. McPherson?<br>11    A.    Yes.<br>12    Q.    Is he a respected cardiologist here in<br>13 town?<br>14    A.    Yes.<br>15    Q.    And he was the one who actually prepared<br>16 Exhibit 3; is that right?<br>17    A.    He dictated it, yeah.<br>18    Q.    And then under the reason for admission,<br>19 it goes on to say that he, of course, presented at<br>20 Wayne County emergency room.  Do you see that?<br>21    A.    Yes.<br>22    Q.    And then it says he -- with a 30 to 45<br>23 minute history of severe substernal chest pain.  Do<br>24 you see that?<br>25    A.    Yes.<br>page 46<br>1    Q.    And so, obviously, there would be a<br>2 concern that this person was having a heart attack;<br>3 is that right?<br>4    A.    Yes.<br>5    Q.    And it looks like they immediately gave<br>6 him at Wayne treatment with thrombolytic therapy.  Do<br>7 you see that?<br>8    A.    Yes.<br>9    Q.    Is that the lytic therapy that you were<br>10 talking about earlier?<br>11    A.    Yes.<br>12    Q.    So he must have met the criteria that you<br>13 were talking about?<br>14    A.    Right.<br>15    Q.    And what is your hope for a patient after<br>16 you give them thrombolytic therapy?<br>17    A.    Well, your hope is that the thrombolytic<br>18 therapy dissolves the clot and flow is restored to<br>19 the heart muscle. | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 20    Q.    So one thing you would want to look at is<br>21 whether or not the chest pain has been -- is<br>22 relieved?<br>23    A.    Yes.<br>24    Q.    And another thing you would want to look<br>25 at is whether or not blood had been restored?<br>page 47<br>1    A.    Yes.<br>2    Q.    And I guess -- can you look at an EKG and<br>3 determine whether or not the heart attack is over, so<br>4 to speak?<br>5    A.    The --<br>6    Q.    The event is over?<br>7    A.    You can find the EKG evidence of abortion<br>8 of a heart attack.<br>9    Q.    And if you could turn to the second page<br>10 of Exhibit 3, under impression, it says, Mr. Dedrick<br>11 is a 47-year-old smoker with multiple risk factors<br>12 presenting with an acute inferior MI.<br>13        But then it says, He appears to have<br>14 clinical reperfusion with thrombolytics with<br>15 resolution of his ST elevation and resolution of<br>16 chest pain. Do you see that?<br>17    A.    Yes.<br>18    Q.    And reperfusion, is that -- does that<br>19 mean blood flow has been restored?<br>20    A.    Yes.<br>21    Q.    And it says with thrombolytics. Of<br>22 course, that's the medication we've been talking<br>23 about?<br>24    A.    Yes.<br>25    Q.    And then it says with resolution of his<br>page 48<br>1 ST elevation. Do you see that?<br>2    A.    Yes.<br>3    Q.    That would be the sign on the EKG that<br>4 would indicate that indeed the acute event had<br>5 stopped?<br>6    A.    Right.<br>7    Q.    And then it says resolution of his chest<br>8 pain by the time that Dr. McPherson saw him; is that<br>9 right?<br>10    A.    Yes.<br>11    Q.    And those are all very good signs?<br>12    A.    That's right.<br>13    Q.    That's exactly what you would hope for<br>14 for a patient like Mr. Dedrick?<br>15    A.    Yes.<br>16    Q.    In other words, he came into the<br>17 hospital, they treated him quickly and appropriately<br>18 and resolved his symptoms?<br>19    A.    Yes. | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 20    Q.    And restored blood flow?<br>21    A.    Yes.<br>22    Q.    And that would limit any damage to his<br>23 heart by doing that?<br>24    A.    Yes.<br>25           (Defendant's Exhibit Number 4 was<br>page 49<br>1           marked for identification.)<br>2    Q.    I'm going to hand you what I'm marking as<br>3 Exhibit 4.  If you could, look at that for me and<br>4 tell me when you've had a chance to review it.<br>5    A.    Okay.<br>6    Q.    Exhibit 4 is a cardiac catheterization<br>7 report; is that right?<br>8    A.    Yes.<br>9    Q.    And it's again out of St. Thomas<br>10 Hospital?<br>11    A.    Yes.<br>12    Q.    By the way, is St. Thomas the only<br>13 hospital where you have privileges?<br>14    A.    Yes.<br>15    Q.    So is that the primary place where you<br>16 practice thoracic surgery?<br>17    A.    The only place.<br>18    Q.    The only place.  And so this is a report<br>19 that's generated after a doctor has actually done a<br>20 cardiac catheterization; is that correct?<br>21    A.    Yes.<br>22    Q.    And it lists a number of different<br>23 procedures there, do you see that?<br>24    A.    Yes.<br>25    Q.    And I guess there's five of them.  Can<br>page 50<br>1 you describe for me, just generally speaking, what<br>2 those procedures are?<br>3    A.    Sure.  Cardiac catheterization is in some<br>4 manner inserting a catheter into some part of the<br>5 heart.  Left ventriculography is injection of<br>6 contrast material into the ventricle itself to watch<br>7 the pumping action of the ventricle.<br>8           Coronary angiography is injection of<br>9 contrast material into the coronary arteries<br>10 themselves and taking pictures of them.<br>11 Ventriculography uses -- you take pictures of the<br>12 ventricle as well.<br>13           Angiography to the mammary artery to<br>14 assess use for bypass grafting, again, is contrast<br>15 media being injected into the mammary artery with<br>16 fluoroscopic documentation of it.<br>17           And conscious sedation is just sedation<br>18 that calms and soothes the patients, but they're not<br>19 fully put to sleep. | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 20    Q.    And so those are the procedures that were<br>21  performed on Mr. Dedrick on January 10th of 2003?<br>22    A.    Yes.<br>23    Q.    And this is another record that you would<br>24  have reviewed or you would have discussed with<br>25  doctors in connection with your consultation of<br>page 51<br>1 Mr. Dedrick just a couple days -- or a day later?<br>2    A.    Yes.<br>3    Q.    Would you have actually looked at this<br>4  report or discussed it with a doctor or just one of<br>5  the two?<br>6    A.    If this -- if this report was already in<br>7  the chart, I would have looked at it in addition to<br>8  discussing it with the doctor.<br>9    Q.    I guess one purpose of a cardiac<br>10  catheterization is to determine if there's blockages<br>11  in the arteries?<br>12    A.    Yes.<br>13    Q.    And to what extent there may be blockages<br>14  in the arteries; is that fair?<br>15    A.    Yes.<br>16    Q.    Another purpose is to determine the<br>17  condition of the left -- left ventricle; is that<br>18  right?<br>19    A.    Yes.<br>20    Q.    And I've heard the left ventricle termed<br>21  the main pump of the heart.  Is that true?<br>22    A.    Well, it's the primary pumping chamber of<br>23  the heart, yes.<br>24    Q.    So it's important to know if it's<br>25  functioning normally?<br>page 52<br>1    A.    Yes.<br>2    Q.    What -- let's say someone comes in to<br>3  your office who has never had a heart attack.  What<br>4  would be a way that you could determine if the left<br>5  ventricle is pumping normally?<br>6    A.    Well, you could do an echocardiogram.<br>7    Q.    Could you also do -- I mean, I know you<br>8  wouldn't necessarily do a cardiac catheterization.<br>9 But if for some reason, a stress test problem or<br>10  whatever, you decided to do one, could you also do a<br>11  cardiac catheterization?<br>12    A.    Yes.  Not in your office, but --<br>13    Q.    Right.  I see.  So you may come in to<br>14  your office, but you would refer it to the hospital<br>15  and then see him in the hospital?<br>16    A.    Right.<br>17    Q.    And then what would you look to to<br>18  determine if the left ventricle was pumping normally?<br>19    A.    You would look at the ventriculogram. | |

**Dedrick v. Merck Co., Inc.**
**Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 20    Q.    And that would be where it says findings, | |

20    Q.    And that would be where it says findings,
21 left ventricle.  Is that where you would find the
22 conclusions --
23    A.    Yes.
24    Q.    -- reached or impressions reached?
25    A.    Uh-huh.
page 53
1    Q.    And then it says the EF is 55 to 60
2 percent.  Do you see that?
3    A.    Yes.
4    Q.    Is the EF the ejection fraction?
5    A.    Yes.
6    Q.    And can you describe for the jury what
7 ejection fraction means?
8    A.    It's the percentage of blood that is in
9 the ventricle at the start of systole that's ejected
10 at the end of systole.
11    Q.    And is that a percentage used to
12 determine if that left ventricle is pumping normally?
13    A.    Yes.
14    Q.    And is it an important measurement in
15 determining whether or not the left ventricle is
16 pumping normally?
17    A.    Yes.
18    Q.    And why is it important?  What does it
19 tell you?
20    A.    Well, it's important.  It has prognostic
21 implications both for surgical and medical
22 treatment.
23        The worst ventricular function is the
24 more high risk that patient is as far as a surgical
25 candidate goes.
page 54
1        And the worse their ventricular function
2 is long-term under medical therapy, the likelihood is
3 he'll have a worse course.
4    Q.    So I think what you've told me is that
5 you could actually use it to determine long-term
6 prognosis to some degree in patients like
7 Mr. Dedrick?
8    A.    Yes.  Uh-huh.
9    Q.    Is it an important or powerful tool in
10 that regard?
11    A.    Yes.
12    Q.    And likewise, you could look at that
13 particular number, the ejection fraction, and
14 determine in your case whether he's a surgical
15 candidate?
16    A.    And -- yes.  And to some degree what his
17 risk is.
18    Q.    Risk is in surgery?
19    A.    Yes, risk for surgery.

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 20   Q.    And the EF or ejection fraction with<br>21  Mr. Dedrick on January 10 of 2003 was 55 to 60<br>22  percent.  Do you see that?<br>23   A.    Yes.<br>24   Q.    Is that normal?<br>25   A.    It's right at the -- it's probably within<br>page 55<br>1  normal limits as far as -- strictly by the numbers.<br>2  But as you see on -- in this exhibit, he had -- John<br>3  said he had severe inferior hypokinesis to akinesis<br>4  in the mid inferior wall.<br>5          So I think you have to look at the<br>6  ejection fraction and the wall motion abnormalities<br>7  both.<br>8          He probably, before he had the heart<br>9  attack, had a slightly higher ejection fraction than<br>10  he did at this point in time, because he does have<br>11  wall motion abnormalities.<br>12   Q.    But it's accepted in medicine amongst<br>13  cardiologists that indeed 55 to 75 percent is normal<br>14  in terms of an ejection fraction number?<br>15   A.    I think that's right.<br>16   Q.    And I've been told that it doesn't matter<br>17  if it's -- there's no such thing as optimal.  It's<br>18  just important that it falls within the normal range;<br>19  is that true?<br>20   A.    That's right.<br>21   Q.    And I want to show you -- and I know I'm<br>22  going ahead for just a minute, but -- and I'll come<br>23  back.  But if you could, look at Exhibit 4 to your<br>24  deposition.  This is a discharge summary that you've<br>25  signed; is that true?<br>page 56<br>1   A.    Yes, it is.<br>2   Q.    And what is the second entry on discharge<br>3  diagnosis?<br>4   A.    Triple vessel coronary artery disease<br>5  with normal left ventricle function.<br>6   Q.    And so -- and this would have been after<br>7  you had an opportunity to consult with Mr. Dedrick,<br>8  true?<br>9   A.    Yes.<br>10   Q.    And see all of the records that we've<br>11  just reviewed?<br>12   A.    Yes.<br>13   Q.    And it would likewise be after you had an<br>14  opportunity to actually see in his heart and feel his<br>15  heart?<br>16   A.    That's right.<br>17   Q.    And actually see it beating?<br>18   A.    That's right. | |

**Dedrick v. Merck Co., Inc.**
**Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| [57:5] - [57:14] 10/24/2006 Coltharp, William 9-13-2006 | |

* Defendant's Affirmative Depo Designations

page 57
5    Q.    And after seeing his heart in connection
6 with the surgery that you performed and that we'll
7 talk about in a few minutes and together with this
8 cardiac catheterization and all the other records
9 available to you in the hospital, you concluded that
10 he had normal left ventricular function?
11    A.    Yes.
12    Q.    And that was a very, very important and
13 good sign for Mr. Dedrick?
14    A.    Yes.


[57:19] - [62:7] 10/24/2006 Coltharp, William 9-13-2006

* Defendant's Affirmative Depo Designations

page 57
19    Q.    Yeah.  The reason why it's important is
20 because it can be a good prognosticator for his
21 course long term?
22    A.    It has prognostic input -- the ejection
23 fraction and an abnormal ejection fraction or a
24 normal ejection fraction has prognostic implications.
25    Q.    And what are those?  I guess those are
page 58
1 the ones you talked about earlier?
2    A.    With good left ventricular function, the
3 prognosis is a lot better than with bad left
4 ventricular function.
5    Q.    So this is exactly what you would hope
6 for, I guess --
7    A.    Yes.
8    Q.    -- in a patient like Mr. Dedrick?
9    A.    Yes.
10    Q.    So moving forward, if you could, go back
11 to the cardiac catheterization.  It indicates that --
12 there's a section there called coronary.  Do you see
13 that?
14    A.    Yes.
15    Q.    How would you come up -- or someone who
16 does cardiac catheterization, how do you come up with
17 the findings?  Which procedure would you use to come
18 up with the findings that are listed there?
19    A.    Coronary angiography.
20    Q.    After reading the findings of
21 Dr. Koenig -- do you know Dr. Koenig?

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 22    A.    Yes.<br>23    Q.    And is he well respected?<br>24    A.    Yes.<br>25    Q.    Is he someone who you routinely rely upon<br>page 59<br>1 for purposes of cardiac catheterizations?<br>2    A.    Yes.<br>3    Q.    And you found him to be reliable?<br>4    A.    Yes.<br>5    Q.    And his cardiac catheterizations to be<br>6 reliable?<br>7    A.    Yes.<br>8    Q.    And the ejection fractions that he<br>9 measures to be reliable?<br>10    A.    Yes.<br>11    Q.    In terms of the coronaries, this is where<br>12 you would see a description of the blockages that<br>13 we've been talking about with respect to Mr. Dedrick;<br>14 is that right?<br>15    A.    That's right.<br>16    Q.    And how would you view that as a doctor?<br>17    A.    How would I view his blockages?<br>18    Q.    Yeah.  How do you -- is there an image<br>19 that you're looking at?<br>20    A.    Yes.<br>21    Q.    In your clinic?<br>22    A.    You physically view it.  There is a --<br>23 right.  There is a -- it's a computer generated<br>24 digitalized image.<br>25        Well, in 2003, it probably was still on<br>page 60<br>1 film actually, on 22 millimeter film or something<br>2 like that.  And you put that in a -- in a -- it's in<br>3 a machine and it -- you can run it back and forth.<br>4 It's just like a home movie -- not just like a home<br>5 movie, but similar to a home movie.<br>6    Q.    How do you create that movie?  I mean,<br>7 what is the procedure used in order to create that<br>8 image that you can look at either by computer or<br>9 the --<br>10    A.    Well, the cardiologist puts the catheter<br>11 in the artery and injects contrast media, and they<br>12 take serial X-rays with it.  They film the dye going<br>13 through the arteries.<br>14    Q.    And you can actually see it on a computer<br>15 if it's computerized?<br>16    A.    Right.<br>17    Q.    Or you can see it via tape otherwise?<br>18    A.    Right.<br>19    Q.    And so you can actually see the narrowing<br>20 that's caused by these blockages or atherosclerosis?<br>21    A.    Yes. | |

**Dedrick v. Merck Co., Inc.**
**Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 22   Q.    And what was found with respect to<br>23  Mr. Dedrick when Dr. Koenig looked at that film?<br>24   A.    Well, he had -- he really had triple-<br>25  vessel disease with critical disease in his right<br>page 61<br>1  coronary artery that was associated with the<br>2  thrombus.<br>3   Q.    And I see -- when you say triple-vessel<br>4  disease, what vessels are we talking about?<br>5   A.    They're -- generally people have three<br>6  major arteries taking blood to their heart, the<br>7  anterior descending, the circumflex, and the right<br>8  coronary artery.<br>9        And one way to classify severity of<br>10  disease is to classify it by single two-vessel<br>11  disease or triple-vessel.  And he had triple-vessel<br>12  disease.<br>13   Q.    And are those the three main arteries for<br>14  the heart?<br>15   A.    Yes.<br>16   Q.    And so he had coronary artery disease or<br>17  atherosclerosis in all three of his arteries?<br>18   A.    Yes.<br>19   Q.    And it was significant in all three of<br>20  his arteries?<br>21   A.    Yes.<br>22   Q.    And it was severe or critical as you put<br>23  it in his right coronary artery?<br>24   A.    Yes.<br>25   Q.    Is that consistent with a patient who has<br>page 62<br>1  the risk factors that you've seen in connection with<br>2  Mr. Dedrick?  Are these findings consistent with<br>3  those types of risk factors?<br>4   A.    Yes.<br>5   Q.    Okay.<br>6   A.    Yes, it is.  It might be that a<br>7  patient -- yes.<br><br><br>[62:10] - [63:21] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 62<br>10        It wouldn't be surprising for a patient<br>11  who has the risk factors that Mr. Dedrick has to come<br>12  in with triple-vessel disease like this?<br>13   A.    That's right.<br>14   Q.    It wouldn't be surprising for him to come<br>15  in with triple-vessel disease that is significant?<br>16   A.    That's right. | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 17    Q.    It wouldn't be surprising for someone 18 like Mr. Dedrick to come in, given his risk factors, 19 with a heart attack? 20    A.    That's right. 21    Q.    As a result of his serious and 22 significant coronary artery disease? 23    A.    That's right. 24    Q.    So when you read this and you knew 25 Mr. Dedrick's history, you didn't find anything page 63 1 inconsistent about it?  This is a presentation that 2 you see probably every week? 3    A.    Probably. 4    Q.    And then the discussion section on the 5 next page, it talks about the multi-vessel coronary 6 artery disease again.  Do you see that? 7    A.    Yes. 8    Q.    And by the way, is this coronary artery 9 disease that we've been talking about typically 10 caused over a long period of time? 11    A.    Yes. 12    Q.    Is it typically caused by years, over a 13 number of years? 14    A.    Yes. 15    Q.    And even decades? 16    A.    In some people. | |
| 17    Q.    And I want to talk about that just for a 18 minute.  I've seen studies that discuss the 19 beginnings of atherosclerosis, fatty streaks, so to 20 speak, actually in the second decade of life or in 21 somebody's teens.  Have you seen those studies? | **Pl's Obj.:** Lack of proper foundation. |
| [63:23] - [64:16] 10/24/2006 Coltharp, William 9-13-2006 * Defendant's Affirmative Depo Designations page 63 | |
| 23    A.    Yes. | **Pl's obj.:** Same. |
| 24    Q.    Let me rephrase it.  Have you seen 25 studies that indicate that patients by the second page 64 1 decade of life oftentimes have coronary artery 2 disease? 3    A.    I've seen studies that were based on 4 autopsies of GIs I think in either the Korean War or 5 World War II that were in their teens and had -- they 6 had the beginnings of atherosclerosis, yes. 7    Q.    And so that's been known for some time 8 that this disease can start early in life and take a 9 number of years to progress? 10    A.    Yes. | |

### Dedrick v. Merck Co., Inc.
### Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 11   Q.    Even decades?<br>12   A.    Yes. | |
| 13   Q.    And so it would be fair to say that it<br>14   was likely that Mr. Dedrick's three-vessel<br>15   significant coronary artery disease began years<br>16   earlier?<br><br><br>[64:19] - [70:17] 10/24/2006 Colthorp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 64<br>19   A.    I think -- it think it's accurate to say<br>20   that he -- that atherosclerosis -- the process that<br>21   causes these blockages began years ago, and most<br>22   probably the blockages in the coronary arteries began<br>23   years ago. | Pl's obj.:  Lack of proper<br>foundation. |
| 24   Q.    And you see patients who have this type<br>25   of disease who have never taken Vioxx?<br>page 65<br>1   A.    Yes.<br>2   Q.    And who have never taken a COX-2<br>3   inhibitor?<br>4   A.    Yes.<br>5   Q.    This is something you see each and every<br>6   day in your practice?<br>7   A.    Yes.<br>8   Q.    Now, it talks about what Dr. Koenig<br>9   thinks would be a good course of action, does it not?<br>10   A.    Yes.<br>11   Q.    And that's one of the things that -- one<br>12   of the reasons you do a cardiac catheterization is to<br>13   formulate a plan of action; is that right?<br>14   A.    That's right.<br>15   Q.    And it talks about bypass grafting.  Do<br>16   you see that?<br>17   A.    Yes.<br>18   Q.    Can you describe for the jury what<br>19   coronary artery bypass grafting is?<br>20   A.    It's conventional open-heart surgery<br>21   where either the internal mammary artery or saphenous<br>22   vein or other conduit is used to bypass the blockage<br>23   in the artery to take blood from upstream to the<br>24   blockage to downstream from the blockage.<br>25   Q.    And how many coronary artery bypass<br>page 66<br>1   grafts do you do per year -- per year, excuse me?<br>2   A.    Well, the number of operations that we<br>3   do -- do you mean me personally or --<br>4   Q.    Yeah, you personally.<br>5   A.    Anywhere from 200 to 350.  It just | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 6 depends.<br>7    Q.    So this is not an unusual procedure for<br>8 you to do in your practice?<br>9    A.    Right.<br>10    Q.    This is something you do often when you<br>11 see patients like Mr. Dedrick?<br>12    A.    Right.<br>13    Q.    And just to be clear, there's nothing<br>14 about the cardiac catheterization that suggests<br>15 anything other than risk factors as the reason for<br>16 Mr. Dedrick's coronary artery disease, true?<br>17    A.    Right.<br>18    Q.    And as a result, there's nothing which<br>19 would suggest that he needed this bypass grafting for<br>20 any reason other than the risk factors he faced?<br>21    A.    Right.<br>22    Q.    It talks about restenosis risk.  Do you<br>23 see that?  It's toward -- it's four lines up from the<br>24 bottom.<br>25    A.    Yes.<br>page 67<br>1    Q.    Can you talk about restenosis risk with<br>2 respect to Mr. Dedrick and his risk factors?<br>3    A.    Yes.  Restenosis is -- refers to the<br>4 process where a blockage may be dilated initially,<br>5 but the blockage recurs or the artery becomes<br>6 restenosed.<br>7        Restenosis rates are highest in<br>8 diabetics.  And the same -- and restenosis rates are<br>9 higher in certain width blockages and certain<br>10 anatomic locations.  And the way that Dr. Koenig<br>11 dictated this, it seems that his anatomy would fall<br>12 into that group.  I don't remember, but specifically.<br>13    Q.    So his anatomy -- that means<br>14 Mr. Dedrick's anatomy would make him fall into a<br>15 higher risk group for restenosis?<br>16    A.    That's the way it reads to me.<br>17    Q.    And that's the way you would interpret --<br>18    A.    Yes.<br>19    Q.    -- Dr. Koenig's report?<br>20    A.    Right.<br>21    Q.    And, of course, that's the way you would<br>22 have interpreted it back in January of 2003?<br>23    A.    Right.<br>24    Q.    And you would have had an opportunity to<br>25 discuss that with Dr. Koenig as well?<br>page 68<br>1    A.    Yes.<br>2    Q.    And you mentioned that this is a<br>3 particularly big risk when it comes to diabetics?<br>4    A.    The highest risk of restenosis is in<br>5 diabetics. | |

### Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 6    Q.    So it's particularly important for<br>7  patients like Mr. Dedrick to control his diabetes if<br>8  he can?<br>9    A.    Yes, it is important for him to.<br>10    Q.    And it's also very important for him to<br>11  control these risk factors that we've talked about,<br>12  given all of what's occurring and all of these risks<br>13  that we've been talking about?<br>14    A.    Yes.<br>15    Q.    And then we come to, I think, the first<br>16  time that you actually saw Mr. Dedrick, which was on<br>17  January 11 of 2003; is that correct?<br>18    A.    Yes.<br>19            (Defendant's Exhibit Number 5 was<br>20            marked for identification.)<br>21    Q.    I'm going to hand you what I'm going to<br>22  mark as Exhibit 5 -- is that the right exhibit -- to<br>23  your deposition.  If you could, take a moment to look<br>24  at that, and then I'll ask you some questions.<br>25    A.    Okay.<br>page 69<br>1    Q.    So this is a -- Exhibit 5 is a report<br>2  that you prepared; is that right?<br>3    A.    That I dictated.<br>4    Q.    Okay.  And you -- I appreciate that.<br>5  When you say you dictated it, the way it happens is<br>6  you actually visit with the patient, review the<br>7  chart, dictate a report, and then somebody else<br>8  actually types out the report?<br>9    A.    That's right.<br>10    Q.    And then it ends up in the medical<br>11  records?<br>12    A.    That's right.<br>13    Q.    And it says the attending physician is<br>14  Dr. McPherson; is that right?<br>15    A.    Yes.<br>16    Q.    And then it says the consultant is you;<br>17  is that right?<br>18    A.    Yes.<br>19    Q.    So this is a true and correct copy of the<br>20  report that you dictated in connection with<br>21  Mr. Dedrick?<br>22    A.    Yes.<br>23    Q.    And it says, The patient is a 47-year-old<br>24  man with no antecedent history.  Do you see that?<br>25    A.    Yes.<br>page 70<br>1    Q.    And it says no antecedent history of<br>2  coronary artery disease.  That doesn't mean he didn't<br>3  have coronary artery disease previously obviously,<br>4  right?<br>5    A.    Right. | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 6    Q.    That just simply means he didn't know it?<br>7    A.    He has no history of it, no history that<br>8  he can -- that one can obtain from him that he --<br>9    Q.    He can't show you the previous cardiac<br>10  catheterization, for example?<br>11    A.    That's right.<br>12    Q.    From before January of 2003, or some<br>13  other objective test that would show or demonstrate<br>14  that he had it, true?<br>15    A.    Or subjective symptoms that he had it. | |
| 16    Q.    But what we do know is that he had long-<br>17  standing multi-vessel coronary artery disease? | Pl.'s Obj.:  R.611-Leading. |

[70:19] - [72:24] 10/24/2006 Coltharp, William 9-13-2006

* Defendant's Affirmative Depo Designations

page 70

| | |
|---|---|
| 19    Q.    In all likelihood?<br>20    A.    He had -- when he was cathed, he had<br>21  triple-vessel coronary artery disease.  And the<br>22  likelihood is that it did not appear overnight. | Pl.'s Obj.:  R.611-Leading. |
| 23    Q.    And it took a number of years --<br>24    A.    Yes.<br>25    Q.    -- to occur?<br>page 71<br>1    A.    Yes.<br>2    Q.    And then it talks about he was treated<br>3  with lytic therapy and became pain-free.  Do you see<br>4  that?<br>5    A.    Yes.<br>6    Q.    And that was from your review of the<br>7  records and your history you took from Mr. Dedrick;<br>8  is that right?<br>9    A.    Yes.  Uh-huh.<br>10    Q.    And then on the second page, it says he<br>11  underwent cardiac catheterization and angiography,<br>12  which demonstrates extensive triple-vessel coronary<br>13  artery disease.  Do you see that?<br>14    A.    Yes.<br>15    Q.    And that's the way you described it after<br>16  looking at the cardiac catheterization report,<br>17  talking with Dr. Koenig, and doing whatever else you<br>18  thought was necessary?<br>19    A.    Right.<br>20    Q.    That it was extensive in nature?<br>21    A.    Right.<br>22    Q.    And then you said with good distal<br>23  vessels.  Do you see that?<br>24    A.    Yes.<br>25    Q.    And then you said inferior hypokinesis, | |

Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| page 72<br>1  but relatively well preserved left ventricular<br>2  function.  Do you see that?<br>3    A.    Yes.<br>4    Q.    And that's what you were talking about a<br>5  few moments ago I think is that when you look at the<br>6  left ventricular, it's important to look at the whole<br>7  picture?<br>8    A.    That's right.<br>9    Q.    And so the way you worded it is that,<br>10  While he might have hyp -- inferior hypokinesis, he<br>11  has well-preserved left ventricular function?<br>12    A.    Yes.<br>13    Q.    And so -- and what's important is the<br>14  overall function of the left ventricle, correct?<br>15    A.    That's right.<br>16    Q.    And we know the overall function of the<br>17  left ventricle was normal?<br>18    A.    That's right.<br>19    Q.    And so despite his hypokinesis, that was<br>20  a very good sign?<br>21    A.    Yes. | |
| 22    Q.    And indeed -- I've talked to a couple<br>23  experts, and I guess -- is it true that hypokinesis<br>24  like this is likely to improve over time? | **Pl.'s Obj.:**  Lack of proper<br>foundation; leading; speculative. |
| [73:1] - [73:16] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 73<br>1    A.    In the setting of an acute infarct when<br>2  the hypokinesis is diagnosed, it may improve.  In the<br>3  setting of a history of remote infarct with no new<br>4  infarct, any hypokinesis probably will not improve.<br>5    Q.    So in this setting, there was an acute<br>6  infarct, and so it may improve?<br>7    A.    Yes.<br>8    Q.    And, in fact, is there something called<br>9  stunning?<br>10    A.    Yes.<br>11    Q.    What is stunning?<br>12    A.    Well, it's when the muscle is not dead,<br>13  is not infarcted, but it's not contracting normally.<br>14  And many times we see that.  And with restoration of<br>15  blood flow, the stunning resolves and that muscle<br>16  starts to work normally again.<br><br>[74:8] - [74:13] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| page 74<br>8   Q.    And regardless of the hypokinesis, is it<br>9 true that you would still -- it won't impact his<br>10 prognosis as long as his left ventricle function;<br>11 that is, through his EF, his ejection fraction, is<br>12 normal?<br>13   A.    I think that's right, yes.<br><br><br>[74:16] - [75:15] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 74<br>16        Regardless of the hypokinesis seen,<br>17 his -- given his ejection fraction, the hypokinesis<br>18 would not be expected to impact his prognosis?<br>19   A.    That's right.<br>20   Q.    And then it says past medical history,<br>21 and it talks about hypertension and diabetes and<br>22 hypercholesterolemia there.  Do you see that?<br>23   A.    Yes.<br>24   Q.    And I assume that really you weren't<br>25 trying to be exhaustive there because it was already<br>page 75<br>1 in the records?<br>2   A.    Right.<br>3   Q.    But those were some of the things that<br>4 you at least knew at the time, right?<br>5   A.    Right.<br>6   Q.    And then, of course, you saw it -- under<br>7 social, you talk about smokes and drinks socially.<br>8 Do you see that?<br>9   A.    Yes.<br>10   Q.    It just says he smokes and drinks<br>11 socially.  What do you usually -- what does that mean<br>12 usually when you write that down in terms of what the<br>13 patient has told you?<br>14   A.    It means that he smokes and his alcohol<br>15 intake is not to an abusive state. | |
| [76:4] - [76:9] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 76<br>4   Q.    Let me say it a different way.  If<br>5 somebody told you that he smoked a pack to two packs<br>6 of cigarettes for 25 to 30 years, would you say that<br>7 he smokes socially -- | **Pl.'s Obj.:**  Lack of proper foundation.  Leading. |

### Dedrick v. Merck Co., Inc.
### Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 8    A.    No.  The socially actually refers to his<br>9  drinking.<br><br><br>[76:16] - [76:21] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 76<br>16    Q.    What does that mean to you?<br>17    A.    That he doesn't abuse alcohol. | |
| 18    Q.    If he drank -- if it showed that he<br>19  drinks and drank at the time, you know, a case or two<br>20  of beer on a weekend, would that be a social drinker<br>21  to you?<br><br><br>[76:23] - [77:22] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 76 | **Pl.'s obj.:**  Assumes facts<br>not in evidence.  Improper<br>hypothetical.  R. 602 - lack of<br>personal knowledge. |
| 23    A.    No.<br>24    Q.    Would that be a concern to you?<br>25    A.    Yes.<br>page 77<br>1    Q.    Would it be a concern that he wasn't<br>2  accurately telling you all of the information about<br>3  his health history?<br>4    A.    If he told me he drank a couple of cases<br>5  on the weekend?<br>6    Q.    If he told you that but he only suggested<br>7  to you that he drank socially?  If he knew that and<br>8  all he told you --<br>9    A.    Well, yes, there would be a discrepancy<br>10  there that I would wonder about.<br>11    Q.    Okay.<br>12    A.    But I must say the likelihood that -- I<br>13  don't think that he told me that he drinks socially.<br>14  Some people -- some patients do, but it's rare.<br>15  That's a conclusion that I draw from asking them how<br>16  much they drink.<br>17    Q.    I see.  And if he told you he drank a<br>18  case or two a day -- excuse me, a weekend, would you<br>19  have put down that he drank socially?<br>20    A.    No.<br>21    Q.    What would you have put?<br>22    A.    That he drinks a case or two a weekend.<br><br><br>[77:25] - [78:3] 10/24/2006 Coltharp, William 9-13-2006 | **Pl.'s obj.:**  Assumes facts<br>not in evidence.  Improper<br>hypothetical.  R. 602 - lack of<br>personal knowledge. |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| * Defendant's Affirmative Depo Designations<br><br>page 77<br>25    Q.   And then it says under physical<br>page 78<br>1  examination, well developed, well nourished man in no<br>2  distress.  Do you see that?<br>3    A.    Yes.<br><br><br>[78:17] - [83:8] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 78<br>17    Q.    Then it says in no distress.  What does<br>18  that mean?<br>19    A.    Distress -- no distress in that context<br>20  means that he's not breathing laboriously.  He's not<br>21  diaphoretic.  He doesn't appear acutely or gravely<br>22  ill and appears comfortable.<br>23    Q.    And these were important determinations<br>24  in assessing whether or not you were comfortable<br>25  doing a bypass graft on Mr. Dedrick?<br>page 79<br>1    A.    Well, it's more -- it guess it's more<br>2  important in assessing the timetable for doing a<br>3  bypass graft.<br>4        At that time, I'm sure I knew that he had<br>5  critical disease.  If he had been in distress, I<br>6  would have been more inclined to operate on him as an<br>7  emergency.<br>8    Q.    I assume not everybody is a candidate for<br>9  surgery; is that right?<br>10    A.    That's right.<br>11    Q.    What do you look to in a patient like<br>12  Mr. Dedrick to determine whether a patient is a<br>13  candidate for bypass graft?<br>14    A.    Well, like I said earlier, the primary<br>15  risk factor that you look at is their ventricular<br>16  function.  And his ventricular function wasn't a<br>17  problem.<br>18        End-stage lung disease where people are<br>19  short of breath at rest.  Malignant disease<br>20  frequently makes a patient not a candidate for<br>21  surgery.  Ongoing infection or sepsis.  Adult<br>22  respiratory distress syndrome.  All of those things<br>23  make people not a candidate for surgery.<br>24    Q.    But based upon his left ventricle<br>25  function and the other factors you've just discussed,<br>page 80<br>1  did you conclude consistent with Dr. Koenig that | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 2 Mr. Dedrick should indeed have the bypass surgery<br>3 recommended?<br>4    A.    Yes.<br>5    Q.    So you concurred with Dr. Koenig?<br>6    A.    Yes.<br>7    Q.    And in fact, you scheduled him for bypass<br>8 surgery the following Monday?<br>9    A.    Yes.<br>10    Q.    I guess that means you saw him on a<br>11 Saturday; is that right?<br>12    A.    Let's see. I saw him on the --<br>13    Q.    The 11th?<br>14    A.    The 11th and then operated on him on the<br>15 13th. Yes.<br>16    Q.    So you saw him in the hospital on<br>17 Saturday, and you felt comfortable enough to wait<br>18 until Monday to do any sort of surgery?<br>19    A.    Yes.<br>20    Q.    And so -- first of all, I guess he was in<br>21 stable condition?<br>22    A.    Yes.<br>23    Q.    Not emergent condition?<br>24    A.    Right.<br>25    Q.    And then second of all, you were able to<br>page 81<br>1 perform the bypass surgery based on a timetable that<br>2 made sense for the patient?<br>3    A.    Yes.<br>4    Q.    And that was in the best interest of<br>5 Mr. Dedrick?<br>6    A.    Yes.<br>7    Q.    And when you actually perform a bypass or<br>8 several bypasses, you prepare a report or dictate a<br>9 report; is that right?<br>10    A.    Yes.<br>11        (Defendant's Exhibit Number 6 was<br>12        marked for identification.)<br>13    Q.    And is Exhibit 6 a true and correct copy<br>14 of your report that you dictated in connection with<br>15 the bypass surgery performed on him in January of<br>16 2003?<br>17    A.    Yes.<br>18    Q.    And this is the procedure that was indeed<br>19 done on that Monday, January 13?<br>20    A.    Yes.<br>21    Q.    And then it says, you -- I guess you were<br>22 the surgeon, it indicates at the top; is that right?<br>23    A.    Yes.<br>24    Q.    And then you had an assistant,<br>25 Dr. Shuman?<br>page 82<br>1    A.    Yes. | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 2    Q.    And just generally speaking, what -- and<br>3  in terms that we all can understand, if you don't<br>4  mind, what sort of procedure did you perform on<br>5  Mr. Dedrick that day?<br>6    A.    We performed conventional open-heart<br>7  surgery where we bypassed the blockages in the<br>8  coronary arteries.<br>9    Q.    And how many of the coronary arteries did<br>10  you bypass?<br>11    A.    Four.<br>12    Q.    And which arteries did you bypass?<br>13    A.    The anterior descending, the diagonal<br>14  branch of the anterior descending, the obtuse<br>15  marginal branch of the circumflex, and the posterior<br>16  descending branch of the right.<br>17    Q.    Where are the last two located?<br>18    A.    The obtuse marginal branch of the<br>19  circumflex is on the obtuse margin of the heart on<br>20  the left side of the heart.  And the posterior<br>21  descending is one of the distal branches of the<br>22  right, coronary artery that runs on the inferior<br>23  surface of the heart.<br>24    Q.    And then the left anterior descending<br>25  comes off the front of the heart?<br>page 83<br>1    A.    Uh-huh.<br>2    Q.    Is that true?<br>3    A.    Comes down the front of the heart.<br>4    Q.    And then the diagonal off the left<br>5  anterior descending is just a branch really off the<br>6  primary artery or the main artery which is the left<br>7  anterior descending?<br>8    A.    That's right.<br><br><br>[83:16] - [90:2] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 83<br>16    Q.    Let me phrase it a different way.  Given<br>17  the three-vessel coronary artery disease that was<br>18  found -- and I guess that you actually saw in<br>19  Mr. Dedrick -- did you actually see his diseased<br>20  arteries?<br>21    A.    Sometimes you see the lesions, and<br>22  sometimes -- I saw the arteries, yes.<br>23    Q.    When you see arteries like Mr. Dedrick's,<br>24  do you -- do you realize that they're -- if you leave<br>25  them alone that there's a certain risk involved in<br>page 84<br>1  terms of his prognosis? | |

**Dedrick v. Merck Co., Inc.**
**Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 2    A.    Yes.<br>3    Q.    And in fact, if he never had this heart<br>4  attack and he just had the coronary artery disease<br>5  that we've been talking about in January of '03, what<br>6  would have been his risks associated with that multi-<br>7  vessel disease?<br>8    A.    His risk would have been -- had he not<br>9  had the heart attack but just evaluating his coronary<br>10  disease?<br>11    Q.    Yes, sir.<br>12    A.    It would have been high for -- high risk<br>13  for a heart attack.<br>14    Q.    And would it also be a significant risk<br>15  for death as a result of a heart attack?<br>16    A.    Well, he had this 95 percent lesion in<br>17  his right.  So that's a critical lesion in a big<br>18  artery.  Yes, I'd say so.<br>19    Q.    Would you have recommended the same<br>20  bypass surgery had you known the extent of his multi-<br>21  vessel disease and he had not had a heart attack?<br>22    A.    Yes.<br>23    Q.    So he needed this procedure no matter<br>24  what?<br>25    A.    Yes.<br>page 85<br>1    Q.    And it was important that he have this<br>2  procedure?<br>3    A.    Yes.<br>4    Q.    And it was a good thing that he had this<br>5  procedure?<br>6    A.    Yes.<br>7    Q.    Because it opened up his arteries?<br>8    A.    It didn't open up the arteries.  It<br>9  restored blood flow distal to the blockages.<br>10    Q.    So it -- this surgery -- is it a<br>11  quadruple bypass that you performed?<br>12    A.    Yes.<br>13    Q.    The quadruple bypass restored blood flow<br>14  and allowed Mr. Dedrick to decrease the risk of<br>15  myocardial infarctions in the future?<br>16    A.    Yes.<br>17    Q.    And that would have been the case prior<br>18  to his MI?<br>19    A.    Yes.<br>20    Q.    And it is the case after his MI?<br>21    A.    Yes.<br>22    Q.    And you mentioned that it was<br>23  particularly important for patients like Mr. Dedrick<br>24  to not smoke?<br>25    A.    Yes.<br>page 86<br>1    Q.    And to control their diabetes? | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 2   A.   Yes.<br>3   Q.   Because these patients who have this sort<br>4 of procedure are at particular risk when it comes to<br>5 further complications if they don't watch those<br>6 things carefully?<br>7   A.   Yes.<br>8   Q.   And were there any complications at all<br>9 in connection with Mr. Dedrick's quadruple bypass<br>10 surgery?  According to the third page, you made a<br>11 notation under paragraph eleven.<br>12   A.   No complications.<br>13   Q.   So that was a very good sign for<br>14 Mr. Dedrick as of January 13?<br>15   A.   Yes.<br>16   Q.   That is that y'all were able to get him<br>17 to the hospital -- and when I say y'all, I mean, the<br>18 doctors involved -- and give him thrombolytic<br>19 therapy, true?<br>20   A.   Yes.<br>21   Q.   And then to confirm that indeed after<br>22 giving him thrombolytic therapy, he had restored<br>23 blood flow while he was in the hospital?<br>24   A.   Yes.<br>25   Q.   And his chest pain was completely<br>page 87<br>1 resolved, right?<br>2   A.   That's right.<br>3   Q.   And then to be able to assess Mr. Dedrick<br>4 to determine what was going on with him physically,<br>5 right?<br>6   A.   Yes.<br>7   Q.   Including a cardiac catheterization in<br>8 determining for the first time in Mr. Dedrick's life<br>9 that he had -- determining it for the first time that<br>10 he indeed had this coronary artery disease that was<br>11 likely to have occurred over a number of years?<br>12   A.   Yes.<br>13   Q.   And to be able to plan out a course of<br>14 action to treat that coronary artery disease?<br>15   A.   Yes.<br>16   Q.   And to actually do the surgery that would<br>17 restore blood flow so this coronary artery disease<br>18 that had been a problem for Mr. Dedrick hopefully<br>19 would not be a significant problem for him in the<br>20 future?<br>21   A.   Yes.<br>22   Q.   And these procedures that you performed<br>23 and the other doctors performed, fortunately for<br>24 Mr. Dedrick, went very, very well?<br>25   A.   Without complication.<br>page 88<br>1   Q.   And that's exactly what you had hoped for | |

**Dedrick v. Merck Co., Inc.**
**Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 2 Mr. Dedrick?<br>3    A.    Yes.<br>4    Q.    What is the normal course of follow-up in<br>5 connection with patients like Mr. Dedrick after<br>6 quadruple bypass surgery?<br>7    A.    Well, for me, the normal follow-up is, I<br>8 see them about four weeks after they go home.  And if<br>9 they're doing well at that point in time, I won't see<br>10 them again.<br>11        If they need to be followed up again,<br>12 I'll see them in another month, monthly intervals<br>13 until they're -- until they're okay.<br>14    Q.    And that was Exhibit 6?<br>15    A.    Yes.<br>16    Q.    So they would normally come to you around<br>17 three weeks later?<br>18    A.    Four weeks --<br>19    Q.    Four weeks?<br>20    A.    -- after they go home, yeah.<br>21        (Defendant's Exhibit Number 7 was<br>22        marked for identification.)<br>23    Q.    Okay.  And I'm going to hand you what's<br>24 been marked as Exhibit Number 7.  And if you could,<br>25 tell us what that is.<br>page 89<br>1    A.    This is a letter that is sent to<br>2 referring physicians when we discharge one of our<br>3 patients.<br>4    Q.    Okay.  So he had been discharged by the<br>5 time --<br>6    A.    Actually, pardon me.  This is a letter<br>7 that is -- that Mark Tedder wrote to John McPherson<br>8 after Mark Tedder saw Mr. Dedrick in follow-up in the<br>9 office.<br>10    Q.    So that would have been after he had been<br>11 discharged; is that right?<br>12    A.    Yes.<br>13    Q.    I want to refer you back to your<br>14 discharge summary.  And did you sign your discharge<br>15 summary?<br>16    A.    Yes.<br>17    Q.    Okay.  I just want to make sure that<br>18 that's your signature.  I know -- my dad is a<br>19 doctor.  So I kind of know y'all don't have the best<br>20 writing.<br>21        But regardless, you recognize that as<br>22 your signature, true?<br>23    A.    Yes.<br>24    Q.    And are those the sorts of documents you<br>25 prepare or dictate when one of your patients is<br>page 90<br>1 discharged from the hospital? | |

Dedrick v. Merck Co., Inc.
**Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 2    A.    Yes.<br><br>[90:20] - [91:15] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 90<br>20  I do, it says towards the bottom, His operation went<br>21  well and his postoperative course has been<br>22  uneventful.  Do you see that?<br>23    A.    Yes.<br>24    Q.    That's what we've been talking about, his<br>25  course in the hospital and during the operation and<br>page 91<br>1  thereafter was very, very good?<br>2    A.    Yes.<br>3    Q.    And then it says, He has remained in<br>4  sinus rhythm.  Do you see that?<br>5    A.    Yes.<br>6    Q.    What does that mean?<br>7    A.    That he doesn't have any arrhythmias<br>8  after surgery.<br>9    Q.    And that's a good sign?<br>10    A.    Fifteen percent of people have<br>11  arrhythmias -- eighteen percent.  And he didn't fall<br>12  into that group.<br>13    Q.    And so that was a risk for Mr. Dedrick<br>14  that didn't happen?<br>15    A.    That's right.<br><br><br>[91:18] - [93:15] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 91<br>18    Q.    And that's a good thing?<br>19    A.    Yes.<br>20    Q.    And there are other risks associated with<br>21  patients who have acute events such as this?<br>22    A.    Yes. | |
| 23    Q.    Such as -- I think I've heard something<br>24  about congestive heart failure?<br>25    A.    Right. | Pl's Obj.:  R.401, R. 402.<br>Irrelevant to issues in case. |
| page 92<br>1    Q.    But that didn't happen with Mr. Dedrick<br>2  either?<br>3    A.    That's true.<br>4    Q.    And that was really good?<br>5    A.    Yes.<br>6    Q.    And then it says, he was tolerating a<br>7  regular diet at this point and participating in the | |

**Dedrick v. Merck Co., Inc.**
**Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 8 rehabilitation program.  Do you see that?<br>9    A.    Yes.<br>10    Q.    And that's important, is it not?<br>11    A.    Yes.<br>12    Q.    And why is that?<br>13    A.    Well, it means that he's regained his<br>14 appetite to the point he can eat a regular diet and<br>15 that he's participating in the cardiac -- that's the<br>16 cardiac rehabilitation program which is a monitored<br>17 exercise program that we start patients on during the<br>18 postoperative period that includes walking and --<br>19 sometimes on a treadmill and sometimes in the hall.<br>20    Q.    So as of January 17 of 2003 -- and that's<br>21 the date he was discharged, right?<br>22    A.    Yes.<br>23    Q.    Mr. Dedrick had gone through all of these<br>24 procedures that we've talked about, and they had all<br>25 gone well, and now he was on rehabilitation?<br>page 93<br>1    A.    Yes.<br>2    Q.    And if he followed this course, followed<br>3 your recommendations about his risk factors and<br>4 otherwise, you had high hopes for Mr. Dedrick?<br>5    A.    Sure.<br>6    Q.    And -- but if he didn't follow your<br>7 advice and didn't take care of himself, he would be<br>8 putting himself at significant risk?<br>9    A.    Yes. | |
| 10    Q.    Let me ask you this.  At the time -- at<br>11 his January 17, of 2003, was it your opinion that his<br>12 traditional risk factors we've talked about, his<br>13 diabetes, hypertension, high cholesterol, family<br>14 history and the others, were the cause of his<br>15 coronary artery disease? | **Pl.'s obj.:** R. 611 - leading.<br>Speculative.  Improper |

[93:17] - [94:9] 10/24/2006 Coltharp, William 9-13-2006

* Defendant's Affirmative Depo Designations

| | |
|---|---|
| 17    A.    Yes, I think they, added together,<br>18 produced his coronary artery disease. | **Pl.'s obj.:** R. 611 - leading.<br>Speculative.  Improper |
| 19    Q.    And at the time, was it also your opinion<br>20 that those risk factors were the cause of his heart<br>21 attack?<br>22    A.    Yes.  Having caused the atherosclerosis,<br>23 yes.<br>24    Q.    Okay.  And I see here his discharge<br>25 medications included Vioxx.  Do you see that?<br>page 94<br>1    A.    Yes.<br>2    Q.    So he was still on Vioxx at discharge? | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 3    A.    Yes. | |
| 4    Q.    And so as far as you knew, none of the<br>5  doctors had indicated or suggested that Vioxx was<br>6  related in any way to his coronary artery disease or<br>7  heart attack?<br>8    A.    That's right.<br>9    Q.    And you didn't believe that at the time?<br><br><br>[94:11] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 94 | Pl.'s Obj.:  R. 611 - leading. |
| 11   A.    Right. | Pl.'s Obj.:  R. 611 - leading. |
| [95:3] - [95:13] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 95<br>3    Q.    Doctor, we were talking about this<br>4  Dr. Tedder letter, I think.  And I refocused on<br>5  another issue, but I wanted to go back to it.  And I<br>6  guess this was the follow-up that you asked<br>7  Mr. Dedrick to come in for; is that right?<br>8    A.    Yes.<br>9    Q.    Is Dr. Tedder a partner of yours?<br>10   A.    Yes.<br>11   Q.    Is he a cardiovascular surgeon like<br>12  yourself?<br>13   A.    Yes.<br><br><br>[96:3] - [97:13] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 96<br>3    Q.    And what's your sense of what happened at<br>4  this follow-up visit given what's written in February<br>5  of 2003 by Dr. Tedder?<br>6    A.    Well, it's a good report.  He's walking<br>7  two miles a day.  He's not having any significant<br>8  problems healing, his incisions.  His glucose is<br>9  under reasonable control.<br>10        Dr. Tedder didn't give him a return<br>11  appointment.  So I'd say that's a -- his short-term<br>12  result was good.<br>13   Q.    So this is another indication that<br>14  postoperatively and now after discharge, Mr. Dedrick | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 15  is doing very well? | |
| 16    A.    Yes. | |
| 17    Q.    And is doing physically -- and I guess | |
| 18  emotionally as well, as well as -- as well as what | |
| 19  you would have hoped for? | |
| 20    A.    Yes. | |
| 21    Q.    And then it says Mr. Dedrick is walking | |
| 22  at least two miles per day? | |
| 23    A.    Yes. | |
| 24    Q.    That's significant, is it not? | |
| 25    A.    That's good.  That's gratifying for a | |
| page 97 | |
| 1  surgeon. | |
| 2    Q.    That means you did a good job in your | |
| 3  bypass surgery, and I guess the other doctors did a | |
| 4  good job in helping you get that result? | |
| 5    A.    Yes. | |
| 6    Q.    And that would be a good thing for | |
| 7  Mr. Dedrick to continue to do? | |
| 8    A.    Yes. | |
| 9    Q.    And, obviously, it would be a good thing | |
| 10  for him to control his diet as well? | |
| 11    A.    Yes. | |
| 12    Q.    And to stop smoking? | |
| 13    A.    That's right. | |
| | |
| | |
| [97:24] - [98:2] 10/24/2006 Coltharp, William 9-13-2006 | |
| | |
| * Defendant's Affirmative Depo Designations | |
| | |
| page 97 | |
| 24        Today, as you see the chart and as you | **Pl.'s Obj.:** R. 611 - leading. |
| 25  now recall Mr. Dedrick, is it fair to say that his | Speculative. |
| page 98 | |
| 1  traditional risk factors are sufficient to fully | |
| 2  explain his coronary artery disease? | |
| | |
| | |
| [98:4] - [98:7] 10/24/2006 Coltharp, William 9-13-2006 | |
| | |
| * Defendant's Affirmative Depo Designations | |
| | |
| page 98 | |
| 4    A.    Yes. | **Pl.'s Obj.:** R. 611 - leading. |
| 5    Q.    And are his traditional risk factors, the | Speculative. |
| 6  ones that we've described, sufficient to fully | |
| 7  explain and account for his heart attack? | |
| | |
| | |
| [98:9] - [98:11] 10/24/2006 Coltharp, William 9-13-2006 | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| * Defendant's Affirmative Depo Designations<br><br>page 98<br>9   A.    Yes.<br>10   Q.    You saw no reason at the time to do any<br>11 further investigation in that regard?<br><br><br>[98:13] - [98:20] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 98 | **Pl.'s Obj.:** R. 611 - leading.<br>Speculative. |
| 13   A.    That's right.<br>14          MR. KRUMHOLZ:  Pass the witness.<br>15          EXAMINATION<br>16 BY MR. BIRCHFIELD:<br>17   Q.    Dr. Coltharp, I'm Andy Birchfield, and I<br>18 represent Tony Dedrick.  And we have not met before<br>19 today; is that correct?<br>20   A.    That's right.<br><br><br>[100:13] - [100:18] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 100<br>13   Q.    Did Mr. Dedrick suffer a myocardial<br>14 infarction?<br>15   A.    Yes.  I -- yes.  I don't have the enzyme<br>16 data in front of me, but I believe that he did suffer<br>17 a myocardial infarction that was partially and mostly<br>18 avoided -- aborted with the thrombolytic therapy.<br><br><br>[136:10] - [136:12] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 136<br>10   Q.    And did you -- while you were holding the<br>11 heart in your hand, did you see the abnormal wall<br>12 motion, any abnormal wall motion?<br><br><br>[136:14] - [137:3] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 136<br>14   A.    I don't know if -- I don't -- I don't | **Pl.'s Obj.:** R. 611 - leading.<br>Speculative. |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 15 know based on this report.  I don't think I dictated<br>16 that I could see any.<br>17    Q.    Any observations or findings of<br>18 significance about the posterior wall?<br>19    A.    No.  I don't -- I don't believe there<br>20 are.<br>21    Q.    Of the lateral wall?  And what about your<br>22 observation; what you could see about ventricular<br>23 function?<br>24    A.    I just want to make sure I don't miss<br>25 anything.  I didn't comment on -- let's see.  I<br>page 137<br>1 didn't comment on wall motion abnormalities that I<br>2 can find right now.  And therefore, I would conclude<br>3 that there were no severe wall motion abnormalities.<br><br><br>[145:11] - [145:15] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 145<br>11    Q.    And in doing the bypass surgery and<br>12 actually looking at and holding Tony Dedrick's heart,<br>13 was there anything that you observed that's<br>14 inconsistent with this -- with what you see in the<br>15 echo report?<br><br><br>[145:17] - [146:1] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 145<br>17    A.    I don't -- I can't say for sure because I<br>18 can't recall precisely the operation.  But since I<br>19 did not make any note of wall motion abnormalities, I<br>20 would say that he may have -- that the echo may have<br>21 overread his ejection -- his ventricular<br>22 dysfunction.<br>23        You know, I would -- to say that another<br>24 way, if I were operating on somebody with an ejection<br>25 fraction of 35 to 40 percent, I would expect to see<br>page 146<br>1 some wall motion abnormality and make a record of it.<br><br><br>[147:9] - [147:13] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 147 | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
| --- | --- |
| 9    Q.    Is a difference in ejection fraction<br>10  measurement of 35 to 40 percent versus an ejection<br>11  fraction reading of 55 to 60 percent within a day of<br>12  one another, is that -- is that unusual, or what<br>13  would account for that?<br><br><br>[147:15] - [148:15] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 147<br>15    A.    I think there are a couple of things.<br>16  One is, these are different methods of arriving at<br>17  the ejection fraction.  And hardly ever will they<br>18  exactly agree.<br>19          The ejection fraction in this cath report<br>20  is calculated, I think, and McPherson or Koenig can<br>21  tell you for sure.  But it's calculated by their<br>22  program that takes all of these movies of the<br>23  angiograms.<br>24          It's a computer program that calculates<br>25  the ejection fraction.  And the ejection fraction on<br>page 148<br>1  the echocardiogram is usually -- it may be calculated<br>2  from a computer program as well.<br>3          Usually, the echocardiogram doctors will<br>4  give an estimate if it's not calculated.  So it's<br>5  a --<br>6          Number one, there's a difference in<br>7  method -- methodology of arriving at an ejection<br>8  fraction.<br>9          Number two, just for accuracy, I did --<br>10  even though I made reference to his echocardiogram<br>11  findings, I also made reference to normal left<br>12  ventricular function in the discharge diagnoses.<br>13          So there was, you know -- I would say<br>14  that there are -- the difference in methodology<br>15  probably is the reason for the difference in numbers.<br><br><br>[151:4] - [151:16] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 151<br>4    Q.    If you'll take a look again at Exhibit 7<br>5  to your deposition, it's the letter that Mark Tedder,<br>6  your partner, wrote to John McPherson.  You may not<br>7  even need it -- where it notes that Mr. Dedrick is<br>8  walking at least two miles a day.  What's the<br>9  significance of that? | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 10    A.    Well, again, that's a good sign.  You<br>11 know, recovery from heart surgery is not the type<br>12 recovery where you should feel a little better every<br>13 day and be a little stronger every day and be able to<br>14 walk a little farther every day.  Some people are<br>15 lucky and get back to a real functional level pretty<br>16 quickly, and he's one of those guys.<br><br><br>[191:9] - [193:6] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 191<br>9    Q.    Okay.  You talked a little bit earlier<br>10 about hypokinesis.  And we talked about hypokinesis<br>11 is just some lack of wall motion when we see it<br>12 referenced in the record?<br>13    A.    Right.<br>14    Q.    And it was noted in the cath report?<br>15    A.    Right.<br>16    Q.    And then it was noted in an echo report<br>17 of some sort.  Do you recall that?<br>18    A.    Yes.<br>19    Q.    And then in the echo that was done on the<br>20 9th, just, I guess, a day before the cath report, the<br>21 ejection fraction was lower than what it was on the<br>22 cath report, right?<br>23    A.    Yes.<br>24    Q.    All right.  And you talked about<br>25 technical limitations of the echo report.  Do you<br>page 192<br>1 recall that?<br>2    A.    Right.<br>3    Q.    But you actually saw the cath report,<br>4 right -- I mean, the cath film, right?<br>5    A.    Yes.<br>6    Q.    Now, that's something you routinely do?<br>7    A.    Yes.<br>8    Q.    And if you disagreed in any way with the<br>9 55 to 60 percent ejection fraction number, you would<br>10 have noted that?<br>11    A.    If -- if there was a disagreement that<br>12 was significant.  You know, if I thought it was 48 or<br>13 50, I might not have noted it.  But if I thought it<br>14 was 25, I would have noted it.<br>15    Q.    But regardless, you read it, and you<br>16 didn't note anywhere that it was anything other than<br>17 55 to 60 percent?<br>18    A.    Right.<br>19    Q.    And, I mean, from the cath forward is<br>20 what I'm saying? | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 21   A.    Right.<br>22   Q.    And, of course, you then prepared a<br>23 discharge summary and signed it at the time?<br>24   A.    Yes.<br>25   Q.    At or around the time?<br>page 193<br>1   A.    Yes. | |
| 2   Q.    And in that regard, after holding the<br>3 heart in your hand and not seeing any notable wall<br>4 motion abnormality in the left ventricle, you put<br>5 normal left ventricle function as a discharge<br>6 diagnosis in your discharge summary?<br><br><br>[193:8] - [193:11] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 193 | Pl's obj.:  R. 611-leading. |
| 8   A.    Right.<br>9   Q.    Did you put normal left ventricular<br>10 function in your discharge summary?<br>11   A.    Yes.<br><br><br>[193:13] - [195:16] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 193<br>13   Q.    Was that based on having -- in addition<br>14 to having seen the cath film also actually seeing the<br>15 heart while you were performing your surgery?<br>16   A.    More on actually seeing the heart.<br>17   Q.    And -- and just to be clear, you<br>18 routinely note if you see any wall function<br>19 abnormality at all in your surgery report?<br>20   A.    Right, in the operative report.<br>21   Q.    And there is no mention of that -- any<br>22 sort of abnormality in your report in connection with<br>23 Mr. Dedrick's bypass surgery?<br>24   A.    That's right.  I looked for it earlier<br>25 and didn't see it.<br>page 194<br>1   Q.    Now, we talked a little bit about the<br>2 procedure and the way -- I think we'll say that it's<br>3 a very impressive procedure that is performed and was<br>4 performed after hearing all about it.<br>5       But regardless, this is obviously an<br>6 invasive procedure?<br>7   A.    Yes.<br>8   Q.    And it requires that the patient undergo | Pl's obj.:  R. 611-leading. |

Dedrick v. Merck Co., Inc.
Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 9  some invasive -- an invasive surgery? | |
| 10    A.    Yes. | |
| 11    Q.    But regardless, four days after this | |
| 12  procedure was performed, this man was discharged; is | |
| 13  that right? | |
| 14    A.    Yes. | |
| 15    Q.    And would you have done that if you felt | |
| 16  like his pain was not properly managed? | |
| 17    A.    No. | |
| 18    Q.    Would you have done that if you had any | |
| 19  concerns whatsoever about him functioning normally in | |
| 20  his daily routine? | |
| 21    A.    No, given the instructions to call me if | |
| 22  he does have any problems. | |
| 23    Q.    And you didn't receive any calls to your | |
| 24  knowledge? | |
| 25    A.    Right. | |
| page 195 | |
| 1    Q.    And your record does not reflect that he | |
| 2  called you with any complaints or concerns? | |
| 3    A.    That's right. | |
| 4    Q.    And in fact, four weeks later he showed | |
| 5  up at your office, true? | |
| 6    A.    Yes. | |
| 7    Q.    And he was already walking two miles per | |
| 8  day? | |
| 9    A.    Right. | |
| 10    Q.    And so -- and do you give him pain | |
| 11  medications to help him through any pain that the | |
| 12  procedure causes? | |
| 13    A.    Customarily. | |
| 14    Q.    And would he have needed this procedure | |
| 15  regardless of if he had a heart attack? | |
| 16    A.    Yes. | |
| | |
| [197:13] - [198:2] 10/24/2006 Coltharp, William 9-13-2006 | |
| | |
| * Defendant's Affirmative Depo Designations | |
| | |
| page 197 | |
| 13    Q.    We talked about cholesterol, and you were | |
| 14  shown a series of laboratory results regarding | |
| 15  cholesterol readings in the hospital.  Do you recall | |
| 16  that? | |
| 17    A.    Uh-huh. | |
| 18    Q.    And to be fair, you don't know what | |
| 19  Mr. Dedrick's cholesterol history was; is that right? | |
| 20    A.    That's right. | |
| 21    Q.    Before the heart attack or after for that | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 22 matter?<br>23    A.    That's right. | |
| 24    Q.    But if his triglycerides were read in<br>25  2001 as being at 536 and his HDL read at 25, those<br>page 198<br>1  are the kinds of numbers that would concern you for<br>2  the purposes of cholesterol build-up? | **Pl.'s Obj.:**  Assumes facts not in evidence.  Improper hypothetical. |
| [198:4] - [198:9] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 198<br>4    A.    Yes. | |
| 5    Q.    All right.  And if his -- and in 2002, if<br>6  his cholesterol readings were 282 for triglycerides<br>7  and 26 for HDL, again that would be concerning for<br>8  the purposes of plaque build-up and risk of heart<br>9  attack? | **Pl.'s Obj.:**  Assumes facts not in evidence.  Improper hypothetical. |
| [198:11] - [198:15] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 198<br>11    A.    Yes. | |
| 12    Q.    Would it be concerning to you as a<br>13  cardiologist -- as a cardiovascular surgeon if you<br>14  had readings of triglycerides of 536 and 282 in 2001<br>15  and 2002 for Mr. Dedrick? | **Pl.'s Obj.:**  Assumes facts not in evidence.  Improper hypothetical. |
| [198:17] - [199:12] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 198<br>17    A.    Yes. | |
| 18    Q.    Would you also be concerned if his HDL<br>19  calculations or measurements were 25 and 26 during<br>20  that same time frame?<br>21    A.    Yes. | **Pl.'s Obj.:**  Assumes facts not in evidence.  Improper hypothetical. |
| 22    Q.    And then you would defer, I guess, to<br>23  physicians who read all of these -- this lab data to<br>24  determine whether or not that was an issue for<br>25  Mr. Dedrick?<br>page 199<br>1    A.    I would -- I would defer to his<br>2  cardiologist and primary care physician since that's<br>3  the most important physician relationship he has. | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
## Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 4   Q.    And then in connection with -- is it A1C?<br>5   A.    Hemoglobin A1C.<br>6   Q.    You talked about his ability to tolerate<br>7  glucose.  And I won't go through all of them. | |
| 8       But if in 1999 he was diagnosed as having<br>9  high glucose continuing in 2000 and in 2001 and in --<br>10  actually all the way up until July 8 of 2002, so not<br>11  long before his heart attack, would those types of<br>12  things concern you in connection with his diabetes? | Pl.'s Obj.:  Assumes facts<br>not in evidence.  Improper<br>hypothetical. |
| [199:14] - [200:1] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 199<br>14   A.    Yes, it would concern me.<br>15   Q.    And are those types of numbers the types<br>16  of numbers or measurements that would concern you in<br>17  terms of atherosclerosis build-up and risk of heart<br>18  attack and heart disease?<br>19   A.    Yes.<br>20   Q.    And so family history, we talked a little<br>21  bit about that and whether it's genetic or not.<br>22   A.    Yeah. | |
| 23   Q.    Is it true that if -- let's say someone<br>24  has -- a patient has one family member with premature<br>25  heart disease or heart attack, is that less<br>page 200<br>1  significant than someone who has multiple? | Pl.'s Obj.:  Assumes facts<br>not in evidence.  Improper<br>hypothetical. |
| [200:3] - [200:20] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 200<br>3   A.    I don't know.  Intuitively, it's a<br>4  stronger risk factor if it's multiple, but I can't --<br>5  I don't -- can't base that on data. | |
| 6   Q.    Let me ask you this.  If a patient<br>7  reported to you that a grandmother on the maternal<br>8  side died of a myocardial infarction and that the<br>9  mother died of heart-related issues prematurely and<br>10  that two brothers have hypertension and one had a<br>11  heart attack before age 47 and the mother was<br>12  diabetic and the brother was borderline diabetic and<br>13  the mother has three half brothers who died of<br>14  myocardial infarctions, and if the plaintiff has<br>15  testified that his brother after the heart attack<br>16  needed a stent placed to resolve his coronary artery<br>17  disease, and his father died of heart disease, | Pl.'s Obj.:  Assumes facts<br>not in evidence.  Improper hypothetical |

Dedrick v. Merck Co., Inc.

**Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections**

**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 18  according to his medical records, is that the kind of<br>19  history that would indicate to you a significant<br>20  family risk factor?<br><br><br>[200:23] - [201:2] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 200 | |
| 23   A.   I would say that's positive family<br>24  history. | Pl.'s Obj.:  Same as above. |
| 25   Q.   And would put him at greater risk?<br>page 201<br>1   A.   Put him at an increased risk for coronary<br>2  artery disease.<br><br><br>[204:3] - [204:11] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 204<br>3   Q.   Counsel mentioned in your discharge<br>4  summary that the only ejection fraction number was<br>5  from the echo.  Do you recall that?<br>6   A.   Yes. | |
| 7   Q.   But the reality is that you concluded,<br>8  based upon the ejection fraction in the cardiac<br>9  catheterization and together with what you saw when<br>10  you opened this man's chest up, that he had normal LV<br>11  function? | Pl's obj.:  R. 611. |
| [204:13] - [204:17] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 204<br>13   A.   That's right. | |
| 14   Q.   And that's the only reason really you<br>15  look at the ejection fraction?  That's the import of<br>16  the ejection fraction is to determine if it's --<br>17  there's normal function? | Pl.'s Obj.:  R. 611 - Leading. |
| [204:19] - [205:12] 10/24/2006 Coltharp, William 9-13-2006<br><br>* Defendant's Affirmative Depo Designations<br><br>page 204<br>19   A.   When there is a -- it's my practice to -- | |

## Dedrick v. Merck Co., Inc.
## Dr. William Coltharp -- Defendant's Affirmatives with Plaintiff's Objections
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 20  when I find something in the operating room that<br>21  doesn't necessarily mesh with the objective results,<br>22  I try to make it a practice to point that out in<br>23  documents such as a discharge summary, so that if<br>24  Mr. Dedrick comes back in, they'll realize that he<br>25  had a good ventricle rather than a 35 percent<br>page 205<br>1  ventricle.<br>2      Q.     So it was important for you to document<br>3  that he had normal left ventricular function?<br>4      A.     Yes.<br>5      Q.     Based upon what you saw when you held the<br>6  heart --<br>7      A.     Right.<br>8      Q.     -- in your hand?<br>9      A.     Right.<br>10     Q.     And when you saw Mr. Dedrick's heart, was<br>11  it consistent with someone who had diabetes?<br>12     A.     Yes. | |