UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL DOCKET No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L - DIVISION 3 |
| | * | |
| This document relates to | * | JUDGE FALLON |
| CASE NO. 2:05CV2524 | * | |
| | * | |
| ANTHONY WAYNE DEDRICK, | * | MAG. JUDGE KNOWLES |
| an Individual, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |

Motion in Limine No. 13

PLAINTIFF'S MOTION IN LIMINE REGARDING THE APRIL 6, 2005
FDA STAFF MEMORANDUM ADDRESSING ANALYSIS AND
RECOMMENDATIONS FOR AGENCY ACTION

Plaintiff Anthony Dedrick, by and through his undersigned counsel, hereby respectfully moves the Court for an order excluding the admission into evidence of a Food and Drug Administration (FDA) April 6, 2005 Staff Memorandum addressing analysis and recommendations for agency action on NSAIDs and coxibs (hereafter "FDA Staff Memorandum") and all evidence, inference and/or argument that the FDA has concluded anything with regard to NSAIDs and coxibs, including without limitation about their mechanism of action , risk/benefit, or a "class effect" for all NSAIDs.

1

Plaintiff believes that Merck may attempt to infer or introduce evidence and/or argument that the FDA has disapproved of the Fitzgerald Hypothesis for the mechanism of action of Vioxx in causing adverse cardiovascular events; that the risk benefit of Vioxx warranted its marketing; and/or that the class of drugs known as NSAIDs —of which, COX-2 inhibitors such as Vioxx are a subset—<u>all</u> carry an increased risk of cardiovascular injury. To support its claims in previous trials, Merck has referenced a memorandum and contents or alleged contents published on the FDA website on April 6, 2005. A copy of the FDA Staff Memorandum is attached hereto as Exhibit "A".

### I.     FDA Staff Memorandum Represents Mere Recommendations to FDA

The FDA Staff Memorandum is a memorandum authored by two FDA staff physicians -- John Jenkins and Paul Seligman. It does not state in any manner that it represents the views of FDA as an entity. The authors nowhere state that the memorandum represents the official position of the FDA on any issue therein. Indeed, the very subject of the memorandum, as noted on the "subject line" of the heading, states its purpose to provide an "analysis and *recommendations* for Agency action regarding non-steroidal anti-inflammatory drugs and cardiovascular risk". See *FDA Memorandum,* at 1.

Despite this fact, Merck's counsel continually refers to the Staff Memorandum as meaning the FDA itself has concluded whatever information he chooses it to have included. By way of one example only, in Opening Argument in the recent case of *Smith v. Merck*, tried in this Court, Mr. Beck argued as follows:

> THEN THE FDA TOOK THESE RECOMMENDATIONS
> FROM THE ADVISORY COMMITTEE IN APRIL OF 2005,
> AND THEY CAME OUT WITH AN OFFICIAL DECISION
> MEMORANDUM.  THEY LOOKED AT ALL OF THE

> SCIENCE, ALL OF THE CLINICAL TRIALS FOR ALL THE DIFFERENT PAIN RELIEVERS, AND THEY REACHED SOME IMPORTANT CONCLUSIONS. CONCLUSION NUMBER 1 THAT'S IMPORTANT IN THIS CASE IS THAT IMBALANCE THEORY THAT MR. BOUNDAS SHOWED YOU WITH PROSTACYCLIN AND THROMBOXANE AND GETTING THROWN OUT OF WHACK, THE FDA CONCLUDED THAT THAT WAS NOT SCIENTIFICALLY SOUND. THAT WAS NOT THE EXPLANATION. THE FDA ALSO CONCLUDED THAT ALL OF THE PAIN RELIEVERS, WITH THE EXCEPTION OF NAPROXEN, ALL OF THE NSAIDS LIKE IBUPROFEN, CELEBREX, VIOXX, BEXTRA -- I THINK SOMEBODY TOOK BEXTRA -- THAT THEY ALL POSED THE SAME CARDIOVASCULAR RISKS. SO THAT'S NUMBER 2. NUMBER 3 IS THE FDA SAID, BUT THESE ARE RISKS IF YOU USE IT FOR VERY LONG PERIODS OF TIME. AND MOST IMPORTANTLY IN THIS CASE, NUMBER 4, IS THEY CONCLUDED FOR SHORT-TERM USE, NONE OF THESE MEDICINES INCREASED THE CARDIOVASCULAR RISKS, INCLUDING VIOXX. AND, OF COURSE, WE HAD VERY SHORT-TERM USE WITH MR. SMITH.

*Smith v. Merck & Co.,* trial transcript at 202:5-25 (September 11, 2006).

Similar unfounded statements were made throughout the earlier trials since the Staff Memorandum was published. For the reasons set forth below, Plaintiff requests that the Court grant this Motion *in Limine*.

## II.     Original Publications Relied Upon Were Later Retracted Or Called Into Question

The Memorandum's authors do not provide a list of the documents reviewed in preparation of the memorandum. Rather, they state only that they reviewed the "available data." *FDA Memorandum,* at 1. When specific documents are referenced as supportive of the comments therein, they include such information as VIGOR and APPROVe, two Merck clinical trials that were published prior to April 6, 2005, the date of the FDA Staff Memorandum. *Id.* at 5.

3

Presumably, the FDA memo could not have considered relevant information after April 6, 2005, and there has been no clarification or update to the FDA memo. The significance is that, although a few specific studies such as VIGOR and APPROVe were referenced, both VIGOR and APPROVe were the subject of the later published Expression of Concern (VIGOR) and correction of statistical errors (APPROVe). *See* Ex. "B" and "C", respectively. Thus, the very stated premise for which the FDA Staff Memorandum cites these studies was called into question or refuted.

For example, the NEJM issued an Expression of Concern relating to the original VIGOR publication that the authors stated "raise concern about certain conclusions in the article." *See* Ex "B" at 1. In particular, the true data concealed by Merck in the original publication did not include three myocardial infarctions that "made certain calculation and conclusions in the article incorrect." *Id*. To bring this point home, the authors concluding remarks state that "taken together, these inaccuracies and deletions call into question the integrity of the data on adverse cardiovascular events in this article." *Id*. at p. 2. This was written and published in the NEJM on December 29, 2005, some 8 months after the FDA Staff Memorandum that relied upon the original inaccurate VIGOR publication.

In addition, the FDA Staff Memorandum authors cited at page 5 of the memorandum, in dealing with rofecoxib, the contrast between the early separation of cardiovascular events in VIGOR compared to the APPROVe data, which allegedly did not separate until 18 months. As reported on July 14, 2006, in the NEJM, Merck used a p-value of 0.01 in its reported version of the study relating to the APPROVe data, when in fact the correct statistical analysis resulted in a p-value of 0.07, which did not meet the criterion of .05 specified for rejecting the assumption made – that the events did not appear until 18 months. *See* Lagakos, Stephen, PhD, NEJM

4

355:2:113-117, 115 (July 13, 2006) (Ex. "D"); *see* also "Adverse Cardiovascular Effects of Rofecoxib," NEJM 355:2: 203-205 (July 13, 2006) (Ex. "E"). This meant that when applied to APPROVe, the confidence band would provide a plausible range of excess risks associated with less than 18 months of rofecoxib use, contrary to the manufacturer's assertions in the original published article. *Id.* at 117 ("one could not conclude from the [APPROVe] data that a shorter course of rofecoxib is safe"). The NEJM itself issued a correction to the statistical errors in the APPROVe study in the same issue, p. 221 (*see* Ex. "C") removing the assertions that the risk only became apparent after 18 months. Thus, a cornerstone of the FDA Staff Memorandum was disproved after the publication of the memorandum and calls into question any use for the FDA Staff recommendations. As the Court may note in the portion of the transcript cited in Section I above, Mr. Beck argues that the memorandum shows the FDA "concluded for short-term use, none of these medicines increased the cardiovascular risk, including Vioxx." Because the very premise cited in the memorandum was Merck's false statement in APPROVe that the risks did not occur until longer than 18-months of use, a fact <u>unknown</u> to the authors of the Staff Memorandum at the time it was written, the memorandum is improperly cited for this assertion.

### III.   No Disagreement with the Fitzgerald Hypothesis

In prior trials, Merck's counsel has inferred that the FDA disagreed with its consultant, Dr. Garrett Fitzgerald, and the Fitzgerald Hypothesis, which sets out the primary mechanism of action for the increased cardiovascular risks associated with Vioxx and the very mechanism allowed by this Court in testimony. However, this FDA Staff Memorandum does not disagree with Dr. Fitzgerald or refute the Fitzgerald Hypothesis. Further, similar to the later true data

made available on VIGOR and APPROVe, in 2006 the premier pharmacological medical reference text known widely in the medical community as the pharmacological bible, Goodman & Gillman, 11th Edition, was published and included the definitive article on the pharmacological mechanism of action for the coxibs, including Vioxx, as the Fitzgerald Hypothesis. *See* Ex. "F." Being published in 2006, it was not considered by the authors of the Staff Memorandum.

As set out in section I above, in Argument in previous trials, Merck's counsel has flatly stated that FDA has concluded the Fitzgerald hypothesis was "not scientifically sound" and "not the explanation" for the imbalance in the vessel that leads to increased cardiovascular events among Vioxx users. That conclusion is not made in the Staff Memorandum, nor is it a "conclusion" of FDA. In addition, the authors of the Staff Memorandum could not have had the benefit of the premier pharmacological text that definitively sets out the mechanism and was not considered by the authors or FDA.

**IV.   No Conclusion on Class Effect**

Moreover, this FDA Staff Memorandum does not state that the FDA has concluded there is a class effect of increased cardiovascular risk for all NSAIDs. Instead, it contains preliminary and conditional opinions and recommendations, offered during a time period when the FDA was (and continues to be) under intense public and government scrutiny and was being widely criticized for failing to be diligent in its evaluations of the safety of Vioxx and the accuracy of its label and promotional materials. Further, it explicitly acknowledges that the FDA lacks data to draw final conclusions regarding the cardiovascular risks of NSAIDs. Rather than wait, however, until more conclusive data is available, the FDA chose to err on the

side of caution and offer preliminary opinions that might be beneficial to public safety. As a result, the "conclusions" lack the scientific certainty and reliability which might be presumed by the jury to attach to information coming from the FDA.

The Court has previously admitted this document into evidence and has allowed testimony about the document. Plaintiff urges the Court to reconsider its position given the substantial weight of the published literature since the FDA memo was written that discredits the few documents actually referenced in the FDA memo as source documents for the staff authors' conclusions. Testimony or argument regarding the April 6th FDA Staff Memorandum should be excluded because it is factually incorrect, is based upon outdated and erroneous information and is irrelevant. If permitted at this trial, it would also be unfairly prejudicial to Plaintiff and confusing to juries. In particular, the fact that two authors who happen to work at the FDA authored the memo has allowed Merck's counsel to infer that this is the official position of FDA when it is not.

The FDA has not scientifically "concluded" anything in this Staff Memorandum. In fact, the bulleted points making recommendations to FDA based upon the authors' review only suggest in each point what FDA "should" consider. See *FDA Memorandum,* at 2. Merck, however, would seek to take the FDA's precautionary statements and use them for argument, inferences, or bolstering the opinions of its own representatives and experts to transform this ongoing litigation from a controversy about Merck's conduct with respect to Vioxx, into a controversy about all NSAIDs. For these reasons – the lack of relevancy, the substantial danger of unfair prejudice, the likelihood of confusion to a jury, and the lack of scientific reliability related to the "conclusions" in the FDA's memorandum, the Honorable Judge Higbee in the *Humeston v. Merck & Co.* case ruled that evidence and/or

7

testimony related to the FDA's memorandum is inadmissible. Judge Higbee followed her previous ruling during the *McDarby/Cona* trial. This Court should do the same.

With respect to a "class effect of NSAIDs," the FDA memorandum states that:

> Long-term placebo-controlled clinical trial data are not available to adequately assess the potential for the non-selective NSAIDs to increase the risk of serious adverse events. . . <u>Pending the availability of additional long-term controlled clinical trial data, the available data are best interpreted as being consistent with a class effect of an increased risk of serious adverse CV events for COX-2 selective and non-selective NSAIDs.</u>

*Id.* at 2 (emphasis added).

This equivocal and qualified observation cannot reasonably be interpreted as meaning that the "FDA has concluded that there is a class effect of increased cardiovascular risks for <u>all</u> NSAIDs." In the section of the memorandum entitled, "Analysis and Conclusions," the reviewers retreat from their earlier summary opinion:

> <u>The absence of long-term controlled clinical trial data for the non-selective NSAIDs significantly limits our ability to assess whether these drugs may also increase the risk of serious adverse CV events. . .</u> The adverse CV risk for the COX-2 selective drugs became apparent only from large, long-term controlled clinical trials and large retrospective cohort studies. Similar clinical trials are needed to assess the potential risks of the non-selective NSAIDs.

*Id.* at 11 (emphasis added).

Oddly, the reviewers then offer a <u>qualified</u> statement "that it is reasonable to conclude that there is a 'class effect' for increased CV risk for all NSAIDs *pending the availability of data from long-term controlled clinical trials that more clearly delineate the true relationships*." *Id.* (emphasis added). This qualification appears to be founded in the authors' acknowledgment that "[f]or the vast majority of non-selective NSAIDs we do not have <u>any data</u> that allow comparisons with COX-2 selective agents for CV risk." *Id.* at 10 (emphasis added).

8

Moreover, with respect to the authors' hypothesis of a class effect, it was noted that "Naproxen may be an exception." *Id.*

The FDA Staff Memorandum demonstrates that as far as these FDA employees are concerned, more data is needed before reaching an unqualified conclusion that there is a "class effect" of increased risk of adverse cardiovascular events. The authors observe significant differences in cardiovascular events among several NSAIDs, including Celebrex, Vioxx, and Naproxen. *Id.* at 4-5, 10. In short, as far as the authors are concerned, they are not concluding that there is a class effect since additional data is needed. Further, there is evidence that the agency felt pressured to provide guidance on the COX-2 controversy, even in the absence of long-term clinical trials addressing the cardiovascular risks of non-selective NSAIDs. As the reviewers noted:

> The inability to reliably estimate the absolute magnitude of the increased risk of serious adverse CV events for individual COX-2 agents, combined with <u>the inability to reliably draw conclusions about the risk of COX-2 agents compared to one another or to other NSAIDs</u>, highlights the conundrum the Agency faces in making decision on appropriate regulatory actions. <u>There is an urgent health need to make appropriate regulatory decisions because the adverse events at issue are serious and a very large number of patients use selective and non-selective NSAIDs . . .</u> Although the currently available data are not definitive, <u>the Agency cannot await more definitive data</u>, which may take years to accumulate from studies that have not even begun, before taking action.

*Id.* at 10 (emphasis added).

Irrespective of the merits of the FDA's opinions,[1] it is apparent that the FDA was under enormous pressure to weigh in on the COX-2 controversy and be transparent in their process.

---

[1] Plaintiffs note that the FDA analysis does not seem to account for several published studies that "ranked" the relative risk for serious adverse cardiovascular events among COX-2 inhibitors and non-selective NSAIDs, including Ray, *Non-steroidal Anti-inflammatory Drugs and Risk of Serious Coronary Heart Disease: an Observational Cohort Study*, The Lancet, Vol. 359, Pg.118-123 (2002) and Juni, *Risk of Cardiovascular Events*

This is made clear in the last sentence of the FDA Staff Memorandum and by the fact that this Staff Memorandum with its recommendations was published on the FDA website. At the time the FDA memorandum was published on its website, the FDA's oversight of the development and marketing of Vioxx was being widely criticized by the medical community and in the media, and was the subject of committee hearings in both the United States House of Representatives and Senate. As demonstrated above, any allegation that the FDA has definitely concluded that there is a class effect of increased cardiovascular risks for all NSAIDs is false. Further, the circumstances under which the FDA rendered such opinions are suspect.

As an example of the misuse of the FDA Staff Memorandum in this regard, Dr. Alise Reicin went even beyond stating it was an FDA conclusion to testify on direct for Merck in *Barnett v. Merck* about what she thought FDA meant:

> Q. LET ME ASK YOU ABOUT THE LAST SENTENCE FIRST: "THE AVAILABLE DATA DO NOT PERMIT A RANK ORDER." HOW DO YOU INTERPRET THAT?
> A: IT MEANS THEY CAN'T TELL -- THEY CAN'T SAY THAT VIOXX IS WORSE THAN CELEBREX OR CELEBREX IS WORSE THAN VIOXX. ALL THEY CAN SAY IS THAT ALL THREE OF THEM HAVE BEEN ASSOCIATED WITH AN INCREASED RISK.

*Barnett v. Merck & Co.*, trial transcript at 2340:1-9 (August 2006).

This is consistent with Mr. Beck's opening for Merck, as set out in Section I above, where he concludes "they all pose the same cardiovascular risk." The only basis cited for this proposition is the FDA Staff Memorandum, which does not conclude that, is not an official

---

*and Rofecoxib: Cumulative Meta-analysis,* The Lancet, Pg. 1-9 (Nov. 5, 2004). This is a core problem with a memorandum that only states that the authors reviewed the "available data". Such statements cannot be examined with any rigor and are subject to the mere *ipse dixit* of the declarant, who makes it so simply upon his or her untestable word.

10

FDA position statement, and was written well before data correcting Merck's omissions and errors that were relied upon in making the recommendations therein.

Accordingly, the inferences and argument based upon this FDA Staff Memorandum are incorrect, misleading and improper.

V.    **The FDA Staff Memorandum is Unreliable and Highly Prejudicial**

All evidence, including expert opinion, is subject to the requirements of Rules 401, 402 and 403 which address relevancy and reliability. Rule 403 provides, "relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

Any suggestion that the FDA has made FDA conclusions about the Coxibs and NSAIDs is not supported by the Memorandum and is misleading and confusing to the jury. As noted above, the FDA has not reached any such conclusion. The "conclusions" reflected in the memorandum are, by the authors' own acknowledgment, based on incomplete data, precautionary speculation, and a list of recommendations for agency action. They are further based upon bad or incomplete data.

The FDA is widely perceived by the public to be an authority on such issues and, thus, the danger of unfair prejudice is magnified. Allowing such evidence or argument will distract future juries from the central questions regarding Vioxx to each case in this multidistrict litigation — did Merck fail to adequately warn physicians and patients about known cardiovascular risks associated with Vioxx? Is Vioxx defective or unreasonably dangerous?

If the FDA's April 6, 2005 Memorandum is admitted into evidence and testimony regarding its contents is allowed, there is a substantial danger that the jury will attach

11

disproportionate significance to this evidence -- even with its dubious reliability or marginal relevance -- and give less weight to the scientific evidence presented by Plaintiff that has qualified for admission into evidence by passing through *Daubert's* gates. Moreover, it gives rise to argument and inferences by counsel that are then never put into evidence, but rather are erroneously stated and pointed to as being contained in a memorandum.

Further, the prejudice to Plaintiff is heightened by the fact that the authors of the FDA memorandum will likely not be testifying at trial. Plaintiff has not had opportunity to verify or ascertain the basis of the authors' conclusions. Moreover, Plaintiff will likely not have opportunity to cross-examine the authors of the FDA memorandum concerning their opinions prior to the upcoming trials. If Defendant is permitted to introduce evidence or argument that the FDA has concluded whatever it wants to say FDA concluded, then Merck, in essence, will have the unfair advantage of bolstering the opinions of its representatives and experts without Plaintiff having the opportunity to cross-examine the authors of the memorandum. Such an outcome is particularly troubling when one further considers the equivocal and confusing nature of the document, and the suspect circumstances under which it was published by the FDA.

Without question, the probative value of this memorandum is substantially outweighed by its prejudicial effect. Its admission at this trial only serves to confuse and mislead the jury and therefore, the memorandum should be excluded under Rule 403.

Plaintiff urges the Court to reverse its position and find that the FDA's April 6, 2005 Staff Memorandum is not admissible in future trials, and exclude all evidence and/or argument thereon.

Date:  October 27, 2006                              Respectfully submitted,

By *P. Leigh O'Dell*
      Andy D. Birchfield, Jr.
      P. Leigh O'Dell
      BEASLEY, ALLEN, CROW,
      METHVIN, PORTIS & MILES, P.C.
      P.O. Box 4160
      234 Commerce Street
      Montgomery, Alabama  36103-4160
      Telephone:  (334) 269-2343
      Facsimile: (334) 954-7555

Counsel for Plaintiff

**Russ M. Herman** (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
 **Plaintiffs' Liaison Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
& WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

**Christopher A. Seeger**, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

## CERTIFICATE OF SERVICE

    I hereby certify that the above and foregoing Plaintiff's Motion in Limine to Exclude Evidence, Testimony or Argument that Vioxx is a Potential Cure for Cancer has been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail or by hand delivery and e-mail, on Merck's Counsel, Douglas R. Marvin and Philip S. Beck, by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 27th day of October, 2006.

                                                            _/s/ P. Leigh O'Dell_
                                                            P. Leigh O'Dell
                                                            Attorney for Plaintiff
                                                            Beasley, Allen, Crow,
                                                            Methvin, Portis & Miles, P.C.