# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL DOCKET No. 1657 |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | SECTION L - DIVISION 3 |
| | * | |
| This document relates to | * | JUDGE FALLON |
| CASE NO. 2:05CV2524 | * | |
| | * | |
| ANTHONY WAYNE DEDRICK, | * | MAG. JUDGE KNOWLES |
| an Individual, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |

## Plaintiff's Objections to Defendant's Designations of Deposition Testimony of Melissa McAllister

Plaintiff, Anthony Wayne Dedrick, by and through his attorneys, hereby submits the following deposition testimony for the Court's consideration and pre-trial rulings:

1. Plaintiff's Objections to Defendant's Affirmative Designations of Deposition Testimony of Melissa McAllister (Ex. "A").

Plaintiff reserves the right to supplement or amend his objections based upon any ruling of the Court or any other court decisions that affect the scope of evidence in this trial, including rulings on its motions *in limine*. Plaintiff makes no counter designations at this time but reserves the right to do so in the future. Plaintiff reserves the right to also counter-designate any testimony designated by Defendant in the event it is not offered by Defendant.

Plaintiff reserves the right to make additional completeness designations upon receipt of any of Merck's final designations or counter-designations.

Respectfully submitted this _21ᵗʰ_ day of October, 2006.

*P. Leigh O'Dell*

**ANDY BIRCHFIELD**
P. LEIGH O'DELL
Attorney for Plaintiff
**_BEASLEY, ALLEN, CROW,_**
**_METHVIN, PORTIS & MILES, P.C._**
234 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103
(334) 269-2343 telephone
(334) 954-7555 facsimile

**Russ M. Herman** (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
**Plaintiffs' Liaison Counsel**

**Christopher A. Seeger**, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
& WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiff's Objections and Counter-Designations to Defendant's Designations of Deposition Testimony of Melissa McAllister has been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail or by hand delivery and e-mail, on Merck's Counsel, Douglas R. Marvin and Philip S. Beck,  by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this  27th  day of October, 2006.

P. Leigh O'Dell
Attorney for Plaintiff
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.

## Dedrick v. Merck Co., Inc.
## Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister
## Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| [160:11] - [162:23] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations<br><br>page 160<br>11   Q.      Good afternoon, Mrs. McAllister.  As<br>12  you know, my name is Paul Hourihan and I<br>13  represent Merck and Company in this action and I<br>14  have some questions that I want to ask you both<br>15  to follow up on questions Mr. Birchfield asked<br>16  you earlier as well as to fill in a little more<br>17  information about your experience regarding<br>18  Vioxx.<br>19            First, can you please tell us a<br>20  little bit about yourself starting with where you<br>21  grew up?<br>22    A.      I was born and raised in Lawton,<br>23  Oklahoma and went to University of Oklahoma, my<br>24  bachelor's arts and letters and went on to school<br>25  of economics for my masters science in European<br>page 161<br>1  studies.  From there, I went to -- for employment<br>2  to WilTel and primarily in the event<br>3  coordination.<br>4   Q.      Okay.  Let me just break that down a<br>5  little.<br>6   A.      Uh-huh (affirmative response).<br>7   Q.      So where did you get your<br>8  undergraduate degree and when?<br>9   A.      University of Oklahoma in 1991.<br>10   Q.      You said you received a graduate<br>11  degree, as well?<br>12   A.      Yes, graduate degree in London School<br>13  of Economics in England and it was in -- a<br>14  masters in European studies.<br>15   Q.      And when was that?<br>16   A.      I received that in 1992. | |
| 17   Q.      And then you said you worked a company<br>18  called WilTel?<br>19   A.      WilTel.<br>20   Q.      And what kind of company was that?<br>21   A.      WilTel was telecommunications.<br>22   Q.      And we're in Memphis, Tennessee today;<br>23  correct?<br>24   A.      Yes, we are.<br>25   Q.      Where do you live now?<br>page 162<br>1   A.      I currently live in Oklahoma City,<br>2  Oklahoma.<br>3   Q.      How old are you, ma'am?<br>4   A.      37. | **Pl's Obj.:**  R. 401, R. 402. |

## Dedrick v. Merck Co., Inc.
## Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister
## Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 5    Q.    And are you married? | |
| 6    A.    Yes, I'm married. | |
| 7    Q.    Do you have children? | |
| 8    A.    I have one child, Claire.  She's 20 | |
| 9 months. | |
| 10    Q.    And you are currently a Merck | |
| 11 employee? | |
| 12    A.    Yes, currently work for Merck. | |
| 13    Q.    Could you tell us what your current | |
| 14 job title is? | |
| 15    A.    I currently am a senior vaccine | |
| 16 representative. | |
| 17    Q.    And what are your responsibilities as | |
| 18 a senior vaccine representative? | |
| 19    A.    Responsibilities are to educate | |
| 20 physicians on Merck vaccines, the disease states | |
| 21 that incorporate those vaccines and I call on | |
| 22 physicians, nurses, county health departments so | |
| 23 theirs public health, as well. | |
| | |
| | |
| [163:11] - [172:15] 10/25/2006 McAllister, Melissa | |
| | |
| * Defendant's Affirmative Depo Designations | |
| | |
| page 163 | |
| 11    Q.    For what vaccine products are you | **Pl's Obj.:**  R. 401, R. 402. |
| 12 currently responsible? | |
| 13    A.    I'm currently responsible for | |
| 14 Gardasil, that's spelled G-A-R-D-A-S-I-L and it's | |
| 15 for -- it's indicated for prevention of cervical | |
| 16 cancer and genital warts in girls and women.  I | |
| 17 also have responsibility for Vaqta, V-A-Q-T-A and | |
| 18 that's for hepatitis A and also Singulair which | |
| 19 is a tablet for allergies, seasonal allergic | |
| 20 rhinitis asthma and then I have secondary | |
| 21 responsibility for several vaccines, measles, | |
| 22 mumps and rubella, chicken pox vaccine, Hep-B, | |
| 23 hepatitis B, so all of the vaccines that Merck. | |
| 24    Q.    And before you became a vaccine | |
| 25 representative, what was your position with | |
| page 164 | |
| 1 Merck? | |
| 2    A.    Before that, I was a senior | |
| 3 professional representative. | |
| 4    Q.    And as a -- well, when did you first | |
| 5 join Merck? | |
| 6    A.    I first joined Merck on, I believe it | |
| 7 was April 19th of 1998. | |
| 8    Q.    And how was it that you came to work | **Pl's Obj.:**  R. 401, R. 402. |
| 9 for Merck? | |
| 10    A.    I had done research on the company and | |
| 11 had always thought it would be an incredible | |

## Dedrick v. Merck Co., Inc.
## Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 12 place for a career and I came to employment<br>13 through a friend of the family that was a<br>14 business manager and submitted my resume and went<br>15 through the interview process. | |
| 16  Q.    What was it that made you want to work<br>17 for Merck?<br>18  A.    Well, Merck has always been known to<br>19 have incredible medications and vaccines, helped<br>20 a lot of people as far as preventing disease and<br>21 treating disease and strong ethical background,<br>22 very fluent type company that I really thought I<br>23 would enjoy working. | Pl.'s Obj.:  Improper character evidence. R. 404(a). |
| 24  Q.    Presently, what geographic area are<br>25 you responsible for as a vaccine representative?<br>page 165<br>1  A.    As vaccine representative, I'm in<br>2 Oklahoma. I have western Oklahoma, southern<br>3 Oklahoma City and I30 divides Oklahoma in half so<br>4 I basically have the western part of the state.<br>5  Q.    At one point, were you a professional<br>6 representative for Merck in the state of<br>7 Tennessee?<br>8  A.    Yes, I was.<br>9  Q.    When was that?<br>10  A.    I started in Jackson, Tennessee March<br>11 of 2001 through June of 2004.<br>12  Q.    And how did you come to work in<br>13 Tennessee?<br>14  A.    My future husband, we gotten engaged<br>15 and he was actually in working in Jackson,<br>16 Tennessee.<br>17  Q.    So you were a professional<br>18 representative for Merck in Oklahoma?<br>19  A.    In Oklahoma.<br>20  Q.    And you came to Tennessee?<br>21  A.    Uh-huh (affirmative response). | |
| 22  Q.    Did you return to Oklahoma after that?<br>23  A.    Yes, I returned to Oklahoma.<br>24  Q.    How did that come about?<br>25  A.    We loved Tennessee, enjoyed it but had<br>page 166<br>1 family here and we really wanted to be back with<br>2 our family. | Pl's Obj.:  R. 401, R. 402. |
| 3  Q.    With Mr. Birchfield earlier today, you<br>4 discussed, to some extent, the training that you<br>5 received when you first joined Merck.  Do you<br>6 remember that?<br>7  A.    Yes.<br>8  Q.    Can you elaborate on what the nature<br>9 of that basic training, I think you referred to<br>10 it as, was?<br>11  A.    Uh-huh (affirmative response).  Basic<br>12 training when I went through was ten weeks long | |

**Dedrick v. Merck Co., Inc.**
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 13  and it was a very intense training because we had<br>14  to learn a great deal about pharmacology, medical<br>15  terms, the disease state of the product that we<br>16  would be representing.  So, you know, the disease<br>17  state, the product label, the class of<br>18  medications, the other medications on the market.<br>19  We also were studying and were tested on policies<br>20  so it incorporated a lot of different aspects.<br>21    Q.      Where did that ten week training take<br>22  place?<br>23    A.      It was in Dallas, Texas.<br>24    Q.      So did you actually stay down in<br>25  Dallas during the training?<br>page 167<br>1    A.      At some points, yeah, I would stay<br>2  down in Dallas and then we had home home study. | |
| 3    Q.      What were you actually doing while you<br>4  were at the training session?  Where were you<br>5  located and what kinds of things were going on?<br>6    A.      I think it was Homewood Suites.  I'm<br>7  not real sure but it was a place like that<br>8  because we were there for long periods of time<br>9  but we would -- I think there was 21 people in my<br>10  class and you would just be -- we were in<br>11  sessions all day long and then we had study<br>12  periods, you know.  We had binders that were<br>13  rather large on the disease state that we were<br>14  studying and we would be tested almost on an<br>15  every other day basis.<br>16    Q.      Let me ask you about the testing.<br>17  What subject areas were you tested on?<br>18    A.      Well, it would correspond with the<br>19  products that I represented.  I had Zocor which<br>20  is a cholesterol medicine so we learned about<br>21  hyperlipidemia, it's a medical term for high<br>22  cholesterol.  I had Cozaar and Hyzaar which is<br>23  hypertension blood pressure medicine, Maxalt<br>24  which is a migraine medicine.  Singulair which,<br>25  at the time, it had asthma indications so those<br>page 168<br>1  were the disease states that I learned about.<br>2    Q.      And were you tested on anything<br>3  besides disease states?<br>4    A.      Well, we were tested on the disease<br>5  state, the prescribing information and, like I<br>6  said, policies, pharmacology information, medical<br>7  terms.<br>8    Q.      And what did you have to get to pass<br>9  the test?<br>10    A.      You had to achieve 90 percent or<br>11  better.<br>12    Q.      And what happens if you didn't achieve<br>13  90 percent? | Pl's Obj.:  R. 401, R. 402.<br>Location of training irrelevant.<br>Neither training or testing related<br>to Vioxx. |

Dedrick v. Merck Co., Inc.
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 14   A.      Well, it was communicated to us that<br>15  if you failed or received below 90 percent for<br>16  three exams, that you could be terminated from<br>17  the program.<br>18   Q.      And other than that initial ten week<br>19  training period, have you received any other<br>20  training from Merck regarding products and<br>21  policies and all the other topics you described?<br>22   A.      Yeah, if new indications came out,<br>23  say, for instance, Singulair, we had allergic<br>24  rhinitis and so we could get disease background<br>25  on that and be tested and certified to talk about<br>page 169<br>1  that.  New indications -- we were continually<br>2  required to take tests and to study and were<br>3  periodically just PI examed, as well.<br>4   Q.      Okay.  You've used the term PI, I<br>5  think, a couple times.  What does that<br>6  abbreviation stand for?<br>7   A.      It stands for product insert so it's<br>8  the product label for a product that's been<br>9  approved by FDA. | |
| 10   Q.      Okay.  So when you use the term PI or<br>11  product insert or product label, that's all<br>12  referring to the same thing?<br>13   A.      Yes, it is.<br>14   Q.      And does prescribing information also<br>15  refer to the same thing?<br>16   A.      Yes, yes.<br>17   Q.      So when we're talking about those<br>18  different terms, be it label or product insert --<br>19  oh, excuse me.  Is product circular another term<br>20  for the same thing?<br>21   A.      Yes, it is.<br>22   Q.      So regardless of whether we're using<br>23  the term PI or prescribing information or product<br>24  insert or product circular or label, those all<br>25  refer to the same --<br>page 170<br>1   A.      Yes.<br>2   Q.      -- thing?<br>3   A.      Same thing.<br>4   Q.      And what is that thing physically?  I<br>5  mean, what does it look like?<br>6   A.      It's a document that has all the<br>7  information that Merck has submitted to FDA and<br>8  FDA has approved as part of what we can discuss<br>9  about that product.  So it includes the<br>10  description, the pharmacology of it, indication,<br>11  contraindication, warning, precautions, adverse<br>12  events, dosage administration.<br>13   Q.      And who receives the copy of the<br>14  product label? | |

**Dedrick v. Merck Co., Inc.**
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 15   A.      Everybody receives a copy of the 16 product label.  Once the product is approved, 17 that's what we use to educate our physicians with 18 and other healthcare professionals. 19   Q.      Well, do physicians have access to 20 that? 21   A.      Yes, they do.  You know, we leave 22 copies of the PI when we are visiting with the 23 physicians.  They have access to it on handheld 24 personal device software I've seen them use. 25 They have old fashioned PDR which is the page 171 1 physician drug reference book, huge book with all 2 prescribing information in it.  Now -- I think 3 for a while on the internet, each drug has its 4 own web-site so there's several resources to 5 obtain the prescribing information. | |
| 6   Q.      The training that you had, both 7 initial basic training as well as the follow up 8 training, have you found it to be challenging or 9 easy? 10   A.      Oh, it's very challenging.  It's very 11 in-depth.  They really cover all the bases. 12   Q.      I think you said that the training 13 also covers policy? 14   A.      Yes, yeah. 15   Q.      What basic policies were you trained 16 on that govern your interactions with physicians? 17   A.      I think the main, you know, concept is 18 that we always provide complete and accurate 19 information about our product and that we always 20 have fair balance within a discussion. | PI's Obj.:  R. 401, R. 402. Self-serving R. 404(a) testimony. |
| 21   Q.      And with respect to the complete and 22 accurate information you described, what is -- 23 what's your source of that information? 24   A.      The prescribing information. 25   Q.      The label? page 172 1   A.      The label, circular, PI, uh-huh 2 (affirmative response). 3   Q.      What's your understanding of who 4 determines what goes into a product label? 5   A.      I'm not part of that process.  I don't 6 know who comes up with that.  Someone at Merck 7 and the FDA and how that happens, I don't know. 8   Q.      What's your understanding of what the 9 FDA's role is with respect to product labels? 10   A.      I think it's very rudimentary as far 11 as what I know what the FDA looks for.  I think 12 they look at all the information. 13   Q.      And then what? 14   A.      They either approve the product or 15 they don't. | |

Dedrick v. Merck Co., Inc.
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| [172:18] - [173:9] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations<br><br>page 172<br>18        In response to several questions<br>19 from Mr. Birchfield earlier today, you said that<br>20 in responding to physicians, you had to deliver<br>21 information on or consistent with the product<br>22 label. Do you remember that?<br>23   A.    Yes, I do.<br>24   Q.    What's your understanding as to why<br>25 you as a sales representative were constrained by<br>page 173<br>1 the information that was -- constrained to the<br>2 information that was on or consistent with the<br>3 label?<br>4   A.    It was, you know, based on the<br>5 policies that Merck has set up that we stay<br>6 within the product label and it has to be in the<br>7 product label or consistent with and that --<br>8 those were the policy that was set forth from day<br>9 one of basic training.<br><br><br>[173:20] - [181:7] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations<br><br>page 173<br>20   Q.    How did -- how did Merck ensure that<br>21 the messages that you were delivering were on or<br>22 consistent with the product label?<br>23   A.    Well, the policy was to send out<br>24 bulletins specific to the products that we had<br>25 responsibility for, and in those bulletins, it<br>page 174<br>1 contained, you know, direction as far as what we<br>2 could discuss with physicians and then, you know,<br>3 to stay within the product circular.<br>4   Q.    Are you familiar with the term<br>5 approved message?<br>6   A.    Yes, I am.<br>7   Q.    And what does that term mean as used<br>8 at Merck?<br>9   A.    Merck would send out bulletins with<br>10 approved messages that would be encompassing<br>11 efficacy, safety, dosing, that type of thing.<br>12   Q.    Okay. In addition to what kinds of<br>13 things were approved messages, what was the<br>14 definition of that term? | |

Dedrick v. Merck Co., Inc.
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 15   A.      Well, an approved message was a<br>16  message that was taken from the product label or<br>17  consistent with the product label.<br>18   Q.      And were you also given certain<br>19  written materials that were approved for your use<br>20  with physicians?<br>21   A.      Yes, we had pieces that were given to<br>22  us from Merck. | |
| 23   Q.      And what's your understanding of the<br>24  FDA's role with respect to whether or not you<br>25  could use certain written materials?<br>page 175<br>1   A.      From my understanding, when Merck<br>2  would come up with a piece for us to use, they<br>3  had to send it to the FDA for approval. | **Pl's Obj.:**  R. 602. Witness<br>lacks personal knowledge.<br>She is speculating as to<br>whether Merck sends all<br>sales pieces to FDA.  Her<br>lack of knowledge is clear as<br>it relates to the CV Card.  The<br>witness testified that the CV<br>Card was approved by the FDA<br>when it was neither submitted<br>or approved by the FDA. |
| 4   Q.      And what, if anything, were you<br>5  trained regarding deviation from the approved<br>6  messages and approved materials?<br>7   A.      Well, that was being -- that would be<br>8  inconsistent with policy and that was -- you<br>9  weren't -- you weren't allowed to do that.<br>10   Q.      What would happen if you did?<br>11   A.      Well, get in trouble, I mean, as far<br>12  as, you know, different disciplinary actions, I<br>13  suppose that they could take including<br>14  termination.<br>15   Q.      Now, you also mentioned a policy of<br>16  providing fair balance?<br>17   A.      That's correct.<br>18   Q.      What does the term fair balance mean?<br>19   A.      Well, fair balance is, you know,<br>20  you've got benefits and limitations to a<br>21  medication and you don't just -- all you talk is<br>22  about all the benefits.  You also talk about the<br>23  limitations of the medication to a doctor.<br>24   Q.      And what are some examples of the<br>25  categories of information that would be part of<br>page 176<br>1  the limitation?<br>2   A.      A limitation would be maybe a type of<br>3  patient that you would need to make sure you<br>4  start with the lowest dose.<br>5   Q.      Let me ask a different question.<br>6  Where would you look on the label to find the<br>7  type of information that constitutes limitations<br>8  of the product?<br>9   A.      Well, it would be -- it can be under<br>10  the contraindications, warnings, precautions,<br>11  adverse events and even dosing.  I mean, that<br>12  would constitute.<br>13   Q.      How often were you supposed to include<br>14  fair balance in your discussions with physicians?<br>15   A.      On every sales call. | |

## Dedrick v. Merck Co., Inc.
## Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister
## Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 16   Q.      Based on your eight and a half years 17 at Merck, how important are these policies 18 staying on or consistent with the label and 19 providing fair balance? 20    A.      Very important.  I mean, that was 21 always instilled from the very beginning of my 22 career with Merck. 23    Q.      And did anybody ever tell you that was 24 okay to violate those policies in certain 25 circumstances? page 177 1   A.   No. 2    Q.      How often are you retrained on those 3 policies of delivering approved messages and 4 providing fair balance? 5    A.      Well, as far as the first part, as far 6 as policies, we are on a quarterly or 7 semester-type basis.  We have to be tested on a 8 group of policies and so that, you know, revolves 9 each year and then as far as fair balance, that's 10 always a continual education, as well. | |
| 11    Q.      What do you mean by that? 12    A.      Just that, you know, we're always 13 making sure that we're always delivering the 14 complete story of the product. | Pl's Obj.:  R. 401, R. 402. Self-serving R. 404(a) testimony. |
| 15    Q.      During your details or your calls on 16 physicians, are there ever situations where a 17 doctor asks a question that you can't answer? 18    A.      Oh, absolutely.  That comes up quite 19 often because they're inquisitive people and they 20 want to know different information, if it's 21 something that's beyond the product label. 22    Q.      Let me interrupt you for a second. 23 First before you get to that, why is it that you 24 can't answer certain questions? 25   A.      Because their questions are referring page 178 1 to something that is not part of the product 2 label. 3    Q.      Why can't you answer those questions? 4    A.      Because they're not part of the 5 product label and those conversations, we can't 6 have because they're not part of the FDA approved 7 product label. 8    Q.      And if a doctor asks you a question 9 that calls for information that's not from or 10 pertaining to the FDA approved product label, 11 what do you do? 12    A.      We ask them -- we tell them, you know, 13 I can't go into that because that's not part of 14 our product label but I can send for professional 15 information request, a PIR, to address the 16 question that he or she would have. | |

### Dedrick v. Merck Co., Inc.
### Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 17   Q.     Okay.  And exactly how does the PIR or 18  professional information request process work? 19   A.     Well, it's an unsolicited request from 20  a physician, so in having a discussion, they 21  bring up a question or subject that's not part of 22  the PI.  I asked if they would like one.  They 23  say yes, so in -- it's a computer based, so when 24  I'm going in to my call information, I can go 25  into a subject of PIR and submit a PIR and it's page 179 1  sent to them in the mail. 2   Q.     And what, if anything, is a 3  representative's responsibility after the PIR is 4  sent to the physician?  Actually, before I ask 5  that, will the rep receive a copy of the PIR 6  that's sent to the physician in response? 7   A.     We are sent an electronic file 8  attachment that's downloaded into our computers 9  and it's a read only text and policy is that we 10  delete them after 60 days. 11   Q.     Back to my earlier question now.  What 12  is the responsibility of the representative once 13  the PIR letter gets sent out to a physician? 14   A.     Really, the only thing that we can do 15  is, you know, did you get that because you want 16  to make sure that they did get because you 17  offered and you say you were going to do that and 18  hopefully that addressed their question. | |
| 19   Q.     And what, if anything, could a 20  physician do if he or she had a question about a 21  product for which he or she wanted an immediate 22  answer? 23        MR. BIRCHFIELD:  Object to form. 24        THE WITNESS:  In some instances, we 25   had to do a faxable PIR or if they wanted an page 180 1   answer right then, I would give them the number 2   for the national call -- service call center 3   which is a big call center that has operators 4   and account type people that can help address 5   questions so depending on what they needed to 6   know, they could route them to the appropriate 7   person because in that case, like the PIR, it's 8   a physician to physician response. | **Pl's Obj.:**  R. 401, R. 402. There is no evidence that Dr. Herrera made any request for immediate information from Merck. |
| 9  BY MR. HOURIHAN: 10   Q.     That was my next question.  Who is it 11  that actually sends the responsive letters when a 12  PIR comes in on behalf of a physician? 13   A.     It would be the Merck medical 14  services. 15   Q.     And are those doctors? 16   A.     Yes. 17   Q.     During the time that Vioxx was on the | |

Dedrick v. Merck Co., Inc.
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 18 market and I think you established with Mr. | |
| 19 Birchfield this morning, that was roughly spring | |
| 20 or May of 1999 through September of 2004. | |
| 21     A.     Uh-huh (affirmative response). | |
| 22     Q.     What was your job title and | |
| 23 responsibilities? | |
| 24     A.     During that time? | |
| 25     Q.     Yes. | |
| page 181 | |
| 1     A.     Well, when I first started in Lawton, | |
| 2 Oklahoma, I was a professional rep, | |
| 3 representative and as far as having | |
| 4 responsibility for Vioxx, it was -- when I was in | |
| 5 Oklahoma, it was a secondary product and then | |
| 6 when I moved to Jackson, Tennessee in March of | |
| 7 2001, it shifted into more of a primary product. | |
| | |
| | |
| [182:11] - [185:23] 10/25/2006 McAllister, Melissa | |
| | |
| * Defendant's Affirmative Depo Designations | |
| | |
| page 182 | |
| 11     Q.     Now, I think you said earlier that | |
| 12 Vioxx was a COX-2 inhibitor? | |
| 13     A.     Yes. | |
| 14     Q.     What is your understanding of what | |
| 15 COX-2 inhibitors are? | |
| 16     A.     COX-2 inhibitors are different from | |
| 17 the traditional NSAIDs that they provided the | |
| 18 pain relief but that they were -- they didn't | |
| 19 have COX-1 which is just that protective quality | |
| 20 for the stomach. | |
| 21     Q.     Let's break that down a little bit | |
| 22 maybe in nonmedical terms. | |
| 23     A.     Okay. | |
| 24     Q.     First off, what general, in layman's | |
| 25 terms, what type of drug is a COX-2 inhibitor | |
| page 183 | |
| 1 like Vioxx? | |
| 2     A.     Well, the class -- it's a pain | |
| 3 reliever and it's a different class than what had | |
| 4 been out before. | |
| 5     Q.     Okay. You said -- you used the term | |
| 6 NSAID? | |
| 7     A.     NSAID. | |
| 8     Q.     Is that nonsteroidal antiinflammatory | |
| 9 drug? | |
| 10     A.     Uh-huh (affirmative response). | |
| 11     Q.     And what kinds of drugs are NSAIDs? | |
| 12     A.     Like Ibuprofen, Aleve, I mean, those | |
| 13 kind of -- the ones that are on the market that | |
| 14 you can buy. | |

## Dedrick v. Merck Co., Inc.
## Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 15   Q.      Kind you can buy at a drugstore? | |
| 16   A.      Yes. | |
| 17   Q.      And again, in layman's terms, what was | |
| 18  your understanding of what the basic difference | |
| 19  was between COX-2 inhibitor pain relievers as | |
| 20  compared to the traditional types of pain | |
| 21  relievers? | |
| 22   A.      Traditional pain relievers, they took | |
| 23  care of the pain but they also could cause | |
| 24  ulcers, bleeding ulcers in the stomach, GI issues | |
| 25  whereas the COX-2 inhibitors, because they were | |
| page 184 | |
| 1  more specific, more targeted in what they did, | |
| 2  they targeted the pain but they didn't also | |
| 3  target the stomach. | |
| 4   Q.      Now, based on your experience while | |
| 5  you were responsible for Vioxx, were the doctors | |
| 6  that you were seeing interested in learning about | |
| 7  COX-2 inhibitors? | |
| 8   A.      Oh, absolutely. | |
| 9   Q.      Why was that? | |
| 10   A.      Any time a new class comes out, | |
| 11  they're very interested in knowing about the | |
| 12  medication and in this case, because -- it was | |
| 13  different than anything they had had before and | |
| 14  they were very interested in the GI safety it | |
| 15  would offer. | |
| 16   Q.      Now, Vioxx was not the only COX-2 | |
| 17  inhibitor on the market; correct? | |
| 18   A.      That's correct. | |
| 19   Q.      What other drug in that class was | |
| 20  available, at least in 1999 when Vioxx first came | |
| 21  into the market? | |
| 22   A.      Celebrex. | |
| 23   Q.      And who sold Celebrex?  Who | |
| 24  manufactured Celebrex? | |
| 25   A.      Phizer. | |
| page 185 | |
| 1   Q.      Was there competition between Phizer | |
| 2  and Merck with respect to these two drugs? | |
| 3   A.      Yeah, I would say there was | |
| 4  competition. | |
| 5   Q.      And how did that effect your job as a | |
| 6  professional representative? | |
| 7   A.      Well, I think you take it in stride as | |
| 8  far as, you know, knowing that that's out there | |
| 9  and that's -- that could be an issue but, you | |
| 10  know, we were really trying to -- we were new on | |
| 11  the market and just trying to explain what our | |
| 12  product offered for a physician's patients. | |
| 13   Q.      Were the Celebrex or Phizer | |
| 14  representatives talking to doctors about Vioxx as | |
| 15  well as about Celebrex? | |

**Dedrick v. Merck Co., Inc.**
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 16   A.     I would think they would have.<br>17   Q.     What makes you say that?<br>18   A.     It's just a competitive environment<br>19 and doctors routinely how do you rate against<br>20 Celebrex or they might ask the Celebrex rep how<br>21 do you rate with Vioxx.  They were trying to kind<br>22 of understand the differences in the drugs or,<br>23 you know, whatever.<br><br><br>[187:23] - [188:5] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations<br><br>page 187<br>23   Q.     Was there any change in the policies<br>24 with respect to how you should interact with<br>25 physicians when you took on Vioxx in 1999?<br>page 188<br>1   A.     No. | |
| 2   Q.     Did anybody at Merck ever tell to you<br>3 deviate from the policies of staying consistent<br>4 with the label and providing fair balance with<br>5 respect to Vioxx?<br><br><br>[188:7] - [188:13] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations<br><br>page 188 | Pl's Obj.:  R. 611. |
| 7        THE WITNESS:  No, they did not. | Pl's Obj.:  R. 611. |
| 8 BY MR. HOURIHAN:<br>9   Q.     And with respect to Vioxx, did you --<br>10 well, with respect to Vioxx, were there ever any<br>11 instances in which you disregarded those<br>12 policies?<br>13   A.     No.<br><br><br>[188:16] - [193:18] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations<br><br>page 188<br>16        You referred earlier today to<br>17 bulletins?<br>18   A.     Yes.<br>19   Q.     And you told Mr. Birchfield that from<br>20 time to time, you received bulletins from Merck<br>21 pertaining to Vioxx; is that right?<br>22   A.     Yes, I did.<br>23   Q.     What did those bulletins communicate | |

Dedrick v. Merck Co., Inc.
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 24  to you?<br>25   A.      Well, you know, it depended on, you<br>page 189<br>1  know, the time frame.<br>2   Q.      Okay.  I don't want to know the<br>3  specifics but generally, what was the purpose<br>4  of -- what was your understanding of what the<br>5  bulletins were being sent to you for?<br>6   A.      Well, giving us direction on Vioxx and<br>7  as far as when VIGOR was published, had direction<br>8  and then once VIGOR was put in our PI, we had<br>9  direction on that.<br>10   Q.      Did any of the bulletins give you<br>11  instructions on how to respond to specific types<br>12  of questions from physicians?<br>13   A.      Yes.<br>14   Q.      And did some of the bulletins address<br>15  how to respond to questions about VIGOR or<br>16  cardiovascular safety issues?<br>17   A.      Yes, they did.<br>18   Q.      You answered a number of questions<br>19  earlier today from Mr. Birchfield about VIGOR.<br>20  What is your general recollection as to what<br>21  the -- what that study showed?<br>22   A.      Well, VIGOR was a study that was<br>23  looking at GI safety.<br>24   Q.      And GI is gastrointestinal?<br>25   A.      Gastrointestinal, stomach safety and<br>page 190<br>1  it looked at Vioxx versus naproxen.<br>2   Q.      What kind of drug is naproxen?<br>3   A.      It's an NSAID.<br>4   Q.      Does that have a brand name that folks<br>5  would recognize?<br>6   A.      Oh, I can't think of the name.  I<br>7  guess Aleve, yeah, Aleve is that.  So anyway, it<br>8  was looking at how -- the safety on the stomach<br>9  and at the end of the study, it did show that<br>10  there were fewer perforations, ulcers and bleeds<br>11  or basically that Vioxx did show it was safer on<br>12  the stomach.  Then there were also findings as<br>13  far as cardiovascular.  There was a higher<br>14  cardiovascular number of MIs or cardiac events<br>15  versus -- with Vioxx versus naproxen.<br>16   Q.      And I think we established just a<br>17  moment ago, that study was first disclosed to the<br>18  public when?<br>19   A.      In 2000, spring of 2000.<br>20   Q.      And what -- do you remember how Merck<br>21  disclosed those results in spring of 2000?<br>22   A.      I can only think of how -- I remember<br>23  how it was disclosed to us as through a bulletin.<br>24   Q.      Do you remember whether it was | |

**Dedrick v. Merck Co., Inc.**
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 25  disclosed in any other manner in the year 2000?<br>page 191<br>1  For example, let me ask a more specific question.<br>2  Do you remember whether there was ever any<br>3  studies published pertaining to VIGOR?<br>4    A.    Yeah, I mean, I think there were<br>5  studies published and Merck issued press<br>6  releases, as well.<br>7    Q.    During that period immediately after<br>8  VIGOR was disclosed to the public in the spring<br>9  of 2000, were you as a professional<br>10  representative allowed to initiate discussions<br>11  about VIGOR?<br>12    A.    No, we weren't allowed to initiate<br>13  discussions.<br>14    Q.    And why not?<br>15    A.    Because it wasn't consistent or on the<br>16  product label.<br>17    Q.    Notwithstanding the fact that you<br>18  couldn't initiate discussions, did VIGOR<br>19  nevertheless come up in any of your conversations<br>20  with physicians?<br>21    A.    Yes, it did come up.<br>22    Q.    How frequently?<br>23    A.    Probably on a daily basis.<br>24    Q.    And if physicians weren't learning<br>25  about VIGOR through you initiating conversations<br>page 192<br>1  about it, did they tell you how they were<br>2  learning about it?<br>3    A.    I think a lot of it came from the<br>4  Phizer representatives bringing it up as part of<br>5  their call on a physician.  It was being spoken<br>6  at conventions, conferences, that type of thing;<br>7  and there was a lot of press reports about it.<br>8  So several different avenues of information.<br>9    Q.    Now, I think we established a second<br>10  ago that the VIGOR data did not actually go into<br>11  the Vioxx label until April 2002.  Prior to that,<br>12  did you receive bulletins instructing you how to<br>13  respond to questions about cardiovascular safety?<br>14    A.    Yes, we did.<br>15    Q.    And what -- generally speaking, what<br>16  was your instruction with respect to how to<br>17  approach doctors' questions about cardiovascular<br>18  safety?<br>19    A.    Well, we received different bulletins<br>20  and depending on the time frame and what the<br>21  direction was, that if we were asked about<br>22  cardiovascular safety, we could proactively, you<br>23  know, then say -- have a verbal statement<br>24  regarding the VIGOR study and then depending on<br>25  what the doctor wanted, we could say, would you | |

## Dedrick v. Merck Co., Inc.
## Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister
## Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| page 193<br>1 like for me to show you information that isn't on<br>2 product label or consistent with our product<br>3 label, the OA studies and cardiovascular event<br>4 card and/or if they wanted information regarding<br>5 VIGOR, then I would send a PIR.<br>6   Q.     Okay. So you may have already<br>7 explained this, but just so it's clear, what<br>8 distinguished whether you used -- after you gave<br>9 your oral statement.<br>10   A.     Right.<br>11   Q.     What determined whether you utilized<br>12 the cardiovascular card or PIR or both?<br>13   A.     It's really what the physician was<br>14 wanting. What information did they want? Did<br>15 they want to see what had already been in our PI<br>16 or were they wanting to know about the VIGOR<br>17 study which was not part of the PI? So it<br>18 depended on what they wanted.<br><br><br>[198:18] - [199:12] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations<br><br>page 198 | |
| 18   Q.     After April 2002, if Dr. Herrera had<br>19 asked a question about the cardiovascular safety<br>20 of Vioxx, how would you have responded to such a<br>21 question?<br>22   A.     I would have gone over the information<br>23 in the product information including, you know,<br>24 data from the OA study and the data from the<br>25 VIGOR study. | **PI's Obj.:** R. 602. Witness is speculating. There is no evidence that Dr. Herrera asked for information. Improper hypothetical. |
| page 199<br>1   Q.     Was there a bulletin that governed how<br>2 to respond to questions about cardiovascular<br>3 safety after the label changed?<br>4   A.     Yes. It was a bulletin I can remember<br>5 because it was -- it was a mandatory -- it was<br>6 you must go out and talk about all aspects of the<br>7 new label change.<br>8   Q.     Was it your regular practice with all<br>9 physicians to deliver the approved messages that<br>10 were set forth in the bulletins that were in<br>11 effect at the time?<br>12   A.     Yes.<br><br><br>[203:18] - [204:14] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations | |

Dedrick v. Merck Co., Inc.
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| page 203 | |

page 203
18   Q.      What did you say to physicians with
19  respect to what was the correct explanation for
20  the cardiovascular adverse event rates in VIGOR?
21   A.      I didn't give an explanation either
22  way.
23   Q.      What did you do?
24   A.      Well, depending on if it was in the
25  label, the VIGOR study, like I said, I could give
page 204
1  an oral statement about it depending on the
2  bulletin at that time.  If they wanted
3  information on the OA studies that was in the
4  prescribing information, I could do that, but if
5  they are wanting to know about the VIGOR
6  information, that's what I could do is to submit
7  the PIR.
8   Q.      Okay.  How about after the label
9  changed in April 2002?
10   A.      I still didn't make a comment either
11  way.
12   Q.      What did you do?
13   A.      Just go over the information that was
14  part of the product label.


[204:25] - [209:4] 10/25/2006 McAllister, Melissa

* Defendant's Affirmative Depo Designations

page 204
25   Q.      Ms. McAllister, do you recall a Dr.
page 205
1  Esmereldo Herrera who practiced in Waynesboro,
2  Tennessee?
3   A.      Yes, I remember him.
4   Q.      Did you call on Dr. Herrera while you
5  were a professional representative with
6  responsibility for Vioxx?
7   A.      Yes, when I was in Jackson, I did call
8  on him.
9   Q.      Where was Dr. Herrera located?
10   A.      In Waynesboro, Tennessee.
11   Q.      And how far away is that from Jackson,
12  Tennessee where you were based?
13   A.      Probably a little over two hours.
14   Q.      And did you call on Dr. Herrera more
15  or less frequently than other doctors that you
16  called on?
17   A.      No, I didn't.
18   Q.      What was your relationship with Dr.
19  Herrera like?
20   A.      It was -- he thought it was a, you

**Dedrick v. Merck Co., Inc.**
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 21 know, good relationship as far as between a<br>22 pharmaceutical rep and a physician.<br>23   Q.      Did he seem to you like he tried to<br>24 stay up to date on medical issues?<br>25   A.     Yes, I think so.<br>page 206<br>1   Q.      And did you have discussions with Dr.<br>2 Herrera about Vioxx?<br>3   A.      Yes, I did have discussions.<br>4   Q.      I think you testified to Mr.<br>5 Birchfield earlier that you don't recall any<br>6 specific conversations with Dr. Herrera about<br>7 Vioxx; is that right?<br>8   A.      That's true, nothing specific. | |
| 9   Q.      Do you have a -- what's your general<br>10 recollection as to whether or not you would have<br>11 had discussions about VIGOR or cardiovascular<br>12 safety with Dr. Herrera?<br>13   A.     If it came up, I mean, I promoted<br>14 Vioxx. It was a responsibility for Vioxx and so,<br>15 yeah, I would -- it would have been my routine to<br>16 talk to him about that. | **Pl's Obj.:** R. 602. Witness<br>has no memory of any<br>conversation with Dr. Herrera<br>and is speculating. |
| 17   Q.      How frequently were those sorts of<br>18 questions coming up when you were in Tennessee?<br>19 Let's talk about when you first arrived in<br>20 Tennessee sort of mid 2001.<br>21   A.      From what I can remember, you know,<br>22 issues came up with Vioxx.<br>23   Q.      How frequently? Let me make the<br>24 question more specific first. How frequently<br>25 were you getting questions about VIGOR or<br>page 207<br>1 cardiovascular safety in 2001?<br>2   A.      Probably daily. | |
| 3   Q.      And did you have any reason to believe<br>4 that those sorts of questions did not come up<br>5 with Dr. Herrera?<br>6   A.      I don't have any reason not to believe<br>7 they wouldn't. | **Pl's Obj.:** Same. |
| 8   Q.      Let me ask you to take a look at what<br>9 I'm going to mark as McAllister Exhibit 4, which<br>10 is a bulletin dated May 23rd, 2001.<br>11          (WHEREUPON, THE ABOVE-MENTIONED<br>12          DOCUMENT WAS MARKED AS EXHIBIT NO. 4<br>13          TO THE TESTIMONY OF THE WITNESS AND<br>14          IS ATTACHED HERETO.)<br>15 BY MR. HOURIHAN:<br>16   Q.      Do you have a copy McAllister Exhibit<br>17 4 in front of you, ma'am?<br>18   A.      Yes, I do.<br>19   Q.      Is this a -- can you identify what<br>20 this document is?<br>21   A.      It's a bulletin in regards to Vioxx. | |

## Dedrick v. Merck Co., Inc.
## Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister
## Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 22   Q.       And is this a bulletin that you<br>23  received?<br>24   A.       Yes, I would have received this<br>25  bulletin.<br>page 208<br>1    Q.       Is this the bulletin -- is this the<br>2   bulletin that would have been in effect in summer<br>3   of 2001 when you were first calling on Dr.<br>4   Herrera?<br>5    A.       Yes, I believe it would.<br>6    Q.       The title of this bulletin is action<br>7   required response to New York Times article.  Do<br>8   you have a recollection about a New York Times<br>9   article that pertained to Vioxx that came out<br>10  around this time?<br>11   A.       Yes, I do remember this.<br>12   Q.       And what do you recall?<br>13   A.       Just that there was a lot of<br>14  information going on about it, a lot of talk.<br>15   Q.       A lot of information and talk about<br>16  what?<br>17   A.       As far as physicians bringing up this<br>18  article and news reports and that type of thing.<br>19   Q.       And what was the subject of the<br>20  article?<br>21   A.       Well, the subject was about the VIGOR<br>22  study.<br>23   Q.       In any particular aspect of VIGOR?<br>24   A.       I think it was talking about the<br>25  cardiovascular information involving VIGOR.<br>page 209<br>1    Q.       And so this bulletin was sent to you<br>2   all in the field to instruct you how to respond<br>3   to those sorts of questions?<br>4    A.       Yes.<br><br><br>[213:25] - [215:23] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations<br><br>page 213 | |
| 25   Q.       And you said in your responses to Mr.<br>page 214<br>1  Birchfield that sometimes you could actually give<br>2  the actual cardiovascular event rates pertaining<br>3  to VIGOR?<br>4    A.       Yes.<br>5    Q.       Is that right?<br>6    A.       Uh-huh (affirmative response).<br>7    Q.       And is that contained somewhere in<br>8  this paragraph that you just pointed out?<br>9    A.       Yes, it has it in here. | **Pl's Obj.:**  Lack of foundation. |

**Dedrick v. Merck Co., Inc.**
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 10   Q.      Could you read the sentence that 11 you're talking about? 12   A.      Uh-huh (affirmative response).  It 13 says in the Vioxx GI outcomes trial, VIGOR, the 14 incidence of MI was .5 percent with Vioxx and .1 15 percent with naproxen. 16   Q.      So that's something you would have 17 said in response to a doctor who asked you a 18 question about cardiovascular at that time this 19 bulletin was in effect? 20   A.      Yes, that was the oral statement I 21 could give as of May 23rd, 2001. | |
| 22   Q.      So if Dr. Herrera asked you a question 23 along those lines in mid 2001 when you were first 24 calling on him, this was the first thing you 25 would say to him in response, this statement in page 215 1 here in paragraph that includes the sentence in 2 Vioxx GI outcomes trial, the incidence of MI was 3 0.5 percent with Vioxx and 0.1 percent with 4 naproxen? 5   A.      That's correct. | **Pl's Obj.:**  R. 602.  Witness remembers no sales calls with Dr. Herrera and is speculating. |
| 6   Q.      And then you also referenced the 7 potential use of a PIR and/or cardiovascular 8 card? 9   A.      Uh-huh (affirmative response). 10   Q.      And how would that flow after you've 11 given this oral statement that we see here? 12   A.      Well, after giving the oral statement 13 in regards to VIGOR, you know, it -- you know, 14 what did the doctor want?  Ask them do you -- 15 would you like more information than what's on 16 the product label, our OA studies that I can go 17 over or are you wanting information in regards to 18 VIGOR which I will send a PIR. 19   Q.      Did you feel that this particular 20 obstacle response that you were given was 21 responsive to the types of questions that you 22 were getting from physicians in 2001? 23   A.      Yes, I did.  [217:13] - [220:18] 10/25/2006 McAllister, Melissa  * Defendant's Affirmative Depo Designations  page 217 13   Q.      Mrs. McAllister, do you have a copy of 14 what's been marked as McAllister Exhibit 5 in 15 front of you? 16   A.      Yes, I do. 17   Q.      Can you identify that document, 18 please? | |

## Dedrick v. Merck Co., Inc.
## Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister
## Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 19   A.      It's a PIR, professional information 20  request. <br> 21   Q.      Is it a request from -- well, who is 22  this letter from and who is it to? <br> 23   A.      Well, it's from Merck Medical Services 24  and it's addressed to Esmereldo Herrera, Dr. 25  Herrera in Waynesboro, Tennessee and it was a <br> page 218 <br> 1  request given to Lee English and he obviously 2  submitted it in. <br> 3   Q.      Okay.  So this is an example of the 4  responsive letter from Merck medical doctors to a 5  physician? <br> 6   A.      Yes. <br> 7   Q.      And it is in response to a PIR? <br> 8   A.      Yes, a PIR. <br> 9   Q.      And this particular document, which is 10  dated June 8th, 2001, was sent from Merck to Dr. 11  Herrera? <br> 12   A.      Yes. <br> 13   Q.      According to the first paragraph of 14  the document, it was sent in response to a PIR 15  submitted by Lee English; is that right? <br> 16   A.      Yeah. <br> 17   Q.      Do you know who Lee English is? <br> 18   A.      Yes, Lee English was one of my 19  colleagues in Jackson, Tennessee. <br> 20   Q.      He was another professional 21  representative? <br> 22   A.      Yes. <br> 23   Q.      Did he call on Dr. Herrera? <br> 24   A.      Yes, he did call on Dr. Herrera. <br> 25   Q.      Did he promote Vioxx to Dr. Herrera? <br> page 219 <br> 1   A.      Yes, he did. <br> 2   Q.      So he would have had discussions with 3  Dr. Herrera about Vioxx; right? <br> 4   A.      Yes, he would. <br> 5   Q.      And he would have fielded questions 6  from Dr. Herrera about Vioxx? <br> 7   A.      Yes. <br> 8   Q.      Just like you? <br> 9   A.      Just like me. <br> 10   Q.      Is this the kind of PIR -- well, let's 11  talk about the PIR for just a second.  Could you 12  read the first and second sentences of this 13  letter to Dr. Herrera? <br> 14   A.      It says Dear Dr. Herrera -- <br> 15   Q.      Let me just ask you to read slowly 16  because it's hard sometimes to get all the words 17  down. <br> 18   A.      Okay. <br> 19   Q.      If you read quickly. |  |

**Dedrick v. Merck Co., Inc.**
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 20 A. Okay.<br>21 Q. So if you would, Mrs. McAllister,<br>22 please read the first two sentences of this PIR<br>23 letter from Merck to Dr. Herrera.<br>24 A. Our medical representative Lee English<br>25 has referred your request for information<br>page 220<br>1 regarding Vioxx (rofecoxib tablets and oral<br>2 suspension) your inquiry concerned a request for<br>3 a reprint of the Vioxx gastrointestinal outcomes<br>4 research trial (VIGOR).<br>5 Q. Based on what you just read, what is<br>6 your understanding of the question that Dr.<br>7 Herrera was asking Mr. English that led to this<br>8 letter?<br>9 A. Well, I mean, I don't know what the<br>10 exact question is but it had to have been in<br>11 regards to VIGOR.<br>12 Q. Okay.<br>13 A. And the PIR was sent.<br>14 Q. And if you look at the very last line<br>15 on the first page of this PIR.<br>16 A. Uh-huh (affirmative response).<br>17 Q. It begins with the words the enclosed<br>18 reprint?<br><br><br>[221:2] - [222:2] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations<br><br>page 221<br>2 A. Gotcha. The enclosed reprint of the<br>3 VIGOR study should be reviewed for complete<br>4 information.<br>5 Q. And then if you flip it over to the<br>6 very last page underneath the signature block, it<br>7 says that enclosed with the letter is a circular<br>8 and reference?<br>9 A. Uh-huh (affirmative response).<br>10 Q. And what does the term circular mean?<br>11 A. That would mean the product label,<br>12 product information, PI.<br>13 Q. What does the term reference refer to?<br>14 A. I would assume that that would be the<br>15 VIGOR study.<br>16 Q. The reprint?<br>17 A. The reprint, yeah.<br>18 Q. And again, just to tie it in with your<br>19 testimony earlier about your general instructions<br>20 regarding how to respond to questions about<br>21 cardiovascular safety, if you had a physician who<br>22 asked you about cardiovascular safety and wanted | |

## Dedrick v. Merck Co., Inc.
## Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister
## Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 23  additional information on the VIGOR study, is | |
| 24  this the kind of PIR, at least one of the PIRs, | |
| 25  that would have been submitted on behalf of such | |
| page 222 | |
| 1  physician? | |
| 2   A.     Yes, that's what I would have done. | |
| | |
| | |
| [222:25] - [227:21] 10/25/2006 McAllister, Melissa | |
| | |
| * Defendant's Affirmative Depo Designations | |
| | |
| page 222 | |
| 25   Q.     Well, now let's shift the time frame | |
| page 223 | |
| 1  to the label change.  Do you remember the label | |
| 2  change in April 2002? | |
| 3   A.     Yes, I do. | |
| 4   Q.     Do you recall receiving bulletins from | |
| 5  Merck concerning the label change? | |
| 6   A.     Yes, I do remember those. | |
| 7   Q.     Let's take a look at those bulletins | |
| 8  and let me hand you now what I'm marking at | |
| 9  McAllister Exhibit 6. | |
| 10            (WHEREUPON, THE ABOVE-MENTIONED | |
| 11         DOCUMENT WAS MARKED AS EXHIBIT NO. 6 | |
| 12         TO THE TESTIMONY OF THE WITNESS AND | |
| 13         IS ATTACHED HERETO.) | |
| 14  BY MR. HOURIHAN: | |
| 15   Q.     Ask you to take a moment and | |
| 16  familiarize yourself with that document.  Do you | |
| 17  have McAllister 6 in front of you, ma'am? | |
| 18   A.     Yes, I do. | |
| 19   Q.     Can you identify that document, | |
| 20  please? | |
| 21   A.     It's a bulletin for Vioxx. | |
| 22   Q.     And was this a bulletin that you | |
| 23  received as a member of the field personnel with | |
| 24  responsibility for Vioxx? | |
| 25   A.     Yes, I received this. | |
| page 224 | |
| 1   Q.     And you would have received this on | |
| 2  April 11th, 2002? | |
| 3   A.     That's -- yeah, that's the day it has | |
| 4  on it. | |
| 5   Q.     Okay.  Have you had an opportunity to | |
| 6  kind of review the first page of this exhibit? | |
| 7   A.     Can I have another minute? | |
| 8   Q.     Sure. | |
| 9   A.     Okay. | |
| 10   Q.     What is the overall purpose of this | |
| 11  communication to you? | |
| 12   A.     Overall is to -- I mean, the words | |

## Dedrick v. Merck Co., Inc.
### Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 13 here, diligently follow all actions with, you | |
| 14 know, physicians and customers and to proactively | |
| 15 review all changes to the PI. | |
| 16   Q.     Okay.  Let's read together the section | |
| 17 of this bulletin under the heading introduction. | |
| 18   A.     Uh-huh (affirmative response). | |
| 19   Q.     It says as previously communicated in | |
| 20 June 2000, Merck submitted a supplemental MDA for | |
| 21 Vioxx based on the Vioxx GI outcome's research | |
| 22 study, VIGOR.  On April 11th, 2002, the FDA | |
| 23 issued the following label revisions based upon | |
| 24 the VIGOR results.  Simultaneously, the FDA | |
| 25 issued a new indication for Vioxx for treatment | |
| page 225 | |
| 1 of signs and symptoms of rheumatoid arthritis in | |
| 2 adults.  The purpose of this bulletin is to | |
| 3 provide you with important updated information | |
| 4 based on the results of this label change and | |
| 5 immediate actions required by you. | |
| 6             Did I read that correctly? | |
| 7   A.     Yes, you did. | |
| 8   Q.     Under the heading below that of action | |
| 9 required, the first bulletin point says | |
| 10 diligently follow all actions with physicians and | |
| 11 customers; right? | |
| 12   A.     Yes. | |
| 13   Q.     The next bullet point says review the | |
| 14 new label for Vioxx and distribute to physicians | |
| 15 and customers, and attached to this bulletin | |
| 16 are -- well, there's several items that are | |
| 17 attached to it.  Can you tell us whether or not | |
| 18 one of the things that's attached is a copy of | |
| 19 the new Vioxx label? | |
| 20   A.     Yes, it has it on the very last page | |
| 21 of the PI issued April 2002. | |
| 22   Q.     And now let's look at the next heading | |
| 23 on Page 1 of the bulletin which was referenced | |
| 24 earlier.  Actions with physicians and customers. | |
| 25 What does -- what does actions with physicians | |
| page 226 | |
| 1 and customers mean? | |
| 2   A.     Means this is what we're supposed to | |
| 3 do when we went to visit with them. | |
| 4   Q.     Okay.  And the very first thing listed | |
| 5 under that heading is proactively review all | |
| 6 changes to the PI with physicians and customers, | |
| 7 and then underneath that, it says, bullet point, | |
| 8 new Vioxx GI outcomes research study information, | |
| 9 then another bullet point, new CV precaution.  Do | |
| 10 you see that? | |
| 11   A.     Yes, I do. | |
| 12   Q.     What did you interpret this | |
| 13 instruction to mean? | |

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 14    A.      It means that we were to go out and<br>15  proactively discuss all of the new label changes<br>16  on every call.<br>17    Q.      And what does it mean when you say<br>18  proactively discuss?<br>19    A.      It means that's the first thing that<br>20  comes out of your mouth is I've got these changes<br>21  to discuss with you.<br>22    Q.      And what specific changes were you<br>23  instructed to point out to physicians?<br>24    A.      The Vioxx GI outcomes research<br>25  information.<br>page 227<br>1    Q.      That's the VIGOR information?<br>2    A.      VIGOR, uh-huh, the new CV precaution.<br>3    Q.      What's the new CV precaution?<br>4    A.      It was under the precautions that<br>5  included the VIGOR study, findings of the VIGOR<br>6  study was now included in the PI.<br>7    Q.      Under the heading of precautions?<br>8    A.      Precautions.<br>9    Q.      And anywhere else in the label, as<br>10  well?<br>11    A.      From what I can remember, it was under<br>12  the precautions.<br>13    Q.      Okay.  We'll take a look at the label<br>14  in just a second.<br>15    A.      Okay. | |
| 16    Q.      And what did this bulletin tell you<br>17  not to do?  If you look at the next bullet point<br>18  under the heading action with physicians and<br>19  customers, it reads do not provide promotional<br>20  messaging until the PI has been thoroughly<br>21  reviewed with the physician or customer. | **Pl's Obj.:**  R. 611 - leading. |

[227:23] - [228:9] 10/25/2006 McAllister, Melissa


* Defendant's Affirmative Depo Designations


page 227
23  BY MR. HOURIHAN:

| | |
|---|---|
| 24    Q.      Do you see that? | **Pl's Obj.:**  R. 611 - leading. |
| 25    A.      Yes, I do. | **Pl's Obj.:**  R. 611 - leading. |
| page 228<br>1    Q.      What did you understand this<br>2  instruction to mean?<br>3    A.      We were to utilize the prescribing<br>4  information in all of our contacts with<br>5  physicians.  That was what we were to use and we<br>6  weren't to have promotion.  It was to inform them<br>7  of all the new product label changes.<br>8    Q.      Did you follow this bulletin? | |

## Dedrick v. Merck Co., Inc.
## Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister
## Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 9    A.    Yes. | |
| | |
| [229:7] - [229:15] 10/25/2006 McAllister, Melissa | |
| * Defendant's Affirmative Depo Designations | |
| page 229 | |
| 7    Q.    Okay. Let's do it this way. I'm | |
| 8 going to mark a new exhibit which is McAllister | |
| 9 Exhibit 7. It's got some of the same | |
| 10 information, but why don't you take a look at | |
| 11 that? And I just want to explain to you, because | |
| 12 I know you've never seen this before, Ms. | |
| 13 McAllister, but this is a document that was | |
| 14 produced by Merck in this litigation. | |
| 15    A.    Uh-huh (affirmative response). | |
| | |
| [230:1] - [230:20] 10/25/2006 McAllister, Melissa | |
| * Defendant's Affirmative Depo Designations | |
| page 230 | |
| 1 BY MR. HOURIHAN: | |
| 2    Q.    And I want to point you in particular | |
| 3 to the very last page of McAllister 7, and if you | |
| 4 look there about halfway down the page, there's a | |
| 5 series of entries with your name next to it. It | |
| 6 says Dr. Herrera and then there's several dates | |
| 7 and then it says MeLissa McAllister. Do you see | |
| 8 that? | |
| 9    A.    Yes, uh-huh. | |
| 10    Q.    And among other things, it reflects | |
| 11 calls on Dr. Herrera pertaining to Vioxx on April | |
| 12 11th, 2002. Do you see that? | |
| 13    A.    Uh-huh, yes, I do. | |
| 14    Q.    And above that, May 23rd, 2002? | |
| 15    A.    Uh-huh (affirmative response). | |
| 16    Q.    And above that, June 11th, 2002. | |
| 17    A.    Uh-huh (affirmative response). | |
| 18    Q.    Do you have any reason to doubt that | Pl's Obj.: R. 602. Lack of |
| 19 you, in fact, did call on Dr. Herrera to discuss | personal knowledge. |
| 20 Vioxx on those dates? | |
| | |
| [230:22] - [231:21] 10/25/2006 McAllister, Melissa | |
| * Defendant's Affirmative Depo Designations | |
| page 230 | |
| 22        THE WITNESS: I mean, it states that | Pl's Obj.: R. 602. Lack of |
| 23    I was there and I had discussions with him, and | personal knowledge. |

Dedrick v. Merck Co., Inc.
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 24    I think it would be reasonable that I would<br>25    have brought up the product label changes. | |
| page 231<br>1  BY MR. HOURIHAN:<br>2    Q.    Okay.  Well, that's kind of my<br>3  question.  You have this bulletin that went to<br>4  you on April 18th; right -- excuse me -- April<br>5  11th?<br>6    A.    Okay.<br>7    Q.    Instructing you to go over the new<br>8  label with all the physicians that you called on.<br>9    A.    Uh-huh (affirmative response).<br>10   Q.    Right?<br>11   A.    Right.<br>12   Q.    And I think we just saw that Merck<br>13  records reflect that you called on Dr. Herrera on<br>14  April 11th as well as May 23rd and June 11th?<br>15   A.    Uh-huh (affirmative response).<br>16   Q.    2002; right?<br>17   A.    Right. | |
| 18   Q.    How confident are you that during that<br>19  time period, you did, in fact, follow that<br>20  bulletin and go over the new label with Dr.<br>21  Herrera? | **Pl's Obj.:**  R. 602.  Lack of personal knowledge. Witness does not remember. |
| [231:23] - [232:8] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations<br><br>page 231 | |
| 23          THE WITNESS:  I'm confident that I<br>24    would have in my discussions with him because<br>25    that was the directive that Merck had for us<br>page 232<br>1    was to proactively bring this up with<br>2    physicians regarding the label change. | **Pl's Obj.:**  R. 602.  Lack of personal knowledge. Witness does not remember. |
| 3  BY MR. HOURIHAN:<br>4    Q.    Was it -- how often did you get<br>5  instructions from Merck to go out and discuss a<br>6  label change and make sure you discussed it<br>7  before having any promotional conversations with<br>8  the physician? | **Pl's Obj.:**  R. 611. |
| [232:10] - [234:19] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations<br><br>page 232 | |
| 10          THE WITNESS:  It was very strong<br>11    language for sure as far as, you know, what<br>12    they wanted us to do. | **Pl's Obj.:**  R. 611. |

Dedrick v. Merck Co., Inc.
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 13  BY MR. HOURIHAN: | |
| 14    Q.     And in your career, how often have you | |
| 15  received those sorts of very strong language | |
| 16  bulletins, to use your phrase? | |
| 17    A.     Not very often. | |
| 18    Q.     Do you have a memory of going out and | |
| 19  going over this label change with different | |
| 20  physicians? | |
| 21    A.     Yes. I remember this, uh-huh | |
| 22  (affirmative response). | |
| 23    Q.     Do you know whether Merck -- do you | |
| 24  recall whether Merck did anything else to alert | |
| 25  physicians to this label change besides the | |
| page 233 | |
| 1  bulletin that we just looked at that instructed | |
| 2  sales representatives to speak with physicians? | |
| 3    A.     I mean, other than the bulletin, I | |
| 4  mean, I don't know if they issued press releases | |
| 5  at that time or, you know, what; but as far as | |
| 6  any experience as a professional rep at that | |
| 7  point, I followed the bulletin that was on April | |
| 8  11th. | |
| 9    Q.     Okay. Well, let me -- let's move now | PI's Obj.:  Sidebar. |
| 10  to another bulletin just a week later on April | |
| 11  18th, 2002. I've marked this as McAllister | |
| 12  Exhibit 8 and you're obviously getting a few of | |
| 13  those in front of you there. You can push those | |
| 14  to the side now and get them out of your way. | |
| 15  Let me hand you now a copy of McAllister Exhibit | |
| 16  8 and ask you to take a moment to familiarize | |
| 17  yourself with that. | |
| 18        (WHEREUPON, THE ABOVE-MENTIONED | |
| 19        DOCUMENT WAS MARKED AS EXHIBIT NO. 8 | |
| 20        TO THE TESTIMONY OF THE WITNESS AND | |
| 21        IS ATTACHED HERETO.) | |
| 22  BY MR. HOURIHAN: | |
| 23    Q.     Okay. Do you recognize this document, | |
| 24  ma'am? | |
| 25    A.     Yes, I do. | |
| page 234 | |
| 1    Q.     And what is it? | |
| 2    A.     It's another bulletin in regards to | |
| 3  Vioxx, and it's an action required for dear | |
| 4  healthcare provider letter distribution. | |
| 5    Q.     What is the date on this particular | |
| 6  bulletin? | |
| 7    A.     April 11th -- I mean April 18th, 2002. | |
| 8    Q.     And again, that's the same time frame | |
| 9  that we just saw you had several calls on Dr. | |
| 10  Herrera? | |
| 11    A.     Yes. | |
| 12    Q.     And this particular bulletin is | |
| 13  addressed to all field sales representatives? | |

Dedrick v. Merck Co., Inc.
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 14   A.      Uh-huh (affirmative response). | |
| 15   Q.      Would that include you? | |
| 16   A.      Yes, that would include me. | |
| 17   Q.      So is this a document that you would | |
| 18 have received? | |
| 19   A.      Yes, I would have received this. | |
| | |
| [235:5] - [237:5] 10/25/2006 McAllister, Melissa | |
| | |
| * Defendant's Affirmative Depo Designations | |
| | |
| page 235 | |
| 5    Q.      When you received this bulletin back | |
| 6  in April 2002, what did you understand its | |
| 7  purpose to be? | |
| 8    A.      Was to let us know that there was a | |
| 9  dear healthcare provider letter that was going | |
| 10 out to physicians but it wasn't something that we | |
| 11 could print off but we were to receive additional | |
| 12 quantities and to make sure that, you know, in | |
| 13 our follow-up visits with physicians that they | |
| 14 did receive it and if they didn't receive it, to | |
| 15 offer that to them. | |
| 16   Q.      What is a dear healthcare provider | |
| 17 letter? | |
| 18   A.      Basically what it is.  It's a dear | |
| 19 healthcare provider with changes like, you know, | |
| 20 in this situation to the prescribing information | |
| 21 for Vioxx. | |
| 22   Q.      Well, who sends out a dear healthcare | |
| 23 provider letter? | |
| 24   A.      Merck.  Merck sends that out. | |
| 25   Q.      And when we use the term healthcare | |
| page 236 | |
| 1  provider, who are we talking about? | |
| 2    A.      That would include physicians, nurse | |
| 3  practitioners, physician assistants, pharmacists, | |
| 4  healthcare professionals. | |
| 5    Q.      So is this a letter from Merck to all | |
| 6  healthcare professionals? | |
| 7    A.      I believe it would be. | |
| 8    Q.      And did you follow this bulletin back | |
| 9  in April of 2002? | |
| 10   A.      Yes, I did. | |
| 11   Q.      How confident are you that you would | |
| 12 have followed this bulletin with all your | |
| 13 physicians? | |
| 14   A.      I mean, I was very confident because | |
| 15 this was the direction that was set forth for us. | |
| 16   Q.      Attached to this bulletin is a | |
| 17 letter -- I think it's Page 3 of the exhibit on | |
| 18 Merck letterhead dated April 2002.  It says dear | |

## Dedrick v. Merck Co., Inc.
## Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister
## Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 19 healthcare professional underneath it and then it<br>20 contains the following -- the first two<br>21 paragraphs read as follows: Merck and Company<br>22 would like to bring to your attention recent<br>23 changes in the current prescribing information<br>24 and patient product information for Vioxx. Vioxx<br>25 is a nonsteroidal antiinflammatory drug NSAID<br>page 237<br>1 that was approved by the United States Food and<br>2 Drug Administration or FDA in May 1999 for relief<br>3 of the signs and symptoms of osteoarthritis,<br>4 management of acute pain in adults and the<br>5 treatment of primary dysmenorrhea?<br><br><br>[237:11] - [237:21] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations<br><br>page 237<br>11   Q.      Did I read that paragraph correctly?<br>12   A.      Yes, you did.<br>13   Q.      The next sentence reads -- the next<br>14 paragraph reads, the prescribing information has<br>15 been revised to reflect the results of the Vioxx<br>16 gastrointestinal outcomes research or VIGOR study<br>17 and the FDA approval of Vioxx for the relief of<br>18 the signs and symptoms of rheumatoid arthritis in<br>19 adults. Excerpts of the changes to the<br>20 prescribing information are provided below. Did<br>21 I read that sentence correctly?<br><br><br>[237:23] - [238:25] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations<br><br>page 237<br>23           THE WITNESS: Yes, you did.<br>24 BY MR. HOURIHAN:<br>25   Q.     The remainder of this letter contains<br>page 238<br>1 what, ma'am?<br>2   A.      The prescribing information.<br>3   Q.      And attached to the letter -- well,<br>4 let me step back for just a second. The<br>5 information that's contained in the remainder of<br>6 this dear healthcare provider comes from where?<br>7   A.      Comes from the PI.<br>8   Q.      The new PI?<br>9   A.      The new PI, uh-huh (affirmative<br>10 response).<br>11   Q.      And attached to the letter itself is | |

Dedrick v. Merck Co., Inc.
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 12  what? | |
| 13   A.     The new PI. | |
| 14   Q.      The bulletin that attaches these | |
| 15  letters refers to a highlighted PI, highlighted | |
| 16  copy of the PI.  If you look at the first | |
| 17  paragraph under the heading overview? | |
| 18   A.      Uh-huh (affirmative response). | |
| 19   Q.      It says that beginning Friday, a copy | |
| 20  of the attached dear healthcare provider letter | |
| 21  will be sent to all prescribers of Vioxx, | |
| 22  pharmacists and managed care customers in the | |
| 23  Merck universe along with highlighted copies of | |
| 24  the PI and PPI for Vioxx.  Do you know what that | |
| 25  term refers to, highlighted copy of the PI? | |
| | |
| [239:2] - [240:1] 10/25/2006 McAllister, Melissa | |
| | |
| * Defendant's Affirmative Depo Designations | |
| | |
| page 239 | |
| 2         THE WITNESS:  It refers to a PI that | |
| 3    Merck has highlighted with the changes to -- | |
| 4    the new changes. | |
| 5  BY MR. HOURIHAN: | |
| 6    Q.     Now, this copy of the PI that was | |
| 7  attached to the bulletin, is that what you were | |
| 8  actually supposed to distribute to physicians? | |
| 9   A.     No. | |
| 10   Q.     Where were you supposed to get the | |
| 11  copy to distribute to physicians? | |
| 12   A.      It was going to be mailed to us. | |
| 13   Q.     I may have asked this before but let | **Pl's Obj.:**  Witness is |
| 14  me ask again, how confident are you that you | speculating. R. 602. Witness |
| 15  would have followed up with all your physicians | has no memory of |
| 16  to confirm that they had received a dear | specific conversations with |
| 17  healthcare provider as set forth in this | Dr. Herrera. |
| 18  bulletin? | |
| 19   A.      I'd be very confident that I followed | |
| 20  these instructions. | |
| 21   Q.      And how confident are you that you | |
| 22  would have followed up with Dr. Herrera to ensure | |
| 23  that he received a copy of the dear healthcare | |
| 24  provider letter? | |
| 25   A.      I would have followed up with Dr. | |
| page 240 | |
| 1  Herrera, as well. | |
| | |
| [240:4] - [244:25] 10/25/2006 McAllister, Melissa | |
| | |
| * Defendant's Affirmative Depo Designations | |

**Dedrick v. Merck Co., Inc.**
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| page 240<br>4    Q.     Let me now hand you what I've marked<br>5  as McAllister Exhibit 9.<br>6          (WHEREUPON, THE ABOVE-MENTIONED<br>7        DOCUMENT WAS MARKED AS EXHIBIT NO. 9<br>8        TO THE TESTIMONY OF THE WITNESS AND<br>9        IS ATTACHED HERETO.)<br>10 BY MR. HOURIHAN:<br>11    Q.     Can you identify what McAllister<br>12 Exhibit 9 is, ma'am?<br>13    A.     It's the dear healthcare professional<br>14 letter that was sent out for Merck in April and<br>15 has the excerpts from the PI and has the<br>16 highlighted PPI and the highlighted prescribing<br>17 information.<br>18    Q.     So this is the actual color copy of<br>19 the document that we saw in black and white<br>20 attached to the bulletin; right?<br>21    A.     Yes.<br>22    Q.     And the version that would have been<br>23 sent to physicians and distributed by you and<br>24 your colleagues to physicians, would that have<br>26 been color or black and white?<br>page 241<br>1    A.     It would have been color.<br>2    Q.     And in this document, McAllister<br>3 Exhibit 9, the color PPI, at the top of the<br>4 letter in the blue box are the words important<br>5 prescribing information.<br>6    A.     Yes.<br>7    Q.     Right?<br>8    A.     Uh-huh (affirmative response).<br>9    Q.     And that blue box with those words<br>10 would have been a letter that you distributed to<br>11 physicians you called on?<br>12    A.     Yes, sir.<br>13    Q.     And if you flip now to the attachments<br>14 and in particular, the attached copy of the<br>15 product label which I believe begins at the page<br>16 with the Bates ending MRK -- well, last three<br>17 digits are 436.  Do you have that in front of<br>18 you?<br>19    A.     Yes, I do.<br>20    Q.     There's yellow highlighting in<br>21 numerous places both on this first page and<br>22 throughout the rest of the label; right?<br>23    A.     Yes.<br>24    Q.     Would that yellow highlighting have<br>25 been on the version of the PI and dear healthcare<br>page 242<br>1 provider letter that was sent to Dr. Herrera and<br>2 that was distributed by you to the physicians you<br>3 called on? | |

## Dedrick v. Merck Co., Inc.
## Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister
## Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 4  A.    Yes. | |
| 5  Q.    And what portions of the label are | |
| 6  highlighted in yellow? | |
| 7  A.    The new changes to the PI. | |
| 8  Q.    And does that highlighted section | |
| 9  include -- well, let's talk about the dear | |
| 10  healthcare provider letter first.  If you flip | |
| 11  back to Page 1 of the dear healthcare provider | |
| 12  letter.  As we just read a moment ago, it says | |
| 13  that there have been changes to the prescribing | |
| 14  information; right? | |
| 15  A.    Yes. | |
| 16  Q.    And as we turn over to Page 2 and | |
| 17  carrying over to Page 3, what kinds of changes | |
| 18  are discussed on Pages 2 to 3 of the dear | |
| 19  healthcare provider letter? | |
| 20  A.    Are you referring to the second from | |
| 21  the bottom paragraph? | |
| 22  Q.    Yes. | |
| 23  A.    Other safety findings, cardiovascular | |
| 24  safety. | |
| 25  Q.    And in particular, on that page | |
| page 243 | |
| 1  carrying over to the next page, is there anything | |
| 2  about the VIGOR cardiovascular data as set forth | |
| 3  in the dear healthcare provider letter? | |
| 4  A.    Yes, Table 2 and Table 3, it has | |
| 5  information regarding VIGOR summary of patients | |
| 6  with serious cardiovascular thrombotic adverse | |
| 7  events over time comparison to naproxen. | |
| 8  Q.    And if you now turn to the fourth page | |
| 9  of the dear healthcare provider letter, there's a | |
| 10  section under the heading precautions.  Do you | |
| 11  see that? | |
| 12  A.    Yeah, uh-huh. | |
| 13  Q.    And what kind of information is | |
| 14  discussed under the heading of precautions? | |
| 15  A.    Cardiovascular events. | |
| 16  Q.    And what specifically is discussed as | |
| 17  a precaution under the heading cardiovascular | |
| 18  effects? | |
| 19  A.    The information below should be taken | |
| 20  into consideration and caution should be | |
| 21  exercised when Vioxx is used in patients with a | |
| 22  medical history of ischemic heart disease. | |
| 23  Q.    And following that in the paragraph | |
| 24  below, is there anything about VIGOR? | |
| 25  A.    Yeah, it states in VIGOR. | |
| page 244 | |
| 1  Q.    And what information from VIGOR is | |
| 2  contained in that paragraph? | |
| 3  A.    You want me to read it? | |
| 4  Q.    Why don't you take a moment and review | |

## Dedrick v. Merck Co., Inc.
## Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister
### Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 5 it and just let us know if there's anything that | |
| 6 pertains to cardiovascular results in there? | |
| 7   A.     Yeah, it does talk about in the | |
| 8 duration of exposure of nine months, the risk of | |
| 9 developing a serious cardiovascular thrombotic | |
| 10 event was significantly higher in patients | |
| 11 treated with Vioxx 50 milligram once daily, | |
| 12 number was 45 as compared with patients treated | |
| 13 with naproxen 500 milligrams twice daily and the | |
| 14 number there was 19. | |
| 15   Q.     Now let me ask you to turn to the | |
| 16 highlighted PI that was attached to this letter | |
| 17 that was sent to physicians.  The very first page | |
| 18 of this highlighted PI, almost the entire right | |
| 19 hand column is in yellow highlighting. | |
| 20   A.     Uh-huh (affirmative response). | |
| 21   Q.     And that's under the heading special | |
| 22 studies and in particular, it says Vioxx GI | |
| 23 outcomes research or VIGOR study.  Do you see | |
| 24 that? | |
| 25   A.     Yes. | |
| | |
| | |
| [245:3] - [246:15] 10/25/2006 McAllister, Melissa | |
| | |
| * Defendant's Affirmative Depo Designations | |
| | |
| page 245 | |
| 3   Q.     What kind of -- where under that | |
| 4 heading would we find any information about the | |
| 5 cardiovascular safety results of VIGOR? | |
| 6   A.     It's actually further down.  It's the | |
| 7 paragraph above Table 2. | |
| 8   Q.     Okay.  And Table 2, by the way, is | |
| 9 titled -- Table 2 contains what information? | |
| 10   A.     VIGOR summary of patients with serious | |
| 11 cardiovascular thrombotic adverse events over | |
| 12 time comparison to naproxen. | |
| 13   Q.     And the paragraph that you're | Pl's Obj.:  R. 611. |
| 14 referring to above that is under the heading | |
| 15 other safety findings, cardiovascular safety; | |
| 16 right? | |
| 17   A.     Yes, it does state that. | |
| 18   Q.     And if you turn to the next page, | |
| 19 there's another table that contains data from | |
| 20 VIGOR pertaining to cardiovascular results; | |
| 21 correct? | |
| 22   A.     Yes. | |
| 23   Q.     Now, can you also point us to the | |
| 24 precaution section of this new label? | |
| 25   A.     Yes.  It's on two columns over from | |
| page 246 | |
| 1 that. | |

## Dedrick v. Merck Co., Inc.
## Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister
## Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 2 Q. So we're still on the second page of<br>3 the label, far right hand column?<br>4 A. Yes, far right hand column under<br>5 precautions. | |
| 6 Q. Under precautions, there's a one --<br>7 three paragraph section under the heading of<br>8 cardiovascular effects. Is that what you're<br>9 referring to?<br>10 A. Yes, I am.<br>11 Q. Does that also contain a discussion of<br>12 the VIGOR cardiovascular data?<br>13 A. Yes, it does. | Pl's Obj.: R. 611. |
| 14 Q. What's your understanding of why Merck<br>15 has highlighted the new portions of the label?<br><br><br>[246:17] - [247:5] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations<br><br>page 246<br>17 THE WITNESS: Because it's the new --<br>18 it's new information that's been added to the<br>19 PI and wanted to draw attention to all the new<br>20 information that was added to the PI.<br>21 BY MR. HOURIHAN:<br>22 Q. Did you use this highlighted copy of<br>23 the PI in your conversations with physicians to<br>24 draw their attention to the new information?<br>25 A. Well, I mean, if they had not received<br>page 247<br>1 this information, we received copies of that and<br>2 we were able to use it. | |
| 3 Q. Did Dr. Herrera ever indicate to you<br>4 that he didn't understand any aspect of the VIGOR<br>5 study? | Pl's Obj.: R. 611. R. 602.<br>Witness does not recall any<br>conversations with Dr. Herrera.<br>Speculative. |
| [247:7] - [247:21] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations<br><br>page 247 | |
| 7 THE WITNESS: I don't recall any<br>8 specific question.<br>9 BY MR. HOURIHAN: | Pl's Obj.: R. 611. R. 602.<br>Witness does not recall any<br>conversations with Dr. Herrera.<br>Speculative. |
| 10 Q. Do you recall Dr. VIGOR ever<br>11 indicating -- sorry. Do you recall Dr. Herrera<br>12 ever indicating that he did not understand any of<br>13 the VIGOR cardiovascular data that was contained<br>14 in the new label or in the dear healthcare<br>15 provider label?<br>16 A. I don't recall a specific time of him | Pl's Obj.: R. 611. R. 602.<br>Witness does not recall any<br>conversations with Dr. Herrera.<br>Speculative. |

## Dedrick v. Merck Co., Inc.
## Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister
## Exhibit "A"

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 17  asking that.<br>18    Q.      Did Dr. Herrera ever indicate to you<br>19  that he wasn't satisfied in any way with the<br>20  information that he was receiving from you or<br>21  from Merck concerning Vioxx?<br><br><br>[247:23] - [247:24] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations<br><br>page 247 | |
| 23         THE WITNESS:  No, I don't remember<br>24    any specific times.<br><br><br>[248:1] - [248:16] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations<br><br>page 248 | Pl's obj.:  R. 611.  R. 602.<br>Witness does not recall any<br>conversations with Dr. Herrera.<br>Speculative. |
| 1    Q.      During the course of your trainings<br>2  and retrainings at Merck and just across the<br>3  eight and a half years you've been with the<br>4  company, what have you been taught about the<br>5  importance of patient safety?<br>6    A.      It's first and foremost.  I mean, that<br>7  was one of the -- I can remember the first day of<br>8  training, they talked about, you know, Merck's,<br>9  you know, statements that you put patients first<br>10  and the profits will follow and that's -- that is<br>11  definitely something that has been engrained in<br>12  all Merck employees. | Pl's Obj.:  R. 404(a). Self-<br>serving statements. |
| 13    Q.      At any time did Merck or -- did<br>14  anybody at Merck ever suggest to you that sales<br>15  or profits were more important than patient<br>16  safety?<br><br><br>[248:20] - [249:25] 10/25/2006 McAllister, Melissa<br><br>* Defendant's Affirmative Depo Designations<br><br>page 248<br>20    Q.      How, if at all, did patient safety<br>21  effect how you did your job?<br>22    A.      Well, I mean, it's always part of the<br>23  conversation.  I want to make sure that I convey<br>24  the information so that the physician makes the<br>25  right choice for that patient to make sure that<br>page 249<br>1  they have the appropriate drug for the<br>2  appropriate patient, appropriate dose so that | |

**Dedrick v. Merck Co., Inc.**
**Defendant's Affirmatives with Plaintiff's Objections - Melissa McAllister**
**Exhibit "A"**

| Defendant's Affirmatives | Plaintiff's Objections |
|---|---|
| 3  they make the most -- the best decision for that<br>4  patient.<br>5    Q.      Did you ever see any situation where a<br>6  Merck employee was doing something that you felt<br>7  compromised a patient's safety?<br>8    A.      No, I have not.<br>9    Q.      When you were promoting Vioxx to<br>10  physicians, did you believe that you were selling<br>11  a drug that was causing heart attacks?<br>12    A.      No, I did not. | |
| 13    Q.      Did you ever use Vioxx?<br>14    A.      Yes, I did.<br>15    Q.      And did any member of your family ever<br>16  use Vioxx?<br>17    A.      Yes, my husband took Vioxx. My<br>18  parents took Vioxx and my grandmother took Vioxx.<br>19    Q.      During that period when you and your<br>20  family were using the product, did you ever have<br>21  any concern about your family's safety as a<br>22  result of taking the drug?<br>23    A.      I did not have any concerns of safety. | **Pl's Obj.:** R. 401, R. 402,<br>R. 403.  See MIL # 5. |
| 24          MR. HOURIHAN:  Thanks.  I have no<br>25    further questions at this time. | |