## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | JUDGE FALLON |
| This document relates to Case No. 06-0810 | * | |
| CHARLES L. MASON, | * | MAGISTRATE JUDGE KNOWLES |
| Plaintiff, | * | |
| v. | * | |
| MERCK & CO., INC., | * | |
| Defendant. | * | |

* * * * * * * * * * * * * * * * * * *

**MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") TO EXCLUDE EVIDENCE OR ARGUMENT ABOUT DR. GRAHAM'S "EXCESS EVENTS" CALCULATION**

**(MOTION IN *LIMINE* NO. 3)**

In a paper published in *The Lancet* in January 2005, Dr. David Graham opined that Vioxx had caused between 88,000 to 144,000 excess cases of serious coronary events in the United States and that 44% of these excess cases were fatal.[1] These figures are completely unrelated to the findings of the study Dr. Graham actually conducted. Instead, Dr. Graham derived his "excess events" estimate through a series of manipulative calculations based on data from four

---

[1] David J. Graham et al., *Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study*, available at http://image.thelancet.com/extras/05art1005web.pdf (Jan. 25, 2005) (hereinafter the "Graham Study").

*entirely different* studies. Accordingly, as the gatekeeper for unreliable evidence, this Court should preclude any evidence or argument about Dr. Graham's "excess events" calculation.

If jurors are allowed to hear Dr. Graham's opinion that Vioxx resulted in 88,000 to 140,000 excess cases of heart attacks, 44% of them supposedly fatal, they might be inclined to believe – without regard to the specific facts of plaintiff's medical history or claimed Vioxx use – that plaintiff's use of Vioxx must have caused his alleged heart attack. That would be a manifestly unfair result since, as explained below, Dr. Graham's estimate in fact has no tendency to prove that Vioxx caused or contributed to *plaintiff's* alleged injuries.

Because Dr. Graham's flawed calculation of "excess events" supposedly attributable to Vioxx is unreliable, irrelevant, and would unduly prejudice Merck if admitted, any evidence or argument about the calculation must be excluded.[2]

## I. DR. GRAHAM'S "EXCESS EVENTS" ESTIMATE IS UNRELIABLE.

The methodology Dr. Graham used to derive his "excess events" calculation is flawed. Indeed, Dr. Graham conceded that the estimate was not intended to be an accurate number:

> And we put a number in our paper, and what we were more concerned with was the public health impact of Vioxx exposure than we were with what were the particular numbers, *recognizing that the particular numbers could be different than the range that we gave,* but that was our best estimate at what we thought was likely to be the case.

(Deposition of Dr. David Graham ("Graham Dep.") at 430:6-15 (emphasis added), attached hereto as Ex. A; *see also* Deposition of Dr. Benedict Lucchesi at 116:6-20 (calling Dr. Graham's calculation an "estimate" and a "guesstimate" and noting, "Whether or not it's an accurate figure

---

[2] Perhaps recognizing the flaws in Dr. Graham's "excess events" calculation, plaintiff has not designated Dr. Graham's testimony on the subject. The Court should nonetheless grant Merck's motion, in order to preclude plaintiff's counsel from making any arguments based on the estimate or soliciting expert opinion on the matter.

2

831963v.1

or not, you know, I can't tell. Neither can anyone else, I guess."), attached hereto as Ex. B.) For the following reasons, Dr. Graham's estimate is unreliable and should be excluded.

*First*, Dr. Graham's "excess events" estimate is inconsistent with the data he relies on. Dr. Graham manufactured his estimate through a series of misleading calculations that involved multiplying the relative risk of heart attacks among Vioxx users as reported in the VIGOR[3] and APPROVe[4] studies by the rate of heart attacks in patients receiving other therapies, which he derived from data reported in the CLASS Study[5] and a 2002 observational study performed by Professor Wayne A. Ray.[6] He then applied an overall fatality rate associated with heart attacks in the general population. (Graham Dep. at 152:21-154:1, 402:20-405:11, 419:12-422:11; Graham Study at 6.) His estimate is thus derived from a calculation of numbers from four different studies, only two of which involved patients taking Vioxx: VIGOR and APPROVe. The APPROVe study, however, did not find *any* increased risk of adverse cardiovascular events associated with less than eleven months of continuous use (like Mr. Mason's) of Vioxx at the 25 milligram dose.[7] Moreover, neither VIGOR or APPROVe demonstrated an increased risk of death.[8]

---

[3] Bombardier et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis* (hereinafter "Bombardier"), N. ENGL. J. MED. 343:1520 (2000).

[4] Bresalier et al., *Cardiovascular Events Associated with Rofecoxib in Colorectal Adenoma Chemoprevention Trial*, N. ENGL. J. MED. 352:1092 (2005) (hereinafter "Bresalier").

[5] The CLASS study compared Celebrex to ibuprofen and diclofenac, two traditional NSAIDs. *See* F.E. Silverstein et al., *Gastrointestinal toxicity with celecoxib vs nonsteroidal anti-inflammatory drugs for osteoarthritis and rheumatoid arthritis: the CLASS study – a randomized controlled study* (hereinafter the "Class Study"), JAMA 2000, 284: 1247-55.

[6] The Ray study compared Vioxx to other NSAIDs. *See* W.A. Ray et al., *COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease* (hereinafter the "Ray Study"), LANCET 2002, 360: 1071-73.

[7] Bresalier at 1092. In addition, because VIGOR compared Vioxx against naproxen rather than
(*footnote continued next page*)

***Second***, Dr. Graham's estimate is, in fact, contradicted by the underlying data. As the chart below demonstrates, the actual rate of heart attacks among Vioxx users in the VIGOR and APPROVe studies from which he derived the multipliers for his calculation was *lower* than the rate of heart attacks reported for the patients in the CLASS and Ray studies, which provided the baseline for his computation. (Graham Dep. at 428:13-19, 432:22-433:1 ("Q: And, again, the real life heart attack rate in both VIGOR and APPROVe was lower than what you say is the normal background rate for people who are not taking any medicine at all, right? A: That's correct. . . . Q: . . . VIGOR and APPROVe both had lower rates than your background rates, correct? A: Yes.").)

| Comparison of Heart Attack Rates In Studies Relied on by Dr. Graham | | |
|---|---|---|
| Study | Rate (per thousand patient years) | Patient Group |
| VIGOR | 7.4[9] | 50mg Vioxx users |
| APPROVe | 6.9[10] | 25mg Vioxx users |
| CLASS | 7.9[11] | Ibuprofen/diclofenac users |
| Ray | 12.4[12] | NSAID users and non-users |

placebo, it cannot be determined whether the relative increase of adverse cardiovascular events seen in the Vioxx arm of the study was attributable to: (i) a cardiovascular risk associated with high-dose Vioxx; (ii) a cardio-protective effect associated with naproxen; or (iii) chance, either in whole or in part.

[8] Bresalier at 1092; Bombardier at 1523.

[9] (Graham Dep. at 421:5-18.)

[10] (*Id.* at 423:17-424:24.)

[11] CLASS Study at 1247.

[12] Ray Study at 1072.

4

831963v.1

In other words, while Dr. Graham purports to find an excess number of heart attacks associated with Vioxx use, the underlying data that he relies on for this proposition show the exact *opposite* – namely, that Vioxx users had *fewer* heart attacks than users of other NSAIDs. Given this data, Dr. Graham has no legitimate scientific basis for his opinion that Vioxx caused between 88,000 to 140,000 "excess events" in the general population. The Court can and should exclude any evidence or argument based on this opinion. *See, e.g., Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[C]onclusions and methodology are not entirely distinct from one another. . . . A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Burleson v. Tex. Dep't of Crim. Justice*, 393 F.3d 577, 587 (5th Cir. 2004) ("A court may rightfully exclude expert testimony where a court finds that an expert has extrapolated data, and there is too great an analytical gap between the data and the opinion proffered." (internal quotation marks omitted)); *see also Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997) ("[A]n expert's testimony is unreliable even when the underlying data are sound if the expert draws conclusions from that data based on flawed methodology.").

***Third***, Dr. Graham's "excess events" estimate is not supported by his findings from the Kaiser Permanente data that he analyzed and published in *The Lancet*.[13] Dr. Graham conceded

---

[13] Nor is Dr. Graham's calculation admissible simply because this statement is found in a published article. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316 (11th Cir. 1999) ("[S]crutiny by one's peers does not insure admissibility. Again, it is well established that '[p]ublication . . . is not a *sine qua non* of admissibility.'") (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 593 (1993)); *Jones v. United States*, 933 F. Supp. 894, 899, 899 n.8 (N.D. Cal. 1996) (rejecting expert's reliance on statistically insignificant data to prove causation notwithstanding that articles reporting such data were published in peer-reviewed journals). Rather, Federal Rule of Evidence 702 requires the Court to determine that the opinion is "based upon sufficient facts or data" and is "the product of reliable principles and methods." FED. R. EVID. 702.

5

that the Kaiser Permanente data demonstrated *no* statistically significant increased risk of heart attacks or deaths associated with the use of Vioxx at the 25 milligram dose. (Graham Study at 4, Table 3.) His calculation is thus at odds with the Kaiser Permanente data, which was the basis for his published article.

Because Dr. Graham's estimate is scientifically unreliable and simply wrong, the Court should exclude it and any reference to it.[14] *See Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 (5th Cir. 1998) (en banc) (courts "are encouraged to exclude expert testimony that is speculative and lacking in scientific validity").

## II. DR. GRAHAM'S "EXCESS EVENTS" CALCULATION IS IRRELEVANT TO WHETHER VIOXX CAUSED PLAINTIFF'S INJURY, AND WOULD BE UNDULY PREJUDICIAL IF ADMITTED.

Dr. Graham's opinion that Vioxx caused a certain number of "excess events" in the general population is also irrelevant to plaintiff's claims. It has no tendency in reason to prove that plaintiff's use of Vioxx caused *his* alleged heart attack. *See Mobil Exploration & Producing v. A-Z/Grant Int'l Co.*, CIV. A. Nos. 91-3124, 91-4056, 1996 WL 194931, at *5 (E.D. La. Apr. 22, 1996) (excluding evidence of prior unrelated incidents because such evidence addressed problems with no apparent connection to plaintiff's case and if admitted would lead to a mini-trial, confuse the jury, and waste time); *Lowry v. Seaboard Airline R. Co.*, 171 F.2d 625, 627 (5th Cir. 1948) (noting risks of diversion posed by litigating facts of prior unrelated incidents and observing that "[f]ixing the blame in another case would not fix it in this one").

---

[14] For similar reasons, the Court should exclude any evidence of or reference to any other "excess event" estimates regarding Vioxx. In his deposition, for example, Dr. Graham testified that his estimate is lower than the estimates of "some other folks." (Graham Dep. at 463:5-10.) Dr. Graham could not identify who these "other folks" were or how they derived their estimates.

6

Dr. Graham found *no* statistically significant increased risk of heart attacks or deaths associated with the use of Vioxx at the 25 milligram dose. (Graham Study at 4, Table 3.) Mr. Mason used Vioxx at that dose. Because "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect," Dr. Graham's "excess events" estimate has no relevance to this case. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005) (internal citations omitted).

Even if Dr. Graham's "excess events" estimate had some relevance, the Court still should exclude any evidence of or reference to it on the ground that it is unduly prejudicial and confusing. Plaintiff's only purpose in seeking the admission of this evidence is to inflame the jury's passions against Merck. Indeed, plaintiff apparently hopes that if the jury learns that Vioxx supposedly caused tens of thousands of excess heart attacks and related deaths, then it will conclude that Vioxx must have caused plaintiff's alleged heart attack as well. Federal Rule of Evidence 403 was designed to prevent such tactics. Under Rule 403, evidence is unfairly prejudicial, and thus inadmissible, if it "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, triggers other mainsprings of human action, or may cause a jury to base its decision on something other than the established propositions of the case." *Moore v. Ashland*, 126 F.3d 679, 692 (5th Cir. 1997) (en banc), *cert. denied*, 526 U.S. 1064 (1999). Courts are advised to exclude as unduly prejudicial evidence that has an "undue tendency to suggest decision on an improper basis, commonly . . . an emotional one." *See* FED. R. EVID. 403, advisory committee's note. That is the case here.

Because evidence of or reference to Dr. Graham's "excess events" estimate would not assist the trier of fact to decide any issue that is relevant to this case – and would serve only to

7

831963v.1

inflame the jury's emotions and foster resentment of Merck – the Court should exclude any evidence of or argument about the calculation.

## III. CONCLUSION.

For the reasons stated above, the Court should exclude any evidence or argument pertaining to Dr. Graham's "excess events" calculation.

Dated: September 27, 2006

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
Defendants' Liaison Counsel

Philip S. Beck
Tarek Ismail
Shayna Cook
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

8

831963v.1

And

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: 202-434-5000
Fax: 202-434-5029

Attorneys for Merck & Co., Inc.

9

831963v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of Merck's Motion to Exclude Evidence or Argument Pertaining to Dr. Graham's "Excess Events" Calculation has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 27th day of September, 2006.

        */s/ Dorothy H. Wimberly*
        Dorothy H. Wimberly, 18509
        STONE PIGMAN WALTHER
        WITTMANN L.L.C.
        546 Carondelet Street
        New Orleans, Louisiana 70130
        Phone: 504-581-3200
        Fax: 504-581-3361
        dwimberly@stonepigman.com

        Defendants' Liaison Counsel

831963v.1