# Mason v. Merck & Co., Inc.
## Deposition Designations for Susan Baumgartner

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|

1. 12:14 - 12:15 Baumgartner, Susan 2005-02-05
   12: 14  Q. State your full name for the record.
   12: 15  A. My name is Susan Lynn Baumgartner.

2. 13:11 - 13:18 Baumgartner, Susan 2005-02-05
   13: 11  Q. Now, I take it today youre an'
   13: 12  employee for Merck; is that right?
   13: 13  A. Yes.
   13: 14  Q. And I want to focus probably in the
   13: 15  time period from 99/2000/2001 for a lot of this'
   13: 16  deposition. You were an employee for Merck at that
   13: 17  time; is that right?
   13: 18  A. Correct.

3. 13:19 - 14:01 Baumgartner, Susan 2005-02-05
   13: 19  Q. Why dont you give us a brief'
   13: 20  overview of your education.
   13: 21  A. I have a Doctor of Pharmacy and a
   13: 22  Masters of Business Administration from the'
   13: 23  University of Florida.
   13: 24  Q. Both degrees are from the University
   13: 25  of Florida?
   14: 01  A. They are.

4. 14:02 - 14:23 Baumgartner, Susan 2005-02-05
   14: 02  Q. Why dont you give us just a brief'
   14: 03  chronological history of your work background.
   14: 04  A. I started with Merck in the role of a
   14: 05  cardiovascular consultant.
   14: 06  Q. What year was that?
   14: 07  A. In 1996.
   14: 08  Q. Then what did you do?
   14: 09  A. I went to our U.S. headquarters.
   14: 10  Q. That was in Philadelphia?
   14: 11  A. Correct. Outside of Philadelphia.
   14: 12  Q. Okay.
   14: 13  A. In May of 1997 and worked on a
   14: 14  marketing team for our male pattern baldness
   14: 15  product, Propecia.
   14: 16  In mid-1998 I joined the team for
   14: 17  Vioxx and worked with our analgesic and
   14: 18  anti-inflammatory product, Vioxx, and moved to the
   14: 19  marketing team in May of 1999 where I worked on that
   14: 20  team for about two-and-a-half years.
   14: 21  Q. I saw some documents where you were
   14: 22  designated as marketing manager; is that right?
   14: 23  A. Thats correct.'

5. 19:20 - 20:14 Baumgartner, Susan 2005-02-05
   19: 20  Q. Now, the first paragraph in that
   19: 21  document gives a description of the results of your
   19: 22  work; is that right?
   19: 23  A. To which paragraph are you referring?
   19: 24  Q. Number I.
   19: 25  A. That outlines our brand goals. The
   20: 01  year-end employee input form is the employees'

*(Handwritten annotation in Objections column):* The way I see the thrust of the testimony is that the P. claims that Merck's knew of the cardiovascular "death" early on & explained it with "test results" then discloses them then P. maintains that its policy was effectuated in its marketing strategy. This testimony is relevant for this theory. 401 + 402. Overruled.

Re: 19:20-20:14
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 801 and 802 (hearsay) (2001 personnel file)



| | | | Objections | Ruling in Mason |
|---|---|---|---|---|
| | 20: | 02 | opportunity to provide information about what they | |
| | 20: | 03 | achieve throughout the year. So, we have brand | |
| | 20: | 04 | objectives, and we also have individual performance | |
| | 20: | 05 | objectives that you see under number II. | |
| | 20: | 06 | Q. So, what is the first objective, | |
| | 20: | 07 | brand objective, with regard to Vioxx listed under | |
| | 20: | 08 | Paragraph Number I? | |
| | 20: | 09 | A. It was to "Achieve gross sales" -- | |
| | 20: | 10 | actually, that was the result. Sorry. That was to | |
| | 20: | 11 | "Achieve gross sales of 2.9 billion for Vioxx. '" | |
| | 20: | 12 | Q. Lets stop there. So, your number' | |
| | 20: | 13 | one job was to help achieve gross sales of 2.9 | |
| | 20: | 14 | billion for Vioxx that year; correct? | |
| 6. | 20:17 - 20:19 | | Baumgartner, Susan 2005-02-05 | |
| | 20: | 17 | THE WITNESS: That was a result that | Re: 20:17-21:22 |
| | 20: | 18 | was achieved by a number of individuals within | **Def Obj:** 401 and 402 |
| | 20: | 19 | Merck. | **(relevance), 403 (undue** |
| 7. | 20:21 - 21:22 | | Baumgartner, Susan 2005-02-05 | **prejudice), 801 and 802** |
| | 20: | 21 | Q. But that is listed as your first job | **(hearsay) (2001** |
| | 20: | 22 | duty; right? | **personnel file)** |
| | 20: | 23 | A. The result of the work in 2001. | |
| | 20: | 24 | Q. For example, during the year, did you | |
| | 20: | 25 | have a way to see how the sales were going on Vioxx | |
| | 21: | 01 | during the year, say, 2001? | |
| | 21: | 02 | A. Yes. | |
| | 21: | 03 | Q. How did you do that? | |
| | 21: | 04 | A. We received performance data on | |
| | 21: | 05 | sales. | |
| | 21: | 06 | Q. So, you knew, for example -- I dont' | |
| | 21: | 07 | know if you divide up 12 into 2.9 billion, but youd' | |
| | 21: | 08 | know that you made 200 million or 400 million or | |
| | 21: | 09 | whatever that month in sales? | |
| | 21: | 10 | A. Thats correct.' | |
| | 21: | 11 | Q. Were you given some sort of a bonus | Re: 21:11-21:22 |
| | 21: | 12 | in working for Merck during this period? | **Def Obj:** Merck has |
| | 21: | 13 | A. Yes. Yes. | **moved in limine to** |
| | 21: | 14 | Q. How was the bonus calculated? | **exclude evidence related** |
| | 21: | 15 | A. The bonus is calculated based on the | **to compensation of** |
| | 21: | 16 | company achieving certain objectives, our United | **Merck employees** |
| | 21: | 17 | States division achieving certain objectives, our | |
| | 21: | 18 | marketing team achieving certain objectives, and my | |
| | 21: | 19 | individual performance, which included specific | |
| | 21: | 20 | objectives that were set at the beginning of the | |
| | 21: | 21 | year and also factors such as leadership and | |
| | 21: | 22 | compliance. | |
| 8. | 22:05 - 22:19 | | Baumgartner, Susan 2005-02-05 | |
| | 22: | 05 | A. (Witness nods.) | Re: 22:5-19 |
| | 22: | 06 | Q. Why dont you tell the jury what an' | **Def Obj:** 22:5 is a nod |
| | 22: | 07 | advocate is. | and is incomplete (non- |
| | 22: | 08 | A. An advocate is an individual who | verbal answer but no |
| | 22: | 09 | understands the information about our product, | question) |
| | 22: | 10 | believes in that information and supports the use of | |
| | 22: | 11 | the product in appropriate patients. | |
| | 22: | 12 | Q. So, an advocate is a doctor, right, a | |
| | 22: | 13 | medical doctor? | |

*Overruled*

2



| | | | | Objections | Ruling in Mason |
|---|---|---|---|---|---|
| | 22: | 14 | A. A doctor or another healthcare | | |
| | 22: | 15 | professional. | | |
| | 22: | 16 | Q. So, part of your job was to develop | | |
| | 22: | 17 | advocates all over the country on behalf of Vioxx; | | |
| | 22: | 18 | right? | | |
| | 22: | 19 | A. Thats correct.' | | |
| 9. | 23:03 - | 23:04 | Baumgartner, Susan 2005-02-05 | **Re: 23:3-4** | |
| | 23: | 03 | Q. But youd give money to doctors who' | **Def Obj:** 401 and 402 | |
| | 23: | 04 | prescribe Vioxx; right? | (relevance), 403 (undue | |
| 10. | 23:07 - | 23:10 | Baumgartner, Susan 2005-02-05 | prejudice) | |
| | 23: | 07 | THE WITNESS: There are a number of | **Re: 23:7-23:10** | |
| | 23: | 08 | examples of providing physicians compensation; for | **Def Obj:** 401 and 402 | |
| | 23: | 09 | example, for services provided, consulting services | **(relevance), 403 (undue** | |
| | 23: | 10 | provided, which is part of my responsibility. | prejudice) | |
| 11. | 24:09 - | 24:20 | Baumgartner, Susan 2005-02-05 | | |
| | 24: | 09 | Q. Let me ask you this. Was another | | |
| | 24: | 10 | part of your job to neutralize doctors who had | | |
| | 24: | 11 | spoken against Vioxx? | | |
| | 24: | 12 | A. Part of my responsibility was to | | |
| | 24: | 13 | develop advocates for the product, and in doing so, | | |
| | 24: | 14 | we identified a number of individuals who had | | |
| | 24: | 15 | misinformation, had incomplete information or a lack | | |
| | 24: | 16 | of information and were not supportive of Merck or | | |
| | 24: | 17 | Vioxx and may have been supporters of Celebrex at | | |
| | 24: | 18 | the time. And my responsibility was to provide | | |
| | 24: | 19 | those individuals with accurate information and | | |
| | 24: | 20 | bring them to a more neutral or a balanced position. | | |
| 12. | 28:23 - | 29:10 | Baumgartner, Susan 2005-02-05 | **Re: 28:23-29:10** | |
| | 28: | 23 | Q. Lets go to this Exhibit, Number 2.' | **Def Obj:** 401 and 402 | |
| | 28: | 24 | You were one of the authors of this memo; is that | (relevance), 403 (undue | |
| | 28: | 25 | right? | prejudice), 801 and 802 | |
| | 29: | 01 | A. Yes. | (hearsay) (7/1/99 | |
| | 29: | 02 | Q. The subject is "Advocate Development | Physicians to Neutralize) | |
| | 29: | 03 | Opportunity: Physicians to Neutralize." Did I read | | |
| | 29: | 04 | that right? | | |
| | 29: | 05 | A. Yes. | | |
| | 29: | 06 | Q. This is dated July 1st, 1999; right? | | |
| | 29: | 07 | A. Correct. | | |
| | 29: | 08 | Q. So, you were then up and running as a | | |
| | 29: | 09 | marketing manager at that time? | | |
| | 29: | 10 | A. Yes. | | |
| 13. | 37:19 - | 37:22 | Baumgartner, Susan 2005-02-05 | | |
| | 37: | 19 | Q. Let me go to Exhibit Number 5. Is | | |
| | 37: | 20 | Exhibit Number 5 one of the documents that you | | |
| | 37: | 21 | reviewed over the last couple of months? | | |
| | 37: | 22 | A. Yes. | | |
| 14. | 39:12 - | 39:16 | Baumgartner, Susan 2005-02-05 | **Re: 39:12-39:16** | |
| | 39: | 12 | Q. Do you see where it says, "Leo, As we | **Def Obj:** 401 and 402 | |
| | 39: | 13 | discussed, attached is the list of problem" | **(relevance), 403 (undue** | |
| | 39: | 14 | physicians that we must, at a minimum, neutralize." | **prejudice), 801 and 802** | |
| | 39: | 15 | Thats what you wrote; right?' | **(hearsay) (4/29/99 SB** | |
| | 39: | 16 | A. Yes. | **email to Mendez)** | |
| 15. | 41:20 - | 41:21 | Baumgartner, Susan 2005-02-05 | | |
| | 41: | 20 | Q. Let me go to the next exhibit, which | **Re: 41:20-41:25** | |
| | 41: | 21 | is number 6. | | |

Overruled

3

| | | | | Objections | Ruling in Mason |
|---|---|---|---|---|---|

**41:25 - 41:25 Baumgartner, Susan 2005-02-05**

41:  25     MR. TSOUGARAKIS: Thank you.

*Objections:* **Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 801 and 802 (hearsay) (4/29/99 SB email to Mendez)

Re: 41:25
**Def Obj:** Colloquy

*Ruling:* Overruled

**17. 42:02 - 42:19 Baumgartner, Susan 2005-02-05**

42:  02     Q. Is this one of the exhibits that you
42:  03     reviewed before you came here today?
42:  04     A. Yes.
42:  05     Q. In this exhibit, once again, the
42:  06     subject is "Physicians to Neutralize," right?
42:  07     A. Correct.
42:  08     Q. And Leonardo Mendez is writing back
42:  09     to you, Susan Baumgartner, with this e-mail; right?
42:  10     A. Right.
42:  11     Q. Hes saying, "Susan great Job!!! in'
42:  12     formatting and gathering this information. Now that
42:  13     we have a formal document to circulate, I would
42:  14     recommend we remove the word problem'from the'
42:  15     emails...(just in case...) we should use future'
42:  16     opportunity,etc." Did I read that right?'
42:  17     A. Yes.
42:  18     Q. So, he was saying, this isnt smart'
42:  19     to use the word "problem" in our e-mails; right?

Re: 42:2-42:19
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation), 801 and 802 (hearsay) (email from Mendez to SB)

**18. 42:21 - 42:22 Baumgartner, Susan 2005-02-05**

42:  21     THE WITNESS: Thats what he was'
42:  22     suggesting in his communication to me.

**19. 51:02 - 51:03 Baumgartner, Susan 2005-02-05**

51:  02     Q. Let me show you the next exhibit,
51:  03     Number 8. Its Bates Number AFI-0000026.'

Re: 42:21-42:22
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation), 801 and 802 (hearsay) (email from Mendez to SB)
Re: 51:2-51:3
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 801 and 802 (hearsay) (2/7/01 Baumgartner Diary)

**20. 51:11 - 51:21 Baumgartner, Susan 2005-02-05**

51:  11     Q. This is part of your personal daily
51:  12     record; right?
51:  13     A. Yes.
51:  14     Q. So, this is in your handwriting?
51:  15     A. It is.
51:  16     Q. Now, I want to go down to about the
51:  17     fifth line there. Do you see where it says,
51:  18     "Rheumatological Consulting Meeting." It says,
51:  19     "David Anstice will attend. Action plan for David
51:  20     or Doug Greene to call." Did I read that right?

Re: 51:11-51:21
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 801 and 802 (hearsay) (2/7/01 Baumgartner Diary)

4

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|

51:   21        A. Yes.

21.   52:14  -   52:19  Baumgartner, Susan 2005-02-05
52:   14        Q. So, this document is dated February        **Re: 52:14-52:19**
52:   15        7, right, of 2001?                            **Def Obj:** 401 and 402
52:   16        A. Correct.                                   (relevance), 403 (undue
52:   17        Q. Exhibit Number 7, the Sherwood             prejudice), 801 and 802
52:   18        letter, was dated January 23rd, 2001, just two weeks   (hearsay) (2/7/01
52:   19        before; correct?                              Baumgartner Diary;
                                                              1/23/01 Sherwood memo
                                                              to Anstice)

22.   52:21  -   52:21  Baumgartner, Susan 2005-02-05
52:   21        THE WITNESS: Yes.                             **Re: 52:21-53:10**
23.   52:23  -   53:10  Baumgartner, Susan 2005-02-05        **Def Obj:** 401 and 402
52:   23        Q. The subject of Exhibit Number 7 is         **(relevance), 403 (undue**
52:   24        "Academic Interactions." Right?               **prejudice), 801 and 802**
52:   25        A. Right.                                     **(hearsay) (2/7/01**
53:   01        Q. And lets just do this. Let's just'         **Baumgartner Diary; 1/23/01**
53:   02        go to Exhibit Number 8 for a second and look at the   **Sherwood memo to**
53:   03        doctors that you reference here. Do you see the   **Anstice)**
53:   04        first line? Will you read into the record the
53:   05        doctors that you reference in that note?
53:   06        A. McMillen, Singh, Whelton, Lee Simon,
53:   07        Stillman, Yocum, Lipsky.
53:   08        Q. Do you see where it says "Compilation
53:   09        in one report"?
53:   10        A. Yes.

24.   53:23  -   54:01  Baumgartner, Susan 2005-02-05        **Re: 53:23-54:1**
53:   23        Q. So, youve listed the same one, two,'       **Def Obj:** 401 and 402
53:   24        three, four, five, six, seven, eight, nine doctors   **(relevance), 403 (undue**
53:   25        that are mentioned in Exhibit Number 7 in Exhibit   **prejudice), 801 and 802**
54:   01        Number 8; right?                              **(hearsay) (2/7/01**
                                                              **Baumgartner Diary)**

25.   54:04  -   54:05  Baumgartner, Susan 2005-02-05        **Re: 54:4-54:5**
54:   04        THE WITNESS: Im going to need a'              **Def Obj:** 401 and 402
54:   05        minute to read through this.                  **(relevance), 403 (undue**
                                                              **prejudice), 801 and 802**
                                                              **(hearsay) (2/7/01**
                                                              **Baumgartner Diary)**

26.   54:15  -   54:20  Baumgartner, Susan 2005-02-05        **Re: 54:15-54:20**
54:   15        Q. Okay. We have to move on here.             **Def Obj:** 401 and 402
54:   16        Basically, lets just go down the two exhibits.'   **(relevance), 403 (undue**
54:   17        These were the problem doctors that Dr. Sherwood was   **prejudice), 801 and 802**
54:   18        talking about in Exhibit Number 7; right? McMillen,   **(hearsay) (2/7/01**
54:   19        Singh, Whelton, Lee Simon, Stillman, Yocum, Lipsky,   **Baumgartner Diary)**
54:   20        Petri and John Fries?

27.   54:23  -   54:24  Baumgartner, Susan 2005-02-05        **Re: 54:23-54:24**
54:   23        THE WITNESS: Could you please repeat          **Def Obj:** 401 and 402
54:   24        the question.                                 **(relevance), 403 (undue**
                                                              **prejudice), 801 and 802**
                                                              **(hearsay) (2/7/01**
                                                              **Baumgartner Diary)**

28.   55:01  -   55:03  Baumgartner, Susan 2005-02-05
55:   01        Q. These were the problem doctors that        Re: 55:1-55:3

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|

● 55: 02    you referred to, the same ones youve got in your'
55: 03    memo; right?

**Objections**

**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 801 and 802 (hearsay) (2/7/01 Baumgartner Diary)

29. 56:16 - 57:06 Baumgartner, Susan 2005-02-05
56: 16    A. It looks like theyre similar to some'
56: 17    of the ones in here.
56: 18    Q. Let me ask you. Lets go through'
56: 19    Exhibit Number 8. You have some interlineation up
56: 20    above these doctors. Will you read that into the
56: 21    record.
56: 22    For example, above Dr. McMillen, it
56: 23    says something. Whats it say?'
56: 24    A. It says "done this week."
56: 25    Q. So, he was neutralized this week?
57: 01    A. I dont remember what that refers to.'
57: 02    Q. Well, what does "done" mean? He
57: 03    wasnt cooked; was he?'
57: 04    A. I dont know.'
57: 05    Q. I mean, "done" meant neutralized;
57: 06    right?

Re: 56:16-57:6
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation), 801 and 802 (hearsay) (2/7/01 Baumgartner Diary; 1/23/01 Sherwood memo to Anstice)

30. 57:08 - 57:10 Baumgartner, Susan 2005-02-05
57: 08    THE WITNESS: I dont know what it'
57: 09    meant. These were notes in my planner. Im not'
● 57: 10    sure what discussions I had around them.

Re: 57:8-58:6
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation), 801 and 802 (hearsay) (2/7/01 Baumgartner Diary; 1/23/2001 Sherwood memo to Anstice

31. 57:12 - 58:06 Baumgartner, Susan 2005-02-05
57: 12    Q. Whats the next -- what's the note'
57: 13    above Dr. Singh?
57: 14    A. "Done last summer, no reports."
57: 15    Q. So, the analysis on him was done back
57: 16    then, no reports?
57: 17    A. I dont know what that refers to.'
57: 18    Q. Whats it say about Dr. Whelton?'
57: 19    A. "Done 2 weeks ago."
57: 20    Q. Whats it say about Dr. Simon?'
57: 21    A. "No reports."
57: 22    Q. Dr. Stillman?
57: 23    A. "No reports."
57: 24    Q. Do you see in Exhibit Number 7 where
57: 25    in the third paragraph Dr. Sherwood says to Dr.
58: 01    Anstice, your superior: "During the past three
58: 02    years, as the COX-2 wars have been waged, there have
● 58: 03    been several instances in which I have heard
58: 04    repeated messages from the field and headquarters
58: 05    about problem individuals." Did I read that right?
58: 06    A. Yes.

32. 88:06 - 88:19 Baumgartner, Susan 2005-02-05
88: 06    Q. Let me ask you this. Would it be

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|

88:  07   part of your job to neutralize a doctor who was
88:  08   hostile to Merck and to Vioxx by giving them money
88:  09   to change their attitude?
88:  10   A. No. It would not be a part of my
88:  11   job.
88:  12   Q. Why?
88:  13   A. Because thats not the way we conduct'
88:  14   business.
88:  15   Q. Would it be wrong to do that?
88:  16   A. Yes.
88:  17   Q. It would not meet the company
88:  18   standards?
88:  19   A. Correct.

33. 89:11 -   90:02 Baumgartner, Susan 2005-02-05
89:  11   Q. What was your job duty with regard to
89:  12   neutralizing physicians?
89:  13   A. My involvement with regard to those
89:  14   physicians that we discussed was to collect the
89:  15   information that was sent from the sales
89:  16   representatives and our health science associates
89:  17   who were interacting with these individuals on a
89:  18   regular basis and to try to understand why these
89:  19   individuals were not at a neutral or balanced
89:  20   position with regard to the product. And to the
89:  21   extent that I could collect that information and do
89:  22   what we could to communicate balanced information to
89:  23   those individuals or put them in touch with
89:  24   individuals within the company or --
89:  25   Q. Was part of your job to consider
90:  01   giving funding to the doctors or the hospitals or
90:  02   the universities that they were affiliated with?

34. 91:04 -   91:09 Baumgartner, Susan 2005-02-05
91:  04   THE WITNESS: We had policies and
91:  05   procedures in place for how we provide funding such
91:  06   as in the form of grants, and we have a separate
91:  07   department that handles that and evaluates grant
91:  08   proposals that are submitted by institutions or
91:  09   individuals.

35. 121:11-   121:15 Baumgartner, Susan 2005-02-05
121:  11   Q. Bates Number AFI0193472. Its dated'
121:  12   January 29, 2001. Its a memo from Michael T.'
121:  13   Phelan to Susan L. Baumgartner, copies going to
121:  14   Messrs. Bazmi, Coppola and Miller. The subject is
121:  15   "Medical School Grant Application."

**Re: 121:11-15**
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 801 and 802 (hearsay) (1/29/01 memo from M. Phelan to SB)

36. 124:02-   125:06 Baumgartner, Susan 2005-02-05
124:  02   Q. Tell me what this is about.
124:  03   A. The e-mail exchange is around a
124:  04   proposed study of Vioxx that looks like was
124:  05   submitted to our medical school grant committee for
124:  06   consideration.
124:  07   Q. Who was the proposed medical school?
124:  08   A. It looks like the VA Medical Center

**Re: 124:2-125:6**
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 801 and 802 (hearsay) (email exchange between SB and M. Phelan)

Overruled

7

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|
| 124: | 09 | in Albany. | | |
| 124: | 10 | Q. Why was it coming to you? | | |
| 124: | 11 | A. They were checking on the status of | | |
| 124: | 12 | it. I sat on the medical school grant committee, | | |
| 124: | 13 | and they were trying to find out when it would be | | |
| 124: | 14 | reviewed. | | |
| 124: | 15 | Q. Who was on the medical school grant | | |
| 124: | 16 | committee with you? | | |
| 124: | 17 | A. Primarily the scientists from MRL and | | |
| 124: | 18 | CDP, our two groups of researchers within the | | |
| 124: | 19 | company. | | |
| 124: | 20 | Q. In your e-mail on the front page at | | |
| 124: | 21 | the bottom, do you see where you say, "Sounds like | | |
| 124: | 22 | this is important from a business perspective | | |
| 124: | 23 | relative to the VA based on the brief background | | |
| 124: | 24 | that you provided. We have supported many similar | | |
| 124: | 25 | studies, so it is not critical from either a | | |
| 125: | 01 | scientific or strategic perspective that we support | | |
| 125: | 02 | it. However, clearly there are business reasons | | |
| 125: | 03 | that justify us providing funding. Ill keep you' | | |
| 125: | 04 | posted. Thank you." Signed "Susan." Did I read | | |
| 125: | 05 | that right? | | |
| 125: | 06 | A. Yes. | | |

37. 132:18- 132:2' Baumgartner, Susan 2005-02-05

| | | | | |
|---|---|---|---|---|
| 132: | 18 | Q. Okay. Lets see if I can find some' | Re: 132:18-21 | |
| 132: | 19 | more work that will help you from a business | **Def Obj:** 401 and 402 | |
| 132: | 20 | standpoint. Lets go to the next exhibit, which is' | (relevance), 403 (undue | |
| 132: | 21 | going to be 14. | prejudice) 801 and 802 | |

38. 133:05- 134:0: Baumgartner, Susan 2005-02-05

| | | | | |
|---|---|---|---|---|
| | | | (hearsay) (4/19/99 email | |
| 133: | 05 | Q. But this is a document that you got | to SB from C. | |
| 133: | 06 | from Caroline Yarbrough; right? The Bates was AFI, | Yarbrough); sarcastic | |
| 133: | 07 | which is your Bates Number, 0043312. Do you see | | |
| 133: | 08 | that? | | |
| 133: | 09 | A. Yes. | **Re: 133:5-134:3** | |
| 133: | 10 | Q. Who is Caroline Yarbrough? | **Def Obj:** 401 and 402 | |
| 133: | 11 | A. She was my boss when I first started | (relevance), 403 (undue | |
| 133: | 12 | with the marketing team. | prejudice), 602 (lacks | |
| 133: | 13 | Q. Now, she asked you if you could | foundation/calls for | |
| 133: | 14 | attend a meeting, right, regarding this HealthSouth | speculation), 801 and | |
| 133: | 15 | program? | 802 (hearsay) (4/19/99 | |
| 133: | 16 | A. Let me read through very quickly. | email to SB from C. | |
| 133: | 17 | (Witness reviewing document.) | Yarbrough) | |
| 133: | 18 | Q. I want to get through this before we | | |
| 133: | 19 | break for lunch. | | |
| 133: | 20 | So, just looking at this document, it | | |
| 133: | 21 | says, "Re: HealthSouth programs." Who is | | |
| 133: | 22 | HealthSouth? | | |
| 133: | 23 | A. There is a reference in here to | | |
| 133: | 24 | HealthSouth being the "Nations leading health care' | | |
| 133: | 25 | provider of comprehensive outpatient surgery and | | |
| 134: | 01 | rehab." | | |
| 134: | 02 | Q. Theyre a nationwide outfit; right?' | | |
| 134: | 03 | A. Uh-huh. | | |

39. 134:13- 134:1: Baumgartner, Susan 2005-02-05

| | | | | |
|---|---|---|---|---|
| 134: | 13 | Q. So, it says, "This is the group that | **Re: 134:13-19** | |

*(handwritten annotation: "Overruled" with bracket spanning the Ruling in Mason column)*

|  | Objections | Ruling in Mason |
|---|---|---|

134:  14    we partnered with," meaning HealthSouth, "theyre'
134:  15    all over the US." Did I read that right?
134:  16    A. Yes.
134:  17    Q. Then it says, "Were committing'
134:  18    700,000 to them." Right?'
134:  19    A. Right.

40. 134:24 - 134:25 Baumgartner, Susan 2005-02-05
134:  24    Q. So, this could be a big business
134:  25    connection, right, for you guys, HealthSouth?

**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 801 and 802 (hearsay) (4/19/99 email to SB from C. Yarbrough)

**Re: 134:24-134:25**
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation), 801 and 802 (hearsay) (4/19/99 email to SB from C. Yarbrough)

41. 135:03 - 135:04 Baumgartner, Susan 2005-02-05
135:  03    THE WITNESS: Im not sure what she'
135:  04    meant by that, but its stated in here.'

42. 135:06 - 135:20 Baumgartner, Susan 2005-02-05
135:  06    Q. Then it says, "They also have over
135:  07    6500 monitors in all patient rooms and waiting rooms
135:  08    and we will be running an arthritis segment and our
135:  09    commercial when it is available." Did I read that
135:  10    right?
135:  11    A. Yes.
135:  12    Q. So, you committed 700,000 to them,
135:  13    and youre going to be running your commercial and'
135:  14    an arthritis segment in all of their patient rooms
135:  15    and waiting rooms; right?
135:  16    A. Thats how this reads.'
135:  17    Q. Then it says, "In order to lock them'
135:  18    in,we had to start paying them in May." Did I'
135:  19    read that right?
135:  20    A. Yes.

**Re: 135:3-135:20**
**Def Obj: 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation), 801 and 802 (hearsay) (4/19/99 email to SB from C. Yarbrough)**

43. 167:22 - 168:16 Baumgartner, Susan 2005-02-05
167:  22    Q. The Bates Number on number 20 is
167:  23    AFI0044662 through 665. This is an e-mail from you
167:  24    to Bruce Freundlich; right? Who is Bruce
167:  25    Freundlich?
168:  01    A. Hes a region medical director with'
168:  02    Merck.
168:  03    Q. The subject was "Physicians to
168:  04    Neutralize." Right?
168:  05    A. Yes.
168:  06    Q. Under Dr. McMillen do you see down
168:  07    here about midway through, "met with" him -- "met
168:  08    with and fired a shot across the bow as Lou Sherwood
168:  09    would say - but he bashed Vioxx a few days later -
168:  10    some docs have told us that he is so biased that he
168:  11    has poor credibility and does not do a service to
168:  12    Searle - maybe worse things could happen." Did I
168:  13    read that right?
168:  14    A. Yes.

**Re: 167:22-168:16**
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation), 801 and 802 (hearsay) (7/26/99 email to SB from B. Freundlich); incomplete fragment, excludes answer



|  | | Objections | Ruling in Mason |
|---|---|---|---|

168:   15   Q. So, what was the "shot across the
168:   16   bow" that Lou Sherwood would use?

44. 168:18 -   168:18 Baumgartner, Susan 2005-02-05
168:   18   THE WITNESS: I dont know.'

45. 168:20 -   169:22 Baumgartner, Susan 2005-02-05
168:   20   Q. You dealt with Dr. Sherwood before;
168:   21   right?
168:   22   A. Ive never heard the term "shot'
168:   23   across the bow."
168:   24   Q. But you got this e-mail; right?
168:   25   A. Right.
169:   01   Q. Did you ask Mr. Freundlich what he
169:   02   meant by that?
169:   03   A. No. I dont remember doing that at'
169:   04   the time.
169:   05   Q. Lets look down below. Your e-mail'
169:   06   to him says -- actually, to him and others says, "I
169:   07   thought you should be aware of our most challenging
169:   08   (and also some of the most vocal and influential)
169:   09   national and regional physicians for Vioxx. The
169:   10   attached document lists 36 physicians who the
169:   11   National HSAs and A&A Specialty Representatives have
169:   12   identified as being:
169:   13   "1) Important from a business
169:   14   perspective in terms of influence and/or
169:   15   prescribing, and
169:   16   "2) Not as supportive of Merck and/or
169:   17   Vioxx as we would like."
169:   18   Did I read that right?
169:   19   A. Yes.
169:   20   Q. So, the first group includes people
169:   21   that were actually influential, but also people who
169:   22   were potential prescribers of Vioxx; right?

Re: 168:20-169:22
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation), 801 and 802 (hearsay) (7/26/99 email to SB from B. Freundlich)

46. 169:24 -   169:25 Baumgartner, Susan 2005-02-05
169:   24   THE WITNESS: It could be either/or
169:   25   or both.

47. 170:02 -   170:15 Baumgartner, Susan 2005-02-05
170:   02   Q. So, you were looking at these 36
170:   03   physicians as possible people who could be
170:   04   prescribing Vioxx?
170:   05   A. They were either using pain medicine
170:   06   or they were influencing. Based on their reputation
170:   07   or their knowledge or their position, they were
170:   08   communicating information about pain medicine to
170:   09   others.
170:   10   Q. Lets go on here. It says number 2,'
170:   11   "Not as supportive of Merck and/or Vioxx as we would
170:   12   like." So, this list, and well go to the list, but'
170:   13   these 36 included people that werent supportive of'
170:   14   Vioxx; right?
170:   15   A. Correct.

Re: 169:24-170:15
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation), 801 and 802 (hearsay) (7/26/99 email to SB from B. Freundlich)

48. 199:22 -   199:23 Baumgartner, Susan 2005-02-05
199:   22   Q. Lets go. Here's Exhibit 25 that I'
199:   23   previously referenced.

49. 206:23 -   207:02 Baumgartner, Susan 2005-02-05

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|

206:  23    Q. Let me ask it this way. Does this
206:  24    appear to be, first of all, work product done by
206:  25    your department at Merck, "this" being the
207:  01    attachment?
207:  02    A. It looks like a list that I compiled.

50.  207:09 - 207:12 Baumgartner, Susan 2005-02-05
207:  09    Q. So, whether its the 36 that were'
207:  10    attached to this memo of July 23rd or not, you did
207:  11    compile a list that appears like this list; correct?
207:  12    A. Yes.

51.  208:12 - 208:14 Baumgartner, Susan 2005-02-05
208:  12    Q. Going through, the first name on
208:  13    there is Roy Altman.
208:  14    A. Yes.

Re: 208:12-208:14
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation), 801 and 802 (hearsay) (list of physicians)

52.  208:20 - 209:15 Baumgartner, Susan 2005-02-05
208:  20    Q. Then if you go to the third page of
208:  21    this document which is AFI0201418, it says "Roy
208:  22    Altman." And then under the category called
208:  23    "Recommendations (in addition to continued focus by
208:  24    the specialists and HSAs), would you read into the
208:  25    record what it says in the box next to Roy Altman
209:  01    including quotes?
209:  02    A. It says "Show me the money.'-'
209:  03    clinical trials
209:  04    "- funding greater than 50,000,'
209:  05    Rheum Fellowship Program.
209:  06    "- Task Force to continue to work
209:  07    with him.
209:  08    "- Task force in place - Dr. Bruce
209:  09    Freundlich SBD (J.G.) RMD K. Edwards, M. Halpin &
209:  10    local reps."
209:  11    Q. When that "Show me the money" is in
209:  12    quotes, is that something that was attributed to Dr.
209:  13    Altman, or is that something that your
209:  14    representative as part of the task force that
209:  15    interviewed him made up?

Re: 208:20-209:15
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation), 801 and 802 (hearsay) (list of physicians)

53.  209:17 - 209:20 Baumgartner, Susan 2005-02-05
209:  17    THE WITNESS: I dont know. In'
209:  18    compiling this information, I cut and paste
209:  19    information provided in e-mails from our sales team
209:  20    and our health science associates.

Re: 209:17-209:20
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation), 801 and 802 (hearsay) (list of physicians)

5.  210:11 - 210:19 Baumgartner, Susan 2005-02-05
210:  11    Q. It says "Show me the money" and then
210:  12    theres a "- clinical trials." What does that refer'
210:  13    to?
210:  14    A. I dont know.'

Re: 210:11-210:19
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks

11

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|
| 210: | 15 | Q. I mean, this is your document. Im' | foundation/calls for speculation), 801 and 802 (hearsay) (list of physicians) | |
| 210: | 16 | asking what you meant when you put that down. | | |
| 210: | 17 | A. I have nothing further to add to what | | |
| 210: | 18 | I previously communicated about how the information | | |
| 210: | 19 | was collected. | | |

55. 213:20 -   214:16 Baumgartner, Susan 2005-02-05

| | | | | |
|---|---|---|---|---|
| 213: | 20 | Q. Then under Jane and Pat Box, it says, | Re: 213:20-214:16 | |
| 213: | 21 | "Continue to support with clinical studies. Visit | Def Obj: 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation), 801 and 802 (hearsay) (list of physicians) | |
| 213: | 22 | by Dr. Greg Geba, CDP." Do you know Greg Geba? | | |
| 213: | 23 | A. Yes. | | |
| 213: | 24 | Q. How do you know him? | | |
| 213: | 25 | A. I worked with him throughout my | | |
| 214: | 01 | career. Hes a researcher in our clinical' | | |
| 214: | 02 | development department. | | |
| 214: | 03 | Q. Then it says "If continue to | | |
| 214: | 04 | support," the Boxes, they "will be neutralized." | | |
| 214: | 05 | Right? Thats what it appears to say.' | | |
| 214: | 06 | A. Thats what it says.' | | |
| 214: | 07 | Q. What does that mean "If continue to | | |
| 214: | 08 | support" — oh, with clinical studies? | | |
| 214: | 09 | A. Again, this is information that I cut | | |
| 214: | 10 | and paste provided by others. | | |
| 214: | 11 | Q. Okay. But I mean, if you had to tell | | |
| 214: | 12 | someone that was superior to you at your company | | |
| 214: | 13 | what you meant by "If continue to support, will be | | |
| 214: | 14 | neutralized," would that mean that if you continued | | |
| 214: | 15 | to support with clinical studies, theyll be' | | |
| 214: | 16 | neutralized? | | |

56. 214:20 -   214:23 Baumgartner, Susan 2005-02-05

| | | | | |
|---|---|---|---|---|
| 214: | 20 | Q. Correct? | Re: 214:20-214:23 | |
| 214: | 21 | A. I would inform my superior that I did | Def Obj: 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation), 801 and 802 (hearsay) (list of physicians) | |
| 214: | 22 | not write this statement and that Im not sure what' | | |
| 214: | 23 | was meant by it. | | |

57. 218:16 -   219:04 Baumgartner, Susan 2005-02-05

| | | | | |
|---|---|---|---|---|
| 218: | 16 | Q. Lets go to William Dillin and go to' | Re: 218:16-219:4 | |
| 218: | 17 | "Recommendations." Thats 1424, Bates Number 1424.' | Def Obj: 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation), 801 and 802 (hearsay) (list of physicians); sarcastic | |
| 218: | 18 | Do you see that one? Will you read into the record | | |
| 218: | 19 | the recommendations for William Dillin? | | |
| 218: | 20 | A. "Weekend ConsultantsMeeting in an' | | |
| 218: | 21 | elegant location (New York, Hawaii) or a five-day | | |
| 218: | 22 | International Meeting with the top thought leaders | | |
| 218: | 23 | on pain management. Visit from L. Mendez or M. | | |
| 218: | 24 | Thomas to open door. Would prefer to stay with | | |
| 218: | 25 | Specialty Senior Management." | | |
| 219: | 01 | Q. Was it your practice at Merck to set | | |
| 219: | 02 | up weekend consultant meetings in Hawaii or elegant | | |
| 219: | 03 | places in order to convince the doctor to be | | |
| 219: | 04 | neutral? | | |

59. 219:07 -   219:10 Baumgartner, Susan 2005-02-05

| | | | | |
|---|---|---|---|---|
| | 07 | THE WITNESS: Im not familiar with' | | |

|  | Objections | Ruling in Mason |
|---|---|---|

08 any meeting in Hawaii, and the purpose of our
09 consultants meetings was to conduct market research
10 with physicians.

58. 219:25 - 220:04 Baumgartner, Susan 2005-02-05
219: 25 Q. Is it wrong for Merck to promise
220: 01 trips to Hawaii or a five-day international trip in
220: 02 order to induce or entice a doctor such as Dr.
220: 03 Dillin to change his position from anti-Vioxx to
220: 04 neutral?

**Re: 219:7-219:10**
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation), 801 and 802 (hearsay) (list of physicians); sarcastic

60. 220:07 - 220:08 Baumgartner, Susan 2005-02-05
220: 07 THE WITNESS: Its -- I'm limited to'
220: 08 my experience with --

61. 220:10 - 220:13 Baumgartner, Susan 2005-02-05
220: 10 Q. Is it right or wrong?
220: 11 A. Ive never seen a meeting conducted'
220: 12 for that purpose, and the consultants meetings that
220: 13 Im aware of were used for market research.'

62. 225:14 - 225:24 Baumgartner, Susan 2005-02-05
225: 14 Q. Now, under James McMillen, under his
225: 15 name it says "Discredit." Right?
225: 16 A. Yes.
225: 17 Q. And then under the recommendation,
225: 18 the recommendation says, "Strong recommendation to
225: 19 discredit him." Is that what it says?
225: 20 A. Yes.
225: 21 Q. Was that part of your attempt to give
225: 22 information to doctors when you were neutralizing
225: 23 physicians, that you would discredit some doctors as
225: 24 well?

**Re: 225:14-225:20**
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation), 801 and 802 (hearsay) (list of physicians)

64. 226:02 - 226:03 Baumgartner, Susan 2005-02-05
226: 02 THE WITNESS: Im not familiar with'
226: 03 instances where Merck discredited individuals.

65. 226:07 - 226:09 Baumgartner, Susan 2005-02-05
226: 07 Did Merck attempt to discredit Dr.
226: 08 McMillen?
226: 09 A. I dont know.'

**Re: 226:7-226:9**
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation)

66. 228:15 - 229:02 Baumgartner, Susan 2005-02-05
228: 15 Q. By the way, how was the term
228: 16 "neutralized" first used? Do you know who first
228: 17 used it at Merck?
228: 18 A. I dont remember.'
228: 19 Q. Was that a term that was already
228: 20 being used in documents when you first were hired by
228: 21 Merck?
228: 22 A. I dont recall.'
228: 23 Q. Well, we saw there was a document in
228: 24 April of 1999 that you were listed as an author
228: 25 using the term "Physicians to Neutralize." Is that
229: 01 the first time you used that term or had you used it
229: 02 previous to April of 99?'

**Re: 228:15-229:2**
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 602 (lacks foundation/calls for speculation)

| | Objections | Ruling in Mason |
|---|---|---|

● 229:05 -      229:05 Baumgartner, Susan 2005-02-05
   229:  05          THE WITNESS: I just dont remember.'

**Re: 229:5-229:5**
**Def Obj:** 401 and 402
(relevance), 403 (undue
prejudice), 602 (lacks
foundation/calls for
speculation)

*Overruled*

1.  567:25 -      568:09 Baumgartner, Susan 2005-03-11
    567:   25          Q. I want to ask you some questions
    568:   01          about Plaintiffs counsel's examination regarding'
    568:   02          threatening -- Merck threatening physicians. Do you
    568:   03          recall that?
    568:   04          A. Yes.
    568:   05          Q. And Plaintiffs counsel asked you'
    568:   06          questions regarding whether or not certain
    568:   07          statements in your own view constituted threats to
    568:   08          physicians. Do you recall that?
    568:   09          A. Yes.
2.  568:12 -      568:13 Baumgartner, Susan 2005-03-11
    568:   12          Q. And what was your opinion as to
    568:   13          whether or not those constituted threats?
3.  568:15 -      568:20 Baumgartner, Susan 2005-03-11
    568:   15          THE WITNESS: They were so far from
●   568:   16          the reality of what I saw in terms of Merck
    568:   17          personnel interacting with physicians, it wasnt'
    568:   18          consistent with my experience. I have not seen or
    568:   19          heard about Merck personnel threatening physicians.
    568:   20          And thats all I thought about.'
4.  568:22 -      569:04 Baumgartner, Susan 2005-03-11
    568:   22          Q. To your knowledge, did you or anyone,
    568:   23          to your knowledge, at Merck threaten physicians?
    568:   24          A. No.
    568:   25          Q. We also heard a lot in your testimony
    569:   01          about the word neutralize. Can you explain to the
    569:   02          ladies and gentlemen of the jury what you meant when
    569:   03          you used the word neutralized in those documents
    569:   04          that you offered?
5.  569:06 -      569:14 Baumgartner, Susan 2005-03-11
    569:   06          THE WITNESS: Neutralize refers to
    569:   07          bringing physicians to a more neutral or balanced
    569:   08          position. We identified selected individuals,
    569:   09          selected physicians, who either had misinformation
    569:   10          or lack of information, incorrect information, and
    569:   11          presented those individuals with accurate and
    569:   12          balanced information about the product in an effort
    569:   13          to bring them to a more neutral or balanced
    569:   14          position.
6.  569:16 -      569:24 Baumgartner, Susan 2005-03-11
●   569:   16          Q. Did you ever pay physicians to change
    569:   17          their minds about Vioxx?
    569:   18          A. No.
    569:   19          Q. Did you ever pay physicians to
    569:   20          improperly influence them?
    569:   21          A. No.

|  |  |  | Objections | Ruling in Mason |
|---|---|---|---|---|
| | 569: | 22 | Q. During the course of your deposition, | | |
| | 569: | 23 | did you feel that that is what Plaintiffs counsel' | | |
| | 569: | 24 | was accusing you of doing? | | |
| 7. | 570:01- | 570:0' | Baumgartner, Susan 2005-03-11 | | |
| | 570: | 01 | THE WITNESS: Yes. | | |
| 8. | 570:03- | 572:0! | Baumgartner, Susan 2005-03-11 | | |
| | 570: | 03 | Q. And how did those accusations make | | |
| | 570: | 04 | you feel? | | |
| | 570: | 05 | A. They were offensive. | | |
| | 570: | 06 | Q. And why is that? | | |
| | 570: | 07 | A. Because that was not what we were | | |
| | 570: | 08 | doing. Its in no way reflective of what I saw or' | | |
| | 570: | 09 | what the company did during that period. | | |
| | 570: | 10 | Q. During the time that you had | | |
| | 570: | 11 | responsibility for Vioxx, did you become aware of | | |
| | 570: | 12 | the VIGOR results? | | |
| | 570: | 13 | A. Yes. | | |
| | 570: | 14 | Q. And could you tell the jury what the | | |
| | 570: | 15 | results of the VIGOR trial were? | | |
| | 570: | 16 | A. The VIGOR trial demonstrated that | | |
| | 570: | 17 | Vioxx was associated with less stomach problems than | | |
| | 570: | 18 | naproxen and those stomach problems included | | |
| | 570: | 19 | perforations, ulcers, bleeds and obstructions. And | | |
| | 570: | 20 | the other result from VIGOR was that naproxen was | | |
| | 570: | 21 | associated with fewer heart attacks than Vioxx | | |
| | 570: | 22 | because it behaved like aspirin. It was | | |
| | 570: | 23 | cardioprotective in that study. | | |
| | 570: | 24 | Q. Did you believe, when you received | | |
| | 570: | 25 | the VIGOR results, that Vioxx caused heart attacks? | | |
| | 571: | 01 | A. No, I did not. | | |
| | 571: | 02 | Q. Did anybody, to your knowledge, at | | |
| | 571: | 03 | Merck believe that Vioxx caused heart attacks? | | |
| | 571: | 04 | A. No. | | |
| | 571: | 05 | Q. What was your basis for your belief | | |
| | 571: | 06 | that Vioxx did not cause heart attacks? | | |
| | 571: | 07 | A. Our researchers at Merck. | | |
| | 571: | 08 | Individuals who studied the data that was available | | |
| | 571: | 09 | had concluded that Vioxx did not cause heart | | |
| | 571: | 10 | attacks. We had data supporting the safety of | | |
| | 571: | 11 | Vioxx, the cardiovascular safety profile of Vioxx | | |
| | 571: | 12 | relative to placebo and non-naproxen NSAIDS. And | | |
| | 571: | 13 | the reason for the results in the view of the MRL | | |
| | 571: | 14 | researches who evaluated that information, | | |
| | 571: | 15 | physicians, was that the reason for the difference | | |
| | 571: | 16 | in heart attacks in the VIGOR study was due to the | | |
| | 571: | 17 | cardioprotective effects of naproxen. | | |
| | 571: | 18 | Q. That was the explanation provided by | | |
| | 571: | 19 | the scientists at MRL? | | |
| | 571: | 20 | A. Correct. But that was also confirmed | | |
| | 571: | 21 | in my interactions with physicians in various | | |
| | 571: | 22 | specialties as part of the work that I did in | | |
| | 571: | 23 | understanding what the perspectives of the medical | | |
| | 571: | 24 | and scientific community were. The consensus from | | |
| | 571: | 25 | those meetings was consistent with MRLs' | | |
| | 572: | 01 | interpretation of the data or our researchers -- | | |

|  |  | | Objections | Ruling in Mason |
|---|---|---|---|---|

572: 02    interpretation of the data by our researchers at
572: 03    Merck. So the consensus from the physicians that we
572: 04    spoke with in the community was that Vioxx did not
572: 05    cause heart attacks.

**Baumgartner, Susan 2005-09-30**

1.  18:16  -  18:24  Baumgartner, Susan 2005-09-30
    18:  16    Q. And was part of that your
    18:  17    responsibility to provide those
    18:  18    individuals with accurate information
    18:  19    about the product Vioxx?
    18:  20    A. It was providing information
    18:  21    about Vioxx, as well as other pain
    18:  22    medicine that was available, and getting
    18:  23    thoughts on all of those areas. But I
    18:  24    did present scientific data for Vioxx.
2.  21:19  -  22:02  Baumgartner, Susan 2005-09-30
    21:  19    Q. And in order for them to
    21:  20    have any understanding of the scientific
    21:  21    data, it was important that that
    21:  22    information be accurate that you gave
    21:  23    them; is that correct?
    21:  24    A. It was my hope that the
    22:  01    information that was communicated by the
    22:  02    presenters there was accurate, yes.

    22:24  -  23:3  Baumgartner, Susan 2005-09-30
    22: 24    Q:  Tell me why that's important
    23: 1    that a doctor that might be prescribing
    23: 2    Vioxx have accurate information. Why is
    23: 3    that important?

Re: 22:24-23:3
**Def Obj:** 602 (lacks foundation/calls for speculation)
Re: 22:23-23:3
**Def Obj:** Incomplete designation

3.  23:06  -  23:08  Baumgartner, Susan 2005-09-30
    23:  06    THE WITNESS: We want
    23:  07    physicians to be fully informed
    23:  08    about the products.
4.  23:10  -  23:23  Baumgartner, Susan 2005-09-30
    23:  10    Q. And why is it important that
    23:  11    they be fully informed about the
    23:  12    products?
    23:  13    A. So they can use the products
    23:  14    appropriately. The --
    23:  15    Q. Is part -- excuse me. I
    23:  16    dont mean to cut you off. Were you'
    23:  17    finished there?
    23:  18    A. And make the right decisions
    23:  19    about use of the product.
    23:  20    Q. So, in other words, its'
    23:  21    important that you give the doctor the
    23:  22    correct information so they can use it
    23:  23    properly; is that correct?
5.  24:02  -  24:04  Baumgartner, Susan 2005-09-30

Re: 23:6-23:8
**Def Obj: Answer without a question**

Re: 23:10-23:23
**Def Obj:** 602 (lacks foundation/calls for speculation)

Overruled

16



| | | | |
|---|---|---|---|
| 24: | 02 | THE WITNESS: It is | |
| 24: | 03 | important that we give accurate | |
| 24: | 04 | information. | |

**Objections**

Re: 24:2-24:4
**Def Obj:** 602 (lacks foundation/calls for speculation)

6.  30:15 - 30:16 Baumgartner, Susan 2005-09-30
    30: 15    Q. Well, let me just show you
    30: 16    what Im talking about.'

Re: 30:15-30:20
**Def. Obj.:** sidebar

7.  30:20 - 30:20 Baumgartner, Susan 2005-09-30
    30: 20    BY MR. PAPANTONIO:

8.  33:01 - 33:17 Baumgartner, Susan 2005-09-30
    33: 01    Q. So, before I had asked you,
    33: 02    remember, before I showed you this
    33: 03    document, whether one of the things that
    33: 04    you did was to review medical literature
    33: 05    and give your impressions about that
    33: 06    literature. Do you remember me asking
    33: 07    you that question?
    33: 08    A. Correct.
    33: 09    Q. So, this document, obviously
    33: 10    thats what you did in this document, you'
    33: 11    reviewed a piece of medical literature in
    33: 12    the JAMA. Tell the jury what that is.
    33: 13    A. The Journal of the American
    33: 14    Medical Association.
    33: 15    Q. And you gave your
    33: 16    impressions; is that correct?
    33: 17    A. Of this publication.

Re: 33:1-33:17
**Def Obj:** 401 and 402 (relevance), 403 (undue prejudice), 801 and 802 (hearsay)

9.  34:12 - 35:06 Baumgartner, Susan 2005-09-30
    34: 12    Q. Well, do you see where it
    34: 13    says "Threats" there, Ms. Baumgartner?
    34: 14    A. Yes.
    34: 15    Q. Lets read. It says,'
    34: 16    "Available data raise a cautionary flag'
    34: 17    about the risk of cardiovascular events
    34: 18    with COX-2 inhibitors...Our findings
    34: 19    suggest a potential increase in CV event
    34: 20    rates for the presently available COX-2
    34: 21    inhibitors...We believe that it is
    34: 22    mandatory to conduct a trial specifically
    34: 23    assessing CV risk and benefit of these
    34: 24    agents.'"
    35: 01    Now, I want to ask you some
    35: 02    questions since this is the beginning of
    35: 03    this deposition. What is a "CV risk"?
    35: 04    What does that mean?
    35: 05    A. It typically refers to
    35: 06    cardiovascular risk.

Re: 34:12-35:6
**Def. Obj:** 401 and 402 (relevance), 403 (undue prejudice), 801 and 802 (hearsay)

10.  38:18 - 38:19 Baumgartner, Susan 2005-09-30
     38: 18    Q. You wrote that underneath
     38: 19    the heading that says "Threats."

11.  38:24 - 39:06 Baumgartner, Susan 2005-09-30
     38: 24    Q. Do you see this on your
     39: 01    screen, where it says "Threats"? So, you
     39: 02    wrote "Threats," and then underneath
     39: 03    "Threats" you wrote, "VIGOR," Which was a

Re: 38:18-39:6
**Def. Obj:** 401 and 402 (relevance), 403 (undue prejudice), 801 and 802 (hearsay)

**Ruling in Mason**

*Overrule*

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|



```
    39:   04    study that was conducted by Merck; is
    39:   05    that correct?
    39:   06    A. Correct.
12. 48:02  -  48:13 Baumgartner, Susan 2005-09-30         Re: 48:2-48:13
    48:   02    Q. In terms of this document,             Def. Obj: 401 and 402
    48:   03    we want to talk about definitions here.   (relevance), 403 (undue
    48:   04    "Threat" means what to Susan Baumgartner? prejudice), repetitive
    48:   05    A. When I look at this document
    48:   06    today?
    48:   07    Q. Yes.
    48:   08    A. I defined it as inconsistent
    48:   09    with Mercks position about the product'
    48:   10    and other products.
    48:   11    Q. You would say bad for
    48:   12    Mercks position; right? Bad?'
    48:   13    A. Different. Not consistent.
13. 55:01  -  55:07 Baumgartner, Susan 2005-09-30
    55:   01    You chose to write down
    55:   02    underneath "Threats," Susan Baumgartner,
    55:   03    not anybody else, chose to write down
    55:   04    that theres an "Increased relative risk'
    55:   05    of developing CV events." Correct?
    55:   06    Susan Baumgartner chose to write that
    55:   07    down underneath "Threats"?
14. 55:11  -  55:14 Baumgartner, Susan 2005-09-30
    55:   11    Q. Nobody else but Susan
    55:   12    Baumgartner wrote that?
    55:   13    A. Thats what this e-mail'
    55:   14    indicates.
15. 57:01  -  57:08 Baumgartner, Susan 2005-09-30         Re: 57:1-57:8
    57:   01    Q. And so were talking about'            Def. Obj: 401 and 402
    57:   02    in this document that you created, were' (relevance), 403 (undue
    57:   03    talking about increased risk, relative    prejudice), repetitive
    57:   04    risk of developing CV events, and youre'
    57:   05    also talking about MI rates; correct?
    57:   06    "MI" is heart attack. They were higher
    57:   07    according to what you wrote down here
    57:   08    also, werent they?'
16. 57:11  -  57:17 Baumgartner, Susan 2005-09-30         Re: 57:11-57:17
    57:   11    THE WITNESS: Its stated'                 Def. Obj: 401 and 402
    57:   12    here. As I mentioned, I believe           (relevance), 403 (undue
    57:   13    this is a summary of what the             prejudice), repetitive
    57:   14    authors in that publication
    57:   15    concluded, because these were
    57:   16    contrary to Mercks beliefs and'
    57:   17    conclusions about the product.
17. 245:01 -  245:18 Baumgartner, Susan 2005-09-30
    245:  01    BY MR. PAPANTONIO:                        Re: 245:1-245:18
    245:  02    Q. Now, I believe youve seen'            Def. Obj: 401 and 402
    245:  03    this document. Take a minute, but it      (relevance), 602 (lacks
    245:  04    says, "To: Baumgartner, Susan L."        foundation/calls for
    245:  05    Thats you, correct?'                     speculation)
    245:  06    A. Yes.
    245:  07    Q. From Charlotte McKines? Is
    245:  08    it McKines?
```

18

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|



245:  09   A. McKines.
245:  10   Q. McKines. Okay. From
245:  11   Charlotte McKines. Tell us who Charlotte
245:  12   McKines is.
245:  13   A. She was the head of our
245:  14   marketing team.
245:  15   Q. Do you see the date on that
245:  16   letter, that memo, was it 1999, 8-23-99;
245:  17   correct?
245:  18   A. Correct.

18. 248:05 - 249:02 Baumgartner, Susan 2005-09-30

248:  05   Q. The document I want to go to
248:  06   now is, please take that down, is 1260
248:  07   that you have in front of you, and thats'
248:  08   to Susan Baumgartner, thats you, and it'
248:  09   says, "Background - Dr. Andrew Welton."
248:  10   Do you see that? And it says, "for bad
248:  11   guys list." Whats the "bad guys list"?'
248:  12   Are you putting Dr. Whelton on a bad guys
248:  13   list in 1999?
248:  14   A. The list that we were
248:  15   probably referring to is the list of
248:  16   physicians that did not have complete
248:  17   information.
248:  18   Q. Well --
248:  19   A. That were collecting'
248:  20   background information about. So, its'
248:  21   --
248:  22   Q. Why do you call them "bad
248:  23   guys"? They dont have complete'
248:  24   information, so you put them on a bad
249:  01   guys list? What does "bad guys" mean to
249:  02   you?

Re: 248:5-249:2
**Def. Obj:** 401 and 402
(relevance), 403 (undue
prejudice), 602 (lacks
foundation/calls for
speculation), 801 and 802
(hearsay)

19. 249:05 - 249:06 Baumgartner, Susan 2005-09-30

249:  05   THE WITNESS: I didnt call'
249:  06   them that.

Re: 249:5-249:10
**Def. Obj:** 401 and 402
(relevance), 403 (undue
prejudice), 602 (lacks
foundation/calls for
speculation), 801 and 802
(hearsay)

20. 249:08 - 249:10 Baumgartner, Susan 2005-09-30

249:  08   Q. Well, did you write back and
249:  09   say, why are we calling these guys bad
249:  10   guys?

21. 249:13 - 249:14 Baumgartner, Susan 2005-09-30

249:  13   THE WITNESS: I dont'
249:  14   remember.

Re: 249:13-249:14
**Def Obj:** 401 and 402
(relevance), 403 (undue
prejudice), 602 (lacks
foundation/calls for
speculation), 801 and
802 (hearsay)

22. 498:02 - 498:24 Baumgartner, Susan 2005-09-30

498:  02   Q. Okay, Ms. Baumgartner, you
498:  03   are on camera. Im George Tsougarakis.'
498:  04   I think everybody in the room would agree
498:  05   it is a good thing that Im not on'
498:  06   camera, but you should address your
498:  07   remarks to the camera. I represent Merck
498:  08   & Company, and Im going to ask you a few'
498:  09   questions.
498:  10   Lets begin by introducing'
498:  11   yourself to the jury. Can you tell the
498:  12   jury where you were born and raised?

Re: 498:2-9
**Pltf Obj:** Sidebar; 401;
402; Predatory Comment

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|

```
498:   13      A. My name is Susan Lynn
498:   14      Baumgartner. I was born in DeLand,
498:   15      Florida and raised in Gainesville,
498:   16      Florida where I went to high school at
498:   17      would Buchholz High School.
498:   18      Spent a couple of years
498:   19      doing prepharmacy work at the University
498:   20      of Florida in Tampa, Florida, and then
498:   21      did five years of work to obtain my
498:   22      Doctor of Pharmacy degree and Master of
498:   23      Business Administration degree from the
498:   24      University of Florida in Gainesville.
23.  499:01 -  499:24 Baumgartner, Susan 2005-09-30
499:   01      Q. Can you tell the jury what
499:   02      year you graduated with your joint degree
499:   03      in pharmacy and your M.B.A.?
499:   04      A. I graduated in 1996.
499:   05      Q. In 1996, did you become
499:   06      employed?
499:   07      A. I did. In August of 1996, I
499:   08      was employed by Merck & Company.
499:   09      Q. Can you tell the jury a
499:   10      little bit about -- firstly, why did you
499:   11      choose a career in pharmacy?
499:   12      A. The main reason I chose a
499:   13      career in pharmacy is that my father is a
499:   14      pharmacist, and I wanted to follow in his
499:   15      footsteps. I wanted to be involved in
499:   16      healthcare because I believe its an'
499:   17      important part of life, and I believe
499:   18      pharmacy is a very noble profession.
499:   19      Q. Can you tell the jury in
499:   20      1996 when you graduated with your degree
499:   21      in pharmacy and your M.B.A., how is it
499:   22      that you became employed by Merck?
499:   23      A. I was actually recruited by
499:   24      an individual within Merck who was aware
24.  500:01 -  500:24 Baumgartner, Susan 2005-09-30
500:   01      of the dual Doctor of Pharmacy and Master
500:   02      of Business Administration degree
500:   03      program, and asked one of my teachers at
500:   04      the time about -- one of the faculty
500:   05      members there about the program. I
500:   06      talked with them, I had a number of
500:   07      different opportunities that I was
500:   08      exploring and did a lot of research about
500:   09      the company and talked with a lot of
500:   10      different individuals who had experiences
500:   11      with the company, and I felt it was a
500:   12      great opportunity.
500:   13      Q. Can you tell the jury when
500:   14      you were researching what issues were
500:   15      important to you in choosing a career?
500:   16      A. It was important to me that
500:   17      I was with a company that had ethics and
```

**Re: 499:9-18**
**Pltf Obj:** 401; 402

Overruled

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|



500: 18    values that were similar to my own. I
500: 19    had just finished training as a
500: 20    pharmacist, so, it was important that the
500: 21    company had good products that
500: 22    represented medical advances and
500: 23    breakthroughs. It was important to me
500: 24    how they communicated information about

**Re: 500:13-501:12**
**Pltf Obj:** 401; 402; 403; 602; lack of foundation; improper opinion testimony of Merck

25. 501:01 - 501:12 Baumgartner, Susan 2005-09-30
501: 01    the products and the use of their
501: 02    products to produce good outcomes in
501: 03    patients. And their financial
501: 04    information was very good. Their
501: 05    opportunities in terms of career were
501: 06    good as well. And their reputation and
501: 07    scientific integrity and everything they
501: 08    stood for was also very strong.
501: 09    Q. Can you tell the jury what
501: 10    you learned in your research about
501: 11    Mercks ethics in the scientific'
501: 12    integrity?

26. 501:20 - 501:23 Baumgartner, Susan 2005-09-30
501: 20    A. I learned that Mercks'
501: 21    mission from the very beginning was to
501: 22    help patients, and their ethics were very
501: 23    strong. They did the right thing.

27. 503:12 - 503:20 Baumgartner, Susan 2005-09-30
503: 12    THE WITNESS: The decisions
503: 13    that were made, I felt, were
503: 14    consistent with values, scientific
503: 15    integrity, presenting information
503: 16    to allow prescribers to make
503: 17    decisions, making decisions with a
503: 18    patient in mind. Those were all
503: 19    very important to me, and I felt
503: 20    Merck exemplified that.

**Re: 503:12-21**
**Pltf Obj:** 401; 402; 403; 602; lack of foundation; improper opinion testimony of Merck

28. 503:22 - 503:24 Baumgartner, Susan 2005-09-30
503: 22    Q. How was your experience at
503: 23    Merck compared to the research you did
503: 24    before you joined Merck?

29. 504:01 - 504:24 Baumgartner, Susan 2005-09-30
504: 01    A. My experience with Merck has
504: 02    been very positive, and it has exceeded
504: 03    the expectations that I had before I came
504: 04    in to the company.
504: 05    Q. When did you first get
504: 06    responsibility for Vioxx?
504: 07    A. I joined the market
504: 08    integration team for Vioxx in the middle
504: 09    of 1998.
504: 10    Q. How many years of experience
504: 11    did you have at Merck when you joined the
504: 12    marketing team for Vioxx?
504: 13    A. Just under two years --
504: 14    well, just under two years.
504: 15    Q. During the time you had

**Re: 503:22-504:4**
**Pltf Obj:** 401; 402; 403; 602; Lack of Foundation

21

|  | Objections | Ruling in Mason |
|---|---|---|

504: 16   responsibility for marketing of Vioxx,
504: 17   who was the most junior member of that
504: 18   team?
504: 19   A. I was.
504: 20   Q. How many people reported to
504: 21   you, Ms. Baumgartner, when you were on
504: 22   the marketing team for Vioxx?
504: 23   A. No individuals reported to
504: 24   me.

30. 505:01 -   505:24 Baumgartner, Susan 2005-09-30
505: 01   Q. Can you tell the jury what
505: 02   your responsibilities were for Vioxx
505: 03   while you were on the marketing team?
505: 04   A. My responsibilities included
505: 05   interacting with physicians, and the
505: 06   majority of my time was spent in
505: 07   coordinating advisory board meetings and
505: 08   consultant meetings. And by that I mean
505: 09   setting up the logistics of those
505: 10   programs, putting together agendas,
505: 11   inviting presenters or Merck scientists
505: 12   or external physicians and thought
505: 13   leaders to present information at those
505: 14   meetings, and inviting physicians to
505: 15   those meetings and facilitating the
505: 16   gathering of the information and the
505: 17   reporting of the data within Merck.
505: 18   Those meetings were primarily designed to
505: 19   understand the perspective of physicians,
505: 20   understand what they thought. We had a
505: 21   product that we were marketing and
505: 22   communicating information about. We
505: 23   wanted to understand how physicians were
505: 24   receiving it and what they thought of it,

31. 506:01 -   506:24 Baumgartner, Susan 2005-09-30
506: 01   and so we brought groups together. And
506: 02   my role was around the things -- the
506: 03   activities that I mentioned in putting
506: 04   together those meetings.
506: 05   Q. I want to be very clear as
506: 06   to your role.
506: 07   Can you tell the ladies and
506: 08   gentlemen of the jury, when putting
506: 09   together those consultant meetings and
506: 10   advisory board meetings, what exactly it
506: 11   is that you did?
506: 12   A. When organizing the
506: 13   meetings, I usually worked with a
506: 14   third-party company to help with some of
506: 15   the tasks, but my responsibilities
506: 16   included identifying the location for the
506: 17   meeting, extending invitations to
506: 18   attendees, and determining who was going
506: 19   to attend that meeting, putting together
506: 20   an agenda and working with others to

**Re: 504:15-19**
**Pltf Obj:** Leading

**Re: 506:5-6**
**Pltf Obj:** Sidebar; object
speculation



22

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|

506: 21   decide what questions we had, what
506: 22   feedback we wanted, and, therefore, what
506: 23   presentations -- what presenters we
506: 24   needed to invite to present information

32. 507:01 - 507:24 Baumgartner, Susan 2005-09-30
507: 01   about different topics. I extended the
507: 02   invitation to those presenters and
507: 03   brought them in. And the presenters put
507: 04   together the content of the slides that
507: 05   were presented there, and the -- I helped
507: 06   with the logistics, the location and the
507: 07   organization of the day, and actual
507: 08   implementation of the meeting.
507: 09   Q. Who is responsible for the
507: 10   presentation -- the decision of what
507: 11   scientific data to present and the
507: 12   presentation of that scientific data at
507: 13   those meetings?
507: 14   A. Each of the presenters was
507: 15   responsible for the data, the scientific
507: 16   data and information that was presented
507: 17   during that meeting.
507: 18   Q. Did you take the time to
507: 19   become intimately familiar with all the
507: 20   data that was presented at those
507: 21   meetings?
507: 22   A. No, I did not. The
507: 23   presenters were the ones responsible for
507: 24   content and who had access to those data

33. 508:01 - 508:18 Baumgartner, Susan 2005-09-30
508: 01   and information.
508: 02   Q. Now, can you tell the jury a
508: 03   little bit more about the consultants
508: 04   meetings and the advisory board meetings
508: 05   that you had responsibility for? What
508: 06   were the purposes of those meetings?
508: 07   A. The purpose of those
508: 08   meetings was to conduct market research,
508: 09   and what that means is just understanding
508: 10   what those physicians thought about new
508: 11   scientific data, about the current
508: 12   market, about the use of pain medicines,
508: 13   about our product Vioxx. So, it was
508: 14   really a chance for us to get insight
508: 15   into what these doctors thought about and
508: 16   what these experts in their areas thought
508: 17   about the product and the data and the
508: 18   information that was out there.

34. 509:06 - 509:24 Baumgartner, Susan 2005-09-30
509: 06   Q. Can you tell the ladies and
509: 07   gentlemen of the jury what the methods of
509: 08   communicating -- Merck had communicating
509: 09   the benefits and limitations of its
509: 10   products to the medical community?
509: 11   A. I wouldnt consider'

**Re: 507:18-508:1**
**Pltf Obj:** Leading

Overrule

23

|  | | | | Objections | Ruling in Mason |
|--|--|--|--|------------|-----------------|

**Re: 509:6-510:2**
**Pltf Obj:** Non-responsive

Overruled

| | | |
|--|--|--|
| 509: | 12 | consultants meetings or advisory board |
| 509: | 13 | meetings a vehicle for communicating |
| 509: | 14 | information. We did have to present |
| 509: | 15 | information to get their responses and |
| 509: | 16 | feedback, but there were many mechanisms, |
| 509: | 17 | many vehicles for communication that were |
| 509: | 18 | used to communicate with physicians, such |
| 509: | 19 | as scientific sessions, publications, the |
| 509: | 20 | sales representatives, the professional |
| 509: | 21 | information requests that were physician |
| 509: | 22 | to physician communications, educational |
| 509: | 23 | programs. There were many vehicles that |
| 509: | 24 | were used by Merck to communicate with |

35. 510:01 - 510:24 Baumgartner, Susan 2005-09-30

| | | |
|--|--|--|
| 510: | 01 | the scientific community and the medical |
| 510: | 02 | community. |
| 510: | 03 | Q. Do you know how many doctors |
| 510: | 04 | were potential prescribers of Vioxx |
| 510: | 05 | during the time you had responsibility |
| 510: | 06 | for marketing Vioxx? |
| 510: | 07 | A. I do not know. |
| 510: | 08 | Q. Did you invite all the |
| 510: | 09 | doctors who were potential prescribers of |
| 510: | 10 | Vioxx to your consultants meetings and |
| 510: | 11 | advisory board meetings? |
| 510: | 12 | A. No. They were samples of |
| 510: | 13 | the physicians. They were smaller groups |
| 510: | 14 | of those physicians that represented the |
| 510: | 15 | views of the universe. So, they were |
| 510: | 16 | small groups of physicians that were |
| 510: | 17 | assembled to understand their |
| 510: | 18 | perspectives. |
| 510: | 19 | Q. Who did you invite to the |
| 510: | 20 | consultant meetings or advisory board |
| 510: | 21 | meetings? |
| 510: | 22 | A. Our advisory board group was |
| 510: | 23 | a set group of about 15 individuals who |
| 510: | 24 | met with us on a quarterly basis. So, |

36. 511:01 - 511:24 Baumgartner, Susan 2005-09-30

| | | |
|--|--|--|
| 511: | 01 | they were a fixed group that met with us |
| 511: | 02 | at regular times throughout the marketing |
| 511: | 03 | of the product. The consultants meetings |
| 511: | 04 | were more of a one-time activity where we |
| 511: | 05 | identified a group of attendees and |
| 511: | 06 | consulted with them on specific research |
| 511: | 07 | questions and on specific things that we |
| 511: | 08 | wanted feedback on. |
| 511: | 09 | Q. Weve heard the term' |
| 511: | 10 | "thought leaders." Can you tell the |
| 511: | 11 | ladies and gentlemen of the jury what a |
| 511: | 12 | thought leader is? |
| 511: | 13 | A. A thought leader is someone |
| 511: | 14 | who leads thought. It is a physician who |
| 511: | 15 | is an expert in a specific area as |
| 511: | 16 | determined by his or her peers. So, this |

| | | | | Objections | Ruling in Mason |
|---|---|---|---|---|---|

511:  17     is not Merck deciding that someone is a
511:  18     thought leader, but actually the medical
511:  19     community or scientific community
511:  20     determining that someone is an expert or
511:  21     has expertise or knowledge in a given
511:  22     area.
511:  23     Q. Did you invite thought
511:  24     leaders to participate on your advisory
37. 512:01 -   512:24 Baumgartner, Susan 2005-09-30
512:  01     boards and consultants meetings?
512:  02     A. Yes. We included thought
512:  03     leaders in both of those meetings.
512:  04     Q. Were the participants that
512:  05     you invited to be on your advisory boards
512:  06     and to your consultants meetings, were
512:  07     they all supporters of Merck?
512:  08     A. No. It was important for us
512:  09     to get feedback from all of the
512:  10     individuals out there. We didnt just'
512:  11     want individuals who were supportive of
512:  12     our views. We wanted to hear from those
512:  13     who were not supportive as well. So, we
512:  14     invited physicians who had a range of
512:  15     levels of support for the product and the
512:  16     company.
512:  17     Q. Did you invite to your
512:  18     consultants meetings and advisory boards
512:  19     physicians who were critical of Merck or
512:  20     Vioxx?
512:  21     A. The -- by the nature of the
512:  22     meetings, we did want feedback on the
512:  23     product, we did include physicians who
512:  24     were not supportive of the product and

**Re: 512:17-514:4**
**Pltf Obj:** Non-responsive

38. 513:01 -   513:24 Baumgartner, Susan 2005-09-30
513:  01     who were critical, but that was important
513:  02     because the purpose of the meeting was to
513:  03     understand their thoughts and views, and
513:  04     that to the extent that they didnt agree'
513:  05     with the conclusions that the Merck
513:  06     scientists arrived at, we wanted to hear
513:  07     why and understand their perspectives.
513:  08     Q. Was scientific data
513:  09     presented at these advisory board
513:  10     meetings and consultant meetings?
513:  11     A. Yes, it was.
513:  12     Q. And what was the purpose of
513:  13     presenting data at these meetings?
513:  14     A. The purpose was to present
513:  15     information that the physicians in
513:  16     attendance could respond to or react to
513:  17     and to serve as a basis for the
513:  18     discussion that we had and the questions
513:  19     that we wanted to ask them.
513:  20     Q. Did you solicit feedback
513:  21     from the attending physicians on the data

*Overruled* (handwritten)

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|

● 513:   22        presented at these meetings?
● 513:   23        A. Yes. That was a primary
  513:   24        purpose of the meeting, to present
39. 514:01 –   514:24 Baumgartner, Susan 2005-09-30
  514:   01        scientific information and to have them
  514:   02        respond, react, give us their thoughts,
  514:   03        ask any questions, and also help us
  514:   04        communicate that ultimately to others.
  514:   05        Q. And in your experience in
  514:   06        soliciting feedback from the physicians
  514:   07        who attended the consultant meetings and
  514:   08        the advisory board meetings, did those
  514:   09        groups of physicians reach unanimity on
  514:   10        any issue that you presented?
  514:   11        A. I cant remember an instance'
  514:   12        where the physicians in attendance
  514:   13        reached unanimity, and its probably'
  514:   14        consistent with other forums for
  514:   15        scientific discussion and debate. There
  514:   16        were physicians who held different views,
  514:   17        and that was the purpose of that meeting,
  514:   18        to express that and to discuss and debate
  514:   19        the different views on the product and on
  514:   20        the information in general.
  514:   21        Q. During the time that you
● 514:   22        had -- what was the period that you had
  514:   23        responsibility for the marketing of
  514:   24        Vioxx?
40. 515:01 –   515:03 Baumgartner, Susan 2005-09-30
  515:   01        A. I was actually on the
  515:   02        marketing team from mid-1999 through the
  515:   03        third quarter of 2001.
41. 516:05 –   516:24 Baumgartner, Susan 2005-09-30
  516:   05        Q. And during the time you had
  516:   06        responsibility for Vioxx, did you learn
  516:   07        the results of the VIGOR study?
  516:   08        A. Yes, I did.
  516:   09        Q. Can you tell the ladies and
  516:   10        gentlemen of the jury what you learned
  516:   11        about the results of the VIGOR study?
  516:   12        A. The VIGOR study was designed
  516:   13        to look at stomach problems for Vioxx
  516:   14        compared to naproxen, and it was a
  516:   15        landmark study of over 8,000 patients.
  516:   16        And the results of that study were that
  516:   17        Vioxx showed a lower number of stomach
  516:   18        problems than naproxen.
  516:   19        Q. Were there also
  516:   20        cardiovascular results of that VIGOR
● 516:   21        study?
● 516:   22        A. Yes, there were.
  516:   23        Q. Can you tell the ladies and
  516:   24        gentlemen of the jury what the
42. 517:01 –   517:24 Baumgartner, Susan 2005-09-30
  517:   01        cardiovascular results of the study were?

*Overruled*

**Re: 514:5-20**
**Pltf Obj:** Vague and
ambiguous hearsay;
801; 802

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|



517: 02    A. In that study, there was a
517: 03    five-fold difference in the rate of
517: 04    cardiovascular events between Vioxx and
517: 05    naproxen.
517: 06    Q. Did Merck disclose the VIGOR
517: 07    data?
517: 08    A. Yes.
517: 09    Q. Can you tell the jury how
517: 10    Merck disclosed the VIGOR data and what
517: 11    the timing of it was?
517: 12    A. The VIGOR data was disclosed
517: 13    starting -- Im not sure when the actual'
517: 14    first disclosure took place, but after
517: 15    the results were received in March of
517: 16    2000, Merck communicated that information
517: 17    through press release, through
517: 18    professional information requests that
517: 19    our representatives had available in the
517: 20    event there were questions about the
517: 21    product and that specific study.
517: 22    There were numerous
517: 23    scientific sessions starting in May of
517: 24    2000. There was a big gastroenterology

43. 518:01 -  518:24 Baumgartner, Susan 2005-09-30
518: 01    meeting in May of 2000 at which Merck
518: 02    presented the scientific data in a
518: 03    scientific session. There were numerous
518: 04    other scientific sessions at which the
518: 05    data was discussed and throughout the
518: 06    rest of 2000 as well.
518: 07    There were advisory board
518: 08    meetings and consultant meetings at which
518: 09    we communicated the information to obtain
518: 10    physiciansviews and thoughts on those'
518: 11    data. And there were publications,
518: 12    support for CME programs, there were
518: 13    communications with investigators, and,
518: 14    obviously, within the company there was
518: 15    communication as well.
518: 16    Q. Based on your experience, do
518: 17    you have a view as to whether or not
518: 18    Mercks efforts to disclose the data were'
518: 19    successful?
518: 20    A. In my view, Mercks efforts'
518: 21    were very successful. I think it was
518: 22    widely communicated, and I know in my
518: 23    research, physicians were aware of the
518: 24    study, aware of the results, and it

44. 519:01 -  519:24 Baumgartner, Susan 2005-09-30
519: 01    was -- there were many, many different
519: 02    communication vehicles and multiple
519: 03    communication vehicles used in order to
519: 04    communicate that.
519: 05    Q. Were you ever provided with
519: 06    an explanation of the results, the

**Objections column:**

Re: 517:6-8
Pltf Obj: Vague-What part of Vigor dates and where?
Re: 517:9-24
Pltf Obj: 602; assumes facts not in evidence

Re: 518:16-519:4
Pltf Obj: 702; 703; 602; assumes facts not in evidence; improper opinion testimony; speculation; vague as to "successful"

**Ruling in Mason column:**

Overruled

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|



519:  07    cardiovascular results of the VIGOR
519:  08    trial?
519:  09    A. Yes.
519:  10    Q. What was that explanation?
519:  11    A. The explanation for the
519:  12    results of the VIGOR study was that
519:  13    naproxen was acting as a cardioprotective
519:  14    agent in the study due to its platelet
519:  15    effect. It was acting similar to
519:  16    aspirin.
519:  17    Q. And who provided you that
519:  18    explanation or what group provided you
519:  19    with that explanation?
519:  20    A. The Merck scientists arrived
519:  21    at that conclusion after reviewing the
519:  22    available data.
519:  23    Q. Was the VIGOR data ever the
519:  24    subject of any consultants meetings or

45.  520:01 -  520:24  Baumgartner, Susan 2005-09-30
520:  01    advisory board meetings?
520:  02    A. Definitely. We had many
520:  03    discussions with our advisors as well as
520:  04    at consultants meetings following the
520:  05    presentation of the information to get
520:  06    views on those data.
520:  07    Q. Were the cardiovascular
520:  08    results of the VIGOR study presented to
520:  09    these groups of physicians?
520:  10    A. Yes.
520:  11    Q. What was the purpose to
520:  12    provide the cardiovascular results of the
520:  13    VIGOR study to these physicians at the
520:  14    consultants meetings and the advisory
520:  15    board meetings?
520:  16    A. The purpose of presenting
520:  17    the information was to, as I mentioned,
520:  18    understand the thoughts of the
520:  19    physicians, understand their
520:  20    interpretation of the data in light of
520:  21    all the other data available for the
520:  22    coxibs and for Vioxx and the NSAIDs and
520:  23    for naproxen. So, the purpose was to
520:  24    present that information and also to see

46.  521:01 -  521:24  Baumgartner, Susan 2005-09-30
521:  01    if external thought leaders, people
521:  02    outside of the company, experts and
521:  03    thought leaders in different specialties
521:  04    came to the same conclusion as the Merck
521:  05    scientists did, so, kind of a check for
521:  06    the interpretation that our own
521:  07    scientists had of those data.
521:  08    Q. Did the Merck scientists who
521:  09    presented the data to these physicians
521:  10    present only data that supported Mercks'
521:  11    conclusions?

Re: 519:17-22
**Pltf Obj:** Hearsay; 801; 802

Re: 519:23-520:6
**Pltf Obj:** 602; assumes facts not in evidence

28



| | | | Objections | Ruling in Mason |
|---|---|---|---|---|

● 521: 12    A. No. They presented all of
  521: 13    the data in all of the possible -- or all
  521: 14    of the discussions that were taking place
  521: 15    in the medical community and debate that       **Re: 521:8-20**
  521: 16    was taking place. They tried to frame          **Pltf Obj:** Leading; 801;
  521: 17    all of that up in order to discuss and          802
  521: 18    debate all of the different angles that
  521: 19    were being taken outside of the company
  521: 20    on the data.
  521: 21    Q. Did you solicit feedback
  521: 22    from these physicians as to their
  521: 23    reactions to the cardiovascular results
  521: 24    of the VIGOR study?
47. 522:01-   522:0: Baumgartner, Susan 2005-09-30
  522: 01    A. Yes.
  522: 02    Q. Can you tell the jury what
  522: 03    you learned in soliciting that feedback?
48. 522:08-   522:2: Baumgartner, Susan 2005-09-30
  522: 08    A. The consensus from those
  522: 09    advisory board meetings and consultant
  522: 10    meetings were that the conclusion that
  522: 11    Merck reached, the Merck scientists
  522: 12    reached about naproxen being          **Re: 522:2-17**
  522: 13    cardioprotective and that being the    **Pltf Obj:** Hearsay; 801;
  522: 14    explanation for the results in VIGOR was   802; assumes facts not
● 522: 15    the explanation for that result in light
  522: 16    of the other data that was available on
  522: 17    the product.
  522: 18    Q. Do you recall whether the
  522: 19    physicians were unanimous in believing
  522: 20    that the most plausible explanation was
  522: 21    that naproxen was acting
  522: 22    cardioprotectively?
49. 523:05-   523:1: Baumgartner, Susan 2005-09-30
  523: 05    A. I cant recall any meeting'
  523: 06    where there was a unanimous view on the
  523: 07    data. There were a vast majority whose
  523: 08    conclusion was that naproxen was acting
  523: 09    as a cardioprotective agent in that
  523: 10    study. Naproxen was cardioprotective in
  523: 11    that study. And there were some who
  523: 12    could not arrive at a conclusion based on   **Re: 523:5-15**
  523: 13    the data that was available. And there      **Pltf Obj:** Hearsay; 801;
  523: 14    were some who felt that it could have         802; facts not in
  523: 15    been caused by Vioxx.                          evidence
  523: 16    MR. TSOUGARAKIS: Let me
  523: 17    show you what we'll mark as
  523: 18    Baumgartner Exhibit 1.
  523: 19    - - -
● 523: 20    (Whereupon, Deposition
  523: 21    Exhibit Baumgartner-1, Market
  523: 22    research report, February 2001,
  523: 23    was marked for identification.)
50. 523:24-   523:2: Baumgartner, Susan 2005-09-30
  523: 24    - - -



|  |  |  | Objections | Ruling in Mason |
|---|---|---|---|---|

524:02 - 524:2( Baumgartner, Susan 2005-09-30
524:  02    Q. I ask you to identify that,
524:  03    please.
524:  04    A. This is a market research
524:  05    report from a national rheumatology
524:  06    consultants meeting that took place in
524:  07    February of 2001.
524:  08    Q. If I can direct your
524:  09    attention to Page 6 of that report, and I
524:  10    would ask you to read the sentence under
524:  11    cardiovascular CV outcomes that begins
524:  12    with the word "The consensus." Can you
524:  13    read that into the record, please?
524:  14    A. "The consensus seemed to be
524:  15    that coxibs did not pose an increased
524:  16    risk for cardiovascular or
524:  17    cerebrovascular thromboembolic events."
524:  18    Q. Is that consistent with your
524:  19    recollection at other meetings with
524:  20    consultants and advisory boards?

Re: 524:2-17
**Pltf Obj:** Lack of foundation

52. 524:24 - 524:2( Baumgartner, Susan 2005-09-30
524:  24    THE WITNESS: It was
53. 525:01 - 525:0: Baumgartner, Susan 2005-09-30
525:  01    definitely consistent with what I
525:  02    saw in the many meetings that I
525:  03    attended.
54. 525:05 - 525:1( Baumgartner, Susan 2005-09-30
525:  05    Q. Ms. Baumgartner, in your
525:  06    time at Merck, did you ever intimidate or
525:  07    threaten any physicians?
525:  08    A. No, I did not.
525:  09    Q. In your time at Merck, did
525:  10    you ever improperly influence any
525:  11    physicians?
525:  12    A. No, I did not.
525:  13    Q. During the time of your
525:  14    responsibility for Vioxx, did you believe
525:  15    that Vioxx could cause heart attacks?
525:  16    A. No

Re: 524:24-525:3
**Pltf Obj:** Hearsay; 801; 802; 602; assumes facts not in evidence

Re: 525:4-8
**Pltf Obj:** Speculation – depends upon receiver of communication

Re: 525:9-12
**Pltf Obj:** Speculation – depends upon receiver of communication

Re: 525:13-16
**Pltf Obj:** 702; 703; lay opinion; improper expert