**Mason v. Merck & Co., Inc.**
**Deposition Designations for Krahe**

|  | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|

12:19  -  12:23   Krahe, Marilyn 2006-02-09
    12  19        I would like to start off by asking you to
    12  20        state your name and spell your first and last name for
    12  21        the record.
    12  22        A:  My first name is Marilyn, M-A-R-I-L-Y-N. And
    12  23        my last name is Krahe, K-R-A-H-E.

15:21  -  16:7    Krahe, Marilyn 2006-02-09
    15  21        Q:  How many total hours did you spend meeting
    15  22        with lawyers prior to your deposition today?
    15  23        A:  Well, I would have to sit and calculate each
    15  24        day to make sure I gave you a hundred percent accurate
    15  25        number.
    16   1        Q:  We are entitled to an estimate, if you can
    16   2        give one.
    16   3        A:  Okay. Well, I would have to think.
    16   4        Somewhere between -- and this isn't -- I would
    16   5        really have to look back. But somewhere around 45,
    16   6        50 hours because of the number of days, because of me
    16   7        getting sick and the depositions being cancelled.

**Re: [15:21-16:7]**
**Def Obj** 401; 403;
improper attack on
witness' amount of prep
when she got sick and
the attorney cancelled
the deposition

*Overrule*

24:11  -  26:21   Krahe, Marilyn 2006-02-09
    24  11        Q:  Where did you attend college?
    24  12        A:  The Pennsylvania State University.
    24  13        Q:  And when did you graduate from there?
    24  14        A:  I graduated in 1978.
    24  15        Q:  What did you take your degree in?
    24  16        A:  My degree was a bachelor of science.
    24  17        Q:  Did you have a major?
    24  18        A:  Yes, I did.
    24  19        Q:  What was it?
    24  20        A:  Health planning administration.
    24  21        Q:  Since you took your degree from Penn State,
    24  22        have you gotten any additional degrees since then?
    24  23        A:  No, sir.
    24  24        Q:  After you graduated from Penn State in 1978,
    24  25        did you join the work force?
    25   1        A:  Yes, I did.
    25   2        Q:  And who did you go to work for?
    25   3        A:  For Merck.
    25   4        Q:  At which -- which Merck office did you start
    25   5        at?
    25   6        A:  In the -- out of the Teeterborough (phonetic)
    25   7        office.
    25   8        Q:  My geography isn't what it once was.
    25   9        Where is Teeterborough?
    25  10        A:  It's in New Jersey.
    25  11        Q:  What position were you hired on as?
    25  12        A:  I believe my first title was associate
    25  13        professional representative.
    25  14        Q:  And how long did you have that position in
    25  15        Teeterborough?

|  | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

25 16   A:  Let's see. I was a professional sales
25 17   representative for approximately two years.
25 18   Q:  After you left Teeterborough -- your position
25 19   as associate professional representative in
25 20   Teeterborough, what did you do next?
25 21   A:  I worked in our home office.
25 22   Q:  Which one?
25 23   A:  In West Point, Pennsylvania.
25 24   Q:  And what position did you take at
25 25   West Point?
26  1   A:  I worked in the health education liaison
26  2   department.
26  3   Q:  How long did you work in West Point in that
26  4   position?
26  5   A:  One year.
26  6   Q:  And where did you go next either physically or
26  7   professionally?
26  8   A:  I came to Los Angeles.
26  9   Q:  What position did you undertake in
26 10   Los Angeles?
26 11   A:  I was a business manager.
26 12   Q:  And how long were you a business manager in
26 13   the LA office?
26 14   A:  I was a business manager about --
26 15   approximately about 10, 11 years, somewhere in that
26 16   range.
26 17   Q:  And so up until the -- sometime in the
26 18   early '90s, you were a business manager in
26 19   Los Angeles?
26 20   A:  Los Angeles and Orange County. Our geography
26 21   changed a lot.

27:6   -   27:13   Krahe, Marilyn 2006-02-09
27  6   So when you last served as a business
27  7   manager, what was the geographic region that you were
27  8   responsible for?
27  9   A:  Oh, let's see. I don't remember the exact
27 10   boundaries.
27 11   But it encompassed the Orange County,
27 12   San Clemente up through Long Beach and up through
27 13   Santa Monica.

27:21   -   28:11   Krahe, Marilyn 2006-02-09
27 21   Q:  What was the next position that you took?
27 22   A:  Then I worked with the health science
27 23   associates as a region executive, was the title.
27 24   Q:  And what were your duties and responsibilities
27 25   in that position?
28  1   A:  In that position, I just managed a group of
28  2   health science associates.
28  3   Q:  What were the health science associates tasked
28  4   to do?
28  5   A:  Their job is to call on physicians.
28  6   Q:  With what goal or aim?
28  7   A:  To communicate information about our
28  8   products.
28  9   Q:  How long did you serve as the regional

| | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|

```
     28  10      executive overseeing HSAs?
     28  11      A:  I think that was about a year.

31:6    -   31:14   Krahe, Marilyn 2006-02-09
     31   6      Q:  Then when you were appointed as senior
     31   7      business director in 1996, were you given a particular
     31   8      area geographically that you would be responsible
     31   9      for?
     31  10      A:  Yes.
     31  11      Q:  What area was that?
     31  12      A:  That would be the Los Angeles area, the
     31  13      Inland Empire, Orange County and the San Diego
     31  14      marketplaces.

31:15   -   31:25   Krahe, Marilyn 2006-02-09
     31  15      Q:  And what were your responsibilities as a
     31  16      business director when you were initially appointed in
     31  17      1996?
     31  18      A:  Well, the business director is charged with
     31  19      leading a large sales organization, ensuring that we
     31  20      recruit, retain and hire employees and reward and
     31  21      recognize those folks.
     31  22      And in addition, we are responsible for the
     31  23      business planning.
     31  24      And then ultimately the last piece is that we
     31  25      are responsible for the sales in that geography.

        -   32:18   Krahe, Marilyn 2006-02-09
     32   9      Q:  As we are sitting here today, do you hold the
     32  10      same position at Merck?
     32  11      A:  It's a similar position. But I received a
     32  12      promotion in the position to executive business
     32  13      director.
     32  14      Q:  When did you receive that promotion?
     32  15      A:  About five years ago.
     32  16      Q:  In 2001?
     32  17      A:  I can't remember the exact year. It was
     32  18      probably around that time frame.

32:19   -   32:22   Krahe, Marilyn 2006-02-09
     32  19      Q:  Did your duties and responsibilities change
     32  20      when you received that promotion?
     32  21      A:  No. They are similar. It's just a ladder
     32  22      within the position.

38:9    -   38:11   Krahe, Marilyn 2006-02-09
     38   9      Q:  Were you ever a member of the cross-functional
     38  10      team?
     38  11      A:  Yes.

40:21   -   41:10   Krahe, Marilyn 2006-02-09
     40  21      Q:  And what did cross-functional teams do?
     40  22      A:  Cross-functional teams prepare -- if you are
     40  23      talking about before launch, they prepare for that
     40  24      launch by looking at the data, trying to define, you
     40  25      know, the marketplace for the product.
     41   1      Q:  And that is pre-launch.
```

|  |  | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|

41  2   And what do they do at the time of launch?
41  3   A:  At the time of launch it's really important
41  4   that the representatives are extremely well-trained.
41  5   And so one of the things that the teams do is
41  6   try to make sure that if there is any issues that have
41  7   come up that the representatives need assistance with
41  8   that we provide that feedback into the home office so
41  9   that they have the information and can help rectify
41  10  whatever the situation is.

71:4   -   71:15   Krahe, Marilyn 2006-02-09
71  4   Q:  Do you know what department at Merck was
71  5   responsible for creating written material that was used
71  6   to market Vioxx?
71  7   A:  I don't know exactly which department would be
71  8   responsible for actually writing and developing because
71  9   I didn't work in that department.
71  10  Q:  Well, over the course of your years --
71  11  A:  Uh-huh.
71  12  Q:  -- in working as the point person for the
71  13  western region on Vioxx, did you ever get an
71  14  understanding as to who, for example, authored the
71  15  cardiovascular card that was used to market Vioxx?

71:18   -   72:4   Krahe, Marilyn 2006-02-09
71  18  THE WITNESS:  Well, a couple things. I mean,
71  19  first of all, the cardiovascular card was not used to
71  20  market Vioxx.
71  21  Secondly, if you are asking for my general
71  22  understanding of does marketing provide those
71  23  promotional materials, yes. It would be the marketing
71  24  department that would do that.
71  25  BY MR. O'CALLAHAN: Q:  Would you characterize the
72  1   CV card as a promotional piece?
72  2   A:  It was used to clarify questions that
72  3   physicians had.
72  4   Q:  Who would utilize that card?

72:6   -   73:8   Krahe, Marilyn 2006-02-09
72  6   THE WITNESS:  What do you mean by that?
72  7   BY MR. O'CALLAHAN: Q:  Who was it that would have
72  8   the cardiovascular card and would utilize it to clarify
72  9   questions that physicians had?
72  10  A:  That would be professional sales
72  11  representatives.
72  12  Q:  And what were their duties and
72  13  responsibilities?
72  14  A:  Whose duties and responsibilities are you
72  15  referring to?
72  16  Q:  The duties and responsibilities of
72  17  professional sales representatives who worked under
72  18  you.
72  19  A:  Well, professional sales representatives
72  20  are charged with communicating to physicians about
72  21  the features, benefits and limitations of our
72  22  products.
72  23  And they are -- they are responsible for the

Objections/Responses In Mason:

Re: [72:4-72:4]     Def
Obj Vague; question not answered and later rephrased

Re: [72:6-72:6]     Def
Obj Vague; question not answered and later rephrased

Rulings In Smith/Barnett:

Sustained

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

72 24     business planning in their geographies.
72 25     Q:  In your mind, did the professional sales
73  1     representatives have anything to do with marketing?
73  2     A:  That's -- that's really not in their job title
73  3     or their position specifically.
73  4     Q:  Well, you indicated that their title is
73  5     professional sales representatives.
73  6     A:  That is correct.
73  7     Q:  And so was one of their duties involved
73  8     encouraging sales of the product, correct?

73:12   -   73:16   Krahe, Marilyn 2006-02-09
73 12     THE WITNESS:  I think one of the objectives
73 13     that representatives have is to ensure that physicians
73 14     in the geography that they have responsibility for is
73 15     to communicate the value of our products to them,
73 16     meaning the physicians.

74:14   -   74:21   Krahe, Marilyn 2006-02-09
74 14     Q:  Was one of the duties of the professional
74 15     sales representatives to encourage sales?
74 16     A:  One of the duties of the professional sales
74 17     representatives is to communicate the value of our
74 18     products, the features and limitations in order to make
74 19     sure that physicians are aware of the benefits of the
74 20     products so that they can prescribe them for their
74 21     patient.

75:11   -   75:14   Krahe, Marilyn 2006-02-09
75 11     (The record was read as follows:
75 12     Q Was one of the duties of the
75 13     professional sales representatives to
75 14     encourage sales?')

75:18   -   76:3   Krahe, Marilyn 2006-02-09
75 18     THE WITNESS:  Again, the representative's job
75 19     is to communicate with physicians. That is first and
75 20     foremost their job.
75 21     And they are charged with communicating that
75 22     information to physicians accurately about our
75 23     products.
75 24     And it is extremely important that they
75 25     provide that information to physicians so that
76  1     physicians then can evaluate the needs and the values
76  2     of that product for their population of patients. And
76  3     then they can prescribe accordingly.

*Sustained* (handwritten)

76:10   -   76:15   Krahe, Marilyn 2006-02-09
76 10     Q:  Why don't we read the question again and see
76 11     if you can answer it yes or no.
76 12     (The record was read as follows:
76 13     Q Was one of the duties of the
76 14     professional sales representatives to
76 15     encourage sales?')

Re: [76:10-76:15]
**Def Obj** Asked and
answered; harassing
witness

76:19   -   76:24   Krahe, Marilyn 2006-02-09
76 19     THE WITNESS:  Again, I think I have answered

Re: [76:19-76:24]

| | | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|

| 76 | 20 | that. | **Def Obj** Asked and answered; harassing witness | |
| 76 | 21 | I -- their -- their absolute obligation is to | | |
| 76 | 22 | communicate the value of the products, the features, | | |
| 76 | 23 | the benefits and the limitations. That is their | | |
| 76 | 24 | charge. | | |

**77:5  -  77:9    Krahe, Marilyn 2006-02-09**

| 77 | 5 | BY MR. O'CALLAHAN: Q:  Was one of their charges |
| 77 | 6 | to encourage sales? |
| 77 | 7 | A:  No. I would not characterize the |
| 77 | 8 | representatives' charge -- their charge is to |
| 77 | 9 | communicate. |

*Sustained*

**77:22  -  79:21    Krahe, Marilyn 2006-02-09**

| 77 | 22 | BY MR. O'CALLAHAN: Q:  In your mind, do the | | |
| 77 | 23 | professional sales representatives who serve under you | | |
| 77 | 24 | have anything to do with sales? | | |
| 77 | 25 | A:  They are responsible for the sales and share | | |
| 78 | 1 | in their geographies as one of the components of their | | |
| 78 | 2 | job. | | |
| 78 | 3 | But their primary responsibility is | | |
| 78 | 4 | communication to physicians. | | |
| 78 | 5 | Q:  When you say that one of their | **Re: [78:5-78:14]** **Def Obj** Question not answered but repeated | *Sustained* |
| 78 | 6 | responsibilities in their position is associated | | |
| 78 | 7 | with sales and market shares, do you recall whether | | |
| 78 | 8 | or not during the time that you served as the senior | | |
| 78 | 9 | business director and later as the executive business | | |
| 78 | 10 | director of the Southern California region whether or | | |
| 78 | 11 | not you expected the sales representatives who worked | | |
| 78 | 12 | under you to achieve certain sales goals? | | |
| 78 | 13 | A:  So your -- could you read back his | | |
| 78 | 14 | question? | | |
| 78 | 15 | (The record was read as follows: | | |
| 78 | 16 | Q When you say that one of | | |
| 78 | 17 | their responsibilities in their | | |
| 78 | 18 | position is associated with sales and | | |
| 78 | 19 | market shares, do you recall whether | | |
| 78 | 20 | or not during the time that you | | |
| 78 | 21 | served as the senior business | | |
| 78 | 22 | director and later as the executive | | |
| 78 | 23 | business director of the | | |
| 78 | 24 | Southern California region whether or | | |
| 78 | 25 | not you expected the sales | | |
| 79 | 1 | representatives who worked under you | | |
| 79 | 2 | to achieve certain sales goals?') | | |
| 79 | 3 | THE WITNESS:  Okay. Yes. The representatives | | |
| 79 | 4 | who served underneath me within the region were | | |
| 79 | 5 | responsible for sales goals. | | |
| 79 | 6 | And through the effective communication of | | |
| 79 | 7 | the products, physicians would understand the value of | | |
| 79 | 8 | the product. And the sales ultimately would follow. | | |
| 79 | 9 | BY MR. O'CALLAHAN: Q:  Didn't you, in fact, set | **Re: [79:9-79:21]** **Def Obj** 401; 402; 403; Questioning about employees' compensation and bonuses is irrelevant and prejudicial | *Overruled* The P's position is that the reps. is that they overly aggressively & improperly pushed the product on MDs. This goes to motive. 401 402 403 |
| 79 | 10 | goals with respect to sales for them to -- for your | | |
| 79 | 11 | salespeople to achieve? | | |
| 79 | 12 | A:  Yes. We do set sales targets for the | | |
| 79 | 13 | representatives. | | |
| 79 | 14 | Q:  And were -- in fact, was compensation based -- | | |

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

```
79  15    start that over again.
79  16    Was compensation of professional sales
79  17    representatives based in some part on whether or not
79  18    they achieved certain sales goals?
79  19    A:  Professional sales representatives are
79  20    compensated in a number of different ways. And one of
79  21    the components of their compensations is sales.

80:1   -  80:11   Krahe, Marilyn 2006-02-09
80   1    Q:  And did you, in fact, have sales incentive
80   2    plans in place for the sale -- professional sales
80   3    representative who were marketing Vioxx to
80   4    physicians?
80   5    A:  Yes. There were sales incentive programs for
80   6    representatives.
80   7    Q:  And let me mark as next in order Exhibit 3,
80   8    which is a --
80   9    A:  Thank you.
80  10    Q:  -- folder or a group of materials starting at
80  11    CAAD-7581 going through CAAD-7635.

81:13  -  82:7   Krahe, Marilyn 2006-02-09
81  13    BY MR. O'CALLAHAN: Q:  Okay. Do you recognize
81  14    this as being the sales incentive plan that was in
81  15    place in 2001?
81  16    A:  No. I'm not sure. I would have to read
81  17    through it to make sure what this is.
81  18    Q:  Okay. Well, you already heard your counsel
81  19    stipulated that the documents that are marked
81  20    CAAD-1 through CAAD-19898 are from your file.
81  21    Do you recall that, Miss Krahe?
81  22    A:  Yes. I do recall that.
81  23    But I did not write this document. So this
81  24    may have been a document that I received and put in
81  25    that file because I would always keep my Vioxx
82   1    documents.
82   2    So I would have to look through the whole
82   3    document, though, to make sure what it is.
82   4    Q:  Okay.
82   5    A:  It's a long document, too.
82   6    Did you want me to read the whole
82   7    document?

84:24  -  85:18   Krahe, Marilyn 2006-02-09
84  24    BY MR. O'CALLAHAN: Q:  Why don't you turn to the
84  25    third page of this document.
85   1    And these documents are numbered in the lower
85   2    right-hand corner.
85   3    And Page 3 of Exhibit 3, do you see there is a
85   4    sales theme at the top?
85   5    And could you read that into the record?
85   6    A:  The sales theme, you would like me to read
85   7    that?
85   8    Vigorous growth and competitive victories.'
85   9    Q:  And then the next sentence there goes on to --
85  10    it says, 'Objectives of the 2001 SIP.'
```

**Re: [80:1-80:11]**
Def Obj 401; 402; 403;
Questioning about employees' compensation and bonuses is irrelevant and prejudicial

*Overrule*

**Re: [81:13-82:7]**
Def Obj 401; 402; 403;
Questioning about employees' compensation and bonuses is irrelevant and prejudicial. Objection to foundation on all questions on this document – she does not know who wrote it (see 86:4-5) or when presentation was given or where (see 88:14-17)

*Overrule*

**Re: [84:24-85:18]**
Def Obj 401; 402; 403;
Questioning about employees' compensation and bonuses is irrelevant and prejudicial. Objection to foundation on all questions on this document – she does not know who wrote it (see 86:4-5) or when presentation was given or where (see 88:14-17)

*Overrule*

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

85  11     Do you see that?
85  12     A:  Correct.
85  13     Q:  And 'SIP' stands for sales incentive plan,
85  14     correct?
85  15     A:  Correct.
85  16     Q:  And what is the first objective of the 2001
85  17     SIP?
85  18     A:  Motivate sales achievement.

87:13  -  87:16     Krahe, Marilyn 2006-02-09
87  13     Q:  Then on the fifth page, there is a -- it's
87  14     entitled Elements of Total Compensation.
87  15     Do you see that?
87  16     A:  Yes.

**Re: [87:13-87:16]**
**Def Obj** 401; 402; 403;
Questioning about
employees'
compensation and
bonuses is irrelevant and
prejudicial. Objection to
foundation on all
questions on this
document – she does not
know who wrote it
(see 86:4-5) or when
presentation was given
or where (see 88:14-17)

*Overruled*

87:20  -  87:25     Krahe, Marilyn 2006-02-09
87  20     BY MR. O'CALLAHAN: Q:  Do you see the reference
87  21     to incentive compensation in the third block on the
87  22     left-hand side of the page?
87  23     A:  Incentive compensation, yes.
87  24     Q:  And what did -- what did that phrase mean at
87  25     Merck back in 2001?

**Re: [87:20-87:25]**
**Def Obj** 401; 402; 403;
Questioning about
employees' compensation
and bonuses is irrelevant
and prejudicial. Objection to
foundation on all questions
on this document – she
does not know who wrote it
(see 86:4-5) or when
presentation was given or
where (see 88:14-17)

88:4  -  88:7     Krahe, Marilyn 2006-02-09

**Re: [88:4-88:7]**
**Def Obj** 401; 402; 403;
Questioning about
employees' compensation
and bonuses is irrelevant
and prejudicial. Objection to
foundation on all questions
on this document – she
does not know who wrote it
(see 86:4-5) or when
presentation was given or
where (see 88:14-17).
Speculation

88  4     THE WITNESS:  Well, actually I don't know from
88  5     2001. And I didn't write it.
88  6     So I don't think I could speak for somebody
88  7     else about their document.

92:14  -  92:24     Krahe, Marilyn 2006-02-09
92  14     Q:  And then the following page describes the
92  15     sales incentive plan structure, correct?
92  16     A:  Correct.
92  17     Q:  And then the page after that is entitled
92  18     Fact-Finding Process.
92  19     Do you see that?
92  20     A:  Yes. I see that.
92  21     Q:  And that indicates that the fact-finding
92  22     process with respect to the sales incentive plans was
92  23     done as -- with input from different managers in the

**Re: [92:14-92:24]**
**Def Obj** 401; 402; 403;
Questioning about
employees' compensation
and bonuses is irrelevant
and prejudicial. Objection to
foundation on all questions
on this document – she
does not know who wrote it
(see 86:4-5) or when
presentation was given or

| | Objections/Responses In Mason where (see 88:14-17). | Rulings In Smith/Barnett |
|---|---|---|

92 24          company, correct?

93:3    -    93:22    Krahe, Marilyn 2006-02-09

| | | |
|---|---|---|
| 93  3    THE WITNESS:  Well, I'm not sure exactly what | | |
| 93  4    this -- I'm not sure exactly because my name is not on | | |
| 93  5    there. | **Re: [93:3-93:22]** | |
| 93  6    I didn't participate in the process. And I | **Def Obj** 401; 402; 403; | |
| 93  7    just don't recall. | Questioning about | |
| 93  8    BY MR. O'CALLAHAN: Q:  Okay. Miss Krahe, why | employees' | |
| 93  9    don't you take another look at that page we were just | compensation and | |
| 93 10    going over. | bonuses is irrelevant and | |
| 93 11    And you see there is a section there called | prejudicial. Objection to | |
| 93 12    business directors. It's the -- | foundation on all | |
| 93 13    A:  Right. | questions on this | |
| 93 14    Q:  -- third section. | document – she does not | |
| 93 15    A:  Right. | know who wrote it | |
| 93 16    Q:  Do you see your name in that column? | (see 86:4-5) or when | |
| 93 17    A:  Yes, I do. | presentation was given | |
| 93 18    Q:  And so according to this document, you were a | or where (see 88:14-17). | |
| 93 19    participant in the process of developing the sales | | |
| 93 20    incentive plan, correct? | | |
| 93 21    A:  According to this. I just don't recall it, | | |
| 93 22    like I said. | | |

95:19    -    96:15    Krahe, Marilyn 2006-02-09

| | | |
|---|---|---|
| 95 19    BY MR. O'CALLAHAN: Q:  Well, take a look at 7597. | | |
| 95 20    A:  7597. Okay. Got it. | **Re: [95:19-96:15]** | |
| 95 21    Q:  And that has a target bonus summary? | **Def Obj** 401; 402; 403; | |
| 95 22    A:  Yes. | Questioning about | |
| 95 23    Q:  And this is an example of how bonuses would be | employees' | |
| 95 24    calculated, correct? | compensation and | |
| 95 25    A:  Yes. That is. | bonuses is irrelevant and | |
| 96  1    Q:  And in looking at this page on the right-hand | prejudicial. Objection to | |
| 96  2    side, the middle of the page, there is a reference to | foundation on all | |
| 96  3    Vioxx, correct? | questions on this | |
| 96  4    A:  Correct. | document – she does not | |
| 96  5    Q:  And did that -- does that indicate to you | know who wrote it | |
| 96  6    that part of the compensation for the salespeople who | (see 86:4-5) or when | |
| 96  7    worked under you was based upon their success in | presentation was given | |
| 96  8    selling Vioxx? | or where (see 88:14-17). | |
| 96  9    MR. TSOURGARAKIS:  Could I hear that again? | **Re: [96:9-15]** | |
| 96 10    (The record was read as follows: | **Def Obj**  No need to | |
| 96 11    Q And does that indicate to | repeat question | |
| 96 12    you that part of the compensation for | | |
| 96 13    the salespeople who worked under you | | |
| 96 14    was based upon their success in | | |
| 96 15    selling Vioxx?') | | |

96:19    -    97:9    Krahe, Marilyn 2006-02-09

| | | |
|---|---|---|
| 96 19    THE WITNESS:  The way in which the sales | | |
| 96 20    representatives' bonus is calculated is based on, | **Re: [96:19-97:9]** | |
| 96 21    as you can see here, a weighting of each of the | **Def Obj** 401; 402; 403; | |

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

```
96 22        products.
96 23        So one of the components of their
96 24        compensation -- because you have got the piece of
96 25        their compensation that is based on the sales
97  1        incentive plan. And then you have the other stock
97  2        options and merit increases and other of their total
97  3        compensation.
97  4        So one of the pieces would have been a
97  5        product. And then each of the products would be
97  6        weighted accordingly in terms of how many products that
97  7        they had to them.
97  8        It looks like there is blackout on this. I'm
97  9        not sure what that is, though.
```

Objections/Responses In Mason: Questioning about employees' compensation and bonuses is irrelevant and prejudicial. Objection to foundation on all questions on this document – she does not know who wrote it (see 86:4-5) or when presentation was given or where (see 88:14-17).

Rulings In Smith/Barnett: Overruled

```
97:19  -  97:21  Krahe, Marilyn 2006-02-09
97 19        Q:  So the answer then is, the salespeople who
97 20        worked under you were compensated, in part, for their
97 21        success in selling Vioxx, true?


97:25  -  98:5  Krahe, Marilyn 2006-02-09
97 25        THE WITNESS:  One of the components of the
98  1        representatives' sales incentive plan is they have that
98  2        target bonus.
98  3        As you can see here, they have overall
98  4        performance, and then they would have a weighting for
98  5        the products that they represent.
```

Re: [100:9-100:11]
Def Obj 401; 402; 403; Questioning about employees' compensation and bonuses is irrelevant and prejudicial. Objection to foundation on all questions on this document – she does not know who wrote it (see 86:4-5) or when presentation was given or where (see 88:14-17).

```
    9  -  100:11  Krahe, Marilyn 2006-02-09
100  9        BY MR. O'CALLAHAN: Q:  Miss Krahe, is it true
100 10        that sales reps working under you were compensated for
100 11        their success in selling Vioxx?


100:15  -  100:18  Krahe, Marilyn 2006-02-09
100 15        THE WITNESS:  Yes. It is true that
100 16        representatives, as one of the components of their
100 17        sales incentive program -- one of the components of
100 18        that, the product was Vioxx.
```

Re: [100:15-100:18]
Def Obj 401; 402; 403; Questioning about employees' compensation and bonuses is irrelevant and prejudicial. Objection to foundation on all questions on this document – she does not know who wrote it (see 86:4-5) or when presentation was given or where (see 88:14-17).

```
106:15  -  106:19  Krahe, Marilyn 2006-02-09
106 15        Q:  After the product was available on the
106 16        market, did you ever attend any role-playing
106 17        sessions?
106 18        A:  I would have been at those sessions if -- for
106 19        role play.


107:1  -  107:2  Krahe, Marilyn 2006-02-09
107  1        Q:  Was it your understanding that the content was
107  2        consistent throughout the country?
```

Re: [107:1-107:2]
Def Obj Foundation; No personal knowledge

```
107:5  -  107:10  Krahe, Marilyn 2006-02-09
107  5        THE WITNESS:  I don't think I can speak for
107  6        all the country.
107  7        But the intent is is that all the professional
107  8        sales representatives have approved promotional items
107  9        that they use with physicians to communicate
107 10        information about the product.
```

Re: [107:5-107:10]
Def Obj Foundation; No personal knowledge

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

110:15  -   110:19  Krahe, Marilyn 2006-02-09
110 15   BY MR. O'CALLAHAN: Q:
110 16   as Exhibit 4 is a document that starts at CAAD-8318 and
110 17   goes to CAAD-8325.
110 18   And if you take a look --
110 19   A:  Okay.

111:5   -   111:9   Krahe, Marilyn 2006-02-09
111  5   Q:  And then this exhibit was sent to a number of
111  6   people.
111  7   And your name is the second name that appears
111  8   in the 'to' section, correct?
111  9   A:  Right.

111:10  -   111:19  Krahe, Marilyn 2006-02-09
111 10   It look like there is George Grissom and then
111 11   Krahe. So I'm the third actually but -- okay.
111 12   Q:  And if you take a look at this, this -- the
111 13   subject -- well, first of all, let's look at the date
111 14   it was -- the date it was received. It's at the top of
111 15   the second page.
111 16   A:  Uh-huh.
111 17   Q:  And that is June 10th, 1999.
111 18   Do you see that?
111 19   A:  Yes.

112:18  -   113:19  Krahe, Marilyn 2006-02-09
112 18   BY MR. O'CALLAHAN: Q:  In this particular e-mail
112 19   that was sent out, the word 'obstacle' is capitalized.
112 20   Do you see that, 'the C2 Obstacle Mailbox' in
112 21   the first sentence.
112 22   A:  In the first sentence, the 'C' is capitalized.
112 23   The '2' is large, uh-huh.
112 24   And then 'obstacle' and 'mailbox' is
112 25   capitalized, yes.
113  1   Q:  As of the time that this particular e-mail was
113  2   sent to you, did you have an understanding as to what
113  3   obstacle' meant in the context of Vioxx?
113  4   A:  No. I don't know what you mean.
113  5   Q:  Let me ask you to take a look at the first
113  6   sentence of the fourth paragraph there.
113  7   Could you read that sentence into the record,
113  8   please?
113  9   A:  Now, where do you want me to go?
113 10   Q:  All right. The sentence that starts, 'I am.'
113 11   A:  Okay. And you want me to read that whole
113 12   paragraph?
113 13   Q:  Just that sentence.
113 14   A:  Okay. 'I am excited to announce a new process
113 15   that will clear out obstacles down the expressway to
113 16   success for Vioxx.'
113 17   Q:  Now, did you have any understanding as to what
113 18   the word 'obstacles' meant in the context of that
113 19   sentence?

113:23  -   114:7   Krahe, Marilyn 2006-02-09

11

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

113 23     THE WITNESS:  Well, I'm still not quite sure
113 24     what this is because I don't recall this one. I would
13 25     have to read through it.
114   1     But an obstacle, by definition, is -- are
114   2     questions.
114   3     Q:  And how long in your life have you thought of
114   4     the definition of an obstacle as a question?
114   5     A:  Well, in our industry, that is what -- what an
114   6     obstacle -- if someone gives you a question, that is an
114   7     obstacle.

114:8   -   114:9   Krahe, Marilyn 2006-02-09
114   8     Q:  Why is a question an obstacle?
114   9     A:  I never --

114:12   -   114:13   Krahe, Marilyn 2006-02-09
114 12     THE WITNESS:  I never really thought about why
114 13     we call it that. It's just what it's called.

114:14   -   114:22   Krahe, Marilyn 2006-02-09
114 14     BY MR. O'CALLAHAN: Q:  And so am I correct then
114 15     in understanding that whenever a physician asks a
114 16     question about a Merck product, that was treated as an
114 17     obstacle?
114 18     A:  Yes, because, I mean, an obstacle -- a
114 19     question can be -- like it could be cost, is an example
114 20     of an obstacle.
14 21     So it's -- it's a question that the physician
14 22     has that you need to address.

114:23   -   115:9   Krahe, Marilyn 2006-02-09
114 23     Q:  Okay. And is it your recollection that Merck
114 24     set up a technique of handling obstacles with respect
114 25     to Vioxx?
115   1     A:  Well, Merck has a process by which all of our
115   2     professional sales representatives are to answer
115   3     questions.
115   4     And it is extremely important that they handle
115   5     the questions because a physician can't prescribe a
115   6     product for a patient unless they have answered all the
115   7     questions that a physician has.
115   8     So it's really important that they do it in
115   9     the right way.

117:2   -   117:12   Krahe, Marilyn 2006-02-09
117   2     Q:  If you turn to the -- if you look at the third
117   3     paragraph of this document, there is a line that --
117   4     it's the third -- third paragraph down. There is a
117   5     quote there.
117   6     Do you see that?
117   7     It starts with the word 'we.'
117   8     A:  Yes.
117   9     Q:  Could you read that into the record?
117 10     A:  'We are in it to win it.'
117 11     Q:  Was that a slogan that Merck used?
117 12     A:  Yes. It was something that was used.

| | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|

117:13  -   117:15   Krahe, Marilyn 2006-02-09
117  13          Q:  And for -- for how long was that slogan
⬤17  14          used?
117  15          A:  I don't remember the time frame.

117:16  -   118:12   Krahe, Marilyn 2006-02-09
117  16          Q:  And what is -- what does the 'it' refer to?
117  17          A:  It refers to the COXIB class.
117  18          Q:  And this slogan was shorthand for
117  19          something?
117  20          A:  No. It's -- it's just to -- to motivate the
117  21          sales representatives to realize that what their goal
117  22          is is to in the COXIB class be the Number 1 product
117  23          because it was our goal to communicate with
117  24          physicians.
117  25          And they would understand the value of our
118   1          product and know that our product should be the
118   2          Number 1 prescribed product for patients.
118   3          Q:  And the reference there to winning it means to
118   4          get the most sales?
118   5          A:  It means that what we wanted to accomplish was
118   6          that we wanted to be the Number 1 product in the COXIB
118   7          class.
118   8          Q:  Well, how does one become the Number 1 product
118   9          in the COXIB class?
118  10          A:  By communicating to physicians the value of
118  11          our products and having the physician then prescribe it
⬤18  12          for appropriate patients.

119:1   -   119:2   Krahe, Marilyn 2006-02-09
119   1          Q:  So the idea was to make Vioxx the best-selling
119   2          product in the COXIB class?

119:6   -   119:9   Krahe, Marilyn 2006-02-09
119   6          THE WITNESS:  The objective that we had is to
119   7          make sure that all patients had available this product
119   8          and that physicians were aware of the benefits because
119   9          we felt it was the best product for patients.

119:12  -   119:18   Krahe, Marilyn 2006-02-09
119  12          THE WITNESS:  And so it was really
119  13          motivational for the representatives to know that we
119  14          had the best product and that it was available for
119  15          patients.
119  16          And the way in which they do that in which
119  17          they generate sales is to go to physicians and
119  18          communicate the value of the product.

141:12  -   141:17   Krahe, Marilyn 2006-02-09
141  12          Q:  Later on were you provided with something
141  13          called an Obstacle Handling Guide?
141  14          A:  See, that is more traditionally what I
⬤141  15          remember is that the company would provide examples of
141  16          questions, obstacles that had come up and then approved
141  17          responses.

141:18  -   141:19   Krahe, Marilyn 2006-02-09

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

141 18      Q:  And do you recall when you were first provided
141 19      with an Obstacle Handling Guide?

141:21 -  142:8   Krahe, Marilyn 2006-02-09
141 21      MR. O'CALLAHAN:  For Vioxx.
141 22      THE WITNESS:  I don't recall the date, no.
141 23      BY MR. O'CALLAHAN: Q:  Did you have an Obstacle
141 24      Handling Guide for Fosamax?
141 25      A:  We have Obstacle Handling Guides for all
142 1      products. So that would be common practice.
142 2      Q:  And do you have one for Singulair as well?
142 3      A:  Yeah. All products would have obstacle
142 4      handlers --
142 5      Q:  Okay.
142 6      A:  -- because questions come up that
142 7      representatives need assistance with in order to
142 8      provide service to their customers.

142:9 -  142:10  Krahe, Marilyn 2006-02-09
142 9      Q:  Let me mark as next in order as Exhibit 5.
142 10      A:  Thank you.

143:9 -  143:13  Krahe, Marilyn 2006-02-09
143 9      Q:  And so with respect to the first -- or I
143 10      should say the second page of this exhibit, there is a
143 11      section there entitled Cardiovascular Events.
143 12      Do you see that?
143 13      A:  Yes.

143:20 -  143:22  Krahe, Marilyn 2006-02-09
143 20      BY MR. O'CALLAHAN: Q:  When did you first become
143 21      aware that cardiovascular events were an obstacle with
143 22      respect to the sale of Vioxx?

**Re: [143:20-143:22]**
**Def Obj** Colloquy;
Question not answered
and later withdrawn and
a different question
asked

*Sustained* (handwritten)

143:24 -  144:8   Krahe, Marilyn 2006-02-09
143 24      THE WITNESS:  When did I first become aware
143 25      that there was an -- a question about -- I'm not sure I
144 1      understand the question.
144 2      MR. O'CALLAHAN:  Okay. Could you read the
144 3      question back?
144 4      (The record was read as follows:
144 5      Q When did you first become
144 6      aware that cardiovascular events were
144 7      an obstacle with respect to the sale
144 8      of Vioxx?')

**Re: [143:24-144:8]**
**Def Obj** Colloquy;
Question not answered
and later withdrawn and
a different question
asked

144:12 -  144:22  Krahe, Marilyn 2006-02-09
144 12      THE WITNESS:  I'm not -- I'm not sure I really
144 13      understand what the question is.
144 14      If you are asking when did I get this, I don't
144 15      know when I got this obstacle handler.
144 16      BY MR. O'CALLAHAN: Q:  My question was
144 17      different.
144 18      My question was, when did you first become
144 19      aware that --
144 20      A:  Uh-huh.

**Re: [144:12-144:22]**
**Def Obj** Colloquy;
Question not answered
and later withdrawn and
a different question
asked

*Overruled* (handwritten)

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

144 21     Q: -- cardiovascular events were an obstacle with
144 22     respect to the sale of Vioxx?

145:1 - 146:7   Krahe, Marilyn 2006-02-09

*Re: [145:1-145:5]*
*Def Obj Colloquy;*
*Question not answered*
*and later withdrawn and*
*a different question*
*asked*

Overruled

145 1     THE WITNESS: Well, I'm not sure. The way you
145 2     phrase it, it's hard for me to understand what you are
145 3     asking.
145 4     So I wasn't aware of what you are -- what you
145 5     are referring to.
145 6     BY MR. O'CALLAHAN: Q: At some point during
145 7     the --
145 8     A: Uh-huh.
145 9     Q: -- sale of Vioxx did you become aware that
145 10     there were concerns about the cardiovascular effect of
145 11     Vioxx?
145 12     A: In the -- in the time in which we were
145 13     promoting Vioxx, yes. Questions did come up from
145 14     clinicians about cardiovascular -- the effects that
145 15     Vioxx had, uh-huh.
145 16     Q: When did you first become aware that those
145 17     questions had arisen?
145 18     A: I'm not sure what you mean.
145 19     I mean, from the day a product is launched,
145 20     physicians ask, 'What is the profile of a product on
145 21     all of the systems in the body?'
145 22     So that wouldn't have been one highlighted
145 23     differently than the others. I mean, everyone would
145 24     have asked about, you know, the profile of the
145 25     product.
146 1     So I guess I'm just having trouble answering
146 2     the question because it's -- you know, people would
146 3     always ask about the safety of a product. That is very
146 4     common.
146 5     Q: When did you become aware that people were
146 6     expressing concerns about the cardiovascular safety of
146 7     Vioxx?

146:10 - 146:14   Krahe, Marilyn 2006-02-09
146 10     THE WITNESS: Well, I don't recall if people
146 11     were expressing concern about cardiovascular.
146 12     I mean, we -- we always got questions about
146 13     any one of these things, you know, dosing, renal, cost,
146 14     those -- you know, as stated on here.

149:8 - 150:6   Krahe, Marilyn 2006-02-09
149 8     Q: Sure. What was your understanding as to why
149 9     Merck was manufacturing and selling this drug?
149 10     A: My understanding of why -- you mean why Vioxx
149 11     came to market? What was the benefit of Vioxx?
149 12     Q: Yes.
149 13     A: Well, Vioxx was brought to market because it
149 14     provided pain relief for patients compared to many
149 15     other NSAIDS.
149 16     And in addition, you know, the real benefit of
149 17     this product is that it was safe on the stomach.
149 18     Q: Compared to what?
149 19     A: Compared to other comparator NSAIDS what was

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

149 20      available on the marketplace because one of the -- one
149 21      of the most difficult problems for patients with
149 22      osteoarthritis and rheumatoid arthritises, that they
149 23      have severe pain.
149 24      And they have to take nonsteroidals that are
149 25      very, very harsh on the stomach. And so if they could
150  1      get a product that had equivalent or superior pain
150  2      relief, more range of motion for the patient but be
150  3      less harsh on the stomach, that would be just an
150  4      outstanding benefit for patients.
150  5      And so patients were very excited about Vioxx
150  6      coming out on the market.

150:12  -    150:19  Krahe, Marilyn 2006-02-09
150 12      BY MR. O'CALLAHAN: Q:  What benefit would Vioxx
150 13      have provided above aspirin or beyond aspirin?
150 14      A:  Well, the -- the benefit that we were -- that
150 15      we were looking for on nonsteroidals and products like
150 16      aspirin that are very, very harsh on the stomach was to
150 17      provide a product that was -- was safer for patients.
150 18      Q:  Safer than aspirin?
150 19      A:  On the stomach.

182:8  -    182:20  Krahe, Marilyn 2006-02-09
182  8      Q:  These individuals are called professional
182  9      sales representatives, correct?
182 10      A:  Yes.
182 11      Q:  And I want to highlight the term
182 12      professional' here.
182 13      Is that in reference to their conduct or in
182 14      reference to who they are communicating to?
182 15      A:  It -- I think that it's related to their
182 16      conduct, too, because there is no question that the
182 17      sales representatives have, you know, a code of not
182 18      only policies that they are to cover and to make sure
182 19      that they are always conducting themselves in a manner
182 20      in which Merck would be proud.

183:12  -    183:21  Krahe, Marilyn 2006-02-09
183 12      Q:  Do you know what fair balance is?
183 13      A:  Yes, I do, sir.
183 14      Q:  What is fair balance?
183 15      A:  Fair balance means that a representative --
183 16      what they would do with fair balance means that they
183 17      would present the features of the product.
183 18      And then over time, fair balance means that
183 19      they would provide clinicians with information on the
183 20      balance of the product or the limitations of the
183 21      product.

184:13  -    184:21  Krahe, Marilyn 2006-02-09
184 13      Q:  And in running your large sales organization,
184 14      do you not know whether a fair balance is required by
184 15      FDA rules?
184 16      A:  I know that it is required by Merck. It's one
184 17      of our policies.
184 18      Q:  Okay. And anybody who doesn't follow that

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

184 19      would be in violation at least of Merck's policy,
184 20      correct?
184 21      A:  That is correct.

184:22  -  185:4   Krahe, Marilyn 2006-02-09
184 22      Q:  Okay. We had a -- we have a concept in the
184 23      law. You actually took an oath here today to tell the
184 24      truth and the whole truth.
184 25      A:  Yes.
185  1      Q:  Because there is an understanding that by
185  2      stating a partial truth, you may be misleading
185  3      somebody.
185  4      Do you understand that concept?

185:8  -  185:18  Krahe, Marilyn 2006-02-09
185  8      THE WITNESS:  Yes. I -- I think I'm following
185  9      you, yes.
185 10      BY MR. BLIZZARD: Q:  Okay. And is that also part
185 11      of what fair balance is, that is, you have to tell the
185 12      physicians the whole truth?
185 13      A:  Absolutely. I mean, it's really important
185 14      that -- that representatives provide information to
185 15      physicians.
185 16      And then if a physician has a question, that
185 17      they go to every effort possible to provide that
185 18      clarification on -- on what the physician needs.

185:19  -  186:2   Krahe, Marilyn 2006-02-09
185 19      Q:  Okay. So it's Merck's policy that fair
185 20      balance requires Merck about their products to tell
185 21      physicians the whole truth?
185 22      A:  Well, fair balance -- remember that the
185 23      interaction with the physician can be from -- from one
185 24      time frame to another and if a representative had the
185 25      time to go through every single thing in one setting so
186  1      remembers over time that they are providing information
186  2      about the product.

186:3  -  186:8   Krahe, Marilyn 2006-02-09
186  3      Q:  Okay. Was it acceptable to minimize the risks
186  4      of a product?
186  5      A:  No. It's not acceptable to minimize risks.
186  6      Q:  Is it acceptable to overstate the benefits of
186  7      a product?
186  8      A:  No. It is not acceptable.

186:9  -  186:16  Krahe, Marilyn 2006-02-09
186  9      Q:  Okay. Would it be a violation of the policies
186 10      and standards of Merck to do such a thing?
186 11      A:  It's -- it's actually in our communicating
186 12      policy that they not minimize risks --
186 13      Q:  Okay.
186 14      A:  -- and that they always provide fair balance
186 15      on every call and provide a package insert on every
186 16      call to the physician.

191:16  -  191:17  Krahe, Marilyn 2006-02-09

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

191 16    Q: So you said -- I believe you said that
191 17    obstacles are, by definition, questions.

191:21 -   192:13  Krahe, Marilyn 2006-02-09
191 21    BY MR. BLIZZARD: Q:  Is that right?
191 22    A:  Yeah. I -- that's the way I characterized --
191 23    that's the best way for me to describe it to you so
191 24    that it's clear.
191 25    Q:  Now, is every question by a physician an
192  1    obstacle?
192  2    A:  Yes, because they have a question. And they
192  3    are not going to prescribe the product until they get
192  4    that question answered.
192  5    Q:  Okay. So every question however mundane by a
192  6    physician is an obstacle?
192  7    A:  I guess by definition if every question
192  8    related to a product, I would -- I would classify that
192  9    as an obstacle.
192 10    Q:  Well, was there -- as part of developing the
192 11    resource, the Obstacle Handling Guide, did -- was there
192 12    an attempt to come up with the tough questions and
192 13    classify those as obstacles?

192:16 -   192:23  Krahe, Marilyn 2006-02-09
192 16    THE WITNESS:  Well, I don't think they ever
192 17    classified this is a tough one or this is an easy
192 18    one.
192 19    They are -- they are just questions. And any
192 20    question is important to us to address with a
192 21    physician.
192 22    So all questions are important. And they are
192 23    not ranked.

195:6  -   195:19  Krahe, Marilyn 2006-02-09
195  6    Q:  Okay. Now, when you were -- when your sales
195  7    reps that were a part of the large sales organization
195  8    that you were running in 1999 and 19 -- and 2000 and
195  9    2001 were asked the question, does a person who takes
195 10    Vioxx have an increased risk for a heart attack, what
195 11    was Merck's answer?
195 12    A:  Geez, I don't know what the exact -- if you
195 13    are looking for an exact answer that was in the guide,
195 14    I wouldn't be able to recall what the exact answer, if
195 15    a physician would have asked that question.
195 16    Q:  What was your answer?
195 17    A:  Oh, I wouldn't speculate because I wouldn't be
195 18    someone who is certified on the product and giving
195 19    product presentations to physicians.

195:16 -   195:19  Krahe, Marilyn 2006-02-09
195 16    Q:  What was your answer?
195 17    A:  Oh, I wouldn't speculate because I wouldn't be
195 18    someone who is certified on the product and giving
195 19    product presentations to physicians.

195:20 -   195:21  Krahe, Marilyn 2006-02-09
195 20    Q:  So you didn't know the answer to that

| | | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|
| 195 | 21 | question? | | |

195:25 - 196:7   Krahe, Marilyn 2006-02-09

| 195 | 25 | THE WITNESS:  No. What I said is, I don't |
|---|---|---|
| 196 | 1 | recall in the obstacle handler exactly what it said. |
| 196 | 2 | So I wouldn't try to guess, Number 1. |
| 196 | 3 | Number 2 is that you asked what did I do when |
| 196 | 4 | asked that. I was not certified on the product -- |
| 196 | 5 | MR. BLIZZARD:  Okay. |
| 196 | 6 | THE WITNESS:  -- to go out and make product |
| 196 | 7 | presentations to physicians. |

196:10 - 196:15   Krahe, Marilyn 2006-02-09

| 196 | 10 | BY MR. BLIZZARD: Q:  Okay. We will do some role |
|---|---|---|
| 196 | 11 | playing here. |
| 196 | 12 | I'm the doctor. 1999 and 2000, 2001, 2002, |
| 196 | 13 | 2003, 2004, before the product is removed from the |
| 196 | 14 | market, I asked you, 'Are patients who take Vioxx at an |
| 196 | 15 | increased risk for a heart attack?' |

**Re: [196:10-196:15]**
**Def Obj** Foundation; Speculative- she testified at 196:4-7 that she was not certified to detail Vioxx. Asked and answered.

197:3 - 197:7   Krahe, Marilyn 2006-02-09

| 197 | 3 | THE WITNESS:  Well, I think I already told |
|---|---|---|
| 197 | 4 | you. |
| 197 | 5 | I -- I -- I'm -- I'm not -- I'm not sure what |
| 197 | 6 | I would answer because I'm not sure what you are asking |
| 197 | 7 | me. |

**Re: [197:3-197:7]**
**Def Obj** Foundation; Speculative- she testified at 196:4-7 that she was not certified to detail Vioxx. Asked and answered.

199:1 - 199:4   Krahe, Marilyn 2006-02-09

| 199 | 1 | BY MR. BLIZZARD: Q:  Okay. So did the company |
|---|---|---|
| 199 | 2 | then communicate to doctors on a consistent basis that |
| 199 | 3 | there was no increased cardiovascular risk from taking |
| 199 | 4 | Vioxx? |

199:7 - 199:10   Krahe, Marilyn 2006-02-09

| 199 | 7 | THE WITNESS:  And I don't think I would |
|---|---|---|
| 199 | 8 | characterize that there was -- that there was a |
| 199 | 9 | message, you know, like that. |
| 199 | 10 | So no. |

199:15 - 199:22   Krahe, Marilyn 2006-02-09

| 199 | 15 | Q:  Well, let me put it another way. |
|---|---|---|
| 199 | 16 | Did the company -- |
| 199 | 17 | A:  Okay. |
| 199 | 18 | Q:  -- ever develop, as far as you know as a |
| 199 | 19 | senior business director, a message during the time |
| 199 | 20 | that Vioxx was on the market that there was an |
| 199 | 21 | increased risk that patients had for a heart attack |
| 199 | 22 | from taking Vioxx? |

**Re: [199:15-22]**
**Def Obj:** Foundation; no personal knowledge; witness not qualified to discuss CV risk

200:1 - 201:1   Krahe, Marilyn 2006-02-09

| 200 | 1 | THE WITNESS:  The company did not believe that |
|---|---|---|
| 200 | 2 | there was an increased risk. That is not what our data |
| 200 | 3 | showed. And that's not -- |
| 200 | 4 | MR. BLIZZARD:  That's not -- |
| 200 | 5 | THE WITNESS:  -- what we believed. |
| 200 | 6 | BY MR. BLIZZARD: Q:  That's not my question. My |

Overruled (Goes to credibility)

| | | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|
| 200 | 7 | question is not what the company believed. | | |
| 200 | 8 | My question is, did the company ever | | Sustained |
| 200 | 9 | communicate to doctors the message that there was an | | |
| 200 | 10 | increased risk from taking Vioxx for having a heart | | |
| 200 | 11 | attack during the time Vioxx was on the market? | | |
| 200 | 12 | A:  Well, why would they do that when it didn't | | |
| 200 | 13 | cause an increased risk? | | |
| 200 | 14 | Q:  Exactly. So the answer to my question should | **Re: [200:14-200:21]** | |
| 200 | 15 | be easy then, shouldn't it? | **Def Obj** No question | |
| 200 | 16 | Answer it directly, please. | asked; colloquy | |
| 200 | 17 | A:  Well, I'm having trouble understanding you. | | |
| 200 | 18 | Q:  Okay. | | |
| 200 | 19 | A:  I'm sorry. | | |
| 200 | 20 | Q:  Let me -- let me slow down then. | | |
| 200 | 21 | A:  Okay. | | |
| 200 | 22 | Q:  Did the company ever communicate a consistent | | |
| 200 | 23 | message to doctors or to patients, for that matter, | | |
| 200 | 24 | while Vioxx was on the market that there was an | | |
| 200 | 25 | increased risk for a patient to have a heart attack | | |
| 201 | 1 | while taking Vioxx? | | |
| | | | | |
| 201:4 | - | 201:8    Krahe, Marilyn 2006-02-09 | | Overrul |
| 201 | 4 | THE WITNESS:  Again, the company did not | **Re: [201:4-8]** | |
| 201 | 5 | believe that. | **Def Obj:** Foundation; | |
| 201 | 6 | So there was no reason why there would be a | no personal knowledge; | |
| 201 | 7 | message that said -- because it didn't cause -- I mean, | witness not qualified to | |
| 201 | 8 | the clinical trials did not show an increased risk. | discuss CV risk | |
| | | | | |
| 201:6 | - | 201:8    Krahe, Marilyn 2006-02-09 | | |
| 201 | 6 | So there was no reason why there would be a | | |
| 201 | 7 | message that said -- because it didn't cause -- I mean, | | |
| 201 | 8 | the clinical trials did not show an increased risk. | | |
| | | | | |
| 201:10 | - | 202:2    Krahe, Marilyn 2006-02-09 | | |
| 201 | 10 | Q:  My -- my question is not what the company | | |
| 201 | 11 | believed. My question is what they communicated. | | |
| 201 | 12 | Do you understand that? | | |
| 201 | 13 | A:  Well, it's one in the same. | | |
| 201 | 14 | Q:  No, it's not. | | |
| 201 | 15 | A:  What we believed and what we communicated | | Sustained |
| 201 | 16 | are the same because if we believed it didn't cause | | 403 |
| 201 | 17 | heart attacks, then that is what we would have | | |
| 201 | 18 | communicated so -- | | |
| 201 | 19 | Q:  Okay. | | |
| 201 | 20 | A:  See what I'm saying? | | |
| 201 | 21 | Q:  Now, do you know what everybody in the company | | |
| 201 | 22 | believed? | | |
| 201 | 23 | A:  I know what I believed. | | |
| 201 | 24 | Q:  Okay. | | |
| 201 | 25 | A:  I know I took the product personally. And if | **Re: [201:25-202:2]** | |
| 202 | 1 | I believed it caused heart attacks, I wouldn't have | **Pltf Obj** Rule 403; | |
| 202 | 2 | taken it. | personal use of product | |
| | | | | |
| 202:14 | - | 202:20    Krahe, Marilyn 2006-02-09 | | |
| 202 | 14 | Q:  Okay. So somebody who did analyze the data | | |
| 202 | 15 | told you there was no increased risk for heart attack, | | |
| 202 | 16 | correct? | | |

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

202 17   A:  That's correct.
202 18   And I think they are well qualified to
202 19   evaluate the data on behalf of Merck and with the FDA.
202 20   And so I -- I had no reason not to believe them.

204:17  -  204:20  Krahe, Marilyn 2006-02-09
204 17   Q:  You have already told me you weren't capable
204 18   of analyzing the data, correct?
204 19   A:  No. That is -- that is not my area of
204 20   expertise --

204:21  -  204:22  Krahe, Marilyn 2006-02-09
204 21   Q:  Okay.
204 22   A:  -- nor what I'm responsible for.

*Overrule[d]*

205:12  -  205:24  Krahe, Marilyn 2006-02-09
205 12   BY MR. BLIZZARD:  Q:  So individuals within the
205 13   company who were capable of analyzing the data
205 14   communicated to you their analysis, correct?
205 15   A:  Through the bulletins and other mechanisms,
205 16   that is my understanding.
205 17   Q:  And that analysis that was communicated to you
205 18   was that there is no increased risk of heart attack,
205 19   correct?
205 20   A:  That's correct.
205 21   Q:  And then that message that was communicated to
205 22   you you carried out into the field and communicated to
205 23   doctors -- not you personally but your organization,
205 24   correct?

**Re: [205:12-24]**
**Def Obj:** Foundation; no personal knowledge; witness not qualified to discuss CV risk

206:2   -   206:8   Krahe, Marilyn 2006-02-09
206  2   THE WITNESS:  Again, you are characterizing
206  3   like there was a series of events that people were
206  4   asking this question, and this was being
206  5   communicated.
206  6   And there was just a general -- there was
206  7   knowledge based on the fact of the studies that it did
206  8   not cause an increased risk.

**Re: [206:2-8]        Def Obj:** Foundation; no personal knowledge; witness not qualified to discuss CV risk

206:14  -  206:17  Krahe, Marilyn 2006-02-09
206 14   Q:  That was your organization -- your sales
206 15   organization's communications to doctors was that the
206 16   studies and the science showed there was no increased
206 17   risk for heart attack, correct?

**Re: [206:14-206:17]**
**Def Obj** Lawyer testifying (sustained in Barnett)

206:20  -  206:20  Krahe, Marilyn 2006-02-09
206 20   THE WITNESS:  I think, yes.