## Olson-Fields, Karen 2006-07-27

70: 1 letters.
2 A: Let's see. If I -- well, I couldn't identify
3 specific, but if I were to receive a letter that was clearly
4 an alert to something, yes, I would review it.
5 Q: Let's just go through the process. You get mail
6 every day?
7 A: Uh-huh, yes.
8 Q: And you open your mail?
9 A: Yes.
10 Q: And you read your mail?
11 A: I don't read every single piece of literature. No,
12 I don't.
13 Q: Okay. So let's determine how you decide to review
14 it. If you open up a letter, and it's addressed to you, you
15 at least become familiar with the topic enough to know
16 whether or not it's important information.
17 A: I glance at the topic. It really depends. So much
18 of the junk mail, it all looks the same, and so it's kind of
19 a tedious process of trying to go through that. There's
20 other ways. You know, I also rely on -- wish -- I would like
21 to rely on my pharmaceutical reps to bring to my attention
22 when there's a major issue so....
23 Q: And from time to time you ask pharmaceutical reps
24 to provide you information?
25 A: Yeah. If I have a question about a medication,
71: 1 I'll ask them to track that down and give me some information
2 on it.
3 Q: I want to make sure. You are not suggesting you
4 ignore safety-related letters from pharmaceutical companies
5 that are addressed to you?
6 A: No, I do not ignore --
7 Q: You open them, and if you see that they're safety
8 related, you review them?
9 A: Yes.
10 Q: And then if they're important, you share them with
11 Dr. Vogeler?
12 MR. NABERS: Objection to the form.
13 A: He usually gets the same literature.
14 Q: (By Mr. Krumholtz) And do you discuss that
15 literature on occasion with Dr. Vogeler?
16 A: Yes.
17 Q: And you all have full discussions about the
18 propriety of prescribing any given medication, given their
19 safety?
20 MR. NABERS: Objection to the form.
21 A: We do not meet regularly to discuss details of
22 things. I think if something major is brought to our
23 attention, we will as colleagues discuss, you know, what else
24 needs to be done to look into the issue, like I would imagine
25 he and I are going to sit down and talk about something like

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4                                                        72

72:  1  this, saying that antiinflammatories that we've used for
      2  years and years now have this warning that I was not aware
      3  of. So we would probably likely discuss something like this.
      4  Q:  (By Mr. Krumholtz)  If you receive a correspondence
      5  from a pharmaceutical company about something you deem to be
      6  a significant safety issue, then you normally would discuss
      7  it with Dr. Vogeler?
      8  A:  Yes.
      9  Q:  And it's your understanding that his practice is
     10  similar, that if he receives something significant in
     11  connection with the safety of any particular medication that
     12  you prescribed, he would bring it to your attention?
     13  A:  Yes.
     14  Q:  And you all would discuss it to the extent
     15  necessary?
     16  A:  Yes.
     17  Q:  And you can even request of the pharmaceutical reps
     18  particular information if you're concerned about something?
     19  A:  Yes.
     20  Q:  And when that happens, have you heard of a
     21  physician information request or a health care provider
     22  information request?
     23  A:  Not that specifically, but, for example, I had a
     24  patient who had a side effect from a new antibiotic that was
     25  different. It hadn't been listed in the PPI, and I asked the
73:   1  pharmaceutical rep about it because they acted very
      2  astonished that this patient had this side effect.
      3  And I asked them to track it down, and then I had
      4  to write an incident report for that company. And then they
      5  gave me -- sent me information addressing that concern, and I
      6  read that.
      7  Q:  And that company was not Merck, just --
      8  A:  I don't know what company -- can I say the drug?
      9  Is it fair for me to say the drug? I can't remember the --
     10  it's Ketek, macrolide.
     11  Q:  Okay. You have no reason to believe, as you sit
     12  here today, that it involved Merck?
     13  A:  That incident involved the drug Ketek, and I was
     14  using it as an example.
     15  Q:  And you just don't know one way or the other what
     16  drug company it involved?
     17  A:  I can't remember who makes Ketek.
     18  Q:  Okay. And if you have any -- now, you have never
     19  reported any sort of issue or concern to Merck, true?
     20  A:  About what?
     21  Q:  About Vioxx, for starts.
     22  A:  Lately?
     23  Q:  Have you ever?
     24  A:  Yeah.
     25  Q:  Have you called Merck and told them that you had

Printed: 10/4/2006   3:16:27PM

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4                                              74

74:  1  concerns?
2  A: I didn't call the corporate office.
3  Q: Have you ever heard of adverse event reporting?
4  A: Yes. That's what this Ketek was. I felt my
5  patient had an adverse event, and I informed the
6  pharmaceutical rep, who then sent me a lot of paperwork to
7  fill out.
8  Q: You have never reported adverse events in
9  connection with Vioxx to Merck, true?
10  A: No. True, true.
11  Q: My statement is correct? You have never reported
12  any adverse event in connection with your patients who were
13  on Vioxx?
14  A: No. I have never —
15  Q: Correct?
16  A: — made a formal report, no.
17  Q: Okay. You have never communicated to Merck that
18  you thought any particular patient suffered from some sort of
19  untoward side effect as a result of Vioxx?
20  A: Correct.
21  Q: True?
22  A: True.
23  Q: And that includes Mr. Mason?
24  A: True.
25  MR. KRUMHOLTZ: Let's go off the record for another

75:  1  minute.
2  VIDEOGRAPHER: It's 36 minutes after nine o'clock.
3  We're going off the record. This is the end of Tape No. 1.
4  (Recess.)
5  VIDEOGRAPHER: It's 52 minutes after nine o'clock.
6  We're back on the record. This is the beginning of Tape No.
7  2.
8  Q:   (By Mr. Krumholtz)  Do you know Jan Lawrence?
9  A: Yes.
10  Q: Do you know Natalie Nielsen?
11  A: Nancy?
12  Q: Or Nancy Nielsen.
13  A: Yes.
14  Q: Thank you. And what other Merck sales
15  representatives have you dealt with that you can recall?
16  A: A lot of them are still our reps. They kept the
17  same Merck reps largely coming to our territory. Robert
18  Fisher frequents, and then there's some new ones I don't know
19  as well. Some have gone. Yeah, so those are the three main
20  Merck reps. Trying to think who else.
21  Q: I saw a Shane Jensen.
22  A: Shane Jensen, yes. Shane Jensen.
23  Q: And again, all of the major pharmaceutical
24  companies have representatives come and provide you with
25  information about their medications, true?

## Olson-Fields, Karen 2006-07-27

76: 1  A: Yes.
2  Q: And they come by the office and leave materials and
3  sometimes speak with you as well?
4  A: Yes.
5  Q: And that's true with respect to Pfizer?
6  A: Yes.
7  Q: Bayer?
8  A: Yes.
9  Q: And other pharmaceutical companies?
10  A: Yes.
11  Q: And if you had a problem with any particular
12  pharmaceutical rep, you have an option to call the company
13  and complain?
14  A: Yes.
15  Q: Have you ever called Merck and complained about any
16  of the conduct of their representatives?
17  A: No.
18  Q: In fact, have you found all of the individuals you
19  have just referenced to be professional to you?
20  A: Yes.
21  Q: And courteous?
22  A: Yes.
23  Q: And do they attempt to provide you with information
24  that you have requested?
25  A: Yes.

77: 1  Q: And have they been helpful in that regard when you
2  needed information?
3  A: I believe so. I can't think of anything specific
4  but...
5  Q: You find them to be trustworthy people?
6  A: I would like to hope so.
7  Q: And you don't believe they have intentionally
8  misled you, I assume?
9  MR. NABERS: Objection to the form.
10  A: About?
11  Q: (By Mr. Krumholtz) About anything?
12  MR. NABERS: Objection to the form.
13  A: Well, that opens up opinion. I would have to say
14  that if we're -- if we want to bring up the topic of Vioxx, I
15  feel that initially when there were concerns about Vioxx that
16  I was given a lot of reassurance from those particular people
17  we just mentioned because they have been the same reps.
18  Intentional, no. I think pharmaceutical representatives do
19  what their company tells them to do.
20  Q: (By Mr. Krumholtz) I'd like to hand you what's
21  been marked as Exhibit 4 to your deposition. And this is a
22  Dear Health Care Provider letter, true?
23  MR. NABERS: Objection to the form.
24  Q: (By Mr. Krumholtz) That is a letter from Merck to
25  you, true?

*[Handwritten annotation:]* Overruled

*[Handwritten annotation:]* Re: 77:7 - 77:19
Def Obj: Foundation - improper opinion about what merck sales representative intended

Plaintiff Response: Again def. counsel is abject to their own question. They asked for her opinion and she was responsive + provided it. She has had extensive communications with sales reps from Merck and has more than adequate basis for this opinion.

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4                                                78

| 78: | |
|---|---|
| 1 | A: My name's on it. |
| 2 | Q: Meaning that it is addressed to you? |
| 3 | A: It is addressed to me. |
| 4 | Q: And that is your correct address, 9600 South 1300 |
| 5 | East, Sandy, Utah? |
| 6 | A: Yes. |
| 7 | Q: And it's dated November 19, 2001; is that correct? |
| 8 | A: Yes. |
| 9 | Q: And it indicates, 'Dear Ms. Olson. Our senior |
| 10 | professional representative, Jan Lawrence,' and you indicated |
| 11 | that you're familiar with Jan, true? |
| 12 | A: True. |
| 13 | Q: She's one of the folks that you believe has been |
| 14 | professional and courteous to you? |
| 15 | A: Yes. |
| 16 | Q: Has referred your request for information regarding |
| 17 | Vioxx. Then it says rofecoxib tablets and oral suspension. |
| 18 | That's just another way of saying Vioxx, true? |
| 19 | A: True. |
| 20 | Q: So you -- it indicates that you had a request for |
| 21 | information regarding Vioxx, does it not? |
| 22 | A: Yes. That's what it says. |
| 23 | Q: And it says, Your inquiry concerned the occurrence |
| 24 | of cardiovascular effects in patients receiving Vioxx. Do |
| 25 | you see that? |

| 79: | |
|---|---|
| 1 | A: Yes. |
| 2 | Q: In or around November of 2001 or before, did you |
| 3 | have concerns about whether or not there was any sort of risk |
| 4 | associated with Vioxx with respect to cardiovascular effects? |
| 5 | A: You know, I don't remember specifics on that. I do |
| 6 | recall a couple years before Vioxx was pulled from the |
| 7 | market, there had been rumors that there was some problems. |
| 8 | I was concerned. The only thing I really remember |
| 9 | specifically is that I had conversations with the |
| 10 | pharmaceutical reps who gave me a lot of reassurance that |
| 11 | Vioxx was safe. |
| 12 | And in fact, I remember possibly even Ms. Lawrence |
| 13 | being the one saying that those rumors were instigated by |
| 14 | their competition, and really the other specifics to any |
| 15 | conversation I would have had specific to Vioxx, I wouldn't |
| 16 | be able to recall the details of that. |
| 17 | Q: I'll object to the nonresponsive portion the |
| 18 | answer. But I just want to be clear -- and you understand we |
| 19 | just have to make objections on the record for a later date? |
| 20 | MR. NABERS:   (Unintelligible.) |
| 21 | COURT REPORTER:  Say that again. |
| 22 | MR. NABERS:  Nothing. |
| 23 | MR. KRUMHOLTZ:  Object to the side bar. |
| 24 | Q:   (By Mr. Krumholtz)  It says, Your inquiry concerned |
| 25 | the occurrence of cardiovascular effects in patients |

*[Handwritten annotation in right margin:]* Overruled

*[Handwritten annotation in right margin:]* Re: 79:2 - 79:16 Def obj: Speculation— does not remember details and is testifying about what "possibly" happened.

Plaintiff Response: The witness is providing her best answer to the question. She clearly points out what she recalls specifically in her answer. Its not therefore Speculation on her part.

Printed: 10/4/2006   3:16:27PM

## Olson-Fields, Karen 2006-07-27

80:
1  receiving Vioxx.' Did I read that right?
2  A: That's what the document says.
3  Q: And you don't have any reason to dispute that in
4  November of 2001 you raised that issue or question with
5  Ms. Lawrence, true?
6  A: My only dispute is, I cannot recall whether this
7  date would have been accurate. I don't remember. That was a
8  -- quite a while ago.
9  Q: Okay. So your memory has faded since then, I
10  assume?
11  A: Yes, details.
12  Q: And as a result, we must rely on documents and
13  other information to determine what happened in that regard?
14  MR. NABERS: Objection to the form.
15  Q: (By Mr. Krumholtz) True?
16  A: I don't know whether I would say rely on them, but
17  certainly acknowledge them.
18  Q: Okay. You don't dispute that you received Exhibit
19  4, do you?
20  MR. NABERS: Objection to the form. You got a
21  certified mail receipt you want to show her?
22  A: I do not remember receiving this document
23  specifically.
24  Q: (By Mr. Krumholtz) But you don't deny that you
25  received it?

81:
1  MR. NABERS: Objection to the form.
2  Q: (By Mr. Krumholtz) In other words, you don't
3  specifically know that you did not receive it?
4  A: I don't remember, and the only way I could say for
5  sure I received it, if my signature was on a document that I
6  received. And so therefore, I do not remember receiving this
7  document.
8  Q: But if Merck's records that they keep specifically
9  indicate that you were sent and that you received this
10  document, you would have no reason to dispute that.
11  MR. NABERS: Objection to the form.
12  Q: (By Mr. Krumholtz) Is that fair?
13  MR. NABERS: Do you have those? Do you want to
14  show her those?
15  MR. KRUMHOLTZ: You know, this is completely
16  inappropriate. It's a question and answer to the witness,
17  and you know that. You're just trying to coach her to an
18  answer. But the truth is, I'd like an answer from the
19  witness.
20  A: Okay. Would you repeat the question?
21  MR. KRUMHOLTZ: You can read it back.
22  THE WITNESS: Would you repeat the question?
23  (Record read.)
24  A: No. I would dispute receiving the document. I am
25  not disputing them sending it, but I don't know if I received

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4

82

| 82: | 1 | it because I do not recall. And there's no way for me to -- |
| | 2 | I mean, my signature is not on anything. So I would dispute |
| | 3 | that I received it because I do not know whether I did or |
| | 4 | not. |
| | 5 | Q:   (By Mr. Krumholtz)   Actually, just to be fair, |
| | 6 | you're not disputing that you received it. You just don't |
| | 7 | recall one way or the other. Is that fair? |
| | 8 | MR. NABERS: Objection to the form, misstates her |
| | 9 | prior testimony. |
| | 10 | A: Would you repeat the question? |
| | 11 | Q:   (By Mr. Krumholtz)   Yeah. To be fair, you don't |
| | 12 | dispute receiving it. You just don't recall whether you did |
| | 13 | or not? |
| | 14 | A: Correct. |
| | 15 | MR. NABERS: Objection to the form. |
| | 16 | A: Therefore, I am just answering the question. You |
| | 17 | had mentioned that they documented that I received it. They |
| | 18 | cannot document that I received it. There's no documentation |
| | 19 | that I received it. That's my point. |
| | 20 | Q:   (By Mr. Krumholtz)   And I just want to be very |
| | 21 | clear so the jury understands it, and I'm just trying to make |
| | 22 | sure the record's clear as to the truth of the matter. |
| | 23 | A: Okay. |
| | 24 | Q: Okay? First of all, the letter is addressed to |
| | 25 | you, true? |
| 83: | 1 | A: Yes, yes. |
| | 2 | Q: And it indicates Jan Lawrence had indicated that |
| | 3 | you had an information request, true? |
| | 4 | A: True. |
| | 5 | Q: And you don't deny having questions about |
| | 6 | cardiovascular issues and Vioxx back in November of 2001, |
| | 7 | true? |
| | 8 | A: I don't deny that. |
| | 9 | Q: And in fact, you asked sales representatives or |
| | 10 | pharmaceutical representatives that question, those |
| | 11 | questions, true? |
| | 12 | A: True. |
| | 13 | Q: And so it wouldn't be necessarily unusual for them |
| | 14 | to provide you information that you request, true? |
| | 15 | A: True. |
| | 16 | MR. NABERS: Objection to the form. |
| | 17 | Q:   (By Mr. Krumholtz)   And all you're saying is that |
| | 18 | you may or may not have received Exhibit 4. You just don't |
| | 19 | recall one way or another in that regard. |
| | 20 | A: True. |
| | 21 | Q: Okay. Now, if you received this letter, this is |
| | 22 | the sort of safety bulletin that you would want to review, |
| | 23 | true? |
| | 24 | MR. NABERS: Objection to the form. |
| | 25 | A: If I received it, I would want to review it. |

Printed: 10/4/2006   3:16:27PM

*Handwritten notes:*

Re: 82: 11 - 82: 13
Def Obj: Question
without answer

PLAINTIFF RESPONSE
The answer
appears on lines
14 and, 16 - 19.
These should be
included within
the testimony.

## Olson-Fields, Karen 2006-07-27

84: 1   Q:   (By Mr. Krumholtz)  And it's the sort of
2   information that you would want to discuss with Dr. Vogeler?
3   A:  Yes.
4   Q:  Okay. And you mentioned questions regarding Vioxx
5   and cardiovascular issues back in this time frame. Do you
6   recall that?
7   A:  I'm sorry. I lost my focus.
8   Q:  You mentioned questions in your mind about the
9   cardiovascular effects of Vioxx, whether or not they had any,
10   in this time frame; that is, November 2001. Do you recall
11   that?
12   A:  Yes. I recall there had been -- I don't know if it
13   was a -- where I got the information that there might be some
14   concerns. And I do recall questioning the pharm -- the Merck
15   reps about the, you know, what that meant. What was the
16   situation? And I did want -- I did ask for clarification
17   about that concern.
18   Q:  And if you were to have reviewed Exhibit 4, if you
19   turn to the second page under Roman numeral 2.
20   A:  Okay.
21   Q:  Do you see where it says The Vioxx Gastrointestinal
22   Outcomes Research Trial?
23   A:  Yes.
24   Q:  And it indicates that that's known as VIGOR. Do
25   you see that?

85: 1   A:  Yes.
2   Q:  And that's a study that you have heard of before?
3   A:  Yes.
4   Q:  And this letter includes a whole section discussing
5   VIGOR, true?
6   A:  I'd have to read it.
7   Q:  Feel free to read it. I don't want to -- you to
8   guess. And just let me know when you're finished so that I
9   can ask some questions.
10   A:  Okay. I'm sorry. Do you want to repeat the
11   question? I've made it through most of it so...
12   Q:  Okay. So Exhibit 4 contains a whole section on
13   VIGOR?
14   A:  Yes.
15   Q:  That is, a trial called VIGOR, true?
16   A:  True.
17   Q:  And under -- I'd like to direct your attention to
18   that first paragraph of the description of the VIGOR study on
19   page 2.
20   A:  Okay.
21   Q:  And in that, the second to the last sentence says,
22   the incidence of myocardial infarction, and that's another
23   way of saying heart attack, true?
24   A:  True.
25   Q:  So the incidence of heart attack was .5 percent for

**Olson-Fields, Karen 2006-07-27**

Olson-Fields DA PC on 10-4                                                86

| | |
|---|---|
| 86: | 1  patients treated with Vioxx 50 milligrams once daily and .1 |
| | 2  percent for naproxen-treated patients, 500 milligrams. Is |
| | 3  that twice daily? |
| | 4  A: Yes. |
| | 5  Q: Okay. Did I read that correctly? |
| | 6  A: Yes. |
| | 7  Q: The difference in MI rates was statistically |
| | 8  significant. Do you see that? |
| | 9  A: Yes. |
| | 10  Q: That is the sort of information that you would want |
| | 11  a pharmaceutical company to provide to you if a study like |
| | 12  this had been done? |
| | 13  A: Yes. |
| | 14  MR. NABERS:  And I just need to object -- |
| | 15  Q:   (By Mr. Krumholtz)  True? |
| | 16  MR. NABERS:  -- object to the form and ask for |
| | 17  optional completeness that you read the next paragraph. |
| | 18  Q:   (By Mr. Krumholtz)  You can answer. True? |
| | 19  A: Yes. |
| | 20  Q: And if you had read this document in or around |
| | 21  November of 2001, you would have understood that in |
| | 22  connection with the VIGOR study, that the incidence of heart |
| | 23  attacks was five times greater in patients who were treated |
| | 24  with Vioxx, 50 milligrams once daily, than those that were |
| | 25  treated with naproxen. |
| 87: | 1  MR. NABERS:  Again, I need to object to -- |
| | 2  Q:   (By Mr. Krumholtz)  True? |
| | 3  MR. NABERS:  -- object to the form and ask under |
| | 4  optional completeness for the next paragraph be read, too. |
| | 5  Q:   (By Mr. Krumholtz)  You can answer. |
| | 6  (Discussion off the record.) |
| | 7  Q. (By Mr. Krumholtz) Did you hear the question? |
| | 8  A: I'm sorry. It's distracting. Go ahead and -- |
| | 9  Q: Yeah. He had -- |
| | 10  A: Okay. So yes. If I read this paragraph -- |
| | 11  Q: In -- |
| | 12  A: Yes. |
| | 13  Q: In 2001? |
| | 14  A: One. |
| | 15  Q: If you read the sentence that I have just -- the |
| | 16  two sentences that I just read to you, you would have |
| | 17  understood that Merck was telling you that in VIGOR, patients |
| | 18  who had heart attacks on Vioxx occurred five times more often |
| | 19  than patients who received 50 milligram naproxen? |
| | 20  A: Yes. |
| | 21  Q: And you would have taken that into account in |
| | 22  connection with your prescribing decisions if you had indeed |
| | 23  read that? |
| | 24  A: I would have taken it into account, yes, if I had |
| | 25  read it. |

## Olson-Fields, Karen 2006-07-27

88:
1   Q: And that is something that you would have been
2   happy that a drug company like Merck would have communicated
3   to prescribing nurses and physicians?
4   MR. NABERS: Objection to the form.
5   A: I would have appreciated the information.
6   Q: (By Mr. Krumholtz) And you would have appreciated
7   that they would have gone on to tell you that this difference
8   in MI rates was statistically significant?
9   A: Yes.
10  Q: Now, Mr. Mason did not take 50 milligram Vioxx,
11  true?
12  A: I'd have to look. I have read here that I
13  prescribed the 25 milligram tablet.
14  Q: And you never prescribed anything other than the 25
15  milligram tablet of Vioxx for Mr. Mason, true?
16  A: In my notes I wrote that he was given prescription
17  for or samples -- I didn't note which one -- Vioxx, 25
18  milligrams.
19  Q: Okay. And nothing in your records indicate or
20  suggests that he was prescribed or that he took 50 milligram
21  Vioxx, true?
22  A: I did not make a notation as to whether he was
23  taking more than the 25 milligrams.
24  Q: Meaning that your records indicate you prescribed
25  25 milligram Vioxx, true?

89:
1   A: True.
2   Q: And they do not indicate that you prescribed 50
3   milligram Vioxx, true?
4   A: True.
5   Q: And nothing in your file indicates that he took
6   more than 25 milligrams at any one time?
7   A: Nothing in my file indicates that.
8   Q: And now, in the next paragraph it says, the lower
9   incidence of MI. That's heart attacks, right?
10  A: Yes.
11  Q: In patients treated with naproxen compared with
12  patients treated with rofecoxib is consistent with naproxen's
13  ability to block thromboxane A synthesis and platelet
14  aggregation. Do you see that?
15  A: Yes.
16  Q: And then it cites an article, does it not?
17  A: Yes.
18  Q: It has a footnote 3.
19  A: Yeah.
20  Q: And if you turn to the footnotes, it cites an
21  article by Van Hecken, Schwartz and Depre?
22  A: Yes.
23  Q: Is that true?
24  A: True.
25  Q: Now, you have not attempted to go out and analyze

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4                                                        90

90: 1 all available literature or studies into whether or not
2 naproxen is cardioprotective?
3 A: No.
4 Q: You're not an expert in that regard, true?
5 A: True.
6 Q: You do understand that the medical community has
7 believed that that is a possibility, that naproxen is
8 cardioprotective?
9 MR. NABERS: Objection to the form.
10 A: I had heard a debate on that. I had heard both
11 sides of that. I have heard that —
12 Q: (By Mr. Krumholtz) It may be or it may not be?
13 A: It may or may not. It is, it isn't. I do recall
14 that there was a — a discussion about whether traditional
15 NSAIDs reduce the cardiac protectiveness of aspirin.
16 Q: But regardless, you have heard of the debate as to
17 whether or not naproxen is cardioprotective?
18 A: Yes. I have heard the debate.
19 Q: And you understand that's a debate that scientists
20 around the world are discussing probably even today?
21 A: Yes.
22 Q: And that's something you're aware of through your
23 review of literature and just —
24 A: Yes, yes.
25 Q: -- keeping apprised of issues in your field?
91: 1 A: Yes.
2 Q: And so one thing you would want a company like
3 Merck to do after receiving information from a study like
4 VIGOR -- and first of all, it would be good for Merck to
5 perform studies like VIGOR to determine these kinds of
6 issues, true?
7 MR. NABERS: Objection to the form.
8 A: Yes.
9 Q: (By Mr. Krumholtz) I mean, you would -- that's a
10 good thing when they perform studies to determine benefits
11 and potential risks, true?
12 A: True, hoping that the study is a good study.
13 Q: And this particular study indicates, at least in
14 terms of numbers, that as compared to naproxen -- not a
15 placebo, but naproxen -- that Vioxx had a greater rate of
16 myocardial infarctions?
17 A: That's what this is suggesting in this paragraph.
18 Q: And that's what it says, true?
19 A: That's what it says in the paragraph.
20 Q: And it clearly says that?
21 A: Yes.
22 Q: And so one thing you would want a pharmaceutical
23 company like Merck to do in this circumstance is to try to
24 figure out if it's an issue with Vioxx on the one hand or an
25 issue with chance. It could just be chance, right?

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4

92

92:  1    MR. NABERS:  Objection to the form.
2    A:  What could be chance?
3    Q:   (By Mr. Krumholtz)  The difference in rates.
4    MR. NABERS:  Objection to the form.
5    Q:   (By Mr. Krumholtz)  Let me ask it --
6    A:  Well, that's why a study needs to be --
7    Q:  Done.
8    A:  -- done well is to eliminate chance, to eliminate
9    variabilities.
10   Q:  But any study you understand has some risk of
11   chance in being involved. Do you understand that?
12   A:  Yes.
13   Q:  Okay. So this difference, what you would want a
14   pharmaceutical company to do when this information is
15   received is to analyze whether it's an issue with their drug
16   on the one hand, true?
17   A:  True.
18   Q:  Whether it -- chance is involved, true?
19   A:  True.
20   Q:  Whether naproxen is cardioprotective and therefore
21   that would explain it, true?
22   A:  True.
23   Q:  Those are the things that you would want a
24   pharmaceutical company to do in this circumstance?
25   A:  I would -- in this circumstance what I would like a
93:  1    pharmaceutical company to do is to pursue what is being
2    suggested by this paragraph, what is being stated by this
3    paragraph. I would --
4    Q:  And it would be prudent to do the things I just
5    outlined?
6    MR. NABERS:  Objection to the form.
7    Q:   (By Mr. Krumholtz)  True?
8    A:  It would be prudent to further investigate. Well,
9    this doesn't really address cardioprotectiveness of Naprosyn.
10   Q:  Well, that's the question, right? There's a
11   difference here in rates of myocardial infarctions in the
12   VIGOR study.
13   A:  Right.
14   Q:  And so we're trying to figure out why.
15   A:  Right.
16   Q:  And one of the reasons could be Naprosyn being
17   cardioprotective, true? It's a possibility?
18   A:  It's a possibility. I am not --
19   Q:  Another possibility is chance?
20   MR. NABERS:  Yeah. You need to let her finish her
21   answer. You get to finish your answer.
22   Q:   (By Mr. Krumholtz)  I apologize.
23   A:  Okay. Hang on a second here.
24   (Discussion off the record.)
25   A. Okay. Would you restate what you said about

*Overrule Objection as possible*

*Plaintiff's objection re: 93:10-12 attorney testifying*

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4                                          94

Overruled

94:  1  cardioprotective?
     2  Q:  (By Mr. Krumholtz)  We were just talking about what
     3  you would want a pharmaceutical company to do when they
     4  receive information like this in the VIGOR study is to
     5  investigate it.
     6  A: Yes.
     7  Q: Okay. And investigate why there's a difference.
     8  A: Yes, but I would also -- my main concern would be
     9  to further investigate their drug's safety profile.
    10  Q:  And so one of the things you might want them to do
    11  is go back to all of the clinical trials that had been done
    12  and determine if Vioxx had any difference in terms --
    13  statistically significant difference in terms of rates of
    14  myocardial infarctions or heart attacks when compared to
    15  placebos during those clinical trials.
    16  A: Yes.
    17  MR. NABERS:  Objection to the form.
    18  Q:  (By Mr. Krumholtz)  And another thing you would
    19  want to do is, any other studies that were ongoing, to the
    20  extent they could unblind them, you would want to look at
    21  look at those patients to determine in those patients who
    22  were taking Vioxx versus those patients who were taking
    23  placebo if there was any statistically significant difference
    24  in terms of myocardial infarctions.
    25  MR. NABERS:  Objection to the form.
95:  1  Q:  (By Mr. Krumholtz)  It's another thing that would be
     2  prudent to do.
     3  A: True.
     4  Q:  Okay. And are you aware that as soon as Merck
     5  received this information, they did indeed go back and look
     6  at all of their clinical trial data and determined that there
     7  was no difference between Vioxx on the one hand and placebo
     8  on the other hand when it came to cardiovascular events in
     9  the clinical trials?
    10  MR. NABERS:  Objection to the form, assumes facts
    11  not in evidence.
    12  Q:  (By Mr. Krumholtz)  Has anyone ever told you that?
    13  MR. NABERS:  Same objection.
    14  A:  I do not recall those details. What I do recall
    15  is, when I had heard the rumors about Vioxx having these
    16  concerns, I addressed it with the pharmaceutical rep. And
    17  all is I remember is them giving me many reassurances,
    18  constant reassurances, many reps coming in and giving me
    19  reassurances that there was not validity. They didn't go
    20  away and then come back and say, you know, now Merck is doing
    21  this, this and this to prove this.
    22  All is I remember is them saying, these are not
    23  valid concerns. Vioxx is safe. Vioxx does not -- it's still
    24  on the market. We're not pulling Vioxx. That's all I can
    25  remember. I don't remember the details of what Merck was

Printed: 10/4/2006   3:16:27PM

PLAINTIFF's
OBJection
Re: 94:10-16
RULE 401 - RELEVANCE
LEADING
Respon: This is an extension of
the questioning to the
plaintiff designated
above

Overruled

Re: 95: 14 - 96:2
DefObj: non-
responsive
→ Plaintiff Response
This answer is
very responsive
and sets out
exactly what
She was aware of
the defense counsel
has been Testifying
in his questions leading
up to This, absent all the good things
Merck did and She is trying to answer her
question but let let she ...

## Olson-Fields, Karen 2006-07-27

96: 1  going to do. All I remember is them addressing my concerns
2  verbally and saying, You don't need to worry about Vioxx.
3  Q: (By Mr. Krumholtz) I'll object as nonresponsive.
4  My question was this. My question is, do you recall anyone
5  telling you before you had become completely familiar with
6  VIGOR, but when you had some concern about cardiovascular
7  issues, that as soon as these results came out that are in
8  Exhibit 4, that indeed Merck went back to their clinical
9  trials and compared patients taking placebo and patients
10  taking Vioxx?
11  MR. NABERS: Objection to the form.
12  A: No, I don't recall that.
13  Q: (By Mr. Krumholtz) And no one, including the
14  plaintiff's attorneys, have told you that that occurred?
15  MR. NABERS: Objection to the form.
16  Q: (By Mr. Krumholtz) True?
17  A: I don't recall that.
18  Q: And no one, including the plaintiff's attorneys,
19  have told you that when that effort was made, it was
20  determined, both by Merck and others, that there was no
21  statistically significant difference between placebo and
22  Vioxx in those clinical trials with respect to myocardial
23  infarctions?
24  MR. NABERS: Objection to the form.
25  A: I don't remember. I can't answer that because I do

97: 1  not remember.
2  Q: (By Mr. Krumholtz) And nobody has told you that
3  additional studies were unblinded, studies containing
4  thousands of patients, and to determine whether folks who
5  took placebo in those studies and folks who took Vioxx in
6  those studies -- to determine whether or not there was any
7  statistically significant difference between Vioxx and
8  placebo -- the Vioxx arm and the placebo-controlled arm with
9  respect to myocardial infarctions?
10  MR. NABERS: Objection to the form.
11  A: I don't remember the details of that. I mean,
12  we're getting into a lot of details.
13  Q: (By Mr. Krumholtz) No one's ever told you that
14  that you can recall?
15  MR. NABERS: Objection to the form.
16  A: I recall the first couple of years after Vioxx was
17  a concern, I recall being told it was safe, and the
18  accusations were coming from competition. And so a lot of
19  the description you just gave me of, do you recall this, I
20  don't recall specifically what I was told about -- and saying
21  placebo, I don't recall. I know that Vioxx stayed on the
22  market for two more years, and I was told it was safe.
23  Q: (By Mr. Krumholtz) But you don't know whether --
24  you haven't been told by the plaintiff's attorneys or anyone
25  else that those efforts were made once the VIGOR results came

*Overruled*

Re: 97:13 - 97:22
Def Obj: non-responsive,
speculating (doesn't
recall) Plaintiff Response:
The question here
is objectionable
but the witness
is giving her best
answer based on
what she recalls
from years earlier.
This testimony is critical to
the witness and to π b/c it shows
what up, she was aware of when

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4                                                        98

| 98: | 1 | out, true? |
|---|---|---|
| | 2 | MR. NABERS:  Objection to the form. |
| | 3 | A: I don't recall. |
| | 4 | Q:  (By Mr. Krumholtz)  And those are the kinds of |
| | 5 | things that you would want a pharmaceutical company to do? |
| | 6 | MR. NABERS:  Objection to the form. |
| | 7 | **Q:  (By Mr. Krumholtz)  Can we at least agree to that?** |
| | 8 | **MR. NABERS:  Same objection.** |
| | 9 | **A: I would agree that I would expect a pharmaceutical** |
| | 10 | **company to do everything in their power to ensure the safety** |
| | 11 | **of patients by looking at a drug that had those concerns.** |
| | 12 | **Q:  (By Mr. Krumholtz)  And looking at clinical trials** |
| | 13 | **and other studies just as I have described?** |
| | 14 | **A: Yes.** |
| | 15 | MR. NABERS:  Objection to the form. |
| | 16 | Q:  (By Mr. Krumholtz)  And if it is indeed true, what |
| | 17 | I'm saying, that they looked back and that's exactly what we |
| | 18 | find, then it wouldn't be a stretch by any means to look at |
| | 19 | Naprosyn and ask, is it cardioprotective? |
| | 20 | MR. NABERS:  Objection to form. |
| | 21 | Q:  (By Mr. Krumholtz)  True? |
| | 22 | A: I don't see a correlation here. |
| | 23 | Q:  (By Mr. Krumholtz)  Well, you do understand that |
| | 24 | when there's a difference in incidence, it could be because |
| | 25 | Naprosyn may actually be cardioprotective? |
| 99: | 1 | MR. NABERS:  Objection to the form. |
| | 2 | A: I think that could be a theory. |
| | 3 | Q:  (By Mr. Krumholtz)  And you understand that is a |
| | 4 | theory? |
| | 5 | A: Theory is an unproven. |
| | 6 | Q: And people, scientists, well respected scientists, |
| | 7 | believe in that theory? |
| | 8 | MR. NABERS:  Objection to the form. |
| | 9 | A: I don't know that. I haven't talked to a scientist |
| | 10 | who believes that. |
| | 11 | Q:  (By Mr. Krumholtz)  So before you could give any |
| | 12 | opinion here today as to whether or not that is an |
| | 13 | appropriate theory or an appropriate conclusion, you would |
| | 14 | need to do a host of research? |
| | 15 | A: Yes, definitely. I have never known ibuprofen-type |
| | 16 | medications, NSAIDs, to be theorized as cardiac protective. |
| | 17 | Q: Well, hold it. You told us earlier you know that |
| | 18 | had been debated and studied, true? |
| | 19 | MR. NABERS:  Debated. |
| | 20 | A: Debated. |
| | 21 | MR. KRUMHOLTZ:  Are you going to answer for her |
| | 22 | now? Let the record reflect that plaintiff's counsel is |
| | 23 | answering for the witness. |
| | 24 | MR. NABERS:  Well, let the record reflect that |
| | 25 | counsel for Merck is continuing to raise -- |

# Olson-Fields, Karen 2006-07-27

**100:**

1  MR. KRUMHOLTZ: Are you going to coach again?
2  MR. NABERS: No. I'm just pointing out that you're
3  raising your voice and getting a little animated.
4  MR. KRUMHOLTZ: Yeah.
5  A: Okay. Can we back up? Because this is kind of
6  like boggling my brain, and I want to be very clear about
7  what your questions are.
8  Q:  (By Mr. Krumholtz)  Sure.
9  A: So we're on this thing about Naprosyn being cardiac
10 protective.
11 Q: And you have testified, have you not, that you have
12 seen literature, and you understand that there is a debate in
13 the scientific community as to whether or not Naprosyn is
14 cardioprotective.
15 A: And I understand that there's also debate whether
16 now NSAIDs are -- have cardiovascular risk, so this *is a lot*
17 of theory and debate going on.
18 Q: And what you're referring to is a potential class
19 effect of all NSAIDs?
20 A: That's what this article that I was just handed
21 today is, I imagine, suggesting, but I will need to read it.
22 Q: You mean the label, not the article that's Exhibit
23 3?
24 A: The Exhibit 3, yeah. This Exhibit 3., so I will
25 need to read this.

**101:**

1  Q: And Exhibit 3 is a label, a package insert, not an
2  article, true?
3  A: That's what you have told me.
4  MR. KRUMHOLTZ: Let's go off the record for a
5  minute.
6  VIDEOGRAPHER: It's 22 minutes after ten o'clock.
7  We're going off the record.
8  (Recess.)
9  VIDEOGRAPHER: It's 29 minutes after ten o'clock,
10 and we're back on the record.
11 Q:  (By Mr. Krumholtz)  Ms. Olson, we're back on the
12 record after a short break, and we were talking about Exhibit
13 4, the safety letter that was addressed to you. That's
14 Exhibit 4.
15 A: Yes.
16 Q: Do you recall that? And on the third page of that
17 exhibit, do you see a big table that's at the bottom half of
18 the page?
19 A: Page 3?
20 Q: Yes.
21 A: Yes.
22 Q: Entitled types of confirmed cardiovascular events
23 in the VIGOR study?
24 A: Yes, I see that.
25 Q: And if you had read this in November of 2001, you

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4                                                    102

| 102: | | |
|---|---|---|
| | 1 | would find that in connection with Vioxx, the Vioxx part of |
| | 2 | the arm, there were 20 heart attacks, true? |
| | 3 | A: Twenty heart attacks. Let me find it here. Yes. |
| | 4 | I see that. |
| | 5 | Q: And then in connection with the naproxen part of |
| | 6 | the arm of the study there were four. |
| | 7 | A: Yes. |
| | 8 | Q: Okay. So that would have been information you |
| | 9 | would have had if did you indeed receive this letter and if |
| | 10 | you reviewed the letter? |
| | 11 | A: Okay. |
| | 12 | Q: True? |
| | 13 | A: True. |
| | 14 | Q: Now, how long before Mr. Mason was prescribed Vioxx |
| | 15 | is this letter? |
| | 16 | A: This letter is dated November 19th of '01, and |
| | 17 | unless I am not seeing something, it looks as though in |
| | 18 | September of '02, that would be the first time I prescribed |
| | 19 | Vioxx, unless I have missed something. |
| | 20 | Q: So if you had reviewed and received Exhibit 4, the |
| | 21 | letter from Merck addressed to you, then you would have |
| | 22 | understood some 10 months before you prescribed Vioxx to |
| | 23 | Mr. Mason that in the VIGOR study there were five times more |
| | 24 | myocardial infarctions reported than in the naproxen arm? |
| | 25 | MR. NABERS: I need to object to the -- |

Overruled

| 103: | | |
|---|---|---|
| | 1 | Q: (By Mr. Krumholtz)  True? |
| | 2 | MR. NABERS: -- object to the form of the question, |
| | 3 | the fact that it assumes facts not in evidence, and I also |
| | 4 | need to object to the question as it assumes that she |
| | 5 | receives the letter in November of 2001. Okay. You can |
| | 6 | answer. |
| | 7 | MR. KRUMHOLTZ: Can you read it back to her just so |
| | 8 | that she -- |
| | 9 | (Record read.) |
| | 10 | A: If I would have read this study, I would have |
| | 11 | looked at the data, and it does suggest, does state, that |
| | 12 | there were 20 events under the Vioxx arm, and there were four |
| | 13 | events under the Naprosyn arm. |
| | 14 | Q: (By Mr. Krumholtz)  When you're talking about the |
| | 15 | study, you're talking about Exhibit 4? |
| | 16 | A: Exhibit 4, the VIGOR -- |
| | 17 | Q: The letter -- |
| | 18 | A: Reviewing the VIGOR study. |
| | 19 | Q: Okay. |
| | 20 | A: I would have understood that data. |
| | 21 | Q: Okay. I'd like to hand you what's been marked as |
| | 22 | Exhibit 5, and Exhibit 5 has important prescribing |
| | 23 | information on the front. Do you see that on the very front |
| | 24 | cover of Exhibit 5? |
| | 25 | A: It says important prescribing information. |

PLAINTIFF'S OBJECTION
RE: 103:1
LACK OF FOUNDATION
Response: this is a letter
Merck sent to Ms. Olson

PLAINTIFF'S
OBJECTION
RE: 103:10 –
104:17
LACK OF
FOUNDATION
same response

## Olson-Fields, Karen 2006-07-27

104:
1  Q: It's in a big box that's been bolded, true?
2  A: Yes.
3  Q: It says important?
4  A: Yes.
5  Q: And it would call attention to this document if you
6  were to have received it, true?
7  A: True.
8  Q: Okay. And it's dated April of 2002. Is that
9  right?
10  A: Yes.
11  Q: And it's a letter, and it's a Dear Health Care
12  Professional letter, true?
13  A: That's what it says.
14  Q: And if Merck's records state that this letter
15  was -- and the label that's attached was sent to Dr. Vogeler
16  or your office, you would have no reason to dispute that
17  fact?
18  MR. NABERS: Objection to the form.
19  Q:   (By Mr. Krumholtz)  True?
20  MR. NABERS: Calls for her to speculate.
21  A: Well, would you restate that, please?
22  (Record read.)
23  A. I could -- I could dispute Merck's records. I
24  don't have access to Merck's records. I don't know if
25  Merck's records are accurate. I don't know what form Merck's

105:
1  records are. So, yeah, I could dispute it actually.
2  Q: Right. You could, but what I'm saying is that you
3  -- let me ask it a different way. You don't recall one way
4  or another whether or not you received Exhibit 5, true?
5  A: No, I don't recall --
6  Q: Okay.
7  A: -- receiving it.
8  Q: So we would have to try to figure out some other
9  way to determine if your office or Dr. Vogeler received it,
10  true?
11  A: Yes, true. You would have to find a way to prove
12  that.
13  Q: Okay. And if you could turn -- it's a letter dated
14  April 2002, true?
15  A: Yes.
16  Q: And that would have been how many months before you
17  prescribed Vioxx to Mr. Mason?
18  MR. NABERS: Objection to the form.
19  A: I prescribed, didn't I say September of '02? So
20  five months, four months.
21  Q:   (By Mr. Krumholtz)  Okay. So if your office
22  received this letter and this package insert, this important
23  prescribing information in April '02, then it would have been
24  some five months before you prescribed Vioxx to Mr. Mason?
25  MR. NABERS: Object to the form.

## Olson-Fields, Karen 2006-07-27

106:  1   A: This document is dated April 2002. Therefore, if
      2   it was sent in April of 2002, and I could speculate it was.
      3   I don't have any proof of that but...
      4   Q:   (By Mr. Krumholtz)  Well, objection, nonresponsive.
      5   My question, I think, assumed that away. I think -- what all
      6   I said was, if indeed this letter was sent and Dr. Vogeler's
      7   office received -- your office received this letter and
      8   attached package insert in April of '02, then that means that
      9   you all would have had that information five months before
     10   Mr. Mason was prescribed Vioxx.
     11   MR. NABERS:  Objection to the form.
     12   A: If we received this and we received it in April of
     13   2002, it would have been five months prior to my prescribing.
     14   Q:   (By Mr. Krumholtz)  Vioxx to Mr. Mason?
     15   A: Vioxx to Mr. Mason, yes.
     16   Q: And do you see in the second -- first of all, it
     17   says, 'Merck and Company Inc. would like to bring to your
     18   attention recent changes to the current prescribing
     19   information and patient product information for Vioxx.' Do
     20   you see that?
     21   A: Yes.
     22   Q: And it says, 'Vioxx is a nonsteroidal
     23   antiinflammatory drug, an NSAID.' Do you see that?
     24   A: Yes.
     25   Q: That was approved by the United States Food and

107:  1   Drug Administration in May of 1999 for relief of the signs
      2   and symptoms of osteoarthritis, the management of acute pain
      3   in adults, and the treatment of primary dysmenorrhea.
      4   A: Yes.
      5   Q: And those are the sorts of things that you
      6   prescribed Vioxx for?
      7   A: Yes.
      8   Q: And you understood that it would -- had been
      9   approved by the FDA as safe and effective as indicated in
     10   this letter?
     11   A: Yes.
     12   Q: And it states that the prescribing information has
     13   been revised to reflect the results of the Vioxx
     14   Gastrointestinal Outcomes Research study, VIGOR. Do you see
     15   that?
     16   A: Yes.
     17   Q: And the FDA approval of Vioxx for the relief the
     18   signs and symptoms of rheumatoid arthritis in adults. Do you
     19   see that?
     20   A: Yes, I see that.
     21   Q: And it says, 'Excerpts of the changes to the
     22   prescribing information are provided below.' Do you see
     23   that?
     24   A: Yeah.
     25   Q: And that's the sort of thing that you would want a

## Olson-Fields, Karen 2006-07-27

108:
1. company like Merck to do; that is, change their prescribing
2. information and send out letters to health care providers
3. apprising them of those changes?
4. A: Yes.
5. Q: And in this particular package in -- this letter,
6. it does talk about VIGOR, does it not?
7. A: Yes.
8. Q: Feel free to become as familiar with it --
9. A: Yes.
10. Q: -- as you need to.
11. A: Yes, I -- yes.
12. Q: It says special studies on the very first page
13. under the heading special studies, true? Very first page of
14. the letter, of the letter.
15. A: Yeah. Clinical studies? Oh, special studies. I
16. see it.
17. Q: Okay. Let's start over because it was poorly
18. *worded. First of all, on the very first page there's a*
19. *bolded section called clinical studies.*
20. A: Yes.
21. Q: If the letter.
22. A: Yes.
23. Q: The very first page of the letter.
24. A: Yes.
25. Q: And under that, again on the very first page of the

109:
1. letter, it states special studies --
2. A: Yes.
3. Q: -- does it not?
4. A: It does.
5. Q: And it says, 'The VIGOR study was designed to
6. evaluate the comparative GI safety of Vioxx 50 milligram once
7. daily? Do you see that?
8. A: Yes.
9. Q: Okay. And if you turn the page, on the second page
10. it then talks about study results. Do you see that?
11. A: Yes.
12. Q: And it says, Gastrointestinal safety of VIGOR. Do
13. you see that?
14. A: Yes.
15. Q: And it says, 'The VIGOR study showed a significant
16. reduction in the risk of development of PUBs,' and you
17. understand PUBs to be perforations, ulcers and bleeds?
18. A: Okay.
19. Q: True?
20. A: Yes.
21. Q: Including complicated PUBs in patients taking Vioxx
22. compared to naproxen.
23. A: Yes.
24. Q: Do you see that?
25. A: I see that.

## Olson-Fields, Karen 2006-07-27

| 110: | |
|---|---|
| | 1 | Q:  And then it says, 'The risk reduction for PUBs and |
| | 2 | complicated PUBs for Vioxx, when compared to naproxen, was |
| | 3 | main — approximately 50 percent was maintained in patients |
| | 4 | with or without the following risk factors.' Do you see |
| | 5 | that? |
| | 6 | A: Uh-huh, yes. |
| | 7 | Q:  And if you look at that chart in the middle of the |
| | 8 | page, what it tells you is, there was a statistically |
| | 9 | significant difference between the rate of PUBs in the |
| | 10 | naproxen arm, as compared to the rate of PUBs in the Vioxx |
| | 11 | arm. |
| | 12 | MR. NABERS:  Objection to the form. |
| | 13 | A:  Okay. |
| | 14 | Q:   (By Mr. Krumholtz)  True? Because you see there |
| | 15 | that there's 121 reported in the naproxen arm and then 56 |
| | 16 | reported in the Vioxx, 50 milligram arm. Do you see that? |
| | 17 | A: I see that. |
| | 18 | Q:  And it states in the very first sentence under |
| | 19 | gastrointestinal safety in VIGOR that the VIGOR study showed |
| | 20 | a significant reduction in the risk of development of PUBs? |
| | 21 | You see that? |
| | 22 | A:  I see that. |
| | 23 | Q:  And that was important to prescribers like you, |
| | 24 | true? |
| | 25 | A:  True. |
| 111: | 1 | Q:  Because you had a significant problem with |
| | 2 | traditional NSAIDs in terms of stomach issues? |
| | 3 | A:  There were some patients who couldn't tolerate |
| | 4 | traditional. |
| | 5 | Q:  And there was a risk of ulcers and bleeds? |
| | 6 | A:  In some patients. |
| | 7 | Q:  And in those patients that had ulcers and bleeds, |
| | 8 | it would be important to avoid those types of issues? |
| | 9 | A:  Yes. |
| | 10 | Q:  Because that can lead to hospitalization and in |
| | 11 | some rare circumstances a life-threatening condition. |
| | 12 | A:  Yes. |
| | 13 | Q:  And obviously, for purposes of tolerability, as |
| | 14 | we've discussed, it was important to have choices amongst |
| | 15 | drugs that could lend these types of benefits? |
| | 16 | A:  Yes. |
| | 17 | Q:  And then if you look at other safety findings, |
| | 18 | cardiovascular safety, do you see that? |
| | 19 | A:  Yes. |
| | 20 | Q:  It says, 'The VIGOR study showed a higher incidence |
| | 21 | of adjudicated, serious cardiovascular thrombotic events in |
| | 22 | patients treated with Vioxx once daily as compared to |
| | 23 | patients treated with naproxen twice daily.' Do you see |
| | 24 | that? |
| | 25 | A: Uh-huh, yes. |

*Handwritten annotations:*

Overrule

PLAINTIFF's
OBJECTION
Re: 110:13 —
112:9

LACL OF
FOUNDATion
LEADING

same response — this
is a letter sent to
Ms. Olson's office

### Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4                                                112

| 112: | 1 | Q: Did I read that accurately? |
|---|---|---|

**112:**
1  Q: Did I read that accurately?
2  A: Yes.
3  Q: And so what this letter was telling the readers is
4  that on the one hand, in this study, VIGOR, Vioxx showed a
5  reduction in risk of ulcers and bleeds, true?
6  A: Yes.
7  Q: And on the other hand, it showed some -- a
8  potential risk as compared to naproxen, not placebo, for
9  Vioxx in connection with CV events?
10  MR. NABERS: Objection to the form.
11  A: Yes.
12  Q: (By Mr. Krumholtz) And that's exactly what you
13  would want a pharmaceutical company to do after a study like
14  this; that is, to provide this sort of information to
15  prescribers such as yourself and Dr. Vogeler?
16  A: Yes.
17  Q: And if you would have read this in April or
18  thereabout of 2002, you would have known and understood that
19  in VIGOR there was a higher rate of CV events and myocardial
20  infarction events as compared to naproxen?
21  MR. NABERS: Objection to the form.
22  A: If I had read the study, I would have -- I would
23  agree that that's what the study suggested.
24  Q: (By Mr. Krumholtz) And you would agree that if
25  this letter was sent and you had reviewed it, you would have

**113:**
1  understood that from reading this letter?
2  MR. NABERS: Objection to the form.
3  A: I would have understood what the -- what the
4  documentation was presenting, yes.
5  Q: (By Mr. Krumholtz) I mean, you would have
6  understood that it was communicating to you that the VIGOR
7  study showed a higher incidence of adjudicated CV events in
8  patients treated with Vioxx as compared to naproxen?
9  A: Yes.
10  MR. NABERS: Objection to form.
11  Q: (By Mr. Krumholtz) True?
12  A: True.
13  Q: Okay. And if you turn the page to page 3 of the
14  letter, you see where -- in Table 2?
15  A: Yep, yes.
16  Q: At the very top of page 3. It shows that in Vioxx
17  in patients who had been taking it for 10 months; that is, 50
18  milligram Vioxx, there were 45 CV events, true?
19  A: That's what this says.
20  Q: And in naproxen, the naproxen arm, there were 19.
21  It clearly indicates that?
22  A: That's what that says.
23  Q: And if you had read this back in April of 2002, you
24  would have understood that information?
25  MR. NABERS: Objection to the form.

Printed: 10/4/2006   3:16:27PM

*Handwritten annotations:*

Overrule

PLAINTIFF'S
OBJECTION
RE: 112:10 —
112:20
LACK OF
FOUNDATION
SAME RESPONSE

PLAINTIFF'S
OBJECTION
RE: 113:3-9
LACK OF
FOUNDATION

PLAINTIFF'S
OBJECTION
RE: 113:11-24
LACK OF
FOUNDATION

## Olson-Fields, Karen 2006-07-27

114:
1  Q:  (By Mr. Krumholtz)  True?
2  A:  True.
3  Q:  And then if you turn the page, the letter goes on
4  to talk about information contained in the precautions
5  section. Do you see that?
6  A:  Yes.
7  Q:  And it's prominently stated there that these are
8  precautions, true?
9  A:  Yes. It's bold faced saying precautions.
10  Q:  And it's important for folks like yourself; that
11  is, treating nurse practitioners and medical doctors, to read
12  precautions?
13  A:  Yes.
14  Q:  So that you have information that you need to
15  prescribe medication safely and effectively?
16  MR. NABERS:  Objection to the form.
17  A:  Yes.
18  Q:  (By Mr. Krumholtz)  True?
19  A:  True.
20  Q:  And what it states here is that the information
21  below should be taken into consideration, and caution should
22  be exercised when Vioxx is used in patients with a medical
23  history of ischemic heart disease. Do you see that?
24  A:  I see that.
25  Q:  But in addition to that, it says, 'In VIGOR, a

115:
1  study of 8,076 patients with a medium duration of exposure of
2  nine months, the risk of developing a serious cardiovascular
3  thrombotic event was significantly higher in patients treated
4  with 50 milligrams of Vioxx once daily as compared to
5  patients treated with naproxen twice daily.' Did I read that
6  correctly?
7  A:  Yes.
8  Q:  And so you would have understood in April of 2002,
9  had you read this letter, that indeed in VIGOR there was a
10  significantly increased risk of CV events with 50 milligram
11  Vioxx as compared to naproxen?
12  MR. NABERS:  Objection to the form.
13  A:  I would have had a question whether the patients in
14  the VIGOR study had increased risk of ischemic heart disease.
15  Q:  (By Mr. Krumholtz)  Well, you do understand from
16  reading other documentation that has already been shown to
17  you that it was a study on rheumatoid arthritis patients?
18  A:  It was a study on gastrointestinal side effects.
19  Q:  In rheumatoid arthritis patients?
20  A:  Correct.
21  Q:  Okay. So with that background, you would have
22  understood that in that patient pool, Merck was telling you
23  that the risk of developing a serious cardiovascular
24  thrombotic event, such as a heart attack, was significantly
25  higher in patients treated with 50 milligram Vioxx once daily

*Overruled*

## Olson-Fields, Karen 2006-07-27

116:

| | |
|---|---|
| 116: | |
| 1 | as compared to naproxen? |
| 2 | MR. NABERS: Objection to the form. |
| 3 | Q:  (By Mr. Krumholtz)  True? |
| 4 | A: Yep. I would go back to the statement they made |
| 5 | about the difference in percentages that was listed. Is it |
| 6 | here? That was in the Exhibit 4, the statement saying that |
| 7 | the differences in MI rates was statistically significant, .5 |
| 8 | percent for Vioxx and .1 percent for Naprosyn. I would |
| 9 | understand that statement. |
| 10 | Q:  (By Mr. Krumholtz)  And that it was fivefold, |
| 11 | fivefold difference. You would have understood that? |
| 12 | A: Yes, yes. |
| 13 | Q: You would have understood that in connection with |
| 14 | Exhibit 5 and Exhibit 4? |
| 15 | A: Yes. |
| 16 | Q: Okay. And then it goes on to state, 'This finding |
| 17 | was largely due a difference in the incidence --' I'm sorry. |
| 18 | If you could go back to page 2, because I wanted to note |
| 19 | something. |
| 20 | A: Okay. |
| 21 | Q: When talking about the cardiovascular safety, it |
| 22 | says, this finding, meaning the higher incidence, was largely |
| 23 | due to a difference in the incidence of myocardial infarction |
| 24 | between the groups. Do you see that? |
| 25 | A: I'm sorry. Where is that? |
| 117:  1 | Q:  The last sentence of the first, very first |
| 2 | paragraph under cardiovascular safety. |
| 3 | A: Yes. I see that. |
| 4 | Q:  And so you would have understood that if you had |
| 5 | received and reviewed this correspondence? |
| 6 | MR. NABERS:  Objection to the form. |
| 7 | A: Yes. |
| 8 | Q:  (By Mr. Krumholtz)  In going on further, in the -- |
| 9 | let me ask you something. You read precautions when you are |
| 10 | presented with them from drug companies and from the FDA, |
| 11 | true? |
| 12 | A:  True. |
| 13 | Q: You take them seriously? |
| 14 | A:  Yes. |
| 15 | Q: You take warnings seriously? |
| 16 | A:  Yes. |
| 17 | Q: But it would be misleading for anybody to suggest |
| 18 | that you would ignore precautions? |
| 19 | A: I would not ignore precautions. |
| 20 | Q: You would take them into account in your |
| 21 | prescribing decisions? |
| 22 | A: Yes. |
| 23 | Q: And then do you see the section in this letter on |
| 24 | page 4 under adverse reactions? |
| 25 | A: Yes. |

Plaintiff's
Objection
Re: 116:3 –
117:5

LACK OF
FOUNDATION

response: she
is discussing
letters Merck
sent to her office

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4                                            118

*Overruled*

| 118: | | |
|---|---|---|
| | 1 | Q: It's also bolded? |
| | 2 | A: Yes. |
| | 3 | Q: And under that it says rheumatoid arthritis, and |
| | 4 | that's also bolded? |
| | 5 | A: Yes. |
| | 6 | Q: And it says, 'The incidence of hypertension in |
| | 7 | rheumatoid arthritis patients receiving the 25 milligram once |
| | 8 | daily dose of Vioxx was 10 percent, and the incidence of |
| | 9 | hypertension in patients receiving naproxen 500 milligrams |
| | 10 | twice daily was 4.7 percent.' |
| | 11 | A: Yes. |
| | 12 | Q: So you would have understood that at least in |
| | 13 | connection with the VIGOR study, that there was a greater |
| | 14 | percentage of folks who had hypertension on Vioxx than |
| | 15 | Naprosyn? |
| | 16 | A: Yes. |
| | 17 | Q: And if you turn to the attached package information |
| | 18 | or label that's attached to this document. |
| | 19 | A: Yes. |
| | 20 | Q: If you turn to the page that ends in 36 at the |
| | 21 | bottom right-hand corner. |
| | 22 | A: Yes. |
| | 23 | Q: The tables that are referenced in the letter are |
| | 24 | again located in the label, true? |
| | 25 | A: Yes. |
| 119: | 1 | Q: You see that on the very first page in Table 1 and |
| | 2 | Table 2? |
| | 3 | A: Uh-huh. |
| | 4 | Q: Is that a yes? |
| | 5 | A: Yes. |
| | 6 | Q: I'm sorry. You understand I'm not fussing at you. |
| | 7 | It's just for the record. |
| | 8 | A: Yeah. It's such small writing I'm just -- |
| | 9 | Q: I understand. |
| | 10 | A: -- trying to focus here. |
| | 11 | Q: But it's highlighted, true? |
| | 12 | A: Yes. |
| | 13 | Q: And I guess as you sit here today you don't know if |
| | 14 | it was highlighted when your office received it or not? |
| | 15 | MR. NABERS: Objection to the form. |
| | 16 | Q: (By Mr. Krumholtz)  True? |
| | 17 | MR. NABERS: Assumes she received it. |
| | 18 | A: I have never gotten a PPI, which is we call these, |
| | 19 | that has been highlighted by a drug company. I find that |
| | 20 | unusual. In fact, I guess I can't -- can I comment like |
| | 21 | this? Okay. |
| | 22 | In fact, when I get PPIs, I find drug reps really |
| | 23 | don't make a big deal about them, and I certainly have never |
| | 24 | been handed one or given one. I think I would have found it |
| | 25 | unusual to see one highlighted. I would have thought I would |

PLAINTIFF's
Objection
Re: 118; 12-25
LACK OF
FOUNDATION
Same response

Re: 119:6 - 119:10
Def Obj: Colloquy -
no question
asked

Re: 119:15-119:17
Def Obj: remove
objection
π agree
PLAINTIFF Response

## Olson-Fields, Karen 2006-07-27

120:
1   remember that because I don't -- that doesn't happen so...
2   Q: If you had received it --
3   A: But this one is highlighted.
4   Q: And if you had received it, you would have read it?
5   A: I would be struck by the fact that it was
6   highlighted, and I would assume I would have read it.
7   Q: That is something you would want Merck to do; that
8   is, send a correspondence like Exhibit 5 in highlighted
9   format so that you could see the differences in the labeling?
10  A: That is one of the things I would like them do,
11  yes.
12  Q: That would be a prudent thing for a drug
13  manufacturer to decide to do?
14  A: Yes.
15  Q: That would be something that you would appreciate
16  in terms of your practice?
17  A: Yes.
18  Q: And if you look on the page that ends in 37, do you
19  see that?
20  A: Yes.
21  Q: It also in the right hand column discusses fluid
22  retention, edema and hypertension. Do you see that? In the
23  middle?
24  A: Middle column?
25  Q: No, the middle of the far column. I'm sorry.

121:
1   A: Middle of the far column. Yes, I see that.
2   Q: And the fact that fluid retention, edema and
3   hypertension have been reported in some patients taking
4   Vioxx. Do you see that?
5   A: I see that.
6   Q: And it talks about in clinical trial of Vioxx at
7   daily doses of 25 milligram in patients with RA, rheumatoid
8   arthritis, the incidence of hypertension was twice as high in
9   patients treated with Vioxx, as compared to patients treated
10  with a thousand milligrams of naproxen. Do you see that?
11  A: Yes, I see that.
12  Q: That's a fairly high dose of naproxen, is it not?
13  A: Was that daily thousand, or was that twice a day?
14  A. thousand daily. That would have meant that they had 500
15  twice a day, so that's a normal dose actually.
16  Q: Okay. And then it says, 'Clinical trials with
17  Vioxx at daily doses of 12.5 and 25 milligrams in patients
18  with osteoarthritis have shown effects on hypertension and
19  edema similar to those observed with, compared or NSAIDs.'
20  Do you see that?
21  A: Yes.
22  Q: These occurred with an increased frequency with
23  chronic use of Vioxx at daily doses of 50 milligrams. Do you
24  see that?
25  A: Yes.

## Olson-Fields, Karen 2006-07-27

| Olson-Fields DA PC on 10-4 | 122 |

122:
1  Q:  But of course, Mr. Mason did not receive 50
2  milligrams to your knowledge?
3  A:  Correct.
4  Q:  And then it goes on to discuss renal effects as
5  well?
6  A:  Yes.
7  Q:  And all of this information is information that you
8  would have understood had you read it back in April of 2002?
9  MR. NABERS:  Objection to the form.
10  A:  Yes.
11  Q:  (By Mr. Krumholtz)  And then on the page ending in
12  38, do you see that?
13  A:  Yes.
14  Q:  In the far right-hand column under adverse
15  reactions?
16  A:  Yes.
17  Q:  Adverse reactions is bolded, true?
18  A:  True.
19  Q:  It says cardiovascular about two inches from the
20  bottom of the page. Do you see that?
21  A:  I see it.
22  Q:  And it says, 'Cerebrovascular accident, congestive
23  heart failure, deep venous thrombosis, myocardial infarction,
24  pulmonary edema, pulmonary embolism, transient ischemic
25  attack, and unstable angina.' Do you see that?

123:
1  A:  Yes.
2  Q:  So these were all reported adverse reactions in
3  connection with studies that are reflected in this document,
4  true?
5  MR. NABERS:  Objection to the form.
6  Q:  (By Mr. Krumholtz)  As you understand it?
7  A:  As I understand it.
8  Q:  And you would have understood that if you had read
9  this document in April of 2002?
10  MR. NABERS:  Objection to the form.
11  A:  Yes.
12  Q:  (By Mr. Krumholtz)  And you would have appreciated
13  receiving this document if it was indeed sent and received by
14  your office?
15  A:  I would have appreciated receiving this document
16  with it being highlighted like this.
17  Q:  And would -- and if Dr. Vogeler had received this
18  document, you would have expected him to provide it to you as
19  well?
20  MR. NABERS:  Objection to the form.
21  A:  Not necessarily. We both assume that each other as
22  independent practitioners would receive -- if they actually
23  sent this to every practitioner, I should have gotten one,
24  and he would have gotten one. He wouldn't necessarily have
25  made sure that I got one. He would assume I got one as well.

Printed: 10/4/2006   3:16:27PM

*[Handwritten:]* Sustained

*[Handwritten:]* Re: 123:17 - 123:25
Def obj: Foundation-
speculation as to
what Dr. Vogeler
would assume and
do.
The witness is
answer def. counsel
question which
asked what was
expected. It disingenuous

*[Handwritten:]* Plaintiff
response
to argue when she gives
her best answer based on 10 or more

*Sustained*

**Olson-Fields, Karen 2006-07-27**

124:
1  Q:  (By Mr. Krumholtz)  Well, if Dr. Vogeler testifies
2  or has testified that he would provide you with important
3  safety information that is provided to him, you would have no
4  reason to dispute that?
5  MR. NABERS:  Objection to the form, misstates his
6  testimony.
7  A:  I would have no reason to dispute his testimony.
8  Q:  (By Mr. Krumholtz)  And in fact, that is something
9  that has routinely occurred in your practice, true?
10  MR. NABERS:  Objection to the form.
11  A:  We discuss safety issues with medicines.
12  Q:  (By Mr. Krumholtz)  And you exchange safety
13  information concerning medications that you prescribe?
14  A:  We discuss it.
15  Q:  I hand you what's been marked as Exhibit 6 to your
16  deposition. I'll represent to you that these are pharmacy
17  records relating to prescriptions for Mr. Mason. Does this
18  document reflect the first prescription you prescribed of
19  Vioxx for Mr. Mason?
20  A:  Yes.
21  Q:  I'm going to hand you a highlighter. Could you
22  just highlight for me on that — thank you. That was
23  impressive.
24  A:  Stretch.
25  Q:  Can you highlight for me on that exhibit the entire

125:
1  line that relates to your first prescription of Vioxx to
2  Mr. Mason?
3  A:  (Witness complied.)
4  Q:  Can I see that real quick? Thank you. Just wanted
5  to confirm that's — I have been looking at the right thing.
6  And you have done so now. You have highlighted the September
7  11, 2002 prescription of Vioxx that you — that reflects your
8  prescription of that — your first prescription to Mr. Mason?
9  A:  Yes, I have.
10  Q:  Okay. Now, I want to talk to you about Mr. Mason
11  in particular now. When did you first start seeing
12  Mr. Mason?
13  A:  First visit was — with Mr. Mason appears to be
14  January 7th of 1998.
15  Q:  And so that was the first visit where you actually
16  met Mr. Mason in person?
17  A:  Yes.
18  Q:  Okay. And what did he come into the office for on
19  that occasion?
20  A:  Lower back pain.
21  Q:  And did you indicate or did you find out from
22  Mr. Mason that indeed Mr. Mason had significant and recurring
23  back pain since 1972? And if that record doesn't indicate —
24  let me ask you something. Maybe you just know this without
25  looking at the record. Do you know that Mr. Mason has had

*PLAINTIFFS OBJECTION RE: 124:1-4 RULe 801-802 Hearsay*

*Question is about whether she had discussions with Dr. Vogeler*

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4                                    126

126:  1    significant back pain, recurring back pain, since 1972?
      2    MR. NABERS: Objection to the form.
      3    A: I have not seen Mr. Mason as a patient for a while.
      4    In fact, I have not had a visit with Mr. Mason since June of
      5    '05. Therefore, off the top of my head, no. I could not
      6    recall the date when he first had back pain and the -- so no.
      7    Q:   (By Mr. Krumholtz)  Can you look at Exhibit No. 7?
      8    A: Yes.
      9    Q: Thank you. Do you recognize that as a history and
      10   physical dated April 8, 1998, from your office for Mr. Mason?
      11   A: Yes.
      12   Q: And so in April of 1998 Mr. Mason came in for a
      13   history and physical to see either you or Dr. Vogeler, true?
      14   A: Yes. This is Dr. Vogeler's handwriting, so he saw
      15   Dr. Vogeler on this visit.
      16   Q: Okay. So you recognize this as a visit to
      17   Dr. Vogeler?
      18   A: It appears to be his handwriting.
      19   Q: Okay. And it talks about a number of different
      20   issues, true?
      21   A: Yes, true.
      22   Q: It talks about his father and the fact that he had
      23   had a stroke, true?
      24   A: Let me look.
      25   Q: In the family history section?
127:  1    MR. NABERS:  Objection to the form.
      2    A: Family history, father, stroke is checked as family
      3    history.
      4    Q:   (By Mr. Krumholtz)  And it shows that the father
      5    had -- Mr. Mason's father has diabetes?
      6    A: That is also checked.
      7    Q: And by the way, is this information that you get
      8    from the patient?
      9    A: Yes.
      10   MR. NABERS:  Objection to the form.
      11   A: Well, I can't tell whose checkmarks they are.
      12   Usually the patient fills out the front page, but I can't
      13   tell who checked the boxes. But usually the patient, yes,
      14   fills out this first from the top of this where it says
      15   history and physical through to synopsis.
      16   Q:   (By Mr. Krumholtz)  Okay. So just to be clear,
      17   Mr. Mason would -- or the patient would normally fill out the
      18   family history section of this exhibit, true?
      19   A: True.
      20   Q: And even if they did not fill it out in their own
      21   hand, you or Dr. Vogeler would check off the appropriate
      22   boxes based on what Mr. Mason tells you?
      23   A: True.
      24   Q: In response to questions?
      25   A: Yes.

# Olson-Fields, Karen 2006-07-27

| 128: | 1 | Q: Because family history is important? |
|---|---|---|
| | 2 | A: Yes. |
| | 3 | Q: Okay. And then under family history it says his |
| | 4 | mom had high blood pressure. Do you see that? |
| | 5 | A: Yes. |
| | 6 | Q: And diabetes as well? |
| | 7 | A: Yes. |
| | 8 | Q: And that the father's parents had -- or one of |
| | 9 | whom, I guess, or at least one had a stroke, it indicates, |
| | 10 | does it not? |
| | 11 | A: The mother's parents had -- oh, excuse me. Yes, |
| | 12 | you're correct. The father's parent had a stroke. |
| | 13 | Q: And then the mother's parents, one or both, had |
| | 14 | high blood pressure. I guess you really can't tell if it's |
| | 15 | one or more, true? |
| | 16 | A: True. |
| | 17 | Q: But you do know that it's checked and that the |
| | 18 | mother's parents of Mr. Mason had high blood pressure. |
| | 19 | A: Yes. |
| | 20 | Q: And then it says, the siblings, the cancer is |
| | 21 | checked off, true? |
| | 22 | A: Yes, true. |
| | 23 | Q: Can you read that towards the bottom of that |
| | 24 | section, what it says? |
| | 25 | A: Under mental illness? |
| 129: | 1 | Q: Yes. |
| | 2 | A: I believe it says schizophrenia. |
| | 3 | Q: Okay. So somebody in the family had schizophrenia |
| | 4 | according to Mr. Mason? |
| | 5 | A: A sibling. |
| | 6 | Q: Oh, it's a sibling. Oh, I see. There's a check, |
| | 7 | and there's an explanation there. |
| | 8 | A: And there's a question whether or not it was |
| | 9 | schizophrenia. There's a question mark. |
| | 10 | Q: Meaning he was unsure about that one, true? |
| | 11 | A: True. |
| | 12 | Q: Okay. And then it talks about hospitalizations or |
| | 13 | surgeries. Do you see that? |
| | 14 | A: Yes. |
| | 15 | Q: And then it talks about habits. Do you see that? |
| | 16 | A: Yes. |
| | 17 | Q: And it says he has a sleeping -- a sleep pattern |
| | 18 | problem, true? |
| | 19 | A: True. |
| | 20 | Q: And you're familiar with that problem? |
| | 21 | A: It says CPAP. |
| | 22 | Q: Do you know whether or not Mr. Mason has |
| | 23 | obstructive sleep disorder? |
| | 24 | MR. NABERS: Objection to the form. |
| | 25 | A: It's in his record under chronic problems. |

## Olson-Fields, Karen 2006-07-27

130:
1   Q:  (By Mr. Krumholtz)  And so that that's your belief,
2   he does have that problem, based upon that record?
3   A:  Based upon this record, yes.
4   Q:  And then it talks about chief complaint and
5   problems. Do you see that?
6   A:  Yes.
7   Q:  And it says, No. 1. What does that say under one?
8   A:  Moody -- perhaps moodiness.
9   Q:  Yes, moodiness. And then No. 2 says depression.
10  Do you see that?
11  A:  Yes.
12  Q:  And you have known Mr. Mason to suffer from
13  depression?
14  A:  Yes.
15  Q:  For some time, true?
16  A:  It's in his record.
17  Q:  And that's been something that's been an ongoing
18  problem for him for many, many years?
19  MR. NABERS:  Objection to the form.
20  Q:   (By Mr. Krumholtz)  True?
21  A:  In our records it's first documented in 1998.
22  Q:  In 1998, so in this year of this record depression
23  is first documented. I don't know if it was in this record.
24  It could have been, I guess, before this record in 1998.
25  A:  Yes.

131:
1   Q:  Is that what you're checking?
2   A:  Yes, yes. In our record the first documentation of
3   depression as a diagnosis is April 13th of 1998.
4   Q:  And he's fairly consistently diagnosed with
5   depression throughout his care thereafter?
6   A:  It looks like that from the record.
7   Q:  And then it goes on to some other issues, but back
8   pain is checked off. Do you see that in the third column?
9   A:  Yes.
10  Q:  And it says recurrent. What does that mean?
11  A:  Repeated.
12  Q:  Okay. So that happens -- it's kind of ongoing?
13  MR. NABERS:  Objection to the form.
14  A:  Recurrent means that episodes could happen again,
15  not ongoing. Ongoing means that constantly all the time,
16  whereas recurrent means you had episodes.
17  Q:   (By Mr. Krumholtz)  I see. And --
18  A:  Usually that's what -- that's how I interpret it.
19  Q:  And that's been going on since what date does it
20  say?
21  A:  It looks like it says 1972.
22  Q:  And that is again all information from the patient,
23  Mr. Mason, true?
24  A:  True.
25  Q:  And the reason why you get all of this sort of

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4                                                          132

| 132: | 1 | information, one of the reasons that his family history and |
|------|----|----|
| | 2 | his medical history is because it's important for you to know |
| | 3 | the full picture of a patient when you're treating them? |
| | 4 | A: Yes. |
| | 5 | Q: So that you can decide appropriate treatment |
| | 6 | options? |
| | 7 | A: Yes. |
| | 8 | Q: And for example, you can determine the extent to |
| | 9 | which Mr. Mason has any risk factors? |
| | 10 | A: Yes. |
| | 11 | Q: For any particular condition? |
| | 12 | A: Correct. |
| | 13 | Q: And family history, of course, you understand to be |
| | 14 | a risk factor in connection with cardiovascular disease? |
| | 15 | A: Yes. |
| | 16 | Q: And then, of course, it says moodiness excessive. |
| | 17 | That's checked off as well? |
| | 18 | A: Yes. |
| | 19 | Q: And that's one of his primary complaints indeed, |
| | 20 | under chief complaint slash problems? |
| | 21 | A: Yes. |
| | 22 | Q: And then on the second page do you see where it |
| | 23 | says synopsis at the bottom? |
| | 24 | A: Yes. |
| | 25 | Q: It says depressive illness. Do you see that? |
| 133: | 1 | A: Yes. |
| | 2 | Q: And that's referring to what we talked about |
| | 3 | earlier that he was indeed prescribed with depressive |
| | 4 | illness, right? |
| | 5 | A: Diagnosed with, yes. |
| | 6 | Q: And what is well adult care? |
| | 7 | A: Well adult care is health promotion. |
| | 8 | Q: And describe for us what that means. |
| | 9 | A: Health promotion is measures to keep a patient |
| | 10 | healthy; for example, diet, exercise, getting your |
| | 11 | immunizations, getting yearly physicals, depending on your |
| | 12 | age, mammograms, breast exams, things to detect medical |
| | 13 | problems early. But health promotion is encouraging patients |
| | 14 | to take all possible measures to stay healthy. |
| | 15 | Q: You know Mr. Mason, true? |
| | 16 | A: Yes. |
| | 17 | Q: I mean, you remember him and know him as a person, |
| | 18 | I guess? |
| | 19 | A: I know him as a patient. |
| | 20 | Q: I meant, that's a better way to put it. You don't |
| | 21 | know him personally? |
| | 22 | A: No. |
| | 23 | Q: But you do -- you would recognize him if he walked |
| | 24 | in? |
| | 25 | A: I haven't seen him for a couple years. I imagine I |

# Olson-Fields, Karen 2006-07-27

134:
1    would recognize him.
2    Q:  You may not know that's Mr. Mason, but you would
3    recognize him as one of your patients. Is that fair, or
4    would you actually remember --
5    A:  If he was in my office, I would obviously know he
6    was a patient. If it was out in the community, I would
7    imagine I would recognize him.
8    Q:  As Mr. Mason or as a patient?
9    A:  Probably I would recognize him as someone I knew,
10   and then it -- you know, depending. It might click that he's
11   a patient, and it might click that he's Charles Mason.
12   Q:  Okay. But as you sit here today you can't recall
13   what he looks like?
14   A:  Vaguely, yeah. I can recall what he looks like, at
15   least the last time I saw him, which was a couple of years
16   ago or year or so ago.
17   Q:  In this record it says he's five foot nine, true?
18   A:  That's what it says.
19   Q:  And at the time he weighed 221 pounds; is that
20   right?
21   A:  That's right.
22   Q:  Would you consider that to be a significantly
23   overweight person?
24   A:  I would consider that to be overweight. I would
25   probably have to clarify what significant means, but he's --

135:
1    that would be overweight for -- depending on body build.
2    Q:  Okay.
3    A:  Body build has -- body type and body build has
4    impact on that.
5    Q:  Do you from time to time rely on literature from
6    the American Heart Association?
7    A:  I read it, yes.
8    Q:  Show you what's been marked as Exhibit 8, and if
9    you could just identify that brochure for the jury.
10   A:  This is a brochure from the American Heart
11   Association. It says Learn and Live, and it says American
12   Stroke Association. It says Controlling Your Risk Factors,
13   Our Guide to Reducing Your Risk of Heart Attack and Stroke.
14   Q:  And is that the sort of brochure that you from time
15   to time see from the American Heart Association?
16   A:  Yeah.
17   Q:  And if you could turn to -- I think it might flip
18   right open to a table that discusses body weight. Right
19   there, I think.
20   A:  Body mass index?
21   Q:  Yes.
22   A:  Okay.
23   Q:  First of all, has Mr. Mason always been around
24   five-nine and above 220 pounds when he's been your patient?
25   A:  Well, someone wrote five-ten in 1990, 190 pounds.

## Olson-Fields, Karen 2006-07-27

| 136: | |
|---|---|
| | 1 | Q: No, I'm talking -- that was way back, I guess 16 |
| | 2 | years ago. |
| | 3 | A: Do you mean when I first saw him as a patient? |
| | 4 | Q: Let's start with your care and treatment. |
| | 5 | A: My care and treatment? |
| | 6 | Q: When was that in 1998? |
| | 7 | A: September. Let's see. First time -- oh, wait. |
| | 8 | Let me go back, find my writing. First visit, January 7th of |
| | 9 | '98, he was 224 pounds. No measure of height at that time. |
| | 10 | Q: Okay. But you assume he's between five-nine and |
| | 11 | five-ten? |
| | 12 | A: Yes. |
| | 13 | Q: Somewhere around that range? |
| | 14 | A: Yes. There's another spot here that says |
| | 15 | five-nine. |
| | 16 | Q: Okay. So five-nine to five-ten, somewhere around |
| | 17 | in there, and 224 pounds the first time you saw him, true? |
| | 18 | A: True. |
| | 19 | Q: And he's always been above 221 pounds or more since |
| | 20 | that time, according to your records. Is that right? |
| | 21 | A: Would you give me those parameters again? |
| | 22 | **Q: He's always been above 220 pounds since he's been** |
| | 23 | **your patient?** |
| | 24 | **A: No. Actually, in October of '03 he was 216 pounds.** |
| | 25 | **Q: Okay. Has he ever been below 216 pounds since** |
| 137: | 1 | **January of 1998?** |
| | 2 | **A: In 11-10 of '03 he was weighing at 215.** |
| | 3 | Q: I'm sorry. I was -- we were talking, I apologize. |
| | 4 | What did you say? |
| | 5 | A: I said, there was documentation in November of 2003 |
| | 6 | of him weighing in at 215. |
| | 7 | **Q: Okay. Is that the lowest weight that you have** |
| | 8 | **found in your record since January of 1998 for Mr. Mason?** |
| | 9 | **A: Yes.** |
| | 10 | **Q: And what is the highest weight that you have seen** |
| | 11 | **for Mr. Mason since you have — he's been your patient?** |
| | 12 | **A: 238 pounds.** |
| | 13 | **Q: And that's obviously significantly overweight?** |
| | 14 | **A: It's overweight.** |
| | 15 | **Q: Let me ask you this. What is on the page you're** |
| | 16 | **looking at in the American Heart Association brochure that is** |
| | 17 | **Exhibit 8?** |
| | 18 | **A: This exhibit, body mass index?** |
| | 19 | **Q: Yeah. What's that chart? What does it say?** |
| | 20 | **A: That chart says body mass index, risk levels for** |
| | 21 | **adults.** |
| | 22 | Q: Okay. And what are the various categorizations of |
| | 23 | risk in connection with that table? |
| | 24 | A: Minimal risk with a BMI under 25, moderate risk BMI |
| | 25 | 25 to 29, and high risk, BMI of 30 and above. |

# Olson-Fields, Karen 2006-07-27

| Olson-Fields DA PC on 10-4 | **138** |
|---|---|

**138:**

1  Q:  And if you look at that chart -- first of all, that
2  chart allows you to go to a patient's weight and their height
3  and determine, based on that chart, whether someone is
4  overweight, high risk, low risk, obese, whatever it may be,
5  true?
6  A:  Actually, this is a confusing brochure because it
7  gives you their weight but not what their body mass index is.
8  Weight and body mass index can be completely different.
9  Q:  Let's go with the chart just for a moment, and then
10  we'll get into body mass in a second. But if you assume that
11  he's five-nine or let's say five-ten, just to be
12  conservative, and you assume that he has been 215 pounds or
13  more since he's been under your care since January 1998,
14  where does he fall within that table, according to the
15  American Heart Association?
16  A:  If he's weighing in at five-ten, this is saying
17  that above 208, 174 to 208 would be considered overweight
18  according to this chart.
19  Q:  So he would be more than overweight?
20  A:  Well, that's the confusing thing about this. They
21  say overweight, but then they have got body mass index up
22  here. That doesn't make sense, but if you go up --
23  Q:  According to the chart.
24  A:  According to the chart, this is body mass index
25  risk levels, but they're not giving you body mass indexes.

**139:**

1  So -- but if go -- if you want to just take it, this portion
2  down here which just lists height and weight, they are
3  suggesting that 174 to 208 may be overweight.
4  Q:  And he's more than 208 pounds?
5  A:  He was.
6  Q:  And he has been since you have treated him?
7  A:  He has been since I have been treating him.
8  **Q:  He has been 215 pounds or more since you have**
9  **treated him?**
10  **A:  Correct.**
11  **Q:  In fact, he's been all the way up to, what was it?**
12  **Two hundred --**
13  **A:  238, I think was the highest.**
14  **Q:  And according to the chart, he would be considered**
15  **obese by the American Heart Association, true, regardless of**
16  **his body mass index? It says that he would be considered**
17  **obese.**
18  **A:  That's what this is suggesting.**
19  Q:  And it says high risk above that column, does it
20  not?
21  A:  Yeah, but this is still confusing.
22  Q:  You don't understand that chart?
23  A:  I think the chart's misleading. I think the chart
24  is talking about two different things. Body mass index and
25  your actual weight are not the same. Body mass index

Printed: 10/4/2006   3:16:27PM