Overruled

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4                                             140

PLAintiff's
OBJEction
Re: 140:10-
141:13

RuLe 801-
And 802
HeArsAy

Response: this is
a discussion of
Mr. Mason's medical
records

| 140: | | |
|---|---|---|
| | 1 | measures fat according to your height, and so this -- I just |
| | 2 | think this is a confusing chart. |
| | 3 | Q: But regardless, according to the chart he's at high |
| | 4 | risk and considered obese, true? |
| | 5 | A: There is a label up here that says obese. Under -- |
| | 6 | it says high risk, BMI 30 and above, obese. And if you go |
| | 7 | down the chart to five-ten, it says if you are above 209, |
| | 8 | then you go back up, and it says obese, and you go back up, |
| | 9 | and it says BMI of 30. |
| | 10 | Q: Okay. Well, just so it's clear on the record, the |
| | 11 | column in which his height and weight are categorized by the |
| | 12 | American Heart Association -- I understand you may think it's |
| | 13 | confusing, but the column is labeled obese where he falls, |
| | 14 | true? |
| | 15 | A: Yes. |
| | 16 | Q: And the column is labeled high risk where he falls. |
| | 17 | A: Yes. |
| | 18 | Q: True? |
| | 19 | A: Yes. |
| | 20 | Q: Okay. And then could you turn to your June 21, |
| | 21 | 2002 record? |
| | 22 | A: Yes. |
| | 23 | Q: And first of all, that's where his weight was 238.2 |
| | 24 | pounds, true? |
| | 25 | A: True. |
| 141: | 1 | Q: And so three months before he took Vioxx was his |
| | 2 | highest weight recorded in your chart? |
| | 3 | A: Yes. |
| | 4 | Q: And three months before he took Vioxx he had a |
| | 5 | blood pressure of 148 over 64? |
| | 6 | A: Yes. |
| | 7 | Q: And so three months before he took Vioxx his |
| | 8 | systolic blood pressure was high? |
| | 9 | A: Yes. |
| | 10 | Q: As recorded by you? |
| | 11 | A: As recorded by my medical assistant. |
| | 12 | Q: Who you believe to be reliable? |
| | 13 | A: Yes. |
| | 14 | Q: And that would concern you? |
| | 15 | MR. NABERS: Objection to the form. |
| | 16 | Q: (By Mr. Krumholtz) A man who is 238 pounds, |
| | 17 | five-nine, highest weight he has been since he's seen you, |
| | 18 | and who has blood pressure that is registering high of 148 |
| | 19 | over 64. |
| | 20 | A: Well, the diastolic blood pressure has a big |
| | 21 | bearing here. I would not look at this blood pressure and be |
| | 22 | overly concerned. I would want to get additional blood |
| | 23 | pressure readings, but no, I wouldn't look at this blood |
| | 24 | pressure and say this is a dangerous blood pressure. |
| | 25 | Q: Well, I am just saying dangerous meaning emerging. |

## Olson-Fields, Karen 2006-07-27

142:
1    In other words, you wouldn't send him to hospital right now,
2    true?
3    A: Not with a blood pressure like that.
4    Q: Well, of course not, but it's something -- it's a
5    flag. It's something you have to consider and then assess to
6    determine whether or not, given his weight and other factors,
7    he deserves further follow-up cardiovascularly, true?
8    A: Blood pressure-wise, yes. We would want to recheck
9    his blood pressure.
10   **Q: And you would be concerned about his weight?**
11   **A: Yes.**
12   **Q: And you have indeed counseled him about his weight.**
13   **You have seen that in your records?**
14   **A: I would need to read through. Is there --**
15   **Q: That's your typical practice. I mean, I don't want**
16   **to --**
17   **A: My typical practice would be to counsel a patient**
18   **about diet and exercise at their physical.**
19   **Q: Especially when they're Mr. Mason's age as of June**
20   **of 2002?**
21   **A: I would counsel anyone who is overweight. I would**
22   **counsel anyone I'm doing a physical on for good diet and**
23   **normal weight, healthy life-style.**
24   **Q: Do you find that diet can have -- play a**
25   **significant part in someone's health?**

143:
1    **A: Yes.**
2    **Q: Including their cardiovascular health?**
3    **A: Yes.**
4    **Q: And a poor diet can cause significant risk to a**
5    **patient?**
6    **A: Yes.**
7    **Q: Including cardiovascular risks?**
8    **A: Yes.**
9    Q: We were talking a moment ago about Exhibit, I
10   think, 7. What is the April 8, 1998 record labeled?
11   A: Exhibit 7?
12   Q: Yes.
13   A: What is it labeled?
14   Q: Well, it's labeled Exhibit 7. I was just asking --
15   A: Oh, okay.
16   Q: -- what the exhibit number was.
17   A: Seven.
18   **Q: Thank you. And we had talked about the fact that**
19   **it indicates he had back pain since 1972?**
20   **A: Yes.**
21   **Q: Recurrent back pain since 1972, true?**
22   **A: Recurrent.**
23   Q: Yes, and you understand that was a significant
24   problem for Mr. Mason?
25   MR. NABERS: Objection to the form.

## Olson-Fields, Karen 2006-07-27

144:  1   A: I now understand it. You have mentioned it a few
      2   times.
      3   Q:  (By Mr. Krumholtz)  Well, outside of me, as his
      4   nurse practitioner, he's told you that, has he not?
      5   MR. NABERS:  Objection to the form.
      6   A: He has seen me on occasion for episodes where his
      7   back has been aggravated.
      8   Q:  (By Mr. Krumholtz)  Handing you what's been marked
      9   as Exhibit 9, can you confirm that that's yet another medical
      10  record from your office?
      11  A: This is a copy of an office note, Exhibit 9.
      12  Q: And is that your handwriting or someone else's
      13  under the entry dated January 1998?
      14  A:  The first two lines are entered by a medical
      15  assistant.
      16  Q: And what does it say?
      17  A: Complain of lower back pain, shoveling snow Monday,
      18  felt a pop. It would have been, she meant times three days.
      19  Took Naprosyn, no help.
      20  Q: So Naprosyn, it indicates here, did not help?
      21  A: Correct.
      22  Q: And Naprosyn is the same thing as naproxen?
      23  A: Yes.
      24  Q: Okay. And then does it say, pain is constant?
      25  A: Yeah. Pain is constant since he heard the pop.
145:  1   Q: Pain radiates down to knees bilaterally. Is that
      2   what that says?
      3   A: Yes.
      4   Q: And what does that mean?
      5   A:  That means the discomfort goes down both legs
      6   rather — and rather than just one leg.
      7   Q: Okay. And so this is a condition that you have
      8   treated Mr. Mason for for some time?
      9   A: I treated him on that date, and I would have to
      10  look at the medical record to see if I treated him again.
      11  Q: Well, you know you at least treated him in
      12  connection —
      13  A: Once.
      14  Q: — with your prescription of Vioxx, right?
      15  A: Yes. I treated him once for the note of '98, and
      16  then we - on September of '02 I mentioned his back pain. And
      17  I don't believe I saw him again for specifically back pain
      18  other than that. But let me look. It looks like those were
      19  the two visits that I addressed back pain.
      20  Q: Okay. And so he told you that he had recurrent
      21  back pain since 1972?
      22  A: No. He did not tell me that.
      23  Q: I'm sorry.
      24  A: I don't have that documented.
      25  Q: Fair enough. He told Dr. Vogeler that, according

## Olson-Fields, Karen 2006-07-27

146: 1  to your medical records?
2  A: Yeah. It's on the physical form of '98.
3  Q: And then he came to you for back pain in connection
4  with a traumatic event in January of 1998?
5  A: Yes.
6  Q: And that was where Naprosyn could not help his back
7  pain?
8  A: It did not help.
9  Q: Okay. And so this is something you had been
10  treating Mr. Mason for since January 1998? Is that fair?
11  A: I consider this note from '98 an acute episode of
12  back pain. So all is I can say is, I treated him for this
13  episode of back pain that was brought on by shoveling snow.
14  Q: Fair enough. And then why did you prescribe Vioxx?
15  A: Well, in 1998 it looks as though I gave him
16  etodolac, which is another antiinflammatory, and muscle
17  relaxers.
18  Q: And what date was that?
19  A: That was the January. Does it say January of '98?
20  It's a little foggy up there.
21  Q: That was that first --
22  A: January 20 -- when is that?
23  Q: That was when his traumatic event occurred?
24  A: Yeah, yeah.
25  Q: Okay.

147: 1  A: And then --
2  Q: Why did you prescribe his Vioxx in September of
3  2002?
4  A: I didn't on the -- oh, let me look. September 10th
5  of 2002, it looks like he had tried Vioxx, and I noted that
6  it had helped him.
7  Q: Do you know where he got the Vioxx from before you
8  prescribed it?
9  A: I don't recall.
10  Q: Okay. But it does indicate that he had tried it,
11  and it had worked well for back pain?
12  A: I noted, tried Vioxx, helped, exclamation point.
13  Q: And if you look at the history and physical for
14  September 10, 2002, and let me go ahead and mark this.
15  Handing you Exhibit 10, is this a copy of the history and
16  physical that you conducted in connection with Mr. Mason in
17  September -- on September 10 of 2002?
18  A: Yes.
19  Q: And do you see at the bottom where it says, tried
20  Vioxx, worked well for back pain?
21  A: Yes.
22  Q: Is that your handwriting?
23  A: Yes.
24  Q: And so that would have been something that
25  Mr. Mason told you in connection with his September 10 of

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4                                                 148

148:  1    2002 visit?
      2    A: Yes.
      3    Q: Then it also says, admits to anxiety attack seven
      4    months ago.
      5    A: Yes.
      6    Q: And it says chest pain. Do you see that?
      7    A: Yes.
      8    Q: And so as a result of his trying Vioxx and the fact
      9    that it had worked well, you decided to -- and it worked well
      10   for what, by the way, as you understand it?
      11   A: Back pain.
      12   Q: Okay. So -- and did you prescribe it so that he
      13   could take it each and every day?
      14   A: I would have to see the prescription.
      15   Q: There's a prescription record over there, and so it
      16   may be able to help you refresh your recollection.
      17   A: Vioxx 25 milligrams. He was dispensed 30 tablets.
      18   Q: And then does it indicate on that sheet of paper
      19   how many times you prescribed him Vioxx?
      20   A: On Exhibit 6?
      21   Q: Yes.
      22   A: It does list, one -- ten. Ten prescriptions were
      23   filled.
      24   Q: And are those refills, or are those separate
      25   prescriptions each and every time?

149:  1    A: Those would have been refills.
      2    Q: Okay. So you prescribed 25 milligram Vioxx for
      3    Mr. Mason because of his back pain?
      4    A: Yes.
      5    Q: And we have already talked about the fact that back
      6    pain can be quite debilitating.
      7    A: Yes.
      8    Q: It's important for patients with back pain to be
      9    able to have relief in terms of the inflammation and the pain
      10   that they feel?
      11   A: Yes.
      12   Q: So that it won't impact their quality of life as
      13   much as it does without that sort of medication?
      14   MR. NABERS: Objection to the form.
      15   Q: (By Mr. Krumholtz)  True?
      16   A: Could you repeat that?
      17   Q: Yeah. The hope is that when you provide -- when
      18   you prescribe medications like Vioxx that it will relieve the
      19   pain and inflammation that is a problem for the patient?
      20   A: Yes.
      21   Q: And in fact, that was the reason you prescribed it
      22   for Mr. Mason?
      23   A: Yes, and it had been effective for him.
      24   Q: And he told you that it had been effective for him?
      25   A: I noted that he had told me it helped.

## Olson-Fields, Karen 2006-07-27

150:
1  Q:  And it would help him in connection with his
2  quality of life if he could control his pain and
3  inflammation?
4  A:  Yes.
5  Q:  And that was your hope in September of 2002?
6  A:  Yes.
7  Q:  Now, if you had provided Mr. Mason samples, would
8  you have recorded that in your chart?
9  A:  That's a practice that I have become much better
10  at. Now when we give out samples, we do document samples
11  given. I obviously did not document that here, so whether or
12  not we gave him samples, I can't recall.
13  Q:  Okay. But there's no indication in your records
14  that suggest you provided him samples?
15  A:  It's not noted in there.
16  Q:  So my statement is correct?
17  A:  It's correct.
18  Q:  Okay. And so as of September of 2002, when you
19  prescribed Vioxx for Mr. Mason -- first of all, do you see in
20  that September 10 record where it says -- I think it's
21  Exhibit 10. It says getting old, in the bottom, in the
22  synopsis on the first page. You have it in your hand, I
23  think.
24  A:  On seven?
25  Q:  Oh, no, Exhibit 10.

151:
1  A:  No. That's not it. Exhibit 10, yes.
2  Q:  You see where it says getting old in the synopsis
3  section?
4  A:  Yes.
5  Q:  Whose handwriting would that have been?
6  A:  That is apparently Mr. Mason's.
7  Q:  So he told you that he felt like he was getting
8  old?
9  A:  He noted it on his chart. I don't recall whether
10  he told me that.
11  Q:  And he again -- and he checks arthritis and
12  rheumatism in his chief complaint, medical history?
13  A:  Yes.
14  Q:  And it says back pain, recurrent. Do you see that?
15  A:  Yes.
16  Q:  So he has conditions that he's reporting where it
17  would be appropriate for him to receive a COX-2 inhibitor?
18  A:  Yes.
19  Q:  And appropriate to receive Vioxx, according to your
20  judgment, in September of 2002?
21  A:  Yes.
22  Q:  Now, if you look -- where is the diagnosis section
23  on your history and physical?
24  A:  On the back page.
25  Q:  Can you point that out to me just so I know I'm

## Olson-Fields, Karen 2006-07-27

| | | |
|---|---|---|
| 152: | 1 | looking at the right spot? |
| | 2 | A: Exhibit 10, right? |
| | 3 | Q: Right. |
| | 4 | A: Second page. The — you have got 00028 on the |
| | 5 | bottom right hand on the copy that I have. |
| | 6 | Q: Got it. And so where it says synopsis? |
| | 7 | A: Yes. |
| | 8 | Q: Those are your diagnoses? |
| | 9 | A: Yes. |
| | 10 | Q: And again, you say well adult care, true? |
| | 11 | A: Yes. |
| | 12 | Q: And that would include appropriate dietary |
| | 13 | recommendations? |
| | 14 | A: Yes. |
| | 15 | Q: Because you understood he was overweight at the |
| | 16 | time at 228 pounds? |
| | 17 | A: Yes. |
| | 18 | Q: And then it says back pain of course. Do you see |
| | 19 | that? |
| | 20 | A: Yes. |
| | 21 | Q: And then what does it say next? |
| | 22 | A:   ED. |
| | 23 | Q: What is that? |
| | 24 | A: That's erectile dysfunction. |
| | 25 | Q: And then on September 10 of 2002, what does it next |
| 153: | 1 | say under your diagnosis? |
| | 2 | A: Change in EKG. |
| | 3 | Q: And was that a concern for you? |
| | 4 | A: Yeah. Any change in an EKG is one way we decide |
| | 5 | whether we want to order a stress test or evaluate it any |
| | 6 | further. |
| | 7 | Q: And then what does the next diagnosis state? |
| | 8 | A: Increased cholesterol. |
| | 9 | Q: And what does that mean? |
| | 10 | A: It means his cholesterol levels are elevated above |
| | 11 | normal. |
| | 12 | Q: And why is that a concern? |
| | 13 | A: High cholesterol can lead to coronary artery |
| | 14 | disease, and that would be my main concern. |
| | 15 | Q: Okay. And then it says, is that IBS? |
| | 16 | A: Yes, irritable bowel syndrome. |
| | 17 | Q: Okay. And you understood that that had been a |
| | 18 | problem for Mr. Mason for some time? |
| | 19 | A: Yes. |
| | 20 | Q: And of course, on the first page you understood |
| | 21 | that Mr. Mason had at least one anxiety attack, true? |
| | 22 | A: Yeah. |
| | 23 | Q: And that he had suffered from chest pain? |
| | 24 | A: With the anxiety attack. |
| | 25 | Q: And you understood — you understand that anxiety |

## Olson-Fields, Karen 2006-07-27

| | |
|---|---|
| 154: | 1  or stress and chest pain are additional signs of or risks |
| | 2  factors for cardiovascular disease? |
| | 3  MR. NABERS: Objection to the form. |
| | 4  A: I don't agree with that statement. |
| | 5  Q: (By Mr. Krumholtz) Okay. I just want to make sure |
| | 6  I'm accurately stating it. Is chest pain, can it be a sign |
| | 7  of cardiovascular disease? |
| | 8  A: Yes. |
| | 9  Q: And I assume you're not the person to try to figure |
| | 10  that out? |
| | 11  MR. NABERS: Objection to form. |
| | 12  Q: (By Mr. Krumholtz) It would be a cardiologist who |
| | 13  tries to figure that out? |
| | 14  A: Actually, in this case it depends on who is seeing |
| | 15  him at the time and what facility. An emergency room can |
| | 16  assess whether a person's chest pain is cardiac or not. |
| | 17  Q: Okay. |
| | 18  A: So -- |
| | 19  Q: Let me just -- I think I can state it in a way that |
| | 20  we can get past this. Chest pain can be a risk factor in |
| | 21  connection with cardiovascular disease. |
| | 22  A: Chest pain is not a risk factor. Chest pain can be |
| | 23  a symptom. |
| | 24  Q: Okay. Now I understand. It can be a symptom or a |
| | 25  sign of cardiovascular disease? |
| 155: | 1  A: Cardiovascular event, not cardiovascular disease. |
| | 2  Q: Or actually, angina is a condition? |
| | 3  A: It's a symptom. Angina -- |
| | 4  Q: It can be a sign of atherosclerosis? |
| | 5  A: Angina is cardiac pain. Not all patients who have |
| | 6  angina have coronary artery disease. |
| | 7  Q: All I'm -- and I'm not trying to say extremes like |
| | 8  all. I'm just saying that chest pain can be angina, true? |
| | 9  A: Yes. |
| | 10  Q: Angina can be a sign or symptom of cardiovascular |
| | 11  disease? |
| | 12  A: Yes. |
| | 13  Q: Okay. So when you have a patient that reports |
| | 14  chest pain, it's important to monitor them? |
| | 15  A: Yes. |
| | 16  Q: If you have a patient with chest tightness, it's |
| | 17  important to monitor them? |
| | 18  A: Yes. |
| | 19  Q: Because there is a risk that it could be |
| | 20  cardiovascular-related issues? |
| | 21  A: Yes. |
| | 22  Q: Okay. And anxiety attacks or stress levels at |
| | 23  work, do you consider that a risk factor for cardiovascular |
| | 24  disease? |
| | 25  A: Not necessarily. |

## Olson-Fields, Karen 2006-07-27

| | | |
|---|---|---|
| 156: | 1 | Q:  But it can be? |
| | 2 | A:  Would you restate the question? |
| | 3 | Q:  Yeah. And I guess refer to the brochure if you |
| | 4 | don't mind, and maybe that can clear some of these issues up. |
| | 5 | That -- when I'm talking about brochure, I'm talking about |
| | 6 | exhibit -- |
| | 7 | A:  Oh. |
| | 8 | Q:  No. That's it. That's it. |
| | 9 | A:  Exhibit 8? |
| | 10 | Q:  Exhibit 8 from the American Heart Association, and |
| | 11 | if you could find the section on stress, that would be great. |
| | 12 | A:  Individual response to stress? |
| | 13 | Q:  Yes. |
| | 14 | A:  Yes. |
| | 15 | Q:  So stress can be a risk for heart disease according |
| | 16 | to the American Heart Association? |
| | 17 | A:  It doesn't say it's a risk factor. It says it can |
| | 18 | contribute to heart disease. |
| | 19 | Q:  Fair enough. So stress can contribute to heart |
| | 20 | disease, and that would be a risk, true, to a patient? |
| | 21 | A:  If a patient has heart disease and they had lots of |
| | 22 | stress, yes, it would contribute. |
| | 23 | Q:  And that would be a risk factor, so to speak, for |
| | 24 | further heart disease? |
| | 25 | A:  For that particular patient, but it's not -- stress |
| 157: | 1 | does not cause cardiovascular disease. It can contribute to |
| | 2 | someone who has cardiovascular disease. |
| | 3 | Q:  Can it contribute to acceleration of heart disease? |
| | 4 | A:  I don't believe so. It can contribute to a risk of |
| | 5 | actually having an event, but it is not a cause of coronary |
| | 6 | artery disease. Either you have coronary artery disease or |
| | 7 | you don't. |
| | 8 | Q:  That makes sense. Okay. So it can contribute to |
| | 9 | like a myocardial infarction or a heart attack? |
| | 10 | A:  There is some opinion that enormous amounts of |
| | 11 | stress, certain stressful episodes could be a part of |
| | 12 | precipitating an actual event. |
| | 13 | Q:  And do you agree that anxiety attacks are the type |
| | 14 | of stressful events that may result in events like myocardial |
| | 15 | infarctions? |
| | 16 | A:  I think -- I don't put them together like that. I |
| | 17 | think if someone has an anxiety attack, they have an anxiety |
| | 18 | disorder that needs to be treated. |
| | 19 | Q:  And that's what you thought as to Mr. Mason? |
| | 20 | A:  Mr. Mason had reported to me at the time that he |
| | 21 | had had an anxiety attack that included a symptom of chest |
| | 22 | pain seven months prior. |
| | 23 | Q:  And as a result, I guess your testimony, you would |
| | 24 | have thought that he had an anxiety disorder that needed to |
| | 25 | be treated? |

## Olson-Fields, Karen 2006-07-27

158:
1  A: Yes, yes, which -- yes.
2  Q: And just to kind of summarize what we have been
3  talking about today so far, as of the time that you
4  prescribed Vioxx to Mr. Mason, he had told you he felt like
5  he was getting old. True?
6  A: He didn't tell me that, but he did put it on -- I
7  can't remember if he told me that. He put it on his form.
8  Q: That he was getting old?
9  A: That's what it says on the form.
10  Q: And that's how you would interpret -- as his
11  doctor, if that showed up in your record, you would interpret
12  that as he felt like he was getting old.
13  MR. NABERS: Objection to the form.
14  Q:  (By Mr. Krumholtz)  True?
15  A: I could -- you could interpret this many ways. I
16  would have to go back and ask Mr. Mason because it could have
17  been whimsical. It could have been a joke, especially when
18  you look at the fact that he also was getting treatment for
19  ED, and some men find that embarrassing. They want to find
20  reasons why they're having sexual dysfunction, and so it
21  could have been a whimsical comment on his part.
22  Q: One thing we do know is that Mr. Mason wrote down
23  that he was getting old and -- on the September 10, 2002
24  history and physical?
25  A: That's written in what I think is his handwriting.

159:
1  It says under synopsis, which is usually where I write
2  things, he put getting old.
3  Q: And we also know that he had been over --
4  significantly overweight since January of 1998?
5  A: He had been overweight.
6  Q: And you know that according to him, he had had
7  recurrent back pain since 1972?
8  A: Yes.
9  Q: And you had diagnosed him as having high
10  cholesterol?
11  A: Yes.
12  Q: And if you look at the plan of action in connection
13  with your diagnosis of high cholesterol, you had provided
14  him, it looks like, a handout. Is that right?
15  A: Yes.
16  Q: On what?
17  A: Low cholesterol diet.
18  Q: Okay. And again, why is that important?
19  A: Reducing cholesterol does two things. One, reduces
20  your risk of coronary artery disease and helps you lose
21  weight because cholesterol and fat go together.
22  Q: And you also indicated that he should increase his
23  exercise?
24  A: Yes.
25  Q: And why is that?

**Olson-Fields, Karen 2006-07-27**

160:

1   A: To lose weight, and also for fitness purposes.
2   Q: And you had diagnosed him with erectile
3   dysfunction?
4   A: Yes.
5   Q: You had understood that he had sleep apnea or
6   obstructive sleep disorder?
7   A: I didn't mention it in this visit, but I do
8   understand that from his records. And let's see.
9   Q: You can reliably determine that by looking at your
10  medical chart, that he did indeed did have sleep apnea or
11  obstructive sleep disorder, true?
12  A: That's what his chart states.
13  Q: And in June of 2002 just before, or three months
14  before you gave him Vioxx, you had diagnosed him as having
15  high blood pressure?
16  MR. NABERS: Objection to the form.
17  A: I did not diagnose him as having high blood
18  pressure. In fact, if you look at the other blood pressures
19  in his chart, he has beautiful blood pressure.
20  Q: (By Mr. Krumholtz)  Maybe I misstated that. He was
21  recorded as having high systolic blood pressure in June of
22  2002.
23  A: Yes, but you do not diagnose high blood pressure
24  with one reading. It could have been a medical assistant
25  error. It could have been a stressful day. I diagnose high

161:

1   blood pressure with more than one reading and --
2   Q: How many readings?
3   A: Three.
4   Q: If you could turn to Exhibit 8, how many readings
5   does the American Heart Association suggest for purposes of
6   diagnosis of high blood pressure?
7   A: What page? What's it under? High blood pressure?
8   Q: Yes. And first of all, it does indicate that
9   high blood pressure can be a silent killer. Do you see that?
10  A: Are we talking about page 3?
11  Q: Yes.
12  A: Okay. What risk factors for heart attack and
13  stroke can you control or modify? High blood pressure.
14  Q: And there's a section on high blood pressure that
15  talks about it specifically. Are you there?
16  A: Yes.
17  Q: And then in the second or third paragraph it has
18  some language that's bolded. Do you see that?
19  A: Yes. I see what you are saying. The silent killer
20  in parenthesis is what you had mentioned.
21  Q: And that's something that you agree with?
22  A: Yes.
23  Q: And then if you could look in that section and tell
24  us how many readings it would take to have somebody be --
25  have high blood pressure.

*[Handwritten annotations:]*
Overruled

PLAintiffs
OBJection
Re: 161:4 -25
RULe 801
RULe 802
HEARSAY

Response - questions
are about risk
factors and her
understanding of them

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4

162

162:   1   A: On the same page?
       2   Q: I think it's just in that section. I apologize. I
       3   don't have it completely memorized, but it should be in the
       4   next couple pages.
       5   A: I'm sorry. I'm not -- maybe can you point this out
       6   to me. I'm not seeing it.
       7   Q: Yeah. Could I see it real quick?
       8   A: Yeah.
       9   Q: I apologize. I should have pointed you to it. If
      10   you could look at the second paragraph in the middle of page
      11   3.
      12   A: Second paragraph in the middle, page 3. Two or
      13   more occasions.
      14   Q: Okay. Two or more occasions of what?
      15   A: If your systolic blood pressure is 140 or greater
      16   or your diastolic pressure is 90 or more or both when
      17   measured or two or more occasions.
      18   Q: And do you think that's a reliable standard?
      19   A: I think two or more is a reliable standard.
      20   Especially if you are going to put patients on medication,
      21   you want to make sure that the patient truly has high blood
      22   pressure and it's not an error from the blood pressure cuff,
      23   your medical assistant.
      24   Q: I'm handing you what's been marked as Exhibit No.
      25   11. Have you seen that document before?

163:   1   A: Perhaps at some point, but I would have to look at
       2   his chart. My initials's not on here, so I am not sure
       3   whether I have seen this or not.
       4   Q: It is copied to Douglas Vogeler though, true?
       5   A: Let's see. Referring physician, Douglas Vogeler,
       6   copy Douglas Vogeler.
       7   Q: And you referred Mr. Mason, after your September
       8   2002 evaluation of him, to Dr. Madsen at the Heart and Lung
       9   Institute, true?
      10   A: Yes.
      11   Q: And Dr. Madsen is a cardiologist?
      12   A: True.
      13   Q: Because when a patient has any cardiac issues, I
      14   think you indicated earlier in the deposition you refer them
      15   to cardiologists, right?
      16   A: Yes.
      17   Q: Okay. And they performed a stress test on
      18   Mr. Mason, true?
      19   A: True.
      20   Q: And in the interpretation section it says, 'The
      21   patient exercised seven minutes and nine seconds on a Bruce
      22   protocol.' Do you see that?
      23   A: I see it.
      24   Q: And you know what the Bruce protocol is?
      25   A: No, not specifically.

*Overruled*

*Plaintiff's
OBjection
Re: 162:9-23
Rule 801 & 802
HEARSAY
same response*

Printed: 10/4/2006   3:16:27PM

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4                                                     164

164: 1   Q: But it says, 'The normal exercise time for this age
2   is 8 minutes and 20 seconds.' Do you see that?
3   A: Yes.
4   Q: So we know at or around the time that you began
5   prescribing Vioxx to Mr. Mason that he was unable to exercise
6   for the normal exercise time for this particular type of
7   testing.
8   A: This says that -- it doesn't state that. It says
9   how long the patient was able to tolerate the treadmill.
10  Q: Well, it does say the normal exercise time for his
11  age is 8 minutes and 20 seconds.
12  A: That's what this says.
13  Q: And it says, he couldn't -- it says the patient
14  exercised for seven minutes and nine seconds?
15  A: Correct. That's what it says.
16  Q: And it says the test was stopped because of
17  fatigue?
18  A: That's what it says.
19  Q: So you understand he could not exercise for as long
20  as was expected for his age, true?
21  A: That's what you would infer.
22  Q: That's what you infer from reading this record?
23  MR. NABERS: Objection to the form.
24  Q: (By Mr. Krumholtz)  True? True?
25  A: That's what you would infer. Is that -- the only
165: 1  thing you say from this is, he did not stay on the treadmill
2   8 minutes and 20 seconds.
3   Q: Well --
4   A: Which says the normal exercise time is -- for this
5   age is eight. So he fell short slightly of the 8 minutes and
6   20 seconds.
7   Q: (By Mr. Krumholtz)  In fairness, the test was
8   stopped because of fatigue, true?
9   A: That's what it says.
10  Q: And as a medical professional, you would agree that
11  -- when reading this record, you would interpret it as saying
12  that he was unable to exercise for as long as he was expected
13  to, given his age?
14  MR. NABERS: Objection to the form.
15  Q: (By Mr. Krumholtz)  Is that true?
16  A: No.
17  Q: That's not what you believe?
18  A: No. I would -- do you want to know what I believe
19  or --
20  Q: Sure.
21  A: That this form of exercise under the conditions,
22  that he was not able to stay on the treadmill for 8 minutes
23  and 20 seconds. That would be -- that's really the only
24  thing I would glean from this.
25  Q: Does it concern you that it states that he could

*(handwritten annotations in right margin:)*

Re: 164: 24 - 165: 6
Def obj: question
omitted

Add P. 164
line 22.
a typo error.

Plaintiff 's
Response

Re: 165: 14
Def obj: Remove
objection

π agree
Plaintiff 's
Response

Printed: 10/4/2006   3:16:27PM

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4                                                                166

| 166: | |
|---|---|
| 1 | not exercise for as long as what would normally be expected? |
| 2 | A:  Actually, I see that often, even in people who are |
| 3 | fit, that they can't seem to tolerate the test necessarily |
| 4 | all the way. But this doesn't say it was a -- Mr. -- |
| 5 | Dr. Madsen did not comment that this wasn't a -- he didn't |
| 6 | comment on that being a problem for the test. |
| 7 | Q:  Of course, the very first notation in the chart |
| 8 | regarding Vioxx indicates Mr. Mason believed that Vioxx was |
| 9 | working well for his back pain. |
| 10 | A:  That it helped him. |
| 11 | Q:  Do you -- by the way, did it bother you that he had |
| 12 | taken at least one Vioxx pill without a prescription? |
| 13 | MR. NABERS:  Objection to the form. |
| 14 | Q:   (By Mr. Krumholtz)  Let me ask it differently |
| 15 | because I guess you don't know that for sure, true? |
| 16 | A:  I don't know that. |
| 17 | Q:  So -- but if it were shown or if Mr. Mason has told |
| 18 | us that in fact he took a Vioxx pill without prescription, |
| 19 | would that concern you? |
| 20 | MR. NABERS:  Objection to the form. |
| 21 | A:  It would concern me if Mr. Mason -- well, first of |
| 22 | all, there's a good chance he had samples, so that if he had |
| 23 | been given a sample and tried it, obviously that wouldn't |
| 24 | have concerned me. |
| 25 | Q:   (By Mr. Krumholtz)  Actually, there's no evidence |

| 167: | |
|---|---|
| 1 | in the record that he was provided samples. |
| 2 | A:  There is not. It's not mentioned in the record |
| 3 | whether he had been provided samples or not. |
| 4 | Q:  Assume with me that he didn't take any samples and |
| 5 | he simply took one from his son-in-law in an unprescribed |
| 6 | form. Would that concern you? |
| 7 | A:  I would talk to him about that. |
| 8 | Q:  Why? |
| 9 | A:  I would educate him that he -- you know, any |
| 10 | patient with any medicine should ask their practitioner about |
| 11 | the medicine and obtain it for themselves. Patients do that |
| 12 | all the time, and when I find patients trying medicines, I do |
| 13 | educate them that it is preferable to discuss medicines with |
| 14 | your practitioner before trying them. |
| 15 | Q:  Let me hand you what's been marked as Exhibit 12. |
| 16 | I'm sorry. I may have given you more than one copy. In |
| 17 | fact, I have so many copies of this one -- |
| 18 | A:  Pulled together. |
| 19 | Q:  You can just take one of them and give me back the |
| 20 | rest, except for one for counsel. You can have those two if |
| 21 | you want. Okay. So I'll represent to you that Exhibit 12 is |
| 22 | an excerpt from Mr. Mason's deposition. |
| 23 | And it says, 'So July of 2002, you took one Vioxx |
| 24 | from your son-in-law, right? |
| 25 | 'Answer: Uh-huh. |

## Olson-Fields, Karen 2006-07-27

168:
1   'Is that right?
2   'Answer: That's correct.
3   'And it worked very well for you?
4   'Answer: It worked very well for me.' Do you see
5   that?
6   A: No. I'm sorry. Could you go back?
7   Q: At the bottom of the first page starting at line
8   19.
9   A: Okay, thank you.
10  Q: Apologize. Tell me when you're there, and we can
11  start again.
12  A: Okay. I'm on line 19.
13  Q: It states, 'So July of 2002 you took one Vioxx from
14  your son-in-law, right?
15  'Answer: Uh-huh.
16  'Question: Is that right?
17  'Answer: That's correct.
18  'Question: And it worked very well for you?
19  'Answer: It worked well for me.'
20  Do you see that?
21  A: Yes.
22  Q: And that's consistent with what Mr. Mason told you,
23  true?
24  A: That it worked well for him, yes.
25  Q: Okay. And then on the next page I ask him, 'And

169:
1   was that the best pain relief you had gotten as compared to
2   other pain relievers for back pain?'
3   A: What line is that?
4   Q: And that is at page 15 -- line 15 on page 182.
5   A: Yes, I see that.
6   Q: So in answer to that question, and I'll repeat it,
7   'And was that the best pain relief you had gotten as compared
8   to other pain relievers for back pain?'
9   The answer at Line 18 is, 'That was. That was the
10  best that I had at the time, yes.'
11  Did I read that correct?
12  A: Yes.
13  Q: Okay. Is that consistent with what your patients
14  reported to you in connection with Vioxx?
15  A: I would have to look. I noted that it helped.
16  Q: But other patients? Is that consistent with what
17  other patients reported to you in connection with their use
18  of Vioxx?
19  MR. NABERS: Objection to the form.
20  A: Not necessarily, no. It depends on the patient.
21  Some patients did very well with Vioxx, and it had been the
22  best remedy for their pain and arthritis. But not everyone
23  felt Vioxx was a effective pain reliever for them.
24  Q: (By Mr. Krumholtz)  But based upon Mr. Mason's
25  testimony and your medical records, it suggests that Vioxx

## Olson-Fields, Karen 2006-07-27

| 170: | 1 | was effective in relieving Mr. Mason's pain? |
|---|---|---|
| | 2 | A: Yes. |
| | 3 | Q: Do you know or can you recall of any complaints |
| | 4 | that Mr. Mason made while he was on Vioxx? |
| | 5 | A: I can't recall any. |
| | 6 | MR. KRUMHOLTZ: I need to take a quick break. |
| | 7 | VIDEOGRAPHER: It's 52 minutes after 11 o'clock. |
| | 8 | We're going off the record. This is the end of Tape No. 2. |
| | 9 | (Lunch Recess.) |
| | 10 | VIDEOGRAPHER: It's 41 minutes after 12 o'clock. |
| | 11 | This is the beginning of Tape No. 3, and we're back on the |
| | 12 | record. |
| | 13 | Q:   (By Mr. Krumholtz)  Ms. Olson, we're back from a |
| | 14 | break for lunch. When did you find out that Mr. Mason was |
| | 15 | suing Merck? |
| | 16 | A: Within the last couple months, when I was told |
| | 17 | about these proceedings. |
| | 18 | Q: Mr. Mason never approached you and asked you your |
| | 19 | opinion about the extent to which Vioxx contributed or did |
| | 20 | not contribute to his heart attack? |
| | 21 | A: I don't recall that he did. |
| | 22 | Q: Okay. And I noticed -- I think you said earlier |
| | 23 | that you hadn't seen Mr. Mason in a while, but maybe -- I |
| | 24 | don't recall exactly what you said. Can you remind me -- |
| | 25 | A: Yeah. |
| 171: | 1 | Q: -- the last time you saw him? |
| | 2 | A: Actually, it was a year ago. It was June of '05, |
| | 3 | so I had not seen him in a visit since then. |
| | 4 | Q: And then what was the visit before that? |
| | 5 | A: The June of -- oh, before that? That would have |
| | 6 | been -- his last visit would have been September 10th of '02. |
| | 7 | Q: Okay. So from September 10 of 2002 up until June |
| | 8 | of 2005 you had not seen Mr. Mason, true? |
| | 9 | A: True. |
| | 10 | Q: You had not treated Mr. Mason? |
| | 11 | A: I didn't have a visit with him or see him for any |
| | 12 | other health problems during that time span. |
| | 13 | Q: Okay. And did Dr. Vogeler have visits with him |
| | 14 | from time to time during that time frame? |
| | 15 | A: Yes. |
| | 16 | Q: Okay. So -- and you understand he's been under the |
| | 17 | care of a cardiologist since his heart attack? |
| | 18 | A: Okay. |
| | 19 | Q: Do you understand that or -- |
| | 20 | A: I would assume that. |
| | 21 | Q: Okay. |
| | 22 | A: Yes. |
| | 23 | Q: Regardless, I assume you would defer to a |
| | 24 | cardiologist regarding his prognosis? |
| | 25 | A: Yes. |

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4                                                    172

172:  1   Q:  And you would defer to his cardiologist in terms of
      2   what activities he can participate in or not participate in
      3   in light of his heart attack?
      4   A:  Yes.
      5   Q:  And likewise, you would defer to his cardiologist
      6   in terms of any contributing factors that may have led to
      7   Mr. Mason's heart attack?
      8   A:  Do you mean if he came and talked to me now about
      9   it?
      10  Q:  No. I'm just saying --
      11  A:  About his heart attack or --
      12  Q:  -- you understand Mr. Mason's cardiologists have
      13  treated him now?
      14  A:  Yes.
      15  Q:  And have been following him since the heart attack?
      16  A:  Yes.
      17  Q:  And you understand that they have had an
      18  opportunity to visit with him, true?
      19  A:  I would assume that.
      20  Q:  Yeah, just in the normal course?
      21  A:  Yes, normal course, yes, he would be followed by a
      22  cardiologist.
      23  Q:  And prepare differential diagnoses and things of
      24  that nature if necessary?
      25  A:  Well, from -- his post-MI care would be -- that's
173:  1   what he would be receiving from a cardiologist, is managing
      2   has care, his cardiac care from then on since he did have an
      3   event.
      4   Q:  And you would defer to them in terms of any
      5   potential contributing causes to his heart attack, I assume,
      6   as specialists in the field of cardiology?
      7   A:  I would suggest he go over that with a
      8   cardiologist. I could offer an opinion. You know, it's not
      9   like I can't offer an opinion, but I think anything after a
      10  patient's had a heart attack should be, you know, at least
      11  followed once a year by a cardiologist.
      12  I see patients who have had heart attacks for other
      13  things and manage that -- you know, give them refills on
      14  their blood pressure medicines and things.
      15  Q:  But you would agree a cardiologist, someone who
      16  specializes in heart issues, is the best person to speak to
      17  causation issues?
      18  A:  Well, you can go over with a patient the usual risk
      19  factors associated with a heart attack. In his particular
      20  case, he could discuss that with a cardiologist, what -- if
      21  the cardiologist had an opinion of what might have
      22  precipitated.
      23  Q:  You bring up a fair point. I wanted to ask you
      24  about that. Have you ever heard of silent heart attacks or
      25  silent --

## Olson-Fields, Karen 2006-07-27

174:
1   A: Yes.
2   Q: -- MIs? What are those?
3   A: Generally a patient had a heart attack at some
4   point, and it wasn't identified at the time as a heart
5   attack.
6   Q: Are there also heart attacks that occur in folks
7   who don't, before their heart attack, have any signs or
8   symptoms?
9   A: I can't answer that. I would have to ask a
10  cardiologist that.
11  Q: Okay. So you would defer to a cardiologist in that
12  regard?
13  A: Well, if a patient says to me, I have never had
14  chest pain, I never had this, never had that, I had never had
15  an episode of chest tightness, I -- you know, yet they show
16  on diagnostics that they had had an MI, I wouldn't understand
17  that. So I would have to say, defer to the cardiologist for
18  that question.
19  Q: Have you seen patients in your practice who have
20  MIs or heart attacks who haven't taken Vioxx and who don't
21  have any risk factors?
22  A: I could not think of a patient off the top of my
23  head who had no risk factors and had a heart attack, but I
24  would have to go through patient records. I see so many
25  people that I can't say that for a hundred percent certainty.

175:
1   Q: You do read The Medical Letter, true?
2   A: The Medical Letter?
3   Q: Yes.
4   A: Yeah, not every month but frequently.
5   Q: What do you mean by frequently?
6   A: I don't even know. I think it comes out quarterly,
7   and I don't get the prescription -- the subscription.
8   Dr. Vogeler gets the subscription to that, and I burn that off
9   him when I get an opportunity.
10  Q: Okay. So you read the subscriptions that he
11  receives but after the fact?
12  A: After he receives the prescription?
13  Q: After he receives them and --
14  A: Yeah. He reads them first, and then I borrow them
15  or -- you know.
16  Q: Okay. And so you have kept up with the medical
17  literature, I guess, to the point where you know that people
18  can have absolutely no risk factors and have a heart attack?
19  MR. NABERS: Objection to the form.
20  Q: (By Mr. Krumholtz) True?
21  A: I would have to -- I would have to look into that
22  myself.
23  Q: You don't know that?
24  A: I don't know that as common knowledge, not
25  necessarily.

## Olson-Fields, Karen 2006-07-27

| Olson-Fields DA PC on 10-4 | 176 |

```
176:    1    Q:  You don't know that as a nurse practitioner?
        2    A:  Nurse practitioner, I think it's uncommon for
        3    patients to have heart attacks with no risk factors. I would
        4    be surprised at that, and I would be curious to look at
        5    literature on that.
        6    Q:  You would be surprised that patients may have no
        7    risk factors and yet have heart attacks?
        8    A:  Yeah. That would surprise me, and I would be
        9    interested in investigating that.
       10    Q:  But regardless, what you do know is that when you
       11    do have risk factors, it can significantly increase the risk
       12    of heart attacks?
       13    MR. NABERS:  Objection to the form.
       14    A:  Actually, it depends on how many risk factors and
       15    what risk factors, but yes, I know risk factors contribute to
       16    coronary artery disease. And the end point of that or the
       17    worst scenario of having coronary artery disease is an MI.
       18    Q:  (By Mr. Krumholtz)  And there are several risk
       19    factors that are known to increase the risk of cardiovascular
       20    disease and heart attacks, true?
       21    A:  Yes.
       22    Q:  Obesity is one of those?
       23    A:  Yes.
       24    Q:  A family history of heart disease or myocardial
       25    infarctions is also one of those?
177:    1    A:  Yes.
        2    Q:  Stress is also one of those?
        3    A:  Again, I would say that can be -- that is not in
        4    the list of -- when I go over that with a patient, things I
        5    talk about are obesity, smoking, family history, stress in
        6    certain situations. I think we're all under stress, and I
        7    think there is the whole thing about the Type A versus Type B
        8    personality.
        9    Q:  Unusual stress?
       10    A:  Unusual duress stress and perhaps a person who has
       11    this Type A personality they're talking about, a lot of
       12    anger.
       13    Q:  Anxiety?
       14    A:  Lots of anxiety, lots of anger, lots of poor coping
       15    mechanisms. There's a lot that goes into you saying that
       16    stress is a risk factor. I think that's a big -- kind of a
       17    bigger can of worms.
       18    Q:  And high cholesterol can speed up atherosclerosis
       19    or plaque buildup?
       20    A:  Yes.
       21    Q:  And lead to heart attacks?
       22    A:  Yes.
       23    Q:  And of course, hypertension can speed up
       24    atherosclerosis or plaque buildup?
       25    A:  Well, would you --
```

*overrule* (handwritten)

## Olson-Fields, Karen 2006-07-27

| | |
|---|---|
| Olson-Fields DA PC on 10-4 | 178 |

```
178:  1    Q: Let me rephrase that.
      2    A: Yeah, rephrase that.
      3    Q: I think it's the same issue we have had before.
      4    Hypertension can increase the likelihood of a myocardial
      5    infarction or heart attack?
      6    A: Yes.
      7    Q:  Do you know whether depression can speed up
      8    cardiovascular disease?
      9    A:  There are a few vague studies that suggest that
      10   untreated depression and anxiety over a lifetime can
      11   contribute. That's not considered general knowledge in the
      12   medical community, but I know of a physician who speaks on
      13   this topic, and he has quoted some smaller studies that
      14   suggest that.
      15   Q: And Mr. Mason is significantly overweight, true?
      16   MR. NABERS:  Objection to the form.
      17   A:  I -- you have to understand that I treat lots of
      18   obese patients, and so you really have to clarify what you
      19   mean by significantly overweight.
      20   Q:  (By Mr. Krumholtz)  I'm sorry. But you would agree
      21   that he's overweight?
      22   A: Yes.
      23   Q: Okay. And you do understand that that puts him at
      24   an increased risk for cardiovascular disease?
      25   A: Yes.
179:  1    Q: And heart attacks?
      2    A: Yes.
      3    Q: And likewise, if he has a family history of heart
      4    disease or heart attacks, that would put him at an increased
      5    risk, true?
      6    MR. NABERS:  Objection to the form.
      7    A:  Family history of heart attacks I consider a risk
      8    factor in a direct relative, parent more so or brother and
      9    sister.
      10   MR. KRUMHOLTZ:  I'm sorry. Could you repeat that
      11   last answer? I was looking for a document.
      12   (Record read.)
      13   Q:  (By Mr. Krumholtz)  Okay. So if a sister has a
      14   heart attack at age 63, that would be a family history that
      15   you would be concerned about?
      16   A: Yes.
      17   Q:  And that would indicate that that patient who had a
      18   sister who had a heart attack at that age would be at an
      19   increased risk for heart disease?
      20   MR. NABERS:  Objection to the form.
      21   A:  I would want to investigate a patient's other risk
      22   factors if they have a direct relative who has had a heart
      23   attack, especially at a younger age.
      24   Q:  (By Mr. Krumholtz)  Can you turn to your September
      25   17, 2004 record? And is this Dr. Vogeler's writing that's
```

(Handwritten annotations in right margin:)

Re: 178:7 - 178:14
Def Obj: Foundation

The witness has provided her best answer to Def counsel questions.
PLAINTIFF Response

Re: 178:15
Def Obj: No Answer designated

Answer lines 17-19 should be included.
PLAINTIFF Response

Re: 179:20
Def Obj: Remove objection
I agree
PLAINtiFF Response

## Olson-Fields, Karen 2006-07-27

180:
1   contained in part on September 17.
2   A: Yes.
3   Q: Do you find Dr. Vogeler to be a reliable source of
4   medical information?
5   A: Yes.
6   MR. KRUMHOLTZ:  What exhibit number are we on? Do
7   you know?
8   MR. NABERS:  Thirteen.
9   MR. KRUMHOLTZ:  Thank you. Exhibit next is 13?
10  MR. NABERS:  Yep.
11  Q:   (By Mr. Krumholtz)  I'm going to hand you what I've
12  marked as Exhibit 13, and that's a copy of the September 17,
13  2004 history and physical for Mr. Mason, true?
14  A: Sure.
15  Q: And if you turn the page, under physical exam, it
16  indicates that Mr. Mason is a 62-year-old person. True?
17  A: Yeah.
18  Q: And it indicates he's five-ten; is that right?
19  A: Yes.
20  Q: Indicates he's 231.8 pounds?
21  A: Yes.
22  Q: And it says, 62-year-old, obese white male, true?
23  Underneath his weight.
24  A: It does seem to say obese.
25  Q: And is that -- do you recognize that as

181:
1   Dr. Vogeler's handwriting?
2   A: Yeah. I can't read what's right of obese. WA or I
3   don't know.
4   Q: But regardless, it does say 62-year-old, obese?
5   A: Yes.
6   Q: And so your understanding in reading Mr. Mason's
7   chart would be that Dr. Vogeler on that date thought that
8   Mr. Mason was obese?
9   A: That's what's written there.
10  Q: And that would be a significant risk factor for
11  cardiovascular disease?
12  MR. NABERS:  Objection to the form, asked and
13  answered.
14  Q:   (By Mr. Krumholtz)  You can answer.
15  A: Obesity is considered a risk factor for coronary
16  disease.
17  Q: And heart attacks, true?
18  A: Yes.
19  Q: And would you want to monitor someone like
20  Mr. Mason for chest pain?
21  A: Yes.
22  Q: And would it be a concern in connection with any
23  cardiovascular issues?
24  A: Do you mean after this particular visit?
25  Q: Or just generally speaking. I'm just asking,

**Olson-Fields, Karen 2006-07-27**

182:
1  before July of 2003, for any patient, that is, would you want
2  to monitor chest pain?
3  A: Well, first of all, you are going to need to find
4  the diagnosis of what their chest pain is, and then after you
5  know what the etiology of their chest pain is, then you do
6  the appropriate follow-up.
7  Q: But many times you can't determine what the cause
8  of chest pain is, true?
9  A: Well, I think you find the cause of the chest pain,
10  and you determine it.
11  **Q: So the standard of care would be that if someone**
12  **has chest tightness or chest pain, that you determine**
13  **ultimately what the cause is?**
14  **A: Yes. You rule out — clearly chest pain, in my**
15  **eyes, you need to rule out cardiac primarily, and then --**
16  Q: How do you rule that out?
17  A: Stress test, Cardiolite.
18  Q: Okay. So any time someone presents with chest
19  tightness or chest pain, you recommend a stress test or a
20  Cardiolite test?
21  A: I'd start with a EKG, possibly run cardiac enzymes,
22  and depending on that and risk factors, whether you would do
23  a stress test, Cardiolite or cardiac workup, and what the
24  cardiac workup would be.
25  Q: Have you seen patients of yours who have a similar

183:
1  health history prior to July 2003 to Mr. Mason have heart
2  attacks?
3  MR. NABERS: Objection to the form.
4  A: Could you be more specific? Restate it or say it
5  again.
6  **Q: (By Mr. Krumholtz) Okay. Have you seen patients**
7  **of yours with health histories that are similar to**
8  **Mr. Mason's prior to July of 2003 have heart attacks?**
9  MR. NABERS: Objection to the form.
10  **A: It's a pretty broad question. So you mean back**
11  **pain, anxiety, depression?**
12  **Q: (By Mr. Krumholtz) Obesity.**
13  **A: Obesity. I have seen patients or known patients to**
14  **have heart attacks who have risk factors, including obesity.**
15  **Q: It's not surprising to you when that occurs?**
16  MR. NABERS: Objection to the form.
17  **A: Well, if they have got multiple risk factors, it's**
18  **not surprising to me.**
19  Q: (By Mr. Krumholtz) And so it wouldn't be
20  surprising to you in connection with Mr. Mason, regardless of
21  whether he was taking Vioxx?
22  MR. NABERS: Objection to the form.
23  A: Well, it would be surprising to me if a patient who
24  had studies and tests done, they all seemed fine, had a heart
25  attack.

Printed: 10/4/2006   3:16:27PM

*[Handwritten: Overruled]*

*[Handwritten notes:]*
Re: 182:19 - 183:25
Def Obj: speculation;
hypothetical question

Re: 183:22 - 185:22
Def obj: remove   OK
objection

PLAINTIFF RESPONSE
Again def counsel is object to these same
questions b/c they don't like the answer and
its improper. The witness answers the questions
responsively with no speculation.

Overruled

## Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4                                                184

184:
1   Q:  (By Mr. Krumholtz)  I'll object as nonresponsive.
2   Mr. Mason had multiple risk factors, according to your
3   records, prior to his heart attack?
4   MR. NABERS: Objection to the form, misstates the
5   evidence.
6   A: I don't agree that he had multiple risk factors.
7   Q:  (By Mr. Krumholtz)  You don't think he had a family
8   history of heart attacks?
9   MR. NABERS: Objection to the form.
10  A: The documents that you and I have looked over, he
11  did not check heart attack there, so I'd have to go through
12  his entire chart if I am missing that.
13  Q:  (By Mr. Krumholtz)  I'm going to hand you what's
14  been marked as Deposition Exhibit 14. What is the
15  Intermountain Sleep Disorder Clinic?
16  A: I'm unsure of all the services they provide, but
17  most sleep clinics deal with sleep apnea, insomnia, and
18  probably do the diagnostics to come up with a diagnosis of
19  sleep apnea and then different -- insomnia, narcolepsy, those
20  type of disorders.
21  Q: And according to Exhibit 14 -- well, first of all,
22  this appears to be a questionnaire filled out by Mr. Mason in
23  connection with his visit to Intermountain Sleep Disorders
24  Clinic, true?
25  MR. NABERS: Objection to the form.

185:
1   A: This appears to be a form that Mr. Mason filled
2   out?
3   Q:  (By Mr. Krumholtz)  That's the question.
4   A: Well, I don't -- I'd have to look at his
5   handwriting. Is it signed by him somewhere?
6   Q: No, but you're welcome to look at handwriting if
7   that's helpful.
8   A: Okay. It looks like it could be his handwriting.
9   Q: And then if you turn to page 3 of Exhibit 14, do
10  you see where it asks about family history?
11  A: Third page?
12  Q: Yes.
13  A: Family history.
14  Q: And it says sisters. He has -- he had five?
15  A: Five sisters.
16  Q: And he has one sister who died at 63, according to
17  his handwriting, true?
18  MR. NABERS: Objection to the form.
19  A: Sisters, five, and then it says heart attack in
20  number one.
21  Q:  (By Mr. Krumholtz)  Actually, if you go up and look
22  at the chart, what it says is, age or age at death in
23  parenthesis.
24  A: Okay.
25  Q: True?

Printed: 10/4/2006  3:16:27PM

Re: 184:7 - 184:12
(ref obj) Foundation -
She has not reviewed
Mason's entire set of
medical records.
Plaintiff Response
The witness d/a
knew of any family
history based on her
medical records and
none is noted. Her
answer is accurate
and responsive.

Def. counsel is frustrated
by the answer b/c
he has a death certificate
of a Sister which was
obtained illegally +
in violation of HIPPA.

## Olson-Fields, Karen 2006-07-27

186:
1   A: Age or age at death. So --
2   Q: So what he has stated here is, he has a sister who
3   died at 63, as indicated by the 63 in parenthesis.
4   A: Okay.
5   Q: Of a heart attack, true?
6   MR. NABERS:  Objection to the form.
7   A: That's what you're telling me.
8   Q:  (By Mr. Krumholtz)  Was that not how you interpret
9   the record?
10   MR. NABERS:  Objection to the form.
11   A: You know, I would actually have to -- you know,
12   there are numbers here. There's things in parenthesis. I
13   mean, I could say that that's likely what it means. This
14   isn't my form, so I don't know that I could really make that
15   kind of statement. That's what it appears.
16   Q:  (By Mr. Krumholtz)  Is that how you would interpret
17   it if it was in your medical records?
18   MR. NABERS:  Objection to the form.
19   A: Yes.
20   Q:  (By Mr. Krumholtz)  Assuming Mr. Mason has that
21   family history, together with his obesity, it's not
22   surprising to you that he would have a heart attack with
23   that -- with those multiple risk factors, true?
24   MR. NABERS:  Objection to the form, misstates
25   Mr. Mason's testimony.

187:
1   A: Well, Mr. Mason, his risk factors, looking back at
2   his whole record and what I would know at the time would be
3   that he's overweight. And then at some point he has one
4   relative that -- a direct relative, that had a heart attack.
5   Q: At age 63, true?
6   A: At age 63.
7   MR. NABERS:  Objection to the form.
8   A: If I am interpreting this correctly.
9   Q:  (By Mr. Krumholtz)  And his age is a risk factor,
10   true, given his gender?
11   A: Yes.
12   Q: Okay. And you had diagnosed him as having high
13   cholesterol. We talked about that, true?
14   MR. NABERS:  Objection to the form.
15   A: He had had high cholesterol, yes.
16   Q:  (By Mr. Krumholtz)  And with all that in mind, you
17   would consider that someone with multiple risk factors, true?
18   MR. NABERS:  Objection to the form.
19   A: Multiple being more than one, yes.
20   Q:  (By Mr. Krumholtz)  And you have seen people with
21   multiple risk factors have heart attacks?
22   A: Yes.
23   Q: That's not unusual in your practice?
24   MR. NABERS:  Objection to the form.
25   A: Well, that's loaded question because if I have

## Olson-Fields, Karen 2006-07-27

188:

1  patients with multiple risk factors, I'm going to remove
2  them. So it's not common in my practice for my patients to
3  have heart attacks.
4  Q:   (By Mr. Krumholtz)  Fair enough. I'm just saying
5  that it's not unusual for folks, maybe not in your practice,
6  but folks with multiple risks factors to have heart attacks?
7  MR. NABERS:  Objection to the form.
8  A:  Depending on -- yeah, if you are talking about the
9  American population, I think multiple risk factors can lead
10  to heart attacks.
11  Q:   (By Mr. Krumholtz)  And pose a greater risk for
12  those patients?
13  A:  Yes.
14  Q:  In connection with heart attacks?
15  A:  Yes.
16  Q: And as a result, you can't rule out Mr. Mason's
17  multiple risk factors as a probable cause of his heart
18  attack?
19  MR. NABERS:  Objection to the form.
20  A: Well, I don't think it's my place to find the cause
21  of Mr. Mason's heart attack.
22  Q:   (By Mr. Krumholtz)  So you're not going to be
23  opining in connection with this deposition as to the cause of
24  Mr. Mason's heart attack?
25  A: No. That's not -- I don't think that's my role.

189:

1  Q: Okay. Have you ever placed any restrictions or
2  limitations on Mr. Mason's activities?
3  MR. NABERS:  Objection.
4  A: I don't recall ever doing that. I'd have to look
5  at the chart, and if it's not in the chart, then I'd have to
6  say I don't remember.
7  Q:   (By Mr. Krumholtz)  But you would note that in the
8  chart if you placed him on any restrictions?
9  A: I would have noted it if it would have been a
10  significant restriction and I might have written a note. For
11  example, a work note, can't lift or do this or that.
12  Q: Why don't we go ahead and look at your chart, if
13  you don't mind.
14  A: Okay.
15  Q: And determine if you ever placed Mr. Mason on any
16  sort of work-related or nonwork-related restrictions in terms
17  of the activities he could perform?
18  MR. NABERS:  And you're just asking her at any
19  point in time, right?
20  A: In any of my visits with Mr. Mason did I ever
21  specifically limit his activities?
22  Q:   (By Mr. Krumholtz)  Yes.
23  A: Okay. There is no notation that I can see that I
24  specifically limited Mr. Mason's activity.
25  Q: Before or after his heart attack, true?

## Olson-Fields, Karen 2006-07-27

| Olson-Fields DA PC on 10-4 | 190 |
|---|---|

190:
1  VIDEOGRAPHER: Mr. Krumholtz.
2  Q:  (By Mr. Krumholtz)  Before or after his heart
3  attack, true?
4  A: Yeah. There is no notation anywhere in the chart
5  of any visits that I saw Mr. Mason of me stating in the chart
6  that I limited his activity.
7  Q:  (By Mr. Krumholtz)  Now, did you ever refer
8  Mr. Mason to any sort of psychologist after his heart attack?
9  A: I don't think I saw him. Besides the knee, swollen
10  knee, I don't think that we had a conversation about a
11  psychologist. At least I'm not seeing that in the chart.
12  Q: So you never referred him to a psychologist?
13  A: Not directly. I mean, if he had asked me off --
14  you know, sometimes patients passing you in the office, do
15  you know a good psychologist. I believe in counseling, but I
16  don't recall specifically referring him to a psychologist.
17  But again, you know, sometimes patients come in
18  with their other people. They ask me a quick question in
19  some passing and so I -- my practice would be to, if I
20  thought it was appropriate for that particular patient, I'm
21  not adverse to psychologists. But I don't -- I can't recall
22  Mr. Mason specifically as a patient.
23  Q: Just so the record is clear, you can't recall ever
24  referring Mr. Mason to a psychologist or psychiatrist, true?
25  A: True.

191:
1  Q: And your records don't indicate that you ever
2  referred Mr. Mason to a psychologist or psychiatrist, true?
3  A: True.
4  Q: Okay. And could you take a look at your June 2005
5  record that you mentioned?
6  A: Yes.
7  Q: First of all, does he mention anything in that
8  regard that suggests he was having some sort of cardiac
9  issue?
10  A: In the June 10th of '05?
11  Q: Visit.
12  A: Visit? No.
13  Q: What was he coming to you complaining about?
14  A: Both knees painful for three to four months. He
15  had a lump in his left eye that was itchy and red.
16  Q: Okay. And then what does it say under S? Is that
17  symptoms?
18  A: Subjective.
19  Q: Subjective. I'm sorry. What's it say under that?
20  A: Takes aspirin, ASA, BP meds, and then worse with
21  driving, kneeling, stiff, achy.
22  Q: And do you know what blood pressure medications
23  he's been prescribed?
24  A: I can find out by looking at his chart.
25  Q: Please do.

## Olson-Fields, Karen 2006-07-27

192:  1  A: Okay. We have got Norvasc, Toprol. That looks
       2  like the most current record from our chart here.
       3  Q: Okay. And what he is coming to you for is pain in
       4  connection with both of his knees; is that right?
       5  A: He -- yeah. It sounds like his knees have been
       6  painful for three to four months without having an jury.
       7  Q: And can that -- and what does that indicate to you
       8  as a nurse practitioner?
       9  A: Well, maybe some kind of overuse injury the
      10  patient's not aware of. Could be some arthritis changes.
      11  Those are things I would think of initially.
      12  Q: Are those the sorts of things that can limit your
      13  ability to perform certain activities?
      14  A: Yes.
      15  MR. NABERS: Objection to the form.
      16  Q:  (By Mr. Krumholtz)  What sort of limitations might
      17  a patient have who has these sorts of problems?
      18  MR. NABERS: Objection to the form.
      19  A: Well, it depends on the severity. It depends on
      20  the diagnosis. Obviously, if a patient has sore knees, I'm
      21  going to tell them not to jog on asphalt.
      22  Q: It says painful, does it not? It doesn't say just
      23  discomfort.
      24  MR. NABERS: Objection to the form.
      25  A: Painful.
193:  1  Q:  (By Mr. Krumholtz)  Do you see that?
       2  A: Yes.
       3  Q: Okay. And what is your diagnosis?
       4  A: Knee effusion.
       5  Q: And is that swelling?
       6  A: It's -- yeah, it's swelling within the joint of the
       7  knee.
       8  Q: And can that be quite painful?
       9  A: I have never had that, but patients say it can be
      10  painful. Again, there's a -- different levels of pain,
      11  depending on how bad the effusion is.
      12  Q: And how can we determine from your records how
      13  significant his pain was that he reported?
      14  A: Well, you can assume that he's in enough discomfort
      15  to come in and get it taken a look at. I didn't do a number,
      16  one to ten, but the patient states his knees are painful.
      17  And it prompted him to do a visit.
      18  Q: It also prompted you to prescribe Mr. Mason
      19  Celebrex 12 days later, true?
      20  A: Well, that's what it says. 6-22 of '05, medical
      21  assistant wrote in here Celebrex per Karen.
      22  Q: And that would be you?
      23  A: That would be me.
      24  Q: And you prescribed Celebrex 200 milligrams, and
      25  what does that say beside that?

Printed: 10/4/2006  3:16:27PM

## Olson-Fields, Karen 2006-07-27

194: 1    A:  One POBID.
2    Q:  What does that mean?
3    A:  Twice a day.
4    Q:  And then again on July 5th of 2005, there's another
5    entry for Celebrex 200 milligrams twice a day. Do you see
6    that?
7    A:  Yes.
8    Q:  And so it was significant enough pain that he came
9    to you, first of all?
10   A:  Yes.
11   Q:  And then he reported that it was painful for him,
12   true?
13   A:  True.
14   Q:  He had inflammation, true?
15   A:  True.
16   Q:  Which you know can be a sign of discomfort and
17   pain?
18   A:  True.
19   Q:  And he was prescribed a COX-2 inhibitor in
20   connection with that pain?
21   A:  Yes.
22   Q:  On two different occasions?
23   A:  Yes.
24   Q:  Once in June and once in July?
25   A:  Yes.

195: 1    Q:  And how many refills did he receive in connection
2    with the Celebrex that was prescribed in July?
3    A:  What it states on 7-5 of '05 is that he was
4    prescribed three refills.
5    Q:  And whose initials are those next to that entry?
6    A:  Medical assistant, Maryann Schultz.
7    Q:  And she's reliable in terms of a source of
8    information for you?
9    A:  She's a reliable medical assistant.
10   Q:  Okay. So we can be assured that that's indeed
11   true?
12   A:  That she called that medicine in and -- yes.
13   Q:  And under what circumstances would she call the
14   medicine in? What would prompt her to do that normally?
15   A:  If a pharmacy had called asking for refills.
16   Q:  And what would prompt a pharmacy to call asking for
17   refills?
18   A:  If the patient asked for refills.
19   Q:  So this would indicate that Mr. Mason was asking
20   for refills of Celebrex on not one or two but on three
21   different occasions?
22   MR. NABERS:  Objection to the form.
23   A:  You could presume that.
24   Q:   (By Mr. Krumboltz)  Okay. That's what you would
25   presume in looking at your own records?

## Olson-Fields, Karen 2006-07-27

| 196: | | |
|---|---|---|
| | 1 | MR. NABERS:  Objection to the form. |
| | 2 | A:  That's what you would presume. |
| | 3 | Q:   (By Mr. Krumholtz)  And then if you could go to |
| | 4 | your October 18, 2005 record. |
| | 5 | A:  Yes. |
| | 6 | Q:  And is that a visit, I assume, that Dr. Vogeler |
| | 7 | oversaw? |
| | 8 | A:  October 18th of '05? |
| | 9 | Q:  Yes. |
| | 10 | A:  That was a visit of Dr. Vogeler. |
| | 11 | Q:  Okay. So Mr. Mason came in to see Dr. Vogeler? |
| | 12 | A:  Yes, and have a physical, complete physical. |
| | 13 | Q:  Okay. And he has various items listed in his |
| | 14 | October 18, 2005 record, true? |
| | 15 | A:  Yes. |
| | 16 | Q:  One of those things is coronary artery disease? |
| | 17 | A:  Yes. |
| | 18 | Q:  One is increased lipids? |
| | 19 | A:  Yes. |
| | 20 | Q:  Which is another way of saying high cholesterol, |
| | 21 | true? |
| | 22 | A:  True. |
| | 23 | Q:  It could also mean high triglycerides? |
| | 24 | A:  Yes. |
| | 25 | Q:  And it talks about a history of GIRD. Do you see |
| 197: | 1 | that? |
| | 2 | A:  Yes. |
| | 3 | Q:  By the way, in patients with GIRD, is that one of |
| | 4 | those signs or symptoms where it would be important to have |
| | 5 | medications that don't impact the GI system or the digestive |
| | 6 | tract? |
| | 7 | A:  Yes, or if you used medicines that could impact |
| | 8 | them, you would want to do an adjunct medication to protect. |
| | 9 | Q:  But it's nice as a medical practitioner to have |
| | 10 | medications that you can use that have -- that have less risk |
| | 11 | when it comes to GI tracts for patients who have GIRD? |
| | 12 | A:  Yes. |
| | 13 | Q:  And then it says something below refill. What does |
| | 14 | that say? Can you read it? |
| | 15 | A:  Refill meds but change Norvasc 5 milligrams. I'm |
| | 16 | assuming he meant to Toprol Excel 50 for tremor, blood |
| | 17 | pressure and post-MI. |
| | 18 | Q:  Okay. So is that blood pressure medication that |
| | 19 | has been changed for Mr. Mason? |
| | 20 | A:  Well, what I'm assuming Dr. Vogeler was doing here |
| | 21 | is that he wanted to treat the tremor as well, and so he |
| | 22 | chose a medication that would cover tremor, blood pressure, |
| | 23 | and cardiac protection after post-MI. |
| | 24 | Q:  And then it says continue Zocor 40 milligrams. Do |
| | 25 | you see that? |

## Olson-Fields, Karen 2006-07-27

| 198: | 1 | A: Yes. |
|---|---|---|
| | 2 | Q: And Zocor is a cholesterol-lowering drug, true? |
| | 3 | A: True. |
| | 4 | Q: And so he was being treated for his high |
| | 5 | cholesterol, true, in October of 2005? |
| | 6 | A: When you read, continue Zocor 40, that would |
| | 7 | suggest that continuing means he had been being treated for |
| | 8 | his high cholesterol. |
| | 9 | Q: And he was -- that was continuing, given his high |
| | 10 | lipids that is indicated in that record? |
| | 11 | MR. NABERS: Objection to the form. |
| | 12 | A: At this visit the diagnosis said high lipids, so |
| | 13 | yes, then the Zocor would be being used to treat the lipid, |
| | 14 | high lipid panel. |
| | 15 | Q: (By Mr. Krumholtz) I assume that you have |
| | 16 | performed no objective testing on Mr. Mason to determine what |
| | 17 | activities he can perform or participate in after his heart |
| | 18 | attack. |
| | 19 | A: I don't recall doing any testing. |
| | 20 | Q: You understand that cardiologists do perform |
| | 21 | testing of that nature? |
| | 22 | A: No. I don't believe I am clear what you mean. |
| | 23 | Could you describe what sort of testing? Are we talking |
| | 24 | orthopedic testing? Are we talking exercise tolerance? |
| | 25 | Q: Functional work load testing. |
| 199: | 1 | A: Functional work load testing, okay. |
| | 2 | Q: Are you aware that cardiologists perform that? |
| | 3 | A: No. |
| | 4 | Q: Okay. Are you aware they perform Bruce protocols? |
| | 5 | A: Yes. |
| | 6 | Q: Are you aware that they perform Cardiolite |
| | 7 | perfusion studies, including stress tests? |
| | 8 | A: Yes. |
| | 9 | Q: Okay. And you understand that that information, |
| | 10 | taken together with other information that cardiologists |
| | 11 | collect, can allow them to determine what physical activities |
| | 12 | a particular patient can participate in? |
| | 13 | A: It sounds reasonable. |
| | 14 | Q: Okay. That's your understanding? |
| | 15 | A: That sounds reasonable. I -- again, I would |
| | 16 | clarify that with a friendly neighborhood cardiologist but -- |
| | 17 | Q: Would you defer to a cardiologist as to Mr. Mason's |
| | 18 | prognosis since his heart attack from a cardiology |
| | 19 | perspective? |
| | 20 | A: Yes. |
| | 21 | MR. KRUMHOLTZ: Let's go off the record for just a |
| | 22 | few minutes. |
| | 23 | VIDEOGRAPHER: It's 17 minutes after one o'clock. |
| | 24 | We're going off the record. |
| | 25 | (Recess.) |

## Olson-Fields, Karen 2006-07-27

200:  1    VIDEOGRAPHER: It's 30 minutes after one o'clock.
      2    We're back on the record.
      3    Q:  (By Mr. Krumholtz)  Ms. Olson, I wanted to talk to
      4    you a little bit about any meetings that you might have had
      5    with any counsel in connection with this litigation prior to
      6    today.
      7    A: For example, anyone this room?
      8    Q: Correct.
      9    A: I have met with --
      10   MR. NABERS: Mr. Nabers.
      11   A: -- Mr. Nabers and Glenda asking me if I would do
      12   the deposition and again telling me what it entailed.
      13   Q:  (By Mr. Krumholtz)  How many meetings in person
      14   have you had with Mr. Nabers and Glenda, his assistant?
      15   A: Two.
      16   Q: And do you recall, was Dr. Vogeler in the room with
      17   you?
      18   A: He had stopped in to introduce us initially, and
      19   then no, I don't believe he was.
      20   Q: How long was the -- or let me ask you this. When
      21   was the first meeting approximately?
      22   A: A month or so?
      23   Q: Ago?
      24   A: I think, yeah.
      25   Q: And how long was that initial meeting with the
201:  1    plaintiff's counsel?
      2    A: Oh, short, 20 minutes because I was seeing patients
      3    in between. So it had to have been fairly short.
      4    Q: And when was your second meeting with Mr. Nabers
      5    and Glenda?
      6    A: A week or two ago, a month ago. I'd have to look
      7    at my -- I don't even know if I have it in my day planner
      8    but --
      9    Q: But sometime in the last couple months?
      10   A: Yeah, last two or three months.
      11   Q: So in the last two or three months you have met
      12   with plaintiff's counsel twice?
      13   A: Yes.
      14   Q: Once for about 20 minutes?
      15   A: Yes.
      16   Q: And then when -- for how long the second time?
      17   A: Probably about the same, 20 minutes, half hour.
      18   Q: And did you go over medical records of Mr. Mason?
      19   A: I don't think -- we certainly didn't have the --
      20   going over them, reviewing his medical records, no. In fact,
      21   I hadn't looked definitely in this older chart. I did look
      22   over my physical exam I did with Mr. Mason.
      23   Q: And then did -- what other, what topics were
      24   discussed, if not his medical records?
      25   A: What I would expect from a deposition, the time it

# Olson-Fields, Karen 2006-07-27

202:
1 would take, what the issue at hand was, who -- you know,
2 Merck versus Mr. Mason and what the -- what the controversy
3 is, what the questions are, and what my part in this is, was.
4 Q: And did they ask you any questions about your
5 opinions in connection with any of the subject matters they
6 talked to you about?
7 A: I was not asked the opinion of, do I think Vioxx
8 did this or that. I think we went over some things about
9 high cholesterol or different things like that and nothing
10 real -- I'm trying to think of specifics for you. I think
11 the real gist was of what, what the -- what this meeting is
12 about and, you know, what the issues are around Vioxx, its
13 safety and how it may or may not have affected Mr. Mason.
14 Q: And did you take any notes in connection with this
15 meeting?
16 A: I didn't take any notes, but I was given this.
17 Q: At the first meeting you were provided Exhibit 15?
18 A: Is this Exhibit 15? Oh, yes. I -- it was not the
19 first visit. I had asked some questions about the deposition
20 and about information. I had been asked if I had saved
21 documents about Vioxx from 1997 or whenever Vioxx was -- the
22 controversy.
23 And I had told Mr. Nabers that I did not save
24 literature about Vioxx. I didn't have -- I didn't have a
25 Vioxx file, and so I had asked questions about if there were
203:
1 copies of any things that I could read at a later date.
2 Q: Exhibit 15 contains all the documents and
3 literature that plaintiffs' counsel wanted to provide you in
4 advance of this deposition?
5 MR. NABERS: Objection to the form, calls for
6 speculation.
7 Q: (By Mr. Krumholtz) You can answer.
8 A: That -- you're telling me that's what this is?
9 Q: True?
10 MR. NABERS: Objection to the form.
11 A: I haven't --
12 Q: (By Mr. Krumholtz) You didn't identify those
13 documents in Exhibit 15 and ask for them. Actually,
14 Mr. Nabers sent them to you.
15 MR. NABERS: Objection to the form.
16 A: Actually, I had asked -- after Mr. Nabers asked me
17 if I had kept any information on Vioxx, I had -- I was
18 somewhat embarrassed that I hadn't. I had asked Dr. Vogeler
19 later if he had, and he didn't have very much information
20 either. And so I -- in preparation for a deposition, I --
21 obviously, I would like to come across as an educated person.
22 And I didn't -- so yes, I asked for --
23 You know, first I was asked if I had saved things
24 and I said no. And I did ask that if, is there anything
25 available that I might have gotten then that I could look

## Olson-Fields, Karen 2006-07-27

204:
1  over, and that's what I thought this was. I have not looked
2  in this book except one part because I asked Mr. Nabers about
3  the pharmaceutical reps themselves. For certain reasons I
4  was a bit angry at the whole Vioxx controversy. And I did
5  look at something that had been stated by drug reps.
6  And I was a bit -- and I had asked for that, you
7  know. I am very curious what pharmaceutical company reps say
8  I say, and so I did look at that in this book, and honestly,
9  I have intended to read all of this, and I didn't.
10  Q: But regardless, who chose the documents that are
11  contained in Exhibit 15?
12  MR. NABERS: Objection to the form, calls for
13  speculation.
14  Q:  (By Mr. Krumholtz)  Let me ask it a different way.
15  Did you choose the documents to place in Exhibit 15?
16  A: The individual documents, no, because I did not
17  remember what documents, if any, I had received from Merck.
18  Q: And who sent those documents to you?
19  A: This book was given to me by either Glenda or
20  Mr. Nabers.
21  Q: And what name is on the front of that notebook?
22  A: This notebook is in a binder that says, preprinted,
23  Williams, Blizzard and McCarthy.
24  Q: I assume you did not expect to get any internal
25  documents of Merck, as opposed to what you might have gotten

205:
1  in the medical literature?
2  MR. NABERS: Objection to the form.
3  A: I expected to get literature that would help me
4  remember some things about that time period when there had
5  been question whether Vioxx was safe, and then when Vioxx was
6  taken off the market, since I had not kept any literature
7  that I had been given by Merck reps or in the mail
8  supposedly.
9  Q:  (By Mr. Krumholtz)  Was it your hope that
10  Mr. Nabers would provide to you the -- all of the relevant
11  literature or at least the relevant literature that would
12  give both sides of the story?
13  A: Actually, again, me not reading this --
14  Q: Without regard to what he actually gave you, I'm
15  saying, was it your hope that he would give you both?
16  A: Repeat. I lost my focus.
17  Q: Was it your hope that Mr. Nabers would give you
18  studies on both sides of the equation as to whether or not,
19  for example, Vioxx can carry a risk of cardiovascular --
20  risks?
21  MR. NABERS: Objection to the form.
22  A: I wanted literature that I may have received in the
23  past. I don't feel my role is to decide the fate of Vioxx.
24  I feel my role is simply to provide information as a
25  practitioner of seeing this patient during that time. I

## Olson-Fields, Karen 2006-07-27

206:  1   wanted copies of what I supposedly received in the mail about
2   Vioxx. What I received in the mail about Vioxx is somewhat
3   different than the verbal information I got from
4   pharmaceutical reps, so I was interested in comparing that,
5   more so for my future relationship with pharmaceutical reps.
6   Q:   (By Mr. Krumholtz)  Have you spoken with anyone
7   other than Mr. Nabers or Glenda in connection with your
8   testimony today?
9   A: No. There was a nurse from I believe your office
10  who called me yesterday to ask me about the fee, and I have
11  spoken with Dr. Vogeler about just timing, when he is going
12  to give his deposition and when I am giving mine.
13  Q:  You haven't talked to Dr. Vogeler about the
14  substance of what went on in his deposition, I assume?
15  A:  Just overall. I asked him what I was in for today.
16  Q:  Okay. But nothing specific?
17  A:  How intense it was going to be. How -- you know,
18  these things are nerve racking, and -- but I didn't -- he
19  didn't go into detail.
20  MR. KRUMHOLTZ: Pass the witness.
21  MR. NABERS:  All right. In light of the fact that
22  we are scheduled to stop at two and it's about 1:43, and
23  since we have been going from about eight o'clock this
24  morning, I am going to -- obviously, we're going to have to
25  come back so that I get to ask my questions. I'm not going

207:  1   to try to start now with 15 minutes left.
2   MR. KRUMHOLTZ: You got 15, and that's it.
3   MR. NABERS:  Yeah. So we'll just try to work out a
4   new date that we can come back and finish.
5   MR. KRUMHOLTZ: Did we say anything about the 29th?
6   Was that unavailable?
7   MR. NABERS:  Yeah. We were talking earlier, and we
8   were going to ask you, you know, what day, you know, for us
9   to try to come back. I know, I guess Thursdays, you know,
10  primarily are the best. We were looking in the month of
11  August, and we -- 29th is actually a Tuesday.
12  VIDEOGRAPHER:  Should we go off the record?
13  MR. NABERS:  Oh, yeah, yeah, yeah.
14  VIDEOGRAPHER:  Sorry about that. Forty-one minutes
15  after one o'clock. We're going off the record.
16
17  (The deposition concluded at 1:41 p.m.)
18
19
20
21
22
23
24
25

# Olson-Fields, Karen 2006-07-27

Olson-Fields DA PC on 10-4

208

| 208: | 1 | Case: Mason v. Merck |
|---|---|---|
| | 2 | Reporter: Teri Hansen Cronenwett |
| | 3 | W I T N E S S   C E R T I F I C A T E |
| | 4 | I, KAREN OLSON-FIELDS, RN, FNP, HEREBY CERTIFY that |
| | 5 | I have read the foregoing testimony consisting of 204 pages, |
| | 6 | correct transcription of said testimony, with the exception |
| | 7 | therefor. |
| | 8 | Page Line Change/Correction Reason |

19  KAREN OLSON-FIELDS, RN, FNP
20  Subscribed and sworn to at
21  My commission expires:

23  NOTARY PUBLIC

| 209: | 1 | C E R T I F I C A T E |
|---|---|---|
| | 2 | STATE OF UTAH          ) |
| | 3 | THIS IS TO CERTIFY that the deposition of KAREN |
| | 4 | OLSON-FIELDS, RN, FNP was taken before me, Teri Hansen |
| | 5 | Cronenwett, Certified Realtime Reporter, Registered Merit |
| | 6 | Reporter, and Notary Public in and for the State of Utah. |
| | 7 | That the said witness was by me duly sworn to testify; |
| | 8 | that the testimony was reported by me in Stenotype, and |
| | 9 | thereafter transcribed by computer, and that a full, true, |
| | 10 | and correct transcription is set forth in the foregoing |
| | 11 | pages, numbered 4 through 207 inclusive. |
| | 12 | I further certify that the original transcript of the |
| | 13 | same was delivered to the witness for reading and signature |
| | 14 | before a Notary Public, and to be returned within 30 days of |
| | 15 | the date hereon. |
| | 16 | I further certify that I am not of kin or otherwise |
| | 17 | associated with any of the parties to said cause of action, |
| | 18 | and that I am not interested in the event thereof. |
| | 19 | WITNESS MY HAND and official seal at Salt Lake City, |
| | 20 | Utah, this 31st day of July, 2006. |
| | 21 | My commission expires: |

24  Teri Hansen Cronenwett, CRR, RMR

Printed: 10/4/2006   3:16:27PM