# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-2524 | * | |
| | * | MAGISTRATE |
| ANTHONY WAYNE DEDRICK, | * | JUDGE KNOWLES |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MOTION AND INCORPORATED MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") FOR ORDER EXCLUDING TESTIMONY OF IRA J. GELB, M.D., F.A.C.C.

### (EXPERT CHALLENGE NO. 1)

Plaintiff Anthony Wayne Dedrick suffered a non-fatal heart attack on January 8, 2003. Mr. Dedrick had *numerous* risk factors. These included a family history of heart disease and his own preexisting coronary artery disease. (Deposition of Anthony Dedrick ("Dedrick Dep.") at 101:4-111:6, attached hereto as Ex. A.) He smoked two packs of cigarettes every day for over 30 years and had diabetes, high blood pressure and high cholesterol. (*Id.* at 79:23-80:15, 118:14-119:3.) He was obese, did not exercise, did not maintain a healthy diet, was an alcoholic, and abused both cocaine and marijuana. (*Id.* at 81:6-82:19, 130:13-20, 150:15-151:17, 146:2-23.) In the face of these and other risk factors, Mr. Dedrick proffers Dr. Ira J. Gelb, a cardiologist, to

testify that, in his opinion, Mr. Dedrick's use of Vioxx® at 25 mg per day for six months accelerated the development, progression, and extent of Mr. Dedrick's coronary artery disease and significantly contributed to his heart attack.

Federal Rule of Evidence 702 and the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) require the exclusion of Dr. Gelb's causation opinions.  First, Dr. Gelb lacks the qualifications and experience necessary to opine on general or specific cause.  Dr. Gelb stopped practicing medicine years before Vioxx ever came on the market.  Dr. Gelb has no clinical experience with the drug, has never conducted any research or published on Vioxx or non-steroidal anti-inflammatory drugs (NSAIDs), and has not put in the study time necessary to overcome his lack of experience.  His testimony would duplicate that of plaintiff's many non-case-specific experts.

Second, he concedes that he lacks reliable clinical trial evidence that Vioxx can cause coronary artery disease if taken for six months at the 25-mg dose.  He also lacks reasonably certain proof of a mechanism by which Vioxx supposedly does so.

Third, even if Dr. Gelb could overcome the lack of proof that short-term usage can cause heart attacks and the absence of reliable proof of mechanism, Dr. Gelb has not come forward with any facts specific to Mr. Dedrick that affirmatively prove to a reasonable degree of medical certainty that Vioxx – as opposed to Mr. Dedrick's multiple preexisting risk factors – contributed in any way to Mr. Dedrick's heart attack.  Rather, Dr. Gelb relies entirely on his belief that Vioxx, in general, can cause cardiovascular problems.  A specific cause opinion, however, cannot reliably be based on the mere assertion of general cause (especially when general cause is itself unproven).

The Court should also exclude two of Dr. Gelb's other opinions:  (1) that Merck did not

accurately describe the cardiovascular effects of Vioxx to the medical community; and (2) that the Vioxx label failed to adequately warn of the cardiovascular risks associated with Vioxx.  As discussed below, Dr. Gelb is not qualified to testify to either opinion and instead has merely offered his own personal views on the subjects.  For these reasons, his opinions on these subjects are inadmissible under Federal Rule of Evidence 702 and *Daubert*.

## I.    LEGAL STANDARD.

To prove medical causation under Tennessee law, a plaintiff must present the testimony of a medical expert qualified to opine that the defendant's actions were a substantial contributing factor to the plaintiff's injuries.  *See Richardson v. GlaxoSmithKline*, 412 F. Supp. 2d 863, 869 (W.D. Tenn. 2006) (plaintiff failed to establish causation where plaintiff's treating physician opined that defendant manufacturer's antidepressant was one of seven contributing causes to plaintiff's suicidal conduct, but physician could not state that the drug was the "but-for" or proximate cause; manufacturer's motion for summary judgment was granted); *see also* RESTATEMENT (SECOND) OF TORTS § 431 (1965) ("The actor's negligent conduct is a legal cause of harm to another if . . . his conduct is a substantial factor in bringing about the harm . . . .").

Federal Rule of Evidence 702 governs the admissibility of expert testimony in this Court.  As a threshold matter, Rule 702 requires exclusion of testimony beyond a witness's area of expertise.  *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) (trial court properly excluded property appraisal testimony since witness not a licensed appraiser or real estate broker and lacked training or formal schooling in appraisal methods).  If the proponent of evidence proves that the offered testimony is within the expert's actual expertise, he or she must then establish that the expert testimony to be offered is based on sufficient facts or data and must "demonstrate that the expert's findings and conclusions are based on the scientific method, and,

therefore, are reliable." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

Determination of whether proposed expert testimony is reliable is governed by the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. at 589, and by Rule 702 as amended in the wake of that decision.  In *Daubert*, the Court made clear that district courts must act as gatekeepers to ensure that expert testimony is both relevant and reliable.  The Court identified the following non-exclusive factors a district court may consider in evaluating an expert's testimony in the course of carrying out its role as gatekeeper: (i) whether the expert's theory can be or has been tested; (ii) whether the theory has been subject to peer review and publication; (iii) the known or potential rate of error of a technique or theory when applied; (iv) the existence and maintenance of standards and controls; and (v) the theory or technique's degree of acceptance in the scientific community.  *Daubert*, 509 U.S. 593-94; *Moore*, 151 F.3d at 275; *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 605-06 (E.D. La. 2003).  In *Kumho Tire Co. v. Carmichael*, the Supreme Court further explained that the objective of the *Daubert* gatekeeping requirement is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. 137, 152 (1999).

In addition to the qualifications and reliability requirements of Federal Rule of Evidence 702 and *Daubert*, 509 U.S. at 589, expert testimony, like all evidence, must satisfy the relevant requirements of the Federal Rules of Evidence, including Rules 401 and 403.

## II.    THE COURT SHOULD EXCLUDE DR. GELB'S CAUSATION OPINIONS.

Under Tennessee law, Mr. Dedrick's claims require proof of "cause in fact" and "proximate cause."  *See, e.g., McClenahan v. Cooley*, 806 S.W.2d 767, 774 (Tenn. 1991)

(negligence); *Caldwell v. Ford Motor Co.*, 619 S.W.2d 534, 539 (Tenn. Ct. App. 1981) (strict liability). To prove causation and prevail on his claims, Mr. Dedrick must establish both general and specific causation. In other words, he must establish that using 25 mg per day of Vioxx for six months *can* cause a heart attack (general causation) and that, in this case, such use of Vioxx *did* cause Mr. Dedrick's heart attack (specific causation).

Mr. Dedrick proffers Dr. Gelb primarily as a specific causation expert, although Dr. Gelb also espouses general causation theories. Before Dr. Gelb can be permitted to testify about specific causation, however, Mr. Dedrick must first establish general causation. *See*, *e.g.*, *Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1211 (10th Cir. 2002); *Nat'l Bank of Commerce v. Associated Milk Producers, Inc.*, 22 F. Supp. 2d 942, 963 (E.D. Ark. 1998); *Wynacht v. Beckman Instruments, Inc.*, 113 F. Supp. 2d 1205 (E.D. Tenn. 2000); *Cavallo v. Star Enter.*, 892 F. Supp. 756 (E.D. Va. 1995), *aff'd in part*, *rev'd in part*, 100 F.3d 1150 (4th Cir. 1996); Restatement (Third) of Torts: Liability for Physical Harm § 28 cmt. c (Tentative Draft Nov. 3, 2003) ("[E]vidence of general causation is a prerequisite to proof of specific causation."); Saks *et al.*, Federal Judicial Center, ANNOTATED REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. 2004) ("Reference Manual on Scientific Evidence") at 637 (The "majority position" is that experts "must 'rule in' the substance, *i.e.*, show that it is capable of causing the harm under consideration in some people, before they will be permitted to 'rule out' other possible causes of the harm. This is the better rule."). Dr. Gelb cannot prove general causation, and he should not be allowed to try.

### A. Dr. Gelb Is Not Qualified To Opine On General Cause, And His Opinions Are Not Supported By Reliable Evidence.

Dr. Gelb's general cause opinions fail for several reasons. As a threshold matter, Dr. Gelb has neither the experience nor knowledge to opine on general causation. Moreover, even if

he were found qualified to do so, his own testimony makes clear that his general cause opinions are not supported by reliable scientific evidence.  Specifically, Dr. Gelb is unable to point to any reliable evidence that the use of Vioxx at the 25-mg dose for a period of six months is capable of causing a heart attack.   Additionally, he cannot identify, to a reasonable degree of medical certainty, the specific mechanism by which Vioxx supposedly caused Mr. Dedrick's heart attack, which is required under Fifth Circuit law.

### 1.       Dr. Gelb is not qualified to opine on the cardiovascular risks of Vioxx.

Dr. Gelb opines that Vioxx causes thrombosis, atherosclerosis, plaque rupture, and coronary vasoconstriction and may thereby cause heart attacks.  However, Dr. Gelb's opinions on these theories are not admissible because he lacks the qualifications to testify on these subjects.   Dr. Gelb has no pertinent clinical experience with Vioxx, no pertinent research experience with Vioxx (or any other NSAID), and, because of the relativity short amount of time he has studied the issues, he has no adequate basis upon which to opine as an expert as to the effects of Vioxx.

Dr. Gelb stopped practicing clinical cardiology in 1992.  (*See* Deposition of Ira J. Gelb, M.D., F.A.C.C. ("Gelb Dep.") at 23:23-25, attached hereto as Ex. B)  The last time Dr. Gelb prescribed a medicine was sometime before 1992.  (*See id.* at 24:13-18.)  In fact, Vioxx was not on the market while Dr. Gelb was in practice, and he has never prescribed Vioxx or any other COX-2 inhibitor or even taken one himself.  (*See id.* at 25:6-18.)

In addition to his lack of clinical experience with Vioxx and other COX-2s, Dr. Gelb lacks pertinent research experience as well.  Dr. Gelb has not published any studies or other papers on NSAIDs, Vioxx, COX-2 inhibitors, prostacyclin, prostaglandin, hypertension, atherogenesis, thrombogenesis, plaque rupture, or prostanoids.  (*See* Gelb Dep. at 35:9 - 36:14.)  Nor has he edited any articles dealing with Vioxx or COX-2 inhibitors.  (*See id.* at 28:18-23.)

Dr. Gelb simply is not qualified to provide expert testimony about the cardiovascular effects of Vioxx.  Moreover, his testimony would be cumulative of plaintiff's now familiar array of non-case-specific experts.  Dr. Gelb adds nothing to the debate on this subject.

> **2.     There is no scientifically reliable evidence that use of Vioxx at 25 mg for six months is capable of causing a heart attack.**

In pharmaceutical cases, the dose and duration at which a plaintiff is exposed to a drug are among the most critical facts in any causal analysis.  *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242-43 (11th Cir. 2005); *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1107 (8th Cir. 1996); *Allen v. Penn. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996).  Mr. Dedrick used a common therapeutic dosage of Vioxx (25 mg) for six months prior to his heart attack.  Mr. Dedrick cannot establish general causation simply by proving that exposure to Vioxx at some *other* dosage and duration may cause some adverse health effects.  Instead, he must offer scientifically reliable evidence that the use of 25 mg of Vioxx for a period of six months is capable of causing heart attacks.  As discussed in Merck's concurrently filed Memorandum In Support Of Motion To Exclude Expert Testimony That Short-Term Vioxx Use Increases Cardiovascular Risk, there is no scientifically reliable evidence that the use of Vioxx at this dosage and duration is capable of causing thrombotic cardiovascular events.  Merck incorporates that motion herein by reference.

Whether or not some other expert might have a reliable basis upon which to base a general cause opinion, Dr. Gelb does not.  He admitted at deposition that there is no clinical trial that shows a statistically significant increased risk for cardiovascular events for patients taking 25 mg of Vioxx for less than 18 months:

> Q:     Is there any clinical trial that shows a statistically significant increased risk for cardiovascular events for patients taking 25 milligrams of Vioxx for less than 18 months?

. . .

    A:    The answer is no, I'm not aware.

(Gelb Dep. at 328:8-18.)   Dr. Gelb further admitted that under no circumstances should

conclusions be based on statistically insignificant results:

> Q:    Well, are there circumstances where you rely on and draw
> scientific conclusions based on statistically insignificant
> results?
>
> A:    No, no.

(*Id.* at 275:18 - 276:3.)   Dr. Gelb's opinion that taking 25 mg of Vioxx every day for six months

can cause a heart attack must be excluded.

> **3.**    **Dr. Gelb cannot opine, to a reasonable degree of medical certainty, on
> the mechanism by which Vioxx supposedly causes cardiovascular
> effects.**

Even if Dr. Gelb could point to reliable scientific evidence supporting his opinion that

25 mg of Vioxx taken for six months can cause an increased risk of cardiovascular effects, which

he cannot, his general causation opinions should be excluded because he does not identify, to a

reasonable degree of medical certainty, the mechanism by which this occurs.

In evaluating causation testimony in a pharmaceutical case, the Court must determine

whether the expert's opinion has "tied" the defendant's product "by some specific train of

medical evidence" to the alleged injury.   *Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir.

1999).   To meet this burden, an expert must offer a "reliable explanation of the physiological

process by which [the agent] causes [the alleged harm]."   *McClain*, 401 F.3d at 1253.   The Fifth

Circuit explained this requirement as follows:

> The underlying predicates of any cause-and-effect medical
> testimony are that medical science understands the physiological
> process by which a particular disease or syndrome develops and
> knows what factors cause the process to occur.   Based on such
> predicate knowledge, it may then be possible to fasten legal
> liability for a person's disease or injury.

*Black*, 171 F.3d at 314.

Based on the Fifth Circuit's reasoning in *Black*, an expert's mere assertion that he "knows" that Vioxx can cause a heart attack is scientifically unreliable in the absence of an "explanation of how or why it happen[ed]." *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 616 (E.D. La. 2003). As this Court explained:

> In this case, at best, Drs. Shell and Eckberg have discovered an agent, but not a cause. They fail to identify the exact mechanism by which a person's QT interval can become permanently prolonged well after that person has ceased taking Propulsid. . . . They have theories but they have no proof to support those theories. . . . Under the prevailing logic of *Daubert* and *Black*, their testimony is unreliable.

*Propulsid*, 261 F. Supp. 2d at 617; *see also McClain*, 401 F.3d at 1253 (excluding expert testimony where plaintiffs' experts have not "offered a reliable explanation of the physiological process by which Metabolife causes heart attacks and ischemic strokes, *i.e.*, establish general causation").

Here, Dr. Gelb opines that Vioxx is "thrombogenic" (*i.e.*, prothrombotic) because it "essentially eliminated prostacyclin, which is anti-thrombogenic, and allowed thromboxane, which is thrombogenic, coronary vasoconstricture, and atherogenic to continue." (Gelb Dep. at 202:13-20; Expert Report of Ira J. Gelb, M.D., F.A.C.C. ("Gelb Rpt.") at 5, attached hereto as Ex. C.) As the Court is aware, this theory is known as the FitzGerald hypothesis and, as Dr. Gelb himself admits, it is "still a hypothesis" and has not been conclusively proven. (Gelb Dep. at 266:23 - 267:5.) Dr. Gelb testified that there is "ongoing scientific study and debate" about the FitzGerald hypothesis and that the "hypothesis is that COX-2 inhibitors reduce the level of prostacyclin in the arteries," but that "there are no studies that ever measured the effects of Vioxx on the levels of prostacyclin in the coronary arteries." (*Id.* at 266:13-16, 267:6-11, 271:10 - 272:14.) Nor can Dr. Gelb identify the level of reduction of prostacyclin that is needed in order

to cause a prothrombotic state, and he testified that there are other anti-clotting factors besides prostacyclin and that it is "not just a simple matter of prostacyclin versus thromboxane," but rather a "complex" matter.  (*See id.* at 267:15 - 268:25.)  Even if the Court believes that *some* expert or experts have a sufficient basis to testify that the FitzGerald hypothesis adequately explains mechanism, it should not allow Dr. Gelb to do so.  *See Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir. 1999) (admission of an expert's opinion was an abuse of discretion when the doctor's testimony departed the area of his expertise to a matter in which he had no specialized knowledge or other supporting authority); *see also Black*, 171 F.3d at 314 (admission of expert testimony was abuse of discretion when particular opinion had no apparent underlying support).

Second, Dr. Gelb should not be permitted to opine that Vioxx is "atherogenic" and that "COX-2 inhibition results in atherogenesis and contributes to atherosclerotic progression." (Gelb Rpt. at 5.)  This theory lacks a foundation in reliable science, as explained in Merck's concurrently filed Motion For Order Excluding Testimony Of Colin Funk, Ph.D.  Merck incorporates that motion herein by reference, and for the reasons stated in the motion moves to exclude Dr. Gelb's testimony about Vioxx's alleged ability to cause or accelerate atherosclerosis. Even Dr. Gelb admitted at deposition that there have been no human studies proving that Vioxx causes atherosclerosis:

> Q:  Dr. Gelb, you testified that the VIGOR and APPROVe studies support your view that Vioxx causes atherosclerosis, correct?
>
> A:  Supports my view that there's an increase incidence of myocardial infarction.
>
> Q:  That wasn't my question, sir.  My question was:  Is it your view that those studies support the belief that Vioxx causes atherosclerosis?
>
> A:  No.
>
> Q:  Okay.  Are there any studies that do support that?

A:      In humans?

Q:      Yes, for starters.

A:      No.

(Gelb Dep. at 262:11-23, 261:24 - 262:4.)  Dr. Gelb also conceded that it is "really a hypothesis still that Vioxx causes atherosclerosis."  (*Id.* at 265:8-10.)  Also, in his expert report Dr. Gelb states that animal studies have shown that COX-2 inhibition results in atherosclerosis.  (Gelb Rpt. at 5.)  However, at deposition, he admitted that there are *no* such animal studies testing Vioxx, specifically.  (Gelb Dep. at 262:24 - 264:3.)

Third, Dr. Gelb should not be permitted to opine that Vioxx causes plaque rupture. Although Dr. Gelb did not include this theory in his report, at deposition he hypothesized that Vioxx may have caused an atherosclerotic plaque in Mr. Dedrick's artery to rupture, thereby leading to a thrombus.  (*See* Gelb Dep. at 203:18-22.)  This theory also lacks a foundation in reliable science.  Dr. Gelb cannot point to any study that proves that Vioxx can cause a plaque rupture to occur:

Q:      Are there studies as opposed to articles and reviews and editorials that show that Vioxx causes this plaque rupture to happen?

A:      I haven't seen the studies.

Q:      You haven't seen any studies about that?

A:      No.

Q:      Okay.  Not in animals or humans?

A:      Not yet, maybe before trial there may be.

(Gelb Dep. at 298:18-25.)

Finally, Dr. Gelb should not be permitted to opine that Vioxx causes coronary vasoconstriction.  In his expert report and deposition, Dr. Gelb asserted the conclusory opinion that Vioxx causes coronary vasoconstriction.  Nowhere does Dr. Gelb state the basis for that conclusion, and there is no scientifically reliable evidence that is true.

In short, none of Dr. Gelb's mechanism theories are based on scientifically reliable evidence. Accordingly, the Court should not allow Dr. Gelb to testify about any of them or his ultimate general causation opinions, which are based on those unproven mechanism hypotheses.

**B.** **Dr. Gelb Also Cannot Testify To A Reasonable Degree Of Medical Certainty That Vioxx Caused Mr. Dedrick's Heart Attack.**

Even assuming Mr. Dedrick somehow could establish general causation, Dr. Gelb's specific causation opinion would still be inadmissible because Dr. Gelb cannot opine to a reasonable degree of medical certainty that Vioxx, in fact, caused Mr. Dedrick's heart attack.

Dr. Gelb admits that coronary artery disease is a serious health concern in the United States. (*See* Gelb Dep. at 107:5-7.) He also admits that cardiovascular disease is the leading cause of death in the United States and has been for over 100 years, long before Vioxx was ever on the market. (*See id.* at 100:2-9.) Indeed, Dr. Gelb admits that during the period when Vioxx was on the market, millions of Americans had heart attacks, most of whom never took Vioxx. (*See id.* at 106:13-19.) Despite the prevalence of cardiovascular disease among people who have never taken Vioxx, Dr. Gelb maintains that Vioxx caused Mr. Dedrick's heart attack. Yet, Dr. Gelb cannot identify any facts or evidence that support his conclusory assertion. In fact, at his deposition, Dr. Gelb testified again and again that he could not identify *anything* about Mr. Dedrick's condition that suggested Vioxx contributed in any way to Mr. Dedrick's heart attack.

For example, Dr. Gelb testified that there was nothing distinctive about the appearance of Mr. Dedrick's thrombus:

> Q: Now you believe that Mr. Dedrick's heart attack was caused by a thrombus, correct?
>
> A: Correct.
>
> . . .
>
> Q: So, was there anything in the appearance of the thrombus that indicated to you that it was caused by Vioxx?

> A:     No.

(Gelb Dep. at 191:1-3, 202:6-8.)

He also testified that there was nothing distinctive in Mr. Dedrick's medical records, echocardiogram, angiogram, or nuclear stress test:

> Q:     And there's nothing else in Mr. Dedrick's medical records either that points to Vioxx as the cause, as opposed to something else, of the heart attack, correct?
>
> A:     As you would say, it didn't have a V on it, correct.
>
> Q:     Correct.  So there's nothing in the echocardiogram that suggests that it was Vioxx that caused it?
>
> A:     No.
>
> Q:     Nothing in the angiogram that suggests it was Vioxx that caused the heart attack?
>
> A:     No.
>
> Q:     Or in the nuclear stress test that was recently performed in September of 2006?
>
> A:     No.
>
> Q:     Or the echocardiogram performed in September 2006?
>
> A:     No.

(Gelb Dep. at 209:14 - 210:4.)

Dr. Gelb admitted that there was nothing distinctive about Mr. Dedrick's plaque rupture, wall motion abnormality, or abnormal coronary artery anatomy.  (*See* Gelb Dep. at 297:3-20, 205:7-13.)  He does not know what Mr. Dedrick's prostacyclin and thromboxane levels were at the time of his heart attack or whether he was in a prothrombotic state.  (*See id.* at 269:1-13.)  In fact, Dr. Gelb admits that the sequence of events that he believes led to Mr. Dedrick's heart attack (*i.e.*, "the buildup of atherosclerosis, plaque rupture, clot formation") are the same sequence of events that have led to the "vast majority" of heart attacks in the population, even before Vioxx was on the market.  (*Id.* at 105:6-25.)

Unable to distinguish Mr. Dedrick's condition from many others in the same condition

who never took Vioxx, Dr. Gelb relies completely on his belief that Vioxx *can* cause such events.  But, as discussed above, even Dr. Gelb admits his general cause hypotheses remain unproven at the dose and duration used by Mr. Dedrick.  Moreover, even were Dr. Gelb found to have properly established general cause, this alone is insufficient to prove that Vioxx caused Mr. Dedrick's heart attack.  As Dr. Gelb admits, the overwhelming majority of people who took Vioxx never had heart attacks (*see* Gelb Dep. at 106:25 - 107:2) and not every heart attack suffered by a person while on Vioxx was caused by Vioxx:

> Q:    Well, you don't think, do you, just because a person took Vioxx, and the person had a heart attack, that the Vioxx caused the heart attack; do you?
>
> A:    I treat the whole person, and I determine each case as an individual, then I determine the sequence of Vioxx ingestion.
>
> Q:    But the reason you have to look at each case as an individual is because you can't know, just knowing someone took Vioxx and had a heart attack, that the Vioxx caused the heart attack, correct?
>
> A:    Right.

(Gelb Dep. at 46:22 - 47:7.)  Dr. Gelb's specific causation opinion is based on sheer speculation and must be excluded.

### C.    Dr. Gelb Cannot Rule Out Other Possible Causes Of Mr. Dedrick's Heart Attack.

Dr. Gelb's specific cause opinion is also inadmissible because he has not ruled out other, far more likely, causes of Mr. Dedrick's heart attack.  Before an expert will be allowed to testify that an individual's exposure to an agent resulted in injury, the expert first must rule out alternative explanations of the injury.  *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 423-24 (5th Cir. 1987); *Propulsid*, 261 F. Supp. 2d at 618.  Although many well-known risk factors having nothing to do with Vioxx undoubtedly contributed to Mr. Dedrick's heart attack, Dr. Gelb has failed to rule out the possibility that these other factors alone – and not Vioxx – caused Mr.

Dedrick's heart attack.

For example, Mr. Dedrick had a family history of heart disease.  His younger brother had a heart attack at the age of 39, and his mother and grandmother both suffered heart attacks. (Dedrick Dep. at 101:4-111:6.)   Thus, Mr. Dedrick was genetically predisposed to heart problems.  Mr. Dedrick had preexisting coronary artery disease at the time of his heart attack, but Dr. Gelb does not know whether or how much coronary artery disease Mr. Dedrick had at any point before his myocardial infarction.  (*See* Gelb. Dep. at 174:17-175:5.)  Dr. Gelb cannot rule out that the disease was serious long before Mr. Dedrick started taking Vioxx.[1]

On the day of his heart attack, Mr. Dedrick was a smoker, and had smoked two packs of cigarettes a day for over 30 years leading up to his heart attack.  (*See* Dedrick. Dep. at 79:23-80:15.)  Mr. Dedrick was obese and did not maintain a healthy diet before his heart attack.  (*See* Gelb Dep. at 134:9, 137:20-21.)  He was an alcoholic.  (*Id.* at 81:6-82:19.)  For 20 years, Mr. Dedrick drank up to two cases of beer per week, until 1999, when he claims he reduced his consumption of alcohol to six drinks per week.  (*Id.*)  Mr. Dedrick had rheumatic fever in childhood.  (*Id.* at 48:11-17.)  He was diagnosed with diabetes in 1999.  (*Id.* 118:14-21.)  Mr. Dedrick was diagnosed with high blood pressure in 1997, and he had high cholesterol.  (*Id.* at 118:22-119:3.)  Mr. Dedrick testified that he used cocaine on an "on and off" basis.  (*Id.* at 146:2-23.)  Mr. Dedrick also endured the stress of two-and-a-half years in prison.  (*See id.* at 36:15-17.)  Prison doctors recommended that he receive insulin therapy, but he refused and did not start taking insulin until after his heart attack.  (*Id.* at 119:12-120:1, 185:8-191:14.)

All of the foregoing factors put Mr. Dedrick at an increased risk for a heart attack.  Dr.

---

[1] Indeed, Dr. Gelb's admission that he does not know how significant Mr. Dedrick's coronary artery disease was before or during, his Vioxx usage is fatal to his acceleration opinion given that he lacks a baseline from which to judge its progression.

Gelb failed to consider these risk factors.  In fact, he essentially ignored them in his expert

report.  At deposition, however, Dr. Gelb admitted that many of these factors contributed to Mr.

Dedrick's heart condition:

> Q:    Dr. Gelb, you agree that Mr. Dedrick's diabetes contributed to his atherosclerosis and his heart attack?
>
> A:    Yes.
>
> Q:    And his smoking contributed to his heart attack, his atherosclerosis?
>
> A:    Yes.
>
> Q:    His high blood pressure?
>
> A:    Yes.
>
> Q:    His hyperlipidemia contributed to his heart attack and his atherosclerosis?
>
> A:    Yes.
>
> Q:    And his obesity did too?
>
> A:    Yes.
>
> Q:    His inactivity contributed to his atherosclerosis and his heart attack?
>
> A:    Yes.
>
> Q:    And his metabolic syndrome contributed, as well?
>
> A:    Yes.
>
> Q:    His family history contributed to his atherosclerosis and heart attack?
>
> A:    Yes.
>
> Q:    Mr. Dedrick's stress contributed?
>
> A:    Yes.
>
> Q:    And his alcohol abuse contributed to his heart attack and atherosclerosis?
>
> A:    Well, like I said before, with the caveat, after coming out of his incarceration, he only drank beers on the weekends according to his history.
>
>        . . .
>
> Q:    Yes.  He testified that he drinks now six beers on the weekends, but as a result of that, can you say it as a matter

16

of medical certainty that the drinking up until 1999 did not contribute to his heart attack?

A:     No, I didn't say that.

Q:     So it did?

A:     It did, but we said "alcohol abuse," so --

Q:     Okay.  So, you were just qualifying that he is a recovered alcoholic?

A:     That's what I'm saying.

Q:     But still, the alcohol use up to 1999 contributed to his heart attack and atherosclerosis?

A:     Yes.

Q:     And his cocaine use, we really don't know how much cocaine he used, do we?

A:     No.

Q:     So, do you know, do you have an opinion about whether that contributed to his heart attack and atherosclerosis?

A:     I do have an opinion.

Q:     What's that?

A:     I doubt very much if the cocaine he took when he was supposed to have taken it, according to the various records, contributed, because the most common effect, as we said earlier, is coronary vasospasm.  But the literature does say that it can contribute to atherosclerotic coronary disease.

Q:     So it might have contributed; it might not?

A:     Correct.

(Gelb. Dep. at 157:1 - 159:14.)

Dr. Gelb also admitted that he could not testify with certainty that Mr. Dedrick would not have suffered a myocardial infarction on January 8, 2003, even without having used Vioxx:

Q:     . . . Leaving everything about Mr. Dedrick the same, then assume that he never took Vioxx, you cannot say with certainty that he wouldn't have had the same heart attack at the same time anyways; can you, sir?

         . . .

A:     That's correct. . . .

(Gelb Dep. at 166:18 - 167:3.)  Because Tennessee requires a plaintiff to prove cause in fact, *i.e.,*

"but-for" causation, this concession by Dr. Gelb is fatal to his specific cause opinion and requires exclusion.  *See, e.g., Richardson v. GlaxoSmithKline*, 412 F. Supp. 2d 863, 868 (W.D. Tenn. 2006) ("[T]he cause 'must be such that had it not happened the injury would not have been inflicted.'") (citing *Shouse v. Ortis*, 224 Tenn. 1, 448 S.W. 2d 673, 676 (1969)).

The Court cannot conclude that Dr. Gelb reliably ruled out any preexisting risk factors as the cause of Mr. Dedrick's heart attack.  Consequently, Dr. Gelb's opinion that Vioxx was a substantial contributing factor in causing Mr. Dedrick's heart attack is scientifically unreliable and thus inadmissible.

## III.  THE COURT SHOULD EXCLUDE DR. GELB'S OPINION THAT MERCK FAILED TO PROVIDE AN ACCURATE DESCRIPTION OF VIOXX TO THE MEDICAL COMMUNITY.

Dr. Gelb opines that Merck failed to provide an accurate description of Vioxx to the medical community.  He cites only two alleged instances involving publication of VIGOR and APPROVe, which he claims "clearly reveal that Merck attempted to minimize the perception of the cardiovascular risks associated with Vioxx."  (Gelb Rpt. at 6.)  This testimony is neither grounded in "scientific, technical, or other specialized knowledge" nor necessary, from the jury's point of view, "to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  It is nothing more than "spin" – counsel's attempt to put their arguments before the jury under the guise of expert testimony.  Moreover, such expert testimony regarding the "intent, motives or states of mind of corporations, regulatory agencies and others," is routinely prohibited because experts "have no basis in any relevant body of knowledge or expertise."  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004).  Under Rules 702 and 403 of the Rules of Evidence and *Daubert*, the testimony must be excluded.

## IV.   THE COURT SHOULD EXCLUDE DR. GELB'S OPINION ABOUT THE VIOXX LABEL.

In his expert report, Dr. Gelb baldly opines that "Merck, through its Vioxx label, failed to adequately warn the medical community regarding the cardiovascular risks associated with Vioxx." (Gelb Rpt. at 7.)  Although Dr. Gelb's report does not explain the basis for that opinion, Dr. Gelb elaborated at his deposition.  According to Dr. Gelb, information from VIGOR about the difference in incidence of coronary events between Vioxx and Naproxen users should have been included in the "warnings" section of the label as opposed to the "precautions" section. (Gelb Dep. at 314:4 - 322:3.)  Dr. Gelb should not be permitted to testify about the adequacy of Merck's warning labels for two reasons.  First, he does not have the requisite knowledge, training, or expertise to opine on the subject of labeling.  Second, Dr. Gelb's unsupported personal opinions on what he would have done with the warning labels are not helpful testimony to a jury and are thus inadmissible.

### A.   Dr. Gelb Is Not Qualified To Opine About Merck's Warnings.

Under Rule 702, plaintiff must show that Dr. Gelb has the requisite "scientific, technical, or other specialized knowledge" to opine on the issue of Merck's warning labels.  FED. R. EVID. 702.  Plaintiff cannot meet this burden.  Dr. Gelb has never worked with the FDA, never served on an FDA advisory committee, never been asked to sit on an FDA advisory committee, and never reviewed labeling for a prescription drug on behalf of the FDA.  (*See* Gelb Dep. at 21:11-22:2.)  He has never worked with a pharmaceutical company, never worked in a regulatory affairs department in a pharmaceutical company, never drafted a pharmaceutical drug label, never been consulted about the drafting of a pharmaceutical drug label, never reviewed any complete new drug application or investigational new drug application, and has never been qualified by a court as an expert on labeling or warnings given to the medical community about a

drug.  (*See id.* at 22:24 - 23:19.)  Even Dr. Gelb admitted at his deposition that he is not

considered an expert on FDA regulations for drug labeling:

> Q:      You're not an expert on FDA regulations for drug labeling?
>
> A:      I'm not considered an expert, but I do review the label.

(*Id.* at 22:3-6.)  Because Dr. Gelb is not qualified to testify on the issue of pharmaceutical drug

labeling, his testimony should be excluded.

### B.      Dr. Gelb's Personal Opinions On The Adequacy Of Merck's Labels Are Inadmissible.

An expert's personal opinions that are not grounded in any established standard should be

excluded.  *See, e.g., Turpin v. Merrell Dow Pharms., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992)

(excluding an expert's testimony because "no understandable scientific basis is stated.  Personal

opinion, not science, is testifying here"); *see also Dhillon v. Crown Controls Corp.*, 269 F.3d

865, 870 (7th Cir. 2001) (holding that "conclusions based only on personal opinion and

experience do not suffice" to establish the reliability or utility of expert testimony).  But Dr. Gelb

offers exactly that with respect to Merck's labels.  The sole basis for Dr. Gelb's opinion that the

information from VIGOR should have been included in the "warnings" section of the label as

opposed to the "precautions" section is his personal and unsubstantiated opinion that physicians

generally do not pay attention to the precautions section.  (*See* Gelb Dep. at 314:4 - 322:3.)

Dr. Gelb admits, however, that he knows of no studies or research about whether doctors

actually distinguish between precautions and warnings.  Also, Dr. Gelb's opinion is at odds with

the FDA's recent abolition of the distinction between precautions and warnings.  *Requirements

on Content and Format of Labeling for Human Prescription Drugs and Biological Products,* 71

Fed. Reg. 3922, 3939 (Jan. 24, 2006) (to be codified at 21 C.F.R. Parts 201, 314, and 601).

Beyond Dr. Gelb's anecdotal, uncorroborated, and unscientific observations, he offers no other

basis for his opinion.  This type of testimony is not scientifically reliable and does not assist the

jury in making any factual determinations about Merck's labels.  As such, it is inadmissible under Rule 702 and must be excluded.  (It also is irrelevant because any claim based on the location of information within Merck's FDA-approved label would be preempted.)

Finally, to the extent Dr. Gelb's opinions about the Merck label concern the pre-April 2002 label, they are inadmissible on relevance grounds, or at a minimum, under Rule 403.  It is undisputed that Mr. Dedrick was not prescribed Vioxx until after the April 2002 label change, as Dr. Gelb admitted at his deposition.  (*See* Gelb Dep. at 331:14 - 314:3.)  *See, e.g., Werner v. Upjohn Co.*, 628 F.2d 848, 852 & n.1 (4th Cir. 1980) (noting that because plaintiff first visited the doctor on December 10, 1974, "[t]he adequacy of the warnings issued prior to 1974 was not in issue in this case.").

## V.    CONCLUSION

For the reasons stated above, Merck respectfully requests that this Court grant Merck's Motion For Order Excluding Testimony of Ira J. Gelb, M.D., F.A.C.C.

Dated:  October 30, 2006                          Respectfully submitted,

_____
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Mark Ouweleen

Carrie Jablonski
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

Douglas Marvin
Elaine Horn
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:      202-434-5029

And

Brian Currey
A. Patricia Klemic
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:      213-430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum In Support Of Motion Of Merck & Co., Inc. ("Merck") To Exclude Testimony of Ira J. Gelb, M.D., F.A.C.C. has been served on Liaison Counsel, Russ Herman, and on counsel for Mr. Dedrick, Andy Birchfield, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 30th day of October, 2006.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel