COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                    9/15/2006

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Vioxx<br>**PRODUCTS LIABILITY LITIGATION** | **MDL DOCKET NO. 1657** |
| | |
| THIS DOCUMENT RELATES TO:<br>**CASE NO. 2:05CV2524** | Section L - **DIVISION 3** |
| | |
| ANTHONY WAYNE DEDRICK,<br>an Individual, | Judge Fallon |
| | |
| Plaintiff, | |
| | |
| v. | Mag. Judge Knowles |
| | |
| MERCK & CO., INC., | |
| | |
| Defendant. | |

COX-2 Inhibitor Report of
**Lemuel A. Moyé, M.D., Ph.D.**
September 15, 2006

M007C50260

## Table of Contents

PERSONAL VITA

    PERSONAL VITA ........................................................................................................... 5

    DEGREES ...................................................................................................................... 5

    RESEARCH EXPERIENCE .............................................................................................. 5

    CURRENT ACTIVITIES .................................................................................................. 6

    MANUSCRIPTS ............................................................................................................. 6

    BOOKS ......................................................................................................................... 6

    PRESENTATIONS .......................................................................................................... 7

    TEACHING .................................................................................................................... 7

    INVITED LECTURES ...................................................................................................... 7

    CONSULTATIONS ......................................................................................................... 7

    GRANT REVIEW ........................................................................................................... 8

    MONITORING BOARDS ................................................................................................. 8

    FDA APPEARANCES FOR SPONSORS ............................................................................ 8

    FDA SERVICE .............................................................................................................. 8

    RECENT PUBLICATIONS ............................................................................................... 9

    RISK BENEFIT EXPERIENCE ........................................................................................ 9

    CARDIORENAL COMMITTEE MEETINGS ....................................................................... 9

    FDA SERVICE ............................................................................................................ 10

    EDUCATION ............................................................................................................... 10

    BASIS OF OPINIONS ................................................................................................... 10

    FEES .......................................................................................................................... 10

    PREVIOUS TESTIMONY .............................................................................................. 10

SUMMARY OF OPINIONS .................................................................................................. 11

RISK-BENEFIT ANALYSIS .................................................................................................. 13

ADVERSE EFFECTS ........................................................................................................... 17

    CARDIOVASCULAR TOXICITY ................................................................................... 17

    ROFECOXIB AND STROKE .......................................................................................... 20

    HYPERTENSION ......................................................................................................... 24

    BACKGROUND BIOCHEMISTRY ................................................................................. 24

    BIOCHEMISTRY OF COX-2 INHIBITION ...................................................................... 24

    THE ROLE OF ENZYMES ............................................................................................. 25

M007C50261

THE PROSTAGLANDIN SYSTEM ................................................................... 26

COX-1 AND COX-2 ....................................................................................... 28

INADEQUATE TESTING ......................................................................................... 33

CLINICAL STUDIES ..................................................................................... 40

THE VIGOR TRIAL ....................................................................................... 41

POSSIBLE PROTECTIVE EFFECT OF NAPROXEN ......................................... 45

ADVANTAGE ................................................................................................ 46

VICTOR ....................................................................................................... 47

VIP .............................................................................................................. 47

ALZHEIMER STUDIES .................................................................................. 48

APPROVE ..................................................................................................... 48

FAILURE TO WARN ............................................................................................... 64

FDA EXPERTISE .......................................................................................... 64

ROLE OF FDA .............................................................................................. 64

MODERIZATION ACT ................................................................................... 65

COLLABORATION ........................................................................................ 65

ADVISORY COMMITTEES ............................................................................ 66

DECISION PROCESSES ................................................................................. 67

MATERIAL INFORMATION .......................................................................... 68

ADVERSE EVENTS ....................................................................................... 68

LABELING ................................................................................................... 68

MISLEADING THE FDA ......................................................................................... 73

APPENDIX A: STATISTICAL REASONING IN MEDICINE ....................................... 77

SAMPLING ERROR AND SIGNIFICANCE TESTING ....................................... 78

STATISTICAL POWER .................................................................................. 80

SAMPLE SIZE COMPUTATIONS .................................................................... 81

APPENDIX B: DETERMING CAUSALITY IN MEDICINE ......................................... 82

LIMITATIONS OF CASE REPORTS ................................................................ 85

APPENDIX C: DETECTING ADVERSE EVENTS ...................................................... 88

DETECTING ADVERSE EVENTS: COMPLICATION IN SAFETY MONITORING ......... 88

STRATEGY 1: MONITOR WIDELY ................................................................ 91

STRATEGY 2: ASSESSING UNANTICIPATED ADVERSE EVENTS .................... 92

APPENDIX D: SUBGROUP ANALYSES ................................................................... 96

SUBGROUPS: DEFINITIONS AND BASIC CONCEPTS ..................................... 97

M007C050262

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                    9/15/2006

SUBGROUPS VERSUS SUBGROUP STRATA ........................................................ 97

SUBGROUPS: INTERPRETATION DIFFICULTIES ............................................... 98

RANDOM SUBGROUPS.......................................................................................... 100

PROPER VERSUS IMPROPER SUBGROUPS ..................................................... 101

INTENTION-TO-TREAT" VERSUS "AS TREATED" SUBGROUP ANALYSES............... 101

EFFECT DOMINATION PRINCIPLE ..................................................................... 103

MANUSCRIPT INTERPRETATION ........................................................................ 105

REFERENCES ................................................................................................................ 109

M007C50263

## Personal Vita

1. *Personal Vita*: My name is Lemuel A. Moyé. I am over twenty-one years of age, am of
   sound mind, am not a party to this action, have never been convicted of a felony, and am
   otherwise competent to make this affidavit. I have personal knowledge of all factual
   statements contained herein, and all such factual statements are true and correct to the
   best of my knowledge.

2. *Degrees*: I have a M.D. and a Ph.D. degree in Community Sciences - Biostatistics. I am a
   licensed physician in the states of Texas and Indiana, and I have actively practiced medi-
   cine from 1979-1992. I am a diplomat of the National Board of Medical Examiners. My
   formal training has included many courses in mathematical statistics, epidemiology, and
   biostatistics. I am currently a Professor of Biostatistics at the University of Texas School
   of Public Health in Houston, where I hold a full time faculty position in biostatistics.

3. *Research Experience*: I have carried out cardiovascular research for nineteen years and
   continue to be involved in the design, execution and analysis of clinical trials. I have been
   Principal Investigator on a grant from Schering-Plough and have been Co-Principal In-
   vestigator on two grants from Bristol Myers-Squibb. In these studies, I was responsible
   for the design, execution, and analysis of these experiments. In one case, the experiment
   involved over 2000 patients who were followed for 3.5 years, and in the other case, 4159
   patients were followed for five years. In each of these enterprises, an important compo-
   nent of my responsibility was the reporting of adverse events from physicians. In one of
   these trials, I supervised the collection of adverse events that were reported to both the
   Sponsor and to the Federal Food and Drug Administration (F.D.A.). Each of these clini-

M007C5D264

cal trials has resulted in several articles that were published in the Journal of the Medical
Association and The New England Journal of Medicine, as well as other journals in the
peer reviewed medical literature.

4.  *Current Activities*: I am currently Principle Investigator and in charge of the biostatistics
group that is carrying out research on the treatment of strokes, funded by the National In-
stitute of Neurologic Disorders and Strokes. I am also a co researcher on a federally
funded grant that is examining the influence of behavioral modification of risk factors for
atherosclerotic disease.

5.  *Manuscripts*: I have published over one hundred and twenty manuscripts in peer-
reviewed literature that reflect my experience in the design, execution and analysis of
clinical trials. Included among these manuscripts are papers that provide the mathemati-
cal development of tools that improve both the design and the execution of large-scale
clinical trials

6.  *Books*: I am the author of six books. I am the sole author of the book *Statistical Reason-
ing in Medicine—The Intuitive P value Primer*, published by Springer-Verlag in 2000.
Marcel-Dekker published a second book, entitled *Difference Equations with Public
Health Applications*, co-authored with a colleague, in October 2000. A third book of
which I am sole author, entitled *Multiple Analysis in Clinical Trials: Fundamentals for
Investigators*, was published by Springer-Verlag and appeared in the summer 2003. A
fourth book titled *Finding Your Way in Science* was published in August 2004. A fifth
book entitled *Mathematical Statistics with Applications* appeared in 2005. A sixth book
entitled *Statistical Monitoring of Clinical Trials: Fundamentals for Investigators*; was re-
leased in the Fall, 2005. The second edition of *Statistical Reasoning in Medicine—The In-*

M007C5D2655

*tuitive P value Primer* will appear in the summer of 2006. I have completed a book entitled *Face to Face with Katrina Survivors: A First Responder's Tribute*, which will appear in November 2006. I am currently writing a book *Elementary Bayesian Biostatistics* to be published by Taylor and Francis, to appear during the summer of 2007. In addition I have authored invited book chapters and contributed articles to scientific encyclopedias.

7.  *Presentations:* I have been an Investigator on four grants from the National Institutes of Health, involving the design, execution, and analysis of clinical trials and epidemiologic studies. Each of these has led to publications in the peer-reviewed literature. I have presented results of clinical research at over twenty different professional meetings, including a presentation in 2001 to the Drug Information Agency and a separate presentation at the International Joint Statistical Meetings. I have presented results at the International Joint Statistical Meetings in 2003, 2004, and 2005.

8.  *Teaching:* I have consistently taught courses in biostatistics since my full-time appointment as a faculty member in 1987 at the University of Texas School of Public Health. In these courses, I have taught experimental design in clinical research studies, the statistical methodology that supports these design principles, the statistical analysis of clinical research programs, and the role of epidemiology in interpreting the conclusions from these clinical research programs. For 18 years, I have been a supervisory professor for students training in epidemiology, biostatistics, and other areas of public health.

9.  *Invited Lectures:* I have given over thirty invited guest lectures on research methodology topics.

10. *Consultations:* I have served as a clinical trial consultant to Berlex, Proctor and Gamble, Marion Merrill Dow, Pfizer, Hoerst Roussel, Aventis, Key Pharmaceuticals, Coromed,

M0007C50266

Dupont, Bristol Myers-Squibb, Novartis, Medtronics, Astra-Zeneca, Power3 Medical, CryoCor, and Vasogen.

11. *Grant Review*: I have reviewed grants and/or data on over fifty different occasions on be-half of government research programs.

12. *Monitoring Boards*: I have served on three Data Monitoring Committees (DMC) that oversee the conduct of clinical trials, and most recently have been the chairman of a Data, Safety, and Monitoring Committee of a study sponsored by Bristol-Meyer-Squibb and Key Pharmaceuticals. I currently serve on three DMC's, one privately sponsored and two on NIH sponsored studies.

13. *FDA Appearances for Sponsors*: I have appeared before the F.D.A. on behalf of spon-sors on several occasions.

14. *FDA Service*: In addition to serving as a consultant with the pharmaceutical industry for seventeen years, I have also directly and overtly supported the F.D.A. I have served as a statistician/epidemiologist for four years on the Cardiovascular and Renal Drug Advisory Committee to the Food and Drug Administration. In this capacity, I have reviewed the data provided by pharmaceutical companies and an analysis of that data by the FDA to render opinions about the safety and effectiveness of these medical interventions being considered for FDA approval. In this capacity, I have formally reviewed over twenty clinical trial programs of private sponsors and commented in public testimony that is part of the Federal Registry. In some instances, a component of this review was direct evalua-tion, criticism and comment on the proposed product label by the Sponsor. I currently serve as a statistical consultant to the F.D.A., and most recently have been to a two-year term on the F.D.A. Pharmacy Sciences Advisory Committee.

M007C50267

15. **Recent Publications**: I have published manuscripts as the sole author in *Controlled Clinical Trials*, and *Statistics in Medicine*. This work has promulgated the philosophy (while advancing the supporting mathematics) that clinical research interpretation must be disciplined and must explicitly hold the highest regard for community protection from dangerous, false, and misleading results from clinical research. I have been featured in health care articles in both *Money* magazine (December 1998) and *US News and World Report* (January 11, 1999). In 2000, an article, on which I am the sole author, appeared in *Statistics in Medicine*, and it has generated important published commentary in the peer-reviewed literature.

16. **Risk Benefit Experience**: I have taken part in research studies that have been both observational and experimental. In each of these studies, functioning as an investigator, I have participated in discussions assessing the safety and effectiveness of the medication. This assessment has not been based on complicated economic arguments, but instead places emphasis on balancing the health advantages the therapy offers against the disadvantages its use produces. I have published an article that computed the effectiveness and safety of various strategies in the treatment of essential hypertension.

17. **CardioRenal Committee Meetings**: During the thrice-yearly meetings of the Cardio-Renal Advisory Committee to the F.D.A., I, along with the other committee members, have been asked to weigh the advantages and disadvantages of the medications presented to us for approval. This assessment was not economic but a collective appraisal by physicians and health care researchers of the relative clinical strengths and clinical weaknesses of the intervention.

M007C5D268

18. **FDA Service:** My service on the F.D.A. Advisory Committees, as well as my service to drug manufacturers, has given me specialized knowledge and experience concerning the F.D.A. policies, procedures and regulations as well as the corresponding duties of a reasonable and prudent drug manufacturer. In my service on behalf of sponsors to the F.D.A., and my service to the F.D.A. at Advisory Committee meetings, I have developed expertise, knowledge, education, training and experience in F.D.A. matters.

19. **Education:** My education consists of the following:

| Year | Degree | School |
|------|--------|--------|
| 1987 | Ph.D. Community Sciences -Biometry | University of Texas |
| 1981 | M.S. Statistics | Purdue University |
| 1978 | M.D. | Indiana University |
| 1974 | B.A. Mathematical Sciences | Johns Hopkins |

20. **Basis of Opinions:** I have gained scientific, technical, and specialized knowledge of biostatistics, epidemiology, and risk/benefit assessment. The basis for my opinions is derived from my education, training, research, experience, expertise, and review of the peer-reviewed medical literature.

21. **Fees:** My fees are $400 per hour for review of literature, documents, and $500 for depositions and trial testimonies.

22. **Previous testimony:** A list of previous testimony is attached as Appendix F.

M007C502269

## Summary of Opinions:

23.  The Cox-2 inhibitor rofecoxib, designed to reduce pain while avoiding gastrointestinal ef-

fects, was a therapy with a foreseeable design defect, and whose risks exceeded its bene-

fits. Several studies carried out both before and after rofecoxib was approved by the FDA

demonstrated that rofecoxib's analgesic effect was no better than commonly used, inex-

pensive nonsteroidal anti-inflammatory drugs. In addition, other studies demonstrated the

harmful gastrointestinal effects of rofecoxib produced more gastrointestinal disease then

placebo therapy. Thus, when released, Cox-2 inhibitors were not superior to commonly

used pain relievers for analgesia, nor were they free of gastrointestinal adverse effects.

Thus there was minimal benefit of these agents above and beyond the available, inexpen-

sive alternatives.

24.  Rofecoxib excites the production of cardiovascular disease. It produces this disease

through two mechanisms. First, rofecoxib's propensity to produce elevations in blood

pressure adds to the force of atherosclerotic disease development. In addition, its mecha-

nism of action, i.e., the selective inhibition of the Cox-2 prostanoid synthesis destabilizes

the blood's delicate clotting balance, producing catastrophic thrombotic events in the

heart, and other end organ vasculature. This adverse effect causes angina pectoris, nonfa-

tal heart attacks, fatal heart attacks, and the fatal syndrome known as sudden death.

25.  Rofecoxib is unsafe at any dose/duration combination in any patient regardless of their

underlying risk for cardiovascular disease. The harmful cardiovascular effects of rofe-

coxib have been demonstrated repeated. These dangerous adverse consequences occur in

patients on both low dose and high dose rofecoxib. They occur in short durations of ther-

M007C5D270

apy, as well as in patients exposed for many months to the drug. In addition, these cardiovascular side effects occur in patients who are at low risk for cardiovascular disease, as well as in patients who are at high risk for cardiovascular disease. Rofecoxib is a defective product. In addition, based on the data, it is more reasonable than not that rofecoxib causes cerebrovascular accidents or strokes.

26.   The use of rofecoxib is unjustified in patients who suffer from the chronic paint of rheumatoid arthritis or osteoarthritis. Although each of these chronic conditions produce substantial pain, they are not deadly. The use of a medication that causes death through its combined thrombotic, hypertensive effects is unjustified in patients who suffer from the painful, chronic, but non-lethal illnesses which are the drug's indications. These patients, because of their age and high background risk of atherosclerotic cardiovascular illness are at greater risk of vessel-occlusive attack by this drug. Merck Laboratories was aware of a signal of its cardiotoxic effects of rofecoxib in 1998, a year before the drug was approved. In the presence of increased numbers of adverse cardiovascular effects, Merck allowed the FDA to approve a product that it knew was cardiotoxic. During the appearance of study after study, which confirmed pre-approval suspicions that rofecoxib would be dangerous for the cardiovascular system, Merck continued to defend the drug's use with a scientifically incredulous argument, with no additional warnings for its profound cardiovascular effects.

## Risk-Benefit Analysis

27.  All medication have risks that must be 1) balanced by the benefits to the population to receive the therapy, and 2) promulgated to physicians, pharmacists, and patients, so that these prescriber, dispensers, and users can exercise their independent right to determine if the therapy's benefits outweigh its risks. A fair assessment of the contribution of rofecoxib to the public health requires a fair assessment of its benefits and risks.

28.  Benefits of COX inhibition: The *raison dêtre* of COX-2 inhibition is that selective blocking of the COX-2 pathway blocks pain generation while permitting continued gastrointestinal protection. Thus, the medical community expected superior analgesia to be delivered while the safety of the stomach's protective mucosal lining was preserved.

29.  However, rofecoxib-generated analgesia was quite ordinary, demonstrated to be of no greater magnitude than medications currently on the market. A striking example was the comparison of rofecoxib to nabumeton in Protocol 090. In this study, 12.5 mg rofecoxib was compared to 1000 mg of nabumeton, Merck's own scientists anticipated that pain relief (as measured by the Patient Global Assessment Response to Therapy (PGART) was anticipated to be 15 percentage points greater than that of the comparator drug nabumeton, a well established, commonly used NSAID. However, rofecoxib did not reach this prospectively determined goal. In fact, the difference between the two therapies was not 15 points, but 7-8 points (50.4% versus 43.3%). Thus rofecoxib was not more effective than commonly used, already available pain medications, according to the criteria set by Merck's own scientists.

30.  In addition, rofecoxib produces clinically significant gastrointestinal distress. In the Hippisley-Cox study [1] a nested case-control analysis involving almost 100,000 participants,

M007C5D272

the relationship between gastrointestinal disease and the use of Cox-2 inhibitors was evaluated. This examination revealed that rofecoxib was associated with an elevated risk of adverse gastrointestinal event, with a relative risk of 1.56 (95% confidence interval of 1.30-1.87) for patients with recent exposure to rofecoxib. These findings reflect a 56% increase in gastrointestinal adverse events in patients exposed to rofecoxib versus placebo drug use. Rofecoxib was no more effective then standard, inexpensive NSAIDS, and itself was associated with increased gastrointestinal adverse effects when compared to placebo. However, evidence suggests that both minor symptoms of GI disease (e.g. dyspepsia) and endoscopically detected lesions are not good predictors of future, complicated GI disease.

31. Also, while it is clear that non-selected NSAIDS produce gastrointestinal disease, it is unclear which component of COX-1 inhibition (anti-aggregatory propensity or absence of GI protection) produces the serious GI complications associated with these therapies (e.g., perforations, bleedings, and obstructions). In fact, it was quite possible that the COX-1 inhibition produced by the nonselective NSAIDS was not related to gastric protection, but generated by some other mechanism, e.g., direct gastric mucosal injury. It the latter was the case, then it was unlikely that COX-2 inhibitors would provide any gastrointestinal protection. Thus, it was necessary to carry out large-scale clinical studies comparing NSAIDS with COX-2 inhibitor therapy.

32. Balancing Benefit and Risk: All medication have risks that must be 1) balanced by the benefits to the population to receive the therapy, and 2) must be promulgated to physicians, pharmacists, and patients, so that these prescriber, dispensers, and users can exercise their independent right to determine if the therapy's benefits outweigh its risks.

When a drug's benefit is large, it is reasonable to accept a larger risk for the use of the drug. Examples may be found in oncology, where the combined use of the cancer chemo-therapeutic agents, bleomycin, cisplatin, and vinblastine produced cardiac toxicity. How-ever, their use is tolerated because they prolong the lives of patients who would soon die from their cancer. The greater the benefit, the more willing is the medical community to accept harmful side effects.

33. Alternatively, therapies associated with reduced benefits, must be accompanied by mini-mal level of adverse effects to be accepted by the medical community. However, the benefits of rofecoxib are no better than well-established, low-cost alternatives, and the GI protection offered by rofecoxib does not make it a safe drug. Therefore the adverse ef-fects caused by rofecoxib must be minimal for it to be acceptable to the medical commu-nity. However, rofecoxib's dangerous effects dramatically exceed this low threshold.

34. Rofecoxib causes thrombotic events by mechanisms discussed by Merck in 1998, before the therapy was approved. The measure of the adverse effects of the drug is measured by an odds ratio, and the ARE.

35. Relative risks and odds ratios measure the strength of association between an exposure and an illness. The computations are based on the fundamental principle that is an expo-sure causes a disease, and that one would naturally expect there to be greater disease in the exposed group then the unexposed group. Relative risks measure the occurrence of disease in the exposed group to the control group over a period of time, and is used when one follows patients in the exposed and unexposed group forward in time to compute the occurrence of disease in each of the two groups. Odds ratios are used in circumstances when the ability to follow patients is impaired by the study design (for example, the in-

M007C50274

vestigator takes an epidemiologic snapshot of a cohort, measuring the extent of exposure in a collection of people, and comparing the extent of disease in the exposed and unexposed groups. A relative risk (or odds ratio) of one indicates an equal extent of disease in each group. The larger the relative risk (or odds ratio) the greater the extent of disease.

36.  The attributable risk exposed (*ARE*) is the excess risk of disease produced by an exposure. Developed in the 1970's [2, 3] the *ARE* is a useful quantity that calculates the fraction of events that are attributable to one causative agent when several possible explanations may be available. It is computed as

$$ARE = \frac{OR - 1}{OR}.$$

where *ARE* is the attributable risk exposed and *OR* is the odds ratio. It may also be computed as

$$ARE = \frac{RR - 1}{RR}.$$

where *RR* is the relative risk.

37.  Risk of Coronary Artery Disease: The concept of odds ratios and ARE can be applied to established risk factors for coronary artery disease (Table 1).

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                    9/15/2006

Table 1. Odds Ratios for Coronary Heart Disease Relative Risk[4]

| Risk Factor | Odds Ratio (Men) | Attributable Risk Exposed |
|---|---|---|
| Age | 1.05 | 4.7% |
| High Normal BP | 1.32 | 24.2% |
| Hypertension Stage 1 | 1.73 | 42.2% |
| Hypertension Stage 2 | 1.84 | 45.6% |
| Cigarette Smoking | 1.68 | 40.5% |
| Diabetes(Yes/No) | 1.50 | 33.3% |
| Severe LDL Elevation | 1.74 | 42.5% |
| Very Low HDL | 1.46 | 31.5% |

These are the odds ratio for the risk of developing coronary heart disease in ten years.

38.  The attributable risk exposed reveals the excess risk for coronary heart disease attribut-
able to each of these risk factors. For example, cigarette smoking produces 40.5% excess
risk of coronary heart disease, i.e., after all other risks are considered, the risk is 40.5%
greater on top of that baseline risk in subjects who smoke cigarettes.  These risks will be
compared to the rofecoxib's risk of cardiac toxicity.

## Adverse Effects

39.  *Cardiovascular Toxicity.* The overall risk of cardiovascular events is the VIGOR trial
data (discussed later in this affidavit) as reported to the FDA, with a relative risk of 5.0, a
risk which translate to a ARE of 80%. This holds for short term and long-term use. This
is a greater risk of atherosclerotic disease than any of the known risk factors.

M007C50276

40. A succinct summary of cardiotoxicity provided by Merck reveals the cardiovascular dangers posed by rofecoxib. The report VIOXX Preliminary Cardiovascular Meta-Analysis by Dr. Deborah Shapiro provides a crisp summary of the findings from several of Merck's sponsored trials. In the table entitled MI Endpoints, rofecoxib vs. NSAIDS the following data is depicted.

| Study | Relative Risk of Myocardial Infarction |
|-------|----------------------------------------|
| Overall | 2.02 |
| ViGOR | 5.0 |
| Advantage | 2.95 |
| RA | 1.82 |
| nonRA | 1.68 |
| OA-069 | 0.55 |

A similar table entitled MI endpoint- rofecoxib versus placebo, shows an overall hazard for rofecoxib as well. Since there is no established, credible scientific body of evidence suggesting that NSAIDS are cardioprotective, it is no surprise that the two tables convey the same clear message.

41. The cardiovascular damage produced by rofecoxib in low doses was clearly portrayed in Protocol 090. Table 37 of that report demonstrates a relative risk of 3.0 and an ARE of 66%. . Thus, in this study, excess cardiotoxicity was reported in the presence of reduced efficacy (using the investigator's definition of efficacy), a clear warning that the therapy could be no more effective than standard pain therapy, but increase the cardiac disease event rate.

M007C50277

42.   Statistical significance in these assessments is irrelevant. These studies were not designed
to detect myocardial infarction with precision (i.e., the studies did not include patients
who were at higher risk of developing myocardial infarction and therefore did not have
enough of these events) and did have statistical significance established as a prospective
metric for the assessment of the relationship between rofecoxib exposure and myocardial
infarction. Therefore the cardiovascular results of these studies should not have statistical
significance used as the metric to judge the strength or persuasive power of their results.

43.   Rofecoxib's harmful effect in short duration of therapy was demonstrated in Protocol 201
(VIP study).  Patients were followed for a median period of only four months. The rofe-
coxib dose evaluated in this study was 25 mg.  From Table 1-6 (from the P201 Clinical
Study Report), focusing on drug related adverse events, there were 13 cardiac disorders
(9 in the rofecoxib group, and 4 in the placebo group). There were four episodes of coro-
nary artery occlusion, myocardial infarction, and myocardial ischemia in the rofecoxib
group and none in the placebo group. When the classification is broadened to examine
specific serious clinical adverse events, there were 30 seen in the rofecoxib group and 23
in the placebo group. There were 13 myocardial infarctions in VIP that met this classifi-
cation, 7 in the rofecoxib group, six in the placebo group (Table 1-7).

44.   In addition, the Advantage study following patients treated with either rofecoxib (25 mg)
or naproxen for osteoarthritis for only three months. The medical reviewer's report
(MRK-AFV0341732) revealed that total mortality was higher in the rofecoxib group ($n =$
5) then in the placebo group ($n = 4$) (Page 21). Significantly, three of the five deaths in
the rofecoxib group were sudden death. There were no cardiovascular deaths in the
naproxen group. There were five myocardial infarctions, two anginal events, and three

M007C50278

sudden deaths in the rofecoxib group and one MI and two anginal events (no sudden deaths) in the placebo group (page 10). In addition, more patients (40 versus 21) discontinued rofecoxib then naproxen therapy for cardiovascular related adverse events (page 10). Finally, there were 15 versus 7 patients discontinued for hypertension related events, and 19 versus 12 patients discontinued therapy for edema related events. The increase in number of cardiovascular events is particularly striking since the study was only a twelve-week trial and 25 mg of rofecoxib (half the dose used in VIGOR) was used. The FDA Reviewer stated (page 12) "the CV findings are of concern…"

### Rofecoxib and Stroke

45. Cerebrovascular accidents (CVA's or strokes) are abrupt interruptions of blood flow to the brain. These interruptions lead to massive brain cell death, producing paralysis, loss of cognitive function, and, in extreme cases, coma and death.

46. Stroke is the number one cause of adult disability in the United States and the third leading cause of death. In the United States, stroke mortality fell by 15.1% from 1988 to 1998, but the actual number of stroke deaths rose 5.3% [5,6]. Approximately 600,000 people have a new or recurrent stroke each year in the US. Of these 500,000 are first attacks, and 100,000 are recurrent attacks. More men than women have strokes [5].

47. In many respects, strokes are similar to heart attacks. Atherosclerosis, the pathological process underling the majority of strokes, occurs throughout the arterial blood system. It can produce loss of function in the heart, peripheral vascular system, or kidneys as well as in the central nervous system.

48. Both strokes and heart attacks commonly have the same mechanism of production, i.e., the initiation and development of atherosclerotic plaques in major arteries that supply

M007C50Z79

these two end organs (the brain and the heart) with nutrient and oxygen rich blood. The atheromatous gruel grows over time, fed by lipid rich macrophages, aggravated by high vascular pressures, and the vasoactive affects of smoking. The creation of a fissure in the plaque can activate the intricate collection of clotting mechanisms that leads to the rapid development of a thrombus, further narrowing the lumen of the blood vessels, leading to death of the supplied tissue.

49.  The risk factors for stroke (older age, hypertension, unfavorable lipid panels, smoking) are closely related to those of heart attacks. In addition, treatment is the same. The first treatment, prevention, requires the modulation of risk factor levels. A second is the identification of major blood vessels that are at risk (carotid vessels for the brain, coronary arteries for the heart) including bypassing the lesions or end-arterectomy. Finally, acute treatment for each includes the use of clot lysis therapy including tissue plasminogen activator or tPA. In each case, the lysis therapy must begin as quickly as possible after the onset of the heart attack or stroke. Thus, stroke and heart attacks and sister symptomatic manifestations of the same underlying disease – atherosclerosis.

50.  Thus the introduction of new risk factor for the development of thromboembolic disease would naturally suggest the risk factor would affect not just the occurrence of heart attacks, but the occurrence of strokes as well. Because of the same underlying pathophysiology, the warnings received by Merck outlining the potential dangers of rofecoxib applied to the occurrence of stroke as well.

51.  The epidemiology of risk factor identification and stroke is complicated by the relatively small number of strokes. Therefore, when the a priori warning about cardiovascular adverse events associated with rofecoxib was sounded by Fitzgerald, Oakes, and Patrono,

M007C50280

the search for stroke adverse events must be especially sensitive and diligent since the occurrence of strokes are themselves not common.

52. In the 1998 Watson report. Table 1 of that report reveals that cerebral infarction, and cerebral vascular accident, were included as cardiovascular serious adverse events. In the words of the report (Page 3; C: Cardiovascular Serious Adverse Events). The SAE's chosen were felt to have a high likelihood of representing acute thrombotic events. Table 6 and 7 of that report demonstrate a greater incidence of CV SAE cases in men (relative risk 1.28) and women (relative risk 2.16). Appendix C of that report reveals that there was at least one patient who had a CVA.

53. Preliminary rofecoxib meta-analysis by Dr. Deborah Shapiro (October 18, 2000) noted there were 8 cerebral accidents in the rofecoxib group and 9 in the control group (including one hemorrhagic and one lacunar stroke). However, in that same report, an evaluation of the effect of rofecoxib versus NSAIDS, there were 23 CVA's in the rofecoxib group (11 CVA, 2 hemorrhagic strokes, 9 cerebral vascular strokes, and 1 lacunar stroke) versus only 9 in the NSAIDS group. (7 CVA, 1 hemorrhagic stroke, and 8 ischemic cerebrovascular strokes). This is a remarkably strong signal of rofecoxib-stroke hazard, given the paucity of stroke events.

54. IN VIP (Table 1.12 of the Clinical Study Synopsis), There were five strokes on treatment or within 14 days of study drug discontinuation. However, Table 1.6 which lists events believed to be related to the drug, there was only one infarction (lacunar) in the rofecoxib group and none in the placebo group. This is unquestionably a small number of events, but it is enhanced sensitivity to these rare events that the sponsor is obligated to pay when there has been adequate *a priori* warning.

M007C50281

55.  The Advantage study produced more stroke events in the control group than the rofe-
     coxib group. However, this finding does not "cancel out" the findings of rofecoxib-stroke
     hazard in the other studies. The evidence for hazard includes the mechanism by which
     many strokes are produced, and the greater number of studies that demonstrate rofecoxib
     stroke-excess. These powerful findings are not nullified by the observation that not every
     single study doesn't demonstrate this harmless effect.

56.  In the Alzheimer studies (protocol 091, 078, and 126), three fatal strokes occur, versus
     one  in the placebo groups. (Table 2, FDA Cardiovascular data in Alzheimer's studies).
     This occurred in relatively short term studies, again manifesting a small but clear in-
     creased stroke hazard in patients taking rofecoxib.

57.  In the Victor protocol, as stated in the Overview of Cardiovascular Events in the
     VICTOR Study (Table 1 Summary of Confirmed Thrombotic Cardiovascular Serious
     AE's by Class of Terms Rofecoxib 25 mg vs. Placebo). There were four ischemic cardio-
     vascular strokes observed, 3 in the rofecoxib, and 1 on placebo. The combined endpoint
     analysis including ATPC events revealed the same division (3 in the rofecoxib group and
     1 in the placebo group) again, an excess number of strokes attributable to rofecoxib ther-
     apy.

58.  The published APPROVe study, revealed 22 cerebrovascular events (Table 2, Incidence
     of Adjudicated Thrombotic Adverse Events). Of these 22 CVA's 15 were in the rofe-
     coxib group, and 7 in the placebo group (hazard ratio 2.32: 95% CI 0.89 – 6.74). The no-
     tion of statistical significance means little in this underpowered environment. The only
     fatal stroke occurred in the patients receiving rofecoxib.

M007C50282

59.  While the identification of excess risk can be complex when the number of events are small, a review of the available data reveals consistent excess risk from several Merck sponsored studies. Given the similarities between the pathophysiology of stroke and CVA, a review of the data, consistent with well established epidemiologic principles reveals that it is more reasonable than not that rofecoxib causes strokes.

### *Hypertension*

60.  The rofecoxib group had a greater proportion of patients with hypertension-related and edema-related events, with early separation of the curves. The relative risk of these events was 4.61 with a 95% confidence interval of 1.50 to 18.83. The risk for hypertension was 2.02 (95% confidence interval 1.71 to 2.38) and for edema was 1.57 (1.17 to 2.10). In the ADVANTAGE study, there were more 15 patients versus 7 patients who discontinued therapy for ischemia hypertension-related adverse events, and 19 versus 12 patients discontinued therapy for edema related events. In addition, in the APPROVe clinical trial, the rofecoxib group had a greater proportion of patients with hypertension related and edema-related events, with early separation of the curves. The relative risk of these events was 4.61 with a 95% confidence interval of 1.50 to 18.83. The risk for hypertension was 2.02 (95% confidence interval 1.71 to 2.38) and for edema was 1.57 (1.17 to 2.10).

## Background Biochemistry

61.  *Biochemistry of COX-2 inhibition*: COX stands for cyclooxygenase. It is an enzyme system that expedites, and accelerates a particular type of chemical reaction in the body. Many chemical actions and reactions in the body must be facilitated in order to proceed. Before we can discuss the role of COX inhibition, we must first understand what en-

M007C50283

zymes do, and specifically, the remarkable degree of control their presence gives the organism.

62. *The Role of Enzymes*: While people and governments conduct the affairs of business using money, the body conducts its affairs of living through chemistry. Chemical reactions permit it to feed itself, to grow, to move, to defend itself, and to reproduce. This chemistry is intense and complex.

63. Just as fiscal flow, critical in societal interaction, must be carefully balanced and regulated, so too the intricate chemistry of life must be controlled and monitored. The fact is that chemical reactions, left to their own, would quickly consume all reagents and generate products in unproductive amounts at unhelpful times. Frequently, chemical reactions necessary for life would not take place at all because the chemical environment in the cell or tissue where the reaction is to take place is wrong. (e.g., too little reagent, or not enough acid). In order to bring order to this chemical chaos, the body, over tens of thousands of years, has developed reaction-facilitators. These facilitators are called enzymes. Specifically, an enzyme is a complex molecule that expedites a chemical reaction. The enzyme is neither consumed nor produced by the reaction. The reaction is facilitated by the mere presence and interaction of the enzyme.

64. The human body has tens of thousands (and perhaps many more) of such enzyme complexes. Many of these systems have been studied for generations, e.g., the Kreb cycle, which is the process by which glucose (sugar) is converted in the presence of oxygen to chemical energy, with water and carbon dioxide as byproducts. There are over ten differ-

M007C50284

ent chemical reactions that must take place and each of them is facilitated by enzyme system.* Without it, organized energy production in living tissue would fail.

65.   *The Prostaglandin System*: A prostaglandin is a molecule. Specifically, it is a collection of fatty acids (approximately twenty of them) attached to a five-member ring. Their main function (as best understood at this time) is to function as messengers; their presence initiates a series of other chemical reactions. For example, one signal that prostaglandins send is the need for an inflammatory response. The injured body part notifies its constituency that a self-protective, inflammatory reaction is necessary by synthesizing prostaglandins. Inflammation is commonly and most productively a protective response of the organism, commonly producing increased blood flow to the site of inflammation, an immune response, and pain.

66.   A second function of prostaglandins is to mediate the propensity of blood to clot. The tendency of blood to clot must be carefully balanced. Blood that does not clot loses the ability to repair damaged blood vessels that are commonly injured or worn down in the process of daily living.† Blood that does not clot quickly enough leads to a painfully debilitating and short life, as revealed by the natural history of patients with untreated hemophilia. Alternatively, blood that is too likely to clot (i.e., it exists in a hypercoagulable state) leads to blood clots forming where they are neither required nor helpful. Such clots can break off, be carried though the blood stream, and lodge in small (and sometimes large) vessels. The blockage of blood flow leads to death of the tissue that relies on the blood flow, now impeded by the clot. The results of these clots are pulmonary embolisms

---

* Some of these enzymes are hexokinase, aldolase, dihydrolipoyl dehydrogenase, pyruvate kinase, and dihydrolipoyl transacetylase.
† The body has over 100,00 miles of blood vessels, most of them too small to see. There are frequently hourly tears in these blood vessels that must be immediately repaired.

M007C50285

(if the arteries to the lungs are blocked), and heart attacks (if a coronary artery, a vessel supplying the cardiac muscles own blood supply is blocked) or strokes (if the blood supply to the brain is blocked). Platelet aggregation is one of the precipitating mechanisms in producing a myocardial infarction by producing a blood clot in a vessel that directly supplies the heart with oxygen. This pro-clotting process can trigger the cascade of events that produces a heart attack.

67.  The mechanism by which blood clots is one of most studied and complex biochemical mechanisms known, and a detailed discussion of this complicated system, involving literally hundreds of reagents, enzymes, and coenzymes is beyond the scope of this report. The relevant component here is the compound thromboxane $A_2$. One effect of prostaglandins are that they stimulate hemostasis through up-regulation of thromboxane $A_2$, increasing platelet adhesion and aggregation. Thus the production of prostaglandin, according to this theory, increases the coagulability of the blood.

68.  In addition, prostaglandins control the protection of the sensitive stomach lining from an attack on it by the acids and caustic digestive juices produced by the stomach needed to digest food. Prostaglandins are involved in the regulation of these systems (and most likely, many, many more).

69.  Prostaglandin production is controlled in part by the cyclooxygenase, (COX) enzyme system. By stimulating COX, *ceteris paribus** prostaglandin synthesis is increased. By repressing or inhibiting COX, prostaglandin synthesis is decreased.[†] We might then expect that a COX inhibitor, by down regulating COX and thereby reducing prostaglandin syn-

---

* This is a critical insertion. In a complicated biochemical system, any assertion about the response of a system when a component is changes assumes everything else in the system is constant.
† Aspirin controls pain and inflammation because it blocks prostaglandin synthesis. With a reduction in prostaglandin synthesis, the inflammation signal is not sent, and the production of pain is reduced.

M007C50286

thesis would 1) decrease pain and inflammation, 2) reduce blood coagulability (since prostaglandins up regulate thromboxane $A_2$), and 3) decrease the ability of the stomach to protect itself. This is precisely what the traditional non-steroidal inflammatory agents (NSAIDS) do.

70. These NSAIDS, (e.g. ibuprofen and naproxen) are general or nonselective COX inhibitors[*] and have been available for approximately thirty years. They have well known clinical characteristics. While widely accepted as having generally effective analgesia, or pain control. However, since the mechanism of pain control is based on inhibiting COX, and thereby reducing prostaglandin synthesis, they reduce gastric mucosal protection. This reduction is associated with the production of gastric ulcers, gastric obstruction, and gastrointestinal bleeding, all symptoms of erosion of the gastric mucosa. It has been estimated (MK-966 Cox-2 inhibitor product development plan stage 0 review MRK-NJ0220388 page 8, Introduction and Program hypothesis ) 76,000 patients are hospitalized each year, and that over 7,600 patients die each year in the United States alone as a result of NSAID associated gastrointestinal events.

71. However, there is a huge population of patients who have been exposed to the traditional NSAIDS for over thirty-five years. The number of patients with severe gastrointestinal illnesses and deaths is actually a relatively small proportion of patients taking traditional NSAIDS.

72. *COX-1 and COX-2*: Continued research on the COX system lead to the identification of a bifurcated system. It is now believed that there is not one but two COX systems regulating the production of prostaglandins, identified as COX-1 and COX-2. Each metabolize

---

[*] We will see later that even these broad COX inhibitors have different abilities to repress different aspects of the COX system.

M007C50287

arachidonic acid to prostaglandin $PGH_2$, with is the intermediate step in the synthesis of prostaglandins and related compounds known as prostanoids.

73. It is important to understand the role of these two COX systems to appreciate the advantage and difficulties produced by differential COX inhibition. The currently accepted view is that the COX-1 system is a constitutive system, i.e., it is always active, with the enzyme present in high concentrations within tissues including platelets, vascular endothelium (the special cells that make up the inner layer of blood vessels), gastric epithelial cells, and cells in the kidney (renal parenchyma). The prostanoids produced by the COX-1 system increase stomach-lining protection, and increase the coagulability of the blood.

74. Alternatively, the COX-2 system is not always active, but is induced by inflammation. It produces the prostaglandin that sends the inflammatory signal, thereby inducing the cycle of increase blood flow, immune response and pain. It has also been learned that COX-2 also produces prostacyclin $PGI_2$ that is an anti-aggregator and a vasodilator.

75. Thus, it was believed, that just as NSAIDS were developed to block all COX activity, that further refinement of medical therapy could produce a COX-2 inhibitor. Such a therapy, it was felt, would reduce the inflammatory response, while leaving vascular coagulability unchanged and the protective gastrointestinal lining in tact.

76. Early Investigation of the COX-2 inhibitors: The true effects of a therapy emerge over time, where the speed at which knowledge is gained is related to the experience of the medical community with the therapy. Preapproval studies of the COX-2 inhibitors revealed definite efficacy, but minimal benefit above and beyond the medications that were already available. However, when evidence of harm emerges, however inconsistently, regardless of whether it appears in either the pre-marketing or post-marketing environment,

M007C5D2B8

the burden of proof shifts. Specifically, the appearance of harm requires that the sponsor 1) look for definitive evidence of harm in an ethical way and 2) acknowledge that the risk-benefit balance is beginning to change as evidence of new risk emerges. This requires greater efficacy to offset the greater risk. The threshold of significance for harmful effects is much less extreme than that for determining efficacy.

77.  Undoubtedly, exploratory analyses demonstrating harm may not be generalizable. However, the ethical credo of "First, do no harm," requires a patient protective response to this potential new hazard. An appropriate response includes but is not limited to 1) additional analyses that can, in an ethical fashion, determine if the initial finding represents a result that can be generalized to the population at large, and 2) an immediate recalibration of the risk-benefit balance, tipping this balance in the direction of greater harm.

78.  The requirement of these ethical responses neutralize the assertion that exploratory analyses demonstrating harm can be ignored. The need to protect populations from harmful effects must not be blocked by concerns for statistical significance.

79.  What is most convincing is the consistency of findings across the breath of studies involving rofecoxib. The repeated findings of elevations of cardiovascular thrombotic events associated with rofecoxib use, regardless of dose or duration of use strengthen the argument that rofecoxib causes these serious adverse events.

80.  The identification of compounds that have an increased differential inhibition of COX-2 was heralded as a major step forward in pain control, allowing the patient to obtain effective analgesia while avoiding the difficulties long known to be associated with COX-1 inhibition. However, it was also recognized early in the development of COX-2 inhibitors that, by not inhibiting the COX-1 system, a pro-aggregatory effect might be produced.

M007C50289

Even though, early in vitro studies showed that the COX-2 inhibitor rofecoxib did not inhibit platelet aggregation or prolong bleeding time when administered to health volunteers, the 1998 Scientific Advisory Committee served notice to Merck that the effect of Cox-2 inhibitors on the cardiovascular system might be harmful. Findings supported the idea that the COX-2 inhibitors were not necessarily thrombogenic.

81.  However, although 800 mg of celecoxib (a COX-2 inhibitor), did not alter levels of either serum $TXA_2$ or its urinary metabolites, a modest reduction in serum $TXB_2$ (a metabolite of $TXA_2$) was observed, suggesting that COX-2's might engender a coagulable state (i.e., make the blood more likely to clot). The balance between TXA2 (a platelet aggregator promoted by COX-1) and $PGI_2$ (which counteracts platelet aggregation, modulated by COX-2) requires attention at this point. The difference can be elucidated by the effect of aspirin. COX-1 is selectively inhibited by low-dose aspirin in activated platelets.[*] However, since COX-2 activity is preserved in the presence of aspirin, and the produced $PGI_2$ decreases blood coagulability, the effect of aspirin is to shift the haemostatic balance to an antithrombotic state.

82.  Thus, inhibition of COX 2 suppresses $PGI_2$ formation, blocking the anti-aggregatory effect of $PGI_2$, making the blood more coagulable. This effect should attenuate the anti-aggregatory effect of aspirin. In mechanistic animal studies, the beneficial effect of aspirin was blocked by celecoxib. In addition, the vasodilator effect of $PGI_2$ derived from the endothelium of the coronary vessel and vasodilatory response to application of arachidonic acid was reduced significantly when compared to controls [7]. Because of these results, the authors expressed concern regarding the possibility of an increased risk of acute

---

[*] This occurs by acetylation of the hydroxyl group of a serine residue near the COX active site. Aspirin's COX-1 inhibitory action persists for the lifetime of the platelet. Recovery of the effect is strictly a function of platelet turnover.

MOO7C50290

vascular events in patients receiving COX-2 inhibitors, especially in individuals with un-
derling inflammatory disorders, including coronary artery disease. This bolstered the
theoretical argument that COX-2 inhibitors might increase the likelihood of serious
thrombotic adverse events.

83.  The scientific motivation for this prescient concern is clear. COX-2 inhibition would re-
duce the anti-thrombotic effect of PGI2. By not suppressing COX-1, the thromboxane $A_2$
activity would proceed, tipping the hemostatic balance to a procoagulation state. How-
ever, the interaction between the COX enzyme system and hemostasis is complicated by
the different potencies that the COX-2 inhibitory agents have on COX- inhibition, i.e.,
COX-2 inhibitors can also be COX-1 inhibitors. In one study, the COX inhibitors were
directly evaluated for their differential COX-1/COX-2 inhibitory activity. The main aim
of this investigation was to clarify the possible effect that various COX-2 inhibitors might
have on the aggregatory propensity of blood. The researchers found that the COX-2 in-
hibitors had widely variable selectivity for COX-1 inhibition. Rofecoxib as well as the
newer agent etoricoxib have the smallest effect against COX-1. Hence they are closer to
"pure COX-2 inhibitors". Alternatively, celecoxib had more COX-1 inhibitory activity,
and is a less pure COX-2 inhibitor.

84.  In addition an effect of platelet aggregation with possible clinical significance was sug-
gested by observations of elevated prothrombin times and bleeding episodes with con-
comitant use of celecoxib and warfarin in a patient with pre-exiting cardiovascular dis-
ease [8]. In addition, there were reports of patients with connective tissue disorder who
developed arterial thrombosis after initiation of celecoxib therapy [9]. An FDA assess-
ment of the preapproval data led to their acknowledgement that there was a possibility

M007C50291

that COX-2 inhibitors could cause thromboembolic disease. The conclusions from these pharmacological studies and other experimental evidence lent credence to the view that selective COX-2 inhibition reduces synthesis of $PGI_2$ and may promote a pro-aggregatory state before rofecoxib was approved.

## Inadequate Testing

85. The potential cardiovascular risks of Vioxx were apparent well before the drug was approved, and Merck was aware of these dangers. Their testing program was inadequate.

86. On September 12, 1996, before rofecoxib was approved, a memo from Dr. Randall to the Cox-2 Team, on page 6 stated, "Another SAE (severe adverse event) of unstable angina was reported in extension to RA (rheumatoid arthritis) study. The vascular AE's are expected since COX-1 is not inhibited". This memo demonstrates that Merck appreciated not just that cardiovascular serious adverse events could be anticipated with rofecoxib, but that they understood the mechanism by which they would be produced. They accepted the causal link between rofecoxib and cardiothrombotic adverse events before the drug was approved.

87. On Thursday, October 10, 1996, before rofecoxib was approved, a review of protocol 017 was described (MRK-ABC0048706). In this review the following statement appears "Adverse events of most concern were in the cardiovascular system (e.g., MI, unstable angina, rapid fall in hemoglobin and hematocrit in some subjects, and a small increase in blood pressure), documenting the potential for cardiovascular adverse effects caused by rofecoxib.

88. On November 11, 1996, before rofecoxib was approved, Dr. Musliner anticipated that there would be 25% more adverse cardiovascular events with rofecoxib (Memo: Subject-

M007C650292

Anticipated consequences of NSAID anti-platelet effects on cardiovascular events and effects of excluding low-dose aspirin use in the Cox-2 GI Outcomes Megatrial – Page 5.). Dr, Musliner also stated the rofecoxib-induced increased cardiovascular event rate might be expected "due to the absence of anti-platelet effect for the selective Cox-2 inhibitor," and "would create a negative aspect to the results and leave open the question (reasonable or unreasonable) whether the drug might in some other way be contributing to such events." The concern about an increased cardiovascular adverse event profile was well established years before the drug was approved, requiring adequate testing.

89.  However, rather than design a clinical trial that was designed to fully elaborate the risks and benefits of rofecoxib, Merck designed VIGOR to underestimate the true risk rofecoxib for increasing cardiovascular events. A concern about possibility of rofecoxib caused an increase in CV events and "you will get more thrombotic events and kill drug." a prescient concern that time demonstrated was the fact of the matter. Dr. Reicin in a later email that day provided an unethical solution, actively considering "the idea of excluding high risk cardiovascular patients, i.e., those that have already had an MI, CABG, and PTCA. This may decrease the CV event rate so that a difference between the two groups would not be evident" This was a deliberate attempt to confuse the medical community about the potential cardiovascular risk associated with rofecoxib. The only concern about this unethical thought process was not that the medical community would be mislead, but "would we be able to recruit any patients?" A following email from Brian Daniels (February 26, 1997) stated "It is clear to me that the program will be severely hurt if a megatrial shows a win in PUB's and a loss in MI/CVA." Thus VIGOR was designed not to demonstrate the true benefits and risks of the therapy, but to understate the risks while

M007C50293

magnifying the benefits. VIGOR's configuration was crippled, designed to deceive the
medical community.

90. On October 24, 1997, before rofecoxib was approved, Dr. Fitzgerald emailed Dr. Nies, in
which Dr. Fitzgerald made specific recommendations for further cardiovascular studies
based on the concerns for the effects of Cox-2 inhibitor therapy.

91. On October 27, 1997, in a letter from Dr Oates to Dr. Nies, Dr. Oates warned of the
mechanism by which Vioxx could produce adverse events and proposed additional test-
ing. Specifically, Dr. Oats made suggestions on how to study the effects of rofecoxib on
prostacyclin biosynthesis in order to determine whether an imbalance is created between
prostacyclin and thromboxane-A2.

92. On February 2, 1998, before rofecoxib was approved, Dr. Watson's final results on the
analysis of cardiovascular SAE's in the Phase IIb/III Vioxx osteoarthritis clinical trials
was received. This was a detailed analysis demonstrating that rofecoxib produced more
cardiovascular events in the VIOXX program This analysis demonstrated that the inci-
dence ratio of cardiovascular serious adverse events was 19.4/1000 in men and 15.5/1000
in women. The overall incidence rate for women was elevated when compared to
FOSAMAX controls with a relative risk of 2.16 and a 95% confidence interval of 1.14 –
3.94. On page 2, the description of the results of protocol 023 states, "These findings
raised concern about the potential for VIOXX to predispose to thrombotic cardiovascular
(CV events) page 2. In fact, risk for cardiovascular events was elevated for two of the
three age groups in men and three of the four age groups in women (Table 6). The report
states that the VIOXX 125 mg and 25 mg treatment groups also had more clinical cardio-
vascular AE's then the placebo group in protocol 010 (page 1 following executive sum-

M007C50294

mary). The next sentence which states there is no evidence of an increased incidence of such events ignores the findings from Table 6. This analysis revealed a signal to Merck that the thromboembolic events whose occurrence was anticipated by the understanding by which rofecoxib worked. Given the *a priori* concern about the relationship between rofecoxib and cardiovascular events, this was clear signal that Merck missed.

93. The inappropriate interpretation of the Watson report reveals a substantial, persistent inconsistency in Merck's philosophy toward rofecoxib-induced cardiovascular events. From 1996-98, there were well documented points at which Merck received advice about the likelihood that rofecoxib produces cardiovascular events. Clearly Merck absorbed this message because it was repeated by key Merck personnel. Merck's understanding of this threat to rofecoxib was complete enough for them to distort the design of VIGOR, excluding patients who were at high risk of cardiovascular events. However, when the threat becomes reality, as in the Watson report, where almost all age-gender groups manifest excess cardiovascular serious adverse events in patients taking rofecoxib, revealing the relationship that Merck has been educated to fear, its scientists turn a blind eye to the results. It is this reaction that governs Merck's perspective on the rofecoxib-CV event relationship.

94. From May 3 – May 6, 1998, the Science Advisory Committee to Merck reviewed the Vioxx program. They wrote that there were significant safety risks with Vioxx. On page 11, they stated that the possible harmful effects of Cox-2 inhibition could be produced by a combination of three mechanisms 1) development of lipid-rich plaques in the coronary arteries, 2) plaque cap destabilization, making them rupture prone, and 3) thrombotic occlusion of the vessel at the rupture site. They further warned Merck, before rofecoxib was

M007C50295

approved, that more information is needed to address these questions related to the possible influences of a COX-2 inhibitor on coronary morbidity and mortality.

95. On May 20, 1998, before rofecoxib was approved, Dr. Watson convened a meeting of the Cox-2 cardiovascular SAE Surveillance Task Force. During the introduction to the meeting, he states, "these findings raised concern about the potential for VIOXX to predispose to thrombotic cardiovascular (CV events).

96. On September 9, 1998, before rofecoxib was approved, Dr. Patrono wrote a letter to Dr. Laurenzi at Merck, in which Dr. Patrono warned of potential CV issues with rofecoxib, suggesting that more tests are required. Specifically, he said (page 1), speaking about Cox-2 inhibitor effect, "I would like to emphasize that this is likely to be but one of several facets of the potential cardiovascular implications of Cox-2 expression and inhibition." In addition, he said (page 2), "Because companies making non-selective Cox-2 inhibitors are likely to emphasize the cardiovascular implications of specific Cox-2 inhibitors, I would suggest that it would be in the best interest of Merck to look into these issues as quickly and thoroughly as possible."

97. On September 29, 1998, before rofecoxib was approved, Dr. Nies penned a handwritten note in which he tells Dr. Oates and Dr. Patrono that Merck will not do the kinds of studies that the two experts have proposed to explore the cardiovascular risks of rofecoxib. He anticipated that the drugs would become available without the need for the safety testing Drs. Oates and Patrono warned were so necessary.

98. This body of information demonstrates that before rofecoxib was approved, the mechanism by which it produced harmful cardiovascular events had been elucidated, and sig-

M007C50296

nals of cardiovascular events had occurred. Merck's pre approval testing program was incomplete.

99. On May 20, 1999, the month Vioxx was approved, the FDA Medical Officer Review reflected concern about rofecoxib's cardiovascular risk. He noted that the cardiovascular trends and that a larger databases was needed to assess CV safety. He also commented on the relatively small number of patients that Merck exposed to Vioxx prior to approval.

100. The role of statistical errors. The Appendices to this report lay out the basis of statistical errors in clinical research. Essentially, since researchers in health care cannot study entire populations but only samples from those populations, they must acknowledge that the occurrence of misleading samples can skew their research results. For example, it is possible that a population in which there is no relationship between exposure and disease can produce a sample in which a relationship exists. In this case, the positive sample results mislead the medical community. Similarly, populations in which there is no relationship between the exposure and disease can, just through the play of chance, produce a sample in which there is a relationship. Thus, researchers must understand that sampling error, or the variability of results from the population to the sample can provide misleading results.

101. Well-designed, well-executed studies tailored to produce effects for desired endpoints must therefore have adequate protection against the first error (populations with negative results producing positive findings in samples, a type I error). This protection is statistical significance. In addition, there must be protection of samples from populations which have negative results producing positive results in samples (a type II error) – this projection is provided by the statistical power of the research. Research protocols typically are designed to produce low levels of type I error (traditionally p values less than 0.05, or

M007C50297

high levels of statistical significance) and high values of power (typically greater than 0.80).

102. For example Protocol 090 was designed to have adequate protection against these statistical errors, but only for the pain relief component. It was not designed to be adequately powered for the cardiovascular effects. Therefore, since the study was not designed to have this adequate statistical protection, we can take no assurance from the absence of statistical significance of its findings for myocardial infarction. The relative risk of 3.0 for cardiovascular events, demonstrating increased risk of Vioxx, does not required statistical significance since the study was not designed to demonstrate this effect with statistical significance (i.e., it lacked adequate power).

103. Typically, underpowered studies that produce non-statistically significant results are termed "non-informative." However, while this is a reasonable approach for findings that produce efficacy, it is not helpful for findings that identify harm. This is because the medical community typically cannot afford to wait for the ideal study to be done in a large number of patients with appropriate protection against type I and type II statistical errors, in the meantime exposing patients to risk needlessly. Thus, small signals of harm while not statistically significant, must be taken seriously by the investigator and the sponsor.

104. In addition, statistically insignificant signals of harm in small samples can have terrible consequences for the community of patients at large. The identification of four cases of myocardial infarction in the exposed group when compared to one case in the control group out of total of less than 100 patients may be statistically insignificant. However, this four fold increase in risk when transmitted to hundreds of thousands of patients tak-

M007C50298

ing the drug would be a public health catastrophe. Thus, statistically insignificant signals of harm in small studies must be taken seriously.

105. In the presence of statistically insignificant signals of harm, studies with reverse findings from each other do not commit fratricide – they do not cancel each other out. The presence of sample-to-sample variability blocks our natural tendency to insist that all studies show the same result. Thus the identification of a harmful effect of Vioxx on cardiovascular findings in Protocol 090 is not negated by the presence of the reverse effect in its sister study 085. The mechanism of action by which Vioxx produced heart attacks remains the same in the two studies, however, sample to sample variability produced the reverse findings in 085. This is also the explanation for the absence of a harmful effect of Vioxx on the occurrence of strokes in the Advantage study. The epidemiologic assertion of consistency does not require that all studies show the same result – only that a number of them, carried out in different patients using different methodologies produce similar results.

## Clinical Studies

106. Clinical Studies: When considering the evidence to support or disprove a hypothesis, one must consider the quality of evidence available on the subject matter. Randomized controlled trials are generally accepted as the gold standard for assessing efficacy of medicines, a justifiable conclusion assuming that the clinical trials were well conducted and executed according to their prospective plan However, not all hazards can be identified from these types of studies, or from studies conducted before the compound receives final regulatory approval.

M007C50299