**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In re:  VIOXX** | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No.  05-2524** | * | |
| | * | **MAGISTRATE** |
| **ANTHONY WAYNE DEDRICK,** | * | **JUDGE KNOWLES** |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| **MERCK & CO., INC.**, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK")
TO EXCLUDE TESTIMONY OF JOHN L. GUERIGUIAN, M.D.**

**(EXPERT CHALLENGE NO. 5)**

The testimony of Dr. John L. Gueriguian fails to meet the requisites of Rule 702 and *Daubert* because it both ventures well beyond his expertise and well into subjects on which expert testimony is inappropriate.  Dr. Gueriguian lacks sufficient knowledge or expertise to support his testimony on the adequacy of the Vioxx labels, the duties of a "responsible and prudent" pharmaceutical company, Merck's state of mind, and the history of Vioxx – and those are, in any event, not the proper ken of expert testimony.  He is also not qualified to second-guess the decisions of the FDA on labeling or any other issue, and here too ventures beyond proper expert testimony.  His opinions on general causation exceed his expertise and lack scientific support.  And much of his testimony focuses on events that are irrelevant because they predate the 2002 label change that preceded Mr. Dedrick's Vioxx use.

I.      **LEGAL STANDARD.**

The legal standard for the admission of expert testimony in federal court is set forth at pages 3-4 of Merck's Memorandum In Support of Motion For Order Excluding Testimony Of Ira J. Gelb, M.D., which has been filed concurrently herewith and is incorporated herein by reference.

In addition to the qualifications and reliability requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993), expert testimony, like all evidence, must satisfy the relevant requirements of the Federal Rules of Evidence, including Rules 401 and 403.

II.     **DR. GUERIGUIAN MAY NOT OPINE THAT MERCK'S WARNINGS WERE INADEQUATE OR THAT MERCK DID NOT ACT AS A "REASONABLE AND PRUDENT" PHARMACEUTICAL COMPANY.**

For two reasons, Dr. Gueriguian should not be permitted to testify about the adequacy of Merck's warning labels, warning labels generally, or his view about the duties of a "responsible and prudent" pharmaceutical company.   First, Dr. Gueriguian does not have the requisite knowledge, training, or expertise to opine on such subjects.   Second, Dr. Gueriguian's unsupported personal opinions on what he thought Merck *should have* done are not helpful to a jury and are thus inadmissible.

A.      **Dr. Gueriguian Is Not Qualified To Render Opinions On Warning Labels Or The Standards To Which A Pharmaceutical Company Should Be Held.**

Under Rule 702, plaintiff must show that Dr. Gueriguian has the requisite "scientific, technical, or other specialized knowledge" to opine on the issue of Merck's warning labels and the standards to which pharmaceutical companies should be held.   FED. R. EVID. 702.   Plaintiff cannot meet this burden.

During his tenure at the FDA, Dr. Gueriguian focused on testing drugs (mainly related to diabetes) for their safety and efficacy.  He never had authority for final approval of labels and reviewed only "two or three" changes being effected ("CBE") labeling supplements.  (July 12, 2006 Deposition of John L. Gueriguian, M.D. ("Gueriguian 07/12/06 Dep.") at 157:25-158:3, 158:23-159:5, 160:19-25, attached hereto as Ex. A.)   That limited experience, even supplemented by his self-professed general "familiarity" gained from industry-related publications, falls well short of the requirements of Rule 702 and *Daubert*.  (Gueriguian Expert Report ("Gueriguian Rpt.") at 2, attached hereto as Ex. B); *cf. Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir. 1999) (requiring specialized knowledge or other assurances of reliability). Nor does Dr. Gueriguian have specific knowledge of or experience with Vioxx labeling.  He was not involved with the Vioxx labeling process and has never discussed the Vioxx label with anyone who was.  (*See* Gueriguian 07/12/06 Dep. at 141:13-18 ("Q:  Okay.  And you have never spoken to any FDA employees involved in reviewing the VIGOR label submission?  A:  I didn't speak about Vioxx with any employee of FDA present or past.  I do speak to myself from time to time, but that's an exception.").)   Dr. Gueriguian stopped seeing patients 32 years ago, well before Vioxx entered the market.  (*Id.* at 33:11-13.)  He has never prescribed Vioxx, does not assert that he read the product label for Vioxx while it was on the market, and has never prescribed any other COX-2 inhibitor.  (*Id.* at 33:14-23.)  He has never even discussed with other physicians their experience with prescribing Vioxx.  (July 13, 3006 Deposition of John L. Gueriguian ("Gueriguian 07/13/06 Dep.") at 238:23-239:5, attached hereto as Ex. C.)

Despite this lack of relevant training, experience, education, or knowledge, Dr. Gueriguian offers purported expert opinions criticizing the labeling for Vioxx and Merck's conduct during the labeling process:

- "[A] reasonable and competent pharmaceutical company would have updated the warning [in 2002]."  (Gueriguian Rpt. at 28.)

- "Based on my review of the available data, the 2002 label was inadequate." (*Id.* at 34.)

- The language suggested in 2005 for labeling Vioxx is a "further indication of the inadequacy of the Vioxx label during the time it was on the market" and "should have been incorporated into the Vioxx label as early as 2000."  (*Id.* at 36.)[1]

Because Dr. Gueriguian is not qualified to testify on the issue of labeling in general or the Vioxx label in particular, his opinions and testimony of this sort should be excluded.  Moreover, for these same reasons as well as those discussed below, he should not be permitted to opine on what a "reasonable and competent" pharmaceutical company would do in connection with labeling or communications with the medical community, including "Dear Doctor" letters or responses to physician-initiated requests.

### B.      Dr. Gueriguian's Subjective Ethical Or Normative Standards Concerning The Federal Regulations, The Pharmaceutical Industry, And Merck Specifically Are Irrelevant And Unreliable.

An expert's personal opinions that are not grounded in any established standard should be excluded under Rule 702.  *See, e.g.*, *Turpin v. Merrell Dow Pharms., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992) (excluding an expert's testimony because "no understandable scientific basis is stated. Personal opinion, not science, is testifying here"); *see also Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001) (holding that "conclusions based only on personal opinion and experience do not suffice" to establish the reliability or utility of expert testimony). Rule 702 does not permit "opinion evidence that is connected to existing data only by the *ipse*

---

[1] Opinion testimony that future labeling for Vioxx would contain warnings about adverse cardiovascular events, a black-box warning, or other revisions or additions is improper as such evidence is prohibited by Federal Rule of Evidence 407 as subsequent remedial measures. (*See* Aug. 31, 2006 *Smith v. Merck* Tr. at 28:18-29:13.)

*dixit* of the expert." *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 616 (E.D. La. 2003) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (courts should guard against the admission of subjective or speculative opinions); *Daubert*, 509 U.S. at 589-90 (more is required than "subjective belief or unsupported speculation").

Dr. Gueriguian's proposed testimony is replete with opinions that are little more than his personal views. For example, Dr. Gueriguian asserts that "federal regulations governing pharmaceuticals are minimal standards" and that these regulations "should be exceeded where it is responsible and prudent to do so." (Gueriguian Rpt. at 4.) Dr. Gueriguian offers no support for that opinion, which is contrary to the views of the FDA itself.[2] Nor does he offer any guidance on what it means to "exceed" federal standards or when it would be "responsible and prudent" to do so. Particularly in the arena of drug labeling – where over-warning of remote risks may dilute warnings that address more common risks – it is not clear what a company would need to do even if it wished to comply with Dr. Gueriguian's personal rules. *See, e.g.*, Requirements for Content and Format of Labeling for Human Prescription Drug and Biological Products, 71 Fed. Reg. 3922, 3935 (Jan. 24, 2006) (to be codified at 21 C.F.R. pts. 201, 314, 601) ("Overwarning, just like underwarning, can similarly have a negative effect on patient safety and public health."). Dr. Gueriguian similarly opines that a "responsible" pharmaceutical company must exceed its legal obligations "when reasonably necessary" in order to "protect the public health and well-being." (Gueriguian Rpt. at 4, 11.) Here again he offers no support for

---

[2] The FDA has stated that its regulations seek to accomplish the objectives of the FDCA by establishing labeling requirements that are both a minimum and a maximum "ceiling" for the content and format of prescription drug labeling. 71 Fed. Reg. at 3935. Dr. Gueriguian himself, at his deposition, also testified that he had never heard of the labeling requirements being a "minimal thing." (*See* Gueriguian 07/12/06 Dep. at 189:11-24.)

his conclusion or guidance on when something would be "reasonably necessary" or what other
"obligations" should be met.

Dr. Gueriguian's subjective and normative opinions are also inadmissible because they
are not based on reliable methodology and because they are irrelevant to the issue the jury must
decide – whether Merck met its *legal* obligations to plaintiff.[3]  To be reliable under Rule 702, the
"reasoning or methodology" underlying the testimony must be both applicable to the facts and
scientifically valid.  *Vogler v. Blackmore*, 352 F.3d 150, 155 (5th Cir. 2003) (citing *Daubert*, 509
U.S. at 592-93).  By definition, subjective normative testimony is unreliable under *Daubert*.  A
recent order in *In re Welding Fume Products Liability Litigation*, where the court faced the
question the admissibility of expert testimony about whether the defendants had acted as they
"*should have done*," addresses the dual problems of the lack of reliability or relevance of such
testimony:

> No right-minded person would disagree with the aspirational character of [the
> expert's] ethical principles.  But the critical question for the jury in this case is
> whether the defendant corporations did what the law *required* them to do, not
> whether, from a societal perspective, they did what an "ethical corporation"
> *should have* done.  [The expert's] opinions regarding the latter, accordingly, will
> tend to misdirect the finder of fact.

*In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, MDL 1535, 2005 WL 1868046, at
*20 (N.D. Ohio Aug. 8, 2005) (Order).  The court found that the subjective standards crafted by
the expert "set[] out a standard in excess of what the law requires; this is unlikely to 'assist the

---

[3] The standard Dr. Gueriguian applies would require these companies to "project a message
consistent with the information known or knowable regarding the drugs safety and efficacy
profile."  (Gueriguian Rpt. at 11-12.)  This is not consistent with the legal standard for strict
liability and negligence in this action, which measures Merck's conduct by what was known or
*reasonably scientifically knowable* at the time. RESTATEMENT (SECOND) TORTS (1965), cmts. j
and k; *Larkin v. Pfizer, Inc.*, 153 S.W.3d 758, 761 (Ky. 2004); *Carlin v. Super. Ct. (Upjohn)*, 13
Cal. 4th 1104 (1996).

trier of fact to understand the evidence or to determine a fact in issue'" as required by Rule 702.

*Id.*

The Court should require that plaintiff's claims be resolved on their merits, not based on Dr. Gueriguian's subjective, *ex post facto* opinions about what Merck could or should have done differently.

## III.   THE COURT SHOULD NOT PERMIT DR. GUERIGUIAN TO TELL HIS "VIOXX STORY" OR OPINE ON MERCK'S STATE OF MIND OR MOTIVE.

Dr. Gueriguian should not be allowed to offer his Vioxx timeline or "story" or opine as to Merck's state of mind or motive.  Such testimony is improperly designed to supplant the role of the jury.

### A.   <u>Dr. Gueriguian Should Not Be Allowed To Tell His "Vioxx Story."</u>

The vast majority of Dr. Gueriguian's expert report is devoted to chronicling the "Vioxx Story."  (*See* Gueriguian Rpt. at 12-42.)  He summarizes the "evidence," given to him by plaintiff's counsel, and provides a timeline starting in 1996 and ending with the February 2005 FDA Advisory Committee.  This narrative, which is essentially a collection of excerpts from internal Merck documents, the reviews and recommendations of FDA staff, and other memoranda, does not qualify as "expert" testimony under Rule 702 and should be excluded.

There is no evidence that Dr. Gueriguian has any personal knowledge of or expertise on any of the "facts" or issues he has included in his narrative of the case, other than knowledge acquired from his review of the documents given to him by plaintiff's counsel in anticipation of this litigation.[4]  (*See, e.g.*, Gueriguian 07/12/06 Dep. at 108:9-13 ("Q: Are you offering any

---

[4] Courts should be especially cautious in dealing with expert opinions developed solely for the purpose of litigation. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the

(*footnote continues on next page*)

7

opinions regarding, specifically Protocols 10 and 17?  A:  I'm just extracting what Dr. Watson said . . .  Q:  What are you reading from?  A:  From document 47, Dr. Watson's – tab 47, rather, Dr. Watson's epidemiological study . . . .".).)  Dr. Gueriguian's description of selected events is "merely a narrative of the case which a juror is equally capable of constructing." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 551 (citation and internal quotation marks omitted).  It "does no more than counsel for plaintiff will do in argument, *i.e.*, propound a particular interpretation of [Merck's] conduct." *Id.* (citation and internal quotation marks omitted).  It certainly does not require any "scientific, technical, or other specialized knowledge," and it would not assist the trier of fact.  Instead, it would simply give Dr. Gueriguian a platform to act as an advocate for the plaintiff.  For example, Dr. Gueriguian asserts that his review of documents produced to him by plaintiff's counsel allows him to conclude that Merck acted in an "unprofessional and obstructive" way.  (Gueriguian Rpt. at 33.)  Based on that same review, Dr. Gueriguian concludes that it was clear "that the FDA was concerned about incidence of cardiovascular events in the pre-approval trials but that the data provided by Merck was insufficient to draw any conclusions about cardiovascular safety." (*Id.* at 15.)

Counsel is free to argue at trial that the jury should reach the same conclusions that Dr. Gueriguian is attempting to offer – but it is not the role of experts to tell the jury how to review and interpret the evidence presented.  An expert such as Dr. Gueriguian who "lacks personal knowledge may only testify about the underlying facts if he is actually bringing to bear his

---

litigation, or whether they have developed their opinions expressly for purposes of testifying. That an expert testifies for money does not necessarily cast doubt on the reliability of his testimony, as few experts appear in court merely as an eleemosynary gesture. But in determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office."); *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 252 (6th Cir. 2001).

scientific expertise" – which Dr. Gueriguian is not doing here, since his narrative does not draw on his background in pharmacology or as a clinical reviewer. *See In re Rezulin*, 309 F. Supp. 2d at 554 (citation and internal quotation marks omitted). The proposed testimony runs afoul of both Rule of Evidence 702 and, because it is in essence disguised argument, Rule 403.

Dr. Gueriguian's proposed testimony summarizing evidence should also be excluded because it is cumulative and would waste the Court's and the parties' time. *Meadows & Walker Drilling Co. v. Phillips Petroleum Co.*, 417 F.2d 378, 382 (5th Cir. 1969) ("It is well established that evidence which is merely repetitious and cumulative of testimony already introduced may be excluded by the court."); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 551 (excluding expert's "historical commentary of what happened").

**B.      Opinions About Merck's State Of Mind Or Intent Violate Rule 702 And Must Be Excluded.**

Dr. Gueriguian should also not be permitted to offer his views on Merck's state of mind and intent.[5]  For example, Dr. Gueriguian testifies that:

- "Merck didn't agree with the proposed labeling change of the FDA, fought tooth and nail, didn't budge." (Gueriguian 07/12/06 Dep. at 178:5-7.)

- Merck was "not going to accept what the FDA" said about what the Vioxx label should include and that "the company was adamant in its opposition to any of the substantive proposals made by the FDA people as to how the label should change." (*Id.* at 180:5-6; Gueriguian 07/13/06 Dep. at 244:8-10.)

---

[5] This Court has consistently prohibited plaintiffs' experts from opining about Merck's state of mind. (*See, e.g.*, July 29, 2006 *Barnett* Order Regarding Dr. Zipes ("Dr. Zipes may testify as to what was known in the relevant medical/scientific community based upon the literature and studies available at the time and, based on this knowledge, what the Defendant should have known regarding the risks associated with Vioxx.  To the extent that Dr. Zipes attempts to go beyond this limit, the Defendant's motion is granted."); July 29, 2006 *Barnett* Order Regarding Dr. Fosslien (same); July 6, 2006 *Barnett* Tr. at 53:10-56:24 (precluding Professor Pechmann from testifying about Merck's state of mind).)

- "The potential that the suppression of [prostacyclin] could increase the risk of serious CV risks was known by Merck by early 1998."  (Gueriguian Rpt. at 13.)

- A "senior committee of Merck scientists expressed concern over the results of the osteoarthritis clinical trial and Protocols 010 and 017."  (Gueriguian Rpt. at 13.)

- Despite the VIGOR results, "Merck continued to misrepresent the CV risk" associated with Vioxx and "falsely claimed" that VIGOR confirmed a favorable safety profile for Vioxx.  (*Id.* at 29.)

As the court in another failure-to-warn case against a pharmaceutical manufacturer reasoned when rejecting similar expert testimony about corporate intent and state of mind:

> The witnesses are qualified in particular scientific disciplines.  These disciplines do not include knowledge or even experience in the manner in which corporations and the pharmaceutical marketplace react, behave or think regarding their nonscientific goals of maintaining a profit-making organization that is subject to rules, regulations, standards, customs and practices among competitors and influenced by shareholders or public opinion.

*In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 U.S. Dist. LEXIS 9037, at *28-29 (E.D. Pa. June 20, 2000); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 546 (rejecting expert testimony "on the intent, motives or states of mind of corporations, regulatory agencies and others" because they "have no basis in any relevant body of knowledge or expertise").

The jury is fully capable of deciding whether the evidence supports plaintiff's claims about what Merck knew and intended.  *See In re Rezulin*, 309 F. Supp. 2d at 546 (excluding expert testimony as to corporate state of mind because otherwise experts would "improperly . . . assume the role of advocates for the plaintiffs' case"); *see also In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d at 616 (a court should not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert") (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir. 1999).  To the

extent that evaluating the evidence requires a credibility determination about Merck, it is especially important that that judgment be reserved for the jury. *See Sec. & Exch. Comm'n v. Lipson*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998) (expert accountant was not "specially equip[ped] . . . to divine what [defendant] truly believed" about reliability of financial reports; any opinions offered in that regard are "at worst, rank speculation" and at best, "credibility choices that are within the province of the jury").

Permitting Dr. Gueriguian to give "expert" opinions on Merck's state of mind could also confuse the jury, because the jury may attribute undue credibility to an alleged expert opinion from the witness stand. *See Eymard v. Pan Am. World Airways (In re Air Crash Disaster at New Orleans, La.)*, 795 F.2d 1230, 1233 (5th Cir. 1986) (holding that expert testimony should be excluded if it fails to "bring to the jury more than the lawyers can offer in argument"). A similar attempt by a plaintiff to introduce experts simply to parrot his views was rejected by the court in a recent pharmaceutical product liability multi-district litigation case, where the district court noted that plaintiffs were increasingly attempting to twist the Federal Rules of Evidence to allow expert witnesses to be "oath helpers":

> A practice reminiscent of wager of law has become fashionable among some well-financed litigants – the engagement of "expert" witnesses whose intended role is more to argue the client's cause from the witness stand than to bring to the fact-finder specialized knowledge or expertise that would be helpful in resolving the issues of fact presented by the lawsuit. These "experts" thus are loosely analogous to compurgators, also known as oath helpers, in that they lend their credentials and reputations to the party who calls them without bringing much if any relevant knowledge to bear on the facts actually at issue.

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 538. As in *In re Rezulin*, this Court should prevent Dr. Gueriguian's "oath helping" testimony.

**IV.    DR. GUERIGUIAN'S OPINIONS ABOUT MERCK'S INTERACTIONS WITH THE FDA AND THE FDA'S DECISIONS SHOULD BE EXCLUDED.**

Dr. Gueriguian seeks to second-guess Merck's disclosures to and interactions with the FDA – disclosures and interactions that the FDA has never questioned.    For example, he claims that:

- Merck "was not forthcoming," "sent information in dribs and drabs" to the FDA, and "otherwise obstructed the system."  (Gueriguian 07/13/06 Dep. at 244:4-6; Gueriguian 07/12/06 Dep. at 178:8-9.)

- "[T]he information reflected in the sNDA proposed label was both incomplete and misleading."  (Gueriguian Rpt. at 29.)

- Certain Merck "analyses were not shared with the FDA in 2001-02 while in labeling discussions with the FDA even though Merck was using the interim results from theses studies to fight a warning on the Vioxx label." (*Id.* at 25.) Merck did not cooperate "in terms of accepting a reasonable change in the label" and that instead it was "foot dragging, [] insisting to have [its] way." (Gueriguian 07/12/06 Dep. at 183:16-20.)

- Merck did not "timely" update the Vioxx label "to reflect new safety information" and its labeling and promotional activities were not reasonable. (Gueriguian Rpt. at 18, 30.)

- Despite the VIGOR results, "Merck continued to misrepresent the CV risk" associated with Vioxx and "falsely claimed" that VIGOR confirmed a favorable safety profile for Vioxx.  (*Id.* at 29.)[6]

Dr. Gueriguian also opines that the FDA would have responded differently to Merck in the approval and labeling of Vioxx if the company had acted differently:

- "While it is impossible to state with certainty what the FDA's response to this knowledge would have been, in my opinion it would have – at a minimum – required further clinical trials designed to assess cardiovascular safety."  (*Id.* at 14.)

---

[6]  Dr. Gueriguian's use of inflammatory language accusing Merck of continuing to "misrepresent" and "falsely" claim facts is designed to inflame the jury and convince it that Merck was deliberately misleading the FDA.  As such, the testimony should be excluded under Rule 403 and *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) (*discussed infra* at p. 14).

- "It is my opinion that Merck's lack of candor and failure to disclose to the FDA and it's the [*sic*] pre-approval Advisory Committee the pre-approval concerns it and its consultants identified pre-approval effectively deprived the FDA of the opportunity to compel such studies to, or as a condition to, approval of Vioxx." (*Id.* at 16.)

Dr. Gueriguian's testimony boils down to an assertion that Merck was not forthcoming with the FDA and that, if it had been, the FDA would have acted differently. But Dr. Gueriguian is not an expert in what should and should not be given to the FDA, or on what the FDA would and would not do with information given to it. While he was at the FDA, Dr. Gueriguian worked with scientists to *evaluate* diabetic-related drugs. He did not have responsibility for labeling decisions, nor did he work on any studies or drugs related to cardiovascular safety. (*Id.* at 2; Gueriguian 07/12/06 Dep. at 157:25-158:3, 158:23-159:5, 160:19-25.)

Indeed, Dr. Gueriguian's lack of expertise is demonstrated by his apparent unfamiliarity with the relevant FDA regulations. For example, he asserts that Merck could have initiated a label change, such as a black box warning (Gueriguian Rpt. at 8), or could have otherwise exceeded the "minimum" labeling requirements. (*Id.* at 4.) He apparently is unaware that the decision to implement a black-box warning is within the *sole* province of the FDA. 44 Fed. Reg. 37,434, 37,448 (June 26, 1979) ("to ensure the significance of boxed warnings in drug labeling, they are permitted in labeling only when specifically required by the FDA") (comments of the Commissioner of the FDA regarding 21 C.F.R. § 201.57); *see also* 21 C.F.R. § 201.80(e) ("If a boxed warning is required, its location will be specified by the [FDA]" . . . "Special problems, particularly those that may lead to death or serious injury, may be required by the [FDA] to be placed in a prominently displayed box."). The FDA required no such label for Vioxx.[7]

---

[7] Dr. Gueriguian also misstates the requirements for warnings on prescription drug labels. He asserts that that a mere "well documented single case report" or a single "adverse event analysis," without more, is sufficient to satisfy the "clinically significant" standard for inclusion

*(footnote continues on next page)*

Likewise, Dr. Gueriguian's assertion that Merck should have somehow "exceeded" the FDA requirements contradicts the FDA's view of its own rules.   71 Fed. Reg. at 3935.

Moreover, Dr. Gueriguian's testimony is inappropriate for the independent reason that it amounts to a claim that Merck committed a fraud on the FDA – and that is a claim that the U.S. Supreme Court has held is preempted by the FDCA.  *Buckman*, 531 U.S. at 350, 353.[8]   In reaching its decision in *Buckman*, the Supreme Court stressed that companies should not have to "fear that their disclosures to the FDA, although deemed appropriate by the Administration, will later be judged insufficient in state court."   That is precisely what Dr. Gueriguian attempts to do.

Dr. Gueriguian also exceeds his expertise – and runs afoul of the *Buckman* opinion – by opining that the FDA's own decisions were imprudent:

- "[T]he Alzheimer's results do not, in my opinion, eliminate the need for a cardiovascular warning.  In fact, the results of the 3 Alzheimer's studies required an additional warning on the Vioxx label for mortality risk, when that information became available in 2001."  (Gueriguian Rpt. at 26.)

- "The FDA cardio-renal reviewer concluded that 'one can argue that naproxen would be the preferred drug compared to Vioxx'" and that "'[t]hat it would be difficult to imagine inclusion of the VIGOR results in the rofecoxib labeling without mentioning cardiovascular safety results in the study descriptions as well as the Warning Sections.'" (*Id.* at 21.)

Regardless of what Dr. Gueriguian or individual FDA staff believe should have been included in the Vioxx label, the FDA ultimately deemed the Vioxx labels appropriate.   Dr. Gueriguian is not

---

of a warning in a drug label.  (Gueriguian Rpt. at 37.)  But to accept Dr. Gueriguian's opinion would inevitably require warning and precaution sections to include data that is not supported by "reasonable evidence of an association of a clinically significant hazard" and would dilute the clinical utility of the warning section.  21 C.F.R. § 201.57(c)(6); 65 Fed. Reg. 81,082, 81,116.

[8] Although it is a case involving medical devices, the reasoning and holding of *Buckman* apply equally to cases involving pharmaceuticals. *See Bouchard v. Amer. Home Prods. Corp.*, 213 F. Supp. 2d 802, 812 (N.D. Ohio 2002) ("The Court does not need to engage in searching analysis of *Buckman* to determine that claims of fraud on the FDA are preempted with respect to pharmaceuticals.") (citing *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 236 (6th Cir. 2000)).

qualified – and under *Buckman* should not be permitted – to second-guess those decisions, particularly years after the fact.

Nor is Dr. Gueriguian qualified to second guess the FDA Decision Memorandum of April 6, 2005.  He claims that memorandum is "contradictory," "does not reflect the final conclusions or a mandate of the Agency with respect to cardiovascular safety and appropriate labeling for NSAIDs," and "seems designed to assuage public concern that the agency has failed to diligently monitor the safety of NSAIDs." (*Id.* at 41-42.)   But he has no basis to opine on the legal effects or finality of the Decision Memorandum, or to speculate on motivations of the FDA in propounding it.

## V.   DR. GUERIGUIAN SHOULD NOT BE PERMITTED TO RENDER OPINIONS ON GENERAL CAUSATION.

Dr. Gueriguian lacks the expertise to support opinions that pervade his report about the alleged cardiovascular effects of Vioxx and the FitzGerald Hypothesis:

- "Upon VIGOR's unblinding in March 2000, it became clear that there was a significant imbalance in serious cardiovascular events, such as myocardial infarctions, against Vioxx."  (Gueriguian Rpt. at 19.)

- "The VIGOR results alone established 'reasonable evidence of an association' between VIOXX and CV events, significant hypertension and congestive heart failure." (*Id.* at 28.)

- "The magnitude of the result seen in VIGOR could not be explained by naproxen alone." (*Id.* at 21.)

- "It is my opinion that . . . [the] clinical studies and the mechanistic studies developed pre-approval, demonstrated that the effect seen in VIGOR was due to the cardiotoxic effect of rofecoxib, not the cardioprotective effect of naproxen." (*Id.* at 22-23.)

Dr. Gueriguian was a clinical reviewer for the FDA, focusing mainly on diabetic drugs, and before that was a pharmacology professor.  (*Id.* at 2.)  He has never studied Vioxx, the impact of any drugs on the heart, or any of the COX-2 inhibitors. (Gueriguian 07/12/06 Dep. at

33:11-13, 33:14-23.)  He has virtually no experience with Vioxx and has not practiced medicine in at least thirty-two years.  (*Id.*)  His testimony that Vioxx is associated with an increased risk of adverse cardiovascular events and that Naproxen does not have a cardioprotective effect must be excluded because he does not have the special "knowledge, skill, experience, training, or education" to render them.  *Tanner*, 174 F.3d at 548 (expert witnesses may not testify on matters outside their fields of expertise).

### VI.   DR. GUERIGUIAN'S TESTIMONY THAT THE 2002 LABEL SHOULD HAVE BEEN IMPLEMENTED EARLIER SHOULD BE EXCLUDED.

Plaintiff only began using Vioxx after the 2002 label change.  Dr. Gueriguian's testimony that Merck should have provided certain information to the FDA sooner so that the 2002 label change could have been implemented sooner is irrelevant.  (Gueriguian 07/12/06 Dep. at 178:4-9; Gueriguian Rpt. at 18.)  The FDA did approve the new label in 2002 and that was prior to plaintiff's use of Vioxx.

To allow plaintiff to introduce evidence and opinions about events related to the timeliness of the 2002 label change would effectively put Merck on trial for conduct divorced from the relevant question at issue – whether Merck adequately warned plaintiff's physician of the alleged risks associated with Vioxx.  Such diversion of the jury's attention from the facts and claims at issue in this case can only lead to juror confusion and undue prejudice to Merck.  The Court should exclude this testimony under Rule of Evidence 702 as well as Rules 401 and 403.

### VII.   CONCLUSION.

For the reasons stated above, Merck respectfully requests that the Court grant its Motion to Exclude Testimony of John L. Gueriguian, M.D.

Dated:  October 30, 2006                    Respectfully submitted,


                                            s/ Dorothy H. Wimberly
                                            Phillip A. Wittmann, 13625
                                            Dorothy H. Wimberly, 18509
                                            STONE PIGMAN WALTHER
                                            WITTMANN L.L.C.
                                            546 Carondelet Street
                                            New Orleans, Louisiana  70130
                                            Phone:  504-581-3200
                                            Fax:     504-581-3361

                                            Defendants' Liaison Counsel

                                            Philip S. Beck
                                            Mark Ouweleen
                                            Carrie Jablonski
                                            BARTLIT BECK HERMAN PALENCHAR
                                            & SCOTT LLP
                                            54 West Hubbard Street, Suite 300
                                            Chicago, Illinois  60610
                                            Phone:  312-494-4400
                                            Fax:     312-494-4440

                                            Douglas Marvin
                                            Elaine Horn
                                            WILLIAMS & CONNOLLY LLP
                                            725 Twelfth Street, N.W.
                                            Washington, D.C.  20005
                                            Phone:  202-434-5000
                                            Fax:     202-434-5029

                                            And

                                            Brian Currey
                                            A. Patricia Klemic
                                            O'MELVENY & MYERS LLP
                                            400 South Hope Street
                                            Los Angeles, CA 90071
                                            Phone:  213-430-6000
                                            Fax:     213-430-6407

                                            Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum In Support Of Motion Of Merck & Co., Inc. ("Merck") To Exclude Testimony of John L. Gueriguian, M.D. has been served on Liaison Counsel, Russ Herman, and on counsel for Mr. Dedrick, Andy Birchfield, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 30th day of October, 2006.

*/s/ Dorothy H. Wimberly*
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel