*Report to*

Seeger Weiss LLP

# John Leo Guerigian, M.D.
PharmaGenesis, Inc.
14513 Woodcrest Drive
Rockville, MD 20853-2371

MOO9612690

## I.    INTRODUCTION AND QUALIFICATIONS

I, John Leo Gueriguian, M.D., hereby declare that the following are true to the best of my knowledge, information, and belief.

In 1965, I graduated from the School of Medicine, University of Paris. I also obtained at the Arts & Sciences University of Paris, a Licence-es Sciences (equivalent to a "fortified" Bachelors of Science) in Biology, and Masters in Chemistry (with a minor in Endocrinology). While at this institution, I performed research on the diagnosis and treatment on chorio-epitheliomas, developing a method to assess the prognosis of testicular cancer.   This research culminated in a Doctoral Thesis demonstrating that a simple blood test could result in early and specific diagnosis of the more malignant types of this class of tumors.   I also became a Teaching Assistant in medical biochemistry and laboratory examinations. I spent several years in clinical practice during the numerous externships in various Parisian hospitals. Finally, I had my internship and residency training at the Community Hospital of Mantes-la-Jolie, a fully accredited medical facility affiliated with the School of Medicine, University of Paris.

In 1965, I came to the United States as a Research Fellow at the Harvard Medical School. While at Harvard, I co-discovered the sex hormone-binding globulin.  At that time, I continued my  clinical pursuits as a Staff Attendant in Endocrinology at the Brigham Hospital in Boston.  In 1967, I returned to France and accepted the position of Laboratory Chief, in the Biochemistry Department, School of Medicine, University of Paris.  I was also a research associate at INSERM, the French equivalent to our National Institute of Health (NIH).  While there I published in the areas of steroid hormone transportation and metabolism.

In 1969, I returned to the United States to accept a position as an Assistant Professor of

M000912691

Pharmacology at the University of North Carolina, Chapel Hill. In 1973, I was invited to become an Associate Professor of Pharmacology at the University of Minnesota, School of Medicine in Duluth. While there, I obtained a tenured position teaching pharmacology and conducting endocrinological research in the human species. There, I discovered a method to measure minute amounts of albumin in urine, thus providing the ability to detect early kidney damage in the diabetic patient. I also published in the area of prostaglandins, whose metabolism is affected by NSAIDs and Cox-2 inhibitors.

In 1978, I was invited to join the Food and Drug Administration (FDA) as a group leader and, later, as a Medical Officer in the Division of Endocrine and Metabolic Drug Products. I served in those positions for exactly twenty years until I retired in 1998. During my tenure as a Medical Officer at the FDA, I reviewed several hundred drugs for their safety and efficacy. In this capacity, I worked with industry scientists and academic clinical investigators in the discovery, clinical development, and scientific, medical, and regulatory evaluation of new drugs. I was personally instrumental in introducing new anti-diabetic drugs in the United States, particularly highly purified and DNA-recombinant porcine and human insulins, metformin, and first and second generation sulfonylureas. In addition to my research activities, I organized several international conferences to discuss and obtain global expert consensus regarding the development of new drugs as well as evaluating existing drugs on the market for safety and efficacy.

My literary works include numerous scientific volumes. In this capacity, I have become familiar with the requirements for drug discovery, development, and approval; and post-marketing requirements, and product labeling. I have also become familiar with the

2

interrelationship between the Food and Drug Administration and the pharmaceutical industry with respect to the development, testing, approval and marketing of drugs in the United States.

In September of 1998, I retired from the FDA and founded a scientific consulting think tank known as PharmaGenesis, Inc. My company seeks to provide the pharmaceutical industry with expertise regarding new drug discovery and development and the safety of marketed drugs. A copy of my *curriculum vitae* is attached to this report as Exhibit 1.

The opinions expressed in this declaration are based on my education, experience and training in the fields of chemistry, pharmacology and regulatory compliance. I have also reviewed relevant medical, scientific and regulatory materials as well as relevant documents produced during this litigation. See Exhibit 2. A statement of my prior expert testimony is attached hereto as Exhibit 3. I hold the opinions expressed in this declaration to a reasonable degree of medical and scientific certainty.

## II   BACKGROUND OF THE FDA

### A.   The FDA and Regulation of the Pharmaceutical Drug Industry

It is the intent of the FDA, under a Congressional mandate, to protect the public health and welfare in a number of medical and therapeutic areas including xenobiotic and biological drugs, medical devices, foods and cosmetics. Its statutory mandate is to take appropriate steps within its regulatory confines to see that drugs are approved only after they have been shown to be safe and effective. In addition, the FDA is empowered to exert pharmacovigilance after the approval and marketing of new drugs to ensure continued safety of drugs used by the very large patient population.

To the extent possible, given its finite and limited resources, the FDA is responsible for

3

M000612693

monitoring whether the pharmaceutical industry is undertaking the necessary steps to insure the safety of the manufacturer's product.  In carrying out this function, however, the FDA is dependent upon the drug manufacturer to provide complete, accurate, timely, and truthful information about its drug.  Thus, the FDA's decisions and actions regarding an eventual approval of a new drug are directly dependent on the manufacturer fully testing the drug and disclosing, in a truthful, coherent, timely and accurate manner, all material information concerning that drug.  Similarly, the FDA's decisions with respect to marketed drugs depend on the manufacturer's disclosure of timely, accurate, and relevant information concerning the safety of the drug, its use by the public and effectiveness in treating disease.  The manufacturer's obligations to the FDA and to the public are continuing in nature; both prior to and after approval of the drug, though the extent of its powers vary and depend on a number of well known variables.

In my opinion, communications with the FDA must be timely, concise, accurate, complete and forthcoming and in a manner consistent with the regulations governing drug safety and efficacy.  In my opinion, federal regulations governing pharmaceuticals are minimal standards.  21 C.F.R. § 314.70.  It is my opinion that these regulations can and should be exceeded where it is responsible and prudent to do so.

**B.**     **The Investigational New Drug Application (IND)**

The Code of Federal Regulations, 21 C.F.R. 312, defines the procedures and requirements for submitting an application for an investigational new drug ("IND").  These procedures generally govern the early investigation of the safety and efficacy of potential new drugs in humans.  Phase 1 trials are closely monitored studies which are designed to "determine the

4

M000612694

metabolism and pharmacologic actions of the drug in humans, the side effects associated with increasing doses, and, if possible to gain early evidence on effectiveness." 21 C.F.R. § 312.21(a). Following Phase I studies, the sponsor will generally conduct Phase 2 studies which are "controlled clinical studies conducted to evaluate the effectiveness of the drug for a particular indication...in patients with the disease or condition under study and to determine the common short-term side effects associated with the drug." *Id.* Phase 3 studies are "expanded controlled and uncontrolled trials'...performed after preliminary evidence suggesting effectiveness of the drug has been obtained, and are intended to gather additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling." 21 C.F.R. § 312.21(c).

IND regulations require the FDA to monitor clinical studies conducted under its administrative purview. This monitoring function is critical to the overall mission of the FDA to ensure "that the quality of the scientific evaluation of drugs is adequate to permit an evaluation of the drug's effectiveness and safety," 21 C.F.R. § 312.22(a). The FDA's ability to monitor and evaluate these studies, given the limited resources of the FDA, is wholly dependent on the company's truthful, thorough, timely and balanced compliance with the regulations and disclosure of relevant information. In my position as a Medical Reviewer for the FDA, I can state that we relied heavily on a manufacturer's truthfulness, timeliness and honesty.

The FDA will accept foreign clinical studies that are not conducted under the IND "provided that they are well designed, well conducted, performed by qualified investigators, and conducted in accordance with ethical principles acceptable to the world community." 21 C.F.R. § 312.120(a). In the event that foreign studies are submitted with an IND, the FDA requires that

5

M00961269S

the manufacturer provide specific information.  This information includes "a description of

(each) investigator's qualifications; [a] description of the research facilities; a detailed summary

of the protocol and the results of the study...[finally providing that] the study is adequate and well

controlled under paragraph 314.126."  As I stated, the regulatory system, which permits the FDA

to approve drugs, depends on the quality, correctness, completeness, timeliness and integrity of

the information provided by the drug manufacturer.

In the case of studies not conducted pursuant to an IND, but instead submitted in a New

Drug Application (NDA) for new drug approval by the FDA, it is clearly the drug company's

responsibility to:

- Ensure that the studies submitted either meet all the FDA's minimal criteria as described above for safety and effectiveness, with sufficient reliable data permitting an overall risk-benefit analysis of the drug;

- Or, if the foreign studies do not meet the criteria, to conduct new studies, which comply with the minimal criteria outlined in the regulations.

## C.   The New Drug Application (NDA)

A drug sponsor takes the initiative to send a New Drug Application (NDA) to the FDA

when it has adequately investigated the safety and efficacy of the new drug for the indicated

medical condition.  It is the responsibility of the drug sponsor to provide the FDA with relevant

safety information and to highlight any safety concerns the drug sponsors may have regarding the

drug.  Upon receipt of the NDA, the FDA submits the NDA to its specialized reviewers.  After a

cursory yet sufficient review, the FDA may decide to send to the Sponsor a Refusal-To-File

letter, meaning that the NDA is too deficient for the FDA to review it thoroughly. If the NDA is

filed by the FDA, its reviewers analyze the information provided by industry and transmit their

MDL0961269696

report and recommendations to their respective supervisors. These supervisors have the right to accept or reject the reviewer's findings. Under the stewardship of a project manager the entire NDA is submitted to the appropriate Division Director or the Office Director. At the conclusion of the first level of review, the NDA application is either approved, or not approved, or receives an approvable, or receives a non-approvable letter. If the NDA is not approved, the FDA delineates the deficiencies allowing the company under some circumstances to correct the deficiencies in the form of a supplement.

During this process, a Divisional Advisory Committee comprised of independent experts is selected, based upon their expertise, to sit in an advisory capacity to assess the information provided to it by the manufacturer. Their ultimate purpose is to assess a drug's safety and efficacy as well as post-marketing concerns where applicable. In my experience, the FDA accords great weight to the recommendations of its Advisory Committees. In my experience, the FDA has very rarely rejected the recommendation of its Advisory Committees. I have served, for some three years, as Executive Secretary of the Endocrine & Metabolic Drugs Advisory Committee and am thoroughly familiar of the functioning of such a body.

The FDA approves a new drug if, in its judgment, based upon the information provided by the sponsor and after receiving the recommendations of a separate Advisory Committee; the benefits in the indicated population and the disease or condition to be treated outweigh the risks. It is incumbent to a Sponsor to present to the members of the Advisory Committee ALL the pertinent information that will allow members of the Committee to have a full appreciation of the safety and efficacy of the drug, to b able to weigh the benefits and risks of the drug; and thus, to be able to confidently and usefully advise the FDA in it final appreciation of the Sponsor's NDA.

7

M00961 2697

It is the company's obligation to furnish the FDA (prior to approval of the drug) updated and complete documentation regarding safety, as well as information suggesting potential toxicity associated with the drug.  Such information enables the FDA to require post-marketing Phase IV studies to further assess the drug's safety after its introduction into the marketplace and permit the FDA to:

- Require additional safety studies before approval; or
- Approve the drug on the condition of post-marketing Phase IV studies; or
- Not approve the drug

### D.    Labeling Issues and Procedures

Once the drug is approved, the FDA and the manufacturer must decide on labeling for the product.  In my experience, this process usually involves negotiations between the FDA and the drug's manufacturer.  FDA regulation regarding labeling states that the "warning" section of the product "label shall describe serious adverse events and potential safety hazards..." 21 C.F.R. § 201.57(e).  This section also provides that "the labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a casual relationship need not have been proved." *Id.*  This section further provides for a "boxed warning" for "special problems, particularly those that may lead to death or serious injury." *Id.*  Particularly when there are safety concerns raised concerning the drug, the sponsor can choose to initiate a warning addition or change a label without prior prompting or approval by the FDA as through a process required to as a "special supplement changes being effected." (CBE).

Information contained in the "precautions section" of a label is not a "warning".  A "warning" of a serious adverse event associated with a drug must be placed in the "warning"

8

M00961269B

section of the label and, if serious enough, in a black box prominently displayed at the very top of the label.

Information contained in the "contraindication section" of a label shall describe those situations in which the drug should not be used because the risk of use clearly outweighs any possible benefit. These situations include administration of the drug to patients known to have a hypersensitivity to it; use of the drug in patients who, because of their particular age, sex, concomitant therapy, disease state, or other condition, have a substantial risk of being harmed by it; or continued use of the drug in the face of an unacceptably hazardous adverse reaction. Known hazards and not theoretical possibilities shall be listed, e.g., if hypersensitivity to the drug has not been demonstrated, it should not be listed as a contraindication. If no contraindications are known, this section of the labeling shall state "None known."

The frequency of serious adverse events and other pertinent information "shall" be provided under the "adverse reaction" section of the label. 21 C.F.R. § 201.57(g). That section of the label "shall list the adverse reactions that occur with the drugs in the same pharmacologically active and chemically related class." *Id.*

### E.   Post-Marketing Adverse Drug Event (ADE) Reporting

Following FDA approval, a drug continues to be governed by post-marketing regulations requiring, among other things, the reporting of adverse drug events (ADEs). An ADE is defined as "any adverse event associated with the use of a drug in humans, whether or not considered drug related," 21 C.F.R. § 314.80(a). There are varying degrees of severity for an ADE from mid to moderate to serious to severe. A serious ADE is "an adverse experience that is fatal or life threatening, is permanently disabling, [or] requires inpatient hospitalization." In turn, an

9

on the company to "promptly review all adverse drug experience information obtained or otherwise received by the (company) from any source, foreign or domestic, including information derived from commercial marketing experience, post-marketing clinical investigations, post-marketing epidemiological/surveillance studies, reports in the scientific literature, and in published scientific papers." 21 C.F.R. § 314.80(b).

Federal regulations require that a drug manufacturer submit to the FDA all ADE reports that are serious and unexpected regardless of the source within 15 days of their having been received by the company. 21 C.F.R. § 314.80(c) (i). This regulation further requires the manufacturer to "promptly investigate" all "15 day reports" and submit follow up reports to the FDA. Among the reasons for these requirements is to determine new adverse reactions, which may be associated with the drug so that decisions can be made to change labeling or restrict the use of the drug. The FDA depends on the manufacturer to correctly identify an adverse event as "serious and unexpected" and to inform the FDA of same in a timely manner, particularly when such information may impact the public health.

Federal regulations also expressly mandate the additional requirement that the manufacturer submit periodic reports to the FDA. 21 C.F.R. 314. These reports are to include serious and "expected," i.e. labeled events and shall report any "significant increase in frequency." The purpose of this requirement is to enable the manufacturer and the FDA to determine whether additional labeling needs to be added or to determine whether the product should be withdrawn and/or restricted. Again, the FDA relies on the drug manufacturer to truthfully and accurately report these events in a timely and accurate fashion, particularly when such information may impact the public health.

M009612700

should be withdrawn and/or restricted.  Again, the FDA relies on the drug manufacturer to truthfully and accurately report these events in a timely and accurate fashion, particularly when such information may impact the public health.

Compliance with these post-marketing regulations is the responsibility of the company and is mandated by the federal regulations.  It is also the company's responsibility to fulfill Phase IV studies within a reasonable period of time, to comply with the regulations that govern promotional materials, the reportability of adverse events (ADEs), and actions designed to govern continued drug safety.  Upon approval, the drug monitoring process shifts to the company.  It is the company's responsibility to continue to inform the FDA of safety issues concerning its drug.  It is my opinion that reasonable and prudent drug companies will exceed these regulatory requirements when reasonably necessary to protect the public health and well being.

A reasonable and prudent pharmaceutical manufacturer has the continuing duty to monitor its drugs in the marketplace.  Among other things, a reasonably prudent drug company has the obligation to continually monitor and investigate how its products are used, the efficacy of its drugs (and chemically related drugs) and the risks of its drugs (and chemically related drugs).  The company has a further duty to inform the FDA in a timely fashion of material changes in the safety and risks of its drugs and to update its product label when it becomes apparent that the label is misleading and inaccurate regarding risks and benefits associated with its use.

It is my opinion that any representation, communication, and advertising to physicians and/or the general public, must project a message consistent with the information known or

11

M009612701

knowable regarding the drugs safety and efficacy profile in a fair and balanced manner. It is important not to minimize the dangers of the drug, nor overstate its advantages.  Important adverse events should be communicated in a timely an accurate fashion.

III.   **VIOXX**

   A.    **Pre-Approval Period**

Vioxx is an NSAID [Non-Steroidal Anti-Inflammatory Drug] described as a selective inhibitor of COX-2, an enzyme implicated in the inflammatory process and other physiologic functions.  First approved for marketing and sale in May 1999, the drug was withdrawn from the market by Merck on September 30, 2004, following the termination of the APPROVe trial at the recommendation of the External Safety Monitoring Board (ESMB) for that study.  Long before withdrawal of the drug, however, significant evidence of cardiovascular risk was apparent in trials and studies concerning Vioxx.

Merck began to investigate Vioxx in the early 1990s.  The promise of Vioxx was that of an NSAID that was equally effective to traditional NSAIDs (non-selective NSAIDs, such as Advil (ibuprofren) and Alleve (naproxen)) at relieving pain and inflammation, but one that reduced—but not eliminated—NSAID-related gastrointestinal problems.  Thus, the "benefit" of Vioxx was not that it provided more pain or inflammation relief than traditional prescription and non-prescription NSAIDs.  Rather, with Vioxx, the touted benefit was an improved safety profile compared to traditional NSAIDs.

Prior to approval of VIOXX, and indeed prior to the submission of the Vioxx NDA to the FDA for the drug, concerns were raised by internal and external scientists about the potential for serious adverse cardiovascular events. These safety concerns were based primarily on Vioxx's

12

MDL00612702

known and intended mechanism of action in suppressing the COX-2 enzymes.   In particular, in 1997, Merck investigators involved in a clinical study  focused on kidney function, observed a reduction in the amount  of a stable metabolite of prostacyclin (also known as PGI) found  in the urine of Vioxx study participants. The potential that the suppression of PGI could increase the risk of serious CV risks was known by Merck by early 1998.

In February 1998, Merck's epidemiology group, analyzed the incidence of thrombotic events in the Vioxx osteoarthritis (OA) clinical trials and compared them with two placebo-controlled databases for other Merck drugs.  This analysis suggested a statistically significant increased risk for certain populations.  I understand that the February 1998 analysis was never transmitted to FDA.   This analysis was conducted in response to concerns raised in part by an increased incidence of cardiovascular events seen in another Merck study, Protocol 010, which was completed in 1996.  In this OA study, which compared 25 mg and 125 mg of Vioxx to placebo, patients taking Vioxx experienced six times the amount of cardiovascular events than those taking a sugar pill.  In a rheumatoid arthritis (RA) study from 1996, Protocol 017, there was a myocardial infarction in the Vioxx arm of the study (compared to placebo).  A senior committee of Merck scientists expressed concern over this and other cardiovascular findings. Protocol 017 and its extensions involved a relatively small number of patients in the Vioxx arm of the studies.

Further, in May 1998, Merck conducted a programmatic review of the Vioxx development program using an outside Board of Scientific Advisors.  This Board of Advisors highlighted the possibility that selective inhibition of COX-2 could lead to the development of coronary ischemic events through various mechanisms.  These included (i) the developments of

13

lipid rich of coronary plaque; and/or (ii) destabilization of existing plaque making them "rupture prone"; and/or (iii) negatively affecting the homeostatic balance between prostacyclin and thromboxane to favor thrombosis. The Board stated that" [m]ore information is clearly needed to address these hypotheses and the other questions related to the possible influences of a COX-2 inhibitor on coronary morbidity and mortality." Notwithstanding these concerns, Merck filed its NDA in November 1998 and sought priority review of its application.

The NDA has been made available to me for review and I have reviewed the sections pertinent to my analysis herein. In particular, I have reviewed the "Clinical Safety and Clinical efficacy" submission, including Section 1.7 entitles "Potential Risks Based Upon Specific Cyclooygenase -2 Inhibition." This submission, which is an important part of the NDA, functions as an alert to the FDA Medical Officer of potential safety issues. Importantly, the Vioxx NDA failed to disclose the significant concerns related to selective inhibition of COX-2 as outlined by its consultants, including Dr. FitzGerald and the Merck Board of Scientific Advisors. Rather than highlighting (or even mentioning) the serious safety concerns, the Company postulated only that Vioxx would be neutral on serious cardiovascular events, much like a placebo.[1] Responsible and prudent drug development calls for candor in dealing with FDA and active pursuit of potential safety concerns. While it is impossible to state with certainty what the FDA's response to this knowledge might have been, in my opinion it would have—at a minimum—required further clinical trials designed to assess cardiovascular safety. This seems particularly likely when one considers in the aggregate, the early clinical trial results, concerns raised by Merck's Board of Scientific Advisors, and the February 1998 analysis (the last two

---

[1] Although the Company asserted that rofecoxib had no effect on platelet aggregation, it failed to disclose concerns that Vioxx might suppress prostacyclin production in the endothelium and cause patients to become prothrombotic.

M00961270 4

items do not appear to have been disclosed to the FDA). Once the drug was ultimately approved, the Agency's power to insist upon safety studies was greatly curtailed. Merck never completed any clinical trials designed to evaluate the cardiovascular safety of Vioxx.

I have reviewed the pre-approval Medical Officer Reviews of Maria Lourdes Villalba and Carlos Peloya. This review confirmed that the FDA was concerned about incidence of cardiovascular events in the pre-approval trials but that the data provided by Merck was insufficient to draw any conclusions about cardiovascular safety. With respect to the pre-approval trials, Dr. Villalba observed that "[a] larger database will be needed to answer this [whether the risk of cardiovascular and thromboembolic events is increased in patients on rofecoxib] and other safety comparison questions." Dr. Peloya similarly observed that the clinical database was inadequate to assess cardiovascular risk.

As noted by the FDA, the pre-approval trials were not designed or powered to test the comparative risk of Vioxx on cardiovascular disease, whether versus placebo or comparator NSAIDs. Indeed, the pre-approval trials had limited long-term exposure for a drug that was designed to be taken chronically. Of the 5435 patients in the pre-approval trials that took Vioxx, 1428 took it for less than a week (1032 patients took only a single dose). Of the 1971 patients who took the drug for two months or more, only 428 patients took 50mg or greater; only 1486 took dosages less than 50mg (12.5mg to less than 50mg) for that period of time. Only 822 patients took Vioxx for more than a year. Of those, 63 patients took 50mg or more for that period of time; 381 patients took 25mg to less than 50mg over that period. There was likewise very little placebo-controlled data from these pre-approval trials. Of the 783 placebo-using patients in these trials, only half that number participated in trials up to 18 weeks; the remaining

15

M00961270S

placebo data is from trials of six weeks or less.  *See* 1999 Villalba Medical Officer Review.

In terms of patient population in these pre-approval trials, patients with a recent history of MI or unstable angina, CVA and TIAs within 2 years prior to entry were excluded from the studies.

The inability of the Vioxx clinical program to provide data regarding cardiovascular safety, as of November 1998, is underscored by the Company's failure to fully comply with the International Conference for Harmonisation (ICH) guidelines—an organization to which the FDA is a member and which issues guidance documents to the pharmaceutical industry.  In 1994, the ICH made several recommendations concerning the size and scope of clinical studies testing safety and efficacy in human subjects.  While Merck's clinical program for Vioxx appeared to comply with the minimum standards established by ICH with respect to the number of patients tested, the Company failed to follow ICH requirements for additional testing where there is concern the drug may cause specific adverse events.

It is improper to draw conclusions from the absence of a safety concern in the pre-approval trials as evidence that no safety concern existed with Vioxx.  To make such a claim, specific trials, with pre-specified cardiovascular endpoints and sufficient sample size, would need to be designed and conducted.  Such trials were not done prior to approval of the drug.

It is my opinion that Merck's lack of candor and failure to disclose to the FDA and its the pre-approval Advisory Committee the pre-approval concerns it and its consultants identified pre-approval effectively deprived  the FDA of the opportunity to compel such studies prior to, or as a condition to, approval of Vioxx.  Such studies would have undoubtedly delayed approval of the drug.  As noted above, however, after approval of a drug, the FDA is in a substantially weakened

16

M00961270E

position with respect to its ability to compel studies and labeling changes.

**B.**    **The 1999 Label**

Vioxx was approved by the FDA in May 1999 for the treatment of acute pain,

dysmenorrhea, and osteoarthritis.  It is noteworthy that at the time of approval, the clinical

studies were considered by FDA *insufficient* to justify elimination of the Warning for serious GI

side effects associated with the broader class of NSAIDs.  As a result, the 1999 label provided

the following general NSAID GI Warning:

**WARNINGS**

**Gastrointestinal (GI) effects — Risks of GI ulceration, Bleeding, and Perforation:**

Serious gastrointestinal toxicity such as bleeding, ulceration, and perforation of the stomach, small intestine, can occur at anytime, with or without warning symptoms, in patients treated with nonsteroidal anti-inflammatory drugs (NSAIDs). Minor upper gastrointestinal problems, such as dyspepsia, are common and may also occur at any time during NSAID therapy.  Therefore, physicians and patients should remain alert for ulceration and bleeding, even in the absence of previous GI tract symptoms. Patients should be informed about the signs and/or symptoms of serious GI toxicity and the steps to take if they occur.  The utility of periodic laboratory monitoring has not been demonstrated, nor has it been adequately assessed. Only one in five patients who develop a serious upper GI adverse event on NSAID therapy is symptomatic.  It has been demonstrated that upper GI ulcers, gross bleeding or perforation, caused by NSAIDS, appear to occur in approximately 1% of patients treated for 3-6 months, and in about 2-4% of patients treated for one year. These trends continue thus, increasing the likelihood of developing a serious GI event at some time during the course of therapy. However, even short-term therapy is not without risk.

In addition to the above paragraph, the initial 1999 Vioxx label stated that: "It is unclear,

at the present time, how the above rates apply to VIOXX (See CLINICAL STUDIES, Special

Studies, *Upper Endoscopy in Patients with Osteoarthritis*).  Safety data from two endoscopic

17

MC0961270?

studies in which ibuprofen was an active comparator is included under the Clinical Studies Section of the label."

In contrast to the extensive GI warning set forth above, the 1999 label for Vioxx failed to disclose the potential for serious cardiovascular events secondary to the selective suppression of COX-2. The label contained no Contraindication for use in particular patients, nor any Warning or Precaution concerning the risk of serious cardiovascular events such as heart attacks and strokes. Thereafter, and notwithstanding receipt of significant safety information by the Company concerning Vioxx after approval, the label was not timely updated to reflect new safety information. The 1999 label remained in effect until April 2002.

C.       **Post-Approval and Pre April 2002 Clinical Trial Data**

After Vioxx was approved in May 1999, Merck began to receive the results of larger Vioxx clinical trials that confirmed the drug's association with cardiovascular events. These studies include the VIGOR trial (088/089), the ADVANTAGE (102), and protocols 085/090. In addition, Merck received interim and partial data from 3 Alzheimer's Studies, protocols 091, 126, and 078, as well as a pooled analysis of the Vioxx clinical trial program. These studies and their relevance are described below:

1.       *VIGOR (088/089).*   In order to test the hypothesis that Vioxx would reduce the incidence of clinically relevant GI events relative to another NSAID, Merck conducted the Vioxx Gastrointestinal Outcomes Research study, also known as VIGOR. VIGOR was an 8000 person trial in patients with rheumatoid arthritis, half of which took Vioxx 50mg once a day, half of which took naproxen 500mg twice a day.[2]  Patients with recent medical history of

---

[2]       Rofecoxib 50mg/day was twice the maximum approved dose for chronic treatment of osteoarthritis; naproxen 500mg/twice daily was the maximum daily dose.

M009612708

heart attacks or stroke, or who were taking low dose aspirin for cardiovascular prophylaxis were excluded from the trial.  Roughly 79% of the study population was women; the average age was 58.  Thus, the patient population studied was healthier from a cardiovascular perspective than the general population.  The median treatment period was 9 months.

Despite these exclusion criteria, the results of VIGOR were alarming from a cardiovascular perspective. Upon VIGOR's unblinding in March 2000, it became clear that there was a significant imbalance in serious cardiovascular events, such as myocardial infarctions, against Vioxx.  Merck's initial reaction was that the "CV events are clearly there," they were "real," and that the problem was "mechanism based, as [Dr. Scolnick and others] worried it was."

In fact, there were 45% more deaths on Vioxx as compared to naproxen (22 to 15), [including 9 CV deaths on Vioxx versus 5 on naproxen].  Similarly, there were 5 times the number of heart attacks on Vioxx as compared to naproxen (20 to 4), (p=0.003]), as well as an excess of the broader category of serious cardiovascular events.  Specifically, there were 45 patients on Vioxx (1.1%) and 19 on Naproxen (.5%) who sustained adjudicated thrombotic cardiovascular Serious adverse event experiences for a relative risk (RR) of 1.37, CI (1.39-4.06), p=.0016. A post-hoc subgroup analysis of these events performed by Merck showed that the relative risk for thrombotic cardiovascular serious adverse events in patients deemed potential candidates for low-dose aspirin therapy was 4.89, CI 1.41-16-88, p=.0122.  For the patients who were subsequently found to not be candidates for low-does aspirin therapy, the RR was 1.88, CI 1.03-3.45, p=.041.  VIGOR further revealed significant congestive heart failure and hypertension concerns with Vioxx as compared to the traditional NSAID naproxen.

19

M00961270

VIGOR also demonstrated a reduction (but not the elimination of) in both PUBS (Perforations, Ulcerations and Bleeds) and Complicated PUBS relative to Naproxen. PUBS were seen in 56 patients on Vioxx (1.28%) verses 121 patients on Naproxen (3.0%) for a RR of .46, 95% CI0.33, 0.64, P<0.001. Complicated PUBS occurred in 16 patients on Vioxx (0.4%) and in 37 patients on Naproxen (0.92%), for a RR of .43, CI 0.24-0.78, P=0.005.

The VIGOR results were submitted by Merck to the FDA in June 2000 in an effort to remove and modify the GI warning referred to above. In addressing the cardiovascular findings, Merck claimed that the results were primarily due to: (a) the "potent antiplatelet aggregation effect of naproxen," and (b) the fact that VIGOR was a study of rheumatoid arthritis patients who are at increased risk of cardiovascular vents. In their reviews of the VIGOR results, the FDA medical officers (Villalba and Targum) properly discounted these explanations for the following reasons:

- There are no prospective placebo–controlled trials with naproxen that support the hypothesis that naproxen, a transient inhibitor of thromboxane, is effective in decreasing the risk of CV events. (*See* Villalba Review at p. 11; Targum Review at 34-5).

- The effect size of naproxen in reducing CV events relative to Vioxx in VIGOR (58%) was *twice* the effect size of aspirin (25%-30%) compared to placebo in other clinical trials. (*See id.* at 12).

- Several other studies, including ADVANTAGE, 090 and 085 (discussed below) suggested a trend towards higher MI rates in Vioxx treated patients, including patients on low dose aspirin, at short durations, as compared to non-naproxen comparators and placebo and in Osteoarthritis patients. *See id.*

- Contrary to Merck's suggestion, the imbalance was not limited to patients who were subsequently found to be indicated for low-dose aspirin therapy. As noted by Dr. Targum, there was an increased incidence of events in patients receiving Vioxx who did not fall into the "aspirin indicated subgroup." *See* Targum Review at 35.

- The difference seen was not due to the fact that VIGOR was in rheumatoid arthritis patients, a population which may be at increased risk for CV events. First, the trend was

20

MOO9612710

seen in both OA and RA trials.  Second, even if RA patients are at increased risk, "one is still faced with the difference in cardiovascular events between [Vioxx] and naproxen." *See id.*

The FDA cardio-renal reviewer concluded that "*one can argue that naproxen would be the preferred drug compared to Vioxx.*"  Targum Review at 35.  That reviewer further stated that "*It would be difficult to imagine inclusion of the VIGOR results in the rofecoxib labeling without mentioning cardiovascular safety results in the study descriptions as well as the Warnings Sections.*"  *Id.* at 37.

In my opinion, the Medical officer properly analyzed the VIGOR data and concluded that the magnitude of the result seen in VIGOR could not be explained by naproxen alone.

2.    *ADVANTAGE (Trial 102).*  ADVANTAGE was completed in March 2000, at approximately the same time as VIGOR.  It was a study of Vioxx 25mg vs. naproxen 1000mg/day in approximately 5500 osteoarthritis patients.  In this 12 week study, aspirin use was permitted.  In ADVANTAGE, there were nine cardiac events in the Vioxx 25mg group (five MI, two unstable angina, and 3 sudden deaths) versus three cardiac events in the naproxen 1000mg group (2 unstable angina, one MI).  *See* Medical Officer Review of Complete Response to Approvable Letter.  Of the 5 MIs in the Vioxx group, 3 were in patients taking aspirin.  As noted by the FDA in their October 2001 proposed labeling, ADVANTAGE "showed a similar pattern of overall GI and CV safety observed in VIGOR."  Though not statistically significant, there was an obvious trend against Vioxx that was noteworthy because (1) this study focused on the 25mg dose, (2) for short term use, (3) in an osteoarthritis population, (4) who were permitted to take low dose aspirin.

Concerning the naproxen issue, I note that Dr. Villalba has observed that "If the

21

M009612711

cardiovascular findings of VIGOR were all explained by naproxen antiplatelet effect, a difference would not be expected between naproxen and rofecoxib in ADVANTAGE when patients at risk in both treatment groups were already maximally protected by aspirin." (Villalba Advantage Review). I agree with Dr. Villalba.

> 3.     *OA Knee Trials (085/090).*  Other trials conducted with low doses of Vioxx in osteoarthritis demonstrated a trend against Vioxx for cardiovascular risk in the short term against non-naproxen NSAIDs and placebo. In particular, in the 085/090 trials, Merck studied Vioxx 12.5mg, nabumetone 1000mg, and placebo with approximately 2000 patients with osteoarthritis of the knee. Both studies were 6 week trials and used a 2:2:1 randomized design. Aspirin use was permitted in the trials. Taken together, these trails revealed an increased number of serious cardiovascular events on Vioxx relative to placebo. In 085 there were two events on Vioxx (1 MI and 1 cardiac trauma), two on nabumetone (1 coronary artery disease and 1 congestive heart failure), and none on placebo. Trial 090 demonstrated a trend against Vioxx. There were six serious cardiovascular events on Vioxx (3 MIs, 2 CVAs, and 1 atrial fibrillation), two on nabumetone (1 MI and 1 congestive heart failure), and one on placebo (coronary artery occlusion). Targum report, 2/1/2001.

The 085/090 trials are notable because (1) they were short term trials (6 weeks), (2) in an osteoarthritis population, (3) that was permitted to take aspirin, and (4) compared low dose Vioxx (12.5mg) versus non-naproxen comparators (nabumetone and placebo).

> 4.     *Summary of the Trials completed in 2000:*  It is my opinion that, taken together, these four clinical studies and the mechanistic studies developed pre –approval, demonstrated that the effect seen in VIGOR was due to the cardiotoxic effect of rofecoxib, not

22

MO09612712

the cardioprotective effect of naproxen. Certainly, there was "reasonable evidence of an association of a serious hazard with" Vioxx, such that a Warning should have been added to the Vioxx label and all promotional material shortly after VIGOR was unblinded. 21 C.F.R. § 201.57(e). As set forth above, this warning could have been instituted unilaterally by Merck without FDA approval through the "Changes being effected" mechanism.

     5.     *Alzheimer's Studies (Trials, 091, 126 and 078)*: I understand that Merck has claimed that the interim results of then-ongoing Alzheimer's studies justified its failure to take more aggressive steps to warn physicians about the cardiovascular risks associated with the drug. A brief discussion of these studies is therefore warranted.

     The Vioxx Alzheimer's disease trials consisted of three placebo-controlled clinical trials: protocols 091, 126 and 078. Protocols 091 and 126 were nearly identical 12-month studies in Alzheimer's patients, each involving approximately 350 patients per treatment arm. Protocol 078 was a 2-year Alzheimer's prevention study in patients with mild cognitive impairment involving about 720 patients per treatment arm. Therefore, 078 consisted of elderly patients with memory disturbance but not Alzheimer's disease. The dose of Vioxx used in all three studies was 25 mg/day. These studies specifically excluded patients at high cardiovascular risk. After patient enrollment, the protocols were amended to permit prophylactic aspirin. *See* Villalba 3/12/03 Memo to File. The total Alzheimer's clinical trial database was 3000 patients. In early 2001, protocol 091 was analyzed for both safety and efficacy. There was no treatment effect and, as a result, protocol 126 was terminated. Protocol 078 (the prevention study) was permitted to continue.

     a) <u>Cardiovascular results</u>

MO0961271.3

In the combined database, there were 8 adjudicated cardiovascular deaths in the Vioxx arms vs. 4 in the placebo arm. Villalba 3/12/02 review, at 2. However, there was no excess of overall adjudicated cardiac thrombotic events. *Id.* at 3, tb.3. In a subsequent analysis of 078 and 091 conducted by Dr. Villalba on 12/18/04, there were 11 adjudicated cardiovascular deaths in the Vioxx arms of 091 and 078 vs. 5 in the placebo arms. In this analysis, there were equal numbers of MIs in both Vioxx and Placebo arms with 14 in each. Interim review, 12/8/04 at 8, tb.5.

### b) All Cause Mortality

In April and May 2001, Merck performed various statistical analyses of the Alheimer's studies for all-cause mortality. During this period, Merck was also engaged in labeling discussions with the FDA. These analyses, conducted by Merck Statistician J. Chen, were performed using two approaches; an "on drug" approach (defined as an event that occurs while on drug or up to 14 days thereafter) and an Intent-to-Treat "ITT" approach. Parenthetically, an ITT design is one in which ALL patients are followed until death, or the end of the trial, or until the outcome event is reached in a time-to-event trial, irrespective of whether the patient is still receiving or complying with the assigned treatment. This is predicated on the understanding that randomization alone is not always sufficient to provide an unbiased comparison of the effects of therapy in comparison to placebo, or an unbiased comparison between two therapies. These numerous analyses consistently showed a statistically significant risk of death from all cases. For example:

- ***091 study alone*:** Dr. Chen provided his analysis of the Mortality data in the 091 study on April 4, 2001. Using the ITT analysis, he found that there were 13 deaths (Vioxx) vs. 3

24

M009612714

deaths (placebo). The hazard ratio was 4.43 (95% CI: 1.26 to 15.5). Using an "on drug"

analysis, there were 9 deaths (Vioxx) vs. 2 deaths (placebo). The hazard ratio for this "on drug"

analysis was 4.68 (95% CI: 1.01 to 21.68). Thus, under either ITT or "on drug," the results were

highly statistically significant. These analyses were not shared with the FDA in 2001-02 while in

labeling discussions with the FDA even though Merck was using the interim results from theses

studies to fight a warning on the Vioxx label. Nor were these serious mortality data published in

the publication entitled, Reines, S.A, et al, *Rofecoxib: No Effect on Alzheimer's Disease in a 1-

year, Randomized Blinded, Controlled Study*, NEUROLOGY 2004:62:68-71. Indeed, given

Merck's knowledge, it is surprising that the Merck authors asserted that in protocol 091, adverse

events were "similar or only slightly increased for rofecoxib vs. placebo."

- ***091 and 078 combined:*** Dr. Chen provided his analysis of the mortality data in the

completed 091 and then-ongoing 078 studies on April 8, 2001. Using the ITT approach for these

combined studies there were 34 deaths (Vioxx) vs. 12 deaths (placebo). The hazard ratio for ITT,

adjusted for age, gender, treatment and protocol was statistically significant at 2.99 (95% CI:

1.55, 5.77). Using the "on drug analysis" for these combined studies there were 21 deaths

(Vioxx) vs. 9 deaths (placebo). The hazard ratio for "on drug" approach adjusted for age, gender

and protocol for the combined studies was statistically significant at 2.68 (95% CI: 1.23, 5.82). [3]

As with the 091 analysis, the combined 090/078 analysis was not shared with the FDA.

- ***091 and 078 and 126 combined:*** Dr. Chen provided his analysis of the combined

mortality data for the 091, 078 and 126 studies on May 1, 2001. Using the ITT approach for all 3

studies there were 38 deaths (Vioxx) vs. 16 deaths (placebo). The hazard ratio for ITT, adjusted

for age, gender and protocol, for the combined studies was statistically significant at 2.49 (95%

M00961271S

CI: 1.39-4.47).  Using the "on drug analysis" there were 25 deaths (Vioxx) vs. 12 deaths (placebo).  The hazard ratio for "on drug" for the combined studies, adjusted for age, gender and protocol, was statistically significant at 2.27 (95% CI: 1.14, 4.52). [4]  This analysis was not ever provided to the FDA.

### c) Conclusion from the Alzheimer's Studies.

In 2005, the FDA convened an advisory committee to consider issues related to the withdrawal of Vioxx from the market. In that hearing, one of the advisors, Dr. Fleming, made the following observation with which I fully agree:

> The most favorable of these [studies] is the Alzheimer's study (sic) if you are just looking at cardiovascular events and yet, that is the study—if that is our positive study, that is the study that shows a statistically significant increase in mortality at 41 against 23.  So we have got some significant concerns in each of the trials. Even with the trial that is favorable or neutral is a better term, in terms of cardiovascular events, is very unfavorable in mortality.

Transcript of the Joint Meeting of the Arthritis Advisory Committee and the Drug Safety and Risk Management Advisory Committee, at 34 (Feb 17, 2005).

In fact, the Alzheimer's results do not, in my opinion, eliminate the need for a cardiovascular warning.  In fact, the results of the 3 Alzheimer's studies required an additional warning on the Vioxx label for mortality risk, when that information became available in 2001.

**6.     Meta-Analysis.**  Subsequent to the release of the VIGOR results, and to assess the cardiovascular issue raised by VIGOR, Merck undertook a pooled analysis of all of its Vioxx clinical trials to assess whether an increased cardiovascular risk was apparent across all trials.  In so doing, Merck pooled together data of trials in (1) disparate patient populations, (2) taking different Vioxx dosages, (3) against multiple comparator drugs, (4) for different lengths of

---

[3]   Using on drug for 078 alone, the hazard ratio was 2.07 (95 CI: o.82 to 5.19)

M00961271e

time, and (5) for different indications.  As a result, Merck's meta-analysis is methodologically flawed and analytically weak.  As a result, and as noted by the FDA medical officer with whom I agree, the meta-analysis is not reassuring on cardiovascular safety issues.  Further, to suggest that such a study reflects the risk of cardiovascular events across the patient populations in 28,000 patients (or more), is grossly misleading.  Prospectively designed trials to test the CV safety of the drug are the proper scientific vehicle to reach such conclusions.

Merck reported its meta-analysis results to FDA and the medical community using a combined endpoint known as the Anti-Platelet Trialist Collaboration (APTC) endpoint, which was used in various aspirin trials to assess the relative risk versus benefit of aspirin.  However, the most prominent safety signal for VIOXX coming out of the VIGOR trial was for myocardial infarctions (MI) (20 to 4).  Unbeknownst to the FDA and the medical community, Merck had prepared an MI-only meta-analysis to accompany the APTC meta-analysis.  That MI-only meta-analysis, which was never published, was less favorable than the APTC analysis.

       7.     **Other Studies.**  Certain other studies done by Merck failed to observe the increased risk of serious cardiovascular risks identified in the above studies.  That they failed to replicate the observed risk in the foregoing trials does not undermine the findings of these trials.  In fact, the failure to see this risk is what is expected when a sponsor fails to properly power and design trials to assess a specific risk.  What is surprising is that the cardiovascular risk was seen at all in trials not designed to detect such risk. In addition, a study with negative results implies either that the study was not properly powered; and, therefore that the study cannot answer the question put to it;, or that the studied endpoint was not significantly higher in the drug-arm, as opposed to the control-arm. In any event, small negative studies cannot negate large and well-powered studies

---

[4]    Using on drug for 078 alone, the hazard ratio was 2.07 (95 CI: o.82 to 5.19)

with positive findings.

**D.**     **Post-Approval Labeling Discussions**

      **1.**     **VIGOR sNDA.**  In June 2000, Merck submitted a supplemental NDA (sNDA) to the FDA following the VIGOR trial wherein the Company sought to (i) incorporate the positive GI findings from VIGOR, (ii) remove the GI warning, (iii) indicate that Vioxx could be safely used concomitantly with aspirin, and (iv) state that the CV events seen in VIGOR were "consistent with the known antiplatelet effects of naproxen."  While eliminating the GI Warning from its label proposal, the Company failed to propose any Contraindication, Warning, or Precaution associated with cardiovascular risks in its sNDA submission.

      As set forth above, the VIGOR results alone established "reasonable evidence of an association" between VIOXX and CV events, significant hypertension and congestive heart failure.  This association was further supported by other clinical trial data available to Merck in June of 2000 when the VIGOR NDA was filed, including protocols 090/085 and ADVANTAGE. This information would have supported an immediate label change and warning using the "changes being effected" mechanism. It is my opinion that a reasonable and competent pharmaceutical company would have updated the warning at that time and would have let physicians and consumers know of the risk. Nevertheless, Merck chose to address the cardiovascular findings in the context of the NDA which was intended to *remove* the GI warning. In the context of that sNDA, the only reflection of any of the VIGOR CV findings in the proposed label was in the "CLINICAL STUDIES, Use with Aspirin" section.  There, the Company proposed to say:

      In this study, in order not to confound the analysis of PUBs, patients were not

MDL0961271B

permitted to use concomitant aspirin or other anti-platelet drugs.... The incidence of acute myocardial infarction was 0.4% in patients treated with VIOXX 50mg daily and 0.1% in patients treated with naproxen 500mg twice daily (difference = 0.3; 95% C.I. = 0.07, 0.57). *This is consistent with the known anti-platelet effects of naproxen.* In retrospect, aspirin was indicated for secondary cardiovascular prophylaxis in 4% of patients; 38% of these cardiovascular events occurred in this cohort of patients. In the remaining 96% of patients, the incidence of confirmed acute myocardial infarction was 0.2% in patients treated with VIOXX 50mg daily and 0.1% in patients treated with naproxen 500mg twice daily (difference = 0.1; 95% C.I. = -0.08, 0.32).

6/29/2000 sNDA submission.

As set forth above, the information reflected in the sNDA proposed label was both incomplete and misleading. At that time, and even today, there is no "known antiplatelet effect of naproxen," and the magnitude of the risk seen in VIGOR was several times what would have been expected if naproxen was as effective as aspirin. Nor was the effect seen only in the "aspirin indicated" subgroup. In fact, as seen in the ADVANTAGE and 085/090 trials, the results in VIGOR were consistent in exposing a risk. As recently reported in the New England Journal of Medicine, the incidence of MIs in VIGOR was (0.5%) and the breakout of MIs among aspirin indicated Vioxx and naproxen users was 0.3 to 0.1, respectively. Merck's proposed label in its sNDA further failed to reveal the other serious cardiovascular findings from VIGOR, including the global serious CV event rate and breakouts for serious CHF and hypertension.

In the absence of a label or other materials which expressed a fair and balanced presentation of the cardiovascular data seen in VIGOR and the other studies, Merck continued to misrepresent the CV risk. For example, on April 28, 2000, and May 22, 2001 Merck issued a press releases which falsely claimed that Merck "Confirms a Favorable Safety Profile for Vioxx" through the VIGOR study. Similarly, Merck's promotional material strongly advocated that the

29

M009612719

VIGOR established a cardioprotective effect for naproxen and that this was the explanation for the dramatic results of that study.  On September 17, 2001, the FDA issued a strongly worded "Warning Letter" that reprimanded Merck for its promotional activities which "minimizes the potentially serious cardiovascular findings that were observed" in VIGOR.  It called Merck's naproxen hypothesis a "selective presentation" of the evidence and concluded that Merck's promotional activities raised "significant public health and safety concerns."  Further, the FDA found Merck's promotion of Vioxx misleading because it endorsed the naproxen hypothesis while failing to inform physicians that the drug might be prothrombotic.

It is my opinion that Merck's failure to promptly amend the label to include the VIGOR and ADVANTAGE cardiovascular data (and subsequently the Alzheimer's total mortality data) was unreasonable and against FDA guidelines which require warnings to be issued in circumstances like this.  It is my further opinion that Merck's promotional activities post-VIGOR were not reasonable and in compliance with expected conduct.

2.   ***FDA Advisory Committee of February 8, 2001:***   FDA convened an Advisory Committee in February 2001 to consider the Company's application.  FDA Medical Officer Shari Targum, M.D., from the Division of Cardio-Renal drug products, prepared a medical officer review (dated 2/1/2001) of the cardiovascular events from VIGOR and certain other trials (085/090) in preparation for the that Advisory Committee meeting.  In that review, Dr. Targum stated: "It would be difficult to imagine inclusion of VIGOR results in the rofecoxib labeling without mentioning cardiovascular safety results in the study description ***as well as the Warnings section.***"

In its opening statement to the VIGOR Advisory Committee, Merck emphasized its focus

30

MOO961272O

on eliminating the GI Warning from the initial label: "We believe the highly significant results [of VIGOR] merit modification of our product label to reflect a more appropriate presentation of the demonstrated GI safety of rofecoxib." Tr. at 5. I note that nowhere in the Company's introductory remarks to the Advisory Committee, where it framed the issues for consideration, did Merck articulate concern over cardiovascular events. By contrast, the FDA's presentation emphasized that the naproxen theory was not proven and that "regardless of mechanism, with cardiovascular benefit with naproxen or cardiovascular risk with rofecoxib, the cardiovascular data favor naproxen." Tr. at 112 (comments by Dr. Targum).

It is clear that the Advisors were also concerned and expected a warning of an increased risk associated with Vioxx (as opposed to a decreased risk associated with Naproxen). For example, Dr. Wofsky made the following comments

- "I *have also been concerned that reduction in GI toxicity may come at a high cost in terms of complications elsewhere. From a labeling point of view, it seems to me that it would be indefensible not to share that information with the publics, both pieces of that information." (p. 190)*

- "I should say that what I have just said is from a labeling standpoint. *From a patient standpoint, I think that there are very serious questions about whether patients who take these drugs would be better served by a cardioprotective traditional NSAID unless they are at a high risk for ulcer disease."*

Similarly, Dr. Pina, a cardiologist, stated that:

- *"I have been going through the labeling template that we have in front of us and under the warnings section here is a whole lot of gastrointestinal warnings. There is a list of anaphylactoid pregnancy, hepatic, renal;, hematologic, asthma, fluid retention, edema and there is no cardiac. The cardiac is way back here where additional adverse experiences have bee reported. So I think that this warrants a paragraph up here, sooner rather than at the bottom, about the observations made in this trial about the risk of thrombotic events. ...At the same time, I want to see a paragraph about the cardiac events." (p. 192)*

Finally, Dr, Nissen, another cardiologist, stated that:

31

MO0961272I

- *"Briefly, I think that I would say in the label that there was an excess of cardiovascular events in comparison to naproxen that it remains uncertain whether this is due to a beneficial cardioprotective effect of naproxen of prothrombotic effects of the agent, and leave it at that, that basically we do not know the reason. We do know that there is a difference. That awareness should be made available to the prescriber and to the consumer, but without necessarily a final judgment as to the reasons for that difference." (p.206)*

Very clearly, it was expected that a warning would occur.[5]  At a minimum, the

Committee voted unanimously that any label language should note the potential for Vioxx to be

prothrombotic.  Such language was never proposed by Merck, and indeed, was rejected by the

company when proposed by the FDA.  Ultimately, the language that was included in the label did

not state that Vioxx could be prothrombotic, but that the significance of the VIGOR clinical

findings was "unknown."

Rather than enact the recommendations of the Advisory Committee of the FDA medical

officers, shortly after the February 2001 meeting, the Company submitted revised labeling that

proposed a Precaution on Cardiovascular Effects.  Specifically, Merck stated:

> In the VIGOR study, patients were not permitted to use concomitant aspirin or other antiplatelet drugs. . . . The incidence of acute myocardial infarction was 0.5% in patients treated with 50 mg daily and 0.1% in patients treated with naproxen 500 mg twice daily (difference = 0.4; 95% C.I. = 0.1, 0.7).  As noted in its product circular, naproxen may decrease platelet aggregation and prolong bleeding time.  In other controlled trials in which patients were not permitted to use concomitant aspirin or other anti-platelet drugs, the incidence of myocardial infarction was similar between VIOXX, nonselective NSAID comparators (ibuprofen, diclofenac and nabumetone), and placebo.

Merck further proposed to state that "VIOXX can be used concomitantly with low dose aspirin."

3.      *FDA's Proposed Warning:*  In October 2001, and in response to having

received additional data from Merck on the ADVANTAGE and Alzheimer's studies, FDA

---

[5]  I note that the ITT Alzheimer's mortality analysis was not provided to the Advisory committee either.

32

MOO961272Z

submitted its proposed labeling to Merck in connection with Merck's request to eliminate the GI

warning from the label.  The FDA proposal was notable for the following inclusion in the

**WARNING** section of the label:

> VIOXX should be used with caution in patients at risk of developing
> cardiovascular thrombotic events such as those with a history of myocardial
> infarction and angina and in patients with preexistent hypertension and
> congestive heart failure.

> The risk of developing myocardial infarction in the VIGOR study was five fold
> higher in patients treated with VIOXX 50 mg (0.5%) as compared to patients
> treated with naproxen (0.1%) (See Special studies, VIGOR).  The finding was
> consistent in a smaller and shorter study using VIOXX 25 mg that allowed the
> use of low dose ASA (See Special Studies, ADVANTAGE).  Prospective, well
> powered, long term studies required to compare the incidence of serious CV
> events in patients taking VIOXX versus NSAID comparators other than naproxen
> have not been performed.

The FDA's October 2001 proposal further deleted the Company's proposed statement about

aspirin use and proposed an amendment to the "Information for Patients" section to state that

"VIOXX should be used with caution in patients with prior history of hypertension and heart

disease."

I have reviewed Merck documents which describe Merck's unprofessional and

obstructive conduct with FDA during this period and its refusal to accept the FDA proposed

label.  The FDA and its medical officers rely and depend upon a professional and collaborative

process in protecting the public health.  It is my opinion that Merck's dealings with FDA, and its

outright rejection of a CV warning for Vioxx, was unreasonable and endangered the public

health.

      4.       **The 2002 Vioxx Label.**  In April 2002, following protracted discussions

33

M009612723

with FDA over the revised Vioxx label and Merck's rejection of a warning for Vioxx, Merck changed the label for Vioxx to incorporate certain information from the VIGOR trials and noted in the "PRECAUTIONS" section of the label that "caution should be used in patients with a medical history of ischemic heart disease." Based on my review of the available data, the 2002 label was inadequate. In particular, it failed to describe the frequency, character, and severity of the risk of serious cardiovascular events seen to that point in time in the Vioxx clinical trial program. Notably, and contrary to prior labels proposed by the FDA, it failed to warn doctors of the increased risk for patients *with pre-existing risk factors* for cardiovascular events. Instead, the language only provided a precaution to those with *a history of such events*.

Further, it failed to disclose the still worrisome risk of serious GI events, including the very real risk that use of Vioxx in combination with aspirin would eviscerate the GI benefit of the drug. Clinical trials conducted by the Company to assess this very issue, for which Merck had interim data during labeling negotiations (Protocol 136) and prior to the April 2002 label change, demonstrated comparable incidence of ulcers on Vioxx plus aspirin versus ibuprofen.

5. *Timing of Label Change.* I am advised that Merck contends that, regardless of the adequacy of the label it implemented in 2002, it was unable to incorporate the cardiovascular data from VIGOR sooner due to delays by the FDA in considering its sNDA. Based on my review of the record, I cannot agree with that assertion. This is so for several reasons.

First, Merck failed to avail itself of the procedure that exists to promptly change labels when important safety information arises (and which Merck used in several other circumstances to update the Vioxx label). That procedure, known as CBE (Changes Being Effected) allows a

M00961272

manufacturer to amend its label to warn of safety risks without prior FDA approval. Typically, unless the Agency objects to the label change within 30 days, the amendment is considered approved. The cardiovascular data from VIGOR and mortality data from the Alzheimer's trials were information highly relevant to potentially serious health risks. Updated labeling to reflect that information could and should have been submitted under the CBE procedure.

Second, Merck failed to timely and fully respond to FDA requests for information in connection with its review of Merck's sNDA. For example, FDA made repeated requests for data from Merck [November 2000 through the summer of 2001] concerning the ADVANTAGE trial. As noted above, ADVANTAGE was significant because it was a short term study at the most common dose (25mg) in osteoarthritis patients who were allowed to take aspirin. An imbalance of cardiac events was noted. It thus addressed several of Merck's initial explanations for the VIGOR CV event data (RA, 50mg dose, and absence of aspirin prophylaxis in those who needed it). Further, the FDA needed to assess these data to evaluate Merck's sought-after label change that Vioxx could be used safely with aspirin. Therefore, the FDA's insistence on receiving this data prior to approving Merck's sNDA was entirely reasonable. Merck cannot rightly complain about delayed consideration of its request when it failed to provide the data necessary for review. Emails from Merck's senior-most scientist, Edward Scolnick, reflect that Merck viewed the turning over of the ADVANTAGE data as a "mistake." FDA regulations and prudent drug development/marketing require candor, not delay and obfuscation.

Third, in response to Dr. Targum's review, which suggested a Warning for cardiac events, Merck submitted a watered down Precaution. Rather than accepting the FDA's recommendations in February 2001, it took another 14 months to supplement the label with

M00961272б

VIGOR data.

Fourth, in response to FDA's proposed label in October 2001, which included a cardiac Warning, Merck resisted the label and entered into lengthy labeling "negotiations." Indeed, in emails laced with colorful language, Merck's senior most executives refused any label that included a CV Warning and vowed to fight the FDA. It took more than six months for Merck to agree with the FDA on labeling. As noted above, and as evidenced with Vioxx, after approval of a drug, the FDA is in a substantially weakened position when it comes to compelling labeling terms it believes are appropriate.

A further indication of the inadequacy of the Vioxx label during the time it was on the market can be found, ironically, in Merck's March 2005 proposal to the FDA for the reintroduction of Vioxx to market. In this proposal, Merck suggests new labeling for Vioxx that places significant limitations on use of the drug, including but not limited to:

- A black box warning for cardiovascular risk;

- A recommendation that the drug only be used at the lowest dosage and for the shortest duration; and

- Elimination of the 50 mg dose.

Notably, according to official FDA minutes of a June 2005 meeting with Merck to discuss its proposal to return Vioxx to market, Merck had decided to eliminate the 50 mg dose because it had demonstrated such a "strong CV signal" in the VIGOR trial. This language or similar warning language, proposed by Merck for the first time in 2005, should have been incorporated into the Vioxx label as early as June 2000.

> 6. **Summary of labeling opinions:** During the pre and post approval process,

M009612726

Merck, not the FDA, was primarily responsible for the content of the Vioxx labeling. The sponsor, not the FDA, is responsible for initializing, preparing, and drafting the original label and is expected to draft all additional or supplemental labels including revised warnings.

The FDA regulations expressly state that labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved. 21 C.F.R. § 201.57(e). "Reasonable association" can be provided by evidence of a variety of sources including:  a) in vivo and in vitro evidence collected during the preclinical period; b)  well documented single case report  (particularly, where there is evidence of challenge or rechallenge); c)   a case series;  d) adverse event analysis; e)  epidemiological studies (including observational studies); and  f) clinical trials.  The collection and assessment of evidence at any point in time, of safety signals associating the use of a product with an adverse event or toxicity, should be assessed during the entire pre-marketing and  post-marketing phase  of the drug. When those signals are suggestive of a "reasonable association" between drug exposure and adverse event, it is the responsibility of the drug sponsor to initiate a labeling change.  Such labeling changes can be unilaterally initiated by the drug sponsor through a mechanism known as "Changes being Affected" (CBE).

It is my opinion that there was a reasonable association between Vioxx and cardiovascular events, hypertension and congestive heart failure by March 2000 at the latest when VIGOR was unblinded.  It is my opinion that a cardiovascular warning should have issued from Merck at that time and that this warning should have been reflected in all communication and promotions for Vioxx

It is my opinion that even the May 1999 label for Vioxx should have contained a

37

MDL00961272727

thorough discussion of the drug's mechanism of action and the potential for selective COX-2 inhibition to result in adverse cardiovascular events.

It is my opinion that the April 2002 label does not accurately reflect the cardiovascular data and that physicians were not adequately warned of the risks of Vioxx until after it was removed from the Market in September of 2004.

It is my opinion that there was a reasonable association between Vioxx and all- cause mortality by April 2001 at the latest when the Alzheimer's studies were analyzed. It is my opinion that a reasonable and prudent drug manufacturer would have amended the Vioxx label and promotional materials to include data on all cause mortality and that it was unreasonable for Merck not to have done so.

It is my opinion that a reasonable and prudent manufacturer would not have resisted such warnings and promoted Vioxx in a manner that was contrary to the evidence and which minimized potential risks.   Indeed, independent of, and in addition to the Vioxx label, Merck could have taken steps to warn the medical community of the drug's potential or known risks. For example, communication devices commonly used by pharmaceutical companies to disseminate new information about a drug include "Dear Doctor" letters and Physician Information Requests (PIRs).

It is my opinion that Merck's dealings with FDA, the FDA Advisory Committees, and the public was unreasonably combative, evasive, and/or inappropriate, and that this conduct endangered public health.

### E.   APPROVe and the Risk-Benefit of Vioxx

*1.*     ***APPROVe:***  APPROVe was a study in 2586 patients to test the potential

M009612728

of Vioxx to reduce the recurrence of colon polyps.  In this trial, patients were randomized to either Vioxx 25mg or placebo for three years.  Low dose aspirin use was permitted.  One year after completion of therapy, patients were to return for follow-up colonoscopies. The trial was terminated in September 2004 shortly before its scheduled completion date at the recommendation of the trial's ESMB (External Safety Monitoring Board).  Based on concerns regarding the cardiovascular safety of Vioxx, the ESMB voted to terminate the study.

The trial revealed a statistically significant risk of cardiovascular events associated with use of Vioxx 25mg as compared to placebo.  In particular, Merck reported 31 cardiac events on Vioxx versus 12 on placebo (RR=2.8, 1.44-5.45).  For the combined endpoints reported by the company, there was a statistically significant increased risk of serious cardiovascular events on Vioxx versus placebo: adjudicated thrombotic endpoint, RR=1.92 (1.19, 3.11) (primary endpoint); adjudicated APTC endpoint, RR=2.06 (1.16, 3.64) (secondary endpoint); investigator reported events (secondary endpoint), RR=1.90 (1.31, 2.76).  Notably, while hazard rates for the adjudicated thrombotic and APTC endpoints, when compared to placebo, did not appear to separate until after 18 months, this was not true of the investigator reported cardiovascular events, for which there was immediate separation.  Serious risk was likewise confirmed for other cardiovascular events as well, such as serious and non-serious hypertension, edema, and congestive heart failure.

APPROVe also revealed a statistically significant increased risk on Vioxx of the serious gastrointestinal events that Vioxx was supposed to reduce and prevent.  In the trial, the RR for confirmed PUBs was 4.90 (1.98, 14.52), suggesting that for long-term use, Vioxx had an incidence of serious adverse GI events that is comparable to traditional NSAIDs.

M009612729

VIOXX was withdrawn from the market following the termination of the APPROVe study. The APPROVe results—including both the unfavorable cardiovascular and gastrointestinal adverse event data—and its ultimate withdrawal from market underscore the poor overall safety of rofecoxib, particularly when there are safer, less expensive NSAIDs available on the market. I note that as early as 2001, Dr. Targum noted that with respect to overall safety, naproxen would be the preferred drug over Vioxx. This is particularly true when traditional NSAIDs, which may cause adverse GI events, are used in combination with other medications which protect the stomach (e.g., proton pump inhibitors, (PPIs)).

　　　　2.　　　*February 2005 Advisory Committee:*  In February 2005, the FDA held a joint meeting of the Arthritis Advisory Committee and the Drug Safety and Risk Management Advisory Committee. This committee was asked to address several issues. The first question was "whether the available data supports a conclusion that rofecoxib significantly increases the risk of cardiovascular events." (Feb 17, 2005 TR at 328.). The committee unanimously concluded that the answer to that question is "yes". Based on my review of the literature, clinical study data, and other documents, I agree with the Advisory Committee. The second question was whether Vioxx should come back to market and, if it does, what restrictions should be placed on its use. Although the committee voted 17-15 to permit the reintroduction of Vioxx (a position that the FDA had rejected), *all but two* of the committee members placed significant restrictions on the availability of the drug. Limitations proposed by the panel included: 1) a black box warning for CV events;  2) a dose and duration restriction; 3) a requirement that a signed informed consent be obtained; and 4) a recommendation that the drug be limited to second or third line therapy. It is my opinion that Vioxx was an unreasonably dangerous drug, particularly

40

M009612730

given the other alternative NSAIDS available for use.

**F.      FDA Decision Memo of April 6, 2005**

On April 6, 2005, in response to public concern over the Vioxx withdrawal, the FDA issued a memorandum concerning the safety profile of NSAIDs and labeling recommendations for such medications. My review of the document finds that it has many contradictory and equivocal statements concerning the cardiovascular safety of prescription NSAIDs, including COX-2 inhibitors, such as Vioxx, Celebrex, and Bextra. Further, the document makes many recommendations and/or assertions that do not appear to be supported by the published literature, clinical data, and FDA documents that I have reviewed.

For example, the authors suggest that the available data does not permit a ranking of NSAIDs with respect to cardiovascular risk and recommends a black-box warning for all prescription NSAIDs. By contrast, I note that members of the advisory committee discussed the fact that Vioxx appears to have the worst safety profile of all NSAIDS, including other COX-2 inhibitors. See, TR at 329 (Comments of Dr. Nissen). Further, the Advisory Committee only recommended black-box warnings for COX-2 inhibitors. I agree with these comments and do not believe that all NSAIDs carry a cardiovascular risk or the same cardiovascular risk as Vioxx. There is only limited clinical data informing the cardiovascular safety of NSAIDs. Additionally, I note that while the FDA has permitted another COX-2 inhibitor, Celebrex, to be marketed with a black-box warning for cardiovascular risk, it has not approved Merck's proposal to put Vioxx back on the market at any dose or for any duration.

My review of the April 6, 2005 FDA memorandum has led me to conclude that it does not reflect final conclusions or a mandate of the Agency with respect to cardiovascular safety and

M009612731

appropriate labeling for NSAIDs.  Rather, it seems designed to assuage public concern that the

Agency has failed to diligently monitor the safety of NSAIDs.   Notably, while the FDA had

suggested in the memorandum that all prescription NSAIDS carry a black-box warning for

cardiovascular risk, I note that to my knowledge, at the present time—more than one year after

the FDA issued its memorandum—only two NSAIDs carry such warnings:  Celebrex, a selective

COX-2 inhibitor, and Flurbiprofen, an NSAID once claimed by Merck to be cardioprotective.

Indeed, if the FDA memorandum had actually reflected a final Agency position, the apparent

refusal of the pharmaceutical industry to follow FDA labeling recommendations only

underscores the inability of the FDA to force label changes for marketed pharmaceuticals.   The

responsibility for labeling and promotion lies with the sponsors.

M009612732

## CONCLUSION

The opinions expressed are based upon my training, research, and expertise in the fields of pharmacology and drug safety, my review of peer reviewed medical scientific and regulatory literature and relevant documents and testimony produced during the discovery process. I will continue my education throughout the discovery process and I am not limiting my opinions to the above. I may supplement this report if necessary based upon additional receipt of information received during the cause of the litigation. My consulting fee is $400.00 per hour for review and consultation.

On this _____ day of March, 2006.

_____

John L. Gueriguian, M.D.

43

M009612733