Nicholas A. Flavahan, Ph.D.

Page 190

1    Q. Well, let's just start with textbooks. Are
2  there any textbooks that do not have the imbalance
3  theory?
4        MR. KREPS: Objection to the form of
5  the question.
6    A. (Continuing) Again, in my daily life I don't
7  read textbooks. The textbooks are generating
8  information from literature. The -- the best thing
9  to do is to go to the same literature and come up
10  with your -- your own conclusions regarding.
11    Q. Okay. Let's do that then. You -- we have
12  looked at FitzGerald's presentation, February 2005.
13  Since that presentation is there any peer reviewed
14  article that questions or doubts the imbalance
15  theory as presented by FitzGerald to the ACM in
16  February 2005?
17    A. Again, I'm not sure of the -- the dates of
18  everything, but there are peer reviewed published
19  manuscripts by experts in the field that question
20  the imbalance theory as proposed in Garrett's
21  manuscripts.
22    Q. Okay. Who -- who -- who are -- who are
23  those experts and what -- what -- have you cited
24  those in your report?
25    A. I think some of them are cited. I didn't

Page 191

1  address the specific issue --
2    Q. Okay.
3    A. -- of whether they were agreeing or not with
4  the --
5    Q. Well, why don't -- why don't you identify
6  for us the articles that, to your mind, call -- or
7  refute the imbalance theory.
8    A. I know there's -- you'll need to give me a
9  couple of days to get the exact list to you, but I
10  know there's articles from Mitchell, there's
11  articles from Cipollone, and there's articles from
12  Patro -- Patrono, as far as I'm aware.
13    Q. Okay. So if -- if -- if you want to -- it's
14  fine with me -- you can attach the articles that you
15  would rely on to the deposition when you -- you --
16  there's an errata sheet that -- that -- you know,
17  you're familiar with that. So if you -- I'm -- I'm
18  perfectly happy to allow that to be part of the --
19        MR. KREPS: Well -- well, hold --
20        THE WITNESS: I'm not --
21        MR. KREPS: Hold on. There's
22  no -- there's no question pending, Doctor Flavahan,
23  but I'm not --
24        THE WITNESS: Reasonable explanation --
25        MR. KREPS: But I'm not comfortable,

Page 192

1  Counsel, with some kind of an open-ended produce all
2  articles that disagree with the imbalance theory.
3        MR. HORNBECK: No, no, no, no.
4        MR. KREPS: Many, many of those are
5  referenced in here.
6        MR. HORNBECK: Okay. Let -- let's be
7  real specific.
8    Q. (By Mr. Hornbeck, continuing)
9  Doctor Flavahan, I am asking you for articles
10  referenced in your expert report that directly
11  contradict or -- or refute the imbalance theory by
12  that name. That is, they look at the imbalance
13  theory, as -- as we've just looked at in
14  FitzGerald's article, and they say, this is
15  scientifically unsound.
16    A. Nobody obviously says that, but they obvious
17  -- the way they say it is to discuss the imbalance
18  theory and demonstrate or discuss the fact that it's
19  implausible. I don't think they use the word --
20  that it's unsound.
21    Q. Okay, okay. Let's look at the last page of
22  this FitzGerald article, if I can. The last -- very
23  last -- yeah, I'm sorry. Last page. Yeah.
24      You can see the last paragraph begins,
25  "Patient in the APPROVe -- in the APPROVe study

Page 193

1  should continue to be followed."
2    A. Yes.
3    Q. Okay. And it goes on to say, "We" -- "we'd
4  allow an estimate of how quickly risk
5  may dissipate."
6      And here is the sentence I want to focus on.
7  "On the other hand, if treatment has accelerated
8  atherosclerosis, the offset of risks may be more
9  gradual."
10      Do you see that?
11    A. Yes.
12    Q. Do you have an opinion to a reasonable
13  scientific probability as to whether or not the
14  follow-up data for a year after patients
15  discontinued Vioxx in the APPROVe study support the
16  acceleration of atherogenesis?
17        MR. KREPS: Objection to form of the
18  question.
19    A. (Continuing) Again, that's getting into the
20  area of clinical trials again. And that's not
21  something that I've addressed.
22    Q. As a general matter, do you think it is
23  important for a scientific hypothesis to have
24  predictive capacity?
25    A. It's -- it's important for a scientific

Golkow Litigation Technologies - 1.877.DEPS.USA

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 194

1  hypothesis to be evaluated within humans and to be
2  relevant to humans.
3     Q. Okay. Doctor, in -- in -- as I read your
4  report, I see that you disagree with the FitzGerald
5  and others imbalance theory. I don't see that
6  you've put forth another or alternative biologic
7  explanation to explain any of the data in the
8  clinical trials.
9        Have -- have you done that and I've missed
10  it or you have not done that?
11     A. What I've done is an extensive review of the
12  actions of Vioxx and an extensive review of the
13  function of COX-2 within the blood vessel wall. And
14  both of them -- both components of the report come
15  to the conclusion that a Vioxx and other COX-2
16  inhibitors will not have a detrimental effect on the
17  cardiovascular system.
18     Q. Okay. So -- so -- and -- and so there can't
19  be any ad -- there can't be any plausible biologic
20  mechanism of action if, in fact, the drug is -- is
21  not cardio harmful. Is that true?
22     A. Say again?
23     Q. Yeah. If -- your -- your -- your position
24  now, today, is that Vioxx is not cardiotoxic,
25  correct?

Page 195

1     A. That's correct.
2     Q. Okay. And you base that on all the papers
3  that you have in your expert report, correct?
4     A. That's correct.
5     Q. Okay. And so there is no, in your mind,
6  reason to have a potential biological explanation
7  for any adverse cardiovascular properties of Vioxx.
8  Is that true?
9        MR. KREPS: Objection to form of the
10  question.
11     A. (Continuing) I -- I've been -- I didn't go
12  specifically looking for data to support either side
13  of this issue. I went to look at the data. And the
14  data suggests that it has no cardiotoxic effect.
15     Q. Okay. That's -- that's the -- does not
16  include the randomized clinical trial data, though.
17  Is that true?
18     A. Includes looking at the randomized clinical
19  trial publications, but I did not look at or assess
20  the data within those clinical trials.
21        MR. HORNBECK: Okay. I have an exhibit
22  here. Let's see if I can -- okay. We'll -- up to
23  13. Would you mark that, please.
24        (Deposition Exhibit Number 13 was marked for
25  identification.)

Page 196

1     Q. (By Mr. Hornbeck, continuing)
2  Doctor Flavahan, would you look at Exhibit 13.
3  That's a article in circulation 2005, by
4  Doctor Antman, among others.
5        Do you see that?
6     A. Yes.
7     Q. And are you familiar with Doctor Antman?
8     A. No.
9     Q. You -- are you aware that circulation is the
10  publication of the American Heart Association?
11     A. Yes.
12     Q. And would you agree that it is a
13  well-respected peer reviewed journal and widely read
14  by cardiologists?
15     A. It is, yes.
16     Q. Do you, yourself, subscribe to this
17  publication?
18     A. I have free access online.
19     Q. Have you read this article before?
20     A. Yes.
21     Q. And did you include this article in your
22  list of references?
23     A. I don't think so, no.
24     Q. I want you to look at page 764 of this
25  article. It's got wonderful diagrams. I happen to

Page 197

1  have one in color. That's it.
2     A. Yep.
3     Q. Do you see it?
4     A. Yes.
5     Q. Okay. Looking at Figure 4, it has, on the
6  left-hand column, normal, on the right-hand column,
7  atherothrombosis -- thrombosis, correct?
8     A. Correct.
9     Q. Then it goes, untreated low-dose aspirin and
10  coxibs, correct?
11     A. Correct.
12     Q. Okay. Then there's an explanation for
13  Figure 4, correct?
14     A. Correct.
15     Q. Okay. And let's look at the -- at the
16  middle of that explanation. First talks about the
17  normally artery. And then let's look at the
18  atherosclerotic artery. In the --
19     A. Wait a minute, wait a minute.
20     Q. I'm sorry?
21     A. "In the normal artery"?
22     Q. "In the normal artery the balance between
23  prostacyclin and thromboxane production favors
24  prostacyclin and an inhibition of platelet-dependent
25  thrombis formation. In the atherosclerotic artery

50 (Pages 194 to 197)

Nicholas A. Flavahan, Ph.D.

Page 198

1  both the prostacyclin and thromboxane production is
2  increased, owing in part to the increased platelet
3  activity with compensatory prostacyclin formation
4  via both COX-1 and COX-2 and endothelial cell."
5     Do you agree with that as a scientific
6  proposition?
7     A. First of all, I don't degree with the
8  diagram. And the available evidence from
9  atherosclerotic systems is a prostacyclin --
10 the -- the ability of the blood vessel to generate
11 prostacyclin is actually reduced, not increased.
12    Q. Okay.
13    A. And then available evidence also suggests
14 that the prostacyclin is being generated
15 predominantly by COX-1, not COX-2.
16    Q. Okay. So scientifically Doctor Antman is
17 wrong, correct?
18    A. Yeah, he's -- he's -- this interpretation is
19 incorrect and the diagram is incorrect.
20    Q. So when you say "incorrect," that's a polite
21 way of saying he's scientifically wrong, correct?
22    A. Yes.
23    Q. Okay. The last sentence. "In the setting
24 of atherosclerosis, however, COX-2 plays a greater
25 role as a source of prostacyclin and more

Page 199

1  thromboxane is produced, thus inhibiting COX-2 has a
2  more profound affect on prostanoid balance favoring
3  thromboxane production and promoting platelet-
4  dependent thrombosis."
5     Is that scientifically wrong?
6     A. Yes.
7     Q. Okay. And in Doctor Antman's language that
8  essentially is the same theory as FitzGerald,
9  correct?
10    A. As -- well, it's kind of like the imbalance
11 theory, but it's -- yeah.
12    Q. It's very similar, isn't it?
13    A. Similar.
14    Q. They are both scientifically incorrect?
15    A. They are both scientifically unfounded
16 and -- yes, and incorrect.
17    Q. Okay. Let me just ask you a couple other
18 things. Have -- have you looked at the affect of
19 selective COX-2 inhibitors on the late phase of
20 myocardial ischemic preconditioning?
21    A. No, I have not.
22    Q. Have you looked at the affect of selective
23 COX-2 inhibitors on angiogenesis -- angiogenesis?
24    A. You mean by -- assume these questions refer,
25 have I specifically done experiments in these areas.

Page 200

1  And the answer is -- to both questions is no.
2     Q. Have you looked in your research on the
3  effect of selective COX-2 inhibition either on
4  myocardial ischemic preconditioning or angiogenesis?
5     A. I've looked at the angiogenesis -- some of
6  the angiogenesis studies.
7     Q. Okay. Have you found a beneficial or
8  adverse effect from Vioxx on angiogenesis in -- in
9  cardiovascular vessels?
10       MR. KREPS: Objection to the form of
11 the question.
12    A. (Continuing) I don't think -- I'm not aware
13 of any studies that have specifically looked at
14 Vioxx with regard -- that has -- there are some
15 studies in cancer with regard to Vioxx, where Vioxx
16 was inhibiting angiogenesis in the cancers.
17    Q. Well, cancer limiting new growth would be a
18 good thing, correct?
19    A. That's correct.
20    Q. Yeah. But in -- in someone who is depending
21 on collaterals for blood flow with ischemic heart
22 disease it would be a bad thing, wouldn't it?
23    A. Well, the angiogenic blood vessels are
24 thought to contribute to the growth of the plaque,
25 as well as the potential and destabilization of the

Page 201

1  plaque. So inhibition of angiogenesis would be a
2  good thing.
3     Collaterals specifically aren't angiogenic
4  channels. They are arteriogenic channels.
5     Q. Okay.
6     A. And I don't think anyone has analyzed the
7  role of COX-2 in angiogenesis.
8     Q. Okay. That's a good distinction. And
9  I -- I'm just going to follow up with your answer.
10       Is -- is -- to your knowledge, there has not
11 been any study of arteriogenesis, i.e.,
12 collateralization for ischemic heart disease with
13 regard to selective COX-2 inhibitors. Is that true?
14    A. I mean, I -- humans -- the ability of humans
15 to have collateral circulation and the bypass
16 blockage from the coronary arteries is very limited.
17 It's a lot more prominent in animals. And as far as
18 I'm aware nobody has analyzed the role of COX-2 in
19 that process.
20    Q. Sir, can -- for example, when a patient -- a
21 CABAG patient is -- is first -- the surgery is -- is
22 just completed, can't they have a normal profusion
23 scan?
24       MR. KREPS: Object to form of the
25 question.

51  (Pages 198 to 201)

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 202

1    A. (Continuing) Again, that's a clinical
2  diagnostic test I wouldn't be familiar with.
3    Q. Are you aware of any studies on CABAG
4  patients in which a specific COX-2 inhibitor was
5  administered?
6    A. I may have read them, but I don't recall.
7    Q. Okay. If your theory of -- of that -- that
8  a selective COX-2 inhibitor is not cardiotoxic
9  is -- is correct, would you expect there to be an
10  excess of thrombotic events in CABAG patients
11  administered a selective COX-2 inhibitor?
12    A. It shouldn't increase thrombotic events.
13  And that's been demonstrated numerous times in -- in
14  individuals.
15    Q. Okay. So if there were one or two
16  randomized clinical trials that showed an excess of
17  thrombotic events in CABAG patients, your theory
18  could not explain that result. Is that true?
19    A. Again, you're asking me to interpret the
20  clinical trials, which --
21    Q. Just ask --
22    A. -- I can't do.
23    Q. I'm sorry. I'm sorry. I'm just asking you
24  a hypothetical question.
25    A. Vioxx has been demonstrated not to increase

Page 203

1  thrombotic events in humans.
2    Q. Okay.
3    A. And that's --
4      MR. HORNBECK: I don't have -- I don't
5  have any further questions.
6      Mr. Sizemore, did you have questions you
7  want --
8      MR. SIZEMORE: Yes, I do, I do. I'm
9  going to have about -- probably about 30 minutes,
10  Doctor.
11      The good thing about going last is I don't
12  have as many questions. The bad thing is I -- I
13  skip around more than -- more than the other folks.
14  So do you want to take a break right now or do you
15  want to just go ahead and push through?
16      MR. KREPS: I need to take a stretch.
17      MR. HORNBECK: Yeah, let's take a
18  short -- a short stretch, if we could, Paul.
19      MR. SIZEMORE: Okay. No problem.
20      MR. HORNBECK: Okay.
21      THE VIDEOGRAPHER: Going off the record
22  at 3:07 p.m.
23      (Recess from 3:07 p.m. to 3:16 p.m.)
24      THE VIDEOGRAPHER: We are back on the
25  record. The time is 3:16 p.m.

Page 204

1      EXAMINATION
2  BY MR. SIZEMORE:
3    Q. Doctor -- Doctor, do you have a BA degree in
4  pharmacology? Is that correct?
5    A. It's a BSc and a MSc and a Ph.D.
6    Q. Okay. Do you have a Ph.D. in pharmacology?
7    A. Well, it was a pharmacological degree.
8  Whether it was actually within the pharmacology
9  department -- I think my mentor was a pharmacologist
10  working within physiology, so it's -- it was --
11    Q. Okay.
12    A. -- it was a pharmacology degree.
13    Q. Okay. I thought I read it to be a -- a
14  Ph.D. in physiology. Is that -- is that what your
15  actual Ph.D. is in?
16    A. The department I was working in at the time
17  was a department of physiology, but it -- the degree
18  was a pharmacology degree. I spent the whole time
19  doing pharmacological analysis.
20    Q. Okay. Did -- are you familiar with
21  Steadman's Medical Dictionary for health
22  professions, Doctor?
23    A. I don't think I've used it.
24    Q. Okay. They -- the only reason I ask is I
25  wasn't familiar with -- with what exactly physiology

Page 205

1  entailed and I -- I looked it up in that -- that
2  treatise. And I wanted to read the definition they
3  gave and -- and see if that fairly accurately
4  summarizes what physiology involves.
5      You following me?
6    A. Yep.
7    Q. Okay. And I apologize for not having a copy
8  there in front of you, but I -- I'll read it to the
9  best of my ability here.
10      "Physiology is the science concerned with
11  the normal vital processes of animal and vegetable
12  organisms, especially as to how things normally
13  function in the living organism, rather than their
14  anatomical structure, their biochemical composition,
15  or how they are affected by drugs or disease."
16      Is that a fairly accurate description of
17  what physiology involves, Doctor?
18    A. It's different from the one I would give. I
19  think it's different from the way that the subjects
20  evolved. I didn't even realize it stretched to
21  vegetables or plants.
22    Q. Okay. Is there any particular -- any
23  particular aspect of that definition you would
24  disagree with, but you -- aside from the vegetable
25  reference?

Nicholas A. Flavahan, Ph.D.

Page 206

1    MR. KREPS: Well, object to the form of
2  the question, but he hasn't been able to see it.
3  Obviously, as counsel said, he heard him read it
4  once.
5    But go ahead.
6    A. (Continuing) Right. I mean, certainly,
7  it -- most physiology now extends to cell and
8  molecular physiology, but the -- the kind of -- the
9  kind of global picture behind the discipline is to
10  analyze how the systems function. It's like in a
11  systems label approach to everything.
12    Q. Okay. Thank you, Doctor.
13    And, Doctor, again I apologize. I'm going
14  to be jumping around a bit, being the third person
15  to go in this deposition, so bear with me. If I ask
16  you a question that doesn't make any sense in the
17  context I'm asking it, please feel free to stop me
18  and I'll rephrase it.
19    You've been asked about your billing
20  records, Doctor. Can you tell me how many total
21  hours you spent working on Vioxx to date?
22    A. With -- the best way to do that is to add up
23  the total hours from the invoices. There's only one
24  invoice, I think, outstanding, but adding up the
25  existing ones will give you a good idea.

Page 207

1    Q. Okay. Can you give me a -- an estimate on
2  that, Doctor?
3    A. I'm sure it's one of these. So the first
4  invoice was for 30 hours, second invoice was for
5  143.5 hours, the third invoice was for 58 hours. So
6  that's roughly what? 230 hours.
7    Q. Well, I'll accept your estimate on that,
8  Doctor, so I don't have to add it up. I -- I think
9  you said you were about an hour behind on your
10  billing, too. Does the --
11    A. No. I'm --
12    Q. -- total number that you just gave me
13  include that?
14    A. A month behind.
15    Q. I -- I'm sorry. I -- what did I say? An
16  hour?
17    MR. HORNBECK: You did.
18    Q. (By Mr. Sizemore, continuing) Are you a
19  month behind --
20    A. Yes.
21    Q. -- on your billing?
22    Is that month behind included in the -- the
23  approximate 230-hour total you just gave me?
24    A. No. And I'm -- I can't give you a decent
25  estimate on the last month.

Page 208

1    Q. Okay. And that would not include,
2  obviously, your time for deposition today, is that
3  right?
4    A. That is correct.
5    Q. All right. What is your hourly rate,
6  Doctor?
7    A. $450.
8    Q. Okay. And this is a simplistic question,
9  but we can find out approximately how much you've
10  charged Merck to serve as an expert in this case by
11  adding up the total number of hours, including the
12  approximate month billing you're behind right now,
13  and multiplying that times $450 an hour, correct?
14    A. That's correct.
15    Q. Okay. Do you have any -- an estimate as to
16  the total amount of money you've charged Merck to
17  serve as an expert in this case?
18    A. Again, we could look at the invoices and
19  roughly add them. That's going to be more
20  difficult. Bigger numbers.
21    Q. Let's -- let's say subtracting out your
22  deposition testimony today and the month of -- of
23  billing you're behind, do you have an estimate as to
24  how much you've -- you've charged Merck up until
25  that point in time?

Page 209

1    A. Do you want me to give you a guesstimate of
2  the invoices?
3    Q. Sure. That's fine.
4    A. First invoice was for 13,700, roughly.
5  Second invoice was 64,500, roughly. And the last
6  invoice was about 26,000 roughly. So that's
7  77 -- 97 -- 103, roughly.
8    Q. Thank you, Doctor.
9    Now, Doctor, I believe you were asked
10  earlier about this distinction, but you are not a
11  medical doctor, is that correct?
12    A. That's correct. I have a Ph.D. I'm a
13  scientist, not a medical doctor.
14    Q. Okay. And when you say "a scientist, not a
15  medical doctor," does that mean you engage in basic
16  science or basic research, as opposed to seeing
17  patients in a clinical setting?
18    A. I don't see patients. I don't diagnose
19  disease in patients. I don't treat patients.
20    Q. Would it be accurate to say then that you
21  have never prescribed Vioxx or any other COX-2
22  inhibitor to any patient?
23    A. That's correct.
24    Q. As a matter of fact, you don't have the
25  ability to actually prescribe medications. Is that

Nicholas A. Flavahan, Ph.D.

Page 210

1  correct?
2      A. I would be arrested. That's correct.
3      Q. Okay. Doctor, when -- when did you begin
4  working in the area of atherosclerotic research?
5      A. Oh, gosh. Five -- it's kind of getting
6  close to 20 years ago probably.
7      Q. Okay. Did -- how long ago did you start
8  your research on the atherogenesis? Would it be the
9  same time frame?
10     A. Same time.
11     Q. Okay. Doctor, I want to make sure that I'm
12 absolutely clear on your opinions in this case. Is
13 it true that you do not deny that Vioxx clinical
14 trial showed an increased risk of cardiovascular
15 adverse events?
16     A. Again, I'm not here to evaluate or interpret
17 the clinical trials.
18     Q. Okay. So you would have no opinion on that
19 subject, correct?
20     A. I have no opinion on that subject.
21     Q. Okay. Doctor, what is the mechanism of
22 action by -- by which Vioxx increases the risk of
23 heart attacks and strokes?
24     A. Again, that's interpreting clinical trial
25 data. And I'm not doing that.

Page 211

1      Q. Okay. Again, would that be something you
2  have no opinion on?
3          MR. KREPS: Objection to form of the
4  question.
5      A. (Continuing) I have opinion on what Vioxx
6  does within the -- the cardiovascular system and
7  blood vessels of humans. I have no opinion on the
8  validity or the interpretation of the clinical
9  trials.
10     Q. Let me rephrase my question then, Doctor,
11 and see if we can come to an understanding.
12         What is the mechanism of action by which
13 Vioxx increases the risk of heart attack and strokes
14 in Vioxx clinical trials then?
15     A. Same question. Similar answer. I have
16 not evaluated the validity or the data or the
17 interpretations of the clinical trials.
18     Q. So you have no opinion on that particular
19 question, is that true?
20     A. As of detail during the course of today, I
21 think there's strong data demonstrating the Vioxx
22 does not increase the atherothrombotic process.
23     Q. Okay. And I need to make sure that I
24 understand what opinions you're going to give at the
25 MDL trial and the California trial, Doctor, so bear

Page 212

1  with me here.
2          Do you -- do you plan on coming to court and
3  saying that Vioxx does not increase the risk of
4  heart attacks and strokes in Vioxx clinical trials?
5          MR. KREPS: Objection to form of the
6  question.
7      A. (Continuing) I think, as we've already
8  spelled out today, I don't think my participation in
9  these proceedings is to discuss or interpret or
10 evaluate those clinical trials.
11     Q. Okay. And it would be fair to say then that
12 whether or not Vioxx was shown to increase the risk
13 of heart attack and strokes in Vioxx clinical trials
14 is not something that you have utilized in forming
15 your opinions in this case, correct?
16     A. I have looked at the clinical trials, as I
17 said earlier, to look at the mechanisms that were
18 being discussed within those manuscripts. And I did
19 not and will not evaluate the conduct of the
20 interpretation of the trials.
21     Q. Okay. And including -- included in that is
22 you will not comment on whether or not the clinical
23 trial showed an increased risk of heart attack and
24 strokes in the Vioxx clinical trial, right?
25     A. I will not be commenting on the data or

Page 213

1  interpretation or the conduct of those trials,
2  that's correct.
3      Q. Okay. Just to make sure that -- that we're
4  not missing the point here, you're not going to come
5  to court and say that the clinical trials on Vioxx
6  did not show that Vioxx increased the risk of heart
7  attack and stroke, correct?
8      A. Again, I will not be coming to trial and
9  commenting on the conduct, results, or
10 interpretation of those trials.
11     Q. And could you answer "yes" or "no,"
12 Doctor --
13         MR. KREPS: Objection, form.
14     Q. (By Mr. Sizemore, continuing) -- to my
15 question?
16     A. I think I answered your question. I can
17 repeat it, if you want.
18     Q. Okay. Doctor, I think before we -- before
19 we moved over to my line of questioning you
20 indicated that Vioxx has not been demonstrated to
21 increase cardiovascular events. Is that correct?
22     A. It's been demonstrated not to increase
23 vascular thrombotic events.
24     Q. Okay. Just so I'm clear then, it's your
25 testimony that Vioxx has been demonstrated not to

54 (Pages 210 to 213)

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 214

1 increase vascular thrombotic events, correct?
2     A. That's correct.
3     Q. Okay. And I want to be sure that -- that
4 we're on the same page, too, in -- in using
5 the -- the -- the terminology that you used today.
6         Are you distinguishing between vascular
7 thrombotic events and other cardiovascular adverse
8 events, Doctor?
9     A. No. I think we may need to define what we
10 mean by "events." And my definition of an event may
11 be different from your definition of an event.
12     Q. Okay. That's what I'm trying to get at
13 here. You -- you've been very definitive in -- in
14 what you're saying and describing that Vioxx is not
15 demonstrated -- or not been demonstrated to increase
16 vascular thrombotic events.
17         Are you making a distinguish --
18 distinguishment between thrombotic events and other
19 cardiovascular adverse events?
20     A. Well, no. I was -- I was trying to make a
21 distinction between the term "event" and the fact
22 that your definition of "event" may rely on clinical
23 trials, my definition of an "event" would be from
24 the clinical experiments and clinical studies.
25     Q. Okay. Your -- your definition of -- of --

Page 215

1 strike that question.
2         Your statement that Vioxx is not -- or has
3 been demonstrated not to increase vascular
4 thrombotic events does not rely in any way upon
5 information from the Vioxx clinical trials, correct?
6     A. That's correct.
7     Q. Okay. Now, I -- I think I understand now,
8 Doctor. Thank you.
9         Doctor, aside from the specific term of
10 vascular thrombotic events, do you have any opinions
11 whether Vioxx increases cardiovascular adverse
12 events, in general?
13     A. It's my opinion that based on the data
14 that -- I have reviewed for the report, that there's
15 no evidence that a Vioxx increases or causes adverse
16 cardiovascular events.
17     Q. Again, Doctor, your last statement that
18 there's no evidence based upon the data you've
19 reviewed that Vioxx increases cardiovascular adverse
20 events -- that data does not include information
21 from the clinical trials involving Vioxx, correct?
22     A. That's correct. As I said before, I did not
23 review or evaluate the data from the clinical
24 trials.
25     Q. Your opinions here today are -- are based

Page 216

1 upon -- upon the basic science and upon science
2 that's actually been done in animal -- animal models
3 inside and outside of Merck, is that correct?
4     A. My opinions are predominantly -- if you read
5 the report, my opinions are predominantly based on
6 data from human studies, both in living human
7 volunteers, as well as tissues obtained from humans.
8 All of that data has been published in the world's
9 literature.
10     Q. Okay. So -- just so I'm clear then, the --
11 the -- all of the human data upon which you are
12 basing your opinions in this case have appeared in
13 the published literature, correct?
14     A. That's correct.
15     Q. Doctor, I do note that you have cited or at
16 least referenced several animal studies. Is -- is
17 it -- is it fair to say then that the animal studies
18 referenced in your report have not helped form the
19 basis of the opinions that you've expressed in your
20 report?
21     A. Basically don't need them for the opinions
22 of the report. Restricted the animal studies and
23 mainly -- I think perhaps solely to the analysis of
24 the COX-2 inhibitors and atherosclerotic models.
25     Q. Doctor, while we're on the report, could you

Page 217

1 turn to page 12, please, sir.
2     A. Okay.
3     Q. In the first full paragraph there -- do you
4 see where it says -- I believe it's bolded and says,
5 "The imbalance theory" -- that you -- you following
6 me?
7     A. Yes.
8     Q. Okay. The third sentence there, it says,
9 "Furthermore, vascular homeostasis is not determined
10 solely by a balance between platelet-derived
11 thromboxane and endothelium-derived prostacyclin."
12         Did I read that correct?
13     A. That's correct.
14     Q. Is it -- am I understanding your report
15 correctly when you state -- or when I -- let me
16 strike that question.
17         Is prostacyclin derived from the
18 endothelium, Doctor?
19     A. It's one of the areas that's derived from,
20 yes.
21     Q. Okay. And when we say "endothelium" are --
22 we're referring essentially to the vasculature?
23     A. The endothelium lines the entire
24 cardiovascular system. So the heart actually has an
25 endothelium which is called the endocardium.

Golkow Litigation Technologies - 1.877.DEPS.USA

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 218

1    Q. When we see references to vascular
2  prostacyclin, is that -- is that analogous or the
3  same thing to endothelium-derived prostacyclin?
4    A. Yeah. Well, vascular smooth muscle cells
5  can also generate prostacyclin, but the predominant
6  source of prostacyclin within the blood vessel wall
7  is the endothelium.
8    Q. Is -- is the endothelium then
9  distinguishable from -- from the vasculature?
10   A. It's a component of the vasculature.
11   Q. Okay. I -- I guess my question then
12  is -- is, Doctor, I note in several different
13  point -- or points in your report -- I see the usage
14  of the verbiage "endothelium-derived prostacyclin"
15  and then I see "vascular prostacyclin." Are those
16  two -- are you making a differentiation between
17  those two terms in your report?
18   A. We'd have to go through the report and see
19  specifically. It may be a -- a switching that was
20  in inadvertent, but it may be that the -- the sense
21  has changed. I would need to go through and need to
22  check.
23   Q. Yes, sir. Yes. I -- I don't want you to
24  have to do that. Let me ask it a different way
25  then.

Page 219

1      Does your mind -- in your mind, as you sit
2  here right now, when we use -- utilize the
3  terminology "endothelial-derived prostacyclin" and
4  "vascular prostacyclin," are those two terms
5  analogous or do they have different meanings?
6    A. They are not interchangeable. However, the
7  major source of prostacyclin within the vasculature
8  is the endothelial cell.
9    Q. Okay. Thank you, Doctor.
10   A. But, strictly speaking, they are not
11  interchangeable.
12   Q. Thank you.
13     Going back to the -- the sentence that we
14  just read, that vascular homeostasis is not
15  determined solely by a balance between
16  platelet-derived thromboxane and endothelium-derived
17  prostacyclin.
18     Doctor, is -- is what you're saying in this
19  sentence that the imbalance or potential imbalance
20  between thromboxane and prostacyclin alone would not
21  be -- or could not be the sole cause of a
22  thrombosis?
23     MR. KREPS: Objection to form.
24   A. (Continuing) Yeah, well, I'm telling you --
25  what I'm saying there is it revolves around the word

Page 220

1  "solely." They both contribute. They are both
2  mediators involved in regulating platelet
3  aggravation, but they are not the only factors
4  involved. And so it's a -- single out prostacyclin
5  and single out thromboxane is artificial.
6    Q. Right. That's where I was going with that.
7  Thank you, Doctor.
8      Let me -- let me ask you this question,
9  Doctor: Is prostacyclin a potent antiaggregatory
10  and vasodilator?
11   A. It's an antiaggregator and it can be a -- a
12  vaso dilator. We'd have to discuss the potency with
13  regard to specific studies.
14   Q. Okay. Have you seen the Merck manual where
15  they -- where Merck itself describes prostacyclin as
16  the most potent anti -- antiaggregatory and
17  vasodilator in the vasculature?
18   A. I have not seen that.
19   Q. Okay. And the Merck attorneys haven't shown
20  you that?
21   A. No.
22   Q. Okay. Can we also agree, Doctor, that
23  thromboxane is a proaggregatory and -- enzyme and is
24  also a vasoconstrictor?
25   A. It's not an enzyme. It's a mediator. And

Page 221

1  it's a proaggregatory and vasoconstrictor, yes.
2    Q. Okay. Thank you. Let me re-ask my question
3  then.
4      Is thromboxane proaggregatory and also a
5  vasoconstrictor?
6    A. Yes.
7    Q. And when -- when we say "proaggregatory,"
8  what does that mean in layman's terms, Doctor?
9    A. Well, I think you mean that -- does it
10  stimulate platelet aggregation. Certainly is
11  what --
12   Q. Does it --
13   A. Certainly what I took from your usage of the
14  word.
15   Q. Okay. Thank you.
16     I want to make it even more simple. Does
17  that mean -- does "proaggregatory" mean it can cause
18  a clot?
19   A. It's one of the agents that can drive
20  thrombosis and clot formation, yes.
21   Q. Thank you, Doctor.
22     I'm from the south, as John pointed out,
23  Doctor, so you have to break these down -- things
24  down for me very simply.
25     Now, Doctor, in -- in -- in layman's terms,

Golkow Litigation Technologies - 1.877.DEPS.USA

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 222

1   what does vasoconstriction mean?
2       A.  Vasoconstriction means a narrowing of the
3   blood vessel.  And that's --
4       Q.  And would --
5       A.  And that's a functional narrowing of the
6   blood vessel, which means it involves an active
7   process to close the blood vessel off, rather than a
8   structural narrowing of the blood vessel.
9       Q.  Okay.  Is the net effect of that then --
10  does a vasoconstrictor mean that it makes the -- the
11  amount of flow that will go through that vessel
12  less?
13      A.  It depends on where the blood vessel is.  If
14  it's a large -- the blood vessel has to be what's
15  termed a resistance artery.  The resistance blood
16  vessels are the small arteries and arterials which
17  actually regulate blood flow.  And so
18  vasoconstriction -- they are like the faucets in the
19  vascular system.  And so vasoconstriction of those
20  faucets would regulate blood flow.  Vasoconstriction
21  in larger blood vessels that are not part of that
22  faucet structure wouldn't restrict blood flow.
23      Q.  If we're talking specifically about the
24  coronary arteries and vasoconstriction --
25  constriction, would an agent that is

Page 223

1   vasoconstrictive in the coronary arteries have the
2   functional effect of limiting the amount of flow
3   through those arteries?
4       A.  Again, it would have to be vasoconstriction
5   down in the small arteries.  And you would get
6   vasoconstriction and limiting flow.
7          Alternatively, if you get vasoconstriction
8   in large blood vessels that have a limiting
9   stenosis, then that vasoconstriction could limit
10  flow.
11      Q.  Okay.  Would you consider the -- the
12  coronary arteries smaller or larger arteries?
13      A.  The main coronary artery where most of the
14  travel is happening is in the large coronary artery.
15  And downstream, in the smaller artery and arterials,
16  you don't get structural lesions.
17      Q.  Okay.  Is it true that most atherosclerosis
18  would occur in the smaller coronary arteries?
19      A.  No.  They are actually occurring in the
20  larger coronary arteries.
21      Q.  Is it true that generally speaking most
22  atherosclerosis would occur at -- at the site of
23  branching in the coronary arteries?
24      A.  Yeah.  There's areas of the blood vessels
25  that are susceptible to atherosclerosis.  And you're

Page 224

1   right, it's generally flow dividers.
2       Q.  And -- and what does "branching" mean or
3   "flow dividers" mean, Doctor?
4       A.  It means the shear stress or the flow on the
5   endothelia cells is different, like, in a
6   straightaways where it's just, like, in a
7   straightforward tube.
8       Q.  Now, going back to this sentence, "vascular
9   homeostasis is not determined solely by a balance
10  between platelet-derived thromboxane and
11  endothelium-derived prostacyclin."
12         Doctor, you're not saying that thromboxane
13  and prostacyclin don't play any role in
14  atherothrombotic -- thrombosis, are you?
15      A.  No.  I mean -- I'm saying that they have a
16  role, but they are not the only players in this.
17  And so singling them out in some artificial ratio
18  is -- is incorrect.
19      Q.  Okay.  Thank you.
20         The -- the -- both of those factors,
21  thromboxane and prostacyclin, do play important
22  roles in -- in atherothrombosis, correct?
23      A.  They are both involved in regulating the
24  thrombotic process, that's right.
25      Q.  Okay.  Thank you, Doctor.

Page 225

1          And, Doctor, just -- just so I -- I can make
2   sure that I understand the gist of your -- your --
3   your report, it seems to me that you have two
4   general opinions in your report -- or at least break
5   it down into two areas.  One dealing with the
6   imbalance theory.  And then the second portion of
7   your report, in general, dealing with
8   atherosclerosis and atherogenesis.
9          Is that -- is that a fair division?
10      A.  It's a fair division I think, yeah.
11      Q.  And I'd like to talk about each of those
12  divisions separately, if you will, Doctor, if that
13  kind of helps you understand where I'm going.
14         In -- in reference to the -- the -- the
15  first division, the imbalance theory, if you will,
16  is it -- is it your opinion that there is no COX-2
17  in the healthy vasculature of a human?
18      A.  The available evidence and the totality of
19  the evidence demonstrates that the endothelial COX
20  is COX-1.  And there is no COX-2 within those
21  endothelial cells.
22      Q.  I used the word "vasculature" there.
23         Did you understand that to mean endothelial?
24  Just so we're on the same page.
25      A.  Yeah, I did.

Nicholas A. Flavahan, Ph.D.

Page 226

1    Q. Okay. Thank you.
2        And also want to make sure I understand, are
3    you -- is it also your opinion that even in a
4    diseased state, as opposed to a normal, healthy
5    vasculature or endothelium, that COX-1 is the
6    primary source of prostacyclin production?
7        A. Yeah, even within the atherosclerotic lesion
8    the primary source of prostacyclin still appears to
9    be COX-1, that's correct.
10   Q. Okay. And it's your opinion that COX-1
11   makes prostacyclin, correct?
12       A. Under these -- COX-1 doesn't make
13   prostacyclin. It makes PGH2, which then gets
14   converted to prostacyclin by prostacyclin synthesis.
15   Q. Okay. Does COX-2 play any role in
16   generating prostacyclin in humans?
17       A. Yes.
18   Q. Okay. Can you explain that to me?
19       A. Well, it's easily demonstrated with regard
20   to Garret FitzGerald's studies and everybody else's
21   studies when they were looking at the excretion of
22   the urinary metabolite of prostacyclin PGI-M.
23   Clearly there's a large component, if not all of the
24   component of that urinary metabolite is derived from
25   COX-2 activity.

Page 227

1    Q. Okay. Are you referring to the
2    Cetella-Lawson study?
3        A. Yeah. There's a whole --
4    Q. -- co-authored with Doctor FitzGerald?
5        A. Let me just check. Yeah, Catella-Lawson was
6    one of them, but there's been a whole bunch of
7    studies that have basically come to the same
8    conclusion.
9    Q. Okay. Have you spoken with Doctor Michael
10   Grazziano, Doctor?
11       A. Don't think so.
12   Q. Okay. So you have no idea who he is?
13       A. No.
14   Q. Would that be accurate?
15       A. Yep.
16   Q. Have you been shown any reports from
17   Doctor Grazziano or any information whatsoever from
18   him?
19       A. I don't recall reading anything from
20   Doctor Grazziano.
21   Q. Doctor, you -- you published an article back
22   in 1998 in the British Journal of Pharmacology,
23   entitled "Prostacyclin releases endothelium-derived
24   relaxing factor and -- potentiates its action in
25   coronary arteries of the pig."

Page 228

1        Do you recall that?
2        A. Yep.
3    Q. Okay. It -- it's listed in your -- in your
4    CV, if that helps.
5        A. What manuscript number was it?
6    Q. Let me see.
7        A. It's all right. I found it.
8    Q. You got it?
9        A. Yep. It's number -- number 42.
10   Q. Number 42?
11       A. Yes.
12   Q. Okay. You -- you recall writing or
13   co-authoring that paper, Doctor?
14       A. Yes.
15   Q. Okay. The first sentence in that -- that
16   paper states, "Prostacyclin and endothelium-derived
17   relaxing factor are potent vasodilator and
18   antiaggregatory substances released from the
19   endothelium."
20       Do you still agree with that statement,
21   Doctor?
22       A. I need to see the paper again. Obviously
23   you'd have to -- I need to check to see how it broke
24   down. Nitric oxide is a very potent vasodilator.
25   Prostacyclin isn't all that potent. They both act

Page 229

1    effectively to inhibit platelet aggregation.
2    Q. Well, let me just ask you, since you
3    don't -- don't recall that sentence in the paper as
4    you sit here today, in general, is it true that
5    prostacyclin and endothelium-derived relaxing factor
6    are potent vasodilator and antiaggregatory
7    substances released from the endothelium?
8        A. The statement as read is correct, but
9    the -- the characterization refers to different
10   mediators. So endothelial-derived nitric oxide is
11   potent in both activities. Prostacyclin is not that
12   effective as a vasodilator.
13   Q. Okay. So if it says prostacyclin and
14   endothelium-derived relaxing factor are potent
15   vasodilators and antiaggregatory substances released
16   from the endothelium, you would disagree with the
17   way that's phrased?
18       A. I would, yeah. It needs -- it needs some
19   alteration, I think.
20   Q. Okay. Doctor, in your study, as well --
21   and I won't site you to any more specific quotes
22   because you don't have it in front of you. But
23   suffice it to say you've referenced several
24   different animal studies where you examine
25   prostacyclin expression from different portions or

58 (Pages 226 to 229)

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 230

1  different animal aortas, hearts, or coronary
2  arteries.
3      Is there anything unique about the
4  individual species? In this specific study you
5  utilize the pig. Say -- is there -- let me just
6  start this over.
7      A. Yeah.
8      Q. I'll strike that question. That was getting
9  very long. I -- even I realized that one.
10      Is it true that in the study we just were
11  referencing, Doctor, you examined the coronary
12  arteries of the pig?
13      A. That's correct.
14      Q. And in -- in your study on page 1201 you
15  also reference other studies involving animals,
16  utilizing the arteries of the dog --
17      A. What did you say?
18      Q. -- or the aorta of the pig.
19      I'm sorry?
20      A. Where are you found -- to now?
21      MR. KREPS: He's still in the paper he
22  has, not your -- not this.
23      A. (Continuing) You're still in British Journal
24  of Pharmacology?
25      Q. I -- I'm in your art -- article in the

Page 231

1  British Journal of Pharmacology.
2      A. Right. Okay.
3      Q. We on the same page now?
4      A. Right.
5      Q. Okay. And I'm referring to the article
6  where you examined prostacyclin in the coronary
7  arteries of the pig.
8      A. Right.
9      Q. Okay. In that same article, on page 1201,
10  you also make reference to studies in -- involving
11  arteries of the dog, art -- or aorta of the pig, or
12  the basilar arteries of the dog or the aorta of a
13  rabbit.
14      Is -- is there anything unique about these
15  different body parts, for lack of a better word, to
16  describe from these animals that would have unique
17  affects on the expression of prostacyclin?
18      MR. KREPS: Objection to the form of
19  the question. Obviously, Counsel, you're asking him
20  to refer to something that you've got in front of
21  you that he doesn't have in front of him. I think
22  that's -- that's an unfair question.
23      A. (Continuing) Can you make the question --
24      Q. I'm not quoting --
25      A. Can you make the question more --

Page 232

1      Q. Yeah. I'm not quoting the article. Yeah.
2  I'm not quoting the article. I'm just making
3  reference to the fact that you have cited studies
4  previously that -- that tested various substances in
5  pig aortas, dog arteries, rabbit aortas, et cetera.
6      A. Right.
7      Q. Is there anything unique about these various
8  animal body parts that would limit prostacyclin
9  expression in the various studies?
10      MR. KREPS: Object to form of the
11  question.
12      A. (Continuing) Specific -- well, first of all,
13  most vascular beds have their own characteristics.
14  Every vascular bed is trying to kind of perform kind
15  of the same function within a unique environment and
16  so has developed somewhat unique characteristics.
17  And I'm not sure what you're getting at with regard
18  to all the different blood vessels and
19  whether -- you know, was -- was the question
20  specific to the studies we performed or the
21  relevance of the studies we performed?
22      Q. I -- I think it goes to the latter, Doctor.
23  And let me see if I can clarify even more so.
24      Is there anything unique about the coronary
25  arteries -- or strike that question.

Page 233

1      Is prostacyclin expression in the coronary
2  arteries of the pig analogous to prostacyclin
3  expression in the vasculature from the endothelium
4  in humans?
5      MR. KREPS: Object to form of the
6  question.
7      A. (Continuing) The prostacyclin molecule is
8  the same. I don't know if that's what you mean.
9      Q. I -- you're -- we're getting there. Bear
10  with me.
11      Is prostacyclin expression in a rabbit aorta
12  analogous to vascular or endothelial prostacyclin
13  expression in humans?
14      MR. KREPS: Same objection.
15      A. (Continuing) Are you asking whether you can
16  take the animal study and say this is the exact same
17  that's going to happen in a human? Is that what
18  you're asking?
19      Q. That's exactly right, Doctor.
20      A. Right.
21      There's good evidence that -- I mean, with
22  every animal model you have to, you know, be careful
23  extrapolating it to the human. And so you need to
24  evaluate it very carefully. Is --
25      Q. Okay.

59 (Pages 230 to 233)

Nicholas A. Flavahan, Ph.D.

Page 234

1   A. -- prostacyclin production within a rabbit
2   blood vessel or a mouse or a pig blood vessel the
3   same as the -- the activity within a human blood
4   vessel? It may be and it may be not.
5       Q. Okay. Let's -- let's talk specifically
6   about a rabbit aorta then, if that helps narrow
7   the -- the -- the field a bit.
8       If we're talking specifically about a rabbit
9   aorta, is that -- is prostacyclin expression in a
10  rabbit aorta analogous or identical to prostacyclin
11  expression in the vasculature or endothelium of a
12  human?
13      MR. KREPS: Objection, form of the
14  question.
15      A. (Continuing) I would -- I would need to go
16  and look at the -- the data for that specific
17  question to evaluate the level of expression and the
18  regulation of expression and the actual release of
19  the mediator so the -- it could be evaluated to see
20  whether it is relevant. I haven't done that.
21      Q. Okay. And that's fair. To -- to be fair
22  then, as we sit here today, off the top of your
23  head, you can't say whether prostacyclin expression
24  in the rabbit aorta is identical to prostacyclin
25  expression in the vasculature from the endothelium

Page 235

1   in a human. Is that fair?
2       A. I can't -- you're right. I -- I can't -- I
3   can't extrapolate from one to the other without
4   going and studying it.
5       Q. Okay. All right, Doctor. In your -- in
6   your report you have cited to an article by
7   Doctor Wong and various co-authors.
8       Do you recall that -- that article as we sit
9   here today?
10      A. If you tell me in what context it was
11  referenced I can tell you if I remember it.
12      Q. It's on page 32. The -- the title may help
13  you. It's Number 150. It's Wong, Effects of COX-2
14  inhibitors on aortic prostacyclin production in
15  cholesterol-fed rabbits. It was in --
16      A. Yeah.
17      Q. -- the Journal of Atherosclerosis.
18      A. Yeah, I recall --
19      Q. Do you recall that now?
20      A. Yes.
21      Q. Okay. Do you recall in that article that
22  rabbits that were given the COX-2 selective
23  inhibitor celecoxib or Celebrex showed decreased
24  prostacyclin expression?
25      A. Say again?

Page 236

1       Q. Yes, sir.
2       MR. SIZEMORE: Could you read the
3   question back, please.
4       (Requested portion read.)
5       A. (Continuing) First, you keep saying
6   "expression." You should say "release" or "amount."
7   Expression really refers to what would be COX or
8   prostacyclin synthesis.
9       I don't think, looking at where I referenced
10  the article, I seem to be coming to a different
11  interpretation than you just described. I mean,
12  I -- I refer to that article on page 18 of the
13  report. It says, "Furthermore, in a distinct model
14  of rabbit atherosclerosis the generation process" --
15      COURT REPORTER: Excuse me. I have to
16  ask you to slow down. I'm sorry.
17      A. (Continuing) Sorry. "The generation of
18  prostacyclin from atherosclerotic arteries was
19  dependent on COX-1, not COX-2 activity, and was not
20  affected by Vioxx."
21      Q. Okay. Let me see if I can re-ask my
22  question then.
23      Do you recall from that study, Doctor, that
24  rabbit aortas showed a decreased release of
25  prostacyclin when those rabbits were given Celebrex

Page 237

1   or Celecoxib, which is a selective COX-2 inhibitor?
2       A. I think we're maybe talking about a
3   different article. Certainly I have a different
4   interpretation in the report. So I think we need to
5   get the article to make sure we're on the same page.
6       Q. Okay. The -- that -- that's fair. We are
7   talking about the same article, Doctor, but I guess
8   since I'm -- I'm -- I'm -- where I am and can't give
9   you the article right now --
10      A. We have --
11      Q. -- would it be --
12      A. We have the article close by, I think.
13      Q. Okay. Okay.
14      MR. KREPS: We can get out the article,
15  if you want.
16      MR. SIZEMORE: Let -- let me see if I
17  can do this without having to spend an hour.
18      Q. (By Mr. Sizemore, continuing) Would
19  it -- can you hear me?
20      A. Yes.
21      Q. Would -- as we sit here today would it be
22  fair to say that you do not recall from reading that
23  article the findings of the authors being that
24  rabbits who were given Celebrex showed a decreased
25  release of prostacyclin in their aortas? Is that

60 (Pages 234 to 237)

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 238

1  fair?
2        MR. KREPS: Objection, form of the
3  question.
4    A. (Continuing) I'd need to check the article,
5  but I sadly don't recall that, no.
6    Q. Okay. Doctor, do you -- do you agree that
7  the urinary excretion of prostacyclin metabolites
8  has been reported to be inhibited by Vioxx and
9  Celebrex in humans?
10   A. Yes.
11   Q. Let me also ask you if you agree with this
12  statement.
13     "Although urinary prostacyclin metabolites
14  are generally thought to be an index of vascular
15  prostacyclin synthesis, their production has not
16  been conclusively attributed to a specific tissue."
17   A. I agree with the latter part. You need to
18  read the first part again.
19   Q. Sure. I'll be happy to.
20     Let me just ask you, do you agree with the
21  statement: "Although urinary prostacyclin
22  metabolites are generally thought to be an index of
23  vascular prostacyclin synthesis, their production
24  has not been conclusively attributed to a specific
25  tissue."

Page 239

1    A. Agree with the second part. I don't agree
2  with the first part.
3    Q. Okay. So you would disagree with the
4  authors of that study on at least the first part of
5  the statement that I just read?
6        MR. KREPS: Objection to form of the
7  question.
8    A. (Continuing) There's no evidence that that
9  PGI-M is derived from the vascular endothelial
10  cells.
11   Q. Okay. So at least that part of that
12  particular study would be -- be incorrect?
13   A. And I should -- can I add to that, that
14  refers solely to the basal production of PGI-M.
15   Q. And I'm sorry, Doctor, you -- I think we're
16  moving around paper. I didn't get to hear the first
17  part of that. Did you agree with my statement
18  or -- or not?
19   A. If you look at my report you'll see
20  that I specifically address the basal generation of
21  PGI-M. And so the basal PGI-M is -- nobody's clear
22  on where that is generated from.
23   Q. And let me just make sure I'm clear on -- on
24  this, Doctor. Would it be fair to say that you
25  would disagree with the statement that urinary

Page 240

1  prostacyclin metabolites are generally thought to be
2  an index of vascular prostacyclin synthesis?
3    A. Read it again.
4    Q. Yes, sir.
5        MR. SIZEMORE: Could you read that
6  back, please.
7        (Requested portion read.)
8    A. (Continuing) I'd disagree with that
9  statement.
10   Q. Okay.
11   A. Can I -- can we take a break? I'm just
12  needing to get up and walk around, I think.
13   Q. Sure. I don't have too much more. That
14  will be fine.
15   A. All right. Thanks.
16        THE VIDEOGRAPHER: Going off the record
17  at 4:02 p.m.
18        (Recess from 4:02 p.m. to 4:11 p.m.)
19        MR. KREPS: Let's go back on the
20  record.
21        THE VIDEOGRAPHER: We are back on the
22  record. The time is 4:11 p.m.
23   Q. (By Mr. Sizemore, continuing) Okay. Doctor,
24  we were -- we were talking, I believe, about a
25  rabbit aorta study before we -- took a break.

Page 241

1    Are you ready to resume now?
2    A. Yes.
3    Q. Okay. Doctor, if the authors in that study
4  stated that there is evidence from in vitro studies
5  using cultured cells that suggest that prostacyclin
6  production is mediated by COX-2 in macrophages,
7  endothelial cells, and vascular smooth muscle cells
8  following the activation of these cells with various
9  stimuli, would you agree or disagree with that
10  statement?
11        MR. KREPS: Objection to form. Again,
12  Counsel, I think it's unfair to the witness for you
13  to be reading something from wherever you're at and
14  not allowing him to see it.
15        MR. SIZEMORE: You can pull it out, if
16  you want to, Ronn. It doesn't matter to me. If he
17  wants to see it, he's welcome to.
18        MR. KREPS: Should we get the study?
19  I'm not -- which study specifically are you
20  referring to that you're reading from?
21        MR. SIZEMORE: It's Wong, Number 150 on
22  his reference list.
23   A. (Continuing) Okay. I have it now.
24   Q. Yeah. I'm -- I was reading, if you look at
25  the top left-hand side, on page 400 -- Doctor, I'll

Nicholas A. Flavahan, Ph.D.

Page 242

1  let you turn to that.
2     You there?
3     A. Oh, yes.
4     Q. Okay. There's two columns. On the
5  right-hand column there's a paragraph -- the first
6  full paragraph on the right side that says "the
7  present data."
8     A. Yes.
9     Q. If you go down about a -- go down about
10 halfway there, the quote that I just read begins --
11 right after a footnote 38 and 49, it's -- it reads,
12 "There is evidence from in vitro studies using
13 cultured cells that suggest that prostacyclin
14 production is mediated by COX-2 in macrophages,
15 endothelial cells, and vascular smooth muscle cells
16 following the activation of these cells with various
17 stimuli."
18    Now, did I read that correct -- correctly?
19    A. Yes.
20    Q. Okay. Do you agree or disagree with the
21 author's statements there?
22    A. I obviously need to go and read those papers
23 that he's referring to, but it's not beyond the
24 realms of possibility that that's what the papers
25 demonstrated.

Page 243

1     Q. Okay. And following -- the next sentence
2  says, Indeed, the study by Okahara and colleague
3  suggest that both isoforms of COX participate in
4  prostacyclin production in endothelial cells."
5     Again, did I read that correctly?
6     A. Yes.
7     Q. Do you disagree with the authors of the Wong
8  study and Doctor Okahara, that both isoforms of COX
9  participate in prostacyclin production in
10 endothelial cells?
11    MR. KREPS: Objection to form.
12    A. (Continuing) Yes. I mean, I don't object
13 yet to what has said -- been said in the manuscript.
14 I may object to your interpretation as to a global
15 effect and endothelial cells. I think you may find
16 those studies analyze cultured endothelial cells.
17 And, as you'll notice from my report, I go into the
18 regulation of a COX-2 and cultured endothelial
19 cells.
20    Q. Okay. And do you agree that both isoforms
21 of COX participate in prostacyclin production and
22 endothelial cells?
23    A. I'd need to go and see the data. Certainly
24 in cultured endothelial cells you can get expression
25 of COX-2 and it's a -- an artifact of the culture

Page 244

1  system.
2     Q. Okay. So when we're saying about -- when
3  we're discussing both ISO Forms of COX, are we
4  talking about both COX-1 and COX-2?
5     A. We are, yes.
6     Q. And would you agree then that there are some
7  occasions when COX-2 can participate in prostacyclin
8  production and endothelial cells?
9     A. When you take an endothelial cell, strip it
10 off a blood vessel, and grow on plastic, the
11 endothelial cells expressed COX-2, yes.
12    Q. Would that be the only occasion in -- at
13 least in your mind, in which COX-2 could release
14 prostacyclin from endothelial cells?
15    A. Again, the -- the COX-2 is -- isn't
16 generating prostacyclin, it's generating PGH2. It
17 then gets converted to prostacyclin. The available
18 data and the totality of the data from humans
19 demonstrates the prostacyclin generation from
20 endothelial cells, as mediated by COX-1, not COX-2.
21    Q. Okay. Would you agree then that there are
22 limitations in extrapolating animal data? For
23 example, rabbit data to humans?
24    A. That's not been what these papers are
25 describing. I think these papers are probably

Page 245

1  actually looking at human cells, but they are
2  looking at human cells in an artificial setting,
3  which is the culture of endothelial cells on
4  plastic. We've already addressed the issue of the
5  rabbit aorta and the needs to go and evaluate
6  the -- the regulation of the COX enzymes, as well as
7  the -- the prostacyclin release within that system.
8     Q. And I'm actually moved on from that quote,
9  Doctor. I apologize for not making that clear. Let
10 me see if I can restate that with that
11 understanding.
12    Will you -- will you agree that there are
13 limitations in extrapolating data obtained from a
14 rabbit aorta to humans?
15    A. As I said earlier, it's important to
16 evaluate the relevance of any animal model you're
17 working on. And so, yes, you need to truly test the
18 system to see if it's a good model of the human
19 condition and human blood vessel.
20    Q. There are limitations in any animal model
21 and extrapolating data received from that an --
22 animal model to humans, right?
23    A. Some animal models are highly relevant,
24 other animal models are not so much. And you really
25 need to look at each one individually to see how

62 (Pages 242 to 245)

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 246

1  relevant it is.
2      Q. Would one of those highly relevant animal
3  models be the knockout mouse - mouse model?
4          MR. KREPS: Object to form.
5      A. (Continuing) There's a lot of problems
6  associated with the knockout mouse models. They are
7  commonly used. They are very easy to use. And so
8  you need to define what knockout model you're --
9  you're -- you're referring to.
10     Q. If you'll go to the first page of this
11 study, please, Doctor.
12     A. Of the Wong study?
13     Q. The Wong study.
14     A. All right.
15     Q. Yes, sir.
16         Under the introduction it says,
17 "Prostacyclin is a potent vasodilator and inhibitor
18 of platelet aggregation that is produced by
19 prostacyclin synthase via the cyclooxygenase COX
20 pathway of aracodomic acid oxidation. The balance
21 between this production and of that thromboxane A2,
22 another product of the cyclooxygenate's pathway that
23 is involved in platelet aggravation, play an
24 important role in the regulation of
25 vascular — excuse me -- hemostasis."

Page 247

1          Do you agree or disagree with that
2  statement, Doctor?
3          MR. KREPS: Objection to form.
4      A. (Continuing) Again, I don't think it's
5  correct to solely consider the generation of these
6  two products as being in balance or not in balance.
7  Vascular hemostasis is a lot more complicated than
8  these two individual mediators.
9      Q. Okay. Is it fair to say then that you would
10 disagree with this statement by the authors of the
11 Wong study?
12         MR. KREPS: Same objection.
13     A. (Continuing) I think the -- the word I would
14 object to is "balance."
15     Q. Okay. So when the -- the authors of the
16 Wong study refer to a balance between the production
17 of thromboxane -- strike that question.
18         When the Wong authors state the balance
19 between its production and that of thromboxane A2,
20 another product of the cyclooxygenate's pathway that
21 is involved in platelet aggravation, played
22 important role in the regulation of vascular
23 hemostasis, you would disagree with that statement?
24     A. As I said, I think it's an artificial
25 balance and it doesn't mean anything.

Page 248

1      Q. Will you look up at the top, Doctor?
2      A. Yes.
3      Q. Under department of biochemistry and
4  molecular biology, Merck Frost Center.
5          Do you see that?
6      A. Yes.
7      Q. Are you familiar with the Merck Frost
8  Center?
9      A. I've heard of it before.
10     Q. Okay. Are -- do you have any knowledge that
11 each of the authors of this study with which you've
12 just disagreed with are all Merck Frost employees?
13     A. I hadn't known that the first time I read
14 the article. I didn't know that until today.
15     Q. Thank you, Doctor. I'm through with that
16 one.
17         I think you've got Exhibit — an Exhibit 11,
18 which is a -- a Doctor Grosser study?
19     A. Yes.
20     Q. Am I pronouncing that right, do you know?
21     A. No idea.
22     Q. Okay. I'll just go ahead and say
23 Doctor Grosser then.
24         If you'll look at the — this study written
25 by Doctor -- Doctors Grosser, Fries, and FitzGerald,

Page 249

1  in the first portion that is bolded, Doctor -- are
2  you following me there?
3      A. Yes.
4      Q. Right next to the little picture of the
5  microscope?
6      A. Yes.
7      Q. About halfway down it says, "However, five
8  RCTs." And if you look up above it says,
9  "Randomized controlled outcome trials" -- just so we
10 know what RCTs are.
11     A. Yep.
12     Q. "However, five randomized controlled outcome
13 trials of three structurally distinct inhibitors
14 also indicate that such compounds elevate the risk
15 of myocardial infarction and stroke. The clinical
16 information is biologically plausible as it is
17 compatible with evidence that inhibition of COX-2
18 derived prostacyclin removes a protective constraint
19 on thrombogenesis, hypertension, and atherogenesis
20 in vivo."
21         Now, first, did I read that correctly?
22     A. Yes.
23     Q. And, second, do you disagree with -- with
24 those authors' conclusions?
25         MR. KREPS: Objection to form.

63 (Pages 246 to 249)

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 250

1    A. (Continuing) Specifically, if we remove the
2  statement regarding the five RCTs, obviously that
3  gets to an earlier discussion regarding
4  interpretation and evaluation of a clinical trials.
5  If you restrict it to the last sentence, obviously I
6  do disagree with that.
7    Q. Okay. And that -- that's fair. Let's --
8  let me restrict it then, just so it's clear on the
9  record to the sentence we're -- we're discussing
10  here.
11    "The clinical information is biologically
12  plausible as it is compatible with evidence that
13  inhibition of COX-2 derived prostacyclin removes a
14  protective constraint on thrombogenesis,
15  hypertension, and atherogenesis in vivo."
16    Now, is that the particular statement from
17  the authors that you disagree with, Doctor?
18    A. Yes.
19    Q. Okay. Doctor, I think I'm through with that
20  one.
21    MR. SIZEMORE: Give me just a second,
22  please, gentlemen.
23    Q. (By Mr. Sizemore, continuing) Doctor, you
24  indicated earlier that you had attended a Merck
25  consultant conference.

Page 251

1    Do you recall that?
2    A. Yes.
3    Q. Do you recall what that Merck consultant
4  conference discussed or what the subjects discussed
5  at that conference were?
6    A. It is on atherosclerosis.
7    Q. Did that conference in any way involve the
8  potential propensity of COX-2 inhibitors to increase
9  or retard atherosclerosis in -- in Vioxx users?
10    A. That -- no.
11    Q. Did -- did the issue of COX-2 related
12  atherogenesis or -- or the retardation of
13  atherosclerotic progression -- did that come up in
14  that consultants meeting?
15    A. I think this was -- it was definitely before
16  COX-2 inhibitors had been developed. It may have
17  been before COX-2 was widely known. This was a long
18  time ago.
19    Q. Okay. It's fair to say then -- and this
20  will cut to the quick of it -- that COX-2s were more
21  than likely not discussed at that meeting, correct?
22    A. That's correct.
23    Q. Okay. Did you ever attend any other Merck
24  consultant conferences, Doctor, besides the one we
25  just discussed?

Page 252

1    A. I don't think so, no.
2    Q. Is -- is it true that you have never been
3  asked by Merck to serve as a consultant to either
4  Vioxx or any of its other COX-2 inhibitors?
5    A. Apart from these proceedings, no.
6    Q. Okay. You only became involved with Vioxx
7  when you were asked to serve as a paid Merck expert,
8  correct?
9    A. That's -- well, I read about it in the
10  world's literature, but personally involved in it
11  with regard to Merck, you're correct.
12    Q. Okay. And -- and you've never published any
13  research or -- or medical literature specifically in
14  reference to Vioxx, have you?
15    A. We've used other COX inhibitors in our
16  publications. We haven't used Vioxx.
17    Q. Have you ever utilized Vioxx's sister
18  compounds, etoricoxib or arcoxia in any of your
19  studies?
20    A. No.
21    Q. Have you ever published any medical
22  literature in reference to arcoxia or etoricoxibs?
23    A. No.
24    Q. Are you familiar with arcoxia or
25  etoricoxibs?

Page 253

1    A. I don't recall them.
2    Q. And I want to be clear on the record,
3  Doctor. You have not been given for review by
4  either Merck or the Merck-paid attorneys any of the
5  APPROVe follow-up data, is that correct?
6    MR. KREPS: Object to the form of the
7  question.
8    A. (Continuing) I haven't looked through
9  everything that the Merck-attorneys have given me.
10  I think you're going to be getting or receiving
11  documents -- or a list of documents that they did
12  provide. As far as I'm aware, they have not given
13  me that data.
14    Q. Okay. And just so I'm -- I'm very specific
15  and clear, Doctor, you have not been given by the
16  Merck or the Merck-paid attorneys here today the
17  approved intention-to-treat follow-up data, correct?
18    A. As far as I'm aware, no. That's correct.
19    Q. And, accordingly, then, you would have no
20  ability to opine one way or the other whether that
21  data either supported or was adverse to your theory
22  that Vioxx is not atherogenic, correct?
23    A. I have got no way to evaluate something that
24  I haven't seen, so no.
25    Q. Doctor, have you seen any African green

64 (Pages 250 to 253)

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 254

1 monkey studies that were performed by Merck?
2    A. I don't recall that, no.
3    Q. Okay. Were -- and I -- that may be a bad
4 question. First, were you provided with any African
5 green monkey studies by either Merck or the
6 Merck-paid attorneys?
7          MR. KREPS: Object to form of the
8 question.
9    A. (Continuing) Not to my knowledge.
10    Q. Okay. And, second, have you reviewed any
11 African green monkey data that in any way referenced
12 Vioxx?
13    A. No.
14    Q. Have you seen the abstract of an African
15 green monkey study performed by Merck involving
16 Vioxx?
17    A. No.
18    Q. You referenced earlier, I believe, a
19 bleeding-time study. Is that the study from -- from
20 Talusia, from Poland?
21    A. Yeah. There's a few bleeding time -- or
22 analysis of bleeding studies within the report. One
23 of them was Talusia -- is Talusia or Talusia.
24    Q. Okay. Have you looked at any
25 time-to-occlusion studies?

Page 255

1    A. Well, do you mean bleeding-time studies or
2 other kind of studies?
3    Q. Well, I -- I -- the reason I ask it like
4 that, Doctor, is I got in trouble asking another
5 expert one time and he made a distinction between
6 the two, but maybe I'll roll them in together here.
7          Have you looked at any bleeding-time studies
8 in reference to Vioxx? Let me break it down that
9 way.
10    A. Well, the Talusia -- I'm not sure if Talusia
11 describes the bleeding time. Certainly had access
12 to it. I think there are other papers in there that
13 describe bleeding time. Perhaps Van Hecken. I'm
14 not sure.
15    Q. And it -- now making a distinction between
16 bleeding-time studies and time-to-occlusion studies,
17 have you seen or have you been provided by Merck or
18 the Merck-paid attorneys any time-to-occlusion
19 studies?
20    A. You mean time-to-occlusion thrombosis within
21 an animal blood vessel?
22    Q. Yes, sir.
23    A. I recall looking at some manuscripts in the
24 past few months, but if you mention one or provide
25 one in particular, we can have a look at it.

Page 256

1    Q. Okay. Let me -- let me ask you specifically
2 then. Have you seen any time-to-occlusion data
3 involving African green monkeys from Merck?
4    A. No.
5    Q. Okay. And -- and, Doctor, is -- is it -- is
6 it fair to say that as a man of science and that as
7 a man who -- who is giving a deposition under oath,
8 that you would like to see both data that is helpful
9 and confirmatory of your opinions in this case, as
10 well as data that may be adverse to your opinions in
11 this case?
12          MR. KREPS: Objection to form of the
13 question.
14    A. (Continuing) I didn't select manuscripts
15 during my review and during the generation of the
16 report. And so I -- I looked at all manuscripts
17 that were available.
18    Q. Okay. You looked at all of the manuscripts
19 that were provided to you by Merck, as well as all
20 of the manuscripts that were actually published,
21 correct?
22    A. Yeah. And I should probably -- can I change
23 that slightly? I mean, I think it's impossible to
24 read everything that they are -- regarding
25 cyclooxygenates. And I've looked at a heck of a lot

Page 257

1 of manuscripts. I have not discriminated between
2 ones that might agree or disagree with -- with the
3 report.
4    Q. Okay. Is it fair to say that you've looked
5 at -- at, number one, data that has been provided to
6 you by Merck? Is that correct?
7    A. They have provided me with some manuscripts.
8 For the most part, I think they were manuscripts I
9 already had within my file. There are other things
10 that Merck has provided to me. Mainly it's
11 plaintiff's experts' reports and depositions. And I
12 think you'll be getting a list of them.
13    Q. Thank you, Doctor.
14          Have you also looked at a good bit of the
15 published literature in reference to cyclooxygenate?
16    A. A lot.
17    Q. Is -- is it -- is it fair to say that you
18 have not been able to review any unpublished
19 literature in reference to COX-2 inhibitors,
20 especially Vioxx?
21    A. I have not looked at unpublished data.
22    Q. Doctor, you -- you've published medical --
23 or excuse me. You've published scientific articles,
24 correct?
25    A. Correct.

Nicholas A. Flavahan, Ph.D.

Page 258

1    Q. And is it proper for a scientist to withdraw
2  a potential publication simply because the results
3  are unfavorable to the study's sponsor, Doctor?
4         MR. KREPS: Objection to the form of
5  the question.
6    A. (Continuing) I have never heard of that
7  occurring. And it certainly has never occurred with
8  regard to any basic science investigators that I've
9  interacted with.
10   Q. Okay. Certainly you would never do that?
11   A. No.
12   Q. Is it true, Doctor, that if there was data
13 that was unfavorable to a specific product,
14 specifically Vioxx, in this case, that you would
15 want to see that data published so that you could
16 incorporate it into your general opinions in this
17 case? Is that correct?
18   A. We'd have to talk specifics about the data.
19 I mean, sadly, I have been looking at published
20 data. The report is restricted to published data.
21 I don't need to see and don't care to see any
22 unpublished data at this point.
23   Q. Okay. Is it fair to say, Doctor, that in
24 being a prudent scientist and coming before the
25 court and this jury in giving opinions about Vioxx,

Page 259

1  that you would want to see both information and data
2  that is favorable to your opinions, as well as data
3  that is unfavorable to your opinions?
4    A. Yeah, that's correct.
5    Q. Do you know Doctor Stephen Epstein, Doctor?
6    A. I know the name. And I've seen him present
7  at various conferences. I don't personally know
8  him.
9    Q. Do you know him by reputation?
10   A. I wouldn't even say that. I've read some of
11 his manuscripts.
12   Q. Okay. The -- are you aware that he's a -- a
13 cardiologist?
14   A. I hadn't realized he was a cardiologist. I
15 know him through scientific manuscripts.
16   Q. Okay. In reviewing those scientific
17 manuscripts would it be fair to say that -- that he
18 is a well-respected scientist?
19   A. I can't give a comment on that.
20   Q. Do you know his co-author, Doctor Rott?
21   A. No.
22   Q. Would -- would you agree with me, Doctor,
23 that there are studies in animal models that show
24 that COX-2 inhibitors increase atherosclerotic
25 progression and atherogenesis?

Page 260

1         MR. KREPS: Objection to form of the
2  question.
3    A. (Continuing) We'd have to go over the
4  specific studies and see --
5    Q. Okay.
6    A. -- whether they are valid or not --
7    Q. Doctor -- I'm sorry, Doctor. I didn't catch
8  the last part.
9    A. We'd have to go over the specific studies to
10 see how valid the data is.
11   Q. Okay. Well, validity of the data aside, can
12 we both agree that there are peer reviewed and
13 published studies wherein the authors have come to
14 the conclusion that the use of COX-2 inhibitors is
15 atherogenic and promotes atherosclerosis
16 progression?
17   A. Again, we'd need to look at the individual
18 manuscripts.
19   Q. But to look at those they would have to be
20 published, correct?
21   A. Yes.
22   Q. Okay. So then can we agree that there are
23 published manuscripts wherein the authors conclude
24 that the use of COX-2 inhibitors, including Vioxx,
25 increase atherogenesis and atherosclerotic

Page 261

1  progression?
2         MR. KREPS: Objection to the form.
3    A. (Continuing) Again, we'd need to get the
4  individual manuscripts and then let's get through
5  them.
6    Q. Okay. Can you think of any off the top of
7  your head that we would need to review?
8    A. It would be nice if you could provide them.
9    Q. Well, I -- fortunately, I get to ask the
10 questions here, Doctor.
11      In all seriousness, could you -- can
12 you -- are you -- are you aware of any published
13 peer reviewed scientific literature that indicates
14 that the use of cyclooxygenase to specific
15 inhibitors increases atherosclerotic progression and
16 athero -- atherogenesis?
17   A. I mean, there's one study within the report
18 by -- I think it was Rott, et al. -- that includes
19 Doctor Epstein, which perhaps came to that
20 conclusion. We'd have to go and check the
21 manuscript.
22   Q. Prior to being -- being hired by Merck as an
23 expert back in December of 2005, had you come to an
24 independent conclusion as to whether or not the use
25 of a cyclooxygenate to specific inhibitor could

66 (Pages 258 to 261)

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 262

1  increase or decrease atherogenesis and
2  atherosclerotic progression?
3      A. I don't think I've had -- specifically
4  considered that question.
5      Q. Is it fair to say then that the opinions
6  expressed in your report in reference to
7  atherogenesis and atherosclerotic progression have
8  been developed since you were initially hired by
9  Merck back in December of 2005?
10     A. No. I don't think that's fair to say.
11  There's a lot of concepts and manuscripts referenced
12  in the report that I held. The concepts I held and
13  the manuscripts I had read before then.
14     Q. Okay. Let me rephrase it then.
15     Is it fair to say that you had not come to
16  the conclusions in reference to atherogenesis and
17  atherosclerotic progression expressed in your report
18  until after you were hired by Merck in December of
19  2005?
20     A. I think I already had the idea that COX-2
21  and prostaglandin E2 were bad players within the
22  cardiovascular system through reading the
23  literature.
24     Q. So is that -- I'm not sure I'm following
25  your answer then, Doctor. Did -- let me see if I

Page 263

1  can re -- restate my question.
2      Did you formulate your opinion that the use
3  of Vioxx did not increase atherogenesis or
4  atherosclerotic progression before December of 2005
5  or after December 2005, when you were hired by
6  Merck?
7      A. I had been looking at data manuscripts
8  dealing with cyclooxygenase and prostaglandin E
9  activity within atherosclerotic blood vessels. So I
10  already had some concept and some understanding of
11  what was going on.
12     Specifically with regard to Vioxx, I
13  probably didn't focus on Vioxx until after
14  December 2005.
15     Q. Okay. Is it also fair to say, Doctor, that
16  you have never -- never published any scientific
17  literature in a peer reviewed journal wherein you
18  express the opinion that Vioxx is neither
19  atherogenetic nor increases atherosclerotic lesion
20  progression?
21     A. Say that again.
22     Q. I'm not sure I can.
23     MR. SIZEMORE: Can you read it back.
24     (Requested portion read.)
25     A. (Continuing) Obviously I wouldn't write a

Page 264

1  manuscript that says Vioxx is atherogenic or
2  increases atherosclerotic progression.
3      Q. Let me -- let me just start over then. I'm
4  not sure the question was -- was clear.
5      THE VIDEOGRAPHER: Excuse me.
6      THE WITNESS: Wait a minute, wait a
7  minute. Hang on.
8      MR. KREPS: Hold on, Counsel.
9      THE VIDEOGRAPHER: Excuse me. We're
10  going to need to do a tape change.
11     MR. KREPS: He's got to change tapes --
12  on the videographer.
13     MR. SIZEMORE: I've got 20 seconds.
14  Does he have --
15     THE VIDEOGRAPHER: Go.
16     MR. SIZEMORE: Does he need to change
17  tape?
18     THE VIDEOGRAPHER: Yeah, we can squeeze
19  two or three minutes on.
20     Q. (By Mr. Sizemore, continuing) Okay. Doctor,
21  is it fair to say that you have never published in a
22  peer reviewed medical journal your conclusions that
23  Vioxx is not proatherogenetic and does not increase
24  atherosclerotic lesion formation?
25     A. That is a double negative in there.

Page 265

1  That -- I have not published any manuscripts that
2  addresses the actions of Vioxx on the cardiovascular
3  system.
4      Does that cover it? That means you don't
5  need --
6      Q. Excluding atherogenesis?
7      A. Specifically with -- specifically with
8  regard to Vioxx and atherogenesis I have not
9  published anything.
10     MR. SIZEMORE: Thank you very much,
11  Doctor. I think that's all I've got.
12     MR. KREPS: All right. Thank you very
13  much, Counsel.
14     THE WITNESS: Thank you.
15     MR. SIZEMORE: Thank you.
16     MR. KREPS: That's all we have.
17     THE VIDEOGRAPHER: All right. This is
18  the end of the deposition. Going off the record at
19  4:43 p.m.
20     MR. KREPS: All right.
21     (Deposition concluded at 4:43 p.m.)
22
23
24
25

67 (Pages 262 to 265)

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 266

1   REPORTER'S CERTIFICATE
2   STATE OF WISCONSIN
3
4   I hereby certify that I reported the
deposition of NICHOLAS A. FLAVAHAN, Ph.D., on the
7th day of June, 2006, in Minneapolis, Minnesota,
5   and that the witness was by me first duly sworn to
tell the whole truth;
6
That the testimony was transcribed by me and
7   is a true record of the testimony of the witness;
8   That the cost of the original has been
charged to the party who noticed the deposition, and
9   that all parties who ordered copies have been
charged at the same rate for such copies;
10
That I am not a relative or employee or
11  attorney or counsel of any of the parties, or
relative or employee of such attorney or counsel;
12
That I am not financially interested in the
13  action and have no contract with the parties,
attorneys, or persons with an interest in the action
14  that affects or has a substantial tendency to affect
my impartiality.
15
16  WITNESS MY HAND AND SEAL THIS 13th day of
June, 2006.
17
18
19
20
21
Nancy G. Gisch, RMR
22  Notary Public, State of Wisconsin
23
24
25

Page 267

1   ACKNOWLEDGMENT OF DEPONENT
2   I,_____, do
hereby certify that I have read the
3   foregoing pages, 1 - 265 , and that the
same is a correct transcription of the
4   answers given by me to the questions
therein propounded, except for the
5   corrections or changes in form or
substance, if any, noted in the attached
6   Errata Sheet.
7
8   _____
NICHOLAS A. FLAVAHAN, Ph.D.      DATE
9
10
11  Subscribed and sworn
to before me this
12     day of        , 20  .
13  My commission expires:
14
15  Notary Public
16
17
18
19
20
21
22
23
24
25

Page 268

1   - - - - - -
E R R A T A
2   - - - - - -
3   PAGE  LINE  CHANGE
4   ___  ___  _____
5   ___  ___  _____
6   ___  ___  _____
7   ___  ___  _____
8   ___  ___  _____
9   ___  ___  _____
10  ___  ___  _____
11  ___  ___  _____
12  ___  ___  _____
13  ___  ___  _____
14  ___  ___  _____
15  ___  ___  _____
16  ___  ___  _____
17  ___  ___  _____
18  ___  ___  _____
19  ___  ___  _____
20  ___  ___  _____
21  ___  ___  _____
22  ___  ___  _____
23  ___  ___  _____
24  ___  ___  _____
25  ___  ___  _____

68 (Pages 266 to 268)

d2b9f24b-cedb-443c-88de-1a0602890c3b

# EXHIBIT  C



LEXISNEXIS' FILE & SERVE
12075457
E-SERVICE
Aug 14 2006
10:29PM

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| | Section L |
| | Judge Eldon E. Fallon |
| | Magistrate Judge Daniel E. Knowles, III |

**THIS DOCUMENT RELATES TO:**
  *Robert G. Smith v. Merck & Co., Inc.*, Case No. 2:05-CV-04379

---

## PLAINTIFF'S MOTION TO EXCLUDE ARGUMENT OR OPINION TESTIMONY THAT AN INCREASED RISK OF HEART ATTACK EXISTS ONLY AFTER 18 MONTHS OF VIOXX USE

---

Plaintiff, R. Garry Smith, files this motion and memorandum to exclude argument or opinion testimony to the effect that an increased risk of heart attack exists only after 18 months of Vioxx use.

## I.   INTRODUCTION

Defendant Merck should be precluded from arguing or offering testimony to the effect that an increased risk of heart attack exists only after 18 months of Vioxx use. Plaintiff anticipates that Merck witnesses will testify, and counsel will argue, that an excess risk of heart attack requires 18 months of Vioxx use. Such argument or testimony is misleading and scientifically baseless and should be excluded under Rule 702 of the Federal Rules of Evidence.

## II.   FACTUAL BACKGROUND

This action for personal injuries arises from Plaintiff, R. Garry Smith's use of Vioxx, which Plaintiff contends caused a heart attack on February 17, 2003, damaging his heart. Mr. Smith was approximately 52 years old when his doctor prescribed him Vioxx on October 12, 2002. He had been taking the drug for approximately 4 months at the time of his heart attack.



**PLAINTIFF'S EXHIBIT**
**C**

## III.   LEGAL STANDARDS

Federal Rule of Evidence Rule 702 governs the admissibility of expert testimony.  Rule 702 is in effect a codification of the United States Supreme court's opinion in *Daubert v. Merrell Dow Pharmaceutical,* 508 U.S. 576, 133 S. Ct. 2786, 125 L. Ed.2d 469 (1993).  In *Daubert,* the Supreme Court held that trial court should serve as the gatekeeper for expert testimony and should not admit such testimony without first determining that the testimony is both "reliable" and "relevant."  *Id.* at 589, 113 S. Ct. 2786.

Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known.  *Id.* at 592093, 113 S. Ct. 2786. In *Daubert,* the Supreme Court set forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony.  *Id.* at 592093, 113 S. Ct. 2786.  These factors are: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. *Id.* Whether some or all these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony.  *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 138, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999).

In addition to the five factors laid out in *Daubert,* a trial court may consider additional factors in assessing the scientific reliability of expert testimony.  *Black v. Food Lion, Inc.,* 171 F.3d 308, 312 (5th Cir. 1999).  Some of these factors may include: (1) whether the expert's opinion is based on incomplete or inaccurate dosage on duration data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3) whether the expert

has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5) has conducted independent of the litigation. *See e.g., id.* at 313; *Moore v. Ashland Chem., Inc.,* 141 F.3d 269, 278-79 (5th Cir. 1998); *Christophersen v. Allied-Signal Corp.,* 939 F.2d 1106, 1114 (5th Cir. 1991); *Newton v. Roche Labs., Inc.,* 243 F. Supp.2d 672, 678 (W.D. Tex. 2002). Scientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case. *Daubert,* 509 U.S. at 593, 113 S. Ct. 2786. Scientific evidence is irrelevant, however, when there is too great an analytical gap between the data and the opinion proffered. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 188 S. Ct. 512, 139, L.Ed.2d 508 (1997).

The party seeking to introduce the expert testimony bears the burden of demonstrating that the testimony is both relevant and reliable. *Moore,* 151 F.3d at 275-76. The focus is not on the result of conclusion, but on the methodology. *Id.* The proponent need not prove that the expert's testimony is correct, but must prove by a preponderance of the evidence that the methodology used by the expert was proper. *Id*

The trial court is the gatekeeper of scientific evidence. *Daubert,* 509 U.S. at 596, 113 S. Ct. 2756. It has a special obligation to ensure that any and all expert testimony meets these standards. *Id.* Accordingly, it must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether the reasoning or methodology can be properly applied to the facts in issue. *Id.* at 592-93, 113 S. Ct. 2786. In making this assessment, the trial court need not take the expert's word for it. *Joiner,* 522 U.S. at 147, 118 S. Ct. 512. Instead, when expert testimony is demonstrated to be speculative and lacking in scientific validity, trial courts are encouraged to exclude it. *Moore,* 1512 F.3d at 279.

## DISCUSSION

**Merck's 18-Month Defense is Scientifically Unreliable**

Defendant Merck should be precluded from arguing or offering testimony to the effect that an increased risk of heart attack exists only after 18 months of Vioxx use. Any such testimony or argument should be excluded, since it is speculative, based on unreliable methodology, and contrary to the prevailing scientific consensus that Vioxx imposes increased risk shortly after ingestion.

A.     **No peer-reviewed literature supports merck's 18-month claim - the APPROVe manuscript**

The only peer-reviewed literature Merck offers to its 18-month claim is the APPROVe Manuscript, with which the Court is already familiar. *See* Bresalier R., et al. *Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial (APPROVe Trial)*, New England Journal of Medicine, February 21, 2005, attached as Exhibit "A". The APPROVe Trial terminated in September of 2004 and resulted in the removal of Vioxx from the market. Unfortunately, the manuscript published in the New England Journal of Medicine misstates the results of the trial to support a legal defense to claims brought by users of Vioxx for less than 18 months. In particular, Figure 2 of the manuscript describes curves for thrombotic events in patients exposed to Vioxx vs. placebo. The two curves appear to separate at 18 months. The text below figure 2 states:

> In a post hoc analysis, the difference between the two groups in the incidence of thrombotic events was evident in the second 18 months of the study, whereas the event rates were similar for the first 18 months. The changing pattern of the treatment effect over time was confirmed by a failed test for proportionality of hazards (P=.01).

*Id.* at 6. The manuscript further concludes that the increased risk of thrombosis was limited to "long-term use" and "not evident during the first 18 months of the trial." *Id.* at 8.

After the publication of these claims, the world discovered that the Merck authors had applied an erroneous logarithm, in contravention of prescribed statistical and generally-accepted methods, in order to calculate the P-value supporting Merck's 18 month defense. On July 13, 2006, The New England Journal of Medicine published a correction applying appropriate statistical methods. *See* Correction, *Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial (APPROVe Trial)*, the New England Journal of Medicine, July 13, 2006, attached as Exhibit "B". In the corrected manuscript, **the New England Journal of Medicine expunged every claim limiting increased risk to post 18 month exposure**, writing:

> [S]tatements regarding an increase in risk after 18 months should be removed from the Abstract (the sentence "the increased relative risk became apparent after 18 months of treatment; during the first 18 months, the event rates were similar in the two groups" should be deleted, as should the sentence beginning "There was earlier separation. . .") and from the Discussion section (the sentence "In post hoc analyses, the increased relative risk of adjudicated thrombotic events was first observed after approximately 18 months of treatment" should be deleted).

*Id.* The propriety of the correction by the Journal, and the fact of statistical error committed by Merck in its "18 month" analysis, are uncontested. Thus, there is no peer-reviewed literature, offered or extant, that supports Merck's claim.

### B.  Merck's 18-month analysis is based upon scientifically unreliable methodology

Merck's flawed statistics are themselves the result of "post-hoc subgroup analysis." The testimony of Plaintiff's epidemiologist, Dr. Lemuel Moye, will demonstrate that subgroup analysis has been proven to be scientifically unreliable. *See* Appendix D to Expert Report of Dr. Lemuel Moye, May 31, 2006, attached as Exhibit "C". Furthermore, "improper subgroup" analysis is even more unreliable. *Id.* at paragraphs 125-129. An "improper subgroup" is different from a "proper subgroup." An improper subgroup is a subgroup whose membership cannot be ascertained at

baseline, such as the members of the placebo group in APPROVe who had cardiovascular events after 18 months of exposure. *Id.*

Merck's expert epidemiologist, Dr. Ronald Marks, was recently deposed in the *Smith* case. Dr. Marks continues to rely upon the false 18-month statistical defense published by Merck in the original APPROVe manuscript. *See* Expert Report of Ronald G. Marks, July 21, 2006, at p. 10, attached as Exhibit "D". Specifically, Dr. Marks' bases his opinion on Figure 2 of the manuscript, which is known to be misleading. *See* Deposition of Ronald G. Marks, August 10, 2006, at p. 174:15 – 176:06, attached as Exhibit "E". Dr. Marks relies upon the original, uncorrected manuscript, despite admitting that the post-hoc analysis done by the Merck authors was not fair, unbiased, or objective:

> Q.     And what's the danger with post hoc subgroup analysis?
>
> A.     Because oftentimes when subgroup analyses are done after the fact, they're done because someone's already observed something in the data that looks like it might be different.  So when you put a statistical test on it, you have an inflated chance of getting statistical significance but it's not -- it's not a fair, objective and unbiased analysis.

*Id.* at p. 178:11 – 178:19.  Dr. Marks defined subgroup analysis as taking "a *subset* of the subjects in your study and perform[ing] a specific analysis on them." *Id.* at p. 176:07 – 176:11.  Yet Dr. Marks denied Merck's 18-month defense constituted subgroup analysis. Rather, according to Dr. Marks, Merck's defense is "subset analysis." *Id.* at p. 179:14 – 180:21.  Dr. Marks could not cite a single published piece of literature in his field to support his novel distinction between "subgroup" and "subset" analysis. *Id.* Dr. Marks has "no clue" that an "improper subgroup" is a defined term in the field of epidemiology. *Id.* at 177:14 – 177:15.

### C.     Merck's 18-month theory has been tested – and proven wrong

The publication of the corrected APPROVe manuscript was accompanied by a statistically

sound set of graphs like Figure 2 in the original publication.  *See* Nissen, Steven E., M.D., *Adverse Cardiovascular Effects of Rofecoxib*, New England Journal of Medicine, July 31, 2006, attached as Exhibit "F".  These graphs demonstrate significant increased risk with Vioxx use long before 18 months. *Id.*

The published, peer-reviewed graphs by Dr. Nissen are consistent with the analysis of Plaintiff's expert epidemiologist.  For example, Dr. Richard Kronmal's calculations from APPROVe reveal elevated risk of heart attack within the first few month of use.  *See* Expert Report of Dr. Richard Kronmal, Figures 8 and 9, Page 35, attached as Exhibit "G".  These calculations by Dr. Kronmal, based upon Merck's own data, are not disputed.

Finally, the data from Merck's Protocol 203, which incorporated the APPROVe data, disprove Merck's 18 month defense.  Another graph of this data, never published by Merck, shows the excess risk of heart attack from Vioxx "starts soon after beginning therapy and continues throughout follow-up."  *Id.* at p. 38.

**D.**      **Merck's experts have done no analysis independent of litigation and articulate no mechanism by which the 18-month premise is true**

At his deposition, Merck's expert Dr. Marks did not disagree with Dr. Kronmal's analysis in any way, having done no analysis of his own.  Deposition of Ronald G. Marks, August 10, 2006, at p. 154:01 – 154:22, attached as Exhibit "E".   Dr. Marks provided no biologically plausible mechanism by which excess risk could magically manifest at 18 months.  There is none.  As Dr. Lemuel Moye writes, the lack of any mechanism is strong evidence that Merck's 18 month defense is wrong.  *See* Expert Report of Dr. Lemuel Moye, May 31, 2006, paragraph 128 (Exhibit C).

**IV.    CONCLUSION**

For the reasons set forth above, Plaintiff requests that the Court preclude Defendant Merck

from arguing or offering expert testimony an increased risk of heart attack exists only after 18

months of Vioxx use.

Dated:  August 14, 2006

Respectfully submitted,


Drew Ranier
Louisiana Bar No. 8320
**RANIER, GAYLE & ELLIOT LLC**
1419 Ryan Street
Lake Charles, Louisiana 70601
(337) 494-7171; fax (337) 494-7218


Walter Umphrey
Texas Bar No. 20380000
**PROVOST UMPHREY LAW FIRM LLP**
490 Park Street
Beaumont, Texas 77701
(409) 835-6000; fax (409) 838-8888


James L. "Larry" Wright
Texas Bar No. 22038500
**THE WATTS LAW FIRM LLP**
111 Congress Avenue, Suite 1010
Austin, Texas 78701
(512) 479-0500; fax (512) 473-0328


/s/ Grant Kaiser
Grant Kaiser
Texas Bar No. 11078900
**THE KAISER FIRM LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
(713) 223-0000; fax (713) 223-0440


Mikal Watts
Texas Bar No. 20981820
**THE WATTS LAW FIRM LLP**
Tower II Building, 14th Floor
555 North Carancahua Street
Corpus Christi, Texas 78478
(361) 887-0500; fax (361) 887-0055


John Eddie Williams, Jr.
Texas Bar No. 21600300
Jim Doyle
Texas Bar No.6094450
**WILLIAMS BAILEY LAW FIRM LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
(713) 230-2200; fax (713) 643-6226


ATTORNEYS FOR PLAINTIFF ROBERT G. SMITH

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 14th day of August, 2006.

/s/ Grant Kaiser

Grant Kaiser
**THE KAISER FIRM LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
(713) 230-0000; fax (713) 230-0440
gkaiser@thekaiserfirm.com

cc      By email only:

Robert Van Kirk            rvankirk@wc.com
**Williams & Connolly LLP**
725 Twelfth Street Northwest
Washington, D.C.  20005
(202) 434-5000; fax (202) 434-5029

Carrie A. Jablonski        carrie.jablonski@bartlit-beck.com
**Bartlit, Beck, Herman, Palenchar & Scott LLP**
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
(312) 494-4400; fax (312) 494-4440