6/15/2006 J. Avorn Deposition Excerpts

• **Dedrick - Daubert (Avorn)**

| | | |
|---|---|---|
| [1:] - [1:24] | 6/15/2006 | Avorn, Jerry (Barnett) |

```
page 1
   0001
1                         UNITED STATES DISTRICT COURT
                          EASTERN DISTRICT OF LOUISIANA
2                         MDL DOCKET NUMBER:  1657
                                 SECTION L
3
          In re:  VIOXX PRODUCTS LIABILITY LITIGATION
4         GERALD BARNETT AND CORRINE BARNETT,
5              Plaintiffs,
6              VS.                    CIVIL ACTION NUMBER:
                                          2:06cv485
7         MERCK & CO., INC.,
8              Defendant.
          ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
9
                              DEPOSITION OF
10
                            JERRY AVORN, M.D.
11
                             June 15, 2006
12                            8:36 a.m.
13                        Sheraton Boston Hotel
                             39 Dalton Street
14                       Boston, Massachusetts 02199
15    Susan A. Romano, Notary Public, Register Merit Reporter and Certified
      Realtime Reporter within and for the Commonwealth of Massachusetts
   15
16
17
18
19
20
21
22
23
24
page 2
1                              APPEARANCES:
2           ON BEHALF OF THE PLAINTIFFS:
3              CHRISTOPHER V. TISI, ESQUIRE
4              JENNIFER L. ORENDI, ESQUIRE
```

| | | |
|---|---|---|
| [56:22] - [57:1] | 6/15/2006 | Avorn, Jerry (Barnett) |

```
page 56
18  A.   I'm not an expert in that.  To the
19  extent that it impacts on the areas that I
20  do have expertise in, I know something
21  about it.  But I'm not an expert.
22  Q.   You wouldn't consider yourself to
23  be an expert in the state of mind of a
24  pharmaceutical company, right?
page 57
1   A.   Right.
2   Q.   You wouldn't consider yourself to
3   be an expert in the conduct of any
4   pharmaceutical company, true?
5   A.   I don't agree with that statement.
```

| | | |
|---|---|---|
| [59:13] - [60:12] | 6/15/2006 | Avorn, Jerry (Barnett) |

```
page 59
9   form.
10  A.   I think no one -- It's difficult to
11  know intent. One can only know about
12  behaviors.
```

6/15/2006 J. Avorn Deposition Excerpts

• Dedrick - Daubert (Avorn)

```
13   Q.   So I take that to mean you don't
14 consider yourself an expert in determining
15 pharmaceutical companies' intent?
16   A.   Well, I think that's a very
17 problematic question for a lot of ways.
18 One is there are no standards for
19 determining expertise, and it's not like
20 you're board certified in pharmaceutical
21 company intent.
22        Secondly, the concept of intent
23 implies knowing something about the
24 intrapsychic processes of a company, and
page 60
1  companies don't have intrapsychic
2  processes.
3        So I think one can look at
4  behaviors of individuals in companies, and
5  one can make very plausible conclusions
6  about the goals that those behaviors were
7  designed to achieve.
8        But the way you phrased it, since
9  nobody can get inside the head of a
10 company, since companies don't have heads,
11 no one can be an expert in that, the way
12 you phrased the question.
13   Q.   Well, you wouldn't consider
14 yourself to be an expert in determining
15 the intent of individuals who work at
16 pharmaceutical companies, true?
```

[164:20] - [165:4]          6/15/2006    Avorn, Jerry (Barnett)

```
page 164
16   Q.   Do you know whether Dr. Mikola or
17 Dr. McCaffrey read any of the promotional
18 materials for Vioxx?
19   A.   No.
20   Q.   Can you say, sir, under oath, that
21 you are aware of what the doctors who are
22 treating -- were treating the patients in
23 the Vioxx litigation knew, actually knew,
24 about the potential cardiovascular effects
page 165
1  of Vioxx?
2         MR. TISI:  Objection.
3    A.   Of course I can't get into the head
4  of a given doctor that I've never met.
5    Q.   So the answer is no?
6         MR. TISI:  Objection.
7    A.   But I can know what doctors in
8  general knew.
```

[180:2] - [180:14]          6/15/2006    Avorn, Jerry (Barnett)

```
page 179
22 avoided all that.
23       BY MR. GOLDMAN:
24   Q.   When you say you were asked the
page 180
1  question about -- Withdrawn.
2         When you say that you were asked to
3  assess the methods by which Merck
4  evaluated and managed the cardiovascular
5  issue during the time that Vioxx was
6  developed and while it was on the market,
7  are you basically offering your opinion
8  about what Merck knew about any potential
9  cardiovascular risks, what Merck did or
10 didn't do in response to what you believe
11 they knew, and whether you believe that
12 Merck's actions or inactions were
```

**6/15/2006 J. Avorn Deposition Excerpts**

• **Dedrick - Daubert (Avorn)**

```
13  reasonable?
14  A.   Correct.
15  Q.   What does assess methods mean?
16  A.   Can you show me where you're
17  referring?
18  Q.   The second question you were asked
```

[191:7] - [191:15]          6/15/2006     Avorn, Jerry (Barnett)

```
page 191
 3  Merck's conduct in this case?
 4          MR. TISI:  Objection.
 5  A.   Certainly statistics play a role in
 6  looking at data, yes.
 7  Q.   What statistics have you applied to
 8  demonstrate that Merck's conduct concerning
 9  Vioxx was unreasonable?
10  A.   Well, it's not like there's a
11  statistical test for reasonable behavior.
12  But what I mean is that there -- in
13  looking at study results, one needs to
14  know enough statistics to be able to
15  interpret the importance of the findings.
16  Q.   What is the test for reasonable
17  behavior by a drug company?
18  A.   Like I just said, there is no test
19  that you can apply a Chi-square to and see
```

[192:17] - [193:17]         6/15/2006     Avorn, Jerry (Barnett)

```
page 192
13  test of, I think, whether any individual
14  layperson or a juror would expect that a
15  reasonable company would do X, Y, Z given
16  a given piece of data.
17  Q.   Do you believe that jurors are
18  capable of evaluating Merck's conduct in
19  coming to a conclusion about whether
20  Merck's conduct was reasonable or
21  unreasonable?
22  A.   In some ways yes and in some ways
23  no, and let me explain.  They would not
24  be able to understand what acceptable
page 193
 1  standards of behavior in the medical
 2  community are because they're not doctors,
 3  or about interpreting the meaning of
 4  certain findings because they're not
 5  pharmacoepidemiologists.  So there are some
 6  important technical things which a juror,
 7  on his or her own, could not be able to
 8  interpret.
 9          And then there are other things
10  which any person with common sense can
11  interpret, as in if you saw a particular
12  signal of a problem what would a
13  reasonable company do.  So there's --
14  There's the two kinds.
15          And the latter I think a juror
16  could handle on their own.  The former, I
17  think, requires some expert interpretation.
18  Q.   So as I understand it, you believe
19  that expertise is required to be able to
20  explain the standards that you believe are
21  acceptable for a pharmaceutical company's
```

[279:6] - [279:15]          6/15/2006     Avorn, Jerry (Barnett)

```
page 279
 2  United States, is it your testimony, sir,
```

6/15/2006 J. Avorn Deposition Excerpts

• Dedrick - Daubert (Avorn)

```
 3  that the scientists at Merck believed that
 4  Vioxx caused heart attacks?
 5  A.  No.
 6   Q.  Is it your testimony that when
 7  Vioxx was on the market, the marketing
 8  people believed that Vioxx causes heart
 9  attacks?
10   A.  I can't indicate what people
11  believed or didn't believe.  What I can
12  indicate is that there was information
13  available to Merck, because Merck generated
14  most of it, indicating a higher risk of
15  heart attacks in people taking its drug.
16   Q.  You talked about Dr. Watson's
17  analysis from February of 1999.  That's on
18  Page .4 of your report, sir.
19   A.  Yes.
```

[326:23] - [327:2]    6/15/2006    Avorn, Jerry (Barnett)

```
page 326
19  indication being considered, but that it's
20  not symmetrical.  FDA would be concerned
21  with theoretical reasons for potential
22  harms.
23   Q.  Have you ever worked for the FDA as
24  an employee?
page 327
 1   A.  I've been on advisory committees,
 2  but I've not been an employee.
 3   Q.  I'm not asking about what the FDA
 4  would consider important or what they
 5  should or should not consider, okay?
 6   A.  Okay.
```

[428:1] - [429:1]    6/15/2006    Avorn, Jerry (Barnett)

```
page 427
21  .
22  .
23  .
24  .
page 428
 1             CERTIFICATE
 2        COMMONWEALTH OF MASSACHUSETTS
 3              SUFFOLK SS.
 4   I, SUSAN A. ROMANO, Certified Shorthand
 5  Reporter No. 119393, Registered Merit
 6  Reporter and Notary Public in and for the
 7  Commonwealth of Massachusetts, do hereby
 8  certify that the witness whose deposition
 9  is hereinbefore set forth, was duly sworn
10  and that such deposition is a true record
11  of the testimony given by the witness.
12   I further certify that I am neither
13  related to or employed by any of the
14  parties in or counsel to this action, nor
15  am I financially interested in the outcome
16  of this action.
17   In witness whereof, I have hereunto set
18  my hand and seal this 19TH day of June
19  2006.
20  .
21  .
22
23
24    Susan A. Romano, Notary Public
page 429
 1      My commission expires April 21, 2006
 2                  CAPTION
 3        The Deposition of Jerry Avorn, M.D.,
```

**6/15/2006 J. Avorn Deposition Excerpts**

**• Dedrick - Daubert (Avorn)**

```
             4       taken in the matter, on the date, and at the
             5       time and place set out on the title page
```