| | | Objections | Ruling in Barnett |
|---|---|---|---|

**19 97:1   -   97:14**   Avorn, Jerome 2006-06-29

| | | | |
|---|---|---|---|
| 97: 1 | First of all, were you | | |
| 97: 2 | personally involved in how Merck managed | | |
| 97: 3 | the risks of Vioxx through your work with | | |
| 97: 4 | them on the observational studies that | | |
| 97: 5 | you testified to earlier? | | |
| 97: 6 | A.  Yes.  We performed research | **Re: 97:1-97:14** | |
| 97: 7 | funded by them with which we worked very | **Def. Obj**: Not the proper | |
| 97: 8 | closely with Merck epidemiologists on the | subject of expert | |
| 97: 9 | development of the study and on the | testimony.  Witness not | |
| 97: 10 | conduct of the study and on the | qualified to opine on these | |
| 97: 11 | interpretation of the findings.  And that | subject matters, | |
| 97: 12 | was germane to what was known at the time | specifically Merck's | |
| 97: 13 | as it was developing about the cardiac | conduct or management | |
| 97: 14 | risks of Vioxx. | of risks.  See Merck's | |
| | | Daubert Motion. | |

*Overruled & asked & be answered.*

**20 107:17   -   108:13**   Avorn, Jerome 2006-06-29

| | | | |
|---|---|---|---|
| 107: 17 | Q.  Doctor, are you an expert on | | |
| 107: 18 | the issue of Vioxx's risks throughout the | | |
| 107: 19 | development and marketing of that drug? | | |
| 107: 20 | A.  Yes. | | |
| 107: 21 | Q.  Thank you. | | |
| 107: 22 | Why? | **Re: 107:22-108:13** | **Re: 107:22-108:13** |
| 107: 23 | A.  Is that a question? | **Def. Obj**: Not relevant | Overruled. |
| 107: 24 | Q.  Yes.  Why? | why witness believes he | |
| 108: 1 | A.  Okay. | is an expert in | |
| 108: 2 | Because, as I said before, | something, witness has | |
| 108: 3 | pharmacoepidemiology and also the | already been qualified on | |
| 108: 4 | research about medication risks and | this subject matter. | |
| 108: 5 | benefits beyond the epidemiology is about | Cumulative. | |
| 108: 6 | looking at all aspects of the drug's | | |
| 108: 7 | properties, the pharmacology, the | | |
| 108: 8 | clinical effects in the early trials, the | | |
| 108: 9 | randomized trials that occur on a larger | | |
| 108: 10 | scale, and the post-marketing use of that | | |
| 108: 11 | drug.  And all of that is a part of what | | |
| 108: 12 | I study and teach at Harvard and write | | |
| 108: 13 | papers about. | | |

*Overruled*

**21 109:11   -   109:16**   Avorn, Jerome 2006-06-29

| | | | |
|---|---|---|---|
| 109: 11 | Have you carefully studied. | | |
| 109: 12 | Vioxx? | **Re: 109:11-16** | |
| 109: 13 | A.  Yes, I have. | **Def. Obj**: Not the proper | |
| 109: 14 | Q.  And have you carefully | subject of expert | |
| 109: 15 | studied Merck's conduct? | testimony, witness is not | |
| 109: 16 | A.  Yes, I have. | qualified to opine on these | |
| | | subject matters, | |
| | | specifically "Merck's | |
| | | conduct." See Merck's | |
| | | Daubert Motion. | |

*Overruled*

**22 109:18   -   110:13**   Avorn, Jerome 2006-06-29

| | | | |
|---|---|---|---|
| 109: 18 | Do you have an opinion that | | |
| 109: 19 | you hold to a reasonable degree of | | |
| 109: 20 | medical certainty as to whether or not | | |
| 109: 21 | Vioxx is a drug for which the risks | | |
| 109: 22 | outweigh the benefits? | **Re: 109:24-110:3** | **Re: 109:24-110:3** |
| 109: 23 | A.  Yes, I have that opinion. | **Def. Obj**: Witness | Overruled |
| 109: 24 | Q.  What is that opinion? | cannot testify to what | |
| 110: 1 | A.  That Vioxx's risks do indeed | FDA's views are about | |
| 110: 2 | outweigh its benefits, which is the view | whether the risks | |
| 110: 3 | that the FDA agreed with as well. | outweigh the benefits | |
| 110: 4 | Q.  And do you have an opinion | of Vioxx and witness | |
| 110: 5 | that you hold to a reasonable degree of | provides no basis for his | |
| 110: 6 | medical certainty as to whether or not | opinions. | |
| 110: 7 | Merck accurately conveyed through all of | **Re: 110:4-13** | |
| 110: 8 | its activities, publications, detailing, | **Def. Obj**: Question seeks | |
| 110: 9 | direct-to-consumer advertising, labeling, | improper expert testimony | |

*Overruled. He said he can't be impeached with his testimony or other witness(s)*

|  |  |  | Objections | Ruling in Barnett |
|---|---|---|---|---|

110: 10    "Dear Doctor" letters, et cetera,
110: 11    effectively communicated the risks and
110: 12    benefits so doctors can make
110: 13    evidence-based prescribing decisions?

regarding Merck's conduct and state of mind, not the proper subject of expert testimony, witness not qualified to opine on these subject matters. See Merck's Daubert Motion.

23 110:18   -   110:22    Avorn, Jerome 2006-06-29
110: 18    THE WITNESS: Yes, I have
110: 19    such an opinion.
110: 20    BY MR. TISI:
110: 21    Q.  Okay.
110: 22    And what is that opinion?

Re: 110:18-110:19
**Def Obj:** Answer to improper question (see above)

24 110:24   -   111:10    Avorn, Jerome 2006-06-29
110: 24    THE WITNESS: That Merck's
111: 1    conduct over the research program
111: 2    and analysis of its data and
111: 3    communication of those data to
111: 4    physicians, to patients, even to
111: 5    FDA, was inadequate in that it
111: 6    failed to truthfully represent
111: 7    what was known to Merck at the
111: 8    time about the risks of its drug
111: 9    in relation to the cardiovascular
111: 10    symptoms.

Re: 110:24-111:10
**Def. Obj:** Not the proper subject of expert testimony, witness is not qualified to opine on these subject matters, specifically See Merck's Daubert Motion.

Re: 110:24-111:10
Overruled

Re: 112:2-112:5
**Def. Obj:** Not the proper subject of expert testimony, witness is not qualified to opine on these subject matters, specifically See Merck's Daubert Motion.

25 112:2   -   112:5    Avorn, Jerome 2006-06-29
112: 2    Q.  Do you have an opinion as to
112: 3    whether or not Merck acted reasonably and
112: 4    prudently in communicating the risks of
112: 5    Vioxx to physicians?

Re: 112:2-112:5
Overruled

112:11   -   113:15    Avorn, Jerome 2006-06-29
112: 11    THE WITNESS: As someone who
112: 12    has conducted years of research on
112: 13    how physicians make prescribing
112: 14    decisions in relation to what
112: 15    evidence is available to them and
112: 16    have conducted studies and actual
112: 17    interventions to improve
112: 18    physicians' use of drugs which
112: 19    have been published in the New
112: 20    England Journal of Medicine and
112: 21    other peer-reviewed journals, I
112: 22    think a lot about how physicians
112: 23    use information that they have
112: 24    available to them in making
113: 1    prescribing decisions. And my
113: 2    clear impression is that doctors
113: 3    did not have adequate information
113: 4    presented to them by Merck to make
113: 5    a fair and reasonable
113: 6    evidence-based decision about
113: 7    Vioxx.

Re: 112:11-113:7
**Def. Obj:** Not the proper subject of expert testimony, witness is not qualified to opine on these subject matters, specifically See Merck's Daubert Motion.

Re: 112:11-113:7
Overruled

27 113:21   -   115:15    Avorn, Jerome 2006-06-29
113: 21    Q.  First, I would like to help
113: 22    the jury understand a little bit about
113: 23    the drugs we'll be talking about today.
113: 24    What are nonsteroidal
114: 1    anti-inflammatory drugs?
114: 2    A.  That's a class of drugs that
114: 3    actually includes aspirin, but the more
114: 4    modern nonsteroidal anti-inflammatory
114: 5    drugs began to appear in the 1970s, and
114: 6    they are called nonsteroidal

| | | Objections | Ruling in Barnett |
|---|---|---|---|

134: 8  Q. Okay.
134: 9  What, if anything, does the
134: 10  paper say about naproxen and the role of
134: 11  naproxen in heart disease?
134: 12  A. Okay.
134: 13  At the very bottom of Page
134: 14  1526, the last two words "Thus, our,"
134: 15  and then it goes on to 1527. "Thus, our
134: 16  results are consistent with the theory
134: 17  that naproxen has a coronary protective
134: 18  effect and highlight the fact that
134: 19  rofecoxib does not provide this kind of
134: 20  protection owing to its selective
134: 21  inhibition of cyclogenase-2," or COX-2,
134: 22  "at its therapeutic dose and at higher
134: 23  doses."
134: 24  Q. Doctor, having reviewed the
135: 1  entirety of the paper, but looking at
135: 2  this particular statement as well, did
135: 3  Merck and the Merck authors on this paper
135: 4  ever communicate that there was a
135: 5  potential for an increased risk of heart
135: 6  attacks related to the use of Vioxx as
135: 7  opposed to a decreased risk associated
135: 8  with the cardioprotectiveness of
135: 9  naproxen?
135: 10  A. I don't think there is
135: 11  anything in the paper that suggests that
135: 12  Vioxx increases the risk of heart attack.

**Re: 134:24-135:12**
**Def. Obj:** Is not proper expert testimony, witness is speculating as to what was "communicated" by the VIGOR study publication. Implication is that doctors who read the VIGOR study publication did not understand possible CV risk. Witness not giving his own opinion but trying to speculate by implication

**Re: 134:24-135:12**
Overruled

---

37 136:7  -  136:11  Avorn, Jerome 2006-06-29
136: 7  Q. Did you have any concerns
136: 8  about the way in which this particular
136: 9  article was written in terms of the
136: 10  accurate presentation of the potential
136: 11  benefits and the potential risks?

**Re: 136:7-11**
**Def. Obj:** Irrelevant

**Re: 136:7-136:11**
Overruled

---

38 136:14  -  137:12  Avorn, Jerome 2006-06-29
136: 14  THE WITNESS: Yes. As
136: 15  someone who thinks about drug
136: 16  benefits and risks and patterns of
136: 17  use of drugs and has written about
136: 18  the presentation of risk data to
136: 19  physicians, I was concerned that
136: 20  it did not seem to be an accurate
136: 21  way of presenting the risk and, in
136: 22  fact, it was, I think the term
136: 23  that the Merck people might have
136: 24  used was "flipped" from the way
137: 1  that one would normally present
137: 2  risk information.
137: 3  BY MR. TISI:
137: 4  Q. Let me ask you this
137: 5  question, Doctor.
137: 6  A. reasonable and prudent
137: 7  company presenting the risks and the
137: 8  benefits, potential risks and benefits of
137: 9  a drug using evidence-based medicine,
137: 10  does this comport with what is expected
137: 11  of pharmaceutical companies in doing
137: 12  that?

**Re: 136:14-137:12**
**Def. Obj:** Irrelevant, what a "reasonable and prudent company" would do is not the proper subject of expert testimony, witness is not qualified to opine on these subject matters. See Merck's Daubert Motion.

**Re: 136:14-137:12**
Overruled

---

39 137:17  -  143:17  Avorn, Jerome 2006-06-29
137: 17  THE WITNESS: Well, as
137: 18  someone who reviews papers for the

**Re: 137:17-138:16**
**Def. Obj:** Witness is

**Re: 137:17-138:16**
Overruled

| | | **Objections** | **Ruling in Barnett** |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 137: 19 | New England Journal of Medicine | not qualified to testify to | |
| 137: 20 | and JAMA and also runs programs | what a reasonable and | |
| 137: 21 | about communication of risks and | prudent company would | |
| 137: 22 | benefits to physicians and has | do. | |
| 137: 23 | written a book about that topic, I | | |
| 137: 24 | don't feel that this was a fair | | |
| 138: 1 | way of presenting the data.  I | | |
| 138: 2 | think a fair way would have been | | |
| 138: 3 | to say, in essence, the good news | | |
| 138: 4 | is, our drug seems to cause less | | |
| 138: 5 | gastrointestinal problems.  The | | |
| 138: 6 | bad news is, it doesn't work any | | |
| 138: 7 | better or any worse than the | | |
| 138: 8 | comparison drug in terms of being | | |
| 138: 9 | a pain reliever.  And the really | | |
| 138: 10 | bad news is that the people given | | |
| 138: 11 | our drug had five times more heart | | |
| 138: 12 | attacks than the people given a | | |
| 138: 13 | comparison drug.  I think that | | |
| 138: 14 | would have been a fair and neutral | | |
| 138: 15 | presentation of the good and bad | | |
| 138: 16 | news that came out of this study. | | |
| 138: 17 | BY MR. TISI: | | |
| 138: 18 | Q.  Now, Doctor, did there come | | |
| 138: 19 | a time where you had contact with Merck | | |
| 138: 20 | officials about the results of VIGOR? | | |
| 138: 21 | A.  Yes. | | |
| 138: 22 | Q.  Who is Lou Sherwood? | | |
| 138: 23 | A.  Lou Sherwood was actually a | | |
| 138: 24 | physician at the Beth Israel Hospital in | | |
| 139: 1 | Boston, another one of the Harvard | | |
| 139: 2 | teaching hospitals, at around the same | | |
| 139: 3 | time that I was there.  He was in | | |
| 139: 4 | academics before he went to work for | | |
| 139: 5 | Merck.  And I kind of knew him a little | | |
| 139: 6 | bit around those years, and we had been | | |
| 139: 7 | at some meetings together in the | | |
| 139: 8 | intervening years. | | |
| 139: 9 | And around January of 2000, | | |
| 139: 10 | I was asked by the chairman of our | | |
| 139: 11 | department of medicine to set up a weekly | | |
| 139: 12 | lecture that would be about controversies | | |
| 139: 13 | in pharmaceuticals.  And they asked me to | | |
| 139: 14 | moderate it and to pick the presenters. | | |
| 139: 15 | So, I thought it would be fair to pick | | |
| 139: 16 | somebody from the pharmaceutical industry | | |
| 139: 17 | and somebody from an HMO who had been | | |
| 139: 18 | critical of the pharmaceutical industry | | |
| 139: 19 | and have them discuss issues about | | |
| 139: 20 | medications. | | |
| 139: 21 | And I identified Dr. | | |
| 139: 22 | Sherwood as somebody who had been an | | |
| 139: 23 | academic who was known to me and who was | | |
| 139: 24 | now in a senior position with the drug | | |
| 140: 1 | company, and I asked Lou to come and be | | |
| 140: 2 | the pharmaceutical company guy.  And I | | |
| 140: 3 | asked somebody from one of the HMOs in | | |
| 140: 4 | Boston to be the critic guy.  And it was | | |
| 140: 5 | a very stimulating discussion which I was | | |
| 140: 6 | just kind of the referee for. | | |
| 140: 7 | And then afterwards, we | | |
| 140: 8 | arranged to have Dr. Sherwood meet with | | |
| 140: 9 | me and members of my division to talk | | |
| 140: 10 | about matters of mutual interest, our | | |
| 140: 11 | work on drugs, his work at Merck.  And | | |

| | | Objections | Ruling in Barnett |
|---|---|---|---|

193: 15    A.  That's right.
193: 16    Q.  Okay.
193: 17        Would you please turn to the
193: 18        page containing the Bates range 20167.
193: 19        Do you see that?
193: 20    A.  Yes.
193: 21    Q.  See "Overall Communication
193: 22        Objectives."  Do you see that?
193: 23    A.  Yes.
193: 24    Q.  Do you see the first bullet
194: 1         point?
194: 2     A.  Yes.
194: 3     Q.  Would you please tell the
194: 4         members of the jury what it says?
194: 5     A.  It says "Do no harm."
194: 6     Q.  Can you read the rest?
194: 7     A.  Yes.
194: 8         "Refrain from proactively
194: 9         generating coverage that jeopardizes
194: 10        label negotiations and/or that links
194: 11        Vioxx to cardiovascular adverse events."
194: 12    Q.  Doctor, were you concerned
194: 13        in 2001 and 2002 about the delay in
194: 14        actually getting your study off the
194: 15        ground?
194: 16    A.  Very concerned.
194: 17    Q.  Do you have any explanation
194: 18        for Merck's inability to execute a
194: 19        contract until after the label was
194: 20        approved for Vioxx?

**194:24   -   195:13**    Avorn, Jerome 2006-06-29
194: 24        THE WITNESS:  At that time,
195: 1         I had no understanding of the
195: 2         label discussions that were going
195: 3         on.  I just was concerned that
195: 4         either this was a very big company
195: 5         that couldn't get out of its own
195: 6         way and make a decision in less
195: 7         than a year on an important study,
195: 8         or perhaps, and I vividly recall
195: 9         raising this possibility with Dr.
195: 10        Solomon, perhaps the foot dragging
195: 11        was intentional because they
195: 12        really didn't want the study to
195: 13        get done.

65 195:24   -   196:3    Avorn, Jerome 2006-06-29
195: 24        First of all, was that what
196: 1         was on your mind at the time, that there
196: 2         was a concern there was foot dragging on
196: 3         the part of the company?

66 196:8   -   196:17    Avorn, Jerome 2006-06-29
196: 8         THE WITNESS:  We had
196: 9         conversations on almost a biweekly
196: 10        basis about why is it taking so
196: 11        long.
196: 12        BY MR. TISI:
196: 13    Q.  Okay.
196: 14        Now, Doctor, I assume that
196: 15        once the contract was signed, you got
196: 16        right to work on actually doing the
196: 17        study; is that correct?



Re: 194:17-20
**Def. Obj:** Calls for
speculation on Merck's
state of mind.

Re: 194:17-194:20
Overruled.  Not asked
state of mind.

Re: 194:24-195:13
**Def. Obj:** Witness
speculates on Merck's
state of mind/intent/
decision-making

Re: 196:14-17
**Def. Obj:** Is a leading
question, form objection
preserved.

Re: 196:14-196:17
Overruled.  Is leading
but on point 4-11(c)

|  |  | Objections | Ruling in Barnett |
|---|---|---|---|

254: 8      these should be drugs used in patients
254: 9      who are -- in whom it's worth taking that
254: 10     risk if you really needed to have a drug
254: 11     that was gentler on the stomach, but not
254: 12     in other people who didn't need that
254: 13     extra degree of stomach protection.
254: 14   Q.  Could you turn to Page
254: 15      718 -- 719, excuse me.
254: 16   A.  Yes.
254: 17   Q.  It says, "Other factors" in
254: 18      the middle of the page.  "Other factors
254: 19      may also be important correlates to
254: 20      prescribing, such as patients education
254: 21      level and...social" work, as well as --
254: 22   A.  Social network.
254: 23   Q.  -- "social network," and
254: 24      "patient...exposure to advertising."
255: 1      Do you see that?
255: 2   A.  Patient and physician
255: 3      exposure to advertising.
255: 4   Q.  Yeah.  And what did you mean
255: 5      by that?
255: 6   A.  That since we couldn't
255: 7      explain the very, very widespread use of
255: 8      these drugs based on their being
255: 9      prescribed to patients in whom it would
255: 10     be worth the tradeoff of higher heart
255: 11     attack risk in exchange for perhaps more
255: 12     ulcer protection, that there must be
255: 13     something else going on.  And one of the
255: 14     factors that was an obvious potential
255: 15     cause was the extensive advertising to
255: 16     patients and to doctors.
255: 17   Q.  Have you written about the
255: 18      effect of direct-to-consumer advertising
255: 19      in commercial detailing on prescribing
255: 20      practices?
255: 21   A.  Yes, I have.
255: 22   Q.  What, if any, effect does
255: 23      direct-to-consumer advertising have on
255: 24      physician prescribing behavior?
256: 1   A.  As I've written, and as many
256: 2      people have found, it drives physician
256: 3      prescribing, which is why it gets done so
256: 4      much.  And that patients will often tell
256: 5      a doctor, I saw this ad or I heard this
256: 6      commercial, do you think I ought to be on
256: 7      this drug, give me t drug.
256: 8   Q.  Now, you've testified to a
256: 9      lot of issues that you developed during
256: 10     the course of your work with Merck and
256: 11     during the course of the time the drug
256: 12     was on the market.  Do you hold those
256: 13     opinions in things that you've testified
256: 14     to to a reasonable degree of medical
256: 15     certainty, Doctor?
256: 16   A.  Yes, I do.
256: 17   Q.  Okay.
256: 18      And you still hold those
256: 19      opinions to a reasonable degree of
256: 20      medical certainty today?
256: 21   A.  Absolutely.

91 **268:11  -  268:21**      Avorn, Jerome 2006-06-29
268: 11   Q.  Do you feel it important to

| | | Objections | Ruling in Barnett |
|---|---|---|---|

286: 1 — people taking Vioxx out there in the
286: 2 — normal world, not in the clinical trial,
286: 3 — are having more heart attacks than people
286: 4 — not taking it.
286: 5 — And then in a way, the icing
286: 6 — on the cake is if there is some reason
286: 7 — for being able to say we think we may
286: 8 — know why this happens, that is additional
286: 9 — helpful information.
286: 10 — Q.  And did you have all three
286: 11 — of those in connection with -- to support
286: 12 — Vioxx?

**Re: 286:5-9**
**Def. Obj:** Speaks to biological plausibility mechanism, a subject matter not contained in Dr. Avorn's report and on which he is not qualified to testify

**Re: 286:5-286:9**
Overruled

97 287:3   -   288:14  Avorn, Jerome 2006-06-29
287: 3 — A.  Yes.  I think all three
287: 4 — lines of argument were present and
287: 5 — reasonably clear in the case of Vioxx.
287: 6 — Q.  All right.  Moving forward,
287: 7 — Doctor.
287: 8 — Do you have an opinion as to
287: 9 — whether or not it is generally accepted
287: 10 — in the medical and scientific community
287: 11 — today that Vioxx is capable of causing
287: 12 — heart attacks in human beings?
287: 13 — A.  Yes.  That was the unanimous
287: 14 — view of the FDA Advisory Committee that
287: 15 — met in 2005.
287: 16 — Q.  When you say "the unanimous
287: 17 — view," what do you mean?
287: 18 — A.  I think there were 32 people
287: 19 — voting, and I believe that 32 in answer
287: 20 — to the question, does Vioxx cause
287: 21 — cardiovascular disease in humans, I think
287: 22 — 32 out of the 32 said yes, and I don't
287: 23 — think anyone said no.
287: 24 — Q.  Okay.
288: 1 — Dr. Avorn, do you have an
288: 2 — opinion that you hold to a reasonable
288: 3 — degree of medical certainty as to whether
288: 4 — or not a person has to be taking Vioxx
288: 5 — for any particular period of time before
288: 6 — they are actually at risk for a
288: 7 — Vioxx-induced heart attack?
288: 8 — A.  Well, in our study, we found
288: 9 — an increase in risk in 1 to 30 days, as
288: 10 — well as 30 to 90 days.  So -- and we've
288: 11 — recently just in the last week or two
288: 12 — seen that the contention --
288: 13 — Q.  Let me ask you a question.
288: 14 — A.  Okay.

Overruled

98 290:5   -   290:11  Avorn, Jerome 2006-06-29
290: 5 — Has there been any evidence
290: 6 — that has come out in the past two days
290: 7 — that support your opinion that there is
290: 8 — not a period of time in which it is
290: 9 — necessary for a person to be on Vioxx
290: 10 — before they develop a Vioxx-induced heart
290: 11 — attack?

**Re: 290:5-11**
**Def. Obj:** Plaintiff seeks to elicit opinions not disclosed in Dr. Avorn's expert report.

**Re: 290:5-290:11**
Overruled

290:15   -   291:21  Avorn, Jerome 2006-06-29
290: 15 — A.  Well, let's call it the last
290: 16 — week, because it was put up on the
290: 17 — website of the New England Journal of
290: 18 — Medicine in the last several days, and I

**Re: 290:15-291:21**
**Def. Obj:** Undisclosed opinions, Merck did not have an opportunity to

| | | Objections | Ruling in Barnett |
|---|---|---|---|

| | | |
|---|---|---|
| 290: 19 | don't remember if it was two or three. | conduct a discovery |
| 290: 20 | Q. Go ahead. | deposition on these |
| 290: 21 | A. But it has just become known | opinions and therefore |
| 290: 22 | to the world at large that the analysis | preservation video |
| 290: 23 | which was performed on the data from the | deposition is not the |
| 290: 24 | APPROVe study, which was the study that | proper means for plaintiff |
| 291: 1 | was released in September of '04, which | to present testimony on |
| 291: 2 | was the occasion for withdrawing the drug | opinions that are not in |
| 291: 3 | from the market, that the analysis which | report. |
| 291: 4 | was initially done and reported in the | |
| 291: 5 | New England Journal, to their | |
| 291: 6 | embarrassment, was incorrect, and that it | |
| 291: 7 | was -- it looked at this issue of before | |
| 291: 8 | 18 months versus after 18 months in a way | |
| 291: 9 | that was erroneous in a statistical | |
| 291: 10 | sense. And that if one looks at it in | |
| 291: 11 | the correct way, that there is not this | |
| 291: 12 | phenomenon of no effect before 18 months | |
| 291: 13 | and then the effect starts. | |
| 291: 14 | Q. And -- | |
| 291: 15 | A. And if I could just complete | |
| 291: 16 | that thought. | |
| 291: 17 | The New England Journal | |
| 291: 18 | required the authors of that paper to | |
| 291: 19 | publish a correction to their original | |
| 291: 20 | report, which is the new element that has | |
| 291: 21 | come out in just the last few days. | |

| | | |
|---|---|---|
| 100 **292:2 - 293:8** | Avorn, Jerome 2006-06-29 | |
| 292: 2 | Q. Doctor, are there any other | |
| 292: 3 | clinical trials that you are aware of in | |
| 292: 4 | reviewing the materials we asked you to | |
| 292: 5 | review which were shorter term studies | |
| 292: 6 | where risks were seen? | |
| 292: 7 | A. Yes. The VIGOR study itself | |
| 292: 8 | only lasted nine months, and that was the | |
| 292: 9 | study in which the four or five-fold | |
| 292: 10 | increase in heart attacks was seen. So, | |
| 292: 11 | if there was no effect before 18 months, | |
| 292: 12 | it would have not been seen in VIGOR, but | |
| 292: 13 | it was. | |
| 292: 14 | In addition, studies like | |
| 292: 15 | ADVANTAGE and study 090 were much briefer | |
| 292: 16 | than that, and they also found an effect | |
| 292: 17 | that was different in Vioxx users versus | |
| 292: 18 | the comparison group in well under six | |
| 292: 19 | months. | |
| 292: 20 | Q. And looking at all of those | |
| 292: 21 | together, in your opinion, did a pattern | |
| 292: 22 | emerge that in any way suggested, good or | |
| 292: 23 | bad, that there was not a cutoff period | |
| 292: 24 | of time where the risk begins? | |
| 293: 1 | A. I think looking at all the | |
| 293: 2 | data together from the clinical trials, | |
| 293: 3 | and in addition, separately looking at | |
| 293: 4 | the data from the observational or the | |
| 293: 5 | epidemiologic studies, the totality of | |
| 293: 6 | the evidence does not suggest that there | |
| 293: 7 | is a, quote, safe period early on when | |
| 293: 8 | you don't get into trouble with the drug. | |

*Overruled*

| | | |
|---|---|---|
| 101 **294:21 - 296:6** | Avorn, Jerome 2006-06-29 | |
| 294: 21 | Q. Doctor, we talked about the | Re: 294:21-296:6 |
| 294: 22 | VIGOR study in the earlier part of your | **Def. Obj:** Opinions on |
| 294: 23 | deposition. Have you since come to learn | NEJM and VIGOR issue |

Re: 294:21-296:6
Overruled



| | | Objections | Ruling in Barnett |
|---|---|---|---|

298: 19   didn't need aspirin to do any
298: 20   worse, but, in fact, the people
298: 21   who didn't need aspirin also did
298: 22   worse on Vioxx, which is
298: 23   consistent with the idea that it
298: 24   wasn't just about some imagined
299: 1   naproxen protective effect, but,
299: 2   rather, about the likelihood,
299: 3   which I think is now quite
299: 4   plausible that Vioxx was actually
299: 5   precipitating the heart attacks.

**103 300:9   -   301:15**   Avorn, Jerome 2006-06-29
300: 9   Q.   Let's go to the next
300: 10   question that we asked you to address,
300: 11   which is Merck's investigation and
300: 12   management of -- investigation of the
300: 13   potential of Vioxx to cause heart attacks
300: 14   and their management of that issue, the
300: 15   studies, the communications, et cetera.
300: 16   Okay?
300: 17   First of all, have you
300: 18   reviewed documents that were before the
300: 19   new drug application was filed for Vioxx?
300: 20   A.   Yes.   There were some
300: 21   initial reports of clinical trials that
300: 22   had been conducted.
300: 23   Q.   What is the term "signal,"
300: 24   Doctor?  First of all, is the term
301: 1   "signal" something that is commonly used
301: 2   in your field of pharmacoepidemiology?
301: 3   A.   Yes.
301: 4   Q.   Would you please explain to
301: 5   the jury what a "signal" is?
301: 6   A.   Yes.  I think a good regular
301: 7   language word would be "clue."  That if
301: 8   there may be some evidence that comes up
301: 9   that is not in itself a slam dunk proof
301: 10   that there's a problem, but something
301: 11   that might be called a smoking gun,
301: 12   something that sure looks suspicious and
301: 13   warrants followup, even though in itself
301: 14   it does not absolutely wrap up the
301: 15   certainty that there's a problem.

**104 301:22   -   302:7**   Avorn, Jerome 2006-06-29
301: 22   Q.   Okay.
301: 23   Doctor, do you have an
301: 24   opinion as to whether or not Merck should
302: 1   have recognized -- a reasonable and
302: 2   prudent company with the knowledge that
302: 3   Merck had before the drug was on the
302: 4   market should have recognized that there
302: 5   was the potential for cardiovascular
302: 6   disease in patients who took Vioxx?
302: 7   A.   Yes.

**105 302:14   -   307:17**   Avorn, Jerome 2006-06-29
302: 14   If one looks at the totality
302: 15   of the information that was
302: 16   available as of the time that the
302: 17   new drug application was
302: 18   submitted, there were a number of
302: 19   pieces of information from
302: 20   clinical trial data, as well as

**Objections column:**

Re: 300:9-300:16
**Def. Obj:** Lawyer sidebar and it references improper expert testimony.

Re: 301:6-15
**Def. Obj:** Improper expert testimony including references to "smoking gun" - answer is also non-responsive to the question.

Re: 301:22-302:7
**Def. Obj:** Not the proper subject of expert testimony, witness is not qualified to opine on these subject matters, including what a "reasonable and prudent company" should have done. See Merck's Daubert Motion.

Re: 302:14-309:13
**Def. Obj:** Not the proper subject of expert testimony, witness is not qualified to opine on these subject matters, including what a

**Ruling in Barnett column:**

Re: 300:9-300:16
Overruled

Re: 301:6-301:15
Overruled

Re: 301:22-302:7
Overruled

Re: 302:14-309:13
Overruled

| | Objections | Ruling in Barnett |
|---|---|---|

| | | |
|---|---|---|
| 302: 21 | from other sources, that certainly | "reasonable and prudent |
| 302: 22 | raised a question as to whether or | company" should have |
| 302: 23 | not this was a problem.  And I'm | done. See Merck's |
| 302: 24 | not saying that they were slam | Daubert Motion. |
| 303: 1 | dunk, to use a phrase from the | |
| 303: 2 | current administration, slam dunk | |
| 303: 3 | evidence that there was a problem, | |
| 303: 4 | but that certainly were very | |
| 303: 5 | suspicious worries. | |
| 303: 6 | - - - | |
| 303: 7 | (Whereupon, Deposition | |
| 303: 8 | Exhibit Avorn-31, Research | |
| 303: 9 | Management Committee 4-10-96 | |
| 303: 10 | MRK-ABC0048699 - MRK-ABC0048706, | |
| 303: 11 | was marked for identification.) | |
| 303: 12 | - - - | |
| 303: 13 | BY MR. TISI: | |
| 303: 14 | Q.  I'm going to hand you what I | |
| 303: 15 | have had marked as Exhibit Number 31. | |
| 303: 16 | And for the record, this is a Research | |
| 303: 17 | Management Committee document dated | |
| 303: 18 | October 10, 1996, MRK-ABC0048699. | |
| 303: 19 | Have you seen this document | |
| 303: 20 | before? | |
| 303: 21 | A.  Yes, I have. | |
| 303: 22 | Q.  Is this a document you | |
| 303: 23 | relied on in supporting your opinion that | |
| 303: 24 | there was a, quote, signal of potential | |
| 304: 1 | cardiotoxicity for Vioxx prior to filing | |
| 304: 2 | of the new drug application? | |
| 304: 3 | A.  In part. | |
| 304: 4 | Q.  Okay. | |
| 304: 5 | Would you please go to Page | |
| 304: 6 | 8. | |
| 304: 7 | A.  Yes. | |
| 304: 8 | Q.  First of all, what is | |
| 304: 9 | MK-966? | |
| 304: 10 | A.  That was the working name | |
| 304: 11 | for Vioxx before it was called Vioxx. | |
| 304: 12 | Q.  And is this a document that | |
| 304: 13 | is a Merck document? | |
| 304: 14 | A.  Yes. | |
| 304: 15 | Q.  In Section 3, it indicates a | |
| 304: 16 | section that says "Adverse Events."  Do | |
| 304: 17 | you see that? | |
| 304: 18 | A.  Yes. | |
| 304: 19 | Q.  Okay. | |
| 304: 20 | Would you tell us what, if | |
| 304: 21 | anything, was significant in your review | |
| 304: 22 | of this document which supports your | |
| 304: 23 | opinions? | |
| 304: 24 | A.  Sure.  In fairness, I should | |
| 305: 1 | point out that these were very, very big | |
| 305: 2 | doses of Vioxx.  This was before they | |
| 305: 3 | really knew what the right dose would be, | |
| 305: 4 | and so these doses were 125 to 175 | |
| 305: 5 | milligrams.  I think that's part of the | |
| 305: 6 | picture here. | |
| 305: 7 | Q.  Sure. | |
| 305: 8 | A.  Having said that, the second | |
| 305: 9 | paragraph -- and the other important | |
| 305: 10 | point was that this study lasted only six | |
| 305: 11 | weeks.  And so it was a really remarkably | |
| 305: 12 | short period of time in which you really | |
| 305: 13 | would not expect to see a cardiovascular | |

*[Handwritten note in right column: "This fellow studies stuff + has written a book on it"]*

| | | | Objections | Ruling in Barnett |
|---|---|---|---|---|

311: 21   Q.  Doctor, putting all the kind
311: 22      of evidence that we've been talking about
311: 23      together, do you have an opinion as to
311: 24      whether or not there was evidence prior
312: 1      to Vioxx being on the market that a
312: 2      reasonable and prudent company reviewing
312: 3      the safety profile of this drug would
312: 4      have considered in terms of designing
312: 5      their clinical trial program and
312: 6      investigating this signal?
312: 7   A.  Yes.
312: 8   Q.  What is that opinion?

**Re: 311:21-312:8**
**Def. Obj:** Not the proper subject of expert testimony, witness is not qualified to opine on these subject matters, including what a "reasonable and prudent company" should have done. See Merck's Daubert Motion.

**Re: 311:21-312:8**
Overruled

109 313:2  - 316:8   Avorn, Jerome 2006-06-29

313: 2      THE WITNESS:  In developing
313: 3      a drug or looking at drug risks
313: 4      and benefits, it is necessary to
313: 5      look not just at what is found in
313: 6      a particular study, but also what
313: 7      is all the evidence about what
313: 8      might work and what might not
313: 9      work.  And, in fact, what might
313: 10      work can be very useful in
313: 11      planning the development of the
313: 12      drug.
313: 13      And when I teach in a course
313: 14      at Tufts Medical School for drug
313: 15      company executives about thinking
313: 16      about risks and benefits in drug
313: 17      development, one of the points I
313: 18      mention is that it's key to pull
313: 19      together everything that's known
313: 20      so that you can plan your clinical
313: 21      development program, whether it's
313: 22      animal studies or human studies or
313: 23      followup epidemiologic studies so
313: 24      as to follow up on signals.  Some
314: 1      signals may be good signals, like
314: 2      here is a potential really good
314: 3      effect of this drug that we want
314: 4      to find out more about, as well as
314: 5      the bad signals.
314: 6      And looking at it all
314: 7      together, there is the evidence
314: 8      from Merck's own pharmacology
314: 9      advisors saying here's some
314: 10      problems that you guys need to
314: 11      keep an eye out for because,
314: 12      specifically, 1, 2, 3, here are
314: 13      ways in which this drug might
314: 14      cause heart attacks.  Nobody knew
314: 15      specifically at the time that it
314: 16      would, but they were told, watch
314: 17      out for this.  I think there was
314: 18      some phrase in here that they
314: 19      should be actively pursued or
314: 20      something to that effect.
314: 21      There were the earlier
314: 22      clinical trials that Merck had
314: 23      performed in which whatever the
314: 24      dose, if you have a drug that
315: 1      increases heart attacks in a
315: 2      six-week study, that's an
315: 3      important signal to worry about.
315: 4      There were the animal

**Re: 313:2-316:8**
**Def. Obj:** Not the proper subject of expert testimony, witness is not qualified to opine on these subject matters, including what a "reasonable and prudent company" should have done. See Merck's Daubert Motion. Opinions also undisclosed.

*[Handwritten note:]* This witness is a past Pres. of the Int'l Society of Pharmacological [?]. He peer reviews articles from various journals including the New England Journal of Med. He has written journal articles + books on drug safety including his patterns on Merck's actions regarding [?] ion on this subject. He can opine on this subject.

| | | Objections | Ruling in Barnett |
|---|---|---|---|

|  | | | |

315: 5 studies and other pharmacologic
315: 6 studies that say, gee, you know,
315: 7 maybe blocking COX-2 selectively
315: 8 is not a totally good idea, maybe
315: 9 there are some important good
315: 10 things a COX-2 does that you don't
315: 11 want to block totally. And that
315: 12 was in the literature before the
315: 13 drug was on the market.
315: 14 And so combining the advice
315: 15 from their scientific advisors,
315: 16 the evidence from the animal
315: 17 studies, from the pharmacologic
315: 18 literature and the evidence from
315: 19 their own clinical trial
315: 20 suggesting an increase in events,
315: 21 I'm not saying they should have
315: 22 not marketed the drug, I'm not
315: 23 saying they should have pulled it
315: 24 off the market the day it was
316: 1 approved, but I am saying that
316: 2 these were some smoking guns that
316: 3 a reasonable company would have
316: 4 said, as we market this drug,
316: 5 let's make sure that we're also
316: 6 keeping an eye on this potential
316: 7 problem that we've been warned
316: 8 about from multiple sources.

**Overruled**

110 327:18 - 328:1 Avorn, Jerome 2006-06-29
327: 18 Dr. Avorn, do you have an
327: 19 opinion that you hold to a reasonable
327: 20 degree of medical certainty as to when
327: 21 there was reasonable evidence of an
327: 22 association between Vioxx and heart
327: 23 attacks?
327: 24 A. Yes.
328: 1 Q. What is that opinion?

Re: 327:18-328:1 **Def. Obj:** Not the proper subject of expert testimony, witness is not qualified to opine on these subject matters. See Merck's Daubert Motion.

Re: 327:18-328:1 Overruled

111 329:19 - 330:16 Avorn, Jerome 2006-06-29
329: 19 That said, I have such an
329: 20 opinion, and it is that by the
329: 21 time the data from the VIGOR study
329: 22 were available to Merck, which
329: 23 would have been the spring of
329: 24 2000, combining the VIGOR data
330: 1 with the evidence from the other
330: 2 clinical trials, all of which
330: 3 Merck had conducted itself,
330: 4 coupled with the guidance that
330: 5 Merck had sought and received from
330: 6 its own Board of Scientific
330: 7 Advisors, coupled with the
330: 8 pharmacologic evidence that was
330: 9 out there in the literature prior
330: 10 to that point, by the spring of
330: 11 2000, the burden of evidence was
330: 12 enough to suggest that there was
330: 13 indeed a reason for concern that
330: 14 Vioxx was associated with heart
330: 15 attack and other cardiovascular
330: 16 disease in humans.

Re: 329:19-330:16 **Def. Obj:** Not the proper subject of expert testimony, witness is not qualified to opine on these subject matters. See Merck's Daubert Motion.

Re: 329:19-330:16 Overruled

112 331:5 - 333:13 Avorn, Jerome 2006-06-29
331: 5 Q. Let's talk about a couple of



| | | Objections | Ruling in Barnett |
|---|---|---|---|

338: 3    does not cancel out the presence of a
338: 4    finding especially if the finding is an
338: 5    excess risk of heart attacks. And --
338: 6  Q.  Why is that? Why is that?
338: 7  A.  Because sometimes you don't
338: 8    find a bad thing. Sometimes you don't
338: 9    find a good thing. So, for example,
338: 10    companies will often do multiple clinical
338: 11    trials, and if some show good effect and
338: 12    the others don't, very often they will
338: 13    bring the ones that show a good effect to
338: 14    FDA and say approve our drug on that
338: 15    basis because a lot of things can cause a
338: 16    study to yield a null finding, either a
338: 17    good effect or a bad effect, and we know
338: 18    that. Studies are good things to do, and
338: 19    often things don't go as expected.
338: 20  Q.  Okay.
338: 21  A.  But I think when one looks
338: 22    at a 12-week study and you are seeing
338: 23    heart attacks, that's enormously
338: 24    important because you shouldn't be on
339: 1    anything that will cause a higher risk of
339: 2    heart attacks in 12 weeks.
339: 3  Q.  Using VIGOR, 090 and
339: 4    ADVANTAGE and all the other evidence you
339: 5    talked about before, do you have an
339: 6    opinion to a reasonable degree of medical
339: 7    certainty as to what a reasonable and
339: 8    prudent company looking at the totality
339: 9    of that evidence should have concluded
339: 10    about the cardiovascular safety of Vioxx
339: 11    in the spring of 2000 when --

**Re: 339:3-11**
**Def. Obj:** Not the proper subject of expert testimony, witness is not qualified to opine on these subject matters, including what a "reasonable and prudent company" should have done. See Merck's Daubert Motion. Opinions also undisclosed.

**Re: 339:3-339:11**
Overruled

116 340:3   -  342:23   Avorn, Jerome 2006-06-29
340: 3  Q.  Doctor, what is your
340: 4    opinion?
340: 5  A.  My opinion is that the
340: 6    burden of evidence in the spring of 2000
340: 7    was such that there was evidence of a
340: 8    likely association between Vioxx and
340: 9    heart disease in humans.
340: 10    - - -
340: 11    (Whereupon, Deposition
340: 12    Exhibit Avorn-33, FDA Advisory
340: 13    Committee Briefing Document
340: 14    2-8-01 (27 pages), was marked for
340: 15    identification.)
340: 16    - - -
340: 17    BY MR. TISI:
340: 18  Q.  Doctor, I'm going to show
340: 19    you two documents I'm going to hand you
340: 20    side by side. One is Exhibit Number 33,
340: 21    which is the FDA Advisory Committee
340: 22    briefing document, specifically the
340: 23    report of Dr. Villalba, and that is
340: 24    February 8th, 2001.
341: 1    And I'm also going to hand
341: 2    you a second document, which is the FDA's
341: 3    cardiovascular report consultation of a
341: 4    Shari Targum.
341: 5    Have you seen both of these
341: 6    documents in connection with your
341: 7    opinions?
341: 8  A.  I've reviewed both of these.

**Re: 340:3-342:23**
**Def. Obj:** Not the proper subject of expert testimony, witness is not qualified to opine on these subject matters, including what a "reasonable and prudent company" should have done. See Merck's Daubert Motion. Opinions also undisclosed.

**Re: 340:3-342:23**
Overruled

| | | Objections | Ruling in Barnett |
|---|---|---|---|

| | | |
|---|---|---|
| 392: 15 | section.  Do you remember that? | |
| 392: 16 | A.  Correct. | |
| 392: 17 | Q.  Okay. | |
| 392: 18 | Do you know whether or not | |
| 392: 19 | the FDA, in fact, did recommend that the | |
| 392: 20 | company include a warning about the | |
| 392: 21 | cardiovascular risk seen in VIGOR? | |
| 392: 22 | A.  Yes, I know that. | |
| 392: 23 | Q.  And do you have an opinion | |
| 392: 24 | as to whether or not there was a | |
| 393: 1 | reasonable evidence of association | |
| 393: 2 | between Vioxx and cardiovascular disease | |
| 393: 3 | at the time that VIGOR became available? | |

*Overruled* (handwritten)

| | | | | |
|---|---|---|---|---|
| 137 393:9 - 393:16 | | Avorn, Jerome 2006-06-29 | | |
| | 393: 9 | Q.  If that is the standard for | Re: 393:9-16 | Re: 393:9-393:16 |
| | 393: 10 | placing a warning -- | **Def. Obj:** Not the proper | Overruled |
| | 393: 11 | A.  Yes. | subject of expert | |
| | 393: 12 | Q.  -- would that information | testimony, witness is not | |
| | 393: 13 | alone have been enough to include the CV | qualified to opine on | |
| | 393: 14 | risk in the warnings section of the Vioxx | these subject matters, | |
| | 393: 15 | label? | including labeling. | |
| | 393: 16 | A.  Yes. | See Merck's Daubert | |
| | | | Motion. | |

| | | | | |
|---|---|---|---|---|
| 138 394:1 - 394:13 | | Avorn, Jerome 2006-06-29 | | |
| | 394: 1 | Do you have an opinion, | Re: 394:1-13 | Re: 394:1-394:13 |
| | 394: 2 | again, to a reasonable degree of medical | **Def. Obj:** Not the proper | Overruled |
| | 394: 3 | certainty, as to whether or not the | subject of expert | |
| | 394: 4 | information in the warning label in 2002 | testimony, witness is not | |
| | 394: 5 | contained information about increased | qualified to opine on | |
| | 394: 6 | mortality? | these subject matters, | |
| | 394: 7 | A.  Do I have an -- I'm sorry. | including labeling. | |
| | 394: 8 | Do I have an opinion as to whether it was | See Merck's Daubert | |
| | 394: 9 | there? | Motion. | |
| | 394: 10 | Q.  Do you know whether it is | | |
| | 394: 11 | there or not? | | |
| | 394: 12 | A.  I know that it was not | | |
| | 394: 13 | there. | | |

| | | | | |
|---|---|---|---|---|
| 139 395:19 - 395:24 | | Avorn, Jerome 2006-06-29 | | |
| | 395: 19 | Do you have an opinion to a | Re: 395:19-24 | Re: 395:19-395:24 |
| | 395: 20 | reasonable degree of medical certainty as | **Def. Obj:** Not the proper | Overruled |
| | 395: 21 | to whether or not the evidence of an | subject of expert | |
| | 395: 22 | association between Vioxx and increased | testimony, witness is not | |
| | 395: 23 | mortality should have been contained in | qualified to opine on | |
| | 395: 24 | the warnings section of the Vioxx label? | these subject matters, | |
| | | | including labeling. See | |
| | | | Merck's Daubert Motion. | |

| | | | | |
|---|---|---|---|---|
| 140 396:23 - 397:12 | | Avorn, Jerome 2006-06-29 | Re: 396:23-397:2 | Re: 396:23-397:2 |
| | 396: 23 | I have such an opinion, and | **Def. Obj:** Not the proper | Overruled |
| | 396: 24 | my opinion is that if a company is in | subject of expert | |
| | 397: 1 | possession of data that indicates a | testimony, witness is not | |
| | 397: 2 | statistically significant doubling of the | qualified to opine on | |
| | 397: 3 | death rate in a placebo-controlled | these subject matters, | |
| | 397: 4 | randomized control trial that it | including labeling. | |
| | 397: 5 | conducted, then that information needs to | See Merck's Daubert | |
| | 397: 6 | be in the label to be able to guide | Motion. | |
| | 397: 7 | physicians to make appropriate decisions | | |
| | 397: 8 | about the use of that drug. | | |
| | 397: 9 | Q.  Have you seen any evidence | | |
| | 397: 10 | that the FDA wanted to include | | |
| | 397: 11 | information about VIGOR and ADVANTAGE in | | |
| | 397: 12 | the warnings section? | | |

| | | | | |
|---|---|---|---|---|
| 141 398:5 - 398:16 | | Avorn, Jerome 2006-06-29 | | |
| | 398: 5 | THE WITNESS:  I have seen | Re: 398:5-16 | Re: 398:5-398:16 |

| | | Objections | Ruling in Barnett |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 398: 6 | correspondence between Merck and | **Def. Obj:** Not the proper | Overruled |
| 398: 7 | FDA in both directions about the | subject of expert | |
| 398: 8 | modifications to the label that | testimony, witness is not | |
| 398: 9 | were proposed. | qualified to opine on | |
| 398: 10 | BY MR. TISI: | these subject matters, | |
| 398: 11 | Q.  Okay. | including labeling. | |
| 398: 12 | And do you know whether or | See Merck's Daubert | |
| 398: 13 | not the FDA proposed that information | Motion. | |
| 398: 14 | about VIGOR and ADVANTAGE on | | |
| 398: 15 | cardiovascular events and cardiovascular | | |
| 398: 16 | risk be placed in the warnings section? | | |

| | | | |
|---|---|---|---|
| 142 399:19  -  400:4 | Avorn, Jerome 2006-06-29 | | |
| 399: 19 | A.  Yes. | **Re: 399:19-400:4** | **Re: 399:19-400:4** |
| 399: 20 | Q.  Okay. | **Def. Obj:** Not the proper | Overruled |
| 399: 21 | Having seen it, and as | subject of expert | |
| 399: 22 | somebody who is an expert in the factors | testimony, witness is not | |
| 399: 23 | that drive doctors' prescribing | qualified to opine on | |
| 399: 24 | practices, do you have an opinion as to | these subject matters, | |
| 400: 1 | whether or not that kind of information | including labeling. | |
| 400: 2 | in the warnings section would have | See Merck's Daubert | |
| 400: 3 | assisted doctors in making a risk/benefit | Motion. | |
| 400: 4 | analysis for their patients? | | |

| | | | |
|---|---|---|---|
| 143 400:11  -  400:20 | Avorn, Jerome 2006-06-29 | | |
| 400: 11 | THE WITNESS: I have such an | **Re: 400:11-20** | **Re: 400:11-400:20** |
| 400: 12 | opinion that that would have been | **Def. Obj:** Not the proper | Overruled |
| 400: 13 | an important piece of information | subject of expert | |
| 400: 14 | for doctors to have. | testimony, witness is not | |
| 400: 15 | BY MR. TISI: | qualified to opine on | |
| 400: 16 | Q.  Do you think that the lack | these subject matters, | |
| 400: 17 | of that information deprived doctors of | including labeling. | |
| 400: 18 | an important piece of information from | See Merck's Daubert | |
| 400: 19 | which they could make reasonable | Motion. | |
| 400: 20 | prescribing choices? | | |

| | | | |
|---|---|---|---|
| 144 401:9  -  402:13 | Avorn, Jerome 2006-06-29 | | |
| 401: 9 | As someone who has done | **Re: 401:9-402:13** | **Re: 401:9-402:13** |
| 401: 10 | research on published and peer-reviewed | **Def. Obj:** Not the proper | Overruled |
| 401: 11 | journals about physicians' assessments of | subject of expert | |
| 401: 12 | risks and benefits, and as someone who | testimony, witness is not | |
| 401: 13 | teaches physicians about weighing risks | qualified to opine on | |
| 401: 14 | and benefits, and has written a book | these subject matters, | |
| 401: 15 | about risks and benefits as drivers of | including labeling. | |
| 401: 16 | drug use, and as somebody who has written | See Merck's Daubert | |
| 401: 17 | a paper recently in the New England | Motion. | |
| 401: 18 | Journal about the effect of labeling on | | |
| 401: 19 | warnings and on prescribing, I can say | | |
| 401: 20 | with a great deal of certainty that a | | |
| 401: 21 | physician not having information about | | |
| 401: 22 | doubling of mortality risk and of | | |
| 401: 23 | increased risk of heart attack caused by | | |
| 401: 24 | a drug would deprive that physician from | | |
| 402: 1 | the ability to be able to make a wise | | |
| 402: 2 | prescribing decision. | | |
| 402: 3 | Q.  Doctor, let me ask you this. | | |
| 402: 4 | Do you have any evidence you | | |
| 402: 5 | have seen in this case that the addition | | |
| 402: 6 | of such a warning, as opposed to a | | |
| 402: 7 | precaution, would have been made a | | |
| 402: 8 | difference with respect to prescribing | | |
| 402: 9 | practices with respect to Vioxx? | | |
| 402: 10 | A.  Yes. | | |
| 402: 11 | MR. TISI:  Let me show you | | |
| 402: 12 | what I'd like to have marked as | | |

| | | Objections | Ruling in Barnett |
|---|---|---|---|

*This is a part written + clearly testimony neither at or during either one testimony before testimony 403*

402: 13    Exhibit Number 39.

**● 403:3    -  403:13**    Avorn, Jerome 2006-06-29
403: 3    Q.  Doctor, have you seen this
403: 4    before in preparation for your testimony
403: 5    today?
403: 6    A.  Yes, I have.
403: 7    Q.  Would you describe --
403: 8    First of all, this is July
403: 9    of 2001?
403: 10   A.  Right.
403: 11   Q.  This is before the label
403: 12   change?
403: 13   A.  Right.

**Re: 403:3-13**
**Def. Obj:** Entire examination on this document is not proper expert testimony, witness not qualified and speculates. See Merck's Daubert Motion.

**Re: 403:3-403:13**
Overruled

**146 404:8    -  404:11**    Avorn, Jerome 2006-06-29
404: 8    What does this document
404: 9    indicate as to doctors' willingness to
404: 10   prescribe Vioxx if there is a warning
404: 11   versus a precaution?  Go ahead.

**Re: 404:8-11**
**Def. Obj:** Entire examination on this document is not proper expert testimony, witness not qualified and speculates. See Merck's Daubert Motion.

**Re: 404:8-404:11**
Overruled

**147 404:15   -  405:2**    Avorn, Jerome 2006-06-29
404: 15   THE WITNESS:  This document
404: 16   indicates that the individuals at
404: 17   Merck who prepared it had exactly
404: 18   the same impression as I did about
404: 19   the effect of a clear warning
404: 20   versus what they call a mild
404: 21   warning on utilization of the
404: 22   drug.  And what their graph
404: 23   indicates is their projection that
404: 24   utilization of the drug would be
405: 1    much lower if there was a strong
405: 2    warning versus a mild warning.

**Re: 404:15-405:2**
**Def. Obj:** Entire examination on this document is not proper expert testimony, witness not qualified and speculates. See Merck's Daubert Motion.

**Re: 404:15-405:2**
Overruled

**148 405:14   -  406:21**    Avorn, Jerome 2006-06-29
405: 14   Q.  Is this consistent with your
405: 15   own research that the various levels of
405: 16   warning make a difference with doctors?
405: 17   A.  Yes.
405: 18   Q.  Doctor, you mentioned
405: 19   another method by which doctors
405: 20   communicate -- companies communicate with
405: 21   doctors is their statements to the press.
405: 22   I think you mentioned that before?
405: 23   A.  Right.
405: 24   Q.  Have you seen statements
406: 1    that Merck has made to the press about
406: 2    the cardiovascular safety of Vioxx?
406: 3    A.  Yes.
406: 4    MR. TISI:  I'm going to hand
406: 5    you what I would like to have
406: 6    marked as Exhibit Number 40.
406: 7    - - -
406: 8    (Whereupon, Deposition
406: 9    Exhibit Avorn-40, News Release
406: 10   5-22-01, MRK-ABI0003228 -
406: 11   MRK-ABI0003230, was marked for
406: 12   identification.)
406: 13   - - -
406: 14   THE WITNESS:  Sounds right.
406: 15   BY MR. TISI:
406: 16   Q.  Doctor, have you seen this
406: 17   before as an example of the kind of
406: 18   communication that Merck made to the

**Re:405:14-406:3**
**Def. Obj:** Entire examination on this document is not proper expert testimony, witness not qualified and speculates. See Merck's Daubert Motion.

**Re: 405:14-406:3**
Overruled

| | | Objections | Ruling in Barnett |
|---|---|---|---|



413: 24   Reason number two is the
414: 1     so-called flipping of the data, and,
414: 2     again, that's a Merck term, not mine, to
414: 3     present the difference in the heart
414: 4     attack rate between naproxen and Vioxx as
414: 5     being explained by the fact that naproxen
414: 6     was protecting patients' hearts, when at
414: 7     least an equally plausible conclusion,
414: 8     and, frankly, a far more plausible
414: 9     conclusion was that Vioxx was causing the
414: 10    heart attacks, and that inversion is
414: 11    something which was not a fair
414: 12    presentation of the data.
414: 13  Q. Let's move forward to the
414: 14    APPROVe study. Having reviewed the
414: 15    APPROVe study and now knowing what you
414: 16    know and seeing what you've seen, was the
414: 17    evidence presented and the information
414: 18    presented in the APPROVe study a
414: 19    medically and scientifically accurate
414: 20    presentation of the data collected in
414: 21    that study so that doctors in the
414: 22    scientific community would understand the
414: 23    risks and benefits associated with Vioxx?

155 415:3   -   417:2    Avorn, Jerome 2006-06-29

415: 3     THE WITNESS: All right.
415: 4     APPROVe was not a fair and
415: 5     accurate depiction of the data, we
415: 6     now know, for a couple of reasons.
415: 7     One is that it eliminated
415: 8     patients who had their cardiac
415: 9     events greater than two weeks
415: 10    after stopping the drug, and we
415: 11    now understand that there are
415: 12    aspects of the way that Vioxx
415: 13    might cause damage that could
415: 14    easily occur greater than two
415: 15    weeks after stopping the drug,
415: 16    and, in fact, the stroke data from
415: 17    the APPROVe followup does indicate
415: 18    that patients who had been on
415: 19    Vioxx continued to have a
415: 20    statistically significant higher
415: 21    rate of stroke after the study was
415: 22    completed or the active phase was
415: 23    completed compared to the patients
415: 24    who were on placebo. That's
416: 1     reason number one.
416: 2     Reason number two is that it
416: 3     is now fairly well recognized that
416: 4     the study used an incorrect
416: 5     statistical approach which created
416: 6     the misimpression that the risk
416: 7     from Vioxx in that study only
416: 8     began at month 18 and that anyone
416: 9     taking the drug for less than 18
416: 10    months, according to the way that
416: 11    study was originally presented,
416: 12    had no risk.
416: 13    As of the last few days,
416: 14    that has been corrected in the New
416: 15    England Journal, and the statement
416: 16    that this is not a problem before
416: 17    18 months has been modified, as I

Re: 415:3-416:12
**Def. Obj**: Not the proper
subject of expert
testimony, witness is not
qualified to opine on
these subject matters,
invades province of jury.
See Merck's Daubert
Motion.

Re: 415:3-416:12
Overruled

Re: 416:13-417:2
**Def. Obj**: Contains
undisclosed expert
opinions that Merck
did not have an
opportunity to take a

Re: 416:13-417:2
Overruled

| | | Objections | Ruling in Barnett |
|---|---|---|---|

discovery deposition.

416: 18  understand it, in response to this
416: 19  becoming known by the editors of
416: 20  the New England Journal, who, as I
416: 21  know it, requested that change.
416: 22  And I think those are the
416: 23  two most important ways that, and
416: 24  very important ways, APPROVe did
417: 1  not present the data in an
417: 2  accurate and balanced manner.

**156 417:23 - 419:8**   Avorn, Jerome 2006-06-29
417: 23  Q. Doctor, we talked about the
417: 24  ADVANTAGE study and the publication of
418: 1  the ADVANTAGE study. Did the publication
418: 2  of the ADVANTAGE study contain
418: 3  information about myocardial infarction,
418: 4  heart attacks, as opposed to APTC events?
418: 5  A. No. The endpoint --
418: 6  although that data was collected, the
418: 7  endpoint that was chosen for publication
418: 8  was the so-called APTC or Anti-Platelet
418: 9  Trialists Collaborative definition, which
418: 10  was much broader. That definition did
418: 11  not reveal a striking difference in
418: 12  outcomes, but had heart attacks, which is
418: 13  exactly the issue at hand, been the
418: 14  outcome that was presented, that would
418: 15  have revealed a difference.
418: 16  Q. Did any of the published
418: 17  Alzheimer's studies publish the intention
418: 18  to treat analysis that Dr. Chen reported
418: 19  about the increased mortality in both of
418: 20  those studies?
418: 21  A. No. Even though that
418: 22  analysis was done by Merck and available
418: 23  to Merck, it was not presented in
418: 24  published form to doctors.
419: 1  Q. Looking at all the major
419: 2  publications that were submitted to the
419: 3  medical and scientific community, do you
419: 4  have an opinion as to whether or not the
419: 5  medical and scientific information that
419: 6  came to them in their totality was a
419: 7  reasonable exposition of the medical and
419: 8  scientific information known to Merck?

Re: 419:1-8
**Def. Obj:** Not the proper subject of expert testimony, witness is not qualified to opine on these subject matters, invades province of jury. See Merck's Daubert Motion.

Re: 419:1-419:8
Overruled

**157 419:14 - 420:13**   Avorn, Jerome 2006-06-29
419: 14  THE WITNESS: As someone who
419: 15  reviews articles for the New
419: 16  England Journal of Medicine,
419: 17  reviews articles for JAMA, a
419: 18  number of other publications in
419: 19  which the editors seek my peer
419: 20  review as to the appropriateness
419: 21  of presentation of the data, as
419: 22  someone who has published over 200
419: 23  articles in which I myself have
419: 24  been subjected to peer review
420: 1  about the fairness of the
420: 2  presentation of our own data, as
420: 3  someone who has written widely
420: 4  about physicians' and patients'
420: 5  perception of risk and how that
420: 6  perception drives their
420: 7  prescribing, I can say that I have

Re: 419:14-420:13
**Def. Obj:** Not the proper subject of expert testimony, witness is not qualified to opine on these subject matters, invades province of jury. See Merck's Daubert Motion.

Re: 419:14-420:13
Overruled

*Overruled* (handwritten)

*(witness writes + teaches + he is a peer reviewer of a number of journals. So qualified)* (handwritten)

| | | Objections | Ruling in Barnett |
|---|---|---|---|

|  | 420: 8 | never known a collection of papers | | |
|---|---|---|---|---|
|  | 420: 9 | on any one topic in which there | | |
|  | 420: 10 | has been such a constellation of | | |
|  | 420: 11 | skewed and distorted presentation | | |
|  | 420: 12 | of data in any drug studies that | | |
|  | 420: 13 | I've ever looked at. | | |

*overruled*

| 158 421:1 - 421:15 | | Avorn, Jerome 2006-06-29 | Re: 421:1-15 | Re: 421:1-421:15 |
|---|---|---|---|---|
|  | 421: 1 | Q.  Doctor, we talked about | **Def. Obj:** Not the proper | Overruled |
|  | 421: 2 | another method of Merck communicating the | subject of expert | |
|  | 421: 3 | risks, accurate information about the | testimony, witness is not | |
|  | 421: 4 | risks.  You do understand that there was | qualified to opine on | |
|  | 421: 5 | direct-to-consumer advertising for | these subject matters, | |
|  | 421: 6 | patients -- directly to patients, and | including direct-to- | |
|  | 421: 7 | you've written about that, correct? | consumer marketing, | |
|  | 421: 8 | A.  Yes. | invades province of jury. | |
|  | 421: 9 | Q.  Do you have an opinion as to | See Merck's Daubert | |
|  | 421: 10 | a reasonable degree of medical certainty | Motion. | |
|  | 421: 11 | as to whether or not the | | |
|  | 421: 12 | direct-to-consumer advertising conducted | | |
|  | 421: 13 | by Merck played a role in what's a fair | | |
|  | 421: 14 | and accurate depiction of the risks and | | |
|  | 421: 15 | benefits associated with Vioxx? | | |

*(See P. 12 of report)*

| 159 421:22 - 423:2 | | Avorn, Jerome 2006-06-29 | Re: 421:22-423:2 | Re: 421:22-423:2 |
|---|---|---|---|---|
|  | 421: 22 | THE WITNESS:  Yes.  As I | **Def. Obj:** Not the proper | Overruled |
|  | 421: 23 | said in my Health Affairs article | subject of expert | |
|  | 421: 24 | about direct-to-consumer | testimony, witness is not | |
|  | 422: 1 | advertising a couple of years ago, | qualified to opine on | |
|  | 422: 2 | it's vital that patients be able | these subject matters, | |
|  | 422: 3 | to get a reasonable depiction of | including direct-to- | |
|  | 422: 4 | both the good news and the bad | consumer marketing, | |
|  | 422: 5 | news about a drug.  And given what | invades province of jury. | |
|  | 422: 6 | we now understand was available to | See Merck's Daubert | |
|  | 422: 7 | Merck at the time that all -- that | Motion. | |
|  | 422: 8 | those $100 million a year of | | |
|  | 422: 9 | commercials and ads were being | | |
|  | 422: 10 | run, I think it is absolutely | | |
|  | 422: 11 | correct to say that they provided | | |
|  | 422: 12 | all the good news about the drug | | |
|  | 422: 13 | and did an inadequate job of | | |
|  | 422: 14 | presenting the bad news about the | | |
|  | 422: 15 | drug to patients. | | |
|  | 422: 16 | BY MR. TISI: | | |
|  | 422: 17 | Q.  Now, Doctor, let me turn to | | |
|  | 422: 18 | the one last topic I would ask you about | | |
|  | 422: 19 | here, and that is the detailing of the | | |
|  | 422: 20 | doctors, which is another method in which | | |
|  | 422: 21 | companies will communicate with doctors. | | |
|  | 422: 22 | Have you reviewed any of the | | |
|  | 422: 23 | detailing information that was provided | | |
|  | 422: 24 | to doctors? | | |
|  | 423: 1 | A.  Yes, as well as the training | | |
|  | 423: 2 | of the sales reps, which is part of that. | | |

| 160 423:21 - 425:9 | | Avorn, Jerome 2006-06-29 | Re: 423:21-425:9 | Re: 423:21-425:9 |
|---|---|---|---|---|
|  | 423: 21 | Q.  Did you see any information | **Def. Obj:** Not the proper | Overruled |
|  | 423: 22 | about how to respond to doctors' | subject of expert | |
|  | 423: 23 | inquiries about cardiovascular events in | testimony, witness is not | |
|  | 423: 24 | your review of the documents? | qualified to opine on | |
|  | 424: 1 | A.  Yes. | these subject matters, | |
|  | 424: 2 | Q.  What did you see? | including marketing, | |
|  | 424: 3 | A.  Well, the most memorable was | invades province of jury. | |
|  | 424: 4 | the dodge ball game that was apparently | See Merck's Daubert | |
|  | 424: 5 | developed as a training tool for their | | |



| | | Objections | Ruling in Barnett |
|---|---|---|---|

424: 6   sales reps to be able to respond to — Motion.
424: 7   doctors' questions about the
424: 8   cardiovascular risks of Vioxx
424: 9   particularly after the APPROVe study
424: 10   findings had come out. And I was
424: 11   struck --
424: 12   Q.  You meant VIGOR, right?
424: 13   A.  I'm sorry. That's what I
424: 14      meant to say.
424: 15   Q.  All right. Okay.
424: 16   A.  And I was struck by the fact
424: 17      that the purpose is pretty much summed up
424: 18      in the name, that it was to dodge
424: 19      questions about this very important risk
424: 20      of the company's drug.
424: 21      Merck's training materials
424: 22      to their sales reps explicitly tell them,
424: 23      do not raise or do not initiate any
424: 24      discussion of our paper or of other
425: 1   papers related to cardiovascular risk.
425: 2   And there were a number of completely
425: 3   evasive answers that were being fed to
425: 4   the sales reps for them to give as
425: 5   responses to doctors who asked about
425: 6   whether or not this drug could cause
425: 7   heart attacks. And that did not seem to
425: 8   me to be a reasonable or scientifically
425: 9   accurate presentation of the data.

161 426:17  -  426:22   Avorn, Jerome 2006-06-29
426: 17   Q.  We talked about academic
426: 18      detailing earlier in your deposition and
426: 19      the programs that you've developed and
426: 20      studied and published in the New England
426: 21      Journal of Medicine.
426: 22   A.  Yes.

Re: 426:17-22
**Def. Obj:** Not the proper subject of expert testimony, witness is not qualified to opine on these subject matters, invades province of jury. See Merck's Daubert Motion.

Re: 426:17-426:22
Overruled

162 430:4  -  430:21   Avorn, Jerome 2006-06-29
430: 4   Q.  Okay.
430: 5      Now, let me ask you, given
430: 6      all of that experience, Doctor, in your
430: 7      experience of 20-some odd, 30-some odd
430: 8      years in teaching how to communicate the
430: 9      risks and the benefits, looking at all
430: 10      the ways in which Vioxx was communicated,
430: 11      the risks and the benefits, the good news
430: 12      and the bad news to doctors, press
430: 13      releases, medical journals, labels,
430: 14      detailers, all of those things put
430: 15      together, do you have an opinion to a
430: 16      reasonable degree of medical and
430: 17      scientific certainty as to whether or not
430: 18      an accurate picture of the risks and
430: 19      benefits of the drugs was communicated to
430: 20      doctors so that they can make accurate
430: 21      prescribing decisions for their patients?

Re: 430:4-21
**Def. Obj:** Not the proper subject of expert testimony, witness is not qualified to opine on these subject matters, including whether information was accurately conveyed to physicians. See Merck's Daubert Motion.

Re: 430:4-430:21
Overruled

163 431:9  -  432:10   Avorn, Jerome 2006-06-29
431: 9   THE WITNESS:  That there was
431: 10      a pattern of gross distortion of
431: 11      the risks of Vioxx, and that no
431: 12      matter which way physicians turn,
431: 13      whether it was looking at the
431: 14      label, hearing what they were
431: 15      hearing from the Merck-trained

Re: 431:9-432:10
**Def. Obj:** Improper expert testimony, witness opines on subjects on which he is not qualified including labeling and marketing.

Re: 431:9-432:10
Objection overruled.

| | | Objections | Ruling in Barnett |
|---|---|---|---|
| | | | |

431: 16  sales representatives, trying to
431: 17  read the literature in the medical
431: 18  journals and trying to get some
431: 19  accurate, complete depiction of
431: 20  what was happening in the clinical
431: 21  trials, even the information their
431: 22  patients were bringing to them
431: 23  from the commercials and ads that
431: 24  they had seen, across the board,
432: 1   there was a pattern of what I
432: 2   would characterize as systematic
432: 3   distortion that rose almost to the
432: 4   level of grotesque. And, frankly,
432: 5   it was an embarrassment for me as
432: 6   a member of the medical profession
432: 7   that this was going on in
432: 8   presenting information to doctors
432: 9   in such a one-sided and lopsided
432: 10  way.

*Objections:* See Merck's Daubert Motion.

164 432:19   -   433:3   Avorn, Jerome 2006-06-29
432: 19  Q.  Now, is that opinion you
432: 20      just gave an opinion that you are basing
432: 21      on the scientific and medical information
432: 22      that you know was available at the time?
432: 23  A.  It is the opinion of me as
432: 24      an expert who has spent 25 years studying
433: 1       the risks and benefits of drugs and how
433: 2       those risks and benefits should be
433: 3       communicated to doctors and to patients.

*Objections:* Re: 432:19-433:3
**Def. Obj:** Improper expert testimony, witness opines on subjects on which he is not qualified including labeling and marketing. See Merck's Daubert Motion.

*Ruling:* Re: 432:19-433:3 Overruled

165 447:15   -   447:16   Avorn, Jerome 2006-06-30
447: 15  Q.  Doctor, once again, my name
447: 16      is Phil Beck, and I represent Merck.

166 447:17   -   448:12   Avorn, Jerome 2006-06-30
447: 17      As I understand it, sir, you
447: 18      were retained as an expert by the
447: 19      plaintiffs' lawyers in around May of
447: 20      2005; is that right?
447: 21  A.  That's right.
447: 22  Q.  And I think Mr. Tisi
447: 23      mentioned this, but they provided you
447: 24      with a large number of documents to
448: 1       review; is that right?
448: 2   A.  Thousands of pages, yes.
448: 3   Q.  And were these documents
448: 4       contained in binders that Mr. Tisi showed
448: 5       to us during your first deposition?
448: 6   A.  Yes.
448: 7   Q.  And I think you've got those
448: 8       binders with you today?
448: 9   A.  Right.
448: 10  Q.  What, are there ten or so
448: 11      binders of documents that they gave you?
448: 12  A.  Sounds about right, yes.

167 470:21   -   471:7   Avorn, Jerome 2006-06-30
470: 21  Q.  When you wrote your report,
470: 22      did the lawyers that you worked with turn
470: 23      around and mark it up and provide you
470: 24      with suggestions and changes from your
471: 1       report?
471: 2   A.  They did not do any marking
471: 3       up, but they did comment on aspects of