# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In re:  VIOXX              *    MDL Docket No. 1657

                                    *

PRODUCTS LIABILITY LITIGATION   *    SECTION L

                                    *

                                    *    JUDGE FALLON

This document relates to        *

Case No.  05-2524              *

                                    *    MAGISTRATE

ANTHONY WAYNE DEDRICK,      *    JUDGE KNOWLES

                                    *

           Plaintiff,         *

                                    *

v.                                       *

                                    *

MERCK & CO., INC.,           *

                                    *

           Defendant.        *

                                    *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") FOR ORDER EXCLUDING THE TESTIMONY OF JOHN W. FARQUHAR, M.D.

### (EXPERT CHALLENGE NO. 8)

This is the fourth time that MDL plaintiffs have designated Dr. Farquhar, a cardiologist and epidemiologist, as a testifying expert.  But Dr. Farquhar has not yet been called to testify in any trial.  He has issued a total of four reports of general applicability in this MDL.[1] Collectively, they make up an all-purpose compendium of opinions on general causation that encompass many more issues than will ever be relevant in any given case.  He asserts that

---

[1] These are his initial report, dated September 26, 2005 ("Initial Report," attached as Ex. A); the Supplemental Expert Report Of John W. Farquhar, M.D., dated May 22, 2006 ("Supplemental Report," attached as Ex. B); the Supplemental Expert Witness Disclosure As To John W. Farquhar, dated May 26, 2006 (attached as Ex. C); and finally a report entitled Supplemental/Rebuttal Expert Report of John W. Farquhar, M.D., dated June 22, 2006 ("Rebuttal Report," attached as Ex. D).

Vioxx® "causes cardiovascular disease. . . , including heart attacks, strokes, transient ischemic attacks. . . , peripheral edema and congestive heart failure."  (Initial Report at ¶18.)  He also opines that Vioxx causes hypertension (*id.*) and asserts that the risk of heart attack associated with taking Vioxx begins when the patient first takes Vioxx and continues throughout the period of usage (*id.* at ¶¶ 176-183).

Despite the repeated designations and the extensive briefing that his multiple reports and depositions[2] have necessitated, the Court has only ruled once on the admissibility of any of Dr. Farquhar's proposed testimony.  Before the first trial in *Plunkett,* when only the Initial Report had been issued, the Court denied Merck's motion to exclude Dr. Farquhar's general causation opinions.  At the same time, the Court reserved ruling on whether Dr. Farquhar could testify about Merck's alleged knowledge and state of mind and did not specifically address whether Dr. Farquhar could give testimony that amounted to value judgments on the propriety of Merck's conduct.  (*See* Order and Reasons, filed in *Plunkett v. Merck* Nov. 18, 2005 (Record Docket No. 1516).)[3]

Merck respectfully disagrees with the Court's ruling in *Plunkett* that Dr. Farquhar's testimony on general causation would be admitted.  For the reasons stated here and in the prior briefing in *Plunkett, Barnett,* and *Smith,* which Merck incorporates here by reference, Merck urges the Court to determine that Dr. Farquhar's anticipated testimony on general causation is not scientifically reliable and must be excluded under Federal Rule of Evidence 702, *Daubert v.*

---

[2] Dr. Farquhar has been deposed in the MDL three times: October 10, 2005; June 8, 2006; and July 19, 2006, on the third occasion in connection solely with *Barnett v. Merck.*  The MDL plaintiffs' attempt to set a fourth deposition on November 16 for preservation of his testimony is the subject of Merck's Motion for A Protective Order Regarding The Trial Preservation Deposition Of John W. Farquhar, filed on October 25, 2006.

[3] Appended to this memorandum is a more detailed summary of the history of the designations and withdrawals of Dr. Farquhar as a testifying expert in the various  trials.

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), and other rules of evidence.  Dr. Farquhar's own testimony unequivocally demonstrates that such opinions are not based on a reliable scientific basis.  His reliance, since issuance of his Initial Report in 2005, on the attorney-commissioned work of a non-testifying statistician – Nicholas Jewell – has simply confirmed the unreliability of the causation opinions he is prepared to give.

Dr. Farquhar also purports to opine on the state of Merck's knowledge and understanding of the risks allegedly associated with Vioxx and to make value judgments about the "appropriateness" of Merck's conduct.  (*E.g.,* Initial Report at ¶¶ 21, 185-99.)  All testimony concerning what Merck knew should also be excluded under Rule 702.  Such testimony is without foundation, is not based on any specialized knowledge that Dr. Farquhar has, and will not assist the trier of fact.  Dr. Farquhar's subjective normative judgments must be excluded as well; such opinions are irrelevant and will not assist the jury in finding the facts necessary to determine whether Merck's conduct met the applicable legal standards.  The Court should rule on the admissibility of Dr. Farquhar's anticipated testimony in these areas now,  before trial,  to make it clear that Dr. Farquhar may not impart his personal views on these matters while ostensibly giving what plaintiffs will no doubt say is "scientific" testimony.

## I.     THE LEGAL STANDARD.

The legal standard for the admission of expert testimony in federal court is set forth at pages 3-4 of Merck's Memorandum In Support of Motion For Order Excluding Testimony Of Ira J. Gelb, M.D., which has been filed concurrently herewith and is incorporated herein by reference.

## II.    THE COURT SHOULD NOT PERMIT DR. FARQUHAR TO PARROT CONCLUSIONS OUTSIDE HIS AREA OF EXPERTISE OF OTHER INDIVIDUALS WHO CANNOT BE CROSS-EXAMINED AT TRIAL.

### A.    The Court Should Preclude Dr. Farquhar From Presenting Professor Jewell's Statistical Work With Data From The APPROVe,  VICTOR, And ViP Trials.

#### 1.    Plaintiff may not properly use Dr. Farquhar's testimony as a vehicle for relating to the jury the statistical analysis of Professor  Jewell that was appended to Dr. Farquhar's Supplemental Report.

Dr. Farquhar's Supplemental Report is heavily dependent upon certain Kaplan-Meier graphs prepared by Nicholas Jewell.  Professor Jewell is a statistician hired by MDL plaintiffs whom plaintiff in this case first designated and then withdrew as a testifying expert in the upcoming trial.  Professor Jewell provided Dr. Farquhar a report purportedly based on data from Protocol 203. (*See* Supplemental Report at ¶¶ 5-6, 11-16, 17-18, 20-21; Analysis Of Vioxx Data From The APPROVe, VICTOR, And ViP STUDIES – Protocol 203 ("Jewell Report"), Exhibit A to the Supplemental Report, attached as Ex. E.)   Dr. Farquhar also relies on Professor Jewell's analysis of a subgroup of "high-risk" patients in APPROVe who took Vioxx.   (Supplemental Report at ¶ 11.)

MDL plaintiffs' counsel retained Professor Jewell to perform this analysis. (June 8, 2006 Deposition of John W. Farquhar, M.D. ("6/8/06 Farquhar Dep.") at 32:7-12, attached as Ex. F.) This analysis does not appear in any peer-reviewed literature and constitutes work done solely for this specific litigation – attributes that clearly weigh against finding this evidence reliable and admissible. *See Daubert*, 509 U.S. at 593-94.

Dr. Farquhar himself is not a statistician and thus is not qualified to perform or to testify about the preparation of statistical analyses.  (Oct. 10, 2005 Deposition of John W. Farquhar, M.D. ("10/10/05 Farquhar Dep.") at 12:19-14:10, attached  as Ex. G; 6/8/06 Farquhar Dep. at 31:12-20.)  Even if he were qualified to do so as a general matter, in *this* case he is unable to

provide any meaningful testimony about the validity of the Jewell analyses that are a significant basis for his opinions on causation.  He did not have any hand in preparing the analyses, nor did he review the data files Professor Jewell used.  (*Id.*. at 63:11-13.)  In his depositions, Dr. Farquhar could not answer even basic questions about the data used in the Jewell Report.[4]  Dr. Farquhar also refused to answer questions about the Jewell Report's statistical validity.  (*E.g., id.* at 86:7-10, 86:20-23, 141:9-150:14.)  Instead, time and time again, he simply reiterated that he had complete confidence in Professor Jewell's work.  (*E.g., id.* at 143:7-144:2.)  In relying on the Jewell analysis appended to his Supplemental Report, therefore, Dr. Farquhar is prepared to do no more than simply parrot the work of another expert.

Professor Jewell will not testify at trial and thus of course will not be subject to cross-examination.  As the Fifth Circuit has noted, "to admit the hearsay opinion of an expert not subject to cross-examination goes against the natural reticence of courts to permit expert opinion unless the expert has been qualified before the jury to render an opinion."  *Bryan v. John Bean Div. of FMC Corp.*, 566 F.2d 541, 546 (5th Cir. 1978) (opinions of non-testifying experts should have been excluded in part because "the excerpts proffered by plaintiff's counsel from the [non-testifying experts'] reports lacked any independent guarantee of trustworthiness that would justify dispensing with cross-examination");  *cf. Soden v. Freightliner Corp.*, 714 F.2d 498, 503-05 (5th Cir. 1983) (upholding trial court's exclusion of expert testimony based on statistics of

---

[4] Dr. Farquhar's inability to define what VICTOR data Professor Jewell used in his "Protocol 203" analysis is significant because he is demonstrably wrong in his assertion that, when the studies were terminated in 2004, "there was no apparent impediment to simultaneously collecting the data and presenting the pooled analysis of cardiovascular risks for all three trials, as pre-specified."  (Supplemental Report at ¶ 8.)  In fact, the VICTOR data have always been under the control of Oxford University, the outside institution that conducted the study, not under Merck's control.  Indeed, available data were only released in late spring, subject to a protective order, in response to discovery in the MDL.  (*See* Order Regarding Production Of Data From The VICTOR Study, filed May 4, 2006 (Record Docket No. 4573).)

questionable validity given to expert by a third party).   As a matter of fundamental fairness, plaintiff should not be allowed to put an expert witness on the stand who effectively cannot be cross-examined because he is simply passing on opinions of an out-of-court declarant that he cannot explain, amplify, or comment on in any meaningful fashion.

> **2.     Dr. Farquhar may not properly relate to the jury any of the conclusions and arguments of Professor Jewell contained in the report that plaintiff submitted with Professor Jewell's expert designation in this case.**

In opposing Merck's motion in *Barnett* for an order excluding Dr. Farquhar's testimony, plaintiff filed a declaration of counsel attaching a document attributed to Professor Jewell and entitled "Rebuttal Expert Witness Report."   ("Jewell Rebuttal Report," attached  as Ex. H; *see* Declaration Of Donald C. Arbitblit In Support Of Plaintiffs' Memorandum In Opposition To Motion To Exclude Testimony Of John W. Farquhar, M.D., served in *Barnett v. Merck* June 27, 2006 (Record Docket No.  5608 ), Ex. 3 thereto.)   Plaintiff in the instant case, *Dedrick v. Merck,* served that report in connection with his designation of Professor Jewell as an expert witness.

The Jewell Rebuttal Report no longer has any applicability in this case, since Professor Jewell will not testify.   However, Dr. Farquhar has repeatedly expressed agreement with Professor Jewell's assertions.  (*See*  Rebuttal Report, *passim* (Ex. D ).)   It would be entirely improper for Dr. Farquhar, if he testifies at all, to parrot any of the content of the Jewell Rebuttal Report while on the stand.   This is true not only for the reasons explained in section III.A.1, *supra,* but also because the Jewell report on its face is a piece of litigation-driven advocacy.   Its stated purpose is to "respond to some issues raised by defense counsel" in one of Dr. Farquhar's depositions and to statements by Dr. Peter Kim, one of Merck's expert witnesses.  (Jewell Rebuttal Report at 1.)   It also takes issue at length with arguments made by Merck's counsel in briefs filed in this Court.  (*See id.* at 12.)   It is improper for an expert witness simply to assume

the rule of a paid "advocate" for a given party's case.  *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004); *In re Propulsid Prods. Liab. Litig.,* 261 F. Supp. 2d 603, 616 (E.D. La. 2003).  Dr. Farquhar must not be permitted to cross that line by improperly passing on to the jury Dr. Jewell's views and contentions, no matter how strongly Dr. Farquhar agrees with them.

> ### B.   Dr. Farquhar May Also Not Properly Relate The Conclusions Of Richard Kronmal, Another Non-testifying Expert.

For similar reasons, Dr. Farquhar should not be permitted to offer any opinion that two Merck-conducted randomized clinical trials involving patients with Alzheimer's disease, Protocol 078 and Protocol 091, showed any significant difference in adverse cardiovascular events among patients taking Vioxx versus those on placebo.  (*See* Initial Report at ¶¶ 132-37, 156.)  Dr. Farquhar has made it clear that he relies solely on reports from Richard Kronmal for his opinion based on the Alzheimer's studies.  (6/8/06 Farquhar Dep. at 212:4-18.)  He has not looked at the peer-reviewed articles on these two studies, and he cannot say how Professor Kronmal's analysis differs from that of the investigators who conducted the trials.  (*Id.* at 217:7-10 ("At this point, I have to say that my conclusions about Alzheimer's are based on Kronmal.  I didn't put time into assessing the literature beyond what Kronmal had.").)

Professor Kronmal, like Professor Jewell, is a paid expert for plaintiffs.  His analysis, like that of Professor Jewell, has not been published in any peer-reviewed journal.  Professor Kronmal is not slated to testify in the upcoming trial.  If Dr. Farquhar is permitted to pass on Professor Kronmal's opinions to the jury, Merck's counsel not only will be unable to cross-examine Professor Kronmal himself but also will be deprived of any meaningful opportunity to test the validity of the opinions of Dr. Farquhar that are based on Professor Kronmal's work.  Since he himself cannot address Professor Kronmal's work in any detail, it is apparent that once

again Dr. Farquhar is poised simply to present to the jury the opinions of an out-of-court expert in such a way as to make these opinions effectively immune to challenge.  The Court should prohibit him from doing so.

**III.     DR. FARQUHAR'S OPINIONS ON GENERAL CAUSATION DO NOT HAVE A RELIABLE SCIENTIFIC BASIS.**

Dr. Farquhar's cumulative reports attempt to show that there is an elevated risk of a thrombotic cardiovascular event from Vioxx use that begins early and continues throughout the time it is taken, regardless of the duration of use.  (*E.g.,* Supplemental Report at ¶¶ 1-6.)  In an effort to overcome the absence of clinical trial data to support his opinion, Dr. Farquhar has changed tack more than once in the course of his reports and depositions in this MDL.  But Dr. Farquhar's shift of focus and his attendant reinterpretation (and misinterpretation) of data cannot compensate for the fundamental absence of reliable scientific support for his opinion.

**A.      Dr. Farquhar's Opinion That Short-Term Use Of Vioxx Causes Cardiovascular Disease Is Based On A Misinterpretation Of Merck's Clinical Studies And Therefore Lacks A Reliable Scientific Basis.**

Dr. Farquhar's assertion that Vioxx causes cardiovascular disease when used for any duration is based primarily on his analysis of the results of the APPROVe trial and other clinical trials that Merck conducted.  (*See, e.g.,* Initial Report at ¶¶ 71-157, 200; Supplemental Report at ¶¶ 2-31.)  For the reasons discussed below and in Merck's prior briefing in other MDL cases, the selective data from the Merck studies upon which he relies do not supply a reliable scientific basis for his opinion.

**1.      Professor Jewell's analysis of combined data from the APPROVe, VICTOR, and ViP studies does not provide reliable scientific support for Dr. Farquhar's opinion.**

Since issuance of his Initial Report, Dr. Farquhar has attempted to  prove an elevated risk from Vioxx at all durations of use by relying on the calculations in the Jewell report that purport

to pool cardiac event data from the APPROVe, VICTOR, and ViP studies and to analyze it in accordance with Protocol 203. (*See* Jewell Report, Ex. E .) Merck intended Protocol 203 to be a combined analysis of thrombotic cardiovascular events in the APPROVe, VICTOR, and ViP studies, which were randomized, placebo-controlled clinical studies of patients at risk of developing, respectively, adenomatous colon polyps (APPROVe), recurrent colon cancer (VICTOR), or prostrate cancer (ViP). All three studies were designed to run for several years but were terminated prematurely in September 2004 when Merck withdrew Vioxx from the market. As Dr. Farquhar acknowledges, this meant that VICTOR and ViP, both of which began later than APPROVe, ran only for short periods of time, ten months in the case of VICTOR, and five months in the case of ViP. (*See* Initial Report at ¶¶ 129, 131.)

As a result of the early termination, there was substantially fewer thrombotic events than had been envisaged when Protocol 203 was designed. The Merck Data Analysis Plan for Protocol 203 contemplated that a combined analysis of cardiac events in all three studies would be conducted only when each study had run its full pre-specified course. It thus is misleading for Dr. Farquhar and Professor Jewell to assert – in an apparent effort to bolster the persuasiveness of the analysis – that the Jewell statistical work was based on Protocol 203 or is simply following Merck's pre-specified analysis. (*See., e.g.*, Supplemental Report at ¶ 1.) Professor Jewell and Dr. Farquhar have in fact engaged in a *post hoc* analysis, not, as they attempt to suggest, the combined analysis that was pre-specified when the studies were designed.[5]

---

[5] Initially, Dr. Farquhar, lacking any study data showing a statistically significant increased risk from short-term use of Vioxx, was forced to fall back on an assumption that he described as follows: "[T]here's a generalization that when you end up with a relative risk at the end of the trial, you *assume* it applies throughout. (October 10, 2005 Deposition of John W. Farquhar ("10/10/05 Farquhar Dep.") at 194:15-197:3 (emphasis added; objections and colloquy omitted).) This "generalization" is not only contrary to fact; it is also not "scientific knowledge" and cannot

Even apart from the *post hoc* nature of this analysis, any attempt by Dr. Farquhar to pass on Dr. Jewell's estimates of the relative risk of a "cardiac event" from taking Vioxx over different time periods cannot constitute relevant and scientifically reliable evidence of causation. Mr. Dedrick took Vioxx for six months before he had a heart attack.[6]  Professor Jewell concluded that from zero to six months of use of Vioxx the relative risk of a cardiac event was 1.35 (95 % confidence interval 0.64, 2.86). (Jewell Report at 1.) He concluded that the relative risk of such an event from zero to twelve months of use was 1.51 (95 % confidence interval 0.82, 2.80).

These are the only time intervals even arguably relevant here, and neither relative risk estimate rises to the level of statistical significance. Dr. Farquhar himself acknowledged that a relative risk is statistically significant if the lower bound of the confidence interval exceeds one. (*See* 6/8/06 Farquhar Dep. at 37:12-38:12.) That is not the case with either Professor Jewell's six-month or one-year estimate. As Merck has explained in prior briefings, statistically insignificant data cannot be relied on to establish causation. (*See, e.g.,* Memorandum In Support Of Omnibus Motion Of Merck & Co., Inc. ("Merck") For Order Excluding Evidence And Testimony On Issues Previously Addressed By The Court, filed in *Smith v. Merck* August 7, 2006 (Record Docket No. 6125) at 6-8.)

The six-month and the one-year estimate do not constitute reliable evidence of causation for the additional reason that they do not show a doubling of the risk. An epidemiologic study

---

establish legal causation. *See Daubert*, 509 U.S. at 589-90 ("The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation."); *cf. Anderson v. Bristol Myers Squibb Co.*, No. H-95-0003, 1998 U.S. Dist. LEXIS 23259, at *15-16 (S.D. Tex. Apr. 17, 1998) (rejecting argument that medical expert's opinions should be excluded only if unreliable and irrelevant in light of theories and techniques within the physician's clinical discipline). As discussed in the main text, Professor Jewell's later calculations did not supply the needed proof.

[6] Mr. Dedrick took Vioxx (at the 25 mg dose) for exactly six months before his heart attack in January 2003. (*See* Sept. 29, 2006 Plaintiff Profile Form at 2, 5-6.)

cannot establish causation by a preponderance of the evidence unless it shows that the agent in question more than doubles the risk of injury.  *See, e.g., Deluca v. Merell Dow Pharms., Inc.,* 911 F.2d 941, 958-59 (3d Cir. 1990).  It follows that an expert's testimony on causation should not be admissible when based on a study that does not show  an increased risk of at least that magnitude.  *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1321 (9th Cir. 1995) (upon remand from United States Supreme Court) (noting that studies relied on by epidemiologists that did not state that the relevant risk was greater than two "would not be helpful, and indeed would only serve to confuse the jury.");  *see also Allison v. McGhan Medical Corp.,* 184 F.3d 1300, 1315 & n. 16 (11th Cir. 1999) ("The threshold for concluding that an agent more likely than not caused a disease is 2.0."); *Chambers v. Exxon Corp.,* 81 F. Supp. 2d 661, 665 (M.D. La. 2000) ("What is significant in this case is that the substantial body of epidemiological evidence demonstrates that [exposure to benzene] [does] not double the risk….").

It will not assist the jury, within the meaning of Rule 702, for an expert to present risk calculations that cannot possibly establish medical causation.   Such calculations cannot constitute reliable and relevant evidence under Rule 702 and *Daubert*.  *See Daubert,* 43 F.3d at 3121 (opinion on remand).   The Court should thus preclude Dr. Farquhar from giving any testimony that relates to the jury Professor Jewell's' relative risk calculations.

### 2.      Dr. Farquhar's attempt to use APPROVe data to support his opinion regarding elevated risk at all durations of use is not based on a sound methodology.

Dr. Farquhar and Professor Jewell's analysis of data from APPROVe alone also fails to follow a methodology that can pass muster under the *Daubert* and Rule 702 analysis.    In his Supplemental Report, Dr. Farquhar opines that APPROVe participants who were at high baseline risk for cardiovascular events at the start of the study had a statistically significant higher relative risk of cardiovascular events from taking Vioxx.  (*See* Supplemental Report at ¶¶ 1, 11-16 and

Figure 3.)  He bases this opinion on Professor Jewell's *post hoc* analysis primarily of data from a subgroup analysis of APPROVe participants contained in the Cardiac Safety Report ("CSR") that Merck submitted to the FDA in June 2005.  (*See id*. at ¶ 11.)  APPROVe participants were categorized as being at "high cardiovascular risk" either because they had symptomatic atherosclerotic cardiovascular disease at the start of the study or at least two specified risk factors for coronary artery disease.[7]

Subgroup analyses often serve a useful purpose.  They can be used, for example, to generate hypotheses or identify subjects for further study.  As a recent New England Journal of Medicine article noted, however, overstating a subgroup analysis can misinform.  *See* Lagakos S.W., *The Challenge of Subgroup Analyses – Reporting without Distorting*, NEW ENGLAND J. MED. April 2006; 354:16; 1667-1669 at 1669.  That is what has happened here.  Whatever their utility in other contexts, subgroup analyses cannot supply scientifically reliable evidence of medical causation – a fundamental burden that plaintiff must carry in this action to establish liability.  Any testimony by Dr. Farquhar that relies on the *post hoc* analysis of the subgroup of patients on Vioxx in APPROVe  should be excluded.

Similarly, it is a fundamental scientific principle that a *post hoc* analysis cannot prove a causal relationship.  Instead, it is a tool to generate hypotheses for future study.  "Post hoc analysis is of major importance in the generation of hypotheses.  However, the hypothesis is created by the analysis and has not been proved by any 'experiment'."  *See* Elliott H.L., *Post hoc*

---

[7] Dr. Farquhar's earlier analysis of "high risk" APPROVe participants – *i.e.*, those with a prior history of symptomatic atherosclerotic disease or diabetes – does not support his opinion. Although this "high risk" subgroup shows a higher relative risk than the overall study population, Dr. Farquhar acknowledged that the confidence interval for even this subgroup falls below 1.0 at 18 months, which means that any increased risk is *not* statistically significant. (Initial  Report at 32 n.3.)

*analysis: use and dangers in perspective*, JOURNAL OF HYPERTENSION 1996, 14 (suppl 2):S21-S25 at S21.  Here, the *post hoc* analysis of patients who were in the "high risk" group at most creates the hypothesis that such patients are at higher risk of cardiovascular events on Vioxx than the general population.  It does not constitute proof that such patients are in fact at higher risk.

Even if it were not unreliable because of its *post hoc* nature and the small numbers involved, this subgroup analysis is still subject to the problem of data dredging.  The Merck CSR from which Professor Jewell and Dr. Farquhar took data about "high risk" participants contained thirteen subgroup analyses for thrombotic cardiovascular events in APPROVe.  (*See* APPROVe Cardiac Safety Report at 277, attached  as Ex. I.)  Again according to a recent New England Journal of Medicine article, there is nearly a 50% chance of at least one false positive result from this many subgroup analyses.  *See* Lagakos S.W., *The Challenge of Subgroup Analyses*, *supra*, at 1668-69 ("[W]hen treatments have identical efficacy, the probability of finding at least one "statistically significant" interaction test when 10 independent interaction tests are undertaken is 40 percent").  The reason is that the subgroup analyses in APPROVe accepted a 5% error rate when identifying a relative risk as statistically significant.  (*See* APPROVe CSR at 277 (using a 95% confidence interval).)  But a 5% error risk repeated 13 times amounts to a 49% risk of finding a false "significant" relative risk in one of the subgroups.  The scientifically and statistically proper evaluation for such a subgroup analysis would use at least a 99% confidence interval (1% error rate) for each subgroup to correct for the data dredging problem.  *See* Lagakos S.W., *The Challenge of Subgroup Analyses, supra*, at 1668.

In short, expert testimony that presents a *post hoc* subgroup analysis as proof of causation should be excluded because that is not a scientifically valid use of such data, and because it would be confusing to the jury and unfairly prejudicial to Merck.  To the extent that plaintiff

seeks to show that he is within the "high-risk" subgroup that was the subject of this analysis, therefore, plaintiff should be precluded from offering the testimony of Dr. Farquhar that is based on this flawed analysis.[8]

### 3. Other Merck studies likewise do not support Dr. Farquhar's opinion.

**VIGOR.** Dr. Farquhar also cannot look to the VIGOR study to support his opinion. The VIGOR participants took Vioxx only at the 50 mg dose for a duration of nine months. Here, by contrast, Mr. Dedrick took Vioxx at the 25 mg dose, for six months. The VIGOR participants comprised an elderly population with rheumatoid arthritis, itself a risk factor for fatal cardiovascular events, as Dr. Farquhar acknowledged. (*See* 10/10/05 Farquhar Dep. at 98:4-98:20, 125:23-126:18.) VIGOR did not compare Vioxx to placebo but instead to naproxen, making it impossible to determine whether the higher rate of cardiovascular events seen in the Vioxx arm by the end of the study was attributable to the prolonged use of Vioxx at the 50 mg dosage, a cardioprotective effect of naproxen, or chance.

**Alzheimer's Studies.** In the first of these two studies, the number of confirmed serious cardiovascular events was greater in the placebo arm than in the Vioxx arm – an outcome that

---

[8] Before Professor Jewell performed his sub-group analyses, Dr. Farquhar admitted that there was no statistically significant difference in adjudicated cardiovascular events in  the Vioxx group and the placebo group in APPROVe during the first six months of use:

Q:   [W]ill you agree that there is no statistically significant separation of those events between Vioxx and placebo within the first eighteen months?

….

A:   Well, Mr. Parker, there's no statistically significant difference, but there is a difference, and the relative risk is 1.18 at six months.

(10/10/05 Farquhar Dep. at 189:24-190:5.)  In fact, Dr. Farquhar's earlier analysis of APPROVe data for the incidences of heart attack, sudden death, and unstable angina did not reveal a statistically significant difference between the rates of occurrence of those events in the Vioxx and placebo groups until after nearly three years. (*Id*. at 270:7-23.)

plainly does not support Dr. Farquhar's opinion.  The second study, in which the median duration of Vioxx usage was 94 weeks, did not reveal a statistically significant difference in the number of heart attacks and cardiac arrests that occurred within the Vioxx group as compared to the placebo group.

**ADVANTAGE.**  Like VIGOR, this study compared Vioxx to naproxen, not placebo, and it did not reveal a statistically significant disparity in the incidence of thrombotic cardiovascular events that occurred in the Vioxx and naproxen groups, as Dr. Farquhar himself acknowledges. (*Id.* at 295:12-296:11.)

**B.      The Observational Studies That Dr. Farquhar Reviewed Do Not Supply A Reliable Scientific Basis For His Opinions.**

Dr. Farquhar also relies, to a much lesser extent, on data from five observational studies that he contends "amplify, complement, and verify the conclusions reached from the [randomized clinical trials]."[9]  (Initial Report at ¶¶ 158-64.)  Merck addressed in detail the reasons why those studies do not supply a scientifically reliable basis for Dr. Farquhar's opinion on cardiovascular risk in its briefing in *Plunkett v. Merck.*  In the interest of brevity, instead of

---

[9]  Daniel Solomon *et al., Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults,* CIRCULATION 2004 MAY; 109: 2068-2073; W. Ray *et al., Cox-2 selective non-steroidal anti-inflammatory drugs and the risk of serious conanary heart disease: an observational cohort study,* THE LANCET 2002: 360:1071-73; David J. Graham, *Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study, available at* http://image.thelancet.com/extras/05art1005web.pdf (Jan. 25, 2005); Levesque, L.E., *The Risk for Myocardial Infarction with Cyclooxygenase-2 Inhibitors: A Population Study of Elderly Adults,* ANN. OF INTERN. MED. 2005; 142: 481-489; Mamdani, M. *et al., Effect of selective cyclooxygenase 2 inhibitors and naproxen on short-term risk of acurte mycardial infarction in the elderly,* ARCH. INTERN. MED. 2003 Feb. 24; 163(4):481-6.
      Dr. Farquhar himself was dismissive of the significance of these studies in particular and observational studies in general.  He testified that "[a]nything that is involved in observational epidemiology has less relevance [than] different kinds of data that comes out of the randomized control trials."  (10/10/05 Farquhar Dep. at 16:5-17:9.)  He also observed that he "was not interested in being pinned down on observational epidemiology.  It's not [an] important part of my total report."  (*Id.* at 289:10-12.)

15

repeating that discussion here, Merck  incorporates its prior briefing by reference,[10] For the Court's convenience, Merck has appended to this memorandum a summary of the reasons why those studies do not provide reliable scientific support for Dr. Farquhar's causation opinions in this case.

### C.   Dr. Farquhar's Causation Opinion Is Inadmissible Because He Does Not Offer A Scientifically Valid Explanation For The Mechanism By Which He Contends That The Short-Term Use Of Vioxx Causes Cardiovascular Disease.

Dr. Farquhar's opinion that short-term usage of Vioxx causes a prothrombotic state rests upon the unproven assumption that Vioxx ingestion, by selectively inhibiting COX-2, results in an imbalance between prostacyclin and thromboxane.  (Farquhar Report at ¶ 58.)  Nothing in his background or experience, however, allows him to render such an opinion.  Dr. Farquhar admits that he does not consider himself an expert on the issue of prostacyclin/thromboxane imbalances. (10/10/06 Farquhar Dep. at 63:1-4.)   Nor is he prepared to examine the scientific evidence in support of prostacyclin thromboxane imbalances, which is also known as the "FitzGerald hypothesis." (*Id.* at 66:25-67:7.)

Indeed, initially Dr. Farquhar took the position that, as an epidemiologist, he does not need to know the internal mechanism for thrombus formation:

Q:   Okay.  Doctor, does the term "Fitzgerald hypothesis" have any meaning to you?

A:   I'm going to give you a fairly long answer on that.

Q:   The first question is yes or no.

---

[10] *See* Merck & Co.'s Memorandum In Support Of Motion To Exclude Evidence Of Plaintiff's Experts Regarding Causation, filed in *Plunkett v. Merck* on Oct. 21, 2005 (Record Docket No. 1515) at 31-33; Appendix Of Studies Relied On By Plaintiff's Experts, filed in *Plunkett v. Merck* on Oct. 21, 2005 (Record Docket No. 1515) at 11-22; Memorandum In Support Of Merck & Co., Inc.'s Motion To Exclude Testimony Of John W. Farquhar, M.D., filed in *Plunkett v. Merck* on Oct. 21, 2005 (Record Docket No. 1122) at 11-14.

A:      Yes.  It has a lot of meaning to me.

Q:      All right.

A:      I think the main point I want to get across as an epidemiologist, *I need not
        spend a lot of time on the question of the internal mechanisms by which a
        thrombus appears.*

        *It isn't – it isn't part of the data that I'm examining to – examining to
        draw conclusions that are relevant to – to Vioxx.*

        I – I have great respect for Dr.  Fitzgerald.  I – I agree with the proposition
        that there is very likely a propensity for thrombosis induced by Vioxx, but
        just to make the – the point clear, cardiologists when they think about
        coronary artery disease and its complications, they don't start with the
        word thrombosis, thrombogenesis.

        They start with the atherosclerosis and atherosclerotic plaques and
        hemorrhage into such plaques or erosion of such plaques with the idea that
        thrombus formation is secondary to the primary event.

        So the data I have in front of me has to do with principally the appearance
        of serious heart disease and its complications.

(*Id.* at 58:13-59:15 (emphasis added).)   But, where admissible evidence in a trial is the question,

Dr. Farquhar is wrong.  To give the causation testimony he seeks to give, Dr. Farquhar must

provide a reliable explanation of the physiological process by which he contends Vioxx forms

thrombi.[11]

        To establish causation in a pharmaceutical case, the trial court must determine whether

the expert's opinion "tied" the defendant's product "by some specific train of medical evidence"

to the alleged injury.  *Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999).   To

accomplish this task, an expert must offer a "reliable explanation of the physiological process by

---

[11] The article reporting on mice studies that Dr. Farquhar refers to in his Supplemental Report
(Cheng *et al., Cyclooxygenase, Microsomal Prostaglandin E Sythase-1, and Cardiovascular
Function*, J. CLIN. INVEST. 2006; doi:10:1172/JCI27540) does not provide any support for this
mechanism theory for the reasons explained in Merck's concurrently filed Memorandum In
Support Of its Motion for Order Excluding Opinion Testimony by Plaintiff's Experts That Vioxx
Accelerates Atherosclerosis.

which [the agent] causes [the alleged harm]." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005). The Fifth Circuit explained this requirement as follows:

> The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur. Based on such predicate knowledge, it may then be possible to fasten legal liability for a person's disease or injury.

*Black*, 171 F.3d at 314.

Thus, an expert's mere assertion that he or she "knows" that Vioxx can cause sudden death is scientifically unreliable in the absence of an "explanation of why or how it happen[ed]." *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d at 616. Indeed, without a reliable explanation of the specific mechanism by which Vioxx supposedly causes sudden cardiac death, plaintiff's experts cannot conclude to any degree of medical certainty that Vioxx has this effect. As this Court explained:

> In this case, Drs. Shell and Eckberg have discovered an event, but not a cause. They fail to identify the exact mechanism by which a person's QT interval can become permanently prolonged well after that person has ceased taking Propulsid. . . . They have theories but they have no proof to support those theories. . . . Under the prevailing logic of Daubert and Black, their testimony is unreliable.

*Id.* at 617; *see also McClain*, 401 F.3d at 1253 ("Here, [plaintiffs' experts have not] offered a reliable explanation of the physiological process by which Metabolife causes heart attacks and ischemic strokes, *i.e.*, establish general causation. . . . In the absence of such a foundation for a differential diagnosis analysis, a differential diagnosis generally may not serve as a reliable basis for an expert opinion on causation in a toxic tort case."). Because he can point to no reliable scientific basis to describe the mechanism by which he claims Vioxx increases cardiovascular risk after short term use, Dr. Farquhar's  testimony on medical causation must be excluded.

IV. **THE COURT SHOULD EXCLUDE ALL TESTIMONY FROM DR. FARQUHAR ADDRESSING MERCK'S KNOWLEDGE AND STATE OF MIND OR WHETHER MERCK ACTED "APPROPRIATELY."**

As noted earlier, Dr. Farquhar does not confine himself to opinions on medical causation. He is also poised to give his personal views on the state of Merck's knowledge and understanding of alleged risks associated with Vioxx. (*See, e.g.,* Initial Report at ¶ 21 ("By no later than December 1997, Merck *knew* that Vioxx caused an imbalance in the levels of chemicals in the body that regulate clotting…." (emphasis added)); *id.* at ¶¶ 185-199.) And his reports are rife with value judgments on the appropriateness or propriety of Merck's actions. As just one example of the latter, in his Supplemental Report he asserts: "I agree with Dr. Curfman that the related studies of Protocol 203 should have been made known to the editors of the NEJM." (Supplemental Report at ¶ 10 (emphasis added); *see also id.* at ¶ 24; Initial Report at ¶¶ 191-94, 196-97, 199.)

Plaintiff may not be heard to respond that there is no intention to elicit value judgments and testimony about Merck's alleged knowledge and state of mind from Dr. Farquhar. The content of Dr. Farquhar's various reports strongly suggests that that is exactly what he intends to testify about, either explicitly or in the guise of giving medical or scientific testimony. He should be precluded from giving any such testimony, even if the Court permits him to testify on issues of medical causation. Dr. Farquhar possesses no expertise or specialized knowledge and no foundation in personal knowledge that qualifies him to address Merck's knowledge or state of mind. He repeatedly draws inferences from his review of internal Merck documents selected by plaintiffs' counsel, many of which may be the same documents that are admitted into evidence and that the jury will see. (*E.g.,* 10/10/05 Farquhar Dep. at 56:3-57:3.) In doing this, he invades the exclusive province of the jury. At the same time, his personal conclusions will not assist the jury in any respect. Similarly, whether or not Dr. Farquhar agrees with Dr. Curfman or any other

individual is irrelevant in this action, and the expressions of agreement and other value judgments he is eager to make will again not assist the jury.  As discussed more fully in Merck's concurrently-filed Motion for Order Excluding Testimony of Jerry Avorn, M.D., incorporated herein by reference,[12] expert witnesses are routinely prohibited from providing testimony regarding the "intent, motives or states of mind of corporations, regulatory agencies and others," because they "have no basis in any relevant body of knowledge or expertise."  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 546; *see also In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d  at 616.   They  are also precluded from giving subjective testimony on ethics for similar reasons.  *See, e.g., In re Rezulin*, 309 F. Supp. 2d at 542-45  (expert testimony on subjective ethical standards was "(1) unreliable because purely speculative; (2) unhelpful to the fact-finder because irrelevant in a case where liability is premised on legal, not ethical, standards; and (3) likely to prejudice and confuse fact-finders concerning the pertinent legal standards").[13]

---

[12] Merck also incorporates by reference its prior briefing in *Plunkett v. Merck* addressing Dr. Farquhar's inadmissible views on Merck's knowledge, state of mind, and ethics.

[13] The Court should also not permit Dr. Farquhar to assert that Vioxx is the most hypertensive of the NSAIDs or "the most dangerous drug in its class."   (*See* Initial Report at ¶ 42.)   It is irrelevant and, even more fundamentally, Dr Farquhar's deposition testimony established that he has no reliable scientific basis for any such assertion.  Time and again he testified that it was his "guess" or "suspicion" that Vioxx had a greater propensity to cause hypertension than any other NSAID.  (*E.g.,* 6/8/06 Farquhar Dep. at 244:18-246:14.)  For example, he stated, "At the moment, I suspect that Vioxx stands out among all the NSAIDs in its blood pressure effect.  But at the moment, I cannot be certain whether valdecoxib and a few others might be similarly disposed.  (*Id.* at 245:25-246:4.)  Yet he admitted that he had seen evidence comparing Vioxx's hypertensive effect to only five other NSAIDs (diclofenac, ibuprofen, indomethacin, Celebrex®, and naproxen), not to all of the prescription drugs in this class available in the United States.  He had seen no clinical study comparing the hypertensive effect of the following prescription NSAIDs to that of Vioxx: diflunisal, etodolac, fenoprofen, flubiprofen, ketoprefen, mefanamic acid, meloxicam (Mobic®), nabumetrine (Relafen®), oxaprozin (Daypro®), piroxicam (Feldene®), sulindac (Clinoril®), and tolmetin.  (6/8/06 Farquhar Dep. at :289:25-292:23.)  *See* Center for Drug Evaluation and Research, United States Food and Drug Administration, Medication Guide for Non-Steroidal Anti-Inflammatory Drugs (NSAIDs), available at http://www.fda.gov/cder/drug/infopage/COX2/NSA/medguide.htm.  Dr. Farquhar's speculative

## V.     CONCLUSION.

For all the reasons stated in this memorandum and in Merck's briefing addressing Dr. Farquhar's testimony in connection with previous MDL trials, Merck respectfully requests that the Court grant this motion and exclude Dr. Farquhar's testimony.

Dated:  October 30, 2006

Respectfully submitted,

s/ Dorothy H. Wimberly
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Mark Ouweleen
Carrie Jablonski
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Douglas Marvin
Elaine Horn
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005

---

assertion that Vioxx is worse than all other such drugs in this respect is not scientifically reliable and should be excluded on that basis.   It should also be excluded under Rule 403 as it would plainly be unfairly prejudicial for the jury to hear his unsupported belief.

Phone:  202-434-5000
Fax:     202-434-5029

And

Brian Currey
A. Patricia Klemic
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

Attorneys for Merck & Co., Inc.

**APPENDIX 1**

**Procedural History of Dr. Farquhar's Reports And Designations**

Plaintiffs in *Plunkett v. Merck* designated Dr. Farquhar a testifying expert witness and provided Merck with Dr. Farquhar's first expert report in this MDL, dated Sept. 26, 2005.  The Initial Report, applicable to all cases in the MDL, addresses general causation issues.  Merck moved to exclude Dr. Farquhar's testimony for the reasons addressed in its memorandum in support of its Motion To Exclude Testimony Of John W. Farquhar, M.D., filed in *Plunkett v. Merck* on Oct. 21, 2005 (Record Docket No. 1515), and in its reply memorandum in support of that motion filed Nov. 9, 2005 (Record Docket No. 1515.), both incorporated by reference herein.  The Court denied Merck's motion as to Dr. Farquhar's causation opinions and reserved ruling on whether Dr. Farquhar could testify about Merck's alleged knowledge and state of mind.  The Court did not specifically address whether Dr. Farquhar could give testimony amounting to value judgments about Merck's conduct.  (*See* Order and Reasons, filed in *Plunkett v. Merck* Nov. 18, 2005 (Record Docket No. 1516).)  Following the disposition of Merck's motion, plaintiffs elected not to call Dr. Farquhar to testify in the initial trial.  They did not designate or call him as an expert witness in connection with the retrial of the *Plunkett* case in January 2006.

Plaintiff in *Barnett v. Merck*  also designated Dr. Farquhar as an expert witness.  While pretrial briefing was underway in that case,  Dr. Farquhar submitted three additional expert reports on general causation, each applicable to all cases in the MDL – the Supplemental Expert Report Of John W. Farquhar, M.D., dated May 22, 2006; the Supplemental Expert Witness Disclosure As To John W. Farquhar, dated May 26, 2006; and the  Supplemental/Rebuttal Expert Report of John W. Farquhar, M.D., dated June 22, 2006.  Appended to the Supplemental Report

as Exhibit A, and referred to extensively in the Supplemental Report, was the first of Professor Jewell's two reports, entitled Analysis Of Vioxx Data From The APPROVe, VICTOR, And ViP STUDIES – Protocol 203.

In *Barnett* Merck again filed a motion challenging the admissibility of Dr. Farquhar's testimony.  In connection with the opposition to Merck's motion, plaintiff submitted the second of Professor Jewell's reports, his "Rebuttal Expert Witness Report.  (*See* Declaration Of Donald C. Arbitblit In Support Of Plaintiffs' Memorandum In Opposition To Motion To Exclude Testimony Of John W. Farquhar, M.D., served in *Barnett v. Merck* June 27, 2006 (Record Docket No. 5608), Ex. 3 thereto.)  Merck subsequently withdrew its motion before the scheduled hearing, and thus the Court did not rule on it.  Plaintiff later withdrew his designation of Dr. Farquhar, and Dr. Farquhar did not testify in the *Barnett* trial.

Plaintiff in *Smith v. Merck* also designated Dr. Farquhar as a testifying expert, and Merck again filed a motion challenging his anticipated testimony.  Plaintiff withdrew Dr. Farquhar as an witness before the briefing on Merck's motion had been completed, and Dr. Farquhar did not testify at the trial.

**Appendix 2**

**Observational Studies Relied On By Dr. Farquhar**

**Solomon**.   This retrospective observational study, conducted by Dr. D. H. Solomon in 2003, was based on a review of patient records in a Medicare database. For several reasons the Solomon study does provide support for Dr. Farquhar's opinion regarding short-term use:

- It did not report a statistically significant increased risk of myocardial infarction from Vioxx at any dose as compared to no current NSAID use or NSAID use generally.

- It anomalously found that Vioxx "may include a period of elevated risk" for cardiovascular events, when compared to Celebrex®, during the first 30 days of use, but not after 90 days.

- Its findings conflict with years of randomized controlled clinical data showing no increased risk associated with the short-term use of Vioxx – including data from APPROVe and other studies.  *See* Declaration of J. Michael Gaziano, M.D., M.P.H. in Support of Merck's Motions to Exclude Evidence, at ¶ 54.

- Dr. Solomon himself concedes that there are "important potential limitations" to his study, including "the potential for bias by unmeasured confounders" as well as "residual confounding by factors that were incompletely assessed in this administrative database, such as severity of cardiovascular risk factors."

Causation Testimony Brief, App. of Studies at 10-12.

**Graham.**   Dr. Farquhar cites a 2005 study by Graham that purports to find an increased risk of heart attacks and sudden cardiac death associated with the use of Vioxx as compared to Celebrex.   Graham's analysis is deeply flawed[14] and cannot apply to this case for at least the following reasons:

---

[14] Dr. Farquhar admitted that he has a "generic objection" to observational studies such as that conducted by Dr. Graham that consist of a retrospective analysis of data obtained from insurance companies.  (6/8/06 Farquhar Dep. at 131:16-132:16.)  Such studies, unlike randomized clinical trials, "are subject to confounding" and do not supply the same degree of assurance as clinical trials.  (*Id.*)

- Most significantly, the Graham study found no increased risk of heart attack from taking Vioxx at the 25 mg dose.  (10/10/05 Farquhar Dep. at 290:14-19.)

- Graham acknowledged that, because of the limited power of his study, he was "unable to fully address whether the cardiovascular risk associated with rofecoxib varied by duration of use."

- Graham's estimates of the excess number of fatal and non-fatal heart attacks supposedly attributable to Vioxx are inconsistent with the results of the APPROVe study, which showed that the risk of adverse cardiovascular events or death associated with the use of Vioxx at the 25 mg dose was very similar to that applicable to the placebo group during the first 18 months.

- Graham's estimates also are inconsistent with the findings of his own study, which likewise show no statistically significant increased risk of adverse cardiovascular risks associated with the use of 25 mg Vioxx (odds ratio of 1.23, with a confidence interval of 0.89 – 1.71).

Causation Testimony Brief, App. of Studies at 14-16.

**Ray.**  This 2002 observational study found *no* increased cardiovascular risk from taking Vioxx at the 25 mg dose – the dose that Mr. Dedrick took.  *See id.* at 13-14.  Not only does this study not provide reliable scientific support for Dr. Farquhar's opinion, but it flatly contradicts his opinion.

**Levesque.**  This 2005 study found only a marginal 1.24 elevated risk of myocardial infarction, with a confidence interval ranging from 1.02 to 1.43 – a result that under *Daubert* is insufficient to support causation testimony.  *See id.* at 17-18.  The authors themselves noted that the use of the study was limited for various reasons, including the lack of control for significant risk factors.  *See id.*

**Mamdani.**  This 2003 study likewise does not support Dr. Farquhar's opinion in this case; indeed, the findings are directly contrary to Dr. Farquhar's opinion:

- The study did not find a statistically significant difference in the number of heart attacks between new users of Vioxx compared to non-users of

other NSAIDs.   Indeed, Mamdani notes that "[t]he findings of this observational study suggest no increase in the short-term risk of [acute] MI among users of selective cyclooxygenase 2 inhibitors as commonly used in clinical practice."

- Mamdani did not distinguish between patients taking Vioxx at the 25 mg or 50 mg dose.  Thus, it cannot be determined whether the study has any relevance to Mr. Dedrick, who took Vioxx at the 25 mg dose only.

*Id.* at 18-19.

**Ingenix.**  Dr. Farquhar also inappropriately relies on the Ingenix study:

- The study did not distinguish between individuals who took Vioxx at the 25 mg or 50 mg doses during the first 30 days when compared against use of ibuprofen/diclofenac, making it inapplicable to a purely 25 mg cases, such as Mr. Dedrick's.

- Even this combined dose comparison was statistically insignificant for heart attacks and sudden cardiac death (CI = 0.98-2.34).

- The study's author notes that the study has several "limitations," including reliance on pharmacy records to determine exposure levels and "[r]esidual confounding by other unmeasured factors such as smoking, body mass index, diet and exercise."

*Id.* at 19-20.

**Nussmeier**.  This 2005 study did not evaluate Vioxx at all.  Instead, it evaluated different dosages of different drugs – valdecoxib and parecoxib.  *Id.* at 21.  A study involving different dosages of different drugs is plainly not a reliable basis for an opinion that Vioxx at the 25 mg dose supposedly has a thrombotic effect.[15]

---

[15]  In fact, this study did not even show a statistically significant difference in the rate of cardiovascular adverse events between patients receiving the NSAIDs actually under study.  Causation Testimony Brief, App. of Studies at 21.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of Motion of Merck & Co., Inc. ("Merck") for Order Excluding the Testimony of John. W. Farquhar, M.D. has been served on Liaison Counsel, Russ Herman, and on counsel for Mr. Dedrick, Andy Birchfield, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 30th day of October, 2006.

<div style="margin-left:50%">

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

</div>