

IN RE VIOXX PRODUCTS LIABILITY          )   MDL No. 1657
LITIGATION                              )
                                        )

## SUPPLEMENTAL EXPERT REPORT OF JOHN W. FARQUHAR, M.D.
### THIS DOCUMENT APPLIES TO ALL CASES

### A.   Introduction and Summary of Opinions

1.   This Report is submitted to supplement the opinions provided in my Report dated September 26, 2005, based on review of the additional materials referenced herein. The opinions provided herein are stated to a reasonable degree of medical and scientific probability. In summary, the Supplemental Report includes the following:

- **Protocol 203:** Merck's pre-specified analysis of data from three pooled studies (APPROVe, VICTOR and ViP), known as "Protocol 203," shows early and continuous excess risk of cardiac adverse events, statistically significant at 18 months and at all times thereafter, thereby refuting Merck's hypothesis that no excess risk appears until after 18 months of exposure.

- **High-Risk Patients:** Data from the APPROVe and VIGOR studies are analyzed, showing greater relative risks and rapid onset of excess cardiovascular events among patients at higher background risk; that is, the level of the cardiovascular (CV) risk before using Vioxx.

- **Hypertension:** Data from the APPROVe and VIGOR studies are displayed, showing early, continuous and statistically significant excess risk of hypertension due to Vioxx, compared to both placebo and naproxen. Also, data from the APPROVe study show

M006E7380B

significantly greater incidence of both "Stage 2" (more severe) hypertension and thrombotic events among Vioxx patients who suffered Stage 2 hypertension. No such increase in CV event risk appeared among placebo patients who experienced Stage 2 hypertension, supporting the conclusion that there was a synergistic interaction between hypertension and Vioxx use.

- APPROVe "extension" data: According to documents submitted to the FDA by Merck in May 2006, the excess risk of CV events, including myocardial infarction ("MI") and ischemic stroke, remains statistically significant when data from a one-year off-drug follow-up were combined with the previously published data. For the extension period alone, there was a 64% increased risk of thrombotic events in the Vioxx group.

- Biological Mechanism: Recent publications support Cox-2 inhibition as the cause of hypertension and thrombosis.

**B.** **Protocol 203 Shows Early and Continuous Risk of Excess Cardiac Events Among Vioxx Patients.**

2.       In 2002, following the VIGOR study, Merck prepared a plan to analyze CV adverse events in a pooled analysis of 3 large placebo controlled studies: APPROVe, VICTOR and ViP. The plan, known as "Protocol 203," was submitted to the FDA for its response. On December 19, 2002, FDA Medical Officer Lawrence Goldkind responded to Merck's proposal, indicating general acknowledgment that Protocol 203 would provide "clinically important safety information" about the risk of Vioxx. (Letter, Goldkind to Braunstein, 12/19/02, at p. 1.) Merck proceeded to implement Protocol 203.

3.       Merck's Protocol 203 Data Analysis Plan ("DAP") stated a purpose "to provide increased precision on estimates of the comparability between

- 2 -

M006E73809

rofecoxib and placebo on the incidence of thrombotic cardiovascular serious adverse experiences" (SAEs). (MRK-AFL0015451-484, at 454). The Protocol commented that the larger data set would be more accurate than data from any single one of the three studies. The DAP stated that the findings of Protocol 203 would allow "generalization of the results to other populations" who used Vioxx, including arthritic patients, because the study populations were of similar age and had risk factors for CV events. (Id.)

4.      The endpoints defined in the Protocol 203 included "Cardiac" (MI, Sudden Death, Unstable Angina, etc.), and "Cerebrovascular" (Ischemic Stroke, Transient Ischemic Attack) events. (MRK-AFL0015463). The DAP for Protocol 203 also called for Kaplan-Meier (KM) cumulative incidence graphs to compare the risk of Vioxx versus placebo for CV events over time. (MRK-AFL0015474-75). To the best of my knowledge, Merck has never presented these analyses for Protocol 203, but instead has claimed support for the "18-month hypothesis" based only on the KM curve for "all thrombotic events" in the APPROVe study, which was only one of the 3 studies to be included in the pre-specified analysis.

5.      Following preparation of my Report dated September 26, 2005, data produced by Merck became available to calculate the RR and prepare the KM cumulative incidence curve for Vioxx versus placebo from the Protocol 203 studies. The Protocol 203 data were analyzed and KM cumulative incidence graphs were prepared by Nicholas Jewell, Ph.D., a renowned biostatistician at the University of California at Berkeley School of Public Health, who applied generally accepted methods. Professor Jewell's report on Protocol 203 is attached as Exhibit A.

6.      Based upon this larger and statistically more reliable data set, Protocol 203 directly refutes Merck's hypothesis that no excess risk appears until after 18 months of Vioxx use. To the contrary, the RR of cardiac events (MI, Sudden Cardiac Death and Unstable Angina) in the Vioxx population was 2.68 after 30 days, and 2.37 ($p<0.001$, 95% CI 1.43-3.91) at the end of the study. There was a statistically significant

- 3 -

M006E73810

excess risk by 18 months, and continuously thereafter until the end of the study.  As seen in **Figure 1**, below, the rate of cardiac events in the Vioxx population exceeded placebo from the first month through the end of the study.  Further, statistical analysis shows that there was <u>no</u> significant difference in the RR of cardiac events over time.  (Jewell Report, at pp. 1-2).



**Figure 1:** Kaplan – Meier Estimation of cumulative cardiac events.  The inset in the upper left corner of the Figure presents an expanded scale for the 0-6 month period, to better illustrate the early separation of the incidence curves.

      7.     The scientific method is largely based upon testing of hypotheses which are specified before a study is conducted.  To prevent manipulation of the results, an essential element of this method is that the data must be analyzed according to the plan made at the outset.  That was not done by Merck or its consultants in this case.  The DAP did <u>not</u> call for a KM curve of CV event data over time for APPROVe alone.  (MRK-I8940080858-928, at 875-876); nevertheless, Merck has promulgated the "18-month" hypothesis based on that single study, which was underpowered to detect differences in the rate of events over time.  Conversely, the DAP for Protocol 203 did specify that a KM curve would be prepared from the larger data set of the 3 combined studies, but Merck

-4-

M008E73811

has failed to perform such an analysis. The results of that pre-specified plan show early and persistent excess risk of CV events, with the risk due to Vioxx significantly greater than placebo at 18 months and all later periods (see Figure 1, above), refuting the " no risk for 18-months" hypothesis. The scientific method does not prohibit conducting exploratory analyses that were not pre-specified, and such analyses may provide important information. However, such exploratory analyses are not an acceptable substitute for those that were planned in advance.

8. Since all of the Protocol 203 studies were terminated on the same date (9/30/04), there was no apparent impediment to simultaneously collecting the data and presenting the pooled analysis of CV risk for all three trials, as pre-specified. Indeed, a November 12, 2004, draft version of the subsequently published APPROVe study acknowledged the pre-specified Protocol 203 plan, as follows: "Assessment of cardiovascular safety was not the primary purpose of this study [APPROVe] and there was no pre-specified hypothesis concerning this endpoint for this study alone. However, an analysis of combined cardiovascular data from this study and the data from two other studies was planned." (RBRES-001054-1079, at 1066). The authors deleted such references from later drafts (e.g., 1/26/05 Draft, MRK-AHD0075201-234, at 75209), and no reference to Protocol 203 appeared in the final draft submitted for peer review on February 6, 2005.

9. At his deposition in November 2005, New England Journal of Medicine (NEJM) Editor Gregory Curfman testified that NEJM had not been informed of the plan to combine APPROVe with two other studies; that the existence of the related studies should have been disclosed; and that clinical trial registration is intended to prevent "bad news" from being "buried away" by the sponsor. (Depo. of Curfman, 11/21/05, at 136-141).

10. I agree with Dr. Curfman that the related studies of Protocol 203 should have been made known to the editors of NEJM. The scientific method and the

- 5 -

538398.1

M006E73812

interests of the medical community required disclosure of results of the pre-specified data analysis of all three pooled studies, and not only the results of APPROVe. Such disclosure is particularly important where the undisclosed, pre-specified analysis contradicts the substitute analysis offered by the sponsor, as in the case of the "18-month" hypothesis based on APPROVe alone, which is refuted by the complete Protocol 203 data.

       **C.**    **Patients in APPROVe Who Were at High Risk for CV Events at Baseline Had Higher Relative Risks of CV Events Due to Vioxx, Supporting the Synergistic and Multiplicative Effect of Vioxx and Baseline High-Risk Status.**

       11.    Data from Merck's APPROVe Cardiovascular Safety Report (CSR), filed with the FDA in June 2005, in conjunction with data provided by Merck in this litigation, were used by Professor Jewell to evaluate RRs of thrombotic events among patients at "high cardiovascular risk," compared to patients with lower risk status. Merck defined the "high cardiovascular risk" category to include those with "a history of symptomatic atherosclerotic cardiovascular disease [SACVD] or the presence of at least two of the following risk factors for coronary artery disease: a history of hypertension, a history of hypercholesterolemia, a history of diabetes, or current cigarette use." (Bresalier, 352 NEJM at 1097). Patients identified as diabetics were included in the "high-risk" analysis, based on well-established epidemiologic evidence that the CV adverse event risk conferred by diabetes is equivalent to the CV risk for patients with coronary heart disease (CHD). See, e.g., Third Report of the National Cholesterol Education Program (NCEP) Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults (Adult Treatment Panel III). NIH Publication No. 02-5215, Bethesda, MD, National Institutes of Health 2002 ("ATP III"), which designated diabetes as a CHD risk equivalent.

      12.    The data show not only that Vioxx use caused statistically significant excess risk of CV events, but also that Vioxx interacts synergistically with

- 6 -

M00GE73813

high baseline CV risk status to more than multiply the RR of thrombotic events in high-risk patients. Because interaction tests divide the population into subgroups for comparison, the power to detect important differences is reduced. Therefore, tests of significant interaction may be appropriately set at levels greater than the "p=0.05" level commonly established for significance testing of primary effects. See, Jewell, N., Statistics for Epidemiology (Chapman and Hall, New York 2003) at 159 (setting level of significant interaction at ≤ 0.2 has "the desired effect of drawing attention to important variations that might be missed by inappropriately fixating on the standard 0.05 level of significance"). The results of this analysis are discussed at paragraphs 13–15, and presented graphically in **Figure 2**, below:



**Figure 2:** Summary Incidence rate of Confirmed Cardiac and Cerebrovascular Events in the APPROVe Study by Baseline Risk Status and Treatment Group. Relative Risks (RR) and p-values based on Proportional Hazard Model

13.     These data from APPROVe reveal a statistically significant increased risk of cardiac plus cerebrovascular events in the high-risk Vioxx group v. high-risk placebo group, RR = 3.83 (95% CI 1.67-8.77), p = 0.001. For the lower-risk Vioxx group v. lower-risk placebo group, the RR = 1.43. Comparison of the high-risk RR (3.83) to the lower-risk RR (1.43) yields a p value of 0.086, indicating significant

M006E73814

interaction between baseline risk and Vioxx use, that is, the higher RR is due to the synergistic effect of CV risk due to both Vioxx and to baseline risk status.

14.     For a second category of outcomes, "all thrombotic" events, for the high-risk Vioxx group v. high-risk placebo group, the RR = 2.87 (95% CI 1.40-5.86), p = 0.004. For the lower-risk Vioxx group v. lower-risk placebo group, the RR = 1.15. An interaction p value of 0.07 for the comparison of high-risk RR (2.87) to low-risk RR (1.15) provides strong evidence of the synergistic relationship between baseline risk and Vioxx use, consistent with the findings cited above (see ¶ 13).

15.     This synergistic interaction is supported by consistent results when RRs are compared for "high risk" and "lower-risk" Vioxx patients. The RR for high-risk Vioxx patients is significantly higher than for low-risk Vioxx patients, RR = 4.36, 95% CI (2.38-7.99), p < 0.001 for "all thrombotic events"; RR = 4.35, 95% CI (2.32-8.14) p < 0.001 for cardiac plus cerebrovascular events. These data again support interaction between Vioxx use and baseline risk, since high-risk status plus Vioxx resulted in a significantly greater RR than lower-risk status and baseline risk.

M005ET3815

16.     A KM cumulative incidence curve for the "high-risk" APPROVe patients shows early separation for the outcome category of cardiac plus cerebrovascular events, with the Vioxx rate above placebo, and a doubling of risk in the first 18 months; overall RR = 3.83, P < 0.001 (95% CI, 1.67-8.77), as set forth in **Figure 3**, below:



**Figure 3:** Comparison of the Kaplan-Meier Estimates of Confirmed Cardiac + Cerebrovascular Events by Treatment Group Restricted to the High Risk Subgroups of VIGOR and APPROVe Studies

### D.     VIGOR Analysis Shows Similarly Higher Relative Risk and Rapid Onset of CV Disease in Vioxx Patients v. Naproxen.

17.     In my previous Report, data from the VIGOR study were presented, showing, among other things, a greater RR of thrombotic events in the Vioxx subgroup of aspirin-indicated patients versus the naproxen subgroup of aspirin-indicated patients, RR = 4.89, p = 0.012, 95% CI (1.44-16.88) compared to the non-aspirin-indicated (lower-risk) Vioxx v. naproxen subgroup, RR = 1.88, p = 0.04, 95% CI (1.02-3.44). FDA Medical Officer Review, 3/30/01, p. 5. Professor Jewell has prepared a KM curve (**Figure 3**, above) using Merck's data, showing that the high-risk VIGOR population on Vioxx experienced very rapid onset of CV thrombotic events, immediately and continuously in excess of the naproxen group, and statistically significant after a study of only 8 months mean exposure duration.

538398.1

M005E73816

18.     These data are not explained by a "protective effect" of naproxen. If Vioxx were harmless and the VIGOR results were explained by a naproxen "protective effect," then the Vioxx cardiac event rate would have come out "even" with the rate for the harmless placebo given in APPROVe and Protocol 203. Instead, the Vioxx event rates were significantly worse than placebo, and particularly elevated for high-risk patients. Thus, the data from APPROVe and Protocol 203 confirm the refutation of the cardioprotection theory advanced by Merck to explain VIGOR's results.

19.     As noted by Cox-2 researcher Garret FitzGerald in the aftermath of the removal of Vioxx from the market, "[t]he higher a patient's intrinsic risk of cardiovascular disease, the more likely it would be that such a hazard [of Cox-2 inhibition] would manifest itself rapidly in the form of a clinical event"(FitzGerald, "Coxibs and Cardiovascular Disease," NEJM 2004; 351:1709-1711). The elevated RRs of the high-risk status patients from APPROVe and VIGOR, as shown above, are consistent with FitzGerald's assessment of the increased likelihood of events in patients on Vioxx with high background risk.

E.      **Vioxx Causes Significant Increased Hypertension, Including Severe "Stage 2" Hypertension That Was Strongly Associated With Thrombotic Events in APPROVe.**

20.     In both APPROVe and VIGOR, Vioxx caused large and statistically significant increased incidence of hypertension. **Figure 4**, below, presents the KM for hypertension in VIGOR, prepared by Professor Jewell from Merck's data, along with the KM curve for hypertension in APPROVe from Merck's "Figure 9" in the "General Safety Report," (GSR), Reference P122, Appendix 2.1.1 (MRK-AFV0426229).

- 10 -

M00GE73817



**Figure 4:** Comparison of Cumulative Incidence Rates of Hypertension Adverse Events in the VIGOR and APPROVe Studies.

21. These figures demonstrate a remarkably consistent, statistically significant, approximate doubling of hypertension in Vioxx patients, at both 25 mg. versus placebo (APPROVe) and at 50 mg. versus naproxen (VIGOR). Also, the data show a disturbing, continuously increased cumulative incidence of hypertension-related adverse events (AEs) due to Vioxx suffered by approximately 30% of the patients in the APPROVe study by the end of 3 years' use of Vioxx at the standard therapeutic dose. In APPROVe, there were 377 (29.3%) hypertension AEs in the Vioxx patients compared to 219 (16.99%) on placebo (Table 32; MRK-AFV0426227). Merck reported the "Difference in Percentage Points" (12.4%) and the 95% CI for that difference (9.2, 15.6), a highly significant result. In the VIGOR study, Professor Jewell used Merck's data to calculate the RR = 1.83, P < 0.0001, 95% CI 1.55-2.16. Of further interest, in APPROVe, Merck analyzed the hypertension-related AEs based on "Common Toxicity Criteria" of the National Cancer Institute, graded 0 (no event) through 4 (most severe). (Table 33, MRK-AFV0426228). The Vioxx group had more than double the incidence

538398.1

M006E73818

of "Grade 2"[1] hypertension (8.08% v. 3.77%) and "Grade 3"[2] hypertension (5.67% v. 2.69%), and the p-value for treatment based on a logistic regression model was "0.000," i.e., a less than 1 in 1,000 possibility that the result was due to chance. (Id.)

      22.    Additional unpublished APPROVe data demonstrate increased risk of more severe "Stage 2" hypertension on Vioxx versus placebo. As can be seen in Table 39 below, reproduced from the Merck GSR (MRK-AFV0426242), the Vioxx and placebo populations had essentially identical prevalence of Stage 2 hypertension at baseline (before the study). However, as seen in Table 40 from the GSR, below (MRK-AFV0426243), the Vioxx population experienced a large and highly statistically significant increased incidence of both systolic and diastolic blood pressure increases exceeding the threshold for Stage 2 hypertension. For patients who developed both Systolic Blood Pressure (SBP) $\geq$ 160 and Diastolic Blood Pressure (DBP) $\geq$ 100, the RR was 2.14 p < 0.001 (95% CI 1.57, 2.92), that is, more than double the risk that Vioxx patients would develop this severe form of hypertension.

**Table 39**

**Summary of Baseline or Screening Stage II Hypertension**

| Blood Pressure | Rofecoxib 25 mg n/N(%) | Placebo n/N(%) |
|---|---|---|
| DBP ≥100 | 26/1287 (2.02) | 29/1299 (2.23) |
| DBP ≥100 and SBP ≥160 | 14/1287 (1.09) | 13/1299 (1.00) |
| DBP ≥100 or SBP ≥160 | 141/1287 (10.96) | 147/1299 (11.01) |
| SBP ≥160 | 132/1287 (10.26) | 128/1299 (9.85) |

Data Source: [4.2]

[1] "Grade 2": "recurrent or persistent symptomatic increase by > 20mmHg (diastolic) or to > 150/100 if previously within normal limits (WNL); not requiring treatment." (Id.)
[2] "Grade 3": "requiring therapy or more intensive therapy than previously."

538398.1

- 12 -

M00GE73819



12074756
E-SERVICE
Aug 14 2006
6:17PM

**Table 40**

**Analysis of Stage II Hypertension**

| Co-therapeutic Blood Pressure (mmHg) | Rofecoxib 25mg (N=1268) Event/Patient-yrs (rate/person) | Placebo (N=1286) Event/Patient-yrs (rate/person) | Comparison | | |
|---|---|---|---|---|---|
| | | | Difference (95% CI) | Relative Risk (95% CI) | P-Value |
| DBP ≥ 90 | 3.60/2.49 (0.17) | 1.76/2.46 (0.10) | 2.18 (1.15, 5.64) | 1.76 (1.24, 1.77) | 0.004 |
| DBP ≥ 90 and SBP<140 | 1.88/2.03 (0.39) | 0.93/0.13 (0.82) | 1.24 (1.34, 5.13) | 2.34 (1.29, 5.32) | 0.021 |
| SBP ≥ 140 and DBP<90 | 4.05/0.85 (0.71) | 3.02/2.00 (11.00) | 0.53 (0.56, 2.89) | 1.57 (1.23, 1.52) | 0.400 |
| SBP ≥ 140 | 2.03/0.89 (0.56) | 1.07/0.56 (0.30) | 5.32 (6.74, 5.17) | 1.01 (0.45, 1.56) | 0.400 |

Data Source: [4.12]

23.     Several unpublished documents from Merck's files demonstrate the strong association between Stage 2 hypertension and thrombotic events in APPROVe:

    a.     On February 20, 2004, APPROVe External Safety Monitoring Board (ESMB) Chair James Neaton, Ph.D., wrote an email to other members of the ESMB, which made the following points:

- The data so strongly indicated cardiac toxicity that Dr. Neaton raised the possibility of stopping the APPROVe study at that time, over 7 months before it was actually terminated. (MRK-AG00000394).

- Some of the statistical results of the study were unlikely to change before the planned termination date, and, if they remained unchanged, they would be "interpreted as very damning to the drug." (Id.).

- As one of the "alternatives" to stopping the APPROVe trial in February 2004, Dr. Neaton proposed "that treatment be discontinued if Stage 2 hypertension develops" because a disproportionately large percentage of the confirmed CV events in the Vioxx group occurred among patients who had Stage 2 hypertension. As of that time, 20 of the 38 events (53%) in the Vioxx group had occurred among 390 patients who developed Stage 2 hypertension (30% of the Vioxx treatment population).

538398.1

M006E73920

(Id.)  Another alternative proposed by Dr. Neaton was to "[s]top the study for the subgroup of patients likely to develop Stage 2 hypertension" (Id.).

b.      On March 4, 2004, two weeks later, Dr. Neaton wrote a letter informing Merck of the ESMB's recommendation that patients with "uncontrolled hypertension" (>165mm Hg systolic or >95 mm Hg diastolic) should be removed from the APPROVe study.  (MRK-AF00262446).  In contrast, the Vioxx label did not include a warning to discontinue such patients from Vioxx therapy.  Dr. Neaton's letter comments that it is "well-known that NSAIDs and Cox-2 inhibitors raise blood pressures" (id.), while Merck's own unpublished data showed that Vioxx caused a statistically significant doubling of the risk of hypertension exceeding predefined limits of change, compared to Celebrex (Protocol 112; see my Report, 9/26/05, ¶ 150, p. 67).[3] A letter prepared by Merck to send to APPROVe investigators perpetuated the mistaken impression that Vioxx effects on blood pressure were simply an example of a class effect, without mentioning the adverse data when Vioxx was compared to Celebrex (MRK-AF00262435).

c.      On November 11, 2004, Merck's James Bolognese prepared an "Assessment of rofecoxib TCVSAE [Total Confirmed Cardiovascular Adverse Experiences] results by Systolic BP spike occurrence," which reported as follows:

---

[3] "In 2001, Merck itself had conducted a head-to-head trial of Vioxx versus Celebrex and placebo, known as Protocol 112, which supported Whelton's conclusion that Vioxx was associated with a greater degree of hypertension.  Protocol 112 was a 6-week controlled study of 1,521 patients in four treatment groups, Vioxx 12.5 mg, Vioxx 25 mg, Celebrex 200 mg, and placebo.  (MRK-AIN0001240).  The Merck Statistical Report showing analyses as of January 9, 2001, indicates that approximately 10% of the subjects in each of the Vioxx 12.5 mg. and 25 mg. arms of the study had increased systolic blood pressure greater than 20 mm and absolute value of over 140 mm, exceeding the pre-defined limits of change, compared to 5.3% in the Celebrex arm and 4.8% in placebo.  The increased hypertension on Vioxx 25 mg. versus Celebrex 200 mg. was highly statistically significant, $p = 0.004$, and also statistically significant versus placebo ($p = 0.046$).  (MRK-AIN0001608-609).  Id.  However, Merck did not publish the data from Protocol 112".  Report of John W. Farquhar, 9/26/05 at 67.

M006E73821

- In APPROVe, "examination of the results split by systolic BP (SBP) ≥ 160 mmHg on at least one occasion during the study revealed a striking relationship" to the occurrence of confirmed thrombotic events. (MRK-AGO0074496; emphasis added).

- "The interaction between SBP spike (y/n) and treatment in TCVSAE [total confirmed cardiovascular events] was statistically significant [p =0.0471]. In the patients with no SBP spike, the RR was close to 1, but in those with at least one SBP spike, the RR was close to 4. These data suggest that nearly all of the excess CV events observed on rofecoxib versus placebo were in patients with at least one SBP spike. However, in the placebo group, the occurrence of SBP spike showed no increase in rate of TCVSAE's." (Id.; emphasis added).

- When the data were analyzed according to a new "at risk" status as of the date when the SBP spike was first recorded, "the interaction . . . was highly significant (p = 0.0043), indicating strong dependence of the treatment effect (hazard ratio) on whether there was a previous SBP spike or not." (MRK-AGO0074497; emphasis added).

- A comparable analysis of data from the Alzheimer's trials showed a "numerically similar" relationship between SBP spikes in relation to TCVSAE's, but the interaction was not statistically significant. (Id.)

      d.     Between November 2004 and January 2005, drafts of the APPROVe study included references to the SBP spike data that were considered for inclusion in the manuscript to be submitted to NEJM for publication (e.g., MRK-AHD0075212). However, the data were not submitted to NEJM, nor ever disclosed in

- 15 -

M006E73822

the scientific literature. Instead, the APPROVe authors reported increases of approximately 3 to 4 mmHg in "mean arterial pressure" in the Vioxx group, along with the inaccurate statement that the BP changes did not explain the excess risk of CV events in the Vioxx population. (Bresalier, 352 NEJM at 1100).

        e.      At his deposition on November 21, 2005, Dr. Curfman of NEJM testified that the editors were never informed that Merck had analyzed the CV events for patients with BP spikes or Stage 2 hypertension, nor that a statistically significant relationship existed between those conditions. Dr. Curfman testified that such data would have been relevant to the editors and readers, because "one, of course, of the mechanisms of concern in terms of vascular disease would be hypertension as a substrate leading to vessel damage. So that would be — if such an analysis existed, it would be very appropriate to include that." (Curfman Depo., 11/21/05, at 167-169).

        24.      I agree with Dr. Curfman that the analysis of Stage 2 hypertension was highly relevant to the excess CV risk, and that it should have been included in the published article. Where the internal documents acknowledge a "striking relationship," a "highly significant interaction," and the suggestion that "nearly all of the excess CV events" on Vioxx occurred among patients with SBP spikes, it was misleading to delete references to such effects, to disclose only the mean arterial pressure changes, and to deny the clearly apparent relationship between Stage 2 hypertensive changes and thrombotic adverse events.

        25.      Abundant literature in the fields of cardiology and epidemiology supports the conclusion that blood pressure changes of the magnitude reported for Vioxx contributed substantial excess risk of CV events. See, e.g., SHEP Cooperative Research Group: Prevention of Stroke by Anti-hypertensive Drug Treatment in Patients with Isolated Systolic Hypertension: Final Results of the Systolic Hypertension in the Elderly Program (SHEP). JAMA 1991; 265:3255-3264. In numerous clinical trials of antihypertensive medications, including Merck's principal drug in this class

538398.1