## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: VIOXX** | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| | * | |
| **This document relates to** | * | **MAGISTRATE JUDGE KNOWLES** |
| | * | |
| **Gerald Barnett v. Merck & Co, Inc.** | * | **CASE NO. 02:06CV00485** |

---

## PLAINTIFF GERALD BARNETT'S MEMORANDUM IN OPPOSITION TO RENEWED MOTION OF MERCK & CO., INC. ("MERCK") FOR JUDGMENT AS A MATTER OF LAW

---

## <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*Abbot by Abbot v. American Cyanamid Co.,*
   844 F.2d 1108, 1112 (4th Cir. 1988) ............................................................32

*Allen v. Pennsylvania Eng'g Corp.,*
   102 F.3d 194 (5th Cir. 1996) ........................................................................6

*Anderson v. Sandoz Pharmaceuticals Corp.,*
   77 F.Supp.2d 804, 807 Prod.Liab.Rep. (S.D.Tex. 1999) .............................19, 29

*Black v. Food Lion, Inc.,*
   171 F.3d 308, 313 (5th Cir. 1999) ................................................................4

*BMW of North America, Inc. v. Gore,*
   517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) .............................36, 37

*Bonner v. ISP Tech., Inc.,*
   259 F.3d 924, 929 (8th Cir. 2001) ...............................................................7

*Bragg v. Hi-Ranger, Inc.,* 319 S.C. 531, 462 S.E.2d 321 (1995) .................................18

*Brasher v. Sandoz Pharm. Corp.,*
   160 F.Supp.2d 1291, 1296-98 (N.D. Ala. 2001) ..........................................7

*Brock v. Merrell Dow Pharmaceuticals, Inc.,*
   874 F.2d 307, 313 (5th Cir. 1989) ................................................................6

*Brooks v. Medtronic,*
   750 F.2d 1227, 1232 (4th Cir. 1984) ...........................................................16

*Brown v. Bryan County, Okla.,*
   219 F.3d 450 at 456 (5th Cir. 2000)...........................................................1

*Bryant v. Waste Management, Inc.,*
   342 S.C. 159, 536 S.E.2d 380, 386 (S.C. App. 2000) ....................................37

*Carlin v. Superior Court,*
   13 C.4th 1104, 56 C.R.2d 162, 920 P.2d 1347 (1996) ...............................16, 17

*Caraker v. Sandoz Pharmaceuticals Corp.,*
   172 F.Supp.2d 1018, 1030 ( S.D.Ill. 2001).................................................26

*Cartwright v. Pfizer, Inc.*,
    369 F.Supp.2d 876, 885 (E.D. Tex. 2005) .......................................................32

*Clark v. Cantrell*,
    339 S.C. 369, 378, 529 S.E.2d 528, 533 (2000) ..............................................39

*Coffel v. Stryker Corp.*,
    284 F.3d 625, 630 (5th Cir. 2002) ..................................................................1

*Curtis v. M&S Petroleum, Inc.*,
    174 F.3d 661, 670 (5th Cir. 1999) ..................................................................10

*Desiano v. Warner-Lambert & Co.*,
    --- F.3d ----, 2006 WL 2846454, FN9, C.A.2 (N.Y.), (October 05, 2006) .......32

*Doe v. Miles Lab., Inc.*,
    927 F.2d 187 (4th Cir. 1991) ....................................................................17, 18

*Ellis v. Weasler Eng'g Inc.*,
    258 F.3d 326, 337 (5th Cir. 2001) ..................................................................1

*Feldman v. Lederle Laboratories*,
    125 N.J. 117, 147, 592 A.2d 1176, 1192 (1991)..............................................32

*Finn v. G. D. Searle & Co.*,
    35 Cal. 3d 691, 701 (Cal. 1984) ......................................................................18

*Flowers v. S. Reg'l Physician Servs.*,
    247 F.3d 229, 235 (5th Cir. 2001) ..................................................................1

*Gardner v. Q.H.S., Inc.*,
    448 F.2d 238 (4th Cir. 1971) ..........................................................................19

*Hackett v. G.D.Searle & Co.*,
    246 F.Supp.2d 591, 595 (W.D. Tex. 2002) .............................................15, 16

*Hermes v. Pfizer, Inc.*,
    848 F.2d 66, 69-70 (5th Cir. 1988) ...........................................................28, 29

*Hopkins v. Dow Corning*,
    33 F.3d 1116, 1124-25 (9th Cir. 1994)…………………………………………7

*In re: Propulsid Products Liability Litigation*,
    261 F.Supp.2d 603, 618 (E.D. La. 2003) ........................................................4

*In Re: Propulsid Products Liability Litigation*,
  Not Reported in F.Supp.2d, 2003 WL 22023398, *4, E.D.La., (March 11, 2003)............17

*In re Rezulin Prods. Liab. Litig.*,
  331 F. Supp. 2d 196, 200 (S.D.N.Y. (2004) ....................................................18

*Incollingo v. Ewing*,
  444 Pa. 263, 282 A.2d 206 (1971) ..........................................................26, 29

*Jackson v. Pfizer, Inc.*,
  432 F.Supp.2d 964 (D. Neb. 2006) ...............................................................32

*Krasnopolsky v. Warner-Lambert Co.*,
  799 F.Supp. 1342, 1345-46 (E.D.N.Y. 1992) ...................................................19

*Little v. Brown & Williamson Tobacco Corp.*,
  243 F. Supp. 2d 480, 498 (M.S.C. 2001) ....................................................2, 17

*Livingston v. Noland Corp.*,
  293 S.C. 521, 525, 362 S.E.2d 16 (S.C. 1987) ................................................18

*Magistrini v. One Hour Martinizing Dry Cleaning*,
  180 F.Supp.2d 584, 610 (D. N. J.2002) ........................................................20

*Martin v. Hacker*,
  83 N.Y.2d 1, 11, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (1993)...........................19

*Maurer v. Heyer-Schulte Corp.*,
  2002 WL 31819160, E.D. La., (December 13, 2002) ..........................................6

*Mazur v. Merck & Co., Inc.*.
  742 F.Supp. 239, 247 (E.D. Pa. 1990) ..........................................................32

*McClain v. Metabolife Intern., Inc.*,
  401 F.3d 1233,1242-1243 (11th Cir. 2005) .................................................4, 10

*McNeil v. Wyeth*,
  462 F.3d 364, 368-374 (5th Cir. 2006) ....................................................20, 29

*McNellis ex rel DeAngelis v. Pfizer, Inc., Slip Copy*,
  2006 WL 2819046, D.N.J., (September 29, 2006) ............................................32

*McDonnell v. Chelsea Mfrs., Inc.*,
  259 A.D.2d 674, 676, 687 N.Y.S.2d 172, 1999 N.Y. Slip Op. 02491
  (N.Y.A.D. 2 Dept. 1999)..............................................................................19

*Medalen v. Tiger Drylac U.S.A., Inc.,*
  269 F.Supp.2d 1118, 1133 (D. Minn. 2003) ...................................................11

*Metabolife Intern., Inc. v. Wornick,*
  264 F.3d 832 (9th Cir. 2001) ..........................................................................7

*Moore v. Ashland Chem. Ins.,*
  151 F.3d 269, 278 (5th Cir.1998) ..................................................................10

*Nat'l Bank of Commerce of El Dorado v. Associated Milk Producers, Inc.,*
  22 F.Supp.2d 942, 952 (E.D. Ark. 1998) .......................................................11

*Nobles v. Astrazeneca Pharmaceuticals,*
  48 Conn.Supp. 134, 832 A.2d 1241, 1242-1243 (Conn.Super. 2003) .............26

*Odom v. G.D. Searle & Co.,*
  979 F.2d 1001, 1003 (4th Cir. 1992) .............................................................24

*Ohio v. U.S. Dept. of Interior,*
  880 F.2d 432, 473 (D.C. Cir. 1989) ...............................................................10

*Omnitech Int'l, Inc. v. Clorox Co.,*
  11 F.3d 1316, 1322 (5th Cir. 1994) .................................................................1

*Reeves v. Sanderson Plumbing Prods., Inc.,*
  530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) .............................1

*Rife v. Hitachi Const. Machinery Co., Ltd.,*
  363 S.C. 209, 215, 609 S.E.2d 565, 569 (S.C. App. 2005) .............................17

*Ruff v. Ensign-Bickford Indus., Inc.,*
  168 F.Supp.2d 1271, (D. Utah 2001) ..............................................................7

*Salmon v. Parke Davis & Co.,*
  520 F.2d 1359, 1363 (4th Cir. 1975)  ......................................................26, 29

*Stahl v. Novartis Pharms. Corp.,*
  283 F.3d 254, 267 (5th Cir. 2002) .................................................................19

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
  538 U.S. 408, 123 S. Ct. 1513 (2003) ...........................................................36

*Stevens v. Parke, Davis & Company,*
  9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 53, 507 P.2d 653, 661 (1973) ..............26, 29

*Talkington v. Atria Reclamelucifers Fabrieken BV*,
    152 F.3d 254, 261-262. (4th Cir. 1998) ........................................................................18

*Tatum v. Schering Corp.*,
    795 F.2d 925, 928-929 (11th Cir. 1986) ......................................................................24

*Thomas v. Hoffman-LaRoche, Inc.*,
    949 F.2d 806, 812 (5th Cir. 1992) ................................................................................37

*Timm v. Upjohn Co.*,
    624 F.2d 536 (5th Cir. 1980)…………………………………………………….…... 24

*Turner v. Iowa Fire Equipment Co.*,
    229 F.3d 1202, 1208 (8th Cir.2000) ............................................................................11

*WadeGreaux v. Whitehall Lab. Inc.*,
    874 F.Supp. 1441, 1480 (D.Vi. 1994) ...........................................................................6

*Wheat v. Pfizer, Inc.*,
    31 F.3d 340, 342-43 (5th Cir. 1994) ...........................................................................10

*White v. Ford*,
    312 F.3d 998, 1014 (9th Cir. 2002) .............................................................................38

*Whitley v. Cubberly*,
    24 N.C.App. 204, 210 S.E.2d 289, 207-208 (1974) ....................................................29

*Witczak v. Pfizer, Inc.*,
    377 F.Supp.2d 726, 728-30 (D. Minn. 2005)...............................................................32

*Woodbury v. Janssen Pharmaceutica, Inc.*,
    1997 WL 201571*8 (N.D.Ill. 1997) ............................................................................19

## <u>STATUTES</u>

63 Fed.Reg. 66378, 66384 (Dec. 1, 1998) ......................................................................32

65 Fed.Reg. 81082, 81103 (Dec. 22, 2000) ....................................................................32

71 Fed. Reg. at 3923-35 ....................................................................................................31

## <u>OTHER</u>

Reference Manual on Scientific Evidence 2nd Ed. (FJC 2000) ......................................7

Restatement (Second) of Torts § 431 (1965) ...........................................................2, 15

http://www.census.gov/population/cen2000/phc-t2/tab01.pdf …………………………....38

## <u>TABLE OF CONTENTS</u>

I.    THE LEGAL STANDARD FOR JUDGMENT AS A MATTER OF LAW
      UNDER RULE 50(B)……………………………………………………..…1

II.   THE JURY'S FINDINGS ON CAUSATION WERE REASONABLE, AND BASED
      UPON MORE THAN LEGALLY SUFFICIENT EVIDENTIARY BASIS. ……….…1

      A.    Plaintiff Introduced Significant and Scientifically Reliable Evidence of
            General Causation. ...................................................................................1

            1.    Plaintiff's Experts Offered More Than Sufficient Evidence to Show an
                  Association Between Vioxx at the 25 mg Dose and an Increased Risk of
                  Cardiovascular Events…………………………………………………2

            2.    Plaintiff Affirmatively Demonstrated the Mechanism by which
                  Vioxx Accelerates Atherosclerosis. ………………………………………4

                  a.   Plaintiff Offered Significant and Substantial Evidence to Show that
                       Vioxx Accelerates Atherosclerosis. ………………………………5

                  b.   The Articles Used by Dr. Zipes are Scientifically Reliable Evidence
                       that Vioxx Accelerates Atherosclerosis. ...............................................8

                  c.   Dr. Zipes Thoroughly Reviewed the Literature. .................................9

      B.    Plaintiff Introduced Significant and Scientifically Reliable Evidence of
            Specific Causation. . ...................................................................................10

            1.    Plaintiff's Experts Effectively Ruled Out Possible Risk Factors as a Cause
                  of His Heart Attack and Subsequent Injuries. ...........................................11

            2.    Vioxx Was Shown to be the Most Probable Cause of the Plaintiff's
                  Heart Attack and Subsequent Injuries........................................................14

III.  THE JURY'S FINDINGS ON THE NEGLIGENT FAILURE-TO-WARN AND
      DECEIT-BY-CONCEALMENT CLAIMS WERE REASONABLE, AND BASED
      UPON MORE THAN LEGALLY SUFFICIENT EVIDENTIARY BASIS. …………   15

      A.    Plaintiffs Negligence Claim, Which Is a Separate and Distinct Cause of
            Action From Strict Liability, Was Proven By a Preponderance
            of the Evidence. . ...................................................................................15

            1.    The Nature And Extent of the Risks of Vioxx Which Merck Should
                  Have Conveyed to Plaintiff's Prescribing Physicians Were Known and
                  Knowable to Merck, and Were Neither Uncertain Nor Unproven. ...........18

2. Knowledge of a Risk Associated with a Drug Does Not Absolve a Manufacturer of Liability, Where, As Here, the Warnings Are Inadequate. .......................................................................24

3. The Evidence, Both Subjective and Objective, Establishes That Had Merck Provided an Adequate Warning, Dr. Mikola Would Not Have Prescribed Vioxx and Mr. Barnett Would Not Have Continued to Take Vioxx. ........................................................................27

B. Merck's Argument Regarding Plaintiff's Deceit Claim Fails for the Same Reasons. .................................................................................31

C. Plaintiff's Claims Are Not Preempted by Federal Law. ..........................................31

D. Plaintiff Presented More Than Sufficient Evidence of Causation. .......................32

E. The Evidence Was More Than Sufficient To Support  Punitive Damages. ..........33

IV. CONCLUSION ..................................................................................................40

**INTRODUCTION**

**I.    THE LEGAL STANDARD FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(B)**

"Although our review is de novo, … our standard of review with respect to a jury verdict is especially deferential." *Flowers v. S. Reg'l Physicians Servs.*, 247 F.3d (5th Cir. 2001) at 235 (internal quotations omitted) (quoting *Brown v. Bryan County, Okla*, 219 F.3d 450 at 456 (5th Cir. 2000). Therefore, judgment as a matter of law should only be granted if "the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Id*. (internal quotations omitted) (quoting *Omnitech Int'l, Inc. v. Clorox Co.,* 11 F.3d 1316, 1322 (5th Cir.1994).)  *Coffel v. Stryker Corp.*, 284 F.3d 625, 630 (5th Cir. 2002)…"'… Moreover, in entertaining a Rule 50 motion, the court "must review all of the evidence in the record, draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh the evidence." *Ellis v. Weasler Eng'g Inc*., 258 F.3d 326, 337 (5th Cir. 2001) (citing *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).)  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  In reviewing the record as a whole, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 630-631.

**II.    THE JURY'S FINDINGS ON CAUSATION WERE REASONABLE, AND BASED UPON MORE THAN LEGALLY SUFFICIENT EVIDENTIARY BASIS.**

   **A.    Plaintiff Introduced Significant and Scientifically Reliable Evidence of General Causation.**

Merck contends that there is no legally sufficient evidence to show that Vioxx was the

proximate cause of Mr. Barnett's injuries.[1] Merck argues that the Plaintiff failed to satisfy his burden to prove general causation because he "introduced no relevant and reliable studies to show that use of Vioxx at the 25mg dose causes heart attacks," and that he did not prove a biologically plausible mechanism by which Vioxx caused his injuries.

However, the evidence in the record supports the jury's findings and demonstrates that Vioxx causes heart attacks and rapid progression of atherosclerosis. Plaintiff's experts cited to numerous studies, both human as well as animal, and data from clinical trials, yet Merck offered not a single retained expert witness in response. (Drs. Karavan and Bryan concededly were not knowledgeable about the Vioxx science.) In fact, Merck's witness, Dr. Reicin admitted that APPROVe showed an excess of thrombotic events at 18 months or longer, (8/14/06 Tr. at 2354:22-2355:1) and the Plaintiff used Vioxx for 31 months before his first heart attack, and another 24 months thereafter.

> 1.   **Plaintiff's Experts Offered More Than Sufficient Evidence to Show an Association Between Vioxx at the 25 mg Dose and an Increased Risk of Cardiovascular Events.**

Through the testimony of his causation experts, Dr. Zipes and Dr. Avorn, the Plaintiff proved that Vioxx causes an increased risk of heart attacks.  Merck contends that Plaintiff's proof is scientifically unreliable because the experts could point to only one study (APPROVe) that shows an

---

[1] Merck is correct that under Restatement (Second) of Torts § 431 (1965), "[t]he actor's negligent conduct is a legal cause of harm to another if . . . his conduct is a substantial factor in bringing about the harm . . . ." However, the substantial factor test does not require absolute certainty nor proof beyond a reasonable doubt.  'The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, …" Restatement 2d Torts 431, Comment a. As stated by Merck in its Memorandum Addressing Applicable South Carolina Law filed 5/17/06:  "When there are several alleged - or possible - causes of an injury, a defendant is not relieved from liability because it is responsible for only one of those causes.) *Little v. Brown & Williamson Tobacco Corp.*, 243 F. Supp. 2d 480, 498 (M.S.C. 2001)  Plaintiffs can recover if they show that the defendant's conduct was an "efficient cause" that contributed to the injury. Id. Thus, under South Carolina law, "the defendant's conduct can be a proximate cause if it was at least one of the direct, concurring causes of the injury." Small, 494 S.E.2d at 843."

increase in cardiovascular events. Merck concedes that APPROVe is a statistically significant, placebo controlled, clinical trial, yet discounts this evidence by saying Dr. Moye suggested "one study is not enough." Motion at 6. However, Merck ignores Dr. Moye's testimony that recently the FDA has decided that "if they have one good, large and well-designed, well-executed, well-analyzed confirmation study, that will be enough." (8/3/06 Tr. at 778:20-23.)

Standing alone, APPROVe is statistically significant, scientifically reliable evidence that Vioxx causes cardiovascular events at the 25 mg dose. Nevertheless, Dr. Zipes also relied upon statistically significant evidence from the Alzheimer's trials. He explained that often in people with Alzheimer's the first manifestation of heart attack is sudden death, so there is good reason to combine the two endpoints of sudden death and heart attack. Once combined, the relative risk becomes 1.89, which is statistically significant. (8/8/06 Tr. at 1713:23-1714:20.) In addition to epidemiological data from various clinical studies, Dr. Zipes relied upon the Plaintiff's medical records and the results of the 2005 FDA Advisory Committee, wherein 32 independent scientists reviewed clinical data and unanimously concluded that Vioxx causes an increase in cardiovascular events. (8/8/06 Tr. at 1666:11-1667:6.)

Dr. Avorn testified about how the results of VIGOR study showed a five-fold increased risk of heart attack with Vioxx versus naproxen, (8/1/06 Tr. at 295:23-297:14) and why Merck's theory that naproxen is cardioprotective does not explain a five-fold increase. (*Id.* at 323:22-324:18.) Dr. Avorn testified that in his own study he found an increased risk of MI in people taking regular doses of Vioxx, (*Id.* at 336:5-336:14) and that the FDA medical reviewer cited several studies that suggest trends toward higher rates of myocardial infarction with Vioxx, even with lower doses of Vioxx or shorter duration. (*Id.* at 373:10-374:6.) The ADVANTAGE trial showed an increased risk of heart attack on Vioxx, (*Id.* at 367:16-20) as did Study 090 (*Id.* at 367:23-368:9.) In the Alzheimer's trials,

the number of cardiac deaths on Vioxx was "striking" (*Id.* at 378:25-379:5), and even Merck's own internal meta-analysis conducted by Dr. Shapiro showed an increased risk of heart attack on Vioxx. (*Id.* at 559:7-561:4.)  From all of this evidence, it was more than reasonable for a jury to conclude that Vioxx causes an increase of cardiovascular events at the 25 mg dose.

**2.    Plaintiff Affirmatively Demonstrated the Mechanism by which Vioxx Accelerates Atherosclerosis.**

Merck contends that Plaintiff presented no evidence of any biologically plausible mechanism by which Vioxx could accelerate atherosclerosis. First of all, the cases relied upon by Merck are readily distinguishable in that they all addressed obvious failures of proof. *Black v. Food Lion, Inc*., 171 F.3d 308, 313 (5th Cir. 1999) (Expert's testimony that customer's fall caused hormonal damage leading to fibromyalgia was not sufficiently reliable where neither expert nor medical science knew exact process that resulted in fibromyalgia, and expert testified, "I didn't find the cause. I found an event that contributed to the development of the symptom. I did not find the cause."); *McClain v. Metabolife Intern., Inc*., 401 F.3d 1233, 1242-1243 (11th Cir. 2005)(Expert had no opinion as to dose that could would cause injury. "He only said that any amount of Metabolife is too much, which clearly contradicts the principles of reliable methodology…."  "He offered no epidemiological data. He offered no clinical trials. He offered no animal studies to support his opinions." *Id.* at 1251.); *In re: Propulsid Products Liability Litigation*, 261 F.Supp.2d 603, 618 (E.D.La.2003)(Experts admitted they did not know how or why the drug allegedly caused the effect, and had no evidence that the plaintiff did not have the condition prior to taking the drug. *Id*. at 615-616.)

The experts here provided reliable and compelling explanations of how Mr. Barnett's use of Vioxx caused his extensive cardiac injuries. Dr. Zipes demonstrated - unrebutted by any defense expert opinion to the contrary - the mechanism by which Vioxx caused Mr. Barnett's rapid

4

progression of atherosclerosis.    Based upon vast clinical experience as well as hundreds of hours reviewing materials regarding Vioxx and Cox-2 inhibition (8/8/06 Tr. at 1654:7-17), Dr. Zipes explained that Vioxx prevents the development of prostacyclin, creating an imbalance favoring thromboxane, leading to vasoconstriction, platelet clumping, narrowing of the artery and eventual heart attack.  Because of the imbalance, cells will tend to adhere to an injury in the blood vessel, causing an increase in platelet migration to that area, which in turn causes an acceleration of plaque build-up.  (*Id*. at 1677:9-1679:2; 1679:10-1680:12.)  In his testimony regarding the APPROVe follow-up data, Zipes described how the acceleration of atherosclerosis can affect a person even after Vioxx use is discontinued.   In essence, the damage done to the artery, or the plaque that has accumulated within the artery during the time that a person was on Vioxx remains, putting the person at greater risk for a thrombotic event.  (*Id.* Tr. at 1700:21-1701:17.)

> a.    **Plaintiff Offered Significant and Substantial Evidence to Show that Vioxx Accelerates Atherosclerosis.**

Dr. Zipes explained the body of evidence which demonstrates that Vioxx accelerates atherosclerosis. This includes human data from Merck's own clinical trials and the APPROVe follow-up data, as well as the Alzheimer's data from study 078 described in the *Thal* article. Both of these studies were in humans and showed that Vioxx continued to increase the risk of cardiovascular events even after discontinuation of the drug, which is best explained by the acceleration of atherosclerosis while the person was on the drug.  As discussed by Merck's own consultant, Dr. FitzGerald, "Patients in the APPROVe study should continue to be followed. This will allow some estimate of how quickly the developed risk may dissipate given the relatively short-half lives of these compounds.  Such dissipation may occur rapidly.  On the other hand, if treatment accelerates atherosclerosis, the offset of the risk may be more gradual."

Indeed, as described by Dr. Zipes, the APPROVe follow-up date proved exactly the prediction provided by Dr. FitzGerald, namely that the risk dissipates gradually after discontinuation of the drug.  (8/8/06 Tr. at 1700:18 – 1704:23; 1713:21 – 1714:20; 8/10/06 Tr. at 1857:1-8; 1861:1-12; 1863:7 – 1864:10; 1867:19-25.)  Protocol 112 also provides evidence that Vioxx increases cardiovascular risk by showing that in a comparison between Celebrex and other NSAIDs, Vioxx caused a greater increase in blood pressure than the other drugs. (8/8/06 Tr. at 1709:24-1710:24.)

In addition to data involving humans, Dr. Zipes also relied upon animal studies which provide "an understanding of mechanisms that help us interpret clinical information."  (*Id.* at 1793:9-10.)  Ignoring all of the human data relied upon by Plaintiff's experts, Merck contends that "animal studies cannot establish causation in humans."  However, two of the cases cited by Merck involved animal studies which were themselves unreliable. See *Allen v. Pennsylvania Eng'g Corp.,* 102 F.3d 194 (5th Cir. 1996) (Affirming exclusion where the animal studies themselves were inconclusive and unreliable, (*Id.* at 195) and there were numerous contrary reputable epidemiological studies. (*Id.* at 197.); *Brock v. Merrell Dow Pharmaceuticals, Inc*., 874 F.2d 307, 313 (5th Cir. 1989)("We need not address at length the animal studies presented by plaintiffs below, except to note several of the more important studies and their methodological flaws." *Id.* at 313.) The other cases involved unique case-specific problems not present here. *Maurer v. Heyer-Schulte Corp.*, 2002 WL 31819160, E.D. La., December 13, 2002 (Summary judgment granted where the only scientific support was an FDA report regarding effect of chemical on rats.); (*Wade-Greaux v. Whitehall Lab. Inc.,* 874 F.Supp. 1441, 1480 (D.Vi. 1994), *aff'd* 46 F.3d 1120 (3d Cir.1994) (Summary judgment in action alleging birth defects where Plaintiff's expert had testified in other litigation that "because so many substances are teratogenic in animals, before you can make a conclusion that a substance is teratogenic in humans, you must

6

look to the human data." *Id.* at 1483.)

Despite these limited factual scenarios, use of animal studies is an accepted and reliable methodology. See *e.g.* Reference Manual on Scientific Evidence 2d Ed. FJC 2000, 345-346.  Blanket arguments against animal studies like Merck is making here were rejected by the court in *Metabolife Intern., Inc. v. Wornick*, 264 F.3d 832, 842 (9th Cir. 2001):

> "First, *Daubert II* itself recognized that animal studies are not per se inadmissible and should be subjected to substantive analysis, just like other scientific evidence. … None of these cases holds that animal studies will always be too unreliable to provide admissible evidence about human health issues. Notwithstanding the moral and ethical problems often surrounding animal studies, in some circumstances they provide useful data about human health. The district court erred in rejecting the animal studies proffered by Metabolife merely because of the species gap." *Id.* at 842..

Large-scale epidemiological studies are not essential to the formation of an expert opinion as to causation. See *Bonner v. ISP Tech., Inc.,* 259 F.3d 924, 929 (8th Cir. 2001); *Brasher v. Sandoz Pharm. Corp.,* 160 F.Supp.2d 1291, 1296-98 (N.D. Ala. 2001; *Ruff v. Ensign-Bickford Indus., Inc.,* 168 F.Supp.2d 1271 (D. Utah 2001). See also *Hopkins v. Dow Corning,* 33 F.3d 1116, 1124-25 (9th Cir.1994), *cert. denied,* 513 U.S. 1082, 115 S.Ct. 734, 130 L.Ed.2d 637 (1995).

Even ignoring the studies and data involving humans upon which Dr. Zipes relied, the animal studies show compelling proof that Vioxx accelerates atherosclerosis.  Genetic alteration allows scientists to closely mimic the conditions of a human heart under the influence of Cox-2s, thereby providing reliable predictors of the mechanism by which Vioxx accelerates atherosclerosis.  Dr. Epstein testified that animal studies are relevant to the human situation, (8/5/06 Tr. at 1176:13-16) and that his animal study raised a yellow flag for Merck that Vioxx causes accelerated atherosclerosis.  (*Id.* at 1201:19-25.)  Dr. Zipes opined that animal studies help to explain the mechanism by which Vioxx causes heart attacks.  (8/8/06 Tr. at 1686:21-1687:1.)  Dr. Epstein

explained that in his study he used an analog of Vioxx called MF-Tricyclic because it shares so much

of the same structure, and has similar biologic activity.  (8/5/06 Tr. at 1184:6-23.)

> **b.**    **The Articles Used by Dr. Zipes are Scientifically Reliable Evidence that Vioxx Accelerates Atherosclerosis.**

Merck refers to an Egan study (Circulation 2005) and argues that it does not show that Vioxx

accelerates atherosclerosis.  Motion at 11-12. Because this study is not in the record, Merck's

argument is patently meritless. Zipes testified about another study conducted by Egan (Science

2004), in which the authors conclude that the synthesis of prostacyclin, along with estrogen, plays a

role in protecting female mice from developing atherosclerosis. Therefore, by inhibiting prostacyclin,

Vioxx contributes to the development of atherosclerosis.  (8/8/06 Tr. at 1695:19-1697:10.)

Merck objects to parts of the Rudic article.  Motion at 12.  However, the particulars of this

second experiment were not specifically discussed in Dr. Zipes testimony and are not contained

within the record. Dr. Zipes briefly explained the parameters and results of the Rudic study on direct

examination, and on cross-examination was asked only about whether the study involved Vioxx and

whether it examined acceleration of atherosclerosis.  (8/8/06 Tr. at 1690:23-1692:3; 1834:24-

1835:15.) This article was not admitted into evidence, and Merck's arguments go beyond any

testimony in the record.  Dr. Zipes explained that nimesulide, a Cox-2 inhibitor like Vioxx,

diminished the prostacyclin within the arteries of mice and effected a change in the inner wall of the

arteries by increasing the number of smooth muscle cells.  He explained that this increase is "part

and parcel of the artery wall that can go on to the development of atherosclerosis." (*Id.* at 1691:8-

1692:3.)  This article is further evidence that the inhibition of Cox-2 has a direct effect on the

progression of atherosclerosis.  Next, Merck refers to an article by Cheng (Science 2002), which

again was not discussed in Dr. Zipes testimony, and which is not within the trial record.  Merck also

argues that the Antman article does not support Plaintiff's theory because it is a review article. Motion at 13.  However, it is a peer-reviewed publication, was not prepared for litigation, (*Id.* at 1684:8-13), and is in accord with independent articles. (*Id.* at 1792:22-25.)

Contrary to Merck's assertion, the articles relied upon by Dr. Zipes provide substantial evidence that the damage caused by Vioxx can have lasting effects. Moreover, Merck did not offer a single expert witness to refute Dr. Zipes' conclusions and methodology, nor the studies and literature upon which they were based. Merck instead relied, as it does here, upon argument of counsel.

### c.     Dr. Zipes Thoroughly Reviewed the Literature.

Merck contends that Dr. Zipes "inexplicably dismissed" various studies that did not clearly show that Vioxx causes acceleration of atherosclerosis.  Motion at 13.  This is not the case.  Dr. Zipes spent between 300 and 400 hours reviewing Vioxx related materials, including hundreds of published articles, and conducted extensive review of the basic and clinical literature. (8/8/06 Tr. at 1654:7-20.)  In fact, as Merck points out in its brief, Dr. Zipes does not dismiss these articles, but readily acknowledged their existence.  He discussed how Pratico disputed the concept of accelerated atherosclerosis in earlier literature, but that the author recently showed he is changing this opinion. (*Id*. Tr. at 1693:10-1694:4.)  Further, he had read and was able to explain why the Burleigh articles were not relevant.  (8/10/06 Tr. at 1838:9-19 and 1842:12.)

Dr. Zipes did not "dismiss" the studies such as Bogaty (Circulation 2004), as Merck suggests, because the findings were opposite to Plaintiff's theory of acceleration of atherosclerosis.  Instead, he testified that the results of the studies are skewed because the patients enrolled were taking low-dose aspirin, thus masking the effects of unopposed thromboxane on the development of atherosclerosis, since aspirin acts in a manner similar to prostacyclin.  (*Id.* at 1921:13-14 and 1923:11-16.) Despite the difference in some of the studies, accelerated atherosclerosis is proven by both the

clinical data as well as the animal studies Dr. Zipes reviewed.  (8/8/06 Tr. at 1692:25-1693:7.)

     **B.**     **Plaintiff Introduced Significant and Scientifically Reliable Evidence of Specific Causation.**

Merck argues that "[t]he specific causation opinion Dr. Zipes offered amounts to nothing more than a temporal proximity argument."  Motion at 15.  The cases relied upon by Merck are either completely off point (*Ohio v. U.S. Dept. of Interior*, 880 F.2d 432, 473 (D.C. Cir. 1989) (criteria for determining whether oil spills and hazardous substance releases caused injury to natural resources), or involved obvious flaws in the experts' methodologies. *E.g. McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1242-1243 (11th Cir. 2005)(Plaintiffs' expert had no opinion about dose that could would cause injury.)("He only said that any amount of Metabolife is too much, which clearly contradicts the principles of reliable methodology…."); *Moore v. Ashland Chem. Ins.,* 151 F.3d 269, 278 (5th Cir. 1998)(Expert relied solely upon Material Safety Data Sheet from the manufacturer stating that the contents of the drum in question were 'irritating to the lungs.') See also, *Curtis v. M&S Petroleum*, Inc., 174 F.3d 661, 670 (5th Cir. 1999), distinguishing *Moore*, supra. (Trial court abused its discretion in excluding the plaintiffs' expert's specific causation opinion.)("[A] temporal connection is entitled to greater weight when there is an established scientific connection between exposure and illness or other circumstantial evidence supporting the causal link.")

Moreover, the cases cited by Merck almost all involved situations where the experts could not even 'rule in' the defendant's product, let alone 'rule out' other more likely causes. *E.g. Wheat v. Pfizer, Inc*., 31 F.3d 340, 342-43 (5th Cir. 1994) (Despite evidence that the decedent had been exposed to hepatitis, and testimony by her treating physicians that she had a viral hepatitis unrelated to medication, plaintiffs offered no evidence or expert testimony excluding it as a cause. *Id.* at 342-

343.); *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F.Supp.2d 1118, 1133 (D. Minn.2003) (Expert conceded he was aware of no published literature supporting his opinion on causation and could not 'rule in' the defendant's products.); *Nat'l Bank of Commerce of El Dorado v. Associated Milk Producers, Inc.*, 22 F.Supp.2d 942, 952 (E.D. Ark.1998)("[E]xperts must turn to epidemiological studies, in vitro studies, animal studies, and other indirect methods in an attempt to make the connection. FN5 Here, there are no such studies." *Id.* at 952.); *Turner v. Iowa Fire Equipment Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000)(Physician "admitted that he made no attempt to consider all the possible causes, or to exclude each potential cause until only one remained, or to consider which of two or more non-excludable causes was the more likely to have caused the condition." *Id.* at 1208.); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F.Supp.2d 584, 610 (D. N.J. 2002)(Expert offered no reliable methodology for ruling out alternative causes, and defendant presented testimony of experts demonstrating that smoking was a greater risk factor for leukemia than PCE exposure.)

Unlike the cases cited by Merck, Plaintiff's experts provided substantial reliable scientific evidence of both general and specific causation.  Plaintiff's experts were able not only to 'rule in' Vioxx as the most probable cause of Mr. Barnett's heart attack and increased atherosclerosis, but to rule out each of the other 'possible' causes which Merck has alleged.

    **1.**    **Plaintiff's Experts Effectively Ruled Out Possible Risk Factors as a Cause of His Heart Attack and Subsequent Injuries.**

In January 2000, approximately two weeks after starting Vioxx, Mr. Barnett had a Cardiolite stress test showing mild lateral wall ischemia. The coronary artery disease from which he suffered was of a mild degree, and placed him at only a 1-2% risk of having a future heart attack.  (8/8/06 Tr. at 1716:3-1717:1.)  However, just 31 months later he suffered a heart attack and developed multi-vessel coronary disease.  According to Dr. Zipes, this rapid progression of CAD and heart attack was

11

a very unusual occurrence for someone in Mr. Barnett's medical condition. (*Id.* at 1715:20-25.) Dr. Popma agreed. (8/7/06 Tr. at 1396:23.)

Plaintiffs' experts both took into account the Plaintiff's age, family history, high cholesterol, stress, gender and exposure to secondhand smoke. Dr. Popma explained that some risk factors are modifiable, such as high cholesterol, stress and exposure to secondhand smoke, while others, such as age, family history and gender are not modifiable risk factors. (*Id.* at 1329:19-1330:1.)  Yet neither type of risk factor could have explained the type of injuries that the Plaintiff experienced.  As to modifiable risk factors, Dr. Karavan testified that Mr. Barnett was in the top 1% of his patients in terms of his vigilance in modifying risk factors.  According to Dr. Karavan, "Mr. Barnett's always been very aggressive with risk factor modification."  (8/4/06 Tr. at 1028:5-6; 8/5/06 Tr. at 1153:7-10.)  He had engaged in strict medical management of his cholesterol by taking Lipitor, and brought his LDL levels down to the range of 100 during the time frame of 2000 to 2002.  (8/7/06 Tr. at 1495:5-9.)  Dr. Popma explained that by bringing down his LDL levels he was lowering his risk of heart attack to the point where his cholesterol could not have caused the type of accelerated plaque progression seen in 2002.  (*Id.* at 1360:11-17.) ("it should markedly slow the rate of progression by having this LDL cholesterol the way it was.")

Even after his heart attack and bypass surgery, Mr. Barnett continued to lower his LDL levels down to below the 100 range, the point at which Dr. Popma expected to see a freeze or regression in plaque build-up. Instead, the angiogram in July 2006 revealed further blockages of the arteries, causing vein graft occlusions.  (*Id.* at 1387:9-11; 1389:7-9.) ("And this is at a time when, at least the amount of data we have available, the plaque should be getting – regressing, going away.")

The Plaintiff's experts were also able to rule out stress and exposure to secondhand smoke as contributors to Mr. Barnett's heart attack and subsequent injuries.  Dr. Zipes testified that if stress

12

from being an FBI Agent for almost 30 years or from his wife's diagnosis of cancer was a possible source of his decline in cardiac health, then more plaque build-up would have been visible on Mr. Barnett's January 2000 Cardiolite test.  (8/8/06 Tr. at 1735:1-6.)  Dr. Karavan noted that stress is not a major risk factor.  (8/4/06 Tr. at 1143:16-17.)  Dr. Popma testified that it has not been proven that secondhand smoke has a negative effect.  (8/7/06 Tr. at 1429:13-16.)  Both Mr. Barnett and Mrs. Barnett testified that the Plaintiff did not like to be around the smoke, and required Mrs. Barnett to smoke outside of the house out of his presence.  (*Id*. at 1534:3-1535:1; 1542:17-1543:2.) Stress and secondhand smoke were nominal, if not nonexistent risk factors, and could not have been the cause of the extreme amount of plaque build-up that Mr. Barnett experienced in such a short time.

While discussing age as a risk factor, Dr. Popma cited a study by Nissen, which showed that by age 50 men have an 85% chance of having atherosclerotic narrowings in their blood vessels. (*Id*. at 1339:4-10.)  However, Dr. Popma distinguished this study, saying, "but many of these patients [in the study] didn't have Mr. Barnett's exercise test," referring to the results of mild ischemia on the Plaintiff's January 24, 2000 Cardiolite exam.  (*Id*. at 1405:6-7.)  Furthermore, while Mr. Barnett may have been at a greater risk for heart disease because he was over 50 at the time of his heart attack, Dr. Popma testified that the Plaintiff had only had a short six years for the risk factors that come along with age, such as cholesterol build-up, to take effect.  (*Id*. at 1406:1-7.)

As with age, Dr. Popma discussed how Mr. Barnett's unclear family history does not sufficiently explain Mr. Barnett's injuries.  Merck first cites to Mr. Barnett's father's cardiac history as having predisposed Mr. Barnett to the type of damage he experienced.  However, Plaintiff's father did not modify his risk factors.  He was overweight, did not watch his diet, exercise or take cholesterol lowering medications. (*Id*. at 1501:18-1502:11.)  Furthermore, it is not clear how many heart attacks the Plaintiff's father had, or how old he was when he had them.  (*Id*. at 1503:18-1504:2;

1407:1-2.)  The Plaintiff recalls that his father may have had two events.  (8/8/06 Tr. at 1596:3-5.)

However, even assuming that Mr. Barnett's father had two events, it is possible that the earlier heart

attack did not occur until age 62, which would not qualify as a risk factor according to the Adult

Treatment Panel Guideline, which sets less than age 55 as a criterion for this risk factor.  (8/7/06 Tr.

at 1407:1-7.)  Merck also contends that the Plaintiff's mother's and sister's history of TIAs is a

contributing factor to Plaintiff's injuries.  A TIA is a neurological, not a cardiac injury, which is

similar to stroke. According to Dr. Karavan, "I don't think stroke had anything to do with his heart

disease, so I don't see the connection with stroke." (8/4/06 Tr. at 1073:14-15.)

All of this evidence was uncontested proof that the alleged risk factors raised by Merck could

be ruled out as causes of Mr. Barnett's heart attack and subsequent injuries

## 2. Vioxx Was Shown to be the Most Probable Cause of the Plaintiff's Heart Attack and Subsequent Injuries.

Dr. Zipes "ruled in" Vioxx as the cause of Mr. Barnett's injuries. (8/8/06 Tr. at 1666:11-

15;1679:11-17; 1716:3-12; 1716:19-1717:1), testifying that even in the presence of risk factors, Mr.

Barnett had only a 1-2% risk of having a heart attack in 2000, and yet once he began taking Vioxx,

his plaque progressed from a mild to severe state in just 31 months.  Contrary to what the defense

argued during the trial, the damages in this case are not limited to a "small heart attack." Mr.

Barnett's heart attack was just the first overt manifestation of the injuries caused by Vioxx that took

him from a favorable cardiac health status with prospects of a full life in 2000, to a dire situation in

2006, in which he now suffers from diffuse coronary disease throughout his heart.  Since his heart

attack in 2002 he has also suffered: a quintuple open-heart CABG surgery; continued rapid

development of plaque; a second heart attack resulting in vein occlusions; another angiogram and

placement of a stent; likelihood of further surgical intervention and a loss of nine to ten years of his

life. Plaintiff's doctors testified as to the difference in Mr. Barnett's present cardiac status and at the time of his heart attack in 2002. In each of Mr. Barnett's various coronary arteries, the plaque burden is worse (8/5/06 Tr. at 1162:23-1163:19), and has shortened his life by 10 years. (8/8/06 Tr. at 1733:24 - 1735:16.)

Vioxx caused a disease process that aggressively occluded Mr. Barnett's arteries, not once, but twice, to the point where he is now at increased risk of future cardiac events requiring surgical intervention, and which can result in premature death. The 2002 heart attack, whether categorized as "small" or otherwise, was only the first conspicuous physical injury. Mr. Barnett then had to undergo a quintuple CABG surgery, which should have resolved his coronary artery disease in light of his continued lowering of his LDL levels. (8/7/06 Tr. at 1385:7-23.) Instead, even after CABG, Mr. Barnett suffered from rapid plaque development again, resulting in occlusion of two grafts as well as two other vessels and his second heart attack. (8/8/06 Tr. at 1723:5-18; 1724:14-1725:20.) Vioxx caused increased plaque burden and decreased exercise tolerance, (8/5/06 Tr. at 1162:23-1163:19; 8/8/06 Tr. at 1727:20-23; 8/7/06 Tr. at 1477:1-1478:6), and Mr. Barnett has had to undergo another angiogram and surgical stenting in one of his grafted vessels. (8/7/06 Tr. at 1481:8-13.)

## III. THE JURY'S FINDINGS ON THE NEGLIGENT FAILURE-TO-WARN AND DECEIT-BY-CONCEALMENT CLAIMS WERE REASONABLE, AND BASED UPON MORE THAN LEGALLY SUFFICIENT EVIDENTIARY BASIS.

### A. Plaintiffs Negligence Claim, Which Is a Separate and Distinct Cause of Action From Strict Liability, Was Proven By a Preponderance of the Evidence.

Arguing that comment k, Restatement (Second) of Torts § 402A "defeats" plaintiff's negligence claim, Merck contends that because "this issue was already tendered" by a strict liability claim for failure to warn "in the circumstances of this case, an independent "negligence" claim was superfluous and should have been dismissed." Merck cites *Hackett v. G.D. Searle & Co.,* 246

F.Supp.2d 591, 595 (W.D. Tex. 2002) for this proposition, as "granting summary judgment on design defect claim in COX-2 prescription drug case involving Celebrex where application of comment k left only a duplicative warning claim." Merck's brief leaves the misimpression that the court in *Hackett* dismissed one failure to warn claim as 'duplicative' or 'superfluous.' In fact, the court in *Hackett* granted partial summary judgment on a 'design defect claim' under comment k. As to the negligence claim, the court granted judgment on the pleadings as to claims Searle "failed to warn *users and consumers of Celebrex and physicians other than Hackett's physician.*"  *Id.* at 594.

As the court in *Hackett* correctly recognized, comment k precludes liability for design defects in prescription drug cases, (". . .Defendants can only be held strictly liable if the drug was *not properly prepared or marketed or accompanied by proper warnings,*"  (*Id.* at 595. Emphasis added.) but it has no effect on other theories of liability. Comment k does not change the standard for determining whether warnings are adequate, nor does it eliminate the manufacturer's duty to exercise reasonable care, nor does it eliminate liability for negligence in *testing, inspection* and *marketing* its products. *Brooks v. Medtronic,* 750 F.2d 1227, 1232 (4th Cir. 1984) (under South Carolina law that pacemakers are unavoidably unsafe products within the scope of comment k) does not hold otherwise. In fact, the plaintiff in *Brooks* had dismissed his negligence claim during deliberations, which the Fourth Circuit noted by saying: "Undoubtedly Brooks and his counsel regretted the decision for it was a misreading of the probable outcome on strict liability." *Id.* at 1230.  The court also commented on the distinction between negligence and strict liability for failure to warn. "[D]uty to warn under breach of warranty, the functional equivalent of strict liability, focuses upon whether the lack of warning rendered the *product* unreasonably dangerous; whereas a manufacturer may be liable in negligence for failure to warn if its *conduct* is unreasonable." *Id.* at FN13.

Merck also cites *Carlin v. Superior Court* (1996) 13 C.4th 1104, 56 C.R.2d 162, 920 P.2d

16

1347, a California Supreme Court case. California has long followed comment k in prescription drug cases and in fact the court in *Carlin* explained in detail that "[f]ailure to warn in strict liability differs markedly from failure to warn in the negligence context." *Id.* at 1112. This Court also noted the distinction under Louisiana law in *In re Propulsid Products Liability Litigation,* Not Reported in F.Supp.2d, 2003 WL 22023398, *4, E.D. La. March 11, 2003:

> "Thus, the design defects and inadequate warnings claims are separable. A finding of liability on one theory does not guarantee or preclude a finding of liability on the other. The required elements of proof are also different and distinct. A warnings claim in a prescription drug case such as this one focuses on whether the defendant adequately warned the plaintiff's doctor of the dangers of the product, while the defective design claim focuses on the actions of the defendant in manufacturing the drug despite alternative designs."

Comment k eliminates design defect claims which are based upon strict liability. It does not, as Merck seems to suggest, merge strict liability for inadequate warnings with negligent failure to warn, nor does it eliminate a negligence claim which includes conduct other than failure to warn. See also *Doe v. Miles Lab Inc.,* 927 F.2d 187 (4th Cir. 1991), also relied upon by Merck. Although the court held summary judgment was proper, and that comment k was applicable to the product (*Id.* at 191), it applied different standards to both the negligence claim and the strict liability claims. *Id.* at 195. Plaintiff's negligence claim is not superfluous, and failure to warn is not, and has never been, 'the only issue on the table.' This is consistent with South Carolina law, which provides that a products liability action may be brought under several theories, including negligence, strict liability, and warranty. *Rife v. Hitachi Const. Machinery Co., Ltd.* (S.C. App. 2005) 363 S.C. 209, 215, 609 S.E.2d 565, 569; *Little v. Brown & Williamson Tobacco Corp*., 243 F.Supp.2d 480 (D. S.C. 2001). Under South Carolina law, a jury finding for the manufacturer on a strict liability claim does not exonerate the manufacturer for a claim based upon negligence. Moreover, negligence may be the broader theory of recovery under the instructions given to the jury, thereby eliminating any claim of

inconsistency. *Talkington v. Atria Reclamelucifers Fabrieken BV,* 152 F.3d 254, 261-262 (4th Cir. 1998), citing and quoting from *Bragg v. Hi-Ranger, Inc.,* 319 S.C. 531, 462 S.E.2d 321 (1995).

> 1.   **The Nature And Extent of the Risks of Vioxx Which Merck Should Have Conveyed to Plaintiff's Prescribing Physicians Were Known and Knowable to Merck, and Were Neither Uncertain Nor Unproven.**

Merck argues that "during the relevant period there was no medical consensus about the cardiovascular risks of Vioxx," and "thus Merck was not required to give warnings of these risks." Once again, the cases Merck cited are not even close to the facts here.  *Doe v. Miles Lab., Inc.,* 927 F.2d 187, 195 n. 32 (4th Cir.1991) (Blood product administered in 1983, when there was no consensus that AIDS was even transmissible by blood and no way to detect contamination. *Id.* at 191, 194.); *In re Rezulin Prods. Liab. Litig*., 331 F. Supp. 2d 196, 200 (S.D.N.Y. 2004) (Plaintiffs who suffered no liver injury alleged manufacturer failed to warn of the risk of liver damage.)

The dicta from *Finn v. G. D. Searle & Co.*, 35 Cal. 3d 691, 701 (Cal. 1984), which says that "[k]nowledge of a potential side effect which is based on a single isolated report of a possible link between a prescription drug and an injury *may* not require a warning," does not change the standard here.  As correctly stated in the jury charge, Merck is liable under a theory of negligence for failure to "adequately warn the Plaintiff's treating physicians or the medical community of a known or reasonably scientifically or medically knowable risk of Vioxx." Jury Charge at 11.  Or as Merck stated earlier in this case:  "Under South Carolina law, a manufacturer has a duty to warn of only known or reasonably knowable risks." Motion at 21.  A supplier and manufacturer of a product are liable for failing to warn if they know or have reason to know the product is or is likely to be dangerous for its intended use; they have no reason to believe the user will realize the potential danger; and, they fail to exercise reasonable care to inform of its dangerous condition or of the facts which make it likely to be dangerous. *Livingston v. Noland Corp*., 293 S.C. 521, 525, 362 S.E.2d 16

(S.C. 1987), citing *Gardner v. Q.H.S., Inc*., 448 F.2d 238 (4th Cir. 1971).

Although there is a paucity of South Carolina decisional authorities regarding prescription drugs, there is a large body of law from other jurisdictions regarding prescription drugs, the extent of manufacturers' duties, and what a manufacturer must disclose. A warning must be correct, complete, and fully descriptive, and it must convey updated information as to all of the drug's known side effects. *Martin v. Hacker*, 83 N.Y.2d 1, 11, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (1993); *Krasnopolsky v. Warner-Lambert Co.*, 799 F.Supp. 1342, 1345-46 (E.D. N.Y. 1992) (Manufacturer's duty to warn of all potential dangers "is a continuous one, and requires that the manufacturer be aware of the current information concerning the safety of its product.") The warning must also have clarity so that the language of the warning is "direct, unequivocal and sufficiently forceful to convey the risk." *Martin* supra, 83 N.Y.2d, at 11.  Merely mentioning a possible injury or adverse effect is not necessarily adequate. *Stahl v. Novartis Pharms. Corp*., 283 F.3d 254, 267 (5th Cir. 2002)) A manufacturer's disclosure of  a particular risk of injury does not foreclose liability if the degree of risk is not sufficiently conveyed.  *McDonnell v. Chelsea Mfrs., Inc.*, 259 A.D.2d 674, 676, 687 N.Y.S.2d 172 (N.Y.A.D. 2 Dept. 1999); *Anderson v. Sandoz Pharmaceuticals Corp*., 77 F.Supp.2d 804, 807 Prod.Liab.Rep. (S.D. Tex. 1999)(Summary judgment denied even though package insert and PDR entry disclosed risk of myocardial infarction injury suffered by the plaintiff.) Even where a 'dear doctor letter' discloses the risk, affirmatively misleading information may cause a warning to be inadequate. *Woodbury v. Janssen Pharmaceutica, Inc.*, 1997 WL 201571*8 (N.D.Ill. 1997).

The evidence at trial established that the CV risks of Vioxx, which were not adequately conveyed by Merck, were not only reasonably scientifically and medically knowable, but known to Merck long before Mr. Barnett's heart attacks and surgical interventions, and before Mr. Barnett began taking Vioxx.  Dr. Avorn's unrebutted testimony regarding the current state of knowledge

19

about Vioxx's CV risks was "that it is now universally agreed that Vioxx causes heart attacks…"
(8/1/06 Tr. at 428:18-429:2.)  This fact was generally accepted within the medical community in
February 2005 when the FDA Advisory Committee met and unanimously voted that Vioxx causes
cardiovascular disease.  (*Id.* at 353:13-23.)  Dr. Reicin admitted that the APPROVe study showed
"an excess in thrombotic events of Vioxx over placebo…"  (8/14/06 Tr. at 2354:22-2355:1.) [2]
Combining the VIGOR data with evidence from other clinical trials, by at least the Spring of 2000
there was enough evidence to suggest that Vioxx was associated with heart attack and other
cardiovascular disease. (8/1/06 Tr. at 365:18-366:10.)   At least 11 months before Mr. Barnett's heart
attack, Merck was aware of a statistically significant doubling of the risk of heart attacks with Vioxx,
based upon a meta-analysis of all clinical trials . (8/2/06 Tr. at 558:12-561:4.)  Merck implies that its
knowledge of an *association* does not trigger its duty to warn.  However, Dr. Moye testified that
"when it comes to assessing risks, the FDA does not require the sponsor to wait until they have
fleshed out whether the relationship is a mere association or is causative.  The very identity of the
association is sufficient for it to go in the label…" (8/3/06 Tr. at 836:1-5.)  This was admitted by Dr.
Reicin:  "…My understanding from my regulatory colleagues is that warnings are appropriate when
there's a known association.  It had nothing to do with causation…" (8/14/06 Tr. at 2408:7-10.) *See
also McNeil v.* Wyeth, 462 F.3d 364, 370 (5th Cir. 2006)(Noting that FDA regulations require
warnings as soon as there is reasonable evidence of an association of a serious hazard.)  Merck's
knowledge of Vioxx's CV risks goes back even earlier.

By March 2000, and within two months of Mr. Barnett starting Vioxx, Merck knew the
results of the VIGOR study, which showed a fivefold increase in heart attacks in those using Vioxx.

---

[2] According to Dr. Reicin (but refuted by the overwhelming weight of the evidence) this increase only
begins after 18 months.  (*Ibid.*)

(8/1/06 Tr. at 295:23-297:14.)  The immediate reaction of Dr. Edward Scolnick, Merck senior executive and the head of Merck Research Laboratories, was that he believed that the findings of increased heart attacks were valid and mechanism based.  (8/2/06 Tr. at 617:20-618:5.)  Dr. Reicin also thought one of the explanations for the VIGOR data was that Vioxx could be causing heart attacks.  (8/14/06 at Tr. 2367:21-24.)  Even before Mr. Barnett's first use of Vioxx, clinical trials submitted by Merck to the FDA in the late 1990's revealed an excess of CV disease.  This red flag was noticed by the FDA (8/1/06 Tr. at 361:3-20) and was known and knowable by Merck.  In a memo dated May 3-6 of 1998, Merck was advised by its Scientific Advisors, a board of outside pharmacologists, that the mechanism of Vioxx could result in potentially dangerous developments which would lead to heart disease and heart attacks.  (*Id.* at 363:2-15.)

Further, animal studies conducted before Vioxx ever went on the market showed that Vioxx's mechanism of action (*i.e.* selective inhibition of Cox-2) could be dangerous for the heart.  (*Id.* at 548:19-551:14.)  Finally, Merck knew well before Vioxx went to market of the significance of the relationship and balance between thromboxane and prostacyclin and their roles in vasoconstriction and platelet aggregation.  In fact, the Sixteenth Edition of the Merck Manual, which was published by Merck in 1992, contains a discussion of this balance.  (8/2/06 Tr. at 599:8-604:14.)

It was more than reasonable for the jury to determine that Merck knew of Vioxx's risks before Mr. Barnett's began taking Vioxx.  Further, to the extent the CV risks were "uncertain" or "unproven," as Merck argues, such uncertainty was the product of Merck's overpromotion and conscious efforts to confuse, conceal and suppress information about the true CV risks of Vioxx.  Spinning the results of the VIGOR study in a misleading manner, Merck "flipped" the data to suggest that Vioxx did not increase the risk of heart attacks (8/1/06 Tr. at 301:4-21 (Test. Dr. Avorn)) and framed the data in a manner that did not convey the true risk of the drug.  (*Id.* at 299:15-

300:12; 301:22-302:15.)  Merck claimed that the study's methods did not support an extension of the study results to broader population groups.[3]  Even though Merck knew of three additional reported cases of heart attacks prior to the publication of the VIGOR study, Merck did not tell the New England Journal of Medicine, further creating uncertainty among the medical community and public. (8/14/06 Tr. at 2384:25-2391:17.)

Merck fostered uncertainty by claiming that the VIGOR results were explained by the fact that the comparator drug, naproxen, had cardioprotective properties (*i.e.* the "naproxen theory") even though Merck knew this to be untrue.  (8/1/06 Tr. at 324:7-11.)  Merck made this claim via a press release despite the fact that not one randomized clinical trial showed a cardioprotective effect of naproxen.  (8/14/06 Tr. at 2370:11-2372:10, discussing P1.0581.)  In fact, the FDA issued a warning letter to Merck in response to its integrated marketing campaign and took particular issue with Merck's use of the naproxen theory.  (P1.0006) ("…you fail to disclose that your explanation is hypothetical and has not been demonstrated by substantial evidence and that there is another reasonable explanation, that Vioxx may have prothrombotic properties." at p.1); *See also* 8/14/06 Tr. at 2421:1-2424:1 (Test. Dr. Reicin).)  One FDA official went so far as to describe Merck's use of the naproxen theory as "implausible."  (8/1/06 Tr. at 371:13-372:11 (Test. Dr. Avorn).)  Even Merck documents confirmed the naproxen theory did not satisfactorily explain the VIGOR data.  (8/2/06 Tr. at 623:4-624:22 (Test. Dr. Scolnick).)  Dr. Scolnick himself sent an email to his colleagues within Merck stating that there was no way to prove that the naproxen theory was valid, that "IT IS IMPOSSIBLE TO PROVE THIS."  (*Id.* at 626:25-627:17.)  Nevertheless, Merck continued to use the naproxen theory to create uncertainty about the risks of Vioxx.

---

[3]  Contrary to Merck's claim, the FDA found that other Merck studies (*e.g.* 085, 090 and 102), with different methods, found similar increases in heart attacks.  (*Id.* at 373:10-374:6.)

In cross-examination of Dr. Alise Reicin, Plaintiff's Exhibit P1.004 was introduced which showed that Merck was aware of the cardiovascular risk in 1997 and Dr. Reicen talked of a study which would exclude high risk patients in an effort to "decrease the CV event rate so that a difference between the two groups would not be evident.  (8/14/06 Tr. at 2355:12-2356:16.) Although Merck knew of the CV risks and although Merck could have conducted a study specifically designed to ascertain the true risks, either before or after the drug went on market, Merck never conducted such a study.  (8/2/06 Tr. at 614:6-615:3; 615:9-616:14 (Test. Dr. Scolnick).)  As discussed herein at section III.A.2, Merck so manipulated the scientific literature related to Vioxx that Dr. Avorn characterized it as "skewed and distorted."  (*Id.* at 399:18.) Merck also created confusion by concealing information from the FDA.  Dr. Scolnick never told the FDA that his initial reaction to the VIGOR data was that the increased heart attacks with Vioxx were mechanism based and attributable to Vioxx.  (*Id*. at 644:8-12.)  Merck successfully stalled updating the Vioxx label with the VIGOR data for two years by protracted negotiations.  (*Id.* at 671:7-676:23; 685:4-687:12.) Merck never shared the death imbalance data from its Alzheimer's studies (*Id.* at 558:2-11), nor the Shapiro meta-analysis (*Id.* at 558:12-561:12), with the FDA Advisory Committee reviewing the label change.

Other tactics employed by Merck to conceal the truth and suppress free discussion included: persuading Wall Street analysts that Vioxx did not have a CV risk (8/14/06 Tr. at 2382:4 (Test. Dr. Reicin).); challenging and even intimidating those who tried to give an alternate explanation (*e.g.* that Vioxx causes heart attacks) for the VIGOR results (8/2/06 Tr. at 609:25-611:8 (Test. Dr. Scolnick) "if he says this I will boil him in oil at the meeting."); and never communicating Dr. Scolnick's initial conclusion to the public. (*Id*. at 641:18-642:9.)

Merck knew of the CV risks of Vioxx before Mr. Barnett's injuries and before he began

taking Vioxx.  Any uncertainty as to these risks on the part of the FDA, the medical community or the public was due to Merck's overpromotion and concealment of the risks.

> 2.    **Knowledge of a Risk Associated with a Drug Does Not Absolve a Manufacturer of Liability, Where, As Here, the Warnings Are Inadequate.**

 Merck contends that the Mr. Barnett's doctors "had independent knowledge of the cardiovascular risks associated with Vioxx," [4] and therefore "an absent or allegedly inadequate warning is not the cause of the plaintiff's injury." This is factually incorrect and contrary to established law. Again, Merck relies upon a string of factually inapposite cases. E.*g, Odom v. G.D. Searle & Co.,* 979 F.2d 1001, 1003 (4th Cir. 1992)(Summary judgment granted where physician "stated that he had always believed and still believed that "the Cu-7 is the best IUD that's ever been on the market," and that he would still prescribe it today," (*Id.* at 1002), and physician's "own estimate of the risk actually exceeded" that of the plaintiff's expert.)

A prescribing physician's awareness of risks involved with a drug does not absolve a manufacturer of liability, where a jury could reasonably infer that additional and more complete disclosures should have been made and the physician was not sufficiently informed. See *Tatum v. Schering Corp.,* 795 F.2d 925, 928-929 (11th Cir. 1986)(Jury could infer from the evidence that prescriber "did not possess the knowledge that he described himself as having."); *Timm v. Upjohn Co.*, 624 F.2d 536 (5th Cir. 1980), cert. denied, 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981)(Affirming verdict for the plaintiff, noting that although prescriber testified he was aware of the risks involved, he had responded to a hypothetical that had he known of the types and incidence of certain adverse reactions he probably would not have prescribed the drug. *Id.* at 538-539.)

---

[4] By claiming that Mr. Barnett's doctors had "independent knowledge of the cardiovascular risks associated with Vioxx," Merck is arguing against its earlier position (III.A.1) that the CV risks of Vioxx were unproven, uncertain and unknowable.

The weight of the evidence is that Mr. Barnett's prescribing doctors were not sufficiently aware of the risks associated with Vioxx.[5]  Dr. Mikola, who began prescribing Vioxx for Mr. Barnett at least as early as 12/28/2001 (8/4/06 Tr. at 925:6-11), was never told by Merck that the President of Merck Research Laboratories believed that the CV events associated with Vioxx in the VIGOR trial were mechanism-based. (*Id.* at 912:23-913:1.)  While he reviewed the VIGOR study, neither the title of the article nor the abstract stated that Vioxx significantly increases the risk of heart attack. (*Id.* at 973:20-974:15.) He further testified that if Merck had had information of a statistically significant increase in the risk of serious cardiovascular thrombotic events, that information was not shared with him. (*Id.* at 977:13-978:15.)

Dr. Mikola further testified that had he been aware of or seen the information in the FDA's proposed label change to the effect that Vioxx should be used with caution in patients at risk of developing cardiovascular thrombotic events, such as those with a history of angina and in patients with preexisting hypertension and congestive heart failure, he would not have put Mr. Barnett on Vioxx. (*Id.* at 914:16-915:11.) Dr. Mikola's testimony establishes that Merck withheld information vital to his making a fully informed decision as to whether or not to prescribe Vioxx to Mr. Barnett. In failing to provide Mr. Barnett's prescribing physician with such information, Merck removed the possibility that he could act as a learned intermediary.

Dr. Avorn also explained how Merck's incomplete and misleading communications mislead physicians. (8/1/06 Tr. at 298:20-300:12.; 301:4-302:15)  According to Dr. Avorn "…Merck's conduct of … communication … was inadequate in that it failed to truthfully represent what was known to Merck at the time about the risks of its drug in relation to the cardiovascular symptoms."

---

[5] At page 26 of Merck's brief Merck discusses the independent knowledge of Dr. Karavan.  There is no evidence that Dr. Karavan ever prescribed Vioxx to Mr. Barnett or even treated Mr. Barnett before Barnett's September 6, 2002 heart attack.

(*Id*. at 289:12-290:1.)  He also testified that "…Doctors did not have adequate information presented to them by Merck to make a fair and reasonable evidence-based decision about Vioxx."  (*Id.* at 290:2-15.)

Furthermore, assuming *arguendo* that Mr. Barnett's physicians had in fact been fully apprised of all pertinent and necessary information in Merck's possession, Merck would still not be relieved of liability. This is because the evidence showed that Merck's overpromotion of the drug had the effect of nullifying the already inadequate warnings. *Caraker v. Sandoz Pharmaceuticals Corp.,* 172 F.Supp.2d 1018, 1030 ( S.D. Ill. 2001); *Salmon v. Parke Davis & Co.*, 520 F.2d 1359, 1363-1364 (4th Cir. 1975); *Stevens v. Parke, Davis & Company*, 9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 53, 507 P.2d 653, 661 (1973); *Incollingo v. Ewing,* 444 Pa. 263, 288-289, 282 A.2d 206 (1971); *Nobles v. Astrazeneca Pharmaceuticals*, 48 Conn.Supp. 134, 832 A.2d 1241, 1242-1243 (Conn.Super. 2003) Merck's integrated national marketing campaign downplayed, deemphasized and misrepresented the true risks of Vioxx to such a degree as to result in the overpromotion of Vioxx.   (8/1/06 Tr. at 325:21-326:16; 399:21-400:14.)   Merck instructed its sales representatives ("detailers") to treat negative findings about Vioxx's risks as "obstacles" and to suppress open discussion of such information within the medical community.  (*Id*. at 342:1-343:22; 400:15-401:20.)  As Dr. Avorn testified, Merck's news releases were "an inadequate and a deceptive way of presenting this information to the press, to doctors, to patients, or to anyone."  (*Id.* at 393:14-395:20.)

Merck's studies were published in such a way as to bury risk data (*Id*. at 368:10-20; 398:11-21), while other studies were never published at all by Merck (*Id*. at 368:21-369:1.)  Data from the APPROVe study was presented in an inaccurate and unfair manner,  (*Id.* at 395:21-398:10), and even though Merck had data from Alzheimer's studies related to an increased mortality rate associated with Vioxx, Merck did not convey this data to physicians.  (*Id*. at 398:22-399:2.)  Dr. Avorn summed

up all the major Vioxx publications by testifying,"…I have never known a collection of papers on any one topic in which there has been such a constellation of skewed and distorted presentation of data in any drug studies that I've ever looked at." (*Id.* at 399:3-20.)

Merck's overpromotion is also illustrated in an FDA Warning Letter that Merck received in September 2001. (P1.0006; *See* also 8/14/2006 Tr. at 2421:1-2424:1 (Test. of Alise Reicin).) That letter references three facets of Merck's Vioxx promotional campaign that minimized the cardiovascular findings of VIGOR and misrepresented Vioxx's safety profile. According to the FDA, these activities and materials were "…false, lacking fair balance, or otherwise misleading…" (*Id*. at p.1, para. 1 and 3.) In the year 2000 Merck generated "a billion" media impressions that carried Merck's message that Vioxx does not cause heart attacks. (8/5/06 Tr. at 1277:1-25.) Merck issued press releases and videos giving the impression that Vioxx was safe from a cardiovascular standpoint, and completely failed to mention that Vioxx could cause heart attacks and that one explanation for the VIGOR results was that Vioxx caused the heart attacks. (*Id.* at 1289:12-1295:22); (1296:23-1299:13.) Merck's integrated campaign amounted to overpromotion of the drug that minimized and deemphasized the true nature of the drug's risks. From this evidence the jury could reasonably have found that regardless of the knowledge of the prescribing physicians, and even if Merck had provided complete and thorough warnings and disclosures, Merck's overpromotion had the effect of nullifying the warnings, rendering them inadequate. Jury Charge at 10.

### 3. The Evidence, Both Subjective and Objective, Establishes That Had Merck Provided an Adequate Warning, Dr. Mikola Would Not Have Prescribed Vioxx and Mr. Barnett Would Not Have Continued to Take Vioxx.

Merck next argues that there is no evidence that a different warning would have changed Mr. Barnett's doctors' decisions to prescribe Vioxx to him. Again, Merck is wrong. First, Dr. Mikola testified unequivocally that if Merck had fully disclosed what it knew regarding cardiovascular risks

27

he would not have prescribed Vioxx to Mr. Barnett.

> 915
>  3  Q.  OKAY. NOW, GIVEN THE INFORMATION THAT YOU'VE READ IN
>  4  EXHIBITS I'VE JUST SHOWN YOU AND THIS PROPOSED LABEL, IF YOU
>  5  HAD KNOWN THAT INFORMATION THAT I'VE SHOWN YOU AND YOU HAD SEEN
>  6  A LABEL LIKE THIS, WOULD YOU HAVE PRESCRIBED VIOXX TO
>  7  MR. BARNETT, GIVEN HIS HISTORY WITH POSSIBLE ANGINA, IN JANUARY
>  8  OF 2000?
>  9  A.  I BELIEVE I WOULD HAVE LEFT HIM ON FELDENE.
> 10  Q.  YOU WOULDN'T HAVE PUT HIM ON VIOXX?
> 11  A.  I DON'T BELIEVE SO, NO, SIR.

(8/4/06 Tr. at 915:3-11)

> 928
>  2  Q.  AND GIVEN WHAT YOU'VE READ TODAY, THAT COMBINED WITH HIS
>  3  ANGINA, WOULD YOU SAY THAT FROM EVERYTHING YOU'VE READ ABOUT
>  4  VIOXX TODAY, THAT YOU PROBABLY WOULD NOT HAVE PRESCRIBED VIOXX
>  5  FOR, HIM IF YOU'D KNOWN ALL OF THIS INFORMATION, IN 2000?
>  6  A.  HAVING KNOWN TODAY WHAT I KNOW ABOUT VIOXX, I WOULD NOT
>  7  HAVE PRESCRIBED IT.   (*Id.* at 928:2-7)

Based on this uncontroverted testimony alone the jury could have reasonably found that

Merck's inadequate warning was a cause of Mr. Barnett's injuries.

Second, assuming *arguendo*  that Dr. Mikola did not testify as he did that the inadequate

warning caused him to prescribe the drug, the jury could still have reasonably found that Merck's

inadequate warning was a cause of Mr. Barnett's injuries. Proof that the inadequacy of a warning

was a proximate cause of injury is not limited to, nor dependent solely upon, the testimony of the

prescribing physician. "To satisfy the burden of establishing warning causation, a plaintiff may

introduce either objective evidence of how a reasonable physician would have responded to an

adequate warning, or subjective evidence of how the treating physician would have responded."

*Thomas v. Hoffman-LaRoche, Inc*., 949 F.2d 806, 812 (5th Cir. 1992); *Hermes v. Pfizer, Inc.*, 848

F.2d 66, 69-70 (5th Cir. 1988).  Testimony from a prescribing physician that he or she appreciated

the risks does not preclude a finding that the warnings were inadequate, nor does it preclude a finding of causation. *Anderson v. Sandoz Pharmaceuticals Corp.*, 77 F.Supp.2d 804, 808-809 (S.D.Tex. 1999); *Whitley v. Cubberly,* 24 N.C.App. 204, 210 S.E.2d 289, 207-208 (1974); *Stevens v. Parke-Davis & Co.*, (1973) 9 Cal.3d 51, 54-56, 507 P.2d 653. See also, *Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1971), (cited by the court in *Salmon v. Parke Davis* & Co., 520 F.2d 1359, 1363 (4th Cir.1975)) ("Dr. Cucinotta stated, in effect, that he was adequately warned and understood the dangers and proper use of the drug. The jury was not obliged to believe the oral, uncorroborated testimony of either doctor. The evidence of Parke, Davis' efforts in promoting the drug would tend to refute Dr. Cucinotta's testimony in the sense that he may have been influenced by the efforts, perhaps even unconsciously, to prescribe the drug ...." *Id.* at 221-222.)

 Merck's overpromotion and misleading statements about Vioxx, through its integrated marketing campaign, nullified the already insufficient warning.  Thus, even if Dr. Mikola had testified that he would still have prescribed Vioxx if he had received an adequate warning (as is not the case here), the jury could still have reasonably found that Dr. Mikola was not in a position to fully appreciate Vioxx's risks and that he would have taken Mr. Barnett off of Vioxx had he been provided with an adequate warning.

Moreover, even where a risk is disclosed, and even where the prescribing physician testifies he would have still prescribed the drug in light of the risk, liability is not foreclosed.  See *e.g., McNeil v. Wyeth,* 462 F.3d 364, 372-373 (5th Cir. 2006).  The court in *McNeil* also found it significant that the plaintiff testified she would not have taken the drug had she been made aware of the full extent of the risk.  See also *Hermes v. Pfizer, Inc.*, 848 F.2d 66, 69-70 (5th Cir.1988) ("Furthermore, Hermes herself testified that she would not have taken the Sinequan had she known that it could cause the injury she experienced." *Id.* at FN.20) Similarly, Mr. Barnett testified that if

29

he had been told of the risk of heart attack by Dr. Mikola or any doctor, he never would have taken it. During the entire time that he took Vioxx he was unaware that Vioxx could cause heart problems. (8/7/06 Tr. at 1565:11-13.) During his use of Vioxx he was never told that the VIGOR results showed a 5-fold increase in heart attacks with Vioxx. (*Id*. at 1560:12-20.) However, Mr. Barnett testified that if he had ever been told that Vioxx could cause heart attacks he never would have taken Vioxx, (*Id*. at 1554:5-7) and if asked to do so would have gone back on Feldene. (*Id*. at 1557:9-11.)

The jury could reasonably have found Mr. Barnett's testimony in this regard especially credible, because there was substantial evidence that he was concerned about and was an active participant in his health and health care. (*Id*. at 1552:4-1553:10.)[6] In fact, Mr. Barnett stopped taking Vioxx following one such discussion with his doctor after hearing that there may be safety concerns with Vioxx (*Id*. at 1553:11-1554:4) and he stopped taking Mobic as soon as he learned that it could increase the risk of heart attacks (*Id*. at 1605:4-8; 1607:7-14.)

Merck's argument is based on the erroneous proposition that the 2002 label "contained all the information that [plaintiff's expert] Dr. Moye said was necessary." Motion at 29. The testimony cited by Merck is limited to Dr. Moye's opinion of the accuracy of the VIGOR information that was included within the 2002 label. Merck ignores Dr. Moye's testimony that the label failed to properly disclose that the VIGOR results showed a 5-fold *increase* in heart attacks for Vioxx over Naproxen, and that the significance of these results was not made clear to prescribing physicians. (8/3/06 Tr. at 841:1-13.) Dr. Moye was also of the opinion that data from studies other than VIGOR were not fully disclosed in the label. (*Id*. at 877-881.)

---

[6]Dr. Mikola assured him that his medications were safe because at that time (due to Merck's inadequate warnings and overpromotion) Dr. Mikola believed that Vioxx did not significantly increase the risk of heart disease (8/4/06 Tr. at 926:13-21.)

Additionally, Dr. Moye criticized the location of the VIGOR data within the label and opined that such data should have been in the "Warnings" section rather than the "Precautions" section. There is a significant difference in the level of warning between these sections.  (8/3/06 Tr. at 838:13-839:15.) The "Warnings" section of the label has a specific meaning to physicians and should include the serious adverse events that have been associated with the drug, including heart attacks. (*Id.* at 833:11-25-834:3.) According to Merck's own internal forecast, the difference between placing the cardiovascular risks of Vioxx in the Warnings versus the Precautions section amounted to approximately $1 Billion in lost sales of the drug.  (*Id.* at 872:25-875:13 referencing Trial Exhibit P1.1135.)  As Dr. Moye testified, "Well, my sense about this is that doctors pay attention to labels and, as we said earlier, that they take warnings much more seriously than they take precautions and that this same concern is reflected by Merck."  (8/3/06 Tr. at 875:10-13.)

### B.    Merck's Argument Regarding Plaintiff's Deceit Claim Fails for the Same Reasons.

Although the jury was correctly instructed on the learned intermediary doctrine, again Merck argues that the learned intermediary doctrine applies to fraud and defeats the Plaintiff's deceit claim. However, Merck's only argument as to this cause of action is still the same premise asserted in section III.A.3 of its motion- that "There was no evidence that a different warning could have changed Mr. Barnett's doctors' decisions to prescribe Vioxx to him."

Merck's argument fails for the same reasons, authorities and evidence cited above.

### C.    Plaintiff's Claims Are Not Preempted by Federal Law.

At the present time the preemptive effect of 71 Fed.Reg. 3923-35 (Jan. 24, 2006) is the subject of some controversy. Merck is correct that at least one trial court has found preemption. However, other more recent and more well-reasoned decisions are directly contrary to the holding in

se

*Colacicco.* See e.g. *McNellis ex rel DeAngelis v. Pfizer*, Inc., Slip Copy, 2006 WL 2819046, *10

D.N.J., (September 29, 2006); *Jackson v. Pfizer, Inc.*, 432 F.Supp.2d 964, 968 (D. Neb. 2006);

*Desiano v. Warner-Lambert & Co.*, --- F.3d ----, 2006 WL 2846454, FN9, C.A.2 (N.Y.), October 05,

2006.  In all likelihood when other appellate courts including the Fifth Circuit address this same

claim by pharmaceutical manufacturers they will, as they have many times in the past, reject

preemption of common law failure to warn claims. The statement regarding preemption is

inconsistent with past statements made by the FDA. See 65 Fed.Reg. 81082, 81103 (Dec. 22, 2000)

("FDA's regulations establish the minimal standards necessary, but were not intended to preclude the

states from imposing additional labeling requirements."); 63 Fed.Reg. 66378, 66384 (Dec. 1, 1998)

("[F]ederal preemption could unduly interfere with the goals and objectives of existing State

programs ... This final rule is intended to complement these State efforts, not replace or hinder

them.") and myriad decisions over several decades. See, e.g., *Feldman v. Lederle Laboratories* 125

N.J. 117, 147, 592 A.2d 1176, 1192 (1991); *Abbot by Abbot v. American Cyanamid Co.* (4th

Cir.1988) 844 F.2d 1108, 1112; *Mazur v. Merck & Co., Inc.*  (E.D. Pa. 1990) 742 F.Supp. 239, 247;

*Cartwright v. Pfizer, Inc.*, 369 F.Supp.2d 876, 885 (E.D. Tex. 2005). Additionally, FDA regulations

permit a manufacturer to strengthen its warnings any time without the approval of the FDA. *Witczak

v. Pfizer, Inc.*, 377 F.Supp.2d 726, 728-30 (D. Minn. 2005).

### D.  Plaintiff Presented More Than Sufficient Evidence of Causation.

Merck next argues that the Plaintiff failed to prove that his damages were caused by his use

of Vioxx "because the undisputed evidence proves that Mr. Barnett had preexisting CAD."  Motion

at 32.  This is essentially a repeat of its earlier arguments. First of all, to the extent Merck's argument

is based upon the premise that if the Plaintiff had preexisting conditions which increased his risk of a

heart attack or of requiring bypass surgery, it cannot be liable for either or for worsening his

condition, Merck is mistaken as to the fundamental law on causation. As this Court instructed the jury:

> "In order to be regarded as the proximate cause of the injury, however, the defect need not be the only cause. A defect may be a legal cause of an injury even though it operates in combination with the act of another, some natural cause, or some other cause if such other cause occurs at the same time the defect has its effect and if the defect contributes substantially to producing the alleged injury. Furthermore, a defendant may still be held liable when the defendant's fault operates upon a concealed physical condition, such as a latent disease, to produce consequences which the defendant could not reasonably anticipate."

Secondly, as set forth in detail above, Mr. Barnett was a man who in 2000 had only a 1-2% risk of having heart attack. However, just a short time later, he not only had a heart attack, but suffered from severe coronary artery disease, inexplicable by anything other than Vioxx. The evidence at trial demonstrated that the Plaintiff's heart attack was just the first injury of many resulting in diffuse coronary disease and multiple surgical interventions.

Merck argues that "plaintiff's counsel admitted in his opening statement that Mr. Barnett *would likely* have had a heart attack at some point, even if he had never taken Vioxx." (7/31/06 Tr. at 124:13-17.) (emphasis added). This is a mischaracterization. The point Plaintiff's counsel made was simply that Mr. Barnett "might have" had a heart attack but not until he was 75 or 80. The evidence at trial showed that in a little over 2 years while on Vioxx, Mr. Barnett went from a less than 2% chance of having a heart attack to a 100% chance. Merck submitted no medical evidence to support its contention that "he likely would at some point have had a heart attack and/or bypass surgery, and would have incurred certain medical bills relating to his heart disease."

### E.     The Evidence Was More Than Sufficient To Support Punitive Damages.

Merck has pigeonholed the punitive damages claim into two main points regarding VIGOR and the post-VIGOR label. However, the evidence of willful, wanton misconduct and reckless

disregard of Plaintiff's rights was much broader. Evidence of Merck's misconduct came from the testimony of numerous witnesses and documents presented at trial, showing that even prior to VIGOR findings in March 2000 and well before the launch of the drug in 1999, Merck had knowledge of the potential cardiovascular risks of Vioxx.  Prior to the launch of Vioxx in 1999, Merck was warned by its own scientific advisors to conduct further testing, including a cardiovascular outcome (CV outcome) study.  Rather than test the drug or warn of the potential risk, Merck rushed to market in an effort to compete for pain reliever market share with its primary competitor, Celebrex.  This evidence alone showed reckless disregard for the safety of patients.

It would be impractical to recite here each one of the over 200 documents and all of the testimony of the numerous witnesses supporting the jury's findings on the punitive liability issues. Briefly however, there was compelling evidence of the cardiovascular risks of Vioxx even before Merck placed the drug on the market (8/2/06 Tr. at 548:19-551:14; 361:11-363:15; 546:15-546:25; 8/11/06 Tr. at 2095:9-2099:23; 2100: 6-2102:7; 2108:6 - 2118:24.)  Merck was aware of the cardiovascular risk in 1997 and discussed designing its study to exclude high risk patients in an effort to "decrease the CV event rate so that a difference between the two groups *would not be evident.*" (Exhibit P1.004; 8/14/06 Tr. at 2355:12-2356:16.)  Notwithstanding the early warning signs of the cardiovascular risk of Vioxx prior to marketing the drug, Merck then obtained the results of the VIGOR study in March of 2000 which showed a 500% increase in cardiovascular risk.  (8/2/06 Tr. at 617:20-623:3.)  Merck disregarded this information and told doctors, the public and the FDA that the VIGOR results could be explained by Naproxen, knowing this was untrue. (*Id.* at 623:4-627:17; (8/5/06 Tr. at 1289:12-1290:23.)  Merck violated its own Code of Conduct in failing to communicate openly and honestly with physicians about the CV risks associated with Vioxx. The CV risk was seen as an "obstacle" to sales and was not included in the discussions representatives had with

34

physicians (8/5/06 Tr. at 1252:20-1259:2), and Merck continued to market Vioxx despite there being an increased risk of myocardial infarctions.  (8/2/06 Tr. at 580:10-589:7.)

On top of this, rather than immediately advising physicians of the serious risks of Vioxx shown in the VIGOR study as well as other studies, including ADVANTAGE and Alzheimer's, through an appropriate warning label as suggested by the FDA, Merck chose instead to fight the FDA and request a watered down label with the VIGOR results in the "precaution" section.  Merck's internal documents reflect that the reason Merck fought to place the cardiovascular risk information in the precaution section as opposed to the more prominent and heightened warning section was to generate an additional $1 Billion in sales. The financial reward from Vioxx sales provided Merck with the economic motive to carry out this fraud on the public. (8/1/06 Tr. at 196:14-208:12.)

Dr. Scolnick admitted that he never told the FDA about his concerns regarding the cardiovascular risk of Vioxx.  (8/2/06 Tr. at 644:8-12.)  He admitted that a CV outcome study was an appropriate study to properly address the CV concern Merck recognized internally, but it was never performed.  (*Id.* Tr. at 652:2-23.)  Following the VIGOR study, after the FDA issued a proposed label with the cardiovascular risks in the "warnings" section, he stated "we will fight back", "it is ugly cubed" and "they (referring to the FDA) are Bastards."  (*Id.* Tr. at 685:4 to 687:12.)  Scolnick felt that it would be a "miracle" if they were able to place the cardiovascular risk information in the "precaution" section (*Id.* Tr. at 677:6-18), and was adamant he would not "sign off any label that has a warning." (8/2/06 Tr. at 676:1-23.)

Merck attempted keep physicians and the public in the dark about the true nature of the cardiovascular risk.  (See generally, the testimony of Anstice, Scolnick, Cannell, Weiner, Blake and Avorn.) Through Thomas Cannell's testimony, the jury was shown how Merck taught its sales representatives to highlight the difference between the "precaution" and "warning" sections of the

label to doctors, thereby downplaying the risk. (8/5/06 Tr. at 1259:12-1261:10.) Merck employees made incomplete statements to the public, minimizing the risk (8/5/06 Tr. at 1277:1-25-1290:14-23.) When doctors asked questions about the VIGOR findings, Merck sales representatives were instructed to show the Cardiovascular Card, containing misleading data. (8/1/06 Tr. at 254:21-258:14.) Merck published incorrect data in the New England Journal of Medicine to indicate that there was only a risk from Vioxx after 18 months of use. (*Id.* at 356:2-357:21.) Merck distanced itself from Dr. Avorn's study by instructing him and his colleagues to remove the name of one of their epidemiologists as a co-author. (*Id.* at 340:12-340:18.) Merck instructed its sales representatives to view Dr. Avorn's study as an "obstacle" to prescriptions of Vioxx and that they should not initiate discussions with physicians about his study. (*Id.* at 342:1-343:22.) All of this affected the prescribing practices of doctors. (*Id.* at 346:25-347:14.)

Based upon Merck's conduct of intentionally failing to disclose a known and serious cardiovascular risk of the drug, downplaying the CV risk from VIGOR and delaying and then minimizing the warning label for VIGOR in order to reap $1 Billion in profits, the jury had clear and convincing evidence that Merck's conduct was fraudulent, as well as willful, wanton and in reckless disregard of Plaintiff's rights.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513 (2003) holds that a jury must be instructed "that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred." *Id.* at 1522-1523, quoting from *BMW of North America v. Gore*, 517 U.S. 559, 572-573 (1996) (noting that a State "does not have the power ⋯ to punish [a defendant] for conduct that was lawful where it occurred and that had no impact on [the State] or its residents".) Accordingly, this Court so admonished the jury. (8/17/06 Tr. at 2691:20-2692:3), and left no doubt on this point, mentioning that the specific documents to which

36

Merck refers here could not be considered in the amount of punitive damages. (*Id.* at 2693:10-25.)

*State Farm* did not, as Merck implies, proscribe the introduction of evidence of a party's wealth. It merely held that the wealth of a defendant cannot justify an otherwise unconstitutional award. "[Wealth] provides an open-ended basis for inflating awards when the defendant is wealthy. ...That does not make its use unlawful or inappropriate; it simply means that this factor cannot make up for the failure of other factors, such as 'reprehensibility,' to constrain significantly an award that purports to punish a defendant's conduct." *Id.* at 427-428, quoting *BMW*, supra, at 591, 116 S.Ct. 1589. This Court appropriately instructed the jury that in determining the amount of punitive damages it should consider "the ability of the defendant to pay any punitive damage award." (8/17/06 Tr. at 2690:18-19.) This is consistent with South Carolina law. *Bryant v. Waste Management, Inc.*, 342 S.C. 159, 536 S.E.2d 380, 386 (S.C. App. 2000). Merck's argument also assumes that extraterritorial conduct evidence has no legitimate purpose. However, the Supreme Court has never held that extraterritorial conduct has no relevance to issues of punitive liability. In fact, the Court in *BMW of North America, Inc. v. Gore* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) stated just the opposite:

> "Of course, the fact that the Alabama Supreme Court correctly concluded that it was error for the jury to use the number of sales in other States as a multiplier in computing the amount of its punitive sanction does not mean that evidence describing out-of-state transactions is irrelevant in a case of this kind. To the contrary, as we stated in *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 462, n. 28, 113 S.Ct. 2711, 2722, n. 28, 125 L.Ed.2d 366 (1993), such evidence may be relevant to the determination of the degree of reprehensibility of the defendant's conduct." *Id.* at FN21.

The fact that some of the documents included projected revenue from sales as opposed to actual sales is a distinction without a difference. The evidence of projected sales and revenues Merck expected as a result of its misconduct and concealment of the risks of Vioxx is all part and parcel of

the identical conduct which resulted in injury to Mr. Barnett. See *State Farm*, supra, at 409-410. ("Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff."); *White v. Ford*, 312 F.3d 998, 1014 (9th Cir. 2002)(" Evidence of extraterritorial conduct, such as sales in other states, "may be relevant to the determination of the degree of reprehensibility of the defendant's conduct…")

Merck argues that "Mr. Barnett introduced no evidence of the magnitude of any harm caused by Merck in South Carolina." Motion at 37. Plaintiff did in fact introduce evidence of the harm caused by Merck in South Carolina---Mr. Barnett's atherosclerosis, his heart attack, his bypass surgery and his diminished life expectancy. The injuries to Mr. Barnett, which occurred in South Carolina, are sufficient in and of themselves to justify the punitive damages award. If Merck is suggesting that the Plaintiff should have introduced evidence of the total sales of Vioxx in South Carolina and the total number of probable injuries from Vioxx there, there is no such requirement. (The fact that the Plaintiff did not introduce evidence of other Vioxx heart attack victims in South Carolina probably worked to Merck's benefit, as evidenced by the relatively miniscule punitive damages award. This is undoubtedly why, even though it was within Merck's exclusive power to introduce its South Carolina Vioxx sales figures to the jury, it chose not to do so.) Moreover, Merck's argument rests on the false assumption that the amount of the jury's award is somehow based upon the total amount of Vioxx sales nationwide, and that evidence of South Carolina's much lower sales figures would have resulted in a lower award. According to the 2000 Census, South Carolina had 4,012,012 residents and the U.S. had a total population of 281,421,906. (http://www.census.gov/population/cen2000/phc-t2/tab01.pdf) Assuming, arguendo, that South Carolina's Vioxx sales as a percentage of nationwide sales were similar to its share of the U.S.

population, accepting Merck's argument would mean the jury should have awarded $14,256.22 in punitive damages in order to set an example and deter this multi-billion dollar business from engaging in similar conduct in the future.

As to the brief argument of Plaintiff's counsel to which Merck objects, this was an appropriate response to what counsel for Merck had just told the jury. Immediately following Plaintiff's abbreviated argument on punitive damages (which was less than 4 pages of transcript), counsel for Merck told the jury that Merck had "already gotten" their message:

> "….I think you have sent you message loud and clear.' …. '[p]eople currently who run Merck have heard that message and are reflecting on it as we speak…' (8/17/06 Tr. at 2696)  'I believe in my heart that you determined that amount was what you needed to award in order to send a message….The message has been sent and received. (*Id*. at 2697)

>  "If we made mistakes—and you have determined that we did. You have already delivered that message loud and clear. As I said, the people at Merck take it seriously and will take it seriously.' (*Id.* at 2698)  'So $50 million, as I said, it's a lot of money. I believe in my heart that you gentlemen have already awarded an amount intended to send a message and to deter and punish….As I said, the bottom line, I think everybody in the courtroom and everybody back in New Jersey …everybody has already gotten the message. We certainly have, and as I said, we take it to heart.' (*Id.* at 2703)

This strategy worked well for Merck. By telling the jury that everybody back in New Jersey was reflecting on the award and that that they had already gotten the message and were taking it to heart, Merck dodged what should have been tens of millions of dollars in punitive damages. Mr. Robinson's minimal argument on this point was an entirely appropriate response. Punitive damages are intended not only to punish but "deter the wrongdoer and others from engaging in similar reckless, willful, wanton, or malicious conduct in the future." *Clark v. Cantrell,* 339 S.C. 369, 378, 529 S.E.2d 528, 533 (2000).  Counsel for Plaintiff never suggested that Merck should be punished for defending itself. Rather, he focused on the deterrent purpose of punitive damages in his

39

response to Merck's argument. "The point of punitive damages is to deter others, to deter Merck from doing this in the future." (8/17/06 Tr. at 2505:5-6.)  In light of the statements by counsel for Merck on matters entirely outside the record (i.e. how the verdict on compensatory damages had already sent a message, how it had affected Merck and how is was then being 'reflected on' by Merck management), Plaintiff's counsel had every right to respond by arguing, based upon matters in the record, that Merck was not affected and had not been deterred, by results in the ongoing litigation.

Further, the Court admonished the jury to disregard the comment regarding defending cases. There is no reason to believe the jury ignored the Court's instruction. As set forth above, the evidence supports the jury's finding on liability, including liability for punitive damages. This Court concluded that the jury's findings on liability are reasonable, and commented that the Court "is not troubled by $1 Million punitive damage award."

Further evidence of the fact that the punitive damage award was not the result of passion, prejudice or any improper influence is its relatively exiguous amount. Although additur is not permitted in the federal courts, if it were the Plaintiff would be justified in seeking a larger award, for $1 million is patently insufficient to achieve the purposes of punishing Merck and deterring similar conduct in the future.

## IV.   CONCLUSION.

For the reasons stated above, the Court should deny Merck's motion for judgment as a matter of law.

Date:  October 31, 2006                    Respectfully submitted,


                                           By:   /s/   MARK P. ROBINSON, JR.
                                                 Mark P. Robinson, Jr.
                                                 Kevin F. Calcagnie

Carlos A. Prietto, III
Ted B. Wacker
Lexi W. Myer
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Floor
Newport Beach, California  92660
Telephone:  (949) 720-1288
Facsimile: (949) 720-1292

Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama  36103-4160
Telephone:  (334) 269-2343
Facsimile: (334) 954-7555

Donald C. Arbitblit
LIEFF, CABRASER, HEIMANN and
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, California  94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Counsel for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on Defendants'

Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs'

Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically

uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No.

8A, and that the foregoing was electronically filed with the Clerk of the Court of the United

States District Court for the Eastern District of Louisiana by using the CM/ECF system which

will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657

on this 31st day of October, 2006.


                                        By:   /s/  MARK P. ROBINSON, JR.
                                              MARK P. ROBINSON, JR.
                                              State Bar No. 054426
                                              Attorney for Plaintiff
                                              Robinson, Calcagnie & Robinson

42