**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: VIOXX | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| | * | |
| **This document relates to** | * | **MAGISTRATE JUDGE KNOWLES** |
| | * | |
| **Gerald Barnett v. Merck & Co, Inc.** | * | **CASE NO. 02:06CV00485** |

---

**PLAINTIFF GERALD BARNETT'S MEMORANDUM IN OPPOSITION TO MOTION
OF MERCK & CO., INC. ("MERCK") FOR A NEW TRIAL ON ALL ISSUES**

---

i

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Alabama v. Blue Bird Body Co.*,
 573 F.2d 309, 318 (5th Cir. 1978) .................................................................20

*Allen v. Pennsylvania Eng'g Corp.*,
 102 F.3d 194 (5th Cir. 1996) .........................................................................24

*Anderson v. Sandoz Pharmaceuticals Corp.*,
 77 F.Supp.2d 804, 807 Prod.Liab.Rep. (S.D.Tex. 1999)............................39, 44

*Anderson v. Siemens Corp.*,
 335 F.3d 466, 471-72 (5th Cir. 2003) .............................................................32

*Asad v. Continental Airlines, Inc.*,
 314 F.Supp.2d 726, 740 (N.D.Ohio 2004)........................................................49

*Atlantic & Gulf Stevedores v. Ellerman Lines*,
 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962)..........................33

*Atlas Food Systems and Services, Inc. v. Crane Nat. Vendors, Inc.*,
 99 F.3d 587, 599-600 (4th Cir. 1996) .............................................................30

*Automotive Products v. Tilton Engineering, Inc.*,
 Not Reported in F.Supp., 1993 WL 661138,*1, C.D.Cal.,
 (November 18, 1993) ....................................................................................21

*Bianchi v. City of Philadelphia*,
 80 Fed.Appx. 232, 237, 2003 WL 22490388, (3rd Cir. 2003) ........................28

*Bigham v. J.C. Penney Co.*,
 268 N.W.2d 892, 898 (Minn. 1978)................................................................34

*Bonner v. ISP Tech., Inc.*,
 259 F.3d 924, 929 (8th Cir. 2001) .................................................................25

*Bragg v. Hi-Ranger, Inc.*,
 319 S.C. 531, 540, 462 S.E.2d 321 (1995) ....................................................35

*Brasher v. Sandoz Pharm. Corp.*,
 160 F.Supp.2d 1291, 1296-98 (N.D. Ala. 2001)..............................................25

ii

*Bray v. Marathon Corp.*,
    356 S.C. 111, 116, 588 S.E.2d 93 (S.C. 2003) .................................................32

*Brock v. Merrell Dow Pharmaceuticals, Inc.*,
    874 F.2d 307 (5th Cir. 1989) .....................................................................25

*Brunnemann v. Terra Intern., Inc.*,
    975 F.2d 175,179 (5th Cir. 1992) .....................................................17, 19, 29

*Brunner v. Maritime Overseas Corp.*,
    779 F.2d 296, 299 (5th Cir. 1986) .................................................................31

*Caraker v. Sandoz Pharmaceuticals Corp.*,
    172 F.Supp.2d 1018, 1030 ( S.D.Ill. 2001).......................................................55

*Castano v. Am. Tobacco Co.*,
    84 F.3d 734, 744 (5th Cir. 1996) .................................................................20

*Chemical Distributors, Inc. v. Exxon Corp.*,
    1 F.3d 1478 (5th Cir. 1993) ...................................................................3, 31

*Christopher v. Florida*,
    449 F.3d 1360, 1368 (11th Cir. 2006) ...........................................................27

*City of Phoenix v. Com/Systems, Inc.*,
    706 F.2d 1033, 1036 (9th Cir. 1983) .............................................................16

*Colonial Leasing v. Logistics Control Int'l*,
    770 F.2d 479, 481-82 (5th Cir. 1985) ...........................................................18

*Continental Cas. Co. v. Howard*,
    775 F.2d 876, 886 (7th Cir. 1985) .................................................................30

*Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194 (4th Cir. 2001)........................................49

*Curtis v. M&S Petroleum, Inc.*,
    174 F.3d 661, 670 (5th Cir. 1999) .................................................................46

*Curtis Publishing Co. v. Butts*,
    351 F.2d 702, 718 (5th Cir. 1965) .................................................................42

*Davis v. Safeway Stores, Inc.*,
    532 F.2d 489, 491 (5th Cir. 1976) .................................................................18

iii

*DIJO, Inc. v. Hilton Hotels Corp.*,
  351 F.3d 679, 687-688 (5th Cir. 2003) ........................................................... 17

*Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.*,
  791 F.2d 1416, 1424-1425 (10th Cir.) ........................................................... 32

*Duk v. MGM Grand Hotel, Inc.*,
  320 F.3d 1052, 1056-1057 (9th Cir. 2003) .................................................... 30

*Edwards v. Sears, Roebuck and Co.*,
  512 F.2d 276, 292 (5th Cir. 1975) ................................................................. 27

*Eiland v. Westinghouse Elec. Corp.*,
  58 F.3d 176 (5th Cir. 1995) .......................................................................... 17

*Evans v. Port Authority of New York and New Jersey*,
  273 F.3d 346, 352 (3rd Cir. 2001) ................................................................ 29

*Evers v. Equifax, Inc.*,
  650 F.2d 793, 798 (5th Cir. 1981) ................................................................. 27

*Eximco, Inc. v. Trane Co.*,
  748 F.2d 287 (5th Cir. 1984) ........................................................................ 18

*Fibermark, Inc. v. Brownville Specialty Paper Products, Inc.*,
  419 F.Supp.2d 225, 235 (N.D.N.Y. 2005) .................................................... 21

*Fox v. United States*,
  417 F.2d 84, 88 (5th Cir. 1969) .................................................................... 30

*Gallick v. Baltimore & Ohio R. Co.*,
  372 U.S. 108, 119 (1963) .............................................................................. 30

*Garrett v. Hamilton Standard Controls, Inc.*,
  850 F.2d 253 (5th Cir. 1988) ........................................................................ 35

*Gasoline Products Co. v. Champlin Refining Co.*,
  283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931) ....................................... 17

*Green v. American Tobacco Co.*,
  325 F.2d 673, 678 (5th Cir. 1963) ................................................................. 21

*Griffin v. Matherne*,
  471 F.2d 911, 915 (5th Cir. 1973) ................................................................. 31

iv

*Haynes v. Manning*,
    717 F.Supp. 730, 735-736 (D. Kan. 1989) .......................................................32

*Heller v. Shaw Industries, Inc.*
    167 F.3d 146 (3d Cir. 1999) ................................................................48, 49

*Hermes v. Pfizer, Inc.*,
    848 F.2d 66, 69-70 (5th Cir. 1988) ......................................................44, 45

*Hopkins v. Dow Corning*,
    33 F.3d 1116, 1124-25 (9th Cir. 1994) ........................................................26

*Houseman v. U.S. Aviation Underwriters*,
    171 F.3d 1117, 1128 (7th Cir. 1999) ..........................................................20

*Hundley v. Rite Aid of South Carolina, Inc.*,
    529 S.E.2d 45 (S.C. App. 2000) ....................................................................1

*Hurley v. Atlantic City Police Dept.*,
    174 F.3d 95, 114 (3rd Cir. 1999) ................................................................28

*Hutson v. Continental Assurance Co.*,
    269 S.C. 322, 237 S.E.2d 375 (1977) ..........................................................17

*In re Chevron U.S.A., Inc.*,
    109 F.3d 1016, 1019 (5th Cir. 1997) ..........................................................14

*In re Innotron Diagnostics*,
    800 F.2d 1077, 1986 (Fed Cir. 1986) ..........................................................20

*In re Paoli R.R. Yard PCB Litigation*,
    35 F.3d 717, 759 (3rd Cir. 1994) ................................................................49

*In re Plywood Antitrust Litigation*,
    655 F.2d 627, 636 (5th Cir. 1981) ..............................................................20

*In re: Propulsid Products Liability Litigation*,
    Not Reported in F.Supp.2d, 2003 WL 22023398, *6, E.D. La., (March 11, 2003).....14, 35

*In re Rhone-Poulenc Rorer Inc.*,
    51 F.3d 1293, 1300-03 (7th Cir. 1995) ........................................................20

*Incollingo v. Ewing*,
    444 Pa. 263, 282 A.2d 206 (1971) ........................................................41, 44

*J.T. Baggerly v. CSX Transp., Inc.*,
   --- S.E.2d ----, 2006 WL 2474203,*3, S.C., (August 28, 2006) .......................................18

*Jahn v. Equine Services, PSC*,
   233 F.3d 382, 390 (6th Cir. 2000) ...................................................................................49

*Johnson v. Ablt Trucking Co., Inc.*,
   412 F.3d 1138, 1144 (10th Cir. 2005) .............................................................................30

*Kellassy v. Cirrus Design Corp.*,
   No. 3:04-CV-0727-N, 2006 U.S. Dist. Lexis 34347, at *13-14
   (N.D. Tex. May 30, 2006)................................................................................................30

*Kiriakides v. Atlas Food Systems & Services, Inc.*,
   338 S.C. 572, 586, 527 S.E.2d 371 (S.C. App. 2000) .....................................................33

*Krasnopolsky v. Warner-Lambert Co.*,
   799 F.Supp. 1342, 1345-46 (E.D. N.Y. 1992) .................................................................39

*Laxton v. Gap Inc.*,
   333 F.3d 572, 586 (5th Cir. 2003) ...................................................................................29

*LeBlanc-Sternberg v. Fletcher*,
   67 F.3d 412, 427 (2d Cir. 1995).......................................................................................21

*Lehrman v. Gulf Oil Corp.*,
   464 F.2d 26, 47 (5th Cir. 1972) .......................................................................................30

*Levesque v. Marine Drilling Co.*,
   783 F.Supp. 302, 306 (E.D.Tex. 1992) ...........................................................................19

*Lifschultz Fast Freight, Inc. v. Haynsworth, Marion, McKay & Guerard*,
   324 S.C. 645, 653, 486 S.E.2d 14, S.C.App., (May 19, 1997) ........................................18

*Little v. Brown & Williamson Tobacco Corp.*,
   243  F.Supp.2d  480 (D. S.C. 2001)..................................................................................35

*Lowe v. General Motors Corp.*,
   624 F.2d 1373 (5th Cir. 1980) .........................................................................................42

*Mack Trucks, Inc. v. Arrow Aluminum Castings, Co.*,
   510 F.2d 1029, 1034 (5th Cir. 1975) ...............................................................................18

*Magistrini v. One Hour Martinizing Dry Cleaning*,
    180 F. Supp. 2d 584, 609 (D. N.J. 2002) ........................................................50

*Martin v. Hacker*,
    83 N.Y.2d 1, 11, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (1993).........................39

*Mason v. Texaco, Inc.*,
    948 F.2d 1546, 1561 (10th Cir. 1991) ...........................................................28

*Maurer v. Heyer-Schulte Corp.*,
    2002 WL 31819160, E.D. La. (December 13, 2002) ........................................25

*Maxey v. Freightliner Corp.*,
    727 F.2d 350, 351-352 (5th Cir. 1984) ...........................................................16

*McClain v. Metabolife Intl Inc.*,
    401 F.3d 1233, 1243 (11th Cir. 2005) .............................................................46

*McDonnell v. Chelsea Mfrs., Inc.*,
    259 A.D.2d 674, 676, 687 N.Y.S.2d 172,
    (N.Y.A.D. 2 Dept. 1999).................................................................................39

*McNeil v. Wyeth*,
    464 F.3d 364 (5th Cir. 2006) ..........................................................................45

*Medalen v. Tiger Drylac U.S.A., Inc.*,
    269 F. Supp. 2d 1118, 1139 (D. Minn. 2003) ................................................50

*Metabolife Intern., Inc. v. Wornick*,
    264 F.3d 832, 842 (9th Cir. 2001) ..................................................................25

*Miller v. Royal Netherlands Steamship Co.*,
    508 F.2d 1103, 1106 (5th Cir. 1975) ..............................................................37

*Moore v. Ashland Chem. Ins.*,
    151 F.3d 269, 278 (5th Cir. 1998) ..................................................................46

*Morales v. American Honda Motor Co., Inc.*,
    151 F.3d 500, 511 (6th Cir. 1998) ..................................................................34

*Mueller v. Hubbard Milling Co.*,
    573 F.2d 1029, 1038 (8th Cir.1978) ...............................................................27

*Murray v. Bank of America, N.A.*,
    354 S.C. 337,344, 580 S.E.2d 194 (S.C. App. 2003) ......................................................29

*Nat'l Bank of Commerce of El Dorado v. Associated Milk Producers, Inc.*,
    22 F. Supp. 2d 942, 963 (E.D. Ark. 1998) .......................................................................50

*National Hispanic Circus, Inc. v. Rex Trucking, Inc.*,
    414 F.3d 546, FN16 (5th Cir. 2005) ................................................................................34

*Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*,
    729 F.2d 1530, 1538-1539 (5th Cir. 1984) .....................................................................18

*Nobles v. Astrazeneca Pharmaceuticals*,
    48 Conn.Supp. 134, 832 A.2d 1241, 1242-1243 (Conn.Super. 2003), .............................41

*Odom v. G.D. Searle & Co.*,
    979 F.2d 1001, 1003 (4th Cir. 1992) ..............................................................................38

*Ohio v. Dept of the Interior*,
    880 F.2d 432, 437 (D.C. Cir. 1989) ................................................................................46

*Paine, Webber, Jackson & Curtis, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
    587 F.Supp. 1112, 1117 (D. Del. 1984) ..........................................................................20

*Pryer v. C.O. 3 Slavic*,
    251 F.3d 448, 455 (3rd Cir. 2001) ..................................................................................20

*Poullard v. Turner*,
    298 F.3d 421, 423 (5th Cir. 2002) ..................................................................................17

*Raino v. Goodyear Tire & Rubber Co.*,
    309 S.C. 255, 259, 422 S.E.2d 98, 100 (1992) ................................................................18

*Ramar Coal Co., Inc. v. International Union, United Mine Workers of America*,
    814 F.Supp. 502, 510 (W.D. Va. 1993) ..........................................................................16

*Resolution Trust Corp. v. Stone*,
    998 F.2d 1534, 1547 (10th Cir. 1993) ............................................................................32

*Richard v. Firestone Tire & Rubber Co.*,
    853 F.2d 1258, 1260 (5th Cir. 1988) ..............................................................................30

*Rife v. Hitachi Const. Machinery Co., Ltd.*
    363 S.C. 209, 215, 609 S.E.2d 565, 569 (S.C. App. 2005) ..............................................34

*Ruff v. Ensign-Bickford Indus., Inc.*,
    168 F.Supp.2d 1271 (D. Utah 2001) .............................................................25

*Salmon v. Parke Davis & Co.*,
    520 F.2d 1359, 1363 (4th Cir. 1975) .......................................................41, 44

*Sheikh v. Lexington Medical Center*,
    Case No. 2003-CP-32-0675 (Lexington C.P. Sept. 18, 2006) ...........................1

*Stahl v. Novartis Pharms. Corp.*,
    283 F.3d 254, 267 (5th Cir. 2002) ................................................................39

*Stevens v. Parke, Davis & Company*,
    9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 53, 507 P.2d 653, 661 (1973) ..............41, 44

*Stockton v. Altman*,
    432 F.2d 946, 951 (5th Cir. 1970) ...............................................................34

*Talkington v. Atria Reclamelucifers Fabrieken BV*,
    152 F.3d 254, 261-262 (4th Cir. 1998) .........................................................35

*Tatum v. Schering Corp.*,
    795 F.2d 925, 928-929 (11th Cir. 1986) .......................................................40

*Thomas v. Hoffman-LaRoche, Inc.*,
    949 F.2d 806, 812 (5th Cir. 1992) ...............................................................44

*Timm v. Upjohn Co.*,
    624 F.2d 536 (5th Cir.1980) .......................................................................40

*Tipton v. Michelin Tire Co.*,
    101 F.3d 1145, 1151, 1152 (6th Cir. 1996) ..................................................31

*Turner v. Iowa Fire Equip. Co.*,
    229 F.3d 1202, 1209 (8th Cir. 2000) ...........................................................50

*University Computing Co. v. Lykes-Youngstown Corp.*,
    504 F.2d 518, 547 (5th Cir. 1974) ...............................................................10

*Valentine v. Baxter Healthcare Corp.*
    68 Cal.App.4th 1467, 1480, 1481 (1999) .....................................................30

*Wade-Greaux v. Whitehall Lab. Inc.*,
    874 F.Supp. 1441, 1480 (D.Vi. 1994) ............................................................25

*Wagner v. Reading Co.*,
    428 F.2d 289 (3d Cir. 1970)...........................................................................16

*Walters v. Mintec/International*,
    758 F.2d 73, 82 (3rd Cir. 1985) . ...................................................................15

*Waring v. Johnson*,
    341 S.C. 248, 260, 533 S.E.2d 906, 912-913 (S.C.App. 2000) ........................18

*Watson v. Wilkinson Trucking Co.*,
    244 S.C. 217, 136 S.E.2d 286 (1964) ............................................................18

*Welch v. Epstein*,
    342 S.C. 279, 536 S.E.2d 408, 420 (Ct.App. 2000)..........................................1

*Westbrook v. General Tire and Rubber Co.*,
    754 F.2d 1233, 1242 (5th Cir. 1985) ..............................................................16

*Westberry v. Gislaved Gummi AB*,
    178 F.3d 257, 265 (4th Cir. 1999) ..................................................................49

*Wheat v. Pfizer, Inc.*,
    31 F.3d 340, 343 (5th Cir. 1994) ...................................................................49

*White v. Grinfas*,
    809 F.2d 1157, 1161 (5th Cir. 1987) ........................................................21, 34

*Whitehead v. Food Max of Mississippi, Inc.*,
    163 F.3d 265 (5th Cir. 1998) ........................................................................16

*Whitley v. Cubberly*,
    24 N.C.App. 204, 210 S.E.2d 289, 207-208 (1974) ........................................44

*Willard v. The John Hayward*,
    577 F.2d 1009, 1011 (5th Cir. 1978) ..............................................................37

*Willett v. Western Oceanic, Inc.*,
    117 F.R.D. 379 (E.D. La. 1987)......................................................................28

*Williams v. Slade*,
    431 F.2d 605, 609 (5th Cir. 1970) ............................................................18, 27

*Woodbury v. Janssen Pharmaceutica, Inc.*,
    1997 WL 201571*8 (N.D. Ill. 1997) ................................................................39

## STATUTES

S.C. CODE ANN. § 15-73-30 ......................................................................32

## OTHER

Anderson, S.C. Requests to Charge - Civil, § 32-2 (2002)............................................35

9A Wright & Miller, Federal Practice and Procedure § 2510 (2006) ...........................................32

Daniel J. Capra, The Daubert Puzzle, 32 Ga.L.Rev. 699, 728 (1998)...........................................49

Manual for Complex Litigation, Fourth §20.132, 22.315 (FJC 2004)...........................................14

Reference Manual on Scientific Evidence 2nd Ed. 345-346 (FJC 2000) .....................................25

## **TABLE OF CONTENTS**

INTRODUCTION..................................................................................................................1

I.  PLAINTIFF'S DAMAGES AND THE EVIDENCE SUPPORTING THE
    JURY'S FINDING OF LIABILITY AND CAUSATION....................................................2

    A.  Vioxx Accelerated Mr. Barnett's Atherosclerosis.  ..................................3

    B.  Mr. Barnett's Current Plaque Build-Up is Due to Vioxx. ......................5

    C.  Before He Began Taking Vioxx, Mr. Barnett Had 5 Non-Occluded Coronary
        Vessels; Only the Small Circumflex Had Greater Than 50% Stenosis. ..................6

    D.  The State of the Record Shows That Because of Vioxx and Accelerated Plaque
        Build-Up, Mr. Barnett Suffered From the Following: ..............................................6

        1.  Heart Attack on September 6, 2002 and a First Angiogram
            Showing 6-Vessel Stenosis ............................................................6

        2.  CABG Surgery with 5 Grafts on September 10, 2002.....................7

        3.  More Likely Than Not a Second Heart Attack in July 2004 ...........7

        4.  A Second 2006 Angiogram Which Showed 2 Occluded Bypass
            Grafts, and a Stent Placed in the Native Ramus Coronary Vessel to
            Supply Replacement Perfusion For One of the Occluded Grafts,
            and 2 New Fully Occluded Native Vessels – the RCA and the
            PLSA…………………………………………………………………8

    E.  Today, Mr. Barnett Has 2 Fully Occluded Native Vessels – the RCA and
        PLSA, 2 Occluded Bypass Grafts, and Some Blood Flow Vis a Vis Collaterals
        to the Very Bottom Part of the PDA.  He Does Not Have Proper Blood Flow to
        the Upper and Proximal Sections of the RCA. ......................................................9

    F.  In Addition to These Injuries, the Posterolateral Part of Heart (Not Seen on the
        Ventriculogram) Has Some Level of Kinesis.  Also, He Has Inferior Wall
        Hypokinesis Which is Permanent. ......................................................................10

    G.  Pain and Suffering.................................................................................................12

    H.  Merck's National Litigation Posture....................................................................13

II.     ANY NEW TRIAL SHOULD BE LIMITED TO DAMAGES ........................................15

        A.      The Court Should Order a Remittitur, With Any Conditional New Trial
                Limited to Damages Only. ....................................................................................15

        B.      The Damages and Liability Issues are Not Inextricably Intertwined. ...................17

III.    THERE IS NO EVIDENCE, MUCH LESS A REASONABLE PROBABILITY, THAT
        THE VERDICT WAS THE RESULT OF PASSION OR PREJUDICE, OR OTHER
        IMPROPER MOTIVE, NOR THAT THE JURY'S FINDINGS ON LIABILITY WERE
        IMPROPERLY INFLUENCED. THE COURT SHOULD THEREFORE ISSUE A
        REMITTITUR. ...............................................................................................................22

IV.     THE VERDICT CANNOT BE INCONSISTENT, AS IT INVOLVES
        SEPARATE AND DISTINCT CLAIMS AND STANDARDS OF PROOF. ...................29

        A.      The Verdict Is Not Inconsistent - Strict Liability And Deceit Are Separate and
                Distinct Causes of Action with Different Standards of Proof. ...............................31

        B.      Even if the Jury Had Not Found for the Plaintiff on the Deceit Cause of Action,
                the Jury Instructions Rendered Negligence the Broader Theory of Recovery Under
                South Carolina Law. .............................................................................................33

V.      THE GREAT WEIGHT OF THE EVIDENCE SUPPORTS THE JURY'S FINDINGS. 37

        A.      Knowledge of a Risk Associated with a Drug Does Not Absolve a Manufacturer
                of Liability. The Plaintiff's Physicians Were Not Provided Adequate Warnings
                Regarding Vioxx. ...................................................................................................38

        B.      The Evidence, Both Subjective and Objective, Establishes That Had Merck
                Provided an Adequate Warning, Dr. Mikola Would Not Have Prescribed Vioxx,
                and Mr. Barnett Would Not Have Continued to Take the Drug. ...........................43

        C.      The Weight of the Evidence is That in All Probability Vioxx Caused Mr.
                Barnett's Heart Attack and Accelerated His Atherosclerosis. ...............................46

VI.     CONCLUSION. .............................................................................................................52

**INTRODUCTION**

During the course of this trial, Plaintiff proved unequivocally that he will lose nine to ten years from his life due to his ingestion of Vioxx. The weight of the evidence – unchallenged by a single Merck retained expert - showed that Vioxx caused plaque build-up in the Plaintiff's heart, causing him to suffer from a heart attack, multiple surgical interventions, a second heart attack, and the fear of early death. Juries in South Carolina have rendered similar verdicts in cases involving serious injuries. See *Sheikh v. Lexington Medical Center*, Case No. 2003-CP-32-0675 (Lexington C.P. 9/18/06)(Plaintiff claimed drug heart sudden death; defense claimed heart attack-$30 million verdict.) Additionally, South Carolina courts have upheld $35.4 million and $16 million verdicts in personal injury cases. See *Welch v. Epstein*, 536 S.E.2d 408 (S.C.App. 2000); *Hundley v. Rite Aid of South Carolina, Inc.*, 529 S.E.2d 45 (S.C. App. 2000) Much like these cases, the Plaintiff believes that $50 million in compensatory damages is justified for the loss of a decade of life expectancy, yet acknowledges that this Court believes the amount was excessive. Although Plaintiff agrees with the Court that any new trial should be limited to damages, Plaintiff requests the option to accept a remittitur of $10 million for the compensatory damages, all the while leaving the punitive damages at $1 million. Each year taken off Jerry Barnett's life has a high value, and is arguably worth up to $1 million per year during the golden years of his life.

The Seventh Amendment, the law of the Fifth Circuit, considerations of judicial economy, as well as basic principles of equity and fairness, require that Plaintiff be given the option of remittitur. The Court concluded "that the jury's findings for the Plaintiff on his negligent failure-to-warn and deceit-by-concealment claims were reasonable," and stated that "the Court is not troubled by the $1 million punitive damage award." Under these circumstances remittitur is appropriate.

Moreover, if, as Merck suggests, the issues of liability are so intertwined as to require a new

trial of all issues, why should the Plaintiff be forced to take such a risk, either in this courtroom, or in the court of appeals, when liability has already been determined in his favor?  It is not fair to the Plaintiff or the Court, nor consistent with the premise of bellwether trials in multi-district litigation to unnecessarily conduct a second trial. This was not a hung jury like Irvin/Plunkett. The jury clearly found in favor of Gerald Barnett on liability for negligence, breach of duty, deceit and proximate cause, and found by clear and convincing evidence that Merck's conduct was willful, wanton or in reckless disregard of the Plaintiff's rights.

The Court should not feel that by setting a value for a reasonable compensatory award in this bellwether case it would be placing a value on settlement for future cases. In reality, the ad damnum is going to be several times what the cases will eventually settle for, because there will be multiple defense verdicts as well as some plaintiff verdicts.  However, in order for a plaintiff who tries a bellwether case to receive a reasonable net from a remitted award, the extraordinary costs and expenses must be considered.

## I.    PLAINTIFF'S DAMAGES AND THE EVIDENCE SUPPORTING THE JURY'S FINDING OF LIABILITY AND CAUSATION

Contrary to Merck's assertions at trial, this is not a case of a "small heart attack" with minimal medical billing.  Jerry Barnett's heart attack was just the first manifestation of the multiple serious and ongoing injuries caused by Vioxx which took him from a favorable cardiac health status with prospects of a full life in 2000, to a dire situation in 2006, in which he now suffers from diffuse coronary disease throughout his heart and dismal prospects for the future.  Since his heart attack in 2002 he has also suffered: a quintuple open-heart CABG surgery; continued rapid development of plaque; a second heart attack resulting in vein occlusions; another angiogram and placement of a stent; and the likelihood of further surgical intervention and a loss of nine to ten years of his life.

The evidence in this case showed, through the testimony of Dr. Zipes, that Mr. Barnett was a man who in 2000 had only a 1-2% risk of having a heart attack. However, just a short time later, he not only had a heart attack, but suffered from a severe amount of coronary artery disease, inexplicable by anything other than Vioxx. Dr. Karavan testified as to the difference in Mr. Barnett's cardiac status today as compared to the time of his heart attack in 2002. In each of Mr. Barnett's various coronary arteries, such as the LAD, the diagonals off the LAD, the Ramus Intermedius, the RCA and the posterolateral branch of the RCA, the plaque burden is worse today than it was at the time of the heart attack. Therefore, when evaluating the overall compensatory damages for this case, the focus should not be solely placed upon Mr. Barnett's heart attack and resulting CABG surgery. This is but one aspect of his overall damage from taking Vioxx. Instead the focus should be on the extensive coronary artery disease caused by Vioxx.

This trial was a story not just of a "small heart attack," but one of a disease process that aggressively occluded Mr. Barnett's arteries, not once, but twice to the point where he is now at increased risk of future cardiac events requiring surgical intervention, and the prospect of premature death. Mr. Barnett's damages are more than his lost years of life. The following is a brief summary of the ongoing damage that Jerry suffered as a result using Vioxx, starting with his overall health status in 2000, to the heart attack in 2002, to the CABG surgery in 2002, to his vein graft occlusions and second heart attack in 2004, to his decreased exercise tolerance and finally to his current status of occlusion. Included in the summary are excerpts from the trial transcript supporting showing what evidence the jury was able to consider when deciding to award damages to Mr. Barnett.

### A.     Vioxx Accelerated Mr. Barnett's Atherosclerosis.

- Douglas Zipes, MD, 8/8/06 Tr. at 1677:13-1678:12

1677

13   A.   Sure.   I do.   When Vioxx, as a Cox-2 inhibitor, works, it

3

14  will prevent the development of the prostacyclin part of the
15  whole balance that I told you.  So, then, that will lead to
16  thromboxane not being opposed, not being balanced, by the
17  prostacyclin.
18      And that, then, will lead to the steps that I talked
19  about before so that we're going to have constriction.  We call
20  that vasoconstriction.  That water pipe is going to get
21  narrower.  The blood pressure is going to go up.  The platelets
22  are going to get more sticky because they don't have the
23  prostacyclin to prevent them from sticking together.  And there
24  are other things that can happen that I didn't touch on.
25      But, if you remember, in the very beginning I said

1678

1   that, if there is an injury to the inner wall, there is a
2   signal that's sent out for cells to come and try to repair that
3   injury.  There is a balance between the thromboxane and
4   prostacyclin in terms of attracting those cells.  It's called a
5   chemoattractant mechanism.  And prostacyclin tends to prevent
6   the cells from adhering while thromboxane tends to encourage
7   the cells to adhere.
8       So if you get rid of the prostacyclin with Vioxx and
9   you get this little injury that we all have from age 10 or 20
10  years old, you're now going to have more of these cells migrate
11  into that area of the blood vessel, and this, then, can
12  accelerate the development of the plaque.

- Stephen Epstein, MD: Trial Transcript Volume 6, August 5, 2006, 1201:19-22;
  1203:2-7

1201

19  A.  **Well, our initial proposal to Merck had the hypotheses**
20  **that Vioxx would be protective against viral infection and**
21  **protective against the development of atherosclerosis, and we**
22  **found just the opposite**.

1203

2   Q.  Before we move on to this clinical study and away from
3   this e-mail, doctor, based on your experience in this area and
4   your study and your years of research in this area, **was Merck**
5   **given a yellow flag or a warning back in 2001 about the**
6   **potential harmful effects of Vioxx in humans?**
7   **A.  Yes.**

4

**B.     Mr. Barnett's Current Plaque Build-Up is Due to Vioxx.**

- Dr. Karavan, 8/5/06 Tr. at 1153:15-1154:11

                                  1153

15   Q.   Given the amount of plaques that he's got, CAD, would you
16   be able to compare his prognosis versus a person who does not
17   have this level of plaque?
18   A.   I think he -- **clinically, the thing that would be the most**
19   **worrisome is that he has somewhat of a diffuse process and**
20   **progression of that process would be -- more progression of it**
21   **is the main concern to me.**
22          Again, given the fact that his heart pumps normally
23   and the overall blood flow is probably normal now -- it was
24   only mildly diminished -- that still would, overall, give him a
25   good prognosis, but I am concerned about his total plaque

                                  1154

1   burden and that progression.
2   Q.   Do you have an opinion as to whether or not that total
3   plaque burden could shorten his life expectancy?
4   A.   **Well, one of the hardest things, in my mind, is to tell**
5   **someone how long they're going to live or have to live and**
6   **the -- but the amount of plaque burden would be one of the**
7   **things I'd be concerned about.  He certainly, from a cardiac**
8   **standpoint, would not have the same prognosis of someone that**
9   **had more simple, you know, less diffuse disease.  I think he**
10  **has a different prognosis than someone like that.**  I would not
11  put a number on it.

- Dr. Zipes, 8/8/06 Tr. at 1734:25-1735:14

                                  1734

25   Q.   Why?

                                  1735

1   A.   I can come up with no other answer.  As I expressed to
2   you, all of his risks were taken into consideration when he has
3   the first stress test January 24, 2000.  If being an FBI agent
4   and his wife's cancer, all of these things, family history had
5   played a role, whatever role it played, we should have seen it
6   on the stress test at January 24, 2000.  So we start basically
7   from that point.
8          Then he starts taking the Vioxx, and the one major
9   big risk that he had was the elevated LDL, the bad cholesterol.
10  that is brought under control by July of 2000 and comes down to
11  numbers that, as I cited from two trials, actually produced

                                  5

12   reversal of coronary plaque. **So the only way I can account for**
13   **the progression of the plaque buildup that Jerry Barnett has**
14   **had is that it has to be the Vioxx.**


**C.**   **Before He Began Taking Vioxx, Mr. Barnett Had 5 Non-Occluded Coronary Vessels; Only the Small Circumflex Had Greater Than 50% Stenosis.**

- Jeffrey Popma, 8/7/06 Tr. at 1344:19-1345:5

1344
19   Q.  Now, can you tell from the results of this test whether
20   the blockage is confined to that one area?
21   A.  Again, I'm going to try to qualify the statement
22   "blockage." I think that there is blockages in the arteries.
23   but what I want to differentiate is:  are there important
24   blockages, more than 50 percent narrowings, that with maximum
25   exercise -- and this isn't just maximum exercise; this is
1345
1   rather heroic exercise -- that with this maximum exercise, with
2   the heart pumping, getting to 92 percent of his maximum
3   predicted heart rate, that **only one area right over here had**
4   **any important reduction of the blood flow.  The rest of the**
5   **heart was functioning normally.**


**D.**   **The State of the Record Shows That Because of Vioxx and Accelerated Plaque Build-Up, Mr. Barnett Suffered From the Following:**

**1.**   **Heart Attack on September 6, 2002 and a First Angiogram Showing 6-Vessel Stenosis.**

- Dr. Jeffrey Popma, 8/7/06 Tr. at 1366:9-20

9    Q.  And what's that stump?
10   A.  That stump is a combination of the cholesterol buildup and
11   blood clot.
12        And the blood clot, which is dynamic, which just came
13   on and formed a blood clot, **stopped the flow, caused the chest**
14   **pain, caused part of his heart muscle tissue to die, and cut**
15   **off the circulation to the distal portion of this vessel**.
16   Q.  And what is that called?
17   A.  In this particular case, it was called a non q-wave
18   myocardial infarction.
19   **Q.  Is that another term for a heart attack?**
20   **A.  Yes, exactly.**

6

- Dr. Mark Karavan, 8/4/06 Tr. at 1001:118

### 1001

1  Q.  And tell the jury what a cardiac catheterization is.
2  A.  That's a test where we slide tubes from the groin up into
3  the heart and inject contrast dye into the blood vessels of the
4  heart and feed blood to the heart and assess for blockage.
5  Q.  And blockage is -- is -- you'll give a percentage of the
6  blockage; is that right?
7  A.  Yes, sir, we give --
8  Q.  We'll come to that.
9  A.  Yes, sir.
10  Q.  Could you read into the record what you say in your
11  handwriting on 9/9/02 on exhibit 12.
12  A.  Cath without complication.  LVEF approximately 50 percent.
13  LVEDP 16.  **Left main, 50 percent distal**.  **LAD, mild proximal**
14  **irregularities, mid vessel 80 percent.  D1 small 80 percent.**
15  **D2 moderate, mild irregularities.  Circumflex, small diffuse,**
16  **high-grade disease.  Ramus, large, proximal 80 percent lesion.**
17  **RCA hundred percent PDA with collaterals.  Posterolateral**
18  **branch 80 percent.  Recommendation, CABG**.

**2.      CABG Surgery with 5 Grafts on September 10, 2002.**

- Dr. Karavan, 8/4/06 Tr. at 1014:4-11

### 1014

4  Q.  Okay.  He described on page 2 details of the operation;
5  right?
6  A.  That's correct.
7  Q.  Just in laymen's terms, what did he do there?
8  A.  **He performed a five way coronary artery bypass grafting to**
9  **Mr. Barnett.**
10  **Q.  Five different vessels?**
11  **A.  Five, that's correct.**

**3.      More Likely Than Not a Second Heart Attack in July 2004.**

- Dr. Zipes, 8/6/06 Tr. at 1726:10-20

### 1726

10  Q.  So, in other words, you didn't do the test.  You had
11  somebody else doing the tests.
12  A.  Absolutely.  Now, I looked at the tests after they had
13  done them and after they had written their decisions.  I didn't

7

14   change anything.  I didn't influence them.  Those are the
15   decisions that they came up with.
16        **They said two occluded vein grafts, new wall motion**
17   **abnormality -- that is abnormal squeeze -- when it had been**
18   **normal July of '03.  And I said I don't know how else to**
19   **explain it except that the vein grafts have closed and he**
20   **probably had a heart attack at this point.**

- Dr. Karavan, 8/4/06 Tr. at1116:11-1117:3

1116
11   Q.   Let me ask you this.  Was the ramus saphenous vein graft
12   the graft that was occluded?
13   A.   Correct.
14   Q.   Remember in the echocardiogram there was some wall motion
15   abnormalities; is that right?
16   A.   What we call mid basal and lateral, uh-huh.
17   Q.   Would that be consistent with a possible occlusion to the
18   ramus?
19   A.   I felt that most likely that area was ischemic, giving
20   that wall motion abnormality.  The vessel was patent.  It
21   wasn't 100 percent closed.  It was said to be ischemic, not
22   scarred, on his perfusion study.  So I think the wall motion
23   could be attributed to that vessel.  **Did he have a heart attack**
24   **there?  If he did, it wasn't a big one.  I can tell you that.**
25   **Q.   Is it possible that he had a small one?**

**1117**
1   **A.   Given the fact that he has a small wall motion abnormality**
2   **there, it's consistent -- it's possible that he might have had**
3   **a small market in that area.**

[The last line of this above excerpt was incorrectly transcribed by the court reporter at
trial.  In the deposition it is recorded correctly (*See* July 17, 2006 trial deposition, 41:7-
10.)  Instead of reading "small market" it should read "small heart attack."]

   **4.   A Second 2006 Angiogram Which Showed 2 Occluded Bypass Grafts, and a**
        **Stent Placed in the Native Ramus Coronary Vessel to Supply Replacement**
        **Perfusion For One of the Occluded Grafts, and 2 New Fully Occluded Native**
        **Vessels – the RCA and the PLSA.**

- Dr. Popma, 8/7/06 Tr. at 1377: 6-14; 1481:8-16

1377
6   Q.   I'm going to lay a foundation before I ask you the opinion
7   question.  Would you tell us, at some time after the

8

8      September 9 cath and the September 10 bypass operation, do you

9      have an opinion as to whether or not his grafts occluded?

10     A.  Yes, I do.

11     Q.  And what is that opinion?

12     A.  **The saphenous vein graft that went to the ramus branch**

13     **occluded, and one of the sequential limbs of the graft that**

14     **went to the bottom portion of the heart also occluded.**

1481

8      Q.  He then had a stent inserted by Dr. Karavan while he was

9      in the hospital; right?

10     A.  That's one -- yes.

11     Q.  The stent was inserted into the artery called the ramus?

12     A.  That's correct, because the vein graft to that ramus

13     branch had closed.

14     Q.  We'll talk about that.  The ramus was one of the arteries

15     that had been bypassed in 2002; true?

16     A.  That's correct.

E.     **Today, Mr. Barnett Has 2 Fully Occluded Native Vessels – the RCA and**
       **PLSA, 2 Occluded Bypass Grafts, and Some Blood Flow Vis a Vis Collaterals**
       **to the Very Bottom Part of the PDA.  He Does Not Have Proper Blood Flow**
       **to the Upper and Proximal Sections of the RCA.**

   •   Dr. Popma, 8/7/06 Tr. at 1388:8-1389:3

1388

8      **Q.  So add it up.  Between September 9, '02, and July 10, '06,**

9      **did you list or calculate how many areas of actual occlusion or**

10     **total blockage?**

11     **A.  Total blockages, yes.**

12     **Q.  How many?**

13     **A.  Four.**

14     **Q.  Tell the jury where they were.**

15     **A.  Oh, so from that period of time, 2002 to 2006, there were**

16     **four areas that became totally blocked.**

17             And as I've intimated, different, I mean, different

18     cardiologists will convince about how narrow something is,

19     between 50 and 70, and 70 and 80.  But total is total.  We

20     can't argue with the fact that it's totally blocked.

21             **And so we have the vein graft that went to the ramus**

22     **branch totally blocked that was likely open in July of 2003**.

23             The sequential limb -- I think the sequential limb to

24     the posterolateral branch -- others would say it's to the PDA,

25     but **one of the sequential limbs -- 100 percent blocked**; the

1389

9

1   **distal portion of the coronary artery, a big vessel, totally**
2   **blocked**; and finally **this limb right here of this segment right**
3   **there, "patent and open now," September 9, now totally blocked**.


**F.    In Addition to These Injuries, the Posterolateral Part of Heart (Not Seen on the Ventriculogram) Has Some Level of Kinesis.  Also, He Has Inferior Wall Hypokinesis Which is Permanent.**

- Dr. Popma, 8/7/06 Tr. at 1379:20-1382:25

                           1379
20   By Mr. Robinson:
21   Q.  Tell us about those tests that you relied upon.
22   A.  So there were three tests -- which I'll just go through
23   very briefly because they are in the record and we can talk
24   about them -- there were three tests that Dr. Zipes performed?
25   Q.  What's the date of the tests, for the jury?
                           1380
1   A.  So the first test is an echocardiogram, and the
2   echocardiogram was performed on 5/2/06.  **Echocardiogram is a**
3   **soundwave test that allows us to look, without going into the**
4   **heart, through the procedures that I perform, how well the**
5   **heart contracts and are there any areas of scar and what's the**
6   **overall function.**
7          Now, although Mr. Barnett's overall function of his
8   heart was good, was normal, what was noted on that test was
9   that **there was incomplete contraction in the lateral and the**
10   **basal section of the heart down here.  It just didn't squeeze**
11   **normally.  And there was severely reduced wall motion that was**
12   **in the basal posterior and inferior portion**.
13          I'm just showing you on the heart where this is.  So
14   this is kind of this area, in this same zone that he had his
15   heart attack previously; but also, **as we'll see in just a**
16   **minute, in a zone where one of the vein grafts also occluded.**
17   **and importantly, it wasn't moving, which implies there is**
18   **actually a scar that is there**.
19          So the next test that he had was a ct angio.  Sorry.
20   Let me just say that -- a ct angiogram.
21   Q.  Quickly, what is a CT?
22   A.  A CT angiogram is another way we inject dye into the veins
23   and we can image, without our coronary angiography, what the
24   state of the vessels are.
25          On that, just very briefly, it appeared that one of
                           1381
1   the main grafts that went to the ramus branch had occluded.
                           10

2    and finally, he had an exercise stress test that was performed
3    on May 2, and he could no longer exercise with the same
4    capacity that he could do before.
5    Q.   How many minutes did he do in that exam?
6    A.   I think he got to nine minutes and 30 seconds.  So rather
7    than being 17.2 and 17.5 minutes, which is phenomenal
8    exercise --
9    Q.   The mets, you mean?
10   A.   The mets, yes, that he's actually down to 13.1 mets.
11   Q.   And how many minutes did he do before on the first
12   cardiolite?
13   A.   15 minutes and now we're down to 9 minutes.  So a marked
14   reduction in his exercise tolerance.
15   Q.   And what opinion do you have regarding the change?
16   A.   Well, we'll put this in aggregate, but I think that there
17   is evidence, which we'll see with the angiogram, that there was
18   more heart disease, either by occlusions of these grafts or by
19   progression of his native disease.
20          And interestingly, it's all in the setting when he
21   should be having additional plaque formation because his LDL
22   cholesterol has been so well controlled.
23          Now, just the final piece which I'll mention again.
24   it's a sestamibi scan.
25   Q.   What is a sestamibi scan?
                              1382
1    A.   Sorry.  Cardiolite.  A Cardiolite scan.  Thank you very
2    much.
3    Q.   Is the old name for it sestamibi?
4    A.   It is.  Thank you.  Yes.  And on that particular scan,
5    there was an area of reduced perfusion -- I'm reading from the
6    report -- in the inferior and infero -- and basal inferolateral
7    segments.
8    Q.   What does that mean?
9    A.   That area down here, that, with exercise, starts to fall
10   out.  But the important part of this is that, during rest, it
11   doesn't come back all in towards normal.  **There is still a**
12   **residual problem, and that implies that there has been some**
13   **heart muscle damage; a heart attack in that area.**
14   Q.   And can you tell me whether, in your opinion, was that the
15   same?  Was that the residue from the original heart attack, or
16   was that a residue from a new one?
17   A.   **I believe that it's new**.  And the reason I say that,
18   although it's impossible to predict these things, the reason I
19   say that is because his cardiolite test that he had back in
20   2003 --
21   Q.   July.
                              11

22    A.  -- didn't show this problem.  So if the old heart attack
23    healed up, had bypass surgery, everything got fixed, **there is**
24    **now a new abnormality, a new problem, to the back portion that**
25    **wasn't there in 2003.**

- Dr. Zipes, 8/8/06 Tr. at 1730:17-1731:18

17         Click again.  I measured the relaxed area that's red.
18    click again.  The squeezed area, healthy muscle, is yellow.
19    That gets thicker.  That's like squeezing your bicep.  Go
20    forward again.  This is the scarred area that's narrow.  Click
21    again.  This is the scarred area when the heart is contracting
22    staying narrow.  **This is absolute, unequivocable, unarguable**
23    **proof that he has damaged heart muscle; that he has scar in**
24    **that area; and that this changed from '03 to '06.  Something**
25    **happened, and my interpretation is that it's related to the**
                                1731
1    **obstruction of the two vein grafts and he indeed had a heart**
2    **attack, and he now has to live with the scar.**
3    Q.   Go to the next slide, please.  You did a stress test;
4    right?
5    A.  I did.  Probably blow up, yeah --
6    Q.   What's the point of that?
7    A.   The point of that is this subtle basal inferior
8    hypokinesis.  This was read by our expert in this area, and he
9    confirms this is an abnormal area of contraction and that this
10     is the scar.  In addition, he says that "the mildly reduced
11     perfusion in the fifth inferobasal and inferolateral segments,
12     which is partially reversible, is suggestive of mild
13     stress-induced ischemia."
14         **"Partially reversible," what does that mean?  It**
15     **means that, at rest, the area that didn't take up the**
16     **cardiolite did not improve.  So it's scarred.  So even at rest,**
17     **it won't take up the cardiolite.  This is what we call a fixed**
18     **defect, and this is consistent with a heart attack.**

**G.      Pain and Suffering.**

In determining the appropriate amount for a remittitur the Court should take into account that

Mr. Barnett has suffered a great deal, both physically, as detailed above, and emotionally.

Physically, he has endured the pain of a heart attack and the burden of major medical procedures

such as catheterization, stent placement and bypass surgery.  As the Plaintiff's brother John testified,

he spent quality time with the Plaintiff before the heart attack, and together they engaged in many activities such as golf, shag dancing and walking on the beach. (8/7/06 Tr. at 1520:12-20.)  John notes that since Mr. Barnett's heart attack and subsequent episodes of chest pain, the Plaintiff's energy level has markedly decreased.  He states, "most definitely, as far as his energy level, he has never come back to the level that he had when he came down here to North Carolina."  (*Id.* at 1514:6-9.)  Reiterating this point, John testified that "I remember that in my mind that he seemed to be recovering slower than what I thought he ought to."  (*Id*. at 1512:13-14.) John further describes the Plaintiff as "not quite hitting on all cylinders."  (*Id.* at 1520:4-5.) As the Plaintiff described in his testimony, "I know after the heart attack I've been doing things at a lower level . . ." (8/8/06 Tr. at 1594:5-6.)

Mr. Barnett has also suffered emotionally. When asked about his concerns for the future, he responded that his major concern is dying early and leaving his wife behind.  As he testified, "My biggest one would be my family, particularly my wife, because she really depends on me a lot.  And I can't imagine her – you know, really what life would be life for her, you know, if I wasn't here . . . It's my biggest worry is, you know, my mom, how is she going to handle it, the brothers?  But my wife, particularly, because she's more vulnerable."  (*Id.* at 1594:11-17.) Each day, Mr. Barnett is fearful of another heart attack and premature death, which is a heavy burden for him to carry during his golden years. Nothing is more stressful in life than fear of death. This fear is a compensable damage everyday that he stays alive.  Plaintiff's first heart attack and loss of years off of his life, in and of themselves, would justify a remitted award of $10 million in compensatory damages.  When the overall permanent and life-threatening damage to Mr. Barnett's cardiac health caused by Vioxx is also considered, compensatory damages in that amount are clearly reasonable.

**H.      Merck's National Litigation Posture.**

The Court can and should also take into account Merck's national litigation posture and the effect the reduction of this verdict will have on other cases.[1] Despite Merck's argument that the Defendant and the people who currently run Merck had gotten the 'message' and taken it 'to heart,' it is ironic, though not surprising, that soon thereafter representatives of Merck were reiterating their scorched earth litigation strategy of trying every case. According to the Associated Press as reported in the Washington Post, in a news release a member of Merck's national defense team "said that the company intended to maintain its policy of trying every Vioxx case."

(http://www.washingtonpost.com/wp- dyn/content/article/2006/08/17/AR2006081701609.html)

This case and this verdict have national resonance.[2] Merck must accept the good and the bad which are inherent in its litigation strategy. It must live with the larger awards just as it has accepted the defense verdicts. Otherwise, if all large awards are artificially lowered Merck will only be encouraged to continue to try every case, requiring every plaintiff to spend millions of dollars to have their day in court.  It is essential that the bellwether cases in the mass tort context be truly representative. *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997.) Because the purpose of test cases is to produce a reliable range of potential values, (Manual for Complex Litigation,

---

[1] As this Court noted in *In Re: Propulsid Products Liability Litigation*, Not Reported in F.Supp.2d, 2003 WL 22023398, *6, E.D. La., March 11, 2003:

> "Finally, the Court is mindful that its primary duty in this case is owed to the litigants in this case, but the Court cannot ignore its responsibilities as an MDL transferee court. The Court must balance the two interests. In doing so, the Court reiterates its previous statements that trial of the issue of adequate warnings will be helpful to all litigants, including the [plaintiffs], in an attempt to move this litigation forward toward an ultimate conclusion."

[2] According to the Manual for Complex Litigation, Fourth:

> "One of the values of multidistrict proceedings is that they bring before a single judge all of the federal cases, parties, and counsel comprising the litigation.  They therefore afford a unique opportunity for the negotiation of a global settlement.  Few cases are remanded for trial; most multidistrict litigation is settled in the transferee court.  As a transferee judge, it is advisable to make the most of this opportunity and facilitate the settlement of the federal and any related state cases."  Id at §20.132.

14

Fourth, § 22.315(FJC 2004), any significant reduction of the jury's verdict here would artificially skew the global liability picture. It would render an unrealistic view of Merck's potential exposure in the Vioxx litigation, by narrowing and lowering the anticipated range of verdict amounts.

## II.   ANY NEW TRIAL SHOULD BE LIMITED TO DAMAGES.

### A.   The Court Should Order a Remittitur, With Any Conditional New Trial Limited to Damages Only.

Merck argues that Court has found the damages award was so excessive as to be the result of caprice, passion, or prejudice. Actually the court did not make such a finding, nor was it required to in order to find the verdict excessive. The Order states:  "The Court finds that the $50 million compensatory damages award is excessive under any conceivable substantive standard of excessiveness," and that "no reasonable jury could have found that the Plaintiffs losses totaled $50 million." This does not mean the jury acted out of passion or prejudice, in either its award or its liability findings.  To the contrary,  the Court, having heard all the evidence, concluded " the jury's findings for the Plaintiff on his negligent failure-to-warn and deceit-by-concealment claims were reasonable,"  and that it "is not troubled by the $1 million punitive damage award in this case."

There is nothing in the record and no reason to believe that the jury, which acted dispassionately in its findings on the liability issues as well as its award of punitive damages, somehow acted with caprice, passion, and prejudice. Where, as here, the jury's liability findings are reasonable and supported by the evidence, any new trial, with or without remittitur, must be limited to damages. Merck should not be allowed to take advantage of the jury's generosity to obtain another chance at a verdict on liability. Merck had its day in court on the liability issues. Where the excessiveness of a verdict does not implicate the jury's liability findings, a new trial, where required, may be limited to damages. *Walters v. Mintec/International*, 758 F.2d 73, 82 (3rd Cir. 1985) citing

*Wagner v. Reading Co.,* 428 F.2d 289 (3d Cir. 1970) (ordering partial retrial on damages in personal injury action.)  Moreover, this Court is the best judge of the fact that the liability ruling was not in any way tainted. *City of Phoenix v. Com/Systems, Inc.,* 706 F.2d 1033, 1036 (9th Cir. 1983).

The excessive nature of an award does not impugn the reasonable liability findings. In fact, an excessive award may demonstrate that the jury had little doubt as to issues of liability. *Westbrook v. General Tire and Rubber Co.,* 754 F.2d 1233, 1242 (5th Cir. 1985). Even if a damages award is found to be the result of passion or prejudice, this does not mean the liability findings were improperly influenced or that liability must be retried. *Whitehead v. Food Max of Mississippi, Inc.,*163 F.3d 265, 278-279 (5th Cir. 1998)("Here, the new trial need be only on damages. ….[T]he damage awards were high; this also indicates the jury's strong belief that Kmart was liable.")

This Court should also examine the question of a new trial in terms of the fairness to the Plaintiff, who has already proven liability, being forced to retry the issue solely because it is this court's opinion the jury by its honest judgment placed a much higher value on the injuries than most juries would have awarded. See *Ramar Coal Co., Inc. v. International Union, United Mine Workers of America*, 814 F. Supp. 502, 510 (W.D. Va. 1993) ("Defendants assert that they are entitled to a new trial on all issues because the jury did not fairly consider the issue of damages. Although the Court is convinced that the jury was mistaken as to damages, the Court finds nothing to suggest that the jury's verdict was based on anything other than honest judgment.") "Considerations of economy, fairness, and repose may provide justification for preserving a jury's liability determination that has been fairly and fully made and ordering only a new trial on damages "where there is no substantial indication that the liability and damage issues are inextricably interwoven, or that the first jury verdict was the result of a compromise of the liability and damage questions."" *Atlas Food Systems and Services, Inc. v. Crane Nat. Vendors, Inc.,* 99 F.3d 587, 599-600 (4th Cir. 1996). See also *Maxey*

16

*v. Freightliner Corp.*, 727 F.2d 350, 351-352 (5th Cir. 1984)(" To subject the plaintiffs to re-entering the judicial fray, should they reject remittitur, to re-prove liability either for purposes of compensatory or exemplary damages (both issues decided favorably in plaintiffs' favor after three appellate appearances) would be judicially wasteful, as well as unfair to the plaintiffs.")

Where a new trial is appropriate because of an excessive damage award the Fifth Circuit has not hesitated to remand for a new trial limited to the issue of damages. *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 687-688 (5th Cir. 2003); *Poullard v. Turner,* 298 F.3d 421, 423 (5th Cir. 2002)(New trial on compensatory and punitive damages.) This often occurs with the court offering the plaintiff a choice of accepting a remittitur or a new trial on damages only. *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176 (5th Cir. 1995); *Chemical Distributors, Inc. v. Exxon Corp.*, 1 F.3d 1478 (5th Cir. 1993); *Brunnemann v. Terra Intern., Inc.*, 975 F.2d 175,179 (5th Cir. 1992).

### B.  The Damages and Liability Issues are Not Inextricably Intertwined.

Merck contends that the evidence of damages falls into three categories ((i) medical bills; (ii) non-economic damages and (iii) diminished life of nine to ten years), and argues that as to each of these injuries, there is conflicting evidence as to whether, and to what extent, it was caused by Vioxx, and that therefore "all of this requires specific causation evidence that is properly part of liability, not damages." In *Gasoline Products Co. v. Champlin Refining Co*., 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931), a breach of contract action, damages were entirely dependent upon very specific findings regarding the contracts and the contemplation of the parties. While damages for breach of contract are limited to the contemplation of the parties, tort actions are subject to an entirely different set of rules.  Merck is responsible for all damages suffered regardless of the extent to which its conduct contributed, and regardless of whether such damages were within the contemplation of the parties. *Hutson v. Continental Assurance Co.,* 269 S.C. 322, 332, 237 S.E.2d

17

375 (1977); *Lifschultz Fast Freight, Inc. v. Haynsworth, Marion, McKay & Guerard*, 324 S.C. 645,

653, 486 S.E.2d 14, (S.C.App. 1997.) See also *J.T. Baggerly v. CSX Transp., Inc.*, --- S.E.2d ----,

2006 WL 2474203,*3, S.C., August 28, 2006. Additionally, damages here are not dependent upon

the extent to which Merck's conduct contributed to Mr. Barnett's heart attacks nor to which they

contributed to his loss of life expectancy.  Under South Carolina law the defendant takes the plaintiff

as he is found, and the plaintiff is entitled to recover damages resulting from the aggravation of pre-

existing conditions. *Watson v. Wilkinson Trucking Co.*, 244 S.C. 217, 136 S.E.2d 286 (1964); *Raino*

*v. Goodyear Tire & Rubber Co.,* 309 S.C. 255, 259, 422 S.E.2d 98, 100 (1992); See also, *Waring v.*

*Johnson*, 341 S.C. 248, 260, 533 S.E.2d 906, 912-913 (S.C.App. 2000). Even if all issues of liability

and damages were retried, the jury still would not be required to itemize each injury in special

interrogatories, nor the extent to which Merck's conduct was a contributing factor to each injury.

The authorities cited by Merck are of no help. *Anderson v. Siemens Corp.*, 335 F.3d 466, 471-

72 (5th Cir. 2003)(Liability finding  based upon erroneous admission of evidence and the court found

it could not separate two intertwined *liability* issues.  *Id.* at 475-476.);  *Mack Trucks, Inc. v. Arrow*

*Aluminum Castings, Co.,* 510 F.2d 1029, 1034 (5th Cir. 1975) (rejecting separate trials on two

different but related liability theories); *Eximco, Inc. v. Trane Co.*, 748 F.2d 287, 289 (5th Cir.

1984)(breach of contract and federal statutory violations.); *Nissho-Iwai Co. v. Occidental Crude*

*Sales, Inc.,* 729 F.2d 1530, 1538-1539 (5th Cir.1984)(rejecting separate trials of fraud and breach of

contract causes of action); *Davis v. Safeway Stores Inc.*, 532 F.2d 489, 491 (5th Cir. 1976)(default

judgment in personal injury action reversed as to damages where affidavits insufficient); *Colonial*

*Leasing v. Logistics Control Int'l,* 770 F.2d 479, 481-82 (5th Cir. 1985) (Plaintiff was entitled to new

trial on all issues relevant to its right to recover under Texas Fraudulent Transfer Act, rather than

solely to issue of creditor status.); *Williams v. Slade,* 431 F.2d 605, 609 (5th Cir. 1970))(Issue of

18

whether a retrial could be ordered only as to one defendant who had been erroneously granted a directed verdict, or whether case should be retried as to both.)

Unlike the cases cited by Merck, *Brunnemann v. Terra Int'l, Inc.,* 975 F.2d 175, 179 (5th Cir.1992), cited by this Court, actually involved a tort claim and actually addressed the issue of a possible new trial limited to damages. Although the appellate court found the verdict was excessive, because there was no evidence it was the result of passion or prejudice the court held that the appropriate remedy was remittitur, subject to a new trial on damages only if the plaintiff did not accept the reduced amount. *Id.* at 178-179. Like *Brunnemann*, there is no evidence that the jury's award was the result of passion or prejudice. As this Court noted, the jury's liability findings were reasonable. This combined with the relatively minimal award on punitive damages demonstrates this jury was attempting to be eminently fair. As is *Brunneman*, a new trial can be ordered on the issue of damages alone, conditioned upon the Plaintiff rejecting a remittitur.

Merck argues that the jury never decided which, if any, of Mr. Barnett's injuries resulted from his Vioxx use, and that a second jury would be required to reexamine all the issue of general and specific causation in order to do so. However, this same argument could be applied to almost any products liability case, and virtually every one of thousands of cases in the Vioxx litigation. Accepting Merck's argument would guarantee a retrial of all issues in every Vioxx case, every time a jury renders an excessive award.[3]   Merck would always argue that different aspects of damages and the absence of jury findings separating out medical bills and preexisting conditions, two factors

---

[3] Merck's position is not unlike the argument made by the defendant in *Levesque v. Marine Drilling Co.,* 783 F.Supp. 302, 306 (E.D.Tex. 1992), that the plaintiff's credibility on liability was 'intertwined' with his credibility on damages. ("Plaintiff's credibility has already been determined as to liability. A new jury can judge his credibility as to damages. The credibility of the plaintiff is present in every case. If the court follows the defendant's suggestion, no case could ever be tried on damages alone. Such a position is contrary to the law.")

present in most Vioxx cases, foreclose a trial on damages without retrying liability. The resulting waste of judicial resources, and the unfair burden to injured victims of Vioxx, would be monumental.

The requirement that issues retried be separate and distinct from those not retried is to ensure that improper influence that may have affected one did not affect the other, (*Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 455 (3rd Cir. 2001)) and  to avoid a risk of inconsistent verdicts. *In re Plywood Antitrust Litigation*, 655 F.2d 627, 636 (5th Cir. 1981).  However, there is no danger of inconsistency here, nor is there any evidence that the cause of the allegedly excessive award affected the jury's findings on liability. Merck asserts that it is a practical impossibility to try damages alone in that it would require presentation of most or all of the evidence from the first trial. The cases Merck cites for this proposition all concern bifurcation of trials in class actions. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 749-751 (5th Cir.1996); *Alabama v. Blue Bird Body Co.,* 573 F.2d 309, 318 (5th Cir. 1978); *In re Rhone-Poulenc Rorer Inc.,* 51 F.3d 1293, 1303-1304 (7th Cir. 1995).

The fact that some of the evidence relevant to one claim may have to be presented again to the second jury does not implicate the constitutional concerns behind the rule. See *Houseman v. U.S. Aviation Underwriters*, 171 F.3d 1117, 1128 (7th Cir. 1999)("…Seventh Amendment argument boils down to an assertion that much of the evidence presented in the first trial would have been re-examined in the second. Yet, this alone does not raise constitutional concerns. The Seventh Amendment is concerned about factual conclusions, not evidence: "The prohibition is not against having two juries review the same evidence, but rather against having two juries decide the same essential issues." (citing *Paine, Webber, Jackson & Curtis, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 587 F.Supp. 1112, 1117 (D. Del. 1984)) and *In re Innotron Diagnostics*, 800 F.2d 1077, 1986 (Fed Cir. 1986) (Bifurcation of anti-trust and patent claims upheld despite likelihood that "most of the facts and issues in the patent trial [were] overwhelmingly intertwined and overlapping with

20

those [in the anti-trust case].")

A new trial on the amount of punitive damages does not, as Merck contends, necessitate a retrial of liability issues. See *White v. Ford Motor Company*, 2003 WL 23353600 (D.Nev. Dec 30, 2003) (NO. CV-N-95-0279-DWH) Not Reported in F.Supp.2d, 2003 WL 23353600, *2 (Rejecting argument that retrial of amount of punitive damages must include retrial of liability issues.) Even if some evidence of the conduct for which Merck was found liable must be put before a second jury to determine the appropriate amount of the award of punitive damages, this does not require a new trial on liability issues. See *e.g. Automotive Products v. Tilton Engineering, Inc.*, Not Reported in F.Supp., 1993 WL 661138,*1, C.D.Cal., November 18, 1993.( "Although the Court agrees that AP and *Tilton* must present the evidence of liability to the new jury, the jury does not need to retry that issue…") Proper deference to the Seventh Amendment precludes entry of a judgment that disregards any material jury finding. *LeBlanc-Sternberg v. Fletcher,* 67 F.3d 412, 427-428 (2d Cir. 1995). "Whether and to what extent issues should be separated out should be considered in light of the legal principles that, even when general verdicts are vacated, the parties are still bound by the jury's answers to the written interrogatories, *Green v. American Tobacco Co.,* 325 F.2d 673, 678 (5th Cir. 1963) ("the parties may not re-litigate the issues already decided under the guise of presenting evidence on the issue [that needs to be retried]"), and the Court may not enter a judgment that disregards any material jury finding." *Fibermark, Inc. v. Brownville Specialty Paper Products, Inc.*, 419 F.Supp.2d 225, 234 (N.D.N.Y. 2005) citing *LeBlanc, supra, at* 427.) The Plaintiff's Seventh Amendment rights are at stake here as well, and Mr. Barnett is entitled to the benefit of the findings by the jury on the liability issues already tried.

21

**III.    THERE IS NO EVIDENCE, MUCH LESS A REASONABLE PROBABILITY, THAT THE VERDICT WAS THE RESULT OF PASSION OR PREJUDICE, OR OTHER IMPROPER MOTIVE, NOR THAT THE JURY'S FINDINGS ON LIABILITY WERE IMPROPERLY INFLUENCED. THE COURT SHOULD THEREFORE ISSUE A REMITTITUR.**

The jury's verdict in this case was based upon Plaintiff's presentation of a wealth of evidence showing that Vioxx caused acceleration of atherosclerosis and heart attacks.  Plaintiff's experts relied upon numerous studies, in humans and animals, as well as data from clinical trials, to explain the mechanism by which Vioxx causes increased cardiovascular risk and accelerated atherosclerosis. Through the testimony of Drs. Zipes and Avorn, the Plaintiff proved that Vioxx causes an increased risk of heart attacks.  This evidence went unrebutted, as Merck offered not a single retained expert witness in response. (Drs. Karavan and Bryan concededly were not knowledgeable about the Vioxx science.) Merck's witness, Dr. Reicin admitted APPROVe showed an increased cardiovascular risk at 18 months or longer, (8/14/06 Tr. at 2354:22-2355:1), and Mr. Barnett used Vioxx for 31 months. Merck concedes that APPROVe is a statistically significant, placebo controlled, clinical trial, yet argues that Dr. Moye suggested  "one study is not enough."  However, Merck ignores his testimony that the FDA has decided "if they have one good, large and well-designed, well-executed, well-analyzed confirmation study, that will be enough." (8/3/06 Tr. at 778:20-23.)

Standing alone, APPROVe is statistically significant, scientifically reliable evidence that Vioxx causes cardiovascular events at the 25 mg dose. Dr. Zipes also relied upon statistically significant evidence from the Alzheimer's trials. (8/8/06 Tr. at 1713:23-1714:20.)  In addition to epidemiological data from various clinical studies, Zipes relied upon the Plaintiff's medical records and the results of the 2005 FDA Advisory Committee, wherein 32 independent scientists reviewed clinical data and concluded, 32 to zero, that Vioxx causes an increase in cardiovascular events.  (*Id.* Tr. at 1666:11-1667:6.) Dr. Avorn testified how the VIGOR study results showed a 5-fold increased

risk of heart attack with Vioxx versus naproxen, (8/1/06 Tr. at 295:23-297:14) and why he dismissed Merck's theory that naproxen is cardioprotective. (*Id.* at 323:22-324:18.)  In his own study, he found an increased risk of MI in people taking regular doses of Vioxx, (*Id.* at 336:5-336:14) and the FDA medical reviewer cited several studies that suggest trends toward higher rates of myocardial infarction with Vioxx, even with lower doses of Vioxx or shorter duration.  (*Id.* at 373:10-374:6.) The ADVANTAGE trial showed an increased risk of heart attack, (*Id.* at 367:16-20), as did  Study 090.  (*Id.* at 367:23-368:9.)  In the Alzheimer's trials  the number of cardiac deaths was "striking," (*Id.*  at 378:25-379:5), and even Merck's own internal meta-analysis conducted by Dr. Shapiro showed an increased risk of heart attack.  (*Id.* at 559:7-561:4; 8/1/06 Tr. at 365:24-366:10.)

From all of this evidence it was more than reasonable for a jury to conclude that Vioxx causes an increase of cardiovascular events at the 25 mg dose.  The experts provided  reliable and compelling explanations of how Mr. Barnett's use of Vioxx caused his extensive cardiac injuries. Dr. Zipes demonstrated - unrebutted by any defense expert opinion to the contrary - the mechanism by which Vioxx caused Mr. Barnett's rapid progression of atherosclerosis. Based upon clinical experience as well as hundreds of hours  reviewing materials regarding Vioxx and Cox-2 inhibition (8/8/06 Tr. at 1654:7-20), Dr. Zipes explained that Vioxx prevents the development of prostacyclin, creating an imbalance favoring thromboxane, leading to vasoconstriction, platelet clumping, narrowing of the artery and eventual heart attack.  Because of the imbalance, cells will tend to adhere to an injury in the blood vessel, causing an increase in platelet migration to that area, which in turn causes an acceleration of plaque build-up.  (*Id*. at 1677:9-1679:2; 1679:10-1680:12.)  In his testimony regarding the APPROVe follow-up data, Zipes described how the acceleration of atherosclerosis can affect a person even after Vioxx use is discontinued.  In essence, the damage done to the artery, or the plaque that has accumulated within the artery during the time that a person

23

was on Vioxx remains, putting the individual at greater risk for a thrombotic event.  (8/8/06 Tr. at 1700:21-1701:17.)

Dr. Zipes explained the body of evidence which demonstrates that Vioxx accelerates atherosclerosis, including human data from Merck's own clinical trials, the APPROVe follow-up data as well as the Alzheimer's data from study 078 described in the *Thal* article. These studies were in humans and showed that Vioxx continued to increase the risk of cardiovascular events even after discontinuation of the drug, which is best explained by the acceleration of atherosclerosis while the person was on the drug.  As discussed by Merck's own consultant, Dr. FitzGerald, "Patients in the APPROVe study should continue to be followed.  This will allow some estimate of how quickly the developed risk may dissipate given the relatively short-half lives of these compounds.  Such dissipation may occur rapidly.  On the other hand, if treatment accelerates atherosclerosis, the offset of the risk may be more gradual."  Indeed, as described by Dr. Zipes, the APPROVe follow-up data proved exactly the prediction provided by Dr. FitzGerald, namely that the risk dissipates gradually after discontinuation of the drug.  (*See*, testimony of Dr. Zipes - 8/8/06 Tr. at 1700:18–1704:23; 1713:21–1714:20; 8/10/06 Tr. at 1857:1-8; 1861:1-12; 1863:7–1864:10; 1867:19-25.) Protocol 112 also provides evidence that Vioxx increases cardiovascular risk by showing that in a comparison between Celebrex and other NSAIDs, Vioxx caused a greater increase in blood pressure than any of the other drugs. (8/8/06 Tr. at 1709:25-1710:24.)

Dr. Zipes also relied upon animal studies which provide "an understanding of mechanisms that help us interpret clinical information."  (*Id.* at 1793:9-10.)  Ignoring all of the human data relied upon by Plaintiff's experts, Merck cites several cases and argues that "animal studies cannot establish causation in humans."  However, two of the cases involved animal studies which themselves were unreliable. See *Allen v. Pennsylvania Eng'g Corp.,* 102 F.3d 194 (5th Cir. 1996)

(Affirming exclusion where the animal studies themselves were inconclusive and unreliable, (*Id.* at 195) and there were numerous contrary reputable epidemiological studies. (*Id.* at 197); *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307, 313 (5th Cir.1989)("We need not address at length the animal studies presented by plaintiffs below, except to note several of the more important studies and their methodological flaws." *Id.* at 313.) The other cases involved unique case-specific problems not present here. *Maurer v. Heyer-Schulte Corp.*, 2002 WL 31819160, E.D.La., December 13, 2002 (Summary judgment granted where the only scientific support was an FDA report regarding effect of chemical on rats.); (*Wade-Greaux v. Whitehall Lab. Inc.,* 874 F.Supp. 1441, 1480 (D.Vi. 1994), *aff'd* 46 F.3d 1120 (3d Cir.1994) (Summary judgment in action alleging birth defects where expert testified in other litigation that "because so many substances are teratogenic in animals, before you can make a conclusion that a substance is teratogenic in humans, you must look to the human data." *Id.* at 1483.)

Despite these limited factual scenarios, the use of animal studies is an accepted and reliable methodology. See *e.g.* Reference Manual on Scientific Evidence 2d Ed. 345-346 (FJC 2000.) Blanket arguments against animal studies like Merck is making here, were rejected by the court in *Metabolife Intern., Inc. v. Wornick*, 264 F.3d 832, 842 (9th Cir. 2001):

> "First, *Daubert II* itself recognized that animal studies are not per se inadmissible and should be subjected to substantive analysis, just like other scientific evidence. … None of these cases holds that animal studies will always be too unreliable to provide admissible evidence about human health issues. Notwithstanding the moral and ethical problems often surrounding animal studies, in some circumstances they provide useful data about human health. The district court erred in rejecting the animal studies proffered by Metabolife merely because of the species gap." *Id.* at 842.

Large-scale epidemiological studies are not essential to the formation of an expert opinion as to causation. See *Bonner v. ISP Tech., Inc.,* 259 F.3d 924, 929 (8th Cir. 2001); *Brasher v. Sandoz Pharm. Corp.,* 160 F.Supp.2d 1291, 1296-98 (N.D. Ala. 2001; *Ruff v. Ensign-Bickford Indus., Inc.,*

168 F.Supp.2d 1271, (D. Utah 2001). See also *Hopkins v. Dow Corning,* 33 F.3d 1116, 1124-25 (9th Cir. 1994), *cert. denied,* 513 U.S. 1082, 115 S.Ct. 734, 130 L.Ed.2d 637 (1995). Even ignoring the studies and data involving humans upon which Dr. Zipes relied, the animal studies provided compelling evidence about the mechanism by which Vioxx accelerates atherosclerosis. Genetic alteration allows scientists to closely mimic the conditions of a human heart under the influence of Cox-2s, thereby providing reliable predictors of the mechanism by which Vioxx accelerates atherosclerosis. Dr. Epstein testified that animal studies are relevant to the human situation, (8/5/06 Tr. at 1176:13-16) and that his animal study raised a yellow flag for Merck that Vioxx caused accelerated atherosclerosis. (*Id.* at 1201:19-25.) Dr. Zipes also testified how the animal studies help to explain the mechanism by which Vioxx causes heart attacks. (8/8/06 Tr. at 1686:21-1687:1.)

Based upon the totality of the evidence presented at trial, the jury's findings were reasonable and based on scientifically reliable evidence, including clinical data, medical literature, and studies involving both humans and animals.

Merck argues that the jury ignored the Court's instructions and awarded a verdict intended to punish Merck. Merck's basis for this assertion is defense counsel's unrecorded recollection of the jurors nodding in agreement with his argument to that effect, to wit: "My guess is that you have already awarded punitive damages and that you did not know that this stage was even a possibility." (8/17/06 Tr. at 2696:19-22.) If this is evidence, it opens up a whole new chapter in the FRE. But even assuming, *arguendo,* that this were actually part of the record, and admissible evidence of anything, the statement is ambiguous, as is the alleged 'response' of the jurors. If they in fact nodded, the jurors could just as easily have been agreeing that they did not know punitive damages were even a possibility in phase 1, and therefore they did not intend to punish Merck or make them part of the phase 1 award.

Regardless of Merck's rank speculation as to this undocumented communication from the jury, of actual significance is that this Court found that "the jury's findings on liability are reasonable in this case," and that "the jury's findings for the Plaintiff on his negligent failure-to-warn and deceit-by-concealment claims were reasonable."  This contradicts Merck's empty assertions that the award was the result of improper jury conduct. The authorities cited by Merck all involved misconduct of counsel which the court found to have improperly influenced the jury, or circumstances where there was concrete evidence that the jury disregarded the court's instructions. *Edwards v. Sears, Roebuck and Co.*, 512 F.2d 276, 292 (5th Cir. 1975)(Jury failed to respond to instructions and court found "clear and prejudicial error in the closing arguments of plaintiff's counsel which unduly influenced the jury's sympathies." *Id.* at 283.); *Evers v. Equifax, Inc.,* 650 F.2d 793, 798 (5th Cir. 1981)(Verdict of liability itself was affected by improper considerations where counsel twice made improper argument to the jury to, in effect, award punitive damages despite admonition against and withdrawal of punitive damages issue.); *Mueller v. Hubbard Milling Co.,* 573 F.2d 1029, 1040 (8th Cir.1978)(Verdict was "tainted with the trial court's erroneous and prejudicial admission of parole evidence," and jury added punitive damages where the issue had not been submitted to them.); *Christopher v. Florida,* 449 F.3d 1360, 1368 (11th Cir. 2006)(Plaintiff's counsel made a series of statements which implied to the jury that the State of Florida was underwriting the costs of defense.); *Williams v. Slade*, 431 F.2d 605, 609 (5th Cir.1970)( Passion or prejudice was not in issue, but rather, whether a retrial could be ordered only as to one defendant who had been erroneously granted a directed verdict.)

Unlike the authorities it relies upon, Merck has nothing to point to here other than the size of the award to support its contention the verdict "was infected with passion and prejudice."  Where a damages award is found to be excessive courts do not blindly assume that a liability finding has been

27

wrongfully decided. Even where a damages award is excessive or has been improperly influenced, if liability is "firmly and correctly established" the court should issue a remittitur. *Willett v. Western Oceanic, Inc.,* 117 F.R.D. 379, 382-383 (E.D. La. 1987)("A jury's finding as to liability can be binding even though its monetary award is found to be excessive or even improperly influenced-our deference to faith in the jury system demands at least this much.") Merck is unable to cite a single case where the size of the damages award alone was enough to support a finding of passion and prejudice, let alone one where it was found to have affected the finding of liability as well. This is why Merck has gone to great lengths to attempt to convince this Court that a finding that the award is excessive necessarily includes a finding that it was also the result of passion and prejudice, and "improper jury conduct." The Court made no such finding, nor was it required to in order to find the award excessive, or to issue a remittitur.

Just because a trial court believes an award is excessive, does not mean it was the result of passion or prejudice sufficient to require a new trial. *Curtis Publishing Co. v. Butts,* 351 F.2d 702, 718 (5th Cir. 1965)("Reviewing the amount of the verdict and reaching the conclusion that it is more than the law would permit is not, therefore, the equivalent of the judge's determination that excessiveness is due to a runaway jury, under the spell of passion or bias."); See also *Lowe v. General Motors Corp.*, 624 F.2d 1373, 1383-1384 (5th Cir. 1980)(Ordering remittitur or new trial on damages only, even though  trial court had opined that the damages awarded were "excessive and demonstrate(d) prejudice, bias and passion.")  Numerous courts have held that the size of an award does not by itself demonstrate that it resulted from prejudice and passion. *Bianchi v. City of Philadelphia*, 80 Fed.Appx. 232, 237, 2003 WL 22490388 (3rd Cir. 2003)("[T]he defendant's only evidence of jury prejudice and passion is the amount of the punitive damage award itself. This is insufficient…"); *Mason v. Texaco, Inc.,* 948 F.2d 1546, 1561 (10th Cir. 1991); *Hurley v. Atlantic*

*City Police Dept.,* 174 F.3d 95, 114 (3rd Cir. 1999); *Evans v. Port Authority of New York and New Jersey*, 273 F.3d 346, 352 (3rd Cir. 2001).  See also *Murray v. Bank of America, N.A.*, 354 S.C. 337,344, 580 S.E.2d 194 (S.C. App. 2003)("Mere undue liberality on the part of the jury does not warrant an inference that the verdict resulted from caprice, passion, prejudice, or other improper motives.")

The rule in the 5th Circuit is that "when a jury verdict results from passion or prejudice, a new trial is the proper remedy, but when a damage award is merely excessive or so large as to appear contrary to right reason, remittitur is the appropriate remedy." *Laxton v. Gap Inc.*, 333 F.3d 572, 586 (5th Cir. 2003), citing *Brunnemann v. Terra Int'l., Inc.*, 975 F.2d 175, 178 (5th Cir.1992)("Damage awards which are merely excessive or so large as to appear contrary to right reason, however, are subject to remittitur, not a new trial. 'When a jury's award exceed[s] the bounds of any reasonable recovery, we must suggest a remittitur ourselves or direct the district court to do so.'…If the plaintiff refuses to remit, we order a new trial on damages only." *Id.* at 178-179.)

While the jury's award of $50 million in compensatory damages is admittedly high, and in this court's opinion excessive, there is no evidence that the jury's award was the result of passion or prejudice or improper motive, much less a 'reasonable probability.' There is certainly no evidence that there were any improper influences upon the findings of liability, which this Court has already found to be reasonable. Accordingly, the Court should give Plaintiff the option of either accepting the maximum amount the jury could properly have awarded, or submitting to a new trial limited to the issue of damages.

## IV.  THE VERDICT CANNOT BE INCONSISTENT, AS IT INVOLVES SEPARATE AND DISTINCT CLAIMS AND STANDARDS OF PROOF.

When a party contends that a verdict is inconsistent, the remedy is to request that the court

order the jury to continue its deliberations. "[T]he proper procedure is for the attorney to request the verdict to be clarified before the jury was discharged." *Continental Cas. Co. v. Howard,* 775 F.2d 876, 886 (7th Cir. 1985) citing *Fox v. United States,* 417 F.2d 84, 88 (5th Cir. 1969.)  See *University Computing Co. v. Lykes-Youngstown Corp.,* 504 F.2d 518, 547 (5ᵗʰ Cir. 1974). Counsel for Merck never requested that the verdict be clarified.

Moreover, there is in fact no inconsistency in the verdict. The cases cited by Merck involve unique unusual circumstances of actual and obvious inconsistency which are not present here.[4] *Kellassy v. Cirrus Design Corp.*, No. 3:04-CV-0727-N, 2006 U.S. Dist. Lexis 34347, at *13-14 (N.D. Tex. May 30, 2006)(Plaintiff failed to designate experts on causation and could not under Texas law demonstrate a defect without expert testimony. *Id.* at *5.); *Valentine v. Baxter Healthcare Corp.* (1999) 68 Cal.App.4th 1467, 1480, 1481 (Jury deadlock on negligent failure to warn "as well as whether any negligence in testing or inspection caused injury" foreclosed a finding of negligent failure to warn under California law.); *Richard v. Firestone Tire & Rubber Co.*, 853 F.2d 1258, 1260 (5th Cir.1988)(Jury answered interrogatory finding no causation between defect and injury, but assigned 10% of the fault for injury to manufacturer.); *Duk v. MGM Grand Hotel, Inc.*, 320 F.3d 1052, 1056-1057 (Even though Nevada's comparative negligence law allowed damages only if a plaintiff is 50% negligent or less, jury found 65%, ignored stop instruction in special verdict form and awarded damages.); *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 47 (5th Cir. 1972) (After jury in action for treble damages under Sherman Act determined that harm to plaintiff extended for ten

---

[4] Two of the cases cited by Merck support the Plaintiff's position here. *Gallick v. Balitmore & Ohio R. Co.*, 372 U.S. 108, 119(1963) ("But it is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them: 'Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.' (citations omitted) We therefore must attempt to reconcile the jury's findings, by exegesis if necessary…"); *Johnson v. Ablt Trucking Co., Inc.*, 412 F.3d 1138, 1144 (10th Cir.2005)("If there is any plausible theory that supports the verdict, the reviewing court must affirm the judgment.")

years, court could not properly base remittitur on finding of lesser duration.); *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir. 1973) (Special verdict that third defendant was guilty of passive negligence and not proximate cause of injury, taken with colloquy between judge and jury in which jury indicated that plaintiff was to be awarded some damages, was inconsistent and did not support judgment as to third defendant.); *Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1151, 1152 (6th Cir. 1996)( Strict liability and negligence instructions were directed toward the actions of an "ordinarily prudent" manufacturer "fully aware of the risk" of accidental injury. "From the manner in which the instructions were propounded to the jury, it is difficult for this court to determine the distinctions between the two different theories of recovery." *Id.* at 1150.)

None of the cases cited by Merck involved a situation where a separate claim was brought under a theory of fraudulent deceit, none involved negligence allegations beyond failure to warn, and none involved instructions which would have allowed a broader theory of liability under negligence.

A.     **The Verdict Is Not Inconsistent - Strict Liability And Deceit Are Separate and Distinct Causes of Action with Different Standards of Proof.**

This Court need not even address whether the findings on Strict Liability and Negligence are inconsistent. As the court correctly observed in its Order of 8/30/06 "Regardless, the jury's finding for the Plaintiff on the deceit by concealment claim would be unaffected by either potential consequence, and thus he would still be entitled to damages." The jury found in favor of the Plaintiff on his cause of action for Deceit, a separate and entirely distinct claim which involves not only different elements, but a higher standard of proof.   Under these circumstances there is no inconsistency which would affect the verdict on that independent cause of action. See *Brunner v. Maritime Overseas Corp.*, 779 F.2d 296, 299 (5th Cir. 1986) ("In the present case, the jury answers to the negligence and unseaworthiness interrogatories are not in irreconcilable conflict. Rather, they

31

represent differing answers to two separate theories of recovery. The judgment was properly based upon the jury verdict. It must be upheld.") (See 9A Wright & Miller, *Federal Practice and Procedure* § 2510 (2006), "[A]lthough both claims arose from the same alleged unsafe condition, negligence and unseaworthiness require different standards of proof for causation…" *Id.* at FN 8.); *Haynes v. Manning*, 717 F.Supp. 730, 735-736 (D. Kan. 1989)("Here, we have a verdict resolving separate and distinct causes of action (breach of warranty and fraud) in favor of both parties. Therefore, the verdicts are not inconsistent on their face."); *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1547 (10th Cir. 1993) (No facial inconsistency between jury's general verdict finding liability under RICO fraud counts and general verdict finding no liability under Securities Act.); *Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.,* 791 F.2d 1416, 1424-1425 (10th Cir.), *cert. denied,* 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986).

Strict liability and deceit are entirely separate and distinct causes of action under South Carolina law. The elements of a strict liability claim are established by statue.  S.C.Code Ann. § 15-73-10 (1976) (the Defective Products Act), provides that "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user or consumer, or to his property, if (a) The seller is engaged in the business of selling such a product, and (b) It is expected to and does reach the user or consumer without substantial change in the condition in which it is sold;  See also, *Bray v. Marathon Corp.*, 356 S.C. 111, 116, 588 S.E.2d 93 (S.C. 2003)( "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user or consumer…..")  However, a cause of action for fraud is an entirely different theory of liability. "To establish fraud, the following nine elements must be shown: 1) a representation or nondisclosure of a material fact, 2) its falsity, 3) its materiality,

4) either knowledge of its falsity or a reckless disregard of its truth or falsity, 5) intent that the representation be acted upon, 6) the hearer's ignorance of its falsity, 7) the hearer's reliance on its truth, 8) the hearer's right to rely thereon, and 9) the hearer's consequent and proximate injury." *Kiriakides v. Atlas Food Systems & Services, Inc.*, 338 S.C. 572, 586, 527 S.E.2d 371 (S.C. App. 2000). In addition, a fraud claim must be proven by clear and convincing evidence.

Based upon the evidence the jury could have reasonably found that, regardless of the warnings issued with Vioxx, and regardless of whether or not Vioxx was defective and unreasonably dangerous, Merck in connection with the marketing and promotion of Vioxx "knowingly misrepresented or failed to disclose a material fact to Plaintiff's treating physicians in a circumstance where it was required to do so, that the Plaintiff's treating physicians were entitled to and did rely on that the misrepresentation or nondisclosure, and that the misrepresentation or nondisclosure was a legal cause" of Mr. Barnett's injuries. (Jury Charge, Page 12.) The strict liability and deceit claims have entirely different elements, are based upon entirely different evidence and allegations, and require different standards of proof. Because the jury found for the Plaintiff on the deceit claim, a separate and distinct cause of action from the strict liability claim, no inconsistency exists. The jury's verdict based upon the deceit cause of action stands. It is unaffected by the jury's findings on the strict liability claim, and provides an independent basis for upholding the verdict.

> **B.      Even if the Jury Had Not Found for the Plaintiff on the Deceit Cause of Action, the Jury Instructions Rendered Negligence the Broader Theory of Recovery Under South Carolina Law.**

Even where there is an inconsistency in the jury's verdict, a court is obligated to attempt to reconcile and harmonize the jury's answers to validate the verdict. "Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." *Atlantic & Gulf Stevedores v. Ellerman Lines,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798

(1962); *Stockton v. Altman*, 432 F.2d 946, 951 (5th Cir. 1970) (A reviewing court "is duty bound to reconcile or harmonize answers to interrogatories if it can reasonably do so…Indeed, '* * * a search of one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment.') "A jury's answers "should be considered inconsistent ⋯ only if there is no way to reconcile them." N*ational Hispanic Circus, Inc. v. Rex Trucking, Inc.*, 414 F.3d 546, FN16 (5th Cir. 2005); As the court stated in *White v. Grinfas*, 809 F.2d 1157, 1161 (5th Cir. 1987):

> "When the jury's answers appear to conflict, we are obliged to reconcile the answers, if possible, in order to validate the jury's verdict. *See, e.g., Federal Deposit Ins. Corp. v. Munn,* 804 F.2d 860, 867 (5th Cir.1986); *Crossland v. Canteen Corp.,* 711 F.2d 714, 725 (5th Cir.1983). Indeed, this effort is required by the Seventh Amendment. *See, e.g., Crossland,* 711 F.2d at 725. The touchstone in reconciling apparent conflict is whether "the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted.""

In keeping with the court's obligation to 'attempt to harmonize the jury's answers' 'where there is a view of the case that makes the jury's answers to special interrogatories consistent,' verdicts in product liability actions which may seem inconsistent at first glance, are routinely upheld. See *e.g. Bigham v. J.C. Penney Co.,* 268 N.W.2d 892, 898 (Minn. 1978); *Morales v. American Honda Motor Co., Inc.,*151 F.3d 500, 511 (6th Cir. 1998) (Jury verdict finding that motorbike was defective, that manufacturer had failed to exercise ordinary care in design and sale of motorbike, and manufacturer had breached warranties, but that plaintiff had failed to show that directions and warnings of potential dangers were inadequate, was not legally inconsistent.)

When the alleged inconsistency here is examined according to these principles and South Carolina substantive law, as well as the instructions that were given to the jury, it becomes apparent that the verdict on the negligence claim must stand, regardless of the negative finding on the strict liability claim. A products liability case in South Carolina may be brought under several theories, including negligence, strict liability, and warranty. *Rife v. Hitachi Const. Machinery Co., Ltd.* (S.C.

App. 2005) 363 S.C. 209, 215, 609 S.E.2d 565, 569; *Little v. Brown & Williamson Tobacco Corp.*, 243 F.Supp.2d 480 (D.S.C. 2001). A finding in favor of the manufacturer on a strict liability claim does not preclude a verdict based upon a finding of negligence. Anderson, S.C. Requests to Charge - Civil, § 32-2 (2002)

The few cases cited by Merck which actually involved the circumstance of a verdict on strict liability for the manufacturer with a verdict for the plaintiff on failure to warn, are uniformly distinguishable. First of all, they were all decided upon state substantive laws which, as interpreted by their appellate courts, did not distinguish between strict liability and negligent failure to warn. *E.g. Garrett v. Hamilton Standard Controls, Inc.,* 850 F.2d 253 (5th Cir. 1988) ("In Texas, the standard of care is the same in failure to warn cases brought under negligence and strict liability theories." *Id.* at FN4.) This is not the law in South Carolina.[5] *Talkington v. Atria Reclamelucifers Fabrieken BV*, 152 F.3d 254, 261-262 (4th Cir. 1998) citing *Bragg v. Hi-Ranger, Inc.,* 319 S.C. 531, 540, 462 S.E.2d 321 (1995). Under South Carolina law, a jury finding for the manufacturer on a strict liability claim does not exonerate the manufacturer for a claim based upon negligence. Moreover, negligence may be the broader theory of recovery under the instructions given to the jury, thereby eliminating any alleged inconsistency. In *Talkington,* the jury found for the manufacturer on the strict liability claim and against the manufacturer on the negligence cause of action. *Id.* at 258. The Court of Appeals held that under South Carolina law the two findings were not inconsistent:

---

[5] Nor is it the law in Louisiana. This Court addressed the distinction between strict liability and failure to warn under Louisiana Law in *In Re: Propulsid Products Liability Litigation.,* Not Reported in F.Supp.2d, 2003 WL 22023398, *4, E.D. La., March 11, 2003:

"Thus, the design defects and inadequate warnings claims are separable. A finding of liability on one theory does not guarantee or preclude a finding of liability on the other. The required elements of proof are also different and distinct. A warnings claim in a prescription drug case such as this one focuses on whether the defendant adequately warned the plaintiff's doctor of the dangers of the product, while the defective design claim focuses on the actions of the defendant in manufacturing the drug despite alternative designs."

> "The distinction between strict liability and negligence in design-defect and failure-to-warn cases is that in strict liability, knowledge of the condition of the product and the risks involved in that condition will be imputed to the manufacturer, whereas in negligence these elements must be proven.
>
> Whether strict liability or negligence affords a plaintiff the broader theory of recovery will depend largely on the scope of evidence admitted by the trial court and on the jury instructions given under each theory." *Id.* at 261-262.

Similarly, a reading of the jury instructions here shows that the negligence cause of action here afforded the broader theory of recovery. In the strict liability charge the jury was told: "you must determine whether Vioxx was defective and unreasonably dangerous by reason of an inadequate warning." Jury Charge at 8. As to the negligence claim, they were instructed that the Plaintiff must prove that "1. Merck negligently failed to adequately warn the Plaintiff's treating physicians or the medical community of a known or reasonably scientifically or medically knowable risk associated with Vioxx, 2. He suffered injuries as a result of Merck's alleged failure to warn, and 3. Merck's negligence was the proximate cause of his injuries." Jury Charge at 11.

Additionally, the negligence cause of action included instructions regarding the duty to conduct inspections and conduct adequate testing. As part of the negligence cause of action, jurors were instructed: "A manufacturer owes a duty to conduct adequate tests and inspections of its products such as will reveal latent defects or defects that are not apparent upon a reasonable inspection so that it can give adequate warnings. The failure to exercise reasonable care in fulfilling any of these duties constitutes negligence." Jury Charge at 12.

Looking at the jury charge in its entirety, the instructions rendered the negligence cause of action the broader theory of recovery. Substantial evidence was presented at trial regarding Merck's negligent conduct in connection with the testing of Vioxx, and showing that Merck had failed to conduct adequate testing of Vioxx prior to and after marketing the drug. The instructions on the strict

liability theory did not encompass negligent testing and inspection, nor did they tell the jury to analyze the conduct of the manufacturer. The jury could have found that Merck was negligent in failing to conduct adequate testing, and that such negligence was a proximate cause of Plaintiff's injuries.

Moreover, the instructions on strict liability stated that 'a product is defective due to inadequate warning if the manufacturer fails to give a reasonably prudent physician adequate warning.' Jury Charge at 8-9. However, the instructions on negligence stated that the Plaintiff must prove that Merck 'negligently failed to adequately warn the Plaintiff's treating physicians *or the medical community.*' Jury Charge at 11.

Under these instructions negligence was again the broader theory. The jury could have found that Merck had failed to adequately warn the medical community, and that such negligence was a proximate cause of the Plaintiff's injuries. An alternative explanation for the different findings is that the jury simply wanted to leave no doubt that they believed Merck to be negligent, and that an affirmative answer to the first question, which made no reference to negligence, might be misinterpreted as implying that Merck was not negligent. "Even a jury verdict inconsistent on its face is not inconsistent if it can be explained by assuming the jury reasonably misunderstood the instructions." *Willard v. The John Hayward*, 577 F.2d 1009, 1011 (5th Cir. 1978), citing *Miller v. Royal Netherlands Steamship Co.*, 508 F.2d 1103, 1106 (5th Cir. 1975).

## V.   THE GREAT WEIGHT OF THE EVIDENCE SUPPORTS THE JURY'S FINDINGS.

The unrebutted evidence presented at trial demonstrates that the Plaintiff in fact suffered significant, serious, permanent and life-threatening damage and disability as a result of his use of Vioxx, which has substantially reduced his remaining life expectancy. The damages evidence

presented at trial showed even though he was personally modifying every modifiable coronary disease risk factor, Mr. Barnett was unknowingly subjected to 55 months of Vioxx-induced plaque build-up in his arteries.  The jury had the benefit of Mr. Barnett's well-documented medical history, which includes objective serial diagnostic testing before, during and after Vioxx use.

On January 24, 2000, the same month he started Vioxx, he underwent a cardiolite test which showed mild lateral ischemia and one mild vessel greater than 50% blockage.  At that time his LDL cholesterol was 174.  Then on September 6, 2002 he had a heart attack.  The testing three days later showed 6 vessel blockage of 50-80%, even though in 27 months his LDL had been reduced to 101.  As of July 2006, Mr. Barnett's LDL was only 52, yet he has now suffered 2 heart attacks as a consequence of Vioxx use, and he has two occluded bypass graft occlusions which occurred while he was taking Vioxx.

The compensatory award undoubtedly reflects the unrebutted mountain of evidence of "plaque burden" which has taken 10 years off Mr. Barnett's life expectancy. The award demonstrates a realistic measure of what juries will award in long term exposure cases, because of the plaque build-up caused by Vioxx. It also shows that there is an upper range of reasonable jury awards in cases such as this, where the plaintiff suffers serious debilitating and life-threatening injuries.

A.    **Knowledge of a Risk Associated with a Drug Does Not Absolve a Manufacturer of Liability. The Plaintiff's Physicians Were Not Provided Adequate Warnings Regarding Vioxx.**

Merck asserts that "when a prescribing physician has independent knowledge of the risks associated with a drug from sources other than the manufacturer, an absent or allegedly inadequate warning is not the cause of the plaintiff's injury." This oversimplification and generalization of a complex issue is not only incorrect, but it is contrary to established law. Again, Merck relies upon a string of factually inapposite cases. *E.g. Odom v. G.D. Searle & Co.,* 979 F.2d 1001, 1003 (4th Cir.

38

1992)(Summary judgment granted where physician "stated that he had always believed and still believed that "the Cu-7 is the best IUD that's ever been on the market," and that he would still prescribe it today,"  (*Id.* at 1002) and physician's "own estimate of the risk actually exceeded" that of the plaintiff's expert.)

Merck ignores a large body of law regarding prescription drugs and what a manufacturer is required to disclose. The manufacturer's duty is to warn of all potential dangers in its prescription drugs that it knew or should have known to exist, and a warning must be correct, complete, and fully descriptive, and must convey updated information as to all of the drug's known side effects. *Martin v. Hacker*, 83 N.Y.2d 1, 11, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (1993); *Krasnopolsky v. Warner-Lambert Co.*, 799 F.Supp. 1342, 1345-46 (E.D. N.Y. 1992) The warning must also have clarity so that the language of the warning is "direct, unequivocal and sufficiently forceful to convey the risk." *Martin* supra, 83 N.Y.2d, at 11.

Merely mentioning a possible injury or adverse effect is not necessarily adequate. *Stahl v. Novartis Pharms. Corp*., 283 F.3d 254, 267 (5th Cir. 2002)) A manufacturer's disclosure of a particular risk of injury does not foreclose liability if the degree of risk is not sufficiently conveyed. *McDonnell v. Chelsea Mfrs., Inc*., 259 A.D.2d 674, 676, 687 N.Y.S.2d 172, (N.Y.A.D. 2 Dept. 1999); *Anderson v. Sandoz Pharmaceuticals Corp*., 77 F.Supp.2d 804, 807 Prod.Liab.Rep. (S.D. Tex. 1999)(Summary judgment denied even though package insert and PDR entry disclosed risk of myocardial infarction injury suffered by the plaintiff.) Even where a 'dear doctor letter' discloses the risk, affirmatively misleading information may cause a warning to be inadequate. *Woodbury v. Janssen Pharmaceutica, Inc*., 1997 WL 201571*8 (N.D. Ill. 1997).

A prescribing physician's awareness of risks involved with a drug does not absolve a manufacturer of liability, where a jury could reasonably infer that additional and more complete

disclosures should have been made and the physician was not sufficiently informed. See *Tatum v. Schering Corp.,* 795 F.2d 925, 928-929 (11th Cir. 1986)(Jury could infer from the evidence that prescriber "did not possess the knowledge that he described himself as having."); *Timm v. Upjohn Co.*, 624 F.2d 536 (5th Cir.1980), cert. denied, 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981)(Affirming verdict for the plaintiff, noting that although prescriber testified he was aware of the risks involved, he had responded to a hypothetical that had he known of the types and incidence of certain adverse reactions he probably would not have prescribed the drug. *Id.* at 538-539.)

Merck's argument is also unsupported by the record. The weight of the evidence is that Mr. Barnett's prescribing doctors were not sufficiently aware of the risks associated with Vioxx. Dr. Mikola, who began prescribing Vioxx for Mr. Barnett at least as early as 12/28/2001 (8/4/06 Tr. at 925:6-11), was never told by Merck that the President of Merck Research Laboratories believed that the CV events associated with Vioxx in the VIGOR trial were mechanism-based. (*Id.* at 912:23-913:1.) While he reviewed the VIGOR study, neither the title of the article nor the abstract stated that Vioxx significantly increases the risk of heart attack. (*Id.* at 973:20-974:15.) He further testified that if Merck had had information of a statistically-significant increase in the risk of serious cardiovascular thrombotic events, that information was not shared with him. (*Id.* at 977:13-978:15.)

Dr. Mikola further testified that had he been aware of or seen the information in the FDA's proposed label change to the effect that Vioxx should be used with caution in patients at risk of developing cardiovascular thrombotic events, such as those with a history of myocardial infarction and angina and in patients with preexisting hypertension and congestive heart failure, he would not have put Mr. Barnett on Vioxx. (*Id.* at 914:16-915:11.) Dr. Mikola's testimony establishes that Merck withheld information vital to his making a fully informed decision as to whether or not to prescribe Vioxx to Mr. Barnett. In failing to provide Mr. Barnett's prescribing physician with such

information, Merck removed the possibility that he could act as a learned intermediary.

Dr. Avorn also explained how Merck's incomplete and misleading communications mislead physicians. (8/1/06 Tr. at 298:20-300:12; 301:4-302:15.)  According to Dr. Avorn "…Merck's conduct of … communication … was inadequate in that it failed to truthfully represent what was known to Merck at the time about the risks of its drug in relation to the cardiovascular symptoms." (*Id*. at 289:12-290:1.)  He also testified that "…Doctors did not have adequate information presented to them by Merck to make a fair and reasonable evidence-based decision about Vioxx."  (*Id.* at 290:2-15.)  It is also important to note that Dr. Avorn's opinion testimony regarding the inadequacy and inaccuracy of Merck's communications with physicians was unopposed by any defense witness.

Furthermore, assuming *arguendo* that Mr. Barnett's physicians had in fact been fully apprised of all pertinent and necessary information in Merck's possession, Merck would still not be relieved of liability. This is because the evidence showed that Merck's overpromotion of the drug had the effect of nullifying the already inadequate warnings. *Caraker v. Sandoz Pharmaceuticals Corp.,* 172 F.Supp.2d 1018, 1030 ( S.D. Ill. 2001): *Salmon v. Parke Davis & Co*., 520 F.2d 1359, 1363-1364 (4th Cir. 1975); *Stevens v. Parke, Davis & Company*, 9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 53, 507 P.2d 653, 661 (1973); *Incollingo v. Ewing,* 444 Pa. 263, 288-289, 282 A.2d 206 (1971); *Nobles v. Astrazeneca Pharmaceuticals*, 48 Conn.Supp. 134, 832 A.2d 1241, 1242-1243 (Conn.Super. 2003) Merck's integrated national marketing campaign downplayed, deemphasized and misrepresented the true risks of Vioxx to such a degree as to result in the overpromotion of Vioxx.  (8/1/06 Tr. at 325:21-326:16; 399:21-400:14.)  Merck instructed its sales representatives ("detailers") to treat negative findings about Vioxx's risks as "obstacles" and to suppress open discussion of such information within the medical community.  (*Id*. at 342:1-343:22; 400:15-401:20.)  As Dr. Avorn testified, Merck's news releases were "an inadequate and a deceptive way of presenting this

information to the press, to doctors, to patients, or to anyone."  (*Id.* at 393:14-395:20.)

 Merck's studies were published in such a way as to bury risk data (*Id.* at 368:10-20; 398:11-21) while other studies were never published at all by Merck.  (*Id.* at 368:21-369:1.) Data from the APPROVe study was presented in an inaccurate and unfair manner, (*Id.* at 395:21-398:10), and even though Merck had data from Alzheimer's studies related to an increased mortality rate associated with Vioxx, Merck did not convey this data to physicians.  (*Id.* at 398:22-399:2.) Dr. Avorn summed up all the major Vioxx publications by testifying,….  "I have never known a collection of papers on any one topic in which there has been such a constellation of skewed and distorted presentation of data in any drug studies that I've ever looked at."  (*Id.* at 399:3-20.)

 Merck's overpromotion is also illustrated in a FDA Warning Letter that Merck received in September 2001.  (P1.0006; *See* also 8/14/2006 Tr. at 2421:1-2424:1 (Test. of Alise Reicin).)  That letter references three facets of Merck's Vioxx promotional campaign that minimized the cardiovascular findings of VIGOR and misrepresented Vioxx's safety profile.  According to the FDA, these activities and materials were "…false, lacking fair balance, or otherwise misleading…" (*Id.* at p.1, para. 1 and 3.)  In the year 2000 Merck generated "a billion" media impressions that carried Merck's message that Vioxx does not cause heart attacks.  (8/5/06 Tr. at 1277:1-25.) Merck issued press released and videos giving the impression that Vioxx was safe from a cardiovascular standpoint and completely failed to mention that Vioxx could cause heart attacks, and that one explanation for the VIGOR results was that Vioxx caused the heart attacks.  (*Id.* at 1289:12-1295:22);(296:23-1299:13.)  Merck's integrated campaign amounted to overpromotion of the drug that minimized and deemphasized the true nature of the drug's risks.  From this evidence the jury could reasonably have found that regardless of the knowledge of the prescribing physicians, even if Merck had provided complete and thorough warnings and disclosures, Merck's overpromotion had

the effect of eroding the warnings, rendering them inadequate.  (Jury Charge at 10.)

**B.     The Evidence, Both Subjective and Objective, Establishes That Had Merck Provided an Adequate Warning, Dr. Mikola Would Not Have Prescribed Vioxx, and Mr. Barnett Would Not Have Continued to Take the Drug.**

Merck next argues that there is no evidence that a different warning would have changed Mr. Barnett's doctors' decisions to prescribe Vioxx to him. Again, Merck is wrong. First, Dr. Mikola's testimony unequivocally shows that had he been adequately informed as to the risks of Vioxx and what Merck knew, he would not have prescribed Vioxx to Mr. Barnett:

> 915
> 3  Q.  OKAY. NOW, GIVEN THE INFORMATION THAT YOU'VE READ IN
> 4  EXHIBITS I'VE JUST SHOWN YOU AND THIS PROPOSED LABEL, IF YOU
> 5  HAD KNOWN THAT INFORMATION THAT I'VE SHOWN YOU AND YOU HAD SEEN
> 6  A LABEL LIKE THIS, WOULD YOU HAVE PRESCRIBED VIOXX TO
> 7  MR. BARNETT, GIVEN HIS HISTORY WITH POSSIBLE ANGINA, IN JANUARY
> 8  OF 2000?
> 9  A.  I BELIEVE I WOULD HAVE LEFT HIM ON FELDENE.
> 10  Q.  YOU WOULDN'T HAVE PUT HIM ON VIOXX?
> 11  A.  I DON'T BELIEVE SO, NO, SIR.

(8/14/06 Tr. at 915:3-11)

> 928
> 2  Q.  AND GIVEN WHAT YOU'VE READ TODAY, THAT COMBINED WITH HIS
> 3  ANGINA, WOULD YOU SAY THAT FROM EVERYTHING YOU'VE READ ABOUT
> 4  VIOXX TODAY, THAT YOU PROBABLY WOULD NOT HAVE PRESCRIBED VIOXX
> 5  FOR, HIM IF YOU'D KNOWN ALL OF THIS INFORMATION, IN 2000?
> 6  A.  HAVING KNOWN TODAY WHAT I KNOW ABOUT VIOXX, I WOULD NOT
> 7  HAVE PRESCRIBED IT.

(*Id.* at 928:2-7)

Based on this uncontroverted testimony alone the jury could have reasonably found that Merck's inadequate warning was a cause of Mr. Barnett's injuries.

Second, assuming *arguendo* that Dr. Mikola did not testify as he did that the inadequate warning caused him to prescribe the drug, the jury could still have reasonably found that Merck's inadequate warning was a cause of Mr. Barnett's injuries. Proof that the inadequacy of a warning is

43

a proximate cause of injury is not limited to, nor dependent solely upon, the testimony of the prescribing physician. "To satisfy the burden of establishing warning causation, a plaintiff may introduce either objective evidence of how a reasonable physician would have responded to an adequate warning, or subjective evidence of how the treating physician would have responded." *Thomas v. Hoffman-LaRoche, Inc*., 949 F.2d 806, 812 (5th Cir. 1992); *Hermes v. Pfizer, Inc.*, 848 F.2d 66, 69-70 (5th Cir. 1988). Testimony from a prescribing physician that he or she appreciated the risks does not preclude a finding that the warnings were inadequate, nor does it preclude a finding of causation. *Anderson v. Sandoz Pharmaceuticals Corp*., 77 F.Supp.2d 804, 808-809 (S.D. Tex. 1999); *Whitley v. Cubberly,* 24 N.C.App. 204, 210 S.E.2d 289, 207-208 (1974); *Stevens v. Parke-Davis & Co.*, (1973) 9 Cal.3d 51, 54-56, 507 P.2d 653. See also, *Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1971), (cited by the court in *Salmon v. Parke Davis* & Co., 520 F.2d 1359, 1363 (4th Cir. 1975)) ("Dr. Cucinotta stated, in effect, that he was adequately warned and understood the dangers and proper use of the drug. The jury was not obliged to believe the oral, uncorroborated testimony of either doctor. The evidence of Parke, Davis' efforts in promoting the drug would tend to refute Dr. Cucinotta's testimony in the sense that he may have been influenced by the efforts, perhaps even unconsciously, to prescribe the drug …." *Id.* at 221-222.)

Merck's overpromotion and misleading statements about Vioxx, through its integrated marketing campaign, nullified the already insufficient warning.  Thus, even if Dr. Mikola had testified that he would still have prescribed Vioxx even if he had received an adequate warning (as is not the case here), the jury could still have reasonably found that Dr. Mikola was not in a position to fully appreciate Vioxx's risks and that he would have taken Mr. Barnett off of Vioxx had he been provided with an adequate warning.

Moreover, even where a risk is disclosed, and even where the prescribing physician testifies

he would have still prescribed the drug in light of the risk, liability is not foreclosed.  See *e.g.,* *McNeil v. Wyeth,* 464 F.3d 364, 372-373 (5th Cir. 2006).   The court in *McNeil* also found it significant that the plaintiff testified she would not have taken the drug had she been made aware of the full extent of the risk.  See also *Hermes v. Pfizer, Inc*., 848 F.2d 66, 69-70 (5th Cir.1988) ("Furthermore, Hermes herself testified that she would not have taken the Sinequan had she known that it could cause the injury she experienced." *Id.* at FN.20.)

Similarly, the actions that Mr. Barnett took after his heart attack shed light upon what he would have done if he had been adequately informed of the risks *before* his heart attack.  After his heart attack, Mr. Barnett initiated a conversation with Dr. Mikola about the potential cardiac risk from any of his medications he was taking (including Vioxx.)  Dr. Mikola assured him that he had no concerns.  In March 2003, three years after the VIGOR study was published, and approximately one year after Merck changed the Precautions section of its label, Dr. Mikola informed Mr. Barnett that Vioxx did not increase the risk of heart attacks. (8/4/06 (Mikola) Tr. at 926:3-21.) This is strong evidence of Dr. Mikola's lack of awareness of the risks of Vioxx, and that the inadequacy of Merck's warnings was a cause of Mr. Barnett's injuries. The fact that Mr. Barnett would not have taken Vioxx had he been warned of the cardiac risks is illustrated by the fact that once he learned about the potential risks of Vioxx, he again initiated a conversation with Dr. Huberty, one of his physicians, and stopped taking Vioxx at that point.  Further evidence that he would not have taken Vioxx if his doctors had warned him of the heart attack risk is that he stopped taking Metabolife when he learned that drug had the potential for adverse effects on the heart. (8/7/06 Tr. at 1552:4-1554:15.)

Mr. Barnett also testified that if Dr. Mikola had known of the risks of Vioxx and wanted to put him back on Feldene, he would have been happy to revert to Feldene for his pain relief medication. (8/7/06 Tr. at 1556:23-1557:11.)   Under cross-examination by Mr. Goldman, Mr.

Barnett was shown the label for another NSAID, Mobic, which contained a detailed black-box warning of cardiovascular risks.  Mr. Barnett testified that upon learning of the information in that label, he immediately stopped taking Mobic.  He also testified that if he had ever known of the risks he would not have taken the drug. (8/8/06 Tr. at 1603:21-1605:8; 1607:7-14.)

### C.   The Weight of the Evidence is That in All Probability Vioxx Caused Mr. Barnett's Heart Attack and Accelerated His Atherosclerosis.

Merck argues that 'the weight of the evidence is that Mr. Barnett's use of Vioxx did not accelerate his atherosclerosis or cause his heart attack,' and 'the specific causation opinion of Dr. Zipes amounts to nothing more than a temporal proximity argument.' The cases relied upon by Merck are either completely off point (*Ohio v. U.S. Dept. of Interior*, 880 F.2d 432, 473 (D.C.Cir.1989) (criteria for determining whether oil spills and hazardous substance releases caused injury to natural resources ) or involved obvious flaws in the experts' methodologies. *E.g. McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1242-1243 (11th Cir. 2005)( Plaintiffs' expert had no opinion about dose that could would cause injury.)("He only said that any amount of *Metabolife* is too much, which clearly contradicts the principles of reliable methodology…."); *Moore v. Ashland Chem. Ins.,* 151 F.3d 269, 278 (5th Cir.1998)( Expert relied solely upon Material Safety Data Sheet from the manufacturer stating that  the contents of the drum in question were 'irritating to the lungs.') See also, *Curtis v. M&S Petroleum*, Inc., 174 F.3d 661, 670 (5th Cir. 1999), distinguishing *Moore*, supra. (Trial court abused its discretion in excluding the plaintiffs' expert's specific causation opinion.)("[A] temporal connection is entitled to greater weight when there is an established scientific connection between exposure and illness or other circumstantial evidence supporting the causal link.")

Unlike the expert in *Moore* and the other cases cited by Merck, the Plaintiffs' experts here

relied upon a broad spectrum of reliable scientific evidence demonstrating that Vioxx causes heart attacks as well as atherosclerosis, and that, in all likelihood Vioxx caused Mr. Barnett's heart attack and accelerated his atherosclerosis. Dr. Zipes described in detail the basis of his opinions and in order to provide the court with an outline the Plaintiff categorized the issues Dr. Zipes discussed:

1. Cause of Heart Attacks in General – (8/8/06 Tr. at 672: 2-17);
2. Pharmacology of Cox-2 Inhibitors – (8/8/06 Tr. at 672:9-25 to 1677:1-7);
3. Mechanism of Action for Vioxx – (8/8/06 Tr. at 1677:9-25 to 1679:1-9);
4. Vioxx accelerates Plaque Build-up – (8/8/06 Tr. at 1679:10-25 to 1683: 1-13);
5. Vioxx Inhibits Prostacyclin – (8/8/06 Tr. at 1683:14-25 to 1685:1-17);
6. Vioxx Accelerates Atherosclerosis – (8/8/06 Tr. at 685:18-23);
7. Basis of Opinion That Vioxx Accelerates Atherosclerosis – (8/8/06 Tr. at 1685:23-25 to1692:1-3);
8. Dr. FitzGerald and Others Support that Vioxx Accelerates Atherosclerosis – (8/8/06  Tr. at 1692:7-25 to 1697);
9. The Biologic Plausibility for Vioxx Accelerating Atherosclerosis – (8/8/06 Tr. at 1697:11-25 to 1700:1-16);
10. APPROVe Follow-up Data Provide Evidentiary Support in Humans of Vioxx Accelerating Atherosclerosis – (8/8/06 Tr. at 1700:17-25 to 1704:1-23);
11. FDA Advisory Committee Votes 32-0 that Vioxx Significantly Increases the Risk of Heart Attack – (8/8/06 Tr. at 1704:24-25 to 1705:1-23);
12. VIGOR Data Provides Evidence of Vioxx Causing Heart Attacks – (8/8/06 Tr. at 1705:24-25 to 1710:1-10);
13. Protocol 112 – Shows Vioxx Significantly Increases Blood Pressure More Than Any Other NSAID – (8/8/06 Tr. at 1709:18-25 to 1711:1-6);
14. APPROVe Clinical Trial Shows Blood Pressure Spikes Which Increase the Relative Risk of Heart Attacks and Atherosclerosis Acceleration – (8/8/06 Tr. at 1711:1-7 to 1715:1-3.)

Merck chose not to offer any expert testimony to challenge Dr. Zipes' opinions. In response to the scientific evidence, including the opinions of two highly qualified experts, scientific literature, and clinical trial data as well as Merck internal documents, Merck did not offer any testimony from a qualified cardiologist in rebuttal. In fact, Merck never called its own designated expert cardiologist Paul Roach, M.D.  The only reasonable explanation for the defense failing to call its own expert is that he could not rebut the opinions of Plaintiffs' experts.

As to specific causation, Plaintiff offered opinions from Dr. Zipes and Dr. Popma, and again,

Merck offered no expert testimony in rebuttal.  (8/8/06 Tr. at 1666:11-1667:6; *See also*, *Id.*  Tr. at 1715:15-24; 1734:23-1735:15.)  Prior to taking Vioxx for 31 months, Mr. Barnett's risk of a heart attack was no more than approximately 2%. (*Id.* Tr. at 1715:25-1717:1.)  In January 2000, Mr. Barnett underwent a cardiolite stress test which showed nothing more than "mild ischemia" in one minor vessel in his heart.  (*Id.* Tr. at 1718:22-1724:24.)  Nevertheless, after taking Vioxx for 31 months during which time he had blood pressure spikes like the patients in the APPROVe study, he suffered a heart attack and underwent 5-way bypass surgery.

After his heart attack and bypass surgery in September 2002, Mr. Barnett continued taking Vioxx for another 24 months for a total of 55 months.  While on Vioxx, he suffered a second heart attack. (*Id.* Tr. at 1726:10-1727:2.)  As of May of 2006 Mr. Barnett had 2 occluded vein grafts from the underlying bypass surgery, which were likely closed due to the acceleration of his plaque caused by Vioxx.  (*Id.* Tr. at 1722:25-1726:9.)  Ultimately, the 2 occluded vein grafts required stents and additional cardiovascular surgery in July 2006.  (8/8/06 Tr. at 1727:3-25 - 1729:2.) Contrary to Merck's assertions, Dr. Zipes described in detail Mr. Barnett's damages from Vioxx, as well as his current condition (*Id.* Tr. at 1728:21-1733:18), including the fact that Mr. Barnett in all likelihood has a reduced life expectancy of 9-10 years.  (8/8/06 Tr. at 1733:19-1734:23.)

Offering no expert testimony in rebuttal, Merck was content to argue as it does now, that Mr. Barnett had other risk factors and coronary artery disease ("CAD") before he took Vioxx. Merck contends that to establish specific causation, plaintiff must "rule out" the possibility that his heart attack was caused by something other than Vioxx." This is a misstatement of the law.  "Obvious alternative causes need to be ruled out.  All possible causes, however, cannot be and need not be eliminated before an expert's testimony will be admitted." *Heller v. Shaw Industries, Inc.,* 167 F.3d 146 (3d Cir. 1999), citing Professor Capra, Reporter to the Advisory Committee on the Federal Rules

48

of Evidence. ("[T]o require the experts to rule out categorically all other possible causes for an injury would mean that few experts would ever be able to testify…. Obvious alternative causes need to be ruled out. All possible causes, however, cannot be and need not be eliminated before an expert's testimony will be admitted." Daniel J. Capra, *The* Daubert *Puzzle,* 32 Ga.L.Rev. 699, 728 (1998).); See also *Asad v. Continental Airlines, Inc.*, 314 F.Supp.2d 726, 740 (N.D. Ohio 2004) ("In order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury. *Jahn v. Equine Services, PSC,* 233 F.3d 382, 390 (6th Cir. 2000). The fact that several possible causes might remain "uneliminated" goes to the accuracy of the conclusion and not to the soundness of the methodology. *Id"*)

Federal circuit courts of appeal have found differential diagnosis to be a reliable scientific method of determining causation in an individual case, even when physicians do not rule out every potential cause of the patient's illness. *See e.g., In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 759 (3rd Cir. 1994)(finding "sometimes differential diagnosis can be reliable with less than full information and, to the extent that the district court concluded otherwise, we hold that it abused its discretion"); *Heller v. Shaw Industries, Inc.,* 167 F.3d 146 (3d Cir.1999)(not addressing every possible alternative cause in a differential diagnosis did not render expert's opinion inadmissible); *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194 (4th Cir. 2001) (recognizing that a medical expert opinion based upon differential diagnosis normally should not be excluded because "the opinion fails to rule out every possible alternative cause of a plaintiff's illness.")(citing *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 265 (4th Cir. 1999).)

The cases cited by Merck almost all involved situations where the experts could not even 'rule in' the defendant's product, let alone 'rule out' other more likely causes. *E.g. Wheat v. Pfizer, Inc.*, 31 F.3d 340, 342-43 (5th Cir.1994) (Despite evidence that the decedent had been exposed to

hepatitis, and testimony by her treating physicians that she had a viral hepatitis unrelated to medication, plaintiffs offered no evidence or expert testimony excluding it as a cause. *Id.* at 342-343); *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F.Supp.2d 1118, 1133 (D. Minn.2003) (Expert conceded he was aware of no published literature supporting his opinion on causation and could not 'rule in' the defendant's products); *Nat'l Bank of Commerce of El Dorado v. Associated Milk Producers, Inc.*, 22 F.Supp.2d 942, 952 (E.D. Ark. 1998)("[E]xperts must turn to epidemiological studies, in vitro studies, animal studies, and other indirect methods in an attempt to make the connection.FN5 Here, there are no such studies." *Id.* at 952.); *Turner v. Iowa Fire Equipment Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000)(Physician "admitted that he made no attempt to consider all the possible causes, or to exclude each potential cause until only one remained, or to consider which of two or more non-excludable causes was the more likely to have caused the condition." *Id.* at 1208.); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F.Supp.2d 584, 610 (D. N.J. 2002)(Expert offered no reliable methodology for ruling out alternative causes, and defendant presented testimony of experts demonstrating that smoking was a greater risk factor for leukemia than PCE exposure.)

Unlike the cases cited by Merck, Plaintiff's experts provided substantial reliable scientific evidence of both general and specific causation. Plaintiff's experts were able not only to 'rule in' Vioxx as the most probable cause of Mr. Barnett's heart attack and increased atherosclerosis, but to rule out each of the other 'possible' causes which Merck has alleged. In January 2000, Mr. Barnett's treating physician, Dr. Mikola, felt that Barnett was at low risk for a coronary event. (8/7/06 Tr. at 1493:6-1493:23.) The January 2000 Cardiolite established that Mr. Barnett had superb exercise tolerance, only mild disease located in only one small area of his heart, and that he had an excellent prognosis. (*Id.* at 1342:15-1343:16; 1344:7-1345:18; 1445:25-1446:10.) Contrary to Merck's assertions, as of January of 2000 Mr. Barnett had minimal coronary artery disease in his five major

vessels. (*Id.* at 1353:21-1355:15; 1447:15-1449:4.)   According to Dr. Zipes, when Mr. Barnett first

started Vioxx he had a 2% or less chance or having a heart attack within the next three years. (*Id.* at

1349:20-1350:19; 1352:19-1353:20; 1445:25-1446:10; 1486:18-1486:22.)

Between January 2000 and Mr. Barnett's heart attack in September 2002, Mr. Barnett took

steps to further decrease his risk such as reducing his LDL cholesterol levels, which dramatically

slows the progression of plaque.  (*Id.* at 1357:24-1361:8.) Nevertheless, in September 2002, at the

time of his heart attack, which was the result of plaque build-up and a blood clot, Mr. Barnett had

multiple blockages that were not present when he began taking Vioxx in January of 2000.  (*Id.* at

1364:2-1369:11.)

Dr. Popma testified that after Mr. Barnett's heart attack and bypass surgery in September

2002, as of his July 2003 Cardiolite exam his bypass grafts were working and Mr. Barnett was

almost back to the cardiac level he was back in January 2000.  At that time the bypass grafts were

still open and were not blocked or occluded.  (*Id.* at 1372:18-1373:22.)  From the time of Barnett's

heart attack and bypass surgery in 2002 until July 2006, the trend of his LDL cholesterol was a

progressive decline to such a degree that since October 2005 his LDL levels have been in the range

where plaque begins to regress.  (*Id.* at 1360:18-1361:8.)  Mr. Barnett's LDL cholesterol levels were

so low from 2002 to 2006 that a dramatic progression of blockages within the arteries would not be

expected during that time frame. (*Id.* at 1362:3-1362:14.) This evidence supported Dr. Popma's

conclusion that his cholesterol levels played little, if any, role in accelerating his plaque build-up.

Notwithstanding the decrease in his cholesterol levels, in July 2004 two of the Plaintiff's vein

grafts occluded.  A May 2006 CT angiogram showed that Mr. Barnett's saphenous graft to the

Ramus branch and one of the sequential limbs of a second graft had completely occluded.  This rapid

progression of plaque occurred at a time when Barnett's LDL was well controlled.  The May 2006

Cardiolite showed that Barnett had experienced new heart muscle damage since the original heart attack in September 2002 (*Id.* at 1377:6-1383:14) and that in comparison with the January 2000 and July 2003 examinations, Mr. Barnett had a marked reduction in exercise tolerance and a decreased heart rate.  (*Id.* at 1477:1-1478:6.)  Further, from September 2002 to July 2006 (a time period when Mr. Barnett had reduced his LDL levels to the point of significantly slowing and then reversing plaque development), he experienced unexpected, dramatic progression of plaque to the point of complete occlusion or blockage in four new vessels, including two of the grafted vessels.  (*Id.* at 1383:17-1389:9; 1391:10-1394:25; 1494:9-1495:18.)  Mr. Barnett's rapid plaque progression from 2002 to 2006 was very unusual and not explained by traditional risk factors, particularly since he was lowering his LDL levels to the point of reversing plaque development. (*Id.* at 1396:18-1397:8.) In summary, there was more than sufficient evidence to rule out the risk factors and rule in Vioxx as the cause of Mr. Barnett's heart attack and accelerated atherosclerosis.

## VI.    CONCLUSION.

This Court was entirely correct when it concluded that the jury's findings on liability are reasonable on the negligent failure-to-warn and deceit-by-concealment claims. Although the Plaintiff believes the jury's damages award in its entirety is appropriate, if the Court believes a new trial is appropriate, the Plaintiff should be permitted the option of either accepting a remittitur in an amount the Court deems reasonable, or a new trial limited to damages.

Date:  October 31, 2006                    Respectfully submitted,


                                           By:    /s/  MARK P. ROBINSON, JR.
                                                  Mark P. Robinson, Jr.
                                                  Kevin F. Calcagnie
                                                  Carlos A. Prietto, III
                                                  Ted B. Wacker
                                                  Lexi W. Myer

ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Floor
Newport Beach, California  92660
Telephone:  (949) 720-1288
Facsimile: (949) 720-1292

Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama  36103-4160
Telephone:  (334) 269-2343
Facsimile: (334) 954-7555

Donald C. Arbitblit
LIEFF, CABRASER, HEIMANN and
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, California   94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Counsel for Plaintiff

53

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs' Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 31st day of October, 2006.


By:   /s/ MARK P. ROBINSON, JR.
      MARK P. ROBINSON, JR.
      State Bar No. 054426
      Attorney for Plaintiff
      Robinson, Calcagnie & Robinson