## Mason v. Merck & Co., Inc.
## Deposition Designations for James Fries

| | Objections | Ruling in Mason |
|---|---|---|

| | | |
|---|---|---|
| 1  11:8  -  14:6 | Fries, James 2006-06-16 | |
| 11: 8 | Q. Could you state your name | |
| 11: 9 | for the jury, please, Doctor. | |
| 11: 10 | A. James Franklin Fries. | |
| 11: 11 | Q. You are a medical doctor, | |
| 11: 12 | correct? | |
| 11: 13 | A. That's correct. | |
| 11: 14 | Q. We're here at Stanford | |
| 11: 15 | University to take your deposition today. | |
| 11: 16 | Is this where you're currently employed? | |
| 11: 17 | A. That's right. | |
| 11: 18 | Q. And what is your current | |
| 11: 19 | position here? | |
| 11: 20 | A. I'm a professor of medicine, | |
| 11: 21 | emeritus active. | |
| 11: 22 | Q. Okay. | |
| 11: 23 | And how long have you been a | |
| 11: 24 | professor of medicine here at Stanford? | |
| 12: 1 | A. At one grade or another, a | |
| 12: 2 | professor since 1971. | |
| 12: 3 | Q. Okay. | |
| 12: 4 | Do you have a particular | |
| 12: 5 | specialty? | |
| 12: 6 | A. I'm a rheumatologist. I | |
| 12: 7 | also do work in clinical epidemiology, in | |
| 12: 8 | aging research and health public policy | |
| 12: 9 | and in information technology. | |
| 12: 10 | Q. Okay. | |
| 12: 11 | In terms of your specialty, | |
| 12: 12 | rheumatology, have you done particular | |
| 12: 13 | research in regards to NSAIDs? | |
| 12: 14 | A. Yes. I should probably give | |
| 12: 15 | you a little bit of background because it | |
| 12: 16 | will be important probably for everything | |
| 12: 17 | that happens. | |
| 12: 18 | Q. Sure. | |
| 12: 19 | A. 30 years ago, about 30 years | |
| 12: 20 | ago, I founded ARAMIS, that's | |
| 12: 21 | A-R-A-M-I-S, the Arthritis, Rheumatism & | |
| 12: 22 | Aging Medical Information System. And | |
| 12: 23 | we've tracked some 17,000 people in total | |
| 12: 24 | from when we get ahold of them until they | |
| 13: 1 | die or just say good-bye to us in another | |
| 13: 2 | way. And we follow them for everything | |
| 13: 3 | that happens to them medically. We get | |
| 13: 4 | their clinical information, we go to them | |
| 13: 5 | with questionnaires about health status | |
| 13: 6 | each six months. We collect information | |
| 13: 7 | at that time on the drugs that they've | |
| 13: 8 | taken, the disability level that their | |
| 13: 9 | arthritis has inflicted on them, the pain | |

|  |  | | Objections | Ruling in Mason |
|---|---|---|---|---|
| | 13: 10 | they have, their use of medical care | | |
| | 13: 11 | services, the drugs they're taking and | | |
| | 13: 12 | any side effects that they've had for | | |
| | 13: 13 | those drugs, whether they're symptoms | | |
| | 13: 14 | side effects or side effects that cause | | |
| | 13: 15 | hospitalizations or that cause death. | | |
| | 13: 16 | We tally these and we write | | |
| | 13: 17 | papers with regard to the comparative | | |
| | 13: 18 | toxicity of different drugs. So, this is | | |
| | 13: 19 | the first chronic disease databank system | | |
| | 13: 20 | that has existed. It's also the longest | | |
| | 13: 21 | in duration. There are about 1,000 | | |
| | 13: 22 | papers that have emerged from it on a | | |
| | 13: 23 | series of different subjects. Probably | | |
| | 13: 24 | my guesstimate would be around 20 on the | | |
| | 14: 1 | subject that we're discussing today, | | |
| | 14: 2 | which are side effects of the -- side | | |
| | 14: 3 | effects assessment in general and side | | |
| | 14: 4 | effects of the nonsteroidal | | |
| | 14: 5 | anti-inflammatory drugs in particular, | | |
| | 14: 6 | so... | | |

| 15:23 | - | 16:7 | Fries, James 2006-06-16 |
|---|---|---|---|
| | 15: 23 | | Prior to October 28, 2000, |
| | 15: 24 | | had you ever met Dr. Louis Sherwood |
| | 16: 1 | | before? |
| | 16: 2 | | A.  I don't have any recall of |
| | 16: 3 | | that, but it certainly could have |
| | 16: 4 | | happened. |
| | 16: 5 | | Q.  When I say "Dr. Sherwood," |
| | 16: 6 | | do you know who I'm referring to? |
| | 16: 7 | | A.  Yes. |

| 16:9 | - | 16:15 | Fries, James 2006-06-16 |
|---|---|---|---|
| | 16: 9 | | October 28, 2000, did you |
| | 16: 10 | | have a conversation with Dr. Sherwood? |
| | 16: 11 | | A.  Well, now you're going to |
| | 16: 12 | | have to apologize for my memory of dates |
| | 16: 13 | | and sequences five years ago. Anything |
| | 16: 14 | | that's in the written record I would |
| | 16: 15 | | prefer to refer to than to my memory. |

| 2 17:4 | - | 17:11 | Fries, James 2006-06-16 |
|---|---|---|---|
| | 17: 4 | | Q.  I'm going to go ahead and |
| | 17: 5 | | hand you what's been marked as |
| | 17: 6 | | Plaintiff's Exhibit 1.0176, which is a |
| | 17: 7 | | copy of the letter on Stanford University |
| | 17: 8 | | letterhead addressed to Dr. -- or, I'm |
| | 17: 9 | | sorry, Mr. Ray Gilmartin, and you can |
| | 17: 10 | | feel free to refer to this. |
| | 17: 11 | | A.  Yeah. Thank you. |

| 17:23 | - | 18:22 | Fries, James 2006-06-16 |
|---|---|---|---|
| | 17: 23 | | Q.  I think this may refresh |
| | 17: 24 | | your recollection in terms of certain |
| | 18: 1 | | dates and sequences. |

2

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|
| | 18: 2 | A. Yes. | | |
| | 18: 3 | Q. So, getting back, on October | | |
| | 18: 4 | 28, 2000, did you receive a call from Dr. | | |
| | 18: 5 | Sherwood? | | |
| | 18: 6 | A. Yes. | | |
| | 18: 7 | Q. Okay. | | |
| | 18: 8 | And at that time, did he | | |
| | 18: 9 | identify himself as being with Merck? | | |
| | 18: 10 | A. Yes, I believe so. | | |
| | 18: 11 | Q. And during that | | |
| | 18: 12 | conversation, where did you -- where did | | |
| | 18: 13 | you receive the phone call? | | |
| | 18: 14 | A. Well, I received that call | | |
| | 18: 15 | at home. | | |
| | 18: 16 | Q. Okay. | | |
| | 18: 17 | Had you ever received a call | | |
| | 18: 18 | from a pharmaceutical company like that | | |
| | 18: 19 | at home before? | | |
| | 18: 20 | A. No. | | |
| | 18: 21 | Q. Did you find that unusual? | | |
| | 18: 22 | A. Yes. | | |
| 5 19:2 - 19:23 | | Fries, James 2006-06-16 | | |
| | 19: 2 | Q. Was it during the week or on | | |
| | 19: 3 | a weekend? | | |
| | 19: 4 | A. It was on a Saturday. | | |
| | 19: 5 | Q. On a Saturday. Okay. | | |
| | 19: 6 | What was Dr. Sherwood | | |
| | 19: 7 | calling to discuss with you at that time? | | |
| | 19: 8 | A. He was concerned that a | | |
| | 19: 9 | doctor, research associate on my staff, | | |
| | 19: 10 | Gurkipal Singh, had been giving talks in | | |
| | 19: 11 | public which were critical of Merck's | | |
| | 19: 12 | Vioxx, and in particular, had emphasized | | |
| | 19: 13 | the potential cardiovascular toxicity of | | |
| | 19: 14 | Vioxx. | | |
| | 19: 15 | Q. In particular, what was he | | |
| | 19: 16 | complaining about, Dr. Sherwood? | | |
| | 19: 17 | A. He believed that the talks | | |
| | 19: 18 | in question were unbalanced and that this | | |
| | 19: 19 | was something that I, as his immediate | | |
| | 19: 20 | supervisor, should know about and take | | |
| | 19: 21 | some action. And he also contacted the | | |
| | 19: 22 | chairman of the department and the | | |
| | 19: 23 | chairman of our division. | | |
| 6 20:9 - 20:12 | | Fries, James 2006-06-16 | | |
| | 20: 9 | What did Dr. Sherwood say at | | |
| | 20: 10 | that time? Did he imply to you any | | |
| | 20: 11 | consequences if -- or what did he want | | |
| | 20: 12 | you to do in regards to Dr. Singh? | | |
| 7 20:18 - 20:20 | | Fries, James 2006-06-16 | | |
| | 20: 18 | A. Yeah. He wanted Dr. Singh | | |
| | 20: 19 | to stop making the kinds of statements | | |
| | 20: 20 | that he had been making -- | | |
| 8 20:22 - 21:11 | | Fries, James 2006-06-16 | | |
| | 20: 22 | A. -- and he wanted, you know, | | |

3

|  |  | Objections | Ruling in Mason |
|---|---|---|---|
| 20:23 | me to assist him in that task. | | |
| 20:24 | Q. Okay. | | |
| :1 | And did he indicate to you | | |
| :2 | that there would be any kind of | | |
| 21:3 | consequences if you didn't or if Dr. | | |
| 21:4 | Singh did not? | | |
| 21:5 | A. Well, he did, and I wrote | | |
| 21:6 | up, when I was much closer to the time, | | |
| 21:7 | some of the things that he said, that Dr. | | |
| 21:8 | Singh would flame out if he didn't change | | |
| 21:9 | his behavior and that there would be | | |
| 21:10 | consequences for Stanford, and he implied | | |
| 21:11 | that there might be consequences for me. | | |
| 9 21:13 - 21:23 | Fries, James 2006-06-16 | | |
| 21:13 | At that time, did you take | | |
| 21:14 | that to mean that Stanford or yourself | | |
| 21:15 | would not be receiving research funds if | | |
| 21:16 | that didn't stop? | | |
| 21:17 | A. Well, that was never stated. | | |
| 21:18 | Q. Is that what you -- | | |
| 21:19 | A. And it's always a question, | | |
| 21:20 | sort of an implied thing. When you say | | |
| 21:21 | how would it be bad for Stanford, I guess | | |
| 21:22 | it would be bad for Stanford if the | | |
| 21:23 | research funding dried up. | | |
| - 23:21 | Fries, James 2006-06-16 | Re:22:12-23:21 | |
| 22:12 | After that conversation with | Def Obj: Hearsay | Overruled except to this |
| 22:13 | Dr. Sherwood, did you contact Dr. Singh? | | |
| 22:14 | A. Yes. I took this the same | | |
| 22:15 | way that I think anybody should who hears | | |
| 22:16 | about it. You want to determine if it's | | |
| 22:17 | true or not. And so I did ask Dr. Singh, | | |
| 22:18 | and I told Dr. Sherwood that I would do | | |
| 22:19 | this, that I would ask Dr. Singh what had | | |
| 22:20 | transpired and I would check out. And if | | |
| 22:21 | there was action that was required, I | | |
| 22:22 | would take the action. And I did that. | | |
| 22:23 | Q. When you say you "did that," | | |
| 22:24 | did you actually review the -- or did you | | |
| 23:1 | talk to Dr. Singh specifically about his | | |
| 23:2 | presentation? | | |
| 23:3 | A. I talked with him about the | | |
| 23:4 | presentation. He felt that it was a | | |
| 23:5 | balanced presentation. That's what he | | |
| 23:6 | maintained. And I said, well, can I see | | |
| 23:7 | the slides? And so I looked at the | | |
| 23:8 | PowerPoint slides that he had. There | | |
| 23:9 | were, I don't remember, maybe 30 of them. | | |
| 23:10 | I counted up the ones which were pro -- | | |
| 23:11 | much of the talk was on -- much of his | | |
| 23:12 | talks were on GI NSAID safety in general | | |
| 23:13 | not connected with a particular product. | | |
| 23:14 | But there was mention of both the VIGOR | | |
| 23:15 | trial and the CLASS trial and of | | |

4

|   |   |   | Objections | Ruling in Mason |
|---|---|---|---|---|
| | 23: 16<br>23: 17<br>23: 18<br>23: 19<br>23: 20<br>23: 21 | celecoxib and of rofecoxib during that<br>talk.  And I counted the slides for<br>rofecoxib and for celecoxib, and there<br>were the same number, and they were both<br>from similar studies and were really<br>quite parallel. | | |
| 11 24:9  -  25:8 | | Fries, James 2006-06-16 | | |
| | 24: 9<br>24: 10<br>24: 11<br>24: 12<br>24: 13<br>24: 14<br>24: 15<br>24: 16<br>24: 17<br>24: 18<br>24: 19<br>24: 20<br>24: 21<br>24: 22<br>24: 23<br>24: 24<br>25: 1<br>25: 2<br>25: 3<br>25: 4<br>25: 5<br>25: 6<br>25: 7<br>25: 8 | Q.  Did you find the<br>presentation to be balanced?<br>A.  It looked to me to be<br>reasonably balanced.  You can't tell by<br>looking at a set of slides what someone<br>is saying when they have those slides on.<br>So, I went a little bit further and I<br>checked with three people who had been in<br>the audience of the most offending of<br>these, and none of them were particularly<br>offended or thought it particularly<br>unbalanced.<br>         So, it was a funny<br>situation, because the data that were of<br>interest were on something that would<br>almost automatically unbalance a balanced<br>presentation, because there was negative<br>information on one product of different<br>degrees of certainty, and there wasn't<br>any balancing information.  So, if you<br>really were explaining things at that<br>point, one would tend to probably<br>overemphasize or emphasize more the Vioxx<br>data. | | |
| 12 26:22  -  27:2 | | Fries, James 2006-06-16 | | |
| | 26: 22<br>26: 23<br>26: 24<br>27: 1<br>27: 2 | When you say the American<br>College of Rheumatology or ACR, when was<br>that?  Was that in November of 2000,<br>approximately?<br>A.  It must have been, yes. | | |
| 13 34:4  -  35:1 | | Fries, James 2006-06-16 | | |
| | 34: 4<br>34: 5<br>34: 6<br>34: 7<br>34: 8<br>34: 9<br>34: 10<br>34: 11<br>34: 12<br>34: 13<br>34: 14<br>34: 15<br>34: 16<br>34: 17<br>34: 18 | Q.  Okay.  All right.<br>         You also reference in these<br>-- or during that time of the ACR<br>meeting, did it also come to your<br>attention that other doctors had<br>complaints of Merck contacting either<br>themselves or their bosses in an effort<br>to intimidate them?<br>         MR. RABER:  Objection to<br>form.<br>         THE WITNESS:  Yes.  It was<br>kind of at that time that the<br>rumor mill was going, and once<br>people started talking about this,<br>there were other people that had | | |

5

|  |  |  | | Objections | Ruling in Mason |
|---|---|---|---|---|---|
| | 34: 19 | | similar experiences. And they | | |
| | 34: 20 | | reported them, and a number of | | |
| ● | 34: 21 | | them had the same reaction that I | | |
| | 34: 22 | | did, that this was a way of | | |
| | 34: 23 | | influencing academic debate, which | | |
| | 34: 24 | | was not appropriate and could not | | |
| | 35: 1 | | continue. | | |
| 14 35:20 - | | 36:1 | Fries, James 2006-06-16 | | |
| | 35: 20 | | Did you actually talk with | | |
| | 35: 21 | | Dr. Sherwood about these different | | |
| | 35: 22 | | allegations prior to writing your letter? | | |
| | 35: 23 | | A. Yes. But my recollection is | | |
| | 35: 24 | | that was a telephone call after the | | |
| | 36: 1 | | meetings. | | |
| 15 36:3 - | | 36:20 | Fries, James 2006-06-16 | | |
| | 36: 3 | | Tell me about that telephone | | |
| | 36: 4 | | call. | | |
| | 36: 5 | | A. We'd gone backwards and | | |
| | 36: 6 | | forwards and got a connection, and then | | |
| | 36: 7 | | we discussed these issues much as they're | | |
| | 36: 8 | | laid out there. I put some quotes in | | |
| | 36: 9 | | that letter that were not recorded | | |
| | 36: 10 | | quotes, but they were ones that I had | | |
| | 36: 11 | | remembered from the -- from one | | |
| ● | 36: 12 | | discussion. | | |
| | 36: 13 | | One ironic one was that he | | |
| | 36: 14 | | had said that the side effects didn't | | |
| | 36: 15 | | occur at all, they had internal data to | | |
| | 36: 16 | | indicate that they didn't occur, but that | | |
| | 36: 17 | | anyway it was only at high doses. I | | |
| | 36: 18 | | thought that that was an interesting way | | |
| | 36: 19 | | to put an affirmation and a denial into | | |
| | 36: 20 | | the same sentence. | | |
| 16 37:9 - | | 37:17 | Fries, James 2006-06-16 | | |
| | 37: 9 | | So, after having the phone | | |
| | 37: 10 | | conversation on October 28, 2000, seeing | | |
| | 37: 11 | | Dr. Sherwood at the ACR meeting, seeing | | |
| | 37: 12 | | the VIGOR posters at the ACR meeting, | | |
| | 37: 13 | | talking with Dr. Sherwood again on the | | |
| | 37: 14 | | phone, you then wrote this letter on | | |
| | 37: 15 | | January -- or sent the letter on January | | |
| | 37: 16 | | 9, 2001, correct? | | |
| | 37: 17 | | A. Yes. | | |
| 17 37:19 - | | 38:9 | Fries, James 2006-06-16 | | |
| | 37: 19 | | And you wrote this letter to | | |
| | 37: 20 | | Mr. Raymond Gilmartin, correct? | | |
| | 37: 21 | | A. Yes. | | |
| | 37: 22 | | Q. Had you ever met Mr. | | |
| | 37: 23 | | Gilmartin before? | | |
| ● | 37: 24 | | A. No. | | |
| | 38: 1 | | Q. He is the -- or at the time | | |
| | 38: 2 | | was the Chief Executive Officer of Merck, | | |
| | 38: 3 | | correct? | | |
| | 38: 4 | | A. Yes. | | |

|  |  |  | Objections | Ruling in Mason |
|---|---|---|---|---|
| | 38: 5 | Q. Okay. | | |
| | 38: 6 | Had you ever written a | | |
| | 38: 7 | letter to the CEO of a pharmaceutical | | |
| | 38: 8 | company before? | | |
| | 38: 9 | A. No. | | |
| 18 38:11 - | 38:14 | Fries, James 2006-06-16 | | |
| | 38: 11 | Had you ever written a | | |
| | 38: 12 | letter with these kind of allegations in | | |
| | 38: 13 | them to a pharmaceutical company before? | | |
| | 38: 14 | A. No. | | |
| 19 54:21 - | 55:21 | Fries, James 2006-06-16 | | |
| | 54: 21 | The contact that you had | | |
| | 54: 22 | from Dr. Sherwood and from Merck in | | |
| | 54: 23 | regards to Vioxx, did you feel that was | | |
| | 54: 24 | at all appropriate? | | |
| | 55: 1 | MR. RABER: Objection to | | |
| | 55: 2 | form. | | |
| | 55: 3 | THE WITNESS: I felt that | | |
| | 55: 4 | belief in the scientific | | |
| | 55: 5 | marketplace where you have freedom | | |
| | 55: 6 | of expression on all sides without | | |
| | 55: 7 | overt intimidation, let alone this | | |
| | 55: 8 | kind of thing, really was a threat | | |
| | 55: 9 | to academic freedom. And I saw it | | |
| | 55: 10 | and phrased my position in terms | | |
| | 55: 11 | of the academic freedom issues, | | |
| | 55: 12 | not in terms of is it toxic or is | | |
| | 55: 13 | it not toxic issues. That was | | |
| | 55: 14 | irrelevant to the question that | | |
| | 55: 15 | they would come down on people | | |
| | 55: 16 | that said something they didn't | | |
| | 55: 17 | like. And if everybody did that, | | |
| | 55: 18 | we would not have a scientific | | |
| | 55: 19 | process. So, I became incensed on | | |
| | 55: 20 | academic freedom issues, and that | | |
| | 55: 21 | was my real motivating factor. | | |
| 21 68:19 - | 69:15 | Fries, James 2006-06-16 | | |
| | 68: 19 | Why did you write Ray | | |
| | 68: 20 | Gilmartin a letter? | | |
| | 68: 21 | A. I was concerned with some | | |
| | 68: 22 | internal practices at Merck which I felt | | |
| | 68: 23 | infringed on academic freedom, and I felt | | |
| | 68: 24 | it was not in Merck's interest to | | |
| | 69: 1 | continue those. I attempted to make that | | |
| | 69: 2 | case to them, and it concerned, in | | |
| | 69: 3 | particular, a lot of allegations around | | |
| | 69: 4 | the Vioxx drug. | | |
| | 69: 5 | Q. Had you had some | | |
| | 69: 6 | interactions with Merck at this point? | | |
| | 69: 7 | A. No. Prior to the Sherwood | | |
| | 69: 8 | call, I had no interactions whatsoever | | |
| | 69: 9 | with Merck. | | |
| | 69: 10 | Q. Now, by "Sherwood call," are | | |
| | 69: 11 | you talking about Louis Sherwood? | | |

7

|  |  | Objections | Ruling in Mason |
|---|---|---|---|

```
      69: 12            A.  Yes.
      69: 13            Q.  The Merck vice president?
      69: 14            A.  Yes.  He was vice president
      69: 15            for medical affairs or some such title.
22  80:12  -  81:2     Fries, James 2006-06-16
      80: 12            Q.  Did you go to a lot of care
      80: 13            to make sure it was accurate?
      80: 14            A.  Yes.
      80: 15            Q.  Did you write it and rewrite
      80: 16            it and rewrite it?
      80: 17            A.  Yes.
      80: 18            Q.  How long did it take you to
      80: 19            finally get that in final form?
      80: 20            A.  Well, we saw a draft a
      80: 21            little while ago which was back in
      80: 22            November I think, and then it came out on
      80: 23            January 9.
      80: 24            Q.  About six weeks?
      81: 1             A.  So, I'd say six weeks or so,
      81: 2             yes.
23  81:9   -  82:5     Fries, James 2006-06-16
      81: 9             Q.  I want you to focus on that
      81: 10            for a minute because I want to ask you,
      81: 11            did you get a followup phone call or two
      81: 12            from people at Merck after you sent your
      81: 13            letter?
      81: 14            A.  Yes.
      81: 15            Q.  Do you remember anything at
      81: 16            all about those conversations and what
      81: 17            was said?
      81: 18            A.  Yes, a little bit.  One was
      81: 19            from a vice president who offered to show
      81: 20            me any data that I wanted to see.  That
      81: 21            wasn't my major thing.  I knew the data
      81: 22            would come out, so, I had other things to
      81: 23            do, so, I declined that.
      81: 24            A. second one was from Dr.
      82: 1             Anstice, and he told the -- of a
      82: 2             four-part plan that Merck had to remedy
      82: 3             the problem and that they were taking
      82: 4             action in terms of changing their
      82: 5             internal operations --

25  89:1   -  89:9     Fries, James 2006-06-16
      89: 1             Q.  Well, by the way, are you
      89: 2             the Dr. Fries who is behind the longest
      89: 3             running, largest arthritis study there
      89: 4             is, the ARAMIS study?
      89: 5             A.  Yes.
      89: 6             Q.  How many people in that
      89: 7             study?
      89: 8             A.  In the various data banks,
      89: 9             about 17,000.
```

For segment 23 (81:9-82:5):

**(81:9-82:5)**
**Plaintiff's Objection:**
**Optional completeness – Should include 82:6-21**

[signature: Denied as moot]

8

| | | | | Objections | Ruling in Mason |
|---|---|---|---|---|---|
| 2❚9:12 | - | 89:14 | Fries, James 2006-06-16 | | |
| | 89: 12 | | Q. How long has that been going | | |
| | 89: 13 | | on? | | |
| | 89: 14 | | A. 30 years. | | |
| 27 89:15 | - | 92:8 | Fries, James 2006-06-16 | Re: 89:18 – 92:8 | overruled |
| | 89: 15 | | Q. 30 years. A lot of those | **Def Obj**: Improper and | |
| | 89: 16 | | people take naproxen? | undisclosed expert | |
| | 89: 17 | | A. Yes. | opinion on Naproxen. | |
| | 89: 18 | | Q. Have you written up any | **Prejudicial and unfair** | |
| | 89: 19 | | papers or anybody else written up any | **surprise.** | |
| | 89: 20 | | papers from the largest, longest running | | |
| | 89: 21 | | study that says naproxen is five times | | |
| | 89: 22 | | better than aspirin at stopping heart | | |
| | 89: 23 | | attacks? | | |
| | 89: 24 | | MR. RABER: Object to form. | | |
| | 90: 1 | | THE WITNESS: Our research | | |
| | 90: 2 | | is not -- the data banks aren't | | |
| | 90: 3 | | set to answer that specific | | |
| | 90: 4 | | question. But we have studied the | | |
| | 90: 5 | | general overall toxicities, and | | |
| | 90: 6 | | certainly nothing jumped out with | | |
| | 90: 7 | | regard to cardiovascular events | | |
| | 90: 8 | | being protective. Internally at | | |
| | 90: 9 | | what was then Syntex, who had | | |
| | 90: 10 | | developed naproxen -- | | |
| | 90: 11 | | BY MR. LANIER: | | |
| | 90: 12 | | Q. Syntex is a company? | | |
| | 90: 13 | | A. Syntex was a company which | | |
| | 90: 14 | | is now, if I'm correct, it has, in a | | |
| | 90: 15 | | series of big fish eating littler fish, | | |
| | 90: 16 | | arrived as a part of Pfizer. | | |
| | 90: 17 | | Q. Oh, okay. All right. | | |
| | 90: 18 | | So, the company that started | | |
| | 90: 19 | | naproxen, go ahead. | | |
| | 90: 20 | | A. Yes, yes. | | |
| | 90: 21 | | Q. What happened with them and | | |
| | 90: 22 | | naproxen? | | |
| | 90: 23 | | A. Well, Syntex. Well, they | | |
| | 90: 24 | | were looking for indications of it, and | | |
| | 91: 1 | | one obvious indication was that you could | | |
| | 91: 2 | | prevent heart attacks, because the then | | |
| | 91: 3 | | theory of how aspirin prevented heart | | |
| | 91: 4 | | attacks, which was known, was that it was | | |
| | 91: 5 | | an action on the platelets. And the | | |
| | 91: 6 | | action of the platelets by aspirin is | | |
| | 91: 7 | | irreversible, so that for the entire life | | |
| | 91: 8 | | of the platelet, it -- | | |
| | 91: 9 | | Q. Will never clump. | | |
| | 91: 10 | | A. -- will never clump. Okay. | | |
| | 91: 11 | | And naproxen has a similar effect on the | | |
| | 91: 12 | | platelet, but it lasts only while the | | |
| | 91: 13 | | drug is still circulating in the | | |
| | 91: 14 | | bloodstream, not for the life of the | | |
| | 91: 15 | | platelet. So, it's called reversible | | |

| | | | | Objections | Ruling in Mason |
|---|---|---|---|---|---|
| | 91: 16 | | inhibition of cyclooxygenase in the | | |
| | 91: 17 | | platelets. Okay. | | |
| | 91: 18 | | But nevertheless, because | | |
| | 91: 19 | | it's longer acting, one could make the | | |
| | 91: 20 | | case that it would prevent heart attacks, | | |
| | 91: 21 | | and so they did a lot of internal | | |
| | 91: 22 | | speculation because it would be a big | | |
| | 91: 23 | | market if they could make the case that | | |
| | 91: 24 | | it prevented heart attacks, and they | | |
| | 92: 1 | | never could make that case. And the | | |
| | 92: 2 | | studies both before and after, if you | | |
| | 92: 3 | | take them in the aggregate, indicate that | | |
| | 92: 4 | | this is not the case. | | |
| | 92: 5 | | Q. Naproxen is not the -- | | |
| | 92: 6 | | A. It does not prevent heart | | |
| | 92: 7 | | attacks to any degree which is measurable | | |
| | 92: 8 | | in any studies. | | |
| 29 | 99:7 | - | 99:7 | Fries, James 2006-06-16 | |
| | 99: 7 | | Q. Good afternoon, Dr. Fries. | | |
| 30 | 99:13 | - | 100:4 | Fries, James 2006-06-16 | |
| | 99: 13 | | I want to follow up on | | |
| | 99: 14 | | questions about your reasons for writing | | |
| | 99: 15 | | the letter to Mr. Gilmartin. I think you | | |
| | 99: 16 | | said that you wanted to deal with some | | |
| | 99: 17 | | things in a private way? | | |
| | 99: 18 | | A. That's right. I started, | | |
| | 99: 19 | | and I tried to indicate in the letter my | | |
| | 99: 20 | | great approval of Merck as a company, and | | |
| | 99: 21 | | I followed it over the years with, you | | |
| | 99: 22 | | know, top five respected companies in the | | |
| | 99: 23 | | United States and so forth. And I | | |
| | 99: 24 | | respected a lot of the things that they | | |
| | 100: 1 | | did, respected their previous chairman | | |
| | 100: 2 | | immensely, who I now know a little bit, | | |
| | 100: 3 | | Roy Vagelos, who did extraordinary things | | |
| | 100: 4 | | for Merck from the scientific side. | | |
| 31 | 100:21 | - | 101:13 | Fries, James 2006-06-16 | |
| | 100: 21 | | Q. You received a letter from | | |
| | 100: 22 | | Mr. Gilmartin in response to your letter? | | |
| | 100: 23 | | A. Yes. | | |
| | 100: 24 | | Q. What was your reaction to | | |
| | 101: 1 | | receiving that letter? | | |
| | 101: 2 | | A. Well, I think any of us -- I | | |
| | 101: 3 | | was pleased that rather promptly a | | |
| | 101: 4 | | response had come which had taken the | | |
| | 101: 5 | | letter seriously and which had promised | | |
| | 101: 6 | | some action. I recognized that it was -- | | |
| | 101: 7 | | that I was going to be running into | | |
| | 101: 8 | | damage control types of activities, so, I | | |
| | 101: 9 | | interpreted that and subsequent | | |
| | 101: 10 | | conversations as having in part some | | |
| | 101: 11 | | degree of damage control. People wanted | | |
| | 101: 12 | | me to be happy with the actions that were | | |

|  |  |  | Objections | Ruling in Mason |
|---|---|---|---|---|
| 101: 13 | | being taken. | | |
| 2:20 - | 103:2 | Fries, James 2006-06-16 | | |
| 102: 20 | | Were you satisfied with | | |
| 102: 21 | | Merck's response to your concerns? | | |
| 102: 22 | | A. Yes. And I thought about -- | | |
| 102: 23 | | I mean, they didn't say specifically what | | |
| 102: 24 | | they were going to do with Dr. Sherwood, | | |
| 103: 1 | | but they said that something was going to | | |
| 103: 2 | | happen. | | |
| 33 104:6 - | 104:24 | Fries, James 2006-06-16 | | |
| 104: 6 | | Q. Sir, did you receive the | | |
| 104: 7 | | data relating to Vioxx that you had | | |
| 104: 8 | | requested? | | |
| 104: 9 | | A. I didn't request data per se | | |
| 104: 10 | | for me. I requested the data be made | | |
| 104: 11 | | available to others. I wasn't | | |
| 104: 12 | | specifically studying -- | | |
| 104: 13 | | Q. Were you satisfied that | | |
| 104: 14 | | Merck made that data available to others? | | |
| 104: 15 | | A. I believe so, yes. | | |
| 104: 16 | | Q. Is it fair to say then that | | |
| 104: 17 | | as of about March of 2001, as far as you | | |
| 104: 18 | | were concerned, the matter was closed? | | |
| 104: 19 | | A. My job here was done. | | |
| 104: 20 | | Q. Dr. Fries, I take it that | | |
| 104: 21 | | Merck chose not to rebut the points in | | |
| 104: 22 | | your letter, but, rather, to address your | | |
| 104: 23 | | concerns. Is that a fair assessment? | | |
| 104: 24 | | A. That's true. | | |
| 34 105:24 - | 106:9 | Fries, James 2006-06-16 | | |
| 105: 24 | | Q. Dr. Fries, I want to talk to | | |
| 106: 1 | | you a little bit about, you referred to | | |
| 106: 2 | | an investigation that you did into things | | |
| 106: 3 | | that you had heard in the rumor mill. Do | | |
| 106: 4 | | you remember that? | | |
| 106: 5 | | A. Yes. | | |
| 106: 6 | | Q. I take it that you didn't | | |
| 106: 7 | | have firsthand knowledge about the | | |
| 106: 8 | | matters that you've testified about in | | |
| 106: 9 | | your letter. Is that fair to say? | | |
| 35 106:12 - | 107:7 | Fries, James 2006-06-16 | | |
| 106: 12 | | THE WITNESS: I believe | | |
| 106: 13 | | that's probably true. That was | | |
| 106: 14 | | one reason I tried to be as | | |
| 106: 15 | | careful and as balanced as I | | |
| 106: 16 | | could, because I was getting | | |
| 106: 17 | | dangerously toward what I would | | |
| 106: 18 | | even call hearsay if I got too | | |
| 106: 19 | | far. | | |
| 106: 20 | | BY MR. RABER: | | |
| 106: 21 | | Q. And, of course, you can't be | | |
| 106: 22 | | expected to have firsthand knowledge of | | |

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|
| | 106: 23 | all these things with the different | | |
| ● | 106: 24 | doctors that you were writing about, | | |
| | 107: 1 | right? | | |
| | 107: 2 | A.  That's right. | | |
| | 107: 3 | Q.  And is it fair to say that | | |
| | 107: 4 | certain doctors and Dr. Singh told you | | |
| | 107: 5 | things, and then you relayed that | | |
| | 107: 6 | information to Merck? | | |
| | 107: 7 | A.  Yes. | | |
| 108:15 - 109:17 | | Fries, James 2006-06-16 | | Sustained |
| | 108: 15 | Q.  But the heart attack data | | |
| | 108: 16 | was clearly in the public domain, wasn't | | |
| | 108: 17 | it, throughout 2000? | | |
| | 108: 18 | A.  I think that it was not. I | | |
| | 108: 19 | talked with Claire about it a good deal. | | |
| | 108: 20 | The senior investigator on that was a | | |
| | 108: 21 | physician that I trained here. And there | Re: 108:15-109:3 | |
| | 108: 22 | were some issues with the journal about | **Def Obj**: Hearsay | |
| | 108: 23 | putting in some things the investigators | conversation with third | |
| | 108: 24 | wanted in. It was part of her view that | party; lack of foundation. | |
| | 109: 1 | they would have put more in, but the | | |
| | 109: 2 | journal wouldn't let you with space | | |
| | 109: 3 | constraints and other things. | | |
| | 109: 4 | Q.  I'm not talking about the | | Overruled |
| | 109: 5 | New England Journal. I'm talking about | | |
| ● | 109: 6 | just -- it was publicly known in, let's | | |
| | 109: 7 | say, the summer of 2000 that there were | | |
| | 109: 8 | significantly more heart attacks in the | | |
| | 109: 9 | Vioxx group than in the naproxen group. | | |
| | 109: 10 | Would you agree with that? | Re: 109:4-109:17 | |
| | 109: 11 | A.  It was known by a small, | **Def Obj**: Lack of | |
| | 109: 12 | relatively small number of people who | foundation; speculation | |
| | 109: 13 | focus on these things. If you had asked | about what other people | |
| | 109: 14 | generically probably rheumatologists, I | knew. | |
| | 109: 15 | would say it was not well known. And if | | |
| | 109: 16 | you said general public, I would say it | | |
| | 109: 17 | wasn't known at all. | | |
| 36 115:10 - 115:17 | | Fries, James 2006-06-16 | | |
| | 115: 10 | Q.  Okay. | | |
| | 115: 11 | Let me go back to your | | |
| | 115: 12 | letter. You've told us that you relied | | |
| | 115: 13 | on what you were told by doctors and Dr. | | |
| | 115: 14 | Singh. Did you talk to any third parties | | |
| | 115: 15 | to confirm or verify what you had been | | |
| | 115: 16 | told by any of those doctors? | | |
| | 115: 17 | A.  No. | | |
| 115:18 - 116:5 | | Fries, James 2006-06-16 | | Denied as Moot |
| | 115: 18 | Q. So, for example, if we look | | |
| ● | 115: 19 | at Exhibit P 1.0176, which is your | | |
| | 115: 20 | January 9, 2001 letter, on the third page | | |
| | 115: 21 | of that letter, towards the top, it says, | | |
| | 115: 22 | "Dr. McMillen believes that his VCF | (115:18-116:5) | |
| | 115: 23 | appointment at Hershey was revoked | **Plaintiff's Objection:** | |

12

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|
| 115: 24 | | because of these accusations." Do you | **Optional completeness-** | |
| 116: 1 | | see that? | **Should include 116:6-21** | |
| 116: 2 | | A. Yes. | | |
| 116: 3 | | Q. Now, is that something that | | |
| 116: 4 | | Dr. McMillen told you? | | |
| 116: 5 | | A. That's right. | | |
| | | | | |
| 116:22 | - 117:2 | Fries, James 2006-06-16 | | |
| 116: 22 | | Q. Sir, the question was, did | | |
| 116: 23 | | you speak with anybody from the Hershey | | |
| 116: 24 | | Medical Center to verify what Dr. | | |
| 117: 1 | | McMillen had told you? | | |
| 117: 2 | | A. No. | | |
| | 119:7+ | | | |
| 117:20 | - D748 | Fries, James 2006-06-16 | | |
| 117: 20 | | Q. Dr. Fries, you have in front | | |
| 117: 21 | | of you Defense Exhibit Number 952. Does | | |
| 117: 22 | | this appear to be a letter from the | | |
| 117: 23 | | Hershey Medical Center dated February | | |
| 117: 24 | | 1st, 2000? | | |
| 118: 1 | | A. Yes. | | |
| 118: 2 | | Q. From a -- | | |
| 118: 3 | | A. I'm familiar with this | | |
| 118: 4 | | letter. | | |
| 118: 5 | | Q. Okay. | | |
| 118: 6 | | This letter was among the | | |
| 118: 7 | | documents that Dr. McMillen gave to you? | | |
| 118: 8 | | A. Probably. | | |
| 118: 9 | | Q. It was in your file? | | |
| 118: 10 | | A. Yes. | | |
| 118: 11 | | Q. And does this letter | | |
| 118: 12 | | describe Dr. McMillen's status with the | | |
| 118: 13 | | Hershey Medical Center? | | |
| 118: 14 | | A. Yes. It purports to. | | |
| 118: 15 | | Q. Okay. | | |
| 118: 16 | | And it says in the second | | |
| 118: 17 | | paragraph, "Dr. McMillen held an | | |
| 118: 18 | | appointment as Clinical Assistant | | |
| 118: 19 | | Professor of Medicine from" July 1st, | | |
| 118: 20 | | 1978 to December 31st, 1999, "at the | | |
| 118: 21 | | Milton S. Hershey Medical Center of the | | |
| 118: 22 | | Pennsylvania State University College of | | |
| 118: 23 | | Medicine," correct? | | |
| 118: 24 | | A. Yes. | | |
| 119: 1 | | Q. All right. | | |
| 119: 2 | | At the bottom of the first | | |
| 119: 3 | | page, it says, "Dr. McMillen currently | | |
| 119: 4 | | has an intensive and ongoing commitment | | |
| 119: 5 | | to clinical studies and a very active | | |
| 119: 6 | | speaking schedule," true? | | |
| 119: 7 | | A. Yes. That's what it says. | | |
| | | | | |
| 119:12 | - 119:21 | Fries, James 2006-06-16 | | |
| 119: 12 | | Q. Then the letter from the | | |

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|
| 119: 13 | | Hershey Medical Center states, | (119:12-119:21) **Plaintiff's Objection:** Optional completeness- Should include 119:22-121:13:00 | Denied Moot |
| 119: 14 | | "Recognizing his past teaching | | |
| 119: 15 | | contributions but acknowledging that he | | |
| 119: 16 | | has not been actively involved in | | |
| 119: 17 | | teaching our students or housestaff in | | |
| 119: 18 | | recent years, his clinical faculty | | |
| 119: 19 | | position has not been renewed." Do you | | |
| 119: 20 | | see that? | | |
| 119: 21 | | A.  Yes. | | |
| 125:17 - 126:18 | | Fries, James 2006-06-16 | | |
| 125: 17 | | Q.  Dr. Fries, let's go back to | | |
| 125: 18 | | your letter. On Page 3 of your letter, | | |
| 125: 19 | | you state near the top that "Dr. Simon | | |
| 125: 20 | | believes that one of his two academic | | |
| 125: 21 | | appointments has been jeopardized." Do | | |
| 125: 22 | | you see that? | | |
| 125: 23 | | A.  Yes. | | |
| 125: 24 | | Q.  Is that something Dr. Simon | | |
| 126: 1 | | told you? | | |
| 126: 2 | | A.  Yes. | | |
| 126: 3 | | Q.  Did you talk with Dr. | | |
| 126: 4 | | Simon's boss or anybody to verify that? | | |
| 126: 5 | | A.  No. | | |
| 126: 6 | | Q.  No? | | |
| 126: 7 | | A.  And I tried when I wrote | | |
| 126: 8 | | this to be as careful as I could with | | |
| 126: 9 | | words. So, it was me, not you, that said | | |
| 126: 10 | | Dr. Simon believes. He did believe that. | | |
| 126: 11 | | I know that for sure. But I don't know | | |
| 126: 12 | | that his belief was correct, and I tried | | |
| 126: 13 | | to indicate that. | | |
| 126: 14 | | Q.  Is it possible that his | | |
| 126: 15 | | belief was incorrect? | | |
| 126: 16 | | A.  Of course. Just like it was | | |
| 126: 17 | | possible that Dr. McMillen's belief was | | |
| 126: 18 | | incorrect. | | |
| 37 149:6 - 149:14 | | Fries, James 2006-06-16 | | |
| 149: 6 | | Q.  And you talk about in your | | |
| 149: 7 | | letter, it was your experience that | | |
| 149: 8 | | certainly your mindset in 2001 was that | | |
| 149: 9 | | the COX-2 inhibitors looked like a | | |
| 149: 10 | | significant "medical advance" for dealing | | |
| 149: 11 | | with the serious GI problems from | | |
| 149: 12 | | traditional pain relievers? | | |
| 149: 13 | | A.  Yes. I even took credit for | | |
| 149: 14 | | having created them. | | |
| 38 150:6 - 150:6 | | Fries, James 2006-06-16 | | |
| 150: 6 | | Q.  Sir, at the time -- | | |
| 150:9 - 150:21 | | Fries, James 2006-06-16 | | |
| 150: 9 | | Q.  -- though, if you look at | | |
| 150: 10 | | Page 3 of your letter, in the middle of | | |

|  |  | Objections | Ruling in Mason |
|---|---|---|---|
| 150: 11 | the page you say, "These drugs should on | | |
| 150: 12 | balance, save a substantial number of | | |
| 150: 13 | lives." | | |
| 150: 14 | A.  Yeah, that was actually my | | |
| 150: 15 | mindset.  That's fair. | | |
| 150: 16 | Q.  Okay. | | |
| 150: 17 | Back in 2001. | | |
| 150: 18 | A.  Yes. | | |
| 150: 19 | Q.  And some of what you're | | |
| 150: 20 | saying today -- | | |
| 150: 21 | A.  Yeah. | | |
| 40 155:4 - 155:16 | Fries, James 2006-06-16 | | |
| 155: 4 | Q.  Dr. Fries, we've put in | | |
| 155: 5 | front of you Defense Exhibit 245.  Can | | |
| 155: 6 | you identify this? | | |
| 155: 7 | A.  Yes.  We've spoken to this | | |
| 155: 8 | before.  This is a letter from Mr. | | |
| 155: 9 | Gilmartin to me. | | |
| 155: 10 | Q.  Dated January 23rd, 2001? | | |
| 155: 11 | A.  Yes. | | |
| 155: 12 | Q.  And I think this is the | | |
| 155: 13 | letter that you've described as a | | |
| 155: 14 | "thoughtful" and positive letter? | | |
| 155: 15 | A.  Yes, it was a response to my | | |
| 155: 16 | letter of January 9th. | | |
| 41 156:4 - 156:17 | Fries, James 2006-06-16 | | |
| 156: 4 | Q.  Dr. Fries, I'm putting in | | |
| 156: 5 | front of you a document marked as Defense | | |
| 156: 6 | Exhibit 264.  Can you tell us what that | | |
| 156: 7 | is? | | |
| 156: 8 | A.  It's a letter to me from | | |
| 156: 9 | David Anstice, the copy to Doug Greene. | | |
| 156: 10 | Q.  Dated February 16th, 2001? | | |
| 156: 11 | A.  February 16th, 2001. | | |
| 156: 12 | Q.  And is this the letter that | | |
| 156: 13 | came with the data that you received from | | |
| 156: 14 | Merck? | | |
| 156: 15 | A.  Yes.  I don't remember | | |
| 156: 16 | receiving any data.  There must have been | | |
| 156: 17 | some.  There are attachments noted here. | | |
| 42 157:5 - 158:6 | Fries, James 2006-06-16 | | |
| 157: 5 | And by this time, there had | | |
| 157: 6 | been an Advisory Committee concerning | | |
| 157: 7 | Vioxx and Celebrex.  Do you recall that | | |
| 157: 8 | in February of 2001? | | |
| 157: 9 | A.  Yeah.  As I say, | | |
| 157: 10 | reconstructing these dates and what order | | |
| 157: 11 | they are is really hard for me, but there | | |
| 157: 12 | was one roughly around there.  Yeah.  So, | | |
| 157: 13 | these data had already in that interval | | |
| 157: 14 | been, I guess, released pretty generally. | | |
| 157: 15 | Q.  And have you been on FDA | | |
| 157: 16 | Advisory Committees before? | | |

15

| | | | Objections | Ruling in Mason |
|---|---|---|---|---|
| 157: 17 | | A. Yes. | | |
| 157: 18 | | Q. And has it been your | | |
| 157: 19 | | experience that data from studies before | | |
| 157: 20 | | the Advisory Committee are discussed at | | |
| 157: 21 | | those meetings? | | |
| 157: 22 | | A. The data are discussed, yes, | | |
| 157: 23 | | at the meeting. I don't recall the exact | | |
| 157: 24 | | details. Sometimes it's long, and | | |
| 158: 1 | | sometimes it's short. | | |
| 158: 2 | | Q. Has it been your experience | | |
| 158: 3 | | that members of FDA Advisory Committees | | |
| 158: 4 | | are respected scientists in the relevant | | |
| 158: 5 | | fields? | | |
| 158: 6 | | A. Yes, for the most part. | | |
| 43 168:13 - | 168:22 | Fries, James 2006-06-16 | | |
| 168: 13 | | Q. Are you familiar, just in | | |
| 168: 14 | | your 40 years of medicine, with the idea | | |
| 168: 15 | | of drug companies choosing to neutralize | | |
| 168: 16 | | and discredit doctors? | | |
| 168: 17 | | A. I was amazed earlier when we | | |
| 168: 18 | | saw something that said somebody was | | |
| 168: 19 | | going to control me as part of -- that's | | |
| 168: 20 | | hard to do. So, no, I've never seen | | |
| 168: 21 | | anything like this. This is really | | |
| 168: 22 | | unprecedented in my experience. | | |
| 4  170:23 - | 171:6 | Fries, James 2006-06-16 | | |
| 170: 23 | | Q. You believe in safety first? | | |
| 170: 24 | | A. No. I believe that you have | | |
| 171: 1 | | a balance with pharmaceutical treatments | | |
| 171: 2 | | between the good and the harm that they | | |
| 171: 3 | | do. Things that do a whole lot of good, | | |
| 171: 4 | | they can do quite a bit of harm. And you | | |
| 171: 5 | | still would say that on balance, they're | | |
| 171: 6 | | good drugs. So, it's a balance issue. | | |