IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | Section L |
| | * | |
| *This document relates to ALL CASES* | * | Judge Fallon |
| | * | Mag. Judge Knowles |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION OF MERCK & CO., INC'S MOTION FOR A PROTECTIVE ORDER PROHIBITING DISCOVERY OF ATTORNEY WORK PRODUCT RELATING TO THE MARTIN REPORT

## I.    INTRODUCTION

On October 13, 2006, Merck filed a Motion and Incorporated Memorandum for Protective Order Prohibiting Discovery of Attorney Work Product and Privilege Communications Related to the Martin Report after being served with discovery requests relating to the creation, preparation and publication of the Martin Report.  In Merck's Memorandum, Merck asserted that the materials being requested related to the widely publicized Martin Report are protected from disclosure as they constitute work-product and/or are protected from disclosure under the attorney-client privilege. They are not.

## II.    BACKGROUND

On September 30, 2004, Merck withdrew Vioxx from the market.  Following the withdrawal, Merck was faced with a publicity nightmare as numerous scholars, high ranking members of the FDA and members of Congress expressed outrage at what they perceived to be unethical conduct in the marketing and development of Vioxx.  Much of this criticism related to Merck's interpretation of the Vigor trial and the development of the Fitzgerald  hypothesis, which attempted to explain away higher incidence rates of serious adverse cardiovascular events in patients taking Vioxx by

suggesting that the comparator drug, naproxen, was cardio-protective.  Although this explanation for the disparity in cardiovascular injuries allowed Merck to continue collecting profits from the sale of its blockbuster drug, the explanation proved false and thousands of individuals suffered cardiovascular injuries while taking Vioxx.

As evidence suggesting Vioxx contributed to cardiovascular injuries began to mount, hundreds, if not thousands, of highly critical articles were published in medical literature and by sources in the main-stream media.  This public criticism questioned Merck's explanation of the disparity in adverse events and ultimately attracted the attention of Congress, which held public hearings to explore Merck's conduct in the marketing and development of Vioxx.  As if this negative publicity were not enough to cripple the image of the drug giant, after it became clear that Vioxx played a role in causing cardiovascular injuries, thousands of individuals began filing lawsuits in both federal and state courts.  Thus, Merck's image was under siege and the specter of unprecedented civil liability was on the horizon.

In light of the tremendous backlash following the withdrawal of Vioxx, it was clear that a direct and forceful response was required if Merck was to survive the Vioxx disaster and retain its market share with respect to the other drugs it continued to market.  Merck vigorously prosecuted its defense by, for instance, publishing studies designed to clear itself of public criticism.  Merck published one such study, which was later found to be tainted by a critical mathematical error, that purportedly established that the risks associated with Vioxx did not arise until 18 moths after a patient began using the drug.  Based on the results of this study, Merck argued that clinical trials, which are generally short-term and almost never approach 18 months in duration, failed to uncover the health risks associated with Vioxx.  Merck used this 18 month defense in product liability

2

litigation and to defend its image by helping to shape public opinion.

In a further effort to re-establish its credibility and clear the names of upper management, Merck's board of directors established a special committee ("Special Committee") on November 23, 2005. The special committee hired the former federal judge, John S. Martin, Jr. ("Mr. Martin"), a partner with the law firm of Debevoise & Plimpton LLP ("Debevoise"), to conduct an "independent" investigation regarding the development and marketing of Vioxx.[12] *See* Report of

---

[1]Although Mr. Martin is no longer a member of the judiciary, in his report, he refers to himself as "Judge Martin". Merck adopts this same terminology in its pleadings. Both Merck and Mr. Martin are improperly using this title in order to lend false credibility to the Martin Report by suggesting that Mr. Martin is above reproach. For similar reasons courts have objected to the use of active and former judges as witnesses in ongoing litigation. *See Joachim v. Chambers*, 815 S.W.2d 234, 239-40 (Tex. 1991)(finding canons of judicial conduct are breached when a former judge testifies as an expert witness due to the "appearance of impropriety"). These same concerns are implicated in this case since Mr. Martin and Merck use the term "Judge Martin" to suggest that greater credibility should be afforded to the Martin Report. It is also significant that the use of this term is misleading to members of the public. That is, many members of the public will be confused by this term since it suggests that Mr. Martin is an active member of the judiciary and further suggests a greater level of autonomy. Mr. Martin is an attorney who was employed by Merck's board of directors to absolve the company of any wrongdoing. This is precisely what his report seeks to accomplish.

[2] Merck admits that the purpose of the Martin Report was to aid the company in the context of shareholder litigation only. That is, the Martin Report and the "independent investigation" were not prepared to help the company evaluate concerns related to personal injury litigation. In its Memorandum, Merck states as follows:

> To be sure, Debevoise was not retained to investigate facts related to *all* threatened and ongoing Vioxx litigation. In particular, Debevoise was not asked to investigate Merck's civil liability in connection with potential personal injury and consumer fraud claims resulting from the withdrawal of Vioxx from the worldwide martket. Instead, the investigation materials and report were created for the purpose of determining whether the Board could trust the integrity of senior management or whether, if not, legal action should be brought as a result of the shareholder demand.

(continued...)

John S. Martin, Chronology of Actions by Special Committee of Board of Directors of Merck & Co.,

attached hereto as Exhibit 1.  According to Dr. William G. Bowen, a member of Merck's Board of

Directors and Chairman of the Special Committee, an investigation regarding the development of

and marketing was Vioxx was necessary because:

> It became clear to me and the entire Board that in light of the
> threatened shareholder litigation, pending investigation by regulators
> and Congress, *and the public criticism of management* that had given
> rise to those investigations, the Board needed to investigate the
> conduct of senior management.  It was imperative to me and my
> colleagues on the Board that the corporate executives responsible for
> running the Company had *acted with integrity* and, if they had not,
> that the Board evaluate whether it should initiate litigation against
> any members of senior management.

*See* Declaration of William G. Bowen at ¶¶ 1 and 5 ("Bowen Declaration"), Exhibit 3 to Merck's

Memorandum.

During the course of this investigation Mr. Martin and "fourteen lawyers and six legal

assistants" reviewed millions of pages of documentation and interviewed Merck employees and

management.  *See* Report of John S. Martin, Jr. To the Special Committee of the Merck Board of

Directors, Vioxx Investigation; Outline of Investigative Process, attached hereto as Exhibit 2.

During the investigation, Mr. Martin and his staff had virtually unfettered access to over one

hundred of Merck's current and former employees and twelve Merck consultants.  *Id.* at 2; *see also*

Report of John S. Martin, Jr. to the Special Committee of the Board of Directors of Merck and Co.,

"Alphabetical List of Witnesses Interviewed", attached hereto as Exhibit 3.

---

[2](...continued)
*See* Merck's Memorandum at 2-3 (Emphasis is original).

After 20 months of investigation, Mr. Martin submitted his report to Merck's board of directors on or about July 26, 2006. Merck was billed approximately $22 million for the investigation and preparation of the Martin Report. *See generally*, John Carreyrou and Heather Won Tesoriero, *Merck Believed Vioxx Was Safe*, Toronto Globe and Mail, September 7, 2006, 2006 WLNR 15476265 at B14. Given this massive expenditure, it is not surprising that the report fully exonerates Merck of any wrongdoing, and that the findings therein "mirror" Merck's defenses in the personal injury actions filed against it. *See* Theresa Agovino, *Report Exonerates Merck: The 21 Million Investigation that was funded by the Maker of Vioxx*, Intelligencer, September 7, 2006, 2006 WL 16088421, at C10 ("... its conclusions mirror the company defense."). Shortly after receiving the Martin Report, Merck's board of directors approved the report and published it on the company website effective September 6, 2006.[3] The decision to publish the Martin Report and all appendices was made by the Special Committee on August 30, 2006. *See* Report of John S. Martin, Chronology of Actions by Special Committee of Board of Directors of Merck & Co.

The release of the Martin Report was intended to influence public opinion and to create positive publicity of the eve of critical Vioxx trials. Indeed the release of the Martin Report was such that it was made publically available less than a week before the start date of the Smith trial in these MDL proceedings. Additionally, the Mcfarland case was also scheduled to be heard by Judge Higbee in the New Jersey state court proceedings. That Merck intended for the Martin Report to be picked up in the main-stream news media on the eve of these trials is clear since Merck issued a press release in conjunction with Debevoise on the date the report was released. *See* Press

---

[3] The report was also made available on the Debevoise website. *See* http://161.58.184.45/martinreport/.

Release, *Special Committee of the Board of Directors of Merck & Co., Inc. Releases Results of Independent 20-Month Investigation Into Integrity of Merck Senior Management in Developing, Testing and Marketing of Vioxx*, September 6, 2006, attached hereto as Exhibit 4. At the same time, Merck and Debevoise held a joint "News conference" to discuss the committee's findings. *See* Alex Berenson, *Hired Investigator Clears Merck in Vioxx case*, International Herald Tribune, September 8, 2006, 2006 WL 15589179. These methods of drawing attention to the Martin Report proved successful and its release was immediately picked up by several news sources, many of which reported that an "independent" investigation conducted by a former federal judge had concluded that Merck acted reasonably.[4] It was also curious that Merck directed all medical inquiries to an employee of a public relations firm, Burson-Marstellar, LLP.[5] In addition, Merck went so far as to hire the public relations firm, Ogilvy International.

Notwithstanding Merck's assertion that the materials underlying the Martin Report are protected from disclosure pursuant to the work-product doctrine since Mr. Martin was purportedly retained to prepare a report in response to shareholder demands and the prospect of litigation, the materials are not protected from disclosure since it is clear from Merck's subsequent conduct that the primary purpose of this investigation was for the business purposes of re-establishing the good will of Merck and of clearing Merck's upper management of any responsibility for the Vioxx debacle. *See* Report of John S. Martin, Jr. To the Special Committee of the Merck Board of Directors, Vioxx Investigation; Outline of Investigative Process, at pg. 2 (the Martin investigation was sanctioned in order "to make recommendations to the full Merck Board regarding shareholder

---

[4] *See* printout of 20 News Articles, attached as Exhibit 5.

[5] *See* http://161.58.184.45/martinreport/contact.html.

demand letters."). It is also clear that Merck hoped the release of the Martin Report would influence public opinion in such a way that it would have an impact on pending civil litigation. Why else would Merck release the Martin Report on the eve of critical personal injury cases?

In addition, it is also evident that Merck would have authorized the investigation even if there had been no shareholder demand since Merck intended to make the report publicly available all along. Simply stated, Merck needed an "independent" investigation clearing it of any wrongdoing to re-establish good-will and to absolve its upper management of any responsibility for any wrongdoing. This is why Merck authorized the investigation to continue several months after the shareholder derivative suit had been dismissed with prejudice on May 5, 2006.[6] *See In Re: Merck & Co., Inc. Derivative & ERISA Litigation*, MDL 1658 (SRC), Civil Action Nos. 05-1151 and 2368 (Dismissal Order)(May 4, 2006)(Chesler, J.), attached hereto as Exhibit 6.[7] Why else would Merck allow an investigation designed to assist the special committee in making "recommendations to the full Merck Board regarding shareholder demand letters" to continue after all shareholder litigation had been rendered moot? Merck's conduct in releasing the Martin Report shortly after its completion and waiving its right to assert a privilege as to the report itself further suggests that the Martin Report was intended for public release all along.

---

[6] Since Merck asserts that the Martin Report was generated to evaluate the claims of shareholders, documents generated after the shareholder litigation was dismissed would not be covered by the privilege even assuming Merck can establish its applicability to earlier documents. *See Guy v. United Healthcare Corp.*, 154 F.R.D. 172, 181 (S.D.Ohio 1993)("the scope of the protection is limited to that time in which a real and substantial possibility of litigation exists").

[7] A notice of Appeal was filed in the dismissed action on June 1, 2006.

For these reasons the Martin Report and underlying materials are not within the work-product privilege since they were not prepared "in anticipation of litigation" but rather for non-litigation purposes.  Additionally, even if the materials qualify as work-product and/or are subject to protection under the attorney-client privilege, Merck has waived such privileges by publishing the Martin Report.  Finally, assuming there has been no waiver of privilege and that the materials underlying the Martin Report qualify as work-product and/or are protected by the attorney-client privilege, the proper remedy is for this Court to shield those materials within the attorney-client privilege and to permit discovery of those materials that qualify as work-product, subject to redaction, as Plaintiffs have a "substantial need" for such materials.

## III.   LEGAL ARGUMENT

### A.   The Materials Underlying the Martin Report Do not Qualify for Protection Under the Work-Product Doctrine

The materials underlying the Martin Report are not within the work-product privilege, even though the investigation was conducted by a law firm, since the primary purpose of the report was for business as opposed to litigation purposes.

Fed.R.Civ.P. 26(b)(3) recognizes the work product privilege which, protects from disclosure those "documents and other tangible things ... [that are] prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) ..."[8].  In determining the applicability of

---

[8] Merck may contend that it cannot produce materials in the possession of third-parties, *i.e.* its outside counsel, Debevoise, since it lacks custody or control over such materials.  Since Merck has <u>control</u> over its lawyers, the third-party, as an agent, there would be no merit to such an assertion.  *See Green v. Fulton*, 157 F.R.D. 136, 142 (D.Me. 1994)("documents are considered to be under a party's 'control' when that party has the right, authority or ability to

(continued...)

the work product privilege, the threshold question is whether the document was prepared in anticipation of litigation rather than in the ordinary course of business. *See Upjohn Co. v. United States.*, 449 U.S. 383, 397 (1981); *Carroll v. Praxair, Inc.*, 2006 WL 1793656, *2 (W.D.La. 2006)(Wilson, M.J.).   "The work-product doctrine does not protect materials assembled in the ordinary course of business, pursuant to regulatory requirements, or for other non-litigation purposes." *See Carroll*, 2006 WL 1793656, * 1, *citing United States v. El Paso Co.*, 682 F.2d 530 (5th Cir. 1982), *cert. denied*, 466 U.S. 944; *Naquin v. Unocal Corporation*, 2002 WL 1837838, * 7 (E.D.La. 2002)(Wilkinson, M. J.)("If a party or its attorney prepares a document in the ordinary course of business, 'it will not be protected [from discovery] even if the party is aware that the document may also be useful in the event of litigation.'")(citations omitted).   Indeed, "[t]he law is settled that 'excluded from the work product doctrine are materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation.'" *Naquin*, 2002 WL 1837838,

---

[8](...continued)

obtain those documents upon demand."); *Rosie D. v. Romney*, 256 F.Supp.2d 115, 119 (D.Mass. 2003)("control" exists where a party has a legal right to obtain documents, where there is a principal-agent relationship or where a contractual provision confers a legal right); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 530 (S.D.N.Y. 1996)(defendants retain control of documents in hands of former non-party employees and must produce them to plaintiffs); *In re Woolworth Corp. Sec. Class Action Litig.*, 166 F.R.D. 311, 313 (S.D.N.Y. 1996)(defendant obligated to produce SEC transcript of employee testimony still in possession of the SEC); *Wardrip v. Hart*, 934 F.Supp. 1282, 1286 (D.Kan. 1996)(defendants had control of financial documents in the possession of their accountants for the purpose of Rule 34 and, upon receipt of the request for production, should have produced the documents to plaintiffs); *Winston v. Alhadeff, No. 83 C 3801*, 1986 U.S. Dist. LEXIS 27167 (N.D.Ill. Apr. 4, 1986)(party ordered to produce documents in possession of non-party accountant; party retained control of the documents as he had the right to demand their return).   Indeed, proof that Merck asserts control over the materials in its counsel's possession is borne out by correspondence by Debevoise.   *See* October 23, 2006 Letter of Mark Goodman at pg. 2, attached hereto as Exhibit 7 ("Finally, as we explained during our telephone call, Merck, as the holder of the protections afforded under the work product doctrine and the attorney-client privilege, has instructed us to fully assert those protections in response to the subpoenas.").

* 7, *citing Guzzino v. Felterman*, 174 F.R.D. 59, 62 (W.D.La. 1997)(Tynes, M.J.).

A document or other item is prepared in anticipation of litigation "as long as the _primary motivating purpose_ behind the creation of the document was to aid in possible future litigation." *See United States v. Davis*, 636 F.2d 1028, 1039 (5th Cir. 1991), *cert. denied*, 454 U.S. 862, *accord In re Kaiser Alum. & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000), *cert. denied*, 532 U.S. 919 (2001). Although the "involvement of an attorney is a highly relevant factor ... making materials more likely to have been prepared in anticipation of litigation ... [t]he involvement of an attorney is not dispositive of the 'in anticipation of litigation' issue." *Carroll*, 2006 WL 1793656, *2 (Citation ommitted).

The party asserting the privilege has the burden of establishing that the materials fall within the privilege, and that the privilege has not been waived. *See Carroll*, 2006 WL 1793656, *1, *citing In re the Leslie Fay Companies, Inc. Securities Litigation*, 161 F.R.D. 274, 280 (S.D.N.Y. 1995); *Naquin*, 2002 WL 1837838, * 7; *see also In re OM Group Securities Litigation*, 226 F.R.D. 579, 590 (N.D.Ohio 2005); *Lasalle Bank N.A. v. Mobile Hotel Properties, LLC*, 2004 WL 1238024, * 2 (E.D.La. 2004)("[i]nasmuch as the plaintiff bears the burden of proving that the documents withheld are subject to the claimed privilege/protection which has not been waived by disclosure, it appears on this record that the plaintiff has failed to carry its burden of proof with respect to the "Business Plan.")(Knowles, M.J.), *reconsideration denied*, 2004 WL 1562846 (E.D.La. 2004)(Livaudais, J.).

Here, although the materials underlying the Martin Report were prepared by a law firm, these materials do not qualify for protection under the work-product privilege since the primary purpose for their preparation was for business purposes. That is, "the fact that a defendant anticipates litigation resulting from an incident does not automatically insulate investigative reports [and other

associated materials] from discovery as work product." *See Carroll*, 2006 WL 1793656, * 2 (citation omitted). "If the document would have been created regardless of whether litigation was expected to ensue, the document is deemed to have been created in the ordinary course of business and not in anticipation of litigation." *Carroll*, 2006 WL 1793656, * 2, *citing Electronic Data Systems Corporation v. Steingraber*, 2003 WL 21653414, * 5 (E.D. Tex. 2003); *see also Southern Scrap Material Co. v. Fleming*, 2003 WL 21474516, * 7 (E.D.La. 2003)(Knowles, M.J.)("If in connection with an accident or an event, a business entity in the ordinary course of business conducts an investigation for its own purposes, the resulting investigative report is produceable in civil pre-trial discovery."), *reconsideration denied*, 2003 WL 21783318 (E.D.La. 2003)(Knowles, J.).[9]

In fact, several federal cases have rejected the assertion of the work product privilege and allowed discovery in factually similar cases. *See Davis*, 636 F.2d at 1039-40 (rejecting argument that materials prepared by attorney should be subject to work-product protection where the primary motivating purpose for the preparation of the materials was not for possible future litigation); *Carroll*, 2006 WL 1793656, * 4 (finding investigative report and related documents that were prepared following an accident at a company's facility were not protected from disclosure as work-product); *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 477 (N.D.Tex. 2004)(finding materials were not protected by work-product privilege even though developed in the course of an investigation conducted by an attorney, who was asked amongst other things to "investigate possible legal causes of action", even though the materials "may be helpful in legal proceedings", since the

---

[9] "If a party or its attorney prepares a document in the ordinary course of business, it will not be protected from discovery even if the party is aware that the document may also be useful in the event of litigation." *Fleming*, 2003 WL 21474516, * 7.

"primary motivation in preparing these documents was the protection of its confidential information."); *see also Leslie Fay*, 161 F.R.D. at 280-81 (rejecting assertion of work product privilege and finding primary purpose of investigation conducted by outside counsel who was employed by audit committee was for business purpose despite, "ancillary existence of ongoing litigation", where the report was used to make decisions in terms of firing personnel, "to determine the magnitude of fraud and implement new financial structure, organization, reporting, and internal control systems, and, possibly most important, to reassure creditors and future lenders that the culpable parties and suspect internal policies were being vigorously sought and rooted out.").[10]

As stated by the court in *Leslie Fay*, "[i]n the instant case, the simple fact that the Company foresaw securities fraud litigation or that the SEC had initiated its own investigation prior to the Audit Committee's investigatory efforts does not automatically qualify the Audit Committee's investigation materials as work product." *Id*. at 280 (citations omitted).

The court in *Carroll* reiterated these same concerns and ultimately rejected the assertion of the work-product privilege, where the materials would have been generated in the ordinary course

_____

[10] *See also Seibu Corporation v. KPMG LLP*, 2002 WL 87461, * 4 (N.D. Texas 2002)(finding files and document created by auditors pursuant to an internal investigation initiated by in-house counsel were not within work-product doctrine even if "KPMG reasonable anticipated litigation", where "the primary purpose of the internal investigation was to make personnel decisions regarding the termination of partners responsible for the Q-Zar audit.", *citing Leslie Fay, supra*); *McEwen v. Digitran Systems, Inc.*, 155 F.R.D. 678 (D.Utah 1994)(Counsel's retained accountants prepared the documents primarily to enable the re-issuance of the corporation's financial statements despite pending litigation and SEC investigation); *In re Subpoena Duces Tecum Served on Willkie Farr & Gallagher*, 1997 WL 118369 (S.D.N.Y. 1997)(the documents were primarily prepared for business purposes in order to maintain the integrity of the financial reports of the corporation); *In re OM Group Securities Litigation*, *supra*, (documents generated for dual litigation and business purposes would have been generated in the absence of pending or possible future litigation and thus were not protected from disclosure under the work-product doctrine).

of business despite the existence of pending litigation. The court summarized its conclusions as follows:

> Even if these documents were prepared with an eye towards litigation, it is evident that the RCA contains information which Praxair would be expected to compile in the ordinary course of its business after an accident has occurred in order to ascertain the cause of the accident, to evaluate equipment failures, and to implement changes in an effort to prevent similar accidents in the future.

*See Carroll*, 2006 WL 1793656, * 4, *citing Poseidon Oil Pipeline Co. v. Transocean Sedco Forex*, 2001 WL 1360434, * 4 (E.D.La. 2001) *and Occidental Chemical Corp. v. OHM Remediation Service Co.*, 175 F.R.D. 431, 435 (W.D.N.Y. 1997).[11]

Pursuant to this line of cases, federal courts have recognized that where a company is motivated by dual purposes in retaining outside counsel to conduct an internal investigation, *i.e.* where there is a business purpose as well as existing or potential litigation, courts will not shield documents under the work product privilege where the company would have conducted the investigation anyway had there been no ongoing or anticipated litigation. *See Carroll*, 2006 WL 1793656, * 4 (finding investigative report and related documents that were prepared following an accident at a company's facility were not protected from disclosure as work-product where company would have conducted the investigation anyway "in the ordinary course of business"); *Leslie Fay*, 161 F.R.D. at 281 ("had there been no ongoing or anticipated litigation, Leslie Fay would have

---

[11] Merck has relied upon a series of cases from other jurisdictions that are distinguishable and/or inconsistent with the law of this Circuit. For instance, *Hollinger International Inc. v. Hollinger Inc.*, 230 F.R.D. 508, 515 (N.D.Illinois 2005), is distinguishable since the court found no waiver of work-product doctrine where a party voluntarily produced the fact section of a report prepared following an internal investigation to the SEC, where the fact section had been carefully redacted to remove attorney conclusions, mental impressions, and other privileged information. Here, Merck voluntarily published the entire text of the Martin Report, which clearly includes attorney conclusions and mental impressions.

conducted an investigation anyway."); *In re OM Group Securities Litigation*, 226 F.R.D. at 597 (where documents are essentially generated for dual litigation and business purposes and such purposes are "inextricably intertwined in that neither purpose dominates the other" the issue to be determined "is whether the documents would have been generated in the absence of pending or possible future litigation."); *Amway Corp. V. The Procter & Gamble* Co., 2001 WL 1818698, * 6 (W.D.Mich. 2001)(when it is clear that documents would have been prepared independent of any anticipation of use in litigation, no work-product can attach); *Maine v. United States DOT*, 298 F.3d 60, 70 (1ˢᵗ Cir. 2002)(documents that would have been created in essentially similar form irrespective of the litigation are not protected even if such documents aid in the preparation of litigation); *Stout v. Illinois Farmers Ins. Co.*, 150 F.R.D. 594, 604 (S.D.Ind. 1993)(if document would have been created for non-litigation uses regardless of intended use in litigation preparation, it should not be afforded work-product protection)(Foster, M.J.), *aff'd*, 852 F.Supp. 704 (S.D.Ind. 1994)(Barker, J.).

Regardless of what may be stated in Merck's pleadings and in the text of the Martin Report itself, it is clear that Merck retained Mr. Martin for the "primary purposes" of absolving upper management of any wrongdoing and re-establishing the good-will of the company with the general public. As noted above, following the withdrawal of Vioxx, Merck was subject to tremendous public scrutiny that involved high profile Congressional hearings and the publication of numerous articles that criticized Merck's conduct in some of the most elite medical journals in the world.[12] Merck's misconduct in the development and marketing of Vioxx was also front page news in various

---

[12] For instance, scathing critiques were published in the *Journal of the American Medical Association*, *The Lancet*, *The British Medical Journal* and the *New England Journal of Medicine*.

news media around the world.  Under these circumstances, Merck's motivation for generating the Martin Report was significantly influenced by its need to re-establish its credibility with the public and for the purpose of vindicating its senior management as in *Carroll*, *supra*; *Leslie Fay*; *supra*; *McEwen*, *supra*; *In re OM Group Securities Litigation*, *supra*; and *In re Subpoena Duces Tecum Served on Willkie Farr & Gallagher*, *supra*.  Merck needed the appearance of an "independent" investigation to accomplish these objectives.

The further fact that Merck publically released the full text of the Martin Report on its website, called a press conference, issued press releases and made its officials available for interview further establishes that the "primary purpose" of the report and investigation was to re-establish good-will with the public and to vindicate senior management.  Indeed, the fact that the report was issued after the shareholder action was dismissed with prejudice supports the view that there were other reasons behind this report and its publication.

Finally, even assuming the need to re-establish public integrity and to vindicate senior management were not the "primary purposes" of the report, they were at minimum "dual purposes" for the preparation of the report and the question becomes whether Merck would have conducted the investigation had there been no actual or threatened litigation.  Although this is difficult to contemplate given the facts of this case, it is clear that Merck's public image was tarnished in the aftermath of the Vioxx debacle and that a purportedly "independent" investigation by a former federal judge would go a long way in helping to rebuild the company's image.  In short, such an investigation was essential to re-establish good-will and to absolve Merck's upper management of responsibility for any wrongdoing.  For these reasons, it is clear that Merck would have conducted the investigation even if there had been no actual or threatened litigation.

15

**B.**    **The Materials Underlying the Martin Report Do not Qualify for Protection Under the Attorney-Client Privilege**

Because the investigation by Mr. Martin was conducted for business as opposed to legal purposes, the attorney-client privilege is inapplicable and does not shield the materials underlying the Martin Report from disclosure.  In *Metalsalts Corporation v. Weiss*, 184 A.2d 435, 438-9 (N.J.Super. 1962), the court recognized that the attorney-client privilege was only applicable where a strict relation of attorney and client existed and where communications are made to an attorney in his or her professional capacity.  *See United Jersey Bank v. Wolosoff*, 483 A.2d 821 (N.J.Super.A.D. 1984)(for attorney-client privilege to apply, attorney must be acting in professional capacity as a lawyer).  The court in *Weiss* determined that an attorney conducting an internal investigation was acting as a agent of the corporation, and that the attorney-client privilege was inapplicable since the purpose of the investigation was for the business purpose of uncovering grounds to terminate an employee.  *Id.* at 439; *see also Leonen v. Johns-Manville*, 135 F.R.D. 94 (D.N.J. 1990)("Communications which relate to business rather than legal matters do not fall within the protection of the privilege.").  Since the attorney client privilege is to be "strictly construed", and since the investigation undertaken by counsel "could have been rendered by any corporate agent", the court found the privilege inapplicable and stated that:

> If all activities of a lawyer are to be classified as warranting the bar of discovery proceedings because of the attorney-client privilege, then it would be appropriate for clients to retain lawyers as investigators, custodians of records and the like, thereby turning the shield of the privilege into the sword of injustice.

*Id.* at 440; *see also Payton v. New Jersey Turnpike Authority*, 691 A.2d 321, 334 (N.J. 1997)(quoting the above statement and determining that communications related to internal investigation of sexual harassment complaints that was conducted by attorneys would not normally qualify for protection

16

under the attorney-client privilege).

In fact, although making no ruling as to the applicability of the attorney-client privilege due to the insufficiency of the record below, the New Jersey Supreme Court discussed these same concepts at length in *Payton*.  In *Payton*, the New Jersey Supreme Court observed that:

> An attorney who is not performing legal services or providing legal advice in some form does not qualify as a "lawyer" for purposes of the privilege.  Thus, when an attorney conducts an investigation not for the purpose of preparing for litigation or providing legal advice, but rather for some other purpose, the privilege is inapplicable.  That result obtains even where litigation may eventually arise from the subject of the attorneys activities.
>
> The key issue regarding the applicability of the privilege in this case is the purpose of the various components of the investigation that defendant initiated into plaintiff's allegations of sexual harassment.  If the purpose was to provide legal advice or to prepare for litigation, then the privilege applies.  However, if the purpose was simply to enforce defendant's anti-harassment policy or to comply with its legal duty to investigate and to remedy the allegations, then the privilege does not apply.

*Payton*, 691 A.2d at 334.

Likewise, the attorney-client privilege is inapplicable since the investigation undertaken by Mr. Martin was for the business purposes of re-establishing good-will and clearing Merck's upper management of responsibility for the Vioxx debacle.

**C.      Even if the Materials Underlying the Martin Report Qualify for Protection Under the Attorney-Client Privilege or as Work Product, Merck has Waived the Privileges by Publishing the Report to the Public**

Merck has waived any privilege applicable to the materials underlying the Martin Report by publishing the full text of the Martin Report on its website.  Although the applicability and waiver of the work-product privilege is governed by federal law and the applicability and waiver of the attorney-client privilege is governed by New Jersey law, the standards for finding waiver have key

17

similarities and Merck has waived both privileges by voluntarily publishing the Martin Report on its website.

Under both New Jersey law and Fifth Circuit precedent, Merck has waived any privilege as to the Martin Report itself.  Issues regarding the scope of the waiver, i.e. with respect to the underlying materials, are governed by slightly different standards since application of both federal and state law is involved.  That is, the standard for finding a broad subject-matter waiver of the attorney-client privilege under New Jersey law is slightly different from the standard for finding such a waiver of the work-product doctrine under the law of this Circuit.  For instance, in the context of the attorney-client privilege, New Jersey often recognize broad subject-matter waiver where privileged information is disclosed.  New Jersey also recognizes the "fairness doctrine", which is similar to the standard applied in the Fifth Circuit for finding subject-matter waiver of the work-product doctrine.  The "fairness doctrine" is frequently invoked by courts in order to extend an otherwise narrow waiver of a privilege.  As the name suggests, this doctrine is based on underlying principles of fairness.

Because mere disclosure of the Martin Report should result in broad subject-matter waiver of the attorney-client privilege under New Jersey law, this argument is addressed first.  However, although it is submitted that mere disclosure of the Martin Report resulted in subject-matter waiver of the attorney-client privilege, Plaintiffs argue in the alternative that assuming the disclosure did not result in subject-matter waiver of the attorney-client privilege, the waiver of such privilege should be extended under the "fairness doctrine."  Since the "fairness doctrine" is similar to the Fifth Circuit's standard for finding subject-matter waiver of the work-product privilege, these concepts are discussed in conjunction below.

18

### 1.   By Publishing the Martin Report Merck has Waived the Attorney-Client Privilege

New Jersey recognizes a broad waiver of the attorney-client privilege when confidential information is disclosed.  For instance in *Sipca North America, Inc. V. Donaldson Enterprises, Inc.*, 430 A.2d 262 (N.J.Super.L.D. 1981), the court found a waiver of the attorney-client privilege where a party disclosed a report to opposing counsel for settlement purposes with the understanding that it would not be shared with the opposing party.  This broad waiver concept is set forth in N.J. R.E. 530, which provides in relevant part:

> A person waives his right or privilege to refuse to disclose or to prevent another from disclosing a specified matter if he or any other person while the holder thereof has (a) contracted with anyone not to claim the right or privilege or, (b) without coercion and with knowledge of his right or privilege, *made disclosure of any part of the privileged matter or consented to such a disclosure made by anyone*.

N.J. R.E. 530 (emphasis added).

Under New Jersey law, a waiver of a privilege by a voluntary disclosure waives such privilege with respect to materials on the same subject matter.  For instance, the court in *Sipca* determined that, "disclosure of a part of a protected communication results in a total waiver of the attorney-client privilege with respect to that communication."  *Sipca*, 430 A.2d at 265; *Perth Amboy City Council*, 2005 WL 4014435, * 4 (N.J.Super.A.D. 2006)(citing *Sipca* and acknowledging that partial waivers of privileged communications could waive the entire privilege); *see also U.S. v. Workman*, 138 F.3d 1261, 1263 (8th Cir. 1998)("The waiver covers any information directly related to that which was actually disclosed."); *In re OM Group Securities Litigation*, 226 F.R.D. at 591 (scope of waiver "applies to the rest of the communications on the same subject matter."); *In re Grand Jury Proceedings October 12, 1995*, 78 F.3d 251, 254 (6th Cir. 1991)(same); *In re Papst*

19

*Licensing*, 2001 WL 1135265, * 2 (E.D.La. 2001)("A waiver of attorney-client privilege as to a particular communication extends to all other communications relating to the same subject matter.")(Citation omitted)(Judge Sear).

Under New Jersey law the voluntarily disclosure of the Martin Report on Merck's website, constitutes a broad waiver of any privilege that could be asserted as to the underlying material since Merck had made a disclosure of "part of a privileged matter", *i.e.*, the report itself, and the underlying materials involve the same subject matter as the report.  In *In re OM Group Securities Litigation, supra*, the Court found a broad waiver of the attorney-client privilege where privileged materials that were voluntarily disclosed, "were not brief or cryptic summaries .... [that ] merely acknowledged the existence of an investigation .... [but rather were] a substantial presentation of the investigation ... [and were] more than 30 pages in length, [and] listed detailed conclusions and cited specific findings, interviews and documents in support."  *See In re OM Group Securities Litigation*, 226 F.R.D. at 591-592.  Likewise, the Martin Report is voluminous, presents the entire investigation, lists detailed conclusions and findings, and specifically relies on several witness interviews in reaching its conclusions.

> 2.   **Assuming that Publication Does not Constitute a Waiver of the Attorney-Client Privilege, Application of the "Fairness Doctrine" Establishes a Waiver of Both the Attorney-Client Privilege and the <u>Work-Product Doctrine</u>**

Although the standard for finding subject-matter waiver under the work-product doctrine is more stringent, this standard is satisfied under the facts of this case, and is similar to the "fairness doctrine", which is followed by New Jersey courts and authorizes the broadening of a waiver of the

attorney-client privilege under certain circumstances.[13]   Under this same standard, assuming the waiver of the attorney-client privilege is less broad than is suggested by Plaintiffs, New Jersey courts would recognize broad subject-matter waiver of the attorney-client privilege.

Many courts are critical of self-serving disclosures of otherwise privileged materials and will recognize a waiver in such instances.  For this reason, New Jersey courts have frequently ordered that additional materials be disclosed where a party has selectively disclosed otherwise privileged materials.  For instance, in *Sipca*, the court made the following observation with respect to a selective disclosure by a party:

> The result is the same where the client discloses, or consents to counsel's disclosure, of some of the privileged information where the purpose of such disclosure is to advance the client's own self-serving objectives.  It makes no difference in such a situation that only a part of the privileged information is disclosed, as a partial waiver of a privileged communication effectively waives the entirety thereof.
>
> **********
>
> The limitation of the disclosure, for certain purposes helpful to plaintiff's interests, should not be sufficient to avoid a waiver of the privilege.  A party may not insist on the protection of the privileges for damaging communications while disclosing other selected communications because they are self-serving.  A client who chooses to disclose secrets within the privilege waives it and cannot later insist upon it.

*Sipca*, 430 A.2d. at 265.

Courts frequently refer to this waiver concept as the "fairness doctrine" and it is applied where a party has disclosed privileged information or materials and it would be unfair to shield other

---

[13] Federal courts sitting in the Fifth Circuit have recognized the fairness doctrine, and in so doing have relied on cases such as *Leslie Fay*, *supra*.  *See In re Papst Licensing*, 2001 WL 1135265, * 4 (relying on *Leslie Fay* in applying the fairness doctrine).

related materials involving the same subject-matter.  *See Leslie Fay*, 161 F.R.D. at 283 ("Based

principally on notions of fairness, courts have imposed such a "subject matter waiver" most often

when the privilege-holder has attempted to use the privilege as both "a sword" and "a shield" or

when the party attacking the privilege will be prejudiced at trial.")(citation omitted).  New Jersey

courts have clearly embraced this concept.  In *Wolosoff, supra*, the court recognized the danger of

permitting selective disclosure of otherwise privileged materials without ordering additional

disclosures as follows:

> We note the inherent inequity in permitting [a party] to use the
> privilege as a sword rather than a shield.  If permitted to do so, [a
> party] could divulge whatever information is favorable to its position
> and assert the privilege to preclude disclosure of the detrimental
> facts.  The resulting half-truth that would be revealed might well be
> more disabling than a total distortion.

*Wolosoff*, 196 N.J.Super. at 567.

As noted above, the law of this Circuit with regard to the waiver of the work-product

doctrine, is similar to the fairness doctrine.  Fifth Circuit cases recognize that "a general subject-

matter waiver of work-product immunity is warranted only when the facts relevant to a narrow issue

are in dispute and have been disclosed in such a way that it would be unfair to deny the other party

access to facts relevant to the same subject matter."  *See Fleming*, 2003 WL 21474516, * 8.  That

is, "[C]ourts have recognized subject-matter wavier of work-product in instances where a party

deliberately disclosed work product in order to gain a tactical advantage and in instances where a

party made testimonial use of work-product and then attempted to invoke the work-product doctrine

to avoid cross-examination."  *Id., quoting, Varel v. Banc One Capital Partners, Inc.*, 1997 WL

86457, * 3 (N.D.Tex. 1997).[14]

In this case, Merck has used the report in an effort to mislead the public and to influence potential jurors. The Martin Report wastes no time in concluding that Merck's management did not breach any duty in the development and marketing of Vioxx. Merck also made the Martin Report readily available to members of the public, including prospective jurors, as it appears on Merck's website. Merck further drew attention to the report by issuing press releases and by holding a press conference. It is also significant that Merck released the report on the eve of two product liability trials in the hopes of influencing public opinion and with the hope of influencing the outcomes of such trials. Merck's offensive use of the Martin Report to gain a tactical advantage demands that examination of the underlying data and documentation be permitted under the fairness doctrine.

Although Merck may argue that further disclosures are unwarranted since it professes not to use the Martin Report as evidence in any litigation, the court in *In re OM Group Securities Litigation, supra*, rejected this same argument in a factually similar case. In *In re OM Group Securities Litigation*, the defendants attempted to distinguish cases like *Leslie Fay*, wherein courts found additional disclosures warranted, where a party intended to use a report as part of its case and

---

[14] Under the law followed in this circuit it is clear that Merck committed a waiver of the work-product doctrine. The Fifth Circuit recognizes that the ability of a party to assert that materials are protected by the work-product privilege is extinguished when either a party or a party's attorney discloses such information. *See Fox v. Taylor Diving & Salvage Company, et al.*, 694 F.2d 1349, 1356 (5th Cir. 1983) (finding work-product immunity is lost where attorney voluntarily discloses information in court). The work-product privilege is waived where materials have been disclosed in a manner that makes it likely that they will be available to an adversary. *See Stanley v. Trinchard*, 2005 WL 399460, * 3 (E.D.La. 2005)("Only those disclosures that are inconsistent with the adversary system are deemed to waive the work product protection. The predicate of the inquiry in the work product context is not, as it is in the attorney-client context, whether the material was disclosed, but whether the material was disclosed to an adversary.")(Shushan, M.J.), *reconsideration denied*, 2005 WL 711585 (E.D.La. 2005)(Livaudais, J.).

the report tended to exonerate upper management by implicating another party to the litigation. Under such circumstances, cases like *Leslie Fay* determined that additional disclosures were necessary pursuant to the fairness doctrine.   In rejecting the defendant's argument, the court observed that:

> These arguments are unavailing.   Defendants attempt to restrict application of the fairness doctrine solely to whether they would gain a tactical advantage in litigation by not disclosing the underlying documents.   The Court does not interpret the fairness doctrine so narrowly.   The Court must consider, not only whether there is a tactical benefit, but whether it is fair to uphold the privilege considering the nature of the disclosure.   Here, the Court finds that the Audit Committee's disclosure of the presentation would make it unfair to protect the documents underlying the presentation.   The disclosure to OMG's Board was substantial, intentional, and deliberate.

*Id*.   The court thus determined that plaintiff was entitled to "information that would allow Plaintiff to review the whole picture.   *Id*. (emphasis added).[15]

---

[15] In suggesting that any waiver associated the disclosure of the Martin Report should be narrowly construed, Merck heavily relies upon *Ziner v. Cedar Crest College*, Civ. No. 04-3491, 2006 U.S. Dist. LEXIS 34858 (E.D. Pa. May 30, 2006).   This case is distinguishable for several reasons.   First, in *Ziner* the defendants had voluntarily disclosed a report prepared by outside counsel in an unrelated sexual harassment claim and the plaintiff was seeking production of the underlying materials used in preparing the report.   Second, the defendants had not otherwise released the report.   Finally, the defendants had not attempted any offensive or tactical use of the report.   Although the court was willing to recognize a "partial waiver" as to the report itself, under the "fairness doctrine" the court was unwilling to order further production of the underlying materials since the report had no bearing on the reasonableness of the defendant's actions and investigation in response to the plaintiff's charges of misconduct.

The facts involving the disclosure of the Martin Report are very different.   First, the Martin Report explores the conduct of Merck's senior management with respect to the development and marketing of Vioxx.   This conduct has relevance to each and every claim that has been brought in this litigation.   Second, although Merck has not attempted to use the report itself during litigation, the Martin Report has been made publically available and was released on the eve of trial in two product liability cases.   Thus, unlike *Ziner*, the Martin Report has been

(continued...)

There is no reason for determining that this case is any different than *In re OM Group Securities Litigation*.  By committing a broad waiver of any privilege that Merck could have asserted as to the Martin Report, it would be unfair to limit the waiver to those documents that have already been produced.[16]

**D.    Assuming the Materials Underlying the Martin Report are Privileged and there has Been no Waiver, Plaintiffs are Entitled to the Production of Such Materials Based on "Substantial need"**

_____

[15](...continued)
made available to the public and has been used for the tactical purpose of influencing public opinion on the eve of trial.

Another case heavily relied upon by Merck, *In re Commercial Fin. Servs.*, 247 B.R. 828 (Bankr. D. Okla. 2000), is also distinguishable since it involved a Debtor's request for a protective order prior to the voluntary disclosure of a confidential report.  The protective order would have foreclosed all parties reviewing the report from arguing that there had been a broad subject matter waiver and thereby seeking the underlying materials.  Obviously, Merck did not and could not seek such an order where it intended to broadly distribute the Martin Report for public consumption.

[16] Although Merck attempts to liken the Martin Report to a pleading by arguing that submission of a pleading does not ordinarily waive any privilege as to drafts and other materials reviewed while drafting a pleading, this argument completely fails to address the concept of waiver by voluntary disclosure.  While drafts of pleadings and materials reviewed while drafting such pleadings may be privileged from disclosure, once a party submits a pleading the pleading itself is no longer privileged unless subject to a confidentiality agreement or an order of court.  In contrast to a pleading which is drafted with the intent that it will be filed and provided to opposing counsel, where a company such as Merck retains outside counsel to conduct an independent investigation, investigative reports that are prepared primarily in anticipation of litigation are generally privileged absent a waiver.  *In re the Leslie Fay Companies, Inc. Securities Litigation*, *supra*; *In re OM Group Securities Litigation*, *supra*; *McEwen v. Digitran Systems, Inc.*, *supra*; *In re Subpoena Duces Tecum Served on Willkie Farr & Gallagher*, *supra*. By publishing such a report there will be a waiver that will extend to the underlying materials involving the same subject matter.  N.J. R.E. 530; *Sipca*, *supra*; *Perth Amboy City Council*, *supra*; *U.S. v. Workman*, *supra*; *In re OM Group Securities Litigation*, *supra*; *In re Grand Jury Proceedings October 12, 1995*, *supra*;  *In re Papst Licensing*, *supra*; *Fleming*, *supra*; *Kapoor*, *supra*.  Likewise, there will be a similar waiver where a party voluntarily discloses otherwise privileged information in the text of a pleading.

Unlike many other privileges that are absolute, work-product is a qualified privilege. Thus, even assuming Merck carries its burden of establishing that the materials underlying the Martin Report are subject to work-product protection, and even if it can demonstrate that it has not waived work-product protection when it massively publicized the Martin Report, Plaintiffs can still obtain the information where they have a "substantial need" for the materials and are "unable without undue hardship to obtain the substantial equivalent of the material by other means." Fed.Rules Civ.Proc. Rule 26(b)(3).

Notwithstanding the obvious need to poke holes in the Martin Report and to explore the good-faith conduct of the investigation, Plaintiffs have a substantial need for the underlying materials since these materials have direct relevance to the development and marketing of Vioxx, and therefore, may be useful in the upcoming trials. *See Parks v. U.S.*, , 451 A.2d 591 (D.C. 1982)("Where an attorney's work product, sought at trial, contains evidentiary facts, the seeking party has, by definition, a "substantial need" for the material."), *cert. denied*, 461 U.S. 945 (1983); *see also U.S. v. Nobles*, 422 U.S. 225, 245 (1975)(White, J., concurring); *Hickman v. Taylor*, 329 U.S. 495, 515 (1947)(Jackson, J., concurring). These materials could be used to help establish Merck's knowledge of adverse event data and to evaluate the reasonableness of its conduct once evidence establishing that Vioxx was cardiotoxic became available to the company. Simply stated, this evidence goes to the heart of this litigation and Plaintiffs have a substantial need for such production. *See Weber v. Paduano*, 2003 WL 161340 (S.D.N.Y. 2003)(plaintiff entitled to work-product materials where they went to heart of negligence claim, contained more details as to cause of fire, and since plaintiff could no longer produce an independent evaluation since it had been over a year since the fire occurred); *Cornelius v. Consolidated Rail Corp.*, 169 F.R.D. 250 (N.D.N.Y.

1996)(plaintiff established substantial need for work-product materials where such materials helped to establish defendant's knowledge of condition and availability of remedial measures).

Moreover, Plaintiffs are "unable without undue hardship to obtain the substantial equivalent of the material by other means." During the course of the investigation Mr. Martin and his staff reviewed millions of pages of documentation. They also interviewed hundreds of Merck employees and contractors. This investigation transpired over the course of 20 months and cost in excess of $22 million dollars. Plaintiffs cannot fairly be expected to conduct an investigation of this magnitude and of this expense in order to obtain the "substantial equivalent" of the materials underlying the Martin Report. *See In re International Systems and Controls Corp. Securities Litigation*, 693 F.2d 1235, 1241 (5th Cir. 1982)(cost of obtaining materials contained in work-product from another source may be inquired into as a factor in determining whether undue hardship exists); *Resolution Trust Corp. v. Heiserman*, 151 F.R.D. 367 (D.Colo. 1993)(undue hardship established for purposes of piercing work-product privilege since it would be extremely difficult, as well as wasteful, for party to duplicate three-year investigation); *State of Fla. ex rel. Butterworth v. Industrial Chemicals, Inc.*, 145 F.R.D. 585 (N.D.Fla. 1991)(same with respect to two-year investigation). The magnitude of the investigation that would be involved and the expense that would be incurred in conducting such an investigation make this case distinguishable from cases such as *Ziner, supra*, that are relied upon by Merck, in suggesting that Plaintiffs should be required to conduct their own investigation.[17]

─────────────────────

[17] Although Plaintiffs deny the applicability of any privilege to the materials underlying the Martin Report, should this Court find the work-product privilege applicable and determine that certain materials contain the mental impressions or conclusions of an attorney, production of such material in a redacted form is the appropriate relief, as opposed to an outright protective

(continued...)

Plaintiffs would also be at a tremendous disadvantage if required to conduct a similar investigation, since they are adversaries and were not retained by Merck's board of directors. *See In re Doe*, 662 F.2d 1073, (4th Cir. 1981)(cooperation of witnesses is a factor in determining substantial need and undue hardship), *cert. denied*, 455 U.S. 1000 (1982). For this reason Plaintiffs will be unable to replicate the information that has been uncovered by Mr. Martin. *See Payton*, 691 A.2d at 336 (finding plaintiff entitled to underlying data from investigation since plaintiff would not necessarily be in a position to replicate information uncovered by defendant during its investigation). Finally, to the extent any statement given by a fact witness during the investigation conducted by Mr. Martin is inconsistent with subsequent statements or testimony by the same witness, Plaintiffs should be entitled to have this evidence available in order to conduct a meaningful cross-examination. *See Duck v. Warren*, 160 F.R.D. 80, 82-3 (E.D.Va. 1995); *Gargano v. Metro-North*, 222 F.R.D. 38, 40-1 (D.Conn. 2004); *Dinter v. Sears, Roebuck & Co.*, 599 A.2d 528, 536 (N.J.Super.A.D. 1991).

---

[17](...continued)
order prohibiting any production whatsoever. *See Trico Marine Assets, Inc. v. Alpha Marine Service*, 1999 WL 694103, * 1-2 (E.D.La. 1999)(ordering production of attorney-work product in redacted format upon showing of substantial need and undue hardship)(Livaudais, J.).

IV.    **CONCLUSION**

For the reasons set forth above, Merck's motion for a protective order should be denied.

Respectfully submitted,

**PLAINTIFFS' STEERING COMMITTEE**

Date: November 1, 2006                    By:_____

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, L.L.P.***
Place St. Charles
201 St. Charles Avenue, Suite 4310
New Orleans, Louisiana 70170
Telephone: (504) 581-4892
Facsimile: (504) 561-6024
**PLAINTIFFS' LIAISON COUNSEL**


Andy D. Birchfield, Jr., Esquire
Leigh O'Dell, Esquire
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA  71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
  MEUNIER & WARSHAUER, L.L.C.
Energy Centre
1100 Poydras Street, Ste. 2800
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (fax)

29

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL  32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008  (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA  70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Thomas R. Kline, Esquire
Shanin Specter, Esquire
David J. Caputo, Esquire
Lisa S. Dagostino, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street
19th Floor
Philadelphia, PA  19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA  92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Arnold Levin, Esquire **(on brief)**
Fred S. Longer, Esquire **(on brief)**
Daniel Levin, Esquire
Matthew C. Gaughan, Esquire **(on brief)**
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA  19106
(215) 592-1500 (telephone)
(215) 592-4663  (telecopier)

Shelly A. Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX  77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Christopher V. Tisi, Esquire **(on brief)**
ASHCRAFT & GEREL
2000 L Street, N.W., Suite 400
Washington, DC  20036-4914
(202) 783-6400 (telephone)
(307) 733-0028  (telecopier)

## PLAINTIFFS' STEERING COMMITTEE

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 1st day of November, 2006.

Leonard A. Davis (Bar No. 14190)
*Herman, Herman, Katz & Cotlar, LLP*
201 St. Charles Ave., Suite 4310
New Orleans, LA  70170
PH:    (504) 581-4892
FAX:  (504) 561-6024
ldavis@hhkc.com