SUPERIOR COURT OF NEW JERSEY
ATLANTIC COUNTY
CASE TYPE NO. 619

--------------------------------x
IN THE MATTER OF IN RE:

VIOXX

STENOGRAPHIC TRANSCRIPT
OF:
--------------------------------x   - CASE MANAGEMENT -
CONFERENCE

    PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
             1201 BACHARACH BOULEVARD
             ATLANTIC CITY, NJ  08401

    DATE:   JULY 18, 2006


B E F O R E:

    THE HONORABLE CAROL E. HIGBEE, J.S.C.

TRANSCRIPT ORDERED BY:

    DAVID BUCHANAN, ESQ. AND THEODORE MAYER, ESQ.

A P P E A R A N C E S:

    DAVID BUCHANAN, ESQUIRE
    JEFFREY GRAND, ESQUIRE
    SEEGER, WEISS
    ATTORNEYS FOR THE PLAINTIFFS

    TRACY FINKEN, ESQUIRE
    ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY
    ATTORNEYS FOR THE PLAINTIFFS

    LEE BALEFSKY, ESQUIRE
    KLINE & SPECTER
    ATTORNEYS FOR THE PLAINTIFFS


        *     *     *     *     *     *

            REGINA A. TELL, CSR-CRR
            OFFICIAL COURT REPORTER
            1201 BACHARACH BOULEVARD
            ATLANTIC CITY, NJ  08401



EXHIBIT 4

M007D17331
10bfed97-c074-4a52-b2a5-cae4cb0b387

Page 2

```
 1  APPEARANCES CONTINUED...
 2    NICHOLAS DIAMAND, ESQUIRE
      LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
 3    ATTORNEY FOR THE PLAINTIFFS
 4    TERRENCE SMITH, ESQUIRE
      DAVIS, SAPERSTEIN & SALOMON, P.C.
 5    ATTORNEY FOR THE PLAINTIFFS
 6    DAVID COHEN, ESQUIRE
      THEODORE M. LIEVERMAN, ESQUIRE
 7    SPECTOR, ROSEMAN & KODROFF, P.C.
      ATTORNEY FOR THE PLAINTIFFS
 8
      GENE LOCKS, ESQUIRE
 9    JAMES PETTIT, ESQUIRE
      LOCKS LAW FIRM
10    ATTORNEYS FOR THE PLAINTIFFS
11    MICHAEL FERRARA, ESQUIRE
      THE FERRARA LAW FIRM
12    ATTORNEY FOR THE PLAINTIFFS
13    RICK MEADOW, ESQUIRE
      MEREDITH GURSKY, ESQUIRE
14    THE LANIER LAW FIRM
      ATTORNEY FOR THE PLAINTIFFS
15
      GREG SHAFFER, ESQUIRE
16    WILENTZ, GOLDMAN & SPITZER
      ATTORNEY FOR THE PLAINTIFFS
17
      CHRISTOPHER JOHNSON, ESQUIRE
18    DANIEL FETTERMAN, ESQUIRE
      KASOWITZ, BENSON, TORRES & FRIEDMAN
19    ATTORNEY FOR THE PLAINTIFFS
20    BENEDICT MORELLI, ESQUIRE
      MORELLI & ASSOCIATES
21    ATTORNEY FOR THE PLAINTIFFS
22    JONATHAN SHUB, ESQUIRE
      SHELLER, LUDWIG & BADEY
23    ATTORNEY FOR THE PLAINTIFFS
24    MICHELE A. DiMARTINO, ESQUIRE
      MILLER & ASSOCIATES
25    ATTORNEYS FOR THE PLAINTIFFS
```

Page 3

```
 1  APPEARANCES CONTINUED...
 2    SUSANNE SCOVERN, ESQUIRE
      ALEXANDER, HAWS, AUDET
 3    ATTORNEY FOR THE PLAINTIFFS
 4    ROBERT DASSOW, ESQUIRE
      HOVDE, DASSOW & DEETS
 5    ATTORNEY FOR THE PLAINTIFFS
 6    DAVID CHRISTIE, ESQUIRE
      BURRELL, REGENSTREICH
 7    ATTORNEY FOR THE PLAINTIFFS
 8    STEVEN B. STEIN, ESQUIRE
      LEVIN, SIMES & KAISER
 9    ATTORNEY FOR THE PLAINTIFFS
10    JERRY KRISTAL, ESQUIRE
      PAUL PENNOCK
11    WEITZ & LUXENBERG
      ATTORNEY FOR THE PLAINTIFFS
12
      CHRISTOPHER PLACITELLA, ESQUIRE
13    COHEN, PLACITELLA
      ATTORNEY FOR THE PLAINTIFFS
14
      MICHAEL WEINKOWITZ, ESQUIRE
15    LEVIN, FISHBEIN, SEDRAN & BERMAN
      ATTORNEY FOR THE PLAINTIFFS
16
      ROBERT W. ROWAN, ESQUIRE
17    GOLLITZ, GRIFFIN & EWING
      ATTORNEY FOR THE PLAINTIFFS
18
      MARC GROSSMAN, ESQUIRE
19    SANDERS, VIENER & GROSSMAN
      ATTORNEY FOR THE PLAINTIFFS
20
      ROBERT BAYER, ESQUIRE
21    STARKEY, KELLY, BAYER, KENNEALLY & CUNNINGHAM
      ATTORNEY FOR THE PLAINTIFFS
22
      FRED THOMPSON, ESQUIRE
23    MOTLEY RICE
      ATTORNEY FOR THE PLAINTIFFS
24
      ANDREW SEHIR, ESQUIRE
25    SILVERMAN & FODERA
      ATTORNEY FOR THE PLAINTIFFS
```

Page 4

```
 1  APPEARANCES CONTINUED...
 2    FOREST HORNE, ESQUIRE
      MARTIN & JONES
 3    ATTORNEY FOR THE PLAINTIFFS
 4    MICHELLE ALTENPOHL, ESQUIRE
      ALTENPOHL
 5    ATTORNEY FOR THE PLAINTIFFS
 6    JACQUELINE DeCARLO, ESQUIRE
      HOBIE CORRIGAN
 7    ATTORNEY FOR THE PLAINTIFFS
 8    GREG SMITH, ESQUIRE
      McELDREW & FULLER
 9    ATTORNEY FOR THE PLAINTIFFS
10    THEODORE V.H. MAYER, ESQUIRE
      WILFRED CORONATO, ESQUIRE
11    CHARLES W. COHEN, ESQUIRE
      HUGHES, HUBBARD & REED, LLP
12    ATTORNEYS FOR THE DEFENDANT, MERCK
13
      HOPE FREIWALD, ESQUIRE
14    JAN CALL, ESQUIRE
      DECHERT, LLP
15    ATTORNEYS FOR THE DEFENDANT, MERCK
16    JEFFREY JUDD, ESQUIRE
      O'MELVENY & MEYERS, LLP
17    ATTORNEY FOR THE DEFENDANT, MERCK
18
19
20
21
22
23
24
25
```

Page 5

```
 1              PROCEEDINGS
 2         THE COURT: Okay. We have Paul on the line?
 3         MS. MANGUAL: I'm going to get him on the
 4  phone now, Judge.
 5         THE COURT: Okay. The first thing I wanted to
 6  talk about briefly was the Doherty trial was just
 7  finished, as you know. I passed out for -- I didn't
 8  make enough copies for everybody, but there's a jury
 9  verdict form. If you want to get it you can get it off
10  the website. I just wanted to point out in the first
11  two trials we didn't put direct-to-consumer advertising
12  on the verdict form. In this trial the Locks Law Firm
13  convinced me finally that Perez applied and that I
14  should put the question on the form, so I did, in fact,
15  put direct-to-consumer advertising on the form.
16         In addition, I was not persuaded that the
17  rebuttable presumption did not apply, and in Cona for
18  those of you who were --
19         Hello, Paul.
20         (Whereupon, Mr. Strain appears by phone.)
21         MR. STRAIN: Thanks very much. I'm sorry to
22  make you go to the trouble of hooking me in.
23         THE COURT: You're connected now.
24         So there's two things different in Doherty.
25  And one was that the plaintiffs had wanted the
```

M007D17332
10bfed97-c074-4a52-b2a5-cee4cb0b38

Page 6

1  direct-to-consumer, they requested it in Humeston and
2  in Cona/McDarby, and I didn't give to it them. I did
3  decide that it was appropriate and should be on the
4  jury verdict form, which is somewhat of a change, and I
5  just wanted to bring that to people's attention. I did
6  do it in Doherty.
7       The heeding presumption I applied in
8  Cona/McDarby and in Humeston, and I still believe the
9  heeding presumption applies. I still do not believe
10 that the jury should have to make a determination as to
11 whether the doctor would have prescribed the drug or
12 whether the consumer would have taken the drug,
13 however, what I did here was basically for
14 informational purposes because I don't want to have
15 to -- if we can avoid the prospect of having a 7-week
16 trial redone I put the two questions, the third
17 question is the Caskey question, and the fourth is the
18 Doherty question, whether Mrs. Doherty had been
19 adequately warned would she have taken the drug. I put
20 them on the jury form, but I didn't make them
21 determinative, so whether they answered yes or no they
22 just kept going on. That way if, in fact, the
23 Appellate Division found that that was a key question
24 that should have been on the form we wouldn't require a
25 new trial.

Page 7

1       I'm throwing that out because for the next
2  trial everybody may want to think about it, whether
3  they think that's appropriate, not appropriate, maybe
4  we'll have to talk about it, but, obviously, it is in
5  everyone's best interest if we can avoid having to have
6  retrials. So it was an alternative way, and I'm giving
7  it to everybody so it doesn't come up at the last
8  minute. It is something you can give to the people in
9  your offices that are really smart to look over and
10 tell us how we can do it better.
11      The next thing is there's a September trial
12 listed. I got a letter yesterday indicating that the
13 plaintiffs had withdrawn or were dismissing the Hatch
14 case. I also got a call from Steve Raber that
15 indicated he was no longer going to be able to try the
16 September trial on behalf of the defense and he would
17 be trying cases in California in September or in
18 October. And probably Mr. Strain would be lead counsel
19 for the next case.
20      Is that right, Paul?
21      MR. STRAIN: Yes, it is, Judge.
22      THE COURT: I hate to do this to you, Paul,
23 but the September case is cancelled. I'm not going to
24 try McFarland in September. I do not intend to have
25 a -- you know, I have done three of these now, which is

Page 8

1  a lot in one court. I don't think it is productive for
2  me to continue to try one case for 7 weeks. I also
3  don't think it is productive for me to try cases where
4  one of the primary issues -- and it turned out that
5  that really probably wasn't a major factor in this
6  case -- I think it was in Cona -- but the issue of
7  whether or not someone took the medication or not. It
8  doesn't really seem like we have to take 7 weeks to try
9  a case for the jury to decide whether somebody was on
10 VIOXX or not.
11      I understand the Hatch case is being dismissed
12 with prejudice, so the McFarland case will be in the
13 next group of cases that are tried. It is not going to
14 be wasted work. The next group of cases that are tried
15 will include McFarland. But I intend to group cases at
16 this point and start trying hopefully...
17      My plan is to do this: My plan is to try to
18 take between five and 10 cases, group them together,
19 set them up for trial together with one attorney trying
20 liability at least. Either plaintiffs it will have to
21 be one attorney's cases or plaintiffs will agree
22 they'll allow somebody to handle the general -- one
23 attorney doesn't mean you have to have one lawyer
24 there. It just means that we're not going to have
25 three openings or three closings. It can be one firm

Page 9

1  working in conjunction with another, one does the
2  opening, one does the closing, but it is going to have
3  to be -- it is not going to be separate. I'm not going
4  to have three openings, five openings, five closings,
5  five crosses, five directs.
6       MR. KRISTAL: But different lawyers can do the
7  questioning.
8       THE COURT: Different lawyers can do different
9  parts. Basically what you did in Cona/McDarby, except
10 I'm going to restructure it, and I'm going to try this
11 once. Everything has to be done on an experimental
12 basis, unfortunately. Poor VIOXX is being the
13 experiment for here, but I think it is -- so far what
14 we have done has really worked, actually, and now I'm
15 going to try something a little different, and what I'm
16 going to do is my plan at this point, and I'll have to
17 see if it is workable, but my plan at this point is I'm
18 going to take these five to 10 cases that are grouped
19 together. I'm going to have the case tried on
20 liability first, liability being whether or not there
21 was a failure to warn and whether or not there was
22 consumer fraud. At the end of that that question --
23 those questions will be submitted to the jury. If the
24 jury finds in favor of the defense on those two
25 questions then we have resolved 10 cases or 8 cases or

Page 10

1  whatever. If the jury finds in favor of the plaintiffs
2  on those cases we are then going to proceed with the
3  same jury to try specific causation and damages with
4  each plaintiff. Those cases would last, approximately
5  I'm hoping, two days each. One to two days, hopefully
6  we could do them two days maximum with the cardiologist
7  testifying to specific causation. They will have
8  gotten some general causation testimony through the
9  failure to warn case. There's no question that they're
10 sort of intermingled. That's why I'm not doing a
11 bifurcation the other way and doing damages first
12 because -- Paul, are you hearing this?
13       MR. STRAIN: Yes, I am.
14       THE COURT: I wanted to make it a lot more
15 exciting for you.
16       MR. STRAIN: All right. I appreciate the
17 thought anyway.
18       THE COURT: So, all right. So that's the way
19 I'm planning it at this point.
20       MR. LOCKS: Judge, do you expect that after
21 you -- assume the plaintiffs win, and you try the first
22 case on damages the jury will then deliberate on the
23 first case for damages.
24       THE COURT: Yes. They'll do one case, go out
25 make a decision on that plaintiff and then they'll go

Page 11

1  out and hear the next plaintiff, then they will make a
2  decision on that plaintiff, then they'll hear the next
3  plaintiff and make a decision on that plaintiff, I
4  think. I guess we could do all the plaintiffs, but I
5  think it would be better to do one at a time. But, you
6  know, we can play with that a little bit. I can think
7  about that.
8        MR. PLACITELLA: In the beginning of the case
9  the jury will know that there are --
10       THE COURT: They will know that there are 10
11 plaintiffs who are claiming they had a heart attack or
12 stroke or whatever. But they're not going to hear
13 details about it. I'm going to identify approximately
14 50 to 60 cases that I intend to have worked up for
15 trial very quickly. From that pool we'll start pulling
16 the trials of 10 or so together. I'm going to need a
17 bank of cases in order to pick, hopefully, two trials
18 of 10 cases each or something like that. I'm sure
19 there won't be 10. As I said, it is five to 10.
20       There might be two cases of seven or six or
21 eight or whatever works out. But, basically, we're
22 going to need a bank of that many cases from what I can
23 see because people take their cases and then they
24 decide they have to dismiss them because they really
25 aren't good cases. People have problems or issues that

Page 12

1  really illnesses or other -- you know, Abdel-Malek,
2  remember, had a divorce, a messy divorce going on.
3  Hopefully he is done that. We may want to resurrect
4  his case. But those kind of issues maybe --
5        It is my intent, and I said this about the
6  prescription issue at least, whether they took the drug
7  or not to not make that part of any of the long trials.
8  What I do intend to do is if, in fact, there's a real
9  question as to whether -- and I'm talking about
10 somebody who doesn't have prescriptions, they either
11 say they took samples or they took it and say they took
12 it when the records don't verify that they have
13 prescriptions. There's always going to be, of course,
14 some fact issue as to whether somebody took the drug or
15 not maybe, but those where there's a genuine issue
16 after the plaintiff's dep and after the doctor's dep
17 and after the defense has those they should be able to
18 identify those cases where they have an issue as to
19 whether the plaintiff took the drug or not.
20       I intend to have those tried in mini trials
21 with separate juries simply as to the issue of did this
22 plaintiff take the drug or not. That would be a
23 one-day trial probably, which will be decided before
24 the trial -- before the damages liability trial.
25 Again, I'm not going to try a case for 7 weeks for the

Page 13

1  jury to find they didn't take the drug. That is such a
2  waste of judicial time, such a waste of defense time
3  and such a waste of plaintiff time.
4        MR. BUCHANAN: We agree with that observation,
5  Judge. There's at least some science there's some
6  science surrounding what's insufficient usage that may
7  render -- obviously, if there's a samples issue, that's
8  one thing.
9        THE COURT: Let me say this: I'm not going to
10 dismiss cases -- those cases would have to be very fact
11 oriented. The jury forms would have to be -- it is a
12 fact-finding jury, and the fact -- it would be real
13 simple if the question is did the plaintiff ever take
14 VIOXX, and if those cases are -- if they say, no, they
15 never took it then, obviously, those cases will be
16 dismissed. But if they say, yes, they took VIOXX, and
17 we determined that they took it for 2 years but hadn't
18 taken it for 3 months before the drug we may, actually,
19 ask specific questions, depending on what the
20 allegation is. Then there would be that determination,
21 and if they determined, for example, that the plaintiff
22 took the drug for 6 months and then didn't take it for
23 3 months that would be told to the second jury. It
24 would be a predetermined fact, and the plaintiffs then
25 would have the option of saying I don't want to try

Page 14

1  this case. I'm not going to put my money into a case
2  where that's an issue or they could -- and I assume
3  plaintiffs aren't going to really want to try too many
4  of those. Maybe I'm wrong.
5      MS. FREIWALD: You're talking about having a
6  different jury decide the usage question?
7      THE COURT: The usage question will be decided
8  in a very short one-day trial. I may be able to do
9  five of those in a week. That's really optimistic. I
10 might be able to do two of those in a week. But I can
11 also have some other judges do bench trials on that.
12 If people wanted bench trials I could get other judges
13 to do bench trials. If you want juries we can have
14 juries. Eventually I would hope that's an issue that
15 can be done through an arbitrator or a mediator. Not a
16 trial issue. Not in a 6-week trial. It is just too
17 expensive for both sides.
18     MR. KRISTAL: Does the Court need to think
19 about how specific factual determination on use may
20 impact the expert's opinions, whose opinions might have
21 been based on prior assumptions of fact? In other
22 words, if you take what was an 18-month use case and
23 the jury finds it was 3 months if the discovery has
24 already happened on the experts...
25     I'm just throwing that out.

Page 15

1      THE COURT: What I'm going to do is have --
2  what we're going to try to do is schedule that in, and
3  as soon as the plaintiffs' deps and the doctors' deps
4  are taken before the experts are hired and before the
5  experts give reports let the defense identify those
6  cases where they're going to challenge whether they did
7  or didn't take the drug. If they identify it as a case
8  where they're challenging that they took the drug then
9  we can have a mini hearing right then, and then
10 plaintiffs can make a determination as to whether or
11 not they want to proceed with their case.
12     I'm assuming that those will weed out a lot of
13 cases. But it may turn out that that's a disaster, and
14 I may go back to way I did it before. You know, I'm
15 throwing these out as ideas of things that I'm going to
16 try. I really have to -- we have to see how it plays
17 out. It may not work. These are things I have been
18 trying to rack my brain to think about about how we can
19 do this, what we can do to try to move things with some
20 efficiency, and these are some ideas I have come up
21 with. If it doesn't work, and it turns out that it is
22 being abused by plaintiffs or it is just not -- it is
23 not creating what I want, which is efficiency as
24 opposed to, you know.
25     MR. BUCHANAN: That's the issue, you know,

Page 16

1  what is sufficient to trigger one of these hearings in
2  terms of a usage issue? And I guess we'll talk with
3  the Court about that. Obviously, we have been in
4  trials where the plaintiff has had, you know, 50
5  something days' worth of drug for 60 days, are we going
6  to litigate about intermittent use on that type of case
7  as opposed to the gap in usage you spoke about?
8      It will probably -- I could foresee a
9  situation where rather than expediting the case we're
10 doing 104 hearings on 45 cases, and we spend 3 months
11 doing 104 hearings.
12     THE COURT: Well, if it turns out that the
13 plaintiffs are -- if it turns out that -- not that
14 either side is misusing it, but if it turns out that it
15 is not just working out fairly for both sides, but if
16 it is not saving time then, obviously, we're not going
17 to do it. I'm just throwing it out there. It is
18 something I'm thinking about.
19     MR. MAYER: Just in the realm of flagging an
20 issue as you think about it, I think we do have concern
21 that if you have a plaintiff who's misrepresenting
22 about ingestion that it shouldn't necessarily be barred
23 from the main case to be able to cross-examine the
24 plaintiff on that and so on. We should have a right to
25 do that, so and...

Page 17

1      THE COURT: Credibility.
2      MR. MAYER: Not because we didn't have a mini
3  trial on that be barred from raising it from in the
4  trial.
5      MS. FREIWALD: There may be issues of simple
6  uncertainty in the records or inconsistency in the
7  records, which don't necessarily rise to the level of a
8  challenge but go into the mix of the analysis, and it
9  could be highly prejudicial.
10     THE COURT: That is true. It might very well
11 be a problem. And I don't really think -- I agree with
12 the defense that the plaintiffs shouldn't be able to
13 catch -- you know, the plaintiff shouldn't be able to
14 testify in one trial that she took the drug.
15     MR. BUCHANAN: But the finding -- they have
16 had an opportunity to cross the plaintiff in the mini
17 trial. The jury has incorporated whatever credibility
18 findings into the --
19     THE COURT: But the mini trial is not going to
20 be the same jury that's going to find.
21     MS. FREIWALD: Or, also, if there's an issue
22 of deciding not to challenge in the form of a mini
23 trial because there are issues of clarity or
24 inconsistency in the record that don't rise to the
25 level of saying, oh, he wasn't taking the drug but

Page 18

1  questions about the pattern of use, it is just too
2  complicated for a mini trial. We want to reserve that
3  and have that part of the defense in the trial. I just
4  think that's an issue of concern.
5      MR. KRISTAL: If you take the Cona case as an
6  example if that had been tried with a -- just the
7  discrete issue, and the jury had found in favor of the
8  plaintiff, it sounds like Merck wants to redo all the
9  cross on that issue anyway, in which case there's no
10 real efficiency.
11     THE COURT: Well, if they found in favor of
12 the plaintiff they don't want to redo it. If they
13 found against the plaintiff --
14     MR. KRISTAL: Then the case is over. I think
15 they want to be able to cross-examine, quote, Cona --
16     MR. MAYER: Mr. X says I took it for 36 months
17 continuously; the jury finds he took it for a week
18 before.
19     (Simultaneous, overlapping colloquy by the
20 parties interrupted by the court reporter.)
21     MS. FREIWALD: What I'm saying is there may
22 be --
23     MR. MAYER: That may become an issue for the
24 main case.
25     MS. FREIWALD: There may be cases where there

Page 19

1  are big issues of product usage that we can deal with
2  in advance. In fact, in the Cona case we raised in
3  advance that we thought it was troublesome to try it as
4  an 18-month case because we didn't think it ever was or
5  would be an 18-month case. There are other cases where
6  things are much grayer and much more interwoven with
7  the general difference in the case, and that's merely
8  what I'm saying. I would be troubled by the idea that
9  we might be put in a bind to either vet this issue
10 first or be barred from discussing it at a subsequent
11 trial if we want to do it all together.
12     THE COURT: Okay. Why don't we just do this,
13 at this point we'll leave that as a -- something that
14 we're going to attempt to discuss, and I guess we may
15 have to at this point discuss it on a case-by-case
16 issue.
17     Why don't we do this, we'll take the cases we
18 have listed. If after the -- if after the discovery of
19 the plaintiffs and the plaintiffs' physicians and the
20 records are in if either plaintiff or defense would
21 like to have a smaller hearing they can request it, and
22 at that point we'll discuss it, whether it is --
23 whether it works or doesn't work. All right?
24     Okay. Did I give --
25     MR. LOCKS: Judge, did you intend to group the

Page 20

1  groups by the specific time period?
2      THE COURT: The groups I hope -- I think I'm
3  going to group them preVIGOR heart attacks, which none
4  of those are worth a 7-week trial in my estimation, but
5  they might be. It is plaintiffs really having a long
6  shot on those. Post VIGOR. Actually, in this group I
7  don't think I put in preVIGORs. Because I think that
8  should be subject to a motion, and we should deal with
9  that issue. Post VIGOR, prelabel, post label. And
10 you'll find that in the cases I have chosen they
11 include both heart attacks and strokes because I intend
12 to do probably the second trial -- the next one will be
13 a heart attack case, and then I intend to try a group
14 of stroke cases.
15     The way that they'll finally be selected which
16 ones are for trial will be that there should be some
17 similarities between them. I don't really think length
18 of use is going to be a criteria, but we can talk about
19 that. I think that the criteria should be the time
20 frame, whether it was prelabel or post label or
21 preVIGOR or post VIGOR.
22     I think that the -- for the rest of it a
23 diversity in time that they took the drug may be
24 helpful, and we can get 10 cases, and maybe three will
25 be early and three will be middle and three will be

Page 21

1  long in use. You know, we can sort of go through and
2  see if that makes a difference on the verdicts with the
3  same basic liability time frame. That might tell us
4  more than anything that's happened so far. You
5  actually get to compare plaintiff to plaintiff. We can
6  also maybe determine whether, again, the same liability
7  picture, assuming that there is a plaintiff's win then
8  you can determine whether age affects the verdict. I
9  think this is a way we could really determine some
10 things better as to comparing one plaintiff to another
11 if there was ever to be any type of settlement
12 negotiations as to which -- or even just to weed it out
13 as to which cases plaintiffs really want to pursue and
14 which ones they don't want to invest the money in.
15     So if we can do a few of these I think we
16 might really create a much better idea, rather than
17 just trying one that has a lot of different nuances to
18 it.
19     MR. LOCKS: Are you going to include death
20 cases?
21     THE COURT: One of the reasons for criteria
22 for choosing of trials is going to be that the lawyers
23 that are chosen agree that they can deal with this
24 attorney doing this and that. I can't force you to do
25 that. I can't force you not to try the entire case for

Case Management Conference - 7/18/06

Page 22

1  your own client. I would not order that. So that
2  would have to be a voluntary agreement, but I'm
3  obviously going to move the cases first where I get
4  some kind of consensus where plaintiffs are going to be
5  trying them together. You know, if you want to try all
6  your own cases that's fine, but then you're going to
7  have your own group of six or eight and try them, and
8  they probably won't be group one or two. I'm not
9  saying you won't get reached, but it is not going to be
10 your first couple groups.
11       MR. LOCKS: Are you going to include death
12 cases and live cases in the same group?
13       THE COURT: Yes. I think death -- I don't
14 think so that would matter. Do people have these?
15       Now, I'll get her to make more of these
16 because everybody should have one. These are the list
17 of cases I have chosen so far. What I want you to do
18 -- what I would like to do today is actually look over
19 them and, hopefully, today try to put together a final
20 list.
21       For example, Anapol, Schwartz here -- I mean,
22 there's a lot of cases listed. I listed a lot of
23 theirs because they have the old cases. So I listed
24 several of theirs because I wanted to get rid of old
25 cases, and one of my criteria was I didn't put any

Page 23

1  '06 cases on the list. They're all '03, '04, '05. But
2  if Anapol, Schwartz feels this is too many to get
3  together in the short time frames I'm giving, which it
4  may be, then if they let me know that they only want to
5  do four or they only want to do five or they only want
6  to do two I will accommodate them.
7        MR. BUCHANAN: Judge, I think --
8        THE COURT: And the same is true of Seeger
9  Weiss. Seeger Weiss is doing the class action, and I
10 know that that's going to be consuming a lot of time,
11 and I want them to focus on the class action basically
12 because I want to keep moving that. So I probably have
13 listed too many Seeger Weiss cases. One of them that
14 will be tried, however, is Mr. McFarland. But...
15       MR. BALEFSKY: What is your time period on
16 discovery?
17       THE COURT: Okay. My thoughts are, and this
18 is a rough thing, but, David, take it down because I
19 don't have Heather here or somebody else who writes
20 fast.
21       My thoughts are that -- I don't know yet, and
22 I really need you to focus on which cases are which...
23       What's the matter?
24       MR. JUDD: I was just thinking that Regina
25 writes fast, and she might be able to take it down.

Page 24

1        THE COURT: Regina can do it. Oh, I'm sorry,
2  Regina.
3        What I actually wanted...
4        Those cases -- I don't have anyway of knowing,
5  but in some of these cases the deps of the plaintiffs
6  and the doctors have already been taken. In those
7  cases I think that we should immediately have the sales
8  rep documents produced by August 4th, have the sales
9  reps' deps taken by August 18th, have the plaintiff
10 expert reports by August 25th, have the defense expert
11 reports by September 29.
12       MS. FREIWALD: Can you go a little slower,
13 Judge?
14       THE COURT: The sales rep documents by August
15 4th. The sales rep deps by August 18th. The plaintiff
16 expert reports by August 25th. The defense expert
17 reports by September 29th. A list of all witnesses and
18 exhibits to be used at trial by October 6th. I believe
19 I'm going to order that there be a maximum of 20
20 witnesses per side on your witness list and that there
21 be a maximum of three experts per side on your witness
22 list. And that will be true for all the cases. On
23 the --
24       MS. FREIWALD: For each case?
25       THE COURT: For each case.

Page 25

1        MS. FREIWALD: For each plaintiff or each
2  group? For each plaintiff?
3        THE COURT: At this point it would be for each
4  plaintiff.
5        MS. FREIWALD: Okay.
6        THE COURT: I would suggest, obviously, that
7  one of the things I'm going to take into account when I
8  pick 10 cases is that I'm not going to pick 10
9  different cases where there's 30 different experts, so
10 if you want your case to be in the first couple groups
11 you're going to try to consolidate experts so that I
12 have a trial of one -- one liability trial at least.
13 You know, even if you each have your own cardiologist
14 at least you have your own, you know, your treater.
15 I'm suggesting that there should be unity of experts.
16       The cases where the facts sheets of the
17 plaintiffs have been provided but the deps have not
18 taken place then I'm thinking in those cases we have to
19 just add some time and basically say that the
20 defendants facts sheets if it hasn't been produced have
21 to be produced by August 11th. And the sales rep's
22 documents should be produced by August 11th in those
23 cases, that the plaintiff -- the sales reps and the
24 doctors should be taken by September 8th. That the
25 plaintiff expert reports would be due by September

Page 26

1  22nd, and that the defense expert reports would be due
2  by October 20th, with the list of exhibits and
3  witnesses for each side to be produced by October 31st.
4  Will there be cases on here, David, where there's no
5  facts sheet yet?
6      MR. BUCHANAN: No. I mean, not unless they're
7  severely deficient. These are '05 cases.
8      MR. COHEN: We'll get all this information at
9  a break.
10     MR. CORONATO: We'll know at the break.
11     MR. BUCHANAN: The plaintiff, actually, should
12 have been filed within 6 months of filing the case.
13 Service would have been at most 120 days, so it should
14 be there by now.
15     THE COURT: Another issue that's come up in
16 the cases that I have tried so far is the issue of FDA
17 experts. It has been my -- I don't know if it -- I
18 don't know what the right analogy is. I don't know if
19 it has been a dark cloud over my head or -- it has been
20 a source of contention in each trial. It has been a
21 source of briefing in each trial. It has been somewhat
22 difficult for me to be sure as to exactly really what I
23 should do with FDA experts.
24     In the Humeston trial I basically said that we
25 didn't need them but that I would allow them to testify

Page 27

1  on a very limited effect, and plaintiffs chose not to
2  call them, and the defense chose not to call them, but
3  the defense did so after they had been restricted
4  severely in what they could do.
5      In this last trial both sides called experts
6  from the FDA, and the plaintiff's FDA expert testified
7  for, like, three days and the defense expert testified
8  for pretty much a full day. I know that the defense's
9  position has been that the expert has a right to
10 explain why what they did could fit with the statutes
11 or didn't fit with the statutes or did fit with the
12 regs or didn't fit with the regs and whether they could
13 or couldn't have done different things under the regs,
14 and I have ruled consistently and will continue to rule
15 consistently until there is an appellate decision or a
16 Supreme Court decision that tells me that I'm wrong
17 that that is not appropriate for an expert witness,
18 that whether someone has complied with the law or
19 whether or not a law -- what a law says or what the
20 interpretation of the law is something that should be
21 provided through testimony of a fact witness from the
22 company describing what they did or didn't do and why
23 they did or didn't do it but not in relation to regs.
24     So far I have to say defense counsel has not
25 produced one regulatory expert from the defense. In

Page 28

1  other words, they haven't called in a regulatory
2  witness who says, We did this because of this, this and
3  this. And I have found, and particularly in the last
4  trial after listening to all the FDA testimony, have
5  grave concerns about whether an FDA expert has any role
6  at all in these trials. It just doesn't seem to me
7  that it's -- I have a real question if under the
8  evidence rules whether what they're testifying to is
9  something that requires an expert. To have an expert
10 witness simply relate what the company did or didn't do
11 should be done through company witnesses, rather than
12 an FDA witness. For an FDA expert to say that they
13 complied with the regs or the couldn't comply with the
14 regs or that they disagree with the interpretation of
15 the reg that I give in the charge is not something I'm
16 going allow an expert to do.
17     So I have genuine concerns about whether the
18 three experts on either side should be FDA experts, and
19 I'm giving you a heads up on that right now. I think
20 that before we try this next group of cases if the
21 defense or the plaintiffs wish to have an FDA expert
22 that I'm definitely going to hold a 104 hearing on what
23 that expert is going to testify to. I'm going to hear
24 their testimony outside the presence of the jury, and
25 I'm going to make a decision as to whether that

Page 29

1  testimony has any merit. I may hold a hearing. I may
2  just look at the report and say there's nothing in this
3  report for them to say, but, you know, I'm going to
4  look at the reports and look at the hearing.
5      I'm telling you right now I don't see that
6  they add anything to the trial.
7      MR. BUCHANAN: Your Honor, I just want to --
8  and this is me speaking for myself not for all
9  plaintiffs, I'm not sure the analysis would be any
10 different, though, if it was a company witness coming
11 in to offer their interpretation of the regs.
12     THE COURT: Well, a company witness can't give
13 an interpretation of the regs but a company witness can
14 testify that we did this, this and this. And they can
15 also say we did this, this and this, and we were
16 concerned about people or we were concerned about
17 competitors or we were concerned -- they can testify as
18 to the reasonableness of conduct. They can also
19 testify consistent with the regs. What I have stopped
20 company representatives from doing is to testify that
21 the --
22     MR. BUCHANAN: The regs require them to do
23 what they did.
24     THE COURT: That they couldn't warn because
25 the regs didn't allow them to warn, which I believe is

Page 30

1  a misinterpretation and a nonfact. And we may have to
2  deal with that in terms of if someone wants to testify
3  that that's true, but I'm still going to advise the
4  jury -- I did -- I just don't think that the
5  misinterpretation of the law -- and I still have an
6  issue, and I guess this is one of my major problems.
7  Even though, and I'm not picking on the defense, but
8  this is a problem I have. I do have this problem with
9  the defense case. The issue of continually trying to
10 present the fact that they can't -- they had no ability
11 to warn, and, yet, they have never presented a witness
12 who -- or I don't think they have a witness who is
13 ready, and, certainly, I don't think one has been
14 presented that said that that is why they did what they
15 did. If the defense is actually going to put on a
16 witness who is going to say, We carefully reviewed the
17 regulation and we wanted to warn but we couldn't warn
18 or we wanted to put out a different warning but we
19 couldn't do it that's a lot different, and now we're
20 not talking about not being able to change the label
21 because you couldn't put in all of the VIGOR. You're
22 allowed to testify to that, and they have done that.
23 The defense has testified to the jury, and it is a very
24 strong argument, and it is a strong argument and one I
25 have let them present and one I will continue to let

Page 31

1  them present that we could not present all the VIGOR
2  data, including the benefits and the risks without FDA
3  approval because they couldn't. They could present the
4  risks alone, and is that unreasonable for them to have
5  chosen not to want to only put out the risks and not
6  the benefits. That's a question of reasonableness for
7  a jury, and that's a question that the defense is
8  allowed to present, but what -- anyway...
9        It is just an issue that I want to crystallize
10 because I'm not going to spend the whole next trials,
11 you know, ruling on FDA people, who I don't even think
12 have a role. So we'll look at it. To have a basic
13 person get on the stand and testify that the FDA has 28
14 people that work for them and they have 2000 people who
15 do this and 5,000 people who do that, that may be
16 appropriate. It is more of a fact witness than an
17 expert witness, but it might be that you would want a
18 witness to do that. I don't think that's really an
19 expert. It is basically just someone saying that -- I
20 guess it is an expert in the sense that you say, I'm
21 familiar with the FDA and this is what the FDA is like.
22 And they carefully scrutinize everything and they do
23 this or that, and they do it through this and that.
24 That kind of testimony I would allow.
25        All right. Anyway, I just want to give you a

Page 32

1  heads up about what is an issue and the fact that this
2  is something that before the next trial I also intend
3  to address in advance. I'm not going to wait until the
4  trial starts and then make decisions on this. So I'm
5  not telling you not to get expert reports on FDA. If
6  you want them, get them, But then we're going to deal
7  with them pretrial. So some time in September or
8  October I'm going to have those witnesses in for
9  hearings in front of me, and I'm going to make some
10 decisions, and I'm going to clarify what they can and
11 can't do.
12        So if you want your three experts plus an FDA
13 expert I'll give you that.
14        As to the -- I think -- as to the procedure,
15 the time frame for taking these people where we don't
16 have the plaintiff, the sales rep and the doctor taken
17 yet the plaintiff should be taken first. The sales rep
18 documents have to be produced, obviously, in advance of
19 the sales rep or the doctor being taken, and I
20 understand there's some dispute or has been between
21 parties about whether plaintiff should go first --
22 whether doctors should go first or sales reps should go
23 first. I think usually the doctors have gone first,
24 haven't they? And then the sales reps.
25        MR. BUCHANAN: The problem has been that quite

Page 33

1  often we like to present to the doctors what the sales
2  reps have said about what they knew and what they
3  conveyed versus what they didn't convey to the
4  prescribing physician, and they're far more difficult
5  to get back for a second day, so we would like to have
6  the option have the sales reps taken before the
7  doctors.
8        THE COURT: All right. There is no -- this is
9  a solemn -- this is one of those decisions where it's a
10 little bit favorable to the defense to take the doc
11 first. It is a little bit favorable to the plaintiffs
12 to take the sales rep first. All the sales rep
13 documents should be produced before either dep. In all
14 docket numbers that are even the doctor will be taken
15 first. In all docket numbers that are odd the doctor
16 will be taken first. Did we get that right? Even are
17 sales reps and odd are docs first.
18        MR. BUCHANAN: I take it though that we should
19 -- our priority is keeping to the schedule, and the
20 parties can agree...
21        THE COURT: Oh, yes, if you can agree, you
22 know, and, obviously, you have to have them done by the
23 time frame, so if it turns out your doctor is not able
24 until towards the end but you have a doctor first then
25 you're going to have to take the sales reps first.

Case Management Conference - 7/18/06

Page 34

1  MR. MAYER: One of the things we would like to
2  address, among other aspects of the schedule is --
3  THE COURT: You can trade. We'll trade our
4  two odds for two evens.
5  MR. MAYER: In order to proceed on this
6  schedule we're going to -- we have had trouble with
7  scheduling of doctors simply because of unavailability
8  sometimes of plaintiff's counsel or working up four
9  cases, and if we're going to proceed on this schedule
10 we're going to have to have a more rapid fire ability
11 to schedule the doctors.
12 THE COURT: Well, let me just say this,
13 unavailability of plaintiff's counsel or unavailability
14 of defense counsel is not a reason for any deviation
15 from the schedule. If you can't be there for your
16 client's dep get somebody else from your firm or
17 somebody else from another firm to cover it. The
18 defense has plenty of lawyers. The plaintiffs have
19 plenty of lawyers. I mean, obviously, you should try
20 to work with each other, and, you know, I don't expect
21 everybody to arbitrarily pick dates. You should try to
22 work, but it is like any other case where you have
23 discovery deadlines, you know, you work with each other
24 to try to be as nice to each other as you can and
25 convenient with each other as you can, but I'm not

Page 35

1  going to allow -- these dates are not going to be
2  extended by consent on either side. These dates are
3  dates that if you don't get it done there's going to be
4  a problem.
5  MS. FREIWALD: Understood, Judge, and I don't
6  mean to cast aspersions, but it has been our experience
7  where sometimes we feel as if because the plaintiff's
8  counsel have unfettered access to the doctors and we do
9  not they have an ability to suggest dates to the
10 doctors that are later down the road than ones that we
11 might initially get when we contact their staff.
12 We have had experiences where we contact
13 staff, hear the doctor might be available some time in
14 the next week or so and then convey that, and then
15 somehow it seems that all the sudden the doctor is not
16 going to be available for 3 or 4 weeks, and I wouldn't
17 cite a specific case, but I'm just telling you we have
18 had a great deal of difficulty along those lines, and
19 it has been very frustrating to us in many, many of the
20 waive cases that that has happened, not just because of
21 unavailability of counsel.
22 THE COURT: Well, doctors are hard to get, and
23 they frequently do, especially treaters who don't
24 really want to be involved most of the time, and --
25 MR. BUCHANAN: We had 14 deps scheduled in

Page 36

1  waive cases 2 weeks ago, and after clearing schedules
2  to accomplish it only seven of the 13 went forward. I
3  believe that the doctors picked up the phone, and it
4  was frustrating for us. We had cleared deps and had
5  people ready to go in six different states, and a
6  number of them cancelled, and we learned simply because
7  we called defense counsel the day that week to confirm.
8  It does happen. It happens with doctors. It happens
9  the week of not, only 3 weeks before, and it is
10 frustrating for all of us, and I certainly wouldn't --
11 THE COURT: I'm just going to ask plaintiff's
12 counsel don't make any attempt to delay depositions of
13 doctors just for your unilateral benefit. Work with
14 defense counsel to pick dates, and if the defense has
15 got a date try to honor it.
16 MR. PLACITELLA: Just practical logistics, and
17 we're all for going forward rapidly, but getting
18 treaters doctors' deps in August may not be the
19 simplest thing to accomplish, so I don't know whether
20 you want to give us just a little more room there.
21 MS. FREIWALD: Can I broaden the discussion?
22 Are we going to have an opportunity --
23 MR. PLACITELLA: As long as you don't cast any
24 aspersions.
25 MS. FREIWALD: Are we going to have an

Page 37

1  opportunity to discuss with each other or you guys
2  first about the schedule? Perhaps it goes beyond just
3  that issue, which I definitely agree with.
4  THE COURT: At this point anybody who doesn't
5  have a list of the cases we have chosen, one of the
6  other things I'm going to tell you I'm going to have
7  the secretary make more copies and pass them out so
8  everybody gets them. If your firm wants to be in this
9  group of cases and one of your cases isn't on the list
10 I will allow you to choose any case you want as long as
11 it is an '03, '04 or '05 case to put on the list. If
12 you don't already have a case on the list.
13 So if any plaintiff's lawyer wants to have
14 their case... But don't put your case on there unless
15 you're prepared to either have it dismissed or to hire
16 your experts by the deadline because if you don't have
17 expert reports your case is going to be tossed. I
18 mean, if you don't have -- so if you're prepared to
19 proceed, fine, if you're not going to be prepared to
20 proceed on a relatively short schedule and you're
21 not -- some people can't do it because of manpower.
22 You know, some people can't do it for other reasons,
23 they have other smaller firms or they've got -- there
24 can be all kinds of issues. I'll put anybody's case on
25 here, one case from any firm that wants a case, but

10 (Pages 34 to 37)

Case Management Conference - 7/18/06

Page 38

1  make sure you're ready to proceed. It is my
2  understanding, and, for example, one of the things on
3  the agenda was the gastro cases. I mean, I gave a
4  deadline for expert reports in those cases, and I
5  expect that deadline to have been complied with, and,
6  apparently, it hasn't been, and I expect defense
7  counsel to now make a motion to dismiss those cases.
8  And I am going to dismiss cases where expert reports
9  haven't been provided when I have put a deadline in.
10 Those gastro cases should have experts or get
11 dismissed. And that's the way we're going to function
12 with these, too. If you want to be part of the list,
13 fine; if you don't that's fine, too. I'm giving you
14 that option, but don't afterwards tell me, well, I
15 couldn't hire an expert, I couldn't do this, I couldn't
16 do that. I really don't what want to hear it at that
17 point.
18        The other thing is some of the firms, such as
19 Anapol, Schwartz, I have listed a lot of their cases.
20 This may be too much for this short a time, but in some
21 of these cases I don't know whether someone else --
22 some of Anapol's cases may be someone else's cases.
23        MR. BUCHANAN: I think some of those cases are
24 Beasley, Allen cases.
25        THE COURT: So they may want to keep them and

Page 39

1  do them.
2        MR. WEINKOWITZ: Did you say one case or
3  cases?
4        THE COURT: It should be one.
5        Unless you have over 100 cases filed. If you
6  have over 100 cases filed then you can pick two or
7  three. If you have under 100 cases you should pick
8  one.
9        MS. FINKEN: Tracy Finken from Anapol,
10 Schwartz. Some of these cases on them, the bulk of
11 them are Anapol, Schwartz cases, but some of them
12 discovery has been done, deps have been taken, however,
13 Merck has refused to produce sales reps for
14 depositions, and we have worked out a briefing schedule
15 to compel the deps of the sales reps. In particular I
16 know the Brodemoyer and the Michael Thomas case. We
17 were going to submit a briefing schedule to Your Honor
18 today, however, it goes past these deadlines that you
19 put in place.
20        THE COURT: They're going to produce the sales
21 reps.
22        MR. COHEN: The doctors in those cases
23 testified they did not rely on sales reps and got no
24 information from them, so there's no reason to go
25 forward with additional sales reps stuff when the

Page 40

1  doctor testified unequivocally that they got nothing.
2        MS. FINKEN: Your Honor, if I may, in those
3  cases that they're referring to the call notes for the
4  sales reps paint a different picture of the
5  conversation with the doctors, and we did not have the
6  call notes before the doctor's depositions went
7  forward.
8        THE COURT: Those are strictly fact questions,
9  the plaintiffs don't have to rely on the doctor. The
10 doctor is not the plaintiff, and the doctor may not
11 even be friendly to the plaintiff. It is a credibility
12 question of whether the doctor was advised of things,
13 not advised of things. Sales reps deps are going to go
14 forward. I'm not going to read briefs on that. Every
15 case where there were sales reps sales reps can be
16 deposed.
17        MS. FINKEN: In that regard, we have a case
18 where there's a motion to compel.
19        THE COURT: Again, we have to deal with a
20 number of sales reps. We may want to limit that.
21 There may be cases where there's 25 sales reps. You
22 can't take 25 sales reps on this schedule, so if you
23 want 25 sales reps then you better forget it. If you
24 want to take -- and I guess there should be an
25 agreement of how many sales reps can reasonably be

Page 41

1  taken.
2        MS. FINKEN: We have limited the amount of
3  sales reps that we requested in our cases. We're not
4  taking them all. There's one or two in each case that
5  we wanted to take, and there's a few that they have
6  refused to produce. We actually have a motion pending
7  in the Bezdeki case that you're supposed to hear oral
8  argument on Friday that we were going to address here,
9  as well.
10       THE COURT: To what, to take sales rep deps?
11       You're going to get those. We don't need oral
12 argument on that.
13       MS. FINKEN: We don't need to file a motion to
14 compel?
15       THE COURT: No, they're going to give them to
16 you.
17       MR. COHEN: I don't think the Bezdeki case is
18 on the list to go forward. Those depositions and those
19 representatives --
20       THE COURT: I would expect that these cases
21 will now take precedence over those cases, so if, for
22 example, that case isn't on the list then they're going
23 to have to produce the sales reps, but if they're
24 producing the sales reps in all these cases they're
25 probably not going to produce somebody who is not on

### Page 42

1  the list, and I'm not going to require them to do that
2  right away. They'll produce them before you get to
3  that trial, but they're not going to have to produce
4  them at the same time they're doing this. This will be
5  more than enough for the defense to deal with in the
6  next few months.
7      All right. What I'm going to do is I'm going
8  to get my secretary to make enough copies of these so
9  everybody can have one. I'm going to ask you guys to
10 meet and confer about whether you want to change my
11 schedule, and, you know, this is very aggressive.
12     MR. BUCHANAN: Where did you see trial
13 settings? I got a note on that in terms of...
14     THE COURT: You know, that's a problem, isn't
15 it? Quite frankly, my thought was that I would have
16 trials scheduled, I would like to have one of the
17 trials scheduled in November. I do have Accutane in
18 December. The problem, of course...
19     Let's go off the record.
20     (Discussion off the record.)
21     MR. CORONATO: The first group of trials do
22 you anticipate they will be taken from that list of
23 cases where the deps of plaintiffs' doctors have
24 already been taken or do they include some from where
25 we don't have facts sheets?

### Page 43

1      THE COURT: Everything by November -- if we do
2  my sheet everything will be done by October 31st,
3  except for expert's deps.
4      MR. BUCHANAN: There's a pretty short list
5  that fits your first category, which is cases where the
6  plaintiffs and doctors have been done already that are
7  on the list that you sent around, so I think
8  realistically we're probably looking at the whole list
9  and the time frame --
10     THE COURT: I don't think it's going to be the
11 ones where they have been deposed so far. It may be
12 that...
13     All right. Why don't you guys talk about it.
14 I'm going to send this list in for everybody to have.
15     MR. MORELLI: I have two cases on the list.
16 The name of my firm was changed. One case is under one
17 firm's name, and the other is under the other.
18     MR. PLACITELLA: So he wants to add a case
19 under each case name.
20     THE COURT: You have Shanoski.
21     MR. MORELLI: Morelli Ratner, and Benedict P.
22 Morelli. So the name of the firm is now Morelli
23 Ratner.
24     THE COURT: Well, I don't care, do you?
25     MR. MORELLI: No, I don't care, as long as it

### Page 44

1  is listed.
2      THE COURT: If you want both of them that's
3  fine.
4      MR. MORELLI: It is fine. I just wanted the
5  Court to realize.
6      THE COURT: I did choose some of these cases
7  from cases that plaintiffs sent in. I really -- you
8  know, I truly don't care that much which cases they
9  are. I would want to have a mix. I picked, I think,
10 eight or nine of the defense cases that they sent a
11 list of. And I picked most of the others -- some of
12 the others I picked not quite at random but looking for
13 firms. I was more looking for firms that I thought
14 would be prepared to deal with this aggressive
15 schedule. And I was looking for -- somewhat for time
16 frames as far as a division between post VIGOR and post
17 label cases. And I also wanted a mix of stroke cases,
18 so I, you know, I did use the letters that plaintiff's
19 counsel sent in. I used the letter defense counsel
20 sent in, but it was more like, okay, this is a stroke
21 case...
22     I wasn't trying to pick for usage of time or
23 that they were the same age or anything like that.
24     MR. KRISTAL: Would Your Honor consider a few
25 cases to the firms...

### Page 45

1      MR. BUCHANAN: To work a few more cases up?
2      MR. KRISTAL: To work a few more cases up.
3      MR. MORELLI: If you wanted to add a case or
4  two to our firms.
5      THE COURT: Yes, if the defense wants to add a
6  case or two, too, but if everybody ads a case or two it
7  is not going to work, so let's see.
8      MR. MAYER: Judge, we have some information on
9  many of the individual cases, except the few that have
10 been waive cases, but we have comments on at least one
11 of the individual cases on this list and some comments
12 on the mix.
13     Do you want to talk about that now or should
14 we do that after?
15     THE COURT: Okay. What are your comments?
16     MR. MAYER: There was one case I know that's a
17 physician/plaintiff who has no prescription, so that's
18 the plaintiff Milanesi.
19     THE COURT: Which one is that?
20     MR. MAYER: It is about the fifth or sixth
21 case listed, Albert and Ann Milanesi. I understand
22 there's no prescription there, so we can just flag that
23 one.
24     MR. BUCHANAN: Were there no samples given to
25 his office?

Case Management Conference - 7/18/06

Page 46

1    MR. MAYER: Obviously, his office had samples,
2 but there's no record of --
3    MR. BUCHANAN: It wasn't obvious to me, that's
4 why I was asking.
5    MR. MAYER: I am told there's no record of his
6 having a prescription.
7    THE COURT: So he prescribed it for himself?
8    MR. MAYER: I think that's the allegation in
9 the case.
10     We also just noted there were higher
11 proportions of death cases on the list than there seem
12 to be in the total mix of cases, and the same with
13 plaintiffs 45 or under.
14    THE COURT: Well, I think there's a higher
15 proportion of death cases in the stroke cases, and
16 that's why I think that might explain that.
17    MR. MAYER: Our numbers it looks like there
18 are about 12 percent are death cases, and in this list
19 it seemed to be about 30 percent.
20    THE COURT: That may be because I did try to
21 get some death cases. I was actually trying to pull
22 some death cases because we haven't done a death case.
23 And I did want to have some death cases.
24    MS. FREIWALD: This may change if plaintiffs
25 add additional cases, but there is that issue of does

Page 47

1 this pool of cases represent the total pool as to death
2 and as to age it seems not to, how that may become more
3 or less exaggerated with the addition of new cases we
4 can't say, but we would like the opportunity to comment
5 on it.
6    THE COURT: Well, these aren't going to all be
7 tried together, and, as I said, this is going to be a
8 pool of cases, but when we take the 10 cases or
9 whatever we put together for the first trial, for
10 example, I'm hoping we'll have a mixture of ages.
11 We'll have some death cases, we'll have some nondeath
12 cases. We'll have some -- you know, and as I said, I
13 think the way for us to get at this point an idea of
14 what the value of cases are is not necessarily to pick
15 the most representative person, but, rather, to try
16 like 10 together and then have the jury look at
17 different plaintiffs, different scenarios assuming they
18 find in favor of the plaintiff. If they find in favor
19 of the defense then the defense has won, and we're not
20 looking at any of those plaintiffs anymore. But if the
21 plaintiffs prevail then you have 10 different kinds of
22 people, and I agree with you, they shouldn't all be
23 death cases under 40. That wouldn't be too helpful,
24 and I'm not going to make a mix like that of 10 cases,
25 but...

Page 48

1    MS. FREIWALD: What I'm saying is if in this
2 vetting process --
3    THE COURT: So far everybody we have tried has
4 been older, but we have people on here that are 69, 70,
5 66, many in their sixties. I have one on here that is
6 81.
7    MS. FREIWALD: I think about 20 percent of
8 your list is 45 or younger --
9    THE COURT: We haven't tried any of those.
10    MS. FREIWALD: -- which is significantly
11 greater than what is in the general pool. The general
12 pool --
13    THE COURT: But I want to try one or two of
14 those and see what happens with them. Then we know
15 what happens with those kind of cases, and the way to
16 do that is to list 10 or 15 here and then we'll wind up
17 probably with two or three of them being tried. That's
18 my goal, to have some younger cases, try some death
19 cases, still be able to mix them with some older people
20 and some, you know...
21    MR. STEIN: To clarify something about the
22 Merck rep docs, does it include the custodial file?
23    THE COURT: Yes.
24    MR. STEIN: The other question I have is on
25 the wave cases it had deadlines. With this kind of

Page 49

1 aggressive schedule for both sides would Your Honor
2 consider waiving the discovery deadlines on wave cases
3 that are not on the list?
4    THE COURT: Why don't you guys talk to each
5 other and see what you would want on that?
6    MR. COHEN: We have a Canadian plaintiff.
7    THE COURT: I put you on here even though you
8 didn't seem to like the way I was going to do this.
9    MR. FERRARA: On the bifurcation issue?
10    THE COURT: When we met with plaintiffs
11 separately Michael was not happy about my plan of
12 trying ten together.
13    MR. MAYER: You know the defense position on
14 that, Your Honor, as well.
15    THE COURT: He is actually on the right side
16 of the table. He doesn't like the grouping, and he
17 doesn't like the bifurcation.
18    MR. MAYER: We also have issues with that.
19    MR. FERRARA: I think the unity of expert
20 approach with all 10 using one or two of the same
21 experts is a great idea. I'm just concerned that, and
22 I'm sure it may not happen, but I think it would be
23 improper then for the defendant to argue this is a
24 lawyer-driven case where they all have the same
25 experts. I'm sure that -- I just want to raise that

Case Management Conference - 7/18/06

Page 50

1   issue to make sure we're not — we have done what Your
2   Honor said, they have the same expert, then they can't
3   use that, even hint at it at trial.
4       THE COURT: It may be something that at trial
5   we have to address with an instruction to the jury that
6   I requested that counsel use a similar expert. If they
7   see — the jury, believe me, would rather listen to one
8   expert rather than 10, I think. All right. Why don't
9   you guys talk? I'm ignoring your agendas today and
10  doing my own agenda. Heather is supposed to be
11  bringing in a status report for me this afternoon, and
12  we're going to talk about the motions that are
13  outstanding in McFarland, but it is not quite as
14  pressing either since there's not a September trial.
15      MR. BUCHANAN: It sounds like there's
16  breathing room.
17      THE COURT: The one thing I wanted to make
18  sure we address today is the issue of gastro cases. At
19  this point anybody — first of all, I don't want any
20  more extensions. I don't know if you have agreed to
21  extensions for expert reports with some of the
22  plaintiffs or if you have gotten expert reports in any
23  of them?
24      MR. COHEN: No. The Anapol, Schwartz firm
25  withdrew all those. The other people had no contact.

Page 51

1       THE COURT: They withdrew the cases? Then
2   make a motion on the others.
3       MR. BUCHANAN: It is my understanding they
4   did. Is there anybody here from the Anapol firm?
5       THE COURT: Your gastro cases have all been
6   withdrawn?
7       MS. FINKEN: I believe so.
8       THE COURT: Then make a motion to dismiss the
9   others because if they didn't do it by the time they
10  were supposed to I'll probably still give them time if
11  they want to come up with expert reports, but they're
12  either going to dismiss or produce their expert
13  reports.
14      MR. STEIN: Your Honor, I'm here for a lawyer
15  from Texas that asked me to deal with that issue. We
16  can meet and confer, and did Your Honor say it would be
17  all right to give an extension?
18      MS. FREIWALD: No, she said no more
19  extensions.
20      MR. STEIN: I thought Your Honor said you
21  would.
22      THE COURT: Let me say this: What I said was
23  at this point I think they should be filing a motion to
24  dismiss for anybody that didn't comply with the
25  deadline. Do you immediately dismiss when there's a

Page 52

1   deadline in New Jersey? You don't. I don't know that
2   any Court would be upheld if they dismissed if a lawyer
3   came in and said we missed the deadline but we now have
4   the report. But if you're looking for an extension for
5   4, 5 months, you're not going to get it. If you're
6   looking for — if they make a motion I'm going to be
7   signing an order dismissing your case with prejudice
8   and giving you a chance to reinstate it.
9       MR. STEIN: For the reasons I'll explain to
10  them I'm going to ask for a month, and see if they may
11  do that and come back to you.
12      THE COURT: All right.
13      MR. STEIN: I'm trying to help another lawyer.
14      THE COURT: That's between you, if you want to
15  agree on a month delay before you file your motion,
16  fine; if you don't, just file your motions.
17      MR. MAYER: We'll discuss it.
18      MR. STEIN: Hear the problem and then decide.
19      THE COURT: You'll make your decision. You
20  certainly have my permission to file motions if you
21  want to. We have to resolve them one way or the other.
22      MR. BUCHANAN: Judge for those firms —
23      THE COURT: And the same is true of anybody
24  who didn't suffer a heart attack or a stroke, I'm
25  urging the defense for other types of injuries to file

Page 53

1   a motion in those cases requiring an expert report be
2   provided.
3       MS. FREIWALD: You have included some other
4   cases on this list here, Judge.
5       THE COURT: But, you know, there are other on
6   the access database that we have, which is isn't
7   100 percent accurate, but I didn't pick anything that's
8   other — I mean, the other places where I picked these
9   came from letters or something, I think. I don't think
10  I would have just picked another. But if I did it was
11  by mistake. I'm certainly not going to try a case in
12  this wave. We're not going to develop a case in this
13  wave that's an "other" case. If it is not a heart
14  attack or stroke, and it is truly an "other" then it
15  will be off. But I do think the defense counsel —
16  obviously, I haven't set deadlines for other types of
17  injuries, but I think I'm going to encourage defense
18  counsel to file motions to compel expert reports in
19  those cases where there are other types of injuries,
20  let's say pre2006 cases because you're not in a
21  position where — at least in those cases where there's
22  been a wave discovery, so that we can start to weed out
23  cases that have no — that simply are not likely to go
24  to trial.
25      MR. MORELLI: Your Honor, excuse me, when we

Page 54

1  reconvene are we going to be discussing time limits,
2  not only for the depositions that we talked about the
3  last time we were here not taking the spouse for two
4  days and time limits with reference to trial?
5       THE COURT: Why don't you discuss today --
6  while we break why don't you discuss whether you want a
7  time limit on plaintiff's dep, time limit on doctor's
8  dep, time limit on sales reps.
9       MR. LIEVERMAN: When do you want to resume?
10      THE COURT: We'll meet back at 1:30. Is that
11 too long?
12      MR. BUCHANAN: That's fine.
13      Judge, do you want me -- Your Honor, I have
14 already gotten notes from a couple people who are not
15 on the list who have a case they want to add. Do you
16 want me to create a master list that I can bring to you
17 over the break?
18      THE COURT: Yes. Okay. And for those of you
19 who don't have copies of this I'm going to have extra
20 copies made and passed around.
21      (Break taken.)
22      MR. BUCHANAN: Judge, the plaintiffs met over
23 the break before we met with the defense. We endorse
24 the proposal by the Court in this sense: We agree with
25 rapped discovery on a large block of cases using the

Page 55

1  list that Your Honor selected. I have received a list
2  from firms that were not on the list that had one to
3  three cases, and I'll hand that up today. We also
4  endorse the decision to have a trial by the end of the
5  year in New Jersey along the lines that you proposed.
6  There were some intermediate deadlines that we're
7  willing to talk about with the defense, but I think
8  they have more substantial concerns with the proposal,
9  so we don't have a lot to talk about in terms of dates
10 because I think they want to address Your Honor's
11 proposal.
12      THE COURT: Okay. What are your issues?
13      MS. FREIWALD: We have several, some of which
14 I think we would like the opportunity to present to you
15 in writing, although I can certainly preview at least
16 what has come to us in the time we have had.
17      We're extremely concerned that there's --
18 there are -- while we appreciate Your Honor's efforts
19 to come up with better ways to expedite trials, there
20 are fundamental fairness issues, constitutional issues
21 of fairness that are raised by this proposed form of
22 trial, and --
23      THE COURT: Which part of the constitution is
24 that?
25      MS. FREIWALD: I think there are questions of

Page 56

1  whether if we're going to have different juries -- if
2  we're going to have different juries trying these one
3  case different issues in the same case I think that
4  potentially raises a constitutional issue. I think
5  there is a due process issue in terms of separating out
6  the liability issue from causation in the way that Your
7  Honor has proposed. We have concerns about whether
8  we're really speeding things along or not because
9  presumably you're going to have to have a trial where
10 the jury is going to have to decide the question of
11 failing to warn the particular doctor who prescribed
12 and/or depending upon what verdict form Your Honor
13 decides on the particular plaintiff, and that's going
14 to need to be tried one plaintiff at a time.
15 Presumably that gets tried at the time the failure to
16 warn question gets tried. That's going to make for
17 very long trials in phase one, and you're only going to
18 have -- if you're just trying medical causation in
19 phase two you're only going to have a short phase two
20 trial, but it is the same concern you had when we
21 suggested bifurcating -- reverse bifurcating that it
22 becomes not efficient, it only makes things longer if
23 you're going to separate out this small piece, and you
24 still have to do the biggest piece for each plaintiff
25 in the first phase. I mean, there's no way that a jury

Page 57

1  can decide failure to warn in the air and then not --
2  and not decide was the warning adequate as to this
3  Doctor, did the doctor have the information, et cetera.
4  And we would like a chance to put that in writing.
5       So we have some real concerns about the trial
6  structure that we would want to address with Your
7  Honor.
8       Beyond those concerns and the fact that we
9  think we're probably looking at if we do, say, a
10 10-person trial, I mean, it is hard to imagine
11 particularly doing a bifurcated how you're not going to
12 end up with at least an eight or six-week phase one
13 followed by close to a week a piece phase two trials,
14 so very, very long trials.
15      So beyond that we have the issue of the
16 discovery schedule Your Honor has proposed. I'm sure I
17 don't need to remind you that Merck's position has been
18 that they worked up the first four test cases, got them
19 ready, we had this wave system which was an effort to
20 prioritize our discovery, which we have done, and now
21 we have jettisoned the first four cases. We appear to
22 be jettisoning the majority.
23      THE COURT: We're not jettisoning anything.
24 All the cases are still --
25      MS. FREIWALD: We worked up 80 cases we're

Page 58

1   not -- we had 80 cases in a wave system that are fairly
2   far along, and I think out of those 80 cases 12 are on
3   this list of 52, so we're not prioritizing those cases
4   that have been our greater priority up until now. And
5   now we're looking at a schedule where essentially we
6   might be getting no more than 3 weeks in real world
7   terms to do fact discovery. I totally agree with the
8   comment that it is going to be extremely difficult to
9   get doctors -- not just to appear for depositions in
10  July and August but to get their office staff to
11  produce records for us. That's going to be a big
12  problem.
13         THE COURT: You have had facts sheets and
14  authorizations for these people most of them for a long
15  time.
16         MS. FREIWALD: We have in some cases, but they
17  haven't been priority cases. We have been doing what
18  we have been told to do, which is working up the wave
19  cases. And we know just by way of example, we know
20  that in Cona and McDarby we spent about -- we
21  technically, I think, had somewhere between six to
22  8 weeks, but in reality we spent longer than that
23  because bits and pieces were still coming in in the end
24  doing fact discovery. That was on two cases. Now
25  we're talking about 52 cases.

Page 59

1          THE COURT: But you're just going to have to
2   have 52 lawyers doing it.
3          MS. FREIWALD: It is not that, Your Honor. I
4   mean, it is one thing to say you can have a lot of
5   paralegals, a lot of junior associates, but these cases
6   require thoughtful analysis. Everybody knows that for
7   Merck the facts of the specific plaintiff are extremely
8   important, and you can't try -- Merck can't fairly try
9   these cases if it doesn't have the opportunity to have
10  people who are really in decision-making positions
11  think the kinds of thoughts that real lawyers want to
12  think about their case. It is not simply a matter of
13  gathering and turning it over. The thought process,
14  the analytical process, the strategic process is a part
15  that we feel that we're entitled to. And we don't
16  know -- I can't think of any case where a defendant
17  would be told you have 3 weeks to do discovery and fact
18  discovery and then go to trial, let alone 3 weeks for
19  52 cases.
20         And a lot of it is not in our control.
21  Doctors will turn around records at the speed they'll
22  turn them around. We can try to push them, but if he
23  tells us his staff is short during the summer...
24         Even in the best of circumstances it can take
25  30 to 60 days to get the records. We all know that we

Page 60

1   find things in the records. Both sides do. I think
2   Mr. Lanier would admit if he were here today that he
3   could have used more time to look at the Cona case.
4          MR. MEADOW: No, we had enough.
5          MS. FREIWALD: And, certainly, that's just the
6   nature of it. We want to try these cases not just
7   efficiently, but I think both sides have the right to
8   try them fairly without great disadvantage, really
9   trying the case that should be tried and not saying,
10  you know, what good does it do us if we get a verdict
11  and say that wouldn't had been the result if we had
12  actually had the chance to do real discovery. We can't
13  put that into the hopper of any kind of analysis
14  because what does it mean when we're asked to do a case
15  with 3 weeks of discovery? It doesn't mean anything to
16  us.
17         THE COURT: I'll tell you right now anything
18  you want to put in writing you can put in writing.
19  This is what I'm going to do: I will look at any case
20  law you give me. I will look at any arguments you give
21  me from a legal point of view, and if you show me any
22  law that says I can't do what I'm doing or it would be
23  a violation of the law for me to do what I'm doing I'll
24  be happy to read that law, and I may very well change
25  my mind. What you're arguing to me I have spent

Page 61

1   months, not just the last couple weeks thinking about
2   this. This whole plan is something I thought about for
3   3 or 4 months, and I have been thinking about it, and I
4   have been trying to figure out how to do it, and this
5   is what I'm going to try.
6          The idea that you're only going to have
7   3 weeks is just wrong. You don't have just 3 weeks.
8   The fact discovery -- you may have 3 weeks to take the
9   plaintiff's dep and the doctor's dep, but for most of
10  these people you're going to have the facts sheets.
11  You'll get the facts sheets, and after that if you want
12  to spend up until November doing other fact discovery
13  you can do that, too. That's okay. Until the November
14  1st deadline or whatever. If you need to follow up on
15  a doctor's report you can do that. Obviously, if a
16  physician will not give you his records then we're
17  going to have to deal with that, and if that comes up
18  in a particular case that a doctor's totally
19  uncooperative, will not appear for a deposition without
20  a commission and a subpoena and an order then we may
21  have to remove that case from the list. I mean, that's
22  a fact. I'm not going to make you go to trial without
23  a doctor's deposition or without doctor's records. So
24  that's not going to happen. I'm not going to put you
25  in a position where that happens.

Page 62

1    As far as number of attorneys, you're right,
2 paralegals can't prepare a case like this, but, you
3 know, we're not talking about paralegals, we're talking
4 about Merck at the last trial had three law firms
5 present. Every trial you have had you have had
6 representatives from not just one, but at least three,
7 sometimes four or five of the largest firms in the
8 country.
9    MS. FREIWALD: In order to prepare.
10    THE COURT: Thousands of lawyers literally.
11    MS. FREIWALD: In order to prepare one or two
12 cases, and now we're looking at 52 cases. One of the
13 things --
14    THE COURT: You know what, it is tough. It is
15 tough out there, you know? That's the way it is.
16    MS. FREIWALD: Your Honor, one suggestion that
17 we had since we're not going to try 52 cases at once is
18 to at least find out what the final list is and stage
19 the cases in some way, even if it is separated by a
20 matter of a few weeks in groups of 15, something like
21 that, so that we have some sense of better priorities
22 for the cases.
23    THE COURT: All right. Maybe we could do
24 that. Maybe we could move the stroke cases, for
25 example, out of the discovery pattern, do the discovery

Page 63

1 on the heart attack cases and then come back and do the
2 discovery on the stroke cases when we finish the first
3 trial or when we're just about finished the first
4 trial, so we can do one tier. I'm willing to work with
5 you as long as we can get -- maybe that would be a
6 large accommodation that we can give you not 50 cases
7 but now 30 cases right away. So we can move the stroke
8 cases to a second tier. That I think is a good idea.
9 I don't have a problem with that. The only reason I'm
10 suggesting 30 is because I'm afraid to get 10 -- to get
11 10 -- to get eight I'm afraid I have to have 30 being
12 worked up.
13    MS. FREIWALD: That goes to another point we
14 have.
15    MR. BUCHANAN: Excuse me, Hope, I want to
16 address that issue before we go forward. In terms of
17 staging the stroke cases separately what we want to do,
18 Judge, is not wait to start that until the end of the
19 trial. We would want to after the core fact discovery
20 is done on the first whatever 30 whatever 30 or
21 40 cases, however many it is, that we then go into
22 starting the fact discovery in the stroke cases
23 immediately after, so when we finish that trial that
24 issue is at least worked up.
25    THE COURT: Okay. I can tell you I'm not

Page 64

1 going to do the heart attack case and do the stroke
2 case two days later, so...
3    MR. BUCHANAN: You may do another heart attack
4 case after that. I don't know.
5    THE COURT: I intend to do the stroke cases as
6 soon as possible after that, but as soon as possible
7 means I need a few weeks to recover, I'm sure of that,
8 at least, if not a month or two to recover. So that's
9 just a fact. My staff and the resources here can't go
10 from 6-week trial to 6-week trial. We need a little
11 gap. And I agree, we may want to start the stroke
12 cases at some point. I'm not saying we have to wait
13 until the last day, you're right. But on the other
14 hand -- and if there's some other way to narrow
15 cases --
16    MS. FREIWALD: Another thought I have, which
17 is not fully formed yet, but I'll throw it out, is that
18 there might be some I'll call it election period for
19 lack of a better term before we see expert reports
20 before even the plaintiffs produce expert reports where
21 maybe at the close of paper discovery or if you're
22 saying paper discovery won't be formally closed where
23 at some date where the majority of paper discovery
24 should be in and certain fact depositions are done
25 where they tell us we're going forward or not because

Page 65

1 even with staggered expert schedules we have to -- we
2 need a lot of lead time on our experts, and we
3 shouldn't have to wait until just 30 days before when
4 we see their reports to know whether it is worth
5 investing hours and hours with experts reviewing files.
6 We should be able to know earlier than that. If they
7 can't know today at what point relatively soon are they
8 going to be in a position of saying this case we're
9 really prepared to try in the first group. These are
10 maybe a question mark. These are clearly going out.
11    THE COURT: Okay. I agree that that's a real
12 concern, and it is a concern for me and for the defense
13 and for other plaintiffs. We can't really keep working
14 up cases that don't get tried. So, therefore, I agree
15 with you that what we should do is after the deps of
16 the reps and the plaintiffs and the docs are taken
17 before the plaintiffs want to invest their money in the
18 expert report -- let's face it, if they're going to
19 dismiss a case they should probably choose to dismiss
20 it before they hire their experts, rather than hiring
21 their experts and then dismissing it.
22    But with that comes the fact that that sort
23 of -- I think that's true. I think we should try to
24 make some arrangement for that. And there may have to
25 be at some point, and I'm not ready to do this yet, but