Case Management Conference - 7/18/06

Page 66

1  at some point we may have to arrange for some type of
2  sanction if you force the defense to get a report
3  before you -- and then just dismiss your case. I will
4  consider maybe fees or something because -- not for
5  fact discovery because everybody, you know, a case
6  isn't frivolous when you're still taking deps and still
7  determining what is going on, but at some point...
8      What I want to avoid is having them work up
9  30 cases and then when they pick the first 10 all the
10 sudden nine of them decide to drop out on the eve of
11 trial. That scenario has been occurring too frequently
12 with the plaintiffs, and I'm not going to deal with it
13 in the future. I'm going to deal with it differently
14 in the future. It may be through having the defense...
15     You know, at some point you should be
16 responsible for the fact that you're just making them
17 generate money. I recognize, though, that the
18 plaintiffs themselves are still holding on to those
19 cases at this point because they think they have a shot
20 of trying them because you're putting money into them,
21 too. That's why I think you're right, Holly. I think
22 there would be a point at the end of the fact discovery
23 where can start weeding out...
24     And there may also be very extreme cases
25 again, where there's other issues. You know, the

Page 67

1  person also has developed cancer or developed
2  something, and you feel it would be too sympathetic to
3  the plaintiff or the defense feels that the person has
4  just been admitted to a psychiatric hospital, and they
5  really don't want to put that person on the stand on
6  the day they're discharged. Those kind of things
7  should probably be -- those kind of cases are ones
8  we're going to have to weed out. They may be here,
9  too.
10     MR. BUCHANAN: We propose, Judge, that,
11 frankly -- and recognizing the issue that was raised by
12 Mr. Placitella with the August setting, we had proposed
13 actually providing the fact discovery go and still
14 holding the November 27th trial date, extend the time
15 for fact witnesses to be deposed until September 22nd,
16 and then have a CMC or a conference at least among the
17 attorneys who are on this list who are discovering
18 cases in the following week after all that core
19 discovery was done where Your Honor would consider the
20 trial grouping for the November setting, obviously, any
21 dismissals that the plaintiffs -- 104 hearing issues,
22 usage issues, whatever the appropriate -- any issue the
23 party wanted to raise, but allow the parties to focus
24 on case-specific discovery until September 22nd, have a
25 CMC. Just to finish to get the dates out there, we

Page 68

1  propose the plaintiff's expert reports go in October
2  10th and the defense reports come in October 31st. And
3  exhibit list, witness lists --
4      THE COURT: Then you have to do deps between
5  what then and --
6      MR. BUCHANAN: October 31st and November 17th.
7      THE COURT: All right. Are those dates
8  better?
9      MR. BUCHANAN: I assume the extra 3 weeks will
10 help.
11     MS. FREIWALD: Well...
12     THE COURT: With the understanding that you're
13 still not at all happy and still object to the whole
14 thing.
15     MS. FREIWALD: You know, it is a highly
16 leading question to say "better" because, yes, it is
17 better, Judge.
18     THE COURT: Anything is better.
19     MS. FREIWALD: I want to let Charlie talk
20 about the specific concerns he has, and I think that
21 might -- I think that might flesh out some of the real
22 scheduling problems we have and show you why I don't
23 think we're quite there with the schedule that Dave is
24 proposing.
25     MR. BUCHANAN: Then I take it off the table.

Page 69

1  That was my final.
2      THE COURT: That was his final offer.
3      MR. BUCHANAN: That was my final. That was
4  not an opening offer.
5      THE COURT: It would be so easy if we could
6  just say we're going to do these 10. Until we get the
7  fact discovery we're just not there.
8      All right. Go ahead.
9      MR. COHEN: As you may notice, there are two
10 empty chairs, so I have the privilege of presenting to
11 Your Honor's everyone's favorite topic, which is, okay,
12 now that we're looking at doing some more discovery we
13 have document production, and, specifically, document
14 productions from the professional reps.
15     And we have talked about this a couple of
16 times, and most notably in the Cona/McDarby case and
17 got that moving. What I wanted to talk to you today
18 about a little bit was actually the scope of what
19 60 cases might mean and some things that -- some ideas
20 we might have to start dealing with this and even with
21 those ideas what kind of schedule we would be looking
22 at.
23     The first thing to put in perspective, and I
24 know I have come to Your Honor a couple of times saying
25 I can't produce some number of documents by such and

Page 70

1  such a time, and you have given me a different time,
2  and, generally, I have actually been able to do it, and
3  the one I'm proudest of that I call the "miracle
4  production" was the one that came out January 31st,
5  2004 was 2.6 million pages and about 105 days.
6      It turns out that over the New Jersey cases --
7      MR. KRISTAL: Which case was that?
8      MR. COHEN: In general.
9      It turns out that if you look at the cases we
10 worked up in 2006 for this litigation we average
11 180,000 pages of sales reps documents per case. If you
12 multiply that out by 60 cases we're looking at 10.8
13 million pages of documents or four times what I did in
14 105 days in what I really considered a miracle.
15     There's just --
16     THE COURT: How about if we knock out the
17 stroke cases? I'm only kidding. Go ahead. I'm
18 listening. I'm listening to what you're saying.
19     MR. COHEN: So what we have also found is
20 that -- one thing, of course, is that the plaintiffs on
21 that schedule can't read 10 million pages either, so
22 there's no way that these documents are going to mean
23 anything to anybody. What we have been thinking about
24 is at the end of the case --
25     MS. FREIWALD: Jerry does document review at

Page 71

1  high levels.
2      THE COURT: All right. What is the thought on
3  this? How can we narrow the scope?
4      MR. BUCHANAN: This is an easy one, I think.
5  One thing I want to respond to before we do that is,
6  Your Honor, we had several conference calls on sales
7  rep documents earlier this year, and Your Honor I think
8  expressed on the record or maybe there wasn't a
9  reporter on those teleconference calls, that you're
10 going to have to find a faster way to get these
11 documents out. We're not going to have this issue
12 every time we talk about producing sales rep documents,
13 and that was the instruction a long time ago, and I
14 realize the cases are now being identified, but we can
15 help -- we can help make it a narrow universe, rather
16 than 25 sales reps in, I think, the LoPresti case,
17 there are 20 in the McFarland case. We can help narrow
18 the universe so as a threshold matter we're looking at,
19 you know, five to eight sales reps, and then if there
20 needs to be more somebody can make an application to
21 you or by agreement maybe they'll do more, but let's
22 focus on the ones that from the FACTS database or from
23 the production of sales call notes appear to be the
24 most relevant.
25     THE COURT: What if it was limited to a

Page 72

1  maximum of five per doctor?
2      MR. COHEN: Well, we were thinking -- that's
3  absolutely going in the right direction. We definitely
4  would endorse a plan like that. One thought we had,
5  given when we actually see what comes of all this work
6  that we have all done and very little comes out is that
7  we say two, and then if plaintiffs wanted more we start
8  talking about that they pay for it to give them an
9  incentive to really prioritize and let them look at the
10 call notes, which we produce for everybody because it
11 is electronic there's going to be profile forms for
12 everybody. That's getting done. And then they get the
13 two, and they can pick those, and if they want more
14 they pay for it. They have an incentive to not ask for
15 a whole bunch of folks. We haven't charged for
16 anything in this litigation to date, and, you know,
17 different -- sometimes it works and sometimes we think
18 plaintiffs have asked for too much, but here that would
19 be a way to really keep this down, and then there's
20 also some additional requests that come over and above
21 just the custodial files like Am Ex receipts that
22 turned out to be a big nothing and was a real waste of
23 time.
24     MR. MAYER: Two per case load, how many pages
25 would that be?

Page 73

1      MR. COHEN: Well, depending on what the reps
2  are that could knock it down -- it could knock it down
3  as much as 75 to 80 percent.
4      MR. BUCHANAN: Two reps, and Mr. Kristal
5  looked at the sales rep documents for a number of reps.
6  You can tell us whether two is enough or not.
7      MR. KRISTAL: I think once we get the call
8  notes you can tell fairly quickly who the main sales
9  reps were. You're going to find the ones who called
10 probably there were three or four or five that did
11 95 percent of the calls. So we certainly, I don't
12 think as an initial production, need all of them. I
13 think two is not enough. It is kind of like the old
14 prune commercial is three enough, is six too many?
15 That was a joke.
16     THE COURT: If we say five everybody is going
17 to pick five.
18     MR. KRISTAL: No. Exactly. I think there are
19 rational people on both sides.
20     MR. BUCHANAN: There are 20 in some of these
21 cases.
22     MS. FREIWALD: But the more there are the
23 fewer there are that are of any real relevance.
24     MR. KRISTAL: I think if the plaintiffs are
25 given the call notes within a certain period of time

Page 74

1  after we have the call notes we can let Charlie know
2  how many we really think, and if there's an issue about
3  that we can come to the Court, but I think -- we don't
4  want to review more than we need, but we don't want to
5  be stuck with an arbitrary two.
6      THE COURT: I don't want to make them produce
7  documents that wind up never being looked at.
8      MR. KRISTAL: Exactly.
9      THE COURT: Because there's just too much.
10     MR. KRISTAL: I think if you have a
11 presumptive limit of five with plaintiffs requesting
12 less if they think it is necessary.
13     THE COURT: I'll make a presumption of three
14 with a request of something more.
15     MR. KRISTAL: That's fine.
16     THE COURT: Three is not enough?
17     MR. DASSOW: I don't think so. That's what we
18 have worked up, and I don't think three is enough. And
19 the only comment I have is, Charlie, this is what I
20 don't want to have happen is have them choose who, one,
21 the reps are, and, two --
22     THE COURT: You're going to chose the reps.
23     MR. DASSOW: That's what I hear. But the
24 second thing is I certainly don't want Charlie to say
25 he didn't think the Am Ex stuff was any good when I

Page 75

1  thought it was going to be good if we used it. There's
2  some stuff that we do want down the line.
3      MR. BUCHANAN: We can take that on a
4  case-by-case --
5      THE COURT: What is the Am Ex stuff?
6      MR. DASSOW: American Express.
7      THE COURT: That can be dealt with, and, you
8  know, I have the utmost respect for Charlie's
9  integrity. So far I've found him to be way above and
10 beyond what he needs to be as far as being fair and
11 producing what he has to produce and producing it under
12 pressure and as quickly as he can. Although anybody
13 can -- I just, you know, I don't think that it's -- I
14 don't think he has to sit here and listen to somebody
15 say he tried not to do something because I don't
16 believe it.
17     Now, it may be true...
18     (Laughter.)
19     MR. BUCHANAN: Can I make a suggestion?
20     THE COURT: Why don't we say four, is four too
21 many?
22     MR. BUCHANAN: Four is fine.
23     THE COURT: Charlie, is four livable?
24     MR. COHEN: It all then just becomes how long.
25     THE COURT: We're not talking about the

Page 76

1  strokes.
2      MR. COHEN: Because four per case,
3  obviously --
4      THE COURT: How many cases do we actually
5  have, did anybody count?
6      MR. FERRARA: There's 53, and there's 11
7  strokes.
8      THE COURT: Strokes are not helping us that
9  much.
10     MR. COHEN: The first thing that has to happen
11 is we need to set a date and get a final, final list,
12 because one of the things I was actually thinking of
13 remember this happened to us actually with Mr. Dassow a
14 while back, which was we started arguing about how long
15 it was going to take to do something, and it turns out
16 I already produced some of it in the Cona/McDarby case
17 and we got it. So if I get the final list what I can
18 do is find out where we are in each one of these cases.
19 If there are cases that have any overlapping doctors or
20 reps I would suggest that as a criteria that the Court
21 should look at and say this is a way to move cases
22 faster, you know, if there's other things we can do if
23 there are cases where we have already produced
24 something that would be great, and then I can tell you
25 exactly how long it would take.

Page 77

1      MR. BUCHANAN: The one thing I would ask --
2      MR. PLACITELLA: I would have concerns about
3  picking cases based upon who was visited the most
4  often.
5      MR. BUCHANAN: In terms of the four could we
6  say, though, if there's more than a dozen details that
7  we can have a fifth sales rep. If there's more than 12
8  detailers or so we can have a fifth? There are some
9  people who have 20 and 25 detailers. We saw that with
10 LoPresti. We saw that with McFarland.
11     THE COURT: How many did most of the doctors
12 have? Is 20 like an average?
13     MR. COHEN: I thought it was about 12. It
14 depends. People come and go in this job a lot,
15 especially if you have a case that's 18 months plus or
16 if you have a case that's later on in time just, you
17 know, the number of people coming in and out does take
18 it up to somewhere in the neighborhood between 12 and
19 20.
20     MR. KRISTAL: It depends on the doctor status,
21 if they were a high prescriber, and they got --
22     MR. COHEN: What we see is a curve where it is
23 just a tremendous amount of -- number of people who put
24 down a couple of calls, and so one thing, again, one
25 way that we could do this is there's an incentive

Page 78

1  program so you get four, and then I just need enough
2  time, and I have to figure out how much time we could
3  go to do that. You know, if you want something else,
4  you know, ask for it and one of the thoughts that we
5  had was pay for it.
6       THE COURT: All right. Let's start with the
7  premise that I'm instructing plaintiff's counsel to
8  look at the list and if realistically you're not going
9  to depose more than two sales reps and there's two that
10 did most of the work just ask for two. If there's
11 three that you can narrow it to that were there
12 90 percent of the time do three. The maximum will be
13 four without a specific application to the Court. But
14 if you've got somebody who was visited by 30 different
15 reps and five or six people visited them 20 times each
16 or something then over a long period of time for some
17 of the people that are here longer -- some of these
18 people are -- some of these cases are 3-month cases,
19 too, or not too many. Most of them are 18. Some of
20 them are -- there was one zero to 30. I was trying to
21 get some shorter. It doesn't look like I did too well
22 on them. I did get the six to 12 cases, several six to
23 12 cases. You're talking about 4 years' of a doctor's
24 reps as opposed to 6 months, obviously, in a 6-month
25 case I don't think you're going to need probably four

Page 79

1  sales reps, but maybe you will. So let's say a maximum
2  of four with the understanding that in good faith
3  plaintiffs are not going to automatically ask for four,
4  and after four you'll have to ask me. I'm not inclined
5  to impose costs at this time, but you're going to have
6  to come to me and say we have this many sales reps in
7  this case and for this reason I need another two people
8  or another three people or another one person. So
9  that's first.
10      Second, we do have to -- I would like to
11 before the end of the week have the final list. As I
12 said, we'll take the strokes out. We'll set a separate
13 timetable for that. The other we have to check and see
14 what other is. If it is not a heart attack or stroke
15 it will just be off the list, obviously. Mary Bodine.
16 A couple of these strokes were stroke and heart attack.
17 There were at least two or three that were stroke and
18 heart attack, but I'm going to try those with the
19 stroke cases not with the heart attack cases. So if
20 other means stroke and heart attack or if you see that
21 you have a heart attack and a TIA then those should be
22 moved to the stroke column. It may be listed here as
23 heart attack but it was a stroke and heart attack or a
24 TIA and a heart attack you should move those to the
25 stroke column.

Page 80

1       Was there some way we're going to eliminate --
2  are these Seeger Weiss ones?
3       MR. BUCHANAN: Yes. I'll tell you which ones
4  fall into that category.
5       THE COURT: All right. So there's going to be
6  a group of those out. How about Anapol, Schwartz? Do
7  you know yet?
8       MS. FINKEN: I don't. I don't. I'm sorry,
9  Your Honor. I know that -- I need to speak to Sol and
10 David Jacoby before we make a decision.
11      THE COURT: All right. I want everyone on the
12 plaintiff's side to report to David. Are you going to
13 be around tomorrow, David?
14      MR. BUCHANAN: Yes, Judge, I'll be around.
15      THE COURT: I want anybody who wants their
16 name added or anybody who wants cases deleted or their
17 name removed from the list or a case removed to advise
18 him. I don't want to remove the cases that the defense
19 chose, though.
20      MR. COHEN: I was thinking if you get them to
21 do something the next day we can have a call on Friday.
22      MR. BUCHANAN: I was traveling yesterday.
23 Maybe we can highlight it and deliver it to the judge.
24      THE COURT: They just sent a letter and they
25 listed like 20 something cases. If, in fact, you don't

Page 81

1  remove any of their cases, if somebody wants their case
2  removed then just put a star beside it and let me look
3  at it because I don't want to wind up removing all the
4  defense cases.
5       MR. BUCHANAN: So, and, perhaps, Judge, you
6  have a spreadsheet that I can highlight or maybe Carmen
7  can give me an electronic copy of the spreadsheet.
8       THE COURT: She did. She can do it by e-mail.
9       MR. BUCHANAN: You want a letter from us by
10 3:00 tomorrow? What time do you need to hear from us
11 tomorrow.
12      THE COURT: I want you to have it by the end
13 of the day, and then I want you to confer with
14 whichever firm, I don't know who you want it to go to,
15 but defense advise on who you want to talk to about it
16 and see what your position is on other people. And
17 let's do a new two sheets, and we'll try to find by
18 Friday have a stroke sheet and a heart attack sheet
19 with some cases eliminated, some cases, a few cases
20 added, but, hopefully, we'll wind up with instead of 50
21 we'll wind up with something a little less, something
22 less than 40, and then we may want to look at whether
23 we should divide them into 20 and 20 for discovery
24 purposes. I hate to do that because I know I'm going
25 to wind up --

Page 82

1    MR. BUCHANAN: That's four traunches then or
2 three traunches.
3    MR. COHEN: I know Your Honor hates to hear
4 this, but it is better for that if we move -- if you
5 move the date back a bit and if you want to get them
6 all in because one thing I have to do even to get them
7 the list is I have to go back once we get the final
8 list is go run the call notes and stuff, which I forget
9 how long it takes. I can't do it immediately, so in
10 order to get them the list for them to first choose the
11 reps and get everything started and then I go collect
12 I'm going to have a little delay, and there is nothing
13 I can do in that period. Everything else on the
14 Cona/McDarby schedule have already been -- I know how
15 to bang people's heads, and once it is in the process
16 in the pipeline I push those people. They hate me, but
17 I'll get it done, but I do have this lead time until
18 that gets done it is not even in the process for me to
19 be whipping them to move faster.
20    MR. BUCHANAN: We'll have the final list this
21 week. We would like, Judge, the FACTS data by the
22 following, I don't know, Thursday or Friday of the next
23 week, so if the plaintiffs can make the selections of
24 the sales reps within days after that so that you guys
25 can get the sales --

Page 83

1    THE COURT: How long does it take you to get
2 the calls?
3    MS. CALL: Two to 3 weeks. If some of these
4 are already done with MPFs and that kind of thing, but
5 I can't give you a specific estimate until we know how
6 many --
7    THE COURT: It can't take two to three weeks
8 to get a list of doctors' call notes.
9    MR. BUCHANAN: They're a table in the FACTS
10 database. That's what it is right now. It is a matter
11 of searching by the plaintiff name.
12    MS. CALL: And the prescriber name and the
13 address.
14    MR. BUCHANAN: That is fine. It is the sales
15 call notes.
16    THE COURT: You're going to have to assign
17 people to do that. That is not a difficult --
18    MS. CALL: We'll do it as fast as we can. I'm
19 not sure one week is enough time.
20    MR. BUCHANAN: They can certainly start now
21 without the final list on the defense selections.
22 Unless there's reasons they may go away for other
23 reasons, but there's some subset of 23 that's on the
24 list now. They might as well get started right away
25 with sales rep lists and FACTS data for those people

Page 84

1 and get that going, so this time next week by Tuesday
2 that list is out the door, they can do the next 25,
3 whatever the final list is.
4    THE COURT: Start right away with as many as
5 you can.
6    MS. CALL: We will. And some are out.
7    MR. FERRARA: At the end of the day then when
8 David gives the final list there's 53 now, say 11
9 strokes, that takes it to 42, so some will come off,
10 some will be added. Is your goal to wind up with about
11 42 or 40, somewhere in that area or more? Do you want
12 it to be back to 50?
13    THE COURT: No. Well, I don't really care if
14 it is back to 50, but the defense is telling me they
15 can't do 50 so between 30 -- closer to 30 would be good
16 for me, but you're adding people, too, how many people
17 are you adding?
18    MR. BUCHANAN: I don't know because some,
19 obviously, will come off. I have a list. By tomorrow
20 we'll know.
21    THE COURT: Do you have 10 people to add?
22    MR. BUCHANAN: Yes. Yes, there's 10 on the
23 list from firms that were not represented.
24    THE COURT: All right. If there's 10 firms
25 that weren't represented that are going to be on the

Page 85

1 list we may want to consider setting a maximum of --
2    MR. BUCHANAN: Of 50.
3    THE COURT: For heart attack? Well, we might
4 want to ask if those people would list stroke cases.
5    MS. FREIWALD: Or maybe some of the firms that
6 have multiple cases on will have to reduce down their
7 number.
8    THE COURT: Someone like maybe even though
9 maybe the Ferrara firm is willing to prepare three,
10 maybe they should only prepare two.
11    MR. FERRARA: We'll drop the one that Merck
12 wants.
13    MR. BUCHANAN: Including a case from each of
14 these people because some from my firm and maybe Sol.
15    THE COURT: I would like to see them -- I
16 would like to see if you have several cases listed, and
17 it turns out we're over that 40 number we want to drop
18 it down to that at least.
19    MR. BUCHANAN: We're trying to be mindful of
20 your thought.
21    THE COURT: I think 35 would be a good number.
22    MR. BUCHANAN: There's two issues, Judge. One
23 is, obviously, there's discovery and how you work them
24 all up, and the other is purposes of trial trying to
25 keep the number of firms involved in the trial. If

Case Management Conference - 7/18/06

Page 86

1  you're going the try five to 10 cases, having enough
2  cases from any one firm so there's really only two
3  firms involved in the trial or maybe three, otherwise,
4  you start to run into the dynamic of a lot of lawyers
5  popping up to examine witnesses.
6       THE COURT: Well, the problem is, you know,
7  we're going -- you're going to have to work that out
8  mostly, but if one firm has one case and they want to
9  be in the mix and their case fits other criteria then
10 they're going to have to decide whether they're going
11 to let the lead counsel carry it, and maybe they can do
12 the two days of their own client.
13      MR. MORELLI: The case-specific.
14      THE COURT: But you're right, if they want to
15 run the show then they're going to have to have their
16 own show, obviously.
17      MR. MORELLI: We'll have to do arm wrestling.
18      MR. BUCHANAN: My point was if you have four
19 or 5 cases --
20      THE COURT: I don't think that's my problem.
21 You're going to have to battle that out yourselves. If
22 you can't do it I'll do it for you.
23      MR. BUCHANAN: We either work them out or
24 they're not in the same trial.
25      MR. FERRARA: I don't anticipate that's going

Page 87

1  to be a problem, Judge.
2       THE COURT: Well, it shouldn't be, and I hope
3  it is not. It is just that it's --
4       MR. FERRARA: A lot of people want to bury
5  their egos.
6       THE COURT: I was just going to say Jerry and
7  Rob tried with Lanier, and it was two different firms
8  with excellent lawyers, but I think it is hard,
9  wouldn't you agree?
10      MR. KRISTAL: No, not at all. At times.
11      THE COURT: At times it was probably very
12 wonderful.
13      MR. MORELLI: Do you want to ask me if it was
14 hard?
15      THE COURT: Is it hard?
16      MR. MORELLI: No, we got it done, and now we
17 know how to deal with each other. They need an older
18 guy to tell them what to do.
19      THE COURT: And I don't know, David, but Sol
20 keeps bailing out on you. I can't figure out if it is
21 because he doesn't want to try a case with you or...
22      MR. KRISTAL: Your Honor, is it your intent to
23 then get the stroke cases up from 11 to around 30, 35
24 for the second?
25      THE COURT: Yes, I guess that's what we'll do.

Page 88

1  And then I want to try a wave of --
2       MS. FREIWALD: Your Honor, that doesn't then
3  solve the problem of peeling off the stroke cases as a
4  way of reducing the load because if those cases are
5  only staged a little bit behind, but we add 20 more of
6  those that's just a further drain on resources, so we
7  would need a much bigger separation, and it would be --
8  frankly, it would be a further reason once we have the
9  universe of heart attack cases to divide those cases in
10 waves, which I think is going to be an important --
11      MR. BUCHANAN: Judge, we got to this point --
12 just to turn back the block clock a few months, and I
13 know you said you were talking about it for a while
14 because we're nearing 8,000 cases on the document.
15 There's been math done by lawyers in the room that I
16 won't replicate that suggests this litigation could go
17 on beyond all of our lives, and it is a one case at a
18 time trial approach, a one case at a time for
19 consideration for early resolution and settlement. The
20 cases need to be worked up on a large scale, so Your
21 Honor has options available, whether it is consolidated
22 trials before yourselves as you just articulated or
23 other options, and the cases should all be worked up.
24 They should all be worked up at the same time. They
25 shouldn't be traunched. We shouldn't go back to waves.

Page 89

1  This is a litigation that is very large, and it is
2  going to be very time consuming, unless we start to
3  deal with it in the manner I think we proposed.
4       THE COURT: I intend to do a heart attack case
5  and then a stroke case and then probably another group
6  of heart attack cases, and I think that will pretty
7  much take care of this group of cases. And then we'll
8  move on to something else.
9       MR. STRAIN: Your Honor --
10      MR. KRISTAL: If you work up 11 stroke cases
11 when it comes up to trial --
12      THE COURT: That's what I'm saying, we'll have
13 to add more stroke cases, but I won't put that burden
14 on them at this point. Certainly, Mr. Cohen is not
15 going to be producing prescription call reps for the
16 stroke people until he has all the heart attacks out.
17 I mean, we're going to have to do it --
18      MR. KRISTAL: We understand that. We just
19 didn't wanted to have heart attacks getting worked up,
20 trial ending some time in January or February and then
21 starting from the beginning with the strokes.
22      THE COURT: And that's not going to be. Once
23 the production of, say, sales rep things are done then
24 there's no reason why the sales rep strokes thing can't
25 be produced. You may not want to be taking plaintiffs

23 (Pages 86 to 89)

M007D17353
10bfed97-c074-4a52-b2a5-cee4cb0b38

Page 90

1  deps at the same time you're taking expert deps. You
2  may have to stagger that out a little further, but
3  we'll see.
4      MR. STRAIN: Your Honor —
5      THE COURT: Yes, Paul?
6      MR. STRAIN: And I'm sorry, I can only pick up
7  part of what's being said, and I'm sorry if a lot of
8  this has been said, but I'm still back on the issues of
9  the importance of the careful case preparation on the
10 specific cases, and I don't understand why as we're
11 factoring in the planning that's important in how we
12 handle many, many, many cases why we need to work up
13 35 cases or whatever to get down to 10 that are tried.
14     I mean, in our recent experience with the
15 Hatch case and the Klug case and the LoPresti case, all
16 of which I had some involvement in in my understanding
17 of each one of those cases all three of those things
18 that led to — all the things that led to the dropping
19 of each of those three cases were knowable in advance.
20 They were not something to come out of a call report,
21 not something to come out of a sales rep's deposition.
22 They were all knowable, and I think what we're dealing
23 with is one of the issues Charlie raised and Hope has
24 raised and things others are dealing with. If we find
25 a way to get some careful vetting of these cases up

Page 91

1  front then we can all work on preparing the 10 or at
2  least get it down to 15 or 18 or something and cut the
3  number in half we have to focus on. A lot of these
4  logistical issues will be if not resolved they'll be a
5  lot, lot better, and I think we have to find a way to
6  factor that in, because these things that have led in
7  our recent period of dropping cases were all knowable
8  in advance. They weren't things that came out, you
9  know, in adverse discovery, and I just feel...
10     And, again, I'm sorry if I'm missing a lot of
11 the detail and the nuance on this call, I'm concerned
12 we're in a square peg and round hole situation in what
13 we're trying to accomplish, particularly if we try to
14 accomplish it for trial at the end of November instead
15 of, say, the first of January.
16     THE COURT: I'm hoping out of 40 cases or
17 30 cases, whatever, the 40 cases we'll be able to get
18 two trials of 10 each, I mean, basically. The fact
19 that people could weed out their cases early is true,
20 but it is not real life because if you have taken
21 someone as a client and they have had a heart attack
22 and you have told them you're going to represent them
23 and you start representing them, and when you look at
24 their facts sheet maybe it is not as good as you would
25 have hoped. Sometimes it is hard to at that point give

Page 92

1  up on the case or tell a person that their case should
2  be dismissed until at least you give them a chance to
3  have their deposition taken and the doctor's dep and
4  see if the case gets better. Cases get better, cases
5  get worse, you know, and until the dep at least of the
6  plaintiff and the doctor are taken you can't really
7  assess what the highs and lows of your cases are.
8      I do think at the end of plaintiff's — and I
9  have said this repeatedly, that at the end of the fact
10 discovery or at least — not even at the end of fact
11 discovery because fact discovery can go right to the
12 end of the case, but at the end of the dep of the
13 plaintiff and the dep of the doctor and the dep of the
14 sales reps or maybe even before the dep of the sales
15 reps in the odd cases people should be able to say this
16 is not a case I'm going to pursue and dismiss it at
17 that point.
18     MS. FREIWALD: One other thing —
19     THE COURT: And I am going to let counsel pare
20 this list down. If you have a case on here you don't
21 want on here you can take it off, unless it is on the
22 defense list.
23     MR. BUCHANAN: Judge, and I think just in
24 fairness to Mr. Strain's proposal the plaintiffs,
25 speaking from my firm, I'm sure other plaintiffs firms

Page 93

1  feel this way, what appear to be factual issues prior
2  to discovery often turn out not to be factual issues at
3  the close of discovery. Other issues that plaintiffs
4  hope to resolve either with treaters, often the
5  treaters have not been deposed prior to trial
6  selection. They just haven't in most cases. And that
7  deposition, as we know, can have a significant impact
8  on the case. And that deposition is — I guess I'm
9  concerned at the suggestion that we need to be a little
10 more careful on how we pick cases because these cases
11 are being selected prior to discovery, as Your Honor
12 knows, and we have seen that the defense has picked a
13 case that the plaintiffs have won, the plaintiffs have
14 picked cases that we have lost, and it is going to be
15 that way, apparently, and until discovery is done it is
16 going to continue to be that way, and I don't think
17 plaintiffs can be faulted for, quote, not dismissing
18 cases that plaintiffs have lost or not dismissing cases
19 that are later dismissed prior to expert reports or
20 during, and I understand Your Honor's admonition to be
21 more cautions in the dismissals.
22     THE COURT: And we are shortening — there
23 have been witness lists. I don't know how long the
24 witness list was in Humeston or how long the witness
25 list was in your case for each side, but, I mean, I'm

Case Management Conference - 7/18/06

Page 94

1  limiting it to 20 witnesses a side. That's
2  substantially different than what you got as a witness
3  list, wasn't it?
4       MR. PETIT: Ours was pretty short for the
5  other side and yours too?
6       THE COURT: Well, that's good.
7       MS. FREIWALD: Judge, I understand what Mr.
8  Buchanan is saying, but a great deal of the cost and
9  the burden of discovery is on Merck for the sales reps.
10 The LoPresti example of somebody who had a lot of sales
11 reps, asked for a lot of sales reps and then dismissed
12 his case not because of a sales rep issue but because
13 of an issue having to do with the merits of his usage
14 and his injury in his case, at some point we are
15 appreciative of your suggestion, and we're going to
16 have a vetting process mid discovery for lack of a
17 better term, but at some point it seems to us, perhaps,
18 the Court could think about either a certification
19 process, a certification of good faith like, for
20 example, in med mal cases in Philadelphia as to what
21 has been done before a case is nominated for trial,
22 particularly if plaintiffs are going to nominate a
23 bunch of these cases, and we find out, for example,
24 they haven't collected any of the medical records
25 themselves, they don't have their own client's medical

Page 95

1  records, is that a case that should really qualify to
2  go in the first 50?
3       MR. BUCHANAN: They're getting dismissals.
4  They're getting rid of cases without motion practice.
5  I mean, they're getting -- the cases are going to be
6  resolved by the program you set forth. Rapid
7  discovery, dismissals, trial or, perhaps, usage.
8       MS. FREIWALD: But all of these dismissals --
9       MR. BUCHANAN: I'm sorry. There hasn't been a
10 single case settled, 18-month continuous use or not.
11 There's been significant verdicts. There have been
12 losses. The litigation needs to go forward. Discovery
13 needs to be done, and the costs associated with
14 litigation of this size are the costs associated with
15 it for our side and their side, and I don't think
16 that's a proper consideration for the Court.
17      THE COURT: Each of these cases cost money for
18 Merck, and they cost money for the plaintiffs, and if a
19 plaintiff has to fly out of state to take a doctor's
20 dep or -- you know, they're investing money in these
21 cases, too, that they're not going to get back if these
22 cases are dismissed, and it is just the risk that
23 everybody takes as part of the cost of litigation. I
24 do think that eventually, we may come up with a much
25 better way to pick cases than this, but at this point

Page 96

1  this is what I have got, and after this, you know, we
2  went with trying to have each side put up their 10, and
3  I'm just -- this is what -- I'm going with this this
4  time. It may turn out, as I said, that by November
5  I'll say to you we're not going to do it this way
6  again, we're going to switch. I have switched a few
7  times. You know, we're going to -- eventually if
8  things aren't going to work out then we're going to
9  wind up being together for a long time, and we're going
10 to try a lot of cases, and I'm going to wind up having
11 to group in different ways and do different things, but
12 this is something -- at this stage this works. It may
13 not be the eventual way we keep going.
14      The next thing I'm going to advise counsel is
15 that I -- I am going to require that a demand be given
16 on each file to the defense. It is simply unhelpful
17 for us to continue to litigate every case with the
18 defense never having a demand. There may be that
19 they're never going to make an offer, that's their
20 choice. I cannot, obviously, force people to make an
21 offer. And I really can't make plaintiffs make a
22 realistic demand. I can tell you to make a demand, and
23 you can just put $50 million on every case and -- in
24 which case my just having asked you to make a demand is
25 an absolute waste of time. If you don't make a

Page 97

1  reasonable demand then you're just hurting yourself.
2       MR. MORELLI: Some of my cases are only worth
3  40 million anyway.
4       THE COURT: Are you sure you haven't got any
5  that are worth 50,000 or 10,000?
6       MR. MORELLI: I don't know, Judge. We'll see
7  soon, I'll tell you that.
8       MR. BUCHANAN: Judge, you want that done on
9  the schedule -- for the cases that are on the schedule.
10      THE COURT: Yes. I don't mean for every case
11 you have in your office. For the ones that are getting
12 ready. I would expect some time before trial for a
13 demand to be made, and it shouldn't be the day before
14 trial.
15      MR. BUCHANAN: The usual 408 confidential
16 stipulation?
17      THE COURT: Yes. No demand should be
18 published by either side. I mean, I don't restrict
19 much to the press, but I don't think it helps.
20      MR. LOCKS: If we make an offer of judgment
21 can that be sealed?
22      THE COURT: If, God forbid, an offer is made
23 it won't be disclosed to the press.
24      MR. LOCKS: If we make an offer of judgment as
25 opposed to a demand, can that be sealed?

Page 98

1  THE COURT: No.
2  MR. LOCKS: I didn't think so.
3  MR. FERRARA: Your Honor, if it would help I
4  have the eight cases that you have on your list from
5  Merck. It is Pope, four down from the top, Sandra
6  Pope. Then about six more down is Williams-McCray, and
7  then about eight more down is Michael Utter and then
8  about 12 down is Richard Smith. Three below that is
9  William Walburn. Right below that is Glenn Allphin.
10 Second from the bottom is Leon Roy and mid page next
11 page is Richard Slade.
12 MR. BUCHANAN: Thanks, Mike.
13 THE COURT: Who was right after Utter?
14 MR. FERRARA: Utter? Smith. Richard Smith.
15 THE COURT: All right. Now the defense can
16 look at those. If you decide you want to withdraw the
17 request for those you can do that, too, to shorten the
18 time, but I don't want it -- I want a mix, so, you
19 know, if those were picked...
20 I really felt that the defense list was more
21 done by time slots than anything else and what they
22 were looking for timewise as opposed to -- it appeared
23 to be that way. It appeared to be a pretty -- it
24 really didn't -- I don't know that they took criteria
25 of what they thought was best.

Page 99

1  MR. DASSOW: Richard Allen, which is on the
2  Ferrara Law Firm is also on their list. It is on Page
3  3. 0162-05 right at the bottom.
4  THE COURT: The bottom of the first page,
5  Richard Allen?
6  So that's nine. All right. So if we
7  eliminate -- I don't know how many of those are
8  strokes. I don't think any of the defense are strokes.
9  So we can eliminate the 11. We're down to 40
10 something, and nine of those are defense cases and
11 chosen by the defense. All these others weren't chosen
12 by the plaintiff, although I think most of them came in
13 letters, but there were others that I just picked.
14 MR. BUCHANAN: A couple other things while
15 we're on the trials, and one of the things we would
16 like to do and the defense may agree because I guess --
17 we would like to presumptively limit the length of
18 depositions of plaintiffs, treaters and sales reps to
19 5 hours. We have gotten in situations with multi-day
20 deps, I'm sure they have, as well, where they have gone
21 far longer than either side really believes they
22 should. So I don't think the schedule is going to
23 allow for multi-day deps in that setting, but we would
24 like to presumptively limit them for 5 hours, and for
25 spouses we would like to limit them to two.

Page 100

1  THE COURT: Any problem?
2  MR. CORONATO: What was the last thing you
3  said?
4  MR. BUCHANAN: Spouses to 2 hours.
5  MS. FREIWALD: You know --
6  THE COURT: You're talking about 2 hours for
7  the defense?
8  MR. BUCHANAN: Yes, two hours for the defense
9  for the spouse.
10 THE COURT: Is that a problem?
11 MS. FREIWALD: I think we would like to talk
12 about this with the client. My initial reaction is I
13 don't have a problem with a one-day deposition.
14 MR. BUCHANAN: In a nondeath case. Let me
15 just clarify in a nondeath case. If the plaintiff is
16 the estate then, obviously, it is a spouse.
17 THE COURT: It might require more.
18 MS. FREIWALD: My reaction is I think most of
19 these depositions in the categories Mr. Buchanan
20 identified should be completed in 1 day. Once you're
21 there for 5 hours should it be a 5-hour deposition, a
22 6-hour deposition, a 7-hour deposition the problem we
23 have had is that, you know, some plaintiffs know a
24 great deal and they have a lot to say and they have
25 complicated medical histories and some don't, and I

Page 101

1  think you can see as an example I was at the deposition
2  we took of Mr. Cona. I think we did his deposition and
3  his wife in one day together. Other depositions the
4  plaintiffs have taken longer than that. I don't have a
5  problem agreeing to a business day for the deposition,
6  , but I'm concerned about saying no more than five
7  hours.
8  THE COURT: All right. That is fine. We'll
9  say that no deposition of a treater -- for prescribers
10 you should be able to do two in one day, don't you
11 think?
12 MS. FREIWALD: The prescriber is more
13 important.
14 THE COURT: Okay. I meant for the reps. Do
15 you have issues with two reps in one day?
16 MR. KRISTAL: Yes.
17 THE COURT: They take a day?
18 MR. KRISTAL: It depends be on how forthcoming
19 they may be.
20 THE COURT: All right. We'll say one day each
21 for a sales rep and plaintiff and the prescriber as far
22 as the --
23 MR. BUCHANAN: Can we keep the spouse to a
24 half a day? The nonplaintiff spouse.
25 MS. FREIWALD: Honestly, Dave, what I would

Page 102

1  like to do is if we can play it by ear. My instinct is
2  that most of the time the spouses have not taken a full
3  day, and I think we have been pretty cooperative about
4  that, and I would rather just not -- I'm willing to
5  work with you if you're willing to work with us.
6     THE COURT: Let's say it this way. We're
7  going to wind up with plaintiffs -- we have had so far
8  people who were very knowledgeable about the cases and
9  attorneys who are very knowledgeable taking deps, and
10 people that are very knowledgeable take less time.
11 People who are very experienced take less time. You
12 know, it is just a fact. It is like a learning curve
13 of anything else. If you're in your third year out of
14 school or fifth year you're not -- people who have been
15 out for 10 or 15 or 20 years take shorter deps. They
16 know what to get to. They get to the point. They know
17 what they want. They go for it. Whereas, if you're
18 younger, and you have to go back and report to this
19 20-year guy you want to make sure he doesn't say to
20 you, What did they say when you asked that, and you
21 say, Oh, my God, I didn't ask that. So you try to
22 cover everything from birth to death. I guess what we
23 have to do with that, and that's going to happen
24 probably with some plaintiffs that might not be as
25 familiar with the case, some counsel, and it may happen

Page 103

1  when you're sending out more different types of
2  lawyers, especially now that they have geared up in
3  other courts and they're trying cases in California and
4  other places, too. I guess we just have to live with
5  that to some degree, but I think we have to make sure
6  that -- that's why one day and a half day -- the one
7  day should be sufficient, and even the half day should
8  be sufficient to advise people that -- and except for
9  extraordinary circumstances they shouldn't exceed a
10 half a day.
11    I'm not at this point going to say you
12 shouldn't exceed a half a day. If they start -- if you
13 started getting four or five in a row where they're
14 taking the spouse for 8 hours then give me a phone
15 call, and we'll talk to defense counsel about it.
16    MR. BUCHANAN: Those guideposts are helpful.
17    THE COURT: And defense counsel could
18 encourage people who are taking the dep to know that
19 they have a certain -- that they're really not at
20 luxury to just ask everything in the world. And then
21 we'll go from there and see what happens. Obviously,
22 death cases you may have to take more than the spouse.
23 You may have to take the children. And you may have to
24 question them longer than you would, you know, a
25 consortium claim. Go off the record.

Page 104

1     (Discussion off the record.)
2     MR. COHEN: You threw out dates of August 4th
3  and August 11th for production of documents, and what I
4  need to -- what I'd like to do is after we get the
5  final list and they see where we are and see when we're
6  getting the call notes to the plaintiff and see when
7  the plaintiffs can get back to me on which reps to go
8  out and collect come up with, and I --
9     THE COURT: What I would like to do is say we
10 want to have -- if I wasn't going away on Saturday, and
11 I'm not even going to think about this, I would want
12 to --
13    MR. COHEN: As soon as you come back we can
14 have another.
15    THE COURT: But we should have --
16    MR. COHEN: I'm going to get them call notes,
17 whatever I can get, whatever has been out, whatever I
18 can get as soon as I can get, we'll be working these
19 2 weeks, but as soon as you come back I'll be able to
20 say --
21    THE COURT: What deadline have I given for
22 call notes?
23    MR. BUCHANAN: You gave us August 11th for the
24 defendant's facts sheet and the sales rep documents.
25 I'm sure the defense facts sheet is ready for some

Page 105

1  cases and has been produced and not ready in others.
2     MR. COHEN: Here I think it is not for many,
3  and the facts sheets --
4     MR. BUCHANAN: Well, the wave cases should
5  have the facts sheets.
6     MR. COHEN: They went separately. They had a
7  separate order. My understanding is there were only
8  some. That's the other thing as to whether the
9  plaintiff's facts sheets had all the information, so I
10 just need to look. You know, I hate making
11 representations to you or to the Court until I just see
12 the cases on the list, see where we are and tell you
13 what the deal is, and sometimes it is good for you, and
14 sometimes you don't like it.
15    MR. BUCHANAN: I think we have to pin down
16 some presumptive deadlines just or else -- because
17 we're going to be waiting on sales rep documents to do
18 prescribing doctors. At least in those cases that you
19 said are even? I can't remember whether it was even or
20 odd. I'm sure we can shoot it out.
21    MR. MEADOW: Even are sales reps first.
22    MR. BUCHANAN: The people who have the luxury
23 of having the sales rep documents and sales rep
24 deposition before the prescribing doctors I know will
25 AVAIL themselves of that opportunity, so we want to

Case Management Conference - 7/18/06

Page 106

1  make sure that's being produced as quickly as possible.
2  MR. FERRARA: I would think, Judge, whatever
3  is done has to be done before you go away, so we're not
4  calling you in Italy.
5  MR. BUCHANAN: We won't be.
6  THE COURT: I'm not taking a phone. I'm not
7  like you. I don't have a Blackberry. I don't need to
8  check my e-mail. I'm taking a couple trashy novels and
9  that's it.
10 MR. KRISTAL: And a list of Chris Placitella's
11 restaurants.
12 THE COURT: And he is giving me lists of
13 restaurants just to get on my good side.
14 MR. PLACITELLA: You can take an even number
15 of restaurant lists from Charlie, and they'll submit
16 them before you leave.
17 THE COURT: Charlie already gave me the tip on
18 Nickelodeon. I already took his tip on that with my
19 granddaughter.
20 Okay. I do want to have a schedule. I want
21 to have an order, and I want to sign it before Friday,
22 and I want that order to include the list of cases
23 attached. I want it to have dates, and I want it to
24 have the even odd -- is 20 too many witnesses to list?
25 Should we list 15 each?

Page 107

1  MR. BUCHANAN: What's that?
2  THE COURT: Your witness list.
3  MR. MORELLI: She wants to limit it to 15 a
4  side.
5  THE COURT: Let's leave it at 20.
6  MS. FREIWALD: We would like to -- we would
7  like an opportunity to propose a somewhat different
8  schedule than the one you have set out because I don't
9  want our silence to be heard as acquiescence on the
10 November 27th trial date.
11 THE COURT: Let's see if by tomorrow you guys
12 can work this out. You have my dates. See if you can
13 maneuver from there and work it out. I do like the
14 idea of a trial that last week in November.
15 MR. BUCHANAN: We can do jury selection on the
16 27th. You can do openings the 30th or December 1st.
17 MR. STRAIN: We won't finish that case before
18 trial, not the kind of case Judge Higbee has in mind
19 that will not be finished before Christmas. Even the
20 first phase.
21 MS. FREIWALD: It won't be. It will go well
22 into January, and you'll have a break in Christmas, and
23 you'll lose a lot of jurors, also, because of it.
24 MR. BUCHANAN: We don't agree with your
25 assessment in terms of the number of trial days and the

Page 108

1  type of trial.
2  THE COURT: Well, Mr. Lanier has advised me
3  that when at the last meeting he said --
4  MR. MORELLI: He can do 28 plaintiffs in
5  5 minutes.
6  THE COURT: 2 weeks?
7  MS. FREIWALD: We have heard a lot of
8  representations about 3-week trials that were going to
9  happen, and we have lived through a lot of 7- to 8-week
10 trials.
11 MR. GRAND: Those weren't general liability
12 only, though.
13 MR. STRAIN: I was thinking back over Doherty
14 and thinking if case-specific stuff were taken out of
15 the first phase there would be different things that
16 would go into a more general first phase. I really
17 don't see how that will be done before Christmas, and I
18 think, obviously, we have to advise the jurors one way
19 or the other they would be coming back, but I'm afraid
20 we would end up with a case with a big break in it
21 right in the middle of the defense case.
22 THE COURT: That didn't hurt the defense last
23 time.
24 MR. LOCKS: It sure didn't.
25 MS. FREIWALD: You're still going to have to

Page 109

1  try the case, the issues related to the failure to warn
2  the doctor, the failure to warn the plaintiff. You're
3  going to have a lot of issues to try with multiple
4  plaintiffs, and if we have five plaintiffs together or
5  10 That will drive the length of the trial
6  significantly even in the first phase. There's no way
7  if we start the end of November that we will finish
8  before the first of the year.
9  MR. BUCHANAN: Judge, we laid it out over
10 lunch because before we came back in and said we can
11 start on the 27th -- pick a jury on the 27th, open on
12 the 30th or the 1st and finish before Christmas.
13 Believe me, we have the same issue. We don't want to
14 start on the 27th and not finish, and we're gonna.
15 MS. FREIWALD: There's no way you'll be able
16 to put on the evidence.
17 MR. BUCHANAN: I appreciate you don't think we
18 can. We disagree. We disagree. We envision the trial
19 differently than you do.
20 MS. FREIWALD: I understand that, but the
21 liability issues have to be linked to the particular
22 plaintiff and the particular doctor, and that clearly
23 involves --
24 MR. KRISTAL: Not necessarily.
25 MS. FREIWALD: That's the failure to warn

Page 110

1  question.
2      MR. KRISTAL: Not necessarily.
3      MS. FREIWALD: And --
4      MR. PLACITELLA: Suppose we take 30 detail
5  people over the course of the next 30 days, and we find
6  out that they all delivered the same message?
7      MS. FREIWALD: There's always the issue of
8  what the individual doctor knew from other sources,
9  what he told the plaintiff, what other sources of
10 information the plaintiff had.
11     MR. KRISTAL: That's case-specific.
12     MS. FREIWALD: That's the issue of failure to
13 warn.
14     MR. STRAIN: And the same with the individual
15 plaintiff for the direct -- the duty to warn directly.
16     MS. FREIWALD: That's the failure to warn
17 question.
18     THE COURT: I don't really think I defined
19 failure to warn.
20     MR. STRAIN: I can understand what Your Honor
21 is trying to accomplish here, and I can understand what
22 you're trying to accomplish, but I get back to what I
23 said earlier about the square peg in a round hole. I
24 think the logistics of this are really going to be
25 daunting, and I think that we would be a lot better off

Page 111

1  starting this as early in January as Your Honor's
2  schedule would permit.
3      THE COURT: I don't like the idea of telling a
4  jury that they're not going to get a break, actually,
5  in this type of case, so I have no problem with going
6  through December, and I do believe that we can finish
7  the liability part by December 22nd. If we can finish
8  that by then we may even be able to -- if we finish it
9  earlier we may be able to do some plaintiff specific.
10 If not, we would be able to start the plaintiff
11 specific after the break. There would be a break,
12 there's no question, and that's not ideal. But in some
13 ways it is nice for a jury to be able to have a
14 breather and then come back rather than go 8 weeks in a
15 row. To me it would seem more logical that they go
16 4 weeks, take a rest and then come back for 3 weeks.
17     You know, I know the case in Texas was tried
18 like two days a week for 10 weeks.
19     MR. JUDD: It was 3 months.
20     THE COURT: Not that I want to do things that
21 way. I don't think anyone liked that, probably not the
22 plaintiffs, the defendants or the judge, but I'm going
23 to keep my goal of November 27th.
24     All right. Anything else?
25     MR. BUCHANAN: Judge, there were a couple

Page 112

1  items on the general agenda.
2      THE COURT: I guess what we need is to have by
3  -- hopefully by tomorrow at noon for you to have the
4  list to them.
5      MR. BUCHANAN: Yes.
6      THE COURT: Then if they want to remove
7  anything they can look at that, and then we'll
8  hopefully have a final list, so by -- so that Charlie
9  can report back on Friday as to what he thinks the time
10 frames are. Hopefully a lot of these have already been
11 produced.
12     MR. BUCHANAN: Just so we're clear, and,
13 actually, I was trying to get -- I was hoping to get
14 word from all the plaintiffs by noon so I could
15 assemble everything, is it okay if I get it to you by
16 2:00 in the afternoon?
17     MR. COHEN: Tomorrow? Sure.
18     MR. BUCHANAN: When do we provide it to you,
19 Judge, end of the day?
20     THE COURT: I would like to talk to you
21 tomorrow at 4:15 tomorrow.
22     MR. COHEN: Do you want to talk first because
23 once you get to it me I need a little time to see if
24 we're taking anything off, so I thought maybe we would
25 do that Thursday morning or Thursday afternoon even.

Page 113

1      THE COURT: Tomorrow is Wednesday. Thursday
2  morning we'll talk. We'll talk Thursday morning at
3  10:00.
4      MR. BUCHANAN: Yes.
5      THE COURT: By phone? Whoever wants to be
6  involved in that. Well, it can't be everybody. Pick a
7  couple per side.
8      MR. BUCHANAN: Okay.
9      THE COURT: All right. Now what about the
10 agenda?
11     MR. BUCHANAN: Do you want to take a break
12 before the general agenda items?
13     THE COURT: Sure, let's take a short break.
14     (Break taken.)
15     MS. FREIWALD: I have one issue related to
16 trials, two issues. One is easy, I think, which is can
17 we tell our folks that wave discovery, unless one of
18 the wave cases was in this new group is essentially off
19 is not a priority at this point.
20     THE COURT: Paul, are you there? I'm sorry.
21 I keep forgetting to click the phone.
22     Okay. We just got back in the room, though,
23 and Holly had indicated that the concern that she has
24 is the wave -- Hope. Hope indicated that she is
25 concerned about the wave discovery.

Page 114

MS. FREIWALD: I'm going to feel lonely if you stop calling me Holly. It will be unfamiliar, actually.

MR. BALEFSKY: I like that better.

MS. FREIWALD: I'll tell my parents, Lee.

THE COURT: I, actually, like Hope much better is the weird thing. Hope is a very pretty name.

MS. FREIWALD: Thank you.

THE COURT: Okay. Yes, I think we should suspend the wave discovery at this moment, and we're going to have to regroup again in a couple months, and maybe we'll go back to waves, maybe we go back -- but I think it is enough to say that at this point you have a full enough plate with just doing these.

MS. FREIWALD: Good. Thank you.

The second thing is I know Your Honor because of your vacation schedule wants to feel that we're kind of left with appropriate tasks before you go away. Can I suggest, though, that maybe we deal with things in pieces that Charlie can make commitments to do what he needs to do and maybe we can solidify that piece of it, which will take us through the next couple weeks without committing to the whole schedule, because I really would like to have the chance to put in front of you in writing what we think are the fundamental

Page 115

fairness/due process issues with trying to work up this number of cases on this schedule at this point in the game, and we could get some something, you know, in a week that would give the plaintiffs time to respond so that you would have the whole package on your desk when you got back, and then we would -- and then we can look at the schedule in its totality, but I'm just concerned that I don't want -- I don't want the current tight time frames to drive decision making on a very big issue, and if we can just deal with kind of the commitment of making sure that people aren't losing the 2 weeks and reserve the rest until you get back it would be awfully helpful to feel like Merck has had a chance to present you with its full position.

THE COURT: How do we make sure that we use the 2 weeks?

MR. BUCHANAN: I think people are going home Friday, Judge, with your final order and a discovery schedule certainly and a pretrial schedule for these cases, whichever ones are ultimately selected, but a discovery schedule for everything else, and people are going to use that time. They understand what the limitations are. I'm afraid if we don't have the list nailed down with that time frame that any hope for achieving what I thought was a good program that was

Page 116

getting a general liability trial prior to Christmas won't happen.

MR. MAYER: We would have the list nailed down, and we would also be directed to fill within the next 2 weeks or 3 weeks with everything that we would be doing anyway.

MS. FREIWALD: That's exactly right. We would have the list nailed down to do whatever Charlie represents he can do and/or Your Honor orders that he has to do in that time, and, certainly, we're not -- I can tell you we're not going to not starting getting subpoenas out, commissions, whatever we need to do. We're going to start because 2 weeks -- we're going to take every 2 weeks we can get regardless of what the schedule ultimately ends up being, but I do think -- this is a huge step. Your Honor has never before suggested that we should work up this number of cases on this kind of schedule. All of the waves, which have been a fraction of the size of this new wave have provided for much longer periods of time, and the Cona/McDarby situation was extraordinary, and I think both sides felt somewhat disadvantaged with two cases, let alone with 50 cases or 20 cases or whatever it is going to be, so I would just like to lay it out there. I think there's no harm to either side. In the grand

Page 117

scheme of things it is not going to make a difference, and I'm just concerned about having an order and then undoing that order as opposed to -- as opposed to covering only what we need to cover now and then moving forward within a day or two when you get back.

THE COURT: I'm going to do it the opposite way. I'm going to enter the order, and then I will obviously -- if you want to prepare your writing opposition and get it to me like a week from Friday I won't be here, but get it to my desk. I'm going to require the plaintiffs to respond within the next week, and I will then have argument and the motion basically will be a motion to reconsider the order, and, certainly, you are already placing on the record that you have objections, and I'm going to let you do that.

MR. BUCHANAN: Thank you, Judge. I think we can go through the agenda quickly. I just would like to memorialize a couple things.

The plaintiff's agenda, Judge, we disposed of several items, but we just put on the agenda a couple of holding items as a reminder to the Court with trials and everything else.

THE COURT: The three McFarland?

MR. BUCHANAN: There's a motion on Stempler interviews that Merck had made. There's a motion

Page 118

1  concerning the deposition of Joanne Lahner that
2  plaintiffs made, and there's a motion concerning
3  conduct with respect to --
4      THE COURT: I'll try to focus on those as soon
5  as I get back and get you decisions by August 15th or
6  so, all right?
7      MR. BUCHANAN: We're all aware of how busy the
8  Court has been.
9      THE COURT: But I definitely will focus on
10 those.
11     MR. COHEN: One other that went here, the
12 forum non conveniens motion on the foreign plaintiffs.
13     THE COURT: We have a Canadian --
14     MR. COHEN: There's a Canadian person on here
15 because they didn't put anything down for the state of
16 residence and it didn't kick it out. I assume we're
17 taking that off.
18     THE COURT: Which one is that?
19     MR. COHEN: Hutchens.
20     MR. BUCHANAN: I spoke to the Locks Firm, and
21 they offered to supply a substitute plaintiff.
22     THE COURT: At this point we don't want
23 substitutes. The Locks Firm has one, two, three cases.
24 We take that off, they'll have one case. So tell them
25 that Hutchens is out.

Page 119

1      MR. BUCHANAN: Or two cases. If we took one
2  off.
3      THE COURT: Hutchens.
4      MR. BUCHANAN: When I spoke to Mr. Locks at
5  the break he intended to send me a letter on some
6  issues.
7      THE COURT: He wants to take away two and add
8  one?
9      MR. BUCHANAN: I think something like that.
10     THE COURT: He probably wants to pick three
11 different ones. He probably doesn't like anything I
12 picked. I chose his at random.
13     MR. BUCHANAN: He noted to me that they
14 were -- he noted correctly they were in trial last week
15 and they did not have the opportunity or the resources
16 to review their files to make suggestions to the Court,
17 and we're hoping that Your Honor would consider their
18 suggestions. So I'll include that in what I provide to
19 Mr. --
20     THE COURT: You have to have a final list, so
21 you'll have to get on the phone with Mr. Locks and find
22 out what he wants.
23     MR. BUCHANAN: He is aware of that.
24     THE COURT: Okay?
25     MR. BUCHANAN: Okay. Next item, Judge, SAS

Page 120

1  data sets. Just for the record, I'm working with
2  Mr. Yannella who is now on leave, I understand,
3  congratulations, but for the production of certain SAS
4  data sets that have not yet been produced concerning
5  various pooled anaylses that Merck did after the
6  initial cardiovascular pooled analysis, and he is
7  undertaking to get those. We're looking for a prompt
8  production of those certainly in time for expert
9  analysis prior to future trials.
10     Next item, Judge, is plaintiff's request for
11 admissions. We have heard you, Judge, and your
12 interest in trying to simplify certain proofs at trial
13 for stipulations, admitted exhibits et cetera.
14 Plaintiffs in February of this year served requests for
15 admissions that we thought were fairly straightforward
16 and call for straightforward responses. We would like
17 straightforward responses or for Merck to file a motion
18 for a protective order or something because when we ask
19 whether something is provided to the FDA we don't want
20 them to object and say that the request for admission
21 implies that something had to be given to the FDA. It
22 is a yes-or-no answer. It was something as a factual
23 matter that you never gave this particular analysis
24 reflected in this particular document to the FDA. We
25 want clean questions and answers in terms of admissions

Page 121

1  or denials so that we can have motion practice on the
2  issue if they deny it or something, but you can't just
3  say that it implies a duty that doesn't exist, and we
4  would like to find out a means to get this resolved
5  promptly.
6      MR. MAYER: Judge, the responses to the -- and
7  objections to the requests for admission were served
8  April 14th and --
9      MR. BUCHANAN: These are February.
10     MR. MAYER: Pardon? The responses.
11     MR. BUCHANAN: I'm sorry. I thought you were
12 referring to the document admissions. No, there's a
13 different set, Ted. These are the ones concerning
14 information given to the FDA and not given to the FDA,
15 not concerning authenticity of documents.
16     MR. MAYER: This is what I'm looking at, and
17 it has a stamp on it that says it was file and serve on
18 April 14th.
19     MR. BUCHANAN: I'm confused. I'm sorry.
20     MR. MAYER: The point I'm getting to is we
21 understand from Phil Yannella that seeing it in the
22 agenda was the first this issue has been raised, there
23 hasn't been any meet and confers.
24     MR. BUCHANAN: The question is going to be
25 what the process is and whether you're going to answer

Page 122

1  the admissions or not, and when we ask, you know --
2       THE COURT: If you don't answer an admission
3  it is deemed admitted.
4       MR. BUCHANAN: They answered them. They
5  answer --
6       MR. MAYER: Leafing through this I can see
7  that there are responses to everything.
8       MR. BUCHANAN: There are answers...
9       Admit that on April 8, 2001 Merck conducted an
10 intention to treat analysis on mortality in protocol
11 78, the results of which are reported in a memorandum
12 from Josh Chen to so-and-so, and then admit that that
13 document was never given to the FDA, and the answer is
14 Merck objects to this because the implication is that
15 there was an obligation by Merck to do such a thing,
16 and they neither admit nor deny.
17      THE COURT: As soon as he gets back have him
18 look over them. There is no duty to -- I mean, if
19 someone asks you did you have a duty to give this and
20 you didn't give it then your answer can be, you know,
21 first of all, that's just not appropriate for an
22 admission. You know, but to ask did you give this
23 document is appropriate. And it should be answered.
24      MR. MAYER: Okay.
25      THE COURT: Have him just look at it again.

Page 123

1       MS. CALL: Is there an objection to every
2  single one that we answered?
3       MR. BUCHANAN: No. There are a number as a
4  factual matter plaintiffs wanted the defense to admit
5  so there's no dispute at trial as to all the documents
6  that were given to the FDA or not.
7       THE COURT: I suggest you send a letter, send
8  a letter that says specifically that we request that
9  you answer the following more specifically, either
10 admit or deny and then give them -- they should have
11 approximately, you know, a week or so to respond to
12 that.
13      MR. BUCHANAN: I suspect the answer is no, so
14 I think it won't take too long after we identify it by
15 letter. So we'll get the letter out this week, Phil
16 will be back next week. Two weeks is fine from our
17 perspective. We don't have a case going to trial for
18 some time, but 2 weeks after we get you the letter
19 would be fine.
20      THE COURT: Maybe he knows. Maybe he would
21 have to look through all the FDA documents, which he
22 didn't want to do, which nobody has done in the whole
23 case yet I don't think.
24      MR. COHEN: There's a lot of them.
25      THE COURT: You have seen most of them?

Page 124

1       MR. COHEN: Yes.
2       MR. BUCHANAN: There was a time when there was
3  more.
4       MR. COHEN: That was time when I would say all
5  of them.
6       MR. BUCHANAN: The next item on our agenda is
7  I have dealt with Mr. Averith, a partner of Mr. Mayer
8  and Mr. Cohen, and I understand they're going to
9  provide us with deposition dates for a deponent on a
10 deposition on certain specific corporate rep topics.
11      There is a question that has arisen with
12 respect to the administration of joint Bextra VIOXX and
13 Celebrex case, and I put in on the agenda for someone,
14 Meredith Gurski, who is not here. So I can report
15 back, is there a process in place that I can deal with
16 with those who have questions about where those cases
17 go, and I guess they all come here, it is just a matter
18 under which mass tort they're filed.
19      THE COURT: Well, at this point, I mean,
20 they're filed here. They're both going to be assigned
21 to me no matter which they are, but I think because of
22 the number of VIOXX cases at this point I'm going to
23 have the Bextra/VIOXX cases switched to the Bextra list
24 so I have -- maybe I'll create a Bextra/VIOXX --
25      MR. COHEN: She gave them Case No. 273.

Page 125

1       THE COURT: She may have done that. We may
2  have a separate filing for Bextra/Celebrex and VIOXX
3  and one for Bextra/Celebrex and one for VIOXX.
4       MR. COHEN: Bextra/Celebrex is 272 and VIOXX
5  is 619 and both are 273.
6       THE COURT: She may want to change her
7  designation.
8       MR. FERRARA: I know we have separate facts
9  sheets.
10      MR. MAYER: And they continue to be
11 administered separately.
12      MR. BUCHANAN: Judge, we had a separate
13 conversation about the IMS issue, and I understand
14 we're going to try to resolve that with IMS tomorrow
15 via teleconference.
16      THE COURT: Right. Okay. And then what's on
17 the defense agenda?
18      MR. CORONATO: Your Honor --
19      MR. COHEN: The GI cases.
20      MR. CORONATO: Before we spend money on a
21 motion, Your Honor, we have been trying to reach out to
22 these firms to find out what they're doing with the
23 cases, and we're hopeful they'll dismiss these cases so
24 we don't have to bother with filing a motion.
25      THE COURT: If you want you can send me an

Page 126

1  order. I will sign an order that indicates that they
2  have to provide their expert report within another
3  30 days or their case will be dismissed, and at that
4  point you can just file an affidavit, and you can
5  include in the order that an affidavit can be filed by
6  the defense with notice to the plaintiff, and I'll
7  automatically dismiss it without prejudice. I have to
8  dismiss it, but you don't have to put that in the
9  order, just put I'm going to dismiss it.
10      MR. CORONATO: It will be based on a
11  certification from us --
12      THE COURT: That you didn't get it within the
13  time frame. Instead of 30 days put a specific date.
14  Figure your 30 days from approximately when I'm going
15  to sign it, give them a couple days, and then we'll get
16  rid of those cases unless someone does come up with an
17  expert report, which would be fine, but I don't know
18  that anybody is going to want to do that.
19      MR. BUCHANAN: There were some McFarland items
20  on the defense agenda in light of the Court's rulings
21  today I think we can defer.
22      MR. COHEN: Yes. The thing about Lexis/Nexis.
23      MR. CORONATO: Apparently, the plaintiffs,
24  despite Your Honor's direction, are not registering
25  their cases on Lexis Nexis when they file their

Page 127

1  complaint with the Court, so then, I guess, when a
2  party has to file something against Merck there's
3  nothing for us to file it to on Lexis/Nexis.
4      MR. BUCHANAN: It becomes an issue for all of
5  us, actually. We have to get notices to people when we
6  serve the Court.
7      THE COURT: Certainly to the Court because I
8  put them out through there, too.
9      MR. BUCHANAN: We'll again --
10      THE COURT: I'll have Carmen -- we'll post
11  another letter from me to counsel to advise you that
12  this is to remind all counsel that they have to -- of
13  course.
14      MR. BUCHANAN: Can you put that on the
15  website.
16      THE COURT: Of course, if I post it on
17  Lexis/Nexis it is not going to do much good.
18      MR. BUCHANAN: Put it on the website.
19      MR. CORONATO: Would you mind sending an
20  e-mail to the plaintiffs you have?
21      MR. BUCHANAN: Absolutely, and one other thing
22  I would like, perhaps, for the Court to issue, and that
23  is to --
24      THE COURT: In the order, isn't it?
25      MR. BUCHANAN: It is.

Page 128

1      THE COURT: But we should -- I think I should
2  post it more prominently maybe now we're getting a lot
3  more people coming in with -- Jill also asked me, and
4  she had to -- she had to take today off, but, again, if
5  you can let people know if they send in a group of
6  complaints if instead of sending them all in just in
7  one box or one group they bundle them in 25 or 50 at
8  this point and identify them as a package. She wants
9  you to put some kind of number or name like, you know,
10  Seeger Weiss A, Seeger Weiss B on each bundle, A, B or
11  AA or BB, and then when you call in and ask has a
12  docket number been assigned to this yet she can say
13  packet A of 25 of 50 have all been assigned docket
14  numbers.
15      MR. BUCHANAN: I'll have Sinu Daniels from our
16  office contact her and Jill and get some protocols.
17      THE COURT: See if you can let everybody know
18  that. You may have to sign an order if we're not
19  getting the docket numbers back in time for service
20  within the time frame to extend the time for service.
21      MR. BUCHANAN: Is it taking longer than
22  2 weeks?
23      THE COURT: Not yet.
24      MR. BUCHANAN: Judge, one other thing.
25      THE COURT: Well, the week out nobody was here

Page 129

1  really put us behind a little bit because we had a lot
2  of other things we had to catch up on, not so much
3  VIOXX, but we had just, you know, 200 landlord/tenant
4  cases that had to be rescheduled. There's a lot of
5  things that had to be done because we missed that week,
6  but I think right now we're within less than 5 days or
7  I think we're within trying to keep within 48 hours or
8  something like that, but we're keeping up, but we're
9  struggling to keep up.
10      MR. BUCHANAN: They're segregating them by
11  dates like, for example, if they receive a bunch on the
12  29th of June...
13      THE COURT: They're all stamped the day they
14  come in. Nothing is not stamped "received" on the date
15  it comes in. Everything is stamped "received" on the
16  day that it comes in.
17      MR. BUCHANAN: What happened with the shut
18  down?
19      THE COURT: We came back.
20      MR. BUCHANAN: So everything was stamped?
21      THE COURT: Nothing was received, but the
22  Governor signed an order extending statute of
23  limitations for that week. Everything would have been
24  stamped on the Monday we got back. Nothing was opened
25  while we were away. We weren't allowed to open the

Case Management Conference - 7/18/06

Page 130

1  mail.
2      MR. BUCHANAN: One housekeeping issue for
3  plaintiffs' counsel. We have with the increasing
4  number of filings I'm not sure the plaintiffs' counsel
5  me or Sol have accurate contact information for all the
6  plaintiffs' lawyers, and I would like to submit
7  something to Your Honor that you can direct plaintiffs'
8  counsel to review a service list that we'll send out
9  and affirm the accuracy of the e-mail information and
10 other contact information or maybe I can get a service
11 list that you guys have.
12     MR. CORONATO: We update it every couple
13 months.
14     MR. BUCHANAN: You may not have e-mail
15 addresses on it which is our primary means of
16 communication.
17     MR. CORONATO: Actually, I think we only list
18 New Jersey state counsel.
19     MR. BUCHANAN: So you wouldn't have everyone.
20 I'll put together something that, perhaps, Carmen can
21 post.
22     THE COURT: If you want it in the form of an
23 order send it to me, and send a copy to the other side
24 so they can see what it is before I sign it.
25     MR. BUCHANAN: It will get to everybody other

Page 131

1  than those who haven't signed up for Lexis/Nexis, I
2  guess.
3      THE COURT: The problem with any of these
4  things where you're telling people what to do is the
5  people that don't do it are the ones that aren't seeing
6  it and hearing it.
7      MR. COHEN: I also need to give Dave a little
8  more enforcement power on we had sent from your
9  database all the errors and omissions that we had
10 found, and I think folks have not been getting back to
11 Dave, so I notice on the chart that you have done here
12 a number of errors and things, and I think it is
13 important that when we identify the errors that
14 plaintiffs' counsel fix them.
15     MR. BUCHANAN: I sent them out, and I directed
16 people to contact Michelle Yeary directly.
17     MR. COHEN: That really doesn't happen, so
18 maybe we can put that in an order, too.
19     MR. BUCHANAN: I will follow-up again.
20     MR. COHEN: It doesn't have to come back
21 through you.
22     THE COURT: Don't wait for the big management
23 order that never comes. Send a small order, and I'll
24 sign it. These things can be an order, and I'll sign
25 it. We'll do better that way.

Page 132

1      We are -- you know, as you can see, we're
2  still using the access database and it's continuing to
3  be refined. By the time we're done VIOXX we may
4  actually have it figured out, but I think that at this
5  point if some of the information is inaccurate it
6  doesn't matter that much -- it is like I didn't pick
7  people in this based on necessarily too many details,
8  although, obviously, if "other" is not correct or if
9  "heart attack" is not correct that makes a huge
10 difference, so we're just going to have to sort those
11 out as we go, but you're right we should be --
12     MR. COHEN: It is not that much information
13 per case, and we specifically identified a particular
14 field in each case, and we do all that work for them.
15 All they have to do is write back.
16     THE COURT: And we have a lot of lawyers who
17 haven't submitted, people who have newer cases and
18 don't have cases.
19     MR. BUCHANAN: And, again, I'm worried that,
20 perhaps, we don't have the right e-mail addresses for
21 the people who may be the problem filers, so we'll try
22 to get the service issue sorted out, as well.
23     What time are we on for on Thursday?
24     MR. MAYER: 10:00 a.m.
25     THE COURT: Tomorrow at 11:00.

Page 133

1      MR. BUCHANAN: Tomorrow at 11:00 for IMS and
2  Friday at 9:30, which is specific to Local 68.
3      MS. FREIWALD: I will be on Thursday, I hope,
4  but I'm probably going to be in an airport, so I'll
5  apologize in advance if there's background noise, and
6  if it is annoying I'll drop off and let Ted and Charlie
7  handle it.
8      THE COURT: Are you going on vacation?
9      MS. FREIWALD: Actually, I'm going to visit my
10 daughter at summer camp.
11     (Discussion off the record.)
12     MR. FERRARA: Your Honor, one of the lawyers
13 who had left had asked me to raise this with you. On
14 Merck's list where the 9 cases they had submitted 25,
15 and you picked nine of their 25. If -- is there a
16 procedure if one of the nine they pick turns out to be
17 a bad case for a plaintiff is there a procedure that
18 they can withdraw it?
19     MS. FREIWALD: If there's a case that we
20 picked that you don't like?
21     MR. FERRARA: Right. In other words, you got
22 9 out of 25. You got a good percentage of return on
23 your request.
24     MS. FREIWALD: You guys get to supplement your
25 list with whatever you want.

Page 134

1   MR. FERRARA: We submitted 15 and got none, so
2   you did quite well.
3   MR. BUCHANAN: Mike, I imagine --
4   THE COURT: I think if it is a bad case you
5   can just dismiss it, and they won't mind. If it is a
6   case that -- as I said before, if there's something
7   about the case that you want to approach me about, the
8   client is, you know, has just -- has just had an
9   illness, the client is in a psychiatric hospital, the
10  client is whatever, but just that the client is an old
11  grouch that nobody is going to like...
12  MS. FREIWALD: Client's wife prescribed all
13  the VIOXX.
14  THE COURT: As we said before I don't really
15  think you guys -- you know, the best case has been
16  McDarby, and it was the defense choice, and the
17  plaintiffs' picks haven't been spectacular.
18  MR. FERRARA: We're hoping that happens again,
19  Judge.
20  THE COURT: I'm not the least bit concerned
21  that the plaintiffs' cases are all going to be great
22  plaintiffs and the defense are all going to wind up
23  being terrible plaintiffs. I don't know that that's
24  going to happen. It certainly hasn't worked out that
25  way in the past.

Page 135

1   All right. Okay.
2   (End of proceedings.)

Page 136

CERTIFICATION

I, REGINA A. TELL, C.S.R., R.M.R, R.P.R., C.R.R.,
License Number 30XI00161000, an Official Court Reporter
in and for the State of New Jersey, do hereby certify
the foregoing to be prepared in full compliance with

the current Transcript Format for Judicial Proceedings

and is a true and accurate compressed transcript to the

best of my knowledge and ability.


_____07-21-06
Regina A. Tell, CSR-RPR-RMR-CRR
Official Court Reporter
Atlantic County Courthouse
Mays Landing, New Jersey