UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL DOCKET No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L - DIVISION 3 |
| | * | |
| This document relates to | * | JUDGE FALLON |
| CASE NO. 2:05CV2524 | * | |
| | * | |
| ANTHONY WAYNE DEDRICK, | * | MAG. JUDGE KNOWLES |
| an Individual, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |

---

**PLAINTIFF'S MOTION TO REASSERT PLAINTIFF'S OPPOSITIONS
TO DEFENDANT'S MOTIONS *IN LIMINE* PREVIOUSLY
CONSIDERED BY THE COURT**

---

Plaintiff Anthony Dedrick hereby reasserts Plaintiff's Oppositions to Defendant's Motions *in Limine* Nos. 1 through 4 and No. 7, filed previously in the *Mason v. Merck & Co.*  Plaintiff will oppose Defendant's Motion *in Limine* No. 5 in a separate pleading.  Where the Court has previously granted Defendant's motions and is not inclined to change its prior rulings, Plaintiff reasserts these oppositions to preserve his record on appeal.

Plaintiff reasserts and incorporates by reference "Opposition of Plaintiff Charles Laron Mason to Defendant's Motion to Preclude Improper Reference to Merck's Defense of Other Vioxx-Related Lawsuits or to the Number of Times Merck Witnesses Have Testified Previously (Defendant's Motion in Limine No. 1)," which was filed in *Mason v. Merck & Co.*  See Ex. "A."  In *Mason*, the Court made

1

the following ruling, "Deferred – likely inadmissible unless witness is being impeached with prior testimony or if issue is made of Plaintiff's experts testifying in other cases." *Mason v. Merck & Co.,* Order of October 13, 2006, at 2.

Plaintiff reasserts and incorporates by reference "Opposition of Plaintiff Charles Laron Mason to Defendant's Motion to Exclude Improper Personal Opinions of David Graham Regarding the Food and Drug Administration (Defendant's Motion in Limine No. 2)," which was filed in *Mason v. Merck & Co.* See Ex. "B." In *Mason,* Merck's motion was denied.

Plaintiff reasserts and incorporated by reference, "Opposition of Plaintiff Charles Laron Mason to Defendant's Motion to Exclude Evidence or Argument About Dr. Graham's 'Excess Events' Calculation (Defendant's Motion in Limine No. 3)," which was filed in *Mason v. Merck & Co.* See Ex. "C." In *Mason,* Merck's motion was denied as moot.

Plaintiff reasserts and incorporated by reference, "Opposition of Plaintiff Charles Laron Mason to Defendant's Motion to Exclude Testimony or Argument That Merck: (1) Should or Could Have Unilaterally changed the Vioxx Label to Include the VIGOR Data; or (2) 'Dragged Its Feet' to Prevent the VIGOR Data From Being Added to the Vioxx Label (Defendant's Motion in Limine No. 4)," which was filed in *Mason v. Merck & Co.* See Ex. "D." In *Mason,* Merck's motion was denied.

Plaintiff reasserts and incorporated by reference, "Opposition of Plaintiff Charles Laron Mason to Defendant's Omnibus for Order Excluding Evidence and Testimony Raised by Motions Previously Denied by the Court (Defendant's Motion in Limine No. 7)," which was filed in *Mason v. Merck & Co.* See Ex. "E." In *Mason,* Merck's motion was granted in part and denied in part.

For the reasons set forth above and in the attached memoranda in opposition to Defendant's motions, Plaintiff respectfully moves the Court to deny Defendant's Motions *in Limine* Nos. 1 through 4 and No. 7 in their entirety.

Respectfully submitted this 3rd day of November, 2006.

_____
**ANDY BIRCHFIELD**
P. LEIGH O'DELL
Attorney for Plaintiff
***BEASLEY, ALLEN, CROW,***
***METHVIN, PORTIS & MILES, P.C.***
234 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103
(334) 269-2343 telephone
(334) 954-7555 facsimile

**Russ M. Herman** (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
**Plaintiff's Liaison Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
& WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

**Christopher A. Seeger**, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiff's Motion to Reassert Plaintiff's Opposition to

Defendant's Motions in Limine Previously Considered by the Court has been served on Liaison

Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail or by hand delivery and e-mail,

on Merck's Counsel, Douglas R. Marvin and Philip S. Beck, by e-mail, and upon all parties by

electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial

Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United

States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send

a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 3rd day

of November , 2006.

P. Leigh O'Dell
Attorney for Plaintiff
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.

# EXHIBIT  A



12548474

Oct 4 2006
6:00PM

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

In Re: Vioxx |     **MDL DOCKET NO. 1657**
**PRODUCTS LIABILITY LITIGATION** |

THIS DOCUMENT RELATES TO: |     Section L
Case No. 2:06cv810 |

CHARLES LARON MASON v. |     Judge Fallon
MERCK & CO., INC. |     Mag. Judge Knowles

---

**OPPOSITION OF PLAINTIFF CHARLES LARON MASON TO DEFENDANT'S MOTION TO PRECLUDE IMPROPER REFERENCE TO MERCK'S DEFENSE OF OTHER VIOXX-RELATED LAWSUITS OR TO THE NUMBER OF TIMES MERCK WITNESSES HAVE TESTIFIED PREVIOUSLY**

**(Defendant's Motion in Limine No. 1)**

---

**TO THE HONORABLE JUDGE ELDON FALLON:**

In an effort to streamline this issue, Plaintiff will not make any "gratuitous" reference to Merck's defense of other Vioxx-related lawsuits. Plaintiff also will not make any reference to the number of times Briggs Morrison or Alice Reicin or any other Merck witnesses have testified at trial during opening or closing statements. However, as this Court has implied, plaintiffs' experts are questioned time and time again about the number of times that have testified on behalf of plaintiffs in litigation and the amount of money they have earned doing so. The reason courts continue to allow these questions is because defense attorneys argue that such testimony goes to potential bias and credibility. The same is true here. If Merck questions Plaintiff's experts about the number of times they have testified for plaintiffs, Plaintiff should be entitled to question Merck's witnesses about the number of times they have testified on behalf of Merck. Obviously, this issue may also be raised for impeachment purposes.

1

Therefore, Plaintiff requests, at a minimum, that the Court defer its ruling on this issue until the time of trial as it has previously done.

Dated:  October 4, 2006

Respectfully submitted,

Edward Blizzard (TBN 02495000)
Scott Nabers (TBN 14769250)
Rebecca Briggs King (TBN 24027110)
Holly M. Wheeler (TBN: 24006035)
BLIZZARD, MCCARTHY & NABERS, L.L.P.
440 Louisiana, Suite 1710
Houston, Texas 77002
(713) 844-3750
(713) 844-3755 (fax)

**ATTORNEYS FOR PLAINTIFF
CHARLES LARON MASON**

| | |
|---|---|
| Andy D. Birchfield, Esq.<br>P. O. Box 4160<br>234 Commerce Street<br>Montgomery, AL  36103-4160<br>PH:  (800) 898-2034<br>FAX:  (334) 954-7555 | Christopher Seeger, Esq.<br>One William Street<br>New York, NY  10004<br>PH:  (212) 584-0700<br>FAX:  (212) 584-0799 |
| Leonard Davis<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA  70013<br>PH:  (504) 581-4892<br>FAX:  (504) 561-6024 | Russ M. Herman<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA  70013<br>PH:  (504) 581-4892<br>FAX:  (504) 561-6024 |

**PLAINTIFFS' STEERING COMMITTEE**

2

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Opposition has been served on Liaison Counsel Russ Herman and Phillip Wittmann, Shayna S. Cook and Richard Krumholz by U.S. Mail, facsimile and/or e-mail; and e-mail upon all parties by electronically uploading the same to Lexis-Nexis File and Serve Advanced, in accordance with Pretrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of the Court of the Untied States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 4th day of October, 2006.

Holly M. Wheeler

# EXHIBIT  B



LEXISNEXIS' FILE & SERVE
12547772
E-SERVICE
Oct 4 2006
5:19PM

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Vioxx | **MDL DOCKET NO. 1657** |
| **PRODUCTS LIABILITY LITIGATION** | |
| | Section L |
| THIS DOCUMENT RELATES TO: | |
| Case No. 2:06cv810 | |
| | Judge Fallon |
| CHARLES LARON MASON v. | Mag. Judge Knowles |
| MERCK & CO., INC. | |

---

## OPPOSITION OF PLAINTIFF CHARLES LARON MASON TO DEFENDANT'S MOTION TO EXCLUDE IMPROPER PERSONAL OPINIONS OF DAVID GRAHAM REGARDING THE FOOD AND DRUG ADMINISTRATION

### (Defendant's Motion in Limine No. 2)

---

**TO THE HONORABLE JUDGE ELDON FALLON:**

Plaintiff Charles Laron Mason, by and through his undersigned counsel, asks this court to deny Defendant Merck & Co., Inc.'s Motion to Exclude Improper Personal Opinions Of David Graham Regarding The Food And Drug Administration (FDA). In support thereof, Plaintiff would show as follows:

## I.
## INTRODUCTION

The Court has addressed this issue and previously denied Merck's request.[1] In every Vioxx trial, Merck has argued it should not be held liable for failing to warn plaintiffs' doctors because Vioxx's FDA approval for certain uses meant that the drug was safe and effective, and its labeling adequate.

---

[1] *See* Sept. 6, 2006 Order, *Smith v. Merck & Co., Inc.* (Rec. Doc. 6721).

The truth is that, like other governmental decisions, the decisions of the FDA approving or rejecting a drug should be excluded from this trial at least under Rule 403 because of the high likelihood of juror confusion between the FDA's balancing test of risks and benefits and the standard of care a jury must use in deciding the case. Moreover, the imprimatur implied by saying a drug is FDA approved is, as other agencies have recognized, too unfairly prejudicial to allow such evidence even to be admitted in a civil trial.

Plaintiff may seek to exclude such evidence in this trial, and has already moved to stop Merck's misuse it. In that regard, Plaintiff Mason has sought and will seek at trial a mandatory limiting instruction each time such approval is mentioned. To the extent it is admitted in the case at all, however, and the jury is permitted to draw inferences therefrom, Plaintiff Mason should be able to introduce evidence that would correct any misimpression Merck fosters and/or give the jury a complete picture of the FDA process. For these reasons, under FED. R. EVID. 106, the first time evidence is admitted regarding FDA approval, Plaintiff should be entitled to introduce *any* other deposition testimony or documents "which ought in fairness to be considered contemporaneously with it." Dr. Graham's testimony is exactly the kind of evidence envisioned when Rule 106 was drafted. Further, Dr. Graham testimony about his first hand experience with the FDA would be beneficial to the trier of fact. As such, it is admissible under Rule 701(a) and (b), or, to the extent it might be considered expert testimony, Rule 702.

Merck suggests that by obtaining FDA approval for Vioxx it met its standard of care as a matter of law, and that any evidence tending to show that FDA approval is not the gold-standard must be excluded. If Merck does not want the jury to hear evidence that FDA approval is not

---

[1] *See* Sept. 6, 2006 Order, *Smith v. Merck & Co., Inc.* (Rec. Doc. 6721).

evidence that it met the standard of care for a pharmaceutical company, it should not be allowed to repeatedly introduce testimony and evidence that Vioxx was repeatedly approved by the FDA for carious medical conditions.

## II.
## DISCUSSION

### A. DR. GRAHAM'S TESTIMONY CONCERNING THE FDA'S WORKINGS IS UNQUESTIONABLY RELEVANT AND ADMISSIBLE UNDER RULES 701, 702 AND 106, TO THE EXTENT MERCK INJECTS FDA APPROVAL INTO THE CASE

Plaintiff will introduce at trial the testimony of David Graham, M.D., the FDA's Associate Director for Science and Medicine, Office of Drug Safety, Center for Drug Evaluation and Research, U.S. Department of Health and Human Services. Although Merck injects FDA approval into every case, Merck is quick to challenge the admissibility of Dr. Graham's testimony, which points out the flaws and limitations of such approval.

As Merck did in its Motion to Exclude Testimony of John L. Gueriguian, M.D., Merck attempts to exclude certain aspects of Dr. Graham's testimony by characterizing the testimony as "personal opinions." Dr. Graham's criticisms of the FDA and the regulatory process stem from his expertise and first hand experience as a representative of the FDA. Those opinions are relevant to this case and would not confuse or mislead the jury. As Merck points out, the Court has already ruled on this issue and has allowed this testimony to be heard by the juries. The Court should allow Plaintiff to present this testimony as well.

In Merck's view, FDA regulatory processes approving and labeling Vioxx are highly relevant, but the criticisms by an FDA safety officer addressing the foundation of those regulatory processes are not. If the FDA's processes are relevant at all, then the flaws in those processes are

equally relevant.   As an FDA employee, Dr. Graham speaks to both subjects with first-hand knowledge and proficiency from 20 years of experience. Under Rule 701(a) and (b), his rationally-based perceptions would be very helpful to the determination of the issue of a fact issue in the case: Merck's duty to warn and Vioxx's safety. As such, they are admissible.

Merck challenges several of Graham's deposition excerpts. However, under Rule 701(a), Dr. Graham may testify to his perceptions which must be rationally-based. As one court explained: "Lay opinion may be based on the witness' own perceptions." *United States v. Polishan*, 336 F.3d 234, 242 (3d Cir. 2003). That is all Dr. Graham is testifying about in these instances.

In this regard, if and when Merck introduces documents or deposition testimony touting the FDA's approval of Vioxx in this case, which it has done in every trial this far, Plaintiff Mason should also be entitled to correct contemporaneously any attending misimpression that such approval is conclusive of the issue of the adequacy of Merck's disclosures regarding Vioxx's dangers, or that it means that there could be no dangers because the FDA found the drug "safe." Dr. Graham's testimony correcting such misimpressions would, therefore, be admissible under Rule 106 as well.[2]

## B.   MERCK'S SUGGESTION THAT ANY CRITICISM OF THE FDA IS PREEMPTED AND AUTOMATICALLY INADMISSIBLE IS UNFOUNDED

In its motion, Merck interprets *Buckman v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), as holding that any testimony that may be interpreted as criticism of the FDA or its processes is

---

[2] Although the Fifth Circuit has not spoken on the issue, this may be true even if Dr. Graham's testimony is otherwise inadmissible. Following 21 C. Wright & K. Graham, Federal Practice and Procedure, §§ 5072, 5078 (1977 & Supp.1987), several courts have held that Rule 106 can fulfill its function adequately only if otherwise inadmissible evidence can be admitted under the rule. *See, e.g., United States v. Sutton*, 255 U.S. App. D.C. 307, 801 F.2d 1346, 1368-69 (D.C.Cir.1986); *see also United States v. LeFevour*, 798 F.2d 977, 981 (7th Cir.1986) (either otherwise inadmissible evidence becomes admissible or if inadmissible (perhaps because of privilege), then the misleading portion must be excluded as well). This analysis emphasizes the rule's provision that "any other portion" may be admitted, with the only stated limitation being that the other portion "in

preempted as a matter of law and absolutely inadmissible in a court of law. No court in the land has recognized and the FDA itself has never asserted such sweeping authority. This Court should not be the first. In fact, this Court has repeatedly held that *Buckman* is "completely inapplicable to the issue at hand."[3]

In truth, the Court's evidentiary ruling on Dr. Graham's testimony here has nothing to do with preemption. Regardless of whether information was concealed from the FDA, the issue that usually implicates preemption analysis, Merck undertook to misrepresent the facts to ***plaintiff and/or his physicians***, and to conceal ***from plaintiff and or his physicians*** facts it was bound to disclose. Under those circumstances, there can be no preemption. *See Caraker v. Sandoz Pharm. Corp.,* 172 F.Supp.2d 1018, 1033 (S.D. Ill. 2001); *Globetti v. Sandoz Pharm. Corp.,* 2001 WL 419160 (N.D. Ala. 2001); *Eve v. Sandoz Pharm. Corp.,* 2002 WL 181972 (S.D. Ind. 2002).

Instead, numerous courts have recognized that evidence of defendants' communications with the FDA may be relevant and thus admissible in a lawsuit involving a state tort claim. For example, in *Bouchard v. Amer. Home Products Corp.,* 213 F.Supp.2d 802, 812 (N.D. Ohio 2002), the court specifically stated:

> If, as Bouchard has stated, her claims are based on direct fraud against her and her healthcare provider, rather than the FDA, then her claims are not preempted [under *Buckman*], and evidence concerning what information was and was not provided to the FDA might still be relevant.

Consistent with this authority, this Court previously rejected Merck's preemption arguments with regard to other witnesses testifying about similar subjects. *See In re Vioxx Products Liability Litigation,* 401 F.Supp.2d 565, 587 (E.D.La. Nov. 18, 2005). This Court should do the same here.

---

fairness ought to be admitted." FED. R. EVID. 106.

## III.
## CONCLUSION

For all of the reasons stated, Merck's Motion to Exclude Improper Personal Opinions Of

David Graham Regarding The Food And Drug Administration should be summarily denied.

Dated:  October 4, 2006

<div style="margin-left: 40%;">

Respectfully submitted,

*[signature]*

Edward Blizzard (TBN 02495000)
Scott Nabers (TBN 14769250)
Rebecca Briggs King (TBN 24027110)
Holly M. Wheeler (TBN: 24006035)
BLIZZARD, MCCARTHY & NABERS, L.L.P.
440 Louisiana, Suite 1710
Houston, Texas 77002
(713) 844-3750
(713) 844-3755 (fax)

**ATTORNEYS FOR PLAINTIFF**
**CHARLES LARON MASON**

</div>

---

[3] Nov. 18, 2005 Order & Reasons, *Plunkett v. Merck & Co., Inc.* at 33 (Rec. Do. 1516).

| | |
|---|---|
| Andy D. Birchfield, Esq.<br>P. O. Box 4160<br>234 Commerce Street<br>Montgomery, AL  36103-4160<br>PH:  (800) 898-2034<br>FAX: (334) 954-7555 | Christopher Seeger, Esq.<br>One William Street<br>New York, NY  10004<br>PH:  (212) 584-0700<br>FAX: (212) 584-0799 |
| Leonard Davis<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA  70013<br>PH:  (504) 581-4892<br>FAX: (504) 561-6024 | Russ M. Herman<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA  70013<br>PH:  (504) 581-4892<br>FAX: (504) 561-6024 |

**PLAINTIFFS' STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 4th day of October, 2006.

_____
Holly M. Wheeler

8

# EXHIBIT  C



LEXISNEXIS' FILE & SERVE
12547909
E-SERVICE
Oct  4 2006
5:27PM

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Vioxx | **MDL DOCKET NO. 1657** |
| **PRODUCTS LIABILITY LITIGATION** | |
| | Section L |
| THIS DOCUMENT RELATES TO: | |
| Case No. 2:06cv810 | |
| | Judge Fallon |
| CHARLES LARON MASON v. | Mag. Judge Knowles |
| MERCK & CO., INC. | |

## OPPOSITION OF PLAINTIFF CHARLES LARON MASON TO DEFENDANT'S MOTION TO EXCLUDE EVIDENCE OR ARGUMENT ABOUT DR. GRAHAM'S "EXCESS EVENTS" CALCULATION

### (Defendant's Motion in Limine No. 3)

**TO THE HONORABLE JUDGE ELDON FALLON:**

Plaintiff Charles Laron Mason, by and through his undersigned counsel, asks this Court to deny Defendant, Merck & Co., Inc.'s Motion To Exclude Evidence Or Argument About Dr. Graham's "Excess Events" Calculation.

## I.
## INTRODUCTION

Merck asks the Court to exclude testimony by David Graham regarding the number of cases of serious coronary heart disease occurred over the market life of Vioxx. The Court has addressed this issue and previously denied Merck's request.[1]  For the reasons discussed below, the Court should do the same in this case.

---

[1] See Sept. 6, 2006 Order, *Smith v. Merck & Co., Inc.* (Rec. Doc. 6721).

# II.
# DISCUSSION

### A.   DR. GRAHAM'S ESTIMATES ARE RELIABLE AND RELEVANT.

Merck again seeks to exclude evidence relating to or referencing findings from a retrospective nested case-control study conducted by Dr. David Graham, an FDA scientist, and other (hereinafter "Graham Study"), in which Dr. Graham found an in creased risk of heart attacks and sudden death associated with the use of Vioxx as compared to Celebrex, even where such evidence has been relied upon by Plaintiff's experts, including Dr. Wayne Ray and Dr. Benedict R. Lucchesi. *See* P.2.0050 (Exhibit A). This study was published in a peer-reviewed, medical journal. *See id.* Using the relative risks from randomized clinical trials and the background rates seen in NSAID risk studies, Dr. Graham suggests that an estimated 88,000 to 140,000 excess cases of serious coronary heart disease occurred over the market life of Vioxx. *See id.* Dr. Graham observes that the United States national estimate of case-fatality rate (fatal acute myocardial infarction plus sudden cardiac death) was 44% , and extrapolates from this that many of the above mentioned excess cases attributable to Vioxx use were fatal. *See id.* at 6.

Merck has asked this Court to exclude all testimony and evidence related to Dr. Graham's estimates of excess heart attacks and sudden cardiac death ("Graham's Estimates"), because Merck claims that such evidence relies on clinically insignificant data. Such a request is improperly overbroad because Dr. Graham's study, in its entirely, has its own independent basis for admissibility. Additionally, information as early as November, 1999 suggested that there was an increased risk of serious cardiovascular events occurring in patients taking Vioxx compared to naproxen. The Graham Estimates bring forward the result of Merck's failure to properly warn

2

against the adverse reactions attributable to the ingestion of Vioxx.  The Graham Estimates are derived from sound, well-founded methodology and, as indicated by the Defendants in their motion, supported by several experts in the field that have relied to some extent on his findings.  Thus, the Graham Study is sufficiently reliable under the Federal law and is admissible.

Merck suggests that the Graham Estimates are irrelevant because Merck claims that the Graham Study did not show a statistically significant association between 25 mg Vioxx and the risk of serious coronary heart disease.  This narrow-viewed approach to the important data found in Dr. Graham's Study is a perfect example of the myopic view taken by Merck in analyzing all study data related to Vioxx and cardiovascular risk.  The Graham Study data exemplify the total potential impact of Merck's failure to warn, which denied Mr. Mason of his right to given informed consent.  Also, the data is relevant to Merck's duty, level of conscious disregard for the safety of the consumer, and the unreasonableness of Merck's conduct when presented with such data.  Merck had a continuing duty to warn about all adverse events, including death.  If the true extend of the risks had been disclosed, doctors would not have continued to prescribe these drugs in such rapid numbers and Mr. Mason would have had knowledge of his increased risk for myocardial infarction or death.  Moreover, if Merck had disclosed its knowledge sooner, the Graham Study would not have been supplied with the data sufficient to generate the damning estimates Merck now seeks to avoid.  Finally, listings of death suggest the fact that Merck was inaccurate in its measurement of the rate of MI with Vioxx.

Merck argues that the Graham estimates are flatly inconsistent with the findings of APPROVe and VIGOR, and, therefore, are irrelevant.  This assumption is incorrect.  First, Dr. Graham clearly relies on additional data and studies in reaching his conclusion.  As stated on page

six of his study, his estimates evolved from the total estimated number of Vioxx prescriptions dispensed in the USA , indicated by IMS Health, combined with the use of relative risks generated in the APPROVe and VIGOR clinical trials, together with the background rates seen NSAID risk studies.

Merck argues that the Graham Study found no statistically significant increased risk of heart attacks or deaths associated with Vioxx use at the 25 mg dose. From this, Merck alleges that the Graham Study data is inconsistent and pure chance. To support its argument, Merck cites the fact that some Texas courts have held that epidemiological data must demonstrate an odds ratio of 2.0 or greater to be reliable. Merck is incorrect in its assertion that this Court is bound by or should even find persuasive Texas Substantive law on the question of reliability. To the extent that the matter is one of substantive, rather than procedural law, Florida law should apply. As stated above, Dr. Graham considers several bases for his estimates and any suggestion by Merck that his estimates are inconsistent with his data should not be determinative for the admissibility of this evidence. The Graham Study is supported by sound methodology and expert support, and admissible under Federal law.

It is well-settled that there are at least ten kinds of evidence that can support a causal connection between a drug and its adverse reactions. These lines of evidence include, but are not limited to, case reports in series, adverse event reports, animal studies, case reports that are published in peer reviewed medical literature, chemical structure, studies based on pharmacological classes similar to the drug at issue, textbooks, and literature on similar drugs of the same class that have the same mechanisms of action. *See In Re: Phenylpropanolamine (PPA)*, 2003 WL 22417238* 26 (N.J.Super. 2003). For this reason, and all those stated above, Defendant's final argument to exclude

the Graham Study data is also unpersuasive.

This evidence is relevant to Plaintiff's claims that Merck had notice of the adverse risks associated with Vioxx and failed to adequately study and test the drug before selling it on the market. If Merck had responded appropriately to earlier findings, and had taken into consideration the material analyzed by Dr. Graham, the vast injuries suffered by many people, including Mr. Mason, could have been avoided. Instead, Merck delayed and postponed studies until the true consequences of the ingestion of this drug could no longer be concealed.

**B.     ESTIMATES OF EXCESS NUMBER OF HEART ATTACKS OR DEATH HAS SUBSTANTIAL PROBATIVE VALUE WHICH IS NOT SUBSTANTIALLY OUTWEIGHED BY ANY POTENTIAL PREJUDICE TO MERCK, NOR WILL SUCH EVIDENCE CONFUSE OR MISLEAD THE JURY.**

The probative value of the Graham Study data is clearly shown in the previous section. Any prejudicial effect felt by Merck hardly reaches the level of "unfair." Direct proof of a claim does not create the *unfair* prejudice that Rule 403 intended to avoid. The touchstone for excluding evidence under Rule 403 is not prejudice, but *unfair* prejudice, which must substantially outweigh the probative value of the evidence. This Court does not view Rule 403 as a tool designed to permit the trial court to "even out" the weight of the evidence. "Instead, there is a place in the courtroom where the skill and acumen of professional trial lawyers should be brought to bear. Indeed, the motion practice presaging the subject jury trial admits that the trial lawyers in this case are keenly aware of the points of contest, and quite capable of fairly evening out the score at trial on the merits and paring down any inaccuracy or exaggeration, such that it more closely comports with the truth." *Soll v. Provident Life & Acc. Ins. Co.*, 2002 WL 1461891 at 6 (E.D.La. July 5, 2002).

The Fifth Circuit in *United States v. Pace*, 10 F.3d 1006 (5th Cir. 1993), *cert. denied*, 511 U.S. 1149, 114 S.Ct. 2180, 128 L.Ed.2d 899 (1994) observed that the exclusion of evidence under

Rule 403 should occur only sparingly. *Id.* Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. "Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Id.* "As to such, Rule 403 is meant to relax the iron rule of relevance. It is not designed to permit the court to 'even out' the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none." *Id.* at 1115-16 (quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.), *cert denied*, 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979)).

Relevant evidence may be excluded under Rule 403 if its probative value is substantially outweighed by the risk of undue prejudice. *United States v. Adair*, 2005 WL 2990586 (5th Cir. 2005). Once evidence has been established as being relevant, the burden is on the party urging exclusion of evidence to convince the court that Rule 403 considerations should control. *State v. Jones*, 891 So.2d 760, 767 (La.App. 4 Cir. 2004). It should be emphasized, however, that exclusion of relevant evidence pursuant to Rule 403 "is an extraordinary measure that should be used sparingly." *Campbell v. Keystone Aerial Surveys, Inc.*, 138 F.3d 996, 1004 (5th Cir. 1998).

Merck seeks to exclude evidence relating to or referencing findings from a retrospective nested case-control study conducted by Dr. David Graham, an FDA scientist, and others (hereafter "Graham Study"). The Graham Study authors found an increased risk of heart attacks and sudden death associated with the use of Vioxx as compared to Celebrex. This study was published in a peer-reviewed, medical journal. *See id.* Using the relative risks from randomized clinical trials and the

6

background rates seen in NSAID risk studies, Dr. Graham suggests that an estimated 88,000 to 140,000 excess cases of serious coronary heart disease occurred over the market life of Vioxx. *See id.* Dr. Graham observes that the United States national estimate of case-fatality rate (fatal acute myocardial infarction plus sudden cardiac death) was 44%, and extrapolates from this that many of the above mentioned excess cases attributable to Vioxx use were fatal. *See id.* at 6.

Merck has asked this Court to exclude all testimony and evidence related to Dr. Graham's study and estimates of excess heart attacks and sudden cardiac death ("Graham's Estimates"). Merck claims that such evidence relies on clinically insignificant data. Such a request is improperly overbroad because Dr. Graham's study, in its entirety, has its own independent basis for admissibility. Additionally, information as early as November 1999 suggested that there was an increased risk of serious cardiovascular events occurring in patients taking Vioxx compared to naproxen. The Graham Estimates bring forward the result of Merck's failure to properly warn against the adverse reactions attributable to the ingestion of Vioxx. The Graham Estimates are derived from sound, well-founded methodology and, as indicated by the Defendants in their motion, supported by several experts in the field that have relied to some extent on his findings. Thus, the Graham Study is sufficiently reliable under the Federal law and is admissible.

Merck suggests that the Graham Estimates are irrelevant because, it contends, the Graham Study did not show a statistically significant association between 25 mg Vioxx and the risk of serious coronary heart disease. This narrow-viewed approach to the important data found in Dr. Graham's Study is a perfect example of the myopic view taken by Merck in analyzing all study data related to Vioxx and cardiovascular risk. The Graham Study data exemplify the total potential impact of Merck's failure to warn. Also, the data is relevant to Merck's duty, level of conscious

disregard for the safety of the consumer, and the unreasonableness and reprehensibility of Merck's conduct when presented with such data. Merck had a continuing duty to warn about all adverse events, including death. If the true extent of the risks had been disclosed, doctors would not have continued to prescribe these drugs in such large numbers and Mr. Mason would have had knowledge of his increased risk for myocardial infarction or death. Moreover, if Merck had disclosed its knowledge sooner, the Graham Study would not have been supplied with the data sufficient to generate the damning estimates Merck now seeks to avoid. Finally, listings of death suggest the fact that Merck was inaccurate in its measurement of the rate of MI with Vioxx.

Merck argues that the Graham Estimates are inconsistent with the findings of APPROVe and VIGOR, and, therefore, are irrelevant. This assumption is incorrect. First, Dr. Graham relies on additional data and studies in reaching his conclusion. As stated on page six of his study, his estimates evolved from the total estimated number of Vioxx prescriptions dispensed in the U.S., indicated by IMS Health, the relative risks generated in the APPROVe and VIGOR clinical trials, and the background rates seen NSAID risk studies.

Merck has previously argued that the Graham Study found no statistically significant increased risk of heart attacks or deaths associated with Vioxx use at the 25 mg dose. From this, Merck alleges that the Graham Study data is inconsistent and pure chance. Merck's argument is not based in fact or law. Federal courts throughout the country have held that epidemiological evidence involving odds ratios below 2.0 is admissible and consistent with a plaintiff's recovery at trial. The Second Circuit has held that a "qualified expert may view the epidemiological studies and factor out other known risks . . . which might enhance the remaining recognized risks, even though the risk in the study fell short of the 2.0 correlation." *In re Joint E. & S. District Asbestos Litig.*, 964 F.2d 92,

97 (2d Cir. 1992). The court found further that, where plaintiff's experts use epidemiological studies as *one* basis for an expert opinion but do not rely solely on epidemiological evidence, epidemiological evidence of a certain magnitude need not be provided because the expert does not rely on those studies along. *Id.* As stated above, Dr. Graham considers several bases for his estimates and any suggestion by Merck that his estimates are inconsistent with his data should not be determinative for the admissibility of this evidence. The Graham Study is supported by sound methodology and expert support, and admissible under Federal law.

It is well-settled that there are at least ten kinds of evidence that can support a causal connection between a drug and its adverse reactions. These lines of evidence include, but are not limited to, case reports in series, adverse event reports, animal studies, case reports that are published in peer-reviewed medical literature, chemical structure, studies based on pharmacological classes similar to the drug at issue, textbooks, and literature on similar drugs of the same class that have the same mechanisms of action. *See In Re: Phenylpropanolamine (PPA)*, 2003 WL 22417238* 26 (N.J.Super. 2003). For this reason, and all those stated above, Defendant's final argument to exclude the Graham Study data is also unpersuasive.

This evidence is relevant to Plaintiff's claims that Merck had notice of the adverse risks associated with Vioxx and failed to adequately study and test the drug before selling it on the market. If Merck had responded appropriately to earlier findings, and had taken into consideration the material analyzed by Dr. Graham, the vast injuries suffered by many people, including Mr. Mason, could have been avoided. Instead, Merck delayed and postponed studies until the true consequences of the ingestion of this drug could no longer be concealed.

9

## III.
## CONCLUSION

For these reasons, Plaintiff respectfully requests that Merck's Motion To Exclude Evidence Or Argument About Dr. Graham's "Excess Events" Calculation be denied.

Dated: October 4, 2006

Respectfully submitted,

Edward Blizzard (TBN 02495000)
Scott Nabers (TBN 14769250)
Rebecca Briggs King (TBN 24027110)
Holly M. Wheeler (TBN: 24006035)
BLIZZARD, MCCARTHY & NABERS, L.L.P.
440 Louisiana, Suite 1710
Houston, Texas 77002
(713) 844-3750
(713) 844-3755 (fax)

**ATTORNEYS FOR PLAINTIFF
CHARLES LARON MASON**

| | |
|---|---|
| Andy D. Birchfield, Esq.<br>P. O. Box 4160<br>234 Commerce Street<br>Montgomery, AL 36103-4160<br>PH: (800) 898-2034<br>FAX: (334) 954-7555 | Christopher Seeger, Esq.<br>One William Street<br>New York, NY 10004<br>PH: (212) 584-0700<br>FAX: (212) 584-0799 |
| Leonard Davis<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA 70013<br>PH: (504) 581-4892<br>FAX: (504) 561-6024 | Russ M. Herman<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA 70013<br>PH: (504) 581-4892<br>FAX: (504) 561-6024 |

**PLAINTIFFS' STEERING COMMITTEE**

10

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 4th day of October, 2006.

Holly M. Wheeler

11

# EXHIBIT  D



## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In Re: Vioxx** | **MDL DOCKET NO. 1657** |
| **PRODUCTS LIABILITY LITIGATION** | |
| | Section L |
| THIS DOCUMENT RELATES TO: | |
| Case No. 2:06cv810 | |
| | Judge Fallon |
| CHARLES LARON MASON v. | Mag. Judge Knowles |
| MERCK & CO., INC. | |

---

### OPPOSITION OF PLAINTIFF CHARLES LARON MASON TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OR ARGUMENT THAT MERCK (1) SHOULD OR COULD HAVE UNILATERALLY CHANGED THE VIOXX LABEL TO INCLUDE THE VIGOR DATA; OR (2) "DRAGGED ITS FEET "TO PREVENT THE VIGOR DATA FROM BEING ADDED TO THE VIOXX LABEL

#### (Plaintiff's Opposition to Defendant's Motion in Limine No. 4)

---

**TO THE HONORABLE JUDGE ELDON E. FALLON:**

Plaintiff Charles Laron Mason, by and through his undersigned counsel, asks this court to deny Defendant Merck & Co., Inc.'s Motion to Exclude relating to evidence that Merck (1) should or could have unilaterally changed the Vioxx label to include the so-called VIGOR data; or (2) "dragged its feet" to prevent the VIGOR data from being added to the Vioxx label. In support thereof, Plaintiff would show as follows:

### I.
### INTRODUCTION

Merck asks the Court to exclude evidence responsive to Merck's consistent argument that it would have been illegal for Merck to add a warning about the known cardiovascular risks associated with Vioxx use to the original Vioxx label without prior FDA approval because this is a "post-

1

VIGOR label case."[1] The Court denied Merck's motion on this issue in the *Smith* case, indicating "this is a question of fact"[2] and permitted the plaintiff to present such evidence at trial. For the reasons discussed below, the Court should do the same in this case.

While in prior trials the focus of Merck's argument has been the VIGOR data, the data the initial label change was specifically made to reflect, Plaintiff's motion is not confined to such data. Instead, it deals with the underlying legal issue. Moreover, nothing in Merck's motion here should be read to affect Plaintiff's ability to respond to such a "legal" argument or prevent this Court from granting Plaintiff's motion to prohibit Merck from misrepresenting FDA regulations to a jury.

Placed in its proper context, Merck's motion should be read as addressing only specific evidence that Merck should have added the information confirmed by the VIGOR data to the Vioxx label but delayed including it. The admissibility and relevance of such evidence has already been discussed in detail in Plaintiff's Opposition to Defendant's Motion to Exclude (1) Evidence of Motive and (2) Evidence Relating to the Assets and Profitability of Merck or to the Compensation and Financial Decisions of Employees, filed in this case contemporaneously with this document and incorporated herein for all purposes.

First, Merck's motion is based on the flawed assumption that *any* mention of the VIGOR results in a label, no matter how inadequate or misleading, somehow ended its "footdragging" or obligation to strengthen its label. It did not. Second, such evidence is admissible to show Merck's routine practice of failing to disclose or downplaying the cardiovascular risks associated with Vioxx at every turn. Either way, Merck's motion should be denied.

---

[1] *See* Plaintiff's Motion to Exclude or, in the Alternative, Motion in Limine Concerning Defendant's Argument That it Was Prohibited by FDA Regulations from Making Label Changes Without Prior Approval, filed September 27, 2006, and incorporated herein by reference.

[2] *See* Order, *Smith v. Merck & Co., Inc.* (Sept. 6, 2006) (Rec. Doc. 6721).

## II.
## DISCUSSION

**A.    MERCK DID NOT ADEQUATELY WARN OF VIOXX'S CARDIOVASCULAR EFFECTS IN ANY LABEL; THEREFORE, EVIDENCE OF MERCK'S ATTEMPTS TO WITHHOLD AND/OR MISREPRESENT SUCH INFORMATION ARE RELEVANT TO PLAINTIFF'S CLAIMS**

Merck's motion's underlying assumption is that its calculated attempt to withhold from patients and their doctors Vioxx's dangers somehow ended when *some* reference to the so-called VIGOR test results were finally included in the warning label and that anyone who used Vioxx thereafter was adequately warned of such dangers. If Merck succeeds in having this Court adopt such an argument without examining it too carefully, Merck apparently hopes to deal a fatal blow to all post-label change cases, including the one filed by Mr. Mason.

Merck's assumptions are not well-founded or, at the very least, are fact issues for the jury. As Mr. Mason's prescriber has testified, Merck's labeling was still inadequate even when Mr. Mason used Vioxx because Merck never fully or accurately apprised doctors or their patients of the VIGOR results or Vioxx's cardiovascular effects until the day it was pulled off the market. Thus, even after Merck finally included some mention of Vioxx's cardiovascular effects in its label, Merck so badly misrepresented those effects that practitioners could not accurately assess whether the drug was appropriate for use with their patients. For example, even after the label change, a practitioner reading the label would have been told that the potential cardiovascular problem was only a concern in patients "with a medical history of ischemic heart disease" when the VIGOR data actually showed *all* patients were at risk. In short, even after Merck changed its label, it continued to "drag its feet" on including *accurate and complete* warnings of Vioxx's cardiovascular risks. Merck had a duty to accurately and completely warn doctors of Vioxx's risks, which it breached.

3

**B.     THE EVIDENCE IS RELEVANT TO SHOW MERCK'S ROUTINE PRACTICE OF WITHHOLDING OR MISREPRESENTING INFORMATION REGARDING THE CARDIOVASCULAR RISKS OF VIOXX.**

The evidence will show that, from the first day it considered marketing Vioxx, Merck's strategy and practice was to ignore, minimize or "spin" the cardiovascular risk to gain and preserve market share and avoid losses related to stronger warnings.  Despite having clear notice of a potentially serious risk from Vioxx as early as 1998 Merck and its marketing department, which conducted many of the studies, (1) designed those studies to obscure a cardiovascular risk, (2) failed to disclose other studies that showed the risk, and (3) refused to do a specific study to analyze the cardiovascular risk until it was effectively force to do the so-called VIGOR study.

Once they got the VIGOR results, Merck consistently downplayed the risk, even in its revised label, concocted the "naproxen" alibi (that the drug against which Vioxx was compared was allegedly *cardioprotective* and this such qualities accounted for the difference in heart attack risks), misrepresented the results, withheld data (which the New England Journal has criticized them for), again refused to do an additional cardiovascular study, and dragged their feet as long as they could before issuing a new label which did not include a complete and accurate warning about such risks. At every turn then, Merck always tried to withhold, minimize or misrepresent the cardiovascular risk, from rushing the drug to market all the way to product withdrawal.

Plaintiffs believe that such conduct constitutes a continuing tort.  If, however, Merck is permitted to portray each instance of its conduct as discrete and separable, Plaintiff should, under FED. R. EVID. 406, be permitted to show each discrete instance is part of Merck's routine practice in dealing with Vioxx.

Rule 406 permits a party to show that a corporation such as Merck engaged in a routine practice and that "[t]he conduct of that organization on a particular occasion was in conformity with the habit or routine practice." The comments to Rule 406 note that:

> *Courts admit routine organizational practice fairly liberally, noting that there is significant probative value in the routinized aspects of organizational activity. See, e.g., Rosenburg v. Lincoln Am. Life Ins. Co.*, 883 F.2d 1328, 1336 (7th Cir. 1989) (evidence that an insurance company waived certain standard conditions when issuing a policy was admissible as evidence of routine practice). However, in order to invoke the more liberal admissibility requirements attendant to organizational activity, the proponent must at least show that *the activity is that of a structured organization*; a loose-knit, ad hoc alliance of individuals does not give rise to the same inference of consistent, routinized activity. *See, e.g., United States v. Rangel-Arreola, 991 F.2d 1519, 1524 (10th Cir. 1993)* (evidence that it was common practice for truck drivers to accept jobs without checking the fuel tanks was properly excluded; 406 was not applicable because the loose-knit group of freelance truck drivers did not form a cohesive organization with a structure and routinized practice).

(Emphasis added). On this ground, Plaintiff should be permitted to introduce the evidence Merck seeks to exclude on the ground that it represents Merck's routine practice with regard to Vioxx and is relevant to show that Merck acted in precisely the same manner even after it made its label change to add some mention of the VIGOR study.

For these reasons, and for the reasons set forth in Plaintiff's Motion To Exclude Or, In The Alternative, Motion In Limine Concerning Defendant's Argument That It Was Prohibited By FDA Regulations From Making Label Changes Without Prior Approval, which Plaintiff incorporates herein, evidence relating to Merck's actions with regard to the VIGOR data through its labeling are relevant to and probative of Plaintiff's claims.

## III.
## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion to Exclude relating to evidence that Merck (1) should or could have unilaterally changed the Vioxx label to include the so-

called VIGOR data; or (2) "dragged its feet" to prevent the VIGOR data from being added to the Vioxx label.

Dated:  October 4, 2006                    Respectfully submitted,

_____
Edward Blizzard (TBN 02495000)
Scott Nabers (TBN 14769250)
Rebecca Briggs King (TBN 24027110)
Holly M. Wheeler (TBN: 24006035)
BLIZZARD, MCCARTHY & NABERS, L.L.P.
440 Louisiana, Suite 1710
Houston, Texas 77002
(713) 844-3750
(713) 844-3755 (fax)

**ATTORNEYS FOR PLAINTIFF
CHARLES LARON MASON**

| | |
|---|---|
| Andy D. Birchfield, Esq.<br>P. O. Box 4160<br>234 Commerce Street<br>Montgomery, AL 36103-4160<br>PH: (800) 898-2034<br>FAX: (334) 954-7555 | Christopher Seeger, Esq.<br>One William Street<br>New York, NY 10004<br>PH: (212) 584-0700<br>FAX: (212) 584-0799 |
| Leonard Davis<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA 70013<br>PH: (504) 581-4892<br>FAX: (504) 561-6024 | Russ M. Herman<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA 70013<br>PH: (504) 581-4892<br>FAX: (504) 561-6024 |

**PLAINTIFFS' STEERING COMMITTEE**

6

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 4th day of October, 2006.

Holly M. Wheeler

# EXHIBIT  E



LEXISNEXIS® FILE & SERVE
12547667
E-SERVICE
Oct 4 2006
5:31PM

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In Re: Vioxx** | **MDL DOCKET NO. 1657** |
| **PRODUCTS LIABILITY LITIGATION** | |
| | Section L |
| THIS DOCUMENT RELATES TO: | |
| Case No. 2:06cv810 | |
| | Judge Fallon |
| CHARLES LARON MASON v. | Mag. Judge Knowles |
| MERCK & CO., INC. | |

---

## OPPOSITION OF PLAINTIFF CHARLES LARON MASON TO DEFENDANT'S OMNIBUS MOTION FOR ORDER EXCLUDING EVIDENCE AND TESTIMONY RAISED BY MOTIONS PREVIOUSLY DENIED BY THE COURT

### (Defendant's Motion in Limine No. 7)

---

**TO THE HONORABLE JUDGE ELDON FALLON:**

Plaintiff Charles Laron Mason, by and through his undersigned counsel, asks this Court to deny Defendant, Merck & Co., Inc.'s Omnibus Motion For Order Excluding Evidence And Testimony Raised By Motions Previously Denied By The Court.

## I.
## INTRODUCTION

Merck provides this Court with no new reason for it to change any of its prior adverse rulings on Merck's motions to exclude (1) all "Warning Letters" and other informal "Untitled Letters" (collectively "informal FDA letters") from the FDA; (2) evidence relating to the *New England Journal of Medicine's* (NEJM) December 2005 "Expression of Concern;" (3) marketing and promotional materials; (4) evidence of Adverse Event Reports and case reports; (5) "unreliable and irrelevant" medical and scientific evidence; and (6) the testimony of Eric J.

1

Topol, M.D.  Nevertheless, Plaintiff will address each topic in turn.

## II
## DISCUSSION

Merck's attempt to exclude broad categories of evidence in this case is inappropriate. Merck has essentially requested that the Court exclude any and all relevant evidence that even contradicts the theories of Merck's defense.  This is not the purpose of the motion to exclude or in limine.  *See United States v. Feola*, 651 F.Supp. 1068, 1129 9S.D.N.Y. 1987) ("it would be improper for this court to speculate as to the circumstances that might surround the introduction of this evidence at trial, specifically, the adequacy of the foundation . . . the probative value weighed against the potential prejudicial impact in light of the evidence presented, and the purpose for which such a statement will be introduced at the time."), *aff'd*, 875 F.2d 857 (2nd Cir. 1989).

The Fifth Circuit has noted: "[w]hen evidence is challenged solely on the ground that it is irrelevant, it is inadmissible only if it fails to meet the definition of Rule 401 – it must be without probative value as to *any* fact of consequence to the determination of the action.  If it is relevant as to any issue, it is relevant to the action and is not inadmissible under Rule 402."  *See Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F.Supp. 587, 599 (E.D.La. 1993)(quoting *Lubbock Feed lots, Inc. v. Iowa Beef Processors*, 630 F.2d 250, 167 (5th Cir. 1980)(emphasis in original).  Thus, Merck must establish that the evidence it seeks to have be excluded on relevancy grounds is *not* relevant to *any* issue in the case, not simply the issues it thinks are important. It has not done so.

## A.    INFORMAL FDA LETTERS

Such evidence, which was admitted in the *Plunkett*, *Barnett* and *Smith* trials, is highly relevant, and is properly admissible for multiple purposes including: (1) demonstrating that

Merck's warnings were inadequate and that Merck was on notice that its promotional activities contributed to this inadequacy; (2) rebutting claims of good character; (3) rebutting claims of efficacy or safety of Vioxx based on the FDA's "approval" or blessing; (4) impeachment purposes; (5) showing Defendant's intent and/or state of mind; (6) demonstrating a routine business practice; and (7) pattern of misconduct for purposes of punitive damages. The Court denied Merck's motion on this issue in *Smith* and *Barnett*.[1] In *Barnett*, the Court indicated that this evidence "has relevance to Merck's knowledge . . . [and] may have relevance to its advertisements, Dear Dr. letters and its duty regarding its sales force . . . 401 and 402, 607, 803(3)."[2]

In essence, these are precisely the messages that Plaintiff contends Merck was making to doctors and the public about Vioxx and cardiovascular safety, including using the manufactured "naproxen theory" to explain away the five to one risk for heart attack shown in the VIGOR results. This subject documents are, therefore, relevant and admissible to show that Merck knew that its Vioxx message minimized serious cardiovascular risks, was inappropriate and misleading, and violated the FDCA.

1.    **Relevant Facts**

In its prior briefing, which Merck has incorporated, Merck primarily argues for the exclusion of the September 17, 2001 warning letter issued by Dr. Thomas W. Abrams, R.Ph., MDA, then acting Director of the Division of Drub Marketing, Advertising and Communications for the FDA, to Merck President and CEO, Raymond V. Gilmartin. In the letter Dr. Abrams admonished Merck to cease and remediate promotional activities dating back to June of 2000

---

[1] *See* Order, *Barnett v. Merck & Co., Inc.* (June 28, 2006); Order, *Smith v. Merck & Co., Inc.* (Sept. 6, 2006) (Rec. Doc. 6721).
[2] Order, *Barnett v. Merck & Co., Inc.* (June 28, 2006).

3

that the FDA found misleading in regards to Vioxx.[3]  Merck acknowledges that this letter was admitted by the Court in *Plunkett*, *Barnett* and *Smith* on the ground it was relevant to the plaintiffs' contention that Merck rushed Vioxx to the market.  That same contention is made by Plaintiff here, and the Court's reasoning is equally applicable.

Plaintiff alleges that Merck designed and initiated a marketing campaign that would impact physicians and consumers both directly and indirectly.  Merck's marketing campaign, which included the hiring of its national speaker, Dr. Peter Holt, was designed to create a "buzz" among the public and medical community by which Vioxx's alleged benefits were promoted while simultaneously minimizing concerns and negative data relevant to its cardiovascular risks sufficient to establish, increase and maintain a multi-billion dollar market share at the expense of, and irrespective of, human safety and life.

Dr. Abrams' September 17, 2001 warning letter and other FDA communications generically referenced in Merck's Motion in Limine No. 7 are directly relevant to establish Merck's efforts to foist a dangerous drug onto the market at the expense of patient safety, including the safety of Mr. Mason, by failing to properly and adequately warn of the risks associated with Vioxx, a drug which, but for Merck's failure to warn, would never have been prescribed by Plaintiff's nurse practitioner, nor ingested by Mr. Mason.  Moreover, such evidence goes directly to issues relating to the adequacy of Merck's warning and is further relevant and admissible: to rebut claims of good character and/or drug efficacy or safety; for

---

[3] As the Court is aware, In the September 17, 2001 warning letter, the FDA advised Merck of its finding that Merck had engaged in misrepresentation regarding the risks associated with Vioxx during six (6) audio- conferences (led by its national speaker, Dr. Peter Holt), one (1) press release ("Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx"), and in three (3) oral presentations made by Merck sales representatives (one at the Annual Meeting of the Maryland Pharmacists Association and two at the Annual Meeting of the American Society of Health-Systems Pharmacists).

impeachment purposes; for showing Defendant's motive, intent, and/or state of mind; and for showing a pattern and practice of misconduct for purposes of punitive damages.

**2.** **Relevance of FDA Warning Letters Addressing Merck's Marketing Scheme for Vioxx**

Plaintiff asserts that Merck failed to adequately warn (and in so doing, affirmatively misled) consumers, physicians and other members of the medical community, including Plaintiff, regarding the safety and efficacy of Vioxx. First, Merck spent millions of dollars on direct-to-consumer advertising to generate a "buzz" about Vioxx and to insure that patients would request Vioxx prescriptions from their physicians. Second, Merck promoted the drug directly to physicians fought on four fronts: (1) Merck sought out highly respected physicians - who had influence in the medical community and with the FDA - to advocate the drug as part of its medical education program; (2) Merck sought to use the financial gain and prestige associated with its medical programs to influence individual physicians' opinions and prescribing habits with respect to the drug; (3) Merck disseminated misleading sales and promotional materials - including its product labeling and product information circulars - directly to individual physicians; and (4) Merck disseminated misleading safety and efficacy information through "press releases" and other communications to the medical community. The September 17, 2001 FDA warning letter along with other FDA communications directly support Plaintiff's claims that Merck failed to provide adequate warnings, and refute Merck's arguments or defenses that it acted appropriately.

Merck attempts to assert several arguments in support of its contention that evidence regarding Dr. Abrams' warning letter and other FDA communications regarding Merck's marketing or promotional activities are somehow irrelevant. Merck has not satisfied its burden

of establishing that evidence of the FDA communications regarding Merck's acts and omissions are "without probative value as to any fact of consequence to the determination of the action." *See Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F.Supp. 587, 599 (E.D.La. 1993).

**B.    EVIDENCE RELATING TO THE NEJM'S DECEMBER 2005 "EXPRESSION OF CONCERN"**

Merck argues that the NEJM "Expression of Concern" is not relevant to the questions at issue in this case, is hearsay and prejudicial.   Merck's arguments are without merit.   In the *Barnett* case, he Court reserved its ruling on Merck's motion regarding this issue, indicating the evidence "may go to credibility and also have some relevance as to what Merck knew and when . . . [b]ut its relevance is in rebuttal or cross."[4]   In the *Smith* case, the Court deferred its ruling on this issue, indicating the evidence is "probably admissible because of influence and effect of original article on giving treating physicians comfort in prescribing Vioxx."[5]

### 1.    The "Expression of Concern" Is Admissible Under Rule 803(6).

Federal Rule of Evidence 803(18) provides:

> (18) **Learned treatises.**  To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice.  If admitted, the statements may be read into evidence but may not be received as exhibits.

In accordance with Rule 803(18), it is understood that the article itself should not be admitted into evidence.  Testimony regarding the "Expression of Concern," however, should be allowed. In addition, in conjunction with that testimony, Plaintiff should be allowed to publish the document to the jury.

---

[4] Order, *Barnett v. Merck & Co., Inc.* (June 28, 2006).
[5] Order, *Smith v. Merck & Co., Inc.* (Sept. 6, 2006) (Rec. Doc. 6721).

6

There is no question that the NEJM is a reliable authority. It is one of the premier medical periodicals in the world. Numerous experts in this case have testified to that fact. *See Carroll v. Morgan*, 17 F.3d 787, 790 (5th Cir. 1994). In fact, the Court may take judicial notice that the NEJM is a reliable authority in the medical field. Testimony regarding other articles published the NEJM has been allowed during previous trials. The "Expression of Concern" is a statement made in a periodical of reliable authority and is authoritative. The "Expression of Concern" was written by Dr. Gregory Curfman, Dr. Stephen Morrissey, and Dr. Jeffrey Drazen, all editors of the NEJM, and was peer-reviewed.[6] Plaintiff's experts have relied on the "Expression of Concern." Therefore, testimony relating to the "Expression of Concern" should be allowed as the Court has done in previous trials, including the recent *Smith* trial.[7]

## 2.   The "Expression of Concern" is Relevant in Plaintiff's Case in Chief

In March 2000, after receiving the VIGOR results, Merck became aware that the VIGOR trial showed that those patients taking Vioxx experienced five times more heart attacks than those taking Naproxen. Merck was put on notice (though 090 and other studies should have done this already) that there were serious cardiovascular safety concerns associated with Vioxx.

In November 2000, the VIGOR results were published in the NEJM, and Merck's witness, Dr. Alise Reicin, was one of the co-authors of the study. The "Expression of Concern" and Dr. Gregory Curfman's testimony show that the actual results of the VIGOR study were significantly misstated; that is, the authors understated the number of heart attacks experienced by patients taking Vioxx by three. Thus, "the fact that these three myocardial infarctions were

---

[6] *See* Deposition of Dr. Gregory Curfman, at 77-78 (Jan. 24, 2006), attached as Exhibit A.
[7] *See* Sept. 21, 2006 Trial Transcript, *Smith v. Merck & Co., Inc.*, 2421:24-2423:2; 2474:1-18.

not included made certain calculations and conclusions in the article incorrect."[8]

Dr. Reicin has testified at most of the Vioxx trials thus far.  She is Merck's corporate face and Vioxx's staunchest defender.  Evidence relating to the validity and honesty of her work is directly relevant to her credibility and professional competence or that of any Merck witness who sponsored the study or championed its results.  When Dr. Reicin or any similar Merck witness takes the stand, or when any Plaintiff's witness is cross examined about her article or the idea that Merck was open and honest about disclosing the risks of Vioxx, this matter becomes relevant and admissible under Rule 402.  *See also* FED.R.EVID. 106 (optional completeness). This is true despite Merck's argument that Dr. Vogeler, *who did not prescribe Vioxx to Mr. Mason,* knew Vioxx carried a cardiovascular risk five times greater than Naprosyn at the time Mr. Mason was taking Vioxx.  Any testimony from Dr. Vogeler on whether he would prescribe Vioxx to Mr. Mason today if it were still on the market has not relevance to this issue whatsoever, particularly since Dr. Vogeler *never* prescribed Vioxx to Mr. Mason.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Campbell v. Keystone Aerial Surveys, Inc.*, 138 F.3d 996, 1004 (5th Cir. 1998); *U.S. v. Chavful*, 100 Fed.Appx. 226, 231 (5th Cir. 2004); FEDR.EVID. 401.  "Thus, if probative of *any* fact that is of consequence to the determination of the action, evidence is relevant within the meaning of the Federal Rules, and is therefore admissible." *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 267 (5th Cir. 1980)(internal quotation omitted)(emphasis added).  To say that evidence is irrelevant in the sense that it lacks probative

---

[8] Gregory D. Curfman, et al., *Expression of Concern: Bombardier, et al, "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis, N. Engl. J. Med. 2000; 343:1520-8,"* N. ENGL. J. MED. 2005; 353:2813-4, at 2813, attached as Exhibit B.

value therefore means that it does not justify *any* reasonable inference as to the fact in question. *See* McCormick on Evidence, § 185 at 544 (3rd dd. 1984)(emphasis added).   Conversely, if evidence does support the existence of a specific fact, even obliquely, it is relevant.

The VIGOR article misrepresented vital safety data to physicians and the healthcare community.  Merck and Dr. Reicin championed that lie and continue to do so to this day.  As the result, such evidence cannot be unduly prejudicial.  Instead, Merck richly deserves all the prejudice that properly flows from deceiving to the scientific community about a dangerous drug.

### 3.   Admission of Evidence Relating to the "Expression of Concern" Would Not Cause Undue Prejudice, Confusion, or Waste Time

Merck's alternative argument that evidence of the "expression of concern" should be excluded under Rule 403, should also be rejected. Unfair prejudice within the context of Rule 403 "means an undue tendency to suggest (a) decision on an improper basis, commonly, though not necessarily, an emotional one."  Notes of the Advisory Committee on Proposed Federal Rules of Evidence, Rule 403 at 102.  *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979).

In relevant part, Federal Rule of Evidence 403 directs that relevant evidence is inadmissible if its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.  Fed. R. Evid. 403.  The careful use of "substantially" demonstrates the emphasis placed on this balancing test.  "Rule 403 is an extraordinary remedy that should be used sparingly because it allows the court to exclude admittedly probative evidence." *United States v. Ross*, 33 F.3d 1507, 1524 (11th Cir. 1994).  As this court has noted, "Rule 403 rulings are best made at the time of trial when the court may balance relevant factors before it."  *Minshew v. Brown*, NO. 95-2507, 1996 WL 601436 (E.D.La. 1996) (Fallon, J.).

9

Evidence relating to the "Expression of Concern" is clearly relevant to Plaintiff's failure to warn and defect claims because it shows Merck's continuing attempt to downplay the risks of Vioxx which continued even *after* references to cardiovascular risks were included on its label. Such evidence will not result in confusion to the jury. Moreover, the documents and evidence is clearly related to Dr. Reicin's credibility and Merck's central defense that it fully disclosed the dangers, if any, of Vioxx to the public.

## C.    MARKETING AND PROMOTIONAL MATERIALS

Merck designed and initiated a marketing campaign that impacted physicians and consumers both directly and indirectly. Merck spent hundreds of millions of dollars assuring the medical community and the public that Vioxx was safe, while simultaneously minimizing concerns and negative data relevant to its cardiovascular risks. In doing so, Merck created widespread awareness of the drug in the medical community and among the public as well as knowledge of the characteristics in its advertising.

### 1.    Merck's Marketing Scheme For Vioxx

In addition to other claims, Plaintiff asserts that Merck failed to adequately warn (and in so doing, affirmatively misled) consumers, physicians and other members of the medical community regarding the safety and efficacy for Vioxx. This goal was accomplished chiefly in two ways. First, Merck spent millions of dollars on direct-to-consumer advertising to generate a "buzz" about Vioxx and to insure that patients would request Vioxx prescriptions from their physicians.

Second, Merck promoted the drug directly to physicians. This campaign was fought on three fronts. On one front, Merck sought out highly respected physicians—who had influence in

the medical community and with the FDA—to advocate the drug as part of its medical education program. On another front, Merck sought to use the financial gain and prestige associated with its medical programs, to influence individual physicians' opinions and prescribing habits with respect to the drug. Finally, Merck disseminated misleading sales and promotional material— including its product labeling and product information circulars—directly to individual physicians.

Inherent to this scheme is the understanding that physicians do not develop their opinions about the safety and efficacy of drugs in a vacuum. Although information received directly from the manufacturer's labeling, promotional, and educational programs are clearly factors, physicians also rely on a dialogue and an exchange of ideas and experience with other doctors to formulate their opinions about a particular drug. Merck understood this and relied upon their knowledge to develop their marketing scheme.

With respect to sales and promotional materials used by Merck detailers or that were disseminated directly to physicians, Merck's approach to dealing with individual physicians was uniform. The information provided to all physicians—whether national thought leaders or local doctors—and Merck's attempts to influence opinions and prescribing habits of individual physicians, are central to Merck's overall scheme to inform and control the dialogue in the medical community about the cardiovascular safety of Vioxx. Evidence relating to this marketing plan is central to Plaintiff's allegations; particularly his failure to warn claims.

2.    **The Specific Documents Merck Seeks To Exclude Are Relevant**

Each of these specific categories of evidentiary items is relevant and probative of Plaintiff's case and should be admitted at trial. Plaintiff treats each category in turn.

11

### (i)      Internal Marketing Communications

Merck suggests that Mr. Mason's "prescribers" (Mr. Mason, in fact, had only one prescriber – Nurse Olson-Fields) were not exposed to these communications and, therefore, they are not relevant.  The Court previously denied Merck's motion in limine on this very issue in the *Smith* case.[9]  The *jury* should decide whether these documents are innocuous or whether they are (as indeed they are) probative of Merck's reckless approach to the promotion of Vioxx despite its knowledge of the drug's dangers.  The evidence speaks for itself.

Again, Merck inadequately identifies these documents by exhibit number.  Based on Merck's prior briefing, Plaintiff assumes Merck complains about the following: (1) a memo in which Merck executive Susan Baumgartner identified physicians Merck should "neutralize" with respect to the cardiovascular risks of Vioxx as well as "related communications"; (2) a memo in which key Vioxx player David Anstice sought to "rally the troops" at Vioxx's market launch; (3) a memo from Louis Sherwood to David Anstice pertaining to Merck's widely-publicized efforts to intimidate academics who dared to publicly suggest the cardiovascular risks of Vioxx; and (4) a detailed memo from Ms. Baumgartner to Louis Sherwood that serves as a virtual dossier on Gurikpal Singh, M.D., a doctor critical of Merck's approach to the cardiovascular problems associated with Vioxx.

As with the marketing materials discussed generally above, these specific documents are relevant first as a backdrop—corporate character and "state of mind" evidence (and Merck's "state of mind" undisputedly is at issue with respect to plaintiff's negligence and fraud-bases claims.)   More specifically these are core documents revealing Merck's reaction to any suggestion that Vioxx carried cardiovascular risks.  As such, the documents serve a number of

---

[9] Order, *Smith v. Merck & Co., Inc.* (Sept. 6, 2006) (Rec. Doc. 6721).

relevant purposes. First they suggest the existence of cardiovascular risks. They release Merck's knowledge of those cardiovascular risks by virtue of its attempts to thwart all discussion of the subject. And the communications reveals Merck's highest-level corporate policy of callous, reckless, fraudulent, and grossly negligent efforts to cover up the known cardiovascular risks. And to the extent these efforts succeeded, they are relevant to demonstrating why Nurse Olson-Fields (as well as the medical community at large and general consumer population) knew little or nothing of the cardiovascular risks associates with Vioxx. Nurse Olson-Fields testified in his deposition that she was not aware of cardiovascular risks associates with Vioxx.[10]

### (ii)   Internal Training Materials

This section addresses a few specific materials used to train Merck drug representatives. As with the documents discussed in the preceding section, Merck asks this Court to declare that the documents have only one possible interpretation—that offered by Merck—and that the documents are irrelevant as interpreted. But it is the function of a jury to interpret the significance of documentary evidence unless Merck can establish that under any possible interpretation the documents are irrelevant or so prejudicial that their relevance is nullified. Merck has not and cannot make such a showing.

These documents demonstrate the uniformity of Merck's message to the medical community, the emphasis placed upon and sophistication of its delivery system, and specific techniques that sales representatives were trained to employ in order to keep "on message." The bulletin, for example, reveals Merck's favored method of "obstacle handling"—a euphemism for avoiding tough questions posed by prescribing physicians while returning to Merck's "core

---

[10] *See* Deposition of Karen Olson-Fields, 95:4-96:17, attached hereto as Exhibit C.

message" of efficacy. This particular bulletin addresses cardiovascular safety concerns in the wake of the VIGOR study. Fully aware that the study would raise concerns about cardiovascular safety, Merck chose to downplay those concerns and this bulletin spells out exactly how its reps were to handle "obstacles" to sales such as safety issues raised by doctors.

For example, the "Dodge Ball" training technique was a variation on this theme, instructing sales reps in how best to skirt safety issues while emphasizing efficacy. Likewise, the training manual is probative by the very fact that it is, in Merck's words, "generic." Merck demanded absolute obedience to its technique and messages.

In short, Merck chose to handle the cardiovascular safety concerns about Vioxx in this way. These and other documents addressed in Merck's motion and this response portray a profit-driven company willfully ignorant of obvious safety concerns.

### (iii)    Promotional Materials

Merck seeks to exclude: (1) three internal marketing communications, and (2) two internal documents "suggesting responses to questions posed by doctors" in the field. The first marketing document portrays, as the other marketing materials discussed throughout this response, Merck's corporate focus in the face of known cardiovascular risks attending Vioxx use. The document is a management committee briefing that depicts market "opportunities" based upon Vioxx's efficacy, while treating cardiovascular risks as a "threat" to sales, suggesting that Merck must "break {the} link to CV outcomes." In addition to demonstrating Merck's sophistication (suggesting its ability to learn of, and then manipulate the perception of, cardiovascular risks), this document, like so many others, proves that at its highest level, Merck was actually aware of cardiovascular risk, perceived it as more of a threat to profits than to

14

patient safety, and acted accordingly to minimize perceptions of the risk. This does not suggest Merck's response to physician questions. Rather, it directs sales representatives on specifically how they are to answer anticipated questions by physicians, including directly relevant and misleading admonitions such as "VIOXX has no effect on platelet aggregation."

Again, in addition to providing general context for the jury, these materials not only demonstrate Merck's overarching principle of "sales over safety" but they specifically target the central issue in this action: the cardiovascular risks associated with Vioxx ingestion.

### 3.     All Evidence is Relevant to Plaintiff's Claim for Punitive Damages.

Plaintiff seeks punitive damages in this action. Rather than inform the medical community and those ingesting the drug, Merck taught their sales representatives how to "dodge" questions regarding cardiovascular risks, spent millions in direct-to-consumer advertising, all the while never warning those who might be injured by the drug. The marketing documents at issue in this motion are evidence that Merck intentionally took steps to cover up danger associated with Vioxx in order to continue marketing it.

### 4.     Marketing And Promotional Evidence Should Not Be Excluded Under Rule 403.

Merck's alternative argument, that this marketing evidence should be excluded under Rule 403, should also be rejected. Virtually all evidence is prejudicial or is not material. The prejudicial must be "unfair." *Dollar v. Long Manufacturing, N.C., Inc.,* 561 F.2d 613, 618 (5th Cir. 1977). Unfair prejudice within the context of Rule 403 "means an undue tendency to suggest (a) decision on an improper basis, commonly, though not necessarily, an emotional one." Notes of the advisory Committee on Proposed Federal Rules of Evidence, Rule 403 at 102. Just

15

because the evidence is damaging or prejudicial to Defendant's case does not mean that the evidence should be excluded. *United States v. McRae,* 593 F.2d 700, 707 (5th Cir. 1979).

In relevant part, Federal Rule of Evidence 403 directs that relevant evidence is inadmissible if its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of issues, misleading of jury, or needless presentation of cumulative evidence. FED. R. EVID. 403.   The careful use of "substantially" demonstrated the emphasis placed on this balancing test, and "Rule 403 is an extraordinary remedy that should be used sparingly because it allows the court to exclude admittedly probative evidence." *United States v. Ross,* 33 F.3d 1507, 1524 (11th Cir. 1994).  Moreover, slight prejudice is insufficient to warrant granting a motion *in limine.  Gross v. Black & Decker (U.S.), Inc.,* 695 F.2d 858, 863 (5th Cir. 1983) (quoting, *United Stated v. Hearod,* 499 F.2d 1003 (5th Cir. 1974)).  Given this weight, it is difficult to make a pre-trial determination on these evidentiary issues without a substantive background.  *See Hines v. Consolidated Railroad Corporation,* 926 F 2d 262, 274 (3d Cir. 1991) ("Excluding evidence under Fed. R. Evid. 403 at the pretrial stage is an extreme measure.").

Plaintiff asserts that evidence of marketing is admissible under Rule 403.  It is premature to determine the importance of much of the evidence Merck seeks to exclude in this motion in limine.

D.   **EVIDENCE OF ADVERSE EVENT REPORTS AND CASE REPORTS**

Merck also argues that adverse event reports ("AERs") be excluded on the basis of relevancy, hearsay and Federal Rule of Evidence 403.  The Court recently denied Merck's motion in limine on this issue in the Smith case.[11]  This contention may be attacked on many of the same grounds as that of the previous section.

---

[11] Order, *Smith v. Merck & Co., Inc.* (Sept. 6, 2006) (Rec. Doc. 6721).

Two primary issues in this case are Merck's notice of adverse events associated with Vioxx and, in light of its knowledge, Merck's failure to properly warn about the dangerous side effects associated with Vioxx.   The role of AER, including reports made by clinical investigators, are central to the issues in this case, namely, notice to the company of adverse events and Merck's continuing duty to monitor and warn about these events.   Clinical trial adverse event investigation and post-marketing surveillance are critical components of all pharmaceutical companies' duties in maintaining a safety profile of a specific drug for meeting the company's responsibilities to physicians and patients as well as reporting to the FDA.

### 1.    Evidence of Adverse Event Reports are Admissible

AERs and clinical trial investigator reports do not fall within the definition of hearsay under Rule 801 to the extent that they are not being offered to prove the truth of the matter asserted.  Primarily, Plaintiff intends to offer AERs and investigator data reports to prove notice and Merck's failure to warn to properly investigate, evaluate, and resolve cardiovascular safety risk.

Merck's suggestion that the FDA has cautioned about the reliability of AERs and other anecdotal reports does not negate the fact that Merck had knowledge of such AERs, similar to the injury suffered by Mr. Mason which resulted in his injury, and failed to exercise its duty to investigate such claims.   Furthermore, Merck's assertions that AERs or investigator data are scientifically unreliable and inadmissible, and that opinion testimony based on such reports should also be inadmissible, is unfounded.   Merck proceeds in its motion to string cite cases that ostensibly stand for this proposition.   However, its effort, as with the animal studies, is dubious at best.

In the cases cited by Merck, AERs or case reports were excluded as evidence where the

17

AERs or case reports were scant in number or were the sole support for the expert's testimony. Neither situation is at issue in the present case because there are countless AERs and/or case reports on point. Case reports have long-standing use as evidenced by publication of such reports in peer-reviewed scientific journals. *Reference Manual on Scientific Evidence*, supra, at 469. *See also Caraker v. Sandoz Pharmaceuticals Corp.*, 172 F.Supp.2d 1046, 1050 (S.D.Ill. 2001)(where the court declined to allow an expert to rely solely on a scant number of case reports, but acknowledge that an overwhelming amount of case reports, [without additional support] showing a temporal proximity between a very specific drug and a very specific adverse event might be enough to make a general causation conclusion sufficiently reliable).

Moreover, the AERs and Clinical Investigator data kept by Merck are also admissible under the business records exception to the hearsay rule and as admissions by a party. *See generally Martinkovic v. Bangash*, 1987 WL 28400 (explaining that receipt of adverse event reports and records maintained of them are admissible against defendants as either records of regularly conducted business under FED.R.EVID. 703(6) or as defendant's admissions under FED.R.EVID. 801(d)(2)). For purposes of notice, the reports in Merck's database are sufficiently trustworthy to fall within the exceptions to the hearsay rule.

Additionally, AERs are admissible as an exception to the hearsay rule for statements made for purposes of medical diagnosis or treatment, because an important purpose of the AER program or clinical investigator reports is to identify whether the cause of an adverse reaction is due to the ingestion of a drug. FED.R.EVID. 803(4).

2.   **Adverse Event Reports are Admissible When They Involve Incidents Sufficiently Similar to Place Defendant on Notice of Danger.**

The requirement of similarity of circumstances is relaxed where evidence, such as AERs

18

or clinical investigator reports, is offered to show that a defendant had notice of a danger rather than where the prior incidents are directed at proving actual negligence. *Kehm v. Procter & Gamble Manufacturing Co.*, 724 F.2d 613, 626 (8th Cir. 1983)(explaining how it is up to the jury to decide what weight to give complaints from other customers). Further, "[u]nder Fed.R.Evid. 401, evidence of similar occurrences 'might be relevant to the defendant's notice, magnitude of the danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, [or] the standard of care, and causation.'" *Ramos v. Liberty Mut. Ins. Co.*, 615 F.2d 334, 338-39 (5th Cir. 1980), *cert. denied*, 449 U.S. 1112 (1981)). To the extent experts rely on the numbers of AERs, the Defendant will have ample opportunity to counter this evidence and explain dissimilarities.

### 3.    Adverse Event Reports Are More Probative Than Prejudicial

Given the fact that AERs including investigator reports are being presented by Plaintiff as admissible non-hearsay, as well as hearsay that falls within the exceptions above, AERs are relevant evidence a jury should be permitted to consider in determining the issue of notice. Merck is free to offer testimony regarding the importance and underlying procedure involved with AERs or with their self-proclaimed "adjudication process" begun 1998. *See Bendi v. McNeil-P.P.C., Inc.*, 6 F.3d 1378, 1385 (4th Cir. 1995) (explaining how the probative value of these reports was not outweighed by the danger of unfair prejudice, because the reports were highly probative on the issue of notice and defendant was free to offer testimony rebutting their significance). Similarly, Plaintiff will be able to show that the 1998 adjudication program, was not a method for assessing causation, but instead was part of Merck's pattern of failing to properly investigate cardiovascular risk and disregarding such evidence of risk. This evidence is directly relevant and admissible to support Plaintiff's challenge of Merck's adjudication process

19

and how it handled the early signals of the cardiovascular risk

Merck argues that a jury may afford more weight to AERs simply because they are collected by a federal agency and might confuse the jury by placing Merck in a bad light. As noted above, there is a relaxed standard for admitting AERs and other anecdotal evidence, including testimony based on such evidence when sued to show notice on behalf of the defendant rather than to prove negligence. To the extent the evidence may be considered by the jury for one purpose but not another, the issuance of a limiting instruction at trial can resolve any potential concern of prejudice or confusion. *See O.L. Maudlin v. Upjohn Co.*, 697 F.2d 664, 648 (5th Cir. 1983)(explaining how a limiting instruction by the Court as to the use of AERs in determining notice, prevented possible jury confusion and/or prejudice with regard to AERs which report injuries other than the one at issue). Further, the time and testimony that would be necessary for Merck to deny notice of voluminous AERs would be minimal, at best, and not meet the level of undue delay under Rule 403. The fact that Merck received and kept records of investigator reports and AERs relating the ingestion of Vioxx goes directly to the issue of awareness of the dangerous propensities of its prescription drug.

### 4.     AERs and Investigator Reports Are Relevant to Show Merck's Course of Conduct and Conscious Disregard for the Safety of the Consumer

This Court should allow AERs and Investigator data received by Merck in to evidence, at least up to the date of Mr. Mason's injury. Events up to this date show Merck's awareness and continuing failure to warn doctors and consumers about the injuries suffered by Mr. Mason. AERs not only serve as a monitoring function for the pharmaceutical manufacturer, but proper notation and forwarding of the information found in the AERs serves as a tool for doctors in determining when to prescribe and how to monitor the prescription drug in question. The fact

20

that all of the AERs do not relate to Mr. Mason's injury does not negate the fact that every AER, especially those related to cardiovascular injuries and stroke, could and would be used in a doctor's analysis as related to the prescribing and monitoring of those ingesting the drug. And the investigator data is relevant to many issues including Merck's duty to investigate, Merck's duty to warn in its initial product labeling, and Merck's motive to manipulate other trials.

Furthermore, AERs relating to Vioxx are relevant to Merck's course of conduct and conscious disregard of the safety of the consumer. Where punitive damages are sought, evidence of events occurring subsequent to the incident in question is highly probative on the issue of conscious disregard for the safety of others. Despite the fact that a defendant's conduct may not have had a possible effect on the particular plaintiff, evidence of related conduct by the defendant, which amounted to a conscious disregard for the safety of others is entirely relevant to the issue of punitive damages.

E.    "UNRELIABLE AND IRRELEVANT" MEDICAL AND SCIENTIFIC EVIDENCE

Beyond reference to multiple exhibit numbers that do not provide a description of the document, Merck does not specify what falls into the categories of "statistically insignificant data" and "investigator-reported data." Plaintiff assumes this is why the Court has previously commented that Merck's motion on this issue is "too broad and vague." Merck has not revised its arguments on this issue and Plaintiff cannot respond to such a vague and sweeping request. For this reason alone, Merck's request should be denied as the Court as done on previous occasions.

1.   **Testimony Regarding the Studies and Data at Issue Should Not Be Precluded; Particularly Where, As Here, Plaintiff's Experts Have Relied on Such Studies in Forming Their Opinions**

The Federal Rules of Evidence control the admission of expert testimony in this case. *Doddy v. Osy USA, Inc.*, 101 F.3d 448, 459 (5th Cir. 1996). Rule 702 governs the admission of expert testimony and provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods and (3) the witness has applied the principles and methods reliably to the facts of the case." FED.R.EVID. 702.

The expert testimony must be relevant, not simply in the sense that all testimony must be relevant, FED.R.EVID. 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue. *Bocanegra v. Vicmar Services, Inc.*, 320 F.3d 581 (5th Cir. 2003) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 506 U.S. 579, 591-92, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Rule 702 "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 584.

The Supreme Court has provided five, non-exclusive factors to consider when assessing whether a methodology is scientifically reliable. These factors are "(a) whether the expert's theory can be or had been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community." *Id.* at 584-85

(citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1193)); *Mathis v. Exxon Corp.*, 302 F.3d 448 (5th Cir. 2002); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998)(en banc).

As the *Bocanegra* court stated, "the test for determining reliability is flexible and can adapt to the particular circumstances underlying the testimony at issue." *Id.* (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct 1167, 143 L.Ed.2d 238 (1999)). The party seeking to have the district court admit expert testimony must demonstrate that the expert's finding and conclusions are reliable, but need not show that the expert's findings and conclusions are correct. *Id.* at 585.

The Fifth Circuit has noted that "the *Daubert* analysis should not supplant trial on the merits." *Mathis*, 302 F.3d at 461 (quoting *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002)). "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786).

In addition, "whether an expert's testimony is reliable is a fact-specific inquiry." *See Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 583-584 (5th Cir. 2004)(citing *Skidmore v. Precision Printing & Pkg., Inc.*, 188 F.3d 606, 617-18 (5th Cir. 1999)). The broad generalization made by Merck in the motions in limine make such required factual inquiry impossible until trial, where the context and facts related to the evidence sought to be introduced may be analyzed by the Court.

The types of material that Merck seeks to exclude, published studies, clinical study data, and adverse event reports, are of the type that is regularly relied upon by experts and clearly admissible under Federal law. *See id.* Plaintiff submits that the Court should permit his experts

23

to testify and consider, in the overall context of their testimony, whether they have established that any test, article, clinical data or adverse event report that they rely on is "reliable." Without testimony establishing whether the evidence at issue is representative of that which experts in the field typically rely on, a ruling on whether this, or any other evidence should be excluded is premature.

F.    TESTIMONY OF ERIC J. TOPOL, M.D.

As Merck has provided this Court with no new reason to change its rulings denying Merck's motions to exclude, it need not discuss them here. Moreover, Merck does not include in its actual motion any reference to the objections this Court allegedly sustained in *Barnett*. For these reasons and those set forth in Plaintiff's Memorandum on Opposition to Motion of Merck & Co., Inc. to Exclude Testimony of Eric. J. Topol, M.D, filed in *Gerald Barnett v. Merck & Co.*, Case No. 02:06CV00485, In re: Vioxx Products Liability Litigation, MDL Docket No. 1657, U.S. District Court, Eastern District of Louisiana, and attached and incorporated herein as Exhibit D, Merck's motion should be denied.

## IV.
## CONCLUSION

For these reasons, Plaintiff respectfully requests that Merck's Omnibus Motion For Order Excluding Evidence And Testimony Raised By Motions Previously Denied By The Court be denied.

Dated:  October 4, 2006

Respectfully submitted,

Edward Blizzard (TBN 02495000)
Scott Nabers (TBN 14769250)
Rebecca Briggs King (TBN 24027110)
Holly M. Wheeler (TBN: 24006035)
BLIZZARD, MCCARTHY & NABERS, L.L.P.
440 Louisiana, Suite 1710
Houston, Texas 77002
(713) 844-3750
(713) 844-3755 (fax)

**ATTORNEYS FOR PLAINTIFF
CHARLES LARON MASON**

25

| Andy D. Birchfield, Esq.<br>P. O. Box 4160<br>234 Commerce Street<br>Montgomery, AL  36103-4160<br>PH:  (800) 898-2034<br>FAX:  (334) 954-7555 | Christopher Seeger, Esq.<br>One William Street<br>New York, NY  10004<br>PH:  (212) 584-0700<br>FAX:  (212) 584-0799 |
| --- | --- |
| Leonard Davis<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA  70013<br>PH: (504) 581-4892<br>FAX: (504) 561-6024 | Russ M. Herman<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA  70013<br>PH: (504) 581-4892<br>FAX: (504) 561-6024 |

**PLAINTIFFS' STEERING COMMITTEE**

26

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Opposition has been served on Liaison Counsel Russ Herman and Phillip Wittmann, Shayna S. Cook and Richard Krumholz by U.S. Mail, facsimile and/or e-mail; and e-mail upon all parties by electronically uploading the same to Lexis-Nexis File and Serve Advanced, in accordance with Pretrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of the Court of the Untied States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 4th day of October, 2006.

Holly M. Wheeler