UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Anthony Dedrick v. Merck & Co, Inc. | * | CASE NO. 02:05CV2524 |

**PLAINTIFF'S MOTION TO EXCLUDE OPINION
TESTIMONY OF PAUL J. ROACH, MD**

TO THE HONORABLE JUDGE FALLON:

PLAINTIFF, Anthony Wayne Dedrick, files this Motion to Exclude Opinion Testimony of Paul J. Roach, M.D., and in support thereof shows:

**I.   INTRODUCTION**

Defendant has designated Paul J. Roach, M.D., an interventional cardiologist in Austin, Texas, as an expert who intends to testify in this matter. Dr. Roach's expert report, dated October 6, 2006, was tendered to Plaintiff. A true and accurate copy of this report is attached as Exhibit 1. On October 24, 2006, Dr. Roach provided deposition testimony. Deposition Testimony of Paul J. Roach, MD is attached as Exhibit 2.

Dr. Roach intends to testify regarding: (1) the cause and manner of Mr. Dedrick's heart attack; (2) the role of Mr. Dedrick's pre-existing atherosclerosis leading to his heart attack; (3) the role of other medical and social conditions which contributed to the development of atherosclerosis;

1

and (4) the lack of evidence linking use of Vioxx with serious adverse cardiovascular events. However, Dr. Roach should be precluded from proffering opinion in two specific areas: (1) the role of remote cocaine use in the development of atherosclerosis and in causing Tony Dedrick's myocardial infarction; and (2) the role of prison-related stress in the development of atherosclerosis and in causing Tony Dedrick's myocardial infarction. These opinions should be excluded because, as his testimony demonstrates, they are not based on scientifically reliable methodology, nor supported by appropriate validation, nor based on sufficient facts or data.

## II.     LEGAL STANDARDS

The *Daubert* trilogy cases, <u>*Daubert v. Merrell Dow Pharmaceuticals,* 113 S. Ct. 2786 (1993)</u>, *General Electric Co. v. Joiner*, 118 S.Ct. 512, 517-519 (1997) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), have made the district judge the "gatekeeper who must pass on the reliability and relevance of proffered evidence pursuant to Federal Rule of Evidence 702."[1] Rule 702 takes into account the trilogy and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experiences, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. This Rule establishes general standards for the judge to use in determining the reliability of expert testimony. The Rule "not only requires that the testimony be relevant, but also that it be based on sufficient facts or data, that it be the product of reliable principles and methods,

---

[1] Manual for Complex Litigation, 472 (4th ED. 2004)

and that the witness applied those principles and methods reliably to the facts of the case."[2]

Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known. *Daubert,* 113 S. Ct. at 2786. In *Daubert,* the Supreme Court set forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony. *Id.* These factors are: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. *Id.* Whether some or all these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 138 (1999).

In addition to the five factors laid out in *Daubert,* a trial court may consider additional factors in assessing the scientific reliability of expert testimony. *Black v. Food Lion, Inc.,* 171 F.3d 308, 312 (5th Cir.1999). Some of these factors may include: (1) whether the expert's opinion is based on incomplete or inaccurate dosage or duration data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5) whether the expert proposes to testify about matters growing directly out of research he or she has conducted independent of the litigation. *See, e.g., id.* at 313; *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 278-79 (5th Cir.1998);

---

2   *Id.* at 484.

*Christophersen v. Allied-Signal Corp.,* 939 F.2d 1106, 1114 (5th Cir.1991); *Newton v. Roche Labs., Inc.,* 243 F.Supp.2d 672, 678 (W.D.Tex.2002). Scientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case. *Daubert,* 113 S. Ct. at 2786. Scientific evidence is irrelevant, however, when there is too great an analytical gap between the data and the opinion proffered. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

The person seeking to admit expert testimony bears the burden of proving reliability and relevance by a preponderance of the evidence. *Moore v. Ashland Chemical, Inc.*, F.3d 269, 276 (5th Cir. 1998) (en banc). The focus is not on the result or conclusion, but on the methodology. *Id.*

### III.   ARGUMENT

Dr. Roach is simply not qualified to render opinions regarding the subjects the role of Tony Dedrick's cocaine use or his prison-related stress in the development of atherosclerosis or the Plaintiff's later myocardial infarction. In addition, Dr. Roach's opinions are not reliable.

#### A.   DR. ROACH OPINION REGARDING COCAINE IS UNRELIABLE

Dr. Roach's testimony shows that he cannot offer credible evidence for evaluation by the trier of fact in this case pertaining to the association of cocaine use by the Plaintiff and the development of atherosclerosis. His opinion regarding cocaine is not based upon sufficient facts or data. In his deposition, Dr. Roach testified as follows:

```
Page 102
 4      Q    (By Mr. Birchfield) And in forming that
 5   opinion, what was the -- what's the most recent cocaine
 6   use for Tony Dedrick that you rely on?
 7      A    Well, the only documented -- the only
 8   medical record that I can rely on for -- to time his
 9   use of cocaine was his hospitalization either in
10   1989 or 1992 when he was hospitalized after one of his
```

4

11  mo -- motor vehicle accidents.  He tested positive for
12  cocaine during one of those two hospitalizations.
13      Q   Okay.  And are you confident that
14  that -- those test results show cocaine use on behalf of
15  Tony Dedrick?
16      A   I'm pretty confident, because they did
17  a confirmatory test.  One test popped up and then
18  they did a subsequent test which was confirmatory and --
19      Q   Okay.  And you're confident that it was --
20      A   -- and he has -- I'm sorry.  Go ahead.  I'm
21  sorry.  I'll let you finish.
22      Q   You're confident that it was not the
23  administration of Xylocaine?
24      A   That, I cannot answer with absolute certainty.
25  I certainly can tell you that Mr. Dedrick has admitted to
Page 103
 1  the use of cocaine.  So even if we discount that finding
 2  in the medical record we have his own testimony
 3  that tells us that he had used cocaine.
 4      Q   And what is the -- what's the use of
 5  cocaine that you rely on in stating your opinion to a
 6  reasonable degree of medical certainty that cocaine was a
 7  substantial contributing factor in his heart attack?
 8      A   I think the fact that he's admitted to its use.
 9      Q   Okay.  And how much use has he admitted to?
10      A   I think he's admitted to using it on at least
11  several occasions.
12      Q   Okay.  And it's your opinion that cocaine
13  use on several occasions, at least years prior
14  to a myocardial infarction, is sufficient to
15  establish that cocaine use is a substantial
16  contributing factor?
17      A   Well, again, I might not wish to use the term
18  substantial contributor in Mr. Dedrick's case because, as
19  I mentioned just few minutes ago, I think our data with
20  regard to his use of cocaine is certainly less robust than
21  the other risk factors that we've talked about.
22          So if we want to talk about substantial
23  versus contributor maybe we should scrub out
24  the term substantial and say that it's a contributing
25  factor.
Page 104
 1          Again, I think the robustness of the data does
 2  not allow me to determine to say that that factor,

>     3  the cocaine use, would be what I would call a
>     4  substantial contributor.
>     5       I certainly don't want to put it on the same
>     6  playing field as his smoking, as his diabetes, as his
>     7  dyslipidemia, his metabolic syndrome or the other risk
>     8  factors, the other standard established risk factors.  So
>     9  perhaps maybe I should soften that and say that it's a
>     10  contributing factor.

Dr. Roach's testimony also establishes that his opinion regarding cocaine is not based upon reliable methodology:

>     Page 99
>     8       Q    All right.  The studies that you
>     9  rely on to establish a link between cocaine use and
>     10  atherosclerosis, what's the nature of those studies?
>     11      A    Well, those studies --
>     12      Q    How did the -- how did they determine that
>     13  cocaine causes atherosclerosis?
>     14      A    Again, there will be no randomized controlled
>     15  trials as we've discussed with some of the other
>     16  issue -- other factors.
>     17           These were epidemiologic studies or studies --
>     18  the Italian study in particular was an epidemiologic
>     19  study.  What it looked at was patients who were users of
>     20  cocaine and not users or people who had come in with
>     21  atherosclerotic events or for whatever reason got a cath.
>     22  I can't remember the exact design of the study, but
>     23  they're going to be retrospective looks.  There --
>     24  I am aware of no randomized controlled clinical
>     25  trial that looks at the effect of cocaine on the
>     Page 100
>     1  development of atherosclerosis.
>     2       Q    And based on those studies what is the -- what's
>     3  the relative risk with the association of cocaine use and
>     4  the development of atherosclerosis?
>     5       A    Again, I'm not even sure that that was addressed
>     6  in those articles.  I would have to -- well, it obviously
>     7  had to have been addressed in there, because they had to
>     8  have shown in the population that used versus the nonusers
>     9  that there was increased risk.  I can probably go back to
>     10  the Italian study and get you a number right now, if you
>     11  would like me to do that.

```
12    Q   Do you know right now whether it was
13  greater than two or not?
14    A   As I sit here talking to you, I don't recall off
15  the top of my head what the actual relative risk was.
16    Q   Okay.  If it were less than two, would
17  that impact your decision as to whether or not it was a
18  substantial contributing factor in Tony Dedrick's case?
19    A   No, it would not.
```

Page 103
```
12    Q   Okay.  And it's your opinion that cocaine
13  use on several occasions, at least years prior
14  to a myocardial infarction, is sufficient to
15  establish that cocaine use is a substantial
16  contributing factor?
17    A   Well, again, I might not wish to use the term
18  substantial contributor in Mr. Dedrick's case because, as
19  I mentioned just few minutes ago, I think our data with
20  regard to his use of cocaine is certainly less robust than
21  the other risk factors that we've talked about.
22        So if we want to talk about substantial
23  versus contributor maybe we should scrub out
24  the term substantial and say that it's a contributing
25  factor.
```
Page 104
```
 1        Again, I think the robustness of the data does
 2  not allow me to determine to say that that factor,
 3  the cocaine use, would be what I would call a
 4  substantial contributor.
 5        I certainly don't want to put it on the same
 6  playing field as his smoking, as his diabetes, as his
 7  dyslipidemia, his metabolic syndrome or the other risk
 8  factors, the other standard established risk factors.  So
 9  perhaps maybe I should soften that and say that it's a
10  contributing factor.
```

For these reasons, Dr. Roach should be precluded from offering opinion testimony regarding cocaine use.

### B. DR. ROACH'S OPINION REGARDING STRESS IS UNRELIABLE

Dr. Roach should not be permitted to testify that prison-related stress in Mr. Dedrick's life

was a substantial contributing factor to his heart attack.

    Page 115
2    Q   Okay.  And just so that we're --
3  we're clear, at trial if I ask you, "Was stress a
4  substantial contributing factor in Tony Dedrick's
5  heart attack," what's your answer?
6    A   It would be no.
7    Q   Okay.
8    A   But it is a contributing factor.
9    Q   Okay.  And in stating that it is a
10  contributing factor to Tony Dedrick's heart attack what do
11  you base that on?
12    A   There is a body --
13    Q   What --
14    A   I'm sorry.  Go ahead.  I didn't mean to over --
15    Q   All right.  I'm not talking about the body of
16  literature.  We'll get to that in just a minute.
17        But first what are the -- what's the
18  factual basis for saying that Tony Dedrick had sufficient
19  stress to contribute to his myocardial infarction on
20  January the 8th, 2003?
21    A   Well, in his deposition he admits to being under
22  stress while in prison.
23    Q   Okay.  And how long was that before his
24  myocardial infarction?
25    A   I believe he was released from prison -- I don't
Page 116
1  know.  I want to say got out of -- I think it was -- I"m
2  trying to remember when he was released from prison.
3  January '03 is when he had the myocardial infarction.  I
4  want to say it was probably about a year prior.  He had
5  been released about a year prior, around a year prior to
6  his myocardial infarction.
7    Q   Okay. All right. Okay.  Prison.
8        Were there any other sources of stress in Tony
9  Dedrick's life that you rely on to say that stress was a
10  contributing factor in his heart attack?
11    A   Well, that is the one that he admitted to.
12    Q   Okay.  Well, are there others that you rely on
13  based on review of any of the deposition testimony or any
14  of the records in this case?
15    A   I mean, I can speculate that he may have been
16  under stress for various reasons, but I don't think that's

17  fair for me to do.
18     Q   Okay. Well, in formulating your opinion that --
19  that stress was a contributing factor in his heart attack,
20  are you relying on anything other than his deposition
21  testimony about the stress of being in prison?
22     A   That's what I'm relying on.
23     Q   Okay. And what literature do you rely on to say
24  that a -- a period of stress approximately a year prior to
25  the myocardial infarction contributes to that event?
Page 117
 1     A   Well, again, we need to keep in mind
 2  that the stress itself did not directly cause the
 3  myocardial infarction. There is literature suggesting a
 4  link between stress and the development of
 5  atherosclerosis. And as I've said on a number of
 6  occasions, it was the atherosclerosis that caused his
 7  heart attack. It was the presence of the atherosclerosis
 8  that was responsible for the myocardial infarction.
 9         So the notion that we can disassociate these
10  things based on time is really not a fair
11  construct.
12         If he was under stress that could have
13  contributed to his atherosclerosis.
14     Q   Could have or did?
15     A   Well, again, I would say that it was a
16  contributing factor.
17         Do I think that it was a substantially
18  contributing factor? I don't think that one has
19  enough robust information in Mr. Dedrick's case or -- to
20  make that comment -- to make that statement. So I will
21  put it into the category of a contributing factor, not a
22  substantially contributing factor.
23     Q   Will you describe for me the nature of
24  stress that is necessary to meet the threshold
25  that it contributes to atherosclerosis?
Page 118
 1     A   Well, the studies that have actually looked at
 2  that looked at a number of different types of stress. And
 3  as you are probably well aware, it's difficult to
 4  quantitate stress. So what the studies did was they took
 5  various situations that might be considered by most of us
 6  to be stressful. So perhaps a job situation where you
 7  don't have control. Perhaps a situation where you are
 8  asked to be the care provider for a loved one and may not

9   have the resources to fulfill all those duties.
10         They've actually looked at Type A behavior and
11  looked at whether they -- that type of personality is
12  related -- has a higher rate of atherosclerosis.  And
13  what they've kind of found out as you parse through that
14  it's really the Type A personality that is hostile that
15  ends up having a relationship to atherosclerosis.
16         The reason that I would put this into the
17  category of a contributing factor and not substantial
18  contributing is as you can probably surmise it is
19  difficult to quantitate stress.  And so -- but if someone
20  is willing to admit to a stressful situation, then I think
21  that we could assume that Mr. Dedrick was under
22  the right sort of physiologic conditions to have
23  allowed this to contribute to his atherosclerosis.
24         There is a notion that stress is related to
25  increased sympathetic nerve activity and increased
Page 119
 1  secretion of various hormones and -- from the adrenal
 2  gland and that the atherosclerosis is really
 3  linked in some way to those phenomenon.
 4         Now, in this particular case, we have his
 5  testimony that says he's under stress.  I can't quantitate
 6  it.  He says that he's under stress.  And there is
 7  literature that suggests that stress is related to
 8  atherosclerosis.
 9     Q   Is giving a deposition stressful?
10     A   It can be.
11     Q   Is public speaking stressful?
12     A   It certainly is.
13     Q   Okay.  All right.  And would you be prepared to
14  say --
15     A   And I guess that -- I guess to answer
16  your question -- I don't mean to talk over you.  I
17  think that, again, you know, stress may be subjective.
18  You've been really nice to me, so I'm not as stressed
19  talking to you as I might be with someone else.  So it --
20  it can be somewhat subjective.  And that's why I'm
21  not going to necessarily place this into the category
22  of dyslipidemia and diabetes and family history and
23  smoking and hypertension and metabolic syndrome, but I
24  think that it contributed to his atherosclerosis.

```
          25     Q    And it's your position that it
Page 120
 1   contributed to the development of atherosclerosis because,
 2   A, Tony Dedrick acknowledged stress in his deposition,
 3   stress related to being in prison and, B, the
 4   literature -- there is literature to suggest that stress
 5   increases the risk of myocardial infarction.  Correct?
 6       A    Well, increases not only the risk of myocardial
 7   infarction but increases the risk of the development of
 8   atherosclerosis.
 9       Q    What's the relative risk between stress and the
10   increase or -- atherosclerosis -- causing
11   atherosclerosis?
12       A    I don't know that I can -- I couldn't
13   tell you that, as I sit here.
14       Q    Okay.  Do you -- can you name any
15   articles that you rely on for saying that it was a
16   contributing factor in Tony Dedrick's case?  I mean --
17       A    Those articles are in the materials
18   reviewed.  And I can review pull -- I can review those or
19   pull them out and look at them and -- or else I can go to
20   the boxes and try to pull them out if you want to do that.
21       Q    Okay.  So they're all either in the
22   boxes -- they're all in the boxes and on this list.
23   Correct?
24       A    That's correct.
25       Q    All right.  But you can't name one sitting
Page 121
 1   there.  Right?
 2       A    No, I cannot.
```

## IV.   CONCLUSION

For the reasons stated herein, Dr. Roach's opinions do not meet the scientific standards for expert testimony. Plaintiff respectfully requests that the Court strike any opinion or fact testimony from Dr. Roach in regarding cocaine use and prison-related stress.

Respectfully submitted this 3rd day of November, 2006.

/s/ Andy Birchfield
**ANDY BIRCHFIELD**
P. LEIGH O'DELL
**Attorney for Plaintiff**
*BEASLEY, ALLEN, CROW,*
*METHVIN, PORTIS & MILES, P.C.*
234 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103
(334) 269-2343 telephone
(334) 954-7555 facsimile

| | |
|---|---|
| **Russ M. Herman** (Bar No. 6819)<br>Leonard A. Davis (Bar No. 14190)<br>Stephen J. Herman (Bar No. 23129)<br>*Herman, Herman, Katz & Cotlar, LLP*<br>820 O'Keefe Avenue<br>New Orleans, LA 70113<br>PH: (504) 581-4892<br>**Plaintiffs' Liaison Counsel** | **Christopher A. Seeger**, Esquire<br>SEEGER WEISS<br>One William Street<br>New York, NY 10004<br>(212) 584-0700 (telephone)<br>(212) 584-0799 (telecopier)<br>**Co-Lead Counsel** |
| Richard J. Arsenault, Esquire<br>NEBLETT, BEARD & ARSENAULT<br>2220 Bonaventure Court, P.O. Box 1190<br>Alexandria, LA 71301-1190<br>(318) 487-9874 (telephone)<br>(318) 561-2591 (telecopier) | Arnold Levin, Esquire<br>LEVIN, FISHBEIN, SEDRAN & BERMAN<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106<br>(215) 592-1500 (telephone)<br>(215) 592-4663 (telecopier) |
| Gerald E. Meunier, Esquire<br>GAINSBURGH, BENJAMIN, DAVID, MEUNIER<br>& WARSHAUER, L.L.C.<br>2800 Energy Centre<br>1100 Poydras Street<br>New Orleans, LA 70163<br>(504) 522-2304 (telephone)<br>(504) 528-9973 (telecopier) | Shelley Sanford, Esquire<br>GOFORTH, LEWIS, SANFORD LLP<br>2200 Texaco Heritage Plaza<br>1111 Bagby<br>Houston, TX 77002<br>(713) 650-0022 (telephone)<br>(713) 650-1669 (telecopier) |
| Troy Rafferty, Esquire<br>LEVIN, PAPANTONIO, THOMAS, MITCHELL,<br>ECHSNER & PROCTOR, PA<br>316 S. Baylen Street, Suite 400<br>Pensacola, FL 32502<br>(850) 435-7000 (telephone)<br>(850) 497-7059 (telecopier) | Drew Ranier, Esquire<br>RANIER, GAYLE & ELLIOT, L.L.C.<br>1419 Ryan Street<br>Lake Charles, LA 70601<br>(337)494-7171 (telephone)<br>(337) 494-7218 (telecopier) |
| Elizabeth J. Cabraser, Esquire<br>LIEFF, CABRASER, HEIMANN &<br>BERNSTEIN, LLP<br>Embarcadero Center West<br>275 Battery Street, 30th Floor<br>San Francisco, CA 94111<br>(415) 956-1000 (telephone)<br>(415) 956-1008 (telecopier) | Mark Robinson, Esquire<br>ROBINSON, CALCAGNIE & ROBINSON<br>620 Newport Center Drive<br>7th Floor<br>Newport Beach, CA 92660<br>(949) 720-1288 (telephone)<br>(949) 720-1292 (telecopier) |
| Thomas R. Kline, Esquire<br>KLINE & SPECTER, P.C.<br>1525 Locust Street, 19th Floor<br>Philadelphia, PA 19102<br>(215) 772-1000 (telephone)<br>(215) 772-1371 (telecopier) | Christopher V. Tisi, Esquire<br>ASHCRAFT & GEREL<br>2000 L Street, N.W.<br>Suite 400<br>Washington, DC 20036-4914<br>(202) 783-6400 (telephone)<br>(307) 733-0028 (telecopier) |

**PLAINTIFF'S STEERING COMMITTEE**

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing Plaintiff's Motion to Exclude Opinion Testimony of Paul J. Roach, M.D. has been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail or by hand delivery and e-mail, on Merck's Counsel, Douglas R. Marvin and Philip S. Beck, by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 3rd day of November, 2006.

                                  /s/ P. Leigh O'Dell
                                  P. Leigh O'Dell
                                  Attorney for Plaintiff
                                  Beasley, Allen, Crow,
                                  Methvin, Portis & Miles, P.C.