# Plaintiff's Exhibit "1"

### Expert Report of Paul Roach, M.D., F.A.C.C.

I am a cardiologist and have been practicing medicine for approximately 20 years. I am board certified in Internal Medicine and Cardiovascular Diseases by the American Board of Internal Medicine. My education, background and experience are more fully set forth in my curriculum vitae, a copy of which is attached to this report. My opinions as set forth in this report are based on my knowledge, training and experience as a medical doctor and cardiologist. Furthermore, these opinions are based on medical probability and supported by peer reviewed medical literature.

Myocardial infarction and stroke often occur in the setting of thrombosis of an artery. The underlying pathology which predisposes to thrombosis is atherosclerosis. Atherosclerosis is the leading cause of the death in the developed world. The risk factors for the development of atherosclerosis are family history, dyslipidemia, diabetes mellitus, hypertension, smoking, obesity, male gender, age, and metabolic syndrome. Additionally, there is evidence that elevated blood levels of homocysteine, microalbuminuria, alcohol abuse and cocaine abuse are related to the development of atherosclerosis. Furthermore, stress has been implicated in myocardial infarction. Additionally, there is evidence that certain disease states, like rheumatoid arthritis, are associated with an increased risk of developing cardiovascular disease. This observation suggests that other factors, in addition to the traditional risk factors are involved in the development of atherosclerosis in rheumatoid arthritis as well as other forms of arthritis.

It is well accepted that local vascular injury, inflammation and oxidative stress contribute to the development of the disease. The lesions of atherosclerosis typically occur in large and medium-sized elastic and muscular arteries which feed the brain, heart and other organs. This process can result in progressive narrowing of an artery resulting in impaired blood flow to the target organ with resultant impairment of the function of that organ. Additionally, there can be acute thrombosis in the vessel resulting in cell death and acute impairment of the target organ. Myocardial infarction and stroke are examples of the latter process. The earliest anatomic finding in atherosclerosis is the fatty streak, which can be seen at an early age. The fatty streak is purely an inflammatory lesion. Typically atherosclerosis occurs as the result of deposition of lipid material in the arterial wall followed by a cellular mediated inflammatory response. This is associated with endothelial dysfunction which impairs the usual homeostatic mechanisms of the endothelium. Ongoing inflammation results in recruitment of additional macrophages and lymphocytes resulting in the release of various factors which result in further damage to the arterial wall with resultant necrosis. Eventually a fibrous cap will form over the area of lipid deposition and necrosis resulting in what is commonly referred to as a plaque. Endothelial dysfunction and/or rupture of the fibrous cap leads to platelet activation and subsequent thrombosis. It is this thrombosis that is often the cause of a myocardial infarction or stroke.



PLAINTIFF'S EXHIBIT

tabbies®

1

Nonsteroidal anti-inflammatory drugs (NSAIDs) are commonly and widely used as analgesics and anti-inflammatory agents. They are used to treat many causes of pain as well as to reduce inflammation in the setting of arthritis. Certain types of NSAIDs have been investigated for their potential impact on the prevention or slowing of the development of Alzheimer's disease and the prevention of certain cancers. NSAIDs have been classified into three broad classes: aspirin, nonselective NSAIDs, and selective cyclooxygenase-2 (COX-2) inhibitors, commonly referred to as coxibs. The nonselective NSAIDs inhibit both cyclooxygenase-1 (COX-1) and cyclooxygenase-2 (COX-2), with wide variation in their effectiveness at inhibiting one form or the other of cyclooxygenase. Low dose aspirin (e.g., 81mg) has been shown to be approximately 170 fold more potent in inhibiting COX-1 than COX-2. On the other hand, the coxibs have far greater potency at inhibiting COX-2 than COX-1.

All classes of NSAIDs inhibit prostaglandin G/H synthase, which has both cyclooxygenase and hydroperoxidase activity, and is colloquially referred to as cyclooxygenase. This is the enzyme that catalyzes the conversion of arachadonic acid to either prostaglandins or thromboxane. Prostaglandin G/H synthase comes in two forms. COX-1 is felt to be expressed constitutively and is thought to mediate the production of prostaglandins some of which have cytoprotective effects, whereas COX-2 is felt to be inducible at sites of inflammation resulting in increased production of prostaglandins involved in pathophysiologic processes.

The inhibition of COX-2 is felt to have a greater impact on the reduction of inflammation, while COX-1 inhibition has been implicated in injury of the mucosa of the gastrointestinal tract, resulting in bleeding, ulcers and perforations. Additionally, the inhibition of COX-1 results in impairment of platelet function with increased bleeding. It is believed that the fact that low-dose aspirin selectively inhibits COX-1 most likely explains why even low-dose aspirin is associated with the aforementioned gastrointestinal side effects. There are multiple studies which address the efficacy of aspirin in both the primary and secondary reduction of myocardial infarction and stroke. Platelet thromboxane A2 (TXA2) is synthesized and released in response to various stimuli such as arachidonate and collagen. Thromboxane then results in irreversible platelet aggregation through an interaction with the TXA2 receptor on the platelet. It is this platelet aggregation which is an essential component of thrombosis. Platelet TXA2 production is a COX-1 mediated process. Aspirin irreversibly binds and acetylates a serine residue at position 529 of platelet COX-1 resulting in irreversible and permanent impairment of platelet TXA2 production and the ability of platelets to aggregate in response to TXA2. Since platelets are anucleate, the TXA2 mediated platelet aggregation is irreversible for the life of the platelet.

When given at doses as little as 81 mg per day aspirin results in a significant reduction in thrombosis mediated events like stroke and heart attack. Over the usual dosing range of aspirin there is no dose effect response with regard to platelet inhibition. Certain non-aspirin nonselective NSAIDs have been shown to reversibly bind the platelet COX-1 resulting in the impairment of platelet TXA2 production and thus platelet aggregation. Depending on the dose and frequency of administration of the particular drug there can

2

be clinically significant impairment of platelets and an increased risk of bleeding. However not all nonselective NSAIDs impair platelet function to the same degree.

The development of coxibs was driven by the unsatisfactory side effect profile associated with nonselective NSAIDs, namely the aforementioned gastrointestinal bleeding, perforation and ulcer formation, leading to substantial morbidity and mortality. It was hypothesized that if an NSAID more selective for COX-2 inhibition could be developed that there would be just as effective reduction in pain and inflammation with far fewer gastrointestinal side effects.  In May 1999, the COX-2 inhibitor rofecoxib (Vioxx) was granted FDA approval.

The Vioxx Gastrointestinal Clinical Outcomes Research (VIGOR) Study was published in 2000 and addressed the efficacy of Vioxx with regard to the reduction of gastrointestinal side effects. In this study, 8076 patients with rheumatoid arthritis were randomly assigned to the selective COX-2 inhibitor Vioxx 50 mg per day (twice the recommended chronic dose) or to the nonselective NSAID naproxen 500 mg twice daily. Although the two drugs had similar efficacy for the treatment of rheumatoid arthritis, the relative risk (RR) of gastrointestinal events was much lower with Vioxx (RR 0.5; 95% confidence interval [CI], 0.3, 0.6; P<.001).  However, myocardial infarctions were more frequent in the patients treated with Vioxx (0.5%) compared to those treated with naproxen (0.1%). This result was statistically significant (RR 0.2; 95% CI 0.07, 0.58). There was no difference between the treatment groups with regard to stroke or death from myocardial infarction or stroke. The study protocol prohibited the use of aspirin. Vioxx was administered at twice the standard recommended dose and naproxen was given at a usual clinical dose.  Four percent of the patients met FDA criteria for the use of aspirin for secondary prevention of cardiovascular events, namely history of myocardial infarction, angina, stroke, transient ischemic attack, angioplasty or coronary artery bypass grafting. These patients accounted for 38% of the patients who had a myocardial infarction. The VIGOR investigators noted that naproxen given at the doses specified in the study inhibited the production of TXA2 by 95% and platelet aggregation by 88%. Thus, based on the data the question about the cause of the increased risk of myocardial infarction associated with Vioxx use remained open. Was it due to random chance, a reduction in the risk of myocardial infarction in the group treated with naproxen, an increased risk of myocardial infarction in the group treated with Vioxx, or some combination of the aforementioned factors?  Subsequently, the labeling of Vioxx was changed to include the findings of the VIGOR study.

There are a number of randomized, blinded, placebo and comparator controlled studies as well as one crossover open-label study which address whether naproxen given at the dose and frequency used in the VIGOR Study results in platelet inhibition similar to that seen with aspirin administration.

Van Hecken et al. examined the effect of placebo, Vioxx 12.5 mg per day, Vioxx 25 mg per day, diclofenac 75 mg three times daily, ibuprofen 800 mg three times daily, sodium naproxen 550 mg twice daily, or meloxicam 15 mg per day on COX-1 and COX-2 inhibition using ex-vivo techniques and measurement of bleeding times in seventy-six

healthy females with normal baseline platelet function. The study was partially blinded, randomized and placebo controlled. Parameters were measured at baseline and after six days of treatment.  Mean-inhibition of COX-2 as measured by weighted average of lipopolysaccharide induced PGE2 generation was -2.4%, 66.7%, 69.2%, 77.5%, 93.9%, 71.4%, and 71.5% for placebo, Vioxx 12.5 mg, Vioxx 25 mg, meloxicam, diclofenac, ibuprofen, and naproxen, respectively. Corresponding values for COX-1 inhibition as measured by serum TXB2 (a serum metabolite of platelet TXA2) were -5.15%, 7.98%, 6.65%, 53.3%, 49.5%, 88.7%, and 94.9%. Vioxx (12.5mg and 25 mg), meloxicam, and diclofenac did not affect bleeding times, while ibuprofen and naproxen prolonged bleeding times on day 6 (p<0.002 for ibuprofen and naproxen vs. placebo).

Capone et al. performed a crossover open-label study of low dose aspirin (100 mg/day) or naproxen (500 mg/dl) administered to nine healthy subjects for six days. The effects on thromboxane and prostacyclin were assessed up to 24 hours after oral dosing. The administration of aspirin and naproxen caused a similar reduction in whole-blood TXB2 production, an ex-vivo measurement of platelet COX-1 activity, by 99+/-0.3% and 94+/-3%. The authors noted that naproxen 500mg twice daily caused persistent and complete suppression of platelet TXB2 production throughout the 12-hour dosing interval that was indistinguishable from that of low dose aspirin.  Further, while aspirin had no effect on the production of urinary metabolite of PGI2, naproxen significantly reduced the urinary metabolite of PGI2.

Tuleja et al. used a double blind comparator-controlled study to evaluate the effect of Vioxx 25 mg twice daily, naproxen 500 mg twice daily, aspirin 75 mg per day or diclofenac 75 mg per day on serum thromboxane and serum prostacyclin production, using standard ex-vivo techniques, as well as on the bleeding-time at baseline and after seven days of treatment in forty-five healthy men. Aspirin, naproxen, and diclofenac caused a statistically significant increase in bleeding time. Vioxx, on the other hand, had no effect on bleeding time. Naproxen, as well as aspirin, caused a significant reduction in thromboxane and prostacyclin production, whereas diclofenac decreased prostacyclin synthesis but had no effect on thromboxane production. Vioxx had no effect on prostacyclin or thromboxane synthesis. This study suggested that naproxen had anti-platelet effects similar to aspirin and that endothelial prostacyclin in healthy humans is COX-1 mediated.

Two randomized comparator-controlled trials conducted by Leese et al. examined the effects of two other coxibs, celecoxib and valdecoxib versus naproxen 500 mg twice daily on platelet function. One of the studies as a double-blind, randomized, comparator-controlled study of ten days duration conducted in twenty-four healthy subjects. A supra-therapeutic dose of celecoxib, 600 mg twice daily, was compared to naproxen 500 mg twice daily. Parameters were measured at baseline and after ten days. Ex-vivo platelet aggregation in response to standard agonists (collagen, arachidonate, or U46619 [a thromboxane A2 receptor]), bleeding time, and serum TXB2 levels were measured. Unlike celecoxib, naproxen reduced ex-vivo platelet aggregation and TXB2 levels, and increased bleeding time. Leese et al. also compared valdecoxib 40 mg twice daily, diclofenac 75 twice daily, naproxen 500 mg twice daily or placebo in a randomized,

double-blind, comparator and placebo-controlled trial designed to measure the effects of these drugs on platelet function. Sixty-two healthy subjects were enrolled. Ex-vivo measurements of platelet aggregation (response to arachidonate, collagen, and adenosine diphosphate), bleeding time, and serum TXB2 were measured at baseline and on day 8. Valdecoxib had no effect on any measurements of platelet function. Naproxen and diclofenac significantly reduced platelet aggregation to arachidonate and to a lesser extent collagen and adenosine diphosphate compared to placebo. Naproxen significantly reduced TXB2 levels.

Further, randomized double-blind placebo-controlled trials have looked at the anti-thrombotic effects of certain nonselective NSAIDs. Fornaro et al. performed a randomized double-blind placebo-controlled study to assess the efficacy of the nonselective NSAID indobufen 100mg twice daily on the prevention of embolic events of cardiac origin. All patients had heart disease and risk for cardiogenic emboli. The endpoints were stroke, transient ischemic attack, systemic embolism, and fatal myocardial infarction. The RR of an endpoint with indobufen compared to placebo was 0.35 (95% CI: 0.14, 0.89). This study suggested that indobufen could reduce the risk of cardiovascular events. Brochier studied the effect of flurbiprofen, another nonselective NSAID, on secondary prevention of myocardial infarction in patients treated with thrombolysis or percutaneous revascularization for myocardial infarction. Patients were treated with either flurbiprofen 50 mg twice daily or placebo. The reinfarction rate in the flurbiprofen group was 3% compared to 10.5% in the placebo group RR 0.285 (95% CI: 0.116, 0.649, p<0.001). Both these studies would suggest that nonselective NSAIDs can have a significant effect on the reduction of cardiovascular thromboembolic events.

Taken together these trials show that naproxen, as well as certain other NSAIDs, can exhibit strong anti-platelet effects similar to aspirin. Since aspirin has been demonstrated to exhibit substantial benefit in the primary and secondary prevention of stroke and heart attack, and that naproxen has anti-platelet effects similar to aspirin, it would seem reasonable that the difference in the rate of myocardial infarction is due to a protective effect of naproxen and the play of chance, rather than any adverse effect of Vioxx.

Prior to the publication the VIGOR Study theoretical concerns were raised about the potential pro-thrombotic potential of COX-2 inhibitors, based on the notion that selective COX-2 inhibition (in the relative absence of COX-1 inhibition) might result in reduced endothelial prostacyclin production without concomitant impairment of platelet thromboxane synthesis (sometimes referred to as the "FitzGerald hypothesis"). Prostacyclin (PGI2) is a potent vasodilator and inhibitor of platelet aggregation that is produced by prostacyclin synthase via the cyclooxygenase pathway of arachadonic acid metabolism. The balance between prostacyclin production and that of platelet TXA2, another product of the cyclooxygenase pathway that is involved in platelet aggregation, per the Fitzgerald hypothesis, is felt to be important in the maintenance of vascular hemostasis.

Catella-Lawson et al. examined the effect of the selective COX-2 inhibitor MK-966 (Rofecoxib) and the nonselective COX inhibitor indomethacin on the production of

serum thromboxane (TXB2), as well as the urinary metabolite of thromboxane (TX-M) and the urinary metabolites of prostacyclin (6-keto-PGF1a and PGI-M) in thirty-six older healthy subjects. MK-966 50 mg per day, indomethacin 50 mg three times per day or placebo was administered for two weeks. Platelet thromboxane synthesis was inhibited by indomethacin only. The urinary metabolites of prostacyclin were inhibited by both MK-966 and indomethacin and were unchanged by placebo. The data suggested that urinary prostacyclin production was COX-2 dependent. However, the exact source of the prostacyclin production could not be determined and this study therefore could not conclude that endothelial prostacyclin production was COX-2 mediated.

McAdam et al. examined the effect of celecoxib, a selective COX-2 inhibitor, and ibuprofen, a nonselective COX inhibitor, on the production of platelet derived thromboxane and prostacyclin in vivo. Thirty-seven healthy subjects were randomized to celecoxib (100 mg, 400 mg, or 800mg), ibuprofen 800mg, or placebo. Parameters were measured at several times over the ensuing twenty-four hours. Both serum and urinary metabolites of prostacyclin and platelet thromboxane were measured. The indomethacin inhibited the production of both the serum and urinary metabolites of prostacyclin and platelet derived thromboxane to a comparable degree. Celecoxib significantly inhibited the production of the urinary and serum metabolites of prostacyclin. Although there was some inhibition of the production of thromboxane metabolites with celecoxib it was much less pronounced. Placebo had no effect on the metabolite production of either prostacyclin or thromboxane. It was concluded that urinary prostacyclin production was mediated by COX-2. However, as with the study by Catella-Lawson, this study was not designed to determine the site of production of prostacyclin and therefore it could not be determined whether COX-2 inhibition affected endothelial prostacyclin production.

Indeed, other studies have examined the question of the effect of COX-2 inhibition on endothelial prostacyclin production. As referenced above, Tuleja et al. evaluated the effect of a selective COX-2 inhibitor (rofecoxib) and various nonselective COX inhibitors on the production of serum metabolites of thromboxane and prostacyclin at the site of microvascular injury in forty-five healthy subjects. The design of the study allowed for localization of the prostacyclin production to the endothelium. With administration of nonselective COX inhibitors there was inhibition of both thromboxane and prostacyclin metabolite production. There was no inhibition of thromboxane or prostacyclin metabolites with selective COX-2 inhibition, leading the authors to conclude that COX-1, and not COX-2, was the source of prostacyclin in the human endothelium.

Tsang et al. evaluated the effect of aspirin, a selective COX-1 inhibitor at low doses, on the production of prostacyclin (PGI2) in human aortas. Prostacyclin released by human aortic tissue was obtained at surgery was assessed in patients (n=23) with ischemic heart disease undergoing coronary artery bypass grafting (group 1), patients (n=14) undergoing surgery for aortic stenosis (group 2), patients (n=4) undergoing surgery for aortic insufficiency (group 3), and patients (n=8) with ischemic heart disease undergoing coronary bypass grafting who had taken aspirin (group 4). The latter group took 75-150 mg of aspirin daily for at least six months prior to surgery. The aortic stenosis and regurgitation groups served as controls in order to eliminate any effect that the presence

of atherosclerosis would have on the analysis. The decreased aortic production of prostacyclin in group 4 patients compared to group 1 patients was pronounced (95%) and highly significant (p<0.002). This study further supports the notion that human endothelial production of prostacyclin is a COX-1 mediated process.

Also, Wong et al. examined this issue using an animal model. The investigators evaluated the effect of two COX-2 inhibitors, rofecoxib and celecoxib, and the nonselective COX inhibitor indomethacin on the production of prostacyclin metabolites in rabbit aortic tissue. They found that Vioxx had no effect on the production of prostacyclin metabolite production in rabbit aortas, whereas indomethacin caused significant inhibition of prostacyclin metabolite production. This study also supports that endothelial prostacyclin production is COX-1 dependent.

It has also been suggested that Cox-2 inhibitors might accelerate or enhance the development of atherosclerosis.  While there are no human clinical trials addressing this theory, there are numerous mice studies using genetically altered mice models—low-density lipoprotein receptor deficient and apolipoprotien-E deficient knockout mice. Those mice, altered to allow for the development of atherosclerosis, were subjected to both selective and non-selective NSAIDs to test the effect of these agents on the initiation or progression of atherosclerosis.  In general, all but one of these studies found that Cox-2 inhibitors had either no effect or a beneficial effect on atherosclerotic lesion size (Burleigh 2002 & 2005; Paul 2000: Pratico 2001; Heeschen 2001; Oleson 2002; Egan 2005; Bea 2003; Linton 2002; and Belton 2003).  Two of the three studies that tested Vioxx (Burleigh 2002 and 2005) showed a regression of atherosclerosis. In Linton 2002, Vioxx was shown to have no effect on lesion size.  Only one mouse study found that a Cox-2 inhibitor--MF tricyclic-- might be associated with a greater degree of initiation of atherosclerosis (Rott 2003).

Based on the concerns raised about the theoretical potential for adverse effects of COX-2 inhibitors, Merck initiated a standard operating procedure (SOP) to evaluate potential adverse cardiovascular events in any study involving rofecoxib initiated in or after the second quarter of 1998. The SOP was designed to monitor (through outside and independent adjudication) thrombotic vascular events such myocardial infarction, ischemic stroke, unstable angina, transient ischemic attacks, sudden death, pulmonary embolism, peripheral arterial thrombosis, peripheral and cerebrovascular venous thrombosis, and death associated with any of the aforementioned conditions. The VIGOR Study was the first trial to which the SOP was applied.

Konstam et al. performed a meta-analysis of the cardiovascular events in twenty-three phase IIb to V rofecoxib trials (including the VIGOR Study). Comparisons were made between patients taking rofecoxib, naproxen (a NSAID with near-complete inhibition of platelet function over its dosing interval), other nonselective NSAIDs (diclofenac, ibuprofen, and nabumetone), and placebo. These trials were designed to evaluate the effect of rofecoxib on rheumatoid arthritis, osteoarthritis, Alzheimer's prevention and treatment, and chronic low back pain.  The major outcome measure was the combined end point used by the Antiplatelet Trialists' Collaboration (APTC). The endpoints were

cardiovascular, hemorrhagic, and unknown deaths; nonfatal myocardial infarctions; and nonfatal strokes. More than 28,000 patients, representing >14,000 patient-years at risk were analyzed. When compared across all trials, the RR for the ATPC end point was 0.84 (95%: 0.51, 1.38) when comparing rofecoxib with placebo; 0.79 (95% CI: 0.40, 1.55) when comparing rofecoxib with non-naproxen NSAIDs; and 1.69 (95% CI: 1.07, 2.69) when comparing rofecoxib to naproxen. The analysis was repeated in patients at high risk for cardiovascular thrombotic events as defined by either two or more major risk factors for coronary artery disease (current smoker, diabetes, hypertension and/or hypercholesterolemia) or a prior history of a cardiovascular thrombotic event. The RR for an endpoint was 1.04 (95% CI: 0.51, 2.12) when comparing rofecoxib to placebo; 0.96 (95% CI: 0.40, 2.29) when comparing non-naproxen NSAIDs to rofecoxib; and 1.88 (95%CI: 0.93, 3.81) when comparing rofecoxib to naproxen. It was concluded that rofecoxib did not result in an excess risk of thrombotic cardiovascular events when compared to placebo or non-naproxen NSAIDs. The differences between rofecoxib and naproxen were likely the result of the anti-platelet effects of naproxen (as described above). Further, it should be noted that Weir et al. updated this analysis by Konstam et al. and came to similar conclusions.

Reicin et al. examined the risk of thrombotic cardiovascular events in the rofecoxib IIb/III osteoarthritis trials. The endpoint was an adverse event, either an arterial or venous thrombotic event, as defined by the SOP, with a second analysis performed using the endpoint as defined by the APTC.  This study looked at 5,435 participants in 8 phase IIb/III osteoarthritis trials who took Vioxx for a median duration of 3.5 months and that supported the original approval of rofecoxib. Rofecoxib was compared to placebo and nonselective NSAIDs (ibuprofen, diclofenac, or nabumetone). The RR of the primary endpoint was 1.15 (95% CI: 0.63, 2.09) when comparing nonselective NSAIDs to rofecoxib and 0.94 (95% CI: 0.31, 2.92) when comparing placebo to rofecoxib. The analysis did not change when aspirin indicated patients (history of stroke, transient ischemic attack, myocardial infarction, stable angina, unstable angina, coronary bypass grafting, or percutaneous coronary intervention) were evaluated separately. The RR in this analysis was 1.45 (95% CI: 0.53, 4.00) for nonselective NSAIDS compared to rofecoxib and 1.24 (95% CI: 0.02, 15.47) for rofecoxib compared to placebo. The analysis using the APTC end point was no different. The RR for an endpoint was 1.44 (CI: 0.65, 3.17) when comparing nonselective NSAIDs to rofecoxib and 1.42 (CI: 0.24, 6.22) when comparing placebo to rofecoxib. In summary, an analysis of the rofecoxib osteoarthritis studies showed no difference between rofecoxib, nonselective NSAIDS, and placebo with regard to the risk of cardiovascular thrombotic events.

Mukerjee et al. reached a different conclusion about the risk of cardiovascular events when they compared the myocardial infarction rates for celecoxib and rofecoxib (in CLASS and VIGOR, respectively) to the placebo arm of a meta-analysis of aspirin use. The study design was criticized because it compared absolute event rates from different studies. To be valid it would assume similar cardiovascular risks in the populations studied, as well as having the same study endpoints – two things which cannot be assured. The annualized myocardial infarction event rates for rofecoxib (0.74%) and for celecoxib (0.80%) are similar. The annualized myocardial infarction rate for the placebo

arm of the aspirin trials meta-analysis was 0.52%. Targum in the FDA memorandum dated February 1, 2001, showed the annualized myocardial infarction rate for naproxen users in the VIGOR study to be 0.15%. Taken together, this information would suggest a protective effect of naproxen with regard to prevention of myocardial infarction. The authors did not conclude that rofecoxib definitely caused an increased risk of thrombotic cardiovascular events, but rather reached the same conclusions as the authors of the VIGOR study. Further, Mukerjee et al. did not find any significant increase in risk of thrombotic cardiovascular events among users of rofecoxib in studies 090 and 085. However, one of the authors, Topol, later suggested in deposition testimony that the findings of study 090 (which is detailed in the Targum FDA memorandum, dated February 1, 2001) showed that rofecoxib was related to an increase in cardiovascular thrombotic events. His post hoc analysis of 090, which he talks about in his deposition, does not use a pair wise comparison of the cardiovascular events with rofecoxib use to event rates with nabumetone and placebo as called for in the protocol but rather he combines the nabutemone and placebo groups and compares the cardiovascular event rates in the combined group to the rates in rofecoxib group, resulting in a different conclusion about event risk. Furthermore, in his deposition, he states that 090 is important, but reaches a different conclusion in the article stating that it is too small to make any meaningful conclusions.

Lisse et al. published a study which looked at the thrombotic cardiovascular events in the ADVANTAGE (Assessment of Differences between Vioxx and Naproxen to Ascertain Gastrointestinal Tolerability and Effectiveness) Study Group. This study enrolled 5557 patients with osteoarthritis with a mean age of 63 years. The patients were randomized to either rofecoxib 25 mg per day or naproxen 500 mg twice daily, for a period of three months, in a double blind controlled fashion. Approximately sixty percent of each group had a history of a cardiovascular event. Low-dose aspirin (<100 mg/day) was allowed if taken for cardiovascular prophylaxsis prior to randomization. The rofecoxib and naproxen groups did not significantly differ in the number of thrombotic cardiovascular events, as defined by the combined APTC end points, (10 [0.4%] vs. 7 [0.3%]; p>0.2, or in adjudicated confirmed thrombotic events (9 [0.3%] vs. 12 [0.4%] p>0.2). Five myocardial infarctions occurred in the rofecoxib group and one in the naproxen (p>0.2). There were no strokes in the rofecoxib group and six in the naproxen group, all thrombotic (p=0.015).

Reines et al. performed a study to examine the effect of rofecoxib on the rate of progression of mild to moderate Alzheimer's disease in 692 patients aged 50 years or older. They were randomized to receive either rofecoxib 25 mg per day or placebo for a period of 12 months. The number of confirmed adjudicated serious thrombotic vascular events during the twelve month period was lower in the rofecoxib group (4 events) compared to the placebo group (11 events; 1 additional event occurred in a patient on placebo during months 13 to 15).

Thal et al. used a randomized, double-blind, placebo-controlled study to determine whether rofecoxib would slow the onset of Alzheimer's disease in patients with mild cognitive impairment. A total of 1457 patients aged 65 years or greater were randomized

to either rofecoxib 25 mg per day or placebo for 4 years. The number of confirmed thrombotic events during the four year period was similar in the two groups (38 in the rofecoxib group and 36 in the placebo group). Four patients on rofecoxib suffered fatal myocardial infarctions and another two had cardiac arrests while taking the drug. Three patients on placebo suffered a fatal myocardial infarction and none had a cardiac arrest.

Juni et al. examined the risk of myocardial infarction with use of rofecoxib compared to nonselective NSAIDs and placebo by performing a meta-analysis on randomized controlled trials. I should note that the Alzheimer's studies were excluded from their analysis. They concluded that the RR for Vioxx for myocardial infarction with rofecoxib use was 2.30 (95% CI: 1.22, 4.33). It should also be noted that this analysis was with respect to rofecoxib versus any comparator and excluded certain randomized trials from the analysis. However, according to Table 2 in the article, the RR for rofecoxib compared to placebo was 1.04 (95% CI: 0.34, 3.12); 1.55 (95% CI: 0.55, 4.36) when compared to non-naproxen NSAIDS; and 2.93 (95% CI: 1.36, 6.33) when compared to naproxen. Thus, in actuality, their results did not differ from the results of Konstam et al. and Weir et al., in that, there did not appear to be an increased risk with rofecoxib compared to placebo and non-naproxen NSAIDs, but there was a difference in cardiovascular events when rofecoxib was compared to naproxen.

Several epidemiologic studies have looked at the effect of nonselective NSAID and coxib use on the risk of thromboembolic cardiovascular events. Watson et al. (2002) examined the risk of acute thromboembolic (myocardial infarction, sudden death, and stroke) events in patients with rheumatoid arthritis (RA) taking naproxen. This study was a population-based, case-controlled study, using patients from the UK General Practice Research Data Base (GPRD). Those patients with a current prescription for RA had a reduced risk of major acute thromboembolic events relative to those with no prescription in the past year. The RR was 0.61 (95% CI: 0.39, 0.94), whereas past use was 0.87 (95% CI: 0.65, 1.16).

Rahme et al. (2002) evaluated the association between naproxen use and acute myocardial infarction in a population of elderly patients in Quebec using a case-control study. They showed that concurrent naproxen use reduced the risk of acute myocardial infarction compared to those using other NSAIDs. The RR was 0.79 (95% CI: 0.63, 0.99). This effect was seen only in those who had filled at least two consecutive thirty day prescriptions.

Solomon et al. (2002) performed a case-controlled study of patients with myocardial infarctions using a healthcare data base that contained all prescriptions, diagnoses and procedural information on patients enrolled in the New Jersey Medicare and Medicaid programs. Although NSAID users had the same risk of myocardial infarction as nonusers, those who used naproxen had a significant reduction in the risk of myocardial infarction RR 0.84 (95% CI: 0.72, 0.98).

Ray et al. (Jan 2002) came to a different conclusion about the cardio-protective effects of naproxen by examining non aspirin NSAID use in the Medicaid population in Tennessee.

They found no effect on acute myocardial infarction or coronary heart disease death when NSAIDs were compared to placebo. The RR for naproxen was 0.96 (CI: 0.92, 1.16), ibuprofen 1.15 (95% CI: 1.02, 1.28), and other non-aspirin NSAIDs 1.02 (95% CI: 0.92, 1.16). When naproxen was directly compared with ibuprofen the RR was 0.83 (95% CI: 0.69, 0.98).

Ray et al. (October 2002) performed another retrospective cohort study in the TennCare program. Compared to current users, they found no increased risk with ibuprofen, naproxen, celecoxib, rofecoxib 25mg RR 1.03 (95% CI: 0.78, 1.35), and rofecoxib 50mg RR 1.70 (95% CI: 0.98, 2.95). An increased risk was found with rofecoxib 50mg compared to new users during the study RR 1.93 (95% CI: 1.09, 3.43).

Mamdani et al. (2003) conducted a population based retrospective cohort study using health care data from Ontario, Canada. They identified new users of coxibs and nonselective NSAIDs who were over the age of sixty-six. Relative to control subjects, there were no differences in acute myocardial infarction risk for new users of celecoxib RR 0.9 (95% CI: 0.7, 1.2), rofecoxib RR 1.0 (95% CI: 0.8, 1.4), naproxen RR 1.0 (95% CI: 0.6, 1.7) or non-naproxen nonselective NSAIDs RR 1.2 (95% CI: 0.9, 1.4).

Solomon et al. (2004) performed a matched case control study of patients with myocardial infarction using a database of Pennsylvania and New Jersey Medicare beneficiaries. The authors did not find a statistically significant increase in risk for MI when rofecoxib was compared to no current use OR 1.14 (95% CI: 1.00-1.31). It is interesting to note that in this study, statins were found not to be cardioprotective and hormone replacement therapy was found to be cardioprotective.

Graham et al. (2005) performed a nested case-control study using data from Kaiser Permanente in California. Cases of myocardial infarction and sudden death were matched with controls. Current exposure to coxibs and nonselective NSAIDs was compared to remote exposure to any NSAID, and rofecoxib was compared to celecoxib. For all doses of rofecoxib versus celecoxib the odds ratio (OR) was 1.59 (95% CI: 1.10, 2.32), for rofecoxib 25 mg/day or less 1.47 (95% CI: 0.99, 2.17), for rofecoxib greater than 25 mg/day 3.58 (95% CI: 1.27, 10.11). However, when rofecoxib was compared to remote use, there was no statistically significant increased risk for all doses of rofecoxib OR 1.34 (95% CI: 0.98, 1.82) or rofecoxib 25mg/day or less OR 1.23 (95% 0.89, 1.71). There was an increase risk for rofecoxib greater than 25mg, but the number of events was small. For naproxen use versus remote NSAID use the OR was 1.14 (95% CI: 1.00, 1.30).

Kimmel et al. (2005) used a case-control study to examine the risk of nonfatal myocardial infarction among users of celecoxib and rofecoxib compared to users of non-aspirin NSAIDs and those who did not use non-aspirin NSAIDs. The OR for celecoxib compared to nonusers was 0.43 (95%CI: 0.23, 0.79), for rofecoxib compared to nonusers was 1.16 (95% CI: 0.70, 1.93). When rofecoxib was compared to naproxen, the OR was 3.39 (95% CI: 1.37, 8.40).

Levesque et al. (2005) evaluated the risk of acute myocardial infarction in users of coxibs and nonselective NSAIDs compared to placebo in residents of Quebec, Canada. The study was a retrospective, population-based cohort study using a time-matched, nested case-control approach. Those who used rofecoxib compared to nonusers of a NSAID the RR was 1.24 (95% CI: 1.05, 1.46). There was no evidence for elevated risk with current use of celecoxib RR 0.99 (95% CI: 0.85, 1.16), non-naproxen NSAIDs RR 1.00 (CI: 0.73, 1.37), naproxen RR 1.17 (95% CI: 0.75, 1.84), and meloxicam RR 1.06 (CI: 0.49, 2.30).

Levesque et al. (2006) also looked at a population similar to the one in the study mentioned above to assess the timing of the onset of cardiovascular events with the use of coxibs. They found the risk of myocardial infarction was highest following the first-time use of rofecoxib, RR 1.67 (95% CI: 1.21, 2.30), with events occurring a median of nine days after starting the drug. This finding was not replicated for first-time users of celecoxib. Repeated exposure to rofecoxib was not associated with an increased risk of myocardial infarction, RR 1.29 (95% CI: 0.98, 1.40). The same was seen with celecoxib. Although the risk of myocardial infarction remained elevated for up to seven days after the discontinuation of rofecoxib RR 1.23 (95% CI: 1.05, 1.44) it returned to baseline beginning eight days after the drug was discontinued RR 0.82 (95% CI: 0.61, 1.09).

Hippisley-Cox and Coupland (2005) compared the risk of myocardial infarction in patients taking coxibs and nonselective NSAIDs. The study was a nested case-control. There was an increased risk with use of rofecoxib OR 1.32 (95% CI: 1.09, 1.61), diclofenac OR 1.55 (95% CI: 1.39, 1.72) and with ibuprofen OR 1.24 (95% CI: 1.11, 1.39). Increased risk was also seen with naproxen, other nonselective NSAIDS, as well as other COX-2 inhibitors.

Johnsen et al. (2005) used a case-controlled study to examine the risk of myocardial infarction among users of coxibs and non-selective NSAIDs (including naproxen) compared to nonusers. The coxibs and nonselective NSAIDs, with the exception of naproxen, were associated with an increased risk of myocardial infarction. The adjusted RR for myocardial infarction for users of rofecoxib compared to nonusers of NSAIDs was 1.80 (95% CI: 1.47, 2.21). Increased risk was also found with users of other COX-2 selective inhibitors and other non-aspirin users.

Shaya et al. (2005) compared the risk of cardiovascular thrombotic events with use of coxibs and nonselective NSAIDs. The OR for cardiovascular thrombotic events for users of coxibs versus non-naproxen nonselective NSAIDS was 1.09 (95% CI: 0.90, 1.33). For rofecoxib only, the OR was 0.99 (95% CI: 0.76, 1.30).

Harrison-Woolrych et al. (2005) using a prospective, longitudinal, observational cohort study, showed no difference in the incidence of cardiovascular thrombotic events when comparing rofecoxib to celecoxib. The age adjusted RR for celecoxib use versus rofecoxib was 0.94 (95% CI: 0.51, 1.70).

Velentgas et al. (2005) performed a retrospective cohort study amongst users of rofecoxib, celecoxib, and the nonselective NSAIDs, ibuprofen and diclofenac. Compared to ibuprofen or diclofenac the RR of rofecoxib use was 1.35 (95% CI: 1.09, 1.68). Interestingly, higher doses of rofecoxib (26 to 50 mg/day) were not associated with an increased risk RR 0.81 (95% CI: 0.41, 1.60).

Kasliwal et al. (2005) performed a retrospective analysis of thromboembolic events in users of rofecoxib and celecoxib using an observational cohort technique, namely prescription event monitoring (PEM). The rofecoxib and celecoxib PEM cohorts contained 15,268 and 17,458 patients, respectively. The adjusted RRs for rofecoxib compared to celecoxib were 1.04 (95% CI: 0.50, 2.17) for cardiovascular thromboembolic events, 1.43 (95%CI: 0.86, 2.38) for cerebrovascular thromboembolic events, and 0.36 (95% CI: 0.01, 1.34) for peripheral venous thromboembolic events.

Andersohn et al. (2006) conducted a nest case-control study using the GPRD to determine whether the purported increased risk of myocardial infarction associated with COX-2 use was a class effect. They compared the rate of myocardial infarction in users of both COX-2 selective and nonselective NSAIDs to nonusers of either class of drug. Etoricoxib was associated with a RR of 2.09 (95% CI: 1.10, 3.97), rofecoxib 1.29 (95% CI: 1.02, 1.63), celecoxib 1.56 (CI: 1.22, 2.00), and diclofenac 1.37 (CI: 1.17, 1.59). For valecoxib the RR was 4.69 (95% CI: 0.61, 34.51). The authors concluded that the increased risk of myocardial infarction was a class effect.

Chan et al. (2006) conducted a prospective cohort study to examine the effect of NSAIDs and acetaminophen on the risk of major cardiovascular events (nonfatal myocardial infarction, fatal coronary heart disease, nonfatal and fatal stroke). They found no increase in the risk of these events in a cohort of 70,791 women examined over a 12 year period if the use of NSAIDs or acetaminophen was less than 22 months. For use of 22 months or more the RR among NSAID users compared to nonusers was 1.44 (95% CI: 1.27, 1.65). The RR for acetaminophen users was 1.35 (95% CI: 1.14, 1.59). The authors concluded that frequent use of either NSAIDs or acetaminophen was associated with an increased risk of major cardiovascular events.

Huang et al. (2006) used an observational study to examine the risk of acute myocardial infarction (AMI), angina, stroke, and transient ischemic attack (TIA) in long-term users of rofecoxib and celecoxib compared to meloxicam. Patients in the study used the drugs for at least 180 days. Compared with meloxicam users, celecoxib users had lower hazard ratios (HR) for the development of AMI (HR 0.78, 95% CI: 0.63, 0.96) and stroke (HR 0.81, 95% CI: 0.70, 0.93). Rofecoxib users had no higher event rates than the users of meloxicam. Further, there was no significant difference between rofecoxib and celecoxib. Not surprisingly, the authors found that having had an event in the year prior to drug use was significant predicator of a subsequent event.

Solomon et al. (2006) examined the risk of cardiovascular events in users of coxibs, NSAIDs and nonusers in a longitudinal cohort of Medicare beneficiaries enrolled in a state-run prescription drug plan. The coxibs included rofecoxib, celecoxib, and

valdecoxib. The NSAIDs were diclofenac, ibuprofen, naproxen, and a composite of all other NSAIDs. When compared to non-users, rofecoxib users had a RR of 1.15 (95% CI: 1.06, 1.25), whereas naproxen users had a RR of 0.75 (95% CI: 0.62, 0.92). No other coxib or NSAID was associated with a significant increase or decrease in cardiovascular events.

In summary, the epidemiologic studies provide conflicting results which is not surprising given the inability of such studies to control for multiple confounding factors. Moreover, given the conflicting results, I do not believe that any reliable conclusions can be drawn from these studies.

The Adenomatous Polyp Prevention on Vioxx (APPROVe) Trial was conducted to evaluate the hypothesis that three years of treatment with rofecoxib 25 mg per day would reduce the risk of recurrent of adenomatous polyps among patients with a history of colorectal adenomas. As part of the SOP, cardiovascular events were assessed. The RR for thrombotic cardiovascular events in the rofecoxib group was 1.92 (95% CI: 1.19, 3.11). Furthermore, the Kaplan-Meier event plot shows that the separation in events did not occur until after 18 months of use. I have also received data regarding the follow up of the APPROVe Trial which examined off drug events. For the off drug period only, there is no statistically significant difference between persons who had previously used Vioxx versus those randomized to placebo. Table B6: RR 1.64 (95% CI: 0.89, 3.04).

Two studies, which were terminated early because of the voluntary withdrawal of rofecoxib, were analyzed for cardiovascular event rates. ViP was a double-blinded, randomized, placebo-controlled, multi-center study to evaluate the effect of rofecoxib in decreasing the risk of prostate cancer. The planned study population of 15,000 was randomized to either rofecoxib 25 mg per day or placebo. Patients with low dose aspirin use were randomized equally. The study was initiated on June 24, 2003 and was intended to run for 72 months. The study was terminated in September 2004, when Merck voluntarily withdrew rofecoxib. At the time of termination, 4,741 patients had been enrolled. The mean duration of treatment was 5.12 months. Cardiovascular events were analyzed using confirmed thrombotic cardiovascular serious adverse events (TCVSAE) as defined by the SOP as well as by applying APTC criteria. Using the TCVSAE criteria there were 15 (0.63%) events in the placebo group and 14 (0.59%) events in the rofecoxib group resulting in rates of 1.36 and 1.27, respectively. When examined using the APTC criteria there 9 (0.38%) events in the placebo group and 8 (0.34%) in the rofecoxib group. VICTOR (Vioxx in Colorectal Therapy: Definition of Optimal Regime) was designed to examine the effect of rofecoxib on the recurrence of colorectal carcinoma. At the time of termination, a total 2434 patients were enrolled with equal numbers assigned to either rofecoxib 25 mg per day or placebo. Cardiovascular events were analyzed using both the TCVSAE and APTC criteria while on treatment and within 14 days after discontinuation of treatment. Using the TCVSAE criteria there were 14 (1.15%) events in the rofecoxib group and 4 (0.33%) events in the placebo group. When APTC endpoints were used there were 9 (0.74%) events in the rofecoxib group and 3 (0.25%) events in the placebo group.

An April 6, 2005, FDA memorandum provided a summary of the available data about the cardiovascular risk of NSAIDs. It concluded that COX-2 selective NSAIDs do not differ from non-selective NSAIDs with regard to risk of serious cardiovascular events and that there is no rank order in risk with the approved COX-2 selective NSAIDs (i.e. celecoxib, rofecoxib, and valdecoxib) and non-selective NSAIDs. In short, the FDA concluded that any cardiovascular event risk is a class effect. Furthermore, short-term use of NSAIDs, particularly at low doses, does not appear to confer an increased risk of cardiovascular events (with the exception of valdecoxib in hospitalized patients immediately post-operative from coronary artery bypass surgery). It was also concluded that chronic use COX-2 selective NSAIDs does not confer an increased risk of cardiovascular events compared to non-selective NSAIDs with the possible exception of naproxen. Aspirin is the only agent that is an exception to the class effect, since aspirin use has been demonstrated to be associated with a reduction in cardiovascular events.

In conclusion, based on the totality of the data, rofecoxib does not differ from other NSAIDs, whether COX-2 selective or non-selective, with regard to cardiovascular risk, if any. The evidence supports that with short-term use there is no increased risk of cardiovascular events and that long-term use has a risk no different from that of other NSAIDs, with the exception of naproxen and aspirin.  I should note, however, that the randomized trial data with respect to long-term use of Vioxx is inconsistent: an increased risk shown in the APPROVe study, but no increased risk in the Alzheimer's studies.

I have reviewed the medical records of Anthony Wayne Dedrick (DOB 08/16/1955) from Vanderbilt University Medical Center, Saint Thomas Hospital, Maury Regional Medical Center, Wayne Medical Center, Tennessee Department of Correction, the Veterans Administration, LabOne, Esmeraldo Herrera, M.D., Mark Koenig, M.D., John McPherson, M.D., William Coltharp, M.D., Thomas J. Limbird, M.D., Kevin Kelly, M.D., Darrel R. Rinehart, M.D., Gene W. Bratt, The Heart Group, SleepRite Technologies, the reports of the stress echocardiogram and the echocardiogram performed on September 11, 2006; the DVDs of the echocardiograms performed on Mr. Dedrick on January 9, 2003 and September 11, 2006; the DVD of the coronary angiograms and the left ventriculogram performed on January 10, 2003; and the DVDs of the  lower extremity arterial studies performed on April 21, 2003 and March 10, 2005; materials relating to the adenosine nuclear stress test performed on September 27, 2006; the pharmacy records from Duren Discount Drugs and Fred's Pharmacy #3226; Plaintiff Complaint; Plaintiff Profile Form, dated November 24, 2005; the depositions of Esmeraldo Herrera, M.D., Mark Koenig, M.D., John McPherson, M.D., William Coltharp, M.D., Anthony Wayne Dedrick, Kenny Dedrick, Phil Dedrick, and Sherry Curtis; the expert reports of Ira J. Gelb, M.D. and Mark I. Furman, M.D.

Mr. Dedrick is a fifty-one year old man who prior to his myocardial infarction suffered from coronary artery disease, diabetes mellitus, hypertension, dyslipidemia, metabolic syndrome, microalbuminuria, arthritis, obesity, tobacco abuse, erectile dysfunction, tinnitus, and hearing loss. He continues to suffer from these conditions. Additionally, after his myocardial infarction he was diagnosed with peripheral arterial disease and neuropathy. He also claims to have had rheumatic fever. He has a history of alcohol and

cocaine abuse for which he was psychologically evaluated in the Tennessee Department of Correction on October 18, 1999. Mental health treatment for his cocaine and alcohol abuse was started on September 5, 2000 at the Tennessee Department of Correction because of failed abstinence. His family history is remarkable for multiple members with premature coronary artery disease. The medical records indicate that he was prescribed Vioxx 25 mg per day from July of 2002 until April of 2003. Subsequent to his Vioxx use, Mr. Dedrick used valdecoxib and celecoxib.

In January of 1989, he was admitted to Vanderbilt University Medical Center for treatment of trauma after a motor vehicle accident. He suffered chest trauma with multiple rib fractures and a severe pulmonary contusion requiring intubation and mechanical ventilation. He also had a right radius fracture and multiple facial lacerations. The blood alcohol level on admission was 164 mg/dl. During that hospitalization, all of the blood glucose measurements were elevated with the highest value being 218 mg/dl (normal 70-110 mg/dl). In 1992, he was admitted again to Vanderbilt University Medical Center for treatment of multiple trauma after an automobile accident. He suffered a closed head injury, LeForte I fracture, pulmonary contusion, lacerations and abrasions. His blood alcohol level on admission was 136 mg/dl. He also tested positive for cocaine. During that hospitalization, he again had elevated blood glucoses as well as a urinalysis which was positive for glucose. On February 4, 1997, his serum glucose was 189 mg/dl (normal 70-110 mg/dl). A serum glucose obtained on December 10, 1997 was 195 mg/dl. A urinalysis obtained on the same day was positive for glucose. The serum glucose obtained on March 12, 1998 was 247 mg/dl. On September 23, 1999, Mr. Dedrick was started on Avandia 4 mg per day for treatment of his diabetes. Shortly thereafter, his diabetes treatment was changed to Diabeta 5 mg per day. A urinalysis done on March 9, 2000 showed 3+ glucose (normal is no glucose). The Diabetic Record from the Tennessee Department of Correction showed persistently elevated blood sugars from April 15, 2000 to December 24, 2000. Subsequently, on April 4, 2001, Mr. Dedrick's serum glucose was 264 mg/dl, the HbA1c was 10.4% (normal 4.5-5.7%), and the urinalysis showed 3+ glucose. Due to Mr. Dedrick's poorly controlled diabetes, on May 9, 2001, the Diabeta was increased to 10 mg twice daily.

Despite the increase in Diabeta, Mr. Dedrick's blood glucoses remained poorly controlled throughout the remainder of 2001. Laboratory evaluation was again performed on December 6, 2001 and showed an elevated glucose of 298 mg/dl and an elevated HbA1c of 11.4%. Glucophage 1000 mg. per day was added in December of 2001 to Mr. Dedrick's diabetes treatment. Because of continued poor control of his blood sugars it was recommended to Mr. Dedrick in February of 2002 and again in April 2002 that he begin insulin therapy. On both occasions he refused. Subsequent to that, his diabetes treatment consisted of glyburide 5 mg twice daily and glucophage 1000 mg twice daily. Urine chemistry obtained on July 8, 2002 showed an abnormal microalbumin level of 8.1 mg/dl (normal 0-1.8 mg/dl) and an elevated urine protein of 19 mg/dl (normal < 12 mg/dl). On January 8, 2003, when he presented to Wayne Medical Center for treatment of an acute inferior myocardial infarction, Mr. Dedrick's blood glucose was 169 mg/dl.

As evident by the history stated above, Mr. Dedrick has had elevated blood glucoses since at least 1989. At no time since initiation of treatment for his diabetes has it been controlled for any prolonged period of time. It is well established that diabetes is related to the development of cardiovascular disease, nephropathy, neuropathy, and retinopathy. Furthermore, there is evidence that there is an increased risk of cardiovascular events and mortality with increasing levels of hyperglycemia (blood sugar level). Additionally, there is evidence that microabuminuria leads to an increased incidence of cardiovascular disease and events. The diabetes substantially contributed to Mr. Dedrick's coronary artery disease and the myocardial infarction which occurred as a result of the coronary artery disease. His risk was increased even further by the finding of microalbumuria in the setting of hypertension.

Mr. Dedrick also suffered from long-standing hypertension. Records from the Veterans Administration clinic show him to have elevated blood pressures in 1997. In August of 1997 he was diagnosed with hypertension and placed on Accupril 20 mg per day. Because of persistently elevated blood pressure, this medication was increased to 20 mg twice daily in September of 1997. Despite the increase in the Accupril dose, Mr. Dedrick's blood pressure remained elevated. As of October of 1999, Mr. Dedrick was switched to Adalat CC 60 mg per day for treatment of his hypertension. For a one month period in January 2000 his high blood pressure was also treated with Maxide. Despite this therapy, Mr. Dedrick's hypertension was marginally controlled with many blood pressure readings above normal. In July of 2001, his antihypertensive regimen was changed to Cardiazem 60 mg per day. In October of 2001, Vasotec 5 mg per day was added to Mr. Dedrick's hypertension therapy with some improvement, but still not optimal control of his blood pressure.

Hypertension is a clearly established risk factor for the development of cardiovascular disease and the events associated with it, such as myocardial infarction. Alcohol consumption, obesity, smoking, and insulin resistance are well accepted contributing factors to development of hypertension. Additionally, there is evidence of an increased risk of ischemic heart disease among hypertensive or borderline hypertensive patients with microalbuminuria. Mr. Dedrick was diagnosed with hypertension over five years prior to his myocardial infarction in January of 2003. During that time there were multiple blood pressure measures which were above normal. Furthermore, he had multiple blood pressure measurements above both the normal as far back as 1989. His hypertension substantially contributed to Mr. Dedrick's coronary artery disease and the myocardial infarction associated with it.

There is evidence that Mr. Dedrick also had elevated triglycerides, a finding of dyslipidemia, as early as 1997. A chemistry profile obtained on December 10, 1997 showed an elevated triglyceride of 165 mg/dl. Laboratory evaluation obtained on April 4, 2001 showed a triglyceride level of 194 mg/dl. Subsequently, on December 6, 2001, laboratory evaluation revealed a triglyceride level of 536 mg/dl and an HDL cholesterol of 25 mg/dl (normal 35-150 mg/dl). A lipid panel obtained on March 13, 2002 showed a total cholesterol of 192 mg/dl, triglycerides of 282 mg/dl, HDL cholesterol of 26 mg/dl and LDL cholesterol of 112 mg/dl. The pattern of Mr. Dedrick's lipid abnormalities is

17

often referred to as atherogenic dyslipidemia which is characterized by normal or mildly elevated total cholesterol, elevated triglycerides, low HDL cholesterol, and normal or mildly elevated LDL cholesterol which often has a small and dense particle pattern. LDL cholesterol size correlates positively with HDL cholesterol levels and negatively with triglyceride levels.  In all likelihood, Mr. Dedrick has small dense LDL cholesterol based on his elevated triglyceride levels and low HDL cholesterol. Low HDL cholesterol is an established risk factor for the development of atherosclerotic vascular disease. Additionally, there is evidence that small dense LDL cholesterol is predictive of the development of ischemic heart disease. Mr. Dedrick had atherogenic dyslipidemia prior to his myocardial infarction. The degree of dylipidemia and certain characteristics of the dyslipidemia are correlated to blood glucose levels. Mr. Dedrick's blood glucoses were poorly controlled prior to his myocardial infarction. One month prior to his myocardial infarction Mr. Dedrick was started on statin therapy. Mr Dedrick's atherogenic dyslipidemia substantially contributed to the development of his coronary artery disease and the myocardial infarction which occurred as a result of it.

Metabolic syndrome is a constellation of risk factors that are accompanied by an increased risk for cardiovascular disease and type 2 diabetes. The risk factors are atherogenic dyslipidemia, elevated blood pressure, elevated plasma glucose, a prothrombotic state, and a proinflammatory state. The two major risk factors leading to the metabolic syndrome are obesity and insulin resistance. Factors which can contribute to or exacerbate the metabolic syndrome are physical inactivity, advancing age, endocrine, and genetic factors. The primary treatment is lifestyle modification, namely weight loss, increased physical activity, and anti-atherogenic diet. However, additional pharmacologic treatment of dyslipidemia, elevated blood pressure, and elevated blood glucose may be necessary. The diagnosis of metabolic syndrome is made when three of the five findings are present: elevated triglycerides, reduced HDL cholesterol, elevated blood pressure, elevated blood glucose, and increased waist circumference. By some criteria microalbuminuria is one of the factors considered in the diagnosis.  Mr. Dedrick met the criteria for metabolic syndrome prior to his myocardial infarction, placing him at high risk for the development of cardiovascular disease and the events associated with it. Furthermore metabolic syndrome is associated with a number of other conditions including sleep apnea, which is linked to insulin resistance, hypertension, dysrhythmias and progression of atherosclerosis. Although suspected it is unknown if Mr. Dedrick suffers from sleep apnea, since he did follow through on testing for this condition.

Mr. Dedrick had other risk factors for the development of cardiovascular disease prior to his myocardial infarction, namely smoking and a strong family history of premature coronary artery disease. He has a smoking history starting at age seventeen. When hospitalized at Vanderbilt University Medical Center in 1989, he admitted to smoking two packs of cigarettes per day for the past seventeen years. He continued smoking approximately two packs of cigarettes per day up to the time of his myocardial infarction. He continues to smoke despite having had a myocardial infarction. Although he was offered counseling for smoking cessation in August of 2003 he refused it. Smoking is a clearly established risk factor for the development of atherosclerotic vascular disease and the consequences of it, including myocardial infarction. Mr. Dedrick's approximate 30

year history of smoking substantially contributed to the development of his atherosclerosis and the myocardial infarction associated with it.

It is well accepted that a family history of premature coronary artery disease is a risk factor for the development of coronary artery disease. There is also evidence that this risk is even greater if the premature coronary artery disease exits on the maternal side. Mr. Dedrick's mother suffered from premature coronary artery disease. She had several half-brothers who also had coronary artery disease. His maternal grandmother suffered from coronary artery disease. His brother suffered a myocardial infarction at age thirty-nine. Mr. Dedrick's family history of premature coronary artery disease which appears to be mediated through his mother's family is a significant risk factor contributing to his atherosclerosis and the myocardial infarction associated with it. Furthermore, male gender and age are risk factors for coronary artery disease. Although not advanced in age, given his multiple risk factors, atherosclerotic vascular disease and myocardial infarction are not unexpected. Both cocaine and alcohol abuse have been associated with the development of atherosclerosis and myocardial infarction. Mr. Dedrick has a history of cocaine abuse, having tested positive for cocaine when hospitalized at Vanderbilt University Medical Center in 1992. He received counseling for alcohol and cocaine abuse while incarcerated in the Tennessee Department of Correction in September of 2000. Furthermore, although not a risk factor for the development of atherosclerosis, erectile dysfunction is a marker for atherosclerotic vascular disease. Mr. Dedrick suffered from erectile dysfunction prior to his myocardial infarction in January of 2003. Lifestyle factors such as physical inactivity, increase weight and poor diet contribute to the development of atherosclerosis and the complications associated with it such as myocardial infarction. The cornerstone of the treatment of cardiovascular risk factors is lifestyle modification, i.e. increasing physical activity, weight loss, dietary modification, and cessation of smoking. Mr. Dedrick admits to physical inactivity prior to and after his myocardial infarction. Mr. Dedrick was determined to be disabled as of 1999. He admits that his diet prior to his myocardial infarction was poor. Furthermore, at no time prior to or after his myocardial infarction has he been able to achieve significant weight loss.

On January 8, 2003, Mr. Dedrick presented to Wayne Medical Center with an acute inferior myocardial infarction. He was treated with thrombolytic therapy and transferred to St. Thomas Hospital in Nashville, TN for further evaluation and treatment. By the time that Mr. Dedrick arrived at St. Thomas Hospital, the thrombolytic therapy resulted in reperfusion and his chest pain had resolved.  He was admitted to St. Thomas under the care of John McPherson, M.D. An echocardiogram was done on January 9, 2003 and interpreted by Evans Kemp, M.D. as showing borderline left ventricular enlargement, borderline left ventricular hypertrophy, and a left ventricular ejection fraction of 35-40% with inferior wall akinesis and moderate posterior wall hypokinesis. The associated doppler interrogation was interpreted as showing mild to moderate mitral regurgitation, mild to moderate pulmonic regurgitation and trace tricuspid regurgitation.

On January 10, 2003, a left heart catheterization with coronary angiography and left ventriculography was performed by Mark Koenig, M.D. The left ventriculogram was

interpreted as showing a left ventricular ejection fraction of 55-60% with severe hypokinesis to akinesis of the mid inferior wall. The coronary angiograms were interpreted as showing a normal left main coronary artery; sequential 40% and 70-75% stenosis in the mid left anterior descending artery, and a 50-60% stenosis at the osteum of the first diagonal artery; a long 50-60% involving the proximal and mid circumflex artery with a 70-80% in the distal circumflex artery, and a 50% ostial stenosis in the third obtuse marginal artery; a 95% stenosis with thrombus in the mid right coronary artery with a bifurcating posterior descending artery with a 50-60% ostial stenosis in one branch and a long 60-70% in the other branch. I have reviewed a DVD of the coronary angiograms and left ventriculogram. I interpret the coronary angiograms to show a normal left main coronary artery; sequential 40% and 70% stenoses in the mid left anterior descending artery with the vessel caliber being small throughout, and an osteal 60% in the first diagonal artery; a long 50-60% involving the proximal and mid circumflex artery, an 80-90% stenosis in the distal circumflex, and a 60-70% osteal stenosis at the ostium of the third obtuse marginal artery; and a 90% stenosis in the mid portion of the right coronary artery with thrombus at the site of the mid segment stenosis, a 60% stenosis distally, and bifurcating posterior descending artery with a 70-80% at the osteum and proximal segment of the superior branch, and 80% stenosis at the osteum of the inferior branch. Nothing is unusual about the findings on the angiograms, including the finding of a thrombus. I interpret the left ventriculogram to show normal left ventricular function with an ejection fraction of 55-60%. There is severe hypokinesis to akinesis of the inferior wall. The left ventricle is normal in size.

On January 13, 2003 Mr. Dedrick underwent coronary artery bypass grafting by William Coltharp, M.D. A left internal artery mammary graft was placed to the left anterior descending artery, and saphenous vein grafts to the first diagonal artery, obtuse marginal, and the posterior descending artery. His postoperative course was uncomplicated and he was discharged from St. Thomas Hospital on January 17, 2003. Since discharge from the hospital he has done well. He has had no cardiac complications subsequent to the myocardial infarction and does not have any cardiovascular limitations to his daily activities. He had a cardiology follow up on March 24, 2003. He was noted to be doing well at the time of that visit. Although no further cardiac testing was recommended at that time, he was advised to follow up in six months. None of his treating physicians have noted any cardiac complications since his discharge from St.Thomas Hospital.

On September 11, 2006 Mr. Dedrick was evaluated with an echocardiogram and stress echocardiogram. The echocardiogram was interpreted by Philip Oranburg, M.D. He interpreted the echo to show a normal-sized left ventricle with small area of apical hypokinesis, with an estimated left ventricular ejection fraction of 50% and 1+ mitral regurgitation. I interpret that echo to show normal cardiac chamber sizes, normal left ventricular systolic function with the left ventricular ejection fraction being approximately 55%, with mild hypokinesis of the inferobasal segment, and no significant valvular regurgitation or stenosis. Using an exercise protocol, Mr. Dedrick exercised for 3 minutes and 19 seconds before terminating the exam because of fatigue. Dr. Oranburg reported that there was no chest discomfort nor were there any ECG changes. He also reported the blood pressure to have remained unchanged at peak exercise compared to

rest; and the maximum heart rate achieved was 120 beats per minute, which is 71% of the maximum predicated heart rate for someone of Mr. Dedrick's age. Dr. Oranburg's interpretation of the echocardiographic portion of the stress test was that the resting images demonstrated normal left ventricular size with a very small area of hypokinesis at the apex. Following exercise, the contractility of the apex improved slightly. There were no new regional wall motion abnormalities. Dr. Oranburg interpreted the resting ECG to show inferior and mid anterior Q waves, however this interpretation is inconsistent with the ECG tracings obtained on September 27, 2006. No ECG tracings or stress images from the Boca Raton Community Hospital records have been provided for my review. The only echocardiographic portion of the stress test made available for my review are the resting images, which I interpret to show normal left ventricular function with a resting left ventricular ejection fraction of approximately 55%, with mild hypokinesis of the inferobasal segment.

On September 27, 2006 Mr. Dedrick was evaluated with an adenosine nuclear stress test. The baseline ECG was reported to show a normal sinus rhythm with Q waves in leads 3 and aVF and poor R wave progression from leads V1 to V3. There were no dysrhythmias nor any changes suggestive of ischemia during the infusion of adenosine. Mr. Dedrick was reported to have had no chest pain and the hemodynamic response was noted to be normal. The tomographic images were reported to show fixed inferior and anterior defects with a reversible anteroapical defect. The perfusion of the septal and lateral segments was noted to be normal. The gated images were reported to show mild inferior and septal hypokinesis with a calculated left ventricular ejection fraction of 49%. The resting left ventricular ejection fraction was reported to be 52%. I interpret the baseline ECG to show normal sinus rhythm, Q waves in leads III and aVF, which is consistent with the prior inferior myocardial infarction, and normal resting ST segments. The stress ECGs are unchanged from the baseline. I interpret the tomographic images to show a fixed inferior defect and a reversible defect in the anterior wall (this would not be indicative of a myocardial infarction involving the anterior wall). I have reviewed the gated images and agree with the findings as stated above. However, septal wall motion abnormalities are typically seen after coronary artery bypass surgery. Furthermore, the degree of change between the rest and stress left ventricular ejection fraction is not clinically significant.

Based on the materials that have been provided to me I believe that Mr. Dedrick's prognosis is good given his normal left ventricular function, the revascularization of his coronary arteries, and absence of significant dysrhythmias. To date he does not have any evidence of impairment due to his coronary artery disease and the myocardial infarction which occurred as a result of it. In all medical probability his atherosclerosis and the consequences of it (including his myocardial infarction) are the result of his numerous risk factors, which have been discussed above. Furthermore, he would have developed atherosclerosis and had the myocardial infarction even if he had not taken Vioxx. Neither his atherosclerosis nor the myocardial infarction which resulted from it were caused by or substantially contributed to by his use of Vioxx.

I reserve the right to amend this report and my opinions should additional information become available.

My billable rate is $400.00 per hour for record review, preparation of materials, and meetings; and $600.00 per hour for testimony.


Paul J. Roach, M.D., F.A.C.C.
October 6, 2006

# Plaintiff's Exhibit "2"

Paul J. Roach, M.D.

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  VIOXX                    *    MDL DOCKET NO. 1657
                                 *
PRODUCTS LIABILITY LITIGATION *    SECTION L - DIVISION 3
                                 *
This Document relates to         *
CASE NO. 2:05CV2524              *    JUDGE FALLON
                                 *
ANTHONY WAYNE DEDRICK,           *    MAG. JUDGE KNOWLES
An Individual,                   *
                                 *
         Plaintiff,              *
                                 *
v.                               *
                                 *
MERCK & CO., INC.,               *
                                 *
         Defendant.              *

         * * * * * * * * * * * *
     ORAL/VIDEO/VIDEOTELECONFERENCE DEPOSITION
                    OF
            PAUL J. ROACH, M.D.
              OCTOBER 24, 2006
         * * * * * * * * * * * *


         ORAL/VIDEO/VIDEOTELECONFERENCE DEPOSITION OF PAUL J.

ROACH, M.D., produced as a witness at the instance of the

Plaintiff, and duly sworn, was taken in the above-styled

and numbered cause on the 24th of October, 2006, from 2:00

p.m. to 6:25 p.m., before RHONDA HOWARD, CSR in and for

the State of Texas, reported by machine shorthand, at the

offices of Fulbright & Jaworski, 600 Congress, Suite 2300,

Austin, Texas, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.



PLAINTIFF'S
EXHIBIT
2

bbc4ba51-be76-433c-abad-5884dba30a44

Paul J. Roach, M.D.

Page 2

1         APPEARANCES
2
3    FOR THE PLAINTIFF:
4    Mr. Andy Birchfield
     BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.
5    234 Commerce Street
     Montgomery, Alabama 36103
6    (334) 269-2343
     (PRESENT VIA TELECONFERENCE)
7
8         -and-
9    Mr. Marcus L. Stevenson, JD, LLM
     GOFORTH LEWIS SANFORD, LLP
10   1111 Bagby, Suite 2200
     Houston, Texas 77002
11   (713) 650-0022
12
13   FOR THE DEFENDANT:
14   Mr. Robert A. Blackwell
     Mr. Sean P. Brennan
15   FULBRIGHT & JAWORSKI, L.L.P.
     2200 Ross Avenue, Suite 2800
16   Dallas, Texas 75201-2784
     (214) 855-8000
17
18   THE VIDEOGRAPHER:
19   Mr. Ernest Manzaranes
20
21
22
23
24
25

Page 3

1              INDEX
2    Appearances                      2
     Change Page                    165
3
4    EXAMINATION
5    Examination by Mr. Birchfield      4
6
7    SIGNATURE SHEET                166
     REPORTER'S CERTIFICATION       167
8
9              EXHIBITS
10   NUMBER        DESCRIPTION        PAGE
11   1       NOTICE OF DEPOSITION        5
12   2       CURRICULUM VITAE            5
13   3       EXPERT REPORT               5
14   4       DEDRICK MATERIALS           5
15   5       INVOICES                   10
16   6       BINDERS                   160
17   7       VIOXX LITERATURE          160
18   8       DEDRICK MEDICAL RECORDS   160
19   9       FOLDER OF LITERATURE      161
20   10      FOLDER OF LITERATURE      161
21   11      FOLDER OF LITERATURE      161
22   12      FOLDER OF LITERATURE      162
23
24
25

Page 4

1            (2:10 p.m.)
2         THE VIDEOGRAPHER:  Today's October 24th,
3    2006.  The time is 2:10 p.m., and we're on the record.
4         PAUL J. ROACH, M.D.,
5    having been duly sworn, testified as follows:
6            EXAMINATION
7    BY MR. BIRCHFIELD:
8      Q   Good afternoon, Dr. Roach.
9      A   Good afternoon, Mr. Birchfield.
10        MR. BLACKWELL:  Andy --
11        MR. BIRCHFIELD:  Yes.
12        MR. BLACKWELL:  -- just as one housekeeping
13   matter, I just wanted to put our agreement on the record.
14   The deposition today, we've agreed that it be limited to
15   four hours of time on the record.  We also have agreed
16   that the deposition will be limited to case-specific
17   issues relating to Mr. Dedrick.
18        MR. BIRCHFIELD:  Okay.  Well, I agreed to
19   limit the deposition today to four hours, and I
20   think that I can cover them -- the material that I need to
21   cover in four hours.  However, I'm not agreeing to waive
22   the additional time if it's necessary.  And I do intend
23   to focus primarily on the case-specific areas, but
24   general causation is a -- it's intertwined with
25   a specific -- case-specific issues and I intend to go

Page 5

1    into some of those.  I don't intend to replow the same
2    ground that's been covered in other depositions, but
3    I'm going to move, you know, as efficiently as possible,
4    but I do not intend to say I'm only going to talk about
5    issues specifically related to Tony Dedrick and
6    exclude all matters of general causation.  I suggest that
7    we -- either that we proceed and if you've got a --
8    if you want to stop me from going into certain areas,
9    then, you know, then we can do that and we can
10   take it up with Judge Fallon.  And hopefully, it won't
11   come to that.  I don't think that it will, Bob.
12        MR. BLACKWELL:  Agreed.
13        MR. BIRCHFIELD:  Okay.
14     Q   (By Mr. Birchfield) Dr. Roach, I wanted
15   to hand you what's marked as Exhibit 1 to your
16   deposition.  It's a -- the deposition notice in this
17   case.  Have you seen that before?
18        (Deposition Exhibit Nos. 1-4 marked)
19     A   To be honest with you, Mr. Birchfield, I think
20   this is actually the first time that I've actually seen
21   the document.  However, I was aware that the deposition
22   would occur today.
23     Q   Okay.  Thank you, Doctor.  If you'll turn to
24   Page 5, the document is labeled Attachment A and there
25   is -- there's a request for materials to be produced at

2 (Pages 2 to 5)

Paul J. Roach, M.D.

Page 6

1  your deposition. And I know that you have several boxes
2  of materials that are there in the room
3  with you. And I just want to make sure that all the
4  materials that are listed here on Attachment A are
5  covered. Can we go through this list starting
6  with No. 1, "Request all materials Dr. Roach has
7  reviewed prior to or since he was retained as an expert in
8  this litigation that would relate to Vioxx."
9      A   I --
10     Q   Are all those materials in the boxes that you
11  have --
12     A   May I interrupt you for one second
13  to clarify. When I said that I had not seen this
14  prior to today, I saw this yesterday when I met with
15  Mr. Brennan, so to clarify. And I apologize for that.
16     Q   Okay. All right.
17     A   I think the reason that I didn't recognize it is
18  I didn't see the attachment -- the original -- what you
19  showed me there, I didn't see the Attachment A, but I
20  now recognize the document based on the Attachment A.
21        To answer your first question, I have tried
22  to be as complete as possible and I have brought the
23  materials that I have reviewed pertaining to the general
24  issues in the Vioxx litigation as well as case-specific
25  issues. So I have tried to be as complete and thorough in

Page 7

1  bringing those materials and those are contained in the
2  boxes and folders that are to my right.
3      Q   And you have three boxes of materials and three
4  folders. Is that correct?
5      A   As I count them, it looks to me as if there are
6  three banker's boxes and I'm seeing what appear to be,
7  yes, three folders.
8      Q   Okay. And do those boxes and those three
9  folders, do those -- they comprise your file for the Vioxx
10  litigation and Tony Dedrick's case?
11     A   They do.
12     Q   Okay. And the materials there in the box and in
13  the --
14     A   And I'm sorry. The attorneys just
15  pointed something out. There are some additional
16  materials that we may get to later on which are some
17  billing records that I believe you requested. Now, when
18  you say materials related, there are some additional
19  materials here and there may be some additional articles
20  here that I'll give to the attorney that's with you
21  present as well as a package insert on TPA.
22     Q   Okay. Thank you.
23        The material that's in the boxes and in those
24  three folders, is that your original file or is that a
25  photocopy?

Page 8

1      A   You know, as I sit here, I can't tell you for
2  sure. I think that some of those materials have been used
3  at other depositions and may be photocopies. I'd have to
4  go through them and look at them to tell you that for
5  sure.
6      Q   As you reviewed the medical records in
7  this case and as you reviewed articles that pertain to
8  Vioxx, did you make notes or highlight the
9  articles?
10     A   I did not.
11     Q   Okay. In reviewing the materials, did you
12  prepare notes of any sort?
13     A   I did not.
14     Q   All right. And so everything that you have
15  under Item No. 1 would be contained in those boxes.
16  Correct?
17     A   That's correct.
18     Q   Boxes -- and then No. 2, all materials in which
19  you rely as support for your opinions in the Vioxx
20  litigation. Is that all contained in that file?
21     A   Well, substantial body of it. I suppose as we
22  begin to get into discussing general cardiology issues or
23  cardiology issues that may pertain to Mr. Dedrick, I
24  don't know that I have every article that I've ever read
25  in my entire life with regard to cardiology.

Page 9

1        And so I -- I've tried to be as thorough as I
2  possibly can addressing issues such as risk factor
3  assessment and other case-specific issues that might
4  arise. But there -- you know, depending on the questions
5  that might arise, I may rely on materials that are
6  sort of in my domain from my general practice, for lack of
7  a better way to say it.
8      Q   Okay. And Item No. 3, all work product
9  other than draft reports that you prepared in the Vioxx
10  litigation, would all of your work product be contained
11  in that file, those three boxes and three folders?
12     A   Yes.
13     Q   And then all statements reflecting the
14  time that you have spent on Vioxx-related work, invoices
15  and bills. I think you said that there are some on the
16  table. Is that correct?
17     A   That's correct.
18     Q   Okay. Can we mark those as a
19  composite exhibit, Exhibit No. 2 to your deposition.
20        And Dr. Roach --
21        THE REPORTER:  Sir, we already had a No. 2.
22  Do you want to take that No. 2 away?
23        MR. BIRCHFIELD:  No, no, that's fine.
24        THE REPORTER:  Did you want to make that 5?
25        MR. BIRCHFIELD:  What's the next available

3 (Pages 6 to 9)

bbc4ba51-be76-433c-abad-5884dba30a44

Paul J. Roach, M.D.

Page 10

1  exhibit number?
2       THE REPORTER: Five.
3       MR. BIRCHFIELD: That's five? Mark it as
4  Exhibit 5.
5       (Deposition Exhibit No. 5 marked)
6    Q  (By Mr. Birchfield) Are all -- are those
7  invoices all the invoices that you have submitted for
8  Vioxx-related work?
9    A  These are invoices pertaining to general matters
10 and then invoices pertaining to the Dedrick case. There
11 are no invoices pertaining to other cases that I have
12 reviewed.
13   Q  Okay. And can you tell me how much you
14 have billed for related to the Vioxx litigation work?
15   A  Probably around $200,000.
16   Q  And that includes work on the Tony Dedrick case?
17   A  Yes, sir.
18   Q  Okay. And what other cases have you
19 reviewed?
20       MR. BLACKWELL: I'm just going to object
21 and instruct him not to answer as to any sort of cases in
22 which he might be involved as a consulting expert at this
23 time and just answer as to those that he's been disclosed
24 as an expert.
25       MR. BIRCHFIELD: Okay. Bob, is it your

Page 11

1  position, then, that any -- even though he's a testifying
2  expert, any work that he has done as a consultant relating
3  to Vioxx litigation is not discoverable?
4        MR. BLACKWELL: No, sir. My position is
5  just as to a specific case we may have sent him that he
6  hasn't been disclosed in or perhaps even reviewed records
7  in. Just in that limited circumstance.
8    Q  (By Mr. Birchfield) Okay. What cases have
9  you been -- have you reviewed related to
10 Vioxx?
11   A  Well, the Barnett case that I know that you're
12 aware of and then there's another case, the Smith case.
13   Q  Okay. Any other cases, then, that you have
14 reviewed?
15   A  Well, I have reviewed, but I guess if I'm being
16 instructed by Mr. Blackwell not to give you those names,
17 I'm going to let you guys work that out.
18   Q  Have you formed any opinions and provided
19 any opinions to Merck or Merck's counsel in any
20 other Vioxx-related cases?
21   A  I have provided them opinions in the Smith case
22 and the Barnett case.
23   Q  Any others?
24   A  I have reviewed the records, but I -- in several
25 other cases, but we have not discussed those.

Page 12

1    Q  Okay. Have you been retained by Merck
2  as an expert in any other Vioxx lit -- any
3  other Vioxx cases other than Barnett and Smith?
4        MR. BLACKWELL: Objection; form.
5    A  I'm sorry. I'm sorry. I apologize. If you
6  could, repeat the question.
7    Q  (By Mr. Birchfield) Have you been retained by
8  Merck as an expert witness in any other Vioxx-related
9  cases?
10       MR. BLACKWELL: Objection; form.
11   A  Besides this particular case?
12   Q  (By Mr. Birchfield) Other than Dedrick, Barnett
13 and Smith.
14   A  Well, as I mentioned before, I had been sent
15 records on other cases. I don't know whether that
16 qualifies as being retained in the case, but I've been
17 asked to review other cases.
18   Q  Okay. Were you retained in the Diaz case?
19   A  I was sent records in the Diaz case.
20   Q  Were you retained in the Kozic case?
21   A  I was.
22   Q  Okay. And --
23   A  Well, I was sent records and, again, I
24 don't know how -- whether retained is the same as being
25 sent records, but I was sent records in those cases.

Page 13

1    Q  Okay. Any other cases that you recall
2  reviewing?
3    A  Not off the top of my head. That would be it.
4    Q  All right. No. 4, all statements reflecting
5  time that's -- oh, we just covered -- that's what we just
6  covered. Right? Got them all on the table there as part
7  of Exhibit 5. Is that correct?
8    A  You mean -- yes, as Exhibit 5 with the exception
9  of any billings that would have pertained to the
10 Kozic case and the Diaz case.
11   Q  Okay. Can you tell me, Dr. Roach,
12 approximately how much -- what the total amount of
13 time you have spent in the Vioxx litigation [sic]?
14   A  Well, my billing rate is 400 an hour for
15 review of records, meetings, preparation of reports. And
16 it's $600 an hour for deposition testimony and trial
17 testimony. So we could get at some rough estimate based
18 on the total amount of billings that have been sent to
19 date and then just simply dividing that out.
20       And obviously, if you look at it, it's been
21 hundreds and hundreds of hours.
22   Q  Okay. And the 200,000 figure that
23 you gave me earlier, that would include the work
24 that you have done reviewing cases such as Kozic
25 and Diaz where you have not given testimony. Is that

Golkow Litigation Technologies - 1.877.DEPS.USA

bbc4ba51-be76-433c-abad-5884dba30a44

Paul J. Roach, M.D.

Page 14

1  correct?
2     A   That's correct.
3     Q   The 200,000 is an approximation of the total
4  amount that you have been paid or billable time that
5  you have in this litigation.  Correct?
6     A   That's correct.
7     Q   Okay.  All right.  No. 5, all publications,
8  abstracts, notes, et cetera -- do you see No. 5?
9     A   Yes, I do.
10    Q   Okay.  Would all of that material be included
11  in the file, those three boxes and three folders?
12    A   Yes.
13    Q   Okay.  And Item No. 6, are all of the items
14  listed in No. 6 included in that file?
15    A   Correct.
16    Q   Okay.  And Item No. 7, all communications that
17  you have had with any defendants' counsel in the Vioxx
18  litigation, would that be included in your file?
19    A   Yes.
20    Q   Do you maintain copies of communication that you
21  have had with defendants' counsel?
22    A   Well, there are -- you -- you've
23  seen copies here.  I try to maintain a copy -- both either
24  a print copy or a copy on my computer, so I try to keep
25  that.

Page 15

1     Q   Okay.  So any communication that you
2  would maintain on your computer you've printed off and
3  would be contained in that file?
4     A   That's correct.  And then I retain any -- I
5  guess to further clarify that, any -- anything that's sent
6  from the attorneys you know, in most
7  instances there is a cover letter.  I keep those cover
8  letters.  I try and -- I do not discard any of that.
9          THE REPORTER:  Make sure and let him
10  finish.
11    Q   (By Mr. Birchfield) And Item No. 8, all
12  documents reflecting communications with Merck or other
13  experts retained by defendants or other counsel,
14  would that be included in that file?
15    A   Again, with the exception of any documents or
16  any cover letter or E-mail that would have accompanied the
17  billings in those -- in the Kozic case and the Diaz case,
18  those would not be in this file today.
19    Q   Okay.  But all other communications
20  would be?
21    A   Well, and I apologize, also.
22        We -- you would not have them from Barnett or
23  Smith, as well.  So the only -- the communications that
24  you would have from me to the attorneys would have been
25  the communications accompanying billings in the general

Page 16

1  issues and then communications that are specific to this
2  particular case.
3     Q   Have you had any communications with other
4  experts in the Vioxx litigation?
5     A   I have not.
6     Q   Okay.  Have you talked to Dr. Craig Pratt?
7     A   I wouldn't know Craig Pratt if I ran into him.
8     Q   Okay.  Never had any communication with
9  Dr. Flavahan?
10    A   I have not.
11    Q   Okay.  All right.  Have -- Doctor, I want to
12  mark as Exhibit 2 to your deposition your curriculum
13  vitae.
14        Can you tell us, Doctor, is
15  this -- if this is a current and up-to-date copy of your
16  curriculum vitae?
17    A   It is.  There are some of these
18  committees, if you have a copy in front of
19  you --
20    Q   Yes, I do.
21    A   -- that go back, you know, like the -- a
22  committee, like chair -- 1994 to the present, member Ex
23  Officio Medical Executive Committee at Brack.  I'm
24  actually on that Med Exec committee now.  That's probably
25  not accurate to call it Ex Officio.  Below that 1994 to

Page 17

1  the present says Director of Special Procedures Committee.
2  I think that when the secretary prepared that, she just
3  put that in there.  I don't even know that that committee
4  still exists.  And I think at the last deposition when
5  Mr. Abney asked me about a number of these different
6  committees, I told him that I'd probably go back and clean
7  them up, but I just haven't had time to really do that.
8        So I think that if you look at, for example, the
9  ones that are pertinent, we could probably take out all of
10  those things that say 1994 to the present.  I don't even
11  know if those committees still even exist at this point.
12    Q   Okay.
13    A   So -- but the rest of them, the more
14  current things from 2005 forward, those are
15  accurate.
16    Q   Okay.  In regards to the bibliography
17  section, is that accurate and up-to-date?
18    A   It is.  I have had no publications since the
19  last time I was deposed.
20    Q   Okay.  And the -- let's see.
21        Okay.  In regards to your visiting cardiology
22  fellow at Utah, who did you study under?
23    A   There was a guy named Mike Bristow
24  (phonetic), Dale Renlen (phonetic), and I'm blanking on
25  the last gentleman's name, an Irish name, who I think went

5 (Pages 14 to 17)

bbc4ba51-be76-433c-abad-5884dba30a44

Paul J. Roach, M.D.

Page 18

1   on to become the Chief of Cardiology or the Chair of
2   Medicine at the University of Mississippi. And I'm
3   blanking on his name.
4       But Mike Bristow was the chief of the --
5   was the cardiologist who, I think, was designated
6   as the chief of the transplant program there.
7       Q   Did you know David Bjorkman?
8       A   David Bjorkman. That name does not --
9       Q   Bjorkman.
10      A   -- does not ring a bell to me.
11      Q   B-J-O-R-K-M-A-N.
12      A   It doesn't ring a bell.
13      Q   Okay. All right. Let me show you
14  what's marked as Exhibit 3, which is your expert report in
15  this case.
16      Dr. Roach, did you review your expert
17  report in preparation for your deposition?
18      A   I did not go back through it line by line
19  by line. I probably more had reviewed more of the
20  case-specific aspects of it but not the entire report.
21      Q   Okay. Well, are there any additions or
22  corrections that need to be made to your report in
23  this case?
24      A   Well, having not reviewed the entire report
25  prior to sitting here, I can't tell you that. But I --

Page 19

1   you know, having the report is dated October 6,
2   2006, and I did go through the report.
3       I mean, I guess -- let me clarify
4   that, because maybe I'm being a little too concrete in my
5   thinking. I didn't actually sit down, like last night,
6   and go through the report. But obviously I went through
7   the report on the date of October 6th when it was signed
8   and reviewed the report to make sure that what was said in
9   the report was accurate.
10      So if that answers the question for you, that's
11  what I did.
12      But since that date, I have not sat down and
13  gone through the report again in the same detail that I
14  did at that time.
15      Q   Okay. Have you reviewed any materials or
16  records that would change any of the opinions in your
17  report?
18      A   I do not believe so.
19      Q   Okay. All right. And then I want to mark as
20  Exhibit No. 4 the materials reviewed in the Anthony
21  Dedrick versus Merck case.
22      And we were provided a couple hours ago an
23  updated list of materials reviewed. Do you
24  have that updated list in front of you as
25  Exhibit 4?

Page 20

1       A   Okay. Yes, I have it in front of me.
2       Q   Dr. Roach, can you tell me what materials you
3   have reviewed since you initially prepared your report
4   that would be included in this updated materials
5   reviewed list that was not in the original?
6       A   I would have to look at the original and compare
7   it to this list, to be honest with you. If we had that
8   original -- I don't know if we do.
9       Q   Okay.
10      A   I couldn't -- I honestly couldn't tell you just
11  looking at this - it's an exhaustive list - which ones
12  were reviewed subsequent.
13      Q   Do you recall whether or not you have
14  reviewed any additional articles that would
15  apply to your opinions on general causation?
16      A   I don't believe I have.
17      Q   All right. You told me, Dr. Roach, that you --
18  your estimate is that you have about $200,000 that you've
19  either been paid or billed for your time as it relates
20  to Vioxx.
21      What is your best estimate of the
22  amount of money that you have been paid or billed
23  for in pharmaceutical litigation for either expert
24  testimony or for consulting work?
25      A   Well, I have testified previously that the

Page 21

1   amount of money received in the Phen/Fen litigation was
2   around a half a million dollars and that was for work done
3   from late 1997 through, I believe, 2004 or 2005.
4       And now I have received 200,000 for work that
5   started in spring of 2005 through the fall of 2006 in the
6   Vioxx litigation.
7       Q   Okay. Any other money that you have
8   received from pharmaceutical companies or the
9   pharmaceutical industry that pertains to expert testimony
10  or consulting work?
11      A   Well, there would have been a small amount of
12  money that came related to the Baycol litigation. I had
13  met with Joe Tomaselli very briefly several years ago
14  at -- and billed for a couple of hours of time. And that
15  was the sum total of my involvement in the Baycol
16  litigation.
17      Q   Okay. Any other areas where you would have
18  billed the pharmaceutical industry for your time?
19      A   No, sir.
20      Q   Okay. Dr. Roach, are you board certified?
21      A   I am.
22      Q   You're board certified in several areas --
23      A   I am.
24      Q   -- is that correct?
25      A   I am.

6 (Pages 18 to 21)

bbc4ba51-be76-433c-abad-5884dba30a44

Paul J. Roach, M.D.

Page 22

1    Q   All right.  Can you tell us what areas you're
2  currently board certified?
3    A   I'm board certified in internal
4  medicine and cardiology -- well, it's technically
5  cardiovascular diseases.
6    Q   Okay.
7    A   And those are both through the American Board of
8  Internal Medicine.
9    Q   Have you been board certified in any other
10 areas?
11   A   I have not.
12   Q   Okay.  And have you kept your board
13 certification in internal medicine and cardiovascular
14 diseases current at all times?
15   A   I have.
16   Q   Okay.  And did you pass your boards in
17 both of those areas on your first pass?
18   A   I did.
19   Q   Okay.
20   A   And I passed the recertification in 2001 on
21 cardiovascular diseases on the first pass on that, as
22 well.
23   Q   Okay.  Doctor, do you hold yourself out as a --
24 an epidemiologist?
25   A   I do not hold myself out as someone who

Page 23

1  engages in epidemiology for a living or doing epidemiology
2  on a day-to-day basis.
3       I do consider myself to be expert insofar as I
4  can read studies that are based on epidemiologic
5  principles and draw conclusions from those studies and use
6  them in my day-to-day practice.
7    Q   Do you hold yourself out to the medical
8  community as an expert in epidemiology?
9    A   I do not.
10   Q   Okay.  Do you hold yourself out to the medical
11 community as an expert in pharmacology?
12   A   Again, sort of going through that very same
13 process that we just went through, I do not engage in
14 doing pharmacologic research on a daily basis.  I don't
15 hold myself out as a pharmacologist in that regard.
16       Do I understand pharmacology enough to apply it
17 to my practice?  Yes.
18   Q   Okay.  But do you hold yourself out to the
19 medical community as an expert in pharmacology?
20   A   Well, I don't hold any official titles as a
21 professor of pharmacology.  But, again, I feel that I have
22 enough expertise in pharmacology based on my training and
23 my day-to-day practice and my ongoing review of literature
24 to understand the issues in pharmacology.  And I feel that
25 I have expertise in the area of pharmacology.  But I don't

Page 24

1  hold myself out to the community as a professor of
2  pharmacology.
3    Q   Okay.  And you say that you have expertise in
4  the area of pharmacology.  What do you base that on?
5    A   Based on my schooling and based on my ongoing
6  education.
7    Q   Okay.  If you would, describe for me the
8  schooling that you had in the area of pharmacology.
9    A   Well, there -- one, you -- there are precursors
10 to pharmacology which will be basically chemistry courses,
11 biology courses.  Those would be courses that I would have
12 taken as far back as high school.
13       When you get to the medical school level, there
14 are courses in pharmacology.  And, in fact, when I was in
15 medical school, I actually took an additional elective
16 course my senior year in clinical pharmacology that was
17 taught by Arthur Atkinson at Northwestern University, and
18 we went into much greater detail in terms of pharmacologic
19 principles and how those are applied in a clinical
20 setting.
21       As one gets into your training years,
22 internship, residency and fellowship, you're required to
23 have an understanding of the medications and therapies
24 that you're applying.  So to that degree you have to
25 maintain an expertise in pharmacology.

Page 25

1       And as one moves beyond that to practice, one
2  has to have an understanding and an expertise in
3  pharmacology in order to understand the medications that
4  you're prescribing for patients.
5    Q   Have you ever been consulted as an
6  expert in pharmacology?
7    A   Well, that's a broad question.
8       Do you mean have other doctors asked my opinions
9  about certain medications for patients --
10   Q   Have other doctors --
11   A   Yes, in that sense, yes, I have been.  I guess I
12 have been considered as an expert, because if you ask me
13 to treat someone with heart failure or some -- or any
14 other cardiology condition, one has to understand the
15 medications that you're prescribing, so to that extent,
16 yes.
17       THE REPORTER:  Can I interrupt you all for
18 just a minute?  When you talk over each other, I can't
19 hear what's being said on the television.  So -- I know
20 it's hard, but if you can just try to take a pause in
21 between, that would help a lot.  Okay?
22       THE WITNESS:  Sure.
23   Q   (By Mr. Birchfield) So, Dr. Roach, you
24 would consider yourself an expert in pharmacology.
25 Correct?

7 (Pages 22 to 25)

bbc4ba51-be76-433c-abad-5884dba30a44

Paul J. Roach, M.D.

Page 26

1    A    To a certain degree I consider myself to be --
2  to have expertise in pharmacology.
3         Now, do I hold myself out again as a professor
4  of pharmacology? No.
5         Do I engage solely in activities directly
6  related to investigations in pharmacology on a day-to-day
7  basis? No.
8         But do I have an understanding of the principles
9  of pharmacology, do I apply those on a day-to-day basis?
10  Yes.
11    Q    Are you a biostatitician?
12    A    No, I am not a biostatitician.
13    Q    And do you hold yourself out as an expert in
14  biostatistics?
15    A    Again, I think the same thought process would
16  apply to that question that we just went through with
17  pharmacology is that I have an understanding of
18  biostatistics. I do not do that on a day-to-day basis nor
19  do I earn my living as a biostatitician, but I have an
20  understanding of the basic principles and how those
21  principles apply to clinical practice.
22    Q    But do you hold yourself out as an expert in
23  biostatistics?
24    A    Again, I don't consider myself to be a professor
25  of biostatistics. I think I have expertise in the area in

Page 27

1  regard to what we just talked about.
2    Q    Okay. So you consider yourself an expert in
3  biostatistics?
4    A    Not --
5         MR. BLACKWELL: Objection; form.
6    A    -- well -- again, what I don't want to
7  mislead anybody into thinking that I hold any sort of
8  academic title as a biostatitician.
9         Do I have expertise or an understanding of it?
10  Yes.
11         If by -- well, perhaps maybe you should help me
12  understand what you mean by expert.
13    Q    (By Mr. Birchfield) Okay. Well, if you're
14  in a medical setting, would you tell folks in the
15  medical community that you're an expert in
16  biostatistics?
17    A    I would probably not hold myself out in that
18  regard.
19    Q    Okay. And -- well, let me go back to
20  pharmacology in the same framework there.
21         If you're in a medical setting, would you tell
22  members of the medical community that you are an expert in
23  pharmacology?
24    A    Not -- I would not hold that out. I
25  wouldn't put that on my signage at my office that says,

Page 28

1  "Paul Roach, expert in pharmacology. Paul Roach, M.D.
2  expert in biostatistics."
3    Q    Okay. And do you hold yourself out as an expert
4  in clinical trials?
5    A    I do not.
6    Q    Okay.
7    A    Again, applying that very same framework that we
8  have been talking about, I understand in general the
9  principles that go into that, but I do not hold myself out
10  as someone who is expert in the design of those trials.
11    Q    Okay. And do you consider yourself an expert in
12  cellular biology?
13    A    Again, I think applying the same framework, do I
14  have an understanding of it, yes. An understanding
15  insofar as it applies to my clinical practice. But I do
16  not hold myself out as an expert in cell biology.
17    Q    Okay. And what about platelet function, would
18  you hold yourself out as an expert in platelet function?
19    A    Again, probably applying the same framework and
20  understanding that that's not something that I do day in,
21  day out, in terms of research in that arena or publication
22  of articles in that arena. I would not hold myself out as
23  an expert.
24         Do I have an understanding of platelet function
25  and the medications that are used to manipulate platelet

Page 29

1  function, yes.
2         Do I understand how platelet function impacts on
3  cardiovascular disease, yes.
4    Q    And what about prostaglandins, do you hold
5  yourself out as an expert in prostaglandins?
6    A    Again, using the definition that we've used
7  before, no.
8    Q    I'm sorry?
9    A    I said using the construct that we've gone
10  through with regard to the other issues, no.
11    Q    Okay.
12    A    Again, the same caveats apply.
13    Q    Dr. Roach, I'm going to ask you some questions
14  about your experience with COX-2 inhibitors.
15         Have you ever published any articles in
16  peer-reviewed literature regarding COX-2 inhibitors?
17    A    I have not.
18    Q    Have you ever participated in any
19  clinical trials involving COX-2 inhibitors?
20    A    I have not.
21    Q    Have you ever conducted any basic
22  research involving COX-2 inhibitors?
23    A    By that, do you mean have I been involved in the
24  design of studies to evaluate COX-2 function or COX-2
25  inhibition? No.

8 (Pages 26 to 29)

bbc4ba51-be76-433c-abad-5884dba30a44