**Mason v. Merck & Co., Inc.**
**Deposition Designations for Curfman**

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

12:13  -  12:14   Curfman 11/21/2005
    12 13        Good morning, Dr. Curfman.
    12 14        Good morning.

13:11  -  13:19   Curfman 11/21/2005
    13 11        And what is your current employment, sir?
    13 12        I am the executive editor of The New
    13 13        England Journal of Medicine.
    13 14        How long have you held that position?
    13 15        Since July of 2000.
    13 16        Did you have prior positions at New England
    13 17        Journal?
    13 18        For the previous 14 years I was a deputy
    13 19        editor at The New England Journal.

13:20  -  14:18   Curfman 11/21/2005
    13 20        What is the role of a deputy editor?
    13 21        Deputy editor is an in-house editor who is
    13 22        involved in editing manuscripts, reviewing
    13 23        manuscripts, medical data, and moving those
    13 24        manuscripts to publication in The New England
    14  1        Journal.
    14  2        Deputy editor also is involved in
    14  3        soliciting editorial articles to comment on the
    14  4        original scientific work and to -- is involved in
    14  5        bringing articles into The Journal.
    14  6        What is the difference between the role of
    14  7        deputy editor and executive editor?
    14  8        The executive editor has administrative
    14  9        responsibilities that a deputy editor does not.
    14 10        The executive editor reports directly to the
    14 11        editor-in-chief and serves in the capacity of
    14 12        filling in for the editor-in-chief when he was
    14 13        traveling or otherwise unavailable.
    14 14        Executive editor is in charge of the
    14 15        editorial office, of the day-to-day operations of
    14 16        the editorial office, and is involved in setting
    14 17        editorial policy, editorial directions for The
    14 18        Journal.

20:22  -  22:1    Curfman 11/21/2005
    20 22        Is it -- how would you characterize the
    20 23        role you had in the review process concerning the
    20 24        VIGOR study in the year 2000?
    21  1        Well, each manuscript that is submitted to
    21  2        The Journal is assigned to an editor, an associate
    21  3        editor, who's job it is to handle that article
    21  4        through the review process.
    21  5        In addition, that associate editor is
    21  6        teamed with a deputy editor.  So there are two
    21  7        editors who work in tandem to handle the article
    21  8        through the review process.

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

| | | |
|---|---|---|
| 21  9 | I was not either the associate editor | |
| 21 10 | nor the deputy editor on the VIGOR article. | |
| 21 11 | *During the time that the VIGOR* | |
| 21 12 | manuscript was being handled in our office, between | |
| 21 13 | May and July, I was still a deputy editor. | |
| 21 14 | In July, I became the executive editor. | |
| 21 15 | So it was during the time that the VIGOR article | |
| 21 16 | was being reviewed that I had a change in my | |
| 21 17 | position. | |
| 21 18 | I did, however, attend all of the | |
| 21 19 | editorial meetings where the VIGOR article was | |
| 21 20 | discussed.  I was a part of those discussions. | |
| 21 21 | I had the opportunity to express | |
| 21 22 | opinions about the manuscript and the data, and so | |
| 21 23 | I was a part of the process in that sense, but I | |
| 21 24 | was not the primary editor who was responsible for | |
| 22  1 | taking that article through the process. | |

**23:2   -   24:12   Curfman 11/21/2005**

| | | |
|---|---|---|
| 23  2 | Dr. Curfman, marked as Exhibit 2 is a | |
| 23  3 | document bearing the heading of "The New England | |
| 23  4 | Journal of Medicine," entitled "Information For | |
| 23  5 | Authors," dated January 6, 2000. | |
| 23  6 | Are you familiar with this document? | |
| 23  7 | Yes, I am. | |
| 23  8 | *Does this document express the policy of* | |
| 23  9 | The New England Journal of Medicine as of the year | |
| 23 10 | 2000? | |
| 23 11 | Yes, that's correct, in terms of the | |
| 23 12 | submission of manuscripts. | |
| 23 13 | Directing your attention to the second full | |
| 23 14 | paragraph on the left-hand side under the heading | |
| 23 15 | "Manuscripts," there is a statement, "A covering | |
| 23 16 | letter signed by all authors should identify the | |
| 23 17 | person, with the address and telephone number, | |
| 23 18 | responsible for negotiations concerning the | |
| 23 19 | manuscript.  The letter should make it clear that | |
| 23 20 | the final manuscript has been seen and approved by | |
| 23 21 | all authors and that they have taken due care to | |
| 23 22 | *ensure the integrity of the work ."* | |
| 23 23 | Was that part of the policy of The New | |
| 23 24 | England Journal of Medicine in the year 2000? | |
| 24  1 | Yes. | |
| 24  2 | And with respect to that quoted language, | |
| 24  3 | what does the phrase "ensure the integrity of the | |
| 24  4 | work" mean? | |
| 24  5 | "The integrity of the work" refers to the | |
| 24  6 | accuracy of the work, the completeness of the data, | |
| 24  7 | and the conclusions flowing from the data being | |
| 24  8 | appropriate and accurate. | |
| 24  9 | Does the phrase "ensure the integrity of | |
| 24 10 | the work" include ensuring that the actual data are | |
| 24 11 | accurately presented in the manuscript? | |
| 24 12 | Yes. | |

**44:1   -   45:11   Curfman 11/21/2005**

| | | |
|---|---|---|
| 44  1 | Doctor, Exhibit 8 is from The New England | |

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

| | | |
|---|---|---|
| 44 | 2 | Journal of Medicine, Volume 336.  It's got a |
| 44 | 3 | copyright "1997" in the lower right. |
| 44 | 4 | Right. |
| 44 | 5 | The page is entitled "Uniformed |
| 44 | 6 | Requirements For Manuscripts Submitted to |
| 44 | 7 | Biomedical Journals." |
| 44 | 8 | Is this a document you are familiar |
| 44 | 9 | with? |
| 44 | 10 | Yes.  This is an earlier version of the |
| 44 | 11 | document that we were just -- that you were just |
| 44 | 12 | reading from. |
| 44 | 13 | So it has gone through a number of |
| 44 | 14 | iterations over the years.  This would, I believe, |
| 44 | 15 | have been the document in place at the time of the |
| 44 | 16 | consideration of the VIGOR trial. |
| 44 | 17 | And this again is a joint statement of The |
| 44 | 18 | International Committee of Medical Journal Editors |
| 44 | 19 | that The New England Journal has adopted for its |
| 44 | 20 | own policies; is that right? |
| 44 | 21 | That's right. |
| 44 | 22 | Turning to Page 315, underneath the heading |
| 44 | 23 | "Sending the Manuscript to the Journal," there is a |
| 44 | 24 | statement that, "Manuscripts must be accompanied by |
| 45 | 1 | a covering letter, signed by all co-authors," and |
| 45 | 2 | underneath that there is Subparagraph C that states |
| 45 | 3 | the following: "A statement that the manuscript |
| 45 | 4 | has been read and approved by all the authors, that |
| 45 | 5 | the requirements for authorship as stated earlier |
| 45 | 6 | in this document have been met, and that each |
| 45 | 7 | author believes that the manuscript represents |
| 45 | 8 | honest work." |
| 45 | 9 | Did that establish the policy of The |
| 45 | 10 | New England Journal from 1997 forward? |
| 45 | 11 | Yes. |

| | | | | |
|---|---|---|---|---|
| 45:17 | - | 45:22 | Curfman 11/21/2005 | |
| 45 | 17 | | Dr. Curfman, Exhibit 9 is a copy of a |
| 45 | 18 | | letter date May 18, 2000 from Claire Bombardier and |
| 45 | 19 | | to Robert Utiger, Deputy Editor, New England |
| 45 | 20 | | Journal of Medicine, dated May 18, 2000. |
| 45 | 21 | | Have you seen this letter before? |
| 45 | 22 | | Yes, I have. |

| | | | | |
|---|---|---|---|---|
| 45:23 | - | 46:3 | Curfman 11/21/2005 | |
| 45 | 23 | | Is it correct that The New England Journal |
| 45 | 24 | | received a draft manuscript of the VIGOR study from |
| 46 | 1 | | Claire Bombardier, along with that letter dated May |
| 46 | 2 | | 18, 2000? |
| 46 | 3 | | That's correct. |

| | | | | |
|---|---|---|---|---|
| 46:8 | - | 48:8 | Curfman 11/21/2005 | |
| 46 | 8 | | The letter itself, Dr. Curfman, is |
| 46 | 9 | | consecutively Bates numbered at Page 2000 NEMJ 1 |
| 46 | 10 | | and 2, is that correct, in the document that you |
| 46 | 11 | | have? |
| 46 | 12 | | Yes, uh-huh. |
| 46 | 13 | | And are the pages marked ending in the |

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

46 14   numbers 5, 7 and 16 the author statements signed by
46 15   Drs. Bombardier, Alise Reicin -- that's R-E-I-C-I-N
46 16   -- and Deborah Shapiro that were submitted with the
46 17   manuscript?
46 18   Correct.
46 19   In those letters, each of the signatories
46 20   attested that they had fulfilled the authorship
46 21   criteria of the uniform requirements that we read a
46 22   few moments ago from the 1997 standards; is that
46 23   right?
46 24   That is right.
47 1   Doctor, how long after The New England
47 2   Journal received the draft with the May 18, 2000
47 3   letter were you assigned in any capacity to the
47 4   review process?
47 5   I was not assigned to handle this
47 6   manuscript through the review process.
47 7   So my colleagues Dr. Utiger, Dr. Kaplan
47 8   and Dr. Steinbrook were the three editors who
47 9   handled this manuscript through the review process.
47 10   Dr. Utiger and Dr. Steinbrook are
47 11   deputy editors, and Dr. Steinbrook was the primary
47 12   deputy editor.  When he was away, Dr. Utiger would
47 13   step in for him in that capacity; and Dr. Kaplan,
47 14   Marshall Kaplan, was the associate editor who was
47 15   primarily responsible for selecting the reviewers
47 16   and taking the manuscript through the review
47 17   procedures.
47 18   Was the VIGOR article sent for external
47 19   review?
47 20   Oh, yes.
47 21   Was there a standard as to how many
47 22   reviewers you would send an article to?
47 23   Well, in this particular case, the article
47 24   was sent to two outside reviewers.  It was also
48 1   reviewed by a statistical consultant who works in
48 2   that capacity for The Journal.
48 3   It would have also been read very
48 4   carefully by Dr. Kaplan, by Dr. Steinbrook, by
48 5   Dr. Utiger; and then toward the end of the process,
48 6   I also read the manuscript before it was finally
48 7   approved, and then accepted by Dr. Jeffrey Drazen,
48 8   the editor-in-chief.

48:10  -  49:23   Curfman 11/21/2005
48 10   Doctor, the court reporter has marked as
48 11   Exhibit 10 a draft version of the study submitted
48 12   by Bombardier, et al.
48 13   Does this appear to be a copy of the
48 14   manuscript submitted on May 18, 2000.
48 15   Yes, it does.
48 16   If you would turn to the page that is
48 17   marked with the Post-It -- this document was not
48 18   Bates-stamped, since it came from a diskette -- but
48 19   if you turn to the page that's marked with the
48 20   Post-It.
48 21   Right.

| | | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|---|

| | | |
|---|---|---|
| 48 | 22 | Do you see the reference in the middle of |
| 48 | 23 | the page to "myocardial infarctions"? |
| ● | 24 | Uh-huh, yes. |
| 49 | 1 | And do you see the statement, "Myocardial |
| 49 | 2 | infarctions were less common in the naproxen group |
| 49 | 3 | than rofecoxib group:  0.1 percent versus 0.4 |
| 49 | 4 | percent (95 percent confidence interval of |
| 49 | 5 | difference 0.1 to 0.6 percent"? |
| 49 | 6 | Yes. |
| 49 | 7 | And reading on, it states, "Four percent of |
| 49 | 8 | the study population met FDA criteria for aspirin |
| 49 | 9 | use for secondary cardiovascular prophylaxis |
| 49 | 10 | (history of myocardial infarction, unstable or |
| 49 | 11 | stable angina, cerebrovascular accident, transient |
| 49 | 12 | ischemic attack, angioplasty, coronary bypass) but |
| 49 | 13 | were not on low-dose aspirin therapy.  These |
| 49 | 14 | patients accounted for 38 percent of the myocardial |
| 49 | 15 | infarctions in the study.  The difference in |
| 49 | 16 | myocardial infarction rate between treatments in |
| 49 | 17 | the other 96 percent of patients was much less |
| 49 | 18 | apparent:  Rofecoxib 0.2 percent versus naproxen |
| 49 | 19 | 0.1 percent.  95 percent confidence interval of |
| 49 | 20 | difference, negative 0.1 to 0.3 percent." |
| 49 | 21 | Did you see that text in the manuscript |
| 49 | 22 | that you reviewed? |
| 49 | 23 | Yes, uh-huh. |

| | | |
|---|---|---|
| 51 - | 53:11 | Curfman 11/21/2005 |
| ● | 10 | Did you get the message from that |
| 51 | 11 | statement, Doctor, that the authors intended to |
| 51 | 12 | characterize the significant difference as being |
| 51 | 13 | found in those patients who are at risk to begin |
| 51 | 14 | with? |
| 51 | 15 | MR. FITZPATRICK:  I object to the form. |
| 51 | 16 | Yes.  I interpreted this that the authors |
| 51 | 17 | interpreted their data as indicating that the |
| 51 | 18 | difference in myocardial infarction rate was more |
| 51 | 19 | important in those patients who would qualify for |
| 51 | 20 | aspirin therapy; i.e., patients who were at risk |
| 51 | 21 | for coronary heart disease to begin with; but that |
| 51 | 22 | that risk was less apparent or less important in |
| 51 | 23 | those patients who were not eligible by FDA |
| 51 | 24 | criteria to receive aspirin, and therefore, were at |
| 52 | 1 | lower risk at baseline for coronary heart disease. |
| 52 | 2 | Now, was the VIGOR manuscript ultimately |
| 52 | 3 | published on November 23, 2000? |
| 52 | 4 | That's correct. |
| 52 | 5 | EXHIBIT NO. 11 MARKED |
| 52 | 6 | Is Exhibit 11 a copy of the published |
| 52 | 7 | article, "Comparison of Upper Gastrointestinal |
| 52 | 8 | Toxicity of Rofecoxib and Naproxen in Patients with |
| 52 | 9 | Rheumatoid Arthritis," by Bombardier et al., from |
| ● | 10 | The New England Journal, dated November 23, 2000? |
| ● | 11 | Yes. |
| 52 | 12 | And turning to Page 1523 of the document, |
| 52 | 13 | do you see under the heading "General Safety" the |
| 52 | 14 | same statistical information about the rates of |

Re: [51:10-52:1]
Def Obj Leading

Sustained

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

52 15  myocardial infarction in the aspirin-indicated and
52 16  nonaspirin-indicated groups that appeared in the
52 17  earlier draft?
52 18  Yes.
52 19  The article states that, "The aspirin-
52 20  indicated patients accounted for 38 percent of the
52 21  patients in the study who had myocardial
52 22  infarctions"; is that correct?
52 23  That is correct.
52 24  And it then goes on to state, "In the other
53 1  patients, the difference in the rate of myocardial
53 2  infarction between groups was not significant (0.2
53 3  percent in the rofecoxib group and 0.1 percent in
53 4  the naproxen group)."
53 5  Do you see that text?
53 6  Yes, I do.
53 7  So this article conveyed to readers that
53 8  the difference in the rate of myocardial infarction
53 9  between groups was not significant for the patients
53 10  who are not aspirin-indicated; is that right?
53 11  Yes.

Re: [53:7-53:11]
Def Obj Leading

54:5   -   54:21   Curfman 11/21/2005
54 5  Now, is it correct that the authors
54 6  submitted a revised manuscript with a diskette
54 7  containing three versions of the VIGOR manuscript,
54 8  with a letter dated August 20, from Dr. Bombardier?
54 9  That's correct.
54 10  EXHIBIT NO. 12 MARKED
54 11  Dr. Curfman, is Exhibit 12 a copy of the
54 12  August 20, 2000 letter from Bombardier to
54 13  Dr. Steinbrook at New England Journal?
54 14  Yes, it is.
54 15  And if you look at Page 3 of the letter,
54 16  which is the Bates-stamp ending in 042, just before
54 17  the final paragraph, is it stated that, "We have
54 18  included two triple-spaced copies of the revised
54 19  manuscript as well as a diskette with the
54 20  manuscript files"?
54 21  Right.

55:16   -   55:21   Curfman 11/21/2005
55 16  Dr. Curfman, the diskette was received
55 17  shortly after August 20, 2000; is that right?
55 18  Yes. The original diskette.
55 19  This would be a copy, but that original
55 20  diskette was received with this letter
55 21  (indicating).

55:22   -   56:1   Curfman 11/21/2005
55 22  Did the folders on the disk include three
55 23  draft versions of the VIGOR study from May, July
55 24  and August of 2000?
56 1  That's correct.

56:2   -   57:6   Curfman 11/21/2005
56 2  Did you personally review any part of the

*[Handwritten note in right column:]* This is leading & timely obj. was made obj. is sustained if not then waived. I do not have entire transcript. This portion stops at p 53 l 11 so I don't know whether timely obj. made. This is also based on what I assume the attys agreed to in these depo. i.e. "all objections reserved until time offered except as to form of Q & responsiveness of answer."

6

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

56  3   contents of the disk at any time before the
56  4   publication of the VIGOR study on November 23,
56  5   2000?
56  6   No.
56  7   And as explanation, at that time, we
56  8   were still receiving, editing and handling
56  9   manuscripts in paper form.  We were in transition
56  10  from a paper format to an electronic format, but we
56  11  had not completed that transition.
56  12  So we were requesting diskettes from
56  13  authors, but this was in anticipation of moving to
56  14  an electronic platform, which we had not yet done.
56  15  *So in the case of this diskette, the*
56  16  authors, at our request, had submitted a diskette,
56  17  but we never accessed it, because we were doing all
56  18  of our editing on paper.  So Dr. Bombardier also
56  19  provided paper copies, and we worked on those.
56  20  The diskette, however, was saved, put
56  21  into an envelope, stapled into the manuscript file,
56  22  and made a permanent part of the manuscript file,
56  23  but was not used in any way in the handling of the
56  24  VIGOR manuscript at that time in the year 2000.
57  1   *Is it correct then that based on your*
57  2   investigation to prepare for this deposition that
57  3   none of the editors at The New England Journal
57  4   reviewed the contents of the diskette before
57  5   November 23, 2000?
57  6   Yes, that's correct.

57:7  -  58:15   Curfman 11/21/2005

57  7   At some point before today, have you seen
57  8   the contents of the disk, the diskette?
57  9   Yes, I have.
57  10  And, in particular, have you seen the
57  11  contents of the May 2000 version on the diskette?
57  12  Yes, I have.
57  13  When did you first see the contents?
57  14  We first accessed the contents of the
57  15  diskette on Tuesday, October 5th, 2004, during the
57  16  afternoon.
57  17  And when you say "we," who are you
57  18  referring to?
57  19  The editor in the office who first found
57  20  the disk is our managing editor, the managing
57  21  editor of The Journal, Dr. Stephen Morressey.
57  22  What were the circumstances under which the
57  23  diskette was viewed?
57  24  On September 30, 2004, rofecoxib had been
58  1   removed from the market; and in the wake of that
58  2   decision, we wanted to take a look at the VIGOR
58  3   file to refresh our memories about certain aspects
58  4   of the manuscript.
58  5   We did that, on October 5th, and it was
58  6   on that day that Dr. Morressey found the diskette,
58  7   and we accessed it.  We put it into one of our
58  8   drives, and brought it up and looked at it on the
58  9   computer screen, and we also made hard copy

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

58 10    printouts of the three files that were on the
58 11    diskette, and then read them.
58 12    And during that review, did you determine
58 13    that there were marked-up, edited, tracked changes
58 14    versions of the manuscripts on the diskette?
58 15    That's correct.

59:8    -    59:20    Curfman 11/21/2005
59  8    Dr. Curfman, please take a look at what has
59  9    been marked as Exhibit 14, that has been Bates-
59 10    stamped 2000 NEJM 000235 through 282, and can you
59 11    tell me if this is an accurate copy of the May 2000
59 12    draft of the VIGOR study that you observed at the
59 13    time you reviewed the contents of the diskette in
59 14    October 2004, as you've testified earlier?
59 15    Yes, it is.
59 16    You'll notice that we talked a little
59 17    before the break about the word "tracked changes."
59 18    Do tracked changes show when deletions
59 19    or insertions are made to a manuscript?
59 20    That's correct.

60:1    -    61:2    Curfman 11/21/2005
60  1    And is that done by using the mouse to
60  2    hover over a specific insertion or deletion --
60  3    Yes.
60  4    -- until some information appears on the
60  5    screen showing that a particular insertion or
60  6    deletion was made at a particular time by a
60  7    particular person?
60  8    Right.  So it tracks the change and also
60  9    the individual and the time and date when the
60 10    change was made.
60 11    Now, when you observed this document on
60 12    screen in October 2004, did you observe that there
60 13    had been deletions with respect to the text that we
60 14    looked at earlier?
60 15    In particular, if you look at Page 251,
60 16    under the general "Safety Heading," do you see that
60 17    there is a reference to "Deleted:  8 and 0 patients
60 18    with myocardial infarction in the rofecoxib and
60 19    naproxen treatment groups respectively"?
60 20    Yes.
60 21    And do you see that in the next sentence
60 22    the information that was deleted refers to the
60 23    absolute numbers of myocardial infarctions in the
60 24    nonaspirin indicated group, 9 for rofecoxib and 4
61  1    for naproxen?
61  2    Yes, I do.

61:10    -    62:19    Curfman 11/21/2005
61 10    Okay.  Let's look at the Table 5 on the
61 11    last page, that's 282.
61 12    There's highlighting there that was on
61 13    this copy when we received it.
61 14    Right.
61 15    Was that highlighting visible to you on the

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

| 61 | 16 | computer screen? |
| 61 | 17 | On the computer screen, yes. |
| 61 | 18 | And does this Table 5 on the last page, |
| 61 | 19 | 282, show "deleted" at the top? |
| 61 | 20 | Yes, it does. |
| 61 | 21 | And does it show tracked change indicating |
| 61 | 22 | that the deletion was made by Merck? |
| 61 | 23 | That's correct. |
| 61 | 24 | Does it show that the deletion was made by |
| 62 | 1 | Merck on May 16, 200 at 8:02 p.m.? |
| 62 | 2 | Correct. |
| 62 | 3 | And what was the content of Table 5 that |
| 62 | 4 | was deleted? |
| 62 | 5 | MR. FITZPATRICK: I object to the form. |
| 62 | 6 | Well, as you can see, this was a table that |
| 62 | 7 | never -- well, what we have in front of us is -- I |
| 62 | 8 | interpret this as a table that had been proposed, |
| 62 | 9 | but the data themselves had not been entered into a |
| 62 | 10 | table. |
| 62 | 11 | In the highlighted area, the yellow |
| 62 | 12 | highlighting, in Footnote No. 1, I think that we |
| 62 | 13 | can conclude that these were the data categories |
| 62 | 14 | that would have been included in this table had the |
| 62 | 15 | data been introduced into the table, but what we |
| 62 | 16 | had in this May version was an incompleted table. |
| 62 | 17 | And in particular, Table 5 referred to |
| 62 | 18 | cardiovascular events; is that correct? |
| 62 | 19 | That's the title of the events, yes. |

| 75:24 | - | 77:20 | Curfman 11/21/2005 | | |
|---|---|---|---|---|---|
| 75 | 24 | Now, Doctor, Exhibit 18 is a memo from | **Re: [75:24-77:20]** | _Overruled_ |
| 76 | 1 | Deborah Shapiro to Alise Reicin and others dated | **Def Obj** Foundation; |
| 76 | 2 | July 5, 2000. | internal Merck document |
| 76 | 3 | Do you recognize the names of Shapiro | witness has never seen |
| 76 | 4 | and Reicin as the two Merck authors on the VIGOR | before |
| 76 | 5 | study? |
| 76 | 6 | Yes, I do. |
| 76 | 7 | Now, I take it you have never seen this |
| 76 | 8 | document before, or have you? |
| 76 | 9 | I have probably seen some of these data on |
| 76 | 10 | the FDA Website, I think, but I have never seen it |
| 76 | 11 | as a document per se. |
| 76 | 12 | If you could take a look -- certainly you |
| 76 | 13 | didn't see it on the FDA Website before the |
| 76 | 14 | publication of the -- |
| 76 | 15 | No. |
| 76 | 16 | -- the article? |
| 76 | 17 | No.  Oh, no.  No.  No. |
| 76 | 18 | Could you take a look at Table 7, which is |
| 76 | 19 | on Pages 9 and 10 of the document.  You have to use |
| 76 | 20 | the column headings from Page 9 to follow the |
| 76 | 21 | information onto Page 10. |
| 76 | 22 | But do you see that there is |
| 76 | 23 | information in this document dated July 5, 2000 |
| 76 | 24 | concerning the number of patients with different |
| 77 | 1 | adverse events? |
| 77 | 2 | (Nodding.) |

| | | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|

| | | |
|---|---|---|
| 77 | 3 | You have to answer out loud, sir. |
| 77 | 4 | Yes, sorry. |
| ● | 5 | And under the "Aspirin Indicated" row on |
| 77 | 6 | Page 9, do you see the MI listing of 8 versus 0 for |
| 77 | 7 | rofecoxib versus naproxen? |
| 77 | 8 | Yes, I do. |
| 77 | 9 | *And there, do you see that the -- on Page* |
| 77 | 10 | 10, the "Aspirin Not Indicated" group MI row shows |
| 77 | 11 | 12 for Vioxx and 4 for naproxen? |
| 77 | 12 | That's correct. |
| 77 | 13 | *Now, the data that had been in the deleted* |
| 77 | 14 | text from the May 2000 version showed 9 versus 4 |
| 77 | 15 | for the nonaspirin-indicated; is that correct? |
| 77 | 16 | That's correct. |
| 77 | 17 | And by July 5, 2000, the data of the Merck |
| 77 | 18 | authors showed that those numbers were 12 versus 4; |
| 77 | 19 | is that correct? |
| 77 | 20 | That's correct. |

80:20  -  81:9   Curfman 11/21/2005

| | | | |
|---|---|---|---|
| 80 | 20 | Considering the severity of the endpoint, | **Re: [80:20-81:9]** |
| 80 | 21 | myocardial infarction, and the fact that there was | **Def Obj** Leading; |
| 80 | 22 | additional data showing a larger number than | Speculative |
| 80 | 23 | initially represented in the manuscript submitted | |
| 80 | 24 | to The Journal, would it have been of interest to | |
| 81 | 1 | readers of The Journal to know that the results for | |
| 81 | 2 | the nonaspirin-indicated group achieved a level | |
| 81 | 3 | that was at least borderline significant? | |
| ● | 4 | MR. FITZPATRICK:  I object to the form. | |
| 81 | 5 | *Oh, absolutely.* | |
| 81 | 6 | The difference between 9 MIs and 12 MIs | |
| 81 | 7 | is absolutely of importance and quite relevant, and | |
| 81 | 8 | I certainly would have wanted to have access to | |
| 81 | 9 | these data, absolutely. | |

Overruled

84:14  -  84:18   Curfman 11/21/2005

| | | |
|---|---|---|
| 84 | 14 | Exhibit 20 is a letter dated July 7th, |
| 84 | 15 | 2000, with attachment, from Bombardier to |
| 84 | 16 | Dr. Kaplan. |
| 84 | 17 | Have you seen this before? |
| 84 | 18 | Yes, I have. |

89:2  -  91:2   Curfman 11/21/2005

| | | | |
|---|---|---|---|
| 89 | 2 | And the July 17th letter from the authors | |
| 89 | 3 | 12 days after this July 5 memo does not anywhere | |
| 89 | 4 | inform The New England Journal of the 12 versus 4 | |
| 89 | 5 | figures, does it? | |
| 89 | 6 | That's correct. | |
| 89 | 7 | Now, is it The Journal's policy to rely on | |
| 89 | 8 | the manuscript authors to submit true and accurate | |
| 89 | 9 | statements of the data? | |
| 89 | 10 | Yes.  That is imperative. | |
| ● | 11 | *Do The Journal's readers rely on the truth* | **Re: [89:11-89:15]** |
| 89 | 12 | and accuracy of the authors' statements of the dat[a] | **Def Obj** Foundation; |
| 89 | 13 | in making decisions as to treatment of their | Speculative |
| 89 | 14 | patients? | |
| 89 | 15 | Yes, they do. | |

Overruled

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

89 16   MR. FITZPATRICK:  I object to the form.
89 17   Is it The Journal's policy to require
89 18   authors to correct the statements in drafts of the
89 19   articles on the basis of information that becomes
89 20   known after an initial draft has been submitted?
89 21   Our expectation is that if there is an
89 22   important relevant update to a piece of data during
89 23   the review process, that we would be informed about
89 24   that update, yes.
90  1   Is it correct that the authors did not
90  2   inform The New England Journal as to the change
90  3   from 9 versus 4 to 12 versus 4 in the nonaspirin-
90  4   indicated patients for Vioxx versus naproxen at any
90  5   time prior to the publication of the article?
90  6   Well, not only did they not inform us that
90  7   the 9 was actually a 12, but you'll recall,
90  8   Attorney Arbitblit, that none of those data were in
90  9   the manuscript at all, none of the raw numbers of
90 10   heart attacks appeared in any version of the
90 11   manuscript, and therefore, are not in the published
90 12   article either.
90 13   So 9 versus 4 was not in there; 8
90 14   versus 0 was not there; 17 versus 4 was not in
90 15   there; and certainly 20 versus 4 was not in there.
90 16   Now, on the basis of the difference between
90 17   the data in the July 5 memo and the published
90 18   article, would you agree that physicians who read
90 19   The Journal for accurate information about efficacy
90 20   and toxicity did not receive accurate information
90 21   about the relative risk of MI and other
90 22   cardiovascular events in the Vioxx patients
90 23   compared to naproxen?
90 24   MR. FITZPATRICK:  I object to the form.
91  1   Yes.  The risk would have appeared lower
91  2   than the real data would support.

**Re: [90:16-91:2]**
*Def Obj Leading;*
Speculative

*Sustained*

190:15 -   191:4   Curfman 11/21/2005
190 15   Generally speaking, what's the purpose of
190 16   the peer-review process at The New England Journal?
190 17   There are two general purposes:  The first
190 18   is for us to have a process for selecting that
190 19   research among a huge body of medical research that
190 20   we and our reviewers believe will have the highest
190 21   impact the practice of medicine and healthcare;
190 22   and secondly, to try to present that information in
190 23   the clearest manner, the most accurate manner, to
190 24   our readers.
191  1   So there is a selection part of the
191  2   process, and there is an editing part of the
191  3   process; and in the broadest frame, those are the
191  4   two parts of our procedures.

191:13 -   191:21   Curfman 11/21/2005
191 13   And there are quite a few steps to the
191 14   peer-review process at The New England Journal; is
191 15   that fair?
191 16   Yes.

| | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|

191 17    One of the things that that means is that
191 18    *there are a lot of different people, both at The*
191 19    Journal and outside The Journal, who see drafts of
191 20    manuscripts before they are ever published in The
191 21    New England Journal?

191:23 -    192:10   Curfman 11/21/2005
191 23    That's correct.
191 24    And I believe -- and you can feel free to
192 1    *refer* to this *if* it is helpful -- is the first step
192 2    in that process that the editor-in-chief, or the
192 3    executive editor if the editor-in-chief is not
192 4    available, reviews each manuscript as it comes in
192 5    briefly?
192 6    Yes.
192 7    And do you know whether that occurred with
192 8    the VIGOR manuscript?
192 9    I have to assume.  I wasn't in the room.
192 10    So I can't -- but it must have, yes.

192:18 -    193:2   Curfman 11/21/2005
192 18    And what is the purpose of that initial
192 19    review conducted by the editor-in-chief?
192 20    The editor-in-chief is trying to, first of
192 21    all, make a determination if it is an article that
192 22    we want to review at all.
192 23    Then, if it is, which editor is the
192 24    most appropriate editor to be the point person on
193 1    that manuscript, and then to assign that manuscript
193 2    to that editor.

193:14 -    195:9   Curfman 11/21/2005
193 14    And how is the -- I think you mentioned
193 15    that the editor-in-chief will try to select an
193 16    appropriate editor.
193 17    How is that selection made?
193 18    Primarily based on the topic of the article
193 19    in question.
193 20    And do you know who the associate editor
193 21    was who was selected with respect to the VIGOR
193 22    manuscript?
193 23    Yes, I do.
193 24    Who was that?
194 1    Dr. Marshall Kaplan.
194 2    And do you know, Dr. Kaplan is a medical
194 3    doctor?
194 4    He is a medical doctor, and his training is
194 5    in gastroenterology; and since the primary focus of
194 6    the VIGOR trial was a gastrointestinal endpoint,
194 7    the manuscript was assigned to Dr. Kaplan to
194 8    handle.
194 9    Okay.  And what -- I believe your article
194 10    states that the associate editor, at least
194 11    initially, is assessing the value and the validity
194 12    of the manuscript; is that right?
194 13    Yes.  The associate editor would then take
194 14    another read.  It might be a fairly quick read.

|  | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

194 15 Again, to determine in his or her mind if it was
194 16 something that would be appropriate for The New
194 17 England Journal; and if so, go on to identify the
194 18 outside reviewers for the manuscript.
194 19 Okay. And if it -- if at that step the
194 20 associate editor determines that the piece is not
194 21 valid or the piece is not fairly written, does --
194 22 can the associate editor at that point reject the
194 23 piece?
194 24 Yes.
195 1 And I think your article, I think your
195 2 article mentions that, should the associate editor
195 3 determine that the piece is not appropriate, it
195 4 could go to a deputy editor for a second opinion;
195 5 is that correct?
195 6 Yes. Our general procedure is that we
195 7 don't reject manuscripts with only one pair of eyes
195 8 having seen it. We like two pairs of eyes to have
195 9 seen it.

195:12 - 196:10 Curfman 11/21/2005
195 12 Did Dr. Kaplan on his initial
195 13 assessment of the value and validity of the piece
195 14 determine that it should be further reviewed, or
195 15 did Kaplan reject the piece and therefore require a
195 16 second opinion from a deputy editor?
195 17 No. He determined that it was worthy of
195 18 review, and then went ahead and assigned the
195 19 reviewers.
195 20 And so that is -- that is the next step, as
195 21 your article mentioned -- mentioned, and as you
195 22 just testified, that Dr. Kaplan would assign the
195 23 manuscript to outside reviewers; is that correct?
195 24 That's correct.
196 1 And there can be -- there can be two
196 2 reviewers with certain manuscripts?
196 3 Oh, sure.
196 4 And I believe -- I believe VIGOR actually
196 5 received a review from three viewers; is that
196 6 correct?
196 7 Yes. Two of the reviewers were outside
196 8 reviewers, and one of the reviewers was a
196 9 statistical consultant who is a part-time member of
196 10 our staff.

196:17 - 197:17 Curfman 11/21/2005
196 17 And what is the -- what's the purpose of
196 18 the review conducted by the external reviewers as
196 19 well as the statistical consultant?
196 20 The external reviewers are asked to
196 21 carefully read and evaluate the manuscript and give
196 22 us their opinion on its suitability for publication
196 23 in terms of the novelty of the research, the
196 24 accuracy and the validity of the research, the
197 1 composition of the manuscript -- how it is written,
197 2 how the data are displayed -- and the overall
197 3 interest to the readership of The New England

| | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|

197  4   Journal of Medicine.  So there are four categories
197  5   of evaluation that they are asked to make.
197  6   Reviewers serve as advisors to the
197  7   editors.  We ask them for a judgment on the
197  8   suitability for the publication of the manuscript
197  9   in The New England Journal, but the final decision
197 10   is really made by the editors, collectively.
197 11   We meet together, discuss the
197 12   manuscript in quite a lot of detail.  *All of the*
197 13   *editors are there.  The statistical consultants are*
197 14   *there, and we have an opportunity then to take the*
197 15   *reviewers' comments and put them into a larger*
197 16   *context, a larger discussion, with input from all*
197 17   the editors.

198:24 -   200:6   Curfman 11/21/2005
198 24   Can the reviewers, if they feel
199  1   additional data would appropriate, request that the
199  2   authors provide additional data that was not
199  3   provided in the manuscript?
199  4   Yes.
199  5   And if the reviewers believe that data --
199  6   data are presented inappropriately or in a
199  7   misleading way in the manuscript, is that something
199  8   the reviewers are permitted to comment on?
199  9   Yes.
199 10   And similarly, separate from the data, but
199 11   with the conclusions and the interpretations that
199 12   are drawn from that data, if the reviewers believe
199 13   those invalid or inappropriate, the reviewers have
199 14   the right to comment on that as well?
199 15   That's right.
199 16   Now, I believe you mentioned that the next
199 17   step, once the reviewers return their reviews to
199 18   The New England Journal, is that the associated
199 19   editor, who has control of the manuscript or has
199 20   been assigned to the manuscript, has the
199 21   opportunity to discuss the reviews and the
199 22   *manuscript with the entire editorial board; is that*
199 23   correct?
199 24   Yes.
200  1   And mentioned in the case of the VIGOR
200  2   manuscript, I believe you said that that was the
200  3   stage at which you first became involved, was
200  4   during these discussions with the entire editorial
200  5   board; is that right?
200  6   Yes.  That's correct.

204:7  -   206:10  Curfman 11/21/2005
204  7   So you had -- is it fair to say that you,
204  8   therefore, received the input of medical doctors
204  9   and at least one statistical consultant that had
204 10   expertise in a variety of different fields?
204 11   Correct.
204 12   I think you mentioned before, Doctor, that
204 13   you're board-certified in internal medicine and
204 14   cardiology; is that correct?

|  |  | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|---|

| | | |
|---|---|---|
| 204 | 15 | That's right. |
| 204 | 16 | Are there other cardiologists, to your |
| | 17 | knowledge, that participated in the review of the |
| 204 | 18 | VIGOR manuscript, with the exception, of course, of |
| 204 | 19 | the anonymous reviewers? |
| 204 | 20 | Yes.  Dr. Lagakos is a board-certified |
| 204 | 21 | cardiologist, and he would have had an opportunity |
| 204 | 22 | to weigh in as well. |
| 204 | 23 | And ultimately -- ultimately, after this |
| 204 | 24 | group deliberates, the editors have to determine |
| 205 | 1 | ultimately that a piece is appropriate for |
| 205 | 2 | publication before it is published in The New |
| 205 | 3 | England Journal; is that correct? |
| 205 | 4 | That's correct. |
| 205 | 5 | But usually there is an intervening step, |
| 205 | 6 | which there was here, which is that the paper is |
| 205 | 7 | sent back to the authors for some revision based on |
| 205 | 8 | the comments of reviewers and perhaps the editors |
| 205 | 9 | as well; is that right? |
| 205 | 10 | *That's right.* |
| 205 | 11 | And I think I said this, but that actually |
| 205 | 12 | did happen with the VIGOR paper? |
| 205 | 13 | Correct. |
| 205 | 14 | And, in fact, there can be multiple |
| 205 | 15 | requests for revisions where the paper is sent to |
| 205 | 16 | the authors for revision, and the authors make |
| 205 | 17 | certain revisions, and the editors determine that |
| | 18 | more revisions are appropriate; is that correct? |
| 205 | 19 | That's correct. |
| 205 | 20 | And, again, that did -- that did in fact |
| 205 | 21 | happen with the VIGOR manuscript? |
| 205 | 22 | Yes. |
| 205 | 23 | And so what -- what that means is that on |
| 205 | 24 | more than one occasion editors at The Journal sent |
| 206 | 1 | the paper back to the authors of the manuscript and |
| 206 | 2 | told them that changes would be required before it |
| 206 | 3 | could be published in The New England Journal, and |
| 206 | 4 | the authors then made changes and sent it back to |
| 206 | 5 | the editors for review; is that right? |
| 206 | 6 | That's right. |
| 206 | 7 | Is it fair to say that The New England |
| 206 | 8 | Journal has one of the most rigorous peer-review |
| 206 | 9 | processes of any peer-review journal? |
| 206 | 10 | It's rigorous. |

| | | |
|---|---|---|
| 219:7 | - | 220:16  Curfman 11/21/2005 |
| 219 | 7 | Doctor, I would ask you to take a look at |
| 219 | 8 | the Bombardier article as it was published, which |
| 219 | 9 | was marked as Exhibit 11 earlier today, and for now |
| 219 | 10 | I am just going to be looking at the first page of |
| 219 | 11 | the article. |
| 219 | 12 | First of all, looking at the top of the |
| | 13 | page, it appears that there are 12 authors listed |
| | 14 | as authors of this article right under the title; |
| 219 | 15 | is that correct? |
| 219 | 16 | Correct. |
| 219 | 17 | And, in fact, is -- The New England Journal |

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

219 18   has a limit of 12 authors that can be listed in
219 19   *that position on the page right below the title; is*
219 20   that correct as well?
219 21   At that time there was a limit.  There is
219 22   no longer a limit.
219 23   And if you look down at the bottom of this
219 24   *page in the footnote, in the very last two lines,*
220 1   there is note that Arthur Weaver, M.D. from the
220 2   Arthritis Center of Lincoln, Nebraska was another
220 3   author.
220 4   Do you see that?
220 5   *Yes, I do.*
220 6   He is listed down there rather than above
220 7   because of the rule at the time that you mentioned
220 8   that there could only be 12 listed at the top of
220 9   page; is that correct?
220 10   *That's correct.*
220 11   And the footnote at the -- or not the
220 12   footnote, but the smaller text at the bottom of the
220 13   page describes where the authors -- the various
220 14   authors are from.
220 15   *Do you see that?*
220 16   Yes, I do.

221:3 ~ 224:24 Curfman 11/21/2005
221 3   And if you look at the bottom of the page,
221 4   *these doctors come from a variety of institutions.*
221 5   For example, the lead author, Claire
221 6   Bombardier, is listed as coming from the Institute
221 7   For Work and Health as well as Mount Sinai Hospital
221 8   and the University Health Network of Toronto.
221 9   *Do you see that?*
221 10   Yes, I do.
221 11   The second author, Loren Laine, is from the
221 12   gastrointestinal Division, Department of Medicine
221 13   at the University of Southern California School of
221 14   *Medicine in Los Angeles.*
221 15   Do you see that as well?
221 16   Yes.
221 17   And then there is the notation that two of
221 18   the authors, Dr. Alise Reicin and Dr. Deborah
221 19   *Shapiro, are from Merck.*
221 20   Do you see that?
221 21   Yes.
221 22   Those are the only two of the 12 authors --
221 23   13 if you count Dr. Weaver -- that are actually
221 24   *from Merck.  All of the other -- all of the other*
222 1   authors are from outside institutions; is that
222 2   correct?
222 3   That's correct.
222 4   And I won't go through all of them, in the
222 5   interest of time, but they are from a variety of
222 6   respected institutions, both within the United
222 7   States and around the world, including, just for
222 8   example, the University of Texas, Houston School of
222 9   Public Health; the Division of Rheumatology and
222 10   Clinical Immunology at the University of Maryland

| | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|

222 11   in Baltimore; the Office of Clinical Research and
222 12   *Training at Northwestern University School of*
222 13   *Medicine in Chicago, just as examples.*
222 14   Do you see those?
222 15   Yes.  Those are U.S. examples.
222 16   I named the U.S. examples, yes; and there
222 17   are also examples from Australia, Brazil, Mexico
222 18   and other countries around the world; is that
222 19   *right?*
222 20   That's right.
222 21   Now, in order to be an author on the New
222 22   England -- on a paper within The New England
222 23   Journal of Medicine, there are certain requirements
222 24   that The New England Journal has; is that correct?
223  1   That's correct.
223  2   *One of those requirements is that each of*
223  3   the authors must sign a statement that attests that
223  4   they have met certain requirements that The New
223  5   England Journal imposes in order to be an author on
223  6   the paper; is that right?
223  7   Correct.
223  8   MR. FITZPATRICK:  I am going to mark
223  9   *another document.*
223 10   EXHIBIT NO. 45 MARKED
223 11   And, Doctor, do you recognize this as the
223 12   signed statements by the authors on the VIGOR
223 13   publication?
223 14   Yes, I do.
223 15   And these came from your files.
223 16   *They are all submitted as part of The*
223 17   New England Journal's requirement that these
223 18   attestations be submitted before someone can appear
223 19   as an author on the article; is that correct?
223 20   That's correct.
223 21   And just taking a look at the language of
223 22   the attestation, each of these doctors attest that
223 23   *they have done several things in order to fulfill*
223 24   the authorship criteria of what are known as the
224  1   uniform requirements; is that correct?
224  2   That's correct.
224  3   And those include stating that they have
224  4   made substantial contributions to (A) the
224  5   conception and design and/or analysis and
224  6   interpretation of *the data.*
224  7   That's one of the -- that's one the
224  8   substantial contributions, correct?
224  9   Correct.
224 10   And, two, they have made substantial
224 11   contributions to drafting the article or revising
224 12   it critically for important intellectual content;
224 13   *is that correct?*
224 14   That's correct.
224 15   And the third requirement that they have to
224 16   attest to is that they have made substantial
224 17   contributions to the final approval of the version
224 18   of the article to be published; is that correct?
224 19   Correct.

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

| | |
|---|---|
| 224 20 | And each of the -- each of the authors that |
| 224 21 | appeared as an author in The New England Journal |
| 224 22 | for the VIGOR manuscript signed these statements |
| 224 23 | attesting to each of those facts; is that correct? |
| 224 24 | That's correct. |

**225:11 -   225:22  Curfman 11/21/2005**

| | |
|---|---|
| 225 11 | Do you have Exhibit 46, Doctor? |
| 225 12 | Yes, I do. |
| 225 13 | And you recognize this as the letter that |
| 225 14 | you spoke about this morning, which was the May 18, |
| 225 15 | 2000 letter which submitted the original VIGOR |
| 225 16 | manuscript to The New England Journal; is that |
| 225 17 | correct? |
| 225 18 | That's correct. |
| 225 19 | And I think you mentioned the letter is |
| 225 20 | from Dr. Bombardier, who is a medical doctor and is |
| 225 21 | also at the University of Toronto? |
| 225 22 | That's correct. |

**226:23 -   229:5   Curfman 11/21/2005**

| | |
|---|---|
| 226 23 | If you turn to the -- just moving down |
| 226 24 | to the next sentence, it reads, "Given that NSAIDs |
| 227 1 | are among the most commonly used medications in the |
| 227 2 | world and the significant benefit for patients from |
| 227 3 | the reduction in gastrointestinal morbidity, we ask |
| 227 4 | that you please consider this manuscript for an |
| 227 5 | expedited review." |
| 227 6 | Do you see that sentence? |
| 227 7 | I do. |
| 227 8 | You would agree in that sentence |
| 227 9 | Dr. Bombardier is asking that The Journal give this |
| 227 10 | manuscript an expedited review? |
| 227 11 | That's correct. |
| 227 12 | Does The Journal have a specific procedure |
| 227 13 | whereby it can give a manuscript an expedited |
| 227 14 | review? |
| 227 15 | Yes, we do. |
| 227 16 | And what is that procedure? |
| 227 17 | Requests for expedited review are |
| 227 18 | considered by the editors based on the substance of |
| 227 19 | the research; and in particular, as I have alluded |
| 227 20 | to earlier, it's our estimation of the overall |
| 227 21 | impact on the health of the public and whether |
| 227 22 | people in our society and around the world will be |
| 227 23 | immediately impacted, immediately impacted in an |
| 227 24 | important way in terms of their health. |
| 228 1 | In addition, the other qualifying |
| 228 2 | factor is:  Can this research be reviewed |
| 228 3 | adequately in an expedited fashion, or are there |
| 228 4 | other complexities that will need to be dealt with |
| 228 5 | in the review process that will take more time? |
| 228 6 | So those are the two considerations |
| 228 7 | that go into a determination of whether we will do |
| 228 8 | an expedited review. |
| 228 9 | And is the effect of an expedited review, |
| 228 10 | if it is granted and the piece is in fact |

18

| | Objections/Responses in Mason | Rulings In Smith/Barnett |
|---|---|---|

| | |
|---|---|
| 228 11 | published, that the manuscript would be published |
| 228 12 | faster than it would in the normal -- in the |
| 228 13 | ordinary course of peer review? |
| 228 14 | Yes. |
| 228 15 | And so what Dr. Bombardier was requesting |
| 228 16 | was an expert review that, if granted, would have |
| 228 17 | resulted in a faster publication of the VIGOR |
| 228 18 | results than had expedited review not been granted? |
| 228 19 | Correct. |
| 228 20 | Was expedited review in fact granted for |
| 228 21 | the VIGOR manuscript? |
| 228 22 | No, it was not.  And I guess I should |
| 228 23 | qualify my answers to your questions about |
| 228 24 | expedited review. |
| 229 1 | What we -- what we commit ourselves to, |
| 229 2 | if we agree to expedited review, is an expedited |
| 229 3 | review.  We do not commit to publication, |
| 229 4 | necessarily.  We commit to a review process that |
| 229 5 | will take less time. |

236:22 -   237:22  Curfman 11/21/2005

| | |
|---|---|
| 236 22 | And, Doctor, do you have Exhibit 47 in |
| 236 23 | front of you? |
| 236 24 | I do, uh-huh. |
| 237 1 | Could you identify that, please. |
| 237 2 | This is a letter written by the deputy |
| 237 3 | editor primarily responsible for the VIGOR |
| 237 4 | manuscript, Dr. Robert Steinbrook, to Dr. Claire |
| 237 5 | Bombardier, asking for some additional information, |
| 237 6 | pretty early on in the process, about the efficacy |
| 237 7 | of the two drugs in the treatment of rheumatoid |
| 237 8 | arthritis, and those data, in his mind, had not |
| 237 9 | been really very clearly displayed in the first |
| 237 10 | version of the manuscript, and he wanted to know |
| 237 11 | about that. |
| 237 12 | Okay.  So Dr. Steinbrook basically wanted |
| 237 13 | to know some additional data about the efficacy of |
| 237 14 | rofecoxib or Vioxx in the treatment of rheumatoid |
| 237 15 | arthritis, and he requested that Dr. Bombardier |
| 237 16 | provide that data to him; is that fair? |
| 237 17 | Right.  And then an additional question had |
| 237 18 | to do with prior history of gastrointestinal events |
| 237 19 | and proton-pump-inhibitor therapy or misoprostol |
| 237 20 | therapy, yes. |
| 237 21 | So these are issues he wanted more |
| 237 22 | information about as the editor. |

240:5   -   241:24  Curfman 11/21/2005

| | |
|---|---|
| 240 5 | Doctor, do you have Exhibit 48 in front of |
| 240 6 | you? |
| 240 7 | Yes, I do. |
| 240 8 | And does this appear to be Dr. Bombardier |
| 240 9 | response to Dr. Steinbrook's letter that we just |
| 240 10 | looked at? |
| 240 11 | Yes, it does. |
| 240 12 | And just looking, just looking generally at |
| 240 13 | this response, does it appear to provide a fair bit |

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

240 14  of detail on the efficacy data requested by
240 15  Dr. Steinbrook in his letter?
240 16  Yes.
240 17  For example, Dr. Bombardier provides,
240 18  although they are not very clear in this copy, what
240 19  appear to be several -- several figures depicting
240 20  *various measurements of efficacy in the treatment*
240 21  of rheumatoid arthritis; is that correct?
240 22  That's correct.
240 23  And so it is fair to say that when
240 24  Dr. Steinbrook did request this specific piece of
241  1  data, specifically the efficacy data in the
241  2  treatment of rheumatoid arthritis, Dr. Bombardier
241  3  was responsive and cooperative in providing that
241  4  data; is that fair?
241  5  Yes.
241  6  Doctor, if you could take a look at what
241  7  was marked this morning as Exhibit 19.
241  8  Do you have Exhibit 19, Doctor?
241  9  Yes, I do.
241 10  And I believe you already described this
241 11  document this morning.
241 12  Is it correct that this is a June 30
241 13  letter from Dr. Kaplan at The New England Journal
241 14  to Dr. Bombardier?
241 15  Yes.
241 16  And this letter discusses the -- among
241 17  other things, it discusses some of the comments of
241 18  the reviewers to the VIGOR manuscript?
241 19  Correct.
241 20  And I apologize, I think you told us
241 21  before, but who is Dr. Kaplan?
241 22  He is the associate editor who was
241 23  responsible for handling this manuscript, and he is
241 24  a gastroenterologist by background.

242:11 - 243:4  Curfman 11/21/2005
242 11  And as Dr. Kaplan writes, "While the
242 12  editors are interested in your manuscript" -- and
242 13  then he gives the title of the manuscript -- "we
242 14  could not accept it for publication without
242 15  substantial revision"; is that correct?
242 16  That's correct.
242 17  And so Dr. Kaplan is basically saying that
242 18  unless the comments of the reviewers and the
242 19  editors are addressed to the editors' satisfaction,
242 20  the manuscript will not be published in The New
242 21  England Journal of Medicine; is that correct?
242 22  Correct.
242 23  Okay.  And the letter also goes through a
242 24  *variety of requirements for a manuscript in order*
243  1  to be published in The Journal, generally speaking,
243  2  and in addition to the comments of the specific
243  3  reviewers; is that correct?
243  4  Yes.

244:3  -  244:16  Curfman 11/21/2005

| | | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|

| 244 | 3 | And specifically, in this letter Dr. Kaplan |
|---|---|---|
| 244 | 4 | gave some specific instructions regarding figures |
| | 5 | in the next paragraph, figures and tables. |
| 244 | 6 | He stated that Table 1 should be an |
| 244 | 7 | appendix.  All of the figures should be deleted and |
| 244 | 8 | summarized in the text as needed, and then |
| 244 | 9 | Tables 2, 3, 4 and 5 should be maintained and an |
| 244 | 10 | additional table about efficacy should be added; is |
| 244 | 11 | that correct? |
| 244 | 12 | Right. |
| 244 | 13 | And that would -- that would meet the |
| 244 | 14 | target of five figures and tables that The Journal |
| 244 | 15 | had set? |
| 244 | 16 | That's correct. |

| 245:4 | - | 245:12 | Curfman 11/21/2005 |
|---|---|---|---|
| 245 | 4 | The last sentence of that paragraph reads, |
| 245 | 5 | "All numerical data should be rounded to a |
| 245 | 6 | reasonable number of significant figures in |
| 245 | 7 | accordance with the precision of the data." |
| 245 | 8 | Do you see that sentence? |
| 245 | 9 | Yes, I do. |
| 245 | 10 | Is that standard practice in The New |
| 245 | 11 | England Journal? |
| 245 | 12 | Yes, it is. |

| 250:19 | - | 251:1 | Curfman 11/21/2005 |
|---|---|---|---|
| | 19 | Okay.  Okay.  I don't need to show you the |
| | 20 | letter, Doctor, but this morning we did look at the |
| 250 | 21 | letter from Dr. Drazen to Dr. Bombardier in which |
| 250 | 22 | Dr. Drazen, as the editor-in-chief of The New |
| 250 | 23 | England Journal, accepted the VIGOR manuscript for |
| 250 | 24 | publication; is that correct? |
| 251 | 1 | Yes, uh-huh. |

| 252:10 | - | 253:3 | Curfman 11/21/2005 |
|---|---|---|---|
| 252 | 10 | So in their judgment -- well, the editors |
| 252 | 11 | of The New England Journal would not accept for |
| 252 | 12 | publication a piece where they believed the data |
| 252 | 13 | were presented in a misleading way, for example; is |
| 252 | 14 | that correct? |
| 252 | 15 | MR. ARBITBLIT:  Objection. |
| 252 | 16 | If we were presented with a manuscript |
| 252 | 17 | where data were presented in a way that we |
| 252 | 18 | *knowingly knew was misleading, that's correct.* |
| 252 | 19 | We would not accept the manuscript at |
| 252 | 20 | that point if we -- if we had certain knowledge |
| 252 | 21 | that the data were presented in some misleading |
| 252 | 22 | way, or if we had knowledge that there was |
| 252 | 23 | additional information that was not there, that if |
| 252 | 24 | we had known about it, we thought that maybe it |
| 253 | 1 | should be there, that would have been grounds for |
| | 2 | turning the manuscript down, turning it back and |
| | 3 | trying to fix that. |

Re: [252:10-253:3]
**Def Obj** Leading;
Speculative

Sustained
(if extremely
objection made
if not waived
provided "usual
stipulation" was
agreed to by counsel

| 255:9 | - | 256:3 | Curfman 11/21/2005 |
|---|---|---|---|
| 255 | 9 | Okay.  Let's take a look again at the |

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

255 10  published article, which is Exhibit 11.  If you
255 11  *could get that, please, Doctor, and, Doctor, I*
255 12  would likes to take a look at some of the data that
255 13  are presented in this article, and first I would
255 14  ask you to just take a look at the abstract on the
255 15  first page of the article.
255 16  Is it fair to say that, generally
255 17  *speaking, the abstract is meant to be a summary of*
255 18  the important information in the article?
255 19  Yes.
255 20  Summary.
255 21  Summary, yes.
255 22  Yes.
255 23  So if we go to the results part of *just the*
255 24  abstract, there is a brief summary of some of the
256  1  information that appears later on in more detail in
256  2  the article; is that correct?
256  3  That's right.

259:4  -  262:9  Curfman 11/21/2005
259  4  Then if you go a little further down in the
259  5  "Results" section of the abstract on the first
259  6  page, it reads, "The incidence of myocardial
259  7  infarction was lower among patients in the naproxen
259  8  group than among those in the rofecoxib group, 0.1
259  9  percent versus 0.4 percent; relative risk, 0.2.  95
259 10  percent confidence interval, 0.1 to 0.7."
259 11  Do you see that?
259 12  I do.
259 13  So based on that, if a person read -- if a
259 14  reader of this article read the first -- just the
259 15  first page of this article, they would see that
259 16  there was a -- there was a difference in lower
259 17  incidences of heart attacks in the patient taking
259 18  naproxen than in the patient taking Vioxx; is that
259 19  correct?
259 20  MR. ARBITBLIT:  Objection.
259 21  Well, that's what it says, yes.
259 22  And I would like to ask you specifically a
259 23  few questions about the way the data are presented
259 24  there, and specifically the relative risk
260  1  presentation there of 0.2.
260  2  *Could you describe what a relative risk*
260  3  of 0.2 means?
260  4  The relative risk is a measure of the risk
260  5  of one therapy versus another with respect to this
260  6  particular endpoint.
260  7  The confidence intervals reflect the
260  8  *variation on that point estimate of .2.  So the*
260  9  point estimate of .2 means that the risk of having
260 10  a myocardial infarction with naproxen was only 20
260 11  percent that of taking naproxen --
260 12  Than taking Vioxx; is that right?  I'm
260 13  sorry, Doctor, I think you may have misspoken.
260 14  Oh, did I?
260 15  The relative risk of naproxen was 20
260 16  percent --

| | | | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|---|---|
| 260 | 17 | Of rofecoxib. | | |
| 260 | 18 | Of rofecoxib? | | |
| | 19 | Yeah. | | |
| 260 | 20 | I'm sorry. Go ahead. | Re: [260:20-260:21] | Sustained |
| 260 | 21 | That's okay. Go ahead. | Def Obj Colloquy | |
| 260 | 22 | So that's another way of saying, if someone | | |
| 260 | 23 | read this, that's another way of saying that the | | |
| 260 | 24 | rate of heart attacks on naproxen was one-fifth the | | |
| 261 | 1 | rate of heart attacks on Vioxx, roughly; is that | | |
| 261 | 2 | correct? | | |
| 261 | 3 | Yes. | | |
| 261 | 4 | And, conversely, and I think we discussed | | |
| 261 | 5 | this this morning, that's another way of saying | | |
| 261 | 6 | that the relative risk -- that the risk of | | |
| 261 | 7 | myocardial infarctions on Vioxx was five times that | | |
| 261 | 8 | of the relative risk -- sorry, the risk of heart | | |
| 261 | 9 | attacks on naproxen; is that correct? | | |
| 261 | 10 | MR. ARBITBLIT: Objection. | | |
| 261 | 11 | Yeah, it doesn't say that here. The | Re: [261:11-261:21] | Overrule |
| 261 | 12 | authors chose and the editors allowed to go through | Def Obj Non-responsive | |
| 261 | 13 | the statement that naproxen was protective. | | |
| 261 | 14 | So that is the way it is stated here in | | |
| 261 | 15 | this summary, but it doesn't acknowledge the other | | |
| 261 | 16 | hypothesis here in the abstract. | | |
| 261 | 17 | Well -- | | |
| 261 | 18 | The other hypothesis being just what you | | |
| 261 | 19 | said: That the risk of heart attack is five times | | |
| | 20 | greater with naproxen -- with rofecoxib than with | | |
| 261 | 21 | naproxen. | | |
| 261 | 22 | Well, it's fair to say, isn't it, Doctor, | Re: [261:22-262:9] | |
| 261 | 23 | that neither hypothesis is really discussed in this | Def Obj Non- | |
| 261 | 24 | abstract? | responsive; improper | |
| 262 | 1 | What is discussed in the abstract is | and undisclosed expert | |
| 262 | 2 | that the incidence on naproxen was lower than that | opinion on naproxen | |
| 262 | 3 | on the Vioxx and that the magnitude of that | | |
| 262 | 4 | difference was about fivefold; is that fair? | | |
| 262 | 5 | MR. ARBITBLIT: Objection. | | |
| 262 | 6 | Yes. But again, that's only one | | |
| 262 | 7 | possibility. The implication here is that naproxen | | |
| 262 | 8 | is protective. Now, of course, we know -- we know | | |
| 262 | 9 | now that that is not true at all. | | |

| | | | | |
|---|---|---|---|---|
| 262:13 - | 263:17 | Curfman 11/21/2005 | | |
| 262 | 13 | Yes. But specifically, at least anyone | | |
| 262 | 14 | reading this first page of this article would know | | |
| 262 | 15 | that there was a fivefold difference between the | | |
| 262 | 16 | incidence of heart attacks on Vioxx and naproxen. | | |
| 262 | 17 | Whether that was a result of a protective effect of | | |
| 262 | 18 | naproxen or some effect of Vioxx, they would know | | |
| 262 | 19 | from reading this first page that there was a | | |
| 262 | 20 | fivefold difference in heart attacks? | | |
| 262 | 21 | No. I disagree with that. | | |
| | 22 | They are being told that there are | | |
| 262 | 23 | fewer events with naproxen. The clear implication | | |
| 262 | 24 | there is that naproxen is protective and not that | | |
| 263 | 1 | rofecoxib is deleterious. | | |
| 263 | 2 | Right. I understand -- and I understand | Re: [263:2-263:2] | |

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

Def Obj  Sidebar

263  3    that that is your view, Doctor, but my question is
263  4    just, specifically, they wouldn't -- a person
263  5    reading the first page of this article would know
263  6    that there was a fivefold difference between the
263  7    two -- that there were different rates of heart
263  8    attacks on naproxen and rofecoxib?  They wouldn't
263  9    have had to read past the abstract to understand
263  10   that particular fact?
263  11   MR. ARBITBLIT:  Objection.
263  12   Yes.  They would know that particular fact,
263  13   but they would also take away the secondary fact
263  14   that the clear implication is that naproxen is
263  15   protective.
263  16   Okay.
263  17   And we know now that that is not true.

Re: [263:12-263:15]
Def Obj Non-responsive after "Yes"
Re: [263:13-263:17]
Def Obj Non-responsive; no question asked.  Improper and undisclosed expert opinion on naproxen

263:21 -   264:3   Curfman 11/21/2005
263  21   The further -- the "Results" section
263  22   goes on further to state that, "The overall
263  23   mortality rate and the rate of death from
263  24   cardiovascular causes were similar in the two
264  1    groups."
264  2    Do you see that?
264  3    Yes, I do.

Re: [263:21-264:3]
Pltf Obj Cuts off deponent's full answer

*Overruled*

264:11 -   265:7   Curfman 11/21/2005
264  11   And the same -- the same really holds true
264  12   with all of the cardiovascular events that are
264  13   being discussed here.  We are talking about low
264  14   number of events, and there is fairly low power to
264  15   make any determinations about the cardiovascular
264  16   events in this study; is that correct?
264  17   MR. ARBITBLIT:  Objection.
264  18   No.  I wouldn't agree with that.
264  19   It's true that cardiovascular endpoints
264  20   were not the primary endpoints in the trial; but
264  21   the numerical data that we went through this
264  22   morning, I think that valid conclusions about
264  23   cardiac toxicity can be drawn from those data.
264  24   It's not that there are too few of them
265  1    that we can't say anything about it, that we can't
265  2    validly assess cardiovascular toxicity from all of
265  3    those tables of data that we reviewed this morning.
265  4    There is very important information in
265  5    those tables of data that indicate a very clear
265  6    signal about the cardiac toxicity of rofecoxib, and
265  7    we shouldn't sweep that under the rug.

Re: [264:19-265:7]
Def Obj Non-responsive -- witness is giving a speech.  Improper and undisclosed expert opinion on statistical analysis of study

*Sustained*

267:15 -   269:16   Curfman 11/21/2005
267  15   Doctor if you could also take a look at
267  16   Exhibit 16, which -- I'm sorry -- 17, which is one
267  17   of the exhibits we looked at this morning, and I
267  18   would refer you specifically to Page 25 of that
267  19   exhibit, which is one -- which is the table that
267  20   you talked about this morning.
267  21   Are you there, Doctor?
267  22   Yes, I am.

| | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|

267 23   Okay.  Thanks.
267 24   Just taking a look at this table, this
268  1   was the table that you talked about this morning,
268  2   and this table did not ultimately appear in the
268  3   final published VIGOR article as a table, correct?
268  4   That's correct.
268  5   I just want to go over some of the -- I
268  6   just want to go over the percentages that appear in
268  7   that table and confirm that those percentages do in
268  8   fact appear in the text of the final VIGOR article
268  9   with you.
268 10   Specifically, if you look at the first
268 11   row on Table 5 on Page 25, you have all deaths and
268 12   the percentages there are 0.5 percent and 0.4
268 13   percent.
268 14   Do you see those?
268 15   Yes, I do.
268 16   And if you look at the second sentence
268 17   under "General Safety" it states that, "The
268 18   mortality rate was 0.5 percent in the rofecoxib
268 19   group and 0.4 percent in the naproxen group."
268 20   Do you see that?
268 21   Yes.
268 22   So those percentage were disclosed in the
268 23   text of the article; is that correct?
268 24   That's correct.
269  1   And then if you go to the -- back to Page
269  2   25 of Exhibit 17, if you look at cardiovascular
269  3   deaths, the percentages are 0.2 percent and 0.2
269  4   percent.
269  5   Do you see that?
269  6   Yes, I do.
269  7   And in the next sentence, moving to the
269  8   next sentence of the published VIGOR article, it
269  9   states, "The rate of death from cardiovascular
269 10   causes was 0.2 percent in both groups"; is that
269 11   correct?
269 12   Correct.
269 13   So, again, the percentage of cardiovascular
269 14   deaths from Table 5 do appear in the text of the
269 15   final published VIGOR article; is that correct?
269 16   The percentages do, yes.

269:19 -   270:6   Curfman 11/21/2005
269 19   Then if you go to -- I am going to skip the
269 20   third row, which is composite endpoint, and go to
269 21   the next row, which is myocardial infarction, and
269 22   that has -- the percentages from the table are 0.4
269 23   percent and 0.1 percent; is that correct?
269 24   Right.
270  1   The corresponding sentence in the published
270  2   paper states that, "Myocardial infarctions were
270  3   less common in the naproxen group than in the
270  4   rofecoxib group, 0.1 percent versus 0.4 percent,"
270  5   and then gives the 95 percent confidence interval
270  6   and relative risk; is that correct?

| | Objections/Responses in Mason | Rulings In Smith/Barnett |
|---|---|---|

270:8  -   270:14  Curfman 11/21/2005

| 270 | 8 | Yes, uh-huh. |
| 270 | 9 | So, again, the percentages of the |
| 270 | 10 | myocardial infarction that occurred in both the |
| 270 | 11 | Vioxx arm and the naproxen arm of the study from |
| 270 | 12 | this Table 5 here do appear in the text of the |
| 270 | 13 | final published VIGOR article; is that correct? |
| 270 | 14 | The percentages do, yes. |

270:20 -   271:17  Curfman 11/21/2005

| 270 | 20 | And the final row of Table 5 is |
| 270 | 21 | *ischemic cerebrovascular accidents, which are* |
| 270 | 22 | essentially a type of stroke; is that correct, |
| 270 | 23 | Doctor? |
| 270 | 24 | Correct. |
| 271 | 1 | And the percentages in that table are 0.2 |
| 271 | 2 | percent on Vioxx and 0.2 percent in the naproxen. |
| 271 | 3 | Do you see that? |
| 271 | 4 | Yes, I do. |
| 271 | 5 | And I think I skipped this sentence before. |
| 271 | 6 | It's above the prior one in the final published |
| 271 | 7 | article, but it states, "Ischemic cerebrovascular |
| 271 | 8 | events occurred in 0.2 percent *of the patients in* |
| 271 | 9 | each group"; is that correct? |
| 271 | 10 | *Yes.* |
| 271 | 11 | So, again, the percentages of stroke in |
| 271 | 12 | *both the* Vioxx arm -- the percentage of patients |
| 271 | 13 | who suffered from a stroke in both the Vioxx arm |
| 271 | 14 | and the naproxen arm that were in this table also |
| 271 | 15 | appeared in the text of the final published |
| 271 | 16 | article; is that correct? |
| 271 | 17 | The percentages did, yes. |

279:15 -   281:12  Curfman 11/21/2005

| 279 | 15 | And, Doctor, just continuing with our |
| 279 | 16 | discussion of some of the *data that were presented* |
| 279 | 17 | in the "General Safety" section of the VIGOR study, |
| 279 | 18 | *which is 1523 of Exhibit 11.* |
| 279 | 19 | Are you there? |
| 279 | 20 | Yes. |
| 279 | 21 | After the data we talked about, the article |
| 279 | 22 | describes that four percent of the study subjects |
| 279 | 23 | met the criteria of the FDA for the use of aspirin |
| 279 | 24 | for secondary cardiovascular prophylaxis -- and |
| 280 | 1 | then it describes that indication -- but were not |
| 280 | 2 | taking low-dose aspirin therapy. |
| 280 | 3 | Do you see that? |
| 280 | 4 | Yes. |
| 280 | 5 | And the article states *that these patients* |
| 280 | 6 | accounted for 38 percent of the patients in the |
| 280 | 7 | *study who had myocardial infarctions,* or heart |
| 280 | 8 | attacks; is that correct? |
| 280 | 9 | Yes. |
| 280 | 10 | And then the article goes on to describe |
| 280 | 11 | the difference that was seen in the patients who |
| 280 | 12 | were not indicated for low-dose aspirin, and states |
| 280 | 13 | that, "In the other patients, the difference in the |

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|
| 280 14 | rate of myocardial infarction between groups was | | |
| 280 15 | not significant, 0.2 percent in the rofecoxib group | | |
| ● 16 | and 0.1 percent in the naproxen group." | | |
| 280 17 | Do you see that? | | |
| 280 18 | Yes. | | |
| 280 19 | So you -- would you agree, at least, that | | |
| 280 20 | the fact that there was still a difference, albeit | | |
| 280 21 | not statistically significant, in the rate of heart | | |
| 280 22 | attacks among the nonaspirin-indicated patients is | | |
| 280 23 | disclosed in the article? | | |
| 280 24 | MR. ARBITBLIT:  Objection. | Re: [280:24-280:24] Def Obj Remove Objection | |
| 281  1 | Well, your clients held back three of the | | |
| 281  2 | heart attacks. | | |
| 281  3 | Yes. | Re: [281:1-281:3] Def Obj Non-responsive | |
| 281  4 | But my question, Doctor, was | | |
| 281  5 | specifically, is the fact that there is a | | |
| 281  6 | difference in the rate of heart attacks in the | | |
| 281  7 | patients who were not indicated for low-dose | | |
| 281  8 | aspirin disclosed in the article; is that correct? | | |
| 281  9 | MR. ARBITBLIT:  Objection. | Re: [281:9-281:9] Def Obj Remove Objection | |
| 281 10 | Your client withheld three of the heart | | |
| 281 11 | attacks, and therefore, these numbers are not | | |
| 281 12 | really the final accurate numbers. | Re: [281:10-281:12] Def Obj Non-responsive | |

281:13 -   281:16  Curfman 11/21/2005

| 281 13 | When you say -- when you say Merck withheld | | |
|---|---|---|---|
| 281 14 | heart attacks, you are -- you are not stating Merck | | |
| ● 15 | withheld any of the heart attacks from the FDA, are | | |
| ● 16 | you? | | |

281:18 -   281:18  Curfman 11/21/2005

| 281 18 | No. | | |
|---|---|---|---|

281:19 -   283:5   Curfman 11/21/2005

| 281 19 | In fact, Merck disclosed those heart | | |
|---|---|---|---|
| 281 20 | attacks to the FDA, as far as you can tell; is that | | |
| 281 21 | correct? | | |
| 281 22 | That's the way I learned about them. | | |
| 281 23 | Right.  And that's how you learned about | Re: [281:23-282:6] Def Obj Non-responsive; no question was asked | |
| 281 24 | them -- | | |
| 282  1 | After this was published. | | |
| 282  2 | Right.  I understand.  But so Merck did -- | | |
| 282  3 | I am the responsible editor and I find out | | |
| 282  4 | after -- | | |
| 282  5 | Right. | | |
| 282  6 | -- it was published. | | Overruled |
| 282  7 | But we do -- we are in agreement that Merck | Re: [282:7-282:10] Def Obj Non-responsive after "To the FDA" | |
| 282  8 | did disclose the three heart attacks that you are | | |
| 282  9 | referring to to the FDA; is that correct? | | |
| 282 10 | To the FDA, but not to us. | | |
| 282 11 | Right. | Re: [282:11-282:11] Def Obj Sidebar | |
| 282 12 | And are you aware, Doctor, that this -- | Re: [282:12-282:20] Def Obj Non-responsive - everything after "I am very well aware of that." | |
| ● 13 | that the analysis that was presented of the data | | |
| ● 14 | that was given to The New England Journal of | | |
| 282 15 | Medicine was an analysis of the events that had | | |
| 282 16 | occurred as of a certain date? | | |
| 282 17 | I am very well aware of that, and I also | | |

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|
| 282 | 18 | think that, regardless of that arbitrary date, that | |
| 282 | 19 | we are talking about peoples lives, and one trumps | |
| | 20 | the other. | |
| 282 | 21 | No.  I understand. | Re: [282:21-282:21] |
| 282 | 22 | Are you aware that the date cutoff that | Def Obj  Sidebar |
| 282 | 23 | I mentioned was pre-specified in the protocol as | |
| 282 | 24 | the primary analysis of safety that would be done | |
| 283 | 1 | in the study? | |
| 283 | 2 | MR. ARBITBLIT:  Objection. | Re: [283:2-283:2] |
| 283 | 3 | Yes.  And that I still contend is a minor | Def Obj  Remove |
| 283 | 4 | technicality compared to the overriding importance | Objection |
| 283 | 5 | of these sorts of data to the health of the public. | Re: [283:3-283:5] |
| | | | Def Obj  Non-responsive after "Yes" |

Overruled

285:10 -   286:14  Curfman 11/21/2005

| | | | |
|---|---|---|---|
| 285 | 10 | But can you -- can you answer my | |
| 285 | 11 | question with respect to the data that existed | |
| 285 | 12 | prior to the pre-specified cutoff point, and were | |
| 285 | 13 | in fact the percentages presented accurately with | |
| 285 | 14 | respect to that? | |
| 285 | 15 | MR. ARBITBLIT:  Objection.  Asked and | |
| 285 | 16 | answered. | |
| 285 | 17 | They were, but I don't think that's the | Re: [285:17-285:18] |
| 285 | 18 | relevant question. | Def Obj  Non-responsive after "They were " |
| 285 | 19 | Fair enough. | Re: [285:19-285:19] |
| 285 | 20 | You are talking to a doctor and a | Def Obj  Sidebar |
| 285 | 21 | cardiologist who cares and who has cared for man | Re: [285:20-285:23] |
| 285 | 22 | patients with heart attacks, and to withhold three | Def Obj  Non- |
| | 23 | of them like that is wrong. | responsive; no question |
| 285 | 24 | I understand. | was asked |
| 286 | 1 | I just -- I want just to make sure the | Re: [286:1-286:2] |
| 286 | 2 | record is clear. | Def Obj  Sidebar |
| 286 | 3 | When you're referring to withholding, | Re: [286:3-286:14] |
| 286 | 4 | you are referring to what was submitted to editors | Def Obj  Non- |
| 286 | 5 | of The New England Journal, but these heart attac | responsive; no question |
| 286 | 6 | were in fact disclosed to the FDA. | was asked; witness is |
| 286 | 7 | Are we not important? | improperly questioning |
| 286 | 8 | Of course not.  No, of course not, Doctor. | the examiner |
| 286 | 9 | Is The New England Journal not important? | |
| 286 | 10 | Of course not.  We are in agreement. | |
| 286 | 11 | Then why weren't we given the data? | |
| 286 | 12 | We are in agreement about the importance | |
| 286 | 13 | of -- | |
| 286 | 14 | Why weren't we given the data? | |

Sustained

287:11 -   287:14  Curfman 11/21/2005

| | | | |
|---|---|---|---|
| 287 | 11 | So, Doctor, my specific question now is the | Re: [287:11-287:14] |
| 287 | 12 | data you are referring to, the myocardial | Pltf Obj  Repetitious |
| 287 | 13 | infarction data from VIGOR, was disclosed to the | |
| 287 | 14 | FDA; is that correct? | |

Overruled

287:16 -   287:16  Curfman 11/21/2005

| | | | |
|---|---|---|---|
| 287 | 16 | Yes.  They are on the FDA Website, yes. | Re: [287:16-287:16] |
| | | | Pltf Obj  Repetitious |

18:  -   18:24  Curfman 01/24/2006

| | | | |
|---|---|---|---|
| 18 | 21 | Dr. Curfman, are you | |
| 18 | 22 | currently actively practicing medicine? | |
| 18 | 23 | A very small fraction of my | |

| | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|

18 24       time is in medical practice in teaching,

19 ● - 19:4   Curfman 01/24/2006
19 1      but my main responsibility is I'm the
19 2      executive editor of the New England
19 3      Journal of Medicine, which is a full-time
19 4      job.

20:8 - 20:24   Curfman 01/24/2006
20 8      I'd like to take a few
20 9      minutes and just establish with you, sir,
20 10     a basic chronology of some of the key
20 11     events that we'll be talking about.
20 12     You recall that the VIGOR
20 13     manuscript was submitted to the New
20 14     England Journal of Medicine in May of
20 15     2000; is that right?
20 16     Well, it was submitted -- it
20 17     was received into our system on May 23rd
20 18     of 2000. For the record, I think it's
20 19     important that we note that the letter of
20 20     transmission from the corresponding
20 21     author was dated May 18th.
20 22     Do you remember that the
20 23     authors asked for expedited treatment of
20 24     the VIGOR manuscript?

21 ● - 21:7   Curfman 01/24/2006
21 1      Yes, I do.
21 2      Do you remember that the New
21 3      England Journal of Medicine determined
21 4      not to grant the expedited treatment?
21 5      Yes. The editor who made
21 6      that decision decided that it was not
21 7      indicated in that case, yes.

21:20 - 21:24   Curfman 01/24/2006
21 20     Again, because we'll be
21 21     referring to it during the deposition, do
21 22     you recognize Exhibit 1 as a copy of the
21 23     VIGOR manuscript as it eventually was
21 24     published in November of 2000?

22:21 - 22:21   Curfman 01/24/2006
22 21     Okay.

23:23 - 23:24   Curfman 01/24/2006
23 23     Continuing with the
23 24     chronology, do you recall that in

24:1 - 24:19   Curfman 01/24/2006
24 1      February 2001 the FDA convened an
● 2      Advisory Committee?
● 3      Yes. I did not have that
24 4      information in February, but I did learn
24 5      about that at a later time, later in
24 6      2001, yes.

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

```
24  7      Do you remember when you
24  8      learned in 2001 that the FDA had convened
24  9      an Advisory Committee?
24 10      To the best of my
24 11      recollection, it was in August or perhaps
24 12      September of 2001 that I first learned
24 13      about that.
24 14      And did you learn that the
24 15      FDA had information that they had posted
24 16      on their website concerning VIGOR?
24 17      Yes.  I learned about that
24 18      from a colleague, again, it was perhaps
24 19      late August or September of 2001, and
```

24:20  -  24:23   Curfman 01/24/2006
```
24 20      there was -- I guess I should point out
24 21      that the authors of the VIGOR article
24 22      didn't inform us that additional data
24 23      were being posted.
```
**Re: [24:20-24:23]
Def Obj: Non-
responsive;
volunteering; late
addition by plaintiff after
deadline**

26:23  -  26:24   Curfman 01/24/2006
```
26 23      Eventually, did you read a
26 24      memorandum that was part of the FDA's
```

27:1  -  27:3   Curfman 01/24/2006
```
27  1      file on this that was posted on line
27  2      called the Targum memorandum?
27  3      That's right.
```

27:14  -  27:24   Curfman 01/24/2006
```
27 14      Is Exhibit 2, does that
27 15      appear to you to be a copy of the Targum
27 16      memorandum?
27 17      (Witness reviewing
27 18      document.)
27 19      Yes, it does.
27 20      When did you first read the
27 21      Targum memorandum?
27 22      I first became aware of the
27 23      data on the FDA website in late August or
27 24      perhaps September of 2001.
```

28:23  -  28:24   Curfman 01/24/2006
```
28 23      Continuing in the
28 24      chronology, in 2004, did you learn that
```

29:1  -  29:24   Curfman 01/24/2006
```
29  1      Merck had voluntarily withdrawn Vioxx
29  2      from the marketplace?
29  3      That's correct.
29  4      And when in 2004 did you
29  5      learn that?
29  6      I believe that the date was
29  7      September 30th, 2004, plus or minus a day
29  8      or two.
29  9      Did you learn around that
```

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

29 10   time or soon after the withdrawal that
29 11   the FDA was convening another Advisory
29 12   Committee?
29 13   Right.
29 14   And you understood that this
29 15   Advisory Committee would be looking at
29 16   all COX-2 inhibitors; is that right?
29 17   Right.
29 18   As well as other NSAIDs.
29 19   Did you understand that?
29 20   Yes.
29 21   Did the New England Journal
29 22   of Medicine ask the people who were
29 23   writing up the APPROVe study to submit it
29 24   to the New England Journal of Medicine

30:1   -   30:1   Curfman 01/24/2006
  30  1   for possible publication?

30:23   -   30:24   Curfman 01/24/2006
  30 23   There were discussions
  30 24   between our editor-in-chief and one of

31:1   -   31:23   Curfman 01/24/2006
  31  1   the authors about that possibility, yes,
  31  2   but I honestly don't know who made the
  31  3   first phone call.  I was not involved in
  31  4   those conversations.
  31  5   Was it the case that even
  31  6   though Vioxx had been voluntarily
  31  7   withdrawn from the market, the New
  31  8   England Journal of Medicine was
  31  9   interested in publishing the APPROVe
  31 10   study so that it would be available to
  31 11   the public before the Advisory Committee
  31 12   met?
  31 13   I don't recall that.  I
  31 14   think that we were interested in
  31 15   publishing the data, because it seemed to
  31 16   us to be an important data set, very
  31 17   informative data set, that would inform
  31 18   physicians and the rest of the medical
  31 19   community about this drug and this class
  31 20   of drugs, but I don't recall anything
  31 21   about trying to publish it before an
  31 22   Advisory Committee.  I don't recall that
  31 23   at all.

32:23   -   32:24   Curfman 01/24/2006
  32 23   Did there come a time when
  32 24   people in the medical community began

33:1   -   33:3   Curfman 01/24/2006
    1   criticizing the New England Journal of
  33  2   Medicine for the way that it handled the
  33  3   VIGOR publication?

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

33:10  -  33:24   Curfman 01/24/2006
33  10    I can't recall exactly criticism.  I do
33  11    recall discussions.  There wasn't a lot
33  12    of discussion, but I'm not sure that I
33  13    would have recognized it as criticism.
33  14    By the middle of 2005, was
33  15    the senior editorial group at the New
33  16    England Journal of Medicine meeting on a
33  17    regular basis with a public relations
33  18    firm?
33  19    Excuse me?  Could you repeat
33  20    that?
33  21    Sure.
33  22    By the middle of 2005, was
33  23    the New England Journal of Medicine
33  24    editorial folks, you and the other senior

34:1  -  34:24   Curfman 01/24/2006
34  1    editors, were you meeting on a regular
34  2    basis with a public relations firm?
34  3    I personally did attend some
34  4    meetings with a public relations firm,
34  5    yes.
34  6    Was one of the subjects that
34  7    you discussed in late 2005 continuing
34  8    into early 2006, one of the subjects that
34  9    you discussed with the public relations
34  10    firm was how to deal with criticism of
34  11    the New England Journal of Medicine for
34  12    the way it handled the VIGOR publication?
34  13    Well, I don't recall that as
34  14    being the focus of discussion myself.  I
34  15    think the topic of COX-2 inhibitors, that
34  16    topic probably did come up, but I don't
34  17    recall that we were talking about -- I
34  18    don't think so.
34  19    So, you don't remember that
34  20    in November and December, in fact, you
34  21    were communicating almost on a daily
34  22    basis with this PR firm on subjects
34  23    including the criticisms of the New
34  24    England Journal of Medicine concerning

35:1  -  35:1   Curfman 01/24/2006
35  1    how they handled the VIGOR publication?

35:11  -  35:18   Curfman 01/24/2006
35  11    Do you -- are you saying
35  12    that as you sit here today that you don't
35  13    know that the New England Journal of
35  14    Medicine in November and December was
35  15    communicating with this PR firm on almost
35  16    a daily basis about criticisms of the New
35  17    England Journal of Medicine on how it
35  18    handled the VIGOR publication?

36:19  -  36:23   Curfman 01/24/2006

**Re: [34:19-35:1]**
**Pltf Obj** Argumentative;
No answer; Defense
attorney is testifying.

**Re: [35:1-35:1]**
**Pltf Obj** See above

*Overruled*

|  | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

36 19        THE WITNESS:  Well, all I
36 20        can do is tell you that I was not
36 21        talking with people at a PR firm
36 22        about, what did you say, how to
36 23        handle the VIGOR article or --

37:22  -  37:24   Curfman 01/24/2006

37 22        My question to you, sir, is,
37 23        is it your testimony today that you don't
37 24        know that back in November and December,

Re: [37:22-40:16]
Pltf Obj
Argumentative;
Harassing; Witness'
answer unfinished.

38:1  -  38:6     Curfman 01/24/2006

Re: [38:1-38:6]
Pltf Obj See above

38  1        the New England Journal of Medicine was
38  2        communicating on a regular basis with a
38  3        PR firm about how to handle criticism of
38  4        the manner in which the New England
38  5        Journal of Medicine handled the VIGOR
38  6        publication?

38:12  -  38:24   Curfman 01/24/2006

Re: [38:12-38:24]
Pltf Obj See above

38 12        Okay.  To the best of my
38 13        recollection, to the best of my memory,
38 14        there was a member of the, what you call
38 15        the PR firm, Morrissey & Company, that
38 16        would provide us with e-mail updates
38 17        about articles in the media that would be
38 18        of interest to the New England Journal of
38 19        Medicine, to the editors, other staff
38 20        members at the journal.  And I would be
38 21        copied on these e-mails.  I have to say
38 22        that I didn't open all of them, but I did
38 23        open some.  They would contain sometimes
38 24        copies of articles in the media that

39:1  -  39:5     Curfman 01/24/2006

Re: [39:1-39:5]
Pltf Obj See above

39  1        relate to journal activities, and some of
39  2        those, I'm sure, related to rofecoxib,
39  3        other COX-2 inhibitors, and this general
39  4        topic which was being written about in
39  5        the media at that time.  So, that's the

39:6  -  39:24   Curfman 01/24/2006
39  6        best of my recollection, that the
39  7        communications that were coming to me
39  8        from Morrissey & Company, the ones that I
39  9        can remember, were articles from the
39 10        public media, again, not dealing only
39 11        with rofecoxib or COX-2 inhibitors, but a
39 12        whole variety of topics in healthcare and
39 13        sometimes articles about articles that
39 14        were published in the New England Journal
39 15        of Medicine, because we do try to keep
39 16        track of what's going on in the media
39 17        with respect to our journal and with

*Overruled*

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

39 18   respect to important issues in
39 19   healthcare, in medicine and the
39 20   healthcare community. So, that's the
39 21   best of my recollection about the
39 22   communications that I would have been
39 23   copied on with respect to Morrissey &
39 24   Company.

40:1   -   40:6   Curfman 01/24/2006

**Re: [40:1-40:6]**
**Pltf Obj** See above

40   1   Don't you remember that they
40   2   coached you on what to say to the media
40   3   when the media asked any questions that
40   4   might be critical of the way that the New
40   5   England Journal of Medicine handled the
40   6   VIGOR publication?

40:13   -   40:16   Curfman 01/24/2006

**Re: [40:13-40:16]**
**Pltf Obj** See above

40 13   THE WITNESS: Well, I don't
40 14   recall specifically receiving any
40 15   coaching about how to handle the
40 16   VIGOR publication. Now, I do

40:17   -   41:24   Curfman 01/24/2006
40 17   recall -- it is standard practice
40 18   for the media team, and it's not
40 19   just a PR company, by the way, we
40 20   have several people in our own
40 21   organization who are responsible
40 22   for dealing with the media, and
40 23   when an issue comes up, it's
40 24   standard practice for them to
41   1   develop some points called -- we
41   2   call them talking points, that
41   3   would cover certain aspects of
41   4   issues that one of us, one of us
41   5   editors might be called upon to
41   6   ask questions -- to answer
41   7   questions about. And I would
41   8   receive copies of these talking
41   9   points. And I will have to say
41 10   that I didn't use them very often.
41 11   Sometimes they were useful.
41 12   Sometimes they weren't useful to
41 13   me. But if that's what you're
41 14   referring to, if I understood your
41 15   question correctly, I assume that
41 16   you were referring to the talking
41 17   points that were prepared. But
41 18   they weren't prepared only by a PR
41 19   firm. It's important -- there are
41 20   several people inside our
41 21   organization who've worked at the
41 22   Journal for some time who are
41 23   involved as well in developing
41 24   talking points.

|  | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

42:17  -  42:22   Curfman 01/24/2006
42 17    And then moving on with our
42 18    chronology, did you and your colleagues,
42 19    Dr. Morrissey and Dr. Drazen, prepare and
42 20    post on your website a document called an
42 21    "Expression of Concern"?
42 22    That's correct.

43:22  -  43:24   Curfman 01/24/2006
43 22    What date did you release
43 23    this and post it on your website?
43 24    I believe it was December

44:1  -  44:3   Curfman 01/24/2006
44 1    8th or 9th, somewhere in that area.
44 2    I think we'll see as we go
44 3    forward that it was December 8.

44:9  -  44:24   Curfman 01/24/2006
44 9    And do you remember that on
44 10    December 8th, Thursday, the day that you
44 11    decided to release this Expression of
44 12    Concern, that that was the day of closing
44 13    argument and submission to the jury of
44 14    the case called the Irvin case?
44 15    Well, I certainly know that
44 16    a case was going on.  I'm not familiar
44 17    with the term "Irvin case," but I know
44 18    that a case is going on.  But I honestly
44 19    didn't know exactly what was going on in
44 20    the case on that particular day.
44 21    Did you know that there was
44 22    a case being tried in Federal Court in
44 23    Houston in early December?
44 24    Yes.

**Re: [44:9-45:9]**
**Pltf Obj** Argumentative.
Assumes facts not in
evidence. Rule 611 -
leading; improper to
inject another trial into
case

*Sustained*

45:1  -  45:3   Curfman 01/24/2006

45 1    And, in fact, you got daily
45 2    updates on that trial, didn't you, from
45 3    your PR team and the others?

**Re: [45:1-45:3]**
**Pltf Obj** See above

45:6  -  45:9   Curfman 01/24/2006

45 6    THE WITNESS:  I don't -- I
45 7    don't know if they were daily
45 8    updates.  I think that there were
45 9    updates from time to time.

**Re: [45:6-45:9]**
**Pltf Obj** See above

*Overrule*

45:11  -  45:24   Curfman 01/24/2006
45 11    And --
45 12    Newspaper articles.
45 13    And when you released the
45 14    Expression of Concern --
45 15    Uh-huh.

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

45 16    -- which I think you'll
45 17    agree was critical of the authors of the
45 18    VIGOR study, is that a fair statement?
45 19    That was not the purpose of
45 20    the Expression of Concern.
45 21    Whether it was its purpose
45 22    or not, would you agree that the
45 23    Expression of Concern was critical of the
45 24    authors of the VIGOR study?

46:1    -    46:18    Curfman 01/24/2006
46    1    The Expression of Concern
46    2    was focused on an article that was
46    3    published in the New England Journal of
46    4    Medicine, a document, scientific document
46    5    that we had obtained evidence that made
46    6    us concerned about the procedures that
46    7    led to the publication of that document.
46    8    And our Expression of Concern was focused
46    9    on the scientific document in order to
46    10    correct the scientific record.  It was
46    11    not focused on individuals.
46    12    Well, do you remember that
46    13    you went out and gave a bunch of
46    14    interviews after the Expression of
46    15    Concern was published where you were
46    16    critical of the authors of the VIGOR
46    17    study?
46    18    I did not --

**Re: [46:12-46:23]**
**Pltf Obj** Argumentative.
Rule 611-improper
leading question

46:21    -    46:24    Curfman 01/24/2006

46    21    THE WITNESS:  I did not go
46    22    out and give a bunch of
46    23    interviews.
46    24    BY MR. BECK:

**Re: [46:21-46:24]**
**Pltf Obj** See above

47:1    -    47:6    Curfman 01/24/2006
47    1    You didn't?
47    2    No, I did not.
47    3    How many did you give?
47    4    The way the --
47    5    Can you just answer how many
47    6    you gave?

**Re: [47:1-47:6]        Pltf**
**Obj** Argumentative;
Interrupts Dr. Curman's
answer; asked answered

47:11    -    47:24    Curfman 01/24/2006
47    11    THE WITNESS:  The way the --
47    12    we were surprised that there were
47    13    so many press calls.  We did not
47    14    issue a press release about the
47    15    Expression of Concern.  We posted
47    16    it on our website, and after it
47    17    was posted, we began to receive
47    18    calls from the media.  I was
47    19    surprised that they were
47    20    interested in this.  For us --
47    21    this was standard editorial

|  | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

47 22        procedure for us.  We have issued
47 23        a total of three Expressions of
⬤ 24        *Concern since 2002, and we were*

48:1    -    48:1    Curfman 01/24/2006
    48    1        following standard procedures.

48:2    -    48:21    Curfman 01/24/2006
    48    2        When calls from the media
    48    3        came in, they were screened by the
    48    4        *people in our organization who*
    48    5        screen the media calls.  They
    48    6        attempted to answer as many of the
    48    7        questions as possible.  And when
    48    8        there were questions more of a
    48    9        *technical nature that they felt*
    48  10        that an editor needed to answer,
    48  11        they were referred to me.  And I
    48  12        took the calls in my office.  *I*
    48  13        didn't go out anywhere.  I was in
    48  14        my office, and the calls were
    48  15        referred to me, and I did the best
    48  16        that I could to answer the
    48  17        *questions objectively so that the*
    48  18        media would get the right story
    48  19        about why we had issued this
    48  20        Expression of Concern.  And that
    ⬤  21        is how this unfolded.

48:24    -    48:24    Curfman 01/24/2006
    48  24        and my question was, how many interviews

49:1    -    49:2    Curfman 01/24/2006
    49    1        did you give?  Can you answer that
    49    2        question?

49:7    -    49:11    *Curfman 01/24/2006*
    49    7        THE WITNESS:  I can't
    49    8        really.  Probably more than four
    49    9        and less than ten.  I don't know.
    49  10        I didn't count the number of
    49  11        telephone calls that came in.

49:13    -    49:23    Curfman 01/24/2006
    49  13        When you said under oath a          **Re: [49:13-49:23]**
    49  14        minute ago that you did not issue a press    **Pltf Obj** Argumentative.
    49  15        release, in fact, the New England Journal    Rule 611-improper
    49  16        of Medicine sent out an e-mail alert to     leading questions.
    49  17        the media --
    49  18        Right.
    49  19        -- informing the media that
    49  20        this Expression of Concern that you say
    ⬤  21        was routine was going to be posted later
    ⬤  22        that day?
    49  23        Yes.

50:10    -    50:14    Curfman 01/24/2006

| | | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|

| 50 10 | | And are you claiming that | **Re: [50:10-50:14]** | |
| 50 11 | | the New England Journal of Medicine | **Pltf Obj** Argumentative; | |
| ● 12 | | treated this Expression of Concern as a | Rule 611 – improper | |
| 50 13 | | routine matter, nothing out of the | leading question. | |
| 50 14 | | ordinary? | | |

| 50:23 | - | 50:24 | Curfman 01/24/2006 | |
| 50 23 | | THE WITNESS:  I didn't say | | |
| 50 24 | | that. | | |

| 51:6 | - | 51:10 | Curfman 01/24/2006 | **Re: [51:6-51:10]** |
| 51 6 | | Are you claiming that the | **Pltf Obj** Argumentative; |
| 51 7 | | New England Journal of Medicine treated | Asked and answered; |
| 51 8 | | this Expression of Concern as a routine | Rule 611 – improper |
| 51 9 | | matter that was nothing out of the | leading question. |
| 51 10 | | ordinary? | |

| 51:13 | - | 51:17 | Curfman 01/24/2006 | |
| 51 13 | | THE WITNESS:  This is part | |
| 51 14 | | of the responsibility of editors. | |
| 51 15 | | It's part of our job that when, | |
| 51 16 | | after an article has been | |
| 51 17 | | published in a journal, and it's | |

| 51:18 | - | 51:19 | Curfman 01/24/2006 | |
| 51 18 | | not just our journal, it's any | |
| 51 19 | | medical journal, if an article is | |

| 51:● | - | 51:24 | Curfman 01/24/2006 | |
| 51 20 | | published in a journal and at a | |
| 51 21 | | later time new evidence comes to | |
| 51 22 | | light that causes the editors to | |
| 51 23 | | be concerned about some aspect of | |
| 51 24 | | that article, the process by which | |

| 52:1 | - | 52:9 | Curfman 01/24/2006 | |
| 52 1 | | it was published, the data, the | |
| 52 2 | | content, issuing an Expression of | |
| 52 3 | | Concern is part of the standard | |
| 52 4 | | operating procedure.  It's set | |
| 52 5 | | down in the uniform requirements | |
| 52 6 | | of the International Committee of | |
| 52 7 | | Medical Journal Editors of which | |
| 52 8 | | the New England Journal is one of | |
| 52 9 | | the founding members. | |

| 52:10 | - | 52:23 | Curfman 01/24/2006 | |
| 52 10 | | And so that, fortunately, we | |
| 52 11 | | have not had to issue Expressions | |
| 52 12 | | of Concern very often.  We feel | |
| 52 13 | | very fortunate about that.  But | |
| 52 14 | | since 2002, we have issued three | |
| ● 15 | | of them.  And when we have to do | |
| ● 16 | | it, it's part of our job, and we | |
| 52 17 | | do it.  And we are accustomed -- | |
| 52 18 | | we know the protocol, we follow | |
| 52 19 | | the same procedure each time that | |

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

52 20     we've done this, and as I've said,
52 21     it's a part of the
52 22     responsibilities.  Editors
52 23     sometimes have to do this.

53:8  -  53:8    Curfman 01/24/2006
53  8     What's Exhibit 4?

54:17  -  54:24    Curfman 01/24/2006
54 17     To the best of my
54 18     recollection, when the Expression
54 19     of Concern was posted on the
54 20     website, I believe that this may
54 21     have been a statement that was
54 22     placed below it or next to it,
54 23     below it, I guess, to provide
54 24     additional explanation for why it

55:1  -  55:1    Curfman 01/24/2006
55  1     was being released.

55:3  -  55:14    Curfman 01/24/2006
55  3     So, this was a statement
55  4     issued by the New England Journal of
55  5     Medicine on December 8th, the same day as
55  6     the Expression of Concern, and it
55  7     accompanied the Expression of Concern on
55  8     the New England Journal of Medicine's
55  9     website?  Isn't that true?
55 10     Well, if you tell me -- to
55 11     the best of my recollection -- it doesn't
55 12     say that here, but that's the best of my
55 13     recollection.  If you tell me that that's
55 14     where you got it, I believe you.

55:15  -  55:17    Curfman 01/24/2006
55 15     And you'd never done that
55 16     before in connection with an Expression
55 17     of Concern, had you?

55:20  -  55:21    Curfman 01/24/2006
55 20     THE WITNESS:  I don't
55 21     recall.  I don't recall.

55:23  -  55:24    Curfman 01/24/2006
55 23     Well, you don't recall one
55 24     way or another whether you issued a

56:1  -  56:3    Curfman 01/24/2006
56  1     one-page statement accompanying either
56  2     one of those other two Expressions of
56  3     Concern that you talked about?

56:13  -  56:24    Curfman 01/24/2006
56 13     helpful, because I didn't write
56 14     this statement, and I do remember
56 15     being informed that, would it be

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|
| 56 16 advisable to provide some | | |
| 56 17 explanation given the technical | | |
| 56 18 nature of the Expression of | | |
| 56 19 Concern, would it be advisable to | | |
| 56 20 have such a statement? And I | | |
| 56 21 remember discussing that, and | | |
| 56 22 so -- but I did not write the | | |
| 56 23 statement. I remember discussing | | |
| 56 24 it. | | |
| | | |
| **57:2 - 57:24 Curfman 01/24/2006** | | |
| 57 2 You said before that you | **Re: [57:2-58:24]** | |
| 57 3 handled this Expression of Concern the | **Pltf Obj** Argumentative; | |
| 57 4 same way you handled the other two? | Interrupts witness and | |
| 57 5 Yes. *In terms of --* | *will not allow witness to* | |
| 57 6 And my question for you, | finish; Defense attorney | |
| 57 7 sir, is, in either one of the other two | is testifying; Assumes | |
| 57 8 Expressions of Concern, did the New | facts not in evidence. | |
| 57 9 England Journal of Medicine release a | | |
| 57 10 statement that accompanied the Expression | | |
| 57 11 of Concern? | | |
| 57 12 Again, I don't recall the | | |
| 57 13 answer to that, but what I was referring | | |
| 57 14 to was the -- in terms of handling the | | |
| 57 15 Expression of Concern, what I was talking | | |
| 57 16 about is the steps that we took, how | | |
| 57 17 the -- how we made the decision to write | | |
| 57 18 an Expression of Concern, how that | | |
| 57 19 Expression of Concern was written, who | | |
| 57 20 read it and reviewed it, and when it was | | |
| 57 21 released. Those kinds of steps were the | | |
| 57 22 *same steps that we followed in each of* | | |
| 57 23 these three cases. And that's what I was | | |
| 57 24 referring to. | | |
| | | |
| **58:1 - 58:14 Curfman 01/24/2006** | | |
| | | |
| 58 1 Now, you say that you did | **Re: [58:1-58:14]** | |
| 58 2 not write this statement, Exhibit 4, that | **Pltf Obj** See above | |
| 58 3 was posted on the website. Did Dr. | | |
| 58 4 Morrissey write it? He was one of the | | |
| 58 5 co-authors with you of the Expression of | | |
| 58 6 Concern, right? | | |
| 58 7 Yes, he was. | | |
| 58 8 Did Dr. Morrissey write this | | |
| 58 9 statement that was posted on your | | |
| 58 10 website? | | |
| 58 11 I don't know who wrote this | | |
| 58 12 statement, to be honest with you. | | |
| 58 13 Well, don't you know, in | | |
| 58 14 fact, that it was written by your PR guy? | | |
| | | |
| **58 - 58:24 Curfman 01/24/2006** | | |
| | | |
| 58 17 THE WITNESS: No, I don't | **Re: [58:17-58:24]** | |
| 58 18 know who wrote the statement. | **Pltf Obj** See above | |
| 58 19 BY MR. BECK: | | |

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

58 20   Did you have a chance to
58 21   spend some time reviewing this statement
58 22   *before it was posted on behalf of the New*
58 23   England Journal of Medicine on your
58 24   website?

59:1  -  59:9   Curfman 01/24/2006
59  1   I believe I saw it briefly,
59  2   but I did not spend a lot of time with
59  3   it, no.
59  4   *Do you remember that you*
59  5   *weren't even shown this statement that*
59  6   *was posted on your website until the day*
59  7   *it was posted?*
59  8   I think that's certainly
59  9   possible, yes.

59:23  -  59:24   Curfman 01/24/2006
59 23   *Ed, do you remember Ed?*
59 24   *Ed?*

60:1  -  60:4   Curfman 01/24/2006
60  1   The PR guy named Ed?  Do you
60  2   remember a PR guy named Ed that you
60  3   talked with almost every day during this
60  4   period?

60:⬤  -  60:20   Curfman 01/24/2006
60 15   THE WITNESS:  You mean Ed
60 16   Cafasso?  Is that who you mean, Ed
60 17   Cafasso?
60 18   BY MR. BECK:
60 19   Yes.  The PR guy, Ed.
60 20   Yes.

61:20  -  61:24   Curfman 01/24/2006
61 20   During early December, were
61 21   the senior editors of the New England
61 22   Journal of Medicine following the trial
61 23   *down there in Houston so closely that*
61 24   they were actually reading or being

**Re: [61:20-62:7]**
**Pltf Obj** Improper to
interject another trial into
case; Argumentative;
Assumes facts not in
evidence; Rule 611-
*improper leading*
question.

62:1  -  62:2   Curfman 01/24/2006
62  1   informed of the contents of the testimony

62  2   that was coming in during that trial?

**Re: [62:1-62:2]**
**Pltf Obj** See above

62:5  -  62:7   *Curfman 01/24/2006*

62  5   THE WITNESS:  I can really
62  6   only speak for myself, and the
62  7   answer is unequivocally no.

**Re: [62:5-62:7]**
**Pltf Obj** See above

62:⬤  -  62:16   Curfman 01/24/2006
62 15   I'm handing you what we've
62 16   *marked as Exhibit 5.*

41

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

62:19  -  62:24   Curfman 01/24/2006
62 19   Do you see here, sir, that
62 20   this is an e-mail, internal e-mail from
62 21   or among the senior editors of the New
62 22   England Journal of Medicine?
62 23   Yes.
62 24   And it's from Dr. Drazen;

63:1  -  63:24   Curfman 01/24/2006
63  1   right?
63  2   Well, there are two e-mails
63  3   here.  Are you talking --
63  4   The one on the top.
63  5   The one on the top.  Yes.
63  6   From Dr. Drazen, yes.
63  7   He's the editor-in-chief of
63  8   the New England Journal of Medicine,
63  9   right?
63 10   Yes, he is.
63 11   It's dated Saturday,
63 12   December 3rd; correct?
63 13   Right.
63 14   And it's to you, right?
63 15   Uh-huh.
63 16   And to Dr. Morrissey,
63 17   correct?
63 18   Right.
63 19   And you would be the three
63 20   top editors of the New England Journal of
63 21   Medicine, right?
63 22   We're three of the top
63 23   editors, yes.
63 24   And do you see here where

*Overruled* (handwritten)

64:1  -  64:10   Curfman 01/24/2006
64  1   the editor-in-chief of the New England
64  2   Journal of Medicine is reporting to you
64  3   concerning the contents of the deposition
64  4   testimony of Dr. Reicin?
64  5   Uh-huh.
64  6   Why was the editor-in-chief
64  7   of the New England Journal of Medicine
64  8   giving you updates concerning the
64  9   contents of Dr. Reicin's testimony down
64 10   there in the Houston trial?

**Re: [64:6-64:10]**
**Pltf Obj** No answer

65:9  -  65:10   Curfman 01/24/2006
65  9   And I will read it into the
65 10   record.

**Re: [65:9-65:10]**
**Pltf Obj** Rules 801 and 802; Hearsay

65:13  -  65:20   Curfman 01/24/2006
65 13   "Steve and Greg, in her
65 14   depositional testimony Reicin says that
65 15   there were also GI events that were not
65 16   recorded but came in late.  We should
65 17   make this clear in the note of concern
65 18   and ask them to provide full reporting of

**Re: [65:13-67:4]**
**Pltf Obj** Not a question; Improperly interjects another trial into case; Defense lawyer is testifying.

*Sustained* (handwritten)

|  |  |  | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|
| 65 | 19 | all data they had on or before October | | |
| 65 | 20 | 13, 2000." | | |

66:20  -  66:24   Curfman 01/24/2006

|  |  | | Re: [66:20-66:24] |
|---|---|---|---|
| 66 | 20 | You know there are | Pltf Obj See above |
| 66 | 21 | depositions, then there are trials. | |
| 66 | 22 | You're in a deposition now.  The thing | |
| 66 | 23 | that was going down in Houston with a | |
| 66 | 24 | jury was a trial. | |

67:1  -  67:18   Curfman 01/24/2006

|  |  | | Re: [67:1-67:18] |
|---|---|---|---|
| 67 | 1 | Now, when you read this, did | Pltf Obj See above |
| 67 | 2 | you understand it to refer to trial | |
| 67 | 3 | testimony by Dr. Reicin or deposition | |
| 67 | 4 | testimony or which? | |
| 67 | 5 | Well, I'll have to be very | |
| 67 | 6 | honest with you.  I only vaguely remember | |
| 67 | 7 | this e-mail message.  I remember that it | |
| 67 | 8 | was on a Saturday late in the morning.  I | |
| 67 | 9 | was working at my desk in my home. | |
| 67 | 10 | Actually, it says 11:31 p.m. | |
| 67 | 11 | Oh, p.m., I'm sorry. | |
| 67 | 12 | Almost midnight he's telling | |
| 67 | 13 | you about this testimony, right? | |
| 67 | 14 | I don't think I was awake | |
| 67 | 15 | then.  I try to be in bed earlier than | |
| 67 | 16 | that.  So, I think that I got it perhaps | |
| 67 | 17 | the next morning, maybe it was actually | |
| 67 | 18 | Sunday morning, I was working at my desk. | |

67:18  -  68:3   Curfman 01/24/2006

| 67 | 18 | Sunday morning, I was working at my desk. |
|---|---|---|
| 67 | 19 | And I have to say, I didn't pay too much |
| 67 | 20 | attention to this message.  It's a |
| 67 | 21 | three-line message.  It didn't -- it |
| 67 | 22 | wasn't very informative to me, and I |
| 67 | 23 | wasn't sure where we would actually take |
| 67 | 24 | something like this.  So, I don't think |
| 68 | 1 | there was any followup action on this, |
| 68 | 2 | so, I can't really comment much more than |
| 68 | 3 | that. |

68:14  -  68:24   Curfman 01/24/2006

| 68 | 14 | When you released the |
|---|---|---|
| 68 | 15 | editorial on December 8th, I think you |
| 68 | 16 | indicated before you didn't know, you |
| 68 | 17 | say, precisely what was going on in the |
| 68 | 18 | trial down in Houston.  Is that right? |
| 68 | 19 | Right. |
| 68 | 20 | You knew that the trial was |
| 68 | 21 | still going on down in Houston? |
| 68 | 22 | Yes. |
| 68 | 23 | You also knew, obviously, |
| 68 | 24 | that Vioxx was not being prescribed and |

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

69:1 ~ 69:4   Curfman 01/24/2006
69   1   sold on December 8th, 2005; right?
69   2   Yes.  That's right.  We
69   3   generally -- we have referred to it as
69   4   rofecoxib, but, yes, that's right.

69:5 - 69:8   Curfman 01/24/2006
69   5   And so on December 8th, when
69   6   you released this Expression of Concern,
69   7   there was no public health emergency --
69   8   No.

71:11 - 71:24   Curfman 01/24/2006

**Re: [71:11-72:7]**
**Pltf Obj** Rules 801 and 802- Hearsay.

71   11   You've got what we've marked
71   12   as Defendant's Exhibit 6 in front of you,
71   13   right?
71   14   Right.  Uh-huh.
71   15   And do you see that the
71   16   first page of Defendant's Exhibit 6 is an
71   17   e-mail string of e-mails from December
71   18   8th?
71   19   Right.
71   20   And the first one is from
71   21   Karen Pedersen --
71   22   Pedersen, yes.
71   23   Pederson to you?
71   24   Right.

72:1 - 72:17   Curfman 01/24/2006
72   1   With a copy to Dr.
72   2   Morrissey?
72   3   That's right.
72   4   And it says she's forwarding
72   5   something called talking points; right?
72   6   Yes.  That's what I referred
72   7   to earlier.
72   8   And Karen Pedersen, is she
72   9   an internal PR person for the New England
72   10   Journal of Medicine?
72   11   She's the manager of media
72   12   relations.  We don't call her a PR
72   13   person, but she is our interface with the

72   14   media.
72   15   And she's forwarding on
72   16   talking points that were sent to her by
72   17   Ed Cafasso; right?

**Re: [72:15-72:17]**
**Pltf Obj** See above
**Re: [72:15-72:17]**
**Pltf Obj** No Answer

73:2 - 73:20   Curfman 01/24/2006
73   2   But do you see right
73   3   underneath the first e-mail --
73   4   Yeah.
73   5   -- that we looked at, which
73   6   would have been the most recent e-mail,
73   7   there's an e-mail -- she's forwarding the
73   8   thing that she got right below from Ed
73   9   Cafasso to her --