| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

73 10     Right.
73 11     -- "Subject: Talking
73 12     points," "Importance: High"?
73 13     Uh-huh. Yep.
73 14     And Ed Cafasso, he's the
73 15     outside PR guy; right?
73 16     Yes.
73 17     So, he's attaching the
73 18     talking points and the Q&A, he says;
73 19     correct?
73 20     Right.

74:3 - 74:16     Curfman 01/24/2006
74 3     Are you on the page that has
74 4     at the top the title "Expression of
74 5     Concern: Key Points and Q&A."
74 6     *Right.*
74 7     Are these the kind of
74 8     talking points that you referred to
74 9     earlier in your testimony that people
74 10     would give you to use?
74 11     *Sometimes they would, yes.*
74 12     And they did this time;
74 13     right?
74 14     They did. I can't say that
74 15     I used these talking points because I
74 16     *don't think I did, but...*

**Re: [74:12-74:13]**
**Pltf Obj** Rule 611 - Improper leading question.

74:17 - 74:24     Curfman 01/24/2006
74 17     Well, let's take a look down
74 18     at the one that says "Why Did we Release
74 19     this Today?"
74 20     Uh-huh.
74 21     And the talking point says,
74 22     "We felt it was important to release this
74 23     information as soon as we understood how
74 24     it impacted *the conclusions of the paper*

**Re: [74:17-75:9]**
**Pltf Obj** Improperly interjects another trial into case; Rules 801 and 802-Hearsay.

75:1 - 75:9     Curfman 01/24/2006
75 1     we had published. We felt we should
75 2     announce this once we had completed *our*
75 3     investigation of the data, which included
75 4     a statistical analysis, and had raised
75 5     our concerns with the authors."
75 6     Did you follow that talking
75 7     point when members *of the media asked you*
75 8     why you released the Expression of
75 9     *Concern when the jury was out in Houston?*

**Re: [75:1-75:9]**
**Pltf Obj** See above

611(c), 607
Overruled

75:15 - 75:15     Curfman 01/24/2006
75 15     THE WITNESS: I don't --

76 - 76:11     *Curfman 01/24/2006*
76 1     Is it still your testimony
76 2     that you didn't know on December 8th when
76 3     you released the Expression of Concern

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

76  4   that the jury was out in Houston?
76  5   I don't know how I could
76  6   have known that.  I mean, you know, it's
76  7   not something that I would have known.
76  8   Did you use this talking
76  9   point when you answered questions from
76 10   the media about why you released that
76 11   Expression of Concern on that date?

76:16  -  76:21   Curfman 01/24/2006
76 16   Well, you were asked about
76 17   why in the media, weren't you?
76 18   I don't recall, but what I
76 19   can say is that I didn't use this talking
76 20   point because I didn't need to use this
76 21   talking point.  Because the truth --

77:1  -  77:17   Curfman 01/24/2006
77  1   THE WITNESS:  The truth of
77  2   the matter is that we released the
77  3   Expression of Concern when we had
77  4   all of the data assembled, when we
77  5   had deliberated, we had the facts
77  6   in hand.  We very carefully
77  7   deliberated.  The editors had come
77  8   together, reviewed all the
77  9   information that we had, including
77 10   information that we obtained on
77 11   November 21st, 2005.  We made our
77 12   best judgment as editors of the
77 13   New England Journal of Medicine
77 14   with many years of experience
77 15   collectively, and we sat down and
77 16   wrote the document, the Expression
77 17   of Concern.  We worked very hard

**Re: [77:1-78:6]**
**Pltf Obj** Cuts witness' answer off.

*Overruled*

77:18  -  77:24   Curfman 01/24/2006
77 18   on every word of that document.
77 19   Every word was a focus.
77 20   We then had the document
77 21   peer reviewed by someone who we
77 22   have a lot of respect for and who
77 23   is very good with numbers and
77 24   statistical analysis, who went

78:1  -  78:6   Curfman 01/24/2006
78  1   over things for us.  And when we
78  2   finally reached what we considered
78  3   to be a final version after going
78  4   through many versions of the
78  5   Expression of Concern we released
78  6   it, which is our responsibility as

**Re: [78:1-78:6]**
**Pltf Obj** See above

78:7  -  78:19   Curfman 01/24/2006
78  7   editors under the uniform
78  8   requirements of the International
78  9   Committee of Medical Journal

**Re: [78:7-78:19]**
**Def Obj** Non-responsive; late addition

|  | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|
|  | by plaintiff after deadline |  |

78 10     Editors. And that's what we did.
78 11     We followed the standard protocol
78 12     that we've followed in the past,
78 13     and we released the information
78 14     when we had it ready in order to
78 15     inform the medical community that
78 16     we had some concerns about this
78 17     work and had referred these
78 18     concerns to the authors of the
78 19     *article for a response.*

80:17 - 80:19     Curfman 01/24/2006
80 17     We've been looking at the
80 18     December 8 talking points. Let me show
80 19     you Exhibit 7.

81:7 - 81:10     Curfman 01/24/2006
81 7     BY MR. BECK:
81 8     Do you see that this
81 9     *document is the December 5th version of*
81 10     the talking points?

81:13 - 81:13     Curfman 01/24/2006
81 13     THE WITNESS: Yes.

81:15 - 81:16     Curfman 01/24/2006
81 15     Down at the bottom it says,
81 16     "Why Did We Release This When We Did?"

**Re: [81:15-81:16]**
**Pltf Obj** No answer.

*Overruled*

82:15 - 82:24     *Curfman 01/24/2006*
82 15     I apologize. I've got the
82 16     date wrong. So, now we're talking about
82 17     after it's been released and out there in
82 18     the public for a while; right?
82 19     Right. Uh-huh.
82 20     And so this was a later
82 21     version of the talking points. And down
82 22     at the bottom it says "Why Did We Release
82 23     This When We Did?" Could you read for me
82 24     *the first sentence --*

83:1 - 83:7     Curfman 01/24/2006
83 1     Sure.
83 2     -- of the talking points?
83 3     Sure. "We made this
83 4     information public as soon as we could,
83 5     without regard to the trial."
83 6     Now, that statement in the
83 7     talking points was false, wasn't it?

**Re: [83:6-83:7]**
**Pltf Obj** No answer.

83:11 - 83:15     Curfman 01/24/2006
83 11     In fact, when you were
83 12     planning the release of the Expression of
83 13     Concern, you were planning it to coincide
83 14     with specific events of the trial down in
83 15     Houston. Isn't that true?

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

83:22  -  83:24     Curfman 01/24/2006
    83 22           You were planning to release
    83 23           the Expression of Concern based on
    83 24           specific events that you had been told

**Re: [83:22-83:24]**
**Pltf Obj** Improperly
interjects another trial
into case.

84:1  -  84:2      Curfman 01/24/2006
    84  1           would take place down in the trial in
    84  2           Houston, isn't that true, sir?

84:6  -  84:6      Curfman 01/24/2006
    84  6           THE WITNESS:  No.

84:14  -  84:14    Curfman 01/24/2006
    84 14           What is Exhibit 8?

84:18  -  84:22    Curfman 01/24/2006
    84 18           THE WITNESS:  Right.  This
    84 19           is some e-mail from December 8th
    84 20           among the various editors of the
    84 21           Journal about the Expression of
    84 22           Concern.

**Re: [84:18-84:22]**
**Pltf Obj** Rules 801 and
802-Hearsay.

84:24  -  84:24    Curfman 01/24/2006
    84 24           And on the bottom, which

85:1  -  85:18     Curfman 01/24/2006
    85  1           would be the earliest of the three
    85  2           e-mails printed on this page; is that
    85  3           correct?
    85  4           Yes.  December 7th, right.
    85  5           And it's December 7th, 6:00
    85  6           p.m. from Tad Campion.  Who is Tad
    85  7           Campion?
    85  8           He's the senior deputy
    85  9           editor at the journal.
    85 10           Then it says to -- and it
    85 11           has Lisa Scott, Karen Pedersen, Sandra
    85 12           Jacobs, Andrea Graham and Julie Mooza.
    85 13           Are they all employees of the New England
    85 14           Journal of Medicine?
    85 15           This is the web team, yes.
    85 16           And then cc, that means
    85 17           copies; right?
    85 18           That's right.

87:6  -  87:24     Curfman 01/24/2006
    87  6           And then you're copied on
    87  7           this December 7th 6:00 p.m. e-mail;
    87  8           right?
    87  9           Yes.
    87 10           Dr. Drazen, the
    87 11           editor-in-chief is also copied; correct?
    87 12           Correct.
    87 13           Then the subject, what does
    87 14           the subject line read?
    87 15           "Probable Early Release
    87 16           Tomorrow P.M.," is that what you're

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

87 17    referring to?
87 18    Yes.  Underneath where it
87 19    says "Probable Early Release Tomorrow
87 20    P.M.," there's a line that says
87 21    "Importance," and what did Mr. Campion
87 22    say was the importance of this e-mail?
87 23    It says "High."
87 24    Then the e-mail says,

88:1  -  88:2    Curfman 01/24/2006
88 1    "Steve." Who would that be? Is that
88 2    Steve Morrissey?

88:4  -  88:5    Curfman 01/24/2006
88 4    THE WITNESS:  That would
88 5    probably be Dr. Morrissey, yes.

88:7  -  88:24    Curfman 01/24/2006
88 7    "Steve wants us to know
88 8    that we need to get ready to post as an
88 9    early release the Expression of Concern
88 10    that is scheduled for the editorial pages
88 11    of the December 29th issue."
88 12    Let me ask you first, as of
88 13    December 7 at 6 p.m., in fact, the
88 14    Expression of Concern had been scheduled
88 15    to be printed on December 29th with the
88 16    regular edition of the journal, right?
88 17    Yes.
88 18    And then it says, "The
88 19    reason," that's the reason for this early
88 20    release; right?
88 21    Right.
88 22    "The reason is that
88 23    tomorrow's testimony in the Vioxx trial
88 24    may involve part of a deposition that

89:1  -  89:3    Curfman 01/24/2006
89 1    Greg gave about the NEJM and the VIGOR
89 2    trial." "Greg" is you; right?
89 3    That's right.

89:4  -  89:16    Curfman 01/24/2006
89 4    And then it says, "If so,
89 5    there will be press attention, and we
89 6    want the press to know about the official
89 7    NEJM statement.  That is being laid out
89 8    and needs to be ready to go" on the
89 9    website "as an early release." Right?
89 10    Correct.
89 11    "Steve or Greg or I will
89 12    let you know when it's time to go.
89 13    Things in a trial can always get pushed
89 14    back a day or two, so we cannot yet be
89 15    positive." Right?
89 16    Uh-huh.

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

89:20  -  89:24    Curfman 01/24/2006
89 20        And that's what you were
89 21        *told on December 7, 6:00 p.m.; correct?*
89 22        Right.
89 23        Then earlier you said that
89 24        you were surprised at the press reaction

90:1  -  90:15    Curfman 01/24/2006
90  1        to the --
90  2        Yes.
90  3        -- Expression of Concern?
90  4        Yes, I was.
90  5        Do you see the last line, it
90  6        says, "It will be essential to notify the
90  7        *press and make it prominent on the press*
90  8        site"?  Do you see that?
90  9        Yes, I do.
90 10        Now, how is it that you and
90 11        your colleagues at the New England
90 12        *Journal of Medicine knew that the*
90 13        plaintiffs' lawyers were hoping to play
90 14        your deposition on the next day, December
90 15        8, as is reflected in this e-mail?

90:19  -  90:22    Curfman 01/24/2006
90 19        THE WITNESS:  I don't -- you
90 20        *know, Dr. Campion didn't tell me*
90 21        where he got the information, so,
90 22        I can't answer that.

90:24  -  90:24    Curfman 01/24/2006
90 24        *Well, do you know who it was*

| | Re: [90:24-90:24] **Pltf Obj** Argumentative; Rules 801 and 802- Hearsay. | *Overruled* (handwritten) |
|---|---|---|

91:1  -  91:24    Curfman 01/24/2006
91  1        from the New England Journal of Medicine
91  2        who was gathering information about what
91  3        was expected to be done down there in the
91  4        Houston trial and when it was expected to
91  5        happen?
91  6        I don't know who was
91  7        collecting that, no.
91  8        Do you know whether somebody
91  9        at the New England Journal of Medicine
91 10        *was in communication with the plaintiffs'*
91 11        lawyers to find out what they were
91 12        planning to do each day?
91 13        I certainly am not aware of
91 14        that, no.
91 15        Well, did you ever ask Tad
91 16        Campion how he came to know that the
91 17        plaintiffs' lawyers were hoping to play
91 18        your deposition on December 8th?
91 19        I didn't ask him, no.  I
91 20        received the e-mail, and that was really
91 21        the extent of the communication.
91 22        *Did you ever tell any of the*
91 23        newspaper or broadcast media folks that

| | | | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|---|---|

91 24        you gave interviews to that, in fact, the

92:● - 92:5   Curfman 01/24/2006
92  1     reason that you released the Expression
92  2     of Concern on December 8th instead of
92  3     waiting until December 9th was because of
92  4     what you expected was going to happen
92  5     down in the Vioxx trial?

92:8  -  92:11   Curfman 01/24/2006
92  8     THE WITNESS:  I don't recall
92  9     getting that question or giving
92 10     that kind of answer.  I don't
92 11     recall.

92:13  -  92:21   Curfman 01/24/2006
92 13     Did you ever tell anybody
92 14     that the reason that you released the
92 15     Expression of Concern in the middle of
92 16     the trial in Houston was because you'd
92 17     been told that they were planning on
92 18     playing your testimony, and you wanted to
92 19     coordinate the release of the Expression
92 20     of Concern with the playing of your
92 21     testimony in Houston?

**Re: [92:13-92:21]**
**Pltf Obj** Rules 801 and
802-Hearsay;
Argumentative;
Assumes facts not in
evidence.

93:13  -  93:14   Curfman 01/24/2006
93 13     THE WITNESS:  Could you
93 14     repeat the question?

**Re: [93:13-93:14]**
**Pltf Obj** See above

93:16  -  93:24   Curfman 01/24/2006
93 16     Sure.
93 17     Did you ever tell anybody
93 18     that the reason you released the
93 19     Expression of Concern in the middle of
93 20     the trial in Houston was because you'd
93 21     been told that they were planning on
93 22     playing your testimony, and you wanted to
93 23     coordinate the release of the Expression
93 24     of Concern with the playing of your

94:1  -  94:1   Curfman 01/24/2006
94  1     testimony down in Houston?

94:5  -  94:24   Curfman 01/24/2006
94  5     THE WITNESS:  Well, I
94  6     can't -- I can't imagine that I
94  7     would have said that because Dr.
94  8     Campion articulates very precisely
94  9     in his e-mail what the issue was
94 10     with respect to my testimony.  And
94 11     the issue with respect to my
94 12     testimony was that my testimony
94 13     consisted, as it does today, with
94 14     a series of questions and answers.
94 15     And I did the best that I could in

Overruled

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

94 16  that deposition of November 21st
94 17  to answer the questions.  But it
94 18  was not a written, an official
94 19  written statement of the journal.
94 20  It was testimony, it was oral
94 21  testimony.
94 22  We believed that in order to
94 23  make sure that the Expression of
94 24  Concern was clearly understood by

95:1   -   95:4   Curfman 01/24/2006
95  1  those who would be interested in
95  2  the public, that we needed to have
95  3  our official statement out before
95  4  the deposition was played.

95:5   -   96:2   Curfman 01/24/2006
95  5  Now, to my way of thinking,
95  6  this is not the trial.  It's my
95  7  deposition, it's things that I
95  8  said in deposition which, as I
95  9  said, was a free flowing
95 10  conversation just like we're
95 11  having here today, questions and
95 12  answers, questions and answers,
95 13  but deposition does not allow me
95 14  to sit down and actually write out
95 15  and think very carefully in
95 16  written form, as you would in an
95 17  official written statement, which
95 18  the Expression of Concern was
95 19  intended to be an official written
95 20  statement.  So, we felt that the
95 21  official written statement, as Dr.
95 22  Campion indicates in this e-mail,
95 23  needed to be out in advance of the
95 24  testimony, which might have been
96  1  misinterpreted given the free
96  2  flowing nature of testimony.

*Overruled*

96:4   -   96:8   Curfman 01/24/2006
96  4  Well, do you now admit that
96  5  the timing of the release of the
96  6  Expression of Concern was, in fact,
96  7  dictated by what was happening down in
96  8  the Houston trial?

**Re: [96:4-96:8]**
**Pltf Obj** Argumentative

96:11   -   96:19   Curfman 01/24/2006
96 11  THE WITNESS:  Well, that's
96 12  not what -- as I just said, as far
96 13  as the trial is concerned, I was
96 14  not following the trial closely.
96 15  The issue was my personal
96 16  testimony and when that would be
96 17  played and how that might be
96 18  interpreted or misinterpreted by
96 19  members of the media.

| | Objections/Responses in Mason | Rulings In Smith/Barnett |
|---|---|---|

96:24   -   96:24   Curfman 01/24/2006
    24          THE WITNESS:  So, yeah, it's

97:1   -   97:8   Curfman 01/24/2006
    97   1          not a matter of admitting to
    97   2          anything.  It's what I have just
    97   3          said and said a moment ago.  I
    97   4          think the explanation is quite
    97   5          clear and coherent, and that's my
    97   6          answer to your question.  I can't
    97   7          really say any more about it than
    97   8          that.

97:10   -   97:14   Curfman 01/24/2006
    97   10          Well, do you remember
    97   11          earlier this morning saying that the
    97   12          Expression of Concern, the timing of its
    97   13          release had nothing to do with what was
    97   14          going on in the trial in Houston?

**Re: [97:10-97:14]**
**Pltf Obj** Argumentative;
Misstates testimony.

Overruled 611(c)
607)

97:16   -   97:24   Curfman 01/24/2006
    97   16          THE WITNESS:  Well, what I
    97   17          recall is that you asked, you
    97   18          know, did it have something to do
    97   19          with the trial.  And it did have
    97   20          something to do with my testimony.
    97   21          But it turned out that my
    97   22          testimony was not part of the
    97   23          trial at all anyway.  It never was
    97   24          played, and, therefore, was not

98:1   -   98:1   Curfman 01/24/2006
    98   1          part of the trial.

98:3   -   98:18   Curfman 01/24/2006
    98   3          But you released the
    98   4          Expression of Concern early anyway --
    98   5          Yes, we did.
    98   6          -- even though there was no
    98   7          need to in order to have the record
    98   8          straight concerning your deposition;
    98   9          right?
    98   10          Yes.  But we were prepared,
    98   11          and as I explained to you, according to
    98   12          the uniform requirements, and that's an
    98   13          important word, "requirements," of the
    98   14          International Committee of Medical
    98   15          Journal Editors, this is what was
    98   16          expected of us as editors.  We had the
    98   17          information put together, and we released
    98   18          it.

99:   -   99:24   Curfman 01/24/2006
    99   16          Dr. Curfman, is it your
    99   17          testimony that the New England Journal of
    99   18          Medicine did not do anything out of the

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

99  19  ordinary in terms of press relations with
99  20  the Expression of Concern concerning the
99  21  VIGOR article compared to what it did
99  22  with those other two Expressions of
99  23  Concern you mentioned?
99  24  Well, in fact, one of those

100:1  -  100:15  Curfman 01/24/2006
100  1  three Expressions of Concern was released
100  2  last Friday, and there was some media
100  3  attention given to that Expression of
100  4  Concern as well.  So, the first one that
100  5  we released back in 2002, my
100  6  recollection, did not generate as much
100  7  media attention.
100  8  Looking still at Exhibit 8,
100  9  we were looking at the bottom of the
100  10  three e-mails, which would have been the
100  11  earliest.  If you look up to the middle
100  12  one, you see that that's from Dr. Drazen
100  13  at 6:57 a.m. on December 8th to several
100  14  people, including you?
100  15  Right.

100:20  -  100:24  Curfman 01/24/2006
100  20  And Dr. Drazen says "Ali," I
100  21  guess that means to everybody whose name
100  22  appears on the e-mail; right?
100  23  Right.
100  24  And he says, "I think it

101:1  -  101:5  Curfman 01/24/2006
101  1  would make sense for me to contact" and
101  2  then there's a name I can't pronounce.
101  3  Can you pronounce that name?
101  4  Yes.  Her name is Snigdha
101  5  Prakash.

101:14  -  101:20  Curfman 01/24/2006
101  14  Who is Snigdha Prakash, and
101  15  how did you learn how to pronounce that
101  16  name so well?
101  17  Snigdha Prakash is a
101  18  reporter for National Public Radio.
101  19  She follows the Vioxx
101  20  litigation?

101:22  -  101:24  Curfman 01/24/2006
101  22  THE WITNESS:  I think she
101  23  follows a lot of things.  She
101  24  probably follows that too, yes.

102:1  -  102:4  Curfman 01/24/2006
102  2  Well, as you know, it's not
102  3  just probably.  You know that she follows
102  4  it quite closely, don't you?

| | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|

102:9  -   102:11 Curfman 01/24/2006
102  9       THE WITNESS:  She's done
102 10       stories on NPR about the
102 11       litigation, yes.

102:13  -   102:16 Curfman 01/24/2006
102 13       *And she's quoted people from*
102 14       the New England Journal of Medicine about
102 15       the litigation, hasn't she?
102 16       I believe she has.

102:24  -   102:24 *Curfman 01/24/2006*
102 24       In any event, here is the

103:1   -   103:13 Curfman 01/24/2006
103  1       editor-in-chief asking whether it makes
103  2       sense in connection with *the probable*
103  3       early release of the Expression of
103  4       Concern to contact this reporter from
103  5       National Public Radio; right?
103  6       Uh-huh.
103  7       And then if we look up to
103  8       the next e-mail, you see that that's from
103  9       you?
103 10       That's right.
103 11       To Dr. Drazen and others;
103 12       right?
103 13       Correct.

103:15  -   103:24 Curfman 01/24/2006
103 15       Read what you said in your
103 16       e-mail back to Dr. Drazen about
103 17       contacting the NPR reporter in connection
103 18       *with the early release of the* Expression
103 19       of Concern.
103 20       "I have some concerns about
103 21       giving her an exclusive.  Langreth has
103 22       been following the situation closely.  I
103 23       *think that maybe both of them could be*
103 24       called at the time the media e-mail is

104:1   -   104:1 Curfman 01/24/2006
104  1       sent out."

104:10 -   104:16 Curfman 01/24/2006
104 10       Did the New England Journal
104 11       of Medicine send out a media e-mail
104 12       alerting members of the media to the
104 13       Expression of Concern?
104 14       That's our routine for any
104 15       kind of early web release, to inform
104 16       people that it's there, yes.

10⬤  -   108:23 Curfman 01/24/2006
108  2       Certainly it's not part of
108  3       the regular procedure with Expressions of
108  4       Concern to call up individual members of

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

108  5  the media and give them exclusive
108  6  interviews, is it?
108  7  Well, we've only done three
108  8  Expressions of Concern since 2002, so, we
108  9  don't have a big track record with these.
108 10  *Your e-mail referred to*
108 11  Langreth.  Who's Langreth?
108 12  *Robert Langreth is a*
108 13  reporter with Forbes magazine.
108 14  Is he also someone who
108 15  followed the Vioxx litigation closely?
108 16  Well, I learned that he did.
108 17  Yes.
108 18  In fact, that's what you
108 19  meant when you said that "Langreth has
108 20  been following the situation closely."
108 21  Isn't that right?
108 22  That's right.  I learned
108 23  that he was.

110:9  -  110:14  *Curfman 01/24/2006*
110  9  How about Ms. Prakash, did
110 10  you give her an interview?
110 11  I believe so.  You can
110 12  probably show me -- I think I did.  I
110 13  think so.  Yes, I think I did.  I think
110 14  that may have been on the second day.

111  -  111:24  Curfman 01/24/2006
111  8  Did you personally tell Dr.
111  9  Bombardier that you were going to have an
111 10  early release of the Expression of
111 11  Concern rather than wait until December
111 12  29th?
111 13  I don't recall personally
111 14  *talking with her about that.  The*
111 15  conversations that we had, I think, were
111 16  earlier and went over the fact that we
111 17  would be releasing this and that we would
111 18  be sending a series of questions to her
111 19  that she could respond to at a later time
111 20  at her leisure.
111 21  Don't you remember that you
111 22  told her when you first talked with her
111 23  that you were scheduling the Expression
111 24  of Concern for December 29th?

112:1  -  112:10  Curfman 01/24/2006
112  1  *Well, my colleague, Dr.*
112  2  Morrissey, does all the scheduling for
112  3  *the Journal, and so perhaps he said*
112  4  something, but I don't recall saying
112  5  anything myself.
112  6  Do you recall when it was
112  7  that the New England Journal of Medicine
112  8  notified Dr. Bombardier -- and what's the
112  9  correct pronunciation of her name?

| | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|

112 10      That would be Bombardier.

112  -   112:24  Curfman 01/24/2006
112 13      Do you recall when it was
112 14      that the New England Journal of Medicine
112 15      notified Dr. Bombardier that the
112 16      Expression of Concern was going to be
112 17      subject to this early release on December
112 18      8, 2005?
112 19      I don't recall.
112 20      Do you recall whether they
112 21      gave her more than three hours' notice,
112 22      "they" being the New England Journal of
112 23      Medicine, that this thing was going to be
112 24      released early?

113:1  -   113:11  Curfman 01/24/2006
113  1      I don't know.
113  2      Do you remember that when
113  3      Merck learned of your plans for an early
113  4      release on December 8 that Merck asked
113  5      you to consider some information to
113  6      perhaps include in the Expression of
113  7      Concern?
113  8      If you have a document that
113  9      you can show me, that might jog my
113 10      memory, but I am a little foggy about
113 11      that.

114:4  -   114:5  Curfman 01/24/2006
114  4      MR. BECK:  I'm now handing
114  5      you what I've marked as Exhibit 9.

114:14  -   114:16  Curfman 01/24/2006
114 14      This is another e-mail
114 15      string; correct?
114 16      Right.

114:22  -   114:24  Curfman 01/24/2006
114 22      And there's an e-mail to you
114 23      and Dr. Morrissey; right?
114 24      Right.

115:1  -   115:4  Curfman 01/24/2006
115  1      And he is basically
115  2      attaching an e-mail that he got from a
115  3      lawyer for Merck, right?
115  4      Mr. Fitzpatrick.

115:8  -   115:21  Curfman 01/24/2006
115  8      And then there are some --
115  9      he says, "Paul," that's Mr. Shaw, "Please
115 10      see the points below concerning the
115 11      proposed editorial," and then there's
115 12      three points made.  And without going
115 13      through each one in detail, do you now
115 14      remember --

**Re: [115:8-115:21]**
**Pltf Obj** Rules 801 and
802-Hearsay.

*Overruled* (handwritten)

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

| | | |
|---|---|---|
| 115 15    Yes, I now remember.  Thank | | |
| 115 16    you. | | |
| ● 17    -- that, in fact, Merck | | |
| 115 18    did ask you to consider some points | | |
| 115 19    before you released -- made the early | | |
| 115 20    release of the Expression of Concern? | | |
| 115 21    Yes. | | |

116:12 -   116:18  Curfman 01/24/2006
116 12    You say that you've
116 13    considered these points?
116 14    Well, I read the points,
116 15    yes.
116 16    Do you see that you received
116 17    this e-mail from Mr. Shaw at 2:59 p.m.?
116 18    Uh-huh.

117:13 -   117:14  Curfman 01/24/2006
117 13    *I'm handing you what we've*
117 14    marked as Exhibit 10.

117:17 -   117:24  Curfman 01/24/2006
117 17    This is an e-mail -- let me
117 18    state that your name is not on this one.
117 19    Right.
117 20    -- from Karen Pedersen.
117 21    That's the in-house, I think you had
● 22    something other than PR person, right?
● 23    Media relations.
117 24    Media relations?

**Re: [117:17-118:6]**
**Pltf Obj** Rules 801 and
802 –Hearsay; Witness
did not receive e-mail.

*Sustained*

118:1  -   118:6  Curfman 01/24/2006

118  1    Media relations specialist.
118  2    So, the media relations
118  3    specialist is sending it to the outside
118  4    PR person's, "Subject:  For talking
118  5    points."  Do you see that?
118  6    Right.

**Re: [118:1-118:6]**
**Pltf Obj** See above

119:16 -   119:24  Curfman 01/24/2006
119 16    *Then at the bottom, it says,*
119 17    "Also, Paul Shaw called and said the
119 18    Merck attorney (Fitzpatrick) who
119 19    cross-examined Greg e-mailed him saying
119 20    he knows we're releasing a statement at 3
119 21    and he wants to send some information for
119 22    us to consider including in the
119 23    statement, which we're not going to do,
119 24    regardless of what it says, of course."

**Re: [119:16-120:6]**
**Pltf Obj** Rules 801 and
802-Hearsay;
Compound question;
*Cuts off answer.*

*Sustained*

120:1  -   120:6  Curfman 01/24/2006

● 1    Did you talk with Karen
120  2    Pedersen about this subject and about
120  3    whether you would refuse to consider the
120  4    information regardless of what it said?

**Re: [120:1-120:6]**
**Pltf Obj** See above

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

| | | |
|---|---|---|
| 120  5       I don't recall talking with | | |
| 120  6       Karen Pedersen about this, but as I | | |
| 120:7  -  120:15 Curfman 01/24/2006 | | *Sustained* |
| 120  7       indicated previously, Expressions of | **Re: [120:7-120:15]** | |
| 120  8       Concern are statements from the editors, | **Def Obj Non-** | |
| 120  9       and they're not subject to negotiation. | responsive; late addition | |
| 120 10      They're simply not that kind of document. | by plaintiff after deadline | |
| 120 11      It's an explicit document written by the | | |
| 120 12      editors expressing the concern of the | | |
| 120 13      editors, and it's really not a document | | |
| 120 14      that can be the subject of negotiation | | |
| 120 15      with outside parties. | | |

121:6  -  121:24 Curfman 01/24/2006
121  6       You mentioned before the
121  7       standards for -- that you say you
121  8       followed, and I think you said they were
121  9       the standards of some organization?
121 10      The International Committee
121 11      of Medical Journal Editors.  We sometimes
121 12      call it the ICMJE.
121 13      They have standards that
121 14      you're supposed to follow in connection
121 15      with things like Expressions of Concern?
121 16      Well, the uniform
121 17      requirements is a fairly lengthy
121 18      document, the uniform requirements for
121 19      the preparation of manuscripts, and it's
121 20      a document that deals with guidelines
121 21      about a whole range of issues relating to
121 22      medical publication.  So, I believe --
121 23      it's probably about a 25 or 30-page
121 24      document.  It's contained on the website.

122:1  -  122:8  Curfman 01/24/2006
122  1       And among other things, it does deal with
122  2       retractions and Expressions of Concern.
122  3       That is one part of a much larger
122  4       document.
122  5       So, the answer is yes, they
122  6       do have standards on Expressions of
122  7       Concern?
122  8       Yes, that's right.

122:22 -  122:24 Curfman 01/24/2006
122 22      Do you recognize this as a
122 23      printout of the ICMJE standards that you
122 24      were referring to?

123:1  -  123:1  Curfman 01/24/2006
123  1       Right.

123:  -  123:24 Curfman 01/24/2006
123 16      And I just want to take a
123 17      few minutes walking you through some of
123 18      these.

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

```
123 19        The first sentence says,
123 20        "Editors must assume initially that
●    21        authors are reporting work based on
123 22        honest observations."  You agree that
123 23        that's appropriate; right?
123 24        Yes, indeed.

125:15 -  125:24  Curfman 01/24/2006
125 15        Continuing on then with that
125 16        paragraph, it says, "If substantial
125 17        doubts arise about the honesty or
125 18        integrity of work, either submitted or
125 19        published, it is the editor's
125 20        responsibility to ensure that the
125 21        question is appropriately pursued,
125 22        usually by the authors' sponsoring
125 23        institution."  Right?
125 24        Yes.

126:11 -  126:24  Curfman 01/24/2006
126 11        So, this procedure says then
126 12        it's the editors, that would be the New
126 13        England Journal's editors' --
126 14        Right.
126 15        -- "responsibility to ensure
126 16        that the question is appropriately
126 17        pursued, usually by the authors'
●    18        sponsoring institution."  So, in the case
●    19        of Dr. Bombardier, for example, who would
126 20        the sponsoring institution be?
126 21        Her university in Toronto.
126 22        But you did not follow the
126 23        procedure of referring this matter to her
126 24        university to pursue in the first

127:1  -  127:1  Curfman 01/24/2006
127  1        instance, did you?

127:17 -  127:19  Curfman 01/24/2006
127 17        THE WITNESS:  We have been
127 18        in touch with her superiors at the
127 19        University of Toronto, yes.

129:16 -  129:21  Curfman 01/24/2006
129 16        Before you published your
129 17        conclusions in your Expression of Concern
129 18        on December 8th, did you give the
129 19        university a chance to conduct its own
129 20        investigation?
129 21        No.

131:10 -  131:14  Curfman 01/24/2006
131 10        Before you published your
●    11        conclusions in the Expression of Concern,
131 12        did you give any of the authors an
131 13        opportunity to respond to what you were
131 14        proposing to publish?
```

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

131:19 -   131:24  Curfman 01/24/2006
131 19          THE WITNESS:  Yes, we did.
131 20          But their response follows the
131 21          publication of the Expression of
131 22          Concern.  But we did discuss with
131 23          them before we published it that
131 24          they would have an opportunity to

132:1  -   132:1   Curfman 01/24/2006
132  1          respond.  Yes.

132:3  -   132:18  Curfman 01/24/2006
132  3          Actually, what you told them
132  4          before when you first contacted them was
132  5          that they would have an opportunity to
132  6          comment before you published the
132  7          *Expression of Concern, isn't that true?*
132  8          I don't -- I can't imagine
132  9          that's true because that's not the
132 10          protocol for an Expression of Concern.
132 11          Didn't you tell Dr.
132 12          Bombardier that you -- didn't you send
132 13          her a copy of the draft Expression of
132 14          Concern ask her for her comments to be
132 15          received in a couple of weeks so that
132 16          they could accompany any publication of
132 17          the Expression of Concern?
132 18          No.

Re: [132:3-132:7]
Pltf Obj No foundation;
Assumes facts not in
evidence.


Overruled

133:2  -   133:15  Curfman 01/24/2006
133  2          Did the New England Journal
133  3          of Medicine, when it first communicated
133  4          with Dr. Bombardier about this, tell her
133  5          that you had a draft Expression of
133  6          Concern that you were planning on
133  7          publishing it on December 29, that you
133  8          asked for her comments in response in
133  9          advance of December 29th so that they
133 10          could be considered in connection with
133 11          the publication of the Expression of
133 12          Concern?
133 13          No.  Because the response
133 14          from the authors is intended to follow
133 15          the Expression of Concern.

133:23 -   133:24  Curfman 01/24/2006
133 23          What is Exhibit 12?
133 24          MR. SHAW:  If you know.

134:1  -   134:19  Curfman 01/24/2006
134  1          THE WITNESS:  (Witness
134  2          reviewing document.)
134  3          This is -- on the bottom of
134  4          Page 1 and the top of Page 2 is an
134  5          e-mailed letter that I and Dr.
134  6          Morrissey and Dr. Drazen sent to

| | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|

134  7   Dr. Bombardier on December 5th
134  8   informing her about the Expression
⬤  9   of Concern, and I believe we
134 10   attached to this a series of
134 11   questions that we wanted her to
134 12   address in her response.
134 13   And then above that, a
134 14   couple of days later is a response
134 15   saying that she and Dr. Loren
134 16   Laine, who was her co --
134 17   corresponding author on the VIGOR
134 18   trial, wanted to have a conference
134 19   call.  And we then set that up.

134:21 -   134:24  Curfman 01/24/2006
134 21   Focusing on the e-mail from
134 22   you and your colleagues to Dr.
134 23   Bombardier --
134 24   Yes.

135:1  -   135:16  Curfman 01/24/2006
135  1   -- the first sentence says
135  2   you're writing concerning the VIGOR
135  3   study; correct?  And then the second
135  4   sentence says, "Recently we obtained new
135  5   information that has led us to be
135  6   concerned about the accuracy of certain
⬤  7   data and conclusions in your article.
135  8   The specific points at issue are"
135  9   addressed "in the attached Expression of
135 10   Concern, which we plan to publish in an
135 11   upcoming issue of the Journal."
135 12   As of December 5th, 2005,
135 13   the plan was to publish this in the
135 14   December 29th edition of the Journal;
135 15   correct?
135 16   Yes.

136:6  -   136:14  Curfman 01/24/2006
136  6   And then in the next
136  7   sentence, you ask her to submit a
136  8   correction for publication in the
136  9   Journal, and you ask her to do that by
136 10   December 22nd; right?
136 11   That's right.
136 12   So, a few weeks after this
136 13   e-mail; right?
136 14   Correct.

137:7  -   137:13  Curfman 01/24/2006
137  7   You talked before about two
137  8   earlier or two other Expressions of
⬤  9   Concern.
10   Yes.
137 11   And let me ask you to take a
137 12   look at Exhibit 12 -- or am I on 13 now?
137 13   Exhibit 13.

| | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|

138:5   -   138:24  Curfman 01/24/2006
138     5        Is that one of the
138     6        Expressions of Concern that you were
138     7        talking about?
138     8        Yes, it is.
138     9        Would you agree with me that
138   10        this one is different in kind from what
138   11        you published concerning VIGOR?
138   12        Oh, I think it's very
138   13        different in kind, yes.
138   14        And in this one, you report
138   15        in a single paragraph that concerns were
138   16        raised concerning the data published in
138   17        one of *your articles, right?*
138   18        Correct.
138   19        And you say, "We have
138   20        informed the director of Dr. Subdo's" --
138   21        Subdo.
138   22        -- "Subdo's institution...
138   23        and await the results of his
138   24        investigation."  Correct?

139:1   -   139:5   Curfman 01/24/2006
139     1        Correct.
139     2        And you do not set forth any
139     3        conclusions that you reached in advance
139     4        of hearing from the author's institution;
139     5        right?

139:8   -   139:11  Curfman 01/24/2006
139     8        THE WITNESS:  Oh, there are
139     9        preliminary conclusions in this
139   10        paragraph, yes, that we had
139   11        reached, yes.

139:13  -   139:24  Curfman 01/24/2006
139   13        Well, the paragraph says,
139   14        "In the issue of April 26, 2001, we
139   15        published a study by John Sudbo.  Figure
139   16        3B and Figure 3C of that article, which
139   17        purport to represent two different
139   18        patients and stages of oral" -- what's
139   19        the next word?
139   20        -- "epithelial dysplasia."
139   21        -- "are in fact different
139   22        magnifications of the same
139   23        photomicrogram."
139   24        That's right.

140:1   -   140:10  Curfman 01/24/2006
140     1        "Because the results of
140     2        another study of Dr. Sudbo, published in
140     3        the issue of April 1, 2004 were derived
140     4        from the same subjects followed through
140     5        the same database, we have similar
140     6        concerns."  Then you say, "We have

| | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|

```
140  7      informed the director...and [we] await
140  8      the results of his investigation."
     9      Right?
140 10      Uh-huh.

141:6  -  141:24  Curfman 01/24/2006
141  6      Do you have in front of you
141  7      the document that I've marked as Exhibit
141  8      14?
141  9      Yes.
141 10      Was this the other
141 11      Expression of Concern that you testified
141 12      about earlier?
141 13      This is one of the three,
141 14      yes.
141 15      Okay.
141 16      And we talked about the one
141 17      concerning VIGOR, we just talked about
141 18      the one concerning Dr. Sudbo, and this is
141 19      the third; right?
141 20      That's right.
141 21      This concerns an article by
141 22      Dr. Schiff; is that right?
141 23      Schiffl.
141 24      Schiffl.  I'm sorry.  What

142:1  -  142:15  Curfman 01/24/2006
     1      it says is that it has come to your
     2      attention that there was an "ongoing
142  3      investigation into potential scientific
142  4      misconduct" concerning this article that
142  5      you published?
142  6      (Witness nods.)
142  7      And you said you will inform
142  8      your readers of the outcome of the
142  9      investigation when it's complete.  Right?
142 10      That's right.
142 11      And that investigation that
142 12      you referred to was the investigation by
142 13      Dr. Schiffl's sponsoring institution;
142 14      correct?
142 15      Correct.

142:16 -  142:21  Curfman 01/24/2006
142 16      And then later on they told
142 17      you that they had not found sufficient
142 18      evidence of misconduct, and you,
142 19      therefore, retracted the Expression of
142 20      Concern, right?
142 21      Right.

143:6  -  143:6  Curfman 01/24/2006
     6      Do you recognize Exhibit 15?

143:11 -  143:21  Curfman 01/24/2006
143 11      THE WITNESS:  Yes, I do.
143 12      BY MR. BECK:
```

| | | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|---|
| 143 13 | Is this a message from you | | |
| 143 14 | and Dr. Morrissey to Dr. Bombardier | | |
| 15 | informing her of the early release of the | | |
| 143 16 | Expression of Concern? | | |
| 143 17 | It's an e-mail from me and | | |
| 143 18 | Dr. Morrissey to Dr. Bombardier regarding | | |
| 143 19 | the release, yes. | | |
| 143 20 | What's the date and time of | | |
| 143 21 | your e-mail to Dr. Bombardier? | | |

144:8 - 144:16 Curfman 01/24/2006

| | | | |
|---|---|---|---|
| 144 8 | December 8 at 11:59 a.m. | | |
| 144 9 | When do you tell her that | | |
| 144 10 | the Expression of Concern is going to be | | |
| 144 11 | released? | | |
| 144 12 | At 3:00. | | |
| 144 13 | So, you gave her three hours | | |
| 144 14 | and one minute notice? | | |
| 144 15 | Of the exact release time, | | |
| 144 16 | yes. | | |

146:4 - 146:12 Curfman 01/24/2006

| | | | |
|---|---|---|---|
| 146 4 | I guess in between 11:59 | Re: [146:4-146:12] | |
| 146 5 | a.m. when you first told her you were | Pltf Obj Rules 801 and | |
| 146 6 | going to do it and 3:00 when you did it, | 802-Hearsay; Assumes | |
| 146 7 | did she tell you that that didn't give | facts not in evidence | |
| 146 8 | her time to respond? | | |
| 9 | Well, I don't recall. I | | |
| 10 | don't think I spoke with her. I don't | | |
| 146 11 | recall anything about that. But ~ | | |
| 146 12 | Please look at Exhibit 16. | | |

*Overruled*

147:7 - 147:24 Curfman 01/24/2006

| | | | |
|---|---|---|---|
| 147 7 | This is an e-mail from Dr. | Re: [147:7-147:24] | |
| 147 8 | Bombardier to Mr. Morrissey. | Pltf Obj Rules 801 and | |
| 147 9 | Dr. Morrissey. | R. 802-Hearsay | |
| 147 10 | Dr. Morrissey, excuse me. | | |
| 147 11 | It says, "Dr. Morrissey, | | |
| 147 12 | Thank you for sending this in advance, | | |
| 147 13 | given the nature of your expression of | | |
| 147 14 | concern, we want the opportunity to | | |
| 147 15 | respond but as you can well imagine it | | |
| 147 16 | will not be possible to respond by the | | |
| 147 17 | deadline of 3:00 p.m. this afternoon." | | |
| 147 18 | Did Dr. Morrissey | | |
| 147 19 | communicate to you this message from Dr. | | |
| 147 20 | Bombardier? | | |
| 147 21 | Yes, he did. | | |
| 147 22 | But you went ahead with the | | |
| 147 23 | publication anyway at 3 p.m., didn't you? | | |
| 147 24 | Yes, we did. | | |

149: - 149:16 Curfman 01/24/2006

| | | | |
|---|---|---|---|
| 12 | Did you personally decide to | | |
| 149 13 | go ahead with the publication, even | | |
| 149 14 | though she had told you, the New England | | |
| 149 15 | Journal of Medicine, that she wanted an | | |

|  | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|

149 16      opportunity to respond in advance?

14● - 149:24 Curfman 01/24/2006
149 19      THE WITNESS: The final
149 20      decision -- the final decision, as
149 21      is always the case at the New
149 22      England Journal about any
149 23      decisions, comes from the
149 24      editor-in-chief. And I'm not the

150:1 - 150:1 Curfman 01/24/2006
150 1      editor-in-chief.

150:20 - 150:24 Curfman 01/24/2006
150 20      Later on, were you involved
150 21      in sending Dr. Bombardier a seven-point
150 22      *letter telling her what points the New*
150 23      England Journal of Medicine wanted her to
150 24      make when she responded?

151:1 - 151:16 Curfman 01/24/2006
151 1      Yes. She had -- my
151 2      recollection is that she had asked for
151 3      additional clarification from us about
151 4      what specifically we wanted her to
151 5      respond to. Up until that time, we had
151 6      only given her a copy of the Expression
151 7      of Concern itself. And she wanted more
151 8      guidance from us about our points of
151 9      concern. And in response to that
151 10      request, I believe Dr. Morrissey and I
151 11      were the authors of that seven-point
151 12      *document that you mentioned.* And we
151 13      tried to bring out in that document some
151 14      additional explanation of our reasons for
151 15      concern about the article so that that
151 16      could focus her response more directly.

151:24 - 151:24 Curfman 01/24/2006
151 24      Please look at Exhibit 17.

152:1 - 152:1 Curfman 01/24/2006
152 1      Do you recognize that?

152:4 - 152:16 Curfman 01/24/2006
152 4      Well, this, I think, begins
152 5      with an e-mail from Dr. Bombardier to me
152 6      and Dr. Morrissey along the lines of what
152 7      *I just said, requesting some*
152 8      additional -- I mean, we can read this.
152 9      We could, but what you had
152 10      said was she asked you for guidance about
152 11      how she should respond. In fact, if you
152 12      read this, what she asks you for is a
152 13      copy of the information that you referred
152 14      to in your Expression of Concern so that
152 15      she could write her own response. Isn't

**Re: [152:4-152:16]**
**Pltf Obj** Rules 801 and
802 – Hearsay

*(handwritten ruling signature)*

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

152 16        that true?

15● -   153:24  Curfman 01/24/2006
153  2        THE WITNESS:  Okay.  Well,
153  3        what she says is that "You
153  4        requested a submission from the
153  5        authors of that study that
153  6        addresses the additional data and
153  7        the issues set forth in the
153  8        Expression of Concern that you
153  9        published this week, and I agreed
153 10        to your request as lead author of
153 11        that study.
153 12        "We have already started on
153 13        that task, and I seek your
153 14        assistance for the project.  In
153 15        order for us to fully and properly
153 16        evaluate the data and the issues,
153 17        we will need to have copies of all
153 18        the materials that the New England
153 19        Journal of Medicine has that you
153 20        referred to in your telephone call
153 21        as well as those to which the
153 22        Expression of Concern referred.
153 23        *While you suggested earlier that*
153 24        we obtain these materials from

15● -   154:17  Curfman 01/24/2006
154  1        *Merck, in light of the questions*
154  2        *that you have raised about*
154  3        *confidence in the provenance of*
154  4        *data and information, we believe*
154  5        *that it is essential for us to*
154  6        obtain such materials directly
154  7        from the New England Journal of
154  8        Medicine in order to ensure that
154  9        the material we are reviewing is
154 10        in fact the same data that is
154 11        referred to in your Expression of
154 12        Concern."
154 13        BY MR. BECK:
154 14        You agree, sir, that all she
154 15        asked you for here was a copy of the data
154 16        and the materials that you referenced in
154 17        your Expression of Concern?

154:22 -   154:22  Curfman 01/24/2006
154 22        Yes.

156:2 -   156:4  Curfman 01/24/2006
156  2        So, point number 7 of your
156  3        seven-point letter to her basically said
15● 4        get these from the Merck lawyer; right?

156:5 -   156:24  Curfman 01/24/2006
156  5        Yes.  And I think that it's
156  6        fairly explicit.



|  |  |  | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|---|

156  7   Yes, I agree.
156  8   But now what you also did is
156  9   you and Dr. Morrissey attempted to
156 10   dictate to Dr. Bombardier the content of
156 11   her response?
156 12   We did not attempt to
156 13   dictate.  We attempted to articulate or
156 14   provide additional explanation of points
156 15   of our concern.  We are the editors.  We
156 16   had concerns.  It's not a matter of
156 17   dictating.  It's a matter of expressing
156 18   what the concerns were so that she could
156 19   respond to those concerns.  That's what
156 20   an Expression of Concern is.  That's why
156 21   it's called an Expression of Concern.
156 22   It's an expression of our concern that
156 23   then we ask her to address.  We thought
156 24   this would be helpful to her in framing a

Re: [156:7-156:11]
Pltf Obj Argumentative.

157:1 -  157:24 Curfman 01/24/2006
157  1   response.
157  2   Didn't you tell her "We will
157  3   explain herein what we expect this
157  4   correction to include"?
157  5   Uh-huh.
157  6   The very first point you
157  7   say, "You should acknowledge."  Then you
157  8   go on to tell her what she's supposed to
157  9   acknowledge in her response, right?  Is
157 10   that right?
157 11   That's the way the sentence
157 12   reads, yes.
157 13   And then basically you tell
157 14   her that she's supposed to say she's
157 15   sorry, don't you?
157 16   MR. SHAW:  Objection to
157 17   form.
157 18   BY MR. BECK:
157 19   Point number 6.  You're
157 20   telling the author of this study that,
157 21   number 6, "These omissions and
157 22   inaccuracies are regrettable, and this
157 23   should be acknowledged in your
157 24   statement."  You're telling her to

Re: [157:13-157:17]
Pltf Obj Argumentative;
No answer; Cuts witness
off

158:1 -  158:20 Curfman 01/24/2006
158  1   apologize for her article, aren't you?
158  2   We asked her for a response,
158  3   and --
158  4   And you told her what you
158  5   wanted --
158  6   She --
158  7   -- it to include?
158  8   *She can respond in any way*
158  9   that she wishes.  We were laying out our
158 10   concerns.  And one of our concerns was
158 11   that there were omissions and

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

| 158 12 | inaccuracies that were regrettable.  And |
| 158 13 | we had evidence to back it up.  And she |
| 158 14 | can respond to that statement in any way |
| 158 15 | that she wants. |
| 158 16 | And she did, in fact, |
| 158 17 | respond to that statement, did she not? |
| 158 18 | She did, yes. |
| 158 19 | And she told you that you |
| 158 20 | were wrong, right? |

159:2  -  159:3   Curfman 01/24/2006

| 159 2 | THE WITNESS:  I don't |
| 159 3 | recall. |

159:5  -  159:16  Curfman 01/24/2006

| 159 5 | You don't recall -- |
| 159 6 | No, I don't. |
| 159 7 | -- what she said in her |
| 159 8 | response? |
| 159 9 | No. |
| 159 10 | Have you looked at her |
| 159 11 | response? |
| 159 12 | Only very cursorily at this |
| 159 13 | point.  We just received the response, |
| 159 14 | and, in fact -- |
| 159 15 | Well, you received it more |
| 159 16 | than a week ago, didn't you? |

159:19  -  159:24  Curfman 01/24/2006

| 159 19 | THE WITNESS:  We didn't |
| 159 20 | receive one response, and part of |
| 159 21 | the complexity now of the issue is |
| 159 22 | that we received two separate |
| 159 23 | responses from two different |
| 159 24 | groups of authors, and -- |

**Re: [159:19-159:24]**
**Pltf Obj** Cuts off answer

*Overrule* (handwritten)

160:18  -  160:19  Curfman 01/24/2006

| 160 18 | My question is, you received |
| 160 19 | it more than a week ago, didn't you? |

161:10  -  161:12  Curfman 01/24/2006

| 161 10 | We received two responses, |
| 161 11 | and I don't remember the exact dates of |
| 161 12 | receipt. |

161:23  -  161:23  Curfman 01/24/2006

| 161 23 | What is Exhibit 18? |

162:7  -  162:9   Curfman 01/24/2006

| 162 7 | Is this some transmittal |
| 162 8 | e-mail and then the response from Dr. |
| 162 9 | Bombardier? |

162:  -  162:12  Curfman 01/24/2006

| 162 12 | Yes, it is. |

162:13  -  162:20  Curfman 01/24/2006

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

162 13   Dr. Bombardier responded on
162 14   behalf of herself and the other nine
162 15   authors who were not Merck employees;
162 16   right?
162 17   Yes.
162 18   And in this response, these
162 19   ten non-Merck authors told you that you
162 20   were wrong; right?

162:24 -  162:24 Curfman 01/24/2006
162 24   No.  I don't read it that

**Re: [162:24-162:24]**
**Pltf Obj** Cuts off answer

163:1  -  163:5 Curfman 01/24/2006
163  1   way.  But, again, I want to make it clear
163  2   that I have not had an opportunity to go
163  3   through this, and I'm not prepared to
163  4   discuss this document.  I wasn't -- we
163  5   have read these documents, and, again, I

163:6  -  163:11 Curfman 01/24/2006
163  6   think that the most important aspect of
163  7   the response from the authors so far is
163  8   the fact that we received not one
163  9   response --
163 10   I'll get to the other one.
163 11   -- but two responses.

**Re: [163:6-163:11]**
**Def Obj** Non-responsive; volunteering; lacks foundation; late addition by plaintiff after deadline

163  -  163:24 Curfman 01/24/2006
163 20   Now, are you telling me --
163 21   you've certainly known that your
163 22   deposition was going to be taken in
163 23   connection with the Expression of
163 24   Concern.  You've known that for certainly

**Re: [163:20-164:9]**
**Pltf Obj** Argumentative

164:1  -  164:9 Curfman 01/24/2006
164  1   over a week, right?
164  2   Right.
164  3   And you've had the answer
164  4   from the ten non-Merck authors --
164  5   Right.
164  6   -- to your Expression of
164  7   Concern, and you say you haven't read it
164  8   carefully enough to be prepared to
164  9   discuss it?

**Re: [164:1-164:9]**
**Pltf Obj** See above

164:10 -  164:24 Curfman 01/24/2006
164 10   I have -- we have -- a
164 11   document like this requires reading by
164 12   more than one person, deliberation,
164 13   meeting together among the head editors
164 14   of the Journal.  And we have not had the
164 15   opportunity to do that yet.  I could go
164 16   into reasons why that is, logistic
164 17   reasons of getting a Journal out every
164 18   week, logistic reasons that our
164 19   editor-in-chief is currently attending in
164 20   the intensive care unit at Brigham and

**Re: [164:10-164:24]**
**Def Obj** Non-responsive; late addition by plaintiff after deadline

*Overruled*

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

164 21   Women's Hospital and is working basically
164 22   almost 20 hours a day in the intensive
● 23   care unit, but I won't bore you and take
164 24   up your time with that.

165:2  -  165:5   Curfman 01/24/2006
165  2   My answer to your question
165  3   -- yes.  My answer to your question is, I
165  4   have not had time to adequately digest
165  5   this.  And one of the key issues in

165:6  -  165:12   Curfman 01/24/2006
165  6   digesting this is that we are going to
165  7   have to decide what to do about receiving
165  8   two different responses when we asked for
165  9   one.  And it suggests to me, raises the
165 10   question that there may be some sort of
165 11   schism between the authors here that may
165 12   have to be worked out.

**Re: [165:6-165:12]**
**Def Obj** Non-responsive; lacks foundation; speculative; late addition by plaintiff after deadline

166:16 -  166:24   Curfman 01/24/2006
166 16   Do you recognize Exhibit 21
166 17   to be a response on behalf of Drs. Reicin
166 18   and Shapiro who are both affiliated with
166 19   Merck?
166 20   Right.  It's being
166 21   communicated by a medical communications
● 22   person.
● 23   Right.
166 24   Right.

Overruled

170:2  -  170:16   Curfman 01/24/2006
170  2   And you had not only Dr.
170  3   Bombardier's response on behalf of the
170  4   ten non-Merck authors for over a week
170  5   before today, you also had Dr. Reicin's
170  6   response on behalf of herself and Dr.
170  7   Shapiro, the Merck authors, for over a
170  8   week before today, right?
170  9   If you say so.  I'll take
170 10   your word for it.  Sure.
170 11   And here you are, you know
170 12   this is the only chance that I get to ask
170 13   you questions about the Expression of
170 14   Concern, and you didn't take the time to
170 15   read either one of these to comment on
170 16   their substance?

**Re: [170:2-170:16]**
**Pltf Obj** Argumentative.

171:14 -  171:23   Curfman 01/24/2006
171 14   My question is simply that
171 15   knowing that your deposition was going to
171 16   be taken today and that the main subject
171 17   was your Expression of Concern, and
171 18   having the responses filed by both the
171 19   non-Merck lawyer -- the non-Merck authors
171 20   and the Merck authors for over a week,
171 21   it's your testimony that you didn't take

**Re: [171:14-171:23]**
**Pltf Obj** Argumentative

| | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|

171 22    the time to read them so that you could
171 23    talk about the substance of them?

172:2 -  172:16  Curfman 01/24/2006
172  2    THE WITNESS: *Our response*
172  3    *to these documents will require*
172  4    *very careful deliberation.*
172  5    Editors of journals don't do
172  6    things on a knee jerk.  We can't
172  7    afford to do that.  *I did not set*
172  8    the date for this deposition, and,
172  9    in fact, we received these when we
172 10    received them.  And we will need
172 11    time to very carefully digest the
172 12    situation, and then we'll have an
172 13    official response to it.  I'm not
172 14    prepared to do that now.  We do
172 15    things carefully in our office.
172 16    That's how we do things.  That's

172:17 -  172:20  Curfman 01/24/2006
172 17    the way we do things.  And I'm
172 18    sorry if that doesn't fit with
172 19    your timetable, but that's the
172 20    reality of the situation.

172:22 -  172:24  Curfman 01/24/2006
  22    Have you looked at these two
  23    responses enough to know whether they're
172 24    in basic agreement or whether there's any

173:1 -  173:9  Curfman 01/24/2006
173  1    points of disagreement?
173  2    No.  I can't really comment
173  3    about that.
173  4    So, it's not just that you
173  5    *haven't had, you know, conferences with*
173  6    *your colleagues to talk it all through,*
173  7    you just haven't read them carefully in
173  8    advance of your deposition.  Is that your
173  9    testimony?

**Re: [173:1-173:9]**
**Pltf Obj** Argumentative

*Overruled* (cross Exam)

173:12 -  173:24  Curfman 01/24/2006
173 12    THE WITNESS:  I'm saying
173 13    that we -- documents of this kind
173 14    will demand careful deliberation
173 15    *among the editors at the New*
173 16    England Journal of Medicine, and
173 17    we have not gone through that
173 18    process yet.  And anything that I
173 19    might say today might not be fully
173 20    *accurate because we've not gone*
  21    through this process of
  22    deliberating together and
173 23    interpreting these two documents.
173 24    And that's all I can say about

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

174:1  -  174:1  Curfman 01/24/2006
174   1        this.

174:3  -  174:7  Curfman 01/24/2006
174   3        Well, getting back to your
174   4        Expression of Concern, you indicated it
174   5        got a lot of media attention, and you and
174   6        your outside PR people followed the media
174   7        attention pretty closely, didn't you?

**Re: [174:3-174:13]**
**Pltf Obj** Argumentative;
Cuts off answer;
Compound question.

174:12  -  174:13  Curfman 01/24/2006
174  12        THE WITNESS:  No.  I
174  13        certainly didn't.  I mean --

**Re: [174:12-174:13]**
**Pltf Obj** See above

174:15  -  174:19  Curfman 01/24/2006
174  15        Did you get daily updates on
174  16        how many people were accessing the
174  17        Expression of Concern on the website and
174  18        how many reports were in the newspaper
174  19        about the Expression of Concern?

**Re: [174:15-174:19]**
**Def Obj** Late addition by
plaintiff after deadline
and violates parties
stipulation

174:21  -  174:23  Curfman 01/24/2006
174  21        THE WITNESS:  If I got the
174  22        updates, I wasn't reading them
174  23        carefully.

**Re: [174:21-174:23]**
**Def Obj** Late addition by
plaintiff after deadline
and violates parties
stipulation

175    -  175:6  Curfman 01/24/2006
175   1        Did the people at the New
175   2        England Journal of Medicine monitor at
175   3        least the major newspapers to see how
175   4        they were reporting on the Expression of
175   5        Concern and whether there were any errors
175   6        that should be corrected?

175:9  -  175:22  Curfman 01/24/2006
175   9        THE WITNESS:  Our media
175  10        relations specialist always
175  11        monitors the news.  That's what
175  12        her job is.  She does that every
175  13        day about everything that we
175  14        publish to see what the media is
175  15        writing about it.  That's what her
175  16        job is.  And part of it is to make
175  17        sure that they're reporting
175  18        accurately on articles that we
175  19        publish, not just the Expression
175  20        of Concern.  This happens every
175  21        day for every article.  We get
175  22        news updates every day.

176:16  -  176:24  Curfman 01/24/2006
176  16        Dr. Curfman, you were quoted
176  17        in the Forbes article as saying you were
176  18        somewhere between surprised and stunned
176  19        that some cardiovascular data that was in
176  20        a presubmission draft, a draft that was

73

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

176 21   prepared before it was submitted to the
176 22   New England Journal of Medicine, had been
⬤ 23   deleted before the draft was submitted.
176 24   Do you remember that and were you

177:1  -  177:1   Curfman 01/24/2006
177  1   accurately quoted?

177:10 -  177:24   Curfman 01/24/2006
177 10   THE WITNESS:  Well, I can
177 11   tell you what I was somewhere
177 12   between surprised and stunned
177 13   about, and that was the document
177 14   that was presented to me for the
177 15   first time on November 21st, 2005,
177 16   Exhibit 18, among the exhibits on
177 17   that day, which was an internal
177 18   memorandum dated July 5th, 2000,
177 19   which contained an extensive body
177 20   of data on the cardiovascular
177 21   adverse events in VIGOR that I had
177 22   never seen before.  And that put
177 23   me somewhere between surprised and
177 24   stunned.

179:22 -  179:24   Curfman 01/24/2006
179 22   My question is, from your
⬤ 23   review of the materials, are you aware
⬤ 24   that all of the data that was collected

180:1  -  180:4   Curfman 01/24/2006
180  1   in the July 2000 memorandum and including
180  2   the tables and the statistical analyses,
180  3   that all of that was communicated to the
180  4   FDA in the fall of 2000?

180:8  -  180:10   Curfman 01/24/2006
180  8   THE WITNESS:  Yes.  I'm
180  9   aware that it was communicated to
180 10   the FDA.  It was not posted by the

| | Re: [180:8-180:10] Pltf Obj Cuts off answer | |

180:11 -  180:17   Curfman 01/24/2006
180 11   FDA until the following year,
180 12   months --
180 13   BY MR. BECK:
180 14   In February?
180 15   -- months after, months
180 16   after the publication of the misleading
180 17   New England Journal article.

| | Re: [180:11-180:17] Def Obj Non-responsive; unnecessary volunteering of commentary | Overruled |

183:2  -  183:18   Curfman 01/24/2006
183  2   How about in the materials
⬤ 3   communicating the information to the FDA,
⬤ 4   was there a mention there of a
183  5   prespecified cutoff date?
183  6   I don't recall.  It's a big
183  7   document, and I'd have to go back through

| | Re: [183:2-183:18] Pltf Obj Cuts off answer | |

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

| 183 | 8 | it. |
|---|---|---|
| 183 | 9 | How about in the FDA |
| | 10 | materials prepared by people within the |
| 183 | 11 | FDA, is there an indication in the FDA |
| 183 | 12 | materials that this additional |
| 183 | 13 | information that was transmitted to them |
| 183 | 14 | in October had come in after a |
| 183 | 15 | prespecified cutoff date that was used in |
| 183 | 16 | the VIGOR study? |
| 183 | 17 | Well, I don't know.  I don't |
| 183 | 18 | know about that.  What I can tell you is |

183:19 -   183:19 Curfman 01/24/2006
183 19      that in the VIGOR --

**Re: [183:19-183:19]**
**Def Obj** Non-responsive


Overruled

185:5 -    185:12 Curfman 01/24/2006
| 185 | 5 | Did you ever look at the |
|---|---|---|
| 185 | 6 | Targum memo that we talked about earlier, |
| 185 | 7 | that internal FDA memo that analyzes |
| 185 | 8 | data?  Did you ever look at the Targum |
| 185 | 9 | memo to see whether it explains that that |
| 185 | 10 | information that was provided in the fall |
| 185 | 11 | of 2000 had come in after a prespecified |
| 185 | 12 | cutoff date for the VIGOR study? |

185:17 -   185:19 Curfman 01/24/2006
| 185 | 17 | Did you ever look at the |
|---|---|---|
| | 18 | Targum memo to see that? |
| | 19 | Yes, I did. |

192:10 -   192:24 Curfman 01/24/2006
| 192 | 10 | Let me turn to another |
|---|---|---|
| 192 | 11 | subject that is addressed in your |
| 192 | 12 | Expression of Concern, and that is |
| 192 | 13 | information that was in a draft before |
| 192 | 14 | the draft was submitted to the New |
| 192 | 15 | England Journal of Medicine, but then was |
| 192 | 16 | taken out in the draft that was submitted |
| 192 | 17 | to the New England Journal of Medicine. |
| 192 | 18 | Do you understand what topic |
| 192 | 19 | I'm talking about? |
| 192 | 20 | Right. |
| 192 | 21 | Now, this is not the three |
| 192 | 22 | MIs, right? |
| 192 | 23 | No.  This has nothing to do |
| 192 | 24 | with the three MIs. |

193:1 -    193:12 Curfman 01/24/2006
| 193 | 1 | Okay. |
|---|---|---|
| 193 | 2 | And this has to do with a |
| 193 | 3 | table that at least the shell or the form |
| 193 | 4 | of the table was in an electronic version |
| | 5 | of the manuscript that you could see that |
| | 6 | it had been in the draft before it had |
| 193 | 7 | been submitted to the New England Journal |
| 193 | 8 | of Medicine, but that had been taken out |
| 193 | 9 | before the submission was actually made; |

| | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|

193 10    is that right?
193 11    Well, that's part of the
⬤  12    story.

194:3  -  194:7  Curfman 01/24/2006
194  3    Am I correct that the New
194  4    England Journal of Medicine requested the
194  5    authors of the VIGOR manuscript to
194  6    provide an electronic version to the New
194  7    England Journal?

194:10 -  194:20 Curfman 01/24/2006
194 10    THE WITNESS: I don't know
194 11    whether we requested it or not.
194 12    They did send it.  I'd have to --
194 13    you know, you can show me a
194 14    document with a sentence in there,
194 15    but they provided the disk.
194 16    BY MR. BECK:
194 17    Okay.
194 18    And they provided the disk
194 19    in August of 2000, right?
194 20    Yes.

194:23 -  194:24 Curfman 01/24/2006
194 23    And when they provided you
194 24    with this disk, the electronic version,

195:⬤  -  195:4  Curfman 01/24/2006
195  1    they gave it to you with a feature called
195  2    track changes that was turned on when
195  3    they gave it to you, right?
195  4    Yes.

195:6  -  195:18 Curfman 01/24/2006
195  6    And this disk, little
195  7    computer disk, had three versions of the
195  8    VIGOR manuscript on it; is that right?
195  9    That's correct.
195 10    So that you could compare,
195 11    if you wanted to, you know, how the
195 12    versions evolved over time?
195 13    Yes, you could.
195 14    And even within a single
195 15    version with the track changes feature
195 16    turned on, or it's sometimes called a red
195 17    lining feature, are you familiar with
195 18    that term?

195:19 -  195:23 Curfman 01/24/2006
195 19    Sure.
195 20    And you can see, because the
195 21    computer keeps track of any language or
195 22    tables or data that was taken out during
195 23    the drafting process; correct?

196:22 -  196:24 Curfman 01/24/2006

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

196 22     With the track changes
196 23     feature turned on, within a single
● 24     version of the manuscript you can see,

197:1  -  197:3  Curfman 01/24/2006
197  1     because the computer keeps track of what
197  2     language or data is added and what
197  3     language or data is taken out, right?

197:6  -  197:6  *Curfman 01/24/2006*
197  6     THE WITNESS:  Right.

201:18 -  201:24  Curfman 01/24/2006
201 18    And my question is, when you
201 19    wrote that Expression of Concern focusing
201 20    on the fact that the table was taken out,
201 21    did you take into account the fact that
201 22    the authors showed you that when they
201 23    gave you the electronic version with the
201 24    *track changes feature turned on?*

202:3  -  202:4  *Curfman 01/24/2006*
202  3    THE WITNESS:  Yes.  We took
202  4    that into consideration.  The

**Re: [202:3-202:4]**
**Pltf Obj** Cuts off answer

202:5  -  202:6  *Curfman 01/24/2006*
202  5    table was not the only data that
● 6    were removed from the manuscript.

**Re: [202:5-202:6]**
**Def Obj** Non-
responsive; late addition
by plaintiff after deadline

204:9  -  204:24  *Curfman 01/24/2006*
204  9    Now, even though the authors
204 10    gave you the electronic version with the
204 11    track changes turned on back in August of
204 12    2000, am I correct from your Expression
204 13    of Concern that it looked like you never
204 14    looked at the electronic version until
204 15    *sometime in the fall of 2004;* is that
204 16    right?
204 17    That's right.
204 18    *Now, did you ever tell,*
204 19    "you" being Dr. Curfman, covering you,
204 20    personally, first, back during the
204 21    editorial process in 2000, when the
204 22    authors gave you the electronic version
204 23    with the track changes turned on, did you
204 24    communicate in any way to them that you

205:1  -  205:4  Curfman 01/24/2006
205  1    and your colleagues were not going to
205  2    look at the electronic version, "you,"
205  3    personally, now?
205  4    Yeah, no.

20●  -  205:24  Curfman 01/24/2006
205 15    In terms of tables in
205 16    articles published in the New England
205 17    *Journal of Medicine, is there some kind*

*Overruled*

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|
| 205 18  of guideline or limit on the number of | | |
| 205 19  tables that are supposed to be included? | | |
| 205 20  There's a guideline. | | |
| 205 21  There's not a limit. | | |
| 205 22  What does the guideline say | | |
| 205 23  as to the number of tables? | | |
| 205 24  We generally go for five or | | |
| | | |
| 206:1  -  206:4  Curfman 01/24/2006 | | |
| 206  1  six tables in the print version.  We can | | |
| 206  2  publish additional information on our | | |
| 206  3  website, or sometimes we will publish | | |
| 206  4  additional tables in print as well. | | |
| | | |
| 206:9  -  206:17  Curfman 01/24/2006 | Re: [206:9-206:17] | |
| 206  9  You say there's a guideline | Pltf Obj Argumentative | |
| 206 10  of five or six.  You know that that's not | | |
| 206 11  true, don't you?  You know the guideline | | |
| 206 12  is five, right? | | |
| 206 13  Well, the guideline in that | | |
| 206 14  information of authors at that time | | |
| 206 15  probably said five. | | |
| 206 16  Well, you know it said five, | | |
| 206 17  don't you? | | |
| | | |
| 207:3  -  207:10  Curfman 01/24/2006 | | |
| 207  3  THE WITNESS:  The letter | | |
| 207  4  that I send out to the authors at | | |
| 207  5  the moment says five or six. | | |
| 207  6  BY MR. BECK: | | |
| 207  7  How about back in 2000 when | | |
| 207  8  VIGOR was written, what was the guideline | | |
| 207  9  then? | | |
| 207 10  It was probably five then. | | |
| | | |
| 209:2  -  209:3  Curfman 01/24/2006 | | |
| 209  2  The next exhibit is Exhibit | | |
| 209  3  Number 19. | | |
| | | |
| 211:19 -  211:24  Curfman 01/24/2006 | | |
| 211 19  And do you see here in the | | |
| 211 20  very middle of the page that the VIGOR | | |
| 211 21  authors -- up at the top it says, | | |
| 211 22  "Suggestion for Transmittal to Authors." | | |
| 211 23  Right?  Right? | | |
| 211 24  Yes. | | |
| | | |
| 212:1  -  212:6  Curfman 01/24/2006 | | |
| 212  1  Assuming that the suggestion | | |
| 212  2  was followed, right there in the middle | | |
| 212  3  of the page, it says, "The total number | | |
| 212  4  of figures plus tables should not total | | |
| 212  5  more than five."  Do you see that? | | |
| 212  6  Yes. | | |
| | | |
| 214:1  -  214:3  Curfman 01/24/2006 | | |
| 214  1  So, look through Exhibit 1 | | |

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

214  2    and tell the jury how many tables there
214  3    were in the VIGOR article.

214:6  -  214:8  Curfman 01/24/2006
214  6    There were five tables and
214  7    one figure for a total of six pieces of
214  8    documentation.

217:5  -  217:24  Curfman 01/24/2006
217  5    Look at Exhibit 20.  Is
217  6    Exhibit 20 some comments by a reviewer,
217  7    or is this a direct communication from an
217  8    editor of the New England Journal of
217  9    Medicine to the lead author of the VIGOR
217 10    publication?
217 11    It is a letter from
217 12    associate editor Marshall Kaplan to the
217 13    corresponding author of the VIGOR
217 14    article, correct.
217 15    And Marshall Kaplan, in
217 16    terms of this time frame in June of
217 17    2000 --
217 18    Right.
217 19    -- in terms of
217 20    communications with Dr. Bombardier,
217 21    Marshall Kaplan was really the voice of
217 22    the New England Journal of Medicine,
217 23    right?
217 24    He was the associate editor,

218:1  -  218:11  Curfman 01/24/2006
218  1    yes.
218  2    But he was the one who was
218  3    in charge of communicating the views and
218  4    instructions --
218  5    In this particular letter.
218  6    -- of the New England
218  7    Journal of Medicine to the author, Dr.
218  8    Bombardier --
218  9    He wrote this letter, yes.
218 10    -- Dr. Bombardier; right?
218 11    Yes.  Uh-huh.

219:18 -  219:24  Curfman 01/24/2006
219 18    And why don't you read the
219 19    rest of that sentence that talks about
219 20    how it should be no longer than 3,000
219 21    words.  What does it say right after
219 22    that?
219 23    "With a total of no more
219 24    than five figures and tables."  And I

221:10 -  221:15  Curfman 01/24/2006
221 10    Doctor, on the subject of
221 11    the significance of the deletion of Table
221 12    5, did Dr. Drazen tell you that he
221 13    thought that that whole subject did not

| | Objections/Responses<br>In Mason | Rulings In<br>Smith/Barnett |
|---|---|---|

221 14       even have enough significance to be
221 15       mentioned in the Expression of Concern?

221:18 -  221:19 Curfman 01/24/2006
221 18       THE WITNESS:  Not to my
221 19       knowledge.

222:3 -  222:24 Curfman 01/24/2006
222  3      I've handed you Exhibit 22.
222  4      Do you see that this is an e-mail from
222  5      Dr. Drazen, the editor-in-chief, to you
222  6      and Dr. Morrissey, "Subject: Expression
222  7      of Concern"?
222  8      I do, yes.
222  9      And it's dated December 4th.
222 10       Was that pretty early in the drafting of
222 11       the Expression of Concern?
222 12       That was still pretty early,
222 13       yes.
222 14       Okay.
222 15       And do you see here on the
222 16       e-mail he's attached a document.  And
222 17       when explaining his attachment, he says,
222 18       "I attach another edited version of the
222 19       expression.  The biggest change is the
222 20       deletion of the stuff about Table 5.  I
222 21       think it attributes more to this table
222 22       than it deserves and the numbers speak
222 23       for themselves.  This piece is cleaner
222 24       without it."

223:1 -  223:6 Curfman 01/24/2006
223  1      So, does that refresh your
223  2      recollection that the editor-in-chief of
223  3      the New England Journal told you that he
223  4      didn't think that the stuff about Table 5
223  5      was even significant enough to be
223  6      included in the Expression of Concern?

223:9 -  223:17 Curfman 01/24/2006
223  9      THE WITNESS:  He changed his
223 10       mind.
223 11       BY MR. BECK:
223 12       Well, my question is, does
223 13       this refresh your recollection that, in
223 14       fact, he told you, at least on December
223 15       4th, that this whole table 5 stuff was
223 16       not even a big enough deal to be included
223 17       in the Expression of Concern?

224:19 -  224:22 Curfman 01/24/2006
224 19       Yes.  That's what he said.
224 20       I, frankly, don't exactly remember this
224 21       e-mail because he changed his mind, and
224 22       we did include the material on Table 5.

225:18 -  225:24 Curfman 01/24/2006

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

225 18    And I will show you Exhibit
225 19    23, which is the attachment to the e-mail
225 20    that we just looked at.
225 21    Yes.
225 22    And this is kind of a
225 23    printed out version of that track changes
225 24    feature that we talked about, isn't it?

226:1   -   226:19  Curfman 01/24/2006
226  1    This is a draft of the Expression of
226  2    Concern, and you can see on the right
226  3    things that have been deleted and things
226  4    that have been added?
226  5    Right.  Yep.
226  6    Okay.
226  7    And do you see over here on
226  8    this attachment to the editor-in-chief's
226  9    e-mail to you that that last square over
226 10    there that shows what was deleted, at
226 11    least as of December 4, he wanted to take
226 12    out the entire paragraph having to do
226 13    with Table 5, right?
226 14    Yes, at that time.  And then
226 15    he changed his mind.  That was an early
226 16    version.  And we went through many
226 17    versions of this document and a lot of
226 18    editing was done.  The final version, of
226 19    course, did include that material.

236:14 -   236:19  Curfman 01/24/2006
236 14    Let me hand you the next
236 15    document, Exhibit 26.  Now, again, this
236 16    is a series of e-mails, and you see that
236 17    you're on these first two at least on
236 18    Page 1.
236 19    Right.

237:4   -   237:7  Curfman 01/24/2006
237  4    So, let's go to Page 3 of
237  5    this exhibit, and this is an e-mail that
237  6    you got a copy of from Caryn Sandrew on
237  7    behalf of Dr. Drazen.  Do you see that?

**Re: [237:4-237:11]**
**Pltf Obj** Rules 801 and 802-Hearsay; Witness is not on this part of e-mail.

237:8   -   237:10  Curfman 01/24/2006
237  8    Yes, I do.
237  9    And it's, again, to Ms.
237 10    Prakash of NPR; right?

**Re: [237:8-237:10]**
**Pltf Obj** See above

237:11 -   237:11  Curfman 01/24/2006
237 11    Right.

239:15 -   239:21  Curfman 01/24/2006
239 15    Let's go down to the very
239 16    bottom where he says, "It is generally
239 17    inappropriate to mine a data set for
239 18    endpoints that were not pre- specified in

**Re: [239:15-239:21]**
**Pltf Obj** Rules 801 and 802-Hearsay; Witness is

*Overruled + get copy can testify*

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

239 19      the research protocol."

239 20      Yes.  The problem is that in

239 21      a safety study, that does not apply.

not on this part of e-mail.

240:14 -   240:23  Curfman 01/24/2006

240 14      My focus is, he's making a

240 15      general observation about whether it is

240 16      *appropriate or not to mine a data set for*

240 17      endpoints that were not prespecified in

240 18      the research protocol.

240 19      Except for safety endpoints.

240 20      But he doesn't say that,

240 21      does he?

240 22      Well, that's fine, but I'm

240 23      telling you what the facts are.

**Re: [240:14-240:23]**
**Pltf Obj**  Rules 801 and
802-Hearsay; Witness is
not on this part of e-mail.

*overruled*

241:10 -   241:24  Curfman 01/24/2006

241 10      Does he go on to say to the

241 11      NPR author, "Such a *fishing expedition*

241 12      *can lead to misleading conclusions, both*

241 13      positive and negative"?

241 14      They could, but he had never

241 15      seen this document.  And this is a

241 16      critical document that no editor or

241 17      physician would ever overlook, the

241 18      importance of this document.  These are

241 19      critical *safety endpoints, safety*

241 20      endpoints.  And safety endpoints are

241 21      often not prespecified in a protocol.

241 22      But, in fact, when he made

241 23      that observation about how that's

241 24      inappropriate and it's a fishing

**Re: [241:10-241:24]**
**Pltf Obj**  Rules 801 and
802-Hearsay; Witness is
not on this part of e-mail.

242:1 -   242:13  Curfman 01/24/2006

242 1      *expedition, he was talking about the*

242 2      safety endpoints of the VIGOR article,

242 3      was he not, sir?

242 4      He was not -- he was not

242 5      privy to this document.

242 6      Was he talking about the

242 7      safety endpoints of the VIGOR article

242 8      when he said that "It is generally

242 9      *inappropriate to mine a data set for*

242 10      endpoints that were not pre-specified to

242 11      the research protocol.  Such a fishing

242 12      expedition can lead to misleading

242 13      conclusions, both positive and negative"?

**Re: [242:1-242:13]**
**Pltf Obj** Rules 801 and
802-Hearsay; *Witness is*
not on this part of e-mail.

242:12 -   242:16  Curfman 01/24/2006

242 12      expedition can lead to misleading

242 13      conclusions, both positive and negative"?

242 14      He doesn't say --

242 15      Was the subject he was

242 16      talking about --

242:17 -   242:23  Curfman 01/24/2006

242 17      It's not clear from this.

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

| 242 | 18 | It's a new paragraph. | Re: [242:17-242:23] | |
| 242 | 19 | The entire subject of the | Pltf Obj Rules 801 and | |
| | 20 | NPR article was the safety endpoints -- | 802-Hearsay; Witness is | |
| 242 | 21 | The words don't say that. | not on this part of e-mail. | |
| 242 | 22 | MR. BECK: No more | | |
| 242 | 23 | questions. | | |

| 242:24 - | 243:12 | Curfman 01/24/2006 | | |
| 242 | 24 | THE WITNESS: Thank you. | Re: [242:24-243:5] | |
| 243 | 1 | MR. ARBITBLIT: Take a | Def Obj Colloquy | _Sustained_ |
| 243 | 2 | ten-minute break. | | |
| 243 | 3 | THE VIDEOTAPE TECHNICIAN: | | |
| 243 | 4 | The time is 4 minutes after 3:00. | | |
| 243 | 5 | We are off the record. | | |
| 243 | 6 | - - - | | |
| 243 | 7 | (Whereupon, a recess was | | |
| 243 | 8 | taken from 3:04 p.m. until | | |
| 243 | 9 | 3:17 p.m.) | | |
| 243 | 10 | - - - | | |
| 243 | 11 | THE VIDEOTAPE TECHNICIAN: | | |
| 243 | 12 | We're back on the record. This is | | |

| 243:13 - | 249:10 | Curfman 01/24/2006 | | |
| 243 | 13 | Tape Number 3. The time is 3:17. | | |
| 243 | 14 | - - - | | |
| 243 | 15 | EXAMINATION | | |
| 243 | 16 | - - - | | |
| | 17 | BY MR. ARBITBLIT: | | |
| 243 | 18 | Good afternoon, Doctor. | | |
| 243 | 19 | Good afternoon. | | |
| 243 | 20 | - - - | | |
| 243 | 21 | (Whereupon, Deposition | | |
| 243 | 22 | Exhibit Curfman-27, Letter | | |
| 243 | 23 | 6-30-00, with attachments, 2000 | | |
| 243 | 24 | NEMJ000025 - 2000 NEMJ000027; | | |
| 244 | 1 | 2000 NEMJ000134 - 2000 | | |
| 244 | 2 | NEMJ000138, was marked for | | |
| 244 | 3 | identification.) | | |
| 244 | 4 | - - - | | |
| 244 | 5 | BY MR. ARBITBLIT: | | |
| 244 | 6 | The exhibit in front of you | | |
| 244 | 7 | has been marked as Exhibit 27. | | |
| 244 | 8 | MR. ARBITBLIT: Here is a | Re: [244:8-244:9] | _Sustained_ |
| 244 | 9 | copy for counsel. | Def Obj Colloquy | |
| 244 | 10 | (Handing over document.) | | |
| 244 | 11 | BY MR. ARBITBLIT: | | |
| 244 | 12 | If you'll notice, if you go | | |
| 244 | 13 | through the document to the seventh page, | | |
| 244 | 14 | I believe you will find the previously | | |
| 244 | 15 | introduced suggestion for transmittal to | | |
| 244 | 16 | authors, which mentioned that the total | | |
| 244 | 17 | number of figures plus tables should not | | |
| | 18 | total more than five. That's on the page | | |
| | 19 | number ending 136 at the bottom right. | | |
| 244 | 20 | Do you see that, sir? | | |
| 244 | 21 | Yes, I do. | | |
| 244 | 22 | And can you take a look at | | |

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|
| 244 23 | the entire document, and does this appear | | |
| 244 24 | to be a letter from Dr. Kaplan to Dr. | | |
| 1 | Bombardier enclosing the comments from | | |
| 245 2 | Reviewers A and B on the VIGOR study? | | |
| 245 3 | MR. SHAW:  Take your time to | Re: [245:3-245:4] | *Sustained* |
| 245 4 | look.  It's a long document. | Def Obj Colloquy | |
| 245 5 | THE WITNESS:  Right.  And I | | |
| 245 6 | think A, B and C actually for | | |
| 245 7 | reviewers, yes. | | |
| 245 8 | MR. ARBITBLIT:  For the | | |
| 245 9 | record, this document begins at | | |
| 245 10 | Bates Number 2000 NEMJ 000025, and | | |
| 245 11 | the Bates Numbers for the letter | | |
| 245 12 | go through 027, and then the | | |
| 245 13 | comments of the reviewers are at | | |
| 245 14 | 134 through 138. | | |
| 245 15 | BY MR. ARBITBLIT: | | |
| 245 16 | Do you see that? | | |
| 245 17 | Yes. | | |
| 245 18 | Now, the date on this letter | | |
| 245 19 | is June 30, 2000; is that correct? | | |
| 245 20 | Yes. | Re: [245:20-246:3] | |
| 245 21 | Is it also correct that in | Def Obj Leading | |
| 245 22 | your Expression of Concern, you and the | | |
| 245 23 | other editors who authored that | | *Sustained* |
| 245 24 | Expression of Concern noted that the | | |
| 246 1 | information that was deleted from the | | |
| 2 | manuscript was deleted two days before | | |
| 246 3 | the manuscript was submitted? | | |
| 246 4 | MR. BECK:  Object, leading. | Re: [246:4-246:6] | |
| 246 5 | MR. ARBITBLIT:  Good one, | Def Obj Colloquy | |
| 246 6 | Phil. | | |
| 246 7 | THE WITNESS:  Yes.  That is | | |
| 246 8 | correct.  There were a number of | | |
| 246 9 | edits during the previous week | | |
| 246 10 | before submission of the | | |
| 246 11 | manuscript. | | |
| 246 12 | BY MR. ARBITBLIT: | | |
| 246 13 | Now, when did you receive | | |
| 246 14 | the manuscript for the first time? | | |
| 246 15 | We received it, the receipt | | |
| 246 16 | date was May 23rd, 2000.  The letter of | | |
| 246 17 | transmission was dated May 18, 2000. | | |
| 246 18 | (Phone interruption). | | |
| 246 19 | THE WITNESS: There was some | | |
| 246 20 | kind of interval of time between | | |
| 246 21 | Dr. Bombardier's signing of the | | |
| 246 22 | letter and the actual submission | | |
| 246 23 | of the manuscript.  But with that | | |
| 246 24 | detail, the submission date was | | |
| 247 1 | May 23rd. | | |
| 247 2 | BY MR. ARBITBLIT: | Re: [247:2-247:7] | |
| 3 | Could the authors of the | Def Obj Question is | |
| 4 | VIGOR study have removed Table 5 before | withdrawn without an | |
| 247 5 | submitting the manuscript in response to | answer | |
| 247 6 | a letter from the New England Journal | | |
| 247 7 | dated six weeks later? | | |

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|
| 247 | 8 | MR. SHAW:  Objection. | Re: [247:8-247:11] |
| 247 | 9 | MR. BECK:  Objection. | Def Obj Colloquy |
| ● | 10 | MR. ARBITBLIT:  Well, I'll | *Sustained* |
| 247 | 11 | withdraw it. | |
| 247 | 12 | BY MR. ARBITBLIT: | |
| 247 | 13 | Doctor, this letter is dated | |
| 247 | 14 | June 30 with the suggestion that there | |
| 247 | 15 | should be five tables; right? | |
| 247 | 16 | Right. | |
| 247 | 17 | And the table that you are | |
| 247 | 18 | concerned about in the Expression of | |
| 247 | 19 | Concern was deleted before the manuscript | |
| 247 | 20 | was even submitted to you; wasn't it? | |
| 247 | 21 | That's correct. | |
| 247 | 22 | So, the authors didn't | Re: [247:22-248:4] |
| 247 | 23 | suddenly decide that they should only | Def Obj Foundation; |
| 247 | 24 | have five tables and should delete the | calls for speculation |
| 248 | 1 | cardiovascular event table because of | |
| 248 | 2 | some letter written on June 30, 2000 | |
| 248 | 3 | when, in fact, it had been removed before | |
| 248 | 4 | that; correct? | |
| 248 | 5 | MR. SHAW:  Objection. | Re: [248:5-248:8] |
| 248 | 6 | MR. BECK:  *Objection.* | Def Obj Colloquy |
| 248 | 7 | MR. SHAW:  You can answer it | |
| 248 | 8 | if you understand the question. | |
| 248 | 9 | THE WITNESS:  That would be | |
| 248 | 10 | correct. | |
| ● | 11 | BY MR. ARBITBLIT: | |
| 248 | 12 | Doctor, you had your | |
| 248 | 13 | deposition taken on November 21st, 2005? | |
| 248 | 14 | Yes. | |
| 248 | 15 | Did you have any intention | |
| 248 | 16 | of writing an Expression of Concern about | |
| 248 | 17 | the VIGOR study before that date? | |
| 248 | 18 | No, we did not. | |
| 248 | 19 | Did you formulate an | |
| 248 | 20 | intention to write an Expression of | |
| 248 | 21 | Concern on or after November 21st, 2005? | |
| 248 | 22 | At 8:30 in the morning on | |
| 248 | 23 | November 22nd, Dr. Morrissey and I | |
| 248 | 24 | initiated discussions about some kind of | |
| 249 | 1 | editorial intervention, and then we | |
| 249 | 2 | continued those discussions in the | |
| 249 | 3 | subsequent days, leading eventually to an | |
| 249 | 4 | *Expression of Concern.* | |
| 249 | 5 | Now, the Expression of | Re: [249:5-249:10] |
| 249 | 6 | Concern itself has previously been marked | Def Obj "Expression of |
| 249 | 7 | as Exhibit 3, and do you have that in | Concern" is hearsay |
| 249 | 8 | front of you? | |
| 249 | 9 | I can get that.  Yes, I have | |
| 249 | 10 | it. | |
| 260:14 - | 261:13 | Curfman 01/24/2006 | |
| ● | 14 | Doctor, in the Expression of | Re: [260:14-261:13] |
| 260 | 15 | Concern, did you state the relative risks | Def Obj Relevance; |
| 260 | 16 | in terms of an increase in risk with | improper and |
| 260 | 17 | rofecoxib or Vioxx, rather than a | undisclosed expert |

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

260 18    decrease in risk with naproxen?
260 19    Yes, that's correct.
260 20    Why did you do that?
260 21    Well, the original VIGOR
260 22    article presented the relative risks in
260 23    the opposite direction, the implication
260 24    being from that presentation that
261  1    naproxen was protective against
261  2    cardiovascular disease, not that
261  3    rofecoxib increased the risk of heart
261  4    disease.
261  5    We now know that that is not
261  6    the case, and in order to set the record
261  7    straight, we made the decision in this
261  8    Expression of Concern to express the
261  9    relative risks as if rofecoxib increased
261 10    the risk of cardiovascular disease.
261 11    And, again, it was our
261 12    interest here to correct the scientific
261 13    record on this important point.

264:8  -  264:11  Curfman 01/24/2006
264  8    Can you please look at the
264  9    document marked as Exhibit 17 earlier
264 10    today which consists of the NEJM 000011
264 11    through 14, and the last two pages.

264: -  264:23  Curfman 01/24/2006
264 19    THE WITNESS:  Right.
264 20    BY MR. ARBITBLIT:
264 21    The last two pages being the
264 22    letter to Dr. Bombardier.
264 23    Right.  I've got it.

266:1  -  268:4  Curfman 01/24/2006
266  1    Now, going on to Paragraph 2
266  2    of your letter to Dr. Bombardier, could
266  3    you please read the first sentence of
266  4    Paragraph 2?
266  5    "Inclusion of the three
266  6    myocardial infarctions would have
266  7    invalidated your claim in the article
266  8    that there was a difference in the risk
266  9    of myocardial infarction only in
266 10    high-risk patients (i.e., those in the
266 11    aspirin indicated group)."
266 12    Can you explain what you
266 13    mean by that?
266 14    The authors in the VIGOR
266 15    article concluded that the difference in
266 16    rate of myocardial infarction between the
266 17    two treatment groups was present only in
266 18    high-risk patients, high risk for heart
266 19    disease, but not in low-risk patients,
266 20    low risk for heart *disease*.
266 21    If you add in the three
266 22    additional heart attacks that were not

opinion on naproxen

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

266 23    reflected in the data and do the
266 24    appropriate statistical analysis for
● 1    interaction, this conclusion in the
267 2    article is no longer sustained, and
267 3    that's what this point is about.
267 4    Can you explain what a test
267 5    for interaction means?
267 6    There are two variables, the
267 7    drug variables, rofecoxib versus
267 8    naproxen; and second variable, aspirin
267 9    indicated high-risk group, aspirin not
267 10    indicated low-risk group.  And an
267 11    interaction means that these two terms
267 12    will interact statistically, and the
267 13    appropriate test involves a determination
267 14    of whether there's an interaction.
267 15    And was such a test
267 16    performed by a statistician at your
267 17    request in connection with the Expression
267 18    of Concern?
267 19    Yes, it was.
267 20    Can you summarize the result
267 21    of that test?
267 22    The test indicated that the
267 23    risk -- the increased risk of
267 24    cardiovascular disease associated with
268 1    the use of rofecoxib or Vioxx was found
● 2    in both the high risk and the low-risk
3    groups, and it was not restricted to the
268 4    high-risk group.

268:16 -   270:3   Curfman 01/24/2006

268 16    Could you please take a look
268 17    at the July 5th memorandum, July 5, 2000
268 18    memorandum, I believe it's been marked
268 19    today as Exhibit 24 --
268 20    Right.
268 21    -- but it also has the
268 22    exhibit sticker 18 from the previous
268 23    deposition.
268 24    Right.
269 1    Is this the table you're
269 2    referring to in Paragraph 2 of the letter
269 3    to Dr. Bombardier?
269 4    Yes.  It's Table 4.  This is
269 5    what I was referring to.
269 6    Does this table indicate a
269 7    statistically significant increased risk
269 8    of Vioxx in both aspirin indicated and
269 9    aspirin not indicated patients?
269 10    Yes, it does.  Again, in
269 11    this particular table, the relative risks
269 12    are indicated in the reverse direction.
● 13    But the fact is that this table clearly
269 14    indicates that the increase in risk
269 15    associated with the use of rofecoxib was
269 16    present and statistically significant in

Objections/Responses In Mason column (for 268:16-270:3):
Re: [268:16-270:3]
Def Obj Foundation;
Merck internal document
Witness had not seen
before

Rulings In Smith/Barnett column:
*(handwritten)* ← Overruled witness recognizes table 4 as one he was referring to)

|  | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|

269 17    both the aspirin indicated, the high-risk
269 18    patients, high risk for heart disease,
269 19    and the lower risk group for heart
269 20    disease in whom aspirin was not
269 21    indicated.
269 22    So, the risk is present in
269 23    both groups.  When you look at the
269 24    totality of the adjudicated
270 1    thromboembolic serious adverse events,
270 2    the conclusion in the article is not
270 3    sustained by this table.

306:24 - 307:11 Curfman 01/24/2006
306 24    Now, Doctor, are you
307 1    familiar with the claim by the authors
307 2    that there was a cutoff date of February
307 3    10 for cardiovascular events, February
307 4    10, 2000?
307 5    I am now, yes.
307 6    Please take a look at
307 7    Exhibit 34, which is a letter from Alise
307 8    Reicin to Michael Weinblatt.  I take it
307 9    you haven't seen this one either; is that
307 10    correct?
307 11    That's correct.

**Re: [306:24-307:5]**
**Def Obj** Sarcastic

**Re: [307:6-307:11]**
**Def Obj** Foundation;
Witness has not seen
document before

308:11 - 309:7 Curfman 01/24/2006
308 11    Do you see that there's a
308 12    reference to a cutoff date for reporting
308 13    of these events to Merck will be February
308 14    10th?
308 15    I do.
308 16    And do you consider that a
308 17    prespecified cutoff date?
308 18    Well, let's just say that
308 19    the letter is dated February 7th, and the
308 20    cutoff date is designated February 10th,
308 21    and this is called prespecified?  Not
308 22    according to any definition of
308 23    prespecified that I've ever heard, which,
308 24    as I said earlier in testimony, involves
309 1    specifying the item in advance of the
309 2    beginning of the trial.
309 3    So, I haven't ever heard of
309 4    a definition of prespecified that would
309 5    come that late in the trial.  That's
309 6    three days shy of when they want to shut
309 7    down tabulation of the endpoints.

**Re: [308:11-309:7]**
**Def Obj** Foundation;
Witness has not seen
document before.
Witness opinion about
what constitutes a
prespecified cutoff date
is irrelevant and
speculative

319:2 - 319:21 Curfman 01/24/2006
319 2    Can you please take a look
319 3    at the document marked as Exhibit 36,
319 4    which is a memorandum to Alise Reicin
319 5    from Linda Nelson dated May 26, 2000,
319 6    "Subject: Adjudication results for 11
319 7    events after 2/10/2000."  Do you see this
319 8    document?

**Re: [319:2-319:21]**
**Def Obj** Foundation;
Witness has not seen
document before

*[Handwritten notes in right margin:]* overrule — The P. questions the validity, appropriateness etc of the "cut off" date. This testimony is relevant to this point. The documents + 901 test pass admissible under 801(d)(1)

| | | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|

319  9    Right.
319 10    If you could turn to the
319 11    second page, do you see that there are
319 12    three myocardial infarctions with the
319 13    report dates of February 22nd, 2000,
319 14    February 17, 2000 and February 16, 2000?
319 15    Right.
319 16    At any time during the
319 17    review process for the VIGOR manuscript,
319 18    did Alise Reicin inform you that she knew
319 19    the confirmed status of the three MIs
319 20    reported after February 10, 2000 no later
319 21    than May 26, 2000?

319:24 -    320:2    Curfman 01/24/2006
319 24    THE WITNESS:  None of the
320  1    authors informed the Journal about
320  2    the three myocardial infarctions.

**Re: [319:24-320:2]**
**Def Obj** Foundation; Witness has not seen document before

320:24 -    322:8    Curfman 01/24/2006
320 24    Doctor, what is Exhibit 37?
321  1    This is a series of three
321  2    e-mail messages involving our media
321  3    specialist Karen Pedersen, myself and Dr.
321  4    Drazen and some of the other editors.  It
321  5    has to do with an editorial that was
321  6    published in the Washington Post in early
321  7    January that Karen Pedersen brought to
321  8    our attention because she thought that it
321  9    might contain some factual inaccuracies
321 10    and is asking us if we wanted to perhaps
321 11    respond in some way.
321 12    And did Ms. Pedersen send
321 13    you an e-mail suggesting four points that
321 14    you might make in response to the
321 15    editorial?
321 16    Right.
321 17    Just to back up and identify
321 18    it for the record, it's dated January
321 19    3rd, 2006, NEJM 000280.
321 20    Doctor, did you respond to
321 21    Ms. Pedersen's e-mail concerning point
321 22    number 2 which stated, "The 3 MIs are a
321 23    trivial amount of the total data
321 24    withheld"?
322  1    Yes.  I think that she
322  2    wasn't correct about that, and I wanted
322  3    to give her some feedback about that so
322  4    we could correct that statement.
322  5    Could you read the first
322  6    paragraph, the e-mail that you sent to
322  7    Ms. Pedersen on January 3rd, 2006 into
322  8    the record, please?

**Re: [320:24-322:8]**
**Def Obj** Beyond the scope of cross exam

*Overruled*

322:14 -    323:16    Curfman 01/24/2006
322 14    "The only comment I have is
322 15    about # 2.  I would not characterize the

**Re: [322:14-323:16]**
**Def Obj** Beyond the

89

| | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|
| | scope of cross exam; 403; lacks foundation as to what Merck wanted to do and what is and is not appropriate | *[handwritten signature]* Overruled |

322 16   3 MIs as trivial exactly.  It is never
322 17   appropriate to withhold data, under any
322 18   circumstances, and we don't want to
322 19   appear as if we are endorsing that
322 20   practice.  It's just that they were
322 21   withheld" -- "that they withheld not only
322 22   3 MI's, but 9 tables and two figures of
322 23   additional data, all of which, in total,
322 24   painted a very ominous picture regarding
323  1   cardiovascular toxicity of Vioxx.  They
323  2   never revealed these data to the editors,
323  3   and therefore readers never saw them.
323  4   They were disclosed to FDA, but not
323  5   posted on the FDA website until 2001,
323  6   months after the New England Journal of
323  7   Medicine VIGOR article was published.  In
323  8   any case, the FDA Web site does not
323  9   constitute publication in the usual
323 10   sense; doctors don't read the FDA Web
323 11   site - they read journals.  The cardiac
323 12   toxicity data from VIGOR have never been
323 13   published in any medical journal.  The
323 14   company wanted to keep the Journal
323 15   article pristine for purposes of
323 16   marketing.  And it worked - for a while."

325:19 -   325:24 Curfman 01/24/2006
325 19   My question, whether you
325 20   choose to answer it or not, sir, is, you
325 21   testified about various matters that you
325 22   said you could not understand concerning
325 23   the prespecified cutoff date and the
325 24   rationale for it.  Did you make any

326:1 -   326:17 Curfman 01/24/2006
326  1   effort to look at what the authors said
326  2   and their response to the Expression of
326  3   Concern to understand their reasoning for
326  4   using the prespecified cutoff date?
326  5   Well, we will be looking
326  6   very carefully at their responses to that
326  7   question to see if we learn any new
326  8   information.  So far, as of today, we
326  9   haven't learned any new information.  But
326 10   we will be looking very, very carefully
326 11   at that crucial point to see what their
326 12   response is.
326 13   So, in terms of your
326 14   testimony about what you cannot
326 15   understand, you haven't tried to take
326 16   into account yet the responses of the
326 17   authors; is that right?

32●  -   326:23 Curfman 01/24/2006
326 22   THE WITNESS:  You said one
326 23   question.

| 326:24 - | 327:24 Curfman 01/24/2006 | Objections/Responses In Mason | Rulings In Smith/Barnett |
|---|---|---|---|
| 326 24 | BY MR. BECK: | Re: [326:24-326:24] | |
| ● 1 | Well, is that right, sir? | Pltf Obj No answer from | |
| 327 2 | MR. SHAW:  Thank you.  You | witness; Attorney | |
| 327 3 | said one question. | argument | |
| 327 4 | BY MR. BECK: | | |
| 327 5 | Do you refuse to answer that | | |
| 327 6 | question? | | |
| 327 7 | MR. SHAW:  No.  He's not | | |
| 327 8 | refusing.  You said one question, | | |
| 327 9 | and he just answered it, so that's | | |
| 327 10 | it.  We're done. | | |
| 327 11 | THE VIDEOTAPE TECHNICIAN: | | |
| 327 12 | The time is 4:57.  We're off the | | |
| 327 13 | record. | | |
| 327 14 | - - - | | |
| 327 15 | (Whereupon, the deposition | | |
| 327 16 | concluded at 4:57 p.m.) | | |
| 327 17 | - - - | | |