## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL DOCKET No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L - DIVISION 3 |
| | * | |
| This document relates to | * | JUDGE FALLON |
| CASE NO. 2:05CV2524 | * | |
| | * | |
| ANTHONY WAYNE DEDRICK, | * | MAG. JUDGE KNOWLES |
| an Individual, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |

---

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S OMNIBUS MOTION FOR ORDER EXCLUDING EVIDENCE AND TESTIMONY ADDRESSED IN MOTIONS PREVIOUSLY GRANTED BY THE COURT

---

Plaintiff Anthony Dedrick, by and through his undersigned counsel, urges this Court to deny Defendant, Merck & Co., Inc.'s Omnibus Motion For Order Excluding Evidence And Testimony Addressed In Motions Previously Granted By The Court.

## I.  INTRODUCTION

Merck's attempt to exclude broad categories of evidence in this case is inappropriate.  Merck has essentially requested that the Court exclude any and all relevant evidence that even contradicts the theories of Merck's defense.  This is not the purpose of the motion to exclude or in limine.  See *United States v. Feola*, 651 F. Supp.

1068, 1129 (S.D.N.Y. 1987) ("it would be improper for this court to speculate as to the circumstances that might surround the introduction of this evidence at trial, specifically, the adequacy of the foundation ... the probative value weighed against the potential prejudicial impact in light of the evidence presented, and the purpose for which such a statement will be introduced at the time."), *aff'd,* 875 F.2d 857 (2nd Cir. 1989).

The Fifth Circuit has noted: "[w]hen evidence is challenged solely on the ground that it is irrelevant, it is inadmissible only if it fails to meet the definition of Rule 401 - it must be without probative value as to *any* fact of consequence to the determination of the action. If it is relevant as to any issue, it is relevant to the action and is not inadmissible under Rule 402." *See Chrysler Credit Corp. v. Whitney Nat'l Bank,* 824 F. Supp. 587, 599 (E.D. La. 1993) (quoting *Lubbock Feed lots, Inc. v. Iowa Beef Processors,* 630 F.2d 250, 167 (5th Cir. 1980) (emphasis in original). Thus, Merck must establish that the evidence it seeks to have be excluded on relevancy grounds is *not* relevant to *any* issue in the case, not simply the issues it thinks are important. It has not done so.

## II.  DISCUSSION

### A.  COMMUNICATION BETWEEN MERCK AND THE FDA IN 2005

Although the Court granted Merck's motion on this issue in *Smith* and *Mason*, the Court indicated that it would "revisit if the issue of ability to reintroduce w/ black box comes up."'  At a minimum, Plaintiff asks that the Court consider revisiting the issue during trial. Merck has consistently opened the door to such evidence by arguing that the FDA has concluded that all NSAIDs are equal from a cardiovascular risk standpoint and that various doctors, scientists and FDA representatives have suggested that Vioxx is safe enough to be reintroduced to the market.  If Merck presents such evidence or testimony to

that effect at trial, Plaintiff should be entitled to[1] present evidence that Vioxx could *not* be placed back on the market ***without*** a black box warning and should be able to show the jury what a black box warning looks like.

### 1.      Background

In February 2005, the FDA held an Advisory Committee meeting to discuss COX-2 inhibitors.  The conclusions of the Advisory Committee were memorialized to some degree in the April 6, 2005 Memorandum authored by two employees of the FDA, which is the subject of a motion in limine.  In prior trials, Merck has relied heavily on the April 6th Memo.   In that memo, the employees of the FDA recommended that "the professional labeling (package insert) for all prescription NSAIDs, including both COX-2 selective and non-selective drugs, be revised to include a boxed warning highlighting the potential increased risk of CV events."[2]   In response to the Advisory Committee's finding, Merck prepared and presented a "Type A Meeting Background Package" (Pl.'s Ex. 1.1031, 1.1220) that it now seeks to exclude. In these documents, Merck offered that "[a] black box is proposed to convey the results of the APPROVe study" and proposed the following labeling language to the FDA: "Use of selective COX-2 inhibitors has been associated with an increased risk of serious cardiovascular thrombotic events," ***See*** Pl.'s Ex. 1.1031 at MRK-18940096278 and MRK-18940096282.

### 2.      Evidence is Not Excludable as a Subsequent Remedial Measure

Merck seeks to exclude these documents as a subsequent remedial measure under Federal Rule of Evidence 407. The Court should deny Merck's motion because the

---

[1] Order, *Smith v. Merck & Co., Inc.* (Sept. 6, 2006) met. Doc. 6721)
[2] *See* FDA Memo at 13-14.

documents it seeks to exclude do not represent subsequent remedial measures. It is undisputed that Merck withdrew the drug from the market in 2004. The evidence Merck seeks to exclude is not a remedial measure, but rather a *proposal* to the FDA in an attempt to reintroduce Vioxx to the market Rule 407 provides:

> When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a waning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Rule 407 is based on the theory of "encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety." Advisory Committee Note, Fed. R. Evid. 407. Rule 407 is intended to apply in situations in which subsequent remedial measures were actually taken. In this case, there has been no remedial measure, but rather a proposal to the FDA in an attempt to reintroduce Vioxx to the market. Under these circumstances, the documents are not excludable as a subsequent remedial measure. The documents are also admissible for impeachment purposes under Fed. R. Evid. 407.

### 3. Evidence is Not Unfairly Prejudicial under Federal Rule of Evidence 403.

Evidence of Merck's communications with the FDA should not be excluded under Federal Rule of Evidence 403. Merck contends that the probative value of this evidence is outweighed by its prejudicial nature. As the court in *National Railroad Passenger Corp. (Amtrak) v. Transwood Inc.*, 2001 W.L. 986868 (E.D.La. August 27, 2001), noted: "The Fifth Circuit has explained that all probative evidence is by its very nature prejudicial." See *United States v. Rermea*, 30 F.3rd 1539, 1562 (5th Cir. 1994). As a

result, evidence "should be excluded 'sparingly' and only in those circumstances where the prejudicial effect substantially outweighs the probative value." *United States* v. *Powers,* 168 F.3d 741, 749 (5th Cir. 1999); *United States* v. *Leahy,* 82 F.3rd 634, 637 (5th Cir. 1996).

The issue in this motion is whether evidence of the Merck's communications with the FDA regarding a warning label is substantially outweighed by the damage of unfair prejudice or confusion. Federal Rule of Evidence 403 "does not exclude evidence because it is strongly persuasive or compellingly relevant ... The truth may hurt, but Rule 403 does not make it inadmissible on that account." *In re: Air Crash Disaster,* 86 F3d 498, 538 (6th Cir. 1996).

While Merck argues that the information was not available to it at the time Mr. Dedrick took Vioxx, the issue of how much information Merck had and the type of warning it should have issued are contested factual matters in this case.  Plaintiff contends that Merck had enough information for years to issue the type of strong warning that ultimately it was later forced to recognize was appropriate.  It is for the jury to decide whether Merck did or did not have sufficient information to issue a stronger warning, but this evidence tends to support Plaintiff's claim and is therefore admissible.

### B.  THE FRIES LETTER AND RELATED EVIDENCE

Merck seeks to exclude in its entirety a letter from Dr. James Fries ("Fries Letter").[3]  In *Smith,* the Court reserved its ruling on this issue, indicating that the Fries

---

[3]  As the Court is aware, Dr. James Fries is a California physician and professor at Stanford University's School of Medicine. The letter at issue was written by Dr. Fries to then Merck CEO, Raymond Gilmartin. *See* P. 1.0179 (Ex A.)  Dr. Fries complains that Merck failed to disclose to doctors Vioxx safety data and had attacked academics, including Dr. Fries himself, who questioned the drug's safety. *See id.* at 4. In addition, Dr. Fries also relates his first hand experience with a Merck employee, Dr. Louis Sherwood,

Letter "might be admissible to show action or habit.[4]   In *Mason*, the Court granted Merck's motion in part with the same reservations.

Merck objects to the Fries Letters on hearsay, relevance and Rule 403 grounds.

### 1.   The Fries Letter Should Be Admitted Because Any Alleged Hearsay It Contains is Subject to Recognized Exceptions or is Not Hearsay.

Hearsay concerns out-of-court statements, not out-of-court actions. Thus, Dr. Fries' own complaints about Merck's actions and his own investigation of its conduct cannot constitute hearsay.

Similarly, Dr. Fries' statements concerning his encounter with Dr. Sherwood cannot be excluded on hearsay grounds because Dr. Sherwood is a Merck employee. As such, his statements are considered admissions of Merck under Rule 801(d)(2). Moreover, such statements are not offered for their truth but only to demonstrate how they made Dr. Fries and other physicians' state of mind.  *See* Fed. R. Evid. 801(c).  Thus, even idle threats are admissible to show their impact on Dr. Fries. *See United States* v. *Tinsley,* 172 Fed. App. 431,441; 2006 U.S. App. Lexis 7571 (3d Cir., Jan. 31, 2006) ("evidence of the purported threats was not hearsay"); United *States* v. *Saada,* 212 F.3d 210 (3d Cir. 2000).  The Court explained: "The testimony was not offered to establish the truth of any threat of harm, but to establish the threat was made. . ."

In the alternative, if the Court finds that the letter contains hearsay, Plaintiff submits that the letter is admissible under the business record exception to the hearsay rule.  Fed. R. Evid. 803(6). Under 803(6), records of regularly conducted activity such as reports or letters are admissible if: (1) the memorandum or report is made at or near the time the information was transmitted; (2) by a person with knowledge; (3) if kept in the

---

during which Dr. Fries himself felt threatened and intimidated.  *See id.* At 1-3. Additionally, Dr. Fries

regular course of business; and ( 4) it was the regular practice of the business activity to make such a letter.

The letter was written at or near the time of observation, by a person with actual knowledge. Clearly, Dr. Fries had personal knowledge of the information contained in the letter; indeed, the information contained in the letter was obtained as a result of his own personal investigation.  Plaintiff assumes that Dr. Fries kept the letter in his ordinary course of business.  The letter was written on the Stanford School of Medicine letterhead and, as such, bears the indicia of correspondence regularly written and maintained in the academic, medical community. Merck does not dispute that deans, department heads, and noted physicians from medical schools correspond with drug companies all the time.

Whether evidence is admissible under rule 803(6) is "chiefly a matter of trustworthiness." *Mississippi River Grain Elevator, Inc. v. Bartlett* & Co. *Grain,* 659 F.2d 1314, 1319 (5th Cir. 1981); see also *United States v. Morrow, 177* F.3d 272, 295 (5th Cir.) (per curiam), *cert. denied,* 120 S. Ct. 333 (1999); *United States v. Box,* 50 F.3d 345, 355-356 (5th Cir. 1995); *United States v. Veytia-Bravo,* 603 F.2d 1187, 1188-1189 (5th Cir. 1979), *cert. denied,* 100 S. Ct. 686 (1980).  Plainly, the letter is trustworthy, comes from a credible source, and was not written in anticipation of litigation. Indeed, in support of its claims that the Fries letter is confidential, Merck has previously submitted an affidavit to Dr. Fries that attested to the fact that he wrote the letter with the intention that Merck would be on notice of his concerns and respond accordingly.

---

reported the results of his own personal investigation into Merck's conduct. *See id.*
[4] Order, *Smith v. Merck & Co., Inc.* (Sept. 6, 2006) (Rec. Doc. 6721).

### 2. The Fries Letter is Relevant

As this Court has already recognized, the Fries Letter may be relevant to showing action or habit by Merck. More specifically, the Fries Letter demonstrates Merck's pattern of "neutralizing" and intimidating members of the scientific and medical community who were not echoing Merck's messages about the safety and efficacy of Vioxx. As such, the Fries Letter is very relevant to the issues in this case.

Merck claims that the Fries Letter is irrelevant if offered to show that Merck "attacked" certain members of the scientific community. In making this argument, Merck fails to disclose the full nature of the document. First, the Fries Letter is a four-page document which makes no mention of "attacks" by Merck employees until the last page. The letter is primarily devoted to alerting Merck of the serious concerns Dr. Fries and other notable research physicians have about the company's failure to disclose Vioxx clinical data. The letter gives specific examples regarding the lack of information Merck has provided about the safety of Vioxx following the VIGOR study and explains that several investigators and speakers have felt harassed by Merck employees when they raised safety concerns with respect to the drug.

The question is whether Merck had a duty to warn physicians like Dr. Herrera or patients like Mr. Dedrick, whether Merck knew the safety information was not reaching its target audience and whether Merck directly or indirectly placed misinformation about the risks associated with Vioxx into the marketplace. With respect to failure to warn, the duty arises when the Defendant knew or should have known of the need to issue a warning. *See GNR Energy Corp v. Carboline Co.,* 744 F**.** Supp. 1405, 1407 (E.D. La. 1990). To establish duty to warn, the plaintiff must prove a manufacturer had knowledge of the harmful and dangerous nature of the drug. *See id***.** Plaintiff anticipates Merck will

defend this case by arguing it fully discharged its duty to warn.  As such, Plaintiff should be permitted to offer evidence showing that Merck was on notice that members of the medical community thought Merck was failing to disclose safety data related to Vioxx and that the safety data was not reaching the people who needed it to make informed prescribing decisions.

The Fries Letter demonstrates that Merck was on notice of Vioxx's dangers and had established a pattern of "neutralizing" and intimidating persons who questioned the safety of Vioxx.  The letter is relevant, fits within recognized exceptions to the hearsay rule, and should be admitted into evidence

### 3.   The Fries Letter Will Not Cause Unfair Prejudice, Jury Confusion, or Undue Delay

The Fries Letter is not unduly prejudicial under Rule 403. Evidence is unduly prejudicial only when "its probative value is *substantially* outweighed by the danger of unfair prejudice." *US. v. Delgado,* 903 F.2d 1495, 1503-04 (11th Cir. 1990); see also *U.S.* v. *Cerullo,* 435 F.2d 142, 143 (5th Cir. 1970). "'Unfair prejudice' cannot be simplistically defined as evidence having adverse effects on a party's case; rather, it is an undue tendency to suggest a decision on an improper basis, commonly though not necessarily, an emotional one." See *Cauchon* v. *United States, 824* F.2d 908, 914 (11th Cir. 1987) (citations omitted); see also *Delgado,* 903 F2d at 1504. The letter's probative value is not outweighed by the danger of unfair prejudice.  Moreover, "Rule 403 rulings are best made at the time of trial when the Court may balance relevant factors before it." *Minshew* v. *Brown,* No. 95-2507, 1996 WL 601436 (E.D. La. 1996) (Fallon, J.).

### C. EVIDENCE OF MOTIVE AND EVIDENCE RELATING TO ASSETS AND PROFITABILITY OF MERCK OR COMPENSAITON AND FINANCIAL DECISIONS OF ITS EMPLOYEES

In *Smith* during the cross-examination of Briggs Morrison, the Annual Report was admitted without objection from Merck.[5]  The Court also allowed Briggs Morrison to testify about Vioxx profit forecasts, over Merck's objection, stating that such information "is always relevant."[6]  Also in *Smith*, Alise Reicin was allowed to testify about Merck's long-range operating plans for Vioxx which predicted that Merck would lose $500 million a year if Vioxx contained a cardiovascular risk warning."[7]  The Court admitted Merck 2001 and 2003 Long-Range Operating Plans into evidence.[8]  Merck's attempts to have this Court issue a definitive ruling to exclude all evidence of financial motive and Merck's profitability by erroneously suggesting it has done so in the past is highly improper.

Merck apparently wants to have it both ways. It wants to tell the jury that its motive for putting Vioxx on the market was to help the public, while attempting to withhold from the jury evidence that it fought a cardiovascular risk warning because the negative effect the warning would have on its profits.  This evidence is essential to show the reasons for Merck's actions and inactions.  On this basis alone, it should be admitted.

The financial information Merck seeks to exclude is also critical to the jury's assessment of Merck's credibility. Merck will argue that the evidence will reveal a company that acted reasonably and promptly with patient safety first and foremost amongst its concerns at all times.  Evidence of the personal financial incentives of Merck

---

[5] *See* Smith v. Merck & Co., Trial transcript at 610:25-612:14.
[6] *See id.* at 702:25-705:23.
[7] *See* Sept. 21, 2006 *Smith v. Merck & Co., Inc.* Trial Transcript, 2333:2-2336:24.

employees as they made critical safety and marketing decisions, evidence of the profit incentive for the company as it chose between safety studies, and evidence of the financial pressures Merck faced during the time that it made these critical decisions, is admissible.  Such evidence bears directly on the credibility of Merck's interpretation of the evidence and the testimony of its witnesses.

Merck's alternative argument that this evidence should be excluded under Rule 403 should also be rejected.  Just because the evidence is damaging or prejudicial to Merck does not mean such evidence should be excluded.  <u>See</u> *United States* v. *McRae,* 593 F.2d 700, 707 (5th Cir. 1979).  Instead, any prejudice must be "unfair" or undue. *Dollar* v. *Long Mfg, N.C, Inc.,* 561 F.2d 613, 618 (5th Cir. 1977).  Unfair prejudice within the context of Rule 403 "means an undue tendency to suggest (a) decision on an improper basis, commonly, though not necessarily, an emotional one." Notes of the Advisory Committee on Proposed Fed. R. Evid. 403, at 102.

In relevant part, Federal Rule of Evidence 403 directs that relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence. Fed. R. Evid. 403. The careful use of "substantially" demonstrates the emphasis placed on this balancing test. "Rule 403 is an extraordinary remedy that should be used sparingly because it allows the court to exclude admittedly probative evidence" *United States* ***v. Ross, 33*** F.3d 1507, 1524 (11th Cir. 1994).  Moreover, as this Court has noted, "Rule 403 rulings are best made at the time of trial when the Court may balance relevant

---

[8] *See id.* at 2335:IO-24 (admitting P1.0166 [July 15, 2003 Long-Range Operating Plan] and P7.0200 [July 2001 Long-Range Operating Plan]).

factors before it." *Minshew* v. *Brown, NO.* 95-2507, 1996 WL 601436 (E.D. La. 1996) (Fallon, J.); see *Hine v. Consol. R. R. Corp.,* 926 F.2d 262,274 (3rd Cir. 1991).

Evidence of the financial incentives that Merck executives had to maximize sales at the expense of patient safety is not unfairly prejudicial.  Such evidence will give the jury necessary context and insight as they evaluate the credibility of Merck's employees as well as the validity of Plaintiff's claims and Merck's defenses.  Lastly, such evidence is not cumulative but helpful in giving the jury a clear picture of the decision making process relating to Vioxx, specifically, the market and profit forces and pressures that were impacting Merck's decisions not to inform physicians and patients about the potentially harmful side effects associated with Vioxx.

**D.**    **Merck's Incorporated Arguments**

Merck incorporates a number of its prior motions into its omnibus motion. Similarly, Plaintiff incorporates by reference the oppositions filed by the Plaintiffs in *Irvin, Barnett, Smith*, and *Mason* to the following Merck motions:   (1) Motions to Exclude Evidence of Motive Evidence Relating to the Assets and Profitability of Merck or to the Compensation and Financial Decisions of its Employees; (2) Motions to Exclude Communications Between Merck and the FDA in 2005 About the Potential Reintroduction of Vioxx to the Market and/or Any Proposed Black Box Warning; (3) Motion for Order Excluding the Fries Letter (*Barnett*); (4) Motion to Exclude Evidence or Argument Pertaining to Conduct with No Nexus to Issues Being Tried in This Case (*Irvin*); and (5) Omnibus Motion to Exclude Evidence and Testimony on Issues Previously Addressed by the Court (*Smith*).

### III.    CONCLUSION

For these reasons, Plaintiff respectfully requests that Merck's Omnibus Motion be denied.

Respectfully submitted this 6th day of November, 2006.

/s/ P. Leigh O'Dell
ANDY BIRCHFIELD
**P. LEIGH O'DELL**
Attorney for Plaintiff
*BEASLEY, ALLEN, CROW,*
*METHVIN, PORTIS & MILES, P.C.*
**234 Commerce Street**
**Post Office Box 4160**
**Montgomery, Alabama 36103**
**(334) 269-2343 telephone**
**(334) 954-7555 facsimile**

Russ M. Herman (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
 Plaintiffs' Liaison Counsel

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
Co-Lead Counsel

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
& WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

PLAINTIFF'S STEERING COMMITTEE

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiff's Opposition to Defendant's Omnibus Motion for Order Excluding Evidence and Testimony Addressed in Motions Previously Granted by the Court has been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail or by hand delivery and e-mail, on Merck's Counsel, Douglas R. Marvin and Philip S. Beck,  by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 6th day of November, 2006.

/s/ P. Leigh O'Dell
P. Leigh O'Dell
Attorney for Plaintiff
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.

# Exhibit "A"



**Hennepin County Medical Center**

# HCMC

**L vel 1 Trauma C nter**

Department of Medicine
Division of Rheumatology

701 Park Avenue
Minneapolis, MN 55415 1829
612 347 2704
FAX: 612 904 4200
www.HCMC.org

Peter A. Schlesinger, M.D., F.A.C.P. *
Director
Thomas J. Bloss, M.D. **
David J. Rhuder, M.D. *
M.Thomas Sebman, M.D., F.A.C.P. **

L. M. SHERWOOD, M.D.

JUN 1 3 2000

RECEIVED

June 9, 2000

Louis M. Sherwood, M.D., F.A.C.P.
Senior Vice President
Medical and Scientific Affairs
U.S. Human Health
Merck & Co., Inc.
P.O. Box 4
Sumneytown Pike
West Point, PA 19486-0004

Dear Dr. Sherwood:

I would like to respond to your recent letter dated June 2, 2000 regarding concerns related to a presentation given at a GRECC-CME accredited VA telecast. Your major points focused upon a single slide I created one week prior to the conference, dealing with edema rates for celecoxib and rofecoxib. Upon reviewing the slide and your concerns, although I believe my oral discussion was clear, I agree that the visual appearance of the slide could be confusing. I agree that one might interpret the slide as representing a single head-to-head study which was certainly not my intent. In addition, the data did inadvertently mix peripheral and generalized edema which could be misleading when shown side by side on a single slide. My intent was to relate changes in edema in any form caused by sodium retention as an effect of the drugs on COX-2 inhibition within the tubular portion of the kidney. I stand firm on my opinion that there are differences between celecoxib and rofecoxib with regards to higher dose related edema and/or hypertension rates. This is supported by package insert data as well as various studies submitted to the Arthritis Advisory Committee that are available for public review. In an attempt to present these data in a concise and time-limiting manner, the slide in question was created. I agree that the resulting slide, but not my oral discussion, could be confusing. The slide has been removed and is being replaced by two separate slides, each dealing with this kidney tubular effect as it relates to each drug in an independent manner. I contacted Timothy D. Bauer and he and I agreed that in the event this tape is to be reproduced in any manner, the substitute slides will be dubbed in to more clearly visually represent my oral discussion.

* Fellow, American College of Rheumatology, Board certified from Internal Medicine and Rheumatology
* Director, Undergraduate Medical Education
* Director of Employee Care Outreach

*An equal opportunity employer*

P1.0179

MRK-ABO0000448

June 9, 2000
Page 2

I would also like to address additional concerns that you expressed in your letter. In answering the question why there are differences in renal profiles of celecoxib and rofecoxib, I clearly stated that I was unaware of any definitive explanation. The reasons stated represent my opinion and the differences that exist between these two agents, with regards to degree of excretion in the kidney, could be a potential explanation. There are differences in clearance rates of rofecoxib based on increasing doses. Although the relationship of active and inactive metabolites may be small, I believe this could be contributing to the increased rates of edema and/or hypertension with rofecoxib when used in increasing doses i.e., outside clinical dose range. In general, the use of medications outside clinical dose range is unfortunately seen a great deal in clinical practice. You also expressed concern with my statement that higher rates of hypertension and edema for rofecoxib may have been related to the increase cardiovascular events that occurred in the VIGOR Trial. Until data regarding incidence of hypertension and edema is shared with me, information I have requested several times, this opinion is no more "highly speculative and inappropriate" then the explanation given that Naprosyn may be cardioprotective in this trial.

With the exception of the potential visual confusion present in a single slide, I feel there was nothing in my presentation that was inconsistent with the principles of the Accreditation Council for Continuing Medical Education (ACCME) Standards for Commercial Support of CME. I feel my opinion regarding differences between rofecoxib and celecoxib with regards to their renal profile is based upon data and is free of any commercial bias for or against either product. In presenting their differences of renal profile, I am in fact intending to "enhance the physicians ability to care for patients," a standard set forth by the ACCME. This is especially true when dealing with older patients with mild to moderate renal insufficiency who may be placed on a COX-2 inhibiting agent. In my recent conversation with Timothy Bauer, he reassured me that the follow up evaluations from the telecast were extremely positive with regards to information presented in a balanced manner regarding these two COX-2 agents.

I believe the above response adequately deals with your concerns relating to my presentation.

I would now like to remind you of a situation that remains unresolved. As an appointed speaker for Merck & Co., in the summer of 1999, I was scheduled to give seven lectures to various groups of physicians using different venues including a conference for continuing medical education. Financial support for these lectures were to be provided by Merck & Co., and it included an educational grant for a CME lecture in Bismarck, North Dakota. The first of these lectures was the Bismarck, North Dakota CME lecture and was to take place on June 20, 1999. On June 15, 1999, five days prior to this scheduled CME lecture, I was notified that all seven lectures were canceled by Merck & Co. No explanation was given to me as to why these lectures were being cancelled. I felt it was my professional responsibility to express my concern for cancellation of a CME program on such short notice and I contacted an individual in Bismarck who was

MRK-ABO0000449

June 9, 2000
Page 3

associated with this CME program. This individual indicated that a Merck representative informed her that Dr. Stillman was responsible for this last minute cancellation. When I related the facts to this individual involved with the program she was very upset with Merck's inappropriate action and also expressed that several physicians were disappointed as they were looking forward to my presentation.

I felt that this action of Merck & Co. was irresponsible, dishonest, and reflected negatively upon my professional integrity. Following this experience, I had a series of meetings with Spencer Kubo, the Merck Regional Medical Director. I was led to believe that there was a difference of opinion regarding the need for me to point out my professional opinion regarding the difference between celecoxib and rofecoxib in the area of effects on the kidney related to increasing incidence of edema and hypertension at high doses of these two medications. Although he was not responsible, Dr. Kubo shared with me that this difference in opinion was the reason that the seven scheduled programs were cancelled. Subsequently, Dr. Kubo attended a Grand Rounds that I gave at Hennepin County Medical Center on COX-2 technology and following this presentation he assured me that in his opinion the lecture was well balanced. I would like to point out that this Grand Rounds presentation did not include the slide in question, since again it was created one week prior to the GRECC-CME presentation on May 3, 2000. Dr. Kubo was very cooperative and agreed that the Bismarck CME program was handled in a very inappropriate manner. He informed me that Dr. Louis Sherwood was the appropriate individual in a position to resolve this situation. He reassured me that you were fully informed and would be in touch with me. To be sure of your complete knowledge of this problem, as well as an opportunity to discuss our differences of opinion, we had an extended telephone conversation in February of 2000. It was this conversation that you referred to in your letter dated June 2. We discussed our differences of opinion regarding celecoxib and rofecoxib at higher doses and their effects on edema and hypertension. You also expressed the opinion that the Bismarck situation was inappropriate and I was given your reassurance that you would attempt to correct the situation.

To date, approximately one year following the incident, nothing has been done. There was complete disregard for my professional integrity with regards to the blatant misrepresentation as to the origin and responsibility of the cancellation of the CME lecture. In addition, I am concerned that the cancelling of such a CME program by a sponsoring pharmaceutical company represents inappropriate censorship of medical information to be presented, and may be in violation of ACCME Standards for Commercial Support of a CME presentation.

I feel that your pointing out the potential misunderstanding that may occur by the single slide in a CME presentation was appropriate and I acted immediately by discussing this with Timothy Bauer, the individual involved with the CME program. The slide has been removed from my talks and two slides dealing with the information of the two drugs will replace this slide. Again, I state that it is important to point out to physicians the difference between these agents. By using two slides, there should be no potential confusion regarding the visual interpretation of these differences between celecoxib and

June 9, 2000
Page 4

rofecoxib regarding effects on edema and hypertension at higher doses. Using two slides
will also avoid any confusion that there has been any head-to-head study with regards to
this difference. I feel that I have responded to your concerns in a timely manner, one
week. I strongly believe that your continued failure to respond to my concerns, one year,
is certainly not being addressed in a timely manner. I would still like to discuss with you
appropriate ways to resolve this issue.

Thank you for some of the concerns expressed in your letter of June 2. I assure you that
they were viewed as constructive criticism. I believe that those concerns have been
addressed appropriately. I take pride in the fact that it has always been my intention to
present medical information in a credible and balanced manner. Numerous very positive
personal CME speaker evaluations underscore my success in this endeavor. These
evaluations have included those from many pharmaceutical company supported CME
programs given throughout my lecturing career of over 30 years.

Sincerely,

M. Thomas Stillman, M.D., F.A.C.P.
Director, Undergraduate Medical Education
Associate Director, Graduate Medical Education
Former Director, Division of Rheumatology
Department of Medicine
Hennepin County Medical Center

Clinical Professor of Medicine
University of Minnesota Medial School

MTS:sb

cc:     Timothy D. Bauer, MPH
        VAMC
        Department of Education
        One Veteran's Drive
        Minneapolis, MN

        Joseph Fieczko, M.D.
        Senior Vice President, Medical and Regulatory Operations
        Pfizer Pharmaceutical Groups
        Mailstop 15-11
        235 E. 42nd Street
        New York, NY 10017

MRK-ABO0000451

June 9, 2000
Page 5


Leslie Tive
Director of Clinical Research
Pfizer, Inc.
Mailstop 219-4
235 E. 42nd Street
New York, NY 10017

Michael Friedman, M.D.
Senior Vice President of Clinical Affairs
Searle Parkway
4901 Searle Parkway
Skokie, IL 60077

William F. Keane, M.D.
Chairman, Department of Medicine
Hennepin County Medical Center

David Anstice
President U.S. Human Health
Merck & Co., Inc.
Sumneytown Pike
West Point, PA 19486-0004

MRK-ABO0000452