UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 2:05-CV-04379 | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| ROBERT G. SMITH, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * *

**OPPOSITION OF MERCK & CO., INC. ("MERCK") TO PLAINTIFF'S MOTION TO EXCLUDE ARGUMENT OR OPINION TESTIMONY THAT AN INCREASED RISK OF HEART ATTACK EXISTS ONLY AFTER 18 MONTHS OF VIOXX USE**

Plaintiff seeks an order precluding Merck "from arguing or offering testimony to the effect that an increased risk of heart attack exists only after 18 months of Vioxx use," claiming that such argument or testimony should be excluded under Federal Rule of Evidence 702. (Pl.'s Mot. at 1.)  The Court should deny plaintiffs' Motion for two reasons:

First, plaintiff wrongly assumes that Merck has the burden of proof on causation.  That burden belongs solely to plaintiff.  Because plaintiff intends to offer opinion testimony that Mr. Smith's use of Vioxx® increased his risk of thrombotic cardiovascular events, despite the short

825024v.1

M0072225767

duration of his use of Vioxx – less than five months – Merck is entitled to challenge plaintiff's experts' causal inference, either by challenging the validity of plaintiff's evidence or by presenting expert testimony explaining the results of the available clinical studies, including APPROVe, and why those results do not support plaintiff's theory.

      Second, plaintiff's criticisms of Merck's interpretation of the clinical data, specifically the data from the APPROVe study, are without merit. Plaintiff's motion relies on a recently published "correction" concerning the statistical analysis of the APPROVe results. The correction made certain changes to the text of the article describing the APPROVe study, because the authors had reported using one type of statistical analysis rather than the one they actually used. The correction revised the analysis to use the reported method, but does not conclude that use of the other method would have been invalid if it had been specified. Moreover, even after the correction, there remains no statistically significant data showing an increase in cardiovascular risk for patients who used Vioxx for less than 18 months. In APPROVe, after 18 months there were 22 confirmed on-drug thrombotic cardiovascular events among the patients on Vioxx and 20 among the patients on placebo. During the same time period there were nine myocardial infarctions (heart attacks) among the patients on Vioxx versus eight among the patients on placebo. These results simply do not add up to a statistically significant increase in risk among patients who used Vioxx for 18 months or less. Additionally, while plaintiff might wish it otherwise, Merck's analysis was neither a flawed *post hoc* sub-group analysis, nor was it undertaken for purposes of litigation. Moreover, plaintiff's argument ignores the fact that the lack of demonstrated short-term cardiovascular risk found in APPROVe is wholly consistent with the other available Vioxx clinical data. In short, Merck's position, and that of its experts, results from the application of valid scientific methods.

825024v.1

M007225768

I.   **PLAINTIFF, NOT MERCK, BEARS THE BURDEN OF PROOF ON CAUSATION.**

Unsurprisingly, given plaintiff's lack of reliable scientific evidence supporting causation in this case, he impermissibly seeks to shift the burden of proof to Merck. Plaintiff even criticizes Merck for failing to identify a "biologically plausible" mechanism by which Vioxx becomes harmful only after 18 months. (Pl.'s Mot. at 7.) Proving causation, however, is plaintiff's burden, not Merck's. *King v. Ford Motor Co.*, 209 F.3d 886, 893 (6th Cir. 2000) (under Kentucky substantial factor test, used in product liability cases, plaintiff bears the burden to establish causation); *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 507 (6th Cir. 1998) ("Under Kentucky law, a plaintiff has the burden of establishing causation in claims of strict liability, as well as in claims of negligence and breach of implied warranty."); *Fitzgerald v. Manning*, 679 F.2d 341, 348 (4th Cir. 1982) ("when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant") (internal quotation marks and citations omitted). Specifically, plaintiff must identify "reliable epidemiologic evidence" that his short-term Vioxx use was capable of causing his alleged heart attack.[1] *See, e.g., In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1136 (9th Cir. 2002) (in the absence of other scientific evidence, statistical epidemiological evidence has been found necessary to meet burden of proving causation); *Allen v. Penn. Eng'g Corp.*, 102 F.3d 194, 197 (5th Cir. 1996) (epidemiologic studies are "[u]ndoubtedly, the most useful and conclusive type of evidence" of causation).

---

[1] There are two types of epidemiologic studies – randomized clinical trials and observational studies. Randomized clinical trials are at the top of the hierarchy of data that scientists typically consider when assessing whether a particular dose of a drug is capable of causing a specific injury. Observational epidemiological studies occupy the next level down on the hierarchy of scientific evidence. *See* Michael J. Saks et al., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE ("Reference Manual on Scientific Evidence") at 484-90 (2d ed. 2005-2006).

Given the record in other Vioxx cases, Merck anticipates that plaintiff will assert that one or two observational studies with extremely low relative risks – which are not scientifically reliable for the purpose of drawing conclusions about causation – indicate that short-term Vioxx use might be capable of causing thrombotic cardiovascular events. Should plaintiff do so, Merck would be entitled as a matter of law to demonstrate the shortcomings of the observational studies on which plaintiff relies and to explain how the results of those studies are inconsistent with randomized clinical trial data involving thousands of patients from APPROVe and other studies. After all, assessing causation requires consideration of *all* the available epidemiologic data. *See, e.g.*, Reference Manual on Scientific Evidence at 480 ("[I]t should be emphasized that *an association is not equivalent to causation*. An association identified in an epidemiological study may or may not be causal. Assessing whether an association is causal requires an understanding of the strengths and weaknesses of the study's design and implementation, as well as a judgment about how the study findings fit with other scientific knowledge."). Indeed, the absence of consistent findings in epidemiologic studies "is a strong indication" that the existing research "does not support a causal interpretation." *Id.* at 531.

Thus, to the extent plaintiff seeks to present only a limited, cherry-picked, set of scientific data to the jury, Merck is entitled to present expert testimony on the results of any relevant studies, including the lack of short-term risk shown in APPROVe, so that the Court or jury can decide whether the *totality* of scientific evidence supports plaintiffs' theory that their limited Vioxx use is capable of causing thrombotic cardiovascular events.

825024v.1

M007225770

II.  **THERE IS NO RELIABLE SCIENTIFIC EVIDENCE INDICATING AN INCREASED CARDIOVASCULAR RISK IN PATIENTS USING VIOXX FOR LESS THAN 18 MONTHS.**

Merck voluntarily withdrew Vioxx from the market on September 30, 2004, when interim unblinded data from the APPROVe[2] study – a long-term, randomized placebo-controlled clinical trial – indicated that continuous daily use of Vioxx for an average of 30 months might increase the risk of thrombotic cardiovascular events.[3] No other placebo-controlled clinical trials had shown any such risk, for *either* short-term or long-term use of Vioxx. Over the ensuing months, the study's authors collected the APPROVe data and published it in January 2005 in the *New England Journal of Medicine*.[4]

The APPROVe study results, published in 2005, showed that, during the first 18 months of use, those taking Vioxx and those taking a placebo encountered nearly the same rate of cardiovascular thrombotic events such as myocardial infarctions.[5] After 18 months of continuous use the number of events began to increase among Vioxx users, but the difference did not become statistically significant until after about 30 months of continuous use. In May of 2006, "extension data" from APPROVe was published.[6] Like the original APPROVe data, the extension data did not find a statistically significant difference in the risk of confirmed

---

[2] "APPROVe" stands for Adenomatous Polyp Prevention On Vioxx. The study assessed whether Vioxx could help prevent the recurrence of precancerous colon polyps, and in fact, recently-compiled efficacy data from the study indicate a potential benefit.

[3] *See* Bresalier RS et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, 352 NEW. ENG. J. MED. 1092-102 (Mar. 17, 2005), at 1097.

[4] *See* Bresalier RS et. al. *supra*.

[5] *See* Bresalier RS et al., *supra*.

[6] *See* APPROVe Extension Statistical Package, dated May 26, 2006, attached as Ex. A. The extension data evaluated the rate of serious thrombotic cardiovascular events experienced by patients more than 15 days after they stopped taking Vioxx or placebo, while the original published data only considered events up to 15 days later.

thrombotic cardiovascular events in patients who had previously taken VIOXX compared to those who had previously taken placebo over the first 18 months. In June of 2006, the New England Journal of Medicine published a Correction of the March 2005 APPROVe article relating to the test for proportionality of the risks and the statistical model used for interpreting the data.[7]

### A. The APPROVe Data Does Not Prove that Vioxx Increases Cardiovascular Risk With Less Than 18 Months of Use.

Plaintiff claims that, as a result of the 2006 Correction, the 2005 New England Journal of Medicine article "misstates the results of the trial," that the Journal's original report that the increased relative risk was only observed after 18 months was in error, and "there is no peer-reviewed literature" supporting the argument that there is no risk prior to 18 months of Vioxx use. (Pl.'s Mot. at 4-5.) Plaintiff is wrong.

In reality, the June 2006 Correction regarding the type of statistical analysis used in APPROVe did nothing to show that a statistically significant risk of thrombotic cardiovascular events exists after less than 18 months of Vioxx use – much less after less than five months of use, as is the case here. The Correction did nothing to change the fact that, during the first 18 months of the study, there were 22 confirmed on-drug thrombotic events on Vioxx versus 20 on placebo, nowhere near a statistically significant relationship.[8] During the same 18 month period, there were nine MI's among patients on Vioxx and eight for patients on placebo, also not a statistically significant difference.[9] The only reason for the Correction was that the

---

[7] *Correction*, NEW. ENG. J. MED. 355(2):221. (July 13, 2006), ("Correction") attached to Pl.'s Mot. as Ex. B.

[8] *See* Bresalier RS et al., *supra*.

[9] *See* APPROVe Trial Abbreviated Clinical Study Report, excerpt attached as Ex. B.

825024v.1

M007225772

proportionality test was originally conducted using linear time, but was reported as having been conducted as a logarithm of time.[10] That proportionality test was "corrected" to log time, but the Correction did nothing to alter the study's published data and the figures illustrating the data remained unchanged.

Plaintiff attacks Dr. Marks' reference to "figure 2," which plaintiff claims is "known to be misleading." (Pl.'s Mot. at 6.) Contrary to plaintiff's claims, figure 2 – the APPROVe Kaplan-Meier curve – was not altered or deleted from the article.[11] The curve shows without dispute that the actual rate of events in the APPROVe trial began to diverge only after 18 months, and it remains a legitimate piece of evidence in support of Merck's contention that the totality of the evidence – including the Alzheimer's and osteoarthritis trials comparing Vioxx to placebo[12] – does not demonstrate any increased short-term cardiovascular risk. While the Correction deleted some language in the article describing the results as being "inconsistent with the existence of a risk before 18 months," it expressly reaffirmed that "[v]isual inspection of the Kaplan-Meier curves suggested that there was an increasing frequency of thrombotic events associated with rofecoxib therapy after 18 months."[13]

---

[10] *See* Correction. There is no suggestion in the Correction that use of a linear time analysis is not an appropriate scientific method.

[11] *See* Correction; Bresalier RS et al., *supra*; APPROVe Extension Statistical Package, *supra*, at 52.

[12] Merck's position and its experts' opinions do not rely solely on the APPROVe results to show the absence of scientific evidence supporting plaintiff on the threshold issue of general causation. On the contrary, consistent with sound science, this position is based on the *totality* of available clinical evidence. (*See, e.g.*, Merck's Motion for Order Excluding Expert Testimony that Short-Term Vioxx Use Increases Cardiovascular Risk, filed August 14, 2006, Docket No. 6261.)

[13] Correction.

825024v.1

M00722 5773

In fact, nothing about the Correction has changed what the APPROVe base study demonstrated and the May 2006 extension data confirmed – that there was no statistically significant increase in the number of confirmed thrombotic events for patients on Vioxx compared to placebo during the first 18 months of use.[14]

### B. The APPROVe Data Does Not Show An Increased Risk at Less Than 18 Months of Vioxx Use, Much Less Five Months.

Even if, *arguendo*, the Correction actually showed that APPROVe cannot establish the lack of increased risk in patients who use Vioxx for less than 18 months, the Correction still utterly fails to show the contrary – the fact that plaintiff must prove – that APPROVe provides statistically significant evidence showing there *is* an increased risk for periods of use shorter than 18 months. More importantly for purposes of this case, the Correction certainly does not indicate that APPROVe found an increased risk at under five months of use – the time period in which plaintiff actually claims to have used Vioxx, and thus the period of use for which plaintiff has the burden to establish general causation. Accordingly, to exclude Merck's argument that there is no evidence showing an increased risk during plaintiff's period of use based solely on plaintiff's interpretation of the APPROVe study would be in error.

### C. Expert Testimony About APPROVe is Relevant to Plaintiff's Allegations of Causation.

In pharmaceutical and toxic tort cases, a plaintiff must prove general causation before

---

[14] *Compare* APPROVe Extension Statistical Package, *supra*, at 51 *with* Bresalier RS et al., *supra*, at 1092-1102. Over the first 18 months of use, the extension data revealed a relative risk of 1.27, with a 95% confidence interval between 0.71 and 2.25, while the published base study produced a relative risk of 1.18, with a 95% confidence interval between 0.64 and 2.15. Thus, given that the confidence intervals fell below 1.0, neither revealed a statistically significant increased risk within the first 18 months. Not only did the small number of additional events reported in the extension study fail to support a statistically significant difference at 0-18 months, but they consisted of events that occurred more than 15 days after the additional patients in question had stopped taking Vioxx.

825024v.1

M0072 2577 4

proving specific causation. *See, e.g., McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005); RESTATEMENT (THIRD) OF TORTS: Liability for Physical Harm § 28 cmt. c (Tentative Draft Nov. 3, 2003); Reference Manual on Scientific Evidence at 653. Moreover, because "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect," *McClain*, 401 F.3d at 1242, a plaintiff cannot establish general causation merely by showing "that a certain chemical agent sometimes causes the kind of harm that he or she is complaining of." *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1107 (8th Cir. 1996). Instead, the plaintiff must present evidence that he or she was "exposed to levels of that agent that are known to cause the kind of harm" that he or she allegedly suffered. *Id.*; *In re Hanford Nuclear Reservation Litig.*, 292 F.3d at 1133 ("[T]he appropriate understanding of generic causation is . . . whether exposure to a substance for which a defendant is responsible, such as radiation at the level of exposure alleged by plaintiffs, is capable of causing a particular injury or condition in the general population.").

Here, Mr. Smith claims to have used 25 mg Vioxx for less than five months.[15] The threshold issue to be decided is whether plaintiff's short-term use of Vioxx is capable of causing the type of injury he allegedly suffered – a heart attack. Expert testimony about APPROVe is unquestionably relevant to that issue. In sum, plaintiff's Motion seeks to exclude reliable testimony which is relevant to the threshold issue in this case.

---

[15] June 29, 2006 Discovery Deposition of Michael Grefer ("Grefer Dep.") at 44:19-25, 46:6-21, 46:22-47:3, 47:19-23, attached as Ex. C; Deposition of Robert Smith ("Smith Dep.") at 149:11-152:1, attached as Ex. D.

> D. **Plaintiff's Specific Criticisms Regarding Merck's Analysis of the APPROVe Data Are Meritless.**

Finally, none of plaintiff's specific criticisms of Merck's analysis of the APPROVe data has any merit. The analysis is not a flawed *post hoc* sub-group analysis, it was not undertaken for purposes of litigation, and it is not inconsistent with other epidemiological data.

> 1. **The APPROVe Duration Analysis Is Not Scientifically Unreliable *Post Hoc* Subgroup Analysis.**

Plaintiff contends that the duration analysis contained in APPROVe is scientifically unreliable because it is a "*post hoc* subgroup analysis." (Pl.'s Mot. at 5.) This claim is baseless.

*Post hoc* analysis is analysis conducted after the study and not a planned analysis included in the study design. As Dr. Marks explained, however, it was the intention from the beginning of the APPROVe study that hazards would be reviewed over various time periods and any statistically significant results would require additional analysis. (*See* Report of Ronald Marks at 9-12, attached to Pl.'s Mot. as Ex. D; Deposition of Ronald Marks ("Marks Dep.") at 181:11-182:8, attached to Pl.'s Mot. as Ex. E.) The analysis in question – known as a "Kaplan-Meier survival analysis" – is a generally accepted method for plotting and analyzing the comparative rates of adverse events over time.[16]

Nor does examining the relative risk of exposure for 18 months or less constitute a "subgroup analysis." (Pl.'s Mot. at 6.) Subgroup analysis breaks down data from a study into smaller "subgroups," which are then tested for significant interactions. Regardless of whether subgrouping is performed *post hoc*, subgroup analysis is sometimes less reliable – only examining results for some of a study's participants may cause the study to lose the necessary

---

[16] *See, e.g.*, Elandt-Johnson and Johnson, SURVIVAL MODELS AND DATA ANALYSIS (Wiley 1980) at 172-174; Cox, DR and Oakes, D, ANALYSIS OF SURVIVAL DATA (Chapman and Hall 1984).

number of subjects to reach adequate statistical power, and a statistically insignificant result from a subgroup analysis is not as helpful as the fully powered study. The durational analysis of the APPROVe data, however, was not a subgroup analysis, as it examined the entire study population rather than divide members of the Vioxx or placebo groups into smaller subgroups. Neither is Dr. Marks' analysis of the APPROVe data a subgroup analysis, as he explained:

> Q.  Okay. You did a subgroup analysis, didn't you, with respect to your 18-month explanation that's reflected on page ten?
>
> A.  Well, that's a little different than a subgroup analysis. That's – I used all the patients. A subgroup analysis is different.

(Marks Dep. at 178:24-179:4.) Examining the entire population over a given time period obviously is not the same thing as examining only a subgroup of the population. The final APPROVe results did not break the patients into subgroups – the *entire population of participants was analyzed*. Plaintiff's claims that the APPROVe results are unreliable because they are a *post hoc* subgroup analysis therefore are groundless.

Plaintiff's sudden concern about the unreliability of *post hoc* and subgroup analyses, although inapplicable to the APPROVe study, is a welcome change. Plaintiffs in previous cases have relied on analyses by Topol, Kronmal, Juni, and others that suffer from these or similar flaws. In the past, the Court has overruled Merck's objections to the scientific reliability of those analyses. Hopefully the Court will now be willing to reconsider.

2. The APPROVe Duration Analysis Was Not Undertaken for Purposes of Litigation.

Plaintiff also claims that Merck can provide no supporting evidence that was not developed solely for litigation and is thus scientifically reliable. (Pl.'s Mot. at 7.) Again, plaintiff's argument is contrary to fact. The use of Kaplan-Meier curves to analyze the APPROVe data was part of an article published – after peer review – in *The New England*

11

*Journal of Medicine.* The mere fact that these results were published after some lawsuits had been filed against Merck does not remotely warrant an *assumption* that the duration analysis was conducted for purposes of litigation. Plaintiff offers *no* evidence that the authors of APPROVe were motivated by any lawsuit or that their analysis – or the analysis of the peer reviewers – was related to any lawsuit. Unsupported allegations of counsel provide no basis for excluding evidence.

Moreover, as discussed *supra*, Merck relies on not just APPROVe but all peer-reviewed published data when it challenges plaintiff's unfounded claims that there is an increased cardiovascular risk associated with less than five months of use of Vioxx.

3.  The APPROVe Duration Analysis Is Consistent with the Available Epidemiologic Data.

Plaintiff's claim that the APPROVe data is somehow inconsistent with the available clinical and observational data, including Merck's own unpublished data (Pl.'s Mot. at 6-7), is simply wrong. In fact, before seeking FDA approval of Vioxx, Merck conducted over 55 clinical studies involving over 8,000 patients exposed either to Vioxx or to placebo or traditional NSAIDs for up to 86 weeks.[17] These comparisons revealed *no* statistically significant difference in the rate of adverse cardiovascular events.[18] After receiving FDA approval of Vioxx, Merck

---

[17] *See* Merck's New Drug Application submitted November 23, 1998, attached as Ex. E.

[18] *See, e.g.*, Aug. 10, 2005 Testimony of Alise Reicin, M.D., in the *Ernst* case, at 29:23-31:6, attached as Ex. F. Dr. Reicin is designated as a witness in this case. *See also* Merck's Motion for Order Excluding Expert Testimony that Short-Term Vioxx Use Increases Cardiovascular Risk, filed August 14, 2006, and Merck's prior motions incorporated therein from *Estate of Irvin v. Merck & Co., Inc.*, Case No. 05-4046, including: Memorandum in Support of Merck's Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation and the "Appendix of Studies" attached thereto, filed October 27, 2005, Docket No. 1116; Reply in Support of Merck's Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation, filed November 15, 2005, Docket No. 1392; and Merck's Opposition to Plaintiff's Motion to Exclude Opinion Testimony That Vioxx Cannot Cause Thrombotic Cardiac Events Unless Ingested 18 Months or Longer,

(*footnote continued next page*)

825024v.1

M00722577B

scientists conducted a pooled analysis of cardiovascular data from over two dozen randomized clinical trials that lasted longer than four weeks and that involved more than 28,000 patients and more than 14,000 patient years. This pooled analysis similarly revealed *no* statistically significant increased risk of cardiovascular adverse events for patients taking Vioxx, as compared to placebo or NSAIDs other than naproxen.[19] In addition, multiple observational studies have *failed* to find a statistically significant increased risk associated with the use of 25 mg Vioxx.[20] Contrary to plaintiffs' suggestion, the APPROVe data is fully consistent with the data from these and other clinical trials and observations studies.

### III.   CONCLUSION

Merck is entitled to refute plaintiff's causation argument, both by challenging plaintiff's evidence and by presenting expert testimony explaining why the available clinical studies, including APPROVe, refute plaintiff's theory. Plaintiff's criticisms of Merck's interpretation of the clinical data, specifically the data from the APPROVe study, are without merit. As plaintiff has failed to show that the results of the APPROVe study should somehow bar Merck from making its arguments on causation, the Court should deny plaintiff's Motion.

Dated:  August 21, 2006                                  Respectfully submitted,

                                                         /s/ Dorothy H. Wimberly
                                                         Phillip A. Wittmann, 13625

---

filed November 3, 2005, Docket No. 1206.

[19] See Konstam MA, et al., *Cardiovascular Thrombotic Events in Controlled, Clinical Trials of Rofecoxib*, CIRCULATION (Nov. 2001) 104(19):2280-2288; Weir MR, et al., *Selective COX-2 Inhibition and Cardiovascular Effects: A Review of the Rofecoxib Development Program*, AM. HEART J. (Oct 2003) 146:591-604.

[20] See, e.g., Juni, P., et al., *Risk of cardiovascular events and rofecoxib: cumulative meta-analysis*, THE LANCET (2004) 364:2021-2029; W. Ray et. al, *Cox-2 selective non-steroidal anti-inflammatory drugs and the risk of serious coronary heart disease: an observational cohort study*, THE LANCET (2002) 360:1071-73 ("there was no evidence of a raised risk" of coronary heart disease in patients taking Vioxx "at doses of 25 mg or less" over an average of nearly one year).

825024v.1

M0072255779

Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
Carrie A. Jablonski
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

Richard B. Goetz
Ashley A. Harrington
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:      213-430-6407

And

Douglas R. Marvin
Robert A. Van Kirk
M. Elaine Horn
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:      202-434-5029

Attorneys for Merck & Co., Inc.

825024v.1

M0072225780

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Opposition of Merck to Plaintiff's Motion to Exclude Argument or Opinion Testimony That an Increased Risk of Heart Attack Exists Only After 18 Months of Vioxx Use has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 21st day of August, 2006.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

825024v.1

M007225781