UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL DOCKET No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L - DIVISION 3 |
| | * | |
| This document relates to<br>CASE NO. 2:05CV2524 | * | JUDGE FALLON |
| | * | |
| | * | |
| ANTHONY WAYNE DEDRICK, | * | MAG. JUDGE KNOWLES |
| an Individual, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |

---

## PLAINTIFF'S OPPOSITION TO MERCK'S MOTION
## FOR ORDER EXCLUDING TESTIMONY OF LEMUEL MOYÉ, M.D., PH. D.

---

Plaintiff, by and through his attorneys, files this brief in opposition to *Merck's Motion to Exclude the Opinion Testimony of Lemuel Moyé, M.D., Ph. D.* As outlined below, Dr. Lemuel Moyé is qualified to proffer each of the opinions challenged in Merck's motion. Indeed, this Court has already allowed Dr. Moye to testify in *Barnett v. Merck & Co.* and *Smith v. Merck & Co.*

## I.    STATEMENT OF THE FACTS

This action for personal injuries arises from Plaintiff Anthony Dedrick's use of Vioxx, which caused a heart attack on January 8, 2003, and resulting damage to his heart,

necessitating coronary artery bypass surgery five days later.  Mr. Dedrick was approximately 47 years old when he was prescribed Vioxx by his physician in July 2002, and he had been taking the drug for approximately 6 months at the time of his heart attack.

Plaintiff contends that his heart attack was caused by a clot in one of his coronary arteries which resulted from a plaque rupture as well as the acceleration of atherogenesis due to Vioxx use.  Dr. Esmeraldo Herrera, Mr. Dedrick's treating physician, testified that had Merck disclosed the known risks of Vioxx he would not have prescribed Vioxx to Mr. Dedrick.  However, because Dr. Herrera was unaware of the risks of Vioxx, and Merck failed to disclose and warn what it knew regarding the dangers of Vioxx, Mr. Dedrick continued to take the drug even after his heart attack, until June 2003.

As a result of the heart attack and 4-way bypass surgery at the early age of 47, Mr. Dedrick suffers from permanent damage to his heart, which has reduced his life expectancy.  In addition, he is now at a much greater risk of suffering another heart attack, and the bypass surgery has placed him at a greater risk for heart failure.

## II.   DR. MOYÉ'S QUALIFICATIONS AND OPINION SUMMARY

### A.   Summary of Dr. Moyé's Qualifications

Dr. Moyé is a Professor of Biostatistics at the University of Texas School of Public Health in Houston.  *See* COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D. ("Moyé Rpt.") at ¶ 2, attached hereto as Ex. A.  Dr. Moyé, a medical doctor and Ph.D. in Biostatistics, actively practiced medicine from 1979-1992, and continues to hold active licenses in Texas and Indiana.  *Id.*  Dr. Moyé has carried out cardiovascular research, and designed, executed, and analyzed clinical trials for over nineteen years, and continues to do so today.  *Id.* at ¶ 3.  Dr.

2

Moyé has been the Principal Investigator of numerous clinical trials including one that involved over 4,159 patients who were followed for five years. *Id.* As a Principal Investigator of a trial, Dr. Moyé has been responsible for collecting and reporting adverse events to the sponsor as well as the FDA. *Id.* In his capacity as a Principal Investigator of clinical trials, Dr. Moyé has had instruction in FDA regulations.

Dr. Moyé's work has resulted in over 120 articles being published in numerous scientific journals, including *The New England Journal of Medicine* and *The Journal of the American Medical Association. Id.* Dr. Moyé has authored six books, such as *Statistical Reasoning in Medicine – The Intuitive P value Primer* (2000), *Difference Equations with Public Health Applications* (2000), *Multiple Analysis in Clinical Trials: Fundamental for Investigators* (2003), among others. Moyé Rpt. ¶ 6.

Dr. Moyé serves as the statistician/epidemiologist on the FDA's Cardiovascular and Renal Drug Advisory Committee. *Id.* at ¶ 17. In addition, Dr. Moyé serves as a statistical consultant for the FDA, and most recently completed a two-year term on the FDA's Pharmacy Sciences Advisory Committee. *Id.* ¶¶ 14 & 18.

In relation to this case, Dr. Moyé has devoted approximately 250 hours to reviewing the scientifically relevant literature on Vioxx and other NSAIDs. *See* June 2, 2006 Deposition of Lemuel A. Moyé ("Moyé Dep."), at 35:2-20, attached hereto as Ex. B. Dr. Moyé's report includes a list of 63 of these publications, studies, reports and other documents. Moyé Rpt., ¶¶ 106-118, 123-153. These materials include, but are not limited to, the following: (1) VIGOR (Moyé Dep., 373:4-9; *see also* Moyé Rpt., ¶¶ 109-118); (2) Protocol 090 (Moyé Dep., 373:14-374:4; *see also* Moyé Rpt., ¶¶ 29, 41); (3) ADVANTAGE (Moyé Rpt., ¶¶ 44, 55, 123; (4) meta-analysis by Dr. Deborah Shapiro (October 18, 2000) (evaluating the effect of Vioxx verses

NSAIDS) (Moyé Rpt., ¶¶ 40, 53); (5) VIP study (Moyé Rpt., ¶¶ 54, 125); (6) VICTOR (Moyé Rpt., ¶ 57, 124); (7) Alzheimer's studies (Moyé Rpt., ¶ 126); and (8) APPROVe (Moyé Rpt., ¶¶ 127-144); and (9) the Solomon study (Moyé Rpt., ¶¶ 145-149).  Dr. Moyé's report exceeds 100 pages and provides a detailed analysis of the various studies addressing the cardiovascular effects associated with Vioxx and other NSAIDs.

**B.      Summary of Dr. Moyé's Opinions**

Based on his education, training, research, experience and review of peer-reviewed medical literature, Dr. Moyé expects to offer the following opinions:

- Vioxx, designed to reduce pain while avoiding gastrointestinal effects, was a therapy with a foreseeable design defect, and whose risks exceeded its benefits.  Studies, before and after approval, indicated that the drug demonstrated no better analgesic effect than commonly used, inexpensive NSAIDs and that the harmful gastrointestinal effects of Vioxx exceeded placebo.  Moyé Rpt. ¶ 23.

- Vioxx produces cardiovascular disease through:  1) elevations in blood pressure adds to the force of atherosclerotic disease development; and 2) the selective inhibition of the Cox-2 prostanoid synthesis destabilizes the blood's delicate clotting balance, producing catastrophic thrombotic events in the heart, and other end organ vasculature.  Moyé Rpt. ¶ 24.

- Vioxx is unsafe at any dose/duration combination in any patient regardless of the underlying risk for cardiovascular disease.  Moyé Rpt. ¶ 25.

- The use of Vioxx is unjustified in patients who suffer from chronic pain of rheumatoid arthritis or osteoarthritis.  The use of a medication that causes death through its combined thrombotic, hypertensive effects is unjustified in patients who suffer from painful, chronic, but non-lethal illnesses.   These patients because of their age and high background risk of atherosclerotic cardiovascular illness are at greater risk of vessel-occlusive attack by this drug.  During the appearance of study after study, which confirmed the pre-approval suspicions that Vioxx would be dangerous for the cardiovascular system, Merck continued to defend the drug and market the drug with no additional warnings for its profound cardiovascular effects.  Moyé Rpt. ¶ 26.

- There was and is no justifiable basis for Merck to suggest that the difference in CV events between the two test groups in VIGOR could be explained by same cardioprotective effect of Naproxen.  Moyé Rpt. ¶ 119-122.

4

## III.   ARGUMENT

### A.   Legal Standard

*Daubert v. Merrell Dow Pharmaceuticals,* 113 S. Ct. 2786 (1993) and its progeny,[1] provides that the district judge is the "gatekeeper who must pass on the reliability and relevance of proffered evidence pursuant to Federal Rule of Evidence 702."[2] Rule 702 reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experiences, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. The Rule "not only requires that the testimony be relevant, but also that it be based on sufficient facts or data, that it be the product of reliable principles and methods, and that the witness applied those principles and methods reliably to the facts of the case."[3]

*Daubert* sets forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. *Id.* Whether some or all these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony. *Kumho Tire,* 526 U.S. at 138. Additional factors the trial court may consider include: (1) whether the expert's opinion is based on incomplete or inaccurate dosage or

---

[1] *General Electric Co. v. Joiner*, 118 S. Ct. 512, 517-519 (1997), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).
[2] MANUAL FOR COMPLEX LITIGATION § 472 (4th ed. 2004).
[3] MANUAL FOR COMPLEX LITIGATION § 484 (4th ed. 2004).

duration data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5) whether the expert proposes to testify about matters growing directly out of research he or she has conducted independent of the litigation. *Black v. Food Lion, Inc.,* 171 F.3d 308, 312-313 (5th Cir. 1999); *Christophersen v. Allied-Signal Corp.,* 939 F.2d 1106, 1114 (5th Cir. 1991); *Newton v. Roche Labs., Inc.,* 243 F.Supp.2d 672, 678 (W.D. Tex. 2002),.

### B.      Dr. Moyé Is Qualified To Offer Opinions That Vioxx is Unsafe at Any Dose.

Merck argues Dr. Moyé cannot testify that Vioxx is unsafe at any dose because he has no personal knowledge in prescribing Vioxx.  Merck Memo., p. 4.  In essence, Merck argues that Dr. Moyé is unqualified to testify about Vioxx's risks versus its benefits because he has not prescribed the drug for patients.  This argument misses the point of Dr. Moyé's testimony on this issue.

Dr. Moyé opines that Vioxx's risks outweigh any potential benefits, is unsafe, at any dose from an epidemiologic perspective.  The upshot of Dr. Moyé's testimony is that the available Vioxx studies and data reveals that the purported improvement over other pain relievers in terms of decreased gastrointestinal side effects is not so great to justify exposing patients to the significant increase in cardiovascular risks.  Moyé Report ¶¶ 23, 25, 27-60, 166-173.  Moreover, stomach problems are not nearly as great a concern for patients as a heart attack or stroke.  *Id.* at ¶¶ 171-72.  And Dr. Moyé is well-qualified to render these opinions.

As Dr. Moyé explains in paragraph 16 of his report, he has taken part in both observational and experimental research studies where he was an investigator for the

pharmaceutical industry.  In that role, he participated in discussions assessing the safety and effectiveness of the medication at issue, with an emphasis on whether the balancing of the health advantages and disadvantages warranted its use. *Id.* at ¶ 16.  In addition, Dr. Moyé has published in this area.

In addition to that, at paragraph 17 of his Report, Dr. Moyé explains how, during his work as part of the Cardio-Renal Advisory Committee to the F.D.A., he, along with other members, were asked to weigh the advantages and disadvantages of medications presented to the committee for approval for marketing in the United States.  Dr. Moyé walked through this analysis and the attributable risk (a statistical and epidemiologic standard) as part of the Risk-Benefit Analysis portion of his opinions at paragraphs 27 through 38.  For the reasons cited above, Dr. Moyé is qualified to offer these opinions and furthermore, brings to this epidemiologic foundation the perspective of a currently licensed physician and doctor who performs risk analysis with his colleagues in his assignments for the F.D.A.

**C.    Dr. Moyé is Qualified to Offer Opinions as to the Mechanism By Which Vioxx Causes Injury, and His Opinion is Based on Reliable Scientific Methodology.**

Merck argues that Dr. Moyé is unqualified to render opinions about the mechanism by which Vioxx causes heart attacks and similar events, and that this opinion thereon is based on an unreliable methodology.  The facts, however, wholly belie this contention.

Dr. Moyé is currently a full time Professor in biostatistics and epidemiology at the University of Texas School of Public Health.  Dr. Moyé's qualifications and expertise are similar to that of Dr. Wayne Ray, previously qualified by this Court in the area of epidemiology, clinical study risk analysis, and general causation. *See Plunkett v. Merck & Co., Inc.*, 401 F. Supp. 2d 565 (E.D. La 2005).

7

Dr. Moyé is both an epidemiologist and a medical doctor.  He received a Ph.D. in biostatistics from the University of Texas, an M.S. in statistics from Purdue, an M.D. from Indiana University, and a B.S. in mathematical sciences from Johns Hopkins.  Moyé Rpt., ¶ 19. Dr. Moyé has some 19 years of experience in cardiovascular research.  *Id.* at ¶ 3.  He has extensive experience in consulting for pharmaceutical entities, the FDA and National Institute of Neurology Disorders and Strokes.  *Id.* ¶¶ 3-4.  Dr. Moyé is a co-researcher on a government-funded grant on atherosclerotic disease.  *Id.* ¶ 4.

Like Dr. Wayne Ray in *Plunkett*, Dr. Moyé's career has involved pharmacoepidemiologic and epidemiologic investigations that concern the risk of cardiovascular events, neurological events and atherosclerotic events.  *See generally* Moyé Curriculum Vitae; *Plunkett,* 401 F.Supp. 2d at 41-44.[4]  More specifically, Dr. Moyé's career has been based around investigations that concern the adverse and beneficial effects of medication.

It is with this expertise, knowledge and experience that Dr. Moyé presented his analysis of Vioxx in his report and deposition testimony.  In both, Dr. Moyé made clear that he reviewed and analyzed the scientifically relevant literature surrounding Vioxx, and that a general theme running the data was that Vioxx can cause adverse cardiovascular effects.  Dr. Moyé's reliance on existing medical data for his opinions is noteworthy because Merck does not challenge his expertise in statistical interpretation of medical data.  Merck Memorandum, p. 1.  Merck also acknowledges Dr. Moyé is a Professor of Biostatistics and Epidemiology, and is experienced in designing and conducting clinical trials.  *Id.*  And of course, this Court recognizes that reliance

---

[4]  The only limitation in the Court's November 18, 2005 Order as to Dr. Ray was that he not opine as a medical doctor, since he was not an M.D.  Indeed, Dr. Ray offered no medical opinions.  The distinction here falls in favor of Dr. Moyé, who is an M.D. and was an invited member of the FDA's Cardio-Renal Advisory Committee at the time the coxibs, Celebrex and Vioxx, were applied for and approved for marketing beginning in the first half of 1999.

on relevant scientific data and studies is a proper methodology for arriving at causation opinions. *Plunkett*, 401 F.Supp.2d at 593.

Moreover, Dr. Moyé's mechanism of injury and general causation opinion is also based in large part on the so-called Fitzgerald hypothesis, of which this Court is well-versed. The Court noted in *Plunkett* that "the Fitzgerald hypothesis [] has been supported by numerous articles as well as recognized medical journals. Although Merck may disagree with the conclusions reached in the Fitzgerald hypothesis and supporting literature, a disagreement does not amount to improper methodology or scientifically unreliable data." *Plunkett*, 401 F.Supp.2d at 587. Thus, Merck's assertion that his opinions regarding causation lack scientific basis are meritless.

Nonetheless, Merck asserts that Dr. Moyé is unqualified to render opinions on causation and mechanism of injury because he is not a board certified cardiologist or pharmacologist. Again, Merck expressly admitted Dr. Moyé is qualified as an epidemiologist to discuss clinical study design, relative and attributable risk issues, and interpretation of medical data. The assertion that he must be a cardiologist or pharmacologist to testify that the data shows Vioxx can cause adverse cardiovascular events is nonsensical. This Court has rejected any such contention in allowing Dr. Ray to testify on this very issue. In any event, Dr. Moyé has been a duly licensed medical doctor in both the States of Texas and Indiana for 27 years, and spent 13 years as a treating physician before focusing on research and academia. He is also a diplomat of the national Board of Medical Examiners. Moyé Report ¶ 2.

Dr. Moyé also has 19 years experience in clinical trials that have dealt with cardiovascular events. He has been an investigator in this area and responsible for the collection of adverse events and adverse event reporting in clinical trials. He has written and lectured in the

area.  He has served as a member of the FDA's Cardiovascular Renal Advisory Committee.  He is a Professor of epidemiology and biostatistics.  He has published peer-reviewed papers in this area.  He has authored books that deal with clinical trial design and assessment.  Most significantly, he has consulted for and been hired by pharmaceutical companies in this area.  As Merck knows, Dr. Moyé has extensive training and experience carrying out cardiovascular trials.

### D.   Dr. Moyé is Qualified to Offer Opinions About Vioxx As Compared to Other Cox-2 Inhibitors.

Merck contends that Dr. Moyé is not qualified to offer opinions about Vioxx as compared to other COX-2 inhibitors, and even goes so far as to represent that he "admitted" he was not so qualified.  See Merck Memorandum, at 9.  What Merck contends and represents, however, are at odds with the facts.

The thrust of Merck's argument is that because Dr. Moyé does not "rank order" the other COX-2 inhibitors versus Vioxx, in terms of potential CV risk, he has no basis to opine Vioxx has the greatest CV risk.  As such, Merck argues, Dr. Moye's should be precluded from disagreeing with the FDA's inability, as stated in a 2005 FDA memorandum, to "rank order" the COX-2's.  This, yet again, misses the point:  Dr. Moyé need not rank, for example, Celebrex number 2, and Bextra number 3, but only needs a sufficient basis to opine that Vioxx is the worst of all.  And he makes abundantly clear in his deposition that he reviewed all the relevant scientific literature, and relied on his own knowledge and experience to opine that Vioxx is the worst of all:

> Q.  Okay.  You also mentioned here today that while you haven't reviewed every NDA or every study concerning Bextra or Celebrex, you've looked at those generally with respect to their relationship with Vioxx?
>
> A.  Yes.  And having reviewed all the FDA, the 2005 Advisory Committee meeting, I certainly read about -- I read their discussion of the data.
>
> Q.  And we know that Celebrex remains on the market, right?

A.   Yes.

Q.   And Bextra has been removed from the market?

A.   That's correct.

Q.   And Vioxx has been removed from the market?

A.   Yes.

Q.   Would it be fair to say that based upon the studies that you have reviewed, looking at those drugs, that Vioxx was the worst of those COX-2 inhibitors?

A.   I would say not just based on those studies, but based on my understanding of the role of the – the differential role of COX-1, COX-2, that Vioxx is the worst.   That's my understanding as I sit here today.

Moyé Deposition, p. 393:1-394:18.[5]

Merck's position on "rank order" of COX-2s and the 2005 FDA memorandum is also hypocritical.[6]   Dr. Moyé has reviewed the same material Merck's experts reviewed but reached a different conclusion.   This Court repeatedly emphasizes that Merck may disagree with Dr. Moyé's conclusions, but mere disagreement does not render his methodology unreliable. *Plunkett*, 401 F. Supp. 2d at 587.

Merck further argues that because Dr. Moyé is not a pharmacologist, he cannot compare Vioxx with other COX-2 inhibitors.   See Merck Memorandum at 9-10.   This Court, however, already addressed this issue in connection with expert challenges made by the plaintiff and Merck prior to the *Irvin I* trial.   For example, with respect to the Plaintiff's challenge to one of

---

[5] Dr. Moyé also opines Vioxx poses a greater CV compared to all other NSAIDs.   Moyé Dep., 368:22-369:9; 371:22-372:2; 372:17-373:3; 394:4-18.

[6] As the Court is aware, it is the Plaintiff's contention that the FDA Memorandum lacks scientific reliability due in part to the significant analytical gap between the data relied on by the FDA and the FDA's conclusions. *Joiner*, 522 U.S. at 146.   The FDA acknowledges in its Memorandum that it lacks data to draw final conclusions regarding the cardiovascular risks of NSAIDs.   The reasoning and methodology underlying the conclusions in the Memorandum have not been tested, peer-reviewed, published, or generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-95.

Merck's experts, Dr. David Silver, the Court stated: "[Dr. Silver] has reviewed all the relevant literature and studies.  If the Plaintiff wishes to attack Dr. Silver because he is not a cardiologist, pharmacologist, biostatistician, neurologist, regulatory expert, hematologist/clot expert, or pharmacoepidemiologist, she will be allowed to do so on cross-examination." *Plunkett*, 401 F.Supp.2d at 582.   If Merck contends that Dr. Moyé does not understand or cannot compare the cardiovascular effects of Vioxx and other COX-2 inhibitors due to an alleged lack of practical experience with COX-2 inhibitors, Merck will be able to address those concerns on cross-examination.  *Plunkett*, 401 F.Supp.2d at 584 ("To the extent that Merck asserts that [Winston Gandy, Jr., M.D.] does not understand Vioxx and its alleged effects, Merck will be able to attack Dr. Gandy at cross-examination much like it did at his deposition.").

In any event, Merck forgets Dr. Moyé spent 250 hours reviewing the relevant scientific literature on Vioxx and other NSAIDs.  Moyé Dep., 35:2-20.  Dr. Moyé's report includes a list of 63 of these publications, studies, reports and other documents.  Moyé Rpt., ¶¶ 106-110.  Dr. Moyé's report exceeds 100 pages and provides a detailed analysis of the various studies addressing the cardiovascular effects associated with Vioxx and other NSAIDs.  He specifically describes the data that supports his conclusions and provides a detailed analysis of the COX system, demonstrating his clear understanding of COX-2 inhibitors.  Moyé Rpt., ¶¶ 70-82.

Furthermore, in formulating his opinion that Vioxx poses a greater cardiovascular risk as compared to other COX-2 inhibitors, Dr. Moyé relied upon his own training, knowledge, and experience in the areas of biostatistics and epidemiology.  There is no question that Dr. Moyé possesses the qualifications to testify as an expert in these areas.  Furthermore, Dr. Moyé's vast experience with clinical trials qualifies him to testify regarding the various trials which have

addressed the adverse and beneficial effects of NSAIDs.[7]  This experience includes post approval marketing safety surveillance, data safety monitoring, the drug approval process, and interpretation of adverse drug effects.  His experience with determining drug risks and benefits includes his work on multiple DSMBs (data safety monitoring boards), consulting with pharmaceutical companies, his experience as a practicing physician, his work with the FDA Cardiovascular Renal Advisory Committee,[8] and epidemiologic lectures at the University of Texas School of Public Health.

> **E.    Dr. Moyé Is Qualified to Opine That the Authors of VIGOR Failure To Update Article With Safety Data Was Scientific Misconduct.**

Merck argues that Dr. Moyé should not be allowed to offer the opinion contained in paragraph 108 of his report.  Though Merck points to only a portion of the opinion, in full it reads as follows:

> Neither the VIGOR authors nor the sponsors updated the data in the article that appeared in the *New England Journal of Medicine* in November 2000 with the new safety data, a critical ethical omission.  Even if one accepts that the occurrence of the three additional heart attacks did not occur before the pre-specified data cut-off date, the three events were known in August 2000, several months before the appearance of the manuscript in the *New England Journal of Medicine* in November 23, 2000.  It would have been easy for the investigators to add a statement in this manuscript, acknowledging the three additional cardiovascular events, and in addition, providing computations for the updated risk of cardiovascular events caused by rofecoxib.  *The New England Journal of Medicine* was concerned enough about this omission that they published an Expression of Concern.

Moyé Report ¶ 116.

---

[7] Dr. Moyé has acted as an investigator in large clinical trials in which one of his primary responsibilities was collecting adverse events that occurred in patients who were taking drugs in post marketing studies (the SAVE study, 1987-1992, and the CARE study, 1989-1996).  Moyé Curriculum Vitae, p. 22.

[8] Dr. Moyé's service on the Cardiovascular Renal Advisory Committee involved discussion and voting on whether the contemplated drugs were safe and effective.  This necessarily involved risk-benefit assessment.

Dr. Moyé has published over 120 articles in peer-review journals, including *The New England Journal of Medicine* (NEJM). Dr. Moyé is familiar with the standards of the *The New England Journal of Medicine.* Since 2000, Dr. Moyé has been a co-author of an article published in NEJM. Dr. Moyé has served as a journal reviewer for NEJM. In addition, Dr. Moyé has reviewed manuscripts for the following journals: *Lancet, Journal of Clinical Epidemiology, Journal of the American Statistical Association, Biometrics, Controlled Clinical Trials, Journal of Biopharmaceutical Statistics, Journal of Applied Literature, PharmacoEconomics, American Journal of Epidemiology, Statistics in Medicine, Circulation, American Family Physicians*, and *Atherosclerosis.* Based on these credentials, Dr. Moyé is more than qualified to opine that in regard to VIGOR the additional three heart attacks in question should have been included in the manuscript prior to publication, given the fact that heart attacks were known months prior to publication. Dr. Moyé's on this point is clearly relevant.

### F. Dr. Moyé's Opinions About the 1999 Vioxx Label and Whether Vioxx's 2002 Label Should Have Had a Black Box Warning Is Relevant and Proper.

Merck does not dispute that Dr. Moyé is well-qualified to render opinions about the veracity and completeness of Vioxx's 1999 and 2002 labels. Indeed, it cannot. Dr. Moyé's has vast experience with clinical trials, with post approval marketing safety surveillance, with data safety monitoring, with the drug approval process, and with the interpretation of adverse drug effects. His experience with determining drug risks and benefits includes his work on multiple data safety monitoring boards, consulting with pharmaceutical companies, his experience as a practicing physician, and his work with the FDA's Cardiovascular Renal Advisory Committee. As an investigator for several clinical trials, Dr. Moyé was responsible for reporting adverse events that occurred in patients taking drugs in post-marketing experiences. During meetings of

14

the Cardiovascular Renal Advisory Committee, Dr. Moyé, as an FDA consultant, was specifically asked questions about drug labeling. *See* Moyé Dep., 112, 115, 157-158. Dr. Moyé is clearly qualified to evaluate a drug label and to opine when the label misstates or is insufficient to communicate the risks associated with the drug.

Rather than challenging these qualifications, Merck argues that testimony about the 1999 label is "irrelevant" to this case because Mr. Dedrick took Vioxx after the 2002 label change. This case, however, cannot be viewed in a vacuum of Merck's choosing. The 1999 label is relevant to the 2002 label because they both suffer the same defect from the same source: incomplete and false information regarding the true nature and scope of Vioxx's CV risk, due to Merck's refusal to be truthful about Vioxx's dangers. Both the 1999 and 2002 labels fail to inform physicians and patients that Vioxx increases the risk of an adverse cardiovascular event for all persons, not just patients already at increased risk for a CV event. Both labels fail to disclose that the cardiovascular risks associated with Vioxx are immediate and occur at all doses. Both labels fail to clearly communicate the breadth of scientific data in Merck's possession regarding the CV dangers associated with the drug. Both the 1999 and 2002 labels are relevant to prove Plaintiff's claim that Merck's failed to warn physicians and patients, withholding critical safety data from prescribers and those taking the drug.

### G. Dr. Moyé's Testimony Regarding Merck's Knowledge Of The Cardiovascular Risks Posed By Vioxx Is Admissible As It Addresses Issues Of Notice, Not Corporate Intent Or State Of Mind.

Merck seeks an order from the Court precluding the introduction of "motive and intent" testimony through Dr. Moyé. Plaintiff does not intend to solicit testimony from Dr. Moyé regarding the motive and intent behind Merck's actions or inactions. However, in preparing his report, Dr. Moyé examined numerous documents produced by Merck during discovery,

including internal studies, reports, e-mails and other communications that address Vioxx's cardiovascular risks. Dr. Moyé's extensive knowledge and expertise of FDA procedures, regulations, and regulatory guidelines, as well as his first hand knowledge of a pharmaceutical company's obligations regarding disclosure regarding their drugs, qualify him to explain to the jury what Merck knew or should have known about the risks associated with Vioxx based on these documents.

The Court previously ruled that experts can testify regarding "what information was available, what studies were available, what was known in the medical community, what Merck knew, studies they conducted, reports they prepared, e-mails indicating what they knew about this situation may be germane, what Merck did, whether it was consistent with the pharmaceutical and medical community, what was given to the FDA, what should have been given to the FDA." See Transcript of November 16, 2005 Hearing, at 29-30. Furthermore, the Court ruled that Dr. Richard M. Kapit and Dr. Janet Arrowsmith-Lowe could offer guidance to the jury regarding the meaning and significance of the voluminous materials, including Merck's internal communications, which demonstrate Merck's knowledge of the cardiovascular risks associated with Vioxx. *Plunkett*, 401 F.Supp.2d at 578, 595. Given his undeniable qualifications and extensive review of the relevant documents, Dr. Moyé is entitled to do the same. The sheer complexity and volume of these materials necessitates the testimony of Dr. Moyé, whose specialized knowledge and expertise will undoubtedly assist the jury in understanding the issues.

In addition to Dr. Moye being qualified to render opinion testimony regarding what was known and knowable by Merck during the time that Vioxx was being developed and marketed, such testimony is crucial to assist the jury on this critical issue. Not only is this testimony relevant and material to Plaintiff's claim, but also is valid impeachment testimony. Without the

16

assistance of a qualified expert it would be difficult for a jury to sift through the enormous technical, scientific literature and documentary evidence and seine out what was known and knowable at the relevant time.  Therefore, such testimony is valid to impeach Merck's claim that the cardiovascular risk of Vioxx was unknown and unknowable, and Dr. Moye is qualified to provide this testimony.

Merck's objections to Dr. Moyé's testimony are also premature.  In order to judge the appropriateness of Dr. Moyé's testimony regarding Merck's knowledge, the testimony needs to be placed in the proper context.  The Court previously deferred its ruling on Merck's challenge to Professor Wayne Ray's qualifications to testify as to what Merck should have done or as to Merck's state of mind.  *Plunkett*, 401 F. Supp. 2d at 587.  At a minimum, the Court should do the same with respect to Dr. Moyé's opinions regarding what Merck knew or should have known about the cardiovascular risks associated with Vioxx.

### H.      Dr. Moyé's Opinions That Merck Misled The FDA Are Not Preempted.

Merck argues that any testimony that Merck misled the FDA is preempted by *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001).  This Court has already addressed this issue and ruled that *Buckman* is not applicable under these circumstances.  *Plunkett*, 401 F.Supp.2d at 587, 595 ("*Buckman* is not applicable to this case  . . . at all.").  During the November 15, 2005 *Daubert* hearing in *Irvin*, the Court stated as follows:  "I see *Buckman* as a different case, frankly.  That was a direct fraud on the FDA.  I don't get any help from *Buckman* in this particular case."  Transcript of November 15, 2005 Hearing, p. 34.  As in *Irvin*, there is not a claim of fraud on the FDA in the present case.  The Court's prior ruling on this issue is applicable.

IV.     **CONCLUSION**

For these reasons, Plaintiff urges the Court to deny Merck's motion for an order excluding the testimony of Lemuel A. Moyé, M.D., Ph. D.

Respectfully submitted this _7th_ day of November, 2006.

_____
**ANDY BIRCHFIELD**
P. LEIGH O'DELL
Attorney for Plaintiff
***BEASLEY, ALLEN, CROW,***
***METHVIN, PORTIS & MILES, P.C.***
234 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103
(334) 269-2343 telephone
(334) 954-7555 facsimile

18

**Russ M. Herman** (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
**Plaintiffs' Liaison Counsel**

**Christopher A. Seeger**, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
& WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiff's Opposition to Merck's Motion for Order Excluding Testimony of Lemuel Moyé, M.D., Ph.D. has been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail or by hand delivery and e-mail, on Merck's Counsel, Douglas R. Marvin and Philip S. Beck,  by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this _7th_ day of November, 2006.

                                 _____

                                 Andy D. Birchfield
                                 Attorney for Plaintiff
                                 Beasley, Allen, Crow,
                                 Methvin, Portis & Miles, P.C.



11635568

Jun 26 2006
6:26PM

# EXHIBIT  A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| *COORDINATION PROCEEDING* | ) DOCKET NO. 2:06-cv-00485-EEF-DEK_____ |
| | ) |
| SPECIAL TITLE [Rule 1550(b)] | ) MDL NO. 1657 |
| | ) |
| IN RE VIOXX® CASES | ) SECTION: L |
| _____ | ) |
| GERALD D. BARNETT and CORINNE | ) JUDGE FALLON |
| BARNETT, | ) MAG. JUDGE KNOWLES |
| | ) |
| | ) |
| Plaintiffs, | ) |
| vs. | ) |
| MERCK & COMPANY, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |

COX-2 Inhibitor Report of
## Lemuel A. Moyé, M.D., Ph.D.

May 22, 2006



**PLAINTIFF'S**
**EXHIBIT**
*A*
tabbies

## Table of Contents

PERSONAL VITA

 PERSONAL VITA ............................................................................. 5

 DEGREES ......................................................................................... 5

 RESEARCH EXPERIENCE ............................................................... 5

 CURRENT ACTIVITIES .................................................................... 6

 MANUSCRIPTS ................................................................................ 6

 BOOKS ............................................................................................. 6

 PRESENTATIONS ............................................................................. 7

 TEACHING ....................................................................................... 7

 INVITED LECTURES ........................................................................ 7

 CONSULTATIONS ............................................................................ 7

 GRANT REVIEW .............................................................................. 8

 MONITORING BOARDS .................................................................. 8

 FDA APPEARANCES FOR SPONSORS ........................................... 8

 FDA SERVICE .................................................................................. 8

 RECENT PUBLICATIONS ................................................................ 9

 RISK BENEFIT EXPERIENCE ......................................................... 9

 CARDIORENAL COMMITTEE MEETINGS ..................................... 9

 FDA SERVICE .................................................................................. 10

 EDUCATION .................................................................................... 10

 BASIS OF OPINIONS ....................................................................... 10

 FEES ................................................................................................ 10

 PREVIOUS TESTIMONY ................................................................. 10

SUMMARY OF OPINIONS ....................................................................... 11

RISK-BENEFIT ANALYSIS ...................................................................... 13

ADVERSE EFFECTS ................................................................................. 17

 ROFECOXIB AND STROKE ............................................................. 20

 HYPERTENSION ............................................................................. 23

 BACKGROUND BIOCHEMISTRY ................................................... 24

 BIOCHEMISTRY OF COX-2 INHIBITION ...................................... 24

 THE ROLE OF ENZYMES ................................................................ 24

 THE PROSTAGLANDIN SYSTEM ................................................... 25

COX-1 AND COX-2 .................................................................................... 28

INADEQUATE TESTING ........................................................................... 32

    CLINICAL STUDIES ............................................................................. 37

    THE VIGOR TRIAL ............................................................................... 38

    POSSIBLE PROTECTIVE EFFECT OF NAPROXEN ......................... 42

    ADVANTAGE ........................................................................................ 43

    VICTOR ................................................................................................. 44

    VIP ......................................................................................................... 44

    ALZHEIMER STUDIES ........................................................................ 45

    APPROVE .............................................................................................. 45

FAILURE TO WARN .................................................................................. 60

    FDA EXPERTISE .................................................................................. 60

    ROLE OF FDA ...................................................................................... 61

    MODERIZATION ACT ......................................................................... 62

    COLLABORATION .............................................................................. 62

    ADVISORY COMMITTEES ................................................................. 63

    DECISION PROCESSES ...................................................................... 64

    MATERIAL INFORMATION ............................................................... 64

    ADVERSE EVENTS ............................................................................. 65

    LABELING ............................................................................................ 65

MISLEADING THE FDA ............................................................................ 70

APPENDIX A: STATISTICAL REASONING IN MEDICINE ................. 74

    SAMPLING ERROR AND SIGNIFICANCE TESTING ..................... 75

    STATISTICAL POWER ........................................................................ 77

    SAMPLE SIZE COMPUTATIONS ...................................................... 78

APPENDIX B: DETERMING CAUSALITY IN MEDICINE ................... 79

    LIMITATIONS OF CASE REPORTS .................................................. 82

APPENDIX C: DETECTING ADVERSE EVENTS .................................. 85

    DETECTING ADVERSE EVENTS: COMPLICATION IN SAFETY MONITORING .......... 85

    STRATEGY 1: MONITOR WIDELY .................................................. 88

    STRATEGY 2: ASSESSING UNANTICIPATED ADVERSE EVENTS ............... 89

APPENDIX D: SUBGROUP ANALYSES .................................................. 93

    SUBGROUPS: DEFINITIONS AND BASIC CONCEPTS ................. 94

    SUBGROUPS VERSUS SUBGROUP STRATA .................................. 94

SUBGROUPS: INTERPRETATION DIFFICULTIES ........................................................... 95

RANDOM SUBGROUPS.................................................................................................. 97

PROPER VERSUS IMPROPER SUBGROUPS ..................................................................... 98

INTENTION-TO-TREAT" VERSUS "AS TREATED" SUBGROUP ANALYSES............... 98

EFFECT DOMINATION PRINCIPLE ................................................................................. 100

MANUSCRIPT INTERPRETATION ................................................................................... 102

REFERENCES ...................................................................................................................... 107

## Personal Vita

1.  *Personal Vita*: My name is Lemuel A. Moyé. I am over twenty-one years of age, am of
    sound mind, am not a party to this action, have never been convicted of a felony, and am
    otherwise competent to make this affidavit. I have personal knowledge of all factual
    statements contained herein, and all such factual statements are true and correct to the
    best of my knowledge.

2.  *Degrees*: I have a M.D. and a Ph.D. degree in Community Sciences - Biostatistics. I am a
    licensed physician in the states of Texas and Indiana, and I have actively practiced medi-
    cine from 1979-1992. I am a diplomat of the National Board of Medical Examiners. My
    formal training has included many courses in mathematical statistics, epidemiology, and
    biostatistics. I am currently a Professor of Biostatistics at the University of Texas School
    of Public Health in Houston, where I hold a full time faculty position in biostatistics.

3.  *Research Experience*: I have carried out cardiovascular research for nineteen years and
    continue to be involved in the design, execution and analysis of clinical trials. I have been
    Principal Investigator on a grant from Schering-Plough and have been Co-Principal In-
    vestigator on two grants from Bristol Myers-Squibb. In these studies, I was responsible
    for the design, execution, and analysis of these experiments. In one case, the experiment
    involved over 2000 patients who were followed for 3.5 years, and in the other case, 4159
    patients were followed for five years. In each of these enterprises, an important compo-
    nent of my responsibility was the reporting of adverse events from physicians. In one of
    these trials, I supervised the collection of adverse events that were reported to both the
    Sponsor and to the Federal Food and Drug Administration (F.D.A.). Each of these clini-

cal trials has resulted in several articles that were published in the Journal of the Medical Association and The New England Journal of Medicine, as well as other journals in the peer reviewed medical literature.

4. **Current Activities**: I am currently Principle Investigator and in charge of the biostatistics group that is carrying out research on the treatment of strokes, funded by the National Institute of Neurologic Disorders and Strokes. I am also a co researcher on a federally funded grant that is examining the influence of behavioral modification of risk factors for atherosclerotic disease.

5. **Manuscripts**: I have published over one hundred and twenty manuscripts in peer-reviewed literature that reflect my experience in the design, execution and analysis of clinical trials. Included among these manuscripts are papers that provide the mathematical development of tools that improve both the design and the execution of large-scale clinical trials

6. **Books**: I am the author of six books. I am the sole author of the book *Statistical Reasoning in Medicine—The Intuitive P value Primer*, published by Springer-Verlag in 2000. Marcel-Dekker published a second book, entitled *Difference Equations with Public Health Applications*, co-authored with a colleague, in October 2000. A third book of which I am sole author, entitled *Multiple Analysis in Clinical Trials: Fundamentals for Investigators*, was published by Springer-Verlag and appeared in the summer 2003. A fourth book titled *Finding Your Way in Science* was published in August 2004. A fifth book entitled *Mathematical Statistics with Applications* appeared in 2005. A sixth book entitled *Statistical Monitoring of Clinical Trials: Fundamentals for Investigators*; was released in the fall, 2005. The second edition of *Statistical Reasoning in Medicine—The In-*

*tuitive P value Primer* will appear in the summer of 2006. I am currently writing a book *Elementary Bayesian Biostatistics* to be published by Taylor and Francis, to appear during the summer of 2007. In addition I have authored invited book chapters and contributed articles to scientific encyclopedias.

7. *Presentations:* I have been an Investigator on four grants from the National Institutes of Health, involving the design, execution, and analysis of clinical trials and epidemiologic studies. Each of these has led to publications in the peer-reviewed literature. I have presented results of clinical research at over twenty different professional meetings, including a presentation in 2001 to the Drug Information Agency and a separate presentation at the International Joint Statistical Meetings. I have presented results at the International Joint Statistical Meetings in 2003, 2004, and 2005.

8. *Teaching:* I have consistently taught courses in biostatistics since my full-time appointment as a faculty member in 1987 at the University of Texas School of Public Health. In these courses, I have taught experimental design in clinical research studies, the statistical methodology that supports these design principles, the statistical analysis of clinical research programs, and the role of epidemiology in interpreting the conclusions from these clinical research programs. For 18 years, I have been a supervisory professor for students training in epidemiology, biostatistics, and other areas of public health.

9. *Invited Lectures:* I have given over thirty invited guest lectures on research methodology topics.

10. *Consultations:* I have served as a clinical trial consultant to Berlex, Proctor and Gamble, Marion Merrill Dow, Pfizer, Hoechst Roussel, Aventis, Key Pharmaceuticals, Coromed,

DuPont, Bristol Myers-Squibb, Novartis, Medtronics, Astra-Zeneca, CryoCor and Vasogen.

11. *Grant Review*: I have reviewed grants and/or data on over fifty different occasions on be-half of government research programs.

12. *Monitoring Boards*: I have served on three Data Monitoring Committees (DMC) that oversee the conduct of clinical trials, and most recently have been the chairman of a Data, Safety, and Monitoring Committee of a study sponsored by Bristol-Meyer-Squibb and Key Pharmaceuticals. I currently serve on three DMC's, one privately sponsored and two on NIH sponsored studies.

13. *FDA Appearances for Sponsors*: I have appeared before the F.D.A. on behalf of spon-sors on several occasions.

14. *FDA Service*: In addition to serving as a consultant with the pharmaceutical industry for seventeen years, I have also directly and overtly supported the F.D.A. I have served as a statistician/epidemiologist for four years on the Cardiovascular and Renal Drug Advisory Committee to the Food and Drug Administration. In this capacity, I have reviewed the data provided by pharmaceutical companies and an analysis of that data by the FDA to render opinions about the safety and effectiveness of these medical interventions being considered for FDA approval. In this capacity, I have formally reviewed over twenty clinical trial programs of private sponsors and commented in public testimony that is part of the Federal Registry. In some instances, a component of this review was direct evalua-tion, criticism and comment on the proposed product label by the Sponsor. I currently serve as a statistical consultant to the F.D.A., and most recently have been to a two-year term on the F.D.A. Pharmacy Sciences Advisory Committee.

15. *Recent Publications*:  I have published manuscripts as the sole author in each of the fol-
lowing journals:  *Controlled Clinical Trials*, and *Statistics in Medicine*. This work has
promulgated the philosophy (while advancing the supporting mathematics) that clinical
research interpretation must be disciplined and must explicitly hold the highest regard for
community protection from dangerous, false, and misleading results from clinical re-
search. I have been featured in health care articles in both *Money* magazine (December
1998) and *US News and World Report* (January 11, 1999). In 2000, an article, on which I
am the sole author, appeared in *Statistics in Medicine*, and it has generated important
published commentary in the peer-reviewed literature.

16. *Risk Benefit Experience*: I have taken part in research studies that have been both obser-
vational and experimental. In each of these studies, functioning as an investigator, I have
participated in discussions assessing the safety and effectiveness of the medication. This
assessment has not been based on complicated economic arguments, but instead places
emphasis on balancing the health advantages the therapy offers against the disadvantages
its use produces. I have published an article that computed the effectiveness and safety of
various strategies in the treatment of essential hypertension.

17. *CardioRenal Committee Meetings*: During the thrice-yearly meetings of the Cardio-
Renal Advisory Committee to the F.D.A., I, along with the other committee members,
have been asked to weigh the advantages and disadvantages of the medications presented
to us for approval. This assessment was not economic but a collective appraisal by physi-
cians and health care researchers of the relative clinical strengths and clinical weaknesses
of the intervention.

18. **FDA Service:** My service on the F.D.A. Advisory Committees, as well as my service to drug manufacturers, has given me specialized knowledge and experience concerning the F.D.A. policies, procedures and regulations as well as the corresponding duties of a reasonable and prudent drug manufacturer. In my service on behalf of sponsors to the F.D.A., and my service to the F.D.A. at Advisory Committee meetings, I have developed expertise, knowledge, education, training and experience in F.D.A. matters.

19. **Education**: My education consists of the following:

| Year | Degree | School |
|------|--------|--------|
| 1987 | Ph.D. Community Sciences -Biometry | University of Texas |
| 1981 | M.S. Statistics | Purdue University |
| 1978 | M.D. | Indiana University |
| 1974 | B.A. Mathematical Sciences | Johns Hopkins |

20. **Basis of Opinions**: I have gained scientific, technical, and specialized knowledge of biostatistics, epidemiology, and risk/benefit assessment. The basis for my opinions is derived from my education, training, research, experience, expertise, and review of the peer-reviewed medical literature.

21. **Fees**: My fees are $400 per hour for review of literature, documents, and $500 for depositions and trial testimonies.

22. **Previous testimony**: A list of previous testimony is attached as Appendix E.

## Summary of Opinions

23.   The Cox-2 inhibitor rofecoxib, designed to reduce pain while avoiding gastrointestinal ef-
fects, was a therapy with a foreseeable design defect, and whose risks exceeded its bene-
fits. Several studies, carried out both before and after rofecoxib was approved by the
FDA, demonstrated that rofecoxib's analgesic effect was no better than commonly used,
inexpensive nonsteroidal anti-inflammatory drugs. In addition, other studies demon-
strated the harmful gastrointestinal effects of rofecoxib produced more gastrointestinal
disease than placebo therapy. Thus, when released, Cox-2 inhibitors were not superior to
commonly used pain relievers for analgesia, nor were they free of gastrointestinal adverse
effects. Thus there was minimal benefit of these agents above and beyond the available,
inexpensive alternatives.

24.   Rofecoxib excites the production of cardiovascular disease. It produces this disease
through two mechanisms. First, rofecoxib's propensity to produce elevations in blood
pressure adds to the force of atherosclerotic disease development. In addition, its mecha-
nism of action, i.e., the selective inhibition of the Cox-2 prostanoid synthesis destabilizes
the blood's delicate clotting balance, producing catastrophic thrombotic events in the
heart, and other end organ vasculature. This adverse effect causes angina pectoris, nonfa-
tal heart attacks, fatal heart attacks, and the fatal syndrome known as sudden death.

25.   Rofecoxib is unsafe at any dose/duration combination in any patient regardless of their
underlying risk for cardiovascular disease. The harmful cardiovascular effects of rofe-
coxib have been demonstrated repeated. These dangerous adverse consequences occur in
patients on both low dose and high dose rofecoxib. They occur in short durations of ther-

apy, as well as in patients exposed for many months to the drug. In addition, these cardiovascular side effects occur in patients who are at low risk for cardiovascular disease, as well as in patients who are at high risk for cardiovascular disease. Rofecoxib is a defective product. In addition, based on the data, it is more reasonable than not that rofecoxib causes cerebrovascular accidents or strokes.

26.  The use of rofecoxib is unjustified in patients who suffer from the chronic pain of rheumatoid arthritis or osteoarthritis. Although each of these chronic conditions produces substantial pain, they are not deadly. The use of a medication that causes death through its combined thrombotic, hypertensive effects is unjustified in patients who suffer from the painful, chronic, but non-lethal illnesses which are the drug's indications. These patients, because of their age and high background risk of atherosclerotic cardiovascular illness are at greater risk of vessel-occlusive attack by this drug. Merck Laboratories was aware of a signal of its cardiotoxic effects of rofecoxib in 1998, a year before the drug was approved. In the presence of increased numbers of adverse cardiovascular effects, Merck allowed the FDA to approve a product that it knew was cardiotoxic. During the appearance of study after study, which confirmed pre-approval suspicions that rofecoxib would be dangerous for the cardiovascular system, Merck continued to defend the drug's use with a scientifically incredulous argument, with no additional warnings for its profound cardiovascular effects.

## Risk-Benefit Analysis

27.  All medication have risks that must be 1) balanced by the benefits to the population to receive the therapy, and 2) must be promulgated to physicians, pharmacists, and patients, so that these prescriber, dispensers, and users can exercise their independent right to determine if the therapy's benefits outweigh its risks. A fair assessment of the contribution of rofecoxib to the public health requires a fair assessment of its benefits and risks.

28.  Benefits of COX inhibition: The *raison dêtre* of COX-2 inhibition is that selective blocking of the COX-2 pathway blocks pain generation while permitting continued gastrointestinal protection. Thus, the medical community expected superior analgesia to be delivered while the safety of the stomach's protective mucosal lining was preserved.

29.  However, rofecoxib-generated analgesia was quite ordinary, demonstrated to be of no greater magnitude than medications currently on the market. A striking example was the comparison of rofecoxib to nabumeton in Protocol 090. In this study, 12.5 mg rofecoxib was compared to 1000 mg of nabumeton, Merck's own scientists anticipated that pain relief (as measured by the Patient Global Assessment Response to Therapy (PGART) was anticipated to be 15 percentage points greater than that of the comparator drug nabumeton, a well established, commonly used NSAID. However, rofecoxib did not reach this prospectively determined goal. In fact, the difference between the two therapies was not 15 points, but 7-8 points (50.4% versus 43.3%). Thus rofecoxib was not more effective than commonly used, already available pain medications, according to the criteria set by Merck's own scientists.

30.  In addition, rofecoxib produces clinically significant gastrointestinal distress. In the Hippisley-Cox study [1] a nested case-control analysis involving almost 100,000 participants,

the relationship between gastrointestinal disease and the use of Cox-2 inhibitors was evaluated. This examination revealed that rofecoxib was associated with an elevated risk of adverse gastrointestinal event, with a relative risk of 1.56 (95% confidence interval of 1.30-1.87) for patients with recent exposure to rofecoxib. These findings reflect a 56% increase in gastrointestinal adverse events in patients exposed to rofecoxib versus placebo drug use. Rofecoxib was no more effective than standard, inexpensive NSAIDS, and it-self was associated with increased gastrointestinal adverse effects when compared to pla-cebo. However, evidence suggests that both minor symptoms of GI disease (e.g. dyspep-sia) and endoscopically detected lesions are not good predictors of future, complicated GI disease. Also, in the APPROVe trial, rofecoxib at the standard 25 mg dose was associated with approximately a four-fold, statistically significant excess of gastrointestinal adverse events compared to placebo. Further, in the VIGOR trial, the authors reported that gastro-intestinal mortality was "similar" for the rofecoxib and comparator NSAID, naproxen. Taken together, these studies show that rofecoxib was harmful to the GI system.

31. Also, while it is clear that non-selected NSAIDS produce gastrointestinal disease, it is unclear which component of COX-1 inhibition (anti-aggregatory propensity or absence of GI protection) produces the serious GI complications associated with these therapies (e.g., perforations, bleedings, and obstructions). In fact, it was quite possible that the COX-1 inhibition produced by the nonselective NSAIDS was not related to gastric pro-tection, but generated by some other mechanism, e.g., direct gastric mucosal injury. It the latter was the case, then it was unlikely that COX-2 inhibitors would provide any gastro-intestinal protection. Thus, it was necessary to carry out large-scale clinical studies com-paring NSAIDS with COX-2 inhibitor therapy.

32.  Balancing Benefit and Risk: All medication have risks that must be 1) balanced by the benefits to the population to receive the therapy, and 2) must be promulgated to physicians, pharmacists, and patients, so that these prescriber, dispensers, and users can exercise their independent right to determine if the therapy's benefits outweigh its risks. When a drug's benefit is large, it is reasonable to accept a larger risk for the use of the drug. Examples may be found in oncology, where the combined use of the cancer chemotherapeutic agents, bleomycin, cisplatin, and vinblastine produced cardiac toxicity. However, their use is tolerated because they prolong the lives of patients who would soon die from their cancer. The greater the benefit, the more willing is the medical community to accept harmful side effects.

33.  Alternatively, therapies associated with reduced benefits, must be accompanied by minimal level of adverse effects to be accepted by the medical community. However, the benefits of rofecoxib are no better than well-established, low-cost alternatives, and the GI protection offered by rofecoxib does not make it a safe drug. Therefore the adverse effects caused by rofecoxib must be minimal for it to be acceptable to the medical community. However, rofecoxib's dangerous effects dramatically exceed this low threshold.

34.  Rofecoxib causes thrombotic events by mechanisms discussed by Merck in 1998, before the therapy was approved. The measure of the adverse effects of the drug is measured by an odds ratio, and the ARE.

35.  Relative risks and odds ratios measure the strength of association between an exposure and an illness. The computations are based on the fundamental principle that is an exposure causes a disease, and that one would naturally expect there to be greater disease in the exposed group than the unexposed group. Relative risks measure the occurrence of

disease in the exposed group to the control group over a period of time, and is used when one follows patients in the exposed and unexposed group forward in time to compute the occurrence of disease in each of the two groups. Odds ratios are used in circumstances when the ability to follow patients is impaired by the study design (for example, the investigator takes an epidemiologic snapshot of a cohort, measuring the extent of exposure in a collection of people, and comparing the extent of disease in the exposed and unexposed groups. A relative risk (or odds ratio) of one indicates an equal extent of disease in each group. The larger the relative risk (or odds ratio) the greater the extent of disease.

36.  The attributable risk exposed (*ARE*) is the excess risk of disease produced by an exposure. Developed in the 1970's [2, 3] the *ARE* is a useful quantity that calculates the fraction of events that are attributable to one causative agent when several possible explanations may be available. It is computed as

$$ARE = \frac{OR-1}{OR}.$$

where *ARE* is the attributable risk exposed and *OR* is the odds ratio. It may also be computed as

$$ARE = \frac{RR-1}{RR}.$$

where *RR* is the relative risk.

37.  Risk of Coronary Artery Disease: The concept of odds ratios and ARE can be applied to established risk factors for coronary artery disease (Table 1).

Table 1. Odds Ratios for Coronary Heart Disease Relative Risk[4]

| Risk Factor | Odds Ratio (Men) | Attributable Risk Exposed |
|---|---|---|
| Age | 1.05 | 4.7% |
| High Normal BP | 1.32 | 24.2% |
| Hypertension Stage 1 | 1.73 | 42.2% |
| Hypertension Stage 2 | 1.84 | 45.6% |
| Cigarette Smoking | 1.68 | 40.5% |
| Diabetes(Yes/No) | 1.50 | 33.3% |
| Severe LDL Elevation | 1.74 | 42.5% |
| Very Low HDL | 1.46 | 31.5% |

These are the odds ratio for the risk of developing coronary heart disease in ten years.

38. The attributable risk exposed reveals the excess risk for coronary heart disease attributable to each of these risk factors. For example, cigarette smoking produces 40.5% excess risk of coronary heart disease, i.e., after all other risks are considered, the risk is 40.5% greater on top of that baseline risk in subjects who smoke cigarettes. These risks will be compared to the rofecoxib's risk of cardiac toxicity.

## Adverse Effects

39. *Cardiovascular Toxicity.* The overall risk of cardiovascular events in the VIGOR trial data (discussed later in this affidavit) as reported to the FDA, with a relative risk of 5.0, a risk that translates to an ARE of 80%. This holds for short term and long-term use. This is a greater risk of atherosclerotic disease than any of the known risk factors.

40. A succinct summary of cardio toxicity provided by Merck reveals the cardiovascular dangers posed by rofecoxib. The report VIOXX Preliminary Cardiovascular Meta-Analysis by Dr. Deborah Shapiro provides a crisp summary of the findings from several of Merck's sponsored trials. In the table entitled MI Endpoints, rofecoxib vs. NSAIDS the following data is depicted.

| Study | Relative Risk of Myocardial Infarction |
|---|---|
| Overall | 2.02 |
| ViGOR | 5.0 |
| Advantage | 2.95 |
| RA | 1.82 |
| nonRA | 1.68 |
| OA-069 | 0.55 |

A similar table entitled MI endpoint- rofecoxib versus placebo shows an overall hazard for rofecoxib as well. Since there is no credible scientific body of evidence suggesting that NSAIDS are cardio protective, it is no surprise that the two tables convey the same clear message.

41. The cardiovascular damage produced by rofecoxib in low doses was clearly portrayed in Protocol 090. Table 37 of that report demonstrates a relative risk of 3.0 and an ARE of 66%. . Thus, in this study, excess cardio toxicity was reported in the absence of efficacy, a clear warning that the therapy could be no more effective than standard pain therapy, but increase the cardiac disease event rate.

42. Rofecoxib's harmful effect in short duration of therapy was demonstrated in Protocol 201 (VIP study) The average follow-up study for a median follow-up period of 4 months. The

rofecoxib dose evaluated in this study was 25 mg.  From Table 1-6 (from the P201 Clinical Study Report), focusing on drug related adverse events, there were 13 cardiac disorders (9 in the rofecoxib group, and 4 in the placebo group. There were four episodes of coronary artery occlusion, myocardial infarction, and myocardial ischemia in the rofecoxib group and none in the placebo group. When the classification is broadened to examine specific serious clinical adverse events, there were 30 seen in the rofecoxib group and 23 in the placebo group. There were 13 myocardial infarctions in VIP that met this classification, 7 in the rofecoxib group, six in the placebo group (Table 1-7).

43. In addition, the Advantage study following patients treated with either rofecoxib (25 mg) or naproxen for osteoarthritis for only twelve weeks. The medical reviewer's report (MRK-AFV0341732) revealed that total mortality was higher in the rofecoxib group (n = 5) than in the placebo group (n=4) (Page 21). Significantly, three of the five deaths in the rofecoxib group were sudden death. There were no cardiovascular deaths in the naproxen group.  There were five myocardial infarctions, two anginal events, and three sudden deaths in the rofecoxib group and one MI and two anginal events (no sudden deaths) in the placebo group (page 10). In addition, more patients (40 versus 21) discontinued rofecoxib than naproxen therapy for cardiovascular related adverse events (page 10).  In addition, 15 versus 7 patients discontinued for hypertension related events, and 19 versus 12 patients discontinued therapy for edema related events. The increase in number of cardiovascular events is particularly striking since the study was only a twelve-week trial and 25 mg of rofecoxib (half the dose used in VIGOR) was used. The FDA Reviewer stated (page 12) "the CV findings are of concern…"

# Rofecoxib and Stroke

44.  Cerebrovascular accidents (CVA's or strokes) are abrupt interruptions of blood flow to the brain. These interruptions lead to massive brain cell death, producing paralysis, loss of cognitive function, and, in extreme cases, coma and death.

45.  Stroke is the number one cause of adult disability in the United States and the third leading cause of death. In the United States, stroke mortality fell by 15.1% from 1988 to 1998, but the actual number of stroke deaths rose 5.3% [5,6]. Approximately 600,000 people have a new or recurrent stroke each year in the US. Of these 500,000 are first attacks, and 100,000 are recurrent attacks. More men than women have strokes [5].

46.  In many respects, strokes are similar to heart attacks. Atherosclerosis, the pathological process underling the majority of strokes, occurs throughout the arterial blood system. It can produce loss of function in the heart, peripheral vascular system, or kidneys as well as in the central nervous system.

47.  Both strokes and heart attacks commonly have the same mechanism of production, i.e., the initiation and development of atherosclerotic plaques in major arteries that supply these two end organs (the brain and the heart) with nutrient and oxygen rich blood. The athermanous gruel grows over time, fed by lipid rich macrophages, aggravated by high vascular pressures, and the vasoactive affects of smoking. The creation of a fissure in the plaque can activate the intricate collection of clotting mechanisms that leads to the rapid development of a thrombus, further narrowing the lumen of the blood vessels, leading to death of the supplied tissue.

48.  The risk factors for stroke (older age, hypertension, unfavorable lipid panels, smoking) are closely related to those of heart attacks. In addition, treatment is the same. The first

treatment, prevention, requires the modulation of risk factor levels. A second is the iden-

tification of major blood vessels that are at risk (carotid vessels for the brain, coronary ar-

teries for the heart) including bypassing the lesions or endarterectomy. Finally, acute

treatment for each includes the use of clot lysis therapy including tissue plasminogen ac-

tivator or tPA. In each case, the lysis therapy must begin as quickly as possible after the

onset of the heart attack or stroke. Thus, stroke and heart attacks and sister symptomatic

manifestations of the same underlying disease – atherosclerosis.

49.  Thus the introduction of new risk factor for the development of thromboembolic disease

would naturally suggest the risk factor would affect not just the occurrence of heart at-

tacks, but the occurrence of strokes as well. Because of the same underlying pathophysi-

ology, the warnings received by Merck outlining the potential dangers of rofecoxib ap-

plied to the occurrence of stroke as well.

50.  The relatively small number of strokes complicates the epidemiology of risk factor identi-

fication and stroke. Therefore, when the a priori warning about cardiovascular adverse

events associated with rofecoxib was sounded by Fitzgerald, Oates, and Patrono, the

search for stroke adverse events must be especially sensitive diligent since the occurrence

of strokes are themselves not common.

51.  In the 1998 Watson report. Table 1 of that report reveals that cerebral infarction, and

cerebral vascular accident, were included as cardiovascular serious adverse events. In the

words of the report (Page 3; C: Cardiovascular Serious Adverse Events). The SAE's cho-

sen were felt to have a high likelihood of representing acute thrombotic events. Table 6

and 7 of that report demonstrate a greater incidence of CV SAE cases in men (relative

risk 1.28) and women (relative risk 2.16). Appendix C of that report reveals that there was at least one patient who had a CVA.

52.  Preliminary rofecoxib meta-analysis by Dr. Deborah Shapiro (October 18, 2000) there were 8 cerebral accidents in the rofecoxib group and 9 in the control group (including one hemorrhagic and one lacunar stroke). However, in that same report, an evaluation of the effect of rofecoxib versus NSAIDS, there were 23 CVA's in the rofecoxib group (11 CVA, 2 hemorrhagic strokes, 9 cerebral vascular strokes, and 1 lacunar stroke) versus only 9 in the NSAIDS group. (7 CVA, 1 hemorrhagic stroke, and 8 ischemic cerebrovascular strokes). This is a remarkably strong signal of rofecoxib-stroke hazard, given the paucity of stroke events.

53.  IN VIP (Table 1.12 of the Clinical Study Synopsis), There were five strokes on treatment or within 14 days of study drug discontinuation. However, Table 1.6, which lists events, believed to be related to the drug, there was only one infarction (lacunar) in the rofecoxib group and none in the placebo group. This is unquestionably a small number of events, but it is enhanced sensitivity to these rare events that the sponsor is obligated to pay when there has been adequate *a priori* warning.

54.  In the Alzheimer studies (protocol 091, 078, and 126), three fatal strokes occur, versus one in the placebo groups. (Table 2, FDA Cardiovascular data in Alzheimer's studies). This occurred in relatively short-term studies, again manifesting a small but clear increased stroke hazard in patients taking rofecoxib.

55.  In the Victor protocol, as stated in the Overview of Cardiovascular Events in the VICTOR Study (Table 1 Summary of Confirmed Thrombotic Cardiovascular Serious AE's by Class of Terms Rofecoxib 25 mg vs. Placebo). There were four ischemic cardio-

vascular strokes observed, 3 in the rofecoxib, and 1 on placebo. The combined endpoint analysis including APTC events revealed the same division (3 in the rofecoxib group and 1 in the placebo group) again, an excess number of strokes attributable to rofecoxib therapy.

56.   The published APPROVe study, revealed 22 cerebrovascular events (Table 2, Incidence of Adjudicated Thrombotic Adverse Events). Of these 22 CVA's 15 were in the rofecoxib group, and 7 in the placebo group (hazard ratio 2.32: 95% CI 0.89 – 6.74). The notion of statistical significance means little in this underpowered environment. The only fatal stroke occurred in the patients receiving rofecoxib.

57.   While the identification of excess risk can be complex when the number of events is small, a review of the available data reveals consistent excess risk from several Merck sponsored studies. Given the similarities between the pathophysiology of stroke and CVA, a review of the data, consistent with well-established epidemiologic principles reveals that it is more reasonable than not that rofecoxib causes strokes.

## Hypertension

58.   The rofecoxib group had a greater proportion of patients with hypertension-related and edema-related events, with early separation of the curves. The relative risk of these events was 4.61 with a 95% confidence interval of 1.50 to 18.83. The risk for hypertension was 2.02 (95% confidence interval 1.71 to 2.38) and for edema was 1.57 (1.17 to 2.10). In the ADVANTAGE study, there were more 15 patients versus 7 patients who discontinued therapy for ischemia hypertension-related adverse events, and 19 versus 12 patients discontinued therapy for edema related events. In addition, in the APPROVe clinical trial, the rofecoxib group had a greater proportion of patients with hypertension

related and edema-related events, with early separation of the curves. The relative risk of these events was 4.61 with a 95% confidence interval of 1.50 to 18.83. The risk for hypertension was 2.02 (95% confidence interval 1.71 to 2.38) and for edema was 1.57 (1.17 to 2.10).

## Background Biochemistry

59. *Biochemistry of COX-2 inhibition*: COX stands for cyclooxgenase. It is an enzyme system that expedites, and accelerates a particular type of chemical reaction in the body. Many chemical actions and reactions in the body must be facilitated in order to proceed. Before we can discuss the role of COX inhibition, we must first understand what enzymes do, and specifically, the remarkable degree of control their presence gives the organism.

60. *The Role of Enzymes*: While people and governments conduct the affairs of business using money, the body conducts its affairs of living through chemistry. Chemical reactions permit it to feed itself, to grow, to move, to defend itself, and to reproduce. This chemistry is intense and complex.

61. Just as fiscal flow, critical in societal interaction, must be carefully balanced and regulated, so too the intricate chemistry of life must be controlled and monitored. The fact is that chemical reactions, left to their own, would quickly consume all reagents and generate products in unproductive amounts at unhelpful times. Frequently, chemical reactions necessary for life would not take place at all because the chemical environment in the cell or tissue where the reaction is to take place is wrong. (e.g., too little reagent, or not enough acid). In order to bring order to this chemical chaos, the body, over tens of thousands of years, has developed reaction-facilitators. These facilitators are called enzymes.

Specifically, an enzyme is a complex molecule that expedites a chemical reaction. The enzyme is neither consumed nor produced by the reaction. The reaction is facilitated by the mere presence and interaction of the enzyme.

62.  The human body has tens of thousands (and perhaps many more) of such enzyme complexes. Many of these systems have been studied for generations, e.g., the Kreb cycle, which is the process by which glucose (sugar) is converted in the presence of oxygen to chemical energy, with water and carbon dioxide as byproducts. There are over ten different chemical reactions that must take place and each of them is facilitated by enzyme system.[*] Without it, organized energy production in living tissue would fail.

63.  *The Prostaglandin System*: A prostaglandin is a molecule. Specifically, it is a collection of fatty acids (approximately twenty of them) attached to a five-membered ring. Their main function (as best understood at this time) is to function as messengers; their presence initiates a series of other chemical reactions. For example, one signal that prostaglandins send is the need for an inflammatory response. The injured body part notifies its constituency that a self-protective, inflammatory reaction is necessary by synthesizing prostaglandins. Inflammation is commonly and most productively a protective response of the organism, commonly producing increased blood flow to the site of inflammation, an immune response, and pain.

64.  A second function of prostaglandins is to mediate the propensity of blood to clot. The tendency of blood to clot must be carefully balanced. Blood that does not clot loses the ability to repair damaged blood vessels that are commonly injured or worn down in the

---

[*] Some of these enzymes are hexokinase, aldolase, dihydrolipoyl dehydrogenase, pyruvate kinase, and dihydrolipoyl transacetylase.

process of daily living.[*] Blood that does not clot quickly enough leads to a painfully de-

bilitating and short life, as revealed by the natural history of patients with untreated he-

mophilia. Alternatively, blood that is too likely to clot (i.e., it exists in a hypercoagulable

state) leads to blood clots forming where they are neither required nor helpful. Such clots

can break off, be carried though the blood stream, and lodge in small (and sometimes

large) vessels. The blockage of blood flow leads to death of the tissue that relies on the

blood flow, now impeded by the clot. The results of these clots are pulmonary embolisms

(if the arteries to the lungs are blocked), and heart attacks (if a coronary artery, a vessel

supplying the cardiac muscles own blood supply is blocked) or strokes (if the blood sup-

ply to the brain is blocked). Platelet aggregation is one of the precipitating mechanisms in

producing a myocardial infarction by producing a blood clot in a vessel that directly sup-

plies the heart with oxygen. This pro-clotting process can trigger the cascade of events

that produces a heart attack.

65. The mechanism by which blood clots is one of most studied and complex biochemical

mechanisms known, and a detailed discussion of this complicated system, involving liter-

ally hundreds of reagents, enzymes, and coenzymes is beyond the scope of this report.

The relevant component here is the compound thromboxane $A_2$. One effect of pros-

taglandins are that they stimulate hemostasis through up-regulation of thromboxane $A_2$,

increasing platelet adhesion and aggregation. Thus the production of prostaglandin, ac-

cording to this theory, increases the coagulability of the blood.

66. In addition, prostaglandins control the protection of the sensitive stomach lining from an

attack on it by the acids and caustic digestive juices produced by the stomach needed to

---

[*] The body has over 100,00 miles of blood vessels, most of them too small to see. There are frequently hourly tears in these blood vessels that must be immediately repaired.

digest food. Prostaglandins are involved in the regulation of these systems (and most likely, many, many more).

67.  Prostaglandin production is controlled in part by the cyclooxgenase, (COX) enzyme system. By stimulating COX, *ceteris paribus*[*] prostaglandin synthesis is increased. Repressing or inhibiting COX decreases prostaglandin synthesis.[†] We might then expect that a COX inhibitor, by down regulating COX and thereby reducing prostaglandin synthesis would 1) decrease pain and inflammation, 2) reduce blood coagulability (since prostaglandins up regulate thromboxane $A_2$), and 3) decrease the ability of the stomach to protect itself. This is precisely what the traditional non-steroidal inflammatory agents (NSAIDS) do.

68.  These NSAIDS, (e.g. ibuprofen and naproxen) are general or nonselective COX inhibitors[‡] and have been available for approximately thirty years. They have well known clinical characteristics. While widely accepted as having generally effective analgesia, or pain control. However, since the mechanism of pain control is based on inhibiting COX, and thereby reducing prostaglandin synthesis, they reduce gastric mucosal protection. This reduction is associated with the production of gastric ulcers, gastric obstruction, and gastrointestinal bleeding, all symptoms of erosion of the gastric mucosa. It has been estimated (MK-966 Cox-2 inhibitor product development plan stage 0 review MRK-NJ0220388 page 8, Introduction and Program hypothesis ) 76,000 patients are hospital-

---

[*] This is a critical insertion. In a complicated biochemical system, any assertion about the response of a system when a component is changes assumes everything else in the system is constant.
[†] Aspirin controls pain and inflammation because it blocks prostaglandin synthesis. With a reduction in prostaglandin synthesis, the inflammation signal is not sent, and the production of pain is reduced.
[‡] We will see later that even these broad COX inhibitors have different abilities to repress different aspects of the COX system.

ized each year, and that over 7,600 patients die each year in the United States alone as a result of NSAID associated gastrointestinal events.

69.    However, there is a huge population of patients who have been exposed to the traditional NSAIDS for over thirty-five years. The number of patients with severe gastrointestinal illnesses and deaths is actually a relatively small proportion of patients taking traditional NSAIDS.

70.    *COX-1 and COX-2*: Continued research on the COX system led to the identification of a bifurcated system. It is now believed that there is not one but two COX systems regulating the production of prostaglandins, identified as COX-1 and COX-2. Each metabolize arachidonic acid to prostaglandin $PGH_2$, which is the intermediate step in the synthesis of prostaglandins and related compounds known as prostanoids.

71.    It is important to understand the role of these two COX systems to appreciate the advantage and difficulties produced by differential COX inhibition. The currently accepted view is that the COX-1 system is a constitutive system, i.e., it is always active, with the enzyme present in high concentrations within tissues including platelets, vascular endothelium (the special cells that make up the inner layer of blood vessels), gastric epithelial cells, and cells in the kidney (renal parenchyma). The prostanoids produced by the COX-1 system increase stomach-lining protection, and increase the coagulability of the blood.

72.    Alternatively, the COX-2 system is not always active, but is induced by inflammation. It produces the prostaglandin that sends the inflammatory signal, thereby inducing the cycle of increase blood flow, immune response and pain. It has also been learned that COX-2 also produces prostacyclin $PGI_2$ that is an anti-aggregator and a vasodilator.

73. Thus, it was believed, that just as NSAIDS were developed to block all COX activity, that further refinement of medical therapy could produce a COX-2 inhibitor. Such a therapy, it was felt, would reduce the inflammatory response, while leaving vascular coagulability unchanged and the protective gastrointestinal lining intact.

74. Early Investigation of the COX-2 inhibitors: The true effects of a therapy emerge over time, where the speed at which knowledge is gained is related to the experience of the medical community with the therapy. Pre-approval studies of the COX-2 inhibitors revealed definite efficacy, but minimal benefit above and beyond the medications that were already available. However, when evidence of harm emerges, however inconsistently, regardless of whether it appears in either the pre-marketing or post-marketing environment, the burden of proof shifts. Specifically, the appearance of harm requires that the sponsor 1) look for definitive evidence of harm in an ethical way and 2) acknowledge that the risk-benefit balance is beginning to change as evidence of new risk emerges. This requires greater efficacy to offset the greater risk. The threshold of significance for harmful effects is much less extreme than that for determining efficacy.

75. Undoubtedly, exploratory analyses demonstrating harm may not be generalizable. However, the ethical credo of "First do no harm," requires a patient protective response to this potential new hazard. An appropriate response includes but is not limited to 1) additional analyses that can, in an ethical fashion, determine if the initial finding represents a result that can be generalized to the population at large, and 2) an immediate recalibration of the risk-benefit balance, tipping this balance in the direction of greater harm.