76. The requirement of these ethical responses neutralizes the assertion that exploratory analyses demonstrating harm can be ignored. The need to protect populations from harmful effects must not be blocked by concerns for statistical significance.

77. What is most convincing is the consistency of findings across the breath of studies involving rofecoxib. The repeated findings of elevations of cardiovascular thrombotic events associated with rofecoxib use, regardless of dose or duration of use, that strengthen the argument that rofecoxib causes these serious adverse events.

78. The identification of compounds that have an increased differential inhibition of COX-2 was heralded as a major step forward in pain control, allowing the patient to obtain effective analgesia while avoiding the difficulties long known to be associated with COX-1 inhibition. However, it was also recognized early in the development of COX-2 inhibitors that, by not inhibiting the COX-1 system, a pro-aggregatory effect might be produced. Even though, early in vitro studies showed that the COX-2 inhibitor rofecoxib did not inhibit platelet aggregation or prolong bleeding time when administered to health volunteers, the 1998 Scientific Advisory Committee served notice to Merck that the effect of Cox-2 inhibitors on the cardiovascular system might be harmful. Findings supported the idea that the COX-2 inhibitors were not necessarily thrombogenic.

79. However, although 800 mg of celecoxib (a COX-2 inhibitor), did not alter levels of either serum $TXA_2$ or its urinary metabolites, a modest reduction in serum $TXB_2$ (a metabolite of $TXA_2$) was observed, suggesting that COX-2's might engender a coagulable state (i.e., make the blood more likely to clot). The balance between TXA2 (a platelet aggregator promoted by COX-1) and $PGI_2$ (which counteracts platelet aggregation, modulated by COX-2) requires attention at this point. The difference can be elucidated by the effect of

aspirin. COX-1 is selectively inhibited by low-dose aspirin in activated platelets.[*] However, since COX-2 activity is preserved in the presence of aspirin, and the produced $PGI_2$ decreases blood coagulability, the effect of aspirin is to shift the haemostatic balance to an anti-thrombotic state.

80.  Thus, inhibition of COX 2 suppresses $PGI_2$ formation, blocking the anti-aggregatory effect of $PGI_2$, making the blood more coagulable. This effect should attenuate the anti-aggregatory effect of aspirin. In mechanistic animal studies, the beneficial effect of aspirin was blocked by celecoxib. In addition, the vasodilator effect of $PGI_2$ derived from the endothelium of the coronary vessel and vasodilatory response to application of arachidonic acid was reduced significantly when compared to controls [7]. Because of these results, the authors expressed concern regarding the possibility of an increased risk of acute vascular events in patients receiving COX-2 inhibitors, especially in individuals with underling inflammatory disorders, including coronary artery disease. This bolstered the theoretical argument that COX-2 inhibitors might increase the likelihood of serious thrombotic adverse events.

81.  The scientific motivation for this prescient concern is clear. COX-2 inhibition would reduce the anti-thrombotic effect of PGI2. By not suppressing COX-1, the thromboxane $A_2$ activity would proceed, tipping the hemostatic balance to a procoagulation state. However, the interaction between the COX enzyme system and hemostasis is complicated by the different potencies that the COX-2 inhibitory agents have on COX- inhibition, i.e., COX-2 inhibitors can also be COX-1 inhibitors. In one study, the COX inhibitors were directly evaluated for their differential COX-1/COX-2 inhibitory activity. The main aim

---

[*] This occurs by acetylation of the hydroxyl group of a serin residue near the COX active site. Aspirin's COX-1 inhibitory action persists for the lifetime of the platelet. Recovery of the effect is strictly a function of platelet turnover.

of this investigation was to clarify the possible effect that various COX-2 inhibitors might have on the aggregatory propensity of blood.  The researchers found that the COX-2 inhibitors had widely variable selectivity for COX-1 inhibition. Rofecoxib as well as the newer agent etoricoxib (brand name Arcoxia®) have the smallest effect against COX-1. Hence they are closer to "pure COX-2 inhibitors". Alternatively, celecoxib (brand name Celebrex®) had more COX-1 inhibitory activity, and is a less pure COX-2 inhibitor.

82.   In addition an effect of platelet aggregation with possible clinical significance was suggested by observations of elevated prothrombin times and bleeding episodes with concomitant use of celecoxib and warfarin in a patient with pre-exiting cardiovascular disease [8]. In addition, there were reports of patients with connective tissue disorder who developed arterial thrombosis after initiation of celecoxib therapy [9]. An FDA assessment of the pre-approval data led to their acknowledgement that there was a possibility that COX-2 inhibitors could cause thromboembolic disease. The conclusions from these pharmacological studies and other experimental evidence lent credence to the view that selective COX-2 inhibition reduces synthesis of $PGI_2$ and may promote a pro-aggregatory state before rofecoxib was approved.

## Inadequate Testing

83.   The potential cardiovascular risks of Vioxx were apparent well before the drug was approved, and Merck was aware of these dangers. Their testing program was inadequate.

84.   On September 12, 1996, before rofecoxib was approved, a memo from Dr. Randall to the Cox-2 Team, on page 6 stated, "Another SAE (severe adverse event) of unstable angina was reported in extension to RA (rheumatoid arthritis) study. The vascular AE's are expected since COX-1 is not inhibited". This memo demonstrates that Merck appreciated

not just that cardiovascular serious adverse events could be anticipated with rofecoxib, but that they understood the mechanism by which they would be produced. They accepted the causal link between rofecoxib and cardiothrombotic adverse events before the drug was approved.

85.   On Thursday, October 10, 1996, before rofecoxib was approved, a review of protocol 017 was described (MRK-ABC0048706). In this review the following statement appears "Adverse events of most concern were in the cardiovascular system (e.g., MI, unstable angina, rapid fall in hemoglobin and hematocrit in some subjects, and a small increase in blood pressure), documenting the potential for cardiovascular adverse effects caused by rofecoxib."

86.   On November 11, 1996, before rofecoxib was approved, Dr. Musliner anticipated that there would be 25% more adverse cardiovascular events with rofecoxib (Memo: Subject-Anticipated consequences of NSAID anti-platelet effects on cardiovascular events and effects of excluding low-dose aspirin use in the Cox-2 GI Outcomes Megatrial – Page 5.). Dr, Musliner also stated the rofecoxib-induced increased cardiovascular event rate might be expected "due to the absence of anti-platelet effect for the selective Cox-2 inhibitor," and "would create a negative aspect to the results and leave open the question (reasonable or unreasonable) whether the drug might in some other way be contributing to such events." The concern about an increased cardiovascular adverse event profile was well established years before the drug was approved, requiring adequate testing.

87.   However, rather than design a clinical trial that was designed to fully elaborate the risks and benefits of rofecoxib, Merck designed VIGOR to underestimate the true risk rofe-coxib for increasing cardiovascular events. A concern about possibility of rofecoxib

caused an increase in CV events and "you will get more thrombotic events and kill drug." a prescient concern that time demonstrated was the fact of the matter. Dr. Reicin in a later email that day provided an unethical solution, actively considering "the idea of excluding high risk cardiovascular patients, i.e., those that have already had an MI, CABG, and PTCA. This may decrease the CV event rate so that a difference between the two groups would not be evident" This was a deliberate attempt to confuse the medical community about the potential cardiovascular risk associated with rofecoxib. The only concern about this unethical thought process was not that the medical community would be mislead, but "would we be able to recruit any patients?"    A following email form Brian Daniels (February 26, 1997) stated "It is clear to me that the program will be severely hurt if a megatrial shows a win in PUB's and a loss in MI/CVA." Thus VIGOR was designed not to demonstrate the true benefits and risks of the therapy, but to understate the risks while magnifying the benefits. VIGOR's configuration was crippled, designed to deceive the medical community.

88. On October 24, 1997, before rofecoxib was approved, Dr. Fitzgerald emailed Dr. Nies, in which Dr. Fitzgerald made specific recommendations for further cardiovascular studies based on the concerns for the effects of Cox-2 inhibitor therapy.

89. On October 27, 1997, in a letter from Dr Oates to Dr. Nies, Dr. Oates warned of the mechanism by which Vioxx could produce adverse events and proposed additional testing. Specifically, Dr. Oates made suggestions on how to study the effects of rofecoxib on prostacyclin biosynthesis in order to determine whether an imbalance is created between prostacyclin and thromboxane-A2.

90.  On February 2, 1998, before rofecoxib was approved, Dr. Watson's final results on the analysis of cardiovascular SAE's in the Phase IIb/III Vioxx osteoarthritis clinical trials was received. This was a detailed analysis demonstrating that rofecoxib produced more cardiovascular events in the VIOXX program This analysis demonstrated that the incidence ratio of cardiovascular serious adverse events was 19.4/1000 in men and 15.5/1000 in women. The overall incidence rate for women was elevated when compared to FOSAMAX controls with a relative risk of 2.16 and a 95% confidence interval of 1.14 – 3.94. On page 2, the description of the results of protocol 023 states, "These findings raised concern about the potential for VIOXX to predispose to thrombotic cardiovascular (CV events) page 2. In fact, risk for cardiovascular events was elevated for two of the three age groups in men and three of the four age groups in women (Table 6). The report states that the VIOXX 125 mg and 25 mg treatment groups also had more clinical cardiovascular AE's than the placebo group in protocol 010 (page 1 following executive summary). The next sentence which states there is no evidence of an increased incidence of such events ignores the findings from protocol 010. This analysis revealed a signal to Merck that the thromboembolic events whose occurrence was anticipated by the understanding by which rofecoxib worked. Given the *a priori* concern about the relationship between rofecoxib and cardiovascular events, this was clear signal that Merck missed.

91.  The inappropriate interpretation of the Watson report reveals a substantial, persistent inconsistency in Merck's philosophy toward rofecoxib-induced cardiovascular events. From 1996-98, their were well documented points at which Merck receives advice about the likelihood that rofecoxib produces cardiovascular events. Clearly Merck absorbed this message because it was repeated by key Merck personnel. Merck's understanding of this

threat to rofecoxib was complete enough for them to distort the design of VIGOR, excluding patients who were at high risk of cardiovascular events. However, when the threat becomes reality, as in the Watson report, where almost all age-gender groups manifest excess cardiovascular serious adverse events in patients taking rofecoxib, revealing the relationship that Merck has been educated to fear, its scientists turn a blind eye to the results. It is this reaction that governs Merck's perspective on the rofecoxib-CV event relationship.

92. From May 3 – May 6, 1998, the Science Advisory Committee to Merck reviewed the Vioxx program. They wrote that there were significant safety risks with Vioxx. On page 11, they stated that the possible harmful effects of Cox-2 inhibition could be produced by a combination of three mechanisms 1) development of lipid-rich plaques in the coronary arteries, 2) plaque cap destabilization, making them rupture prone, and 3) thrombotic occlusion of the vessel at the rupture site. They further warned Merck, before rofecoxib was approved, that more information is needed to address these questions related to the possible influences of a COX-2 inhibitor on coronary morbidity and mortality.

93. On May 20, 1998, before rofecoxib was approved, Dr. Watson convened a meeting of the Cox-2 cardiovascular SAE Surveillance Task Force. During the introduction to the meeting, he states, "these findings raised concern about the potential for VIOXX to predispose to thrombotic cardiovascular (CV events).

94. On September 9, 1998, before rofecoxib was approved, Dr. Patrono wrote a letter to Dr. Laurenzi at Merck, in which Dr. Patrono warned of potential CV issues with rofecoxib, suggesting that more tests are required. Specifically, he said (page 1), speaking about Cox-2 inhibitor effect, "I would like to emphasize that this is likely to be but one of sev-

eral facets of the potential cardiovascular implications of Cox-2 expression and inhibition." In addition, he said (page 2), "Because companies making non-selective Cox-2 inhibitors are likely to emphasize the cardiovascular implications of specific Cox-2 inhibitors, I would suggest that it would be in the best interest of Merck to look into these issues as quickly and thoroughly as possible."

95.  On September 29, 1998, before rofecoxib was approved, Dr. Nies penned a handwritten note in which he tells Dr. Oates and Dr. Patrono that Merck will not do the kinds of studies that the two experts have proposed to explore the cardiovascular risks of rofecoxib. He anticipated that the drugs would become available without the need for the safety testing Drs. Oates and Patrono warned were so necessary.

96.  This body of information demonstrates that before rofecoxib was approved, the mechanism by which it produced harmful cardiovascular events had been elucidated, and signals of cardiovascular events had occurred. Merck's pre approval testing program was incomplete.

97.  On May 20, 1999, the month Vioxx was approved, the FDA Medical Officer Review reflected concern about rofecoxib's cardiovascular risk. He noted that the cardiovascular trends and that a larger databases was needed to assess CV safety. He also commented on the relatively small number of patients that Merck exposed to Vioxx prior to approval.

## Clinical Studies

98.  Clinical Studies: When considering the evidence to support or disprove a hypothesis, one must consider the quality of evidence available on the subject matter. Randomized controlled trials are generally accepted as the gold standard for assessing efficacy of medicines, a justifiable conclusion assuming that the clinical trials were well conducted and

executed according to their prospective plan However, not all hazards can be identified from these types of studies, or from studies conducted before the compound receives final regulatory approval.

99. Rofecoxib was approved by the FDA based on several pivotal, short-term studies. These short-term studies followed patients for three to six months. Furthermore, these studies did not study definitive clinical endpoints (gastric ulceration that was visualized using endoscope.) Additionally, these short-term studies made no important contribution to the understanding of the long-term hazards of these drugs. In the absence of this information, large post marketing efficacy studies have become the foundation of the assessment of the long-term hazard produced by COX-2 inhibition.

100. The concern that increased cardiovascular risk may be associated with use of COX-2 inhibitors arose from two sources; case reports of patients with connective tissue disease who developed arterial thrombi after starting celecoxib, and a small clinical study (Protocol 090) which confirmed the suspicions of the 1998 Merck Scientific Advisory Panel. The presaging comments of the Scientific Advisory Panel are critical. Presence of cardiotoxic effects that appears in subsequent clinical trials carries greater weight in the presence of the prospective statement that the risk may be present. The *a priori* concerns about the possibility of risk does not permit the researcher do discard the result as a random, non-meaningful, and non-generalizable one based only on sampling error.

101. *The VIGOR Trial*: The VIGOR trial was designed to evaluate the effect of rofecoxib versus the competing NSAID naproxen on the event rate of serious gastrointestinal disease. In the manuscript describing its results [10], the investigators examined just over 8000 patients with rheumatoid arthritis who were assigned to either of these two agents ran-

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                                5/22/2006

domly. The primary endpoint for the principal analysis of the study was the combined
endpoint of perforation, obstruction and severe upper gastrointestinal bleeding.

102. The evaluation of this endpoint demonstrated 121 confirmed upper gastrointestinal events
in the naproxen group (3.0%) and 56 (1.4%) in the rofecoxib group, reflecting a 50% re-
duction, with a $p$-value < 0.001. This trial demonstrated using acceptable methodology
that the COX-2 inhibitor rofecoxib could reduce the incidence of upper gastrointestinal
events compared to a nonselective COX inhibitor.

103. The rate of myocardial infarction was greater in the rofecoxib group than in the naproxen
group (0.4 percent to 0.1 percent, relative risk 0.2, 95 percent confidence interval 0.1 to
0.7). This bald reversal in the computation of the relative risk[*] fails to hide the fact that
rofecoxib was associated with a substantially greater incidence of myocardial infarction.
Additionally, thirty eight percent of these patients should have been taking aspirin based
on clinical indications; this subset of patients was an increased risk of having a myocar-
dial infarction.[†]

104. Fortunately, a separate analysis of adjudicated cardiovascular events from the VIGOR
study [11] provided a detailed evaluation of the overall serious adverse events data
(death, hospitalization or extension of hospitalization, and/or any life-threatening events
or serious disability). This evaluation revealed that the majority of the thrombotic events

---

[*] At this juncture, it must be pointed out that the reporting of these adverse event results in VIGOR was unusually
insipid. The benefit of therapy was stated in a way that was beneficial to the sponsor (i.e. relative risk for GI injury
is less than 1, illustrating a benefit of rofecoxib), yet the harmful effect of rofecoxib on the myocardial infarction
rate is stated not as an elevated relative risk, but again as a relative risk less than one. This is inconsistent, mislead-
ing, and produces unnecessary and predictable confusion if one tries to weigh risk vs. benefit of rofecoxib in this
population. In addition, the numbers of patients with heart attacks are not reported, a frankly glaring and shocking
omission in a manuscript purporting to make a contribution to the modern clinical literature. The investigators were
supported by Merck as stated on page 1527 of the manuscript) and all parties must share responbility for this singu-
larly misleading and meretricious description of cardiovascular adverse events.
[†] Patients were permitted to take low dose aspirin when this result was revealed at the end of the study.

were myocardial infarctions (MI) (rofecoxib 20, versus naproxen 4). This produces a relative risk of 5. Of the serious vascular adverse events meeting criteria for adjudication, twice as many cases were reported for rofecoxib than for naproxen (n=65 1.6% versus 33 (0.8%). Stratification according to aspirin (indicated or not indicated) and use of the standard APTC combined endpoint revealed a higher risk of MI in the rofecoxib group when compared to naproxen (the use of combined endpoints in clinical trials is expatiated in the Appendix). Additionally, the risk of serious thrombotic events was greater in the rofecoxib group than the naproxen group. The examination of time to event was particularly revealing, demonstrating a clear divergence of the survival curves after starting treatment (within 2 months), persisting during the remainder of the study period (log rank test result not reported).

105. The conclusion of the adjudication for the VIGOR study was that a significant difference was seen in the comparison of stroke, MI and cardiac death that was unfavorable for rofecoxib vs. naproxen. The VIGOR study was designed to illuminate the relationship between the use of rofecoxib and the incidence of gastrointestinal illness, and was not planned to be a definitive evaluation of the relationship between rofecoxib and myocardial infarction. However, the demonstration of a potential public health hazard for the millions of patients taking COX-2 inhibitor therapy cannot be lightly dismissed. Thus the findings of VIGOR confirmed the findings of Protocol 90, demonstrating and computing the magnitude of the risk associated with rofecoxib.

106. It should be noted that the drug was approved in 1999 on the basis of data submitted to the FDA, the results of VIGOR were not published until November 2000, one and a half

years after commercial approval had been granted. In addition, the cardiovascular data reported in that article were incomplete.

107. A clearer evaluation of the VIGOR cardiovascular results is provided in the Merck cardiovascular update from VIGOR from Deborah Shapiro to Drs. Alise Reicin, Eliav Barr, and Dennis Erb on July 5, 2000. In addition, Figure 1 of this document demonstrates a clear separation in the Kaplan- Meier time to event curves for confirmed thromboembolic cardiovascular serious adverse events in VIGOR demonstrating the increased risk of thromboembolic events on VIGOR when compared to Naproxen occurred early in follow-up (less than two months of follow-up time). Table 3 demonstrated 47 thrombotic events in 4047 patients takes rofecoxib (1.2%) versus 20 thrombotic events in 4029 patients (0.5%), excess risk associated with rofecoxib. A review of adjudicated cardiovascular events (Table 4, revealed 45 events in 4047 patients (1.67 per 100 patient years) in patients treated with rofecoxib, 19 in 4029 patients on naproxen (0.70 per 100 patient years. The relative risk of events in rofecoxib group to those in the naproxen group is 1/0.42 = 2.38 and 95% CI is 1/0.72 − 1/0.25. or 1.39 to 4.00, based on the Cox analysis results from Table 4.

108. Neither the VIGOR authors nor the sponsors updated the data in the article that appeared in the New *England Journal of Medicine* in November 2000 with the new safety data, a critical ethical omission. Even if one accepts that the occurrence of the three additional heart attacks did not occur before a pre-specified data cut-off date, the three events were known in August 2000, several months before the appearance of the manuscript in the New England Journal of Medicine in November 23, 2000. It would have been easy for the investigators to add a statement in this manuscript, acknowledging the three addi-

tional cardiovascular adverse events, and in addition, providing additional computations for the updated risk of cardiovascular events caused by rofecoxib. *The New England Journal of Medicine* was concerned enough about this omission that they published an Expression of Concern [12].

109. Since it is unethical to deliberately expose patients to risk without a clear and overwhelming expectation of benefit, other studies have to be examined for evidence of harm. The best evidence for a harmful effect must come from reproducibility, i.e. consistency of the finding. This is particularly compelling if the mechanism of harm has been clearly elucidated, as has been clearly elaborated in the preapproval evaluations of the COX-2 inhibitors.

110. The overall conclusion from this FDA report was that there was an increased risk of thromboembolic events particularly MI in patients exposed to rofecoxib compared with naproxen. Unfortunately, the absence of a placebo group precluded an assessment of the absolute risk of rofecoxib. Although only the MI result was published in the main paper, the FDA report clearly showed a higher risk of serious thrombotic cardiovascular events for rofecoxib in both aspirin indicated and non-indicated patients when compared with naproxen [13]. It is surprising that the coded cardiovascular analysis was not published in the VIGOR main paper, especially since the coding necessary for cardiovascular adjudication was available to the sponsor before VIGOR was published [14].

111. *Possible Protective Effect of Naproxen*: One possible explanation for the findings of the VIGOR trial was that undue attention was paid to the relationship between rofecoxib and cardiovascular disease. The proponents of this thesis argue that it is not that exposure to

rofecoxib increases the risk of cardiovascular disease, but that the control therapy naproxen decreases the risk of this class of illnesses.

112. However, this idea was not accepted before VIGOR in the many years during which this drug was on the market. Specifically, while data from randomized controlled trials have documented that aspirin is an effective anti-thrombotic agent for primary as well as secondary prevention of thromboembolic events, trials evaluating the effects of nonselective NSAIDS on the occurrence of cardiovascular disease have not affirmed there own purported benefit; the findings are inconclusive. In these trials on nonselective NSAIDS, the question of whether the degree of COX-1 selectivity (known to vary from drug to drug) translated into clinically detectable cardiovascular protection (as is achieved by aspirin with its characteristic irreversible inhibition of COX-1) has not been addressed.

113. A review of four epidemiologic studies with different designs and populations suggesting no overall effect of nonselective NSAIDS including naproxen [15]. The results of this review included prepublication material from Ray which itself was subsequently published in full [16]. The authors concluded that none of the NSAIDS included in the study should be used for cardioprotection.

114. Even though Merck argued that the cardiovascular effect in VIGOR could be explained by the beneficial effect of naproxen, and email from Dr. Reicin to Dr. Scolnick revealed that Dr. Scolnick was in "minor agony" over the issue, and that he wanted a cardiovascular study. Dr. Scolnick was not convinced that naproxen "benefits" explained the VIGOR findings. However, even after outside consultants advised Merck to do a CV study (in an email from DiBasttiste to Exposito on March 9, 2002), the study was not carried out.

115. *ADVANTAGE*: This clinical trial compared the use of rofecoxib 25 mg to naproxen 500 mg bid in patients with osteoarthritis. This twelve week controlled study recruited 2700 patients to each arm of the trial. The study showed no safety advantage of rofecoxib over naproxen, and demonstrated a trend of excess serious cardiac thrombotic events in the rofecoxib group.  There were five myocardial infarctions, two anginal events, and three sudden deaths in the rofecoxib group and one MI and two anginal events in the naproxen group. In addition, more patients (40 versus 21) discontinued rofecoxib than naproxen therapy for cardiovascular related adverse events. Finally, 15 versus 7 patients discontinued for hypertension related events, and 19 versus 12 patients discontinued therapy for edema related events. The striking increase in number of cardiovascular events is particularly striking since the study was only a twelve-week trial and 25 mg of rofecoxib (half the dose used in VIGOR) was used. (Villalba ML. Food and Drug Administration – Division of Anti-inflammatory, Analgesic, and Ophthalmic Drug Products HFD-550. Medical Officer Review End of Review Date 11-18-2001.

116. *VICTOR*: The VICTOR Study (Protocol 145), a study designed to determine whether rofecoxib could help prevent the recurrence of colon cancer, recruited and reported on 1217 patients in each of the placebo and rofecoxib groups. In Table 1 of the Overview of the Cardiovascular Events in the VICTOR Study (Reports Received by Merck as of 31-May-2005), there were 14 patients who had confirmed cardiovascular serious adverse events in the rofecoxib group and 4 patients in the placebo group. In Table 2 of the same report, when patients were classified by the occurrence of the APTC endpoint, there were 9 patients who reached the APTC endpoint, and 3 in the placebo group.  Most importantly,

the Kaplan-Meier curves demonstrated an early separation between the event rates of these events between the two groups.

117. *VIP*. VIP- Protocol 201 was designed to determine if rofecoxib 25 mg could help prevent prostate cancer. The study recruited 4741 patients of the anticipated 15,000-sample size. The study was approved on May 4, 2004, but was terminated prematurely due rofe-coxib's withdrawal from the market. There were 13 myocardial infarctions in this study 7 in the rofecoxib group, six in the placebo group. There were 26 vascular disorders in the rofecoxib group and 10 in the placebo group, and 19 patients in the rofecoxib group and 2 in the placebo group. When the analysis is restricted to specific drug related clinical adverse experiences (incidence $\geq 0.0\%$ in one or more treatment groups, there were 9 in the rofecoxib group and 4 in the placebo group. Five cases of coronary artery occlusion/myocardial infarction/ischemia/silent myocardial infarction occurred in the rofecoxib group. There were none in the placebo group. There were nine APTC events in the placebo group and eight in the rofecoxib group, respectively

118. *Alzheimer studies*: The Alzheimer studies (Protocols 078, 091, and 126) revealed excess deaths in patients on rofecoxib when compared to placebo. In 078, there were 13 deaths in rofecoxib compared to 7 on placebo. (8 versus 2 cardiovascular deaths on/off drug). In protocol 091, there were 9 rofecoxib deaths to 2 placebo (6 versus 4 cardiovascular deaths on/off drug), and in protocol 126 there were 3 rofecoxib deaths versus 3 placebo (2 rofecoxib cardiovascular deaths, versus 2 placebo on/off drug).

119. *APPROVe*: The APPROVe study [17] must be set apart from VIGOR and CLASS in that the evaluation of COX-2 inhibitor exposure and cardiovascular disease was prospectively declared and the analysis prospectively planned. APPROVe was designed to provide a

confirmatory and therefore more definitive evaluation of COX-2 use and cardiovascular disease.

120. The principal goal of the Adenomatous Polyp Prevention on Vioxx (APPROVe - Protocol 122) Trial was to determine the effect of a 36-month course of rofecoxib therapy on the risk of recurrent Adenomatous polyps in patients at risk of colorectal adenomas. Men and women at least 40 years of age were eligible if they had one large bowel adenoma and were not anticipated to need long-term NSAID therapy including aspirin (thus patients taking aspirin were excluded from the study). However, patients recruited after VIGOR's findings were announced were permitted to take low dose aspirin for cardiovascular protection.

121. Patient with 1) hypertension, 2) history of a myocardial infarction, 3) coronary angiography, 4) recent history of congestive heart failure (CHF), 5) bypass surgery within the previous year, or 6) stroke or TIA within the previous two years were excluded, thereby excluding patients who were at higher risk of myocardial infarction or other thromboembolic phenomena. This exclusion criterion served in the long run to protect patients from the potential thrombogenic effects of COX-2 inhibitors, but it also reduced the number of events in the study, under powering any determination of the relationship between COX inhibition and thrombotic cardiovascular disease. The inclusion of a six-week run-in period permitted physicians to assess patient compliance with therapy. During the randomization period, 1287 patients were assigned to rofecoxib 25 mg/day, and 1299 assigned to placebo. The trial was terminated two months before its scheduled end.

122. The evaluation of the relationship between COX inhibitor therapy and thrombotic events was a prospectively declared evaluation of the study. Thrombotic events included fatal

and nonfatal myocardial infarction, unstable angina, sudden death from cardiac causes, fatal and nonfatal ischemic stroke, transient ischemic attack, peripheral arterial thrombosis, peripheral venous thrombosis, and pulmonary embolus were measured. However, the endpoint used was the APTC combined endpoint (i.e., death from cardiovascular, hemorrhagic, and unknown causes, nonfatal myocardial infraction, and nonfatal ischemic or hemorrhagic stroke. Monitoring and analysis were prospectively declared.

123. During the trial, there were more patients discontinued from rofecoxib than placebo due to adverse events. When the trial ended, patients in the rofecoxib group had an increase risk of confirmed thrombotic events. Specifically, there were 46 patients in the rofecoxib group that had confirmed thrombotic events, versus 26 patients in the placebo group. (RR 1.92, 95% confidence interval $1.19 - 3.11$, $p = 0.008$). The risk for cardiac events (RR 2.80 95% CI 1.44-5.45) and cerebrovascular events (RR 2.80, 95% CI $1.44 - 5.45$) was substantially higher. Representing substantial risk

124. Even though the increased risk was seen throughout the duration of follow-up in AP-PROVe, some have posited that the harmful thromboembolic does not emerge until after patients have been followed for longer than 18 months.

125. This conclusion is epidemiologically unsound for several reasons. First, the evaluation of the putative 18-month effect is the result of a subgroup analysis. Subgroup analyses, i.e., the process by which an effect in the overall cohort is adumbrated by effects in subsets of the patient has been shown to be unreliable. The findings in the ELITE trials demonstrate the misleading conclusion drawn from subgroup analyses (discussed in the Appendix of this report).

126. The "eighteen month analysis is based on an improper subgroup. A proper subgroup is a subgroup whose membership cannot be ascertained at baseline. These analyses have been debunked by Yusuf [62].

127. In addition, analyses based on a sub-cohort have a small number of events. The absence of cardiac events makes it difficult to identify an isolated effect with statistical regularity. Thus the absence of statistical significance is not due to the lack of an effect, only due to the inability to have enough events to identify the effect. This is the heart of the admonition "the absence of evidence is not evidence of absence."

128. Third, there is no plausible explanation in the literature to explain why an effect whose mechanism (differential effect on prostanoid synthesis), an effect that is observed within several half-lives of Cox-2 inhibitors should require eighteen months to manifest itself. It does not take eighteen months to observe the analgesic activity it is not biologically plausible that eighteen months would be required to observe the cardiovascular toxicity, and the idea is epidemiologically incoherent.

129. Finally, the suggestion that the harmful cardiovascular effect requires eighteen months of exposure is inconsistent from the Sponsor's own data. The VIP trial, a part of Protocol 203, assessing the effect of rofecoxib in patients with prostate cancer demonstrated cardiovascular toxicity that emerged in less than one month of exposure.

130. In addition, the examination of investigator reported events demonstrates early separation of the cardiac event rates at approximately three months of follow-up (MRK-AHK0075759)

131. In addition, deeper analysis of the APPROVe data demonstrates that cardiovascular toxicity emerges early in patients who are at higher risk of cardiovascular disease. The rela-

tive risk in the rofecoxib group compared to placebo was 9.59 (95% confidence interval 1.26 to 416 for patients with a history of cardiovascular disease. It was also elevated among diabetics (6.10: 95% confidence interval 1.36 to 56.1). An evaluation of the AP-PROVe cardiovascular safety data revealed that there was early separation of the event curves when investigator reported cardiovascular events were considered. Thus, the most robust conclusion from APPROVe is that cardiotoxicity is apparent, and appears early.

132. In addition, the rofecoxib group had a greater proportion of patients with hypertension re-lated and edema-related events, with early separation of the curves. The relative risk of these events was 4.61 with a 95% confidence interval of 1.50 to 18.83. The risk for hy-pertension was 2.02 (95% confidence interval 1.71 to 2.38) and for edema was 1.57 (1.17 to 2.10). In 1998, one of the fears voiced by the Merck Scientific Advisory Panel was that Cox-2 inhibitors could accelerate atherosclerosis. This would occur by fostering the de-velopment of lipid rich plaque or the destabilization of the plaque's fibrous cap. In 2004, Dr. FitzGerald wrote an article entitled Coxibs and Cardiovascular Disease [18]. On page 1711 of that manuscript, he stated. "Patients in the APPROVe study should continue to be followed. This will allow some estimate of how quickly the developed risk may dissi-pate. Give the relatively short half-lives of these compounds, such a dissipation may oc-cur rapidly. On the other hand, if treatment has accelerated atherosclerosis, the offset of risk may be more gradual." Dr. FitzGerald stated an a priori hypothesis, recognizing that the continued follow-up of the APPROVe patients would answer the salient question he posed.

133. An initial evaluation of the follow-up analysis that Dr. FitzGerald called for became available in 2006. The follow-up analysis of the APPROVe data provided by Merck

demonstrated that when patients were followed for approximately one year after the con-

clusion of the blinded component, the increased risk of serious cardiovascular adverse

events persisted. Table E1 and E2 of the APPROVe follow-up reveals that when followed

through Week 210, the relative risk of fatal/nonfatal myocardial infarction was 2.22 (95%

CI 0.67-7.36) demonstrating excessive hazard associated with rofecoxib. When the cen-

soring date was October 31, 2005, the relative risk of fatal/nonfatal myocardial infarction

was 2.04 (95% CI 0.75 – 5.52).

134. This observation of prolonged elevated risk clearly answers the prospective question

raised by Dr. FitzGerald and persuasively confirms the fears of the 1998 Merck Scientific

Advisory Panel. Specifically, the elevated risk of cardiovascular disease seen in the AP-

PROVe follow-up more likely than not stands for the proposition that rofecoxib acceler-

ates atherosclerosis.

135. The follow-up analysis of the APPROVe data demonstrated that when patients were fol-

lowed for approximately one year after the conclusion of the blinded component, the in-

creased risk of serious cardiovascular adverse events persisted. Table E1 and E2 of the

APPROVe follow-up report reveals that when followed through Week 210, the relative

risk of fatal/nonfatal myocardial infarction was 2.22 (95% CI 0.67-7.36) demonstrating

excessive hazard associated with rofecoxib. When the censoring date was October 31,

2005, the relative risk of fatal/nonfatal myocardial infarction was 2.04 (95% CI 0.75 –

5.52). This prolonged elevated risk explains the findings of the Merck Scientific Advi-

sory Board, which stated that COX-2 inhibitors produce increased thrombosis, as well as

accelerated atherogenesis. This, in combination with the blood pressure elevation associ-

ated with rofecoxib explains the prolonged increased risk of fatal/nonfatal myocardial in-

farction.

136. Epidemiologic studies are not the most persuasive evidence; however they do help to ex-

tend the context in which the effect of the study can be anticipated. Several observational

studies were carried out to examine the effect of COX -2 inhibitor therapy on the occur-

rence of cardiovascular disease.

137. Solomon [19] carried out an observational study utilizing the Medicare beneficiaries who

received prescription medications through the Pennsylvania Pharmaceutical Assistance

Contract for the Elderly or the New Jersey Pharmaceutical Association Program for the

Aged and Disabled during 1998, 1999, and 2000. Patients with a life threatening illness

such as HIV/AIDS, malignance, or coagulopathy were excluded, as were patients with an

AMI that was not the principal discharge diagnosis.

138. Cases were defined as acute myocardial infarction (AMI) if this diagnosis was listed as

one of the first three top diagnoses in a hospitalization that was between three days and

180 days. To increase the stability of the estimate of cardiac events in the control group,

four control patients were matched to each case. Date of hospitalization was the index

date for each case. Controls had to have the same (or nearly the same) age, and have the

same gender and month of the index date as the case to which they were matched.

139. Once cases and controls were identified, their antecedent exposure to COX-2 inhibitor

therapy was ascertained.  Exposure was based on celecoxib or rofecoxib on the index

date. Dose and duration categories were defined for each exposure. Covariates were

demographic and morbidity measures. Mean age of all patients was over eighty years.

Thus, any findings of this study face difficulty in generalizing to younger cohorts. In ad-

dition, even after matching, patients in the COX-2 inhibitor groups older than the control cohort, an effect who potential for effect size perturbation can be modulated through statistical adjustment.

140. Rofecoxib had slightly greater risk 1.14 (95% CI:1.00-1.31) when referent group was no current use. Patients in the rofecoxib group were more likely to have an MI when compared to celecoxib 1.24 (1.05-1.46, p =0.011). In addition, rofecoxib > 25 mg was associated with higher adjusted relative risk to AMI than rofecoxib < 25 mg (1.70, 95% CI 1.07-2.71). Risk was elevated during the first 90 days of exposure, but not thereafter. This is directionally the reverse of the finding in the APPROVe study, and is most likely attributable to the random aggregation of patients within subgroups and therefore should hold no real persuasive power. The deleterious cardiovascular effects of COX-2 inhibition are most likely seen for the duration of therapy.

141. Overall, the Solomon study confirms the concept that the Cox-2 inhibitor rofecoxib is cardiotoxic.

142. Three additional retrospective studies have been carried out that examine the relationship between rofecoxib and cardiovascular events. Bannwarth [20] reported on the safety profile of patients included in an open-label study conducted to evaluate the influence of non-pharmacological interventions on the outcomes of osteoarthritis in patients receiving rofecoxib. However, the authors acknowledge the highly selective nature of the cohort with its limited definition of cardiovascular risk, the absence of a control group, and the difficulties of comparing incidence rates of studies with different designs.

143. A second retrospective analysis examined investigator-reported cardiovascular adverse event data held within the osteoarthritis safety database. This was collected from several

pre-marketing randomized controlled trials assessing the efficacy of rofecoxib [21]. However, the authors themselves acknowledge that the combined sample size of each treatment group, together with the low number of serious thromboembolic events reduces any illumination this study might shine on the exposure-disease relationship of interest. This is the classic underpowered environment, which forces us to discount the findings of no relationship between COX-2 inhibitor use and cardio-embolic disease in this study. Its null findings are merely uninformative.

144. The third evaluation also investigated this topic, but assessed thromboembolic events across 23 randomized controlled trials in over 28,000 patients with any of osteoarthritis, rheumatoid arthritis, Alzheimer's disease, or chronic back pain. The researchers concluded that the risk of a cardiovascular thromboembolic events was similar between rofecoxib and placebo cohorts and the non-naproxen NSIAD groups, but were significantly higher when compared to the naproxen cohort. They argue that these results support the cardioprotective effect of naproxen.

145. This cohort, completed in September 2000 has been followed and a resulting manuscript appeared describing the publication of the additional adjudicated data by Weil et. al. [22]. The pooled analyses when repeated with the new data were unchanged.

146. Population based pharmacoepidemiologic studies aim to identify and quantify adverse events from the treatment experiences of the population and examine that population for characteristic features in order to learn and inform from these experiences. Such studies usually include far more patients than randomized controlled trials, but suffer from bias and confounding. They do not alter with the prescribing practice of the physician, nor do they require strict inclusion and exclusion criteria. Therefore they are more representative

of the experience of the population. They may contribute useful information about the possible relationship between any NSAID use and the risk of TE events in patients with concurrent medical problems and or using concomitant medication.

147. The strongest evidence for a relationship between cardiovascular thromboembolic events and COX-2 inhibitor therapy comes from Ray[23]. The conclusion was that high-dose (> 25 mg rofecoxib) could be associated with an increased risk of serious CHD, whereas rofecoxib <25 mg, celecoxib, naproxen, and ibuprofen were not. However, in contrast to the randomized controlled trials presented earlier, this study did not examine all serious cardiovascular thromboembolic events or report on the proportion of patients who were prescribed aspirin use

148. Another epidemiologic study that assessed the role of Cox-2 inhibitors and cardiovascular events was the study by David Graham. A nested case-control study was conducted at the Kaiser-Permanente clinic system in California. Appropriate covariate control was exerted, and the analysis was proper. The study demonstrated that rofecoxib increases the risk of acute myocardial infarction and sudden cardiac death above patients taking Celecoxib. The overall increase in risk was 1.59 (95% confidence interval $1.10 - 2.32$, $p = 0.015$). The risk was greater for high dose rofecoxib (3.58 fold increase) than lower dose (1.47 fold increase) when compared to celecoxib use. In addition, this study failed to reveal any cardio-protective effect of naproxen.

149. Another observational studied was conduced using administrative healthcare data from Canada [24]. The authors determined that no significant difference was observed in acute myocardial infarction risk for new users of celecoxib, rofecoxib, naproxen, or non-naproxen NSAIDS (used continuously for more than 30 days) compared to non-users. Pa-

tients who were reported to have taken study drugs for less than 30 day were excluded. The effect of this exclusion on the relative risk of myocardial infarction in unclear.

150. Two observational studies were carried out in the United Kingdom. Users of rofecoxib, celecoxib, and melocixam were compared [25] and [26] (melocixam is less COX-2 selective than either of rofecoxib or celecoxib. After adjusting for age and gender, these two studies revealed a statistically significant higher rate of cerebrovascular thromboembolic events for both rofecoxib and celecoxib when compared with melocixam, but a statistically significant lower rate of peripheral venous thrombotic events for the rofecoxib cohort compared with melocixam, but neither revealed a difference in the rate of cardiovascular thromboembolic event group.

151. A major source of information on suspected medication exposure-disease relationships is the post marketing database held by pharmacovigilence units, including those of the regulatory community and manufacturers. There are problems of selection and confounding by indication, as well as recall bias, and information bias. Such data provides a complimentary perspective on adverse reaction frequency with randomized controlled studies and observational studies. They are derived from national populations and operate over the timeline of the drug, include drug use in the hospital as well as the general practice and ambulatory setting. They are useful for signal generation.

152. Commonly, the data that comprises these individual cases is incomplete. The source of the information is inhomogeneous and there is no accepted a priori threshold for reporting. Such voluntary reporting schemes are useful in signal generation or detection, but have important limitations in science.

153. An independent study of adverse reactions primarily adverse renal effects reported for ro-
fecoxib (n = 2720) versus celecoxib (n=8434) reported to the WHP UMC up until the
middle of 2000[27]. The SOH Uppsala Monitoring Centre in Sweden maintains a data-
base of spontaneous reports received from the national monitoring centers worldwide.
Suspected adverse reactions are coded onto the WHP database. Signal score processing
uses a collection of sophisticated techniques includes Bayes procedures. Although the fo-
cus was on renal events, thromboembolic disease was examined. The strength of associa-
tion between rofecoxib and thromboembolic disease was greater than that for celecoxib.
However, the authors concluded that there was no association. One possible explanation
for these null results was that patients with renal disease are more likely to have sympto-
matic cardiovascular disease. However, this was an ecologically based argument and no
case-by-case examination took place.

154. In Canada, spontaneous reports are submitted to the regulatory authorities, health Canada
through the Canadian Adverse Drug Reaction Monitoring Program [28]. They reported
that they had received by October 2001 70 cardiovascular/cerebrovascular cases out of
528 total reports) for celecoxib, and 68 out of 348 for rofecoxib. Seven of the cases re-
ported on celecoxib were fatal. Of these, two were cerebral hemorrhage in patients also
taking warfarin. However, prevalence of the thromboembolic events was not computed
from those at risk, not only from all events. This does not address the relative risk of the
medications in the general public.

155. Meta Analyses: The interpretation of meta-analyses is problematic. They purport to com-
bine studies, and through the increased sample size and number of events, identify a
highly reliable estimate of effect size. However, complications quickly arise to vacate

many of their results. Meta analyses are rarely prospectively defined. Thus the definition of exposure is commonly not standardized across the combined studies. In addition, endpoints rarely have a common definition across studies. This heterogeneity reduces the persuasive ability of this style of analysis. Typically, only positive studies are included in the analysis, producing a clear bias in their interpretation. Finally, the aforementioned problems with random research also complicate the interpretation of this post hoc manner of analysis. Thus, post hoc meta-analytic results are not confirmatory.

156. Nevertheless, meta-analyses have been carried out in an attempt to assess the relationship between COX-2 inhibitor therapy and thrombotic disease. One such meta-analysis has been published with the goal of evaluating the totality of the evidence on cardiovascular thromboembolic events and the cyclooxygenase-2 inhibitor. This was conducted by Mukherjee et al. [29]. The goal of this effort was to determine if the COX-2 inhibitors as a class were associated with either a protective, or a harmful effect on the risk of cardio-vascular events. They compared the adjudicated cardiovascular outcomes from major trials. The control group event rate was provided externally, as reported in the placebo group of a recent meta-analysis of four aspirin primary prevention trials.

157. The authors reported that their findings suggested a potential increase in cardiovascular event rates for users of COX-2 inhibitors as a class effect, even though only data for rofe-coxib and celecoxib were examined. Criticisms include the lack of consistency in displaying each trial's results. In addition, there was no over all estimate of the magnitude of treatment difference, nor did it investigate the heterogeneity between trials or explore the robustness of the main findings with a sensitivity analyses. In addition, the contributory trials were of different designs, had different study endpoints, involved patient popula-

tions with dissimilar cardiovascular risk and they compared unequivalent doses of rofecoxib and celecoxib. The sample sizes of the studies differed widely, ensuring that VIGOR's findings would exert undue influence on the effect ascribed to the findings. Finally, a number of studies that found no relationship between rofecoxib and thrombotic events were excluded. These limitations in addition to the invocation of the random research paradigm, limit the generalizability of post hoc meta-analyses.

158. Risk-Benefit Analysis: Risk benefit analysis is the comparison of the risks of therapy to the therapy's benefits. This can be considered on the macroscopic (societal) level as well as on the microscopic (patient level). The tools used for each of these evaluations are different and thus these two perspectives must be viewed differently.

159. Risk-benefit analysis on the macroscopic scale considers the relative risks to the society when assessed against the benefits to society i.e., the population of patients taking COX-2 inhibitors. In this calculation, the benefits of COX-2 inhibitors are assessed primarily in the degree to which they reduce pain, and the degree to which these agents reduce gastrointestinal adverse effects. It is recognized that neither moderate doses of NSAIDS nor moderate doses of aspirin produce this combination of pain relieve without GI distress. Estimates are that more than 100,000 hospitalizations and 16,500 deaths each year in the United States occur as a result of NSAID use. Since is was believed that the COX-2 inhibitors avoided this extent of GI disease, it is claimed that their use provides an important societal benefit in patients with chronic pain. However, recent evidence reveals that the Cox-2 inhibitors are associated with upper gastrointestinal illnesses. In addition, the acknowledgement that they are the producing cause of cardiovascular thrombotic disease dramatically and unfavorably tilts the risk-benefit balance.

160.  This risk benefit calculus requires that one consider alternative modalities of pain re-
lieve.  Specifically, Tylenol, a well-established pain reliever, is neither habit-forming nor
associated with adverse gastrointestinal distress. In addition, low dose NSAID use is less
damaging to the GI tract than moderate or high dose NSAIDS. Thus, the macroscopic
benefits of COX-2 inhibitor therapy are less clear when compared to these latter agents
and doses.

161.  Furthermore, the mechanism by which COX-2 inhibitor therapy produces fewer upper GI
adverse effects is speculative. Evidence suggests that both minor symptoms (e.g., dys-
pepsia) and endoscopically detected lesion are not good predictors of future complicated
GI disease. It is also unclear whether serious GI complications such as perforations and
bleeding are a consequence of COX-1 inhibition in platelets (the supposed mechanism) or
a direct interaction between the NSAID and the gastric mucosa. Thus, while the macro-
scopic benefits of COX-2 inhibitors over high dose NSAID and aspirin use are clear in
terms of GI relief, the benefits over low dose aspirin/NSAID are not. Similarly, the ad-
vantage of COX-2 inhibitors when compared to high dose Tylenol, or a combination of
high dose Tylenol and low dose NSAIDS, has not been established.

162.  In addition, the risk of thromboembolic disease is greater with the use of COX-2 inhibi-
tors. The occurrence of COX-2 induced MI's and strokes with the consequent production
of new deaths and hospitalizations require a complete new assessment of the risk-benefit
balance of this therapy. Neither Tylenol (at low doses or high doses), nor aspirin (at low
doses or moderate doses) is associated with a greater risk of MI.

163.  The microscopic consideration of risk-benefit is an assessment of the risk of COX-2 in-
hibitor therapy versus its benefit in the individual patient. There are no reliable models to

review this; each patient-practitioner couple provides its own unique risk-benefit metric in the decision as to whether a patient should accept COX-2 inhibitor therapy. In patients with chronic arthritic pain, a combination of Tylenol (low or high dose) and low dose aspirin or NSAIDS provides substantial analgesia without GI distress. Should upper GI symptoms appear, the dosing of aspirin or NSAIDS can be reduced, or even temporarily discontinued. There is no established increased risk of thromboembolic disease with low or high dose Tylenol, or low or moderate aspirin use. Therefore the use of COX-2 inhibitor therapy confers no advantage for these patients.

164. However, the greater risk of serious thromboembolic events with COX-2 inhibitor adversely tips the risk-benefit balance. To offset this greater risk, greater benefit must be achieved when compared to therapies that 1) are not associated with thromboembolic adverse events, and 2) do not produce a significant increase in upper GI events.

165. However, implicit in the individual risk-benefit assessment that each physician-patient pair undertakes is the assumption that each of the practitioner and the patient have access to all relevant facts available on risk and benefit are available to those who must make the final decision. Patients and physicians have the right to make an independent assessment of the risk of therapy. The requisite for the discharge of this right is that they each have access to all risks and benefits of the intervention. This implies that the absence of complete disclosure of the risks of a therapy produces flawed decisions about the implementation of the therapy.

## Failure to Warn

166. **FDA Expertise**: I have attended more than 20 meetings of the Cardio-Renal Advisory Committee to the Food and Drug Administration (F.D.A.), and I have served for four years

on the Cardio-Renal Advisory Committee, served as an ad hoc member of other FDA Advisory Committees, and currently serve on the FDA Pharmacy Sciences Advisory Committee. These positions have provided me the opportunity to observe and take part in the interplay that characterizes the relationship between the F.D.A. and the drug sponsors.

167. As an actively serving member of this advisory committee, I have published two articles on the deliberations of the Cardio-Renal Advisory Committee to the F.D.A. which have appeared in the peer reviewed, public literature (30, 31).

168. My service on the F.D.A. advisory committees, as well as my service to drug manufacturers, has given me specialized knowledge and experience concerning the F.D.A. policies, procedures and regulations as well as the corresponding duties of a reasonable and prudent drug manufacturer.

169. In addition, I have argued before the F.D.A. on behalf of sponsors on numerous occasions. In my service on behalf of sponsors to the F.D.A., and my service to the F.D.A. at advisory committee meetings, I have developed expertise, knowledge, training and experience in F.D.A. matters.

170. *Role of F.D.A.* The Federal Food and Drug Administration (F. D. A.) is an organization charged by the public through Congress to insure the effectiveness and safety of foods and compounds produced for public consumption. Over the course of this century, the powers of the F. D. A. have expanded commensurate with their public responsibilities in a growing and increasingly complex food and drug environment.

171. The responsibilities of the F. D. A. have often placed it in perceived opposition to the pharmaceutical industries. The F.D.A. regrets this comparison and has devoted substantial effort to overcome it. The F.D.A. has encouraged the view that the relationship between it

and the pharmaceutical industry is a collaborative one, and has suggested that the efforts of both the F.D.A. and the pharmaceutical industry be viewed as one of joint partnership.

172. *Modernization Act*: This emphasis can been seen in the F.D.A. Modernization Act, which provided a set of streamlined procedures for the sponsor and F.D.A. to follow, helping to insure a prompt and efficient review of a new drug application (NDA). These procedures have substantially reduced the time it took the F.D.A. to complete the review of a sponsor's application for a new drug approval. This pivotal move to streamline the administrative review process was a direct response to complaints from both the pharmaceutical industry, and, to some extent, from segments of the public that the F.D.A. was not responsive enough to the need for the swift introduction of safe and effective medications. The F.D.A. correctly recognized that the timely delivery of these new medications was essential for maintenance of the public health.

173. *Collaboration:* In order for the F.D.A.-pharmaceutical industry collaborative process to work, the F.D.A. and the Sponsor must work together to demonstrate the efficacy and safety of the compounds. Contrary to public perception, the F.D.A is not a central laboratory. It generally does not carry out independent testing of the products submitted to it by the pharmaceutical industry for approval. The F.D.A. does not independently execute clinical trials to study in an independent manner the safety and effectiveness of new compounds. The F.D.A. instead receives the crucial information about the effects of a drug from outside sources. The F.D.A. has developed skill in identifying relevant information for the effects of a drug. Several of these sources include the general medical literature, and research reports from academic investigators, and research study results which are sponsored by other institutions e.g. the National Institutes of Health, (NIH). However, the

primary source of information concerning the safety and efficacy of the compound is the

sponsor itself. It is the sponsor's task to provide the F.D.A. with the majority of the infor-

mation concerning the effects of its compound in animals (when appropriate) and in hu-

mans. The F.D.A. reviews, scrutinizes and reanalyzes the information it receives, but it re-

lies on its partner, the sponsor, to provide the data on which its decision ultimately rests.

174. It is therefore essential that the sponsor and the F.D.A. have a relationship, which at its

foundation is truthful, honest, open, characterized by a timely and accurate communication

process. The pharmaceutical company must provide accurate information describing the

pharmacology (including the mechanism of the compound's action), the effectiveness of

the compound (known as the efficacy), and the risk afforded by the compound (the safety).

The F.D.A. must respond to this information in a timely manner, either approving the

compound in a reasonable period of time, or disapproving the compound. When the com-

pound is disapproved, the reasons for the disapproval must be clear, and the procedure to

appeal the decision must be available. One of the mechanisms of appeal is the convening

of an advisory committee.

175. *Advisory Committees*: The collection of advisory committees to the F.D.A. is an official

body with codified rules in the Code of Federal Regulations (C.F.R.). It consists of experts

in the field in which the drug is expected to be effective. It also includes experts from the

disciplines of epidemiology and biostatistics, and, in some instances, consumer advocates

and representatives from the pharmaceutical industry itself.   The F.D.A. and the sponsor

each provide written information to the advisory committees, and each make presentations

before the committee in a session that is in general open to the public. The advisory com-

mittee provides guidance to the F.D.A. by responding to specific questions posed to it by

the F.D.A. The F.D.A. considers both the content of the advisory committee's delibera-
tions and committee's answers to the F.D.A. posed questions very seriously. However, the
advisory committee can only render its most informed and effective judgments when it is
also the beneficiary of open, honest, accurate and timely reporting from both the F.D.A.
and the sponsor. To this end, the sponsor spends months preparing briefing packets for the
advisory committee, and weeks in intense practice sessions preparing for the meeting.

176. **Decision Processes:** The decision process of the F.D.A. and its external advisory com-
mittees is built on a foundation of the open, accurate and timely dissemination of scien-
tific evidence concerning the mechanism of drug action, the drug's effectiveness, and the
drug's safety profile. When this foundation is solid, the process will swiftly identify and
rapidly approve drugs that are safe, effective, and meet a medical need. During this proc-
ess, the public is protected from compounds that either have no efficacy or are unsafe,
these inferior products being removed from further consideration. The maintenance and
promotion of the public health depend on the integrity of this system. If either the sponsor
or the F.D.A. engage in dishonest or deceptive practices, the process begins to erode, and
the public suffers. This occurs either through the delay in the approval of safe and effec-
tive compounds that meet a medical need, or through the publics direct exposure to inef-
fective and dangerous compounds. The F.D.A. cannot make timely, informed decisions
when the sponsor denies them information.

177. **Material Information**: Embedded in this body of procedures are the channels through
which accurate, relevant, and material information describing the drugs actions is
promptly communicated to practicing physicians and through the physicians to their pa-
tients. After the F.D.A. approves the drug and the sponsor to the medical community ad-

vertises the drug, it is the sponsor's obligation to closely monitor the use of the drug for the appearance of unanticipated adverse events.

178. *Adverse Events*: An adverse event is an undesirable effect produced by the drug. Many adverse events are identified during the early testing phase of the drug. These adverse effects are included in the drug label. The drug label is the official description of the drug, which appears, with all the labels of all approved drugs in the Physicians' Desk Reference (PDR). This label describes the effect of the drug, the population in which the drug is effective, the adverse effects of the drug, and the general precautions reasonable and prudent physicians should take in prescribing the drugs. Physicians and pharmacists rely on these labels in making decisions involving the use of these drugs in their patients, and they require that the information in these drug labels be accurate and up to date. The sponsor owns the drug label. It has the responsibility for ensuring that the information in the label is accurate and up to date. Although there are specific regulations in the C.F.R., which govern the content of the label, responsibility for guaranteeing that the information in the drug label is accurate resides with the sponsor.

179. *Labeling*. Both physicians and patients have the right to draw independent conclusions concerning the risks and benefits of a therapy. Their best and clearest recommendations come from these considerations. Review of the Rofecoxib labels reveals several understatements about the label. The federal regulations require that the labeling shall contain a summary of the essential scientific information needed for the safe and effective use of the drug. The essential information was lacking in the warning labels for the fenfluramines.

180. Drug labels are to be designed for the safe and effective use of the drug. There is no way to write an adequate label about a drug that has minimal efficacy and causes serious, life

threatening side effects because such a compound cannot be used safely and effectively. By definition an adequate label cannot be written for Rofecoxib since the drug cannot be used safely and effectively. The particular defects in the Vioxx label are as follows.

181. An adequate label must contain complete statements about the effectiveness of the compound. The data for the analgesic effect of Vioxx did not state that was of the same effectiveness as standard NSAIDS.

182. 21 CFR Parts 201 and 202 states, "The Commissioner also advises that these labeling requirements do not prohibit a manufacturer, packer, relabeler, or distributor from warning health care professionals whenever possibly harmful adverse effects associated with the use of the drug are discovered. The additional labeling and advertising of additional warnings, as well as contraindication, adverse reactions, and precautions regarding the drug, or the issuance of letters directed to health care professionals (e.g., 'Dear Doctor' letters containing such information) is not prohibited by these regulations.

183. However, Merck did not provide adequate warnings. On February 25, 1996 in an email from Brian F. Daniels to Thomas Simon, et. Al, regarding GI Outcomes Trial Protocol, he states, "Would allow low dose ASA real world everyone is on it, so why exclude AND without COX-1 inhibition you will get more thrombotic events and kill drug". With this comment, not only does Merck recognize that without COX-1inhibition, rofecoxib will increase cardiovascular thrombotic events, but also that patients should take low dose ASA while on rofecoxib. Yet, this warning never appeared in the rofecoxib label.

184. The attitude toward the FDA, whose only mission is ensure that only safe and effective compounds are used by the public was antagonistic. On May 14, 1999, in an email form Scolnick to Blois, Goldmann regarding the Vioxx US label, he states "I think the ONLY

way to handle is to GO THERE AND INVOLVE LUMPKIN and word by word agree to

the final circular by next Mon/Tue.  I DID THIS WITH TEMPLE ON VASOTEC IN

1985.

185.  On March 9, 2000, email for Scolnick to Shapiro, Reicin, Nies, regarding VIGOR stated,

"The CV events are clearly there. Since no obvious correlate…this is real…it is a shame,

but it is a low incidence and it is mechanism based as we worried it would be." The early

preapproval data demonstrated a signal of CV hazard that Merck ignored. Leadership in

Merck acknowledged the hazardous effect of rofecoxib. There was no mention of a possi-

ble, scientifically unsupportable beneficial effect of naproxen as a possible explanation.

186.  On March 27, 2000, Merck announced through a press release the preliminary results of

GI outcome study with Vioxx (VIGOR). One day later, in an email from Alan Nies to

Barry Gertz regarding Dr. Patrono on VIGOR, they state that Dr. Patrono "does not think

that the CV effect that we observed can be attributed to naproxen for a couple of good rea-

sons. Merck's consultant who correctly warned before the drug was approved that rofe-

coxib could produce serious cardiovascular adverse effects, also warned them that the re-

sults in VIGOR, while confirmed his own concerns, could not be explained away.

187. However, on April 28, 2000, in a press release, Merck misinforms the public by "confirm-

ing a favorable CV profile.

188.  On June 20, 2000, email from Laurenzie to Daniels regarding Dr. Patrono warned, "the

presentation of VIGOR data must not mislead the audience into thinking that the difference

in CV events could be explained by an anti-thrombotic effect of naproxen, which is not

demonstrated.

189. On June 29, 2000, the Vioxx sNDA (supplemental new drug application) with Dennis Erb's letter to Central Document Room of the FDA for submission of labeling supplement to NHDA 21-042 based on VIGOR GI results. In this document, Merck argues that VIGOIR reinforces the need for concomitant aspirin use is some patients. Merck submitted protocols 085 and 090. However did not change the label adding the warning about required aspirin use.

190. On July 5, 2000, a memo from the statistician Deborah Shapiro Alise Reicin revealed that Merck knew it was not publishing all of the myocardial infarctions that occurred in VIGOR in the *New England Journal of Medicine* that would not be published until November 2000. They had the opportunity to update the data but refused to take it.

191. On November 8, 2000, in an email from Reicin to Barr involving a hypertensive patient, Dr. Barr believes a hypertension-related death in ADVANTAGE should have been classified as an MI, stating in an email timed at 11:43AM "Common things being common, the clinical scenario is likely to be an MI." He then explained the definition of sudden death and unexplained death in an email timed at 12:58 PM. However, Dr. Reicin challenged him, saying, "I still strongly feel that this should not be an MI-..." However, she went further than that, saying the death should be classified as "unknown". Specifically, she stated, "...I would prefer unknown cause of death so that we don't raise concerns." This statement's egregious insensitivity to the importance of identifying appropriate safety monitories speaks for itself.

192. On October 18, 2000, Deborah Shapiro, Merck statistician carried out a preliminary meta-analysis that demonstrated an increased CV risk. Specifically, this report showed that Vioxx more than doubled the risk of MI related to all NSAIDS, and that this increase was sta-

tistically significant. This included a MI-only analysis of the Vioxx program. This report was omitted in Merck's FDA submission and in the published meta-analysis of Konstam.

193. On January 31, 2001, a national thought leader summary of the VIGOR study recommended that Merck not emphasize the "protective effect" of Naprosyn as an explanation." In that same paragraph, they state that there is no supporting data to substantiate a protective effect for Naproxen.

194. On this same date, January 31, 2001, Dr. Scolnick of Merck sent an email to Mr. Anstice and Gilmartin, it which he stated, "...there is no way to prove that in patients with rheumatoid arthritis that ALL of the difference between Vioxx and naproxen is due to the benefit of naproxen. It is impossible to prove this; it is impossible to know this with certainty."

195. On February 1, 2001, Targum of the FDA wrote a memo to Cook and Villalba regarding NDA 21-042, S-007 review of cardiovascular safety database. He stated that "Despite lower dose, smaller sample size and aspirin use, the trend is against rofecoxib." He also stated "The sponsor claims that the difference in MI between the two groups is primarily due to the anti-platelet effects of naproxen. This hypothesis is not supported by any prospective placebo-controlled trials with naproxen."

196. On Thursday, February 8, 2001, the FDA Arthritis Advisory Committee met to discuss the safety and efficacy of Vioxx. On Page 24 of that transcript, Merck told the Advisory Committee in public session that there was no evidence from an examination of their Phase IIb/III database of excess cardiovascular events. A similar statement was also made on page 56. This was false. The Watson report on which that was based clearly demonstrated excess cardiovascular events in women, and in most of the age ranges examined in men.

This information was withheld from both the 1999 Advisory Committee and the 2001 Advisory Committee, as well.

197. On September 17, 2001, the FDA sent a Warning letter from Abrams to Gilmartin regarding Vioxx. That letter stated that Merck's promotional activities were "false, lacking in fair balance or otherwise misleading." It also stated," your claim in the press release that Vioxx has a 'favorable cardiovascular safety profile,' is simply incomprehensible."

198. Nevertheless, on November 6, 2001, in a draft letter to Jonca Bull regarding the Amendment to the Supplemental New Drug Application, Merck expressed strong disagreement with FDA's initial October 15, 2001 labeling proposal, which it argues is unprecedented. Merck argues for labeling information tempering any commentary on CV/T data from VIGOR.

## Misleading the FDA

199. Regulation Sec. 14.171: Utilization of an advisory committee on the initiative of FDA. (f) Presentation of all relevant information about the matter will be made in open session unless it relates to an IND the existence of which has not previously been disclosed to the public as defined in Sec. 20.81 or is otherwise prohibited from public disclosure under part 20 and the regulations referenced therein. Sections 314.430 and 601.51 determine whether, and the extent to which, relevant information may be made available for public disclosure, summarized and discussed in open session but not otherwise made available for public disclosure, or not in any way discussed or disclosed in open session or otherwise disclosed to the public.

200. Merck mislead the FDA at the FDA Advisory Committee Meeting. On April 20, 1999, the FDA Arthritis Advisory Committee met to discuss the consideration of whether Vioxx

should be approved for use for pain relief. During that discussion, both efficacy and safety of Vioxx were discussed. There was a section of the presentation of the thromboembolic cardiovascular adverse experience. Beginning on page 105 of the transcript, the individual presenting on behalf of Merck states "I will now review the thromboembolic cardiovascular adverse experiences. We looked at an extensive list of adverse experiences representing peripheral, myocardial, and central nervous system thromboembolic events. The data presented on this slide is a combined analysis from all of our osteoarthritis studies. This is reported in events per 100 patient years. The event rate was low and was similar between placebo, rofecoxib, and the NSAID comparators. All deaths across all osteoarthritis studies are summarized on this slide: The events are reported again, per 100 patient years. The rates for rofecoxib, as you can see, are if anything, lower than with the NSAID group.

201. However, one year before, on February 2, 1998, Watson's Final results of an analysis of the incidence of Cardiovascular SAE's in the Phase IIb/III Vioxx Osteoarthritis Clinical Trials demonstrated a CV signal. In fact, risk for cardiovascular events was elevated for two of the three age groups in men and three of the four age groups in women (Table 6). The overall relative risk for cardiovascular SAE for men was 1.28 and for women was 2.16, demonstrating a clear signal of increased cardiovascular risk associated with rofecoxib therapy (Table 7). The report states that the VIOXX 125 mg and 25 mg treatment groups also had more clinical cardiovascular AE's than the placebo group in protocol 010(page 1 following executive summary). This finding was not reported to the FDA advisory committee at this meeting. These relevant tables were omitted from the Merck FDA Advisory Committee Background Information Packet for this meeting. The FDA Advisory Commit-

tee was never told about the increased cardiovascular risk associated with rofecoxib at this
critical juncture in the FDA's deliberations for the approval of rofecoxib.

202. On Thursday, February 8, 2001, the FDA Arthritis Advisory Committee met to discuss the
safety and efficacy of Vioxx. On Page 24 of that transcript, Merck told the Advisory
Committee in public session that there was no evidence from an examination of their Phase
IIb/III database of excess cardiovascular events. A similar statement was also made on
page 56. This was false. The Watson report on which that was based clearly demonstrated
excess cardiovascular events in women, and in most of the age ranges examined in men.
This information was withheld from both the 1999 Advisory Committee as well. The
Merck FDA Advisory Committee Background Information Packet dated February 8, 2001
was incomplete. On page 9 of that document (Section 2.2.1.1. Rationale for the Choice of
Patient Population in VIGOR), no description of the rationale for only including patients
who were not at high risk for cardiovascular disease. The critical information intimated in
an email on November 11, 1996 by Dr. Reicin stating the plan of "excluding high risk car-
diovascular patients, i.e., those that have already had an MI, CABG, and PTCA. This may
decrease the CV event rate so that a difference between the two groups would not be evi-
dent" was not included in the Advisory Committee Packet. This critical information that
altered the VIGOR study, blocking its ability to fairly assess the risk associated with rofe-
coxib was not shared with the FDA at this critical decision point in the FDA review proc-
ess. In addition, Tables 6 and 7 of the Watson report, which demonstrated a clear signal of
the cardiovascular danger of rofecoxib was omitted from this critical document on which
the FDA reviewers relied.

203. In addition the emails dated April 6 and 7, 2001 between Dr. Greene and Dr. Scolnick revealed the internal attitude of Merck to the FDA, whose only desire was to ensure that safe and effective medications be available to the US public.

204. On April 6, 2005, John Jenkins, Director of the Office of New Drugs and Paul J. Seligman, Director Office of Pharmacoepidemiology and Statistical Science wrote a memorandum bearing the FDA's imprimatur whose subject was Analysis and recommendations for Agency action regarding nonsteroidal anti-inflammatory drugs and cardiovascular risk. The specific sources of the information on which the statements within this memo are based are not revealed in the document (e.g., the findings from the Alzheimer's trials for Vioxx, page 5). It is therefore unclear what the scientific basis for the statements and actions recommended in the document are. Without knowing the source of the information, it is difficult to assess the worthiness of the recommendations provided in this document. However the basis of my conclusion that Vioxx is a dangerous compound with unacceptable cardiovascular risks, regardless of dose or duration of exposure, are clearly delineated in this affidavit.

205. This affidavit draft does not discuss the results of analyses yet to be produced by Merck, nor does it discuss an evaluation of the actual APPROVe datasets that I plan to undertake. This affidavit will be amended as additional relevant information becomes available, and, if appropriate, upon completion of my evaluation of the SAS APPROVe datasets.

## Appendix A: Statistical Reasoning in Medicine

206. Statistical Reasoning in Medicine: Statistical reasoning in { XE "statistical reasoning:definition" }medicine is, at its heart, the process by which we determine if health care research results identified in one sample apply to a much larger population. The urgent question for a reviewer of the COX literature is whether results from all of the studies (or any of the studies) can be generalized from the peer reviewed manuscript to the population at large, and therefore be extended to a particular plaintiff. Is there a subset of studies that contribute more to our understanding, and can therefore be extended to the population? The type of generalization is not automatic; in fact, commonly in science this generalization is inappropriate. Thus, the reviewer must precisely identify the circumstances in which extension to the population is appropriate, and, alternatively, when the research results must be firmly circumscribed by the sample from which they are obtained.

207. A negative answer to this critical question does not imply that the veracity of the investigator's work is in question. { XE "statistical reasoning:critical question" }The authors of a published article did in fact find what they claimed to find in the sample; their probity is not in question. The relevant, question is whether the sample findings translate to the population from which the sample was obtained? Specifically, does the examination of the relationship between exposure and disease in the sample concisely and efficiently capture what they would find if they examined the entire population, or, alternatively, are the sample results merely due to the freak of chance, the vicissitudes of their inadvertent selection of the wrong, unrepresentative sample from the population. If the former is the case, then a whirlwind of scientific discussion is necessary and valid. However, if the relationship is one that is seen only in the sample, and does not adequately depict a population finding,

then any ensuring discussion is based on a fantasy. These questions are of direct relevance to the COX inhibitor literature, which is replete with studies of different designs, different sensitivities, and widely disparate results.

208. *Sampling Error and Significance Testing* Sample-based research is the study of a sample obtained from a population. Different samples, obtained from the same population, contain different individuals with different experiences an{ XE "p value:and sampling error" }d therefore contain different results. Sampling error is simply this sample-to-sample variability. The symbol $\alpha$, representing the type I error is the specific sample error that allows a population to generate a sample which contains a spurious relationship that is not seen in the population.

209. Clinical trial investigators recognize that there are many reasons why the positive findings of clinical experiment may be misleading. For example, they may have selected a population of patients in whom the therapy works but the inclusion and exclusion criteria of the study were too restrictive. The dose of the medication chosen may be effective, but it produces too many side effects. The blinding of the procedure may have been ineffective, leading to a more diligent search for endpoints among the subjects randomized to placebo therapy. These are all problems with the execution of the trial. They can be anticipated and the trial designed to remove them as obstacles to the trial's success. However, there is one problem that, no matter how well the clinical trial is designed, cannot be removed as the generator of false positive results — chance alone. This is a $\alpha$ error.

210. Statistical significance addresses the possibility that sampling error has produced the positive findings in the sample. If an $\alpha$ (or type I) error occurs, then there is no effect of the therapy in the population, but the population produced a sample in which, just through

chance alone, the therapy produced an effect. There is no question that the therapy worked in the sample; however, the sample results are not a reflection of the population effect, but instead were generated by the random aggregation of subjects selected for the sample.

211. The occurrence of a type I error is solely a property of the sampling process. Since sampling is necessary for the research effort, the investigators understand that they cannot remove this possible explanation of these results. They instead decide to measure the possible influence of sampling error. Investigators set the $\alpha$ error level at the beginning of the study, and compute a sample size based on the maximum acceptable type I error rate, as well as on other parameters. At the conclusion of the experiment, the investigators compute the $p$-value for the result of the study. The $p$-value is the measure of the type I error rate at the end of the study and is based on the actual research results. If the $p$-value is less than the $\alpha$ error rate that was prospectively identified (commonly set at the 0.05 level, a decision that has its sole basis in tradition), then researchers conclude that it is very unlikely that chance alone produced the findings of the study, and that the results of the study (be they clinically significant or clinically negligible) are truly reflective of what would occur in the larger population from which the sample was obtained.

212. Therefore, if (1) the systematic explanations for a spurious research finding are removed from the experiment by exceptional planning and good clinical trial execution, (2) the probability of a false finding just by chance alone is reduced to a small level (i.e., the $p$-value is less than the prospectively set $\alpha$ error rate), and (3) the magnitude of the findings are clinically important, then the medical and regulatory communities are assured that, to a

reasonable degree of certainty, the positive results of the trial represent a true population finding.[*]

213. **Statistical Power.** Statistical power, like *p*-values, is a phenomenon of sampling error. The circumstance in which statistical power is relevant in the interpretation of a research program involving the investigation of COX inhibition is when the trial results are not positive, but null; no treatment effect is seen.{ XE "power (statistical):definition" } Of course, there are many systematic explanations for a null finding (the wrong exposure level to the active intervention is but one of many possible circumstance). However, another possible explanation is sampling error. In this circumstance, the therapy is effective in the population. However, the population produced a sample by chance alone in which the therapy was ineffective. This is a type II or beta error. Power is defined as one minus the type II error. High statistical power translates into a low type II error rate.

214. Consideration of statistical power has important implications for the COX literature, since the occurrence of a type II error makes it impossible to assess the implications of a null finding. Specifically, if a study does not find a relationship between exposure to a COX inhibitor and cardiovascular disease, low statistical power means that it is quite likely that, even if there were a relationship between COX inhibition and cardiovascular disease, the study would not have found it. Therefore the null finding must not be treated as implying a null relationship in the population, but as a non-informative finding. This is the justification for the creed "Absence of evidence is not evidence of absence." Specifically, this means that absence of evidence (of a relationship between COX inhibition and cardiovascular disease) need not be evidence of absence (of this relationship existing in the popula-

---

[*] We will have much more to say about the interpretation of *p*-values.

tion). Thus null findings from underpowered evaluations of the relationship between COX inhibition and cardiovascular disease are uninformative.

215. Since the researcher does not know during the design phase of the study whether the results will be positive or null, she must plan for each possibility. Thus, she should design the study so that the type I error rate will be low (customarily no higher than 0.05) and that the power of the experiment will be high (typically, at least 80%). Each of these considerations is part of the sample size computation.

216. *Sample Size Computations*: Good clinical trials, regardless of their size, are characterized by careful planning, controlled execution, and disciplined analysis. An important component of the design of a clinical research effort is the sample size calculation. The sample size computation is the mathematical calculation that determines how many patients the trial should recruit. It is based on clinical concerns, epidemiologic determinations of event rates, and biostatistical considerations about the role sampling error may play in producing the trial's results. It can be said that the sample size computati{ XE "sample size computation:general concerns" \b }on is the forge upon which the clinical trial design is hammered.

217. Exploratory Analysis and Random Research: Exploratory analysis is the process by which the investigator allows the data to answer specific questions that the investigator did not plan to use the data to address. There are two problems with *exploratory research* or *hypothe {* XE "exploratory analyses:definition" *} {* XE "hypothesis generating analyses:definition" \t "*See* exploratory analyses" *}sis generating research*. The first is that commonly the sample is not an optimal one, since the investigator can only design a sample to answer questions that they knew to ask.

## Appendix B: Determining Causality in Medicine

218. Clinical investigation has been a human endeavor for over two thousand years. The most common building block in the edifice of health study is the { XE "case reports" }{ XE "case series" }case report. A case report is a summary of a single patient's findings and the communication of those findings to the medical community. A case series is a collection of case reports, linked together by a common thread (e.g., all of the patients were seen by the same doctor, or each of the patients was exposed to the same agent, e.g., quinine).

219. It is easy to understand how the growth of general medical knowledge has been propelled by the use of case reports. The delivery of healthcare has been governed by the interaction between a single, concerned, responsible provider and his patient. This relationship is private and privileged. However, it has historically been conducted in isolation, by physicians and nurses widely separated from each other. The idea of a community was well established. However, the concept of a medical community (i.e., a collection of practitioners who worked together to jointly expand their knowledge base) was one that took many generations to develop.

220. Therefore, medical care was delivered for hundreds of years by practitioners, who, working alone with incomplete knowledge, made decisions that directly affected the lives of their patients, and indirectly, their patients' families and communities. The one, natural learning tool these physicians could use was the active sharing of their experiences among themselves. This served to expand their expertise, suggest alternative approaches to healthcare, and extend their knowledge. This shared experience is at the heart of the case report.

221. The core thesis of this approach was best captured by{ XE "Celsus" } Celsus (circa A.D. 25) [32], who stated that "Careful men noted what generally answered the better, and then

began the same for their patients." For the next 1900 years, advances in clinical medicine

occurred through the combined use of careful observations, clear recorded descriptions,

and deductive reasoning. The discovery that gunshot wounds could be healed without the

application of burning hot oil [33] demonstrated that a case report-style observation could

uncover new information and overturn prior, erroneous principles in medicine. When

medical journals began to appear, the primary medical information that they dispersed was

that of the case report. Those physicians who had more exposure and experience with a

medical issue compiled their case reports together into a case series that they would pub-

lish. This continues to this day. Examples are diet drugs and heart valve disease [34] and

radiation poisoning [35].

222. However, case reports have well-established difficulties. Although they reflect very clear

and honest observations, the degree to which a single case report represents a general phe-

nomenon in the population can be subject to debate. Even though they are useful, the vari-

ability of observations across patients makes it difficult to assess whether one patient's

findings summarized in a case report can be easily translated to others.

223. However, what the case report and essentially all investigative mechanisms in medicine

hope to illuminate, by examining both the environment (e.g., exposure to a toxin or a po-

tential cure) and the patient's response, is the true nature of the exposure–outcome rela-

tionship. This true nature could be simply an association, or it could be causal.


224. An { XE "association:vs causation" \t "*See* causation" }association is the coincidental oc-

currence of an exposure and an outcome. Its recognition (e.g., the relationship between

coffee drinking and pancreatic cancer) typically does not require direct action by the medi-