cal community. A { XE "causation" }causal relationship, on the other hand, signifies that the exposure excites the production of the outcome. This more powerful, directed relationship incites the medical and regulatory communities to action. For example, the conclusion that exposure to citrus fruits reversed the symptoms of scurvy incited action by the British navy to mandate the storage of fresh fruit in the provisions of its crews for long sea voyages [36]. On the other hand, links between the use of cutting and bleedings and the remission of yellow fever were merely associative. Thus, when we as physicians examine a case report's details, we sift through the provided clinical descriptions in order to discern if the relationship between the exposure and the outcome is either causative or associative.

225. Epidemiologists are specialists who identify the determinants or causes of disease. They have developed criteria that would be useful in ascertaining whether an exposure causes (i.e., excites the production of) the disease. Elaborated by Sir Austin Bradfor{ XE "Hill, Bradford:and causality tenets" }d Hill [37], these tenets are based on a common sense approach to determining causality and are remarkably free from complicated mathematical arguments. These criteria acknowledge that more disease cases in the presence of the risk factor than in its absence raise a causal suspicion. In addition, determining that greater exposure (either by dose or duration) to the risk factor produces a greater extent of disease amplifies our sense that the exposure is controlling the disease's occurrence and/or severity. These two features are important characteristics of a cause–effect relationship.

226. Other questions posed by Hill permit us to explore the "believability" of the relationship. Is there a discernible mechanism by which the risk factor produces the disease? Have other researchers also shown this relationship? Are there other examples that help us to understand the current exposure–disease relationship? The nine precise Bradford Hill criteria

are: (1) strength of association, (2) temporality, (3) dose-response relationship, (4) biologic plausibility, (5) consistency, (6) coherency, (7) specificity, (8) experimentation, (9) analogy. These are well elaborated in the literature [38].

227. Diligent attempts to determine whether specific case reports and case series can satisfy these causality criteria continue to provide invaluable service to patients and communities. The link between methyl mercury exposure and birth defects in communities surrounding Minamata Bay, Japan, [39], and the establishment that thalidomide was the cause of the birth defects phecomelia and achondroplasia [40] are just two 20th century examples of the ability of case reports and case series to establish causal relationships that produced public health action. The identification of (1) the relationship between tick bites and Lyme disease, and (2) the link between new illnesses among postal workers and anthrax exposure in 2001 are recent examples of their continued value.

228. *Limitations of Case Reports*: Although medical knowledge has progressed through the sensitive and intelligent use of case reports and case series, there is no doubt that the illumination provided by these investigational tools are also profoundly limited. There are four major criticisms of the value of case reports and case series in determining the causal nature of an exposure–disease relationship. They are th{ XE "case reports:and limitations" }at (1) case reports and case series do not provide quantitative measures of the relationship between an exposure and a disease, (2) case reports do not always rule out other competing causes of disease, (3) case reports are subject to biases of selection (i.e., the manner in which the case report was selected may make it unreasonable to believe that its occurrence reflects an important finding in the population), and (4) measurements made in the case re-

port may be nonstandard. These limitations reduce the contribution of case reports to our understanding of the exposure–disease relationship.

229. One of the most remarkable deductive failures of case reports was their false identification of the effects of cardiac arrhythmia suppression [41]. In the 1970s, considerable attention was provided to the potential of new therapies (specifically, the drugs encainide, flecainide, or mirtazapine) for the treatment of dangerous ventricular arrhythmias. It was believed that these new drugs would be more effective and produce fewer side effects than the traditional, poorly tolerated medications. The effectiveness and safety of these newer drugs were examined in a collection of case series. At first, only the sickest patients were given the new therapy. When these patients survived, the investigational drug was credited with saving the patient's life. However, if the patient died, then the patient was commonly deemed "too sick to be saved" and the drug was not debited for the death.

230. Based on these observations, despite some opposition, a consensus developed in the cardiology community that patients with arrhythmias would benefit from the use of these new drugs. After a period of intense deliberation, the Federal Food and Drug Administration (FDA) approved the new antiarrhythmic agents. As a consequence of this approval, physicians began to prescribe the drugs not just to patients with severe rhythm disturbances, but also to patients with milder arrhythmias. This new use was consistent with the growing consensus that these drugs would be beneficial in blocking the progression of dysrhythmia from mild heart arrhythmias to more serious rhythm disturbances.

231. Only after the drugs were approved and on the market was a study carried out that incorporated a control group and the use of randomization. This trial, called CAST{ XE "The CAST Trial" } (Cardiac Arrhythmia Suppression Trial) demonstrated that, not only did the

new therapies not save lives, but also their use caused excess mortality [42]. The findings from CAST, demonstrated the lethality of medications whose safety had been "demonstrated" by case series.

## Appendix C: Detecting Adverse Events

232. *Detecting Adverse Events: Complication in Safety Monitoring*: The ethical concern for safety introduces a new complexity into the interpretation of interim monitoring results. Essentially, the primacy of the admonition, "First, do no harm," complicates the interpretation of exploratory analyzes. Recall that confirmatory analyzes, they the product of prospectively declared plans, are most easily generalizable. They produce reliable estimates of effect sizes, effect size variability, and type I error rates. In addition, prospective consideration of the type and number of statistical hypotheses to be tested leads to tight control of the family wise error rate. On the other hand, exploratory analyzes hold none of these features. These latter analyzes that are suggested by the data rather than by prospective planning produce inaccurate estimators and must be repeate{ XE "safety:and confirmatory monitoring" }d (or confirmed) before they can be generalized.[*]

233. With this dis{ XE "estimators:efficacy versus safety" }tinction in place, the evaluation of efficacy examinations in clinical research is clear and straightforward at both the conclusion of the study and during an interim examination. Consider a hypothetical clinical trial designed to determine the effect of an intervention on patients who have suffered a stroke. The primary analysis for this clinical trial is the effect of therapy on the total mortality rate. If the study's design and execution has been (1) carefully considered with a precise, prospectively declared protocol, (2) executed in accordance with that protocol,[†] and (3) produces a type I error rate below the a priori declared threshold for a clinically significant

---

[*] The reasons for the different interpretations of exploratory versus confirmatory analyzes are discussed earlier in this report Two.

[†] This is defined as concordant execution.

level of efficacy, its results on the primary endpoint would be heralded as positive. How-
ever, assume in that same study, that the therapy was observed to produce a reduction in
the myocardial infarction rate. Because the therapy's effect on the myocardial infarction
rate was not prospectively declared, and its results would be seen as exploratory[*], requiring
confirmation before they can be generalized.

234. However, in the reverse setting, where both the findings for mortality and the myocardial
infarction rate indicate harm and not benefit, the ability to interpret the situation is compli-
cated. Again, the prospective nature of the research design that is focused on mortality
permits the investigators to conclude that the study produces a confirmatory evidence of
harm. However, the identification of an early harmful effect of the intervention on the cu-
mulative myocardial infarction rate is problematic. Clearly, the finding of an increased risk
of myocardial infarction associated with the therapy is crippled by the exploratory nature
of the analysis. However, the occurrence of this finding for harm in all likelihood would
not, and could not, be reproduced. The ethics of protecting subjects from known and sus-
pected dangers precludes the initiation of a new confirmatory research effort in order to
demonstrate that the intervention excites the production of myocardial infarctions.[†]

235. Thus, although confirmatory findings of harm carry the same weight as those of efficacy,
exploratory findings of harm commonly carry more weight than exploratory findings of ef-
ficacy. This places a greater burden on investigators, who must balance the ethical re-

---

[*] Because both the effect of therapy on the total mortality rate and the effect of therapy on the myocardial infarction rate appear
to be equally reliable to the observer, both being produced from the same database, concluding that only the myocardial infarc-
tion finding be discounted may appear capricious. However, because the trial was not designed to examine the myocardial infarc-
tion issue, the ability of the study to ensure that (1) it had an appropriate sample size for the evaluation of the effect of therapy on
heart attacks, and (2) the investigators collected all of the cases of heart attacks (including silent myocardial infarctions) even
though they never said that they would must be questioned. Secondly, the "positive" finding of therapy on the myocardial infarc-
tion rate was based on an unplanned interrogation of the database. This inquiry rose to prominence solely because of its unantici-
pated and surprising finding. Allowing the data to suggest answers in this fashion introduces a new sampling error component
into the analysis that undermines the traditional estimates of effect size, precision, p-values and power.
[†] Other information may become available that would allow the evaluation of the possibility of harm produced by the interven-
tion. Additional concurrent studies, case control, and historical cohort studies may provide some illumination of this issue.

quirement to adequately warn about adverse events with the scientific need to avoid misdi-
rection about the risks of an intervention. This is a challenge to healthcare research in gen-
eral and interim monitoring in particular. Because, confirmatory analyzes for harm will be
the most persuasive, investigators make their strongest possible case when they execute as
many confirmatory analyzes as possible.

236. Although two strategies to address this issue of multiple safety measures are reviewed,
the best strategy begins with good a priori knowledge. During the design phase, investiga-
tors can strengthen the interim analyzes that they have in mind for the safety monitoring by
carrying out an in-depth review of the evidence of adverse effects produced by the inter-
vention that they plan to study. This will allow them to put prospective monitoring rules in
place that provide rigor in detecting the early occurrence of several different adverse
events.

237. With foreknowledge of the adverse event profile of the intervention, and some apprecia-
tion of the frequency at which these adve{ XE "safety:exploratory monitoring" }rse events
appeared, the researcher is able to place prospectively declared rules in place.

238. However, many times adverse events occur that were completely unsuspected during the
course of a clinical research effort, which catch the researcher by surprise. The occurrence
of de novo breast cancer in women exposed to lipid lowering agents during the course of a
cardiovascular clinical experiment, the occurrence of dangerous new arrhythmias gener-
ated by an intervention that suppresses other rhythm disturbances, and the production of
liver failure in medications designed to reduce insulin sensitivity are but a few examples of
unanticipated adverse effects that can be produced by a new intervention.

239. This illustration suggests that although monitoring procedures can provide clear warning that a treatment signal has been detected; the presence of this signal does not provide prima facie evidence for drawing a conclusion and terminating the research effort. That decision is more complex, requiring thoughtful consideration of both the efficacy and the safety of the compound. Ultimately, the decision to discontinue a study is not a mathematical one, but a clinical and ethical decision.

240. Statistical monitoring rules do not provide much guidance in this scenario. The absence of prospective identification, in concert with the large probability of a type I error generated by multiple interrogations of the adverse event data confound any attempt to apply statistical rigor to the evaluations executed on behalf of the patients. This is the conundrum of safety-based monitoring. The predomination of ethical considerations requires the researcher to sometimes set aside statistical precepts in order to be assured that patients are not being harmed in the research effort or in the population. This is unacceptable when one is building an argument for efficacy, but is required in the examination of safety. The asymmetry of this circumstance finds its genesis more in an oath than in science. The following are other useful tools in assessing the validity of an unanticipated adverse event finding.

241. *Strategy 1: Monitor Widely*: Researchers m{ XE "adverse events:need to monitor widely" }ust lead diligent adverse event report evaluations. Just as physicians cannot diagnose diseases of which they have never heard, researchers cannot ethically weigh the implications of serious adverse events that they are not measuring. Thus, the researchers must cast a wide net in order to capture the occurrence of all adverse events. The investigators in post marketing clinical trials were able to successfully carry out this strategy.

242. ***Strategy 2: Assessing Unanticipated Adverse Events***: Clinical trials have been executed for only sixty years. This is a relatively short period of time in the history of clinical investigation. However, the assessment of whether the occurrence of the event is related to a treatment has been a cerebral process that has evolved for hundreds of years. Useful skills have been amassed by scientists in the implementation of no statistical evaluations of the relationship between an event (be it either adverse or salubrious) and an exposure. In the setting of exploratory endpoint analyzes, where statistical assessments are not quite so reliable, these other no statistical assessments rise to new prominence.

243. The occurrence of an exposure and an adverse event occurring in the same patient (or group of patients) begs the question of whether the relationship between the two is associative or causal. An associative relationship is merely that the exposure and the disease occurred coincidentally in the same patients, for example, the occurrence of breast cancer in women taking HMG-Coal reductase inhibitor (i.e., statin) therapy for elevated lipid levels. It is a passive relationship. On the other hand, a causal relationship, as discussed earlier, is active. An exposure causes a event if the exposure excites the production of the event. It is an active relationship, a relationship with directionality. An example is the causal relationship between liver hepatotoxicity and thiazolidinedione therapy for diabetes mellitus.

244. When statistical tools are less useful, other tools of observation become more valuable. In 1965, Hill [43] described the nine criteria for causality arguments in healthcare. These nine rules or tenets are remarkably and refreshingly devoid of complex mathematical arguments, relying instead on natural honest intuition and common sense for the inquiry into the true nature of a risk factor–disease relationship. The questions Dr. Hill suggested

should be posed by the investigators in their assessment of the true nature of the exposure–disease relationship.

245. The evaluation begins with a simple assessment of numbers. Are there many more adverse event cases when the intervention is present, and fewer disease cases when the intervention is absent? If this question has been affirmatively answered, other questions follow. Does a greater exposure to the risk factor produce a greater extent of disease? Other questions asked by Hill explore the "believability" of the relationship. Some of these are: is there a discernible mechanism by which the risk factor produces the disease? Have other researchers also shown this relationship? Are there other such relationships whose demonstration helps us to understand the current risk factor– disease relationship?

246. Consistency requires that the findings of one study be replicated in other studies. The persuasive argument for causality is much more clearly built on a collection of studies involving different patients and different protocols, each of which identifies the same relationship between exposure to the risk factor and its consequent effect. There are numerous examples of collections of studies with different designs and patient populations, but that nevertheless successfully identify the same hazardous relationship between an exposure and disease. Identification of case series involving different series of patients in different countries and different cultures—yet each series producing the disease after the exposure would satisfy these criteria. Because research findings become more convincing when they are replicated in different populations, different studies that examine the same exposure–disease relationship and find similar results add to the weight of causal inference.

247. The specificity of a disease is directly related to the number of known causes of the disease. The greater the number of causes of a disease, the more nonspecific the disease is,

and the more difficult it is to demonstrate a new causal agent is involved in the production of the disease. The presence of specificity is considered supportive but not necessary, and researchers no longer require that the effect of exposure to an agent such as a drug be specific for a single disease.

248. Exposure must occur before the disease develops for it to cause that disease. A temporal relationship must exist in order to convincingly demonstrate causation.[*] This criterion can be clearly satisfied by a case report that accurately documents that the exposure occurred before the disease.

249. An evaluation of a relationship between occurrences of the adverse events and either the dose or duration of the intervention is also useful. The observation that a more intense exposure produces a greater frequency or severity of adverse events adds new strength to the notion that the relationship between the intervention and the adverse event is a causal one. In addition there should be some b{ XE "Hill, Bradford:causality and safety" }asis in the scientific theory that supports the relationship between the supposed "cause" and the effect. However, observations have been made in epidemiological studies that were not considered biologically plausible at the time but subsequently were shown to be correct.

250. It is important to note in the application of these tenets that satisfaction of all nine is not required to establish to the satisfaction of the medical community that a causative relationship exists between the exposure and the disease. Hill himself stated [43]:

251. None of my nine viewpoints can bring indisputable evidence for or against the cause–and–effect hypothesis, and none can be required as a *sine qua non*.

---

[*] Protopathic bias, or the result of drawing a conclusion about causation when the disease process precedes the risk factor in occurrence can result without appropriate attention to the condition.

252. However, these tenets are invaluable in the assessment of intervention-adverse event relationships.

# Appendix D. Subgroup Analyses

253. A subgroup analyses in a clinical research effort is the evaluation of the effect of the ran-
domly allocated intervention within a fraction of the recruited subjects. The analysis of
subgroups is a popular, necessary, and controversial component of the complete evaluation
of a controlled clinical trial. Indeed, it is difficult to find a manuscript that reports the re-
sults of a clinical trial that does not report findings within selected subgroups.

254. Subgroup analyses as currently utilized in clinical trials are tantalizing and controversial.
There may be no better maxim for guiding the interpretation of subgroup analyses in this
setting than "Look, but don't touch," The results from subgroup assessments have tradi-
tionally been used to augment the persuasive power of a clinical trial's overall results by
demonstrating the uniform effect of the therapy in patients with different demographic and
risk factor profiles. This uniformity leads to the development of easily understood and im-
plemented rules to guide the use of therapy[*]. Some clinical trials report these results both
in the manuscript announcing the trial's overall results  [44, 45, 46,47] and separately [48,
49, 50]. Such subgroup analyses potentially provide new information about an unantici-
pated benefit (or hazard) of the clinical trial's randomly allocated intervention.

255. However useful and provocative these results can be, it is well established that subgroup
analyses are often misleading [51, 52, 53, 54]. Assmann et al. [55] has demonstrated how
commonly subgroup analyses are misused, while others point out the dangers of accepting
subgroup analyses as confirmatory [56]. For example, the Amlodipine controversy in the
PRAISE trials discussed earlier in this report were based on a subgroup analysis. Neverthe-

---

[*] The finding that a particular lipid lowering drug works better in women than in men can complicate the already complex deci-
sions that practitioners must make as the number of available compounds increase.

less, the medical community continues to be tantalized by spectacular subgroup findings from clinical trials. A recent example is the subgroup analysis-based suggestion that medication efficacy is a function of race; this has appeared in both peer-reviewed journals [57, 58] and the lay press [59]. In this section, we will review the definitions, concepts, and limitations of subgroup utilization in clinical trials.

256. *Subgroups: Definitions and Basic Concepts* While the concept of subgroup analyses is straightforward, the terminology can sometimes be confusing. This report will therefore devote some attention to defining nine and classifying subgroup analyses.

257. *Subgroups Versus Subgroup Strata*: A subgroup is the description of{ XE "subgroups:definition" } patient based characteristic, e.g., gender that can be subdivided into categories. These different categories are described as strata, one stratum level for each category. For example, if an investigator is interested in creating a gender subgroup, patients are classified according to their sexual characteristics; the resultant gender subgroup consists of two strata—male and female.

258. The classic subgroup analysis itself is an evaluation of the effect of therapy within each of the subgroup strata. In this example of a gender-based subgroup, the subgroup analysis consists of an evaluation of the effect of therapy for males and an evaluation of the effect of therapy for females. Thus each stratum analysis produces an effect size with its standard error, a confidence interval, and a *p*-value.

259. The investigators choose the characteristics that form the basis of these subsets. However, over time, a commonly evaluated set of subgroup evaluations has emerged. Although there are differences from one medical subspecialty to another, the most common of these subgroups are based on demographic criteria e.g., gender, ethnicity, and age. Frequently used

sociologic determinants are marital status, education, and acculturation.[*] In addition, there are subgroups that are based on lifestyle choices. Some examples of these are alcohol use, tobacco use, dietary intake, and exercise. Of course findings from medical histories (e.g., history of cancer, history of CHF, history of endocrine disorders) and physical examination (e.g., body mass index or DBP) are among commonly appearing subgroups in clinical trials as well.

260. The definition of a subgroup can be more complicated than a first glance would suggest. Consider the marriage status subgroup. One might think that this is easy to define. Is the patient married or not? Phrased this way, this suggests that the marriage subgroup should have two strata. However, the choices can be much more complex than this. The patient could be married now, or have been married in the past and is single now. The patient could be separated, divorced, or remarried. These alternative classifications can either be useful, or merely distractions depending on the purpose for which the evaluation will take place. For example, in some research, which is not primarily sociologic, these additional classifications may be unnecessary. However, in other research efforts, the intricate differentiation of marriage history details is very important. Thus, one must know how the subgroup analysis will be used so that the most useful strata membership criteria can be developed. Once each of the subgroup strata have been identified, the clinical trial workers will know what data to collect that will be the most useful.[†]

261. *Subgroups: Interpretation Difficulties*: The illustrations of the previous sections have demonstrated that there are many possible ways to subgroup patients. However, we must keep in mind that, in a collection of subgroup analyses, it is the same patien{ XE "sub-

---

[*] Acculturation is the degree to which a community composed primarily of immigrants accepts with approval and is involved in the activities of the surrounding society.
[†] Another subgroup that has grown in complexity is that for race/ethnicity.

groups:interpretation difficulties" }ts that are being stratified in different ways. This observation can complicate the interpretation of a subgroup evaluation.

262. For example, consider a randomized, controlled clinical trial, which is in its analysis phase. At this time, all of its patients are classified by gender, grouping patients into male and female sub-cohorts. Once the stratum membership assignment is finished, the effect of the randomly allocated intervention is assessed in each of the two gender strata. It is seen that the effect of therapy appears to depend on gender, with males experiencing a different effect than females.

263. When completed, these same patients are then re-aggregated based not on gender, but on age. Subjects are placed into one of the following three age strata: (1) less than 40 years of age, (2) between 40 and 60 years of age, and (3) greater than 60 years of age. When the subgroup analysis is carried out for the age strata, it appears that the effect of therapy is the same in each of the age groups.

264. The results from these two subgroup analyses essentially demonstrate that the same patients when characterized one way (by gender) provide a different result than when characterized another way (by age). Was it really gender that modified the effect of therapy or was it the chance collection of patients that made it appear that gender was an influence? Since we can expect that the effect of treatment within a subgroup stratum depends on the patients within that stratum, then the value of the subgroup analysis must be tightly linked to the ability to demonstrate that it is the stratum characteristic that is producing the interesting effect and not just the random aggregation and re-aggregation of patients.

265. *Random Subgroups*. Investigators work to identify subgroup classifications that are meaningful. When examination of the therapy effect within a subgroup appears, it is only

natural for the investigator to believe the rationale for the choice of the subgroup was justified. Furthermore, the scientist may think that the stratum specific therapy effect is due to some effect-mediation ability produced by the subgroup trait. However, the very fact that patients are classified and divided can induce a subgroup effect.

266. Consider the following simple experiment. A courtroom chosen at random has a capacity of seating 60 observers. A central aisle divides these 60 seats, with 30 seats on each of the left-hand and right-hand side of the courtroom. Sixty people seat themselves as they choose, distributing themselves in an unrestricted manner among the seats on each side of the courtroom. When all are seated, we measure the height of each person, finding that the average height is exactly 67 inches. Does that mean that the average height of those seated on the left-hand side of the courtroom will be 67 inches? No. The average height of those seated on the left-hand side of the courtroom will be either less than 67 inches or greater than 67 inches, but it will not be exactly 67 inches (because the average is based on only thirty of the sixty people). If the average height on the left-hand side of the courtroom is less than 67 inches, than those seated on the right-hand side will have an average height greater than 67 inches[*]. Is it fair to conclude that those who sit on the right- hand side of the courtroom are in general taller than those who sit on the left-hand side?

267. The simple, random aggregation and sub-aggregation of the observations has induced a subgroup effect that is based only on the play of chance. This random subgroup effect appears in all subgroup analyses, and we will have to integrate it into our interpretation of any subgroup effect that we see. Some interesting findings of random subgroup analyses

---

[*] If the average height of all in the courtroom is 67 inches, and the average height on the left side is less than 67 inches, then the average height on the right hand side must be greater than 67 inches

are available [60]. These occurrences help to justify the admonition that the best descriptor

of the effect in a subgroup is the finding that is observed in the overall cohort.

268. *Proper Versus Improper Subgroups*: A critical preliminary task that clearly must be

completed before a subgroup analysis proceeds is the classification of each patient into a

subgroup stratum. This is the process by which the subgroup membership f{ XE "sub-

groups:proper vs improper" }or each patient in the study is determined. Although member-

ship determination may appear to be a trivial task, there are circumstances in which this

classification is problematic. These concerns revolve around the timing of the subgroup

membership determination.

269. There are two important possibilities for determination of the timing of subgroup mem-

bership. The first is the classification of patients into the correct subgroup stratum when

the patients are randomized. The second choice is to classify patients into subgroup strata

at some time during the execution of the trial. While each has advantages, the determina-

tion of subgroup membership at the beginning of the study is preferred.

270. Determining subgroup membership at the beginning of the trial requires that, not only

must the subgroup be defined at the beginning of the study, but also subgroup strata mem-

bership should be defined prospectively as well. This is a straightforward procedure to ap-

ply to the gender subgroup with its two strata. However, for other subgroups of clinical in-

terest, the process can be complex.

271. *Intention-to-Treat" Versus "As Treated"  Subgroup Analyses*: Consider a clinical trial

in which patients are randomized to receive an intervention to reduce the total mortality

rate from chronic cirrhosis of the liver. At the inception of the study, patients are random-

ized to receive either control group therapy or the intervention. At the conclusion of the

study, the investigators will compare the cumulative mortality rates of patients in each of the two { XE "intention to treat:vs. \"as treated\"" }treatment groups. However, at the end of the study, how will the investigators decide what patients should be considered active group patients and which patients should be counted as in the control group? The commonly used approach is to assign treatment group membership simply as the group to which the patient was randomized. This is the "intention to treat" principle.

272. The "intention-to-treat" principle of analysis is the standard analysis procedure for the evaluation of clinical trial results. Undoubtedly, this analysis tends to be a conservative one, since not every patient is treated as they were "intended." For example, some patients randomized to the active group may not take their medication. These patients, although randomized to the active group, will have the control group experience and produce endpoints at rates similar to that of the control group. However, they would be included in the active group since they were randomized to and "intended to be treated" like active group patients. The inclusion of these patients in the active group for analysis purposes tends to make the active group experience look more like the control group experience, increasing the overall active group event rate.*

273. Similarly, patients who are randomized to the control group may nevertheless be exposed to active group medication (e.g., from their personal physician who is not an investigator in the study). These patients will experience event rates similar to the rates of the active group, but since they are considered as part of the control group, the inclusion of these patients will produce an event rate for the control group that is closer to that of the active

---

* There are occasional complications in an "intention-to-treat" analysis. In some cases, a patient is tested and randomized, but then, subsequent to the randomization the test result reveals that the patient is not eligible for the trial for a prospectively stated reason. In this case, there was no "intent" to randomize this patient when the test result was known, and the patient is removed from the study.

group. Thus the control group rate will approach that of the active group, while the cumulative event rate in the active group will be closer to that of the control group (described in the previous paragraph). This effect of these combined rate alterations reduces the magnitude of the treatment effect, thereby diminishing the power of the clinical trial.[*]

274. An alternative analysis to the "intent to treat" principle is one that analyzes the endpoint results using an "as-treated" analysis. In this case, although patients are still randomized to receive either placebo or active therapy, they are classified for analysis purposes based on whether they actually took their medication or not. Since this is determined after the patient was randomized to the medication, and the effect (both perceived beneficial effects, and adverse effects) of the medication may determine whether the patient takes the medication, the "as-treated" evaluation is a confounded analysis. A clearly detailed examination of this issue is available [61].

275. *Effect Domination Principle*: I have stated previously that, in the absence of confirmatory subgroup evaluations, the best estimate of the effect of randomly allocated therapy within subgroup strata is the effect of that therapy on the overall cohort. We will call this the principle of *effect domination*— the effect of therapy averaged over all randomized patients dominates the effect seen in the individual subgroup strata.

276. The effect domination principle was the basis { XE "subgroups:effect domination prinicple" } of our decision to overturn the results of several of the subgroup evaluations that were provided previously. Although there are many clinical trials designed to provide confirmatory evaluations of their primary analyses, there are far fewer confirmatory evaluations that occur in the assessments of subgroups. Therefore, the effect domination

---

[*] The effect of the magnitude of the treatment effect on the power of a study for fixed sample size is discussed in Appendix D.

principle is much more frequently required in the interpretation of the results of clinical trials.

277. Since subgroup analyses have and will, in all likelihood, continue to engender the interest of the medical community, it is logical to ask why there aren't more confirmatory analyses involving subgroup evaluations. This is an especially interesting question since there are clear circumstances in which subgroup evaluations can produce confirmatory results of the therapy effect within (or across) subgroup strata. When executed, these confirmatory results stand on their own, separate and apart from the result of the effect of therapy in the overall cohort. The criteria for these evaluations were clearly characterized by Yusuf et al. [62] and are coincident with our development of confirmatory analyses in this text.

278. The first of these criteria for the development of confirmatory analyses in clinical trials is that the subgroup analysis must be prospectively designed and proper. This structure is required so that (1) the therapy effect size estimators that the subgroup analysis produces are trustworthy; and (2) that the effect of therapy to be evaluated in a subgroup is not confounded by (i.e., bound up with) post-randomization events as discussed previously. In general, there has been no difficulty with meeting this requirement of confirmatory subgroup analyses. Many clinical trials make statements in their protocols describing the plans of investigators to evaluate the effect of therapy within their subgroups of interest. These subgroups are, by and large, proper subgroups, e.g., demographic traits, or the presence of risk characteristics at baseline.

279. However, the final requirement for a confirmatory subgroup analysis is the prospective allocation of type I and type II error rates. This last criterion has proved to be especially vexing because of the severe sample size constraints this places on subgroup analyses. As

we have pointed out earlier, the allocation of type I error rates for confirmatory testing must be such that the FWER, $\xi$, is conserved. This requires that statistical testing at the level of subgroup analyses will be governed by test-specific $\alpha$ error rates that are generally less than 0.05.

280. The difficulty of executing subgroup analyses in the presence of type I error rate control and adequate statistical power is not difficult to understand. In fact, resources are generally strained to the breaking point for the analysis of the effect of therapy in the overall cohort. This overall analysis is typically carried out with the minimum acceptable power (80%) because of either financial constraints or patient recruitment difficulties. By definition, subgroup analyses (and certainly within-stratum subgroup analyses) will involve a smaller number of patients; it is a daunting task to prospectively allocate type I and type II error rates at acceptable levels in a smaller number of patients, although the methodology for the accurate computation of sample size is available [63]. Thus, the growth of the use of sub-groups as confirmatory tools has, to some extent, been stunted by the difficulty of con-structing a prospective clinical trial with an embedded, prospectively defined proper sub-group for which tight statistical control is provided for type I and type II statistical errors.

281. *Manuscript Interpretation* The purpose of a published manuscript is to identify the con-tribution the research effort has made. Specifically, this general evaluation reduces to three questions that should be answered. (1) What was the purpose of the research? (2) Do the methods used allow the researcher to answer the question? and, (3) If so, then what is the answer?

282. The motivation for the research is determined from a careful study of the introductory section of the manuscript. Commonly replete with citations, this section should clearly de-

lineates the research question that was raised by the investigators. Whether the investigators are able to answer the research question they asked is determined in the methods section. Your review of this section of the manuscript should be careful and thorough. Was the instrumentation sufficient to provide the measures with the precision that the authors require? If laboratory samples are involved were they preserved using the appropriate environmental conditions?

283. If the research involves subjects, other questions must be adequately addressed in this critical section of the manuscript that describes the methodology used by the authors. Was there an adequate number of subjects? Is the analysis carried our prospectively delineated, leading to trustworthy estimates of effect sizes, standard errors, confidence intervals, and p-values, or were the analyses exploratory, requiring an additional, confirmatory study to sustain the findings.

284. If the methodology empowers the investigators to answer their prospectively asked question, then proceed to read the results section, fully planning to integrate the main findings of the research into your fund of knowledge. However, if the methods reveal that the findings from the study are exploratory and not generalizable, then the results are not generalizable, and cannot really be accepted as reflective of the population. However, considerable care must be given if the manuscript has identified a harmful effect,

285. The reviewer must avoid the temptation to "study count". "Study counting" is the process of simply counting the number of studies that address an issue and deciding if there "are enough" studies to support the result of interest. Some who are involved in study counting argue that there must be more than one study. Others say that the number of "positive" studies must outnumber the number of "negative" studies. Instead, the scientific reasoning

process assesses in detail each of the available studies, carefully dissecting the methodol-

ogy, sifting through the methodology, and carefully considering the conclusions. Study

counting represents the wholesale abandonment of the intellectual principles of careful re-

view.

286. The specific problem with "study counting" is the implicit ceteris paribus (all other things

being equal) assumption, i.e. that all of the studies that are being included in the count are

equal in methodology, equal in the thoroughness of their design, equal in the rigor of their

execution, and equal in the discipline of their analyses and interpretation. This fallacious

assumption is far from the truth of scientific discovery. Studies have different strengths

and different weaknesses. Different investigators with their own non-uniform standards of

discipline execute the research efforts. Some studies give precise results, while others are

rife with imprecision. The panoply of studies is known not for its homogeneity, but for the

heterogeneity of designs and interpretations.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                         5/22/2006

I certify that the foregoing statements made by me are true and correct.  Executed this

_22nd_ day of _May_____ 2006 at Houston, Texas

_____
Lemuel Moyé, M.D., Ph.D.

STATE OF TEXAS    )

                             )  ss.

COUNTY OF HARRIS

Subscribed and sworn to me

Before this _22nd_ day of _May_ 2006

_____
Signature of Notary Public

My Commission Expires _9/30/09_____

APRIL K THOMSON
My Commission Expires
September 30, 2009

# References

1 . Hippisley-Cox JC, et al. Risk of myocardial infarction in patients taking cyclo-oxygenase-2 inhibitors or conventional non-steroidal anti-inflammatory drugs: population based nested case-control analysis. BMJ VOLUME 330 11 JUNE 2005

2 . Cole P, MacMahon B. Attributable risk percent in case-control studies. Br J Prev Soc Med. 1971 Nov;25(4):242-4.

3 . Miettinen OS. Proportion of disease caused or prevented by a given exposure, trait or intervention. Am J Epidemiol. 1974 May;99(5):325-32.

4 . Wilson PW. Prediction of coronary heart disease using risk factor categories. Circulation. 1998 May 12;97(18):1837-47.

5 American Heart Association Stroke Statistics. In: 2001 *Heart and Stroke Statistical Update*. Dallas: American Heart Association, 2000.

6 American Heart Association *2001 Heart and Stroke Facts*, Dallas: American Heart Association, 2000.

7 Hennan JK. Effects of selective cyclooxygenase-2 inhibition on vascular responses and thrombosis in canine coronary arteries. Circulation. 2001 Aug 14;104(7):820-5.

8. Linder JD. Cyclooxygenase-2 inhibitor celecoxib: a possible cause of gastropathy and hypoprothrombinemia. South Med J. 2000 Sep;93(9):930-2.

9 Crofford LJ. Thrombosis in patients with connective tissue diseases treated with specific cyclooxygenase 2 inhibitors. A report of four cases. Arthritis Rheum. 2000 Aug;43(8):1891-6.

10 Bombadier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med. 2000;343:1520-1528.

11 Food and Drug Administration Advisory Committee. Cardiovascular safety review of rofecoxib. Available from URL: http://www.fda.gove/ohrms/dockets/ac/01/briefing/3677b2_06-cardio.pdf.

12 . Curfman GD, Morissey S, Drazen JM (2005). Expression of concern; Bombardier et al., "Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis *N Engl J Med* 2000;353:1520-8. *New England Journal of Medicine* 353:2813-2814.

13. Juni P, Rutjes AW, Dieppe PA. Are selective COX-2 inhibitors superior to traditional non-steroidal anti-inflammatory drugs? BMJ 2002.324:1287-8.

14. Konstam MA, Weir MR, Reicin A, et al. Cardiovascular thrombotic events in controlled clinical trials of rofecoxib. Circulation 2001. 104:2280-8.

15 Garcia Rodriguez LA. The effect of nonsteroidal anti-inflammatory drugs (NSAIDS) on the risk of coronary heart disease: fusion of clinical pharmacology and pharmacoepidemiologic data. Clin Exp Rheumatol 2001:19 (6 Suppl. 25):S41-4.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                        5/22/2006

16 Ray WA, Stein CM, Hall K, et al. Non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease; an observational cohort study. Lancet 2002:359 118-23.

17 Breaslier RS. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med 2005: 352:

18. FitzGerald GA. Coxibs and Cardiovascular Disease. New England Journal of Medicine.351: 1709-1711.

19. Solomon DH. Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults. *Circulation* 2004:109:2068-2073.

20 Bannwarth B, et al. Adverse events associated with rofecoxib therapy. Drug Safety 2003;26(1): 49-54.

21 Reicin A, et al. Comparison of cardiovascular thrombotic events in patients with osteoarthritis treated with rofecoxib versus nonselective nonsteroidal anti-inflammatory drugs (Ibuprofen, diclofenac, and nabumetone). Am J Cardiol 2002;89: 204-9.

22 Weir MR. Selective COX-2 inhibition and cardiovascular effects: a review of the rofecoxib development program. Am Heart J. 2003 Oct;146(4):591-604. Review.

23 Ray W, et al. COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease. The Lancet 2002;360: 1071-3.

24 Mamdani M, et al. Effect of selective cyclooxygenase 2 inhibitors and naproxen on short-term risk of acute myocardial infarction in the elderly. Arch Intern Med 2003;163: 481-6.

25 Layton D, et al. Comparison of the incidence rates of thromboembolic events reported for patients prescribed rofecoxib and meloxicam in general practice in England using prescription-events monitoring (PEM) data. Rheumatology 2003;42:1342-53.

26 Layton D, et al. Comparison of the incidence rates of thromboembolic events reported for patients prescribed rofecoxib and meloxicam in general practice in England using prescription-events monitoring (PEM) data. Rheumatology 2003;42:1354-65.

27 Zhao SZ, Reynold NW, Lejkowth J, et al. A comparison of renal-related adverse drug reactions between rofecoxib and celecoxib based on the World Health Organization/Uppsala Monitoring Centre safety database. Clin Ther 2001; 23:1478-91.

28 Vu D, Murty M, McMorran M, Selective COX-2 inhibitors: suspected cardiovascular/cerebrovascular adverse reactions. Can Adv Reaction News 2002:12:1-3.

29 Mukherjee D, et al. Risk of cardiovascular events associated with selective COX-2 inhibitors. JAMA 2001;286: 954-9.

30. Fisher LD, Moyé LA. Carvedilol and the Food and Drug Administration approval process: an introduction.. Controlled Clin Trials 1999,20:1-15.

31. Moyé LA. P-Value Interpretation in Clinical Trials. The Case for Discipline. Controlled Clin Trials 1999;20:40-49.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                5/22/2006

32. Bull JP. (1959) Historical development of clinical therapeutic trials. *Journal of Chronic Disease* **10**:218–248.

33. Malgaigne LF. (1947) *Weuvres Completes d'Ambrosise Paré*, vol. 2. Paris, p. 127.

34. Connolly HM, Crary JL, McGoon MD, et al. (1997) Valvular heart disease associated with fenflura-mine-phentermine. *New England Journal of Medicine* 337:581–588.

35. Clark C. (1997) *Radium Girls: Women and Industrial Health Reform, 1910–1935* Chapel Hill, University of North Carolina Press.

36. Gehan EA, Lemak NA. (1994) *Statistics in Medical Research: Developments in Clinical Trials*. New York, Plenum Medical Book Company.

37. Hill B. (1953) Observation and experiment. *New England Journal of Medicine* 248:995–1001.

38. Kleinbaum DG, Kupper LL, Morgenstern H. (1982) *Epidemiologic Research: Principles and Quantitative Methods*. New York, Van Nostrand Reinhold Company.

39. Pepall J. (1997) *Methyl Mercury Poisoning: The Minamata Bay Disaster*. Copyright © International Development Research Centre, Ottawa, Canada.

40. Lenz W. (1962) Thalidomide and congenital abnormalities. *Lancet* 1:45.

41. Moore T{ XE *"Thomas Moore"* }{ XE "Moore, Thomas" }. (1995) *Deadly Medicine*. New York, Simon and Schuster.

42. Preliminary report: effect of encainide and flecainide on mortality in a randomized trial of arrhythmia suppression after myocardial infarction. The Cardiac Arrhythmia Suppression Trial (CAST) Investigators. N Engl J Med. 1989 Aug 10;321(6):406-12.

43. Hill B. (1953) Observation and experiment. *New England Journal of Medicine* 248:995–1001.

44. Pfeffer, M.A., Braunwald, E., Moyé, L.A. et al. (1992). Effect of captopril on mortality and morbidity in patients with left ventricular dysfunction after myocardial infarction–results of the Survival and Ventricular Enlargement Trial. *New England Journal of Medicine* 327:669–677.

45.Sacks F.M. Pfeffer M.A., Moyé, L.A. (1996). The effect of pravastatin on coronary events after myocardial infarction in patients with average cholesterol levels. *New England Journal of Medicine* 335:1001–1009.

46  The SHEP Cooperative Research Group (1991) Prevention of stroke by antihypertensive drug therapy in older persons with isolated systolic hypertension: final results of the systolic hypertension in the elderly program (SHEP). *Journal of the American Medical Association* 265:3255–3264

47. The Long-Term Intervention with Pravastatin in Ischemic Disease (LIPID) Study Group. (1998). Prevention of cardiovascular events and death with pravastatin in patients with CAD and a broad range of initial cholesterol levels. *New England Journal of Medicine* 339:1349–1357.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                                    5/22/2006

48. Moyé, L.A., Pfeffer, M.A., Wun, C.C., et. al (1994). Uniformity of captopril benefit in the post infarction population:  Subgroup analysis in SAVE. *European Heart Journal*.15: Supplement B:2–8.

49. Lewis, S.J., Moyé, L.A., Sacks, F.M., et. al (1998). Effect of pravastatin on cardiovascular events in older patients with myocardial infarction and cholesterol levels in the average range. Results of the Cholesterol and Recurrent Events (CARE) trial. *Annals of Internal Medicine* 129:681–689.

50. Lewis, S.J., Sacks, F.M., Mitchell, J.S., et. al (1998). Effect of pravastatin on cardiovascular events in women after myocardial infarction: the cholesterol and recurrent events (CARE) trial. *Journal of the American College of Cardiology* 32:140–146.

51. Peto, R., Collins, R., Gray, R. (1995). Large-scale randomized evidence: Large, simple trials and overviews of trials. *Journal of Clinical Epidemiology* 48:23–40.

52. MRFIT Investigators. (1982). Multiple risk factor intervention trial. *Journal of the American Medical Association* 248:1465–77.

53. ISIS-1 Collaborative Group (1986) Randomized trial of intravenous atenolol among 16027 cases of suspected acute myocardial infarction–ISIS–1. *Lancet* ii;57–66.

54. Lee, K.L., McNeer, F., Starmer, C.F., Harris, P.J., Rosari, R.A. (1980). Clinical judgment and statistics. Lessons from a simulated randomized trial in coronary artery disease. Circulation 61:508–515.

55. Assmann SF, Pocock SJ, Enos LE, Kasten LE. (2000), Subgroup analysis and other (mis)uses of baseline data in clinical trials. Lancet. 2000 Mar 25;355(9209):1064-9.

56. Bulpitt, C. (1988). Subgroup Analysis. *Lancet*: 31–34 .

57. Exner, D.V., Dreis, D.L., Domanski, M.J., Cohn, J.N. (2001), Lesser response to angiotensin–converting enzyme inhibitor therapy in black as compared to white patients with left ventricular dysfunction. *New England Journal of Medicine* 334:1351–7

58. Yancy, C.W., Fowler, M.B., Colucci, W.S., Gilber, E.M., Brsitow, M.R., Cohn, J.N., Luka, M.A., Young, S.T., Packer, M. for the US Carvedilol Heart Failure Study Group. 2001.Race and response to adrenergic blockade with carvedilol in patients with chronic heart failure. *New England Journal of Medicine* 334:1358–65.

59. Stolberg S.G. Should a pill be colorblind? *New York Times*. Week in Review. May 13, 2001.p 1.

60. Moyé, L. (2000) *Statistical Reasoning in Medicine: The Intuitive P-Value Primer*. New York. Springer.

61. Peduzzi, P.,Wittes, J., Deter, K., Holford, T. Analysis as-randomized and the problem of non-adherence; an example from the veterans affairs randomized trial of coronary artery bypass surgery. (1993). *Statistics in Medicine* 12:1185–1195.

62. Yusuf, S, Wittes J., Probstfield, J., Tyroler, H.A. (1991). Analysis and interpretation of treatment effects in subgroups of patients in randomized clinical trials. *Journal of the American Medical Association* 266:93–8.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                                5/22/2006

63. Peterson, B., George, S.L. (1993). Sample size requirements and length of study for testing interaction in a 1 x *k* factorial design when time-to-failure is the outcome. *Controlled Clinical Trials* **14**:511–522.

# EXHIBIT  B

Lemuel A. Moye, M.D., Ph.D.

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX          :   MDL DOCKET NO.
LITIGATION PRODUCTS   :   1657
LIABILITY LITIGATION  :   SECTION L
                      :
This document relates:    JUDGE FALLON
To                    :
GERALD BARNETT AND     :   MAGISTRATE JUDGE
CORRINE BARNETT       :   KNOWLES
       V.             :
MERCK & CO., INC.     :
                      :
Civil Action No.      :
2:06cv485             :
                  _   _   _

            June 2, 2006

                  _   _   _

        Oral deposition of LEMUEL A. MOYE,

M.D., Ph.D., held in the offices of

Abraham, Watkins, Nichols, Sorrels,

Matthew & Friend, 800 Commerce, Houston,

Texas, commencing at 9:30 a.m., on the

above date, before Linda L. Golkow, a

Federally-Approved Registered Diplomate

Reporter and Certified Shorthand

Reporter.
                  _   _   _

        GOLKOW LITIGATION TECHNOLOGIES
              Four Penn Center
        1600 John F. Kennedy Boulevard
                 Suite 1210
        Philadelphia, Pennsylvania 19103
                 877.DEPS.USA



PLAINTIFF'S
EXHIBIT
3

# Lemuel A. Moye, M.D., Ph.D.

## Page 2

1  A P P E A R A N C E S :
2
3     BEASLEY, ALLEN, CROW, METHVIN,
       PORTIS & MILES
4     BY: J. PAUL SIZEMORE, ESQUIRE
       218 Commerce Street
5     Montgomery, Alabama 36103-4160
       (334) 269-2343
6     Counsel for Plaintiffs
7     ROBINSON, CALCAGNIE & ROBINSON
       BY: TED B. WACKER, ESQUIRE
8     110 Laurel Street
       San Diego, California 92101
9     (619) 338-4060
       Counsel for California Plaintiffs
10
11    BLIZZARD MCCARTHY & NABERS
       BY: EDWARD BLIZZARD, ESQUIRE
12    440 Louisiana - Suite 1710
       Houston, Texas 77024
13    (713) 844-3750
       Counsel for MDL Plaintiffs
14    Steering Committee
15
       SNAPKA TURMAN & WATERHOUSE
16    BY: KATHRYN A. SNAPKA, ESQUIRE
       and
17    RICK WATERHOUSE, JR., ESQUIRE
       Suite 1511 - 606 North Carancahua
18    Corpus Christi, Texas 78476
       (361) 888-7676
19    Counsel for Plaintiffs
20
       FIBICH HAMPTON LEEBRON & GARTH,
21    LLP
       BY: TOMMY FIBICH, ESQUIRE
22    Suite 1800, Five Houston Center
       1401 McKinney Street
23    Houston, Texas 77010-9998
       (713) 751-0025
24    Counsel for Plaintiffs

## Page 3

1  A P P E A R A N C E S :  (CONTINUED)
2
3     WATTS LAW FIRM
       BY: T. CHRISTOPHER PINEDO, ESQ.
4     14th Floor, Tower II Building
       555 North Carancahua Street
5     Corpus Christi, Texas 78478
       (361) 887-0500
6     Counsel for Plaintiffs
7
       O'QUINN LAW FIRM
8     BY: JENNIFER J.J. LEACH, ESQUIRE
       2300 Lyric Centre Building
9     440 Louisiana
       Houston, Texas 77002
10    (713) 223-1000
       Counsel for Plaintiffs
11
12    WILLIAMS BAILEY
       BY: AMY M. CARTER, ESQUIRE
13    Suite 600
       8441 Gulf Freeway
14    Houston, Texas 77017
       Counsel for Plaintiffs
15
16
17    JOSEPH D. PIORKOWSKI, JR., ESQUIRE
       Suite 800
18    910 17th Street, N.W.
       Washington, DC 20006
19    (202) 223-5535
       jpiorkowski@lawdoc1.com
20    Counsel for Merck & Co., Inc.
21
22    - - -
23
24

## Page 4

1  A P P E A R A N C E S :  (CONTINUED)
2
3     FULBRIGHT & JAWORSKI LLP
       BY: DAVID WALLACE, ESQUIRE
4     Suite 2800 - 2200 Ross Avenue
       Dallas, Texas 75201
5     (214) 855-8184
       dawallace@fulbright.com
6     Counsel for Merck & Company, Inc.
7
8     BAKER BOTTS LLP
       BY: RICHARD L. JOSEPHSON, ESQUIRE
9     One Shell Plaza
       910 Louisiana Street
10    Houston, Texas 77002
       (713) 229-1460
11    richard.josephson@bakerbotts.com
       Counsel for Merck & Co., Inc.
12
13
       BARTLIT BECK HERMAN
14    BY: SHAYNA COOK, ESQUIRE
       Courthouse Place
15    54 West Hubbard Street
       Chicago, Illinois 60610
16    (312) 494-4451
       Counsel for Merck & Co., Inc.
17
18
19    CRUSE, SCOTT, HENDERSON & ALLEN,
       LLP
20    BY: PEGI S. BLOCK, ESQUIRE
       and
21    VICTORIA A. FILIPPOV, ESQUIRE
       7th Floor - 2777 Allen Parkway
22    Houston, Texas 77019-2133
       (713) 650-6600
23    Counsel for Texas physicians
24    - - -

## Page 5

1     - - -
2     I N D E X
3  WITNESS                        PAGE NO.
4  LEMUEL A. MOYE, M.D., Ph.D.
5
6     By Mr. Piorkowski          10
7     By Mr. Wacker              392
8
9     - - -
10    E X H I B I T S
11
      NO.    DESCRIPTION       PAGE NO.
12
13 Moye MDL 1  "COX-2 Inhibitor  38
                Report of Lemuel A.
14              Moye, M.D., Ph.D."
                5-22-06
15             (110 pages)
16
      Moye MDL 2  "Documents Reviewed 71
17                by Dr. Lemuel A.
                  Moye"
18               (88 pages)
19
      Moye MDL 3  Curriculum Vitae of 136
20                Lemuel A. Moye,
                  M.D., Ph.D.
21               (22 pages)
22
      Moye MDL 4  "Testimony of      224
23                Lemuel A. Moye, MD,
                  PhD"
24               (2 pages)

2  (Pages 2 to 5)

# Lemuel A. Moye, M.D., Ph.D.

**Page 6**

1
2   Moye MDL 5   Invoices        211
3         (9 pages)
4
5
6   Moye MDL 6   "Scientific     228
          Advisors' Meeting
7         May 3-May 6, 1998
          Programmatic Review
8         Vioxx Program"
          MRK-AEI0002734 –
9         MRK-AEI0002746
10  Moye MDL 7   "Final Results of  267
          an Analysis of the
11        Incidence of
          Cardiovascular SAEs
12        in the Phase
          IIb/III Vioxx
13        Osteoarthritis
          Clinical Trials"
14        2-2-98 (Watson)
          MRK-AAD0046029 –
15        MRK-AAD0046030
16
    Moye MDL 8   Vioxx May 1999   317
17        Label
          MRK-LBL0000027 –
18        MRK-LBL0000030
19
20  Moye MDL 9   Memo 4-6-05      360
          "Analysis and
21        recommendations for
          Agency action
22        regarding
          nonsteroidal and
23        anti-inflammatory
          drugs and
24        cardiovascular
          risk" (19 pages)

**Page 7**

1      DEPOSITION SUPPORT INDEX
2
3
     Direction to Witness Not To Answer
4    Page Line Page Line
     (None)
5
6
7
8
     Request For Production of Documents
9    Page Line Page Line
     (None)
10
11
12
13
     Stipulations
14   Page Line Page Line
     (None)
15
16
17
18
     Questions Marked
19   Page  Line Page Line
     (None)
20
21
22
23
24

**Page 8**

```
 1            - - -
 2       MR. PIORKOWSKI:  Is anybody
 3  here who is in New Jersey?
 4       MR. SIZEMORE:  I don't think
 5  so.  Nobody in New Jersey is here.
 6       MR. PIORKOWSKI:  Let me just
 7  state that we received a cross
 8  notice of this deposition for the
 9  New Jersey litigation.  A letter
10  was filed on behalf of Merck with
11  Judge Higbee objecting to that.
12  Apparently there's no counsel from
13  New Jersey here present.  It's my
14  understanding that Dr. Moye has
15  not been designated as an expert
16  at this time in any New Jersey
17  case.
18       Paul, any other preliminary
19  stuff we need to talk about as far
20  as --
21       MR. SIZEMORE:  I can't think
22  of anything.
23       MR. JOSEPHSON:  Let me just
24  say this on the record.  Richard
```

**Page 9**

```
 1  Josephson for Merck in the State
 2  of Texas MDL.
 3       Because of a hearing we had
 4  a few days ago which Paul is
 5  familiar with, I did not
 6  originally intend to be here since
 7  it was a California case.  That's
 8  the position I took.  The judge
 9  has recognized some of the cross
10  notices from Texas that were filed
11  in this case, and, therefore, I'm
12  here representing Merck in this
13  case.  So, to the extent that I
14  feel the need to use our objection
15  form or objection responsiveness,
16  and Mr. Piorkowski doesn't make
17  that connection, then you may hear
18  me make that objection.  I don't
19  want to disrupt the proceedings
20  because I, frankly, didn't want to
21  be here.
22       MR. SIZEMORE:  That's fair.
23  I won't pitch a fit like everyone
24  else has done.
```

3 (Pages 6 to 9)

Lemuel A. Moye, M.D., Ph.D.

Page 10

1    MR. PIORKOWSKI: Anything
2  else preliminary?
3    (No response.)
4        - - -
5    LEMUEL A. MOYE, M.D., Ph.D.,
6  after having been duly sworn, was
7  examined and testified as follows:
8        - - -
9    EXAMINATION
10       - - -
11 BY MR. PIORKOWSKI:
12   Q.  Would you state your full
13 name, Doctor.
14   A.  Sure. Lemuel, L-E-M-U-E-L,
15 Moye, M-O-Y-E.
16   Q.  How are you today, sir?
17   A.  I'm doing fine. How are
18 you?
19   Q.  Are you prepared to give
20 your deposition? This is the first Vioxx
21 case in which you've been deposed; is
22 that right?
23   A.  That's right, yes.
24   Q.  You've been deposed a number

Page 11

1  of times in other matters, true?
2    A.  Yes, I have.
3    Q.  Okay.
4      Let's just talk real briefly
5  about the ground rules. I'm going to ask
6  a series of questions. If you don't
7  understand my question, will you ask me
8  to rephrase it?
9    A.  Yes. I understand that.
10   Q.  If you go ahead and answer
11 the question, I'll assume you understood
12 it.
13     Is that fair?
14   A.  Yes.
15   Q.  If you need a break at any
16 time, just let us know, and we can
17 accommodate you.
18     All right?
19   A.  Okay.
20   Q.  As far as objections, there
21 may be objections by counsel at any point
22 in time to a question. In the event of
23 an objection, you understand you proceed
24 to answer the question?

Page 12

1    A.  Yes.
2    Q.  I may from time to time
3  object to your answer or part of your
4  answer as nonresponsive if I feel like
5  you're not answering my question.
6      Do you understand that?
7    A.  I do.
8    Q.  That's not intended to be a
9  show of disrespect to you. It's just
10 something we're doing to preserve the
11 record.
12   A.  I appreciate that.
13   Q.  Do you understand?
14   A.  Yes.
15   Q.  Can you tell us first how
16 did you get involved in the Vioxx
17 litigation?
18   A.  I have worked with -- well,
19 a couple things. Number one, I have been
20 following, as most physicians have, I
21 think, the whole development of concerns
22 involving Vioxx and had been asked to
23 consider being part of this litigation
24 process actually by both plaintiffs and

Page 13

1  defendants and gave it careful
2  consideration, began to review the
3  literature. Again, this was now, just to
4  put a time frame on this, this was in
5  maybe 2005, and have been reviewing
6  literature during this time. And had
7  finally been decided that my beliefs
8  served the plaintiffs and offered myself
9  as an expert witness, available expert
10 witness for plaintiffs.
11   Q.  Who was the first person to
12 contact you to ask you to be an expert
13 witness on behalf of the plaintiffs?
14   A.  I think it was through
15 Scientific Evidence. I'm a consultant
16 for that company.
17   Q.  Is that still run by Dr.
18 Jean Hoepfel?
19   A.  It is, yes.
20   Q.  Is Dr. Hoepfel the person
21 that called you?
22   A.  Yes.
23   Q.  Who is the first lawyer
24 representing a plaintiff that you talked

4 (Pages 10 to 13)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 14

1  to in connection with the litigation?
2      A.  I don't remember.
3      Q.  You said that you were asked
4  by defendants to become involved in the
5  litigation.  Is that what I heard you
6  say?
7      A.  Yes.
8      Q.  What defense lawyer asked
9  you to become involved in the litigation?
10     A.  It's -- I don't know.  I got
11  a phone call at the University from a
12  group of lawyers who represented the
13  defendants and asked me to consider
14  working on Vioxx.  I told them that I
15  would, that I hadn't made my mind up and
16  let it go at that.  They never called
17  back.  Never any followup conversation.
18     Q.  Do you have the name of the
19  lawyer?
20     A.  I don't.
21     Q.  Did you ever meet with that
22  lawyer?
23     A.  No, sir.
24     Q.  Was there ever a phone call

Page 15

1  following up that conversation after that
2  phone call with that lawyer?
3      A.  No.
4      Q.  Do you know whether that
5  lawyer was based in Texas?
6      A.  I don't remember.
7      Q.  Was it a male or a female?
8      A.  Male, I believe.
9      Q.  Do you remember any other
10  identifying information about that
11  lawyer?
12     A.  No.
13     Q.  When was that phone call?
14     A.  Maybe late 2004, early 2005.
15     Q.  Is that the only contact you
16  had where an attorney asked you to become
17  involved on behalf of Merck?
18     A.  Yes.
19     Q.  Who's the first attorney you
20  met who represented the plaintiff in this
21  case?
22     A.  I don't know.  That is to
23  say, let me answer this way.  I don't
24  think I met with a single attorney.  I

Page 16

1  think I met with a group of attorneys.
2      Q.  Let me back up a minute.
3  And I apologize.  I'm working off of your
4  -- we've been provided for the record
5  with, what is it, 14 disks?
6      MS. COOK:  12.  Yes, 14.
7  BY MR. PIORKOWSKI:
8      Q.  There's a total of 14 disks,
9  I believe, by Mr. Sizemore.  One of them
10  is entitled Vioxx billing, I think, which
11  I'm assuming that contains your billing
12  records to date?
13     A.  Yes, sir.
14     Q.  Is that your understanding?
15     A.  Yes, it is.
16     Q.  Then there are 12 disks that
17  are marked as "Vioxx documents reviewed
18  by Dr. Moye" 1 through 12 of 12?
19     A.  Yes.
20     Q.  Right?  And then there's
21  another independent disk that's entitled
22  "Vioxx documents reviewed by Dr. Moye
23  ,"right?
24     A.  Yes.

Page 17

1      Q.  We'll come back to what
2  those are in a moment.  I apologize, I
3  don't have this in hard copy.  I'm just
4  getting it off the disk.
5      Am I correct that your
6  records reflect that the first time you
7  billed any time on Vioxx was in February
8  of 2005?
9      A.  I believe that's right, yes.
10     Q.  If your records reflect it
11  was February 26, 2005, is that consistent
12  with your recollection?
13     A.  If that's in the record,
14  then I'm willing to stand by that, yes.
15     Q.  And there's a meeting with
16  the lawyers that appears to be on March
17  4th of 2005?
18     A.  Then I accept that, yes.
19     Q.  Now, to come back to what
20  you said, you said you first met with
21  lawyers, that was your first contact with
22  several lawyers?
23     A.  Yes.
24     Q.  Where was that meeting?

Lemuel A. Moye, M.D., Ph.D.

Page 18

1    A.  I don't remember.
2    Q.  Was it in Texas?
3    A.  Yes, it was.
4    Q.  Do you know if it was in
5  Houston?
6    A.  I'm sorry.  It was in
7  Houston, Texas.  I don't know what
8  office.
9    Q.  Some law office in Houston,
10 Texas?
11   A.  Yes.
12   Q.  Who attended the meeting?
13   A.  I don't remember.
14   Q.  Can you remember anybody who
15 attended the meeting?
16   A.  No.
17   Q.  Are any of the attorneys who
18 are present in the room today in
19 attendance at the meeting?
20   A.  I've had subsequent meetings
21 in which they've been in attendance.  I
22 don't remember who was at the -- in
23 attendance at the March 4 meeting.
24   Q.  At the original meeting.  Do

Page 19

1  you know whether that would be contained
2  in your documents anywhere?
3    A.  I don't think so.
4    Q.  Do you know what law firm
5  the lawyers were with who originally
6  represented you?
7    A.  No.  At this meeting, no, I
8  don't.
9    Q.  How long was the meeting on
10 March 4?
11   A.  That's going to be in the
12 record.  I would imagine it was no more
13 than two hours, but that would be in the
14 billing record.
15   Q.  And can you tell me what
16 happened at the meeting?
17   A.  I don't have any particular
18 recollection of it.  I believe it was
19 just about the developing litigation and
20 my willingness to participate in this.
21   Q.  Had it been decided before
22 you attended the meeting that you would
23 serve as an expert on behalf of
24 plaintiffs, or was that the purpose of

Page 20

1  the meeting, to kind of get acquainted?
2    A.  I think the purpose of the
3  meeting was to let me know that they were
4  interested in moving forward and would be
5  interested in my participation.  At that
6  point I guess I wasn't sufficiently
7  informed about the facts of the case to
8  provide an assertion one way or the
9  other.  But I believe I did say that I
10 would begin an investigation.
11   Q.  Now, at the time that you
12 say you weren't sufficiently informed
13 about the facts of the case, what had you
14 looked at at that point in time?  Prior
15 to the meeting I'm talking about.
16   A.  I don't remember.  Let me
17 answer this way.  In the capacity as a
18 physician and a public health worker, I
19 was aware there were several manuscripts
20 out, several controversial manuscripts
21 out that were examining the relationship
22 between Vioxx and serious adverse events,
23 and I had looked at those.
24   Q.  And by "manuscripts," are

Page 21

1  you referring to articles in the
2  published medical literature?
3    A.  Yes.
4    Q.  Had you looked at anything
5  else other than articles in the published
6  medical literature at that point?
7    A.  I don't believe so, no.
8    Q.  Had you attended the 2005
9  Advisory Committee meeting?
10   A.  No.
11   Q.  Had you read newspaper
12 accounts of what was going on in the
13 Vioxx litigation?
14   A.  Well, I have to say yes, I
15 think I did.  I mean, I read the
16 newspaper, and certainly Vioxx was in the
17 newspapers.  I will say about the
18 Advisory Committee meeting, I was not in
19 attendance, but a good portion of it --
20 well, a portion of it was actually
21 televised on C-Span.  And I did watch
22 that.  Also there were, of course, other
23 hearings that were also televised that I
24 watched as well.

6 (Pages 18 to 21)

Lemuel A. Moye, M.D., Ph.D.

Page 22

1    Q.   What else did you watch?
2    A.   David Graham's testimony,
3  Dr. Gilmartin's testimony.  I recall
4  those.  They may have been before a
5  Congressional committee.  I don't
6  remember the exact forum.
7    Q.   So, you watched David Graham
8  and Dr. Gilmartin's testimony on C-Span?
9    A.   Yes.
10     MR. SIZEMORE:  Object to
11  form.
12     THE WITNESS:  Yes, I did.  I
13  didn't mean to cut you off.  Yes,
14  I did.
15  BY MR. PIORKOWSKI:
16    Q.   Anything else you remember
17  having reviewed prior to the initial
18  meeting on March 4th?
19    A.   As I sit here now, no.
20    Q.   During this meeting, did the
21  lawyers who were in attendance present
22  what they thought the facts of the case
23  showed to you?
24    A.   I don't remember in detail.

Page 23

1  I think probably just the broad strokes
2  and nothing that anybody who was
3  conversant with the information that was
4  available in the public domain wouldn't
5  already know.
6    Q.   Were you shown specific
7  documents at that meeting?
8    A.   I don't think so.  I don't
9  remember.
10    Q.   Was there anyone who was not
11  a lawyer in attendance at the meeting?
12    A.   I think there was probably a
13  representative from Scientific Evidence
14  at the meeting, but I don't remember.
15    Q.   Do you know who that was?
16    A.   No, I don't remember.
17    Q.   Do you know if it was Dr.
18  Hoepfel?
19    A.   I don't remember.
20    Q.   Who else works with you from
21  Scientific Evidence besides Dr. Hoepfel?
22    A.   Well, the only support
23  Scientific Evidence provides to me is
24  logistical support.  So, they collect

Page 24

1  information for me.  And they will
2  collect information on CDs, for example,
3  and prepare the CDs that we have today.
4  But to answer your question, April
5  Thompson has been my chief contact person
6  at Scientific Evidence, and her role for
7  me has been administrative.
8    Q.   Did you say before when we
9  were off the record that Dr. Hoepfel is
10  on some sort of a sabbatical?
11    A.   Well, I know she's traveling
12  a lot.
13    Q.   But in terms of this
14  litigation -- let me back up.
15     You've worked with Dr.
16  Hoepfel on other litigations, right?
17    A.   Yes.
18    Q.   In this litigation, have you
19  worked with her?
20    A.   No.
21    Q.   Is there anybody else at
22  Scientific Evidence besides April
23  Thompson with whom you've worked?
24    A.   No.

Page 25

1    Q.   So, if anyone attended the
2  meeting, it most likely would have been
3  April Thompson?
4    A.   I think so, yes.
5    Q.   How was it left at the end
6  of the meeting on March 4th?
7    A.   I think I left it open, that
8  I had no real opinions about Vioxx or
9  Merck's conduct one way or the other and
10  that I would begin to look into it.
11    Q.   What was the plan for you to
12  begin to look into it?
13    A.   As time would allow.  I
14  mean, I really didn't put a time schedule
15  on it, but as time would allow, I would
16  begin to evaluate the information that
17  was available to me in the public domain.
18    Q.   Did you agree at that time
19  to serve as an expert, or did you just
20  agree at that time to review the
21  material?
22    A.   I think I agreed only to
23  review the material.
24    Q.   When did you agree to serve

7 (Pages 22 to 25)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

## Page 26

1  as an expert witness?
2      A.   That was much later, but I
3  don't have a particular date in mind
4  where I say that I agreed to be an expert
5  witness for Vioxx.
6      Q.   It would have certainly been
7  before the 22nd of May?
8      A.   22nd of May, 2006.
9      Q.   Right.
10     A.   Yes.
11     Q.   That's when you signed your
12 report?
13     A.   That's correct.  Yes.
14     Q.   Do you know whether it was
15 within a month or two of the meeting?
16     A.   Maybe closer to earlier this
17 year.
18     Q.   Early 2006?
19     A.   Early 2006, yes.
20     Q.   When you agreed to serve as
21 an expert, did you agree to serve as an
22 expert for certain attorneys, or did you
23 agree to serve as an expert for anybody
24 who wanted to hire you?

## Page 27

1      A.   Let me back up for one
2  second.  Let me amend my answer.
3          I believe I signed an
4  agreement with Scientific Evidence in the
5  fall of '05 to serve as an expert.  I
6  don't have the date specifically in mind,
7  but I think it was a few months earlier
8  than I earlier testified today.
9      Q.   Would a copy of that signed
10 agreement be included on the disks that
11 are provided?
12     A.   I don't know.
13     Q.   Are you in possession of a
14 copy of the agreement?
15     A.   I should say this.  I should
16 be.  I don't know if I have it or not.
17         MR. PIORKOWSKI:  Paul, we
18     would like to receive it if it's
19     not on the CD if that's agreeable.
20         MR. SIZEMORE:  Okay.
21 BY MR. PIORKOWSKI:
22     Q.   Okay.
23         Can you tell me what's the
24 first lawyer who you can remember having

## Page 28

1  had a contact with?
2      A.   I think it would have
3  been -- again, I can't be specifically
4  sure whether this is the first attorney,
5  but I certainly met with Dave Matthews
6  several times this year.
7      Q.   Who is here at this firm
8  where we're taking the deposition?
9      A.   Yes.
10     Q.   All right.
11         Any other lawyers who you
12 specifically remember meeting with
13 multiple times?
14     A.   Oh, sure.  Ted, Tom
15 Sizemore.
16     Q.   Let's just use full names
17 just since we're on the record.
18         MR. SIZEMORE:  Paul
19     Sizemore.
20         THE WITNESS: Thanks.  Paul
21     Sizemore.
22         MR. SIZEMORE:  I've been
23     called worse.  Thanks.
24         MR. WACKER:  Ted Wacker.

## Page 29

1  BY MR. PIORKOWSKI:
2      Q.   Anybody else?
3      A.   Tommy Fibich.  I had
4  conversations with Mark Robinson.
5  Conversation with Ed Blizzard.  That's
6  all I remember now.
7      Q.   Have you had any contact
8  with Chris Seeger or Dave Buchanan?
9      A.   If I did, I don't remember.
10     Q.   Have you had any contact
11 with Mark Lanier?
12     A.   I don't remember.
13     Q.   Do you know as you sit here
14 today whether you've had contact with
15 anybody who represents plaintiffs in New
16 Jersey?
17     A.   Back up a minute.  I know
18 who Mark Lanier is.  I have had no
19 contact with him.  I just realized that.
20     Q.   All right.  Thanks for the
21 clarification.
22     A.   I'm sorry.  Go ahead.
23     Q.   Have you agreed to be
24 retained by any lawyers who you know to

8  (Pages 26 to 29)

Lemuel A. Moye, M.D., Ph.D.

Page 30

1  be representing plaintiffs who have cases
2  pending in New Jersey?
3      A.   To my knowledge, no.
4      Q.   Is the list that you just
5  gave me the list of all of the lawyers by
6  whom you've been retained to date to the
7  best of your knowledge?
8      A.   I would say I think so.  I
9  don't know, but I think so.
10     Q.   Any other lawyers that we
11 didn't mention by whom you believe you've
12 been retained?
13     A.   I don't remember any.  If I
14 do during the proceedings, I will
15 certainly mention them.
16     Q.   How about Tommy Pirtle?
17     A.   I don't think so.  No, not
18 for Vioxx, no.
19     Q.   Tommy Jackson?
20     A.   The name doesn't ring a
21 bell.
22     Q.   Okay.
23          Have you agreed to testify
24 in California as an expert witness?

Page 31

1      A.   I have.
2      Q.   Have you set aside a date to
3  go out there?
4      A.   What month is it?
5          MR. SIZEMORE:  Trial?
6          THE WITNESS:  Yes.
7          MR. SIZEMORE:  In June.
8          THE WITNESS:  Then I have.
9  BY MR. PIORKOWSKI:
10     Q.   Have you agreed to testify
11 in the MDL trial that's pending in New
12 Orleans in July?
13     A.   Yes.
14     Q.   Are there any other specific
15 trials that you've agreed to testify in?
16     A.   I guess I don't know how to
17 answer that.
18     Q.   Let me reword it.  That's a
19 bad question.
20          I understand that you've
21 been retained in a number of cases by the
22 lawyers we already reviewed.  Apart from
23 the California case and the MDL, which
24 are the cases we're primarily here taking

Page 32

1  this deposition in today, are there any
2  other cases where you have a date on your
3  calendar blocked off to go to trial and
4  testify?
5      A.   No.
6      Q.   How do you track your time
7  for purposes of expert witness work?
8      A.   I track it on -- each day I
9  track it, and I log the number of hours I
10 work and to whom it's billed and the
11 amount.
12     Q.   And do you do that on
13 computer, do you do it by hand, how do
14 you do it?
15     A.   I do it by computer.
16     Q.   Okay.
17          Is it on a computer software
18 program or how do you keep track?
19     A.   I can generate reports from
20 it using a software program.
21     Q.   To whom is your time billed?
22 Is there one primary lawyer that you bill
23 your time to for purposes of Vioxx, or is
24 it split between a number of different

Page 33

1  lawyers?
2      A.   I can answer the first part
3  of your question.  I think I bill it to
4  something called Vioxx group or group
5  Vioxx.
6      Q.   Group Vioxx?
7      A.   Yes.
8      Q.   Do you know who the bill is
9  actually sent to?
10     A.   I do not.
11     Q.   Your billing is not done
12 through Scientific Evidence?
13     A.   It is.  I send my bill to
14 Scientific Evidence.  I don't know what
15 they do after that.
16     Q.   Okay.
17          But all of your Vioxx
18 matters have been on general Vioxx
19 matters as opposed to individual
20 plaintiff-specific things?
21          MR. SIZEMORE:  Object to
22 form.
23          MR. PIORKOWSKI:  Let me
24 rephrase it.

9 (Pages 30 to 33)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 34

1  BY MR. PIORKOWSKI:
2      Q.   Apart from group Vioxx work,
3  have you billed any matters to matters
4  involving individual plaintiffs like the
5  Barnett plaintiff, for example?
6      A.   I have not billed to
7  plaintiffs, no. I think, though, that
8  when I started billing in 2005, I didn't
9  start with group Vioxx. It might have
10 been for particular attorneys.
11     Q.   Is it your understanding
12 that the invoices that we have which are
13 approximately $98,800 represents all of
14 your billing in Vioxx to date?
15     A.   That sounds -- the amount
16 sounds correct. Yes. I don't know how
17 inclusive the dates are.
18     Q.   Okay.
19         You don't know when that
20 would go up through?
21     A.   That's true.
22     Q.   In terms of the month of
23 May, what work have you done since the
24 completion of your MDL report, which was

Page 35

1  dated the 22nd?
2      A.   I've reviewed -- the
3  literature -- the material is voluminous,
4  and reading this material one time just
5  hasn't been sufficient for me. So, I've
6  spent some time reviewing material that I
7  have already read.
8      Q.   Okay.
9         Your rate for billing is how
10 much now?
11     A.   $400 an hour.
12     Q.   For reviewing materials?
13     A.   Yes.
14     Q.   Okay.
15         So, if we were going to
16 figure out how much time you spent, it
17 would be roughly 100,000 divided by 400?
18     A.   Right.
19     Q.   So, what's that, 250 hours?
20     A.   250 hours, right.
21     Q.   Your MDL report does not
22 have any specific opinions about the
23 plaintiff in that case, is that correct?
24     A.   Yes, sir.

Page 36

1      Q.   Do you know anything about
2  the plaintiff in the MDL case?
3      A.   No, sir.
4      Q.   You don't intend to offer
5  any opinions at trial about the plaintiff
6  specifically?
7      A.   I intend to offer no such
8  opinions.
9      Q.   Is the same true with
10 respect to the California cases?
11     A.   Yes, sir.
12     Q.   Is there any case in which
13 you've been designated or filed a
14 report -- let me back up.
15         Other than the MDL report,
16 have you filed any other reports in any
17 other Vioxx cases?
18     A.   No, sir. No, sir.
19     Q.   Are you aware that you were
20 designated in a couple Texas cases as an
21 expert witness?
22     A.   I believe that, yes. I
23 haven't seen the designation, I don't
24 think, but, yes.

Page 37

1      Q.   Are you familiar with what a
2  designation is as opposed to a report?
3      A.   I am.
4      Q.   It's a written description
5  prepared by the attorneys, right?
6         MR. SIZEMORE:  Object to
7  form.
8         THE WITNESS:  Yes.
9  BY MR. PIORKOWSKI:
10     Q.   That's your understanding?
11     A.   Yes.
12     Q.   Okay.
13         And there were actually two
14 of them prepared in Texas. Do you
15 understand that?
16     A.   Yes.
17     Q.   Did you review those before
18 they were filed?
19     A.   I reviewed several
20 designations in May. I don't remember to
21 which cases they applied.
22     Q.   Is there any case, as we sit
23 here today, as to which you intend to
24 offer an opinion about a specific

Golkow Litigation Technologies - 1.877.DEPS.USA

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 38

1  plaintiff?
2      A.   There is no such case.
3          - - -
4          (Whereupon, Deposition
5      Exhibit Moye MDL 1, "COX-2
6      Inhibitor Report of Lemuel A.
7      Moye, M.D., Ph.D." 5-22-06 (110
8      pages) was marked for
9      identification.)
10         - - -
11 BY MR. PIORKOWSKI:
12     Q.   Doctor, can you identify
13 what I've marked as Exhibit 1?
14     A.   Yes.  This is my COX-2
15 inhibitor report.
16     Q.   Okay.
17         COX-2 inhibitors are a class
18 of drugs that include Vioxx and Celebrex,
19 right?
20     A.   Yes, sir.
21     Q.   Have you been retained to
22 offer any opinions regarding Celebrex?
23     A.   I have not.
24     Q.   How was this report

Page 39

1  prepared?
2      A.   I reviewed the material and
3  wrote the report.
4      Q.   Did you dictate it or did
5  you type it yourself?
6      A.   I typed it myself.
7      Q.   Did you have a template from
8  other cases that you were involved with
9  that you used?
10     A.   I had no template, but, of
11 course, I've written expert reports in
12 other litigation.  So, I used that
13 experience to write this, but I had no
14 formal template, no formal word
15 processing format to follow.
16     Q.   Okay.
17         Did you use any cut and
18 pastes from old reports in connection
19 with this report?
20     A.   No.
21     Q.   Did you review this report
22 carefully before signing it?
23     A.   I did.
24     Q.   Did you check it for

Page 40

1  accuracy?
2      A.   I did.
3      Q.   Did you check it for errors?
4      A.   As best I could.  There's
5  always the grammatical error that gets by
6  me, but yes.
7      Q.   When is the last time you
8  reviewed the report?
9      A.   Earlier this week.
10     Q.   As you sit here today, are
11 there any corrections that need to be
12 made to it?
13     A.   I don't think so, no.
14     Q.   Are there any changes that
15 need to be made to it?
16     A.   No.
17     Q.   Does the report set forth
18 the opinions that you intend to offer at
19 trial in the MDL?
20     A.   I would say this.  Based on
21 the review of the information I had done
22 at the time -- I had reviewed up to the
23 time of preparing the report, it does.  I
24 am aware that there's always new material

Page 41

1  that's available.  And I will read that
2  material as it becomes available.  I'm
3  also aware of my obligation to announce
4  that I'm looking at new material.
5      Q.   Fair enough.
6          As you sit here today, are
7  there other opinions -- today is June
8  2nd, is that right?
9      A.   Yes, sir.
10     Q.   And the report was on May
11 22nd?
12     A.   Yes.
13     Q.   Are there any opinions that
14 you've formed since May 22nd that need to
15 be added to your report or that are
16 beyond the scope of what's in your report
17 that you're aware of as you sit here
18 today?
19     A.   No, sir.
20     Q.   Are you waiting for any
21 additional information or documents at
22 this time?
23     A.   I am not waiting for any
24 particular document.  However, I am aware

11 (Pages 38 to 41)

a46c412c-de3e-4446-bf8d-937e4e429297

# Lemuel A. Moye, M.D., Ph.D.

Page 42

1 that, waiting or not, documents continue
2 to be produced.
3        Q.   But as we sit here today,
4 you've not asked to see certain documents
5 that you're still waiting for
6 specifically?
7        A.   That's true, yes.
8        Q.   You're referring to a
9 situation where something new may be
10 produced in the context of the litigation
11 and be forwarded to you?
12        A.   Yes, sir.
13        Q.   Okay.
14            Do the opinions that are set
15 forth in your report represent your final
16 opinions subject to additional
17 information that may become available?
18        A.   Yes, sir.
19        Q.   When you first became
20 involved in the litigation, how did you
21 approach your review?  What I'm trying to
22 understand is, were you sent certain
23 materials by the plaintiffs, did you ask
24 the plaintiffs to send you certain

Page 43

1 materials, did you start with a medical
2 literature search?  How did the process
3 start?
4        A.   Well, I began by not asking
5 anybody for information, but just
6 gathering information as best I could.
7 There's a voluminous amount of published
8 material that I have access to.  Of
9 course, the third FDA Advisory Committee
10 on Vioxx met in late winter/early spring
11 of 2005, and I reviewed that transcript
12 when it became available, as well as the
13 other transcripts which were already
14 actually available on the FDA site.  So,
15 much of my early review involved material
16 that I was able to get on my own.
17            Just to finish up here.
18 There were manuscripts that were sent to
19 me through Scientific Evidence that --
20 again, by "manuscripts," information that
21 was published in the peer-reviewed
22 literature that supplemented my review.
23        Q.   We'll talk about the details
24 of these Advisory Committee meetings

Page 44

1 later, but you're referring to there were
2 three Advisory Committee meetings that
3 dealt in part or in whole with Vioxx,
4 right?
5        A.   Yes, sir.
6        Q.   One was in 1999, one was in
7 2001, and one was in 2005?
8        A.   Yes, sir.
9        Q.   And you read the full
10 transcripts of each of those meetings?
11        A.   Yes, sir.
12        Q.   Okay.
13            The 2001 meeting was a
14 two-day meeting.  Do you recall that?
15        A.   Yes, sir.
16        Q.   First day was a day that
17 dealt with Celebrex?
18        A.   Yes.
19        Q.   Did you read the day that
20 dealt with Celebrex?
21        A.   I did not.
22        Q.   In terms of the published
23 medical literature, did you do your own
24 literature search, or did you ask

Page 45

1 Scientific Evidence to do a specific
2 literature search for you?
3        A.   No.  I'm sorry.  I did my
4 own literature searches first.
5        Q.   What was your literature
6 search that you did?
7        A.   By that you mean what
8 literature did I read based on that?
9        Q.   What search terms did you
10 use, or how did you go about your search
11 for relevant medical articles?
12        A.   Oh, I don't remember.  I
13 would tell you it was primarily
14 Internet-based search, but I don't
15 remember what search terms I used.
16        Q.   You have in your report at
17 the end on Pages 106 through 110, you
18 have a list of references.  Do you see
19 that?
20        A.   Yes, sir.
21        Q.   Are all of the published
22 medical articles that you've reviewed
23 listed in these references?
24        A.   I hesitate to say that all

Lemuel A. Moye, M.D., Ph.D.

Page 46

1  of them are listed here. I mean, I think
2  all of them would be on the CDs that you
3  have, but I don't want to suggest that
4  every single medical reference, reference
5  in the medical literature that I based my
6  opinion on is listed in the references.
7  I mean, I wish that were the case, but
8  there may have been a couple that got
9  away.
10      Q.  Okay.
11          It's fair to say that while
12  you may have missed one or two, your
13  intent was to list all of the medical
14  articles that you reviewed or that you
15  thought were important in your
16  references?
17      A.  Yes, sir.
18      Q.  And if there's an article
19  that you looked at that's not in the
20  references, it would be on the CDs that
21  we referred to?
22      A.  I would say if there's an
23  article that I looked at and relied upon
24  and incorporated its ideas in any way,

Page 47

1  shape or form in my report, then it
2  should have been listed in the
3  references.
4      Q.  Okay.
5          Now, did you review the
6  investigational new drug application?
7      A.  Yes, sir, I did.
8      Q.  How did you get access to
9  that?
10      A.  Scientific Evidence sent
11  that to me.
12      Q.  Did you review it in its
13  entirety or did you look at certain parts
14  of it?
15      A.  Well, I only looked at
16  certain parts. It is a voluminous
17  document, of course, so, I looked at what
18  I believe were the relevant sections.
19      Q.  What did you believe were
20  the relevant sections at the time you
21  looked at them?
22      A.  The integrated review of
23  efficacy, the integrated review of
24  safety, integrated summary of safety.

Page 48

1      Q.  Are you talking about the
2  IND or the NDA?
3      A.  I'm talking about the NDA.
4      Q.  The NDA?
5      A.  The NDA. I'm sorry. Did
6  you not ask me about that?
7      Q.  I think I said IND, but I
8  shouldn't -- let's back up and start
9  over.
10      A.  Okay.
11      Q.  Did you look at the
12  investigational new drug application?
13      A.  I did not.
14      Q.  You did look at certain
15  sections of the new drug application?
16      A.  I looked at the new drug
17  application. That's right.
18      Q.  The original new drug
19  application?
20      A.  Yes, sir.
21      Q.  When you said you looked at
22  certain sections, the sections you looked
23  at were the integrated summary of
24  efficacy, the integrated summary of

Page 49

1  safety?
2      A.  Yes, sir.
3      Q.  And what else?
4      A.  If there was an overall
5  summary, I looked at that. I also looked
6  at the statistical reviewer's comments.
7  The medical reviewer's comments really
8  were part of, I thought, the ISS and ISE.
9      Q.  So, you did look at the
10  medical officer reviewer's comments?
11      A.  Yes.
12      Q.  But am I understanding you
13  to say you thought her comments were
14  already included in what was presented in
15  the integrated summary of safety?
16      A.  By and large, yes.
17      Q.  Are you familiar with the
18  summary basis of approval?
19      A.  I am.
20      Q.  Was there any summary basis
21  of approval document related to Vioxx?
22      A.  I don't remember.
23      Q.  Did you look at any of the
24  supplemental new drug applications?

13 (Pages 46 to 49)

Lemuel A. Moye, M.D., Ph.D.

Page 50

1      A.  Not in their entirety, no.
2      Q.  Is there any section of the
3  supplemental new drug applications that
4  you can remember reviewing?
5      A.  I reviewed several reviews
6  of supplemental material -- reviews by
7  the FDA of supplemental materials
8  submitted by Merck.
9      Q.  Like, for example, the
10  medical officer's review of the
11  supplemental new drug application?
12      A.  Yes, sir.
13      Q.  That's what you're talking
14  about?
15      A.  Yes.
16      Q.  Did you review -- you're
17  aware that there was a cardiorenal
18  adviser who looked at information in
19  early 2001 named Shari Targum.  Do you
20  recall that?
21      A.  Yes.
22      Q.  Did you read her review?
23      A.  Yes, sir.
24      Q.  Anything else that you can

Page 51

1  remember in terms of FDA reviews of the
2  supplemental new drug applications?
3      A.  No, sir.
4      Q.  Did you look at the periodic
5  safety updates that were submitted by
6  Merck?
7      A.  I did not.
8      Q.  Did you review any kind of
9  post-marketing analyses that were
10  conducted by FDA?
11      A.  Nothing separate and apart
12  from what was provided to Advisory
13  Committees or provided in the --
14  discussed in the supplemental new drug
15  applications.
16      Q.  Okay.
17          So, you had available to you
18  essentially the same information that was
19  available to the members of the Advisory
20  Committees in 1999 and 2001 respectively?
21      A.  I'm not sure what time frame
22  we're talking about.  I actually believe
23  as I sit here now, I've looked at much
24  more information than they've had, but

Page 52

1  maybe I'm not addressing your question.
2      Q.  Okay.
3          In terms of FDA materials,
4  in terms of materials that Merck
5  submitted to the FDA or medical officer
6  reviews of the FDA, you looked at the
7  same materials that the Advisory
8  Committee members looked at.  Is that
9  your understanding?
10      A.  Again, I think I probably
11  looked at much more than the Advisory
12  Committees would have looked at.
13      Q.  All right.
14          What other things have you
15  looked at other than what the Advisory
16  Committee looked at?
17      A.  Wait.
18      MR. SIZEMORE:  Can you
19  specify which one, Joe?
20      MR. PIORKOWSKI:  Yes.
21  BY MR. PIORKOWSKI:
22      Q.  Let's back up a minute.
23          Let's start with the 1999
24  Advisory Committee.  What materials do

Page 53

1  you believe that you've looked at that
2  were available at the time that the
3  Advisory Committee members in 1999 did
4  not look at?
5      A.  Just so I can be clear, you
6  mean materials that were provided by the
7  FDA or materials in general?
8      Q.  Well, I'm assuming -- let's
9  just say materials in general.
10      A.  Okay.
11          Reports -- excuse me.
12  Reports within Merck that suggest the
13  appearance -- suggest the possibility,
14  I'll say, of a link between Vioxx use and
15  severe cardiac events and also data
16  within Merck that demonstrates a link
17  between Vioxx and severe cardiovascular
18  embolic events.
19      Q.  Are you referring to what
20  you call in your report the "Watson
21  analysis"?
22      A.  That's one thing, yes.
23      Q.  What other materials are you
24  aware of that was available in 1999 that

14  (Pages 50 to 53)

Lemuel A. Moye, M.D., Ph.D.

Page 54

1  was not available to the FDA or the
2  Advisory Committee?
3      A.  What I list in my report,
4  and that is -- let me just look at this
5  specifically.
6      The September -- I'm on item
7  84, Paragraph 84 on Page 32.
8      Q.  Page 32?
9      A.  Yes, sir.
10      Q.  Paragraph what?
11      A.  84, the very last one on
12  that page.
13      Beginning with that
14  Paragraph 84, the September 12, 1996
15  memo; Paragraph 85, the October 10th,
16  '96; Paragraph 86, November 11, 1996.
17      Q.  Right.
18      A.  And this litany of material
19  was available, but had not been presented
20  at the Advisory Committee.  So, that's
21  the basis of my answer to the question.
22      Q.  Okay.
23      The materials you're talking
24  about in Paragraph 84, you're talking

Page 55

1  about an internal memorandum, right?
2      A.  Yes, sir.
3      Q.  And the internal memorandum
4  deals with a case of unstable angina that
5  was reported in an RA study, correct?
6      A.  Yes, sir.
7      Q.  Do you know whether that
8  case was reported to the FDA in
9  accordance with the procedures by which
10  it's supposed to be reported the FDA?
11      A.  I don't know if it was
12  reported to the FDA or not.
13      Q.  Paragraph 85 deals with also
14  an internal memorandum.  Is that right?
15      A.  Yes, sir.
16      Q.  Do you know whether the data
17  that were the subject of that memorandum
18  were or were not reported to the FDA?
19      A.  I don't know.
20      Q.  In Paragraph 86, there's a
21  discussion about a memo authored by a Dr.
22  Musliner, right?
23      A.  Yes.
24      Q.  That talks about an

Page 56

1  anticipation of greater adverse
2  cardiovascular events in rofecoxib
3  compared with comparator NSAIDs, right?
4      A.  Yes.
5      Q.  That was not a study.  That
6  was a memo, right?
7      A.  Yes.
8      Q.  Actually, further on in your
9  report on Page 71, you discuss the Watson
10  analysis, correct?  70 and 71?
11      A.  Yes.
12      Q.  In this discussion you say
13  that Merck misled the FDA, right?
14      A.  Yes.  I also discussed it in
15  90 and 91 as well.
16      Q.  90 and 91?
17      A.  Paragraph 90 and 91, top of
18  Page 35.
19      Q.  Yes.  I understand.  I'm not
20  suggesting that's the only place you talk
21  about it.  I'm just saying in your
22  discussion about misleading the FDA on
23  Page 70 and 71, the first part of your
24  discussion starts with the proposition

Page 57

1  that Merck misled the FDA and the FDA
2  Advisory Committee because at the time of
3  the original Advisory Committee meeting,
4  they did not disclose the Watson
5  analysis.  Right?
6      A.  Yes, sir.
7      Q.  And it's your understanding
8  that the Watson analysis showed a clear
9  signal of an increased cardiovascular
10  risk associated with rofecoxib therapy?
11      A.  Yes, sir.
12      Q.  To your understanding, were
13  the data upon which the Watson analysis
14  was based disclosed to the FDA?
15      A.  I don't know whether the
16  data in any way, shape or form was
17  disclosed to the FDA in the IND or any
18  supplemental information, but it was not
19  disclosed to the Advisory Committee.
20      Q.  You know that because you've
21  reviewed the Advisory Committee
22  transcript?
23      A.  The transcript and also the
24  background dossier provided by Merck for

15 (Pages 54 to 57)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 58

1    the Advisory Committee to review.
2         Q.   Prior to the original 1999
3    Advisory Committee meeting?
4         A.   Yes, sir.
5         Q.   Now, is there any other data
6    besides the data contained in the Watson
7    analysis that you believe that Merck did
8    not disclose to the FDA or to the FDA
9    Advisory Committee prior to the 1999
10   meeting?
11        A.   No. That's the only data I
12   believe I point out in my affidavit for
13   the 1999 Advisory Committee.
14        Q.   Did you look at a file that
15   contained -- well, let me back up.
16             You just alluded to the
17   documents that Merck provided to the
18   Advisory Committee members. There're
19   referred to as briefing documents?
20        A.   Yes, sir.
21        Q.   Right?
22             Did you look at those on
23   line?
24        A.   I don't think I looked at

Page 59

1    those on line, no.
2         Q.   Those are --
3         A.   I'm sorry.
4         Q.   Were they provided by
5    Scientific Evidence?
6         A.   Yes.
7         Q.   Did you look at all of
8    Merck's briefing documents before all of
9    the Advisory Committees?
10        A.   Yes.
11        Q.   Including the 2005?
12        A.   Yes.
13        Q.   Did you review as a part of
14   your review a correspondence file between
15   Merck and the FDA concerning Vioxx?
16        A.   I reviewed some
17   correspondence between the FDA and Merck.
18   I can't say I reviewed one large complete
19   correspondence file.
20        Q.   How was the correspondence
21   that you reviewed selected?
22             MR. SIZEMORE:  Object to
23        form.
24   BY MR. PIORKOWSKI:

Page 60

1         Q.   Let me withdraw the
2    question.
3              If you reviewed some letters
4    but not all the letters, there had to be
5    some selection process in deciding what
6    you saw?
7         A.   Yes.
8         Q.   Fair?
9              Were you involved in that
10   selection process, was that a decision
11   made by Scientific Evidence, or was that
12   a decision made by the lawyers with whom
13   you were working?
14        A.   No. I would say it was a
15   joint decision. At this point in my
16   review, you're talking now about April or
17   May of this year, and I would meet with
18   attorneys, some of whom I mentioned
19   earlier, and we would talk about what
20   information would be most useful, and I
21   would ask for material, as well as have
22   material supplied unvolunteered --
23   supplied, volunteered by others, not by
24   me.

Page 61

1         Q.   Did you give the lawyers
2    directions about what you wanted to see
3    in terms of correspondence?
4         A.   Well, yes. Not just
5    correspondence, but other documents as
6    well, yes.
7         Q.   Let's talk first about
8    correspondence. What directions or
9    guidance did you give them about what you
10   wanted to see?
11        A.   Well, it depended on the
12   topic we were talking about. For
13   example, when we're talking about
14   preparations for Advisory Committee
15   meetings, then any material that
16   corresponded between FDA and the --
17   excuse me -- between FDA and Merck
18   involving the Advisory Committee, I
19   wanted to see. And that included, but
20   wasn't limited to, background documents.
21        Q.   Okay. Anything else?
22        A.   That's the clearest example
23   I can think of as I sit here now.
24        Q.   Have you reviewed all of the

16 (Pages 58 to 61)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 62

1  correspondence dealing with label changes
2  or proposed label changes between Merck
3  and the FDA?
4      A.   I have not, no.
5      Q.   Have you reviewed any of the
6  correspondence concerning label changes
7  or proposed label changes between Merck
8  and the FDA?
9      A.   I don't think so, no.
10      Q.   Have you reviewed
11  correspondence between Merck and the FDA
12  with respect to warning letters?
13      A.   Warning letters? Yes, I
14  have.
15      Q.   Your report makes reference
16  to a warning letter in September of 2001,
17  correct?
18      A.   Yes, sir.
19      Q.   Is that the only letter
20  concerning any DDMAC-related issues that
21  you saw?
22      A.   No, it's not.
23      Q.   Were you provided with
24  Merck's response to that warning letter?

Page 63

1      A.   I believe so, yes.
2      Q.   Were you provided with the
3  FDA's response to Merck's response?
4      A.   That I don't remember.
5      Q.   You said you gave the
6  lawyers guidance not only with respect to
7  correspondence, but with respect to
8  documents generally that you wanted to
9  see?
10      A.   Yes.
11      Q.   What guidance did you give
12  them?
13      A.   Any correspondence relating
14  to communication -- any correspondence
15  involving or centered on the VIGOR
16  manuscript and the -- actually, any and
17  all published manuscripts. So,
18  correspondence between editors and
19  authors involving reviewers,
20  correspondence involving reviewers. I
21  wanted to see all of that material in
22  addition to whatever internal
23  documentation that they had -- I'm sorry,
24  documentation internal to Merck involving

Page 64

1  these studies, as well as the studies
2  themselves.
3      Q.   So, first of all, you wanted
4  to see any correspondence between Merck
5  employees and editors of journals?
6      A.   Let me rephrase.  No.
7      Q.   Okay.
8      A.   Between the authors of
9  Merck's -- Merck-funded manuscripts and
10  editors.
11      Q.   Okay.
12      A.   Including reviews,
13  summaries, cover letters and so on.
14      Q.   Do you believe you were
15  provided with that?
16      A.   Yes.
17      Q.   Is that included in the
18  materials in the disk?
19      A.   Yes.
20      Q.   Any other -- let me back up.
21  I'm sure you did review
22  internal company documents, right?
23      A.   Yes, sir.
24      Q.   How were the internal

Page 65

1  documents selected that you reviewed?
2      A.   They were -- during
3  conversations, face-to-face
4  conversations, there were discussions,
5  and they would say that there were -- the
6  statement would be made that there is an
7  e-mail that is responsive to this issue.
8  Let's just say -- I'll give you a
9  specific example.  The evaluation of the
10  design of VIGOR.  And then my response
11  was, I'd like to see that and all related
12  material involving the design of VIGOR
13  that was available that they had.
14      Q.   So your understanding is
15  that you received that, all materials
16  relating, let's say, to the design of
17  VIGOR?
18      A.   That they had, yes.
19      Q.   That the lawyers had?
20      A.   Yes.
21      Q.   Okay.
22          Anything else besides the
23  design of VIGOR specifically as it
24  applies to internal company documents?

Golkow Litigation Technologies - 1.877.DEPS.USA

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 66

1     A.   Well, I actually -- the
2  tenor of the conversation was precisely
3  that.  So, it was about the design of
4  VIGOR, about concern, early concerns
5  about the possibility of a relationship
6  between Vioxx and cardiothrombolic
7  agents.  If there was any correspondence
8  about that, I wanted to see, not just the
9  correspondence that was in hand, but any
10 and all correspondence related to that.
11    Q.   Including the followup?
12    A.   Yes.
13    Q.   And to your understanding,
14 you've seen that?
15    A.   Yes, sir.
16    Q.   Okay.
17         Anything else that you asked
18 to see?
19    A.   Actually, that's quite a
20 bit.
21    Q.   And I want to focus on
22 internal company documents for this line
23 of discussion.  Any other internal
24 company documents that you specifically

Page 67

1  asked to see?
2     A.   Let me go through my
3  affidavit to see because I think there's
4  probably some others.
5     Q.   Sure.
6         MR. SIZEMORE:  Can we take a
7  break?
8         MR. PIORKOWSKI:  Sure.
9         (Witness reviewing
10 document.)
11         - - -
12         (Whereupon, a recess was
13 taken from 10:30 until 10:44 a.m.)
14         - - -
15         THE WITNESS:  Two other
16 areas.  One was the notion of the
17 naproxen protective effect, and
18 the second broad area was any
19 information that was available
20 about study protocols.  I'll give
21 you an example, the Alzheimer
22 studies.  Another example would be
23 VIP.  Another example would be
24 VICTOR.  I'm not trying to be

Page 68

1         exhaustive here, but that's
2         examples.  If there was a little
3         bit of material I was exposed to,
4         I wanted to see all of the
5         material that was available.
6  BY MR. PIORKOWSKI:
7     Q.   With respect to study
8  protocols?
9     A.   Yes.
10    Q.   For the clinical trials?
11    A.   Yes.
12    Q.   Well, let me ask you, when
13 you looked at the new drug application,
14 did you look at any of the study
15 protocols for the osteoarthritis trials
16 that were submitted as a part of the
17 Phase III studies?
18    A.   Yes.
19    Q.   You looked at that as part
20 of the new drug application?
21    A.   Yes.
22    Q.   But then the later studies
23 that came down the pike like VIP and
24 APPROVe and VICTOR, you asked to see

Page 69

1  those protocols?
2     A.   Yes.  Actually, any and all
3  internal documents related to, be it
4  protocols, internal analyses or
5  meta-analyses or interim reviews, I asked
6  to see.
7     Q.   Okay.
8     A.   And I need to add one other
9  thing.  Kathy Snapka is an attorney who
10 designated me.  I didn't mention that
11 before.  That was my fault.  I want to
12 correct that.
13    Q.   Fair enough.
14         We'll add her to the list.
15 Let me follow up on that.
16    A.   Sure.
17    Q.   Have you met with Kathy
18 separate from the other lawyers?
19    A.   No, I have not.
20    Q.   Has Kathy participated in
21 meetings you've had with other lawyers?
22    A.   Yes.
23    Q.   Are you specifically
24 designated in a case that Kathy has set

18  (Pages 66 to 69)

a46c412c-de3e-4446-bf8d-937e4e429297