Lemuel A. Moye, M.D., Ph.D.

Page 70

1  for trial?
2      A.  I believe so.
3      Q.  Have you set aside a date on
4  your calendar for a case Kathy has set
5  for trial?
6      A.  I don't think so.
7      Q.  Any other corrections we
8  need to make from round one?
9      A.  As I sit here now, no.  If I
10 get some more, I'll let you know.
11     Q.  While we're cleaning up some
12 things, I asked you about whether the
13 opinions you intended to render in the
14 MDL trial in New Orleans were set forth
15 in your report.  My colleague reminded me
16 that I need to ask the same question with
17 respect to California.  Are the opinions
18 you intend to render at trial in
19 California also set forth in your report
20 subject to new information becoming
21 available?
22     A.  Yes, sir.
23     Q.  As a part of your review,
24 did you review the various labels that

Page 71

1  were in force with respect to Vioxx?
2      A.  Yes, sir.
3      Q.  Did you review all of them?
4      A.  Yes, I did.
5      Q.  Did you review all of the
6  draft labels?
7      A.  I don't think so, no.
8              - - -
9      (Whereupon, Deposition
10     Exhibit Moye MDL 2, "Documents
11     Reviewed by Dr. Lemuel A. Moye,"
12     (88 pages), was marked for
13     identification.)
14              - - -
15 BY MR. PIORKOWSKI:
16     Q.  We were provided with a
17 document which I've marked as Exhibit 2.
18     MR. PIORKOWSKI:  I think I
19 gave you a copy there, Paul.
20 BY MR. PIORKOWSKI:
21     Q.  I ask you to identify what
22 Exhibit 2 is.
23     A.  (Witness reviewing
24 document.)

Page 72

1          It is a compendium of the
2  material that I have been provided to
3  review related to the Vioxx litigation.
4      Q.  Is it your understanding
5  that all of the material that's contained
6  in Exhibit 2 is on the CDs that we've
7  been provided?
8      A.  Yes, sir.
9      Q.  Now, you haven't read all of
10 this stuff; is that right?
11     A.  I think in fairness I can
12 say, yes, I have, but I don't remember
13 all of it.
14     Q.  To the best of your
15 knowledge, you've read everything that's
16 listed on this document?
17     A.  Yes, sir.
18     Q.  For example, on Page 2 of
19 88, second -- third line from the bottom,
20 it has, "Carol Ernst...versus Merck -
21 hearing regarding Dr. Araneta's
22 testimony."  Do you see that?
23         MR. SIZEMORE:  Where is it?
24 BY MR. PIORKOWSKI:

Page 73

1      Q.  Page 2 of 8, third entry
2  from the bottom.
3      A.  Oh.  Third entry from the
4  bottom.  Yes.
5      Q.  Do you know why that was
6  provided to you?
7      A.  No, I don't.
8      Q.  Do you remember reading it?
9      A.  No, I don't remember the
10 details of it.
11     Q.  You remember anything about
12 it?
13     A.  No.
14     Q.  Or, for example, the one,
15 the entry right above it, "Hearing on
16 Exhibits"?
17     A.  Yes.
18     Q.  That's a transcript of a
19 court trial?
20     A.  That's right.  That's right.
21     Q.  Do you know why that would
22 have been of interest to you?
23     A.  No.  For that, what I did
24 was look at it to see first, cursorily,

Golkow Litigation Technologies - 1.877.DEPS.USA

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 74

1  to see if it was going to be directly
2  relevant. And if it wasn't going to be
3  relevant to my opinions, then I put it
4  down and moved on to something else.
5      Q. How much of the roughly 250
6  hours that you've spent were spent
7  reviewing documents versus preparing your
8  report versus meetings with lawyers?
9      A. I'll answer the easy part
10  first. A small amount of time, I'd say
11  less than one percent, less than a half
12  of one percent, was spent meeting with
13  attorneys. Maybe 70 percent of the time
14  was spent reviewing documents, and 30
15  percent of the time was preparing an
16  affidavit. It's just a rough ballpark.
17      Q. On Page 4, for example, of
18  this document, it appears the entire
19  trial transcript from the Ernst trial,
20  which was four weeks long, was sent to
21  you?
22      A. Yes.
23      Q. Did you read all of that?
24      A. I went through it all, yes.

Page 75

1  I confess to you, I did not spend hours
2  on parts that I thought were irrelevant
3  for me --
4      Q. Right.
5      A. -- but I did go through it
6  all.
7      Q. Do you remember reading the
8  deposition of Alan Nies?
9      A. No. I don't remember
10  anything particularly relevant from that.
11      Q. Or do you remember reading
12  his trial testimony?
13      A. I remember looking at it,
14  yes.
15      Q. How about depositions or
16  trial testimony of Dr. Alise Reicin?
17      A. Yes.
18      Q. You read that?
19      A. Yes.
20      Q. How about Briggs Morrison?
21      A. I don't remember.
22      Q. Deposition testimony of Dr.
23  Ed Scolnick?
24      A. Yes.

Page 76

1      Q. David Anstice?
2      A. I don't remember that one.
3      Q. Deborah Shapiro?
4      A. Yes.
5      Q. Did you read the depositions
6  of any of the regulatory affairs
7  individuals at Merck?
8      A. I don't remember who they
9  were.
10      Q. Do you remember reading the
11  deposition of any sales and marketing
12  personnel other than Dr. Anstice?
13      A. I've gone through them, but
14  I don't recall any of the details.
15          MR. BLIZZARD: Object to
16  form. Sorry, a little late.
17  BY MR. PIORKOWSKI:
18      Q. Who prepared Exhibit 2?
19      A. Scientific Evidence did.
20      Q. Okay.
21          When was it prepared?
22      A. I don't know. I think
23  recently, but I don't when.
24      Q. Was it prepared in

Page 77

1  anticipation of filing your report?
2      A. Well, I think they knew they
3  had to have that when I filed my report,
4  but that's all I know.
5      Q. Did you look at any Merck
6  standard operating procedures?
7      A. No, sir.
8      Q. You know from your own
9  clinical trial experience what a SAS file
10  is?
11      A. Yes, sir.
12      Q. Did you look at any of the
13  original SAS files on any of the data
14  from the Vioxx clinical trials?
15      A. I answer your question as I
16  have begun to do that. I am nowhere
17  near -- I'm only in the introductory
18  phase of it.
19      Q. When did you begin to do
20  that?
21      A. Last weekend. Actually,
22  about a week ago.
23      Q. Since you filed your report?
24      A. Yes.

20 (Pages 74 to 77)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 78

1    Q.   What was the purpose of
2  looking at the SAS files from your
3  perspective?
4    A.   This file -- excuse me.
5  These files were files that were made
6  available, I believe, of the APPROVe
7  followup -- the followup component of the
8  APPROVe clinical trial.
9    Q.   And you have no opinions on
10 that at this point?
11   A.   I have no opinions on the
12 SAS data set content.
13   Q.   How long do you anticipate
14 that's going to take you to complete that
15 review?
16   A.   I don't know.  I believe
17 it's going to be a long process to get it
18 right.  So, at this point I can't even
19 reasonably estimate the number of hours.
20   Q.   Let me ask you, in coming to
21 your opinions in this case, did you look
22 at the new drug application -- any part
23 of the new drug application for Celebrex
24 or Bextra?

Page 79

1    A.   No, sir.
2    Q.   Did you took at any part of
3  the new drug application for any other
4  nonsteroidal anti-inflammatory drug?
5    A.   No, sir.
6    Q.   Did you look at the medical
7  officer review or summary basis of
8  approval for Celebrex or Bextra?
9    A.   No, sir.
10   Q.   Did you look at the medical
11 officer review or summary basis of
12 approval for any other nonsteroidal
13 anti-inflammatory drug?
14   A.   No.
15   Q.   Did you review the labeling
16 for Celebrex or Bextra in connection with
17 your opinions?
18   A.   No.
19   Q.   Did you review the labeling
20 for naproxen?
21   A.   No.
22   Q.   Did you review the labeling
23 for any other nonsteroidal
24 anti-inflammatory drug?

Page 80

1    A.   No, sir.
2    Q.   Did you do any specific
3  medical literature review concerning
4  Celebrex as a part of your review of this
5  case?
6    A.   No, sir.
7    Q.   How about with respect to
8  Bextra?
9    A.   No, sir.
10   Q.   Did you do a medical
11 literature review on the issue of
12 naproxen?
13   A.   I think I have to say yes
14 insofar as it was related to the
15 possibility of an anticardiothrombotic
16 effect associated with Naprosyn.
17   Q.   Okay.
18       What specific literature
19 search did you do?
20   A.   Well, it's the literature
21 that's in my affidavit.
22   Q.   Just for keeping the record
23 straight, when you are referring to your
24 affidavit, you're referring to Exhibit 1,

Page 81

1  your report?
2    A.   Yes, that's right.
3    Q.   That's fine.  Call it what
4  you want.  I just want to make sure we're
5  clear.
6       So, to the extent that
7  you've reviewed literature on naproxen,
8  that would be listed in your references?
9    A.   Yes, sir.
10   Q.   Okay.
11       Did you do a medical
12 literature review on any other
13 non-selective NSAID other than naproxen?
14   A.   I need to add one thing.  In
15 the literature and also what's on this
16 index because I perhaps didn't include
17 everything in my references.
18   Q.   That was with respect to
19 naproxen?
20   A.   Yes.
21   Q.   Okay.
22       Did you do a specific
23 medical literature review for any other
24 nonselective NSAID?

21 (Pages 78 to 81)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 82

1    A.   No, sir.
2    Q.   Did you review the
3 deposition testimony of Dr. Eric Topol?
4    A.   No, I did not review that.
5    Q.   Did you review the
6 deposition testimony of Dr. Curfman?
7    A.   Yes.
8    Q.   What was the purpose of
9 reviewing his testimony?
10    A.   The Dr. Curfman I'm thinking
11 of is the editor-in-chief of the New
12 England Journal.
13    Q.   Actually, he's not the
14 editor-in-chief, but he's an editor.
15    A.   Actually, you're right.
16    Q.   Same question.
17    A.   That's right, an editor of
18 the New England Journal. I reviewed that
19 because I thought it was related to the
20 reporting of the VIGOR results. So, I
21 thought it was relevant to VIGOR.
22    Q.   Okay.
23        Did you read both of his
24 depositions?

Page 83

1    A.   Yes, sir.
2    Q.   Did you look at the
3 exhibits?
4    A.   Yes.
5    Q.   Did you review the
6 deposition of Dr. David Graham?
7    A.   No, I did not.
8    Q.   In connection with your
9 opinions in California and the MDL, do
10 you intend to offer any opinions about
11 Merck's motives or intent with respect to
12 Vioxx?
13        MR. WACKER: Object to form.
14        MR. SIZEMORE: Object to
15 form.
16        THE WITNESS: I'm not sure I
17 know how to answer that. As I
18 read the internal documents and
19 tried to put together in my mind
20 what was going on here, I think it
21 became clear to me what they
22 weren't doing, so, I suppose I am
23 going to speak to some degree
24 about the motives.

Page 84

1 BY MR. PIORKOWSKI:
2    Q.   Let me rephrase it like
3 this: You understand that there are
4 things that one believes should be done
5 and they don't get done, that that can
6 either be the result of a deliberate
7 process or it can be the result of lack
8 of awareness or negligence or a variety
9 of other reasons. Fair enough?
10    A.   Yes, I understand that.
11        MR. WACKER: I'm sorry. Let
12    me just object to form.
13 BY MR. PIORKOWSKI:
14    Q.   My question is, you're
15 looking at the records, and in a variety
16 of respects you're saying, I think
17 certain things should have been done and
18 I don't think Merck did them. Fair
19 enough?
20    A.   Yes.
21    Q.   Okay.
22        Are you offering any
23 opinions that Merck intended to hurt
24 patients or intended to mislead the FDA?

Page 85

1        MR. SIZEMORE: Object to
2    form.
3        THE WITNESS: I think I am.
4 BY MR. PIORKOWSKI:
5    Q.   What expertise do you have
6 in determining corporate intent?
7    A.   My expertise with working
8 with the drug companies in the past and
9 my expertise in designing, executing and
10 analyzing clinical trials.
11    Q.   Okay.
12        What specific -- I'd like to
13 have you just tell me as far as specific
14 issues are concerned, what specific
15 issues are you intending to offer
16 opinions about with respect to either
17 Merck's intent or Merck's motives?
18    A.   I think I can probably speak
19 most clearly about Merck's intent. And I
20 believe Merck's intent was not to provide
21 a fair, clear assessment of the
22 relationship between Vioxx and
23 cardiovascular events -- cardiovascular
24 serious adverse events.

22 (Pages 82 to 85)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 86

1    Q.   At a particular point in
2  time?
3       A.   I have examples at
4  particular points in time, yes.
5       Q.   Well, let's break it down
6  like this.  Are you offering any opinions
7  along that line about an intent not to
8  provide a fair and clear assessment
9  between Vioxx and cardiovascular events
10  prior to the initial approval?
11        MR. SIZEMORE:  Object to
12  form.
13        THE WITNESS:  Yes.
14  BY MR. PIORKOWSKI:
15       Q.   Are you offering opinions
16  between the time of the initial approval
17  and the April 2002 label change?
18       A.   Yes.
19       Q.   And are you offering
20  opinions about Merck's intent following
21  the April 2002 label change?
22       A.   I think not so much.
23       Q.   Not so much as in no?
24       A.   I mean no, sorry.  No.

Page 87

1    Q.   All right.
2       Any other aspects of Merck's
3  motives or intent that you plan to offer
4  opinions about?
5        MR. SIZEMORE:  Object to
6  form.
7        THE WITNESS:  As I sit here
8  now, I think my answer is no.
9  BY MR. PIORKOWSKI:
10       Q.   In terms of your background,
11  Dr. Moye, you've completed a medical
12  internship; is that right?
13       A.   That's right.
14       Q.   But you've never completed
15  residency training, right?
16       A.   Never entered residency
17  training.  That's right.
18       Q.   You are not fellowship
19  trained in cardiology, correct?
20       A.   That's true.  I'm not
21  fellowship trained.
22       Q.   You're not board certified
23  in cardiology?
24       A.   I'm not board certified.

Page 88

1    Q.   You don't hold yourself out
2  as a cardiologist, right?
3       A.   That's right.
4       Q.   You're not fellowship
5  trained in hematology; is that right?
6       A.   That's right.
7       Q.   You're not board certified
8  in hematology?
9       A.   That's correct.
10       Q.   You don't hold yourself out
11  as a hematologist?
12       A.   That's right.
13       Q.   You're not fellowship
14  trained in rheumatology, right?
15       A.   Right.
16       Q.   You are not board certified
17  in rheumatology?
18       A.   Right.
19       Q.   You don't hold yourself out
20  as an expert in rheumatology, correct?
21       A.   That's correct.
22       Q.   You don't hold yourself out
23  as an expert in pharmacology, either,
24  right?

Page 89

1    A.   That's correct.
2       Q.   Am I correct you've not seen
3  a patient since March of 1992?
4       A.   That's not true.  Certainly,
5  I have not been in practice since March
6  of 1992, but I've seen patients, and the
7  biggest -- I saw many patients during the
8  Katrina debacle, but I've certainly not
9  been in practice since March 1992.
10       Q.   By "not in practice," that
11  means you didn't have regular office
12  hours?
13       A.   That's true.
14       Q.   Is that what that means?
15       A.   That's right.
16       Q.   All right.
17       In what capacity have you
18  seen patients since March of 1992?
19       A.   Actually, more as courtesy
20  than anything else.  And also the
21  emergency care that first responders
22  provided at the Astro Arena last
23  September.
24       Q.   Do you currently keep a

23  (Pages 86 to 89)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 90

1 valid medical license?
2     A.  I do.
3     Q.  In Texas?
4     A.  Yes.
5     Q.  Anywhere else?
6     A.  No.
7     Q.  What was your involvement in
8 the medical arena in Katrina?
9     A.  Providing emergency care and
10 then family practice general medicine
11 responder to the myriad difficulties that
12 the Katrina survivors had.
13     Q.  Did you take off from work
14 to do that, or what were the
15 circumstances?
16     A.  Well, it was off of work,
17 off of weekends.  It was --
18     Q.  Is that something that the
19 University of Texas sort of allows you
20 time off to go do, or did you have to
21 take vacation time to do that?
22     A.  No.  Actually, they made an
23 allowance for us to do that.  They made
24 an administrative time allowance for us

Page 91

1 to do that.
2     Q.  To sort of contribute to the
3 effort?
4     A.  Yes, sir.
5     Q.  Have you ever prescribed
6 Vioxx?
7     A.  No.
8     Q.  Have you ever counseled a
9 patient about Vioxx?
10     A.  No.
11     Q.  Did you ever read the
12 product label for Vioxx while Vioxx was
13 on the market?
14     A.  No.
15     Q.  Have you ever prescribed any
16 COX-2 inhibitor drug?
17     A.  No.
18     Q.  Do you have any personal
19 experience with Vioxx?
20     A.  No.
21     Q.  Are there any physicians
22 that you know who prescribed Vioxx with
23 whom you've discussed their experience?
24     A.  No.

Page 92

1     Q.  Are there any patients you
2 know who've used Vioxx with whom you've
3 discussed their experience?
4     A.  No.
5     Q.  When you were practicing
6 medicine regularly, did you prescribe
7 nonselective nonsteroidal
8 anti-inflammatory drugs?
9     A.  Frequently, yes.
10     Q.  Frequently?
11     A.  Yes.
12     Q.  For what types of problems?
13     A.  Acute injuries, some chronic
14 problems, but primarily acute injuries.
15     Q.  Which nonsteroidal
16 anti-inflammatory drugs did you use?
17     A.  Primarily ibuprofen, also
18 naproxen.
19     Q.  Any others?
20     A.  Those are the only ones that
21 come to mind now.  I'm sorry.  Parafon
22 Forte.  But I'm not sure if that's an
23 NSAID.
24     Q.  I don't think that's an

Page 93

1 NSAID.
2     A.  Okay.
3     Q.  In any event, you prescribed
4 Parafon Forte --
5     A.  Yes.
6     Q.  -- for musculoskeletal pain?
7     A.  Yes.
8     Q.  Was it your practice when
9 you were involved in active regular
10 medical practice to inform patients of
11 the potential risks of medications you
12 prescribed?
13     A.  Yes.
14     Q.  Did you inform patients when
15 you prescribed nonsteroidal
16 anti-inflammatory medications to them
17 that there were potentially serious
18 gastrointestinal risks?
19     A.  Yes.
20     Q.  Did you consider at the time
21 nonsteroidal anti-inflammatory drugs to
22 be unsafe because they had
23 gastrointestinal risks?
24     A.  Not when used as directed.

24 (Pages 90 to 93)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 94

1      Q.   How did you direct people to
2  use them?
3      A.   For a fairly short period of
4  time, no more than five to seven days.
5      Q.   Did you ever use
6  nonsteroidal anti-inflammatory drugs for
7  more than five to seven days?
8      A.   No.
9      Q.   Did you take care of any
10 arthritis patients?
11     A.   Osteoarthritic patients,
12 yes. Very rarely did I care for a
13 rheumatoid arthritic patient chronically,
14 but several osteoarthritic patients.
15     Q.   What medications did you use
16 to control pain and inflammation in
17 osteoarthritis patients?
18     A.   Actually, I didn't use --
19 well, to answer your question directly,
20 Tylenol. An acute bout -- an acute bolus
21 I would say, five to seven days of a
22 nonsteroidal anti-inflammatory, but
23 primarily it was a combination of rest
24 and exercise and warm water baths.

Page 95

1      Q.   Did you conduct at any point
2  in your career any original laboratory
3  research on COX-2 inhibitors?
4      A.   No, sir.
5      Q.   Did you conduct any original
6  laboratory research on the effects of
7  nonsteroidal anti-inflammatory drugs?
8      A.   No.
9      Q.   Were you the author of any
10 original epidemiological studies on Vioxx
11 or any other COX-2 inhibitor?
12     A.   No.
13     Q.   Are you the author of any
14 original epidemiological studies on the
15 effects of NSAIDs?
16     MR. SIZEMORE:  Did you get
17 that question?
18     THE WITNESS:  I did.  Let me
19 answer this way.  I was not
20 involved in an epidemiologic study
21 that focused on the effect of
22 NSAIDs.  That's true.
23 BY MR. PIORKOWSKI:
24     Q.   Were you involved in a study

Page 96

1  that focused on the efficacy of NSAIDs?
2      A.   No.
3      Q.   Were you involved in a study
4  that focused on the safety of NSAIDs?
5      A.   Yes.  We used NSAIDs as a
6  control.  We used actually ibuprofen as a
7  control in an epidemiologic study that we
8  carried out in the 1980s.
9      Q.   Is that a published
10 manuscript?
11     A.   Yes, it is.
12     Q.   Can you direct me to --
13 actually, let me see what I've got here.
14        Do you have your CV with
15 you?
16     A.   I don't, no.
17     Q.   I'll get it on a break.
18        Is it listed in your CV?
19     A.   Yes, it is.
20     Q.   Can you describe for me
21 briefly what the study was?
22     A.   Sure.  It was a study that
23 attempted to evaluate the cardiovascular
24 effects of terfenadine.  And we used

Page 97

1  ibuprofen as a control.
2      Q.   Terfenadine is the drug
3  Seldane?
4      A.   Yes.
5      Q.   And you were a consultant to
6  Marion Merrill-Dow with respect to
7  Seldane, is that right?
8      A.   That's right.
9      Q.   Were you a consultant at the
10 time you were the author of the study?
11     A.   Yes.
12     Q.   And was the study intended
13 to evaluate the potential cardiovascular
14 adverse effects of Seldane?
15     A.   Yes.
16     Q.   And what you're saying is
17 that ibuprofen was used as the control
18 group for your study?
19     A.   Yes.
20     Q.   And is the assumption of
21 your study that ibuprofen does not have
22 any adverse cardiovascular effects?
23     A.   At the time, that was the
24 understanding, yes.

25 (Pages 94 to 97)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 98

1    Q.   And at the time, was that
2  the common understanding of the medical
3  community based on your best opinion?
4    A.   Yes.
5    Q.   Otherwise, you wouldn't have
6  chosen it as a control group, right?
7    A.   That's right.
8    Q.   Any other study that you've
9  been involved with that's involved the
10  use of NSAIDs in any way?
11    A.   No.
12    Q.   Have you published on the
13  subject of COX-2 biochemistry?
14    A.   I have not.
15    Q.   Have you published on the
16  subject of the benefits of nonsteroidal
17  anti-inflammatory drugs?
18    A.   No.
19    Q.   Have you published anything
20  about the risks of nonsteroidal
21  anti-inflammatory drugs?
22    A.   No.
23    Q.   Have you had discussions
24  with any person who was the author of an

Page 99

1  epidemiological study involving NSAIDs
2  about the subject of NSAIDs?
3    A.   No, I have not.
4    Q.   Do you know Dr. Wayne Ray?
5    A.   I do.
6    Q.   Are you aware that Dr. Wayne
7  Ray has published extensively on the
8  gastrointestinal risks of NSAIDs?
9    A.   Yes.  Actually, I think I
10  referred to one of his manuscripts in my
11  affidavit, Exhibit 1.
12    Q.   Have you read Dr. Ray's
13  deposition testimony?
14    A.   No, sir.
15    Q.   Have you read Dr. Ray's
16  trial testimony?
17    A.   Yes.
18    Q.   Do you know he testified
19  twice?
20    A.   I only read one.
21    Q.   Do you know which one you
22  read?
23    A.   No, sir.  I think the answer
24  might be in here.  (Indicating).

Page 100

1    Q.   Okay.
2       It would be reflected in
3  Exhibit 2?
4    A.   Yes, sir.
5    Q.   So, you haven't had any
6  discussions with Wayne Ray about any
7  aspect of this case?
8    A.   That's true.
9    Q.   What about Jerry Avorn, have
10  you had any discussions with Jerry Avorn?
11    A.   No, sir.
12    Q.   Do you know David Graham?
13    A.   Not personally.  We've never
14  met.
15    Q.   Have you had any discussions
16  with him on the phone or otherwise about
17  any aspect of this case?
18    A.   No, sir.
19    Q.   What about Eric Topol?
20    A.   Not about this case, no.
21    Q.   Have you had any discussions
22  with Eric Topol about any aspect of COX-2
23  inhibitors?
24    A.   No, sir.

Page 101

1    Q.   Do you know Dr. Curfman?
2    A.   Not personally, no.
3    Q.   Do you know any of the
4  editors?  Do you know Dr. Drazen?
5    A.   No, I don't.
6    Q.   Do you know any of the
7  editors who were involved in a review of
8  the VIGOR manuscript?
9    A.   No, I don't.
10    Q.   Have you had any discussion
11  with any editors about the VIGOR
12  manuscript personally?
13    A.   No.
14    Q.   Is it fair to say that you
15  do not have any knowledge, experience,
16  training, skill or education in
17  pharmaceutical product marketing?  Is
18  that correct?
19       MR. WACKER:  Object to form.
20       MR. SIZEMORE:  Objection.
21       THE WITNESS:  I don't think
22  I could agree with that.
23  BY MR. PIORKOWSKI:
24    Q.   You don't think you could

26 (Pages 98 to 101)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 102

1  agree with that?
2      A.  No, sir.
3      Q.  Have you ever worked for
4  DDMAC?
5      A.  No, sir.
6      Q.  Have you ever worked, been a
7  consultant to DDMAC?
8      A.  No.
9      Q.  Do you remember giving
10 testimony in the Rocha case in Jim Wells
11 County Texas back in 1999?
12     A.  Yes.
13     Q.  In fact, I think I was the
14 person that was examining you?
15     A.  I think you were.
16         MR. PIORKOWSKI:  Paul, I've
17     got one copy of this, but I'll let
18     you take a look at the transcript.
19         MR. SIZEMORE:  I'd like him
20     to see it before he comments.
21 BY MR. PIORKOWSKI:
22     Q.  Do you recall being asked
23 this question and giving this answer?
24     "Question:  Okay.  Now, you

Page 103

1  have no knowledge, experience, training
2  or education in pharmaceutical product
3  marketing, do you?
4      "Answer:  I think that's
5  true.  Yes."
6         MR. PIORKOWSKI:  (Handing
7     over document.)
8         MR. SIZEMORE:  Is this from
9     the trial?
10         MR. PIORKOWSKI:  Yes
11     (Witness reviewing
12     document.)
13         THE WITNESS:  I understand.
14     Sure.  I recall that's what I
15     said.  I certainly meant then and
16     mean today that I'm not an expert
17     in marketing.  There's no question
18     of that.  I'm not an expert.  But
19     I think any physician who's had
20     marketers come in their office and
21     speak with them about products
22     understands good and bad marketing
23     techniques.
24 BY MR. PIORKOWSKI:

Page 104

1      Q.  All right.
2      A.  So, that was the basis for
3  my answer to your question.
4      Q.  Okay.
5         You've never worked for any
6  company or given advice to any
7  pharmaceutical company about any aspect
8  of pharmaceutical product marketing; is
9  that correct?
10     A.  That's right.
11     Q.  Your report discusses your
12 involvement on the Advisory Committee and
13 actually has some discussion generally
14 about Advisory Committees, is that right?
15     A.  Yes, it does.
16     Q.  Is it correct that an
17 Advisory Committee is an official body
18 under the Code of Federal Regulations?
19     A.  Yes.
20     Q.  And the purpose of an
21 Advisory Committee is to provide
22 independent advice to FDA?
23     A.  Yes.
24     Q.  And the rules of disclosure

Page 105

1  concerning Advisory Committee members are
2  designed to ensure that Advisory
3  Committee members are independent, right?
4      A.  Yes.
5      Q.  In other words, to make sure
6  that they don't have any personal stake
7  in the outcome of the Advisory
8  Committee's decision?
9      A.  I would disagree with you
10 about that.  I think the rules are not to
11 ensure that there is none, but to reveal
12 what there is so that people can view the
13 comments of the advisors in the
14 appropriate context.
15     Q.  Well, there's certainly a
16 threshold beyond which a potential
17 interest in the outcome of a decision is
18 too much as far as the FDA is concerned,
19 right?
20     A.  Right.  I couldn't tell you
21 what that threshold is, but --
22     Q.  But your interpretation of
23 the rules is that at a minimum, wherever
24 that point is, that the disclosure rules

27 (Pages 102 to 105)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 106

1  require that any potential interest be
2  out on the table?
3      A.   Yes.
4      Q.   So that people can evaluate
5  whether, in fact, these individual
6  Advisory Committee members are or are not
7  independent?
8      A.   Yes.
9      Q.   Okay.
10          Advisory Committees
11  generally are made up of scientists in
12  the field in which the drug is expected
13  to be effective, right?
14      A.   Generally.  They also
15  include patients sometimes, and
16  occasionally they will include a
17  representative from the pharmacy industry
18  itself.  But in general, it's composed of
19  scientists.
20      Q.   The lion's share of the
21  voting members on an Advisory Committee
22  are generally scientists who have a
23  medical specialty in the area in which
24  the drug is expected to be effective; is

Page 107

1  that right?
2      A.   Yes.
3      Q.   In your case, the Advisory
4  Committee that you served on was the
5  cardiorenal Advisory Committee?
6      A.   That was the first of two,
7  yes.
8      Q.   That's the one you were on
9  for a period of --
10      A.   Four years.
11      Q.   -- four years?
12      A.   Yes, sir.
13      Q.   Is the pharmaceutical
14  committee that you're on, is that also an
15  Advisory Committee?
16      A.   Pharmacy science is.  I'm
17  not on it now.  I rotated off.  That was
18  a committee that focused on issues
19  involving generic drugs.  It used to be
20  called the generic Advisory Committee,
21  but they changed that.
22      Q.   So, because that has a
23  cross-section of different disciplines,
24  that draws on a number of people from

Page 108

1  different specialties?
2      A.   Yes.
3      Q.   But there are different
4  Advisory Committees for different types
5  of drugs, right?
6      A.   Yes.
7      Q.   And where a drug is expected
8  to have a cardiac effect, that's the
9  cardiorenal Advisory Committee that would
10  do that drug?
11      A.   In general, yes.  Of course
12  drugs have multiple effects, and
13  sometimes Advisory Committees meet
14  together.  Sometimes one group will
15  borrow from another, but in general, what
16  you say is true.
17      Q.   Advisory Committees also
18  include biostatisticians, correct?
19      A.   Yes.
20      Q.   And even though you were on
21  the cardiorenal Advisory Committee,
22  you're not an expert in cardiology or
23  nephrology, right?
24      A.   I would disagree with you

Page 109

1  about that.  I certainly am not a
2  cardiologist, but I have extensive
3  training and experience carrying out
4  cardiovascular clinical trials.
5      Q.   Were you chosen for the
6  committee as a result of your cardiology
7  experience or as a result of your
8  biostatistics experience?
9      A.   I believe it was both.
10      Q.   The way an Advisory
11  Committee works is there's a meeting date
12  that's set, right?
13      A.   Yes, sir.
14      Q.   And prior to the meeting
15  date, the Advisory Committee members
16  receive information from the FDA, right?
17      A.   That's one source of
18  information.
19      Q.   I'm getting there.  That's
20  one source of information.
21          So, the FDA reviewers who
22  are looking at, let's say, whether to
23  approve a product, they have their own
24  ways of input into the Advisory

28 (Pages 106 to 109)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 110

1  Committee, right?
2      A.   Yes, sir.
3      Q.   Additionally, the sponsor
4  whose product is before the Advisory
5  Committee, they also have an opportunity
6  to provide the Advisory Committee members
7  with briefing documents, right?
8      A.   Yes.
9      Q.   Such as we already discussed
10  with Merck?
11      A.   Yes.
12      Q.   Now, from your report, you
13  mention that sponsors often spend months
14  preparing these briefing packets; is that
15  right?
16      A.   Yes, sir.
17      Q.   And you'd agree with me that
18  that makes sense because the sponsor
19  doesn't want to make a presentation and
20  then have something be found to be
21  inaccurate at the presentation?
22      A.   I would say this.  The
23  sponsors want things to go correctly for
24  them, and they work very hard to try to

Page 111

1  bring that event about.
2      Q.   And you make reference in
3  your report to saying that they conduct
4  intense preparation sessions, right?
5      A.   Yes, sir.
6      Q.   There's nothing wrong with
7  that, right?
8      A.   That's right.
9      Q.   And in fact, it's important
10  to be fully prepared for an Advisory
11  Committee meeting?
12      A.   Yes.
13      Q.   It's a serious proceeding?
14      A.   Yes.
15      Q.   Okay.
16          Now, the way this works is
17  that FDA asks the committee members
18  specific questions about a particular
19  drug, right?
20      A.   Yes.
21      Q.   And the role of the Advisory
22  Committee members is to answer the
23  questions that the FDA puts to them?
24      A.   Yes.

Page 112

1      Q.   And the Advisory Committee
2  has no actual legal authority to approve
3  or to disapprove a drug, right?
4      A.   That's true.
5      Q.   The committee provides its
6  input to the FDA, and the FDA considers
7  it and makes it own decision?
8      A.   Yes.  It provides critical
9  input.
10      Q.   The types of questions that
11  the Advisory Committee is asked are
12  things like, does the scientific evidence
13  support that a particular drug is safe
14  and effective when used as labeled?
15      A.   Actually not.  The questions
16  are nowhere near that refined.  The
17  questions are, what are the benefits of
18  this drug?  What are the adverse -- what
19  are the adverse experiences of this drug?
20  Do the benefits outweigh the risks?  What
21  should be in the label?  To whom should
22  the drug be marketed?  Should the drug be
23  approved?
24      Q.   Well, the question of should

Page 113

1  the drug be approved is essentially based
2  on the FDA's standards, right?
3          MR. SIZEMORE:  Object to
4  form.
5          MR. PIORKOWSKI:  Let me back
6  up.  I'll withdraw the question.
7  BY MR. PIORKOWSKI:
8      Q.   The Advisory Committee is
9  not at liberty to sort of make up its own
10  rules about what should or shouldn't
11  constitute approval.  It's applying the
12  set of standards that the FDA has given
13  them, right?
14      A.   No, sir.  Advisory
15  Committees are not so well behaved.
16  Advisory Committees will commonly
17  disagree with what the FDA's rules are.
18  I shouldn't say "commonly."  They will
19  occasionally disagree with what the FDA's
20  rules are.  They will suggest
21  alternatives.  They will even discard the
22  FDA's questions and come up with their
23  own questions.  And so Advisory
24  Committees can be prickly and

29 (Pages 110 to 113)

Lemuel A. Moye, M.D., Ph.D.

Page 114

1   independent.
2       Q.   All right.
3           If the Advisory Committee
4   disregards the questions that the FDA put
5   to it, that has no binding effect on
6   anybody, right?
7       A.   Binding effect, I don't
8   know.  It certainly conveys to the FDA
9   what the Advisory Committee's concerns
10  are.  And --
11      Q.   Okay.  I'm sorry.  Go ahead.
12  I didn't mean to cut you off.
13      A.   And that is one of the most
14  important functions that the Advisory
15  Committee carries out.  It lets the FDA
16  know through the conversations during the
17  day, through the questions and through
18  the conversations around the questions
19  either posed by the FDA or posed by the
20  committee members what the Advisory
21  Committee's concerns are.  So, it's not
22  just the answers to the questions that
23  the FDA responds to, it's the entire
24  gestalt, it's the entire flavor of the

Page 115

1   conversations that took place.
2       Q.   Is it correct that most of
3   the Advisory Committee meetings that you
4   have attended on cardiorenal drugs have
5   ended with a bottom line question about
6   whether a particular drug should be
7   approved as -- should be approved for
8   marketing in the United States?
9           That's the question.
10      A.   Certainly I would agree.
11  Certainly one of the questions is that.
12  Commonly the question is more complicated
13  than that because it has to be because we
14  on the Advisory Committee don't have a
15  label yet.  And there's lots of
16  discussion about label.  And depending on
17  whether the drug should be approved or
18  not, it really depends on what the label
19  is going to say many times.  So, it's
20  really a little more complicated a
21  question that we have to deal with.
22      Q.   So, your testimony is that
23  the FDA Advisory Committee does not have
24  a draft label available to them at the

Page 116

1   time they make a decision as to whether a
2   drug should be approved for marketing?
3       A.   No.  Many times we do have a
4   draft label, but the draft label's
5   tenability may be questioned at the
6   Advisory Committee meeting.  Then when we
7   ask a question about approval, then it
8   has to be clear in what context the
9   approval is going to be gained.
10      Q.   That's an important
11  question.  Let's talk about that for a
12  second.
13          When the FDA approves a
14  drug, it doesn't just approve it in a
15  vacuum, right?
16      A.   That's true.
17      Q.   The FDA approves a drug for
18  a specific indication or specific
19  indications, right?
20      A.   Yes, sir.
21      Q.   With specific dosages,
22  right?
23      A.   Yes, sir.
24      Q.   Sometimes with certain

Page 117

1   duration of use requirements, right?
2       A.   Yes.
3       Q.   And it's always approved --
4   every FDA approval is always approved as
5   used in the approved label, right?
6       A.   Not Advisory Committee,
7   every FDA approval, yes.
8       Q.   Every FDA approval
9   ultimately approves a drug for use as
10  labeled, right?
11      A.   Yes.
12      Q.   Okay.
13          Now, what the proposed
14  labeled indications are and what the
15  proposed doses are, that information is
16  available and is the subject of
17  discussion at Advisory Committee
18  meetings?
19      A.   Those and many other things,
20  yes.
21      Q.   But that's not a secret.
22  The Advisory Committee is not in the dark
23  about what the proposed dosage is going
24  to be?

Lemuel A. Moye, M.D., Ph.D.

Page 118

1    A.   That's right.
2    Q.   They know what's on the
3  table as far as -- I mean, as an Advisory
4  Committee member, you couldn't make a
5  determination about whether a drug should
6  or shouldn't be approved in the absence
7  of specific indications or specific dose
8  information?
9    A.   I agree. My point is that
10  there is disagreement at the Advisory
11  Committee about what the indications are
12  or about what the adverse event complex
13  really is. And so the question for
14  approval really hinges on what the
15  understanding is about those..
16    Q.   Okay.
17        And the truth of the matter
18  is that Advisory Committee members can
19  have different points of view about, for
20  example, whether the scientific evidence
21  on a drug shows that it's efficacious,
22  right?
23    A.   Yes.
24        MR. SIZEMORE: Before you do

Page 119

1  that, there's a interruption --
2  distraction.
3        - - -
4        (Whereupon, a recess was
5  taken from 11:32 a.m. until 11:41
6  a.m.)
7        - - -
8  BY MR. PIORKOWSKI:
9    Q.   Before we took our break, we
10  were talking about Advisory Committees,
11  and I believe you were telling me that
12  the questions that are presented to the
13  Advisory Committee are often difficult
14  questions?
15    A.   Yes. Difficult and
16  complicated questions which spawn
17  unpredictable answers, which lead to
18  changing the question. So, it's a very
19  dynamic process.
20    Q.   The questions that they're
21  considering usually are some variant of
22  whether the drug is effective and whether
23  the drug is safe. Those are really the
24  primary considerations?

Page 120

1    A.   That's a fair statement.
2  The conversations ultimately are about
3  whether the drug can be used safely and
4  effectively.
5    Q.   It may involve at what doses
6  or with what limitations, but those tend
7  to be the central issues. Fair enough?
8    A.   Yes.
9    Q.   And fair to say that
10  Advisory Committee members often have
11  different points of view with respect to
12  these issues of safety and efficacy with
13  respect to a particular drug?
14    A.   Certainly.
15    Q.   And often one or more
16  Advisory Committee member dissents from
17  the majority view?
18    A.   Yes.
19    Q.   Because the decisions often
20  involve questions of medical judgment.
21  Fair to say?
22    A.   Yes. Individual medical
23  judgment, yes.
24    Q.   And reasonable minds can

Page 121

1  often differ on these questions. Would
2  you agree?
3    A.   Yes. There are some tough
4  questions.
5    Q.   And in fact, if we were to
6  look at your own voting record on the
7  cardiorenal Advisory Committee, more
8  often than not you were in the minority,
9  right?
10    A.   That's true.
11    Q.   You voted against approving
12  the vast majority of drugs that came
13  before the Advisory Committee, true?
14        MR. SIZEMORE: Object to the
15  form.
16        THE WITNESS: Yes. That's
17  true.
18  BY MR. PIORKOWSKI:
19    Q.   And one of the drugs you
20  voted against is a drug called Plavix,
21  right?
22    A.   Yes.
23    Q.   Which today is the second
24  most commonly prescribed drug in the

31 (Pages 118 to 121)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

| Page 122 | Page 124 |
|---|---|
| 1  world, right? | 1  A.  No, I have not. |
| 2  A.  I accept your representation | 2  Q.  Do you have any |
| 3  of that. | 3  recollections of having met with sales |
| 4  Q.  Okay. | 4  representatives of Merck about Vioxx? |
| 5  Now, to bring us back to | 5  A.  No, I haven't.  It was |
| 6  Vioxx, at the point after the FDA | 6  approved well after I was out of |
| 7  reviewed the new drug application for | 7  practice, so, no. |
| 8  Vioxx and before FDA issued its approval, | 8  Q.  I assume that you would |
| 9  there was an Advisory Committee convened | 9  really have no occasion to meet with |
| 10  to review Vioxx in 1999, right? | 10  sales reps for any reason now that you're |
| 11  A.  Yes. | 11  not in active practice? |
| 12  Q.  Just so everybody is clear, | 12  A.  That's true.  Again, just to |
| 13  you were not a member of that Advisory | 13  be clear, there were many people in the |
| 14  Committee? | 14  pharmaceutical industry who were at the |
| 15  A.  That's correct. | 15  Astrodome in Katrina who really helped us |
| 16  Q.  That was the arthritis | 16  quite a bit, and so I had lots of |
| 17  Advisory Committee, not the cardiorenal | 17  conversations with them, but it wasn't |
| 18  Advisory Committee that considered Vioxx? | 18  about any of the matter we're talking |
| 19  A.  That's true. | 19  today. |
| 20  Q.  And have you spoken with | 20  Q.  Was there anyone at Merck |
| 21  anyone who was on that Advisory | 21  involved in that? |
| 22  Committee? | 22  A.  I presume there were, but I |
| 23  A.  No. Certainly not about | 23  don't recall who they were. |
| 24  Vioxx. I don't know who was on the | 24  Q.  On the Advisory Committees |

| Page 123 | Page 125 |
|---|---|
| 1  committee, but I've not spoken to any | 1  that you've served on, is it correct that |
| 2  Advisory Committee member about Vioxx. | 2  you have never been involved in any |
| 3  Q.  Well, you do know who was on | 3  aspect of reviewing any COX-2 drug? |
| 4  the committee by virtue of having read | 4  A.  That's certainly true for |
| 5  the transcripts? | 5  cardiorenal.  I can't recall -- well, |
| 6  A.  I don't know today, but I | 6  it's true for both of them because |
| 7  can look it up to see, sure. | 7  pharmacy science, we didn't talk about |
| 8  Q.  The same thing is true for | 8  any drug in particular.  So, it's true |
| 9  the 2001 Advisory Committee, you were not | 9  for both. |
| 10  a member of that committee, right? | 10  Q.  On the cardiorenal Advisory |
| 11  A.  That's true. | 11  Committee, you were never involved in the |
| 12  Q.  And you've not spoken to | 12  consideration of any issue concerning |
| 13  anyone who is on that committee? | 13  nonsteroidal anti-inflammatories, right? |
| 14  A.  That's true.  Again, about | 14  A.  The main focus of the |
| 15  Vioxx. | 15  conversation was never about nonsteroidal |
| 16  Q.  About Vioxx. | 16  anti-inflammatories, that's right. |
| 17  A.  Right. | 17  Q.  Was there ever a |
| 18  Q.  You've never done any work | 18  nonsteroidal anti-inflammatory issue |
| 19  for Merck, is that right? | 19  presented to the pharmacy sciences |
| 20  A.  That's true. I've not done | 20  Advisory Committee? |
| 21  any work for Merck. | 21  A.  Right.  That's the right |
| 22  Q.  Have you spoken to any | 22  committee.  No, there has not been. |
| 23  employee of Merck about any aspect of | 23  Q.  So, fair to say that none of |
| 24  this case? | 24  your Advisory Committee experience has |

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 126

1  involved reviewing any aspect of
2  nonsteroidal anti-inflammatory drugs?
3      A.  That's true.
4      Q.  Okay.
5          Have you ever spoken to any
6  FDA official or former FDA official who
7  was involved in Vioxx about their
8  experience?
9      A.  About their experience with?
10     Q.  With Vioxx.
11     A.  No.
12     Q.  Or about any aspect of
13 Vioxx?
14     A.  No.
15     Q.  Now, on Paragraph 10 of your
16 report, you make reference to having been
17 a consultant to various drug companies?
18     A.  Yes, sir.
19     Q.  Have you ever been a
20 consultant to any pharmaceutical company
21 with respect to any nonsteroidal
22 anti-inflammatory drug?
23     A.  I need a moment.
24         (Witness reviewing

Page 127

1  document.)
2          No.
3      Q.  Have you ever been a
4  consultant to any pharmaceutical company
5  with respect to any drug used for the
6  treatment of arthritis?
7      A.  No.
8      Q.  Have you ever been a
9  consultant to any pharmaceutical company
10 with respect to any drug that had as its
11 purpose pain relief or analgesia?
12     A.  No.
13     Q.  With respect to Paragraph
14 10, what was the earliest of these
15 consultations?  Are these in
16 chronological order on here, or are these
17 just kind of in a random order?
18     A.  They're not in chronological
19 order.  I don't know what order they're
20 in.  They might very well be random, but
21 what's your question?
22     Q.  What's the earliest of your
23 consultancies of these things that are
24 listed in 10?  Is it Marion Merrill-Dow?

Page 128

1      A.  Goodness.  Let's see.
2          Either Marion Merrion-Dow or
3  Key Pharmaceuticals.
4      Q.  Marion Merrill-Dow, you
5  consulted with them with respect to the
6  drug Seldane, correct?
7      A.  Right.
8      Q.  Which you referred to
9  earlier?
10     A.  Yes, sir.
11     Q.  Any other drugs you
12 consulted with them on?
13     A.  I don't think so.
14     Q.  What about Key
15 Pharmaceuticals, what did you consult
16 with them on?
17     A.  Nitro-Dur.
18     Q.  Is that a nitroglycerin
19 product?
20     A.  Yes.  Long acting.
21     Q.  I'm sorry.  Go ahead.
22     A.  Long acting nitroglycerin
23 paste.
24     Q.  Was that before or after you

Page 129

1  were on the Advisory Committee for
2  cardiorenal?
3      A.  I think it was before.
4      Q.  Did you design clinical
5  trials?
6      A.  Yes.
7      Q.  Is that what your role was?
8      A.  Yes, sir.
9      Q.  Phase III clinical trials?
10     A.  Yes.
11     Q.  All right.
12         What about Berlex, what was
13 your involvement with them?
14     A.  Berlex was -- involved
15 development of viral therapy for angina
16 pectoris.
17     Q.  Viral therapy?
18     A.  Yes.
19     Q.  You give a virus to stop
20 their ischemia?
21     A.  The idea is you alter the
22 virus' DNA and provide intercoronary
23 virus so that it perfuses to the
24 myocardium, changes the myocardium,

33 (Pages 126 to 129)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 130

1  develops stronger heart and muscle and
2  more blood vessels.
3      Q.   Is that under the "what
4  doesn't kill you makes you stronger"
5  heading?
6      A.   We had some interesting
7  meetings.
8      Q.   What did you do in their
9  case? Did you design clinical trials?
10     A.   No.  I was on the data
11 monitoring committee for them.
12     Q.   Okay.
13         Are those still in clinical
14 trials today?
15     A.   No.  Those have ended.
16     Q.   Did the data monitoring
17 committee end the clinical trials
18 prematurely?
19     A.   I think we may have ended it
20 barely prematurely, just a few months
21 before its scheduled end.
22     Q.   Because of unforeseen side
23 effects?
24     A.   No.  Just no effects at all.

Page 131

1      Q.   No beneficial effects?
2      A.   No beneficial or adverse
3  effects.
4      Q.   Any other involvement with
5  Berlex?
6      A.   I think so.  I had an
7  earlier involvement with them.  It had to
8  do with designing a monitoring rule for
9  the early termination of studies.  It was
10 a statistical consultation.  That was in
11 1996.
12     Q.   "A monitoring rule," meaning
13 under what circumstances would you
14 terminate a study early?
15     A.   Yes.  Under what statistical
16 criteria would you use that would trigger
17 the conversations that might lead to
18 early termination.
19     Q.   Was that in your capacity as
20 a member of the data safety monitoring
21 board?
22     A.   No.  I was not on the DMC
23 there.  I was just an advisor to Berlex
24 in helping them construct a rule.

Page 132

1      Q.   Was it the same product?
2      A.   No.  It was a different
3  product.
4      Q.   What product was that?
5      A.   I don't remember.
6      Q.   What about Proctor & Gamble?
7      A.   Proctor & Gamble was a
8  consultation about an antipsychotic
9  medication.
10     Q.   Was it in your capacity as a
11 biostatistician?
12     A.   Yes, it was, and also my
13 expertise in cardiology because there was
14 concern about the occurrence of
15 arrhythmias.
16     Q.   Did you design a study?
17     A.   No, sir.  I beg your pardon.
18 Yes.  I didn't execute it or analyze it,
19 but I helped design it.
20     Q.   Was the study you helped
21 design carried out?
22     A.   I believe so, yes.
23     Q.   At what stage was the
24 product when you were involved?  Was it

Page 133

1  already approved?
2      A.   Preapproval.
3      Q.   Was the study that you
4  designed completed prior to approval?
5      A.   Yes.
6      Q.   I'm sorry.  What was the
7  name of the product?
8      A.   I'm trying to remember.  I
9  don't remember what it was.  It was one
10 of the newer generation anti-psychotics,
11 anti-schizophrenic, but I don't remember
12 the name.
13     Q.   All right.
14         Is it on the market today?
15     A.   I don't think so.
16     Q.   You don't think so?
17     A.   I don't think so.
18     Q.   Because it's still under
19 review or because it's been withdrawn?
20     A.   No.  It's been a long time.
21 It may have been -- the company may have
22 decided to withdraw the NDA.  I don't
23 know.  If I'm right that it's not on the
24 market, and I may be wrong about that,

34 (Pages 130 to 133)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

1  but if I'm right, it's because it just
2  didn't finish going through the approval
3  process.
4     Q.   Roughly what time frame are
5  we talking about, year-wise?
6     A.   Early 190s, I think.
7     Q.   Anything else for Proctor &
8  Gamble?
9     A.   No.
10    Q.   Nothing else for Marion
11 Merrill-Dow besides Seldane?
12    A.   That's right.
13    Q.   How about Pfizer?
14    A.   Pfizer, any psychotic
15 medication for them I was involved in
16 analyzing the results of the clinical
17 study. Same type of newer generation
18 anti-schizophrenic medication that they
19 feared was associated with arrhythmias.
20    Q.   Is this by virtue of your
21 work in the Seldane litigation that these
22 came into you?
23    A.   I don't know. It certainly
24 makes sense, because the kind of

1  arrhythmia we were concerned about in
2  Seldane was related to the arrhythmias
3  that were associated with these newer
4  anti-psychotics.
5     Q.   Okay.
6        Did you design a clinical
7  trial or was that just a one-time
8  consultation?
9     A.   I think it was just a short
10 consultation evaluation of their Phase
11 III clinical -- of their Phase III safety
12 program. So, it's preapproval.
13    Q.   While it was still going on?
14    A.   You mean while the trial was
15 still going on?
16    Q.   Yes.
17    A.   I think while the trial --
18 yes, yes, and afterwards, yes.
19    Q.   Okay.
20       Any other work for Pfizer?
21    A.   I've given some lectures at
22 Pfizer, but not consulted on a drug.
23    Q.   What lectures have you
24 given?

1     A.   I gave three lectures to
2  Pfizer, November 2004. Do you want the
3  topics?
4     Q.   Sure.
5     A.   Okay.
6     Q.   Would they be on your CV?
7     A.   Yes, they would.
8     Q.   Let me give you that if that
9  helps.
10          -  -  -
11       (Whereupon, Deposition
12    Exhibit Moye MDL 3, Curriculum
13    Vitae of Lemuel A. Moye, M.D.,
14    Ph.D. (22 pages), was marked for
15    identification.)
16          -  -  -
17 BY MR. PIORKOWSKI:
18    Q.   I'm going to give you what I
19 marked as Exhibit 3, which is your CV.
20    A.   (Witness reviewing
21 document.)
22       Yes. Here they are. Items
23 56, 57 and 58. One was a discussion of
24 dependence in subgroup analyses. The

1  other was hyperdependence in clinical
2  trial analyses.
3     Q.   I'm sorry, what page are you
4  on?
5     A.   I'm on Page 15.
6     Q.   56, 57 and 58?
7     A.   56, 57 and 58. So,
8  dependence in subgroup analyses,
9  hyperdependence in clinical trial
10 analyses, and professionalism in science.
11    Q.   Okay.
12       Anything else for Pfizer?
13    A.   No.
14    Q.   What about -- how do you say
15 that, Hoechst --
16    A.   Hoechst Roussel. Yeah, they
17 were interested -- again, this was a
18 consultation to oversee a clinical trial,
19 evaluating the possible arrhythmogenic
20 effects of an antibiotic. That was circa
21 1996.
22    Q.   Putting aside Seldane,
23 that's three companies that you consulted
24 with in terms of evaluating through

35 (Pages 134 to 137)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 138

1  clinical trials the antiarrhythmic
2  effects of different products?
3      A.  Yes.
4      Q.  What's the name of the
5  product with Hoechst Roussel?
6      A.  I don't remember.  It was an
7  antibiotic.  I don't remember the name of
8  it.
9      Q.  Do you remember what
10 category of antibiotic?  Was it
11 cephalosporin?
12     A.  Cephalosporin.
13     Q.  Third generation?
14     A.  Yes.
15     Q.  Do you know if it's on the
16 market today?
17     A.  I don't know.
18     Q.  Okay.
19         How about Aventis?
20     A.  Aventis was interested in
21 developing an ARB receptor blocker for
22 the treatment of heart failure.  And I
23 was engaged as a consultant to help
24 design a Phase III clinical study.

Page 139

1      Q.  So, the study was designed
2  to look at heart failure as the efficacy
3  endpoint?
4      A.  Actually not.  The study was
5  primarily focused on the occurrence of
6  adverse events.  The concern was for the
7  appearance of angioedema.  So it's
8  primarily a safety study.
9      Q.  Was it a Phase III study?
10     A.  No.  Actually, I call it a
11 Phase II/III study.
12     Q.  Was the study done?
13     A.  No, it was not.  They
14 terminated it because -- well, they
15 terminated it.
16     Q.  They terminated it?
17     A.  They terminated it.
18     Q.  So, the product died on the
19 vine, as they say?
20     A.  Yes.
21     Q.  Do you know what the name of
22 the product was?
23     A.  No.
24     Q.  Any other things for

Page 140

1  Aventis?
2      A.  No.
3      Q.  What was the time frame on
4  that?
5      A.  2001 I think, early 2001.
6      Q.  How about Coromed?
7      A.  Coromed, I was asked to
8  serve as a member of a mock Advisory
9  Committee.
10     Q.  In your report you make
11 reference to the Board of Scientific
12 Advisors?
13     A.  Yes.
14     Q.  That was in place in Merck
15 that you make various references to.  Do
16 you recall that?
17     A.  Yes, I do.
18     Q.  Is this consultancy similar
19 to that?
20     A.  No.  It was as a member of a
21 mock Advisory Committee for rehearsal.
22 The Coromed's group were planning to
23 present before an FDA Advisory Committee.
24 As part of their rehearsals, they called

Page 141

1  together a group of scientists who could
2  pose as Advisory Committee members.
3      Q.  So, you weren't on the
4  Advisory Committee at the time?
5      A.  That's correct.  I was not.
6      Q.  So, based on your experience
7  of having been on that, they thought
8  you'd be a useful person as far as
9  answering questions and so forth?
10     A.  Yes.
11     Q.  Was that a one-time
12 participation?
13     A.  Yes.
14     Q.  What was the product that
15 was at issue?
16     A.  I don't remember.
17     Q.  Do you remember what the
18 nature of the product was?
19     A.  No, I don't.
20     Q.  When was this roughly?
21     A.  This was September 2001.
22     Q.  How about DuPont?
23     A.  DuPont -- before they became
24 part of Bristol-Myers Squibb, I was head

36 (Pages 138 to 141)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 142

1  of a DSMB that reviewed the -- oversaw
2  the conduct of a study that compared
3  medical versus surgical intervention for
4  patients with a class of angina pectoris.
5      Q.   We've had a couple
6  references to DSMB. Is it my
7  understanding that what you described as,
8  I guess you call it a data monitoring
9  committee, DMC or DSMB, are they
10 interchangeable?
11     A.   Actually, DMC is what I
12 should be using. It's the accepted
13 contemporary term for it, right.
14     Q.   DMC is a body that is made
15 up of independent scientists who are not
16 employed by the company that's funding
17 the study?
18     MR. SIZEMORE: Object to
19 form.
20     THE WITNESS: Yes.
21     MR. SIZEMORE: I'm sorry.
22     THE WITNESS: Yes. A small
23 group of distinguished
24 professionals who are independent

Page 144

1  was designed. They have taken on some
2  ancillary responsibilities, but the
3  primary goal is to ensure the safety of
4  the participants.
5      Q.   Okay.
6          Are the DMCs that you've
7  served on the same type of body as the
8  DSMB that was monitoring the VIGOR study?
9      A.   I don't know much about the
10 monitoring of the VIGOR study, but if it
11 was a classic DMC, that is, as we have
12 laid out in the parameters, independent
13 and providing -- after complete review of
14 all the data that neither the sponsor nor
15 the investigators have access to, make
16 recommendations to the sponsors and to
17 the steering committee, the group of
18 investigators, as to whether the trial
19 should continue or not.
20     Q.   Have you, as a part of the
21 documents you've reviewed, the internal
22 company documents, have you reviewed the
23 meeting minutes of the VIGOR DSMB?
24     A.   I have not.

Page 143

1      of the sponsor and of the
2      investigators and who oversee the
3      conduct of the study on a regular
4      basis.
5  BY MR. PIORKOWSKI:
6      Q.   So, they're paid by the
7  company?
8      A.   Yes, that's right.
9      Q.   But they're not employees of
10 the company, right?
11     A.   That's correct.
12     Q.   And they're not involved in
13 the clinical trial itself?
14     A.   That's right.
15     Q.   And their primary goal is to
16 ensure that patients in the clinical
17 trial are safe?
18     A.   Yes.
19     Q.   That's their only goal?
20     A.   Well, I think you said it
21 right at first, the primary goal. The
22 modern DMCs have broadened their
23 portfolio. So, they also look at the
24 underlying assumptions on which the trial

Page 145

1      Q.   Have you reviewed the
2  meeting minutes of the APPROVe, I think
3  it was called an ESMB, but an external
4  safety monitoring board?
5      A.   I have not.
6      Q.   Have you reviewed any
7  correspondence or e-mail exchanges
8  between Merck employees and members of
9  those boards either before or after the
10 blind was broken?
11     A.   No.
12     Q.   What's the status of the
13 Bristol-Myers -- your service on the
14 Bristol-Myers matter right now?
15     A.   Oh, the DSMB?
16     Q.   Yes.
17     A.   I'm sorry. DMC. The study
18 ended about 18 months ago.
19     Q.   What was the name of the
20 product?
21     A.   Well, actually, it was
22 curious. The study was designed to
23 really assess the ability of a
24 radionuclide to differentiate between

37 (Pages 142 to 145)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 146

1    patients with different degrees of left
2    ventricular dysfunction. That was the
3    product. The clinical aspect of it was
4    to demonstrate that patients could be
5    safely -- could have their anginal status
6    safely classified so that appropriate
7    therapy could be targeted for. So, the
8    product really was a radionuclide
9    procedure.
10       Q.   But it still had to be FDA
11   approved, right?
12       A.   Yes.
13       Q.   Was it?
14       A.   Yes.
15       Q.   Do you know the name of the
16   product?
17       A.   I don't.
18       Q.   Is there a product marketed
19   by Bristol-Myers Squibb that is in the
20   form of the radionuclide?
21       A.   I think so.
22       Q.   Was that study terminated
23   early?
24       A.   No.

Page 147

1        Q.   Were there any unusual
2    problems that came up during the study?
3        A.   No. I assume unusual
4    adverse events for patients?
5        Q.   Yes.
6        A.   No, there were not.
7        Q.   Okay.
8            Now, is that the same
9    product that you started off talking
10   about, DuPont, or is that a different
11   DMC?
12       A.   DMC, same product.
13       Q.   Anything else that you've
14   been involved with for Bristol-Myers
15   Squibb?
16       A.   Well, I've done a lot of
17   work for Bristol-Myers Squibb in
18   designing and executing clinical trials.
19   And to answer your first question,
20   probably Bristol-Myers Squibb is the
21   first. We looked at these
22   chronologically.
23       Q.   When did you first consult
24   with them?

Page 148

1        A.   1987. Actually, it wasn't
2    so much as a consultation as it was a
3    grant, that I helped design, execute,
4    analyze a study looking at the effect of
5    Captopril in reducing mortality in
6    patients with LV -- left ventricular
7    dysfunction.
8        Q.   What kind of drug is
9    Captopril?
10       A.   Captopril was an ACE
11   inhibitor, one of the first ACE
12   inhibitors.
13       Q.   Was Captopril approved and
14   on the market at the time you were
15   consulted?
16       A.   Yes, but not for heart
17   failure treatment, for the control of
18   elevated blood pressure.
19       Q.   Any other consultations
20   you've done with Bristol-Myers Squibb?
21       A.   Yes. I helped design,
22   execute and analyze CARE, which was a
23   4100 patient study that evaluated the
24   effect of pravastatin in patients who had

Page 149

1    established positive cardiovascular
2    disease history for reducing the
3    incidence of fatal and nonfatal
4    myocardial infarction.
5        Q.   Pravastatin is a statin
6    drug?
7        A.   Yes, sir.
8        Q.   Lowers lipids?
9        A.   Yes.
10       Q.   Bristol-Myers Squibb was the
11   manufacturer of pravastatin?
12       A.   Yes.
13       Q.   Were you paid --
14       A.   I don't want a nuance here.
15   I don't think so. I think Sankyo was in
16   Japan, and the licensing agreement led to
17   BMS in the United States. I think that's
18   right.
19       Q.   Let me rephrase. The people
20   that were selling pravastatin in the
21   United States, to the best of your
22   understanding, was Bristol-Myers Squibb?
23       A.   Yes.
24       Q.   Now, were you involved in

38 (Pages 146 to 149)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 150

1  the design of the CARE study?
2      A.  I was.
3      Q.  Were you the primary
4  designer of the CARE study?
5      A.  No.  I was not the principal
6  investigator of the CARE study, no.  I
7  was one of the investigators who helped
8  design the study.
9      Q.  As I understand
10  investigators, investigators are the
11  people who are actually conducting the
12  clinical study generally?
13      A.  You have to change your
14  understanding.  Certainly there are a
15  class of investigators who are
16  responsible for seeing patients.  But
17  investigators is a broader -- I mean,
18  it's a broader -- those are, let's say --
19  clinical investigators are what those
20  are.  Investigators of the study are
21  scientists who are involved in the
22  design, execution or analysis of the
23  study.  So, for example, an
24  epidemiologist who is designing an aspect

Page 151

1  of the CARE study that looks at quality
2  of life would be considered an
3  investigator, even though the
4  epidemiologist doesn't see any of the
5  patients.
6      Q.  Okay.
7          Regardless of whether you
8  see patients, though, does your funding
9  come directly from the company?
10      A.  No.  Funding went to the
11  university.  Essentially BMS gave the
12  university a grant or a contract, I don't
13  know which, and I worked through the
14  university's grants.
15      Q.  But the money came from
16  Bristol-Myers Squibb is what I'm trying
17  to pin down?
18      A.  Yes.  Correct.
19      Q.  Was the CARE study
20  published?
21      A.  Yes.
22      Q.  Were you listed as an
23  author?
24      A.  Yes.

Page 152

1      Q.  Did you agree with all the
2  findings?
3      A.  Yes.
4      Q.  Have any of the findings
5  been changed since the publication?
6      A.  No.
7      Q.  Who else was involved in the
8  design of that study?
9      A.  Eugene Braunwald, Frank
10  Sacks, Mark Pfeffer.  I mean, if we had
11  the manuscript here, we could see the
12  masthead, and that would give us a more
13  complete list.
14          MR. SIZEMORE:  Is it listed
15      in your CV?  Would that help?
16          THE WITNESS:  I don't know.
17  Perhaps all the authors are
18  listed.
19  BY MR. PIORKOWSKI:
20      Q.  I can check it.
21      A.  Okay.
22      Q.  Were you pressured at all by
23  Bristol-Myers Squibb concerning your
24  reporting of the results of the CARE

Page 153

1  study?
2          MR. SIZEMORE:  Object to
3  form.
4          THE WITNESS:  No.  I would
5  say, no, I wasn't pressured.
6  BY MR. PIORKOWSKI:
7      Q.  Since we just marked it, is
8  Exhibit 3 a current copy of your
9  curriculum vitae?
10      A.  Yes, it is.
11      Q.  Is there anything that needs
12  to be added or changed to make it up to
13  date?
14      A.  No.
15      Q.  What was your involvement in
16  working -- I'm sorry.  Back to
17  Bristol-Myers Squibb.  Were there any
18  other consultancies besides those two or
19  three things we talked about?
20      A.  As I sit here now, I can't
21  remember any others.
22      Q.  Are you continuing to do any
23  work for Bristol-Myers Squibb today?
24      A.  No.

39 (Pages 150 to 153)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 154

1      Q.   Has it been your experience
2   that they've always behaved as a
3   responsible company?
4           MR. WACKER:  Objection.
5           MR. SIZEMORE:  Same
6   objection.
7   BY MR. PIORKOWSKI:
8       Q.   Let me narrow it down.  On
9   matters with which you have been involved
10  with them, has it been your view that
11  they've always behaved as a responsible
12  company?
13      A.   Yes.
14      Q.   Novartis.  What was your
15  involvement with them?
16      A.   Oh, I don't remember.
17      Q.   I don't mean to be grilling.
18  If you need to look at your CV or
19  anything else to refresh your memory,
20  please feel free to do that.
21      A.   Let's come back to that.
22  Right now I don't remember.
23      Q.   How about Medtronics?
24      A.   Medtronics, I was involved

Page 155

1   in designing a study that would look at
2   the effectiveness of one of their cardiac
3   defibrillators.
4       Q.   How do you do that?
5       A.   Oh, you design a study.  You
6   decide --
7       Q.   No.  I'm sorry.  Let me
8   rephrase it.
9           I meant, given that cardiac
10  defibrillation under the best of
11  circumstances tends to be like a ten
12  percent success, how do you design a
13  study to evaluate whether a defibrillator
14  is effective?
15      A.   Oh, because you look at it
16  in a population in which you expect to
17  have a high mortality rate.  If you can
18  produce -- if you can demonstrate a
19  reduction from the untreated group's high
20  mortality rate, then you've demonstrated
21  the efficacy, let's say, of the device.
22      Q.   Okay.  What was the name of
23  the product you were designing?
24      A.   Maybe it's a product number.

Page 156

1   I don't remember what it was.
2       Q.   Was it an AED, automatic
3   external defibrillator?
4       A.   No.  It was implantable.
5       Q.   An implantable
6   defibrillator?
7       A.   Right.  I'm sorry.  Maybe I
8   wasn't clear about that.  An implantable
9   defibrillator.
10      Q.   So, you're talking about for
11  patients who had chronic arrhythmias that
12  could potentially deteriorate, you
13  designed a study using an implantable
14  defibrillator and compared that with
15  what, medical therapy?
16      A.   Compared that with the
17  standard therapy, which was medical
18  therapy, right.
19      Q.   Okay.
20          When was that study done?
21      A.   That was done in the late
22  1990s perhaps.
23      Q.   Do you know if the product
24  was approved?

Page 157

1       A.   I think the product was
2   already on the market actually.
3       Q.   Was your study that you were
4   designing to approve it for a new
5   indication?
6       A.   Yes.
7       Q.   What was the new indication?
8       A.   I don't remember.
9       Q.   Any other involvement for
10  Medtronic?
11      A.   No.
12      Q.   AstraZeneca?
13      A.   AstraZeneca, I was asked to
14  help them respond to an FDA concern
15  involving one of the beta agonists for
16  the treatment of heart failure.
17  Metoprolol, M-E-T-O-P-R-O-L-O-L, I think.
18      Q.   What was the issue with
19  metoprolol?
20      A.   The issue with metropolol
21  was the interpretation of subgroup
22  analyses.  And they were involved in
23  discussions and negotiations with the FDA
24  about that.  And we drafted a response

40 (Pages 154 to 157)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 158

1  and actually wrote a label that we
2  thought would meet the FDA's concerns.
3       Q.   What was the subgroup
4  analysis issue that was at issue there?
5       A.   It was that -- I forget the
6  name of the study, but it was an
7  international study designed to compare
8  metoprolol versus control therapy in
9  patients who have heart failure, the idea
10  being that metoprolol would reduce the
11  incidence of mortality.  The overall
12  findings were positive.  That is to say,
13  the single omnibus analysis demonstrated
14  that metoprolol was associated with lives
15  saved.  But the FDA did a subgroup
16  analysis and found all the lives saved --
17  let me put it another way.  The positive
18  effect was only seen in non-US countries.
19  The effect in the U.S. was neutral or
20  perhaps slightly harmful.
21       Q.   Was there a rationale?  Did
22  the FDA offer a rationale why patients in
23  the United States would be different?
24       A.   Oh, I understand what you're

Page 159

1  saying.  There were many explanations
2  offered as to why this might be the case,
3  but the bottom line is nobody knew.  I
4  mean, there were concerns about perhaps
5  the concomitant care is different in
6  Europe, perhaps European patients have
7  different referral mechanism, but in the
8  end, nobody knew.
9       Q.   What was the effect on
10  metoprolol?
11       A.   You mean regulatory effect?
12       Q.   Let me back up.  Was this in
13  the context of a supplemental new drug
14  application to approve metoprolol for
15  treatment of heart failure?
16       A.   Either an sNDA or an NDA.  I
17  don't remember which.
18       Q.   Was metoprolol approved?
19       A.   Yes.
20       Q.   Was it approved across the
21  board or were there restrictions?
22       A.   As I sit here now, I'd say,
23  no, there were restrictions.  They did
24  not get -- excuse me.  I don't think they

Page 160

1  got the total mortality indication that
2  they were looking for, but they did get
3  an indication for a secondary finding.  I
4  don't remember what that is right now.
5  It might be -- I just don't remember what
6  it was.
7       Q.   What's the timing of this
8  consultancy with AstraZeneca?
9       A.   Maybe 2002.  Maybe earlier
10  than that.  I don't remember.
11       Q.   Was there -- I'm sorry.
12  2002 or maybe earlier?
13       A.   Maybe earlier.
14       Q.   Was there an Advisory
15  Committee meeting conducted on this
16  issue?
17       A.   Oh, there was no FDA
18  Advisory Committee meeting.
19       Q.   Was there any other Advisory
20  Committee meeting by any other regulatory
21  body that you're aware of?
22       A.   No.
23       Q.   Anything else for
24  AstraZeneca?

Page 161

1       A.   That's it.
2       Q.   CryoCor?
3       A.   CryoCor asked me to help
4  them design a study that would reduce the
5  incidence of -- reduce the prevalence of
6  chronic atrial fibrillation.  It was an
7  ablation procedure where they would
8  freeze part of the electrical conducting
9  system of the heart that they felt was
10  pathogenically -- or pathologically
11  producing these abnormal electrical
12  impulses.
13       Q.   Was this a
14  placebo-controlled study?
15       A.   I would say --
16       Q.   Let me withdraw that.
17            Was this a study that was
18  comparing ablation to conventional
19  medical therapy for chronic atrial
20  fibrillation?
21       A.   Yes, sir.
22       Q.   Was the product approved?
23       A.   I don't remember.
24       Q.   What time frame was this?

41 (Pages 158 to 161)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

1    A.   I think approximately 1998
2 to 2000.
3    Q.   How about Vasogen?
4    A.   Vasogen I am working with
5 now.
6         MR. SIZEMORE:  You might
7    want to be careful.  Is this a
8    drug that's out on the market or
9    are you working with them on an
10   investigational drug?
11        THE WITNESS:  An
12   investigational drug.  I was going
13   to be very careful.
14        MR. SIZEMORE:  Okay.  You
15   need to be careful when you
16   answer.
17 BY MR. PIORKOWSKI:
18   Q.   Does it have anything to do
19 with the issues in this case?
20   A.   Only that it's a drug that
21 involves cardiology and the occurrence of
22 myocardial infarction, but it doesn't
23 involve this drug or any -- or this class
24 of drugs.

1         MR. PIORKOWSKI:  Yes.
2         MS. SNAPKA:  That's fine.
3         MR. SIZEMORE:  We had talked
4    about that, too.
5         MS. SNAPKA:  I didn't hear
6    it, I didn't know, and I just
7    wanted to make sure that that was
8    on the record that I didn't have
9    to object.
10        MR. SIZEMORE:  Objection for
11   one is good for all.
12           - - -
13        (Whereupon, a recess was
14   taken from 12:26 p.m. until 1:16
15   p.m.)
16           - - -
17 BY MR. PIORKOWSKI:
18   Q.   Doctor, have you ever
19 consulted for a company called Power
20 Three General?
21   A.   Power Three Medical.
22   Q.   I didn't see it on your
23 list.
24   A.   Yeah.  Actually, I should

1    Q.   Keep this as general as you
2 need to, but does it involve an
3 investigation of myocardial infarction as
4 an endpoint with the use of a certain
5 drug?
6    A.   With use of a certain
7 treatment, yes.
8    Q.   Did you design the study?
9    A.   I helped design it, yes.
10   Q.   Is the study underway?
11   A.   Yes, sir.
12   Q.   Anything else for Vasogen?
13   A.   No.
14   Q.   Any recollection on
15 Novartis?
16   A.   I'm still working on it.
17        MR. SIZEMORE:  Joe, is this
18   a good time to take a lunch break?
19        MR. PIORKOWSKI:  Sure.
20        MS. SNAPKA:  I have not said
21   anything prior. I'm assuming you
22   don't want this muddled up by too
23   many -- that an objection by them
24   is good for mine as well?

1 have put that there.  That's a local
2 biopharm group.
3    Q.   What have you done for them?
4    A.   We're in the process of
5 studying different combinations of
6 proteins, serum proteins as predictors
7 for Alzheimer's disease, Parkinson's
8 disease.
9    Q.   What's your role with that?
10   A.   To develop the stat models,
11 to develop the statistical models for
12 this.
13   Q.   For the clinical trials?
14   A.   No, it is not a clinical
15 trial at all, actually.  I would call
16 this kind of Phase II, just trying to get
17 sensitivity and specificity parameters
18 for the different tests we have.
19   Q.   Is this a current
20 consultancy?
21   A.   No.
22   Q.   Let me go back for a minute
23 to, I think you mentioned two or three
24 trials that you designed to evaluate

42 (Pages 162 to 165)

a46c412c-de3e-4446-bf8d-937e4e429297