Lemuel A. Moye, M.D., Ph.D.

1  arrhythmic effects?
2      A.   Yes.
3      Q.   Was the purpose of those
4  trials to evaluate the potential for
5  arrhythmias specifically as a primary
6  endpoint?
7      A.   Yes.
8      Q.   Is it fair to say that
9  arrhythmia generally is a fairly rare
10 side effect?
11     A.   I guess I wouldn't say that.
12 Let me back up a second.  There are
13 several -- I'm involved in several
14 arrhythmia studies, some of them looking
15 at chronic atrial fib.  Unfortunately
16 that's not rare at all.  That's common.
17 But there are some arrhythmias such as
18 torsades and ventricular tachycardia
19 which are very rare.
20     Q.   Okay.
21         And assuming that
22 arrhythmias -- well, is it correct that
23 the arrhythmias that you were looking at
24 specifically with respect to the

1  antibiotic product and the antipsychotic
2  product, were those torsade and
3  ventricular fibrillation?
4      A.   Yes.
5      Q.   So, the side effects you
6  were evaluating were rare?
7      A.   Yes.
8      Q.   Okay.
9         And were you evaluating them
10 using prospectively designed clinical
11 trials?
12     A.   Yes.
13     Q.   How many patients did you
14 need to study those?
15     A.   We used, again, it's been a
16 long time, essentially less than 1,000
17 patients.  However, the endpoints of
18 those studies were not the torsades or
19 the v tach, which are very rare.  The
20 endpoints of those studies were
21 prolongation of the electrocardiogram.
22 And those we could measure fairly
23 precisely with a relatively small number
24 of subjects.  And so we were using that

1  as a surrogate for the propensity for
2  torsade de pointes and v tach.
3      Q.   So, you didn't actually
4  measure Torsades and v tach or v fib?
5      A.   That's correct.  As I said,
6  anybody who had it, of course, we
7  accepted that, but it wasn't the endpoint
8  of the study.
9      Q.   Were there discussions about
10 the possibility of designing a study to
11 evaluate the actual endpoints of torsade
12 and v tach?
13     A.   Yes.
14     Q.   Was there a decision made
15 not to pursue those?
16     A.   Oh, yes.  Because in order
17 to have enough patients to evaluate the
18 effect of a therapy on torsade, you would
19 have to recruit the entire Eurasian
20 continent.  I mean, it is a fairly rare
21 disorder, and so you would need tens of
22 -- hundreds of millions patients in the
23 study to be able to detect that
24 particular endpoint.

1      Q.   Okay.
2         Was that the same issue in
3  both of those products?  I know we've
4  been talking about them together, but the
5  antibiotic product and the antipsychotic
6  product was the same issue?
7      A.   Yes.
8      Q.   All right.
9         You also mention in
10 Paragraph 12 of your report, you talk
11 about the data monitoring committees, and
12 I think we already talked about the
13 Bristol-Myers Squibb data monitoring
14 committee.  When we were talking about
15 Key Pharmaceuticals, you mentioned
16 Nitro-Dur?
17     A.   Right.
18     Q.   I don't remember you
19 mentioning a monitoring board for Key
20 Pharmaceuticals.
21     A.   Right.  I served as one of
22 three members on the monitoring board for
23 a Nitro-Dur study.
24     Q.   Okay.

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 170

1    I thought you told me
2 originally you designed the clinical
3 trials for that?
4    A.   That's true.
5    Q.   Okay.
6        So, you designed the trials
7 and you were on the monitoring board?
8    A.   That's correct.
9    Q.   Were you participating in
10 the clinical trials as an investigator at
11 the time you were on the board?
12    A.   Not as a clinical
13 investigator, but as the investigator
14 whose primary responsibility is to
15 collect the data and produce the reports
16 that would be analyzed by others.
17    Q.   Okay.
18        Is that past tense, that
19 monitoring board is completed?
20    A.   Yes.  It ended about --
21 well, maybe five, six years ago.
22    Q.   Was that clinical trial
23 terminated prematurely?
24    A.   No.

Page 171

1    Q.   Were there any unexpected
2 adverse events that arose in the course
3 of that clinical trial?
4    A.   I don't know how to answer
5 that actually.  I mean, I don't know what
6 happened to every patient.  There may
7 have been a small number of adverse
8 events that were serious, not
9 anticipated.
10    Q.   Were there any adverse event
11 report trends that were appreciated by
12 the data monitoring committee in that
13 clinical trial?
14    A.   No, there were not.
15    Q.   You also indicate that you
16 are currently on three DMCs.  I think you
17 told us about one already; is that right?
18    A.   Right.
19    Q.   What are the other two?
20    A.   Actually, there may be more
21 than that.  I'm on one that's looking at
22 the protocols to identify new useful
23 therapies for sickle cell disease.  And
24 that comes out of NHLBI, National Heart,

Page 172

1 Lung & Blood Institute.
2        I'm also on one that is,
3 again, underwritten by NHLBI that is
4 looking at the effect of exercise in
5 heart failure.
6    Q.   Now, are these clinical
7 studies?
8    A.   Yes.  These are both --
9 well, let me back up.  The sickle cell
10 program is an early -- is a collection of
11 Phase II/small Phase III programs.  And
12 so the DMC really is functioning as a
13 protocol review committee.  As much as it
14 is the review of adverse events and what
15 occurs to patients, it really has an
16 expanded role there.  So, that's a little
17 unusual in the traditional DMC paradigm.
18    Q.   Okay.
19    A.   HF action is the clinical
20 trial that the action DMC is overseeing.
21 It is one large multicenter,
22 multinational clinical program that's
23 assessing the effect of exercise in
24 patients with heart failure.

Page 173

1    Q.   In patients with?
2    A.   I'm sorry.  In patients with
3 heart failure.
4    Q.   Okay.
5        Is there any medication
6 involved in that?
7    A.   The medication -- the
8 inter --
9    Q.   Let me withdraw the question
10 and rephrase it.
11        Apart from medications that
12 the patient may be taking as a part of
13 their regular medical therapy, is that
14 clinical trial attempting to evaluate the
15 efficacy or safety of any particular
16 medical therapy?
17    A.   No.
18    Q.   Okay.
19        So, does that cover all of
20 the DMCs that you are on right now?
21    A.   No.  I'm on another one.
22 It's -- actually, I'm on two other ones.
23 One is looking at the effect of beta
24 blockade in helping patients who have

44 (Pages 170 to 173)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

1   pulmonary surgery to determine the
2   positive and negative effects of beta
3   blockers in this type of patient. This
4   is funded now by NIH.
5       Q.   Okay.
6       A.   And there's one I just
7   joined that is assessing the effect of a
8   new therapy, whose name I don't remember
9   right now, on patients with scleroderma.
10      Q.   For what kind of drug?
11      A.   Anti-inflammatory -- no, no.
12  It is a drug related to steroids that
13  they believe might be useful in treating
14  patients with scleroderma.
15      Q.   Steroid-based compound?
16      A.   I believe so, yes.
17      Q.   Have you ever been on a data
18  monitoring committee for any COX-2
19  inhibitor or any nonselective NSAID?
20      A.   No.
21      Q.   Any other data monitoring
22  committees?
23      A.   That I'm currently on?
24      Q.   That you currently are on or

1   that you have been on in the past.
2       A.   Yes. There was one other
3   that I was on, and that was a trial that
4   was looking at the effect of blood
5   transfusions in patients with sickle cell
6   disease.
7       Q.   When was that?
8       A.   Oh, that was -- it ended in
9   2000.
10      Q.   Who was the sponsor of that?
11      A.   NHLBI.
12      Q.   All right.
13          Does that complete that
14  list?
15      A.   Yes.
16      Q.   You indicated in Paragraph
17  13 that you've appeared before the FDA on
18  behalf of sponsors on several occasions?
19      A.   Yes.
20      Q.   Which specific occasions or
21  which specific sponsors?
22      A.   Bristol-Myers Squibb.
23      Q.   What product?
24      A.   Captopril.

1       Q.   Okay.
2       A.   Pfizer. The name of the
3   product I think was ziprasidone,
4   Z-I-P-R-A-S-I-D-O-N-E. Marion
5   Merrill-Dow and Seldane. That's it.
6       Q.   That's it?
7           What was your role for
8   Bristol-Myers Squibb before the FDA?
9       A.   As --
10      Q.   You were hired by
11  Bristol-Myers Squibb to appear before the
12  FDA on their behalf?
13      A.   In the context of our
14  previous discussion about my work in SAE,
15  we had produced a new type of statistical
16  analysis that the FDA was not familiar
17  with, and I gave, I think, one lecture to
18  the FDA officials about the development
19  of this measure.
20      Q.   Okay.
21          So, you were not serving as
22  an advocate for the product, you were
23  just explaining the statistical method?
24      A.   That's correct.

1       Q.   All right.
2           And is that your only
3   involvement before the FDA with
4   Bristol-Myers Squibb?
5       A.   Yes.
6       Q.   Was that an advisory
7   committee or a private meeting of FDA
8   officials?
9       A.   Private meeting with FDA
10  officials.
11      Q.   What about with respect to
12  Pfizer?
13      A.   Pfizer, I appeared before
14  the FDA in discussions involving
15  ziprasidone and the design of the study
16  that would look at the arrhythmogenic
17  potential of this new antipsychotic.
18      Q.   And was your role explaining
19  why the study was designed the way it was
20  designed?
21      A.   Yes.
22      Q.   And that's the discussion we
23  just had about the surrogate marker?
24      A.   Yes, sir.

Lemuel A. Moye, M.D., Ph.D.

Page 178

1    Q.   Okay.
2         Were you involved in
3    explaining the data from the clinical
4    trials to the FDA?
5    A.   No.
6    Q.   Just limited to the design
7    of the study?
8    A.   Yes.
9    Q.   With respect to Marion
10   Merrill-Dow -- actually, let me back up.
11        On the Pfizer front, was
12   that an Advisory Committee meeting or was
13   that a private meeting with FDA
14   officials?
15   A.   Private meeting.
16   Q.   With respect to Marion
17   Merrill-Dow, what was your involvement?
18   A.   I explained the result of
19   the study that we had carried out that
20   used ibuprofen as a comparator, and
21   looking at the incidence of -- well,
22   actually, prevalence of ventricular
23   tachycardia in torsade for terfenadine
24   versus control.

Page 179

1    Q.   That's the study we talked
2    about earlier?
3    A.   Yes.
4    Q.   Okay.
5         We didn't have your CV out
6    before. Can you identify which one that
7    is in it?
8    A.   Sure, yes. There's a fourth
9    one I should tell you about I just
10   remembered.
11   Q.   Sure. We can come back to
12   that.
13   A.   What are we looking for now?
14   Q.   The study.
15   A.   The manuscript?
16   Q.   Right.
17   A.   38 on Page 5.
18   Q.   Okay.
19        Pratt is the first author?
20   A.   Yes. And actually 37, too.
21   Both of them.
22   Q.   I'm sorry, 35 and 37?
23   A.   No, I'm sorry. 37 and 38.
24   Q.   37 and 38.

Page 180

1    A.   Right.
2    Q.   All right.
3         Craig Pratt is a colleague
4    of yours, right?
5    A.   Sure is.
6    Q.   And a personal friend?
7    A.   And a good friend.
8    Q.   Has he served on the FDA
9    cardiorenal advisory committee with you?
10   A.   Not with me, before me.
11   Q.   Before you, okay.
12   A.   Right. I think he was chair
13   before I started.
14   Q.   I saw on the list of
15   reliance materials that you had reviewed
16   his testimony; is that right?
17   A.   Yes.
18   Q.   Did you rely on his
19   testimony in any way in reaching your
20   conclusions?
21   A.   No. I read it. I didn't
22   rely on it.
23        MR. SIZEMORE: Which
24        testimony was that, just for the

Page 181

1         record?
2         MR. PIORKOWSKI: Craig
3    Pratt's testimony in the Ernst
4    case.
5         THE WITNESS: Yeah.
6    BY MR. PIORKOWSKI:
7    Q.   And that's the only one I
8    see on there.
9    A.   Right.
10        Excuse me. I owe you a
11   fourth presentation before I forget.
12   Q.   Yes.
13   A.   It was actually just last
14   year. It was May of 2005, and I
15   presented before the FDA on the use of
16   orthogonal discriminate analysis in
17   developing mixtures of proteomic tests to
18   predict Alzheimer's disease and
19   Parkinson's disease.
20   Q.   On whose behalf was that
21   presentation?
22   A.   Power Three Medical.
23   Q.   Was it in association with a
24   particular product?

46 (Pages 178 to 181)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

| Page 182 | Page 184 |
|---|---|
| 1    A.  Yes, it was.  The product | 1    A.  Well, from 1996 on.  At |
| 2  would be a test kit. | 2  least I can't find them earlier. |
| 3    Q.  Did it have a product name | 3    Q.  Okay. |
| 4  you were aware of? | 4      But that's true regardless |
| 5    A.  I would say not yet.  It | 5  of which Advisory Committee we're talking |
| 6  wasn't even that far. | 6  about, whether it's the arthritis |
| 7    Q.  All right. | 7  Advisory Committee or the cardiorenal |
| 8      Is it fair to say that that | 8  Advisory Committee, from 1996 on, all of |
| 9  presentation was also about the use of a | 9  those transcripts are on the FDA's |
| 10  particular statistical technique? | 10  website, right? |
| 11    A.  Yes, that's right. | 11    A.  I believe so, yes. |
| 12    Q.  And was that also to -- was | 12    Q.  Okay. |
| 13  that a private meeting with FDA officials | 13      The commentary that you are |
| 14  as opposed to a public meeting? | 14  talking about in public testimony, to the |
| 15    A.  Private meeting. | 15  extent it's been since 1996, would all of |
| 16    Q.  Okay. | 16  that be captured on a transcript on the |
| 17      Have you ever spoken on | 17  FDA's website? |
| 18  behalf of a pharmaceutical company | 18    A.  Yes, sir. |
| 19  sponsor at a public meeting? | 19    Q.  We don't have to look |
| 20    A.  No, sir. | 20  anywhere else, in other words, to find |
| 21    Q.  Okay. | 21  what you are referring to in Paragraph |
| 22      You've never made a | 22  14? |
| 23  presentation, for example, at an Advisory | 23    A.  That's correct. |
| 24  Committee meeting? | 24    Q.  Okay. |

| Page 183 | Page 185 |
|---|---|
| 1    A.  That's correct. | 1      Let's talk a little bit |
| 2    Q.  In Paragraph 14 of your | 2  about the development of Vioxx. |
| 3  report, you talk about the fact that as a | 3      Is it correct that the |
| 4  part of your role as an Advisory | 4  development started back in the |
| 5  Committee member that you've reviewed | 5  mid-1990s? |
| 6  over 20 clinical trial programs of | 6    A.  That's my understanding. |
| 7  private sponsors and commented in public | 7    Q.  That's your understanding? |
| 8  testimony that is part of the Federal | 8    A.  Yes. |
| 9  Registry.  Do you see that? | 9    Q.  And it followed the |
| 10    A.  Yes. | 10  discovery that the COX enzyme had two |
| 11    Q.  Are you referring there to | 11  different subcomponents? |
| 12  your service on the cardiorenal Advisory | 12    A.  Yes. |
| 13  Committee at cardiorenal Advisory | 13    Q.  The process started with |
| 14  Committee meetings? | 14  Merck filing an investigational new drug |
| 15    A.  Yes.  The only reason I | 15  application, right? |
| 16  hesitated is that sometimes I was farmed | 16    A.  Yes. |
| 17  out to other Advisory Committee meetings, | 17    Q.  Doing preliminary tests in |
| 18  like blood products, and so I think that | 18  animals? |
| 19  would have to be included in this. | 19    A.  Yes. |
| 20    Q.  Let me just ask it a little | 20    Q.  And then seeking approval |
| 21  differently. | 21  for testing in humans, right? |
| 22      You are aware that there are | 22    A.  Yes. |
| 23  transcripts on the FDA's website of | 23    Q.  The way human testing works |
| 24  Advisory Committee meetings, right? | 24  pursuant to FDA regulations is, it is |

Lemuel A. Moye, M.D., Ph.D.

Page 186

1 done in three phases, right?
2     A.   Traditionally, yes.
3     Q.   Traditionally, and also I
4 mean that prior to the initial approval.
5 There's sometimes what's call it Phase IV
6 after an approval, right?
7     A.   Right.  The only reason I
8 quibble with that, the distinction
9 between Phase I, Phase II and Phase III
10 has gotten very blurred recently.  But I
11 think in the mid-1990s it was still the
12 traditional.
13     Q.   Phase I at least at that
14 time was generally testing in healthy
15 volunteers?
16     A.   Yes.  Well, it is tested in
17 people that have the affliction that the
18 investigators believe the drug would be
19 most effective in
20     Q.   In your review of FDA
21 materials and Merck internal documents,
22 did you see Merck had meetings with the
23 FDA at the end of Phase II?
24     A.   Yes.

Page 187

1     Q.   There were multiple
2 meetings; is that right?
3     A.   Yes.
4     Q.   Do you understand what the
5 purpose of end of Phase II meetings is
6 between a sponsor and the FDA?
7     A.   Yes, I do.
8     Q.   What is that?
9     A.   The purpose is to, number
10 one, make sure that the sponsor and the
11 FDA understand each others' positions
12 about what's been demonstrated about the
13 drug, particularly dose-specific efficacy
14 and dose-specific hazard.
15     Q.   And is it fair to say --
16     A.   One thing.  I'm sorry.
17     And then to begin the
18 delicate stage of discussions about what
19 caliber of Phase III studies or what
20 collection of Phase III studies would be
21 most useful in gaining approval.
22     Q.   Part of the reasoning
23 underlying having an end of Phase II
24 meeting is it doesn't make a lot of sense

Page 188

1 for a sponsor to invest extensively in
2 conducting Phase III studies that the FDA
3 is going to find unacceptable on their
4 face?
5     A.   Right.
6     Q.   Is that fair to say?
7     A.   Sure.
8     Q.   Okay.
9     Now, at this end of Phase II
10 meeting, does the FDA have an opportunity
11 to comment on the study design of the
12 Phase III clinical trials?
13     A.   Certainly.  That's one of
14 the --
15     MR. WACKER:  I --
16     THE WITNESS:  Sorry.
17     MR. WACKER:  I was just
18 going to say objection.
19     THE WITNESS:  That's one of
20 the reasons to have these end of
21 Phase II discussions.
22 BY MR. PIORKOWSKI:
23     Q.   Among the things the FDA has
24 an opportunity to comment on are the

Page 189

1 number of patients, right?
2     A.   Yes, sir.
3     Q.   The type of patients?
4     A.   Yes.
5     Q.   The subgroups that might be
6 considered being analyzed as a part of
7 the patient population?
8     A.   Sure.
9     Q.   The dosages of medication to
10 be tested?
11     A.   Yes.
12     Q.   The length of time for which
13 those dosages need to be tested?
14     A.   Yes.
15     Q.   Okay.
16     The endpoints that the
17 company should be attentive to during the
18 Phase III clinical studies?
19     A.   That's part of it as well.
20     Q.   Okay.
21     Any other aspects that I
22 didn't mention specifically?
23     A.   The performance of the data
24 monitoring committee.  The creation of

48 (Pages 186 to 189)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 190

1    appropriate monitoring rules, document
2    rules, notion of multiplicity of testing,
3    triaging primary versus secondary
4    endpoint analyses, how exploratory
5    analyses would be considered, what trials
6    are being carried out by other sponsors
7    looking at related compounds. I think as
8    I sit here now, that's all I can think
9    of.
10       Q.   But those would all be areas
11   that the FDA would have an opportunity to
12   comment on at these end of Phase II
13   meetings?
14       A.   Yes.
15       Q.   Okay.
16           And from your review of the
17   records in Vioxx, did the FDA actually
18   have an opportunity to comment on those
19   with respect to Merck, with respect to
20   Vioxx?
21           MR. WACKER: Object to form.
22           THE WITNESS: They had the
23   opportunity.
24   BY MR. PIORKOWSKI:

Page 191

1        Q.   Is it your understanding
2    that the FDA gave Merck input on issues
3    like the number of patients that need to
4    be studied, the types of patients that
5    need to be studied, the dosages that need
6    to be studied, et cetera?
7        A.   I don't recall the specific
8    details, but they did have input on
9    important matters in trial design.
10       Q.   When Merck undertook its
11   Phase III studies, is it your
12   understanding that the biggest group of
13   patients were osteoarthritis patients?
14       A.   Yes.
15       Q.   Let me digress for a minute
16   and ask you some questions related to
17   aspirin and stroke, because you have a
18   discussion in your report about stroke,
19   right?
20       A.   Yes, sir.
21       Q.   Am I correct that there are
22   two different kinds of stroke that are
23   commonly recognized?
24       A.   Yes, sir.

Page 192

1        Q.   One type of stroke is what's
2    called a thrombotic or sometimes it is
3    called an ischemic stroke?
4        A.   Yes, sir.
5        Q.   That's related to a blood
6    clot basically?
7        A.   Yes.
8        Q.   Okay.
9            The other kind of stroke is
10   referred to as a hemorrhagic stroke?
11       A.   Yes, sir.
12       Q.   That is different in how it
13   occurs. That tends to be more related to
14   a bleeding episode?
15           MR. SIZEMORE: Object to
16   form.
17           THE WITNESS: It is not
18   quite as easy as that. A
19   hemorrhagic stroke is a stroke in
20   which an immediate product is the
21   rupture of a blood vessel. It
22   doesn't mean a thrombus didn't
23   cause it. But the result, the
24   rupture of the blood vessel is

Page 193

1    what characterized it as
2    hemorrhagic.
3    BY MR. PIORKOWSKI:
4        Q.   But they are recognized as
5    different events. Fair to say?
6        A.   Certainly different
7    pathology, yes.
8        Q.   Different pathology,
9    different endpoints when they are
10   considered in clinical trials?
11       A.   Potentially, yes.
12       Q.   Okay.
13           And I want to bring this
14   back to the context of aspirin, but one
15   thing we know about drugs in general is
16   that there are almost no drugs that are
17   all good or all bad. They all have some
18   helpful effects and some not so helpful
19   effects. Is that a fair statement?
20       A.   Well, I would say that every
21   drug has -- is associated with a
22   collection of adverse events.
23       Q.   Sometimes, though, the
24   effect, the physiological effect that's

49 (Pages 190 to 193)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 194

1 causing the drug to be helpful may also
2 cause an adverse event, right?
3    A.   Yes.
4    Q.   That's exactly the case in
5 aspirin, right?
6    A.   Yes.
7    Q.   Aspirin is well known to
8 prevent the clotting type of strokes,
9 right?
10    A.   Yes.
11    Q.   And on the other hand,
12 aspirin is known to cause the bleeding
13 kind of strokes?
14    A.   Well, I would say this.
15         Aspirin has been strongly --
16 associated with the bleeding types of
17 strokes. I don't know that I can sit
18 here and say the literature says that
19 aspirin causes hemorrhagic stroke. I do
20 know it has been associated with it. But
21 the preponderance of the literature lines
22 up nicely with your first statement, and
23 that is, aspirin prevents ischemic
24 nonbleeding strokes.

Page 195

1    Q.   Well, it's fair to say that
2 there's been controversy for many years
3 about whether aspirin should just be
4 given to everybody or not, right?
5    A.   Yes.
6    Q.   The reason that we don't all
7 take aspirin every day is because there
8 is a risk of hemorrhagic stroke?
9    A.   That's one of the reasons,
10 yes.
11    Q.   Okay.
12         That's the reason that the
13 recommendation is only to give aspirin to
14 people who are at a higher risk, right?
15    A.   Right.
16         MR. SIZEMORE:  Object to
17    form. I'm sorry.
18         THE WITNESS:  There are
19    several reasons why it is
20    restricted to patients who are at
21    higher risk. One reason, perhaps
22    the most important, is that that's
23    been the group that has been
24    studied the most intensively and

Page 196

1 we have the most information on.
2         We have no information among
3 aspirin use, prophylactic aspirin
4 use for teenagers or people in
5 their 20s. We just don't have
6 information about that. So, the
7 main reason that we have the
8 limitation is because we studied a
9 large number in this cohort.
10 BY MR. PIORKOWSKI:
11    Q.   Also, aspirin has
12 gastrointestinal side effects as well as
13 potential cardiovascular side effects,
14 right?
15    A.   Well, it certainly has
16 gastrointestinal side effects, that's
17 right.
18    Q.   Now, the way aspirin works
19 in terms of -- let me back up.
20         Do I understand you to say
21 that there's pretty solid scientific
22 evidence that aspirin prevents the
23 clotting type of stroke?
24    A.   Yes.

Page 197

1    Q.   And the way aspirin does
2 that is it blocks an enzyme known as
3 thromboxane, right?
4    A.   Right.
5    Q.   Thromboxane, the word
6 "thrombo" means clot, right?
7    A.   Yes.
8    Q.   And thromboxane is an enzyme
9 that kind of causes the blood to tend to
10 clot, right?
11    A.   Excuse me. Everything else
12 being equal. I mean, we have to admit
13 that the entire clotting mechanism is a
14 delicate balance that includes a whole
15 panoply of enzymes, proenzymes that
16 govern it. So, everything else being
17 equal, the addition of aspirin tends
18 to -- well, excuse me, thromboxane tends
19 to produce clotting, as we're talking
20 about it.
21    Q.   So, comparing a patient who
22 is the same patient, a patient who is not
23 taking aspirin and a patient who is
24 taking aspirin, the patient who is taking

50 (Pages 194 to 197)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 198

1  aspirin will have thromboxane inhibited
2  by the aspirin, right?
3      A.   Yes.
4      Q.   The way aspirin works is it
5  blocks thromboxane irreversibly, right?
6      A.   Yes, that's right.  For the
7  life of the platelet.
8      Q.   For the life of the
9  platelet?
10     A.   Yes.
11     Q.   Okay.
12          What that means as a
13 practical matter, your platelets
14 regenerate themselves, right?
15     A.   Yes.
16     Q.   So, within a couple of days,
17 you have new platelets that are not
18 inhibited?
19     A.   Unless you continue to take
20 aspirin.
21     Q.   Unless you continue to take
22 aspirin, in which case aspirin
23 irreversibly inhibits the new ones,
24 right?

Page 199

1      A.   Yes.
2      Q.   Aspirin has that effect of
3  irreversibly inhibiting thromboxane even
4  at fairly low doses, right?
5      A.   Yes.
6      Q.   At 81 milligrams a day?
7      A.   Yes.
8      Q.   Now, I want to just talk
9  briefly about the myocardial infarction
10 process.  Are you familiar with that from
11 your work in cardiology drugs?
12     A.   Yes.
13     Q.   Typically when a myocardial
14 infarction occurs, the process starts
15 with some degree of plaque buildup in the
16 artery; is that right?
17     A.   Yes.
18     Q.   And the initiating event
19 most often is what's referred to as a
20 plaque rupture or a plaque fissure?
21          MR. SIZEMORE:  Object to
22 form.
23          THE WITNESS:  That's one
24 possible initiating event, that's

Page 200

1      correct.
2  BY MR. PIORKOWSKI:
3      Q.   It is what's regarded as the
4  most common initiating event, right?
5          MR. SIZEMORE:  Object to
6  form.
7          THE WITNESS:  Well, I would
8  say that the thrombus is what
9  really -- maybe we're having a
10 little discussion about
11 terminology.  The thrombus is what
12 initiates the actual heart attack.
13 BY MR. PIORKOWSKI:
14     Q.   I just want to walk through
15 the process, and correct me if I'm wrong.
16     A.   Okay.
17     Q.   It all has to start with a
18 beginning point?
19     A.   Right.
20     Q.   A thrombus doesn't just
21 spontaneously form in the absence of a
22 plaque rupture?
23          MR. SIZEMORE:  Object to
24 form.

Page 201

1          THE WITNESS:  Unless you've
2  thrown an embolus.
3  BY MR. PIORKOWSKI:
4      Q.   Unless you've thrown an
5  embolus, right.
6      A.   Right.
7      Q.   But, I mean, under normal
8  circumstances, unless you've thrown an
9  embolus, a clot just doesn't form in your
10 artery spontaneously?
11     A.   That's right.
12     Q.   Typically, what happens with
13 a myocardial infarction is the process
14 starts with a plaque rupture or a fissure,
15 right?
16     A.   Well, I guess typically it
17 starts with the development of this
18 atherogenic gruel over time that narrows
19 the artery.
20     Q.   All right.
21          That's a good point.  Let's
22 back up and start there.
23          What plaque represents is a
24 buildup of, as you called it,

51 (Pages 198 to 201)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 202

1  atherosclerotic gruel, is that --
2      A.  Atherogenic gruel.
3      Q.  Atherogenic gruel.
4          And what that means is
5  essentially a buildup of cholesterol and
6  other fibrous deposits?
7      A.  Right. Fibrin, lipid laden
8  macrophages die and deposit their
9  material, and over time the volume of
10 this grows.
11     Q.  What happens is if you think
12 of it as the garden hose, on the inside
13 of the garden hose there's a buildup of
14 essentially layers of this gruel that
15 you're referring to, right?
16     A.  Yes.
17     Q.  That's the beginning of the
18 process?
19     A.  Yes.
20     Q.  If you don't have gruel,
21 then there's no plaque to rupture?
22     A.  Right.
23     Q.  Okay.
24         Then once a person has

Page 203

1  plaque on their artery, if the plaque
2  ruptures or there's a breakoff of a piece
3  of the plaque, that initiates a process,
4  right?
5      A.  Yes.
6      Q.  The body's natural response
7  to that process is to treat that broken
8  off plaque as foreign material, right?
9      A.  Yes.
10     Q.  And the body tries to wall
11 that material off, right?
12     A.  Yes.
13     Q.  And what it does is it forms
14 a clot around the material, right?
15     A.  Yes.
16     Q.  And the problem is that the
17 clot, as it continues, gets bigger and
18 bigger?
19     A.  Yes.
20     Q.  Right?
21     A.  Yes.
22     Q.  Much like a snowball rolling
23 down a hill?
24     A.  Okay. Possible that just

Page 204

1  the presence -- it's possible that the
2  clot could be -- the gruel could be large
3  enough, just the formation of the clot
4  itself is enough to narrow the lumen
5  sufficiently.
6      Q.  Fair enough.
7      A.  And we also can't ignore the
8  chronic effect of conditions such as
9  diabetes or hypertension which would tend
10 to accelerate this process.
11     Q.  Okay.
12         But to come back to the
13 point you were originally making, what
14 ends up happening is eventually either
15 the clot grows so large or the
16 combination of the plaque material in the
17 clot grows so large that it blocks the
18 blood flow through the artery; is that
19 right?
20     A.  Right. And, of course,
21 there also could be a little spasm of the
22 coronary artery itself. Since it has got
23 muscle, that muscle can reflexively
24 contract and cause a further reduction in

Page 205

1  the lumen.
2      Q.  So, in addition to having
3  the clot block the vessel, you can also
4  have spasm of the vessel itself or
5  sometimes called vasospasm, right?
6      A.  Yes.
7      Q.  All right.
8          Now, to come back to
9  aspirin, the way aspirin works is if
10 thromboxane has been inhibited, then when
11 the plaque breaks off, then the clot is
12 not as likely to form; is that right?
13     A.  Right.
14     Q.  Now, in addition to aspirin,
15 there's a number of other nonsteroidal
16 anti-inflammatory drugs that are also
17 known to block thromboxane to various
18 degrees; is that right?
19     A.  Yes.
20     Q.  In fact, when you used to
21 prescribe nonsteroidal anti-inflammatory
22 drugs to your patients, did you typically
23 tell them to stop taking those drugs a
24 few days before having surgery?

52 (Pages 202 to 205)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 206

1    A.  Well, when I prescribed
2 these nonsteroidal anti-inflammatory
3 agents, they were not going to have
4 surgery during the time period that we
5 were prescribing them.  So, it was not a
6 chronic prescription that was achieved.
7    Q.  Okay.
8       Are you familiar with the
9 practice among physicians of instructing
10 patients who are taking nonsteroidal
11 anti-inflammatory drugs on a long-term
12 basis to stop taking them before surgery?
13    A.  Yes.
14    Q.  It is common medical
15 practice?
16    A.  Yes.
17    Q.  Something you learned in
18 medical school?
19    A.  Yes.
20    Q.  Now, one of the things that
21 was known about the COX-2 inhibitors
22 early on in the mid-'90s is they did not
23 have an effect on thromboxane, correct?
24    A.  It depends on which ones

Page 207

1 we're talking about.
2    Q.  Okay.
3       Let's talk about Vioxx.
4    Q.  Okay.
5       Vioxx is primarily a COX-2
6 inhibitor.  And so being primarily a
7 COX-2, I can't say exclusively, but
8 primarily a COX-2 inhibitor, it did not
9 have this effect on thromboxane.
10    Q.  Okay.
11       And the same is true for
12 other COX-2 inhibitors like Celebrex,
13 right?
14    A.  Celebrex, I don't quite
15 agree with that with Celebrex, because my
16 understanding of Celebrex is that it has
17 more COX-1, anti-COX-1 activity than
18 Vioxx does.  So, to the degree that it
19 has more anti-COX-1 activity is the
20 degree to which it might inhibit
21 thromboxane.
22    Q.  Have you looked at any
23 literature that discusses the effect of
24 Celebrex on thromboxane or not?

Page 208

1    A.  I have not looked at any
2 particular literature, no.
3    Q.  There's nothing you've seen
4 that tells you one way or the other?
5    A.  I haven't looked to answer
6 the question.
7    Q.  Okay.
8       Is it fair to say then that
9 you would not expect Vioxx to have an
10 aspirin-like effect on platelets?
11    A.  Yes.  Insofar that it is not
12 a COX-1 inhibitor.
13    Q.  Okay.
14       With respect to thromboxane,
15 the effect you would expect it to have is
16 no effect or a neutral effect on
17 thromboxane?
18    A.  I don't know.  I would just
19 say it is not like aspirin.
20    Q.  Well, would you expect it to
21 have any effect on thromboxane at all?
22    A.  If we accept the premise
23 that it completely ignores COX-1, then
24 you wouldn't expect it to have any effect

Page 209

1 on thromboxane.
2    Q.  Have you seen any data to
3 suggest that Vioxx does, in fact, have
4 any effect on inhibiting thromboxane?
5    A.  I haven't seen anything in
6 particular.  I guess I would say it would
7 be useful to have seen that in Merck's
8 testing program, and if that's available,
9 I would like to see it, but I haven't
10 seen it.
11    Q.  You would like to see in
12 Merck's testing program whether it was
13 evaluated with respect to its effect on
14 thromboxane?
15    A.  Yes.
16    Q.  Okay.
17       Now, a couple of years into
18 the Phase III studies, there was a study
19 called 023 that was done, right?
20    A.  Yes.
21    Q.  You're familiar with that
22 because it is in your report, right?
23    A.  Yes.
24    Q.  One of the incidental

53 (Pages 206 to 209)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

1  findings of study 023 was that they found
2  urinary prostacyclin levels that were
3  lower in Vioxx users, right?
4      A.  I'd have to see my report.
5      MR. SIZEMORE:  Can we take a
6  break?
7      MR. PIORKOWSKI:  Sure.
8          - - -
9      (Whereupon, a recess was
10  taken from 1:58 p.m. until 2:10
11  p.m.)
12          - - -
13      MR. PIORKOWSKI:  Paul needs
14  to catch a flight, so we need to
15  put on the record the notices of
16  deposition and the documents that
17  have been produced in response.
18      Paul, it's my understanding
19  that the CDs that you've produced
20  today, the 14 CDs, represent all
21  available documents responsive to
22  the duces tecum portions of the
23  notice of deposition in both the
24  MDL and California cases; is that

1  right?
2      MR. SIZEMORE:  That's
3  correct.
4      Shayna, if there's an issue
5  with that, will you folks contact
6  me?
7      Just for the record, to Ted
8  Wacker, who is here for the MDL
9  and is going to assume the
10  California duties, any objections
11  that he makes would be applicable
12  among the different cases?  Is
13  that fine?
14      MR. PIORKOWSKI:  Fair
15  enough.
16      MR. WACKER:  Just so that
17  everything is clear, I think we
18  agreed during the break that if
19  any attorney makes an objection,
20  it is equally applicable to all
21  the cases.
22      MR. PIORKOWSKI:  So
23  stipulated.
24          - - -

1      (Whereupon, Deposition
2  Exhibit Moye MDL 5, Invoices (9
3  pages), was marked for
4  identification.)
5          - - -
6  BY MR. PIORKOWSKI:
7      Q.  Before I get back to my
8  question on study 023, let me do some
9  housekeeping things.
10      A.  Sure.
11      Q.  I've marked as Exhibit 5,
12  and I think you've already got a copy,
13  Ted, documents that have been produced to
14  us that are represented as your time
15  records; is that right?
16      A.  Yes.
17      Q.  Does it appear to be an
18  accurate copy?
19      A.  Yes.
20      Q.  Let me just ask you, the
21  2/26 is the first involvement in Vioxx,
22  right?
23      A.  Right.
24      Q.  Where it says "FDA

1  transcript review," that's the Advisory
2  Committee meetings you talked about?
3      A.  Yes, sir.
4      Q.  Okay.
5      You read all three of those
6  transcripts?
7      A.  I don't remember how many I
8  read.  Well, the 26th -- now, wait a
9  second.  26th was actually before, was it
10  not, the third Advisory Committee
11  meeting, was it not?  I'm just trying --
12      Q.  The third Advisory Committee
13  meeting was sometime in --
14      A.  March?
15      Q.  -- February of 2005.  I
16  don't remember which date.
17      A.  Okay.  All right.
18      I certainly read the first
19  two.  I don't know if I read the third
20  one.  I don't know if the third one was
21  available yet.  I certainly read the
22  first two.
23      Q.  All right.
24      And then you have -- on the

54 (Pages 210 to 213)

Lemuel A. Moye, M.D., Ph.D.

Page 214

1  next page it says, "Vioxx Review 2 Hour",
2  "Vioxx Review 3 Hour," and then there's a
3  meeting on March 4th.
4      A.   Right.
5      Q.   Okay.
6          What was the Vioxx review
7  two hours and three hours?  Any
8  indication what that is?
9      A.   Well, I would tell you that
10  the only -- what I would have had
11  available to review were published
12  manuscripts.
13      Q.   Okay.
14          So, other than published
15  manuscripts and what was on the FDA's
16  website, that really would have been the
17  limitations of your review at that time?
18      A.   Yes, sir.
19      Q.   And then the meeting we
20  talked about is the next entry, right?
21      A.   Right.
22      Q.   Then it says on the next
23  page -- well, let me be clear.
24          Did you not do anything

Page 215

1  between March 4th and then May 11th of
2  2005?
3      A.   Did lots of things, nothing
4  to do with Vioxx.
5      Q.   All right.
6          It says, "Vioxx Prep 2
7  Hours," "Vioxx Prep 2 Hours," on the 11th
8  and the 29th.  What does "Vioxx prep"
9  mean as opposed to "Vioxx review"?
10      A.   Just synonymous.  So, I'm
11  still reviewing published literature.
12      Q.   All right.
13          Then it goes from May 30,
14  2005 up to July 10, 2005?
15      A.   Yes.
16      Q.   Did you do anything related
17  to Vioxx in between those dates?
18      A.   No, sir.
19      Q.   Then it starts and it says,
20  "Affidavit Prep."
21      A.   Yes.
22      Q.   And then really until we get
23  down to the bottom of September, which is
24  September the 9th, all of the entries

Page 216

1  there refer to affidavit prep, right?
2      A.   Right.
3      Q.   Now, does that mean that you
4  started writing the report on July 10,
5  2005?
6      A.   Yes.
7      Q.   Okay.
8          And all of these affidavit
9  prep entries are all related to the
10  writing of your report?
11      A.   Yes.
12      Q.   And then there's a break.
13  Did you issue -- let me back up.
14          Between September 9, 2005
15  and December 9, 2005, did you do any work
16  related to Vioxx?
17      A.   No, sir.
18      Q.   Now, you have discussion
19  with one hour.  Is that a meeting with an
20  attorney?
21      A.   Yes.
22      Q.   Vioxx prep is just a review
23  of materials?
24      A.   Yes.

Page 217

1      Q.   "Review Biochemistry," what
2  does that mean?
3      A.   It just means review the
4  published biochemistry.
5      Q.   "Clinical Trial Review," you
6  have that broken out as a separate entry?
7      A.   Right.
8      Q.   What does that mean?
9      A.   Just means review of the
10  clinical trial manuscripts.
11      Q.   What about "Epi Review"?
12      A.   Epi review is a review of
13  the epidemiology underlies and the
14  epidemiologic -- underlies the
15  observational studies and the
16  observational studies themselves that
17  relate to Vioxx -- that relate to the
18  NSAIDs and COX-2 and cardiovascular
19  disease.
20      Q.   That's the only entry I see
21  on epi review three hours; is that right?
22      A.   That's the only one I see,
23  too.
24      Q.   "Manuscript Review," what

Lemuel A. Moye, M.D., Ph.D.

Page 218

1 does that mean?
2      A.   It just means I am reviewing
3 the manuscripts that are published.
4      Q.   Articles?
5      A.   Yes.
6      Q.   And then we're back to
7 affidavit prep.  That's more preparing
8 your report?
9      A.   Yes.
10     Q.   Then "Document Review,"
11 "Review of Materials," is that the same
12 thing?
13     A.   No.  Now, this is -- this is
14 now -- let's see.  I didn't do anything
15 on Vioxx from the end of 2005 until April
16 2006, April 8th.  At this point now I'm
17 reviewing other types of material.  I'm
18 reviewing material that's on the CDs.
19 I'm reviewing internal documents,
20 memoranda, internal reports.
21       So, the material now that
22 I'm reviewing is separate and apart from
23 the articles that I've been reviewing up
24 to this point.

Page 219

1      Q.   Do you know what materials
2 you were reviewing on April 9th and 10th?
3      A.   No.
4      Q.   How about the 11th through
5 the 13th?
6      A.   No.
7      Q.   "Meeting at Dave Matthews 2
8 Hours" on the 14th.  That's a meeting
9 here?
10     A.   Yes, sir.
11     Q.   Do you know who was in
12 attendance at that?
13     A.   Dave Matthews.  I think
14 there was another attorney who I don't
15 remember.
16     Q.   "Document Review," what
17 documents were those?
18     A.   Similar kinds of documents.
19 I think what happens typically is we have
20 a meeting and I express other documents
21 I'd like to review, and they get sent to
22 me.  Commonly they are there waiting by
23 the time I get home.  And I review those
24 subsequent to the meeting.  So, this

Page 220

1 cycle that we've got is a reflection of
2 that work pattern.
3      Q.   "Study Review," what does
4 that mean, 4/18?
5      A.   4/18.  Same thing as a
6 protocol review that's coming up.
7 Looking at some of the clinical studies.
8      Q.   "Curfman Depo Review," I
9 assume that means that's when you read
10 the depositions and the exhibits?
11     A.   Yes, sir.
12     Q.   "Approve New England Journal
13 Review 2 Hours."  What does that mean?
14     A.   I'm sorry, you skipped down.
15 Okay.  APPROVe New England Journal
16 manuscript review and also additional
17 documents related to APPROVe.
18     Q.   Okay.
19        Then it says, "Document
20 Review" from May 2000 -- May 5th down to
21 May 10th?
22     A.   Yes.
23     Q.   "Meeting With Attorneys" on
24 May 11?

Page 221

1      A.   That's what that's supposed
2 to say.  Yes.
3      Q.   What is that?  Do you
4 remember who you met with then?
5      A.   Actually, Ted was here, Paul
6 was here.  I don't remember who else was
7 in attendance, but it was continued
8 discussions about my opinions and my
9 relating to them what additional material
10 I would need to review.
11     Q.   What about 5/18?
12     A.   5/18?  Same thing.  Same
13 kind of pattern.  Same attorneys were
14 here and the same agenda for the meeting.
15     Q.   Okay.
16        Now, I see on 5/22 through
17 5/29, or actually through 5/31, you still
18 have a lot of document reviews.  What
19 were those documents?
20     A.   These are documents now,
21 these are e-mails, these are information
22 like Watson's report, review material
23 from reviewers to authors about
24 Vioxx-related manuscripts.

56 (Pages 218 to 221)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 222

1    Q.   What about the meeting on
2  5/31, was that to prepare for the
3  deposition?
4    A.   Yes.
5    Q.   Who was at that meeting?
6    A.   Paul was on the phone, I
7  think.  Ted was here.  One or two other
8  attorneys were here whose names I don't
9  remember.
10    Q.   Now, I don't see anything on
11  here about SAS file review.
12    A.   I haven't talked anything
13  about SAS file review.
14    Q.   Okay.
15       So, you've started to look
16  at it, but you haven't charged anything?
17    A.   What I have done, and the
18  modus operandi I wanted to use, I didn't
19  want to spend a lot of my time, spend a
20  lot of somebody else's money for an
21  unproductive review.  So, I did a cursory
22  examination and realized it was going to
23  be very complicated.  So, I reported
24  that, didn't charge for that, and had put

Page 223

1  it down for the time being.
2    Q.   Okay.
3       Now, when we talked about
4  your review of these documents in -- I
5  can't remember what exhibit it is, 2?  Is
6  that Exhibit 2?
7    A.   Yes.
8    Q.   Where on your time sheets
9  would all of this review be?  For
10  example, you have the depositions of
11  David Anstice and Briggs Morrison and
12  Eliav Barr and Barry Gertz?
13    A.   Yes.
14    Q.   Where would all of the
15  review of those materials be listed?
16    A.   It would start in April.
17    Q.   April of 2005?
18    A.   2006.
19    Q.   2006?  Okay.
20       So, prior to April of 2006,
21  you had not reviewed internal company
22  documents?
23    A.   Correct.
24    Q.   You had not reviewed company

Page 224

1  witness depositions?
2    A.   Correct.
3    Q.   You had not reviewed Dr.
4  Curfman's deposition?
5    A.   That also is correct.
6    Q.   You had not reviewed the
7  study protocols?
8    A.   That's correct.  The
9  unpublished study protocols, the
10  unpublished FDA reports I had not
11  reviewed, that's right.
12       - - -
13       (Whereupon, Deposition
14       Exhibit Moye MDL 4, "Testimony of
15       Lemuel A. Moye, MD, PhD" (2
16       pages), was marked for
17       identification.)
18       - - -
19  BY MR. PIORKOWSKI:
20    Q.   Okay.
21       I've also marked as Exhibit
22  4 a document that was produced to us and
23  represented to be a summary of your
24  testimony.

Page 225

1    A.   Okay.
2    Q.   Is this a document that you
3  prepared?
4    A.   It is not.
5    Q.   Do you know who prepared it?
6    A.   I think Scientific Evidence
7  prepared this.
8    Q.   Okay.
9       Does Scientific Evidence
10  track your testimony?
11    A.   I think they do.  Actually,
12  yes, they do.
13    Q.   Have you reviewed this to
14  see if it's accurate?
15    A.   I have not until this time.
16  I can look at it for a moment and see if
17  it is accurate.
18    Q.   Sure.
19    A.   (Witness reviewing
20  document.)
21       This is an accurate
22  reflection of my testimony.
23    Q.   All right.
24       Let's go back to where we

57 (Pages 222 to 225)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 226

1  were before the last break. I was asking
2  you about study 023. Do you remember
3  that?
4      A.  Yes.
5      Q.  I had asked whether an
6  incidental finding of the study was that
7  urinary prostacyclin levels were lower in
8  Vioxx users?
9      A.  Yes.
10         MR. SIZEMORE:  Object to
11  form.
12         THE WITNESS:  I'm sorry,
13  yes.
14         MR. PIORKOWSKI:  I'm sorry.
15  What's the basis, Ted?
16         MR. WACKER:  You are calling
17  it an incidental finding.
18         MR. PIORKOWSKI:  That's
19  fair.
20  BY MR. PIORKOWSKI:
21      Q.  Okay.
22         By "incidental finding," is
23  it your understanding an incidental
24  finding is a finding that's an

Page 227

1  observation during a study that was not
2  sort of the intended endpoint of the
3  study?
4      A.  I would say this. That it
5  is -- I would say an exploratory finding.
6  It is a finding on an endpoint that was
7  not prospectively declared.
8      Q.  Is it fair in scientific
9  parlance to refer to it as an incidental
10  finding?
11      A.  I think the two are
12  synonymous, yes.
13      Q.  All right.
14         The finding was that, so
15  we're all clear, urinary prostacyclin
16  levels were lower in Vioxx users?
17      A.  Yes.
18      Q.  All right.
19         Based on the documents you
20  reviewed, there was lots of discussion
21  among the people at Merck about what that
22  finding meant and what that finding
23  didn't mean, right?
24      A.  Yes.

Page 228

1      Q.  One of the things that Merck
2  did was they discussed that finding with
3  their Board of Scientific Advisors,
4  right?
5      A.  Yes, sir.
6      Q.  Okay.
7         Now, let me just ask you, is
8  it your understanding that the study
9  results became known in late 1997?
10      A.  I think so, yes.
11      Q.  Prior to 1997, are you aware
12  of anything that suggested that Vioxx had
13  any effect on the prostacyclin levels?
14      A.  Let me look in my report for
15  a second.
16      Q.  Certainly.
17      A.  (Witness reviewing
18  document.)
19         Not on the prostacyclin
20  levels, no. I'm not aware of any.
21      Q.  Okay. All right.
22             - - -
23         (Whereupon, Deposition
24  Exhibit Moye MDL 6, "Scientific

Page 229

1  Advisors' Meeting May 3-May 6,
2  1998 Programmatic Review Vioxx
3  Program" MRK-AEI0002734 -
4  MRK-AEI0002746, was marked for
5  identification.)
6             - - -
7  BY MR. PIORKOWSKI:
8      Q.  Let me hand you what I've
9  marked as Exhibit 6, and this is one of
10  the documents that you've looked at as a
11  part of your review, right?
12      A.  Yes, sir.
13      Q.  In fact, you specifically
14  reference this document in your report,
15  right?
16      A.  I do.
17      Q.  First of all, the title of
18  this document is "Scientific Advisors
19  Meeting," right?
20      A.  Yes, sir.
21      Q.  What's your understanding of
22  what the Board of Scientific Advisors
23  was?
24      A.  I believe it was a group of

58 (Pages 226 to 229)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 230

1 experts, primarily outside experts whose
2 job it was to examine the progress of the
3 Vioxx development program at Merck.
4     Q.   Were these experts, any of
5 them, company employees?
6     A.   That I don't know.
7     Q.   What was the purpose in
8 having them?
9     A.   Well, in a complicated
10 development program, not just Vioxx, but
11 any complicated program, people who work
12 on the program continuously sometimes
13 lose the appropriate perspective on their
14 work. And it's useful to have an outside
15 group of experts come in and provide
16 their own point of view.
17     Q.   Okay.
18         So, is it your understanding
19 that Exhibit 6 reflects a summary of a
20 meeting of the scientific advisors
21 concerning Vioxx that was held between
22 May 6 -- I'm sorry, May 3rd and May 6th,
23 1998?
24     A.   Yes.

Page 231

1     Q.   Were the results of study
2 023, by the way, published in the
3 peer-reviewed medical literature?
4     A.   I think so, but I'm not
5 sure. Actually, I'm pretty sure they
6 were published. I think I saw them
7 referenced in another manuscript I read.
8 So, they were published.
9     Q.   Now, on the third page of
10 this document -- well, let's put this
11 back up a minute.
12         What this document talks
13 about, this is at a point in time when
14 the Phase III studies are still ongoing,
15 right?
16     A.   Yes, sir.
17     Q.   And they are at a point in
18 time where they are coming up on the end
19 of the middle to the end of Phase III,
20 right?
21     A.   Yes.
22     Q.   New drug application hasn't
23 been submitted yet, but it is probably a
24 few months away?

Page 232

1     A.   Yes, sir.
2     Q.   Is that the appropriate
3 point in time?
4     A.   That's the time when this
5 group was meeting.
6     Q.   What this particular
7 document reviews is it reviews various
8 aspects of the Vioxx development program
9 and issues that have arisen, right?
10     A.   Yes.
11     Q.   And it starts off, for
12 example, talking about gastrointestinal
13 effects, right?
14     A.   Yes.
15     Q.   On the third page, there's a
16 discussion of cardiovascular
17 pathophysiology, right?
18     A.   Yes.
19         MR. WACKER:  The third page,
20     which is Page 11 of the document.
21         MR. PIORKOWSKI:  Fair
22     enough.
23 BY MR. PIORKOWSKI:
24     Q.   Now, if we were going to

Page 233

1 fairly describe what this document said,
2 there's a description by the scientific
3 advisors that talks about the possible
4 effects of COX-2 inhibition on three
5 separate components of the process
6 leading to coronary ischemic events,
7 right?
8     A.   Yes.
9     Q.   And you recognize just
10 conceptually that a drug can have
11 different effects on different parts of
12 the process of coronary artery disease,
13 right?
14     A.   Well, yes. In fact -- yes,
15 I am.
16     Q.   I mean, that's sort of what
17 we talked about with aspirin, right?
18     A.   Yes.
19     Q.   Now, one of the things that
20 the board is raising here is they're
21 raising three possible effects, and the
22 first two possible effects that they're
23 talking about are actually beneficial
24 effects, right?

Golkow Litigation Technologies - 1.877.DEPS.USA

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 234

1      MR. SIZEMORE: Object to
2  form.
3      THE WITNESS: If we're on
4  Page 11, I disagree with you. I
5  mean, development of lipid rich
6  coronary plaques is not
7  beneficial. Destabilization is
8  certainly not beneficial.
9  BY MR. PIORKOWSKI:
10     Q. They are not beneficial
11 processes, but what this is saying is
12 that there's evidence that Vioxx may
13 actually be beneficial, because the
14 development of lipid rich plaques is an
15 inflammatory disease that's associated
16 with the release of cytokines and COX-2
17 expression, and COX-2 inhibition would be
18 beneficial for this.
19     MR. WACKER: Object to form.
20     THE WITNESS: I think I
21 understand what you are saying.
22     Certainly the second -- the
23 bottom two-thirds, let's say, of
24 Page 11, provides a rationale by

Page 235

1      which COX-2 might be expected to
2  be beneficial. However, they also
3  say up above that there are either
4  benefits or adverse consequences
5  on coronary heart disease. So,
6  agreed, here this paragraph is
7  talking about how it might be
8  helpful.
9  BY MR. PIORKOWSKI:
10     Q. Let me back up, because
11 there are three subsections under this
12 cardiovascular pathophysiology, right?
13     A. Yes.
14     Q. The first section is the
15 development of lipid rich coronary
16 plaques, right?
17     A. Yes.
18     Q. Second section is
19 destabilization of the cap of an
20 atheromatous plaque, right?
21     A. Yes.
22     Q. The third section is events
23 following a plaque rupture?
24     A. Yes.

Page 236

1      Q. The purpose of this section
2  is to discuss all of the effective COX-2
3  inhibition on all potential coronary
4  ischemic events, whether beneficial or
5  harmful?
6      A. It is a broad based
7  discussion of possibilities.
8      Q. Right.
9      A. Yes.
10     Q. Okay.
11     And possibility number one
12 that they discuss in the development of
13 lipid rich coronary plaques is suggesting
14 that one possible effect of COX-2
15 inhibition would be to decrease the
16 process of plaque formation?
17     MR. WACKER: Object to form.
18     THE WITNESS: This
19 speculative paragraph says one
20 possibility is this, right.
21 BY MR. PIORKOWSKI:
22     Q. Okay.
23     That's what the Board of
24 Scientific Advisors is discussing, right?

Page 237

1      A. Yes.
2      Q. And under the second
3  paragraph, under "Destabilization," it
4  says that "Recent evidence indicates that
5  inflammatory cells are present in the
6  thinned-out cap that covers the
7  atheromatous plaques, and it is thought
8  that these inflammatory cells contribute
9  to thinning the plaque at its margin that
10 is the frequent site of plaque rupture.
11 As the critical cells in this process are
12 inflammatory cells, the possibility
13 exists that the products of COX-2 could
14 regulate thinning of the caps of plaques
15 and render them rupture-prone." Right?
16     A. Right.
17     Q. So, what it's saying here is
18 that there's some scientific evidence
19 that COX-2 actually promotes plaque
20 destabilization?
21     A. Yes.
22     Q. And so inhibiting COX-2
23 would actually promote stabilization?
24     A. I think that is possible,

60 (Pages 234 to 237)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 238

1  yes.
2      Q.   Are you familiar, Dr.
3  Moye -- have you come across in your
4  studies discussion about matrix
5  metalloproteinase inhibitors?  Are you
6  familiar with those?
7      A.   Yes, yes.
8      Q.   MMP-2 and MMP-9?
9      A.   Well, I didn't know about
10  MMP-2 and P-9, but I know about MMP a
11  little bit.
12      Q.   Okay.
13          But MMPs are thought to
14  contribute to plaque destabilization,
15  right?
16      A.   Yes.
17      Q.   And MMPs are induced by
18  COX-2, right?
19      A.   Yes.
20      Q.   Does that make sense that
21  that is the same scientific understanding
22  to which they are referring?
23      A.   Well, they don't talk about
24  MMPs here.

Page 239

1      Q.   I understand.
2      A.   But it does fit with the
3  thought process that would go again to
4  the speculative statement.
5      Q.   Okay.
6          Now, the third section talks
7  about events following plaque rupture,
8  right?
9      A.   Yes.
10      Q.   This is where it talks about
11  prostacyclin being a potent endogenous
12  inhibitor of platelet aggregation, right?
13      A.   Yes.
14      Q.   Is that consistent with what
15  you know about prostacyclin?
16      A.   Yes.
17      Q.   Okay.
18          And then it says it also
19  potentially inhibits the development of
20  ischemic ventricular fibrillation in
21  dogs, right?
22      A.   Right.
23      Q.   Now, do you understand that
24  this discussion on Page 12 and 13 of

Page 240

1  Exhibit 6 is a discussion that arises
2  from the finding that was found in study
3  023?
4      A.   Yes.
5      Q.   Okay.
6          In other words, this is the
7  scientific advisors following up on the
8  results of study 023?
9      A.   Well, speculating on its
10  implications.
11      Q.   Speculating on its
12  implications.
13          And, in fact, it talks about
14  -- on Page 13, it says, "On this
15  background of information regarding the
16  anti-platelet and anti-fibrillatory
17  effects of prostacyclin and its vascular
18  localization, it has been found that
19  Vioxx reduces the urinary excretion of
20  the prostacyclin metabolite,
21  2,3-dinor-6-keto-PGF alpha."
22      A.   Right.
23      Q.   Right?
24          And then the next sentence

Page 241

1  is, "This is important data but it is not
2  a basis for any conclusion."
3      A.   Sure.
4      Q.   So, again, they are saying
5  that this is still somewhat speculative,
6  right?
7      A.   Right.  I mean, to me this
8  clearly says we don't know.
9      Q.   We don't know.
10          Then in the next paragraph
11  it offers a couple of alternative
12  explanations for this finding of
13  decreased prostacyclin in the urine,
14  right?
15      A.   Right.
16      Q.   The first hypothesis it
17  gives is that "the excretion of the
18  prostacyclin metabolite...does not
19  reflect systemic/vascular prostacyclin
20  biosynthesis."  Right?
21      A.   Right.
22      Q.   Just so we're clear, when we
23  talk about an imbalance between
24  thromboxane and prostacyclin, we're

61 (Pages 238 to 241)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 242

1  talking about that at the level of the
2  endothelium, right?
3      A.   Absolutely.
4      Q.   And endothelium is the
5  lining of the coronary artery?
6      A.   The inner lining.
7      Q.   The inner lining.
8          And what is going on in the
9  endothelium may or may not be reflective
10 of what's going on systemically with
11 prostacyclin?
12     A.   In fact, it probably isn't,
13 because it is just a micro environment.
14     Q.   Right.
15         And are there multiple
16 organs in the body that produce
17 prostacyclin?
18     A.   Yes, sir.
19     Q.   What are the organs?
20     A.   Prostacyclin -- kidney.
21     Q.   Kidney.
22     A.   That's the only one that
23 comes to mind right now.
24     Q.   Is it produced in the lung?

Page 243

1      A.   I don't know about that.
2      Q.   How about the ovary?
3      A.   I don't know about that.
4      Q.   You just don't know one way
5  or the other?
6      A.   Right.
7      Q.   And then you see the second
8  part of that second paragraph on Page 13,
9  it says, "An alternative hypothesis is
10 that prostacyclin biosynthesis in the
11 vasculature is inhibited by Vioxx
12 (without blocking the production of
13 thromboxane A1 by the platelet)."
14     A.   Right.
15     Q.   And it says, "By removing
16 this potent inhibitor of platelet
17 aggregation, the probability that a
18 coronary plaque rupture would lead to
19 myocardial infarction or ischemic
20 ventricular fibrillation is enhanced."
21     A.   Right.
22     Q.   Right?
23         So, it is giving two
24 possible explanations for what this

Page 244

1  finding could mean of decreased urinary
2  prostacyclin, right?
3      A.   I would say it's engaging in
4  speculation.
5      Q.   Okay.
6          But it's important to think
7  this issue through, given where they are
8  in the development of the product, right?
9      A.   Yes.
10     Q.   I mean, no question about
11 that?
12     A.   Right.
13     Q.   Do you know what studies or
14 what tests Merck did to evaluate whether
15 or not Vioxx affected prostacyclin at the
16 level of the endothelium?
17     A.   No, I don't.
18     Q.   Do you know whether they
19 made any effort to determine whether or
20 not the prostacyclin that was decreased
21 in the urine came from the kidney?
22     A.   Just one second, please.
23     Q.   Sure.
24     A.   (Witness reviewing

Page 245

1  document.)
2          I know that recommendations
3  were made to do that by Dr. Oates
4  specifically, and that Merck decided not
5  to go with those specific
6  recommendations.
7      Q.   Who is Dr. Oates?
8      A.   Well, Dr. Oates was an
9  external consultant for Merck.
10     Q.   Do you know what his role
11 was in the Board of Scientific Advisors?
12     A.   I don't, no.
13     Q.   Do you know what was the
14 basis for your saying that Dr. Oates made
15 recommendations?
16     A.   October 27, 1997 letter.
17     Q.   That's one of the internal
18 documents that you were provided?
19     A.   Yes, sir.
20     Q.   Let's go back to Exhibit 6
21 for a minute.
22     A.   Sure.
23     Q.   At the end of this
24 discussion about the two speculative

62 (Pages 242 to 245)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 246

1 benefits and the speculative harm that
2 could be related to Vioxx use, the
3 scientific advisors make some specific
4 recommendations, right?
5    A.   Yes.
6    Q.   The recommendations, the
7 first thing they point out is they say,
8 "It is unlikely that any of the
9 individual trials with Vioxx will have
10 sufficient power to determine whether
11 coronary events are increased or
12 decreased by COX-2 inhibition." Right?
13    A.   Yes.
14    Q.   Now, as someone who has
15 designed clinical trials on rare events,
16 do you agree with that statement?
17    A.   Yes.
18    Q.   I mean, that's a fair
19 statement. Do you agree with it?
20    A.   It's called a truism.
21    Q.   I'm sorry?
22    A.   A truism.
23    Q.   A truism. All right.
24       So, they say, "It is

Page 247

1 therefore proposed that coronary events
2 be predetermined endpoints in all future
3 controlled trials with Vioxx and the
4 'back-up' COX-2 inhibitors." Right?
5    A.   Yes.
6    Q.   Okay.
7       Now, do you think that
8 recommendation was an appropriate
9 recommendation?
10    A.   I think, yes, it was.
11 However, that's not to say that it
12 overshadows the responsibility of any
13 investigator to look at each trial to see
14 if, in fact, there isn't a signal being
15 produced by the trial, be the trial
16 underpowered or not.
17    Q.   Well, certainly nobody is --
18 the board certainly isn't suggesting that
19 they just blow off looking at the data
20 from the clinical trials individually?
21    A.   Right. They just wanted to
22 make sure that it wasn't construed that
23 that was my suggestion either.
24    Q.   Okay.

Page 248

1       What they're saying is that
2 because these events are very rare, you
3 need to study a lot of people to really
4 get any meaningful data, right?
5    A.   That's their sense of it.
6    Q.   That's the layman's version?
7    A.   Right.
8    Q.   And so what they are saying
9 is that the best chance of getting a good
10 answer to this question is to take all of
11 our data at least on a going forward
12 basis and to try to analyze it in a
13 careful and systematic way?
14    A.   Right. I would say maybe
15 not the best chance, but a good chance.
16    Q.   Okay.
17       And one of the things that
18 they advise is that there be endpoints
19 developed that are assessed by a uniform
20 set of criteria so that a meta-analysis
21 of coronary and cerebrovascular events
22 from all of those trials can be
23 performed, right?
24    A.   Yes.

Page 249

1    Q.   Now, as a biostatistician
2 and epidemiologist, was that a smart
3 thing to do?
4    A.   Not necessarily. I would
5 say it was a popular thing to do and even
6 a defensible thing to do. But -- and in
7 order for meta-analyses to be carried
8 out in a way that is most illuminatory,
9 you have to have endpoints that reflect
10 the effect of the therapy, which they
11 really didn't know just yet. I mean, the
12 possible adverse events of therapy, they
13 really didn't know. For example, should
14 they include strokes or not, hemorraghic
15 strokes? They didn't know that yet.
16       And they have to be laid out
17 in a way that they are measured the same
18 way from trial to trial. That's when a
19 meta-analysis is its most productive.
20    Q.   Let's stop and talk about
21 that for a second.
22       The first point you made
23 there in your answer was it is not clear,
24 when we talk about endpoints, it is not

63 (Pages 246 to 249)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 250

1 clear what endpoints we're talking about?
2    A.   Right.
3    Q.   So, if we're going to be
4 prudent about it, the prudent way to
5 proceed would be to cast a wide net and
6 look at a lot of different endpoints
7 which we can either analyze individually
8 or collectively?
9        Is that a fair statement?
10    A.   Well --
11    Q.   Let me withdraw the
12 question.
13    A.   Okay.
14    Q.   You just pointed out that
15 you didn't know, for example, if strokes
16 were included or not in this issue?
17    A.   Right.
18    Q.   So, to be prudent, you would
19 include strokes?
20    A.   You would certainly want to
21 include strokes in your evaluation
22 program.
23    Q.   You would want to include
24 strokes because arguably if there's a

Page 251

1 clotting problem, that could implicate a
2 stroke?
3    A.   Right.
4    Q.   Right?
5        And, in fact, the same
6 reasoning could apply for pulmonary
7 embolism, right?
8    A.   I don't know.  If you're
9 saying that we really don't know, and it
10 is possible that this could produce a
11 large thrombus like a PE, then, yes.
12        But just so we're clear,
13 we're not talking about a combined
14 endpoint at this point, we're just
15 talking about an endpoint collection
16 mechanism?
17    Q.   I understand.
18    A.   Okay.
19    Q.   Okay.
20        But what I'm saying is, if I
21 hire you and you're giving me advice and
22 I say I want to be prudent, I'm in this
23 position that the scientific advisors
24 were in May of 1999, and I want to

Page 252

1 design something on a going forward basis
2 to give me as many answers as possible,
3 you're going to tell me to include
4 stroke, right?
5    A.   I want to measure stroke,
6 right.
7    Q.   You want to measure stroke.
8        You want to measure
9 pulmonary embolism?
10    A.   Right.
11    Q.   You want to measure
12 myocardial infarction?
13    A.   Right.
14    Q.   You want to measure sudden
15 cardiac death?
16    A.   Yes.
17    Q.   You want to measure angina
18 pectoris?
19    A.   Sure.
20    Q.   You want to measure --
21    A.   Venous.
22    Q.   Venous thrombotic events,
23 like deep vein thrombosis?
24    A.   Right.

Page 253

1    Q.   And that would be the
2 prudent way to go forward, is looking at
3 all of those events?
4    A.   Just so we're clear, that
5 would be one mechanism that might produce
6 an answer.  It is not the only mechanism,
7 but it is one mechanism.
8    Q.   But it is certainly more
9 responsible than going forward and not
10 looking at strokes?
11    A.   Sure, sure.
12    Q.   Right?  No question about
13 that?
14    A.   Right.
15    Q.   All right.
16        Now, the other issue that I
17 think you alluded to is it is important
18 if you are going to be looking at
19 different studies to make sure that you
20 are using the same definition for the
21 same endpoint from one study to the next
22 study?
23    A.   For this particular
24 analysis, that would be an important

64 (Pages 250 to 253)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 254

1 methodologic consideration that I would
2 insist on.
3      Q.   One of the reasons you'd
4 insist on it is because when you have a
5 situation where you have rare events, one
6 event one way or the other can greatly
7 affect the results, right?
8      A.   I guess I would say that we
9 want to be sure that events are being
10 captured the same way and we don't
11 inappropriately include or exclude events
12 from one trial because they weren't
13 captured the same way as others were.
14      Q.   And one of the expressions
15 that epidemiologists use for making sure
16 that the comparisons are valid is they
17 say you want to make sure you are
18 comparing apples to apples and oranges to
19 oranges, right?
20      A.   That's true.
21      Q.   And that's exactly what
22 we're talking about right here, right?
23      A.   That's what you and I are
24 talking about and also what I think the

Page 255

1 Board of Scientific Advisors had in mind.
2      Q.   Okay.
3           Now, if you were setting up
4 a program, one of the things that I think
5 I heard you say is that you'd want to
6 have definitions for each of these events
7 that could be applied from study to
8 study, right?
9      A.   Yes.
10      Q.   One of the mechanisms -- it
11 talks about applying the uniform set of
12 criteria.  One of the things that you
13 could do is you could actually have the
14 cases that were potential cases sent off
15 to an independent group of scientists who
16 were specialists in the area to
17 adjudicate those cases, right?
18      A.   That's one thing to do.
19      Q.   Okay.
20      A.   It may not be the best thing
21 to do, because at this point in time, in
22 fact, contemporaneously, there was
23 discussion, public discussion at the FDA
24 about the appropriateness of this

Page 256

1 procedure, the procedure of having
2 endpoints go out to be reviewed by an
3 endpoint review committee.  An endpoint
4 committee, they call it.  It gained a lot
5 of interest in the 1980s and 1990s and
6 was one common modality.
7           The difficulty was, is that
8 commonly endpoint determinations made by
9 the individual investigators on the spot,
10 if you will, might be overturned by the
11 endpoint committee.  Some would argue
12 that that would be a good thing.  Others
13 have argued that since in the end we're
14 concerned about what happens in the
15 community, then perhaps we need to go by
16 what the investigators in the community
17 say.
18           So, I don't know at this
19 point whether the notion of going to an
20 endpoints committee was the best thing to
21 do.
22      Q.   Well, if you are going to
23 be -- if you are not going to use an
24 endpoint committee, then it is important

Page 257

1 to put into place some measure that
2 ensures that the investigators themselves
3 are applying the uniform definitions from
4 one case to the next case, right?
5      A.   They would have a common set
6 of criteria, yes.  By that I mean, for
7 example, that require the same
8 documentation, for example.  But that
9 there would not be a discussion among
10 reviewers sitting at a table like we are
11 today where they reach a consensus about
12 an endpoint.  That's the part that
13 perhaps should be subtracted, the
14 downside of having the endpoint review
15 committee, the need to come to a
16 consensus.
17      Q.   Now, they go on to say that
18 they are aware here that there are trials
19 anticipated or ongoing for both
20 rheumatoid arthritis and Alzheimer's
21 disease patients, right?
22      A.   Yes.
23      Q.   And they recognize that
24 there's an increased probability of those

65 (Pages 254 to 257)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 258

1  events because of the patient
2  populations, right?
3      A.  Yes, right.
4      Q.  They are talking about
5  cardiovascular events?
6      A.  Yes.  I assume they are
7  talking about CV events, yes.
8      Q.  All right.
9          And the reason there's an
10 increased risk of those events in the
11 Alzheimer's population is because the
12 Alzheimer's population by definition is
13 an older population, right?
14     A.  Right.
15     Q.  The rheumatoid arthritis
16 population has an increased probability
17 because rheumatoid arthritis patients
18 have an increased risk of cardiovascular
19 events.  Correct?
20     A.  Right.
21     Q.  Now, do you see at the very
22 bottom it goes on to say, "Such data
23 would address whether the net effect of
24 these COX-2 inhibitors on coronary

Page 259

1  ischemic events and stroke are favorable
2  or adverse"?
3      A.  I'm sorry.  I'm not with
4  you.  What page are you on?
5      Q.  I'm on Page 14.
6      A.  Okay.  Thank you.
7      Q.  Did I read that correctly?
8      A.  Yes.  I'm sorry.
9      Q.  And so the Board of
10 Scientific Advisors is entertaining both
11 possibilities, that Vioxx may have a
12 favorable effect on cardiovascular
13 disease and the possibility that Vioxx
14 may have an adverse effect on
15 cardiovascular disease, true?
16     A.  That's right.  But both
17 possibilities are posed here.
18     Q.  Okay.
19         They go on in the next
20 sentence to say, "Knowledge that this
21 plan is in place should be reassuring to
22 the FDA as they consider the prostacyclin
23 biosynthesis question."  Right?
24     A.  They say that.

Page 260

1      Q.  Do you know if the FDA did
2  consider the prostacyclin biosynthesis
3  question?
4      A.  I don't know if they
5  considered it.  I also don't know if they
6  were reassured.
7      Q.  All right.
8          Do you know whether Merck
9  actually did implement the procedure that
10 the scientific advisors recommended?
11     A.  I believe they did, yes.
12     Q.  Was that procedure known as
13 the cardiovascular standard operating
14 procedure?
15     A.  Yes.
16     Q.  Okay.
17         Do you have any criticisms
18 of their having implemented this
19 cardiovascular standard operating
20 procedure?
21     A.  The criticisms I have of
22 this -- how about we say CSOP?
23     Q.  CVSOP?
24     A.  CVSOP.  Okay.

Page 261

1          The criticisms I have of the
2  CVSOP are twofold.  One, because you are
3  trying to apply it to trials that are
4  already in place, it is going to be
5  difficult to produce the kind of
6  standardization that you and I have
7  discussed.
8          Secondly, the CVSOP cannot
9  suck all of the air out of the room, that
10 is to say, it can't be the only mechanism
11 by which Merck decides to assess the
12 tenability of this CV -- of the
13 rofecoxib/CV relationship, CV adverse
14 event relationship.
15         There are many ways to
16 detect a signal.  This is one of them.
17 There's no guarantee it will work, and it
18 is unreasonable to rely on this and only
19 on this.
20     Q.  But you don't know if they
21 did rely on this and only this because
22 you're not sure what other studies they
23 did?
24     A.  Well, I know -- well, I do

66 (Pages 258 to 261)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 262

1  know, I would say I think do know the
2  answer to that, because when they -- this
3  is all, as you and I have discussed, this
4  is all theory. I mean, what we're
5  talking about here in 1998, the Advisory
6  Committee is saying very nicely that we
7  don't know what the effect is. It may be
8  beneficial, it may be harmful.
9         So, we have to pay -- so,
10  their recommendation to Merck, again, to
11  be brief, is to be vigilant. But we do
12  know, at least I believe I know, that
13  Merck was not vigilant, because when they
14  had data that allowed them to put the
15  elegant theory aside and look at the cold
16  hard fact of the matter, in fact, they
17  did not pay attention to that, and
18  perhaps one of the reasons is they were
19  so invested in this CVSOP, maybe not, but
20  they didn't pay attention to the
21  information when it became available.
22      Q.  What data are you referring
23  to?
24      A.  What data? The Watson

Page 263

1  report.
2      Q.  Okay.
3         Is there any other data that
4  you believe Merck had that showed CV risk
5  at that time?
6      A.  No. I mean, primarily it is
7  the Watson data.
8      Q.  Okay.
9         You would agree with me that
10  if what you are trying to do -- strike
11  that.
12         You described two options
13  for trying to apply uniform criteria,
14  right?
15      A.  Yes.
16      Q.  One option is to have an
17  outside adjudication committee who
18  reviews each case, makes a determination
19  according to the standard uniform set of
20  criteria?
21      A.  Yes.
22      Q.  The other option is to equip
23  the investigators with these uniform set
24  of criteria and rely on them to adhere to

Page 264

1  those?
2      A.  Yes.
3      Q.  One of the problems that you
4  just identified is that they were trying
5  to apply this in part to studies that
6  were already ongoing, right?
7      A.  Right.
8      Q.  When you're trying to apply
9  those two options to studies that are
10  already ongoing, the option of an
11  independent adjudication committee is
12  really the only viable option, right?
13      A.  Except I think you
14  underestimate the diluting effect of the
15  consensus process. If one considers that
16  the worst thing that happens with these
17  external committees is they adjudicate
18  out important signals to reach a
19  consensus, then I would disagree.
20         Certainly having
21  investigators make their own
22  determination when you have post hoc
23  criteria is problematic. I am not going
24  to deny that. That's kind of

Page 265

1  self-evident. But it might be worth it
2  to do that and accept that degradation in
3  signal rather than rely on an expert
4  committee which may dilute the signal by
5  coming to a consensus.
6      Q.  Have you looked at any
7  documents that talked about how many
8  events there was a dispute about on any
9  of the adjudication committees?
10      A.  Not in this matter, no. But
11  I have experience in my own experience,
12  but I don't know what the adjudication
13  rate is in any of the clinical trials
14  involving Vioxx.
15      Q.  But apart from the
16  adjudication rate, I'm talking about the
17  agreement among the members of the
18  adjudication committee.
19      A.  I'm sorry. That's what I
20  meant to imply. The agreement rate is a
21  better term. Right.
22      Q.  All right.
23         Is it your understanding
24  that Merck had one adjudication committee

67 (Pages 262 to 265)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 266

1   or multiple adjudication committees?
2       A.  I don't know.
3           MR. PIORKOWSKI:  Why don't
4   we take five minutes.
5           - - -
6           (Whereupon, a recess was
7       taken from 3:01 p.m. until 3:15
8       p.m.)
9           - - -
10  BY MR. PIORKOWSKI:
11      Q.  Dr. Moye, the data that you
12  indicated that the FDA did not have and
13  that the Advisory Committee did not have
14  was set forth in the Watson memo, right?
15      A.  That the Advisory Committee
16  did not have is in the Watson memo,
17  that's right.
18      Q.  Do you know whether the FDA
19  did or didn't have that?
20      A.  The FDA gets a wealth of
21  material from Merck.  I can't tell you,
22  I've gone through the thousands of pages
23  to see if the Merck -- this data was in
24  it, but I do know that the Advisory

Page 267

1   Committee didn't get it.
2       Q.  You know that because it
3   wasn't in the background package and
4   because it wasn't in the FDA's package?
5       A.  And it wasn't discussed at
6   the meeting.
7       Q.  So, your assumption is if it
8   was provided, then it would have been
9   discussed at the meeting?
10          MR. WACKER:  Objection to
11      the form.
12          THE WITNESS:  Well, no.  My
13      assumption is, if it wasn't in the
14      FDA packet and it wasn't in the
15      background packet and it wasn't
16      discussed in the meeting, then the
17      Advisory Committee did not get it.
18          - - -
19          (Whereupon, Deposition
20      Exhibit Moye MDL 7, "Final Results
21      of an Analysis of the Incidence of
22      Cardiovascular SAEs in the Phase
23      IIb/III Vioxx Osteoarthritis
24      Clinical Trials" 2-2-98 (Watson)

Page 268

1       MRK-AAD0046029 - MRK-AAD0046052,
2       was marked for identification.)
3           - - -
4   BY MR. PIORKOWSKI:
5       Q.  Now, let me hand you what
6   I've marked as Exhibit 7 and ask you if
7   that is the Watson memo that you're
8   referring to, the Watson analysis,
9   rather.
10      A.  Yes, it is.
11      Q.  Okay.
12          Your understanding of this
13  is that it was done in early 1998, right?
14      A.  Yes, sir.
15      Q.  And that it showed, I think
16  the words you used in your report is a
17  clear signal of increased cardiovascular
18  risk associated with rofecoxib therapy,
19  right?
20      A.  Yes, sir.
21      Q.  That's Vioxx?
22      A.  Yes.
23      Q.  All right.
24          Now, do you understand the

Page 269

1   study design for the Watson analysis?
2       A.  Yes, I think so.  It is a
3   little complicated, but I believe I
4   understand it.
5       Q.  Okay.
6           What's your -- can you give
7   me your basic understanding of what the
8   design was?
9           MR. WACKER:  Object to form.
10          THE WITNESS:  Sure.  What
11      they wanted to do was to get some
12      sense of the adverse events
13      associated with Vioxx versus what
14      a reasonable background rate would
15      be.  They had several trials that
16      were placebo controlled that also
17      involved other drugs -- that
18      involved drugs in these other
19      trials, including Fosamax.
20          And so what they did was
21      combine groups to try to get a
22      sense for whether the adverse
23      event rate, I should say
24      cardiovascular adverse event rate

68 (Pages 266 to 269)

a46c412c-de3e-4446-bf8d-937e4e429297