Lemuel A. Moye, M.D., Ph.D.

1  years on some drugs?
2      A.  They do, indeed.
3      Q.  Okay.
4          And the FDA additionally has
5  the ability when a drug is on the market
6  or when a drug is being sought for
7  approval to ask for additional studies
8  really at any time it wants, right?
9      A.  They can ask.
10     Q.  They can ask, and if their
11 request is not complied with, they cannot
12 approve the drug, right?
13     A.  But also they can ask, their
14 request not be complied with, and they do
15 approve the drug.
16     Q.  Can you name me a situation
17 where that has happened?
18     A.  Of course.
19     Q.  Where?
20     A.  Warner-Lambert, Rezulin.
21     Q.  Okay.
22         What specific information
23 did they ask for?
24     A.  Specifically the FDA asked

1  for a long-term study that would assess
2  the effectiveness of any diabetic
3  medication on morbidity and mortality.
4  It was formally asked for in a pre-NDA
5  meeting. Warner-Lambert didn't do the
6  study. They still got it approved.
7      Q.  Did they embark to do the
8  study?
9      A.  I don't know. They didn't
10 do it. I don't know. I don't know what
11 they did do. I know what they didn't do.
12 They didn't do the study.
13     Q.  If the FDA felt it was
14 important enough, they could have
15 withheld its approval, right?
16     A.  We'd like to think so. But
17 the fact of the matter is, you asked for
18 a counter example, I gave you one.
19     Q.  Okay.
20         The background section says,
21 "Following the joint meeting, CDER
22 conducted a thorough internal review of
23 the available data regarding" --
24     A.  Second paragraph?

1      Q.  Under "Background."
2      A.  Okay. Thank you.
3      Q.  "Following the joint
4  meeting, CDER conducted a thorough
5  internal review of the available data
6  regarding cardiovascular safety issues
7  for COX-2 selective and non-selective
8  nonsteroidal anti-inflammatory drugs,"
9  correct?
10     A.  Yes.
11     Q.  That includes all of the
12 clinical trial data available to them,
13 right?
14     A.  Well --
15         MR. WACKER: Objection.
16 Calls for speculation.
17         THE WITNESS: I don't know.
18 You know, I don't know what
19 "available" means.
20 BY MR. PIORKOWSKI:
21     Q.  Okay.
22         Do you disagree that the FDA
23 also found that data from long-term
24 controlled clinical trials that have

1  included a comparison of COX-2 selective
2  and nonselective NSAIDs do not clearly
3  demonstrate that the COX-2 selective
4  agents confer a greater risk of serious
5  adverse CV events than nonselective
6  NSAIDs?
7      A.  If you ask me do I disagree
8  with the fact that they said that, of
9  course not.
10     Q.  Okay.
11         So, let me make sure I got
12 this --
13     A.  That's what they said and I
14 acknowledged that.
15     Q.  And you disagree with that?
16     A.  Well, I'm here to speak
17 today about rofecoxib.
18     Q.  I understand.
19     A.  I'm not here to speak about
20 Bextra or Celebrex.
21     Q.  I understand.
22     A.  And so based on my
23 understanding of the effects of
24 rofecoxib, I would disagree with that.

Golkow Litigation Technologies - 1.877.DEPS.USA

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 370

1    Q.   Okay.
2         But you haven't done a
3  scientific review of the literature on
4  the cardiovascular effects of other
5  NSAIDs, have you?
6    A.   That's true.
7    Q.   And the FDA says that they
8  did that?
9    A.   Fair enough.
10   Q.   Okay.  All right.
11        Is it your position that you
12  know that Vioxx has a greater
13  cardiovascular risk than these other
14  drugs which you have not done a
15  scientific investigation of, or is it
16  your opinion you've not looked at the
17  question and don't have an opinion one
18  way or the other?
19   A.   I have not looked at the
20  question, so, I can't rank order, I think
21  is the term used by the FDA.  At this
22  point in time, I can't rank order.
23   Q.   With respect to
24  cardiovascular risk?

Page 371

1    A.   Right.
2    Q.   Okay.
3         And that's true with respect
4  to Vioxx and Celebrex also, right?
5    A.   Well, it means the same
6  thing.  Rank order with respect to
7  COX-2s -- with respect to rofecoxib and
8  other COX-2s, because I haven't looked at
9  other COX-2s.
10   Q.   I just want to make sure
11  we're clear on two things.
12   A.   Maybe not.
13   Q.   Rank order with respect to
14  Vioxx versus Celebrex, you haven't looked
15  at that question, right?
16   A.   That's right.  I have not
17  looked at that point.
18   Q.   So, you can't have an
19  opinion not having looked at that
20  question?
21   A.   Right.
22   Q.   And you also have not looked
23  at the question of the CV risk of Vioxx
24  versus nonselective NSAIDs?

Page 372

1    A.   I disagree with that.  I
2  have.
3    Q.   What literature search have
4  you done to look -- well, let's back up.
5         You said first that you
6  didn't look at any of the new drug
7  applications on any of the NSAIDs, right?
8    A.   Right.
9    Q.   You didn't look at any of
10  the medical officer reviews on any of the
11  NSAIDs?
12   A.   Right.
13   Q.   You didn't do a medical
14  literature review on any of the
15  nonselective NSAIDs?
16   A.   Right.
17   Q.   And are you prepared today
18  then to say that you've formed an opinion
19  about the cardiovascular risk of the
20  nonselective NSAIDs?
21   A.   What I said about the NSAIDs
22  is that I did look at data involving
23  NSAIDs and their CV risk and I referred
24  to the epidemiological data in my

Page 373

1  affidavit.  So, I am comfortable with the
2  solidity of the basis of my opinion about
3  Vioxx versus NSAIDs.
4    Q.   What is your opinion about
5  Vioxx versus NSAIDs?  What specific
6  studies are you relying on for your
7  opinion of Vioxx versus nonselective
8  NSAIDs?
9    A.   Primarily VIGOR.
10   Q.   Okay.
11        VIGOR is one nonselective
12  NSAID.
13   A.   Okay.
14   Q.   Is there any other study on
15  any other nonselective NSAID you're
16  relying on, or are you extrapolating that
17  because that's the way naproxen behaved,
18  that that's also the way indomethacin and
19  ibuprofen and diclofenac and nabumetone
20  behave?
21   A.   Actually there was an
22  assessment of nabumetone and Vioxx.  That
23  was protocol 90, I think.  I don't
24  remember which number it was.  So, that's

Lemuel A. Moye, M.D., Ph.D.

Page 374

1 another assessment of the two. But
2 nevertheless, I think I've done enough of
3 a review to understand the relative risk
4 of Vioxx for CV events versus NSAIDs.
5    Q.   Do other NSAIDs have an
6 increased CV risk versus placebo,
7 nonselective NSAIDs?
8    A.   Versus placebo?
9    Q.   Yes.
10   A.   It's unclear.
11   Q.   You acknowledged earlier
12 that every one of the other NSAIDs has
13 blood pressure elevation as a potential
14 side effect, right?
15   A.   Yes.
16   Q.   You also acknowledged that
17 any drug that can cause blood pressure
18 elevations potentially can potentiate
19 atherosclerosis, right?
20   A.   I said used chronically.
21   Q.   Used on a chronic basis?
22   A.   Right.
23   Q.   What's your definition of
24 chronic?

Page 375

1    A.   Longer than how I prescribed
2 it, which was for five -- I would say for
3 months.
4    Q.   Okay.
5    A.   For months.
6    Q.   All right.
7        Are you aware of any data to
8 suggest that the effects on blood
9 pressure do not increase the CV risks?
10   A.   Well, I would put it this
11 way. I think for these NSAIDs that have
12 been around for generations now, I think
13 if there was an appreciable increased
14 risk associated with them, we would know
15 it.
16   Q.   That's the basis of your
17 opinion?
18   A.   I think that we would know
19 it.
20   Q.   Okay.
21        And the fact of the matter
22 is that there just had never been studies
23 like APPROVe or CLASS done on any of the
24 nonselective NSAIDs, true?

Page 376

1    A.   That's true. There have
2 been no such studies done with those
3 drugs.
4    Q.   And if APPROVe and CLASS had
5 never been done, elevated risks in Vioxx
6 and Celebrex never would have been
7 appreciated?
8    A.   Well, I mean, that's all
9 speculative, you know.
10   Q.   It's true.
11   A.   No, it's speculative. I
12 don't know.
13        MR. PIORKOWSKI: Why don't
14   we take a brief break.
15        - - -
16        (Whereupon, a recess was
17   taken from 5:05 p.m. until
18   5:14 p.m.)
19        - - -
20 BY MR. PIORKOWSKI:
21   Q.   Dr. Moye, is there any
22 specific study that you're relying on for
23 your opinion that Vioxx causes an
24 imbalance between prostacyclin and

Page 377

1 thromboxane?
2    A.   No. It was my understanding
3 of the biochemistry of it, but I haven't
4 reviewed the basic biochemical studies,
5 no.
6    Q.   Do you know whether the
7 studies measure prostacyclin directly or
8 whether they measure a metabolite of
9 prostacyclin?
10   A.   I don't know that.
11   Q.   Do you know the difference
12 between PGI2 and PGF1a?
13   A.   No.
14   Q.   Are you aware of any studies
15 of a COX-2 inhibitor's impact on
16 prostacyclin in animal blood vessels?
17   A.   I don't think so.
18   Q.   How about in human blood
19 vessels?
20   A.   Human blood vessels? You
21 mean -- I'm not sure I know what you mean
22 by that.
23   Q.   Are you aware of any studies
24 that have been done evaluating it in

Lemuel A. Moye, M.D., Ph.D.

Page 378

1  human blood vessels?
2       A.  I still don't know what you
3  mean.
4       Q.  Evaluating whether
5  prostacyclin causes vasoconstriction.
6       A.  I see.
7       Q.  Whether it causes, you know,
8  an alteration in the endothelium,
9  anything like that?
10      A.  No, I'm not.
11      Q.  We talked about -- when I
12  was asking you originally about your
13  opinions about intent, I broke the time
14  frame down.  One of the things I asked
15  you is whether you were offering any
16  opinions about Merck's intent after April
17  of 2002.  Do you recall that?
18      A.  Yes.
19      Q.  Okay.
20         April 2002 was the point in
21  time in which the VIGOR data was
22  incorporated into the label, right?
23      A.  Right.
24      MR. WACKER:  Well, object to

Page 379

1      form.
2  BY MR. PIORKOWSKI:
3       Q.  Okay.
4         Well, first of all, are you
5  aware of any data pertaining to the VIGOR
6  study that was not provided to the FDA by
7  Merck?
8       A.  That depends on when.
9       Q.  Ever.  I mean, I'm trying to
10  figure out what you're going to say at
11  trial, and there's nothing in your report
12  that suggests that anything about VIGOR
13  was withheld, but I want to be sure that
14  that's your opinion, that there's no
15  information, you are not going to walk
16  into court and say Merck had such and
17  such data about the VIGOR study and never
18  told the FDA.  Understand?
19      A.  Well, I understand.
20         VIGOR is a complicated
21  issue, because there was information that
22  was available at the end of the study
23  that certainly didn't get into the
24  manuscript.  It became available during

Page 380

1  that summer, I guess May/August 2000, I
2  guess it was.
3         Was that information turned
4  over to the FDA before May of 2000?
5  Certainly not.  Was it available after
6  that?  Yes.  So...
7       Q.  Was it available at the time
8  of the Advisory Committee meeting in
9  2001?
10      MR. WACKER:  Objection,
11  vague and ambiguous.
12      THE WITNESS:  Yes, it was.
13  BY MR. PIORKOWSKI:
14      Q.  In fact, you know that
15  because it was specifically written up in
16  the memorandum by Shari Targum, right?
17      A.  Yes, right.
18      Q.  So, as of February 1st,
19  2001, the date of Shari Targum's memo,
20  all of those cases had been reported to
21  the FDA?
22      A.  Yes.
23      Q.  Plus the extra stroke case
24  in the naproxen group?

Page 381

1       A.  Right.
2       Q.  Okay.
3         Now, are you aware of any
4  information about VIGOR that had not been
5  reported to the FDA as of the date of the
6  Advisory Committee meeting in February of
7  2001?
8       MR. WACKER:  Object to form.
9       MR. PIORKOWSKI:  On what
10  basis?
11      MR. WACKER:  Well, the basis
12  is it is overbroad, vague and
13  ambiguous when you are using the
14  statement of, you know, all the
15  data about VIGOR.  And I
16  specifically have in mind
17  something --
18      MR. PIORKOWSKI:  That was
19  sufficient to inform me.
20      MR. WACKER:  I specifically
21  had in mind something about VIGOR
22  that --
23      MR. PIORKOWSKI:  Okay.
24         That's enough.

Lemuel A. Moye, M.D., Ph.D.

Page 382

1      MR. WACKER: That's about
2   VIGOR. Anyway, go ahead.
3   BY MR. PIORKOWSKI:
4      Q.  Well, are you aware of any
5   data from the VIGOR study that was not
6   submitted to the FDA as of the time of
7   the February of 2001 Advisory Committee
8   meeting?
9      MR. WACKER: Same objection.
10      THE WITNESS: As I sit here
11   now, I can't think of any data set
12   component that wasn't provided to
13   the FDA from VIGOR.
14   BY MR. PIORKOWSKI:
15      Q.  Did the April 2002 label
16   change that included information about
17   VIGOR fairly and accurately set forth the
18   results of the VIGOR study?
19      MR. WACKER: Objection to
20   form.
21      THE WITNESS: I would have
22   to look at that again. Without
23   looking at the label again, I
24   can't answer.

Page 383

1   BY MR. PIORKOWSKI:
2      Q.  Is there any information
3   that you believe after the April 2002
4   label change that Merck was aware of and
5   failed to disclose to physicians between
6   the time of the April 2002 label change
7   and the withdrawal of the medication from
8   the market?
9      A.  Maybe it is just late, but
10   I'm really lost in there.
11      Q.  Okay.
12      There was a label change in
13   April 2002, right?
14      A.  Right.
15      Q.  The drug came off the market
16   in 2004?
17      A.  Right.
18      Q.  Okay.
19      We can argue about the
20   period of time between the VIGOR
21   unblinding and the April 2002 label
22   change.
23      A.  Right.
24      Q.  Okay.

Page 384

1      My question is, between the
2   April 2002 label change and the
3   withdrawal of Vioxx from the market, is
4   there any information that you contend
5   that Merck knew about the safety risks of
6   Vioxx that they failed to disclose?
7      MR. WACKER: Now, okay.
8   Object to form.
9      MR. PIORKOWSKI: Okay.
10      THE WITNESS: Yes.
11   BY MR. PIORKOWSKI:
12      Q.  What?
13      A.  The Alzheimer mortality
14   results. Alzheimer study mortality
15   results is one thing that comes to mind.
16   This is not a question about VIGOR
17   anymore. This is a question about any
18   information, if I understand your
19   question correctly.
20      Q.  It is. That's my question.
21      The Alzheimer study
22   mortality results. Okay.
23      What else?
24      A.  I have to look in my report

Page 385

1   to see.
2      MR. WACKER: Your question
3   is limited up until September 30,
4   2004, or are you talking about up
5   until now? Because obviously if
6   you are talking about up until
7   now, you are talking about the
8   APPROVe and the APPROVe followup.
9      MR. PIORKOWSKI: The drug's
10   not on the market.
11      MR. WACKER: Yeah. That's
12   why I wanted to make sure that you
13   were talking about up to September
14   30th.
15      MR. PIORKOWSKI: That wasn't
16   my question.
17      (Witness reviewing
18   document.)
19      THE WITNESS: I guess the
20   fact that they believe, they
21   continue to argue that naproxen
22   might be -- the alleged protective
23   effect of naproxen. They continue
24   to advocate that.

Lemuel A. Moye, M.D., Ph.D.

Page 386

BY MR. PIORKOWSKI:
1  BY MR. PIORKOWSKI:
2      Q.   Okay.
3           Anything else?
4      A.   Deborah Shapiro's October
5  18th, 2000 report that showed that Vioxx
6  more than doubled the risk of MIs related
7  to NSAIDs. But that may be -- I'm
8  confusing the timelines now. That was
9  2000.
10     Q.   My question is between the
11 label change in April of 2002 and the
12 withdrawal.
13         MR. WACKER: I guess the
14     point is that even if -- in other
15     words, if something wasn't
16     disclosed before April 2002 and it
17     wasn't further disclosed even
18     after April 2002, then that would
19     encompass that time frame.
20         MR. PIORKOWSKI: I
21     understand.
22         THE WITNESS: What I said
23     just reflects what's in my report.
24     So, the degree to which my report

Page 387

1      is responsive to the question is
2      the degree to which I can be
3      responsive. I don't have anything
4      in here from 2002 to 2004.
5  BY MR. PIORKOWSKI:
6      Q.   You testified, I believe, in
7  February of 2005 that you had made about
8  $1.35 million in your work in fen-phen;
9  is that right?
10     A.   Yes.
11     Q.   How much have you made since
12 February of 2005 additional?
13     A.   In fen-phen?
14     Q.   Yes.
15     A.   I don't know. 2005. I
16 don't know.
17     Q.   In the last year?
18     A.   I don't know.
19     Q.   Have you testified in cases
20 in the last year?
21     A.   Yeah.
22     Q.   Okay.
23         What's your best estimate of
24 how much you've made in the fen-phen

Page 388

1  litigation overall?
2      A.   I don't know. A little more
3  than $1 million.
4      Q.   Well, if you made 1.35 --
5      A.   To me, that's a little more.
6      Q.   What?
7      A.   To me, that's a little more.
8      Q.   I'm saying if you had 1.35
9  in February of 2005 --
10     A.   But see, even that was an
11 estimate. My overall estimate is
12 somewhere between 1 and $1.5 million.
13 That would be probably the best I can do.
14     Q.   Okay.
15         What other litigation have
16 you testified in as an expert over the
17 last three years?
18     A.   The last three years?
19     Q.   Yes.
20     A.   This is '06.
21     Q.   Let me withdraw the question
22 and see if I can expedite it.
23     A.   Okay.
24     Q.   You testified against

Page 389

1  Pfizer, right, in the Rezulin litigation?
2      A.   Yes. I just wasn't sure
3  that was in the last three years or not.
4      Q.   Okay.
5          Was Pfizer the defendant
6  then or was somebody else the defendant?
7      A.   No. I think Pfizer was the
8  defendant then. My last Rezulin trial
9  may have been in the spring of 2004 in
10 California. I don't remember.
11     Q.   Do you see it on there
12 anywhere?
13         (Handing over document.)
14     A.   Thanks.
15         (Witness reviewing
16 document.)
17         I don't think so, no.
18     Q.   It's not on there?
19     A.   I don't think so.
20     Q.   But it should be on there?
21     A.   Yes.
22     Q.   Okay.
23         Do you know how many cases
24 you testified in against Pfizer?

98 (Pages 386 to 389)

Lemuel A. Moye, M.D., Ph.D.

Page 390

1      A.   For Pfizer?
2      Q.   Yes.
3      A.   I believe there were four.
4      Q.   Four?
5      A.   Four trials against Pfizer.
6      Q.   Okay.
7           And where were those?
8      A.   One was in Houston, one was
9   in Corpus, a third was in McAllen, and a
10  fourth was in Los Angeles.
11     Q.   And your testimony was on
12  behalf of plaintiffs for all of those
13  cases?
14     A.   Yes, sir.
15     Q.   All right.
16          Other than your testimony
17  against Pfizer and American Home Products
18  for Wyeth, have you been involved in any
19  other product cases?
20     A.   Yes, but to very limited
21  degrees.  I gave a deposition I think in
22  Lotronex.  That's all I remember.  I
23  investigated getting into some other
24  ones, but never did.

Page 391

1      Q.   Are you still involved in
2   diet drug cases today?
3      A.   I don't think so anymore,
4   but with fen-phen, one never knows.  So,
5   I would say I think I'm done with that.
6      Q.   You don't have any active
7   things on your calendar at this point?
8      A.   That's right.  That's right.
9      Q.   Do you know how much money
10  you made, best estimate of how much money
11  you made in the Pfizer/Rezulin
12  litigation?
13     A.   No.  I don't have an
14  estimate today.
15          MR. PIORKOWSKI:  Okay.
16      I think we're done for
17  today.  Thanks.
18          THE WITNESS:  Good to see
19      you again.
20          MR. PIORKOWSKI:  Good to see
21      you, too.
22          MR. WACKER:  I just want to
23      ask a few questions.
24          - - -

Page 392

1          EXAMINATION
2             - - -
3   BY MR. WACKER:
4      Q.   Dr. Moye, there was earlier
5   testimony that you had received a SAS
6   database.  I believe you indicated that
7   that was regarding the APPROVe followup
8   data.  Do you recall that?
9      A.   Yes.
10     Q.   Did you also receive a SAS
11  database, it may be on your index,
12  regarding the study out of Oxford?
13          MR. JOSEPHSON:  Objection,
14      form.
15          THE WITNESS:  Yes, I did.  I
16      guess I assumed it was part of the
17      APPROVe data set.  I didn't know
18      it was part of a separate study.
19  BY MR. WACKER:
20     Q.   So, that's another --
21     A.   But I did receive that, yes.
22     Q.   That's another database that
23  you are going to look at?
24     A.   Yes.

Page 393

1      Q.   Okay.
2           You also mentioned here
3   today that while you haven't reviewed
4   every NDA or every study concerning
5   Bextra or Celebrex, you've looked at
6   those generally with respect to their
7   relationship with Vioxx?
8          MR. PIORKOWSKI:  Objection,
9      form.
10          THE WITNESS:  Yes.  And
11      having reviewed all the FDA, the
12      2005 Advisory Committee meeting, I
13      certainly read about -- I read
14      their discussion of the data.
15  BY MR. WACKER:
16     Q.   And we know that Celebrex
17  remains on the market, right?
18     A.   Yes.
19     Q.   And Bextra has been removed
20  from the market?
21     A.   That's correct.
22     Q.   And Vioxx has been removed
23  from the market?
24     A.   Yes.

99 (Pages 390 to 393)

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 394

1    MR. PIORKOWSKI:  Objection
2 to form.
3 BY MR. WACKER:
4    Q.   Would it be fair to say that
5 based upon the studies that you have
6 reviewed, looking at those drugs, that
7 Vioxx was the worst of those COX-2
8 inhibitors?
9    MR. PIORKOWSKI:  Objection
10 to form.
11    THE WITNESS:  I would say
12 not just based on those studies,
13 but based on my understanding of
14 the role of the -- the
15 differential role of COX-1, COX-2,
16 that Vioxx is the worst.  That's
17 my understanding as I sit here
18 today.
19    MR. WACKER:  Thank you.
20    MR. JOSEPHSON:  I have no
21 questions of the witness at this
22 point.  I'll reserve my questions
23 until his next appearance.
24    MS. SNAPKA:  We're reserving

Page 396

1    CERTIFICATE
2
3    I, LINDA L. GOLKOW, a Notary
4 Public and Certified Shorthand Reporter
   of the State of New Jersey, do hereby
   certify that prior to the commencement of
5 the examination, LEMUEL A. MOYE, M.D. was
   duly sworn by me to testify to the truth,
6 the whole truth and nothing but the
   truth.
7
8    I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
9 testimony as taken stenographically by
   and before me at the time, place and on
10 the date hereinbefore set forth, to the
   best of my ability.
11
12    I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor
13 attorney nor counsel of any of the
   parties to this action, and that I am
14 neither a relative nor employee of such
   attorney or counsel, and that I am not
15 financially interested in the action.
16
17
18
19
      _____
20    LINDA L. GOLKOW, CSR
      Notary Number: 1060147
21    Notary Expiration: 1-2-08
      CSR Number: 30XI176200
22    Dated: June 9, 2006
23
24

Page 395

1 ours.
2    MR. JOSEPHSON:  Which I
3 think is on the 20th?
4    MS. FILIPPOV:  We're
5 reserving ours also.
6    MR. JOSEPHSON:  16th.  I
7 stand corrected.  It is the 16th.
8       - - -
9    (Whereupon, the deposition
10 adjourned at 5:31 p.m.)
11       - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 397

1    ACKNOWLEDGMENT OF DEPONENT
2
3
4    I,_____, do
   hereby certify that I have read the
5 foregoing pages, 1 - 399, and that the
   same is a correct transcription of the
6 answers given by me to the questions
   therein propounded, except for the
7 corrections or changes in form or
   substance, if any, noted in the attached
8 Errata Sheet.
9
10
11
12
   _____    _____
   LEMUEL A. MOYE, M.D.       DATE
13
14
15
16
17 Subscribed and sworn
   to before me this
18    Day of      , 20  .
19 My commission expires:
20
21 Notary Public
22
23
24

Lemuel A. Moye, M.D., Ph.D.

Page 398

1     - - - - - -
        E R R A T A
2     - - - - - -
3  PAGE  LINE  CHANGE
4  ___  ___  _____
5  ___  ___  _____
6  ___  ___  _____
7  ___  ___  _____
8  ___  ___  _____
9  ___  ___  _____
10 ___  ___  _____
11 ___  ___  _____
12 ___  ___  _____
13 ___  ___  _____
14 ___  ___  _____
15 ___  ___  _____
16 ___  ___  _____
17 ___  ___  _____
18 ___  ___  _____
19 ___  ___  _____
20 ___  ___  _____
21 ___  ___  _____
22 ___  ___  _____
23 ___  ___  _____
24 ___  ___  _____

Page 399

1     LAWYER'S NOTES
2  PAGE  LINE
3  ___  ___  _____
4  ___  ___  _____
5  ___  ___  _____
6  ___  ___  _____
7  ___  ___  _____
8  ___  ___  _____
9  ___  ___  _____
10 ___  ___  _____
11 ___  ___  _____
12 ___  ___  _____
13 ___  ___  _____
14 ___  ___  _____
15 ___  ___  _____
16 ___  ___  _____
17 ___  ___  _____
18 ___  ___  _____
19 ___  ___  _____
20 ___  ___  _____
21 ___  ___  _____
22 ___  ___  _____
23 ___  ___  _____
24 ___  ___  _____

Golkow Litigation Technologies - 1.877.DEPS.USA

a46c412c-de3e-4446-bf8d-937e4e429297

Lemuel A. Moye, M.D., Ph.D.

Page 400

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX             :  MDL DOCKET NO.
LITIGATION PRODUCTS      :  1657
LIABILITY LITIGATION     :  SECTION L
                         :
This document relates    :  JUDGE FALLON
To                       :
GERALD BARNETT AND       :  MAGISTRATE JUDGE
CORRINE BARNETT          :  KNOWLES
        V.               :
MERCK & CO., INC.        :
                         :
Civil Action No.         :
2:06cv485                :
                         :
And Related Actions      :
                     —   —   —

June 16, 2006

—   —   —

    Videotaped deposition of LEMUEL A.

MOYE, M.D., Ph.D., VOLUME 2, held in the

offices of Abraham, Watkins, Nichols,

Sorrels, Matthew & Friend, 800 Commerce,

Houston, Texas, commencing at 8:10 a.m., on

the above date, before Michael E. Miller,

Registered Merit Reporter and Certified

Realtime Reporter.   —   —   —

            GOLKOW LITIGATION TECHNOLOGIES
                  Four Penn Center
            1600 John F. Kennedy Boulevard
                    Suite 1210
            Philadelphia, Pennsylvania 19103
                  877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 401

1 A P P E A R A N C E S :
2
3    ABRAHAM WATKINS NICHOLS SORRELS
     MATTHEWS & FRIEND
4    BY: JASON C. WEBSTER, ESQUIRE
     800 Commerce Street
5    Houston, Texas 77002
     (713) 222-7211
6    jwebster@abrahamwatkins.com
     Counsel for Plaintiffs
7
8    ROBINSON, CALCAGNIE & ROBINSON
     BY: TED P. WACKER, ESQUIRE
9    620 Newport Center Drive - 7th Floor
     Newport Beach, California 92660
10   (949) 720-1288
     Counsel for Plaintiffs
11
12   BLIZZARD MCCARTHY & NABERS, LLP
     BY: EDWARD F. BLIZZARD, ESQUIRE
13   440 Louisiana - Suite 1710
     Houston, Texas 77024
14   (713) 844-3750
     Counsel for MDL Plaintiffs
15   Steering Committee
16
     THE GALLAGHER LAW FIRM
17   BY: MICHAEL T. GALLAGHER, ESQUIRE
     777 Walker - Suite 2500
18   Houston, Texas 77002
     (713) 222-8080
19   mike@gld-law.com
     Counsel for State of Texas Plaintiffs
20
21        - - -
22
23
24

Page 402

1 A P P E A R A N C E S : (CONTINUED)
2
3    THE PIORKOWSKI LAW FIRM, PC
     BY: JOSEPH D. PIORKOWSKI, JR., ESQUIRE
4    Suite 800
     910 17th Street, N.W.
5    Washington, DC 20006
     (202) 223-5535
6    jpiorkowski@lawdoc1.com
     Counsel for Merck & Co., Inc.
7
8    FULBRIGHT & JAWORSKI, LLP
     BY: DAVID WALLACE, ESQUIRE
9    Suite 2800 - 2200 Ross Avenue
     Dallas, Texas 75201
10   (214) 855-8184
     dawallace@fulbright.com
11   Counsel for Merck & Company, Inc.
12
     FULBRIGHT & JAWORSKI, LLP
13   BY: GERRY LOWRY, ESQUIRE
     1301 McKinney - Suite 5100
14   Houston, Texas 77010-3095
     (713) 651-5151
15   glowry@fulbright.com
     Counsel for Merck & Company, Inc.
16
17   BAKER BOTTS, LLP
     BY: RICHARD L. JOSEPHSON, ESQUIRE
18   One Shell Plaza
     910 Louisiana Street
19   Houston, Texas 77002
     (713) 229-1460
20   richard.josephson@bakerbotts.com
     Counsel for Merck & Co., Inc.
21
22        - - -
23
24

Page 403

1 A P P E A R A N C E S : (CONTINUED)
2
3    BARTLIT BECK HERMAN
     PALENCHAR & SCOTT, LLP
4    BY: KEN BAUM, M.D., ESQUIRE
     Courthouse Place
5    54 West Hubbard Street
     Chicago, Illinois 60610
6    (312) 494-4451
     Counsel for Merck & Co., Inc.
7
8    CRUSE, SCOTT, HENDERSON & ALLEN, LLP
     BY: VICTORIA A. FILIPPOV, ESQUIRE
9    7th Floor - 2777 Allen Parkway
     Houston, Texas 77019-2133
10   (713) 650-6600
     Counsel for Texas Physicians
11
12   ALSO APPEARING:
13      NATALIE EROS, Ph.D.,
        The Piorkowski Law Firm, PC
14
15   VIDEOGRAPHER:
16      BRYAN P. BIRMINGHAM, CLVS
        Esquire Deposition Services
17
18        - - -
19
20
21
22
23
24

Page 404

1          I N D E X
2
3    EXAMINATION OF LEMUEL A. MOYE, M.D., Ph.D.:
4       BY MR. PIORKOWSKI:        411
5       BY MR. JOSEPHSON:         741
6       BY MR. WEBSTER:           759
7       BY MR. GALLAGHER:         761
8       BY MR. PIORKOWSKI:        769
9       BY MR. JOSEPHSON:         777
10
11
12          E X H I B I T S
13   NUMBER          DESCRIPTION      MARKED
14   Moye MDL 10   Testimony of        417
     Lemuel A. Moye, M.D.,
15   Ph.D.
16   Moye MDL 11   "From Test Tube to  419
     Patient: Improving
17   Health Through Human
     Drugs" D2485.1 -
18   D2485.100
19   Moye MDL 12   Division of         440
     Gastrointestinal and
20   Coagulation Drug
     Products, Medical
21   Officer's Consult
     Review, D2319.1 -
22   D2319.113
23
24

2 (Pages 401 to 404)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 405

```
 1        EXHIBITS
 2
 3   NUMBER      DESCRIPTION      MARKED
 4   Moye MDL 13  "Comparison of     507
              Cardiovascular
 5            Thrombotic Events in
              Patients with
 6            Osteoarthritis
              Treated with
 7            Rofecoxib Versus
              Nonselective
 8            Nonsteroidal
              Anti-inflammatory
 9            Drugs (Ibuprofen,
              Diclofenac and
10            Nabumetone)," by
              Reicin, et al.,
11            D616.1 - D616.6
12   Moye MDL 14  "Comparison of Upper  537
              Gastrointestinal
13            Toxicity of Rofecoxib
              and Naproxen in
14            Patients with
              Rheumatoid
15            Arthritis," by
              Bombardier, et al.,
16            (9 pages)
17   Moye MDL 15  "Risk of          559
              Cardiovascular Events
18            Associated with
              Selective COX-2
19            Inhibitors," by
              Mukherjee, et al.
20            (6 pages)
21   Moye MDL 16  1/24/06 Federal    603
              Register Excerpt,
22            Pages 3922 - 3999
23
24
```

Page 406

```
 1        EXHIBITS
 2
 3   NUMBER      DESCRIPTION      MARKED
 4   Moye MDL 17  "The Effect of      656
              Pravastatin on
 5            Coronary Events After
              Myocardial Infarction
 6            in Patients with
              Average Cholesterol
 7            Levels," by Sacks, et
              al. (9 pages)
 8
     Moye MDL 18  10/1/01 Letter to    678
 9            Thomas Abrams,
              Director of DDMAC,
10            from David W.
              Anstice, Merck,
11            Re: NDA No. 21-042
              VIOXX (Rofecoxib)
12            tablets,
              MRK-AAF0007803 -
13            MRK-AAF0007853
14   Moye MDL 19  1/2/02 Fax to       681
              Thomas M. Casola,
15            Merck, from Laura
              Governale, DDMAC,
16            Re: NDA 21-042, Vioxx
              (rofecoxib) tablets,
17            MRK-ACI0013248 -
              MRK-ACI0013249
18
     Moye MDL 20  "Analysis and       686
19            Interpretation of
              Treatment Effects in
20            Subgroups of Patients
              in Randomized
21            Clinical Trials, by
              Yusuf, et al.
22            (6 pages)
23
24
```

Page 407

```
 1        EXHIBITS
 2
 3   NUMBER      DESCRIPTION      MARKED
 4   Moye MDL 21  APPROVe Trial       758
              Cardiovascular Safety
 5            Report,
              MRK-AFV0426355 -
 6            MRK-AFV0426453
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 408

```
 1        PROCEEDINGS
 2        (June 16, 2006, 8:10 a.m.)
 3        (The following proceedings were
 4   held off the video record.)
 5        MR. JOSEPHSON:  Richard
 6   Josephson here for Merck.  Yesterday
 7   there was a hearing, telephonic
 8   hearing, with Judge Wilson in the
 9   Texas MDL at which time, after
10   argument, the Court ordered that
11   Dr. Moye's deposition in the Texas MDL
12   have an additional day added to it so
13   that there will be a third day; and
14   the third day will be devoted to
15   issues relating -- neurological issues
16   related to stroke and other items
17   related to stroke, and it will cover
18   the Texas MDL and the Choctaw Indian
19   case.
20        And the date of that deposition
21   has not yet been selected, but counsel
22   for plaintiff has offered a few dates,
23   and one of those will hopefully be
24   chosen.
```

3 (Pages 405 to 408)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 409

1    So today, the Court told us not
2  to cover those issues in this
3  deposition, but to cover issues
4  related to myocardial infarction and
5  other areas other than stroke in this
6  deposition. Is that correct, Jason?
7       MR. WEBSTER: That's correct.
8  That's what the Court said.
9       THE REPORTER: Is that it?
10      MR. JOSEPHSON: That's it.
11      Let me just say on the record
12 also, so I can say this now, that this
13 deposition has also been -- in
14 addition to the Texas MDL, has also
15 been noticed in the State of Texas v.
16 Merck, and I am here in both the Texas
17 MDL and in the State of Texas v.
18 Merck, as is Gerry Lowry, who is here
19 in the Texas MDL, but not the State of
20 Texas v. Merck.
21      Off the record.
22      (Discussion off the record.)
23      THE VIDEOGRAPHER: Hold,
24 please. Today's date is June 16,

Page 410

1  2006. The time is 8:12. We're on the
2  record.
3       Will counsel please state their
4  appearances for the record at this
5  time.
6       MR. WEBSTER: Jason Webster for
7  the plaintiffs.
8       MR. WACKER: Ted Wacker for
9  plaintiffs.
10      MR. LOWRY: Gerry Lowry for
11 Merck.
12      MR. JOSEPHSON: Richard
13 Josephson for Merck.
14      MR. WALLACE: Ed Wallace for
15 Merck.
16      MR. PIORKOWSKI: Joseph
17 Piorkowski for Merck.
18      MR. BAUM: Ken Baum for Merck.
19      MR. WEBSTER: What's your name?
20      MR. BAUM: Ken Baum.
21      MS. EROS: My name is Natalie
22 Eros.
23      MR. PIORKOWSKI: She's a member
24 of my office. She's not an attorney.

Page 411

1       MR. WEBSTER: Okay. I just
2  wanted to know everybody in the room.
3  No problem.
4       MR. PIORKOWSKI: Yeah.
5       LEMUEL A. MOYE, M.D., Ph.D.,
6  having been duly sworn, testified as follows:
7               EXAMINATION
8  BY MR. PIORKOWSKI:
9       Q.    Doctor, would you state your
10 name for the record, please?
11      A.    Sure. Lemuel, L-E-M-U-E-L,
12 Moye, M-O-Y-E.
13      Q.    Okay. Dr. Moye, about two
14 weeks ago in this room, we conducted a day of
15 deposition on Vioxx issues. Do you recall
16 that?
17      A.    Yes, I do.
18      Q.    Okay. And I'm going to try not
19 to revisit things that we talked about last
20 week, and cover new matters, but there are a
21 couple of things we may need to kind of fill
22 in the gaps.
23      A.    Sure.
24      Q.    At that time, I believe you

Page 412

1  told me that the report that you filed in the
2  MDL also set forth the opinions you intended
3  to render in cases in the State of Texas; is
4  that correct?
5       A.    Yes, it is.
6       Q.    Okay. And since -- during that
7  deposition, we talked about some additions
8  and modifications to the opinions set forth
9  in your report. Do you recall that?
10      A.    I do.
11      Q.    Okay. Since that deposition
12 concluded, have you made any other additions,
13 deletions, modifications or corrections to
14 your report, or do any need to be made?
15      A.    No, I have not.
16      I do need to clarify one thing
17 that we mentioned. I believe you asked me,
18 Mr. Piorkowski, at one point, had I written
19 the affidavit, and the answer is yes. The
20 answer is still yes. But you asked me if I
21 had done any cut-and-pasting, and I said no.
22 I think that that was -- I misremembered.
23      There are some stock things I
24 said in there, for example, discussions of

4 (Pages 409 to 412)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 413

1  the FDA, general discussions of the FDA CFRs.
2  I didn't retype those. I did cut and paste
3  those.
4       Also, part of the appendices
5  which talk about some of the principles of
6  statistical reasoning in clinical trials, I
7  think I cut and pasted those as well. I had
8  written those originally, just didn't rewrite
9  those, but took them from other writings.
10      Q.   Okay. So we're clear, do you
11  have your report available to you?
12      A.   I don't have a copy here with
13  me.
14          MR. WEBSTER: I could get you a
15  copy real quick, if you want to wait
16  two seconds.
17          MR. PIORKOWSKI: Let's do it on
18  a break. Let me --
19          MR. WEBSTER: Okay.
20          MR. PIORKOWSKI: I appreciate
21  that, Jason.
22      Q    (BY MR. PIORKOWSKI) But just
23  so we're clear, what you mean is, starting
24  with Appendix A, where it says, "Statistical

Page 414

1  Reasoning in Medicine" --
2      A.   Yes.
3      Q.   -- and from there to the end,
4  those sections, you may have cut and pasted?
5      A.   Fragments of those sections, I
6  may have cut and pasted. Also, earlier in
7  the affidavit when I provide a general
8  description of the FDA, I believe I cut and
9  paste those as well.
10      Q.   Okay. What did you cut and
11  paste them from?
12      A.   The earlier -- the FDA
13  information, from my earlier affidavits from
14  fen-phen.
15      Q.   I see.
16      A.   Fen-phen litigation.
17      Q.   Okay. Now, have you read your
18  deposition transcript from June 2nd?
19      A.   No, I have not.
20      Q.   Other than those items that you
21  just mentioned, are there any other
22  corrections that you believe you need to make
23  to answers you gave at that deposition?
24      A.   As best as I can recall, the

Page 415

1  only ones I remembered and reflected on were
2  the ones I just discussed about the
3  cut-and-paste components of the affidavit.
4      Q.   Fair enough.
5          Have you looked at any
6  additional materials in the intervening two
7  weeks between the conclusion of the
8  deposition on June 2nd and today?
9      A.   If by "additional" you mean new
10  material, I have just glanced at an updated
11  report from Merck on the approved follow-up
12  data -- data analysis.
13      Q.   And by "updated," you mean
14  updated since the one you looked at that was
15  discussed in your original report?
16      A.   That's right.
17      Q.   Okay. And where did you get
18  the copy of the approved -- the updated
19  approved follow-up data?
20      A.   I was directed -- I got it on
21  the Internet.
22      Q.   At what -- I'm sorry. Are you
23  finished?
24      A.   There was a URL that I don't

Page 416

1  remember that I was able to find and access.
2      Q.   Was it a Merck website, or was
3  it an FDA website?
4      A.   I think it was a Merck website,
5  but I don't really remember.
6      Q.   And did counsel provide that to
7  you?
8      A.   Yes.
9      Q.   Okay. I was handed a copy of
10  your testimony this morning. Is that -- does
11  that contain additional testimony from what
12  we discussed last week -- or on June 2nd?
13      A.   Yes, it does.
14      Q.   It does contain additional
15  information?
16      A.   Yes.
17      Q.   And what additional information
18  does it contain?
19      A.   It includes the testimony I
20  provided in the Rezulin cases, the deposition
21  and the trial testimony from Rezulin.
22      Q.   Okay. And we -- those were not
23  on the version you had last -- a couple weeks
24  ago, right?

5 (Pages 413 to 416)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 417

1    A.    That's right, they weren't.
2    Q.    Okay. Which ones are the
3  Rezulin ones? Could you just identify them
4  for me?
5    A.    Sure. Actually, they're all
6  the ones that mention Warner-Lambert, so
7  numbers 18, 19, 20, 21, 30. Those are the
8  only ones I see.
9    Q.    Okay.
10   A.    And, of course, the Vioxx one's
11  on there as well.
12   Q.    And you added your deposition
13  from June 2nd?
14   A.    Right.
15       (Whereupon, Deposition Exhibit
16   Moye MDL 10, Testimony of Lemuel A.
17   Moye, M.D., Ph.D., was marked for
18   identification.)
19   Q.    (BY MR. PIORKOWSKI) Okay. I'm
20  going to mark this as Moye Deposition
21  Exhibit 10.
22       MR. WEBSTER: May I see that,
23   please?
24       MR. PIORKOWSKI: Yeah.

Page 418

1    Q.    (BY MR. PIORKOWSKI) Dr. Moye,
2  the money that you earn in your capacity as
3  an expert witness, does that money go to you,
4  or does that money go to the University of
5  Texas?
6    A.    To me.
7    Q.    Okay. Have you had any
8  additional bills or invoices to counsel since
9  the ones we talked about on June 2nd?
10   A.    No.
11   Q.    How much time -- well, I assume
12  that you billed counsel or will bill counsel
13  for the deposition time from June 2nd; is
14  that right?
15   A.    Yes.
16   Q.    Okay. And how much additional
17  time since June 2nd have you spent prior to
18  today?
19   A.    I think -- I would say on
20  average, about an hour a day.
21   Q.    So 15 days have gone by --
22   A.    Yes.
23   Q.    -- so about 15 hours?
24   A.    Yes.

Page 419

1    Q.    Okay. Now, when we started
2  last week, I think you said that some of the
3  materials that you looked at initially were
4  materials from the FDA's website; is that
5  right?
6    A.    Yes.
7       (Whereupon, Deposition Exhibit
8    Moye MDL 11, "From Test Tube to
9    Patient: Improving Health Through
10   Human Drugs" D2485.1 - D2485.100, was
11   marked for identification.)
12   Q.    (BY MR. PIORKOWSKI) Okay. I'm
13  going to hand you what I've marked as Moye
14  Deposition Exhibit 11, and represent to you
15  that this is a document that we obtained on
16  the FDA's website. It's entitled "From Test
17  Tube to Patient, Improving Health Through
18  Human Drugs." Does that appear to be what it
19  is?
20   A.    Yes.
21   Q.    Okay. And it entitled "A
22  Special Report," and it's authored by the US
23  Food & Drug Administration; is that correct?
24   A.    Yes.

Page 420

1    Q.    Have you ever seen this
2  document before?
3    A.    I think I got a hard copy of
4  this document years ago when I was finishing
5  up my tenure on the Cardiorenal Advisory
6  Committee.
7    Q.    Okay. I really just want to
8  ask you some specific questions about some of
9  the statements that FDA makes here. Can you
10  turn to what is -- do you see there's numbers
11  in the top right-hand corner?
12   A.    Such as D2485.3?
13   Q.    Right. Exactly.
14   A.    Yes.
15   Q.    Can you turn to .17?
16   A.    (Witness complied.)
17   Q.    And do you see where it says,
18  quote, "CDER's mission is to promote and
19  protect the public health by ensuring that
20  safe and effective drugs are available to
21  Americans," end quote? Did I read that
22  correctly?
23   A.    Yes.
24   Q.    Okay. And CDER is the division

6 (Pages 417 to 420)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 421

1  of FDA that's involved with the review and
2  approval or disapproval of new drugs; is that
3  right?
4      A.    Right, Center For Drug
5  Evaluation and Research.
6      Q.    Okay. And do you agree that
7  that is CDER's mission statement, from your
8  experience on the FDA Advisory Committee?
9      A.    I believe it's their mission
10  and their goal, yes.
11      Q.    Okay. Do you, from your
12  experience in working on the Advisory
13  Committee -- I assume when you work on the
14  Advisory Committee, that you, to some extent,
15  interact with FDA physicians and scientists;
16  is that true?
17      A.    Yes.
18      Q.    Okay. Has it been your
19  experience that the FDA is made up of
20  competent physicians and scientists?
21      A.    Well, I would say this: I
22  mean, not knowing every scientist or
23  physician or regulator, I mean, I can't -- I
24  hesitate to be general. But many of the

Page 422

1  people I met with at the FDA are competent.
2      Q.    Okay. Well, without asking you
3  to -- for a blanket endorsement, has it been
4  your general experience that the people with
5  whom you've interacted at the FDA have been
6  competent, in your view?
7      A.    Yes. However, I will say the
8  people I interact with at the FDA primarily
9  are statisticians and detail scientists.
10  They are not regulators. So the scientists I've met
11  administrators. So the scientists I've met
12  certainly appear to be competent.
13      Q.    Have you had interaction with
14  members of the FDA who are involved with, you
15  know, the regulatory review aspects?
16      A.    Yes.
17      Q.    And who are those people?
18      A.    I don't remember. I mean, it
19  depends on how you define "regulatory." Of
20  course, Ray Lipicki is a scientist, who also
21  was heavily involved in regulatory. Bob
22  Temple, again, a scientist, but heavily
23  involved in regulatory.
24      Q.    Do you have a view as -- do you

Page 423

1  view Bob Temple as a competent scientist?
2      A.    I would say this about Bob: I
3  mean, I know Bob very well. He's a very nice
4  man. Bob is very sophisticated. Bob is a
5  good scientist. He has one of the best
6  memories that -- most complete memories of
7  any man or woman I've ever encountered. But
8  Bob also understands that politics is the
9  mother's milk at the FDA, and he also
10  navigates those waters very well.
11      Q.    All right. You have some
12  references in your report to something called
13  the Prescription Drug User Fee Act; is that
14  right?
15      A.    Yes.
16      Q.    Okay. And that's often
17  referred to by its acronym PDUFA, right?
18      A.    Yes, right.
19      Q.    All right. And if you see on
20  page 35 of the document that I handed you,
21  they make -- have a little discussion about
22  the PDUFA in the upper left-hand corner,
23  right?
24      A.    Just give me a moment here.

Page 424

1          (Witness reviews document.)
2      A.    Yes.
3      Q.    (BY MR. PIORKOWSKI) And just
4  for our understanding, the way the PDUFA Act
5  works, the -- there are user fees that are
6  charged to manufacturers who are seeking to
7  have products approved, right?
8      A.    Yes.
9      Q.    Okay. In other words, if Merck
10  or Pfizer or any other company wants to have
11  a drug approved, there's a fee that has to be
12  paid, right?
13      A.    Yes.
14      Q.    And the idea behind it is that
15  ultimately they're, at least in large part,
16  the financial beneficiaries of the drug, so
17  they should have to pay for part of the
18  regulatory review of the drug, right?
19      A.    That's the -- excuse me. That
20  was the philosophy that justified its use.
21      Q.    Okay. And so we're clear, the
22  payment of the fee, the user fee, is not tied
23  to whether or not the product is approved,
24  right?

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 425

1    A.   I would say this: Certainly,
2  no one anticipated that it would be, and I
3  don't think anyone has ever put on paper that
4  there was any link between the user fee and
5  the understanding of the future approval of
6  the drug. That certainly is true.
7    Q.   Well, a sponsor has to pay the
8  user fee, whether the product is approved or
9  not approved, right?
10    A.   If they want the product
11  reviewed in a timely fashion.
12    Q.   Right.
13    A.   Yes.
14    Q.   Right. You don't get your
15  money back if the FDA reviews your product
16  and denies your new drug application, right?
17    A.   That's true.
18    Q.   Okay. And you see in -- on
19  page 35 where it says, quote, "The Act
20  allowed the agency to hire" --
21    A.   I'm sorry. I'm not with you.
22    Q.   I'm sorry.
23    A.   Okay. I'm with you. Okay.
24  The first paragraph. Right.

Page 426

1    Q.   Right.
2        It says "the Act," and "the
3  Act" is referring to PDUFA, right?
4    A.   Right.
5    Q.   Then it said "allowed the
6  agency"; that's referring to the FDA, right?
7    A.   Yes.
8    Q.   "To hire several hundred
9  additional reviewers and support staff and
10  expedite its move towards accepting
11  computerized NDA's," right?
12    A.   Yes.
13    Q.   Okay. Do you agree with that
14  statement?
15        MR. WEBSTER: Objection, form.
16    A.   I agree with the statement.
17  It's an incomplete description of what the
18  Act allows, but certainly the Act allowed
19  that.
20    Q   (BY MR. PIORKOWSKI) Well, in
21  fact, the FDA -- based on funding obtained
22  from the Act, the FDA did, in fact, hire
23  several hundred additional reviewers and
24  support staff, correct?

Page 427

1    A.   That's true.
2        MR. WEBSTER: Objection, form.
3        THE WITNESS: I'm sorry.
4        MR. WEBSTER: That's all right.
5    A.   Yes.
6    Q   (BY MR. PIORKOWSKI) Now, when
7  it refers to NDAs, it's talking about moving
8  towards computerized NDAs, right?
9    A.   Yes.
10    Q.   So that the jury is clear, NDAs
11  are the -- they're the materials that the
12  manufacturers submit to the FDA in connection
13  with their requests for approval, right?
14    A.   Yes.
15    Q.   Okay. And they contain all of
16  the chemistry studies, the animal studies,
17  the human data and the statistical analyses
18  of human data, right?
19    A.   Yes.
20    Q.   And it's actually a very
21  voluminous amount of material; fair?
22    A.   I think you described it in
23  Alice as a living document.
24    Q.   A living document. Okay.

Page 428

1        And fair to say we're in a --
2  we're in a medium-sized conference room here?
3    A.   Fair, yes.
4    Q.   If we were to take the hard
5  copies of a new drug application and put them
6  in boxes for your average product that the
7  FDA reviews, it would probably fill up a good
8  half of this conference room?
9    A.   Actually, I would think it
10  would fill a good deal more than that.
11    Q.   Okay. Fair enough.
12        And one of the things that the
13  FDA is trying to do is -- by moving to an
14  electronic form, is trying to reduce the
15  volume of hard-copy paper. Is that --
16    A.   Yes.
17    Q.   -- what the plan was?
18        And do you see on page 38,
19  there's a discussion of the review team?
20    A.   Yes, in the middle column
21  there.
22    Q.   Yes, in the middle column.
23        And it says, "The members of
24  the CDER review team simultaneously apply

8 (Pages 425 to 428)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 429

1  their special technical expertise to the
2  review of the NDA," and then it goes on to
3  say -- and is that your experience, first of
4  all, that when an NDA has been submitted on
5  products on which you've been a member of the
6  Advisory Committee, that there has been a
7  team of scientists and chemists and doctors
8  who reviewed the new drug application prior
9  to the time that you, as the Advisory
10 Committee member, were asked to consider
11 questions about it?
12     A.    That's true.
13     Q.    Okay.
14     A.    It's also been my experience,
15 though, that they had many other NDAs to
16 review, so I don't want to suggest that
17 they're -- the only thing that they had to do
18 was to review the one new NDA that arrived.
19     Q.    Right.  I'm not suggesting that
20 any one scientist is spending full time on
21 it, but the fact of the matter is that for
22 any given application, there are many
23 scientists and physicians that spend many
24 weeks and months reviewing that particular

Page 430

1  new drug application; is that a fair
2  statement?
3     A.    That's a fair statement.  I
4  guess we could -- depending -- how much time
5  they have to spend on it might be debatable,
6  but certainly you have many scientists who
7  spend substantial hours working on the new
8  drug applications contents.
9     Q.    Okay.  Fair enough.
10          Now, it says -- under the
11 review team, it says, "Chemists focus on how
12 the drug is made and whether manufacturing
13 controls and packaging are adequate to ensure
14 the identity, strength, quality and purity of
15 the product."  Is that consistent with your
16 understanding from your experience?
17          MR. WEBSTER:  Objection, form.
18     A.    I would disagree with this only
19 insofar as the following:  I would say it is
20 their goal to determine how the drug is made
21 and whether -- and the rest of the
22 description here of their activities and what
23 they hope to be able to do.
24          I mean, their ability to do it

Page 431

1  really depends on the quality of information
2  they receive.
3     Q.    (BY MR. PIORKOWSKI)  Okay.  Is
4  it your understanding, though, that chemists
5  generally focus on those issues we just
6  described?
7     A.    Well, they focus on them to the
8  degree that the content of the NDA permit
9  them to do it, yes.
10     Q.    Okay.  And if the NDA is
11 deficient because there's insufficient
12 information for any scientist to review his
13 or her section of the NDA, one of the options
14 the FDA has is to go back to the sponsor and
15 say, "We need additional information," right?
16     A.    That is an option, yes.
17     Q.    And it's actually an option
18 that often occurs, right?
19     A.    Well, I would say it occurs
20 sometimes.
21          MR. WEBSTER:  Objection, form.
22     Q.    (BY MR. PIORKOWSKI)  Okay.  And
23 is it your experience that there are
24 pharmacologists, typically, as a part of the

Page 432

1  review team, who evaluate the effects of
2  drugs on laboratory animals and short-term
3  and long-term studies?
4     A.    Yes, again to the degree that
5  the NDA allows them, yes.
6     Q.    Okay.  And is it your
7  experience that there are physicians who
8  evaluate the results of clinical tests,
9  including the drug's adverse as well as
10 therapeutic effects, and whether the proposed
11 label accurately reflects the effects of the
12 drug?
13     A.    Yes.
14     Q.    Okay.  Is it your experience
15 that pharmacokineticists evaluate the rate
16 and extent to which the drug's active
17 ingredient is made available to the body the
18 way it is distributed, metabolized and
19 eliminated?
20     A.    Again, to the degree -- same as
21 the physicians, to the degree -- to the
22 degree that the NDA allows them.
23     Q.    Okay.  And is it also your
24 experience that statisticians evaluate the

9 (Pages 429 to 432)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 433

1  designs for each controlled study and the
2  analysis and conclusions of safety and
3  effectiveness based on study data?
4     A.   Yes.
5     Q.   Okay.  Now, in some cases where
6  the FDA thinks that a drug is very promising,
7  it has the option to perform what's referred
8  to as an expedited review; is that right?
9     A.   Yes, except it's not -- I
10 didn't think there was so much that the drug
11 was promising as though as the -- there was
12 the belief that the therapy might meet an
13 unmet medical need.
14    Q.   Fair enough.  Is that -- well,
15 any therapy that might meet an unmet medical
16 need is probably fair to call it promising?
17    A.   Except here's an example.
18 Let's say that somebody's working on the
19 fifth ace inhibitor for blood pressure
20 control.  Well, the drug may be promising in
21 that it reduces blood pressure, but is it
22 really meeting an unmet medical need?  I
23 think that's the distinction.
24    Q.   Okay.  And that's discretionary

Page 434

1  on the FDA's part, right?  I mean, in other
2  words, they have the option of saying, "Yes,
3  we are going to review it in an expedited
4  fashion," or "No, we're not"?
5     A.   Yes.  It's not an option they
6  exercise independently.  The FDA is
7  malleable, and so the degree to which they
8  execute that option depends on the degree to
9  which they've been influenced.
10    Q.   Are you suggesting that people
11 at the FDA are paid off to be granted
12 expedited reviews?
13    A.   I'm not talking about financial
14 malleability.
15    Q.   Okay.
16    A.   But I'm talking about
17 administrative malleability.
18    Q.   Okay.  Well, so we're clear,
19 you don't have any information that anybody
20 at FDA is paid off to conduct expedited
21 reviews?
22       MR. WEBSTER:  Objection, form.
23    A.   I'm not -- I'm not suggesting
24 that that's true.

Page 435

1     Q.   (BY MR. PIORKOWSKI)  Okay.  I
2  just want to make sure we're clear.
3     A.   Right.
4     Q.   And when you say
5  "administratively malleable," can you explain
6  what you mean there?
7     A.   Well, I mean that the FDA
8  engages in conversations with drug companies
9  as to whether -- gaining the company, the
10 sponsor's, perspective on whether the review
11 should be expedited.  Sometimes the FDA hears
12 from Congress, and those are relatively
13 nonscientific concerns, but for the FDA they
14 are real concerns.
15    Q.   But there's nothing inherently
16 improper about the FDA being aware of the
17 manufacturer's views of its product prior to
18 deciding whether to conduct an expedited
19 review, is there?
20    A.   I would say this:  Being
21 aware -- certainly, there's no problem with
22 being aware.  I mean, the more the FDA is
23 aware, presumably the better position they're
24 in to make a fair determination.

Page 436

1        However, there's a difference
2  between being aware and being pushed; and in
3  my sense, that line is crossed commonly.
4     Q.   Can you give me an example of
5  when that line has been crossed, a specific
6  example that you're aware of?
7     A.   I think the line was crossed
8  with Rezulin.
9     Q.   And who at the FDA was pushed?
10    A.   I don't recall any particular
11 names.  I think, perhaps, I used to know, but
12 I don't know today.
13    Q.   Okay.  And is it important for
14 the FDA, whether it's scientific or not, if
15 there are groups of patients who, rightly or
16 wrongly, view a drug as potentially promising
17 or filling an unmet need -- is it good for
18 the FDA to be aware of those concerns?
19    A.   It's good for the FDA to be
20 aware of all concerns, and certainly concerns
21 of patients are -- are paramount; however,
22 not all patient concerns deal with an unmet
23 medical need.
24        Sometimes patient concerns deal

10  (Pages 433 to 436)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 437

1  with unanticipated adverse events, and those
2  types of patient concerns commonly don't rise
3  to the forefront when discussions are
4  being -- are undertaken about the
5  desirability or the utility of an expedited
6  review.
7      Q.    Okay. Would it be fair -- can
8  we agree that it's a useful thing for the FDA
9  to be aware of all concerns, whether the
10  concerns come from the manufacturer, from
11  Congress, from patients or from physicians?
12      A.    I think the FDA's -- the FDA's
13  designed to be that way. Are they better off
14  that way? I don't know.
15      Q.    Okay.
16      A.    They're certainly designed to
17  be that way.
18      Q.    All right. Fair enough.
19          Now, Vioxx was granted a
20  priority review, right?
21      A.    Yes.
22      Q.    And the reason that the FDA
23  thought Vioxx was promising, if you will, is
24  because it had the potential to reduce the

Page 438

1  risks of gastrointestinal toxicity associated
2  with nonselective nonsteroidal
3  anti-inflammatory drugs?
4      MR. WEBSTER:  Objection, form.
5      A.    Right. That was -- that was
6  the need the FDA believed would addressed by
7  these -- this class of drugs, by Vioxx.
8      MR. PIORKOWSKI:  Okay. I'm
9  sorry. What's the basis of the
10  objection, Jason?
11      MR. WEBSTER:  It does not --
12      MR. GALLAGHER:  He doesn't have
13  to tell you. All he has to say is
14  "form," and that's all he's permitted
15  to say.
16      MR. PIORKOWSKI:  No. He has to
17  tell me under Texas Rules, sir.
18      MR. WEBSTER:  Objection, form.
19          Can you read back the question
20  again?
21      MR. PIORKOWSKI:  He does.
22  That's the rules. Look them up.
23      (The following portion of the
24  record was read.)

Page 439

1      "QUESTION: The reason that the
2  FDA thought Vioxx was promising, if
3  you will, is because it had the
4  potential to reduce the risks of
5  gastrointestinal toxicity associated
6  with nonselective nonsteroidal
7  anti-inflammatory drugs?"
8      MR. WEBSTER:  Assumes facts not
9  within evidence.
10      MR. PIORKOWSKI:  Okay. Thank
11  you.
12      Q    (BY MR. PIORKOWSKI) Part of
13  your review, you said you looked at several
14  materials, review materials, that FDA medical
15  officers reviewed; is that right?
16      A.    That -- well, I looked at
17  several reviews that medical officers wrote,
18  yes, that they authored.
19      Q.    Okay. And, in particular, you
20  looked at reviews from the initial -- from
21  the initial review of the NDA at the time of
22  the initial approval, right?
23      A.    Yes.
24      MR. PIORKOWSKI:  Okay.

Page 440

1      (Whereupon, Deposition Exhibit
2  Moye MDL 12, Division of
3  Gastrointestinal and Coagulation Drug
4  Products, Medical Officer's Consult
5  Review, D2319.1 - D2319.113, was
6  marked for identification.)
7      Q    (BY MR. PIORKOWSKI) Let me
8  hand you what I've marked as Exhibit 12.
9      MR. PIORKOWSKI:  Here's a copy
10  for you, Jason.
11      Q    (BY MR. PIORKOWSKI) And ask
12  you: Is this one of the materials -- well,
13  let me represent what it is. Marked as
14  Exhibit 12, the "Division of Gastrointestinal
15  and Coagulation Drug Products, Medical
16  Officer's Consult Review." And it's
17  concerning rofecoxib, and the consultant is
18  Lawrence Goldkind, M.D.?
19      A.    Yes.
20      Q.    Okay. Is this one of the
21  materials that you reviewed in connection
22  with your review of the case?
23      A.    It is.
24      Q.    Okay. And just so we're clear,

11  (Pages 437 to 440)

Lemuel A. Moye, M.D., Ph.D.

Page 441

1  when a drug is approved -- I'm sorry. When a
2  drug is -- new drug application is submitted,
3  there's a particular division within the CDER
4  to which that new drug application is
5  assigned, right?
6      A.   Yes.
7      Q.   Okay. And which division was
8  Vioxx assigned to?
9      A.   It was assigned to
10  rheumatology.
11     Q.   The arthritis --
12     A.   Right.
13     Q.   -- and so forth? Okay.
14         And this consult is from the
15  gastroenterology division, right?
16     A.   Yes.
17     Q.   Okay. And one of the tools
18  that the reviewing division has at its
19  disposal at FDA is the ability to obtain
20  consults with specialists in other divisions;
21  is that right?
22     A.   Yes.
23     Q.   So, for example, this division
24  that Dr. Goldkind is in has expertise in

Page 442

1  gastroenterology, right?
2      A.   Yes.
3      Q.   And so if there's a
4  gastroenterology safety issue, it might be a
5  good idea for them to consult with somebody
6  who has specialized knowledge in
7  gastroenterology?
8      A.   Yes.
9      Q.   That's fair? Okay.
10         Now, Dr. Goldkind -- let me ask
11  you to turn to page D2319.6. He's describing
12  the background of this application, right?
13     A.   He is.
14     Q.   And he says, quote,
15  "NSAID-induced gastrointestinal side-effects
16  are the most frequently reported adverse
17  drug-related events in the United States."
18  Did I read that correctly?
19     A.   Yes.
20     Q.   Okay. Do you agree with that
21  at the -- or let me -- is that a correct
22  statement based on your understanding as of
23  the time that Dr. Goldkind conducted this
24  review?

Page 443

1      A.   I can't say one way or the
2  other whether I agree with this.
3      Q.   Okay.
4      A.   I don't know how he determined
5  it's the most frequently reported ADE.
6      Q.   Okay. Fair enough.
7         You haven't done a study to
8  determine that he's wrong. You just don't
9  know one way or the other?
10     A.   That's right.
11     Q.   Okay. And then he goes on to
12  say, quote, "Although most of these are
13  minor, adverse events such as symptomatic
14  ulcer, perforation and bleeding are reported
15  to occur in 2 to 4% of patients on chronic
16  therapy." Did I read that correctly?
17     A.   Yes.
18     Q.   Okay. Now, do you have any
19  basis to disagree with Dr. Goldkind's
20  statement about the percentage of patients on
21  chronic therapy who develop symptomatic
22  ulcers, perforations and bleeds?
23     A.   I don't -- I haven't done my
24  own study, so I can neither confirm nor deny

Page 444

1  this range of 2 to 4%.
2      Q.   Okay. Fair enough.
3         Just so I'm clear, as a part
4  of -- in connection with your review of the
5  case, and I know you looked at a lot of
6  different things, but did you conduct a
7  separate medical literature review on the
8  subject of NSAID-induced gastrointestinal
9  problems?
10     A.   No. I read some articles on
11  it, but I haven't conducted my own separate
12  comprehensive review.
13     Q.   And are the articles that you
14  read included in the reference list at the
15  end of your report?
16     A.   Of my affidavit, yes.
17     Q.   Okay. Did you come to any
18  independent assessment about the absolute
19  risk of serious GI problems on patients using
20  nonselective NSAIDs, chronically?
21     A.   The only one I came to was
22  fairly -- was a qualitative one, and that is
23  that they are relatively infrequent.
24     Q.   Relatively infrequent?

12  (Pages 441 to 444)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 445

1    A.   Infrequent.
2    Q.   And what does that mean?
3    A.   That means that not only do
4    most patients who take NSAIDs not have these
5    serious problems, but very few patients have
6    these serious problems. There's no denying
7    that some do.
8    Q.   Okay. And by "very few," do
9    you have a percentage in mind? I mean, are
10   you talking about less than 5%, less than 1%,
11   less than .1%?
12       MR. WEBSTER: Objection, form.
13   A.   No. I guess I was thinking
14   less than 3%.
15   Q.   (BY MR. PIORKOWSKI) Less than
16   3%. Okay.
17       And from your perspective, less
18   than 3% would be a relatively infrequent
19   incidence of a side-effect for a chronic
20   drug?
21       MR. WEBSTER: Objection, form.
22   A.   Yes.
23   Q.   (BY MR. PIORKOWSKI) Okay.
24   Now, you see at the bottom of -- of the

Page 446

1    page 6 there, it says the, "The broad" --
2    quote -- it says, quote, "The broad-based
3    usage of NSAIDs for acute and chronic pain in
4    the general population as well as in the
5    large population of arthritis patients
6    translates into a large absolute number of
7    serious complications. It has been estimated
8    that at least 2600 deaths and 20,000
9    hospitalizations per year in the United
10   States can be attributed to NSAID use in
11   rheumatoid arthritis patients alone." Did I
12   read that correctly?
13   A.   Yes, you read it correctly.
14   Q.   Okay. Do you have any basis to
15   dispute Dr. Goldkind's statement in that
16   respect?
17   A.   Well, I don't have any -- any
18   basis to dispute the second statement that
19   you read, "It's estimated that at least" --
20   that begins with, "It has been estimated that
21   at least 26,000 deaths."
22   Q.   I'm sorry. 2600 deaths.
23   A.   2600 deaths.
24   Q.   Right.

Page 447

1    A.   I'm sorry.
2        20,000 hospitalizations. Thank
3    you.
4    Q.   Okay. So you have no basis to
5    dispute that sentence?
6    A.   Yeah. The first sentence
7    ending with the -- ending the second line
8    there "translates into a large absolute
9    number of serious complications," that's
10   relative.
11   Q.   Because we don't know what
12   "large" means?
13   A.   Right.
14   Q.   But we can agree that there's
15   no -- at least you don't have any basis to
16   dispute that it's been estimated that at
17   least 2600 deaths and 20,000 hospitalizations
18   per year in the United States can be
19   attributed to NSAID use in rheumatoid
20   arthritis patients alone?
21   A.   Well, I can't agree or disagree
22   with that. I mean, he references item 7. I
23   don't know what that is.
24   Q.   Okay.

Page 448

1    A.   But I don't -- I just can't
2    comment on that one way or the other.
3    Q.   All right. But you don't have
4    any other study to say it's too high, it's
5    too low, anything like that?
6    A.   Well, actually, I think I did
7    refer in my affidavit to a statement that I
8    thought actually came from Merck. I don't
9    remember what the numbers were in that
10   statement. I guess we'd have to compare them
11   to what we've got here, 2600 deaths and
12   20,000 hospitalizations per year.
13   Q.   Right. Well, you actually did
14   refer to that statement, and I guess my
15   question about the statement in your report
16   was: Were you adopting Merck's statement as
17   accurate, or were you just simply saying
18   that's what Merck said?
19       MR. WEBSTER: Objection, form.
20       MR. PIORKOWSKI: Was my
21   question unclear?
22       THE WITNESS: No. I'm sorry.
23   Were you talking to me?
24       MR. PIORKOWSKI: Yes.

Golkow Litigation Technologies - 1.877.DEPS.USA

Lemuel A. Moye, M.D., Ph.D.

Page 449

1    THE WITNESS: Okay.
2        MR. PIORKOWSKI: Let me
3    withdraw the question and rephrase it.
4        THE WITNESS: Okay. Sure.
5        Q    (BY MR. PIORKOWSKI) There is a
6    statement in your report where you reference
7    a statement made by Merck about what the GI
8    risks associated with NSAID use are.
9        A    Right.
10       Q    Okay. Are you -- were you
11   intending to adopt that statement as being
12   correct and accurate, or were you simply
13   stating as a fact that that's what Merck
14   said?
15       A    You know, probably best to look
16   in my affidavit at this point.
17       Q    I tell you what: Since we
18   don't have -- since we -- we'll get a copy on
19   the break, and we'll come back to that.
20       A    Okay. Okay.
21       Q    Now, the next sentence says,
22   "Put another way, the chance of
23   hospitalization or death from a
24   gastrointestinal adverse event is 1.3 to 1.6%

Page 450

1    per year in patients with rheumatoid
2    arthritis known to be taking NSAIDs." Did I
3    read that correctly?
4        A    Yes, you did.
5        Q    Do you have any basis to
6    dispute that statement?
7        A    Yeah, I can't comment one way
8    or another about this.
9        Q    Okay. Does that sound out of
10   line with other materials that you've read?
11       A    It does not, no.
12       Q    Is that consistent with your
13   view about relatively infrequent events being
14   less than 3%?
15       A    Yes.
16       Q    Okay. Is it -- you would agree
17   with me that that is not -- that -- well,
18   first of all, some of the materials you read
19   were trial transcripts, right?
20       A    Yes, sir.
21       Q    Okay. You'd agree with me that
22   when we're talking about symptomatic ulcers
23   and perforations and bleeds, that we are
24   talking about serious adverse events, right?

Page 451

1        A    In that --
2            MR. WEBSTER: Objection, form.
3        A    In that category of, right.
4        Q    (BY MR. PIORKOWSKI) Right.
5    And we're talking about events that in some
6    cases, are life-threatening, right?
7        A    I would say in rare cases are
8    life-threatening.
9        Q    Okay. But at least according
10   to Dr. Goldkind, there's at least 2600 deaths
11   a year in rheumatoid arthritis patients who
12   are using NSAIDs chronically as a result of
13   gastrointestinal toxicity, right?
14       A    Well, that's interesting. You
15   know, this statement, if I'm reading this
16   correctly, beginning with "The broad-based
17   use of NSAIDs," down to "can be attributed to
18   NSAID use in rheumatoid arthritis patients
19   alone," he doesn't say in here that these are
20   gastrointestinal-related deaths, right, or
21   hospitalizations?
22       Q    Well, actually, I think he
23   does.
24       A    Where? Did I miss that?

Page 452

1    Did --
2        Q    Well, the whole section
3    beginning with the second line is discussing
4    adverse events.
5        A    Well -- but there's no question
6    he's discussing adverse events, but we begin
7    talking about GI side-effects, right? The
8    first line actually kind of lays out the --
9    if you will, the topic sentence for the
10   paragraph. But, "The broad-based use of
11   NSAIDs" -- next paragraph. It's not
12   indented, but -- The broad-based use of
13   NSAIDs for acute and chronic pain based on a
14   large population of arthritis patients
15   translate into a large absolute number of
16   serious complications."
17           It doesn't say whether these
18   are GI.
19       Q    Do you know -- well, let me ask
20   you along that line, then: What other risks
21   of death are associated with NSAID use, to
22   your knowledge?
23       A    Well, I mean -- I mean,
24   anaphylaxis is one. Again, very rare. But

14 (Pages 449 to 452)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 453

1 he doesn't say what he's talking about. I'm
2 just raising the question that he's not being
3 clear about what the source of these deaths
4 and hospital- -- the cause of the deaths and
5 hospitalizations.
6    Q.    The very first sentence of the
7 very first paragraph, though, talks about
8 NSAID-induced gastrointestinal side-effects,
9 right?
10    A.    There's no question about that.
11 I mean, I certainly don't dispute that. I'm
12 just saying the second paragraph, he doesn't
13 say anything at all -- well, until the next
14 sentence about GI adverse events.
15    Q.    Right.
16    A.    So I don't know whether this
17 2600 deaths and 20,000 hospitalizations, even
18 though let's suggest that they were
19 attributed to NSAIDs and use -- and NSAID use
20 in rheumatoid arthritis patients, it doesn't
21 say that they're GI. This is probably all
22 dealt with very easily by looking at
23 reference 7.
24    Q.    Okay.

Page 454

1    A.    That's where this comes from.
2    Q.    But putting aside the 2600
3 deaths and the 20,000 hospitalizations, it's
4 clear that his estimate of 1.3 to 1.6% per
5 year hospitalization or death rate is due to
6 gastrointestinal side-effects of NSAIDs?
7    A.    Yes.
8    Q.    Okay.
9    A.    That's clear, right.
10    Q.    Okay. And presumably, to your
11 knowledge, this is -- this was not -- this
12 was not a secret back in 1999, right? This
13 was common knowledge among physicians, that
14 chronic use of nonsteroidal anti-inflammatory
15 drugs had as a potential side-effect of
16 serious gastrointestinal problems, right?
17    A.    Right. In the uncommon
18 occurrence of serious gastrointestinal
19 problems, that's right.
20    Q.    Right.
21       And, in fact, you prescribed
22 NSAIDs, and one of the reasons that you did
23 not prescribe NSAIDs chronically is because
24 you were concerned about not giving a patient

Page 455

1 a risk for one of -- for this very
2 side-effect, right?
3    A.    Well, that's one reason, right.
4 That's one reason, yes.
5    Q.    Okay. All right. And I assume
6 that doctors would have to have a pretty good
7 reason for prescribing a drug. In other
8 words, they'd have to have an expectation
9 that this drug was working or would improve
10 function to accept a risk of 1.3 to 1.6% of
11 hospitalizations or death per year?
12    A.    I would say there is a
13 risk-benefit calculation that doctors do
14 based on what whatever information that they
15 have available; and physicians believe that
16 for these NSAIDs, if used carefully and
17 wisely and taken wisely, that, in fact, they
18 might be able to keep this risk small.
19    Q.    Do you know whether -- whether
20 patients who have serious bleeds, meaning
21 resulting in hospitalization or death,
22 whether they have warning signs consistently
23 prior to their bleeding episode?
24    A.    Well, anything I would have to

Page 456

1 say would have to be prefaced by the comment
2 that every patient presents differently,
3 okay?
4    Q.    Okay.
5    A.    Having said that, though, it is
6 the rare patient who has absolutely no
7 history of gastrointestinal symptoms and then
8 can't be aroused the next day because they're
9 bleeding acutely into the GI tract. That's
10 the rare patient.
11    Q.    Do you know whether the
12 literature does describe such patients?
13    A.    Oh, I believe it probably does,
14 yes.
15    Q.    Okay. Do you know whether --
16 is it fair to say that all patients using
17 chronic NSAIDs are potentially at risk of
18 gastrointestinal side-effects?
19    A.    Well, not knowing anything else
20 about the patient --
21    Q.    Right.
22    A.    -- you have to believe, I mean,
23 just from a safety perspective, that patients
24 who are placed on these therapies are being

Lemuel A. Moye, M.D., Ph.D.

Page 457

1  placed at risk for these kinds of serious
2  gastrointestinal problems.
3      Q.    When we're talking about these
4  things like bleeding ulcers and perforations
5  and so forth, you'd agree with me that it
6  would be somewhat callous of somebody to
7  characterize those as being tummy aches?
8          MR. WEBSTER: Objection, form.
9          MR. WACKER: Objection.
10     A.    Well, if we're talking about
11  obstructions -- upper GI obstructions, acute
12  perforations and bleeds, we have to be very
13  careful. I mean, patients will -- sometimes
14  will come in and just absolutely minimize
15  their symptoms. So somebody can have a
16  massive heart attack and say they have a
17  little bit of chest discomfort, I mean. So I
18  don't know that I would say one way or the
19  other about tummy aches. I would say this:
20  That is not how I personally would
21  characterize it.
22     Q.    (BY MR. PIORKOWSKI) And that's
23  not how a doctor would fairly characterize a
24  peptic ulcer or a bleed, right?

Page 458

1          MR. WEBSTER: Objection, form.
2      A.    Again, it depends. You have to
3  try to use every possible way to get through
4  to a patient and have them understand. And
5  sometimes, I suppose, you might make -- a
6  physician might make better headway with a
7  patient who doesn't understand the nuances of
8  this and rather than say "perforated ulcer,"
9  may say, "You have a severe tummy ache that
10  needs attention."
11     Q.    (BY MR. PIORKOWSKI) Okay.
12     A.    I don't know.
13     Q.    Fair enough.
14          And if you're talking to a
15  patient, you need to put it in the patient's
16  language?
17     A.    Right.
18     Q.    That's what you're saying,
19  right?
20     A.    Yes.
21     Q.    But if a lawyer were to stand
22  up in court and say the only side-effects
23  associated with NSAID use chronically are a
24  few tummy aches, you agree with me that would

Page 459

1  not be a fair characterization?
2          MR. WEBSTER: Object to form.
3          MR. BLIZZARD: Objection.
4      A.    Well, I would just say -- I
5  mean -- I can talk about what's appropriate
6  for doctors to say, a little less competent
7  about what's appropriate for lawyers to
8  say --
9      Q.    (BY MR. PIORKOWSKI) Okay.
10     A.    -- in a given circumstance.
11     Q.    Fair enough.
12     A.    But it certainly is not a term
13  I would use.
14     Q.    Certainly. Okay. Thank you.
15          Now, at the time that the Vioxx
16  new drug application was submitted, the FDA
17  understood that Vioxx was not completely free
18  from GI side-effects, right?
19     A.    Yes, that's right.
20     Q.    In other words, Merck never
21  represented Vioxx as being free of
22  gastrointestinal toxicity, right?
23     A.    That's true.
24     Q.    Vioxx still had more

Page 460

1  side-effects, for example, than placebo?
2      A.    Yes.
3      Q.    And that would be sort of the
4  benchmark. If you're trying to evaluate your
5  product and say, "Does my product have any
6  effects," you really have to have a
7  comparison to placebo to say that?
8      A.    Yes. And just so we can be
9  clear, we're talking about gastrointestinal
10  side-effects now.
11     Q.    Well, really, that's true with
12  any side-effects, right? I mean, in other
13  words, in order to tell what your product --
14  how your product compares to no product,
15  that's really a placebo-controlled trial
16  that's going to tell you that?
17     A.    A couple of things. Certainly
18  that's true a placebo-controlled trial tells
19  you that, but I thought your question was
20  about what did Merck represent to the FDA
21  about the occurrence of gastrointestinal
22  side-effects.
23     Q.    That was my original question.
24  I thought you answered that.

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 461

1    A.    Okay. All right.
2    Q.    Okay. And then my next
3  question was that the type of -- that if you
4  compared -- when you compared the cases of
5  Vioxx in the clinical trials between Vioxx
6  use and placebo use, you still had an
7  increase in Vioxx use in terms of GI events?
8    A.    Yes.
9    Q.    Right?
10   A.    Right.
11   Q.    All right. And then my next
12  question was that a placebo-controlled trial
13  is really the type of trial that would give
14  you the best information on that --
15   A.    Yes.
16   Q.    -- question, right?
17   A.    Yes.
18   Q.    Okay. Now -- but the reason
19  Vioxx was viewed to be promising was because
20  it had the potential for greatly reduced GI
21  side-effects compared to nonselective NSAIDs;
22  fair?
23        MR. BLIZZARD: Object to form.
24        MR. WEBSTER: Object to form.

Page 462

1    A.    Well, certainly it had the
2  potential for reduced GI side-effects.
3    Q    (BY MR. PIORKOWSKI) Okay.
4  Well, at the time of the new drug
5  application, the studies that had been
6  performed and were submitted and were
7  reviewed by the FDA showed endoscopically
8  that there were less ulcers in Vioxx users
9  compared to nonselective NSAID users, right?
10   A.    Yes.
11   Q.    Okay. And so we're clear on
12  what an endoscopy is -- I assume we are, but
13  just for the purposes of making sure we're on
14  the same page --
15   A.    Uh-huh.
16   Q.    -- endoscopy is where they take
17  a fiberoptic scope or a tube, right --
18   A.    Yes.
19   Q.    -- and they insert it down
20  through the esophagus, and they look directly
21  at the lining of the stomach?
22   A.    Yes.
23   Q.    And they can see whether there
24  are erosions or not, right?

Page 463

1    A.    Yes.
2    Q.    And when they did that in the
3  clinical studies, there were significantly
4  less erosions in Vioxx patients than there
5  were in nonselective NSAID patients, right?
6    A.    Yes. Right.
7         The question that they had was
8  whether in sort of in a longer-term
9  situation, that would actually translate into
10  lower bleeds and ulcers and perforations.
11        MR. BLIZZARD: Object to form.
12   A.    Yes, the concern was that the
13  endoscopy -- endoscopic findings were
14  surrogates.
15   Q    (BY MR. PIORKOWSKI) Right.
16   A.    And surrogates are not always
17  reliable.
18   Q.    Might be; might not be, right?
19   A.    Right.
20   Q.    But at least you'd agree with
21  me that, based on the endoscopic findings,
22  there was certainly a good-faith scientific
23  basis to believe that Vioxx offered promise
24  in terms of lower GI side-effects?

Page 464

1    A.    But this is not faith here, and
2  surrogate endpoints are notoriously
3  unreliable. And so there -- I would say -- I
4  would say this: There was hope that there
5  would be, but there was suspicion that there
6  would not be.
7    Q.    Well, and, in fact, the FDA did
8  not allow Merck on the basis -- even though
9  they had demonstrated improved risk from
10  endoscopic studies, the FDA didn't allow
11  Merck to change the label to make it
12  different from the other nonselective NSAIDs,
13  did it?
14        MR. WEBSTER: Objection, form.
15   A.    In regarding the reduced GI
16  serious side-effects, that's correct.
17   Q    (BY MR. PIORKOWSKI) Right,
18  back in May of 1999, so we're clear on the
19  time frame.
20   A.    Yes.
21   Q.    And that's the reason that the
22  VIGOR study was undertaken eventually, right?
23   A.    Yes.
24   Q.    Okay. Now, so I'm clear on

17 (Pages 461 to 464)

165470b8-f920-4da9-843f-90cc143762f6