Lemuel A. Moye, M.D., Ph.D.

Page 465

1  your report, you're not suggesting that if a
2  drug can reduce gastrointestinal toxicity by
3  half, that's not -- that that is not very --
4  well, bad question. Let me start over.
5       You would agree that if a
6  drug -- even if a drug has some degree of
7  gastrointestinal toxicity, if it's capable of
8  reducing the incidence of ulcerations, bleeds
9  and perforations by 50%, that that's -- that
10 would be an important benefit?
11      MR. BLIZZARD: Objection, form.
12      MR. WEBSTER: Objection, form.
13 A.   As you've stated the question,
14 I must disagree with it for two reasons:
15 Number 1, I can't presume it's doing this
16 safely. Number 2, it depends on what the
17 underlying rate of serious gastro- -- serious
18 upper gastrointestinal side-effects are. By
19 that -- if we could have an agreement that
20 we're talking about bleeds, ulcers and -- I
21 mean, bleeds, perforations and obstructions,
22 that's what I mean with "serious upper
23 gastrointestinal events."
24      If we're talking about a 50%

Page 466

1  reduction from, let's say, one in 1,000, then
2  I'd say, "Well, maybe it's not worth it." If
3  we're talking about a serious reduction from
4  a higher number, then, perhaps, it is. So
5  those are the two reasons I would disagree
6  with you.
7  Q    (BY MR. PIORKOWSKI) Okay.
8  Well, let's see if we can reach agreement on
9  a couple of things.
10      If we're not dealing with a
11 number like one in 1,000, if we're dealing
12 with a number like what Dr. Goldkind cites,
13 which is one to three -- I'm sorry, 1.3 to
14 1.6% per year of patients who are
15 hospitalized or die from gastrointestinal
16 events, would you agree with me, first of
17 all, that reducing that by half would be a
18 valuable and important public health benefit?
19      MR. WEBSTER: Objection, form.
20 A.   No, I would not.
21 Q    (BY MR. PIORKOWSKI) It would
22 not be?
23 A.   Because, again, we're not
24 saying --

Page 467

1  Q.   Well --
2  A.   -- safe reduction.
3  Q.   -- I'm coming back to that.
4  A.   Okay.
5  Q.   I didn't ask you using Vioxx.
6  I said, would you -- my only question is:
7  Would you agree that reducing a 1.3 to 1.6%
8  rate of hospitalization or death is a
9  laudable public health goal, if it can be
10 done safely?
11      MR. BLIZZARD: Objection, form.
12      MR. WEBSTER: Objection, form.
13 A.   Ah. If it can be done safely,
14 I would say yes.
15 Q.   (BY MR. PIORKOWSKI) Okay.
16 Okay. But so I'm clear, you're not saying
17 that it doesn't matter what the rate of
18 gastrointestinal -- of serious
19 gastrointestinal events is because it's so
20 small that it's inconsequential. You would
21 recognize a reduction from 1% to 1/2% as a
22 valuable public health goal, if it could be
23 achieved with no greater risk?
24      MR. BLIZZARD: Object to form.

Page 468

1  A.   If achieved safely, yes.
2  Q    (BY MR. PIORKOWSKI) Okay. All
3  right. Now, the FDA did, in fact, review the
4  Vioxx new drug application, right?
5  A.   Yes, they did.
6  Q.   And based on your review, they
7  had the same kind of team of scientists that
8  we talked about before review the new drug
9  application, right?
10 A.   Yes.
11 Q.   So, in other words, there were
12 physicians, chemists, pharmacologists,
13 pharmacokineticists and statisticians that
14 reviewed and had input on the Vioxx new drug
15 application, right?
16 A.   Yes.
17 Q.   And would you agree with me
18 that they conducted a careful review?
19      MR. WEBSTER: Objection, form.
20 A.   I would agree that they
21 conducted as careful a review as they could,
22 but I think that these review teams are
23 chronically overworked and, therefore, are
24 not able to review the complete NDA in all

18 (Pages 465 to 468)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 469

1  detail.
2          MR. JOSEPHSON: Objection to
3      the responsiveness.
4      Q    (BY MR. PIORKOWSKI) Do you
5  have any personal knowledge that any --
6  anyone involved in the review process for the
7  Vioxx new drug application did not have
8  sufficient time to perform their duties?
9      A    I have no specific information
10  about any one reviewer reviewing this NDA.
11  My comment was a general comment about the
12  workload and constraints within the FDA.
13      Q    Generally speaking?
14      A    Generally speaking, yes.
15      Q    And certainly there's nothing
16  in any of the materials that you reviewed
17  that -- where an FDA reviewer said, "I had
18  insufficient time to conduct this review, I
19  wish I had more time," anything of that
20  nature?
21      A    I have nothing like that.
22      Q    Okay. I'd ask you to turn to
23  page -- you remember the first FDA document
24  we looked at?

Page 470

1      A    Yes.
2      Q    Yes.
3      A    Exhibit 11?
4      Q    Exhibit 11. Could you turn to
5  page 33 for me, please.
6      A    (Witness complies.)
7      Q    And do you see the initial
8  language there where it says, quote, "Under
9  current law, all new drugs need proof that
10  they are effective and safe before they can
11  be approved for marketing"?
12      A    I do.
13      Q    Did I read that correctly?
14      A    You did, yes.
15      Q    Okay. Is that your
16  understanding of the current law with respect
17  to the standards that the FDA needs to employ
18  in approving a drug for marketing?
19      A    Yes.
20      Q    Okay. And then the second
21  sentence says, quote, "No drug is absolutely
22  safe. There is always some risk of an
23  adverse reaction." Did I read that
24  correctly?

Page 471

1      A    Yes.
2      Q    And do you agree with that?
3      A    Yes.
4      Q    Okay. And when it says,
5  "However, when a proposed drug's benefits
6  outweigh known risks, the FDA's Center For
7  Drug Evaluation and Research, CDER, considers
8  it safe enough to approve" -- now, do you
9  agree that that is the FDA's position about
10  approval?
11      A    Well, that's what they say --
12      Q    Okay.
13      A    -- so I guess I do.
14      Q    Okay. Do you -- I guess I'm
15  asking because, you know, I want to make sure
16  that you're not going to, you know, come into
17  court and say, "I have a different
18  understanding, you know. That's not really
19  right."
20      A    Well, it is their goal.
21      Q    Okay.
22      A    But what undermines this all is
23  that the FDA doesn't -- is not able to
24  determine level of safety, commonly.

Page 472

1          MR. JOSEPHSON: Objection,
2      responsiveness.
3      Q    (BY MR. PIORKOWSKI) Okay. You
4  see on page 34 in the third column on the
5  right, the second full paragraph?
6      A    Second full paragraph. Okay.
7  However -- "Whenever an NDA"?
8      Q    Right. Right.
9          It says, "Whenever an NDA is
10  submitted to CDER, the center lists it in a
11  computer database that is monitored by FDA's
12  division of scientific investigations, the
13  division assigns field reviewers to make
14  on-site inspections to verify that the work
15  cited in the NDA is valid."
16          Is that consistent with your
17  experience on the FDA Advisory Committee?
18      A    If the suggestion here is that
19  field reviewers audit the majority of the
20  components of the NDA, then I would disagree
21  with that. I mean, I certainly -- my
22  understanding is that sometimes there are
23  on-site inspections and audits.
24      Q    Is it your understanding that

19 (Pages 469 to 472)

Golkow Litigation Technologies - 1.877.DEPS.USA

Lemuel A. Moye, M.D., Ph.D.

Page 473

1  for any given new drug application, that the
2  FDA conducts some audits, at a minimum, of
3  the clinical trial sites on a random basis to
4  ensure that the manner in which the data were
5  gathered were accurate?
6      A.   No. No.
7      Q.   Your understanding is that they
8  usually do not conduct --
9      A.   I can't say "usually." I can
10 say that many times, they do not.
11     Q.   And what -- how do you know
12 that?
13     A.   Well, because I was involved in
14 clinical trials that led to NDAs and sNDAs,
15 and there were no FDA audits.
16     Q.   Maybe you misunderstood my
17 question. I'm not asking you whether FDA
18 audits every single clinical trial in every
19 single new drug application.
20     A.   Right.
21     Q.   Okay.
22     A.   Right.
23     Q.   What I'm asking you is: For
24 any given new drug application --

Page 474

1      A.   Okay.
2      Q.   -- the FDA conducts some audits
3  of some of the clinical trials to ensure that
4  the data collection was done in an
5  appropriate way; is that true?
6          MR. GALLAGHER: Object to form.
7      A.   Again, I have to disagree with
8  that. They certainly have the option to do
9  that and I believe they do it sometimes, but
10 there are NDAs in which there have been no
11 audits of clinical -- no FDA audits of
12 clinical trials. Now, there have been other
13 audits, but not FDA audits.
14     Q    (BY MR. PIORKOWSKI) Do you
15 know of any products for which there have
16 been no audits at the time of the NDA that
17 you can cite?
18     A.   Well, at the time of the sNDA.
19     Q.   Well, now, my question was the
20 original NDA, an original NDA, not an sNDA.
21     A.   Okay.
22     Q.   If I asked the question just
23 limited to a new drug application, would you
24 agree with me that the FDA routinely conducts

Page 475

1  at least some audits of the clinical trial
2  sites as a part of its review of the new drug
3  application?
4      A.   I guess I'd have to disagree
5  with that, and -- just to say that they can
6  do it, how frequently they do it, I don't
7  know. Whether every NDA has at least some
8  FDA audit presence, I don't know.
9      Q.   Okay. You just -- it's
10 something that's -- you haven't had
11 involvement with directly?
12     A.   With NDAs, right. That's
13 right.
14     Q.   Or with audits, particularly?
15     A.   With FDA audits.
16     Q.   Right.
17     A.   That's correct.
18     Q.   All right. On page -- still on
19 page 34, the next paragraph, it says, "If
20 CDER's evaluation of studies reveals major
21 deficiencies, substantially more work by the
22 sponsor may be needed, ranging from further
23 analyses to the conduct of new studies --
24 either case extends the evaluation time and

Page 476

1  delays approval."
2          Is that consistent with your
3  experience in terms of the way the process
4  works?
5      A.   Well, it's a very soft
6  statement, so I guess I would just say that
7  certainly the FDA, if they -- has the power
8  to declare that studies are deficient, and
9  that puts the onus on the sponsor to make up
10 the deficiency, and that can take more time.
11 They certainly have the power to do that.
12         MR. PIORKOWSKI: Fair enough.
13 I'm advised that we have -- we're out
14 of tape, so we need to change tapes,
15 so probably a good time for a break,
16 Jason?
17         MR. WEBSTER: Sure.
18         THE VIDEOGRAPHER: Off the
19 record at 9:12.
20         (Recess taken, 9:12 a.m. to
21 9:26 a.m.)
22         THE VIDEOGRAPHER: On the
23 record at 9:26.
24     Q    (BY MR. PIORKOWSKI) Doctor,

20 (Pages 473 to 476)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

---

**Page 477**

1  during our first session, we -- you alluded
2  to something in your report about the risks
3  of GI hospitalizations and deaths. Do you
4  remember that?
5      A.    I do.
6      Q.    We didn't have a copy of your
7  report at our fingertips.
8      A.    Right.
9      Q.    Can you turn to page 58 of your
10  report, paragraph 159, tell me if that's what
11  you're referring to?
12      A.    Actually, no.
13      Q.    Okay. Well, let me just ask
14  you a specific question.
15      A.    Sure. Okay.
16      Q.    In your report on page 58, in
17  paragraph 159, about seven lines down --
18      A.    Yes.
19      Q.    -- there's a statement that
20  says, quote, "Estimates are that more than
21  100,000 hospitalizations and 16,500 deaths
22  each year in the United States occur as a
23  result of NSAID use," end quote. Now, did I
24  read that correctly?

---

**Page 478**

1      A.    Yes, you did.
2      Q.    Okay. Do you accept that
3  statement as true?
4      A.    No. Actually, I think that's
5  an overstatement. That's why I said that
6  wasn't the statement I was talking about.
7      Q.    But why --
8      A.    But it's an overstatement.
9      Q.    Okay. Why did you put it in
10  your report, if it's an overstatement?
11      A.    Because it was the first
12  original estimate I had, but I found an
13  estimate that I thought was much more
14  realistic; and it's that that I'm looking for
15  and that that I can't find.
16      Q.    Okay. On what basis did you
17  determine that this was unrealistic or
18  overstated?
19      A.    Well, no. I had another
20  reference. I don't think it was the
21  reference that was referenced in the medical
22  review. I had another reference. But this
23  reference was -- certainly appeared in the
24  literature, but it's obsolete.

---

**Page 479**

1      Q.    Okay. Well, when I -- okay.
2          And why -- why would you
3  include it in your report if it was obsolete?
4      A.    Well, actually, I thought I had
5  taken it out.
6      Q.    Okay.
7      A.    Yeah. I mean, and -- well, I
8  believed I had, but this is still there,
9  so...
10          But there or not, it's
11  obsolete.
12      Q.    And "obsolete," you mean the
13  data are old; is that what you're saying?
14      A.    Yeah, and -- yeah, the data are
15  old, and the methodology that was used
16  wasn't -- wasn't as reliable as a newer
17  estimate that was produced that showed that
18  there were 16 -- primarily, the 16,500 deaths
19  per year, that's an overestimate.
20      Q.    Okay. Do you know what the
21  actual number of deaths per year is?
22      A.    Actually, I can get it for you,
23  but I don't have it for -- I don't remember
24  right now. That's why I wanted to look here

---

**Page 480**

1  and see.
2      Q.    Okay. All right. Maybe you
3  can find it over our lunch break or
4  something, all right?
5      A.    Sure.
6      Q.    Okay. Can we go back to
7  Exhibit 11, please?
8      A.    Exhibit 11, yes.
9      Q.    And turn to the page that ends
10  with 35, please. And do you see on the
11  right-hand side of the page, there's a
12  section called "Final Actions"?
13      A.    Yes.
14      Q.    Okay. And then it says, quote,
15  "In the final analysis, CDER's decision
16  whether to approve a new drug for marketing
17  boils down to two questions: One, do the
18  results of well-controlled studies provide
19  substantial evidence of effectiveness? Two,
20  do the results show the product is safe under
21  the condition of use in the proposed label?
22  'Safe' in this context means that the benefit
23  of the drug -- the benefits of the drug
24  appear to outweigh its risks." Okay.

---

21 (Pages 477 to 480)

Lemuel A. Moye, M.D., Ph.D.

Page 481

1    Did I read that correctly?
2    A.    Yes.
3    Q.    Okay.  Do you agree that that
4  is the analysis that the FDA undertakes when
5  it makes a decision as to whether or not to
6  approve a product?
7    A.    It's their goal to make those
8  determinations.
9    Q.    Okay.  Their definition of
10  "safety," where they say, "'Safe' in this
11  context means that the benefits of the drug
12  appear to outweigh its risks," is that the
13  same definition of "safety" that you use, or
14  do you have a different definition?
15    A.    Well, this is the definition
16  that's used commonly in -- by FDA, public
17  health physicians, so I have no -- I have no
18  different definition.
19    Q.    You have no different
20  definition?
21    A.    That's right.
22    Q.    Okay.  And then in the next --
23  it goes on to say, "When the review is
24  complete, CDER writes the applicant to say

Page 482

1  the drug is approved for marketing; it is
2  approvable, provided minor changes are made;
3  or is not approvable because of major
4  problems."  Did I read that correctly?
5    A.    You did.
6    Q.    And is it your understanding
7  that those are the options that are available
8  to CDER when a new drug application is
9  presented?
10    A.    Yes.
11    Q.    Okay.  You would agree with me
12  that just simply because the manufacturer
13  pays user fees does not mean that the drug
14  automatically gets approved if it doesn't
15  meet CDER's standards?
16    A.    There is no sine qua non.
17  There is no firm link between the two.  But
18  there -- but when you have human interactions
19  and money, things do not always go as
20  originally intended by the law.
21    Q.    So is that a way of saying,
22  yes, I'm correct that the fact that you pay
23  user fees does not automatically mean that
24  the drug gets approved?

Page 483

1    A.    It does not automatically mean
2  it, that's right.
3    Q.    Okay.  Let me -- when the FDA
4  looks at a new drug application, the
5  studies -- there are some studies that are
6  referred to as pivotal studies, right?
7    A.    Yes.
8    Q.    They're generally -- the
9  studies are conducted in Phase III of the new
10  drug application process -- of the drug
11  development process?
12    A.    Yes.
13    Q.    Okay.  And in paragraph 99 of
14  your report, you say, quote, "Rofecoxib was
15  approved by FDA based on several pivotal
16  short-term studies.  These short-term studies
17  followed patients for three to six months."
18  Did I read that correctly?
19    A.    Yes.
20    Q.    Okay.  Is that your
21  understanding of the studies that formed the
22  basis for FDA's approval?
23    A.    It's my understanding of the
24  pivotal studies, yes, that the -- that they

Page 484

1  were short-term studies.
2    Q.    Okay.  And you go on later in
3  that paragraph and you say, "These short-term
4  studies made no important contribution to the
5  understanding of the long-term hazards of
6  this drug," right?
7    A.    "Of these drugs," yes.
8    Q.    "Of these drugs."
9        And "long-term," what are you
10  referring to as "long-term"?
11    A.    Well, I'm referring to the use
12  of -- the use for drugs for months or years
13  beyond the duration of follow-up in the
14  pivotal studies here.
15    Q.    Okay.  And is it your
16  understanding, after your review of the new
17  drug application when you prepared your
18  report, that the longest studies that were
19  included in the new drug application for
20  Vioxx were six months?
21    A.    I guess I would say no.  I
22  think -- I would say -- I would say this:
23  Perhaps, there was one or two that lasted
24  longer than that.  However, there were not

22  (Pages 481 to 484)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 485

1  studies that followed patients for years.
2        And if the drug was going to be
3  used for the long term, then we need to have
4  some assurance in studies of the long-term
5  record of safety.
6    Q.   Okay. The FDA actually has
7  standard guidelines for how long a drug has
8  to be tested in clinical trials prior to the
9  time it can be approved, right?
10   A.   Yes, but as long as we're
11 clear, those are not iron-clad rules. Those
12 are simply guidelines, and the sponsor is
13 free to exceed those guidelines, should they
14 choose.
15   Q.   Okay. And are you familiar
16 with the ICH guidelines?
17   A.   I know about the ICH
18 guidelines, yes.
19   Q.   Okay. The ICH stands for
20 International Conference on Harmonization?
21   A.   Yes.
22   Q.   Okay. And the FDA has adopted,
23 or at the time that Vioxx was under
24 consideration, the FDA had adopted ICH

Page 486

1  guidelines; is that right?
2    A.   Yes.
3    Q.   Okay. And do you know what ICH
4  guidelines require in terms of the length of
5  testing?
6    A.   I think it depends on the drug
7  being tested. I would be surprised to see if
8  they required long-term studies for
9  pain-relief drug therapy.
10   Q.   Do you know whether they
11 require testing for a period of a year for
12 any patients?
13   A.   You mean any patients at all
14 or --
15   Q.   Yeah.
16   A.   -- pain patients?
17   Q.   I mean, is -- well, let me back
18 up.
19        Do you know whether the ICH
20 guidelines that have been adopted by FDA
21 include a requirement, whether it's a hard
22 requirement or not --
23   A.   Yeah, uh-huh.
24   Q.   -- to study patients, any

Page 487

1  number of patients, for a period of up to a
2  year?
3    A.   I guess what I'm unsure of is
4  the kind of patient. If we're talking about
5  heart failure patients, or are we talking
6  about any patients at all?
7    Q.   We're talking about any
8  patients, yeah.
9    A.   I don't know what the ICH
10 guidelines are.
11   Q.   Do you know whether Merck
12 studied any patients using Vioxx for a period
13 of a year prior to the submission of the
14 original new drug application?
15   A.   Perhaps, they did. I don't
16 know if those studies were pivotal, but,
17 perhaps, they did.
18        But, again, my thesis is that
19 even a year is too short if you're looking
20 for -- if patients are potentially going to
21 use this for longer than a year.
22   Q.   Do you know any -- can you name
23 me any drug product that you're familiar with
24 where, at the time of initial approval,

Page 488

1  studies had been done for longer -- clinical
2  trials had been done for longer than one
3  year?
4    A.   In any field?
5    Q.   Yes.
6    A.   On heart failure.
7    Q.   At the time of initial
8  approval. Do you understand my question?
9    A.   Yeah, I understand. I
10 understand.
11        I mean, before it was ever
12 allowed to be on the market, you mean?
13   Q.   Yes.
14   A.   I'll need to continue to think
15 about that. I don't have an answer for you
16 right now, but I'm still thinking about it.
17   Q.   Okay. All right. Well, why
18 don't we leave it at that, and if you think
19 of one later, you can --
20   A.   Okay.
21   Q.   -- I'll give you an opportunity
22 to amend your answer, all right?
23   A.   Thank you. Okay.
24   Q.   Okay. Do you know of any other

23 (Pages 485 to 488)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 489

1  pain reliever, in other words -- well, let me
2  back up.
3          Some pain relievers are
4  anti-inflammatories, and some pain relievers
5  are not, right?
6      A.   Right.
7      Q.   Okay. Do you know of any
8  anti-inflammatory medication that had
9  clinical studies of longer than one-year
10  duration at the time of their initial
11  approval?
12     A.   I don't, no.
13     Q.   Okay. Do you know of any pain
14  reliever medication that had clinical trials
15  longer than one-year duration at the time of
16  initial approval?
17     A.   No.
18     Q.   Do you know whether, at the
19  time Celebrex was approved, it had clinical
20  trials longer than one year?
21     A.   I don't know one way or the
22  other about Celebrex.
23     Q.   Okay. Let me -- I want to just
24  ask you a question about the way Phase III

Page 490

1  testing is done and your understanding about
2  that, all right?
3      A.   Uh-huh.
4      Q.   Phase III testing is where you
5  are actually giving the drug, usually in some
6  sort of a controlled study, right?
7      A.   Yes.
8      Q.   The controlled study may be a
9  placebo-controlled study, or it may be a
10  comparator study, right?
11     A.   Right.
12     Q.   And, generally, you're looking
13  for larger numbers of patients than you would
14  have in your Phase II studies --
15     A.   Yes.
16     Q.   -- right?
17          And one of the things that
18  manufacturers are required to do is they're
19  required to demonstrate efficacy using
20  traditional tests of statistical
21  significance, right?
22     A.   Yes.
23     Q.   And they're also required to
24  evaluate safety, right?

Page 491

1      A.   Yes.
2      Q.   And the way they evaluate
3  safety is they collect all adverse events
4  during the clinical trials, right?
5      A.   Xymelatran, I think, is an
6  example of a drug that was studied for a year
7  or longer -- longer than a year.
8      Q.   I'm sorry. What was the name
9  of it?
10     A.   Xymelatran.
11     Q.   How do you spell that? X-Y --
12     A.   X-Y-M-E-L-A-T-R-A-N.
13     Q.   And you think that was --
14     A.   It's an antithrombotic drug,
15  yeah.
16     Q.   Okay. And you think that was
17  studied for longer than one year?
18     A.   Right.
19     Q.   At the time of the initial
20  approval?
21     A.   Right.
22     Q.   Okay. Do you know that for
23  fact --
24     A.   No, I believe it was longer

Page 492

1  than a year.
2      Q.   Do you know how long?
3      A.   No, I don't.
4          And if I think of any others,
5  I'll let you know as we go, if that's okay,
6  as we go through.
7      Q.   But fair to say you've been on
8  the Advisory Committee for approval of many
9  new products, right? Let me rephrase --
10     A.   Et- -- I'm trying to say the
11  name right. It's a tongue-twister.
12  Ebafitride, I think. E-B-A-F-I-T-R-I-D-E, I
13  think. That's how you pronounce it.
14     Q.   What is that? Is that the
15  generic name for --
16     A.   That's the -- actually, that's
17  the trade name. The generic name is even
18  worse.
19     Q.   Okay. So that's a second drug,
20  you're saying?
21     A.   Yes.
22     Q.   Okay. In your experience on
23  the Advisory Committee during the time you've
24  considered applications for new drug, you'd

24 (Pages 489 to 492)

Lemuel A. Moye, M.D., Ph.D.

Page 493

1  agree with me that studying the drug for
2  longer than a year is the exception to the
3  rule?
4      A.    Actually, I would disagree with
5  you for that -- over that, and it's because
6  many of the drugs that come before the
7  committee have already been approved -- are
8  studied for longer than a year, and I can
9  give you lots of examples of those; however,
10 when they first came on the market, they
11 were -- the company -- the sponsor is looking
12 for another approval.
13     Q.    Right.
14     A.    And the other approval led the
15 FDA to believe that a shorter duration of
16 therapy would be useful; for example,
17 diuretics and blood pressure.
18          Diuretics, when they first
19 appeared on the market, were studied for a
20 relatively short period of time because the
21 only indication was blood pressure control.
22          However, when they -- when the
23 scientific community is interested in and the
24 sponsor is -- is enthusiastic about

Page 494

1  developing another indication for the drug,
2  then it's studied for a much longer period of
3  time for a second approval.
4      Q.    Okay. But applying foresight,
5  one can -- one would expect that a blood
6  pressure medication could be used for longer
7  than a year, right?
8      A.    Of course. Of course.
9      Q.    And most blood pressure
10 medications at the time of their initial --
11 at the time of their initial approval, have
12 not been studied for more than a year?
13     A.    And that is the subject of the
14 debate.
15     Q.    Okay.
16     A.    Because there is ongoing
17 vehement discussion about this deficiency --
18     Q.    Okay.
19     A.    -- in requiring short-term
20 studies.
21     Q.    But that is, in fact, the way
22 it is, whether it's the subject of debate or
23 not, right?
24     A.    As shoddy as they are, those

Page 495

1  are the guidelines.
2      Q.    All right. Now, let's go back
3  to talking about Phase III studies.
4          The way Phase III studies work
5  in terms of safety information is that the
6  manufacturer -- or, actually, it's not the
7  manufacturer. The clinicians who are doing
8  the clinical trials are required to collect
9  any and all --
10     A.    Excuse me. I'm sorry. I think
11 clopidogrel was studied for longer than a
12 year. Its first approval was as an
13 antiplatelet agent. And the studies that
14 were presented before the FDA were for its
15 first approval, and that study was longer
16 than a year.
17     Q.    Okay.
18     A.    I'm trying to get out of the --
19 that track. I'm just trying to give you some
20 examples of these studies, and it's taking me
21 a while to pull them up.
22     Q.    All right.
23     A.    I'm sorry. Let me stay focused
24 on your current question, now.

Page 496

1      Q.    Okay. In Phase III clinical
2  trials, clinical investigators are required
3  to collect any and all adverse event
4  information throughout the duration of the
5  clinical trial, right?
6      A.    They are, yes.
7      Q.    Okay. And whether somebody has
8  a heart attack, an ulcer, a case of
9  pneumonia, an ingrown toenail or hemorrhoids,
10 that information is required to be recorded,
11 right?
12     A.    Yes.
13     Q.    It's required to be analyzed,
14 right?
15     A.    Yes.
16     Q.    And it's required to be
17 submitted to FDA, right?
18     A.    Yes.
19     Q.    Okay. And, in general, one of
20 the reasons that Phase III clinical studies
21 are designed that way is because we don't
22 always know and can't always anticipate what
23 the potential adverse events associated with
24 the medication are, right?

25 (Pages 493 to 496)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 497

1    A.    Yes.
2    Q.    Okay. So the idea is if you
3  study the medication in a large population,
4  that you may see an increased risk of a
5  particular adverse event compared to the
6  comparator group, right?
7    A.    If you have a larger sample in
8  a Phase III study, the more patients you
9  have, the more likely you are to see --
10  everything else being equal.
11    Q.    Right. Everything else
12  being --
13    A.    -- the more likely you are to
14  see adverse events which occur at lower
15  incident rates.
16    Q.    Okay. And that's the way
17  Phase III clinical studies are usually done,
18  right?
19    A.    Yes.
20    Q.    That's the way they're always
21  done, right?
22    A.    Right. Well, reporting, I
23  don't know. Certainly, it's the way they're
24  done now.

Page 498

1    Q.    Okay. And it's the way they
2  were done around the time of the Vioxx
3  approval --
4    A.    Yes.
5    Q.    -- right?
6          And, in fact, that's the way
7  the Phase III studies on Vioxx were
8  conducted, right?
9    A.    Yes.
10    Q.    Okay. Now, are you aware of
11  any study that was done on Celebrex
12  specifically to look at cardiovascular
13  outcomes prior to the time Celebrex was
14  approved?
15    A.    No, I haven't studied that.
16    A.    Haven't studied it, okay?
17    A.    Right.
18    Q.    Are you aware of any kind of
19  cardiovascular outcome study that was done on
20  any nonsteroidal anti-inflammatory medication
21  prior to its approval?
22    A.    No.
23          MR. PIORKOWSKI: Okay. Let me
24  ask you -- let me just go off for a

Page 499

1  second. We don't need to take a
2  break, just...
3          THE VIDEOGRAPHER: Off the
4  record at 9:47.
5          (Recess taken, 9:47 a.m. to
6  9:49 a.m.)
7          THE VIDEOGRAPHER: Hold,
8  please. On the record at 9:49.
9    Q.    (BY MR. PIORKOWSKI) Dr. Moye,
10  in the case of Vioxx, the FDA asked to have
11  an Advisory Committee meeting to get input
12  about the approvability of the Vioxx; is that
13  right?
14    A.    Well, there certainly was an
15  Advisory Committee meeting in 1999.
16    Q.    Right.
17    A.    I guess my understanding was
18  that since this was a new drug --
19    Q.    Right.
20    A.    -- that it was standard
21  operating procedure -- a new class of drugs,
22  sorry, a new class of compounds, it was
23  standard operating procedure for there to be
24  an Advisory Committee.

Page 500

1          So I don't know whether Merck,
2  in addition, asked for one, but I expected
3  that there would be one, anyway.
4    Q.    I actually wasn't -- yeah, I
5  wasn't asking whether Merck asked for one. I
6  was asking whether --
7          Well, first of all, not every
8  drug that's approved by the FDA or submitted
9  for new drug application gets an Advisory
10  Committee meeting, right?
11    A.    That's right.
12    Q.    Okay. The FDA ultimately is
13  the one that decides when an Advisory
14  Committee meeting should be held, right?
15    A.    Yes.
16          MR. PIORKOWSKI: Okay. Excuse
17  me a second.
18          Jason, could I ask somebody to
19  make a couple copies of this?
20          MR. WEBSTER: Yeah.
21          MR. PIORKOWSKI: Thanks.
22    Q.    (BY MR. PIORKOWSKI) And prior
23  to the -- its decision to approve Vioxx, the
24  FDA, in the case of Vioxx, did ask for an

26 (Pages 497 to 500)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 501

1    Advisory Committee, right?
2        A.    Yes.
3        Q.    Okay. And just so we're clear
4    on the timing, when you mentioned that Vioxx
5    was a new class of drugs, you're referring to
6    COX-2 inhibitors, right?
7        A.    Yes.
8        Q.    And at the time that Vioxx
9    approved, there was another COX-2 inhibitor
10   that was already on the market, right?
11       A.    Yes.
12       Q.    That was Celebrex?
13       A.    Right.
14       Q.    Okay. So Celebrex's approval
15   predated Vioxx's approval?
16       A.    Right.
17       Q.    Okay. The Advisory Committee
18   recommended that Vioxx be approved for
19   marketing at the -- for the indications in
20   the label and at the doses set forth in the
21   label, correct?
22       A.    Yes.
23       Q.    Okay. And we had talked
24   last -- couple weeks ago about the fact that

Page 502

1    there are sometimes contentious issues about
2    safety and efficacy and often reasonable
3    minds on the Advisory Committee can differ,
4    right?
5        A.    Yes.
6        Q.    Okay. In this particular
7    Advisory Committee, the vote was eight to
8    nothing in favor of approval, right?
9        A.    Yes.
10       Q.    Okay. And then the FDA, in May
11   of 1999, determined that Vioxx -- or made a
12   decision to approve Vioxx as safe and
13   effective, correct?
14       A.    Yes.
15       Q.    Okay. Now, do you believe that
16   the FDA was wrong in approving Vioxx as safe
17   and effective in May of 1999?
18       A.    I do.
19       Q.    And on what basis do you
20   believe they were wrong?
21       A.    Because its pain relief was no
22   better than standard available therapy, and
23   the reduction in the incidence of gastro- --
24   serious upper gastrointestinal illnesses was

Page 503

1    really unsubstantiated. So those two reasons
2    on the efficacy side.
3             And on the risk side, there was
4    an important serious -- well, an important
5    increase in the risk of serious
6    cardiovascular disease.
7        Q.    Okay. The FDA did not conclude
8    that the reduction of gastrointestinal
9    problems was unsubstantiated -- well, let me
10   back up.
11            We already talked about the
12   fact that endoscopic studies that were
13   performed during the Phase III clinical
14   trials demonstrated a reduction of ulcers
15   endoscopically, right --
16       A.    Right.
17       Q.    -- in Vioxx users compared to
18   comparators, right?
19       A.    I didn't mean to cut you off.
20   Right.
21       Q.    Right.
22            The only information the FDA
23   did not have was information about whether
24   that translated to hard gastrointestinal

Page 504

1    clinical endpoints, right?
2        A.    When we talk about the "only
3    information," we mean the only information
4    about this matter?
5        Q.    About the GI risks.
6        A.    Yes, that's correct. I agree.
7        Q.    All right. But there certainly
8    was reason to believe, based on the
9    endoscopic studies, that there was a GI
10   benefit, right?
11       A.    Well, I guess I would put it
12   this way: If you're asking me was there
13   reason to believe, I'd say, no, not much.
14   There was the promise of this benefit.
15       Q.    Okay.
16       A.    But it hadn't been -- it had
17   not been realized and documented preapproval.
18       Q.    Okay. You -- you're not --
19   you've never done a fellowship in
20   gastroenterology, right?
21       A.    That's true.
22       Q.    And you don't hold yourself out
23   as a gastroenterologist?
24       A.    That's correct.

27  (Pages 501 to 504)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 505

1    Q.    Okay.  And you do recognize
2  that there were gastroenterologists at the
3  FDA who were involved in the review process,
4  right?
5    A.    Yes.
6    Q.    Okay.  And you've not been
7  fellowship-trained in rheumatology, right?
8    A.    That's true.
9    Q.    And you are not board certified
10 in rheumatology, right?
11   A.    That's correct.
12   Q.    You don't hold yourself out as
13 an expert in rheumatology, right?
14   A.    That's right too.
15   Q.    And you recognize that there
16 were people at the FDA who were experts in
17 rheumatology who were involved with the
18 review of this --
19   A.    Yes.
20   Q.    -- drug?  Okay.
21       And, in fairness, the reviewers
22 at the FDA who considered the new drug
23 application spent a lot more time, at least
24 collectively, reviewing the studies on Vioxx

Page 506

1  than you have; is that fair to say?
2        MR. WEBSTER:  Objection, form.
3    A.    If you mean "collectively," you
4  sum the hours of all the reviewers, then I
5  think it's fair to say the sum of those hours
6  exceeds the sum of my hours.
7    Q.    (BY MR. PIORKOWSKI)  Sure.
8  Well, I mean, all of your time hasn't been
9  spent -- I mean, if we go back to the
10 roughly, whatever, 250 hours and let's
11 assume we --
12   A.    Right.
13   Q.    -- let's say with the 15 hours
14 you've spent in the last couple of weeks,
15 let's even say roughly 270 or something like
16 that.
17   A.    Sure.
18   Q.    In the 270 hours that you've
19 spent, part of -- a lot of that time has been
20 spent drafting an expert report, right?
21   A.    Yes.
22   Q.    A lot of it has been spent
23 looking at company documents, right?
24   A.    Yes.

Page 507

1    Q.    A lot of it has been spent
2  looking at medical literature that's come out
3  since the approval, right?
4    A.    Yes.
5    Q.    So in fairness to the FDA, the
6  amount of time that you actually spent
7  looking at the materials that the FDA looked
8  at when they made the reviewing decision,
9  they spent a lot more time than you did;
10 fair?
11   A.    Sure.
12       MR. WACKER:  Objection, form --
13       MR. WEBSTER:  Object to form.
14       MR. WACKER:  -- speculation.
15   Q    (BY MR. PIORKOWSKI)  Fair?
16   A.    Yes.
17   Q.    Okay.  Let me --
18       MR. PIORKOWSKI:  Thank you,
19 Jason, for --
20       MR. WEBSTER:  You're welcome.
21       (Whereupon, Deposition Exhibit
22 Moye MDL 13, "Comparison of
23 Cardiovascular Thrombotic Events in
24 Patients with Osteoarthritis Treated

Page 508

1  with Rofecoxib Versus Nonselective
2  Nonsteroidal Anti-inflammatory Drugs
3  (Ibuprofen, Diclofenac and
4  Nabumetone)," by Reicin, et al.,
5  D616.1 - D616.6, was marked for
6  identification.)
7    Q    (BY MR. PIORKOWSKI)  Let me
8  hand you what I've marked as Exhibit 13,
9  please.
10   A.    Thank you.
11   Q.    As a part of your review, did
12 you look at this article?  And please take a
13 minute, if you need to review it.
14   A.    Sure.  Thank you.
15       (Witness reviews document.)
16   A.    I don't think I referred to
17 this article in my affidavit, but I did look
18 at it.
19   Q.    (BY MR. PIORKOWSKI)  Okay.  You
20 understand this is an article that sets forth
21 the -- first of all, it's based on the
22 Phase IIb and III osteoarthritis trials that
23 were performed prior to the initial approval
24 of Vioxx, right?

28 (Pages 505 to 508)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 509

```
 1     A.    Yes.
 2     Q.    Okay.  And it is authored by
 3  Merck authors, right?
 4     A.    Yes.
 5     Q.    Okay.  And its focus is on
 6  comparing cardiovascular thrombotic events in
 7  Vioxx patients in the control
 8  group in the osteoarthritis trials, right?
 9     A.    Yes.
10     Q.    Okay.  Now, let me ask you to
11  turn to Table 2.
12     A.    Can I have just one second?  I
13  just want to look at the "Methods" section
14  for just a moment.
15     Q.    Certainly.  Certainly.
16     A.    Thanks.
17           (Witness reviews document.)
18     A.    Okay.
19     Q.    (BY MR. PIORKOWSKI)  Okay.
20     A.    Thank you.
21     Q.    Do you see Table 2?
22     A.    I do.
23     Q.    Okay.  And Table 2 sets forth
24  rofecoxib, which is Vioxx, right?
```

Page 510

```
 1     A.    Yes.
 2     Q.    Versus nonselective NSAIDs, and
 3  summarizes investigative reported
 4  cardiovascular thrombotic events, right?
 5     A.    Yes.
 6     Q.    Okay.  In reviewing this, when
 7  you looked at it, did you have any reason to
 8  believe that the data that are set forth in
 9  this paper are inaccurate or wrong?
10           MR. WEBSTER:  Objection, form.
11     A.    Well, let me put it this way:
12  I certainly would not accuse the authors of
13  misrepresenting the numbers.  So I have no
14  reason to suspect that the numbers in
15  Table 2, or any other table, for that matter,
16  are imprecise --
17     Q     (BY MR. PIORKOWSKI)  Okay.
18     A.    -- and don't reflect what they
19  saw in the database.
20     Q.    Okay.  Fair enough.
21           And what -- if we go down and
22  take a look, what it shows is that if we look
23  at cardiac events, for example, we see
24  that -- well, actually, let's look -- there's
```

Page 511

```
 1  an n there at the top of the column, right?
 2     A.    Right.
 3     Q.    And that -- the n means that's
 4  the total number of patients who were in the
 5  studies that were looked at?
 6     A.    Yes.
 7     Q.    Okay.  And that's true for both
 8  the rofecoxib group and for the nonselective
 9  NSAID group, right?
10     A.    Right.
11     Q.    Okay.  And then there are
12  percentages throughout, right?
13     A.    Right.
14     Q.    And that's the percentages of
15  patients in the clinical trials -- these
16  particular clinical trials who experienced
17  those particular side-effects, right?
18     A.    Right.
19     Q.    Okay.
20     A.    Taking these drugs for what
21  period of time.
22     Q.    Right.
23           And what it shows is that
24  cardiac events collectively were .54% in
```

Page 512

```
 1  Vioxx users, right?
 2     A.    Right.
 3     Q.    That's a little more than the
 4  half of 1%, right?
 5     A.    Right.
 6     Q.    And in nonselective NSAID
 7  users, they were .77%, right?
 8     A.    Right.
 9     Q.    Which is a little more than
10  three-quarters of 1%, right?
11     A.    Yes, uh-huh.
12     Q.    Okay.  And nobody would suggest
13  that difference, by the way, is
14  meaningful or statistically significant;
15  would you agree with me?
16     A.    Or even worth comparing.
17     Q.    Okay.  And you see also in
18  myocardial infarctions, that there is a .27%
19  for the rofecoxib group and .26% for the
20  nonselective NSAID group?
21     A.    Right.
22     Q.    And you'd agree with me those
23  are quite similar?
24     A.    Again, there's no question that
```

29 (Pages 509 to 512)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 513

1  in the data that they evaluated, these
2  were -- I mean, I believe these were the
3  rates that they found.
4      Q.    Okay. And on sudden cardiac
5  death, for example, there were no cases in
6  Vioxx, but there was .13% in the nonselective
7  NSAIDs; but, again, you wouldn't consider
8  that a meaningful difference, I assume,
9  right?
10     A.    Well, I don't think it's any
11 difference that -- I mean, certainly the
12 numbers are different.
13     Q.    Right.
14     A.    But would one infer that
15 there's a greater incidence in nonselective
16 NSAIDs from rofecoxib from this? I don't
17 think so.
18     Q.    Right. I don't -- and you
19 haven't seen anybody suggest that, have you?
20     A.    Not from this, no.
21     Q.    Right. Okay. And -- but you
22 understand that these data, this compilation
23 of data in Table 2, is -- this represents the
24 data that the FDA had available to it from

Page 514

1  the Phase IIb and III clinical trials at the
2  time that it made the decision to approve
3  Vioxx?
4      A.    I believe so, yes.
5      Q.    Okay.
6      A.    They had -- they had this
7  information from the pre-NDA evaluations.
8      Q.    Okay. And, similarly, if we go
9  to Table 3, Table 3 reflects -- under
10 "Cardiac Events," it reflects .31% for total
11 cardiac events versus .42% for placebo,
12 right?
13     A.    Right.
14     Q.    And that's somewhere in the
15 neighborhood of 1/3 of 1% to a little less
16 than 1/2 of 1%, right?
17     A.    Yes.
18     Q.    Okay. And for myocardial
19 infarction, for Vioxx, it's .13% and for
20 placebo, it's .28%, right?
21     A.    Yes.
22     Q.    Okay. And, again, nobody would
23 suggest that's -- that's a meaningful
24 difference, right?

Page 515

1      A.    Certainly no one would suggest
2  that's a meaningful difference, but I don't
3  think anybody would suggest that this data
4  are meaningful to draw any conclusion one way
5  or the other --
6      Q.    Okay.
7      A.    -- about the risk for
8  cardiovascular disease with these drugs.
9      Q.    Okay. But what's clear from
10 these results is that among the various
11 adverse events that were looked at in the
12 Phase III clinical trials, myocardial
13 infarctions and coronary vasospasm and sudden
14 cardiac death and coronary artery disease
15 were among the adverse events that were
16 reported and analyzed, right?
17     A.    Well, they reported these
18 results in this way, yes.
19     Q.    Okay. And you agree with me
20 that these are the data that the FDA had
21 available at the time it made this decision
22 to approve Vioxx, even though you don't agree
23 with that decision?
24     A.    This is some of the data that

Page 516

1  the FDA had.
2      Q.    Okay.
3      A.    It is neither comprehensive nor
4  very helpfully elaborated, but this is some
5  of the data that the FDA had, right.
6          MR. JOSEPHSON: Object to the
7      responsiveness.
8          MR. PIORKOWSKI: Okay. Object
9      to responsive.
10     A.    I will also say that I think
11 that people at the FDA understood that data
12 presented in this way, and event rates at
13 such a low incidence rate, precluded any
14 realistic determination of a relationship
15 between cardiovascular thrombotic events and
16 rofecoxib.
17         MR. JOSEPHSON: Objection to
18     the responsiveness.
19     Q.    (BY MR. PIORKOWSKI) All right.
20 In Table 1, one of the things that they look
21 at are baseline demographic data, right?
22     A.    Yes. Right.
23     Q.    And just -- I want to talk for
24 a second about baseline demographic data and

30 (Pages 513 to 516)

Golkow Litigation Technologies - 1.877.DEPS.USA

Lemuel A. Moye, M.D., Ph.D.

Page 517

1   what that means.
2        When you do a study,
3   particularly a randomized placebo-controlled
4   study, one relies on the randomization
5   process to try to get groups that are roughly
6   equivalent; is that a fair statement?
7        A.   Yes, sir.
8        Q.   Okay.  And one of the things
9   that you need to be cognizant of is if the
10  groups are different -- in other words, if
11  one group ends up with twice as much
12  hypertension at baseline or twice as much
13  high cholesterol at baseline -- that could
14  affect the results that you see in the
15  clinical trials, right?
16       A.   It would affect, everything
17  else being equal, the attribution of the
18  effect of the therapy.
19       Q.   Okay.  So I just want to make
20  sure, actually, to clarify that point:  So
21  if, for example, as a baseline, if you had a
22  higher cholesterol level in one group, that
23  would tend to -- that would tend to
24  predispose one to thrombotic events at a

Page 518

1   greater rate than if you had a lower
2   cholesterol level?
3        A.   Again, everything else being
4   equal.
5        Q.   Everything else being equal.
6        A.   We're talking about a
7   population who's typically at risk for this
8   disorder, anyway, right?
9        Q.   All else being equal.
10       A.   Right.
11       Q.   And the same thing would be
12  true, for -- like, for example, hypertension,
13  right?
14       A.   Yes.
15       Q.   All else being equal --
16       A.   Right.
17       Q.   -- if you had high -- greater
18  hypertension in one group, that would be an
19  explanation why you might have greater
20  thrombotic events in that group, right?
21       A.   Right.
22       Q.   Okay.  Now, in Table 1, what
23  they're talking about here is the baseline
24  demographic data, right?

Page 519

1        A.   Yes.
2        Q.   And from your perspective, this
3   baseline demographic data shows that, with
4   respect to most of the variables that could
5   have confounded the analysis, they're fairly
6   evenly distributed; is that a fair
7   characterization?
8        A.   Actually, Mr. Piorkowski, it's
9   not.  And I'm a little surprised at the
10  difference in the systemic hypertension,
11  hypercholesteremia -- hypercholesterolemia a
12  little bit, I guess.
13       Q.   Okay.
14       A.   But this is not one study --
15       Q.   Right.
16       A.   -- that has recruited -- what
17  are we talking about -- almost 5,000
18  patients.
19       Q.   Right.
20       A.   This is a combination of
21  studies.
22       Q.   Right.
23       A.   And so I don't know what to
24  make of that.

Page 520

1        Q.   Okay.
2        A.   I would just tell you I am a
3   little surprised at the difference in the
4   risk factors.
5        Q.   Okay.  But, actually, if we
6   look at hypertension, the difference that I
7   guess you're alluding to is the difference
8   between 30.5% of patients in the placebo
9   group and 39.8% of patients in the Vioxx
10  group, right?
11       A.   Yes.
12       Q.   Okay.  And that actually would
13  tend to make thrombotic events in the Vioxx
14  group greater, right?
15       A.   Again, everything else being
16  equal.
17       Q.   Everything else being equal.
18       A.   But, of course, here it's not,
19  because there are more smokers in the placebo
20  group.
21       Q.   Okay.  But by 1.5%?
22       A.   Right.  And so it depends on
23  the relative risk of smoking versus -- I
24  mean, I'm just saying that things aren't

31 (Pages 517 to 520)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 521

1  equal here.
2      Q.   Okay.  Okay.  One of the
3  reasons you look at this, though, is so you
4  can get some understanding of what the nature
5  of the patients were in the database, right?
6      A.   Yes.
7      Q.   Okay.  Now, it is correct,
8  right, that if -- again, assuming that
9  these -- these data accurately reflect what
10 was seen in the clinical trials, that 11.2%
11 of patients in the Vioxx Phase IIb and III
12 clinical trials had a history of
13 atherosclerotic cardiovascular disease,
14 right?
15     A.   Yes.
16     Q.   Okay.  And 2.5% of patients in
17 the Vioxx group had a history of myocardial
18 infarction prior to -- as a baseline before
19 entering the study, right?
20     A.   Right.  A small number did,
21 2.5 -- well, a small percent did, 2.5%.
22     Q.   Right.
23         And 6.9% of the Vioxx users in
24 the Phase IIb and III clinical studies had a

Page 522

1  history of coronary artery disease at
2  baseline, right?
3      A.   Yes.
4      Q.   Okay.  And then if we actually
5  go down to -- to the risk factors, 57.2% of
6  patients in the Vioxx Phase IIb and III
7  clinical studies had some cardiovascular risk
8  factor at baseline, right?
9      A.   Had at least one of the four
10 that are listed below.
11     Q.   Okay.  And 39.8% of Vioxx users
12 at baseline had hypertension at baseline,
13 right?
14     A.   Yes.
15     Q.   Okay.  And 17.2% of Vioxx users
16 had hypercholesterol at baseline, right?
17     A.   Yes.
18     Q.   Okay.
19     A.   However that's defined here --
20     Q.   Okay.
21     A.   -- but yes.
22     Q.   Prior to the time -- remember
23 we had talked last couple weeks ago about the
24 Fitzgerald hypothesis and that discussion?

Page 523

1      A.   Yes.
2      Q.   Okay.  Prior to the time of the
3  Fitzgerald hypothesis in late 1997, there was
4  a general understanding by both Merck and the
5  FDA that because Vioxx did not inhibit COX-1,
6  that Vioxx did not inhibit thromboxane,
7  right?
8      A.   Yes.
9      Q.   Okay.  And so to the extent
10 that there was some clinical benefit achieved
11 by inhibiting thromboxane, Vioxx would not
12 provide that benefit, right?
13     A.   Yes.
14     Q.   I mean, that was commonly
15 understood?
16     A.   Right.
17     Q.   Is that fair to say?
18     A.   Right.
19     Q.   Okay.  What was less clear at
20 that time is what effect other nonsteroidal
21 anti-inflammatory drugs had on thromboxane
22 inhibition; is that fair?
23     A.   Well, but other inflammatory --
24 other nonsteroidal anti-inflammatories are

Page 524

1  global, both COX-1, COX-2 suppressors.
2      Q.   Right.
3      A.   Right.
4      Q.   Well, let me back up a minute.
5          We agree that aspirin has an
6  effect of irreversibly inhibiting the
7  platelet and has an inhibitory effect on
8  thromboxane, right?
9      A.   Right.
10     Q.   No question about that?
11     A.   Right.  Irreversible inhibitory
12 effect, right.
13     Q.   Okay.  Other NSAIDs, such as,
14 let's say, ibuprofen or diclofenac --
15     A.   Right.
16     Q.   -- have some COX-1 suppression,
17 right?
18     A.   Yes.  Right.
19     Q.   Their COX-1 -- the COX-1
20 suppression of ibuprofen and diclofenac is
21 reversible, right?
22     A.   Yes.
23     Q.   The COX-1 suppression from
24 ibuprofen and diclofenac is also related to

32 (Pages 521 to 524)

Lemuel A. Moye, M.D., Ph.D.

Page 525

1 the dose of those medications, right?
2      A.   Yes.
3      Q.   And it's also related to the
4 duration for which those medications are
5 used?
6      A.   Yes.
7      Q.   Okay. Same is true for
8 naproxen, right?
9      A.   Yes.
10     Q.   In fact, the same is true for
11 every one of the nonsteroidal
12 anti-inflammatory drugs?
13     A.   Yes.
14     Q.   Okay. So prior to the
15 Fitzgerald hypothesis, what was understood is
16 that the effect of Vioxx on thromboxane
17 inhibition was neutral or it was like the
18 effect that a placebo would have?
19     A.   Right.
20     Q.   Okay. All right. Now, there's
21 a lot of discussion in your report about the
22 VIGOR study?
23     A.   Yes.
24     Q.   Okay. I want to just go over

Page 526

1 some basic things about the VIGOR study for a
2 minute.
3         You agree with me that VIGOR
4 was primarily intended as a GI outcome
5 study --
6      A.   Yes.
7      Q.   -- right?
8         The idea was that the -- there
9 was some potential for benefit, as
10 demonstrated by the endoscopy studies in the
11 Phase III trials, the FDA wanted to see some
12 hard data on some GI endpoints, and that was
13 the backdrop of the VIGOR study being
14 conducted?
15     A.   Yes. They were hoping to see
16 clinical -- important reductions in
17 clinically significant symptomatic upper GI
18 adverse events.
19     Q.   Okay. Okay. Now, would you
20 agree with me that if you're doing a study of
21 that endpoint, that aspirin use is a
22 potential confounder?
23     A.   Yes.
24     Q.   Okay. The reason aspirin is a

Page 527

1 potential confounder is because even low-dose
2 aspirin can have a -- can have an adverse
3 gastrointestinal effect --
4      A.   Yes.
5      Q.   -- right?
6         Now, am I correct the dose of
7 Vioxx that was used in the VIGOR study was
8 50 milligrams, right?
9      A.   Yes.
10     Q.   And as it was administered in
11 the VIGOR study, it was 50 milligrams
12 essentially chronic use for a period of
13 several months, right?
14     A.   Yes.
15     Q.   That dosage of Vioxx -- in
16 other words, 50 milligrams for chronic use --
17 was not an approved dosage as marketed at
18 that time --
19     A.   Right.
20     Q.   -- is that right?
21         And the patients in the VIGOR
22 study -- the VIGOR study was conducted
23 entirely in a group of rheumatoid arthritis
24 patients; is that right?

Page 528

1      A.   Yes.
2      Q.   Okay. And at the time the
3 VIGOR study was conducted, rheumatoid
4 arthritis was also not an approved indication
5 for Vioxx; is that right?
6      A.   Right.
7      Q.   Okay. The approved indications
8 originally were osteoarthritis --
9      A.   Right. Right.
10     Q.   -- and short-term pain relief
11 and dysmenorrhea, right?
12     A.   Yes.
13     Q.   And 12.5 and 25 milligrams were
14 approved for chronic use, but 50 milligrams
15 was -- the recommendation was that it be
16 limited to a few days; is that right?
17     A.   Yes.
18     Q.   Okay. Now, the VIGOR results
19 became known to Merck sometime in March of
20 2000; is that right?
21     A.   Yes.
22     Q.   Is that your understanding?
23     A.   Yes.
24     Q.   All right. And do you have any

33 (Pages 525 to 528)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 529

1  criticisms that you intend to offer about --
2  concerning the conduct of the DSMB with
3  respect to VIGOR?  Let me back up and --
4      MR. WEBSTER:  Objection to
5  form.
6      MR. PIORKOWSKI:  Let me back up
7  and lay a foundation for you.
8  Q    (BY MR. PIORKOWSKI) You
9  understand that there was a DSMB that was
10  involved in monitoring the VIGOR trial?
11  A    Yes.
12  Q    Okay.  And the DSMB was
13  composed of outside scientists, primarily,
14  right?
15  A    Yes.
16  Q    And there was one nonvoting
17  member who was a Merck person?
18  A    Right.
19  Q    Deborah Shapiro.
20      Do you have -- do you have any
21  criticisms of the DSMB with respect to their
22  conduct in overseeing the VIGOR study?
23      MR. WACKER:  Objection.
24  A    Not at this time, no.

Page 530

1  Q    (BY MR. PIORKOWSKI) Okay.  Do
2  you agree -- you agree with me that when the
3  results of the VIGOR study, at least the
4  preliminary results -- well, let me back up.
5      The way these studies work,
6  just for the jury's benefit, there's a period
7  of analysis that needs to be done before the
8  data are finally reported, right?
9  A    Yes.
10  Q    But, oftentimes, you can get an
11  early read about what's going on, right?  I
12  mean --
13  A    Well, if by that, you mean at
14  the period at the time of the closeout, there
15  is an early assessment that is typically
16  available from the statistical group --
17  Q    Okay.
18  A    -- that is based on the data
19  that have not really been -- that are not
20  pristine yet.
21  Q    Right.  Let me rephrase the
22  question so we're not misunderstanding each
23  other.
24      Merck became aware of the

Page 531

1  results of the VIGOR study sometime in
2  March 2000, right?
3  A    Yes.
4  Q    But at that time, the data had
5  not been completely reviewed.  It was
6  preliminary data --
7  A    Assessment.
8  Q    -- points; is that fair?
9  A    Yes.
10  Q    Preliminary evaluation.
11      And Merck did promptly disclose
12  to the FDA the results of that preliminary
13  evaluation, right?
14      MR. WEBSTER:  Objection, form.
15  A    I don't know what you mean
16  there.
17  Q    (BY MR. PIORKOWSKI) Well,
18  Merck told -- Merck found out in -- Merck
19  found out in March of 2000 that the VIGOR
20  study -- it first of all found out that the
21  GI results were favorable for Vioxx, right?
22  A    Yes.
23  Q    And also found that there was
24  an unexpected increase in cardiovascular

Page 532

1  events, right?
2      MR. BLIZZARD:  Object to form.
3      MR. WEBSTER:  Objection, form.
4  A    Yes.
5  Q    (BY MR. PIORKOWSKI) Okay.  And
6  both of those facts were relayed to the FDA
7  within a matter of days, right?
8  A    I don't know what fact -- a
9  couple things.  I don't know what day it was
10  relayed.
11  Q    Okay.
12  A    I don't know what fact about
13  the increased risk associated with Vioxx was
14  relayed.
15  Q    Okay.  Do you know whether the
16  FDA knew by the end of March of 2000 that --
17  that the VIGOR study had demonstrated a
18  higher CV rate in Vioxx users compared to
19  naproxen users?
20  A    I know the FDA was told that.
21  I don't know how much higher.
22  Q    Okay.  Do you know whether the
23  FDA was told specifically that the rate of
24  heart attacks was higher?

34 (Pages 529 to 532)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 533

1    A.   I know they were told that.
2  Again, I don't know how much higher they
3  were.
4    Q.   Okay.  Do you know when Merck
5  first proposed a label change to the FDA that
6  included the VIGOR cardiovascular data?
7    A.   I don't know.
8    Q.   Okay.  I mean, do you know if
9  it was a month, a year, two years?
10    A.   I don't know.
11    Q.   Okay.  One of the things the
12  VIGOR study showed -- well, first of all,
13  cardiovascular events were not a primary
14  endpoint for the study; is that right?
15    A.   That's true.
16    Q.   Okay.  One of the reasons
17  cardiovascular events were collected was
18  because Merck had followed the recommendation
19  of its board of scientific advisors and
20  implemented a CVSOP procedure, right?
21    A.   That's why they collected the
22  events the way they — yes.
23    Q.   And that's why we had
24  adjudicated data on VIGOR, right?

Page 534

1    A.   Yes.
2    Q.   Okay.  And you're not critical
3  of Merck for having followed the board of
4  scientific advisors' recommendation to
5  implement the CVSOP?
6    A.   Well, I certainly am not
7  critical of follow -- of developing this
8  common nomenclature and classification
9  system.
10    I am critical of Merck's
11  implementation of this; that is to say, the
12  design of VIGOR, which led to the collection
13  of these endpoints.  I am critical of that.
14  I'm not critical of the nomenclature they
15  used.
16    Q.   You're critical of the design
17  of the study that led to the endpoints?
18    A.   Well, if I can rephrase.  I'm
19  critical of the patient selection decisions
20  that were made that ultimately produced the
21  number of cardiovascular endpoints that VIGOR
22  generated.
23    I'm not critical of Merck of --
24  at least at this point, how they classified

Page 535

1  them, or developing the nomenclature tools
2  that the scientific advisory board suggested.
3    Q.   Okay.  So we agree that
4  implementation of the CVSOP was a good thing
5  to do?
6    A.   Well, yes.  But, to me, that
7  also means that you design a trial so that
8  you will be able to produce these endpoints.
9    Q.   Okay.
10    A.   And so I am critical of Merck
11  in that aspect.
12    MR. JOSEPHSON:  Objection to
13  the responsiveness after the first
14  part.
15    Q.   (BY MR. PIORKOWSKI)  Okay.  In
16  terms of -- what specific aspects of the
17  VIGOR trial design are you critical of?
18    A.   That they prohibited the
19  inclusion of patients who are at high risk of
20  cardiovascular disease.
21    Q.   And if patients are at high
22  risk for cardiovascular disease, a vast
23  majority of that group of patients would
24  probably have an indication for taking

Page 536

1  aspirin, right?
2    A.   Perhaps, yes.  Yes.
3    Q.   I mean, it's like you remember
4  in high school math the Venn diagrams?
5    A.   Venn diagram, yeah.
6    Q.   Okay.  If you drew one Venn --
7  if you drew one circle that were people who
8  had a history of coronary artery disease and
9  you drew another circle of the people for
10  whom aspirin was indicated, there would be a
11  large overlap in the middle, right?
12    A.   I'm not sure.  The
13  recommendation for -- well, I guess if we had
14  the first circle as history of coronary
15  artery disease, then the answer is yes, there
16  is a large overlap.
17    Q.   Okay.  The patients who were
18  excluded were patients who had --
19    A.   I need a copy of the -- I'm
20  sorry.  I need a copy of the manuscript, if
21  you have one.
22    MR. PIORKOWSKI:  Sure.
23    (Interruption by the
24  videographer.)

35  (Pages 533 to 536)

Lemuel A. Moye, M.D., Ph.D.

Page 537

1        (Whereupon, Deposition Exhibit
2    Moye MDL 14, "Comparison of Upper
3    Gastrointestinal Toxicity of Rofecoxib
4    and Naproxen in Patients with
5    Rheumatoid Arthritis," by Bombardier,
6    et al., (9 pages), was marked for
7    identification.)
8        THE WITNESS: Okay. Thank you.
9        MR. PIORKOWSKI: Get one for
10   Jason.
11       MR. WEBSTER: Thank you.
12   Q    (BY MR. PIORKOWSKI) On
13   page 1523 -- first of all, what I've marked
14   as Exhibit 14 is a copy of the published New
15   England Journal of Medicine VIGOR manuscript;
16   is that right?
17   A    It is.
18   Q    Okay. On page 1523, you see
19   under this heading of "General Safety"?
20   A    Yes.
21   Q    Okay. And about halfway down
22   that page, it says, quote, "4% of the study
23   subjects met the criteria of the Food & Drug
24   Administration for the use of aspirin for

Page 538

1    secondary cardiovascular prophylaxis
2    (presence of a history of myocardial
3    infarction angina, cerebrovascular accident,
4    transient ischemic attack, angioplasty or
5    coronary bypass)." Did I read that
6    correctly?
7    A    Yes.
8    Q    Okay. And is it your
9    understanding that those are the patients
10   that were excluded from the study?
11   A    Well, it's my understanding
12   that there were many patients of high risk
13   who were excluded. Now, this says that 4% of
14   the study subjects, so essentially there were
15   really a small percent of patients had one of
16   these criteria, right, and most -- and many
17   patients who could have been --
18       (Interruption off the record.)
19       THE WITNESS: Let's let the
20   noise go away.
21       MR. PIORKOWSKI: Sure.
22   A    -- many patients who had these
23   risk factors and would otherwise have been
24   admissible for the study were not. The

Page 539

1    patients at risk for heart disease were
2    not -- excuse me, were excluded from the
3    study, by and large.
4    Q    (BY MR. PIORKOWSKI) Well, you
5    would agree with me that it would be
6    unethical to conduct a study that prohibited
7    patients from taking medication that they
8    needed to take to reduce their cardiovascular
9    risk?
10   A    Right. And I'm not suggesting
11   that that should be the case at all.
12   Q    Okay.
13   A    I mean, these people should
14   have received the appropriate aspirin
15   prophylaxis while they were in the study.
16       MR. PIORKOWSKI: Right. I
17   think we're out of tape.
18       THE WITNESS: Sure.
19       MR. PIORKOWSKI: Is this a good
20   time for a break, Jason, or what do
21   you want to do?
22       THE VIDEOGRAPHER: Off the
23   record at 10:27.
24       (Recess taken, 10:27 a.m. to

Page 540

1    10:35 a.m.)
2        THE VIDEOGRAPHER: Hold,
3    please. On the record at 10:35.
4    Q    (BY MR. PIORKOWSKI) Doctor, is
5    it your opinion that patients with high
6    cardiovascular risk should have been
7    permitted in the study even if they needed
8    aspirin?
9    A    Yes, and they should have been
10   given aspirin when they entered the study.
11   Q    Okay. Well, you understand
12   that the exclusion criteria intended to
13   exclude patients for whom aspirin was
14   indicated?
15   A    Well, I understand that, but
16   I -- but what I -- but what I disagree with
17   is the result that came from this
18   consideration, I mean, because certainly
19   inclusion and exclusion criteria are a
20   complicated calculus, and every decision has
21   implications.
22   Q    Right.
23   A    The decision to exclude -- to
24   deny patients the use of aspirin was not a

36 (Pages 537 to 540)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 541

1  decision that was -- that was required in
2  order to conduct the study.  In fact --
3      Q.    Okay.  I'm sorry.  Were you
4  done?
5      A.    No, that's okay.
6      Q.    Let me make sure we're clear
7  about what the facts were.
8           First of all, the exclusion
9  criteria are what the study design says --
10  these are patients that should not be
11  participating in the study, right?
12      A.    Yes.
13      Q.    Okay.
14      A.    Right.
15      Q.    There are times where, even
16  though the exclusion criteria intend to
17  exclude certain patients for reasons of lack
18  of adherence to inclusion/exclusion criteria,
19  patients get included in a study even though
20  they should be excluded, according to the
21  protocol, right?
22      A.    Right.  No execution -- no
23  clinical trial has perfect execution.
24      Q.    Okay.

Page 542

1      A.    And there are a small number of
2  patients who, for one reason or another, get
3  through the screening mechanism --
4      Q.    Right.
5      A.    -- and are admitted who should
6  not have been.
7      Q.    Right.  And you understand that
8  that's what happened in VIGOR?
9      A.    For a small number of patients,
10  yes.
11      Q.    For a small number of patients,
12  they should have been excluded because they
13  had aspirin indications but, in fact, they
14  were included in the study, right?
15      A.    Right.
16      Q.    Now, you understand that
17  nobody -- nobody foreclosed them from taking
18  aspirin once they were in the study?
19      A.    I'm not suggesting that that
20  happened.
21      Q.    Okay.  I just want to make sure
22  we're clear about that.
23      A.    Right.  Sure.  Right.
24      Q.    Okay.  The fact of the matter

Page 543

1  is, though, that if the patient needs aspirin
2  because of FDA -- because of the
3  indications --
4      A.    Right.
5      Q.    -- you and I agree that it
6  would be unethical to withhold aspirin during
7  the course of the trial, assuming the patient
8  got into the trial?
9      A.    I agree, right.  Sure.
10      Q.    Okay.
11      A.    Right.
12      Q.    And -- but you also agree with
13  me that if you're studying GI endpoints,
14  aspirin use is going to confound the results?
15      A.    Well, I guess I disagree with
16  that.  Certainly, aspirin is going to
17  increase -- we can get specific here.
18  Aspirin is -- aspirin use is going to
19  increase the rate of GI bleeds in both
20  groups.  That does not preclude demonstrating
21  a rofecoxib effect.  It just means it's going
22  to be a little harder to demonstrate that.
23  It doesn't preclude it, okay?
24      Q.    Okay.  But it does make the

Page 544

1  accomplishment of the primary objective of
2  the study more difficult; you agree with me
3  there?
4      A.    Well, yes and no.  Yes, in --
5  yes, in that it makes the determination of
6  the effectiveness of rofecoxib in reducing
7  GI -- serious GI -- upper GI events more
8  difficult.  However, it makes it easier to
9  identify the harmful effect of rofecoxib on
10  cardiovascular disorders.
11      Q.    Now, let's assume for the sake
12  of discussion that patients were included and
13  that those patients were, in fact, taking
14  aspirin.
15      A.    You mean high-risk patients.
16      Q.    High-risk patients were
17  included with those patients who were taking
18  aspirin.
19      A.    Right.  Right.
20      Q.    We talked last time about the
21  fact that aspirin inhibits thromboxane,
22  right?
23      A.    Yes.
24      Q.    It inhibits thromboxane

37 (Pages 541 to 544)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 545

1  irreversibly?
2      A.   Yes.
3      Q.   And so if your theory is that
4  Vioxx causes an imbalance --
5      A.   Yes.
6      Q.   -- then a study that allowed
7  aspirin use would not give you a thorough
8  evaluation of whether or not Vioxx does or
9  does not adversely affect the
10 thromboxane-prostacyclin balance?
11     A.   I would agree that no study is
12 perfect --
13     Q.   Okay.
14     A.   -- in this complicated -- in
15 this complicated biochemical environment.
16     Q.   Okay.
17     A.   However -- however, including
18 patients who were at high risk of
19 cardiovascular disease would require them to
20 be on aspirin. It would complicate the
21 evaluation.
22          We also recognize as -- I think
23 as you pointed out, that clinical trial
24 execution is not perfect. Some of those

Page 546

1  high-risk patients would not be taking
2  aspirin, and there could be an evaluation of
3  those patients, the effect of
4  cardiovascular -- the effect of rofecoxib on
5  cardiovascular disorders in those patients.
6      Q.   Okay. But you agree with me in
7  principle that aspirin use would complicate
8  the interpretation not only of the
9  gastrointestinal endpoint, it would also
10 complicate interpretation of the
11 cardiovascular endpoint?
12     A.   No, because the cardiovascular
13 endpoint is already complicated by the fact
14 that you have patients who are at low -- you
15 have primarily patients who are at low risk,
16 and I don't accept that admitting patients
17 with high risk and including aspirin would
18 lead to a more complicated interpretation of
19 the effect of rofecoxib on
20 cardiothrombotic -- on atherosclerotic
21 disease.
22     Q.   The -- would you agree with me
23 that in the wake of the VIGOR study, that
24 there was widespread debate about what the

Page 547

1  results of the VIGOR study meant in the
2  medical community?
3          MR. WACKER: Objection.
4      A.   Can I ask you to define for me
5  what you mean by "wake"? Specifically, are
6  we talking about after its publication?
7      Q.   (BY MR. PIORKOWSKI) Well, fair
8  question.
9          Let's talk about the period of
10 time in -- well, let me back up. Withdraw
11 that question.
12          FDA in February 2001 convened
13 an Advisory Committee meeting, right?
14     A.   Yes, they did.
15     Q.   Okay. One of the reasons the
16 FDA convened the Advisory Committee meeting
17 was because the interpretation of the VIGOR
18 study was very complicated; fair to say?
19          MR. WACKER: Objection.
20     A.   Well, I would say that the --
21 its findings surprised many people.
22     Q.   (BY MR. PIORKOWSKI) But if the
23 findings absolutely represented a clear and
24 unequivocal cardiovascular risk, then there's

Page 548

1  no need to have an Advisory Committee to talk
2  about what it means. The FDA can just --
3  just demand that Merck modify its label to
4  add a cardiovascular risk?
5          MR. BLIZZARD: Object to form.
6      A.   Well, I don't think it's that
7  easy at all. Maybe on paper, it is, but, in
8  fact, Merck or a sponsor in general could
9  certainly contest it and ask to have their
10 own advisor -- ask the Advisory Committee as
11 well.
12     Q.   (BY MR. PIORKOWSKI) Merck
13 didn't contest the Advisory Committee.
14     A.   No. No. I said -- no. In
15 this example you gave where the FDA could
16 summarily say you have to change the label,
17 the sponsor can come back and ask that that
18 not happen, that we first have an Advisory
19 Committee meeting.
20     Q.   But that never happened. The
21 FDA never demanded a label change. The FDA's
22 position was these study results are
23 complicated, and we want to get some input
24 from our Advisory Committee about what they

38 (Pages 545 to 548)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 549

1   mean, right?
2       A.   Okay. I don't doubt -- the
3   only thing I'm quibbling about is the
4   "complicated."
5       Q.   Okay.
6       A.   I mean, certainly the results
7   were a surprise, they had new information
8   that had to be considered, and an Advisory
9   Committee meeting was prudent.
10      Q.   Well, one of the reasons that
11  the interpretation of the data were
12  complicated is because it was not -- VIGOR
13  was not a placebo-controlled study, right?
14          MR. WACKER: Objection to form.
15          MR. WEBSTER: Objection, form.
16      A.   That is one reason, yes.
17      Q    (BY MR. PIORKOWSKI) And
18  whether you agree with it or disagree with
19  it, there were people who believed that
20  naproxen's effects may account for part of
21  the findings or that Vioxx effects may
22  account for part of the findings, or some
23  combination of those and chance, or chance
24  alone, right? I mean, there's -- all those

Page 550

1   were possibilities?
2           MR. WACKER: Objection,
3   compound.
4           MR. WEBSTER: Objection, form.
5           MR. PIORKOWSKI: Let me
6   withdraw the question.
7       Q    (BY MR. PIORKOWSKI) Is it fair
8   to say that within the -- outside of Merck,
9   but within the medical community, there
10  were -- there were views reflected in the
11  medical literature throughout 2001 that the
12  results of the VIGOR study were unclear in
13  terms of what they meant as far as
14  cardiovascular risk?
15      A.   Yes, I agree with that.
16      Q.   Okay. You agree with that?
17      A.   Right.
18      Q.   And you agree that there
19  were -- well, at the -- so we have an
20  understanding of what was going on at the
21  time of the Advisory Committee meeting, this
22  was not -- there was not just a study on
23  Vioxx. There was also a study on Celebrex
24  that had been recently released, right?

Page 551

1       A.   Yes.
2       Q.   A study called the CLASS study?
3       A.   Yes.
4       Q.   The CLASS study was a study
5   that was in some ways similar to the VIGOR
6   study in that it was looking at
7   gastrointestinal endpoints, right?
8       A.   Yes.
9       Q.   Okay. There's some differences
10  with the CLASS study, right?
11      A.   Well, I don't know the CLASS
12  study very well.
13      Q.   Okay.
14      A.   I didn't study it.
15      Q.   All right. But you do know
16  from having read the Advisory Committee
17  transcript that there was one day of the
18  Advisory Committee in February 2001 that was
19  devoted to looking at Celebrex --
20      A.   Yes.
21      Q.   -- and there was a separate day
22  devoted to looking at Vioxx?
23      A.   That's right.
24      Q.   And one of the issues that they

Page 552

1   talked about in both meetings is whether, if
2   there is -- whether, if the VIGOR results do
3   mean there's an increased risk, whether that
4   is an increased risk just for Vioxx or
5   whether it's an increased risk for COX-2s
6   generally or whether it's an increased risk
7   across the board?
8       A.   That's right.
9       Q.   That was one of the questions,
10  right?
11      A.   Sorry.
12          Yes. Right.
13      Q.   Okay. And although I
14  understand, you know, you don't know the
15  details of the CLASS study, you do understand
16  that the CLASS study was not a naproxen
17  comparison, right?
18      A.   That's true.
19      Q.   Okay. It was a study of
20  Celebrex versus ibuprofen and diclofenac,
21  right?
22      A.   Yes.
23      Q.   Okay. The 2001 Advisory
24  Committee, in part, included members who were

39 (Pages 549 to 552)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 553

1  trained in cardiology, right?
2      A.   Yes.
3      Q.   And which isn't really typical
4  for an arthritis advisory committee, right?
5      A.   That's right.
6      Q.   The reason that cardiologists
7  were invited to participate is because there
8  were issues with the interpretation of
9  potential cardiac risks, right?
10     A.   Yes.
11     Q.   One of the cardiologists who
12 participated on that panel was a fellow named
13 Dr. Steve Nissen, right?
14     A.   Yes.
15     Q.   Do you know Dr. Nissen?
16     A.   Not personally, no.
17     Q.   Have you served on an Advisory
18 Committee with him?
19     A.   I don't think so. I don't
20 think so.
21     Q.   Dr. Nissen is at the Cleveland
22 Clinic; is that your understanding?
23     A.   Right.
24     Q.   Is he viewed as a prominent

Page 554

1  cardiologist, from your understanding?
2      A.   Yes.
3      Q.   Okay. And Dr. Nissen at the
4  Advisory Committee made comments along the
5  lines of "I suppose people want to hear from
6  me, since I'm the cardiologist who's here,"
7  right?
8      A.   Yes.
9      Q.   And he expressed the view
10 that -- or the question as to whether what
11 was seen in the VIGOR trial was or wasn't
12 different for Vioxx and for Celebrex, right?
13     A.   Yes.
14     Q.   Okay. And at the end of the
15 day, Dr. Nissen's bottom line, if you will,
16 was that he thought the information from the
17 VIGOR label -- or from the VIGOR study should
18 be included in the product label, right?
19     A.   Yes.
20     Q.   But he didn't -- he didn't
21 believe that it was clear that that
22 represented an increased cardiovascular risk;
23 is that fair to say?
24     MR. WACKER: Objection.

Page 555

1      A.   That's a characterization of
2  his opinion.
3      Q.   (BY MR. PIORKOWSKI) Yes, it
4  is.
5      A.   Yes.
6      Q.   I'm asking you: Is that a fair
7  characterization of his opinion?
8      A.   Yes.
9      Q.   Because you read this
10 transcript. Actually, it was one of the
11 first things you read when you got involved
12 in the litigation, right?
13     A.   That's true, right.
14     Q.   Okay. And nobody on the 2001
15 Advisory Committee recommended that Vioxx be
16 withdrawn from the market, right?
17     A.   Well, that's certainly true,
18 but it -- we have to view that decision
19 through the lens of what they were shown.
20 What they were shown was misleading.
21     Q.   Okay.
22     A.   But given they've -- the view
23 that they had, then that was the conclusion
24 they reached.

Page 556

1      Q.   Let's come back and --
2      MR. JOSEPHSON: Objection to
3  the responsiveness.
4      MR. PIORKOWSKI: Okay.
5      Q.   (BY MR. PIORKOWSKI) Let's come
6  back and talk about what they were shown in a
7  minute. Let me be sure we're on the same
8  page with respect to what their conclusions
9  were.
10     A.   Sure.
11     Q.   And then we'll talk about what
12 they may or may not have shown.
13     Their conclusion -- nobody on
14 the Advisory Committee concluded or suggested
15 or recommended that Vioxx should be withdrawn
16 from the market, correct?
17     A.   That's right.
18     Q.   Okay. And nobody suggested
19 that Vioxx have a black box warning for
20 cardiovascular risk, right?
21     A.   That's right.
22     Q.   Okay. What they suggested is
23 that the information from the VIGOR study be
24 included in the product label so that doctors

40 (Pages 553 to 556)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 557

1  had that information available to make their
2  own determination about what it meant?
3      A.   Yes.
4      Q.   Is that fair?  Okay.
5      A.   Yes.
6      Q.   And, in fact, that's the
7  recommendation that was ultimately adopted
8  and integrated into the label in April of
9  2002, right?
10     A.   Yes.
11     Q.   Okay.  Now, you said in
12 response to an earlier question that the FDA
13 Advisory Committee is essentially only as
14 good as the information it's given or
15 something like that?
16     A.   Yes.
17     Q.   Okay.  What specific
18 information is it that you contend that the
19 February 2001 FDA Advisory Committee did not
20 have?
21     A.   Two things:  They didn't have
22 the relevant tables from the Watson report,
23 nor did they have the mortality data from the
24 Alzheimer's studies.

Page 558

1      Q.   Okay.  Anything else?
2      A.   No.  Those are the two things I
3  can -- I believe they should have had and did
4  not have.
5      Q.   Other than those two things,
6  there's nothing else at trial that we're
7  going to hear you say that Merck failed to
8  give to either the FDA or the Advisory
9  Committee in 2001; is that right?
10     A.   I would say this:  If I learn
11 anything else, I will certainly let you know
12 well before trial.
13     Q.   But, as we sit here today,
14 there's nothing other than those two pieces
15 of information?
16     A.   That's true.
17     Q.   Okay.  All right.  One of the
18 articles that you referenced in your -- in
19 your report is an article written by
20 Drs. Mukherjee, Nissen and Topol, right?
21     A.   Yes.
22     Q.   And that was published in the
23 Journal of the American Medical Association
24 in August of 2001, right?

Page 559

1      A.   Yes.
2          (Whereupon, Deposition Exhibit
3      Moye MDL 15, "Risk of Cardiovascular
4      Events Associated with Selective COX-2
5      Inhibitors," by Mukherjee, et al. (6
6      pages), was marked for
7      identification.)
8      Q.   (BY MR. PIORKOWSKI)  And
9  I've --
10     A.   Thank you.
11     Q.   Is the article that I've marked
12 as Exhibit 15 the article to which you
13 referred?
14     A.   Yes.
15     Q.   Okay.  And in this article,
16 Dr. Topol and Nissen, the authors, review the
17 results of a number of different studies,
18 right?
19     A.   Yes, they do.
20     Q.   Including -- they review the
21 VIGOR study first, right?
22     A.   Yes.
23     Q.   They review the CLASS study
24 that we just talked about on Celebrex, right?

Page 560

1      A.   Yes.
2      Q.   They reviewed study 085 and
3  090, right?
4      A.   Yes.
5      Q.   Which you also allude to?
6      A.   Right.
7      Q.   And they also comment about
8  adverse event reporting, right?
9      A.   Yes.
10     Q.   And then they conduct kind of a
11 review, and they do a comparison of the
12 annualized myocardial infarction rates from
13 the VIGOR and the CLASS study with a placebo
14 metanalysis, right?
15     A.   Yes.
16     Q.   Okay.  Let's break down what
17 that means.  Okay.
18          First of all, there's a lot of
19 different ways that you can report risk data;
20 fair to say?
21     A.   Yes.
22     Q.   Okay.  And one of the ways that
23 you can report it is in something called
24 patient-years, right?

41 (Pages 557 to 560)

165470b8-f920-4da9-843f-90cc143762f6