Lemuel A. Moye, M.D., Ph.D.

Page 561

1    A.    Right.
2    Q.    And patient-years actually
3  takes account of -- of the time elements of a
4  drug in addition to just sort of the rate?
5    A.    Well, let's put it this way:
6  It takes into account the duration of
7  follow-up in addition to the number of
8  patients that are in the study.  That's one
9  way to do that.  Not the only way, but that's
10  one way.
11    Q.    Okay.  But, for example, if we
12  have -- let's see what he used here.  Like,
13  for example, he used -- they used .52 per --
14  is it thousand patient-years? -- hundred
15  patient-years on the table for the --
16  Table 3, for the annualized myocardial
17  infarction rate.  You see on page 957?
18    A.    I see Figure 3.
19    Q.    Figure -- I'm sorry.  Figure 3.
20    A.    Yeah, Figure 3.  Right.
21    Q.    I'm sorry.
22    A.    Looks like the arrow bar goes
23  right through it.  That first -- the height
24  of that first point is 0.52.

Page 562

1    Q.    Yes.  Okay.  Yeah, but it is
2  .52, right?
3    A.    Right.  Right.
4    Q.    Okay.  And is that -- is
5  that -- that's .52 per hundred patient-years;
6  is that right?
7    A.    Let's see.
8    Q.    Let's take a second to be sure,
9  because I want to make sure we got it right.
10    A.    Right.
11        (Witness reviews document.)
12    A.    Well, all I can find -- I can
13  only find a reference to the figure at the
14  top of page 958.
15    Q.    (BY MR. PIORKOWSKI)  Okay.  Let
16  me see if I can --
17    A.    Yeah, it's the first column --
18    Q.    All right.
19    A.    -- first complete sentence.
20    Q.    I tell you what:  We'll come
21  back and make sure we get clarified on that.
22    A.    Okay.
23    Q.    You know, one of the sources of
24  information that Dr. Topol and his authors

Page 563

1  refer to in the end notes is the Targum memo
2  that we talked about last time.  Do you
3  remember that?
4    A.    Yes, I remember.  Yes.
5    Q.    Okay.  And we actually, I
6  think, marked that as an exhibit on our first
7  day, right?
8    A.    Yes.
9    Q.    I believe.
10        And that is one of the
11  reference materials that Dr. Topol and
12  Mukherjee used in presenting their data,
13  right?
14    A.    Yes.
15    Q.    Okay.  Let me show you --
16    MR. PIORKOWSKI:  And, Jason, I
17    only have -- we marked this last time.
18    I only have this copy.  You're welcome
19    to take a look at it.
20    Q.    (BY MR. PIORKOWSKI)  But what I
21  want to show you, Doctor, is on page 14 of 38
22  of Dr. Targum's memo.  And there's a
23  category -- there's a table that's entitled
24  "Analyses Of Cardiovascular Events in the

Page 564

1  VIGOR Study Using Endpoint Definitions
2  Standard and Large Antiplatelet Trials."
3        Why don't you just take a look
4  at that for a second.
5    A.    Sure.
6    MR. GALLAGHER:  Which exhibit
7    is it?
8    MR. PIORKOWSKI:  I don't
9    remember which exhibit number it is.
10    I'll see if I got -- do you have
11    another copy?  Here you go.  I've got
12    another copy for you.
13    MR. GALLAGHER:  Thanks.
14    Q.    (BY MR. PIORKOWSKI)  You see
15  what I'm talking about?
16    A.    Yes, sure do.
17    Q.    Okay.  Now, do you see on there
18  that there's a -- hold onto it a second.
19    A.    Okay.
20    Q.    Do you see on there there's a
21  myocardial infarction rate?
22    A.    Yes.
23    Q.    Okay.  And can you read what
24  the myocardial infarction rate is for

Lemuel A. Moye, M.D., Ph.D.

## Page 565

1 rofecoxib from the VIGOR study?
2      A.    0.74.
3      Q.    Okay.
4      And this is using the ATPC
5 endpoint, I presume.
6      Q.    Right. But the myocardial
7 infarctions are broken out separately, right?
8      A.    Right. Sure. Right.
9      Q.    Okay. And so the .74 refers
10 specifically to myocardial infarctions, not
11 to APTC, right?
12      A.    Right. Right.
13      Q.    Okay. And can you tell from
14 Dr. Targum's write-up whether that .74
15 represents .74 per hundred patient-years?
16      A.    What's that? Well, not from
17 the table. Let's -- maybe there's a
18 statement at the end --
19      Q.    Are the numbers on there? Can
20 you --
21      A.    Oh. You want to just compute
22 it from the numbers?
23      Q.    Right.
24           (Witness reviews document.)

## Page 566

1      A.    I think so. If you look at
2 the -- page 15 --
3      Q.    (BY MR. PIORKOWSKI) Yeah.
4      A.    -- it says "per 100 patient
5 year," right.
6      Q.    Yeah, that's what I was going
7 to say. Okay.
8      A.    Right. Right. Right. That's
9 right. Okay.
10      Q.    So does that appear --
11      A.    Right.
12      Q.    -- right, sort of if you're
13 doing the N and the --
14      A.    Right.
15      Q.    I mean, basically, the math
16 that we would be doing here would be dividing
17 20 --
18      A.    20.
19      Q.    -- which is the number of
20 MIs --
21      A.    Right.
22      Q.    -- into 2699, which is the
23 patient-years, right?
24      A.    Right. It's the ratio of 20

## Page 567

1 over 2699, right. Right.
2      Q.    Yeah. Right. Okay. And that
3 would be .74 per hundred --
4      A.    4, right, per hundred per --
5      Q.    Per hundred per year, right?
6      A.    Right.
7      Q.    And -- or another way of saying
8 that would be 7.4 per thousand --
9      A.    Thousand.
10      Q.    -- per year, right?
11      A.    Right.
12      Q.    And to sort of make that
13 understandable, what that means is if you had
14 1,000 patients who were of this same, you
15 know, usage and baseline demographics and so
16 forth, that at least based on VIGOR, you
17 would expect 7.4 myocardial infarctions per
18 thousand. You wouldn't actually have a
19 fraction --
20      A.    Right.
21      Q.    -- but per thousand people
22 using it for a year, right?
23      A.    Right. I would think if you
24 had 10,000 VIGOR patients taking rofecoxib,

## Page 568

1 74 would have had heart attacks.
2      Q.    Okay. In a year?
3      A.    In a year, right.
4      Q.    Okay. Now, the same table
5 actually gives you the number for naproxen,
6 right, the same table on page 14?
7      A.    14? Yes.
8      Q.    Okay. And the number for
9 naproxen is .15 per hundred patient-years,
10 right?
11      A.    Right.
12      Q.    Or to put it in your 10,000
13 range, that means if 10,000 patients used
14 naproxen for a year, 15 would have MIs?
15      A.    Right. Right.
16      Q.    Is that right?
17      A.    Yes.
18      Q.    Okay. Now, I want you to turn
19 back now to Figure 3 of the Topol paper, if
20 you would.
21      A.    Let's see. Oh. Okay.
22      Q.    Okay?
23      A.    Yeah. Okay.
24      Q.    In Figure 3 of the Topol paper,

Lemuel A. Moye, M.D., Ph.D.

Page 569

1 you see under "VIGOR Rofecoxib," there's
2 that .74 again?
3    A.   Right.
4    Q.   Okay.  That .74 is the same .74
5 that we just saw in the Targum paper, right?
6    A.   Right.
7    Q.   They correspond to each other,
8 they're both talking about the same trial,
9 right?
10   A.   Right.
11   Q.   And they're both sort of using
12 the same units, if we will.  They're both
13 using patient year units, right?
14   A.   Yes.  Percent, right.
15   Q.   Now, let's back up for just a
16 second and talk about what Dr. Topol did
17 here.  Basically, what he did, we said he did
18 a metanalysis, right?
19   A.   Yes.
20   Q.   And what he did is he looked at
21 four different studies, placebo groups,
22 right?
23   A.   Right.
24   Q.   And he said, "What I would like

Page 570

1 to do here is kind of get a rough comparison
2 of how the rates that we're seeing for the
3 COX-2s from the VIGOR study and the CLASS
4 study -- how that compares with what we would
5 expect to see in the placebo groups from
6 studies in the general population," right?
7    A.   Right.
8    Q.   And he's just -- it's
9 essentially a rough comparison or a
10 historical --
11   A.   Yes.
12   Q.   -- historical control group,
13 you call it?
14   A.   Yes.
15   Q.   Okay.  Now, do you think that
16 this sort of approach to a question is a
17 reasonable scientific approach, what he's
18 doing here?
19   A.   Well, based on what information
20 was available, I think what Eric's doing is
21 certainly appropriate.  Of course, what he'd
22 like to have and does not have is a
23 head-to-head comparison of rofecoxib versus
24 placebo.

Page 571

1    Q.   Right.
2    A.   But without having that, this
3 is the next best thing he can do, and it's
4 accepted methodology.
5    Q.   Okay.  And what he's seeing
6 here is that he's seeing that there's a
7 higher rate in -- in effect, if we look at
8 the -- if we look at the CLASS study, what he
9 has down here for Celebrex, it's actually an
10 even higher rate than with VIGOR -- with
11 Vioxx in VIGOR, right?
12   A.   Well, .80 to .74.
13   Q.   Right.  And so .80 would
14 translate to -- if you looked at 10,000
15 patients for a year, 80 would be expected to
16 have an MI if they were similar to the
17 patients in the study, right?
18   A.   Right.  Right.
19   Q.   All right.  Now, do you know --
20 in any of the information you've reviewed, do
21 you know what the range of the myocardial
22 infarction rates were in the individual
23 studies that Dr. Topol looked at in this
24 analysis?

Page 572

1    A.   I have to just -- presumably,
2 he has a table here where he shows what the
3 rates are.  I don't know what they are.
4    Q.   Did you -- I think we asked
5 about this.  Did you review a letter from
6 Dr. Temple to JAMA that was kind of
7 critiquing this study?
8    A.   I don't recall that.
9    Q.   Don't recall?
10   A.   No.
11   Q.   Okay.  Are you aware that the
12 individual study rates in the studies that
13 Dr. Topol used ranged from .38 per hundred
14 patient-years to 1.33 per hundred
15 patient-years?
16   A.   I didn't know that.
17   Q.   Okay.  Did -- what the bars are
18 demonstrating on here is the bars are
19 indicating the confidence intervals, right?
20   A.   Yes.
21   Q.   The vertical bars?
22   A.   Right.  Yes.
23   Q.   Okay.  And what they show is
24 that the --

Lemuel A. Moye, M.D., Ph.D.

Page 573

1    A.    Well, the vertical lines, I
2  guess, that go through the bars, right.
3    Q.    Sure. I'm sorry.
4    A.    Okay. Right.
5    Q.    Yeah, that's a better way to
6  say it.
7          The vertical lines that go
8  through the bars indicate the confidence
9  intervals, right?
10   A.    Yes.
11   Q.    And what they show is that the
12 confidence intervals, really, for all three
13 of these groups overlap, right?
14   A.    Yes.
15   Q.    So -- okay. All right.
16         And that means you really can't
17 draw any absolute conclusions one way or the
18 other about one being statistically higher or
19 lower than another one?
20   A.    Well, certainly you can't draw
21 any conclusions between VIGOR and class --
22 between the event rates of rofecoxib and
23 celecoxib.
24   Q.    Uh-huh.

Page 574

1    A.    If I'm looking at this right,
2  though, it appears that they are saying that
3  the rate for -- the MI rates for rofecoxib is
4  greater than the MI rate in the placebo
5  analysis, right?
6    Q.    Right.
7    A.    It's .04. And, similarly,
8  between celecoxib and placebo.
9    Q.    And -- okay. So for -- you're
10 saying that your interpretation of this is
11 for both Vioxx and for Celebrex, that it
12 shows an increased rate?
13   A.    That's my interpretation of the
14 P values as they've denoted them here, yes.
15   Q.    All right. Now, we don't have
16 on here the naproxen rate, right?
17   A.    That's true.
18   Q.    Okay. And if we were to put
19 the naproxen rate on this chart, basically
20 what we would be charting is -- to keep it in
21 the same units, we would be -- based on what
22 you just looked at in the Targum paper, we
23 would put 0.15; is that right?
24   A.    Right.

Page 575

1    Q.    Okay. And 0.15 would be a
2  little less than a third of what they're
3  expect -- they're seeing in the placebo
4  group, right?
5    A.    Right. However, we have to
6  point out, though, that we don't have -- do
7  we -- oh, we do have 95% confidence interval
8  for it, don't we? .07 to .58, so it's got a
9  fairly wide confidence interval.
10   Q.    Which one are you looking at?
11   A.    I'm looking at -- you were
12 pointing out -- if we put -- I think -- if I
13 understood you correctly, if we had -- if we
14 were to have another bar --
15   Q.    Right.
16   A.    -- on Figure 3 --
17   Q.    Right.
18   A.    -- and it would be the naproxen
19 bar --
20   Q.    Right.
21   A.    -- the rate -- and, again, this
22 is percent per -- percent per year --
23   Q.    Right.
24   A.    -- would be 0.15.

Page 576

1    Q.    Right.
2    A.    And you had pointed out that
3  that is a fraction -- I think you were saying
4  it's a fraction of the 0.52.
5    Q.    Okay. Well, I mean, let me
6  actually ask you that.
7    A.    Okay.
8    Q.    It is, in fact, a fraction
9  of --
10   A.    Right.
11   Q.    -- right?
12         It's about -- it's less than a
13 third, right?
14   A.    Right. Right. That's what you
15 said. And I just pointed out that we also
16 had the error bars that would go around
17 that .15 --
18   Q.    Okay.
19   A.    -- and it extends as high as
20 .58, which is greater than the --
21   Q.    Placebo group?
22   A.    -- placebo, 0.52.
23   Q.    Okay. So you're saying the
24 confidence intervals appear to overlap?

45 (Pages 573 to 576)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 577

1    A.   Right.
2    Q.   Okay.  But we don't have a P
3   value for that difference between naproxen
4   and --
5    A.   No, we don't.
6    Q.   Okay.
7    A.   It probably would be
8   meaningless, anyway --
9    Q.   Okay.
10    A.   -- in this kind of coarse
11   analysis, but we don't have one.
12    Q.   Okay.  And by "coarse
13   analysis" -- what do you mean by "coarse
14   analysis"?
15    A.   Well, I mean -- you know, I
16   mean, even though it's an accepted
17   methodology, we have to understand that
18   implications and generalizations from this
19   study have to be more tightly circumscribed
20   than the kinds of generalizations you make
21   from controlled clinical studies that have
22   each of these patients randomized to each of
23   these groups follow the same duration of time
24   and so on.

Page 578

1    Q.   Okay.  Now, let me ask you in
2   Dr. Topol's paper if you could turn to
3   page 9 -- well, if you look at the bottom of
4   page 957, in the bottom left where we're back
5   to the text --
6    A.   Okay.
7    Q.   Okay.
8      -- it says, quote, "There are
9   differential effects of NSAIDs and COX-2
10   inhibitors on ex vivo platelet aggregation to
11   arachidonic acid."
12    A.   Yeah, 1 millimole -- is that
13   what that is -- of arachidonic acid?
14    Q.   Right.  Right.
15    A.   Okay.
16    Q.   Did I read that correctly?
17    A.   Yes.
18    Q.   And then it goes on to say,
19   "Naproxen has significant antiplatelet
20   effects, with mean platelet aggregation
21   inhibition of 93% compared with platelet
22   aggregation inhibition of 92% for those
23   taking aspirin (81 milligrams)," right?
24    A.   Yes.

Page 579

1    Q.   Okay.  Now, my question is:
2   Are you aware of any studies or any data that
3   shows that that statement is incorrect, that
4   naproxen does not have a platelet inhibition
5   that's equal to or greater than aspirin?
6      MR. WEBSTER:  Objection, form.
7    A.   I mean, no.  Naproxen is a
8   COX-1 COX-2 inhibitor, and so it's got
9   COX-1 -- I mean, COX-1 inhibitory effects as
10   well as COX-2 inhibitory.
11    Q    (BY MR. PIORKOWSKI)  Okay.
12   But, I mean, they're not just talking about
13   that basic fact.  They're also talking about
14   the percent inhibition, right?
15    A.   Right.
16    Q.   Okay.  Because when you
17   actually measure the potential for a clinical
18   effect, you need a certain threshold amount
19   of platelet inhibition, right?
20    A.   Yes.
21    Q.   What's the generally accepted
22   amount of platelet inhibition that you need
23   to correspond to a clinical effect?
24    A.   Actually, it's substantial.  I

Page 580

1   don't know exactly how much.  It may be 90%
2   or more, but it's substantial.
3    Q.   Okay.  All right.  But the 92%
4   that they cite for aspirin is certainly
5   accepted as having a clinical effect, right?
6    A.   Well, let me put it this way:
7   First of all, I am not a platelet scientist,
8   so while it certainly appears that there is a
9   lot of inhibitory capacity for naproxen, you
10   know, it's been -- that, in and of itself,
11   isn't reason for us to presume that it's
12   going to have a clinically beneficial effect.
13      MR. PIORKOWSKI:  Okay.  I'm
14    going to just object to the
15    nonresponsive portion of that.
16    Q    (BY MR. PIORKOWSKI)  Even if --
17   my only question has to do with the
18   pharmacological property, okay?
19    A.   Okay.
20    Q.   The pharmacological -- you're
21   not aware of any evidence to dispute that,
22   pharmacologically, that naproxen's inhibition
23   of platelet aggregation is equal to or --
24   equal to aspirin?

46 (Pages 577 to 580)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 581

1      A.    I don't know what the basis of
2  the statement is, and so I can't comment one
3  way or the other about...
4      Q.    Okay.  We're not going to hear
5  any dispute from you, though, as you sit here
6  today --
7      A.    Right.
8      Q.    -- about that fact?
9      A.    That's correct.
10     Q.    All right.  And then you see
11  the next sentence where it says, "Thus,
12  naproxen, but not ibuprofen," and it says,
13  "(platelet aggregation of approximately 80%)
14  or diclofenac (platelet aggregation of
15  approximately 40%) resulted in a high level
16  of platelet aggregation inhibition similar to
17  that achieved with aspirin."  Did I read that
18  correctly?
19     A.    You did.
20     Q.    Okay.  Let's see if we can
21  understand what that's saying.  It's a
22  complicated sentence.
23     A.    Sure.  Okay.
24     Q.    What they're saying is that

Page 582

1  naproxen is different from ibuprofen and
2  diclofenac with respect to its effect on
3  platelet aggregation; is that right?
4      A.    Yes.
5      Q.    Okay.  They're saying --
6      A.    In the magnitude of its effect.
7      Q.    In the magnitude of its effect,
8  because as you said earlier, all of these
9  medications in some way, shape or form, all
10  of the nonselective NSAIDs, all inhibit
11  COX-1, right?
12     A.    Right.
13     Q.    And because they all inhibit
14  COX-1, they all have some degree of platelet
15  aggregation inhibition, right?
16     A.    Right.
17     Q.    But it varies depending on the
18  dosage of the medication and the duration of
19  the medication, particularly for drugs that
20  have a fairly short half-life, right?
21     A.    Right.
22     Q.    Okay.  And so what this
23  sentence is saying is that while naproxen
24  gives you 93% platelet inhibition, ibuprofen

Page 583

1  gives you 80% and diclofenac gives you 40%,
2  right?
3      A.    Yes, that's what he says.
4      Q.    Okay.  All right.  And if -- if
5  it's correct that it's approximately 90%
6  that's needed for a pharmacologic effect,
7  ibuprofen and diclofenac would not have that
8  effect?
9      A.    Right, which is, of course, a
10  separate issue entirely from clinical effect.
11     Q.    Okay.  But at least
12  pharmacologically we agree, right?
13     A.    Right.
14     Q.    Okay.  And then he goes on to
15  talk about the fact that flurbiprofen --
16  which is another nonsteroidal
17  anti-inflammatory, right?
18     A.    Right.
19     Q.    -- that it actually has been
20  demonstrated to reduce the incidence of
21  myocardial infarction by 70% compared with
22  placebo, right?
23     A.    Right.

Page 584

1      Q.    Okay.
2      A.    That's what he says.
3      Q.    Okay.  And do you have any
4  basis to disagree with that?
5      A.    I don't know.  I haven't looked
6  at -- this is a 1993 study out of the
7  European Heart Journal.  I haven't looked at
8  that, so I can't comment one way or the other
9  about it.
10     Q.    Okay.  All right.  Now, can you
11  turn to page 958?
12     A.    Sure.
13     Q.    You see the middle column, the
14  first full paragraph?
15     A.    Okay.
16     Q.    Okay.  They say, quote, "Based
17  on this review, it is useful to consider
18  nonselective and selective COX inhibitors as
19  possessing a spectrum of biological effects,
20  both favorable and unfavorable.  At one end
21  of the spectrum, COX-2 inhibitors show less
22  propensity for gastrointestinal toxicity, but
23  greater thrombo-" --
24     A.    Prothrombo --

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 585

1    Q.   -- "prothrombotic potential,"
2  right? "At the other end of the spectrum,
3  aspirin and naproxen show greater potential
4  for gastrointestinal toxicity, but have a
5  cardioprotective effect." Did I read that
6  correctly?
7    A.   That's what he says, right.
8    Q.   Okay. Do you have any reason
9  to disagree with the general assessment that
10 there may be a range of risks and benefits
11 between the aspirin and naproxen-type NSAIDs
12 on one hand and the COX-2 inhibitors on the
13 other hand?
14   A.   Well, to answer your question:
15 I have no reason to disagree with that. I do
16 have reason to disagree with what Eric and
17 his group have said here.
18   Q.   Okay.
19   A.   But the answer to your question
20 is: Of course there's a range of risks and
21 benefits.
22   Q.   Okay. And what is it that you
23 disagree with about what Dr. Topol said?
24   A.   "At the other end of the

Page 586

1  spectrum, aspirin and naproxen show greater
2  potential for gastrointestinal toxicity, but
3  have a cardioprotective effect."
4          It's well established the
5  cardioprotective effect of aspirin. It's
6  well established what the -- the hazard to
7  upper GI -- the increase in upper GI serious
8  AEs with aspirin and naproxen. It's not well
9  accepted that naproxen has a significant
10 cardioprotective effect.
11   Q.   So you disagree with
12 Dr. Topol -- the portion of Dr. Topol's
13 statement where he refers to naproxen having
14 a cardioprotective effect?
15   A.   Yes.
16   Q.   Okay. Do you know -- this,
17 Dr. Topol's paper, was published in the
18 Journal of the American Medical Association,
19 right?
20   A.   Yes.
21   Q.   Okay. Which is a prominent
22 journal, right?
23   A.   Well, yeah. But let's not
24 suggest that they published it because of

Page 587

1  just one statement.
2    Q.   No, I'm not suggesting they
3  published it because of one statement, but
4  the editors -- one of the jobs of the
5  editors, when they review scientific work, is
6  to identify statements that may not be
7  substantiated and to sometimes request
8  further information or rewording or something
9  along those lines, right?
10   A.   But isn't that one of the sad
11 results of all of this, that we reveal that
12 that does not happen? It doesn't happen. It
13 should happen, we want it to happen, but it
14 doesn't happen.
15   Q.   You don't know that it didn't
16 happen, do you?
17   A.   Well, I know they let that
18 statement in that shouldn't have gotten in.
19   Q.   All right. That's your view,
20 anyway?
21   A.   Well, yes, that is my view.
22   Q.   Okay. We talked about the fact
23 that in April of 2002, the FDA did approve a
24 label change that included, among other

Page 588

1  things, an inclusion of the VIGOR data,
2  correct?
3          MR. WACKER: Objection.
4    A.   We did.
5    Q   (BY MR. PIORKOWSKI) We did?
6    A.   Yes, we did.
7    Q.   Okay. All right. Do you have
8  criticisms of the contents of the April 2002
9  label?
10   A.   Yes.
11   Q.   Okay. Let me ask you some
12 specific questions.
13          Did the April 2002 label
14 accurately set forth the results of the VIGOR
15 study with respect to cardiovascular risk?
16          MR. WEBSTER: Objection, form.
17          MR. WACKER: Objection.
18   A.   Yes.
19   Q   (BY MR. PIORKOWSKI) Okay.
20 You'd agree with me that one of the FDA's
21 goals in reviewing labeling -- proposed
22 labeling changes is to ensure that the data
23 that are in the label are accurate
24 reflections of what happened in the clinical

48  (Pages 585 to 588)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 589

1  trials?
2     A.   That's one of their goals, yes.
3     Q.   Okay. You understand that
4  50 milligrams of Vioxx has never been
5  approved for chronic use?
6     A.   I understand that, yes.
7     Q.   You understand that?
8     A.   Yes.
9     Q.   And you understand that Merck
10 has never sought approval of 50 milligrams of
11 Vioxx for chronic use?
12    A.   I didn't know what -- they saw
13 it, but I know it's not been approved.
14    Q.   Right. Well, I think we talked
15 last time that you had seen some
16 correspondence back and forth, although you
17 weren't sure you'd seen everything; is that
18 right?
19    A.   I'm sorry. Say again?
20    Q.   You'd seen some correspondence
21 back and forth between Merck and the FDA,
22 although you weren't sure you'd seen
23 everything; is that right?
24    A.   Right. That's right, uh-huh.

Page 590

1     Q.   And in the correspondence that
2  you've seen, you never saw any supplemental
3  new drug application where Merck requested
4  approval for 50 milligrams for chronic use?
5     A.   For 50 milligrams, I have never
6  seen such, right.
7        MR. PIORKOWSKI: All right.
8  Off the record for a second.
9        THE VIDEOGRAPHER: Off the
10 record at 11:21.
11       (Recess taken, 11:21 a.m. to
12 11:21 a.m.)
13       THE VIDEOGRAPHER: On the
14 record at 11:21.
15    Q.   (BY MR. PIORKOWSKI) Doctor,
16 one of the -- one of the things that's
17 described in your report in various places,
18 you have a lot of places where you discuss
19 something called relative risk, right?
20    A.   Yes.
21    Q.   And I just want to talk to you
22 to make sure we're on the same page about
23 some terminology, all right?
24    A.   Okay.

Page 591

1     Q.   Relative risk, first of all, is
2  a -- it's a measurement of -- it's considered
3  a ratio of hazards, if you will, between an
4  exposed group and a control group?
5     A.   It is the ratio of -- let's say
6  it's the ratio of incidence rates.
7     Q.   Okay.
8     A.   Okay.
9     Q.   All right. But a couple things
10 about relative risk: First of all, relative
11 risk is often calculated in, like,
12 placebo-controlled studies, right?
13    A.   Well, in controlled studies,
14 many times placebo-controlled studies, but
15 not only placebo-controlled studies.
16    Q.   Well, it's not calculated,
17 typically. In epidemiological observational
18 studies, there's a different term that's
19 used, typically called odds ratio, right?
20    A.   Right. When you don't have an
21 incidence rate.
22    Q.   Right.
23    A.   When you don't have new cases,
24 you only have -- you have new and background

Page 592

1  cases --
2     Q.   Right.
3     A.   -- then you go to the odds
4  ratio.
5     Q.   Right.
6        And many studies look at odds
7  ratio as opposed to relative risk, right?
8     A.   That's true, yes.
9     Q.   Okay. And odds ratio is
10 roughly -- it's not exactly the same thing,
11 but it's a rough estimate of relative risk?
12    A.   It depends on the background
13 rate. If the -- the lower the background
14 rate is, the more closely the odds ratio
15 corresponds to the incidence rate.
16    Q.   Okay.
17    A.   I'm sorry. The more -- I'm
18 sorry. Let me say that again.
19       The lower the background rate
20 of disease, the more closely the odds ratio
21 will approximate the relative risk.
22    Q.   Okay. So for something
23 that's -- and so you're talking about with a
24 particular disease, if the incidence in the

Lemuel A. Moye, M.D., Ph.D.

1  background population is 5% --
2      A.    Right.
3      Q.    -- that the odds ratio would be
4  a better reflection of relative risk in a
5  disease that had a background rate of 1%?
6      A.    Right.
7      Q.    Okay.  The lower the background
8  rate --
9      A.    Right.  More closer --
10     Q.    -- the closer the odds ratio
11 will be?
12     A.    Yes.
13     Q.    All right.
14     A.    Again, everything else being
15 equal, that's right.
16     Q.    All right.  Now, relative
17 risk --
18     A.    I need to get a little closer
19 here.
20     Q.    Gotcha.
21           Relative risk, by definition,
22 needs to be relative to something, right?
23     A.    Yes.
24     Q.    In other words, when you do a

1  study, you can do a relative risk compared to
2  a placebo group, right?
3      A.    Yes.
4      Q.    And you can also do a relative
5  risk compared to a comparator drug, for
6  example?
7      A.    Yes.
8      Q.    Okay.  And, in fact, you can
9  also do a relative risk comparing one dose of
10 a drug to another dose of the same drug?
11     A.    Yes, you can.
12     Q.    Okay.  So whenever we're
13 talking about relative risk, it's always
14 important for purposes of understanding to be
15 clear about relative to what?
16     A.    Yes.
17     Q.    Is that fair to say?
18     A.    Sorry.  Yes.
19     Q.    And the relative risk of a drug
20 against a comparator drug may or may not
21 correspond to the relative risk of a drug
22 against placebo?
23     A.    That's true.
24     Q.    Okay.  Now, also when we're

1  talking about relative risk, relative risk --
2  we usually don't have that discussion in a
3  vacuum.  We usually have that discussion with
4  respect to a particular endpoint; is that
5  right?
6      A.    That's true.
7      Q.    Okay.
8      A.    Right.
9      Q.    So, in other words, if we take
10 the studies that we're looking at here, there
11 are a variety of different endpoints that
12 these studies have looked at, right?
13     A.    Yes.
14     Q.    One of the endpoints, for
15 example, is myocardial infarction, right?
16     A.    Yes.
17     Q.    One of the endpoints is cardiac
18 events, which includes myocardial infarction
19 and angina pectoris and sudden cardiac death
20 and other things, right?
21     A.    Right, a more combined
22 endpoint.
23     Q.    A combined endpoint.
24           One of the relative -- one of

1  the end points is thromboembolic
2  cardiovascular events, right?
3      A.    Right.
4      Q.    Another combined endpoint is
5  the APTC endpoint, right?
6      A.    Yes.
7      Q.    And just so we're clear, even
8  for the same drug and the same dose and the
9  same comparator, the relative risk for one
10 endpoint may be different than the relative
11 risk for a different endpoint, right?
12     A.    Yes.
13     Q.    So, in other words, in our
14 studies, the relative risk of myocardial
15 infarction may be higher than the relative
16 risk of a combined endpoint that includes
17 myocardial infarction and other things?
18     A.    Right.  It would be different.
19     Q.    It would be different, right?
20     A.    Right.
21     Q.    All right.  Now, another thing
22 that you talk about a little bit in your
23 report is another concept called attributable
24 risk, right?

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 597

1    A.   I think I talk about
2  attributable risk exposed.  I think I talk
3  about attributable risk exposed.
4  Attributable risk is different than
5  attributable risk exposed, and I think I talk
6  about the ARE.
7    Q.   And what is the attributable
8  risk exposed?
9    A.   It's the -- well,
10  mathematically, it's the odds ratio minus one
11  divided by the odds ratio, or the relative
12  risk minus one divided by the relative risk.
13    Q.   And how is that different from
14  attributable risk?
15    A.   Attributable risk is just the
16  difference between the event -- between the
17  incidence rates.  For example, if we were
18  dealing with relative -- with incidence rates
19  here, the relative risk, of course, is the
20  ratio, as we talked about.  The attributable
21  risk is the difference between the two,
22  simply the difference.
23    Q.   Okay.
24    A.   And the attributable risk

Page 598

1  exposed is the relative risk minus one
2  divided by the relative risk.
3    Q.   Okay.  And what is it that you
4  understand attributable risk exposed tells
5  you?
6    A.   It's the excess risk
7  attributable to the intervention or to the
8  exposure.  The excess risk attributable to
9  the exposure.
10    Q.   All right.  Let's -- let me use
11  an example to make sure we're on the same
12  page.
13    A.   Sure.  Okay.
14    Q.   Let's say we've got --
15    A.   We have to talk about this
16  before lunch.  After lunch, I probably can't.
17    Q.   Yeah.  Okay.
18         Let's say we're dealing with a
19  relative risk of two, okay?
20    A.   Okay.
21    Q.   All right.  And the two refers
22  to the risk in the exposed population
23  compared to a risk of 1.0 in the background
24  population or the --

Page 599

1    A.   Okay.
2    Q.   -- or the control group.
3    A.   Okay.  So, right, uh-huh.
4    Q.   Now, the attributable risk
5  exposed would be 50%?
6    A.   Right.  It would be two minus
7  one divided by two, and that would be 50%.
8    Q.   And you're saying that refers
9  to the excess risk?
10    A.   Right.  It is the excess risk
11  that is the burden of the exposed.
12    Q.   And is that -- in a situation
13  where a cause-and-effect relationship has
14  been established, is that the percentage of
15  the total cases that are attributable to the
16  drug?
17    A.   Yes.
18    Q.   Okay.
19    A.   In the exposed group.
20    Q.   That's what I mean.
21    A.   Yeah, in the --
22    Q.   So if you have a relative risk
23  of two, you have an attributable risk of
24  50% --

Page 600

1    A.   Right.
2    Q.   -- and you have an established
3  cause-and-effect relationship --
4    A.   Yes.
5    Q.   -- what you're saying is that
6  50% of the cases would be due to the drug?
7    A.   Yes.
8    A.   All right.
9    A.   Right.
10    Q.   Now, I'd just like to run
11  through a couple other numbers.  If you have
12  a relative risk of one, right, that --
13    A.   Yes.
14    Q.   -- translates with -- to an
15  attributable risk exposed of zero, right?
16    A.   Yes.  Right.  There are no
17  excess cases.  Right.
18    Q.   All right.  No excess cases.  A
19  relative risk of one plus or minus a couple,
20  that's essentially saying that there's no
21  increased risk, right?
22    A.   Right.  There's no strength of
23  asso- -- there's no strength of association
24  between the exposure and the endpoint.

51 (Pages 597 to 600)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 601

1    Q.    Okay.  Now, if we have relative
2  risk of 1.5, how does that translate to
3  attributable risk?  Is that about 33%?
4    A.    Right.  Well, that's -- right.
5  It will be .5 divided by 1.5, or a third, so
6  33%.
7    Q.    Okay.  And then, similarly, if
8  you had a relative risk of 2.5, that would
9  be --
10    A.    What is that?
11    Q.    -- 67?
12    A.    Yeah.  That's 1.5 divided by
13  2.5, right, or 15/25, or 3/5ths, or 60%.
14    Q.    Okay.  Now, by definition, any
15  relative risk that's less than two would have
16  an attributable risk of less than 50%, right?
17    A.    Yes.
18    Q.    Okay.  Now, can an attributable
19  risk also be calculated from a study that
20  uses an odds ratio?
21    A.    An attributable risk, not an
22  ARE, but attributable risk.
23    Q.    Let me -- I'm sorry.  Let me
24  rephrase the question.

Page 602

1    A.    Okay.
2    Q.    We just did some attributable
3  risk exposed calculations, right?
4    A.    Right.
5    Q.    Can -- can an attributable risk
6  exposed calculation be done from a study that
7  uses an odds ratio as opposed to a relative
8  risk?
9    A.    Yes.
10    Q.    Okay.  And how does -- how
11  would that be done?
12    A.    The same way.  It's the odds
13  ratio minus one divided by the odds ratio.
14    Q.    Okay.  Now, in your
15  attributable risk, you have a couple of
16  attributable risk exposed calculations you
17  did?
18    A.    Yes.
19    Q.    Did you do any kind of a global
20  attributable risk calculation based on the
21  clinical studies overall, or did you -- did
22  you just limit it to -- I think VIGOR and
23  APPROVe?
24    A.    I don't know.  Let me see what

Page 603

1  I have here.
2        (Interruption by the
3        videographer.)
4    A.    I guess the most responsive
5  part of the affidavit is page 18.
6    Q    (BY MR. PIORKOWSKI)  Okay.
7    A.    And I show the relative risk of
8  myocardial infarction, so I show the overall
9  relative risk here.  If your question --
10  wait.
11    Q.    I'm sorry.
12    A.    If your question was about the
13  AR- -- did I do AREs --
14    Q.    Right.
15    A.    -- I didn't do AREs for this,
16  no.
17        MR. PIORKOWSKI:  Okay.  All
18  right.
19        (Whereupon, Deposition Exhibit
20  Moye MDL 16, 1/24/06 Federal Register
21  Excerpt, Pages 3922 - 3999, was marked
22  for identification.)
23    Q    (BY MR. PIORKOWSKI)  Let me
24  hand you what I've marked as -- as Exhibit 16

Page 604

1  and ask you if you've seen that previously.
2        MR. WEBSTER:  Lunch is being
3  served now, so if you want to take --
4  finish the five minutes and then we'll
5  take, what, 30 minutes for lunch?  Is
6  that all right?
7        MR. PIORKOWSKI:  That's fine.
8    A.    I have not seen this particular
9  rendition, no.
10    Q    (BY MR. PIORKOWSKI)  Okay.  All
11  right.  Let me actually do a few housekeeping
12  things before lunch.  We've got five minutes
13  left on the tape.
14        Is it your opinion that any
15  drug that affects -- let me start over --
16  that any drug that does not inhibit
17  thromboxane, but that does affect a decrease
18  in urinary prostacyclin levels creates a
19  proclotting state?
20    A.    I don't know.  I don't know.
21    Q.    Are you aware of any other
22  drugs that -- well, is it your view that
23  pharmacologically, when you don't inhibit
24  thromboxane but you decrease urinary

52 (Pages 601 to 604)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 605

1  prostacyclin, that there's a potential of
2  cardiovascular risk?
3      A.  Everything else being equal
4  here -- and one thing I keep relearning is
5  that everything else is not equal with these
6  complicated mechanisms -- yes, that's true.
7      Q.  Okay.  Are you aware of any
8  other drugs that decrease urinary
9  prostacyclin levels, but do not inhibit
10  thromboxane, other than Vioxx?
11      A.  No, but I haven't studied other
12  drugs in sufficient detail to be able to
13  really informatively respond.
14      Q.  Okay.  Let me ask you on the
15  document that I just handed you -- actually,
16  I'm going to wait and do that after lunch.
17          Do you know, have you
18  reviewed --
19          MR. PIORKOWSKI: I'm sorry, one
20  minute.
21      Q.  (BY MR. PIORKOWSKI) Have you
22  reviewed all of Merck's submissions with
23  respect to proposed label changes to the FDA
24  concerning Vioxx?

Page 606

1      A.  Yes.  I haven't referred to
2  them in my affidavit, but I have reviewed
3  them, yes.
4      Q.  You've reviewed all of their
5  submissions?
6      A.  Yes.
7      Q.  Okay.  Do you know how many --
8  on how many occasions Merck requested that
9  the FDA change the -- or, I'm sorry.  Let me
10  start over.
11          Do you know on how many
12  occasions Merck proposed a label change to
13  the FDA that included the VIGOR
14  cardiovascular data between March 2000 and
15  April 2002?
16          MR. WEBSTER: Objection, form.
17      A.  I'm not sure I understand your
18  question.  I do know that there was an
19  activity and communication between the agency
20  and Merck about label changes, but how many
21  label changes were proposed by Merck in that
22  time, I don't know.
23      Q.  (BY MR. PIORKOWSKI) Okay.  Do
24  you know whether Merck actually asked the FDA

Page 607

1  to change the label to a label that included
2  the VIGOR cardiovascular data?
3      A.  Well, I imagine that they --
4          MR. WACKER: Objection.
5      A.  -- would -- that they would
6  have to acknowledge that a label change was
7  necessary, but to what extent that first
8  overture -- to what extent they went in the
9  first overture, I don't know.
10      Q.  (BY MR. PIORKOWSKI) Do you
11  know to what extent the first overture was
12  made by Merck as opposed to the FDA?
13      A.  No.
14          MR. PIORKOWSKI: Okay.  All
15  right.  I think we're at the end of
16  our tape.
17          MR. WEBSTER: Okay.
18          THE VIDEOGRAPHER: Off the
19  record at 11:37.
20          (Recess taken, 11:37 a.m. to
21  12:14 p.m.)
22          THE VIDEOGRAPHER: Hold,
23  please.  Back on the record at 12:14.
24      Q.  (BY MR. PIORKOWSKI) Good

Page 608

1  afternoon, Dr. Moye.
2      A.  Good afternoon.
3      Q.  I'd handed you a document that
4  I think we marked as Exhibit 16 before the
5  break.  Do you have that?
6      A.  Yes.
7      Q.  Okay.  And I'll represent to
8  you that this is a section of the Federal
9  Register that contains an update by the FDA
10  concerning its requirements for labeling?
11      A.  Yes.
12      Q.  Does that appear to be what it
13  is?
14      A.  Yes.
15      Q.  Are you familiar generally,
16  from your work at the Advisory Committee,
17  with FDA requirements for labeling?
18      A.  Yes.
19      Q.  You've been -- I think you've
20  testified before that in other cases, that
21  you've been asked to consider labeling issues
22  as a part of your work at the Advisory
23  Committee?
24      A.  Yes.

Lemuel A. Moye, M.D., Ph.D.

Page 609

1    Q.    When you've -- what labels
2  specifically have you worked on in your work
3  on the Advisory Committee?
4    A.    I don't know. I could -- I
5  mean, what -- my recollection here is going
6  to be incomplete, but I think there's four or
7  five drugs that the Advisory Committee was
8  asked specifically questions about labels.
9    Q.    Okay. What kinds of questions
10  were -- do you recall the Advisory Committee
11  being asked by the FDA with respect to
12  products on which you sat on the Advisory
13  Committee?
14    A.    They were -- they ranged from
15  the generic, should the -- what should the
16  label say, to specific, what dosage should be
17  included, what specifically should the
18  indications be, what should the
19  contraindications be, should there be a
20  statement in the -- should there be a
21  statement in the warning section that warns
22  of one particular adverse effect or another.
23          They were -- should there be
24  statements in the precautions section of the

Page 610

1  label. They were actually all over the map.
2    Q.    Okay. But those are all things
3  that, during your tenure, that the FDA,
4  solicited advice from its outside advisors on
5  those labeling questions?
6    A.    Those are the examples I just
7  provided, yes.
8    Q.    Okay. I want to ask you to
9  look at what is page 3334.
10    A.    3934?
11    Q.    Yes. I misspoke. Thanks.
12    A.    Okay. Okay.
13    Q.    And it says, quote, "Under the
14  Act, FDA is the expert federal public health
15  agency charged by Congress with ensuring that
16  drugs are safe and effective, that their
17  labeling adequately informs users of the
18  risks and benefits of the product, and is
19  truthful and not misleading." Did I read
20  that correctly?
21    A.    Yes.
22    Q.    Okay. Is that consistent with
23  your understanding of the FDA's role with
24  respect to labeling?

Page 611

1    A.    Well, it's my understanding of
2  their charge, right.
3    Q.    Okay. Okay. And then it goes
4  on to say, "Under the Act" -- and by "the
5  Act," they mean the Food, Drug and Cosmetic
6  Act?
7    A.    Yes.
8    Q.    That's your understanding?
9    A.    Right.
10    Q.    -- "and FDA regulations, the
11  agency makes approval decisions based, not
12  only on an abstract estimation of its safety
13  and effectiveness, but, rather, on a
14  comprehensive scientific evaluation of the
15  product's risks and benefits under the
16  conditions of use prescribed, recommended or
17  suggested in the label -- labeling." Did I
18  read that correctly?
19    A.    Actually, not. You put in
20  "only." It doesn't matter. But you said
21  "based not only on"; it's really "based not
22  on." But that's a small matter.
23    Q.    I'm sorry. "Based not on an
24  abstract estimation" --

Page 612

1    A.    Right.
2    Q.    -- "of its safety and
3  effectiveness, but, rather, on a
4  comprehensive scientific evaluation of the
5  product's risks and benefits under the
6  conditions of use prescribed, recommended or
7  suggested in the labeling."
8    A.    You read it accurately.
9    Q.    Okay. And do you agree with
10  that? Is that your understanding of FDA's
11  charge under the Food, Drug and Cosmetic Act
12  and the FDA regulations?
13    A.    Well, this is a little
14  different. This now says -- not so much as a
15  charge. It says, "The agency makes approval
16  decisions based, not on" -- based not on --
17  and it goes on and does that.
18          I mean, that's their goal. I
19  mean, they don't do that sometimes, but
20  that's their goal, to, in fact, have a
21  comprehensive scientific evaluation of a
22  product's risk and benefits.
23    Q.    Okay. From your experience at
24  FDA -- or I should say with the FDA Advisory

54 (Pages 609 to 612)

165470b8-f920-4da9-843f-90cc143762f6

...

Lemuel A. Moye, M.D., Ph.D.

**Page 613**

1 Committee, is it correct that there are
2 concerns sometimes about the potential for
3 overwarning with respect to potential safety
4 risks?
5    A.    You're asking me, in my tenure
6 at the FDA?
7    Q.    In your specific experience --
8    A.    At the Advisory --
9    Q.    -- has the FDA -- have FDA
10 officials, or has it been your understanding
11 of FDA philosophy, that there are concerns
12 about potential overwarning about safety
13 risks?
14    A.    The FDA speaks with many
15 voices, and no doubt there are some voices in
16 the agency that would warn about
17 overlabeling.
18        Now, perhaps, some of those
19 voices were -- enunciated this point of view
20 at some of the meetings I was at.  I don't
21 remember.  But there is concern among some
22 about overlabeling.
23    Q.    Do you see on page 3935 in the
24 left-hand column --

**Page 614**

1    A.    Okay.
2    Q.    -- middle of the first full
3 paragraph, it says, quote, "FDA has
4 previously found that labeling that includes
5 theoretical hazards not well grounded in
6 scientific evidence can cause meaningful risk
7 information to lose its significance.
8 Overwarning, just like underwarning, can
9 similarly have a negative effect on patient
10 safety and public health."
11        Have you heard that sentiment
12 expressed at FDA in connection with your
13 service on the Advisory Committee?
14    A.    I have heard the sentiment
15 about overwarning.
16    Q.    Okay.
17    A.    And also, this notion of FDA
18 has previously labeled -- found that labeling
19 that includes theoretical hazards, well, I
20 mean, I'm -- it could be -- anybody would be
21 hard-pressed to disagree with that.  I don't
22 know what relevance that has here.
23    Q.    Okay.
24    A.    But they'd be hard-pressed to

**Page 615**

1 disagree with it.
2    Q.    Do you agree that overwarning
3 can have a negative effect on patient safety?
4    A.    Yeah, I agree that a carelessly
5 written label, one way or the other, is going
6 to do damage.  It's going to misrepresent the
7 risk-benefit ratio.
8    Q.    You understand that one of
9 FDA's concerns, potentially, where there are
10 unknowns is whether an effect -- a safety
11 effect is an effect of just one drug or all
12 drugs within a class?
13    A.    I'm sorry.  A safe -- what do
14 you mean by "safety effect"?
15    Q.    Okay.  Well, let's talk about
16 Vioxx specifically, okay?
17    A.    Okay.
18    Q.    In the wake of the VIGOR study
19 that we talked about, there was a finding of
20 increased cardiovascular events in the VIGOR
21 study --
22    A.    Yes.
23    Q.    -- in Vioxx users compared to
24 naproxen, right?

**Page 616**

1    A.    Right.
2    Q.    One of the comments that
3 Dr. Nissen pointed out and that Dr. Topol
4 noted in his paper that we already reviewed
5 is that the myocardial infarction event rate
6 for Celebrex was similar to the myocardial
7 infarction event rate for Vioxx in the VIGOR
8 study, right?
9    A.    That's what we went through.
10    Q.    We already went through that.
11    A.    Right, before lunch.  Right.
12    Q.    One of the issues raised is if
13 there is, indeed, a cardiovascular effect of
14 Vioxx that's negative, whether that is an
15 effect only of Vioxx or whether that's also
16 an effect of Celebrex.
17    A.    Okay.
18    Q.    Is that -- do you agree with me
19 that that's a fair question?
20    A.    Yes.
21    Q.    That's a question that is one
22 of the questions that the FDA was trying to
23 deal with at the February 2001 Advisory
24 Committee meeting, right?

55 (Pages 613 to 616)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 617

1    A.   Right.
2    Q.   And part of the reason that's
3  an important consideration is because if you
4  end up warning about Vioxx and not warning
5  about Celebrex and it turns out that they all
6  have the same risk, you may have done a
7  disservice, right?
8    A.   Right.
9    Q.   All right. Also, on -- if you
10 turn back to page 3934, do you see in the far
11 left-hand column about two-thirds of the way
12 down the page, it says, quote, "The
13 centerpiece of risk management for
14 prescription drugs generally is the labeling,
15 which reflects thorough FDA review of the
16 pertinent scientific evidence and
17 communicates to healthcare practitioners the
18 agency's formal authoritative conclusions
19 regarding the conditions under which the
20 product can be used safely and effectively"?
21 Did I read that correctly?
22   A.   Yes.
23   Q.   Okay. And do you agree with
24 that statement?

Page 618

1    A.   Well, it's a little too
2  muscular for me. I mean, the FDA, that is
3  the laudable goal, but that's not what the
4  reality is, commonly.
5    Q.   Okay. Well, let's start with
6  the laudable goal part, okay?
7    A.   Okay.
8    Q.   You agree with me that the
9  FDA's goal with respect to labeling is to
10 include pertinent scientific evidence that
11 communicates to healthcare practitioners the
12 FDA's formal authoritative conclusions
13 regarding the conditions under which the
14 product can be used safely and effectively?
15   A.   Right, that's their goal.
16   Q.   That's their goal?
17   A.   Right.
18   Q.   Okay. And what you're saying
19 is sometimes they achieve their goal better
20 than other times, at least in your
21 experience?
22   A.   Right.
23   Q.   Okay. It is correct, though,
24 that when the FDA approves a product, the FDA

Page 619

1  looks very carefully at the entire labeling
2  at issue for the product, right?
3    A.   Looks very carefully at the
4  labeling?
5    Q.   At the proposed labeling as a
6  part of its approval decision?
7    A.   Oh, yes. They look at the
8  proposed labeling, yes.
9    Q.   They literally look at every
10 word in the labeling?
11   A.   Yes.
12   Q.   Look at every -- as it said,
13 every comma, every period, every semicolon;
14 fair?
15   A.   Yes, uh-huh.
16   Q.   Okay. All right. And you see
17 over on the same page on the right-hand side,
18 it says, after the -- there's a various --
19 there's various citations you see to legal
20 cases --
21   A.   Okay. Okay.
22   Q.   -- and then it says, quote, "In
23 fact, the determination whether labeling
24 revisions are necessary is, in the end,

Page 620

1  squarely and solely FDA's under the Act." Do
2  you agree with that?
3    A.   Only insofar with the next
4  paragraph, with the next sentence, yes.
5    Q.   Okay. Well, let's read the
6  next sentence and then see if I can ask you
7  about the entirety of it, okay?
8    A.   Okay. Sure. Okay.
9    Q.   The next sentence reads, quote,
10 "A manufacturer may, under FDA regulations,
11 strengthen a labeling warning, but in
12 practice, manufacturers typically consult
13 with FDA before doing so to avoid
14 implementing labeling changes with which the
15 agency ultimately might disagree and that,
16 therefore, might subject the manufacturer to
17 enforcement action." Did I read that
18 correctly?
19   A.   Yes.
20   Q.   Okay. And do you agree with
21 that statement?
22   A.   No.
23   Q.   You don't agree with that
24 statement?

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 621

1    A.    No, I don't.
2    Q.    Well, does the FDA, as they
3  say, in the end, have the authority,
4  ultimately, to decide whether labeling
5  revisions are or are not necessary?
6    A.    Ultimately, they do, yes.
7    Q.    Ultimately, they do?
8    A.    Right.
9    Q.    And the manufacturer can
10  propose label changes to the FDA, but that
11  doesn't necessarily mean that the FDA will
12  accept those label changes?
13    A.    Well, it depends.  I think we
14  can be more precise than that.
15    Q.    Okay.
16    A.    I think if a manufacturer
17  wanted to weaken its label, let's say remove
18  a warning or weaken the -- weaken the adverse
19  events section, that would really require
20  them to enter into preliminary discussions
21  with the FDA about that.
22          However, if the manufacturer
23  makes a determination that there is a -- and
24  giving them benefit of the doubt in this

Page 622

1  hypothetical circumstance, identify a new
2  serious risk, then they are at liberty of
3  making reasonable changes to the label.
4          And, in fact, the regulations
5  say there's nothing in them that suggests
6  that the manufacturer has any less freedom
7  than that.  However, this reads as though, in
8  fact, manufacturers, if they're smart, are
9  going to consult with the FDA before they
10  make changes.  So I disagree with this.
11    Q.    You don't think that
12  manufacturers should consult with FDA before
13  they make changes to the label?
14    A.    No.  I disagree with the
15  assertion that this statement reflects FDA
16  goals and policies.  That's what I disagree
17  with.
18          In fact, the FDA goes out of
19  its way to tell manufacturers that they are
20  free to make appropriate changes, especially
21  to -- I'm talking now about strengthening
22  the -- adding to contraindications or
23  strengthening the warning or adverse events,
24  and the regulations permit them to do that,

Page 623

1  but that they also have to come to the FDA
2  later and justify the change.
3    Q.    Well, but this section isn't
4  talking about weakening a label.  It's
5  talking about strengthening a label warning.
6    A.    Well, which is right.  Right.
7  And so which leads to my disagreement,
8  because this statement, "in the end, might,
9  therefore, subject the manufacturer to
10  enforcement action," to me, at least, as I
11  sit here and read this -- to me, suggests
12  that manufacturers strengthen the labels at
13  their own peril, which is not the intent of
14  the FDA at all.
15    Q.    Do you know -- did you come
16  across in your review of the correspondence
17  with the FDA any occasions on which Merck
18  strengthened its label to add a safety
19  warning and was told by the FDA, "No, that's
20  not appropriate"?
21    A.    No.
22    Q.    Did you come across any
23  occasion like that?
24    A.    Excuse me.

Page 624

1          I have not.
2    Q.    Okay.  Would you be surprised
3  if an event like that occurred?
4    A.    I don't know.  I'd have to read
5  it to be sure.  I don't know.
6    Q.    Okay.  But to the extent that
7  happened, that's not something that you're
8  aware of?
9    A.    Right.
10    Q.    Okay.  Do you -- have you ever
11  been -- as an Advisory Committee member,
12  you've never been asked to consider what's
13  called a changes-being-effected label change,
14  right?
15    A.    That's true.
16    Q.    Okay.
17    A.    As I sit here now, trying to
18  review the many labels we looked at, I don't
19  think we ever did that.
20    Q.    Right.  Right.  And just so
21  we're clear, the changes-being-effected label
22  change -- or it's sometimes referred to as
23  CBE, right?
24    A.    Uh-huh.

57 (Pages 621 to 624)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 625

1    Q.    Okay. That's a situation where
2 a manufacturer can make a change in its label
3 without prior approval of the FDA --
4    A.    Right.
5    Q.    -- but it has to submit that
6 change to the FDA, and the FDA has to agree
7 with the change, right? ·
8    A.    Right. Right. Within a
9 certain time frame.
10    Q.    Right.
11    A.    I mean, it's very specific
12 about that, right.
13    Q.    Exactly. And if the FDA
14 disagrees with the change --
15    A.    Right.
16    Q.    -- one of the things that this
17 section is saying can happen is the FDA could
18 consider the product misbranded?
19    A.    Yes. That's true.
20    Q.    And that's true, right?
21    A.    That's right.
22    Q.    All right. Now, in terms of --
23 have you ever consulted with a company where
24 you have interacted with the FDA with respect

Page 627

1    A.    I guess the last time was about
2 maybe four years ago. Maybe even longer ago
3 than that. This is 2006. Maybe six years
4 ago.
5    Q.    Okay. And what was the
6 occasion on which you read the CBE
7 regulations?
8    A.    I guess only insofar as I was
9 expected -- well, no. Actually, it was just
10 part of a regulation review, just part of my
11 own regulation review that I read the section
12 talking about CBEs.
13    Q.    Okay. And was that in
14 connection with what -- with a case?
15    A.    I don't remember. I don't
16 remember.
17    Q.    Have you ever reviewed FDA
18 regulations -- well, I withdraw that
19 question.
20        Are you aware of any
21 situations -- you know what a prior approval
22 change is to the label?
23    A.    I could hazard a guess, but I
24 don't know. I don't know.

Page 626

1 to the implementation of a CBE label change?
2    A.    No.
3    Q.    Okay. And I think we
4 established last time, but you've never been
5 employed by the FDA, so you've never had --
6 never had an occasion to review a CBE label
7 change internally at the agency?
8    A.    Right. I mean, I'm a special
9 government employee, the days of the Advisory
10 Committee meeting, but I've never been
11 employed by the FDA exclusive of that --
12    Q.    Right.
13    A.    -- and never reviewed a CBE.
14    Q.    And you never reviewed a CBE as
15 a member of the Advisory Committee?
16    A.    To my knowledge, that's right.
17    Q.    Have you -- in connection with
18 your opinions in this case, have you -- well,
19 have you ever read the FDA regulations about
20 implementing CBE label changes?
21    A.    Yes.
22    Q.    You have?
23    A.    Yes.
24    Q.    When was that?

Page 628

1    Q.    Okay. You're aware that the
2 way most changes, regardless of what the
3 label that goes on it -- most changes to the
4 label, the way they're made, is the
5 manufacturer submits something to the FDA --
6    A.    Yes.
7    Q.    -- and then the FDA takes
8 action on it?
9    A.    Responds to it, yes.
10    Q.    Responds to it.
11        And the manufacturer's
12 submission may be prompted by an FDA phone
13 call --
14    A.    Right.
15    Q.    -- or it may be based on the
16 manufacturer's own initiative, but the
17 process starts with the manufacturer
18 submitting a change request to the FDA, and
19 then the FDA takes action, right?
20    A.    Right.
21    Q.    Okay. Are you aware of any
22 situation for any drug where a manufacturer
23 has submitted a proposal -- a proposed label
24 change to the FDA with respect to a

58 (Pages 625 to 628)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 629

1  particular drug and a particular issue and
2  that while that request is pending, the
3  manufacturer went ahead and made a
4  changes-being-effected label change?
5      A.   No.
6      Q.   No.
7           Are you aware of any -- do you
8  know what an FDA guidance is?
9      A.   Yes.
10     Q.   What's an FDA -- can you tell
11 us what an FDA guidance is, please?
12     A.   Sure.  A guidance is
13 specifically that.  It is information that
14 is -- that counsels and advises sponsors,
15 primarily, as to how they can conduct a
16 particular activity within the confines of
17 the -- and still be -- within the confines of
18 the CFRs.
19     Q.   Okay.  So the guidances
20 themselves are not regulations; is that
21 right?
22     A.   To my knowledge, no, they are
23 not.
24     Q.   But the intent of guidances is

Page 630

1  to give the manufacturers some, literally,
2  guidance --
3      A.   Yes.
4      Q.   -- about how to best comply
5  with the regulations?
6      A.   Right.  The regulations are a
7  complex body of documents and it's easy to
8  get confused through it, and the guidances
9  are to advise sponsors who want to comply,
10 but may not know the best way to do that.
11     Q.   Okay.  Have you looked at FDA
12 guidances that were in place during the time
13 Vioxx was on the market with respect to
14 the -- with respect to making CBE label
15 changes?
16     A.   No.
17     Q.   Okay.  All right.  You're -- I
18 know you're familiar from other cases with
19 the Texas Supreme Court's decision in the
20 Havner case, right.
21     A.   Yes.
22     Q.   In fact, I think you wrote a
23 section of a book chapter on it; is that
24 right?

Page 631

1      A.   Yes.  Yes.
2      Q.   And you realize that there are
3  certain requirements for scientific evidence
4  for causation purposes?
5      A.   Yes.
6      Q.   Okay.  I want to ask you
7  several questions related to scientific
8  evidence that you're relying on here, and I
9  just sort of -- first, I'd like to kind of
10 make sure we're on the same page about a few
11 things.
12     A.   All right.
13     Q.   First of all, I'm going to ask
14 you some questions about controlled studies,
15 okay?
16     A.   Yes.
17     Q.   And I think -- is it your
18 understanding of controlled studies that a
19 controlled study is a study that has a
20 control group?
21     A.   Yes.  It has a cohort of
22 patients who simultaneously are being
23 evaluated under, perhaps, a different
24 intervention, but for the same endpoint; and

Page 632

1  the goal being compared to -- to experience the
2  experience in the exposed group to experience
3  in the group without the exposure.
4      Q.   Okay.  And that's a control
5  group that would be for a clinical trial,
6  right?
7      A.   Sure.
8      Q.   There's other kinds of control
9  groups that you could have for, let's say, an
10 epidemiological or an observational study,
11 right?
12     A.   Yes.  Right.
13     Q.   Okay.  But, in either event,
14 it's still fair to call them control groups,
15 right?
16     A.   Yes.
17     Q.   And you understand the
18 distinction I'm making is between a control
19 study and something that's, let, say, a case
20 series, right?
21     A.   Yes.  Right.
22     Q.   And I'm also going to ask you
23 some questions about studies that have a
24 statistically significant increased risk,

59 (Pages 629 to 632)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 633

1 okay?
2 A. Okay.
3 Q. Now, you -- I know you have
4 some issues with the use of "statistical
5 significance," generally, as far as showing
6 safety risks; is that right?
7 A. Yes, that's right.
8 Q. Okay. But for purposes of my
9 questions, you can -- you understand what I
10 mean by "statistical significance" in
11 accordance with your -- the traditional
12 understanding of that term?
13 A. Yes.
14 Q. Okay. All right.
15 A. We're talking Fisherian rules
16 here?
17 Q. Huh?
18 A. Fisherian rules?
19 Q. Right. Right.
20 A. Okay.
21 Q. All right. Are you aware of
22 any controlled clinical trial prior to
23 APPROVe that showed a statistically
24 significant increased risk of myocardial

Page 634

1 infarction in patients using Vioxx compared
2 to placebo?
3 A. I would have to look at the
4 Watson report.
5 MR. PIORKOWSKI: Okay.
6 MR. GALLAGHER: We'll get it
7 for you.
8 THE WITNESS: Okay. Thank you.
9 (Conference out of the hearing
10 of the reporter.)
11 MR. GALLAGHER: You go ahead.
12 MR. PIORKOWSKI: Oh. Go ahead?
13 All right. Fine.
14 THE WITNESS: Okay. Thank you.
15 MR. GALLAGHER: Is that the
16 Watson report?
17 MR. PIORKOWSKI: Yeah.
18 MR. GALLAGHER: Okay.
19 MR. PIORKOWSKI: That's what I
20 thought you said, go ahead.
21 MR. GALLAGHER: Okay. No. Go
22 ahead. Let me tell him.
23 MR. PIORKOWSKI: Let's just go
24 off the record, then, since Jason

Page 635

1 left. I don't want to -- just for a
2 second.
3 THE VIDEOGRAPHER: Off the
4 record at 12:39.
5 (Recess taken, 12:39 p.m. to
6 12:40 p.m.)
7 THE VIDEOGRAPHER: Hold,
8 please. On the record at 12:40.
9 Q (BY MR. PIORKOWSKI) Okay.
10 A. Okay.
11 Q. Let me -- let me make sure my
12 question is clear.
13 A. Sure.
14 Q. The Watson analysis is an
15 analysis -- first of all, the Watson analysis
16 is not itself a controlled clinical trial,
17 right?
18 A. That's right.
19 Q. Okay. The Watson analysis was
20 an analysis that compared people in an -- in
21 the Vioxx clinical trial to placebo groups of
22 other clinical trials, right?
23 A. Right.
24 Q. Okay. So my question is: Are

Page 636

1 you aware of any controlled clinical trial
2 before APPROVe that showed a statistically
3 significant increased risk of myocardial
4 infarction in patients using Vioxx compared
5 to placebo?
6 A. I also have to look at
7 Study 090. Watson does not do that.
8 Q. Okay.
9 A. Okay.
10 Q. All right.
11 A. I need to look at 090 as well.
12 Q. All right. What source do you
13 need to look at for 090?
14 A. What source? Oh. I mean, I
15 need to look -- well, either the medical
16 review, the medical officer's review --
17 Q. Okay. You have the Targum
18 analysis right there?
19 A. Right.
20 Q. Okay. And she reviews 090,
21 right?
22 A. Right.
23 MS. LAWLER: Doctor, I have
24 another meeting I've got to go to, so

Lemuel A. Moye, M.D., Ph.D.

Page 637

1 excuse me.
2        THE WITNESS:  Okay.  As long as
3 you sat here for the ARE discussions,
4 I'm happy.  Thank you.
5        MR. JOSEPHSON:  She found out
6 they were exposed to --
7        THE REPORTER:  Do we need that
8 on the record?
9        MR. JOSEPHSON:  No.
10        MR. PIORKOWSKI:  No, we don't
11 need that.
12        (Discussion off the record.)
13        MR. WEBSTER:  We need to stay
14 on here if we're burning time here.
15        THE REPORTER:  Just can't get
16 all the conversations.
17        (Witness reviews document.)
18    A.    Well, so far I'm not finding
19 the analysis that I need to find to answer
20 the question and also to be able to include
21 090.
22    Q.    (BY MR. PIORKOWSKI)  Okay.
23 Is -- okay.
24    A.    Excepting that, my answer is

Page 638

1 no.
2    Q.    So your answer is:  With the
3 possible exception of Study 090, you're not
4 aware of any controlled clinical trial before
5 APPROVe that showed a statistically
6 significant increased risk of myocardial
7 infarction in patients using Vioxx compared
8 to placebo?
9    A.    That's right.  I mean, I do
10 have to say that I wouldn't expect to see a
11 study that only looked at myocardial
12 infarction because patients who were at high
13 risk for the disease weren't included in many
14 of the studies; and also my usual disclaimer
15 about stat significance when it comes to
16 safety issues.
17    Q.    Okay.  But the answer to my
18 question is:  With the possible exception of
19 Study 090, you're not aware of any studies,
20 right?
21    A.    That's right.
22    Q.    And the problem with 090 is
23 just that right now as we sit here, you
24 cannot determine if that was a statistically

Page 639

1 significant result or not?
2    A.    That's correct.
3    Q.    Okay.  And you do know that
4 Study 090 had a combined control group,
5 right?
6    A.    Yes.
7    Q.    That was not just placebo; it
8 was placebo and another drug called
9 nabumetone, right?
10    A.    Right.  That's right.  However,
11 the results are broken out for placebo and
12 nabumetone --
13    Q.    Fair enough.
14    A.    -- but I don't see the analysis
15 comparing rofecoxib and placebo.
16    Q.    Okay.  Let me ask you the same
17 question, but with respect to a broader
18 category of events --
19    A.    Yes.
20    Q.    -- which is a combined endpoint
21 of cardiac events, which would include
22 myocardial infarction, sudden cardiac death,
23 angina pectoris, those three.
24    A.    Yes.

Page 640

1    Q.    Is the answer the same?
2    A.    Name the three again for me,
3 please?
4    Q.    Okay.  The events I'm including
5 in this analysis are myocardial infarction --
6    A.    Yes.
7        MR. PIORKOWSKI:  I'm sorry.
8 Let me let the bus pass here one
9 second.
10        THE WITNESS:  There are a lot
11 of them, unfortunately.
12        MR. PIORKOWSKI:  Right.
13    Q.    (BY MR. PIORKOWSKI)  I'm asking
14 the same question, but I'm expanding the
15 point we're talking about from myocardial
16 infarction --
17    A.    Right.
18    Q.    -- to a broader combined
19 endpoint that includes myocardial
20 infarction --
21    A.    Okay.
22    Q.    -- sudden cardiac death --
23    A.    Right.
24    Q.    -- angina pectoris.  I think

61 (Pages 637 to 640)

Lemuel A. Moye, M.D., Ph.D.

Page 641

1 that's it.
2 A. Okay. Prior to APPROVe, is the
3 question?
4 Q. Prior to APPROVe, that's my
5 question.
6 A. Against placebo?
7 Q. That's right.
8 A. Well, that really narrows it
9 down. I can't think of any.
10 Q. Okay. Are you aware of any
11 observational study published prior to
12 withdrawal that showed an increased risk of
13 myocardial infarction with 25 milligrams of
14 Vioxx compared to nonusers?
15 MR. WEBSTER: Objection to
16 form.
17 MR. PIORKOWSKI: Actually, let
18 me back up and ask you a couple
19 predicate questions first.
20 Q. (BY MR. PIORKOWSKI) You gave
21 me a description of how the control group was
22 used in a clinical trial, right?
23 A. Right.
24 Q. Okay. When you're looking at

Page 642

1 epidemiological observational studies of a
2 case-controlled design --
3 A. Yes.
4 Q. -- it's a little bit -- the
5 groups are situated a little bit differently,
6 right?
7 A. Yes.
8 Q. You don't actually have a
9 placebo group the way you do in a clinical
10 trial, right?
11 A. Right. Right.
12 Q. But the closest -- would you
13 agree with me that the closest thing that --
14 well, there's a lot of different ways you can
15 analyze a study that's an observational
16 study, right?
17 A. Yes.
18 Q. You can look at the rate in one
19 drug versus the rate in another drug, right?
20 A. Right.
21 Q. You can look at the rate in one
22 drug versus the rate in nonusers of any drug,
23 right?
24 A. Right.

Page 643

1 Q. You can look at the rate of one
2 drug in current use versus the rate of that
3 drug in remote use, right?
4 A. Right.
5 Q. Is it fair to say that since we
6 don't have a placebo group, that the closest
7 surrogate we have for a placebo in a
8 case-controlled design is a comparison
9 between the drug and nonuse?
10 A. Yes.
11 Q. Okay. All right. With that --
12 with that background, my question is: Is
13 there any observational study that you're
14 aware of that was published prior to
15 withdrawal that showed an increased risk of
16 myocardial infarction with 25 milligrams of
17 Vioxx use when compared with nonusers?
18 A. I don't know when the Solomon
19 report appeared. So, therefore, I'm not sure
20 if that meets your time constraint.
21 Q. Okay.
22 A. But I think that the Solomon
23 report shows an increased risk of -- well,
24 I'm sorry, "to nonusers," you mean nonusers

Page 644

1 of --
2 Q. Of NSAIDs, generally.
3 In other words, the studies
4 that have been done have looked at -- one of
5 the categories of controls that they've
6 looked at are patients who are not using any
7 NSAID drug, right?
8 A. Okay. All right. Okay.
9 Right.
10 Q. You recognize that that's a
11 true statement, right?
12 A. Right. Including COX -- any
13 other COX-2s --
14 Q. Anything, right, including any
15 COX-2s --
16 (Simultaneous discussion
17 interrupted by the reporter.)
18 THE WITNESS: That's my fault.
19 MR. PIORKOWSKI: I apologize.
20 Q. (BY MR. PIORKOWSKI) Including
21 any COX-2s or any nonselective NSAIDs, right?
22 A. I understand, right.
23 Q. Okay. And so that's my --
24 that's my question.

62 (Pages 641 to 644)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 645

1    A.    Okay. Okay.
2         No, I don't.
3    Q.    Okay. Are you aware of any
4 controlled clinical trial that shows -- even
5 to today, that shows a statistically
6 significant increased risk of myocardial
7 infarction in 50-milligram Vioxx users
8 compared to placebo?
9    A.    Compared to placebo?  No.
10   Q.    Okay. Are you aware of any
11 controlled clinical trial that shows a
12 statistically significant increased risk of
13 myocardial infarction in patients using Vioxx
14 for five days or less compared with placebo?
15   A.    No.
16   Q.    Are you aware of any controlled
17 clinical trial that shows a statistically
18 significant increase of myocardial infarction
19 in 12.5-milligram Vioxx users compared to
20 placebo?
21        Actually, in fairness, that --
22 to the extent that you don't know about
23 Study 090, that's probably the same answer,
24 right?

Page 646

1    A.    I don't know.  I'm wondering --
2         MR. WEBSTER:  Objection, form.
3    A.    I actually am wondering about
4 ADVANTAGE, and I'm wondering about VIP.
5    Q    (BY MR. PIORKOWSKI)  Okay.
6 ADVANTAGE and VIP were both 25 milligrams,
7 right?
8    A.    Right.  Well, your question
9 was --
10   Q.    12.5 milligrams?
11   A.    Ah. Well -- no. Okay. Okay.
12   Q.    So let's just -- so the record
13 is clear:  Are you aware of any controlled
14 clinical trial that shows a statistically
15 significant increased risk of MI in
16 12.5-milligram Vioxx users compared to
17 placebo?
18   A.    No.
19   Q.    Okay. And are you aware of any
20 controlled clinical trial that shows a
21 statistically significant increased risk of
22 MI in 12.5-milligram Vioxx users compared to
23 nonselective NSAIDs?
24   A.    No.

Page 647

1    Q.    Okay. Are you aware of any
2 controlled clinical trial that shows a
3 statistically significant increased risk of
4 myocardial infarction in 25-milligram Vioxx
5 users for less than a month?
6    A.    No.
7    Q.    Okay. You -- one of the -- you
8 talk in your report -- do you have your
9 report handy, still?
10   A.    Sure do.
11   Q.    You talk in your report about
12 the VIP study; is that right?
13   A.    Right.
14   Q.    Do you see on page 45,
15 paragraph 117?
16   A.    45, paragraph 117.  Yes.
17   Q.    Do you want to just take a
18 second and read that over?
19   A.    Okay.
20   Q.    I want to ask you a couple of
21 questions about it.
22        (Witness reviews document.)
23   A.    Yes.
24   Q    (BY MR. PIORKOWSKI)  Okay.

Page 648

1 Now, you mentioned in your discussion that
2 there are five cases of a combined endpoint
3 of coronary artery occlusion, myocardial
4 infarction, ischemia, silent myocardial
5 infarction in the rofecoxib group, and none
6 in the placebo group, right?
7    A.    I do, yes.
8    Q.    Is that an analysis that you
9 did --
10   A.    No.
11   Q.    -- that -- I mean, that
12 collection of the events, I mean?
13   A.    No.  That's an analysis that I
14 pulled from a table.
15   Q.    Okay. All right.  Is the --
16 how did the MIs compare in the Vioxx group
17 and the placebo group in the VIP study?
18   A.    I think -- actually, I have a
19 statement four lines down into the paragraph.
20   Q.    Right.
21   A.    There were seven and six.
22   Q.    Okay. And, to your
23 understanding, so we're clear, the VIP study
24 is still being analyzed, right?

63 (Pages 645 to 648)

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 649

1     A.   Right.
2     Q.   I assume that what you reviewed
3  was one of Merck's submissions of interim
4  data to the FDA --
5     A.   Yes.
6     Q.   -- is that right?  All right.
7          To your knowledge, it's not
8  been published yet, right?
9     A.   That's correct.
10     Q.   Okay.  Was the difference in
11  myocardial infarctions in the VIP study
12  between the Vioxx group and the placebo group
13  a statistically significant difference?
14     A.   The data I saw had
15  insignificant differences.
16     Q.   Had what?
17     A.   Insignificant differences.
18     Q.   Insignificant differences?
19     A.   Right.
20     Q.   Or not statistically
21  significant?
22     A.   Yes.
23     Q.   Yes.  Okay.  Okay.
24          One of the studies that we -- I

Page 650

1  think you told us last week that you had
2  participated as an author of a study called
3  the CARE study, right?
4     A.   Yes.
5     Q.   And you were actually involved
6  in the design of the CARE study?
7     A.   Yes.
8     Q.   Were you the designer, or were
9  you kind of a co-designer?
10     A.   Oh, no.  One -- actually,
11  there's no one designer in a study like that.
12  I was one of several different designers.  We
13  worked jointly to design, as well as to
14  execute and analyze it.
15     Q.   But you had input into the
16  study design, at a minimum, right?
17     A.   Yes, that's right.
18     Q.   Okay.  And into, you know,
19  things like how the groups were selected and
20  how the randomization occurred and that kind
21  of thing?
22     A.   Well, more to the point, I
23  guess trying to figure out what the event
24  rates would be, what kind of treatment effect

Page 651

1  we were looking for, how long would patients
2  need to be followed, something about
3  inclusion/exclusion criteria.
4     Q.   Okay.
5     A.   And also the sample size.
6     Q.   Okay.  Now, am I correct that
7  the CARE study was a placebo-controlled
8  study?
9     A.   Yes.
10     Q.   It was a randomized study,
11  right?
12     A.   Yes, that's right.
13     Q.   It was double-blinded?
14     A.   Yes.
15     Q.   It was a study that involved a
16  comparison of a drug called pravastatin,
17  which is known by the brand name Pravachol,
18  right?
19     A.   Right, uh-huh.
20     Q.   And comparing that to placebo,
21  right?
22     A.   Yes.
23     Q.   And it -- Pravachol is a
24  cholesterol-lowering drug, right?

Page 652

1     A.   Yes, right.
2     Q.   And what was -- it would --
3  under normal circumstances, it would be
4  unethical to withhold a cholesterol-lowering
5  drug from patients who you knew in advance
6  needed cholesterol-lowering, right?
7     A.   Right.
8     Q.   Okay.  So what you were doing
9  in Pravachol that was a little bit different
10  was giving it to patients in the wake of
11  myocardial infarctions who did not
12  necessarily have elevated cholesterol?
13     A.   Right, who had, quote/unquote,
14  "normal LDL cholesterols, normal" -- circa
15  1989.
16     Q.   Right.  Or what they refer to
17  in the title as "average cholesterol levels"?
18     A.   Yes.
19     Q.   Okay.  Although those averages
20  have now come down, right?
21     A.   Yes.
22     Q.   All right.
23     A.   Well, we hope they have.
24     Q.   All right.  Now, the study was

64 (Pages 649 to 652)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

## Page 653

1  a study that was five years in duration,
2  right?
3      A.    The follow-up was five years,
4  that's right.
5      Q.    Okay.
6      A.    It took longer to do it, but
7  the follow-up was five years.
8      Q.    The patients were -- the period
9  of time for which the patients were enrolled
10  was five years?
11      A.    Yeah; but, actually, I think
12  the minimum follow-up period was --
13  '95, '91 -- well, the average follow-up
14  five years, I think. Right, a little over
15  five years.
16      Q.    Okay. And you consider this to
17  have been a scientifically rigorous study,
18  right?
19      A.    Yes.
20      Q.    It was ultimately published in
21  the New England Journal of Medicine?
22      A.    Yes, they were.
23      Q.    Okay. You were a co-author,
24  right?

## Page 654

1      A.    Yes.
2      Q.    In fact, you were the third
3  author, right?
4      A.    Yes.
5      Q.    And you personally have
6  responsibility for the contents of the
7  article?
8      A.    Yes.
9      Q.    Okay. The study was sponsored
10  by Bristol-Myers Squibb; is that right?
11      A.    That's right.
12      Q.    They funded the study?
13      A.    Yes.
14      Q.    And were you paid by
15  Bristol-Myers Squibb in connection with your
16  work?
17      A.    Through the university, yes.
18      Q.    Through the university. All
19  right.
20          Now, do you agree -- would you
21  agree with me that breast cancer is a serious
22  risk?
23      A.    Yes.
24          MR. WEBSTER: Objection, form.

## Page 655

1      Q.    (BY MR. PIORKOWSKI) It is?
2  Yes?
3      A.    It is.
4      Q.    It's potentially fatal, right?
5      A.    Right.
6      Q.    And one of the findings in the
7  CARE study was that there were 12 cases of
8  breast cancer in the Pravachol users, right?
9      A.    Right.
10      Q.    And there was one case of
11  breast cancer in the placebo group, right?
12      A.    That's right.
13      Q.    And if we were to calculate the
14  relative risk of breast cancer in the
15  Pravachol group, it would be a relative risk
16  of 12.0, right?
17      A.    Approximately right, assuming
18  the denominators are equal, right.
19      Q.    Okay. Now, if we were to
20  calculate what the increase over -- assuming
21  we're dealing with a relative risk of 12 --
22  have you heard -- have you read in any of the
23  transcripts you've read where the relative
24  risk of myocardial infarctions in the VIGOR

## Page 656

1  study compared to naproxen was five, right?
2      A.    Right.
3      Q.    Okay. And have you heard
4  people characterize that as a 400% increase
5  risk?
6      A.    I've heard it characterized
7  lots of different ways, yeah.
8      Q.    Okay. Do you think that's a
9  fair characterization, to call a relative
10  risk of five, a 400% increased risk?
11      A.    No. I mean, it's five times
12  the rate of the naproxen group.
13      Q.    Okay.
14      A.    So I would just say it's five
15  times.
16      Q.    Okay. And let me -- I don't
17  want to ask you too many more questions
18  without giving you the benefit of your study
19  here.
20          (Whereupon, Deposition Exhibit
21      Moye MDL 17, "The Effect of
22      Pravastatin on Coronary Events After
23      Myocardial Infarction in Patients with
24      Average Cholesterol Levels," by Sacks,

65  (Pages 653 to 656)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 657

1    et al. (9 pages), was marked for
2    identification.)
3    Q    (BY MR. PIORKOWSKI) What I've
4    marked as Exhibit 17 --
5    A.    Thank you.
6    Q.    -- would you agree with me that
7    that's a copy of the published CARE study
8    from the New England Journal of Medicine?
9    A.    Yes.
10   Q.    Okay. Now, you discuss in the
11   results of this section on page 1006,
12   starting at the very bottom of the left-hand
13   side and then going to the top of the page --
14   A.    Yes.
15   Q.    -- you discuss the breast
16   cancer results, right?
17   A.    That's right.
18   Q.    Okay. And you actually give a
19   P value to the difference between the breast
20   cancer cases in the placebo group and the
21   breast cancer cases in the pravastatin group,
22   right?
23   A.    Right.
24   Q.    P value is .002, right?

Page 658

1    A.    Yes.
2    Q.    And what that means, at least
3    in statistical terms, is that the likelihood
4    that that result is due to chance is about
5    one in 500, right?
6    A.    Well, yeah, if it's -- there
7    are a lot of caveats, but in a perfect world,
8    that's what that means.
9    Q.    Okay. All right. Now, prior
10   to the time the study was undertaken, there
11   had been animal studies that showed cancer
12   risks in pravastatin users, right?
13   A.    There certainly were.
14   Q.    Okay. And you were -- when you
15   discuss the results here -- and you also
16   actually discuss the results on the next --
17   on page 1007, right?
18   A.    Right.
19   Q.    Starting at about that first
20   paragraph on the right-hand side, right?
21   A.    Right.
22   Q.    Now, you would agree with me
23   that when you wrote the article, that breast
24   cancer is not mentioned anywhere in the title

Page 659

1    of the article, right?
2    A.    That's true.
3    Q.    Okay. And, in fact, if you
4    read the abstract of the article, breast
5    cancer is not mentioned in the abstract,
6    right?
7    A.    That's true too.
8    Q.    Okay. And, in fact, I asked
9    you about a relative risk of 12, but there's
10   nowhere in the article itself where it
11   actually says there's a relative risk of 12,
12   right?
13   A.    No. Right. It gives the
14   numbers and the P value, but it doesn't give
15   the relative risk.
16   Q.    Right. Okay.
17       Now, there's nothing in here
18   where the authors -- or you or any of the
19   other authors call for a study of the breast
20   cancer -- of breast cancer in pravastatin,
21   right?
22   A.    Well, we didn't have to, but to
23   answer your question, we didn't do that.
24   Q.    You didn't ask for further

Page 660

1    study?
2    A.    That's true. That's right.
3    Q.    Okay. And nobody suggested a
4    black box warning for breast cancer, right?
5    A.    For pravastatin.
6    Q.    For pravastatin?
7    A.    That's correct.
8    Q.    Okay. And nobody suggested any
9    kind of a label change, right?
10   A.    That's true. That's right.
11   Q.    All right. And what -- what
12   the authors, among yourself, did -- one of
13   the things that you did was you looked at
14   other information that was available to see
15   whether the findings in this study fit with
16   other information that was known to the
17   scientific community about the relationship,
18   if any, between pravastatin and breast
19   cancer?
20   A.    Well, we went to a sister study
21   to see if they had identified a similar
22   relationship.
23   Q.    Okay. And what was that study?
24   A.    LIPID.

66 (Pages 657 to 660)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 661

1    Q.    Okay. So you had a study that
2  had a relative risk of 12 with a P value
3  of .002?
4    A.    Right.
5    Q.    You looked at another study to
6  see whether they had an increased risk --
7    A.    Right. And they had many more
8  patients than we did, had a good deal more
9  power to detect it. So if this signal was
10  real, we believe they would have found it.
11    Q.    Okay. And what's the name of
12  the study, again?
13    A.    Actually, it's in the
14  manuscript. It's called LIPID. It's on
15  page 1007.
16    Q.    Okay.
17    A.    The first -- I'm sorry, second
18  column, first full paragraph, about ten lines
19  up, "Long-Term Intervention with Pravastatin
20  in Ischemic Disease."
21    Q.    Okay. All right. Fair enough.
22       So what you did, so we're
23  clear, is you looked at the results of
24  another -- you looked at interim results of

Page 662

1  another study?
2    A.    Yes.
3    Q.    Okay. Interim results -- was
4  the study actually unblinded specifically to
5  look at this issue?
6    A.    It was toward the end of that
7  study, and we had communication with the
8  DSM -- the data monitoring committee chair,
9  to actually ask him to -- ask him or her to
10  unblind this and look specifically at this
11  issue.
12    Q.    Okay. And is it your testimony
13  that the LIPID study actually had greater
14  numbers than your study?
15    A.    They had larger number of
16  patients, yes.
17    Q.    Okay. The manuscript says four
18  years of treatment of 1508 women, right?
19    A.    Right.
20    Q.    That's not as many patients as
21  you have?
22    A.    No, but that's women. Women.
23  We had 4,159 patients.
24    Q.    I see.

Page 663

1    A.    Actually, the study will tell
2  us how many women we had. I think it was on
3  the order of 400, but if you look at the --
4  Table 1 should tell us, right? The baseline
5  characteristics.
6    Q.    Right.
7    A.    Well, all we do is give
8  percent, so it's 14% of 4159, so I think we
9  had like 486 women.
10    Q.    Okay.
11    A.    And the LIPID study had 1500
12  women, so that's why I say the sample was
13  larger.
14    Q.    Okay. Now, if we were to -- in
15  terms of the total number of patients, are
16  the total number of patients who are included
17  in the pravastatin group -- it's 2081; is
18  that right?
19    A.    That's right.
20    Q.    Okay. And 14% of them --
21    A.    Right.
22    Q.    -- were women?
23    A.    Right.
24    Q.    So if we were to do the math

Page 664

1  here, so that means 291 --
2    A.    Yes.
3    Q.    -- were women; is that right?
4  Well, I guess it couldn't be 291.3.
5    A.    Approximately.
6       Yeah. Right.
7    Q.    But in the vicinity of 291 were
8  women; is that right?
9    A.    Right. Right.
10    Q.    Okay. And were all the cases
11  of breast cancer in women?
12    A.    Yes.
13    Q.    I mean, you can have breast
14  cancer in a man?
15    A.    I understand. I remember the
16  discussions back in '95 as well, right. They
17  were all women.
18    Q.    But, I mean, just so I'm
19  right --
20    A.    Sure.
21    Q.    -- you can have breast cancer
22  in a man?
23    A.    In a male, of course, right.
24    Q.    So -- but if we were to figure

67  (Pages 661 to 664)

165470b8-f920-4da9-843f-90cc143762f6