Lemuel A. Moye, M.D., Ph.D.

Page 665

1 out how many -- what the percentage of
2 patients in the pravastatin group were who
3 had breast cancer, what we would -- well, I'm
4 sorry. Let me rephrase the question.
5         If we were to figure out the
6 percentage of women in the pravastatin group
7 who had breast cancer, the way we would do
8 that calculation is to say 12 over --
9     A.   Right.
10    Q.   -- 291, right?
11    A.   Right. That's right.
12    Q.   Which is about 4%, right?
13    A.   Right.
14    Q.   All right. So from your
15 perspective, it was reasonable to look at
16 another, larger placebo-controlled database
17 to see whether that database supported any
18 kind of increased risk?
19    A.   Well, another contemporary,
20 large, well-controlled, well-executed
21 clinical trial, looking at the same dose of
22 medication in the same patients who had a --
23 three times as many women, so more power, to
24 see if there was a signal there.

Page 666

1     Q.   Okay. And you didn't see a
2 signal?
3     A.   That's correct.
4     Q.   So based on not seeing a signal
5 in that database, you were comfortable
6 assuming that this was not something that
7 really represented harm to patients?
8     A.   Comfortable with that
9 conclusion, but also most comfortable with
10 making sure that we got this message out
11 clearly.
12    Q.   Okay. And what message -- what
13 message were you trying to get out clearly?
14    A.   Well, the same thing that you
15 pointed out, that there was an increased
16 number of patients with breast cancer in the
17 pravastatin group in CARE. I mean, we wanted
18 to be very clear that we found that.
19    Q.   Do you know whether that fact
20 was ever put into the product label?
21    A.   I don't think it was.
22    Q.   Do you --
23    A.   I must say I haven't read the
24 product label in a long time. I don't know

Page 667

1 if it has been or not.
2     Q.   Did you ever recommend that
3 that fact be put in the product label?
4     A.   I don't think so, no.
5     Q.   Okay. One of the other things
6 that you did here, really for perspective, is
7 that you looked at, again, a rough estimate
8 of what would be expected in the background
9 population, right?
10    A.   Right.
11    Q.   And of women of similar race
12 and age, right --
13    A.   Right.
14    Q.   -- to the women who were in the
15 placebo -- in the pravastatin group, right?
16    A.   Right.
17    Q.   And based on what you would
18 expect to see in the background population,
19 which you determined that there were five
20 cases that you would expect to see,
21 typically, in the background population, just
22 sort of based on other data, right?
23    A.   Right. Yeah. I mean, that's
24 kind of a throwaway line. Right. I mean,

Page 668

1 you know, that -- it means nothing. What you
2 see is what counts --
3     Q.   Right.
4     A.   -- you know. But you're right.
5 We have that discussion in there about what
6 we might expect to see and -- but --
7     Q.   Well, you didn't object to
8 putting that in there?
9     A.   Sure, I did.
10    Q.   Okay.
11    A.   Sure, I did.
12    Q.   You did object to putting it in
13 there?
14    A.   Yeah, I mean, because it
15 doesn't -- all it does is distract. What --
16 it suggests that, well, what's really going
17 on is we didn't see enough patients in the
18 placebo group that had breast cancer. Well,
19 who cared? The fact is, any way you sliced
20 it, we had an increased risk of --
21 pravastatin in CARE was associated with
22 breast cancer. That's what mattered.
23        Whether we have an increased
24 risk in the active group or a decreased risk

68 (Pages 665 to 668)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 669

1  with the placebo group, the risk is there and
2  the question became:  Is this real?
3        One way to address that
4  question is to go to another independent
5  source of data, and we had an independent
6  source of data.  These other issues are
7  fluff.
8     Q.   Okay.  But based on the other
9  independent source of data, you were assured
10 that this was not a real risk to patients?
11    A.   Right.
12    Q.   Okay.
13    A.   Right.  That it was -- let me
14 put it this way:  That it was not a -- that
15 the finding in CARE was a fluke of chance and
16 would not characterize the response of women
17 to pravastatin in the general population.
18    Q.   But the fact -- the fact of the
19 matter is you can have a finding like a
20 relative risk of 12 with a P value of .002 --
21    A.   Right.  Right.
22    Q.   -- that's due to chance.  That
23 can happen in a study, right?
24    A.   That's true.  That's true.

Page 670

1     Q.   All right.
2     A.   However, that does not mean
3  that even -- even if we believe it's likely
4  to be due to chance, it doesn't excuse us
5  from the obligation to report it as soon as
6  possible in its entirety.
7     Q.   But even a 4% rate of breast
8  cancer in women in pravastatin didn't
9  warrant, in your view, withdrawal of the
10 product from the market or even a black box
11 warning, right?
12    A.   Because we had much more
13 information than that, right.
14    Q.   Right.  Fair enough.
15    A.   Now, I would say this:  If, in
16 fact, we did not have LIPID, that would have
17 been precisely the result because that was
18 the result the investigators wanted to see
19 happen.
20    Q.   What was the result?
21    A.   I mean, that is to say if we --
22 if we did not have LIPID to fall back on and
23 we had this risk that we -- that we
24 identified in CARE, then we are really

Page 671

1  looking at the destruction of the product.
2  That's precisely what we're looking at.
3     Q.   Was -- to your knowledge, are
4  there any subsequent Pravachol studies that
5  have shown an increased risk of breast
6  cancer?
7     A.   To my knowledge, no.
8     Q.   Are you familiar with a study
9  called PROSPER?
10    A.   I just recently saw a -- saw it
11 used, but I haven't read anything about it.
12 I saw the -- I'm sorry, the acronym.
13    Q.   Are you continuing to serve as
14 a consultant to Bristol-Myers Squibb today?
15    A.   No.
16    Q.   When did you stop serving as a
17 consultant to Bristol-Myers Squibb?
18    A.   Well, their CARE funding was
19 discontinued in -- in, I think, 1999 or 2000.
20 About six years ago.
21    Q.   So you continued after the
22 publication of the paper -- you continued to
23 serve as a consultant for Bristol-Myers
24 Squibbs for another -- Squibb for another two

Page 672

1  or three -- for another three or four years?
2     A.   Four years, yes.  Right.
3        MR. PIORKOWSKI:  All right.
4  All right.  We're out of tape again,
5  so we need to --
6        THE WITNESS:  Ah.  Okay.
7        THE VIDEOGRAPHER:  Off the
8  record at 1:13.
9        (Recess taken, 1:13 p.m. to
10 1:21 p.m.)
11       THE VIDEOGRAPHER:  Hold,
12 please.  Back on the record at 1:21.
13    Q    (BY MR. PIORKOWSKI)  Doctor, in
14 your report on page 50, you have a discussion
15 of the APPROVe follow-up data, right?
16    A.   Yes.
17    Q.   Okay.  And you say in your
18 report that the relative risk of
19 fatal/nonfatal myocardial infarction was
20 2.22?
21    A.   Yes.
22    Q.   And then you have 95%
23 confidence intervals, and then you say
24 "demonstrating excess hazard associated with

69 (Pages 669 to 672)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 673

1  rofecoxib," right?
2      A.   Yes.
3      Q.   Okay.  According to traditional
4  principles of interpreting statistical
5  significance, the confidence interval there
6  includes the number 1, right?
7      A.   It does.  That's right, yes.
8      Q.   Okay.  And that would be
9  considered a not statistically significant
10 result; is that right?
11     A.   Right.  That's right.
12     Q.   Okay.  One of the things you
13 address in your report is -- you have some
14 discussion about a warning letter.  Do you
15 remember that?
16     A.   A warning letter?  Actually, I
17 don't remember.
18     Q.   Okay.  Do you have any opinions
19 that you intend to offer at trial with
20 respect to DDMAC or any -- any warning
21 letters that were received by Merck?
22         MR. WEBSTER:  Objection.  Can
23     you clarify which letters you're
24     talking about, please?

Page 674

1          MR. PIORKOWSKI:  I'm sorry.
2  I'm not --
3          MR. GALLAGHER:  Is it the
4  Gilmartin letter?
5          MR. PIORKOWSKI:  There's --
6  there's only one warning letter in the
7  case.
8          MR. WEBSTER:  Okay.
9          MR. PIORKOWSKI:  It was in
10 September of 2002.
11         MR. GALLAGHER:  September 22nd
12 or something?
13         MR. PIORKOWSKI:  Yeah,
14 September 17th, I think.  I mean,
15 that's fine.  If he doesn't have any
16 opinions, I'm not going to -- that
17 saves me a whole bunch of questions.
18     A.   Oh, actually.  I'm sorry.  I
19 have -- in paragraph 197, I talk about a
20 letter of September 17th, 2001.
21     Q    (BY MR. PIORKOWSKI)  Right.
22 Yes.  Right.
23     A.   Right.
24     Q.   Do you intend to offer any

Page 675

1  opinions about that at trial?
2      A.   Only that -- I think I do, but
3  it's confined to the four lines here.  And,
4  for me, the operative part is the claim in
5  the press release that Vioxx had a favorable
6  cardiovascular safety profile.
7      Q.   Okay.  Which line are you on in
8  your report, again?
9      A.   I'm sorry.  I beg your pardon.
10         I'm on paragraph -- I'm on
11 page 70, paragraph 197.
12     Q.   Right.  Okay.
13     A.   And the last -- the end of the
14 third line to the end of the paragraph.
15     Q.   In paragraph 197?
16     A.   Yeah.  Right.
17     Q.   Okay.  All right.  Now -- so
18 the thrust of the opinion is that FDA sent a
19 letter to Merck on September 17th; and,
20 actually, it was not FDA.  It was the DDMAC
21 division of FDA, right?
22     A.   Right.  Right.
23     Q.   And that's the division that
24 deals with advertising, right?

Page 676

1      A.   Yes.
2      Q.   They tend to be the pharmacists
3  as opposed to the doctors and scientists,
4  right?
5      A.   Yes.
6      Q.   Okay.  And the part of that
7  letter that you plan to address was -- well,
8  let me back up.
9          There were three issues that
10 were addressed in that letter.  Do you recall
11 that?
12     A.   Right.
13     Q.   Okay.  One had to do with some
14 audio conferences by a doctor, right?
15     A.   Yes.
16     Q.   One had to do with some
17 representations made by a sales rep?
18     A.   Right.
19     Q.   And one had to do with a press
20 release?
21     A.   Right.
22     Q.   Those were the three subjects,
23 right?
24     A.   Yes.

70 (Pages 673 to 676)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 677

1    Q.    Okay. And I'm assuming from
2  your answer that the audio conference and the
3  sales rep representatives are issues you're
4  not addressing?
5    A.    I am not addressing those.
6    Q.    Okay. The issue you are
7  addressing is the press release?
8    A.    Yes.
9    Q.    Okay. And did you review as
10 part of your opinions Merck's response to the
11 FDA's warning letter with respect to the
12 issue of the press release?
13   A.    Yes.
14   Q.    Okay. And what's your
15 understanding of what Merck's response was to
16 the FDA's concern?
17   A.    Well, I think the -- I think
18 Merck -- I mean, rather than withdraw it, I
19 think Merck defended it.
20   Q.    Merck defended their press
21 release, right?
22   A.    Right.
23   Q.    And basically indicated that it
24 was in response to, essentially, something

Page 678

1  someone else had said in the way of another
2  manufacturer?
3    A.    Right.
4    Q.    Is that right?
5    A.    Yes.
6    Q.    Okay. And do you know whether
7  the FDA accepted Merck's explanation as
8  satisfactory or whether they insisted that
9  Merck take some corrective action?
10   A.    I don't know what the FDA's
11 final determination was.
12        MR. PIORKOWSKI: Okay.
13        (Whereupon, Deposition Exhibit
14   Moye MDL 18, 10/1/01 Letter to Thomas
15   Abrams, Director of DDMAC, from
16   David W. Anstice, Merck, Re: NDA
17   No. 21-042 VIOXX (Rofecoxib) tablets,
18   MRK-AAF0007803 - MRK-AAF0007853, was
19   marked for identification.)
20   Q    (BY MR. PIORKOWSKI) I'm
21 handing you what I've marked as Exhibit 18.
22 That's a copy of Merck's response, right?
23   A.    Okay.
24   Q.    Okay. And that's the letter

Page 679

1  that you've reviewed that we talked about
2  that on page 4, 5, 6 and 7 --
3    A.    Yes.
4    Q.    -- it has Merck's response to
5  the issue of the press release, right?
6    A.    Yes.
7    Q.    And Merck's response is that,
8  quote, "Merck strongly disagrees with DDMAC's
9  comments regarding the May 22nd, 2001 press
10 release for several reasons," right?
11   A.    Yes.
12   Q.    And the first reason is that,
13 "DDMAC's letter does not acknowledge the fact
14 that Merck's press release was issued in
15 response to media and analyst activity and
16 was not proactively used to promote the
17 cardiovascular safety profile of Vioxx,"
18 right?
19   A.    Yes.
20   Q.    Okay. Do you know whether the
21 FDA ever challenged that view?
22   A.    I don't know.
23   Q.    Okay. It says, "Second, the
24 letter appears to create an affirmative

Page 680

1  obligation to disclose alternative
2  explanations for data in a communication
3  whose very purpose is to respond to and
4  debate those same alternative explanations."
5        Do you know whether FDA ever
6  took issue with that?
7    A.    I don't know if they did or
8  not.
9        MR. WEBSTER: Objection, form.
10   Q    (BY MR. PIORKOWSKI) It says,
11 "Third, the letter does not acknowledge the
12 fact that substantial balance, including the
13 existence of alternative hypotheses, was
14 included in that press release."
15        Do you know whether the FDA
16 took issue with that?
17   A.    I don't.
18   Q.    Did you actually go back and
19 look at the press release that was the
20 subject of the warning letter, the press
21 release itself?
22   A.    Yes.
23   Q.    Okay. Where did you get that?
24   A.    I don't remember where I got

71 (Pages 677 to 680)

Lemuel A. Moye, M.D., Ph.D.

Page 681

1    it. I -- I don't remember.
2        Q.    Okay. It says, "Finally, we
3    note that while DDMAC criticizes the press
4    release for reasons 'similar' to the audio
5    conference, many of the reasons do not apply
6    to the press release."
7            Do you know whether the FDA
8    ever took issue with that?
9        A.    I don't know.
10           MR. PIORKOWSKI: Okay.
11           (Whereupon, Deposition Exhibit
12       Moye MDL 19, 1/2/02 Fax to Thomas M.
13       Casola, Merck, from Laura Governdale,
14       DDMAC, Re: NDA 21-042, Vioxx
15       (rofecoxib) tablets, MRK-ACI0013248 -
16       MRK-ACI0013249, was marked for
17       identification.)
18       Q.    (BY MR. PIORKOWSKI) Now, on
19   the other two issues that you're not offering
20   opinions on, the FDA -- or, I'm sorry, Merck
21   told the FDA that it planned to take
22   corrective action on those issues, right?
23       A.    Right.
24           MR. WEBSTER: Objection to

Page 682

1    form.
2        Q.    (BY MR. PIORKOWSKI) All right.
3    But have you seen a letter that says, "DDMAC
4    has reviewed your corrective actions based on
5    the information provided and concludes that
6    this matter has been satisfactorily resolved
7    and is considered closed"?
8        A.    I didn't see that letter.
9        Q.    Okay. Are you -- are you
10   familiar with the way the DDMAC process
11   works?
12       A.    I never worked with them, so I
13   don't have firsthand information about it.
14       Q.    Okay.
15       A.    I have no firsthand experience
16   with it, no.
17       Q.    Okay. Do you have any other
18   opinions that you plan to offer on any other
19   letters that came from the DDMAC division --
20       A.    No.
21       Q.    -- as a part of this case?
22       A.    No.
23       Q.    Okay. Thanks.
24           Let's talk for a couple of

Page 683

1    minutes about subgroups.
2        A.    Yes.
3        Q.    Okay. A subject near and dear
4    to your heart, right?
5        A.    Yes.
6            MR. PIORKOWSKI: Okay.
7            MR. WEBSTER: Objection to the
8        sidebar.
9        Q    (BY MR. PIORKOWSKI) Is -- are
10   subgroup's analysis a subject near and dear
11   to your heart?
12       A.    I write about them, written
13   articles about them, and I've written
14   chapters in my textbooks about them.
15       Q.    In fact, when I cross-examined
16   you at a trial before, part of our dialogue
17   dealt with your views about subgroup
18   analysis?
19       A.    That's right.
20       Q.    Right?
21       A.    That's right.
22       Q.    All right. And your opinions
23   about subgroup analysis are that if the
24   subgroup is not specified in advance --

Page 684

1        A.    Yes.
2        Q.    -- that the subgroup analysis
3    may be interesting to look at, but not
4    something in which you can put scientific
5    stock; is that a fair characterization?
6        A.    Yes. However, I have to add a
7    couple of things. I mean, there are several
8    problems with subgroups. One that you just
9    mentioned is the lack of prospective
10   identification.
11           But we also have to remember --
12   and the reasons for those concerns are
13   primarily mathematical.
14       Q.    Okay.
15       A.    However, when it comes to
16   safety, mathematics has to -- is overshadowed
17   by safety concerns. So those kinds of
18   arguments I've made and as well as Salim
19   Yusuf has made and others have made, really
20   apply more to efficacy findings than they
21   apply to hazard findings.
22           But with that caveat,
23   everything you said is true.
24       Q.    Well, when we talked back in

72 (Pages 681 to 684)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 685

1  Alice, Texas, about the IPPHS study, that
2  involved a hazard finding, right?
3      A.   Well, yes, but it was in a
4  study that was designed specifically to look
5  at hazard as opposed to a study that is
6  designed to look at something else and
7  happens to develop hazard.
8      Q.   But you had told me in Alice,
9  Texas, that the subgroup analysis that was
10 used to come up with a relative risk of 23 --
11     A.   Right.
12     Q.   -- in the IPPHS study was not
13 significantly reliable?
14     A.   Right.  The most reliable --
15     Q.   Right.
16     A.   The most reliable -- I guess we
17 were talking about odds ratios then --
18     Q.   That's right.
19     A.   -- was the 6.8.
20     Q.   Yes.  That's right.
21     A.   I think that came from the
22 overall result.  That's right.
23     Q.   Right.  And that was in the
24 context of a hazard study?

Page 686

1      A.   Right.  And a study designed to
2  examine -- to look for hazards, that's right.
3      Q.   Who was Salim Yusuf?
4      A.   Oh, he's an epidemiologist out
5  of McMaster University -- McMaster's
6  University in Canada.
7      Q.   Okay.  And is he someone whose
8  opinions you respect as a biostatistician?
9      A.   Yes, sure.
10     Q.   Okay.  Is he -- has he
11 published on the subject of analysis and
12 interpretation of subgroups?
13     A.   Yes, he has.
14     Q.   Okay.  Have you reviewed his
15 literature -- in fact, you cited his
16 literature in your report?
17     A.   Yeah, he has a -- I think it
18 was a 1991 article out of JAMA.
19         (Whereupon, Deposition Exhibit
20     Moye MDL 20, "Analysis and
21     Interpretation of Treatment Effects in
22     Subgroups of Patients in Randomized
23     Clinical Trials, by Yusuf, et al.
24     (6 pages), was marked for

Page 687

1      identification.)
2      Q.   (BY MR. PIORKOWSKI)  Which is
3  in this, right?
4      A.   Yes, sure is.
5      Thank you.
6      MR. PIORKOWSKI:  You want one
7  too, Mike?
8      MR. GALLAGHER:  Yeah, please.
9  Thank you.
10     MR. PIORKOWSKI:  Yes, sir.
11     Q.   (BY MR. PIORKOWSKI)  Do you see
12 in this study -- this is a special
13 communication, right?
14     A.   Yes.
15     Q.   That's -- what kind of -- what
16 kind of document is a special communication?
17     A.   Well, it's a peer-reviewed
18 manuscript, but it is separate and apart from
19 many of the others in that it does not have
20 primary research data on which it's -- on
21 which it's reporting.
22     Q.   Okay.
23     A.   This is a description of
24 methodology.

Page 688

1      Q.   All right.  And do you see on
2  the first page, page 93, on the right-hand
3  side, he says, "We define a proper subgroup
4  as a group of patients characterized by a
5  common set of 'baseline' parameters.  These
6  parameters may include inherent patient
7  characteristics that cannot be affected by
8  treatment" --
9      A.   Yes.
10     Q.   -- example, age or sex, "or
11 disease characteristics, defined before
12 randomization (anterior or inferior
13 myocardial infarction when the determination
14 is made before randomization)."
15         He defines those as proper
16 subgroups, right?
17     A.   Yes.  Right.
18     Q.   And it says, "In randomized
19 clinical trials, each proper subgroup
20 constitutes a smaller randomized controlled
21 trial."  Do you agree with that?
22     A.   Basically, yes.
23     Q.   Okay.  He goes on to say,
24 quote, "Sometimes the term 'subgroup' refers

73  (Pages 685 to 688)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 689

1  to a set of outcomes, for example,
2  cause-specific deaths or the number of events
3  within a specific time period." Is that
4  correct? Did I read that correctly?
5      A.   Yeah, you did.
6      Q.   Do you agree with that?
7      A.   At the time, I'd say yes.
8  Now -- I mean, this was 15 years ago. So at
9  the time, yes.
10     Q.   Okay. It says, "When the
11  context is clear, the term 'subgroup' shall
12  refer to a proper subgroup."
13         He's talking for purposes of
14  the rest of his discussion in this paper,
15  right?
16     A.   Yes.
17     Q.   All right. And then he goes on
18  to talk about what's an improper subgroup,
19  right?
20     A.   Right.
21     Q.   He says, "An improper subgroup
22  is defined herein as a group of patients
23  characterized by a variable measured after
24  randomization and potentially affected by

Page 690

1  treatment. Example, separate examination of
2  the prognosis of patients with a patent
3  coronary artery in the trial of a
4  thrombolytic agent when patency is determined
5  after initiating the randomized treatment,"
6  right?
7      A.   Right.
8      Q.   You agree with that example?
9      A.   Yes, I do.
10     Q.   "In such a case, a low
11  mortality rate may reflect not only the
12  effects of the therapy, but also inherent
13  favorable prognostic characteristics of the
14  patients themselves, such as spontaneous
15  recanalization, the presence of a
16  nonocclusive thrombus or the fact that the
17  infarct was small," right?
18     A.   Yes.
19     Q.   "Analysis of improper
20  subgroups, though seductive, can be extremely
21  misleading because a particular treatment
22  effect may influence classification to the
23  subgroup," right?
24     A.   Yes.

Page 691

1      Q.   You agree with that too?
2      A.   Yes.
3      Q.   "Thus, an apparent subgroup
4  effect may not be a true effect of treatment,
5  but, rather, the result of inherent
6  characteristics of patients that led to a
7  particular response or to the development of
8  side-effects." Do you agree with that?
9      A.   Yes.
10     Q.   Okay. Let me ask you, first of
11  all: Is subgroups -- subgroup analysis can
12  depend not only on the subgroup of the
13  patient study, but it can also refer to a
14  subgroup of endpoints, right?
15     A.   See, that was where I think the
16  nomenclature has departed some from what
17  Salim was talking about.
18     Q.   Okay.
19     A.   I think when he was talking
20  about subgroups then, I think what he was
21  really talking about was subsets, like
22  subsets like, for example, of the APTC
23  endpoint, a subset would be fatal/nonfatal
24  myocardial infarction.

Page 692

1      Q.   Right.
2      A.   We don't really talk about --
3  describe those as subgroups. Those are
4  really a subset of the combined endpoint.
5      Q.   Well, that's actually my
6  question, is: Do you view, when you -- you
7  recognize that in the studies that have been
8  done on Vioxx, whether you agree or disagree
9  with the methodology, the endpoint that was
10  studied is generally a combined endpoint of
11  several different thrombotic or cardiac
12  events, right?
13     A.   I actually would say that in
14  these clinical studies looking at Vioxx, all
15  kinds of endpoints have been used. Combined
16  end points have been used, individual
17  analyses have been used, some prespecified,
18  others not. I can't -- don't think there's a
19  rhyme or reason to any of them.
20     Q.   Well, there is a common theme
21  that runs through the Merck-funded studies.
22  There's a common endpoint that runs through
23  them all, right: Combined thromboembolic
24  serious cardiovascular events?

74 (Pages 689 to 692)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 693

1       A.   Yes, but it's not the only one
2   that's used, and --
3       Q.   I'm sorry.  Go ahead.
4       A.   Not the only one that's used,
5   and the evaluations are provided for the
6   individual components as well as for the --
7   the overall combined endpoint.  P values in
8   and confidence are supplied for all of them,
9   and so it's easy to lose the rationale, and
10  it's all underpowered, anyway.
11           And so it's easy to lose the
12  rationale for the notion of prospective
13  determination when you've got all these other
14  forces.
15      Q.   Okay.  Well, let's see if we
16  can agree on a few specific points.
17      A.   Okay.
18      Q.   You agree that starting with
19  the implementation of the CVSOP prior to
20  VIGOR --
21      A.   Right.
22      Q.   -- the primary cardiovascular
23  endpoint that was specified in Merck's
24  clinical trials was a combined thromboembolic

Page 694

1   endpoint?
2       A.   Yes.
3       Q.   Okay.  And all of the studies
4   also included a secondary endpoint, which was
5   the APTC endpoint, right?
6       A.   Right.
7       Q.   At the same time -- I think
8   this is what you're alluding to -- all of the
9   individual data on the individual events
10  themselves were presented when these studies
11  were written up, right?
12      A.   Right, which is -- which is one
13  of the principles of displaying combined --
14      Q.   Right.  I mean, that's
15  appropriate, right?
16      A.   Right.  Right.  That's right.
17      Q.   All right.  And so you have --
18  you have data on the APTC endpoint, you have
19  data on the combined thromboembolic endpoint,
20  you have data on myocardial infarctions,
21  right?
22      A.   Right.
23      Q.   You have data on angina
24  pectoris?

Page 695

1       A.   Right.
2       Q.   You have data on sudden cardiac
3   death?
4       A.   Yes.  Right.
5       Q.   You have data on pulmonary
6   embolism?
7       A.   Right.
8       Q.   You have data on deep vein
9   thrombosis?
10      A.   Right.
11      Q.   You have data on stroke and
12  TIA?  I mean, all of those are within the
13  realm of the data that are displayed for all
14  these settings?
15      A.   Right.  And if I could add to
16  this cascade, we have P values for all of
17  them.
18      Q.   Right.
19      A.   We have relative risk -- I
20  mean, I'm sorry, confidence intervals for all
21  of them, and all are underpowered.
22      Q.   Right.  But the reason they're
23  underpowered is because all of these events
24  are relatively rare?

Page 696

1       A.   Yes.  Rare enough so that the
2   sizes of the sample are not able to identify
3   an effect, should there be one, of clinical
4   magnitude.
5       Q.   Okay.  So they're underpowered
6   because the incidence of these events is
7   small in the background population first,
8   right?
9       A.   Well, let's say -- I mean, it's
10  too small for the small sample to identify
11  them.
12      Q.   Okay.  But even when we have
13  thousands -- thousands of patients, because
14  of the relative rarity of the events, that's
15  why it's underpowered?
16      A.   Well, right.  But I don't
17  think -- if you're looking at -- I mean,
18  studies -- if you look at what we did in
19  CARE, we only had 4100 patients, and we
20  followed them for a long period of time, of
21  course.
22           So it's a combination of the
23  duration of the -- the duration of follow-up
24  as well as the number of patients that

75 (Pages 693 to 696)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 697

1 determines whether you can capture enough
2 events.
3    Q.    Okay. Do you view looking at
4 one subset of the prespecified endpoint as a
5 subgroup analysis?
6    A.    I see what you're saying. No,
7 I don't. I mean, to me, that is not a
8 subgroup analysis. That's the evaluation of
9 a component of a combined or composite
10 endpoint.
11    Q.    Okay.
12    A.    But, to me, I don't think of
13 that as a subgroup analysis.
14    Q.    Do you consider that an
15 appropriate epidemiological method?
16    A.    In some circumstances. Let me
17 try to be clear about that. If someone
18 posits that the finding for a combined
19 endpoint is clinically and statistically
20 significant for efficacy, then the question
21 arises, well, is this a finding that is seen
22 for each of the components, or is it seen for
23 just one of the components?
24        For example, if the study is

Page 698

1 in -- if the combined endpoint is unstable
2 angina and myocardial infarction and the
3 study is positive on this combined endpoint,
4 but 90% of the endpoint cases are unstable
5 angina and very few are MI, then that's a
6 much weaker finding than if you had many of
7 the case -- many more of the cases being MIs.
8    Q.    Okay.
9    A.    If the effective therapy was
10 primarily in the unstable angina --
11    Q.    I see.
12    A.    -- it's a weaker --
13    Q.    I understand what you're
14 saying.
15    A.    Right. Right.
16    Q.    And --
17    A.    So there, it does -- it's
18 useful to look at the analysis for each of
19 the components.
20    Q.    Do you -- in your opinion, is
21 angina --
22        MR. PIORKOWSKI: Do you want me
23 to stop, Jason?
24        MR. WEBSTER: No. Keep going.

Page 699

1    Q.    (BY MR. PIORKOWSKI) In your
2 opinion, is angina a thrombotic event?
3    A.    I don't think so because we
4 think of thrombotic -- I mean, of course,
5 anything is possible, but by and large, I
6 would say no, because we think of thrombotic
7 events as being terminally occlusive, and
8 that would be -- that would produce the MI.
9    Q.    You -- you've actually had some
10 experience working on studies where the
11 endpoint of concern has been sudden cardiac
12 death, right?
13    A.    Right.
14    Q.    For example, your work on
15 Seldane, right?
16    A.    Right. Right.
17    Q.    That was an issue where,
18 because of the effects on the liver
19 enzymes --
20    A.    Right. Right.
21    Q.    -- a drug level became
22 elevated, which led to a cardiac arrhythmia
23 referred to as Torsade, right?
24    A.    Right.

Page 700

1    Q.    And that's potentially fatal
2 arrhythmia?
3    A.    Yes.
4    Q.    Okay. You agree with me that
5 sudden cardiac death can occur either in the
6 context of an arrhythmia -- well, let me back
7 up.
8        Do you agree that in some
9 cases, sudden cardiac death can occur
10 secondary to an arrhythmia in the absence of
11 a myocardial infarction?
12    A.    Sure.
13    Q.    Okay. Do you have any
14 information about whether sudden cardiac
15 death occurs more frequently in the presence
16 of a myocardial infarction or the absence of
17 a myocardial infarction?
18    A.    I don't have any information
19 about that. I mean, it occurs in both.
20    Q.    Okay. Would you agree with me
21 that sudden cardiac -- well, if we're talking
22 about sudden cardiac death secondary to an
23 arrhythmia, not induced by a myocardial
24 infarction, do you regard that as a

76 (Pages 697 to 700)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 701

1 thrombotic event?
2     A.    Sudden cardiac death that is
3 not due to a myo- -- due to an arrhythmia,
4 not due to a myocardial infarction, my
5 understanding is it's electrical.
6     Q.    Right.
7     A.    And so it's not a thrombus.
8     Q.    Okay. Do you regard the --
9 from your perspective, was -- well, in
10 conducting a study of potential cardiac
11 events, okay, is it fair to say that the
12 combined thrombotic event captures all of the
13 potential things that could be related to a
14 clotting problem?
15     A.    Well, it -- I think on our
16 current understanding, yes, the types of
17 events that are associated -- that are
18 generated by thrombosis are the kinds of
19 events -- are the kinds of events that are
20 included in this combined endpoint.
21     Q.    Okay. And it would be fair to
22 say that Merck cast a wide net here with
23 respect to the cardiac endpoints that it was
24 looking at?

Page 702

1     A.    Yes.
2     Q.    Okay. Because some of them, as
3 you've already said, like angina, isn't
4 typically regarded as a thrombotic issue?
5     A.    Right. And it's not really a
6 heart event, anyway.
7     Q.    Right.
8     A.    People can disagree about
9 whether a patient's got angina or not.
10     Q.    Okay.
11     A.    Not quite so much disagreement,
12 still some, but not quite so much with MIs.
13     Q.    And sudden death is the same
14 thing?
15     A.    Right. That's right. Sure.
16     Q.    It may or -- you know, it may
17 be thrombotic, may not be, but --
18     A.    Right.
19     Q.    Okay. Do you have -- one thing
20 that using a combined endpoint allows a
21 doctor or a regulator to do is to look at the
22 data and reanalyze the data any way that
23 person wants to do that, right?
24     A.    When you say -- you mean -- if

Page 703

1 you're suggesting that they can deconstruct
2 the combined endpoint --
3     Q.    Yeah.
4     A.    -- and look at any individual
5 endpoints they like --
6     Q.    Right.
7     A.    -- then they have the original
8 data, they can do that.
9     Q.    Right. Well, I mean, even if
10 they have the -- if the published data break
11 them down, they can do that too, right?
12     A.    If you're looking at tables --
13     Q.    Right.
14     A.    -- and the tables break out the
15 number of events -- number of component --
16 number of events for each of the component
17 endpoints, then yes.
18     Q.    Well -- and, in fact, Merck has
19 presented those data both to the FDA and
20 published papers for all the studies that
21 have come out?
22     A.    Well, that's their obligation
23 to do, yes.
24     Q.    Right. But, I mean, they did?

Page 704

1     A.    Yes.
2     Q.    Okay. And so if somebody else
3 came along and said, "Gee, I really think
4 that what we should be looking at here is a
5 combined endpoint of myocardial infarction
6 plus sudden cardiac death," that person could
7 go to the tables and sort of construct their
8 own analysis and see what they found, right?
9     A.    Yes.
10     Q.    Okay. Do you -- would you
11 agree that it would be unethical to
12 intentionally expose patients to a
13 significant risk of a serious adverse event
14 without some countervailing benefit?
15     A.    Yes. I mean, to expose them in
16 a way that they would ordinarily not be
17 exposed, yes, that's right.
18     Q.    I mean, that would be unethical
19 to do that, right?
20     A.    Right.
21     Q.    Do you -- did you review any
22 documents about Protocol 203? I mean, if you
23 need to refer to something, this isn't a
24 memory test. You're welcome to look at your

77 (Pages 701 to 704)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 705

1  report or anything else.
2       A.   Let me look and see.  I don't
3  think so.
4            MR. WEBSTER:  Do you have
5       Protocol 203 with you?
6            MR. PIORKOWSKI:  I don't.
7       A.   No, I don't have the protocol
8  number for VICTOR, but I assume it's not...
9       Q    (BY MR. PIORKOWSKI)  Let me --
10           MR. PIORKOWSKI:  Oh.  Yeah, do
11      you have that?
12           (Conference out of the hearing
13      of the reporter.)
14           MR. PIORKOWSKI:  I'm sorry.
15      A.   I don't have the protocol
16  numbers for VIP or VICTOR in here.
17      Q    (BY MR. PIORKOWSKI)  Okay.
18      A.   I don't -- so I don't know
19  what --
20      Q.   Did any of the documents you
21  read -- do you recall what Protocol 203 was,
22  generally?
23      A.   I don't, no.
24      Q.   Okay.  Let me represent to you

Page 706

1  that Protocol 203 was intended originally to
2  be a combined analysis of the APPROVe study,
3  the VIP study and the VICTOR study.
4       A.   Okay.
5       Q.   Do you remember reading any
6  documents that discussed that protocol?
7       A.   No, I don't recall reading any
8  documents that discussed that combined
9  analysis of those three studies.
10      Q.   Do you recall reading any
11  documents that indicated that the combined
12  analysis of those three studies was ever
13  discussed with the FDA?
14      A.   No.
15      Q.   Okay.  I think we talked --
16      A.   I don't remember reading any
17  such studies, no.
18      Q.   Okay.  I think we talked
19  earlier about -- I think we went up to the --
20  we were talking about the April 2002 label
21  change.  Do you recall that?
22      A.   Yes.
23      Q.   And I asked you whether you had
24  any criticisms, and you said that you did,

Page 707

1  but then when I asked you about whether the
2  VIGOR data were adequate -- were accurately
3  set forth, I think you also told me that they
4  were, right?
5       A.   Yes.
6       Q.   Okay.  What specific criticisms
7  do you have of the April 2002 label change?
8       A.   It's the criticism I have of
9  all the labels, and that is that Vioxx cannot
10  be labeled for safe and effective use.
11           I don't think Vioxx should ever
12  have been submitted, don't think it should
13  have been approved, and I don't think any
14  label characterizes its use in a way that it
15  can be implemented safely and effectively.
16      Q.   Are you aware, as you sit here
17  today, of any studies that have compared --
18  well, that have looked at the cardiovascular
19  risk of Vioxx and compared it to the
20  cardiovascular risk with nonselective NSAIDs?
21           MR. WEBSTER:  Objection, form.
22      Q    (BY MR. PIORKOWSKI)  And found
23  no difference in risk?
24           MR. WEBSTER:  Objection, form.

Page 708

1       A.   Actually, I'm not sure I
2  understand the question.
3       Q    (BY MR. PIORKOWSKI)  Are you
4  aware of any studies -- observational
5  studies, metanalysis of clinical trials, any
6  studies -- that have looked at the
7  cardiovascular risks of Vioxx and compared it
8  with the cardiovascular risks of nonselective
9  NSAIDs and found no difference in risk?
10      A.   If you're including
11  observational studies, I need to look at my
12  report to see if I have any there.
13      Q.   That's all right.
14      A.   Okay.  Ask the question again,
15  please.  I'm sorry I have to keep asking you
16  to do that.
17      Q.   That's all right.
18           The question is:  Have you seen
19  any studies that have looked at
20  cardiovascular risks in Vioxx users compared
21  to cardiovascular risks in nonselective NSAID
22  users and concluded that the risks are
23  equivalent?
24      A.   No.

78  (Pages 705 to 708)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 709

1     Q.   Is it your view that -- is it
2  your opinion that there's a dose-response
3  relationship with respect to the
4  cardiovascular risks of Vioxx?
5     A.   Yes.
6     Q.   Okay. And by that, you mean
7  that the risk of 50 milligrams is greater
8  than the risk of 25 milligrams, is greater
9  than the risk of 12.5 milligrams?
10     A.   Yes.
11     Q.   Okay. And what do you base
12  that on?
13     A.   Well, it's based on a few
14  things. First of all, just my understanding
15  of how toxins work and the more that you
16  have, the more likely you are to have the
17  event.
18          If you look at -- there are
19  some data from some of the epidemiologic
20  studies, such as Ray, which shows that risks
21  with higher doses of rofecoxib are greater
22  than a risk of lower doses of rofecoxib.
23     Q.   And if we took that same study
24  as an example, like Dr. Ray's study -- you're

Page 710

1  referring to his 2002 study?
2     A.   I need to look at the
3  reference. It'll just take me a moment.
4          (Witness reviews document.)
5     A.   Yes.
6     Q.   (BY MR. PIORKOWSKI) Okay.
7  Dr. Ray's 2002 study found no increased risk
8  with doses of 25 milligrams or less, right?
9     A.   That's true. Right. Right.
10     Q.   Is -- do you know that Dr. Ray,
11  by the way, is an expert in many of the Vioxx
12  cases for the plaintiffs?
13     A.   Well, I don't know about many.
14  I did know that he was -- he has been. I
15  don't know what he's doing now.
16     Q.   Is it your opinion that the
17  cardiovascular -- well, let me ask you: With
18  respect to 12.5 milligrams, what data do you
19  rely on for your opinion that 12.5 milligrams
20  of Vioxx is unsafe, regardless of how it's
21  labeled?
22          (Witness reviews document.)
23     A.   I can't remember, and I can't
24  find it here. There's one other place I need

Page 711

1  to look.
2     Q.   (BY MR. PIORKOWSKI) Take your
3  time, because that's an important point. If
4  you need to take a minute to do it, that's
5  all right.
6          (Witness reviews document.)
7     A.   No, I can't remember. I don't
8  have the doses of the Vioxx in each of the
9  trials that I cite here, and I can't remember
10  what they are.
11     Q.   (BY MR. PIORKOWSKI) Okay. As
12  you sit here today, are you aware of any
13  placebo-controlled trial that shows an
14  increased risk of 12.5 milligrams of Vioxx?
15     A.   I think I am. I just can't
16  find out what that is.
17     Q.   Okay.
18          MR. WEBSTER: You mind if I --
19  I think it may help him if he looked
20  at paragraph 89 of the report, or 90.
21          MR. PIORKOWSKI: Paragraph 90
22  is Watson's report.
23          MR. WEBSTER: Oh. Okay. No,
24  of Moye, I'm sorry, of his report.

Page 712

1          MR. PIORKOWSKI: That's what
2  I'm looking at.
3          MR. WEBSTER: Oh. Okay.
4          MR. PIORKOWSKI: That's about
5  Wat- -- the Watson analysis.
6     A.   Yeah, it's Protocol 010. I'm
7  sorry it took so long. That's not Vioxx 125.
8  That's Vioxx 12.5.
9     Q.   (BY MR. PIORKOWSKI) Okay.
10  Well, actually, are you sure about that?
11     A.   What? It's not 125 milligrams?
12     Q.   Yeah.
13     A.   Yeah, I think so. Yes.
14     Q.   Are you aware that Merck did
15  study Vioxx at 125 milligrams?
16     A.   Yeah. I don't think they did
17  it in Protocol 010, though.
18     Q.   Are you sure?
19     A.   No, I'm not. I can check and
20  see. It's all based on the Watson report.
21     Q.   It's all based on what?
22     A.   The Watson report.
23     Q.   Yeah.
24     A.   So let's see.

79 (Pages 709 to 712)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 713

1      (Witness reviews document.)
2      A.   No, it does say 125 milligrams.
3      Q.   (BY MR. PIORKOWSKI) In fact,
4  are you aware, Dr. Moye, that Merck even
5  studied doses as high as 175 milligrams in
6  that --
7      A.   I don't recall any single study
8  where they did that, no.
9      Q.   Okay. So getting back to my
10  question about 12.5 milligrams, are you able
11  to identify any study that shows an
12  increased -- statistically significant
13  increased risk for 12.5?
14     A.   Well, statistically increased
15  risk, no, but I think there is a study that
16  shows an increased risk, but I haven't found
17  it yet.
18     Q.   Okay.
19     A.   But stat increased risk, the
20  answer is no.
21     Q.   Okay. And Study 010, by the
22  way, that was not a study that found
23  thromboembolic events, is it? It's a study
24  that found hypertension?

Page 714

1      A.   Right.
2      Q.   Right. And hypertension is
3  certainly a cardiovascular event, but
4  that's -- that was -- the risk of
5  hypertension was appreciated by the FDA at
6  the time of the initial approval, right?
7      A.   Yes.
8      (Witness reviews document.)
9      Q    (BY MR. PIORKOWSKI) Okay. I'm
10  sorry. Were you done with your answer,
11  Dr. Moye, or were you waiting for another
12  question?
13     A.   Yeah. No, I'm done. I'm done.
14     Q.   Okay. Let me ask you: Are you
15  aware of any -- any pain reliever that had
16  a --
17     A.   I'm sorry. Excuse me.
18  Protocol 090 used 12.5 milligrams.
19     Q.   Yes?
20     A.   Right. So it didn't -- it did
21  not demonstrate a statistically significant
22  increase --
23     Q.   Right.
24     A.   -- right, but Protocol 090

Page 715

1  gave -- deal with 12.5. Okay.
2      Q.   Okay.
3      A.   Now I'm ready for the next
4  question.
5      Q.   All right. And so we're clear
6  on the answer: Other than Protocol 090,
7  you're not aware of any other study that
8  demonstrated an increased risk of 12.5?
9      A.   I can't think of any right here
10  and now, right.
11     Q.   Okay. And the increased risk
12  that was demonstrated in Study 090 was not a
13  statistically significant increased risk,
14  correct?
15     A.   Right. That's correct.
16     Q.   All right. Is it your -- is it
17  your opinion that the risk of thrombotic
18  cardiovascular events of Vioxx increase with
19  increasing duration of use?
20     A.   Yes.
21     Q.   And is there any threshold
22  period of time below which there is no risk?
23     A.   Absolutely no risk?
24     Q.   Well --

Page 716

1      A.   I'd say -- I'd say the period
2  at which there was no risk is the isolated
3  one after ingestion where you get no pain
4  relief.
5      Q.   Is -- do you have any evidence,
6  scientific evidence, that the risk associated
7  with Vioxx increases immediately after a
8  blood level is achieved?
9      A.   Oh, no. I wouldn't expect to
10  find any. We'd have to have a study that
11  would look at a large number of people for a
12  relatively short period of time after the
13  drug was used, and we're talking about hours.
14  I wouldn't expect there to be a study to show
15  that.
16      But my understanding of the
17  mechanism and of the epidemiology of this
18  says that the risk for -- the risk for
19  cardiovascular effects tracks the risk of
20  pain relief.
21     Q.   So --
22     A.   So on onset. On onset.
23     Q.   So we're clear, though, your
24  opinion there is based on your understanding

80 (Pages 713 to 716)

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 717

1  of the mechanism of action?
2      A.   Yes.
3      Q.   Okay. It's not based on a
4  particular epidemiological or clinical study?
5      A.   That's correct.
6      Q.   Okay. And if it were
7  demonstrated that Vioxx, in fact, does not
8  affect the prostacyclin-thromboxane balance
9  in the way that you believe it does, you'd
10  have to revisit that opinion; fair?
11      A.   Yes.
12      Q.   Okay. Does the risk, in your
13  view, that increases over time -- is that
14  simply a function of longer exposure, exposed
15  every day for many, many days, or is it --
16  does it actually increase over time?
17      A.   I think it's both. I think
18  it's increasing over time, just because of
19  duration of exposure, but also I think that
20  there is a -- a propagation effect that is
21  related to the atherogenic effect of Vioxx as
22  well as to the accelerant effect of elevated
23  blood pressure.
24      Q.   What -- what scientific

Page 718

1  evidence do you have of a proatherogenic
2  effect other than an effect on blood
3  pressure?
4      A.   Just what we saw in the
5  follow-up data for APPROVe.
6      Q.   Okay. Just the APPROVe
7  follow-up data, which we acknowledged earlier
8  was not a statistically significant increase?
9      A.   Right, but we're not concerned
10  about that because it's not powered to detect
11  this with statistical significance with
12  adequate power.
13      MR. PIORKOWSKI: Object to the
14  nonresponsive portion.
15      Q    (BY MR. PIORKOWSKI) What --
16  you have some discussions in your report
17  about various studies that have looked at the
18  cardioprotective effects of naproxen. Do you
19  recall that?
20      A.   Yes.
21      Q.   Okay. Do you know which
22  studies that you looked at -- well, let me
23  back up.
24      Do you know whether the

Page 719

1  platelet inhibition effect of naproxen
2  depends on the dose and the frequency of
3  administration of naproxen?
4      A.   I don't. And, actually, I
5  don't -- I'm not sure I accept the notion of
6  a platelet -- an anti-aggregatory effect of
7  platelets. I accept the COX-1 action, but I
8  don't think I accept this anti-aggregatory
9  effect of platelets.
10      Q.   Okay. But we looked earlier
11  today at Dr. Topol's paper, right?
12      A.   I know what Eric wrote. I
13  appreciate that.
14      Q.   But my point is that he
15  published that in a peer-reviewed paper,
16  right?
17      A.   Yes. Yes.
18      Q.   And he actually cited support
19  for the specific percentage of platelet
20  inhibition from naproxen, right?
21      A.   That's true.
22      Q.   And I thought you told me, and
23  let's make sure I'm clear, you didn't have
24  any study that showed anything to the

Page 720

1  contrary?
2      A.   No, certainly that's true, but
3  that -- that, in and of itself, doesn't mean
4  I believe that Eric has persuaded me and
5  these authors have persuaded me that naproxen
6  has this anti-aggregatory effect.
7      I mean, there are dozens, if
8  not hundreds, of papers that demonstrate that
9  for aspirin. There was one citation, and I
10  don't believe the medical community is
11  persuaded of an anti- -- an anti- -- a
12  platelet anti-aggregatory effect.
13      MR. PIORKOWSKI: Okay. Object
14  to the nonresponsive portion.
15      Q    (BY MR. PIORKOWSKI) Do you --
16  when you were in practice, did you ever
17  prescribe oral contraceptives?
18      A.   Yes.
19      Q.   Okay. Do you view -- did you
20  view -- at the time, did you view oral
21  contraceptives as a safe drug?
22      MR. WEBSTER: Objection, form.
23      Can you specify which ones you're
24  talking about?

81 (Pages 717 to 720)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 721

1      MR. PIORKOWSKI: Any.
2     A.  You don't remember my answer to
3 you in Alice. I'll answer you differently
4 this time.
5      I think that in some women --
6 in many women, not in all women, the benefit
7 exceeds the risk, but it's got to be used
8 safely.
9    Q.   (BY MR. PIORKOWSKI) And do you
10 know for -- so by "used safely," I assume
11 part of what you're talking about is having a
12 patient who's not smoking, right?
13    A.  Right. Right.
14    Q.  Okay. Let's assume we're
15 talking on the same page about a patient
16 who's not smoking, okay?
17    A.  Okay.
18    Q.  Who has no other risk factors
19 for coronary disease or venous disease?
20    A.  Right. Right.
21    Q.  Age 35, no other risk factors.
22 Do you --
23    A.  And I guess is sexually active?
24    Q.  Well, I'm assuming that there

Page 722

1 wouldn't be benefits to outweigh the risks --
2    A.  Well, actually -- actually, if
3 they've got painful menses, sometimes birth
4 control pills can make a difference.
5    Q.  All right. Fair enough.
6    A.  Right.
7    Q.  So -- but in a patient like
8 that, nonsmoker, age 35 --
9    A.  Right.
10    Q.  -- do you consider oral
11 contraceptives to be safe?
12    A.  Yes, when used as directed.
13 Yes.
14    Q.  Okay. Do you know in those
15 patients, age 35, nonsmokers, what the risk
16 of death from cardiovascular problems is per
17 year?
18    A.  Do you mean -- well, I guess
19 however I ask this, I'm not sure, but do you
20 mean -- are we talking about the background
21 rate, or are we talking about the rate for
22 patients on the therapy, that's attributable
23 the therapy?
24    Q.  The rate on patients

Page 723

1 attributable to the therapy.
2    A.  No, I don't. I don't remember
3 that.
4    Q.  Okay. You've got a good
5 memory. I didn't remember asking that
6 question.
7    A.  Oh, you don't? Well, I'm not
8 going to tell you my answer. You have to
9 look it up.
10    Q.  Getting back to the naproxen
11 discussion we were having a minute ago --
12    A.  Right.
13    Q.  -- do you know from any studies
14 you've looked at whether 500 milligrams of
15 naproxen b.i.d. has a greater platelet
16 inhibitory -- platelet aggregation inhibition
17 effect than 250 b.i.d.?
18    A.  I don't know. But, again, I'm
19 just not accepting the notion that it has any
20 platelet anti-aggregatory effect. But I
21 don't know whether 500 would have more than
22 250.
23    Q.  Let me be clear on what you're
24 saying. Are you saying that on a

Page 724

1 pharmacological basis, you don't accept that
2 it inhibits platelet aggregation, or are you
3 saying you're not sure that that has any
4 clinical correlation?
5    A.  Well, I'm just -- I'm saying
6 that -- I mean, certainly naproxen is -- has
7 an effect on thromboxane, no question about
8 that, because it's COX-1 and COX-2.
9    Q.  Right.
10    A.  Okay. To me, that's not the
11 same as platelet anti-aggregatory effect.
12 And I'm saying that I don't accept the
13 platelet anti-aggregatory effect hypothesis.
14 I don't accept the pharmacologic observation.
15      (Interruption by the
16    videographer.)
17    Q   (BY MR. PIORKOWSKI) Did you
18 review Dr. Curfman's deposition, or
19 depositions, in connection with your opinion?
20    A.  Yes. Both depositions.
21    Q.  Do you plan to offer any
22 opinions concerning what Dr. Curfman said?
23    A.  I don't think so.
24    Q.  Did you, in the course of your

82 (Pages 721 to 724)

Lemuel A. Moye, M.D., Ph.D.

Page 725

1  review, also review the response to the
2  expression of concern that was filed by
3  Dr. Bombardier and others?
4      A.   Yes.
5      Q.   Okay.  Did you review Dr. David
6  Graham's deposition?
7      A.   I don't think I read his
8  deposition, no.  I saw his testimony.  I
9  didn't read his deposition.
10     Q.   Okay.  Have you reviewed his
11 paper that was published in The Lancet?
12     A.   If it's the paper about the
13 Kaiser Permanente study --
14     Q.   Yes.
15     A.   -- yes.  Right.
16     Q.   Let me ask you:  If a scientist
17 collects and analyzes data according to a --
18 well, first of all, when you design a study,
19 regardless of whether it's a clinical trial
20 or an epidemiological study, is it important
21 to have a prespecified methodology?
22     A.   Yes.
23     Q.   Okay.  Why?
24     A.   Well, for two reasons:

Page 726

1  Number 1, I guess the one that's most easily
2  accepted is -- and most readily understood is
3  that you have to be able to have the
4  resources to carry out the work, and if the
5  study is going to be -- identify patients
6  with stroke, well, it's best to have
7  specialists available who can review stroke
8  cases.  And so the only way to have them is
9  to know what you're going to do.  So for
10 logistical reasons, it's got to be
11 prospectively specified.
12          But the other, more critical
13 reason is that without a prospective plan to
14 anchor you, you wind up -- the researcher
15 winds up being tossed about on these -- on
16 the -- the random eddies of sample-based
17 results; and many results -- most results
18 that come from samples are misleading.  And
19 without a prospective plan to weight them
20 down, they wind up being carried away by
21 these.
22     Q.   So what you mean is that all --
23 all researchers, however well intentioned, if
24 not forced to adhere to a protocol, can end

Page 727

1  up setting out trying to prove what they
2  intended to prove?
3      A.   Right.  It's -- well, it's a
4  serious risk.  I guess I wasn't thinking so
5  much about proving what you intend to prove,
6  because to me that suggests you need to have
7  a prospective plan.
8          But it's finding something you
9  don't anticipate and the reaction to that
10 which they'd be reacting just to the
11 vicissitudes of sampling error.
12          MR. PIORKOWSKI:  Okay.  I think
13 we're at the end of our tape.  Why
14 don't we go off the record.
15          THE WITNESS:  Okay.
16          THE VIDEOGRAPHER:  Off the
17 record at 2:19.
18          (Recess taken, 2:19 p.m. to
19 2:39 p.m.)
20          THE VIDEOGRAPHER:  Hold,
21 please.  Back on the record, 2:39.
22     Q.   (BY MR. PIORKOWSKI) Dr. Moye,
23 I thought I asked you this, but my trusted
24 colleagues tell me I didn't, so going back

Page 728

1  to -- we were talking about controlled
2  clinical studies.
3          Are you aware of any controlled
4  clinical trials that show a statistically
5  significant increased risk of myocardial
6  infarction with Vioxx users compared to any
7  control group for intermittent use?
8          MR. WEBSTER:  Objection, form.
9      A.   Well, I think every clinical
10 trial has intermittent use in the
11 intervention.  It's not designed to have
12 that.
13     Q.   (BY MR. PIORKOWSKI) Let me
14 rephrase my question.  That's a good point.
15     A.   Okay.
16     Q.   Let's define "intermittent use"
17 as use for more than -- for -- let's say a
18 week or less.
19     A.   Okay.
20     Q.   In other words, the way you,
21 know, you're prescribed Vioxx for knee pain
22 or for --
23     A.   Right.
24     Q.   -- you know, you twist an

83  (Pages 725 to 728)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 729

1  ankle, that kind of thing.
2      A.   Uh-huh.
3      Q.   So let's say for a week time
4  frame.
5          Are you aware of any clinical
6  study that shows an increased risk of
7  myocardial infarction in Vioxx users when
8  used for intermittent use, as I've just
9  defined it?
10     A.   I'm going to answer you this
11 way:  I know of no clinical trial that
12 actually designed the intervention to be used
13 intermittently, but -- and so my answer to
14 your question is no.
15         But I don't know -- but every
16 clinical trial, patients come on and off the
17 drug.  Now, if you're asking whether it's
18 just that they've used for it a week and they
19 go off and they come on again exactly for a
20 week and go off, then there's no trial that
21 does that.
22     Q.   Most trials, though, have some
23 rules that the use has to exceed a certain
24 percentage or the patient doesn't get

Page 730

1  counted, right?
2      A.   No.
3      Q.   Well -- I'm sorry.  Go ahead.
4      A.   A patient -- an intent-to-treat
5  analysis, when you're randomized to active
6  therapy, you are in the trial and remain
7  tethered to the active therapy group in
8  analysis, regardless of what happened, what
9  your individual drug-taking habits are.
10     Q.   Are you aware of any compliance
11 guidelines for -- that patients have got to
12 comply with their pill-taking, if you will --
13     A.   Oh, yes.
14     Q.   -- a certain percentage of the
15 time?
16     A.   And, commonly, there are
17 running periods, where if the patient can't
18 take placebo --
19     Q.   Right.
20     A.   -- 80% of the time, they're
21 not -- they're not randomized to the study.
22     Q.   So that is a common practice?
23     A.   Yes.
24     Q.   And that was a practice in

Page 731

1  Merck's clinical trials?
2      A.   Yes.
3      Q.   Okay.  All right.  We talked
4  about -- at various points, I think, we
5  talked about at the time of initial approval
6  and we talked about at the time of the
7  April 2002 label change what materials --
8  what data you thought that FDA did not have
9  that Merck had.  Do you recall that?
10     A.   Well, it was that the Advisory
11 Committee didn't have that.
12     Q.   Right.
13     A.   That's what I was thinking, the
14 Advisory Committee didn't have.
15     Q.   In 2001?
16     A.   2001, yes.
17     Q.   Okay.  We already talked about
18 that, right?
19     A.   Okay.  Okay.
20     Q.   My question is:  From that
21 point on, is it your contention that Merck
22 failed to provide the FDA with any other data
23 other than what we've already discussed?
24     A.   I -- I guess I would say this:

Page 732

1  I believe that the 112 protocol, which looked
2  at the effect of rofecoxib on hypertension,
3  was not shared with the FDA.  That's the
4  only -- that's the one additional piece of
5  information I can think of that, to my
6  knowledge, it was not shared with the FDA.
7      Q.   And what's the basis for saying
8  it wasn't shared?
9      A.   Well, my review of it -- the
10 only review I have of it is a review that has
11 been -- that was produced by Merck.  I
12 haven't seen any FDA comments on it.
13         It's -- I mean, I think it's a
14 fairly important protocol in assessing the
15 relationship between hypertension and
16 rofecoxib, and my sense is it wasn't shared.
17         Now, I haven't gone through
18 every single document submitted by Merck to
19 check each one to make sure it wasn't 112,
20 but my sense is that 112 wasn't shared.
21     Q.   What document did you look at
22 to see the results of 112?
23     A.   I don't think I have it here.
24 It's -- it's a document which is a summary

84  (Pages 729 to 732)

Lemuel A. Moye, M.D., Ph.D.

Page 733

1  table and summary slides -- I mean, paper
2  copy, a hard copy of slides that demonstrate
3  the effect of rofecoxib versus celecoxib and
4  also versus placebo on increases in blood
5  pressure.
6      Q.   Do you know what the date of
7  that was?
8      A.   I don't.
9      Q.   But in fairness to Merck, as we
10  sit here today, you don't know whether that
11  was or wasn't submitted?
12      A.   That's true.  That's true.
13      Q.   Okay.  All right.  Any other
14  data that you're aware of, other than what
15  we've already discussed, that you contend
16  Merck should have submitted to the FDA but
17  failed to do?
18      A.   I can't think of any, sitting
19  here now.
20      Q.   You would agree with me that,
21  to the best of your knowledge, all of the
22  data with respect to the VIGOR study was
23  submitted to the FDA; is that right?
24      A.   I would say eventually, yes.

Page 734

1      Q.   In the APPROVe study -- we were
2  talking about subgroups earlier.
3      A.   Yes.
4      Q.   In the APPROVe study, there
5  were diabetes -- there was a diabetes
6  subgroup analysis.  Do you recall that?
7      A.   I do.
8      Q.   And would you agree -- would
9  you agree with me that under the criteria
10  that we talked about with the use of paper,
11  that diabetes was not a prespecified
12  subgroup?
13      A.   I believe that's true.
14      Q.   Okay.  And do you believe, and
15  is it correct, that the diabetes subgroup in
16  APPROVe -- that the events were very small
17  numbers of patients?
18      A.   Relatively small numbers of
19  patients, yes.
20      Q.   Do you believe that that risk
21  that comes out of that subgroup analysis is
22  the most appropriate risk, or is the most
23  appropriate risk the overall risk for
24  APPROVe?

Page 735

1      A.   Well, I think the most
2  appropriate risk is the overall risk of
3  APPROVe.  However, when it comes to patients
4  being at risk here, one can't ignore -- one
5  cannot ignore the fact that there are
6  increased events in subgroups in which you
7  would expect increased events.
8          Now, mathematically, we know
9  what to do with that.  We know to discard
10  that.  However, epidemiologically and
11  pathophysiologically, it's very difficult to
12  do that because it aligns with the
13  understanding of the underlying
14  cardiovascular event rates.
15          If these patients are at
16  greater risk of disease, then it's not
17  surprising that larger relative risks are
18  associated with VIGOR.
19          But there is -- there is,
20  admittedly, tension here between the
21  underlying mathematics which suggests one
22  interpretation, the underlying -- and the
23  epidemiology and plus safety considerations
24  which demand another interpretation.

Page 736

1      Q.   Well, at this point, there are
2  no safety considerations.  The drug's off the
3  market, right?
4      A.   Right.  Right.
5      Q.   I mean -- so it's not as if one
6  has to make a decision about whether to take
7  regulatory action on the basis of those
8  numbers at this point?
9      A.   Well, that's true today, but
10  when APPROVe was released --
11      Q.   It's true when APPROVe was
12  released.  The drug was withdrawn immediately
13  after the results of APPROVe were known.
14      A.   Okay.  Fair enough.  Fair
15  enough.  But, I mean, there was a point in
16  time when the available -- the available data
17  were available and the drug was on the
18  market, a relatively short period of time.
19  And then you have this public health concern
20  about trying to react to this as well.
21      Q.   Okay.  But, I mean, that piece
22  of information that you just alluded to, the
23  diabetes subgroup risk, there's no indication
24  that that was known to anybody, that that was

Golkow Litigation Technologies - 1.877.DEPS.USA

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 737

1  known to Merck, that that was known to the
2  data safety monitoring board for APPROVe, at
3  the time that that study was concluded,
4  right?
5      A.   Right. And that, to me, is
6  kind of one of the original sins here.
7  Because they didn't include those types of
8  patients in VIGOR, this information wasn't
9  produced until APPROVe.
10         MR. PIORKOWSKI: All right.
11  Object to the nonresponsive portion.
12     Q    (BY MR. PIORKOWSKI) Is the
13  same thing true with respect to -- APPROVe
14  also had a subgroup analysis of patients who
15  were at increased cardiovascular risk, right?
16     A.   Right.
17     Q.   Okay. And you'd agree with me
18  that for the reasons you already stated, the
19  most appropriate relative risk value for
20  those patients is the overall APPROVe risk?
21     A.   That's true.
22     Q.   Okay.
23     A.   And that goes for all the
24  subgroup analyses in APPROVe, including the

Page 738

1  18-month evaluation.
2      Q.   Okay. All right. I wanted to
3  ask you: There's -- we talked a little bit
4  last time about some of the -- some of your
5  earnings related to your work in fen-phen.
6  Do you recall that?
7      A.   Yes.
8      Q.   Okay. Do you -- was there a
9  point in time at which you had to pay back
10  certain money to the University of Texas
11  related to your fen-phen expert work?
12     A.   Yes --
13         MR. WEBSTER: Objection, form.
14         THE WITNESS: Sorry.
15     A.   Yes. I was -- I couldn't -- I
16  could not use vacation time to work on this,
17  and so I had to pay back the money I made for
18  vacation time.
19     Q    (BY MR. PIORKOWSKI) I'm sorry.
20  You could not use vacation time meaning you
21  didn't have enough vacation time left, or you
22  could not use it meaning they didn't let
23  you --
24     A.   No. Unbeknownst to me, they

Page 739

1  changed the rule where you couldn't use your
2  vacation time to work in these kinds of
3  endeavors. And when I learned that, then I
4  paid back the university the time -- my
5  vacation money earned during that time.
6      Q.   Does that mean you took
7  vacation to undertake activities like
8  depositions and that kind of thing?
9      A.   Yes. Right.
10     Q.   You thought you were taking
11  vacation, and later learned that you weren't
12  allowed to take vacation?
13     A.   That's true.
14         MR. WEBSTER: Objection, form.
15     A.   Right.
16     Q    (BY MR. PIORKOWSKI) Okay. So
17  today, let's say, is a Friday, right? Is
18  this a normal working day for you?
19     A.   It would be, yes.
20     Q.   Are you on vacation now?
21     A.   Oh. Oh. I'm sorry. Normally,
22  I would be at the university.
23     Q.   Right.
24     A.   Today, I take leave without

Page 740

1  pay.
2      Q.   I see. Which is different from
3  vacation time?
4      A.   Exactly. Vacation time, I get
5  paid.
6      Q.   I see.
7      A.   But "leave without pay" means
8  you don't get paid.
9      Q.   I see.
10         And so at some point, the rules
11  changed so that you -- so that you had to
12  take leave without pay instead of vacation,
13  is what you're saying?
14     A.   I didn't realize that, and when
15  I learned it, I paid them pack.
16     Q.   Okay. How much money
17  did you end up having to pay back?
18     A.   About $11,000, I think.
19     Q.   Okay. Have you ever taken any
20  speed-reading courses?
21     A.   Speed-reading courses? Oh, I
22  think I was in middle school or high school,
23  I think, one summer, I read a speed-reading
24  book. Read it too fast, I guess.

86 (Pages 737 to 740)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 741

1    Q.   Okay. Were you a speed -- do
2  you speed-read today?
3    A.   Do I speed-read today? Yes.
4    Q.   Yes?
5    A.   I kind of -- I actually have no
6  choice.
7       MR. PIORKOWSKI: Let's go off
8  the record. I'm going to --
9       THE VIDEOGRAPHER: Off the
10  record at 2:52.
11      (Recess taken, 2:52 p.m. to
12  2:53 p.m.)
13      THE VIDEOGRAPHER: Hold,
14  please. On the record at 2:53.
15         EXAMINATION
16  BY MR. JOSEPHSON:
17    Q.   Good afternoon, Doctor.
18    A.   Good afternoon, sir.
19    Q.   My name is Richard Josephson.
20  You and I have met before, but I haven't
21  asked you any questions today; is that
22  correct?
23    A.   Yes, sir.
24    Q.   All right. I have some

Page 742

1  questions. I'm not going to repeat questions
2  that have already been asked. And if you
3  will stick with me for just a little while, I
4  think we'll be done.
5    A.   Okay.
6    Q.   First of all, let me ask you
7  this: You are -- you have been designated as
8  an expert in a case called State of Texas
9  versus Merck. Were you aware of that?
10    A.   Yes, sir.
11    Q.   Have you ever done any work in
12  that case, that is in addition to that which
13  is outlined in your report?
14    A.   No, sir.
15    Q.   The opinions that you've given
16  in connection to questions today and at
17  your -- at your earlier deposition by
18  Mr. Piorkowski have -- is the same work that
19  you did for the plaintiffs who are pursuing
20  product liability cases the same work that
21  you've done for the State of Texas?
22    A.   Yes, sir.
23    Q.   Okay. So there -- have you
24  reviewed any specific documents or

Page 743

1  correspondence between Merck and the State of
2  Texas?
3    A.   No, sir.
4    Q.   Have you reviewed any -- any
5  information that you can recall that would be
6  germane only to the State of Texas case?
7    A.   No, sir.
8    Q.   The materials that you outlined
9  at your last deposition -- that is, the time
10  that you spent, the documents that you looked
11  at, that information -- did that contain
12  anything that you recall specific to the
13  State of Texas case?
14    A.   No, sir.
15    Q.   There is a reference in your
16  report, and if you've got your report in
17  front of you, let me ask you about that
18  reference. There is a reference toward the
19  tail end of your report. It's on page 73,
20  paragraph 205.
21    A.   Yes, sir.
22    Q.   Do you have that in front of
23  you?
24    A.   Yes, sir.

Page 744

1    Q.   Okay. It talks about your
2  opinion that Merck's actions constitute a
3  violation of the Texas Medicaid Fraud and
4  Prevention Act.
5    A.   Yes.
6    Q.   Do you see that?
7    A.   Yes, sir.
8    Q.   Is that paragraph the only
9  section of your report that deals with the
10  Texas Medicaid Fraud Prevention Act, as far
11  as you know?
12    A.   Yes, sir, it is.
13    Q.   And have you -- have you
14  reviewed the statute?
15    A.   Just basically. I haven't read
16  it in any great detail.
17    Q.   Okay. Do you consider yourself
18  an expert on the Texas Medicaid Fraud
19  Prevention Act?
20    A.   No, sir.
21    Q.   Are you going to be offering
22  legal opinions about the meaning of the Texas
23  Medicaid Fraud Prevention Act?
24    A.   No, sir.

87 (Pages 741 to 744)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel  A.  Moye,  M.D.,  Ph.D.

Page 745

1     Q.    In terms of Merck's actions and
2  inactions being a violation of that Act, do
3  you know which sections of the Act you
4  believe were violated by Merck?
5     A.    I don't know which specific
6  sections, no.
7     Q.    Okay. When you formed the
8  opinion that Merck violated the Texas
9  Medicaid Fraud Prevention Act, did you have
10  the statute in front of you?
11     A.    I did not have the statute in
12  front of me, no.
13     Q.    Okay. How do you know what
14  sections of the statute Merck violated?
15     A.    Oh. I don't -- I'm sorry. I
16  don't know what sections.
17     Q.    Okay. Well, you say they --
18  Merck's actions constitute a violation of the
19  "Unlawful Acts" section in the Texas Medicaid
20  Fraud.
21     A.    I see.
22     Q.    And I'm asking you: Did you
23  have the statute in front of you and offer
24  opinions?

Page 746

1     A.    I see.
2          No, I did not. What I did do
3  is understand -- I believe I understand what
4  Merck did, why Merck's acts were
5  inappropriate, and, therefore, believe they
6  violate the Texas Medicaid Fraud Prevention
7  Act.
8          Now, I don't know what sections
9  they were, and it was suggested to me it was
10  the "Unlawful Acts" section.
11     Q.    Okay. And who suggested that
12  to you?
13     A.    Attorneys.
14     Q.    Okay. So attorneys told you
15  that they believed that Merck had violated
16  the "Unlawful Acts" section?
17     A.    Well, no. I believe that their
18  actions violated the Medicaid Fraud
19  Prevention Act, but I didn't -- I don't know
20  the details of the Act, and they suggested
21  the sections.
22     Q.    Okay. Who suggested the
23  sections?
24     A.    I don't know which attorneys

Page 747

1  did, but attorneys did.
2     Q.    Suggested to you the sections
3  that they believed Merck violated of the
4  Texas Medicaid Fraud Prevention Act?
5     A.    Actually, the sections that I
6  believed that Merck violated.
7     Q.    Okay. And if I showed you the
8  statute today, you told me you're not an
9  expert on the Texas Medicaid Fraud Prevention
10  Act, correct?
11     A.    Yes, sir.
12     Q.    And you're not an attorney?
13     A.    That's right.
14     Q.    And so -- and you're not going
15  to be offering opinions, I presume, about the
16  Texas Medicaid Fraud Prevention Act and its
17  effect at the trial; is that correct?
18     A.    That's correct, yes.
19     Q.    Okay. So if I understand what
20  you're going to be saying is -- and let me
21  see if I understand this -- you're really not
22  going to be talking about whether Merck's
23  actions violated a statute, correct?
24     A.    That's correct.

Page 748

1     Q.    You're really just going to be
2  sitting up there and answering questions, if
3  an attorney asks you about Merck's conduct
4  related to the previous sections, 1 to 204?
5     A.    Yes.
6     Q.    And, factually, you're going to
7  be talking about those sections?
8     A.    Yes, sir.
9     Q.    Okay. So you're not going to
10  get up, just so we can clear this up, and
11  say, "I think Merck violated Section 32.8 of
12  the Texas Medicaid Fraud Statute"?
13     A.    I would say this: At this
14  time, I don't have any intention of doing
15  that. That's correct.
16     Q.    Okay. Have you been paid --
17  have you been compensated in connection with
18  the State of Texas case by -- separate and
19  apart from the compensation that you told us
20  about already?
21     A.    I don't think so. But just so
22  I can be clear, when I bill, I bill to
23  something called the Vioxx Litigation Group;
24  and I must tell you, I don't know whether

88  (Pages 745 to 748)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 749

1  attorneys who will be representing plaintiffs
2  in the State of Texas case are part of that
3  or not. I don't know.
4      Q.    All right. Right now, do you
5  know any attorneys who are part of the State
6  of Texas case?
7      A.    Other than Mr. Gallagher, no.
8      Q.    Okay. So have you met -- what
9  I guess I'm asking you is: Have you met with
10 Mr. Gallagher to discuss this case?
11     A.    No, sir.
12     Q.    Did you meet with someone from
13 his office to discuss the case?
14     A.    No.
15     Q.    Who did you meet with who
16 represents the State of Texas to discuss this
17 case?
18     A.    Well, I've had just the very
19 briefest of conversations with Mr. Gallagher
20 about -- about the intent to go forward with
21 this case.
22     Q.    Okay.
23     A.    But it's not been a
24 conversation in any detail.

Page 750

1      Q.    Well, what I'm -- are your
2  thoughts on the State of Texas case in terms
3  of -- are they preliminary, or are they --
4  have you concluded your work on the State of
5  Texas case, as far as you're concerned --
6      A.    Well, I --
7      Q.    -- to the extent you've
8  concluded it on the --
9      A.    Sure.
10     Q.    -- Texas products liability
11 cases in the MDL and are submitting yourself
12 for deposition?
13     A.    I was presuming that my work
14 represented in this affidavit would be
15 sufficient to cover my involvement in the
16 Texas case.
17     Q.    Okay.
18     A.    And so I wasn't planning to do
19 anything specific for that.
20     Q.    Okay. So -- and that's what I
21 want to try to get at. You've not really
22 specifically gone and done an analysis of the
23 Medicaid Fraud Prevention Act?
24     A.    That's right.

Page 751

1      Q.    You are simply relying upon
2  whatever you concluded for the -- for the
3  cases in California or the cases in the
4  federal MDL or the cases in the Texas MDL?
5      A.    Yes.
6      Q.    And if that turns out to be
7  relevant to the State of Texas case, then
8  you'll be offering those types of opinions in
9  the State of Texas case?
10     A.    Yes, sir.
11     Q.    And if it turns out not to be
12 relevant, then you won't?
13     A.    Then I'll stay home.
14     Q.    All right. So if I looked
15 through your billings, to your knowledge,
16 would I find any specific time that you spent
17 with Mr. Gallagher?
18     A.    You would not.
19     Q.    If I looked through your
20 billings, is it correct I wouldn't find any
21 specific time that you spent with any other
22 attorney purporting to represent the State of
23 Texas?
24     A.    That also is true, you would

Page 752

1  not find such time.
2      Q.    Okay. When you bill, you say
3  you bill to something called the Vioxx
4  Litigation Group?
5      A.    Yes, sir.
6      Q.    And the Vioxx Litigation Group,
7  the bill goes to that group?
8      A.    It goes to Scientific Evidence,
9  and then Scientific Evidence presumably
10 collects from that group.
11     Q.    Okay. Now, the Scientific
12 Evidence -- what I didn't understand from
13 your earlier testimony, you say you charge
14 $400 an hour?
15     A.    Yes, sir.
16     Q.    And of that $400 an hour, does
17 Scientific Evidence get a cut of that?
18     A.    I think they get -- they add to
19 that.
20     Q.    Okay.
21     A.    So on top of that.
22     Q.    Okay. So you keep the $400 an
23 hour, but Scientific Evidence gets something
24 on top of that?

89 (Pages 749 to 752)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 753

1   A.   Yes, sir.
2   Q.   Okay. And, to date, have
3   you -- do you know how much -- well, strike
4   that.
5        Do you know how much you've
6   been paid to date under this arrangement that
7   you've had with Scientific Evidence,
8   regardless of the litigation?
9   A.   Total amount, I don't know.
10  Q.   Several million?
11  A.   No. I would -- I mean, I would
12  estimate less than 2 million.
13  Q.   Okay. All right. And that --
14  and that's principally for the fen-phen
15  litigation?
16  A.   Yes, sir.
17  Q.   The Rezulin litigation?
18  A.   Yes, sir.
19  Q.   Was there anything else, other
20  than the Vioxx litigation?
21  A.   Some small things that didn't
22  go to trial. Lotronex, I gave a deposition
23  for. I may have done a little bit of work on
24  Sulzer hip, but I didn't go to deposition or

Page 754

1   trial. So, principally, it's been fen-phen
2   and Rezulin.
3   Q.   And --
4   A.   And then now Vioxx, of course.
5   Q.   All right. And you've given
6   approximately 55 to 60 depositions?
7   A.   Oh, I hope not that many. I
8   don't know how many.
9   Q.   I think you gave us a new list
10  today that had the --
11  A.   Well, between depositions and
12  trials, appearances, total appearances, it
13  may be that many. I don't know.
14  Q.   Okay. And --
15       MR. GALLAGHER: That would
16  include, probably, Daubert hearings.
17  Q    (BY MR. JOSEPHSON) And you
18  have -- your first time -- your first
19  involvement in the litigation was -- in the
20  pharmaceutical litigation was back in 1999?
21  A.   Yes, sir.
22  Q.   So all of this has occurred in
23  the last six or seven years?
24  A.   Yes, sir.

Page 755

1   Q.   Okay. Now, have you ever been
2   prohibited by a Court from expressing an
3   opinion about the adequacy of labeling?
4   A.   I think, perhaps, there was one
5   court in Santa Fe. As I sit here now, that's
6   the only one I can remember. I mean, there
7   may have been others, but I don't remember.
8   Q.   Do you recall being in
9   Palestine, Texas, earlier this year?
10  A.   Yes.
11  Q.   In a fen-phen case?
12  A.   It was a mistrial. Yes, I
13  remember that, yes.
14  Q.   Right.
15       Before the mistrial, do you
16  recall in any way being limited in the
17  opinions you could offer about the adequacy
18  of the labeling?
19       MR. WEBSTER: Objection, form.
20       MR. GALLAGHER: May I just
21  state for the record, too, that those
22  cases involved -- Richard, weren't
23  they all stipulated liability?
24       MR. JOSEPHSON: I don't know.

Page 756

1   I'm asking. I wasn't in them.
2        MR. GALLAGHER: All the cases
3   were stipulated liability.
4        MR. JOSEPHSON: Well, I
5   wasn't -- no, they were --
6   Q    (BY MR. JOSEPHSON) Do you
7   know, Doctor, if you were prohibited from
8   offering opinions on the labeling?
9   A.   I don't remember.
10  Q.   You remember being at a trial
11  in Palestine?
12  A.   Well, I remember starting a
13  trial. I remember --
14  Q.   And then a mistrial at some
15  point being declared?
16  A.   Yeah, I think I had a day of
17  testimony, was taken on voir dire, and the
18  next day there was a mistrial, a mistrial
19  ruling. So I don't recall what the judge's
20  rulings were.
21  Q.   Okay. Now, in the State of
22  Texas case, just to make it absolutely clear,
23  you don't know what Merck told the State of
24  Texas about Vioxx or its safety?

90 (Pages 753 to 756)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 757

1     A.    That's true.
2     Q.    And you don't know what the
3  State knew or didn't know on its own about
4  Vioxx or its safety?
5     A.    I -- that's correct.  I simply
6  know what I have testified to so far.
7     Q.    Okay.  Which has nothing to do
8  with what either Merck told the State of
9  Texas about the safety of Vioxx or about what
10 the State of Texas may have known about the
11 safety of Vioxx?
12    A.    What other arrangements there
13 may or may not have been, I don't know about.
14    Q.    Okay.  And do you know anything
15 about the approval process by which a drug is
16 approved to be on the state Medicaid
17 formulary?
18    A.    I do not.
19    Q.    And you've not reviewed any of
20 the communications between Merck and the
21 State of Texas regarding that?
22    A.    That's true.
23    Q.    Okay.  And, therefore, you
24 won't be offering any opinions about

Page 758

1  whether -- what Merck said or what the State
2  said and whether what Merck said was adequate
3  or not, because you haven't even seen any of
4  the material?
5     A.    Right.  I cannot offer any
6  opinions now.  I think if I do have opinions,
7  then we'll reconvene.
8     Q.    Okay.  But right now, you have
9  no opinions?
10    A.    That's right.
11       MR. JOSEPHSON:  All right.
12 That's all I have.  Thank you, Jason.
13       MR. PIORKOWSKI:  Jason, do you
14 want to ask questions?
15       MR. WEBSTER:  I've got a
16 couple.  Mine are just real quick.  Do
17 you have the exhibit stickers, please?
18       (Whereupon, Deposition Exhibit
19 Moye MDL 21, APPROVe Trial
20 Cardiovascular Safety Report,
21 MRK-AFV0426355 - MRK-AFV0426453, was
22 marked for identification.)
23
24

Page 759

1           EXAMINATION
2  BY MR. WEBSTER:
3     Q.    Doctor, I'm going to show you
4  what we've marked as Exhibit No. 21 to your
5  deposition.
6       MR. WEBSTER:  There's a copy
7  for you.
8     Q.    (BY MR. WEBSTER)  Could you
9  please identify that for the record, please?
10    A.    It's the APPROVe trial on
11 cardiovascular safety report appendix.
12    Q.    Have you reviewed that in
13 preparation for your testimony?
14    A.    Yes.
15    Q.    And do you rely on that
16 document for the basis of your opinions?
17    A.    Yes, I do.
18    Q.    Specifically, have you reviewed
19 Table 13, which is located in that document?
20    A.    Yes, I have.
21    Q.    And have you relied upon that
22 table also in the basis of your opinions that
23 you've stated here today?
24    A.    Yes, I have.

Page 760

1     Q.    Counsel for Merck asked you a
2  couple of questions about 12-1/2 milligrams'
3  worth of use, and could you please explain
4  your opinions to us as to why that drug --
5  why you would consider it, 12-1/2 milligrams
6  of Vioxx, not safe on the market?
7     A.    Well, a couple of reasons.
8  One, of course, is I finally found that
9  Protocol 090, which uses 12.5 milligrams.
10 The other reason is the -- I guess an
11 understanding for how pain -- how people use
12 pain medications.
13       Patients tend to take the
14 medicine at a level that they think -- many
15 patients tend to take medications at a level
16 that they think is going to provide relief.
17 And patients will, therefore, tend to
18 increase medication doses, sometimes
19 encouraged by physicians, sometimes not, so
20 that 12.5-milligram dose, in fact, may not be
21 12.5 milligrams in reality.  It may be bumped
22 up to 25 milligrams or even 50 milligrams.
23       So regardless of the safety or
24 lack of safety of 12.5-milligram dose, the

Lemuel A. Moye, M.D., Ph.D.

Page 761

1  fact that it is a stepping stone to higher
2  doses, which are much less safe, is a reason
3  to stay away from the 12.5-milligram.
4      Q.    Does that mean, basically, in
5  layman's terms, that if you're a person
6  having pain, one helps you, but two might
7  even help more?
8      A.    Right. Actually, I thought I
9  said that.
10         MR. WEBSTER: I think that's
11     all the questions I have.
12         EXAMINATION
13 BY MR. GALLAGHER:
14     Q.    Dr. Moye, Mike Gallagher.
15 We've met before.
16     A.    You bet, Mike.
17     Q.    And, as you know, I'm one of
18 the lawyers representing the State of Texas,
19 and it was I that asked if you could become
20 involved on behalf of the State of Texas --
21     A.    Yes.
22     Q.    -- do you recall that?
23         I have just a couple of
24 questions here. You were asked a question a

Page 762

1  little bit earlier about Study 090, and the
2  question related to whether or not Study --
3  the results of Study -- of Study 090 were
4  statistically significant.
5      A.    Right.
6      Q.    And you said that they did not
7  reach the level of statistical significance
8  from an epidemiological standpoint?
9      A.    I didn't think so, right. I
10 mean, my answer was that they were clinically
11 significant and demonstrated a signal, but I
12 didn't think that the findings for myocardial
13 infarction were statistically significant.
14     Q.    But was Study 090 an important
15 part of the data that you reviewed in
16 preparing to give the opinions that you've
17 given relative to the drug Vioxx?
18     A.    Yes.
19     Q.    All right, sir. Were you ever
20 shown a Protocol 112? Have you ever --
21     A.    Yes, I have.
22     Q.    -- been --
23         When did you first receive that
24 Protocol 112?

Page 763

1      A.    Oh, actually -- well, I don't
2  know when I first received it. I think I
3  looked at it this week. I don't know when I
4  first received it, though.
5      Q.    Do you know whether or not
6  Protocol 112 was ever provided to the FDA?
7      A.    My sense is, from what I've
8  read, is that it was not provided to the FDA.
9      Q.    Have you had an opportunity to
10 review it sufficiently to make a
11 determination as to whether or not it
12 contains within it information that should
13 have been communicated to the FDA relative to
14 the risk of Vioxx?
15     A.    Yes.
16     Q.    And what is your opinion?
17     A.    My opinion is the information
18 is certainly germane and should have been
19 communicated not just to the FDA, but to
20 physicians and to pharmacists and,
21 ultimately, patients.
22     Q.    I wanted to ask you another
23 question relative to the warning letter that
24 I think is dated September 17th, and it's to

Page 764

1  Mr. Gilmartin. It's from the DDMAC division
2  of the FDA division of drug marketing,
3  advertising and communication. You're
4  familiar with them?
5      A.    Yes.
6      Q.    And you've seen publications
7  from them to various drug manufacturers in
8  other cases?
9      A.    Yes.
10     Q.    Do the publications that are
11 emanated from that division normally deal
12 with the accuracy of the information that the
13 drug company is communicating to the general
14 public?
15         MR. PIORKOWSKI: Objection,
16     lack of foundation.
17     A.    Yes.
18     Q    (BY MR. GALLAGHER) And to the
19 medical community.
20     A.    Yes.
21         MR. PIORKOWSKI: Same
22     objection.
23     Q    (BY MR. GALLAGHER) In response
24 to a question that you were asked a moment

92 (Pages 761 to 764)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 765

1  ago, you indicated that you would probably
2  address only the press release and not deal
3  with the promotional audio conferences given
4  by Peter Holt, who I think was a
5  representative -- he's a private M.D., but a
6  representative of Merck on some audio
7  conferences, or he conducted them; and that
8  you wouldn't deal with the oral
9  representations made by Merck's sales
10 representatives. Do you recall saying
11 something to that effect?
12     A.   Yes.
13     Q.   Well, what I wanted to ask you
14 was if -- and I'll give you the letter to
15 review, if you feel the need to do so. You
16 are going to give testimony at the trial that
17 relates to the obligations of a drug company
18 to communicate fairly and accurately to the
19 general public and to the medical community;
20 is that correct?
21     A.   I am, yes.
22     Q.   All right, sir. And any
23 activity that's conducted by the drug
24 company, whether it be by way of press

Page 766

1  conference, by way of their marketing
2  department, their detail people or doctors
3  who are retained by them to promote their
4  drug, if the promotion of the drug is false
5  and misleading, that will be something that
6  you intend to address in your testimony
7  during the course of the trial, is it not?
8         MR. PIORKOWSKI:  Objection,
9     leading. And, Mike, that's outside
10    the scope of his report and his
11    testimony, so -- you can answer.
12    Q     (BY MR. GALLAGHER)
13 Misrepresentations?
14     A.   Yes.
15     Q.   Okay. And you addressed
16 misrepresentations in your report, didn't
17 you?
18     A.   Yes.
19     Q.   All right, sir. And you intend
20 to address those misrepresentations
21 regardless of the format in which they're
22 made, if they were made to the general public
23 and misrepresent the characteristics of the
24 drug?

Page 767

1     A.   Yes.
2         MR. PIORKOWSKI:  Same
3     objection.
4     Q     (BY MR. GALLAGHER) This has
5  probably been asked, but I'll run the risk of
6  asking it again only once: Have you
7  formulated an opinion with regard to whether
8  or not, based upon the statistical data and
9  the literature that you've reviewed, Vioxx
10 increases the risk of cardiovascular events?
11     A.   Yes, sir, I have an opinion.
12     Q.   And what is that opinion?
13     A.   Vioxx causes an increase in
14 cardiovascular events.
15     Q.   In arriving at that opinion,
16 did you employ the same methodology that you
17 normally employ in -- as an epidemiologist in
18 drawing associations between different drugs
19 and certain conditions?
20     A.   Yes, sir.
21         MR. PIORKOWSKI:  Objection to
22     form.
23         THE WITNESS:  Sorry.
24     A.   Yes.

Page 768

1     Q     (BY MR. GALLAGHER) And you
2  have been -- have you been published with
3  regard to both the methodology that you
4  employed and the results of your methodology?
5     A.   Yes, sir, I have.
6     Q.   And have you been employed -- I
7  mean, have you been published in
8  peer-reviewed journals with regard to the
9  subject of epidemiology?
10     A.   Yes, sir.
11     Q.   All right. Do you feel that
12 the data that you have that you have had an
13 opportunity to review and which was provided
14 through discovery from Merck and from other
15 sources as well, has provided you with a
16 sufficient basis upon which to predicate your
17 opinions?
18     A.   Yes.
19         MR. GALLAGHER:  All right, sir.
20     It's been so long since I've gotten to
21     ask a question, I'm sort of beginning
22     to like it again. But I'll shut up.
23         MR. PIORKOWSKI:  Pass the
24     witness?

93  (Pages 765 to 768)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 769

1    MR. GALLAGHER: Yeah.
2    MR. PIORKOWSKI: All right.
3 Doctor, I have a couple of follow-up
4 questions.
5    EXAMINATION
6 BY MR. PIORKOWSKI:
7    Q.    First of all, Study 090 --
8 well, let me back up.
9    As I understand what your
10 opinion is in response to counsel's
11 questions, your opinion about the safety of
12 the 12.5-milligram dose is based on Study 090
13 and on the possibility that -- of what they
14 call dose creep?
15    A.    Well, it's based on three
16 things. Those are two of them, yes. The
17 third is just my understanding of how -- of
18 how toxins work, and that is the more that
19 you take, the worse it is. Now, it doesn't
20 mean that a low dose is a safe dose.
21    Q.    Okay. It doesn't mean that
22 it's not, either, does it?
23    A.    That's true. But in order to
24 study that, you have to carry out a fairly

Page 770

1 large clinical trial for patients on low-dose
2 therapy, follow them for a long period of
3 time, and we don't have that.
4    And I'm not willing to accept
5 the proposition in the absence of evidence
6 that 12.5 milligrams is safe in the presence
7 of 090.
8    Q.    You want to see at least some
9 patient study for like at least a year,
10 right?
11    A.    For -- yes. I mean, I'd like
12 to see -- to be sure of its safety, yes, an
13 adequate number of patients studied for a
14 sufficient period of time.
15    Q.    Okay. Do you have the Targum
16 paper in front of you?
17    A.    I did. I think I still do.
18    (Witness reviews document.)
19    MR. GALLAGHER: Here it is.
20    A.    Yes, I have it, right here.
21    Q    (BY MR. PIORKOWSKI) Okay. Can
22 you turn to page 29?
23    A.    29?
24    Q.    Okay. Am I correct that the

Page 771

1 Targum -- the Targum memo -- well, let's just
2 back up to make sure the record is clear.
3    Shari Targum was -- we talked
4 earlier about reviewers, right --
5    A.    Right.
6    Q.    -- who were not within the same
7 division as the arthritis doctors, right?
8    A.    Right.
9    Q.    And she's one of those
10 reviewers. She was from the cardiac
11 division, right?
12    A.    Right.
13    Q.    And prior to the 2001 Advisory
14 Committee, she did a whole review of the
15 cardiovascular safety of Vioxx, right?
16    A.    Right.
17    Q.    Okay. And one of the studies
18 that she looked at was Study 090, right?
19    A.    Right.
20    Q.    And, in fact, there are one,
21 two, three, four, five -- six pages of
22 analysis, basically -- five and a half --
23 dedicated to Study 090 in her report back in
24 2001, right?

Page 772

1    A.    Yes.
2    Q.    Okay. So this information
3 about Study 090 -- let me ask you: Is there
4 anything about Study 090 that you're relying
5 on that's not in Shari Targum's report?
6    A.    No.
7    Q.    Okay. So fair to say that all
8 the information in Shari Targum's report was
9 known to the FDA back in February of 2001?
10    A.    Yes.
11    Q.    Okay. And it's fair to say
12 that all the information in Shari Targum's
13 report about Study 090 was also known to the
14 FDA Advisory Committee in February of 2001?
15    A.    I don't know if I accept that.
16 I certainly -- it was known by the FDA.
17    Q.    Okay.
18    A.    I don't know if it was known by
19 the Advisory Committee in 2001. I just don't
20 remember the transcripts of -- and the --
21 whether there was any discussion of 090.
22    Q.    Okay.
23    A.    There may very well have been.
24    Q.    Do you know whether the Targum

94 (Pages 769 to 772)

165470b8-f920-4da9-843f-90cc143762f6

Lemuel A. Moye, M.D., Ph.D.

Page 773

1  memo was prepared in advance of the FDA
2  Advisory Committee?
3      A.    Well, the Advisory Committee
4  meeting was 2001 --
5      Q.    Right.
6      A.    -- February of 2001.  This is
7  dated December 8th, 2000.
8      Q.    Right.
9      A.    So the answer is yes.
10     Q.    Right.
11     A.    Right.  It's three months
12  earlier.
13     Q.    Okay.  Right.
14          I mean, I guess my question is:
15  Are you aware of whether -- if you look on
16  the FDA's website --
17     A.    Right.
18     Q.    -- under briefing documents for
19  the 2001 Advisory Committee, her memo is on
20  the website?
21     A.    Okay.
22     Q.    So that would mean --
23     A.    Okay.
24     Q.    -- that it's a briefing

Page 774

1  document for the Advisory Committee --
2      A.    Right.
3      Q.    -- for the 2001 meeting, right?
4      A.    Yes.  Right.
5      Q.    And, similarly, in -- do you
6  have Eric Topol and Mukherjee's paper?
7      A.    Yes.
8      Q.    Okay.
9      A.    Right.
10     Q.    On page 956, there's also a
11  discussion of Study 090 --
12     A.    Yes.
13     Q.    -- in that paper, right?
14     A.    Yes, there is.
15     Q.    Which was published in JAMA
16  back in 2001, right?
17     A.    Yes.
18     Q.    Okay.  So there's no new data
19  that you're aware of about Study 090 other
20  than what's reflected in the Targum memo and
21  in the Mukherjee paper?
22     A.    That's true.
23     Q.    Okay.  All right.  Now, when a
24  drug is approved, one of the conditions of

Page 775

1  approval is that it's approved for a certain
2  dose for certain indications, right?
3      A.    Yes.
4      Q.    And that doesn't mean that it's
5  not possible that somebody could take it at a
6  higher dose, right?
7      A.    That's true.
8      Q.    I mean, somebody can always --
9  50 milligrams was not approved for chronic
10  use, right?
11     A.    Right.
12     Q.    But that doesn't mean somebody
13  couldn't have used it for a longer period of
14  time --
15     A.    That's right.
16     Q.    -- if they felt it appropriate,
17  or even a patient taking it that way, right?
18     A.    That's right.
19     Q.    Okay.  But that doesn't mean --
20  the fact that somebody could take
21  12.5 milligrams take more than that
22  doesn't mean that there's scientific evidence
23  that 12.5 milligrams itself is unsafe, right?
24     A.    That, in and of itself, doesn't

Page 776

1  mean that 12.5 milligrams isn't safe, okay?
2      Q.    Okay.
3      A.    It does suggest that the drug
4  may not be used as directed, but it doesn't
5  suggest that -- it doesn't denote that
6  12.5 milligrams would be safe --
7      Q.    Okay.
8      A.    -- would be unsafe.
9      Q.    Now, Mr. Gallagher asked you
10  about Protocol 112.  Do you recall that?
11     A.    Sure do.
12     Q.    There's nothing in your report
13  anywhere about Protocol 112?
14     A.    Right.  I just read that this
15  week.
16     Q.    Okay.
17     A.    That's why I wanted to talk
18  about it today.
19     Q.    Okay.  Who gave that to you?
20     A.    I don't know.  I probably got
21  it from several different sources.
22     Q.    Okay.
23     A.    But I just read it this week.
24     Q.    Okay.  Do you know why it was

95 (Pages 773 to 776)

Lemuel A. Moye, M.D., Ph.D.

Page 777

1  given to you?
2      A.   Why?  Because it -- well,
3  because it deals with cardiac events, cardiac
4  adverse events from Vioxx.  But these are --
5  this is primarily a hypertension-induced -- a
6  study of the hypertension -- blood
7  pressure-raising potential for Vioxx.
8      Q.   Okay.  And when you say -- I
9  think you said, quote, "My sense is it wasn't
10  given to the FDA."  Just so the record is
11  clear, you don't know one way or the other,
12  right?
13      A.   I don't.  That's right.  I
14  don't.
15          MR. PIORKOWSKI:  Okay.  All
16  right.  Okay.  I have no further
17  questions.
18          We done, Richard?
19          MR. JOSEPHSON:  I just have a
20  couple of follow-ups from
21  Mr. Gallagher.
22          EXAMINATION
23  BY MR. JOSEPHSON:
24      Q.   Doctor, and this may just be

Page 778

1  that I want to just make sure, because we
2  haven't asked you a lot of questions because
3  of your answers at the first deposition about
4  a particular area, and I want to make sure
5  we're not going into that area.
6      A.   Okay.
7      Q.   Is it correct that you are not
8  going to be commenting upon Merck advertising
9  that may have gone to physicians?
10      A.   The best answer I can give you
11  is this:  I am not going to review in
12  painstaking detail the words used in Merck
13  advertising, nor am I going to compare them
14  to, again, in painstaking detail, any
15  standard.
16          However, it is the -- in my
17  opinion, it is the obligation of a drug
18  company to provide a -- an accurate portrayal
19  of the drug's risks and benefits, and the
20  degree that they don't do that is the degree
21  to which I'll comment.  So it will be general
22  comments, but I don't think it will be
23  specific comments.
24      Q.   Well, let me ask you this,

Page 779

1  Doctor:  The last time you actively practiced
2  medicine was early '90s?
3      A.   March 1992.
4      Q.   Okay.  So you have not
5  practiced medicine in about, what, 14 years?
6      A.   Right.
7      Q.   And never prescribed nor were
8  detailed --
9      A.   Actually, 16 years.
10      Q.   16 years.
11      A.   Right.
12      Q.   I'm sorry.  Your math is --
13          You never prescribed or were
14  detailed on Vioxx, correct?
15      A.   That's right.
16      Q.   Or Celebrex or any of the COX-2
17  drugs?
18      A.   That's correct, yes.
19      Q.   In fact, detail man to promote
20  a medicine to you to prescribe, the last time
21  that happened was back in the early 1990s,
22  correct?
23      A.   That's right.
24      Q.   Okay.  And you've not -- have

Page 780

1  you kept up with the regula- --- the DDMAC
2  regulations on advertising?
3      A.   No.
4      Q.   And so you're not in a position
5  to comment on whether Merck violated DDMAC
6  regulations that may have been attached to
7  certain advertising -- advertisements that
8  were approved by the FDA, correct?
9      A.   Today, I'm certainly in no
10  position to point to one CFR or one
11  regulation and say, "This was violated."
12  That's right.
13          MR. JOSEPHSON:  Okay.  That's
14  all I have.  Thank you.
15          MR. PIORKOWSKI:  I think you're
16  done, Doctor.
17          MR. GALLAGHER:  You're done.
18          MR. PIORKOWSKI:  Thank you very
19  much.
20          THE VIDEOGRAPHER:  Off the
21  record at 3:28.
22          - - -
23          (Deposition concluded at
24  3:28 p.m.)

96 (Pages 777 to 780)

165470b8-f920-4da9-843f-90cc143762f6

# Lemuel A. Moye, M.D., Ph.D.

Page 781

```
1    C E R T I F I C A T E
2
3        I, MICHAEL E. MILLER, a Notary
     Public, Registered Merit Reporter and
4    Certified Realtime Reporter, do hereby
     certify that prior to the commencement of the
5    examination, LEMUEL A. MOYE, M.D., Ph.D. was
     duly sworn by me to testify to the truth, the
6    whole truth and nothing but the truth.
7        I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
8    testimony as taken stenographically by and
     before me at the time, place and on the date
9    hereinbefore set forth, to the best of my
     ability.
10
         I DO FURTHER CERTIFY that I am
11   neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
12   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
13   that I am not financially interested in the
     action.
14
15
16   _____
17   MICHAEL E. MILLER, RMR, CRR
     Notary Public in and for
     The State of Texas
18   My Commission Expires: 7/9/2008
     Dated:  June 19, 2006
19
20
21
22
23
24
```

Page 782

```
1    ACKNOWLEDGMENT OF DEPONENT
2
3
4        I,_____, do
     hereby certify that I have read the foregoing
5    pages, 400 - 784, and that the same is a
     correct transcription of the answers given by
6    me to the questions therein propounded,
     except for the corrections or changes in form
7    or substance, if any, noted in the attached
     Errata Sheet.
8
9
10
11
12   _____
     LEMUEL A. MOYE, M.D., Ph.D.     DATE
13
14
15   Subscribed and sworn
     to before me this
16   _____ day of _____, 20 _____.
17   My commission expires: _____
18
19   Notary Public
20
21
22
23
24
```

Page 783

```
1            E R R A T A
2    PAGE  LINE  CHANGE
3    ____  ____  _____
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```

Page 784

```
1          LAWYER'S NOTES
2    PAGE  LINE
3    ____  ____  _____
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```

97 (Pages 781 to 784)

165470b8-f920-4da9-843f-90cc143762f6