comparable degree of damaging effect of rofecoxib as the RR of 2.8 found for cardiac events.  Excess cerebrovascular events were also found in other Merck-sponsored randomized clinical trials described in this section below and in certain of the studies described below in the section on observational epidemiology

75.     *The Occurrence of Increased Blood Pressure in APPROVe.*
Increased blood pressure was known to be an important effect of rofecoxib since the pre-marketing clinical trials.  See Integrated Safety Summary, October, 1998, page MRK-0S420085537.  Similarly, increases in blood pressure occurred in the APPROVe study as well as investigator-reported peripheral edema and congestive heart failure (CHF).  CHF is associated with peripheral edema and often follows increased blood pressure.  See Bresalier, at 1096.  Although Bresalier, et al reported no statistical association between blood pressure increases and occurrence of heart attack, (see Bresalier at 1097-8), this statistical comparison becomes invalid due to the removal during the trial of those with hypertension, which was done more commonly in the rofecoxib group (31 individuals) than in the naproxen group (8 individuals).  See Bresalier at 1096.  Rofecoxib's blood pressure effect is highly relevant for two reasons: first, it occurs twice as often in those exposed, compared to those on placebo (see Bresalier at 1099, Table 4), and when it occurs, this rofecoxib-induced  hypertensive has almost four times the rate of thrombotic cardiovascular adverse events than occurs in those who develop hypertension while on placebo.  This "extra burden" is seen clearly in a comparison of those in each group (rofecoxib-hypertensives vs placebo-hypertensives) who had comparable "spikes" of systolic blood pressure above 160 or diastolic pressures above 100.  For those two groups the **RR was 3.82, 95% CI 1.42, 12.85,** for rofecoxib/placebo (see APPROVe cardiovascular safety report, Table 23 B.  See MRK-AHD 0075805).

76.     *Incidence of Additional Hypertension-Related Outcomes (Congestive Heart Failure, Pulmonary Edema and Cardiac Failure) in APPROVe.*  The

RR for these hypertension-related complications was **4.61, CI 1.50-18.83**, comparing rofecoxib to placebo.  See Bresalier, Table 4 at 1100.  These are related adverse events for the following reasons: Hypertension increases the burden on the heart because the "pump" must now work harder since it beats against increased peripheral resistance, the hallmark of hypertension.  Second, hypertension increases the occurrence rate of heart attacks, further weakening the heart muscles.  Third, with both types of weakening, the heart begins to fail—and when this happens, water is retained, causing ankle swelling (peripheral edema) and lung congestion (pulmonary edema), with both becoming more evident as the heart failure progresses.  It is likely that blood pressure increases will be greater in those with higher baseline pressures.  It is also likely that the tendency of rofecoxib to increase arterial blood clotting, (see ¶¶ 57 and 67, above) will create more clots in arteries damaged by increased blood pressure than in undamaged arteries.  In this manner, the combination of rofecoxib's tendencies to increase both blood pressure and arterial clotting will increase the likelihood of both heart attacks and strokes.  Therefore, patients who suffered CHF due to Vioxx are at very high risk of further events, including MI, stroke and premature mortality.

**APPROVe Data Shows Excess Risk Throughout Exposure to Vioxx**.

77.     Merck has claimed since September 2004 that the APPROVe study showed no excess risk of thrombotic events until after 18 months' use.  This position is contrary to generally accepted principles of science, and is also contradicted by unpublished data and analyses from Merck's own files.

78.     On January 31, 2005, two weeks before the APPROVe article was published, Merck's consultant and APPROVe co-author Dr. Konstam stated that the authors were "going out on a limb" by emphasizing the assertion of a rate difference between the 0-18 month and 19-36 month time periods.  (MRK-AHD0075697.)  This is a candid admission that there is no scientific support for the assertion.  Yet I have seen

Merck's former CEO, Raymond Gilmartin, testify that there was no effect on people who took Vioxx for less than 18 months. Mr. Gilmartin was going out on the same limb.

79.     The APPROVe study was not designed or "powered" to evaluate CV event rates, and instead the monitoring of CV events was incidental to the study's purpose, i.e., to detect a difference in the rate of recurrent neoplastic polyps of the large bowel for Vioxx versus placebo. "Power" refers to the ability to detect a statistically significant difference in outcomes between the treatment arms when such a difference exists. Scientific studies are designed in advance to include sufficient numbers of subjects to detect such differences, at pre-specified levels of significance, *as to the outcome for which the study was designed.* Thus, the APPROVe Data Analysis Plan (DAP) shows that the study was designed to detect recurrent polyps, not CV events (MRK-I8940080876); the study was certainly not powered to detect a difference in CV event rates for one segment versus another, and this is particularly true for the earliest time period, when there are relatively few events to be analyzed. It is a fundamental principle of science and epidemiology that, unless the study is adequately powered to detect differences in event rates over an early time period as part of the pre-study design, the same relative risk determined when the study is over is presumed to apply throughout. Merck's post-hoc "subgroup analysis" of 0-18 vs 19-36 month time periods violates this principle and lacks any scientific basis. It is axiomatic that the early phase of any RCT is subject to statistical uncertainties, and the entire field of statistics was developed to create rules of judgment on when enough evidence is present to draw sound conclusions.

80.     Despite the design limitations of the APPROVe study, it is important to note that even small studies can yield statistically significant results when the exposure causes a large difference in disease outcomes. This is true because the power of a study to detect a statistically significant effect of exposure is directly proportional to (a) the magnitude of effect, as well as (b) the size of the study population.

Thus, the larger the magnitude of the effect, the smaller the population size necessary to detect the effect at a statistically significant level.  Conversely, even a small increased risk can be detected at a significant level with very large population sizes.  These principles are directly relevant to the analysis of data from the APPROVe study, as discussed below.

81.     The largest magnitude of effect in APPROVe was seen in the patients with pre-existing conditions that placed them at exceptionally high risk for adverse cardiovascular events, including MI and stroke.  Thus, the relative risk for the category of "symptomatic atherosclerotic cardiovascular disease" was **9.59**, and the relative risk for diabetics was **6.10**, and both results were statistically significant.  Importantly, the Kaplan-Meier cumulative incidence curve presented in the published version of the APPROVe study displayed only the data for the population as a whole, without a separate display of the data for the high-risk subgroups.  In fact, one of the reviewers for the *New England Journal of Medicine* specifically asked the authors to present the curve for high-risk patients (MRK-AHD0000075):

> "It is said that the thrombotic events do not separate out for 18 months it [sic] would be important to know if that is true for all risk groups and for the non-aspirin group.  For example did the ACSD [Atherosclerotic Disease] symptomatic group not on ASA [aspirin] separate out earlier . . . did the patients with a CAD [coronary artery disease] history separate out earlier?  <u>I am trying to understand whether patients with already existing ACSD develop problem early while other patients at lower risk (the majority in the study build up risk over time</u>."  (2005 NEJM 000280) (emphasis added).

82.     Rather than provide the requested analysis showing the separation of the curves for high-risk patients, the authors responded that the small numbers of subjects would result in a "lack of statistical power."  (<u>Id.</u>)  This reply to the NEJM reviewers was incorrect.  In fact, the magnitude of the effect in the high risk groups is so

large that early separation and statistically significant increased risk can be observed in both the early and late portions of the study, despite the small size of the sub-population of patients in these categories. Analysis of the SAS files for the APPROVe study, provided by Merck in this case, allowed identification of the patients with pre-existing heart disease and/or pre-existing diabetes and their event rates. For such patients, there were **18 confirmed thrombotic events in the Vioxx arm, versus 3 in the placebo arm, and the curve for Vioxx is above placebo throughout the entire period of the study.** Furthermore, 15 of the 18 events in the Vioxx arm were cardiac in nature, including 11 MIs (2 of which were fatal), 4 unstable angina, and 1 sudden cardiac death, whereas 2 of the events in the placebo group were peripheral venous thromboses which are of questionable relevance to the endpoint of interest. The Kaplan-Meier curve for the high risk patients appears below:



**APPROVe Study**
**Adjudicated events, high risk subgroup**

83.     Contrary to Merck's oft-repeated claim of "no effect" in the first 18 months, the data show a statistically significant increased risk for these high-risk patients in the Vioxx arm for the 0-18 month period.  **RR=3.49, P=0.0406,** by the log-rank test, which is standard in this context.[3]  At 36 months, the Relative Risk was even higher, **RR=5.69 (95% CI 1.68, 19.3)**.  These statistically significant findings mean that it is highly likely the results were due to the toxic effects of Vioxx, rather than chance.

---

[3] The 95% CI at 18 months is 0.974, 12.5.  The CI is based on the estimated standard error of the cox coefficient, and it is not as accurate nor efficient as the log rank test.  The p-value of 0.0406 is the most reliable indicator of statistical significance.

The finding of a significant effect in the 0-18 month period in high-risk patients directly refutes the false claims made by Merck that no such difference exists.

84.     As noted previously, the clearest signal for the toxicity of Vioxx appears with respect to cardiac events, that is, MI, sudden cardiac death and unstable angina, with a highly statistically significant RR of **2.80** in APPROVe, Bresalier at 1096, Table 2.  The SAS files provided by Merck from the APPROVe study did not precisely match the data presented in the published article, in that the SAS files showed 29 "cardiac events" in the Vioxx arm, rather than 31 as stated in Table 2 of the article.  Therefore, the RR in my calculations is slightly lower (2.62) than the RR of 2.80 from Bresalier.  Nevertheless, the RR of **2.62** was significant, **p < .04, 95% CI 1.33, 5.13.**  For the 0 to 18 month period, **RR = 1.81, P = 0.129, 95% CI 0.83, 3.96.**  Although the result at 18 months does not reach statistical significance due to the smaller number of events, there is nevertheless only a 1 in 8 possibility that the result is due to chance.  Particularly where the data at 36 months show a highly significant increased risk, it is far more likely than

not that the different at 18 months is due to the toxic effect of Vioxx. The Kaplan-Meier
cumulative incidence curve, below, shows visual separation with Vioxx above placebo
well·before 18 months:



**APPROVe Study**
**2.a.1 MI/SuddenDeath/Unstable Angina, all**

85.     Equally important is the fact that the investigator-reported (IR)
cardiovascular events from the APPROVe study were analyzed by Merck pursuant to its
pre-study plan, and the results of that analysis, which were not disclosed to the NEJM
peer reviewers or the public, contradict Merck's public position on the supposed lack of
early risk of Vioxx. A Cardiovascular Safety Report (CSR) prepared by Merck in
January 2005 (MRK-AHD0075757, et seq.) includes a narrative description, relative risk
calculation and Kaplan-Meier incidence graph for IR events, and drafts of the APPROVe

manuscript (MS) included data that were <u>deleted</u> from the MS submitted to NEJM, as described below.[4]

86.    The CSR states that IR events constituted a "secondary endpoint" (<u>id.</u> at MRK-AHD0075767) of equivalent status as the endpoint based on the publications of the Antiplatelet Trialists Collaboration (APTC).  The status of IR data as a "secondary endpoint" is confirmed by Protocol 203, which set forth Merck's plan to combine and statistically analyze data from the APPROVe, VICTOR and ViP trials (MRK-I8940077737).  However, Merck published APTC statistical analyses while deleting the data for the IR events.  The IR data show that Vioxx conferred clear early visual separation and therefore supports other evidence, including statistically significant differences that demonstrate increased CV risk throughout the study, contrary to Merck's claim that there was no difference until after 18 months' exposure.

87.    There were 77 patients with IR cardiovascular events in the rofecoxib treatment group and 44 patients with the events in the placebo treatment group.  The patient-year adjusted event rates were 2.54 and 1.33 events per 100-patient years for the rofecoxib and placebo treatment groups, respectively.  The relative risk of IR events for Vioxx versus placebo was **1.90 with a 95% confidence interval of (1.31, 2.76)**.  The relative risk was significantly greater than 1 (p=0.001).  (CSR at p. 33, MRK-AHD0075789).

---

[4] The data were ultimately submitted to the FDA in an appendix to the APPROVe CSR in June 2005.  To my knowledge, they have not been discussed in the media or peer-reviewed literature.  It is clear from the NEJM reviewers' comments that these data are highly relevant and of great interest to the scientific and medical community.

88.     Figure 6 of the CSR (MRK-AHD0075792; MRK-AFV0426392) displayed the Kaplan-Meier cumulative rate curves over time for both treatment groups for investigator-reported cardiovascular events.  Text accompanying the figure states, **"The curve of the rofecoxib treatment group was above the curve of the placebo treatment group during the entire study."**  (Id., emphasis added.)[5]  This curve is reproduced below:

**Figure 6**
**Kaplan-Meier Plot for Investigator-Reported Cardiovascular Events**
**(Events on Treatment through 14 Days After the Last Dose of Study Therapy)**



89.     Tables 12a and 12b of the CSR display the relative risk of Vioxx versus placebo over six-month time intervals and 18-month time intervals, respectively, based on IR events.  Table 12a shows that the relative risk of Vioxx versus placebo was elevated in every six month period, from "0 to 6 months" through "greater than 30

---

[5] A similar result was obtained by a Merck statistician in September 2004, before Vioxx was withdrawn.  (See MRK-AAD0357815.)

months".  Table 12b shows that **the relative risk of IR cardiovascular events for Vioxx versus placebo was statistically significantly elevated during the 0-18 month interval, RR=1.67 (95% CI 1.01, 2.76) and in the 19-36 month interval, RR=2.22 (95% CI, 1.28, 3.85)** (MRK-AHD0075794).  This statistically significant excess risk is not due to chance and should have been published rather than deleted.  The statistical analysis is further evidence that the "18 month" hypothesis is untenable.

90.     Figure 7 of the CSR displayed the hazard functions over time for both treatment groups for investigator-reported cardiovascular events.  "A test of the proportional hazard assumption for the COX proportional hazards model did not show the violation of the assumption (p=0.205)."  (Id. at MRK-AHD0075793.)  That is, **there was no significant difference between the relative risk of Vioxx versus placebo according to duration of exposure, and, instead, Vioxx conferred greater risk than placebo at all periods analyzed**.

91.     The data described above refute Merck's position that there was no difference in CV events until after 18 months of exposure to Vioxx in the APPROVe study.  Merck failed to disclose these data in the published APPROVe study in the NEJM.  It is important that a draft manuscript submitted to NEJM included a reference to the deletion of the IR event analysis from the table of CV adverse events, and that the suggestion to delete the IR data was made by Christopher Lines, an author of the article whose financial disclosure to NEJM a Merck employee and owner of more than $10,000 equity or stock options in Merck.  (MRK-AHD0075698; 2005 NEJM 000008).  Mr. Lines asserted that the deletion of these data "improves clarity" (MRK-AHD0075698).  However, the deletion of data obscured, rather than clarified.

92.     The NEJM reviewers were very concerned about the deletion of investigator-reported event data.  One reviewer stated: "The authors clearly considered including this category in the Table 2, but deleted this category.  There is a note at the

top of Table 2 'suggestion is to delete investigator-reported events.' Recommendation:
Restore this category in Table 2." Another reviewer stated: "There is a worrying note
to delete some reports from Table 2 that the authors ought to explain – we were
obviously not supposed to see that!" (MRK-AHD0000076-77.) On February 9, 2005,
the NEJM (2005 NEJM 000281-282) rejected the APPROVe manuscript, with the
directive, "Restore the investigator-reported events category to Table 2." 2005 NEJM
000013.

       93.    Instead of simply providing the requested investigator-reported
data, Merck prepared a misleading response that "the relative risk [for investigator-
reported events] is similar to that for confirmed events," while failing to disclose that
the IR data contradicted Merck's claim that there was no difference in event rates until
after 18 months of exposure. (MRK-AHD0000077) The importance of this data is
reinforced by the consistent evidence of statistically significant increased risk for the
high risk patients, even when only "confirmed" events are considered. See ¶ 82, above.

       94.    Merck also claimed in its responses to the NEJM reviewers that it
was only appropriate to rely on the "confirmed" events rather than those reported by the
investigators. However, this position is contrary to Merck's practice in the past. There
is no legitimate reason to conceal investigator-reported event analysis, and, indeed,
numerous Merck studies of Vioxx include statistical analysis of both confirmed and
investigator-reported events. In APPROVe itself, the endpoint of CHF, pulmonary
edema and cardiac failure was not adjudicated at all, yet the NEJM reviewers insisted
upon including the statistical analysis showing increased relative risk of 4.6 versus
placebo, and Merck complied. (MRK-AHD0000061; Bresalier, 352 NEJM at 1097.)
Similarly, Merck provided statistical analysis of both confirmed and investigator-
reported gastrointestinal adverse events in the VIGOR publication (Bombardier, NEJM
2000) and such data analyses were considered fit for publication by both the authors and

the journal.  Furthermore, Merck authors published a study of thrombotic events based <u>entirely</u> on investigator-reported data, Reicin, "Comparison of Cardiovascular Events," etc., Am J Cardiol 2002; 89:204-209, and it is improper for Merck to rely on IR data in some studies but delete such data from the APPROVe manuscript, particularly where the NEJM reviewers specifically asked to have it restored.

95.     Merck contends that the difference between Vioxx and placebo after 18 months was attributable to the "flattening" of the curve for the placebo arm of the trial, suggesting that the incidence of CV events declined drastically in the placebo group after 18 months. (Howard Report at 8). Instead, the IR data show a fairly constant event rate throughout the study, and the "flattening" resulted from disparate results of the adjudication process.  In the Vioxx arm, the percentage of cases confirmed by adjudication was roughly the same in both the 0-18 and 19-36 month arms, and totaled 46 out of 77 (approximately 60%).  The confirmation rate was drastically different between the 0-18 month and 19-36 month segments of the placebo arm (80% versus 32%), resulting in an artifactual difference in the relative risks for the first and second halves of the APPROVe study.  There is no biologically plausible explanation for this discrepancy, which instead appears to be either a statistical anomaly or the result of excessively restrictive criteria for adjudication of events, or both.

96.     Merck has also claimed that the APPROVe data failed the test of proportional hazards, to support its position that there is a true difference between the relative risk of Vioxx versus placebo in the 19-36 month segment versus the 0-18 month segment.  However, this flawed statistical analysis is based upon the difference in the rate of adjudicated confirmation, rather than the rate of reported events.  Importantly, the APPROVe CSR states that, when investigator-reported events were analyzed, such events did <u>not</u> fail the proportional hazards test, indicating that **there was no significant**

**difference in the relative risk between the earlier and later portions of the study.**
(MRK-AHD0075793.)

97.     Extending this flawed analysis, Merck attempts to cast doubt on
the APPROVe results by arguing that the difference between the relative risks for the
later versus earlier periods are inconsistent with the proposed thrombotic mechanism of
Vioxx cardiovascular damage, which would be expected to appear more rapidly.  Again,
this argument fails because it is based upon the anomaly in adjudication confirmation
rates, rather than reported event rates.  Also, it fails because the high-risk patients
showed statistically significant increased risk for the 0-18 month period, with immediate
visual separation of the incidence curves, which demonstrates consistency with
mechanisms of damage acting rapidly upon the most susceptible.  Therefore, the
occurrence of early and late effects in the investigator-reported data is coherent with the
prothrombotic and hypertensive mechanisms, providing additional reasons why such
data should not only have been disclosed, but are actually more credible than the
implausible comparison of early to late event rates advanced by Merck.

98.     It should also be noted that Merck's reference to the "apparent
absence of difference in the first 18 months," Bresalier, 352 NEJM at 1099, is factually
incorrect.  At 18 months the Vioxx group adjudicated thrombotic events were 18%
greater than those of the placebo group (RR =1.18).  An 18% difference can certainly be
certainly medically important, and it is misleading to say there is "an apparent absence
of a difference" when, in fact, such a difference exists.

### The risk of cardiac events was more than doubled with standard therapeutic doses of Vioxx.

99.     The subjects in APPROVe received standard therapeutic doses of
25 mg Vioxx per day.  Thus, the excess cardiac injuries cannot be attributed to higher-
than-normal doses. This fact not only distinguishes APPROVe from the 50 mg dose
administered in VIGOR, but also distinguishes the risk of Vioxx from that of Celebrex,

since the only RCT showing higher cardiac event rates for Celebrex compared to placebo involved Celebrex doses that exceeded standard therapy for osteoarthritis by 2 to 4 times. Solomon, et al., "Cardiovascular Risk Associated with Celecoxib in a Clinical Trial for Colorectal Adenoma Prevention," NEJM 2005; 352 (online version, 2/15/05).

**Vioxx was shown to be unsafe for both high-risk and low-risk patients.**

100.    The APPROVe population consisted of both high-risk and relatively low-risk subjects, and there was an excess risk of CV disease in the Vioxx group in both risk categories. Thus, the danger cannot be limited to high-risk populations. This fact again distinguishes APPROVe from VIGOR, in which Merck has attempted to blame the excess risk of CV disease on the predisposition of rheumatoid arthritis (RA) patients.

**Exceptionally high RRs were shown for high-risk patients.**

101.    The RRs for Vioxx in two particularly high-risk populations were exceptionally high: **9.59 (95% CI 1.36, 416)** for those with "symptomatic atherosclerotic cardiovascular disease," and **6.10 (95% CI 1.36, 56.1)** for diabetics. Bresalier, NEJM 352: 1096-97. While the confidence intervals were wide due to small numbers, the magnitude of the effect was so great that the results were nevertheless statistically significant, and it is a generally accepted principle of epidemiology that the "point estimates" within those intervals, i.e., 9.59 and 6.10, are most likely to represent the true risk of exposure.

102.    RRs of this magnitude are rare in clinical trials, and they indicate both a clear cause-and-effect relationship and an exceptionally high degree of toxicity. Indeed, the Vioxx RR of 9.59 equates to an attributable proportion of risk of approximately 90%, which is comparable to the RR for lung cancer among cigarette smokers versus nonsmokers. See, e.g., "Women and Smoking: A Report of the

Surgeon General, Executive Summary, 8/30/02, p.51 RR12:1-30. ("About 90 percent of all lung cancers among U.S. women smokers are attributable to smoking.")[6].

103.    No other NSAID has been reported to have RRs approaching those found for Vioxx and CV disease among high risk patients in APPROVe, at standard doses, again distinguishing Vioxx as the most dangerous drug in its class.

104.    Finally, a reviewer for NEJM told the APPROVe authors that it would be appropriate to include CHF endpoints in the "primary composite outcome," rather than peripheral venous endpoints.  2005 NEJM 000272.  The APPROVe authors did not provide a composite, but in fact Merck had done this analysis in September 2004, which showed early visual separation of the incidence curves, and a doubling of risk within 6 months, as displayed below (MRK-AAD0357814):



Figure 4a
K-M Plot

---

    [6] http://www.cdc.gov/mmwr/preview/mmwrhtml/rr5112a4.htm, last accessed 7/19/05.

**B.**     **The Vigor Study Showed Excessive Cardiovascular Disease Caused By Vioxx, For Both Short And Long-Term Use.**

105.    *Project Description*  VIGOR was a trial in patients with rheumatoid arthritis designed to determine if rofexcoxib at 50 mg/d would result in less bleeding from the gastrointestinal tract than would use of 1000 mg/d of the commonly used "non-selective" NSAID—naproxen.  See para 10, Bombardier, et al.  Patients were predominantly female of mean age 59.  Rofecoxib and naproxen exposures were both approximately 2700 pt-yrs.  The study was of reasonably short duration—a mean of 8 months.  See FDA Memorandum, of Dr. Targum, 2/1/2001, at 7.

106.    *Cardiac events, the main deleterious outcome of interest*.  As compared to records submitted to the FDA, the VIGOR publication was neither complete nor accurate in its description of the impact of rofecoxib on CVD.  The inaccuracy stemmed, in part, from a report of only 16 myocardial infarct (MI) events in the Bombardier, et al. article, whereas 20 such events were submitted to the FDA.  See Targum memo, 2/1/2001, at 13.  Incompleteness was evident from omission of data on differences between rofecoxib and naproxen in total deaths, fatal MIs, congestive heart failure (CHF) and hypertension—always in excess in the rofecoxib group.  The accurate RR for rofecoxib vs naproxen for MI was **5.0, (p < 0.003)**.  See Targum at 13.  The RR listed by Targum is reported as Naproxen rate/Rofecoxib rate as 0.2 with a confidence interval demonstrating statistical significance.  The reciprocal of 0.2 is **5.0**, which gives the more appropriate comparison of Rofecoxib rate/Naproxen rate.  This RR demonstrates a very large magnitude of effect.  In the broader definition of serious heart disease (adding fatal MIs and unstable angina) the number of events for rofecoxib was 28 and for naproxen 10, giving an RR for rofecoxib vs naproxen which remained high at **2.82 (p < 0.005)**.

107.    The published VIGOR study incorrectly states that ischemic cerebral vascular events occurred in 0.2% of the patients in each group, suggesting that

there was no difference in the rate of such events.  However, the Targum memorandum (p. 18) shows that there were 11 confirmed ischemic cerebral vascular events for Vioxx versus 8 for placebo.  Further, for investigator-reported events, there are 17 in the Vioxx arm versus 9 for placebo.  When combined with data from related RA studies, there was a borderline statistically significant increased risk of stroke for Vioxx compared to naproxen.  (See § V.C, below.)

108.    The VIGOR study demonstrated that Vioxx was far more toxic than the comparator NSAID, in this case naproxen, with respect to hypertension, edema and congestive heart failure.  The published article fails to mention these events at all.  The Targum memorandum (p. 10) reports that there were 28 discontinuations in the Vioxx group due to hypertension-related adverse events, versus only 6 in the naproxen group, for a statistically significant relative risk of **4.67 (p < 0.001 95% CI 1.93, 11.28)**.  In addition, there were 19 versus 9, and 25 versus 13 discontinuations for congestive heart failure (CHF) and edema adverse events, in the Vioxx and naproxen groups, respectively, and both results were borderline significant **(CHF:  p=0.005, 95% CI 0.96, 4.67; Edema:  p=0.057, 95% CI 0.98, 3.75)**.  Thus, there were a total of 72 versus 28 discontinuations for these cardiovascular-related adverse events.  None of these events or elevated risks were reported in the published article.

109.    With regard to hypertension, the published VIGOR study offers only the misleading assertion that there was no association between hypertension and myocardial infarction, on the basis that "only a single patient (in the rofecoxib group) had both hypertension and a myocardial infarction as adverse events."  However, the authors failed to report the findings in the Targum memo table entitled "Incidence of Confirmed Thrombotic Cardiovascular Serious Adverse Experiences in Patients With and Without Hypertension-related Adverse Experiences."  (p. 23.)  These data show that there was a strong relative risk of **3.96** among Vioxx patients who suffered both a

hypertension-related adverse experience and a confirmed thrombotic cardiovascular adverse event, compared to patients in the naproxen group. This tends to support a likely multiplicative, synergistic effect of hypertension and Vioxx, since naproxen patients with hypertensive adverse events had a much lower rate of thrombotic events. In addition, as discussed previously, a very similar elevated relative risk of **3.82** for thrombotic events following a "spike" in blood pressure was found in the APPROVe study (see discussion at ¶ 75), and such consistency supports the probability of a cause and effect relationship between Vioxx, hypertension and thrombotic events such as heart attack and stroke. In short, the data show that patients on Vioxx are approximately twice as likely to develop hypertension, and that those Vioxx patients with hypertension are almost four times more likely to develop serious heart disease.

110.    Additional important conclusions follow from the high rate of hypertension in the Vioxx group in VIGOR. First, the hypertensive patients are clearly at increased risk for the cardiovascular toxicity of Vioxx. Therefore, as in APPROVe, the disproportionate early withdrawal of patients from the study due to hypertensive events artificially lowers the relative risk that would have been observed if such patients had continued on Vioxx. In the real world of clinical practice, blood pressure monitoring is not as frequent as in a clinical trial, nor were physicians warned not to give Vioxx to hypertensive patients. Therefore, such patients would have continued taking the drug and would have suffered an even higher relative risk of heart attack and stroke than reported in the VIGOR study. Second, because hypertension is a serious cardiovascular condition that is strongly associated with MI, stroke, and CHF, hypertension adverse event rates should have been reported along with data for the thrombotic events in the published article. Third, as in the pre-marketing trials that compared Vioxx to other (non-naproxen) NSAIDs, the rate of hypertension was

significantly higher for Vioxx, showing either that such events are not due to a class effect of all NSAIDs, or that Vioxx is more toxic than other members of the class.

111.    The VIGOR Kaplan-Meier curve, reproduced below, shows that early separation was apparent for thrombotic events after only 4 to 6 weeks following exposure.  (Targum Memo at 17.)  This is consistent with the APPROVe high-risk patient data and investigator-reported results, demonstrating that the risk of Vioxx exposure begins very early and persists throughout the period of exposure.  The statistically-significant increased relative risks for MI (5.0, see ¶ 105, above), serious heart disease (**2.82**; id.), and all "confirmed thrombotic events" (**2.37**, see ¶ 111, below), were all demonstrated in a study with a mean duration of approximately 8 months, adding further strong evidence refuting Merck's contention that there is "no effect" in the first 18 months of exposure.

**Figure 3**

Thrombotic Cardiovascular Serious Adverse Experiences Referred for
Adjudication in Rheumatoid Arthritis Patients in the VIGOR Study
Time-to-Event Plot (All Patients Randomized)
Updated Application Data



(Source: 10/13/00 Safety Update: Figure 3: pdf. page 41)

112.    The data submitted to the FDA show that there was an exceptionally high risk of thrombotic events, including serious heart disease, among those with high underlying risk.  Thus, for the "low-dose-aspirin-indicated" subgroup, consisting of subjects with prior symptomatic atherosclerotic conditions, the **RR was 4.89 (p=0.012, 95% CI 1.44, 16.88), compared to the overall RR of 2.37 (p=0.0016, 95% CI 1.39, 4.06)**.  (FDA Medical Officer Review, 3/30/01, p. 5; see also Targum Memo at p. 21.)  These data support the conclusion, also found in APPROVe, that the likelihood of serious heart disease is greatly multiplied after exposure to Vioxx, for those who were at higher background risk.  (Id.)

113.    The published VIGOR study includes a misleading and incomplete description of the reasons why cardiovascular events were studied.  The authors state, "Because highly selective cyclooxygenase-2 inhibitors do not inhibit platelet aggregation, which is mediated by cyclooxygenase-1, there was a possibility that the incidence of thrombotic cardiovascular events would be lower among patients treated with non-selective cyclo-oxygenase inhibitors than among those treated with cyclooxygenase-2-selective inhibitors.  Therefore, cardiovascular events were also assessed for a future meta-analysis by independent committees whose members were unaware of the patients' treatment assignments.  A separate analysis of these events, however, was not specified in the study design."  Bombardier, 343 NEJM at 1521.  However, the records I have reviewed show that CV events were studied because Merck had been aware since 1997 that patients taking Vioxx had a decline in the levels of prostacycline, which inhibits platelet aggregation and clotting; the same study (Protocol 023) showed that Vioxx-exposed subjects experienced a significant increase in the levels of serum thromboxane which promotes clotting, by Day 14.  (MRK-OS420022612.)  Therefore, it was predicted that Vioxx could promote thrombotic events, whereas Merck's VIGOR publication attempts to explain the excess events by

reference to a lack of "protective" effect of Vioxx in <u>reducing</u> heart attack risks by anti-platelet activity.  (MRK-ABS0037039, Final Plan, 12/30/97.)  This difference between <u>promoting</u> heart attacks, as opposed to merely not <u>protecting</u> against them, was very important and should have been disclosed.  Further, the Data Safety Monitoring Board (DSMB) for the VIGOR study had directed Merck to conduct an analysis of the CV adverse event rates specific to the VIGOR study, because an excess of such events was seen in the Vioxx treatment group.  (MRK-AAX0002759-760.)

114.    The VIGOR article also states that significant risk of MI was limited to those with high-risk backgrounds who were not taking aspirin for cardiovascular protection.  Bombardier, 343 NEJM at 1523.  However, the Merck update dated October 13, 2000, 6 weeks <u>before</u> VIGOR was published, shows that the adjudicated thrombotic event rate was <u>statistically significantly higher for Vioxx than naproxen, even for the lower-risk, non-aspirin-indicated group</u>.  (Targum Memo at 21.)

115.    These are important inaccuracies and omissions.  Practitioners expect peer-reviewed literature to provide accurate information about the risks and benefits of medications that they prescribe to their patients.  The published VIGOR study deprived practitioners of the facts known to Merck concerning the excess of several categories of CV events, the statistically significant excess in both low and high risk patient groups, and the biologically plausible mechanism by which Vioxx could have caused the excess.  Instead of providing such facts, Merck offered a self-serving hypothesis that the excess MIs in the Vioxx group were attributable to a cardioprotective effect of naproxen, comparable to the effects of aspirin.

116.    There was no scientific support for the claim that naproxen was cardioprotective.  To this day, there has never been a randomized clinical trial of naproxen compared to placebo, which would have been necessary to demonstrate a protective effect of naproxen.  In contrast, the cardioprotective effects of aspirin were

demonstrated by extensive clinical trials in large populations after years of study. Even then, such studies found that aspirin offers a protective effect of only about 25-33%, or in one study, 44%. Thus, even if naproxen had a similar effect, one would reasonably expect a difference of five or six heart attacks in the Vioxx group versus four heart attacks in the naproxen group. Instead, the actual results showed a difference of twenty heart attacks in the Vioxx group versus four in the naproxen group, and a 500% increased risk of MI in the Vioxx group cannot reasonably be attributed to a hypothetical 25-44% protective effect of naproxen. As noted by reviewer for the NEJM in 2005:

> The authors refer to the hypothesis of the "protective effect of naproxen" in VIGOR (page 15). This claim seems a stretch. The protective effect of naproxen is not a credible explanation for the increase in risk associated with rofecoxib in VIGOR. Naproxen would have to be several times more effective than aspirin to eliminate such an elevated risk.

(2005 NEJM 000274.)

117.    Since the VIGOR study, a number of observational studies have been conducted to investigate the hypothesized protective effect of naproxen. I have reviewed the published literature on this subject, including the articles sponsored by Merck and the meta-analysis of Juni, et al. (Juni et al. Lancet 364; 2021-29, 2004). I agree with Juni's conclusion that there is little or no cardioprotective effect of naproxen, and that the excess in risk of heart attacks and other CV events is due to the toxic effects of Vioxx. Indeed, rather than being cardioprotective, naproxen may have a small cardiotoxic effect of its own, particularly in relation to its known effect in increasing blood pressure, albeit to a much lesser degree than Vioxx. (See also FDA Medical Officer's comments rejecting the naproxen cardioprotection theory in the context of the ADVANTAGE study, at § V.D, below.)[7]

---

[7] Of note, a reviewer for NEJM criticized Merck for reiterating the "discredited

**C.     The Rheumatoid Arthritis Supplemental Marketing Application Studies Support the Conclusion that Vioxx Caused Excess Risk of CV Disease**

118.    On February 28, 2001, Merck submitted to the FDA a supplemental marketing application (SMA) for rheumatoid arthritis (RA), which was based upon Merck studies 068, 096, 097 and 98/103.  Safety updates were submitted in June and August, 2001.  These studies exposed approximately 2,000 patients to Vioxx, 550 patients to naproxen, and 1,000 patients to placebo.  It was Merck's initial plan to combine the CV event data from these RA studies with the VIGOR study of RA population, and that plan was changed because of the VIGOR DSMB's demand for a prompt, separate analysis of VIGOR data.  (MRK-NJ0120262; MRK-AAX-0002760.) The data from the Supplemental RA studies support the conclusions of the VIGOR study.  In particular, there was an excess of MI and stroke in the Vioxx group versus naproxen, as follows:

a.      MI:  14 events/1528 patient years of exposure (Vioxx) versus 2 events/503 patient years of exposure (naproxen), **RR = 2.3**.  When combined with the MI data from VIGOR, the **RR = 4.29, P<0.0002, 95% CI 1.78-12.51**.  The significant result is consistent with APPROVe and is due to the cardiotoxic effect of Vioxx.

b.      Stroke/TIA:  8/1528 patient years of exposure (Vioxx) versus 0/503 patient years of exposure (Naproxen).  The relative risk is infinite because the naproxen arm had zero events.  When the Supplemental RA data are combined with the investigator-reported data from VIGOR (17 v 9 events), the result for stroke/TIA is **RR = 2.1, p<0.057, 95 CI 0.95, 5.12**.  This result is borderline statistically significant, and there is only about a 1 in 18 possibility that the result is due to chance.

---

theory" that naproxen explained the VIGOR results (2005 NEJM 000270).