study covered the period from 1/2/92 through 4/02 that encompassed the first 3 years of marketing of these four drugs. Again only rofecoxib was responsible for an appreciable number of hospitalized cases. There were no cases from the two non-selective NSAIDS, and 3.8 times as many for rofecoxib as for celecoxib . See Brinker at 481. Of relevance to the dose required for produce adverse events, 13 of 17 rofecoxib cases were derived from those taking the 25 mg dose and only 4 at the 50 mg dose. The authors stated that the 50 mg dose "did not seem to be over-represented among the cases". See Brinker at 482. Of great relevance to the duration of rofecoxib use required for adverse events to occur is this observation—"the time to hospitalization was 4 weeks on average, but there were reports of acute illness and hospitalization following a single dose." See Brinker at 482. (Emphasis added). The rapid onset of extreme hypertension is a contributing factor to the early appearance of increased risk of MI, stroke and/or CHF due to Vioxx. Of antecedent diseases and risk factors, only pre-existing hypertension was listed as being common (80% of celecoxib cases and 60% of rofecoxib cases). See Brinker at 482. The methodology used by Brinker is identical to the methodology that I used to prepare the adverse event analyses of serious heart disease, stroke/TIA and CHF, that is, Medwatch adverse event reports in the numerator and IMS prescription data as a surrogate for patient years of exposure in the denominator.

   170. The World Health Organization/Uppsala Monitoring Centre (WHO/UMC) of Uppsala Sweden collects adverse drug reactions (ADRs) from 57 countries that belong to the WHO program for international drug monitoring. This center collects about 35,000 new reports quarterly. See Zhao, et al. Clinical Therapeutics, 23:1478-1491, 2001. Zhao and colleagues reported on comparisons of ADRs from celecoxib vs rofecoxib through the second quarter of 2000. The topics they explored in the database were as follows: water retention (which is comprised largely of peripheral edema); abnormal renal function; acute renal failure, nephritis, cardiac failure and

hypertension.  They defined the group of ADRs as all being related to renal safety, including in their definition the three topics encompassed in this section: hypertension, peripheral edema and congestive heart failure (CHF), the latter a synonym for cardiac failure.  They were stimulated to investigate these particular adverse events because of prior studies that had shown rofecoxib to cause more deleterious effects in these categories.  (See Zhao at 1480, and this article's references #s 16-20).  Their analytic method seeks evidence for disproportionality (referred to as "IC") in reporting of ADRs among different drugs.  These IC comparisons were converted into "actual/expected ratios" of rofecoxib/celecoxib.  These ratios were: 1.75 for water retention (p< 0.0001); 3.94 for cardiac failure (p <0.001); and 1.84 for hypertension (p <0.001). See Zhao at 1484.  Comparisons also showed rofecoxib's IC values to be greater than those of two "traditional NSAIDS"--(diclofenac and ibuprofen) (p <0.05), whereas celecoxib was similar to these two other NSAIDs.  See Zhao at 1483.

171.    Hospitalizations for congestive heart failure (CHF) during the years 2000 and 2001 were studied in residents of the Canadian province of Ontario and comparisons were made among the following groups (all over 65 years in age): new users of rofecoxib, celecoxib, non-selective NSAIDS, and non-users of NSAIDs.  See Mamdani, et al. Lancet 363:1751-1756, 2004.  The findings showed the lowest rate of admissions were for celecoxib and non-users.  Non-selective NSAID users had an intermediate rate and rofecoxib the highest rate.  Additionally, rofecoxib users with no prior history of admissions for CHF had a higher readmission rate after their first admission than did either of the other two groups.  See Mamdani at 1755.  The CHF study by Mamdani had almost three times as many events than his study of MI.  Also, the former study did not exclude subjects who took the drug for less than 30 days.  These factors tend to make the CHF study more reliable.

172.    The third article on CHF was that of a single case report of a 42

year-old woman who was diagnosed with this problem after two weeks of use of 25 mg/d of rofecoxib followed by one week at 50 mg/day.  See Campbell and Sneed, JABFP 17(2): 131-135, 2004.  This case was reported to the FDA.  See Campbell at 132. Although single case reports taken in isolation are of limited value in assigning causality, this case report is consistent with other data, including the rapid onset of CHF in the Vioxx arm of the APPROVe RCT.  Therefore, this case provides supportive evidence of the brief duration of Vioxx exposure needed to produce a serious adverse event.

### D.     Cerebrovascular Disease (Stroke and TIA)

173.    *Adverse Event Reporting System of the United States Food and Drug Administration (US-FDA).*  The FDA's quarterly Data Extract provided the number of adverse events (AEs) from 1/1999 through 9/2004 for the two major competitors and major sellers in the COX-2 pharmaceutical field, celebrex and vioxx. The methods used for the calculation of serious heart disease (see Discussion at ¶ X.B, above) were also used for stroke and TIA.  RRR data were derived for four time periods, 1/1999 – 3/2000, 4/2000 – 12/2000; 1/2001–12/2001; and 1/2002 – 9/2004.  In para ___, I reported on the large and consistent increases in myocardial infarction rates for Vioxx/Celebrex from this data set, with the overall RRR being 11.29 (p < 0.001).  Similarly, for stroke and TIA separately and combined, the RRRs for Vioxx/Celebrex were also large and statistically significant for each period and for all periods combined.  The RRR and significance data for stroke and TIA combined are:

|  |  |
|---|---|
| I. | 17.72, (p < 0.001); |
| II. | 6.45, (p <0.001); |
| III. | 11.27, (p < 0.001); |
| IV. | 24.16, (p <0.001); |
| Overall: | 13.44, (p < 0.001) (all 4 periods combined) |

Thus, it is quite remarkable to note the very large excess and comparability of the toxic burden of Vioxx over Celebrex both for MI and stroke plus TIA (11.29 and 13.44, respectively). (Similar findings were present for strokes alone and TIAs alone).

174.    Many comparisons of Vioxx vs Celebrex have been reported, due to their similar dates of initial marketing as well as their classification as COX 2 inhibitors.  A different NSAID also classified as having COX 2 properties, (meloxicam) was compared to rofecoxib by means of a prescription-monitoring program and questionnaires sent to general practitioners in England.  See Layton et al. Rheumatology, 42: 1342-1353, 2003.  Prescription data were obtained from a confidential registry and the prescribing practitioners were sent questionnaires requesting information on adverse events that occurred within 9 months after the time of the prescription.  Four months of prescriptions were assessed: (12/96 to 3/97 for meloxicam and 7/99 to 11//99 for rofecoxib).  See Layton at 1342.  Cerebrovascular disease events were derived from a long list of 23 terms that fit the diagnostic categories used by the practitioners, of which 6 were termed as "non-specific and of the "lowest level" of "relevance".  See Layton at 1344.  These cerebrovascular disease events, which contained at least the terminology for "stroke" and "TIA" more commonly used in the US, revealed an excess of these events for rofecoxib/meloxicam, with an RR of 1.68 (95% CI 1.15-2.46).  See Layton at 1342. Cardiovascular disease events were derived from a short list of accepted terms (cardiac arrest, myocardial infarction and the vague term "CVS not specified", with CVS likely meaning "cardiovascular system").  See Layton at 1344. Despite the uncertainty of the diagnostic criteria, there was an excess of cardiovascular events for rofecoxib/meloxicam, with an RR of 1.38.  This difference was not statistically significant (95% CI 0.71-2.67). See Layton at 1342.

E.    **Summary of the Observational Epidemiology Studies**

175.    These studies provide ancillary support for the findings of increased risk report randomized clinical trials, including:  serious heart disease, stroke and TIA, congestive heart failure, increased blood pressure and peripheral edema.  No evidence was found for an increase in peripheral venous thromboses or for their

complications, such as pulmonary embolism, tending to support the view that such peripheral venous events are of doubtful relevance to the endpoints of damage caused by Vioxx.  They also support the concept that increased risk starts when exposure begins, and significant increases in serious heart disease were found in less than 30 days (Solomon; Ingenix).  Consistency in outcome is therefore present.  Consistency was demonstrated as well for disease outcomes discerned through different types of studies, including retrospective case-control studies, adverse event reports collected by the FDA or WHO, and self-report obtained through mailed questionnaires.  The case-control studies were carried out in groups that varied considerably in age, including one in which the mean age was about 80.  The onset of hypertension occurred very early after beginning Vioxx, and this hypertensive change persisted throughout the duration of use of Vioxx.  One study done on 24-hour measurements revealed that the increase in blood pressure occurred throughout the 24 hours, including measures taken while patients were sleeping.  This tends to support a continuous and chronic increased risk due to hypertension.

### IX.   THE CARDIOVASCULAR RISK OF VIOXX BEGINS WHEN THE PATIENT STARTS TO TAKE THE DRUG AND PERSISTS THROUGHOUT EXPOSURE.

176.   David Graham, M.D., is an FDA official who has studied the effects of Vioxx and published peer-reviewed literature on this subject.  Dr. Graham was invited to testify at the Advisory Committee hearings held by the FDA earlier this year.  During his testimony, Dr. Graham stated to the Panel that "the risk of myocardial infarction with rofecoxib begins when rofecoxib use begins." (Transcript, FDA Advisory Committee Hearings, 2/17/05 at 64).  I consider Dr. Graham's opinion to be reliable, and I agree with his statement.

**A.** **APPROVe, ADVANTAGE, VICTOR and VIGOR Data Show Excess Risk Throughout Exposure to Vioxx, or Promptly after Exposure Begins.**

177.    As described previously, the APPROVe study investigator-reported data showed a statistically significant increased risk of CV events, including MI and stroke, in both the 0-18 month and 19-36 month periods of the study.  The Kaplan-Meier cumulative incidence curve showed that the rate for Vioxx was above placebo throughout the entire period of the study.  (See Figure at ¶ 88, above.)  The Cox proportional hazards test showed no significant difference in the rate during the first and second halves of the study.  These results show early and continued excess of risk.  They cannot be dismissed by suppressing them, as Merck did by failing to disclose them to the New England Journal of Medicine.  Nor can they be explained away by referring to different endpoints that exclude some of the damage attributable to the drug.[10]  Instead, this randomized clinical trial provides reliable evidence of increased risk throughout the period of exposure.  The Kaplan-Meier curve for the APPROVe high-risk patient subgroup provides consistent findings:  statistically significant increased risk in the 0-18 month period, and immediately, visually apparent separation of the incidence curves.  (See Figure at ¶ 82, above.)  As discussed above, similar findings of early visual apparent separation of the incidence curves were made in ADVANTAGE, VICTOR and VIGOR.

**B.** **Early Excess Risk Is Biologically Plausible.**

178.    The rapid appearance of increased risk is biologically plausible and consistent with other evidence.  There is general agreement in the scientific

---

[10] See NEJM reviewer comment:  "'Thrombotic cardiovascular serious events' contains a long list of heterogeneous events, including venous thrombosis and pulmonary embolism. . . .  The use of a composite endpoint that includes 'noise' will reduce power. Based on known biologic mechanisms of COX2 inhibitors, heart failure might have been a better choice as an element of the primary composite outcome than venous thrombosis." (2005 NEJM 000272.)

literature that at least part of the explanation for the excess risk of Vioxx is the reduction of prostacycline without a corresponding reduction of thromboxane, which promotes platelet aggregation, thrombosis and plaque rupture. Protocol 023, the clinical trial that first informed Merck of this effect in 1997, involved Vioxx exposures of only two weeks, and showed that the prothrombotic imbalance of prostacycline and thromboxane occurred within that brief period after exposure began. This evidence supports early onset of increased risk.

179.    As is the case with all cardiovascular risk factors, the chief determinants of both the extent and rapidity of onset of adverse events are the individual "host factors" of the exposed patients. These include, primarily, the underlying state of cardiovascular risk. Thus, as noted above, there was immediate visual separation of the incidence curves for high-risk patients, with Vioxx above placebo throughout the APPROVe study, and a statistically significant excess risk in both the 0-18 month and 19-36 month periods.

180.    Early increased risk of CV events due to COX-2 inhibition is strongly supported by a study of Bextra (valdecoxib) and Dynastat (parecoxib), two other COX-2 inhibitors among patients who had recently undergone coronary artery bypass grafting (CABG). In that RCT the authors found that "short-term COX-2 inhibition is associated with a significant risk of thromboembolic events in patients at high risk for such events." Nussmeier, et al., "Complications of the COX-2 Inhibitors Parecoxib and Valdecoxib After Cardiac Surgery," New England Journal of Medicine, 2005; 352:1081-91 at 1086. The patients were exposed to such drugs for only 10 days, with a 30-day follow-up period, yet despite this relatively brief exposure, a statistically significant increased risk was demonstrated for the occurrence of "cardiovascular events" including MI, sudden cardiac death, stroke, and TIA. Nussmeier at 1087, Table 3 (RR = 3.7, p = 0.03, 95% CI 1.0, 13.5). These results strongly support the

conclusion that the risk of COX-2 inhibitors, including Vioxx, can and does appear within the first days after exposure among high-risk populations. Just as important, the presence of underlying high risk is not known until MI or stroke occurs, leading to post-event diagnostic tests that show atherosclerotic narrowing of the artery where the thrombosis is found.

### C.   Hypertension Effects Begin Early and Increase Risk of Cardiovascular Events.

181.   As discussed previously, increased rates of hypertension adverse events have been reported in almost all studies of Vioxx of which I am aware. These events begin very early. For example, in APPROVe, the authors reported that the Vioxx group's increase in blood pressure had occurred within 4 weeks after the start of the study. (Bresalier, 352 NEJM at 1098.) As also noted above, adverse hypertensive events are significantly correlated with thrombotic events in APPROVe (RR = 3.82), and a similar trend was reported in VIGOR (RR= 3.96). Also, as cited in ¶ 75 above, not only does Vioxx cause hypertension occur more often, but when it does occur, the CV disease risks are magnified. Rapid onset of hypertension probably accelerates the risk of an adverse thrombotic event by multiplying the shear stress, which can disrupt plaque and result in emboli and/or clots. The formation of the clot would be facilitated by the effects of Vioxx in reducing the amount of prostacycline available to combat the clotting effects of thromboxane. Chronic hypertension causes ongoing damage to the arteries, increasing the risk of CV events ever further over time.

### D.   Observational Studies Show Early Onset of Excess Risk

182.   A published study by Solomon, et al. (See Hypertension, 44: 140-145, 2004) reported that there was an increased risk of MI during the first 30 days of exposure to Vioxx, and in the 31-90 day period. The difference between Vioxx and comparator drugs after 91 days was not significant. (See § X.B, above.)

183.    Similarly, in the Merck-sponsored Ingenix study, the authors reported in a 2003 draft that there was a statistically significant increased incidence of MI among Vioxx users compared to diclofenac or ibuprofen users in the United Health Group database of prescriptions and adverse event records, for the 0-30 day exposure period **(Adjusted Rate Ratio = 1.86, 95% CI 1.14, 3.04)**.  (MRK-ADC0032557.)  This study has not been published.

## X.    THE SIGNAL OF VIOXX CARDIOVASCULAR TOXICITY APPEARED BEFORE VIOXX WAS MARKETED

### A.    Vioxx Caused a Significant Increase in "Chest Pain," Hypertension and Edema in Pre-Market Clinical Trials

184.    Protocol 045 was a randomized controlled, pre-marketing study of Vioxx in an osteoarthritic population, consisting of 775 patients  between the approximate ages of 50 and 80 years, given Vioxx 25 mg, Vioxx 50 mg, placebo or ibuprofen 2400 per day.  (MRK-OS420085325-326).  The study was conducted in 1997-1998, prior to marketing of Vioxx , and data were presented in the New Drug Application submitted in November 1998.  Patients participated in an initial 12-week period and a 12-week continuation.  For Vioxx 50 mg patients compared to placebo, there was a significantly higher incidence of both "chest pain" **(3.6% v. 0% by week 18, p = 0.012)**.  (MRK-OS420085536); MRK-OS420085469, Table 44).  Merck did not include "chest pain" as a term that triggered adjudication for confirmed thrombotic events. (MRK-ACV0020385).  Chest pain is the signature symptom for MI, angina, myocardial ischemia, and other illnesses attributable to narrowing and/or blockage of coronary arteries.  This significant difference from placebo was not the result of chance, but rather was likely due to the cardiotoxic effects of Vioxx, including hypertension (also significantly elevated in Protocol 045 for both the 25 mg and 50 mg doses, *see* MRK-OS420085537, 557, Table 59).  The significant excess of chest pain and hypertension in Protocol 045 was a strong signal of the danger of Vioxx to the heart and

CV system.  Edema was also elevated by 2 to 3 times versus placebo, although not statistically significant due to the relatively small number of patients.  See MRK-OS420085604.

**B.**  **Merck Knew of an Excess of CV Events in the Vioxx Pre-Marketing Clinical Trials, Compared to the Placebo Group It Chose for Such a Comparison**

185.    In December 1997, a year and a half before Vioxx was marketed, Merck appointed a Task Force to investigate the incidence of cardiovascular serious adverse events (SAEs) in the ongoing Vioxx clinical trials (Minutes, 12/3/97; MRK-ABY0199809).  The included trials were 029, 029-10/20/30, 033, 034, 035, 040, 044 and 045, which comprised 5236 patients and 1488 patient-years of exposure to Vioxx, comparator drugs and placebo as of December 15, 1997(MRK-NJ0066815, 819).  The stated reason for this investigation was the unexpected result of Protocol 023, which showed a decline in the levels of PGI-2, the "most potent of all inhibitors of platelet aggregation," but no inhibition of systemic thromboxane, in the urinalysis of patients on Vioxx. (Final Plan, 12/30/97, at MRK-ABS0037039).  This imbalance triggered a concern over the potential for thrombotic events. (Id.)  The Task Force held its first meeting on December 3, 1997. ("Updates:  PTM (December, 1997), MRK-ABS0329466 – MRK-ABS0329473, at 9473).

186.    To investigate the concern over thrombotic events, Merck decided to analyze SAEs from the ongoing osteoarthritis (OA) trials listed in the preceding paragraph.  Because the trials were still blinded as to treatment groups, it could not be determined whether SAEs in the database had occurred in the Vioxx, placebo, or comparator drug arms.  Therefore, the Task Force designed a study in which CV SAEs from all arms of the OA trials would be added together, and the combined groups' SAEs incidence rate would be compared to incidence rates of placebo patients from trials of other Merck drugs.  In particular, the incidence among females in the

Vioxx trials would be compared to the placebo groups from trials of Fosamax (an osteoporosis drug), and males from the Vioxx trials would be compared to the placebo groups from trials of Proscar (a treatment for benign prostate hyperplasia). The Task Force agreed to interpret the results according to "specific rules which set numerical cutoffs for when the incidence of a CV condition is greater than expected" for the Vioxx OA trial population. ("Minutes for December's Vioxx (MK-0966) Project Team Meeting," 1/9/98, at MRK-GUE0051409).

187.    An expedited timeframe was established for completion of the analysis. Douglas Watson, Ph.D., a Merck epidemiologist with training in cardiovascular studies, authored a Final Plan dated December 30, 1997. (MRK-ABS0037036-046). Results were to be presented at the January 7, 1998 meeting of the Merck Clinical Development Oversight Committee (CDOC). (Minutes, 12/4/97, MRK-ABY0199805).

188.    On average, women in the Fosamax placebo group were about 3 years older than their counterparts in the Vioxx trials (65.4 v. 62.3 years), which would confer greater risk on the Fosamax group. Women in the Vioxx group had higher prevalence of hypertension, overweight and high cholesterol, while the Fosamax group had a higher prevalence of prior stroke and TIA. Considering the constellation of risk factors, it was reasonable for Merck to conclude, as it did, that it would be useful to compare cardiovascular event rates between the females in the Vioxx trials and females in the Fosamax trials. (See MRK-ABT0014783, 785).

189.    Results calculated by Merck demonstrated a statistically significant increased relative risk (RR) of 2.16 (95% CI 1.14, 3.94) for the Vioxx females compared to the Fosamax placebo group, and a non-significant elevated RR of 1.28 for Vioxx males compared to the Proscar placebo group. The results report did not mention the "specific rules which set numerical cutoffs" for excessive CV SAEs, nor

whether such cutoffs were violated by a statistically significant doubling of the rate for the Vioxx trials compared to the Fosamax group. (Report, 2/2/98 MRK-NJ0066804-827). These results provided another signal of the cardiovascular toxicity of Vioxx.

C.     **Merck inappropriately dismissed the importance of the signal.**

190.     At the January 7, 1998 CDOC meeting, Watson gave a presentation that dismissed any concern over the results of the CV SAE analysis on the grounds that (1) the Fosamax placebo group "may" have had an atypically low incidence rate of CV events, so that the doubling of SAEs in the Vioxx group was not unexpectedly high, and (2) the Vioxx groups' incidence rates were not as high as the incidence rates in a so-called "background population." (1/7/98 Watson presentation; MRK-ABP0002685-686). Merck adopted Watson's view and declared that the results showing a doubling of risk were not felt to be of concern. On February 9, 1998, the Project Team Minutes Executive Summary stated that the "results show no evidence of unexpected rates compared to the general population or to the Fosamax and PROSCAR databases," despite the statistically significant doubling compared to Fosamax. (Memo from Pemrick, 2/9/98, at MRK-ABC0009947).

191.     With regard to Merck's dismissing the appropriateness of the Fosamax placebo subjects as a substitute for a control group, Merck's explanation fails for two reasons. First, Merck's own in-house cardiovascular and epidemiology experts selected the Fosamax subjects as appropriate for comparison to the Vioxx group. The documents that I have reviewed which claim an "atypically low" incidence of CV events in the Fosamax placebo group were written after Merck learned the adverse results of the comparison (e.g., Watson 1/7/98 presentation, Watson 2/2/98 Report.) The scientific method requires adherence to the pre-specified plan for analysis of the data, and does not allow that plan to be disregarded in favor of a different plan after the results are known. Furthermore, the 12/3/97 Agenda shows that the Task Force

475846.1                                        - 88 -

explicitly addressed the question: "Are FOSAMAX and PROSCAR placebo patients appropriate as controls?" An annotated version of the Agenda bearing placed a handwritten checkmark next to that agenda item, without further comment, supporting the conclusion that Merck's Task Force did not find any reason to consider the Fosamax placebo comparison to be inappropriate until after adverse results were calculated. (MRK-ABY0199809).

192.    Merck's second rationale for dismissing the results of the SAE analysis was an indefensible comparison of the incidence of cardiovascular events in the Vioxx trials to a purported "background" rate from an elderly community population. It is important that the "Final Plan" of December 30, 1997, did not state an intent to compare the Vioxx group's CV SAE rate to any "background" general population groups, but instead indicated that the analysis of risk would be based on the study design to compare Vioxx trial CV SAE rates to the Merck-chosen placebo group rates. Nevertheless, after learning that the Vioxx trial rate was more than double the rate for the Fosamax placebo group, Merck altered the study design by deciding to compare the Vioxx group SAE incidence rates to event rates from a general population group, that is, the Cardiovascular Health Study (CHS; Ives, 1995).

193.    On general scientific principles, it was inappropriate to reach outside the study design comparing rates to a clinical trial placebo group, because the Vioxx clinical trial protocols involved selection of subjects who were at lower risk of CV events than the general population. The CHS was a particularly inappropriate comparison group, because the CHS population was, on average, 11 years older than the Vioxx clinical trial population (73 versus 62 years) and the CHS population also included a far greater number of high risk patients with previous MIs, strokes, angina, hypertension, and other preexisting conditions. In addition, the CHS incidence rates included endpoints that Watson had excluded from the search terms for the Vioxx

475846.1

groups, particularly congestive heart failure, which contributed 30% of the events used to calculate the CHS overall incidence rates.

194.    Watson was aware that the background rate of CV events varied "greatly" based upon the age, gender and risk factors of the population selected, as he had written in a memorandum in 1996. That memorandum referenced 15 published articles as the data sources for such highly variable rates. Some of those sources would have provided background rates that were lower than those calculated by Merck for the Vioxx OA trials in 1997, while others, like the CHS, provided higher rates. This variability highlights the impropriety of selecting a "background rate" that would support a claim that Vioxx was not toxic, when other "background" data sources would readily have supported the opposite conclusion. It was wrong to change the study design, wrong to dismiss the results of the statistical analysis v. Fosamax placebo, and wrong to ignore the signal of Vioxx's toxic effects on the heart.

195.    In October 1998, after the OA trials had been unblinded, Merck submitted the New Drug Application (NDA), which included data relating to adverse events. In that document, Merck stated that there was no statistically significant difference between Vioxx and placebo, or between Vioxx and other NSAIDs, with respect to thrombotic event rates. However, the data did not establish the cardiovascular safety of Vioxx, because the comparison to placebo was based on a very small data set, and because the comparisons to other active drugs are inherently capable of establishing only relative, rather than absolute safety.

196.    The Vioxx OA trials involved only 363 patient years of exposure to Vioxx and 127 patient years for placebo. There were only three events classified as "thrombotic" under Merck's classifications, including a single MI, in the placebo group. (MRK-ABS0027726- 728). This is such a small sample size as to be meaningless from a statistical standpoint. By comparison, there were 3327 years of patient exposure to

placebo in the APPROVe study, about 26 times more than in the OA trials.  Dr. Watson,
Merck's cardiovascular epidemiologist, wrote in a published article concerning
gastrointestinal effects of Vioxx versus other NSAIDs that he did not analyze data for a
study in which there were only 194 patient years of exposure and 3 adverse events,
because "the total person-time on the drug (194 person-years) and number of events (3
total) were *too low to provide meaningful analysis*.." (Watson, et al., *The upper
gastrointestinal safety of rofecoxib vs. NSAIDs: an updated combined analysis*," <u>Curr
Med Res and Opin</u> 2004; 20:1539-1548; emphasis added).  I agree with that assessment,
which applied with even greater force to the even smaller person-time placebo data in
the Merck NDA for Vioxx.  Nevertheless, Merck's NDA asserted that the primary
safety analysis should be based on a comparison of Vioxx to placebo, and Merck further
stated that such a comparison did not demonstrate a statistically significant difference in
the rate of thrombotic events. (MRK-ABS0067017-019). This analysis was
scientifically unjustifiable in light of the small amount of data available for the
comparison.

197.    It was equally inappropriate for the Merck NDA to rely upon the
comparisons to other NSAIDs in the OA trials to prove the safety of Vioxx.  The sample
size was not large — only 1657 patient-years on Vioxx, and 706 years on NSAIDs.
Further, as acknowledged by Thomas Bold, M.D., the Merck physician assigned to
evaluate post-marketing adverse event data, such comparisons only establish the profile
of Vioxx in relation to the drugs to which it was compared. (Deposition of Bold,
7/29/05, at 454:24-455:10). Merck had no basis to conclude that the comparator
NSAIDs were safe, and, in fact, recent data tends to support an elevated risk of
myocardial infarction associated with diclofenac, which accounted for 69% of the
exposure to which Vioxx was compared in the OA trials. (See, e.g., Graham, *Risk of
acute myocardial infarction and sudden cardiac death in patients treated with cyclo-*

*oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study,* Lancet 2005; online edition, 1/25/05, at 5; OR for diclofenac 1.60 versus no NSAID use, 95% CI 0.92-2.79, p=0.09; Merck submission to FDA Advisory Committee, 2/8/01, at 83). Thus, the similarity in adverse event rates between Vioxx and diclofenac would only establish that both impose risk.

198.    For the reasons stated above, the NDA data had relatively little to offer concerning CV safety of Vioxx , and instead the best available comparison groups for the Vioxx OA trials were the large data sets of placebo event rates that Merck compiled among similar populations (Fosamax and Proscar placebo groups), and which were chosen for the Watson 1997 analysis. The Fosamax placebo group was particularly large, since it included 4,471 patients followed for over 14,500 patient-years (MRK-NJ0066815, 819, Tables 4 and 7), thus providing sufficient data to allow for stable comparisons.

199.    Merck's failure to acknowledge the signal is attributable to its inappropriate rejection of the data analysis set forth in the Final Plan of 12/30/97, and the indefensible after-the-fact comparison to an inappropriate "background" population of older, sicker subjects. This early error is consistent with other events in the history of this case. At each juncture where evidence of cardiotoxicity of Vioxx appeared, Merck chose to disregard it, and instead to adopt a highly dubious hypothesis that incorrectly absolved Vioxx of blame for the excess cardiovascular illnesses that it caused.

## XI.    SUMMARY AND CONCLUSIONS

200.    Based on my review of the documents and scientific literature, and my experience in the fields of cardiology and epidemiology, it is clear that patients who used Vioxx were exposed to an unacceptably high excess risk of cardiovascular disease. Multiple lines of evidence support this conclusion. Most important are the randomized clinical trials described in this Report, which consistently identified statistically

significant increased risk of Vioxx compared to both placebo and naproxen. These findings are supported by the weight of the evidence from observational epidemiology studies, which found significant increased risk of MI, stroke and TIA, CHF and hypertension among patients who used Vioxx in comparison to other NSAIDs or non-use. Consistent and supportive evidence appears in the literature concerning plausible mechanisms of disease, including Vioxx' effect in causing an imbalance of thromboxane versus prostacycline which favors plaque rupture and thrombus formation, as well as the effects of Vioxx in causing severe hypertension, which contributed to increased risk of MI, stroke and CHF. All Vioxx users were exposed to excess risk, and the magnitude of risk of cardiovascular events was particularly high for patients who were especially susceptible to adverse effects of a prothrombotic, hypertensive drug. The data support the conclusion that the risk of Vioxx begins when the patient begins taking the drug.

201.    Evidence of the toxicity of Vioxx appeared early and repeatedly. The prothrombotic imbalance of thromboxane was known as a result of Protocol 023, conducted between April and August, 1997. The Watson analysis in December 1997 showed a statistically significant increased risk of 2.16 for cardiovascular events (including MI, unstable angina and stroke, and TIA) in the blinded osteoarthritis (OA) trials, for the combined "Vioxx + other NSAIDs + placebo" population versus the Fosamax placebo group that Merck selected as an appropriate comparison group. Merck dismissed the importance of the signal on the basis of an inappropriate comparison of the adverse event rate in the Vioxx OA trials to the rate in an older, sicker community population. Protocol 045, completed before the New Drug Application (NDA) was submitted in November 1998, showed a statistically significant increased risk of "chest pain" for Vioxx versus placebo, and multiple clinical trials during the same pre-market time frame showed significant increased hypertension for Vioxx versus placebo and/or

other NSAIDs. The combination of excess hypertension accompanied by excess chest pain, the hallmark of serious heart disease, was a strong signal of cardiovascular toxicity.

202.    The NDA itself gave no assurance of cardiovascular safety, because the rates of thrombotic events and the patient-years of exposure were too small to provide for meaningful analysis of Vioxx versus the placebo group, and because the comparison to active NSAIDs, primarily diclofenac, was only capable of providing information about the relative danger of Vioxx in relation to such other drugs. Instead, the excess risk compared to the large statistical sample of the Fosamax group provided a strong signal of toxicity that was reinforced by the excess of hypertension and chest pain in the Vioxx arms of the pre-marketing clinical trials.

203.    The VIGOR randomized clinical trial showed clear evidence of Vioxx cardiotoxicity in March 2000, including a statistically significant, five times greater risk of MI, and more than doubling of risk of combined thrombotic events, as well as CHF, edema and hypertension. There was no scientific support for Merck's rationalization that the excess was due to a protective effect of naproxen. The ADVANTAGE study and the Supplemental RA studies showed consistent increased risk of MI, CHF , hypertension and edema, in 2001.

204.    In 2004, the APPROVe study demonstrated a statistically significant increased risk of 2.80 as to cardiac events, including MI, sudden cardiac death and unstable angina, for Vioxx versus placebo. As in VIGOR, the relative risk was elevated for those who were at higher background risk. The results of the APPROVe study are consistent with the earlier indicators of excess toxicity described above. At the same time, by making the unfounded claim that there is "no effect" for Vioxx exposures less than 18 months, Merck's position is consistent with its earlier efforts to absolve Vioxx from blame in causing the excess occurrence of serious and fatal cardiovascular disease.

September 26, 2005

John W. Farquhar, M.D.
_____
John W. Farquhar, M.D.

# EXHIBIT  B

IN RE VIOXX PRODUCTS LIABILITY )   MDL No. 1657
LITIGATION )
 )

## SUPPLEMENTAL EXPERT REPORT OF JOHN W. FARQUHAR, M.D.
### THIS DOCUMENT APPLIES TO ALL CASES

### A.  Introduction and Summary of Opinions

1.       This Report is submitted to supplement the opinions provided in my Report dated September 26, 2005, based on review of the additional materials referenced herein.  The opinions provided herein are stated to a reasonable degree of medical and scientific probability.  In summary, the Supplemental Report includes the following:

- Protocol 203:  Merck's pre-specified analysis of data from three pooled studies (APPROVe, VICTOR and ViP), known as "Protocol 203," shows early and continuous excess risk of cardiac adverse events, statistically significant at 18 months and at all times thereafter, thereby refuting Merck's hypothesis that no excess risk appears until after 18 months of exposure.

- High-Risk Patients:  Data from the APPROVe and VIGOR studies are analyzed, showing greater relative risks and rapid onset of excess cardiovascular events among patients at higher background risk; that is, the level of the cardiovascular (CV) risk before using Vioxx.

- Hypertension:  Data from the APPROVe and VIGOR studies are displayed, showing early, continuous and statistically significant excess risk of hypertension due to Vioxx, compared to both placebo and naproxen.  Also, data from the APPROVe study show

538398.1



PLAINTIFF'S
EXHIBIT
B

significantly greater incidence of both "Stage 2" (more severe) hypertension and thrombotic events among Vioxx patients who suffered Stage 2 hypertension.  No such increase in CV event risk appeared among placebo patients who experienced Stage 2 hypertension, supporting the conclusion that there was a synergistic interaction between hypertension and Vioxx use.

- APPROVe "extension" data:  According to documents submitted to the FDA by Merck in May 2006, the excess risk of CV events, including myocardial infarction ("MI") and ischemic stroke, remains statistically significant when data from a one-year off-drug follow-up were combined with the previously published data.  For the extension period alone, there was a 64% increased risk of thrombotic events in the Vioxx group.

- Biological Mechanism:  Recent publications support Cox-2 inhibition as the cause of hypertension and thrombosis.

**B.     Protocol 203 Shows Early and Continuous Risk of Excess Cardiac Events Among Vioxx Patients.**

2.     In 2002, following the VIGOR study, Merck prepared a plan to analyze CV adverse events in a pooled analysis of 3 large placebo controlled studies: APPROVe, VICTOR and ViP.  The plan, known as "Protocol 203," was submitted to the FDA for its response.  On December 19, 2002, FDA Medical Officer Lawrence Goldkind responded to Merck's proposal, indicating general acknowledgment that Protocol 203 would provide "clinically important safety information" about the risk of Vioxx.  (Letter, Goldkind to Braunstein, 12/19/02, at p. 1.)  Merck proceeded  to implement Protocol 203.

3.     Merck's Protocol 203 Data Analysis Plan ("DAP") stated a purpose "to provide increased precision on estimates of the comparability between

- 2 -

rofecoxib and placebo on the incidence of thrombotic cardiovascular serious adverse experiences" (SAEs). (MRK-AFL0015451-484, at 454). The Protocol commented that the larger data set would be more accurate than data from any single one of the three studies. The DAP stated that the findings of Protocol 203 would allow "generalization of the results to other populations" who used Vioxx, including arthritic patients, because the study populations were of similar age and had risk factors for CV events. (Id.)

        4.      The endpoints defined in the Protocol 203 included "Cardiac" (MI, Sudden Death, Unstable Angina, etc.), and "Cerebrovascular" (Ischemic Stroke, Transient Ischemic Attack) events. (MRK-AFL0015463). The DAP for Protocol 203 also called for Kaplan-Meier (KM) cumulative incidence graphs to compare the risk of Vioxx versus placebo for CV events over time. (MRK-AFL0015474-75). To the best of my knowledge, Merck has never presented these analyses for Protocol 203, but instead has claimed support for the "18-month hypothesis" based only on the KM curve for "all thrombotic events" in the APPROVe study, which was only one of the 3 studies to be included in the pre-specified analysis.

        5.      Following preparation of my Report dated September 26, 2005, data produced by Merck became available to calculate the RR and prepare the KM cumulative incidence curve for Vioxx versus placebo from the Protocol 203 studies. The Protocol 203 data were analyzed and KM cumulative incidence graphs were prepared by Nicholas Jewell, Ph.D., a renowned biostatistician at the University of California at Berkeley School of Public Health, who applied generally accepted methods. Professor Jewell's report on Protocol 203 is attached as Exhibit A.

        6.      Based upon this larger and statistically more reliable data set, Protocol 203 directly refutes Merck's hypothesis that no excess risk appears until after 18 months of Vioxx use. To the contrary, the RR of cardiac events (MI, Sudden Cardiac Death and Unstable Angina) in the Vioxx population was 2.68 after 30 days, and 2.37 ($p<0.001$, 95% CI 1.43-3.91) at the end of the study. There was a statistically significant

excess risk by 18 months, and continuously thereafter until the end of the study.  As seen in **Figure 1**, below, the rate of cardiac events in the Vioxx population exceeded placebo from the first month through the end of the study.  Further, statistical analysis shows that there was <u>no</u> significant difference in the RR of cardiac events over time.  (Jewell Report, at pp. 1-2).



**Figure 1:** Kaplan – Meier Estimation of cumulative cardiac events.  The inset in the upper left corner of the Figure presents an expanded scale for the 0-6 month period, to better illustrate the early separation of the incidence curves.

   7.  The scientific method is largely based upon testing of hypotheses which are specified before a study is conducted.  To prevent manipulation of the results, an essential element of this method is that the data must be analyzed according to the plan made at the outset.  That was not done by Merck or its consultants in this case.  The DAP did <u>not</u> call for a KM curve of CV event data over time for APPROVe alone.  (MRK-18940080858-928, at 875-876); nevertheless, Merck has promulgated the "18-month" hypothesis based on that single study, which was underpowered to detect differences in the rate of events over time.  Conversely, the DAP for Protocol 203 did specify that a KM curve would be prepared from the larger data set of the 3 combined studies, but Merck

- 4 -

has failed to perform such an analysis. The results of that pre-specified plan show early and persistent excess risk of CV events, with the risk due to Vioxx significantly greater than placebo at 18 months and all later periods (see Figure 1, above), refuting the " no risk for 18-months" hypothesis. The scientific method does not prohibit conducting exploratory analyses that were not pre-specified, and such analyses may provide important information. However, such exploratory analyses are not an acceptable substitute for those that were planned in advance.

        8.     Since all of the Protocol 203 studies were terminated on the same date (9/30/04), there was no apparent impediment to simultaneously collecting the data and presenting the pooled analysis of CV risk for all three trials, as pre-specified. Indeed, a November 12, 2004, draft version of the subsequently published APPROVe study acknowledged the pre-specified Protocol 203 plan, as follows: "Assessment of cardiovascular safety was not the primary purpose of this study [APPROVe] and there was no pre-specified hypothesis concerning this endpoint for this study alone. However, an analysis of combined cardiovascular data from this study and the data from two other studies was planned." (RBRES-001054-1079, at 1066). The authors deleted such references from later drafts (e.g., 1/26/05 Draft, MRK-AHD0075201-234, at 75209), and no reference to Protocol 203 appeared in the final draft submitted for peer review on February 6, 2005.

        9.     At his deposition in November 2005, New England Journal of Medicine (NEJM) Editor Gregory Curfman testified that NEJM had not been informed of the plan to combine APPROVe with two other studies; that the existence of the related studies should have been disclosed; and that clinical trial registration is intended to prevent "bad news" from being "buried away" by the sponsor. (Depo. of Curfman, 11/21/05, at 136-141).

        10.    I agree with Dr. Curfman that the related studies of Protocol 203 should have been made known to the editors of NEJM. The scientific method and the