interests of the medical community required disclosure of results of the pre-specified data analysis of all three pooled studies, and not only the results of APPROVe.  Such disclosure is particularly important where the undisclosed, pre-specified analysis contradicts the substitute analysis offered by the sponsor, as in the case of the "18-month" hypothesis based on APPROVe alone, which is refuted by the complete Protocol 203 data.

**C.**     **Patients in APPROVe Who Were at High Risk for CV Events at Baseline Had Higher Relative Risks of CV Events Due to Vioxx, Supporting the Synergistic and Multiplicative Effect of Vioxx and Baseline High-Risk Status.**

11.     Data from Merck's APPROVe Cardiovascular Safety Report (CSR), filed with the FDA in June 2005, in conjunction with data provided by Merck in this litigation, were used by Professor Jewell to evaluate RRs of thrombotic events among patients at "high cardiovascular risk," compared to patients with lower risk status.  Merck defined the "high cardiovascular risk" category to include those with "a history of symptomatic atherosclerotic cardiovascular disease [SACVD] or the presence of at least two of the following risk factors for coronary artery disease:  a history of hypertension, a history of hypercholesterolemia, a history of diabetes, or current cigarette use." (Bresalier, 352 NEJM at 1097).  Patients identified as diabetics were included in the "high-risk" analysis, based on well-established epidemiologic evidence that the CV adverse event risk conferred by diabetes is equivalent to the CV risk for patients with coronary heart disease (CHD).  See, e.g., Third Report of the National Cholesterol Education Program (NCEP) Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults (Adult Treatment Panel III).  NIH Publication No. 02-5215, Bethesda, MD, National Institutes of Health 2002 ("ATP III"), which designated diabetes as a CHD risk equivalent.

12.     The data show not only that Vioxx use caused statistically significant excess risk of CV events, but also that Vioxx interacts synergistically with

- 6 -

high baseline CV risk status to more than multiply the RR of thrombotic events in high-risk patients. Because interaction tests divide the population into subgroups for comparison, the power to detect important differences is reduced. Therefore, tests of significant interaction may be appropriately set at levels greater than the "p=0.05" level commonly established for significance testing of primary effects. See, Jewell, N., Statistics for Epidemiology (Chapman and Hall, New York 2003) at 159 (setting level of significant interaction at $\leq 0.2$ has "the desired effect of drawing attention to important variations that might be missed by inappropriately fixating on the standard 0.05 level of significance"). The results of this analysis are discussed at paragraphs 13-15, and presented graphically in **Figure 2**, below:



**Figure 2:** Summary Incidence rate of Confirmed Cardiac and Cerebrovascular Events in the APPROVe Study by Baseline Risk Status and Treatment Group.
Relative Risks (RR) and p-values based on Proportional Hazard Model

13.     These data from APPROVe reveal a statistically significant increased risk of cardiac plus cerebrovascular events in the high-risk Vioxx group v. high-risk placebo group, RR = 3.83 (95% CI 1.67-8.77), p = 0.001. For the lower-risk Vioxx group v. lower-risk placebo group, the RR = 1.43. Comparison of the high-risk RR (3.83) to the lower-risk RR (1.43) yields a p value of 0.086, indicating significant

- 7 -

interaction between baseline risk and Vioxx use, that is, the higher RR is due to the synergistic effect of CV risk due to both Vioxx and to baseline risk status.

14.    For a second category of outcomes, "all thrombotic" events, for the high-risk Vioxx group v. high-risk placebo group, the RR = 2.87 (95% CI 1.40-5.86), p = 0.004. For the lower-risk Vioxx group v. lower-risk placebo group, the RR = 1.15. An interaction p value of 0.07 for the comparison of high-risk RR (2.87) to low risk RR (1.15) provides strong evidence of the synergistic relationship between baseline risk and Vioxx use, consistent with the findings cited above (see ¶ 13).

15.    This synergistic interaction is supported by consistent results when RRs are compared for "high risk" and "lower-risk" Vioxx patients. The RR for high-risk Vioxx patients is significantly higher than for low-risk Vioxx patients, RR = 4.36, 95% CI (2.38-7.99), p < 0.001 for "all thrombotic events"; RR = 4.35, 95% CI (2.32–8.14) p < 0.001 for cardiac plus cerebrovascular events. These data again support interaction between Vioxx use and baseline risk, since high-risk status plus Vioxx resulted in a significantly greater RR than lower-risk status and baseline risk.

16.     A KM cumulative incidence curve for the "high-risk" APPROVe patients shows early separation for the outcome category of cardiac plus cerebrovascular events, with the Vioxx rate above placebo, and a doubling of risk in the first 18 months; overall RR = 3.83, P < 0.001 (95% CI, 1.67-8.77), as set forth in **Figure 3**, below:



**Figure 3:** Comparison of the Kaplan-Meier Estimates of Confirmed Cardiac + Cerebrovascular Events by Treatment Group Restricted to the High Risk Subgroups of VIGOR and APPROVe Studies

### D.     **VIGOR Analysis Shows Similarly Higher Relative Risk and Rapid Onset of CV Disease in Vioxx Patients v. Naproxen.**

17.     In my previous Report, data from the VIGOR study were presented, showing, among other things, a greater RR of thrombotic events in the Vioxx subgroup of aspirin-indicated patients versus the naproxen subgroup of aspirin-indicated patients, RR = 4.89, p = 0.012, 95% CI (1.44-16.88) compared to the non-aspirin-indicated (lower-risk) Vioxx v. naproxen subgroup, RR = 1.88, p = 0.04, 95% CI (1.02-3.44).  FDA Medical Officer Review, 3/30/01, p. 5.  Professor Jewell has prepared a KM curve (**Figure 3**, above) using Merck's data, showing that the high-risk VIGOR population on Vioxx experienced very rapid onset of CV thrombotic events, immediately and continuously in excess of the naproxen group, and statistically significant after a study of only 8 months mean exposure duration.

18.    These data are not explained by a "protective effect" of naproxen. If Vioxx were harmless and the VIGOR results were explained by a naproxen "protective effect," then the Vioxx cardiac event rate would have come out "even" with the rate for the harmless placebo given in APPROVe and Protocol 203. Instead, the Vioxx event rates were significantly worse than placebo, and particularly elevated for high-risk patients. Thus, the data from APPROVe and Protocol 203 confirm the refutation of the cardioprotection theory advanced by Merck to explain VIGOR's results.

19.    As noted by Cox-2 researcher Garret FitzGerald in the aftermath of the removal of Vioxx from the market, "[t]he higher a patient's intrinsic risk of cardiovascular disease, the more likely it would be that such a hazard [of Cox-2 inhibition] would manifest itself rapidly in the form of a clinical event"(FitzGerald, "Coxibs and Cardiovascular Disease," NEJM 2004; 351:1709-1711). The elevated RRs of the high-risk status patients from APPROVe and VIGOR, as shown above, are consistent with FitzGerald's assessment of the increased likelihood of events in patients on Vioxx with high background risk.

### E.    Vioxx Causes Significant Increased Hypertension, Including Severe "Stage 2" Hypertension That Was Strongly Associated With Thrombotic Events in APPROVe.

20.    In both APPROVe and VIGOR, Vioxx caused large and statistically significant increased incidence of hypertension. **Figure 4**, below, presents the KM for hypertension in VIGOR, prepared by Professor Jewell from Merck's data, along with the KM curve for hypertension in APPROVe from Merck's "Figure 9" in the "General Safety Report," (GSR), Reference P122, Appendix 2.1.1 (MRK-AFV0426229).



**Figure 4**: Comparison of Cumulative Incidence Rates of Hypertension Adverse Events in the VIGOR and APPROVe Studies.

21.    These figures demonstrate a remarkably consistent, statistically significant, approximate doubling of hypertension in Vioxx patients, at both 25 mg. versus placebo (APPROVe) and at 50 mg. versus naproxen (VIGOR). Also, the data show a disturbing, continuously increased cumulative incidence of hypertension-related adverse events (AEs) due to Vioxx suffered by approximately 30% of the patients in the APPROVe study by the end of 3 years' use of Vioxx at the standard therapeutic dose. In APPROVe, there were 377 (29.3%) hypertension AEs in the Vioxx patients compared to 219 (16.99%) on placebo (Table 32; MRK-AFV0426227). Merck reported the "Difference in Percentage Points" (12.4%) and the 95% CI for that difference (9.2, 15.6), a highly significant result. In the VIGOR study, Professor Jewell used Merck's data to calculate the RR = 1.83, P < 0.0001, 95% CI 1.55-2.16. Of further interest, in APPROVe, Merck analyzed the hypertension-related AEs based on "Common Toxicity Criteria" of the National Cancer Institute, graded 0 (no event) through 4 (most severe). (Table 33, MRK-AFV0426228). The Vioxx group had more than double the incidence

- 11 -

of "Grade 2"[1] hypertension (8.08% v. 3.77%) and "Grade 3"[2] hypertension (5.67% v.

2.69%), and the p-value for treatment based on a logistic regression model was "0.000,"

i.e., a less than 1 in 1,000 possibility that the result was due to chance. (Id.)

      22.     Additional unpublished APPROVe data demonstrate increased risk

of more severe "Stage 2" hypertension on Vioxx versus placebo. As can be seen in

Table 39 below, reproduced from the Merck GSR (MRK-AFV0426242), the Vioxx and

placebo populations had essentially identical prevalence of Stage 2 hypertension at

baseline (before the study). However, as seen in Table 40 from the GSR, below (MRK-

AFV0426243), the Vioxx population experienced a large and highly statistically

significant increased incidence of both systolic and diastolic blood pressure increases

exceeding the threshold for Stage 2 hypertension. For patients who developed both

Systolic Blood Pressure (SBP) $\geq$ 160 and Diastolic Blood Pressure (DBP) $\geq$ 100, the RR

was 2.14 p < 0.001 (95% CI 1.57, 2.92), that is, more than double the risk that Vioxx

patients would develop this severe form of hypertension.

**Table 39**

**Summary of Baseline or Screening Stage II Hypertension**

| Blood Pressure | Rofecoxib 25 mg n/N(%) | Placebo n/N(%) |
|---|---|---|
| DBP ≥100 | 26 / 1287 (2.02) | 29 / 1299 (2.23) |
| DBP ≥100 and SBP≥160 | 14 / 1287 (1.09) | 13 / 1299 (1.00) |
| DBP ≥100 or SBP≥160 | 141 / 1287 (10.96) | 143 / 1299 (11.01) |
| SBP ≥160 | 132 / 1287 (10.26) | 126 / 1299 (9.85) |

Data Source: [4,2]

---

538398.1

[1] "Grade 2": "recurrent or persistent symptomatic increase by > 20mmHg (diastolic) or to > 150/100 if
previously within normal limits (WNL); not requiring treatment." (Id.)
[2] "Grade 3": "requiring therapy or more intensive therapy than previously."

Table 49

Analysis of Stage II Hypertension

| On-Treatment Blood Pressure (mmHg) | Rofecoxib 25 mg (N=1250) Events/Patient-years (rate/100) | Placebo (N=1250) Events/Patient-years (rate/100) | Comparison | | |
|---|---|---|---|---|---|
| | | | Difference (95% CI) | Relative Risk (95% CI) | P-Value |
| DBP ≥ 100 | 140/2249 (6.23) | 114/3865 (2.95) | 3.29 (1.23, 3.44) | 1.58 (1.24, 1.99) | 0.000 |
| DBP ≥ 100 and SBP ≥ 140 | 116/3023 (4.15) | 61/3173 (1.92) | 2.36 (1.36, 3.15) | 2.34 (1.57, 3.92) | 0.000 |
| DBP ≥ 100 or SBP ≥ 160 | 425/2341 (17.99) | 363/3232 (11.86) | 6.13 (4.78, 8.95) | 1.57 (1.35, 1.82) | 0.000 |
| SBP ≥ 160 | 304/2296 (16.89) | 213/3803 (9.26) | 6.73 (4.79, 1.71) | 1.81 (1.48, 1.96) | 0.000 |

Data Source: [4.2]

23.     Several unpublished documents from Merck's files demonstrate
the strong association between Stage 2 hypertension and thrombotic events in APPROVe:

    a.  On February 20, 2004, APPROVe External Safety
Monitoring Board (ESMB) Chair James Neaton, Ph.D., wrote an email to other members
of the ESMB, which made the following points:

- The data so strongly indicated cardiac toxicity that Dr. Neaton raised the possibility of stopping the APPROVe study at that time, over 7 months before it was actually terminated.  (MRK-AG00000394).

- Some of the statistical results of the study were unlikely to change before the planned termination date, and, if they remained unchanged, they would be "interpreted as very damning to the drug."  (Id.).

- As one of the "alternatives" to stopping the APPROVe trial in February 2004, Dr. Neaton proposed "that treatment be discontinued if Stage 2 hypertension develops" because a disproportionately large percentage of the confirmed CV events in the Vioxx group occurred among patients who had Stage 2 hypertension.  As of that time, 20 of the 38 events (53%) in the Vioxx group had occurred among 390 patients who developed Stage 2 hypertension (30% of the Vioxx treatment population).

- 13 -

(Id.) Another alternative proposed by Dr. Neaton was to "[s]top the study for the subgroup of patients likely to develop Stage 2 hypertension" (Id.).

b.      On March 4, 2004, two weeks later, Dr. Neaton wrote a letter informing Merck of the ESMB's recommendation that patients with "uncontrolled hypertension" (>165mm Hg systolic or >95 mm Hg diastolic) should be removed from the APPROVe study. (MRK-AF00262446). In contrast, the Vioxx label did not include a warning to discontinue such patients from Vioxx therapy. Dr. Neaton's letter comments that it is "well-known that NSAIDs and Cox-2 inhibitors raise blood pressures" (id.), while Merck's own unpublished data showed that Vioxx caused a statistically significant doubling of the risk of hypertension exceeding predefined limits of change, compared to Celebrex (Protocol 112; see my Report, 9/26/05, ¶ 150, p. 67).[3] A letter prepared by Merck to send to APPROVe investigators perpetuated the mistaken impression that Vioxx effects on blood pressure were simply an example of a class effect, without mentioning the adverse data when Vioxx was compared to Celebrex (MRK-AF00262435).

c.      On November 11, 2004, Merck's James Bolognese prepared an "Assessment of rofecoxib TCVSAE [Total Confirmed Cardiovascular Adverse Experiences] results by Systolic BP spike occurrence," which reported as follows:

---

[3] "In 2001, Merck itself had conducted a head-to-head trial of Vioxx versus Celebrex and placebo, known as Protocol 112, which supported Whelton's conclusion that Vioxx was associated with a greater degree of hypertension. Protocol 112 was a 6-week controlled study of 1,521 patients in four treatment groups, Vioxx 12.5 mg, Vioxx 25 mg, Celebrex 200 mg., and placebo. (MRK-AIN0001240). The Merck Statistical Report showing analyses as of January 9, 2001, indicates that approximately 10% of the subjects in each of the Vioxx 12.5 mg. and 25 mg. arms of the study had increased systolic blood pressure greater than 20 mm and absolute value of over 140 mm, exceeding the pre-defined limits of change, compared to 5.3% in the Celebrex arm and 4.8% in placebo. The increased hypertension on Vioxx 25 mg. versus Celebrex 200 mg. was highly statistically significant, p = 0.004, and also statistically significant versus placebo (p = 0.046). (MRK-AIN0001608-609). Id. However, Merck did not publish the data from Protocol 112". Report of John W. Farquhar, 9/26/05 at 67.

538398.1

- In APPROVe, "examination of the results split by systolic BP (SBP) ≥ 160 mmHg on at least one occasion during the study revealed a <u>striking relationship</u>" to the occurrence of confirmed thrombotic events. (MRK-AGO0074496; emphasis added).

- "The interaction between SBP spike (y/n) and treatment in TCVSAE [total confirmed cardiovascular events] was statistically significant [p =0.0471]. In the patients with no SBP spike, the RR was close to 1, but <u>in those with at least one SBP spike, the RR was close to 4. These data suggest that nearly all of the excess CV events observed on rofecoxib versus placebo were in patients with at least one SBP spike</u>. However, in the placebo group, the occurrence of SBP spike showed no increase in rate of TCVSAE's." (<u>Id.</u>; emphasis added).

- When the data were analyzed according to a new "at risk" status as of the date when the SBP spike was first recorded, "<u>the interaction . . . was highly significant</u> (p = 0.0043), <u>indicating strong dependence of the treatment effect (hazard ratio) on whether there was a previous SBP spike or not</u>." (MRK-AGO0074497; emphasis added).

- A comparable analysis of data from the Alzheimer's trials showed a "numerically similar" relationship between SBP spikes in relation to TCVSAE's, but the interaction was not statistically significant. (<u>Id.</u>)

    d.    Between November 2004 and January 2005, drafts of the APPROVe study included references to the SBP spike data that were considered for inclusion in the manuscript to be submitted to NEJM for publication (<u>e.g.</u>, MRK-AHD0075212). However, the data were not submitted to NEJM, nor ever disclosed in

- 15 -

the scientific literature. Instead, the APPROVe authors reported increases of approximately 3 to 4 mmHg in "mean arterial pressure" in the Vioxx group, along with the inaccurate statement that the BP changes did not explain the excess risk of CV events in the Vioxx population. (Bresalier, 352 NEJM at 1100).

    e.    At his deposition on November 21, 2005, Dr. Curfman of NEJM testified that the editors were never informed that Merck had analyzed the CV events for patients with BP spikes or Stage 2 hypertension, nor that a statistically significant relationship existed between those conditions. Dr. Curfman testified that such data would have been relevant to the editors and readers, because "one, of course, of the mechanisms of concern in terms of vascular disease would be hypertension as a substrate leading to vessel damage. So that would be — if such an analysis existed, it would be very appropriate to include that." (Curfman Depo., 11/21/05, at 167-169).

    24.    I agree with Dr. Curfman that the analysis of Stage 2 hypertension was highly relevant to the excess CV risk, and that it should have been included in the published article. Where the internal documents acknowledge a "striking relationship," a "highly significant interaction," and the suggestion that "nearly all of the excess CV events" on Vioxx occurred among patients with SBP spikes, it was misleading to delete references to such effects, to disclose only the mean arterial pressure changes, and to deny the clearly apparent relationship between Stage 2 hypertensive changes and thrombotic adverse events.

    25.    Abundant literature in the fields of cardiology and epidemiology supports the conclusion that blood pressure changes of the magnitude reported for Vioxx contributed substantial excess risk of CV events. See, e.g., SHEP Cooperative Research Group: Prevention of Stroke by Anti-hypertensive Drug Treatment in Patients with Isolated Systolic Hypertension: Final Results of the Systolic Hypertension in the Elderly Program (SHEP). JAMA 1991; 265:3255-3264. In numerous clinical trials of antihypertensive medications, including Merck's principal drug in this class

- 16 -

(Cozaar/Losartan), reductions of even a few mm of Hg resulted in significantly lower incidence of stroke and coronary heart disease (CHD). (Dahlof, B, Cardiovascular Morbidity and Mortality in the Losartan Intervention for Endpoint Reduction in Hypertension Study (LIFE): a randomized trial against atenolol. Lancet 2002; 359:995-1003). Further, it is well known that the larger the increase in blood pressure, the greater the increased risk, and that each mm increase in blood pressure imposes greater risk at a higher baseline. Merck's own internal documentation shows awareness of these principles as of December 26, 2000 (MRK-NJO281966; Memo from Rush to Dixon). The "striking" interaction between Vioxx and Stage 2 hypertension magnifies the Relative Risk of adverse CV events attributable to hypertension alone, as seen in the APPROVe data discussed above. Thus, the high incidence of increased BP of > 20 mmHg or more, and of absolute values exceeding 160 mm probably contributed substantial excess risk of MI and stroke among the subpopulation of Vioxx users who experienced such significant worsening of hypertension.

### F.   Recent Literature Supports the Biological Plausibility of Increased Risk of Thrombosis Due to Both High Blood Pressure and the Interaction of Cox-2 Inhibition with Increased Blood Pressure.

26.   As noted in my prior Report, blood pressure is known to be a cause of plaque rupture that can result in thrombus and MI. In an authoritative recent article, it was noted that the " vulnerability to rupture depends on ... blood flow characteristics, particularly the impact of flow on the proximal aspect of the plaque...." Fuster, V., et al., "Atherothrombosis and High-Risk Plaque." J. Am. Coll. Cardiol. 2005; 46:937-54 at 945. Chronic and acute blood pressure increases magnify the "impact of flow" that results in plaque rupture. Increased blood pressure begins when Vioxx use begins, resulting in immediate increased risk of plaque rupture and resulting MI.

27.   In an article published in April 2006, noted Cox-2 researcher Garret FitzGerald and colleagues reported on animal data supporting the conclusion that

- 17 -

Cox-2 inhibition is the cause of both elevated blood pressure and thrombosis.  Cheng, et al., Cyclooxygenase, Microsomal Prostaglandin E Synthase-1, and Cardiovascular Function, J. Clin. Invest., 2006; doi:10:1172/JCI27540.  This finding further supports the biological plausibility of the high relative risks of MI for Vioxx users, especially those who had both high background CV risk, or on-drug Stage 2 hypertension, or both.

28.     In a recent review article in Circulation, the peer-reviewed journal of the American Heart Association, Antmann, et al. concluded that the effects of COX-2 inhibition differ between the normal and atherosclerotic conditions. In the former, the effects of COX-2 suppression have "only a marginal effect on the net anti-thrombotic imbalance owing to the importance of COX-1 as a source of PGI2 in the normal state. In the setting of atherosclerosis, however, COX-2 plays a greater role as a source of PGI2 and more TxA2 is produced; thus, inhibiting COX-2 has a more profound effect on prostanoid balance, favoring TxA2 production and promoting platelet-dependent thrombosis." Antmann, Cyclooxygenase Inhibition and Cardiovascular Risk, Circulation 2005; 112:759-770, at 764. Such a differential effect of COX-2 inhibition helps to explain the greater RR among patients who have atherosclerosis and are at greater

baseline risk of CV events due to that condition. **Figure 4 of the Antmann article**, describing this phenomenon, is reproduced below:

*764    Circulation    August 2, 2005*



Figure 4. Consequences of COX inhibition for prostacyclin and thromboxane $A_2$ production in normal and atherosclerotic arteries. Endothelial cells are shown as a source of prostacyclin ($PGI_2$) and platelets as a source of thromboxane $A_2$ ($TxA_2$) under untreated conditions (top row) or treated with low-dose aspirin (middle row) or a coxib (bottom row) in the normal (left column) and atherosclerotic artery (right column) for comparison. COX-1 is the only isoenzyme expressed in platelets; endothelial cells express both COX-1 and COX-2. In the normal artery, the balance between $PGI_2$ and $TxA_2$ production favors $PGI_2$, and inhibition of platelet-dependent thrombus formation. In the atherosclerotic artery, both $PGI_2$ and $TxA_2$ production is increased, owing in part to increased platelet activation with compensatory $PGI_2$ formation via both COX-1 and COX-2 in endothelial cell; the net effect is an imbalance favoring $TxA_2$ production and platelet-dependent thrombus formation. Low-dose aspirin selectively impairs COX-1–mediated $TxA_2$ production in platelets restoring the net antithrombotic balance. Coxib use suppresses COX-2–dependent $PGI_2$ production in endothelial cells, which has only a marginal effect on the net antithrombotic balance owing to the importance of COX-1 as a source of $PGI_2$ in the normal state. In the setting of atherosclerosis, however, COX-2 plays a greater role as a source of $PGI_2$ and more $TxA_2$ is produced; thus, inhibiting COX-2 has a more profound effect on prostanoid balance, favoring $TxA_2$ production and promoting platelet-dependent thrombosis.

- 19 -

### G.    Merck's Recent APPROVe "Extension" Data Confirm Excess CV Risk of Vioxx

29.    In a document submitted to the FDA in May 2006, Merck reported the results of the APPROVe study on an "Intention to Treat" basis, which includes adverse events that occurred both on the drug and after the discontinuation of the drug. According to Merck's summary, the overall data showed a statistically significant increase of risk of MI, 31 Vioxx events v. 15 placebo events, p=0.017. There was also a statistically significant increased risk of ischemic stroke, 17 Vioxx events v. 6 placebo events, p=0.024. These data therefore continue to support the conclusion that Vioxx causes excess risk of CV events, including MI and stroke. The data show, for the first time, that the increased incidence of stroke in the Vioxx group has now exceeded the threshold for a statistically significant effect of Vioxx.

30.    The ITT analysis negates Merck's claim that there is no difference in CV thrombotic event rates between Vioxx and placebo for the first 18 months of use, in two ways. First, the KM graph of cumulative incidents of confirmed events is changed by the addition of data from the ITT analysis. Merck claimed that the original KM graph, presented as "Figure 2" of the published APPROVe article, supported the hypothesis of no effect for 18 months, because the incidence curves did not sharply diverge until after that point in time.[4]

31.    However, the KM graph submitted to the FDA for the ITT analysis in May 2006 (Figure B1, reprinted below), shows that the curve for Vioxx (rofecoxib) separates from placebo at about 3 to 4 months, and remains above placebo for the rest of the study. According to Steven Nissen, M.D., interim Chairman of Cardiovascular Medicine at the Cleveland Clinic and a member of the FDA Advisory Committee on Cox-2 inhibitors, the claim of no effect for 18 months of treatment "makes the drug look

---

[4] A number of flaws in that reasoning have been described in my September 2005 report, and in the preceding portion of this Supplemental Report.

a lot safer than it was." Dr. Nissen stated, "If you wanted to construct a legal defense that says nothing happens for 18 months, this is how you would cut the data." (New York Times, "Why the Data Diverge on the Dangers of Vioxx," May 22, 2006 (p. 1 of 6). Alastair Wood, M.D., Chairman of the FDA advisory committee that reviewed Cox-2 inhibitors in February 2005, criticized the omission of off-day events, noting that "People may drop out because they had chest pain and then weeks later they had a heart attack." (Id. at p. 3 of 6).



Figure B1    All Patients – Confirmed Thrombotic Cardiovascular Events – Week 210 Censoring - Kaplan Meier Plot



| Patients at Risk | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Rofecoxib 25 mg | 1287 | 1221 | 1187 | 1152 | 1131 | 1117 | 1092 | 1032 | 989 |
| Placebo | 1300 | 1247 | 1224 | 1189 | 1173 | 1157 | 1133 | 1071 | 1027 |

32.    Further, Merck has submitted to the FDA a new statistical analysis for the "proportionality" test, indicating a p value of 0.748 (MRK-S0420112037; Figure B2, reproduced below). This non-significant result means that there is no evidence of variation in the rate of events over time. Thus, the ITT analysis contradicts the claim made by Merck in FDA submissions and in the published APPROVe article that there was a statistically significant difference in the rate of events between the 0 to 18 month and 18 to 36 month periods of the APPROVe study. (It is noted that the Heading above Figure B2 does not correspond to the legend below the figure. The heading refers to "Confirmed Thrombotic Events" while the legend below refers to the

- 21 -

"APTC Endpoint". I reserve the right to modify this opinion when the inconsistency is clarified. Whether Figure B2 refers to the thrombotic or APTC endpoint, the lack of variation in event rates over time undermines the 18-month hypothesis.)



Figure B2   All Patients – Confirmed Thrombotic Cardiovascular Events – Week 210 Censoring - Hazard Rate

*(Proportionality p-value=0.748)*
*APTC Endpoint*
*All Patients (MITT Population) and censored at Week 210*

33.     Data from the off-drug period of the APPROVe extension study are also of interest.  During the off-drug period alone, Merck reported that there were 28 thrombotic events in those who had taken Vioxx, compared to 16 in the placebo group, RR=1.64.  Merck has stated that these data are "insufficient to conclude that there was an increased relative risk of confirmed thrombotic events following discontinuation of the therapy." (Press Release, 5/11/06, p. 1).  However, three well-respected independent commentators have stated their disagreement with Merck's interpretation of the data.

(a)     Steven Nissen, M.D., mentioned in ¶ 31 above, stated "You have to look at the big picture.  The big picture is that the hazard stays the same." (Wall Street Journal, 5/12/06, p. A16).  Dr. Nissen further stated, "Merck misrepresented the

- 22 -

results of this study." (AP Press Release, 5/12/06). The 64 percent higher risk in the extension study "has rather important scientific implications, because it suggests that there was some kind of permanent or longstanding injury to the artery that makes it susceptible to these kinds of continuing events. (New York Times, May 13, 2006).

        (b)    According to Curt Furberg, M.D., a member of the U.S. FDA Drug Safety and Risk Management Safety Committee, "It may be that Vioxx is causing permanent damage to the cardiovascular system, accelerating atherosclerosis or a sustained increase in blood pressure." Reuters, May 18, 2006. Dr. Furberg stated, "for a while we assumed Vioxx caused temporary problems, and here it is more than that," referring to the occurrence of 7 strokes and 2 "mini-strokes" or TIAs in the Vioxx group after discontinuing treatment, compared with no such incidents in the placebo group during one year off-drug. (Id.)

        (c)    Bruce Psaty, M.D., a distinguished cardiologist from University of Washington who testified in Congress on COX-2's inhibitors, stated that the 64% higher overall event rate was "closer to a persistent finding than not." (New York Times, May 13, 2006).

        34.    I agree with Drs. Nissen, Furberg and Psaty that the increased RR of thrombotic events in the Vioxx group after discontinuing the drug is "closer to a persistent finding than not," and that the lack of statistical significance does not decide this issue. The off-drug period alone constitutes a subgroup that is not adequately powered to detect such differences to a statistically significant degree. Given the limitations due to the smaller number of events and the time off drug, the 64% increase is an impressive indicator that the risk of Vioxx probably does not end when exposure is discontinued.

        35.    I reserve the right to add to these comments in the event that future data becomes available.

538398.1

## II.   **CONCLUSION**

36.   A consensus exists in the scientific community that Vioxx significantly increases the risk of adverse events, including MI, as noted by the unanimous agreement of 32 FDA Advisory Committee Members. Protocol 203, the analysis pre-specified by Merck for precise estimation of CV effects of Vioxx, shows that this increased risk appears within the first 30 days and persists throughout exposure. Protocol 203 refutes the "18-month" notion advanced by Merck through a "post hoc" hypothesis based on a single, underpowered study. Patients at elevated baseline risk have a statistically significant higher RR of CV events than lower-risk patients, due to a synergistic and multiplicative interaction of Vioxx and baseline risk factors such as SACVD. Stage 2 Hypertension while on Vioxx is also a strong risk factor for CV events. Data from the APPROVe extension study confirm the excess risk of MI and stroke due to Vioxx, and it is likely that the risk persists after Vioxx exposure ends.

_____
/ Date

_____
John W. Farquhar, M.D.

538398.1

# EXHIBIT  C

REBUTTAL EXPERT WITNESS REPORT

For the past 25 years, I have been a Professor in the Division of Biostatistics, School of Public Health, and in the Department of Statistics, both at the University of California, Berkeley. Specifically, I have served as a Full Professor (1987 – present); Associate Professor (1983 – 1987); and Assistant Professor (1981 – 1983). Prior to that, I was an Assistant Professor in the Department of Statistics at Princeton University, Princeton, New Jersey (1979 – 1981) where I also served as Director of the Statistical Laboratories. At Berkeley, I also hold positions as the Director of the Center for Computational Biology, and Chair of the University of California Graduate Groups in (i) Biostatistics, and in (ii) Computational and Genomic Biology. From 1994 to 2000 I served as Vice Provost at the University of California, Berkeley, in the Office of the Chancellor. A true copy of my CV is attached as Exhibit A.

I have served as a member of the National Academy of Sciences Committee on National Statistics (1993 – 1996) and of the Committee on Theoretical and Applied Statistics (1994 – 1996). I received my Ph.D. in Mathematics from the University of Edinburgh, Scotland in June 1976, and was a post-doctoral Harkness Fellow at Stanford University and the University of California at Berkeley from 1976 to 1978 (funded by the Commonwealth Fund of New York). In 1978-79 I was a Research Fellow in the Medical Statistics Unit at the University of Edinburgh, Scotland. I also held a Visiting Professor appointment at Oxford University, England, in Spring 1990.

I am the author of a textbook, "Statistics for Epidemiology," (Chapman and Hall, New York 2003), as well as approximately 100 peer-reviewed articles in the field of biostatistics. I am a founding editor of the *International Journal of Biostatistics*, Senior Editor for the journal *Statistical Applications in Genetics and Molecular Biology*, and Associate Editor for the journal *Biometrika*. In 2005, I received the Snedecor Award, of the Committee of Presidents of the Statistical Societies, awarded to "an individual who was instrumental in the development of statistical theory in biometry." The award is associated with the best publication in biostatistics in the world in the previous 3 years. I also received a Distinguished Teaching Award from School of Public Health, University of California at Berkeley, in 2004.

I am or have been a member of several international statistical societies including the International Biometric Society, the Institute of Mathematical Statistics, and the American Statistical Association. I was made a Fellow of the American Statistical Association in 1991, and a Fellow of the Institute of Mathematical Statistics in 1996. I served as President of the Western North American Region of the International Biometric Society in 1991, and as Treasurer of the Institute of Mathematical Statistics from 1985-1988.

This report is submitted to respond to some issues raised by defense counsel in the deposition of Dr John Farquhar and in the Expert Witness Statement and Deposition of defense biostatistician Dr. Kim.



PLAINTIFF'S
EXHIBIT
C

1

**High Risk and Vioxx Interaction: APPROVe**
In the deposition of Dr. Farquhar, defense counsel challenged the definition of the "high risk" group that I analyzed, as described in Dr. Farquhar's Supplemental Report of May 2006. This is my response.

In my original analysis of the joint effects of Vioxx and baseline high risk status, I defined the high risk group to include anyone classified by Merck as having "increased cardiovascular risk" (defined as a prior history of symptomatic ASCVD, or possessing two or more cardiovascular risk factors) and/or diabetics, after discussion with Dr. Farquhar. Following Dr. Farquhar's deposition, I re-analyzed the data to only include the "increased cardiovascular risk" individuals, as defined by Merck, in the high risk group . This change resulted in a shift of only two of thirty confirmed thrombotic events from the "high risk" Vioxx treatment arm to the "low risk" Vioxx treatment arm. There was no change in the number of placebo events. As would be expected with such a relatively minor change in the overall data, the results are materially very similar to those from my previous analysis. For example, in the analysis of all 72 thrombotic events, the Relative Risk for an event associated with assignment of Vioxx was 1.28 with a 95% confidence interval of (0.65—2.51) in the low-risk group (as compared to 1.15 with the previous definition of baseline risk). On the other hand, the same Relative Risk in the high-risk group remained considerably higher, namely 2.70 with a 95% confidence interval of (1.31—5.57), with an associated p-value of 0.007 (as compared to 2.87 before, with a p-value of 0.004).

Thus it is still apparent that the deleterious effect of Vioxx is more than 2 times worse in the high risk group as compared to the low-risk group. These two Relative Risks can be compared quantitatively by using a test for interaction, to address the question as to whether risk status significantly modifies the effect of Vioxx on the risk for an adverse event. This test yields a p-value of 0.137 (as compared to 0.07 before). The fact that this is not "significant" by conventional or mindless application of a 0.05 significance level has to be viewed in the context that interaction tests are well-known to have reduced power (and raising the significance level is a direct way of addressing this) and the fact that a similar interactive effect was also observed in my analysis of VIGOR. Further, it should be stressed that the interaction test used here is examining the evidence for *multiplicative* interaction which sets a much higher 'bar" than looking for *additive* interaction. Most epidemiologists consider the existence of additive interaction to suggest biological synergism between two factors (here Vioxx exposure, and "increased cardiovascular risk" at baseline)—see Rothman and Greenland (1998). The presence of multiplicative interaction, as described above in detail, always determines that there is even more striking evidence of additive interaction in the data (given that the Relative Risks of both factors are greater than one). I thus consider the evidence of an elevated Relative Risk associated with Vioxx in the high-risk group to be notable, supporting biologic synergism of the effects of Vioxx with other pre-determined cardiovascular risk factors in the APPROVE trial.

Merck's challenge appears to be based on whether a particular high risk subgroup was prespecified. So it is important to note that the high-risk subgroup used in this new analysis was defined by Merck in their own Statistical DAP for Protocol 203 (on p.20). (In the DAP the symptomatic ASCVD individuals were referred to by the term "Aspirin

2

indicated".) Thus, in analyzing the question of synergistic effects of Vioxx and baseline risk status in this document, I have directly followed the DAP for Protocol 203, here applied to available data from APPROVe study. As stated by Merck Research Laboratories President Peter Kim, Merck itself followed the DAP for Protocol 203 in its analysis of APPROVe data. (Conference call transcript, May 30, 2006.) Finally, similar results to prior analyses are again found if other endpoints are examined (cardiac events only, or cardiac and cerebrovascular events).

Merck's challenge raises the question of whether our analysis should be regarded with skepticism as a "post hoc" analysis. However, in this regard it is important to note that the hypothesis of greater CV risk on Vioxx among patients at increased baseline risk was previously raised by Merck itself in the Bombardier (2000) article on the VIGOR trial. That article reported a statistically significant increased risk of MI among the high-risk "aspirin-indicated" subgroup, while stating that there was no significant difference in MI rates in the lower-risk, non-aspirin-indicated subgroup. The question of whether patients at increased baseline risk would be at greater risk of CV events due to Vioxx was subsequently discussed in the FDA Targum report (2/1/01). Thus, my purpose in examining high cardiovascular risk status, was to confirm—or not—the findings in the VIGOR trial regarding the joint effects of baseline risk status and exposure to Vioxx, and make relevant comparisons. In this sense, this particular subgroup analysis is confirmatory rather than exploratory. The above analysis shows that the results do not depend on the exact definition of "high risk" and my conclusions stand when using the "increased CV risk" group pre-defined by Merck. Thus, this examination clearly does not fall prey to the issues of misinterpretation arising from indiscriminate subgroup comparisons, most recently described by Lagakos (2006).

A separate issue, not addressed in Lagakos (2006), is the choice of an appropriate significance level for a single test of interaction with moderate sample sizes (although he uses an example with the "usual P=0.05" he does not discuss other alternatives). This is an important point because statisticians are well aware of the reduced power to detect an interaction effect in samples of moderate size (where the study is usually powered only to detect main effects). Indeed, in a similar vein, defense expert Dr. Kim stated that we (statisticians) have been "too successful" in the promulgation of the $p < 0.05$ significance level, in reference to a test of proportional hazards, a special case of a test for interaction (Kim deposition). A standard and simple way to address this in the case of a test for interaction is to use a larger nominal p-value, such as 0.2, a strategy immediately familiar to statisticians as a way to increase power, and a technique that I have previously recommended in my book (Jewell, 2004). This is particularly appropriate when the analysis is confirmatory—as it is here—rather than exploratory. I also note that Lagakos' conclusions regarding the interaction tests carried out by Bhatt at al (2006) would remain the same even if he had started with a nominal p-value of 0.2 rather than the 0.05 he considered (specifically if the Bhatt et al (2006) interaction tests been assessed with a significance level of 0.2÷20 = 0.01, none would have reached statistical significance).

A higher significance level than 0.05 for examining interactions is widely used in other contexts, including drug safety analyses. In the context of Vioxx analyses, note that "Results that were statistically significant at level 0.1" are listed in a Safety Analysis (Table 4) of the Statistical Reviewer Briefing Document for the Advisory Committee (p.

3

11). In the same document, Table 3 (p. 9) lists "statistically significant subgroup by treatment interactions at level 0.10",  and, for example, a claim that a "statistically significant (p-value = 0.073) treatment by baseline steroid use interaction was observed." In the Vioxx Review of NDA #21-042 transcript, Dr. Li of the FDA states that "there is (sic) a strong statistical significant study by treatment interactions. ... the P-value is (sic) .09 and .08."

Note that if a 0.2 significance level is applied to the subgroup analyses given in Table 19 of the APPROVe Trial Cardiovascular Safety Report, four of the interactions discovered can be considered "significant". All four of these subgroups refer to biologically plausible high risk categories (Symptomatic Atherosclerotic Cardiovascular Disease, History of Ischemic Heart Disease, Diabetes, and Two or More Cardiovascular Risk Factors).  This  further supports the conclusion that a significance level of 0.2 for interaction is a reasonable indicator of consistent elevated risk among prespecified higher risk patient groups, as compared to the circumstances of concern to Lagakos (2006), namely a chance occurrence in one of many subgroups indiscriminately defined potentially after examination of the data.

Finally, these findings regarding the potential synergistic effects of Vioxx with baseline cardiovascular risk factors are consistent with the recent meta-analyses performed by Kearney et al (2006). The authors there reported upon increased CV events among Cox 2 inhibitor users, noting the likelihood of "a smaller excess  [of vascular events due to COX 2 inhibitors] among those at lower risk (such as women with rheumatoid arthritis) and a higher excess in those at above average risk (such as older patients with established atherosclerotic disease)." This expectation of higher excess in patients at above average background risk is precisely the finding that my APPROVe analysis confirmed.

**Time Interaction with Vioxx: Protocol 203**
In his Report and deposition, Dr. Kim stated that there was no effect of Vioxx during the first 18 months of use in the APPROVe study, and he further stated that the assumption of the Cox proportional hazards model was properly assessed using linear time rather than log(time) in an interaction term in the model. The issue of which statistical method to use in this model was raised by Merck's recent public statement that the published APPROVe article employed the linear method, although the DAP had specified log(time) and the authors erroneously reported that log(time) had been used. The following is my response to the recent disclosures and Dr. Kim's testimony about them.

As indicated, the Statistical Data Analysis Plan for Protocol 203 suggested that the issue of variation of the Relative Risk, or Relative Hazard, over time be addressed by including an interaction term with the treatment indicator multiplied by $\log(t)$ where $t$ represents follow-up time. An alternative approach would be to use an interaction term with the treatment indicator multiplied by $t$ itself (the linear time technique noted above).

In my analysis of Protocol 203, I employed a more flexible (and conservative) approach allowing the Relative Hazard to take different values over five time intervals which covered the three years of follow-up. A subsequent test of interaction examined whether there was evidence of variation of these Relative Risks or whether the estimates were

4

compatible with a single constant value over time. As previously reported the p-value for this test of time interaction was 0.13 with cardiac events as the endpoint.

I disagree with the use of log($t$) in the interaction term in a proportional hazards model since it essentially forces the Relative Risk to be 1 or very close to 1 for early follow-up periods (mathematically this follows from the fact that the logarithm of zero is negative infinity so that the constant of proportionality comparing the risks in the two groups is then the exponential of negative infinity or 1). A Relative Risk of 1, or close to 1, would contradict the findings for Protocol 203 where the data provides an estimate of RR = 3.36 over the first 2 months of follow-up, and 1.42 over the first three months. If a parametric model is to be chosen, then the use of $t$ itself in the interaction term is preferable as originally carried out by investigators in their analysis of APPROVe data. However, the analysis begins but does not end with this point.

For completeness, I tested for time-varying Relative Risks using both parametric approaches: with the log($t$) approach, and using cardiac endpoints, the p-value for interaction of Vioxx and time is 0.08. Alternatively, using $t$ itself—more reasonable as I have argued above—the p-value for the test for interaction is 0.035. Note that that the existence of nonproportional hazards does not refer to the magnitude of the Relative Risk in any particular time period, but only states that they are different. So, in the Protocol 203 context, a declaration of "nonproportional hazards", based on these tests, does not say that the Relative Risk is near to 1 in early follow-up periods, only that the data suggests that the Relative Risk apparently grows with increasing exposure to Vioxx (given the sign of the coefficient of the interaction term is positive). This is compatible with my previous Protocol 203 analysis using the more non-parametric analysis (noted above). To emphasize this point clearly, the proportional hazards model with an interaction term of Vioxx and $t$ itself, yields the following (necessarily time-varying) estimates of Relative Hazard:

At $t$ = 3 months, RH= 1.48 with a 95% CI of (0.79, 2.77)
At $t$ = 6 months, RH= 2.09 with a 95% CI of (1.04, 3.10)
At $t$ = 12 months, RH= 2.67 with a 95% CI of (1.53, 4.65)
At $t$ = 18 months, RH= 3.89 with a 95% CI of (1.83, 8.27)

It is important to note here that the prescriptive description of how the Relative Hazard varies smoothly over time allows more accurate estimation of Relative Hazards at earlier follow up times than my previous Protocol 203 analysis which did not make use of this assumed parametric structure. With the Merck approach, which Dr. Kim did not carry out, the Protocol 203 data then establishes significant effects of Vioxx as early as after 6 months of exposure.

The Statistical Analysis Plan for Protocol 203 in fact, envisaged doing both the parametric and non-parametric approaches that I have briefly described above. Quoting the report "If the nonproportionality is large and real, various approaches may be explored to investigate the ... nonproportionality: ... partition of the time axis ..., adding a time-dependent covariate, or using a different model." The partitioning of the time axis is what I used in my original analysis of Protocol 203; the use of a time-dependent covariate—here the treatment term times $t$—is described above.

5