In summary, both the parametric and less parametric approach to time-varying Relative Hazards lead to the same conclusion, namely, a sizeable Relative Hazard—greater than 1—in the early follow-up period, which tends to only increase as exposure to Vioxx lengthens.

**Overall Cumulative Incidence Curves for All Thrombotic Events: Protocol 203**
In his report, Dr. Kim does not mention my Protocol 203 analysis, although at his deposition he said that he had read it. Dr. Kim believed that my Report should have focused on the "primary endpoint" of confirmed thrombotic cardiovascular adverse effects. The following is my response.

In my previous analysis of Protocol 203, I focused on cardiac events as the endpoint, because it was a prespecified endpoint in the statistical DAP for Protocol 203. Also, the published APPROVe study reported separately upon the results for Cardiac Events, Cerebrovascular and Peripheral events, with the highest Relative Risk in the Cardiac Endpoint (2.80).

Nevertheless, to address Dr. Kim's concern, I have since repeated my overall Protocol 203 analysis using two other endpoints: all thrombotic events (the primary endpoint in the DAP), and an endpoint that combines cardiac and cerebrovascular events. In the set of figures attached (Figures 1—8), I provide the analogous graphs of cumulative incidence of all thrombotic events that I originally provided for cardiac events in my previous analysis of Protocol 203 data. The figures reflect increasing cumulative amounts of follow-up data, starting from the first 30 days (Figure 1) to a full three years of follow-up (Figure 8). With the entire follow-up information, the estimate of the Relative Risk, associated with assignment to Vioxx, is 1.77 with a 95% confidence interval of (1.22, 2.56) with a p-value of 0.003.

The cumulative incidence plots (Figures 1—8) are very similar to those produced for cardiac events in my original Protocol 203 analyses, as they should be since the two endpoints (cardiac events only and all thrombotic events) are highly correlated. In fact, one is a major subset of the other so that we would expect similar results. For the same reason, the analysis of multiple endpoints does not suffer from the same multiplicity issue that we previously discussed for subgroups and as noted by Lagakos (2006). Finally, there is consistent evidence that the Relative Risk associated with Vioxx is elevated in the first 18 months of exposure, and then elevated yet higher after 18 months of follow-up, as seen in my original Protocol 203 analysis of cardiac events. As such, we would anticipate a significant p-value in a test for interaction of the Vioxx effects with time itself and that a significant difference between Vioxx and placebo patients in the incidence of thrombotic events would be detected early in the follow-up period if a proportional hazards model—with this time interaction term included—is used (as described above for cardiac events).

6

**Generalizability**

Dr. Kim's central hypothesis appears to be that the results of APPROVe cannot be generalized to other populations. However, the manner in which Dr. Kim appears to have reached this opinion is not reliable. Below is my response to Dr. Kim's claim.

Generalization Was Anticipated by the Protocol 203 DAP

Protocol 203 was designed to allow generalization of its results. The three studies comprising Protocol 203 were based on different patient eligibility criteria— adenomatous polyps, prostate cancer and colorectal cancer. The DAP noted that the patients would have a spectrum of CV risk, and stated that the results would allow generalization to other patient populations including osteoarthritis and rheumatoid arthritis patients. At his deposition, Dr. Kim claimed support for the contrary view (that the results of APPROVe cannot be generalized to other populations) from an overview paper by Kearney et al (2006). In particular, Dr. Kim relied upon Figure 2 of the Kearney article which restricts their meta-analysis to trials with scheduled duration of at least one year, effectively limiting the data for Vioxx to the long-term APPROVe and Alzheimers studies (Kim deposition, p.253). Interpreting differences in estimated Relative Risks as due to the definition of the populations, e.g. one group had polyps and the others didn't, is indefensible without a plausible scientific explanation as to why a polyp patient should anticipate a more serious deleterious effect from Vioxx. Notably, Dr. Kim admitted that he could not identify a single factor that would make a polyp patient more likely than an osteoarthritic to have a myocardial infarction while on Vioxx (Kim Deposition).

Inadequate Power of Alzheimer's Studies

At his deposition, Dr. Kim agreed with the general principle that, when a study with low power fails to show a significant effect, the results are more fairly described as inconclusive than negative; the proof is weak because the power is low. (Kim deposition, p. 206).

Dr. Kim's opinion that the APPROVe results cannot be generalized is largely based on the belief that the Vioxx Alzheimers trials, in particular 078 Thal et al, 2005), were adequately powered to detect an increase in risk due to Vioxx, and that since none was detected the results of APPROVe and Alzheimers are inconsistent and contradictory. Regarding the power of the 078 study to detect Vioxx cardiovascular effects. Dr. Kim states without attribution that "the 078 study had adequate (greater than 80%) power to detect a relative risk of 2 or greater" (Kim report, p. 23). The only information given in his report was the observed number of all  thrombotic events in each group and the average follow-up which he quotes as being "approximately 4 years". When questioned about this power calculation in his deposition, Dr. Kim did not provide further detail regarding the validity of this statement, other than indicating that it was post-hoc (i.e. based on assumed rates and sample sizes as actually observed in the 078 study), and that he "did a calculation on the fly". He indicated that he neither accounted for compliance, nor for patient drop-out; he stated that he "used the patient enrollment duration and the follow-up duration", presumably the latter being assumed to be approximately 4 years as quoted above. It is well-known that compliance, loss to follow-up and duration of study all have serious impact on power calculations so that there seems to be little if any value to Dr. Kim's assertion regarding the power of the 078 study without further analysis of his assumptions.

7

To test Dr. Kim's assertion of adequate power in 078, I carried out power calculations that took into account the effects of poor compliance, loss to follow-up, and shorter study duration, based on information provided in published literature and FDA reviews. Results, sources and methods for this power calculation are described below.

In Thal et al (2005) it is stated that patients were accrued over two years from April 1998 to March 2000. It is stated that the median duration on medication was 94 weeks (about 21 months) in the Vioxx group and a little longer in the placebo group. It is inexplicable to me why Dr. Kim used "approximately four years" as the follow-up duration since Thal et al (2005) clearly state that the study was terminated 11 months earlier than the four year scheduled endpoint, particularly since he did not allow for drop-outs. Next, 36 thrombotic events were observed in 1550.97 patient years of follow-up in the placebo group, yielding a baseline incidence rate of 2.32 events per 100 patient years (12/18/04 Interim Review of thrombotic events in Alzheimer's studies 078 and 091). It is further indicated that 45% of the patients discontinued the study prematurely. No detailed indication of the timing of when these individuals terminated is given. The impact of drop-outs on power is accommodated by using the reported durations.

Crucially, Thal et al (2005) note that there is only 61% compliance to treatment in the Vioxx group, meaning that only 61% of the Vioxx patients took at least 80% of their assigned tablets, determined by counting pills (the authors' definition of compliance). It is known that "pill counts overestimate compliance" (*Encyclopedia of Biostatistics*, p. 836; Rudd et al, 1988), so that the actual compliance rate is likely lower. Dr. Kim indicates that he couldn't do any calculation of the effects of compliance since "we don't have data indicating what … [loss of compliance] …does to the relative risk". Yet Dr. Kim agreed with the generally accepted statement that the main impact of noncompliance is to reduce a treatment effect. This means that the risk in the Vioxx group will be lowered overall because a substantial fraction, 39%, of these individuals took less than the prescribed amount of medication (an insufficient level of compliance for this study to provide a valid estimate of a causal treatment effect). If the risk in Vioxx non-compliers is the same as in the placebo group, Dr. Kim's targeted intent-to-treat Relative Risk of 2.0 would be reduced to 1.61, given the observed low level of compliance; (throughout I assume that non-compliance in the placebo group does not affect their risk, since placebo is not expected to have any effect whether it is taken or not). Since the magnitude of the anticipated Relative Risk is thus lowered, the necessary design sample size (and thus the number of events) needed to achieve appropriate power must be substantially increased. The reduced power due to noncompliance with treatment is widely known to those planning and interpreting the results of randomized clinical trials. The 1998 *Encyclopedia of Biostatistics* (of which I was an Editor) entry on "Compliance Assessment in Clinical Trials" indicates that interpretation of insignificant results from an intention-to-treat analysis of a randomized clinical trial must necessarily be inconclusive in the presence of poor compliance since the latter causes treatment differences to be underestimated thereby reducing power to detect a treatment effect.

I next did a power calculation, with the following inputs: (i) the background (placebo) incidence rate calculated above, (ii) accrual over 24 months with subsequent follow-up for (a median of) 21 months, (iii) that 1460 patients were randomly (and equally)

8

assigned to either Vioxx or placebo, and (iv) the noted reduction in the intent-to-treat relative risk due to non-compliance. The software used is publicly available from the Department of Biostatistics at Harvard (Massachusetts General) at the following website http://hedwig.mgh.harvard.edu/biostatistics/software.php.

With all of these stated inputs based on reported data, the intent-to-treat power declines to 0.71. Now, considering drop-outs, Thal et al (2005) state that 368 of participants (approximately equally split between Vioxx and placebo) withdrew consent and so discontinued the study. Thal et al (2005) does not provide information as to the times when such dropouts occurred, but some reasonable assumptions can be made. If these individuals dropped out early after recruitment, they would contribute few patient months of follow-up to either treatment group, lowering the power even further to 0.58. Even if omitting such individuals increases the median follow-up duration of remaining participants to say 25 months, the power remains as low as 0.63. If we however consider a targeted Relative Risk of 1.5 instead of 2.0, the power is now 0.27 even if all drop-outs contribute some information. These power calculations illustrate that non-compliance and drop-out drastically reduces the power of the 078 study making it considerably less than 0.80. It is my view, that the low compliance rate in study 078 makes reliable estimation of the *causal* effects of Vioxx (as against the intent-to-treat effects) very uncertain; without question, the causal effects in a high-noncompliance situation are greater than those reported by an intent-to-treat analysis, since the latter deems subjects to have been drug-exposed based on their original randomization status, even though they did not meet the protocols for acceptable use of study medication.

These remarks regarding the power of the 078 study are supported by an FDA reviewer's comments concerning the Vioxx Alzheimers trials as a whole. For example, in the Arthritis Advisory Committee transcript, Dr. Villalba of the FDA asserts that the Alzheimers studies "were not powered to show any difference with placebo" in reference to the analysis of cardiovascular events.

<u>Consistency of Increased Risk after 18 Months</u>
While Dr. Kim maintains that the APPROVe and Alzheimers studies are inconsistent, in one relevant respect they are strikingly consistent. As shown above (in the section on time interaction with Vioxx effects), the Protocol 203 data analysis shows that the deleterious effects of Vioxx are greater with longer-term exposure, for example, at least 18 months of exposure than with shorter exposure. This appears to also be true in the combined data for studies 078 and 091 submitted by Merck to the FDA. In the 12/18/04 FDA Interim Review of thrombotic events in Alzheimer's studies 078 and 091, Table 6 indicates that there were 26 thrombotic events after 18 months of exposure (in 538 patient years of follow-up) in the Vioxx group, and 16 thrombotic events (in 665 patient years) in the analogous time period for the placebo group. Comparison of these numbers yields a Relative Risk of 2.01 with an exact 95% confidence interval of (1.03, 4.01), with a p-value of 0.027. Thus, just as in APPROVe specifically, and Protocol 203 more generally, studies 078 and 091 show a consistent and significant elevation of risk of thrombotic events in patients with 18 months or more exposure to Vioxx.

In addition, Dr. Kim's Report does not address the issue of unadjudicated CV thrombotic events that have not been included in the statements regarding the Alzheimers studies

078, 091 and 126. According to the Medical Officer Memo to file (3/12/02) 22 patients had potential cardiovascular thrombotic events with insufficient information to adjudicate. Of these 22 patients, 18 were on Vioxx and only 4 on placebo. Given the small number of observed events, inclusion of these events in the calculations would increase the Relative Risk associated with Vioxx, bringing the estimate substantially closer to what has been observed in other trials.

## The Kearney Article Does Not Support Kim's Claim of Inconsistency between Polyp Patients and other Populations

In Dr. Kim's deposition, he states that the Kearney et al (2006) meta-analysis supports his assertion about inconsistency between polyp data, (as illustrated in APPROVe) and Alzheimer's disease data. However, these two groups of trials do not cover the universe of trial populations assessed by Kearney et al.. Using the data from Kearney's article, we can see that in trials of Vioxx on other patient populations other than the Alzheimer's and polyp patients described in their Figure 2, there is an estimated Relative Risk of 1.45 with a 95% confidence interval of (0.58, 4.07), almost identical to the overall estimated Relative Risk of 1.49 reported for all trials they considered. Thus, these data are consistent with the conclusion that the non-polyp, non-Alzheimer's populations had increased risk of vascular events of the same magnitude as the population as a whole.

## Merck's Trials against Placebo Show Increased Risk for OA and RA Populations

At the deposition of Dr. Farquhar, defense counsel introduced a table of Merck clinical trial data for thrombotic events in Vioxx patients versus placebo, for the apparent purpose of showing no difference in the rate of thrombotic events in the Alzheimer's trials (Table 13 of the Information Amendment – Clinical (IND 46,894: Vioxx (rofecoxib), provided to the FDA by Merck on March 22, 2004). For the reasons stated above, the Alzheimer's studies presented in Table 13 were underpowered to detect a difference. At the same time, Table 13 presents summary information on trials containing rheumatoid arthritis (RA) and osteoarthritis (OA) patients. Combining the OA and RA trials in a similar fashion to Kearney et al (2006) yields an estimated Relative Risk of 3.14 with a 95% confidence interval of (1.19, 10.46) with associated p-value of 0.01 (TCVSAE endpoint). In fact, the analysis of solely the OA trials in Table 13 yields a Relative Risk of 3.03 with a 95% confidence interval of (1.02, 12.13), and p-value of 0.03 (using the grouped data provided). Thus, this clearly suggests that the elevated risk associated with Vioxx is not restricted to "polyp" patients, but appears, for example, in combined studies of OA patients.

As to the OA trials, I note that Kearney included the 010 trial, which does not appear in Merck's Table 13. Merck's documentations of Protocol 010 (MRK-OS420045791-92) shows that there were two events (both TIAs) under Vioxx, and approximately 15.5 and 7.3 patient-years of exposure to Vioxx and placebo, respectively. Thus the Relative Risk for the primary endpoint of TCVSAE among the Merck OA trial populations is now 3.30 [23/765.0 vs. 4/439.6], with 95% confidence interval (1.13, 13.14), and p-value 0.016. It is noteworthy that the mean duration of exposure to Vioxx or placebo in the OA trials was only 76 days. The appearance of a statistically significant tripling of risk of thrombotic events in the OA trials in such a short duration contradicts the hypothesis that there is no effect for the first 18 months of use of Vioxx. (note that the Relative Risk for

10

the combined OA and RA trials, including 010, yields a Relative Risk of 3.27 with a 95% confidence interval of (1.25, 10.86) and p-value 0.007.)

To determine further consistency of the OA trials data with Protocol 203 results I prepared a Kaplan-Meier cumulative incidence plot of the risk of thrombotic events for Vioxx versus placebo participants, as shown in Figure 9 below. These calculations were based upon the data in Table 13, supplemented by the 010 data (both referenced above), as well as exact event day information from the "Listing of All CV Events in Rofecoxib" (MRK-I8940080121-133, p. 56-68). The log-rank test comparing these cumulative incidence curves yields a p-value of 0.023. The estimated Relative Risk is 5.42 with a 95% confidence interval of (1.26, 23.29). Thus, the OA trials again show a significant separation of the risk of a thrombotic event for Vioxx patients above that for the placebo group, even within the first 60 days of exposure. The consistency of the results displayed in Figures 2 (attached) and 9 (below) demonstrates that the Protocol 203 DAP was correct in its assertion that Protocol 203 results allow generalization to other populations at risk, including osteoarthritis patients.

**FIGURE 9**

OA Trials All Thrombotic Events: 0—60 days of Follow-up



**Data sets used**

In constructing a pooled data set for Protocol 203 from SAS data files provided by Merck I checked to confirm counts of particular events by treatment assignment to compare with published and unpublished reports of these counts. It was my understanding that these data files for APPROVe and ViP were considered complete when provided, and that there was delay in finalizing the VICTOR data set. In the VICTOR information I

11

received in November 2005, there was information on exposure periods, treatment assignment, and adverse event outcomes, in sufficient detail to combine with the other trials. Specifically, in addition to data files on a hard drive, I reviewed copies of Tables 1 and 3 from a MRL memo stamped "Final, July 28, 2005" that showed 14 (Vioxx) versus 4 (placebo) confirmed thrombotic events. These totals exactly matched the counts in the VICTOR data records I received. In addition, the event counts correspond exactly with what is described in Dr. Kim's Expert Witness report of June 1, 2006. In May 2006, I received a CD with files containing apparent update data on VICTOR. I did not find any additional information on adverse events on these files, nor data on identification numbers etc. I therefore did not make any changes to the pooled data set based on this update. In Dr. Kim's deposition, there is reference to one possible additional placebo event for VICTOR (subject #10385). If confirmed, an addition of a single event would make very little difference to my reported analyses of Protocol 203.

In a Merck memorandum regarding the testimony of Dr. Farquhar, the defense counsel argues that analysis of Protocol 203 data is premature, claiming that "The Merck Data Analysis Plan for Protocol 203 contemplated that a combined analysis of cardiac events in all three studies would be conducted only when each study had run its full pre-specified course". This statement is incorrect. The ESMB for Protocol 203 was empowered and directed to perform interim analyses during the course of Protocol 203, and to terminate the trials due to "inferiority" applied to the primary endpoint, confirmed thrombotic cardiovascular events. Here, "inferiority" refers to the occurrence of a sufficiently greater number of adverse thrombotic events in patients assigned to Vioxx as compared to placebo. Specifically, according to the DAP, the "Early Decision for Inferiority" stopping rule required "the lower limit of a CI for HR> 1.0 ... and observed HR >1.30". (Here "CI" refers to a confidence interval and "HR" to the term Hazard Ratio, often referred to as Relative Risk.) My analysis of Protocol 203, based on data accumulated by mid-October 2004, indicates that the combined study would have been terminated early on the basis of this stopping rule, even if it had not been stopped because of the termination of the APPROVe study: the event data accumulated through mid-October 2004 data provides an estimated Hazard Ratio of 1.77 (far greater than 1.30), with the lower limit of the appropriate CI as 1.22, again far higher than 1.0. If all three trials had not been terminated due to the finding of excess toxicity in APPROVe by itself, it would have been the obligation of the ESMB to review the same pooled data that I analyzed, which would have required early termination of Protocol 203 based on the inferiority stopping rule.

In addition, the defense counsel statement contradicts what is stated in the Merck Data Analysis Plan. This plan specifically indicates that the ESMB for Protocol 203 would conduct "numerous (approximately twice yearly) interim analyses to monitor safety, which afford potential for consideration of early decision to report scientific conclusions, i.e. publish results" (p. 9). Even more directly, the DAP stated unequivocally that "The combined analysis for formal primary assessment of the primary hypothesis will be performed when the total number of confirmed thrombotic cardiovascular events ... reaches 611 in the three trials combined. It is anticipated that the 611 confirmed thrombotic events will be reached in early 2006, which is after completion of APPROVe and prior to study completion of VICTOR and ViP." Thus, Merck's own plan anticipated publication of results from Protocol 203 in early 2006. Of more importance, the plan

12

anticipated analysis of Protocol 203 data *prior to completion of VICTOR and ViP*. In all regards, these statements indicate that the analysis of Protocol 203 data is overdue rather than premature.

### Effect of Naproxen on Cardiovascular Outcomes

In Dr. Kim's Expert Witness report, he relies on an observational study to establish the protective effect of Naproxen on the rate of thrombotic events, with the assumption that this explains the findings (the deleterious effects of Vioxx) of VIGOR. However, in Kearney et al. (2006), their meta-analysis of NSAID randomized clinical trials show a Relative Risk of 0.92 for a comparison of Naproxen to placebo with a 95% confidence interval of (0.67, 1.26). This fails to exhibit a protective effect for Naproxen.

### Individual Confidence Interval

Dr. Kim's Expert Witness report refers to a confidence interval for the Relative Risk for an *individual*. Defense counsel brought up this subject at the deposition of Dr. Farquhar with reference to the book by Pagano & Gauvreau (2000). This concept is completely inappropriate in a discussion of an increased risk of a cardiovascular event associated with Vioxx. In more detail, Pagano & Gauvreau (2000) are referring to the prediction of a *continuous* outcome for a single individual where it is well known that the confidence interval for a predicted single value is wider than the confidence interval for the population mean. These ideas are not applicable to prediction of a binary outcome such as experiencing a cardiac event or not in a specified window of time. In fact, a binary outcome is either "Yes" or "No" and any prediction would either be "Yes" or "No" depending on the estimated underlying risk of the event for an individual. In most studies such as this where the outcomes are rare (certainly less than 50%) any prediction would have to be "No" whether the individual was exposed to Vioxx or placebo. And there is no such concept then available for the Relative Risk for an individual based on these predicted outcomes. Such a discussion is all beside the point anyway: what we would like to know for a random individual from an appropriate population is: what is the ratio of their estimated risk (of the endpoint of interest) under Vioxx to their estimated risk under placebo. This is, of course, nothing more than the Relative Risk for the population and there is no "widening" of the confidence interval for an estimate of this. It is just this number that been reported by investigators studying Vioxx in their description of risk comparisons.

The generally accepted concept associated with ascertaining how much an individual's risk increases due to exposure to Vioxx is provided by the Attributable Risk. The Attributable Risk quantifies the fraction of cardiovascular outcomes that are *attributable* to exposure to Vioxx in an exposed population. Mathematically the Attributable Risk (AR), among exposed individuals, is related to the cumulative population Relative Risk as follows:

$$AR = \frac{RR-1}{RR}.$$

A confidence interval for *AR* therefore follows directly from a confidence interval for *RR*.

13

**Confidence Intervals Interpretation**

In his Expert Witness Report, Dr. Kim makes the erroneous statement that a "95% confidence interval of 1.19-3.11 (as for all thrombotic events in APPROVe) tells us only that the true relative risk could be as small as 1.19 or as large as 3.11 and does not enable us to assign a probability to either of these two probabilities." (Kim Expert Witness Report, p.6). This error is picked up by defense counsel's questioning of Dr. Farquhar where he asks a question regarding confidence intervals that contains the same misinterpretation. A correct understanding of a 95% confidence interval for the Relative Risk  is as follows: with probability 0.95, the reported confidence interval contains the true unknown Relative Risk. The true value of the Relative Risk is much more likely to fall near the center of the confidence interval than near either endpoint. In fact, the likelihood of the data is more than six times greater at the point estimate of the Relative Risk as compared to the likelihood of the data at either endpoint. In the example used by Dr. Kim, the point estimate of the Relative Risk, 1.92, is *much* more plausible than the estimate 1.2, for example, near the edge of the confidence interval. Similarly, in my analysis of Protocol 203 data, where I estimated the Relative Risk of 2.37 for cardiac events,  associated with exposure to Vioxx, with  a 95% confidence interval of (1.43, 3.91), the value 2.4 is again *much* more plausible as an estimate of the true Relative Risk than the estimate 1.5, for example.


**Book reviews**

My book, *Statistics for Epidemiology*, was published in 2004 before I had any contact with data relating to Vioxx. It has been extremely successful and is used as text in many graduate programs across the world. Reviews were extremely positive. The longest of these (Bellocco, 2005) states that "the book reaches an almost perfect balance between including very advanced concepts, and keeping the discussion at a (sic) acceptable level for intermediate graduate students. I consider it to set a new standard for texts on statistics in epidemiology, especially in its treatment of causation and bias". Professor Sander Greenland, of the University of California, Los Angeles, an international leader in the application of statistics to problems in the health sciences, and a very tough critic, states on the web that this "book is excellent; a real breakthrough in texts on statistics in epidemiology, especially in its attention to causation and bias." My book has now received several citations in medical and epidemiological peer-reviewed journals.


My hourly rate for consulting is $310. I have testified once in the last four years at a deposition in the blood product litigation.




_____              June 21, 2006
Nicholas P. Jewell, Ph.D.                   Date

14

**FIGURE 1**

Protocol 203 All Thrombotic Events: 0—30 days of Follow-up



**FIGURE 2**

Protocol 203 All Thrombotic Events: 0—60 days of Follow-up



**FIGURE 3**

Protocol 203 All Thrombotic Events: 0—120 days of Follow-up



**FIGURE 4**

Protocol 203 All Thrombotic Events: 0—6 months of Follow-up





**FIGURE 5**

Protocol 203 All Thrombotic Events: 0—1 year of Follow-up



19

**FIGURE 6**

Protocol 203 All Thrombotic Events: 0—18 months of Follow-up



**FIGURE 7**

Protocol 203 All Thrombotic Events: 0—2 years of Follow-up



**FIGURE 8**

Protocol 203 All Thrombotic Events: 0—3 years of Follow-up



# EXHIBIT  D

MK-0966 CV Outcomes Data Analysis Plan

# Statistical Data Analysis Plan

## A Combined Analysis of Thrombotic Cardiovascular Events in 3 Placebo-Controlled Studies of Rofecoxib

### (Study 203)

**Prepared by**

**Jennifer Ng - Clinical Biostatistics**

**Jim Bolognese - Clinical Biostatistics**

**CONFIDENTIAL, PROPRIETARY PROPERTY OF MERCK & CO., INC.**

RA404.DOC  VERSION 10.1 APPROVED                                             09-Jan-2004
Restricted ✿ Confidential – Limited Access

Confidential – Subject To Protective Order

PLAINTIFF'S
EXHIBIT

tobbler

MRK-AFL0015451

MK-0966 CV Outcomes Data Analysis Plan

# Data Analysis Plan

## A Combined Analysis of Thrombotic Cardiovascular Events in 3 Placebo-Controlled Studies of Rofecoxib

### (Study 203)

## TABLE OF CONTENTS

PAGE

I. INTRODUCTION ........................................................................... 1
  A. Objective of the Data Analysis Plan ............................................... 1
  B. Description of the Studies and Objectives/Hypotheses ........................... 1
    1. Study Summaries ............................................................. 1
    2. Objective of the Combined Analysis .......................................... 3
    3. Hypotheses for the Combined Analysis ........................................ 3
II. STUDY PARTICIPANTS CHARACTERISTICS ................................................ 4
III. SAFETY ANALYSES .................................................................. 4
  A. Endpoints for Analysis .......................................................... 4
  B. Populations for Analysis ........................................................ 5
    1. Per-Protocol ................................................................ 6
    2. Modified Intention-to-Treat (mITT) .......................................... 6
  C. Approaches to Safety Analysis ................................................... 6
    1. Approach to the Analysis of Non-Inferiority of Rofecoxib
       to Placebo (Primary Hypothesis) ............................................. 6
    2. Approach to the Analysis of Superiority of Rofecoxib to
       Placebo (Secondary Hypothesis) .............................................. 7
  D. Definition of Compliance Measure ................................................ 7
IV. STATISTICAL TECHNICAL ISSUES ...................................................... 8
  A. Planned Statistical Power and Sample Size ....................................... 8
  B. Planned Analyses and Early Decisions ............................................ 9
    1. Early Decision for Inferiority ............................................. 10
    2. Early Decision for Noninferiority .......................................... 11
    3. Early Decision for Superiority ............................................. 12
    4. Roles and Responsibilities of the ESMB ..................................... 14
  C. Blinding/Unblinding ............................................................ 14
  D. Statistical Methods ............................................................ 16
    1. General Approaches ......................................................... 16
    2. Check of Model Assumptions ................................................. 17
    3. Sensitivity and Dropout Analyses ........................................... 18
      a. Sensitivity Analyses .................................................... 18

RA404.DOC VERSION 10.1 APPROVED
Restricted ✥ Confidential – Limited Access
09-Jan-2004

Confidential - Subject To Protective Order

MRK-AFL0015452

MK-0966 CV Outcomes Data Analysis Plan

## TABLE OF CONTENTS

PAGE

b.  Dropouts................................................................................19
4.  Dissemination of Results ...................................................19
E.  Multiplicity ...............................................................................19
F.  Subgroup Analysis....................................................................20
V.  GROUND RULES FOR ANALYSIS ............................................21
A.  Time of Censoring for Patients Without Events ........................22
B.  Definition of Baseline Value and Treatment Period...................22
C.  Description of Data Handling Procedures Prior to Analysis ........22
VI.  PRESENTATION AND FORMAT OF RESULTS .........................23
A.  Data Format ..............................................................................23
B.  Sample CSR Tables and Graphs................................................23
VII.  DATASETS/PROGRAMS/VARIABLES ......................................23
A.  Naming and Storage Conventions of Datasets, Programs, and
Variables ...................................................................................23
B.  Documentation/Validation of Programs ....................................24
VIII.  REFERENCES ............................................................................25
IX.  APPENDICES ..............................................................................27

RA404.DOC  VERSION 10.1 APPROVED                                                09-Jan-2004
Restricted ✪ Confidential – Limited Access

Confidential – Subject To Protective
Order
MRK-AFL0015453

MK-0966 CV Outcomes Data Analysis Plan                                    i

# EXECUTIVE SUMMARY

## Background

This Data Analysis Plan addresses issues and provides details pertaining to the statistical methods that will be used to address the objectives stated in VIOXX™[1] Protocol 203 for the combined analysis of thrombotic cardiovascular events in 3 placebo-controlled trials of VIOXX™: "A Multicenter, Randomized, Parallel-Group, Placebo-Controlled, Double-Blind Study With In-House Blinding to Determine the Effect of 156 Weeks of Treatment With MK-0966 on the Recurrence of Neoplastic Polyps of the Large Bowel in Patients With a History of Colorectal Adenomas" (Protocol 122; APPROVe); "A Double-Blind, Randomized, Placebo-Controlled, Multicenter Study to Evaluate the Effect of Rofecoxib in Decreasing the Risk of Prostate Cancer" (Protocol 201; ViP); and "VIOXX™ in Colorectal Cancer Therapy: Definition of Optimal Regime" (Protocol 145; VICTOR). APPROVe and ViP are being conducted by Merck and Co., Inc.; VICTOR is being conducted by Oxford University and sponsored by Merck.

Previous studies with rofecoxib showed a difference in the incidence of thrombotic cardiovascular events versus naproxen but no difference from other NSAIDs or from placebo. The combined analysis of thrombotic cardiovascular serious adverse experiences (SAEs) described in this DAP has been proposed to provide increased precision on estimates of the comparability between rofecoxib and placebo on the incidence of thrombotic cardiovascular SAEs. A placebo-controlled study can assess the effects of selective COX-2 inhibition, in contrast to an active-controlled study which assesses relative risk to a comparator agent. Data from 3 large placebo-controlled studies are being combined because of the rarity of these events. Rofecoxib is indicated for patients with osteoarthritis and rheumatoid arthritis. However, the chronic nature of these diseases and the need for chronic therapy limits the duration of placebo-controlled studies in these populations. Rofecoxib is also being studied for the suppression of neoplastic cell growth in various indications. Accordingly, this combined analysis is based on data from 3 large placebo-controlled studies of rofecoxib in patients at risk of recurrent sporadic adenomatous colon polyps, recurrent colon cancer, or prostate cancer. All 3 studies allow the use of low-dose aspirin (75 to 100 mg/day) for chronic vascular protection in patients with a past medical history of either cerebrovascular accident, transient ischemic attack, myocardial infarction, unstable or stable angina, coronary artery bypass grafting, or percutaneous coronary interventions. It is anticipated that 10 to 20% of patients in the 3 studies combined will be taking low-dose aspirin cardiovascular prophylaxis, allowing for an assessment in patients with a spectrum of cardiovascular risk. Furthermore, patients in these studies will be comparable in age to patients with osteoarthritis or rheumatoid arthritis, allowing generalization of the results of this analysis to other populations, including those with osteoarthritis or rheumatoid arthritis.

---

[1] VIOXX is a trademark of Merck Co., Inc., Whitehouse Station, New Jersey, U.S.A.

Confidential - Subject To Protective Order

MRK-AFL0015454

MK-0966 CV Outcomes Data Analysis Plan                                          ii

The objective of the study (Protocol 203) is to compare the cardiovascular safety of rofecoxib 25 mg to that of placebo in patients at risk of sporadic adenomous colon polyps, recurrent colon cancer, or prostate cancer. The primary hypothesis of the study is that rofecoxib 25 mg will be non-inferior to placebo in the risk of developing a confirmed thrombotic SAE (i.e., upper limit of a 95% confidence interval [CI] for the hazard ratio [HR, rofecoxib/placebo], will be less than 1.30). In addition, because some data suggest that COX-2 inhibition might reduce the risk of a thrombotic event by an anti-inflammatory effect on atheroma formation and rupture, the possibility that rofecoxib might reduce the risk of such events will also be examined. The secondary hypothesis of the study is that patients treated with rofecoxib 25 mg once daily will have decreased risk of developing a confirmed thrombotic cardiovascular SAE relative to placebo (i.e., upper limit of a 95% CI on the HR <1.0 and lower limit <0.77). This hypothesis will be evaluated in a stepwise fashion if non-inferiority is first established. Investigator-reported cardiovascular events are categorized according to the Standard Operating Procedure (SOP) for surveillance, monitoring, and adjudication of acute thromboembolic vascular events in clinical trials of COX-2 inhibitors [1].

## Statistical Analyses and Power

Non-inferiority will be established if the upper limit of a 95% CI for hazard ratio is less than 1.30. Assuming a true underlying HR of 1.00, approximately 611 confirmed thrombotic cardiovascular SAEs need to be observed to provide 90% power to yield an upper limit of a 95% CI for HR <1.30. With 611 observed events and approximately 38,000 patient-years of exposure from the combined studies, an observed HR of less than approximately 1.12 (i.e., an observed rofecoxib rate of less than approximately 12% higher than that of placebo), depending on the actual event and study discontinuation times of the individual patients, would yield the upper limit of a 95% CI <1.30.

The primary analysis population to address the primary hypothesis of non-inferiority will be per-protocol. In the per-protocol approach, patients with clinically important deviations will be excluded from the analysis. The primary analysis population to address the secondary hypothesis of superiority will be modified intention-to-treat, i.e., all patients randomized who took at least one dose of study drug. Events that occur after randomization and within 14 days of the last dose of study medication will be included in both populations. Sensitivity analyses will be performed by including reports of confirmed thrombotic cardiovascular SAEs up to 28 days after the last dose of study medication.

Based on these design specifications, the combined analysis for formal primary assessment of the primary hypothesis will be performed after observing the first 611 confirmed events from the 3 studies that satisfy the per-protocol definition. Current timelines predict that the complete results from one of the studies (APPROVe) will be available before the accrual of 611 confirmed events and that 2 of the studies (VICTOR, ViP) will still be ongoing when the 611 events have been accrued. However, the primary assessment will be based on the first analysis, as soon as feasible after the first

Confidential - Subject To Protective Order                                          MRK-AFL0015455

611 confirmed thrombotic cardiovascular SAEs that satisfy the per-protocol definition are observed. Subsequent analyses to obtain later estimates of HR with 95% CI will be obtained after every approximately 25% increase in events and again after the conclusion of ViP and of VICTOR. APPROVe is estimated to contribute approximately 130 events (less than 22% of the total number of events); thus, its completion prior to the primary analysis will have little influence on the ultimate results.

For all time-to-event endpoints, survival analytic methods will be used to evaluate the time to first event during the study period. The analysis will be based on a Cox proportional hazards model to compare survival curves between treatment groups. The model will include the following factors: treatment (rofecoxib/placebo), chronic low-dose aspirin use (yes/no), and protocol (122, 145, or 201). Note that chronic low-dose aspirin is assessed at randomization. Interactions will be explored as sensitivity analyses. The hazard ratio between the 2 treatment groups (rofecoxib/placebo) will be estimated and the corresponding CI, adjusted for interim analyses, will be computed and compared to 1.30 to assess the primary hypothesis. The 95% CIs around the estimated HR along with event rates per 100 person years will be presented. Sensitivity analysis will be performed by including confirmed cardiovascular events that are reported within 28 days of study drug discontinuation.

Analytical and graphical methods will be employed to verify the proportional hazards assumption. The primary method for testing the proportional hazards assumption will be by including the factor treatment*log(time) in the model; nonsignificance (p>0.050) of this factor implies proportionality, i.e., constancy of treatment effect over time. Additionally, the log HR will be plotted over time by stratifying time into intervals containing approximately the same number of events within each interval. The log hazard ratio within each successive 6-month time interval with confidence limits will also be calculated and plotted. Such plots will provide an indication of any time effect on the HR. If these approaches indicate issues that warrant further assessment, additional analyses will be undertaken to investigate the causes of nonproportionality.

Finally, Kaplan-Meier plots of cumulative rates over time and nonparametric methods such as the log-rank test will be utilized to compare the survival curves.

### Interim Analyses

The cardiovascular data from the 3 contributing studies are monitored by an independent External Data and Safety Monitoring Board (ESMB). The same ESMB is also responsible for the monitoring of overall study data from 2 of the studies contributing to this analysis, ViP and APPROVe. Overall study data from the third study, VICTOR (Protocol 145), is monitored by a separate ESMB. It is anticipated that there will be numerous (at least twice yearly) looks at cardiovascular safety. All study personnel (with the exception of the ESMBs for each study and the designated unblinded MRL statisticians for Protocols 122 and 201) will remain blinded to treatment assignment throughout the study (i.e., until each study is completed and officially unblinded). As

Confidential - Subject To Protective Order

MK-0966 CV Outcomes Data Analysis Plan                                                    iv

with any monitored study, the ESMB may consider an early decision to report scientific conclusions, i.e., publish results and/or provide results to regulatory agencies. Note that in the event of an early decision for scientific conclusion based on the combined analysis, the 3 individual studies may continue in order to assess risk-benefit in each respective indication based on the ESMB assessment. A total of 4 interim analyses prior to the primary analysis of 611 confirmed events is anticipated. ESMB evaluations of the safety data will begin when ~25% of the event time has accrued and continue approximately semi-annually thereafter (based on the number of events and the fraction of the total information), i.e., 4 interim analyses plus the primary analysis. Interim analyses will not begin until ~25% of the event time has accrued because enrollment projections from ViP and VICTOR suggest that there will be only a small number of events that are not from APPROVe prior to that time (and events from APPROVe are already being monitored by its ESMB).

The $\alpha$-spending function proposed by Hwang et al. [2] with $\gamma$=-4 will be used at the interim analyses to preserve the overall Type I error. This gamma family of the $\alpha$-spending rate function provides conservative boundaries at the initial interim analyses. At each analysis, the CIs will be constructed by using the early decision/stopping boundaries obtained at the time when actual analysis is performed. There are no prespecified plans to stop the trial due to non-inferiority of rofecoxib in comparison to placebo with respect to confirmed thrombotic cardiovascular SAEs based on interim analyses. However, if the ESMB should decide to make an early decision due to the importance of study patients' safety, the early decision rules described below will be considered when making a decision regarding the conduct of this trial.

Early Decision for Inferiority: An early decision/conclusion for inferiority would require the lower limit of a CI >1.0 at overall one-sided $\alpha$=0.025 and an observed HR >1.30.

Early Decision for Superiority: An early decision/conclusion for superiority requires the upper limit of a CI <1.0 at overall $\alpha$=0.001, one-sided. This is a stringent criterion and the probability of crossing the stopping boundaries for superiority is negligible. This level of stringency is desirable when the intent of the trial is to provide compelling results of safety and/or efficacy. There are no plans for an early decision to conclude superiority.

Early Decision for Noninferiority: An early decision/conclusion for noninferiority requires upper limit of a CI <1.20 at overall one-sided $\alpha$=0.001. Estimated HRs which satisfy this rule are all less than 0.91 at the interim analyses. The rationale for this level of stringency is that numerous (at least twice a year) interim analyses to monitor safety will be conducted for the ESMB and if there is to be an early decision for non-inferiority, the level of rigor should be similar to that proposed for early decision for superiority.

Although there are no plans for an early decision to conclude non-inferiority of rofecoxib in comparison to placebo with respect to confirmed thrombotic cardiovascular SAEs

Confidential - Subject To Protective Order                                                    MRK-AFL0015457