UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| **This document relates to** | * | **JUDGE FALLON** |
| **Case No. 05-2524** | * | |
| | * | **MAGISTRATE** |
| **ANTHONY WAYNE DEDRICK,** | * | **JUDGE KNOWLES** |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

---

**PLAINTIFF'S RESPONSE TO MERCK'S
MOTION FOR ORDER EXCLUDING TESTIMONY OF
IRA J. GELB, M.D.**

---

Plaintiff, Anthony Wayne Dedrick, by and through his counsel of record, submits this Response to Merck & Co., Inc.'s Motion for Order Excluding Testimony of Ira J. Gelb, M.D., and in support hereof states as follows:

## Introduction

Merck seeks to exclude the testimony of a "nationally renowned"[1] board-certified cardiologist who has devoted over 50 years of his life to the study of the field of cardiology. Dr. Ira J. Gelb, following his tenure as a medical officer in the United States Army, began the practice of cardiology, both as a practicing clinician and a teacher of medical students and others. Dr. Gelb has served in leadership positions with the American Heart Association ("AHA") since

---

[1] Merck's own counsel, referencing a magazine article in which Dr. Gelb was quoted, referred to Dr. Gelb as a "nationally renowned physician." See depo of Dr. Gelb at 22.

1960, and continues to occupy leadership positions with the AHA.   Dr. Gelb, a co-author of a variety of cardiovascular-related articles and contributor to textbooks and treatises, was recently invited to China to speak on COX-2 inhibitors and coronary artery disease based upon this expertise and knowledge in this area.   Dr. Gelb has also spoken at other functions on COX-2 inhibitors and their role in causing cardiovascular events.   Further, since 1969, Dr. Gelb has served on the editorial board of widely recognized publishers of cardiology articles:   American Journal of Cardiology; Journal of American College of Cardiology; and Cardiology.   Dr. Gelb continues to maintain staff privileges at the Boca Raton Community Hospital and sees patients in his teaching role.   (See Exhibit "A" – depo of Dr. Gelb at 26, 70-74; Exhibit "B".)

Despite his substantial credentials, Merck attacks Dr. Gelb's testimony on a number of fronts, as addressed in more detail herein.   Based upon his expertise, training and education as a clinical cardiologist, based upon his review of the medical records and history of Plaintiff Dedrick, based upon his review of literally hundreds of medical and scientific articles related to COX-2 drugs, based upon his review of FDA documents, based upon his review of the expert reports of others in the Vioxx litigation, and based upon his review of hundreds and thousands of pages of other materials – Dr. Gelb has opined in his Expert Witness Report and in his deposition testimony proffered in this case that:  (1)  Vioxx was the cause or a substantial contributing cause to the acute myocardial infarction suffered by Plaintiff Dedrick on January 8, 2003; (2) Vioxx was prothrombotic, in that the drug affected the prostacyclin-thrombaxane balance in the body, tilting the body toward a prothrombotic state; acted as a vasoconstrictor; accelerated the rate and formation of atherosclerosis; and contributed to plaque rupture or failed to minimize the severity of a plaque rupture and clot formation based upon the known inhibition of prostacyclin; and (3) Merck failed to adequately warn the medical community and patients who took Vioxx prior to

January 8, 2003 of the known risks and dangers associated with the drug, by both failing to state the seriousness of the risks associated with the drug and by providing false and incorrect information to national medical journals and the national press.  (See Expert Report of Ira Gelb, M.D. attached hereto as Exhibit "B"; depo of Gelb at 244-52.)

Materially, in his deposition, Dr. Gelb testified:

(1)    He reviewed the literature relating to Vioxx essentially from the time it was published and thereafter kept current on the literature.  He studied the literature in his role as a cardiologist and as one who keeps current on the literature related to his field of expertise, and not as a retained expert witness (Exhibit "A" -- depo of Dr. Gelb at 61-62; 89-90);

(2)    Vioxx is a thrombogenic and atherogenic drug because it inhibits prostacyclin, and it also contributes to plaque rupture (depo of Gelb at 202-03);

(3)    He treated countless patients with coronary artery disease in his lengthy cardiology practice and based upon his experience coronary artery disease is typically a chronic disease process but can be an acute event (depo of Gelb at 100-01);

(4)    There is no indication that Plaintiff Dedrick suffered a heart attack prior to January 8, 2003 (depo of Gelb at 155, 178);

(5)    Plaintiff Dedrick's known risk factors contributed to his atherosclerosis and his heart attack, but Vioxx was also a risk factor which substantially contributed to his heart attack, and without his Vioxx ingestion he would not have had the heart attack on January 8, 2003 (depo of Gelb at 157-63);

(6)    Plaintiff Dedrick's ingestion of Vioxx accelerated his development of atherogenesis during the six months he took the drug (depo of Gelb at 163), and the fact that he

did not have abnormal electrocardiograms[2] ("ECG") over the years preceding his heart attack might indicate that he did not have advanced coronary artery disease, and to the extent he may have had some coronary artery disease it was asymptomatic prior to his ingestion of Vioxx (depo of Gelb at 176-77);

(7)     Bypass surgery was warranted in Plaintiff Dedrick because "[h]e had a heart attack, and the angiogram demonstrated he had significant obstructive coronary artery disease, with a thrombus, post-thrombolysis, and he demonstrated with wall motion abnormalities" (depo of Gelb at 187-89);

(8)     Plaintiff Dedrick's heart attack on January 8, 2003 was the result of a thrombus formation in the right coronary artery, which was confirmed by Plaintiff's invasive cardiologist, Dr. Koenig (depo of Gelb at 191, 207);

(9)     The unusually large thrombus observed on Plaintiff Dedrick's film is additional evidence that the thrombus was caused by Vioxx and that Vioxx was a substantial contributing factor in the thrombus formation and resulting heart attack (depo of Gelb at 201);

(10)     Plaintiff Dedrick had an abnormal ejection fraction postoperatively which, along with the anterolateral changes shown on his 2003 ECG, indicate he suffered long-term and permanent heart muscle damage; Plaintiff Dedrick also had a recent ejection fraction of less than 50 percent and wall motion abnormalities (depo of Gelb at 220-23, 229-30, 238-40);

(11)     Plaintiff Dedrick's quality of life and life expectancy has been reduced because of the Vioxx-related myocardial infarction that he suffered on January 8, 2003 (depo of Gelb at 153, 241-42);

---

[2] Dr. Gelb did acknowledge that there was one prior abnormal ECG, but he felt that reading was not accurate based upon subsequent normal ECGs.

(12)    It is important for doctors to be informed of the risks associated with a drug so that they can intelligently make decisions about whether a drug is safe to give to their patients; Merck should have included a cardiovascular warning in its 2002 label (depo of Gelb at 132-33, 318-22);

(13)    It is important for scientists who submit articles to peer-review journals to submit complete and accurate information.  In regard to the cardiovascular risks associated with Vioxx, Merck failed to submit important and critical data to the scientific journals (depo of Gelb at 140-42, 309-11, 322-23).

### Materials Submitted In Support Hereof

Exhibit A – Deposition of Ira J. Gelb, M.D. (October 12, 2006)

Exhibit B – Declaration of Ira J. Gelb, offered in support hereof, with attachments:

> B-1:    Curriculum Vitae of Ira J. Gelb, M.D.
>
> B-2:    Billing statements of Ira J. Gelb, M.D.
>
> B-3:    Expert Witness Report of Ira J. Gelb, M.D.
>
> B-4:    Slide presentation on COX-2 Inhibitors prepared by Ira J. Gelb, M.D.

Exhibit C – Selected portions of the deposition of Paul Roach, M.D. (October 26, 2006)

### Legal Standards

This Court has had the opportunity to review countless *Daubert* motions in this litigation. As the Court has indicated previously:

> "Scientific testimony is reliable only if 'the reasoning or methodology underlying the testimony is scientifically valid,' meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known.."

*In re Vioxx Products Liability Litigation*, 401 F. Supp. 2d 565, 573 (E.D. La. 2005).  It is well-recognized that the focus of a *Daubert* analysis "is not on the result or conclusion, but on the

methodology," *id*, citing *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 275-76 (5th Cir. 1998), and "[t]he proponent need not prove that the expert's testimony is correct, but must prove by a preponderance of the evidence that the methodology used by the expert was proper." *In re Vioxx* at 573. The ultimate resolution of the "validity or correctness of the conclusions is for the fact finder to determine." *Id* at 574.

The Court in exercising its "gatekeeper" role should consider: (1) whether the expert's preferred opinions are based upon specialized knowledge; (2) whether the expert's preferred opinions would assist the trier of fact; (3) whether the expert is appropriately qualified; and (4) whether the opinions expressed by the expert are reliable. See F.R.E. 702, 703; *Daubert v. Merrell Dow Pharmaceuticals, Inc*, 509 U.S. 579, 591 (1993).

In determining whether the expert's stated opinions are reliable, the court should consider: (1) whether the testimony is based upon sufficient facts or data; (2) whether the testimony is the product of reliable principles and methods; and (3) whether the witness has applied the principles and methods reliably to the facts of the case. *Daubert* at 591. Of importance, the facts or data relied on by the expert need not themselves be admissible. Indeed, experts commonly rely on books, articles and published data in their field of expertise and apply their education, training and experience to the interpretation and application of that information in forming their opinions. See F.R.E. 703; *LaCombe v. A-T-O, Inc.,* 679 F.2d 431, 436, n. 5 (5th Cir. 1982). See also *Dickenson v. Cardiac & Thoracic Surgery of Eastern Tenn.,* 388 F.3d 976, 980-981 (6th Cir. 2004) (expert opinion which lacks published support does not warrant exclusion of the opinion, but the lack of support goes to the weight, not admissibility). Further, the methodology is reliable if the expert has "good grounds" for the opinion, i.e., the opinion is based on knowledge and experience in the specialty and not on "subjective belief or unsupported

speculation." *Daubert* at 589. As explained in *Daubert* and by this Court in *In re Vioxx*, there is

no definitive "checklist or test" for determining the reliability of the methodology, but there are

factors to be considered, including:

- Whether the methodology can be and has been tested;

- Whether the methodology has been subjected to peer review;

- Whether there is a known potential rate of error;

- Whether there are standards controlling the technique used; and

- Whether a known technique is generally accepted in the relevant scientific
  community.

*Daubert,* supra*; In re Vioxx*, supra*; Black v. Food Lion, Inc.,* 171 F.3d 308, 314 (5th Cir. 1999);

*Curtis v. M&S Petroleum, Inc.,* 174 F.3d 661, 669 (5th Cir. 1999). Even if "a small part of the

basis" of an expert's opinion is believed to be unreliable, the Court still may not exclude the

expert's opinion. *In re Paoli RR Yard PBC Litigation*, 35 F.3d 717 (3rd Cir. 1994).

The Court may also consider issues such as the temporality of the exposure with the

resulting event and the question of whether there are any reasonable explanations for the event.

See, e.g., *Pipitone v. Biometrix, Inc.*, 288 F.3d 239, 248 (5th Cir. 2002). The *Pipitone* court

discussed *Daubert* at great length, taking particular note not only of the rigorous requirements of

*Daubert*, but also that "the trial court's role as gate keeper is not intended to serve as replacement

for the adversary system. Rather, as *Daubert* makes clear, '[v]igorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof are the

traditional and appropriate means of attacking shaky but admissible evidence.'" *Id* at 250, citing

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 596 (1993).

7

Similarly, in *Curtis,* 174 F.3d at 670, the expert scientist relied upon the manufacturer's Material Data Safety Sheet and the Occupational Safety and Health Administration's standards on Benzene, both of which listed the effects of inhalation and dermal exposure to Benzene as being similar to the symptoms experienced by the plaintiffs.   The expert also referred to a toxicological profile published by the federal government which contained information concerning epidemiological studies of the toxicity of Benzene as well as the discussion by the United States Supreme Court of the harmful effects of Benzene in *Industrial Union v. American Petrol, Inst.,* 448 U.S. 607 (1980).   The challenged expert scientist observed that there was a strong temporal connection between the exposure to the Benzene and the plaintiffs' symptoms. In finding that "both scientific literature and strong circumstantial evidence support the causal connection", the Court observed that "a temporal connection is entitled to greater weight when there is an established scientific connection between exposure and illness or other circumstantial evidence supporting the causal link."  *Curtis* at 70, citing *Cavallo v. Star Enter*, 892 F.Supp. 756 (E.D. Va. 1995).

## Argument

Merck contends that Dr. Gelb is not qualified to opine about general causation because (1) he is unable to cite any reliable evidence that the use of Vioxx at 25 mg for six months causes heart attacks, and (2) he was unable to state a specific mechanism of action to support his opinion that Vioxx caused Plaintiff Dedrick's heart attack.   These claims are baseless.   Dr. Gelb's opinions about both issues are supported by the facts, evidence and testimony in this cause.

**A.     Dr. Gelb is eminently qualified to render an opinion about causation.**

Merck challenges Dr. Gelb's qualifications on a number of fronts, contending that he has no clinical experience with Vioxx, that he has studied the issues related to his opinions for too short of a time, and that he has not published on the issues of thrombaxane-prostacyclin imbalance or COX-2 inhibitors.

To the contrary, Dr. Gelb is eminently qualified to testify about the issues set forth in his Expert Witness Report.  He has devoted over two-thirds of his life to the study of cardiology – as a practicing clinician, a teacher of medical students, an active participant and leader in the American Heart Association, and keeping abreast of the literature.  Dr. Gelb has specifically lectured on COX-2 inhibitors and their role in increasing heart attacks at an international conference in China and at domestic conferences.  He has also put together materials explaining the process to others.  (See Exhibit "B-4" attached hereto.)  Dr. Gelb has also put in over 100 hours in the review of studies and materials in this case alone, not to mention the time he has put in reviewing literature and materials on his own.  As Dr. Gelb testified, he has put in countless hours reviewing literature.  Further, Dr. Gelb has been a contributor to cardiology texts and treatises, has published numerous articles on the heart and its processes, and by the very nature of his teaching and practice, has remained current on the anatomy of the heart and cardiovasculature.  (See Exhibit "B".)

Merck's contention that Dr. Gelb is not qualified to offer opinions in this cause is without merit.

**B.     The opinions rendered by Dr. Gelb are reliable and are supported by ample scientific evidence and data.**

Merck next contends that Dr. Gelb's opinion that Vioxx caused or substantially contributed to Plaintiff Dedrick's heart attack is due to be excluded because, Merck argues, Dr.

Gelb could not point to a clinical trial that shows a statistical significant finding that Vioxx 25 mg for six months or less causes heart attacks.

First of all, there is ample evidence that Vioxx usage at 25 mg for six months or less statistically increases the rate of cardiovascular events. Rather than restate that evidence, Plaintiff Dedrick would refer the Court to the Plaintiff's opposition to the *Daubert* challenge of Plaintiff's epidemiologist, Donna Arnett, Ph.D., filed this same date. Summarily, the data shows compelling evidence that the effects of the drug are immediate and continuing.

With respect to causation in this case, Dr. Gelb testified:

> Q.    Now, you also believe Vioxx was a risk factor that contributed to his heart attack, correct?
>
> A.    Yes.
>
> . . . .
>
> Q.    Just like the other risk factors, would you say that if Mr. Dedrick had not taken Vioxx, it's possible he would have had the heart attack anyway?
>
> A.    Not at that time.
>
> Q.    Okay. So, is it your testimony as a matter of medical certainty, he wouldn't have had the heart attack at that time if he had not taken Vioxx?
>
> A.    I would say more likely than not, he wouldn't have had the heart attack [on] January 8, 2003, nor would it have been as extensive, as was demonstrated, in 2003.
>
> Q.    Well, if he had not been a smoker, would he have had the heart attack on January 8[th]?
>
> A.    No. Because he could have, but more to the point, his Vioxx was a major contributing factor to this man's acute episode in January 8, 2003.
>
> Q.    Okay. So, can you say that if he had eliminated smoking, if he had not been a smoker, that the heart attack would not have happened on January 8[th]?
>
> A.    Was he taking Vioxx?

Q.      Everything else the same. Take away the smoking.

A.      He would have still had the heart attack on January 8, 2003 by virtue of the fact he had the other risk factors and aggravated it by taking the Vioxx.

           . . . .

Q.      Well, you said if you took smoking out of the mix, he still would have his heart attack on January 8, 2003?

A.      Smoking – they all attribute.  You treat the whole patient…. You don't treat a risk factor.  You treat the whole patient.
           And this whole patient had all the risk factors we outlined, but, unfortunately, for him, he began Vioxx six months earlier, and that accelerated his atherogenesis and thrombogenesis and coronary vasoconstriction, resulting in the acute myocardial infarction in January 2003.

           . . . .

A.      And by taking Vioxx, that aggravated his underlying atherogenesis because you know … smokers have a higher level of thrombaxane and prostacyclin.  And so when you eliminate prostacyclin by virtue of taking Vioxx, you're leaving a higher level of thrombaxane, atherogenesis, and coronary vasoconstriction.

(Depo of Gelb at 162-63.)

There is a substantial body of scientific and epidemiological evidence that Vioxx, at varying dosages, has an immediate and continuing effect on the cardiovasculature, resulting in immediate and serious events in some people.  The drug is known to act in a number of ways to cause, contribute and lead to heart attacks, including being prothrombotic in nature.  Dr. Gelb testified in his deposition that he was relying on more than 200 scientific articles, and he provided a list of the articles, along with copies thereof to Merck.  These studies included Merck's randomized clinical trials, meta-analyses, observational studies, animal studies, and others.  (See list of exhibits attached to Dr. Gelb's curriculum vitae.)  Dr. Gelb further testified that his opinions were based upon the Targum and Vilalba FDA reports, the Merck FDA

11

submissions, and the epidemiological studies and reports of Wayne Ray and John Farquhar. Dr. Gelb testified to the extent asked in his deposition, about the articles he had reviewed and relied upon. Dr. Gelb specifically testified that his opinions were based upon the VIGOR study; the APPROVe study; the protocol 203 combined analysis; the 023 urine metabolite study, the 1998 Merck Advisory Committee minutes which confirmed the believed mechanism of actions for Vioxx;[3] the excess event numbers and rates compiled and analyzed by the FDA review officers, consistently finding signals from not only VIGOR, but also 090, the Alzheimer's studies, ADVANTAGE, and other randomized clinical trials, both short and long-term; and the reports and opinions of other expert witnesses in this field.[4] VIGOR itself was a 9-month study, with a statistically significant difference of 5:1 between Vioxx and the comparator naproxen. Similarly, 090 and ADVANTAGE were studies lasting less than six months, further verifying that the adverse cardiovascular effects of Vioxx were immediate and continuing.[5]

Defendant Merck's attempt to exclude Dr. Gelb's testimony because he could not point to a placebo-controlled randomized clinical trial that showed a statistically significant difference is meritless. It is well established that a scientist may look to the entire body of evidence on a drug to base his opinions related to general causation. Dr. Gelb, like many other physicians involved in the Vioxx litigation, has done just that.

---

[3] A scientist may reasonably rely upon the statements of a party in formulating his opinions. See F.R.E. 801(d)(2)(A); *Donlin v. Aramark Corp.*, 162 F.R.D. 149, 150 (D. Utah 1995) (party's statement regarding causation is admissible as an admission, even though it is in the form of an opinion). Accord *Owens v. Atchison-Topeka & Santa Fe Ry. Co.*, 393 F.2d 77, 79 (5th Cir. 1968).

[4] Experts may rely upon the opinions of other experts and their independent consultations with other experts, even if those opinions are based upon hearsay or not otherwise admissible. See F.R.E. 703; *LaCombe v. A-T-O, Inc.*, 679 F.2d 431, 436, n. 5 (5th Cir. 1982); *Lewis v. Rego Co.*, 757 F.2d 66,73 (3rd Cir. 1985); *Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1988); *United States v. Brown*, 299 F.3d 1256-57 (11th Cir. 2002). Experts may even rely upon calculations done by other experts or consultants. See *Triton Corp. v. Hardrives, Inc.*, 85 F.2d 343, 346 (8th Cir. 1996).

**C.    Dr. Gelb's opinions relative to mechanism of action are based upon adequate science and data and are supported by the opinions of numerous other medical experts and peer reviewed literature.**

Next, Defendant Merck seeks to exclude the opinions of Dr. Gelb that Vioxx is prothrombotic, atherogenic, increases the risk of plaque rupture, and is vasoconstrictive.   In addition to the testimony set forth above, Dr. Gelb testified:

> Q.    Now, you say Vioxx is a thrombogenic drug.  Do you mean that Vioxx spontaneously caused a thrombus to form?
>
> A.    Vioxx contributes to thrombogenesis.    What causes thrombogenesis, in this case, because of the fact that it eliminated the – essentially eliminated the prostacyclin, which is anti-thrombogenic, and allowed thromboxane, which is thrombogenic, coronary vasoconstricture, and atherogenic to continue.
>
> Q.    As you use the term 'thrombogenic,' does it mean something different than prothrombotic?
>
> A.    No.
>
> Q.    So is it fair to say that you believe Vioxx contributes to thrombosis, rather than that it causes thrombosis to happen where it otherwise would not have happened?
>
> A.    No.  What I say is that Vioxx allows thromboxane, which is prothrombotic, which is vasoconstricter, which is atherogenic, to continue without the prostacyclin presence which does the reverse.
> Prostacyclin is a coronary vasodilator, and it also reduces thrombogenecity.
>
> Q.    . . . .
> But you understand the distinction I'm making between prothrombotic, something that is prothrombotic, which you said it doesn't stop the thrombus from happening, and thrombogenic, which I take to mean something that causes the thrombus to happen where it otherwise would not have happened?
>
> A.    Thrombus happens because he ruptured a plaque.
>
> Q.    And Vioxx didn't cause the plaque to rupture?

---

[5] Experts may rely upon a wide variety of scientific information to support their opinions, even in the absence of a scientific study that confirms a direct connection between the product and the injury.  See *Glaser v. Thompson Medical Co.*, 32 F.2d 969 (6th Cir. 1994); *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228-29 (9th Cir. 1998).

> A. It contributed to it.
>
> Q. So, in your view, the Vioxx contributed to every aspect of his clot formation?
>
> A. Correct.

(Depo of Gelb at 202-03.)

Again, Dr. Gelb in his deposition provided a list of over 200 studies upon which he has reviewed and studied to support his opinions. Among these studies are peer reviewed articles, including articles authored by Merck employees and paid consultants, that espouse the very mechanisms of action that Merck now challenges. This methodology at reaching a scientifically plausible opinion has been widely accepted by courts and is a valid basis upon which to espouse an opinion under F.R.E. 702 and 703, and under the *Daubert* analysis.[6]

Dr. Gelb's analysis is supported by well-established scientific research. For example, as stated in Hanson, G., *Inflammation, Atherosclerosis, and Coronary Artery Disease,* NEJM, 2005, 352:1685-95 (April 21, 2005): "There are two major causes of coronary thrombosis: plaque rupture and endothelial erosion. Plaque rupture, which is detectable in 60 to 70 percent of cases, is dangerous because it exposes prothrombotic material from the core of the plaque – phospholipids, tissue factor, and platelet-adhesive matrix molecules – to the blood…." Hanson goes on to state: "The balance between inflammatory and anti-inflammatory activity controls the progression of atherosclerosis…."

Similarly, in Rott, D., et al, *Effects of MF-Tricyclic, a Selective Cyclooxygenase-2 Inhibitor, on Atherosclerosis Progression and Susceptibility to Cytomegalovirus Replication in*

---

[6] As this Court noted in its Order and Reasons of August 30, 2006, setting aside the damages verdict in *Barnett v. Merck*, the verdict of the jury on liability was "reasonable" as it related to the evidence presented on the "safety risks," the same evidence at issue in this cause. That the drug Vioxx is cardiotoxic cannot seriously be contested, despite the baseless contentions of Defendant Merck.

*Apolipoprotein-E Knockout Mice*, J. Am. College Cardio., 2003, 41:1812-19 (May 21, 2003), the authors wrote: "The mechanisms responsible for precipitation of acute coronary events derive from plaque instability and plaque rupture. Following rupture, the highly thrombogenic plaque core is exposed to blood within the vessel lumen, resulting in platelet aggregation, thrombus formation, and acute vascular occlusion. Thus, any deleterious effects of selective COX-2 inhibitors on the course of the atherosclerosis could involve three separate processes: 1) *a proinflammatory effect* that accelerates the initiation and chronic progression of the atherogenesis process, and that may induce plaque instability and rupture; 2) *a procoagulant effect* (induced by inhibition of COX-2 mediated expression of the highly antithrombotic PGI2 without concomitant reduction of COX-1 mediated expression of the highly thrombotic thromboxane A2 that precipitates an acute coronary syndrome; and 3) *a pro-proliferative effect* that could increase lesion size through accumulation of SMCs."

A clear statement of the substantial body of evidence supporting the cardiotoxicity of Vioxx is found in the peer reviewed article Grosser, T., *Biological basis for the cardiovascular consequences of COX-2 inhibition: therapeutic challenges and opportunities*, J. Clin Invest, 2006, 116:4-15: "In summary, a substantial body of evidence has accumulated that [one] mechanism, suppression of COX-2-dependent PGI2 formation, can both augment the response to thrombotic and hypertensive stimuli and initiate and accelerate atherogenesis." Dr. Grosser, joined by Dr. FitzGerald and other scientists, noted that the first signal of the cardiotoxicity of COX-2 inhibitors, was seen in VIGOR, and observed that the results of VIGOR strongly point to a prothrombotic effect of Vioxx. The authors walked through other significant studies, which further confirm increased cardiovascular risk associated with Vioxx.

15

Dr. Gelb made clear that the statistically significant findings of VIGOR and APPROVe alone establishes the cardiotoxic nature of Vioxx, i.e., that Vioxx causes or significantly contributes to heart attacks. The numerical increases shown in countless other studies confirm the cardiotoxicity of Vioxx. As Dr. Garrett FitzGerald, a paid Merck consultant and a leader in the area of coxib research observed:  :[A single mechanism, depression of [PGI2], might be expected to elevate blood pressure, accelerate atherogenesis, and predispose patients receiving coxibs to an exaggerated thrombotic response to the rupture of an atherosclerotic plaque. The higher a patient's intrinsic risk of cardiovascular disease, the more likely it would be that such a hazard would manifest itself rapidly in the form of a clinical event." FitzGerald, B., *Coxibs and Cardiovascular Disease,* NEJM, 2004, 351:1709-10 (Oct. 21, 2004).

As a result of the compelling scientific evidence on "how" Vioxx causes heart attacks and how it more likely than not played a role in Plaintiff Dedrick's heart attack, Merck's motion is due to be denied.

### D.      Dr. Gelb testified that, to a reasonable degree of medical certainty, Vioxx was a substantial contributing factor in Anthony Dedrick's heart attack.

Merck next argues that Dr. Gelb cannot say definitively that Vioxx caused or substantially contributed to Plaintiff Dedrick's heart attack. Dr. Gelb testified extensively in his deposition (see a portion of his testimony set forth above) and discussed in his Expert Witness Report, to a "reasonable degree of medical certainty," that Vioxx was a substantial contributing factor and cause in the heart attack suffered by Plaintiff Dedrick on January 8, 2003. As Dr. Gelb expressed, considering the total patient history and information, Vioxx was THE event which led to Plaintiff Dedrick suffering a heart attack on the date in question. His opinion is based on reliable scientific data and is reached by applying appropriate methodology.

**E.** **Dr. Gelb was not required to rule out other possible causes of Plaintiff Dedrick's heart attack, but did testify specifically about what role Vioxx played in causing and leading to Plaintiff Dedrick's heart attack in conjunction with his known risk factors.**

As an extension of its lack of specific causal connection argument, Defendant Merck next argues that Dr. Gelb could not rule out all other causes of a heart attack. Tennessee law does not require that a medical expert rule out all other causes of an event; rather, Tennessee law permits proof and evidence that an event was one cause among many, and not the *sole* proximate cause of the plaintiff's injuries. See *Hale v. Ostrow*, 166 S.W.3d 713, 718 (Tenn. 2005).

Dr. Gelb, in his testimony, was scientifically honest. He conceded that Plaintiff Dedrick's other cardiovascular risk factors likely contributed to the development of atherosclerosis and, indirectly, to his heart attack. However, as set forth above, Dr. Gelb made clear that Vioxx was an additional, significant risk factor, which accelerated both the development of atherosclerosis and contributed to plaque rupture and thrombus formation. As Dr. Gelb noted, the size of the thrombus alone was an indication that it did not form by normal means and was helped along, so to speak, by Vioxx's prothrombotic and atherogenic qualities. His opinion, stated to a reasonable degree of medical certainty, is that Vioxx was a substantial contributing factor in Tony Dedrick's heart attack and that Dedrick would not have suffered an acute myocardial infarction on January 8, 2003 but for his use of Vioxx. This opinion is based on reliable scientific data and is reached by applying appropriate methodology.

**F.** **Dr. Gelb is qualified to testify regarding Merck's conduct, as it related to presenting the cardiovascular risk associated with Vioxx to the medical community through medical journals and the product label.**

Lastly, Merck challenges Dr. Gelb's opinions that Merck improperly portrayed the cardiovascular safety profile of Vioxx to the medical community. Dr. Gelb is qualified to render these opinions based upon his training and experience and based upon review of reliable

17

scientific data.  Based upon his 50-year medical practice, principally devoted to the field of cardiology, and his nearly 40 years as an editor of internationally recognized cardiology publications, Dr. Gelb is adequately qualified to testify about the responsibilities of a pharmaceutical company and authors in providing information to medical journals for publication.

Dr. Gelb's expert witness report succinctly sets forth his opinions.

> "My editorial experience began in 1968 with the American Journal of Cardiology through 1983 when I became one of the founding editors of the Journal of the American College of Cardiology.   Presently I am an associate editor of CARDIOLOGY, one of the oldest international peer reviewed journals in the world and published in Basel, Switzerland. Based upon my experience as a senior editor for over twenty six years, it is my opinion that Merck failed to provide an accurate description of the adverse cardiac consequences of Vioxx ingestion to the medical community."

> "A significant example of this behavior is evidenced by Merck's failure to initially provide complete and accurate information to the New England Journal of Medicine (NEJM) in reference to the cardiovascular adverse effects of Vioxx revealed in both the VIGOR and APPROVe studies.  This approach is evidenced by the various Expressions of Concern and ultimate correction published in NEJM.  The incorrect publications resulting from these two studies clearly reveal that Merck attempted to minimize the perception of the cardiovascular risks associated with Vioxx do not become manifest until eighteen months of usage."

> "Finally, it is of note that, Merck, through its Vioxx label, failed to adequately warn the medical community regarding the cardiovascular risks associated with Vioxx.   The inadequate warning was true for both before and after the April 2002 label change."

(See Exhibit "B-3").

Dr. Gelb expanded upon theses opinions in his deposition, noting:

18

(1)    Merck withheld critical information from the NEJM, as supported by Dr. Curfman's testimony;

(2)    Merck presented data to physicians, the public and the scientific journals in a manner that downplayed the seriousness of the cardiovascular risks; and

(3)    Merck should have included a warning on cardiovascular risks in its April 2002 label, not simply provide data in the precautions portion of the label.

(Depo of Dr. Gelb at 309-15.)

As a result of Dr. Gelb's extensive experience as an editor of cardiology journals and as a result of his lifetime experience as a board-certified cardiologist, he is adequately qualified to testify about the adequacy of information and the conduct of Merck in this regard.  Defendant Merck's argument to the contrary is without merit.

### Conclusion

For the reasons stated above, Plaintiff Dedrick respectfully requests that the Court **DENY** Merck's attempts to exclude the testimony of Ira J. Gelb, M.D.

Respectfully submitted this _7th_ day of November, 2006.

**ANDY BIRCHFIELD**
P. LEIGH O'DELL
Attorney for Plaintiff
***BEASLEY, ALLEN, CROW,***
***METHVIN, PORTIS & MILES, P.C.***
234 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103
(334) 269-2343 telephone
(334) 954-7555 facsimile

**Russ M. Herman** (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
  **Plaintiffs' Liaison Counsel**

**Christopher A. Seeger**, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
& WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

### CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiff's Response to Merck's Motion for Order Excluding Testimony of Ira J. Gelb, M.D. has been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail or by hand delivery and e-mail, on Merck's Counsel, Douglas R. Marvin and Philip S. Beck, by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 7th day of November, 2006.

Andy D. Birchfield
Attorney for Plaintiff
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.

# EXHIBIT  A

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


CASE NO.: 2:05-CV-2524

IN RE:  VIOXX
PRODUCTS LIABILITY
LITIGATION


ANTHONY WAYNE DEDRICK,


       Plaintiff,


-vs-

MERCK & CO., INC.,


       Defendant.


_____/




DEPOSITION OF:      IRA J. GELB, M.D.

DATE:           October 12, 2006

TIME:           9:03 a.m.

LOCATION:        Boca Raton Marriott
                  5150 Town Center Circle
                  Boca Raton, Florida

REPORTER:        Erin Pallard, RPR



PLAINTIFF'S
EXHIBIT
A

Ira J. Gelb, M.D.

| Page 2 | Page 4 |

<div style="column: left">

Page 2

```
 1  A P P E A R A N C E S :
 2
 3     BENJAMIN L. LOCKLAR. ESQ., OF:
 4     BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILLS
 5     218 Commerce Street
       Post Office Box 4160
 6     Montgomery, Alabama  36103-4160
       ben.locklar@beasleyallen.com
 7     334-269-2343
       on behalf of the Plaintiff
 8
       KEN BAUM, M.D., ESQ. AND
 9     MARK OUWELEEN, ESQ., OF:
       BARTLIT, BECK, HERMAN, PALENCHAR & SCOTT, LLP
10     54 West Hubbard Street
       Suite 300
11     Chicago, Illinois  60610
       mark.ouweleen@bartlit-beck.com
12     312-494-4435
       on behalf of the Defendant
13
14     ROBERT A. BLACKWELL, ESQ., OF:
       FULBRIGHT & JAWORSKI, LLP
15     2200 Ross Avenue
       Suite 2800
16     Dallas, Texas  75201
       rblackwell@fulbright.com
17     on behalf of the Defendant
18
19     PATRICIA E. LOWRY, ESQ., OF:
       SQUIRE, SANDERS & DEMPSEY, LLP
20     1900 Phillips Point West
       777 South Flagler Drive
21     West Palm Beach, Florida  33401
       plowry@ssd.com
22     on behalf of the Defendant
23  ALSO PRESENT:
24     Fran Parmer - Nurse Consultant
       Beasley, Allen, Crow, Methvin, Portis & Miles, PC
25
```

Page 3

```
 1
 2              I N D E X
 3  TESTIMONY OF:  IRA J. GELB, M.D.
 4     Direct Examination by Mr. Ouweleen          5
 5
 6  STIPULATION                        347
       ERRATA                       349
 7  CERTIFICATE OF OATH               352
       CERTIFICATE OF REPORTER            353
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

</div>

<div style="column: right">

Page 4

```
 1           E X H I B I T S
 2  Exhibit Nos. 1 & 2      11
 3  Exhibit No. 3          12
 4  Exhibit No. 4          42
    Exhibit No. 5         109
 5  Exhibit No. 6         154
    Exhibit No. 7         169
 6  Exhibit No. 8         197
    Exhibit No. 9         215
 7  Exhibit No. 10        224
    Exhibit No. 11        226
 8  Exhibit No. 12        236
    Exhibit No. 13        244
 9  Exhibit No. 14        246
    Exhibit No. 15        247
10  Exhibit No. 16        247
    Exhibit No. 17        247
11  Exhibit No. 18        248
    Exhibit No. 19        249
12  Exhibit No. 20        249
    Exhibit No. 21        250
13  Exhibit No. 22        257
    Exhibit No. 23        258
14  Exhibit No. 24        275
    Exhibit No. 25        278
15  Exhibit No. 26        284
    Exhibit No. 27        287
16  Exhibit No. 28        287
    Exhibit No. 29        290
17  Exhibit No. 30        291
    Exhibit No. 31        296
18  Exhibit No. 32        295
    Exhibit No. 33        319
19  Exhibit No. 34        322
20  Exhibit No. 35        330
21  Exhibit No. 35A       343
22  Exhibit No. 36        336
23  Exhibit No. 37        338
24  Exhibit No. 38        340
    Exhibit Nos. 39 & 40      345
25  Exhibit No. 41        347
```

Page 5

```
 1  Exhibit No. 42         347
 2  Exhibit No. 43         348
 3  Exhibit No. 44         349
 4  Exhibit No. 45         350
    Exhibit No. 46         350
 5  Exhibit No. 47         353
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

</div>

2  (Pages 2 to 5)

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

1          PROCEEDINGS
2   WHEREUPON:
3          IRA J. GELB, M.D.
4   having been first duly sworn to tell the truth, the whole
5   truth and nothing but the truth, testified as follows:
6          DIRECT EXAMINATION
7   BY MR. OUWELEEN:
8      Q   Good morning, Dr. Gelb.
9      A   Good morning.
10     Q   My name is Mark Ouweleen, and I represent Merck in
11  this case. We've been introduced off the record.
12         Please state your full name and full mailing
13  address.
14     A   Ira J. Gelb, M.D., 18489 Long Lake Drive, Boca
15  Raton, Florida 33496.
16     Q   You're here as an expert witness hired by the
17  plaintiff and the plaintiff's lawyers in this case?
18     A   Is that a yes or a statement?
19     Q   That's a question.
20     A   Yes, I am.
21     Q   You can assume that everything I say to you is a
22  question. Okay?
23     A   Fine.
24     Q   Are you under any medication or suffering from
25  any condition that would prevent you from giving accurate

1   and true testimony today?
2      A   I take medication. It has no impact, whatsoever,
3   in the testimony I'm about to give.
4      Q   Is there any other reason you cannot give accurate
5   testimony today?
6      A   Not a bit.
7      Q   You've been deposed before?
8      A   I have.
9      Q   You understand that you need to answer my
10  questions audibly, with an out loud answer, so that she can
11  record it?
12     A   I do.
13     Q   And if you don't understand my question, will you
14  please let me know?
15     A   I certainly will.
16     Q   Okay. If you need to take a break at any time,
17  just say so, and we'll take a break.
18     A   Thank you.
19     Q   Have you ever been a plaintiff or a defendant in a
20  lawsuit, yourself?
21     A   Yes.
22     Q   Can you please tell me when?
23     A   I was a defendant about 25 years ago in a med-mal
24  case, primary pulmonary hypertension. It was settled out of
25  court.

1      Q   Have you ever been a plaintiff in a lawsuit?
2      A   No, not that I remember.
3      Q   Okay. Have you ever been involved in a class
4   action lawsuit --
5      A   What do you mean by "involved"?
6      Q   -- named as a plaintiff, for example.
7      A   Oh, that -- yes, I was, once.
8      Q   What can you tell me about that?
9      A   I don't even remember. It was a long time ago. I
10  was one of the people in a class action.
11     Q   You don't remember how that came about?
12     A   No.
13     Q   Do you remember who the lawyers were who were
14  involved in that?
15     A   Yes, Mel Weiss.
16     Q   Is it Milberg Weiss, that firm?
17     A   Milberg Weiss.
18     Q   And you don't remember anything else about that
19  case?
20     A   I really don't. If I did, I'd be glad to tell
21  you.
22     Q   Okay.
23         You don't even remember, for example, what
24  year it was in?
25     A   Some years ago, that I can tell you.

1      Q   More than ten?
2      A   I would guess it's probably close to ten, if not
3   more than ten. I don't know.
4      Q   Have you ever in the past, say, 15 years, served
5   on the Board of Directors of any companies or institutions?
6      A   Yes.
7      Q   Please tell me which ones.
8      A   I'm blocking on the name, but I relieved myself of
9   being on that Board. Exegenics was the name of the company.
10  I decided to step down.
11     Q   Why did you decide to step down?
12     A   It was interfering with my work in school.
13     Q   When was that?
14     A   Maybe six or seven years ago. I can't give you
15  the exact date. I'm sorry.
16     Q   That's okay. What kind of company was that?
17     A   It was a drug development company.
18     Q   And where is that located?
19     A   Texas, Dallas.
20     Q   Have you been on the Board of Directors of any
21  other companies?
22     A   I'm just trying to remember. If I were, I don't
23  really recall now. Maybe one other.
24     Q   Okay. Can you remember what that one other may
25  have been?

3 (Pages 6 to 9)

577a7cb7-4092-46a3-af7f-4065a7cbae71