Ira J. Gelb, M.D.

| Page 10 |
|---|
| 1    A   No. |
| 2    Q   Have you been on the Board of Directors of any |
| 3  other institutions, other than companies? |
| 4    A   I chaired the foundation board of Florida Atlantic |
| 5  University. |
| 6    Q   What is the foundation board of Florida Atlantic |
| 7  University? |
| 8    A   Our purpose is to help raise funds for the |
| 9  working of the University. |
| 10    Q   So it's like a charitable board? |
| 11    A   Exactly. |
| 12    Q   People make donations to that board to support the |
| 13  work of the University? |
| 14    A   Yes. |
| 15    Q   And you chaired that board? |
| 16    A   Yes. |
| 17    Q   How long have you been on that board? |
| 18    A   I've been on the board for eight or nine years.  I |
| 19  became the chair in April of this year. |
| 20    Q   So, to the best of your recollection, what year |
| 21  did you join that board? |
| 22    A   That I joined that board? |
| 23    Q   Uh-huh. |
| 24    A   Eight or nine years ago. |
| 25    Q   What year would that have been? |

| Page 11 |
|---|
| 1    A   Pardon? |
| 2    Q   What year was that; 1997? |
| 3    A   '96 or '97, something like that.  Oh, I also was |
| 4  on the board of the American Heart Association. |
| 5    Q   And how long have you been on that board? |
| 6    A   Well, first I was on the board up in New York, |
| 7  then I was on the board down here in Florida, and I chaired |
| 8  the leadership council for the American Heart Association |
| 9  down here, but I really can't give you the dates.  Maybe I |
| 10  can look at my CV for a second. |
| 11    Q   Of course. |
| 12        MR. OUWELEEN:  In fact, you know what, we might as |
| 13  well go ahead and mark your CV as an exhibit.  I'm |
| 14  handing you what we marked as Gelb Exhibit 1. |
| 15        (Exhibit Nos. 1 & 2 marked.) |
| 16 |
| 17        THE WITNESS:  I think I may have updated it since |
| 18  then. |
| 19  BY MR. OUWELEEN: |
| 20    Q   Do you have an updated copy I can see? |
| 21    A   I certainly do. |
| 22    Q   May I see it? |
| 23    A   May I finish looking at it? |
| 24    Q   It may save -- |
| 25    A   You asked me a question and I wanted to look at |

| Page 12 |
|---|
| 1  this. |
| 2    Q   I'd appreciate it if you gave me a copy now. |
| 3        MR. LOCKLAR:  Do you all have the ability to make |
| 4    a copy here? |
| 5  BY MR. OUWELEEN: |
| 6    Q   Is that your only copy? |
| 7    A   It will take me two minutes to answer your |
| 8  question. Then you can have it. |
| 9    Q   No -- |
| 10    A   The American Heart Association, and then I joined |
| 11  that in 1960, became president of the West Chester-Putnam |
| 12  division in 1986 until 1988.  I became president of the Boca |
| 13  Raton Chapter of the Heart Association in 1999, and became |
| 14  chairman of the Leadership Council in Boca, 2002. Now you |
| 15  may have this. |
| 16        MR. OUWELEEN:  Can we go ahead and mark this as |
| 17  Exhibit 3. |
| 18        (Exhibit No. 3 marked.) |
| 19        THE WITNESS:  May I have it back, please? |
| 20  BY MR. OUWELEEN: |
| 21    Q   No.  I'll give it to you in a moment. |
| 22        Do you know when the trial in this lawsuit is, |
| 23  Doctor? |
| 24    A   Do I know what? |
| 25    Q   When the trial is? |

| Page 13 |
|---|
| 1    A   I was told the end of November, beginning of |
| 2  December. |
| 3    Q   Do you know where it is? |
| 4    A   In New Orleans. |
| 5    Q   Are you planning on attending? |
| 6    A   I am. |
| 7    Q   How do you describe your profession to others? |
| 8    A   I'm a physician. |
| 9    Q   Are you a cardiologist? |
| 10    A   Yes. |
| 11    Q   You don't hold yourself out to the scientific |
| 12  community as a vascular biologist; do you? |
| 13    A   No. |
| 14    Q   Or an expert in biology? |
| 15    A   No. |
| 16    Q   You're not a rheumatologist? |
| 17    A   No. |
| 18    Q   You're not a gastroenterologist? |
| 19    A   No. |
| 20    Q   You're not an expert in epidemiology? |
| 21    A   No. |
| 22    Q   You're not a biostatistics physician? |
| 23    A   No. |
| 24    Q   You're not an endocrinologist? |
| 25    A   No. |

GOLKOW LITIGATION TECHNOLOGIES - 1.877.337.7872

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

Page 14

1    Q   You're not a hematologist?
2    A   No.
3    Q   You're not a molecular biologist?
4    A   No.
5    Q   Or an expert in nuclear imaging?
6    A   No.
7    Q   You're board certified in cardiology and internal
8   medicine, correct?
9    A   Correct.
10    Q   Is that all of your board certifications?
11    A   Yes.
12    Q   Is there a separate board certification in
13   interventional or invasive cardiology?
14    A   Yes.
15    Q   And what is that about?
16    A   Those are people who do angiograms and perform
17   invasive techniques to improve coronary flow and now
18   improving vascular pathology, too. They insert balloons and
19   then stents to do arteriectomy, sometimes atherogenesis.
20       Like I say, they're improving on a technique for
21   improving on valvulopathy. That's done through a catheter.
22    Q   Now, you said they sometimes do atherogenesis?
23    A   Uh-huh.
24    Q   What does that mean?
25    A   They injected genes to improve circulation.

Page 15

1    Q   And does that make the body grow new arteries?
2    A   Let's put it this way, it's supposed to.
3    Q   Okay. So you're not board certified, though, in
4   interventional or invasive cardiology?
5    A   No.
6    Q   Have you ever performed a cardiac catheterization
7   procedure?
8    A   I have.
9    Q   Have you performed it many times?
10    A   Well, it was part of my training to do it, but I
11   haven't done it since I finished my training.
12    Q   And when did you finish your training?
13    A   If I could have my CV back, I could tell you, but
14   you like to hold on to it.
15    Q   Well, we only have one copy, Doctor.
16       Would that be reflected on the original CV that
17   you provided in this case?
18       MR. LOCKLAR: If you need to look at the original,
19   you certainly can do that.
20       MR. OUWELEEN: Why don't we just stop and get a
21   copy made, or I'll move on to something else.
22       THE WITNESS: Let's see. I finished my training
23   in -- let me -- 1956, so I haven't done any
24   catheterizations since 1956.
25   BY MR. OUWELEEN:

Page 16

1    Q   Okay. Good.
2
3       Now, you provided us with an updated CV today, correct?
4    A   Yes.
5    Q   You may not need to look at that CV to answer this
6   question, but why did you update it?
7    A   Because I was updated to become assistant dean at
8   the school.
9    Q   Congratulations.
10    A   Thank you. I just wanted to make sure that was on
11   the CV.
12    Q   Were there any other changes?
13    A   Not that I recall.
14    Q   Okay. When did you update it?
15    A   The exact date I updated, I don't know, but
16   recently.
17    Q   When did you become assistant dean?
18    A   Okay. About a month ago.
19    Q   So you actually became assistant dean before you
20   produced your expert report in this case?
21    A   Before, yes.
22    Q   But you just -- just got around to updating your
23   CV just now?
24    A   Let me confirm that. That's correct.
25    Q   Okay. Dr. Gelb, have you ever been qualified by

Page 17

1   any court as an expert about Vioxx, an expert to testify
2   about Vioxx?
3    A   I don't know you what mean by "qualified".
4    Q   Well, have you ever testified in a court about
5   Vioxx?
6    A   I've had a deposition taken.
7    Q   In a trial, have you ever testified?
8    A   No, not yet.
9    Q   Has any judge ever said, I will admit you as an
10   expert to talk about Vioxx?
11    A   Not yet.
12    Q   And has any court ever qualified you as an
13   expert to talk about COX-2 inhibitors?
14    A   Not yet.
15    Q   Has any court ever qualified you to talk about
16   causes of atherosclerosis?
17    A   Has any court qualified me?
18    Q   Uh-huh.
19    A   No.
20    Q   And has a court qualified you to talk about the
21   causes of thrombosis?
22    A   No court has.
23    Q   Okay. You've never designed a clinical trial or
24   protocol for a prescription drug, correct?
25    A   Correct.

5 (Pages 14 to 17)

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

Page 18

1    Q   Never conducted a clinical trial, correct?
2    A   Correct.
3    Q   You never participated in a clinical trial for
4  drugs, right?
5    A   When you say "never," you know, years ago I may
6  have when I was in training or -- I may have been involved
7  with a trial about a coronary vasodilator years ago when I
8  was in practice, but it was short-term.
9    Q   Can you remember any trial that you are sure you
10  participated in?
11   A   No.  But I can say I probably did, but I can't
12  give you the particulars, because it was years ago.
13   Q   How long would it have been if you had, before
14  1956?
15   A   No, in the '60s, which was years ago.
16   Q   Yes, it is.  But you can't remember the details of
17  that?
18   A   Well, we tried to find the efficacy of the drug to
19  see if it dilated coronary arteries similar to
20  nitroglycerin.
21   Q   What drug was that?
22   A   I have no idea.
23   Q   Is that pretty much all you remember about that
24  trial?
25   A   That's it.

Page 19

1    Q   What was your role in that trial?
2    A   I was the one to look at the data and help write the
3  paper.
4    Q   Is that paper listed on your curriculum vitae?
5    A   Yes.
6    Q   Where is it?
7    A   Number 8, under "Refereed Journal Articles."
8        Do you have that list?  If you don't, I have it.
9        MR. LOCKLAR:  It's attached to it.
10       THE WITNESS:  It's attached to the original.
11  BY MR. OUWELEEN:
12   Q   So it's --
13   A   But I have my copy, and now you can have your
14  copy.
15   Q   You're looking at Exhibit 1?
16   A   Yes.
17   Q   Gelb Exhibit 1?
18   A   Yes.
19   Q   And on Page --
20   A   Number 8, it says Sherber and Gelb, Clinical
21  Pharmacology.
22   Q   Number 6?
23   A   8.
24       MR. LOCKLAR:  Excuse me.
25       THE WITNESS:  Oh, on that one.  Okay.

Page 20

1  BY MR. OUWELEEN:
2    Q   Doctor, have you updated your publications list,
3  as well?
4    A   I thought I had.  Let me just see it.  The one I
5  submitted is my updated publication list.
6    Q   Okay.
7        Just to be clear, in Gelb Exhibit 1 --
8    A   It's Number 6.
9    Q   Let me finish the question before you finish it,
10  because I had a different question.  Okay?
11   A   Fine.
12   Q   Thank you.
13       My question was, in Exhibit 1, the
14  list of publications and books is the current list, correct?
15   A   Yes.
16   Q   Thank you.  All right.
17       So, Number 6, there, under "Refereed Journal
18  Articles," on Page 3, which is not exactly
19  numbered, Sherber and Gelb, that's the article you're
20  talking about that relates to a clinical trial that you
21  participated in?
22   A   Yes.
23   Q   Thank you.
24   A   You're welcome.
25   Q   Okay.

Page 21

1        So, have you ever analyzed the result of the
2  clinical trial to determine and report the outcome?
3    A   To report the outcome, no.  But as an editor --
4  and I'm sure you're going to go into that -- I do review
5  results.
6    Q   You review other people's --
7    A   Data.
8    Q   -- data and their articles about their clinical
9  trials?
10   A   Correct.
11   Q   You've never worked with the FDA, correct?
12   A   Correct.
13   Q   What is an FDA advisory committee?
14   A   Advisory committee is composed of physicians
15  usually, or doctorates, who advise the Federal Drug
16  Administration on the advantage or disadvantage of a drug
17  that's been submitted.
18   Q   Okay.
19       Have you ever served on an FDA advisory
20  committee?
21   A   No.
22   Q   Have you ever been asked to sit on an FDA advisory
23  committee?
24   A   No.
25   Q   Have you ever reviewed labeling for a prescription

6  (Pages 18 to 21)

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

Page 22

1  drug on behalf of the FDA?
2      A   No.
3      Q   You're not an expert on FDA regulations for drug
4  labeling?
5      A   I'm not considered an expert, but I do review the
6  label.
7      Q   That's good.  Because you're a good doctor, right?
8      A   I'm told I am.
9      Q   You're a nationally renowned doctor, correct?
10     A   I'm told I am.
11     Q   You're quoted in articles about famous people who
12 have heart attacks, like Jim Fixx, right?
13     A   I wasn't involved with him, fortunately, but I
14 wasn't quoted in that article.
15     Q   You were actually quoted in an article about
16 Jim Fixx?
17     A   I was?
18     Q   Yeah.
19     A   I didn't know that.  Thank you.  Did it say I was
20 not involved, I hope?
21     Q   It said you're a nationally known famous
22 cardiologist.
23     A   Thank you.
24     Q   You've never worked with a pharmaceutical company?
25     A   No.

Page 23

1      Q   You never worked in a regulatory
2  affairs department in a pharmaceutical company?
3      A   No.
4      Q   You have never drafted a pharmaceutical drug
5  label?
6      A   No.
7      Q   You've never been consulted with the drafting of a
8  pharmaceutical drug label?
9      A   No.
10     Q   You've never reviewed any complete new drug
11 application or investigational new drug application?
12     A   I have not.
13     Q   Just never been qualified by the court as an
14 expert on labeling or --
15     A   No.
16     Q   You've never been qualified by any court as an
17 expert on the advisory of or concerning warnings given to the
18 medical community about a drug?
19     A   No.
20     Q   Have you ever been precluded from testifying about
21 labeling or other regulatory issues?
22     A   I have not.
23     Q   Did you stop practicing clinical cardiology in
24 1992?
25     A   I did.

Page 24

1      Q   Since then, you focused on an academic career,
2  teaching, university, board work and so on, correct?
3      A   Correct.  And editor.
4      Q   And administrative, you worked as an editor.
5          You don't currently maintain a cardiology office?
6      A   I don't maintain an office, but I must say, I
7  probably have one of the biggest pro bono practices in South
8  Florida.
9      Q   You don't do services as anybody's cardiologist?
10     A   No, I do not.
11     Q   You don't examine patients every day?
12     A   Not every day.
13     Q   When was the last time you prescribed a medicine?
14     A   Probably in the '90s.
15     Q   Okay.  Do you know when in the '90s?
16     A   Before I came to Florida.
17     Q   When did you come to Florida?
18     A   '92.
19     Q   Okay.  And do you currently have privileges at any
20 hospitals?
21     A   No.  Well, I'm on the staff at Boca Raton
22 Hospital.
23     Q   What does that mean, to be on the staff but not
24 have privileges?
25     A   It means because I'm a professor at the medical

Page 25

1  school, we're allowed to go to the hospital with students
2  and examine patients who agree to, despite the HIPAA law, to
3  examine patients.  I would be the preceptor.
4      Q   The student's preceptor?
5      A   The student's preceptor.
6      Q   Vioxx was not on the market while you were a
7  practicing cardiologist, correct?
8      A   Yes.
9      Q   That's correct?
10     A   That's correct.
11     Q   So you never prescribed it?
12     A   No.
13     Q   And never prescribed any COX-2 inhibitor?
14     A   No.
15     Q   Have you taken Vioxx?
16     A   No.
17     Q   Any other COX-2 inhibitor?
18     A   No.
19     Q   Have you ever performed a nuclear stress test?
20     A   No.
21     Q   Have you ever ordered one to be performed for one
22 of your patients?
23     A   Yes.
24     Q   And when was the last time you did that?
25     A   Well, when I was in private practice in '92, but I

7  (Pages 22 to 25)

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

Page 26

1  recommended to the lawyers in this case that maybe they
2  should have Mr. Dedrick's doctor order a stress test.
3      Q    When you say "Mr. Dedrick's doctor," who are you
4  referring to?
5      A    Dr. Herrera -- I forget his name -- the doctor taking
6  care of him, one of the doctors involved in his care.  I
7  forget which doctor.  But I simply advised the law firm it
8  would be advisable for them to get a follow-up study by
9  nuclear examination.
10     Q    So, but you didn't actually order that test,
11  correct?
12     A    No.
13     Q    And so you told the lawyers you thought
14  Mr. Dedrick should have a nuclear stress test?
15     A    Yes.
16     Q    When did you tell them that?
17     A    Before he took the stress test in September.
18     Q    Can you tell me with any more precision than that?
19  Was it a year ago, six months ago, nine months ago, the day
20  before?
21     A    No.  It was this past September.
22     Q    You told them in September?
23     A    This past September.
24     Q    So in September of 2006, you told the lawyers that
25  he should have a nuclear stress test?

Page 27

1      A    Yes.
2      Q    And why did you tell them that?
3      A    For complete evaluation of his ventricular status.
4      Q    Okay.
5           When you were practicing in 1992, was it
6  your practice to order a nuclear stress test every time you
7  wanted to complete an evaluation of somebody's --
8      A    If I --
9      Q    Excuse me, Doctor.  Please let me finish the
10  question.  Thanks.
11     A    Somebody's --
12     Q    Well, Doctor, if we both talk at the same time,
13  Erin, here, can't get it down.
14          So my question was, when you were practicing in
15  1992, was it your practice to order a nuclear stress test
16  every time you wanted a complete picture of someone's
17  ventricular function?
18     A    Not every time.
19     Q    What times, when would you order one?
20     A    How do you pronounce your name?
21     Q    Ouweleen.
22     A    Mr. Ouweleen, every patient is an individual, so I
23  did it on an individual basis.  If I felt it was indicated,
24  I would order it.  If I felt I didn't need that information,
25  I didn't do it.

Page 28

1      Q    I understand.  For example, when you tell your
2  students, here are the circumstances in which you should
3  consider a nuclear stress test, what are those
4  circumstances?
5      A    The circumstances are, I want to clearly know the
6  ventricular function.  If I'm not satisfied with the studies
7  to date, I want to do another non-invasive study to
8  determine wall motion abnormality, ejection fraction.
9      Q    So it's only when you think that there's some
10  reason not to believe an echocardiogram?
11     A    No.
12     Q    So when you say you're not satisfied --
13     A    Maybe I should phrase it this way:  When I want
14  more information, more detailed information on ventricular
15  function, like wall motion, ejection fraction.
16     Q    Okay.
17          So in this case, what more information did
18  you feel you needed that caused you to ask for the nuclear
19  stress test?
20     A    Did I feel I needed?  Is that what your question
21  was?
22     Q    Uh-huh.
23     A    Well, I felt I wanted more information about
24  Mr. Dedrick's wall motion and his ejection fraction.
25     Q    What more information did you need about those

Page 29

1  things?
2      A    Were there other areas of wall abnormality other
3  than the inferior wall or the apex that were not detected by
4  the echo.  And I wanted more information about the ejection
5  fraction, both at rest and with exertion.
6      Q    And the echo -- when you say "the echo," are you
7  referring to the echo on September 11, 2006?
8      A    The stress echocardio, yes.
9      Q    And did you have some reason to doubt the accuracy
10  of the information provided in this stress echocardiogram?
11     A    I wanted to supplement what I saw.
12     Q    Did the nuclear stress test provide the
13  information you needed?
14     A    It did.
15     Q    Did it confirm or contradict the echocardiogram
16  from September 11th?
17     A    It supplemented what was seen on the echo.
18     Q    Was it consistent with the echo?
19     A    It supplemented, is what it was.
20     Q    Was it consistent or inconsistent, Doctor?
21     A    It added to what was seen on the echo.
22     Q    Was it inconsistent with the echo?
23     A    I don't know what you mean by "inconsistent."
24          The echo showed you so much, and I got additional
25  information from the nuclear stress test.

8  (Pages 26 to 29)

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

Page 30

1    Q   For example, you wanted to know --
2  do the nuclear stress test, show any wall motion
3  abnormalities that were not indicated in the echocardiogram
4  of 9/11?
5    A   I want to get both studies out so I can be very
6  concise and complete for you.
7    Q   You know what, Dr. Gelb, if you're going to review
8  things, I would prefer we mark them as an exhibit, just so
9  the record's clear.
10   A   It's your pleasure.  But I want to be clear so
11 there's no misunderstanding --
12   Q   I agree with that.
13   A   -- since you and I are very precise.
14   Q   You know what, Doctor, we'll come back and talk
15 about the nuclear stress test in detail later.  Let's do it
16 that way.
17   A   At your pleasure.
18   Q   Just one more thing. You're not caring for
19 Mr. Dedrick as his cardiologist, correct?
20   A   No.
21   Q   You did this nuclear stress test to gather
22 information for litigation?
23   A   I didn't do the stress test.
24   Q   You asked it be done to provide information for
25 the litigation?

Page 31

1    A   Asked for, to provide me with more information, so
2  I would have a more thorough understanding of his condition.
3    Q   But you're interested in his condition for the
4  purposes of your opinion in this litigation only, correct?
5    A   No.  I'm interested in Mr. Dedrick.
6    Q   I see.  But you're not his doctor?
7    A   I'm not a lot of people's doctors, but when they
8  ask me questions about their health, I still have interest.
9    Q   That's fine.
10   A   Thank you.
11   Q   Did you discuss the results of the test with
12 Mr. Dedrick?
13   A   No.
14   Q   Did you discuss it with his doctors?
15   A   No.
16   Q   You didn't?
17   A   No.
18   Q   But you wanted the test so you could provide the
19 information to Mr. Dedrick for his care?
20   A   To Mr. Dedrick's lawyers, to pass on to the
21 physicians for his care.
22   Q   Do you know if the lawyers passed that information
23 on?
24   A   I have no idea.
25   Q   So as far as you know, Mr. Dedrick or his

Page 32

1  doctors never heard about this information?
2    A   I would have to pursue that before the trial to
3  find out.
4    Q   You didn't take any steps to make sure
5  Mr. Dedrick's doctors found out about this information?
6    A   I presume, since I'm dealing with first-class
7  lawyers, and I told them what should be done, they would
8  pass it on.
9    Q   You didn't pass it on?
10       MR. LOCKLAR:  Object to the form.  It's been asked
11 and answered.
12       MR. OUWELEEN:  It has not.
13 BY MR. OUWELEEN:
14   Q   You didn't pass it on, correct?
15   A   Again, I would reiterate.  That's redundant.  I
16 would reiterate, I did not personally pass it on to
17 Mr. Dedrick.
18   Q   Or to his doctor?
19   A   Or to his doctor, or family, or to anybody but his
20 lawyer.
21   Q   Did you also suggest that the echocardiogram done
22 on 9/11 be done?  Was that your idea, as well?
23   A   It was my idea to tell the lawyers to have it
24 done.
25   Q   Do you have Exhibit 3, the updated version of your

Page 33

1  CV, before you?
2    A   I do.
3    Q   Is that now a full and accurate statement of your
4  qualifications and experience?
5    A   May I look at it?
6    Q   Yes.
7    A   Thank you.  The answer is yes.
8    Q   Thanks.
9        And this is a little complicated, but Exhibit 1 is
10 also a previous copy of your curriculum vitae, which is
11 accurate except for the fact that it doesn't reflect your
12 new position as assistant dean, correct?
13   A   Yes.
14   Q   And the list of publications, of your
15 publications --
16       MR. LOCKLAR:  Excuse me.  Let me interrupt.  I
17 think you did update your reference list. Isn't that
18 part of your CV?
19       MR. OUWELEEN:  We weren't provided with that, and
20 he's already testified that the original reference list
21 was correct.
22       THE WITNESS:  He spoke about my personal
23 references, not the Vioxx reference; is that right?
24 BY MR. OUWELEEN:
25   Q   What I was just asking about, Dr. Gelb, is the

9  (Pages 30 to 33)

GOLKOW LITIGATION TECHNOLOGIES - 1.877.337.7872

Ira J. Gelb, M.D.

Page 34

1  list of publications and refereed journal articles on the
2  fourth and fifth pages of Exhibit 1.
3      A  I thought you were referring to my references.
4      No, I've updated the reference list, the Vioxx
5  reference list.
6      Q  We're talking about --
7      A  -- different things.  Okay.
8      Q  We're talking about different things.
9          Page 4 of Exhibit 1 says at the top, Ira J. Gelb,
10 M.D., publications.  Do you see that?
11     A  That's what I thought you were referring to.
12     Q  Yeah, that is.  So on that page, and the following
13 page that says Ira J. Gelb, M.D. up at the top in
14 Exhibit 1, do you see that?
15     A  Yes.
16     Q  Is that the current and complete list of your
17 publications?
18     A  It is.  That's what I thought you had meant.
19        MR. LOCKLAR:  My apologies.
20        THE WITNESS:  That's okay.
21 BY MR. OUWELEEN:
22     Q  You have not published any peer review
23 publications since 1974, correct?
24     A  Correct.
25     Q  You don't currently do any research of your own?

Page 35

1      A  Is that a question?
2      Q  Yes.
3      A  Yes, I do not do any research on my own.
4      Q  And when was the last time that you did do
5  research on your own?
6      A  May I refer back to my list?
7      Q  Always.
8      A  Thank you.  In the '70s.
9      Q  Okay.  You have not published any studies or other
10 papers on NSAIDs, correct?
11     A  On what?
12     Q  On non-steroidal anti-inflammatory drugs?
13     A  No, I have not.
14     Q  You're familiar with that shorthand term NSAID,
15 N-S-A-I-D?
16     A  Thank you.  I am.
17     Q  It makes this go faster if I don't -- and you
18 haven't published any study or other papers on COX-2
19 inhibitors?
20     A  That's a question, I presume?
21     Q  Everything I say to you is a question, Doctor.
22     A  I'm sure.  No, I have not published any papers on
23 COX-2 inhibitors.
24     Q  And you have not published any studies or other
25 papers on Vioxx?

Page 36

1      A  No.
2      Q  You have not published any studies on prostacyclin
3  or prostaglandin or any imbalance --
4      A  No.
5      Q  You haven't published any papers on hypertension?
6      A  No.
7      Q  Or atherogenesis?
8      A  No.
9      Q  Or thrombogenesis?
10     A  No.
11     Q  Plaque rupture?
12     A  No.
13     Q  Prostanoids?
14     A  No.
15     Q  You've been an editor of some cardiology journals?
16     A  Correct.
17     Q  The Journal of Cardiology, correct?
18     A  Yes.
19     Q  And the Journal of the American College of
20 Cardiology?
21     A  Correct.  That's not complete, though.
22     Q  I know.  What's the third one?
23     A  It's called Cardiology.
24     Q  Cardiology.
25         And are the dates listed for your involvement as

Page 37

1  an editor on those journals, the dates given in Exhibit 3,
2  are they accurate?
3      A  Yes.
4      Q  Are those well -- sorry -- well-respected
5  publications in the field of cardiology, correct?
6      A  They are.
7      Q  And the articles in those journals, are they all
8  subject to peer review?
9      A  Absolutely.
10     Q  And is that important?
11     A  Yes.
12     Q  Why?
13     A  Because it's important that they're reviewed by
14 quality people who are involved in that particular field to
15 make a judgment about the benefits, or lack of benefits, of
16 publishing an article like that.  So --
17     Q  When -- sorry.  Go ahead.  Finish your answer,
18 please.
19     A  Thank you.  So, consequently, one of my main roles
20 with the journals have been to send out to peer review
21 people, and to get their opinion back, before we made a
22 decision on acceptance or not.
23     Q  So -- are you finished?
24     A  Yes.
25     Q  So when you send it out for peer review, are the

GOLKOW LITIGATION TECHNOLOGIES - 1.877.337.7872

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

Page 38

1  people you're sending it out to independent of the authors?
2     A   Absolutely. We try to avoid bias of any kind
3  with any of the journals I'm involved with.
4     Q   Is that one of the purposes of when you're
5  selecting peers for peer review, is to avoid people that
6  might be biased?
7     A   We don't want to send it to somebody that might be
8  involved with one of the authors, for example. Like, in
9  medicine, you're not supposed to take care of your own
10 family, because whether you like it or not, subjectivity
11 does come in unknowingly. Some bias might be involved.
12    Q   Right. So were you involved in getting peer
13 review for articles published in all of those journals?
14    A   Yes.
15    Q   Okay?
16    A   Well, not all of the articles, but many of the
17 articles.
18    Q   Right. And you have never edited, yourself, any
19 articles dealing with Vioxx or COX-2 inhibitors; have you?
20    A   I don't remember seeing any.
21    Q   Okay. You've been deposed many times, correct,
22 Doctor?
23    A   Yes.
24    Q   Always on behalf of the plaintiff in a lawsuit?
25    A   No.

Page 39

1     Q   When have you been deposed on behalf of the
2  defendant?
3     A   In the -- when I first was asked to do some expert
4  witness work, I would get some requests from defense
5  lawyers, but in the real world, as you see from my previous
6  depositions, that stopped, because once you start doing a
7  deposition for a plaintiff's lawyer, you're not asked to do
8  depositions for defense, or so it seems.
9     Q   That's been your experience?
10    A   That's been my experience.
11    Q   Have you ever served as the expert on behalf of a
12 drug company in litigation?
13    A   On behalf of --
14    Q   Retained by a drug company or a drug company's
15 lawyers?
16    A   No.
17    Q   From 2000 to 2002, is it true that the
18 majority of your income came from work as an expert
19 consultant in litigation?
20    A   You mean my earned income?
21    Q   Let's start with that.
22    A   Well, my income comes primarily, fortunately for
23 me, from my investments.
24    Q   You are fortunate.
25        How about your earned income?

Page 40

1     A   The only earned since, I did my work pro bono at
2  the school, then the other earned income I got was doing
3  this work.
4     Q   So all of your earned income that you received
5  from 2000 to 2002 was from doing expert work in litigation?
6     A   Which was a small percentage.
7     Q   But it was all of your earned income, correct?
8     A   Yes, because I didn't have time to search out an
9  income paying position, or didn't want to.
10    Q   When you say it was a small portion, how much
11 money did you earn per year, roughly, in your expert work in
12 litigation?
13    A   I really don't know. I knew you were going to ask
14 that question, but I'll have to consult with my accountant,
15 because he'll be able to give me numbers.
16    Q   Can you give me a ballpark number last year?
17    A   Last year, I did none.
18    Q   Was it --
19    A   I could not. I could not because it comes --
20 April I would know better, but we don't have the numbers
21 now.
22    Q   So you couldn't tell me, sitting here, whether it
23 was the hundreds, the thousands, the hundred thousands or
24 millions?
25    A   I know it was not in the millions.

Page 41

1     Q   Not in the millions?
2     A   Not in the millions.
3     Q   That was good. Now to get it clear --
4     A   Because I don't want to go further. I don't want
5  to say today and at trial say something and have you say,
6  but you said on October 12 --
7     Q   That's a risk you take in these matters.
8     A   That's why I want to be precise.
9     Q   Did you, Doctor -- seriously, you couldn't tell me
10 if it was hundreds of dollars or thousands of dollars?
11    A   I am serious with you. I couldn't tell you. If I
12 could, I would.
13    Q   How much have you billed in this case?
14    A   So far?
15    Q   Yes.
16    A   Am I able to talk to him to get some of the
17 paperwork that I brought with me?
18    Q   Sure.
19    A   Thank you. Now, am I able to look at it?
20    Q   Yes, you can look at it.
21        MR. OUWELEEN: We'll go ahead and mark that as
22 Exhibit Number 4.
23        (Exhibit No. 4 marked.)
24        MR. LOCKLAR: Let me now state, I don't know how
25 you want to handle this. This is correspondence and

11 (Pages 38 to 41)

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

Page 42

1  billing statements.  You may want to mark them
2  separately.  I just put them in a file for you.
3       MR. OUWELEEN:  Thank you.
4       THE WITNESS:  Can it be an approximate?  Is that
5  okay?
6  BY MR. OUWELEEN:
7       Q   Well, yes, for a start.
8       A   Let's see.  1300, 1600, 67 -- 82, 92 -- it looks
9  like about 20,000 in these bills.
10      Q   And you charge -- how much do you charge per hour?
11      A   Just like it says on the sheet you probably have,
12 $400 an hour.
13      Q   Thank you.  I'm not good at math.
14      Is that 50 hours, $20,000, approximately, 50
15 hours?
16      A   Yes.
17      Q   So, you've spent approximately 50 hours working
18 on the Dedrick case; is that correct?
19      A   Well, I haven't sent out the number of hours that
20 I've done in preparation for meeting you.
21      Q   All right.  So up until what date do your bills
22 add up to $20,000?
23      A   It looks like mid September.
24      Q   And since that time, how many more hours beyond
25 the 50 do you think you've spent on the case?

Page 43

1       A   Somewhere in -- I haven't really added it up.
2  Somewhere in 30 to 35 hours.
3       Q   Another 30 to 35 hours just preparing for this
4  deposition?
5       A   Not just preparing for it.
6       Q   Well, were there other things you did other than
7  preparing for your deposition since you wrote your report?
8       A   No.  Preparing to see you and finding out about
9  aspects of the case.
10      Q   Now, was the 50 hours up to the time that you wrote
11 your report?
12      A   Yes.
13      Q   Okay.  Now, before you wrote your report, you had
14 made sure you understood the finite aspects of the case,
15 too, right?
16      A   Of course.
17      Q   Are you serving as an expert in other cases where
18 the plaintiffs claim they have had a heart attack caused by
19 Vioxx?
20      A   Would you repeat the question?
21      Q   Yes.  Are you serving as an expert witness in
22 other cases where the plaintiff claims that he or she had a
23 heart attack that was caused by Vioxx?
24      A   I reviewed cases.  I haven't been designated as an
25 expert witness.

Page 44

1       Q   Have you agreed to serve as an expert witness in
2  other cases, whether or not it's been disclosed to the
3  opposing counsel?
4       A   Not yet.
5       Q   Not yet.  You've not been retained in any other
6  case?
7       A   As an expert, just to review.
8       Q   Have you been retained in another Vioxx case?
9       A   I've been retained in other Vioxx cases.
10      Q   As a consulting expert?
11      A   As a consulting expert.
12      Q   I see.  Have you written opinions in other Vioxx
13 cases?
14      A   Let me make sure -- one case, but it wasn't an MI
15 case.
16      Q   Was it a stroke case?
17      A   No, it was a PI case.
18      Q   What's a PI?
19      A   Pulmonary embolus.
20      Q   Pulmonary embolus?
21      A   Laszlo, L-A-S-Z-L-O.
22      Q   What -- does that have to do with deep vein
23 thrombosis?
24      A   Yes.
25      Q   Are there any other cases where you have been

Page 45

1  retained as a consulting expert by the lawyers for a
2  plaintiff who claims he was injured by Vioxx?
3       A   I just want to make sure I understand, because I
4  review cases.  Now I don't know if that means I'm retained
5  as an expert.
6       Does that mean I'm retained?
7       Q   Well, I want your understanding, Doctor.
8       For example, if someone comes to you and says,
9  will you look at this case and see if you'll agree to be an
10 expert, and you don't agree to be an expert, in my view, you
11 wouldn't be retained.
12      A   Fine.
13      Q   But if someone comes and says, will you be our
14 expert, and you said, fine, I'll be your expert, then you
15 would be retained.
16      Is that your understanding?
17      A   Yes.
18      Q   Given that understanding, have you been retained
19 in other cases where plaintiffs contend they were injured by
20 Vioxx?
21      A   Yes.
22      Q   What were those cases?
23      Q   What are those cases?
24      Q   Yeah.
25      A   Was the question whether -- what were the -- what

12  (Pages 42 to 45)

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

Page 46

1  were the sequences of risk factors in Vioxx in leading up to
2  the event that happened in these particular patients?
3      Q   How many other cases are there that you've been
4  retained as an expert?
5      A   Four or five right now that I can remember.
6      Q   Okay.
7          And were those all cases where you were
8  retained by the Beasley Allen Firm?
9      A   By the what?
10     Q   Beasley Allen firm?
11     A   No.
12     Q   Other firms, too?
13     A   Yes.
14     Q   Now were there other cases where you were
15 approached to review a case and decided not to be the
16 expert?
17     A   Yes.
18     Q   And are there cases where you decided not to be
19 the expert because you decided that you didn't think that
20 you could opine that Vioxx did injure the person?
21     A   That's not the reason.
22     Q   Well, you don't think, do you, just because a
23 person took Vioxx, and the person had a heart attack, that
24 the Vioxx caused the heart attack; do you?
25     A   I treat the whole person, and I determine each

Page 47

1  case as an individual, then I determine the sequence of
2  Vioxx ingestion.
3      Q   But the reason you have to look at each case as an
4  individual is because you can't know, just knowing someone
5  took Vioxx and had a heart attack, that the Vioxx caused the
6  heart attack, correct?
7      A   Right.
8      Q   You have to look at other things?
9      A   Of course.
10     Q   Now, so it's your testimony that you've never
11 declined to be an expert for a plaintiff that took Vioxx on
12 the basis that Vioxx was not the likely cause of their
13 injury?
14     A   Would you say that again?
15     Q   Sure.
16     A   It was a convoluted question.
17     Q   I'll try it a different way.
18         Have you ever declined to be an expert in a case
19 because you concluded that Vioxx was not the likely cause of
20 a person's injury?
21     A   Have I have ever declined a case -- yes.
22     Q   Oh, so you've turned away cases because you
23 thought Vioxx was not the likely cause of this person's
24 injury?
25     A   No.  I felt because of the timeliness of the

Page 48

1  ingestion and the event, it would make it difficult to
2  state that Vioxx was one of the series of risk factors that
3  resulted in that person's event.
4      Q   And when you say the "timeliness of the ingestion,"
5  what are you referring to?
6      A   Well, if a patient had a three-week or four-week
7  interval between his last taking -- his or her last taking
8  of Vioxx and the event, or if I couldn't get documented
9  records indicating the patient did, indeed, take Vioxx, and
10 not rely on any other mechanism for getting the Vioxx.
11     Q   All right.  So just to be sure I'm understanding,
12 you've turned away cases where the person stopped taking
13 Vioxx three to four weeks before they had their injury,
14 correct?
15     A   Or probably longer.
16     Q   Well --
17     A   Yeah, three or four weeks, I would say.
18     Q   Yeah.  So, and that was, in your view --
19     A   At that time.
20     Q   Has your view changed on the subject?
21     A   Well, there has been new data that's coming out
22 that says it's possible that Vioxx is still having an
23 ongoing effect, but as of now, it's not been documented to
24 my satisfaction yet.
25     Q   Okay.

Page 49

1      A   So --
2      Q   So as you sit here today, your best scientific
3  judgment is that if somebody stops taking Vioxx and then is
4  injured, say, four weeks later, the Vioxx is not likely the
5  cause of that injury?
6          MR. LOCKLAR:  Object to the form.
7          THE WITNESS:  Again, I would have to look at the
8  individual circumstances, but my rule of thumb is, I
9  would like a more proximate relationship between Vioxx
10 and the event.
11 BY MR. OUWELEEN:
12     Q   When you say "more proximate relationship" --
13     A   A closer interval.
14     Q   So in order for you to be comfortable taking on a
15 case as an expert and opining that Vioxx contributed to
16 somebody's injury, you want to see that they took Vioxx
17 within four weeks of the injury?
18     A   I prefer to see that.
19     Q   Well, given your current understanding of the
20 scientific knowledge, you would turn away a case where they
21 hadn't taken Vioxx within four weeks of their injury,
22 correct?
23         MR. LOCKLAR:  Object to the form.
24         THE WITNESS:  Correct.
25 BY MR. OUWELEEN:

13 (Pages 46 to 49)

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

Page 50

1    Q   Now, the other thing you mentioned was about
2  records that they took Vioxx.  What I understood you to say
3  there, just you want be sure the guy took Vioxx, you're not
4  going to say Vioxx caused his injury, correct?
5    A   Of course.
6    Q   Have you ever turned away a case on the basis
7  that the person didn't take Vioxx for a sufficient duration,
8  even if he was taking it at the time of the injury?
9    A   It depends how long a person took it.
10   Q   So it depends -- so is that a yes or a no?  Have
11  you turned away cases on that basis?
12   A   Well, there's a minimum amount of time I would
13  like to see the client, or patient, as the case may be, to
14  have taken the Vioxx before I could say I couldn't make a
15  judgment.
16   Q   Okay.  So I think that answer came out a little --
17  there was a triple negative in there.  So there's some time
18  period in which, in your view, a person has to have taken
19  Vioxx for before you could comfortably opine that the Vioxx
20  contributed to his injury, correct?
21   A   Well, we know from the literature, sir, that the
22  effect of Vioxx can come on within hours, and the Levesque
23  article, she clearly showed you can have an event in a
24  median of nine days, so I have to treat -- that's the door.
25  So I have to treat each patient or client as an individual.

Page 51

1    Q   So, in your view, the minimum time that a person
2  has to have taken Vioxx before you could comfortably opine
3  that the Vioxx contributed to the injury is nine days?
4    A   Median of nine days.
5    Q   Median of nine days?
6    A   It could be six to twelve.
7    Q   It could be six days?
8    A   (Witness nods head.)
9    Q   I'm just trying to figure it out.
10       Are you just talking about your criteria
11  when you say certain cases I'm comfortable?  If I bring you
12  a case and the guy's taken Vioxx for seven days, to you,
13  given your understanding of the current scientific
14  knowledge, that's enough Vioxx, that's enough of a time
15  period of taking Vioxx that you might be comfortable concluding
16  that it caused his injury, correct?
17   A   That it could be a contributing factor, yes.
18   Q   Seven days?
19   A   Seven days.
20   Q   But if it's less than seven days, you wouldn't be
21  comfortable --
22       MR. LOCKLAR:  Object to the form, asked and answered.
23  I'm going to object, also, this is not relevant to the
24  Dedrick case.  I'm not sure about inquiring about
25  opinions that are unrelated to care and treatment and

Page 52

1  the relationship of the drug to Mr. Dedrick.
2  BY MR. OUWELEEN:
3    Q   You can answer the question, Doctor.
4    A   I would have to go through it more thoroughly, but
5  right now, as we sit here today, there have been reports
6  coming out that weren't available prior to some of the
7  literature, meaning, you had to take it longer.  So right
8  now, I prefer to see someone -- the Vioxx ingested at least
9  for a week to ten days prior to the event, and it depends on
10  dosage, too, of course.
11   Q   So, what dosage do you have to have taken for a
12  week to ten days in order for you to be comfortable saying
13  Vioxx was likely a contributing --
14   A   25 milligrams.
15   Q   So, not 12 and a half milligrams?
16   A   You said do I prefer.
17   Q   No, I didn't, I don't think.  I said what dosage
18  do you have to have taken?
19   A   Oh.
20       MR. LOCKLAR:  Same objection I stated before.
21       Go ahead.  You can answer it.
22       THE WITNESS:  It's been reported with 12 and a
23  half milligrams, too, but I was under the impression
24  you said --  I prefer to see 25.
25  BY MR. OUWELEEN:

Page 53

1    Q   More is better, right?
2    A   More is better.  See, we do agree.
3    Q   More is worse?
4    A   Say it again.
5    Q   Higher doses of Vioxx are more likely to cause
6  injury than lower doses; is that your view?
7    A   Higher doses are more likely to cause injury than
8  lower doses.  It depends on how long they took the higher
9  dose.
10   Q   Given an equal duration of taking the drug,
11  Doctor, is it your testimony that higher dosage imposes a
12  higher risk than a lower dosage of Vioxx?
13   A   I'd have to check that out.
14   Q   So you don't know one way or the other sitting
15  here today?
16   A   I know what's more likely than not, but I would
17  have to check it out before I can give you a definite
18  answer.
19   Q   You don't have an opinion sitting here today?
20   A   I prefer --
21   Q   Is that a yes or no, Doctor?
22   A   I prefer not to answer.
23   Q   You're not going to answer my question?
24   A   I'll answer.
25   Q   Do you have an opinion or don't you have an

14  (Pages 50 to 53)

Ira J. Gelb, M.D.

Page 54

1  opinion?
2      A   I have an opinion.
3      Q   What is the opinion?
4      A   The opinion is, I prefer to know what the latest
5  data is on 25 versus 50.  And yes, 50 is more toxic than 25
6  if taken for an equal amount of time.
7      Q   So, higher doses are more toxic than lower doses?
8      A   That's my recollection, but I want to take it out.
9      Q   Is it an opinion you can state within a reasonable
10 degree of medical certainty, Doctor?
11     A   Let me think for a minute, if you don't mind.
12     Q   I certainly don't mind if you think.
13     A   It's not been reported that 50 is more toxic.
14     Q   Okay.  So it's not your opinion, sitting here --
15     A   I say it's not been reported.
16     Q   I'm interested in knowing what your opinion is,
17 Doctor.
18     A   My opinion is no, it's not more toxic, as we speak
19 here today, but it may change by trial time.
20     Q   Well, will you let me know if it changes by trial
21 time?
22     A   Oh, absolutely.
23     Q   Before the trial?
24     A   Of course.
25     Q   Thank you.  So sitting here today, you don't think

Page 55

1  that higher doses of Vioxx are more toxic than lower doses,
2  given equal duration of taking it?
3      A   It depends on what the duration is.
4      Q   Equal durations, Doctor.
5      A   I know.
6      Q   Oh, I see.  Okay.
7      A   You're talking about 18 months of 50 versus 18
8  months of 25?  What are the finite times you're talking
9  about?
10     Q   Well, what are the differences we know about?
11     A   The longer you take a toxic drug, like Vioxx, the
12 more toxic effects are going to occur.  So, in other words,
13 the higher the dose -- generically, the higher dose of a
14 toxic drug taken for a longer period of time would be --
15 would result in more side effects than the lesser dose, but
16 that's generic.  I have to check that out.
17     Q   What I wanted to know, though, what information do
18 you have about Vioxx dosages as they relate to toxicity?
19     A   I don't recall a study being done and comparing
20 just 25 to 50.
21     Q   So sitting here today you can't identify --
22     A   That's correct.
23     Q   -- studies on that?
24         Okay.  Now, in your opinion, do other COX-2
25 inhibitors have the same cardiotoxic properties that you

Page 56

1  claim Vioxx has?
2      A   Are you talking about Celebrex and Bextra?
3      Q   I'm talking about COX-2 inhibitors.
4      A   They do.
5      Q   Are you involved in litigation concerning Celebrex
6  and Bextra?
7      A   Not yet.
8      Q   Do you hope to be?
9      A   No, I don't hope to be, but I said not yet.
10     Q   When did you first meet with Mr. Dedrick's
11 lawyers?
12     A   That's what I was trying to remember.
13     Q   Was it a long time ago?
14     A   I knew you were going to ask me that.
15         Possibly a year ago.  Really, I'm not trying to
16 delude you, but I just don't know exactly when I met them.
17     Q   You knew I was going to ask that, Doctor?
18     A   I expected you to ask that.
19     Q   But you didn't look it up?
20     A   I did look it up, but I couldn't find an exact
21 date.
22     Q   Did you ask the lawyers?
23         MR. LOCKLAR:  I'm not testifying, sir.
24         Answer the question the best that you can.
25         THE WITNESS:  Did I ask the lawyer?  I believe --

Page 57

1  I don't know.  I don't remember.  But I can give you a
2  recollection that I met Mr. Sizemore at a meeting in
3  Chicago when I was talking about Bextra.
4          What, that was maybe a year and a half, two years
5  ago, when I happened to be in Chicago?
6  BY MR. OUWELEEN:
7      Q   A year and a half to two years ago.  So, it might
8  have been as long ago as September of 2004?
9      A   It may have been.  And that -- that -- 2004 stands
10 out because that's when my team won the world series, but
11 I'm not sure exactly when.  The Mealey's meeting was in
12 Chicago, and Bextra is when I met --
13     Q   You spoke at meetings hosted by Mealey's?
14     A   Yes.
15     Q   How many times have you spoken at conferences --
16     A   Four.
17     Q   Excuse me -- sponsored by Mealey's?
18     A   Four or five times.
19     Q   Four or five, those are conferences about COX-2
20 inhibitors?
21     A   No, not just about COX-2 inhibitors.
22         It was Mr. Birchfield that I met in Chicago.
23     Q   You met with Mr. Birchfield?
24     A   Yes.
25     Q   How many times have you spoken at Mealey's

15  (Pages 54 to 57)

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

Page 58

1  conferences about COX-2 inhibitors?
2      A   I think twice.
3      Q   And the other times you spoke at Mealey's
4  conferences, were they about medicines that had anything to
5  do with this litigation?
6      A   No.
7      Q   Twice you spoke for Mealey's.  One was in
8  September 2004?
9      A   Yes.
10     Q   And was the other one in January of 2005,
11  thereabouts?
12     A   I really don't know those dates.
13     Q   Was it roughly in that time frame?
14     A   I have no idea.
15     Q   More than a year ago?
16     A   Yes.
17     Q   Okay.  And was Mr. Birchfield speaking at
18  that Mealey's conference, too?
19     A   I believe so.
20     Q   Was there a conference where doctors and attorneys
21  would present information to other lawyers about COX-2
22  inhibitors?
23     A   Yes.
24     Q   COX-2 inhibitors generally or Vioxx specifically?
25     A   No, that one in Chicago, I believe, was Bextra.

Page 59

1      Q   Bextra.  Uh-huh.
2      A   And I believe maybe there was a speaker about
3  Celebrex.  I'm not sure.  But my topic was Bextra.
4      Q   Bextra.  And the second Mealey's conference, were
5  you talking about COX-2 inhibitors, generally, or about
6  Bextra, or about Vioxx, or what?
7      A   No.  The meeting I was referring to was prior to
8  that.  It was about COX-2 inhibitors especially.
9      Q   When was the first Mealey's conference that you
10  spoke at about COX-2 inhibitors?
11     A   I don't remember the exact dates, but I can tell
12  you that the first time I spoke for Mealey's on this was on
13  Vioxx.  The next meeting was Bextra, and the Bextra meeting
14  was in Chicago.  The prior meeting may have been in
15  Philadelphia.  I don't know.
16     Q   The first meeting you spoke about Vioxx?
17     A   Yes.
18     Q   The second one about Bextra, you spoke about
19  Bextra?
20     A   Yes.
21     Q   Mr. Birchfield was at the -- Mr. Birchfield was at
22  the second conference?
23     A   I believe so.
24     Q   And when did you agree to serve as the expert in
25  the Dedrick case, this case?

Page 60

1      A   Between six months and a year ago, when they spoke
2  to me about it.
3      Q   Had you had other contact with Mr. Birchfield or
4  his firm in the interval between the Mealey's conference and
5  when they first contacted you about the Dedrick litigation?
6      A   Yes.
7      Q   And what was the nature of those contacts?
8      A   There was another possible case that they were
9  involved with, and I was asked to be the expert witness.
10     Q   Uh-huh.  And did you agree to be the expert
11  witness?
12     A   I did.
13     Q   Was it a Vioxx case?
14     A   Yes.
15     Q   And is that a case in which you've written a
16  report?
17     A   I have not written a report.
18     Q   Did you conclude in that case, too, that Vioxx
19  contributed to the plaintiff's injuries?
20     A   Yes.
21     Q   Now, when you agreed to work on the
22  Dedrick case, did you ask the plaintiff's lawyers for
23  documents or literature?
24     A   Of course.
25     Q   What did you ask for?

Page 61

1      A   All the medical records.
2      Q   Okay.  Did you ask for any literature?
3      A   Did I ask for literature?
4      Q   Uh-huh.
5      A   I would ask them to supplement whatever literature
6  I may have, then we would discuss the literature.  But I
7  keep very current with literature, so, I really don't need
8  lawyers to tell me what articles to review.
9          Occasionally they'll come up with an article that
10  I may not have seen, and we'll discuss it, and they send it,
11  or I can print it out at home.
12     Q   And you had studied up on the literature on Vioxx
13  before you ever agreed to serve as an expert witness in
14  Vioxx cases, correct?
15     A   Of course.
16     Q   And you continue to try to stay current on the
17  literature on Vioxx?
18     A   I don't try to stay current.  I stay current.
19     Q   You are current?
20     A   I am current.
21     Q   You read all the relevant literature on Vioxx?
22     A   I hope I've read all the relevant, but, you know,
23  there's so much that comes out all the time.
24     Q   I understand.
25     A   You really can't keep up with it.  I do the best

16  (Pages 58 to 61)

GOLKOW LITIGATION TECHNOLOGIES - 1.877.337.7872

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

Page 62

1  that I can. And, fortunately, I can get on to the medical
2  library through being a member of the staff, and so I look
3  through all the journals and see what I can pick up.
4      But, of course, the lawyers, from whatever firm
5  I'm involved with, say, did you see this particular article
6  or that, and either they send it to me or I print it out
7  myself.
8      Q   Of course. Okay.
9          Now you've been paid so far to
10 work on the Dedrick case about $20,000?
11     A   Maybe a little more.
12     Q   About.
13     A   20, maybe 25.
14     Q   Okay.
15         In all the work that you've done on Vioxx
16 cases, can you tell me how much money you've earned?
17     A   No, I can't.
18     Q   Okay. Is it ten times that, do you think?
19     A   I couldn't give you a number.
20     Q   Just no recollection whatsoever?
21     A   I can't give you a number, because I like to be
22 accurate.
23     Q   But I'm not asking you for an accurate number.
24 I'm asking you for a ballpark range. Do you understand?
25     A   I couldn't give you a ballpark range.

Page 63

1      Q   You have no idea if it's $100,000 or $700,000?
2      A   I know it's not $700,000.
3      Q   Do you know?
4      A   I really don't know.
5      Q   You know, some things, Doctor -- I'm trying to
6  figure out what the range is.
7      A   I know what you're trying to do. And I'm trying
8  to help you. But, on the other hand, by keeping at it,
9  you're not going to get an answer to something I can't give
10 an answer for.
11     Q   Is it more than 500?
12     A   I'll give you an answer that I can give, and I
13 don't know the number.
14     Q   Okay. I understand you don't know the number. Do
15 you know whether it's more or less than $500,000?
16     A   It's less than 500,000. But for Vioxx --
17     Q   For Vioxx.
18     A   -- I can't give you an answer.
19     Q   But it's less than 500?
20     A   It's less than $500,000.
21     Q   Is it less than $300,000?
22     A   I don't know. I presume that. I don't know.
23     Q   It might be $300,000?
24     A   I didn't say that. You're saying that.
25     Q   I'm asking. I'm just asking, sir. I'm just

Page 64

1  trying to figure it out.
2      A   I know what you're asking. I know what you're
3  trying to do. If you would appreciate my integrity, if I
4  knew the answer, I would give it to you, but I don't have
5  the answer, and I want to be very forthright with you
6  because I don't want to be set up in December and have you
7  say, well, you said which is more likely than not to happen,
8  you said this, and I don't want that to happen.
9      Q   Sir, you're going to give truthful answers today,
10 too, because you're a truthful person --
11     A   Pardon me?
12     Q   -- just because you're a truthful person, and on
13 top of that, you're under oath.
14     A   I'm truthful and under oath.
15     Q   I'm just assuming you're giving me truthful
16 answers.
17     A   You don't have to assume. You can count on it.
18     Q   Okay. Good.
19         So as a matter of truth, can you
20 remember, sitting here today, whether you've earned more or
21 less than $300,000? If you can't remember, just say I don't
22 remember.
23     A   I'll reiterate, I can't remember.
24     Q   Okay. Do you keep the money that you earn as an
25 expert in litigation?

Page 65

1      A   Do I keep it?
2      Q   Yeah, as opposed to --
3      A   I pay taxes on it.
4      Q   The part you don't pay taxes on, do you keep?
5      A   Well, we put it into an account, and we give
6  donations to many organizations.
7      Q   You don't contribute all the money you earn as an
8  expert to a charitable organizations, correct?
9      A   No.
10     Q   It's part of the money --
11     A   Unless you count children as a charitable
12 organization.
13     Q   Unfortunately, I don't think they qualify.
14     A   No.
15     Q   The fee schedule, your fee schedule for this case
16 is $400 per hour, as shown in your -- where is it shown? On
17 Exhibit 1 it says your fee schedule is $400 per hour, $5,000
18 per day for court appearances and depositions, and then
19 travel time at $200 per hour, correct?
20     A   Correct.
21     Q   And there's a retainer fee of $1,000. That's just
22 sort of the initial charge for you to take the case?
23     A   Yes.
24     Q   And are those -- those are your fees for this
25 case?

17  (Pages 62 to 65)

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

Page 66

1    A   Those have been my fees and are my fees.
2    Q   Okay. And are those the same fees that you charge
3  in other cases where you're an expert?
4    A   Correct.
5    Q   Do you know how long those fees have been in
6  effect?
7    A   Certainly since 2000, but --
8    Q   That's good enough.
9    A   Yeah.
10   Q   Have you spoken to any other people concerning
11 your work on this case? When I say "other people," I mean
12 people besides the lawyers for Mr. Dedrick.
13   A   Have I spoken about my position in this case?
14   Q   About your work in this case.
15   A   No.
16   Q   So you haven't talked to any of the other experts
17 that have been retained?
18   A   Oh, no.
19   Q   You haven't spoken to anybody who served as an
20 expert in other Vioxx litigation?
21   A   I may speak to them, but not about this case.
22   Q   And not about being an expert in Vioxx litigation?
23   A   No.
24   Q   Have you ever met Dr. Mark Furman?
25   A   No.

Page 67

1    Q   Do you know who he is?
2    A   I do now.
3    Q   How do you know who he is?
4    A   Because I got his report that he gave yesterday --
5  oh, the man who did the stress echo, just told me he was
6  doing an echo on Mr. Dedrick.
7    Q   And who is that man?
8    A   Philip Oranburg.
9    Q   Okay.
10       He's not serving as an expert witness in
11 any Vioxx cases, is he?
12   A   No.
13   Q   Dr. Furman, you read his report?
14   A   Yes.
15   Q   When did you read it?
16   A   Last night.
17   Q   Did you ever discuss it with Dr. Furman?
18   A   I never met him, so I haven't spoken to him.
19   Q   Why did you read that?
20   A   Why did I read it?
21   Q   Yeah.
22   A   Because of coming here today, and I thought it
23 would be important to read it.
24   Q   Why?
25   A   Why?

Page 68

1    Q   Yeah.
2    A   I like to read as much material as I can before I
3  appear.
4    Q   Well, do you base your scientific opinion in cases
5  on what other experts have said?
6        MR. LOCKLAR: Don't worry about it.
7        THE WITNESS: No.
8  BY MR. OUWELEEN:
9    Q   Are you looking for something?
10   A   No. I wanted it find out if I had the Furman
11 report.
12   Q   That's okay. We don't need to take Dr. Furman's
13 report --
14       MR. LOCKLAR: He's asking you specific questions.
15       THE WITNESS: No. I base my opinions on my own.
16 BY MR. OUWELEEN:
17   Q   Based on your own study?
18   A   My own evaluation of all the material that I can
19 gather, I review reports, I review literature. Anywhere I
20 can get information. But I process it myself and determine
21 whether I'm going to utilize it.
22   Q   Do you consider the expert reports written by
23 other experts in Vioxx litigation to be a valid consideration
24 for you in reaching your conclusion in these cases?
25   A   They're a source and they have validity, but I

Page 69

1  don't take everything they say as gospel; just like I
2  wouldn't take everything that's written in the literature as
3  gospel until I check it out and cross reference it myself.
4    Q   Uh-huh. Did you go --
5    A   That's the advantage of having been an editor.
6    Q   Did you go and cross reference the things
7  mentioned in Dr. Furman's report?
8    A   I just got it last night. I looked at some. I
9  didn't look at all of it.
10   Q   Did you ask for it, or was it given to you?
11   A   It was given to me.
12   Q   So the plaintiff's lawyers gave you Dr. Furman's
13 report?
14   A   Well, I told them from day one I would like to see
15 any reports that are generated, because I think it's
16 important.
17   Q   Did you review Dr. Pratt and Dr. Roach's reports?
18   A   I certainly did.
19   Q   Have you ever heard of Dr. Pratt or Dr. Roach
20 before this case?
21   A   No.
22   Q   Or Dr. Furman?
23   A   I heard of a Mark Furman, but not Dr. Furman.
24   Q   Was the Mark Furman you're referring to a guy
25 involved in the OJ case?

18  (Pages 66 to 69)

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

---

**Page 70**

1    A   That's the one I heard of.
2    Q   He wasn't a doctor.
3    A   No, and he didn't write this report.
4    Q   Just to be clear.
5        MR. OUWELEEN:  Off the record.
6        (Thereupon, a discussion was had off the record.)
7    BY MR. OUWELEEN:
8    Q   Now, have you given other talks about COX-2
9    inhibitors besides the Mealey's conferences we were talking
10   about --
11   A   I have.
12   Q   How many times?
13   A   Once.
14   Q   Was it in China?
15   A   Yes.
16   Q   Was it in October of 2006 -- no, that's wrong.
17   A   That would be terrific.  I just got back.
18       No, it was October 11, 2005.
19   Q   And how did that come about?
20   A   I was asked as a faculty member of Florida
21   Atlantic University, would I like to come to Shanghai, they
22   were having a talk on drugs and drug therapy, would I like
23   to come to Shanghai and speak about Vioxx and the heart.
24   Q   It was a conference, generally, about drugs and
25   drug therapies?

---

**Page 71**

1    A   Yes.
2    Q   It was a medical conference, not a lawyers'
3    conference, correct?
4    A   There were no lawyers there that I knew of.  They
5    were all physicians -- researchers.
6    Q   Is there some sort of standing relationship
7    between the institution in China that invited you and your
8    medical school?
9    A   No.
10   Q   How did they find you, do you know?
11   A   Yes.  One of the faculty members of FAU is
12   Chinese, who comes from Ma-an Shan, and Ma-an Shan has a
13   medical school that we, subsequently, became affiliated.
14   Q   Subsequent to your presentation, you mean?
15   A   Yes.
16   Q   Okay.
17   A   And then Dr. Huang, H-U-A-N-G, was invited to give
18   a talk, and he said -- I spoke to him, but would you be
19   interested in giving a talk on Vioxx.  I had never been to
20   China, so I couldn't say no.
21   Q   Did your wife go with you?
22   A   Of course.
23   Q   Is your wife named June?
24   A   Yes.
25   Q   And did you have a good time?

---

**Page 72**

1    A   No.  I had a great time, fantastic.
2    Q   How long were you in China?
3    A   Two weeks.  But because we were treated very
4    elegantly, and we had a guide and a driver, and they took us
5    to the restaurants and the hotels, and it was really a
6    wonderful trip.
7    Q   How long did you teach or speak about
8    Vioxx at that conference?
9    A   About an hour.
10   Q   Do you have a copy of any materials that you
11   created in connection with that?
12   A   I don't recall.  I should have kept it, but I
13   didn't.  It was a PowerPoint that I gave, but I don't have
14   it.
15   Q   You don't?  Have you checked your records?
16   A   Yesterday.
17   Q   Can you ask Dr. Huang if he has a copy of the
18   PowerPoint from that presentation?
19   A   I don't know why he would.  I could ask him.
20   Q   Were materials handed out to the attendees of
21   the conference?
22   A   I think so.
23   Q   Was a copy of the PowerPoint handed out to the
24   attendees of the conference?
25   A   I don't remember.  I don't remember.

---

**Page 73**

1    Q   Do you know if the conference -- did you send a
2    copy of your PowerPoint to the conference sponsors before,
3    in advance of the conference?
4    A   No, I brought this little stick with me.
5    Q   You brought your PowerPoint on a little stick?
6    A   Yes.
7    Q   A USB drive, a computer drive?
8    A   That's it, yes.
9    Q   So you never provided a copy to the sponsors of
10   the conference, to your knowledge?
11   A   I used their computer, and I put the stick in, and
12   they may have made a copy.  I don't know.
13   Q   But, to your knowledge, you didn't send them a
14   copy, e-mail them one --
15   A   No.
16   Q   -- hand them a hard copy, nothing like that?
17   A   No, not that I recall.
18   Q   What did you say about -- was it about COX-2
19   inhibitors or just Vioxx, your presentation in China?
20   A   Well, I spoke about COX-2 inhibitors, but a lot
21   about Vioxx.  I mentioned Celebrex, Bextra.  It was mostly
22   about Vioxx.
23   Q   And these were medical doctors you were talking
24   to?
25   A   Researchers.

GOLKOW LITIGATION TECHNOLOGIES - 1.877.337.7872

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

Page 74

1    Q   So you were giving sort of a Vioxx 101
2   presentation?
3    A   Yes.
4    Q   The basics?
5    A   Yes.
6    Q   Explaining the prostacyclin and balance
7   hypothesis, and things of that nature?
8    A   Yes. And they asked me to come back the following
9   month and speak to other organizations, but it's a long
10  trip, so I didn't do it.
11   Q   And did you tell them in that presentation that
12  Vioxx is cardiotoxic?
13   A   I did.
14       MR. OUWELEEN: Can I have Number 18, Bob, please?
15       THE WITNESS: Can I take a break, at this point?
16       MR. OUWELEEN: Sure.
17      (Thereupon, a short break was taken.)
18  BY MR. OUWELEEN:
19   Q   Dr. Gelb, I've handed you what's been marked as
20  Gelb Exhibit Number 4. Is that a copy of a PowerPoint
21  presentation that you gave at one of the Mealey's
22  conferences where you spoke about Vioxx?
23   A   Yes, it is.
24   Q   Are you okay?
25   A   Fine. Thank you.

Page 75

1    Q   Do you know which conference that was, Exhibit 4
2   was from?
3    A   It was a Mealey's conference. I'm not sure. I
4   think this preceded the Chicago conference, I was telling
5   you earlier. I'm not sure exactly.
6    Q   Just flipping through it, do you know if this was
7   the conference where you were talking about Bextra or Vioxx
8   or both?
9    A   No. This is not the one about Bextra.
10   Q   So this was a presentation you made about Vioxx,
11  correct?
12   A   Well, COX-2 inhibitors.
13   Q   Well, I just -- you know, you said earlier that
14  you spoke about Bextra at one conference and Vioxx at a
15  different conference, correct?
16   A   Well, I thought I said COX-2 inhibitors, but in
17  looking through this, I see that I spoke a lot about Vioxx,
18  but it was really generally about COX-2 inhibition.
19   Q   So, just to be clear, Exhibit 4 was a presentation
20  that you made about COX-2 inhibitors and Vioxx?
21   A   And I see in looking at --
22   Q   Can you answer that first before telling me what
23  you see in there? Is Exhibit 4 a presentation that you made
24  about COX-2 inhibitors and Vioxx?
25   A   Yes.

Page 76

1    Q   And it was a presentation you made in 2005?
2    A   I hope that's the date. I'm not sure.
3    Q   To the best of your recollection.
4    A   It looks -- yeah, I believe so.
5    Q   And was this Exhibit 4 the conference where you
6   met Mr. Birchfield, Mr. Dedrick's lawyer?
7    A   I'm not sure. I thought I met him at the Chicago
8   meeting, which followed this one, I believe. I'm losing
9   track of dates.
10   Q   Okay.
11   A   I may have met him there. I don't know. I don't
12  really keep track of --
13   Q   If there are other records that indicate that the
14  Mealey's conference was in January 2005, was that the
15  presentation that you would have given at that conference?
16   A   I believe that's right.
17   Q   And who's Mr. Rheingold, who's on Exhibit 4?
18   A   Paul Rheingold is a lawyer from New York.
19   Q   Does he represent plaintiffs in Vioxx cases?
20   A   He does.
21   Q   Did he give this presentation with you?
22   A   This is my presentation.
23   Q   Well, why is his name on that?
24   A   He was the chair of the meeting, I believe.
25   Q   But this was your -- Exhibit 4 was your

Page 77

1   presentation?
2    A   This is my presentation.
3    Q   Okay. And is this your whole presentation, as
4   best you can tell, in that conference?
5    A   It looks to be my whole presentation.
6    Q   Okay.
7    A   Excuse me. You gave me two copies for --
8    Q   That was meant for somebody else. I'm handing you
9   what's been marked as Exhibit 2.
10   A   Do I need this?
11   Q   You can just put it -- if you wouldn't mind,
12  Doctor, just put all the exhibits in a little pile there. I
13  might refer back to some later at the end. We'll give all
14  the originals back to the court reporter.
15       There, keep this one.
16       This one is Exhibit 2. Did I just say -- what
17  exhibit did I just hand you, Dr. Gelb? I'm sorry. That's
18  your report?
19   A   Exhibit 2.
20   Q   Okay. Is Exhibit 2 your expert report in this
21  case?
22   A   It is.
23   Q   Did you write it?
24   A   I did.
25   Q   Did you type it yourself?

GOLKOW LITIGATION TECHNOLOGIES - 1.877.337.7872

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

| Page 78 | Page 80 |
|---|---|
| 1    A   No. | 1   of -- we'll come back. |
| 2    Q   Who typed it? | 2         MR. OUWELEEN:  Off the record. |
| 3    A   The law firm. | 3         (Thereupon, a discussion was had off the record.) |
| 4    Q   Okay. | 4   BY MR. OUWELEEN: |
| 5    A   The Beasley Law Firm. | 5    Q   So just to get clear the general mechanics, you |
| 6    Q   All right.  And did you write it out long hand? | 6   met with Mr. Sizemore in person, and then you had some phone |
| 7    A   No, I have a computer.  Actually, what happened | 7   conversations, and then he typed up a draft of the expert |
| 8   was, we spoke about the report, and I believe -- I forget | 8   report based on your opinions? |
| 9   how it came about, but I told them what I wanted.  I'm a | 9    A   Recommendations. |
| 10  terrible typist.  And I told them what I wanted in the | 10    Q   Opinions that you had expressed, and then he sent |
| 11  report.  And we went over it, and him or his secretary, | 11   it to you, then you kind of edited it to make sure it |
| 12  Mr. Sizemore, that is, typed it out and sent it to me for my | 12   reflected your opinions, correct? |
| 13  editing, and that's how it came about. | 13    A   Not kind of edit.  I edited. |
| 14    Q   I see.  Okay.  And was that a conversation you had | 14    Q   Okay.  You edited. |
| 15  in person with Mr. Sizemore on the phone? | 15        So he did the first draft, but you edited it to |
| 16    A   On the telephone.  Wait.  It may have been both. | 16   make sure it expressed your opinions? |
| 17  I'm not sure. | 17    A   Absolutely.  We spoke about it, to my |
| 18    Q   Okay.  Well, do you remember -- you live here in | 18   recollection.  You know, I don't keep track of exact days of |
| 19  Florida, correct? | 19   things, but we spoke about it.  He said, we need a report. |
| 20    A   I do. | 20   He said, this is what I'd like, and we'll talk about it.  And |
| 21    Q   And Mr. Sizemore lives in Alabama? | 21   we outlined what I thought should be in the report, and he |
| 22    A   He does. | 22   gave me his ideas, but this final version is mine. |
| 23    Q   Did you go to Alabama, at any time, to work on | 23    Q   Okay.  And you accepted some of his ideas and |
| 24  this report? | 24   rejected some? |
| 25    A   No. | 25    A   That's true. |

| Page 79 | Page 81 |
|---|---|
| 1    Q   Did he come here? | 1    Q   Okay. |
| 2    A   To work on this report? | 2    A   I'm used to doing that as an editor. |
| 3    Q   Yeah. | 3    Q   And was it just Mr. Sizemore who was involved with |
| 4    A   He came to meet with me, and we spoke, and that | 4   you in this process of drafting and revising the report, or |
| 5   generated the nucleus for the report. | 5   were there others? |
| 6    Q   When did he come to meet with you to generate the | 6    A   It probably was Mr. Sizemore. |
| 7   nucleus for the report? | 7    Q   Do you remember -- |
| 8    A   Maybe a month ago. | 8    A   I'm not sure if Mr. Birchfield had anything to do |
| 9    Q   Can you remember the date? | 9   with it when it was talked about in Alabama, but my direct |
| 10    A   I really don't. | 10   involvement on this report was with Mr. Sizemore. |
| 11    Q   Is it reflected in your billing records at all? | 11    Q   You didn't have any direct conversations with |
| 12    A   It could be. | 12   anybody else about this report? |
| 13        MR. OUWELEEN:  Do you have a copy of those billing | 13    A   No. |
| 14   records, Bob? | 14    Q   Okay.  Do you approach your role in this case as a |
| 15        MR. BLACKWELL:  Yeah. | 15   paid advocate for the plaintiff or as an impartial expert? |
| 16        MR. OUWELEEN:  Just check that out. | 16    A   An impartial expert. |
| 17        THE WITNESS:  It was before the report. | 17    Q   And you approached your assignment in a fair and |
| 18   BY MR. OUWELEEN: | 18   objective manner? |
| 19    Q   The report was finished by the date you signed it, | 19    A   Always. |
| 20   correct? | 20    Q   Including here? |
| 21    A   Yes. | 21    A   Pardon me? |
| 22    Q   And on the last page it says executed this 15, | 22    Q   Including in this case? |
| 23   September 2006? | 23    A   Of course. |
| 24    A   Let me check the date.  Yes. | 24    Q   And you agree that it would be wrong to look at |
| 25    Q   Do you have a copy of this?  Can we get copies | 25   only one side of the story as an expert? |

GOLKOW LITIGATION TECHNOLOGIES - 1.877.337.7872

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

Page 82

1    A   Absolutely, correct.
2    Q   It's important to review data on both sides of a
3  question that you're requested to opine about?
4    A   Of course.
5    Q   And it's important to consider the totality of the
6  data on the subject before forming any opinions?
7    A   Absolutely.
8    Q   And it would be wrong to ignore any data that may
9  not support your opinion, correct?
10    A   I agree.
11    Q   Why is that important?
12    A   Because I, for one, know you have to be unbiased,
13  and my opinion has to reflect both sides of an issue, and I
14  weigh one against the other before I conclude which is the
15  valid opinion.
16    Q   Okay.
17        And in this case, did you consider data
18  favorable to Merck's position?
19    A   Did I favor what?
20    Q   Data that are favorable to Merck's position.
21    A   Of course, I put it in the formula.  I considered
22  it before I made any final decision.
23    Q   And did you ask the lawyers for Mr. Dedrick to
24  provide you with any of the data or studies that Merck is
25  relying on?

Page 83

1    A   I never spoke to Mr. Dedrick about this.
2    Q   No, no.  I said speak with the lawyers for
3  Mr. Dedrick.
4    A   Oh, I thought you said Mr. Dedrick.
5    Q   I may have misspoken.
6    A   I asked them for any information I could get from
7  Merck about the background information on Vioxx.
8    Q   But, also, you said, please send me any studies or
9  data that Merck's experts are relying on in their opinions?
10    A   Yes.
11    Q   And you reviewed all that information?
12    A   I did.
13    Q   Do you believe that placebo-controlled clinical
14  trials are the best evidence of a safety of a drug?
15    A   Yes.
16    Q   And you considered here all the placebo-controlled
17  clinical trial data?
18    A   I did, in addition to others, of course.
19    Q   Yes.  And when did you review the medical records
20  for this case?
21    A   I'd have to look at my statement.  Whenever they
22  were sent to me, and I forget exactly when they were sent to
23  me.
24        THE WITNESS:  Fran, do you know?
25        MR. LOCKLAR:  If you don't know --

Page 84

1  BY MR. OUWELEEN:
2    Q   You prepare billing statements that reflect, in
3  general, the work that you're doing?
4    A   Yes.  Yes, sir.
5    Q   So we can determine that from your billing
6  records?
7    A   Yes, sir.
8    Q   You make an effort to make sure your billing
9  records accurately reflect what you did and when you did it?
10    A   Of course.  I'm Type A compulsive.
11    Q   You were asked to opine whether Vioxx is
12  cardiotoxic?
13    A   Yes.
14    Q   Whether Vioxx substantially contributed to
15  Dr. Dedrick's heart attack?
16    A   To Mr. Dedrick.
17    Q   What did I say, Dr. Dedrick?
18    A   Yes, correct.
19    Q   I'll restate it.
20        You were asked to opine as to whether Vioxx
21  substantially contributed to Mr. Dedrick's heart attack?
22    A   Yes.
23    Q   And you were asked to opine about Mr. Dedrick's
24  prognosis going forward?
25    A   Yes.

Page 85

1    Q   And then you were asked to give some opinions
2  about whether Merck adequately labeled or warned about the
3  cardiovascular risks of Vioxx?
4    A   Yes.
5    Q   When did you form your opinions on each of those
6  subjects?  When did you reach your conclusion?
7    A   Prior to writing the report.
8    Q   But how far in advance of writing your report?
9    A   Well, after reviewing the material that was sent
10  to me, you'll note from the records, that I felt strongly
11  that Vioxx played a significant role in Mr. Dedrick's acute
12  myocardial infraction of January 8, 2003.
13    Q   When you say "acute myocardial infraction,"
14  myocardial infraction is the thing that in common terms we
15  call a heart attack, correct?
16    A   Yes.
17    Q   And acute myocardial infraction means what?
18    A   Acute myocardial infarction means just as it says.
19  It happened on that day, or maybe the day prior to, but it
20  is very proximal to the day he was admitted to the hospital.
21    Q   Is there a kind of myocardial infraction that is
22  not acute?
23    A   It could be subclinical.
24    Q   Okay.
25        So an acute myocardial infraction just, in

GOLKOW LITIGATION TECHNOLOGIES - 1.877.337.7872

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

Page 86

1   laymen's terms, means a serious heart attack.
2       A   A serious recognized heart attack.
3       Q   Okay.
4           Is it possible to have a serious heart
5   attack and it go undetected?
6       A   It's possible.
7       Q   People have heart attacks and don't even know they
8   had one?
9       A   Yes.
10      Q   Okay.  When did you form the opinion that Vioxx is
11  cardiotoxic?
12      A   Well, when I started giving -- when I gave that
13  report to Mealey's, I felt it was cardiotoxic, but we don't
14  know if it was January or February.  But when it first came
15  out in the literature, and I started reading about it, I was
16  concerned, and I recognized that it did have some
17  cardiotoxic effects.
18      Q   Do you remember -- I'm sorry.  Go ahead.
19      A   And then when I was asked if I would address the
20  Mealey's people, I said certainly, I'd be happy to do it.
21      Q   So when you addressed the Mealey's people, that was
22  in late 2004, early 2005, correct?
23      A   That was when I addressed it, but I made my
24  opinions -- I made my opinions earlier than that, of course.
25      Q   Earlier than that.  So do you recall whether you

Page 87

1   concluded that Vioxx was cardiotoxic before it was withdrawn
2   from the market?
3       A   Oh, yes.
4       Q   You had concluded that?
5       A   Oh, yes.
6       Q   So, and when was it withdrawn from the market?
7       A   September 30, 2004.
8       Q   How do you remember -- you seem quite confident
9   that you were of the opinion that it was cardiotoxic before
10  it was withdrawn from the market, right?
11      A   Yes.
12      Q   Why are you so confident with that?
13      A   Because I'm current with the literature.
14      Q   So before September 2004, what was the literature
15  that convinced that you Vioxx was cardiotoxic?
16      A   May I have my --
17          MR. LOCKLAR:  Is that what you're looking for?
18  BY MR. OUWELEEN:
19      Q   What -- I notice that you're looking for a
20  document, Doctor.  What are you looking for?
21      A   I'm looking for my Vioxx references.
22      Q   Okay.
23      A   Would you like a copy?
24          MR. LOCKLAR:  He already has one.
25  BY MR. OUWELEEN:

Page 88

1       Q   I have a copy.  Thanks.
2       A   So in looking at this, I can see that in 2001
3   there were articles coming out in, for example, New England
4   Journal of Medicine, and by Dr. FitzGerald and Patrono --
5       Q   I'll stop you right there.
6           When did you read that article?
7       A   I read them as they come out.
8       Q   So it's your testimony that all of the articles on
9   your reference list, in Exhibit 1, are -- you read when they
10  came out, on or about the time they came out?
11      A   I usually do.  I like to keep current.  And not
12  only do I receive them, I can pick them up by plugging on to
13  the --
14      Q   Article Number 1, FitzGerald and Patrono, that was
15  a 2001 article?
16      A   Yes.
17      Q   You read that in 2001?
18      A   Whenever it came out, I read it.
19      Q   So it came out in 2001, right?
20      A   2001.
21      Q   So you read it in 2001?
22      A   Yes.
23      Q   When you read that article, did you form the
24  conclusion that Vioxx was cardiotoxic?
25      A   No, I didn't form a conclusion, but I thought of

Page 89

1   the possibilities.
2       Q   Okay.
3           So when did you form the conclusion -- let
4   me back up.
5           You said a moment ago that you had formed a
6   conclusion that Vioxx was cardiotoxic before September 2004,
7   correct?
8       A   Yes.
9       Q   So when did you form that conclusion, to the best
10  of your recollection?
11      A   I can't tell you exactly when, but I kept reading
12  articles by Topol and Nissen and FitzGerald and Wayne Ray
13  and Juni. And also the American College of Cardiology had a
14  meeting, I forget what year, and they addressed that.  And
15  we had a meeting at Mount Sinai in New York, where I'm still
16  affiliated, so it's during this ongoing phase, you know,
17  like I said, the pros and cons.  I like to get all the
18  information before I form a conclusion.
19      Q   Right.
20      A   So I just don't read an article and say that
21  that's it.
22      Q   I appreciate that.
23      A   So ongoing, and I, respectfully, submit that I
24  always say in my reports, should there be additional
25  information, I will modify my report.  Well, I also modify

GOLKOW LITIGATION TECHNOLOGIES - 1.877.337.7872

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

Page 90

1  what I say based on the latest literature.
2      Q   But at some point, you reached the firm conclusion
3  that that's it, as you say, and concluded that Vioxx was
4  cardiotoxic before September 2004?
5      A   Yes.
6      Q   But other than it was before 2004, you don't
7  remember when it was?
8      A   In the early -- well, 2001, sometime after that.
9      Q   And so did you take any steps at the time, once
10 you concluded that Vioxx, which was still on the market, was
11 cardiotoxic?  And cardiotoxic, does toxic mean poison
12 basically?
13     A   A Side effect.
14     Q   Cardiotoxic means it has cardiac side effects?
15     A   Quote, like you said, to the layman, poison.
16     Q   So in laymen's terms, a toxic means it's poison?
17     A   Yes.
18     Q   So when you say Vioxx is cardiotoxic, you mean
19 it's basically poison to the heart?
20     A   In a lay term.  That's not a scientific
21 description.
22     Q   To the jury, that's what they should understand
23 that to mean, correct?
24     A   Of course.
25     Q   Did you write to the FDA and tell them that you

Page 91

1  thought Vioxx was a poison to the heart?
2      A   No.
3      Q   Did you write to the New England Journal of
4  Medicine, or any other journal, and say that drug should be
5  taken off the market?
6      A   No.
7      Q   Did you publish anything in any of the journals
8  that you were a reviewer for, or you were you on the board
9  of, to say Vioxx was cardiotoxic and should be removed from
10 the market?
11     A   No.
12     Q   Did you send a letter to Merck saying they should
13 stop selling this drug?
14     A   No.
15     Q   Did you write a letter to the president of the
16 Merck research laboratory and say, why are you selling this
17 cardiotoxic drug?
18     A   No.
19     Q   Did you believe lives were in danger as a result
20 of this cardiotoxic drug being on the market?
21     A   I did.
22     Q   But did you take any steps to try to get it taken
23 off the market?
24     A   Whenever somebody asked me about taking Vioxx, I
25 would advise them of my feelings.

Page 92

1      Q   But beyond that, you didn't do anything?
2      A   No.
3      Q   When you wrote your expert report, you understood
4  that it was your obligation to disclose your opinions in
5  there, correct?
6      A   Of course.
7      Q   When you prepared your list of references which
8  you provided to us with your expert report, you understood
9  that you had an obligation to tell us about all the
10 references you were relying on at that time, correct?
11     A   At that time, yes, but I updated it.
12     Q   Subsequently, you've reviewed additional articles
13 and added those to your list?
14     A   Yes, sir.
15     Q   But at the time you prepared your report, the list
16 that's shown in Exhibit 1, it was a complete and full
17 disclosure of your references, to the best of your ability,
18 correct?
19         MR. LOCKLAR:  Do you want to see the original
20 list?
21         THE WITNESS:  Yes, if I could look at the original
22 list for a second.
23         MR. OUWELEEN:  Sure.
24         MR. LOCKLAR:  I don't have the original with me, I
25 don't believe.

Page 93

1          MR. OUWELEEN:  That's Exhibit 1.  It's in
2  Exhibit 1.
3          MR. LOCKLAR:  Oh, is it?  It's not attached to our
4  1.  That's 2.  I'm sorry.  Bear with me here.
5          THE WITNESS:  I saw it.
6          MR. LOCKLAR:  That's it.
7          THE WITNESS:  Yes, my list was attached.  It was
8  current at that time.
9  BY MR. OUWELEEN:
10     Q   And when you say "at that time," at the time you
11 prepared your expert report, the references you relied on,
12 had relied on up to that point, were as listed in Exhibit 1?
13     A   Correct.
14     Q   And the case specific materials, the medical
15 records and so on that you reviewed were fully disclosed
16 in your report on Page 2, that's Exhibit 2, correct?
17     A   Yes.  You can tell I did the typing for the list
18 because there are a lot of typos.
19     Q   Are there?
20     A   Yes.
21     Q   Oh, this list, the reference list?
22     A   Yes.
23     Q   You typed that up yourself?
24     A   That's why I say you can see there's a lot of
25 typos.

GOLKOW LITIGATION TECHNOLOGIES - 1.877.337.7872

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

Page 94

1    Q   So you typed up your Vioxx references list in
2  Exhibit 1?
3    A   Yes.
4    Q   And that's a bill?
5    A   It's ongoing.
6    Q   On an ongoing basis. So you didn't bill the
7  lawyers for Mr. Dedrick for your time spent reviewing all
8  these articles back to 2001, correct?
9    A   No.
10   Q   Do you know how much time you billed for reviewing
11 articles, just how much time you billed just in this case?
12   A   For reviewing articles?
13   Q   Yeah.
14   A   It will be on the bill that will be submitted.
15   Q   So whatever it says on the bill?
16   A   Whatever it says on the bill.
17   Q   Okay. And the medical records and the records
18 that you reviewed, did you ask, basically, just give me all
19 the medical records related to the case?
20   A   Of course. I have to tell you, I'm from New York
21 and Type A, so I want all the records.
22   Q   Did you review any depositions --
23   A   Yes.
24   Q   -- from this case?
25   A   Yes.

Page 95

1    Q   Did you review those before you prepared your
2  expert report?
3    A   I'm not sure. I don't think so.
4    Q   And which depositions did you review?
5    A   Do you have the list there?
6       MR. OUWELEEN: What's this? Oh.
7       THE WITNESS: Does he have a list of depositions?
8       MR. LOCKLAR: No. The depositions are in the box.
9  To the best of your memory, if you do remember.
10      THE WITNESS: The depositions in that big box.
11 BY MR. OUWELEEN:
12   Q   Okay. So did you --
13   A   I look forward to reading them to you.
14   Q   Did you read -- to the best of your recollection,
15 which depositions did you review? Did you review the
16 depositions of the treating doctors?
17   A   Yes.
18   Q   The cardiologists?
19   A   Yes.
20   Q   His primary care doctor, Dr. Herrera?
21   A   Yes.
22   Q   Dr. Koenig?
23   A   Koenig, being in here.
24   Q   Coltharp?
25   A   Yes.

Page 96

1    Q   Any others, Doctor? Did you read Mr. Dedrick's
2  depo?
3    A   And I read Mr. Dedrick's.
4    Q   How about his brother, sister, girlfriend?
5    A   No.
6    Q   And you list in Exhibit 1 on the last page,
7  deposition, trial testimony, and expert disclosures
8  reviewed. That, too, is a running list of things you
9  reviewed in your Vioxx work?
10   A   I just want to look at that. Would you mind
11 asking that question again?
12   Q   Sure. On the last page of Exhibit 1 is another
13 list of deposition, trial testimony, and expert disclosures
14 reviewed.
15   A   Oh, yes, I see it.
16   Q   See that? Now those are not all depositions and
17 transcripts that you reviewed just for this case, correct?
18   A   No.
19   Q   That's a running list of all the depositions and
20 transcripts that you've ever reviewed in Vioxx litigation?
21   A   Yes.
22   Q   So if you take that list of depositions, trial
23 testimony and expert disclosures, and then you add to it
24 the other -- the depositions we just talked about of the
25 treating doctors and Mr. Dedrick, that would be a complete

Page 97

1  list of the testimony and depositions that you've reviewed,
2  correct?
3    A   To the best of my knowledge, yes, sir.
4    Q   Okay.
5       And similarly, if you take the expert
6  disclosures listed there on the last page of Exhibit 1, and
7  you add to it the expert reports, Dr. Furman, Pratt, and
8  Roach, that's a complete list of the expert reports you've
9  reviewed?
10   A   No, there are two others. One was Arrowsmith and
11 Nicholas -- I forgot his last name.
12   Q   Flavahan?
13   A   That's the one.
14   Q   With those two additions, that's a complete list?
15   A   Yes.
16   Q   Okay.
17      Now, in your report, did you -- in your
18 expert report, which is Exhibit 2, did you make an effort to
19 acknowledge doubt where doubt exists in the scientific
20 community?
21      MR. LOCKLAR: Object to the form.
22 BY MR. OUWELEEN:
23   Q   You can answer the question, Dr. Gelb.
24   A   I'm sorry to take the time. I just want to make
25 sure I give you the correct answer. Is it okay if I review

25  (Pages 94 to 97)

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

Page 98

1  it?
2      Q   Yes, it is certainly fine.
3      A   Thank you. Yes, I did.
4      Q   Where?
5      A   On Roman Numeral II, third paragraph, it says,
6  "Merck's internal studies as early as the late-1990's
7  revealed that COX-2 inhibition would reduce systemic
8  production of prostacyclin without an equal reduction in
9  thromboxane."
10     So I mention that there are studies earlier that
11 they were aware that COXs would reduce prostacyclin without
12 an equal reduction in thromboxane.
13     Q   My question was whether you acknowledged in your
14 report whether there was doubt or debate in the scientific
15 community.
16         MR. LOCKLAR: Object to the form.
17         THE WITNESS: Apparently not.
18 BY MR. OUWELEEN:
19     Q   Okay.
20         And would you agree with me that there
21 are -- some of the issues that you discussed in your report
22 are issues about which there is doubt or at least serious
23 disagreement within the scientific community?
24     A   Yes.
25     Q   Okay.

Page 99

1          Now have you brought -- do we have a
2  deposition notice? We'll come back to that.
3          When you were a practicing cardiologist,
4  up until 1992, Dr. Gelb, what percentage of your patients
5  had coronary artery disease?
6      A   Well, 99 percent, or 90-some odd percent, were
7  cardiacs. Most of them had coronary disease. Some, of
8  course, had other entities, rheumatic fever, endocarditis,
9  arrhythmias.
10     Q   You'll have an opportunity to review the record
11 and correct the spelling and so on.
12     A   I'm sorry. Among other things, it wasn't just
13 limited to coronary disease.
14     Q   Now when you say 99 percent of them were cardiacs,
15 what does that mean?
16     A   In other words, restricted, limited my practice to
17 cardiology.
18     Q   Oh, okay.
19         And of your cardiology patients, the
20 majority of them have coronary artery disease, although
21 some of them may have had other things, too?
22     A   The majority had coronary disease.
23     Q   Would you say the overwhelming majority had
24 coronary artery disease?
25     A   I never took a tally, but more than 50 percent had

Page 100

1  coronary disease.
2      Q   Now is coronary -- is cardiovascular disease the leading
3  cause of death in the United States?
4      A   It is.
5      Q   And it has been for over 100 years?
6      A   Yes.
7      Q   And it was the leading cause of death long before
8  Vioxx was ever on the market, of course?
9      A   Yes.
10     Q   Is atherosclerosis the buildup of fatty deposits
11 on the walls of arteries?
12     A   Yes.
13     Q   And then when these fatty deposits build up, the
14 body forms a sort of fibrous cap over the fatty deposit?
15     A   It's supposed to.
16     Q   Typically, it does that?
17     A   Typically, it does that.
18     Q   And does that plaque -- are those buildups sometimes
19 referred to as plaque?
20     A   Yes.
21     Q   And does plaque build up over time?
22     A   It can.
23     Q   And can it show up in a person as young as a
24 teenager or in their 20s?
25     A   Yes.

Page 101

1      Q   And it often takes decades to develop?
2      A   It may. But it may be more acute than that. We
3  know that ongoing -- you're referring to the study of the
4  Korean soldiers that came back. That's one of the studies
5  where they found in 18-year-old boys --
6      Q   You give me too much credit, Doctor. Tell us
7  about that study.
8      A   I'm sorry. These boys were, unfortunately, killed
9  in Korea. When they came back, the autopsy showed they
10 had coronary disease, 18-year-old kids.
11     Q   These were young men with coronary disease?
12     A   Eighteen-year-old children.
13     Q   But, in general, it's true that coronary disease
14 is a chronic disease?
15     A   Yes, but it's not limited to chronic disease. It
16 can be acute.
17     Q   I understand, yes. But it generally is chronic?
18     A   Yes.
19     Q   And there are lots of people walking around right
20 now, there might even be some in this room, that have
21 coronary artery disease and don't know it?
22     A   More likely than not, many of us.
23         MR. OUWELEEN: Off the record.
24     (Thereupon, a discussion was had off the record.)
25 BY MR. OUWELEEN:

26 (Pages 98 to 101)

577a7cb7-4092-46a3-af7f-4065a7cbae71

Ira J. Gelb, M.D.

| Page 102 | Page 104 |
|---|---|

**Page 102**

1    Q   People can have coronary artery disease for years
2   without having any symptoms whatsoever?
3    A   Correct.  Or attributed to something else -- or
4   attributed to something else.
5    Q   So they could have it with no symptoms, right?
6    A   Right.
7    Q   Or they could have some symptoms and think the
8   symptoms are caused by something other than coronary artery
9   disease?
10    A   Yes, sir.
11    Q   In fact, you have -- now stenosis refers to a
12   narrowing of the artery because of these plaque buildups in
13   the arteries, correct?
14    A   If you're talking about the coronaries, yes.
15    Q   And you can have stenosis without having ischemia,
16   correct?
17    A   Correct.
18    Q   And ischemia is where the muscle's not getting
19   enough blood flow, correct?
20    A   Correct.
21    Q   And you usually don't get symptoms of ischemia or
22   get ischemia until you have 70 percent occlusion in the
23   artery, correct?
24    A   70 percent or more.
25    Q   Right.  So you could have -- your arteries could

**Page 103**

1   be 65 percent closed, or occluded, and your muscles would
2   still be getting enough blood?
3    A   At rest.
4    Q   At rest.  Okay.  Well, how about at stress?
5    A   Well, that's why you do stress test.
6    Q   They might be getting enough at stress, too, or
7   they might not, correct?
8    A   Right, or anything that makes your heart rate go
9   fast, that non-symptomatic narrowing will be represented by
10   symptoms with any form of tachycardia.
11    Q   Okay.  What is tachycardia?
12    A   Fast heartbeat.
13    Q   Fast heartbeat.  Now, is erectile dysfunction
14   sometimes an indicator that someone has atherosclerosis?
15    A   It could be.
16    Q   Is it closely associated with coronary artery
17   disease?
18    A   Yes.
19    Q   Now, we talked about the buildup of plaque or
20   these fatty deposits which doctors call atherosclerosis,
21   correct?
22    A   Yes.
23    Q   And from time to time, these plaque deposits in
24   the arteries can rupture, correct?
25    A   Yes.

**Page 104**

1    Q   And when that rupture happens, we're talking
2   before a break in that fibrous cap that's over the plaque
3   buildup --
4    A   Yes.
5    Q   -- Some of that fat underneath gets exposed to the
6   blood?
7    A   Yes.
8    Q   And that -- the body's reaction is to form a clot
9   to kind of plug up the hole, correct?
10    A   Yes.
11    Q   The reason it forms a clot, there are platelets
12   which are little blood cells, that for lack of a better
13   term, get sticky and stick together and plug up that hole,
14   correct?
15    A   Yes.
16    Q   And that's the body's normal response to a plaque
17   rupture?
18    A   Yes.
19    Q   And sometimes the clot, when it forms, plugs up
20   the artery and restricts the amount of blood going through,
21   correct?
22    A   Yes.
23    Q   And when that happens, the blood -- the muscles
24   that were depending on that artery may not get enough oxygen
25   and can die, correct?

**Page 105**

1    A   They don't get enough oxygen.
2    Q   It plugs up.
3    A   Unless they clog circulation, that's true.
4    Q   That's what a heart attack is.
5    A   That's what a heart attack is.
6    Q   Now this series of events, the buildup of
7   atherosclerosis, plaque rupture, clot formation, that causes
8   the vast majority of heart attacks, correct?
9    A   Yes.
10    Q   It always has, as long as you've known?
11    A   Yes.
12    Q   Long before Vioxx was on the market?
13    A   Yes.
14    Q   And in your practice, up until 1992, you routinely
15   saw patients who had atherosclerosis, plaque ruptures, clot
16   formation and heart attacks, correct?
17    A   Yes.
18    Q   So, you saw that every day in your practice?
19    A   Just about.
20    Q   Thousands of times, tens of thousands of times in
21   your career?
22    A   Yes.  I don't have the exact numbers for that
23   either.
24    Q   Lots of people --
25    A   But I could tell you tens of thousands.

27  (Pages 102 to 105)

577a7cb7-4092-46a3-a7f7-4065a7cbae71

Ira J. Gelb, M.D.

Page 106

1    Q   Lots of people are still walking around today
2  because they saw you quickly after it happened to them,
3  correct?
4    A   That's true.
5    Q   Now, of all the patients you treated personally up
6  to 1992 who had this atherosclerosis, plaque rupture and
7  heart attack, none of them had ever taken Vioxx, correct?
8    A   Correct.
9    Q   And even when Vioxx was on the market, you would
10 agree that the overwhelming majority of people who had heart
11 attacks during that time had never taken Vioxx, correct?
12   A   Would you repeat that?
13   Q   Sure.  In the period when Vioxx was on the market,
14 from 1992 to 2004, millions of Americans had heart attacks,
15 right?
16   A   Yes.
17   Q   And even during that period, most of them never
18 took Vioxx, correct?
19   A   Yes.
20   Q   The majority of them never took Vioxx?
21   A   Correct.  I presume that.  We don't have the exact
22 figures.
23   Q   As best as you know.
24   A   Yes.
25   Q   And the overwhelming majority of people who took

Page 107

1  Vioxx never had heart attacks, conversely, correct?
2    A   With the numbers we have, that's correct.
3    Q   Do you have an understanding, with the numbers we
4  have -- forget it.
5        Coronary artery disease is, safe to say, a serious
6  health concern in America?
7    A   It certainly is.
8    Q   Now in your report, which is Exhibit 2, you refer
9  to risk factors of coronary artery disease?
10   A   I do.
11   Q   And you mentioned earlier the American Heart
12 Association and that you were on the board of that
13 organization?
14   A   Yes.
15   Q   What is the American Heart Association?
16   A   The American Heart Association is an organization
17 that is a good fund collector, because we like to collect
18 funds for research and education to the American -- not only
19 the American, but the international population.
20   Q   So the American Heart Association is -- is it
21 primarily an educational organization?
22   A   Well, that's its major function, but it does, with
23 the funding, give out money for research.
24   Q   And it's trying to educate the world about heart
25 disease?

Page 108

1    A   Yes.
2    Q   And does it put out publications, from time to
3  time, for that purpose?
4    A   It does.
5    Q   And are the publications accurate, generally, on the
6  subject of heart disease?  I'm not going to have you sign
7  off without seeing it, but just --
8    A   As long as you put that proviso in.
9    Q   Yeah.
10   A   It's usually accurate, but as an editor, we have
11 to scrutinize everything.
12   Q   Right.
13   A   So for the most part, it's accurate.
14   Q   So the American Heart Association is not just some
15 crackpot organization?
16   A   Oh, no.
17   Q   You know, if I wanted to know about heart
18 disease, for example, meaning a guy who didn't go to medical
19 school or something, if I were to read a pamphlet in the
20 American Heart Association, that would be a good source?
21   A   Or you could call me.
22   Q   But the American Heart Association, if you weren't
23 available, would be a good source?
24   A   Yes.
25   Q   I happen to have a copy of the pamphlet, and I'd

Page 109

1  like to walk you through.  I don't think you'll find
2  anything surprising in there, if I can find my copy.
3        (Exhibit No. 5 marked.)
4  BY MR. OUWELEEN:
5    Q   I'm handing you what I've marked as Exhibit 5,
6  Dr. Gelb.  45 -- no, Exhibit 5.
7        Have you seen Exhibit 5 before, Dr. Gelb?
8    A   I have.
9    Q   What is it?
10   A   It's an article put out by the Heart Association,
11 which is for the public, describing risk factors and how
12 they can affect you or neutralize some of these acquired
13 risk factors.
14   Q   And you reviewed this pamphlet before?
15   A   I have.  Don't ask me when, but I did.
16   Q   And you don't remember that you had any problems
17 with it --
18   A   No.
19   Q   -- in terms of inaccuracies and so forth?
20       Okay.
21       So I would like, if you don't mind, just
22 to sort of walk through Exhibit 5 and see if you agree or
23 don't agree with some of the things it says, with some of
24 the risk factors for heart attack.
25   A   Yes, sir.

28  (Pages 106 to 109)

577a7cb7-4092-46a3-af7f-4065a7cbae71