# EXHIBIT  B

# Relationship Between Selective Cyclooxygenase-2 Inhibitors and Acute Myocardial Infarction in Older Adults

Daniel H. Solomon, MD, MPH; Sebastian Schneeweiss, MD, ScD; Robert J. Glynn, PhD, ScD; Yuka Kiyota, MD, MPH; Raisa Levin, MSc; Helen Mogun, MSc; Jerry Avorn, MD

***Background***—Although cyclooxygenase-2 inhibitors (coxibs) were developed to cause less gastrointestinal hemorrhage than nonselective nonsteroidal antiinflammatory drugs (NSAIDs), there has been concern about their cardiovascular safety. We studied the relative risk of acute myocardial infarction (AMI) among users of celecoxib, rofecoxib, and NSAIDs in Medicare beneficiaries with a comprehensive drug benefit.

***Methods and Results***—We conducted a matched case-control study of 54 475 patients 65 years of age or older who received their medications through 2 state-sponsored pharmaceutical benefits programs in the United States. All healthcare use encounters were examined to identify hospitalizations for AMI. Each of the 10 895 cases of AMI was matched to 4 controls on the basis of age, gender, and the month of index date. We constructed matched logistic regression models including indicators for patient demographics, healthcare use, medication use, and cardiovascular risk factors to assess the relative risk of AMI in patients who used rofecoxib compared with persons taking no NSAID, taking celecoxib, or taking NSAIDs. Current use of rofecoxib was associated with an elevated relative risk of AMI compared with celecoxib (odds ratio [OR], 1.24; 95% CI, 1.05 to 1.46; $P=0.011$) and with no NSAID (OR, 1.14; 95% CI, 1.00 to 1.31; $P=0.054$). The adjusted relative risk of AMI was also elevated in dose-specific comparisons: rofecoxib ≤25 mg versus celecoxib ≤200 mg (OR, 1.21; 95% CI, 1.01 to 1.44; $P=0.036$) and rofecoxib >25 mg versus celecoxib >200 mg (OR, 1.70; 95% CI, 1.07 to 2.71; $P=0.026$). The adjusted relative risks of AMI associated with rofecoxib use of 1 to 30 days (OR, 1.40; 95% CI, 1.12 to 1.75; $P=0.005$) and 31 to 90 days (OR, 1.38; 95% CI, 1.11 to 1.72; $P=0.003$) were higher than >90 days (OR, 0.96; 95% CI, 0.72 to 1.25; $P=0.8$) compared with celecoxib use of similar duration. Celecoxib was not associated with an increased relative risk of AMI in these comparisons.

***Conclusions***—In this study, current rofecoxib use was associated with an elevated relative risk of AMI compared with celecoxib use and no NSAID use. Dosages of rofecoxib >25 mg were associated with a higher risk than dosages ≤25 mg. The risk was elevated in the first 90 days of use but not thereafter. (***Circulation.*** 2004;109:2068-2073.)

**Key Words:** cyclooxygenase inhibitors ■ myocardial infarction ■ aging

---

The Vioxx and Gastrointestinal Outcomes (VIGOR) trial compared the gastrointestinal safety of rofecoxib 50 mg/d with naproxen 1000 mg/d in patients with rheumatoid arthritis who did not take aspirin regularly.[1] Although the trial found that patients taking rofecoxib had fewer serious gastrointestinal outcomes, there were more acute myocardial infarctions (AMIs) with rofecoxib than naproxen. This study could not discern the extent to which the difference in AMI could be explained by a protective effect of naproxen[2][4] and/or an increased risk associated with the selective cyclooxygenase (COX)-2 inhibitor (coxib). Previous studies on the association between coxibs and AMI have provided conflicting results. In an analysis comparing the rates of AMI in phase III trials of rofecoxib and

celecoxib with the rates in the placebo arms of several trials of aspirin, the coxibs were associated with an elevated risk.[5] Pooled analyses of rofecoxib randomized clinical trials, including VIGOR, suggested that there may be a statistically significantly increased risk of cardiovascular events in patients taking rofecoxib compared with naproxen, but this risk was not seen when rofecoxib was compared with other nonsteroidal antiinflammatory drugs (NSAIDs) or with placebo.[6][7] A reanalysis of the Celecoxib Long-term Arthritis Safety Study (CLASS), which compared celecoxib with ibuprofen or diclofenac, found no increase in the risk of AMI associated with celecoxib.[8] A large observational study suggested that rofecoxib at dosages >25 mg was associated with an approximately 2-fold increased risk of AMI compared

Received October 7, 2003; revision received January 22, 2004; accepted February 5, 2004.
From the Division of Pharmacoepidemiology and Pharmacoeconomics (D.H.S., S.S., R.J.G., Y.K., R.L., H.M., J.A.) and Division of Rheumatology, Immunology, and Allergy (D.H.S.), Brigham and Women's Hospital, Harvard Medical School, Boston, Mass.
Drs Solomon, Schneeweiss, and Avorn have received salary support from an unrestricted research grant from Pfizer. No authors have direct personal financial relationships with any pharmaceutical company.
Correspondence to Daniel H. Solomon, MD, MPH, Division of Pharmacoepidemiology and Pharmacoeconomics, Brigham and Women's Hospital, Harvard Medical School, 1620 Tremont St, Suite 3030, Boston, MA 02120. E-mail dhsolomon@partners.org
© 2004 American Heart Association, Inc.

*Circulation* is available at http://www.circulationaha.org                    DOI: 10.1161/01.CIR.0000127578.21885.3E



with celecoxib or no NSAID, whereas rofecoxib ≤25 mg was not associated with an elevated risk.[9] A smaller observational study found no increased risk of AMI with either coxib, but dosage was not addressed.[10]

In 2002, more than 41 million prescriptions were filled in the United States for coxibs,[11] making any potential relationship between coxibs and AMI a substantial clinical and public health issue. We undertook an observational study examining the association between rofecoxib, celecoxib, NSAIDs, and AMI in a large population of older adults for whom complete information was available on prescription medication use and clinical encounters.

## Methods

### Study Participants

All persons studied were Medicare beneficiaries who received prescription medications through the Pennsylvania Pharmaceutical Assistance Contract for the Elderly or the New Jersey Pharmaceutical Assistance Program for the Aged and Disabled during 1998, 1999, and 2000. These 2 programs cover medication expenses for low-income elderly with annual household incomes between $10 000 and $17 000. To be included, participants had to be enrolled and active users of Medicare and AMI a substantial prescription drug benefit program from 1998 through their index date (defined below), as demonstrated by presence in the program eligibility files and filling at least 1 prescription as well as having at least 1 healthcare encounter in a 6-month period.

From this pool of eligible persons (n=310 229), we excluded patients who had illnesses that might have obscured any potential relationship between coxibs and AMI. These included persons with a serious life-threatening illness, including HIV/AIDS (n=114) or malignancy (n=50 973), and persons with a coagulopathy (n=5403). We also excluded persons with a hospitalization during 1998 who received a diagnosis of AMI that was not the principal discharge diagnosis (n=2441).

All patient identifiers and all traceable information were deleted from the case-control study database to protect patients' privacy. The Human Subjects Committee of Brigham and Women's Hospital and the Centers for Medicare and Medicaid Services approved this study.

### Acute Myocardial Infarction

The case-defining event was a hospitalization in 1999 or 2000 with a discharge diagnosis code of AMI (ICD-9-CM 410) in the first or second position. The length of hospitalization must have been at least 3 days and no more than 180 days, unless the patient died. This was found to be an accurate algorithm for defining AMI in another study population.[12] To assess the accuracy of this algorithm in our study population, we identified a subset of patients with Medicare diagnosis codes for AMI and had their primary hospital records reviewed. We chose all patients from Pennsylvania taking a coxib or an NSAID who had a Medicare diagnosis code for AMI in 1998 (n=1525), as well as a random subset of those not taking these agents (n=675). Trained chart abstractors blinded to the study question reviewed the charts using a review form developed as part of the Cardiovascular Coordinating Project.[13] On the basis of the primary medical records, we determined whether each admission met criteria for an AMI established by the World Health Organization.[14] The Medicare ICD-9-CM diagnosis plus the length-of-stay requirements had a positive predictive value of 93% (95% CI, 92% to 94%). We identified 10 895 hospitalizations for AMI in the eligible study population on the basis of this algorithm.

Four control subjects (controls) who did not sustain an AMI during the study period were identified for each case. The date of hospitalization for AMI was the index date for cases. A randomly selected date was the index date for controls. Controls were matched to cases on the basis of age (±1 year), gender, and the month of index date.

### Coxib and Nonselective NSAID Use

The study database contained information on all prescription drugs filled by eligible beneficiaries, including drug name, dosage, frequency, and days of supply. The measures of interest were the use of celecoxib or rofecoxib on the index date. During the study period, both drugs were covered by the prescription benefit programs without restriction, and copayments were less than $10. The risk of AMI associated with these agents was compared with several reference groups: use of the other coxib, no NSAID or coxib, ibuprofen, naproxen, or other NSAIDs. Prescriptions filled on the index date were excluded in the primary analyses. Persons with prescriptions for more than one of the drug categories on the index date were included in both categories.

Two dosage and 3 duration categories were defined a priori for all relevant exposures. Dosage categories for the coxibs and NSAIDs were split at the modal daily dosage. For example, the modal dosage of celecoxib was 200 mg, so current use was categorized as ≤200 mg or >200 mg. For rofecoxib, the modal dosage was 25 mg; current use was dichotomized as ≤25 mg or >25 mg. Dosage categories were created for the NSAIDs on the basis of the same methodology. For each individual study drug, 3 duration categories were created: 1 to 30 days, 31 to 90 days, and >90 days.

### Covariates

Covariates were defined on the basis of data from the year before the study period. Although information for most of these patients and covariates was available for longer than 12 months, we restricted the ascertainment of this period to reduce potential bias that might arise because of varying lengths of covariate assessment. The covariates assessed include age, gender, race, previous MI, angina, coronary artery revascularization, congestive heart failure, ischemic cerebrovascular accident, diabetes, hypertension, use of a lipid-lowering drug (statin), use of hormone replacement therapy, use of an anticoagulant (clopidogrel, dipyridamole, ticlopidine, and warfarin), use of an NSAID in 1998, rheumatoid arthritis, osteoarthritis, presence of a hospitalization, number of visits for ambulatory care, number of comorbid medical conditions,[15] and number of different medications used.

Several variables of interest were not available within the study database, including body mass index, tobacco use, aspirin use, and socioeconomic status. In theory, these variables could be differentially related to use of a coxib, use of an NSAID, and AMI.[16-18] We therefore analyzed data from the Medicare Current Beneficiary Survey,[19] a nationwide in-home survey conducted among 8785 beneficiaries ≥65 years old in 1999 with a 97% response rate. We compared patients' body mass index, tobacco use, aspirin use, annual household income, and educational attainment between patients reporting use of celecoxib (n=562), rofecoxib (n=244), and an NSAID (n=1302). In these analyses, body mass index was comparable in both groups of coxib users (celecoxib, 27.5 kg/m² versus rofecoxib, 27.2 kg/m², P=0.2) and similar to that of NSAID users (27.7 kg/m², P=0.5 versus coxib users). Current tobacco use was equally common in both groups of coxib users (celecoxib, 8.7% versus rofecoxib, 7.0%, P=0.5) and was more common among NSAID users (9.8%, P=0.5). Aspirin use was similar in both coxib groups (celecoxib, 11.5% versus rofecoxib, 11.5%, P=0.2) and among NSAID users (10.2%, P=0.4). The proportion of persons with an educational level of college or higher was not statistically different between coxibs (celecoxib, 29.6% versus rofecoxib, 33.8%, P=0.11) or between coxibs and NSAIDs (26.5%, P=0.2). The mean annual household income of both coxib groups was similar (P=0.7) and higher than that for NSAID users (P=0.0001).

### Analyses

The distribution of covariates was assessed in each exposure category. The unadjusted odds ratio (OR) between each covariate and AMI was then examined separately for New Jersey and Pennsylvania. The CIs for the crude ORs for each state overlapped for every covariate; data from both states were combined for the multivariable analyses. All covariates were tested in multivariable conditional

The material on this page was copied from the collection of the National Library of Medicine by a third party and may be protected by U.S. Copyright law.

The material on this page was copied from the collection of the National Library of Medicine by a third party and may be protected by U.S. Copyright law.

**TABLE 1. Baseline Characteristics of Study Population by Exposure Category**

| | Celecoxib (n=2140) | Rofecoxib (n=941) | Naproxen (n=331) | Ibuprofen (n=263) | Other NSAID (n=1874) | No Current Exposure (n=49 044) |
|---|---|---|---|---|---|---|
| Gender, female | 1814 (84.8) | 813 (86.4) | 272 (82.2) | 207 (78.7) | 1531 (81.7) | 37 690 (76.9) |
| Age, y, mean±SD | 81.4±6 7 | 81.7±6.5 | 80.8+6 7 | 80.8+6 8 | 80 7±6.4 | 81.7±7.0 |
| Race | | | | | | |
| White | 1967 (91.9) | 877 (93.2) | 288 (87.0) | 227 (86.3) | 1686 (90.0) | 44 628 (91.0) |
| Black | 132 (6 2) | 45 (4.8) | 35 (10.6) | 30 (11.4) | 151 (8.1) | 3478 (7.1) |
| Other | 41 (1 9) | 19 (2.0) | 8 (2.4) | 6 (2.3) | 37 (2 0) | 938 (1 9) |
| Nursing home resident in previous year | 135 (6.3) | 56 (6.0) | 8 (2.4) | 16 (6.1) | 82 (4.4) | 3393 (6.9) |
| No. of physician visits, mean±SD | 9.8±7.7 | 9.6±7.1 | 7.9+5.6 | 7 8+6.1 | 8.5±6.3 | 7.5±6 2 |
| Hospitalized in previous year | 617 (28.8) | 266 (28.3) | 70 (21.2) | 72 (27.4) | 429 (22.9) | 13 519 (27 6) |
| Comorbid conditions, mean±SD | 0.9±1.1 | 0.9±1.1 | 0.7±0.9 | 0.9±1.1 | 0.8±1 0 | 0.9±1 2 |
| Diabetes | 674 (31.5) | 273 (29.0) | 92 (27 8) | 77 (29.3) | 549 (29.3) | 14 185 (28.9) |
| Hypertension | 1367 (63.9) | 609 (64.7) | 202 (61 0) | 156 (59.3) | 1178 (62.9) | 27 829 (56.7) |
| No. of different prescription drugs, mean±SD | 7.6±5.2 | 7.3±5.3 | 6.4+4.8 | 6 1+4.5 | 7.3±4.9 | 5 4±4.4 |
| History of previous myocardial infarction | 170 (7.9) | 84 (8.9) | 19 (5.7) | 17 (6.5) | 132 (7.0) | 4293 (8 8) |
| History of angina | 323 (15.1) | 160 (17.0) | 44 (13.3) | 34 (12.9) | 265 (14.1) | 6985 (14.2) |
| History of coronary revascularization | 22 (1 0) | 14 (1.5) | 5 (1.5) | 7 (2 7) | 18 (1.0) | 728 (1.5) |
| History of congestive heart failure | 321 (15.0) | 128 (13.6) | 38 (11.5) | 33 (12.6) | 266 (14.2) | 7166 (14.6) |
| History of a cerebrovascular accident | 273 (12.8) | 141 (15 0) | 30 (9.1) | 24 (9.1) | 219 (11.7) | 6800 (13.9) |
| Use of a statin | 431 (20.1) | 196 (20.8) | 52 (15.7) | 39 (14 8) | 360 (19 2) | 7624 (15 6) |
| Use of hormone replacement therapy | 139 (6.5) | 69 (7.3) | 18 (5.4) | 14 (5.3) | 97 (5.2) | 1756 (3.6) |
| Use of any anticoagulant* | 311 (14.5) | 145 (15.4) | 25 (7 6) | 19 (7 2) | 189 (10.1) | 7047 (14.4) |
| Rheumatoid arthritis | 126 (5.9) | 33 (3.5) | 20 (6.0) | 8 (3.0) | 86 (4.6) | 823 (1.7) |
| Osteoarthritis | 783 (36.6) | 328 (34.9) | 94 (28.4) | 66 (25.1) | 661 (35 3) | 8368 (17.1) |
| Previous nonselective NSAID use | 319 (14.0) | 105 (11.2) | 238 (71 9) | 187 (71 1) | 190 (10.1) | 3451 (7.0) |

Values are n (%) unless noted. Current use refers to use on the index date. Persons who were current users of multiple agents (n =117) are counted in the appropriate column for each drug used.

*Anticoagulants include clopidogrel, dipyridamole, ticlopidine, and warfarin.

logistic regression models conditioning on all matching factors. On the basis of a backward selection routine with a threshold of $P<0.2$, anticoagulant use, previous hospitalization, osteoarthritis, and nursing home residence were dropped from all versions of the adjusted model. The remaining covariates were included in all multivariable conditional logistic regression models. The model was rerun for each reference group (the alternative coxib, no NSAID, ibuprofen, naproxen, and other NSAIDs). A secondary analysis excluded persons exposed to multiple agents on the index date (n 117). The results were virtually identical to the main analyses and are not shown.

We assessed the relationship between dosage categories and AMI for the coxibs and NSAIDs using similar multivariable regression models in which the dosage was classified as less than or equal to the modal dosage or greater than the modal dosage. For example, in analyses comparing the most commonly used dosages of rofecoxib (≤25 mg) were compared with the most commonly used dosages of celecoxib (≤200 mg). Users of rofecoxib >25 mg were then compared with users of celecoxib >200 mg.

Several sensitivity analyses were undertaken. On the basis of previous findings that first-time users may be at the highest risk for cardiovascular events associated with coxibs,[9] we constructed conditional regression models that considered persons exposed only if their use on the index date was their first time using a coxib. We examined the relationship between AMI and the duration of exposure to coxibs in this group of users. Assessing the effect of duration among first-time users provides a more precise estimate of the actual period of exposure, because persons with intermittent prescriptions

were not considered exposed. Another set of sensitivity analyses redefined the no NSAID use reference group to only persons who had never been exposed to an NSAID during the study period. Finally, we assessed the relationship between coxibs and AMI in subgroups of persons with rheumatoid arthritis, a history of MI, or NSAID use during the baseline period.

The data and all analyses were under control of the authors. An independent review of the study protocol and statistical programming was performed by an epidemiologist external to the study sponsor and project team. All analyses were conducted using SAS statistical software (version 8.2).

## Results

The baseline characteristics of patients are shown in Table 1. The study population was primarily elderly women with a mean age >80 years in all drug use groups. More than 85% of patients were white. The study population used substantial healthcare resources. Risk factors for AMI, such as diabetes and hypertension, were common, and previous cardiovascular disease was frequent. In the baseline period, more than 5% of the population had sustained a previous MI, more than 13% had angina, more than 12% had congestive heart failure, and more than 9% had a previous ischemic stroke. Statins were used by more than 15% of all patients. As seen in Table 1, patients using celecoxib or rofecoxib were similar with regard

TABLE 2.   Adjusted Association Between Coxibs and Acute Myocardial Infarction

| | Adjusted Odds Ratio (95% CI) | P |
|---|---|---|
| Exposure (reference group) | | |
| Rofecoxib (celecoxib) | 1.24 (1.05–1.46) | 0.011 |
| Celecoxib (no current use) | 0.93 (0.84–1.02) | 0.13 |
| Rofecoxib (no current use) | 1.14 (1.00–1.31) | 0.054 |
| Celecoxib (naproxen) | 0.95 (0.74–1.21) | 0.7 |
| Rofecoxib (naproxen) | 1.17 (0.90–1.52) | 0.2 |
| Celecoxib (ibuprofen) | 0.98 (0.76–1.26) | 0.9 |
| Rofecoxib (ibuprofen) | 1.21 (0.92–1.58) | 0.2 |
| Celecoxib (other NSAID) | 0.95 (0.82–1.10) | 0.4 |
| Rofecoxib (other NSAID) | 1.17 (0.99–1.38) | 0.073 |
| Covariate | | |
| Race, white | 1.20 (1.12–1.29) | <0.001 |
| No. of physician visits | | |
| 4–6 | 1.11 (1.05–1.18) | <0.001 |
| 7–12 | 1.11 (1.05–1.17) | <0.001 |
| 13+ | 1.09 (1.02–1.16) | 0.011 |
| Comorbid conditions | | |
| 1–2 | 1.25 (1.20–1.31) | <0.001 |
| 3+ | 1.42 (1.33–1.52) | <0.001 |
| No. of different drugs | | |
| 6–9 | 1.14 (1.08–1.19) | <0.001 |
| 10+ | 1.18 (1.12–1.25) | <0.001 |
| Diabetes | 1.48 (1.42–1.54) | <0.001 |
| Hypertension | 1.15 (1.11–1.20) | <0.001 |
| Previous myocardial infarction | 1.56 (1.48–1.66) | <0.001 |
| Angina | 1.31 (1.25–1.38) | <0.001 |
| Previous coronary revascularization | 0.78 (0.69–0.89) | <0.001 |
| Congestive heart failure | 1.37 (1.31–1.44) | <0.001 |
| Cerebrovascular accident | 1.07 (1.01–1.27) | 0.014 |
| Use of statin | 1.00 (0.94–1.04) | 0.7 |
| Use of hormone replacement therapy | 0.88 (0.79–0.98) | 0.02 |
| Rheumatoid arthritis | 1.16 (1.02–1.31) | 0.02 |
| Previous nonselective NSAID use | 0.97 (0.90–1.04) | 0.3 |

Conditional logistic model matched on age, gender, and month of index date. All other variables listed were adjusted for in the multivariable models. The number of AMIs in each exposure group was as follows: celecoxib 425, rofecoxib 225, ibuprofen 49, naproxen 63, other NSAID 371, and no current use 9793.

to baseline characteristics. Compared with NSAID users, coxib users were somewhat less healthy during the baseline period, with more health service use, hypertension, previous MIs, cerebrovascular accidents, angina, and cardiovascular medication use (statins and anticoagulants).

The results of the multivariable conditional logistic regression models are shown in Table 2. After control for all available confounders, rofecoxib was associated with an elevated risk of AMI compared with persons who were taking celecoxib (OR, 1.24; 95% CI, 1.05 to 1.46). The adjusted relative risk of AMI associated with rofecoxib was elevated

but did not reach statistical significance compared with no current NSAID (OR, 1.14; 95% CI, 1.00 to 1.31), naproxen (OR, 1.17; 95% CI, 0.90 to 1.52), and ibuprofen (OR, 1.21; 95% CI, 0.92 to 1.58). Relatively few patients were current users of naproxen (n=331) or ibuprofen (n=263), contributing to the wide CIs. Celecoxib was not associated with an elevated risk of AMI in these analyses.

In all comparisons related to dose, use of rofecoxib >25 mg/d was associated with a higher adjusted relative risk of AMI than rofecoxib ≤25 mg. The adjusted relative risk of rofecoxib >25 mg (OR, 1.70; 95% CI, 1.07 to 2.71) was higher than that seen for ≤25 mg (OR, 1.21; 95% CI, 1.01 to 1.44) compared with celecoxib >200 mg or <200 mg. The magnitude in elevation of relative risk was similar when rofecoxib was compared with no current NSAID, naproxen, ibuprofen, and other NSAIDs. Neither celecoxib dosage was associated with an elevated risk of AMI in any comparison.

Sensitivity analyses that considered only the first-time use of a coxib or NSAID during the study period provided findings very similar to those of the primary analysis. A sensitivity analysis comparing rofecoxib users with patients who had no use of either a coxib or NSAID since January 1, 1999, produced results nearly identical to those of the primary analysis (OR, 1.14; 95% CI, 0.99 to 1.31; P=0.062).

We also examined the relationships between duration of coxib exposure and AMI in first-time users. Compared with celecoxib use of similar duration, rofecoxib use for 1 to 30 days was associated with an elevated risk of AMI (OR, 1.43; 95% CI, 1.12 to 1.83; P=0.005). A similar elevation was associated with 31 to 90 days of rofecoxib use (OR, 1.46; 95% CI, 1.14 to 1.86; P=0.003), but no elevation in AMI risk was observed with >90 days of rofecoxib use (OR, 1.04; 95% CI, 0.77 to 1.38; P=0.8). The elevated relative risk of AMI seen in patients taking rofecoxib for 90 days or less was not restricted to those taking >25 mg. Compared with patients taking celecoxib <200 mg for 1 to 90 days, the adjusted relative risk of AMI associated with rofecoxib ≤25 mg (OR, 1.37; 95% CI, 1.15 to 1.63; P=0.0004) was similar to the adjusted relative risk for rofecoxib >25 mg (OR, 1.38; 95% CI, 0.80 to 2.37; P=0.3). No duration category for celecoxib use was associated with an elevated risk.

Subgroup analyses that focused on patients with previous AMI (n=4698) and compared persons taking rofecoxib with those taking celecoxib found no elevation in relative risk associated with rofecoxib (OR, 0.91; 95% CI, 0.60 to 1.38; P=0.6). Analyses restricted to patients with rheumatoid arthritis (n=1088) also found no elevation in AMI risk with either coxib. These subgroup analyses were limited by small numbers of patients.

## Discussion

We studied the relationship between coxibs, NSAIDs, and hospitalization for AMI in a large population of older patients. The study database contained information on more than 50 000 older adults in 2 US states with complete prescription drug coverage. The main analyses, as well as dose- and duration-specific analyses, found an elevated risk of AMI associated with rofecoxib but not with celecoxib. The risk was higher in persons taking >25 mg of rofecoxib and

The material on this page was copied from the collection of the National Library of Medicine by a third party and may be protected by U.S. Copyright law.

during the first 90 days of use and was observed consistently in relation to several reference groups.

It is important that these findings be considered in light of previous research. In the VIGOR trial, which compared 50 mg of rofecoxib with 1000 mg of naproxen in patients with rheumatoid arthritis, the risk of AMI was elevated in patients treated with rofecoxib.[1] Patients were not allowed to take aspirin during the trial. In an analysis that compared data from phase III randomized clinical trials of celecoxib and rofecoxib with data from the placebo groups of 4 aspirin primary prevention trials, the annualized MI rates for patients randomized to either celecoxib or rofecoxib were higher than rates for the meta-analysis of the placebo groups.[5] This analysis has been criticized because the coxib trials included osteoarthritis and rheumatoid arthritis patients, and the latter group has been observed to have an elevated baseline risk of AMI.[20] The control population was characterized by relatively low rates of AMI. A reanalysis of data from the CLASS trial, in which patients were allowed to take aspirin, found no elevation in risk of AMI associated with celecoxib.[8] An observational study conducted in the Tennessee Medicaid population found that rofecoxib at dosages >25 mg/d was associated with a nearly 2-fold increased risk of AMI compared with nonuse of any NSAID.[9] Our findings differ from the pooled analyses of rofecoxib randomized controlled trials, which showed no significant increase in cardiovascular events compared with non-naproxen NSAIDs.[6,7] In addition, a recently published observational analysis from Ontario also found no increased risk of AMI associated with any dosage of rofecoxib.[10] This analysis excluded persons who were prescribed a coxib for <30 days. The findings of our study suggest that the first 30 days of use may include a period of elevated risk. Finally, rofecoxib dosages >25 mg, which were associated with the highest relative risk of AMI in this study and the study by Ray and colleagues,[9] were not reported separately in the Ontario study.

There are important potential limitations to the present study. One is the concern about possible misclassification of end points using Medicare use data. We studied the accuracy of the AMI diagnosis codes and found that they had a positive predictive value of 9.3% compared with primary hospital records. However, patients who suffered an AMI and were not hospitalized because of sudden death or a silent event would not be counted in these analyses for any exposure group. In addition, it is possible that some cases sustained their AMI during the hospitalization. If so, these patients may not have been exposed to the medications of interest for a period of time before their event. This may have influenced the results if patients taking one particular medication before admission were more likely to suffer an AMI during the course of a hospitalization. However, we have no reason to believe that this was the case. Second, similar to all retrospective observational studies, these results may have been biased because of confounding by factors not observable in Medicare use data. We examined this possibility using data from the in-home Medicare Current Beneficiary Survey and found that people taking rofecoxib or celecoxib were similar with respect to 5 variables known to be independent risk factors for cardiovascular end points, including body mass

index, aspirin use, tobacco use, income status, and educational attainment. A comparison of people taking coxibs with those taking NSAIDs suggests that unmeasured confounding by each of these factors may result in a small degree of bias toward the null. In addition to the potential for bias by unmeasured confounders, these results may be influenced by residual confounding by factors that were incompletely assessed in this administrative database, such as severity of cardiovascular risk factors. However, the relationship between available covariates and AMI is consistent with results from previous observational studies. Third, it is possible that some patients prescribed coxibs and/or NSAIDs used them on an as-needed basis. Thus, patients may not have been exposed to the drug on all days of the calculated prescription period, leading to potential misclassification of exposure status. If the pattern of misclassification was similar across drugs, the bias would be toward the null value. Alternatively, if it varied by drug or dose, as a function of the indication for the medication (such as acute versus chronic pain) or the efficacy of the treatment, the magnitude and direction of bias could be toward or away from the null value. We have no compelling reason to believe that this misclassification of exposure would have differed by drug. Finally, one must consider the generalizability of findings on the basis of data from an older, low-income population in 2 states, whose prescription drug use was slightly higher than the national average. Because the elderly are among the most frequent users of coxibs, the study population examined is relevant.

Several biological pathways could underlie a potential association between selective COX-2 inhibition and coronary events. Although NSAIDs inhibit both COX isoforms, selective inhibition of COX-2 results in decreased prostacyclin, a vasodilator and moderator of platelet activation, without reducing COX-1–dependent thromboxanes, contributors to platelet aggregation and vasoconstriction.[21,22] Emerging data support a varied role for COX-2 in the vascular bed, with important functions in vascular resistance,[23] late preconditioning,[24] endothelial function,[25,26] and atherogenesis.[27,28] Data from rat models of hypertension suggest that celecoxib may be associated with improvements in endothelial function and reductions in oxidative stress[29]; neutral findings have been reported for rofecoxib and diclofenac.[30] Although both rofecoxib and celecoxib, like most NSAIDs, have been associated with hypertension, several large head-to-head randomized controlled trials have reported higher rates among patients treated with rofecoxib[31]; other smaller studies in healthy adults suggest similarity between coxibs.

In conclusion, we observed an elevated risk of hospitalization for AMI among elderly Medicare enrollees treated with rofecoxib. This risk was higher in persons taking >25 mg of rofecoxib than in patients taking the most common dosages used of ≤25 mg. The risk was elevated during the first 90 days of exposure but not thereafter. We did not find an elevated risk of AMI for persons taking celecoxib. Because of the important potential public health implications, our findings should be followed up by additional clinical and mechanistic studies, several of which are ongoing.

The material on this page was copied from the collection of the National Library of Medicine by a third party and may be protected by U.S. Copyright law.

Solomon et al    COX-2 Inhibitors and Acute Myocardial Infarction    2073

## Acknowledgments

This work was supported by Merck & Co through an unrestricted research grant to Brigham and Women's Hospital. The authors had sole responsibility for study design, data interpretation, and publication of findings. Dr Solomon was also supported by grants from the Arthritis Foundation and the National Institutes of Health (AR-48616 and AR-48264). We want to thank an epidemiologist who participated actively in the study design, statistical analysis and interpretation of the data, and preparation of the manuscript. We are also grateful to Rhonda Bohn, ScD, who performed an independent review of the study protocol and statistical programming.

## References

1. Bombardier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med. 2000;343:1520-1528.
2. Solomon DH, Glynn RJ, Levin R, et al. Nonsteroidal anti-inflammatory drug use and acute myocardial infarction. Arch Intern Med. 2002;162:1099-1104.
3. Rahme E, Pilote L, LeLorier J. Association between naproxen use and protection against acute myocardial infarction. Arch Intern Med. 2002;162:1111-1115.
4. Watson DJ, Rhodes T, Cai B, et al. Lower risk of thromboembolic cardiovascular events with naproxen among patients with rheumatoid arthritis. Arch Intern Med. 2002;162:1105-1110.
5. Mukherjee D, Nissen SE, Topol EJ. Risk of cardiovascular events associated with selective COX-2 inhibitors. JAMA. 2001;286:954-959.
6. Konstam MA, Weir MR, Reicin A, et al. Cardiovascular thrombotic events in controlled, clinical trials of rofecoxib. Circulation. 2001;104:2280-2288.
7. Reicin A, Shapiro D, Sperling RS, et al. Comparison of cardiovascular thrombotic events in patients with osteoarthritis treated with rofecoxib versus nonselective nonsteroidal anti-inflammatory drugs (ibuprofen, diclofenac, and nabumetone). Am J Cardiol. 2002;89:204-209.
8. White WB, Faich G, Whelton A, et al. Comparison of thromboembolic events in patients treated with celecoxib, a cyclooxygenase-2 specific inhibitor, versus ibuprofen or diclofenac. Am J Cardiol. 2002;89:425-430.
9. Ray WA, Stein CM, Daugherty JR, et al. COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease. Lancet. 2002;360:1071-1073.
10. Mamdani M, Rochon P, Juurlink DN, et al. Effect of selective cyclooxygenase 2 inhibitors and naproxen on short-term risk of acute myocardial infarction in the elderly. Arch Intern Med. 2003;163:481-486.
11. DrugTopics.com: The Online Magazine for Pharmacists. March 17, 2003. Available at: http://www.drugtopics.com/be_core/content/journals/d/data/2003/0317/past_issues_show. Accessed April 17, 2003.
12. Petersen LA, Wright S, Normand SLT, et al. Positive predictive value of the diagnosis of acute myocardial infarction in an administrative database. J Gen Intern Med. 1999;14:555-558.
13. Ellerbeck EF, Jencks SR, Radford MJ, et al. Quality of care for Medicare patients with acute myocardial infarction: report on a four state pilot of the Cooperative Cardiovascular Project. JAMA. 1995;273:1509-1514.
14. Myocardial infarction and coronary deaths in the World Health Organization MONICA project: registration procedures, event rates, and case-fatality rates in 38 populations from 21 countries in four continents. WHO/MONICA Project. Circulation. 1994;90:583-612.
15. Romano R, Roos LL, Jollis JG. Adapting a clinical comorbidity index for use with ICD-9-CM administrative data: differing perspectives. J Clin Epidemiol. 1993;46:1075-1079.
16. Palmieri V, de Simone G, Arnett DK, et al. Relation of various degrees of body mass index in patients with systemic hypertension to left ventricular mass, cardiac output, and peripheral resistance. Am J Cardiol. 2001;88:1163-1168.
17. Weir MR, Maibach EW, Bakris GL, et al. Implications of a health lifestyle and medication analysis for improving hypertension control. Arch Intern Med. 2000;160:481-490.
18. Kington RS, Smith JP. Socioeconomic status and racial and ethnic differences in functional status associated with chronic diseases. Am J Pub Health. 1997;87:805-810.
19. Adler GS. A profile of the Medicare Current Beneficiary Survey. Health Care Financing Review. 1994;15:153-163.
20. Solomon DH, Karlson EW, Rimm EB, et al. Cardiovascular morbidity and mortality in women diagnosed with rheumatoid arthritis. Circulation. 2003;107:1303-1307.
21. Lipsky PE, Brooks P, Crofford LJ, et al. Unresolved issues in the role of cyclooxygenase-2 in normal physiologic processes and disease. Arch Intern Med. 2000;160:913-920.
22. FitzGerald GA, Patrono C. The coxibs, selective inhibitors of cyclooxygenase-2. N Engl J Med. 2001;345:433-442.
23. Topper JN, Cai J, Falb D, et al. Identification of vascular endothelial genes differentially responsive to fluid mechanical stimuli: cyclooxygenase-2, manganese superoxide dismutase, and endothelial cell nitric oxide synthase are selectively up-regulated by steady laminar shear stress. Proc Natl Acad Sci U S A. 1996;93:10417-10422.
24. Bolli R, Shinmura K, Tang XL, et al. Discovery of a new function of cyclooxygenase (COX)-2: COX-2 is a cardioprotective protein that alleviates ischemia/reperfusion injury and mediates the late phase of preconditioning. Cardiovasc Res. 2002;55:506-519.
25. Chenevard R, Hurlimann D, Bechir M, et al. Selective COX-2 inhibition improves endothelial function in coronary artery disease. Circulation. 2003;107:405-409.
26. Cheng Y, Austin SC, Rocca B, et al. Role of prostacyclin in the cardiovascular response to thromboxane A$_2$. Science. 2002;296:539-541.
27. Burleigh ME, Babaev VR, Oates JA, et al. Cyclooxygenase-2 promotes early atherosclerotic lesion formation in LDL receptor-deficient mice. Circulation. 2002;105:1816-1823.
28. Cipollone F, Prontera C, Pini B, et al. Overexpression of functionally coupled cyclooxygenase-2 and prostaglandin E synthase in symptomatic atherosclerotic plaques as a basis of prostaglandin E$_2$-dependent plaque instability. Circulation. 2001;104:921-927.
29. Hermann M, Camici G, Fratton A, et al. Differential effects of selective cyclooxygenase-2 inhibitors on endothelial function in salt-induced hypertension. Circulation. 2003;108:2308-2311.
30. Title LM, Giddens K, McInerney MM, et al. Effect of cyclooxygenase-2 inhibition with rofecoxib on endothelial dysfunction and inflammatory markers in patients with coronary artery disease. J Am Coll Cardiol. 2003;42:1747-1753.
31. Whelton A, White WB, Bello AE, et al, for the SUCCESS-VII Investigators. Effects of celecoxib and rofecoxib on blood pressure and edema in patients >- or =65 years of age with systemic hypertension and osteoarthritis. Am J Cardiol. 2002;90:959-963.

The material on this page was copied from the collection of the National Library of Medicine by a third party and may be protected by U.S. Copyright law.

# EXHIBIT  C

Jerry Avorn, M.D.

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2                     MDL DOCKET NUMBER:   1657
                            SECTION L
3

    In re:  VIOXX PRODUCTS LIABILITY LITIGATION
4   GERALD BARNETT AND CORRINE BARNETT,

5            Plaintiffs,

6        VS.                        CIVIL ACTION NUMBER:
                                    2:06cv485
7   MERCK & CO., INC.,

8            Defendant.
    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
9
                         DEPOSITION OF
10
                      JERRY AVORN, M.D.
11
                        June 15, 2006
12                        8:36 a.m.

13                  Sheraton Boston Hotel
                       39 Dalton Street
14             Boston, Massachusetts 02199

15   Susan A. Romano, Notary Public, Register Merit Reporter and Certified
     Realtime Reporter within and for the Commonwealth of Massachusetts

15

16

17

18

19

20

21

22

23

24

**PLAINTIFF'S EXHIBIT**
**C**

Jerry Avorn, M.D.

Page 2

1    APPEARANCES:
2  ON BEHALF OF THE PLAINTIFFS:
3  CHRISTOPHER V. TISI, ESQUIRE
4  JENNIFER L. ORENDI, ESQUIRE
5    Ashcraft & Gerel
6    2000 L Street, N.W., Suite 400
7    Washington, District of Columbia 20036
8    202.783.6400
9    cvtisi@aol.com
10
11  JEFFREY S. GRAND, ESQUIRE
12    Seeger Weiss, LLP
13    One William Street
14    New York, New York 10004-2502
15    212.584.0700
16    jgrand@seegerweiss.com
17    .
18  ON BEHALF OF THE DEFENDANT:
19  ANDREW L. GOLDMAN, ESQUIRE
20    Bartlit Beck Herman Palenchar & Scott, LLP
21    54 West Hubbard Street, Suite 300
22    Chicago, Illinois 60610
23    312.494.4400
24    andrew.goldman@bartlit-beck.com

Page 3

1    DEPOSITION OF JERRY AVORN, M.D.
2    JUNE 15, 2006
3    PROCEEDINGS:
4    JERRY AVORN, M.D., the deponent,
5  having been satisfactorily identified and
6  duly sworn by the Notary Public, was
7  examined and testified as follows:
8    EXAMINATION
9  BY-MR.GOLDMAN:
10  Q.  Good morning, sir.
11  A.  Good morning.
12  Q.  Can you please state your name for
13  the record?
14  A.  Yes. It is Jerry Avorn, A-V-O-R-N.
15    MR. TISI: I don't mean to
16  be -- I need to get a couple things on
17  the record, if you don't mind.
18    MR. GOLDMAN: Sure.
19    MR. TISI: Let me tic some
20  of them off.
21    First of all, my name is Chris
22  Tisi. I'm here on behalf of the
23  plaintiff's hearing committee for multi
24  district litigation. I've also been asked

Page 4

1  to represent the California coordinated
2  proceedings in this litigation.
3    With me is Jennifer Orendi from my
4  office, an attorney from my office, and
5  Jeff Grand, who is representing the New
6  Jersey coordinated proceedings before Judge
7  Higbee.
8    My understanding of this is by
9  agreement -- I don't know if all the
10  cross-notices went out, because we had a
11  last minute hearing with the judge
12  yesterday in California -- but that this
13  is a discovery deposition for all of those
14  cases.
15    So that we don't have any
16  misunderstanding later on, this is
17  considered to be a cross-noticed deposition
18  in all three of those jurisdictions.
19    Number 2 is, we're going to try --
20  I'm going to -- I don't know what the
21  rules are in California on objections, but
22  I'm going to abide by Judge Fallon's rules
23  -- and I expect everybody to do the same
24  -- about I'm preserving objections for the

Page 5

1  time of -- for later on. My only
2  objections are going to be to form or if
3  there is a misleading question in any
4  fashion.
5    I understand just -- hopefully, the
6  rules may be different in New Jersey,
7  Jeff, but can we have an agreement that
8  objections for one are objections for all?
9    MR. GOLDMAN: Sure.
10    MR. TISI: Okay. I also
11  wanted to make sure, Andy, that it was on
12  the record that when we got your notice of
13  deposition asking for documents to be
14  produced, we endeavored, as best as we
15  could, to produce documents, produce them
16  before the deposition this morning.
17  Several binders. I'm sure you'll go
18  through them.
19    I also have produced a recent copy
20  of Dr. Avorn's CV, which I sent to you
21  yesterday, as well as -- I think -- and I
22  went through this very quickly yesterday,
23  but I want to put on the record that Dr.
24  Avorn I think has, in addition to the

2 (Pages 2 to 5)

Jerry Avorn, M.D.

**Page 6**

1 documents you see there, reviewed the
2 cardiovascular standard operating procedure
3 as well as an e-mail that I have here. I
4 don't know how important it is, but it is
5 an e-mail. It's a March 5th -- Excuse me
6 -- February 5th, 2001, e-mail, MRK ACT
7 0009918.
8 I just do that to be try to be as
9 complete as possible. Obviously, we'll do
10 our best. We don't always succeed, but we
11 always do our best.
12 There were also some -- Just so you
13 know, in the binders there, there were
14 some expert reports that he had seen of
15 others on the plaintiff and defense side.
16 I don't know if he's reviewed them or not,
17 but they're in the binders there. I've
18 seen them. I want to make sure you're
19 aware that he has actually seen those.
20 MR. GOLDMAN: Which expert
21 reports?
22 MR. TISI: I have no --
23 Quite frankly, I didn't send them to him,
24 but I know he's seen them. So they may

**Page 7**

1 have come from Jeff's office or somebody
2 else's office.
3 MR. GOLDMAN: Okay.
4 MR. TISI: But you can see
5 them, and I want to make sure that you
6 know that they're out there. I think he
7 is -- you could ask him, but I think he's
8 seen Dr. Ray's report. I think he's seen
9 some of the defense expert reports. I
10 don't know who they are.
11 But I just want to make sure all
12 that is on the record so there is no
13 misunderstanding about it, and that you
14 have everything that I hope that we have
15 been able to provide for you.
16 MR. GOLDMAN: Just one
17 comment, Chris, on the materials that you
18 have provided.
19 I have prepared for the deposition,
20 based on the materials considered that was
21 attached to the list that was attached to
22 Dr. Avorn's report from March 2006. I
23 understand those are materials that he's
24 relying on, and you did tell me about

**Page 8**

1 these two additional documents, the e-mail
2 that you just read into the record and the
3 CV SOP.
4 MR. TISI: Those are my
5 notes, but --
6 MR. GOLDMAN: Oh, sorry.
7 MR. TISI: That's okay.
8 This is not under standard operating
9 procedure.
10 THE WITNESS: Close.
11 MR. GOLDMAN: And --
12 MR. TISI: He was also --
13 MR. GOLDMAN: In terms of
14 expert reports, I don't believe any of the
15 expert reports were identified in the
16 materials considered, so I'm not prepared
17 to examine Dr. Avorn on that.
18 MR. TISI: You could do
19 that. I'll also tell you there was a
20 supplement that was sent to Mr. Cohen of
21 documents received, and I think that went
22 in on June 8th. Whether it was
23 communicated to you, I don't know. But
24 there was a letter with some additional

**Page 9**

1 documents that you can put on the record
2 if you want to. So you've had those for
3 a while. I don't know whether they've
4 gotten to you or not, but that's what you
5 got.
6 MR. GOLDMAN: No, I have
7 not seen it --
8 MR. TISI: Okay. Well, I
9 can give you --
10 MR. GOLDMAN: -- so at a
11 break if you can hand me the letter.
12 MR. TISI: I can give you a
13 copy that I printed it out from my
14 computer. It doesn't have the letterhead,
15 but it is a letter dated June 8th, 2006,
16 to Charles Cohen at Hughes, Hubbard &
17 Reed. And I can read, if you want, the
18 documents that are in there.
19 MR. GOLDMAN: Sure.
20 MR. TISI: There are only
21 six or seven, maybe ten of them.
22 FDA medical officer review,
23 MRK-ABX0023672 to ABX0002404. There's an
24 e-mail from Scolnick to Reicin, April

3 (Pages 6 to 9)

Jerry Avorn, M.D.

Page 10

1  12th, 2000, MRK-NJ0121906 to NJ012170907.
2       Actually, why don't I just do this:
3  Why don't I just attach a copy of the
4  letter. It's not the official copy, but
5  it is a copy, and we can -- we can attach
6  that as an exhibit.
7       I also note on the back that
8  there's the approved follow-up data as
9  well as the press release you all issued
10 on the correction, and the improve is in
11 there as well. So that's there. And I
12 will attach to it -- if you wish to
13 attach it as an exhibit, we can certainly
14 do that.
15      MR. GOLDMAN: Yeah.
16      MR. TISI: It is --
17 Understanding that this is a printout from
18 my personal computer. It does not have
19 the letterhead and all that stuff. Do you
20 want to attach that as an exhibit?
21      MR. GOLDMAN: Yeah. Let's
22 do it later.
23      MR. TISI: Fine. Okay.
24 I'm sorry.

Page 11

1       MR. GOLDMAN: That's okay.
2       MR. TISI: What is his
3  name? Go ahead.
4       BY MR. GOLDMAN:
5  Q.  Dr. Avorn, my name is Andy Goldman.
6  I represent Merck. We haven't met before
7  today, right?
8  A.  That's right.
9  Q.  I know you've given depositions
10 before, sir. Let me just review the
11 general process.
12      I'm going to be asking you
13 questions, and if you don't understand my
14 questions, please ask me to rephrase. I'll
15 be happy to do that. Okay?
16 A.  Will do.
17 Q.  If you don't ask me to rephrase,
18 I'll just assume that you understood my
19 question. Fair?
20 A.  Right.
21 Q.  If you need to take a break, Dr.
22 Avorn, for any reason, let me know, and
23 we'll be happy to do that.
24 A.  Right.

Page 12

1  Q.  Is there any reason, sir, that you
2  can't give accurate testimony here today?
3  A.  There's no such reason.
4  Q.  You're not on any medication, no
5  physical ailments or medical reason you
6  can't give accurate testimony?
7  A.  No. It's freezing in here, but
8  aside from that, everything is fine.
9  Q.  The one other rule that I would
10 appreciate -- I'll try to do it if you do
11 it -- let me finish my question before you
12 start your answer, and I'll try to not
13 interrupt your answer.
14 A.  Sounds good.
15 Q.  Can you tell me, sir, what you did
16 to prepare for today's deposition?
17 A.  Yes. I reviewed a huge volume of
18 material that plaintiffs' lawyers had sent
19 me. I also have been working in this
20 general area of nonsteroidal
21 anti-inflammatory drugs and their effects
22 since the early 1990s, and so my
23 familiarity with that field was in some
24 meaningful way preparation for this as

Page 13

1  well.
2       I follow that literature in the
3  medical journals, and I contribute to that
4  literature, and our group does research in
5  this area, and so that was also a kind of
6  preparation for today as well.
7       And of course, with the events in
8  the Vioxx case being so prominent in the
9  media, I've also read with interest lay
10 accounts of the Vioxx story over the years
11 as it has unfolded.
12      And in addition, I should say that
13 I've met with plaintiffs' counsel on a
14 couple of occasions to discuss my opinions
15 with them.
16 Q.  When did you meet with plaintiffs'
17 counsel and who did you meet with?
18 A.  Okay. I met with Mr. Tisi and Mr.
19 Grand. I'll first give you the names, and
20 then we can reconstruct the dates. Mr.
21 Tisi, Mr. Grand, Mr. Buchanan.
22      There was an early meeting with Mr.
23 Seeger. And the most recent of those
24 meetings was yesterday, and there have

4 (Pages 10 to 13)

Jerry Avorn, M.D.

Page 14

1 been other meetings that I could go back
2 to my calendar and get you the dates of,
3 that have occurred over the last year or
4 so.
5     Q.  Would you do that for me before
6 tomorrow's deposition?
7     A.  Sure.
8     Q.  Other than meeting with Mr. Tisi,
9 Mr. Grand, Mr. Buchanan, Mr. Seeger, do
10 you know whether you've met with any other
11 plaintiffs' lawyer in the Vioxx litigation?
12         MR. TISI:  Just for
13 clarification, Ms. Orendi was with us
14 yesterday as well.
15         THE WITNESS:  I'm sorry.
16         MR. TISI:  That's okay.
17     A.  Yes.  Of course.  And in addition,
18 there was a gentleman from Washington that
19 came -- when Mr. Seeger came last year,
20 whose name I would recognize, but can't
21 recall.  And I've had chats, but not
22 actual meetings, with John Ristaino, whom
23 I know in a variety of connections in
24 relation to pharmacoepidemiology meetings

Page 15

1 and so forth.  I don't think we've ever
2 actually had a meeting about this.
3         And I think I've had no other
4 meetings per se with others that I can
5 recall at the moment, unless there's
6 others that counsel remembers that I don't
7 remember.
8         MR. TISI:  Your memory
9 controls, Doctor.
10         THE WITNESS:  Okay.  Okay.
11         BY MR. GOLDMAN:
12     Q.  Tell me about your meeting
13 yesterday, sir.  How long did you meet and
14 what did you talk about?
15     A.  All day, and it was to review the
16 details of my report in preparation for
17 today's discovery deposition.
18     Q.  Whose idea was it to meet?
19     A.  I think all along we had planned
20 that before the preservation -- before the
21 discovery deposition we would get together
22 and discuss what was going to happen
23 today.  And so it was kind of a mutual
24 understanding that would occur.

Page 16

1     Q.  When you say that you reviewed the
2 details of your report with plaintiffs'
3 counsel yesterday, can you be more
4 specific?
5     A.  Sure.  The report, as you know, was
6 submitted on March 20th.  We went through
7 page by page to make sure that there were
8 no errors in it, to make sure that we
9 were — that I was clear on what the
10 relevant evidence was behind each of the
11 points that I had made, to discuss where
12 -- if you were to ask me about, you know,
13 on what basis do you say that, that I'd
14 be able today in an efficient way to get
15 you the source document on which that was
16 based and so forth.
17     Q.  Did you talk about questions that I
18 might ask?
19     A.  Sure.
20     Q.  Can you tell me about the questions
21 that the plaintiffs' lawyers anticipated I
22 might ask?
23     A.  Well, it was not specific questions
24 as much as helping me to understand the

Page 17

1 purposes of a discovery deposition as
2 compared to a preservation deposition, and
3 that the goal, I guess, for the defense
4 today is to understand the dimensions of
5 what I'm going to say and on what basis I
6 would be saying it, and any weak points, I
7 guess, in my arguments, so that you and, I
8 guess, plaintiffs' counsel as well, can
9 prepare for the next deposition, which
10 would be the preservation deposition.
11     Q.  Did the plaintiffs' lawyers tell
12 you the types of questions that I might
13 ask substantively about your report?
14     A.  Mostly generically as in defense
15 will try to depict Merck's actions as
16 reasonable and defensible, and that they
17 will describe Merck's behavior as having
18 been responsible throughout.  It was more
19 that generic kind of approach.
20     Q.  And did you take issue with that
21 concept that Merck's conduct was
22 responsible throughout the time Vioxx was
23 on the market?
24     A.  Well, as you know, I don't — I

Jerry Avorn, M.D.

**Page 18**

1    don't feel that that's the case.  Correct.
2    Q.   Did you practice any questions and
3    answers yesterday?
4    A.   Practice -- not practice questions
5    in a role play kind of way.  But, for
6    example, in the material that Mr. Tisi
7    just showed you, just as one example, the
8    memo from Dr. Scolnick in which he said
9    that he was pleased that everybody was so
10   concerned about patient safety, you know,
11   that that might be presented to me as
12   counterevidence that -- to demonstrate that
13   Merck was always concerned foremost about
14   patient safety, and what was my reaction
15   to that.  And I indicated that my reaction
16   was that previous and subsequent memos
17   didn't seem consistent with that view.
18        So that was the kind of -- you
19   know, what would you -- what's your
20   reaction to this kind of evidence. Because
21   I had -- I had asked to be made aware of
22   the defense's counter arguments to each of
23   these points, so that I would not hear
24   about them for the first time today, and I

**Page 19**

1    wanted to make sure that I gave Merck a
2    fair shake, in terms of knowing any
3    exculpatory evidence that might be out
4    there that would perhaps modify my
5    opinions.
6        And I -- as we'll discuss later,
7    asked for that consistently so that I
8    would be able to see not just the material
9    that painted Merck in a bad light, but
10   also any evidence that would paint Merck
11   in a better light, both, as·I said, to be
12   fair, and also so I don't -- I didn't get
13   surprised today with something that I'd
14   never seen before.
15   Q.   Do you believe that the plaintiffs'
16   lawyers gave you all of the evidence, as
17   you put it, that would show that Merck's
18   conduct was responsible and that might
19   demonstrate that your opinions in this
20   case are not completely accurate?
21   A.   I asked for that information.  I
22   trust them.  I would like to believe
23   that's what they did, and we'll find out
24   as time goes on if there's anything else

**Page 20**

1    that I'm not aware of.
2    Q.   The e-mail that you were shown
3    yesterday from Dr. Scolnick by plaintiffs'
4    counsel, had you seen that e-mail before
5    you formed your opinions in this case?
6    A.   I don't recall having seen that
7    before.
8    Q.   And so that I understand, you
9    specifically asked plaintiffs' counsel
10   before you wrote your report to see all
11   the exculpatory evidence that Merck might
12   have to try to establish that Merck was
13   acting responsibly during the time Vioxx
14   was on the market; is that right?
15   A.   Throughout the process, yes.  "All"
16   is a loaded word, because I'm sure that
17   when there are millions of pages of
18   documents, there are things that I have
19   not seen.  But I wanted to be sure that I
20   got a fair view of the countervailing
21   evidence.
22   Q.   Why was it important to you to get
23   a fair view of the countervailing evidence
24   concerning Merck's conduct concerning

**Page 21**

1    Vioxx, sir?
2        MR. TISI:   Objection.  Asked
3    and answered.
4    A.   Shall I go ahead and answer?
5    Q.   Yeah.
6    A.   Two reasons.  One is, I think
7    that's the right thing to do, and secondly
8    I know that although these seem to be very
9    responsible plaintiffs' attorneys, in my
10   experience with them, nonetheless there's
11   always a risk that a plaintiff's attorney,
12   just like a defense attorney, might
13   present primarily or only their side of
14   the story.  And I, as a person who I think
15   is seen as a responsible observer of the
16   pharmaceutical industry, wanted to make
17   sure that I was seeing all sides of the
18   question before I came up with an opinion.
19   Q.   Did the plaintiffs' lawyers show
20   you any of the opening or closing
21   arguments that Merck has presented in any
22   of the trials to date?
23   A.   I don't think I've seen any
24   materials from any trial on either side.

6 (Pages 18 to 21)

Jerry Avorn, M.D.

Page 22

1   I have followed them in the press, but I
2   didn't see it from plaintiffs' lawyers.
3       Q.   Okay.  Did you review documents
4   with plaintiffs' counsel yesterday, other
5   than the e-mail that Mr. Tisi showed you
6   concerning Dr. Scolnick?
7       A.   Oh, we reviewed tons of documents
8   yesterday.
9       Q.   Were those documents you had with
10  you or that plaintiffs' attorneys brought?
11      A.   They were all documents that I had
12  seen previously.
13      Q.   Have you spoken with any other
14  plaintiffs' expert witnesses in this case?
15          MR. TISI:  Objection.
16  Vague.
17          BY MR. GOLDMAN:
18      Q.   Since you've been retained as an
19  expert witness, Dr. Avorn, have you met
20  with or spoken with any of the experts who
21  have been retained by plaintiffs in the
22  Vioxx litigation?
23          MR. TISI:  Can I ask for
24  clarification, or do you want me to just

Page 23

1   stay out of the way on this one?
2           BY MR. GOLDMAN:
3       Q.   Well, do you understand the
4   question?
5       A.   Yeah.  It's an easy answer.  And
6   that is, I have not discussed this case
7   with any other plaintiffs' witnesses.
8           There are plaintiffs' witnesses
9   that I have had brief chats with on other
10  matters, like Dr. Curfman, but we have not
11  discussed anything related to this case.
12      Q.   So you and Dr. Curfman haven't
13  talked about the expression or concern or
14  anything about the VIGOR publication?
15      A.   That is correct.  I'm trying to
16  recall whether -- since I don't know all
17  of plaintiffs' witnesses, I can't be
18  certain as to whether there may be other
19  people that I have discussed this with.
20  Although in general, I have not discussed
21  this case with people in general.
22          I think the one person that I've
23  discussed it with, more as a piece of our
24  research than as a case, has been Dr.

Page 24

1   Solomon in my division, who, as I
2   understand, is not a witness in the case.
3       Q.   Have you had any discussions with
4   somebody by the name of Dr. Kronmal?
5       A.   I have not had discussions with
6   him.
7       Q.   Have you spoken with Dr. Ray about
8   the Vioxx cases since you were retained as
9   an expert?
10          MR. TISI:  You're talking
11  about Dr. Wayne Ray?
12          MR. GOLDMAN:  Yes.
13      A.   No.
14      Q.   What expert reports have you read,
15  sir, that the plaintiffs' lawyers gave you
16  to read?
17      A.   Okay.  To the best of my
18  recollection, there was one from Dr. Ray,
19  there was one from Dr. Kromholz.  I've
20  seen material from Dr. Kronmal.  I don't
21  know that it was in the form of his
22  report per se, but I'm aware of his work
23  in this case.  I've seen the testimony of
24  Dr. Curfman.

Page 25

1       Q.   I'm actually talking right now
2   about expert reports.
3           MR. TISI:  Okay.  And --
4       A.   Okay.
5           MR. TISI:  Let me -- I'm
6   not sure he knows who's an expert -- I
7   mean, clearly by answering Dr. Curfman's,
8   he doesn't know who's a percipient
9   witness, an expert, or defense expert, as
10  a matter of fact.
11          BY MR. GOLDMAN:
12      Q.   You understand that the plaintiffs'
13  attorneys in the Vioxx litigation have
14  retained expert witnesses who have
15  submitted reports in various cases, right?
16      A.   Correct.
17      Q.   And did the plaintiffs' lawyers
18  send you any reports that were actually
19  written by expert witnesses who you
20  understood were retained by the plaintiffs'
21  lawyers?
22      A.   Yes.
23      Q.   Which expert reports have you
24  reviewed in the Vioxx litigation, Doctor?

7 (Pages 22 to 25)

Jerry Avorn, M.D.

Page 26

1      A.   Okay.
2           MR. TISI:   Reviewed or
3      presented?  Your original question was,
4      were you sent any, and then your next
5      question was which ones you have reviewed.
6      He may not have reviewed all we sent him.
7           BY MR. GOLDMAN:
8      Q.   Reviewed.
9      A.   Right.  Reviewed Dr. Ray's,
10     reviewed Dr. Kromholz's, and reviewed
11     material from Dr. Kronmal, but not -- I
12     don't believe the report itself.
13          And I could be more complete if I
14     were to look at a list of what was sent,
15     and then I could identify which of those
16     come to mind.  The ones I've mentioned are
17     the ones that come to mind most
18     prominently.  There may have been others
19     in the list of materials sent me.  I
20     could look and say, yeah, that was an
21     important one, that was not an important
22     one.  But these are the most important
23     ones that come to mind at present.
24          MR. TISI:   And just to be

Page 27

1      clear, Andy, in the documents that we
2      produced to you at your request this
3      morning, I believe, if I'm not mistaken,
4      Jeff, there's a CD with --
5           MR. GRAND:  Actually I have
6      that with me.
7           MR. GOLDMAN:  A CD with
8      what?
9           MR. TISI:  Expert reports.
10          MR. GRAND:  Some of the
11     defense expert reports that were served in
12     New Jersey litigation cases in Farmington
13     to Hatch.
14     A.   But I can add that those arrived
15     while I was in Australia, from which I've
16     just gotten back on Sunday, for two weeks,
17     and I have not looked at that CD.  It
18     arrived while I was away, and I got back
19     on Sunday.  And so while I received it, I
20     have not looked at it.
21     Q.   Am I right, then, Dr. Avorn, that
22     you have not reviewed any expert reports
23     that were generated by experts who have
24     been retained by Merck?

Page 28

1      A.   That was not the question you
2      asked.
3      Q.   I'm following up on the answer you
4      just gave.
5      A.   Right.  That does not follow from
6      the answer I just gave.
7      Q.   Have you reviewed any expert
8      reports that were written by experts for
9      Merck?
10     A.   I'm trying to recall what was sent,
11     and, again, it would help if I could take
12     a look at what was sent to me, and I
13     could refresh my memory, since a lot of
14     this was done over --
15     Q.   If you need to take a look, you
16     can.  There's binders behind me.
17     A.   Okay.  How about the list of
18     materials sent?  Would that be -- That
19     would be easier than going through all the
20     binders.
21          MR. TISI:  Can I --
22          MR. GOLDMAN:  One second,
23     Chris.
24     ///

Page 29

1           BY MR. GOLDMAN:
2      Q.   Are you referring to the list of
3      materials considered that's attached to
4      your report?  Is that what you're thinking
5      of?
6      A.   Yeah.  The list that defense
7      provided for you to use of everything we
8      sent to Dr. Avorn.
9      Q.   The list that plaintiffs' lawyers
10     provided to us?
11     A.   Right.
12     Q.   Okay.
13     A.   Right.  And then I could scan that
14     and -- because it also, as Mr. Tisi said,
15     I don't always recall whether a statement
16     that I read was made by an expert or by
17     -- or in a deposition.
18          MR. TISI:  Can I also add
19     this.  We did provide you those -- Dr.
20     Avorn's binders kind of as a courtesy so
21     that you can take a look at them, and you
22     asked for them.  But if he needs to refer
23     to this stuff, I don't want -- Can I --
24     Have you reviewed those enough?  Can I

8 (Pages 26 to 29)

Jerry Avorn, M.D.

Page 30

1  bring them over here so that he can --
2       MR. GOLDMAN:  Sure.
3       MR. TISI: -- you know, refer
4  to them?  I mean, I don't want to take
5  them away from you, if you want to take a
6  look at them.
7       MR. GOLDMAN:  That's fine.
8       MR. TISI:  Okay.
9       BY MR. GOLDMAN:
10      Q.  I've handed you, Dr. Avorn, the
11  list of materials considered that's
12  attached to your report.
13      A.  Right.
14      MR. TISI:  And I told you
15  there was a supplement file, which you
16  have a copy of as well.  It's on your box
17  over there.  It doesn't have anything you
18  asked for, but just to be clear.
19      A.  (Witness viewing documents).  Okay.
20  As I look at this, my impression is that
21  the defense-related materials was -- that
22  I've seen was from depositions rather than
23  from expert reports, as near as I can
24  tell.

Page 31

1       Q.  And am I right, Dr. Avorn, that the
2  expert reports that the plaintiffs' lawyers
3  sent you, that were written by Merck's
4  experts, were sent to you after you
5  generated your report and arrived while
6  you were in Australia?
7       A.  That's my understanding.
8       Q.  What material of Dr. Kronmal's did
9  you review?
10      A.  Analyses of data, as I recall,
11  particularly related to the Alzheimer's
12  study, in terms of the outcomes in that
13  trial -- in those trials.
14      Q.  Are you relying on anything Dr.
15  Kronmal prepared in your opinions?
16      A.  Yes.
17      Q.  What are you relying on?
18      A.  The analyses.  And they were the
19  most -- they were reflected in Dr. Ray's
20  expert opinion as well of Dr. Kronmal's
21  analyses of the Alzheimer's data.
22      Q.  We're going to get to the
23  Alzheimer's data later, okay?
24      A.  Okay.

Page 32

1       MR. TISI:  And just so you
2  know, I'm trying to be helpful here.  I
3  don't think he was provided with any -- he
4  certainly wasn't provided with any of Dr.
5  Kronmal's reports nor his supplemental
6  report follow- up APPROVe stuff.
7       MR. GOLDMAN:  Okay.
8       MR. TISI:  It was, I
9  believe, just so you're aware, because I
10  know there were several Kronmal reports,
11  and I want to make sure you know what --
12      A.  It was the data from Dr. Kronmal
13  that was cited by Dr. Ray in Dr. Ray's
14  report.
15      Q.  Did you review any analysis
16  prepared by Kronmal, Dr. Kronmal, other
17  than what was cited in Dr. Ray's report?
18      A.  I can't recall whether what I
19  reviewed from him was what was generated
20  by him or what was cited by Dr. Ray.
21      Q.  Am I right, sir, that you don't
22  have any intention of --
23      MR. TISI:  Should I get
24  this?

Page 33

1       MR. GOLDMAN:  Yeah.
2       (Interruption).
3       BY MR. GOLDMAN:
4       Q.  Dr. Avorn, do you have any
5  intention of appearing in any Vioxx
6  trials?
7       A.  My intention is only that whatever
8  is videotaped in the preservation
9  deposition is presented.  I do not intend
10  to appear personally.
11      (Exhibit-1, Curriculum Vitae of Dr.
12  Avorn, marked for identification).
13      BY MR. GOLDMAN:
14      Q.  I've handed you, Dr. Avorn, a copy
15  of a CV that we were provided yesterday.
16  You see it's dated June 2006, and I've
17  marked this as Exhibit 1.  Do you see
18  that?
19      A.  (Witness viewing document).  Yes.
20      MR. TISI:  Just to be
21  clear, we did provide you an earlier
22  version of this as well.
23      MR. GOLDMAN:  Yes.
24  ///

9 (Pages 30 to 33)

Jerry Avorn, M.D.

Page 34

1  BY MR. GOLDMAN:
2  Q.  I just want to make sure, sir, that
3  the CV that is marked Exhibit 1 is an
4  accurate updated description of your
5  background, experience, publications.
6  A.  To the best of my knowledge, yes.
7  Q.  When were you first contacted by
8  plaintiffs' attorney in the Vioxx
9  litigation?
10  A.  Just about a year ago.  I think it
11  was around May of '05.
12  Q.  Who contacted you?
13  A.  Mr. Tisi was the -- Let me back
14  up.  I have, over the last few years,
15  been getting calls from a variety of
16  attorneys asking if I would become
17  involved in the Vioxx litigation, and for
18  most of that time, I said probably not.
19  And it was only I think in May of '05
20  that Mr. Tisi persuaded me that it would
21  be a good thing for me to become involved
22  on behalf of the plaintiffs.
23  Q.  Did you agree in May of 2005, then,
24  to be retained as an expert witness for

Page 35

1  the plaintiffs?
2  A.  Yes.
3  Q.  Why had you declined to be an
4  expert witness in the Vioxx litigation
5  before, and then decided to be an expert
6  for the plaintiffs in May of 2005?
7  A.  Mostly it was around being busy
8  with other commitments, and I know this
9  kind of involvement can be a real time
10  sink.  And the paperback version of my
11  book, which was substantially revised, was
12  being put together in early '05.  And in
13  late '04, there was the first edition of
14  the book, and not to mention a lot of
15  other kind of media involvement that was
16  keeping me very busy, and I just couldn't
17  see finding enough time to do this until
18  the original issue of the book had
19  subsided and the paperback revisions had
20  been completed.  And so by spring of '05,
21  that was a reasonable time.
22  And also the fact that it was Mr.
23  Tisi, who is somebody that I've known and
24  worked with in the past, made me more

Page 36

1  willing to do it than other attorneys that
2  called out of the blue and asked me to
3  get involved.
4  Q.  When did you first meet Mr. Tisi?
5  A.  Actually several years earlier,
6  because we worked together on the Rezulin
7  litigation.
8  Q.  Did you work as an expert witness
9  with Mr. Tisi in cases involving Rezulin?
10  A.  Yes.
11  Q.  Okay.  Was your meeting with Mr.
12  Tisi in May of 2005 in person or by
13  phone?
14  A.  It began with a phone call, and
15  there was then a personal meeting, and I
16  can't recall whether it was in May or
17  June, but it was around the spring of '05
18  that we did get together in person.
19  Q.  Were other attorneys there with Mr.
20  Tisi?
21  A.  Well, there was one early meeting
22  -- and I could go back and check the
23  dates -- in which there was Mr. Tisi and
24  Mr. Buchanan and Mr. Seeger.  I don't know

Page 37

1  that Mr. Grand was at that first meeting.
2  And that would have been in spring or
3  summer of '05.
4  Q.  Can you tell me about that meeting?
5  A.  That was a meeting in which they
6  came up to Boston and discussed the
7  position that plaintiffs' attorneys had
8  about the Vioxx matter and set forth their
9  -- their case and asked if I would help
10  them with the case.
11  Q.  And you said that you would?
12  A.  Yes.
13  Q.  Was it your understanding that you
14  were being retained as an expert witness
15  in the spring of 2005 by the Seeger Weiss
16  firm?
17  A.  What I indicated was that I would
18  work only with one set of lawyers, and I
19  would do only one preservation deposition,
20  and I did not intend to testify in
21  individual cases all over the country, and
22  that it was up to the attorneys to figure
23  out among themselves how to make that work
24  on their end.

10 (Pages 34 to 37)

Jerry Avorn, M.D.

Page 38

1  And so I have remained ignorant,
2  happily ignorant to the issue of how much
3  is New Jersey versus MDL versus some other
4  combination, because I frankly never have
5  been able to understand how those things
6  work.
7  So I indicated to Mr. Tisi and to
8  Mr. Seeger that they should figure that
9  out among themselves, and I would talk to
10  one group and one group only.
11  Q.  So when you agreed in the spring of
12  '05 to be an expert witness for the
13  plaintiffs, you were agreeing to be an
14  expert witness for Mr. Seeger's firm, for
15  the plaintiffs' steering committee in the
16  federal litigation, but you just wanted to
17  deal with one particular attorney
18  throughout the process?
19  A.  Not one particular attorney, but
20  one group of attorneys who may represent
21  different constituencies, so long as they
22  worked out among themselves how to
23  collaborate with each other.
24  Q.  Am I right, then, Dr. Avorn, that

Page 39

1  in the spring of 2005, you were agreeing
2  to be an expert witness for Mr. Seeger's
3  firm, for the plaintiffs' steering
4  committee in the federal litigation; your
5  only condition was that you work with one
6  particular group of attorneys that would
7  represent different constituencies?
8  A.  Correct.  And by group I don't mean
9  firm.  I mean some may represent the MDL
10  or some may represent New Jersey cases,
11  and that's up to them to figure out.
12  Q.  Did you take any notes of your
13  meeting in the spring of 2005 with the
14  plaintiffs' lawyers?
15  A.  No.
16  Q.  Did you keep any materials that
17  they presented to you?
18  A.  I don't think they presented any
19  materials to me at that meeting.
20  Q.  When you say that the plaintiffs'
21  lawyers discussed their position with you
22  or the plaintiffs' position with you, can
23  you be a little bit more specific about
24  that?

Page 40

1  A.  Yes.
2  Q.  And now I'm talking about your
3  meeting in the spring of 2005.
4  A.  Yes.  And I can't be sure whether
5  I'm referring to that meeting or a
6  subsequent meeting, but there was some
7  question initially.
8  (Discussion off the record.)
9  A.  At those early meetings — and
10  there would have been more than one -- the
11  original question was whether I was to
12  become involved primarily as a fact
13  witness around our own studies of Vioxx
14  and of nonsteroidals in general and heart
15  disease, or whether I would serve as an
16  expert witness and take a broader view or
17  both.
18  And so a lot of the early
19  conversation was around that.  And in the
20  very first conversations, there was no
21  provision to me of materials about Merck's
22  activities because of the expectation that
23  I was going to be just a fact witness on
24  matters of research.  And then over time,

Page 41

1  it became clear that a better plan would
2  be for me to appear as both a fact
3  witness and an expert witness, and that's
4  when the materials began to get sent.
5  MR. TISI:  Can we take that
6  break so I can make the phone call?
7  MR. GOLDMAN:  Sure.
8  (Off the record at 9:12 a.m.)
9  (Recess taken.)
10  (On the record at 9:13 a.m.)
11  BY MR. GOLDMAN: ·
12  Q.  Have you ever worked with any of
13  the plaintiffs' lawyers in the Vioxx
14  litigation to help them identify what you
15  perceive to be strong cases for the
16  plaintiffs?
17  A.  You mean the individual patients?
18  Q.  Yes.
19  A.  No.
20  Q.  Have you met with any of the
21  plaintiffs' lawyers in the Vioxx litigation
22  to discuss their strategy and have input
23  into their strategy in the Vioxx
24  litigation?

11 (Pages 38 to 41)

Jerry Avorn, M.D.

Page 42

1    A.  You mean in particular cases?
2    Q.  No.  As a whole.
3    A.  I'm not clear what you mean by
4   strategy.
5    Q.  Have you ever given any of the
6   plaintiffs' attorneys any advice about a
7   good way to present their side of the
8   story in the Vioxx litigation?
9    A.  Only as reflected in my report.
10    Q.  Have you made any effort to help
11   identify Vioxx cases where you believed a
12   high relative risk would apply to a
13   particular plaintiff?
14    A.  No.
15    Q.  Do you have any written retention
16   agreements?
17    A.  No.
18    Q.  Tomorrow, after you tell me what
19   meetings you had as reflected in your
20   calendar, we'll go through some of those
21   additional meetings with the plaintiffs'
22   lawyers.  Okay?
23    A.  When you say go through --
24    Q.  Talk about.

Page 43

1    A.  Okay.
2    Q.  You are licensed to practice
3   medicine, right?
4    A.  Right.
5    Q.  And what are you board certified
6   in, sir?
7    A.  Internal medicine.
8    Q.  Do you have any board certification
9   in cardiology --
10    A.  No.
11    Q.  -- subspecialty?
12    A.  No.
13    Q.  Can you tell me about how much time
14   you spend taking care of patients?
15    A.  I spent many years being a primary
16   care doctor on the faculty at -- when I
17   was at the Beth Israel Hospital.  More
18   recently, since I've got a division to
19   run, I don't do primary care anymore, but
20   I supervise one of the wards at the
21   Brigham and Women's Hospital for several
22   weeks a year every year.
23    Q.  When would you say you stopped
24   actually taking care of patients, sir?

Page 44

1    A.  I found that I did not have the
2   time to be an active primary care doctor
3   at the same time I was developing a
4   division and writing papers and writing
5   grants.
6    Q.  And when was that?
7    A.  That would have been in the mid
8   1990s.
9    Q.  Have you ever advised patients to
10   use COX-2 inhibitors?
11          MR. TISI:  Objection.
12   Vague.
13    A.  When you say advised patients, you
14   mean as their primary care doctor?
15    Q.  Have you, as a doctor, recommended
16   to any individual that he or she use COX-2
17   inhibitors?
18    A.  Most of my recommendations have
19   been via interns and residents over the
20   last number of years, since I'm not a
21   primary care provider.  And I've certainly
22   talked with interns and residents making
23   recommendations about the use or nonuse of
24   COX-2 inhibitors and other nonsteroidals.

Page 45

1    Q.  Did your advice about whether
2   interns and residents at your hospital
3   change over the years in terms of whether
4   you thought they should prescribe Vioxx?
5    A.  Yes.
6    Q.  Can you tell me, sir, at what point
7   you advised, if at all, internists and
8   residents at your hospital to stop
9   prescribing Vioxx?
10    A.  Well, when Vioxx was first
11   marketed, in fact, before Vioxx was first
12   marketed, Dr. Solomon and I, as part of
13   our role at the Brigham, prepared an
14   educational document for the physicians at
15   the Brigham, since that was one of our
16   division's responsibilities, that we knew
17   that the COX-2s were about to be marketed
18   and we knew that they were about to be
19   marketed very heavily.
20          So before they were available for
21   use, we put together a document advising
22   Brigham physicians how to approach these
23   drugs when they became available.  So that
24   would have been in 1999, I guess, around

12 (Pages 42 to 45)

Jerry Avorn, M.D.

Page 46

1   then.
2        And our recommendation was that
3   they should be used very sparingly, and
4   because they were no more effective than
5   older nonsteroidals, their only virtue
6   would be the potential for less GI
7   toxicity, and that therefore their use
8   should be reserved for patients at risk of
9   gastrointestinal hemorrhage.
10       And so the initial message, even
11  before the drugs were marketed, was they
12  should be used on a limited basis,
13  primarily in patients who particularly
14  needed gastroprotection.
15       And then over the next few years,
16  as data began to appear in the literature
17  about cardiovascular risk, particularly the
18  VIGOR paper of 2000 -- which I bet we'll
19  get to talk about -- we indicated that
20  that was a very worrisome property of, at
21  least of Vioxx, and that that would temper
22  the use of that drug even further, because
23  the risk might exceed the benefit.
24       Q.  Did you ever tell residents or

Page 47

1   internists at your hospital not to
2   prescribe Vioxx under any conditions?
3        A.  Yes.
4        Q.  When?
5        A.  In 2003 — both Dr. Solomon and I
6   are members of the pharmacy and
7   therapeutics committee at our hospital
8   which governs drug use there -- and at
9   that point, there had already been the
10  VIGOR paper out.  Dr. Ray's paper had
11  appeared in the Lancet.  Our own findings
12  were coming together on our own research.
13  And we told the pharmacy and therapeutics
14  committee that we were concerned about the
15  safety of Vioxx, and that we felt that it
16  should -- it was at that point the
17  preferred COX-2 drug at the Brigham -- and
18  we felt that it should not be in that
19  status, and, in fact, it probably should
20  not be used.
21       Q.  When in 2003 did you tell the
22  pharmacy and therapeutics committee that
23  you didn't think that Vioxx should remain
24  on their formulary?

Page 48

1        A.  Okay.  What we said was that it
2   should not be the preferred drug and that
3   it -- our recommendation was it should not
4   be used, especially since Celebrex seemed
5   to not carry the same degree of
6   cardiovascular risk.
7        And I would say that it would have
8   been in the second half of 2003.  But --
9   yeah, that's as near as I can recollect
10  the timing, would have been the second
11  half of '03.
12       Q.  Do you still have a copy of the
13  educational document that you prepared for
14  your residents and internists in 1999?
15       A.  Yes.  There is one in my office.
16       Q.  Would you bring that for me
17  tomorrow?  That would be helpful.
18       A.  Sure.  Let me make a list of what
19  I need to bring.
20           MR. TISI:  I'll make the
21  list for you --
22           THE WITNESS:  Okay.
23           MR. TISI:  -- and we'll
24  certainly discuss whether we'll produce

Page 49

1   these things, obviously, if you have
2   another mechanism to do that.  But I
3   suspect we'll be able to locate them and
4   produce them.
5           BY MR. GOLDMAN:
6        Q.  Did you prepare any revisions to
7   this educational document for internists
8   and residents at your hospital over time?
9        A.  No.  I believe that it was
10  something which we prepared only when the
11  drugs were initially made available, and
12  then what we did over time was to urge
13  the pharmacy and therapeutics committee to
14  revise the computer ordering system that
15  we have at the Brigham to make Vioxx not
16  recommended.  But we, at that point, did
17  not -- we were no longer issuing the
18  print-based document, because we felt that
19  a more efficient thing to do would be to
20  change the system ordering system prompts.
21       Q.  Did you ever --
22           MR. TISI:  That's prompts?
23           THE WITNESS:  Yes.
24           MR. TISI:  P-R-O-M-P-T-S?

13 (Pages 46 to 49)

Jerry Avorn, M.D.

Page 50

1    THE WITNESS: Prompts,
2  right.
3    BY MR. GOLDMAN:
4    Q.   Did you ever advise the pharmacy
5  and therapeutics committee at your hospital
6  to change their status of Celebrex, in
7  terms of whether that was a preferred
8  drug?
9    A.  Well, it never was a preferred
10 drug, so it was nothing to modify.
11   Q.   Did you ever inform the pharmacy
12 and therapeutics committee at Brigham and
13 Women's that you believed Celebrex carried
14 a cardiovascular risk?
15   A.   Oh, we -- we discussed all of that
16 data in detail as it was emerging in --
17 over the last few years.
18   Q.   What have you told the pharmacy and
19 therapeutics committee at your hospital
20 about the cardiovascular risk concerning
21 Celebrex?
22   A.   That among the COX-2 inhibitors is
23 -- was and is our impression -- our being
24 mine and Dr. Solomon's -- that Vioxx

Page 51

1  carried the most substantial cardiovascular
2  risk, and that Bextra, now off the market,
3  Valdecoxib, also carried important
4  cardiovascular risk for -- particularly for
5  patients who were post cardiac surgery,
6  and that Celebrex -- that there was
7  evidence for a cardiovascular risk with
8  Celebrex, but it was a more limited risk
9  that was seen primarily in higher doses
10 than are commonly used, and that of the
11 COX-2s, it was the drug which seemed to
12 confer the lowest cardiovascular risk, but
13 that that risk was not zero.
14   Q.   Did you advise the pharmacy and
15 therapeutics committee at any point not to
16 prescribe Vioxx to patients at high risk
17 of cardiovascular disease?
18   A.   We did not limit the warning to
19 patients at high risk of cardiovascular
20 disease, because I've never been convinced
21 that the data indicate that the risk --
22 the cardiovascular risk of Vioxx is
23 limited to patients at high risk of
24 cardiovascular disease.  So we indicated

Page 52

1  that we thought it was a risky drug for
2  any patient.
3    Q.   As to Celebrex, Dr. Avorn, did you
4  ever tell the pharmacy and therapeutics
5  committee at your hospital that they ought
6  not prescribe Vioxx -- I'm sorry --
7  Celebrex to patients at high risk of
8  cardiovascular disease?
9    A.   No.
10   Q.   Back in 1999, when you advised
11 residents and internists at your hospital,
12 through this educational document, that
13 they should use COX-2 inhibitors on a
14 limited basis, am I right that your basis
15 for that recommendation was not that COX-2
16 inhibitors carried a cardiovascular risk?
17   A.   I think in 1999 the concern was
18 more their very great expense with no
19 countervailing benefit, as opposed to a
20 specific worry about cardiovascular disease
21 in 1999.
22   Q.   In 1999, when you were advising
23 your internists and residents at Brigham
24 and Women's Hospital that they ought to

Page 53

1  prescribe COX-2 inhibitors on a limited
2  basis -- and that would include both Vioxx
3  and Celebrex -- your advice was not based
4  on any potential increased cardiovascular
5  risk, true?
6    MR. TISI:  Objection.  Asked
7  and answered.
8    A.   Yeah.  The materials we're talking
9  about were created before the drugs were
10 even on the market.  But yes, that's true.
11   Q.   Have you given any advice to the
12 pharmacy and therapeutics committee at your
13 hospital about any cardiovascular risks
14 associated with traditional NSAIDs?
15   A.   In the course of the discussions
16 that we've had over many months about this
17 category of drug, that issue has come up,
18 and our group actually did one of the
19 first papers demonstrating the risk of
20 hypertension with Ibuprofen back in the
21 1990s, and we discussed the fact that
22 there is clearly a cardiovascular effect
23 of older nonsteroidals as well.
24   And our view, as shared -- as we

14 (Pages 50 to 53)

Jerry Avorn, M.D.

Page 54

1   shared with the P and T committee, was
2   that that risk was -- appeared, from what
3   we know, to be more modest and less well
4   documented than the risk associated with
5   the COX-2s, particularly Vioxx.
6   Q.   Do you believe that traditional
7   nonsteroidal anti-inflammatory drugs carry
8   a risk of -- a cardiovascular risk?
9   A.   Well, in the sense that we know
10  that they raise blood pressure, they do,
11  and in the sense that we know that they
12  increase the risk of congestive heart
13  failure and peripheral edema, they do.
14       The evidence about precipitating
15  cardiac events, such as MIs, is much more
16  limited because there are very few studies
17  in which -- randomized studies comparing
18  them to placebo.
19  Q.   What areas of science, Dr. Avorn,
20  would you consider yourself to be an
21  expert in?
22  A.   Internal medicine,
23  pharmacoepidemiology, pharmacoeconomics, the
24  determinants of physician prescribing

Page 55

1   practices, methods of influencing physician
2   prescribing, determinants of patient
3   medication use and methods of influencing
4   them, cost effectiveness of
5   pharmaceuticals, and pharmaceutical policy
6   or health policy as it relates to
7   medication use.  And in addition,
8   geriatric medicine and geriatric
9   pharmacology.
10  Q.   Any other areas?
11       MR. TISI:  Isn't that
12  enough?
13       BY MR. GOLDMAN:
14  Q.   That's quite a few.
15       MR. GOLDMAN:  Off the
16  record.
17       (Discussion off the record).
18  A.   That's all that I can think of.
19  Q.   Let me ask the question again.
20  Other than the areas you just mentioned,
21  Dr. Avorn, are there other areas of
22  science you consider yourself to be an
23  expert in?
24  A.   No.

Page 56

1   Q.   Do you consider yourself to be an
2   expert, sir, in pharmacology?
3   A.   To the extent that it relates to
4   both the rational use of drugs and
5   pharmacoepidemiology and cost
6   effectiveness, yes.  To the extent that I
7   am not a clinical pharmacologist, no.
8   Q.   You wouldn't consider yourself to
9   be an expert in prostaglandins or the
10  clotting cascade, true?
11  A.   I'm not an expert in that.
12  Q.   And you're not an expert in
13  prostacyclin and thromboxane and any
14  imbalance that might result from a COX-2
15  inhibitor, true?
16       MR. TISI:  Objection to
17  form.  Vague.
18  A.   I'm not an expert in that.  To the
19  extent that it impacts on the areas that I
20  do have expertise in, I know something
21  about it.  But I'm not an expert.
22  Q.   You wouldn't consider yourself to
23  be an expert in the state of mind of a
24  pharmaceutical company, right?

Page 57

1   A.   Right.
2   Q.   You wouldn't consider yourself to
3   be an expert in the conduct of any
4   pharmaceutical company, true?
5   A.   I don't agree with that statement.
6   Q.   What --
7   A.   That is, I do consider myself to
8   have expertise in that area.
9   Q.   Why do you consider yourself to be
10  an expert in the conduct of a
11  pharmaceutical company?
12  A.   For a number of reasons.  One is
13  that the behavior of a pharmaceutical
14  company in relation to risk and benefit
15  has a great deal to do with
16  pharmacoepidemiology and with the outcomes
17  of drugs.
18       And I've written extensively on --
19  in the New England Journal of Medicine and
20  circulation in JAMA, in my book, in health
21  affairs, on the actions of pharmaceutical
22  companies in relation to the study,
23  follow-up, promotion of their drugs.  So I
24  do consider myself to have expertise in

15 (Pages 54 to 57)

Jerry Avorn, M.D.

Page 58

1  that area.
2      Q.  I understand you've got experience,
3  Dr. Avorn, in how drug companies promote
4  their drugs.  Do you consider that to be
5  the same thing as being an expert in the
6  conduct of a pharmaceutical company?
7          MR. TISI:  Object to the
8  word conduct.  He may be using it in
9  different ways.  But go ahead.
10     A.  Yes.  Because it's not just about
11  promotion; it's also about the way a
12  company evaluates risks and benefits of
13  its products and communicates those --
14  that information to physicians and to
15  patients.  That's all part of the conduct
16  of the company, as you phrase it.
17     Q.  What pharmaceutical companies have
18  you evaluated to make an assessment of how
19  you view their conduct?
20     A.  Merck, Glaxo, in which I felt they
21  behave appropriately and honorably in the
22  context of a study that we're doing with
23  them on one of their drugs.  Pfizer.
24          It's -- We don't study companies

Page 59

1  per se except in the present context.  We
2  study primarily drugs.  But when it's a
3  sole source manufacturer, that involves
4  studying the company as well.
5      Q.  Do you consider yourself to be an
6  expert in determining a pharmaceutical
7  company's intent?
8          MR. TISI:  Objection to
9  form.
10     A.  I think no one -- It's difficult to
11  know intent.  One can only know about
12  behaviors.
13     Q.  So I take that to mean you don't
14  consider yourself an expert in determining
15  pharmaceutical companies' intent?
16     A.  Well, I think that's a very
17  problematic question for a lot of ways.
18  One is there are no standards for
19  determining expertise, and it's not like
20  you're board certified in pharmaceutical
21  company intent.
22          Secondly, the concept of intent
23  implies knowing something about the
24  intrapsychic processes of a company, and

Page 60

1  companies don't have intrapsychic
2  processes.
3          So I think one can look at
4  behaviors of individuals in companies, and
5  one can make very plausible conclusions
6  about the goals that those behaviors were
7  designed to achieve.
8          But the way you phrased it, since
9  nobody can get inside the head of a
10  company, since companies don't have heads,
11  no one can be an expert in that, the way
12  you phrased the question.
13     Q.  Well, you wouldn't consider
14  yourself to be an expert in determining
15  the intent of individuals who work at
16  pharmaceutical companies, true?
17     A.  Primarily their behaviors, and
18  inferences can then be drawn, with some
19  degree of plausibility, about the intent
20  that those behaviors may reflect.  But
21  primarily all that anyone can observe is
22  the behavior.
23     Q.  Other than observing the behavior
24  of a pharmaceutical company, Dr. Avorn,

Page 61

1  you don't consider yourself an expert in
2  determining the intent of individuals who
3  work at pharmaceutical companies; is that
4  fair to say?
5      A.  Not exactly.  I think it's
6  analogous to saying if somebody comes upon
7  a person in the subway and raises a knife
8  to stab them -- as happened yesterday in
9  New York -- you don't need board
10  certification to know that that person had
11  intent to harm them.  One can observe only
12  the raising of the hand with a knife, and
13  one cannot prove that one knows what's in
14  the head of a person.  But it's pretty
15  obvious what the intent was.
16          And so in that sense, there is no
17  expertise that is documentable, but it
18  comes down to common sense, drawing a
19  connection between a behavior and an
20  intent.
21     Q.  You would agree that anybody can
22  look at somebody in the subway raising a
23  knife up and be able to conclude whether
24  or not that person intends to harm the

16 (Pages 58 to 61)

Jerry Avorn, M.D.

**Page 62**

1 victim?
2 A. Yes.
3 Q. You don't have to be a board
4 certified doctor in internal medicine or a
5 pharmacoepidemiologist to make that
6 assessment, true?
7 A. Correct.
8 Q. And the same is true for
9 determining the intent of a pharmaceutical
10 company?
11 MR. TISI: Objection.
12 A. It's less clear cut than a person
13 going to stab somebody, but I think a
14 similar argument can be made.
15 Q. Have you ever worked for a
16 pharmaceutical company, sir?
17 A. Not as an employee. We've received
18 grants from pharmaceutical companies.
19 Q. To do research?
20 A. Yes.
21 Q. How much time would you say, Dr.
22 Avorn, you've spent working as an expert
23 in the Vioxx litigation?
24 MR. TISI: Objection.

**Page 63**

1 Vague.
2 A. Up to the end of calendar '05, I
3 believe it was about 125 hours. And
4 there's been another, I would guess, 200
5 hours since then.
6 Q. How much are you charging the
7 plaintiffs' lawyers to be an expert in the
8 Vioxx litigation?
9 A. I don't accept any compensation for
10 this work. I request if they want, they
11 can make a donation to a charitable fund
12 from which I derive absolutely no benefit.
13 Q. What's the name of the charitable
14 fund that you request the plaintiffs'
15 lawyers donate money to?
16 A. The Fidelity Charitable Gift Fund.
17 Q. Have you submitted any invoices to
18 the plaintiffs' lawyers to date?
19 A. I submitted one a long while ago
20 through the end of '05, which hasn't yet
21 been -- nothing has been -- no checks have
22 been issued as a result of that invoice.
23 Q. Do you know how much the invoice
24 was?

**Page 64**

1 A. It was for about 90,000 -- some odd
2 thousand dollars for about 125 hours. We
3 can get you the exact numbers.
4 Q. You're charging $750 an hour; is
5 that right?
6 A. It's not a charge, but that's what
7 my normal hourly rate is.
8 Q. I read in your book "Powerful
9 Medicines" -- I think I read it in there
10 -- that the revenues that you generate
11 from sales of that book go to a
12 foundation --
13 A. Right.
14 Q. -- is that true?
15 A. Right.
16 Q. What's the name of the foundation?
17 A. Well, thus far, the revenues have
18 also gone to the Fidelity Charitable Gift
19 Fund, pending the IRS approval of the
20 501(c)(3) status of the foundation, which
21 just occurred in the last month. So now
22 -- now the revenues will be directed
23 there.
24 Q. What's the name of the foundation?

**Page 65**

1 A. The Alosa Foundation, A-L-O-S-A.
2 Q. What does the Alosa Foundation do?
3 A. It exists to provide information on
4 rational and appropriate medication use to
5 doctors and students and patients.
6 Q. How does it accomplish that?
7 A. Well, one activity at the moment is
8 a project being supported by the
9 Commonwealth of Pennsylvania in which
10 physicians are given information about the
11 risks and benefits and costs of drugs that
12 is noncommercial based on a lot of earlier
13 research in this area. So they have an
14 alternative to a pharmaceutical company
15 advertising as a source of information.
16 Q. Does the Alosa Foundation have any
17 employees?
18 A. It has a number of contractors,
19 primarily pharmacists and nurses in the
20 state of Pennsylvania, who go out to visit
21 doctors as supported by the state of
22 Pennsylvania.
23 Q. Do any of your family members work
24 for the Alosa Foundation?

17 (Pages 62 to 65)