Jerry Avorn, M.D.

1      So because I am aware of everything
2 that they would have seen, I have a pretty
3 good idea of what they did or didn't know.
4    Q.  So you have a pretty good idea of
5 what doctors in general knew about any
6 potential cardiovascular risks of Vioxx,
7 even though you haven't spoken with any
8 doctors who prescribe Vioxx?
9       MR. TISI:  That's not what
10 the question was, Counsel. In litigation
11 is the question you said. That's not
12 fair.
13    A.  Yeah.  I never said I -- I never
14 said I have not spoken to any doctors who
15 have ever prescribed Vioxx.
16      What I've said was that I have not
17 spoken to individual doctors involved in
18 the cases that are in trial.
19    Q.  Is it fair to say, then, Dr. Avorn,
20 that you don't know what any of the
21 specific doctors in the Vioxx cases knew
22 about potential cardiovascular risks
23 associated with Vioxx?
24       MR. TISI:  Objection.

1    A.  That's not fair to say.
2    Q.  You believe, that even though
3 you've never spoken with them, you know
4 what particular doctors knew about the
5 potential cardiovascular effects of Vioxx?
6    A.  No.  What I said was that I'm
7 aware of the information that was
8 available to any doctor in America, and
9 because -- because what is known to any
10 doctor is only going to come from what's
11 in the label, what's in the marketing
12 campaign, what's in the promotion, what's
13 in the literature and what's in the direct
14 consumer advertising, as well as perhaps
15 their own clinical experience.
16      There's no way that people can know
17 things apart from those channels. And
18 I've done research on the influence of
19 different channels of communication to
20 doctors, whether it's promotional or
21 scientific, in shaping their knowledge and
22 their prescribing.
23      And so in the sense that I know
24 what Merck was saying about Vioxx or

1 wasn't saying and I know what was in the
2 literature the doctors might have read, I
3 can have a pretty good impression of what
4 doctors in general were aware of in
5 relation to Vioxx.
6    Q.  What did Dr. McCaffrey or Dr.
7 Mikola know about the potential risks of
8 cardiovascular -- Sorry. Withdrawn.
9      What did Dr. Mikola or Dr.
10 McCaffrey know about the potential
11 cardiovascular risks of Vioxx?
12       MR. TISI:  Objection.
13    A.  Only what was in the label or the
14 promotional materials or the literature.
15 That I can say with certainty.
16    Q.  Do you know whether Dr. Mikola or
17 Dr. McCaffrey read any of the promotional
18 materials for Vioxx?
19    A.  No.
20    Q.  Can you say, sir, under oath, that
21 you are aware of what the doctors who are
22 treating -- were treating the patients in
23 the Vioxx litigation knew, actually knew,
24 about the potential cardiovascular effects

1 of Vioxx?
2       MR. TISI:  Objection.
3    A.  Of course I can't get into the head
4 of a given doctor that I've never met.
5    Q.  So the answer is no?
6       MR. TISI:  Objection.
7    A.  But I can know what doctors in
8 general knew.
9    Q.  I didn't ask about doctors in
10 general.
11    A.  But given that these specific
12 doctors are a subset of doctors in
13 general, that's a relevant answer.
14    Q.  Do you plan, in your trial
15 testimony, sir, to tell the jurors what
16 you believe the doctors in any particular
17 case knew about the cardiovascular risks
18 of Vioxx?
19       MR. TISI:  Objection.
20    A.  I will be able to comment with some
21 authority on what information was available
22 to physicians and presented to physicians,
23 and that is a very strong and accurate
24 predictor of what any given doctor had

Golkow Litigation Technologies - 1.877.DEPS.USA

Jerry Avorn, M.D.

Page 166

1   available to him.
2      Q.  You work on providing
3   evidence-based noncommercial summaries of
4   medical literature to doctors to help them
5   make accurate drug use decisions, right?
6      A.  Correct.
7      Q.  And when you provide evidence-based
8   noncommercial summaries of medical
9   literature, do you make it a point to
10  provide unbiased and objective views?
11     A.  That's what we try to do.
12     Q.  Why is it important to provide
13  objective unbiased views when it comes to
14  the medical literature about a particular
15  drug or class of drugs?
16     A.  So that a doctor can get
17  information that's not driven by the need
18  to sell a particular product.
19     Q.  Do you feel that your expert report
20  here, sir, contains an objective unbiased
21  review of the medical literature concerning
22  Vioxx?
23     A.  I feel that it does.
24     Q.  Do you agree, sir, that Celebrex,

Page 167

1   Ibuprofen, Feldene and over the counter
2   Advil are all essentially the same drug? .
3      A.  No.
4      Q.  Do you believe that COX-2
5   inhibitors were underused by doctors?
6      A.  No.
7      Q.  Do you believe that Vioxx was
8   underused by doctors?
9      A.  No.
10     Q.  Do you believe, sir, that for
11  patients who had serious risk of cardio --
12  Withdrawn.
13         Do you believe that for patients
14  who had serious risk of gastrointestinal
15  problems, that those patients didn't use
16  COX-2 inhibitors enough?
17         MR. TISI:  Objection.
18         BY MR. GOLDMAN:
19     Q.  Let me ask it a different way.
20     A.  Okay.
21     Q.  Dr. Avorn, do you agree, sir, that
22  for patients who had risk factors for GI
23  problems, Vioxx and COX-2 inhibitors in
24  general were underused?

Page 168

1         MR. TISI:  Objection.
2      A.  All right.  Let me try to answer
3   that.
4         When it appeared, as it did when
5   the drugs were first marketed, that they
6   had a meaningful gastroprotective effect,
7   and there was less evidence available
8   about their cardiac risk, the impression
9   that I, and many of my colleagues had and
10  that we actually wrote in a paper, was
11  that if there were patients who had
12  important gastrointestinal risk and that
13  they were not on a gastroprotective drug,
14  that that was a problem.
15         I now believe that that was not the
16  case, because we now understand that the
17  cardiovascular risk of those drugs exceeded
18  whatever gastroprotective benefit they
19  offered.  But that was not clear when they
20  first were marketed.
21     Q.  Well, there was no evidence to
22  suggest that the cardiovascular risks, if
23  any, of Vioxx outweighed the benefits that
24  it offered for patients who had the

Page 169

1   potential for gastrointestinal problems
2   when Vioxx came to the market, true?
3      A.  Well, actually, I should modify my
4   last sentence.  That was not clear to me at
5   the time the drugs were marketed.
6         I do believe that there was
7   evidence already in place at the time that
8   Vioxx was marketed, of which I was
9   unaware, since it was within the NDA
10  materials that FDA had, that even at the
11  moment of marketing, the cardiovascular
12  risks provided a harm that outweighed the
13  gastrointestinal benefit.
14     Q.  Did the FDA have all the clinical
15  and animal studies that were done on Vioxx
16  before it approved Vioxx?
17     A.  I think there were studies that
18  were not available to FDA in a timely
19  manner, and I would need to go back and
20  look at what they had when.  But ADVANTAGE
21  came to them late.  The mortality data
22  from the Alzheimer studies --
23     Q.  I'm talking about approval.
24     A.  Right.

43 (Pages 166 to 169)

Jerry Avorn, M.D.

Page 170

1   Q.   Let me ask my question again.
2   A.   Okay.
3   Q.   When the FDA approved Vioxx for
4   marketing in the United States, sir, in
5   May of 1999, did they have all of the
6   clinical studies and animal studies on
7   Vioxx?
8        MR. TISI:  Objection.
9   A.   I know that there were studies that
10  FDA received later than they should, and I
11  cannot comment on whether that was pre or
12  post approval.  I simply don't recall.
13  Such as ADVANTAGE.  And I don't remember
14  the dates that ADVANTAGE was completed in
15  relation to the dates of approval.  But
16  for now, I'm willing to say I cannot
17  identify a specific study that FDA did not
18  have.
19  Q.   As you sit here today, Dr. Avorn,
20  you're unaware of any study that Merck
21  withheld from the FDA or they did not have
22  when they decided to approve Vioxx for use
23  in the United States, right?
24  A.   Right.  I think that was a problem

Page 171

1   later, but not at the time of approval, to
2   my knowledge.
3   Q.   And we'll talk about what you
4   thought later.
5   A.   But not at the time of approval, to
6   my knowledge.
7   Q.   I really want to ask you to stick
8   to my question --
9   A.   Okay.
10  Q.   -- and not insert these things
11  about what happened later.  Okay?
12  A.   Okay.
13  Q.   Dr. Avorn, at the time Vioxx was
14  approved in the United States by the FDA,
15  are you aware of any clinical study or
16  animal study that Merck withheld from the
17  FDA?
18  A.   I cannot name such a study.
19  Q.   The FDA, you understand, has
20  experienced scientists who work there,
21  right?
22  A.   Yes.
23  Q.   And the FDA is very experienced in
24  evaluating the risks and benefits of

Page 172

1   medicine, right?
2        MR. TISI:  Objection.
3   A.   Experienced, but I would say not
4   always competent.
5   Q.   Do you believe the people who
6   evaluated the risks and benefits of Vioxx
7   when they approved Vioxx for use were
8   competent?
9   A.   I believe there was a competent
10  evaluation.
11  Q.   Did the FDA conclude, when Vioxx
12  was brought to the market, that the
13  benefits outweighed the risks?
14  A.   Yes.
15  Q.   Did the FDA continue to approve
16  Vioxx as safe and effective and believed
17  the benefits outweighed the risks all the
18  way till the time Vioxx was withdrawn?
19  A.   I can't --
20       MR. TISI:  Objection to the
21  phrase -- what the FDA believed.  Go
22  ahead.
23  A.   I can't comment on FDA's beliefs,
24  but you're right that that was their

Page 173

1   formal position.
2   Q.   Are you aware of an informal
3   position that the FDA felt --
4   A.   No, but you are asking me to say
5   what a federal agency believes, and I
6   don't think federal agencies can believe
7   things.
8   Q.   Based on your observations of the
9   behavior of the Food and Drug
10  Administration, do you agree, sir, that
11  the FDA repeatedly approved Vioxx as safe
12  and effective while it was on the market?
13  A.   Based on my observation of the
14  behavior of FDA, as reflected in memos by
15  FDA personnel who were reviewing Vioxx, I
16  get the clear impression of ongoing
17  worries about cardiovascular safety, from
18  the moment the drug was approved, until
19  the moment that it was withdrawn.
20       MR. GOLDMAN:  Can you repeat
21  my question?
22       (Record read).
23       BY MR. GOLDMAN:
24  Q.   Can you answer that question, sir?

44 (Pages 170 to 173)

Jerry Avorn, M.D.

Page 174

```
1        A.  Yes.
2            MR. TISI:  Objection.  I
3    think he answered it.  Go ahead.
4        A.  There's -- There's no such -- a
5    concept as repeated approval.
6        Q.  Did the FDA approve Vioxx as safe
7    and effective on multiple occasions while
8    it was on the market?
9        A.  It only approved it once.  Drugs
10   don't get approved over and over.
11       Q.  Did the FDA approve Vioxx for use
12   for different indications while Vioxx was
13   on the market?
14       A.  Yes.
15       Q.  You did a study, I think, in
16   2002-2004 time frame, where you received a
17   grant by the NIH, concerning cardiac risk
18   in rheumatoid arthritis patients.  Do you
19   remember that?
20       A.  There was -- The paper was Dr.
21   Solomon.  It was the first health -- in
22   the Circulation.  Is that the one you
23   mean?
24       Q.  This is -- I can't remember if he
```

Page 175

```
1    was on it or not.  But let me ask it a
2    different way.
3            MR. TISI:  Do you want a
4    copy of his CV so you can identify it?
5            BY MR. GOLDMAN:
6        Q.  Do you remember doing any research,
7    Dr. Avorn, about cardiac risk in patients
8    who had rheumatoid arthritis?
9        A.  Well, I know that Dr. Solomon did a
10   paper on that topic, but he did it with
11   another group, and I'm not even sure that
12   I was a co-author of it.
13       Q.  Are you aware that patients with
14   rheumatoid arthritis have an increased risk
15   of heart attacks?
16       A.  Yes.
17       Q.  Just by having the disease
18   rheumatoid arthritis patients are,
19   unfortunately, at higher risk of
20   experiencing heart attacks, right?
21       A.  Correct.
22       Q.  Do you know what the magnitude of
23   the risk is that the patients who have
24   rheumatoid arthritis face compared to
```

Page 176

```
1    somebody who doesn't have rheumatoid
2    arthritis with respect to heart attacks?
3        A.  Not off the top of my head.
4        Q.  Are people with osteoarthritis
5    generally at higher risk of heart disease
6    than those that don't have osteoarthritis?
7        A.  Yes.
8        Q.  Do you know what the magnitude of
9    the increased risk is of the patients with
10   osteoarthritis for having heart disease .
11   than patients who don't have
12   osteoarthritis?
13       A.  Not off the top of my head.
14           MR. GOLDMAN:  Let's take a
15   break.
16       (Off the record at 11:37 a.m.)
17       (Recess taken).
18       (On the record at 11:47 a.m.)
19   BY MR. GOLDMAN:
20       Q.  Were you asked to answer two
21   principle questions by the plaintiffs'
22   lawyers when you were retained as an
23   expert?
24       A.  Yes.  But on re-reading my report,
```

Page 177

```
1    I realized that there were a couple of
2    subtasks within that evaluated and managed
3    issue having to do with how they managed
4    the risk benefit issue and communicated
5    it, and I kind of compressed it into
6    manage.  But yes.
7        Q.  The first question that you were
8    asked to answer was whether Vioxx
9    increased the risk of -- you wrote
10   cardiovascular disease?
11       A.  Right.
12       Q.  What do you mean by increase the
13   risk of cardiovascular disease?
14       A.  Well, broadly, cardiovascular
15   disease would include myocardial
16   infarction, cerebral vascular disease,
17   including stroke, but also hypertension,
18   congestive heart failure.
19       Q.  Anything else?
20       A.  Those are the main components.
21       Q.  So as I understand what you're
22   going to do in your trial deposition, Dr.
23   Avorn, you're going to testify about
24   general causation; that you believe Vioxx
```

45 (Pages 174 to 177)

Jerry Avorn, M.D.

Page 178

1   increases the risk of heart attacks and
2   strokes, right?
3       A.  And other cardiovascular disease,
4   right.
5       Q.  Do you know a plaintiff named Mr.
6   Gerald Barnett?
7       A.  No.
8       Q.  Have you ever reviewed Mr.
9   Barnett's medical records?
10      A.  No.
11      Q.  Do you know Stephen Hatch?
12      A.  No.
13      Q.  Did you know Stephen Hatch before
14  he passed away?
15      A.  No.  We can maybe save time by
16  saying I don't know or get involved with
17  any specific plaintiffs.
18      Q.  Okay.
19          MR. TISI:  And you've
20  actually said -- tried to say that a
21  couple times.
22          THE WITNESS:  Right.
23          BY MR. GOLDMAN:
24      Q.  And you haven't reviewed the

Page 179

1   medical records of any of the plaintiffs
2   in the Vioxx litigation, right?
3       A.  Correct.
4           MR. TISI:  Would it help
5   you if I made a global representation?
6   Supposedly that will cut down some of your
7   time.
8           MR. GOLDMAN:  No.  I'm not
9   going to go through the specific -- If
10  you're going to say general stuff?
11          MR. TISI:  No.  I'm going
12  -- What I'm going to say is he has not
13  reviewed any medical records or any
14  particular plaintiff.  He will not be
15  offered as an expert on behalf of any
16  individual plaintiff other than on -- in
17  court.
18          MR. GOLDMAN:  Okay.
19          MR. TISI:  Hopefully they
20  won't say, did you speak to the doctors?
21  Did you look at the plaintiffs? We've
22  avoided all that.
23          BY MR. GOLDMAN:
24      Q.  When you say you were asked the

Page 180

1   question about -- Withdrawn.
2           When you say that you were asked to
3   assess the methods by which Merck
4   evaluated and managed the cardiovascular
5   issue during the time that Vioxx was
6   developed and while it was on the market,
7   are you basically offering your opinion
8   about what Merck knew about any potential
9   cardiovascular risks, what Merck did or
10  didn't do in response to what you believe
11  they knew, and whether you believe that
12  Merck's actions or inactions were
13  reasonable?
14      A.  Correct.
15      Q.  What does assess methods mean?
16      A.  Can you show me where you're
17  referring?
18      Q.  The second question you were asked
19  was to assess the methods.  It's on --
20      A.  Correct.  Assess what Merck did.
21      Q.  Can you be a little more specific?
22      A.  Sure.  Evaluate and manage are two
23  different pieces.  Evaluate it is how
24  Merck worked up the question of

Page 181

1   cardiovascular risk, in term of studies
2   that it did or did not do.  And manage
3   would include how it dealt with the risk
4   in terms of how it communicated to doctors
5   and to patients.
6       Q.  Do you believe you know all of the
7   studies that Merck did to assess the
8   question of whether Vioxx increases the
9   risk of cardiovascular disease?
10      A.  There could well be studies that
11  I'm not aware of.
12      Q.  You don't know what Merck did in
13  response to the FitzGerald urine study
14  about prostacyclin and Thromboxane, right?
15      A.  I know that animal studies were
16  conducted, but I don't know that I am
17  aware of all of them.  I do believe I
18  have a clear handle on the human studies
19  that were done.
20      Q.  But you don't know any of the
21  pharmacologic studies or any of the animal
22  studies that Merck did to try to test the
23  FitzGerald hypothesis, if you will?
24      A.  I'm sure I don't know all of them.

46 (Pages 178 to 181)

Jerry Avorn, M.D.

Page 182

1    Q.   When you say that you are going to
2  assess how Merck managed the question of
3  cardiovascular risk, you said that that
4  would include how Merck dealt with the
5  risk in terms of how it communicated to
6  doctors and to patients, right?
7    A.   Correct.
8    Q.   How do you know how Merck
9  communicated to doctors and to patients
10 the potential cardiovascular risks
11 associated with Vioxx?
12   A.   Because everything the company is
13 legally permitted to say to doctors and to
14 patients needs to be a reflection of what
15 is approved by the FDA.  And also we have
16 copies of their ads, copies of their
17 statements, copies of their internal
18 documents about their plans for
19 communication.  And the materials that
20 they sent out to patients are obviously in
21 the public domain.
22   Q.   Well, is it your testimony, Dr.
23 Avorn, that you've reviewed all of the
24 advertisements about Vioxx, the statements

Page 183

1  that Merck has made about Vioxx, all the
2  relevant internal documents at Merck that
3  you believe reflect the communications that
4  Merck had concerning any potential
5  cardiovascular risk of Vioxx?
6    A.   Well, I've seen many, many of the
7  ads, and many, many of the statements.
8  I'm sure there may be some ads or -- and
9  I'm sure there are internal statements
10 that I haven't seen.
11   Q.   What scientific methodology are you
12 using when you are assessing the methods
13 of Merck's managing of the cardiovascular
14 problem, as you put it?
15   A.   Okay.  Again, there's the -- the
16 generating of new data and the
17 communication, which are really two -- two
18 separate pieces.
19      There's a growing understanding
20 that a big piece of -- of rational drug
21 use and drug stewardship is about managing
22 risk.  And so there are expectations about
23 what -- in the -- in the medical
24 community, particularly in the pharmacoepi

Page 184

1  community, about what's inappropriate
2  action to take in relation to signals in
3  terms of further studies that need to be
4  done.
5       And there's also general consensus
6  about fairness and accuracy and depiction
7  of information to patients and doctors.
8    Q.   Are you saying there's a standard
9  that you're actually applying when you are
10 assessing Merck's methods of dealing with
11 the cardiovascular risks?
12   A.   There's not a written down standard
13 that one can Xerox, but there is a
14 consensus, I think, within the medical
15 community about what's reasonable behavior.
16   Q.   What source can you point me to
17 that would show that there's a consensus
18 in the medical community about what would
19 constitute reasonable behavior by a drug
20 company?
21   A.   Well, in -- there is a document
22 called -- that I helped to write the first
23 version of.  Something like Guidelines for
24 Appropriate Pharmacoepidemiologic Practice.

Page 185

1  I -- I can't remember.  It's in my CV.
2  That was published by the International
3  Society for Pharmacoepidemiology, of which
4  I was president at one point, that sets
5  forth kind of good pharmacoepidemiologic
6  practice in working up and evaluating
7  risks.  So that's -- that's one piece.
8  And I believe it was -- it was revised in
9  the last year or two.
10      There are a variety of -- of
11 standards for appropriate -- Well, there
12 are standards that are not necessarily
13 written down, but they have to do with
14 fair and accurate communication.
15      There is actually legislation --
16 and I don't claim to be a regulatory
17 authority -- but there is legislation,
18 regulatory language in place about duty to
19 warn and so forth that is in FDA's
20 regulatory mandate as well.  So those
21 would be two kinds of examples of
22 standards.
23   Q.   Are drug companies subject to
24 strict FDA regulatory requirements?

47 (Pages 182 to 185)

Jerry Avorn, M.D.

Page 186

1    MR. TISI: Objection.
2    A.  Not strict enough, in my view.
3    Q.  Does the FDA regulate the conduct
4  of pharmaceutical companies in terms of
5  drug approval and post marketing?
6    A.  Post marketing?  Just post
7  marketing --
8    Q.  Post marketing.
9    A.  -- behavior?  To the latter, no.
10  I think there's -- there's clear evidence
11  that FDA does not have much of a
12  regulatory handle on post marketing,
13  certainly post marketing research.
14    Q.  So when you're talking about
15  assessing the methods of Merck's management
16  and evaluation of the cardiovascular issue,
17  you are talking about describing Merck's
18  conduct, and then why you believe that
19  conduct constitutes unreasonable behavior?
20    A.  Correct.
21    Q.  Is there any objective standard,
22  sir, that you can point me to, that would
23  show how a pharmaceutical company is
24  supposed to evaluate and manage a safety

Page 187

1  issue?
2    A.  Well, I just mentioned the
3  Guidelines for Good Pharmacoepidemiologic
4  Practice.  What --
5    Q.  Let me stop you there.
6    MR. TISI:  Are you going to
7  come back and let him finish his answer?
8  Go ahead.
9    BY MR. GOLDMAN:
10    Q.  Finish the answer.  Tell me, Dr.
11  Avorn, all the places where I can find an
12  objective standard about how a
13  pharmaceutical company should evaluate and
14  manage a safety issue.
15    MR. TISI:  Objection.  Asked
16  and answered.
17    A.  Okay.  For the third time, I will
18  cite the recommendations or the guidelines
19  published by the International Society for
20  Pharmacoepidemiology called Guidelines for
21  Appropriate -- for Good
22  Pharmacoepidemiologic Practice.  That's my
23  recollection of the title.  As I said, I
24  helped to write initially.

Page 188

1    There -- So in terms of -- There
2  also are various papers that have been
3  written by people like Professor Ray.  He
4  had a good paper that was in the New
5  England Journal earlier this year, I
6  believe, on evaluating drug safety.
7    I had a paper that I wrote with
8  him in the New England Journal back in
9  1993, I believe -- it's in my CV -- about
10  evaluating drugs once they are on the
11  market or some title like that.  Alasdair
12  Wood has also written about appropriate
13  safety evaluation of drugs.
14    So there are many papers in the
15  literature in which experts in the field
16  have laid out -- including myself, have
17  laid out what is appropriate assessment of
18  risk for marketed drugs.
19    Q.  Do any of the sources that you just
20  described indicate how a drug company
21  should respond to a particular safety
22  issue?
23    A.  Yes.
24    Q.  When you referenced the Guidelines

Page 189

1  for Good Pharmacoepidemiologic Practice --
2    A.  Right.
3    Q.  -- can you briefly tell me what
4  that is about?
5    A.  Sure.  The goal, back when we wrote
6  it, was to provide a companion to the
7  guidelines that exist for good clinical
8  trial practice, good manufacturing
9  practice, so that there would be something
10  written down in which a company or other
11  interested party could find recommendations
12  about what's the right way to deal with
13  post marketing surveillance, workup of
14  safety signals and so forth.
15    Q.  And you believe that the Guidelines
16  for Good Pharmacoepidemiologic Practice,
17  Dr. Ray's article in the New England
18  Journal of medicine, your article with Dr.
19  Ray in 1993, and articles that Alasdair
20  Wood has written demonstrate that there's
21  a consensus in the medical community about
22  how pharmaceutical companies should act?
23    MR. TISI:  I think you're
24  missing one that he mentioned, but I

48 (Pages 186 to 189)

Jerry Avorn, M.D.

Page 190

1  won't...
2         MR. GOLDMAN:  Okay.
3     A.  Yeah.  That -- There -- Dr. Strom
4  has written about this.  Dr. Sady.  Yeah.
5  I think if you take all of those together,
6  there is a general picture that emerges.
7  There's always going to be differences.
8     Q.  Have you identified any of those
9  sources, sir, that you mentioned in your
10 Materials Considered?
11        MR. TISI:  Counsel,
12 objection.
13    A.  Well, my — my CV has the
14 Guidelines for Good Epidemiological
15 Practices in it.  But no, that -- that
16 would be just in the rubric of -- of
17 general medical behavior.
18    Q.  Have you evaluated the conduct of
19 pharmaceutical companies other than Merck?
20    A.  Yes.
21    Q.  Was that in the context of being an
22 expert witness?
23    A.  And other contexts as well.
24    Q.  Have you ever -- Withdrawn.

Page 191

1         Are you applying any statistical
2  methods, sir, when you're evaluating
3  Merck's conduct in this case?
4         MR. TISI:  Objection.
5     A.  Certainly statistics play a role in
6  looking at data, yes.
7     Q.  What statistics have you applied to
8  demonstrate that Merck's conduct concerning
9  Vioxx was unreasonable?
10    A.  Well, it's not like there's a
11 statistical test for reasonable behavior.
12 But what I mean is that there -- in
13 looking at study results, one needs to
14 know enough statistics to be able to
15 interpret the importance of the findings.
16    Q.  What is the test for reasonable
17 behavior by a drug company?
18    A.  Like I just said, there is no test
19 that you can apply a Chi-square to and see
20 if it passes or fails.
21    Q.  I'm not talking about a statistical
22 test.
23    A.  Okay.
24    Q.  Any test — Withdrawn.

Page 192

1         MR. TISI:  He identified
2  reasonable behavior; isn't that correct?
3         BY MR. GOLDMAN:
4     Q.  Is there a test, sir, that you're
5  applying to determine whether Merck's
6  conduct concerning Vioxx was reasonable?
7     A.  Okay.  There is no one test the
8  way you would do a Chi-square on a
9  clinical trial.  "The test," in quotes, is
10 whether that behavior meets reasonable
11 standards of experts in the field.
12        And there's also a common sense
13 test of, I think, whether any individual
14 layperson or a juror would expect that a
15 reasonable company would do X, Y, Z given
16 a given piece of data.
17    Q.  Do you believe that jurors are
18 capable of evaluating Merck's conduct in
19 coming to a conclusion about whether
20 Merck's conduct was reasonable or
21 unreasonable?
22    A.  In some ways yes and in some ways
23 no, and let me explain.  They would not
24 be able to understand what acceptable

Page 193

1  standards of behavior in the medical
2  community are because they're not doctors,
3  or about interpreting the meaning of
4  certain findings because they're not
5  pharmacoepidemiologists.  So there are some
6  important technical things which a juror,
7  on his or her own, could not be able to
8  interpret.
9         And then there are other things
10 which any person with common sense can
11 interpret, as in if you saw a particular
12 signal of a problem what would a
13 reasonable company do.  So there's —
14 There's the two kinds.
15        And the latter I think a juror
16 could handle on their own.  The former, I
17 think, requires some expert interpretation.
18    Q.  So as I understand it, you believe
19 that expertise is required to be able to
20 explain the standards that you believe are
21 acceptable for a pharmaceutical company's
22 conduct, but whether or not Merck violated
23 those standards a juror could determine on
24 its own?

49 (Pages 190 to 193)

Golkow Litigation Technologies - 1.877.DEPS.USA

Jerry Avorn, M.D.

Page 194

1  A. That's a total distortion of what I
2 said.
3      MR. TISI: I would also
4 add, Counsel, you know, that is clearly a
5 ruling that a judge has to make.
6      Asking an expert witness to sit in
7 the -- to put judicial robes on and decide
8 where his appropriate expert testimony was
9 not appropriate expert testimony is
10 absolutely inappropriate.
11      And I will abide by Judge Fallon's
12 ruling about not, you know, stating
13 speaking objections; however, those kinds
14 of things are so ridiculous that if you
15 really feel like you're compelled to ask
16 this witness to sit as a judge, I will
17 feel that perhaps maybe we should call
18 Judge Fallon on that.
19      MR. GOLDMAN: Fine.
20      MR. TISI: So let's --
21 let's -- let's -- let's stick to medical
22 opinions, and not judicial opinions.
23      BY MR. GOLDMAN:
24  Q. Are you an expert, Dr. Avorn, in

Page 195

1 FDA regulations?
2  A. To the extent that my expertise
3 about drug risks and benefits relate very
4 closely to FDA decisions, yes. Am I a
5 regulatory attorney? No.
6  Q. But you believe you are an expert
7 in FDA guidelines concerning drug labeling?
8  A. We -- We have written on that
9 topic, and I, again, to the extent a great
10 deal of that is about pharmacoepidemiology
11 and data on risks and benefits, yes.
12  Q. We'll talk more about the FDA in a
13 minute.
14      When did you form your opinion that
15 Vioxx increased cardiovascular risk?
16  A. I think it began to form when the
17 VIGOR study was published in November of
18 2000.
19  Q. When did you form your opinion that
20 Merck's conduct in responding to the
21 potential cardiovascular risks of Vioxx was
22 unreasonable?
23  A. It took form over time. I think
24 it began, actually, in early 2001, in a

Page 196

1 conversation with Dr. Lou Sherwood of
2 Merck, whom I had invited to give grand
3 rounds at our hospital. And I asked him
4 about the VIGOR findings, and he said --
5 he dismissed it out of hand and said, "Oh,
6 that's nothing to think about. It's all
7 because Naproxen prevent MIs."
8      And that was the first time that I
9 began to feel, or believe, that Merck's
10 response to the cardiovascular risk of
11 Vioxx was not a reasonable response,
12 because that seemed to me to be a -- a
13 rather quick dismissal of a potentially
14 very worrisome problem.
15  Q. What did you say to Lou Sherwood
16 when he told you that?
17  A. I don't recall what I said to him
18 at the time. I remember thinking to
19 myself, "Gee, that seems like a pretty
20 glib answer." But since he was the vice
21 president of the company that made the
22 drug and knew the data more intimately
23 than I, I don't know that I -- I think I
24 may have indicated that that would make

Page 197

1 Naproxen the most cardioprotective drug
2 ever discovered. I know that that's what
3 many of us were saying at the time. I
4 would expect that I would have said that
5 to Lou.
6  Q. But you don't remember?
7  A. It was six years ago -- or five
8 years ago.
9  Q. Where was the discussion with -- I
10 can't remember. He's a doctor.
11  A. Sherwood is a doctor.
12  Q. Dr. Sherwood.
13      MR. TISI: He actually
14 is --
15      THE WITNESS: He's the head
16 of endocrine at Beth Israel.
17      MR. GOLDMAN: This is off.
18      (Off the record at 12:09 p.m.)
19      (Discussion off the record).
20      (On the record at 12:09 p.m.)
21      BY MR. GOLDMAN:
22  Q. When was your discussion --
23  A. It would have been about --
24  Q. Let me finish. When was your

50 (Pages 194 to 197)

Jerry Avorn, M.D.

Page 198

1 discussion with Dr. Sherwood?
2     A.  It would have been about January of
3 '01, at the Brigham and Women's Hospital,
4 when I had had him come up to give grand
5 rounds.
6     Q.  Was anyone else present during your
7 discussion?
8     A.  That particular discussion, as I
9 recall, was in the hallway walking
10 somewhere, I think.  Although I remember
11 Dr. -- We had a lunch with him after
12 grand rounds, and I remember Dr. Solomon
13 was at -- It was a small lunch, mostly
14 for my division with Dr. Sherwood, and I
15 know Dr. Solomon was there.  But I don't
16 remember all the people that were there.
17     Q.  Have you had dealings with Dr.
18 Sherwood in the past?
19     A.  Over time, as I was just saying, he
20 was, I think, the head of endocrinology
21 around the time that I was at the Beth
22 Israel Hospital in the '70s or early '80s.
23 And I think he had invited -- he and I
24 were both on a panel or two over time of

Page 199

1 -- I remember there was a meeting at the
2 University of Pennsylvania we were both
3 at.  So I've seen him on and off like
4 every few years.  Rarely.
5     Q.  And has Dr. Sherwood ever done
6 anything to you that you viewed was
7 inappropriate?
8     A.  Not to my knowledge.
9     Q.  Was he ever combative or
10 threatening toward you in any way?
11     A.  Not to me.  To others.
12         MR. GOLDMAN:  Move to strike
13 as nonresponsive.
14         BY MR. GOLDMAN:
15     Q.  I'm asking about you.  Did you find
16 that Dr. Sherwood -- Let me back up for a
17 second.
18         Have you read a letter about Dr.
19 Sherwood that was written by Dr. Fries?
20     A.  I'm aware of a concern that Dr.
21 Fries had about Dr. Sherwood's behavior.
22     Q.  Is that based on a conversation you
23 had with Dr. Fries?
24     A.  No.  It was reading about it.

Page 200

1     Q.  In a letter?
2     A.  I don't remember if it was a letter
3 or an account of their interchange.
4     Q.  What type of account did you
5 read --
6     A.  Well, basically --
7     Q.  -- about the interchange between
8 Dr. Fries and Dr. Sherwood?
9     A.  Well, basically -- And this has
10 been, I think, widely reported in the
11 media -- that allegedly Dr. Sherwood
12 phoned or wrote -- I think phoned Dr.
13 Fries at Stanford to complain about the
14 statements made by Dr. Gupta -- no, I'm
15 sorry.  Dr. Singh.  His first name is
16 Gurkirpal Singh, S-I-N-G-H.  Who was a
17 junior faculty at Stanford who had been
18 making statements, based on his reading of
19 the literature and his own research, about
20 Vioxx and its cardiovascular risk, and Dr.
21 Sherwood allegedly called Dr. Fries to
22 warn him to -- as the account goes, to
23 have Dr. Singh stop saying bad things
24 about Vioxx.

Page 201

1     Q.  Do you know how Merck responded to
2 the complaint that Dr. Singh registered
3 with Merck?
4         MR. TISI:  Dr. Fries.
5         BY MR. GOLDMAN:
6     Q.  I'm sorry.  Dr. Fries.
7     A.  I know that there was a statement
8 within Merck that this looked very bad and
9 there was concern.  I don't know that I
10 remember what they did about it.
11     Q.  Do you have an opinion about
12 whether Merck acted responsibly in response
13 to Dr. Fries's letter about Dr. Sherwood?
14         MR. TISI:  A separate report
15 from Dr. Sherwood's conduct?  You're
16 talking about as an institution?  Is that
17 what you're asking?
18         BY MR. GOLDMAN:
19     Q.  Do you understand the question?
20         MR. TISI:  I don't, and I'm
21 going to object.
22     A.  No.  I -- I -- I don't.
23     Q.  Your knowledge about the
24 interaction between Dr. Sherwood and others

51 (Pages 198 to 201)

Jerry Avorn, M.D.

**Page 202**

1  and what Dr. Fries had to say about that
2  comes from your reading the newspaper,
3  right?
4    A.  Correct.  But I can tell you it
5  created quite a stir in the academic
6  community, that a company would sort of
7  threaten a faculty member for saying bad
8  things about their drug.
9        MR. GOLDMAN:  Move to strike
10  as nonresponsive.
11       BY MR. GOLDMAN:
12    Q.  And you've said, allegedly, in
13  several of your --
14    A.  Right.
15    Q.  -- answers, right?
16    A.  Correct.
17    Q.  You don't know whether the
18  statements by Dr. Fries are accurate about
19  Dr. Sherwood, correct?
20    A.  I cannot rule out the possibility
21  that he was lying.
22    Q.  You just don't have any personal
23  knowledge at all about Dr. Sherwood or his
24  interactions with any other doctor, right?

**Page 203**

1    A.  It's from what I've read.
2    Q.  Okay.  You identify the sources of
3  information that you're relying on for
4  your opinion, sir, and you said that you
5  reach your opinions based on peer-reviewed
6  medical literature, right?
7    A.  Right.
8    Q.  Did you reach your opinions based
9  on publicly available material from the
10  FDA?
11    A.  Right.
12    Q.  And did you reach your opinion
13  about what Merck knew about the
14  cardiovascular risks and how it managed
15  those risks from the internal documents
16  that plaintiffs' lawyers sent you?
17    A.  Yes.  There -- There are other
18  sources, too. That was not an exhaustive
19  list.
20    Q.  What are the other sources?
21    A.  Well, there was not publicly
22  available information.  I believe that it
23  was within FDA.  I think that I saw FDA
24  documents that I would not have been able

**Page 204**

1  to get outside of the discovery process.
2  I'm not sure.
3        And other communication to Merck by
4  its -- I guess I got that via Merck
5  internal documents such as correspondence
6  that was sent to Merck by its scientific
7  advisors.  And then, again, the media
8  reports, which were a smaller piece of it,
9  but they were part of that as well.
10    Q.  You're relying on media reports in
11  forming your opinion, in part?
12    A.  In small part.
13    Q.  Were there good public health
14  reasons for Merck to develop Vioxx?
15    A.  Yes.
16    Q.  What were they?
17    A.  The fact that gastrointestinal
18  toxicity, particularly GI bleeds, from
19  traditional nonsteroidals was and is a
20  clinical problem.
21    Q.  Would you agree that
22  gastrointestinal toxicity from traditional
23  NSAIDs is a substantial problem?
24        MR. TISI:  Objection.

**Page 205**

1    A.  Yeah.  Substantial is a subjective
2  word, but it's -- it's -- it's a problem.
3  I -- I -- I just don't know what
4  substantial means in this context.  But
5  yes, it's -- it's an important problem.
6    Q.  Are you aware of epidemiological
7  studies that have suggested there are
8  approximately 107,000 hospitalizations each
9  year because of GI complications from
10  traditional NSAIDs?
11    A.  Yes.
12    Q.  You have no reason to dispute the
13  integrity or accuracy of those studies,
14  right?
15    A.  Right.
16    Q.  Would you agree, sir, that Vioxx
17  worked to reduce pain and inflammation for
18  the vast majority of patients who used it
19  without causing them side effects?
20    A.  Yes.
21    Q.  And you would never say, sir, that
22  Vioxx is unsafe for any patient with any
23  dose for any duration, would you?
24    A.  Sure, I would.  In fact, that's

52 (Pages 202 to 205)

Jerry Avorn, M.D.

**Page 206**

1  what the FDA has said.  That's what Merck
2  has said.  Yes.  Of course I would.
3      Q.  Did you ever say, while Vioxx was
4  on the market, that it was unsafe for any
5  patient at any dose for any duration?
6      A.  I recommended to our P and T
7  committee we not have it on our formulary.
8  That's about as clear I could have been
9  about it.
10     Q.  Did you recommend to the medical
11 community, in terms of writing an article,
12 that you believed while Vioxx was on the
13 market that it was unsafe for any patient
14 at any dose for any duration?
15     A.  I wrote in my book, while the drug
16 was on the market, that it was no more
17 effective than older nonsteroidals and that
18 it raised the risk of heart attack.
19     Q.  Before Vioxx was withdrawn from the
20 market, sir, did you ever write any
21 peer-reviewed article that said that Vioxx
22 was unsafe for any patient at any dose for
23 any duration?
24     A.  I wrote peer-reviewed articles,

**Page 207**

1  while the drug was on the market,
2  indicating that there was a worrisome risk
3  of cardiovascular side effects from the
4  drug.
5      I did not go on to call for its
6  being banned, because that's not what the
7  articles are about.  But we had papers in
8  the literature well before the drug was
9  withdrawn saying this drug carries
10 important cardiovascular risk.
11     I think the papers also indicated
12 that it had no analgesic advantage.
13     Q.  I wasn't asking about other
14 articles.  I was asking about yours, okay?
15     A.  No.  I'm saying, that's -- I'm
16 talking about mine.  Articles that I have
17 written.
18     Q.  Did you ever write in any article
19 that was peer- reviewed while Vioxx was on
20 the market, that Vioxx was unsafe for any
21 patient at any dose for any duration?
22     A.  If you can strain the question by
23 using those particular words, no.  But to
24 complete my answer, I did say that

**Page 208**

1  Vioxx --
2      Q.  Why do you have to complete your
3  answer?
4      A.  Because you're asking --
5      Q.  It's complete.
6      A.  It's really a pretty absurd
7  question.
8      Q.  It's a yes or no question.
9          MR. TISI:  No, it isn't.
10     A.  You're asking if I used a specific
11 set of words that you chose that are
12 extraordinarily extreme.  And what I'm
13 saying is, while I did not use those
14 extreme words, that essentially no one
15 ever uses in an article, what I did say
16 very clearly for many years well before
17 the drug was withdrawn is that it had no
18 analgesic advantage and that it had an
19 increased cardiovascular risk.
20     That is tantamount to saying why in
21 the world would you use this drug?  So
22 technically I did not use the words that
23 were in your question, but I certainly
24 made a statement very much like that in

**Page 209**

1  writing in peer-reviewed articles over the
2  years.
3      Q.  Did you ever say, while Vioxx was
4  on the market in any peer-reviewed
5  article, that you believed it should be
6  withdrawn from the market?
7      A.  No.
8      Q.  Did you ever say in any
9  peer-reviewed article that you wrote while
10 Vioxx was on the market that it should
11 have a black box warning about potential
12 cardiovascular risks?
13     A.  No.
14     Q.  Did you ever write in any article
15 while Vioxx was on the market that you
16 believed that Merck's warning about
17 potential cardiovascular risks was
18 inadequate?
19     A.  I never wrote any papers in which
20 that would have come up.
21     Q.  Is the answer no?
22     A.  Right.
23     Q.  You, I think won a --
24         MR. TISI:  Could you just

53 (Pages 206 to 209)

Jerry Avorn, M.D.

**Page 210**

1  read back that last question, if you don't
2  mind?  I'm sorry.  Let me ask you, was
3  that while he was on the market, while the
4  drug was on the market?
5      MR. GOLDMAN:  Yes.
6      MR. TISI:  That's fine.
7      BY MR. GOLDMAN:
8      Q.  Were you the recipient of a
9  clinical investigator award concerning the
10  issue of drug induced illness in the
11  elderly?  Do you remember that?
12      A.  I don't know that it was a clinical
13  investigator award.  That --
14      Q.  Okay.
15      A.  Tell me what you -- From whom?
16      Q.  Did you receive a grant --
17      A.  From whom?
18      Q.  -- from the NIH in the early '90s
19  to assess drug induced illness in the
20  elderly, and did you use NSAIDs as a
21  model?
22      A.  Yes.
23      Q.  Briefly, can you tell us what your
24  study was about and what were the

**Page 211**

1  conclusions about NSAIDs?
2      A.  Okay.  It was, as I recall -- And
3  this would have been many years ago --
4  looking at patterns of use of NSAIDs and
5  complications, and it -- it led into the
6  work that I did with Dr. Solomon.
7      I think -- If we're talking about
8  the same grant, that was a small grant
9  pilot award from the National Institute on
10  Aging to develop data sets for studying a
11  variety of problems.
12      MR. TISI:  To the extent
13  you refer to stuff like that, because I
14  think it's helpful, if you want to -- he
15  has his CV, so I know --
16      MR. GOLDMAN:  I --
17      MR. TISI:  Okay.  So I
18  mean, it would help me to follow what
19  you're doing.  If you can't do that,
20  that's fine.  I understand.
21      BY MR. GOLDMAN:
22      Q.  Did you discuss, when you were
23  doing this research for the NIH, the
24  gastrointestinal complications from NSAIDs?

**Page 212**

1  Do you remember?
2      A.  Well, yeah.  I remember that that
3  research led to a number of papers that
4  Dr. Solomon and I wrote that dealt with
5  that, yeah.
6      Q.  Have you ever prescribed Vioxx?
7      A.  I have recommended that -- I'm
8  trying to remember whether I've -- Given
9  that it came out after I was no longer
10  doing a lot of direct primary care, I'm
11  trying to recall whether I've recommended
12  that interns or residents prescribe it.
13      I would expect that when it was new
14  to the market, I would have probably had
15  supervised interns who prescribed it.
16      Q.  At what point in time do you
17  believe you told the residents and interns
18  at your hospital that Vioxx carried an
19  increased cardiovascular risk that they
20  should consider when they prescribe Vioxx?
21      MR. TISI:  Objection.  Asked
22  and answered.
23      A.  I think it would have been shortly
24  after the publication of VIGOR in November

**Page 213**

1  of 2000.
2      Q.  Have you ever prescribed Celebrex?
3      A.  Yes.  As above, that is, supervise
4  interns and residents who prescribed it.
5      Q.  Do you know that the FDA has
6  concluded that all NSAIDs carry
7  cardiovascular risk?
8      MR. TISI:  Objection.
9      A.  I know they --
10      MR. TISI:  It misstates the
11  record.
12      A.  I know that they have concluded
13  that.  I think that they have concluded
14  that sloppily.
15      Q.  Why?
16      A.  Because, as I've discussed with Dr.
17  Temple of FDA, they really did not have
18  clinical trial or data or compelling
19  observational data about drugs other than
20  the COX-2s, but that for reasons that are
21  beyond me, they chose to put the same --
22  to recommend the same warning for all
23  nonsteroidals, really on the basis of not
24  having enough data, but just assuming a

54 (Pages 210 to 213)

Jerry Avorn, M.D.

Page 214

1   class vein.
2       And I think that they got it wrong,
3   as I've told Dr. Temple, and I've stated
4   it in print.
5   Q.   What did Dr. Temple say to you when
6   you said that to him?
7   A.   He said that they were working with
8   the best data they had, and they felt that
9   they wanted to be safe about it.
10  Q.   Did you take issue with the FDA's
11  conclusion that all COX-2 inhibitors should
12  have a black box warning about potential
13  cardiovascular effects?
14  A.   I did not take issue with that.
15  Q.   Do you disagree with the FDA's
16  desire to have a black box warning on
17  Celebrex for potential cardiovascular risk?
18  A.   No.
19  Q.   Do you think that there is no
20  cardiovascular risk associated with
21  traditional NSAIDs, other than by
22  increasing hypertension?
23  A.   I do not think that. I don't
24  know. I think we don't have enough data

Page 215

1   to know.
2       MR. GOLDMAN:  Now is
3   probably an okay time to break for lunch,
4   because I'm about to switch topics.
5       MR. TISI:  Okay.
6       (Off the record at 12:25 p.m.)
7       (Lunch recess.)
8       (On the record at 1:38 p.m.)
9       BY MR. GOLDMAN:
10  Q.   I want to switch topics, Dr. Avorn,
11  and talk about statistical significance.
12  Okay?
13  A.   Mm-hmm.
14  Q.   When you analyze and publish data,
15  do you follow generally accepted
16  statistical principles?
17  A.   Usually.
18  Q.   Is it important to follow generally
19  accepted statistical principles?
20  A.   Usually.
21  Q.   Why?
22  A.   To convey a sense of the likelihood
23  that a given finding is the result of
24  chance or of causality.

Page 216

1   Q.   Why do you say usually?
2   A.   Because there are some times in
3   which a -- an excessively rigid use of
4   statistical, quote, rules, unquote, such as
5   saying that any finding with a P value of
6   less than .05 is real and meaningful, and
7   any finding with a P value of greater than
8   .05 is unimportant. Being too rigid about
9   that can lead to erroneous conclusions.
10  Q.   Can taking results that are not
11  statistically significant -- Withdrawn.
12      Do statistical rules and the
13  concept of statistical significance help
14  prevent people from drawing invalid
15  conclusions from the data?
16  A.   When used intelligently, yes.
17  Q.   And is the concept of statistical
18  significance a principle that's been around
19  for many years?
20  A.   Well, yeah. But so has astrology.
21  I don't know that that's a helpful
22  question.
23  Q.   It's helpful to me to ask, so --
24  A.   Okay. It's been around for many

Page 217

1   years.
2   Q.   Merck didn't invent the concept of
3   statistical significance, right?
4   A.   Correct.
5   Q.   And when a result is statistically
6   significant, doesn't that help you
7   distinguish between adverse events that are
8   caused by a drug versus adverse events
9   that are caused by chance?
10  A.   That can be one helpful tool.
11  Q.   And is it true, sir, that it is
12  generally inappropriate to make causal
13  inferences if a difference is not
14  statistically significant?
15      MR. TISI:  Clarification.
16  Because this is important, and I don't
17  want to get in the way, but are you
18  talking about in the confines of one
19  study, or are you talking about looking at
20  overall evidence of a cross- study?
21      BY MR. GOLDMAN:
22  Q.   I'm just talking about the concept
23  of statistical significance --
24      MR. TISI:  But causation --

55 (Pages 214 to 217)

Jerry Avorn, M.D.

Page 218

1  Causation involves more than just looking
2  at one -- one set of numbers, and I want
3  to make sure that we're not creating an
4  inappropriate record.
5      MR. GOLDMAN:  Just object to
6  form, if you would.  I don't -- I'm not
7  sure what your objection is, but --
8      MR. TISI:  All right.
9  Well --
10     MR. GOLDMAN:  Let me ask it
11  a different way.  Okay?
12     MR. TISI:  Sure.
13     BY MR. GOLDMAN:
14  Q.  When you are analyzing adverse
15  events for a particular study, am I right
16  that it is generally inappropriate to make
17  a causal inference if the result is not
18  statistically significant?
19  A.  I think that's an
20  oversimplification of the principle.  And
21  I can explain why, if you like.
22  Q.  Sure.
23  A.  If a study does not have the power,
24  in the statistical sense of the term, to

Page 219

1  be able to identify a, quote, significant,
2  close quote, difference, then assuming that
3  an association with a P value of greater
4  than .05 is unimportant or irrelevant can
5  be an erroneous conclusion.
6  Q.  Assuming that a study does have
7  power to detect a difference between a
8  drug and an event and a placebo and an
9  event, do you agree, sir, that it is
10  inappropriate to make causal inferences if
11  the difference is not statistically
12  significant?
13  A.  If the study had power to detect a
14  difference in that outcome, then that
15  lends credence to adhering to the P 1.05
16  standard.
17  Q.  And if -- Let me see what you
18  said.
19     (Record read).
20  Q.  In your -- The answer before the
21  last one, Dr. Avorn, you said if the study
22  does not have sufficient power to identify
23  a statistically significant difference, it
24  would be wrong to interpret a P value that

Page 220

1  is greater than .05 as unimportant or
2  irrelevant?
3  A.  Correct.
4  Q.  Do you remember that?
5  A.  Correct.
6  Q.  Wouldn't it also be wrong, Dr.
7  Avorn, even if a study didn't have the
8  power to detect a statistically significant
9  difference, to conclude from a P value
10  that is greater than .05, that there is an
11  increased risk or there really is an
12  elevated risk?
13     MR. TISI:  Clarification
14  based on that study alone.
15  A.  I think what you meant was a P
16  value of less than .05 in your question.
17  Q.  No.
18  A.  A P value of less than .05, meaning
19  that it looks significant.
20  Q.  Yeah.  I meant greater than.  So
21  let me ask again.
22  A.  All right.
23  Q.  As I understand your previous
24  statement, sir, if a study does not have

Page 221

1  the power to detect a statistically
2  significant difference, it would be wrong
3  to consider the result where a P value was
4  greater than .05 as being irrelevant or
5  unimportant, right?
6  A.  Correct.
7      MR. TISI:  Objection.
8      BY MR. GOLDMAN:
9  Q.  And my question is:  It would also
10  be wrong to consider that P value of
11  greater than .05 as inferring causation?
12     MR. TISI:  Objection.
13  Clarification on the study alone.
14  A.  I'm not understanding -- I'm not
15  understanding the question.
16  Q.  If you have a P value that is
17  greater than .05, is that statistically
18  significant or not?
19  A.  In the conventional sense, no.
20  Q.  And your point was that if a study
21  that is not powered enough to detect a
22  statistically significant difference
23  reveals a P value of greater than .05,
24  it's wrong to consider that result to be

Jerry Avorn, M.D.

Page 222

1  irrelevant or unimportant, right? --
2      A.  Right. It can be wrong. It --
3  Yeah. I mean, you could be misled by
4  writing off something with a P value
5  greater than .05 if there was no power to
6  detect a significant difference.
7      Q.  You could also be misled by
8  concluding that a P value greater than
9  .05, even in a study that's not powered to
10  detect a difference --
11      A.  Yeah.
12      Q.  -- is evidence of actual causation?
13         MR. TISI:  Objection for the
14  reason stated.
15      A.  Okay. Let me see if I understand
16  what you're saying.
17      Q.  Mm-hmm.
18      A.  I said that dismissing a P value of
19  greater than .05 in a -- for an outcome
20  for which the study was not powered can be
21  an erroneous conclusion, and you're saying
22  -- I think what you're saying is, wouldn't
23  it -- couldn't it also be erroneous to
24  assume that it is meaningful?

Page 223

1      Q.  Correct.
2      A.  I said it can be erroneous to
3  assume it means nothing, and you're saying
4  couldn't it also be erroneous to assume
5  that it means something?
6      Q.  Yes.
7      A.  Correct. I agree with you.
8      Q.  So let me just state it again, just
9  so the record is clear. I think we're on
10  the same page, okay?
11      A.  Yes.
12      Q.  It could be erroneous and
13  misleading for somebody to draw the
14  conclusion that there is a meaningful
15  difference seen in a study where a P value
16  is greater than .05 when that study is not
17  powered to detect a difference.
18         MR. TISI:  Objection.
19  Assuming you're limiting it to one study.
20  Go ahead.
21      A.  Right. In any given study it --
22  and I think what may be the simplest way
23  and clearest way to say this is, it is
24  inappropriate to read too much into the

Page 224

1  presence or absence of significance of a
2  finding for which there was no power to
3  detect a significant finding in either
4  direction.
5      Q.  Do most researchers report results
6  at 95 percent confidence intervals?
7      A.  Yes.
8      Q.  And a 95 percent confidence
9  interval is traditionally used when
10  analyzing data, right?
11      A.  Yes.
12      Q.  And if you use a 95 percent
13  confidence interval, that means that you
14  are 95 percent confident that the true
15  risk lies within the lower and upper
16  bounds of the confidence interval, true?
17      A.  Correct.
18      Q.  And if the number one appears in
19  the confidence interval, then you cannot
20  reject the no hypothesis, right?
21      A.  If one is using the P .05 standard.
22      Q.  Yes.
23      A.  I think -- I think cannot -- I'm
24  trying to avoid black and white, yes, no.

Page 225

1  But yes, it means that there is a 95 --
2  There is not a 95 percent confidence that
3  the finding is difference from one.
4      Q.  It's generally true, sir, that if
5  the number one appears in a confidence
6  interval, that means the result is not
7  statistically significant, right?
8      A.  In the conventional sense, yes.
9      Q.  You said in your report that Merck
10  knew of the risk of heart attack or stroke
11  before approval in May of 1999, yet failed
12  to take reasonable action to address it.
13  Do you remember using words to that
14  effect?
15      A.  Well, I'd like to see the exact
16  words I used, so if you want to tell me
17  where --
18      Q.  Well, if you turn to the section
19  Available Evidence Prior to Approval --
20      A.  Mm-hmm.
21      Q.  -- of Vioxx.
22      A.  (Witness viewing document). Yes.
23      Q.  Is it your position, sir, that
24  based on your analysis in this report,

57 (Pages 222 to 225)

Jerry Avorn, M.D.

Page 226

1   Merck knew about the risk of heart attack
2   or stroke from Vioxx prior to approval?
3        MR. TISI:  Objection.
4   Mischaracterizes his prior testimony on
5   that.
6        A.  Well, that's -- that's why I wanted
7   to see the exact words of mine that you
8   were referring to, because a term like
9   "knew of" is both oversimplified and I
10  think misleading. .
11       Q.  Okay.
12       A.  I think a fairer statement of this
13  is that Merck was aware of the potential
14  for that to be a problem.
15       Q.  And you think that there was clear
16  evidence that Merck was aware of the
17  potential cardiovascular problem with Vioxx
18  before approval, right?
19       A.  Yes.
20       Q.  And I want to make a distinction
21  between being aware of the possibility of
22  an increased risk for cardiovascular events
23  and being aware that Vioxx actually causes
24  heart attacks, okay?

Page 227

1        A.  All right.
2        Q.  Is it your testimony, sir, that
3   Merck knew, prior to approval of Vioxx,
4   that Vioxx causes heart attacks?
5        A.  No.  I think prior to approval,
6   what -- Merck had evidence that this was
7   an important potential problem, but I
8   would not go so far as to say that --
9   Well, let me just think carefully about
10  this.
11       I'm having a problem with the
12  concept of quote, Merck knew that, because
13  Merck is a company, and companies don't
14  know or not know things.
15       I think the -- There was evidence
16  available to Merck, some of which Merck
17  generated, that raised a very worrisome
18  signal about the likelihood that Vioxx
19  could cause heart attack.  I think that
20  that's a fair and accurate depiction of
21  what I think was available to the company.
22       Q.  Do you agree, sir, that there is no
23  evidence that Merck officials, prior to
24  approval, believed that Vioxx causes heart

Page 228

1   attacks?
2        A.  I guess that's asking me to state
3   what I believe individuals' beliefs were.
4        Q.  Well, you say in your report, sir,
5   on Page .2, that the internal documents and
6   the documents in the public domain provide
7   clear evidence --
8        A.  Can you tell me where you're
9   reading from?
10       Q.  Sure.  The second to last paragraph
11  on Page .2.
12       A.  Okay.
13       Q.  "Inspection of information available
14  in the public domain and internal company
15  documents --"
16       A.  Right.
17       Q.  -- "provides clear evidence that
18  Merck officials have been aware of this
19  risk for years."  And then it continues,
20  okay?
21       A.  Yeah.
22       MR. TISI:  Just for
23  completeness sake, I know it comes under
24  the heading of pre -- prior approval, but

Page 229

1   if you read the sentence before, it says,
2   "Leading up to 2004."  So let's -- For
3   completeness, maybe we should read the
4   whole paragraph.
5        MR. GOLDMAN:  No.  I don't
6   need to have him read the whole paragraph.
7        MR. TISI:  Oh, okay.  Then
8   we won't be doing that at trial now, will
9   we?
10       BY MR. GOLDMAN:
11       Q.  Dr. Avorn, do you see how you talk
12  about that there was clear evidence about
13  what Merck officials were aware of, right?
14       A.  Correct.
15       Q.  Those are your words, right?
16       MR. TISI:  Prior to what
17  date, Counsel?
18       BY MR. GOLDMAN:
19       Q.  Are those your words, "prior to
20  approval," sir?
21       A.  Yes.
22       Q.  Is it your testimony that Merck
23  officials, prior to approval, were aware
24  that Vioxx causes heart attacks?

58 (Pages 226 to 229)

Jerry Avorn, M.D.

Page 230

1   A.  Okay.  The problem we have here,
2   Counsel, is that you're distorting my
3   quote, and that really is kind of --
4   Q.  I'm separating -- I'm moving from
5   the quote.
6   A.  You just read my statement.  Okay?
7   My statement is accurate and my statement
8   is what I believe.
9       So I don't understand the purpose
10  of your then recharacterizing it in words
11  that are not my own, and asking if I
12  agree with it.
13      What I agree with is what I wrote,
14  and you can read it again into the record
15  if you'd like.
16  Q.  Dr. Avorn, is it your opinion that
17  Merck officials were aware that Vioxx
18  carried an increased risk of causing heart
19  attacks?
20      MR. TISI:  When?
21      BY MR. GOLDMAN:
22  Q.  Prior to approval.
23  A.  Yes.
24  Q.  Based on what?

Page 231

1   A.  Based on the observation that there
2   was an increased incidence of
3   cardiovascular events in the preapproval
4   studies that they submitted to the FDA.
5   Q.  You believe the preapproval studies
6   submitted to the FDA show an increased
7   cardiovascular risk for Vioxx?
8   A.  Okay.  What we need to do is go
9   back to my words, which was "an increased
10  risk."  Okay.  That's different from
11  saying they knew that it caused heart
12  attacks.
13      What they knew was that their drug
14  was associated with an increased risk of
15  those events in the preapproval studies.
16      Now, the reason I'm being careful
17  about that is that it's an increased risk,
18  which is the potential for a problem.  I'm
19  not saying that there was prima facie
20  evidence that they had all these heart
21  attacks that they were hiding or something
22  like that.
23  Q.  Dr. Avorn, there is a difference
24  between saying that Merck officials were

Page 232

1   aware of the potential that Vioxx could
2   cause cardiovascular events --
3   A.  Right.
4   Q.  -- and taking the position that
5   Merck believed and knew and was aware that
6   Vioxx causes heart attacks yet put the
7   drug on the market anyway.
8       MR. TISI:  Objection.
9       BY MR. GOLDMAN:
10  Q.  Do you understand the difference?
11  A.  Yes.
12  Q.  Is it your testimony that Merck
13  officials were aware that there was an
14  increased risk and that Vioxx caused heart
15  attacks prior to approval of Vioxx?
16      MR. TISI:  Objection.
17  Compound.
18  A.  It's -- As Mr. Tisi said, what I
19  agree with is what I said, which was they
20  were aware of the increased risk, and that
21  is different from the second piece of the
22  question which is, they knew that Vioxx
23  caused heart attacks.
24  Q.  Is it fair to say, then, Dr. Avorn,

Page 233

1   that you don't know of any evidence where
2   Merck officials knew that Vioxx caused
3   heart attacks before approval?
4   A.  I am aware that Merck officials
5   stated, in documents that I could cite for
6   you, that their drug had the potential to
7   increase the risk of heart attack.
8       And the problem is when you keep
9   coming back to the word new, because new
10  implies certainty, and I'm not testifying
11  that as of the time of approval, there was
12  certainty of the cause of heart attacks.
13  But there was very compelling evidence of
14  an increased risk of heart attacks, and
15  that's an important distinction.
16  Q.  And the compelling evidence of an
17  increased risk of heart attacks from Vioxx
18  before approval was what?
19  A.  Both the -- Well, primarily --
20  Well, it was of -- of several kinds.  One
21  was the evidence from the preapproval
22  studies as reflected in the NDA in which
23  there was a succession of what I would
24  characterize as worrisome signals of

59 (Pages 230 to 233)

Jerry Avorn, M.D.

Page 234

1   increase in a variety of different
2   clinical trials that Merck had conducted,
3   increased rates of cardiovascular outcomes,
4   which also was accompanied by evidence
5   from the company's own Scientific Advisory
6   Board and the pharmacological literature,
7   suggesting a precise reason why selected
8   inhibition of the COX-2 receptor might
9   predispose to cardiovascular outcomes.
10      And combining the evidence from
11  pharmacology, the statements of their own
12  advisors, and the signals from their
13  premarketing studies, I would -- and their
14  own statements, as per Dr. Scolnick and
15  others, of this could be a problem, it may
16  be a class effect, this drug could raise
17  the risk of thrombotic events, et cetera,
18  et cetera -- of which there are many such
19  internal documents -- that there was an
20  awareness of the possibility that their
21  drug could increase cardiovascular risk.
22      Q.  Did you read a study by Dr. Reicin
23  that was published in 2002?
24      A.  The one in which she -- American

Page 235

1   Heart Journal or American Journal of
2   Cardiology in which she looked at all
3   their -- she claimed to have looked,
4   although I think erroneously claimed, to
5   have looked at all their osteoarthritis
6   studies.
7       Q.  Are you claiming that Dr. Reicin
8   published an article and did not include
9   an osteoarthritis study in her analysis?
10      A.  I was unable to figure out whether
11  all the studies were there.  I don't know
12  whether ADVANTAGE was in that collection
13  of studies or not, because they were
14  listed by numbers of people rather than
15  specific protocol numbers.  And so my -- I
16  -- I simply can't tell whether ADVANTAGE
17  was listed in there or not.
18      Q.  Am I right, sir, that the
19  conclusion of the study that Dr. Reicin
20  did and published was that if you look at
21  the osteoarthritis studies, there is no
22  increased risk associated with Vioxx
23  concerning heart attacks?
24      A.  That was what she concluded.

Page 236

1       Q.  And that's, in fact, what the
2   analysis of the osteoarthritis studies
3   showed?
4          MR. TISI:  Objection.
5       A.  That was not what FDA's reading of
6   the osteoarthritis study showed.
7       Q.  Have -- You're saying that the FDA
8   concluded that Vioxx's preapproval
9   osteoarthritis studies showed that there
10  was an increased risk of heart attack with
11  Vioxx?
12         MR. TISI:  Objection.
13      A.  No.  I'm concluding that FDA's
14  review of the osteoarthritis studies
15  submitted within the NDA indicated to the
16  FDA medical reviewers that there were --
17  there was evidence of the possibility of
18  increased thrombotic risk, and that there
19  was not enough information to dismiss that
20  risk, in their own words.
21      Q.  Do you agree, Dr. Avorn, that there
22  was no reasonable association of a risk of
23  stroke from Vioxx when Vioxx was on the
24  market?

Page 237

1          MR. TISI:  Objection to
2   form.
3       A.  There was no -- I want to go back
4   and look at the specific stroke outcomes
5   that were in the NDA as well as in other
6   prewithdrawal studies like ADVANTAGE and
7   VIGOR, and I -- I could do that now or
8   prior to tomorrow.
9       Q.  As you sit here today, Dr. Avorn,
10  can you identify any study, while Vioxx
11  was off the market, showing that Vioxx
12  carried an increased risk of stroke?
13      A.  Stroke was included among the
14  cardiovascular outcomes in several of those
15  studies, and so what I would need to do
16  is to see, among the studies that found
17  increased cardiovascular risk, how much of
18  that risk was explained by MI and how much
19  by stroke.
20      Q.  So will you do that by tomorrow?
21  Will you look to see whether you can
22  identify any study before Vioxx was
23  withdrawn from the market showing an
24  increased risk of strokes for Vioxx?

60 (Pages 234 to 237)

Jerry Avorn, M.D.

Page 238

1  A.  Yes.
2  Q.  Do you remember whether the VIGOR
3  study showed any signal that Vioxx causes
4  strokes?
5  A.  I don't recall that it did.
6  Q.  Do you know what the stroke results
7  were in the ADVANTAGE study?
8  A.  Not off the top of my head.
9  Q.  If the results of the ADVANTAGE
10 study showed that there were six strokes
11 on Naproxen and zero on Vioxx, would you
12 say that Vioxx prevents strokes?
13     MR. TISI:  Objection.
14 Mischaracterizes the evidence.
15 A.  Were they comparably sized groups,
16 the same number of people in both arms of
17 the study?
18 Q.  I believe so.  You can check that
19 tonight.  But I believe so.  Let's assume
20 that they were.
21 A.  Okay.  If the only information I
22 had from a study was that one drug caused
23 six strokes in a comparably sized ...
24 Q.  Okay.  In the ADVANTAGE study,

Page 239

1  2,785 patients received Vioxx, and 2,772
2  patients received Naproxen.
3  A.  Okay.  So it's about the same size.
4  Q.  Given that there were a similar
5  number of people who took Vioxx and
6  Naproxen in the ADVANTAGE study, would you
7  conclude, based on the fact there were six
8  strokes in the Naproxen arm and zero in
9  the Vioxx arm, that Vioxx prevents
10 strokes?
11     MR. TISI:  Objection.
12 Assumes facts that are incorrect.
13 A.  Okay.  The problem is the word
14 "conclude."  I think based on any single
15 study, it is -- especially if the findings
16 are of marginal significance, as I don't
17 know if those were or weren't -- I
18 wouldn't conclude anything.  What I would
19 say is that's a worrisome signal.
20 And if it was just Drug A and Drug
21 B, regardless of which drugs they were, I
22 would say this is interesting, this is of
23 concern, let's gather more information to
24 find out whether Naproxen causes strokes

Page 240

1  or whether Vioxx prevents strokes.
2     But I don't think a conclusion
3  based on one study with six events out of
4  thousands of people is likely to be a
5  conclusive conclusion.
6  Q.  Would you agree, sir, that before
7  you can draw firm conclusions about risks,
8  it's important to assess the totality of
9  the data --
10 A.  Yes.
11 Q.  -- and not just one study, right?
12 A.  Correct.  Unless there is one study
13 which has compelling evidence in and of
14 itself, as for example, VIGOR did.  But
15 usually that's not the case.
16 Q.  You think that the VIGOR study on
17 its own demonstrated that Vioxx caused
18 heart attacks?
19 A.  Yes.
20 Q.  And was that your view when you
21 read the VIGOR study in 2000-2001?
22 A.  Yes.
23 Q.  Do you know, while Vioxx was on the
24 market, sir, whether there was any

Page 241

1  reasonable association of risk between
2  Vioxx and arrhythmia?
3  A.  I do not know that there was,
4  whether there was.
5  Q.  Have you seen any evidence in your
6  review of the literature, sir, that there
7  is a reasonable association of risk
8  between Vioxx and heart attacks where
9  patients use Vioxx intermittently?
10     MR. TISI:  Objection.
11 A.  I'm sorry.  Can you repeat the
12 beginning of that question?
13 Q.  Have you seen any evidence in your
14 review of the literature, sir, that there
15 is a reasonable association of risk
16 between Vioxx and heart attacks where
17 patients use Vioxx intermittently?
18     MR. TISI:  Objection.
19 A.  Yes.
20 Q.  What's your basis for saying that
21 there's an increased risk?
22 A.  The observational studies conducted
23 by our group and by Dr. Ray, and most of
24 the other observational studies, if you

61 (Pages 238 to 241)

Jerry Avorn, M.D.

Page 242

1    look at drug use within those cohorts, the
2    use is frequently intermittent, as use of
3    nonsteroidals often is.
4        Q.   And we'll talk about the
5    observational studies later.  I should
6    have limited my question, okay?
7        A.   Okay.
8        Q.   Are you aware, sir, of any
9    randomized clinical trials showing that
10   there is an increased cardiovascular risk
11   associated with Vioxx where patients use
12   the medicine intermittently?
13       MR. TISI:  Objection.
14       A.   That's a faulty question because in
15   clinical trials, drugs are generally not
16   given intermittently, and so there aren't,
17   to my knowledge, no clinical trials in
18   which Vioxx is administered intermittently.
19   And so it's an impossible question to --
20   to respond to.
21       Q.   Based on the clinical trials that
22   were done for Vioxx, you can't
23   conclude that Vioxx increases
24   cardiovascular risk if patients use it

Page 243

1    intermittently, right?
2        MR. TISI:  Objection.
3        A.   The clinical trials didn't speak to
4    that, because they didn't administer the
5    drug intermittently.
6        Q.   So the answer to my question is
7    yes?
8        MR. TISI:  Objection.
9        A.   I think the answer to your question
10   is no, but I know what you mean.
11       Q.   Based on the clinical trials that
12   were done for Vioxx, you cannot conclude
13   that Vioxx increases cardiovascular risk
14   for patients who use the medicine
15   intermittently, correct?
16       MR. TISI:  Objection.
17       A.   Because there was no intermittent
18   use in the clinical trials, that -- that
19   is not a conclusion one can make or refute
20   based on the clinical trials.
21       Q.   You said in your report that the
22   doubling of a cardiovascular risk that was
23   seen in the APPROVe study in September of
24   2004 was known prior to approval.  Do you

Page 244

1    remember that?
2        A.   Can you show me where I say that?
3        Q.   Okay.  Let me rephrase the
4    question.  I don't have quotes around it,
5    so maybe I misspoke.
6        A.   Can you tell me which page you're
7    reading from?
8        Q.   Yes.  Page .2, under Available
9    Evidence Prior to FDA Approval of Vioxx.
10       You see, sir, in the first sentence
11   where you are talking about how you think
12   Merck officials were saying they were
13   astonished by an unanticipated finding --
14       A.   (Witness viewing document).  Yes.
15       Q.   -- that Vioxx could double the risk
16   of heart attack?
17       A.   Yes.
18       Q.   Are you aware of any evidence, sir,
19   that a doubling of a CV, cardiovascular
20   risk with Vioxx was known prior to the
21   approval of Vioxx?
22       A.   Okay.  The problem is you've,
23   again, mischaracterized what I've said.
24       Q.   I'm deviating from this to ask a

Page 245

1    question that is related to this.  Okay?
2    Are you with me?
3        A.   Let's try again.  Why don't you
4    phrase the question in a way that does not
5    misquote me.
6        Q.   Do you know, sir, of any evidence
7    showing that Vioxx doubled the
8    cardiovascular risk prior to approval?
9        A.   Prior to approval.  I'm aware of
10   evidence prior to approval that Vioxx
11   increased cardiovascular risk that --
12   What's problematic is the term "doubling,"
13   because I need to go back and look at the
14   extent to which it increased it.
15       But I -- I'm aware of the
16   preapproval studies demonstrating an
17   increase in risk.  I don't recall whether
18   it was a doubling or a 50 percent greater
19   or a tripling or whatever.
20       Q.   Will you show me any preapproval
21   study of Vioxx that shows a doubling of
22   cardiovascular risk between Vioxx and
23   placebo?  Or between Vioxx and an active
24   comparator?

62 (Pages 242 to 245)

Jerry Avorn, M.D.

Page 246

1    A.   Okay.  There was a binder that was
2   sitting over here --
3         MR. TISI:  I moved it
4   because we were doing that.  I'm sorry.
5         THE WITNESS:  All right.
6   So where is the binder that has 174 in
7   it?
8         (Discussion off the record).
9    A.   Okay.  Looking at Table 52, in the
10.  primary review of the -- of Merck's NDA.
11   Q.   Which is tab what in your binder?
12   A.   Tab 175.  There are the following
13  numbers on -- in Table 52.  And again,
14  I'll just give some examples.
15       For placebo, there are rates of .2
16  percent, .8 percent.  But for Rofecoxib --
17  and the title of this is Thromboembolic
18  Adverse Events all OA, for osteoarthritis
19  trials.
20       So placebo .2 percent, 0.8 percent,
21  whereas for Rofecoxib the numbers -- Okay.
22  Let me just back up.
23       Six week studies which -- we do
24  these by duration.  Six week studies,

Page 247

1   placebo 0.2 percent, Rofecoxib 12.5
2   milligrams, 0.7 percent, Rofecoxib 25
3   milligrams, the rate is 0.18 percent.
4   Rofecoxib 50 milligrams, the rate is 1.1
5   percent.  Rofecoxib 125 milligrams, the
6   rate is 1.4 percent.
7        So for the six week studies we have
8   a dose- dependent increase in the risk of
9   thromboembolic adverse events as per the
10  FDA's review of the data submitted by
11  Merck from its osteoarthritis trials, as
12  compared with placebo, not Naproxen --
13  Q.   Is --
14  A.   I'm sorry.  I'm answering your
15  question now.
16  Q.   Mm-hmm.  Before you go to the next
17  table --
18  A.   As I recall, I was in the middle,
19  actually, of a sentence.
20  Q.   Okay.
21  A.   So we have a rate of .2 for
22  placebo, and then rates that are
23  threefold, fourfold, up to sevenfold
24  greater for Rofecoxib in various doses

Page 248

1   with the increase going higher with the
2   higher doses, as compared with placebo for
3   short studies.  And if you want, we can
4   repeat the data, which are similar, for
5   the longer studies.
6    Q.   Is it your testimony that there is
7   a statistically significant increased risk
8   of thromboembolic events between Vioxx at
9   25 milligrams and placebo in the
10  osteoarthritis studies?
11   A.   The numbers were too small to
12  attain the level of statistical
13  significance, but they are still worrisome
14  and still indicate, as the FDA concluded,
15  evidence of potential increased risk.
16   Q.   It would be wrong to conclude from
17  the table that you just referred to that
18  Vioxx caused the doubling of a
19  cardiovascular risk compared to placebo
20  based on the OA studies, true?
21        MR. TISI:  Objection.
22   A.   I do not agree with that.
23   Q.   Does the -- Sorry.
24   A.   What I -- What I would say is that

Page 249

1   there is clear evidence of an increased
2   risk in a dose-dependent fashion with
3   Vioxx that owing to the small numbers,
4   does not meet the test of statistical
5   significance, but is a clear pattern of
6   increased risk.
7    Q.   Can you conclude from the study
8   that your -- the analysis that the FDA did
9   of the OA studies that Vioxx causes a
10  doubling of cardiovascular risk, sir?
11   A.   The problem is "conclude," and
12  conclude would require larger numbers to
13  say with certainty that there is a
14  doubling, or in the case of the higher
15  dose, a sevenfold increase.  I don't think
16  one could, quote, conclude, close quote,
17  from these data that that is an obvious
18  and significant increase in risk.  But it
19  is a very worrisome pattern.
20   Q.   Did the FDA say that there was a
21  doubling of a cardiovascular risk seen
22  with Vioxx in the OA studies?
23   A.   (Witness viewing documents).  I was
24  looking for -- This is Dr. Pelayo's

63 (Pages 246 to 249)

Jerry Avorn, M.D.

Page 250

1  statement. I was looking for the overview
2  statement.
3      Okay. Let me read from Dr.
4  Pelayo's statement on -- It is the
5  paragraphs that appear right before page
6  -- Table 52.
7      Q.  Doctor, I'm not asking for what he
8  said.
9      A.  Right.
10     Q.  I'm asking you a very simple
11  question.
12     A.  Okay. What's the question?
13     Q.  Did the FDA conclude, before
14  approval, that Vioxx caused a doubling of
15  a cardiovascular risk?
16         MR. TISI:  Objection. What
17  the FDA concluded.
18     A.  The FDA concluded there was a
19  higher incidence of ischemic and
20  thromboembolic events in patients taking
21  Rofecoxib compared to placebo, but it did
22  not conclude that -- it did not conclude
23  there was doublings, because the number of
24  events were underpowered to make such a

Page 251

1  conclusion rigorously.
2      Q.  So the answer to my question is no,
3  the FDA did not conclude that there was a
4  doubling of cardiovascular risk based on
5  the OA studies submitted preapproval --
6         MR. TISI:  Objection.
7      BY MR. GOLDMAN:
8      Q.  -- right?
9         MR. TISI:  Asked and
10  answered.
11     A.  Except I need to point out for
12  accuracy the FDA said the data seems to
13  suggest that in six week studies
14  thromboembolic events are more frequent in
15  patients receiving Rofecoxib than placebo.
16  So they said that there is this increased
17  rate, but they did not conclude that there
18  was a doubling of risk.
19     Q.  I'm going to ask it one more time,
20  and I'm hoping that you won't talk about
21  other things.
22         MR. TISI:  No. Well, I'm
23  hoping you will accept his answer. You
24  can't keep asking the question to get an

Page 252

1  answer that you like. He's answered your
2  question fully.
3      BY MR. GOLDMAN:
4      Q.  Do you see anywhere in the FDA's
5  analysis, Dr. Avorn, a conclusion by them
6  that Vioxx causes a doubling of
7  cardiovascular risk based on the OA
8  studies?
9         MR. TISI:  Objection. Asked
10  and answered.
11     A.  I would agree that I've answered
12  that question already.
13     Q.  Will you answer that question yes
14  or no?
15         MR. TISI:  Objection. Asked
16  and answered.
17     A.  The FDA notes increase in risk.
18  They do not call it a doubling.
19     Q.  Is it true, sir, that based on the
20  studies that were submitted before Vioxx
21  was approved the incidence of thrombotic
22  or thromboembolic events were similar
23  between Vioxx and comparator NSAIDs?
24     A.  In the preapproval trials?

Page 253

1      Q.  Yes.
2      A.  No. That's not true.
3      Q.  You say, and you do, that early
4  papers made it clear that a selective
5  COX-2 inhibitor, the end of your quote,
6  could cause an imbalance.
7      A.  Right.
8      Q.  What papers are you referring to
9  when you say that early papers made it
10  clear that selective COX-2 inhibition could
11  disrupt the thromboxane/prostacyclin
12  balance and lead to heart attacks?
13     A.  Okay. There were several out of
14  Dr. FitzGerald's lab. He was the senior
15  author on most of them. The Dr.
16  Catella-Lawson was the first author.
17  There were others. I think I cited one
18  or more of those in -- from preapproval
19  time frame in the editorial. I just sent
20  it in Circulation a month ago, and I can
21  get you the citations if you want. I
22  don't have them all in my head.
23     Q.  Other than the Catella-Lawson,
24  FitzGerald urine study, are you aware off

Jerry Avorn, M.D.

Page 254

1 the top of your head of any other --
2   A.  Yes, I am.  They were -- And
3 again, I can't give you the citations from
4 memory -- but I remember that in his post
5 approval papers, Dr. Topol cited
6 preapproval papers that had come out
7 before the marketing of the drug also
8 consistent with this notion of an
9 increased risk.
10     So in other words, there are a
11 number of papers that we could get that
12 appeared before the drug was on the
13 market.
14   Q.  Is it your testimony, Dr. Avorn,
15 that in Dr. Topol's August 2001 JAMA
16 article, he cited multiple studies to
17 support the proposition that COX-2
18 inhibition can disrupt the
19 thromboxane/prostacyclin balance and cause
20 heart attacks?
21   A.  That's my recollection.
22   Q.  Before the FitzGerald urine study,
23 am I right, sir, that there was no
24 published article ever that suggested that

Page 255

1 COX-2 inhibition could cause heart
2 problems?
3     MR. TISI:  Objection.
4   A.  I don't think I can testify to
5 there was no published study ever.
6   Q.  Can you testify, Dr. Avorn, that
7 you are not aware of any published
8 article, prior to the Catella- Lawson,
9 FitzGerald urine study, suggesting that
10 COX-2 inhibition could cause heart
11 attacks --
12     MR. TISI:  Objection.
13     BY MR. GOLDMAN:
14   Q.  -- or heart problems?
15   A.  No.  There -- The paper you're
16 referring to is around '97, as I recall.
17 I'd need to --
18   Q.  Published in '99, conducted --
19     MR. GRAND:  Which FitzGerald
20 study?
21   A.  I think there was FitzGerald papers
22 that came out before '99 on this, and I
23 -- I don't think they would -- My sense
24 is they were not the very first papers to

Page 256

1 suggest that.
2   Q.  Do you know, as you sit here today,
3 Dr. Avorn, whether there were any
4 scientific articles before the
5 Catella-Lawson paper which demonstrated
6 this theory that COX-2 inhibition can
7 reduce prostacyclin and potentially cause
8 heart attacks?
9     MR. TISI:  Objection.
10 Objection to your characterization.
11   A.  There -- There are a couple of
12 problems with the question.  One is,
13 you're adding "and potentially cause heart
14 attacks," because I don't know whether
15 such studies will typically go on to say
16 "and this can cause a heart attack."  So
17 -- But if you take that out and just talk
18 about the imbalance between prostacyclin
19 and thromboxane, my impression was that
20 yes, there were papers before the
21 Catella-Lawson paper.
22     MR. GRAND:  Could you
23 clarify which Catella- Lawson paper you're
24 discussing?

Page 257

1     MR. GOLDMAN:  The one that
2 we all refer to as demonstrating the
3 FitzGerald hypothesis.
4     MR. GRAND:  There's one
5 prior to that, so that's why I'm asking.
6     MR. GOLDMAN:  All right.
7     BY MR. GOLDMAN:
8   Q.  Do you agree, sir, that the
9 Catella-Lawson FitzGerald urine study
10 showing a 60 to 70 percent reduction in
11 the urinary prostacyclin metabolite offered
12 an hypothesis?
13   A.  Why don't I just pull the paper,
14 because I think we have it here, and that
15 way we won't have to go on my memory.
16   Q.  Sure.
17   A.  (Witness viewing document).  Okay.
18 This is the Catella-Lawson paper that was
19 in the Journal of Pharmacology and
20 Experimental Therapeutics in May of 1999.
21   Q.  Mm-hmm.
22   A.  Okay.  What is the question?
23   Q.  The question is:  Based on the
24 study that was done by Catella-Lawson and

65 (Pages 254 to 257)

Jerry Avorn, M.D.

Page 258

1  FitzGerald that you're looking at, do you
2  agree that the authors were offering a
3  potential hypothesis concerning COX-2
4  inhibition and the imbalance theory?
5     A.  Tell me what you mean, were
6  offering a hypothesis.
7     Q.  Yes.  Did -- Well, let's do it
8  this way.  Withdrawn.
9        Did the authors in the FitzGerald
10 Catella-Lawson study that you're looking at
11 in the Journal of Pharmacology and
12 Experimental Therapeutics conclude that
13 COX-2 inhibition causes heart attacks?
14    A.  No.  As I said, basic
15 pharmacologists working at this level don't
16 talk about heart attacks.
17    Q.  Did the authors of the
18 Catella-Lawson FitzGerald study conclude
19 that COX-2 inhibition puts patients in a
20 prothrombotic state?
21    A.  Okay.  What they conclude in their
22 conclusion is that COX-2 plays a role in
23 the biosynthesis of prostacyclin.  And it
24 is widely known that prostacyclin -- and

Page 259

1  this is not my quoting them, the quoting
2  of them ends with the word prostacyclin,
3  and now this is me saying that it has
4  been known and was known at the time and
5  was known before that prostacyclin is --
6  and I quote from their paper on Page .740,
7  "an effective antithrombotic strategy that
8  --" I'm sorry.  Let me read that more
9  fully.
10       "Pharmacologic enhancement of
11 endogenous prostacyclin is also an
12 effective antithrombotic strategy in vivo."
13 And other things in their paper refer to
14 the fact that prostacyclin is known to be
15 an antithrombotic agent, as well as having
16 other important effects of a good kind on
17 the vasculature, that act in opposition to
18 the thromboxane, which is known and was
19 known at the time to be prothrombotic.
20       So in their conclusion, they refer
21 to the fact that reducing prostacyclin
22 biosynthesis could relate to reducing
23 antithrombotic activity.
24    Q.  And that's a theory, right?

Page 260

1     A.  Sure.
2     Q.  Isn't it true that the authors of
3  the Catella- Lawson FitzGerald study
4  concluded that the implications of
5  prostacyclin suppression in vivo in living
6  beings was unclear?
7     A.  If you want to show me where they
8  say that, I'd be happy to take a look.
9     Q.  Second to the last paragraph, first
10 sentence.
11    A.  In their paper?
12    Q.  Mm-hmm.
13    A.  (Witness viewing document).
14 Correct.  However, in that same paragraph,
15 for completeness, I've got to point out
16 just a few lines below that they say --
17 we can't be selective in the quotation
18 here -- quote, "Prostacyclin formation by
19 the vasculature is of functional importance
20 in limiting the response to a thrombotic
21 insult."  And so they go on to say that
22 we do know that limiting prostacyclin
23 formation is a problem.
24    Q.  What does the next sentence say,

Page 261

1  for completeness?
2     A.  "We have shown previously that
3  urinary excretion --"
4     Q.  No.  "It remains."
5     A.  Oh, "It remains to be established
6  whether treatment with specific COX-2
7  inhibitors will suppress this response."
8        So there are two kinds of
9  statements here.  One is, there's worrying
10 about this because of the evidence from
11 previous studies, and we don't know what
12 this is going to do in humans.
13    Q.  How much of a reduction in
14 prostacyclin in the vasculature, sir, needs
15 to occur to put a patient in a
16 prothrombotic state?
17    A.  I have no idea.
18    Q.  Do you know how much reduction in
19 the urinary metabolite in the FitzGerald
20 study was seen?
21    A.  I have no idea.  I could look it
22 up.
23    Q.  Is prostacyclin present throughout
24 the body?

66 (Pages 258 to 261)