Jerry Avorn, M.D.

Page 262

1   A.   Yes.
2   Q.   Does the reduction in the urinary
3   metabolite of prostacyclin in the
4   Catella-Lawson FitzGerald study tell you
5   where in the body the prostacyclin is
6   being reduced?
7   A.   No.
8   Q.   For purposes of determining whether
9   Vioxx or any COX-2 inhibitor creates an
10  imbalance and puts patients in a
11  prothrombotic state, you would agree, sir,
12  that the reduction of the prostacyclin
13  needs to occur in the endothelium or the
14  vasculature?
15  A.   I don't know that that's the case.
16  Q.   Well, how could a reduction in
17  prostacyclin outside of the vasculature put
18  patients in a prothrombotic state?
19  A.   In theory, the prostacyclin could
20  be synthesized elsewhere and have an
21  activity on the vasculature.  It needn't
22  be its synthesis in the vasculature.  But
23  again, this is not my field.
24  Q.   Are you aware of literature, sir,

Page 263

1   that shows that COX-1 enzyme actually
2   produces prostacyclin in the vasculature
3   and not COX-2?
4   A.   They both, to my understanding,
5   produce it, and it's a matter of relative
6   balance of which produces it more in one
7   setting versus another.
8   Q.   Do you know whether more
9   prostacyclin is produced in the vasculature
10  by COX-1 compared to COX-2?
11  A.   I don't know.
12  Q.   Are you aware of studies measuring
13  the effect of Vioxx on prostacyclin in
14  coronary arteries?
15  A.   I know that animal studies were
16  done in -- in artery preparations.
17  Q.   Do you know the results of those?
18  A.   That's beyond my area of expertise.
19  But I should also point out that
20  prostacyclin has effects other than
21  prothrombotic, antithrombotic balance.
22  There may be effects on endothelium, there
23  may be effects on vascular resistance.
24  And so it's not only one effect of

Page 264

1   prostacyclin that one would be concerned
2   about.
3   Q.   Do you agree, Dr. Avorn, that the
4   theory that Catella-Lawson and FitzGerald
5   were advancing in this study was that
6   COX-2 inhibition could reduce prostacyclin
7   in the vasculature enough to put a patient
8   in a prothrombotic state?
9   A.   They raise that as a possibility.
10  Q.   And it was a big debate in the
11  medical community about whether or not
12  COX-2 produces prostacyclin in the
13  endothelium and the vasculature or whether
14  COX-1 does, right?
15  A.   That's not a debate that I was part
16  of, so I can't speak to it.
17  Q.   You talk, in your expert report,
18  about Protocol 017, and you mentioned that
19  earlier.  Do you remember that?
20  A.   Yeah.
21  Q.   Did you review the CSR for Protocol
22  017?
23  A.   I think what I had on 017 was a
24  summary of its findings rather than the

Page 265

1   protocol itself.
2   Q.   Who prepared the summary?
3   A.   It was a photocopy of material from
4   Merck.  It was a Xerox, much of which was
5   redacted out.
6          MR. TISI:  Just so you
7   know, it is right here.  I mean, he was
8   provided it.  I don't know whether that's
9   important to you.  But I know --
10  A.   Okay.  But what I remember most was
11  the heavily redacted summary produced by
12  Merck about it, because most of the pages
13  were black.
14  Q.   You didn't review the CSR for
15  Protocol 017, did you, sir?
16  A.   I don't recall reviewing it.  I may
17  have seen it.
18  Q.   What was the purpose of Study 017?
19  A.   Let me pull out the materials
20  relating to 017.
21          (Witness viewing documents).  Okay.
22  Q.   Okay.  So what was the purpose of
23  Protocol 017?
24  A.   All right.  The protocol itself,

67 (Pages 262 to 265)

Jerry Avorn, M.D.

Page 266

1 which is Bates number MRKAFL0010627, refers
2 to it as a double blind placebo controlled
3 study to assess safety and tolerability
4 and preliminarily evaluate efficacy in
5 patients with rheumatoid arthritis.
6    Q.   Do you know long the study was?
7    A.   It was brief, as I recall, six
8 weeks.
9    Q.   Do you know what doses were used of
10 Vioxx?
11    A.   125 milligrams initially -- later,
12 but it also started at a much higher dose
13 of 175 milligrams.
14    Q.   How many cardiovascular adverse
15 events occurred in the Study 017?
16        MR. GRAND:   Would you
17 clarify which version? There's -- Can you
18 clarify what you're talking about, the
19 study or just the extension of the study?
20        BY MR. GOLDMAN:
21    Q.   The study that you reviewed.
22    A.   (Witness viewing documents).  I'm
23 just going through the safety end of the
24 report.

Page 267

1        Okay.  Looking at just the first
2 table, I find here is -- No.  That's not
3 a good one.
4        Okay.  Okay.  Table 46 in the
5 Merck report of this Protocol 017,
6 indicated that 38 percent of patients on
7 what was then called MK0966, which is
8 Vioxx, 38 percent had a drug related
9 adverse experience, versus 16 percent of
10 placebo.  And turning to cardiovascular
11 system --
12    Q.   Which is what I asked about.
13    A.   Okay.  10.1 percent of patients on
14 Vioxx compared to 2.9 percent of patients
15 on placebo.  So that would be a threefold
16 difference.
17    Q.   Can I see what you're looking at?
18    A.   Sure.  Do you want to come over
19 here, or do you want me to hand it over?
20    Q.   How many heart attacks occurred in
21 Protocol 017?
22    A.   Let me look that up.  Since it was
23 a six week study, I would expect that of
24 all the cardiovascular outcomes, very, very

Page 268

1 few, if any, would be heart attacks per se
2 because --
3    Q.   Why would you expect that?
4    A.   Because six weeks is a very, very
5 short period of time to -- to expect a
6 heart attack to occur in.
7        MR. TISI:  I'm sorry.  In
8 what?
9        THE WITNESS:  I'm sorry?
10        MR. TISI:  You said in
11 something.
12    A.   Yeah.  Six weeks is a short period
13 of time in which a drug is likely to
14 cause a heart attack.  The shorter the
15 study, the less likely you are to see an
16 event like an MI as compared to
17 hypertension.
18    Q.   How many heart attacks occurred in
19 Study 017?
20    A.   Okay.  I see acute myocardial
21 infarction in a white 73 year old male,
22 and -- Oh, I'm sorry.  Those were patients
23 who were discontinued due to clinical
24 adverse experiences as opposed to having

Page 269

1 had --
2        So there was -- There was one
3 patient who discontinued this because of a
4 heart attack, and now I'm looking for
5 total heart attacks, which ought to be
6 here.
7        (Witness viewing document).  Okay.
8 Here it is.  Listing of patients.  This is
9 table 55 on page .135. Listing of patients
10 with cardiovascular adverse experiences.
11 Okay.  And here I guess is that same 73
12 year old male, acute myocardial
13 infarctions, intensity severe.  That's one.
14        And all the others were nonspecific
15 STT changes, hypertension, sinus
16 bradycardia, irregular heartbeat.  So if
17 this is the complete listing, there was
18 one.
19    Q.   There was one thrombotic
20 cardiovascular event in Study 017, right,
21 sir?
22    A.   Right.  But there were a number of
23 other cardiovascular events.
24    Q.   Well, the theory that you are

68 (Pages 266 to 269)

Jerry Avorn, M.D.

Page 270

1    operating under and everybody else was
2    operating under concerning how Vioxx
3    increased the risk of heart attack, if it
4    did, was based on an imbalance between
5    prostacyclin and thromboxane, right?
6       MR. TISI: Objection.
7    That's just not true.
8    A.   No. I think -- I think --
9       MR. GOLDMAN: It's not
10   testifying.
11      MR. TISI: No, you're
12   testifying. You're not allowed to testify
13   at all.
14   A.   All right. Let me testify.
15      I think you're either
16   misunderstanding or mischaracterizing the
17   issue here. The -- And you kind of made
18   a leap from discussing prostacyclin and
19   prothrombotic, antithrombotic balance to
20   jumping to heart attack.
21      There are many reasons of -- for
22   concern about potential pathways to
23   cardiovascular morbidity with the COX-2
24   drugs. One of them is the prothrombotic

Page 271

1    effect, but another is the hypertension,
2    another is the congestive heart failure as
3    manifested also by peripheral edema.
4       And so it's not only about the
5    thrombosis. And as I said a minute ago,
6    six weeks is a very short period of time
7    to expect an event.
8    Q.   Do you know, sir, for the patient
9    who had a heart attack, what his risk
10   factors were?
11   A.   No.
12   Q.   Do you take the position that Vioxx
13   caused that man's heart attack?
14   A.   I'm not taking that position.
15   Q.   Do you know if the investigator in
16   Study 017 believed that the man who had a
17   heart attack had it because of Vioxx?
18      MR. TISI: Objection.
19   A.   I don't think any investigator
20   looking at a specific clinical trial
21   patient can rule out or rule in a
22   situation of that kind.
23   Q.   Is the answer no, you don't know
24   what the investigator said?

Page 272

1    A.   I don't know.
2    Q.   Do you know what dose of Vioxx the
3    man took who had a heart attack?
4    A.   These were very high doses. This
5    was 125 and 175 milligram doses.
6    Q.   Am I right, Dr. Avorn, that you
7    didn't look at the details of Protocol 017
8    before you wrote your report? What you
9    did, was you looked at an internal Merck
10   document that commented about Protocol 017.
11   A.   Correct.
12   Q.   So rather than actually look at the
13   Protocol 017 yourself and assess it, in
14   terms of whether it increases the risk --
15   demonstrates an increased risk of
16   cardiovascular events, you relied on an
17   internal document from Merck?
18   A.   It was submitted to their research
19   management committee, and I assumed that
20   they probably got it right.
21   Q.   Do you know if anybody died in
22   Study 017?
23   A.   I don't know.
24   Q.   You quote and discuss at length,

Page 273

1    sir, e-mails from Dr. Musliner, Dr.
2    Morrison and Dr. Reicin. Do you
3    remember --
4    A.   Yes, I do.
5    Q.   -- quoting from them?
6    A.   Yes.
7    Q.   Is it your opinion, sir, that Dr.
8    Morrison and Dr. Reicin believed that
9    Vioxx caused heart attacks back when they
10   wrote these e-mails in 1996, 1997?
11   A.   I believe that they -- I believe
12   that they believed and wrote that they
13   thought that there was a quote,
14   Substantial chance," to quote Dr. Musliner,
15   "that there would be more cardiovascular
16   adverse events in patients given Vioxx
17   than in the comparison group."
18      And I further recognize that it was
19   not clear at that point whether that would
20   be because Vioxx did not have the
21   cardioprotective effect that other NSAIDs
22   or aspirin might have, or whether it was
23   because the drug itself could be
24   prothrombotic. And I'm aware that they

69 (Pages 270 to 273)

Jerry Avorn, M.D.

Page 274

1  considered both possibilities.
2    Q.  You believe that in the e-mails
3  between Dr. Reicin and Dr. Morrison that
4  there was a discussion about whether Vioxx
5  was prothrombotic?
6        MR. TISI:  Objection.
7  Mischaracterizes his testimony.
8    A.  No.  What I said was that they
9  stated that there was a, quote,
10  Substantial chance that significantly
11  higher rates of CV adverse events will be
12  observed in the selective COX-2 inhibitor
13  group, close quote.
14       And that I cannot tell from their
15  memos the extent to which they thought
16  that was because of the fact that Vioxx
17  did not have the cardioprotective effect
18  of other nonsteroidals, or because of
19  their awareness of other reasons for
20  worrying about COX-2 inhibitors being
21  prothrombotic.
22       I cannot tell what -- what was in
23  their minds.  I know that they considered
24  the possibility that it may just be the

Page 275

1  absence of cardioprotection.
2    Q.  Isn't it true, sir, that when they
3  were writing their e-mails back in 1996,
4  1997, that these Merck scientists believed
5  that Vioxx would be neutral in terms of
6  cardiovascular effects?
7        MR. TISI:  Objection as to
8  what they believed.
9    A.  I cannot know what they believed.
10   Q.  Have you read the deposition --
11  We've been through that.
12       Are you accusing at all, sir, the
13  Merck scientists of knowingly selling an
14  unsafe drug when they sold Vioxx?
15   A.  When you say the Merck scientists,
16  the people -- the scientists weren't
17  selling the drug.
18   Q.  Okay.  Are you accusing anybody at
19  Merck of knowingly selling an unsafe drug,
20  when it came to Vioxx?
21   A.  I think that Merck was aggressively
22  marketing a drug for which they had safety
23  concerns that they did not fully address,
24  and that as a minimum, they were aware

Page 276

1  that people would be switching to their
2  drug from a more cardioprotective drug,
3  which is what was in those e-mails you
4  were just referring; that in the marketing
5  consequence of the worries that you were
6  just describing, that Dr. Musliner et al.,
7  expressed, was that a patient might stop
8  taking -- Let me be -- You look confused.
9    Q.  No.  I just asked one question.
10   A.  Yes.  I believe, to be clear --
11   Q.  Let me ask the question again.
12   A.  All right.  All right.
13   Q.  Can you answer this yes or no, and
14  if you can't and you need to explain,
15  that's fine.
16       Are you accusing anybody at Merck
17  of knowingly selling an unsafe drug when
18  they sold Vioxx?
19       MR. TISI:  Are you -- Any
20  particular point in time or at all
21  during --
22       MR. GOLDMAN:  At any point.
23       MR. TISI:  Okay.
24   A.  Yes.  And let me explain.  I

Page 277

1  believe that Merck was promoting use of
2  its drug at the same time that it had
3  evidence that use of its drug created
4  greater cardiovascular risk than other
5  alternatives that a patient would have
6  been taking, and knew, from their own
7  data, that that would have placed these
8  patients at increased cardiovascular risk.
9    Q.  Before accusing Merck's employees
10  of knowingly selling an unsafe drug when
11  they sold Vioxx, do you think that you
12  should have at least reviewed the
13  depositions of the individuals at Merck
14  who were involved in the Vioxx program?
15   A.  Well, there were dozen, if not
16  hundreds, of Merck employees involved in
17  Vioxx, and I could not possibly review all
18  their depositions.  But if there's a
19  statement from one of them that I should
20  consider, I'd be happy to.
21   Q.  My question is:  Before you accuse
22  Merck scientists of knowingly selling an
23  unsafe drug --
24   A.  Can we go back and not

70 (Pages 274 to 277)

Jerry Avorn, M.D.

Page 278

1  mischaracterize my quotes again?  This is
2  becoming tiresome.
3      Q.  I asked you:  Are you accusing
4  anybody at Merck of knowingly selling an
5  unsafe drug when they --
6      A.  Right.
7      Q.  -- sold Vioxx, and your answer was
8  yes and let me explain.
9      A.  I am not accusing the scientists.
10  That's an important distinction.
11     Q.  So are you accusing the marketing
12  people at Merck of knowingly selling an
13  unsafe drug?
14     A.  I think the onus is more on the
15  marketing people than on the scientists,
16  and I would rather not be misquoted as
17  accusing scientists of selling unsafe
18  drugs.
19     Q.  So to be clear, you believe that
20  the scientists at Merck were not knowingly
21  selling an unsafe drug, but the marketing
22  people were knowingly selling an unsafe
23  drug when it came to Vioxx?
24     A.  Scientists don't sell drugs.

Page 279

1      Q.  When Vioxx was on the market in the
2  United States, is it your testimony, sir,
3  that the scientists at Merck believed that
4  Vioxx caused heart attacks?
5      A.  No.
6      Q.  Is it your testimony that when
7  Vioxx was on the market, the marketing
8  people believed that Vioxx causes heart
9  attacks?
10     A.  I can't indicate what people
11  believed or didn't believe.  What I can
12  indicate is that there was information
13  available to Merck, because Merck generated
14  most of it, indicating a higher risk of
15  heart attacks in people taking its drug.
16     Q.  You talked about Dr. Watson's
17  analysis from February of 1999.  That's on
18  Page .4 of your report, sir.
19     A.  Yes.
20     Q.  I have a copy if you want to see
21  it.  Okay?
22     A.  I've seen it.
23     Q.  Do you claim, sir, that the
24  analysis that Dr. Watson did in February

Page 280

1  of 1998 showed a signal of a potential
2  cardiovascular risk with Vioxx?
3      A.  Yes.
4      Q.  You wrote that in your report, in
5  fact, right?
6      A.  Then it's a good thing I believe
7  it.
8      Q.  Is it true that Dr. Watson's
9  analysis compared blinded data from all
10  patients in Vioxx's clinical trials,
11  regardless of what drug they were on,
12  against the placebo rates for
13  cardiovascular events in the Proscar and
14  Fosamax studies?
15     A.  Correct.
16     Q.  Is that a crude study?
17     A.  Yes.
18     Q.  Why is that a crude study?
19     A.  Because ideally one would like to
20  compare rates within the same study.
21     Q.  But why wouldn't you want to
22  compare the rates of Vioxx -- Sorry.
23          Why wouldn't you want to compare
24  the rates the way that Dr. Watson compared

Page 281

1  them?
2      A.  Because one cannot be certain that
3  the rates of events in the placebo group
4  of Study A are a good comparator --
5          (Interruption).
6      A.  One cannot conclude that the event
7  rates in the placebo group of study are
8  the best comparison for the event rates in
9  the active drug group of Study B.
10     Q.  Did the blinded study results in
11  the Watson analysis show any increased
12  risk in cardiovascular events between the
13  Vioxx studies and the men in the Proscar
14  database?
15     A.  Looking together at the men in the
16  Proscar database and the women in the
17  Fosamax database pooled there was an
18  increase in risk, and I don't recall -- I
19  need to go back and look at the men alone
20  versus the women alone.  I don't remember
21  that.
22     Q.  Would it surprise you to learn that
23  there was no difference in cardiovascular
24  events between the events in the Vioxx

71 (Pages 278 to 281)

Jerry Avorn, M.D.

Page 282

1    clinical trials and the Proscar placebo
2    arm?
3            MR. GRAND: Objection.
4    Misstates the evidence.
5        A.  I would want to look at the data
6    and tell you.
7        Q.  Did you ever look at any of the
8    blinded events in Dr. Watson's analysis to
9    determine how many of the cardiovascular
10   events occurred in patients who were
11   taking Ibuprofen?
12           MR. TISI: Objection.
13       A.  I read Dr. Watson's report. I
14   don't remember asking myself that question.
15           MR. TISI: Can I ask you a
16   question, because your question said in
17   the blinded results how many people were
18   taking Ibuprofen.
19           BY MR. GOLDMAN:
20       Q.  Did you ever make any effort to
21   determine, in the analysis that Dr. Watson
22   did, how many of the cardiovascular events
23   occurred in patients who were taking
24   Ibuprofen or Vioxx or Diclofenac or

Page 283

1    placebo?
2            MR. TISI: Objection.
3        A.  Well, in his original analysis,
4    there were no such data available.
5        Q.  Subsequently there was data
6    available, right?
7        A.  Correct.
8        Q.  Did you ever go back and try to
9    determine how many of the cardiovascular
10   events that Dr. Watson included in his
11   analysis in the Vioxx clinical trials
12   occur in patients who were taking Vioxx,
13   Ibuprofen, Diclofenac and placebo?
14       A.  I'm aware that once the data could
15   be unblinded, the evidence was less
16   compelling that there was an increased
17   risk with Vioxx.
18       Q.  In fact, when the data from
19   Watson's analysis was unblinded, it showed
20   that there was no increased cardiovascular
21   risk between Vioxx and placebo, correct?
22           MR. GRAND: Objection.
23       A.  I understand that.
24       Q.  You also understand when the Watson

Page 284

1    analysis was unblinded, that there was no
2    difference in cardiovascular events between
3    Vioxx and placebo, true?
4            MR. GRAND: Objection.
5            BY MR. GOLDMAN:
6        Q.  Do you understand, Dr. Avorn, that
7    when the final results were unblinded and
8    you looked at the events that Dr. Watson
9    was talking about, that there was no
10   increase in cardiovascular events between
11   Vioxx and any of the comparators?
12           MR. GRAND: Objection.
13       A.  I understand that. But the reason
14   that the Watson initial report is in my
15   report is not because I believed that it
16   was a methodologically impeccable study,
17   because everybody recognized that it
18   wasn't, but what's important is that it
19   was an important enough study that Merck
20   had him do it, the design was acceptable
21   enough to Merck; that even with all the
22   caveats, they had him do that analysis,
23   and that when the results came in, they
24   were not acted on.

Page 285

1        And what is important to me is what
2    was known to the company at that stage
3    through the best available information it
4    had, and what they did with it, which was
5    not much, if anything, rather than the
6    ultimate finding, which did not bear out
7    those initial suppositions, but that was
8    much later.
9        Q.  Was it a responsible thing for
10   Merck to have Dr. Watson conduct his
11   analysis?
12       A.  To have him conduct it, yes. To
13   then ignore the findings, no.
14       Q.  You know, I'm trying to -- I don't
15   want you to --
16       A.  I'm sorry.
17       Q.  -- talk about things I'm not asking
18   about, if that's okay.
19           MR. TISI: No. He's
20   allowed to answer the question. Come on,
21   Counsel, we've been through many of these
22   depositions, where the shoe is on the
23   other foot.
24       A.  I just don't want to leave it this

72 (Pages 282 to 285)

Jerry Avorn, M.D.

Page 286

1   was -- this was a high point in Merck's
2   responsibility, because they found a
3   worrisome finding which they then didn't,
4   in my view, act upon.
5       Q.  Dr. Avorn, would you agree that it
6   was a responsible thing for Merck to have
7   Dr. Watson conduct his analysis?
8           MR. TISI:  Objection.  Asked
9   and answered.
10      A.  The conduct of it was a responsible
11  idea.
12      Q.  And is it your position, sir, that
13  Merck did not act on the results of the
14  Watson analysis?
15      A.  Well, it -- it did not act in a
16  way that was adequate.  And what I mean
17  by that is, if, in the early days of a
18  drug's development, one finds that there
19  seems to be a higher rate of an adverse
20  event, by whatever best study you can do
21  at the time method, you find this
22  increased risk and then you don't initiate
23  new studies to test that out while they
24  still believe the data from the Watson

Page 287

1   study as being worrisome, I don't think
2   that's an adequate response.
3       Q.  Do you believe that Merck did
4   anything in response to the results of the
5   Watson analysis?
6       A.  Oh, sure they did things.
7       Q.  What did they do?
8       A.  Well, there was this plan to look
9   at cardiovascular outcomes across all of
10  their studies, which I think was
11  problematic in ways we can talk about
12  later, if you want.  And there were some
13  animal studies, but nothing that -- Let me
14  be clear.
15      The appropriate response to the
16  Watson study and other things we've been
17  talking about, would have been to just cut
18  to the chase, a clinical trial designed to
19  get to the bottom of the cardiovascular
20  risk study; not a re-analysis of data from
21  other studies, or piggybacking new
22  analyses, but it would have been a study
23  targeting that question as aggressively and
24  effectively as they targeted the

Page 288

1   gastroprotection indication when they
2   wanted to sell product.  They never
3   commissioned that study.
4       Q.  Is that your personal opinion, sir,
5   or is that an expert opinion?
6       A.  That is an expert opinion.
7   Absolutely.
8       Q.  How could I test that assertion
9   that you just made?  How could I go and
10  test whether or not the appropriate
11  response to the Watson analysis would have
12  been to conduct a --
13      A.  And to the other data we've been
14  talking about.
15      Q.  How could I go test the assertion
16  that you just made concerning the
17  appropriate thing that you think should
18  have been done in response to the Watson
19  analysis was to conduct a clinical trial?
20      A.  Very simply.  You could ask a
21  hundred clinical trialists or
22  pharmacoepidemiologists or other experts in
23  the evaluation of drugs, and say the
24  following -- ask them the following

Page 289

1   question:  If there are numerous lines of
2   evidence indicating the possibility of an
3   increased cardiovascular risk in a given
4   drug, however flawed any single one of
5   those studies might be, is it appropriate
6   to conduct a new clinical trial designed
7   to understand that problem, or to simply
8   add analytic layers onto other already
9   ongoing studies that were designed for
10  very different purposes, and to do some
11  animal studies that may or may not deal
12  with the issue.
13      And I think that the answer, based
14  on my expertise, as somebody who knows
15  something about adverse events and about
16  the evaluation of drugs, that an
17  overwhelming majority of those hundred
18  people with expertise in drug evaluation
19  would say the responsible thing to do is
20  to do a focused randomized clinical trial
21  in humans to under -- that is designed to
22  understand this particular potential risk.
23      Q.  What numerous lines of evidence
24  were there in February of 1998 indicating

73 (Pages 286 to 289)

Jerry Avorn, M.D.

Page 290

1  the possibility of an increased
2  cardiovascular risk with Vioxx?
3    A.  Okay.  I did not preface my
4  statement with a particular point in time.
5      I think that the appropriate
6  reaction was abundantly clear by the time
7  the VIGOR data were in, which would have
8  been the spring of 2000.  I think it kind
9  of builds to a crescendo at that point.
10  In '98 it was worrisome.  And in '99 it was
11  suggestive.  And by the time they had the
12  original VIGOR data in 2000, in early
13  2000, demonstrating a significant increase
14  in the risk of -- in the rate of heart
15  attacks in people given their drug, by
16  that time it was abundantly clear.
17    Q.  What was abundantly clear?
18    A.  That there was a very worrisome
19  risk of cardiovascular complications
20  associated with their drug.
21    Q.  You talked about the Board of
22  Scientific Advisors's --
23    A.  Yes.
24    Q.  -- memo on Page .5 of your report.

Page 291

1  Do you remember that?
2    A.  Yes.
3    Q.  Do you think it was a responsible
4  thing for Merck to meet with its advisors
5  to discuss the FitzGerald hypothesis?
6    A.  It would have been if they had
7  followed their advice.
8    Q.  That's hindsight, right, that
9  you're applying?
10    MR. TISI:  Objection.
11    A.  No.  These were recommendations
12  made at the time in May of 1998.
13    Q.  I'm not talking about the
14  recommendations.  We'll talk about that in
15  a minute, okay?
16    A.  Was it responsible for them to have
17  a meeting?
18    Q.  Was it responsible for Merck to
19  consult with its scientific advisors,
20  independent scientific advisors to discuss
21  the FitzGerald hypothesis?
22    A.  Yes.
23    Q.  And of the studies that the Board
24  of Scientific Advisors had mentioned in

Page 292

1  that meeting, do you have any idea which
2  ones Merck did and which ones Merck didn't
3  do?
4    A.  I know what they didn't do.  And I
5  know that they also did some animal
6  studies to try to follow up on -- on
7  these worries.
8    Q.  Do you know whether the Board of
9  Scientific Advisors ever said to Merck,
10  you're not doing the studies that we
11  suggested, and you really ought to do
12  them, or was the Board of Scientific
13  Advisors satisfied that Merck was acting
14  responsibly in response to their comments?
15    MR. GRAND:  Objection.
16    MR. TISI:  Objection.
17    A.  I have no way of knowing the level
18  of satisfaction.  I do know that the
19  meeting was in May of '98, and in
20  September of '98, there had -- they had --
21  Merck had already been contacted by Dr.
22  Oates, Dr. Patrono, and perhaps others,
23  asking them to please move forward on the
24  prostaglandin -- on the prostacyclin issue,

Page 293

1  and Dr. Nies indicated that they were not
2  going to.
3    Q.  Did I ask about Dr. Patrono or Dr.
4  Oates?
5    MR. TISI:  Well, yes.  You
6  actually did.
7    MR. GOLDMAN:  Indirectly.
8  BY MR. GOLDMAN:
9    Q.  Are they on Merck's Board of
10  Scientific Advisors?
11    A.  I -- You were talking about whether
12  Merck responsibly followed up on the
13  studies that the Scientific Advisory Board
14  performed.
15    Q.  Let me be clear.  Do you know
16  whether the Board of Scientific Advisors
17  ever took the position that Merck did not
18  act responsibly in response to their
19  suggestions?
20    A.  I do not know of such a document.
21    MR. TISI:  Asked and
22  answered.
23    BY MR. GOLDMAN:
24    Q.  Do you think the Board of

74 (Pages 290 to 293)

Jerry Avorn, M.D.

Page 294

1   Scientific Advisors, in May of '98,
2   conducted an unbiased and objective review
3   of the state of the science concerning
4   Vioxx and any potential cardiovascular
5   effects?
6     A.   That's my impression.
7     Q.   It's also your impression, as you
8   said before, that the Board of Scientific
9   Advisors raised theoretical benefits that
10  Vioxx could have on the heart and
11  theoretical adverse effects that Vioxx
12  could have on the heart, right?
13    A.   Right.
14    Q.   Did the Board of Scientific
15  Advisors, sir, think that more information
16  was needed before any conclusions could be
17  made about the potential for cardiovascular
18  adverse effects from Vioxx?
19    A.   I would expect that they said that.
20  I don't think that they're exact words,
21  but it was -- that would have been a
22  plausible statement.
23    Q.   Do you criticize the Board of
24  Scientific Advisors's suggestion that Merck

Page 295

1   move forward and attempt to put Vioxx on
2   the market?
3     A.   I don't --
4           MR. TISI:  I'm sorry.
5   Could you reread the question?  I just
6   stepped away to get a drink.  I'm sorry.
7           MR. GOLDMAN:  You can read
8   it back.
9           (Record read).
10          MR. TISI:  Objection.
11    A.   I guess I don't -- I don't -- If
12  you can refer me to where they said that,
13  that would be helpful.
14          I don't recall seeing an
15  exhortation to Merck to market the drug in
16  their report.
17          MR. GOLDMAN:  I'll mark this
18  as Exhibit 8.
19          (Exhibit-8, May 1998 Board of
20  Scientific Advisors Meeting, marked for
21  identification).
22          BY MR. GOLDMAN:
23    Q.   This is the Board of Scientific
24  Advisors's meeting from —

Page 296

1     A.   Right.
2     Q.   -- May of 1998.  If you turn to
3   the page that ends with the Bates stamp
4   2742.
5     A.   (Witness complied).
6     Q.   Do you see in the last sentence
7   there's a statement by the board, "Thus,
8   there is a strong mandate for introduction
9   of Vioxx into medical practice as soon as
10  it's feasible."  Do you see that?
11    A.   (Witness viewing document).  Yes.
12    Q.   Do you disagree with that?
13    A.   Let me read what comes before the
14  thus.
15    Q.   Mm-hmm.
16    A.   (Witness viewing document).  Yes.
17  I see that.
18    Q.   Do you disagree with that advice?
19    A.   No.  I think in May of '98 that
20  was a -- that was a plausible conclusion.
21    Q.   Did the Board of Scientific
22  Advisors advise Merck to set up a
23  procedure to monitor potential
24  cardiovascular events in their clinical

Page 297

1   trials?
2     A.   As I recall they did.
3     Q.   Were you also aware, sir, when you
4   read the document that the board wanted
5   Merck to set up this procedure so that
6   Merck could conduct a meta-analysis of all
7   of the cardiovascular adverse events that
8   were seen in the trials?
9     A.   Yes.
10    Q.   And Merck complied with the Board
11  of Scientific Advisors's request, right?
12    A.   Wrong.
13    Q.   Merck did not set up a
14  cardiovascular standard operating
15  procedure?
16    A.   They set one up on paper, but they
17  implemented it in such a flawed manner as
18  to not be considered a compliance with
19  that recommendation.
20    Q.   How did Merck, as you say,
21  implement the cardiovascular operating
22  procedure in a flawed manner?
23    A.   Well, as -- as I describe in my
24  report, when it came to implementing it to

75 (Pages 294 to 297)

Jerry Avorn, M.D.

Page 298

1  the -- before approving the single most
2  important study about cardiovascular
3  outcomes, their implementation of the
4  cardiac standard operating procedure was
5  really -- it would be a comedy of errors
6  except there was nothing funny about it.
7      The disarray and incoherence of
8  their evaluation of the cardiac outcomes.
9  And the VIGOR study was appalling, and
10  reflects either ineptitude or willful
11  neglect, and I can't tell which, but the
12  quotations from within Merck, from Dr.
13  Guess and Dr. Capizzi and Dr. Watson,
14  about what are we doing, what are we
15  counting, how can we do this, there's no
16  time, what are we supposed to measure,
17  reflects the most inept tracking of a
18  potentially lethal outcome that I've ever
19  experienced in my career. So no, I can't
20  say they complied with that recommendation.
21      Q.  Is the way you just described
22  Merck's implementation of the CV SOP and
23  VIGOR the basis for your statement that
24  Merck implemented the CV SOP in a flawed

Page 299

1  manner?
2      A.  Yes.
3      Q.  What about with respect to other
4  studies other than VIGOR?
5      A.  There are problems there, too. Any
6  standard operating procedure for the
7  ascertainment of cardiovascular outcomes
8  needs to have some systematic means of
9  identifying which cases are going to be
10  brought forward for analysis, and there
11  needs to be a fair and rigorous
12  adjudication process. And it appears
13  that, at least in some instances, the
14  adjudication step was skipped because some
15  cases didn't even get put into the file of
16  cases that would be adjudicated.
17      There was one memorable case in
18  which -- I think it was Dr. Barr
19  identified a woman who died of what
20  appeared clinically to be a cardiovascular
21  death that Dr. Reicin urged him to
22  describe as an unknown cause.
23      And that kind of process -- I can't
24  tell how widespread it was, but it

Page 300

1  shouldn't have happened even once, that a
2  cardiac death gets not adjudicated because
3  -- or gets urged to be ignored by a Merck
4  official and recharacterized incorrectly as
5  an unknown cause, that is not exactly an
6  effective standard operating procedure.
7      There were other problems with, as
8  we know, the reporting of data to the New
9  England Journal about cardiovascular
10  outcomes in the VIGOR study, which again,
11  does not seem to reflect a standard
12  operating procedure.
13      The variation in the date of cutoff
14  for cardiac adverse events being earlier
15  than the date of cutoff for favorable
16  gastrointestinal effects in VIGOR was
17  contrary to all standard medical practice
18  in evaluating clinical trial design, and
19  there are other examples as well.
20      If there was a standard operating
21  procedure, it was a major embarrassment.
22      Q.  Are you done?
23      A.  For now.
24      Q.  Did you learn about this incident

Page 301

1  with Dr. Reicin and Dr. Barr when you read
2  it in the newspaper?
3      A.  No. It was in the materials that
4  was -- that were provided to me by
5  counsel.
6      Q.  Is that the first time you learned
7  about it, or did you learn about it in
8  the newspaper?
9      A.  Well, I think it was also in the
10  newspaper but a much more abbreviated -- I
11  think just a snippet. I was able to look
12  at the whole interchange before and after
13  that snippet.
14      Q.  Before you accused Dr. Reicin of
15  doing anything improper concerning that one
16  event, do you think that it would be fair
17  to review her deposition to see what she
18  says about that?
19      A.  I'd be interested in seeing it, but
20  I think that the -- her e-mails speak for
21  themselves as they occurred at the time
22  rather than her post hoc justifications.
23  But if there's something that she's said
24  since then that you wanted me to look at,

76 (Pages 298 to 301)

Jerry Avorn, M.D.

Page 302

1  I could review that.
2      Q.  Well, you reached that conclusion
3  about that incident without bothering to
4  go look at what Dr. Reicin said, right?
5      A.  It's not a matter of bothering.
6  It's a matter of the trail of e-mail
7  correspondence at the time is more
8  reliable than a subsequent, perhaps
9  coached, redescription of what she was
10  really thinking.
11     Q.  Are you suggesting that Dr.
12  Reicin's deposition testimony was coached?
13     A.  Well, I think that whenever there's
14  something as embarrassing as that appears
15  in the media and there's litigation, I'm
16  sure there were conversations about putting
17  the best face on it.  That's
18  understandable.
19     Q.  Do you know whether Dr. Reicin knew
20  whether that particular event that you
21  described occurred in a patient taking
22  Vioxx, or in a patient taking a
23  comparator?
24     A.  I have no way of knowing what she

Page 303

1  knew.  But I do know that the data was
2  already published in the New England
3  Journal, or data were -- not published,
4  but data were already -- There was already
5  a pre-existing worry that -- and knowledge
6  that a cardiovascular event in a Vioxx
7  trial was more likely to be in a Vioxx
8  patient than in a controlled patient, just
9  because that was the way the data were --
10  had -- had sorted out from other studies.
11     Q.  Do you take the position, sir, that
12  Dr. Reicin knowingly changed the nature of
13  that particular event so that it would not
14  be characterized as a sudden cardiac death
15  that would be countered against Vioxx?
16     A.  No, I do not.
17     Q.  Do you know the circumstances, sir,
18  surrounding the data analysis plan that
19  the DSMB suggested be followed for the
20  VIGOR trial?
21          MR. TISI:  Objection.
22  Vague.
23     A.  I know some things, but not all
24  things, about it.

Page 304

1      Q.  Do you understand that all the
2  documents you refer to in your expert
3  report about the -- what you called an
4  embarrassing implementation of the CV SOP
5  actually related to a data analysis plan
6  for VIGOR as opposed to the CV SOP?
7      A.  You mean a specific analysis?
8      Q.  (Counsel nodded).
9      A.  But my understanding was that the
10  CV SOP was supposed to cover all Merck
11  trials.
12     Q.  Did you also understand or did the
13  plaintiffs' lawyers provide you with
14  documentation explaining that for the VIGOR
15  trial, the DSMB wanted a particular
16  procedure followed?
17     A.  I understand that.  But that that
18  would not preclude other analyses from
19  going forward as well.
20     Q.  Back in 1998 and 1999, sir, was it
21  a responsible thing for Merck to plan to
22  adjudicate all different types of
23  thrombotic events that were reported in
24  clinical trials?

Page 305

1      A.  I would need to review the
2  statement in which they put forward that
3  methodology before I could comment on how
4  responsible it was.
5      Q.  Do you know that the CV SOP was a
6  plan to have adjudicated by independent
7  people whether events were considered
8  thrombotic events or not?
9      A.  Right.
10     Q.  Okay.  And that was a responsible
11  thing to do, to have these independent
12  people evaluate these particular events and
13  make a determination about whether or not
14  they were a confirmed cardiovascular event
15  or not, true?
16     A.  You're responsible only if there
17  was a piece of the plan that included how
18  those cases would be identified in the
19  first place --
20     Q.  You don't --
21     A.  -- to be put forward.
22     Q.  You don't know whether the CV SOP
23  had a prespecified --
24          MR. TISI:  Ascertain.

Jerry Avorn, M.D.

Page 306

1    Trying to help you.
2          MR. GOLDMAN: Yeah. I'm
3    trying to think of my word.
4    A.   A prespecified list of diagnoses
5    which would warrant bringing forward for
6    adjudication.
7    Q.   Yes.
8    A.   There was such a prespecified list
9    which contained some very egregious
10   omissions that were put in place in late
11   '99. I cannot understand why that
12   actually removed from adjudication some
13   very important events. So I guess I would
14   not characterize that as responsible.
15   Q.   What was removed?
16   A.   There were -- There were diagnoses
17   such as some arrhythmias, which could well
18   have been a manifestation of an acute MI.
19   Congestive heart failure, which could have
20   been a manifestation of an acute MI, and
21   others, which I could pull out the
22   document and look at with you, that having
23   been struck out in the document that Merck
24   provided with a date in late '99, made me

Page 307

1    wonder why they would want to start
2    excluding cardiac events if the whole
3    point was to get to the bottom of whether
4    their drug was causing cardiac risk.
5    Q.   Wasn't the theory, sir, that the
6    Board of Scientific Advisors was
7    considering as a mechanism for Vioxx being
8    prothrombotic the fact that Vioxx might
9    lower prostacyclin and disrupt its balance
10   and put patients in a prothrombotic state?
11         MR. TISI: Objection.
12   Misstates the record.
13   A.   That is only one very narrow
14   depiction of the potential cardiovascular
15   risks of the drug. The others include the
16   retention of sodium, the precipitation of
17   congestive heart failure, the increase in
18   hypertension, all of which were known,
19   even for older nonsteroidals, so it was
20   not a particularly exotic idea. And
21   elimination of all but a very, very narrow
22   kind of cardiovascular complication from
23   ascertainment was not only not responsible,
24   it was irresponsible.

Page 308

1          And just to be clear about this, it
2    is also well known that the first
3    presentation of myocardial infarction in a
4    patient can easily be acute congestive
5    heart failure, pulmonary edema, arrhythmia,
6    all of which were struck out in the list
7    of ascertainment in the cardiovascular SOP.
8    So I would not characterize that as
9    responsible.
10   Q.   Are the events you've just
11   mentioned thrombotic in nature?
12   A.   Let me explain it a little bit
13   clearer. An acute MI may often present as
14   its first presentation --
15   Q.   Okay.
16   A.   -- as pulmonary edema, congestive
17   heart failure, arrhythmia, and as such,
18   it's a reflection of an acute MI, which is
19   a thrombotic event.
20   Q.   Is it your opinion, sir, that
21   Merck --
22         MR. TISI: I don't know if
23   he was finished, was he?
24         THE WITNESS: Yeah. That's

Page 309

1    fine.
2    BY MR. GOLDMAN:
3    Q.   Is it your opinion, sir, that Merck
4    intentionally changed the criteria for
5    those cases that would be adjudicated in
6    order to cover up the potential of a
7    cardiovascular risk?
8          MR. TISI: Objection.
9    A.   All I can report is that Merck
10   intentionally changed the criteria after
11   they had been established, and I cannot
12   speak to who did it or what they were
13   thinking.
14   Q.   Do you know that the CV SOP
15   contemplated that events would be analyzed
16   during the course of the trial and up to
17   14 days after a patient stopped treatment?
18   A.   Right.
19         MR. GRAND: Objection.
20   Misstates the testimony.
21   BY MR. GOLDMAN:
22   Q.   And the plan, sir, to --
23   A.   If you stipulate that that's the
24   case, that sounds familiar. But I -- I

78 (Pages 306 to 309)

Jerry Avorn, M.D.

Page 310

1  could review that part of the CV SOP.  I
2  recall having seen that.
3      Q.  Do you remember that the plan to
4  review adverse events, sir, that Merck had
5  before VIGOR came out was to monitor those
6  events that occurred during the course of
7  its clinical trials and 14 days
8  thereafter?
9      A.  That's my recollection.
10     Q.  And that's a responsible plan,
11  isn't it?
12         MR. TISI:  Objection.
13         BY MR. GOLDMAN:
14     Q.  Give me something --
15         MR. TISI:  No, no, no.
16  Seriously.  He's -- I know you want to
17  give --
18     A.  No, no.  We're talking about life
19  and death here.  So I think it's worth more
20  than a yes-no answer.
21         It's plausible as a first
22  assumption, but when there's an increase
23  in mortality in a given study, it becomes
24  not so appropriate to ignore all the

Page 311

1  people after they've stopped drugs, because
2  people can have problems that occur more
3  than 14 days after they've stop the drug.
4      Q.  You're talking there about the
5  Alzheimer's trial?
6      A.  Among others, yes.
7      Q.  What others?
8      A.  Well, any -- once -- all right.  I
9  will grant that initially it was plausible
10  to say that an analysis would look at
11  adverse events that occur on drug and 14
12  days afterwards.
13         I think when there becomes evidence
14  that there is an increase incidence of,
15  let's say, MI, that it then becomes more
16  responsible, or it -- what is responsible
17  then becomes going to an intention to
18  create analysis.
19         Even if there was a prespecified
20  prior analysis, I think one needs to do
21  both, because of the emergence of
22  additional information that comes over
23  time.
24      Q.  We'll talk about intention and

Page 312

1  treat analyses later, okay?
2      A.  Okay.
3         (Off the record at 3:27 p.m.)
4         (Brief break).
5         (On the record at 3:35 p.m.)
6         BY MR. GOLDMAN:
7      Q.  Sir, if the imbalance theory were
8  accurate, would you expect to see an
9  increase in strokes because of Vioxx?
10     A.  Probably.
11     Q.  Would you expect to see an increase
12  in unstable angina and sudden cardiac
13  death if the imbalance theory were
14  accurate?
15     A.  Perhaps.
16     Q.  You agree, sir, that it was
17  reasonable for Merck to analyze thrombotic
18  events as a combined end point, given the
19  nature of the imbalance theory?
20         MR. TISI:  Objection.
21     A.  It depends on whether -- on what
22  thrombotic events were included.  For
23  example, I would not include venous
24  thrombotic events in that category.

Page 313

1      Q.  Other than venous thrombotic
2  events, do you agree that it was
3  reasonable for Merck to include the other
4  thrombotic events that were part of a
5  combined end point?
6         MR. TISI:  Again, is your
7  question presuming that the imbalance was
8  the theory?
9         MR. GOLDMAN:  Mm-hmm.
10        MR. TISI:  -- was the only
11  theory?  Okay.
12     A.  Right.  What I would say is that
13  yes, that's plausible, but given the major
14  magnitude of the health problems we're
15  talking about, it was also reasonable to
16  do additional analyses of just MI or just
17  cardiovascular thrombotic -- just cardiac
18  thrombotic events as well.
19     Q.  You're not critical of Merck's
20  decision to analyze a combined end point
21  that included unstable angina, heart attack
22  and strokes, right?
23     A.  Correct.
24     Q.  As to the -- And you wouldn't say

Jerry Avorn, M.D.

Page 314

1    that analyzing heart attacks and sudden
2    cardiac death alone is a better end point
3    to analyze than all thrombotic events,
4    true?
5        A.   It's better and -- It's worse and
6    it's better. It's worse in that you'll get
7    a smaller end.  It's better if for some
8    reason the drug is causing heart attacks
9    and sudden cardiac deaths but for some
10   reason not causing the others.
11       Q.   Do you agree it was reasonable for
12   Merck to use the APTC endpoint in
13   analyzing cardiac events --
14           MR. TISI:  Objection.
15       BY MR. GOLDMAN:
16       Q.   -- in its trials?
17           MR. TISI:  It's vague.
18       A.   Okay.  That would have everything
19   to do with what exactly we mean by the
20   APTC endpoint.
21       Q.   Do you know what APTC endpoint was
22   used in the Vioxx trials?
23       A.   It seems to me that I recall seeing
24   various definitions of that, so we could

Page 315

1    look at the specifics definitions, and I
2    could indicate whether I think that was
3    acceptable or not.
4        Q.   You haven't criticized the --
5    Merck's analysis of the APTC endpoint,
6    have you, sir, in your report?
7        A.   Have I -- In other words, have I
8    specifically --
9        Q.   Mm-hmm.
10       A.   In the report, no.  But I do have
11   a problem with using venous outcomes.
12       Q.   How would the venous outcomes
13   affect the analysis of whether Vioxx
14   causes cardiovascular events?
15       A.   Well, in principle, it could dilute
16   an effect if the principle problem is
17   arterial thrombosis and not venous
18   thrombosis.
19       Q.   And it is your understanding that
20   the principle theory of it was being
21   advanced about why Vioxx could be
22   prothrombotic involve arterial thrombosis
23   not venous, correct?
24           MR. TISI:  Objection.

Page 316

1    Assumes facts not in evidence.
2        A.   Well, that was the main assumption.
3        Q.   How many venous events occurred on
4    Vioxx in the clinical trials?
5        A.   I can't answer that question off
6    the top of my head.
7        Q.   How many venous events occurred on
8    non-Naproxen NSAIDs?
9        A.   I can't answer that off the top of
10   my head.
11       Q.   Do you know if Merck had excluded
12   the venous events, how that would affect
13   the analysis of whether Vioxx increases
14   cardiovascular risk?
15       A.   I know that in one table I looked
16   at there actually were more venous events
17   in the placebo group than the Vioxx group.
18   So it's not about how the numbers would
19   have come out, it's about what's the most
20   plausible way to do it.
21       Q.   So you criticize Merck for
22   including venous events in the analysis,
23   but you recognize that by including it
24   that didn't dilute the results when it

Page 317

1    came to analyzing cardiovascular effects,
2    true?
3        A.   Correct.
4        Q.   Do you know how many -- Well,
5    withdrawn.
6           Under the imbalance theory, Dr.
7    Avorn, if patients take aspirin and Vioxx
8    together, you would agree that there
9    wouldn't be an imbalance?
10       A.   I have two problems with the
11   question.  One is that it kind of presumes
12   that everything is guided by the imbalance
13   theory, and I, as a scientist, would say
14   that while that's an important hypothesis,
15   it should not be the only foundation for
16   all clinical trials.
17          And secondly, I don't think that
18   anyone -- and even Garret FitzGerald --
19   understands all the ins and outs of COX-1,
20   COX-2, thromboxane, prostacyclin, to be
21   able to predict with certainty how aspirin
22   yes, aspirin no would play itself out.
23       Q.   In theory, Dr. Avorn, because
24   aspirin is primarily a COX-1 inhibitor, if

80 (Pages 314 to 317)

Jerry Avorn, M.D.

Page 318

1  patients take low dose aspirin and Vioxx,
2  which is a selective COX-2 inhibitor, at
3  the same time, then you would expect that
4  there would be a balance between
5  prostacyclin and thromboxane, right?
6      MR. GRAND:  Objection.
7      MR. TISI:  Objection.
8      A.  No.  I think that runs counter to
9  what I just said, which is, I certainly
10  don't claim to understand enough about
11  COX-1 and COX-2 to be able to make
12  predictions about that.
13     Q.  Do you know enough about the
14  imbalance theory to know that if that were
15  the mechanism that caused increased
16  cardiovascular events, then you would not
17  see increased cardiovascular events after
18  patients stopped using Vioxx?
19     A.  Again, I think the problem here is
20  assuming that everything is kind of
21  reduced to this balance.  And it also
22  assumes that the whole
23  thromboxane/prostacyclin relationship is
24  about clot, but there is also evidence

Page 319

1  about the beneficial effects of
2  prostacyclin in relation to endothelial
3  function, plaque stability, blood pressure,
4  and other things which I am not an expert
5  in, that it's not just about clotting.
6      Q.  I'm talking about the imbalance
7  theory, okay?
8      A.  Yes.  No.  What I'm saying is,
9  that even within the imbalance theory,
10  it's not just about clotting.
11     Q.  Do you know of any evidence, sir,
12  that any imbalance that might occur
13  because of COX-2 inhibition persists after
14  patients stop taking Vioxx?
15     A.  Just repeat that question one more
16  time.
17     Q.  Are you aware of any evidence
18  suggesting that whatever imbalance might
19  exist because of COX-2 inhibition goes
20  away when patients stop using Vioxx?
21     A.  Okay.  There is reason to be
22  concerned that problems which occur as a
23  result of the imbalance while one is
24  taking Vioxx, which may or may not only be

Page 320

1  about the coagulation story, may affect
2  endothelial function and plaque and other
3  aspects of cardiovascular system that could
4  well persist after the drug itself is
5  stopped.
6      So that, for example, if there were
7  more endothelial damage or more disruption
8  of plaque, that would persist even after
9  the drug stops.
10     Q.  Do you have any evidence that that
11  happens?
12     A.  Well, there -- there -- To jump
13  ahead to the APPROVe follow-up study,
14  there was worrisome evidence of a
15  statistically significant increase in the
16  rate of stroke in people post Vioxx
17  compared to post placebo.
18     Q.  Is there a statistically
19  significant increase in the follow-up
20  period for APPROVe for heart attacks?
21     A.  I don't think there is.
22     Q.  Is there an increased
23  cardiovascular risk after patients stopped
24  using Vioxx in the APPROVe study for

Page 321

1  thrombotic cardiovascular events when
2  looked at as a whole?
3      A.  I don't think there is.
4      Q.  Is there an increased
5  cardiovascular risk in the follow-up period
6  after APPROVe for cardiac events?
7      A.  I'd want to look at the data to be
8  certain, but I don't recall that there
9  was.
10     Q.  Is there an increased risk for
11  death, all cause or cardiovascular death,
12  in the follow-up period after APPROVe --
13         MR. TISI:  Why don't we --
14         BY MR. GOLDMAN:
15     Q.  -- between Vioxx and placebo?
16         MR. TISI:  If you're going
17  to ask him a lot of questions about it,
18  why don't we look at the --
19     A.  If we could pull out the numbers,
20  it would be much easier.
21     Q.  You don't remember?
22     A.  I don't -- I don't recall all of
23  those things that you just said --
24     Q.  We'll get to that in a minute.

81 (Pages 318 to 321)

Jerry Avorn, M.D.

Page 322

1    Are you aware of any scientific
2  evidence, sir, that the imbalance that
3  people say -- Withdrawn.
4    Are you aware of any scientific
5  evidence, sir, that suggests that the
6  imbalance theory that the plaintiffs use
7  in these cases --
8    MR. TISI:  Objection.  That
9  totally mischaracterizes what plaintiffs --
10  plaintiffs are using at any particular
11  theory.  Why don't you just ask him a
12  question, Counsel?
13    BY MR. GOLDMAN:
14    Q.  Under the balance theory, sir,
15  focusing on prostacyclin and thromboxane
16  alone, do you know of any scientific
17  evidence suggesting that an imbalance
18  exists after patients stop using Vioxx?
19    A.  No.
20    Q.  On Page .7 of your report, you make
21  a statement that you are not aware that
22  Merck communicated the risks identified by
23  the Board of Scientific Advisors to the
24  FDA before approval.

Page 323

1    A.  Correct.
2    Q.  Do you remember --
3    A.  Correct.
4    Q.  -- saying that?
5    What's your basis for that
6  statement?
7    A.  I see no reflection of that in the
8  FDA's analysis of the NDA data that would
9  indicate they have been made aware of
10  that.  If there was communication to FDA
11  that I haven't seen, I'd be happy to take
12  a look.
13    Q.  Have you read the integrated
14  summary of safety for the NDA for Vioxx?
15    A.  I believe I have.
16    Q.  Do you think that Merck withheld
17  from the FDA the theory that Vioxx could
18  potentially be prothrombotic?
19    A.  Most of the safety discussions that
20  I remember reading in the FDA's summary
21  were about platelet function, I think,
22  rather than about the other issues that
23  the Scientific Board raised.
24    Q.  Before you were to conclude that

Page 324

1  Merck withheld information about potential
2  thrombotic effects of Vioxx, would you
3  want to review the material that Merck
4  submitted to the FDA?
5    MR. GRAND:  Objection.
6  Misstates his testimony.
7    A.  Right.  I want to be clear that
8  I'm not accusing Merck of withholding
9  information.  I'm saying I'm not aware
10  that the issues that were raised very
11  clearly in the Scientific Advisory Board
12  report were communicated, because I did
13  not see them reflected in the FDA's
14  statement.
15    Q.  You are not aware, Dr. Avorn, one
16  way or the other, whether Merck informed
17  the FDA about the theory that Vioxx and
18  COX-2 inhibition could potentially lead to
19  increased risk of heart attack, true?
20    A.  That's what my statement says.
21    Q.  Do you know whether the FDA was
22  aware of the FitzGerald and Catella-Lawson
23  urine study before Vioxx was approved?
24    A.  I don't know.

Page 325

1    Q.  Do you know whether Merck gave the
2  FDA a copy of the Catella-Lawson
3  FitzGerald urine study?
4    A.  I don't know.
5    Q.  If Merck gave a copy of the
6  FitzGerald urine study and referenced it
7  in its integrated summary of safety, would
8  you agree that that would be a responsible
9  thing to do?  I have to repeat that
10  because, it didn't make sense.  Withdrawn.
11    If Merck gave the FDA a copy of
12  the FitzGerald urine study and referenced
13  it in its integrated summary of safety,
14  would you agree that that would be a
15  responsible thing for Merck to have done?
16    A.  That would have been responsible,
17  but I come back to my statement in the
18  report that I am not aware that the issues
19  raised by the scientific advisory committee
20  were communicated to Merck -- to FDA
21  fully.
22    Q.  Well, did Merck communicate to the
23  FDA that the Board of Scientific Advisors
24  felt that Vioxx could potentially help the

82 (Pages 322 to 325)

Jerry Avorn, M.D.

Page 326

1  heart?
2      A.  I don't know that they communicated
3  either the positive or the negative fully.
4      I think FDA would have — I can
5  tell you that FDA would have had no
6  interest in theoretical benefits that were
7  apart from the indication being reviewed,
8  but they would have had great interest in
9  theoretical harms as something for them to
10  at least be aware of.
11      Q.  My question was:  Did Merck
12  communicate to the FDA that the Board of
13  Scientific Advisors felt that Vioxx could
14  potentially help the heart?
15      A.  Right.  And my answer was that FDA
16  does not and should not consider
17  theoretical statements of potential benefit
18  for an indication other than the
19  indication being considered, but that it's
20  not symmetrical.  FDA would be concerned
21  with theoretical reasons for potential
22  harms.
23      Q.  Have you ever worked for the FDA as
24  an employee?

Page 327

1      A.  I've been on advisory committees,
2  but I've not been an employee.
3      Q.  I'm not asking about what the FDA
4  would consider important or what they
5  should or should not consider, okay?
6      A.  Okay.
7      Q.  Did Merck communicate to the FDA
8  the Board of Scientific Advisors's theory
9  that Vioxx could potentially help the
10  heart?
11      A.  I don't believe they did.
12      Q.  Do you know whether the FDA was
13  aware of the theoretical risk of
14  thrombotic events from Vioxx before it
15  approved Vioxx?
16      A.  I know that there were statements
17  about the theoretical concern about
18  selective inhibition of COX-2, yes.
19      Q.  How do you define hypertension?
20      A.  It changes every month these days,
21  but...
22      Q.  How was it defined while Vioxx was
23  on the market?
24      A.  I think in those years, 140 over

Page 328

1  90.
2      Q.  Do you agree, sir, that if a
3  patient has one elevation of blood
4  pressure to 140 over 90, that doesn't mean
5  that he or she has hypertension?
6      A.  You mean on one occasion?
7      Q.  Mm-hmm.
8      A.  And it's normal on other occasions?
9      Q.  Mm-hmm.
10      A.  Correct.
11      Q.  And even if a patient has
12  intermittent spikes in blood pressure above
13  140 over 90, that doesn't necessarily mean
14  the patient has hypertension, true?
15      A.  It depends how frequent.
16      Q.  In order to know whether a patient
17  has hypertension, you would want to look
18  at the average blood pressure during a
19  particular period, rather than just
20  selecting certain intermittent spikes,
21  true?
22          MR. TISI:  Objection.
23      A.  No.  The clinical definition is
24  that if on three readings they have levels

Page 329

1  above that, then that would be considered
2  grounds for treatment, either with diet or
3  drugs.  In other words, it's not as if
4  one would average in the low blood
5  pressures as well.
6      Q.  Three readings in a row, or don't
7  you know?
8      A.  On three occasions.
9          MR. TISI:  Can I ask a
10  clarification question?  This is not a —
11  Are you talking about people who are not
12  being treated for hypertension?  In other
13  words, people who are not on drugs for
14  hypertension?
15          MR. GOLDMAN:  I'm talking
16  about just the diagnosis of hypertension,
17  yes, without being on blood pressure meds.
18          MR. TISI:  All right.
19          BY MR. GOLDMAN:
20      Q.  Is it your testimony that you would
21  diagnose a patient with hypertension if
22  they had three elevated blood pressure
23  readings over the course of two years?
24      A.  If those were the only — If they

Jerry Avorn, M.D.

Page 330

1  came in only every eight months, and every
2  time you saw them, it was, you know, 160
3  over 95, yeah.
4      Q.  What if a patient actually had
5  mostly normal readings of blood pressure
6  during the period of time that he was on
7  Vioxx, but had some elevated blood
8  pressure spikes?  Would you consider that
9  to be hypertension?
10     A.  No.
11     Q.  Is it true, sir, that the medical
12  community knew long before Vioxx came to
13  the market that all NSAIDs could increase
14  hypertension?
15         MR. TISI:  Objection.  Are
16  you talking about magnitude?  Frequency?
17  Severity?  What are you talking about?
18     A.  It was known -- What the medical
19  community knew is harder to state.  We did
20  some of those original studies
21  demonstrating it with Ibuprofen.  So it
22  was known, yes.
23     Q.  Is it also well known in the
24  medical community that hypertension can

Page 331

1  increase the risk of heart attack and
2  stroke?
3         MR. TISI:  Objection.
4  Vague.
5     A.  That I would say is well known.
6     Q.  Do you know that the FDA was aware,
7  before it approved Vioxx and thereafter,
8  that Vioxx could potentially cause
9  hypertension?
10        MR. TISI:  Objection.
11        MR. GRAND:  Objection.
12     A.  I would think that any nonsteroidal
13  would be expected to cause hypertension --
14     Q.  So the answer is yes?
15     A.  -- although the question is whether
16  it does more than comparable drugs.  But
17  that would seem to me to be a relevant
18  question for FDA to be concerned with.
19     Q.  Based on your review of the
20  materials, Dr. Avorn, isn't it true that
21  the FDA was fully aware that Vioxx could
22  cause hypertension?
23     A.  Yes.
24     Q.  And the FDA was also fully aware,

Page 332

1  prior to approval and thereafter, that
2  Vioxx, in some studies, increased blood
3  pressure and hypertension more than
4  comparator NSAIDs, right?
5     A.  I believe they were aware of that.
6     Q.  Are you aware of studies, sir,
7  showing that there's actually no difference
8  in risk of hypertension between Vioxx and
9  comparator NSAIDs?
10     A.  I'm aware of studies that come to
11  the opposite conclusion.
12     Q.  Mm-hmm.  I'm sure you are.
13     A.  I would be happy to look at a
14  study that found no difference.
15     Q.  Are you aware, one way or the
16  other, of whether there are studies that
17  indicate that Vioxx does not increase
18  hypertension more than comparator NSAIDs?
19     A.  I know that the literature is
20  mixed.  My sense of the literature is that
21  more studies show an increase compared to
22  other drugs than not, but that there are
23  some studies, though fewer, that come to
24  another conclusion.

Page 333

1     Q.  Isn't it true, sir, that Vioxx's
2  label from day one indicated that Vioxx
3  could increase hypertension?
4         MR. TISI:  Objection.
5     A.  I could look at the label and
6  confirm that, but if you stipulate that
7  that's the case, I am not surprised.
8     Q.  Let me see if I can find it.
9         Why wouldn't you be surprised if
10  Vioxx's label indicated that Vioxx could
11  increase the risk of the hypertension?
12     A.  Because all nonsteroidals increase
13  the risk of hypertension.
14     Q.  Do you know also that --
15        MR. GOLDMAN:  I'll mark the
16  original label for Vioxx, albeit a poor
17  copy, as Exhibit 9.
18        (Exhibit-9, Original Vioxx Label,
19  marked for identification).
20        BY MR. GOLDMAN:
21     Q.  And I want to direct your
22  attention, Dr. Avorn, to a table on the
23  last page.
24     A.  Mm-hmm.

84 (Pages 330 to 333)

Jerry Avorn, M.D.

Page 334

1    Q.  Do you see, sir, that there is a
2  table that indicates clinical adverse
3  experiences occurring in greater than or
4  equal to two percent of patients treated
5  with Vioxx?
6    A.  (Witness viewing document).  Yes.
7    Q.  And do you see that there's an
8  entry there for cardiovascular system?
9    A.  (Witness viewing document).  Yes.
10    Q.  What does it reference?
11    A.  Hypertension.
12    Q.  And do you see how there is an
13  indication here that 1.3 percent of
14  patients in the placebo arm in the
15  clinical trials that predated this label,
16  and 3.5 percent of patients in the Vioxx
17  arm had hypertension, 3 percent in the
18  Ibuprofen arm, and 1.6 percent in the
19  Diclofenac arm.
20    A.  Right.
21    Q.  Do you agree, sir, that the Vioxx
22  label, on its face, indicates that Vioxx
23  increased hypertension more than Ibuprofen,
24  Diclofenac and placebo?

Page 335

1    A.  I don't think I could conclude from
2  the data in this table that it is
3  meaningfully more than Ibuprofen, because
4  it may just be the play of chance that
5  it's 3.5 versus 3.0.
6    Q.  You don't have any reason to doubt
7  the accuracy of the percentages in this
8  table, do you, sir?
9    A.  No.
10    Q.  So just based on the numbers
11  themselves, putting aside the question of
12  statistical significance, the numbers
13  themselves indicate that Vioxx increases
14  hypertension more than placebo, Diclofenac
15  and Ibuprofen, right?
16    A.  No.  As I said, I don't think that
17  it would be a plausible conclusion, and
18  specifically within relation to Ibuprofen,
19  to say that 3.5 is meaningfully more or
20  less than 3.0 or 4.0.
21    And the other important point is
22  that they characterize hypertension as
23  yes-no, which is one way to do it.  But
24  of greater importance is, you know, what

Page 336

1  if the people with hypertension from one
2  of the drugs had a mean blood pressure of
3  180 over 110, and the others with
4  hypertension had a mean blood pressure of
5  150 over 92. It's -- Hypertension is not a
6  yes-no disease.
7    So while this is interesting, it's
8  very limited as to what it tells you about
9  the magnitude of the hypertension and the
10  meaningfulness of those differences.
11    Q.  Do you know of any other package
12  insert for any NSAID or COX-2 inhibitor
13  that actually describes the magnitude of
14  the increase in blood pressure for that
15  particular drug versus comparator drugs?
16    A.  I know I've seen it -- I can't
17  recall if it was in clinical trials or in
18  package inserts -- something like the mean
19  blood pressure in people in a given drug
20  group versus placebo as opposed to just
21  hypertension, yes, no. That -- That I
22  would find to be more helpful.
23    Q.  Putting aside what you would find
24  to be more helpful, Dr. Avorn, do you

Page 337

1  agree, sir, that the table in the first
2  package insert for Vioxx indicates that
3  Vioxx can cause hypertension?
4    A.  Yes.
5    Q.  And do you also see, on the
6  previous page, under Precautions down by
7  fluid retention and edema --
8    A.  Is that Column 1 or Column 2?
9    Q.  Column 1, third to the top, it says
10  that --
11    A.  Column 1, third to the top.
12    Q.  I'm sorry.  Third from the bottom.
13  "Fluid retention and edema have been
14  observed in some patients taking Vioxx.
15  Vioxx should be used with caution and
16  should be introduced at the lowest
17  recommended dose in patients with fluid
18  retention, hypertension, or heart failure."
19  Do you see that, sir?
20    A.  (Witness viewing document).  Yes.
21    Q.  So Merck and the FDA wasn't keeping
22  it a secret that Vioxx might cause
23  hypertension and that patients might want
24  to be careful if they have it and they

85 (Pages 334 to 337)

Golkow Litigation Technologies - 1.877.DEPS.USA

Jerry Avorn, M.D.

Page 338

1  take Vioxx?
2      A.  Well, it does — doesn't speak to
3  what the patients may or may not want,
4  because this is written for physicians.
5      Q.  You agree, Dr. Avorn, that Merck
6  and the FDA didn't keep it a secret that
7  Vioxx could potentially increase
8  hypertension and that doctors ought to be
9  careful in prescribing Vioxx to patients
10  who have hypertension?
11          MR. TISI:  Objection to the
12  state of Merck and the FDA.  You can
13  answer.
14      A.  Actually, I wouldn't agree, because
15  I think your wording was Vioxx can
16  increase hypertension.  Is that --
17      Q.  Cause.
18      A.  Cause.  Could you read back --
19      Q.  I'll ask it again.
20          Do you agree, sir, that Merck and
21  the FDA-approved package insert for Vioxx
22  made it clear to doctors that Vioxx ought
23  to be used with caution in patients who
24  have hypertension?

Page 339

1      A.  That's what it says.
2      Q.  And you've never criticized that
3  label before, have you, sir?
4          MR. TISI:  On that basis?
5          MR. GOLDMAN:  Yeah.
6      A.  I've criticized labels in general,
7  most recently in the New England Journal
8  about a week ago, for being so packed with
9  tiny print words as to be irrelevant to
10  most physicians.
11          So in the sense that having
12  something in four point type in a multi
13  thousand word document constitutes a fair
14  warning, I've gone on record as saying I
15  don't believe that that's generally the
16  case.
17      Q.  You've never, during the time Vioxx
18  was on the market, said that Vioxx does
19  not contain an adequate warning for
20  hypertension, right?
21      A.  I've never said that.
22      Q.  And it's true, sir, that you
23  actually think very few doctors pay
24  attention to package inserts, right?

Page 340

1      A.  Correct.  And it's not just what I
2  think.  It's what the literature shows.
3      Q.  So from your perspective, most
4  doctors don't read the package inserts,
5  and it really doesn't matter what's in
6  them?
7          MR. TISI:  Objection;
8  mischaracterizes.
9      A.  I think the first part of the
10  sentence is true.  The second part is not.
11          It is true that most doctors don't
12  read them.  I don't think that means it
13  doesn't matter what's in them. But the
14  relevance here is that whether or not
15  words appear in the package insert does
16  not necessarily constitute appropriate
17  warning.
18      Q.  And that's your personal opinion,
19  right?
20          MR. TISI:  Objection.
21      A.  No.  That's based on the
22  literature, which we cited a couple of
23  those papers in the June 8th New England
24  Journal, documenting that warnings, and

Page 341

1  even black box warnings that appear in the
2  labels do not influence physicians'
3  behavior.  So that's not just my personal
4  opinion.
5      Q.  Is it your testimony, sir, that you
6  have held the opinion and you've expressed
7  the opinion that black box warnings in
8  package inserts do not affect prescribing
9  behavior?
10          MR. TISI:  Objection;
11  mischaracterizes.
12      A.  In last week's New England Journal,
13  I published a piece with Dr. Shrank
14  indicating that, and citing a paper by Dr.
15  Lasser, L-A-S-S-E-R, that appeared I
16  believe in JAMA, in the last year or two,
17  looking at the effect of black box
18  warnings on physician prescribing, and in
19  which she reported, based on data and not
20  based on my opinion, that even black box
21  warnings are an inadequate driver of
22  physicians' prescribing practices.
23      Q.  Have you also said, sir, that less
24  than one percent of physicians, in your

Jerry Avorn, M.D.

Page 342

1    view, have seen a label in the last year?
2       A.   If you can show me where I said
3    that.
4       Q.   Okay.  I won't ask you that.  I
5    won't show you it, because I don't have
6    it.
7       A.   Okay.
8       Q.   Do you believe, sir, that less than
9    one percent of doctors have even seen a
10   label for a pharmaceutical drug in the
11   last year?
12      A.   I don't think I would have put that
13   number to it, because doctors do
14   frequently use the PDR, which is
15   essentially a collection of labels.  So
16   that seems like something I would not have
17   said, that number.
18      Q.   Do you believe that a low
19   percentage of doctors are aware of the --
20   of package inserts in the PDR?
21      A.   I think -- Well, I'm not sure what
22   you mean by "aware of."  They know they're
23   there.
24      Q.   You testified a minute ago that you

Page 343

1    recently published something saying that
2    even black box warnings in package inserts
3    don't change prescribing behavior, right?
4          MR. TISI:  Objection.
5       A.   Have a limited effect on
6    prescribing behavior.  What I said was that
7    even black box warnings have a limited
8    effect on physician prescribing behavior.
9       Q.   Have you also expressed the opinion
10   that printed warnings in package inserts
11   in the PDR -- Withdrawn.
12         Have you also said, sir, that
13   physicians frequently prescribe drugs,
14   despite important contraindications in
15   black box warnings?
16      A.   Yes.
17      Q.   And that is true whether or not the
18   label is handed to the doctor or whether
19   or not it's in the PDR?
20      A.   Correct.
21      Q.   Now, you don't know, sir --
22   Withdrawn.
23         Did you ever say at any point while
24   Vioxx was on the market that a black box

Page 344

1    warning should be added for cardiovascular
2    risk?
3       A.   No.
4       Q.   Did you ever say at any point when
5    Vioxx was on the market that the statement
6    about cardiovascular risk should be in the
7    warning section and not in the precaution
8    section?
9       A.   No.
10      Q.   I'm going to hand you, sir, a
11   document --
12         MR. TISI:  Would you please
13   read that last question back again?  I'm
14   sorry.
15         (Record partially read).
16         MR. TISI:  That's all I
17   need.
18         (Exhibit-10, Table included in a
19   Medical Study, marked for identification).
20         BY MR. GOLDMAN:
21      Q.   Let me hand you, sir, what I've
22   marked as Exhibit 10.
23         MR. TISI:  I've haven't seen
24   this exhibit before, and I'm going to

Page 345

1    object to its use if you don't identify
2    where it is.
3          BY MR. GOLDMAN:
4       Q.   I'm going to represent to you, sir,
5    that this exhibit is a table from a study
6    that's published in a reputable journal.
7    And I'm going to represent to you that the
8    data that's reflected in this study has
9    not been changed and is reported in a peer
10   review journal.  Okay?
11      A.   Okay.
12      Q.   And this is a table that compared
13   various adverse effects for placebo and
14   two different doses of the same NSAID.
15   Are you with me?
16      A.   Mm-hmm.
17      Q.   Yes?
18      A.   Yes.  Is Dose 2 higher than Dose
19   1?
20      Q.   Yes.
21      A.   Okay.
22      Q.   The study involved patients who had
23   colorectal adenomas.  Okay?  Are you with
24   me?

87 (Pages 342 to 345)

Jerry Avorn, M.D.

Page 346

1    A.  Yes.
2    Q.  Do you see, sir, how in this
3  study --
4         MR. TISI:  Let me just
5  place an objection to the use of the
6  document when you've clearly not identified
7  the comparators, and you have not
8  identified the study and all the
9  circumstances surrounding it.  So I will
10  ask for a continuing objection to this.
11         MR. GOLDMAN:  You have it.
12         MR. TISI:  Thank you.
13         BY MR. GOLDMAN:
14    Q.  Dr. Avorn, do you see that if you
15  look at MI, myocardial infarction, and you
16  look at the placebo arm, there was one MI
17  in this study.  Do you see that, sir?
18    A.  (Witness viewing document).  Yes.
19    Q.  And then there were two MIs in the
20  low dose of this particular NSAID, and
21  five MIs in the high dose.  Okay?
22    A.  Right.
23    Q.  Would you be concerned if you saw
24  this table and saw a 7 to 1 difference in

Page 347

1  heart attacks between the NSAID and
2  placebo?
3         MR. TISI:  And let me ask
4  you, is this in the abstract, or is there
5  other information, other studies, biologic
6  mechanisms, et cetera, et cetera?
7         MR. GOLDMAN:  Can you just
8  object in a legitimate fashion?
9         MR. TISI:  Well, I am
10  objecting -- Well, that is a legitimate
11  fashion.  That's an incomplete
12  hypothetical.  You don't --
13         MR. GOLDMAN:  Chris, then
14  just object that way.
15         MR. TISI:  Okay.  Incomplete
16  hypothetical.  Objection.
17    A.  First of all, you're totally
18  incorrect in calling that a 7 to 1.  You
19  can't just add the 5 and the 2 and get 7.
20    Q.  Okay.
21    A.  The only appropriate way to do that
22  would be to get the average of the 5 and
23  2, which would be 3 and a half.
24    Q.  Mm-hmm.

Page 348

1    A.  So even if this was a ratio that
2  we would take seriously, it's a 3 and a
3  half to one, rather than a 7 to 1
4  difference.
5    Q.  Mm-hmm.
6    A.  And what I would say about that is
7  that these are very, very, very small
8  numbers.  It's interesting.  And I
9  wouldn't know what to make of it if this
10  was the only information that I had about
11  this unnamed drug.
12    Q.  What is the importance of the small
13  numbers here when you're looking at five
14  heart attacks in the high dose NSAID and
15  two in the low dose versus one placebo?
16    A.  Well, taken in isolation, one study
17  out of context of any other studies or any
18  known biology or pharmacology, which, of
19  course, is never the case.  In the real
20  world, you never look at one table with
21  the drug names obscured and say what do
22  you think of it.
23    Q.  Mm-hmm.
24    A.  But in this exercise, I would say

Page 349

1  that knowing nothing else about the drug
2  and having no other information about it,
3  I would say that's interesting, somebody
4  should look into this further.
5    Q.  Do you agree that based on this
6  table alone, that if you look at strokes
7  and you take the average, now you have 3
8  and a half to zero in the placebo arm,
9  right?
10    A.  Right.
11    Q.  And if you just look at the high
12  dose for the NSAID, it's 5 to zero right?
13    A.  Right.
14    Q.  Do you view it as a signal of a
15  potential cardiovascular problem with the
16  NSAID?
17         MR. TISI:  Objection.
18    A.  In isolation, I would say that's
19  interesting, somebody should look into this
20  further and see if this is a pattern that
21  is replicated.
22    Q.  If you combine heart attack and
23  stroke, do you see that then you have, for
24  any dose, 14 events to 1 on placebo, and

88 (Pages 346 to 349)

Jerry Avorn, M.D.

**Page 350**

1 if you take the average, then you would
2 have 7 thrombotic events, compared to 1
3 for placebo. Do you see that?
4    A. (Witness viewing document). Yes.
5    Q. Would that generate a potential
6 signal to you that this NSAID was
7 potentially harmful to the heart?
8    A. I would say, as before, that's very
9 interesting, let's look at other studies,
10 pharmacology of the drug, what is the
11 drug, what else is known about it, and it
12 would certainly make me want to learn
13 more. But I would -- it's not prima
14 facie evidence of -- of a problem in
15 isolation.
16    Q. Would you be worried, sir, if you
17 saw this in isolation, and you saw that
18 there was a 7 to 1 difference in
19 thrombotic events, if you take the average
20 of the two different doses of NSAIDs?
21    A. Isn't that what we just said?
22    Q. I had a slightly different
23 question.
24    A. Okay. I think it's what I answered

**Page 351**

1 before, but I would give the same answer,
2 saying this is interesting, it should be
3 looked into further.
4    Q. If you look at heart attack, stroke
5 and death, then you have 21 to 4, if you
6 look at the NSAIDs combined, the doses,
7 versus placebo, right?
8    A. No. You can't --
9    Q. Okay. You can't combine them?
10    A. -- combine them for that reason.
11    Q. If you take the average of the two
12 NSAIDs, you would have 10 and a half,
13 round up to 11, to 4 when you look at MI,
14 stroke and death, right?
15    A. Right.
16    Q. And would you also find that to be
17 an interesting finding that you think
18 ought to be looked into further because
19 there's the potential that this NSAID
20 could cause heart attacks?
21    A. Well, when I say look into further,
22 I'd want to see the rest of the experience
23 in relation to this drug.
24    Q. Mm-hmm.

**Page 352**

1    A. I -- Yes.
2    Q. Okay. Dr. Kronmal, sir, testified
3 that he would actually be worried if he
4 saw results like this. Would you?
5      MR. TISI: Objection.
6      BY MR. GOLDMAN:
7    Q. Let me ask a --
8      MR. TISI: Please show him
9 the testimony.
10      BY MR. GOLDMAN:
11    Q. Would you be worried, sir, if you
12 saw results like this about the potential
13 for this NSAID to cause heart attacks?
14      MR. TISI: Objection. Asked
15 and answered several times now. Go ahead.
16    A. I think "worried" is not a helpful
17 word here. I think -- I mean, that
18 speaks to my emotional state.
19      I think the answer is the same I
20 gave before. I would say this is
21 interesting. It may or may not be
22 important. Let's look at other available
23 information about this drug.
24    Q. Could it be the case that this

**Page 353**

1 particular drug shows an increased
2 incidence of cardiac events or death in
3 the particular population that was studied
4 here in this study and it wouldn't show an
5 increased risk in another population?
6    A. Given that I don't know what this
7 population is, that's very hard to answer.
8 But yes, drugs show different effects and,
9 you know, could show different effects in
10 a different population.
11      (Off the record at 4:17 p.m.)
12      (Recess taken.)
13      (On the record at 4:29 p.m.)
14      BY MR. GOLDMAN:
15    Q. In the portion of your expert
16 report starting on Page .7, sir, through
17 Page .14, you talk about the VIGOR trial.
18    A. Right.
19    Q. Okay? So I want to talk about
20 that.
21      The vast majority of your analysis
22 here concerning VIGOR appears to be based
23 on your interpretation of Merck's internal
24 documents; is that true?

89 (Pages 350 to 353)

Jerry Avorn, M.D.

Page 354

1    A.  My reading of them, yes.
2    Q.  And you're basically trying to put
3  together here a chronology, based on the
4  documents the plaintiffs' lawyers gave you,
5  of Merck's internal documents to try to
6  show what they knew about the VIGOR trial,
7  right?
8    A.  Right.
9    Q.  The VIGOR trial involved Vioxx and
10  Naproxen, right?
11    A.  Right.
12    Q.  Placebo was not involved in that
13  study, was it?
14    A.  Correct.
15    Q.  And what's the significance of not
16  having placebo arm in a study like VIGOR?
17    A.  I'm not sure what you mean.
18    Q.  Is it easier to interpret the
19  significance of a particular result in a
20  study when you have a drug versus placebo
21  versus -- as opposed to a drug versus
22  another drug?
23    A.  I think that depends on whether
24  you're looking at efficacy, where it is

Page 355

1  more challenging to demonstrate equivalence
2  than it is to demonstrate that a drug is
3  better than a sugar pill.
4    The problems are less difficult in
5  an adverse event if the comparator drug is
6  not expected to cause the adverse event.
7    Q.  If there's evidence that the
8  comparator drug in a study could prevent a
9  particular event, do you agree that that
10  type of a study is harder to interpret
11  than a study involving a drug and a
12  placebo?
13    A.  It depends on the magnitude of that
14  protection.
15    Q.  The dose involved in the VIGOR
16  trial was 50 milligrams?
17    A.  Correct.
18    Q.  That was twice the maximum dose
19  that was approved by the FDA at the time,
20  true?
21    A.  Correct.
22    Q.  And it was twice --
23    MR. TISI:  Well, wait a
24  second.  Can you read that back again?

Page 356

1  Twice the maximum dose or twice the
2  standard dose?
3    MR. GOLDMAN:  I'll get to
4  the standard in a minute.
5    MR. TISI:  Well, can we
6  read the question back?  Are you telling
7  me 50 milligrams was not approved by the
8  FDA?
9    MR. GOLDMAN:  No.  That's
10  not what I'm telling you.
11    MR. TISI:  Then I
12  misunderstood the question.
13    BY MR. GOLDMAN:
14    Q.  Was the 50 milligram dose of Vioxx
15  twice the recommended dose for treatment
16  of OA?
17    A.  That's my recollection.
18    Q.  And was the average duration of use
19  in the VIGOR study nine months?
20    A.  That's correct.
21    Q.  And that was not an approved period
22  of time for chronic use of 50 milligrams,
23  right?
24    A.  That's my recollection, too.

Page 357

1    Q.  In the VIGOR trial, was there a
2  finding that Vioxx significantly reduced
3  the incidence of perforations, ulcers and
4  bleeds?
5    A.  Yes.
6    Q.  Was there also a significant
7  reduction in serious complicated
8  gastrointestinal problems in the Vioxx arm
9  versus Naproxen?
10    A.  Yes.
11    Q.  You agree, sir, that even using
12  twice the chronic dose of Vioxx, there's
13  no doubt that the VIGOR trial showed that
14  from a GI perspective, Vioxx was superior
15  to Naproxen?
16    MR. TISI:  Objection.
17    A.  In patients not taking aspirin,
18  yes.
19    Q.  In your report on Page .10, you
20  indicate that -- in the last paragraph,
21  third sentence, "There was a fivefold
22  increase in cardiac events in the patients
23  given Vioxx." Do you see that?
24    A.  (Witness viewing document).  I

Jerry Avorn, M.D.

Page 358

1   probably should. If I didn't have so much
2   jet lag I would find it. Okay.
3       Q.  Do you see that, sir?
4       A.  (Witness viewing document).  Yes.
5       Q.  What cardiac events are you talking
6   about there?
7       A.  All right. Let me just pull the
8   VIGOR paper, so we can have it.
9           MR. TISI:  I've got an easy
10  -- If you don't mind me giving it to him.
11          MR. GOLDMAN:  No.  Please.
12      A.  Okay.  They were myocardial
13  infarctions, as I recall.
14      Q.  So the reference that you're
15  referring to here as a five times increase
16  was actually nonfatal heart attacks, right?
17          MR. TISI:  Well, actually
18  within a fourfold increase as reported in
19  the arm --
20      A.  Right, which then turned out to be
21  a later -- to be a --
22          MR. GOLDMAN:  I'm talking
23  about his report. Stop coaching the
24  witness.

Page 359

1           MR. TISI:  No.  You're now
2   talking referring to the article, which is
3   different, as you know.
4       A.  In VIGOR, there was a fivefold
5   increase.  In the paper, it was a fourfold
6   increase.  And they were myocardial
7   infarctions, and I'm just trying to see
8   whether they were characterized as nonfatal
9   or fatal plus nonfatal.  But we could
10  speed things up if you want to remind me
11  whether it was fatal alone or not -- I
12  mean, not fatal alone.
13      Q.  That's actually not that important.
14      A.  Okay.
15      Q.  Do you know that there was no
16  difference in sudden cardiac death in the
17  VIGOR trial between Vioxx and Naproxen?
18          MR. GRAND:  Objection.
19      A.  That sounds reasonable.
20      Q.  In the abstract of the VIGOR trial,
21  do you see that the relative risk is
22  reported as .2 --
23      A.  Yes.
24      Q.  -- for heart attacks --

Page 360

1       A.  Yes.
2       Q.  -- right?  And you understood that
3   .2 is the same thing as one fifth,
4   correct?
5       A.  Yes.
6       Q.  And you understood, from reading
7   the abstract, sir, that therefore there
8   were five times the number of heart
9   attacks in the Naproxen arm -- Withdrawn.
10          You understood, from reading the
11  results here in the abstract, that there
12  were five times the number of heart
13  attacks in the Vioxx arm than in the
14  Naproxen arm, right?
15          MR. TISI:  Objection.
16      A.  Right.
17      Q.  During the time that Vioxx was on
18  the market, sir, you never criticized the
19  way that Merck or the non-Merck authors
20  described the data of the VIGOR trial, did
21  you?
22      A.  No.  That's not true.  In
23  discussing it with residents, other faculty
24  members, medical students before the drug

Page 361

1   was withdrawn, a number of us commented on
2   the unusual way that it was presented as a
3   reduction in the Naproxen arm compared to
4   the -- to an increase in the Vioxx arm.
5   I never wrote a paper saying that, but I
6   certainly made comments about it.
7       Q.  Back at the time that the VIGOR
8   study was published, did you ever, in any
9   of your subsequent articles, say that you
10  felt that the way the data was presented
11  was misleading in the VIGOR trial?
12      A.  Right.  No.  We commented on the
13  cardiovascular risk of Vioxx in papers,
14  but we never specifically talked about how
15  that was conveyed in the paper.
16      Q.  Did the VIGOR study have a DSMB?
17      A.  Yes.
18      Q.  Do you know what the DSMB believed
19  was causing the difference that they saw
20  in the VIGOR trial?
21      A.  I can't speak to what they
22  believed.
23      Q.  Do you know from reading the
24  documents that the DSMB observed that one

91 (Pages 358 to 361)