Jerry Avorn, M.D.

Page 362

1  drug in Group B was likely
2  cardioprotective as opposed to concluding
3  that Group A drug was harmful to the
4  heart?
5      A.  I can't recall seeing a statement
6  by the DSMB about that.
7      Q.  That wouldn't surprise you if they
8  reached that conclusion, would it, sir?
9          MR. TISI:  Objection.
10      A.  Since I don't know what they wrote,
11  I can't say whether it would or would not
12  have surprised me.
13      Q.  Back in 2000-2001 time frame, sir,
14  did you agree that there were several
15  plausible explanations for the difference
16  in heart attacks seen in the VIGOR trial?
17          MR. TISI:  Objection.
18      A.  In 2000-2001, as I said before, I
19  recall saying to Dr. Sherwood that it
20  seemed implausible to conclude that the
21  obvious explanation was that Naproxen was
22  responsible for the difference in rates.
23      Q.  Did you ever write an article in
24  2000 and 2001 or 2002, where you said that

Page 363

1  it would be an implausible interpretation
2  of the VIGOR trial for one to say that
3  the difference in heart attacks was due to
4  Naproxen?
5      A.  Yes.  I remember writing something,
6  and I can't tell you precisely what year,
7  but it was definitely while Vioxx was
8  still on the market, that said that the
9  rate of cardioprotection that would be
10  required for Naproxen to explain this
11  difference would be so high as to -- I
12  don't remember whether I used the word
13  implausible -- but I remember saying that
14  this is far more than anyone has ever
15  demonstrated, even for aspirin, and that
16  seemed an implausible explanation.
17          I could try to find that citation.
18  But I know I said that in writing during
19  the time the drug was on the market.
20      Q.  Back in 2002, Dr. Avorn, did you
21  believe that the MI difference in the
22  VIGOR trial could have resulted from a
23  protective effect of Naproxen?
24      A.  No.

Page 364

1      Q.  Did you believe that there were
2  three different interpretations of the
3  VIGOR study, if you just look at the VIGOR
4  study alone?  One was that Naproxen was
5  cardioprotective, two was that Vioxx caused
6  heart attacks, and three was both?
7      A.  I think you're referring to a paper
8  that I wrote with Dr. Graham and Dr. Ray
9  and Dr. McDonald and some others that was
10  a symposium that we had of the pharmacoepi
11  meetings.  And in that symposium, we kind
12  of laid out all the possible alternatives.
13          But I would think it would be
14  mischaracterizing it to say that we gave
15  them all equivalent weight.  It was more a
16  matter of saying what could have caused
17  this.  It could have been lower rates with
18  Naproxen, it could have been higher rates
19  with Vioxx, it could have been both.
20          But we then go on to say -- and we
21  can look at the document together if you
22  want -- that to believe that it was the
23  result of Naproxen would require assuming
24  that Naproxen had a cardioprotective effect

Page 365

1  that was unreasonably high and way better
2  than aspirin, which was implausible.
3      Q.  And your testimony is that you've
4  actually taken the position you just
5  stated, that it was implausible to think
6  that Naproxen explained the difference in
7  MIs in the VIGOR study, because for that
8  to be true, Naproxen would have to have a
9  cardioprotective effect that was
10  unreasonably high?
11      A.  Right.  And I think what's
12  important is to understand that in laying
13  out the possible explanations of the data,
14  as I did in that ISPE, I-S-P-E, symposium,
15  and I think on Science Friday on NPR, I
16  stated that there was the possibility that
17  Naproxen was the cause, and that that
18  might have been plausible except for the
19  fact that it would require a rate of
20  cardioprotection for Naproxen that was
21  higher than was seen.
22      Q.  When did you say that in the
23  Science Friday?  And what is Science
24  Friday?

Jerry Avorn, M.D.

Page 366

1    A.  It was some radio show.  And so I
2  think --
3    Q.  What station?
4    A.  BUR, here.  And I think a number
5  of us have said, as you just outlined, it
6  might have been the Naproxen, it might
7  have been the Vioxx, it could have been
8  both, but usually that was in the context
9  of -- but that would require assuming —
10  and the second piece is very important --
11  that Naproxen was this wonder drug that
12  prevents heart attacks.
13    Q.  Was it your view, sir, even in
14  2004, that looking at the VIGOR study
15  alone, you could not discern the extent to
16  which the difference in acute myocardial
17  infarctions could be explained by a
18  protective effect of Naproxen or an
19  increased risk with Vioxx?
20    A.  And just help me with -- What was
21  the beginning of the question?  In 2000 --
22    Q.  Mm-hmm.  Four.
23    A.  I'm sorry.  In 2004 did I say --
24    Q.  In 2004, sir, did you believe that

Page 367

1  if you look at the VIGOR study, you could
2  not discern the extent to which the
3  difference in heart attacks could be
4  explained by the protective effect of
5  Naproxen or an increased cardiovascular
6  risk with Vioxx?
7    A.  I don't recall saying that, because
8  in 2003 and in 2002, I had said that
9  Vioxx increases the risk of MI.
10    So I -- If you have a place where
11  I said that, I would love to see it.
12    Q.  Do you recall what paper in 2002
13  you wrote that Vioxx increases the risk of
14  MI?
15    A.  There was that pharmacoepi
16  symposium with Dr. Ray and Dr. Graham, and
17  I could try to dig that out.
18    There was also a paper that I wrote
19  Dr. Solomon, in which I remember we
20  referred to Dr. Ray's Lancet paper.  I
21  think it was -- It was -- There was one
22  in the Archives of Internal Medicine, and
23  we can try to dig that out -- or perhaps
24  you might even have that there -- in which

Page 368

1  I made that statement.
2    Q.  Did you ever conduct an
3  epidemiologic study NSAIDs, including
4  Naproxen, and conclude that the data that
5  you saw was consistent with a possible
6  protective effect of Naproxen?
7    A.  Yes.  A very modest protective
8  effect of about 15 percent.
9    Q.  And did you indicate that you felt
10  that the Naproxen cardioprotection was not
11  enough to explain the difference in heart
12  attacks in VIGOR?
13    A.  Correct.
14    Q.  Did you think, sir, back in the
15  2002 time frame, that Naproxen was
16  associated with a reduced rate of heart
17  attack which was suggested by the VIGOR
18  study?
19    A.  I don't believe --
20      MR. TISI:  Let me just
21  state an objection.  I don't understand
22  the question.  But go ahead, if you can.
23    A.  I don't believe that I ever cited
24  the VIGOR study as evidence for the

Page 369

1  cardioprotective effect of Naproxen.
2    Q.  Did you find, in your epidemiologic
3  study of NSAIDs, that Naproxen was
4  cardioprotective but other NSAIDs were not?
5    A.  Correct.
6    Q.  And what was your conclusion, as
7  best you can recall, sir, after conducting
8  that epidemiologic study concerning the
9  potential cardiovascular effects of Vioxx?
10      MR. TISI:  I have a copy of
11  the study.  Do you want to put it in
12  front of him, or do you want him to do it
13  from memory?
14      MR. GOLDMAN:  Feel free.
15    A.  There were really two studies,
16  while he's looking.
17    Q.  Mm-hmm.
18    A.  The first one was actually related
19  directly to the Vioxx -- the VIGOR
20  findings in that it was an attempt to see
21  whether patients taking Naproxen had a
22  dramatically lower rate of cardiovascular
23  effects, and Dr. Solomon was the first
24  author.  I think that was the one in the

93 (Pages 366 to 369)

Jerry Avorn, M.D.

Page 370

1   Archives of Internal Medicine.
2       (Witness viewing document).  Yeah.
3   Here it is. That was published in May of
4   2002.
5   Q.  Mm-hmm.
6   A.  And we reported a very modest 16
7   percent reduction in the risk of heart
8   attack in users of Naproxen.  And --
9       MR. TISI:  Here's a clean
10  copy.  I mean, this is a clean copy so
11  you don't --
12      THE WITNESS:  Okay.
13      BY MR. GOLDMAN:
14  Q.  Go ahead.
15  A.  All right.  And then in the
16  discussion section of that paper, we said
17  -- in fact, we even cited the Vioxx --
18  the VIGOR study, and we pointed out that
19  in VIGOR, the rates of an AMI at that
20  point we said fourfold higher in patients
21  taking Vioxx.  And again, in the matter
22  that I described a minute ago, we stated
23  that in kind of a logical possibilities,
24  that it could have been that Naproxen

Page 371

1   lowered the risk, Vioxx increased the
2   risk, or both.
3   Q.  Mm-hmm.
4   A.  And then we go on to say, to put
5   this in context, the reductions seen with
6   Naproxen in our study was not compatible
7   with the idea that it was responsible for
8   the difference in the rates in the VIGOR
9   study, because all we found was a 15
10  percent reduction, and you need to have an
11  80 percent reduction to achieve the
12  magnitude of reduction that was seen in
13  VIGOR.
14  Q.  How much of a reduction in -- I'm
15  going to talk about the extent of
16  Naproxen's cardioprotection in a minute.
17  Okay?
18  A.  Mm-hmm.
19  Q.  While Vioxx was on the market, were
20  there reputable scientists who wrote
21  articles saying that Vioxx -- Sorry.
22  Withdrawn.
23      During the time that Vioxx was on
24  the market, sir, were there reputable

Page 372

1   scientists who wrote articles saying that
2   the VIGOR results and the difference in
3   heart attacks could be explained by
4   Naproxen?
5   A.  Yes.
6   Q.  And do you know, sir, that there
7   was actually much controversy in the
8   medical community about whether the VIGOR
9   study could be explained by Naproxen or
10  Vioxx or both, right?
11  A.  Actually, no.  By reputable
12  scientists, I'm thinking of the editorial
13  that accompanied our paper, but it was
14  editorial without actual data of its own.
15      I cannot think a single study with
16  data -- cite a real study based on data
17  that reported evidence that Naproxen was
18  cardioprotective to the extent that would
19  have explained the difference in rates in
20  VIGOR.  So if there were such a study, I
21  would like to see it.  I don't think such
22  studies ever were written.
23  Q.  Do you remember, sir, whether or
24  not reputable scientists expressed their

Page 373

1   opinion in articles, peer- reviewed
2   articles, that they believed that Naproxen
3   could explain the difference in heart
4   attacks seen in the VIGOR trial?
5       MR. TISI:  Objection.
6   A.  I recall that -- I think it was
7   Dr. Dalen, who is the editor of the
8   Archives, wrote an editorial to that
9   effect.  How peer reviewed it was, I don't
10  know, since editorials are sometimes not,
11  and he was the editor who might have peer
12  reviewed himself.
13      So I'm aware of that, and I
14  remember being struck at the time with how
15  it didn't make sense to me that he could
16  argue that.  And I'm -- I can't think of
17  other reputable authors, certainly with any
18  data, that wrote that.  But there may have
19  been such people.
20  Q.  Do you agree, sir, that there was
21  much debate and controversy in the medical
22  community about whether the VIGOR study
23  could be explained?  And what I mean --
24  Withdrawn.

94 (Pages 370 to 373)

Jerry Avorn, M.D.

Page 374

1    Do you remember a debate in the
2   medical community and controversy about
3   whether the difference in heart attacks
4   seen in the VIGOR study was caused by
5   Vioxx or a cardioprotective effect of
6   Naproxen?
7        MR. TISI:  Objection; asked
8   and answered.
9     A.  Well, to tell you the truth, I
10   can't recall any vigorous debate.  I
11   recall most people that I spoke to saying,
12   how can you take a drug with either --
13   with both no evidence from clinical trials
14   that it is cardioprotective, that is
15   Naproxen, and with the only evidence from
16   an epidemiologic study showing a very
17   modest, around 15 percent, reduction, and
18   claim that that explains a four- or
19   fivefold difference in heart attack.
20      So I guess I don't recall that
21   there was all this so-called controversy
22   or debate.
23    Q.  Do you think it was fairly obvious
24   from the VIGOR study alone, sir, that

Page 375

1   Naproxen could not account for the
2   difference in heart attacks?
3        MR. TISI:  Objection to
4   form.
5     A.  I think it was fairly obvious from
6   the absence of any corroborating evidence
7   of any kind on the planet that Naproxen
8   was a majorly-cardioprotective drug.
9     Q.  So it's your testimony that it was
10   obvious, by reading the VIGOR study, that
11   Vioxx was harmful to the heart and
12   explained the difference in heart attacks
13   in that study, as opposed to Naproxen
14   being cardioprotective?
15        MR. TISI:  Objection.
16    A.  No.  That is not -- That is not
17   what I said.
18      What I said was, the data in VIGOR,
19   combined with the absence of any evidence
20   that Naproxen was cardioprotective to that
21   extent, made the contention
22   that this is all about Naproxen
23   implausible.
24    Q.  Was there discussion about the

Page 376

1   VIGOR trial and this increase in heart
2   attacks seen in the Vioxx arm in the lay
3   press?
4     A.  Was there controversy in the lay
5   press?
6     Q.  Mm-hmm.
7     A.  I don't know.
8     Q.  Was there discussion in the lay
9   press in the 2000, 2001, 2002 time frame
10   about the VIGOR trial and whether or not
11   Vioxx causes heart attacks?
12    A.  Yes.  And I know that Merck was
13   putting out a lot of information depicting
14   it as an Naproxen effect, and to the
15   extent that there was quote, controversy,
16   unquote, that would have been the sole
17   source of the controversy, to my
18   knowledge.
19    Q.  Was there a discussion in the lay
20   press, such as the New York Times and Wall
21   Street Journal, in the 2000 and 2002 time
22   frame, about whether Vioxx causes heart
23   attacks?
24    A.  Yes.

Page 377

1     Q.  Do you know that there was an
2   advisory committee meeting held in February
3   of 2001 to investigate the question about
4   what explained the difference in heart
5   attacks in the VIGOR trial?
6     A.  Yes.
7        MR. TISI:  Objection.
8   Mischaracterizes the scope.
9        BY MR. GOLDMAN:
10    Q.  Did you participate in the advisory
11   committee in February of 2001?
12    A.  No.
13    Q.  Were you invited to participate?
14    A.  No.
15    Q.  Are you aware that respected
16   doctors came to advise the FDA and review
17   the literature to make a recommendation
18   about what should be said about the VIGOR
19   trial?
20    A.  To advise the FDA about what should
21   be said about the VIGOR --
22        MR. GRAND:  Objection.
23        MR. TISI:  Objection;
24   misstates.

95 (Pages 374 to 377)

Jerry Avorn, M.D.

Page 378

1      BY MR. GOLDMAN:
2      Q.  Do you agree there were respected
3   scientists and doctors who participated in
4   the advisory committee meeting in February
5   of 2001?
6      A.  Yes.
7      Q.  Have you reviewed the transcript
8   and the conclusion -- Withdrawn.
9         Have you reviewed the transcript
10  from the 2001 advisory committee meeting?
11     A.  Yes.  I know that I've --
12  transcript.  Yes.
13     Q.  Do you know what the advisory
14  committee suggested to the FDA about what
15  to do in response to the VIGOR trial?
16        MR. GRAND:  Objection.
17     A.  I don't recall off the top of my
18  head.
19     Q.  Do you remember what the advisory
20  committee suggested about what Merck should
21  put in the package insert for Vioxx to
22  describe the VIGOR trial?
23     A.  Yes.  I remember --
24        MR. GRAND:  Objection.

Page 379

1      A.  I remember that at the advisory
2   committee there was discussion about the
3   fact that it would be inappropriate to
4   depict the results of VIGOR as being
5   primarily a protective effect of Naproxen.
6   I remember some folks said that.  I don't
7   think Dr. Nissen was one of the people
8   that made that statement.
9      Q.  In fact, the conclusion of the
10  advisory committee was that it's unknown
11  whether Vioxx causes heart attacks,
12  Naproxen prevents them, or a combination
13  of both, when interpreting the VIGOR
14  trial, right?
15        MR. TISI:  Objection;
16  mischaracterizes.
17     A.  If you would like me to respond to
18  that, I would need to look at the exact
19  statement.
20     Q.  There's no reason to think that the
21  advisory committee in February of 2001 was
22  biased in favor of Merck, was there, sir?
23     A.  Not to my knowledge.
24     Q.  You point out that in 2005, an

Page 380

1   advisory committee voted that Vioxx causes
2   heart attacks.  Do you remember that?
3      A.  Yes.
4      Q.  How many members of the advisory
5   committee in 2005 voted that Vioxx could
6   potentially come back in the market?
7         MR. GRAND:  Objection.
8         MR. TISI:  Objection.
9      A.  I'd need to look at the numbers.
10  I don't have that in my head.
11        But -- But I think the important
12  point there is that virtually none of them
13  said it should come back on the market as
14  it was before, and those who said it
15  should, in general, said that it should
16  come back only with either informed
17  consent by the patient, or a big black box
18  warning, or use in restricted populations.
19  And essentially none of them said yeah,
20  just bring it back like it was.  They all
21  had major caveats.
22     Q.  You don't remember what the vote
23  was about whether or not Vioxx could be
24  brought back on the market when the

Page 381

1   advisory committee met in 2005?
2      A.  I remember that virtually none of
3   them said it should come back without
4   major precautions.
5      Q.  Back in 2001, sir, did you read an
6   article that was published by Dr.
7   Mukherjee and Dr. Topol in JAMA?
8      A.  Yes.
9      Q.  Have you cited that article in
10  several of your own?
11     A.  I don't remember.
12     Q.  Did you think that Dr. Topol and
13  Dr. Mukherjee did an acceptable analysis
14  of the data that existed back at the time
15  concerning VIGOR?
16     A.  I believe they did.
17     Q.  Isn't it true, sir, there were many
18  scientists, actually, who questioned the
19  findings of Dr. Topol and Dr. Mukherjee
20  because the rates of acute myocardial
21  infarction from the aspirin studies that
22  Dr. Topol was looking, at were
23  exceptionally low?
24        MR. GRAND:  Objection.

96 (Pages 378 to 381)

Jerry Avorn, M.D.

Page 382

1    MR. TISI:  I think there's
2 a third author, as well, just to be clear
3 on the record.
4    A.   Okay.  I don't recall that.
5    Q.   Did you ever believe that the acute
6 myocardial infarction rates that were used
7 to compare Vioxx and Celebrex in the Topol
8 article were exceptionally low?
9    A.   I can't recall what I believed in
10 2001 about that.
11    Q.   In 2002, Dr. Avorn, were there four
12 studies that were published examining
13 whether Naproxen was cardioprotective?
14    A.   Well, I know that we published one
15 and -- You mean observational studies?
16    Q.   Yes.
17    A.   I know we published one, and there
18 were several others around that time.
19    Q.   Do you remember that the
20 four observational studies that were
21 published in 2002 showed that Naproxen
22 decreased heart attacks by 17 to 39
23 percent versus traditional NSAIDs?
24    A.   Well, ours was -- didn't even, I

Page 383

1 don't think, reach 17 percent, so I don't
2 know where that lower bound came from.
3 Ours was 16 percent.  And I don't -- And
4 I know that there were a number of studies
5 that found a very small cardioprotective
6 effect.  I don't remember a number as high
7 as 30 something percent, but it's
8 conceivable.  I would like to see that
9 paper before commenting on it.
10    Q.   Or papers, you mean?
11    A.   Well, yeah.  You're talking about
12 the upper bound of 30 something percent.
13    Q.   But you don't remember, as you sit
14 here today, whether there was a study
15 published by Dr. Watson in 2002 reporting
16 that Naproxen has a 39 percent reduction
17 in heart attacks?
18    MR. TISI:  Objection.
19    A.   That was Dr. Watson of Merck?
20    Q.   No.
21    A.   A different Dr. Watson.
22    Q.   I believe so.
23    A.   Okay.  I would like to see such a
24 study.

Page 384

1    Q.   Okay.  Maybe we'll look at it
2 later.
3    Did you talk -- Withdrawn.
4    In your epidemiologic study where
5 you said that there was a 16 percent
6 cardioprotective effect of Naproxen, did
7 you control for the dose that was used by
8 the population you studied?
9    MR. TISI:  Dose of?
10    MR. GOLDMAN:  Naproxen.
11    MR. TISI:  Naproxen.
12    A.   As I recall, it was an exposed, not
13 exposed analysis, rather than looking at
14 doses.
15    Q.   So in your study, when you
16 concluded that Naproxen had a 16 percent
17 cardioprotective effect, you were not
18 looking at patients who took Naproxen 500
19 milligrams twice a day, true?
20    A.   We were looking at the dose as it
21 was used in the population.
22    Q.   Is my statement true?
23    A.   There were people probably on that
24 dose, and there were people on other

Page 385

1 doses, too.  I'm trying to see whether we
2 specified the dose.
3    (Witness viewing document).  We did
4 control for dose in that we looked at the
5 potential -- the percent of maximum
6 anti-inflammatory dosage in Table 2, and
7 I'm just -- in an observational study, you
8 just study the doses as they were used.
9 And there were -- there were people on all
10 kinds of doses.
11    Q.   And my only point, Dr. Avorn, is
12 that when you analyzed Naproxen in your
13 epidemiologic study, you were not focused
14 solely on Naproxen 500 milligrams twice a
15 day, which was the dose that was used in
16 the VIGOR study, correct?
17    MR. GRAND:  Objection.
18    MR. TISI:  Objection.
19    A.   We focused on all the doses that
20 were -- that were being used.  There were
21 some people on that dose and there were
22 people on other doses.  We did not
23 distinguish between doses, and we did not
24 limit it to only one dose.

97 (Pages 382 to 385)

Jerry Avorn, M.D.

Page 386

1    Q.  You never studied a subgroup of the
2  patients who you observed in your
3  epidemiologic study to see of those
4  patients who took 500 milligrams of
5  Naproxen twice a day how much
6  cardioprotection did they get, right?
7    A.  Correct.
8    Q.  And you've never studied 500
9  milligrams of Naproxen twice a day to
10  determine the amount of cardioprotection it
11  affords, right?
12    A.  I'm trying to recall whether in our
13  most recent work, the paper that -- Well,
14  you said never.
15    Q.  Okay.
16    A.  The paper that Dr. Solomon and I
17  published in Arthritis and Rheumatism just
18  a month or two ago, I know we looked at
19  dose, and so I'd want to look at that
20  paper before saying never.
21    Q.  While Vioxx was on the market, Dr.
22  Avorn, did you ever publish any article
23  where you studied the cardioprotective
24  effect of Naproxen 500 milligrams twice a

Page 387

1  day?
2    A.  Not specifically.
3    Q.  In your study with Dr. Solomon in
4  2002, am I right that you couldn't control
5  for whether or not the patients who you
6  were studying took Naproxen every day?
7    A.  Correct.
8    Q.  Are you familiar with a study by
9  Van Hencken?
10    A.  The name doesn't ring a bell,
11  initially.
12    Q.  How about Tuleja?  Ever read a
13  study by him?
14    A.  Also does not ring a bell.
15    Q.  Is it true, sir, that the weight of
16  the evidence and the general pattern of
17  data subjects that Naproxen is good for
18  the heart?
19         MR. TISI:  Objection.
20    A.  I think a fairer way to say it is
21  that there are a number of studies which
22  depict, in general, a very modest
23  cardioprotective effect, and then there are
24  other studies which do not demonstrate

Page 388

1  that effect, and there are some studies,
2  such as Dr. Graham's, that even indicate
3  an increased risk.  I think that's the
4  fairest way of describing the data.
5    Q.  Do you deny that the weight of the
6  evidence and the general pattern of data
7  suggests that Naproxen is good for the
8  heart?
9         MR. GRAND:  Objection.
10         MR. TISI:  Objection to the
11  phrase "good for the heart."
12    A.  I think I would -- I think would
13  deny that, because it's a simplification
14  of the data.
15    Q.  Is Naproxen good for the heart?
16    A.  Not if by that you mean should you
17  take it to help your heart, no.  Would I
18  recommend Naproxen to somebody to help
19  their heart?  No.
20    Q.  Is it true that aspirin reduces the
21  risk of heart attacks to even a greater
22  extent in high risk patients?
23    A.  Yes.
24    Q.  Do you know, sir, is that there are

Page 389

1  multiple studies showing that aspirin can
2  be 50 to 60 percent cardioprotective in
3  high risk populations?
4    A.  That's a slightly higher number
5  than I'm aware of.  I think of more 25 to
6  45 percent.  But there could be such
7  studies.  I don't know.
8    Q.  Have you ever calculated, Dr.
9  Avorn, how much of a cardioprotective
10  effect Naproxen 500 milligrams twice a day
11  would need to have in order to make the
12  difference in heart attacks in the VIGOR
13  study not statistically significant?
14    A.  No.
15    Q.  During the time that Vioxx was on
16  the market, sir, were there reputable
17  scientists who said that Vioxx and COX-2
18  inhibitors in general could protect the
19  heart?
20         MR. TISI:  Objection.
21    A.  I'm not aware of that, but there
22  could have been.
23    Q.  Were you aware of any articles
24  published by reputable scientists while

98 (Pages 386 to 389)

Jerry Avorn, M.D.

Page 390

1  Vioxx was on the market which said that
2  Vioxx's anti-inflammatory properties might
3  actually slow down the progression of
4  arthrosclerosis and help stabilize plaque?
5  A.  Yes.
6  Q.  And that was a theory that actually
7  scientists were suggesting during the
8  entire time Vioxx was on the market, true?
9  A.  Right.
10  Q.  Did you subscribe to that theory?
11  A.  No.
12  Q.  Is it true, sir, that through the
13  third quarter of 2004, scientists were
14  saying that the COX-2 inhibitors might
15  prevent heart attacks?
16  A.  I don't recall seeing such papers.
17  Q.  Have you ever read a study about
18  Flurbiprofen, F-L-U-R-B-I-P-R-O-F-E-N?
19  A.  Yes.  I have seen studies of
20  flurbiprofen.
21  MR. TISI:  Can we go off
22  the record?
23  (Off the record at 5:07 p.m.)
24  (Discussion off the record).

Page 391

1  (On the record at 5:07 p.m.)
2  BY MR. GOLDMAN:
3  Q.  Do you know, sir, that in the
4  clinical study for Flurbiprofen there was
5  a cardioprotective effect that was similar
6  to the difference seen in the VIGOR trial
7  for heart attacks?
8  A.  I know there has been data on the
9  cardioprotective effect of Flurbiprofen,
10  and I don't recall the magnitude of that
11  effect.
12  Q.  During the time that Vioxx was on
13  the market, sir, were you aware of any
14  article or study suggesting that Vioxx
15  could cause plaque formation?
16  A.  Could cause plaque formation, no.
17  Cause plaque formation, no.
18  Q.  Are you aware of any article or
19  study during the time Vioxx was on the
20  market that suggested that Vioxx could
21  accelerate arthrosclerosis?
22  A.  There was the concern about
23  destabilizing plaque, which is a
24  manifestation of arthrosclerosis.

Page 392

1  Q.  I want to talk about destabilizing
2  plaque in a minute.
3  A.  Okay.
4  MR. GRAND:  Clarify what
5  type of study you mean.
6  BY MR. GOLDMAN:
7  Q.  Were there any articles or studies
8  published during the time that Vioxx was
9  on the market suggesting that Vioxx
10  accelerates the progression of
11  arthrosclerosis?
12  MR. TISI:  Objection.
13  A.  I'm not aware of any.
14  Q.  You mentioned plaque stability.  We
15  talked a minute ago about how there were
16  articles written by scientists while Vioxx
17  was on the market saying that Vioxx's
18  anti-inflammatory properties could actually
19  help stabilize plaque, right?
20  A.  Right.
21  Q.  And you're not aware of any article
22  or study that was written at the time
23  Vioxx was on the market suggesting that
24  Vioxx could cause plaque rupture, true?

Page 393

1  A.  I should say that my expertise is
2  not about clinical pharmacology papers --
3  Q.  Mm-hmm.
4  A.  -- and so whether I know or don't
5  know about a study isn't -- a clinical
6  pharmacology study isn't terribly
7  important.
8  Q.  Well --
9  A.  But I don't -- I focus more on
10  clinical events in humans.
11  Q.  Well, were there any studies in
12  humans, that you were aware of, sir, while
13  Vioxx was on the market suggesting that
14  Vioxx causes plaque rupture?
15  A.  I just don't know.
16  Q.  You've certainly never written, in
17  any of your articles, that you think Vioxx
18  causes arthrosclerosis or accelerates it,
19  right?  True?
20  A.  Right.
21  Q.  You may have answered this before,
22  and I apologize if you did.  At what
23  point, when Vioxx was on the market, do
24  you believe it was clear that Vioxx causes

99 (Pages 390 to 393)

Golkow Litigation Technologies - 1.877.DEPS.USA

Jerry Avorn, M.D.

Page 394

1 heart attacks?
2       MR. TISI: Objection. Asked
3 and answered, several times, actually.
4    A. But to say it again, because it's
5 important, in -- I believe it was March of
6 2000 when the -- when the first data for
7 VIGOR became available. For me, that was
8 a point at which it became clear that it
9 -- the drug increased the risk of heart
10 attack.
11    Q. Were there still questions about
12 whether Vioxx causes heart attacks as late
13 as December of 2003, in the medical
14 literature?
15    A. I'm sure there were people up until
16 the day the drug was withdrawn that were
17 writing articles questioning the risks of
18 Vioxx. I would not be surprised if -- In
19 fact, I know that scientists at Merck to
20 this day claim that Vioxx is safe in the
21 first 18 months. So we've been hearing
22 this, and we'll continue to hear it,
23 probably until 2008.
24    Q. Hopefully we won't be talking about

Page 395

1 it then.
2       Were there still questions about
3 whether Vioxx causes heart attacks as late
4 as December of 2003, sir?
5    A. When you say were there questions,
6 there were -- there may have been people
7 expressing doubt in the literature, but
8 there are people who are expressing doubt
9 about whether the theory of evolution is
10 correct. I don't think there was doubt in
11 my mind.
12    Q. On Page .12 of your report, sir,
13 you talk about a draft -- Withdrawn.
14       On Page .12 you mention that a
15 co-author of the VIGOR study suggested in
16 a draft that the study should report that
17 GI benefits should be balanced against the
18 risk of heart attack.
19    A. Can you show me where -- where on
20 the page?
21    Q. Okay. The first paragraph, the
22 last sentence.
23       MR. TISI: Page -- I'm
24 sorry, what page?

Page 396

1       MR. GOLDMAN: Page .12.
2    A. (Witness viewing document). Right.
3    Q. Is it your testimony, sir, that
4 there was a co-author of the VIGOR study
5 who thought that the study should say that
6 the GI benefits of Vioxx should be
7 balanced against the risks of heart
8 attacks?
9    A. That was my understanding from
10 reviewing that draft, yes.
11    Q. Why did you reference the draft and
12 the fact that the VIGOR study ultimately
13 did not include that statement?
14    A. Because there has been a lot of
15 concern about whether the VIGOR paper had
16 been massaged over its development to
17 depict the risks of Vioxx in a way than
18 was more favorable to the drug than would
19 be fair, and that this, along with all the
20 other instances that we can talk about,
21 such as attributing it to -- the heart
22 attack rate to the Naproxen,
23 cardioprotection, this was another example
24 of that kind of spin.

Page 397

1       And because, it turns out, that it
2 is vitally important that the drug's GI
3 benefits should have been balanced against
4 the risk of MIs, because the drug would
5 not have come out looking as well in that
6 balance.
7    Q. But in your analysis here, sir,
8 about this issue about a draft of the
9 VIGOR article, what you're doing is
10 comparing a draft to what ultimately was
11 printed by the New England Journal of
12 Medicine, right?
13    A. Correct.
14    Q. That doesn't take any expertise,
15 does it, sir?
16       MR. TISI: Objection.
17    A. Oh, it sure does. To be able to
18 speak about what was removed from the
19 article, from its original version, to
20 what was finally submitted, and when that
21 deals with the central issue of risk about
22 the drug, and whether this is a very
23 important omission, as it is, does require
24 expertise.

100 (Pages 394 to 397)

Jerry Avorn, M.D.

Page 398

1  Q.  Does it require expertise to look
2  at a draft of the VIGOR study and compare
3  it to the final study to see if a
4  sentence was deleted?
5  A.  Absolutely.  When that sentence
6  deals with the balancing of risks and
7  benefits, and that sentence is deleted in
8  a way so as to minimize the risk of the
9  drug, that is an important piece of the
10 story.
11 Q.  My question was:  Does it require
12 expertise to look at a draft of the VIGOR
13 study, compare it to the final study that
14 was published to see if a sentence was
15 deleted?
16 A.  Well, to understand the importance
17 of that deletion it does, yes.
18 Q.  You don't think a juror on their
19 own could understand the importance of
20 that deletion without your assistance?
21       MR. GRAND:  Objection.
22       MR. TISI:  Objection.  You
23 don't have to get in the mind of the
24 juror or the judge in making that

Page 399

1  decision, Dr. Avorn.
2  A.  I think that looking how a paper is
3  selectively spun from draft to draft so as
4  to maximize the depiction of benefit and
5  minimize the depiction of risk is vitally
6  important and does need to be interpreted
7  and put into context.
8  Q.  Why do you discuss the expression
9  of concern that the New England --
10 A.  Can you tell me where you're
11 referring to?
12 Q.  The third paragraph.
13 A.  Yes.
14 Q.  Why do you discuss the expression
15 of concern that was issued by the New
16 England Journal of Medicine?
17 A.  Because it dealt specifically with
18 my area of expertise, which is the
19 analysis of risk and of adverse events
20 caused by a drug, and because it was a
21 relatively extraordinary step taken by the
22 Journal which, in my memory is hardly ever
23 done, for them to indicate that the
24 depiction of risk of a drug in one of

Page 400

1  their papers was misleading.
2  Q.  Do you think that the expression of
3  concern and the response by the authors of
4  the VIGOR study and then the New England
5  Journal of Medicine's reply speak for
6  themselves?
7  A.  No.  Because a juror would not
8  understand that this is an extraordinary
9  statement unless they read the New England
10 Journal every week, which most jurors
11 don't.
12       For a journal to publicly criticize
13 authors of a paper of distorting risk
14 data, a typical juror would not understand
15 how unusual that is and how important it
16 is.
17 Q.  You don't think a juror would
18 understand the importance of allegedly
19 distorting data to the New England Journal
20 of Medicine?
21       MR. GRAND:  Objection.
22       MR. TISI:  Objection.  Asked
23 and answered.  He's given you an answer.
24 He's given you an answer.  You don't like

Page 401

1  it, but it's the answer.
2  A.  I think a typical juror would have
3  no way of knowing whether -- just like the
4  New York Times publishes corrections every
5  day, whether perhaps the New England
6  Journal publishes expressions of concern
7  every day, every week.
8  Q.  Do you know that Dr. Curfman has
9  given a deposition twice in this case?
10 A.  Yes.
11       MR. TISI:  Objection.  Asked
12 and answered.
13       BY MR. GOLDMAN:
14 Q.  Dr. Curfman knows a lot more about
15 the circumstances, as he sees them,
16 concerning the expression of concern than
17 you do, right?
18 A.  Yes.
19 Q.  And Dr. Curfman is capable of
20 explaining why the New England Journal
21 issued the expression of concern and how
22 rare or not that is, right?
23       MR. TISI:  Objection.
24 A.  Yes.

101 (Pages 398 to 401)

Jerry Avorn, M.D.

Page 402

1  Q.  Are you critical of Merck and the
2  non-Merck authors' decision not to inform
3  the New England Journal of Medicine of the
4  additional three heart attacks that
5  occurred after the prespecified cutoff?
6        MR. TISI:  Objection.
7  Assumes facts not in evidence.
8  A.  Yes, I am.
9  Q.  Did Merck inform the FDA in October
10 of 2000 about the additional three heart
11 attacks?
12 A.  Yes, they did.
13 Q.  Were the additional three heart
14 attacks, sir, included in the analysis
15 that the Food and Drug Administration did
16 in anticipation of the February 2001 Ad
17 Com?
18 A.  Yes, they were.
19 Q.  Were the Ad Com members who
20 participated in the 2001 Ad Com privy to
21 the fact that there were 20 heart attacks
22 in the Vioxx arm and four heart attacks in
23 the Naproxen arm of the VIGOR study?
24       MR. TISI:  Just for the

Page 403

1  record, Ad Com is advisory committee.  New
2  lingo for me.  Go ahead.
3  A.  They were aware of the data.  I
4  don't have the data in my memory.  But
5  that sounds right.
6  Q.  And it wasn't a secret that there
7  were 20 heart attacks in the Vioxx arm and
8  four heart attacks in the Naproxen arm,
9  because that was information that Dr.
10 Topol talked about in his article in
11 August of 2001, right?
12       MR. TISI:  Objection.
13 A.  It was a secret from the readers of
14 the New England Journal of Medicine, which
15 is the most influential medical journal in
16 the world.  So in that sense, it was a,
17 quote, secret.
18 Q.  Do you think that the authors of
19 the VIGOR study intentionally withheld
20 these three heart attacks so as to
21 downplay any potential cardiovascular risks
22 of Vioxx?
23 A.  I can't speak to the intention of
24 the authors.

Page 404

1  Q.  Do you agree, sir, that the
2  difference in heart attacks in the VIGOR
3  study was statistically significant based
4  on the 17 number that was reported to the
5  New England Journal?
6  A.  Yes.
7  Q.  And it remains statistically
8  significant when the true number was 20,
9  if you count the additional three heart
10 attacks, right?
11       MR. GRAND:  Objection;
12 misstates.
13 A.  But it was more -- It was -- It
14 was a greater difference than it was a
15 more significant difference.
16 Q.  Was the -- Is it your testimony,
17 sir, that the additional three heart
18 attacks in the VIGOR study is -- makes the
19 statistical significance of the difference
20 between Vioxx and Naproxen even greater?
21 A.  We would need to go back and look
22 at the P values for the different versions
23 of it, but the magnitude of the difference
24 was certainly greater.

Page 405

1  Q.  Well, in terms of evaluating the
2  statistical significance of 20 heart
3  attacks in Vioxx and four heart attacks in
4  Naproxen versus 17 heart attacks in Vioxx
5  and four in Naproxen, there really isn't
6  any real difference in terms of the P
7  value, right?
8        MR. GRAND:  Objection.
9        MR. TISI:  Objection.
10 A.  There are three people who had
11 heart attacks, and if you've ever known
12 anyone who had a heart attack, that's an
13 important clinical event, and the magnitude
14 of the difference was --
15 Q.  Did the relative risk change much,
16 if you look at the additional three heart
17 attacks?
18 A.  My impression was that it went up a
19 bit, yes.
20 Q.  You talk about a table that was not
21 included in the final manuscript for the
22 VIGOR article.  Do you remember that?
23 A.  Right.
24 Q.  Have you ever seen that table?

102 (Pages 402 to 405)

Jerry Avorn, M.D.

Page 406

1    A.  I believe I saw it in one of the
2  earlier -- I saw the headings for it, at
3  least, in the -- in the earlier draft.
4    Q.  Have you ever evaluated what was in
5  that table?
6    A.  I'm aware that the information from
7  it was for the most part representative of
8  the text in the later versions, but
9  there's an important difference, I think,
10  in whether something is a number in a text
11  versus numbers in a table.  I think tables
12  are much more salient.
13    Q.  Was there any substantive
14  information, sir, that was in the table in
15  -- that was not included in the VIGOR
16  publication --
17    A.  As I --
18    Q.  -- that was not in the text?
19    A.  As I understand it, nearly all of
20  the table data were in the text.  But as
21  I recall, there was maybe one or two
22  numbers -- but sitting here I can't
23  remember what they were -- that didn't
24  make it in the text.

Page 407

1    Q.  Do you know that the New England
2  Journal of Medicine limits the number of
3  tables you can include in an article?
4    A.  Yes.
5    Q.  Did you know that the peer
6  reviewers for the VIGOR publication told
7  the authors of the VIGOR publication that
8  they could only include five tables?
9      MR. TISI:  Objection.
10      MR. GRAND:  Objection.
11  Misstates the evidence.
12    A.  Usually that's not what a peer
13  reviewer would say.
14    Q.  Do you know whether a peer -- Well,
15  withdrawn.
16      Have you reviewed the comments by
17  all the peer reviewers of the VIGOR trial?
18    A.  I believe I've seen peer reviewers'
19  comments.  I can't say whether I've seen
20  every one of them.
21    Q.  Do you remember reading any
22  comments by a peer reviewer who asked
23  Merck to have only five tables in the
24  study?

Page 408

1      MR. TISI:  Objection.
2    A.  It's interesting that you describe
3  it as "asked Merck," because ostensively
4  this was a paper written by Dr.
5  Bombardier, but we all know that it was
6  really about asking Merck, and I don't
7  recall that specific request by a peer
8  reviewer.
9      MR. GOLDMAN:  Move to strike
10  as nonresponsive. I'm going to ask the
11  question again.
12      BY MR. GOLDMAN:
13    Q.  Do you remember whether the New
14  England Journal of Medicine asked the
15  authors of the VIGOR study to include five
16  tables for the VIGOR publication?
17    A.  I know that they will occasionally
18  say there are too many tables.  They will
19  often say limit it to X number, but leave
20  it up to the authors as to what is
21  included in the table and what isn't.
22    Q.  But you don't know the
23  circumstances about what the peer reviewer
24  said or didn't say about the number of

Page 409

1  tables that Dr. Bombardier should include
2  in his article?
3    A.  Her article.
4    Q.  Her article.
5    A.  Correct.
6    Q.  Are you aware, sir, that the New
7  England Journal of Medicine hired a public
8  relations firm to advise it on how to deal
9  with the VIGOR study?
10      MR. TISI:  Objection.  Time
11  frame.
12    A.  Do you mean recently in relation to
13  the current controversies --
14    Q.  Before --
15    A.  -- or back in 2000?
16    Q.  Before the New England Journal of
17  Medicine issued its expression of concern,
18  were you aware that they had hired a PR
19  company to advise it on how to deal with
20  the VIGOR study?
21    A.  I was aware that they have a PR
22  firm.
23    Q.  Did you know that the PR firm
24  advised the New England Journal of

103 (Pages 406 to 409)

Jerry Avorn, M.D.

Page 410

1 Medicine on when they should release the
2 expression of concern?
3     A.  I'm aware of that.
4     Q.  Do you know that the New England
5 Journal of Medicine released the expression
6 of concern the night before the jury in
7 the federal -- the first federal case
8 started deliberating?
9     A.  I'm aware of that.
10     Q.  Do you think that was appropriate,
11 sir?
12     A.  My understanding was that there was
13 concern that other information was going
14 to be released -- and again, I have not
15 followed this closely -- about this issue,
16 and they wanted to make sure that if other
17 information was released, their position
18 was out there at the same time.
19     Q.  Do you think it was appropriate for
20 the New England Journal of Medicine to
21 issue an expression of concern the night
22 before a jury started deliberating in the
23 first federal Vioxx trial?
24         MR. TISI:  Objection.

Page 411

1 Irrelevant.  But you may answer.
2     A.  It depends whether they were
3 issuing it in relation to the jury's
4 deliberation timing, or in relation to
5 other evidence coming out that they wanted
6 to get their position out about.  And I
7 can't know whether it was about the former
8 or the latter for the timing.
9     Q.  Do you know whether the ten
10 non-Merck authors on the VIGOR study
11 agreed with the New England Journal of
12 Medicine's criticisms of the VIGOR study?
13     A.  I know that in their response to
14 the expression of concern, they defended
15 what they had done.
16     Q.  Did you disagree with their
17 position?
18     A.  Yes.
19     Q.  In its entirety?
20     A.  There may have been things that
21 they said that they -- that I would not
22 disagree with.
23         What I specifically disagreed with
24 is that if adverse events come to light

Page 412

1 that an author is aware of, that there is
2 a responsibility to make sure that that is
3 included as fully as possible in the
4 paper, especially if the paper has still
5 not gone to press.
6     Q.  Did you know, prior to withdrawal,
7 that the VIGOR publication reported 17
8 heart attacks in the Vioxx arm, but that
9 there were really 20 in the VIGOR trial?
10         MR. TISI:  Objection.
11     A.  Did I know that prior to
12 withdrawal?
13     Q.  Yes.
14     A.  I don't see how I could have.  You
15 mean by virtue of going back to the FDA
16 Web site?
17     Q.  (Counsel nodded).
18     A.  No.  Most doctors are not -- or
19 even experts -- are not going to go back
20 and double-check numbers on the FDA Web
21 site that they've read in a Journal
22 article.
23     Q.  My question was whether you were
24 aware, prior to withdrawal, that there

Page 413

1 were actually 20 heart attacks in the
2 Vioxx arm and not 17.
3     A.  No.
4     Q.  Were you aware, prior to
5 withdrawal, that there was a five times
6 difference in heart attacks between the
7 Vioxx arm and the Naproxen arm?
8     A.  I think in the publication itself,
9 the relative risk of .2 would be a
10 fivefold difference.
11     Q.  You reference Dr. Scolnick's March
12 9th, 2000, e-mail --
13     A.  Yes.
14     Q.  -- on Page .12.  Why do you
15 reference that, sir?
16     A.  Because the company has taken the
17 position that it was unaware that the drug
18 imposed cardiovascular risk, and that the
19 findings from VIGOR, and later from
20 APPROVe, were surprising to them in that
21 they did not believe that their drug was
22 dangerous to the heart.
23         And it seemed relevant that Dr.
24 Scolnick, as early as March of 2000, wrote

104 (Pages 410 to 413)

Jerry Avorn, M.D.

Page 414

1　the cardiovascular events are clearly
2　there, this is real, and it is
3　mechanism-based as we worried it was,
4　which conveys a concern that the company
5　had had about the cardiovascular risk of
6　the drug even before the VIGOR study was
7　completed.
8　　　　And then going on about Oates and
9　Allen and Barry who write about the
10　metabolite meanings, that is, indicating
11　that the prostaglandin findings were
12　important to the riskiness of the drug.
13　Q.　Is it your position, sir, that it's
14　obvious from the March 9, 2000, e-mail
15　from Dr. Scolnick, that he believed that
16　Vioxx caused heart attacks, and that he
17　and others at Merck were worried that that
18　would happen?
19　A.　Okay.
20　　　　MR. TISI:　At that point in
21　time?　Are you asking what his state of
22　mind is now, or what his state of mind
23　was then?
24　　　　MR. GOLDMAN:　Then.

Page 415

1　A.　Okay.　This is an important point
2　that has come up a number of times, and
3　I'll try to explain it again.
4　　　　Whether or not Dr. Scolnick and the
5　others at Merck believed that more
6　patients given Vioxx in VIGOR would have
7　heart attacks than patients in VIGOR given
8　other drugs, does not require that they
9　have believed that their drug caused heart
10　attacks or whether they believed that the
11　reason was that other drugs prevented
12　heart attacks.
13　　　　The important point is, that if the
14　company was going to go on and spend a
15　hundred million dollars a year to convince
16　patients to take Vioxx, and many millions
17　of dollars more to convince doctors to
18　prescribe Vioxx, instead of Naproxen or
19　other drugs, that the clear result of that
20　would be that patients who were switched
21　to Vioxx, even if they just believed that
22　Naproxen was preventing heart attacks, that
23　they knew that use of Vioxx would result
24　in a net increase in the number of heart

Page 416

1　attacks in patients taking Vioxx instead
2　of taking another drug.
3　　　　And it does not matter as much
4　whether they attributed that to a
5　prothrombotic effect of Vioxx or even if
6　they believed there was an antithrombotic
7　effect of Naproxen.　The net result would
8　obviously be that people who were taking
9　Naproxen and were then persuaded by Merck
10　to take Vioxx or their doctors were
11　persuaded to prescribe Vioxx, would have
12　more heart attacks as a result of that
13　switch.
14　Q.　Did you just say that -- to try to
15　summarize -- that you believe Merck
16　expected there to be more heart attacks if
17　they switched or attempted to switch
18　patients from Naproxen to Vioxx?
19　A.　In clinical practice, yes.
20　Q.　Do you know that the patients who
21　are at risk of heart attacks were
22　encouraged to be on aspirin?
23　A.　By whom?
24　Q.　By their doctors.

Page 417

1　　　　MR. TISI:　In what?　Where.
2　A.　What patients?
3　Q.　Well --
4　　　　MR. TISI:　VIGOR clinical
5　practice?
6　　　　BY MR. GOLDMAN:
7　Q.　Do you know that Merck never took
8　the position that Vioxx was a substitute
9　for aspirin in terms of protecting the
10　heart?
11　A.　I've -- I've seen them say that
12　after VIGOR came out.　I don't recall
13　seeing that before.
14　Q.　When you say the important point is
15　not whether Merck believed that Vioxx
16　caused heart attacks or whether Naproxen
17　prevented heart attacks, the important
18　point is that the net results would mean
19　that there would be more heart attacks in
20　people taking Naproxen --
21　A.　In people taking Vioxx.
22　Q.　Sorry.　Let me start over.
23　A.　Okay.
24　Q.　When you say that the important

105 (Pages 414 to 417)

Jerry Avorn, M.D.

Page 418

1 thing is not whether Merck believed that
2 Vioxx caused heart attacks or Naproxen
3 prevented them but rather there would be
4 more heart attacks when people take Vioxx,
5 who is that important to?
6    A.   The public health.  In that, as I
7 read all of the documents, even if one
8 assumes, in the most generous possible
9 way, that there was not a hint of belief
10 on the part of anyone at Merck that their
11 drug could cause heart attacks -- and I'm
12 not indicating that I think that's the
13 whole story, but even if one assumes that
14 that's all that was going on -- they would
15 still need to have embraced the fact that
16 if they're then going to go out and try
17 and market this drug, in a way that was
18 more active than most any other drug has
19 ever been marketed, that that would
20 clearly result in people stopping what
21 they perceived to be cardioprotective drugs
22 and starting their drug, which they appear
23 to have acknowledged was less
24 cardioprotective.  And as a result -- and

Page 419

1 this is not rocket science -- they would
2 need to assume that, as was seen in VIGOR,
3 more patients would have heart attacks as
4 a result of that switch.
5    Q.   So now you're testifying about what
6 Merck's employees would have had to
7 assume?
8            MR. TISI:  Objection.
9    A.   No.
10           MR. TISI:  Objection.
11 That's not what he testified to, Counsel.
12 Come on.  That's unfair and ridiculous,
13 and you know that.
14    A.   I think -- What I'm trying to say
15 is that -- And this is -- this is not
16 engaging in really extended speculation.
17 If Drug A causes more heart attacks than
18 Drug B, and there's tons of people out
19 there taking Drug B, and the company makes
20 a concerted effort to get people to take
21 Drug A instead, and the evidence is that B
22 causes more heart attacks -- I'm sorry,
23 I've lost track of the letters, but you
24 know what I mean -- that the company's new

Page 420

1 drug will result in more patients having
2 heart attacks than the old drug they were
3 on, I have a problem with that.
4        Even if they believe that it was
5 taking away a cardioprotective drug and
6 replacing it with their drug, whatever the
7 mechanism, VIGOR clearly indicated that
8 patients taking Vioxx would have more
9 heart attacks than patients taking
10 Naproxen.
11    Q.   Do you believe that the mechanism,
12 sir, that was being advanced for how Vioxx
13 might cause heart attacks was common to
14 Celebrex and Bextra?
15    A.   I believe that that was a real
16 concern and still is.
17    Q.   Do you have a problem with the way
18 Pfizer marketed Celebrex and Bextra in
19 terms of attempting to persuade doctors to
20 prescribe Celebrex and Bextra over drugs
21 like Naproxen?
22    A.   For me, clinical outcomes in a
23 randomized trial are the most important
24 kind of evidence.  And I do not believe

Page 421

1 that Pfizer had, certainly in 2000, the
2 level of compelling clinical evidence about
3 Celebrex causing heart attacks comparable
4 to the data that Merck had and was
5 published in 2000 about Vioxx and heart
6 attacks.  So mechanism is less important
7 to me than actual results from a
8 randomized clinical trial.
9        And I feel that the burden of the
10 VIGOR data that Merck had was dramatically
11 different from whatever mechanistic worries
12 one might have had about Celebrex or
13 Bextra.
14    Q.   So your personal opinion is that
15 Merck's effort to market Vioxx was more
16 problematic than Pfizer's efforts to market
17 Celebrex?
18           MR. TISI:  Objection to the
19 personal opinion part.
20    A.   I would say my expert opinion,
21 given the risk data available to both
22 companies, indicates that Merck was
23 marketing a drug with a strong burden of
24 risk evidence from clinical trials that

106 (Pages 418 to 421)

Jerry Avorn, M.D.

Page 422

1  was not the case with Celebrex, and still
2  is not, and the data on Bextra did not
3  emerge for years later.
4      Q.  You refer in your report, sir, to
5  another e-mail from Dr. Scolnick where he
6  calls the FDA --
7      A.  Bastards.
8      Q.  Yes.  Do you remember that?
9      A.  Yes.
10     Q.  Why did you refer to that in your
11 report?
12     A.  Okay.  Why don't we go to where it
13 is.  Remind me what page it's on.  It was
14 in the Negotiations about the Label
15 section.
16     Q.  Twenty-three.  It's at 23, top
17 paragraph, the last sentence.
18     A.  (Witness viewing document).  Right.
19 Yes.  Because -- I think this is very
20 relevant to an assessment of the company's
21 willingness or unwillingness to depict the
22 cardiovascular risk of its drug in a fair
23 and accurate manner in the labeling.
24         And my reading of what FDA was

Page 423

1  proposing that Dr. Scolnick was responding
2  to, was that it was a fair and accurate
3  and helpful depiction of the true
4  cardiovascular risk of Vioxx, and Dr.
5  Scolnick's statement, and not just him
6  calling them bastards, but I think --
7  which is just bad manners -- but I think
8  more relevant, depicting that proposed
9  label as ugly cubed, and descriptions by
10 him and Mr. Anstice about fighting back
11 and the other materials that I cite, are
12 relevant because they depict a clear
13 pattern of resistance on the part of Merck
14 to the accurate depiction of the
15 cardiovascular risk of their drug in its
16 official FDA labeling.
17     Q.  You think that Dr. Scolnick's
18 reference to the FDA as bastards suggests
19 that he didn't want to accurately convey
20 the cardiovascular risks of Vioxx?
21     A.  As I said a minute ago, what is
22 more telling is not his bad language, but
23 the other quotations which I cite, in
24 which he and his colleagues depict the

Page 424

1  FDA's labeling, which in my view, fairly
2  describes the cardiovascular risk as ugly
3  and we will not accept this.
4          I think that's more relevant than
5  the bastards piece, which just indicates
6  the magnitude of his vehemence about this.
7      Q.  Do you know why Dr. Scolnick was
8  frustrated with the FDA over the label
9  negotiations?
10     A.  Part of it was that the company
11 wanted to win a label change that would
12 depict gastroprotection, and as I
13 understand it, FDA would not agree to that
14 until they were satisfied that there was a
15 more accurate depiction of the
16 cardiovascular risk.
17         And my understanding is that Merck
18 preferred to get the label changed to
19 reflect the favorable gastrointestinal
20 effects of the drug, but was not willing
21 to accept FDA's concurrent change of the
22 label to depict the cardiovascular risk
23 component.
24     Q.  What is your basis for saying that,

Page 425

1  sir?
2      A.  Various e-mails within Merck that
3  counsel has presented to me, in which the
4  company wanted to move along its changing
5  of the label, which was the whole reason
6  they did the VIGOR study, to get evidence
7  of Vioxx's lower gastrointestinal toxicity,
8  and the discussions about FDA's
9  unwillingness to change that label piece
10 until the risk piece was changed also.
11     Q.  Was your testimony a minute ago
12 based on anything else?
13     A.  Well, it was Dr. Scolnick's
14 deposition, which I read and it -- And
15 there were -- there were other statements
16 by other people within the company that
17 also wrote e-mails about -- there was
18 several chains of e-mails -- about the
19 labeling that I was able to see.
20         MR. GOLDMAN:  Why don't we
21 call it a day, and resume -- How early
22 can you start so we can end by 2:00?
23         MR. TISI:  Remember you've
24 asked him to do some things tonight, too.

107 (Pages 422 to 425)

Jerry Avorn, M.D.

Page 426

```
1            MR. GOLDMAN:  Yes.
2            (Deposition of JERRY AVORN, M.D.
3       suspended at 5:44 p.m.)
4       .
5       .
6       .
7       .
8       .
9       .
10      .
11      .
12      .
13      .
14      .
15      .
16      .
17      .
18      .
19      .
20      .
21      .
22      .
23      .
24      .
```

Page 428

```
1            CERTIFICATE
2       COMMONWEALTH OF MASSACHUSETTS
3            SUFFOLK SS.
4            I, SUSAN A. ROMANO, Certified Shorthand
5       Reporter No. 119393, Registered Merit
6       Reporter and Notary Public in and for the
7       Commonwealth of Massachusetts, do hereby
8       certify that the witness whose deposition
9       is hereinbefore set forth, was duly sworn
10      and that such deposition is a true record
11      of the testimony given by the witness.
12           I further certify that I am neither
13      related to or employed by any of the
14      parties in or counsel to this action, nor
15      am I financially interested in the outcome
16      of this action.
17           In witness whereof, I have hereunto set
18      my hand and seal this 19TH day of June
19      2006.
20      .
21      .
22
23
24           Susan A. Romano, Notary Public
```

Page 427

```
1            DESCRIPTION OF EXHIBITS
2       Exhibit  Description
3       1       Curriculum Vitae of Jerry Avorn
4       2       Expert Report prepared by Jerry
5       Avorn
6       3       Notice of Deposition in the New
7       Jersey Cases
8       4       Amended Notice of Deposition in the
9       Federal Cases
10      5       Letter of Additional Materials
11      Numbered 178 through 188
12      6       Excerpt of Testimony from the
13      Humeston Trial
14      7       Excerpts of David Anstice's
15      Testimony
16      8       May 1998 Board of Scientific
17      Advisors Meeting
18      9       Original Vioxx label
19      10      Table included in a Medical Study
20
21      .
22      .
23      .
24      .
```

Page 429

```
1       My commission expires April 21, 2006
2            CAPTION
3            The Deposition of Jerry Avorn, M.D.,
4       taken in the matter, on the date, and at the
5       time and place set out on the title page
6       hereof.
7            It was requested that the deposition
8       be taken by the reporter and that same be
9       reduced to typewritten form.
10           It was agreed by and between counsel
11      and the parties that the Deponent will read
12      and sign the transcript of said deposition.
13      .
14      .
15      .
16      .
17      .
18      .
19      .
20      .
21      .
22      .
23      .
24      .
```

108 (Pages 426 to 429)

Jerry Avorn, M.D.

Page 430

```
 1              .
 2                 DEPOSITION ERRATA SHEET
 3      .
 4      RE:        Jack Daniel Court Reporting
 5      File No.      2349
 6      Case Caption:   Gerald Barnett, et al. Vs.
 7                Merck & Co., Inc.
 8
 9      Deponent:      Jerry Avorn, M.D.
10      Deposition Date: June 15, 2006
11      To the Reporter:
12      I have read the entire transcript of my
13      Deposition taken in the captioned matter or
14      the same has been read to me. I request
15      that the following changes be entered upon
16      the record for the reasons indicated.  I
17      have signed my name to the Errata Sheet and
18      authorize you to attach to the original
19      transcript.
20      .
21      Page No.    Line No.    Change to:
22
23      Reason for change:
24      Page No.    Line No.    Change to:
```

Page 432

```
 1      Page No.    Line No.    Change to:
 2
 3      Reason for change:
 4          No changes made to the Errata Sheet
 5          I am returning this signed Errata
 6      Sheet with changes noted.
 7      Under penalties of perjury, I declare that I
 8      have read the foregoing transcript and that
 9      the facts stated in it are true.
10      SIGNATURE:            DATE:
11          Jerry Avorn, M.D.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 431

```
 1
 2          Reason for change:
 3          Page No.    Line No.    Change to:
 4
 5          Reason for change:
 6          Page No.    Line No.    Change to:
 7
 8          Reason for change:
 9          Page No.    Line No.    Change to:
10
11          Reason for change:
12          Deposition of Jerry Avorn, M.D.
13          Page No.    Line No.    Change to:
14
15          Reason for change:
16          Page No.    Line No.    Change to:
17
18          Reason for change:
19          Page No.    Line No.    Change to:
20
21          Reason for change:
22          Page No.    Line No.    Change to:
23
24          Reason for change:
```

109 (Pages 430 to 432)



Jun 26 2006
7:44PM

# Plaintiffs' Response re AVORN

# Exhibit 5D of 10

Jerry Avorn, M.D.

Page 433

1               UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
2             MDL DOCKET NUMBER:  1657
                   SECTION L
3
   In re:  VIOXX PRODUCTS LIABILITY LITIGATION
4   GERALD BARNETT AND CORRINE BARNETT,

5         Plaintiffs,

6     VS                    CIVIL ACTION NUMBER:
                             2:06cv485
7   MERCK & CO., INC.,

8         Defendant.
  -----------------------------------
9
                CONTINUING DEPOSITION OF
10
             JERRY AVORN, M.D.
11
               VOLUME II
12
            June 16, 2006
13               8:38 a.m.

14           Sheraton Boston Hotel
             39 Dalton Street
15         Boston, Massachusetts

16     Laurie J. Driggers, Notary Public, Certified Shorthand Reporter, Realtime Professional Reporter
17    and Certified Realtime Reporter within and for the Commonwealth of Massachusetts

18

19

20

21

22

23

24

Jerry Avorn, M.D.

Page 434

```
 1                APPEARANCES:.
 2         .
 3    ON BEHALF OF PLAINTIFFS:
 4    CHRISTOPHER V. TISI, ESQUIRE
 5    JENNIFER L. ORENDI, ESQUIRE
 6     Ashcraft & Gerel
 7     2000 L Street, N.W., Suite 400
 8     Washington, District of Columbia 20036
 9     202.783.6400
10     cvtisi@aol.com
11     jorendi@dc.ashcraftlaw.com
12         .
13    ON BEHALF OF DEFENDANT:
14    ANDREW L. GOLDMAN, ESQUIRE
15     Bartlit Beck Herman Palenchar & Scott LLP
16     54 West Hubbard Street, Suite 300
17     Chicago, Illinois 60610
18     312.494.4400
19     andrew.goldman@bartlit-beck.com
20         .
21         .
22         .
23         .
24         .
```

Page 435

```
 1       CONTINUING DEPOSITION OF JERRY AVORN, M.D.
 2                    VOLUME II
 3                  JUNE 16, 2006
 4                  PROCEEDINGS:
 5           JERRY AVORN, M.D., the deponent,
 6      having been satisfactorily identified and
 7      duly sworn by the Notary Public, was
 8      examined and testified as follows:
 9           EXAMINATION
10      BY MR. GOLDMAN:
11      Q.  Good morning, Dr. Avorn.
12      A.  Good morning.
13      Q.  Yesterday I asked you to try to get
14   me some answers on a few questions.  Did
15   you attempt to do that last night?
16      A.  Yes, I did.  Whoops.
17      Q.  Can you tell me the list of animal
18   studies that you think show a potential
19   cardiovascular problem with Vioxx that were
20   published before Vioxx was approved?
21      A.  Yes.  I have them written down
22   here.  I can give you the citation and
23   then pull out the document.
24         One is Murata, M-U-R-A-T-A, et al.,
```

Page 436

```
 1    from Nature 1997.  Another is Adderly,
 2    A-D-D-E-R-L-Y, et al., from the Journal of
 3    Biological Chemistry in 1999.  And the
 4    third is Shinmura, S-H-I-N-M-U-R-A, et al.,
 5    and that was in the proceedings of the
 6    National Academy of Sciences.
 7         The paper came out in 2000, but I
 8    believe there was an abstract presented in
 9    1999.
10      Q.  Is that the universe of animal
11    studies you're aware of, sir, that you
12    believe show an increase or a potential
13    cardiovascular risk with Vioxx preapproval?
14      A.  That's the universe that I was able
15    to identify between last night and this
16    morning.
17      Q.  Can you tell me all of the studies
18    that you believe show an increased risk of
19    stroke from Vioxx that existed while Vioxx
20    was on the market?
21      A.  I'm sorry.  I thought the question
22    was preapproval.  Maybe I got the question
23    wrong.
24      Q.  I -- Withdrawn.
```

Page 437

```
 1         My question yesterday, actually,
 2    Dr. Avorn, was whether you were aware of
 3    any clinical trials showing an increased
 4    risk of stroke with Vioxx at any point
 5    while Vioxx was on the market?
 6      A.  Okay.  I erroneously looked for
 7    preapproval evidence of stroke, and found
 8    that in all -- in the data that was
 9    reviewed by FDA, stroke -- in Pelayo's
10    report, stroke had been folded into
11    cardiovascular outcomes, and -- and was
12    not separated out uniquely.
13         I'm sorry if I misunderstood the
14    question about prior to withdrawal as
15    opposed to prior to approval.  I can go
16    back and try to get that information for
17    you.
18      Q.  As you sit here today, Dr. Avorn,
19    are you aware of any clinical trials that
20    show an increased risk of stroke with
21    Vioxx at any point while Vioxx was on the
22    market?
23      A.  I would want to go back and look
24    at the ADVANTAGE trial and the Alzheimer's
```

2 (Pages 434 to 437)

Jerry Avorn, M.D.

Page 438

1   studies and others of the osteoarthritis
2   and RA studies. And I apologize for not
3   having done so, because I misunderstood
4   the question.
5       Q. What I'm going to do is mark as
6   the next exhibit, then, 11, a blank
7   document.
8       A. Mm-hmm.
9       Q. And if you could, after this
10  deposition, find any studies that you
11  think show an increased risk of stroke --
12      A. Okay.
13      Q. -- while Vioxx was on the market,
14  and then if you could just please let Mr.
15  Tisi know --
16      A. Right.
17      Q. -- and then we will make sure that
18  your list --
19          MR. TISI: I've never seen
20  this quite done this way, but I will --
21  Let's -- That's fine.
22          MR. GOLDMAN: -- put it on
23  Exhibit 11.
24          THE WITNESS: That's fine.

Page 439

1           MR. TISI: I'll take Exhibit
2   11 and we'll --
3       And were we successful in getting
4   all those materials that were photocopied
5   back?
6           MR. GOLDMAN: Yes.
7           MR. TISI: Okay. Good. So
8   I'll be able to take those back or get
9   them back to you.
10          (Exhibit-11, Studies That
11  Show An Increased Risk of Stroke,
12  Published During The Time Vioxx Was On The
13  Market, marked for identification).
14          MR. GOLDMAN: I'm going to
15  label Exhibit 11 Studies That Show An
16  Increased Cardio -- sorry -- An Increased
17  Risk of Stroke Published During the Time
18  Vioxx Was on the Market.
19          MR. TISI: And just to be
20  clear, I'm not -- I am not agreeing to
21  produce an exhibit this way. I will think
22  about it, because I've never seen it done
23  this way, whether I would just provide it
24  as a supplement or have an exhibit made

Page 440

1   like this. But I -- I accept that you
2   can mark any exhibit you want.
3           BY MR. GOLDMAN:
4       Q. And to be clear, Dr. Avorn, I don't
5   want the plaintiffs' lawyers to go search
6   the planet to try to find --
7       A. Of course.
8       Q. -- a study. I want it based on
9   the work you've done in formulating your
10  opinions and testifying that you believe
11  there's an increased risk of stroke. I
12  would appreciate if you could do that,
13  okay?
14          MR. TISI: And I will agree
15  that that's the way it's to be done.
16          BY MR. GOLDMAN:
17      Q. Do you know of any clinical trial
18  that showed a doubling of the risk of
19  cardiovascular events from Vioxx before the
20  APPROVe study?
21      A. Yes. And that is derived also from
22  Dr. Pelayo's, P-E-L-A-Y-O, 1999 review of
23  the new drug application for Vioxx. There
24  is a table in it which I can pull right

Page 441

1   now.
2       (Witness viewing documents).
3           MR. TISI: And would that
4   have been the preapproval or post? I
5   don't remember what your question was.
6   I'm sorry.
7           MR. GOLDMAN: At any point
8   Vioxx was on the market.
9           MR. TISI: Any point Vioxx
10  was on the market.
11      A. Okay. Then was I, because it was
12  a long day, just mishearing that as at any
13  time prior to approval as well, and I
14  misheard it? Because you apparently
15  didn't say that yesterday. Is that --
16      Q. Okay. Let me ask it both ways.
17      A. Maybe we can just go back and look
18  at what the wording was.
19          MR. TISI: I think you
20  testified, Jerry. I mean, I don't want --
21          BY MR. GOLDMAN:
22      Q. Let's start with preapproval
23  then --
24      A. Right.

3 (Pages 438 to 441)

Jerry Avorn, M.D.

Page 442

1  Q.  -- and we can go to the next
2  question.
3  A.  And we can review what the question
4  was, if we've got the transcript from
5  yesterday, just to see if I misheard that.
6  Q.  Before Vioxx was approved for use
7  in the United States, sir, can you point
8  to any study that showed an increased
9  cardiovascular risk with Vioxx?  And I
10  believe you said a doubling of the risk.
11       MR. TISI:  I'm just going
12  to object, because I think we covered this
13  yesterday.  But go ahead.
14  A.  Okay.  To be accurate about my
15  recollection of it, the doubling --
16  Q.  Mm-hmm.
17  A.  -- was a description of the finding
18  from APPROVe.  And I believe that it was
19  you who put the doubling concept into the
20  question, rather than me.  But that's
21  fine.  Because there was a substantial
22  increase and in some cases a doubling.
23       And I think we talked about this
24  yesterday when we were going over table --

Page 443

1  I believe it was 52, in -- yes, in Dr. --
2  No.  This is Dr. Villalba's -- I'm sorry,
3  it's Dr. Villalba's report,
4  V-I-L-L-A-L-B-A, review of the new drug
5  application.
6       MR. TISI:  And since there
7  were numerous Villalba reports, can you
8  give the date of that?
9       THE WITNESS:  Yes.
10       MR. TISI:  Because there
11  were numerous ones.
12       THE WITNESS:  Let me just
13  go to the beginning of it.
14       MR. TISI:  I'm sorry.
15       THE WITNESS:  It's all
16  right.
17       MR. TISI:  Actually, just
18  for the record, it's Tab 175 in your
19  binder.
20       THE WITNESS:  Right.  And I
21  can -- It was 1999.  I can get the
22  exact --
23       MR. TISI:  That's okay.
24  A.  Okay.  It is -- The review date

Page 444

1  says December '98 through May of '99.
2  Q.  Okay.
3  A.  Okay.  And it is Table 52.  And as
4  I believe we covered yesterday, it
5  describes thromboembolic adverse events.
6  Q.  Yes.  You did describe it
7  yesterday.
8       Do you have anything to add other
9  than what you talked about yesterday
10  concerning the preapproval studies and
11  whether they show an increased
12  cardiovascular risk with Vioxx?
13  A.  No.  Concerning preapproval, that's
14  what I have.
15  Q.  Okay.  Now, let's go to the broader
16  question, and if there was a
17  misunderstanding, then I apologize.
18  A.  Okay.
19  Q.  So let me just ask you:  Based on
20  your review of the materials before you
21  issued your expert report, okay?
22  A.  Yes.
23  Q.  What clinical trials do you believe
24  show an increased cardiovascular risk with

Page 445

1  Vioxx before the APPROVe study?
2  A.  Okay.  And that would include
3  VIGOR, ADVANTAGE, and there were others
4  whose protocol numbers I don't have in
5  mind.  I think 090 sticks in my mind as a
6  protocol number.  But since I haven't
7  memorized all the protocol numbers, that's
8  something that I would go back and provide
9  specific protocol numbers for you.
10       I was looking and thinking that the
11  question was about pre -- I think the
12  confusion was, you may have said pre
13  APPROVe, and I may have heard that as
14  preapproval.
15       So I can give you other protocol
16  numbers besides VIGOR, ADVANTAGE and O90,
17  if you want, subsequent to today.
18  Q.  Sure.  In fact, what we'll do, on
19  Exhibit 11, is just have another part that
20  says Clinical Trials Before APPROVe --
21  A.  Why don't you say "The APPROVe
22  study," just to keep us from getting
23  confused again.
24  Q.  Okay.  So on Exhibit 11, I added,

4 (Pages 442 to 445)

Jerry Avorn, M.D.

Page 446

1    "These are your opinions now of clinical
2    trials before the APPROVe study that show
3    an increased cardiovascular risk from
4    Vioxx," okay?
5        A.   Good.
6        Q.   And you said VIGOR, ADVANTAGE, 090
7    and whatever else you want to add after
8    the deposition, okay?
9        A.   Correct.
10           MR. TISI:  And again, the
11   same qualified objection.  Go ahead.
12           BY MR. GOLDMAN:
13       Q.   The ADVANTAGE study, sir, did that
14   show an increased risk with Vioxx for
15   strokes?
16       A.   Let me pull the ADVANTAGE study and
17   take a look.  I -- If you have it there
18   and want to present it to me --
19       Q.   Sure.
20       A.   -- that would speed things up.
21   Thank you.
22           MR. TISI:  You're handing
23   him the published study, right?
24   ///

Page 447

1            BY MR. GOLDMAN:
2        Q.   I'm handing you the published study
3    of ADVANTAGE.
4            MR. TISI:  I want to make
5    sure what you're handing him.
6            MR. GOLDMAN:  Okay.
7            MR. TISI:  I mean, we're
8    not handing him the CSR, we're not handing
9    him the medical records to review or
10   anything -- nothing.
11           BY MR. GOLDMAN:
12       Q.   I'm handing you the peer-reviewed
13   published article on the ADVANTAGE study.
14       A.   (Witness viewing document).  Okay.
15   And the question was, is there evidence of
16   an increased risk of stroke in the
17   ADVANTAGE study?
18       Q.   Yes.
19       A.   I cannot see any --
20           MR. TISI:  No.  I think it
21   was -- I think he asked stroke.  You had
22   asked cardiovascular.
23           MR. GOLDMAN:  No.  We're on
24   the same page.

Page 448

1            MR. TISI:  Okay.  Objection.
2            BY MR. GOLDMAN:
3        Q.   Dr. Avorn, when you look at the
4    risk of thrombotic events in the ADVANTAGE
5    study, do you agree, sir, that there is no
6    statistically significant increased risk
7    associated with Vioxx?
8        A.   One problem I have with working
9    from the published version that I know was
10   that there were issues about adjudication
11   of endpoints in a number of the trials
12   that FDA received --
13       Q.   Mm-hmm.
14       A.   -- from -- from Merck.  And I
15   recall clearly that when -- that FDA felt
16   that it had to readjudicate outcomes in a
17   number of the trials.
18       Q.   Mm-hmm.
19       A.   And as I recall, in nearly all of
20   those instances FDA staff readjudicated
21   outcomes and found outcomes that were
22   cardiovascular adverse events in the Vioxx
23   group that Merck scientists had not found
24   to be cardiovascular events.  And I

Page 449

1    believe I recall that the differences also
2    went in the other direction.
3            And so I would like to first look
4    at my report where I discuss that, and
5    secondly, I would want to go back to
6    another version, because there has been
7    this persistent issue of FDA finding, when
8    its scientists looked at outcomes, more
9    events in Vioxx than Merck reported there
10   to be.
11       Q.   Dr. Avorn, in your study -- I'm
12   sorry -- in your report on Page .14, you
13   talk about the ADVANTAGE study --
14       A.   Yes.
15       Q.   -- at the bottom --
16       A.   Yes.
17       Q.   -- right?
18       A.   Right.
19       Q.   And then you continue on Page .15
20   to talk about it, right?
21       A.   Right.
22       Q.   Do you indicate, sir, anywhere in
23   your report that the ADVANTAGE study
24   reflects an increased risk of thrombotic

5 (Pages 446 to 449)

Jerry Avorn, M.D.

Page 450

1  events from Vioxx?
2     A.  That's what I want to review.
3        (Witness viewing document.)  Yes.
4  This is exactly the point that I was going
5  to make.
6     Q.  Mm-hmm.
7     A.  In my report I indicate that there
8  was the question that we discussed
9  yesterday of at least one instance of
10  reassignment by Merck of one probable
11  cardiac death to unknown cause, and to
12  read from my report:  When FDA used a
13  more comprehensive outcome definition of
14  serious coronary heart disease and
15  readjudicated these outcomes, it found a
16  relative risk of 3.2 for Vioxx use.
17     Q.  My question, Dr. Avorn, was about
18  thrombotic events, not about a new
19  category of serious coronary heart disease,
20  okay?  You understand the difference?
21     A.  Well, thrombotic event would be a
22  subset of serious thrombotic -- serious
23  cardiac heart disease.
24     Q.  Do you say in your report, sir,

Page 451

1  that there is an increased risk seen for
2  thrombotic events in the ADVANTAGE study?
3     A.  I would need to look at the report
4  that FDA produced and to look at its
5  definition of serious coronary artery
6  disease which would of course include
7  thrombotic cardiovascular events.
8     Q.  Did you -- I'll ask one more time
9  -- indicate in your report that there was
10  an increased risk in thrombotic events
11  seen in the ADVANTAGE study?
12     A.  All right.  We only -- I will need
13  to repeat that one can play games in a
14  counterproductive manner by using terms
15  such as thrombotic events versus serious
16  coronary heart disease versus myocardial
17  infarction, all of which are intersecting
18  circles which describe similar but related
19  events.
20        If you want, we can stop and I can
21  go back to the FDA's adjudication and see
22  what they considered a serious coronary
23  heart disease event.  But I can assure you
24  that clinically, a thrombotic

Page 452

1  cardiovascular event is going to have
2  heavy overlap with a serious coronary
3  heart disease event.
4     Q.  Are there other events that would
5  be considered part of coronary heart
6  disease events that are not thrombotic in
7  nature?
8     A.  I would need to look at what FDA
9  meant when it used its term "serious
10  coronary heart disease," because many of
11  these are terms that can vary with exactly
12  what one includes.
13        But frankly, in any kind of
14  realistic terms, heart attack, serious
15  coronary heart disease, major thrombotic
16  coronary event all describe pretty much
17  the same thing, although there may be some
18  small differences in the definitions.
19     Q.  At a break maybe we can look at
20  the FDA analysis, because I have to move
21  forward.
22        MR. TISI:  Actually, I have
23  it if you want to --
24        MR. GOLDMAN:  Okay.

Page 453

1        MR. TISI:  I have it right
2  here if you want to --
3        MR. GOLDMAN:  Let's do it
4  at a break.
5        MR. TISI:  Sure.
6        THE WITNESS:  You mean off
7  the record?
8        MR. TISI:  No.  We can do
9  it on break.  I had it.  I was trying to
10  speed things along.
11     A.  All right.
12     Q.  Dr. Avorn, you remember yesterday
13  we were talking about a number of
14  documents written by Dr. Scolnick or Dr.
15  Musliner or Dr. Reicin, internal Merck
16  documents that you're relying on for your
17  opinions, right?
18     A.  Yes.
19     Q.  Am I right, sir, that you don't
20  have any personal knowledge of the facts
21  described in those documents; you're just
22  relying on those documents, true?
23     A.  Correct.
24     Q.  Okay.  In the Materials Considered,

6 (Pages 450 to 453)