Jerry Avorn, M.D.

Page 454

1    which is Exhibit 5, sir --
2        A.  Mm-hmm.
3        Q.  -- if you wouldn't mind looking at
4    that.
5        A.  Got it.
6            (Witness viewing document).
7        Q.  Am I right that you don't indicate
8    anywhere in there that you're relying on
9    Dr. Ray's expert report?
10       A.  I have, indeed, read Dr. Ray's
11   report --
12       Q.  Mm-hmm.
13       A.  -- and been impressed by it.  And
14   I believe that my awareness of Dr.
15   Kronmal's analysis of the Alzheimer's data
16   was as it was reported in Dr. Ray's
17   report, as well as -- I think that was my
18   primary awareness of Dr. Kronmal's data.
19           So, yes, I did read it.  I did
20   take it seriously, and it did inform me
21   about the Kronmal evaluation of the
22   Alzheimer data.
23       Q.  As I understand your testimony, Dr.
24   Avorn, you are relying on a portion of Dr.

Page 455

1    Ray's expert report where he describes an
2    analysis that was conducted by another
3    plaintiff's expert witness, Dr. Kronmal?
4        A.  That's correct.
5        Q.  I'm right, though, sir, that you
6    don't identify and the plaintiffs' lawyers
7    in this case didn't identify either Dr.
8    Ray's report or Dr. Kronmal's report on
9    the list of materials you considered in
10   forming your opinions?
11       A.  Okay.  The list was prepared by
12   plaintiffs' counsel, and --
13       Q.  I can represent to you I've looked
14   at it, and there's no reference to Dr. Ray
15   or Dr. Kronmal.
16       A.  No, I understand that.  But I'm
17   saying having not prepared this list, I'm
18   telling you that I did read and believe
19   Dr. Ray's expert testimony.  And if it was
20   not listed as a report transmitted to me,
21   I think that was an omission by counsel.
22       Q.  Because there's no reference in Dr.
23   Avorn's report to Dr. Ray's analysis or
24   Dr. Kronmal's analysis of the Alzheimer's

Page 456

1    data, and that was not disclosed in any of
2    the materials considered, we're going to
3    object to any testimony in your trial
4    deposition about either of those subjects,
5    okay?
6        A.  That's a legal issue.
7            MR. TISI:  That's between
8    you and me.  You can't ask him.
9            MR. GOLDMAN:  Okay.  And
10   let me also note for the record that I've
11   spoken with Chris -- I'm sorry -- Charlie
12   Cohen, and he doesn't have any record of
13   receiving a letter dated June 8th from the
14   Seeger Weiss firm indicating some
15   additional materials that were sent to Dr.
16   Avorn.  I understand, Chris, that you
17   all --
18           MR. TISI:  We have a
19   signed --
20           MR. GOLDMAN:  -- have a
21   signed copy, and you believe it was sent.
22   I'm just telling you that for the record,
23   I wasn't provided with it, and Charlie
24   doesn't have a record of receiving it.  So

Page 457

1    I think that's going to be sorted out
2    afterwards.
3            MR. TISI:  Yeah.  We'll
4    probably have to just sort it out.  I
5    mean, I just -- It is what it is.  There
6    are a handful of documents, they're not
7    complicated, so I think you'll have an
8    adequate opportunity to take -- to take a
9    look at them.  They're not documents
10   you've not seen before.  Go ahead.
11           THE WITNESS:  I'm listening.
12   I'm just getting a cup of coffee.
13           BY MR. GOLDMAN:
14       Q.  Okay.  You didn't review any of the
15   expert reports that have been submitted by
16   Merck expert witnesses, did you, sir?
17       A.  I don't believe I have.
18       Q.  If you look on the first page of
19   Exhibit 5, you see that there's a number
20   of items there that were not included on
21   your original Materials Considered?
22       A.  (Witness viewing document).  Yes.
23       Q.  I just want to establish that those
24   are materials that you didn't review

7 (Pages 454 to 457)

Jerry Avorn, M.D.

Page 458

1  before that you wrote your report but that
2  you are relying on because you've reviewed
3  them since? Is that the situation?
4      A.  I have no way of knowing whether
5  these were added by counsel because they
6  were omitted in error from what was sent
7  originally, or whether this implies that
8  they were sent subsequently.
9      Q.  Can I look at the list for one
10  second?
11     A.  (Witness complied).  Sure.
12         MR. TISI:  I can make a
13  representation, if you wish.
14         MR. GOLDMAN:  Well, let me
15  just ask Dr. Avorn first.
16         MR. TISI:  Go ahead.
17  BY MR. GOLDMAN:
18     Q.  Prior to issuing your report, Dr.
19  Avorn, did you read the FDA 's medical
20  officer review --
21     A.  Yes.
22     Q.  -- of Vioxx?
23     A.  Yes.
24     Q.  Prior to issuing your report, did

Page 459

1  you read the New England Journal of
2  Medicine's "Expression of Concern" and
3  reaffirmance?
4      A.  Yes.
5      Q.  Prior to issuing your report, did
6  you read the section from the Federal Code
7  of Regulations, 21 CFR Section 201.57(e)?
8      A.  Is that the one about duty to warn?
9      Q.  Do you know?
10     A.  Well, I know that I've read the
11  duty to warn section.
12         MR. TISI:  I have that
13  right in front of me if you want me to
14  show you the --
15         MR. GOLDMAN:  Well, he may
16  not know the number.
17     A.  Yeah.  I've read the duty to warn
18  section of 21 CFR many times over the
19  years, and if that's that particular
20  number, then, yes, I have read it before
21  my report.
22     Q.  Did you read the transcript of the
23  Arthritis Advisory Committee meeting from
24  February 8th of 2001, before you issued

Page 460

1  your report?
2      A.  Yes.
3      Q.  Okay.
4      A.  So it looks as if this was not
5  materials sent to me after my report but
6  material they had failed to list earlier.
7         MR. TISI:  And I can
8  represent, just so that there's clarity of
9  the record, all of these were provided to
10  him before.  It was our initial omission,
11  which we caught when we were preparing.
12         The only documents that were not
13  were obviously the supplemental APPROVe
14  data, which wasn't available at the time
15  of his report.
16         MR. GOLDMAN:  I'm just going
17  to mark for the record the expert report
18  of Dr. Ray that you had in your file,
19  sir.  It's dated January 11th of 2006, and
20  was submitted in the Plunkett case.
21         (Exhibit-12, Expert Report
22  of Dr. Ray dated January 11, 2006, marked
23  for identification).
24  ///

Page 461

1         BY MR. GOLDMAN:
2      Q.  My only question about this, sir,
3  has to do with a reference on one of Dr.
4  Ray's references.  It really has nothing
5  to do with his report, okay?
6      A.  Okay.
7      Q.  You wrote the word zodiac?
8      A.  I wrote?  Oh, okay.  You mean my
9  notes -- My notes, right.
10     Q.  There's an indication on the last
11  page of the report where you're just
12  listing references, and you wrote the
13  reference to zodiac next to Reference 83,
14  which is an article in JAMA from 1991
15  called Analysis and Interpretation of
16  Treatment Effects in Subgroups of Patients
17  in Randomized Clinical Trials.
18     A.  Yes.
19     Q.  Can you tell me, number one, what
20  that issue is about, and number two, why
21  you wrote zodiac?
22     A.  Sure.  Let me take a look.
23         (Witness viewing document).  Sure.
24  That's a very interesting paper that I

8 (Pages 458 to 461)

Jerry Avorn, M.D.

Page 462

1    think I flagged just because it's one of
2    my favorite papers and I wanted to make a
3    note of its relevance to this case.
4        As I recall that paper, it looked
5    ·at the use of subgroup analysis, and
6    pointed out that in one very big clinical
7    trial, if one were to do a post hoc
8    subgroup analysis -- if this is the
9    correct paper I'm thinking of -- if one
10   were to do a subgroup post hoc analysis,
11   you could demonstrate that the given
12   treatment was very much more effective in
13   some patient groups and very much less
14   effective in other patient groups, and
15   that that group – that grouping turned
16   out to be their zodiac sign, like Aquarius
17   or Capricorn.
18       And again, if this is the paper I'm
19   thinking of, the authors pointed out that
20   that was a limitation of post hoc subgroup
21   analyses, because clearly a patient's
22   zodiac sign was not going to be
23   meaningfully predictive of outcome.
24       Q.   Is it your opinion, then, that post

Page 463

1    hoc analyses are limited in what they can
2    establish, or is it your view that post
3    hoc analyses are compelling?
4        A.   Given that this is a topic that
5    people have written long papers about, let
6    me try to give a very brief answer.
7        Post hoc subgroup analyses can be
8    -- Well, subgroup analyses can be
9    meaningful if they have been predetermined
10   as subgroups and are not come up with --
11   are not designated after the fact.  And we
12   do that all the time.  We -- The research
13   community.
14       They can also be informative if
15   after a study is completed it turns out
16   that there may be a patient group that is
17   particularly either susceptible to a side
18   effect or likely to benefit or unlikely to
19   benefit.
20       Q.   Mm-hmm.
21       A.   And often that kind of analysis can
22   be very informative if it has -- Well, if
23   it has the following properties:  A, it is
24   not data dredging, either by an academic

Page 464

1    trying to get a paper or by somebody with
2    an axe to grind otherwise, and if there's
3    a likely biologically meaningful
4    explanation for it, such as diabetics do
5    worse or elderly people do worse.
6        Q.   Mm-hmm.
7        A.   And so in that sense it can be
8    very useful and informative and real.  But
9    it can be noninformative and even
10   counterproductive if it fits into that
11   data dredging or attempting to justify a
12   particular position by looking at --
13   looking for groups in which one can make a
14   case.
15       I'm sorry it's a complicated
16   answer, but it's not a good or bad thing
17   in itself.
18       Q.   Is it fair to say that there are
19   serious limitations when you do a post hoc
20   ·analyses of data?
21       MR. TISI:  Objection to
22   limitations.
23       A.   I don't think -- I don't think
24   that's what I said.  I think it depends

Page 465

1    on the instance.  Sometimes they can be
2    helpful, sometimes they can be
3    counterproductive.
4        Q.   There's a letter that was in your
5    materials that I reviewed last night.  Let
6    me represent to you it's dated March 13th
7    of 2003 -- sorry -- 2006.  Okay?
8        A.   (Witness nods head).
9        Q.   And it was from the plaintiffs'
10   lawyers to you enclosing some material.
11       A.   Okay.
12       Q.   And the letter is dated March 13th,
13   2006, and it referred to the following
14   information:  CSRs for Study 010, 017, 085
15   and 090.  Okay?
16       A.   (Witness nods head).
17       Q.   Early versions of the Ingenix
18   study?
19       A.   Ingenix.
20       Q.   Ingenix study.  And a May 22nd,
21   2001, New York Times article.  Okay?
22       A.   Okay.
23       Q.   That was sent to you a week before
24   your report was signed, right?

9 (Pages 462 to 465)

Jerry Avorn, M.D.

**Page 466**

1    A.  Right.
2    Q.  Did you review those materials,
3  sir, and factor them in to your analysis
4  when you wrote your report?
5    A.  I'm pausing, because I'm having a
6  hard time remembering which materials were
7  received when and what impact they did or
8  didn't have on my report.
9        I recall having seen them, and I
10  just can't tell you how any one of those
11  did or didn't relate to the report.
12    Q.  Okay.  In your expert report, sir,
13  you refer to a draft standby statement
14  dated March of 2000.
15    A.  Please help me to know where you're
16  referring to.
17    Q.  Yes.  It's on Page .13.  You quote
18  from it in the indented paragraph that
19  starts "The implications."
20    A.  (Witness viewing document).  Yes.
21    Q.  Here you're quoting from a standby
22  statement that was a draft and was
23  prepared internally at Merck, right?
24    A.  Correct.

**Page 467**

1    Q.  You don't have any personal
2  knowledge of the facts here, right?
3        MR. TISI:  Objection, other
4  than it was written and that's the
5  document that it says.
6        MR. GOLDMAN:  Okay.
7    A.  I -- I have knowledge that it was
8  a document Merck prepared.
9    Q.  The underlying facts and what Merck
10  did with this draft standby statement you
11  don't have any personal knowledge of,
12  true?
13    A.  My understanding is that they
14  didn't actually implement the -- this --
15  this draft standby statement in that form.
16    Q.  And what's your understanding based
17  on?
18    A.  I believe I asked counsel whether
19  this was ever -- you know, could I see a
20  document that was the final version, and
21  they said they didn't have one.  So that
22  leaves me not knowing its ultimate fate.
23        But I refer to it as evidence of
24  what officials at the company were saying

**Page 468**

1  and doing at the time, whatever the
2  subsequent use of that was.
3    Q.  Which you don't know?
4    A.  Right.  The absence of seeing a
5  final makes me suspect that there may not
6  have been a final.  In other words, if
7  there had been a final, I would have
8  expected that counsel would have gotten it
9  in the discovery process.  And the fact
10  that when I asked for the final they said
11  they did not have one to produce makes me
12  suspect that perhaps there was not a
13  final.  But I can't know that for sure.
14    Q.  Do you think that simple common
15  sense, sir, would lead to the conclusion
16  that if, as you say, the risk benefit
17  relationship of Vioxx were accurately
18  presented to doctors, that Merck would not
19  have sold as much Vioxx?
20        MR. TISI:  Objection.
21    A.  I don't know what simple common
22  sense would -- would indicate in that
23  because how much a company can sell of a
24  given product is a pretty complicated

**Page 469**

1  issue, and I -- I just can't tell you
2  what -- I don't have simple common sense.
3  I think of these things as someone who
4  spent his life studying the issue.  So I
5  can't answer that.
6    Q.  Let's talk about Study 090.  Do you
7  remember what that study was about?
8    A.  It was an osteoarthritis study.
9  And we can look to where I refer to it in
10  my report.  It would have been in a
11  section of pre -- I think pre -- If you
12  have a specific page of my report you want
13  to refer me to, that would save me some
14  time.
15    Q.  Fourteen.
16    A.  (Witness viewing document).  Okay.
17  Got it.
18    Q.  So is your understanding about
19  Study 090 described here in Page .14 of
20  your report, sir?
21    A.  Yes.  That it was Vioxx twelve and
22  a half milligrams compared to Nabumetone
23  or placebo in patients with osteoarthritis.
24    Q.  How many thrombotic cardiovascular

10 (Pages 466 to 469)

Jerry Avorn, M.D.

Page 470

1   events occurred in the 090 study?
2       A.   I'd need to go back to the -- the
3   actual report.  I can't keep all those
4   numbers in my head.  But if you have --
5   If you want to show me, I would be happy
6   to look at it.
7       Q.   Well, you refer, in the second full
8   paragraph, when you're describing protocol
9   090 in the second to the last sentence,
10  you say, "This included a heart attack and
11  two strokes in the Vioxx --"
12      A.   I'm sorry.  The second to the last
13  sentence where?
14      Q.   In the second paragraph when you're
15  describing protocol 090 --
16      A.   Okay.
17      Q.   -- the second to the last
18  paragraph --
19      A.   Right.
20      Q.   -- second to the last sentence you
21  say, "This included a heart attack and two
22  strokes in the Vioxx group within the
23  six-week study period in none or either of
24  the comparison groups."  Is that your

Page 471

1   understanding, sir?
2       A.   (Witness viewing document).  Yes.
3       Q.   While Vioxx was on the market, did
4   you ever write any articles about Study
5   090?
6       A.   No, I did not.  I don't believe
7   that I was aware of Study 090 while Vioxx
8   was on the market.
9       Q.   Did you ever write anything about
10  ADVANTAGE while Vioxx was on the market?
11      A.   No.
12      Q.   It's not your testimony, is it,
13  sir, that Merck hid the results of the
14  Study 090, is it?
15          MR. TISI:  From -- From
16  whom?
17          BY MR. GOLDMAN:
18      Q.   From anybody.
19      A.   First, to answer your question
20  about ADVANTAGE, I just want to see when
21  -- and I think you just handed me the
22  ADVANTAGE paper -- when it was -- There,
23  is that -- no.  I just want to see when
24  it -- It's over here.  Thank you.  Okay.

Page 472

1           MR. TISI:  Can we mark it
2   since you've --
3           THE WITNESS:  Yeah, it is.
4           MR. TISI:  It's not marked.
5           MR. GOLDMAN:  I'll mark it
6   as Exhibit 13.
7           (Exhibit-13, Article Entitled
8   "Gastrointestinal Tolerability and
9   Effectiveness of Rofecoxib Versus Naproxen
10  in the Treatment of Osteoarthritis," marked
11  for identification).
12          MR. TISI:  Okay.
13          BY MR. GOLDMAN:
14      Q.   Exhibit 13 is the peer reviewed
15  publication of the ADVANTAGE study.
16          MR. TISI:  Don't -- Don't
17  bait me.
18      A.   (Witness viewing document).  This
19  is the one with the outcomes as
20  readjudicated by FDA or with Merck's
21  adjudication, or don't we know?
22      Q.   Are you --
23      A.   I know that FDA readjudicated the
24  ADVANTAGE findings.  I just don't know

Page 473

1   which --
2       Q.   Dr. Avorn, you asked to see that
3   article, not to talk about whether the FDA
4   adjudicated events.  You asked to see that
5   article to see whether it was completed to
6   decide whether or not you ever talked
7   about it in any of your articles.
8       A.   Right.
9       Q.   So can we stick to that topic?
10      A.   Right.  Okay.  So it was published
11  in October of '03, and I -- I did not
12  write about it.
13      Q.   Okay.  Is it your position, sir,
14  that Merck hid the results of the Study
15  090?
16          MR. TISI:  Objection.
17      A.   Can you define what you mean by
18  hid?
19      Q.   How would you define hid?
20      A.   Well, if -- if results -- and maybe
21  to define it, I could use ADVANTAGE as an
22  example.  If results are presented in a
23  paper or to FDA with outcomes that are
24  judged by the FDA to be incorrect and

11 (Pages 470 to 473)

Jerry Avorn, M.D.

Page 474

1    misleading, the provision of those outcome
2    data to the FDA does not in my view
3    constitute a full disclosure of the
4    results of that study.
5         So, for example, would I say that
6    the true results of ADVANTAGE were hidden?
7    I would say, as originally presented to
8    FDA, given that FDA felt that the results
9    were incorrect and favored Vioxx by
10   adjudicating outcomes in a way that ended
11   up favoring the drug, I would say that's a
12   kind of hiding.
13   Q.  Is your testimony that the
14   individuals who were involved in the
15   adjudication process in the ADVANTAGE study
16   intentionally adjudicated certain events so
17   that they would favor Vioxx?
18   A.  I can't speak to the intentions of
19   individuals or their motivations.
20   Q.  Well --
21   A.  I can only look at the outcome of
22   those adjudicate -- of those decisions.
23   Q.  Do you think Merck, as a company,
24   or the individuals at Merck played any

Page 475

1    role in how the adjudicators decided what
2    they would call certain events in the
3    ADVANTAGE study?
4    A.  Yes, in that the company did have a
5    procedure for bringing cases forward to
6    adjudication, and that is often one of the
7    most important components of adjudication,
8    which is -- which cases even get
9    adjudicated.
10        And so if there are company
11   policies or procedures that cause cases to
12   not even get adjudicated, that's a very
13   meaningful way of distorting adjudication.
14   Q.  Tell me every case, sir, that you
15   say Merck caused not to get adjudicated --
16        MR. TISI:  Objection.
17   BY MR. GOLDMAN:
18   Q.  -- in the ADVANTAGE study or any
19   other study that has ever been done on
20   Vioxx.
21        MR. TISI:  Objection;
22   improper question.
23   A.  Okay.  Given that I obviously
24   cannot know of every case of the tens of

Page 476

1    thousands of people in the various
2    studies, what I can tell you is the
3    cardiovascular SOP, as we discussed
4    yesterday, specifically -- no.
5         Don't shake your head in the middle
6    of my answer.  I'm responding to your
7    question, Counsel.
8    Q.  No.  You're actually not.
9    A.  You asked me to identify Merck
10   activities that caused adjudications to go
11   wrong.
12   Q.  Un-un.  Then there was a
13   miscommunication.
14        My question is:  Tell me every case
15   where Merck caused a particular event not
16   to be adjudicated in any Vioxx clinical
17   trial.
18   A.  Okay.  All cases after the cardiac
19   SOP was modified in which patients
20   experienced pulmonary edema, congestive
21   heart failure, certain arrhythmias -- and
22   if you want, we can go through the cardiac
23   SOP and look at what diagnoses were
24   systematically struck through by Merck so

Page 477

1    as to prevent those cases from being
2    adjudicated.
3         Now, I can't tell you the case
4    numbers or the gender or the age of those
5    people.  But I can tell you that if you
6    throw out anybody who had pulmonary edema
7    or congestive heart failure from
8    adjudication, you are going to definitely
9    underestimate cardiac events.
10   Q.  And is it your view, sir, that by
11   not including the category of pulmonary
12   edema events in the adjudication process
13   that that ended up creating a misleading
14   or incorrect result in the Vioxx clinical
15   trials?
16   A.  I can say that doing so will
17   clearly and systematically reduce
18   ascertainment of myocardial infarctions and
19   other important cardiac events.
20   Q.  Did you ever look to see which
21   particular cases in the Vioxx clinical
22   trials involved pulmonary edema in the
23   Vioxx arm to see whether or not there were
24   more cases of pulmonary edema in the Vioxx

12 (Pages 474 to 477)

Jerry Avorn, M.D.

Page 478

1  arm than in comparator arms in the Vioxx
2  clinical trials?
3     A.  No.  It's too big.  I would have
4  had to have looked at the case histories
5  of thousands of patients, and I did not do
6  that.  But I think it does speak to a way
7  of analyzing data that caused me concern.
8     Q.  Did the FDA, in any of the
9  documents you reviewed, say that Merck
10  misled them about the ADVANTAGE study?
11    A.  The FDA did indicate that it
12  readjudicated cases and -- excuse me.
13          Counsel, it will help us a great
14  deal if you don't shake your head while
15  I'm trying to -- I'm trying to be
16  responsive to your answer.
17    Q.  That's not what I'm asking.
18    A.  I think it is.
19          (Reporter interruption).
20    A.  The FDA does not -- as you well
21  know -- does not use terms like "The
22  company tried to mislead us."
23    Q.  Did any -- I'm sorry.  Go ahead.
24    A.  That is not what a government

Page 479

1  bureaucrat writes down in a report.
2          What the FDA does state is that it
3  readjudicated outcomes in a given case,
4  and it will describe the original
5  presentation of the outcome, and then its
6  readjudication of that outcome.
7          And my observation, from the FDA
8  report that we're talking about, was that
9  as it turned out, it just so happened that
10  in nearly all cases, the FDA's
11  readjudication found more cardiac events
12  than Merck did in those very same cases.
13    Q.  I've heard you on that answer,
14  okay?
15    A.  Okay.  Okay.
16    Q.  Did you see any reference in any of
17  the FDA materials you reviewed where the
18  FDA said that they believed Merck was
19  misleading them with the results of the
20  ADVANTAGE study?
21    A.  (Witness viewing document).  As I
22  said, the FDA does not use terms that --
23  such as "You have misled us."
24    Q.  Is the answer no?

Page 480

1     A.  Right.
2     Q.  In fact, you haven't seen a single
3  instance in any of the FDA materials for
4  any of the clinical trials where the FDA
5  said they felt Merck mislead them in how
6  Merck presented the data to the FDA, true?
7     A.  (Witness viewing document).
8  Quoting the FDA in a letter to Merck,
9  "Your misrepresentation of the safety
10  profile for Vioxx is particularly
11  troublesome because we have previously, in
12  an untitled letter, objected to promotional
13  materials for Vioxx."
14          And so, yes, FDA has notified Merck
15  that it felt, in as many words, that Merck
16  was misrepresenting the safety profile of
17  Vioxx.
18          Now, in that case they were
19  referring to Merck's promotion.  But, yes,
20  FDA has accused Merck in writing of
21  misrepresenting the safety of its drug.
22    Q.  So the FDA does use words like
23  misleading if they believe an act is
24  misleading, right?

Page 481

1     A.  Yes.
2     Q.  Did you see, in any of the FDA
3  materials that you reviewed, any statement
4  by the FDA that they felt the way Merck
5  presented the data from the Vioxx clinical
6  trials was misleading?
7          MR. TISI:  Data from --
8          MR. GOLDMAN:  To them.  To
9  the FDA.
10          MR. TISI:  Okay.
11    A.  Can you just read back -- Did I
12  see any evidence?
13    Q.  Did you see any reference in any of
14  the FDA materials, sir, where the FDA said
15  that they felt Merck was misleading them,
16  the FDA, in the way that Merck presented
17  data from clinical trials?
18    A.  Okay.  If you want, we can pull
19  out the FDA report of the ADVANTAGE
20  outcomes.
21          What that report says, as you know,
22  was that the outcomes presented by Merck
23  were considered erroneous by the FDA's
24  medical officer as having underestimated

13 (Pages 478 to 481)

Jerry Avorn, M.D.

Page 482

1    the number of cases. That is there in
2    the FDA's report.
3    Q.   Okay.
4    A.   Did they use the word misleading in
5    their report? No. But frankly, it seems
6    pretty obvious to me that if they say,
7    here are the number of cardiac events that
8    Merck reported with patients on Vioxx, we
9    found that many more people had cardiac
10   events on Vioxx, and we corrected the
11   numbers upward because we think Merck got
12   it wrong. And to me, that -- that sure
13   looks like the FDA's perception or the
14   FDA's judgment that Merck had
15   underestimated the cardiovascular outcomes
16   of its drug.
17   Q.   I want to go back to my original
18   question.
19   A.   Did they send a letter saying that?
20   Not to my knowledge.
21   Q.   Did Merck hide the results of Study
22   090?
23   A.   Now we're not talking about
24   ADVANTAGE; we're talking about 090?

Page 483

1    Q.   Well, because you decided to talk
2    about ADVANTAGE --
3    A.   Okay. 090 then.
4    Q.   -- in response to my question about
5    090. So let's start over.
6    A.   Okay. Okay.
7    Q.   Did Merck hide the results of Study
8    090?
9    A.   All right.
10        MR. TISI:  Objection.
11   A.   In that -- as I -- and I just want
12   to refer to my report about the
13   cardiovascular card, because I think that's
14   -- that's exactly the response to your
15   question that I need to give.
16   Q.   The CV Card you're now talking
17   about?
18   A.   Yes. I'd like a minute to read
19   this, please.
20   Q.   Sure.
21   A.   (Witness viewing document). Okay.
22   I can answer your question in the
23   affirmative. I do believe that Merck hid
24   the results of Study 090 in the following

Page 484

1    way, and this is a problem that has come
2    up a number of times.
3        If the main means of communicating
4    results is via, quote, educational
5    materials, unquote, that are actively
6    disseminated to physicians, or a paper, as
7    in the case of VIGOR, that was published
8    in the most widely read medical journal in
9    the country, and if those materials fail
10   to include, or hide, to use your term, .
11   important information about risk, it does
12   not relieve the company of responsibility
13   for them to say, as they did with Study
14   090, and as they did with the additional
15   heart attacks in the case of the VIGOR
16   study, "Oh, well, we told FDA about it."
17   Because most doctors do not go to the FDA
18   Web site to understand the risks of drugs.
19   They read journals. They talk to sales
20   reps. They look at advertisements. And
21   that is where their opinion comes from.
22        In my view, failing to include
23   important risk information in papers or in
24   teaching materials, including the

Page 485

1    cardiovascular card, in the case of Study
2    090, is a very important way of hiding
3    data and saying, "Well, it was put in some
4    FDA report," does not in any way undo that
5    hiding.
6    Q.   Do doctors obtain information from
7    medical journals?
8    A.   Yes.
9    Q.   Did Merck hide the results of Study
10   090 from the FDA?
11   A.   Probably not.
12   Q.   Why do you say probably?
13   A.   Well, I -- I would need to go back
14   and see if there was a problem of their
15   misadjudicating outcomes, as they did with
16   ADVANTAGE, which is, as I said a few
17   minutes ago, a form of hiding.
18   Q.   Is it true, sir, that the numbers
19   of events in the Study 090 were too small
20   for meaningful comparison?
21        MR. TISI:  Objection to the
22   word "meaningful."
23   A.   This deals with an issue that came
24   up yesterday and will come up again today,

14 (Pages 482 to 485)

Jerry Avorn, M.D.

Page 486

1 and we can perhaps dispense with it with a
2 quick response.
3 It is always possible to look at
4 one specific result from one study and say
5 it did not meet the significance test of
6 people in '05, and therefore it was
7 somehow not real or not meaningful or not
8 important.
9 What matters is the totality of all
10 of those results, several of which taken
11 in isolation may not meet the test of
12 significance, but when looked in the
13 totality -- which often can be done only
14 by the company if the results are not all
15 in the public domain -- that it becomes an
16 important finding.
17 And so if you look at any one
18 study with one particular outcome and you
19 say, well, the numbers were small, yes, if
20 that's all there was, that would be not a
21 big deal. But it's the totality where it
22 does become a big deal.
23 Q. Is it your view that when you look
24 at Study 090 and also consider the VIGOR

Page 487

1 study, that the number of events in Study
2 090 are then large enough to be meaningful
3 for comparison?
4 MR. TISI: Objection.
5 A. For comparison of what?
6 Q. Well, when you're evaluating the --
7 the potential cardiovascular risk
8 associated with Vioxx, have you written
9 that you believe Study 090 shows an
10 increased cardiovascular risk associated
11 with Vioxx, right?
12 A. Right.
13 Q. And you believe that Study 090
14 replicates the VIGOR study, and that both
15 demonstrate an increased cardiovascular
16 risk associated with Vioxx, right?
17 A. I think that's a bit of a
18 distortion in that, if all that existed in
19 the world were Study 090, I would not
20 conclude from that this is
21 incontrovertible evidence of the
22 cardiovascular risk of Vioxx.
23 Q. And my question -- I just want to
24 focus on Study 090 and VIGOR. That's all

Page 488

1 I want to talk about. Okay?
2 A. Okay.
3 Q. Is it your view that Study 090
4 replicates the results found in VIGOR?
5 A. I think replicates is not the
6 correct word. But are completely
7 compatible with and -- and further, I
8 guess, demonstrate the results.
9 Q. Do you remember Study 085?
10 A. Yes.
11 Q. I think you mentioned that in your
12 report, right?
13 A. Yes.
14 Q. Did Study 085 demonstrate any
15 increased cardiovascular risk from Vioxx?
16 A. Not to my knowledge.
17 Q. Do you agree, when you look at
18 Study 085 and 090 together you would not
19 conclude that there was an increased
20 cardiovascular risk from Vioxx?
21 A. If one were to pool those two
22 findings, the -- there would not be an
23 impressive signal.
24 Q. Is it true that doctors are

Page 489

1 interested in the tolerability of
2 medications they provide?
3 A. Yes.
4 Q. I said provide.
5 Is it true that doctors are
6 interested in the tolerability of
7 medications that they prescribe?
8 A. Yes.
9 Q. Is it important that patients be
10 able to tolerate medications?
11 A. Yes.
12 Q. If patients can't tolerate
13 medications, then some of them won't be
14 able to treat their disease state, right?
15 A. Correct.
16 Q. You said in your report, and I
17 believe you indicated yesterday, that you
18 think Merck did not provide the results of
19 ADVANTAGE in a timely fashion to the FDA.
20 Is that a fair description?
21 A. If you're quoting my report, please
22 show me where in my report I said it.
23 Q. I'm not quoting. I'm interpreting
24 your report, and tell me if this is fair,

15 (Pages 486 to 489)

Jerry Avorn, M.D.

1  okay?
2  A.  Well, I'd like to read my own words
3  before I confirm what I said.
4  Q.  Well, let me ask you:  Do you
5  believe, sir, that Merck did not submit
6  the results of the ADVANTAGE study to the
7  FDA in a timely fashion?
8  A.  Yes.
9  Q.  Do you know when Merck obtained the
10  final results of the ADVANTAGE study?
11  A.  Well, when a company obtains the
12  final results, it's a function of when the
13  company makes it its business to obtain
14  the final results, in that the company was
15  conducting the study, which was in a time
16  frame similar to that of VIGOR, which
17  somehow had its results finalized much
18  quicker than ADVANTAGE.
19  Q.  Is it your position, sir, that
20  Merck stalled on attempting to get the
21  results of the ADVANTAGE study?
22  A.  I -- I can't know that, but I
23  think it's very important to point out
24  that if a company is conducting a study,

1  when it is -- when, quote, the final
2  results come in, closed quote, has a great
3  deal to do with how expeditiously the
4  company does its work.
5  Q.  Did the FDA, in any of the
6  materials you reviewed, indicate that they
7  believed Merck did not submit the
8  ADVANTAGE study in a timely fashion?
9  A.  I know that FDA wanted the results
10  of the ADVANTAGE study before finalizing
11  its label, and I know that FDA was
12  concerned that it was not getting the
13  results of the ADVANTAGE study when it
14  wanted them.  So I guess I believe that
15  that's the case.
16  Q.  Do you know, sir, that the FDA had
17  the results of the ADVANTAGE study before
18  approving the language of the April 2002
19  Vioxx label?
20  A.  I believe that they eventually got
21  it before April of 2002.  But it was
22  completed well, well before that.
23  (Off the record at 9:36
24  a.m.)

1  (Recess taken).
2  (Back on the record at 9:38
3  a.m.)
4  BY MR. GOLDMAN:
5  Q.  My question, Dr. Avorn, was whether
6  the FDA had the results of the ADVANTAGE
7  study before they approved the language of
8  the April 2002 Vioxx label.
9  A.  I believe they did.
10  Q.  What is the test for heterogeneity?
11  A.  That is a statistical test in which
12  different studies or different groups
13  within a study or the results in different
14  groups are compared with one another to
15  determine if they are significantly
16  different from one another.
17  Q.  Is it important that a study
18  satisfy the test for heterogeneity to be
19  able to make meaningful conclusions from
20  it?
21  A.  That's also not a quick yes-no.  It
22  helps and it's reassuring if there is
23  hetero -- if there is not heterogeneity.
24  Q.  Mm-hmm.

1  A.  But it does not blow away any
2  conclusions if there is.
3  Q.  Is the concept of heterogeneity
4  sort of like making sure that you're
5  comparing apples to apples and not apples
6  to bananas?
7  A.  Yes.
8  Q.  You, I believe, indicate in your
9  report that Merck never told the FDA or
10  the medical community about how Vioxx
11  compared to placebo or other comparators
12  on the endpoint of heart attack or MI.
13  Is that your view?
14  A.  Never told who?
15  Q.  The FDA or the medical community.
16  A.  Well, in the sense that the company
17  eventually gave all of its clinical trial
18  data to FDA and that the FDA eventually
19  readjudicated it as needed and got the
20  data, eventually the FDA received that
21  information.
22  But in terms of its communication
23  to physicians, I think there was selective
24  communication of -- of findings by Merck.

16 (Pages 490 to 493)

Jerry Avorn, M.D.

Page 494

1  Q.  Did Merck tell the medical
2  community in any way how Vioxx compared to
3  placebo or other active comparators on the
4  endpoint of MI or heart attack?
5     A.  Inaccurately, in my view.  And I
6  can explain why.
7        In terms of active comparators,
8  we've discussed the fact that in the main
9  publication, which is probably the single
10  most commonly read paper about Vioxx, the
11  VIGOR study, the company failed to reveal
12  cases of MI that were known to it before
13  the paper was published.
14        In terms of the main tool that the
15  company used to educate, in quotes,
16  physicians about the cardiovascular effects
17  of Vioxx, it selectively presented some
18  studies but not all studies concerning
19  cardiovascular outcomes in its teaching
20  materials.
21        And in its training materials for
22  its sales reps, the famous dodge ball
23  training materials, it presented what seems
24  clearly to be a recipe for minimizing and

Page 495

1  distorting the cardiovascular outcomes of
2  Vioxx.
3        And in relation to its memos to its
4  sales staff about how to discuss various
5  articles that appeared in the literature,
6  whether it was the one from our group or
7  papers that others had produced, those
8  materials also struck me as essentially
9  providing guidance for how to minimize the
10  problem rather than for how to communicate
11  it.
12        So, yes, I would say that Merck
13  failed to provide the medical community
14  with a -- an adequate description of MIs
15  and other cardiovascular outcomes of their
16  drug.
17     Q.  Do you remember my question?
18     A.  I thought I was responsive, but you
19  can read it back.
20     Q.  My question was:  Is it your
21  position that Merck never told the medical
22  community about how Vioxx compared to
23  placebo or other comparators on the
24  endpoint of MI?  You can answer that yes

Page 496

1  or no.
2     A.  I think my answer was responsive
3  exactly to that question.  And when you
4  say never told, that's kind of an odd
5  phrase.  I think their telling was
6  inaccurate and distorted.
7     Q.  Why is the dodge ball training
8  materials considered famous to you?
9     A.  Because it has received a great
10  deal of attention in the circles that I
11  move in in medical school and in
12  pharmacopeia.  It also has received a
13  certain amount of notoriety I think
14  publicly.
15     Q.  Do you know, sir, how the dodge
16  ball training game actually worked?
17     A.  I know that sales reps were to be
18  awarded points for certain answers, and
19  that the answers -- and if I can just
20  refer to my report -- the answers often
21  were written in a way that seemed designed
22  to obscure the relationship with --
23  between Vioxx and cardiovascular outcomes.
24     Q.  Mm-hmm.  Am I right, sir, that when

Page 497

1  you are giving that answer, you're
2  providing your personal opinion about what
3  the dodge ball training materials
4  describe --
5        MR. TISI:  Objection.
6        BY MR. GOLDMAN:
7     Q.  -- right?
8        MR. TISI:  Objection.
9     A.  No.  I'm quoting from Merck's own
10  materials.
11     Q.  Have you ever spoken with any sales
12  representative or any individuals at Merck
13  about how the dodge ball training exercise
14  worked?
15     A.  No.
16     Q.  Did you read any depositions at
17  all, sir, on that topic?
18     A.  No.  But frankly, the fact that
19  anyone could even have prepared a
20  so-called training program of this kind I
21  found appalling.
22     Q.  Is it your position, sir, you're
23  going to tell the jury that the dodge ball
24  materials are being discussed in medical

17 (Pages 494 to 497)

Jerry Avorn, M.D.

1  schools and they're being discussed in the
2  medical community?
3    A.  No.  The -- Yes.  The fact that
4  Merck prepared a training game for its
5  sales reps called dodge ball, which
6  contained material of the kind that I
7  quoted in my report, in conversations with
8  colleagues with an interest in clinical
9  decision making and physician education,
10  many of us were absolutely struck with the
11  -- from reading from the accounts that had
12  made it into the media, that this was a
13  very strange way to educate physicians.
14    Q.  Did the meta-analysis that was
15  prepared by Dr. Shapiro pass the test for
16  heterogeneity?
17    A.  Now, by that do you mean the slide
18  sets that she showed to colleagues at
19  Merck?
20    Q.  What I mean is the materials that
21  you reviewed on the meta-analysis.  And I
22  can show it to you if you want.
23        MR. TISI:  I think that
24  would be helpful.  Thank you.

1        BY MR. GOLDMAN:
2    Q.  While we're looking for it, did you
3  review the --
4    A.  I reviewed Dr. Shapiro's analyses,
5  and we can maybe make things go quicker to
6  say that I would not be surprised if there
7  was heterogeneity across the studies that
8  she looked at.
9        MR. GOLDMAN:  I didn't bring
10  it.
11        MR. TISI:  I have it.  I
12  have it here.  Do you want me to pull it?
13    A.  But if we want to agree that there
14  was probably heterogeneity, we can agree
15  on that.
16        MR. TISI:  I mean, do you
17  want me to pull it?
18        BY MR. GOLDMAN:
19    Q.  I just wanted to know whether or
20  not your view is that the study passed the
21  test for heterogeneity.
22    A.  And my understanding was that there
23  was heterogeneity.
24    Q.  Okay.  Let's talk about the

1  Alzheimer's trials, okay?
2    A.  Okay.
3    Q.  Do you agree that there was no
4  statistically significant difference in
5  heart attacks in the Alzheimer's trials
6  between Vioxx and placebo?
7    A.  (Witness viewing document).  No.
8    Q.  What's your basis for that?
9    A.  That the ascertainment, as I
10  indicated in my report, of heart attack in
11  elderly people, particularly elderly people
12  with dementia, is very difficult.
13        Even in elderly people without
14  dementia, we know that about a quarter of
15  heart attacks are not symptomatic.  So any
16  conclusions about the rate of heart
17  attacks that is not based on a fairly
18  active surveillance mechanism, but rely on
19  kind of spontaneous report of heart
20  attacks but do not have a component of the
21  study designed to determine who had a
22  heart attack and who didn't proactively,
23  is of minimal reliability.
24    Q.  Have you described your bases for

1  saying that there is a statistically
2  significant difference in heart attacks in
3  the Alzheimer's trials between Vioxx and
4  placebo?
5    A.  I didn't say that there was.
6    Q.  Yes, you did.
7    A.  Can you read back the question?
8    Q.  My question was:  Do you agree that
9  there was no statistically significant
10  difference in heart attacks in the
11  Alzheimer's trials been Vioxx and placebo?
12    A.  Right.  And the reason that I said
13  I didn't agree is that I don't know from
14  the data available whether there was or
15  wasn't a difference in heart attack rates.
16    Q.  Do you know that the peer reviewed
17  published article on the Alzheimer's trial
18  -- let's start with 078 -- demonstrated no
19  statistically significant difference in
20  heart attacks?
21    A.  As I recall, there was some
22  very major methodological problems with
23  that article.  And the fact that something
24  makes it into a peer review journal is not

18 (Pages 498 to 501)

Jerry Avorn, M.D.

Page 502

1  in and of itself a guarantee that they got
2  it right.
3          There was problems, as I recall,
4  with the analysis in terms of whether it
5  was intentioned to treat or not in the
6  follow-up of patients. And we could go
7  over that paper in particular.
8          So they did not -- and as I also
9  recalled, there was a paper that was
10  written either mostly or predominantly by
11  Merck scientists, and it did not seem to
12  me to be a compelling representation of
13  the findings in that study.
14  Q.  Do you think because there were
15  Merck scientists on a paper about
16  Alzheimer's that that calls into question,
17  in your mind, the reliability of the study
18  and the way it's presented?
19  A.  Not in and of itself.
20  Q.  Okay. Did you see, sir, in the
21  materials that the FDA believed that there
22  was no statistically significant difference
23  in heart attacks in the Alzheimer's
24  trials?

Page 503

1  A.  Yes.
2  Q.  And you take issue with the FDA's
3  judgment on that?
4  A.  Well, I think FDA -- saying that a
5  study failed to find a difference does not
6  mean to -- does not mean the same thing
7  as there was no -- there was no
8  difference.
9  Q.  Do you dispute the FDA's conclusion
10  that there was no difference in -- in
11  heart attacks in the Alzheimer's trials
12  between Vioxx and placebo?
13  A.  Yes, I do, for the following
14  reason.
15  Q.  Actually, just say yes, you do.
16  Okay?
17  A.  Yes, I do.
18  Q.  Do you believe that there was a
19  statistically significant difference for
20  heart attacks and strokes combined in the
21  Alzheimer's trials between Vioxx and
22  placebo?
23  A.  What I believe is that there was a
24  doubling of mortality and that that raises

Page 504

1  the likelihood that there was an important
2  risk in one group and not in the other.
3          I can't speak to what that risk
4  was, whether it was stroke or heart attack
5  or both.
6  Q.  Before you were retained as an
7  expert witness, sir, did you ever say
8  anywhere that you thought that the
9  mortality question in Alzheimer's raised a
10  question about whether Vioxx caused
11  cardiovascular events in the Alzheimer's
12  trials?
13  A.  I'd never seen data on mortality.
14  Q.  And the data that you're relying on
15  is data from Dr. Ray, who is quoting Dr.
16  Kronmal?
17  A.  No. I believe that there also are
18  other sources of data on the eventually
19  reported mortality difference in that --
20  in those studies.
21  Q.  What are you relying on for your
22  opinion that there was an increase in
23  mortality between Vioxx and placebo in the
24  Alzheimer's trials, sir?

Page 505

1  A.  I honestly can't remember what the
2  source was, but I believe that they were
3  sources apart from Dr. Ray and Dr. Kronmal
4  in the reporting of the mortality data
5  from the Alzheimer's studies. And I
6  simply can't remember where I got that
7  from.
8  Q.  And you don't refer to that in your
9  report anywhere, do you, sir?
10          MR. TISI:  Objection.
11  A.  I thought I did. Let me take a
12  look.
13          MR. TISI:  Yeah.
14  A.  (Witness viewing document).
15          MR. TISI:  What page do we
16  have that discussion on? I'm sorry. Oh,
17  here it is.
18          MR. GOLDMAN:  Fifteen.
19          MR. TISI:  Sixteen,
20  actually.
21          MR. GOLDMAN:  Yeah, top.
22          MR. TISI:  I think it's
23  Page .16. Can I help -- I can find where
24  he's -- It goes 15 to 16.

19 (Pages 502 to 505)

Jerry Avorn, M.D.

Page 506

1    A. (Witness viewing document). Okay.
2  Sure. Thank you. Yes. Here it is.
3  Yeah. It definitely is here. On the top
4  of Page .16.
5    Q. Mm-hmm.
6    A. "Of greatest concern, the mortality
7  rate of subjects given Vioxx in Merck's
8  Alzheimer's studies was double that seen
9  in subjects randomized to placebo. Having
10  practiced and taught geriatrics for many
11  years, I'm aware that ascertainment of and
12  causes of death in an elderly
13  patient's --"
14    (Reporter interruption).
15    MR. TISI: Actually, I think
16  he's got a different question. He just
17  wants to know what you rely on.
18    A. I got it. Right. Okay.
19    Q. My question -- My question --
20    A. Yeah.
21    Q. -- Dr. Avorn, is whether in your
22  report you cite the actual source of the
23  data that you're relying on for the
24  proposition that there was an increase in

Page 507

1  mortality in the Alzheimer's trials between
2  Vioxx and placebo?
3    A. Okay. Let me refer to the tabs
4  that I have indicated here to see, because
5  I'm fairly certain that it was not
6  exclusively via Dr. Ray's report.
7    Q. Okay.
8    A. And I'll just take a moment to do
9  that.
10    MR. TISI: I have a portion
11  of the binders here, if you need.
12    THE WITNESS: Okay.
13    MR. TISI: Which ones do
14  you need?
15    THE WITNESS: Okay. Now,
16  this -- This one doesn't have -- okay.
17  That's old 110 and 109. Okay.
18    MR. TISI: That's --
19    MR. GOLDMAN: Just let him
20  find it.
21    MR. TISI: I'm sorry?
22    MR. GOLDMAN: I said just
23  let him find it.
24    (Off the record at 9:55

Page 508

1  a.m.)
2    (Recess taken).
3    (Back on the record at 9:56
4  a.m.)
5    BY MR. GOLDMAN:
6    Q. In your report, sir, you have
7  handwritten some tab numbers that you say
8  you're now looking for.
9    What are the tab numbers in your
10  binders that you are looking to find
11  the support for the mortality information?
12    A. Okay. The first one is Tab 35 --
13    Q. Okay.
14    A. -- which is a memo to Dr. Scolnick
15  from Dr. Block.
16    Q. Okay.
17    A. And the second one is Tab 68, which
18  is a Merck document called Deaths in
19  Studies 078, 091 and 126.
20    The third is a -- is Tab 69, a
21  memo from Dr. Chen to Dr. Bain called
22  Mortality Analysis for Protocol 091 and
23  078.
24    Q. You can just tell me the tab

Page 509

1  numbers.
2    A. Well, before I tell you them, I
3  want to make sure that they are what I'm
4  thinking of. And to do that I've got to
5  -- It's not that one.
6    THE WITNESS: Do we have
7  more binders?
8    MR. TISI: I have one right
9  here. That's why I was --
10    THE WITNESS: Okay.
11    MR. TISI: It's right here,
12  Doctor.
13    THE WITNESS: Okay.
14    A. Okay. Another is Tab 133.
15    Q. Mm-hmm.
16    A. A memo to Ray Bain from Josh Chen.
17    Q. Mm-hmm.
18    A. That is called Summary of the
19  Mortality Analysis. Another is Tab 147
20  from Dr. Chen to Dr. Bain, similar title.
21  And the last is Tab 146, which is the
22  12/18/04 Interim Review on Cardiovascular
23  Thrombotic Events in Alzheimer's Studies.
24  This looks like an FDA document.

20 (Pages 506 to 509)

Jerry Avorn, M.D.

Page 510

1    Q.  Is that the list of numbers that
2    you've indicated on your --
3    A.  Yes.
4    Q.  -- report?
5        I also want to mark as the next
6    exhibit, Doctor, the expert report you're
7    looking at with the tabs written next to
8    it.  Okay?
9    A.  Sure.  Sure.
10           MR. GOLDMAN:  Let me mark
11   that as 14.
12           MR. TISI:  The only thing
13   is I would like to make a copy, so he can
14   leave with it.
15           MR. GOLDMAN:  That's fine.
16           MR. TISI:  Then you can
17   mark the original report if you'd like.
18           MR. GOLDMAN:  Okay.
19           MR. TISI:  Doctor, can I
20   have your report --
21           THE WITNESS:  Sure.
22           MR. TISI:  -- so I can put
23   a sticker on it, please?
24           (Exhibit-14, Expert Report

Page 511

1    of Jerry Avorn, M.D., dated March 20,
2    2006, marked for identification).
3        BY MR. GOLDMAN:
4    Q.  Dr. Avorn, is it your testimony
5    that you reviewed all of the information
6    that was behind the tabs that you just
7    referred to?
8    A.  Absolutely.
9    Q.  The -- We're going to talk about
10   all-cause mortality in a minute --
11           MR. TISI:  Could we go off
12   the record for one second?
13           MR. GOLDMAN:  Sure.
14           (Off the record at 9:59
15   a.m.)
16           (Recess taken).
17           (Back on the record at 10:00
18   a.m.)
19       BY MR. GOLDMAN:
20   Q.  What's your definition of an ITT
21   analysis, sir?
22   A.  Intention-to-treat, which means that
23   all patients in a study are followed up on
24   regardless of whether they drop out of a

Page 512

1    given treatment group.
2    Q.  Is data better and more reliable
3    the longer you follow people in a
4    particular study?
5    A.  It depends.
6    Q.  Sometimes the data is more
7    reliable, sometimes it's less reliable,
8    depending on how long you study the
9    patients, right?
10   A.  Correct.
11           MR. TISI:  Objection.
12           MR. GOLDMAN:  Mm-hmm.
13           MR. TISI:  Go ahead.
14           BY MR. GOLDMAN:
15   Q.  Do you agree, sir, that on-therapy
16   experience may be more appropriate when
17   analyzing data on the side effects of
18   therapy?
19   A.  Not necessarily.
20   Q.  Well, when is on-therapy experience
21   more appropriate when analyzing side
22   effects of drug therapy?
23   A.  Well, if the side effect is
24   instantaneous, like anaphylaxis, then an

Page 513

1    on-therapy design would be plausible.
2        If the side effect is one that may
3    occur with some delay, even after a drug
4    is stopped, particularly if it might occur
5    more than 14 days after the drug is
6    stopped, then one could definitely miss
7    important adverse events if you stopped
8    considering patients within 14 days of
9    stopping.
10       And there's another important
11   point, and that is that an on-therapy
12   analysis drops out patients who stop
13   therapy, and if they stop therapy because
14   of a side effect, which perhaps may not be
15   documented or detected within 14 days, you
16   lose ascertainment of that side effect if
17   you stop considering that patient once
18   they're off therapy.
19   Q.  Is it your opinion, sir, in Merck's
20   analysis of the Alzheimer's data that
21   Merck did not count patients who stopped
22   the study because of a side effect?
23           MR. TISI:  What analysis,
24   Counsel?

21 (Pages 510 to 513)

Jerry Avorn, M.D.

1    A.  In --
2    Q.  Do you know what I'm talking about?
3    A.  I do.  And I know that Merck did
4    it several different ways, so they were
5    intention-to-treat analyses, and there were
6    on-therapy analyses, both.
7    Q.  Is it your testimony that Merck did
8    not include, in the analyses that were
9    done on the Alzheimer's trials, adverse
10   events that occurred when people stopped
11   using Vioxx in the clinical trials?
12   A.  All right.
13        MR. TISI:  Objection.
14   A.  Let me answer that again.  Merck
15   performed analyses on an intention-to-treat
16   basis as well as on an on-therapy basis.
17   Q.  Fine.
18   A.  If your question is about did they
19   miss side effects in their on-therapy or
20   on-treatment analysis, the important point
21   here, which is a subtle one, but very,
22   very important, is that if a patient has
23   an adverse event, let's say, on March 1st,
24   and perhaps is not identified as a heart

1    attack or -- or anything, but simply feels
2    sick, doesn't show up anymore for the
3    study, doesn't take the drug, and then you
4    stop counting any events in that patient
5    two weeks later after they've dropped out
6    of the study, if the adverse event is not
7    ascertained accurately in those two weeks,
8    that adverse event will not be counted.
9    Q.  Is it important when you are
10   determining, not after the fact, but when
11   you're planning a study, is it important
12   to think about what are the possible
13   biologic mechanisms that could lead to
14   side effects down the road with a
15   particular medicine?
16   A.  That is one important step.
17   Q.  It's important -- Before you just
18   say that everybody should be looking at
19   all the data through the year after a
20   particular study, that there be some
21   mechanism that somebody -- not after the
22   fact -- but at the time -- anticipates
23   might cause heart attacks or strokes after
24   people stop using Vioxx, true?

1    A.  And the -- the first part of the
2    question is, is it important?
3    Q.  You would agree, sir, that before
4    concluding that Merck should have analyzed
5    all of the data and planned to do that in
6    advance of the trials through 210 weeks,
7    let's say, after a particular study ended,
8    it would be important to think about
9    whether there was a biologic mechanism
10   that might cause patients to suffer side
11   effects after they're done taking Vioxx,
12   right?
13   A.  Would it be important -- I'm trying
14   to get back to the beginning of the
15   sentence.
16   Q.  To you.  To you.
17   A.  Would it be important to consider
18   whether there is a mechanism in place?
19   Q.  Yes.
20   A.  That would be an important thing to
21   take into account.
22   Q.  And the mechanism that everybody is
23   talking about, about how Vioxx could
24   potentially cause heart attacks, involved

1    this imbalance between prostacyclin and
2    thromboxane, true?
3        MR. TISI:  Objection.
4    A.  I think that your continuously
5    referring back to that is a kind of
6    reductionist approach that oversimplifies
7    the issues.
8    Q.  Have you ever, in any of your
9    articles, sir, said that Vioxx can cause
10   heart attacks by a mechanism other than by
11   reducing prostacyclin and create an
12   imbalance?
13   A.  I've not -- I don't write about
14   mechanisms.
15   Q.  So the answer is no?
16   A.  Right.
17   Q.  Okay.  If Merck didn't have a
18   reason to think that these patients in
19   their studies would suffer a side effect
20   more than 14 days after stopping the
21   medicine, would you agree that it would be
22   appropriate to stop analyzing the data at
23   14 days after the study?  Just -- Let's
24   assume that my premise is correct.

22 (Pages 514 to 517)

Jerry Avorn, M.D.

Page 518

1    A.  Mm-hmm.
2    Q.  Is my conclusion accurate?
3    A.  In a population of elderly people,
4    I believe that the issues are different,
5    because we know that problems may be
6    underascertained, and their consequences
7    may become clearer or evident more than
8    two weeks after a drug is stopped.
9        So I would say that both an
10   on-treatment and an intention-to-treatment
11   analysis would be appropriate in that
12   setting, particularly in demented elderly
13   patients in whom ascertainment of side
14   effects may not be evident within two
15   weeks.
16       So I'm not saying it's
17   inappropriate to have considered an
18   on-treatment analysis, but I would also
19   have said that if one does that, one
20   should also consider an intention-to-treat
21   analysis.
22   Q.  Did the FDA know what the plan was
23   before the Alzheimer's trials in terms of
24   analyzing the side effects?

Page 519

1    A.  I believe they did.
2    Q.  The FDA was aware that the plan
3    going into the Alzheimer's trials was to
4    look at adverse events that occurred on
5    therapy through 14 days after the study
6    ended, right?
7    A.  Right.
8        MR. TISI:  Objection as to
9    incomplete.
10   BY MR. GOLDMAN:
11   Q.  Do you know, Dr. Avorn, whether in
12   any of the other NSAIDs that are on the
13   market, there have been clinical trials
14   where adverse events have been studied for
15   a year after a particular study ends?
16   A.  I believe that in the Celebrex
17   colon polyps studies, there are ongoing
18   studies, as there was with APPROVe.
19   Q.  Anything else?
20   A.  Not to my knowledge.
21   Q.  Do you know in the Alzheimer's
22   trials whether Vioxx patients were followed
23   for a longer period of time after they
24   stopped using the medicine than the

Page 520

1    patients in the placebo arm were followed?
2    A.  I don't know.
3    Q.  Do you know whether there was a
4    difference in the number of Vioxx patients
5    who were followed after the Alzheimer's
6    trials ended compared to the placebo
7    patients?
8    A.  There should not have been, because
9    they were supposed to be double-blind
10   studies.
11   Q.  Do you agree, sir, that during the
12   off-drug period in the Alzheimer's trial
13   there was no statistically significant
14   difference in heart attacks or thrombotic
15   cardiovascular events between Vioxx and
16   placebo?
17       MR. TISI:  Objection,
18   misstates.
19   A.  I believe that's the case, but for
20   -- my concern is what I stated earlier,
21   which is ascertainment of a heart attack
22   in a demented elderly patient is very
23   problematic.
24   Q.  Well, you would agree, sir, there's

Page 521

1    no reason to think that demented elderly
2    patients would be more likely to miss a
3    heart attack in the Vioxx arm than they
4    would be in the placebo arm, true?
5    A.  That's an incorrect question,
6    because --
7    Q.  I'm not asking you to correct my
8    question.  Can you just say whether or not
9    that's true, or not?
10   A.  Only if I get to explain why that's
11   an incorrect question.  It is -- There
12   would be no reason to think that, except
13   that under-ascertainment of outcomes will
14   always drive the results toward the known.
15   Q.  Is it true that during the off-drug
16   period in the Alzheimer's trials there was
17   no statistically significant difference in
18   heart attacks or thrombotic cardiovascular
19   events?
20   A.  I think we just answered that.
21   Q.  Yes; that's true?
22   A.  I've lost track of who's asking and
23   who's answering.  I believe that that's
24   the case.

23 (Pages 518 to 521)

Jerry Avorn, M.D.

Page 522

1   Q.  You made a statement in the last
2   sentence on Page .15 that Merck did not
3   provide a complete and accurate account of
4   study outcomes to the FDA --
5        MR. TISI:  I'm sorry.  What
6   page?
7        BY MR. GOLDMAN:
8   Q.  -- concerning the Alzheimer's
9   trials --
10       THE WITNESS:  Fifteen.
11       BY MR. GOLDMAN:
12  Q.  -- until Vioxx was off the market.
13  Do you see the last sentence?
14  A.  (Witness viewing document).  Yes.
15  Q.  "To my knowledge, Merck did not
16  provide a complete and accurate account of
17  these study outcomes to the FDA until
18  after the drug had been taken off the
19  market."  Is that your testimony?
20  A.  That is my understanding.  And if
21  there is an account, I would be
22  pleased to review it.
23  Q.  What is the primary analysis that
24  was prespecified in the Alzheimer's trials

Page 523

1   concerning the time period when -- when
2   patients would be studied?
3   A.  On-treatment, up to 14 days after
4   they stopped treatment.
5   Q.  Did Merck provide that analysis to
6   the FDA before the drug was withdrawn?
7   A.  I believe they did.
8   Q.  Did Merck give the FDA all of the
9   information that would allow the FDA to
10  perform any intention-to-treat analysis
11  they wanted for the Alzheimer's trials?
12  A.  I don't know whether FDA provided
13  them with the raw data needed for that.
14       MR. TISI:  You meant Merck,
15  I assume?  Merck provided FDA?
16  A.  Right.  That's what I meant.
17  Q.  You say that, "Mortality is of
18  greatest concern when analyzing the
19  Alzheimer's trials."  Is that your view?
20  A.  Yes.
21  Q.  Now, the mortality that you are
22  referring to includes deaths that occurred
23  off drug, right?
24  A.  Any mortality, on or off.

Page 524

1   Q.  And did you make any effort at all
2   to determine the cause of the deaths that
3   occurred in patients who had stopped using
4   Vioxx?
5   A.  This is an important -- Yeah.  Yes.
6   Q.  Okay.  That's all I want to know.
7   A.  Yes.
8   Q.  Of the deaths, sir, that occurred
9   in the -- let's say the 078 study, how
10  many occurred more than 48 weeks or 300 --
11  after 300 days after patients stopped
12  using Vioxx?
13  A.  I don't recall that number.
14  Q.  Do you know what the number is for
15  placebo?
16  A.  No.
17  Q.  Do you think it would be important
18  before you blame Vioxx for all of the
19  deaths that occurred in its Vioxx arm
20  after the end of the Alzheimer's trial to
21  take a look to see what the nature of
22  those deaths were?
23       MR. TISI:  Objection to
24  after the end of the study.  Intention to

Page 525

1   treat is while the study is ongoing.  But
2   go ahead.
3   A.  The correct answer is yes, I know.
4   And I need to explain why.
5   Q.  Okay.
6   A.  And this -- this relates to my work
7   in geriatric pharmacology and geriatrics.
8   Q.  Mm-hmm.
9   A.  The cause of death in an older
10  patient, as I indicate in my report, is
11  often very tough to determine.  If an
12  older person has a stroke, perhaps, in
13  their sleep, they may aspirate their
14  stomach contents as a result of the
15  stroke.  It goes into the lungs, and the
16  next day they are discovered to have
17  pneumonia.  That will then be diagnosed as
18  pneumonia, and there may or may not be --
19  or if they have a heart attack and have a
20  transient period of unconsciousness or low
21  blood pressure, they may aspirate and
22  develop a pneumonia.
23       We've reported on -- on this kind
24  of issue in a paper in the New England

24 (Pages 522 to 525)

Jerry Avorn, M.D.

Page 526

1  Journal in December of last year in which
2  we looked at deaths related to a different
3  class of drugs. The important point, if I
4  may finish --
5  Q.   Mm-hmm.
6  A.   -- is that because heart attacks
7  and strokes may occur unobserved in an
8  elderly patient and do -- we know they do
9  not present typically as they do in middle
10 aged patients, the so-called terminal event
11 may be recorded as a pneumonia or sudden
12 death or any number of things.
13 Q.   Mm-hmm.
14 A.   So that death is a very, very
15 important outcome, even if the supposed
16 cause of death is gotten wrong. Because
17 one thing you tend to not get wrong in
18 these patients is whether they're dead or
19 not.
20 Q.   Is there a statistically
21 significant difference in all-cause
22 mortality in the Alzheimer's trials if you
23 look at just the on-drug period when
24 patients were taking the medicine?

Page 527

1  A.   I believe there is not.
2  Q.   Are you aware of any other Vioxx
3  clinical trial, sir, other than the 078
4  Alzheimer's trial, that showed a
5  statistically significant difference in
6  all-cause mortality?
7  A.   Okay.
8       (Witness viewing documents).
9  There's protocol 091 --
10 Q.   Mm-hmm.
11 A.   -- as per Tab 35, in which Drs.
12 Block and Reines, R-E-I-N-E-S, report a
13 statistically significant, almost fivefold
14 increase in the death rate in patients in
15 that Alzheimer's study using an
16 intention-to-treat analysis. And that's
17 from a Merck internal document dated March
18 21st, 2001.
19 Q.   Other than Study 078 and 091 in the
20 Alzheimer's trials, do you know, sir,
21 whether or not there was an increased
22 statistically significant difference --
23 Withdrawn.
24      Other than Study 078 and 091 in the

Page 528

1  Alzheimer's trials that was analyzed under
2  this ITT analysis, are you aware of any
3  other Vioxx clinical trial where there was
4  an increase in all-cause mortality in the
5  Vioxx arm?
6  A.   Okay. Let me just continue to look
7  through these, because I obviously don't
8  keep all these in my head.
9       (Witness viewing document).
10 Q.   Why don't I do this, Dr. Avorn --
11 A.   Yes.
12 Q.   Because it's going to take too long
13 for you to look through all of them.
14 A.   Okay.
15 Q.   Do you, in your expert report,
16 indicate, sir, the names or descriptions
17 of any other Vioxx clinical trial that
18 showed an increase in all-cause mortality
19 in the Vioxx arm?
20 A.   I think that's quite different from
21 what you just asked me.
22 Q.   It is different. Can you answer
23 the question I just asked?
24 A.   Okay. Do I indicate study numbers

Page 529

1  in my report?
2  Q.   Do you indicate anywhere in your
3  expert report any studies, other than the
4  Alzheimer's studies, where you claim there
5  was an increase in mortality between Vioxx
6  and a comparator?
7  A.   Where do I make that claim? I'm
8  asking for information about what your
9  question relates to.
10 Q.   Sir --
11 A.   You said I claim all-cause
12 mortality --
13      MR. TISI: I think you're
14 just not --
15      BY MR. GOLDMAN:
16 Q.   Do you indicate anywhere in your
17 report --
18 A.   Right.
19 Q.   -- whether or not a study other
20 than Alzheimer's --
21 A.   Right.
22 Q.   -- for the Vioxx drug reflects an
23 increased risk of mortality between Vioxx
24 and a comparator?

25 (Pages 526 to 529)

Jerry Avorn, M.D.

Page 530

1    A.  No.
2    Q.  Was there a statistically
3  significant increase in all-cause mortality
4  across all the Vioxx studies when you look
5  at them together?
6    A.  I've never done so.  I've never
7  looked at all Vioxx studies together.
8  Again --
9      MR. TISI:  Can I just ask a
10  clarification?  Are you talking about on
11  drug or ITT or both?  Because I just get
12  the impression that perhaps you and he may
13  be thinking of something different, but...
14    A.  I've never had occasion to
15  amalgamate all Vioxx studies and look at
16  all-cause mortality in all studies.
17      MR. TISI:  Okay.
18      BY MR. GOLDMAN:
19    Q.  Do you know what the relative risk
20  of all-cause mortality was in the APPROVe
21  study when you look through 14 days after
22  the study ended?
23    A.  Not off the top of my head.  But I
24  do recall it as having been elevated.

Page 531

1    Q.  In fact, you're aware, sir, that
2  there was no increase in mortality in the
3  APPROVe study between Vioxx and placebo,
4  true?
5    A.  That's my understanding.
6    Q.  Are you aware of any peer-reviewed
7  literature that analyzes the Alzheimer's
8  trials by looking at all-cause mortality?
9    A.  I'm aware of the reports of the
10  Alzheimer's studies as they appeared in
11  the literature, but I'm not aware that the
12  people who wrote them up presented
13  all-cause mortality in any papers.
14    Q.  So it's true that you're not aware
15  of any peer review article that analyzes
16  the Vioxx Alzheimer's trials by looking at
17  all-cause mortality?
18    A.  Right.
19    Q.  Before the withdrawal of Vioxx,
20  sir, wasn't the FDA aware of the deaths
21  that occurred in the Alzheimer's trials?
22      MR. TISI:  Objection;
23  misleading.
24    A.  I cannot speak to what FDA was or

Page 532

1  wasn't aware of.
2    Q.  Did you ever read the FDA's
3  analysis of the Alzheimer's data in
4  December of 2004?
5    A.  I was -- I had just in front of me
6  a minute ago what appeared to be an FDA
7  analysis of that.
8    Q.  I just want to know if you read
9  it.
10    A.  I just want to make sure we're
11  talking about the same thing.
12    Q.  Okay.
13    A.  There's a December of '04, Dr.
14  Villalba, December 18th interim review.
15  Is that what you're referring to?
16    Q.  Yes.  Did you review that?
17    A.  Yes.
18    Q.  Okay.  You were sent the APPROVe
19  extension data, were you not?
20    A.  Yes.
21    Q.  When did you review that, sir?
22    A.  Oh, very recently.  It only became
23  available, I think, in May, just last
24  month, and I reviewed it when it was sent

Page 533

1  in just the last few weeks.
2    Q.  How much time have you spent
3  reviewing the extension data in the
4  APPROVe study?
5    A.  Not very much, because I think it
6  arrived while I was in Australia.  And I
7  looked at it when I was on vacation, but
8  not for hours and hours.
9    Q.  Did you spend more than an hour
10  looking at the extension data from the
11  APPROVe study?
12    A.  I believe I did, because I had been
13  previously sent it by a reporter who
14  wanted my -- my impressions of it as well.
15  So I looked at it before I left town as
16  well as from abroad.
17    Q.  What did the reporter send you?
18    A.  It was information that I think
19  Merck had issued about -- about the
20  APPROVe extension study and its press
21  release, and then there was a concern
22  about whether the press release was
23  accurate.
24      And I think there -- And I can't

26 (Pages 530 to 533)

Jerry Avorn, M.D.

Page 534

1 remember which source I saw this from, but
2 there was also some backup data, which I
3 -- Yeah, I think Merck issued, actually.
4 Merck had a press release, but also issued
5 -- also made available some data as well.
6 Q. Did you review the data that Merck
7 made available about the extension for the
8 APPROVe study before the plaintiffs'
9 lawyers sent you the extension data?
10 A. I think I did, at the request of
11 the reporter, yes.
12 Q. You don't know what you reviewed
13 that the reporter sent you, true?
14 A. Well, no. I recall pretty clearly
15 that it was what Merck had put out on its
16 Web site.
17 Q. Okay. Where is that? Do you
18 still have the information that the
19 reporter sent you?
20 A. I actually looked at it on line.
21 But I can tell you that it was that which
22 was on the Merck Web site.
23 Q. Okay.
24 A. Which, actually I would have

Page 535

1 probably looked at anyway, because it was
2 of interest.
3 Q. Did you analyze the data in the
4 APPROVe study past 210 weeks?
5 A. Was there such -- I'm trying -- I
6 don't recall whether there was any data
7 past 210 weeks.
8 Q. If there was, you didn't review it
9 and analyze it, right?
10 A. I can't --
11 MR. TISI: Can we put the
12 document in front of him? That's the best
13 thing to do.
14 A. Yeah. I -- I can't say yes or no
15 to which week's worth of data I reviewed.
16 I remember there were several cut points.
17 I remember 210 was one of them. If there
18 was data beyond 210, we can look at it
19 and I can tell you --
20 MR. TISI: I mean, if
21 you're going to ask him a question, I'm
22 going to insist that you put it in front
23 of him.
24 ///

Page 536

1 BY MR. GOLDMAN:
2 Q. Do you agree, sir, that there's no
3 evidence of an elevated cardiovascular risk
4 after patients stop taking Vioxx in the
5 APPROVe study?
6 MR. TISI: I'm going to
7 insist that you give him the document,
8 Counsel. I really am.
9 BY MR. GOLDMAN:
10 Q. If you need to look at the
11 document, go ahead.
12 A. I can tell you --
13 MR. TISI: No, no, no.
14 He's not going to. I've allowed you to
15 do this a lot, and I know we're --
16 (Whereupon, all parties
17 speaking at the same time).
18 BY MR. TISI:
19 Q. Dr. Avorn, if you need to look at
20 the document, fine.
21 A. I will look at it, but without
22 looking at it, having reviewed it
23 previously, I can tell you that there was
24 a statistically significant P.01 or P.02

Page 537

1 increase in stroke post-cessation of Vioxx,
2 and that that is a kind of cardiovascular
3 morbidity.
4 Q. If you look at strokes and heart
5 attacks together, sir, you remember that
6 there was no evidence of an elevated
7 cardiovascular risk in patients who had
8 stopped taking Vioxx in the APPROVe study,
9 right?
10 A. I recall that it was not
11 statistically significant, but I'd want to
12 look at the numbers before going beyond
13 that.
14 Q. Do you know, sir, whether there was
15 any increased risk of Vioxx for heart
16 attacks and sudden cardiac death in the
17 APPROVe study when you look at patients
18 off drug?
19 MR. TISI: Again, I object
20 without the document in front of him.
21 BY MR. GOLDMAN:
22 Q. Do you know?
23 A. I recall that the significant
24 findings dealt with stroke, and I don't

27 (Pages 534 to 537)

Jerry Avorn, M.D.

1 recall other significant findings off drug:
2 Q. Do you remember, sir, that when you
3 look at the off-drug data for the APPROVe
4 study in connection with the on-drug data
5 in the APPROVe study, that the relative
6 risk for heart attacks actually goes down?
7 A. As I recall, that was one of the
8 more deceptive ways that the Merck press
9 release presented -- that if you combine
10 the not taking the drug with the taking
11 the drug, there is less of a risk, if you
12 add the off-drug experience. But that's
13 not surprising or important.
14 Q. You can just tell me, sir, whether,
15 based on your analysis, you're aware that
16 the relative risk for heart attacks goes
17 down when you combine the on-drug data in
18 the APPROVe with the off-drug data?
19 A. That's my recollection.
20 Q. You've seen the KM curve in the
21 APPROVe study, haven't you?
22 A. Yes.
23 Q. What does the KM curve in the
24 APPROVe study reflect about when the

1 difference in cardiovascular events -- I
2 should say confirmed APTC events --
3 becomes statistically significant?
4 A. That's been very controversial.
5 Q. I'm only talking right now about
6 the KM curve.
7 A. Right. Merck contended, I think
8 erroneously, that there's no risk until 18
9 months. And I think that's an incorrect
10 assessment, as do most other people whose
11 opinions I respect.
12 There's been some controversy
13 recently as to whether Merck performed the
14 statistics correctly in terms of the log
15 of time versus the actual time as a
16 variable.
17 But I do not believe that the
18 contention that there is no risk prior to
19 18 months is substantiated by that data.
20 Q. If you just look at the APPROVe KM
21 curve, do you agree that looking at just
22 the curve --
23 MR. TISI: The -- Which
24 curve --

1 BY MR. GOLDMAN:
2 Q. -- the difference in --
3 MR. TISI: Which curve are
4 you talking about?
5 BY MR. GOLDMAN:
6 Q. -- confirmed APTC events?
7 MR. TISI: Okay. No other
8 curves.
9 BY MR. GOLDMAN:
10 Q. You agree that the difference in
11 those events does not become statistically
12 significant until 36 months?
13 A. That's an impossible question
14 because you can't determine statistical
15 significance by looking at a curve.
16 Q. Okay. You haven't done any
17 research to determine whether or not using
18 a statistical method involving log of time
19 versus the actual time as a variable was
20 appropriate, right?
21 A. Right.
22 Q. And you don't know because you're
23 not a statistician -- Well, withdrawn.
24 I need to be more specific, because

1 I wasn't referring to studies. Okay?
2 A. Okay.
3 Q. You haven't done any research, Dr.
4 Avorn, to determine whether or not the
5 statistical method that was used in the
6 APPROVe study concerning log of time
7 versus actual time as a variable was
8 appropriate, right?
9 A. That's correct.
10 Q. And when you said before that
11 there's a controversy about whether or not
12 Merck used the appropriate variable, you're
13 basing that on what you've read in the
14 newspaper and heard in the media --
15 MR. TISI: Objection.
16 BY MR. GOLDMAN:
17 Q. -- true?
18 A. No. In conversation with
19 colleagues, including biostatisticians and
20 epidemiologists.
21 Q. Okay. The -- Let me just briefly
22 ask you, sir, about Study 136, which you
23 refer to in your report.
24 A. Can you show me where I refer to

28 (Pages 538 to 541)

Jerry Avorn, M.D.

Page 542

1  it?
2  Q.  Yes.  Page .17 at the top.
3  A.  (Witness viewing document).  Yes.
4  Q.  Was there a statistically
5  significant difference in thrombotic events
6  between Vioxx and placebo in Study 136?
7  A.  Let me just pull it out here.
8  (Witness viewing documents).
9  MR. TISI:  Would you repeat
10  the question?
11  MR. GOLDMAN:  Yes.
12  BY MR. GOLDMAN:
13  Q.  Do you know, sir, that there was no
14  statistically significant difference in
15  thrombotic events between Vioxx and placebo
16  in Study 136?
17  A.  (Witness viewing document).
18  MR. TISI:  While he's
19  looking at that, I hate to do this, I've
20  got to make a quick phone call about my
21  flight.
22  (Off the record at 10:30
23  a.m.)
24  (Discussion off the record).

Page 543

1  (Back on the record at 10:35
2  a.m.)
3  A.  That was a twelve-week study that
4  was designed to ask a totally different
5  question about the rate of ulcer
6  development, and so I would not even have
7  looked for that outcome.
8  Q.  Do you know, sir, one way or the
9  other, whether there was a statistically
10  significant difference in thrombotic events
11  between Vioxx and placebo in Study 136?
12  A.  I didn't even know that they looked
13  at that outcome.  And if they had, I
14  would not have been interested, because it
15  was a different question being asked.
16  Q.  So the answer is you don't know?
17  A.  Right.  I -- I would not expect
18  that there would be.  I don't know.
19  Q.  Do you take the position that Merck
20  delayed submitting the results of Study
21  136 to the FDA?
22  A.  (Witness viewing document).  My
23  understanding -- and I'm pleased to be
24  corrected if I got this wrong -- that the

Page 544

1  results of that study were not submitted
2  to the FDA until after the label was
3  revised.
4  Q.  What's the basis for that
5  understanding?
6  A.  I'm trying to recall whether it was
7  a date on the document in which it was
8  submitted or some other source.  But I
9  can't recall the origin of that knowledge.
10  Q.  Do you know whether the plaintiffs'
11  lawyers told you that fact and you relied
12  on it?
13  A.  Well, I know the plaintiffs'
14  lawyers concurred with that, and I
15  honestly can't recall whether I saw it on
16  a document or heard it from them.
17  Q.  Did you discover on your own the
18  fact that you say Merck did not disclose
19  Study 136 to the FDA in a timely fashion?
20  A.  Well, when I saw that it wasn't
21  published until 2003, I believe I asked
22  when it was submitted to FDA, and either
23  -- and in response to that question, I
24  either was shown a document or was told

Page 545

1  that it was not submitted until after the
2  label was revised.
3  Q.  Do you know when the final results
4  of Study 136 came to Merck's attention?
5  A.  There are two very big problems
6  with your question.  One is --
7  Q.  It calls for a yes or no --
8  A.  No, it does not, Counsel.  I have
9  to answer in a -- in an honest way.
10  Phrasing it as "came to Merck's
11  attention," Merck conducted the study.
12  And as I said a minute ago, final results
13  are a function of how quickly one moves
14  the process along.  But this is a study
15  conducted by Merck.  So the results did
16  not come to their attention until they
17  completed them.
18  Q.  Did --
19  A.  So if it was a late point in time,
20  what I see here on this memo on -- at Tab
21  73 was that the preliminary results of
22  that study were internally circulated
23  within Merck in November of 2001,
24  revealing that there was no advantage in

29 (Pages 542 to 545)

Golkow Litigation Technologies - 877.DEPS.USA

Jerry Avorn, M.D.

Page 546

1  gastrointestinal toxicity between Vioxx
2  with low dose aspirin compared to the
3  comparator.
4      And so what I'm saying to you,
5  Counsel, is that they had their initial
6  results in November of 2001, when the,
7  quote, final, unquote, results, quote, came
8  to their attention, unquote, is completely
9  a function of when they made them come to
10 their attention.
11     Q.  Well, aren't there independent
12 investigators who conduct the study?
13     A.  I am aware that studies progress at
14 a pace that has a great deal to do with
15 the speed with which the sponsor wants
16 those studies to progress.
17     Q.  What was my question, Dr. Avorn?  I
18 didn't ask anything about that.
19     A.  Your question had two very
20 problematic phrases.  One was final
21 results --
22     Q.  Doctor --
23     A.  I'm speaking now.  One was "final
24 results" and one was "came to their

Page 547

1  attention."  Both of those are deceptive
2  aspects of the question.
3      MR. GOLDMAN:  If this
4  continues, I'm going to call Judge Fallon.
5      MR. TISI:  Fine.
6      BY MR. GOLDMAN:
7      Q.  My question, Dr. Avorn, was --
8      A.  When did the final results of Study
9  136 come to Merck's attention?  And I was
10 refusing to answer on the basis that
11 "final" and "come to their attention" are
12 both deceptive aspects of the question.
13     Q.  My question was:  Aren't there
14 independent investigators who conduct
15 studies like Study 136?
16     A.  Studies like 136 or Study 136?
17     Q.  Were there independent investigators
18 who were involved in Study 136?
19     A.  I expect that there were.
20     Q.  Is it your position that the
21 cardiovascular risks that you believe are
22 associated with Vioxx occur in the short
23 term when patients use Vioxx?
24     A.  I think there is evidence of early

Page 548

1  cardiovascular risk with Vioxx.
2      Q.  Is it therefore your position that
3  the cardiovascular risks that you believe
4  are associated with Vioxx occur in the
5  short term?
6      A.  You'd need to define short term.
7      Q.  Less than six months.
8      A.  Yes.
9      Q.  Less than two months?
10     A.  Probably.
11     Q.  Less than one month?
12     A.  As the number approaches zero, the
13 data points are fewer, and if we believe
14 that this is a platelet effect, it could
15 be immediate.
16     Q.  Well, there were several
17 hypothetical statements in what you just
18 said, right?
19     A.  I believe that it is a platelet
20 effect, at least in part, and therefore
21 that provides grounds for expecting that
22 the results could be very early, almost
23 immediate.
24     Q.  What is your basis, sir, for your

Page 549

1  opinion that the cardiovascular risks
2  associated with Vioxx increase immediately
3  after patients start using Vioxx?
4      A.  The curves in VIGOR diverge very
5  early on in the trial.
6      Q.  Immediately?
7      A.  Again, this is a statistical
8  concept in that if you look at the
9  Kaplan-Meyer curves in VIGOR, the curves
10 begin to diverge nearly at the start of
11 the study.
12     Our own observational studies, and
13 those of others, have found an increase in
14 risk within the first several months of
15 use, within -- within 90 days, as a matter
16 of fact.  And so combining that with the
17 expectation that the drug's mechanism of
18 harm may be prothrombotic leads to the --
19     I'm sorry.  I've got a frog in my
20 throat.
21     Q.  Mm-hmm.
22     A.  Let me just get some more water.
23     -- leads to the expectation that
24 the effect could well be immediate.

30 (Pages 546 to 549)

Jerry Avorn, M.D.

1   Q.  So it's your testimony that the
2   combination of the curve, KM curves in
3   VIGOR with the possible mechanism of harm
4   being the imbalance theory, that that
5   leads to the expectation that the
6   cardiovascular effect could be immediate?
7   A.  No.  I said, "And also the
8   observational studies, including our own --
9   Q.  Okay.
10   A.  -- which detected a difference very
11   early on.
12   Q.  So based on the KM curve in VIGOR,
13   the observational studies that you did,
14   which you say showed an increased
15   cardiovascular risk within 90 days, and
16   the theory that Vioxx might be
17   prothrombotic, it's your opinion that Vioxx
18   could increase the cardiovascular risk
19   immediately?
20   A.  When you restate my responses, you
21   somehow contract them so that they do not
22   adequately represent what I said.  I said
23   "our observational studies and those of
24   others."

1   Q.  Okay.
2   A.  There have been other groups.  And
3   if we're trying to get a comprehensive
4   listing here -- which was not what I
5   recall being asked -- there also is
6   clinical trial data indicating a rise in
7   hypertension that occurs -- or a rise in
8   blood pressure that occurs also early on
9   in the course of use of Vioxx as well.
10   Q.  Have you done any analysis, sir, to
11   determine whether or not the cardiovascular
12   risk with Vioxx occurs immediately?
13   A.  Well, I just said that we performed
14   an observational study in which we found
15   an effect that occurred within 90 days.
16   Q.  And what did that study show about
17   the cardiovascular risks of Vioxx after 90
18   days?
19   A.  We did not see the effect
20   persisting after 90 days.
21   MR. TISI:  I'm going to ask
22   him to take a look at the study if you're
23   going to ask him questions about it.
24   ///

1   BY MR. GOLDMAN:
2   Q.  Sir, other than the study that you
3   performed, which was an observational study
4   that you say showed an increase in
5   cardiovascular risk with Vioxx within 90
6   days, am I right that you haven't done any
7   other analysis to determine whether or not
8   the cardiovascular risk associated with
9   Vioxx is immediate?
10   A.  Well, are you asking about the
11   studies I've performed myself, or my
12   review of the literature, the work that
13   other people have done?
14   Q.  Let's start with studies that
15   you've performed yourself.
16   A.  Our studies -- in addition to the
17   study that was in Circulation in 2004, Dr.
18   Solomon and I, and others in our group,
19   had a paper that appeared in Arthritis and
20   Rheumatism in the last month or so.  And
21   if you want, we can refer to that as well
22   and discuss these -- the time course of
23   the -- of the findings.
24   Q.  Is that what your -- one of the

1   things that you did to try to show that
2   there was an increased risk immediately
3   with Vioxx?
4   A.  We weren't trying to show anything.
5   We were trying to get the truth.
6   Q.  Okay.  So it's your testimony, Dr.
7   Avorn, that the day that a patient uses
8   Vioxx, their cardiovascular risk --
9   Withdrawn.
10   It's your testimony, Dr. Avorn,
11   that the day that a patient uses Vioxx,
12   they are then at increased risk of having
13   a cardiovascular event?
14   A.  Right, with the risk increasing
15   over time.
16   Q.  How much does the risk increase
17   over time?
18   (Interruption).
19   MR. TISI:  I'm sorry.  Is
20   that mine?
21   THE WITNESS:  Oh, that's me.
22   Excuse me for one second.
23   (Off the record at 10:47
24   a.m.)

31 (Pages 550 to 553)