Jerry Avorn, M.D.

Page 654

1  characterization of what was asked for.
2       If you want to ask for it, we'll
3  talk getting you documents.
4       MR. GOLDMAN: You know,
5  Chris, I don't want any surprises, and I'm
6  sure Dr. Avorn, in all fairness, you want
7  to tell your story, and you don't want to
8  surprise us with documents that I haven't
9  seen, right?
10      THE WITNESS: (Witness nods
11 head).
12      MR. GOLDMAN: That would be
13 unfair?
14      THE WITNESS: I'll do
15 whatever both of you agree I should do.
16      MR. GOLDMAN: Sure.
17      MR. TISI: And nor do I,
18 Counsel.
19      MR. GOLDMAN: Okay. All
20 I'm saying is, Chris, if you intend to use
21 documents that he has in his file, and
22 you're going to do that, and you're going
23 to have Dr. Avorn testify about what they
24 say or the documents themselves, then I

Page 655

1  need to see those.
2       MR. TISI: But I will --
3  and I said, you make a request and I will
4  attempt to do that.
5       MR. GOLDMAN: Okay.
6       MR. TISI: But I don't know
7  the volume of documents. As I told you,
8  I've never seen them.
9       MR. GOLDMAN: Okay.
10      MR. TISI: So I don't know
11 the volume of documents. I don't know how
12 easy they're going to be to get. I don't
13 -- You know, I don't -- I don't know a
14 lot of variables that may -- that may take
15 these things into consideration.
16      MR. GOLDMAN: All right.
17 We will decide whether to make a request
18 after the deposition, okay, sir?
19      THE WITNESS: I will do as
20 told.
21      MR. GOLDMAN: Thank you.
22      BY MR. GOLDMAN:
23      Q. You mentioned before the three
24 things that you remember Dr. Santanello

Page 656

1  asking you to change in your paper, and as
2  you sit here today, do you remember any
3  other changes that she wanted you to make?
4       A. No.
5       Q. You also said, sir, that -- okay.
6  You testified that it was your
7  understanding that the reason Dr.
8  Cannuscio's name was taken off of your
9  paper was because Merck was concerned
10 about having a Merck employee as a
11 co-author of a paper which documented an
12 increase in risk of heart attack caused by
13 its drug. Do you remember testifying to
14 that?
15      A. That is my belief.
16      Q. Can you tell me the basis for your
17 belief, sir?
18      A. Well, it was never the case that
19 Dr. Cannuscio -- Dr. Cannuscio's
20 involvement with the project failed to
21 meet the standard requirements for
22 authorship. And it was never the plan
23 that she would be stricken from the list
24 of authors as we were working on the

Page 657

1  study.
2       Q. Mm-hmm.
3       A. It was only when we had come up
4  with findings that were unfavorable to the
5  drug that that demand was made. And it
6  was not made initially by Dr. Cannuscio;
7  it was made by the company. And that is
8  my -- the basis for my expect -- or my
9  belief that the company had a problem with
10 Dr. Cannuscio being a co-author.
11      And ironically, she was -- she
12 remained a co-author of the versions that
13 would -- that had been submitted
14 previously. And it was only at the moment
15 of publication, it was indeed almost after
16 the moment of publication that the company
17 became insistent about this change.
18      Q. Did Merck demand that Dr.
19 Cannuscio's name be removed as an author
20 on your paper when you first informed
21 Merck of the findings of your study?
22      A. No. When it was submitted as an
23 abstract, no.
24      Q. I just want to make clear, Dr.

57 (Pages 654 to 657)

Jerry Avorn, M.D.

Page 658

1 Avorn, that you are presuming that the
2 reason Merck did not want Dr. Cannuscio's
3 name on your paper was because Merck
4 didn't want a Merck employee to be on a
5 paper that documented an increased risk of
6 heart attack from Vioxx?
7    MR. TISI:  Objection;
8 mischaracterizes.
9    A.  I can only speak to my belief about
10 what was behind their decision.  I know
11 that as the paper came closer to actually
12 being published, they became more critical
13 of the findings, even though the findings
14 were pretty much the same findings they
15 had always been.
16    Q.  Okay.
17    A.  But as far as what they were
18 thinking, I can't know that.
19    Q.  If a Merck employee were to testify
20 that -- such as Dr. -- Withdrawn.
21       If Dr. Santanello were to say, sir,
22 that the reason that Merck didn't want Dr.
23 Cannuscio's name to appear on your paper
24 was because Merck didn't agree with the

Page 659

1 conclusions that you were drawing from the
2 data, you would agree, sir, that that
3 would not be an unreasonable position to
4 take, true?
5    A.  I don't agree with that.  I think
6 that it would be unreasonable.
7    Q.  Okay.
8    A.  I believe that if a person is a
9 professional and a doctorally-prepared
10 epidemiologist, they should be respected as
11 a scientist, and the decision about
12 whether they are a co-author of a
13 scientific research paper ought to be up
14 to that person and not her boss.
15    Q.  Is it true, sir, that when authors
16 appear on articles that are published,
17 that indicates that the author and his or
18 her affiliation agree with the content of
19 the article?
20    A.  No.  It means that the author
21 agrees --
22    Q.  Okay.
23    A.  -- with -- substantially with the
24 content, and it does not mean -- when I

Page 660

1 write an article it does not mean that
2 Harvard Medical School agrees with the
3 findings of my paper.
4    Q.  If Dr. Cannuscio's name remained on
5 your paper, would you have indicated that
6 she was a Merck employee?
7    A.  We would have had to.
8    Q.  And if Merck doesn't agree with the
9 findings of a particular study, you agree,
10 sir, that Merck isn't obligated to have
11 its employees' names on those study?
12    A.  I do not agree with that at all.
13 I believe that -- as I said, an
14 organization can have its -- a scientist
15 that is in its employ be a co-author of a
16 research paper without it implying that
17 the company subscribes to the finding.
18 And that happens all the time.
19    Q.  Did Merck take away any grant money
20 from you because of the results of your
21 study?
22    A.  No.
23    Q.  Did Merck ever try to intimidate
24 you because of the results your study?

Page 661

1    A.  No.
2    Q.  Did Merck ever try to persuade you
3 not to publish your study?
4    A.  No.
5    Q.  Did Merck ever take any
6 inappropriate action after you published
7 your study?
8    A.  No.
9    Q.  Did Merck have a right to disagree
10 with some of the conclusions in your
11 study?
12    A.  I think any person or entity has a
13 right to the disagree with anything.
14    Q.  So the answer is yes?
15    A.  Yes.
16    Q.  It's true, sir, that you don't have
17 any personal knowledge of the real reasons
18 why Merck didn't want Dr. Cannuscio's name
19 to appear on your study, true?
20       MR. TISI:  Objection; asked
21 and answered.
22    A.  All I know is what we were told by
23 -- by Dr. Santanello and Dr. Merck -- and
24 Dr. Cannuscio.

58 (Pages 658 to 661)

Jerry Avorn, M.D.

Page 662

1    Q.  And neither Dr. Cannuscio nor Dr.
2  Santanello told you that the reason that
3  they didn't want Dr. Cannuscio's name to
4  appear on your paper was because they
5  didn't want a Merck employee on an article
6  that reflected unfavorably about Vioxx?
7    A.  I would need to ask Dr. Solomon
8  specifically what language was used in his
9  conversations.
10    Q.  Well, based on your knowledge, sir,
11  as you sit here today, you don't know that
12  -- you have no reason to think that Dr.
13  Santanello or Dr. Cannuscio told you or
14  Dr. Solomon that the reason that Dr.
15  Cannuscio's name was not going to be on
16  the paper was because Merck didn't want
17  its employees to be affiliated with an
18  article that reflected poorly on Vioxx?
19    A.  That's not correct.
20    Q.  Okay.  Let me ask it differently,
21  then.
22       MR. TISI:  Well, no
23       BY MR. GOLDMAN:
24    Q.  Well, no, it's not correct.  It's

Page 663

1  not correct.
2       MR. TISI:  Okay.  That's
3  fine.
4       BY MR. GOLDMAN:
5    Q.  Doctor, as you sit here today, Dr.
6  Avorn, I understand that you believe, in
7  your heart of hearts, that Merck's reason
8  for not wanting Dr. Cannuscio on your
9  paper was because you think that Merck
10  didn't want an employee of theirs to be on
11  a paper that reflected poorly on Vioxx,
12  right?
13    A.  Yes.
14    Q.  In all fairness, though, Dr. Avorn,
15  you don't know the true reason why the
16  people at Merck didn't want Dr.
17  Cannuscio's name on your paper, right?
18    A.  Can I answer that question?
19    Q.  Yes.
20    A.  When I asked Dr. Solomon -- who, as
21  I said, was the person who had the
22  conversations with Dr. Cannuscio and Dr.
23  Santanello -- what was going on -- because
24  this is pretty unprecedented.

Page 664

1    Q.  Mm-hmm.
2    A.  He said that he had the strong
3  impression, from his conversations with Dr.
4  Cannuscio and Dr. Santanello, that Merck
5  wanted to distance itself from our paper.
6  I can ask him --
7    Q.  Distancing yourself from a paper
8  may be because you don't agree with its
9  conclusions as opposed to not wanting an
10  employee on the paper because it reflects
11  poorly on Vioxx, agree?
12    A.  Well, the conclusions did not
13  change from the original submission.
14    Q.  Let's put any discussions that Dr.
15  Solomon had with Dr. --
16    A.  Cannuscio.
17    Q.  -- Cannuscio and Santanello aside.
18  All right?
19    A.  Right.
20    Q.  Based on your personal knowledge,
21  Dr. Avorn, it's true that you don't know
22  the reason why Merck didn't want Dr.
23  Cannuscio's name on your paper?
24       MR. TISI:  Objection.

Page 665

1    A.  It depends whether my personal
2  knowledge includes my conversations with
3  Dr. Solomon or not.
4       My conversations with him, when I
5  asked him what was going on, he said it
6  was clear to him that Merck wanted to
7  distance itself from the paper.  So it
8  depends on how you define my personal
9  knowledge.
10    Q.  Based on your personal interactions
11  with Merck, you don't know why Merck
12  decided that they didn't want Dr.
13  Cannuscio's name to appear on your paper?
14    A.  That's right.  I did not discuss
15  these matters with these people.
16    Q.  Let's switch to the -- okay.  Let's
17  switch to Dr. Graham's observational study
18  2005.
19    A.  Observational study 2005, the one
20  he did with Pfizer?
21    Q.  Yes.
22    A.  Right.  I'd like to have it in
23  front of me, if I could.
24    Q.  Mm-hmm.  Let me just hand it to

59 (Pages 662 to 665)

Jerry Avorn, M.D.

Page 666

1   you. I'm not going to mark it, okay?
2   This is the Graham study.
3       A. (Witness viewing document).
4           MR. TISI: I'm sorry. Just
5   for -- This may be used. Can we just
6   mark it?
7           MR. GOLDMAN: Okay. Twenty-
8   one.
9           MR. TISI: Thanks. I just
10  -- For the record we need to do that.
11          (Exhibit-21, Study entitled
12  "Risk of Acute Myocardial Infarction and
13  Sudden Cardiac Death in Patients Treated
14  with Cyclo-Oxygenase 2 Selective and
15  Non-Selective Non-Steroidal
16  Anti-Inflammatory Drugs: Nested
17  Case-Control Study," marked for
18  identification.)
19          BY MR. GOLDMAN:
20      Q. This was a study that was published
21  after Vioxx was withdrawn, right?
22      A. (Witness viewing document). Right.
23      Q. And are you relying on the results
24  of this study, sir, for your opinions?

Page 667

1       A. Yes. Among other papers.
2       Q. Okay. Is one result of this study
3   that there was no statistically significant
4   increased risk of heart attack and sudden
5   cardiac death at the 25 milligram dose of
6   Vioxx?
7       A. (Witness viewing document). I see
8   a nearly 60 percent increase in risk at 25
9   milligrams per day or less.
10      Q. Where is that?
11      A. In the abstract. It's in the --
12  under Findings. It's right there. "1.59
13  for an adjusted odds ratio --" if I'm
14  reading this -- "for Rofecoxib, 25
15  milligrams per day or less."
16      Q. Have you read this study carefully,
17  sir?
18      A. Yes.
19      Q. And it's your opinion that Graham's
20  study shows an increased -- statistically
21  significant increased risk of heart attack
22  with Vioxx. Is that your testimony?
23      A. Okay. I think what -- what we're
24  talking about here is the P.054 issue

Page 668

1   again. And if you're -- okay. The
2   1.59 --
3       Q. Mm-hmm.
4       A. -- is for all doses, and I need to
5   explain again that the best estimate of a
6   subgroup -- in this case a dose subgroup
7   -- is generally accepted to be the
8   estimate for the whole group, and that
9   when one looks at numerically smaller
10  subgroups, it is inevitable that the power
11  of any one analysis is going to go down
12  because the number of people studied goes
13  down.
14      Q. Okay.
15      A. And as a result, it is quite
16  possible that the P-value may cross that
17  threshold of significance.
18          But I think that the nearly
19  universal view of most epidemiologists and
20  pharmacoepidemiologists would be that if
21  there is an increased risk in the
22  so-called parent group of all subjects,
23  and the point estimate is about the same
24  in a subgroup, that it is -- I don't want

Page 669

1   to use the word deceptive -- but it is an
2   inappropriate conclusion if, when you look
3   at smaller and smaller subgroups, and
4   therefore the power to achieve statistical
5   significance becomes less because you're
6   dividing the population up into small
7   groups, you cross the threshold, and a
8   given subgroup is P.054 instead of P.05,
9   to conclude that that failed to find a
10  significant difference is absolutely
11  incorrect.
12      Q. If you could -- Because I have more
13  to cover.
14      A. Okay.
15      Q. I heard your explanation.
16      A. Okay.
17      Q. Can you just answer this question
18  yes or no? If you can't, then you can't.
19  Okay?
20      A. Ask the question again, please.
21      Q. Looking at the relative risk of
22  1.47 for Vioxx 25 milligrams a day or
23  less, does the confidence interval cross
24  1?

Jerry Avorn, M.D.

Page 670

1    A.  Yes.
2    Q.  And when a confidence interval
3  crosses 1, as you said before, that means
4  it's not statistically significant, true?
5    A.  That is one conventional
6  explanation of that, yes.
7    Q.  And one other conventional
8  explanation is when a P-value is .054,
9  reasonable people can interpret that to
10  mean that's not statistically significant,
11  right?
12    A.  Yes.  But I'm not in that group
13  that would conclude that.
14    Q.  Do you know, sir, whether the
15  abstract for Dr. Graham's study found
16  there was no statistically significant
17  increase for risk at the 50 milligram
18  dose?
19    A.  The abstract?
20      Q.  That was published previously.
21      MR. TISI:  Are you talking
22  what was presented at the --
23      MR. GOLDMAN:  Yes.
24      MR. TISI:  I mean, unless

Page 671

1  you have it in front of him --
2    A.  I -- I don't recall what an
3  abstract that I don't have here said.
4    Q.  Do you know whether Dr. Graham
5  reclassified any cases from the 25
6  milligram dose of Vioxx to the 50
7  milligram dose?
8    A.  I do not know.
9    Q.  If he did that, that would be
10  inappropriate, right?
11      MR. TISI:  Objection.
12    A.  Well, if it was correct the second
13  way and wrong the first time, then it
14  would be appropriate.  That all depends.
15  I don't know what he did.  But, you know,
16  sometimes things get reclassified to make
17  them more accurate.  I just don't know.
18    Q.  If Dr. Graham reclassified cases in
19  his study from 25 milligrams to 50
20  milligrams in order to make the 50
21  milligram dose appear to have a
22  statistically significant increased risk,
23  you agree would that be inappropriate?
24      MR. TISI:  Objection.

Page 672

1    A.  That's a hypothetical that imputes
2  unethical behavior to a colleague, and I'm
3  not going to answer it.
4    Q.  So you're unwilling to -- even if I
5  ask you to assume that that's what Dr.
6  Graham did, you're unwilling to say
7  whether that's appropriate or not?
8      MR. TISI:  Objection.  You
9  know that's not accurate --
10    A.  Well, you're also imputing the "in
11  order to," which I just can't --
12    Q.  Okay.
13    A.  That's too many hypotheticals.
14    Q.  Was the incidence rate for heart
15  attack in Dr. Graham's study higher on
16  Celebrex than it was for Vioxx?
17    A.  I don't know.  We could look at
18  it.  You could direct me, in the interest
19  of time, to what you're referring to.
20    Q.  If you don't know, we can look
21  later --
22    A.  Okay.
23    Q.  -- when we're in another
24  deposition.

Page 673

1      Do you agree, sir, that a fairly
2  small number of patients in this study use
3  the 50 milligram dose of Vioxx?
4    A.  That is generally the case, and I
5  assumed it was the case here.  We could
6  look at the real numbers if you wanted.
7  But that's almost always true.
8    Q.  Have you looked at all studies that
9  have compared cardiovascular risks of Vioxx
10  to Celebrex?
11    A.  All studies?  I've looked at many
12  of them.  If you have one that you think
13  I haven't seen, I could take a look at
14  it.
15    Q.  I don't know what you've seen.
16    A.  Okay.
17    Q.  But do you know of studies that
18  have shown that the cardiovascular risks
19  that might exist with Vioxx and Celebrex
20  Have you seen any studies, Dr.
21  Avorn, that have shown that there is no
22  more increased risk of cardiovascular
23  events with Vioxx than there is with

61 (Pages 670 to 673)



LEXISNEXIS' FILE & SERVE
11636660
E-SERVICE
Jun 26 2006
7:44PM

# Plaintiffs' Response re AVORN

# Exhibit 5F of 10

Jerry Avorn, M.D.

Page 674

1   Celebrex?
2     A.  I've seen studies that showed the
3   opposite, certainly.  And I don't recall
4   right now sitting here studies that showed
5   the same result.  But I would be happy to
6   look at one if you have it.
7     Q.  What FDA regulatory experience,
8   sir, have you had in the last two years?
9     A.  Can you define what you mean by FDA
10   regulatory experience?
11     Q.  Your experience interpreting FDA
12   regulations for the FDA.
13        MR. TISI:  Objection.
14     A.  I think one can have regulatory
15   experience without working for the FDA.
16       I've written an article in the New
17   England Journal about the FDA's approval
18   standards.  I've written an article, a
19   separate article in the New England
20   Journal about FDA's depiction of risks in
21   its labels.
22       I've been invited to sit on an FDA
23   advisory committee to evaluate adverse
24   effects associated with a drug it was

Page 675

1   considering.  I've written extensively in
2   my book and elsewhere about the relation
3   between FDA's legal obligation and
4   mandating legislation and what is or isn't
5   done by the agency and by companies in
6   relation to the duty to warn.
7       I teach about that in -- at Harvard
8   Medical School and the Harvard School of
9   Public Health.  I'm writing a chapter that
10   will be in the standard Harvard
11   pharmacology textbook on regulatory policy
12   and the affect on ascertainment of drug
13   side effects.
14       I have another paper that I'm
15   completing with a colleague in my division
16   who's a lawyer and a physician on the
17   relationship between 21 CFR and the
18   obligations that it imposes on FDA and on
19   companies about duty to warn.
20       Should I go on?
21     Q.  You can stop.
22     A.  Okay.
23     Q.  Are you holding yourself out as an
24   expert in FDA regulations for labeling,

Page 676

1   sir?
2     A.  I'm holding myself out as an expert
3   in the ascertainment of drug risks and in
4   the responsibilities of companies and,
5   frankly, of the federal government to take
6   those risks and that epidemiology and
7   translate that into communications.
8     Q.  As to labeling, sir, you're not
9   holding yourself out as an expert in the
10   FDA regulations for drug labeling, true?
11     A.  To the extent that those labels
12   require content, and that content is about
13   pharmacoepidemiology, I have expertise
14   about that content and what needs to be
15   communicated in that -- in those labels.
16     Q.  In terms of what needs to be
17   communicated outside of pharmacology
18   within --
19       MR. TISI:
20   Pharmacoepidemiology.
21       MR. GOLDMAN: I'm sorry.
22   Withdrawn.
23       BY MR. GOLDMAN:
24     Q.  Do you agree, sir, that you don't

Page 677

1   hold yourself out as an expert on FDA's
2   regulations concerning the labeling of drug
3   -- prescription drug products?
4       MR. TISI:  Objection.
5     A.  I don't think I can agree to that.
6   I think that while we all know that I'm
7   not an attorney, I think I have
8   considerable expertise in the ascertainment
9   of drug risk and in the quantification of
10   that risk, and in the communication of
11   that risk, which happens to be done
12   primarily through a drug label.
13     Q.  In terms of what the FDA requires
14   of drug companies for labeling drug
15   products, you don't consider yourself an
16   expert in that; is that fair to say?
17     A.  I didn't say that.  I have a
18   fairly good understanding and expertise
19   related to what the legislation of the
20   Code of Federal Regulation requires of
21   companies and requires of FDA in relation
22   to depiction of drug risks.
23     Q.  And you think your fairly good
24   understanding of the FDA regulations makes

62 (Pages 674 to 677)

Jerry Avorn, M.D.

Page 678

1    you an expert in FDA labeling?
2              MR. TISI:  Objection.
3       A.  I think that's something the judge
4    will probably decide.
5       Q.  Have you ever approved a label as
6    an FDA employee, sir?
7       A.  No.
8       Q.  Have you ever prepared a label as
9    an employee of a pharmaceutical company?
10      A.  No.  Thank goodness.
11      Q.  Do you agree, sir, that the FDA
12   advisory committee, before Vioxx was ever
13   brought to the market, approved of the
14   content of the Vioxx label before Vioxx
15   was brought to market?
16             MR. TISI:  Objection.
17      A.  The FDA advisory committee?
18      Q.  Mm-hmm.
19             MR. TISI:  Objection.
20             BY MR. GOLDMAN:
21      Q.  Or don't you know?
22             MR. TISI:  Objection.
23      A.  I'm not aware that the detailed
24   wording of labels is brought to the

Page 679

1    advisory committee.
2       Q.  You understand that the advisory
3    committee recommended that the FDA approve
4    Vioxx for use in the U.S., right?
5       A.  Yes.
6       Q.  And based on the information that
7    was available at the time, sir, you don't
8    disagree with that recommendation, true?
9       A.  Correct.
10      Q.  Nor do you disagree with the
11   decision by the FDA to approve Vioxx in
12   May of 1999, right?
13      A.  Correct.
14      Q.  The advisory committee for the FDA
15   indicated that there is --
16             MR. TISI:  Which one?
17   There's been several, Counsel.  Which
18   advisory committees are we talking about?
19             BY MR. GOLDMAN:
20      Q.  Before Vioxx was approved --
21             MR. TISI:  Okay.
22             BY MR. GOLDMAN:
23      Q.  -- for use in the United States,
24   there was a consensus, according to the

Page 680

1    advisory committee, that information
2    regarding adverse events that are known
3    and learned in trials should be included
4    in the labeling.  Do you agree with that?
5       A.  That information --
6       Q.  In other words, do you agree, sir,
7    that adverse events that are known to a
8    pharmaceutical company and to the FDA
9    should be included in package inserts?
10      A.  Yeah.  That's required by the law.
11      Q.  Okay.  Is that your understanding
12   of the regulations?
13      A.  Yes.
14      Q.  Do you claim, sir, that Merck could
15   have changed the label for Vioxx without
16   getting FDA's approval?
17      A.  Yes.
18      Q.  And what's your understanding based
19   on?
20      A.  That there is a procedure known as
21   notice of changes impending, or something
22   to that effect, in which a company is able
23   to communicate risk to a -- to anybody
24   that it likes, just send out a dear doctor

Page 681

1    letter, to take out an ad, to tell its
2    sales reps -- at the same time that it
3    has requested a change in labeling of the
4    government, without waiting for FDA to
5    approve a label change if it is in order
6    to provide warning about an important
7    risk.
8       Q.  Is that your general understanding,
9    sir, of the way it works, or are you
10   thinking about a particular regulation when
11   you say what you just said?
12      A.  I'm think -- I'm -- Well, I'm sure
13   that there is regulatory language that
14   would allow for that, because that is
15   something which is accepted as behavior of
16   -- of a pharmaceutical company.
17      Q.  Are you familiar with the
18   regulatory language that governs when a
19   package insert can be changed without FDA
20   approval?
21      A.  That there is a -- I'm familiar
22   with the duty to warn section of 21 CFR
23   -- and there are other numbers which I do
24   not recall -- which dates that when a

63 (Pages 678 to 681)

Jerry Avorn, M.D.

Page 682

1  company is aware of an important or a
2  serious adverse event associated with its
3  drug, that it is responsible for providing
4  a warning about that -- that adverse
5  event.
6      Q.  Are you familiar, sir, and can you
7  tell me about the specific regulations
8  that the FDA has that describe when a drug
9  company can change their label without FDA
10  approval?
11     A.  My understanding is that when --
12  the regulations state that when a company
13  becomes aware of an adverse event that
14  requires warning prescribers about it, that
15  the company is free to do so pending --
16  in other words, and can simultaneously
17  request a label change from FDA.  But my
18  understanding is that the company is not
19  required to get FDA approval in order to
20  heighten its warning about its product.
21     Q.  Do you believe, sir, that there's
22  limitations on a drug company's ability to
23  make a label change without FDA approval?
24     A.  Oh, of course.  It cannot assume a

Page 683

1  new indication.  It cannot weaken a
2  warning and so forth.  But my
3  understanding is that it can provide
4  additional warning without FDA's permission
5  at the time.
6      Q.  Is it your understanding, sir, that
7  Merck could have made a change to the
8  label on its own without FDA approval if
9  the change involved a material or major
10  change to the label?
11         MR. TISI:  Objection.  A
12  warning?  Indications?  What are we
13  talking about now, Counsel?
14     A.  It is my understanding that -- that
15  Merck was absolutely free to issue a
16  statement to physicians -- or patients for
17  that matter -- indicating an increased
18  risk beyond what was depicted in an
19  earlier version of a label.
20     Q.  My question is different.  Is it
21  your understanding based on the regulations
22  that Merck could have made a change to the
23  Vioxx label without FDA approval if the
24  change involved a major change?

Page 684

1         MR. TISI:  Objection.
2      A.  My understanding is that the
3  company could have indicated that it was
4  proposing a change to the label -- could
5  have indicated to physicians that it was
6  proposing a change to the label that would
7  heighten a given warning, and that it was
8  free to make that communication without
9  getting FDA's permission.
10     Q.  Can you tell me, sir, what FDA
11  regulation calls for that or permits that?
12     A.  I think it's more a matter of it
13  is not prohibited rather than -- there are
14  two pieces.  And one is, to my knowledge,
15  there is no prohibition in any FDA
16  regulation from a company communicating
17  with physicians or patients about a risk.
18  And secondarily, there is the duty to warn
19  provision in which the company is, in
20  fact, obliged to communicate such a risk.
21         The company managed to send out a
22  dear doctor letter to doctors throughout
23  the country denying the validity of our
24  study, so they conceivably could have sent

Page 685

1  out a dear doctor letter indicating that
2  there was concern about cardiovascular
3  risk.
4      Q.  Is it your testimony that Merck
5  sent a letter to doctors throughout the
6  country that --
7      A.  Oh, they pub -- they dissem -- I'm
8  sorry.  Maybe I should correct that.
9         They disseminated -- I don't have a
10  copy of the dear doctor letter.  They
11  disseminated widely their position about
12  the invalidity of our study.
13     Q.  Is it your testimony that Merck
14  disseminated widely a letter to doctors
15  that challenged the validity of your
16  study?
17     A.  Yes.
18         MR. GOLDMAN:  Do you have a
19  copy?
20         MR. TISI:  I do.
21     A.  I have seen it.
22         MR. TISI:  Do you want --
23     A.  I don't have one with me, but I've
24  seen it.

64 (Pages 682 to 685)

Jerry Avorn, M.D.

**Page 686**

1    MR. GOLDMAN:  We'll mark
2  that as the next exhibit if you've got it,
3  Chris.
4    MR. TISI:  I do.
5    THE WITNESS:  Thank you.
6    MR. GOLDMAN:  I'll mark this
7  as Exhibit 22?
8    (Exhibit-22, Merck
9  Correspondence to Doctors, marked for
10  identification).
11    MR. GOLDMAN:  Okay.  I'm
12  going to mark it.  I'm not going to
13  discuss it right now.  We don't have much
14  time.
15    BY MR. GOLDMAN:
16    Q.  Dr. Avorn?
17    A.  Yes.
18    Q.  Have you read any of the expert
19  reports or trial testimony of FDA experts
20  who have discussed the issue of whether
21  Merck could have changed the label without
22  FDA's prior approval?
23    A.  I know that there are individuals
24  who are ex-FDA employees who characterize

**Page 687**

1  themselves as quote FDA experts.  Are
2  those the people you're referring to?
3    Q.  Are you taking the position that
4  the witnesses who have testified for Merck
5  about FDA regulations are not experts?
6    A.  No.  I'm just trying to distinguish
7  between people who are FDA employees who I
8  believe, apart from Dr. Graham, have not
9  testified in this trial, as opposed to FDA
10  former employees who often consult for
11  drug companies on such matters and
12  testify.  And I just want to be clear
13  what you're talking about.
14    Q.  Have you read any of the testimony
15  of any of the expert witnesses hired by
16  Merck or hired by the plaintiffs' lawyers
17  that address the question of whether Merck
18  could have changed the label without FDA's
19  prior approval?
20    A.  No.
21    Q.  Did you ever say in any of your
22  articles, sir, that you wrote back when
23  Vioxx was on the market that -- that Merck
24  ought to immediately change its package

**Page 688**

1  insert to reflect any potential
2  cardiovascular risks?
3    A.  No.
4    Q.  You make the statement in your
5  report on Page .21 that, "The FDA attempted
6  to get Merck to change the company's
7  official labeling of the drug to more
8  accurately reflect the growing body of
9  data about its cardiovascular risk."  Do
10  you see that?
11    A.  (Witness viewing document).  Yes.
12    Q.  When did the FDA attempt to get
13  Merck to change the label, sir?
14    A.  I know that even in early advisory
15  committee meetings, after the VIGOR study
16  was published, there was discussion by
17  members of the advisory committee that the
18  public needed to be -- or physicians
19  needed to be alerted through the labeling
20  of the increased risk of cardiovascular
21  toxicity that was evident in VIGOR.
22    And that would have been at the --
23  the first advisory committee post-VIGOR,
24  which I believe, was early '01.  Perhaps

**Page 689**

1  February of '01.
2    Q.  Is it your testimony that the
3  advisory committee in February of 2001
4  concluded that Merck needed to change the
5  labeling to tell doctors about the
6  increased risk of Vioxx concerning cardio
7  toxicity?
8    A.  Members of the advisory committee
9  stated that.  Whether there was a formal
10  vote on that or not, I don't know.  But
11  it was clearly a strong theme in the
12  advisory committee.
13    Q.  Were you aware, sir, that the
14  advisory committee was unable to reach any
15  consensus at all on whether Vioxx caused
16  the heart attack difference in the VIGOR
17  study or whether Naproxen prevented heart
18  attacks in the VIGOR study?
19    MR. TISI:  Objection;
20  mischaracterizes.
21    A.  I believe that members of the
22  advisory committee, some of them were
23  quite strong in saying this is an
24  important risk of this drug and this needs

65 (Pages 686 to 689)

Jerry Avorn, M.D.

Page 690

1 to be depicted more fully in a warning.
2    Q.   That's your understanding of what
3 the transcript reflects?
4    A.   Yes.
5    Q.   Do you know what Dr. Nissen's
6 position was on this issue?
7    A.   I believe he was one of the people
8 who said that.
9    Q.   You believe Dr. Nissen was one of
10 the people who said what at that meeting?
11    A.   That the -- That the drug -- That
12 there was -- I believe it was Dr. Nissen
13 who said that there was a concern about --
14 In fact, maybe we could just pull the
15 advisory committee minutes out.
16       But my recollection was that there
17 were members of the advisory committee --
18 and I believe that Dr. Nissen was one of
19 them, although I'm not positive -- who
20 stated that there was a worrisome signal
21 of cardiovascular risk in VIGOR that
22 needed to be communicated to the
23 profession.
24    Q.   Did Dr. Nissen, as far as you can

Page 691

1 recall, Dr. Avorn, say that he believed
2 that the difference in VIGOR concerning
3 heart attack risk was due to Vioxx?
4    A.   I'd want to go back to his words
5 before characterizing what he said.
6    Q.   Do you know when Merck informed the
7 FDA about the results of the VIGOR trial?
8    A.   I believe that it was in the spring
9 of 2000.  Perhaps March.
10    Q.   Do you know whether Merck tried to
11 get the label changed to include the VIGOR
12 results before the FDA suggested that
13 Merck try to make the change?
14       MR. TISI:  Objection.
15    A.   I know that there was ongoing
16 discussion of the Vioxx label going on
17 over many, many months, and that it
18 included both the issue of the depiction
19 of the gastrointestinal protection as well
20 as depiction of the cardiovascular risk.
21    Q.   Have you read all the
22 correspondence between the FDA and Merck
23 concerning the change to the VIGOR label
24 between the time the VIGOR results came

Page 692

1 out and the time the label was changed in
2 April of 2002?
3    A.   I'm sure that, since there was so
4 much of it, I've not read absolutely all
5 of it.
6    Q.   Is it your position that the FDA
7 initiated the label change to get the
8 VIGOR information in the label, or did
9 Merck initiate the label change?
10       MR. TISI:  Which VIGOR
11 information are we talking about, Counsel?
12    A.   Did both, the VIGOR cardiac and the
13 VIGOR gastrointestinal.
14    Q.   Both.
15    A.   But my understanding is that there
16 was ongoing back and forth, and I don't
17 know who started what when.
18    Q.   Is it your testimony that after the
19 advisory committee in 2001 that the FDA
20 initiated the label change, or did Merck
21 initiate that on its own?
22    A.   Well, I know that Merck was very
23 keen to have the gastroprotective component
24 of the label changed, for understandable

Page 693

1 reasons.  And so I would have expected
2 that Merck would have initiated the
3 conversations.
4    Q.   But you don't know?
5    A.   No.  I'm -- I'm -- I don't know.
6 I cannot cite a document indicating who
7 said what first.
8    Q.   Do you know Dr. -- Is it Delap or
9 Delab?
10    A.   No.
11    Q.   Do you know what he -- withdrawn.
12       You've cited Dr. Targum in your
13 report, sir, in comments that she's made
14 about Vioxx.  You didn't talk about any
15 comments that Dr. Villalba made, did you?
16    A.   I believe I did.  I may not have
17 used Dr. Villalba's name, but I know that
18 I cited -- I think it's a she -- her
19 reports.
20    Q.   Is it true, sir, that in practice,
21 manufacturers typically consult with the
22 FDA before implementing a label change?
23    A.   Yes.
24    Q.   Do you know what Merck's prior

66 (Pages 690 to 693)

Jerry Avorn, M.D.

1   experience was with the FDA concerning any
2   label changes that Merck tried to make
3   without FDA approval?
4        A.   No.
5        Q.   You've never been on the company's
6   side of the fence or the FDA's side of
7   the fence when it comes to whether a drug
8   company should make a label change without
9   clearing it with the FDA, true?
10       A.   Right.  I've worked at Harvard my
11  whole life.  I've never worked on either
12  of those sides.
13       Q.   Do you know that the FDA recently
14  amended their labeling regulations?
15       A.   Yes.  I had a paper in the New
16  England Journal of Medicine about that
17  last week.
18       Q.   You're critical of that, right?
19       A.   That's what the paper said.
20       Q.   Do you know that the FDA removed
21  the distinction between warnings and
22  precautions?
23       A.   Yes.  Well, they -- they put them
24  closer together.  I'm trying to recall

1   whether they obliterated the distinction or
2   . just put them more in proximity with one
3   another.
4        Q.   Would the VIGOR results, including
5   the cardiovascular results, be considered a
6   highlight under the FDA's new amended
7   labeling regulations?
8      · A.   Do you mean the cardiovascular
9   results of VIGOR?
10       Q.   Mm-hmm.
11     · A.   It's a hypothetical because those
12  labels have not yet gone into effect.  But
13  my hope is that they would be.
14       Q.   If the cardiovascular results of
15  the VIGOR trial were considered a
16  highlight under the FDA's proposed labeling
17  regulations, that would require prior FDA
18  approval, true?
19       A.   That is so hypothetical because the
20  system you're describing will not go into
21  place until June 30th of this year.
22       Q.   Okay.  You've indicated in your
23  report -- you refer to documents that talk
24  about -- Withdrawn.

1        You've referenced documents that
2   refer to calculations that might reflect
3   how much money Merck would lose if the
4   cardiovascular data from VIGOR were in the
5   warning section versus the precaution
6   section.  Do you remember that?
7        A.   Yes.
8        Q.   And you don't know the
9   circumstances about why Merck decided that
10  the cardiovascular information is more
11  properly in the precaution section, right?
12       A.   Do I know why Merck made a given
13  decision?
14       Q.   Mm-hmm.
15       A.   I have my opinion about that, but I
16  do not have personal experience from
17  having been in the company when the
18  decision was made.
19       Q.   And you make a statement about, if
20  the company was driven by profits in
21  deciding that the cardiovascular
22  information about VIGOR should be in the
23  precaution section as opposed to the
24  warning section, that that would be

1   inappropriate?
2        A.   Right.
3        Q.   And there you're just expressing
4   your opinion about how it would be wrong
5   if Merck, in fact, suggested that the
6   cardiovascular information be in the
7   precaution section, that that would be
8   inappropriate?
9        A.   Correct.
10       Q.   That's your personal view, right?
11           MR. TISI:  Objection.
12       A.   Well, no, it is absolutely not.  It
13  is a view based on the --
14       Q.   I'm sorry.  I wasn't clear.  I'm
15  not asking that.
16           That's very much a hypothetical
17  statement that you made in your report,
18  isn't it, Dr. Avorn, because you don't
19  know why Merck made the decision that the
20  cardiovascular information should be in the
21  precaution section; you're just commenting
22  on if that reason had to do with profits,
23  that would be inappropriate?
24       A.   I need to answer that in more than

67 (Pages 694 to 697)

Jerry Avorn, M.D.

**Page 698**

1  a yes or no.
2      Q.  Mm-hmm.
3      A.  Clinically, I don't know that
4  anybody would look at the causation of
5  heart attack by a drug as a precaution,
6  because normally what belongs in the label
7  as a precaution is things like check the
8  potassium or don't use this drug with --
9  in a particular context.
10          Causing heart attacks is
11  conventionally something that one would
12  expect to see as a warning rather than as
13  a precaution.
14          There's also ample literature, with
15  which I'm very familiar, that describes
16  the reduction in utilization of drugs if
17  physicians perceive excessive risk.  And
18  we've published papers on that topic.
19      Q.  Mm-hmm.
20      A.  There is also the evidence, which
21  you've described, in which Merck employees
22  calculated the effect on sales of -- of
23  vivid depiction of warning versus a more
24  diminished depiction of warning and what

**Page 699**

1  that would do to Vioxx sales.
2          Putting all that together, it seems
3  important to me that the depiction of the
4  risk of cardiovascular toxicity with Vioxx
5  was placed in a location on the label that
6  most observers would think unusual, and
7  that that seems to relate importantly to
8  what -- how the drug was used by
9  physicians.
10      Q.  Did the FDA approve that the VIGOR
11  data be included in the precautions
12  section?
13      A.  By definition, the way the label
14  ended up would have been approved by FDA.
15      Q.  What is the standard for what
16  should be included in the precautions
17  section of a package insert?
18      A.  Tell me what you mean by what is
19  the standard.
20      Q.  What do the FDA regulations say
21  about what information should be in the
22  precautions section as opposed to the
23  warning section?
24      A.  Things which a physician would need

**Page 700**

1  to bear in mind in order to use the drug
2  safely and appropriately.
3      Q.  That's your understanding of the
4  standard that the FDA applies as to
5  whether or not a side effect should be in
6  the precautions section versus the warning
7  section?
8      A.  That's my understanding.
9          MR. GOLDMAN:  Okay.  I
10  believe I don't have anymore questions
11  right now, Dr. Avorn.  But I think Mr.
12  Tisi does, and I might have some questions
13  after that.
14          (Off the record at 1:24
15  p.m.)
16          (Recess taken).
17          (Back on the record at 1:29
18  p.m.)
19      EXAMINATION
20      BY-MR.TISI:
21      Q.  Dr. Avorn, I'm going to go through
22  some of the things we talked about today,
23  because it's most recent in time, and then
24  I'm going to go back to some of the

**Page 701**

1  things we talked about yesterday.  Okay?
2      A.  Okay.
3      Q.  And I may jump around a little bit,
4  so I'm going to ask you to grind gears
5  for a little bit for me just so we can
6  get finished here.
7          You were asked by counsel for Merck
8  whether people who perform observational
9  studies do so for a hypothesis generation.
10      A.  Right.
11      Q.  Do you remember that line of
12  questioning?
13      A.  Right.
14      Q.  How many observational studies have
15  you personally done over the years?
16      A.  Dozens.
17      Q.  Okay.  And you are one of the more
18  prolific researchers in doing observational
19  studies in the country?
20      A.  I believe so.
21      Q.  Okay.  And do you perform
22  observational studies solely for hypothesis
23  generation?
24      A.  No.

68 (Pages 698 to 701)

Jerry Avorn, M.D.

Page 702

1   Q.  When you performed your Naproxen
2   study — and when we talk about the
3   Naproxen study -- I shouldn't say Naproxen
4   study -- your non-COX-2 study --
5        (Reporter interruption).
6   Q.  -- was that for hypothesis
7   generation?
8   A.  No.  It is for hypothesis testing.
9   Q.  And in fact, you understand that
10  Merck used that study to demonstrate the
11  fact that Naproxen was cardioprotective?
12       MR. GOLDMAN:  Object to the
13  form.
14  A.  Yes.
15  Q.  Okay.
16  A.  Incorrectly, in my view.
17  Q.  Okay.  And did you do the Vioxx
18  study, the COX-2 study, for the purposes
19  of quote hypothesis generation?
20  A.  No.  That also was testing a
21  hypothesis.
22  Q.  Okay.  And, in fact, would it be
23  fair to say that you did those studies
24  because of the safety issues that were

Page 703

1   raised as a result of VIGOR?
2   A.  Correct.
3   Q.  All right.  Let me go skip to the
4   ITT issue --
5   A.  Yes.
6   Q.  -- if we could.  You talked about
7   adverse events which are acute, like
8   anaphylactic shock, and then those which
9   may be longer term or appear over a course
10  of time.
11  A.  Correct.
12  Q.  Are you aware that cardiovascular
13  risks are particularly appropriate to look
14  at on an ITT basis?
15       MR. GOLDMAN:  Object to the
16  form.
17  A.  Yes.  I think that in this case it
18  would be appropriate to look at them both
19  ways.
20  Q.  Okay.
21  A.  Both in terms of the acute effect
22  of on-drug use but also the longer term
23  effect, particularly given the possibility
24  that there may be more longer term

Page 704

1   effects.
2   Q.  Okay.  Now, counsel asked you
3   questions about the preliminary analysis
4   plan for the Alzheimer's studies.  Do you
5   remember that?
6   A.  Yes.
7   Q.  Are you aware that the protocols
8   for the Alzheimer's studies actually call
9   for an ITT analysis as a secondary
10  analysis?
11  A.  That's interesting.  I was not
12  aware that that was a prespecified
13  analysis.
14  Q.  All right.  If it was prespecified,
15  it was appropriate to do it, right?
16  A.  Yes.
17       MR. GOLDMAN:  Objection.
18       BY MR. TISI:
19  Q.  And, in fact, we looked at some of
20  the Chen memos that you referred to
21  earlier --
22       MR. GOLDMAN:  Object to the
23  form.
24  ///

Page 705

1       BY MR. TISI:
2   Q.  -- you were aware that, in fact,
3   they did do an ITT analysis in mortality
4   looking at 091, Study 078, Study 126
5   individually, combined and in various
6   different combinations, correct?
7   A.  I've seen all those analyses from
8   the internal company documents.
9       MR. GOLDMAN:  Object to
10  the form.
11       BY MR. TISI:
12  Q.  And if the company had actually
13  done the ITT analysis but did not share
14  that in a timely manner with the FDA,
15  would that in your view have been
16  inappropriate?
17       MR. GOLDMAN:  Object to the
18  form.
19  A.  Yes, particularly if the finding
20  revealed an increase in death rate.
21  Q.  Okay.  Let's talk about the VALOR
22  study for a minute, if you don't mind.
23  A.  Okay.
24  Q.  Counsel asked you about the

69 (Pages 702 to 705)

Jerry Avorn, M.D.

Page 706

1  hypothesis, would it be ethical to test a
2  hypothesis that Vioxx was causing heart
3  attacks.  Do you remember that?
4      A.  Yes.
5      Q.  Okay.  Do you remember yesterday
6  when counsel asked you questions that
7  dealt with the issue that there was also a
8  hypothesis that Vioxx was beneficial by
9  reducing inflammation and thereby being a
10  cardioprotective drug?
11      A.  Right.
12      Q.  That that was a hypothesis.  And
13  then there was also hypothesis that it
14  might also be a neutral --
15      A.  Neutral.
16      Q.  -- a cardiovascular basis?
17      A.  Yes.
18      Q.  Okay.  If there was a hypothesis, a
19  valid hypothesis that Vioxx was
20  cardioprotective, could that have been
21  tested --
22      A.  Yes.
23      Q.  -- ethically?
24      A.  Prior to -- The ethics require more

Page 707

1  than just a hypothesis.  The ethicalness
2  of a study depends on the hypothesis in
3  combination with the available knowledge at
4  the time.
5      Q.  Okay.  Now, the counselor referred
6  to the Konstam meta-analysis.  Are you
7  aware that the FDA discounted the Konstam
8  meta-analysis as being strong evidence of
9  the lack of risk, cardiovascular risk?
10          MR. GOLDMAN:  Object to the
11  form.
12      A.  Discounted it as being strong.
13      Q.  Strong.
14      A.  I'm aware that there were concerns
15  about the Konstam analysis in terms of its
16  reassuringness.
17      Q.  Okay.  You agree that -- Do you
18  have any opinion, that you hold to a
19  reasonable degree of medical and scientific
20  certainty, that -- as to whether or not
21  the Konstam meta-analysis, which involved
22  different doses, different durations,
23  different populations, et cetera, was, in
24  fact, a strong evidence -- a strong

Page 708

1  reassuring evidence of cardiovascular
2  safety?
3      A.  I think once the VIGOR findings
4  were out, one could not get reassurance by
5  that kind of a variegated meta-analysis.
6      Q.  Let me also talk to you about the
7  -- the factual testimony that you gave
8  about your study, going -- jumping to that
9  topic for a moment.
10          In your time line that you had
11  here, you had -- you said you had a
12  conversation with -- in your time line
13  here -- Actually, let me rephrase the
14  question.
15          Yesterday you mentioned a
16  conversation you had with Dr. Sherwood
17  when he came, and he -- I'm not going to
18  characterize it -- that he was --
19      A.  Dismissed.
20      Q.  Okay.  About -- on the -- on the
21  meaning of the VIGOR study.  When did that
22  occur in relationship to the time line
23  that you prepared for your study?
24      A.  I believe that his visit would have

Page 709

1  been around January of 2001.  So it was
2  fairly soon after VIGOR came out.  And
3  that would have been around the time -- a
4  little before the time that Dr. Solomon
5  spoke to Dr. Cannuscio about doing an
6  outcome study.
7      Q.  When you and Dr. Solomon decided to
8  do the non COX-2 NSAID study, the first
9  study, why did you and Dr. Solomon decide
10  to do that study?
11      A.  A couple of reasons.  One big
12  prompt for that reason was the conclusion
13  from VIGOR that Naproxen prevented MIs.
14  Because we felt that if that was true,
15  that would have been one of the biggest
16  stories in cardiology ever, because nothing
17  has ever been shown to reduce the
18  incidence of MIs by 80 percent.
19          And we then spoke to a number of
20  colleagues at the Brigham and asked them
21  if they believed that NSAIDs in general
22  had the same cardioprotective effect as
23  aspirin.  And the answer we most commonly
24  got was, that's never been demonstrated,

70 (Pages 706 to 709)

Jerry Avorn, M.D.

1    but that's something you guys could look
2    at in your database.
3        Q.   And you did that independent of any
4    funding from any source?
5        A.   Correct.
6        Q.   Okay.
7        A.   We had some NIH support at the
8    time, which helped to keep the electricity
9    going, but it was not funded by any
10   company.
11       Q.   During the course of your
12   negotiations with -- And you were
13   involved, in a meaningful way, in both the
14   negotiations leading up to the conduct of
15   the study involving COX-2s, as well as the
16   implementation of the study, the findings
17   and publication of that study?
18       A.   Absolutely.
19       Q.   Okay.  Would you say that you were
20   involved every step of the way?
21       A.   Yes.
22       Q.   Okay.
23       A.   And it all happened within my
24   division for which I'm overall responsible.

1        Q.   In fact, not to pull rank or
2    anything like that, what is your
3    relationship to Dr. Solomon in terms of --
4    in terms of being the primary researchers
5    on the study?
6        A.   He is a very, very smart faculty
7    member within my division.  I guess you
8    could say I'm his boss.
9        Q.   Okay.
10       A.   We work closely together on a
11   number of projects.
12       Q.   Sure.  I understand.
13           The design that -- You testified
14   earlier that the -- You're aware that
15   Merck had actually used your -- I'll call
16   it the Naproxen study?
17       A.   Yes.
18       Q.   I know that's an
19   oversimplification, but your Naproxen study
20   in support of its theory about the results
21   of VIGOR.
22           Was the study designed for your
23   Naproxen study for which they used -- for
24   which they bore -- or as a proponents of

1    that study -- similar in any way to the
2    design of the study that looked at COX-2
3    relationship to cardiovascular disease?
4           MR. GOLDMAN:  Object to the
5    form.
6        A.   They were very similar.
7        Q.   Okay.
8        A.   They were both case-controlled
9    studies of MI.
10       Q.   And in fact, let me ask you this,
11   so this is clear:  Was Merck involved
12   every step of the way with the design and
13   implementation of the COX-2 study that you
14   and Dr. Solomon did?
15       A.   They were in the sense that -- you
16   mean the -- yes, the follow-up study.
17   They were in the sense that the contract
18   provided that we keep them abreast on a
19   very frequent basis of the study design.
20   They had a great deal to say about the
21   protocol and made a number of suggestions,
22   most of which we accepted.  And according
23   to the terms of the contract, we provided
24   them with milestones and progress reports

1    and preliminary data tables and so forth.
2        Q.   Now, during these protracted
3    negotiations that we've talked about, and
4    I think you characterized them as
5    unprecedented, did there ever come a time
6    during the course of that negotiation
7    where you and Dr. Solomon had actually had
8    to tell Merck that, look, if you don't --
9    in effect, that if you don't commit, we're
10   going to have to go elsewhere to start
11   looking to get this study done?
12           MR. GOLDMAN:  Object to the
13   form.
14       A.   Yes.  That's true.
15       Q.   Okay.  Would you describe that for
16   us, please?
17       A.   Sure.  It began to seem to us, at
18   numerous points during that year plus of
19   discussion with them, that this was going
20   to -- this could well be a protracted
21   negotiation, which would then end up with
22   them simply saying forget it, we don't
23   want to do it.  Because we just were
24   never clear that they actually were going

Jerry Avorn, M.D.

Page 714

1 to commit to supporting this study.
2 And Dr. Solomon and I felt this was
3 a very important piece of research that
4 needed to be done, that it was an
5 important scientific question, and equally
6 important, that there were millions of
7 patients taking these drugs and that there
8 was a -- an important safety issue that
9 needed further study. And we felt that
10 the work needed to go on, and if they
11 weren't going to do it, we would have to
12 figure out some other way to get the work
13 done.
14 Q. Okay. You were asked about the
15 changes that were suggested back and forth
16 to the manuscript by counsel, do you
17 remember that? Were you involved in all
18 of the decisions about whether to accept
19 or reject certain changes to the paper?
20 A. Dr. Solomon and I would discuss
21 each of his conversations with -- I don't
22 want to say each -- but the substance of
23 his conversations with Merck.
24 Q. Now, the ultimate conclusions that

Page 715

1 went in to your paper, how did they relate
2 to what was presented at the ACR meeting,
3 in terms of the actual statistics that
4 were presented?
5 A. They were very similar.
6 Q. Okay. And at that time Dr.
7 Cannuscio actually was on the poster
8 presentation at the ACR, correct?
9 A. That's right. It may have even
10 been a podium presentation, but yes.
11 Q. Okay. And the actual statistics,
12 the .54 P-value that I think you discussed
13 with Mr. Goldman, that was in the poster,
14 correct?
15 A. I would need to go back and look
16 to see.
17 Q. Okay.
18 MR. GOLDMAN: Do you still
19 have the poster?
20 THE WITNESS: The relevant
21 document would be the actual abstract
22 itself as opposed to -- Because as I said,
23 I'm not sure. I thought it was
24 actually --

Page 716

1 BY MR. TISI:
2 Q. I actually have it here.
3 A. Okay. I thought it was actually an
4 oral presentation.
5 MR. GOLDMAN: Okay.
6 A. But it's -- it's around. It was
7 published in I think Arthritis and
8 Rheumatism, as all the abstracts were.
9 Q. But the point is, in any meaningful
10 way --
11 A. Correct.
12 Q. -- the statistics changed between
13 the time that Dr. Cannuscio was on the
14 paper -- on the abstract for the
15 presentation at the ACR, and the abstract
16 that actually appeared at the front of the
17 -- at the front of the article when it
18 was ultimately published?
19 A. The findings were basically the
20 same.
21 Q. Let me go back to some of the
22 things that we talked about yesterday.
23 You were asked some questions, and
24 we were objecting to them, but let me

Page 717

1 follow through with it.
2 You were asked about your opinions
3 about product liability lawsuits and your
4 feelings about that. Do you remember
5 those questions?
6 A. (Witness nods head).
7 Q. Do you believe that from a public
8 health perspective of legal liability,
9 failure to disclose drug risks serves any
10 important public health goal?
11 A. Yes. As a matter of fact, we're
12 writing a paper about that now, that
13 sometimes important drug risks are
14 discovered or clarified primarily through
15 information that becomes available in the
16 process of litigation.
17 And secondly, it often is an
18 important quality control mechanism to --
19 in the absence of what I consider to be
20 an inadequately vigilant FDA -- to make
21 sure that adverse events are worked up and
22 taken seriously by manufacturers.
23 Q. Referring to the questions about
24 the New England Journal of Medicine

72 (Pages 714 to 717)

Jerry Avorn, M.D.

Page 718

1  expression of concern and that whole
2  issue, let me ask you generally -- Back
3  up.
4       You're a peer reviewer for medical
5  journals?
6    A.  Yes.
7    Q.  Can you name some of the medical
8  journals that you have been a peer
9  reviewer for?
10   A.  The New England Journal of Medicine
11  and the Journal of the American Medical
12  Association.
13   Q.  In general, do peer reviewers, such
14  as yourself, rely on the honesty and
15  integrity of an author in reporting and
16  analyzing data?
17   A.  You have to.
18   Q.  Okay.  Why is that?
19   A.  Because there's no way that either
20  a peer reviewer, or a journal editor, can
21  go back and re-check the raw data that go
22  into the results section of a paper.  That
23  would just not be feasible.
24   Q.  Okay.  Are they -- In terms of

Page 719

1  knowledge, typically, are peer reviewers on
2  the -- in terms of knowledge of data, are
3  peer reviewers on the same level -- is it
4  the same playing field as the people who
5  actually write the article and look at the
6  data in terms of knowledge about that
7  particular topic?
8    A.  Well, they are certainly experts in
9  the content area, but there's no way that
10  an outsider can ever know as much about
11  the primary data in a given study as the
12  people who actually did the study.
13   Q.  Okay.  Going to the role of
14  clinical trials and observational data as
15  opposed to mechanistic studies, et cetera,
16  are there any instances you can think of
17  where it's generally accepted that a drug
18  causes a beneficial -- either a beneficial
19  effect or a side effect where the
20  mechanisms of actions are not generally
21  accepted as being understood?
22       MR. GOLDMAN:  Objection to
23  form.
24   A.  Oh, that happens all the time.

Page 720

1    Q.  Can you give us examples?
2    A.  For many years -- and in some ways
3  perhaps even up to the present the -- how
4  aspirin worked was not well known, but it
5  clearly worked, and it was used very
6  widely.
7       A more recent example would be the
8  statin drugs to lower cholesterol.  For
9  many years we believed that their main
10  mechanism of action was by lowering
11  cholesterol, but more recently there's some
12  very interesting and important reason to
13  believe that they also have an important
14  effect on the actual wall of the artery in
15  terms of reducing heart attacks that is
16  totally separate from their effect on
17  lowering cholesterol.
18   Q.  Okay.  Is it -- Do you have an
19  opinion, again to a reasonable degree of
20  medical certainty, that -- as to whether
21  it is generally accepted that Vioxx causes
22  cardiovascular injury, including heart
23  attack, congestive heart failure and
24  hypertension?

Page 721

1    A.  I think that's universally accepted
2  at this point.
3    Q.  Is that --
4       MR. GOLDMAN:  Move to strike
5  as nonresponsive.
6       BY MR. TISI:
7    Q.  Is that --
8    A.  And it is also my opinion.
9    Q.  And is that generally understood to
10  include all doses and in all durations?
11       MR. GOLDMAN:  Object to the
12  form.
13   A.  I think as a general principle, if
14  a drug causes a problem at a particular
15  dose, it is quite likely that it will
16  cause a problem at other doses as well,
17  and the same can be said about duration.
18   Q.  Okay.  Let me ask you -- I'm going
19  to go to some documents here.  I'm going
20  to come around here if you don't mind.
21       We've discussed with Mr. Goldman
22  today the Code of Federal Regulations and
23  where they over -- I'm just going to
24  attach it -- I pulled it from the

73 (Pages 718 to 721)

Jerry Avorn, M.D.

Page 722

1    materials that we had provided to Mr.
2    Goldman today, so I don't have a -- but I
3    don't know the tab number.
4         MR. TISI:  Can we mark this
5    as the next exhibit?  What number do we
6    have here?  Is it 23?
7         MR. GOLDMAN:  I think.
8    Yes.
9         (Exhibit-23, Food and Drug
10   Administration, HHS, Section 201.57, marked
11   for identification).
12        BY MR. TISI:
13   Q.   Okay.  Doctor, I'm going to hand
14   this to you.
15   A.   (Witness viewing document).
16   Q.   First of all, there's a highlighted
17   section there.  Could you just read that
18   into the record, please?
19   A.   Sure.  This is the Food and --
20   It's labeled Food and Drug Administration,
21   HHS, Section 201.57.
22   Q.   Okay.
23   A.   And --
24   Q.   The section is highlighted?

Page 723

1    A.   Yes.  And under heading (e)
2    Warnings, "The labeling shall be revised
3    to include a warning as soon as there is
4    reasonable evidence of an association of a
5    serious hazard with a drug;" semicolon, "a
6    causal relationship need not have been
7    proved."  Period.
8    Q.   Okay.  Just taking that language
9    alone, okay, if that language appeared in
10   any other context other than in a
11   regulation, just taking that language, if
12   it appeared in an article, if it appeared
13   in a textbook, if it appeared in a
14   presentation, would that language be
15   language that you are familiar with?
16   A.   Yes.  I've seen it in many of
17   those contexts.
18   Q.   Okay.  Is this language that is a
19   pharmacoepidemiologic concept, a reasonable
20   evidence of association and causation?
21   A.   Yes.  I think pharmacoepidemiology
22   is all about reasonable evidence,
23   determining associations, serious hazards
24   and causal relationships.  That's the

Page 724

1    substance of pharmacopeia.
2    Q.   Are you -- Do you consider yourself
3    an expert in interpreting the scientific
4    and medical concepts embodied in that
5    language?
6    A.   Yes.  In fact, that language cannot
7    be operationalized without having mastery
8    of concepts such as reasonable evidence,
9    serious hazard, and causal relationship.
10   Q.   And is that something that, in your
11   experience, the average lay person
12   understands those concepts without guidance
13   from people such as yourself?
14   A.   They cannot.
15   Q.   Yesterday you were asked -- Stay
16   with that for a moment.  You were asked
17   about written standards that deal with
18   managing risks, and I think you referred
19   to a pharmacoepidemiologic paper or
20   whatever.  Would this be another example
21   of the kind of standards that -- talk
22   about managing risk, this regulation you
23   just referred to?
24        MR. GOLDMAN:  Object to the

Page 725

1    form.
2    A.   Yes.  It is a standard for managing
3    risk.
4    Q.   Okay.  So this would be another
5    kind of source that you might look at?
6    A.   Right.
7         MR. GOLDMAN:  Object to the
8    form.
9         BY MR. TISI:
10   Q.   Oh.  Yeah.  Let me go to this.
11        If you go to Page :12 of your
12   report, sir.
13   A.   (Witness complied).  Yes.
14   Q.   If you look at -- It quotes -- and
15   we can go back to the original document --
16   But it quotes Dr. Scolnick's e-mail about
17   his March 2000 e-mail.  Do you see that?
18   A.   (Witness viewing document).  Yes.
19   Q.   We've referred to that before.  And
20   you were asked, you know, do you know Dr.
21   Scolnick's intent, you can get into his
22   mind and figure out what he was really
23   thinking what he wrote that.  Do you
24   remember that line of questioning?

74 (Pages 722 to 725)

Jerry Avorn, M.D.

Page 726

1    A. Right.
2    Q. I'm going to put that aside for a
3    moment and ask you this: In March of
4    2000, when the VIGOR results came out,
5    would a -- What, if anything, would a
6    reasonable and prudent scientist and
7    pharmaceutical company have interpreted
8    about the relationship between Vioxx and
9    heart attacks?
10            MR. GOLDMAN: Object to the
11   form.
12   A. I think any reasonable person
13   reading those data would see that there is
14   -- depending upon how they counted the
15   numbers -- a fivefold or a fourfold
16   increase in the risk of heart -- or in
17   the rate of heart attacks in people taking
18   Vioxx. For those who believe in
19   statistical significance, it even had that.
20   It was even a, quote, significant finding
21   in terms of the P-value. And it raised a
22   great concern, or it should have, on the
23   part of any responsible person looking at
24   those data, that this was a drug that

Page 727

1    could cause heart attacks, as we now, in
2    fact, years later, have ample evidence
3    that it does.
4    Q. And, in fact, is that the
5    conclusion that you, personally, came to
6    when you saw this data?
7    A. Yes. And I remember at the time,
8    as we discussed, with Dr. Sherwood's
9    visit, when I invited him to give grand
10   rounds at the Brigham, that he, as a
11   senior member of Merck management,
12   dismissed the rate of heart attack seen in
13   VIGOR, in my view, rather glibly as
14   saying, "Oh, yeah, Naproxen prevents heart
15   attacks."
16           And I remember thinking at the
17   time, in early 2001, what a smug and
18   superficial dismissal that was, because, if
19   he was wrong about that, there was a major
20   hazard out there, and I was distressed
21   that he seemed to write it off as --
22   (indicating), "That's just Naproxen
23   preventing heart attacks."
24           MR. GOLDMAN: I move to

Page 728

1    strike as not responsive.
2            BY MR. TISI:
3    Q. Is there any -- Doctor, did you
4    think that a reasonable and prudent
5    company would have relied on heavily on
6    the Naproxen hypothesis to explain the
7    result of VIGOR, especially when -- let's
8    not talk about in isolation -- when we
9    look at the ADVANTAGE study and we look at
10   090 study that we've talked about, and we
11   look at all the evidence together, do you
12   think that it was reasonable that a
13   reasonably prudent company -- it was
14   reasonable and prudent to rely upon the
15   Naproxen hypothesis to explain the VIGOR
16   results?
17           MR. GOLDMAN: Objection as
18   to form.
19   A. I would have -- I would have
20   characterized it as to explain away the
21   findings. And, no, I think that given all
22   that had come before, all the biology that
23   was known, all of the preapproval studies
24   that had raised flags -- frankly, even in

Page 729

1    isolation, this would have been a rather
2    striking signal that would have warranted
3    follow-up.
4            But coming as it did after all of
5    the clinical trial and biological evidence
6    that there was there, it strikes me as
7    unconscionable for there not to have to
8    have been better follow-up of that risk.
9            MR. GOLDMAN: I can't tell
10   -- I'm just going to move to strike as
11   nonresponsive.
12           BY MR. TISI:
13   Q. In your article on -- the Naproxen
14   article --
15   A. Yes.
16   Q. -- if I could ask you to turn to
17   that, if you could pull this out of the
18   pile -- Actually, you may know the
19   answer --
20   A. Okay.
21   Q. -- to this without looking at the
22   article.
23   A. Ask and I'll --
24   Q. You can if you want to.

75 (Pages 726 to 729)

Jerry Avorn, M.D.

Page 730

1   A.  All right.
2   Q.  Do you know whether you relied upon
3   the statement in -- that was in the VIGOR
4   study about the point -- the four to one
5   relative risk as opposed to what we know
6   as the five to one relative risk in the
7   VIGOR study?
8   A.  Let me pull it to -- Was it an
9   exhibit or --
10  Q.  Yeah.  I don't think we attached it .
11  as an exhibit.
12  A.  I know that it's in one of these
13  piles, but if you can put your hands on
14  it quicker.
15  Q.  I can actually -- Actually, I can
16  probably give you my copy.  Here.
17  A.  Okay.
18  (Witness viewing document).
19  Q.  I think it's -- If you go to the
20  last page, that is the -- See at the top
21  of the page, Doctor?
22  A.  Yes.
23  Q.  Okay.
24  A.  Right.  We cited the -- the rate

Page 731

1   of MI as being fourfold higher, citing the
2   paper, the VIGOR paper in the New England
3   Journal.
4   Q.  Now, later on, down at the end of
5   the article, you talk about the magnitude
6   of the risk, it could not be explained by
7   a Naproxen effect alone.
8   A.  Correct.
9   Q.  Would that statement have been even
10  more -- even stronger if you had known
11  that there was a five to one relative risk
12  as opposed to a four to one relative risk?
13  MR. GOLDMAN:  Object to the
14  form.
15  A.  Yes.  Because a four to one risk
16  would have required a 75 percent reduction
17  in risk of heart attack with Naproxen.  A
18  five to one would have required an 80
19  percent reduction in risk.  So it would
20  have been even more implausible.
21  Q.  Just -- In observational studies
22  like yours, have they sometimes been
23  referred to as real-world studies?
24  A.  Yes.

Page 732

1   Q.  Have you heard that term before?
2   A.  Yes.  Yes.
3   Q.  Why is it important to look at,
4   quote, real-world studies as opposed to
5   clinical trial studies?
6   A.  Right.  Right.  Each kind of study
7   has its own very important strengths and
8   very important weaknesses.
9   The strengths of an observational
10  study or a real-world study, as you
11  describe it, are that it depicts patients
12  who are much more typical of real-world
13  users of the drug than clinical trial
14  subjects, who tend to be healthier,
15  younger, and more heavily selected to get
16  into a clinical trial, whereas an
17  observational study just looks at all
18  comers who happen to be taking a given
19  drug as prescribed by their doctor.  And
20  so it's generalizability is often much
21  better than data from a clinical trial.
22  Q.  And in fact, would your study, for
23  example, include people who had had
24  intermittent use?

Page 733

1   A.  Yes.
2   Q.  And, in fact, if you go to the
3   VIGOR study or the APPROVe study, even in
4   those studies, do the protocols tolerate a
5   certain degree of noncompliance?
6   A.  Yes.  And even when they don't --
7   they don't tolerate it, patients do tend
8   to do it.
9   Q.  Okay.  And just for the record,
10  what is noncompliance?
11  A.  Noncompliance is when a patient
12  does not take a drug exactly as directed.
13  Q.  Okay.  And when you say 80 percent
14  noncompliance, which I believe -- the
15  VIGOR, I'll represent to you, I don't know
16  whether you -- is up to 80 percent
17  noncompliance would be, they would still
18  be able to be in the study if --
19  A.  I think you mean 80 percent
20  compliance.
21  Q.  Compliance.  I meant to say that.
22  A.  Right.
23  Q.  Up to 80 percent compliance, which
24  means one in five times they would still

76 (Pages 730 to 733)

Jerry Avorn, M.D.

Page 734

1    remain in the study if they didn't take
2    the drug one every five days?
3        A.   Correct.
4        Q.   You were asked about whether or not
5    the company ever informed the FDA of the
6    concerns, the cardiac concerns of COX-2
7    inhibition in the preapproval phase.  And
8    I think, just referring to your testimony,
9    you referred to the FDA's review of that
10   -- of that data --
11       A.   Right.
12       Q.   -- of that.  I'm going to show you
13   a portion of the new drug application for
14   the Vioxx application, if I can find it.
15           MR. TISI:  And I only have
16   one copy, and I apologize, Counsel.  I'll
17   show it to you if you wish.  Oh, you have
18   another copy?
19           And we'll mark this as Exhibit
20   No. --
21           THE WITNESS:  I think that
22   last one was 23.
23           MR. TISI:  We'll make this
24   24.  Can I have a pen?

Page 735

1           (Exhibit-24, Vioxx, Clinical
2    Efficacy, Clinical Safety Document;
3    Exhibit-24A, Correspondence, marked for
4    identification).
5           BY MR. TISI:
6        Q.   Doctor, I'm placing before you
7    Exhibit No. 24, which is a portion of a
8    binder called Vioxx NDA -- I'll represent
9    is part of the new drug application for
10   Vioxx that says, Clinical Efficacy,
11   Clinical Safety.  And it is a Section 1.7,
12   Potential Risks Based Upon Specific
13   Cyclooxygenase-2 Inhibition.  Do you see
14   that?
15       A.   (Witness viewing document).  Yes.
16       Q.   And that section would refer to the
17   scope of -- that would refer to the kinds
18   of things that were addressed by the Board
19   of Scientific Advisors.
20           And if you need to take a look at
21   that, it's an exhibit that's in front of
22   you.
23           MR. GOLDMAN:  Object to the
24   form.

Page 736

1        A.   (Witness viewing document).
2        Q.   Take your time and look through it.
3    I can reach over you.  I don't want to be
4    rude, but ...
5           MR. GOLDMAN:  Mm-hmm.
6        A.   What's that?
7        Q.   That's the --
8        A.   Right.  Okay.
9           (Witness viewing document).  Yeah.
10   I've seen this before, and what was
11   striking to me the first time I saw it,
12   and continues to be so, is that in the
13   section about --
14       Q.   Well, actually, let me ask the
15   question again.
16       A.   Okay.  That's fine.  That's fine.
17       Q.   Now, having in front of you the
18   Board of Scientific Advisors, which deals
19   with the issue of COX-2 inhibition, and
20   looking at that side by side with the new
21   drug application which deals with potential
22   concerns of COX-2 inhibition, do you see
23   any place in that document where the
24   company raises even the possibility -- the

Page 737

1    possibilities that are raised by the Board
2    of Scientific Advisors that this could
3    result in thrombosis, sheering off of
4    plaque or arthrogenesis?
5           MR. GOLDMAN:  Object to the
6    form.
7        A.   No.  The discussions of the risk
8    are -- deal with renal function and
9    reproduction and bone health.
10          But it's striking how much of the
11   concerns expressed in the May 1998 Board
12   of Scientific Advisors's report does not
13   seem to have made it into the discussion
14   of the potential safety problems --
15          MR. GOLDMAN:  Objection.
16       A.   -- that was presented to FDA.
17
18          MR. GOLDMAN:  Move to strike
19   as not responsive.
20          BY MR. TISI:
21       Q.   Okay.  Let me just go -- I think
22   this will probably be my last area.
23          You were asked yesterday about your
24   general views in your publications about

77 (Pages 734 to 737)

Jerry Avorn, M.D.

**Page 738**

1 the effect of warnings on labels. Do you
2 remember that testimony?
3    A.  Yes.  Yes.
4    Q.   Did you mean to imply by your
5 testimony that you do not think that
6 companies have an obligation to provide a
7 fair and accurate warning about potential
8 risks or -- as we saw in the regulation,
9 reasonable evidence -- where there's
10 reasonable evidence of association between
11 a drug and a serious adverse event?
12       MR. GOLDMAN:  Object to the
13 form.
14    A.  I would never imply that companies
15 do not have such a responsibility.
16    Q.   And would you ever -- Did you mean
17 to suggest that the company never should
18 have put a black box on the label or put
19 something in the warning section about the
20 cardiovascular risk, risk of mortality, et
21 cetera, that we've talked about over the
22 past two days?
23       MR. GOLDMAN:  Object to the
24 form.

**Page 739**

1    A.  Do not.  I certainly do not feel
2 that.
3    Q.   Now, if you -- And you had also
4 given some testimony about the
5 effectiveness of warnings.
6    A.  Yes.
7    Q.   Okay.  Let me broaden it, because
8 you -- you've had -- in your research,
9 there are many ways in which companies
10 communicate with physicians, correct?
11    A.  Correct. ·
12    Q.   Could you name some of them?
13    A.  Certainly what is in the label is a
14 start.  But in addition, what is said in
15 advertisements and by sales reps and by
16 articles which a company might support a
17 piece of research, and then help an
18 investigator to complete and have
19 published; continuing medical education
20 programs, which are often sponsored by
21 companies, direct to consumer advertising.
22    Q.   Have you -- All of those things, is
23 it your -- Do you have an opinion as to
24 whether all those things go into the mix

**Page 740**

1 of how doctors perceive risks and
2 benefits?
3       MR. GOLDMAN:  Object to the
4 form.
5    A.  Yes.  The ultimate decision that a
6 doctor makes is based on all of the above.
7    Q.   Now, going to the issue -- and I
8 think Counsel referred to it at the very
9 end of his questioning -- that the company
10 did a study about the -- or an analysis
11 of the effect of a warning, a
12 cardiovascular warning as a precaution as
13 opposed to a black box.  Do you remember
14 that?
15    A.  Yes.
16    Q.   The putting aside the dollar
17 amounts there, what, if anything, does
18 that document demonstrate to you -- and in
19 the specific context of Vioxx -- as to how
20 a black box warning or precaution could
21 affect actual behavior of doctors?
22       MR. GOLDMAN:  Object to the
23 form; calls for speculation.  Go ahead.
24    A.  There are some things that we know

**Page 741**

1 about black boxes and other kinds of
2 warnings.  One is that competitive
3 companies will typically point out a
4 warning or a black box that the other
5 company's drug has if they don't have such
6 a drug -- such a warning, and use that as
7 an aspect -- as a means of winning market
8 share.
9    It is usually the case that if a
10 black box warning appears, a company will
11 refrain from direct to consumer advertising
12 of that drug.  And we -- There is very
13 good evidence that direct to consumer
14 advertising sharply increases the
15 utilization of a given drug.
16    We also know that doctors are going
17 to be more reluctant to use a drug with a
18 black box warning if there is another drug
19 that doesn't have a black box warning that
20 does about the same thing.
21    Q.  Okay.
22    A.  And finally, the more prominent
23 warning is, even if it's not a black box,
24 the more that's going to shape what a

78 (Pages 738 to 741)

Jerry Avorn, M.D.

Page 742

1  doctor knows, although it may not
2  completely drive prescribing a hundred
3  percent.
4    Q.  You mentioned different ways in
5  which companies in general can communicate
6  information about its drugs.  Going
7  through all of those things, whether it's
8  a dear doctor letter, medical education,
9  labels, direct to consumer advertising, all
10  of those things, have you considered all
11  of those things in how you looked at the
12  communication and warnings or information
13  about risks for Vioxx?
14    MR. GOLDMAN:  Object to the
15  form.
16    A.  Yes, I have.
17    Q.  In any of those methods of
18  communication, did -- do you -- Well, do
19  you have an opinion, that you hold to a
20  reasonable degree of medical certainty, as
21  to whether or not any of those methods of
22  communication adequately communicated the
23  seriousness, the magnitude, the frequency
24  of the risks associated with Vioxx?

Page 743

1    MR. GOLDMAN:  Object to the
2  form, and also to the extent it's outside
3  the scope of his report.
4    A.  I believe that certainly once the
5  VIGOR findings were in hand by March of
6  2000, there was strong evidence in place
7  of an important cardiovascular risk caused
8  by Vioxx, which was not promptly or fully
9  or accurately depicted by the manufacturer
10  in its communications with doctors or in
11  its direct to consumer advertising.
12    And, in fact, there is even
13  evidence that the company attempted,
14  through a variety of means, to undercut
15  the communication of such risk by
16  dismissing it, in a variety of ways,
17  whether it was attributing the findings in
18  VIGOR to Naproxen or preparing training
19  materials for its sales reps as to how to
20  avoid discussion of the risk with
21  physicians, preparing materials which were
22  incomplete, and in my view, misleading
23  about the cardiovascular risk of Vioxx,
24  depicting its risks and benefits in a

Page 744

1  distorted manner, particularly in the
2  direct to consumer ads, in which the
3  benefits of the drug were stated very
4  prominently, and the harms that could be
5  associated with its use were relegated to
6  a very small and, in my view, inadequate
7  presentation.
8    Q.  And in your particular case
9  involving -- You have personal experience
10  with that, don't you, with how your study
11  was treated, in the dear doctor letter
12  that we had marked earlier, correct?
13    A.  Right.  My sense of an appropriate
14  response would have been for the company
15  to initiate at many, many points in time
16  clinical studies to clarify the risk and
17  identify its magnitude and perhaps which
18  patients were at greatest risk.  And
19  instead, in response to our study, at
20  least, as well as at a number of other
21  points, the main communication in the dear
22  doctor letter that we've discussed was to
23  dismiss the findings of, quote,
24  observational studies, including our own.

Page 745

1    Q.  Did they even report the results of
2  the study?
3    A.  No.  They simply said that these
4  studies have limitations, including biases
5  and other factors, that cannot be
6  adequately controlled, and then go on to
7  talk about the advantages of the drug and
8  the -- and directed doctors to the
9  labeling, which, at that point, still did
10  not convey the full magnitude of the risk.
11    Q.  Let me ask you a couple questions.
12  Did they tell the medical community about
13  the results of your study showing an
14  increased relative risk associated with
15  Vioxx?
16    A.  No.  Their response to our study
17  was to not describe the findings, but to
18  send out a letter saying the methodology
19  was flawed, and then making other
20  statements basically defending the product.
21    Q.  Did they tell doctors that it was a
22  Merck-funded study?
23    A.  No.
24    Q.  Did they tell them that they had a

Jerry Avorn, M.D.

Page 746

```
1    role in developing the protocol and
2    running -- and supporting the study in any
3    fashion?
4       A.   No.
5       Q.   You were asked -- Going back to the
6    New England Journal article and .2 --
7    remember that -- the relative risk of .2?
8       A.   Yes.
9       Q.   And Mr. Goldman asked you the
10   question, is that obvious that that's a
11   fivefold increase?
12      A.   (Witness nods head).
13      Q.   As a pharmacoepidemiologist, that
14   is obvious to you; is that fair to say?
15      A.   Right.
16      Q.   In your experience, do non
17   pharmacoepidemiologists typically recognize
18   the importance of that statistical
19   difference as a five to one as opposed to
20   a .2?
21           MR. GOLDMAN:  Object to the
22   form; calls for speculation.  How could he
23   possibly know that?
24      A.   Well --
```

Page 747

```
1       Q.   Actually, let me back up.  Are you
2    an expert in the presentation of
3    statistics and the presentation of risk?
4       A.   Yes.
5       Q.   All right.  And is it also
6    important in your view on how you
7    communicate risks and you can communicate
8    in a variety of different ways?
9       A.   Yes.  And as important as the
10   magnitude is the presentation, which I
11   think virtually everyone now recognizes as
12   problematic of the data as this is the
13   reduction in heart attacks caused by
14   Naproxen, which was clearly Merck's
15   language in that paper, as opposed to this
16   is the increase in risk caused by Vioxx.
17      Q.   Okay.
18      A.   That was a very unconventional way
19   to --
20      Q.   This is really the last question
21   I'm going to ask here.
22           Doctor, you were referred to the
23   advisory committee -- the advisory
24   committee of 2001.  And I'm going to ask
```

Page 748

```
1    you, and I only have my copy of it, so I
2    apologize.
3       A.   But I've seen that document.
4       Q.   Okay.  I'm going to refer to a
5    Page .195 of -- Actually, let's refer --
6    go back up -- 192, which are the comments
7    of Dr. Pena, and I'll read them.
8    Actually, let me -- I know counsel wants
9    to go home.
10           Do you think that, having reviewed
11   the totality of the transcript, that the
12   company followed the direction of the
13   advisory committee members who suggested
14   that a fair representation of the
15   cardiovascular risk be communicated in the
16   label?
17           MR. GOLDMAN:  Objection.
18      A.   I think it's important to
19   distinguish between whatever the advisory
20   committee may or may not have voted on
21   versus the content of what was said by its
22   members.
23           And I read very clearly that a
24   number of its members expressed great
```

Page 749

```
1    concern about the cardiovascular risk of
2    Vioxx and concern that that needed to be
3    communicated more fully to physicians.
4           And I do not see evidence that the
5    company followed up on that fully or
6    promptly.
7           MR. TISI:  Okay.  That's
8    all.
9           MR. GOLDMAN:  Just a couple
10   areas to followup.  And if you could
11   possibly keep it short, that would be
12   great.  Okay?
13           THE WITNESS:  Yes.
14   FURTHER EXAMINATION
15   BY MR. GOLDMAN:
16      Q.   Did you ever have any direct
17   discussions with Dr. Santanello?
18      A.   Yes.
19      Q.   Did you have direct discussions
20   with Dr. Santanello about the issue of
21   whether Dr. Cannuscio would remain an
22   author on your paper?
23      A.   No.
24      Q.   Did you have any discussions with
```

80 (Pages 746 to 749)