As late as September 2000, months after presenting data on elevated cardiac risk to FDA (but not to NEJM), the company was still using the lower figure of 0.4% in its official communications to physicians who inquired about this issue. This pattern of deceptive presentation of risk data to physicians is also illustrated in the "Cardiovascular Card," a sales tool prepared for Merck representatives to use with physicians concerned about the risk of cardiac events caused by Vioxx. Used from May 2000 until April 2002, the card presents known cardiac risks in a misleading manner. It presents a cardiovascular safety profile for Vioxx that appears to be similar to other NSAIDs and to placebo. However, while this "teaching aid" purported to include cardiovascular safety data from Merck's osteoarthritis (OA) trials, it apparently did not include information from other completed OA trials that contradicted this favorable profile (e.g., ADVANTAGE, 085, and 090). Further, the card suggested that the incidence of mortality with Vioxx was more favorable than for placebo, even though other studies had demonstrated a statistically significant increased risk of mortality associated with Vioxx compared to placebo.

Finally, by excluding safety data from other studies, the card fails to present or even consider critical information from the VIGOR study. Assessments of a drug's safety are best done by considering all randomized trial data available, regardless of the underlying purpose of a given study. It is inappropriate to provide only selected, most favorable study results in response to doctor's questions about cardiovascular safety and mortality. The most complete and current information on these topics should have been provided to physicians in any "teaching tool" with this purpose. At a minimum, the Cardiovascular Card should have been recalled by Merck because it contained an incomplete and misleading safety profile. Instead, as late as August 2001, by which time considerable additional information about the drug's risk had become available, the Cardiovascular Card was formally "re-validated" by the company for continuing use in promoting Vioxx, and steps were taken by Merck to make it easier for its sales staff to order large supplies of the cards to reassure physicians about the drug's safety. In doing so, the company undercut a key component of the safe use of drugs in medical practice – the doctor's ability to fairly balance benefit and risk in making prescribing decisions.

By May 2001, in response to a New York Times article on the cardiac risk of Vioxx, Merck issued a bulletin to its sales force in which it instructed them: *"DO NOT INITIATE DISCUSSIONS ON THE RESULTS OF THE [VIGOR] STUDY, OR ANY OF THE RECENT ARTICLES IN THE PRESS ON VIOXX."* The bulletin goes on to advise the sales force to state that the incidence of MI with Vioxx is less than 0.1%, and that cardiovascular mortality caused by other NSAIDs is 8 times greater than that seen with Vioxx. It instructs Merck representatives to present the data in the "Cardiovascular Card" to physicians concerned about Vioxx risks (see above), even though it contained a highly selected and distorted depiction of the totality of that risk.

A response to a paper published in August 2001 in *The Journal of the American Medical Association* provided another opportunity for Merck to deny that there was any

increased cardiovascular risk with Vioxx. In a widely circulated press release, the company stated,

> The relative risks of serious cardiovascular events were similar with Vioxx and placebo, and with Vioxx and the widely prescribed NSAIDs ibuprofen, diclofenac, and nabumetone.

Merck made this statement even though it had completed clinical trials which provided very different evidence. After noting that "Patient safety is of paramount importance to Merck," the statement goes on to dismiss the increased rate of heart attack seen with Vioxx in VIGOR by noting, "This is the first time this result has been observed" — even though by mid-2001 the company had seen the results of several of its own trials which pointed in exactly this direction.

## VIII. Negotiations with FDA over labeling and promotion

Beginning soon after the results of VIGOR were presented to the FDA, the agency had attempted to get Merck to change the company's official labeling of the drug to more accurately reflect the growing body of data about its cardiac risk. In fact in an early review of the VIGOR data one FDA reviewer noted, *"It would be difficult to imagine inclusion of the VIGOR results in the rofecoxib labeling without mentioning cardiovascular safety results in the study descriptions as well as the Warnings sections."* Instead of proactively revising its product label to accurately and prominently reflect this problem, as concern increased about the cardiac risks of Vioxx in March 2001 the company prepared a "Public Affairs Plan" discussing the best way to frame the problem. At first glance, one slide about the campaign seems compatible with the core values of medicine, with the following precept presented first: "Do no harm." However, the rest of that bullet-point provides a very different meaning for that concept: **"refrain from proactively generating coverage that jeopardizes label negotiations and/or that links Vioxx to CV adverse events."** The slide continues: **"Vigilantly defend the brand."** This does not seem compatible with the full and open discussion of risks and benefits that physicians and patients require in order to make appropriate drug choices.

As label negotiations were proceeding with the FDA, the company appears to have had a great deal of concern about the effect of a possible label change on increasing physician awareness of the product's cardiovascular hazards. The level of risk depicted in a product's official labeling can heavily influence a drug's sales. An internal marketing graph prepared by Merck dated July 12, 2001 labeled "Upside/Downside Sales Forecast" presented company staff with three estimates of potential annual sales, in billions of dollars, depending on the outcome of negotiations with FDA about the Vioxx label. The "upside" scenario predicts a 25% increase in sales by 2006 if "CV Labeling Milder; No Prothrombotic language." However, a reduction in sales of 50% is projected by 2006 if the FDA were to require a "black box warning" about cardiovascular risk rather than a milder "precaution." The difference between the two projections on the graph is approximately $1.2 billion in annual sales. If such calculations had influenced the

company's position in its discussions with FDA about the proper warnings to appear on the drug's labeling, that would have been inappropriate.

Merck's mis-communications to physicians about Vioxx had become so egregious that in September 2001 the company's CEO, Mr. Gilmartin, received an unusually strongly worded Warning Letter from the FDA. It read, in part:

> You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the [VIGOR] study, and this, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen)...
>    Your minimizing these potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns. Your misrepresentation of the safety profile for Vioxx is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile... Additionally, your claim in the press release that Vioxx has a "favorable cardiovascular safety profile," is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to naproxen.

Throughout 2001, Merck continued its intense and protracted negotiations with FDA over proposed changes to the drug's labeling. There was controversy within Merck about making the data from the ADVANTAGE study available to FDA, and it appears to have taken the company a year and a half after it obtained the study results (and multiple requests by the agency) before complete safety data from that trial were actually transmitted to FDA. In April 2001, Dr. Scolnick had expressed concern about FDA's requests for more safety data:

> The open ended request for safety updates [from FDA] is a filibuster...I have never seen being nice to the FDA – except on rare occasions – pay off....This division is devious and antagonistic. One cannot deal with them in a rational way...I think giving them [the data from] Advantage was not wise. The alzheimer's data vs placebo is helpful. Advantage is not....we will end up with bad labeling....I realize I can be paranoid and I sometimes overreact but I am not trusting of this [FDA] group.

By October 2001, FDA requested the company to add a warning that would more accurately depict the cardiac risks found in the VIGOR and ADVANTAGE studies over 18 months earlier. In my view, the warning language FDA proposed was a fair representation of the risk information that had been provided to the FDA at the time, and would have helped alert physicians to the CV risks that had become apparent.

22

(Importantly, the FDA was not yet fully aware of the significant and persisting increase in mortality risk with Vioxx vs. placebo that occurred in Merck's Alzheimer's Disease trials, if results were calculated in the usual intention-to-treat method of analysis.) However, the company resolutely and repeatedly resisted having such a warning appear prominently on the Vioxx label. In a memo on October 15, 2001, reacting to the latest FDA proposal for such a label change, Dr. Scolnick wrote to David Anstice, "David Be assured we will not accept this label." Anstice responds, "We knew it would be UGLY and it is. We'll fight back, and see where we get." Around midnight, Scolnick answers: "it is ugly cubed thye [they] are bastards"

Two weeks later Scolnick writes that he will not sign off on the new label until it is acceptable to him: "we need a statement now that will be a substitute for what the fda will not relent on i.e. the unknown about CV risks." The Merck team comes up with an alternative to FDA's proposal. In it, instead of a prominent warning the information about elevated cardiovascular risk would be placed deep in the lengthy official wording much less visibly and would read: "The basis for the difference in cardiovascular event rates with VIOXX vs. naproxen observed in the VIGOR, and the lack of such a difference between VIOXX and placebo or other NSAID comparators in other studies, is not understood." Scolnick declared that this alternative language was "a good start."

As discussions about the label proceeded within the company in the fall of 2001, Scolnick wrote to Douglas Greene, Bonnie Goldmann, and Peter Kim:

> twice in my life I have had to say to the FDA 'That label is unacceptable, we will not under any circumstances accept it.'...You WILL have to do that on the cardiac warning for Vioxx. I assure you that you will. And I assure you I will NOT sign off on any lable [sic] that had a cardiac warning.

This provides a strikingly clear statement of Merck's intention at the highest levels of the company to block a change in the product description that would have presented physicians with an accurate depiction of the drug's risk. The company's position was in clear opposition to the decisions expressed in the February 2001 meeting and formal vote of the FDA Advisory Committee, whose members had voiced strong concerns that the cardiovascular risk of Vioxx be more accurately reflected in its labeling. Even in the absence of a negotiated agreement with FDA concerning the contents of its official label, there is no reason Merck could not have notified physicians or consumers about the emerging data about the risks of Vioxx. Companies are permitted to provide updated information about risk in materials for to doctors and patients without obtaining prior FDA approval, but Merck did not do so. To the contrary, it continued to use misleading depictions of risk (through the "Cardiovascular Card" and other communications noted above) to minimize a very real problem with their product.

The revised cardiac risk labeling which FDA proposed to Merck was quite fair and reasonable in light of a comprehensive review of the data available at that time, and would have provided reasonable guidance to physicians attempting to balance the drug's

benefits and risks. By contrast, the revised label that Merck eventually produced in April 2002 continued to de-emphasize the importance of the cardiovascular risk of Vioxx in a manner that would have been misleading to a physician trying to make a reasoned prescribing decision about Vioxx vs. a traditional NSAID or other alternative. Merck's intense struggle with the FDA over this issue does not appear compatible with its public statements that the company was committed to making the most accurate information on Vioxx available to physicians and the public.

## IX. Additional material

I will also present evidence concerning the experience of my research team in its work on our Merck-funded epidemiological study of the relationship between Vioxx and heart attack that was ultimately published in the cardiology journal *Circulation* in 2004.

## X. Post-withdrawal developments

Four months after Vioxx was taken off the market, the FDA convened an Advisory Committee meeting in February 2005 to consider all the evidence it then had available concerning the cardiac risk of the cox-2 drugs and traditional NSAIDs. After lengthy discussion and review of that extensive collection of materials, committee members were asked whether they believed that Vioxx was a cause of cardiovascular disease events. Without exception, all panel members answered "Yes." The committee members were then asked whether Vioxx should be made available for use, and if so, under what circumstances. Based on their review of all the data, about half of the reviewers said it should never be used in any patients. Nearly all the others said that such use should be permitted only under restricted circumstances. Restrictions proposed by these Advisory Committee members included limiting its use to children only (who would be at reduced risk of cardiac complications), allowing only the lowest dose (12.5 mg) on the market, strengthening the warnings on the drug's label to include a "black box" highlighting its cardiovascular risk, allowing its use only as a second- or third-choice drug after safer agents had been tried, limiting its duration of use, recommending close monitoring of patients for cardiovascular complications such as elevation in blood pressure, and having patients give explicit "informed consent" before taking the drug, acknowledging their awareness of its capacity to induce cardiovascular harm. Only 2 FDA Advisory Committee members voted to allow Vioxx back onto the market with no additional restrictions. These determinations are a comprehensive reflection of the evaluation of a large number of medical experts convened by FDA to review all the information then available to the agency and to the general public.

## XI. Summary and conclusions

Taken together, the available scientific evidence makes it clear that Vioxx is an independent risk factor that increases the risk of cardiovascular disease at all commonly used doses and durations. The risk begins early after drug use starts, is higher with greater doses, and persists over time. Evidence of this risk was available prior to the initial marketing of Vioxx, and was reinforced by repeated clinical trial findings and

24

highly consistent epidemiological data. The doubling of the rate of cardiovascular events that emerges from numerous clinical trials of Vioxx – whether compared to other NSAIDs or to placebo – places the drug in the category of a major risk factor for these events. Despite the evidence, Merck consistently ignored or dismissed the clear signals of cardiac risks attributable to Vioxx. This strategy began early in the drug's clinical development and continued until the day the drug was removed from the market. In the face of ample evidence of potential hazard that continued to accumulate throughout the late 1990s and up until the moment the drug was recalled, the company failed to aggressively mount the studies that could have clarified such risk. It presented the data that did emerge in a distorted manner to the public, to the FDA, and to physicians.

The opinions expressed above are based upon my education, training, research, and expertise, as well as my review of peer reviewed medical scientific and regulatory literature and relevant documents and testimony produced during the discovery process. I may supplement this report if necessary based upon receipt of additional information received during the course of the litigation. My usual consulting fee is $750 per hour for review and consultation, but I am accepting no personal compensation for my work on this case.

Jerry Avorn, M.D.

March 20, 2006

**Materials Considered:**

1.    Amendment to NDA 21-042 - MRK-01420163696 - MRK-01420163721
2.    (Draft) Comparison of the Effects of Rofecoxib, a Highly Selective-Inhibitor of COX 2, and Naproxen (a dual COX-1/COX-2 inhibitor) on the Incidence of Clinically Important Upper Gastrointestinal Events: Results from the VIGOR Trial by Claire Bombardier, et al., - MRK-AAB0109412 - MRK-AAB0109447
3.    Letter from Claire Bombardier to NEJM attaching the manuscript entitled "Comparison of the Effects of Rofecoxib, a Highly Selective-Inhibitor of COX 2, and Naproxen (a dual COX-1/COX-2 inhibitor) on the Incidence of Clinically Important Upper Gastrointestinal Events: Results from the VIGOR Trial," dated 5/18/00 - MRK-NJ0245555 - MRK-NJ0245604.
4.    Draft GI Outcomes Study Protocol - MRK-NJ0315784 - - MRK-NJ0315837
5.    Email from D. Blois, dated 10/15/00 - MRK-AAX0008560 - MRK-AAX0008581
6.    Email from E. Russo to A. Schechter, et al., dated 12/21/01 - MRK-AAX0009235 - MRK-AAX0009257
7.    Email from J. Bull to J. Jenkins, et al., dated 4/11/02 - FDACDER007813 - FDACDER007844
8.    Email from L. Villalba to D. Throckmorton, dated 9/30/01 - FDACDER010143 - FDACDER010149
9.    Excerpts from Alise Reicin 10/11/05 Transcript, pages 3522-3526
10.   Excerpts from David Anstice 9/26/05 Transcript, pages 2016-2017
11.   Deposition transcripts of Edward Scolnick, dated 3/22/05, 3/19/05, 4/29/05, 5/17/05, 6/1/05, & 8/16/05
12.   Deposition transcripts of Gregory Curfman, dated 11/21/05 & 1/24/06
13.   Deposition transcript of Eric Topol, dated 11/22/05
14.   Fax from B. Gould to N. Braunstein, dated 6/7/02 - MRK-AAF0008508 - MRK-AAF0008512
15.   Fax from B. Gould to R. Silverman, dated 6/22/01 - MRK-AAF0004045
16.   Fax from B. Gould to R. Silverman, dated 9/28/01 - MRK-AAF0004250
17.   Fax from B. Gould to R. Silverman, dated 9/26/01 - MRK-AAF0004251
18.   Fax from B. Gould to R. Silverman, dated 9/7/01 - MRK-ABW0008489
19.   Fax from the FDA to R. Silverman, dated 7/13/01 - MRK-ACD0075472 - MRK-ACD0075473
20.   FDA Teleconference Minutes for 3/20/02 - MRK-AAF0008519 - MRK-AAF0008529
21.   Folkendt Report, dated 11/27/00 - MRK-NJ0069724- MRK-NJ0069726
22.   GI Label Change for Vioxx Public Affairs Plan, dated 3/23/01 - MRK-ADJ0020162 - MRK-ADJ0020183
23.   Highlights of Vioxx Labeling Changes Proposed by HFD-550 - FDACDER034122 - HFD-550 - FDACDER034128
24.   Letter from L. Goldkind to Silverman, dated 2/28/01 - MRK-01420031266 - MRK-01420031268
25.   Letter from M. Griffin to D. Watson, dated 10/16/01 - MRK-NJ0185865 - MRK-NJ0185867

26. Letter from R. Silverman to Bull, dated 3/15/01 - MRK-AAF0003775 - MRK-AAF0003776
27. Letter from R. Silverman to Bull, dated 8/30/01 - MRK-AAF0003926 - MRK-AAF0003927
28. Letter from R. Silverman to Bull, dated 5/25/01 - MRK-AAF0003986 - MRK-AAF0003988
29. Letter from R. Silverman to Bull, dated 6/14/01 - MRK-AAF0004013 - MRK-AAF0004014
30. Letter from R. Silverman to Bull, dated 7/26/01 - MRK-AAF0004126 - MRK-AAF0004129
31. Letter from R. Silverman to Bull, dated 3/16/01 - MRK-NJ0265338 - MRK-NJ0265362
32. Fax from S. Folkendt to R. Silverman, dated 6/6/01 - MRK-AAF0003997 - MRK-AAF0003998
33. Memo from D. Watson, dated 10/24/01 - MRK-NJ0185864
34. Memo from E. Wong to D. Riendeau, dated 3/16/99 - MRK-AEG0023306
35. Memo from G. Block to Scolnick, dated 3/21/01 - MRK-NJ0333225 - MRK-NJ0333235
36. *Doubts are Raised on the Safety of 2 Popular Arthritis Drugs* by Melody Petersen, The New York Times, dated 5/22/01 – MRK-ABH0003185 – MRK-ABH0003188
37. Ingenix Epidemiology's Draft Manuscript on Cardiovascular Risk of COX-2 Inhibitors and Other NANSAIDs, dated 2/27/04 – MRK-ABY0153857 – MRK-ABY0153880
38. Ingenix Epidemiology's Draft Manuscript on Cardiovascular Risk of COX-2 Inhibitors and Other NANSAIDs, dated 9/27/04 – MRK-ABY0164090 - MRK-ABY0164115
39. Effects of Cyclooxygenases Inhibitors on Vasoactive Prostanoids and Thrombin Generation at the Site f Microvascular Injury in Healthy Men by Ewa Tuleja, et al., Arterioscler Thromb Vasc Biol., dated June '03 - MRK-ADY0005464 - MRK-ADY0005468
40. Comparative Inhibitory Activity of Rofecoxib, Meloxican, Diclofenac, Ibuprofen, and Naproxen on COX-2 versus COX-1 in Healthy Volunteers by Anne Van Hecken, et al., Journal of Clinical Pharmacology, '00 - MRK-AAD0305229 - MRK-AAD0305240
41. Vioxx Project Team Agenda & Minutes, dated 11/10/00 - MRK-ABF0004419 - MRK-ABF0004442
42. Excerpts from Vioxx Preliminary CV Meta-Analysis – MRK-NJ0070364 -MRK-NJ0070397
43. Excerpts from Long Range Operating Plan: 2002-2007, dated 7/15/02 MRK-ABI0011027- MRK-ABI0011081
44. Excerpts from NDA - MRK-ABS0066396- MRK ABS0067019
45. Excerpts from FDA Medical Officer Review of NDA - MRK-ADI0005375
46. Excerpts from Draft Manuscript entitled "Cardiovascular Events Associated with Rofecoxib in a 3-Year Randomized Colorectal Adenoma Chemorprevention Trial" - MRK-AGO0076955 - MRK-AGO0076990

2

47. Excerpts from APPROVe CSR - MRK-S0420051001 - MRK-S0420053185 (P1.1034)
48. Excerpts from APPROVe Trial CV Safety Report – MRK-S0420051232 - MRK-S0420051330 (P1.1117)
49. Excerpts from VIGOR sNDA – MRK-00420008087 - MRK-00420008117 (P1.1132)
50. Excerpts from U.S. Long Range Operating Plan, dated 7/12/01 – MRK-ABI0008659 - MRK-ABI0008683 (P1.1135)
51. Excerpts from Protocol 090. – MRK-NJ0170152 - MRK-NJ0170511 (P1.1186)
52. Excerpts from COX-2 FDA Advisory Committee Meeting – MRK-AFK0232972 - MRK-AFK0233029 (P1.1238)
53. Excerpts from FDA review of NDA 21-042 and NDA 21-052 – MRK-AFV0341732 - MRK-AFV0341794 (P1.1245)
54. Excerpts from VIGOR Reviews – MRK-AFV0341795 - MRK-AFV0341881 (P1.1246)
55. Email from Edward Scolnick to David Anstice, dated 10/18/01 – MRK-ABW0004799 - MRK-ABW0004799 (P1.0002)
56. Email from Brian F. Daniels to Thomas Simon, et al., dated 2/26/97 – MRK-NJ0315892 - MRK-NJ0315894 (P1.0004)
57. Warning letter from Thomas Abrams to Raymond Gilmartin, dated 9/17/01 – MRK-ABA0003277- MRK-ABA0003284 (P1.0006)
58. Vioxx Dodgeball – MRK-AAR0019773 - MRK-AAR0019786 (P1.0007)
59. CV Card – MRK-AAR0019055 - MRK-AAR0019060 (P1.0008)
60. VICTOR KM Plot--Confirmed Thrombotic CV events, dated 2/1/05 – MRK-AFK0190651 - MRK-AFK0190651 (P1.0015)
61. VICTOR KM Plot--APTC event, dated 2/1/05 MRK-AFK0190652 - MRK-AFK0190652 (P1.0016)
62. Vioxx Preliminary Cardiovascular Meta-Analysis Slide Set by Deborah Shapiro, dated 10/18/00 – MRK-NJ0070364 - MRK-NJ0070397 (P1.0017)
63. FDA-MRL Meeting NDA 21-042/S-007: VIGOR Re: Protocol 069 Minutes, dated 4/11/01 - MRK-01420099060 - MRK-01420099061 (P1.0021)
64. Analyses of Unadjudicated and Adjudicated Thromboembolic Adverse Experiences – MRK-AAB0108912 - MRK-AAB0108932 (P1.0029)
65. Bulletin for Vioxx Action Required: Response to New York Times Article, dated 5/23/01 – MRK-AAR0007240 - MRK-AAR0007248 (P1.0061)
66. Obstacle Jeopardy – MRK-AAR0010111 - MRK-AAR0010126 (P1.0064)
67. Bulletin for Vioxx: Action Required: Response to JAMA, "Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors", dated 8/21/2001 - MRK-AAR0021103 - MRK-AAR0021108 (P1.0068)
68. Deaths in MK-0966 Studies 078, 091, 126 – MRK-AAX0000696 - MRK-AAX0000705 (P1.0076)
69. Memo from G. Block and S. Reines to Edward Scolnick, dated 4/8/01 – MRK-AAX0000752 - MRK-AAX0000776 (P1.0079)
70. Memo from Thomas Musliner to B. Friedman, A. Nies and R. Spector, dated 11/21/06 – MRK-AAX0002413 - MRK-AAX0002420 (P1.0082)

71. Letter from Carlos Patrono to Martino Laurenzi, dated 9/9/98 -- MRK-ABC0002199 - MRK-ABC0002200 (P1.0108)

72. Email from Douglas Greene to Alan Nies, dated 12/3/01 – MRK-ABC0034124 - MRK-ABC0034124 (P1.0119)

73. Memo on protocol 136 results, dated 11/20/01 – MRK-ABC0035654 - MRK-ABC0035657 (P1.0120)

74. A. Nies email to Stone, dated 11/20/01 – MRK-ABC0035680 (P1.0121)

75. Research Management Committee No. 96-10 -- Blue Bell, dated 10/10/96 – MRK-ABC0048699 - MRK-ABC0048706 (P1.0122)

76. Email from Edward Scolnick to Deborah Shapiro et al., dated 3/9/00 – MRK-ABH0016219 (P1.0132)

77. Letter from David Anstice to Thomas Abrams, dated 10/1/01 – MRK-ABI0003148 - MRK-ABI0003155 (P1.0151)

78. Press Release - Merck confirms favorable CV safety profile of Vioxx, dated 5/22/01 -- MRK-ABJ0003228 - MRK-ABJ0003230 (P1.0152)

79. Nies Handwritten Memo Re: Carlo Patrono, dated 9/29/98 – MRK-ABK0311068 (P1.0167)

80. Plan to Evaluate the Incidence of Cardiovascular SAEs in the Phase IIb/III Vioxx (MK-0966) Osteoarthritis Clinical Trials, dated 9/30/97 -- MRK-ABS0037036 - MRK-ABS0037048 (P1.0198)

81. Email from Lawson to Reines, dated 3/1/02 – MRK-ABS0344100 P1.0211

82. Email from Douglas Watson to Thomas Capizzi, et al., dated 1/18/00 – MRK-ABT0022650 - MRK-ABT0022657 (P1.0221)

83. Dear Doctor letter from John Yates, dated 10/30/03 – MRK-ABX0071232 - MRK-ABX0071233 (P1.0243)

84. Email from R. Bain to Ramey, dated 9/29/01 – MRK-ABY0019451 - MRK-ABY0019452 (P1.0246)

85. Ingenix paper 2-17 version, dated 9/3/04 – MRK-ABY0164039 - MRK-ABY0164060 (P1.0263)

86. Email from Deborah Shapiro to Eliav Barr, et al., dated 1/29/02 – MRK-ACF0004015 - MRK-ACF0004016 (P1.0278)

87. Attachments to Casola to Abrams letter, dated 11/19/01 – MRK-ACI0013241 - MRK-ACI0013246 (P1.0288)

88. Email from Edward Scolnick to Douglas Greene, dated 4/9/01 – MRK-ACR0009151 - MRK-ACR0009152 (P1.0300)

89. Email from Edward Scolnick to Douglas Greene, dated 3/22/01 – MRK-ACR0014502 - MRK-ACR0014503 (P1.0309)

90. Bulletin for Vioxx / Background and obstacle responses on retrospective observational analysis - / Solomon article No. COX 04-023, dated 4/21/04 – MRK-ADB0046424 - MRK-ADB0046427 (P1.0340)

91. D. Watson email re: Solomon Cox2 and MI Manuscript Accepted to Circ, dated 2/10/04 – MRK-ADC0003100 - MRK-ADC0003104 (P1.0344)

92. Ingenix Draft Final Report "Cardiovascular Risk of COX-2 Inhibitors and Other NANSAIDs, dated 12/15/03 – MRK-ADC0032522 - MRK-ADC0032573 (P1.0346)

4

93. Email from Adam Schechter to Thomas Cannell, et al., dated 11/22/01 – MRK-ADG0035340 (P1.0352)

94. PIR - Use of Vioxx with Low Dose Aspirin, dated 5/17/02 – MRK-ADZ0017722 - MRK-ADZ0017729 (P1.0369)

95. Scientific Advisors' Meeting May 3 - May 6, 1998 Programmatic Review Vioxx Program, dated 5/6/98 – MRK-AEI0002734 - MRK-AEI0002746 (P1.0386)

96. Email from Barry J. Gertz to Peter S. Kim, et al., dated 4/30/03 – MRK-AFJ0003506 - MRK-AFJ0003510 (P1.0425)

97. PIR - Vioxx 50 mg, dated 5/14/01 – MRK-BDN0000081 - MRK-BDN0000098 (P1.0452)

98. PIR - Results of VIGOR trial, dated 9/2/00 – MRK-HND0000189 - MRK-HND0000193 (P1.0456)

99. Vioxx Label Nov. '99, dated 11/1/99 – MRK-LBL0000035 - MRK-LBL0000038 (P1.0463)

100. Vioxx Final Label April 2002, dated 4/19/02 – MRK-NJ0094478 - MRK-NJ0094493 (P1.0484)

101. Email from Douglas Watson to Alise Reicin, et al., dated 1/18/00 – MRK-NJ0120249 - MRK-NJ0120250 (P1.0490)

102. Email from Alise Reicin to Eliave barr and Deborah Shapiro, dated 3/14/00 – MRK-NJ0121088 - MRK-NJ0121089 (P1.0494)

103. Email from E. Barr to D. Shapiro, dated 9/19/00 – MRK-NJ0123880 - MRK-NJ0123882 (P1.0501)

104. A. Reicin email to E. Barr, dated 11/8/00 – MRK-NJ0124427 - MRK-NJ0124428 (P1.0502)

105. MRL Clinical Study Report: Protocol 90, dated 6/15/00 – MRK-NJ0170152 - MRK-NJ0170274 (P1.0513)

106. MRL Epidemiology Department Technical Report No. EP07006.005.98 Final Results of an Analysis of the Incidence of Cardiovascular SAEs in the Phase IIb/III VIOXX Osteoarthritis Clinical Trials, dated 2/2/98 – MRK-NJ0272249 - MRK-NJ0272272 (P1.0532)

107. Press Release - Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcomes Study with Vioxx, dated 3/27/00 – MRK-PRL0000114 - MRK-PRL0000115 (P1.0581)

108. Email from Edward Scolnick to Karen Grosser, dated 11/1/01 – MRK-AFO0128716 (P1.0729)

109. MRL Clinical Study Report, Multicenter Study: A Double-Blind, Placebo Controlled Study to Evaluate Safety and Tolerability and Preliminarily Assess Clinical Efficacy of MK-0966 in Patients With Osteoarthritis of the Knee (Protocol 010) – MRK-OS420045657 - MRK-OS0420046186 (P1.0967)

110. MRL Clinical Study Report, Multicenter Study: A Double-Blind, Placebo Controlled Study to Assess Safety and Tolerability and Preliminarily Evaluate Efficacy of L-748,731 in Patients with Rheumatoid Arthritis (Protocol 017) – MRK-AFL0010627 - MRK-AFL0010817 (P1.0968)

111. Memo from Eric Maller to Michelle Johnson, dated 5/14/02 – MRK-ABS0415817 (P1.1074)

112. Email from Edward Scolnick to Douglas Greene, dated 11/8/01 – MRK-AFJ0001537 (P1.1098)
113. Excerpts of 10/13/00 sNDA for VIGOR, dated 10/13/00 – MRK-N0520004121 - MRK-N0520004172 (P1.1133)
114. Letter from Jonca Bull to Robert Silverman, dated 4/6/01 – MRK-NJ0274184 - MRK-NJ0274187 (P1.1209)
115. Fax from Barbara Gould to Philip Huan, dated 2/2/05 – MRK-S0420050651 (P1.1214)
116. Memo from Deborah Shapiro to Alise Reicin et al., dated 7/5/00 – MRK-NJ0071320 - MRK-NJ0071332 (P1.1231)
117. Memo from Lourdes Villalba to Brian Harvey – (P1.1253)
118. Version 2 Standby Statement 0 Vioxx and Cardiovascular Events in VIGOR, dated 3/1/00 – MRK-S0420112006 - MRK-S0420112007 (P1.1256)
119. SA Reines, et al., Rofecoxib/No effect on Alzheimer's disease in a 1-year, randomized, blinded, controlled study, Neurology, Vol. 62, Pgs 66-71 – MRK-ADY0006485 - MRK-ADY0006490 (P2.0021)
120. BJ Gertz et al. , Selective COX-2 inhibition and cardiovascular effects: A Review of the rofecoxib development program, American Heart Journal, Vol 146, Issue 4, Pgs 591-604 – MRK-ADY0006153 - MRK-ADY0006166 (P2.0022)
121. Bresalier, Robert et al., Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial, The New England Journal of Medicine, Pg. 1-11, (February 14, 2005) – (P2.0167)
122. Claire Bombardier, et al, Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis, The New England Journal of Medicine, Vol 343, Pg. 1520-1528, dated 11/23/00 – MRK-ABA0001301 – MRK-ABA0001309 (P2.0183)
123. Thal, LJ, Ferris, SH et al., A Randomized, Double-Bind, Study of Rofecoxib with Mild Cognitive Impairment, Neuropsychopharmacology Vol. 30, 1204-1215, advance online publication, 2 March 2005; http://www.nature.com/npp/journal/v30/n6/abs/1300690a.html - (P2.0202)
124. Bombardier, C. et. al, Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis, N. Eng. J. Med, Vol 343, No. 21, 1520 (Nov. 23, 2000) – MRK-ABA0001301 - MRK-ABA0001309 (P2.0146)
125. Lisse, J., et al, Gastrointestinal Tolerability and Effectiveness of rofecoxib verses Naproxen in the Treatment of Osteoarthritis, Ann. Inter. Med 2003; 139:539-546 (October 7, 2003)
126. Advisory Committee Briefing Packet :VIGOR (February 8, 2001) – MRK-ABW0000581 - MRK-ABW0000607 (P1.1084)
127. FDA Medical Officer review by Lourdes Villalba, dated 3/31/01 – MRK-AFV0341574 - MRK-AFV0341594 (P1.1243)
128. VIGOR/RA SNDA Reviews, dated 7/21/01 – MRK-AFV0341732 - MRK-AFV0341794 (P1.1245)
129. Reviewer Comments: New England Journal of Medicine, dated 2/9/05 – 2005 NEJM 000013

6

130. NEJM Manuscript 05-0493-Author's responses to Reviewer's Comments – MRK-AFN0052502 - MRK-AFN0052523 (P1.0755)
131. Investigator Reported AE, Myer Kaplan Curves (excerpts)
132. E-mail from Marvin Konstam to C. Lines, dated 2/2/05 – MRK-AHD0075697
133. Memo from J. Chen to R. Bain, dated 4/4/01 – MRK-AAX0000725 - MRK-AAX0000751 (P1.0078)
134. Author's Responses to Reviewer's Comments – MRK-AAC0146909
135. Protocol 145 (VICTOR) Memo – MRK-I8940096438
136. Excerpt of CSR 201 – MRK-I89400096448
137. Brochier, M.J.., Evaluation of Flurbuprofen for Prevention of Reinfarction and Reocculusion after Successful Thrombosis or Angioplasty in Acute Myocardial Infarction, Eur. Heart J. (1993) 14, 951-957 – MRK-NJ0146547 - MRK-NJ0146553 (P2.0208)
138. Fornaro, G., Induprofen in the Prevention of Thromboembolic Complications in Patients with Heart Disease, Circulation, 1993:87:167-169
139. Konstam, M. A. et al. Cardiovascular Thrombotic Events in Controlled Clinical Trials of Rofecoxib, Circulation 2001: 104: 2280-2288 – MRK-ABA0004431 - MRK-ABA0004440 (P2.0133)
140. E-Mail String, Morrison, Shapiro, Bolognese, et al. – MRK-ACF0005697 - MRK-ACF0005699 (P1.0281)
141. Mukhergee, et al, Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors, JAMA, Vol 286, No 8, 954-959 (August 2002) – MRK-ADJ0035003 - MRK-ADJ0035008 (P2.0032)
142. Reicin, AS, et al, Comparison of Cardiovascular Thrombotic Events in Patients With Osteoarthritis Treated with Rofecoxib Verses Nonselective Nonsteroidal Anti-inflammatory Drugs (Ibuprofen, Docofenac and Nabumatone), Am. J. Cardiol. 2002; 89: 204-209 – MRK-ABT0018283 - MRK-ABT0018288 (P2.0104)
143. E-mail from Reicin to Sperling, dated 4/20/01 – MRK-ABK0156786 - MRK-ABK0156808 (P1.1225)
144. Juni, P., et al, Risk of cardiovascular Events and Rofecoxib: Cumulative Meta-Analysis, Lancet, Vol 364, 2021 (Dec. 4 , 2004) – MRK-ABI0013854 - MRK-ABI0013862 (P2.0126)
145. FDA Medical Officer Review (Villalba)(Cardiovascular Data in Alzheimer's Studies-078, 091 and 126, dated 3/12/02
146. FDA Medical Officer Review in Alzheimer's Studies 078 and 091 (Villalba), dated 12/18/04
147. Memo from Joshua Chen to Raymond Bain, dated 5/1/01 – MRK-ABY0030000 - MRK-ABY0030030 (P1.0255)
148. Ray, W. et al. COX 2 Selective Non-Steroidal Anti-Inflammatory Drugs and Risk of Serious Coronary Heart Disease, Lancet, Vol. 360, 1071-73 (October 5, 2002) – MRK-ADY0004478 - MRK-ADY0004480 (P2.0025)
149. Mamdami, M., et al., Effect of Selective Cyclooxygenase 2 Inhibitors and Naproxen on Short Term Risk of Acute Myocardial Infarction in the Elderly, Arch. Intern. Med., 2003; 163; 481-486 – MRK-ABH0002262 - MRK-ABH0002266 (P2.0103)

7

150. Solomon, et al, Relationship Between Selective Cyclooxigenase-2 Inhibitors and Acute Myocardial Infarction in Older Adults, Circulation, 2004; 109: 2068-2073 – MRK-ADY0006986 - MRK-ADY0006991 (P2.0017)

151. Graham, D.J, Risk of Acute Myocardial Infarction and Sudden cardiac Death in Patients Treated with Cyclo-0xygenase 2 selective and Non-selective Non-Steroidal Anti Inflammatory Drugs: Nested Case Control Study, Lancet Vol, 365, 475 (Feb 2, 2005) – MRK-ACO0144158 - MRK-ACO0144164 (P2.0050)

152. Levesque, L., et al, The Risk of Myocardial Infarction with Cyclooxyegenase-2 Inhibitors: A Population Study in Healthy Adults, Ann. Inter. Med. 2005, 142(7) - MRK-AHD0004828 - MRK-AHD0004837 – (P2.0007)

153. Kimmel, S.E., The effects of non-Selective Non-Aspirin Non-Steroidal Anti-Inflammatory Medications on the risk of Nonfatal Myocardial Infarction and their Interaction with Aspirin, J. Am. Cardiol 2004; 43: 985-990 - MRK-ABY0089726 - MRK-ABY0089731 (P2.0064)

154. Walker, et al (IGENIX), Cardiovascular Risk of COX-2 Inhibitors and Other NSAIDS (Draft Final Report–Nov. 25, 2003)(Unpublished)

155. Solomon, D., Nonsteroidal Anti-inflammatory Drug Use and Acute Myocardial Infarction, Archives in Inter. Med. Vol. 162, 1099 (May 27, 2002) – MRK-ADY0003732 - MRK-ADY0003737 (P2.0026)

156. Ray, W., et al, Non-Steroidal Anti-Inflammatory Drugs and Risk of Serious Coronary Heart Disease: An Observational Cohort Study, Lancet, Vol. 359, 118 (January 12, 2002) – MRK-ABT0015857 - MRK-ABT0015862 (P2.0105)

157. Watson, D.J., Lower Risk of Thromboembolic Cardiovascular Events with Naproxen Among Patients with Rheumatoid Arthritis, Arch, Intern. Med. Vol 162, 1105 (May 27, 2002) – MRK-AEF0000847 - MRK-AEF0000851 (P2.0016)

158. Garcia Rodriguez, L, et al, Differential Effects of Aspirin and Non-Aspirin Nonsteroidal Anti-inflammatory Drugs in the Primary Prevention of Myocardial Infarction in Postmenopausal Women, Epidemiology, Vol 11(4), 382-387 (July 2000) – (P2.0185)

159. Garcia Rodriguez, L, et al, Nonsteroidal Anti-inflammatory Drugs and the Risk of Myocardial Infarction in the General Population, Circulation, 2004: 109: 30-00-3006 – (P2.0191)

160. Rahme E. Association between Naproxen Use and Protection against Acute Myocardial Infarction, Arch., Int. Med., 2002:162; 1111-1115 – MRK-ABS0386560 - MRK-ABS0386564 (P2.0111)

161. Van Hecken, A, et al Comparative Inhibitory Activity of rofecoxib, Meloxicam, Diclofinac, Ibuprofen and Naproxen on COX 2 verses COX-1 in Healthy Volunteers, J. Clin Pharm, 2000; 40; 1109-1120 – MRK-ABA0002280 - MRK-ABA0002291 (P2.0138)

162. Catella-Lawson, et al. Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics and Vasoactive Ecosanoids, J. Pharm. Exper. Ther 289(2): 735-742 (May 1999) – (P2.0189)

163. Tuleja, E. Effects of Cyclooxenases Inhibitors on Vasoactive Prostanoids and Thrombin Generation at the Site of Microvascularc Injury in Healthy Men, Arterioscler. Thromb. Vasc. Biol., 2003; 23; 1111-1115 – (P2.0213)

164. Study to Evaluate he Thrombotic Potential of COX 2 Inhibition in an Animal Model (African Green Monkey)(unpublished) - MRK-NJ0221477-89

165. E-mail String on African Green Monkey data, dated 7/10/01 - MRK-NJ0198045-7

166. Slide on African Green Monkey Study - MRK-ABH0019277-99

167. Slide Presentation: Mechanism Based Adverse Cardiovascular Events and Specific Inhibitors of COX-2, Garret FitzGerald, MD (Presentation to 2005 Advisory Committee)

168. Verna, et al, Cyclooxegenase-2 Blockade does Not Impair Endothelial Vasodilator Function in Healthy Volunteers, Circulation, 2002: 104: 2879-82

169. McAdam, B., et al., Contribution of Cyclooxegenase-2 to Elevate Biosynthesis of Thromboxane A2 and Prostacyclin in Cigarette Smokers, Circulation, 2005, 112:1024-1029

170. Capone, et al., Clinical Pharmacology of Platelet Monocyte and Vascular Cyclooxegenase Inhibition by Naproxen and low-Does Aspirin in Health Subjects

171. Fitzgerald and Patrono, The Coxibs, Selective Inhibitors of Cyclooxegenase-2, N. Eng. J. Med Vol 345, No. 6 (Aug. 9.2001) – MRK-ABI0003298 - MRK-ABI0003307 (P2.0127)

172. FitzGerald, G, Coxibs and Cardiovascular Disease, N. Eng J. Med 35:117 (October 21, 2004) -- (P2.0174)

173. FDA Document, Sequence of Events with Vioxx Since Opening IND

174. FDA Document, FDA Review of cardiovascular and renal Safety by Pelayo, dated 4/30/99

175. FDA Document, Excerpts from Primary Review of NDA 21-042-Osteoarthritis by Villalba, dated May 1999

176. FDA Document, Summary and Transcript of FDA Advisory Committee Meeting (Feb 16,17, 18, 2005)

177. FDA Document, Memorandum from J. Jenkins to Galson, dated 4/6/05

9

# EXHIBIT  I

**Expert report of Jerry Avorn. M.D.**
**March 20, 2006**

**1. Credentials**

I am a Professor of Medicine at Harvard Medical School and Chief of the
Division of Pharmacoepidemiology and Pharmacoeconomics in the Department of
Medicine at the Brigham and Women's Hospital, one of Harvard's main teaching
hospitals. I attended Columbia University as an undergraduate; my medical training was
at Harvard Medical School, where I received the M.D. degree in 1974. In 1977 I
completed a residency in internal medicine at the Beth Israel Hospital in Boston, another
Harvard teaching hospital. I have been teaching at Harvard Medical School continuously
since the 1970s, and am currently responsible for most of the teaching in
pharmacoepidemiology there and at the Brigham and Women's Hospital; I also lecture on
that subject at the Harvard School of Public Health. I am writing the chapter on
pharmacoepidemiology for the revised edition of a textbook by faculty at our university,
*Principles of Pharmacology,* the text used in the course on that topic at Harvard.

The division I founded in the Department of Medicine comprises a staff of 22,
including eleven faculty members. We perform research on the benefits, side effects, and
cost-effectiveness of medications; the determinants and outcomes of physician
prescribing choices; and the relationship between the pharmaceutical industry, the
government, and physicians in shaping medication use, with particular reference to drug
marketing and the communication of risk and benefit information to physicians and
patients. Our division is supported from a variety of sources, primarily peer-reviewed
grants from the National Institutes of Health. We have also received research grants from
various pharmaceutical companies, including Merck. My research has been published in
numerous medical journals, including *The New England Journal of Medicine, the Journal
of the American Medical Association,* and *Circulation,* among others. I am an author of
over 200 papers in the medical literature on these topics, and have been identified as one
of the most highly cited authors in the field of social sciences (including epidemiology)
and medicine. In 2004, my book, *Powerful Medicines: the Benefits, Risks, and Costs of
Prescription Drugs,* was published by Knopf and was well reviewed in both the lay and
medical press.

In addition to pharmacoepidemiologic studies measuring medication risks, a
major focus of my research has been to understand how physicians evaluate the benefits
and risks of alternative medications in making their prescribing decisions, and how those
decisions can be improved. We have published a number of major papers in this area, and
the topic forms the basis of much of my teaching at Harvard Medical School, the Harvard
School of Public Health, and other institutions nationally and internationally. One
component of that work involves providing physicians and patients with evidence-based,
non-commercial summaries of the medical literature to help them make more accurate
drug-use decisions. We have studied this approach in several settings in multi-state
randomized controlled trials and reported the results of these interventions in *The New*



PLAINTIFF'S
EXHIBIT
tabbies®
I

1

*England Journal of Medicine* and several other journals. We also perform such prescribing quality-improvement activities at the Brigham and Women's hospital to educate the interns, residents, and Harvard medical students in training there, and last year my colleagues and I began a large program funded by the state of Pennsylvania to provide this kind of evidence-based medication information for practicing physicians throughout that state on an ongoing basis. In addition to my own research and educational activities in this area, I have consulted internationally on the development and evaluation of programs based on my research that are designed to provide doctors with accurate, unbiased information about drug benefits and risks in countries including Canada, Great Britain, and Australia.

Since my residency I have practiced internal medicine as well as geriatrics in the ambulatory and inpatient settings at several Harvard teaching hospitals; I presently serve as senior attending physician on the General Medicine Service at the Brigham and Women's Hospital, where I supervise and teach interns, residents, and medical students.

## II. The present assignment

I was asked by plaintiffs' attorneys to consider the question of whether rofecoxib (Vioxx) increases the risk of cardiovascular disease, and to assess the methods by which Merck evaluated and managed this issue throughout the development and marketing of Vioxx. In performing these tasks I relied on publications from the peer-reviewed medical literature, publicly available material from the Food and Drug Administration, and other documents (including internal Merck communications) provided by counsel. I relied on these materials as well as my education, experience, and research, and I employed standard methodologies that are generally accepted in the scientific community.

## III. Available evidence prior to FDA approval of Vioxx

Merck's withdrawal of Vioxx (rofecoxib) in September 2004 was followed by numerous statements from company officials that they were astonished at the unanticipated finding that their drug could double the risk of heart attack or stroke. But inspection of information available in the public domain and of internal company documents provides clear evidence that Merck officials had been aware of this risk for years and failed to take reasonable action to address it.

Merck consistently promoted the advantage of its selective cox-2 inhibitor as retaining the favorable effects of suppressing the "bad" cox-2 (so as to reduce pain and inflammation) without suppressing the "good" effects of cox-1 (thus maintaining the gastric mucosa). But there was evidence as early as the 1990s that this good/bad formulation was an oversimplification of reality. Early papers made it clear that a selective cox-2 inhibitor could also suppress vital functions of cox-2 (e.g., prevention of clot formation) along with the more harmful ones (pain and inflammation). Such selective suppression would leave potentially dangerous functions of cox-1 (promotion of clot formation) relatively spared, and thus imbalanced.

2

This knowledge was clearly in place when Merck was developing Vioxx. An internal memorandum from October 1996 describes a very early clinical trial of the new drug compared to placebo (Protocol 017). Even though the trial lasted only six weeks, the committee reviewing the trial results noted that "[a]dverse events of most concern were in the cardiovascular system (e.g., MI, unstable angina...increase in blood pressure)." A plan was described to test the drug in a study in which patients would be given low-dose aspirin to protect against these cardiovascular side effects, but to my knowledge Merck never conducted any clinical trial pro-actively designed to address the crucial topic of the cardiovascular risk and safety of Vioxx in patients taking aspirin.

In 1996, Merck began planning a large-scale gastrointestinal outcomes study (which later evolved into the VIGOR trial), comparing Vioxx to a traditional NSAID. These early documents make clear that Merck anticipated an increase of cardiovascular events in patients taking Vioxx. Internal memos during this period make it clear that Merck was attempting to design a study that would demonstrate favorable results for its drug's g.i. safety, while minimizing the potential for finding more adverse cardiovascular outcomes in the Vioxx arm — whether those events were the result of Vioxx increasing cardiac risk or because Vioxx would not provide cardioprotection (having no effect on platelet function) to a population at risk for such events. A Merck scientist, Tom Musliner, wrote candidly that the new drug was likely to increase cardiac risk compared to a traditional NSAID if patients in the proposed study were not given aspirin to protect their hearts:

> there is a substantial chance that significantly higher rates of CV [cardiovascular] AE [adverse event] events (MIs, angina, strokes, TIAs, etc.) will be observed in the selective Cox-2 inhibitor group compared to the standard NSAID group, as summarized in the preceding section.

He stated the study design option starkly: "Prohibit use of low-dose aspirin and accept the risk of observing significant differences in CV rates [i.e., more heart attacks in the Vioxx group]." In the next sentence, Musliner suggested a way to obscure this problem:

> One could attempt to minimize between-group differences [in CV event rates] by excluding patients at high risk (i.e., with prior MI, angina, stroke, TIA, atrial fibrillation, valvular heart disease, peripheral vascular disease, etc.).

The company was still debating possible study designs in 1997 when Merck scientists commented on a draft protocol for what was then known as the "GI Outcomes Trial." Dr. Briggs Morrison of Merck argued that patients should be allowed to take low-dose aspirin in the trial, because "without COX-1 inhibition [that aspirin would provide] you will get more thrombotic events and kill the drug." Dr. Alise Reicin responded the same day:

3

> Low dose aspirin – I HEAR YOU! This is a no win situation!... the
> possibility of increased CV events is of great concern – (I just can't
> wait to be the one to present those results to senior management!).
> What about the idea of excluding high risk CV patients – i.e., those
> that have already had an MI, CABG, or PTCA? This may decrease the
> CV event rate so that a difference between the two groups would not
> be evident.

Basic principles of medical research, as well as sound science, make it clear that one
should not design a clinical trial with the pre-specified intention of masking negative
outcomes.

The next day, Brian Daniels responded to the same e-mail group:

> It is clear to me that the program will be severly [sic] hurt if the
> megatrial [VIGOR] shows a win in PUBs [gastrointestinal
> perforations, ulcers, and bleeds] and a loss in MI/CVA [heart attack
> and stroke]. That is what we are setting up by not allowing ASA
> [aspirin].

These 1996 - 1997 memos indicated that the Merck officials who designed the
drug's clinical trial program were aware of the drug's potential for cardiovascular harm.
These documents suggest that Merck knew it would be putting patients at an increased
risk for cardiovascular events in the Vioxx arm of the planned study, either because of a
prothrombotic effect of Vioxx or because of the prohibition of cardioprotective use of
aspirin. Arthritis patients (both RA and OA) are generally at higher risk of heart disease,
but Merck decided to prohibit low-dose aspirin because of concern that its use could
reduce or eliminate the postulated difference in gastrointestinal bleeding rates. The final
trial design served to showcase that selling-point while putting patients in the Vioxx arm
at increased risk of cardiovascular events. When the study was published almost exactly
four years after the Musliner memo, it indeed found an increase in cardiovascular events
in the Vioxx arm as had been anticipated by its planners in 1996.

Concern about excess cardiovascular events in patients given Vioxx was not
limited to studies in which it was compared to older NSAIDs. To evaluate other study
results that suggested Vioxx may increase the risk of cardiovascular events, the company
conducted a comprehensive internal review of its clinical trial data in February 1998.
This study found a significant increase in cardiovascular events in patients enrolled in
Vioxx trials, as compared to patients in other trials who had been given placebo. This was
an admittedly crude study, because the Vioxx trials were still blinded and therefore
included *all* study arms (including any comparator drugs as well as placebo), and
compared event rates with the placebo-only arms of different trials. This is not an optimal
alternative to actual randomized trial data testing the hypothesis directly, since such a
cross-study design can produce differences that might not persist when more
appropriately designed trials were done. But in the absence at that point of adequate
information from such trials, the Watson analysis provided a comparison that the

4

company felt was appropriate to conduct in 1998, and was one important source of information available to it at that time. Knowing what it knew then, Merck did not respond to this analysis as a potentially important signal to guide the planning of future clinical trials to determine whether this risk would be refuted or borne out. In the first instance of a pattern repeated several times in later years, company officials dismissed the findings and explained away the results of the comparisons it had requested by suggesting that the higher number of cardiovascular events occurring in patients in the Vioxx studies was not caused by an increase in these problems caused by the drug, but rather by an unusually low rate of such events in the placebo comparator patients. That reaction is a telling one, which indicates the company's response at the time to bad news about its potential blockbuster, and is more important than the subsequent re-analyses of these crude data. Of course, later findings from large randomized clinical trials – even though they had not been designed to address this question – did confirm the pattern of increased cardiovascular risk of Vioxx in relation to placebo.

In May 1998, six months before the Vioxx NDA was filed, the company sought a Programmatic Review from a board of expert scientific advisors it brought together to review the development of the new drug. The advisors' written report warned that greater inhibition of the cox-2 enzyme "could lead to adverse effects of inhibiting COX-2 that are not predictable based on experience with current NSAIDs." They drew the company's attention to three separate mechanisms through which Vioxx could cause serious cardiac complications: fostering the development of lipid-rich plaques in the coronary arteries, destabilizing those plaques and making them "rupture-prone," and the resulting thrombotic occlusion of those arteries (the mechanism causing most heart attacks). The outside panel's report went into considerable detail on how the specific pharmacology of Vioxx could cause this problem by inhibiting the anti-thrombotic effects of cox-2 (particularly by reducing levels of prostacyclin, known to reduce clot formation) while leaving the clot-producing effects of cox-1 (primarily mediated via thromboxane) relatively unaffected.

Taking the concern beyond the level of theory, Merck's external Scientific Advisory Board told the company about specific evidence already in place that made this outcome even more likely: Vioxx was known to reduce the levels of a metabolite (by-product) of prostacyclin.

By removing this potent inhibitor of platelet aggregation [prostacyclin], the probability that a coronary plaque rupture would lead to myocardial infarction [heart attack] or ischemic ventricular fibrillation [potentially fatal heart rhythm disorder] is enhanced. More information is clearly needed to address these hypotheses and the other questions related to the possible influences of a COX-2 inhibitor on coronary morbidity and mortality.

In its May 1998 report, the outside experts strongly urged Merck to evaluate these possibilities with clinical trials and other studies specifically designed to assess the

5

possible increased risk of Vioxx in causing heart attack, noting that such research studies should be "actively pursued."

In September 1998, two months before submission of the Vioxx NDA, a letter was sent to Dr. Martino Laurenzi of Merck from Carlo Patrono, M.D., a Professor of Pharmacology at an Italian university. He wrote to follow up on a prior discussion he had had with Dr. Laurenzi about the need for the company to do further research on the potential cardiac effects of Vioxx. He noted that there were many open questions concerning "the potential cardiovascular implications of COX-2 expression and inhibition," and said that the company needed to do studies to clarify this question: "I would suggest that it would be in the best interest of Merck to look into these issues as quickly and thoroughly as possible."

Dr. Patrono's letter was passed on to Dr. Alan Nies at Merck Research Laboratories. Later that month, on September 29, 1998, Dr. Nies sent a memo to colleagues at the company about Dr. Patrono's proposed research and to "the PGIM issue," referring to the prostacyclin metabolite. The same problem had been noted by Dr. John Oates, the respected head of Clinical Pharmacology at Vanderbilt University. Concerning Dr. Patrono's letter, Dr. Nies wrote:

> His thoughts are similar to those of John Oates who called me a couple of weeks ago wanting to study Vioxx in patients with atherosclerosis/hyperlipidemia and elevated Tx [thromboxane] metabolite excretion. I told John we would not be doing any clinical studies at this time. When these drugs are available, many investigators will probably do such studies with or without our help/consent.

I am not aware that Merck ever commissioned any clinical trials to clarify the potentially crucial issue of cox-2 inhibition increasing the risk of cardiac events, even though the company considered doing such studies (see below) and then decided not to follow through on them. A variety of study designs specifically designed to address the cardiac risk issue would have been practical as well as ethical and could have been initiated as early as 2000, or even earlier. Instead, Merck's failure to conduct such studies bolstered its ongoing claims that it was not aware of sufficient clinical trial data to demonstrate this risk, right up until the day it withdrew the drug from the market.

It is widely understood that once approval has been granted, FDA has very limited regulatory authority to compel a company to begin a new clinical trial for an existing indication. However, a responsible company would have initiated its own targeted study or studies to clarify a potential risk as important as this, even if not required to do so by the government.

The NDA [21-042] submitted by the company to the FDA in November 1998 contained data that indicated a clear increase in adverse events in the "cardiovascular system" category, whether the drug was being compared to placebo or to established non-

6

selective NSAIDs. Most prominent were higher rates of hypertension and edema caused by Vioxx, and these were noted by the FDA reviewer:

> There is an unequivocal association between [Vioxx] administration and the occurrence of cardiovascular and renal effects…Of note, in most of the studies the identified cardiovascular and renal toxicities associated with [Vioxx], when administered at a dose ranging from 25 to 50 mg daily, occur at a higher rate than with the other tested [NSAID] comparators.

I am not aware of any evidence that Merck communicated the risks identified by its own board of scientific advisors to FDA in the agency's initial review of the Vioxx application. The FDA's evaluation of the drug's potential safety problems related to selective inhibition of cox-2 makes no mention of this evidence.

When the NDA data were reviewed by FDA in May 1999, an FDA reviewer noted that of the subjects selected by the company for enrollment in its studies of patients with osteoarthritis, only 20% were 65 or older even though this condition is primarily a disease of the elderly, making it difficult to know how common such problems would be once the drug was in actual use. The reviewers also observed that assessment of such risks was complicated by the fact that Merck excluded from its studies any patients with a recent heart attack or angina or a stroke or transient ischemic attack within the prior two years. Along with the under-representation of patients over 65 in the osteoarthritis studies, this probably served to obscure the detection of cardiovascular complications. Despite this, a substantially higher number of cardiovascular thromboembolic events had been seen in patients randomized to Vioxx vs. placebo, even in relatively brief studies.

**IV. Additional clinical trial evidence of risk following FDA approval of Vioxx**

**A. The VIGOR trial**

The VIGOR study was a randomized controlled trial of Vioxx compared with an older non-steroidal anti-inflammatory drug, naproxen. It was designed by Merck to produce evidence that Vioxx caused less gastrointestinal toxicity than traditional NSAIDs. In light of the biological concerns noted above, when the overall plan for analyzing data from the company's clinical cox-2 trials was first being developed in late 1998 and early 1999 Dr. Douglas Watson, a Merck statistician, proposed an "Analysis Strategy for the Incidence of Serious Thromboembolic Events in the COX-2 Inhibitor Program." His memo recommended that the company track summary statistics and incidence rates of adverse cardiovascular events in each treatment group. Yet he went on to recommend that "No formal statistical hypothesis testing will be performed." This would be an odd analytical approach given the importance of the problem being studied, because such a plan would obscure rather than clarify the drug's role in causing these side effects.

7

Watson then suggested that adverse events be divided into three plausible categories of outcomes – primary, secondary, and tertiary. The first would include fatal and non-fatal MI, unstable angina, and fatal and non-fatal ischemic stroke; this would be an appropriate set of primary outcomes in keeping with much of the clinical trial literature. The second included other reasonable categories of arterial thromboembolic events. The tertiary category was to include thrombotic events occurring in the veins, which have a different pathology from that of primary concern for the cox-2 drugs. Watson's original proposal was to study each category separately, which would have made sense in light of the different mechanisms causing arterial vs. venous thrombosis.

In the minutes of the CDOC meeting of January 6, 1999, the committee accepted his odd recommendation that no statistical testing be performed. But it rejected the idea of studying arterial and venous thrombotic events separately in the primary analysis, relegating such comparisons to a subsidiary status. Instead, it directed Dr. Watson "to exclude plans to conduct separate analyses of event types" in the main analysis. In addition to being pathologically very different from arterial thrombotic events (e.g., MI, ischemic stroke), some venous thrombotic events are quite common (e.g., deep vein thrombophlebitis), so their inclusion in the main analysis of outcomes in a drug with known potential for arterial clots would likely obscure that causal relationship.

Internal Merck documents indicate that as the VIGOR trial was being conducted, the company's scientists were aware that patients enrolled in the Vioxx arm could well have a higher rate of serious arterial embolic events. On January 9, 2000, Michael Gresser wrote a memo titled "stroke outcomes" to Elliot Ehrich, George Robertson, and Mervyn Turner. In it he warned that "if our worst fears concerning the prostacyclin business have any foundation in reality they [patients randomized to receive Vioxx] could have a higher incidence [of stroke]...." Yet despite the substantial pre-existing causes for concern about increased CV toxicity in the Vioxx arm of the study, Merck's initial plan for analysis of the trial data would have obscured rather than clarified any such relationship.

Despite the concern by many in the scientific community about a possible cox-2-thrombosis risk, on January 12 Doug Watson reported to Gresser, Ehrich, Robertson, Turner, and Alise Reicin:

> It has been decided within MRL [Merck Research Laboratories] that analyses of that data [CV serious adverse events] will be confined to descriptive analyses and calculation of incidence rates for blocks of studies, but no formal comparisons among treatments will be done. None of these analyses will be done for another year yet.

Alise Reicin responds that there was a plan for CV events to be assessed in VIGOR. But the following day (January 13, 2000) Doug Watson, who had been central to the company's prior analyses of CV events with Vioxx, writes to others at Merck:

8

> See Alise's message below. I am confused by her statement "As part
> of the VIGOR DAP [data analysis plan], we plan to look at the CV
> events separately. Tom Capizzi is currently writing up the type of
> analysies [sic] which will be done.
>
>> Such plans have not been discussed with me previously. What
> exactly are you planning and is the intent to use adjudicated events?

The following day Watson wrote to Reicin to express his confusion: "I have looked at the
VIGOR DAP and see that such an analysis is not listed as primary, secondary, or
exploratory... I don't recall this ever be [sic] discussed with me or at any meetings where
I was present. In the section on Aes [adverse events] it does not list these as a
prespecified analysis." These memos were written two months before the VIGOR data
were to be unblinded, astonishingly late for such a crucial question to remain unresolved.

On January 17, 2000, Capizzi sends a widely circulated memo in which he reports
that the VIGOR data analysis plan is "undergoing revisions":

> ...we received senior management approval not to pursue a CV
> DAP...When the DSMB [the study's external Data Safety Monitoring
> Board] was notified that there was no program wide plan, the DSMB
> requested that we analyze the adjudicated CV data for VIGOR (their
> request seemed to be based on the size of VIGOR and the importance of
> the CV issue with respect to COX 2 agents).

Watson responds,

> The idea that we would do this runs counter to the directives I had
> previously received from CDOC regarding analyses of adjudicated
> vascular events. As a result, the procedures in the SOP [standard
> operating procedure] are not set up in such a way as to get the events
> adjudicated on the kind of timeline this requires, and doing so will be
> difficult at this point.

On January 17, 2000, Harry Guess, head of epidemiology at Merck, sent an urgently
worded memo to George Williams and others at the company, entitled "VIGOR
Cardiovascular Event Adjudications: Alert on a potential problem." It read, in part:

> The DSMB for VIGOR decided in December [one month earlier] that
> analyses should be conducted of cardiovascular events in VIGOR....
> The issue about which I wanted to alert you is that we (Epidemiology)
> might not be able to get the cardiovascular (CV) events adjudicated in
> time to meet the VIGOR frozen file date of April 24. As of today, we
> have 58 potential CV events, of which only 5 have been adjudicated.
> Of the remaining 53 potential events, we have documentation in
> Epidemiology on 27 of them, so we will need to get the documentation
> sent in on the other 26. We estimate that by Feb 10 we might have a

9