total of about 70 CV events in both treatment groups of 088 and 09
combined. Alise has proposed Feb 10 as the cut off for this analysis.
The most important problem is that it might not be feasible to get the
committees to adjudicate all events by early April....We are in
Epidemiology are not staffed to get this volume of extra CV events
processed between now and April while meting all other
commitments, including keeping up with the GI PUB events
[perforations, ulcers, and bleeds] on VIGOR.

On January 18, 2000, Capizzi reports on a new plan for analyzing CV events in VIGOR:

We currently have in the revised plan that the adjudicated events will be
the primary assessment. I will add statement that explicitly states that no
between group differences, tests or confidence intervals will be provided
for the unadjudicated events in questions [sic]. This will protect us
should the events not be adjudicated in time for the CSR.

Watson responds later that day that given the small number of events that will be
available for analysis, "and that not all of them will be confirmed by adjudication, there
will not be much precision in the analysis no matter what we do."

At the very best, the disarray and last-minute changes to the data analysis plan for
such an important, expected, and potentially damaging side effect of Vioxx reflect
terrible planning on the company's part for studying such a serious problem. Whether or
not the company was ultimately successful in completing the adjudications on time, the
plan to restrict the analysis to only those cardiac events that had been completely
adjudicated, while explicitly excluding analyses of unadjudicated cases, would severely
limit the number of events available for study. This in turn would curtail the analytical
power of these comparisons, thus reducing the chance that a statistically significant
increase in CV events could be detected in the Vioxx group. This analytic strategy was
particularly problematic in light of the company's knowledge that serious difficulties
were expected in getting all the cases processed in time.

The *NEJM* article describing the results of the trial, which appeared in November
2000, reported that VIGOR had achieved its main purpose. It found that while Vioxx had
analgesic efficacy identical to that of naproxen, patients randomized to the Vioxx group
had fewer gastrointestinal complications than those taking naproxen. Yet there was a 5-
fold increase in cardiac events in the patients given Vioxx. In presenting the study results,
the company took the unusual step of attributing this difference to a *reduction* of heart
attacks by naproxen rather than an increase in risk caused by Vioxx. This was done
despite the fact that such a supposed protective naproxen effect on the heart was
primarily theoretical, and had never been demonstrated in any clinical trial. The FDA
review of these data pointed out that naproxen was only a *transient* inhibitor of the clot-
promoting substance thromboxane, and that the cardioprotective effect Merck claimed for
it had never been demonstrated in a placebo-controlled trial. Moreover, such a dramatic
effect of naproxen in preventing MIs would be far greater than that ever seen with

10

aspirin, considered the "gold standard" agent for cardioprotection. Soon after publication of the VIGOR results my colleagues and I group conducted a very large observational study of patients taking naproxen and did not find evidence of such a huge cardioprotective effect in an enormous population of typical NSAID users; other observational studies have reached the same conclusion.

A key aspect of the company's "naproxen hypothesis" was that it was effectively replacing aspirin in the trial for patients who required it (but which the VIGOR design prohibited). Yet FDA's analysis at the time (Targum) reported an increase in CV events with Vioxx even in patients in whom aspirin was not indicated.

In fact, when one compares all serious adverse events seen in VIGOR (either gastrointestinal events or cardiovascular events), these occurred with equal frequency in both study groups. Indeed, the number of additional serious cardiac events in the Vioxx group was actually *greater* than the number of serious gastrointestinal events prevented. Clinically, this overall disadvantage of Vioxx is even more worrisome because non-fatal cardiovascular events such as MI and stroke can produce irreversible damage to the heart or brain, whereas non-fatal drug-induced gastrointestinal side effects are usually readily treated with cessation of the offending product and transfusions (if any are needed at all), and commonly do not produce lasting damage. As one FDA reviewer noted concerning the VIGOR results, in view of the overall findings "one can argue that naproxen would be the preferred drug compared to Vioxx."

My colleagues and I have conducted several studies of physicians' perception of risk vs. benefit and how these assessments shape their prescribing decisions; this has been an important theme of my unit's research work for over two decades. Fair and balanced depictions of the risk profile of Vioxx – that it is no more effective an analgesic than existing NSAIDs, and that in comparison with naproxen it will produce more serious CV events than it will prevent g.i. events – does not yield an attractive risk-benefit profile for Vioxx. Had such a balanced risk-benefit relationship been accurately presented to physicians, the drug would not have been prescribed at the blockbuster level of use which it quickly attained. Simple common sense would lead to the same conclusion. Further, the likelihood that the relative g.i. advantage of Vioxx is negated by low-dose cardioprotective aspirin use (see below) would remove even this reason for using the drug, had it been more widely known.

In its presentations of the VIGOR results, Merck adopted a clear strategy of emphasizing the gastrointestinal superiority of Vioxx while minimizing its cardiac risk. From the early phases of its cox-2 development program, the company had hoped that any increase in cardiovascular risk caused by these drugs would be offset by their capacity to reduce gastrointestinal risk. This was the entire *raison d'etre* for Vioxx, since there was never any evidence it had better analgesic efficacy than numerous NSAIDs already on the market. But if greater efficacy is not an issue, evaluation of any drug requires a careful comparison of *all* the adverse events it causes—those for which it may have an advantage over competing therapies, as well as those for which it may be worse. In the mid-1990s it was reasonable to consider the possibility that a selective cox-2

11

inhibitor might be a useful drug to have available if its reduction of serious harm from gastrointestinal bleeding clearly outweighed the other side effects it might increase. But in its clinical trials, presentations to the FDA, and communications with prescribing physicians and with patients, Merck consistently distorted this crucial comparison by systematically minimizing the drug's cardiovascular risk while emphasizing its purported gastrointestinal advantage. A draft of the VIGOR paper initially described the increased rate of serious cardiac events as "unexpected," to which one of the co-authors added this comment in a working copy of the manuscript: "Is this unexpected? Not really..." A suggestion made by one of the co-authors of the article that the drug's g.i. benefits "be balanced against the risk of MI's" was not included in the draft submitted to the journal or the final, published manuscript.

As noted, the increased rate of heart attacks in the Vioxx group during the VIGOR study was more marked than was initially known: it was subsequently revealed that after the study report had been submitted to the New England Journal of Medicine, Merck learned of additional MIs that occurred during the study in the Vioxx arm of the trial. Even though Merck had this information months before the manuscript was published, it failed to provide this information to the journal. In addition, the originally submitted draft of the article discussed the potential for the drug to be prothrombotic, but this warning did not appear in the published version of the article. A table depicting cardiovascular outcomes was deleted from the final manuscript; the information was instead presented in a much more low-profile way by inserting it into the text as rounded percentages of *risk differences* rather than relative risks, which diminished its impact. Finally, in a highly unorthodox decision that deviates from usual procedures for analyzing clinical trial data, late in the study Merck officials imposed an earlier data cut-off point for adverse cardiovascular events (expected to be higher in the Vioxx arm) than they used for ascertaining gastrointestinal outcomes (expected to favor Vioxx). That is, they ordered that data collection stop earlier on the anti-Vioxx outcomes than on the pro-Vioxx outcomes.

When these facts became known to the editors of NEJM, they took the unusual step of publicly chastising the authors in an editorial "Expression of Concern" published in December, 2005. Even after receiving a response from the study authors published in March 2006, the journal's editors reiterated their concern in a second published statement that reaffirmed their belief that the study data had been handled improperly.

The first public announcement of the VIGOR results by Merck came in a press release on March 27, 2000. It attributed the elevated rate of cardiac events seen in patients given Vioxx to "naproxen's ability to block platelet aggregation," although there was no compelling evidence for such an enormous naproxen effect. In an internal memo dated March 9, 2000, Dr. Edward Scolnick wrote,

"The CV [cardiovascular] events are clearly there....this is real....It is a shame but it is a low incidence and it is mechanism-based as we worried it was. Oates and Alan and barry were right about the metabolite

meanings i.e. urine Pg [prostaglandin] data....This will limit the class somewhat...."

To clarify the cardiac risk issue, he notes that the company could conduct "the tylenol study we discussed to further assess safety....Endpoint studies tell the truth." However, no endpoint trials were ever done that were specifically designed to determine "the truth" concerning the drug's cardiac risk.

In preparing for public reaction to announcement of the results of the VIGOR study, the company prepared a Draft Standby Statement in March 2000. A section for internal company use noted,

> The implications for the arthritis & analgesia franchises are high... We should (hopefully) position this as applying only to patients with RA [rheumatoid arthritis], only with the highest dose of Vioxx, and underscore the substantial benefits of Vioxx compared to traditional NSAIDs (Langman, JAMA; VIGOR). If possible, we should position things as a 'reduction in events with naproxen vs rofecoxib,' rather than an 'increase in CVD events with Vioxx vs naproxen.'

The 4- to 5-fold increase in heart attacks is then re-depicted as a "2-fold decrease in the risk of certain cardiovascular events" in patients taking the comparator drug. This draft document does demonstrate, however, that Merck initially intended to disclose that Vioxx could be prothrombotic. Yet this language does not appear in the press releases discussing the VIGOR study and does not appear to have been disseminated to the public or medical community at all.

A "Q&A" section appended to the draft standby statement posed several potential questions from the press and suggested answers. In response to the boldfaced question, **"What does this mean for Vioxx? How can you promote a product that increases heart attacks and strokes?"** the proposed answer contains the following misleading and incorrect statement:

> This [increased rate of cardiovascular adverse events] has only been seen in this one study of high-dose rofecoxib in patients with RA, who may be particularly suseptable [sic] to the cardioprotective effects of naproxen or at an increased risk of thrombotic-type events when treated with a COX-2 specific inhibitor, as opposed to patients with OA or other conditions...The clinical trials and postmarketing experience with VIOXX in OA and other conditions otherwise show no evidence of any adverse effect on CV SAEs [cardiovascular serious adverse events].

Additional language in the draft statement indicating that the drug could pose particular risk to patients vulnerable to coagulation problems was never, to my knowledge,

disseminated by Merck to physicians or patients in any labeling, press release, or promotional materials.

The Merck staff who prepared the draft Q&A provided a final, telling question that might be asked by the media: "**Over a year ago, scientists at the U. of Pennsylvania (Fitzgerald et al) published a report in PNAS suggesting there might be an increased risk of cardiovascular events in patients taking coxibs, due to changes in levels of certain prostaglandins. Were they right?**"

### B. Additional data of increased risk from other randomized trials

Although Merck depicted the VIGOR results as a one-of-a-kind anomaly, several other randomized controlled clinical trials conducted by the company also documented increased risk with Vioxx. Protocol 090 was conducted by Merck in 1998 and 1999, with the final study results reported internally the following year. Although the company claimed it had never observed an increase in cardiovascular events with Vioxx except in comparison with the supposedly cardio-protective naproxen, Protocol 090 enrolled 978 patients and tested Vioxx against nabumetone, a non-selective NSAID, as well as against placebo. A relatively low dose of Vioxx was used (12.5 mg), and each patient was given the drug for just 6 weeks. Yet significantly higher rates were seen with Vioxx compared to nabumetone, placebo, or both in the following categories: one or more adverse experiences; serious adverse experiences; and study discontinuation due to an adverse experience, a drug-related adverse experience, or a serious adverse experience. (Unconventionally, this calculation included events in patients in the nabumetone and placebo groups who dropped out of the study prior to randomization – an unusual way of counting that served to diminish the effect of higher event rates in the Vioxx group.)

When Merck measured side effect rates in each group among aspirin users vs. non-users, the pattern of higher adverse events with Vioxx compared to both comparison groups was found in aspirin users as well as in non-users. In all patients in Protocol 090, the rate of serious cardiovascular events was 3-fold higher in the Vioxx group as compared to either the nabumetone group or the placebo group. This included a heart attack and two strokes in the Vioxx group within the 6-week study period, and none in either of the comparison groups. To my knowledge the results of this trial have never been published.

ADVANTAGE was an even larger study of approximately 5,500 patients with osteoarthritis randomly allocated to receive either 25 mg Vioxx or 1000 mg naproxen. The initial analysis restricted the CV outcome to MI, and there is evidence of internal re-assignment by Merck employees of at least one probable cardiac death to "unknown cause." However, when FDA used a more comprehensive outcome definition of serious coronary heart disease and re-adjudicated these outcomes, it found a relative risk of 3.2 for Vioxx use. This study had lasted for only 12 weeks. Although the ADVANTAGE trial was completed at about the same time as VIGOR (early 2000), a preliminary report of its findings was not provided to FDA until December of that year, and final data was not submitted until mid-2001.

On October 18, 2000, Dr. Deborah Shapiro of Merck presented a meta-analysis of all the company's existing data on cardiovascular outcomes from its collected Vioxx clinical trials. For the outcome of myocardial infarction (heart attack), her data depict substantially increased risks seen in 4 of the 5 studies reviewed, including a tripling of risk in ADVANTAGE, a near-doubling of risk in a study labeled "RA," and a quintupling of risk (5-fold increase) in VIGOR. All in all, the summary statistic revealed a doubling of risk across all 5 groups of studies that was statistically significant. I am not aware that an analysis reporting on the endpoint of myocardial infarction was ever provided to the FDA or to the medical community.

Following the release of VIGOR, Merck had put forward several explanations for why the study's findings of increased cardiovascular risk should be discounted: the study was done in rheumatoid arthritis patients, who might be unrepresentative; subjects were prohibited from using aspirin, casting Vioxx in a worse light; the comparison drug was naproxen, which was massively cardioprotective; and Vioxx was used in a higher-than-usual dose. But in 2000, other large randomized controlled trials conducted by Merck undercut each of these proposed explanations. ADVANTAGE did use naproxen as a comparator, but studied a lower dose of Vioxx (25 mg) in patients with osteoarthritis, not RA, and aspirin use was allowed. Protocol 090 used placebo as a comparator, studied OA patients, used a low dose of Vioxx (12.5 mg), and also allowed aspirin use. Both studies showed an increase in CV risk with Vioxx. (For completeness, it should be noted that Protocol 085 did not demonstrate an increased CV risk. Nevertheless, the availability in 2000 of three other large randomized studies [VIGOR, ADVANTAGE, and 090], using a variety of doses, populations, and comparator drugs, should clearly have raised an alarm within Merck that the VIGOR findings could not be dismissed so readily.)

As our research unit was conducting its own epidemiological studies of Vioxx risk, colleagues at Merck noted on several occasions that it was unlikely that the drug caused any important cardiac risk because no such problem had been seen in several studies of Vioxx used to prevent or treat Alzheimer's disease. But in the largest of these for which outcome data are available (Protocol 078), there was substantial evidence of harm, although it was obscured in the published results (Thal et al) by a variety of unconventional and inappropriate analytic approaches. The outcome of "serious thrombotic vascular events" included venous thromboses, not usually included in analyses of cardiovascular thrombotic events (which are in the arteries, not the veins). Rather than use the universally accepted intention-to-treat approach to analysis (which had been pre-specified by Merck in the study's data analysis plan), the authors instead stopped counting adverse outcomes two weeks after a patient ended use of the drug. But a subsequent analysis of data submitted to the FDA, performed after Vioxx was withdrawn, found an increase in the risk of serious coronary heart disease in the Vioxx group compared to placebo. To my knowledge, Merck did not provide a complete and accurate account of these study outcomes to FDA until after the drug had been taken off the market.

Of greatest concern, the mortality rate of subjects given Vioxx in Merck's Alzheimer's studies was double that seen in subjects randomized to placebo. Having practiced and taught geriatrics for many years, I am aware that ascertainment of causes of death in an elderly patient (as most of these study subjects were) can be very problematic. Older people are likely to have multiple co-existing illnesses, and it is well documented that MIs in the elderly often present "silently" — that is, without the typical pain or shortness of breath that are likely to accompany an MI in a middle-aged patient. It has been estimated that about a third of MIs may present in this manner in older patients. As a result, a serious MI may be mis-diagnosed as another condition, and a cardiac death may not be recognized as such as readily as in a younger patient. Death has been called "the clearest outcome in drug research" in that its existence need not be adjudicated. It is therefore of particular concern that a doubling of the death rate was seen in Merck's Alzheimer's studies of Vioxx, which it often cited as evidence of the safety of its drug. Re-analysis of serious cardiac event rates by those outside Merck did in fact indicate an increase risk in patients given Vioxx.

Event adjudication has been more problematic in Merck's studies of Vioxx than in any other drug evaluations I am aware of. In November 2001, FDA was reviewing the results of the ADVANTAGE study comparing Vioxx with naproxen. The agency found that it had to re-adjudicate the data the company presented on adverse cardiovascular outcomes; in 12 events (in a total of 21 patients) the FDA found that Merck had under-estimated the number of adverse cardiovascular events that had occurred in Vioxx patients and over-estimated the number of such events in the naproxen group. It found no instances in which the errors went in the opposite direction. The FDA review stated that the available evidence indicated that adding low-dose aspirin to Vioxx may not eliminate the excess cardiovascular risk seen in the study, but that it could eliminate the drug's relative advantage in reducing gastrointestinal side effects. If that were the case, it would negate virtually all of the drug's clinical and economic advantage over older NSAIDs.

A year after the publication of VIGOR, despite public statements discounting the likelihood that Vioxx caused an increase in cardiac events, internal Merck correspondence revealed that senior officials were quite aware of the problem. In a memo of November 21, 2001 circulated among senior company officials, Dr. Scolnick wrote,

> I think the question we should answer now is NOT whether Vioxx or any Coxib is safe for Cv outcomes. I think the question NOW is what is the best antiplatelet regimen to use with a Coxib. I think that is THE medical question and if we answer it, the problem will dissipate.

He then proposes two studies that would combine Vioxx with antiplatelet agents in order to negate its apparent clot-forming properties: "If you think it through this will answer the questions that are medically needed." To my knowledge, no such large-scale clinical trials were ever conducted by the company.

Coincidentally, in the same month (November 2001), Dr. Scolnick was among ten Merck scientists who received a memo describing the initial results of the Vioxx Low-

16

Dose Aspirin Endoscopy Study (Protocol 136). This study randomized 1,200 patients to one of four groups: Vioxx plus low-dose aspirin, low-dose aspirin alone, placebo, or ibuprofen (Motrin), a non-selective NSAID. All underwent g.i. endoscopy to assess ulcer formation. After 12 weeks, the Vioxx plus low-dose aspirin group had about twice the rate of ulcer formation as the placebo or aspirin-alone groups – a rate that was virtually indistinguishable from that in the group taking the older NSAID ibuprofen (Motrin). Thus, in one large patient group in whom gastroprotection would be the most important – those who would require low-dose aspirin to prevent heart disease – the study showed Vioxx to be no better than a much older, cheaper NSAID.  Despite the fact that it was negotiating revisions to the Vioxx label with FDA concerning GI safety, Merck did not disclose the results of Protocol 136 to the agency until after the revised label was approved in April 2002.  This study was not published until 2003.

The APPROVe study which resulted in the eventual withdrawal of Vioxx from the Market in September 2004 had never been designed to answer the question of cardiac risk. In testing Vioxx to determine whether it slowed the progression of colonic polyps, it excluded patients with recent cardiac disease, and had a mean subject age of 59. This was far lower than the age at which cardiovascular adverse events would be most likely to be detected, and far lower than the mean age at which Vioxx was being used and heavily marketed. Nonetheless, the study did reveal a doubling of risk of heart attack or stroke even in this relatively healthy population. Even here the company's presentation of the data was distorted. Merck has consistently maintained that there was no risk evident until 18 months into the trial. (At that point, the divergence of the curves was attributed to an unusual "flattening out" of the event curve for placebo rather than to an increase in the event rate with Vioxx.)

However, inspection of event rates for all adverse cardiovascular events reveals that the curves separate much earlier, as do data for investigator-reported events. Because this was a double-blind placebo-controlled trial one would not expect such investigator-reported outcomes to be biased for or against the drug. Nevertheless, in the final editing stages of the paper a Merck representative suggested deleting mention of all investigator-reported events prior to submission of the paper to *The New England Journal of Medicine*, even though such events were specified as secondary endpoints for analysis in the study protocol.  While Merck did include another secondary endpoint in the published version of the trial (APTC), it did not include the analysis of investigator-reported events which was unfavorable to the drug.

## V. VALOR: an aborted clinical trial

By 2001, Merck was in possession of a substantial number of warning signals about the cardiovascular risk of Vioxx. These included the biological evidence that the drug could inhibit a key cardioprotective substance (prostacyclin) while not inhibiting its clot-inducing counterpart (thromboxane); the data reporting increased occurrence of heart disease events in its early randomized trials; the recommendations of its own scientific advisors about the need to look into this likely complication; and the striking 5-fold increase in MI seen in VIGOR. In response to these issues, the company began to plan a

17

study designed to address this central problem: The Vioxx Cardiovascular Outcomes Study, known as VALOR.

Senior Merck officials began considering such a study almost immediately after the problematic VIGOR MI data were unblinded. On April 12, 2000, Dr. Scolnick sent the following e-mail to Dr. Reicin:

> We are all online too late. I will tell you my worry quotient is high. I actually am in minor agony. What I really want to do is a 10,000 vs 10,000 patient study in mild-moderate OA Tylenol vs Vioxx with prn [as-needed] low dose asa [aspirin] for those judged to need it. Safety first primary endpoint and efficacy secondary or co primary. WE WILL NOT KNOW FOR SURE WHAT IS GOING ON UNTIL WE DO THIS STUDY. PLEASE THINK HARD ABOUT THE DESIGN BEFORE THE PAC MEETING. Thanks / Ed   [emphasis in original]

Plans were developed for a study designed specifically to clarify the Vioxx-CV relationship, and by February 2002 a protocol had been developed that would have enrolled 10,000 patients to be given Vioxx and 10,000 to receive placebo, and compare rates of cardiovascular ischemic events between the two groups. Study documents considered the possibility that "a 3 mmHg increase in systolic BP results in small resultant increase in CV events" in the Vioxx arm. In a Merck presentation dated February 27, 2002, the logic behind the study hypothesis was listed as follows:

> **Issues Associated with current Design and Hypothesis:**
> **Several mechanisms by which VIOXX could hypothetically be associated with elevated risk vs. placebo:**
> -- increase in blood pressure
> -- reduction in prostacyclin to a greater degree than ASA [aspirin] alone
> -- loss of ischemic preconditioning
> -- increase in plaque burden
> -- non-COX-2 mediated mechanisms

VALOR would have reflected typical clinical practice much better than VIGOR had, in that all patients would be given low-dose aspirin for cardioprotection, as well as a gastric acid inhibitor (omeprazole) to protect against g.i. toxicity. Merck scientists presented sound justifications for studying the drug compared to placebo: "placebo comparison provides clear assessment of CV profile of rofecoxib; answers most important clinical question; most efficient use of resources; most timely result." The company identified study centers throughout the world and brought them on-line to plan for subject recruitment. The first patients were scheduled to begin participation in June 2002, and enrollment of each subject would be for 13 months.

But the study was never begun. In March 2002 Merck announced that it "has decided to defer the VALOR Trial at the current time" and suspended further recruitment

18

of outside researchers to enroll subjects. To my knowledge, no study designed to test the cardiovascular risks of Vioxx was ever conducted.

## VI. Observational studies of Vioxx and risk

A total of eight observational studies have appeared in the literature addressing the relationship between Vioxx and cardiovascular events, including one from our group on which I was senior author (Solomon, 2004). Ours was the one of the largest of the studies, and included over 10,000 MI outcomes. Seven of the eight published observational studies found a statistically significant increase in the risk of serious coronary heart disease events for Vioxx, ranging from a 25% increase to a 272% increase when all doses were considered. (The eighth study [Mamdani, 2002] was substantially smaller that the others and had important methodological limitations which my colleagues and I discussed at the time of its publication, including exclusion of all cox-2 or NSAID patients who did not fill two successive prescriptions, exclusion of all users who were on a study drug for less than 30 days, and inappropriate adjustment for cardiovascular disease markers that may have actually been caused by one of the study drugs.) Of the four studies which assessed risk as a function of dose, all four found a greater level of risk at a higher dose.

## VII. Inaccurate communication of risks to physicians

Despite the fact that the five-fold increase in MI risk had been found in the VIGOR study soon after the drug was marketed, the official Vioxx labeling contained no adequate warning of cardiovascular risk in for the first several years the drug was on the market. Even after the label was changed, it still did not accurately portray the risks compared to the benefits of Vioxx in a manner that would have permitted physicians or others to make an informed assessment of whether to use the drug.

Instead of providing accurate risk-benefit information to guide physicians, Merck prepared several training tools to arm its sales force against the difficult questions doctors might ask about the product. One interesting example, called "Dodgeball," taught Merck sales representatives how to overcome physician concerns about the drug's side effects. The strategy the company recommended for handling questions about heart attack seems to emphasize distraction rather than education:

> *Question: If the physician is concerned about a potential increase in the risk of MI, how would you respond?*
> *Response: Doctor, once daily VIOXX has no effect on platelet aggregation. Once daily VIOXX (R) is therefore is [sic] not a substitute for aspirin for cardiovascular prophylaxis. However, once daily VIOXX 50 mg had no effect on the anti-platelet activity of low dose (81 mg daily) aspirin.*

There is no way in which this can be construed to be a fair and helpful response to a doctor's simple question about the risk of a potentially life-threatening side effect.

As late as September 2000, months after presenting data on elevated cardiac risk to FDA (but not to NEJM), the company was still using the lower figure of 0.4% in its official communications to physicians who inquired about this issue. This pattern of deceptive presentation of risk data to physicians is also illustrated in the "Cardiovascular Card," a sales tool prepared for Merck representatives to use with physicians concerned about the risk of cardiac events caused by Vioxx. Used from May 2000 until April 2002, the card presents known cardiac risks in a misleading manner. It presents a cardiovascular safety profile for Vioxx that appears to be similar to other NSAIDs and to placebo. However, while this "teaching aid" purported to include cardiovascular safety data from Merck's osteoarthritis (OA) trials, it apparently did not include information from other completed OA trials that contradicted this favorable profile (e.g., ADVANTAGE, 085, and 090). Further, the card suggested that the incidence of mortality with Vioxx was more favorable than for placebo, even though other studies had demonstrated a statistically significant increased risk of mortality associated with Vioxx compared to placebo.

Finally, by excluding safety data from other studies, the card fails to present or even consider critical information from the VIGOR study. Assessments of a drug's safety are best done by considering all randomized trial data available, regardless of the underlying purpose of a given study. It is inappropriate to provide only selected, most favorable study results in response to doctor's questions about cardiovascular safety and mortality. The most complete and current information on these topics should have been provided to physicians in any "teaching tool" with this purpose. At a minimum, the Cardiovascular Card should have been recalled by Merck because it contained an incomplete and misleading safety profile. Instead, as late as August 2001, by which time considerable additional information about the drug's risk had become available, the Cardiovascular Card was formally "re-validated" by the company for continuing use in promoting Vioxx, and steps were taken by Merck to make it easier for its sales staff to order large supplies of the cards to reassure physicians about the drug's safety. In doing so, the company undercut a key component of the safe use of drugs in medical practice – the doctor's ability to fairly balance benefit and risk in making prescribing decisions.

By May 2001, in response to a New York Times article on the cardiac risk of Vioxx, Merck issued a bulletin to its sales force in which it instructed them: "*DO NOT INITIATE DISCUSSIONS ON THE RESULTS OF THE [VIGOR] STUDY, OR ANY OF THE RECENT ARTICLES IN THE PRESS ON VIOXX.*" The bulletin goes on to advise the sales force to state that the incidence of MI with Vioxx is less than 0.1%, and that cardiovascular mortality caused by other NSAIDs is 8 times greater than that seen with Vioxx. It instructs Merck representatives to present the data in the "Cardiovascular Card" to physicians concerned about Vioxx risks (see above), even though it contained a highly selected and distorted depiction of the totality of that risk.

A response to a paper published in August 2001 in *The Journal of the American Medical Association* provided another opportunity for Merck to deny that there was any

increased cardiovascular risk with Vioxx. In a widely circulated press release, the
company stated,

> The relative risks of serious cardiovascular events were similar with
> Vioxx and placebo, and with Vioxx and the widely prescribed NSAIDs
> ibuprofen, diclofenac, and nabumetone.

Merck made this statement even though it had completed clinical trials which
provided very different evidence. After noting that "Patient safety is of paramount
importance to Merck," the statement goes on to dismiss the increased rate of heart attack
seen with Vioxx in VIGOR by noting, "This is the first time this result has been
observed" — even though by mid-2001 the company had seen the results of several of its
own trials which pointed in exactly this direction.

## VIII. Negotiations with FDA over labeling and promotion

Beginning soon after the results of VIGOR were presented to the FDA, the
agency had attempted to get Merck to change the company's official labeling of the drug
to more accurately reflect the growing body of data about its cardiac risk. In fact in an
early review of the VIGOR data one FDA reviewer noted, *"It would be difficult to
imagine inclusion of the VIGOR results in the rofecoxib labeling without mentioning
cardiovascular safety results in the study descriptions as well as the Warnings sections."*
Instead of proactively revising its product label to accurately and prominently reflect this
problem, as concern increased about the cardiac risks of Vioxx in March 2001 the
company prepared a "Public Affairs Plan" discussing the best way to frame the problem.
At first glance, one slide about the campaign seems compatible with the core values of
medicine, with the following precept presented first: "Do no harm." However, the rest of
that bullet-point provides a very different meaning for that concept: **"refrain from
proactively generating coverage that jeopardizes label negotiations and/or that links
Vioxx to CV adverse events."** The slide continues: **"Vigilantly defend the brand."**
This does not seem compatible with the full and open discussion of risks and benefits that
physicians and patients require in order to make appropriate drug choices.

As label negotiations were proceeding with the FDA, the company appears to
have had a great deal of concern about the effect of a possible label change on increasing
physician awareness of the product's cardiovascular hazards. The level of risk depicted in
a product's official labeling can heavily influence a drug's sales. An internal marketing
graph prepared by Merck dated July 12, 2001 labeled "Upside/Downside Sales Forecast"
presented company staff with three estimates of potential annual sales, in billions of
dollars, depending on the outcome of negotiations with FDA about the Vioxx label. The
"upside" scenario predicts a 25% increase in sales by 2006 if "CV Labeling Milder; No
Prothrombotic language." However, a reduction in sales of 50% is projected by 2006 if
the FDA were to require a "black box warning" about cardiovascular risk rather than a
milder "precaution." The difference between the two projections on the graph is
approximately $1.2 billion in annual sales. If such calculations had influenced the

21

company's position in its discussions with FDA about the proper warnings to appear on the drug's labeling, that would have been inappropriate.

Merck's mis-communications to physicians about Vioxx had become so egregious that in September 2001 the company's CEO, Mr. Gilmartin, received an unusually strongly worded Warning Letter from the FDA. It read, in part:

> You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the [VIGOR] study, and this, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen)...
> Your minimizing these potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns. Your misrepresentation of the safety profile for Vioxx is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile... Additionally, your claim in the press release that Vioxx has a "favorable cardiovascular safety profile," is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to naproxen.

Throughout 2001, Merck continued its intense and protracted negotiations with FDA over proposed changes to the drug's labeling. There was controversy within Merck about making the data from the ADVANTAGE study available to FDA, and it appears to have taken the company a year and a half after it obtained the study results (and multiple requests by the agency) before complete safety data from that trial were actually transmitted to FDA. In April 2001, Dr. Scolnick had expressed concern about FDA's requests for more safety data:

> The open ended request for safety updates [from FDA] is a filibuster...I have never seen being nice to the FDA – except on rare occasions – pay off....This division is devious and antagonistic. One cannot deal with them in a rational way...I think giving them [the data from] Advantage was not wise. The alzheimer's data vs placebo is helpful. Advantage is not....we will end up with bad labeling....I realize I can be paranoid and I sometimes overreact but I am not trusting of this [FDA] group.

By October 2001, FDA requested the company to add a warning that would more accurately depict the cardiac risks found in the VIGOR and ADVANTAGE studies over 18 months earlier. In my view, the warning language FDA proposed was a fair representation of the risk information that had been provided to the FDA at the time, and would have helped alert physicians to the CV risks that had become apparent.

22

(Importantly, the FDA was not yet fully aware of the significant and persisting increase in mortality risk with Vioxx vs. placebo that occurred in Merck's Alzheimer's Disease trials, if results were calculated in the usual intention-to-treat method of analysis.) However, the company resolutely and repeatedly resisted having such a warning appear prominently on the Vioxx label. In a memo on October 15, 2001, reacting to the latest FDA proposal for such a label change, Dr. Scolnick wrote to David Anstice, "David Be assured we will not accept this label." Anstice responds, "We knew it would be UGLY and it is. We'll fight back, and see where we get." Around midnight, Scolnick answers: "it is ugly cubed thye [they] are bastards"

Two weeks later Scolnick writes that he will not sign off on the new label until it is acceptable to him: "we need a statement now that will be a substitute for what the fda will not relent on i.e. the unknown about CV risks." The Merck team comes up with an alternative to FDA's proposal. In it, instead of a prominent warning the information about elevated cardiovascular risk would be placed deep in the lengthy official wording much less visibly and would read: "The basis for the difference in cardiovascular event rates with VIOXX vs. naproxen observed in VIGOR, and the lack of such a difference between VIOXX and placebo or other NSAID comparators in other studies, is not understood." Scolnick declared that this alternative language was "a good start."

As discussions about the label proceeded within the company in the fall of 2001, Scolnick wrote to Douglas Greene, Bonnie Goldmann, and Peter Kim:

> twice in my life I have had to say to the FDA 'That label is
> unacceptable, we will not under any circumstances accept it.'…You
> WILL have to do that on the cardiac warning for Vioxx. I assure you
> that you will. And I assure you I will NOT sign off on any lable [sic]
> that had a cardiac warning.

This provides a strikingly clear statement of Merck's intention at the highest levels of the company to block a change in the product description that would have presented physicians with an accurate depiction of the drug's risk. The company's position was in clear opposition to the decisions expressed in the February 2001 meeting and formal vote of the FDA Advisory Committee, whose members had voiced strong concerns that the cardiovascular risk of Vioxx be more accurately reflected in its labeling. Even in the absence of a negotiated agreement with FDA concerning the contents of its official label, there is no reason Merck could not have notified physicians or consumers about the emerging data about the risks of Vioxx. Companies are permitted to provide updated information about risk in materials for to doctors and patients without obtaining prior FDA approval, but Merck did not do so. To the contrary, it continued to use misleading depictions of risk (through the "Cardiovascular Card" and other communications noted above) to minimize a very real problem with their product.

The revised cardiac risk labeling which FDA proposed to Merck was quite fair and reasonable in light of a comprehensive review of the data available at that time, and would have provided reasonable guidance to physicians attempting to balance the drug's

benefits and risks.  By contrast, the revised label that Merck eventually produced in April 2002 continued to de-emphasize the importance of the cardiovascular risk of Vioxx in a manner that would have been misleading to a physician trying to make a reasoned prescribing decision about Vioxx vs. a traditional NSAID or other alternative. Merck's intense struggle with the FDA over this issue does not appear compatible with its public statements that the company was committed to making the most accurate information on Vioxx available to physicians and the public.

## IX. Additional material

I will also present evidence concerning the experience of my research team in its work on our Merck-funded epidemiological study of the relationship between Vioxx and heart attack that was ultimately published in the cardiology journal *Circulation* in 2004.

## X. Post-withdrawal developments

Four months after Vioxx was taken off the market, the FDA convened an Advisory Committee meeting in February 2005 to consider all the evidence it then had available concerning the cardiac risk of the cox-2 drugs and traditional NSAIDs. After lengthy discussion and review of that extensive collection of materials, committee members were asked whether they believed that Vioxx was a cause of cardiovascular disease events. Without exception, all panel members answered "Yes." The committee members were then asked whether Vioxx should be made available for use, and if so, under what circumstances. Based on their review of all the data, about half of the reviewers said it should never be used in any patients. Nearly all the others said that such use should be permitted only under restricted circumstances. Restrictions proposed by these Advisory Committee members included limiting its use to children only (who would be at reduced risk of cardiac complications), allowing only the lowest dose (12.5 mg) on the market, strengthening the warnings on the drug's label to include a "black box" highlighting its cardiovascular risk, allowing its use only as a second- or third-choice drug after safer agents had been tried, limiting its duration of use, recommending close monitoring of patients for cardiovascular complications such as elevation in blood pressure, and having patients give explicit "informed consent" before taking the drug, acknowledging their awareness of its capacity to induce cardiovascular harm. Only 2 FDA Advisory Committee members voted to allow Vioxx back onto the market with no additional restrictions. These determinations are a comprehensive reflection of the evaluation of a large number of medical experts convened by FDA to review all the information then available to the agency and to the general public.

## XI. Summary and conclusions

Taken together, the available scientific evidence makes it clear that Vioxx is an independent risk factor that increases the risk of cardiovascular disease at all commonly used doses and durations. The risk begins early after drug use starts, is higher with greater doses, and persists over time. Evidence of this risk was available prior to the initial marketing of Vioxx, and was reinforced by repeated clinical trial findings and

24

highly consistent epidemiological data. The doubling of the rate of cardiovascular events that emerges from numerous clinical trials of Vioxx – whether compared to other NSAIDs or to placebo – places the drug in the category of a major risk factor for these events. Despite the evidence, Merck consistently ignored or dismissed the clear signals of cardiac risks attributable to Vioxx. This strategy began early in the drug's clinical development and continued until the day the drug was removed from the market. In the face of ample evidence of potential hazard that continued to accumulate throughout the late 1990s and up until the moment the drug was recalled, the company failed to aggressively mount the studies that could have clarified such risk. It presented the data that did emerge in a distorted manner to the public, to the FDA, and to physicians.

The opinions expressed above are based upon my education, training, research, and expertise, as well as my review of peer reviewed medical scientific and regulatory literature and relevant documents and testimony produced during the discovery process. I may supplement this report if necessary based upon receipt of additional information received during the course of the litigation. My usual consulting fee is $750 per hour for review and consultation, but I am accepting no personal compensation for my work on this case.

Jerry Avorn, M.D.

March 20, 2006

**Materials Considered**:

1.  Amendment to NDA 21-042 - MRK-01420163696 - MRK-01420163721
2.  (Draft) Comparison of the Effects of Rofecoxib, a Highly Selective-Inhibitor of COX 2, and Naproxen (a dual COX-1/COX-2 inhibitor) on the Incidence of Clinically Important Upper Gastrointestinal Events: Results from the VIGOR Trial by Claire Bombardier, et al., - MRK-AAB0109412 - MRK-AAB0109447
3.  Letter from Claire Bombardier to NEJM attaching the manuscript entitled "Comparison of the Effects of Rofecoxib, a Highly Selective-Inhibitor of COX 2, and Naproxen (a dual COX-1/COX-2 inhibitor) on the Incidence of Clinically Important Upper Gastrointestinal Events: Results from the VIGOR Trial," dated 5/18/00 - MRK-NJ0245555 - MRK-NJ0245604.
4.  Draft GI Outcomes Study Protocol - MRK-NJ0315784 - - MRK-NJ0315837
5.  Email from D. Blois, dated 10/15/00 - MRK-AAX0008560 - MRK-AAX0008581
6.  Email from E. Russo to A. Schechter, et al., dated 12/21/01 - MRK-AAX0009235 - MRK-AAX0009257
7.  Email from J. Bull to J. Jenkins, et al., dated 4/11/02 - FDACDER007813 - FDACDER007844
8.  Email from L. Villalba to D. Throckmorton, dated 9/30/01 - FDACDER010143 - FDACDER010149
9.  Excerpts from Alise Reicin 10/11/05 Transcript, pages 3522-3526
10. Excerpts from David Anstice 9/26/05 Transcript, pages 2016-2017
11. Deposition transcripts of Edward Scolnick, dated 3/22/05, 3/19/05, 4/29/05, 5/17/05, 6/1/05, & 8/16/05
12. Deposition transcripts of Gregory Curfman, dated 11/21/05 & 1/24/06
13. Deposition transcript of Eric Topol, dated 11/22/05
14. Fax from B. Gould to N. Braunstein, dated 6/7/02 - MRK-AAF0008508 - MRK-AAF0008512
15. Fax from B. Gould to R. Silverman, dated 6/22/01 - MRK-AAF0004045
16. Fax from B. Gould to R. Silverman, dated 9/28/01 - MRK-AAF0004250
17. Fax from B. Gould to R. Silverman, dated 9/26/01 - MRK-AAF0004251
18. Fax from B. Gould to R. Silverman, dated 9/7/01 - MRK-ABW0008489
19. Fax from the FDA to R. Silverman, dated 7/13/01 - MRK-ACD0075472 - MRK-ACD0075473
20. FDA Teleconference Minutes for 3/20/02 - MRK-AAF0008519 - MRK-AAF0008529
21. Folkendt Report, dated 11/27/00 - MRK-NJ0069724- MRK-NJ0069726
22. GI Label Change for Vioxx Public Affairs Plan, dated 3/23/01 - MRK-ADJ0020162 - MRK-ADJ0020183
23. Highlights of Vioxx Labeling Changes Proposed by HFD-550 - FDACDER034122 - HFD-550 - FDACDER034128
24. Letter from L. Goldkind to Silverman, dated 2/28/01 - MRK-01420031266 - MRK-01420031268
25. Letter from M. Griffin to D. Watson, dated 10/16/01 - MRK-NJ0185865 - MRK-NJ0185867

26. Letter from R. Silverman to Bull, dated 3/15/01 - MRK-AAF0003775 - MRK-AAF0003776
27. Letter from R. Silverman to Bull, dated 8/30/01 - MRK-AAF0003926 - MRK-AAF0003927
28. Letter from R. Silverman to Bull, dated 5/25/01 - MRK-AAF0003986 - MRK-AAF0003988
29. Letter from R. Silverman to Bull, dated 6/14/01 - MRK-AAF0004013 - MRK-AAF0004014
30. Letter from R. Silverman to Bull, dated 7/26/01 - MRK-AAF0004126 - MRK-AAF0004129
31. Letter from R. Silverman to Bull, dated 3/16/01 - MRK-NJ0265338 - MRK-NJ0265362
32. Fax from S. Folkendt to R. Silverman, dated 6/6/01 - MRK-AAF0003997 - MRK-AAF0003998
33. Memo from D. Watson, dated 10/24/01 - MRK-NJ0185864
34. Memo from E. Wong to D. Riendeau, dated 3/16/99 - MRK-AEG0023306
35. Memo from G. Block to Scolnick, dated 3/21/01 - MRK-NJ0333225 - MRK-NJ0333235
36. *Doubts are Raised on the Safety of 2 Popular Arthritis Drugs* by Melody Petersen, The New York Times, dated 5/22/01 – MRK-ABH0003185 – MRK-ABH0003188
37. Ingenix Epidemiology's Draft Manuscript on Cardiovascular Risk of COX-2 Inhibitors and Other NANSAIDs, dated 2/27/04 – MRK-ABY0153857 – MRK-ABY0153880
38. Ingenix Epidemiology's Draft Manuscript on Cardiovascular Risk of COX-2 Inhibitors and Other NANSAIDs, dated 9/27/04 - MRK-ABY0164090 - MRK-ABY0164115
39. Effects of Cyclooxygenases Inhibitors on Vasoactive Prostanoids and Thrombin Generation at the Site f Microvascular Injury in Healthy Men by Ewa Tuleja, et al., Arterioscler Thromb Vasc Biol., dated June '03 - MRK-ADY0005464 - MRK-ADY0005468
40. Comparative Inhibitory Activity of Rofecoxib, Meloxican, Diclofenac, Ibuprofen, and Naproxen on COX-2 versus COX-1 in Healthy Volunteers by Anne Van Hecken, et al., Journal of Clinical Pharmacology, '00 - MRK-AAD0305229 - MRK-AAD0305240
41. Vioxx Project Team Agenda & Minutes, dated 11/10/00 - MRK-ABF0004419 - MRK-ABF0004442
42. Excerpts from Vioxx Preliminary CV Meta-Analysis – MRK-NJ0070364 -MRK-NJ0070397
43. Excerpts from Long Range Operating Plan: 2002-2007, dated 7/15/02 MRK-ABI0011027- MRK-ABI0011081
44. Excerpts from NDA - MRK-ABS0066396- MRK ABS0067019
45. Excerpts from FDA Medical Officer Review of NDA - MRK-ADI0005375
46. Excerpts from Draft Manuscript entitled "Cardiovascular Events Associated with Rofecoxib in a 3-Year Randomized Colorectal Adenoma Chemorprevention Trial" - MRK-AGO0076955 - MRK-AGO0076990

2

47. Excerpts from APPROVe CSR - MRK-S0420051001 - MRK-S0420053185 (P1.1034)
48. Excerpts from APPROVe Trial CV Safety Report – MRK-S0420051232 - MRK-S0420051330 (P1.1117)
49. Excerpts from VIGOR sNDA – MRK-00420008087 - MRK-00420008117 (P1.1132)
50. Excerpts from U.S. Long Range Operating Plan, dated 7/12/01 – MRK-ABI0008659 - MRK-ABI0008683 (P1.1135)
51. Excerpts from Protocol 090. – MRK-NJ0170152 - MRK-NJ0170511 (P1.1186)
52. Excerpts from COX-2 FDA Advisory Committee Meeting – MRK-AFK0232972 - MRK-AFK0233029 (P1.1238)
53. Excerpts from FDA review of NDA 21-042 and NDA 21-052 – MRK-AFV0341732 - MRK-AFV0341794 (P1.1245)
54. Excerpts from VIGOR Reviews – MRK-AFV0341795 - MRK-AFV0341881 (P1.1246)
55. Email from Edward Scolnick to David Anstice, dated 10/18/01 – MRK-ABW0004799 - MRK-ABW0004799 (P1.0002)
56. Email from Brian F. Daniels to Thomas Simon, et al., dated 2/26/97 – MRK-NJ0315892 - MRK-NJ0315894 (P1.0004)
57. Warning letter from Thomas Abrams to Raymond Gilmartin, dated 9/17/01 – MRK-ABA0003277- MRK-ABA0003284 (P1.0006)
58. Vioxx Dodgeball – MRK-AAR0019773 - MRK-AAR0019786 (P1.0007)
59. CV Card – MRK-AAR0019055 - MRK-AAR0019060 (P1.0008)
60. VICTOR KM Plot--Confirmed Thrombotic CV events, dated 2/1/05 – MRK-AFK0190651 - MRK-AFK0190651 (P1.0015)
61. VICTOR KM Plot--APTC event, dated 2/1/05 MRK-AFK0190652 - MRK-AFK0190652 (P1.0016)
62. Vioxx Preliminary Cardiovascular Meta-Analysis Slide Set by Deborah Shapiro, dated 10/18/00 – MRK-NJ0070364 - MRK-NJ0070397 (P1.0017)
63. FDA-MRL Meeting NDA 21-042/S-007: VIGOR Re: Protocol 069 Minutes, dated 4/11/01 - MRK-01420099060 - MRK-01420099061 (P1.0021)
64. Analyses of Unadjudicated and Adjudicated Thromboembolic Adverse Experiences – MRK-AAB0108912 - MRK-AAB0108932 (P1.0029)
65. Bulletin for Vioxx Action Required: Response to New York Times Article, dated 5/23/01 – MRK-AAR0007240 - MRK-AAR0007248 (P1.0061)
66. Obstacle Jeopardy – MRK-AAR0010111 - MRK-AAR0010126 (P1.0064)
67. Bulletin for Vioxx: Action Required: Response to JAMA, "Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors", dated 8/21/2001 - MRK-AAR0021103 - MRK-AAR0021108 (P1.0068)
68. Deaths in MK-0966 Studies 078, 091, 126 – MRK-AAX0000696 - MRK-AAX0000705 (P1.0076)
69. Memo from G. Block and S. Reines to Edward Scolnick, dated 4/8/01 – MRK-AAX0000752 - MRK-AAX0000776 (P1.0079)
70. Memo from Thomas Musliner to B. Friedman, A. Nies and R. Spector, dated 11/21/06 – MRK-AAX0002413 - MRK-AAX0002420 (P1.0082)

3

71. Letter from Carlos Patrono to Martino Laurenzi, dated 9/9/98 -- MRK-ABC0002199 - MRK-ABC0002200 (P1.0108)

72. Email from Douglas Greene to Alan Nies, dated 12/3/01 – MRK-ABC0034124 - MRK-ABC0034124 (P1.0119)

73. Memo on protocol 136 results, dated 11/20/01 – MRK-ABC0035654 - MRK-ABC0035657 (P1.0120)

74. A. Nies email to Stone, dated 11/20/01 – MRK-ABC0035680 (P1.0121)

75. Research Management Committee No. 96-10 -- Blue Bell, dated 10/10/96 – MRK-ABC0048699 - MRK-ABC0048706 (P1.0122)

76. Email from Edward Scolnick to Deborah Shapiro et al., dated 3/9/00 – MRK-ABH0016219 (P1.0132)

77. Letter from David Anstice to Thomas Abrams, dated 10/1/01 – MRK-ABI0003148 - MRK-ABI0003155 (P1.0151)

78. Press Release - Merck confirms favorable CV safety profile of Vioxx, dated 5/22/01 – MRK-ABI0003228 - MRK-ABI0003230 (P1.0152)

79. Nies Handwritten Memo Re: Carlo Patrono, dated 9/29/98 – MRK-ABK0311068 (P1. 0167)

80. Plan to Evaluate the Incidence of Cardiovascular SAEs in the Phase IIb/III Vioxx (MK-0966) Osteoarthritis Clinical Trials, dated 9/30/97 -- MRK-ABS0037036 - MRK-ABS0037048 (P1.0198)

81. Email from Lawson to Reines, dated 3/1/02 – MRK-ABS0344100 P1.0211

82. Email from Douglas Watson to Thomas Capizzi, et al., dated 1/18/00 – MRK-ABT0022650 - MRK-ABT0022657 (P1.0221)

83. Dear Doctor letter from John Yates, dated 10/30/03 – MRK-ABX0071232 - MRK-ABX0071233 (P1.0243)

84. Email from R. Bain to Ramey, dated 9/29/01 – MRK-ABY0019451 - MRK-ABY0019452 (P1.0246)

85. Ingenix paper 2-17 version, dated 9/3/04 – MRK-ABY0164039 - MRK-ABY0164060 (P1.0263)

86. Email from Deborah Shapiro to Eliav Barr, et al., dated 1/29/02 – MRK-ACF0004015 - MRK-ACF0004016 (P1.0278)

87. Attachments to Casola to Abrams letter, dated 11/19/01 – MRK-ACI0013241 - MRK-ACI0013246 (P1.0288)

88. Email from Edward Scolnick to Douglas Greene, dated 4/9/01 – MRK-ACR0009151 - MRK-ACR0009152 (P1.0300)

89. Email from Edward Scolnick to Douglas Greene, dated 3/22/01 – MRK-ACR0014502 - MRK-ACR0014503 (P1.0309)

90. Bulletin for Vioxx / Background and obstacle responses on retrospective observational analysis - / Solomon article No. COX 04-023, dated 4/21/04 – MRK-ADB0046424 - MRK-ADB0046427 (P1.0340)

91. D. Watson email re: Solomon Cox2 and MI Manuscript Accepted to Circ, dated 2/10/04 – MRK-ADC0003100 - MRK-ADC0003104 (P1.0344)

92. Ingenix Draft Final Report "Cardiovascular Risk of COX-2 Inhibitors and Other NANSAIDs, dated 12/15/03 – MRK-ADC0032522 - MRK-ADC0032573 (P1.0346)

4

93. Email from Adam Schechter to Thomas Cannell, et al., dated 11/22/01 – MRK-ADG0035340 (P1.0352)
94. PIR - Use of Vioxx with Low Dose Aspirin, dated 5/17/02 – MRK-ADZ0017722 - MRK-ADZ0017729 (P1.0369)
95. Scientific Advisors' Meeting May 3 - May 6, 1998 Programmatic Review Vioxx Program, dated 5/6/98 – MRK-AEI0002734 - MRK-AEI0002746 (P1.0386)
96. Email from Barry J. Gertz to Peter S. Kim, et al., dated 4/30/03 – MRK-AFJ0003506 - MRK-AFJ0003510 (P1.0425)
97. PIR - Vioxx 50 mg, dated 5/14/01 – MRK-BDN0000081 - MRK-BDN0000098 (P1.0452)
98. PIR - Results of VIGOR trial, dated 9/2/00 – MRK-HND0000189 - MRK-HND0000193 (P1.0456)
99. Vioxx Label Nov. '99, dated 11/1/99 – MRK-LBL0000035 - MRK-LBL0000038 (P1.0463)
100. Vioxx Final Label April 2002, dated 4/19/02 – MRK-NJ0094478 - MRK-NJ0094493 (P1.0484)
101. Email from Douglas Watson to Alise Reicin, et al., dated 1/18/00 – MRK-NJ0120249 - MRK-NJ0120250 (P1.0490)
102. Email from Alise Reicin to Eliave barr and Deborah Shapiro, dated 3/14/00 – MRK-NJ0121088 - MRK-NJ0121089 (P1.0494)
103. Email from E. Barr to D. Shapiro, dated 9/19/00 – MRK-NJ0123880 - MRK-NJ0123882 (P1.0501)
104. A. Reicin email to E. Barr, dated 11/8/00 – MRK-NJ0124427 - MRK-NJ0124428 (P1.0502)
105. MRL Clinical Study Report: Protocol 90, dated 6/15/00 – MRK-NJ0170152 - MRK-NJ0170274 (P1.0513)
106. MRL Epidemiology Department Technical Report No. EP07006.005.98 Final Results of an Analysis of the Incidence of Cardiovascular SAEs in the Phase IIb/III VIOXX Osteoarthritis Clinical Trials, dated 2/2/98 – MRK-NJ0272249 - MRK-NJ0272272 (P1.0532)
107. Press Release - Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcomes Study with Vioxx, dated 3/27/00 – MRK-PRL0000114 - MRK-PRL0000115 (P1.0581)
108. Email from Edward Scolnick to Karen Grosser, dated 11/1/01 – MRK-AFO0128716 (P1.0729)
109. MRL Clinical Study Report, Multicenter Study: A Double-Blind, Placebo Controlled Study to Evaluate Safety and Tolerability and Preliminarily Assess Clinical Efficacy of MK-0966 in Patients With Osteoarthritis of the Knee (Protocol 010) – MRK-OS420045657 - MRK-OS0420046186 (P1.0967)
110. MRL Clinical Study Report, Multicenter Study: A Double-Blind, Placebo Controlled Study to Assess Safety and Tolerability and Preliminarily Evaluate Efficacy of L-748,731 in Patients with Rheumatoid Arthritis (Protocol 017) – MRK-AFL0010627 - MRK-AFL0010817 (P1.0968)
111. Memo from Eric Maller to Michelle Johnson, dated 5/14/02 – MRK-ABS0415817 (P1.1074)

5

112. Email from Edward Scolnick to Douglas Greene, dated 11/8/01 – MRK-AFJ0001537 (P1.1098)

113. Excerpts of 10/13/00 sNDA for VIGOR, dated 10/13/00 – MRK-N0520004121 - MRK-N0520004172 (P1.1133)

114. Letter from Jonca Bull to Robert Silverman, dated 4/6/01 – MRK-NJ0274184 - MRK-NJ0274187 (P1.1209)

115. Fax from Barbara Gould to Philip Huan, dated 2/2/05 – MRK-S0420050651 (P1.1214)

116. Memo from Deborah Shapiro to Alise Reicin et al., dated 7/5/00 – MRK-NJ0071320 - MRK-NJ0071332 (P1.1231)

117. Memo from Lourdes Villalba to Brian Harvey – (P1.1253)

118. Version 2 Standby Statement 0 Vioxx and Cardiovascular Events in VIGOR, dated 3/1/00 – MRK-S0420112006 - MRK-S0420112007 (P1.1256)

119. SA Reines, et al., Rofecoxib/No effect on Alzheimer's disease in a 1-year, randomized, blinded, controlled study, Neurology, Vol. 62, Pgs 66-71 – MRK-ADY0006485 - MRK-ADY0006490 (P2.0021)

120. BJ Gertz et al. , Selective COX-2 inhibition and cardiovascular effects: A Review of the rofecoxib development program, American Heart Journal, Vol 146, Issue 4, Pgs 591-604 – MRK-ADY0006153 - MRK-ADY0006166 (P2.0022)

121. Bresalier, Robert et al., Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial, The New England Journal of Medicine, Pg. 1-11, (February 14, 2005) – (P2.0167)

122. Claire Bombardier, et al, Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis, The New England Journal of Medicine, Vol 343, Pg. 1520-1528, dated 11/23/00 – MRK-ABA0001301 – MRK-ABA0001309 (P2.0183)

123. Thal, LJ, Ferris, SH et al., A Randomized, Double-Bind, Study of Rofecoxib with Mild Cognitive Impairment, Neuropsychopharmacology Vol. 30, 1204-1215, advance online publication, 2 March 2005; http://www.nature.com/npp/journal/v30/n6/abs/1300690a.html - (P2.0202)

124. Bombardier, C. et al, Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis, N. Eng. J. Med, Vol 343, No. 21, 1520 (Nov. 23, 2000) – MRK-ABA0001301 - MRK-ABA0001309 (P2:0146)

125. Lisse, J., et al, Gastrointestinal Tolerability and Effectiveness of rofecoxib verses Naproxen in the Treatment of Osteoarthritis, Ann. Inter. Med 2003; 139:539-546 (October 7, 2003)

126. Advisory Committee Briefing Packet :VIGOR (February 8, 2001) – MRK-ABW0000581 - MRK-ABW0000607 (P1.1084)

127. FDA Medical Officer review by Lourdes Villalba, dated 3/31/01 – MRK-AFV0341574 - MRK-AFV0341594 (P1.1243)

128. VIGOR/RA SNDA Reviews, dated 7/21/01 – MRK-AFV0341732 - MRK-AFV0341794 (P1.1245)

129. Reviewer Comments: New England Journal of Medicine, dated 2/9/05 – 2005 NEJM 000013

6

130. NEJM Manuscript 05-0493-Author's responses to Reviewer's Comments – MRK-AFN0052502 - MRK-AFN0052523 (P1.0755)
131. Investigator Reported AE, Myer Kaplan Curves (excerpts)
132. E-mail from Marvin Konstam to C. Lines, dated 2/2/05 – MRK-AHD0075697
133. Memo from J. Chen to R. Bain, dated 4/4/01 – MRK-AAX0000725 - MRK-AAX0000751 (P1.0078)
134. Author's Responses to Reviewer's Comments – MRK-AAC0146909
135. Protocol 145 (VICTOR) Memo – MRK-18940096438
136. Excerpt of CSR 201 – MRK-189400096448
137. Brochier, M.J.., Evaluation of Flurbuprofen for Prevention of Reinfarction and Reocculusion after Successful Thrombosis or Angioplasty in Acute Myocardial Infarction, Eur. Heat J. (1993) 14, 951-957 – MRK-NJ0146547 - MRK-NJ0146553 (P2.0208)
138. Fornaro, G., Induprofen in the Prevention of Thromboembolic Complications in Patients with Heart Disease, Circulation, 1993:87:167-169
139. Konstam, M. A. et al. Cardiovascular Thrombotic Events in Controlled Clinical Trials of Rofecoxib, Circulation 2001: 104: 2280-2288 – MRK-ABA0004431 - MRK-ABA0004440 (P2.0133)
140. E-Mail String, Morrison, Shapiro, Bolognese, et al. – MRK-ACF0005697 - MRK-ACF0005699 (P1.0281)
141. Mukhergee, et al, Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors, JAMA, Vol 286, No 8, 954-959 (August 2002) – MRK-ADJ0035003 - MRK-ADJ0035008 (P2.0032)
142. Reicin, AS, et al, Comparison of Cardiovascular Thrombotic Events in Patients With Osteoarthritis Treated with Rofecoxib Verses Nonselective Nonsteroidal Anti-inflammatory Drugs (Ibuprofen, Docofenac and Nabumatone), Am. J. Cardiol. 2002; 89: 204-209 – MRK-ABT0018283 - MRK-ABT0018288 (P2.0104)
143. E-mail from Reicin to Sperling, dated 4/20/01 – MRK-ABK0156786 - MRK-ABK0156808 (P1.1225)
144. Juni, P., et al, Risk of cardiovascular Events and Rofecoxib: Cumulative Meta-Analysis, Lancet, Vol 364, 2021 (Dec. 4 , 2004) – MRK-ABI0013854 - MRK-ABI0013862 (P2.0126)
145. FDA Medical Officer Review (Villalba)(Cardiovascular Data in Alzheimer's Studies–078, 091 and 126, dated 3/12/02
146. FDA Medical Officer Review in Alzheimer's Studies 078 and 091 (Villalba), dated 12/18/04
147. Memo from Joshua Chen to Raymond Bain, dated 5/1/01 – MRK-ABY0030000 - MRK-ABY0030030 (P1.0255)
148. Ray, W. et al. COX 2 Selective Non-Steroidal Anti-Inflammatory Drugs and Risk of Serious Coronary Heart Disease, Lancet, Vol. 360, 1071-73 (October 5, 2002) – MRK-ADY0004478 - MRK-ADY0004480 (P2.0025)
149. Mamdami, M., et al., Effect of Selective Cyclooxygenase 2 Inhibitors and Naproxen on Short Term Risk of Acute Myocardial Infarction in the Elderly, Arch. Intern. Med., 2003; 163; 481-486 – MRK-ABH0002262 - MRK-ABH0002266 (P2.0103)

org org

150. Solomon, et al, Relationship Between Selective Cyclooxigenase-2 Inhibitors and Acute Myocardial Infarction in Older Adults, Circulation, 2004; 109: 2068-2073 – MRK-ADY0006986 - MRK-ADY0006991 (P2.0017)

151. Graham, D.J, Risk of Acute Myocardial Infarction and Sudden cardiac Death in Patients Treated with Cyclo-0xygenase 2 selective and Non-selective Non-Steroidal Anti Inflammatory Drugs: Nested Case Control Study, Lancet Vol, 365, 475 (Feb 2, 2005) – MRK-ACO0144158 - MRK-ACO0144164 (P2.0050)

152. Levesque, L., et al, The Risk of Myocardial Infarction with Cyclooxyegenase-2 Inhibitors: A Population Study in Healthy Adults, Ann. Inter. Med. 2005, 142(7) - MRK-AHD0004828 - MRK-AHD0004837 – (P2.0007)

153. Kimmel, S.E., The effects of non-Selective Non-Aspirin Non-Steroidal Anti-Inflammatory Medications on the risk of Nonfatal Myocardial Infarction and their Interaction with Aspirin, J. Am. Cardiol 2004; 43: 985-990 – MRK-ABY0089726 - MRK-ABY0089731 (P2.0064)

154. Walker, et al (IGENIX), Cardiovascular Risk of COX-2 Inhibitors and Other NSAIDS (Draft Final Report–Nov. 25, 2003)(Unpublished)

155. Solomon, D., Nonsteroidal Anti-inflammatory Drug Use and Acute Myocardial Infarction, Archives in Inter. Med. Vol. 162, 1099 (May 27, 2002) – MRK-ADY0003732 - MRK-ADY0003737 (P2.0026)

156. Ray, W., et al, Non-Steroidal Anti-Inflammatory Drugs and Risk of Serious Coronary Heart Disease: An Observational Cohort Study, Lancet, Vol. 359, 118 (January 12, 2002) – MRK-ABT0015857 - MRK-ABT0015862 (P2.0105)

157. Watson, D.J., et al, Lower Risk of Thromboembolic Cardiovascular Events with Naproxen Among Patients with Rheumatoid Arthritis, Arch, Intern. Med. Vol 162, 1105 (May 27, 2002) – MRK-AEF0000847 - MRK-AEF0000851 (P2.0016)

158. Garcia Rodriguez, L., et al, Differential Effects of Aspirin and Non-Aspirin Nonsteroidal Anti-inflammatory Drugs in the Primary Prevention of Myocardial Infarction in Postmenopausal Women, Epidemiology, Vol 11(4), 382-387 (July 2000) – (P2.0185)

159. Garcia Rodriguez, L, et al, Nonsteroidal Anti-inflammatory Drugs and the Risk of Myocardial Infarction in the General Population, Circulation, 2004: 109: 30-00-3006 – (P2.0191)

160. Rahme E. Association between Naproxen Use and Protection against Acute Myocardial Infarction, Arch., Int. Med., 2002:162; 1111-1115 – MRK-ABS0386560 - MRK-ABS0386564 (P2.0111)

161. Van Hecken, A, et al Comparative Inhibitory Activity of rofecoxib, Meloxicam, Diclofinac, Ibuprofen and Naproxen on COX 2 verses COX-1 in Healthy Volunteers, J. Clin Pharm, 2000; 40; 1109-1120 – MRK-ABA0002280 - MRK-ABA0002291 (P2.0138)

162. Catella-Lawson, et al. Effects of Specific Inhibition of Cyclooxigenase-2 on Sodium Balance, Hemodynamics and Vasoactive Ecosanoids, J. Pharm. Exper. Ther 289(2): 735-742 (May 1999) – (P2.0189)

163. Tuleja, E. Effects of Cyclooxenases Inhibitors on Vasoactive Prostanoids and Thrombin Generation at the Site of Microvascular Injury in Healthy Men, Arterioscler. Thromb. Vasc. Biol., 2003; 23; 1111-1115 – (P2.0213)

164. Study to Evaluate he Thrombotic Potential of COX 2 Inhibition in an Animal Model (African Green Monkey)(unpublished) - MRK-NJ0221477-89
165. E-mail String on African Green Monkey data, dated 7/10/01 – MRK-NJ0198045-7
166. Slide on African Green Monkey Study - MRK-ABH0019277-99
167. Slide Presentation: Mechanism Based Adverse Cardiovascular Events and Specific Inhibitors of COX-2, Garret FitzGerald, MD (Presentation to 2005 Advisory Committee)
168. Verna, et al, Cyclooxegenase-2 Blockade does Not Impair Endothelial Vasodilator Function in Healthy Volunteers, Circulation, 2002: 104: 2879-82
169. McAdam, B., et al., Contribution of Cyclooxegenase-2 to Elevate Biosynthesis of Thromboxane A2 and Prostacyclin in Cigarette Smokers, Circulation, 2005, 112:1024-1029
170. Capone, et al., Clinical Pharmacology of Platelet Monocyte and Vascular Cyclooxegenase Inhibition by Naproxen and low-Does Aspirin in Health Subjects
171. Fitzgerald and Patrono, The Coxibs, Selective Inhibitors of Cyclooxegenase-2, N. Eng. J. Med Vol 345, No. 6 (Aug. 9.2001) – MRK-ABI0003298 - MRK-ABI0003307 (P2.0127)
172. FitzGerald, G, Coxibs and Cardiovascular Disease, N. Eng J. Med 35:117 (October 21, 2004) – (P2.0174)
173. FDA Document, Sequence of Events with Vioxx Since Opening IND
174. FDA Document, FDA Review of cardiovascular and renal Safety by Pelayo, dated 4/30/99
175. FDA Document, Excerpts from Primary Review of NDA 21-042-Osteoarthritis by Villalba, dated May 1999
176. FDA Document, Summary and Transcript of FDA Advisory Committee Meeting (Feb 16,17, 18, 2005)
177. FDA Document, Memorandum from J. Jenkins to Galson, dated 4/6/05