UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: VIOXX | MDL Docket NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION L |
| *This document relates to ALL CASES* | JUDGE FALLON<br>MAG. JUDGE KNOWLES |

**PLAINTIFFS' SURREPLY IN OPPOSITION
TO MERCK & CO., INC'S MOTION FOR A PROTECTIVE
ORDER PROHIBITING DISCOVERY OF ATTORNEY
WORK PRODUCT RELATING TO THE MARTIN REPORT**

**I.   INTRODUCTION**

Contrary to the assertions in Merck's reply memorandum filed in support of its motion for a protective order, Plaintiff's responsive memorandum did not ignore the circumstances surrounding the retention of Mr. Martin and his law firm, nor did it engage in "unsupported speculation" about the company's motivation for conducting the investigation and releasing the report. *See* Merck's Reply at 1-2. Plaintiffs fully acknowledged the existence of potential litigation. Plaintiffs went even further by highlighting the public criticism faced by Merck following the withdrawal of Vioxx and by outlining Merck's systematic response to such criticism.

Merck aggressively responded to the public criticism by launching a full out publicity campaign involving television advertisements, the release of study results designed to absolve the company of responsibility, and by initiating the widely publicized investigation by Mr. Martin and his law firm. This publicity campaign, which was designed to re-establish good-will and absolve upper management of responsibility for the Vioxx debacle, culminated in the eventual release of the Martin Report to the public under circumstances that would maximize its impact on public

perception and prospective jurors. As part of Merck's well orchestrated publicity campaign it should come as no surprise that the $22 million dollar investigation undertaken by Mr. Martin and his law firm resulted in a report that mirrors Merck's defense in civil litigation, and that Merck chose to publically release the report shortly after its completion. This spectacle belies Merck's intent to release the Martin Report all along as part of its publicity campaign.[1]

Merck's conduct following completion of the Martin Report clearly establishes that the report was prepared as part of its publicity campaign. Both Merck and the law firm it hired to vindicate the company, in the eyes of the American public, took considerable actions designed to draw attention to the report, *i.e.* both Merck and Debevoise conducted a joint news conference, issued press releases, and published the Martin Report without any redactions on their respective web sites. These efforts of drawing attention to the report were successful and the report's publication was picked up by several sources in the news media on the eve of important litigation in this MDL. It is also significant that Merck hired two public relations firms to help maximize the positive spin on the Martin Report, and that it went so far as to direct all medical inquires generated by the report to an employee of one of the public relations firms. Thus, Plaintiffs do not rely upon mere speculation, but rather rely upon facts that point to the Martin Report being prepared for non-litigation purposes.

---

[1] Although Merck contends that Plaintiffs ignore the declaration of William G. Bowen, a member of Merck's board of directors and chairman of the Special Committee, Plaintiffs actually relied on this declaration in its opposition to Merck's motion for a protective order. *See* Plaintiffs' Memo in Opp. at 3 (Merck's board reached conclusion that an investigation by Mr. Martin was necessary in light of, amongst other considerations, "public criticism of management ..."), *quoting* Declaration of William G. Bowen at ¶ 5, Exhibit 3 to Merck's Memorandum.

II. **ARGUMENT**

Merck has failed to meet its burden of establishing that the materials underlying the Martin Report are within the work-product and/or attorney-client privilege, and that there has been no waiver of these privileges.

A. **The Materials Underlying the Martin Report Should not be Shielded from Disclosure Pursuant to the Work-Product and/or Attorney-Client Privileges**

Although Merck pretends that the mere existence and/or potential of litigation and the use of a law firm in an internal investigation automatically qualifies materials prepared during such an investigation as work-product, Plaintiffs have cited an abundance of case law that refutes this argument. *See Carroll v. Praxair, Inc.*, 2006 WL 1793656, * 2 (W.D.La. 2006)(Wilson, M.J.)(work-product privilege does not protect materials prepared for non-litigation purposes, and involvement of attorney not dispositive of in anticipation of litigation requirement). This authority established that when a party claims the work-product privilege, courts will examine the "primary motivating purpose" behind the creation of a document and because the mere fact that a party "anticipates litigation resulting from an incident does not automatically insulate investigative reports [and other associated material] from discovery as work product." *See United States v. Davis*, 636 F.2d 1028, 1039-1040 (5th Cir. 1991)(rejecting argument that materials prepared by attorney should be subject to work-product protection where the primary motivating purpose for the preparation of the materials was not for possible future litigation), *cert. denied*, 454 U.S. 862; *see also Carroll*, 2006 WL 1793656, * 2.

Nor are materials that would have been generated regardless of pending litigation subject to protection from disclosure under the work-product doctrine even if a party is aware that such materials will be useful in litigation. *See Southern Scrap Material Co. v. Fleming*, 2003 WL

3

21474516, * 7 (E.D.La. 2003)(Knowles, M.J.), *reconsideration denied*, 2003 WL 21783318 (E.D.La. 2003)(Knowles, J.).[2] Where a company is motivated by dual purposes in retaining outside counsel to conduct an internal investigation, whether the company would have conducted the investigation anyway had there been no ongoing or anticipated litigation is the determining factor for recognizing the privilege or not. *See Carrol*, 2006 WL 1793656, * 4; *In re the Leslie Fay Companies, Inc. Securities Litigation*, 161 F.R.D. 274, 281 (S.D.N.Y. 1995); *In re OM Group Securities Litigation*, 226 F.R.D. 579, 586 (N.D.Ohio 2005); *Amway Corp. v. the Procter & Gamble Co.*, 2001 WL 1818698, * 6 (W.D.Mich. 2001).

Even assuming the primary motivating purpose for creating the Martin Report is unclear, it is undisputable that the investigation by Mr. Martin involved dual purposes, and that Merck would have conducted the investigation had there been no actual or threatened litigation. Not surprisingly, Merck fails to even address this argument in its reply and, instead, baldly asserts that the report was prepared for litigation purposes. At the time the Special Committee retained Mr. Martin, however, Merck's image was under siege and the company desperately needed to take action to re-establish good-will and absolve upper management of responsibility for the Vioxx debacle. Indeed, the Bowen declaration acknowledges as much. *See* Bowen Declaration at ¶ 5 (the investigation was necessary in light of "public criticism of management" and to help the board make decisions regarding threatened shareholder litigation).

---

[2] Plaintiffs have cited a number of cases that reject the application of the work-product privilege in cases that involve investigations conducted by outside counsel. *See Carroll*, 2006 WL 1793656, * 4; *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 477 (N.D.Tex. 2004; *Seibu Corporation v. KPMG LLP*, 2002 WL 87461, * 4 (N.D.Texas 2002); *In re the Leslie Fay Companies, Inc. Securities Litigation*, 161 F.R.D. 274, 280 (S.D.N.Y. 1995). These cases reject work-product privilege claims where a party would have conducted an investigation for non-litigation purposes.

4

As noted above, Merck's actions following completion of the Martin Report further establish that the twin purposes of its publicity campaign were the driving factors in sanctioning the investigation by Debevoise, and that the company would have conducted the investigation had there been no actual or threatened shareholder litigation. Merck released the Martin Report without any redactions, and drew attention to the report by issuing press releases, conducting a joint news conference with Debevoise and by hiring publicity firms to help maximize the impact of the Martin Report.[3] Publicity firms serve no role in defending derivative litigation. Also referring to this Mr. Martin as Judge Martin shows that the primary purpose of the report was to engender public acceptance of Merck as a drug manufacturer and not as a derivative defendant.

As with the work-product privilege, which is governed by federal law, New Jersey law, which governs the applicability and waiver of the attorney-client privilege, clearly establishes that

---

[3] Although Merck attempts to distinguish cases cited by Plaintiffs, specifically *Carroll*, it is clear that the cases relied upon by Plaintiffs have application in this discovery dispute. Like the defendant in this case, the defendant in *Carroll* had alternative motives for its investigation and although the materials may have been created with an "eye towards litigation", they were not shielded under the work-product doctrine in light of these significant non-litigation purposes. See *Carroll*, 2006 WL 1793656, * 4 (citations omitted). Regardless of the nature of a party's non-litigation purposes for conducting an internal investigation, i.e. whether they are to evaluate the cause of an accident and implement changes or to re-establish good-will with the public, where the alternative purposes are present and a party would have conducted the investigation even if there had been no existing or pending litigation, the work-product privilege is inapplicable. Merck's conduct establishes the presence of significant non-litigation purposes, and that it would have conducted the investigation had there been no pending or threatened derivative litigation.

Merck efforts to distinguish *Leslie Fay, supra* and *In re OM Group, supra* are similarly without merit. Both of these cases involved internal investigations conducted by attorneys. The fact that these cases explored accounting irregularities as opposed to other types of breaches of fiduciary duties is totally irrelevant. What these cases do is establish that a court should examine a party's primary purpose in conducting an internal investigation, and that the work-product privilege is inapplicable where a party would have conducted an investigation had there been no actual or pending litigation.

the attorney-client privilege is inapplicable where an attorney is acting for business as opposed to legal purposes. *See* Plaintiffs' Memo in Opp. at 15-17. Although Merck attempts to minimize the significance of *Payton v. New Jersey Turnpike Authority*, 691 A.2d 321, 334 (N.J. 1997), its efforts are misplaced. The New Jersey Supreme Court could not address the questions regarding the applicability of the attorney-client privilege based on the insufficiency of the record in that case, however, the court was explicit that where an investigation is undertaken for non-litigation purposes, the attorney-client privilege is inapplicable. *Id.* Because the Mr. Martin report was undertaken for business as opposed to litigation purposes, the attorney-client privilege is inapplicable.

### B. Merck has Waived any Privilege Regarding the Materials Underlying the Martin Report by Publishing the Report Without any Redactions

Under the facts of this case, broad subject-matter waiver of the attorney-client privilege results from Merck's public release of the Martin Report. *See* N.J.R.E. 530; *Perth v. City Council*, 2005 WL 4014435, * 4 (N.J.Super.A.D. 2006)(partial waiver of privileged communications could waive the entire privilege); *In re OM Group Securities Litigation*, 226 F.R.D. at 591-92 (finding a broad waiver of the attorney-client privilege where privileged materials that were voluntarily disclosed, "were not brief or cryptic summaries .... [that] merely acknowledged the existence of an investigation .... [but rather were] a substantial presentation of the investigation ... [and were] more than 30 pages in length, [and] listed detailed conclusions and cited specific findings, interviews and documents in support."). As noted in Plaintiffs' Response, "the Martin Report is voluminous, presents the entire investigation, lists detailed conclusions and findings, and specifically relies of several witness interviews in reaching its conclusions."[4] *See* Plaintiffs' Memo in Opp. at 20. Thus,

---

[4] Merck further attempts to distinguish *Ir re OM Group Securities Litigation*, *supra*, since (continued...)

6

the public release of the Martin Report should result in broad subject-matter waiver of the attorney-client privilege.

Moreover, application of the "fairness doctrine" further establishing that Merck has waived both the work-product and attorney-client privileges with respect to the materials underlying the Martin Report.[5] *See* Plaintiffs' Memo in Opp. at 20-25.[6] Although Merck attempts to limit the significance of *Fleming, supra*, in its reply memorandum by suggesting that a party must make offensive use of a document in litigation before broad subject-matter waiver of the work-product doctrine will be recognized, this novel theory was neither adopted nor discussed by the court in

---

[4](...continued)
the Martin Report does not directly quote privileged communications. This argument is misplaced and inaccurate since the Martin Report actually relies upon witness interviews that Merck is attempting to shield from disclosure. This argument further misses the point since Merck fails to account for its inconsistency in its "voluntary disclosure of purportedly privileged material [since such disclosure] is inconsistent with an assertion of privilege." *In re OM Group Securities Litigation*, 226 F.R.D. at 590. It is also significant that *In re OM Group Securities Litigation, supra*, did not rely exclusively upon the quotation of privileged communications in finding a waiver of the attorney-client privilege. That is, the court found a waiver of the attorney-client privilege where the disclosure constituted "a substantial presentation of the investigation ... [and] listed detailed conclusions and cited specific findings, interviews and documents in support."). *Id.* at 591-92. The Martin Report is a substantial presentation of the investigation, lists detailed conclusions, gives specific findings, and relies upon specific witnesses interviews.

[5] Once again Merck relies on *Hollinger International Inc. v. Hollinger Inc.*, 230 F.R.D. 508 (N.D.Illinois 2005), in arguing it has not waived the work-product privilege. This case is clearly distinguishable since that court found no waiver of privilege where a party produced a carefully redacted version of the fact section from an internal investigation. *See Hollinger*, 230 F.R.D. at 515. The fact section had been redacted to remove attorney conclusions, mental impressions, and other privileged information. Here, the entire Martin Report was produced without any redactions and it clearly reflects the conclusions and mental impressions of counsel.

[6] Contrary to the position asserted by Merck in its reply, Plaintiffs do not merely rely upon *Fleming* in arguing that Merck has waived the attorney-client privilege. *See* Plaintiffs' Memo in Opp. at 22, Fn. 14.

*Fleming*. For there to be broad subject-matter waiver of the work-product privilege, the court in *Fleming* merely required that a party use work-product materials for the purpose of "seeking a tactical advantage." See *Fleming*, 2003 WL 21474516, * 8 (citations omitted); *see also In re OM Group Securities Litigation*, 226 F.R.D. at 593 (recognizing that fairness doctrine is not limited to instances where a party attempts to affirmatively use work-product in litigation). Thus, by voluntarily disclosing the Martin Report in a well orchestrated effort to influence both the public and prospective jurors in a manner calculated to draw maximum attention to the report, Merck has waived any privilege with respect to the underlying materials pursuant to the fairness doctrine.

## IV. CONCLUSION

For the reasons set forth above, Merck's motion for a protective order should be denied.

Respectfully submitted,

**PLAINTIFFS' STEERING COMMITTEE**

Date: November 7, 2006     By: _____
Russ M. Herman (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, L.L.P.***
Place St. Charles
201 St. Charles Avenue, Suite 4310
New Orleans, Louisiana 70170
Telephone: (504) 581-4892
Facsimile: (504) 561-6024
**PLAINTIFFS' LIAISON COUNSEL**

Andy D. Birchfield, Jr., Esquire
Leigh O'Dell, Esquire
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
  MEUNIER & WARSHAUER, L.L.C.
Energy Centre
1100 Poydras Street, Ste. 2800
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Thomas R. Kline, Esquire
Shanin Specter, Esquire
David J. Caputo, Esquire
Lisa S. Dagostino, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street
19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Arnold Levin, Esquire **(on brief)**
Fred S. Longer, Esquire **(on brief)**
Daniel Levin, Esquire
Matthew C. Gaughan, Esquire **(on brief)**
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

9

Shelly A. Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX  77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Christopher V. Tisi, Esquire **(on brief)**
ASHCRAFT & GEREL
2000 L Street, N.W., Suite 400
Washington, DC  20036-4914
(202) 783-6400 (telephone)
(307) 733-0028  (telecopier)

## PLAINTIFFS' STEERING COMMITTEE

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 7th day of November, 2006.

Leonard A. Davis (Bar No. 14190)
***Herman, Herman, Katz & Cotlar, LLP***
201 St. Charles Ave., Suite 4310
New Orleans, LA  70170
PH:     (504) 581-4892
FAX:   (504) 561-6024
ldavis@hhkc.com