# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL DOCKET No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L - DIVISION 3 |
| | * | |
| This document relates to | * | JUDGE FALLON |
| CASE NO. 2:05CV2524 | * | |
| | * | |
| ANTHONY WAYNE DEDRICK, | * | MAG. JUDGE KNOWLES |
| an Individual, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |

---

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR ORDER EXCLUDING EXPERT TESTIMONY THAT SHORT-TERM VIOXX USE INCREASES CARDIOVASCULAR RISK

---

Plaintiff Anthony Dedrick, by and through his undersigned counsel, asks this Court to deny Defendant Merck & Co., Inc.'s ["Merck"] Motion to Exclude expert testimony that short-term Vioxx use increases cardiovascular risk.

Merck's motion has previously been denied in the *Irvin, Smith,* and *Mason* cases. Ironically, as Merck lawyers continue to brief and Merck spokespeople continue to issue press releases that "stand behind" the Merck concocted theory that only after using Vioxx for a period of 18 months or more does one experience an increased cardiovascular risk. Scientifically reliable, peer-reviewed publications continue to appear, however, that

support the fact that increased cardiovascular risk occurs in the first weeks of Vioxx usage.  Merck has known short-term Vioxx usage increases CV risk since the late 1990's, and since that time Merck has flipped, spun, misrepresented, and withheld the data that evidences this fact.  In fact, Judge Higbee recently overturned a verdict in Merck's favor in the case of *Hummeston v. Merck & Co.* because Merck had falsely claimed that there were no adverse effects if one took Vioxx for fewer than 18 months.   Nevertheless, Merck, true to its course, asks this Court to withhold from the jury scientifically reliable, relevant, and admissible testimony.

## I. LEGAL STANDARD

The Plaintiff does not dispute the Defendant's contention that exposure is a critical concept in toxicology.  Defendant submits that plaintiffs in pharmaceutical cases must present evidence that they were "exposed to levels of that agent that are known to cause the kind of harm" they suffered.  Memorandum at 3 (citing *Wright v. Williamette Indus., Inc.*, 91 F. 3d 1105, 1107 (8th Cir. 1996); *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1133 (9th Cir. 2002)).

A court should allow such testimony from an expert if it is reliable.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-593 (1993).   For the expert's testimony to be reliable, a court must consider the following factors: (1) the expert's testimony must be based on sufficient facts or data, (2) the expert's testimony must be the product of reliable principles and methods, and (3) the expert must apply the principles and methods reliably to the facts of the case.  FED. R. EVID. 702.   The Court should allow expert testimony relating to

increased CV risk with short-term Vioxx use here because this testimony has been subjected to peer review and publication. See *Daubert*, 509 U.S. at 593. Much of this testimony is based on independent evaluations of Merck's *own* published, controlled, randomized clinical trials, such as VIGOR and APPROVe, in addition to other scientifically reliable published epidemiological studies.

A court should allow an expert to offer an opinion at trial if it is relevant. FED. R. EVID. 401, 402, 702; *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999); *Wintz v. Northrop Corp.*, 110 F.3d 508, 512 (7th Cir. 1997); see *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-593 (1993). Relevance requires that there be a valid scientific connection to the pertinent inquiry in the case. *Hose v. Chicago Northwestern Transp. Co.*, 70 F.3d 968, 972 (8th Cir. 1995). The Court should allow the testimony of Plaintiff's experts on this short-term usage issue, because the evidence supporting the Plaintiff's experts opinions is sufficient to allow a reasonable juror to conclude more likely to be true than false. See *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002). Again, Mr. Dedrick took Vioxx for six months prior to his heart attack. The VIGOR[1] study, the APPROVe[2] study, the Levesque study[3], and the Ingenix study[4], in addition to others, establish the "scientific connection" between Mr. Dedrick's heart attack and his Vioxx use and all support the proposition that Vioxx usage increases the risk of an adverse cardiovascular event, such as heart attack, immediately.

---

[1] *See* Claire Bombardier et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, 343 NEW. ENG. J. MED. 1520 (Nov. 30, 2000). VIGOR, an acronym, stands for "Vioxx GI Outcomes Research" study. (Ex. "A").

[2] *See* Bresalier RS et al., Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial, 352 NEW. ENG. J. MED. 1092 (Mar. 17, 2005) (Ex. "B").

[3] See Levesque, L.E., *The Risk for Myocardial Infarction With Cyclooxygenase-2 Inhibitors: A Population Study of Elderly Adults*, ANN. OF INTERN. MED. 2005; 142:481-489. (Ex. "C").

[4] Ingenix Epidemiology Report, Cardiovascular Risk of COX-2 Inhibitors and Other NSAIDs, Feb. 16, 2004. (Ex. "D").

Further, Merck's challenges to testimony relating to short term usage only go to the weight and credibility of the expert's testimony, not to the admissibility. Merck challenges only an alleged lack of textual authority for expert opinion, which is an improper challenge. See *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042-1043 (2d Cir. 1995).

Finally, the Fifth Circuit has twice held that, in determining the admissibility of expert testimony, a district court must defer to "the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to bases and sources of an expert's opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.38 Acres of Land, More or Less, Sit in Leflore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

Plaintiff can, is entitled to, and should not be prohibited from offering testimony supported by published, peer reviewed, scientifically reliable evidence that his usage of a 25 mg dosage of Vioxx for six months substantially contributed to his heart attack.

## II.   PUBLISHED, PEER REVIEWED, SCIENTIFIC DATA SUPPORTS EXPERT OPINION THAT SHORT TERM VIOXX USAGE INCREASES CARDIOVASCULAR RISK.

Each and every study addressed by Merck in their memorandum to exclude expert opinion testimony, supports the exact same proposition Merck seeks to exclude:  short term 25 mg exposure to Vioxx increases cardiovascular risk.    Accordingly, Mr. Dedrick's experts have a scientifically reliable basis to opine that Vioxx was a cause of

his heart attack.   Merck tries in vain to undermine the legion of studies, including many it either conducted itself or sponsored.

A. **Merck's *Own* Controlled Randomized Clinical Trials Support the Fact Short Term Usage Increases Cardiovascular Risk**

The "gold standard" for determining the relationship between a drug and a health outcome is the clinical trial.  *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 406 (S.D.N.Y. 2001).   In such investigations, subjects are assigned randomly to one of two groups: one exposed, and the other not exposed, to the drug of interest.  *Id.*

***The VIGOR study***

The VIGOR trial was a controlled randomized clinical trial designed to evaluate the effect of rofecoxib versus naproxen on the event rate of gastrointestinal disease; Merck investigators examined over 8,000 patients who were randomly assigned one of these drugs.  In the VIGOR study, significantly more adverse events, such as stroke, MI, and cardiac death, in the rofecoxib group than the naproxen group.[5]

Over two years before Mr. Dedrick would ever take Vioxx, Merck had a conclusive evaluation of the cardiovascular safety of Vioxx, highlighting the increased cardiovascular risks associated with short term use of Vioxx, in a VIGOR update from Deborah Shapiro to Drs. Alise Reicin, Eliav Barr, and Dennis Erb, dated July 5, 2005. (See P1.1231.)   Further, Figure 1 of the July 5, 2000 document demonstrates a clear separation in the Kaplan-Meier time to event curves for confirmed thromboembolic cardiovascular serious adverse events in VIGOR, demonstrating the increased risk of

---

[5] Expert Report of Lemuel A. Moye, M.D., at 40. (Ex. "E").

thromboembolic events on Vioxx when compared to Naproxen occurred early in follow up -- *less than two months*.[6]

Not only has Dr. Lemuel Moye reached this conclusion, Dr. Jerry Avorn also reached a similar conclusion based on the curve separation and VIGOR data.[7]

In the *Evelyn Irvin Plunkett v. Merck* wrongful death case, decedent Dicky Irvin had taken Vioxx for 23 days prior to his heart attack.[8]  Expert pharmacoepidemiologist Dr. Wayne Ray reached a conclusion similar to that of Drs. Kronmal, Avorn, and Moye, and this Court allowed and permitted him to testify in open court as follows:

> Q:  Do you have an opinion whether Vioxx causes heart attacks in less than 30 days?
>
> A:  Yes.  The evidence that I have reviewed from the clinical trials and the epidemiologic studies shows that it's – to a reasonable degree of certainty, likely to increase heart attacks and serious coronary artery disease in 1 to 30 days.
>
> Q.     Thank you, doctor.  Doctor, how long did it take for heart attack risks to begin in the VIGOR study?
>
> A.   One of the ways we assess that is by looking at what we call cumulative incidence curves, and those are just the curves that show, for a given point in time, how many patients have developed the disease.  When those curves begin to separate, that's when the risk for one drug is – it's at least statistically – we are able to show statistically greater than that for the other drug.  In VIGOR, that happened within two months.[9]

This Court was correct to allow this testimony then because it was relevant and scientifically reliable.  This evidence is even more relevant and reliable today based on subsequent publications discussed below.  This Court should not retreat from the precedent set forth in *Irvin* and thereafter.

---

[6] *Id.* at 41.
[7] Expert Report of Jerome Avorn, M.D. (March 20, 2006). (Ex. "F").
[8] See *Evelyn Irvin Plunkett v. Merck,* November 29, 2005 transcript, at 108.
[9] *Irvin v. Merck & Co.,* Trial transcript at 730-731 (December 1, 2005).

Based on the most powerful randomized clinical trial ever conducted on Vioxx, over 8,000 patients strong, numerous experts have reached an almost identical conclusion:  short term use of Vioxx results in an increased cardiovascular risk.  Contrary to Merck's position, regardless of whether Vioxx was compared to placebo or naproxen, VIGOR was a controlled randomized clinical trial in which one group was exposed to Vioxx and the other group wasn't, thus meeting the "gold standard" for determining a relationship between a drug and its health effect.  Next, Merck argues that VIGOR is inapplicable because the dosage in VIGOR is higher than that Mr. Dedrick took.  Finally, Merck attempts to preclude VIGOR, only with respect to the short term usage issue, on the basis that Mr. Dedrick had a different type of arthritis than those participating in the study.  Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means for Merck to attack this evidence.  *Daubert*, 509 U.S. at 596.

In sum, the strength of the VIGOR study alone provides the reliability and relevance basis for admission of testimony that short term Vioxx use results in increased cardiovascular risk.  But further, even after being forced to disclose the three additional heart attacks that were withheld from the *New England Journal of Medicine*, which coincidently further evidences an association of CV risk with Vioxx use, Merck still "stands firmly behind" the propriety of the scientific analysis and presentation of data in the VIGOR publication.  Given Merck's blind adherence to its original stance with respect to this study, Mr. Dedrick is entitled to refute Merck positions through its expert testimony opining that Merck should have known just ***two months*** into the VIGOR study there was a significant increase in cardiovascular risk associated with Vioxx.

### *The APPROVe Study*

This controlled randomized trial meets the "gold standard" for admissibility. APPROVe had 2,586 subjects with colorectal adenomas to 25 mg of Vioxx versus placebo to test the hypothesis that COX-2 inhibition would prevent recurrence of the adenoma or progression to colon cancer. A Merck statistician prepared a Kaplan-Meier graph for this study showing the Vioxx curve above placebo after only three months.[10] This Court has previously allowed expert testimony that short term usage of Vioxx increases cardiovascular risk based on the APPROVe study. Defense Counsel Philip Beck objected to Dr. Douglas Zipes' testimony that the APPROVe findings evidenced increased cardiovascular risk from short term Vioxx usage, but the Court correctly overruled that objection.[11] The testimony this Court allowed in the *Barnett* case where short term usage was not near the paramount issue it is in this case is as follows:

> A.     But the importance of the APPROVe trial was that Merck then did a study of 25 milligrams against a sugar pill. So there can't be any argument that there's any benefit from the naproxen...
>
> Q.     Can we go to the next slide? What does that show?
>
> A.     ....Now, the importance if this is as follows: When the APPROVe study was published, Merck said, with their primary endpoint, that there was no difference between Vioxx and the sugar pill until patients had taken

---

[10] *See* Expert Report of Douglas P. Zipes (May 22, 2006) (Ex. "G").

[11] *Barnett v. Merck & Co.*, Trial transcript at 1633-1634 (August 8, 2006):

> Mr. Beck: And then, Your Honor, the next one (slide) we object to more strongly...we really think that's cumulative.
> Mr. Robinson: This is the Kaplan-Meier curve for APPROVe. We need that in.
> Mr. Beck: Well, it is in.
> Mr. Robinson: No, no.....
> The Court: Some of these things are – he can refer to it. It's just a question of whether or not he's going to be able to go over the same thing and hammer it more and more and more. And that's going to be – I'm not going to allow that. **But to take out something that he can't even look at or can't even mention doesn't seem to be right either.**

the drug for 18 months, and that if you took it for less than 18 months, you had no difference.   But the investigator-reported results said, "Uh-uh. That's not true."   When we report as the investigator that this patient had a heart attack and so on, those curves separate very early.   You can see that the rofecoxib or Vioxx curve gets higher than the placebo sugar pill curve very early.

Q.      Is that months on the bottom there?

A.      Yes, the months are on the bottom.   So sometimes, four or six months, there is a separation –

Q.      What does this mean if there is a separation?

A.      That means that Vioxx, indeed, is causing increased cardiac events, compared with the placebo pill, and it sure didn't take 18 months for it to happen.[12]

Dr. Zipes is not the only expert to reach this opinion when analyzing the APPROVe data.   Drs. Avorn and Moye have rendered opinions and authored expert reports stating how Merck distorted the data with its 18 month latency theory and have opined that APPROVe makes transparent the cardiovascular risk associated with short term (3 months) 25 mg Vioxx use.

Similar to Merck's scientific misconduct in failing to report the total number of heart attacks in regard to the VIGOR study, Merck engaged in similar misconduct to mask the cardiovascular risk associated with Vioxx in APPROVe.   In APPROVe, Merck employed an "unusual censoring rule" in which events were excluded if they occurred more than 14 days after the drug was stopped. *Id.*   Based on the newly released data, statistical analysis shows no evidence of deviation from the proportional hazard over time. *Id.*

Merck's position that APPROVe did not associate an increased cardiovascular risk with under six months use of 25mg Vioxx is simply wrong.   Scientifically reliable and

---

[12] *Barnett v. Merck & Co.*, Trial transcript at 1707-1709 (August 8, 2006).

relevant evidence is admissible for a host of reasons, not the least of which to simply to debunk the Merck concocted 18-month theory, show that Merck engaged in a pattern of fraud, misrepresentation, and is admissible to the jury for awarding punitive damages. The court was correct to overrule objections to this testimony on *Barnett* and *Smith*, and should not change its course now.

**B.   Epidemiological Studies Support the Fact Short Term Usage Increases Cardiovascular Risk**

Merck erroneously seeks to exclude reliable expert testimony that is based on epidemiological studies because the studies allegedly do not meet conclusively established reliability requirements. The fact that a cause-effect relationship has not been conclusively established does not render an expert's testimony inadmissible. *Ambrosini v. Labarraque*, 2322 U.S. App. D.C. 19 (D.C. Cir. 1996), cert. dismissed, *Upjohn Co. v. Ambrosini,* 520 U.S. 1205 (1997) (reversing district Court's finding that expert testimony was inadmissible because none of the studies relied upon specifically concluded that Depo-Provera caused the type of birth defects suffered by the plaintiff). Plaintiff's experts' opining on increased cardiovascular risks associated with short term use of Vioxx have employed the analogical reasoning based on objective, verifiable evidence and scientific methodology that has been subject to peer review and has been published, and the kind traditionally used by experts in their respective fields. This is precisely what *Daubert* requires. See, e.g., *Hopkins v. Dow Corning.*, 33 F.3d 1116, 1125 (9th Cir. 1994) (finding admissible expert testimony of a rheumatologist based on medical records, his clinical experience, preliminary results of an epidemiological study and medical literature).

### *The 2004 Juni Epidemiological Study*

The peer reviewed study published in *Lancet* by Dr. Peter Juni and colleagues concluded that there is an increased risk of myocardial infarction in both short and long term duration, which is in contrast to Merck's position on APPROVe. (*See* Exhibit H). The findings indicate that patients are at risk even if rofecoxib is taken only for a few months. (*See* Exhibit H). These findings and related expert opinions are obviously relevant to Mr. Dedrick who took Vioxx for six months; they are reliable because they have been peer reviewed by the most prestigious medical journal in Europe. These results undermine Merck's statements that there is no excess risk until after 18 months of usage. Further, Juni's study also reported no evidence to support the theory that rofecoxib's cardiovascular toxicity is dose dependant. *Id.* This study and related opinions are admissible to question the validity of Merck's 18-month defense, and to refute the Merck's position that VIGOR is inapplicable to Mr. Dedrick's case because he took the regular 25 mg dosage as opposed to the 50 mg used in VIGOR.

### *The 2004 Solomon Epidemiological Study*

The peer reviewed *Circulation* study showing the results of Solomon and colleagues reported rofecoxib use for 1 to 20 days was associated with an elevated risk of AMI (OR, 1.43; 95% CI, 1.12 TO 1.83; P=0.005). (*See* Exhibit I). A similar elevation was associated with 31 to 90 days of rofecoxib use (OR, 1.46; 95% CI, 1.14 to 1.86; P=0.003). The elevated relative risk in patients taking rofecoxib for 90 days or less was not restricted to those taking greater than 25 mg. (*See* Exhibit I). This peer-reviewed

scientifically reliable and relevant evidence is properly admissible and has been admitted during prior trials.

### The 2004 INGENIX Epidemiological Study

The INGENIX cardiovascular safety study, which was bought and paid for by Merck, also confirms there is increased cardiovascular risk with short-term Vioxx use. The study confirmed that crude and adjusted rates of MI/ACS (Acute Coronary Syndrome) were higher during periods of current rofecoxib use than periods of other NSAID use, and found that there was no clear trend with time since the onset of use. (RR for rofecoxib 1.51, 95% CI 1.09-1.68). (*See* Exhibit D). Merck seeks to exclude this study on the basis that it did not distinguish between patients who took Vioxx at the 25 mg dosage and those who took it at the 50 mg. However, the Merck's hired scientists, as opposed to their hired lawyers, concluded that dose analyses also did not indicate trends of increasing risk with a higher daily dose of rofecoxib (RR for rofecoxib 25 mg 1.54, 95% CI 1.15-2.04: RR for rofecoxib 26-50 mg 0.81, 95 % CI 0.41-1.60). (*See* Exhibit D). Merck should not be able to pick and choose which if its own studies are presented to the jury.

### The 2006 Levesque Epidemiological Study

As Merck notes, the peer-reviewed *CMAJ* published results of the Levesque and colleagues reported the risk of an acute MI was highest after first Vioxx use with events occurring 9 days after the first prescription. (RR 1.67, 95% CI 1.21-2.30) (*See* Exhibit C). Compared with no use of NSAIDs in the year preceding the index date, the risk for

rofecoxib was highest for those having received only one prescription (RR 1.64, 95% CI 1.20-2.23), only slightly lower and still statistically significant for 2-4 months (RR 1.24, 95% CI 0.95-1.61) and 5-8 prescriptions (RR 1.31, 95% CI 0.97-1.76) and did not return to the baseline statistically insignificant risk until after eight prescriptions.  (*See* Exhibit C).  These statistically significant scientifically reliable findings should be admitted into evidence and prove that Merck's 18-month usage defense should be rejected by the Court.

## III.   CONCLUSION

The VIGOR and APPROVe studies, both of which were randomized clinical trials and financed and conducted by Merck, support the conclusion that there is an increased risk associated with short term usage of Vioxx.  In addition to these studies, there are a number of peer-reviewed and published epidemiological studies which support expert testimony to the same effect.  Reliable scientific evidence exists proving that the risks associated with Vioxx are immediate and that Merck's 18-month "theory" is scientifically indefensible.

Plaintiff asks that this Court adhere to the precedent it has set forth in *Irvin, Barnett,* and *Smith* and allow testimony that there is an increased risk associated with short term 25 mg use of Vioxx.  For these reasons as well as the reasons articulated in Plaintiff's prior and simultaneous briefing on this subject, Plaintiff urges the Court to deny Merck's motion to exclude expert testimony regarding the short-term risks associated with Vioxx.

Respectfully submitted this 7th day of November, 2006.

_____
**ANDY BIRCHFIELD**
P. LEIGH O'DELL
Attorney for Plaintiff
***BEASLEY, ALLEN, CROW,***
***METHVIN, PORTIS & MILES, P.C.***
234 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103
(334) 269-2343 telephone
(334) 954-7555 facsimile

**Russ M. Herman** (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
 **Plaintiffs' Liaison Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
& WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

**Christopher A. Seeger**, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Plaintiff's Memorandum in

Opposition to Defendant's Motion for Order Excluding Expert Testimony that Short-

Term Vioxx Use increases Cardiovascular Risk has been served on Liaison Counsel,

Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail or by hand delivery and e-

mail, on Merck's Counsel, Douglas R. Marvin and Philip S. Beck,  by e-mail, and upon

all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in

accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed

with the Clerk of the Court of the United States District Court for the Eastern District of

Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in

accord with the procedures established in MDL 1657 on this _7th_ day of November,

2006.

                                                _____

                                                Andy D. Birchfield
                                                Attorney for Plaintiff
                                                Beasley, Allen, Crow,
                                                Methvin, Portis & Miles, P.C.

# EXHIBIT  A



12534902

Oct 3 2006
5:33PM

The New England Journal of Medicine

## COMPARISON OF UPPER GASTROINTESTINAL TOXICITY OF ROFECOXIB AND NAPROXEN IN PATIENTS WITH RHEUMATOID ARTHRITIS

Claire Bombardier, M.D., Loren Laine, M.D., Alise Reicin, M.D., Deborah Shapiro, Dr.P.H.,
Ruben Burgos-Vargas, M.D., Barry Davis, M.D., Ph.D., Richard Day, M.D., Marcos Bosi Ferraz, M.D., Ph.D.,
Christopher J. Hawkey, M.D., Marc C. Hochberg, M.D., Tore K. Kvien, M.D.,
and Thomas J. Schnitzer, M.D., Ph.D., for the VIGOR Study Group

### ABSTRACT

*Background*  Each year, clinical upper gastrointestinal events occur in 2 to 4 percent of patients who are taking nonselective nonsteroidal antiinflammatory drugs (NSAIDs). We assessed whether rofecoxib, a selective inhibitor of cyclooxygenase-2, would be associated with a lower incidence of clinically important upper gastrointestinal events than is the nonselective NSAID naproxen among patients with rheumatoid arthritis.

*Methods*  We randomly assigned 8076 patients who were at least 50 years of age (or at least 40 years of age and receiving long-term glucocorticoid therapy) and who had rheumatoid arthritis to receive either 50 mg of rofecoxib daily or 500 mg of naproxen twice daily. The primary end point was confirmed clinical upper gastrointestinal events (gastroduodenal perforation or obstruction, upper gastrointestinal bleeding, and symptomatic gastroduodenal ulcers).

*Results*  Rofecoxib and naproxen had similar efficacy against rheumatoid arthritis. During a median follow-up of 9.0 months, 2.1 confirmed gastrointestinal events per 100 patient-years occurred with rofecoxib, as compared with 4.5 per 100 patient-years with naproxen (relative risk, 0.5; 95 percent confidence interval, 0.3 to 0.6; P<0.001). The respective rates of complicated confirmed events (perforation, obstruction, and severe upper gastrointestinal bleeding) were 0.6 per 100 patient-years and 1.4 per 100 patient-years (relative risk, 0.4; 95 percent confidence interval, 0.2 to 0.8; P=0.005). The incidence of myocardial infarction was lower among patients in the naproxen group than among those in the rofecoxib group (0.1 percent vs. 0.4 percent; relative risk, 0.2; 95 percent confidence interval, 0.1 to 0.7); the overall mortality rate and the rate of death from cardiovascular causes were similar in the two groups.

*Conclusions*  In patients with rheumatoid arthritis, treatment with rofecoxib, a selective inhibitor of cyclooxygenase-2, is associated with significantly fewer clinically important upper gastrointestinal events than treatment with naproxen, a nonselective inhibitor. (N Engl J Med 2000;343:1520-8.)
©2000, Massachusetts Medical Society.

N ONSTEROIDAL antiinflammatory drugs (NSAIDs) are among the most commonly used medications in the world.[1] A major factor limiting their use is gastrointestinal toxicity. Although endoscopic studies reveal that gastric or duodenal ulcers develop in 15 to 30 percent of patients who regularly take NSAIDs,[2] the chief concern is clinically important gastrointestinal problems, such as bleeding. It has been estimated that more than 100,000 patients are hospitalized and 16,500 die each year in the United States as a result of NSAID-associated gastrointestinal events.[3,4]

Most NSAIDs inhibit both cyclooxygenase-1 and cyclooxygenase-2, isoenzymes involved in the synthesis of prostaglandins.[5] Cyclooxygenase-1 is constitutively expressed and generates prostanoids involved in the maintenance of the integrity of gastrointestinal mucosa and platelet aggregation,[6] whereas at sites of inflammation, cyclooxygenase-2 is induced to generate prostaglandins that mediate inflammation and pain.[7] The antiinflammatory effects of nonselective NSAIDs (those that inhibit both cyclooxygenase-1 and cyclooxygenase-2) therefore appear to be mediated through the inhibition of cyclooxygenase-2, whereas their harmful effects in the gastrointestinal tract as well as their antiplatelet effects are believed to occur primarily through the inhibition of cyclooxygenase-1.[5]

Agents that selectively inhibit cyclooxygenase-2 have antiinflammatory and analgesic effects that are simi-

From the Institute for Work and Health, Mount Sinai Hospital, and the University Health Network, Toronto (C.B.); the Gastrointestinal Division, Department of Medicine, University of Southern California School of Medicine, Los Angeles (L.L.); Merck, Rahway, N.J. (A.R., D.S.); the Faculty of Medicine and Research Division, Universidad Nacional Autónoma de México, and Hospital General de México, Mexico City, Mexico (R.B.-V.); University of Texas–Houston School of Public Health, Houston (B.D.); the Department of Clinical Pharmacology, University of New South Wales and St. Vincent's Hospital, Sydney, Australia (R.D.); the Division of Rheumatology, Department of Medicine, Escola Paulista de Medicina, Universidade Federal de São Paulo, São Paulo, Brazil (M.B.F.); the Division of Gastroenterology, School of Medical and Surgical Sciences, University Hospital, Nottingham, United Kingdom (C.J.H.); the Division of Rheumatology and Clinical Immunology, University of Maryland, Baltimore (M.C.H.); Oslo City Department of Rheumatology, and Diakonhjemmet Hospital, Oslo, Norway (T.K.K.); and the Office of Clinical Research and Training, Northwestern University School of Medicine, Chicago (T.J.S.). Address reprint requests to Dr. Bombardier at the Institute for Work and Health, 250 Bloor St. E., Suite 702, Toronto, ON M4W 1E6, Canada, or at claire.bombardier@utoronto.ca.

Arthur Weaver, M.D., Arthritis Center of Nebraska, Lincoln, was another author.

P2.0183



PLAINTIFF'S
EXHIBIT
A
tabbies®

MRK ABA0001301

lar to those of nonselective NSAIDs,[9,12] but they induced significantly fewer ulcers in endoscopic trials.[12-15] Whether such a decrease in the number of ulcers translates into a similar decrease in the number of clinical gastrointestinal events is a matter of controversy. We performed a prospective, randomized, double-blind comparison of rofecoxib and naproxen in more than 8000 patients with rheumatoid arthritis.

## METHODS

### Study Population

Patients with rheumatoid arthritis who were at least 50 years old (or at least 40 years old and receiving long-term glucocorticoid therapy) and who were expected to require NSAIDs for at least one year were eligible. Patients were excluded if they had a history of another type of inflammatory arthritis, upper gastrointestinal surgery, or inflammatory bowel disease; an estimated creatinine clearance of 30 ml or less per minute; a positive test for fecal occult blood (this test was performed at base line in all patients); an unstable medical condition; a history of cancer or alcohol or drug abuse in the five years before the study; a history of cerebrovascular events in the two years before the study; or a history of myocardial infarction or coronary bypass in the year before the study. Patients with morbid obesity and those who required or who had been receiving treatment with aspirin, ticlopidine, anticoagulants, cyclosporine, misoprostol, sucralfate, or proton-pump inhibitors or treatment with histamine $H_2$-receptor antagonists in prescription-strength doses were also excluded from the study. Patients enrolled in the study were not thought to require the use of these agents by their treating physicians.

### Study Design

The study was conducted at 301 centers in 22 countries. Three to 14 days after discontinuing NSAIDs, eligible patients were randomly assigned to receive either 50 mg of rofecoxib (Vioxx, Merck, Whitehouse Station, N.J.) once daily or 500 mg of naproxen (Naprosyn Biotech, Toronto) twice daily. The groups were stratified according to the presence or absence of a history of gastroduodenal ulcer, upper gastrointestinal bleeding, and gastroduodenal perforation. Blinding was achieved through the use of a matching placebo for each study medication.

Patients were permitted to take acetaminophen, non-NSAID analgesic medications, glucocorticoids, and disease-modifying drugs (e.g., methotrexate) to control their rheumatoid arthritis. Patients were also allowed to take antacids and $H_2$-receptor antagonists in the following maximal doses: ranitidine, 150 mg daily; famotidine, 20 mg daily; cimetidine, 400 mg daily; and nizatidine, 150 mg daily. Nonstudy NSAIDs were not allowed. After randomization, the patients returned to the clinic at six weeks and at four months and every four months thereafter until the end of the study. Patients were contacted by telephone at week 10 and every four months thereafter. Compliance was assessed by pill counts at clinic visits and by questioning of patients during the scheduled telephone calls. Serum was obtained from all patients for *Helicobacter pylori* testing (HM-CAP, Enteric Products, Stonybrook, N.Y.). Investigators were not informed of the results of these tests during the study.

The institutional review board or ethics review committee at each center approved the protocol, and all patients gave written informed consent. A steering committee oversaw the study design, conduct of the trial, analyses of data, and drafting of this report. This committee was composed of 14 members, 2 of whom were employees of the sponsoring pharmaceutical company. An independent data and safety monitoring board monitored the patients' safety. An independent, external (end-point) committee whose members were unaware of the patients' treatment assignments reviewed the data to determine which patients had reached the study end points. Because highly selective cyclooxygenase-2 inhibitors do not inhibit platelet aggregation, which is mediated by cyclooxygenase-1, there was a possibility that the incidence of thrombotic cardiovascular events would be lower among patients treated with nonselective cyclooxygenase inhibitors than among those treated with cyclooxygenase-2-selective inhibitors. Therefore, cardiovascular events were also assessed for a future meta-analysis by independent committees whose members were unaware of the patients' treatment assignments. A separate analysis of these events, however, was not specified in the study design.

### Study End Points

Patients who had potential clinical upper gastrointestinal events were evaluated and treated according to the standard practice of the physicians who were caring for them. Patients who stopped taking the study medication before the study ended were followed until the end of the study to determine whether an upper gastrointestinal event had occurred. Only events that were confirmed by the end-point committee according to prespecified criteria (Table 1) and that occurred during treatment or within 14 days after the discontinuation of treatment were included in the primary analysis.

In addition, the protocol called for the analysis of all episodes of gastrointestinal bleeding, including confirmed and unconfirmed episodes of upper gastrointestinal bleeding, and bleeding from a site beyond the duodenum that resulted in hospitalization, discontinuation of treatment, or a decrease in the hemoglobin level of at least 2 g per deciliter.

### Assessment of Efficacy

For each patient both the investigator and the patient answered a Global Assessment of Disease Activity question at base line (after the discontinuation of presudy NSAIDs), 6 weeks, 4 months, and 12 months and at the end of the study or when treatment was discontinued. The score can range from 0 ("very well") to 4 ("very poor"), and higher scores indicate more disease activity. The Modified Health Assessment questionnaire was administered only to patients enrolled at centers in the United States at base line, at six weeks, and at the end of the study or when treatment was discontinued. This questionnaire evaluates the extent of functional disability in eight types of tasks performed on a daily basis. The level of effort required to perform each task is assessed on a 4-point scale on which a score of 0 indicates no difficulty in performing the task and a score of 3 indicates an inability to perform the task.[16] Higher scores indicate more severe disability.

### Statistical Analysis

The primary hypothesis was that the risk of confirmed upper gastrointestinal events (gastroduodenal perforation or obstruction, upper gastrointestinal bleeding, and symptomatic gastroduodenal ulcers) would be lower among patients who were taking rofecoxib than among those who were taking naproxen. Secondary hypotheses were that the risk of confirmed complicated events (perforation, obstruction, and severe upper gastrointestinal bleeding) and the risk of both confirmed and unconfirmed upper gastrointestinal events would be lower among patients who were taking rofecoxib.

Cox proportional-hazards analysis was used to compare the effect of treatment; the presence or absence of a history of gastrointestinal events was a stratification factor in the analysis.[17,18] The scores for the Global Assessment of Disease Activity question and Modified Health Assessment questionnaire were analyzed in terms of the mean change from base line during the treatment period. The primary population for analysis comprised all randomized patients. Subgroup analyses were conducted with use of Cox regression analysis.[17,18] Interactions between treatments and subgroups were assessed to determine whether the effect of rofecoxib as compared with that of naproxen was consistent in the subgroups. We assessed data on general safety by evaluating 95 percent confidence intervals of the differences in the proportions of the treatment groups with each adverse event.[17] All statistical tests were two-sided

MRK-ABA0001302

The New England Journal of Medicine

### TABLE 1. CRITERIA FOR GASTROINTESTINAL EVENTS.

| EVENT | CRITERIA REQUIRED FOR CONFIRMATION OF EVENT |
|---|---|
| Perforation due to nonmalignant gastric or duodenal ulcer | Evidence of perforation on endoscopy, at surgery, on radiography (evidence of free intraabdominal air or extravasation of contrast medium), or at autopsy |
| Obstruction due to gastric or duodenal ulcer | Occurrence of nausea and vomiting >24 hours postprandially and evidence of narrowing of distal portion of stomach or duodenum as a result of a nonmalignant ulcer on endoscopy, at surgery, on radiography, or at autopsy |
| Upper gastrointestinal bleeding | Episode of hematemesis or aspiration of bloody gastric fluid witnessed by health care provider; episode of melena witnessed by health care provider; evidence of active bleeding on endoscopy, at surgery, or on angiography; positive test for fecal occult blood with documented upper gastrointestinal lesion judged to be the source and associated with either clinically significant bleeding or decrease in volume* or evidence of visible vessel, clot, or pigmented spot on ulcer at endoscopy; or episode of hematemesis or melena reported by patient with upper gastrointestinal lesion judged to be the source and associated with either clinically significant bleeding or decrease in volume* or evidence of visible vessel, clot, or pigmented spot on ulcer at endoscopy |
| Gastric or duodenal ulcer | Evidence of gastric or duodenal ulcer on endoscopy, at surgery, on contrast-enhanced radiography of the upper gastrointestinal tract, or at autopsy |

*A decrease in volume was defined by the finding of a decrease in hemoglobin of at least 2 g per deciliter, by the finding of an orthostatically induced change in pulse of more than 20, change in systolic blood pressure of more than 20 mm Hg, or change in diastolic blood pressure of more than 10 mm Hg; by the finding of other evidence of a clinically significant reduction in circulatory volume (e.g., clinically significant hypotension that is corrected by volume replacement); or by the need for blood transfusion.

## RESULTS

### Characteristics of the Patients

Between January 1999 and July 1999, we screened 9539 patients and enrolled 8076; 4047 were randomly assigned to receive rofecoxib, and 4029 to receive naproxen. The major reasons for exclusion were a contraindication to prolonged NSAID therapy (in the case of 246 patients), a positive test for fecal occult blood (203 patients), and a failure to meet inclusion criteria (355 patients). The median follow-up was 9.0 months in both treatment groups (range, 0.5 to 13). A total of 5742 patients (71.1 percent) continued to take their assigned medication until the end of the study. Rates of discontinuation were similar in the two groups: 29.3 percent in the rofecoxib group (16.4 percent because of adverse events, 6.3 percent because of a lack of efficacy, and 6.6 percent for other reasons) and 28.5 percent in the naproxen group (16.1 percent because of adverse events, 6.5 percent because of a lack of efficacy, and 5.9 percent for other reasons). Ninety-nine percent of the patients in both groups took their medication on at least 75 percent of the study days. The base-line characteristics were similar in the two groups (Table 2).

### Efficacy

Rofecoxib and naproxen had similar efficacy against rheumatoid arthritis (Table 3). In addition, the rates of discontinuation of treatment owing to a lack of efficacy were low in both groups (6.3 percent in the rofecoxib group and 6.5 percent in the naproxen group).

### Adverse Gastrointestinal Events

Confirmed upper gastrointestinal events occurred in 177 patients. In 53 of these patients the event was complicated. An additional 13 patients had events that were reported by investigators but that were judged by the end-point committee to be unconfirmed.

The time to the development of a confirmed upper gastrointestinal event is shown in Figure 1. The rates per 100 patient-years and incidences of the pre-specified clinical events are shown in Tables 4 and 5, respectively. The relative risk of confirmed upper gastrointestinal events for patients in the rofecoxib group as compared with those in the naproxen group was 0.5 (95 percent confidence interval, 0.3 to 0.6; P<0.001), whereas the relative risk of complicated confirmed upper gastrointestinal events was 0.4 (95 percent confidence interval, 0.2 to 0.8; P=0.005). The relative risk of complicated upper gastrointestinal bleeding for patients in the rofecoxib group as compared with those in the naproxen group was 0.4 (95 percent confidence interval, 0.2 to 0.7; P= 0.004), whereas the relative risk of bleeding beyond the duodenum was 0.5 (95 percent confidence interval, 0.2 to 0.9; P=0.03).

A per-protocol analysis of the 7925 patients without substantial protocol violations demonstrated relative risks of confirmed upper gastrointestinal events and complicated confirmed events of 0.4 (95 percent confidence interval, 0.3 to 0.6; P<0.001) and 0.4 (95 percent confidence interval, 0.2 to 0.7; P= 0.003), respectively. The results of an intention-to-treat analysis of all confirmed upper gastrointestinal

MRK-ABA0001303

UPPER GASTROINTESTINAL TOXICITY OF ROFECOXIB AND NAPROXEN IN PATIENTS WITH RHEUMATOID ARTHRITIS

TABLE 2. BASE-LINE CHARACTERISTICS OF THE PATIENTS.*

| CHARACTERISTIC | ROFECOXIB GROUP (N=4047) | NAPROXEN GROUP (N=4029) |
|---|---|---|
| Age — yr | 58±9 | 58±10 |
| Female sex — no. (%) | 3223 (79.6) | 3215 (79.8) |
| Race or ethnic group — no. (%) | | |
| White | 3761 (68.2) | 2750 (68.3) |
| Black | 207 (5.1) | 202 (5.0) |
| Asian | 101 (2.5) | 85 (2.1) |
| Hispanic | 501 (12.4) | 516 (12.8) |
| Other | 477 (11.8) | 476 (11.8) |
| Duration of disease — no. (%) | | |
| Unknown | 3 (0.1) | 6 (0.1) |
| <2 yr | 430 (10.6) | 455 (11.3) |
| 2–10 yr | 1991 (49.2) | 1996 (49.5) |
| >10 yr | 1623 (40.1) | 1572 (39.0) |
| Positive test for rheumatoid factor — no. (%) | 2946 (72.8) | 2967 (73.6) |
| Prior use of NSAIDs — no. (%) | 3321 (82.1) | 3331 (82.7) |
| Treatment for rheumatoid arthritis — no. (%) | | |
| Glucocorticoids | 2260 (55.8) | 2263 (56.2) |
| Methotrexate | 2263 (55.9) | 2269 (56.3) |
| Other disease-modifying drugs | 1847 (45.6) | 1826 (45.3) |
| Low-dose H₂-receptor antagonists — no. (%)† | 365 (9.0) | 335 (8.3) |
| History of clinical gastrointestinal events | 314 (7.7) | 316 (7.8) |
| Global Disease Activity score‡ | | |
| Patient's assessment | 2.0±0.9 | 2.0±0.9 |
| Investigator's assessment | 1.9±0.8 | 1.9±0.8 |
| American College of Rheumatology functional class — no. (%)§ | | |
| I | 881 (21.8) | 830 (20.6) |
| II | 2160 (53.4) | 2199 (54.6) |
| III | 928 (22.9) | 932 (23.1) |
| IV | 78 (1.9) | 68 (1.7) |

*Plus–minus values are means ±SD. NSAIDs denotes nonselective nonsteroidal antiinflammatory drugs.

†A low dose was defined as a maximal daily dose of 150 mg of ranitidine, 20 mg of famotidine, 400 mg of cimetidine, and 150 mg of nizatidine.

‡Scores can range from 0 ("very well") to 4 ("very poor"). Higher scores indicate more disease activity.

§According to the American College of Rheumatology's system of classification, functional class 1 indicates complete ability to perform usual activities of daily living, and class IV indicates limited ability to perform usual activities of daily living.

events throughout the study, including those that occurred at any time after the discontinuation of treatment, were similar and remained statistically significant (data not shown).

Subgroup analyses showed the following relative risks of clinical gastrointestinal events among the patients in the rofecoxib group as compared with those in the naproxen group: patients with no prior gastrointestinal events (relative risk, 0.5; 95 percent confidence interval, 0.3 to 0.7), patients with prior gastrointestinal events (relative risk, 0.4; 95 percent confidence interval, 0.2 to 0.8), patients with no glucocorticoid therapy at base line (relative risk, 0.7; 95 percent confidence interval, 0.4 to 1.2), and pa-

tients with glucocorticoid therapy at base line (relative risk, 0.4; 95 percent confidence interval, 0.2 to 0.6). The relative risks in these subgroups and the other prespecified subgroups (defined according to sex, race or ethnic group, and location of study center) were not significantly different, indicating that there was no significant interaction between the treatments and the subgroups.

Treatment with rofecoxib was associated with a significantly lower incidence of clinical gastrointestinal events regardless of the results of serologic tests for *H. pylori*. However, the relative risks of clinical events among *H. pylori*–negative patients and *H. pylori*–positive patients were significantly different (P=0.04, data not shown) Finally, the relative risk of gastrointestinal events remained significantly lower (0.1; 95 percent confidence interval, 0.02 to 1.0) in the rofecoxib group than in the naproxen group even in a subgroup at very low risk (i.e., patients who were younger than 65 years, who were negative for *H. pylori*, who had no history of a clinical gastrointestinal event, and who were not taking glucocorticoids at base line).

### General Safety

The safety of both rofecoxib and naproxen was similar to that reported in previous studies.[20,21] The mortality rate was 0.5 percent in the rofecoxib group and 0.4 percent in the naproxen group. The rate of death from cardiovascular causes was 0.2 percent in both groups. Ischemic cerebrovascular events occurred in 0.2 percent in each group. Myocardial infarctions were less common in the naproxen group than in the rofecoxib group (0.1 percent vs 0.4 percent; 95 percent confidence interval for the difference, 0.1 to 0.6 percent; relative risk, 0.2; 95 percent confidence interval, 0.1 to 0.7). Four percent of the study subjects met the criteria of the Food and Drug Administration (FDA) for the use of aspirin for secondary cardiovascular prophylaxis (presence of a history of myocardial infarction, angina, cerebrovascular accident, transient ischemic attack, angioplasty, or coronary bypass)[22] but were not taking low-dose aspirin therapy. These patients accounted for 38 percent of the patients in the study who had myocardial infarctions. In the other patients the difference in the rate of myocardial infarction between groups was not significant (0.2 percent in the rofecoxib group and 0.1 percent in the naproxen group) When the data showing a reduction in the rate of myocardial infarction in the naproxen group became available after the completion of this trial, Merck, the manufacturer of rofecoxib, notified all investigators in ongoing studies of a change in the exclusion criteria to allow patients to use low-dose aspirin. There was no association between hypertension and myocardial infarction; only a single patient (in the rofecoxib group) had both hypertension and a myocardial infarction as adverse events.

MRK-ABA0001304

The New England Journal of Medicine

TABLE 3. EFFECTIVENESS OF ROFECOXIB AND NAPROXEN FOR RHEUMATOID ARTHRITIS.*

| VARIABLE | BASE-LINE SCORE | | CHANGE IN SCORE DURING TREATMENT | | |
|---|---|---|---|---|---|
| | ROFECOXIB GROUP | NAPROXEN GROUP | ROFECOXIB GROUP | NAPROXEN GROUP | LEAST-SQUARES MEAN DIFFERENCE BETWEEN GROUPS (95% CI)† |
| Global Disease Activity score‡ | | | | | |
| Patient's assessment | 1.96±0.93 | 1.99±0.94 | −0.51±0.93 | −0.53±0.94 | 0.00 (−0.03 to 0.03) |
| Investigator's assessment | 1.85±0.80 | 1.87±0.78 | −0.49±0.84 | −0.52±0.86 | 0.01 (−0.02 to 0.04) |
| Modified Health Assessment score§ | 0.59±0.49 | 0.59±0.49 | −0.11±0.37 | −0.12±0.36 | 0.01 (−0.01 to 0.04) |

*Plus–minus values are means ±SD.

†The values were calculated by analysis of variance in a model that included treatment assignment and presence or absence of a history of gastrointestinal events and the base-line value as covariates. CI denotes confidence interval.

‡Scores can range from 0 ("very well") to 4 ("very poor"). Higher scores indicate more disease activity.

§Scores can range from 0 (no difficulty in performing a task) to 3 (unable to perform the task). Higher scores indicate more severe disability. The questionnaire was administered only to patients enrolled at centers in the United States (1735 in the rofecoxib group and 1732 in the naproxen group).



No AT RISK

| | | | | | | |
|---|---|---|---|---|---|---|
| Rofecoxib | 4047 | 3641 | 3402 | 3180 | 2806 | 1073 | 533 |
| Naproxen | 4029 | 3644 | 3389 | 3163 | 2798 | 1071 | 513 |

Figure 1. Cumulative Incidence of the Primary End Point of a Confirmed Upper Gastrointestinal Event among All Randomized Patients.

The most common adverse events leading to discontinuation of treatment, excluding the gastrointestinal end points, were dyspepsia, abdominal pain, epigastric discomfort, nausea, and heartburn. In the rofecoxib group, significantly fewer patients discontinued treatment as a result of any one of these five upper gastrointestinal symptoms than in the naproxen group (3.5 percent vs. 4.9 percent). The rates of discontinuation for any gastrointestinal events, including gastrointestinal end points, were also significantly lower in the rofecoxib group than in the naproxen group (7.8 percent vs. 10.6 percent). The incidence of adverse effects related to renal function was low and was similar in the two groups (1.2 percent in the ro-

MRK-ABA0001305

UPPER GASTROINTESTINAL TOXICITY OF ROFECOXIB AND NAPROXEN IN PATIENTS WITH RHEUMATOID ARTHRITIS

TABLE 4. INCIDENCE OF GASTROINTESTINAL EVENTS IN THE TREATMENT GROUPS.

| TYPE OF EVENT | ROFECOXIB GROUP (N=4047) | NAPROXEN GROUP (N=4029) | ROFECOXIB GROUP (N=4047) | NAPROXEN GROUP (N=4029) | RELATIVE RISK (95% CI)* | P VALUE |
|---|---|---|---|---|---|---|
| | no. with event | | rate/100 patient-yr | | | |
| Confirmed upper gastrointestinal events | 56 | 121 | 2.1 | 4.5 | 0.5 (0.3–0.6) | <0.001 |
| Complicated confirmed upper gastrointestinal events | 16 | 37 | 0.6 | 1.4 | 0.4 (0.2–0.8) | 0.005 |
| Confirmed and unconfirmed upper gastrointestinal events† | 58 | 132 | 2.2 | 4.9 | 0.4 (0.3–0.6) | <0.001 |
| Complicated confirmed and unconfirmed upper gastrointestinal events‡ | 17 | 42 | 0.6 | 1.6 | 0.4 (0.2–0.7) | 0.002 |
| All episodes of gastrointestinal bleeding | 31 | 82 | 1.1 | 3.0 | 0.4 (0.3–0.6) | <0.001 |

*CI denotes confidence interval.

†The analysis includes 13 events that were reported by investigators but were considered to be unconfirmed by the end-point committee.

‡The analysis includes six events that were reported by investigators but that were considered to be unconfirmed by the end-point committee.

TABLE 5. INCIDENCE OF CONFIRMED UPPER GASTROINTESTINAL EVENTS.*

| TYPE OF UPPER GASTROINTESTINAL EVENT | ALL CONFIRMED UPPER GASTROINTESTINAL EVENTS | | ALL COMPLICATED CONFIRMED UPPER GASTROINTESTINAL EVENTS | |
|---|---|---|---|---|
| | ROFECOXIB GROUP (N=4047) | NAPROXEN GROUP (N=4029) | ROFECOXIB GROUP (N=4047) | NAPROXEN GROUP (N=4029) |
| | number (percent) | | | |
| Perforations† | 3 (0.1)‡ | 4 (0.1) | 3 (0.1) | 4 (0.1) |
| Gastric ulcer | 28 (0.7) | 81 (2.0) | 3 (<0.1) | 6 (0.1) |
| Duodenal ulcer | 27 (0.7) | 39 (1.0) | 3 (0.1) | 5 (0.1) |
| Obstruction† | 1 (<0.1) | 0 | 1 (<0.1) | 0 |
| Bleeding | 14 (0.3) | 35 (0.9) | 12 (0.3)§ | 32 (0.8)¶ |
| Total | 56 (1.4) | 121 (3.0) | 16 (0.4) | 37 (0.9) |

*Patients may have been included in more than one column, but each is counted only once in the total.

†Perforations and obstructions are complicated events by definition.

‡Two confirmed upper gastrointestinal events occurred after only one dose of rofecoxib and most likely resulted from prior use of nonselective nonsteroidal antiinflammatory drugs.

§The cause or source of bleeding was gastric ulcers in five patients, duodenal ulcers in five, and other upper gastrointestinal source in three. One patient in the rofecoxib group had both a gastric and a duodenal ulcer.

¶The cause or source of bleeding was gastric ulcers in 16 patients, duodenal ulcers in 6, and other upper gastrointestinal sources in 7.

fecoxib group and 0.9 percent in the naproxen group); only 0.2 percent of patients in each group discontinued treatment because of these adverse effects.

## DISCUSSION

We found that, in patients with rheumatoid arthritis, treatment with rofecoxib at twice the maximal dose approved by the FDA for long-term use resulted in sig-

nificantly lower rates of clinically important upper gastrointestinal events and complicated upper gastrointestinal events than did treatment with a standard dose (1000 mg per day) of naproxen. We also found that the incidence of complicated upper gastrointestinal bleeding and bleeding from beyond the duodenum was significantly lower among patients who received rofecoxib. Only 41 patients would need to be treated

MRK-ABA0001306

with rofecoxib rather than naproxen to avert one clinical upper gastrointestinal event in a one-year period. Although the optimal dose of rofecoxib for the treatment of rheumatoid arthritis has yet to be determined, data from a prior study indicate that maximal efficacy is achieved at a daily dose of 25 mg.[23]

A prospective study that compared NSAIDs alone with NSAIDs plus misoprostol reported that 0.95 percent of patients with rheumatoid arthritis who were taking an NSAID alone had upper gastrointestinal complications over a period of six months,[24] with a relative reduction in the risk of such complications with combination treatment of 40 percent during this period. These results are similar to our finding of a cumulative incidence of serious upper gastrointestinal events over a six-month period of 0.75 percent in the naproxen group and a relative reduction in risk of 67 percent in the rofecoxib group (data not shown). A 50 percent reduction in the incidence of clinically important upper gastrointestinal events with rofecoxib as compared with a nonselective NSAID was also found in a prespecified combined analysis of eight double-blind studies that included 4921 patients with osteoarthritis, none of whom received glucocorticoids.[25] Patients with rheumatoid arthritis have a higher risk of upper gastrointestinal events than do patients with osteoarthritis.[4] Thus, the results of our study extend the results of the combined analysis to a group of patients at higher risk of bleeding.

The results of a randomized, double-blind comparison of the cyclooxygenase-2–selective inhibitor celecoxib and the nonselective NSAIDs ibuprofen and diclofenac were recently published.[26] In this trial of 7968 patients, 73 percent of whom had osteoarthritis and 27 percent of whom had rheumatoid arthritis, data were reported from the first 6 months of a study period that extended for up to 13 months. Treatment with celecoxib was associated with a nonsignificant (P=0.09) trend toward a decrease in the incidence of the primary end point (complicated ulcers and erosions) and a significant decrease (P=0.02) in the incidence of the secondary end point (complicated and symptomatic ulcers).

The incidence of clinically important gastrointestinal events was lower in the rofecoxib group than in the naproxen group in all subgroups we examined. Concomitant glucocorticoid and NSAID therapy has been reported to be associated with a higher risk of a clinical gastrointestinal event than is NSAID therapy alone.[4] Therefore, a larger reduction in the incidence of events might have been expected in the subgroup that received both an NSAID and glucocorticoids. There was a greater reduction in the relative risk of events in the subgroup of patients who were taking glucocorticoids at base line than in the subgroup of patients who were not taking glucocorticoids at base line, but the difference between the groups was not significant.

Whether ulcers identified by endoscopic examination are markers of a clinical gastrointestinal event has been a matter of controversy. The relative reduction in the risk of such ulcers in two identical studies that compared 50 mg of rofecoxib daily with 800 mg of ibuprofen three times a day was 71 percent at six months.[13,14] Thus, our findings support the concept that the results of endoscopic studies of ulcers can be extrapolated to clinical gastrointestinal events.

In prior endoscopic studies, the frequency of ulcers was similar in patients taking rofecoxib and those taking placebo.[13,14] We could not include a placebo group, and no studies have yet assessed whether a cyclooxygenase-2–selective inhibitor or the combination of nonselective NSAIDs plus gastroprotective drugs (such as misoprostol and proton-pump inhibitors) will achieve similar results.

Gastrointestinal symptoms are extremely common with NSAID therapy, as demonstrated by the fact that, in our study, the five most common adverse events leading to the discontinuation of treatment were upper gastrointestinal symptoms. Although gastrointestinal symptoms are poorly correlated with endoscopic findings of ulcers or clinical gastrointestinal events,[27] significantly fewer patients in the rofecoxib group than in the naproxen group discontinued treatment because of gastrointestinal symptoms.

The overall mortality rate was similar in the two groups, as were the rates of death from gastrointestinal events and from cardiovascular causes. The rate of myocardial infarction was significantly lower in the naproxen group than in the rofecoxib group (0.1 percent vs. 0.4 percent). This difference was primarily accounted for by the high rate of myocardial infarction among the 4 percent of the study population with the highest risk of a myocardial infarction, for whom low-dose aspirin is indicated.[22] The difference in the rates of myocardial infarction between the rofecoxib and naproxen groups was not significant among the patients without indications for aspirin therapy as secondary prophylaxis.

Naproxen inhibits the production of thromboxane by 95 percent and inhibits platelet aggregation by 88 percent, and this effect is maintained throughout the dosing interval[28]; therefore, the effects of regular use of naproxen may be similar to those of aspirin. Flurbiprofen, another NSAID that is a potent inhibitor of platelet-derived thromboxane, led to a 70 percent reduction in the rate of reinfarction as compared with placebo among patients in whom acute myocardial infarction was successfully treated with thrombolysis, angioplasty, or both.[29]

Analyses of 7535 patients in double-blind trials comparing rofecoxib with placebo and other NSAIDs (diclofenac, ibuprofen, and nabumetone that do not produce sustained, maximal inhibition of platelet aggregation revealed similar rates of myocardial infarction in all groups[30] (and unpublished data). Thus, our

MRK-ABA0001307

UPPER GASTROINTESTINAL TOXICITY OF ROFECOXIB AND NAPROXEN IN PATIENTS WITH RHEUMATOID ARTHRITIS

results are consistent with the theory that naproxen has a coronary protective effect and highlight the fact that rofecoxib does not provide this type of protection owing to its selective inhibition of cyclooxygenase-2 at its therapeutic dose and at higher doses. The finding that naproxen therapy was associated with a lower rate of myocardial infarction needs further confirmation in larger studies.

In summary, the use of the cyclooxygenase-2–selective inhibitor rofecoxib resulted in significantly fewer clinically important upper gastrointestinal events than did treatment with naproxen, a nonselective NSAID. The two drugs had similar rates of clinical effectiveness.

Supported by a grant from Merck.

Dr. Bombardier has received clinical research support from Aventis Pharma, Merck Research Laboratories, and Merck Frosst Canada. She has served as a consultant to Knoll Pharmaceutical, Aventis Canada, Schering Canada, Merck Research Laboratories, and Wyeth-Ayerst.

Dr. Laine has received clinical research support from Merck, Wyeth-Ayerst, and AstraZeneca. He has served as a consultant to Merck, Searle, Johnson & Johnson, AstraZeneca, Wyeth-Ayerst, and Tap Pharmaceuticals.

Dr. Burgos-Vargas has received clinical research support from Merck Sharp & Dohme, Pfizer, and Boehringer Ingelheim. He has served as a consultant to Merck and has been a member of a speakers' bureau sponsored by Merck Sharp & Dohme.

Dr. Davis has served as a consultant to Miavant, Merck Research Laboratories, Parke-Davis, and SmithKline Beecham.

Dr. Day has received clinical research support from Merck, Searle, Pfizer, Roche, and Amgen. He has served as a consultant to Merck, Searle, and Pfizer. He has been a member of a speakers' bureau sponsored by Merck Sharp & Dohme, Searle, Pfizer, and SmithKline Beecham.

Dr. Ferraz has received clinical research support from Bristol-Myers Squibb, Merck Sharp & Dohme, and Aventis Pharma. He has served as a consultant to Aventis Pharma.

Dr. Hawkey has received clinical research support from AstraZeneca, Axia Medica, Boehringer Ingelheim, Boots Healthcare International, Cell Tech, Eisai, Elan, Merck Research Laboratories, NicOx, and Novartis. He has served as a consultant to AstraZeneca, Abbott, Cell Tech, Elsai, Merck Research Laboratories, NicOx, Novartis, Parke-Davis, and Synthelabo Pharmacie. He has been a member of speakers' bureaus sponsored by AstraZeneca, Boehringer Ingelheim, Boots Healthcare International, Takeda, Wyeth Lederle, and Merck Research Laboratories.

Dr. Hochberg has received clinical research support from Merck and Quintiles (Aventis Pharma). He has served as a consultant to Aventis Pharma, Biomatrix, Merck, Negma Laboratories, Procter & Gamble, Roche, and Wyeth-Ayerst. He owns stock in Johnson & Johnson, Eli Lilly, Merck, Procter & Gamble, and Schering-Plough.

Dr. Kvien has received clinical research support from Merck, Searle, Aventis Pharma, and Schering-Plough. He has served as a consultant to Merck, Searle, Aventis Pharma, and Schering-Plough. He has been a member of a speakers' bureau sponsored by Merck and Aventis Pharma.

Dr. Schnitzer has received clinical research support from Abbott, Boehringer Ingelheim, Johnson & Johnson, McNeil Consumer Products, Merck, Novartis, Ortho-McNeil, Parke-Davis, Searle, and Wyeth-Ayerst. He has served as a consultant to Boehringer Ingelheim, Merck, Novartis, Ortho-McNeil, Searle, and SmithKline Beecham. He has been a member of speakers' bureaus sponsored by Boehringer Ingelheim, Merck, Ortho-McNeil, Wyeth-Ayerst, and Searle.

Dr. Weaver has received clinical research support from Merck, Searle, Immunex, Wyeth-Ayerst, Aventis Pharma, Pharmacia-Upjohn, Eli Lilly, Connetics, Parke-Davis, Procter & Gamble, Pfizer, Hoffmann-LaRoche, Centocor, Amgen, Cypros Bioscience, Helsinn, Novartis, and Boehringer Ingelheim. He has served as a consultant to Merck, Searle, Immunex, Wyeth-Ayerst, Aventis Pharma, Pharmacia-Upjohn, Eli Lilly, Connetics, Parke-Davis, Procter & Gamble, Pfizer, Hoffmann-LaRoche, Centocor, Amgen, Cypros Bioscience, Helsinn, Novartis, and Boehringer Ingelheim. He has been a member of speakers' bureaus sponsored by Merck, Searle, Immunex, Wyeth-Ayerst, Aventis Pharma, Pharmacia-Upjohn, Eli Lilly, Connetics, Parke-Davis, Procter & Gamble, Hoffmann-LaRoche, Centocor, Amgen, Cypros Bioscience, Helsinn, Novartis, and Boehringer Ingelheim. He is on the board of directors of MGI Pharma.

We are indebted to Christopher T. Brett, Dayna Carroll, Russell Center, Edward Chabut, Laurine Connors, Gary Gartenberg, Nicole Gillies, Richard Holmes, Paige Reagan, Douglas J. Watson, Deborah P.L. Weiss, and Qinfen Yu for their substantial contributions.

## APPENDIX

The following persons participated in the study: International Steering Committee: C. Bombardier (chair), L. Laine (cochair), A. Reicin, M. Hochberg, R. Day, T. Capizzi, P. Brooks, R. Burgos-Vargas, B. Davis, M. Ferraz, C. Hawkey, T.K. Kvien, T. Schnitzer, A. Weaver; Data Safety Board: M. Weinblatt (chair), D. Bjorkman, J. Neaton, A. Silman, R. Sturrock; End-Point Adjudication Committee: M. Griffin (chair), D. Jensen, M. Langman; Investigators: Argentina: E. DiGiorgio, H. Laborde, O. Messina, A. Sturzberg; Australia: J. Bertouch, R. Day, G. McColl, P. Ryan, S. Sharma; Brazil: R. Bonfiglioli, C. Borges, I. Brenol, W. da Silva, M. Ferraz, R. Lima, C. Moreira, G. Novaes, A. Pessoa, F. Perez, S. Radominski, A. Samara, B. Souza; Canada: T. Anastassiades, M. Atkinson, A. Beaulieu, M. Bell, M. Camerlain, J. Carette, M. Hanly, J. Karsh, T. Mc-Carthy, W. Olszynski, P. Patel, T. Prasad, W. Pruzanski, K. Siminovitch, J. Thorne, V. Verdejo-Aguilar, Chile: L. Barria, C. Fuentealba, L. Massardo, F. Riedemann, L. Roca, H. Rossi; Czech Republic: Z. Dostal, J. Gatterova, M. Houba, M. Olejarova, K. Pavelka, P. Vitek; Denmark: T. Ellingsen; Finland: M. Hakala, P. Hannonen, T. Helve, M. Nissila; Germany: R. Alten, M. Gaubitz, E. Gromnica-Ihle, H. Hanrischel, O. Hein, M. Keysser, R. Kurthen, B. Lang, F. Mielke, U. Muller-Ladner, C. Richter, M. Schattenkirchner, M. Schneider, H. Sorenson, E. Wollenhaupt, H. Warnatz, S. Wassenberg; Guatemala: E. Julian; Hungary: G. Bakos; Israel: D. Buskila, A. Nahir, J. Rosner; Malaysia: S. Yeap; Mexico: R. Burgos, I. Garcia de la Torre, F. Irazoque, J. Orozco Alcala; New Zealand: P. Jones, L. McLean, C. Rajapakse; Norway: H. Gulseth, K. Helgetveit, A. Johannessen, C. Kaufmann, O. Kvaalsund, T. Kvien, K. Mikkelsen, B. Rossebo, G. Sidenvall; Peru: A. Calvo Quiroz, M. Guevara, A. Hilgado, L. Portocarrero, E. Vera Bejar; Poland: J. Badurski, J. Brzezicki, M. Bykowska, I. Fiedorowicz-Fabrycy, J. Gawrela, P. Gluszki, B. Konieczna, S. Mackiewicz, J. Pazdur, L. Szczepanski, J. Szczukowski; South Africa: I. Anderson, D. Gotlieb, A. Jacovides, A. Lubbe, G. Mody, M. Tikly; United States: Alabama: G. Divittorio, S. Falahi, D. McLaine, W. Shergy, M.S. Touger, G. Williams; Arizona: B. Harris, P. Howard, D. Michel, L. Taber, J. Tesser, M. Maricle; California: E. Boling, M. Brandon, G. Dalan, R. Dore, M. Greenwald, D. Hassel-wood, M. Keller, K. Kolba, G. Multz, R. Reid, D. Stratton, C. Weidmann, S. Weiner, J. Higashida; Colorado: S. Kassan, R. Lapidus, D. Scott, J. Thompson, C. Van Keuren; Connecticut: E. Feinglass, J. Green, R. Schoen; Florida: M. Belian, C. Chappel, J. Forson, P. Freeman, N. Gaylis, B. Germain, M. Gutierrez, M. Hoist, T. Johnson, M. Kaufman, R. Levin, M. Lowenstein, A. Marcadis, M. Metz, S. Matthew, M. Mellwain, J. Miller, M. Nunez, E. Offenberg, J. Popp, A. Reddy, W. Riskin, A. Rosen, Y. Sherrer, K. Stark, A. Torres; Georgia: J. Lieberman; Iowa: M. Brooks; Idaho: E. Dega, C. Scoville, C. Weetenhaver; Illinois: E. Dore, J. Fenton, M. Pick, B. Tharp, J. Zurga, M. Ellman, G. Liang; Indiana: C. Anexter, R. Khairi, M. Stark, R. Fife; Kansas: N. Becker, P. Ginder, R. Liss; Louisiana: W. Evensmeyer, P. Federak, S. Strelow; Maine: L. Anderson, S. Block; Maryland: S. Marcus, D. McGinnis, H. Wei, T. Zizic, H. Hochberg; Massachusetts: C. Birbara, A. Dahdul, S. Helfgott, J. Hoey, S. Miller, R. Rapoport; Michigan: H. Coleman, R. Rnachmann, H. Uhl, J. Tabors; Missouri: T. Weiss; Montana: S. English; Nebraska: W. Palmer, A. Weaver; Nevada: S. Miller; New Hampshire: B. Samuels, J. Trice; New Jersey: S. Golombek, H. Hassman, R. Hymowitz, C. Knee, D. Macpeck, A. Marcus, G. Ribarro, J. Ruhlf, D. Worth; New Mexico: K. Breederva; New York: P. Chatpar, M. Farber, A. Kaell, A. Porges, P. Riccardi, C. Kitchin; North Carolina: G. Arnold, W. Chmielewski, G. Collins, W. Halperin, R. Harrell, T. Littlejohn, G. Schimizzi, H. Sertter, A. Kashif; Ohio: T. Isakov, B. Long, D. Mandel, B. Rothschild, D. Schumacher, R. Sievers, S. Wolfe, K. Hackshaw, M. Hooper, R. Rothenberg; Oklahoma: C. Codding, R. Hymes, J. McKay, J. Jacobs; Pennsylvania: R. Kancltheim, A. Kiviz, W. Mazanawski, G. McLaughlin, J. McMillen, R. Rense, J. Weisberg; Rhode Island: J. Senno; South Carolina: E. Barton, M. Ilrahzam, K. Flint; Tennessee: J. Arkin, S. Gupta, R. Krause, H. Mader, T. Namey, L. Robinson, P. Wheeler, B. Tanner; Texas: A. Brodsky, E. Burch, W. Chase, A. Chubick, D. Halter, J. Rutstein; Utah: J. Ward; Virginia: C. Fisher, A. Goldstein; Washington: W. Eider, R. Eutinger, R. Levy; Wisconsin: M. Pearson, G. Fiocco.

## REFERENCES

1. Misoprostol for co-prescription with NSAIDs. Drug Ther Bull 1990; 28:25-6.

MRK-ABA0003306