# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL DOCKET No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L - DIVISION 3 |
| | * | |
| This document relates to | * | JUDGE FALLON |
| CASE NO. 2:05CV2524 | * | |
| | * | |
| ANTHONY WAYNE DEDRICK, | * | MAG. JUDGE KNOWLES |
| an Individual, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |

---

## PLAINTIFF'S OPPOSITION TO MERCK'S MOTION TO EXCLUDE THE OPINION TESTIMONY OF DONNA K. ARNETT, PH.D., M.S.P.H.

---

Plaintiff Anthony Dedrick hereby opposes Merck's Motion to Exclude the Opinion Testimony of Donna K. Arnett, Ph.D., M.S.P.H.  As outlined below, Dr. Donna K. Arnett is qualified to proffer each of the opinions challenged in Merck's motion.

## I.     STATEMENT OF THE FACTS

This action for personal injuries arises from Plaintiff Anthony Dedrick's use of Vioxx, which caused a heart attack on January 8, 2003, and resulting damage to his heart, necessitating coronary artery bypass surgery five days later.  Mr. Dedrick was approximately 47 years old when he was prescribed Vioxx by his physician in July 2002, and he had been taking the drug for approximately 6 months at the time of his heart attack.

Plaintiff contends that his heart attack was caused by a clot in one of his coronary arteries which resulted from a plaque rupture as well as the acceleration of atherogenesis due to Vioxx use. Dr. Esmeraldo Herrera, Mr. Dedrick's treating physician, testified that had Merck disclosed the known risks of Vioxx he would not have prescribed Vioxx to Mr. Dedrick. However, because Dr. Herrera was unaware of the risks of Vioxx, and Merck failed to disclose and warn what it knew regarding the dangers of Vioxx, Mr. Dedrick continued to take the drug even after his heart attack, until June 2003.

As a result of the heart attack and 4-way bypass surgery at the early age of 47, Mr. Dedrick suffers from permanent damage to his heart, which has reduced his life expectancy. In addition, he is now at a much greater risk of suffering another heart attack, and the bypass surgery has placed him at a greater risk for heart failure.

## II.   DR. ARNETT'S QUALIFICATIONS AND SUMMARY OF HER OPINIONS

### A.   Summary of Dr. Arnett's Qualifications

Dr. Donna K. Arnett is currently the chair and professor of epidemiology within the Department of Epidemiology, School of Public Health at the University of Alabama at Birmingham. She has served in this position since 2004. Dr. Arnett received her masters in Public Health and Epidemiology from the College of Public Health at the University of South Florida in 1987. She received her Ph.D. in epidemiology from the School of Public Health at the University of North Carolina in 1991. She thereafter served as the American Heart Association Post Doctoral Fellow within the Department of Epidemiology at the University of North Carolina. Later, she served as an Assistant Professor of Epidemiology at the University of Minnesota and was ultimately awarded the Mayo Professor of Epidemiology Position within the Division of Epidemiology at the University of Minnesota School of Public Health in 2003.

Dr. Arnett received the Award of Meritorious Achievement from the American Heart Association in 2004. She was also a finalist for the Roger Williams Award from the American Heart

Association Counsel on Epidemiology and Prevention in March of 2001. Dr. Arnett has served on the Senior Scientific Advisory Committee for the American Heart Association. This Scientific Oversight Committee for the American Heart Association deals with all matters of science relative to the American Heart Association. Dr. Arnett also reviews grant applications which are submitted to the National Institute of Health, and has served as a consultant expert for the National Heart Lung and Blood Institute in reference to coronary artery disease. She is also a member of the National Institutes of Health study called MESA which reviews the multi-ethnic nature of sub-clinical atherosclerosis. Dr. Arnett currently serves as a member of the data safety monitoring board for the National Institutes of Health AIM High study.

Dr. Arnett has authored or co-authored over 164 scientific publications. Moreover, she has given presentations and/or written abstracts dealing with various scientific topics on over 117 different occasions. Dr. Arnett has served as either the principal investigator or co-investigator in numerous studies funded by grants from the National Institutes of Health and/or the National Heart Lung and Blood Institute. A copy of Dr. Arnett's Curriculum Vitae is attached as Exhibit "A" to this memorandum.

It should be clarified that Dr. Arnett has broad expertise in cardiovascular system pathophysicology as well as epidemiology. A majority of the studies conducted by Dr. Arnett, the peer reviewed articles written by Dr. Arnett and/or presentations and abstracts presented by Dr. Arnett deal with cardiovascular related issues. Dr. Arnett's doctoral dissertation involved research in this very area of expertise.

Dr. Arnett's exceptional qualifications, training and experience clearly qualify her to testify as an epidemiologist on the matters for which the Plaintiff has proffered her. Moreover, Dr. Arnett has spent over 100 hours of preparation and study in reference to Vioxx specific issues. (Depo of Dr. Arnett at 63

(9/06/06)) Dr. Arnett testified in her second deposition that she has invested an additional 37 hours. (Depo of Dr. Arnett at 236 (10/20/06))[1]

Finally, it should be noted that Merck has consulted with Dr. Arnett in reference to Vioxx and Cox-2 related issues. Depo. of Dr. Arnett at 95 (9/06/06).) Clearly, Merck considered Dr. Arnett an expert in Vioxx and Cox-2 inhibitors if it consulted her as an "expert" in this arena.

**B.     Summary of Dr. Arnett's Opinions[2]**

Merck has challenged Dr. Arnett's proffered testimony in this case by arguing that the multitude of Vioxx clinical data does not support Dr. Arnett's general causation opinions-and that Dr. Arnett is not qualified to testify that "Merck failed to adequately warn of Vioxx's alleged cardiovascular risk." Memorandum in Support of Motion of Merck & Co., Inc. for Order Excluding Testimony of Donna K. Arnett, Ph.D., M.S.P.H., at 3 and 7 (hereinafter referred to as "Merck Memorandum").  Merck's various challenges to Dr. Arnett's ability to offer general causation opinions are due to be denied as a matter of law.

Dr. Arnett clearly defined her three major opinions in her September 2006 deposition as follows:

> I have three opinions. The first is that Vioxx is cardiotoxic. The second opinion is that the risk appeared early and is continuous. And the third is that after the results of VIGOR were released it was reasonable to warn future patients about the risk associated with Vioxx from a cardiovascular perspective.

(Dep. of Donna Arnett, Ph.D. at 64 (9/06/06).)

Dr. Arnett has articulated and developed these opinions based upon her education, training, research, experience and review of the peer-reviewed medical literature. Indeed, Dr. Arnett clearly stated in her September 2006 deposition: "I'm relying primarily on the published literature, the meta-

---

[1] Dr. Arnett has been deposed twice in the Vioxx litigation – September 6, 2006 in the Albright v. Merck case and on October 20,2006 in the Dedrick v. Merck case. These depositions are attached hereto as Exhibits "C" and "D", respectfully.
[2] Dr. Arnett submitted an Expert Witness Report in this matter on September 18, 2006. That report is attached hereto as Exhibit "B"

analyses by Merck, the studies conducted by Merck and the FDA documents" (Depo of Dr. Arnett at 38 (9/06/06).)

## ARGUMENT

### A.      Legal Standard

The *Daubert* trilogy cases, *Daubert v. Merrell Dow Pharmaceuticals, 113 S. Ct. 2786 (1993)*, *General Electric Co. v. Joiner*, 118 S. Ct. 512, 517-519 (1997), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), have made the district judge the "gatekeeper who must pass on the reliability and relevance of proffered evidence pursuant to Federal Rule of Evidence 702."[3]   Rule 702 takes into account the trilogy and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experiences, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.  The Rule "not only requires that the testimony be relevant, but also that it be based on sufficient facts or data, that it be the product of reliable principles and methods, and that the witness applied those principles and methods reliably to the facts of the case."[4]

Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known. *Daubert,* 113 S. Ct. at 2786.  In *Daubert,* the Supreme Court set forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony. *Id.*  These factors are: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general

---

[3] MANUAL FOR COMPLEX LITIGATION § 472 (4th ed. 2004).
[4] MANUAL FOR COMPLEX LITIGATION § 484 (4th ed. 2004).

acceptance of the methodology in the scientific community. *Id.* Whether some or all these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony. *Kumho Tire,* 526 U.S. at 138.

In addition to the five factors laid out in *Daubert,* a trial court may consider additional factors in assessing the scientific reliability of expert testimony. *Black v. Food Lion, Inc.,* 171 F.3d 308, 312 (5th Cir. 1999). Some of these factors may include: (1) whether the expert's opinion is based on incomplete or inaccurate dosage or duration data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5) whether the expert proposes to testify about matters growing directly out of research he or she has conducted independent of the litigation. *See, e.g., id.* at 313; *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 278-79 (5th Cir. 1998); *Christophersen v. Allied-Signal Corp.,* 939 F.2d 1106, 1114 (5th Cir. 1991); *Newton v. Roche Labs., Inc.,* 243 F.Supp.2d 672, 678 (W.D. Tex. 2002). Scientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case. *Daubert,* 113 S. Ct. at 2786. Scientific evidence is irrelevant, however, when there is too great an analytical gap between the data and the opinion proffered. *Joiner,* 522 U.S. at 146.

## B.      DR. ARNETT IS QUALIFIED TO OFFER GENERAL CAUSATION OPINIONS

### 1.      Merck's argument that "the Vioxx clinical data does not support Dr. Arnett's general causation opinion" is false and misleading.

In its motion, Merck outlines the various clinical studies upon which Dr. Arnett bases her opinions (i.e., ADVANTAGE, Protocol 090, Protocol 010, Protocol 017, Protocol 023, VIGOR, VICTOR, APPROVe and the Shapiro Meta-Analysis), implicitly suggesting that none of these Merck-

sponsored trials indicated an increased cardiovascular risk with Vioxx. See Merck's Memorandum, at 3. As this Court is well aware, there is a multitude of epidemiological evidence and evidence from clinical trials, clearly proving that Vioxx increases the risk of adverse cardiovascular events for patients taking the drug.

Specifically, the ADVANTAGE trial showed an increased risk for patients taking 25mg of Vioxx for less than 12 weeks. Concomitant aspirin usage was also allowed in this study.  Protocol 090 showed an increased risk for users of 12.5 mg of Vioxx in a mere six week period. The VIGOR study showed a statistically significant increased risk for users of 50 mg of Vioxx with a mean exposure period of 8 months. The VICTOR study (a study which Merck has steadfastly refused to publish) shows a statistically increased risk with the usage of 25 mg's of Vioxx with a near immediate onset of hazard. *See*, Exhibit "E".  The APPROVe trial showed a statistically significant increased risk with the usage of Vioxx.  The fallacious 18-month defense theory has been discredited and, indeed, corrected by the authors of the New England Journal of Medicine.

The Shapiro Meta-Analysis is an internal Merck meta-analysis that shows a significantly increased risk of for myocardial infarction for Vioxx users. Protocols 010 and 017 showed a significantly increased level of hypertension and early discontinuations in the trials for hypertension related issues for Vioxx users.  Protocol 023[5] (a study conducted in 1997 before Vioxx was placed on the market by Merck) was substantial proof of a Cox-2 inhibitor's ability to decrease prostacylcin levels within a user's body without a concomitant decrease in thromboxane levels.

In an attempt to avoid the clear implications of the cardiovascular risk associated with its own studies, Merck alleges that Dr. Arnett cannot testify that "Vioxx is capable of causing a heart attack if given at 25 mg for 6 months…." See Merck Memorandum at 3.   This argument is patently false as is proven by the VICTOR and APPROVe trials. See Exs."E" and "F." Merck's argument is also misleading in that other studies noted above clearly evidenced a cardiovascular hazard, yet when Merck

designed them it choose to both under-power the studies for cardiovascular risks and to make them of insufficient duration to reach statistical significance.  Merck's own conduct in this area should not be a basis for exclusion.

Despite Merck's repeated attempts to focus on "statistical significance," Dr. Arnett stated: "As epidemiologist we were trained to pursue causation in a much broader scope than statistically significant." (Depo of Dr. Arnett at 39 (10/20/06).) And Dr. Arnett stated: "With the safety issue numerical risk is incredibly important." (*Id* at 44.)  Dr. Arnett also confirmed that consistency of the data among the studies is critically important. (*Id.* at 58, 141.)  More to the point, she testified: "When safety is an issue --  again, safety is about signals. And we see signals consistently. It's not about statistical significance." (Depo of Dr. Arnett at 145-46 (10/20/06).)

Merck also alleges that Dr. Arnett's general causation opinions must be excluded because Dr. Arnett "admits that the biological mechanisms she believes underlie Vioxx's cardiotoxic effects-increased blood pressure and the FitzGerald hypothesis- are not sufficiently certain to support a causal connection between Vioxx and cardiovascular events." See Merck Memorandum at 4. This contention by Merck is a mischaracterization of Dr. Arnett's testimony. Dr. Arnett did express her opinions about the importance of Vioxx's effects on blood pressure and the significance of the FitzGerald hypothesis, but she did not testify that these factors are the sole causative elements supporting the elevated risks of cardiovascular events. (Depo of Dr. Arnett at 80-88 (10/0/06).) Dr. Arnett stated that there was a much higher dropout rate for Vioxx patients in the clinical trials and, as she opined, elevated blood pressure is a known contributor to cardiovascular disease.[6] (Id at 115-16.)  Indeed, Dr. Arnett noted that Vioxx had other known mechanisms of action, including thrombus formation, promotion of atherosclerosis, and plaque rupture. (Id. at 182-93.)

---

[5] See Depo of Dr. Arnett at 76-80, 105-06 (October 20, 2006).
[6] Ironically, Merck is not conceding that blood pressure did not play a role in Mr. Dedrick's heart attack. It contends blood pressure is a risk factor, but is critical of Dr. Arnett's opinions relative to Vioxx's known effects on blood pressure.

In her deposition, Dr. Arnett outlined the evidence that supports her opinions regarding the increased cardiovascular risks associated with Vioxx:

A:    Actually, it's the totality of data at the point when VIGOR became- the results became known that I'm drawing my opinion about the timing. So it's not simply the VIGOR and ADVANTAGE studies alone. It's the compelling evidence of the cardiovascular risk associated with the drug from its inception.

Q:    And what – what are you putting on your list of the compelling evidence?

A:    So I would start with the 010 and 017 studies and OA and RA that showed dramatic increases in blood pressure. I would include the 023 study which confirmed the mechanism of action that reduced prostacylin with Vioxx, which tended to tip in the balance towards prothrombotic states. I would offer the patent applications of Dr. Scolnick to create a combined product in the rational for that combination product being increased cardiovascular risk associated with unopposed Cox-2 inhibition.

(Depo of Dr. Arnett at 103-04 (9/06/06).)   Dr. Arnett went on to state that: "What I would say is that in the totality of the evidence up to that point when they have the confirmation of the biological mechanism that should have been a red flag." *Id.* at 189. (*See also* depo of Dr. Arnett at 142-45 (10/20/06).)

Though Dr. Arnett is not a pharmacologist, she does intend to testify regarding Merck's internal trials which substantiated the biologically plausible mechanisms of action described above.  In addition, Dr. Arnett intends to offer testimony that Merck's clinical trials generated numerous "red flags" concerning cardiovascular safety of Vioxx prior to the drug being placed on the market and while the drug was being marketed to millions in the United States and abroad. (Depo. of Dr. Arnett at 154-57 (10/26/06).)

### 2.    The majority of Merck's internal studies were underpowered to detect cardiovascular hazards

In its discussion concerning statistical significance, Merck omits any reference to the integral concept of power.[7]  A study that is underpowered has a reduced "chance" of discovering a particular

---

[7] The fact that Merck's clinical studies were not adequately powered to detect cardiovascular risks cannot seriously be contested. The FDA itself rejected many of Merck's contentions about the safety of Vioxx because of the inadequacy of power. (Depo. of Dr. Arnett at 182, 197 (10/20/06).)

endpoint.   Dr. Arnett has actually reviewed, analyzed and calculated the probability (or chance) that

individual Merck studies would detect existent cardiovascular hazards.

Dr. Arnett was specifically questioned about this issue in her depositions and provided detailed

answers and explanations of her findings.  For example:

Q:    Okay. Tell me what opinions you intend to offer regarding the design of any studies by
      Merck?

A:    I will offer the opinion today that the studies, particularly the studies in osteoarthritis and
      Alzheimer's disease, were underpowered to detect cardiovascular types of CD.

(Depo of Dr. Arnett at 117 (9/06/06).)

A:    I have evaluated the Konstam article which is related to the 069 article which combines
      all the OA studies together. And there to find the aggregate outcome which combines all
      of your outcomes together, you had a less than 5 percent chance of finding the correct
      answer about Vioxx being causal in terms of cardiovascular disease

(*Id.* at p. 143.)

A:    …..In aggregate, with the aggregate outcome, I did a sensitivity analysis to evaluate my
      power three different ways using three different programs. And in one program it won't
      even run because the power is too low to even calculate.

(*Id.* at p. 144.)

Dr. Arnett explained in her September 2006 deposition how Merck's underpowered "studies,"

which did not reach statistical significance, are not dispositive of the cardiovascular issue:

A:    As an epidemiologist, as I've said, I evaluate a number of factors. Statistical significance
      is one of five things that are relevant. So while there was – I agree that there was no
      statistically significant finding. Finding the power to detect such a finding was less than
      one in 20 or 5 percent.

                          *          *          *

A:    I will say that there was no statistical significant finding versus placebo, but you had a
      one in 20 shot in really finding the truth.

Q:    And that was based on the power calculation you did?

A:    Yes.

(*Id.* at 182-183.)

Likewise, her October 2006 deposition, Dr. Arnett confirmed: "...I have done power calculations to show [the strokes] were not designed to find a statistically significant effect. And statistical significance is counter balanced with power. If you're not powered to find it, then, no, your not going to find it." (Depo of Dr. Arnett at 37 (10/20/06).)  She also discussed extensively in her second deposition the manner in which she performed her power calculations. (*Id.* at 46 et seq.)

Dr. Arnett clearly states in her deposition that: 1) statistical significance is only one of many factors epidemiologists evaluate in analyzing a particular clinical trial; and 2) that Merck's placebo controlled studies prior to APPROVe had only a 1 in 20 "shot in really finding the truth." (Depo of Dr. Arnett at 183 (9/06/06).) Accordingly, Merck's argument that Dr. Arnett's testimony should be excluded premised upon the assertion that a portion of the studies (i.e., Merck-designed studies) upon which Dr. Arnett bases her opinions did not reach statistical significances is unfunded.

> ### 3.    Dr. Arnett's opinion that Merck's published clinical literature failed to adequately delineate or warn of the true hazard associated with Vioxx is both reliable and admissible

Merck's final challenge to Dr. Arnett implies to this Court that Dr. Arnett has proffered opinions relating to the warnings, or lack thereof, of cardiovascular risks in the Vioxx label. Dr. Arnett clearly states in her deposition that none of her opinions are based upon the "appropriateness of any particular warning that was included or not included in the package label......" (Depo of Dr. Arnett at 101 (9/06/06).)  Dr. Arnett made it clear that she did not intend to address the adequacy of the label. (Depo of Dr. Arnett at 101 (10/20/06).)

Rather, Dr. Arnett intends to testify regarding the lack of appropriate delineation or warning of the risk associated with Vioxx from a cardiovascular perspective in the published Merck clinical trial data, especially the VIGOR publication. Dr. Arnett clearly stated the scope of her opinion in her deposition:

> A:    As a scientist, I will argue that in the scientific literature, there should have been a clearer description of the finding and articulated in the medical literature.

11

*     *     *

A:      ….the publications could have been explicit about the cardiovascular – excess cardiovascular risk of Vioxx, and they were not.

*     *     *

A:      I'm specifically referring to the VIGOR publication by Bombardier published in November of 2000. Actually, the results were out much earlier before the publication.[8]

(*Id.* at 101- 02.)

More specifically, Dr. Arnett expresses the opinion that the statistically significant five-fold increase in myocardial infarction was not clearly enunciated within the Bombardier publication:

A:      In looking at the totality of the information we have evidence that there is a biologic concern with this drug. We have numerous studies showing elevated hypertension rates. We have Scolnick going out and making new patent applications at the same time this goes on because they're concerned about the cardiovascular risk. And then you see five-fold more and you bury it in a general safety table, not even a table, a paragraph.

*     *     *

A:      In the totality of evidence preceding VIGOR, there was all of these other avenues of causation that we discussed that were showing red flags.

*     *     *

A:      I was shocked when I read it that they buried it in text and had no table.

(*Id.* at 241, 239 & 253.)

Dr. Arnett is critical of Merck not only for failing to adequately and timely disclose the true cardiovascular hazards associated with Vioxx in the published scientific literature, but also for implicitly and explicitly indicating within the scientific literature that an alleged anti-platelet effect from Naproxen explained the Vioxx cardiovascular safety signal. For example, Dr. Arnett states:

A:      I will testify that at the time of VIGOR there were no clinical trials of Naprosyn versus placebo, but there were substantial numbers of observational studies that had evaluated – that have subsequently evaluated the effect of Naprosyn. But Naprosyn had been

---

[8]Dr. Arnett is also critical of Merck for failing to expeditiously publish internal clinical trials that evidenced a cardiovascular hazard with Vioxx. In addition to the VIGOR and 090 publications she notes that: "There are publications that did not come out that could have been published sooner relative to the ADVANTAGE study." (*Id.* at 102.)

evaluated – has been on the market for years, and no one has used it as a cardiovascular protective drug.

\*      \*      \*

A:    So the evidence from VIGOR would indicate that the excess cardiovascular risk for Vioxx relative to Naprosyn was associated with a five-fold increase of myocardial infarction.

\*      \*      \*

A:    The conclusions – well, first of all, there could have been a table in the paper itself devoted to cardiovascular disease, and there wasn't. And, secondly, they could have – instead of couching it as cardioprotective effect of Naprosyn – could have and should have labeled it as a cardiotoxic effect of Vioxx.

Q:    And how would you have know that it was a cardiotoxic effect of Vioxx?

A:    From the totality of data that have come heretofore.

(*Id.* at 163-164 & 191.)

Dr. Arnett further notes that her opinions are consistent with criticisms and concerns expressed by the FDA and, more specifically, the medical review officer who was responsible for examining the Merck trials. For example, Dr. Arnett stated in her deposition:

Q:    And what opinions with regard to Villalba's memos do you intend to give?[9]

A:    That the FDA expressed concerns that the studies – first, that there needed to be additional research done to define those risks with placebo – controlled studies; that the Naprosyn hypothesis was not a salient explanation for the VIGOR finding; and that there was inadequate power to detect cardiovascular effect in the Alzheimer's disease and the OA studies.

\*      \*      \*

A:    On page 104 of the Villalba medical review of the NDA application –

Q:    Uh-huh

A:    -- she cites that there is theoretical concern that we've already discussed, in terms of biological plausibility. She states evaluation of CV thromboembolic events regardless of seriousness shows a numerically higher incident of ischemic and thrombotic events in patients taking Vioxx.

(*Id.* at 118-119 & 257; *see also* depo of Dr. Arnett at 128 et seq[10] (10/20/06).)

---

[9] Dr. Villalba is the FDA Medical Review Officer assigned to Vioxx.

In sum, Dr. Arnett will opine that Merck failed to properly delineate the true cardiovascular hazard associated with Vioxx in its published scientific literature and, despite FDA criticism, attributed the increased cardiovascular events seen in Vioxx users to the unproven and completely untested Naproxen hypothesis. Dr. Arnett's opinions are scientifically reliable and should be admitted in this case.

### 4.      The hazard associated with Vioxx manifests itself early and is consistent over time

Though it does not appear that Merck is challenging this aspect of Dr. Arnett's opinions, Plaintiff outlines for the Court's information and understanding Dr. Arnett's proffered testimony that she intends to offer opinion testimony that the cardiovascular risk associated with Vioxx "appears early and is continuous." (Depo of Dr. Arnett at 64 (9/06/06).).  Dr. Arnett outlined a scientifically reliable basis for this opinion in her deposition:

> Q:     You told me one of your opinions is going to be that the risk of Vioxx is early and continuous. Tell me what the basis is for that.

> A:     That is from the variety of studies that I reviewed and also most importantly the Shapiro meta-analysis where we look at the K-M plots for particularly myocardial infarction, you see the risk separates early and is continuous.

*      *      *

> Q:     Anything else besides that K-M plot that you're using to support your conclusion that the effects of Vioxx are –

> A:     Cardiotoxic?

> Q:     --early and continuous?

> A:     The clinical trials, the major clinical trials, that I'm relying  on which include VIGOR and APPROVe show very early discontinuations due to hypertension, elevated blood pressure, and edema. And those are cardio renal consequences of Vioxx.

---

[10] Dr. Arnett also relied upon the Targum FDA memorandum from February 2001, which, among other things, found no reliable scientific support for the Naproxen hypothesis. (Depo of Dr. Arnett at 133 *et seq*, 170 *et seq*, 242 *et seq* (10/20/06).)

14

*(Id.* at 213 & 219.)

Dr. Arnett has reviewed the clinical literature, the Kaplan-Meir curves (i.e., K-M curves) associated with the onset on cardiovascular adverse events in the clinical trials, and the discontinuation rates associated with cardiorenal toxicity associated with these trials. Based upon this scientifically reliable information, she has developed the opinion that the cardiovascular hazard caused by Vioxx is "early and continuous." Accordingly, her opinions in reference to this matter should be admitted.

## CONCLUSION

Based upon the above referenced law and facts, Plaintiff urges the Court to **deny** Merck's motion to exclude the testimony of Dr. Arnett in its entirety and allow Dr. Arnett to testify at trial to the opinions outlined in her report and depositions.

Respectfully submitted this _2ⁿᵈ_ day of November, 2006.

ANDY BIRCHFIELD
P. LEIGH O'DELL
Attorney for Plaintiff
***BEASLEY, ALLEN, CROW,***
***METHVIN, PORTIS & MILES, P.C.***
234 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103
(334) 269-2343 telephone
(334) 954-7555 facsimile

**PLAINTIFFS' LIAISON COUNSEL**

**Russ M. Herman** (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
**PLAINTIFFS' LIAISON COUNSEL**

**Christopher A. Seeger**, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
& WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Plaintiff's Opposition to Merck's Motion to Exclude the Opinion Testimony of Donna K. Arnett, Ph.D., M.S.P.H. has been served on Defendants' Liaison Counsel, Phillip A. Wittman, Merck's Counsel, Douglas R. Marvin and Philip S. Beck, and Plaintiffs' Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this _7th_ day of November, 2006.

Andy D. Birchfield
Attorney for Plaintiff
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.

# EXHIBIT  A

# CURRICULUM VITAE

## Donna K. Arnett, Ph.D., M.S.P.H.

*Current Work Address*
University of Alabama at Birmingham
Department of Epidemiology
1665 University Blvd. Room 220E
Birmingham, AL 35294-0022

*Work Telephone*   205.934.7066
*Fax*   205.934.8665
*Email*   arnett@uab.edu

## *Formal Education*

1981   B.S.   College of Nursing, University of South Florida, Tampa, FL.
1987   M.S.P.H.   Epidemiology, College of Public Health, University of South Florida, Tampa, FL.
1991   Ph.D.   Epidemiology, School of Public Health, University of North Carolina, School of Public Health, Chapel Hill, NC.

## *Professional Experience*

1992 - 1994   American Heart Association Postdoctoral Fellow
Department of Epidemiology
School of Public Health
University of North Carolina

1994 - 1998   Assistant Professor of Epidemiology
Division of Epidemiology
School of Public Health
University of Minnesota

1998 - 2003   Associate Professor of Epidemiology
Division of Epidemiology
School of Public Health
University of Minnesota

2003 – 2004   Mayo Professor of Epidemiology
Division of Epidemiology
School of Public Health
University of Minnesota



EXHIBIT
A
tabbies
9/18/2006

| 2004 – Present | Chair and Professor of Epidemiology |
| | Department of Epidemiology |
| | School of Public Health |
| | University of Alabama at Birmingham |

## Societies and Organizations

| 1990 - Present | Fellow, American Heart Association, Council on Epidemiology and Prevention |
| 1992 - Present | Society for Epidemiologic Research |
| 1992 - Present | American Public Health Association |
| 1996 - Present | Minnesota Public Health Association |
| 1996 - Present | The American Society of Human Genetics |
| 1998 - Present | International Genetic Epidemiology Society |
| 2002 - Present | American Society of Hypertension |
| 2004 – Present | Senior Scientist, UAB Comprehensive Cancer Center |
| 2004 – Present | Senior Scientist, UAB Clinical Nutrition Research Center |
| 2005 – Present | Internal Advisor, UAB Center for AIDS Research |

## Awards and Honors

| 1981 | Graduated magna cum laude |
| 1987 | Outstanding Student Faculty Scholarship, College of Public Health, Department of Epidemiology, University of South Florida |
| 1988 - 1991 | U.S. Public Health Service Traineeship Award, University of North Carolina, Chapel Hill |
| 1989 | Alumni Student Faculty Award for Outstanding Service, School of Public Health, University of North Carolina |
| 1990 | Biomedical Research Service Award, University of North Carolina |
| 1992 | Delta Omega, Honor Society for Public Health, Theta Chapter |
| 2000 | Finalist, Roger Williams Award, American Heart Association, Council on Epidemiology and Prevention, March, 2001 |
| 2004 | Award of Meritorious Achievement of the American Heart Association |

## Grant and Contract Support

| Title: | GenHAT - Genetics of Antihypertensive Treatments |
| Funding source/type: | NIH/NHLBI 5 R01 HL63082 $5,263,486 |
| Summary: | Ancillary to the Antihypertension and Lipid Lowering Treatment to Prevent Heart Attack Trial (ALLHAT), we are investigating whether common polymorphisms of several hypertension candidate genes modify the effect of antihypertensives on long-term outcomes, including mortality, coronary heart disease and stroke. |
| Period: | 8/1/99-7/31/05 |
| Role: | Principal Investigator |

| | |
|---|---|
| Title: | HyperGEN: Genetics of Left Ventricular Hypertrophy |
| Funding source/type: | NIH/NHLBI 2 R01 HL55673, $3,303,849 |
| Summary: | This 5 year project is recruiting family members with left ventricular hypertrophy and/or hypertension. Genetic analysis will be conducted to identify genomic regions contributing to variation in cardiac size and structure. |
| Period: | 8/1/00-7/31/05 |
| Role: | Principal Investigator |

| | |
|---|---|
| Title: | NHLBI Family Blood Pressure Program-HyperGEN |
| Funding source/type: | NIH/NHLBI 2 U01 HL54496, $3,558,679 |
| Summary: | This project addresses the genetics of two major complications of hypertension (hypertensive heart disease and hypertension-associated kidney disease). It is a continuation of the first cycle of the NHLBI-FBPP. |
| Period: | 9/16/00-6/30/05 |
| Role: | Co-Investigator |

| | |
|---|---|
| Title: | FHS SCAN |
| Funding source/type: | NIH/NHLBI, 1 U01 HL67901, $1,171,497 |
| Summary: | As an extension of the NHLBI Family Heart Study, we will re-recruit participants and characterize coronary calcification and inflammatory markers. The goal is to identify genomic regions contributing to inter-individual variation in these traits. |
| Period: | 7/1/01-6/30/05 |
| Role: | Co-Investigator |

| | |
|---|---|
| Title: | Genetic and Environmental Determinants of Triglycerides |
| Funding source/type: | NIH/NHLBI, U 01 HL72524, $10,147,893 |
| Summary: | This study is characterizing the genetic basis of the variable response of triglycerides (TGs) to two environmental contexts, one that raises TGs (dietary fat), and one that lowers TGs (fenofibrate treatment). |
| Period: | 9/30/02–8/31/06 |
| Role: | Principal Investigator |

| | |
|---|---|
| Title: | Genes and Environmental Determinants of Triglycerides Administrative Supplement |
| Funding source/type: | NIH/NHLBI, 3 U01 HL72524-0181, $1,000,000 |
| Summary: | The University of Minnesota serves as the Program Administrative Center for the 5 networks participating in the Gene-Environment Collaborative Studies. |
| Period: | 9/30/02-8/31/06 |
| Role: | Principal Investigator |

| | |
|---|---|
| Title: | MESA Family Study |
| Funding source/type: | NIH/NHLBI, 1 R01 HL071251-01A1, $723,209 |
| Summary: | The goal of this study is to determine the extent of genetic contribution to variation in coronary calcium (EBCT and CT scan) and carotid artery wall thickness (B-mode ultrasound) in non-majority populations. |
| Period: | 8/1/03-6/30/08 |
| Role: | Co-Principal Investigator |

### Submitted Grants

| | |
|---|---|
| Status: | Resubmitted |
| Title: | Identifying Susceptibility Genes for Metabolic Syndrome |
| Funding source/type: | NIH/NIDDK, $1,651,855 |
| Summary: | The overall goal of this 3-year project is to characterize a 19.5 Mb region on chromosome 2q35-2q37 using linkage disequilibrium (LD) mapping to identify genes influencing susceptibility to the MS. |
| Period: | 4/1/05-3/31/08 |
| Role: | Co-Investigator |
| Status: | To be resubmitted November, 2005 |

| | |
|---|---|
| Title: | Pharmacogenomics of HAART – Induced Lipoatrophy in HIV Patients |
| Funding source/type: | NIH/HHS/PHS, $5,186,437.00 |
| Summary: | We will use a whole-genome association study to identify loci that predict lipoatrophy among HIV+ patients undergoing highly active antiretroviral therapy (HAART) |
| Period: | 07/01/05-06/30/10 |
| Role: | PI |
| Status: | To be resubmitted September 2005 |

| | |
|---|---|
| Title: | Delta States Center for Genomics and Public Health: A Four-State Partnership |
| Funding source/type: | CDC/HHS/PHS, $500,000.00 |
| Summary: | Established to develop a strong regional educational and technical assistance program network directed to state and local health departments, K-12 school systems, and the general public. |
| Period: | 09/01/04-08/31/08 |
| Role: | PI |
| Status: | Not funded; Agency withdrew program |

### Former Grants

Completed Research

| | |
|---|---|
| Title: | Colliding Categories:  Haplotypes, Race & Ethnicity |
| Funding source/type: | NIH |

| | |
|---|---|
| Summary: | The aim of this project is to explore the ethical and legal ramifications of the impending collision between biological and regulatory classifications of population subgroups in American society. |
| Period: | 7/1/04-6/30/06 |
| Role: | Consultant |

| | |
|---|---|
| Title: | FHS: Molecular Genetics and Genetic Epidemiology MN |
| Funding source/type: | NIH/NHLBI, 2 R01 HL56567, $182,025 |
| Summary: | This extends the genome-wide analysis for NHLBI FHS conducted during the initial funding period. |
| Period: | 10/23/01-8/31/04 |
| Role: | Principal Investigator |

| | |
|---|---|
| Title: | Training Grant in CVD Genetic Epidemiology |
| Funding source/type: | NIH/NHLBI, 1 T32 HI07972, $694,879 |
| Summary: | This proposal funded 3 pre-doctoral and 1 post-doctoral trainees in CVD genetic epidemiology at the University of Minnesota |
| Period: | 7/16/01-7/15/06 |
| Role: | Principal Investigator |

| | |
|---|---|
| Title: | Community Surveillance of Cardiovascular Disease -- Risk Factor Survey (MHS) |
| Funding source/type: | NIH/NHLBI 5 R01 HL23727, $4,576,444 |
| Summary: | A survey of 5,000 adults, ages 25-74 years, and children ages 8-17 years will be conducted using methodology identical to prior MHS surveys done in 1980-82, 1985-87, 1990-92, and 1995-97. |
| Period: | 3/01/00-2/28/04 |
| Role: | Principal Investigator |

## *Bibliography*

*Peer-reviewed senior & co-authored articles (formerly published under Koehn)*

1. Koehn DK, Glasser SP. The impact of antianginal drug therapy on the incidence of asymptomatic myocardial ischemia. J Clin Pharmacol 1989;29:722.

2. Glasser SP, Bittar N, Kinhal V, Bennet WT, Koehn DK. The efficacy and safety of dilevalol in patients with chronic stable angina pectoris. J Clin Pharmacol 1989;29:983.

3. Glasser SP, Koehn DK, Powell R. Regression of left ventricular hypertrophy in treated hypertensive patients with dilevalol and metoprolol-a double blind randomized study. J Clin Pharmacol 1989;29(9):791.

4.     Glasser SP, Chrysant SG, Graves J, Rofman B, Koehn DK.  Safety and efficacy of amlodipine added to hydrochlorothiazide therapy in essential hypertension.  Am J Hypertens 1989;2(3):154.

5.     Glasser SP, Koehn DK.  Predictors of left ventricular hypertrophy in patients with essential hypertension.  Clin Cardiol 1989;12:129.

6.     Glasser SP, Arnett DK.  Reexamination of tolerance issues and efficacy endpoints of long-acting products.  Hospital Formulary 1990;25(1):42.

7.     Arnett DK, Glasser SP.  The risk factor profile for patients with asymptomatic myocardial ischemia.  Journal of Applied Cardiology 1990;5:239-244.

8.     Rinde-Hoffman D, Glasser SP, Arnett DK.  Update on nitrate therapy.  J Clin Pharmacol 1991;31(8):697.

9.     Arnett DK, Strogatz DS, Ephross SA, Hames CG, Tyroler HA.  Greater incidence of electrocardiographic left ventricular hypertrophy in black men than white men at seven year follow-up in Evans County, Georgia.  Ethn Dis 1992;2(1):10-17.

10.    Howard G, Burke GL, Evans GW, Crouse JR, Riley W, Arnett D, deLacy R, Heiss G.  Relations of intimal-medial thickness among sites within the carotid artery as evaluated by B-mode ultrasound.  Stroke 1994;25:1581-1587.

11.    Arnett DK, Rautaharju P, Crow R, Folsom AR, Ekelund LG, Hutchinson R, Tyroler HA, Heiss G.  Black-white differences in electrocardiographic left ventricular mass and the impact of antihypertensive therapy:  The ARIC study.  Am J Cardiol 1994;74:247-252.

12.    Arnett DK, Evans GW, Riley WA.  Arterial Stiffness:  A New Cardiovascular Disease Risk Factor?  Am J Epidemiol 1994;140: 669-682.

13.    Arnett DK, Tyroler HA, Burke G, Hutchinson R, Howard G, Heiss G.  Hypertension and Subclinical Carotid Artery Atherosclerosis in Blacks and Whites (The ARIC Study).  Arch Intern Med 1996;156:1983-1989.

14.    Bright PE, Arnett DK, Blair C, Bayona M.  Gender and ethnic differences in survival in a cohort of HIV positive clients.  Ethn Dis 1996;1(1):77-85.

15.    Chambless LE, Zhong M, Arnett DK, Folsom A, Riley W, Heiss G.  Variability in B-mode ultrasound in the Atherosclerosis Risk in Communities Study (ARIC).  Ultrasound Med Biol 1996;22(5):545-554.

16.    Arnett DK, Rautaharju P, Sutherland S, Keil J.  The Validity of Electrocardiographic Estimates of Left Ventricular Hypertrophy and Mass in African Americans.  The Charleston Heart Study.  Am J Cardiol 1997;79:1289-1292.

17.    Iribarren C, Luepker RV, McGovern PG, Arnett DK, Blackburn H.  Twelve-Year Trends in Cardiovascular Disease Risk Factors in The Minnesota Heart Survey, Are Socioeconomic Differences Widening?  Arch Intern Med 1997;157:873-881.

18.    Pankow JS, Vachon CM, Kuni CC, King RA, Arnett DA, Grabrick DM, Rich SS, Anderson VE, Sellers TA.  Genetic Analysis of Mammographic Breast Density in Adult Women: Evidence of a Gene Effect.  J Natl Cancer Inst 1997;89(8):549-556.

19.    Pieper RM, Arnett DK, McGovern PG, Shahar E, Blackburn H, Luepker RV.  Trends in Cholesterol Knowledge and Screening and Hypercholesterolemia Awareness and Treatment, 1980-1992: The Minnesota Heart Survey.  Arch Intern Med 1997;157:2326-2332.

20.    Arnett DK, Pankow JS, Atwood LD, Sellers TA.  Impact of Adjustments for Intermediate Phenotypes on the Power to Detect Linkage.  Genet Epidemiol 1997;14:749-754.

21.    Folsom AR, Arnett DK, Hutchinson RG, Liao F, Clegg L, Cooper LS.  Physical activity and incidence of coronary heart disease in middle-aged women and men.  Med Sci Sports Exerc 1997;29(7):901-909.

22.    Glasser SP, Arnett DK, McVeigh GE, Finkelstein SM, Bank AJ, Morgan DJ, Cohn JN.  Vascular Compliance and Cardiovascular Disease: A Risk Factor or a Marker?  Am J Hypertens 1997;10:1175-1189.

23.    Smith MA, Shahar E, Doliszny KM, McGovern PG, Arnett DK, Luepker RV.  Trends in Medical Care of Hospitalized Stroke Patients Between 1980 and 1990: The Minnesota Stroke Study.  J Stroke and Cerebrovascular Disease 1998;7(1):76-84.

24.    Glasser SP, Arnett DK, McVeigh GE, Finkelstein SM, Bank AJ, Morgan DJ, Cohn JN.  The Importance of Arterial Compliance in Cardiovascular Drug Therapy.  J Clin Pharmacol 1998;38:202-212.

25.    Garg UC, Arnett DK, Folsom AR, Province MA, Williams RR, Eckfeldt JH.  Lack of Association Between Platelet Glycoprotein IIb/IIIa Receptor PI[A] Polymorphism and Coronary Artery Disease or Carotid Intima-Media Thickness.  Thromb Res 1998;89:85-89.

26.    Arnett DK, Sprafka JM, McGovern PG, Shahar E, McCarty M, Luepker RV.  Trends in Cigarette Smoking: The Minnesota Heart Survey, 1980-1992.  Am J Public Health 1998;88(8):1230-1233.

27.    Arnett DK, Borecki IB, Ludwig EH, Pankow JS, Myers R, Evans G, Folsom AR, Heiss G, Higgins M.  Angiotensin Converting Enzyme Genotypes and Carotid Atherosclerosis: The Atherosclerosis Risk in Communities and the NHLBI Family Heart Studies.  Atherosclerosis 1998;138(1):111-116.