## Donna K. Arnett

Page 2

1       IT IS FURTHER STIPULATED AND AGREED that the
2   signature to and reading of the deposition by the
3   witness is not waived, the deposition to have the
4   same force and effect as if full compliance had been
5   had with all laws and rules of Court relating to the
6   taking of depositions.
7       IT IS FURTHER STIPULATED AND AGREED that it
8   shall not be necessary for any objections to be made
9   by counsel to any questions, except as to form or
10  leading questions, and that counsel for the parties
11  may make objections and assign grounds at the time of
12  the trial, or at the time said deposition is offered
13  in evidence, or prior thereto.
14
15
16              * * * * *
17
18
19
20
21
22
23
24
25

Page 4

1   CHRISTY JONES
    Attorney at Law
2   christy.jones@butlersnow.com
    Butler, Snow
3   17th Floor, AmSouth Plaza,
    210 East Capitol Street
4   Jackson, Mississippi 39225
5
6   ALSO PRESENT:  DOUG COOPER, videographer
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2           A P P E A R A N C E S
3   FOR THE PLAINTIFF:
4   W. LEWIS GARRISON
    BILL BROSS
5   Attorneys at Law
    wlbross@hgdlawfirm.com
6   Heninger, Garrison & Davis
    2224 First Avenue North
7   Birmingham, Alabama 35202
    205-326-3336
8
9           AND
    BENJAMIN LOCKLAR
10  Attorney at Law
    ben.locklar@beasleyallen.com
11  Beasley, Allen, Crow, Methvin, Portis & Mills
    218 Commerce Street
12  Post Office Box 4160
    Montgomery, Alabama  36103-4160
13  334-269-2343
14
    FOR THE DEFENDANT:
15
    HOPE FRIEWALD
16  KIRSTIN MAZZEO
    Attorneys at Law
17  kirstin.mazzeo@dechert.com
    Dechert LLP
18  Cira Centre, 2929 Arch Street
    Philadelphia, Pennsylvania 19104-2808
19  215-994-4000
20          AND
21  TRIPP HASTON
    Attorney at Law
22  thaston@bradleyarant.com
    Bradley, Arant, Rose & White
23  One Federal Place
    1819 Fifth Avenue North
24  Birmingham, Alabama  35203
25

Page 5

1           EXAMINATION INDEX
2
    DONNA K. ARNETT, Ph.D.
3   BY MS. FRIEWALD . . . . . . . . p.7
    EXHIBIT INDEX
4
5                       MARKED
    Arnett
6   1                   p.8
7   2                   p.20
8   3                   p 23
9   4                   p.27
10  4A                  p.27
11  4B                  p.27
12  4C                  p.144
13  5                   p.68
14  6                   p.276
15
16
17
18
19
20
21
22
23
24
25

2  (Pages 2 to 5)

Donna K. Arnett

Page 6

1    I, Lisa Bailey, a court reporter of Birmingham,
2 Alabama, and a Notary Public for the State of Alabama
3 at large, acting as commissioner, certify that on
4 September 6, 2006 pursuant to the Alabama Rules of
5 Civil Procedure and the foregoing stipulation of
6 counsel, there came before me at University of
7 Alabama, 1665 University Boulevard, Birmingham,
8 Alabama, DONNA ARNETT, witness in the above cause,
9 for oral examination, whereupon the following
10 proceedings were had:
11       THE VIDEOGRAPHER: This is Tape Number
12 One in the videotaped deposition of Dr. Donna
13 Arnett taken by the defendants in the matter of
14 Case Number CV-052316, Gary Albright, plaintiff,
15 versus Merck and Company, Incorporated, et al.,
16 defendants. The deposition is being held at the
17 UAB School of Public Health, Department of
18 Epidemiology, 1665 University Boulevard,
19 Birmingham, Alabama 35294. Today's date is
20 September 6th, 2006, and the time is 9:14 a.m.
21 The court reporter is Lisa Bailey, and the
22 videographer is Doug Cooper on behalf of Esquire
23 Deposition Services located at 2100 Third Avenue
24 North, Suite 420, Birmingham, Alabama 35206.
25       Would counsel and all present please

Page 7

1 introduce yourself, after which the court
2 reporter will swear in the witness?
3       MS. FRIEWALD: I'm Hope Friewald from
4 Dechert, LLC in Philadelphia. I represent
5 Merck.
6       MR. JONES: Christy Jones on behalf of
7 Merck.
8       MS. MAZZEO: Kirstin Mazzeo on behalf of
9 Merck.
10       MR. HASTON: Tripp Haston with Merck.
11       MR. BROSS: I'm Bill Bross with Heninger,
12 Garrison, Davis on behalf of the plaintiff,
13 Mr. Albright.
14       MR. LOCKLEAR: Ben Locklar with Beasley
15 Allen here for the plaintiff.
16       MR. GARRISON: Lew Garrison, Henninger,
17 Garrison, Davis for the plaintiff.
18       DONNA K. ARNETT, Ph.D.
19 being first duly sworn, was examined and testified as
20 follows:
21       EXAMINATION
22 BY MS. FRIEWALD:
23    Q.    Doctor, again I'm Hope Friewald. I
24 represent Merck. We met just a minute ago.
25       I'm going to start the deposition by

Page 8

1 showing you a document that is entitled Notice of
2 Videotaped Oral Deposition, Dr. Donna K. Arnett, and
3 we'll mark that as Arnett 1 for the record. Let the
4 court reporter mark it, and then she'll hand you your
5 copy.
6       (Exhibit Arnett 1 was marked
7       for identification.)
8    Q.    Doctor, is this a document you have seen
9 before today?
10    A.    Yes.
11    Q.    And, if you would, turn to Schedule A,
12 please, on page three.
13    A.    (Witness complies.)
14    Q.    The first item is all documents
15 evidencing your opinions and/or conclusions in this
16 case including any drafts. Have you brought all such
17 documents with you today?
18    A.    I have.
19    Q.    Are there any documents or material of
20 any kind that you will testify are part of your
21 opinion or any of the conclusions that you reached
22 that are not here today?
23    A.    There are not.
24    Q.    And I suppose the answer would be the
25 same for question two, that any documents supporting

Page 9

1 your opinions, you have brought today?
2    A.    I have.
3    Q.    And the same for any documents evidencing
4 any testimony you expect to give; it should all be in
5 what is -- what is here with you?
6    A.    Yes.
7    Q.    Okay. There's no exceptions to that?
8    A.    If there's new data that come -- become
9 available between now and the trial, I would
10 certainly utilize that data.
11    Q.    But everything that is available today
12 that you have looked at and that you intend to rely
13 on, you brought with you?
14    A.    I have.
15    Q.    Have you brought with you any letters or
16 correspondence with counsel?
17    A.    No.
18    Q.    Are there any such documents?
19    A.    There were a couple of e-mails setting up
20 dates, but only e-mails with dates.
21    Q.    Was there a -- any kind of a retainer
22 agreement with any lawyer representing plaintiffs in
23 this litigation?
24    A.    I'm -- I'm unfamiliar with the term
25 "retainer." Could you clarify it?

3 (Pages 6 to 9)

735bbe96-d720-4029-ad8a-be286c23a797

## Donna K. Arnett

1    Q.    I'll use it in the loosest possible
2  sense.
3    A.    Okay.
4    Q.    Did anybody send you a letter or e-mail
5  of any kind that talked about your agreement to work
6  with them in either the Albright matter or the Vioxx
7  litigation generally?
8    A.    I have an agreement with a company called
9  Med-Expertise.
10    Q.    And what is Med-Expertise?
11    A.    They are a service that helps to identify
12  experts.  And I have been meeting with Paul
13  Sizemore's firm in Montgomery, and I've met with
14  Jason from Abraham, et al. firm in Houston, but I
15  have not been named in any cases.
16    Q.    When -- ask this a little differently.
17        I assume -- correct me if I'm wrong --
18  that at some point, you gave your name to
19  Med-Expertise to put in their database of potential
20  litigation experts; is that correct?
21    A.    I -- I was contacted by them.  I did not
22  volunteer to be contacted.
23    Q.    When were you contacted by them?
24    A.    April or May.
25    Q.    Of 2006?

1    A.    2006.
2    Q.    Do you recall the name of the person who
3  contacted you?
4    A.    Melissa Couch.
5    Q.    Did Ms. Couch tell you why she was
6  contacting you?
7    A.    To evaluate my expertise as a
8  cardiovascular epidemiologist.
9    Q.    Did she tell you whether she was
10  contacting you with an eye towards you working in a
11  specific litigation?
12    A.    She contacted me initially for Vioxx
13  litigation.
14    Q.    Do you know if, at the time she contacted
15  you, it was because somebody representing plaintiffs
16  in the Vioxx litigation had asked her to reach out to
17  you?
18    A.    I don't know.  I can't answer for
19  Melissa.
20    Q.    Do you know how she got your name?
21    A.    I do not know how she got my name.
22    Q.    Did you do any research into what
23  Med-Expertise is or what their reputation might be?
24    A.    No, I did not.
25    Q.    Do you have any materials regarding

1  Med-Expertise?
2    A.    I have an initial letter they sent me.
3    Q.    And is that something that you have in
4  your office --
5    A.    Yes.
6    Q.    -- here today that you could provide a
7  copy --
8    A.    Yes.
9    Q.    -- during the deposition?
10    A.    But it's -- it's not part of the Albright
11  case because I worked with Lew before that happened.
12    Q.    Fair enough.  I'm still going to ask, if
13  you wouldn't mind, if you would, during the break,
14  provide us with a copy of that letter --
15    A.    Certainly.
16    Q.    -- and we can mark that for the
17  transcript.
18        I take it you did not know Ms. Couch
19  before she called you around April of this year?
20    A.    No.
21    Q.    And did you do any investigation into who
22  she is or what her qualifications are?
23    A.    I -- I talked to Lew about her.
24    Q.    Did he -- Lew is Mr. Garrison?
25    A.    Sorry.  Yes, Mr. Garrison.

1    Q.    And did he know her previously?
2    A.    He knew of her company.
3    Q.    And is Med-Expertise a local company?
4    A.    They're in Houston.
5    Q.    I gather they obtain experts primarily
6  for use by plaintiffs in litigation?
7    A.    I do not know if they do plaintiffs or
8  defense.
9    Q.    If -- if I have the chain of events
10  right, after you spoke with Ms. Couch, you called
11  Mr. Garrison and asked him about this company?
12    A.    Yes.  Well, actually, I didn't call him.
13  We were meeting about Mr. Albright's case, so I saw
14  him as part of that and said, have you heard of this
15  person.
16        When did you start working with
17  Mr. Garrison in the Albright matter?
18    A.    My timing is fuzzy.  I believe it was
19  March that I was contacted.
20    Q.    So shortly before Med-Expertise called
21  you?
22    A.    Uh-huh, at least a month before.
23    Q.    And had you been working at that time
24  with Mr. Garrison in any other Vioxx litigation?
25    A.    No.

4  (Pages 10 to 13)

Donna K. Arnett

Page 14

1    Q.    Have -- as far as you know, are you today
2  working with Mr. Garrison in connection with any
3  other Vioxx case besides the Albright case?
4    A.    I am not.
5    Q.    Have you ever worked with Mr. Garrison
6  with regard to a case called Crook?
7    A.    Not to my knowledge.
8    Q.    As far as you know, you've never been
9  named as an expert by Mr. Garrison in the Crook case?
10   A.    I know that there was a case that had
11  been before the Albright case, but I was never
12  brought forward as a witness.  I don't know if I was
13  named or not.
14   Q.    Nobody asked you if you would be willing
15  to be a witness in the Crook case?
16   A.    I was asked by Mr. Garrison if I was
17  willing to be part of the Vioxx litigation.  I know
18  that they were working on a case before
19  Mr. Albright's case that didn't come forward.  I
20  didn't know if I was named or not named.
21   Q.    So nobody specifically asked you if you
22  would be willing to be an expert in the Crook case?
23         MR. GARRISON:  Object to the form.
24   A.    I answered it.
25   Q.    I don't think you have.  Nobody

Page 15

1  specifically asked you if you'd be willing to be an
2  expert in the Crook case; is that correct?
3    A.    What Mr. Garrison -- when Mr. Garrison
4  approached me about doing Vioxx work, it was about
5  preparing me as a witness, if I would want to do this
6  kind of work or not, generally speaking.  As to the
7  specifics of the cases I would represent at that
8  point, I was not clear.
9    Q.    Okay.  Just to be clear, nobody ever told
10  you that they were going to put your name as a
11  witness in the Crook case?
12   A.    I don't understand your question.  I've
13  answered to the best of my knowledge.
14   Q.    Nobody ever told you that they were going
15  to designate you on any list in a specific case
16  called Crook and that you would be a -- an expert in
17  this case?
18         MR. GARRISON:  Object to the form.  Asked
19  and answered.
20   A.    I've answered the question.  I was
21  working with Mr. Garrison about a case that had --
22  has not been pursued.  I don't know if the person's
23  name is Crook.  I can't answer any more fully than
24  that.
25   Q.    Have you ever looked at any records

Page 16

1  specific to Mr. Albright?
2    A.    No.
3    Q.    Have you looked at any medical or other
4  records specific to any other plaintiff in the Vioxx
5  litigation?
6    A.    No.
7    Q.    Do you intend to look at any records
8  specific to Mr. Albright?
9    A.    No.
10   Q.    If I understand correctly, you agreed --
11  you received a letter from Med-Expertise.  Did that
12  require you to sign something and send back to them,
13  some kind of an agreement?
14   A.    Yes, it did.
15   Q.    And is that just signing the same letter,
16  counter signing the letter they sent you?
17   A.    Yes.
18   Q.    And are there terms in that letter
19  regarding how you would be compensated?
20   A.    Yes.
21   Q.    And what is your hourly rate?
22   A.    400.
23   Q.    Is it the same whether you're working
24  through Med-Expertise or whether you've been engaged
25  directly by Mr. Garrison?

Page 17

1    A.    It is.
2    Q.    Are you working with any plaintiffs'
3  lawyers who you were introduced to through
4  Med-Expertise?
5    A.    I have met, as I said previously, with
6  Paul Sizemore and Jason -- I believe it's Webster.
7  But I have not been named in any cases for those two
8  firms.
9    Q.    Do you understand yourself to be working
10  with them in connection with any case or cases?
11   A.    I -- I just answered.  I have not been
12  named in any case.
13   Q.    I understand that.  But I -- but often an
14  expert understands that they are working on a matter
15  even before their name has to be disclosed for the
16  matter.  So my question is, without telling me the
17  name of the case, do you have an understanding that
18  you are working with those lawyers in connection with
19  Vioxx cases?
20   A.    I assume, but it's an assumption that I
21  will continue to work with them and develop as cases
22  are named.  But currently, I have no commitment to
23  any case other than Mr. Albright.
24   Q.    Is there any correspondence between
25  yourself and Mr. Sizemore or the gentleman you've

Donna K. Arnett

Page 18

1  identified as Jason?
2      A.   No.
3      Q.   Including e-mails?
4      A.   Including e-mails.
5      Q.   Is there any correspondence between
6  yourself and Mr. Garrison or any other lawyers you
7  understand to be representing plaintiffs in the Vioxx
8  litigation here?
9      A.   No.  Other than, as I previously
10 mentioned, e-mails about setting up dates.  Bill
11 Bross and I have been the primary e-mail
12 correspondence purely date related.
13     Q.   Was there a retainer agreement or a
14 letter setting forth the terms of your engagement
15 specifically with Mr. Garrison?
16     A.   No.
17     Q.   How did you first meet Mr. Garrison?
18     A.   He called me, and we set up a meeting at
19 my office.
20     Q.   And that was back in March?
21     A.   Yes.
22     Q.   Have you ever worked with him in any
23 other litigation?
24     A.   None.
25     Q.   Have you ever been an expert in a

Page 19

1  litigation before the Vioxx litigation?
2      A.   Yes.
3      Q.   Tell me about that.
4      A.   Okay.  I prepared -- I worked with a firm
5  called Kay Schuler in New York for the PPA
6  litigation.  I was working, I believe, for the
7  company Novartis, the companies that produce cough
8  and cold products.  I was developing an expert
9  report, but the case -- cases were dropped or
10 settled.  So I never produced an expert report for
11 any case, and I never was deposed.
12     Q.   Do you know if your name was ever put on
13 a list of experts?
14     A.   I do not know.
15     Q.   Have you done any other litigation work?
16     A.   No.
17     Q.   Have you ever testified for any purpose?
18     A.   No.
19     Q.   And I'm using that broadly, including
20 government hearings or any kind of administrative
21 procedure.
22     A.   Not -- not that I'm aware of.  I've never
23 been sworn in before.
24     Q.   There's a first for everything.
25     A.   Yes.  I think I testified when I got

Page 20

1  married.  Don't you raise your right --
2      Q.   I don't remember that.  Memory dims over
3  time.  I remember something about promising
4  something.
5      A.   I do.  I do remember that.  The I do's.
6      Q.   All right.  We were provided in advance
7  of the deposition of a copy of your CV.  I'm going to
8  mark that as Arnett 2.  And I have an extra copy for
9  Mr. Garrison, if he needs it.
10             (Exhibit Arnett 2 was marked
11             for identification.)
12     Q.   For right now, Doctor, all I want to know
13 is if this is a current and complete and accurate
14 copy of your curriculum vitae.
15     A.   It has not been updated since -- this
16 date is 9 of 2005, so I have a new grant, and I have
17 -- probably my publications are now in the 200 range,
18 so some of my more recent publications will be
19 missing.
20     Q.   What's the new grant?
21     A.   It's the Hypergenetics of Left
22 Ventricular hypertrophy.  It's by NIH.
23     Q.   Do you have a more recent version of your
24 CV on your computer?
25     A.   Yes.

Page 21

1      Q.   Then I'm going to ask that when we take a
2  break at some point, you go get me the Med-Expertise
3  letter, and if you would also provide us with a
4  current copy of your CV.
5           Doctor, have you ever written anything
6  that relates to either COX-2s or traditional NSAIDs?
7      A.   No.
8      Q.   Are there any publications that you
9  authored or coauthored that you believe are -- let me
10 put it this way -- that you might specifically
11 identify, if you come and testify at trial, as
12 particularly relevant to the testimony that you're
13 going to give at trial?
14           MR. GARRISON:  Object to the form.
15     A.   Currently, I have no publications
16 specific to NSAIDs or COX-2 inhibitors.
17     Q.   And what I'm really asking -- I know
18 you've done a lot of research that's generally
19 related to the subject of cardiology and the
20 epidemiology of cardiology.  But what I'm asking is,
21 is there -- is there any aspect of your academic
22 publication work that you're going to say bears
23 specifically on the opinions that you're going to
24 give related to COX-2s in this litigation?
25     A.   My publications, in general, reflect the

6 (Pages 18 to 21)

Donna K. Arnett

Page 22

1  totality of my experience as an epidemiologist, so I
2  can't completely exclude all publications.
3      Q.    I understand there's the general
4  relationship.  What I'm asking you, is there anything
5  where you're going to say, yes, this article that I,
6  back in 1989, although it doesn't talk specifically
7  about COX-2s, I consider it to be very
8  closely-related research, something like that?
9      A.    To the best of my knowledge, there's not
10 a publication on my CV that I would want to
11 specifically bring forward.  But I don't want to
12 exclude everything in the event that if I'm called to
13 question about my methodologic expertise as an
14 epidemiologist, that I couldn't go back and say,
15 well, I've published about methods of epidemiology.
16     Q.    I understand.  But in terms of specific
17 references to the specific topic, there's nothing
18 that comes to mind today?
19         MR. GARRISON: Object to the form.
20     A.    No.
21     Q.    Let's turn -- we're going to go through
22 your CV a little bit more, particularly when we get
23 an updated version.
24         Let's turn to the documents that you
25 brought with you here today and also the list of

Page 23

1  materials that was provided to us by your counsel.
2          Doctor, I'm going to mark as Arnett 3 a
3  list of articles that I'll represent was sent to us
4  by someone from Mr. Garrison's office.
5              (Exhibit Arnett 3 was marked
6              for identification.)
7      Q.    I gather that you have seen this document
8  before today; is that correct?
9      A.    It's correct.  And, in fact, if I could
10 have my notebook, at the end of the -- back of my
11 notebook, there is the same document.  And I've
12 checked what I've read and what I haven't.
13     Q.    I did see that, and I was going to ask
14 you to specifically look at that for me.
15         I'm going to hand you, just so the record
16 is clear -- and we'll deal with some of the paperwork
17 issues later.  You handed me before we started today,
18 among other things, a -- a plastic notebook that's
19 got three rings to it, and it contains a bunch of
20 different materials I'll describe a little bit more
21 later.  And then tucked in the back was what appeared
22 to me to be an annotated by you version of Arnett 3;
23 is that correct?
24     A.    That is correct.
25     Q.    And you wrote "NA" next to a bunch of the

Page 24

1  entries?
2      A.    Correct.
3      Q.    And what does that mean?
4      A.    It means that it's not applicable and
5  that I didn't review the material.
6      Q.    Were there -- do you know if you were
7  given Arnett 3 before it was provided to us?
8      A.    Arnett -- oh, my Exhibit 3?
9      Q.    Yes.
10     A.    Yes, I was sent this earlier.
11     Q.    And did you make any effort to see if
12 there were documents that were not on Arnett 3 that
13 nevertheless were among what you had looked at?
14     A.    I did not do that.  I conducted my own
15 review, which I provided to you, of clinical trials
16 before I ever started working with Mr. Garrison when
17 he first contacted me.  So I haven't cross-referenced
18 that list, which you also have access to --
19     Q.    Do you --
20     A.    -- with this list.
21     Q.    Do you know what the basis was for
22 creating Arnett 3?
23     A.    It was so that I would have reference to
24 everything that had been provided to me.
25     Q.    Now, let me ask you this way.  As far as

Page 25

1  you know, does Arnett 3 represent documents that were
2  sent to you by counsel?
3      A.    Yes, it does represent things sent to me
4  by counsel.
5      Q.    And as you've testified, I gather several
6  of the documents that were sent to you by counsel,
7  you didn't actually look at?
8      A.    Many of them, I did not look at.
9      Q.    Independent of what counsel provided you
10 with, you had your own list of materials, correct?
11     A.    Correct.
12     Q.    Is there an index anywhere of those
13 materials?
14     A.    No, other than the spreadsheet.  The
15 Excel spreadsheet I provided you has a list of
16 clinical trials that I have summarized.
17     Q.    In the back of the binder that we just
18 referenced a minute ago is a document that, by my
19 count, is one -- eight pages --
20     A.    Uh-huh.
21     Q.    -- although it's not numbered.  The pages
22 are not numbered.  And is -- is this document the --
23 you know what, I don't want to mark it 5 -- is this
24 document the Excel spreadsheet you were just
25 referring to?

Donna K. Arnett

Page 26

1   A.   It is.
2   Q.   Is that a complete list of all of the
3   published articles you've reviewed?
4   A.   No.
5   Q.   Is there a complete list anywhere of all
6   the published articles you've reviewed?
7   A.   If you'd like, I will go through Exhibit
8   3 and look at them, or we can look through my
9   notebook.
10   Q.   Okay.  If -- all I want to know for now
11   is whether there is a list somewhere of all of the
12   articles you've reviewed.
13   A.   The articles -- the articles I reviewed
14   are included in Exhibit 3.
15   Q.   And included in your spreadsheet to the
16   extent it's not duplicative?
17   A.   Yes.
18   Q.   But there may be articles you've reviewed
19   that are not on either one of those two documents?
20   A.   I have reviewed some web sites, Google
21   searches for Vioxx.  Those aren't on my list.  But
22   not scientific publications from PubMed.
23        MS. FRIEWALD:  This is -- what I'd like
24     to do, subject to somebody having an objection,
25     based on your practice here, is I'd like to mark

Page 27

1   the binder itself as whatever our next number
2   was -- I thought it was 4 -- and then I'd like
3   to mark Dr. Arnett's annotated copy of the
4   materials list as 4A and the spreadsheet as 4B.
5   And I'm not going to mark all of the other
6   materials in here.  I just want to make a copy
7   --
8        MR. GARRISON:  That's fine.
9        MS. FRIEWALD:  -- of everything.  Okay?
10        MR. GARRISON:  As long as we keep it in
11   order, and she gets her original back.
12        MS. FRIEWALD:  I will do that.  And I'm
13   going to ask the court reporter to copy it and
14   then ask somebody maybe from Mr. Haston's office
15   to make sure that all of Dr. Arnett's
16   highlights, some of which are in yellow and may
17   not produce properly, get reproduced to us.
18        THE WITNESS:  So you want this back, 4A
19   and 4B?
20        MS. FRIEWALD:  I need the court reporter
21   to mark those documents as 4A and 4B and to put
22   an Exhibit 4 tab on the binder itself.
23        (Exhibits Arnett 4, 4A and 4B
24         were marked for identification.)
25        MS. FRIEWALD:  I promise to keep it in

Page 28

1   order.
2        THE WITNESS:  There is a method to my
3   filing.
4        MS. FRIEWALD:  I actually can tell that
5     there is, and it's far more organized than most
6     of what I do.
7   BY MS. FRIEWALD:
8   Q.   Doctor, I noticed that in addition to the
9   published literature that you have in here, you also
10   have some notes.  Are those notes that you created in
11   the course of your work in this litigation?
12   A.   Yes.
13   Q.   Are any of these notes that you created
14   before you were retained by Mr. Garrison?
15   A.   No.
16   Q.   Tell me when and how you went about
17   assembling the set of documents that we've identified
18   as Arnett 4.
19   A.   In the initial period, I did my own
20   PubMed review for Vioxx.
21   Q.   What do you mean by "the initial period"?
22   A.   So -- Mr. Garrison contacted me about my
23   potential availability and willingness to work in
24   this area.  So I conducted a review of the clinical
25   trials conducted on rofecoxib to date and

Page 29

1   cross-referenced them with other trials to create a
2   composite list, evaluated the evidence at that point
3   before making the decision to move forward.
4   Q.   Did you have any kind of a file on either
5   Vioxx specifically or coxibs or NSAIDs generally
6   before you spoke with Mr. Garrison about working as
7   an expert for the plaintiffs?
8   A.   No.
9   Q.   Had you ever done any research related to
10   the coxibs or the NSAIDs before you decided to work
11   with Mr. Garrison for the plaintiffs in this lawsuit?
12   A.   I had not done specific work on COX-2.  I
13   had worked generally in cardiovascular epidemiology,
14   which would not exclude drugs affecting
15   cardiovascular risk.
16   Q.   In addition to the published literature
17   and the notes, I've also come across a couple of
18   Merck documents that were produced to plaintiffs in
19   the course of the litigation.  I assume that you
20   obtained those through Mr. Garrison?
21   A.   I did.
22   Q.   Did he give those to you -- let me ask it
23   open-ended.
24        Do you know how it was decided that you
25   would receive the particular Merck documents you got?

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 30

1    A.    Actually, I, in part of my Google
2  searches, identified topical areas, specific e-mail
3  documents that are posted online, that I requested
4  from him. The FDA documents, I was able to download,
5  but it's easier to just request them because they
6  were on my list of things produced. So in some
7  cases, I requested them of them specifically. But in
8  general, I sought out the information.
9    Q.    The -- the documents that are in Arnett 4
10 are the only internal Merck documents that you have?
11   A.    There are -- if you'll look in the back
12 of Exhibit 4, there are some diskettes. And those
13 diskettes contain the APPROVe data, the VICTOR data,
14 and two or three other diskettes. One has scientific
15 articles; one has other documents. There's a -- some
16 Merck documents on those.
17   Q.    I'm looking at one, two, three, four five
18 diskettes -- I'll put this one in the sleeve for you
19 -- and the first is titled "Miscellaneous Documents
20 for" --
21   A.    Right.
22   Q.    -- "Dr. Arnett, 1 of 1"?
23   A.    Correct.
24   Q.    What is on this disk?
25   A.    That was after I requested specific

Page 31

1  patent applications by Merck after some of my
2  Internet searches, and those are on that document.
3  There's also some clinical review forms for the 010
4  and 017 studies. They were very early Merck
5  studies. One was done in OA, and one was done in
6  RA. They've never been published. I requested
7  those -- those clinical forms so I could review those
8  data. So that happens to be on that disk.
9    Q.    Did --
10   A.    And I -- I don't recall the other
11 documents. I think the Shapiro meta-analysis I also
12 requested is on that.
13   Q.    There is a hard copy of a document titled
14 "Preliminary Meta-Analysis" by --
15   A.    Dr. Shapiro.
16   Q.    -- Dr. Shapiro. Is that a hard copy of
17 what's on the disk?
18   A.    Correct.
19   Q.    Did you review all of the documents on
20 the disk identified as "Miscellaneous Documents for
21 Dr. Arnett" and dated 8/28/06?
22   A.    I can't tell you if I reviewed every
23 one. I looked at the one specifically I asked for.
24   Q.    And then there is a disk that's called
25 "Scientific Articles, July 14th, 2006." Are there

Page 32

1  any documents on this that I don't have in hard copy
2  on the binder?
3    A.    Yes, there are. There's -- on that disk,
4  there are background information about pharmacology
5  and basic science studies I did not review. I'm an
6  epidemiologist. So those you do not have hard copies
7  of.
8    Q.    Are you telling me that you didn't
9  actually review the documents on this list?
10   A.    Not the entire list of documents,
11 correct.
12   Q.    Is there an index on this list; do you
13 know?
14   A.    There is not an index on the disk. There
15 are folders, however, which should help you.
16   Q.    Incidentally, just for the record, the
17 "Miscellaneous Documents for Arnett" is on a disk
18 that has a "Beasley Allen" label, and the "Scientific
19 Articles" is just on a plain white disk. Then there
20 is a disk called "Confidential VICTOR Data, July
21 13th, 2006." And what is on this disk?
22   A.    I opened it. It's SAS files. I couldn't
23 find a data dictionary. I haven't explored it beyond
24 that. It was not transparent.
25   Q.    Do you have an intention of doing an

Page 33

1  independent analysis of the SAS files?
2    A.    I have not done it as of yet. But I
3  would be willing to do one, so I can't say in the
4  future I won't. But currently, I have not done an
5  analysis.
6    Q.    Then there are documents -- are disks,
7  rather, labeled "Confidential APPROVe Data, Disk 1 of
8  2 and Disk 2 of 2."
9    A.    Uh-huh.
10   Q.    What is on these two disks?
11   A.    The APPROVe data. There are also some
12 Merck documents related to the publication in the New
13 England Journal, notes back and forth about the -- to
14 and from the editor.
15   Q.    When you say "the APPROVe data," are you
16 talking about analysis files --
17   A.    Well, interesting --
18   Q.    -- patient level data?
19   A.    There are some patient level data, where
20 there are EKGs, et cetera. There are SAS files, but
21 there's not a data dictionary file.
22   Q.    And do you know how these disks were
23 created?
24   A.    Like -- you mean, like putting them in
25 the computer created, or do you mean --

9 (Pages 30 to 33)

735bbe96-d720-4029-ad8a-be286c23a797

## Donna K. Arnett

<table>
<tr><td>

**Page 34**

1  Q.   Do you know if --
2  A.   -- how are they generated?
3  Q.   Yeah, how are they generated?
4  A.   I received them from Paul Sizemore's firm
5  and was asked to look at them. I didn't ask him how
6  they were generated, so I can't answer you.
7  Q.   Have you had any discussion with any
8  lawyers for plaintiffs about the contents of these
9  disks?
10  A.   I expressed my frustration with the
11  contents of the disk.
12  Q.   Do you know if there was any follow-up
13  effort to help you out with these disks?
14  A.   No, there has not been. I --
15  Q.   Do you know if there was any follow-up
16  effort to help you out with the content -- contents
17  of the disk that's called "VICTOR Data"?
18  A.   Can you clarify what you mean by "help me
19  out"?
20  Q.   See if you could get more information,
21  figure out how to use the files, do anything to make
22  them usable to you.
23  A.   I didn't request specific help. The
24  issue for me was the absence of a clear data
25  dictionary and clear descriptor of where the data

</td><td>

**Page 36**

1  confirm if I've identified those correctly.
2  A.   I believe that the second one from Ray
3  was a deposition and not a trial testimony. I don't
4  know if those differ.
5  Q.   And could you do me a favor, since I
6  failed to do it, and tell me, is there a date on that
7  transcript?
8  A.   I could not find a date on the
9  transcript. I know that it -- it was requested, and
10  I -- I couldn't find the date.
11  Q.   It looked to me like the transcript you
12  had was incomplete as well. Can you identify what
13  the pages are that you have there?
14  A.   I have page 315, which was the beginning
15  of the direct examination of Dr. Ray, to page 547.
16  Q.   And the first question on 315?
17  A.   By Mr. Birchfield: "Dr. Ray, I'm going
18  to show you what's marked as Plaintiff's Exhibit 5.04
19  that is your current CV."
20  Q.   That should help us figure out the date.
21  A.   The next one is the Ray Expert Report,
22  and the next one is the Dr. Krumholz's direct.
23  Q.   From the Cona and McDarby cases?
24  A.   Yes. Well, it says Thomas Cona and
25  Joyce Cona.

</td></tr>
<tr><td>

**Page 35**

1  reside on those disks. It wasn't about my ability to
2  do the analysis.
3  Q.   Do you know if there is a data
4  dictionary?
5  A.   I'm sure that a data dictionary exists.
6  I was unable to identify it on these disks. There
7  are thousands and thousands of files on those disks.
8  Q.   If you don't mind, just to speed things
9  along while we sit here, I'm going to ask Ms. Mazzeo,
10  who's sitting at the end of the table, to pop the
11  Scientific Articles and the Miscellaneous Documents
12  disks into her computer just so I can get a better
13  feel for what's on these two disks.
14  A.   Uh-huh.
15  Q.   I promise I will return them to you.
16      In addition to this plastic binder that
17  is Arnett 4, you've also given me a couple stacks of
18  documents: an Expert Witness Report of John W.
19  Farquhar, what looks like an excerpt of a transcript
20  of some trial testimony; is that correct -- I'll show
21  it all to you in a minute -- Dr. Ray's Expert Report
22  in the Plunkett case, and a transcript dated March
23  14th, 2006 from the Cona and McDarby cases, and the
24  transcript of the videotaped deposition of
25  Dr. Farquhar. I'll show these to you, and you can

</td><td>

**Page 37**

1  Q.   If you look at the top --
2  A.   Oh --
3  Q.   -- it's a joint caption.
4  A.   Got it, yes. And then the Farquhar
5  testimony of June 8th in the Barnett case.
6  Q.   When did you receive those materials?
7  And if you received them at different times, please
8  let me know.
9  A.   I received the Farquhar and the Ray
10  testimony and the Ray report early, I believe when I
11  received those black notebooks. The -- Harlan
12  Krumholz's deposition -- or trial testimony came a
13  bit later. And, no, I did not review the entire
14  testimony. It's three of these large binders. And
15  then Farquhar's most recent deposition in the
16  Beinhart [phonetic] litigation, I received about
17  three weeks ago.
18  Q.   Did you review any of those materials in
19  detail?
20  A.   Could you describe what you mean by
21  "detail"?
22  Q.   Well, did you review them carefully
23  enough that you would say that any of what you read
24  went into forming your opinions?
25  A.   No.

</td></tr>
</table>

10 (Pages 34 to 37)

Donna K. Arnett

Page 38

1   Q.   Are you going to rely on anything you've
2  read in any of the materials you just described in
3  support of your opinions?
4   A.   No.
5   Q.   Is there anything you learned in those
6  materials that you did not know regarding Vioxx or
7  COX-2s before you read them?
8   A.   I have read so much in the hours I've
9  worked on this now that I -- I can't say with
10 certainty that there wasn't something I picked up.
11 But I'm relying on primarily the published
12 literature, the meta-analyses conducted by Merck, the
13 studies conducted by Merck, and the FDA documents.
14  Q.   Just a minute ago, you received the --
15 you told me that you received some of the materials
16 at the time that you got the black binders that I
17 have sitting in front of me.  And I have two black
18 binders identified as Volume I and Volume II Vioxx
19 Expert Information Work Product at Beasley Allen.
20 These were sent to you some months ago by plaintiffs'
21 counsel; is that correct?
22  A.   Correct.
23  Q.   Have you reviewed any of these materials?
24  A.   No.
25  Q.   And these materials include the report --

Page 39

1  well, it looks to me like they included the report of
2  Dr. Ray, but perhaps you took Dr. Ray's report out of
3  this binder and put it in your pile of what you
4  actually looked at; is that correct?
5   A.   As I said, I'm an organized person, and I
6  don't want to carry around a big black binder.
7   Q.   Okay.  And it looks like you also took
8  out the Ray testimony and reviewed that?
9   A.   Uh-huh.
10  Q.   But the report of Dr. Rayburn and the
11 testimony of Dr. Rayburn, you did not review?
12  A.   No.
13  Q.   Do you know Dr. Rayburn?
14  A.   I do not.
15  Q.   You've never met him through any of your
16 just general work at UAB?
17  A.   No.
18  Q.   Would you know him if you walked by him
19 on the street?
20  A.   Not a clue.
21  Q.   Then it also looks like you removed the
22 Farquhar report that must have come in this binder
23 originally, and now it's in your pile of what you've
24 actually looked at, correct?
25  A.   Correct.

Page 40

1   Q.   And but the -- but you were also sent
2  Farquhar testimony, a Krumholz report, the FDA April
3  6, 2005 memo, all of which are still in the binder
4  untouched, correct?
5   A.   Correct.
6   Q.   Have you ever reviewed the April 6, 2005
7  FDA memo?
8   A.   Could you -- could I look at it?
9   Q.   Absolutely.
10  A.   Because I have -- I have some things on
11 disk that I have reviewed.
12      I haven't reviewed this, to the best of
13 my knowledge.  It's not striking a bell.
14  Q.   Then there's one more tab in the back
15 there.  If you could, do me a favor and read it.  It
16 looks like you removed the document from the binder.
17  A.   I did.  It's Shari Targum, FDA Report.
18  Q.   So that's something you looked at and,
19 therefore, you took it out of the binder?
20  A.   Correct.
21  Q.   Okay.  And then there's one last pile of
22 materials that we have here.  And if I understand
23 correctly from what you said before, they include the
24 rest of Dr. Krumholz' testimony from the Cona and
25 McDarby matters --

Page 41

1   A.   Correct.
2   Q.   -- which you did not look at?
3   A.   Correct.
4   Q.   Dr. Avorn's deposition testimony --
5  correct -- from the MDL --
6   A.   Correct.
7   Q.   -- jointly captioned in New Jersey -- and
8  you'll probably be able to tell me quicker than I can
9  figure out -- another deposition transcript.  Do you
10 know whose this is?
11  A.   I do not know.  I didn't -- I haven't
12 looked at any of these documents.
13  Q.   Okay.
14  A.   I had just assumed it was a continuation
15 of Avorn.  I see the pages -- but I haven't reviewed
16 this one.
17  Q.   Have you reviewed any testimony of
18 Dr. Avorn?
19  A.   No, I have not.
20  Q.   Have you reviewed Dr. Avorn's expert
21 report?
22  A.   I have not.
23  Q.   I gather you also haven't read his trial
24 testimony?
25  A.   I have not.

11 (Pages 38 to 41)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 42

1    Q.    I also have here several published
2  articles and review pieces.  Am I correct you have
3  not read any of the published literature that is in
4  the pile you just went through?
5    A.    That is correct.  If you -- those are
6  specifically either review articles about COX-2 or
7  the basic science relative to COX-2.
8    Q.    What I'm going to ask you to do, so that
9  you're comfortable that the documents are identified
10  quickly -- properly, rather -- is just read for the
11  court reporter the half-dozen articles that are
12  here.  I don't think you have to read the whole
13  title.  But if you read the first author and the
14  journal and the date, then we will know what those
15  articles are.
16    A.    So clarify first author, journal, date?
17    Q.    Yes.
18    A.    Okay.  The author is Baigent,
19  B-A-I-G-E-N-T.  It's in Arthritis and Rheumatology
20  2003.
21        The second is by Bea, B-E-A, published in
22  Cardiovascular Research 2003.
23        The third is Caughey, C-A-U-G-H-E-Y,
24  published in Biological -- the Journal of Biological
25  Chemistry in October of 2001.  It's time to get my

Page 43

1  glasses on again.
2        The next is Cipollone,
3  C-I-P-O-L-L-O-N-E, published in ATVB in 2004.
4        The next is by Fosslien, F-O-S-S-L-I-E-N,
5  published in the Annals of Clinical and Laboratory
6  Science 2005.
7        And the last is by FitzGerald in -- I'm
8  sorry.  It's not the last -- New England Journal of
9  Medicine 2004.
10        And the last is by Antman, A-N-T-M-A-N,
11  published in Circulation in 2005.
12    Q.    Have you reviewed any of those articles?
13    A.    I have not reviewed them.
14    Q.    And then the rest of the pile is a letter
15  from Mr. Locklar to you that looks like it was
16  enclosing the APPROVe data we discussed before and a
17  confidentiality agreement, correct?
18    A.    Correct.
19    Q.    And it says, "I will be attending next
20  week's meeting with Bill Bross."  It's dated July 6,
21  2006 --
22    A.    Uh-huh.
23    Q.    -- correct?  And then we have a -- an
24  e-mail that attaches a memo from Merck, and that
25  e-mail is most easily identified as Gertz 110.  It

Page 44

1  has a deposition exhibit sticker dated 9/28/05,
2  correct?
3    A.    It is dated 9/28/05.  And this is about
4  the VALOR study discontinuation.
5    Q.    Did you review that?
6    A.    I glanced at this.
7    Q.    And then the last two documents are a
8  letter from Carlo Patrono, MRK ABC 0002199, correct?
9    A.    (Nods head.)
10    Q.    And a Powerpoint from David Graham dated
11  February 17, 2005, Review of Epidemiologic Studies --
12    A.    Yeah, yeah, I downloaded --
13    Q.    -- on Cardiovascular Risk with Selected
14  NSAIDs?
15    A.    I downloaded that from the web myself.
16    Q.    The Powerpoint you downloaded.  And the
17  letter from Dr. Patrono was provided to you by
18  counsel?
19    A.    By Dr. Garrison (sic) -- Dr. Garrison --
20        THE WITNESS:  I promoted you, Lew.
21        MR. GARRISON:  Thank you.
22  BY MS. FRIEWALD:
23    Q.    And do you know why he gave you that or
24  when he gave you that?
25    A.    It was at a meeting sometime this

Page 45

1  summer.  It was in discussions about the naproxen
2  issues related to VIGOR.
3    Q.    I'm sorry.  Say that again.  You were at
4  a meeting about the naproxen issues related to VIGOR?
5    A.    No.  I was in my office.
6    Q.    I'm not asking you what the substance of
7  the letter is.  I'm asking you why you got that
8  particular letter out of all the documents that have
9  been produced in this litigation, if you know.
10        MR. GARRISON:  That's what she's
11    answering.
12    Q.    Okay.  I may have misunderstood your
13  answer.
14        MR. GARRISON:  Yeah.
15    Q.    Could you start again, because I may have
16  misunderstood something?
17    A.    Okay.  I was in my office meeting with
18  Mr. Garrison.  I was expressing concern about the
19  VIGOR interpretation of naproxen.
20    Q.    And that was the one document that was
21  given to you?
22        MR. GARRISON:  Object to the form.
23    Mischaracterization of testimony.
24    A.    I received many documents.  I found my
25  own documents on the web and through PubMed.  This is

Donna K. Arnett

Page 46

1 one of many documents.
2    Q.    Were there any -- excluding medical
3 literature, were there any other company documents
4 that were provided to you related to the VIGOR data
5 and the analysis of the impact of naproxen?
6    A.    Honestly, I can't recall.
7    Q.    Are there any documents that you have
8 that we haven't identified and that aren't in this
9 room today?
10    A.    I've brought you everything.
11    Q.    And nothing that you've downloaded
12 separately, correct, that you don't have in here with
13 you today?
14    A.    I don't print out every web page I go
15 to. So there were web pages I visited, I -- but I
16 don't have printed copies of those. But they -- they
17 didn't inform my opinion.
18    Q.    Fair to say that anything that you relied
19 on as in forming your opinion, you made a copy of?
20    A.    (No response.)
21    Q.    If it was something that you more than
22 just looked at and passed over, you made a copy of
23 it?
24    A.    As an epidemiologist, I put my strongest
25 faith in peer-reviewed literature that's in the

Page 47

1 public domain, and that has formed the basis of my
2 opinions. It's the totality of all of that
3 information. It's not one single document.
4    Q.    As an epidemiologist, have you ever
5 before relied on internal company documents in
6 forming an opinion?
7    A.    I've -- as -- this is my first ever
8 experience at doing this kind of work.
9    Q.    So -- so the answer is, no, you've never
10 requested or obtained internal documents from a
11 company as part of your work as an epidemiologist?
12    A.    As an epidemiologist?
13    Q.    Yeah.
14    A.    We tend -- I have not done work with
15 pharmaceutical companies, so it's -- as an
16 epidemiologist, I work in my own studies that I
17 design and create and execute. So I've not had a
18 reason to ask for internal documents.
19    Q.    And do you know how many documents were
20 produced in the Vioxx litigation?
21    A.    I would have no idea.
22    Q.    Do you have any sense of what percentage
23 of the documents that might bear on the subject of
24 naproxen you actually were provided by Mr. Garrison?
25    A.    There are no clinical trials or placebo

Page 48

1 control on that, so I have not --
2    Q.    No, that wasn't my question. My question
3 is, he gave you, it looks to me like one letter
4 related to naproxen and VIGOR. And I'm asking you,
5 do you know how many other documents there are that
6 Merck produced in this litigation that discuss
7 naproxen and VIGOR.
8    A.    I have no idea how many there are. But
9 it would not alter my opinion about the relationship
10 of naproxen and VIGOR.
11    Q.    Did you at any point ask whether there
12 were any documents that might offer different
13 opinions that you should see, or did you just decide
14 that you would rely on the published literature for
15 that?
16    A.    I relied on the published literature. I
17 relied on the FDA cardio renal review, as well as the
18 review of the VIGOR data.
19    Q.    And the FDA documents, you obtained on
20 your own?
21    A.    I downloaded some. I also was provided
22 some by counsel.
23    Q.    I haven't seen a lot of FDA documents in
24 what you've provided. Is there anything -- is that
25 because it's on a disk, or is it because you've not

Page 49

1 kept all of what you were given?
2    A.    I have kept all that I've been given by
3 counsel. You have it all before you. The -- some of
4 the FDA documents are on disks.
5    Q.    And those would be the disks that were in
6 the pocket in Arnett 4, correct?
7    A.    Uh-huh.
8    Q.    Before the deposition got started, you
9 mentioned to me that you had some materials on your
10 computer. Are any of those materials different from
11 or in addition to what we've just spent an hour
12 discussing?
13    A.    I have no materials on my computer. To
14 clarify, in case I wanted to look at disks during
15 this presentation -- deposition, I wanted to have
16 access to look at them.
17    Q.    Okay.
18    A.    So there are no -- no files on my
19 computer.
20    Q.    Fair enough.
21        MS. FRIEWALD: Unless somebody else here
22 wants any of the material Dr. Arnett says she
23 has not particularly looked at marked as an
24 exhibit, I'm not going to do so. I assume we
25 can get copies separate from the deposition if

13 (Pages 46 to 49)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 50

1  we want it.  But I'm just going to leave it
2  identified in the record as-is of now.
3       Why don't we put Dr. Patrono's letter
4  back in your stack so that we don't mess up your
5  system of organization?  And I can give you back
6  --
7       THE WITNESS:  Thank you.
8       MS. FRIEWALD: -- your binder.
9       (A discussion was held off the record
10       after which the following occurred.)
11       MS. FRIEWALD:  I just want to make sure
12  that the court reporter understands that in
13  addition to the paper documents in Exhibit 4, we
14  want to get a copy of all OF the CDs that are in
15  the pockets.  Everything that is in Exhibit 4
16  we'd like a copy of, including any tabs that
17  Dr. Arnett has put on those documents.  And we
18  want to make sure all the highlighting and
19  underlining is reflected and all the disks are
20  there, too.
21       THE WITNESS:  What would you like done
22  with these?  This is the stack of things I did
23  semi-review.
24       MS. FRIEWALD:  I don't think -- I'm going
25  to take a look at those and see if there's any

Page 51

1  writing of substance on them.  If not, I don't
2  think I need them either.
3  BY MS. FRIEWALD:
4       Q.  Let me ask you this, though:  Dr. Ray's
5  report, did you rely on that in forming your
6  opinions?
7       A.  I did not.
8       Q.  When did you review that?
9       A.  I reviewed that in the very beginning of
10  when I began my work.  So that had to be April or
11  May.
12       Q.  Do you know Dr. Ray?
13       A.  I know of Dr. Ray.  I know he's at
14  Vanderbilt.  I know that he's a very well-respected
15  pharmacoepidemiologist.
16       Q.  Have you ever worked with him?
17       A.  I have not.
18       Q.  Do you know Dr. Avorn?
19       A.  I've heard of Dr. Avorn.
20       Q.  Have you ever worked with him?
21       A.  I have not.
22       Q.  Have you ever spoken with either Dr. Ray
23  or Dr. Avorn either in connection with the Vioxx
24  litigation or otherwise?
25       A.  I have not.

Page 52

1       Q.  What about Dr. Topol; do you know him?
2       A.  I recently met him.  I don't know him.
3  I've served on a panel with the National Institutes
4  of Health that he chaired.
5       Q.  Is that how you met him?
6       A.  I met him.  I was asked to come and
7  advise them on their strategic plan.
8       Q.  What was the nature of the panel?
9       A.  The panel is defining the strategic plan
10  for the National Heart Lung and Blood Institute for
11  the next five years.  And I was the expert invited
12  for coronary artery disease.
13       Q.  And when did you meet Dr. Topol?
14       A.  At that meeting.  It was June 26th, I
15  believe.
16       Q.  Have you had any discussions with him
17  regarding Vioxx?
18       A.  I've had no discussions with him
19  regarding anything from their strategic planning.
20       Q.  What about Dr. Furberg; do you know him?
21       A.  I do know Dr. Furberg.
22       Q.  How do you know him?
23       A.  He is -- was the chair of the steering
24  committee or executive committee -- and I'm not sure
25  which it was -- for the ALLHAT trial.  The ALLHAT

Page 53

1  trial is an antihypertensive and lipid-lowering trial
2  conducted in the '90s, late '90s through the early
3  2001, 2002.  And I have an ancillary study to do to
4  that study called the GenHAT study -- it's listed on
5  my CV -- Genetics of Hypertension Associated
6  Treatment.  And I contacted Dr. Furberg as chair of
7  that executive committee to gain permission to submit
8  an ancillary study proposal for ALLHAT.  So that's
9  how I know --
10       Q.  How long ago was that?
11       A.  The grant went in in '99, so in 1999.
12       Q.  Have you had any contact with Dr. Furberg
13  since then?
14       A.  Only passing at meetings, and I saw him
15  last at the American Heart Association Council and
16  Epidemiology Prevention Meeting when it was held in
17  Hawaii, which, I believe, was four years ago.
18       Q.  Have you had any communications with him
19  regarding Vioxx?
20       A.  None.
21       Q.  Or any COX-2?
22       A.  None.
23       Q.  What about Dr. Cromwell?  Is he somebody
24  you knew?
25       A.  Dr. Cromwell from Washington, University

14 (Pages 50 to 53)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 54

1  of Washington, Dick Cromwell?
2     Q.    Oh, I'm sorry. That wasn't who I meant
3  to ask you about, but since we're there, sure.
4     A.    I work with him through another study I
5  work on with the National Institutes of Health called
6  MESA, Multiethnic Study of Subclinical
7  Atherosclerosis. And he is the principal
8  investigator for the coordinating center for that
9  study, and I've met him through interactions with
10  that study. I'm an investigator. I was the
11  principal investigator of the field center at
12  Minnesota before I moved here.
13     Q.    Any communications with him related to
14  Vioxx or COX-2s?
15     A.    No.
16     Q.    What about Dr. Krumholz, which is who I
17  meant to mention.
18     A.    Okay. Krumholz?
19     Q.    Yes.
20     A.    Yes. I have met -- are you specifically
21  asking about my COX-2 interactions?
22     Q.    I was asking first if you knew him, and
23  then I want to know about your COX-2 interactions.
24     A.    Yes, I do know Harlan. He and I
25  interacted with American Heart Association

Page 55

1  Committees. I've served on the Senior Scientific
2  Advisory Committee called SSAC for the American Heart
3  Association and Harlan and I served on that together
4  probably 2004, I think, and 2005.
5     Q.    What was the nature of that committee?
6     A.    That's the scientific oversight committee
7  for the American Heart Association, so we deal with
8  all matters of science relative to the broad
9  organization of the American Heart Association.
10     Q.    Can -- can you give me an example of the
11  kinds of things that you would deal with? Because it
12  sounds -- it's a little broad because it sounds like
13  everything science, so I don't know where you draw
14  the line.
15     A.    Actually, it is everything science.
16  There are 13 councils on the American Heart
17  Association and 3 interdisciplinary working groups,
18  and I chaired the interdisciplinary working group on
19  functional genomics and translational biology, and
20  Harlan chaired the interdisciplinary work group on
21  outcomes research. And each of those councils
22  represents a different domain from kidney to
23  radiology to hypertension to cardiology. So it's a
24  very broad field, and we would deal with matters of
25  policy for the organization around science.

Page 56

1     Q.    Have you been on any other committees, or
2  have you had any other professional contacts with
3  Dr. Krumholz other than this one oversight committee
4  you described?
5     A.    No.
6     Q.    And tell me about your coxib-related
7  communications with Dr. Krumholz.
8     A.    I've had none.
9     Q.    Have you talked to him at all about any
10  of your Vioxx litigation work?
11     A.    I have not.
12     Q.    Did you know that any of the people that
13  we've just gone through were working with plaintiffs
14  in the Vioxx litigation before you agreed to be an
15  expert for plaintiffs?
16     A.    I did not.
17     Q.    Did you talk to anybody about whether or
18  not you should agree to be an expert for plaintiffs
19  before you did so?
20     A.    I did not.
21     Q.    Is George Howard a colleague of yours?
22     A.    He is.
23     Q.    And is he somebody who you work with?
24     A.    Yes, although we don't have any studies
25  together. We're not co-investigators. But I chair

Page 57

1  the Department of Epidemiology, and he chairs the
2  Department of Biostatistics. So we interact more on
3  an administrative level.
4     Q.    Is he somebody who you respect?
5     A.    Yes.
6     Q.    And do you consider him to be a top-notch
7  biostatistician?
8     A.    I do.
9     Q.    And do you consider him to be somebody
10  who's careful and thorough in the work that he does?
11     A.    Yes.
12     Q.    And have you ever had any criticisms of
13  his work?
14     A.    Of his scientific work?
15     Q.    Yes, his scientific work.
16     A.    No.
17     Q.    Since you hesitated, is there some other
18  type of work that you have criticisms of?
19     A.    Well, if you ask as chairs of different
20  departments, we're always sparring. So we're always
21  competing for resources.
22     Q.    When you say you're -- you're sparring
23  and competing for resources, you mean there's --
24  there's limited grant and other funds to go around
25  and --

15 (Pages 54 to 57)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 58

1    A.   Oh, it's not about grants.
2    Q.   Okay.
3    A.   It's about running the department from
4  the state funds that are given to the university and
5  to the school.
6    Q.   Okay.  So other than competing for scarce
7  resources, you haven't had any areas of disagreement
8  with him?
9    A.   No.
10   Q.   Although, certainly it is true that
11 reasonable scientists can differ with each other with
12 regard to their scientific conclusions; fair enough?
13   A.   One of the joys of being a scientist is
14 actually disagreeing, and that's how new hypotheses
15 are generated.  But George and I have two different
16 areas.  He works primarily in the area of stroke; I
17 work primarily in the area of genetics, of
18 cardiovascular disease previously and more
19 broad-based cardiovascular epidemiology.
20   Q.   But generally speaking, certainly it is
21 the case that part of what good scientists do is
22 debate questions that are not yet fully answered,
23 often disagree with each other about questions that
24 are not yet fully answered, correct?
25   A.   It is correct that the way that we

Page 59

1  develop as scientists and develop theories is through
2  interaction and discussion.
3    Q.   And often there are even heated
4  disagreements between scientists as we all learn more
5  about different scientific areas?
6    A.   I don't understand what you mean by
7  "heated."
8    Q.   Well, I'm not trying to be pejorative in
9  any way.  I'm just -- I'm saying what I think is
10 actually probably fairly uncontroversial, is that
11 scientists can debate.  It can often be a very active
12 debate where reasonable scientists come out
13 differently on an issue.
14       MR. GARRISON:  Object to the form.
15   A.   It is -- I would agree that scientists
16 debate.  I have never debated with any of the people
17 you have previously listed as having expertise and
18 concerns.
19   Q.   As part of your committee work for
20 various organizations, have you had the experience of
21 engaging in scientific debate with different
22 colleagues?
23   A.   Yes.
24   Q.   And I imagine you've often debated with
25 scientific colleagues whose opinions you generally

Page 60

1  respect and whose expertise you respect?
2    A.   In general, that's true.
3    Q.   Doctor, can you tell me -- let's do this
4  first.
5        Did you meet with anybody to prepare for
6  today?
7    A.   You mean scientists?
8    Q.   I actually meant lawyers.  But we can
9  certainly answer the scientist question.
10   A.   I have not met with any scientists or had
11 discussions with other scientists --
12   Q.   Okay.
13   A.   -- in forming my opinion.  I have met
14 several occasions with Mr. Garrison, Mr. Bross, and
15 Paul Sizemore and Ben.
16   Q.   Have you met with Mr. Sizemore at the
17 same time as you met with Mr. Garrison?
18   A.   Once.
19   Q.   And did you have a meeting specifically
20 in preparation for today's deposition?
21   A.   By "preparation," you mean what?
22   Q.   Did you have a meeting where Mr. Garrison
23 or somebody from his office said, I want to get
24 together with you to prep or to review materials
25 before your deposition?

Page 61

1    A.   We -- we did have a meeting to review
2  materials -- excuse me -- to make sure I have
3  everything I needed.
4    Q.   And when was that?
5    A.   That was yesterday.
6    Q.   Who attended that meeting?
7    A.   Bill, Ben and Lew.
8    Q.   How long did that meeting last?
9    A.   Three hours.
10   Q.   Was it here at UAB?
11   A.   It was.
12   Q.   Have any other meetings to review
13 materials for your deposition?
14   A.   We had a meeting with Paul Sizemore and
15 Ben and, I believe, Bill -- I don't believe you were
16 there -- the week before.
17   Q.   Are you able to tell me in total how many
18 hours you have spent meeting with lawyers for
19 plaintiffs in connection with Vioxx litigation?
20   A.   I could -- I can check my invoice.  I
21 would -- I believe it's -- before yesterday's meeting
22 was 12.
23   Q.   Have you, in fact, submitted invoices so
24 far?
25   A.   I have a draft invoice being reviewed by

Donna K. Arnett

Page 62

1  Melissa Couch.  I haven't officially sent it because
2  she wants detail, and I don't know what level of
3  detail.  So I haven't --
4      Q.    Did --
5      A.    I've sent one to review, but I don't know
6  if it's officially submitted or not.
7      Q.    Does Ms. Couch edit your invoices?
8      A.    No.  I just sent an invoice with a total
9  number of hours, and she said she needed detail.
10     Q.    What was the total number of hours?
11     A.    At that point, it was in the 50s.
12     Q.    And how long ago was that?
13     A.    That was in July.
14     Q.    So as of July, you had spent about 50
15  hours reviewing materials related to the Vioxx
16  litigation?
17     A.    Yes.
18     Q.    Any other hours that you would say went
19  into forming your opinions that you're going to give
20  at trial?
21     A.    For this deposition or for trial?
22     Q.    Well, for this deposition, with the eye
23  towards this being my chance to hear what you're
24  going to say at trial.
25     A.    Okay.  So I have -- I submitted an

Page 63

1  invoice on Saturday that was cumulative -- because
2  I've never gotten approval for the first one -- of 72
3  hours.  I've worked an additional 28 hours since
4  Saturday.
5      Q.    If I understand right, your total time
6  spent so far is 108 hours --
7      A.    It's not -- it's --
8      Q.    -- give or take?
9      A.    100 hours.
10     Q.    Okay.
11     A.    I -- 72 and 30 -- you're right.  That's
12  wrong.  It wasn't 30 --
13     Q.    You're right.  It's what?  I'm sorry.
14     A.    It was 27 --
15     Q.    I had 98 hours.
16     A.    It was 72 plus 20 because I worked
17  through Saturday night, and Sunday and Monday, I
18  spent ten hours each day, and then three hours
19  yesterday morning.
20     Q.    Okay.  Somewhere around 100 hours?
21     A.    Yeah.
22     Q.    And are there any written invoices that
23  reflect that time, how you've spent that time?
24     A.    I -- yes.  To the -- the one to Melissa.
25  But I don't know if it's official yet.

Page 64

1      Q.    Okay.  Do you have a document that goes
2  through and breaks out how you spent the different
3  times that you wanted to bill?
4      A.    I have an e-mail to her that I could
5  probably find.
6      Q.    Okay.  I'm going to ask that we receive
7  that e-mail and any other e-mails to or from Ms. --
8  is it Couch or Crouch?
9      A.    Couch.
10     Q.    Ms. Couch, or anybody else from
11  Med-Expertise.
12          Doctor, what do you understand to be, in
13  general terms, the opinions that you're going to
14  offer if this case goes to trial?
15     A.    I have three opinions.  The first is that
16  Vioxx is cardiotoxic.  The second opinion is that the
17  risk appears early and is continuous.  And the third
18  is that after the results of VIGOR were released, it
19  was reasonable to warn future patients about the risk
20  associated with Vioxx from a cardiovascular
21  perspective.
22     Q.    Let me ask a couple more questions, and
23  then we'll take a break because we've been going
24  about an hour and a half.
25          I forgot to ask you whether you know

Page 65

1  Dr. Graham or have had any contact with him.
2      A.    I -- I have met him at study section.  I
3  work for -- well, I don't work for.  I volunteer as a
4  scientist to review grants for the National
5  Institutes of Health.  And he was meeting with a
6  colleague, and he was introduced to me.  I don't know
7  that I could even recognize him again.
8      Q.    Have you spoken with anybody from Pfizer
9  in connection with this litigation?
10     A.    Not to my knowledge.
11     Q.    Have you had any -- do you do any work
12  with or for Pfizer?
13     A.    I have never worked for Pfizer.
14     Q.    Have you reviewed any materials related
15  to Celebrex or Bextra?
16     A.    I have not.
17     Q.    Is there anybody from the FDA or who was
18  previously with the FDA who you've spoken with in
19  connection with forming your opinions?
20     A.    There is not.
21     Q.    Anybody who I haven't thought to ask you,
22  but who you're going to -- who you would have to say
23  you have consulted with in forming your opinions?
24     A.    There is no one.
25     Q.    Now --

17 (Pages 62 to 65)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 66

1    A.    You didn't ask me about Farquhar.
2    Q.    You're right. I didn't. Thank you very
3  much. So now I will.
4         MR. GARRISON: Don't do her anymore
5  favors.
6         THE WITNESS: All right.
7         MS. FRIEWALD: This is a very helpful
8  witness.
9  BY MS. FRIEWALD:
10   Q.    Do you know Dr. Farquhar?
11   A.    I do not.
12   Q.    And I gather you've never communicated
13  with him regarding Vioxx or COX-2s?
14   A.    I have not.
15        MS. FRIEWALD: Okay. Why don't we take a
16  five-minute break. And if you could get me your
17  updated CV, that would be a big help.
18        THE VIDEOGRAPHER: This is the end of
19  Tape Number One in the videotaped deposition of
20  Dr. Donna Arnett to be continued on Tape Number
21  Two. We're off the record at 10:32.
22        (Off the record.)
23        THE VIDEOGRAPHER: This is the beginning
24  of Tape Number Two in the continued deposition
25  of Dr. Donna Arnett. We're on the record at

Page 67

1  10:49 a.m.
2  BY MS. FRIEWALD:
3    Q.    Dr. Arnett, on the break, you were nice
4  enough to go and get me a cover letter -- actually,
5  two cover letters from Med-Expertise, along with a
6  document captioned "Expert Retention and
7  Confidentiality Agreement" that appears you --
8  appears was sent to you in March of '06. The copy
9  you've given me does not actually have your signature
10  on it. Did you sign a copy of the document?
11   A.    I believe I signed a copy. But I don't
12  have one with my signature on it.
13   Q.    The -- the document that you gave me
14  actually is stamped "Copy." Is it possible that you
15  were given two --
16   A.    Two, yes.
17   Q.    -- versions, an original and a copy, and
18  you retained the unsigned copy, and you sent back the
19  original?
20   A.    To the best of my memory. This is, you
21  know, six months ago, and seven grants have been
22  written since that time. So it's possible.
23        MS. FRIEWALD: I'm going to ask the court
24  reporter to put an exhibit sticker and mark the
25  clipped document, including the cover letters

Page 68

1  and the confidentiality and retention agreement,
2  as Arnett 5.
3         (Exhibit Arnett 5 was marked
4         for identification.)
5    Q.    I apologize if I've asked this before,
6  but I just want to make absolutely certain, you do
7  not have a written agreement with Mr. Garrison
8  independent of the Med-Expertise, correct?
9    A.    I do not have a separate written
10  agreement.
11   Q.    Have you sent Mr. Garrison any bills
12  independent of the invoices you've submitted through
13  Med-Expertise?
14   A.    I have not.
15   Q.    And I don't need them today, but I am
16  going to ask that you provide to Mr. Garrison, so
17  that he can give to us, a copy of any of the invoices
18  that you have, even if they haven't been approved
19  yet, for your services in the Vioxx litigation,
20  whether -- whether submitted through Med-Expertise or
21  otherwise submitted.
22   A.    There have been no otherwise submitted.
23   Q.    The -- did you receive any materials, any
24  substantive materials from Ms. Couch or Ms. --
25  Medical Expertise?

Page 69

1    A.    I did not.
2    Q.    The web sites that you referred to, were
3  some of those lawyers' web sites?
4    A.    The -- they were news web sites. I know
5  forbes.com was one. There was newstarget.com or
6  something like that, which actually played out all
7  the memos that I requested, the internal Merck
8  documents that are requested from Mr. Garrison.
9    Q.    Do you believe the name of that was News
10 --
11   A.    Target.
12   Q.    -- target?
13   A.    I believe it was.
14   Q.    Do you know who sponsors that web site?
15   A.    I didn't -- don't know.
16   Q.    Were there any lawyer web sites that you
17  were directed to?
18   A.    One yesterday. I have no clue who it
19  was. Didn't -- when it was a lawyer web site, I just
20  closed it.
21   Q.    Are you able to tell me what searches you
22  did?
23   A.    The -- the search terms that I used were
24  Vioxx, cardiovascular.
25   Q.    Are you able to tell me how much time you

Donna K. Arnett

Page 70

1  spent looking on the Internet for materials?
2      A.    Could you be more specific?  Because, for
3  instance, I went to the FDA.  That would be
4  considered the Internet.  So do you mean including
5  the FDA?  Do you mean Googling?
6      Q.    Googling.
7      A.    Googling.  Googling, not more than an
8  hour and a half.
9      Q.    Are there search engines that you use in
10  your academic practice to obtain literature related
11  to cardiovascular issues?
12      A.    Yes.
13      Q.    What are they?
14      A.    PubMed and Google Scholar.
15      Q.    And are there journals that you subscribe
16  to?
17      A.    As a premium member of the American Heart
18  Association, I have access to all of their five
19  journals.  And I'm editor of the American Journal of
20  Epidemiology, so I have access to American Journal of
21  Epidemiology, but I have no subscriptions.
22      Q.    What are the five AHA journals?
23      A.    Circulation, Circulation Research, ATBB,
24  Stroke and Hypertension.
25      Q.    ATBB is atherosclerosis and vascular --

Page 71

1      A.    Thrombosis and vascular biology.  That's
2  why I said ATBB.
3      Q.    That was a good move.
4          Do you regularly review any or all of
5  those journals?
6      A.    I am an editor, consulting editor for
7  Circulation.  So I review many of the epidemiological
8  articles from Circulation as an editor.
9      Q.    What does that mean?  You're not on the
10  editorial board of Circulation, correct?
11      A.    I am one of -- I'm a -- what's called a
12  consulting editor.  So for conflicts with
13  epidemiology, I am sent papers, and I serve as a full
14  editor.  I've reviewed or edited for Circulation 53
15  articles in the past year.  It's not a -- it's more
16  like a regular job.
17      Q.    Just because I'm not sure that I
18  understand how all the different journals work
19  exactly, let me tell you my understanding of what you
20  said, and you tell me if I went wrong anywhere.
21          If I open Circulation, I wouldn't see
22  your name on the editorial board, correct?
23      A.    Correct.
24      Q.    But you're called on from time to time,
25  when editorial board members have a conflict that

Page 72

1  prevents them from reviewing articles?
2      A.    From serving as editors.
3      Q.    From serving as editors?
4      A.    For that article.
5      Q.    And are there subareas in cardiology that
6  you specifically will edit articles for and other
7  ones where you'll say, this is outside of my
8  expertise?
9      A.    I review articles that are for
10  epidemiology, so articles that are sent to
11  Circulation tend to be about cardiovascular
12  epidemiology.  And I review some in genetic
13  epidemiology within -- and pharmacogenetics within
14  the general cardiovascular arena for Circulation.
15      Q.    You are not, correct, a medical doctor?
16      A.    I am not a medical doctor.
17      Q.    You are trained as a nurse?
18      A.    I am no longer licensed because I became
19  -- when I became an epidemiologist, I left medical --
20  or nursing practice.
21      Q.    Were you at some point licensed as a
22  registered nurse?
23      A.    I worked five years in all aspects of
24  nursing, from neonatal intensive care, critical care,
25  surgical ICU, recovery room.

Page 73

1      Q.    In what state were you licensed as a
2  nurse?
3      A.    Florida.
4      Q.    You were exclusively a hospital-based
5  nurse?
6      A.    For the first five years of my practice,
7  I was.  I became a research nurse for clinical
8  protocols in cardiovascular disease and clinical --
9  clinical trials in 1985.  And I did that for three
10  years.
11      Q.    Were those hospital-based clinical
12  trials?
13      A.    They were outpatient based.
14      Q.    Are they on your CV?
15      A.    No.  I was not the principal
16  investigator.  I was a research nurse.
17      Q.    Right.  I didn't know if you would have
18  listed them in any way on your CV.
19          Are nurses in Florida allowed to
20  prescribe medications?
21      A.    Nurse practitioners who are certified as
22  nurse practitioners, ANRP certification, can
23  prescribe prescriptions under the direction of a
24  physician.  They have to be oversigned.  I was not an
25  ANRP.

19 (Pages 70 to 73)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 74

1   Q.    So you've never actually prescribed a
2   prescription medication?
3   A.    I have not.
4   Q.    It would be unlawful for you to do so?
5   A.    Correct.
6   Q.    And you have, however, I gather, been
7   asked by physicians to document prescriptions in
8   medical records?
9   A.    Could you be more precise?  What do you
10  mean by "document?"
11  Q.    Well, if you -- you've -- I can't imagine
12  you haven't had situations where you were working
13  with a doctor, caring for a patient, the doctor
14  prescribed the medication, and part of your job was
15  to make sure that was reflected in the medical chart?
16  A.    I worked in the hospital setting.  We --
17  only if I was -- had a call-in order did I transcribe
18  --
19  Q.    I'm not taking about take-home
20  medication.  But in the hospital setting,
21  prescription medication -- medications are prescribed
22  all the time.  The doctor might say, I want an IV
23  medication or I want the patient to have anything
24  from an antihypertensive to an analgesic to -- I
25  don't know -- a medicine to treat post-surgical

Page 75

1   pain.  And -- and that would get documented in the
2   chart, correct?
3   A.    By the medical doctor.
4   Q.    Okay.  Would you ever be responsible for
5   documenting that?
6   A.    No.
7   Q.    Would you be responsible for documenting
8   that you had actually given the medication per the
9   doctor's orders?
10  A.    Yes.
11  Q.    And that was something that was important
12  to do as part of the recordkeeping at the hospital?
13  A.    Yes.
14  Q.    And as part of your work as a nurse, you
15  understood that it was important to have good and
16  accurate and complete records of all the medications
17  that were provided to the patient in the hospital
18  setting?
19  A.    Yes.
20  Q.    Doctor, do we have your updated CV yet or
21  not?
22  A.    No, not yet.
23  Q.    Okay.
24  A.    I'm sorry.
25  Q.    You are currently chair of the Department

Page 76

1   of Epidemiology here at UAB?
2   A.    Correct.
3   Q.    And tell me a little bit of what's
4   involved in your job as chair.
5   A.    I administer the academic department.  We
6   have now -- excuse me -- approximately 20 faculty, so
7   I'm responsible for hiring new faculty, for mentoring
8   junior faculty.  I'm responsible for maintaining a
9   budget of about $9 million per year.  I'm responsible
10  for maintaining the administrative services in the
11  department.  I'm responsible for serving the
12  executive committee of the School of Public Health,
13  to develop and oversee the strategic direction of the
14  School of Public Health.  And I'm responsible for my
15  teaching and research as well.
16  Q.    How much time do you spend doing
17  teaching?
18  A.    I teach -- approximately ten percent of
19  my effort in terms of my total effort is spent
20  teaching.  But I -- I have taught this year almost
21  every semester.
22  Q.    Do you teach one or more than one class?
23  A.    One class a semester.
24  Q.    Have any of your classes at any time
25  related to pharmacoepidemiology?

Page 77

1   A.    I guest-lectured in the
2   pharmacoepidemiology course that we have here last
3   year, but not this year.
4   Q.    What was -- "guest-lectured" means you
5   gave one lecture?
6   A.    Uh-huh.
7   Q.    And what was your one lecture?
8   A.    Pharmacogenomics.
9   Q.    Explain to me what that is.
10  A.    Pharmacogenomics is a relatively new
11  field where we're utilizing information from the
12  human geno project to understand whether there are
13  genetic variations in the human geno that predict
14  response to drugs, either therapeutic response or
15  adverse responses to drugs.
16  Q.    Do you hold the opinion that there are
17  genetic reasons that explain people's responses to
18  different drugs?
19  A.    There are -- there -- there's good
20  evidence that there are some genetic variants that
21  explain response to some drugs.  That is true.
22  Q.    And is that an opinion that you hold to a
23  reasonable degree of expert certainty?
24  A.    Yes.
25  Q.    And do you believe that over time, we

Donna K. Arnett

Page 78

1  will find that there are genetic responses to most
2  drugs?
3      A.   I'm not as certain of that.
4      Q.   Without making me take an entire course
5  on pharmacogenetics, can you tell me why the answer
6  to that might be no?
7      A.   The answer, particularly in
8  cardiovascular diseases -- and that's the area that
9  I've predominantly dealt with -- the -- the diseases
10  are not simple mendelian diseases.  And by
11  "mendelian," I mean responsible from a single gene
12  perspective.
13          The LDL receptor mutation, for instance,
14  raises LDL cholesterol.  And in that situation, we
15  have a specific gene variant mutation that raises
16  cholesterol.
17          But for other -- for other responses to
18  drugs -- you know, I'm not a pharmacologist, so I
19  can't answer for all drugs, for all things.  It's
20  just in general, I'm not -- I'm not -- I don't have
21  medical certainty that we can say something for
22  everything.
23      Q.   Has your work in this area focused
24  primarily on drug efficacy?
25      A.   My work to date has primarily focused on

Page 79

1  efficacy in hypertension and lipid treatment.
2      Q.   Have you done any studies on genetic
3  responses to drugs from the safety standpoint?
4      A.   I have not.
5      Q.   Do you hold an opinion as to whether
6  there are genetic reasons why people might or might
7  not experience adverse reactions to drugs?
8      A.   There is good scientific evidence from
9  the cancer field that that is true.
10      Q.   And do you believe that that is an area
11  where we need more research to understand whether
12  there are genetic variations that might lead one
13  person to take a drug safely and another person to
14  have an adverse reaction to it?
15      A.   Yes.
16      Q.   Can you tell me in three or four
17  sentences -- I hate to -- I hate to limit you that
18  way, but I just want to kind of get the top-level
19  answer first -- what your opinion is regarding the
20  genetic role of hypertension or the genetic response
21  caused by -- the genetic response to hypertension?
22      A.   Could you be more clear?
23      Q.   Sure.  That was not a great question.
24          I -- I understand -- tell me if I'm wrong
25  -- that you believe that there is a genetic role for

Page 80

1  hypertension, a genetic component to people having
2  hypertension.
3      A.   I -- I agree with that statement.
4      Q.   And can you tell me how broad you've --
5  you consider that role to be?  Do you believe that
6  most people have a genetic component to their
7  hypertension?  Is it limited to certain populations?
8  Describe for me in general terms what your scientific
9  opinions are.
10      A.   As a genetic epidemiologist, I first look
11  at whether there's heritability, and by
12  "heritability," I define the heritability to be that
13  portion of a variation within a family that could be
14  attributable to shared genetic information.  And
15  hypertension is a modestly heritable trait.  The
16  heritability estimates range about 30 to 40 percent,
17  depending on the population.  So there are both
18  genetic and environmental causes of hypertension.
19      Q.   Is genetic predisposition different from
20  family history?
21      A.   It's -- yes.
22      Q.   My understanding is that cardiologists
23  talk of family history as one of the traditional risk
24  factors for cardiovascular disease.  Do you agree
25  with that?

Page 81

1      A.   Could -- specifically, a family history
2  of early onset disease in a first-degree relative is
3  considered a risk factor.
4      Q.   Okay.  Well, I don't want to quibble
5  about the parameters of family history.  But my -- my
6  understanding -- tell me if you disagree -- is that
7  there are -- there's kind of a continuum of
8  significance of family history; it's not just early
9  in a first-degree relatives.  It may -- it may be
10  that the family history is more or less significant
11  depending upon how many relatives have been affected,
12  depending upon the severity of the effect, depending
13  upon -- I don't know -- a variety of other things
14  that might go into play.
15      A.   Family history is an independent risk
16  factor, but it's mediated much through the risk
17  factors themselves.  And disentangling how much of it
18  is the genetic component versus the environmental
19  component or other risk factors components has not
20  been well worked out in cardiovascular disease.
21      Q.   Let me go back, then, to my original
22  question, which is that just because somebody doesn't
23  have a family history of cardiovascular disease that
24  they know of, doesn't mean that they are free of any
25  genetic predisposition for cardiovascular disease?

21 (Pages 78 to 81)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 82

1      A.      I would agree with that.
2      Q.      Much of your work, if I understand
3  correctly, has related to arterial function and the
4  role of genetics; is that right?
5      A.      No.
6      Q.      Okay.  I see that you've done research on
7  physical activity and other behavioral aspects of
8  cardiovascular disease; is that correct?
9      A.      That's correct.
10     Q.      And have you done that research -- do you
11  hold an opinion as to whether sedentary lifestyle or
12  lack of physical activity is an independent risk
13  factor for cardiovascular disease?
14     A.      I would agree with that.
15     Q.      You did a study on TV watching and
16  cardiovascular disease?
17     A.      As part of the family heart study, I did.
18     Q.      And tell me about that a little bit.
19     A.      In the family heart study, where I served
20  as principal investigator for the Minneapolis Field
21  Center, we quantified within families the number of
22  hours spent watching television.  And it's shown to
23  be a good marker of physical inactivity.  The more --
24  and it's common sense -- the more television you
25  watch, the less active you are.

Page 83

1      Q.      And when you talk about "good marker,"
2  what you're saying is, it's not that TV, per se,
3  causes heart disease, but it tells you how much
4  people get up and move around.  And failing to get up
5  and move around causes heart disease?
6      A.      Correct.
7      Q.      Doctor, have you had any role, direct or
8  indirect, in the Cardia study?
9      A.      Indirectly, I -- first of all, they're
10  here in Birmingham.  The Corning Center is here.  I
11  have -- I had an ancillary study when I first started
12  my work as a cardiovascular epidemiologist in 1994.
13  My first grant from the University of Minnesota was
14  to do genotyping within the Cardia study for
15  angiotensin-converting enzyme gene.
16     Q.      Are -- you're not trained as a
17  geneticist?
18     A.      I am not.
19     Q.      What type of genotyping do you do?
20     A.      I do no genotyping.  I outsource my
21  genotyping to geneticists.
22     Q.      Okay.  So when you say you were asked to
23  do genotyping, what did that mean?
24     A.      I got a grant to pay for the genotyping
25  to be conducted in the Cardia cohort in cases in

Page 84

1  controls, I believe, with LVH.
2      Q.      Am I right, Cardia is a very large
3  epidemiologic study that, as you say, is out of UAB?
4      A.      The coordinating center is out of UAB,
5  and one of the five clinical centers is out of UAB.
6  It's a large study, five field centers, in existence
7  now, I think, for 20 years.
8      Q.      And it's a long term -- it follows
9  patients long term and looks at risk factors for
10  developing -- development of cardiovascular disease?
11     A.      Correct.
12     Q.      And it looks at a whole host of different
13  risk factors, correct?
14     A.      Correct.
15     Q.      And those would be both the traditional
16  risk factors and various lifestyle risk factors that
17  we're learning more about?
18     A.      That's correct.
19     Q.      Among other things, it tracks patients'
20  blood pressure; is that correct?
21     A.      Correct.
22     Q.      And it looks at the effect of high blood
23  pressure, borderline blood pressure, and hypertension
24  over time?
25     A.      Correct.

Page 85

1      Q.      And there are a bunch of publications
2  that have come out of Cardia; is that right?
3      A.      That's correct.
4      Q.      And is that work that you've relied on or
5  referenced in your work as an epidemiologist?
6      A.      Yes.
7      Q.      Doctor, what role or roles have you
8  played, if any, in relation to the FDA?
9      A.      You'll see on my CV that I was listed as
10  a special government employee, and that happened
11  actually when I was working as a clinical research
12  nurse.  And I was going to participate in a
13  collaborative study with the FDA.  I can't even
14  remember what it was for at this point.  That was the
15  1980s.  But they've never taken it off my CV, so I've
16  listed it.  I was asked to serve on a review panel
17  for them for biostatistics but declined because I was
18  too busy at the time.  I had a conflict for timing,
19  not because I didn't want to help the FDA.
20     Q.      Have you ever consulted for the FDA in
21  any capacities since the work you just described?
22     A.      No.  And I never formally entered a
23  consulting relationship with them.
24     Q.      Fair enough.  Have you ever testified in
25  front of the FDA?  I think the answer is going to be,

22 (Pages 82 to 85)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 86

1  no, you never testified before today.
2      A.    That's correct.
3      Q.    Okay.  Have you ever been called upon to
4  give any advice to the FDA in any way?
5      A.    Well, as I said, I was asked to serve as
6  a biostatistical review for something in the
7  mid-1990s, and I had a conflict with that.  I have no
8  memory of what it was for.
9      Q.    But you didn't actually do it?
10     A.    I didn't do it.
11     Q.    And I assume that you've also never done
12  any work with regard to the approval of a
13  pharmaceutical -- of a prescription pharmaceutical?
14     A.    That is correct.
15     Q.    You've never done any work related to the
16  labeling of a prescription pharmaceutical?
17     A.    That's correct.
18     Q.    You've never done any work related to the
19  advertisement or the promotion of a prescription
20  pharmaceutical?
21     A.    That's correct.
22     Q.    Your -- if I haven't missed anything, I
23  don't -- I don't think I've seen -- I apologize if
24  I've missed something -- any of your publications
25  that actually deal with a prescription

Page 87

1  pharmaceutical; is that right?
2      A.    They're -- that's incorrect.
3      Q.    Well, sorry.  I guess you've looked at
4  the efficacy of certain medications; is that correct?
5      A.    There -- I looked -- in the GenHAT study,
6  I had a publication this year in Circulation looking
7  at the ACE gene in response to four drugs that are
8  approved marketed drugs.
9      Q.    Okay.  I'll modify the question a little
10  bit.
11          You've never done any research related to
12  a prescription pharmaceutical prior to it being
13  approved by the FDA?
14     A.    When I worked with a -- as a nurse, a
15  research nurse, I was working with Phase III
16  studies.  But I was a nurse.  I was not leading the
17  investigation at that point.
18     Q.    Did you --
19     A.    In my professional work since I graduated
20  in '92, I have not done any work of that nature.
21     Q.    And you haven't done any research on
22  approved medications for the purposes of getting them
23  further approved for new or different indications; is
24  that correct?
25     A.    That's correct.

Page 88

1      Q.    And you haven't done any research for the
2  purpose of testing the safety of any medications,
3  either pre-approval or post-approval; is that
4  correct?
5      A.    That's correct.
6      Q.    Have you done any research work that you
7  would consider to be research into the cardiovascular
8  risks of a particular medication?
9      A.    Yes.
10     Q.    Okay.
11     A.    My GenHAT study, in particular, is
12  related to genetic modifiers of drug efficacy, which
13  some could argue the alternative of efficacy is
14  adverse effects.
15     Q.    Just tell me a little more specifically
16  what that work was, what the --
17     A.    In the ALLHAT trial, we have examined 43
18  different genetic variants and evaluated the response
19  to 3 or 4, depending on whether we took doxazosin
20  or not in our comparison, the effect of these genes
21  on response to those drugs.  And by "response,"
22  specifically I mean the risk of coronary heart
23  disease, fatal or nonfatal, MI and other
24  cardiovascular thrombotic events.
25     Q.    So you looked at three or four drugs that

Page 89

1  were meant to provide therapeutic benefit to patients
2  with cardiovascular disease?
3      A.    Specifically hypertension.
4      Q.    They were supposed to lower blood
5  pressure?
6      A.    Right.
7      Q.    And you -- your research was to see if
8  there were -- if any one or more of 43 different
9  genetic variants affected whether people had a good
10  response to those medications?
11     A.    Or an adverse response.
12     Q.    Was the adverse response one of the
13  prespecified end points of the study?
14     A.    Yes.
15     Q.    Where would I find those results
16  published?
17     A.    The ACE insertion/deletion variant is in
18  Circulation.  The adducent variant is in Nature
19  Pharmacogenomics.  The Beta-2 agonist receptor
20  variants are being reviewed by American Journal of
21  Hypertension.  There's one -- two other draft papers
22  that are in review by the ALLHAT steering committee.
23  And the rest are in -- in the process of publication.
24     Q.    How -- how many else are there?  How many
25  others are there?

23  (Pages 86 to 89)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 90

1    A.    There will be -- I'm working on a large
2  summary paper to put everything into one paper.
3    Q.    That's not uncommon, I gather, that a big
4  study will generate a lot of little papers --
5    A.    Right.
6    Q.    -- and then somebody does a comprehensive
7  paper? It's all part of one study, correct?
8    A.    Correct.
9    Q.    Are any of these papers identified by
10 number on your CV?
11   A.    Yes. But that was 2005, I believe, and
12 these papers have come out in 2006. So in the
13 updated CV, they should be present.
14   Q.    Okay. When we get the updated CV, I'm
15 going to ask you to remind me -- show me the numbers
16 because that will help me out a lot later.
17         Were there specific adverse end points
18 that you had designated in those studies?
19   A.    Our primary outcome was fatal and
20 nonfatal CHD. We had combined end points with stroke
21 and heart failure and angina, hospitalized angina.
22 And we've evaluated them both as combined end points
23 and separately.
24   Q.    Now, in those studies, when you say that
25 you were looking at adverse effects, you were looking

Page 91

1  at situations where people had adverse effects
2  because the drug didn't do what it was supposed to
3  do, correct?
4    A.    Could you restate that?
5    Q.    Sure.
6    A.    I didn't understand exactly what you're
7  asking.
8    Q.    Sure. The adverse effects that were part
9  of the study design were adverse effects that
10 resulted from the drugs not having their intended
11 efficacy; is that correct?
12   A.    That is correct.
13   Q.    You didn't have, as a prespecified end
14 point, looking at any adverse effects that were not
15 related to an efficacy failure of those drugs?
16   A.    That is correct.
17   Q.    And was there any kind of a combined end
18 point used to look at adverse effects for those
19 studies, like APTC or --
20   A.    There was a combined end point, not like
21 APTC, that combined nonfatal and fatal CHD, nonfatal
22 and fatal stroke, unstable angina. And I believe
23 that was the combined cardio -- PTCA or CABG, bypass
24 surgery revascularization procedures.
25   Q.    Okay. So just to make sure I have a

Page 92

1  general correct impression of things, what you were
2  basically doing is saying, if we give patients Drug
3  A, will they have a reduced incidence of heart
4  failure, reduced incidence of needing CABG surgery,
5  et cetera, for example, correct? And conversely, if
6  I -- will they have an increased incidence of these
7  things if that drug doesn't work for some reason?
8    A.    That is not the purpose of my study.
9    Q.    Okay. Then correct -- tell me where I
10 went wrong.
11   A.    My study was looking at genetic modifiers
12 of that stated relationship.
13   Q.    So it was looking to see if there was a
14 genetic reason why somebody might have a better
15 outcome taking a drug or might have a worse outcome
16 taking a drug?
17   A.    Correct.
18   Q.    Because the drug either worked better for
19 them or worked less well for them than somebody else
20 who had a different genetic profile?
21   A.    Right.
22   Q.    Any other studies that you can point me
23 to where you would say that you looked at potential
24 adverse effects of a medication?
25   A.    I have one study funded by the National

Page 93

1  Institutes of Health we've named Golden. It's the
2  pharmacogenomics of lipid-lowering response to
3  fenofibrate.
4    Q.    And is that the same kind of thing where
5  you were looking at genetic reasons why somebody
6  might have a good effect with fenofibrate or a poor
7  effect with fenofibrate?
8    A.    That is correct. In --
9    Q.    I didn't mean to cut you off. Go on.
10   A.    In that study, we have collected a lycrid
11 [phonetic] scale index of the severity of GI adverse
12 effects, and we'll be looking for genes that predict
13 those adverse effects.
14   Q.    Is fenofibrate correlated with GI adverse
15 effects?
16   A.    It -- adverse effects are a side effect
17 of ingestion of the drug in some people.
18   Q.    So in this situation, you weren't looking
19 to see whether certain people are genetically
20 predisposed to have more GI effects with fenofibrate;
21 is that right?
22   A.    That is a subbing.
23   Q.    It is a subbing. It's a secondary or
24 third-level end point of the study?
25   A.    A third-level end point.

24 (Pages 90 to 93)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 94

1   Q.    Any other study where you -- and I'm
2   sorry.  Is that listed on your CV?
3   A.    It is.
4   Q.    Can you tell me where?  I think you still
5   have a copy, but I can give you an extra if you need
6   it.
7   A.    It is on page three, "Genetic and
8   Environmental Determinants of Triglycerides."  It's
9   the fourth grant listed on that page.
10   Q.    Is there a published paper that came out
11   of this work?
12   A.    Not yet.  We still are getting our
13   genotyping completed.
14   Q.    Any other work you've done looking at
15   adverse effects of a prescription medication?
16   A.    No.
17   Q.    Have you ever, before doing work in
18   Vioxx, been asked to offer an opinion whether a
19   particular medication was cardiotoxic, to use your
20   term, or cause other adverse effects to the heart?
21   A.    To the heart, no.
22   Q.    Is there -- you repeated back "to the
23   heart."  Is there something a little bit related to
24   that that -- where you -- where the answer would be
25   yes?

Page 95

1   A.    If you recall, when we first started the
2   deposition, I said I'd worked for the Kay Schuler
3   firm in a PPA litigation related to hemorrhagic
4   stroke for Novartis, I believe, was the company.  So
5   I was asked to provide expert opinions about the role
6   of PPA on hemorrhagic stroke.
7   Q.    Okay.  Anything else?
8   A.    No.
9   Q.    Did you at any point have any contact
10   with anyone from Merck related to Vioxx or any COX-2
11   issues?
12   A.    I did.
13   Q.    And tell me about that.
14   A.    I signed a confidentiality agreement with
15   Merck that extends seven years, so I can't discuss
16   that.
17   Q.    Are you able to discuss anything -- have
18   you discussed anything related to your work with
19   Merck with any lawyers for the plaintiffs?
20   A.    No.
21   Q.    And without getting into substance, have
22   you described for them how much work has been done,
23   how little work has been done, who you had contact
24   with, when the work was done, anything like that?
25   A.    I discussed the dates of the work, and

Page 96

1   that's it.
2   Q.    Have you discussed in any way the nature
3   of the work?
4   A.    No.
5   Q.    And did any of that work go into the
6   opinions you formed in this case?
7   A.    Absolutely not.
8   Q.    Are there individuals at Merck who you
9   had contact with who you've identified to the
10   plaintiffs' lawyers or who you would identify if
11   called to testify at trial in this case?
12   A.    I don't know how much -- in fairness to
13   Merck, I signed a confidentiality agreement, so
14   anything and the people I met there, I don't know
15   what fits under that confidentiality agreement, so I
16   told nothing to no one.
17   Q.    Okay.  And sitting here today, it is not
18   your intention to give any testimony along the lines
19   of, I was told something by such and such person at
20   Merck?
21   A.    I relied solely on the published
22   literature and the FDA documents and the documents
23   that you have copies of.
24   Q.    Are you going to offer any criticisms
25   based -- of Merck based upon your interactions with

Page 97

1   the company or any individuals at the company?
2   A.    No.
3   Q.    Are you going to offer any opinions that
4   you feel that Merck did or did not comport itself in
5   an appropriate scientific manner based upon your
6   interactions with people at Merck?
7   A.    Nothing based on my interactions with
8   people.
9   Q.    Or your general -- your consulting work?
10   A.    Or my consulting work.
11   MR. GARRISON:  You're talking about with
12   Merck?
13   MS. FRIEWALD:  With Merck.
14   MR. GARRISON:  Okay.
15   BY MS. FRIEWALD:
16   Q.    Are you going to offer any opinions that
17   there was any information that was not provided to
18   you that should have been provided to you?
19   A.    Could you -- I don't understand that
20   question.
21   Q.    Are you going to -- are you going to
22   speak about or offer any statements that there was an
23   -- that there were any materials that you should have
24   received in the course of your consulting work for
25   Merck that you did not receive?

Donna K. Arnett

Page 98

1    A.    No.
2    Q.    Is there anybody, without identifying
3  names, from Merck who you've had an ongoing
4  relationship with since your consultancy ended?
5    A.    No.
6    Q.    Is there anybody who you -- who you
7  met who was not an employee of Merck in connection
8  with any work you did for Merck? For example, did
9  you meet any other outside experts?
10   A.    Yes.
11   Q.    And have you had any discussions with
12 those outside experts related to Vioxx or COX-2s that
13 you intend to include in your testimony at trial?
14   A.    No.
15   Q.    Do you have any ongoing -- have you had
16 any conversations with any of those experts about
17 Vioxx or COX-2s since your consulting work ended?
18   A.    I've had no conversations, period, with
19 them.
20   Q.    Are there any documents that you received
21 that you still have?
22   A.    No, with the exception of my
23 confidentiality agreement.
24   Q.    Were -- were there documents you were
25 given?

Page 99

1    A.    Yes.
2    Q.    What did you do with those documents?
3    A.    I threw them away.
4    Q.    A long time ago?
5    A.    A long time ago.
6    Q.    When I looked at your copy of the Arnett
7  materials that had all your little NAs next to it, it
8  seemed to me that what you had not looked at were any
9  of the animal studies; is that correct?
10   A.    Correct.
11   Q.    And that's because you consider that
12 outside your area of expertise?
13   A.    I'm an epidemiologist. I work with
14 humans.
15   Q.    And it looked like you didn't look at any
16 of the basic pharmacology research; is that correct
17 also?
18   A.    That's correct. I'm speaking here solely
19 as an epidemiologist.
20   Q.    You don't intend to offer any opinion as
21 to mechanism of action?
22   A.    Correct, I do not.
23   Q.    And if asked, you would not say that you
24 hold an opinion to a reasonable degree of medical
25 certainty as to the mechanism of action?

Page 100

1    A.    I'm here to speak about epidemiology. I
2  understand the general concept, but I am not an
3  expert in terms of cardiology.
4    Q.    You understand the different potential
5  mechanisms of action have been proposed as the
6  potential causes of alleged cardiovascular adverse
7  events caused by Vioxx and other COX-2 inhibitors,
8  correct?
9    A.    I'm generally aware of mechanisms.
10   Q.    But you don't intend to offer an opinion
11 that -- that scientists have concluded what the
12 mechanism is or that you have concluded what the
13 mechanism is; is that right?
14   A.    That is correct.
15   Q.    Do you agree that there continues to be
16 scientific debate as to whether different proposed
17 mechanisms of action, in fact, play a role in any
18 potential adverse effects caused by Vioxx or other
19 COX-2 inhibitors?
20   A.    I don't have expertise to answer that
21 question.
22   Q.    I also did not see in any of the
23 materials you've given me any package labels for
24 Vioxx or any other COX-2 inhibitors. I didn't miss
25 anything, did I?

Page 101

1    A.    You didn't.
2    Q.    And I gather you haven't reviewed any of
3  the package labels, correct?
4    A.    That is correct. I'm an epidemiologist.
5    Q.    So you're not going to offer any opinion
6  as to the appropriateness of any particular warning
7  that was included or not included in the package
8  label at a given time?
9    A.    I will restrict my opinions to
10 epidemiology and the science involved in
11 epidemiology.
12   Q.    One of the three opinions that you told
13 me that you were going to give I wrote down as being
14 after the results of VIGOR were released, it was
15 reasonable to warn future patients. Is that a
16 reasonable paraphrasing of what you said your opinion
17 would be?
18   A.    It is.
19   Q.    And what I want to know is, are you going
20 to testify that there was some particular warning
21 that should have been provided after the results of
22 VIGOR?
23   A.    As a scientist, I will argue that in the
24 scientific literature, there should have been a
25 clearer description of the findings and articulated