Donna K. Arnett

Page 102

1 in the medical literature.
2    Q.    And what -- do you have some specific
3 proposal of what that clearer articulation of the
4 findings should have been?
5    A.    I have not been asked to design the
6 study, but, in general, the publications could have
7 been explicit about the cardiovascular -- excess
8 cardiovascular risk of Vioxx, and they were not.
9    Q.    When you say "the publications could have
10 been explicit," what publications are you referring
11 to?
12    A.    I'm specifically referring to the VIGOR
13 publication by Bombardier published in November of
14 2000. Actually, the results were out much earlier,
15 before the publication.
16    Q.    You have not looked, I gather, at the
17 Vioxx VIGOR label?
18    A.    I have not.
19    Q.    Are there any other publications or
20 communications that you're going to testify should
21 have been more explicit?
22    A.    There are publications that did not come
23 out that could have been published sooner relative to
24 the advantage study.
25    Q.    What are they?

Page 103

1    A.    So the advantage results were not
2 published until July of '05. Whereas, the study
3 did -- was completed around the time of VIGOR.
4    Q.    Just so the record is clear, when you
5 were answering your questions, you were looking at
6 some index cards?
7    A.    Yes.
8    Q.    And those were index cards that were in
9 your binder, Arnett 4; correct?
10    A.    Correct.
11    Q.    And they reflect your notes on several of
12 the clinical trials; is that right?
13    A.    Specifically VIGOR Advantage -- do you
14 want me to list them all?
15    Q.    Sure. That's helpful.
16    A.    Okay. VIGOR, ADVANTAGE, APPROVe, the
17 false Alzheimer's disease study, and Konstam
18 meta-analysis.
19    Q.    And are you going to offer an opinion
20 that there were any conclusions that -- strike that.
21       You mentioned something about doing
22 further studies after VIGOR. And what were you
23 alluding to?
24    A.    Can I strike that?
25       Actually, it's the totality of data at

Page 104

1 the point when VIGOR became -- the results became
2 known that I'm drawing my opinion about the timing.
3 So it's not simply the VIGOR and ADVANTAGE studies
4 alone. It's the compelling evidence of the
5 cardiovascular risk associated with the drug from its
6 inception.
7    Q.    And what -- what are you putting on your
8 list of the compelling evidence?
9    A.    So I would start with the O10 and 017
10 studies in OA and RA that show dramatic increases in
11 blood pressure. I would include the 023 study, which
12 confirmed the mechanism of action that reduced
13 prostacyclin with Vioxx, which tended to tip in the
14 balance towards prothrombotic states. And I would
15 offer the patent applications of Dr. Scolnick to
16 create a combined product and the rational for that
17 combination product being increased cardiovascular
18 risk associated with unopposed COX-2 inhibition.
19    Q.    Anything else?
20    A.    No.
21    Q.    Between when you did whatever consultancy
22 work you did for Merck and when you were first
23 contacted for this litigation, did you do any
24 independent research into COX-2s or Vioxx
25 specifically or nonselected NSAIDs?

Page 105

1    A.    I did not.
2    Q.    And in the course of any work you did for
3 Merck, did you do any independent research on Vioxx
4 or COX-2s, Google searches or reviews of the
5 literature independently?
6    A.    I did.
7    Q.    But you did not keep those materials?
8    A.    I did not.
9    Q.    Is there a way, without violating what
10 you understand to be your confidentiality agreement,
11 that you could just describe for me generally what
12 you looked into?
13    A.    Honestly, I can't remember.
14    Q.    Did you do a search of the published
15 literature?
16    A.    Yes.
17    Q.    Did you do a search of the FDA web site?
18    A.    Yes.
19    Q.    Did you do a search of whether there had
20 been any symposia of -- you know, sponsored, for
21 example, by the American Heart Association or any
22 other respected organization?
23    A.    No.
24    Q.    Any other areas that you might have
25 looked into?

27 (Pages 102 to 105)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 106

1    A.    No.
2    Q.    Can you give me any sense of how much
3 literature you gathered on your own?
4    A.    The major publications at that time for
5 clinical trials.
6    Q.    And did you look at -- did you limit
7 yourself to just Vioxx, or did you look at research
8 on selected and nonselected NSAIDs as well?
9    A.    Restricted to Vioxx.
10   Q.    Did you look at any of the popular press
11 with regard to Vioxx at that time?
12   A.    No.
13   Q.    Did you review Dr. Topol's JAMA paper
14 from 2001 at that time?
15   A.    No.
16   Q.    Did you read that at or about the time it
17 was published in 2001?
18   A.    I did not.
19   Q.    Do you regularly read JAMA?
20   A.    No.
21   Q.    Do you regularly read New England Journal
22 of Medicine?
23   A.    In -- I read articles that are pertinent
24 to my areas of research, but I don't browse it every
25 week when it comes out.

Page 107

1    Q.    Do you subscribe to it?
2    A.    No.
3    Q.    Do you subscribe to Lancet?
4    A.    I do not.
5    Q.    Do you read it regularly?
6    A.    I read articles relative to my field of
7 expertise because we have online access at UAB to
8 all -- all of the journals mentioned, so I try to
9 conserve paper as much as I can.
10   Q.    Would the answer be the same for Annals
11 of Internal Medicine?
12   A.    Yes.
13   Q.    Are there any -- I gather there are no
14 pharmacology journals that you regularly review?
15   A.    Correct.
16   Q.    Is the -- is the UAB chairmanship
17 position a permanent position, or does that rotate?
18   A.    It's a permanent position.  I was
19 recruited here to build the department and given 12
20 new positions.
21   Q.    Is there a department of
22 pharmacoepidemiology at UAB?
23   A.    There is not.
24   Q.    Is there a subgroup of
25 pharmacoepidemiologists?

Page 108

1    A.    There is.
2    Q.    And you do not count yourself among that
3 group?
4    A.    I attend meetings with them when I have
5 time.
6    Q.    How many people are in that group?
7    A.    So there's Mary Bell Sellas, and she's in
8 preventative medicine; and Elizabeth Docell, who's on
9 my faculty; Ken Sagg, who's in rheumatology.  And
10 there are several junior faculty that I would know by
11 face, but not by name.
12   Q.    And are those all people who are
13 specifically trained in pharmacoepidemiology?
14   A.    The only one specifically trained in
15 pharmacoepidemiology is Mary Bell Sellas.
16   Q.    But the others have made that their area
17 of academic interest?
18   A.    Yes.
19   Q.    I gather not being a doctor, you have
20 never diagnosed a patient; is that correct?
21   A.    That's correct.
22   Q.    And you've never been called upon to
23 determine the potential cause of an adverse
24 cardiovascular effect in a particular patient?
25   A.    If we go back to the PPA litigation, I

Page 109

1 reviewed case report forms within that PPA litigation
2 for that case control study that was done on PPA and
3 hemorrhagic stroke.  And I don't know --
4    Q.    Were you part --
5    A.    -- where that fits.
6    Q.    Did you do some work on the hemorrhagic
7 stroke project, or you're talking about litigation
8 work?
9    A.    Litigation work.
10   Q.    And you -- did you review plaintiff forms
11 in the litigation, or did you review actual study
12 participant forms from the hemorrhagic stroke
13 project?
14   A.    I reviewed the study participation
15 forms.  I was working for the defense side.
16   Q.    Okay.  From the hemorrhagic stroke
17 project?
18   A.    Uh-huh.
19   Q.    And -- and that was for the purpose of
20 assessing whether events were accurately classified,
21 or was -- was it for the purpose of trying to class
22 determine causation in someone?
23   A.    Actually, it was to determine whether or
24 not exposure was correctly classified.  I was not
25 offering an opinion about the correct classification

Donna K. Arnett

Page 110

1  of a hemorrhagic stroke because I'm not a medical
2  doctor.
3      Q.    And you weren't offering your opinion as
4  to causation either, correct?
5      A.    Correct.
6      Q.    When was the first time you heard about
7  COX-1 and COX-2?
8      A.    Well, there was -- after the VIGOR
9  publication. After the VIGOR publication, I heard
10 about the concern about elevated risk.
11     Q.    Did you read VIGOR at or about the time
12 it was published?
13     A.    No. I didn't read it until -- I don't
14 remember when I first read it.
15     Q.    You say you heard about elevated risk.
16 Were there discussions among your colleagues?
17     A.    You know, I'm on the American Heart
18 Association -- several national committees, and I --
19 it was part of one of those committee meetings. But
20 it wasn't a particular agenda item. It was hearing
21 people in the hallway.
22     Q.    It was something that had gotten a fair
23 amount of attention in the academic and medical
24 community?
25     A.    Right.

Page 111

1      Q.    So people were talking about VIGOR?
2      A.    (Nods head.)
3      Q.    Yes?
4      A.    Yes.
5      Q.    Sorry. You have to say yes for the
6  record.
7      A.    Yes.
8      Q.    So it was the kind of thing that just
9  being at conferences, you heard other doctors
10 debating what VIGOR might mean, what the significance
11 might mean from a cardiovascular standpoint; is that
12 right?
13     A.    That's right.
14     Q.    And that was a debate that went on for
15 some time after VIGOR was published, correct?
16     A.    Correct.
17     Q.    The -- I've asked you a lot about
18 prescription drugs. I'm assuming you haven't done
19 any particular research into any over-the-counter
20 agents, have you?
21     A.    I have a publication as -- as part of the
22 Minnesota heart survey wherein we quantified the
23 prevalence of OTC use in the twin cities' population.
24     Q.    OTC use of what?
25     A.    All OTC use. Our publication is specific

Page 112

1  to cardiovascular prevention, but that is the only
2  research I've done. I've worked with a
3  pharmacoepidemiologist there to develop the forms and
4  oversaw the conduct of the collection.
5      Q.    Other than classifying the level of use
6  of different OTC agents, did you try to do something
7  with the data in terms of teasing out how that
8  corresponded with risks or benefits?
9      A.    We specifically looked at self-reported
10 ingestion of OTCs for cardiovascular prevention and
11 contrasted it to the actual data collection done in
12 the home for all of the OTCs that were reported to be
13 used by participants.
14     Q.    Did you draw any conclusions about how an
15 -- use of any OTC or group of OTCs affected
16 cardiovascular health?
17     A.    We didn't evaluate the exam -- or examine
18 the association between reported use and
19 cardiovascular risk. Rather, we quantified the
20 prevalence of use.
21     Q.    And did you correlate it in any way with
22 any cardiovascular outcomes?
23     A.    No. This was a cross-sectional study.
24     Q.    Is that in your CV somewhere?
25     A.    It should be in my updated CV.

Page 113

1      Q.    Now, I gather, in addition to -- you're
2  not -- you're not a pharmacologist, you're not a
3  biologist, correct?
4      A.    Correct.
5      Q.    You don't consider yourself an expert in
6  prostaglandins, correct?
7      A.    Correct.
8      Q.    You don't consider yourself an expert in
9  endothelial function, correct?
10     A.    Correct.
11     Q.    And you're not -- you're not a
12 statistician?
13     A.    Correct.
14     Q.    You've never written anything about
15 COX-2s; is that correct?
16     A.    Correct.
17     Q.    Or NSAIDs generally?
18     A.    Correct.
19     Q.    There's no pending research that you're
20 doing related to COX-2s or NSAIDs generally; is that
21 correct?
22     A.    That is correct.
23     Q.    You don't consider yourself an expert on
24 the mechanism of atherogenesis; is that right?
25     A.    That's correct.

29 (Pages 110 to 113)

Donna K. Arnett

## Page 114

1  Q.   Or the mechanism of plaque rupture?
2  A.   Correct.
3  Q.   And at the risk of asking the obvious,
4  you're not a rheumatologist or a GI doctor?
5  A.   Correct.
6  Q.   Okay.  You've never been asked to design
7  any clinical trial of a prescription pharmaceutical;
8  is that right?
9  A.   I designed my own.  So I -- I've not been
10 asked to, but I designed my own.
11 Q.   These are the -- I'm talking about a --
12 these are the observational studies that we've talked
13 about?
14 A.   The -- the trial I outlined to you, the
15 genetic environmental determinates of triglycerides
16 was a clinical trial with fenofibrates that I
17 designed and executed.
18 Q.   Anything else?
19 A.   I participated in the design of one that
20 was not funded by NIH.
21 Q.   That was the one where the grant wasn't
22 approved?
23 A.   Yes, correct.
24 Q.   What was it?
25 A.   It was a salt trial.  So it was a

## Page 115

1  behavioral trial with salt ingestion.
2  Q.   That was going to be an observational
3  study, correct?
4  A.   Well, it was an interventional study,
5  where we would intervene with salt, where we remove
6  the salt.  So the mechanisms, the methodology is the
7  same.
8  Q.   You were going to put people in some kind
9  of controlled environment where you limited their
10 salt intake?
11 A.   And then ramped up their salt intake and
12 look at their blood pressure.
13 Q.   Salt is known to be a cause of
14 hypertension?
15 A.   In some people, in some people.
16 Q.   Do you believe that there's a genetic
17 response to salt?
18 A.   There have been some studies that
19 indicate genetic variation in the angiotensinogen
20 gene, and the angiotensinogen gene may be responsible
21 for blood pressure results from salt intake.
22 Q.   As of today, you've -- am I right, since
23 the fenofibrate study isn't published yet, you've
24 never published the results from any placebo
25 controlled clinical trial?

## Page 116

1  A.   That is not true.  In my -- when I was a
2  research nurse, I designed an LVC study that was --
3  I'm sorry -- left ventricular hypertrophy study that
4  was ancillary to a Phase III trial.  I think it was
5  pentopril was the drug.  I designed the ancillary
6  part.  I didn't design the study itself.
7  Q.   But you weren't an author on that study?
8  A.   Yes, I was -- I was an author.
9  Q.   And you were a nurse at that time?
10 A.   I was.
11 Q.   Is that study on your CV?
12 A.   Yes.
13 Q.   Can you tell me which one that is?
14 A.   Actually, there's several during that
15 period.  That's when I first knew I wanted to be an
16 epidemiologist.  There's Publication Number Two.
17 Publication Number Three is the one I designed and
18 executed.  Publication Number Four --
19 Q.   You were -- am I saying it right -- Koehn
20 at that time?
21 A.   Uh-huh.
22 Q.   Did I say it right?
23 A.   Koehn
24 Q.   Okay.  I'm sorry.  Two, three, and four?
25 A.   Yes.

## Page 117

1  Q.   Is there anything since 1989 where you
2  have published the results of a placebo-controlled
3  clinical trial?
4  A.   No.
5  Q.   What was your specific role in those
6  trials where you -- where you were working as a
7  nurse?
8  A.   In one of them, I designed the ancillary
9  study to conduct echocardiography in -- in our field
10 center and published those results.  The others, I --
11 I authored -- wrote sections of the article.  I, of
12 course, conducted the study as a research nurse.
13 Q.   Am I right in gathering that you are not
14 going to offer any opinions as to the design of any
15 of the studies that were conducted by Merck?
16 A.   That is not true.
17 Q.   Okay.  Tell me what opinions you intend
18 to offer regarding the design of any studies by
19 Merck.
20 A.   I will offer the opinion today that the
21 studies, particularly the studies in osteoarthritis
22 and Alzheimer's disease, were underpowered to detect
23 cardiovascular types of CD.
24 Q.   Alzheimer's and what else did you say?
25 A.   The OA, 069.

Donna K. Arnett

Page 118

1    Q.    Anything else?
2    A.    Not to my knowledge, but I -- there may
3  be something that comes to mind.
4    Q.    Okay. Well, if it does, you'll let me
5  know.
6         You've never been involved in the process
7  of putting together or submitting an NDA; is that
8  correct?
9    A.    That's correct.
10   Q.    And you're not going to offer any
11 opinions as to the Merck NDAs for Vioxx; is that
12 right?
13   A.    I'm not sure.
14   Q.    You're not going to offer any opinions
15 that Merck failed to meet any standards with regard
16 to the NDA submissions, correct?
17   A.    I will offer opinions regarding
18 Villalba's memos with respect to the cardiovascular
19 safety profile.
20   Q.    So you've reviewed information that was
21 had by the FDA and that the FDA analyzed, correct?
22   A.    Correct.
23   Q.    And what opinions with regard to
24 Villalba's memos do you intend to give?
25   A.    That the FDA expressed concerns that the

Page 119

1  studies -- first, that there was a cardiovascular
2  risk and that there needed to be additional research
3  done to define those risks with placebo-controlled
4  studies; that the Naprosyn hypothesis was not a
5  salient explanation for the VIGOR finding; and that
6  there was inadequate power to detect cardiovascular
7  effects in the Alzheimer's disease and the OA
8  studies.
9         And there may be others. I've read a lot
10 of material, and if I look through my notes, my
11 pages, I may find more. But those are the ones that
12 come to mind.
13   Q.    Okay. You're certainly not an expert in
14 how many patients need to be studied or for how long
15 before a drug is approved, correct?
16   A.    Oh, that's not correct. As an
17 epidemiologist who designs studies, I regularly do
18 sample size estimates and power calculations.
19   Q.    My question was more specifically with
20 regard to the regulatory requirements. You're not an
21 expert in what the regulatory requirements are for
22 approval of a drug in terms of how many patients
23 should be studied or how long?
24   A.    In general, I would say that's true.
25   Q.    And are you aware of the fact that, in

Page 120

1  terms of the number of patients studied, Merck
2  exceeded the regulatory requirements?
3    A.    I can't offer an opinion about that.
4  Because it -- they had a different objective, which
5  was a GI objective and efficacy for OA. So in terms
6  of cardiovascular risk, I would say they didn't do an
7  adequate job.
8    Q.    I'm not asking whether you have a
9  personal belief about whether they did an adequate
10 job or not. My question is, you -- you're not an
11 expert in what the regulatory obligations were to
12 test safety and efficacy for Vioxx prior to the NDA
13 approval, correct?
14        MR. GARRISON:  Object to the form. Asked
15   and answered.
16   A.    Correct.
17   Q.    Doctor, have you ever been consulted by
18 -- I've asked you about pharmaceutical companies --
19 any health care entity, an HMO, a hospital, an IRB,
20 with regard to a prescription pharmaceutical
21 decision?
22   A.    I have consulted with drug companies
23 about designs of studies for efficacy. I can't
24 remember which companies. It was in the '90s.
25   Q.    Are you ever called on to make any

Page 121

1  recommendations with regard to any drugs for your own
2  institutions for its -- for example, for its
3  formulary?
4    A.    No.
5    Q.    Or for any hospital or health care
6  agency?
7    A.    No.
8    Q.    Have you ever been a member of any ESMB
9  or DSMB?
10   A.    I'm currently a member of a DSMB for the
11 National Institutes of Health for the Aim High study,
12 which is an intervention study.
13   Q.    Can you describe that study for me in
14 just general terms?
15   A.    In general terms, it's evaluating the
16 effectiveness for coronary heart disease events of a
17 combination product with a niacin and a statin.
18   Q.    What statin?
19   A.    I should know this, shouldn't I? I don't
20 remember which statin. It's a market statin. It's
21 not a new drug.
22   Q.    And the purpose is to see if the
23 combination --
24   A.    Is more efficacious than a statin alone
25 for CHD prevention.

Donna K. Arnett

Page 122

1    MS. FRIEWALD: Okay. Why don't we take a
2  quick lunch break?
3       (Off-the-record discussion.)
4       THE VIDEOGRAPHER: This marks the end of
5  Videotape Number Two in the continued deposition
6  of Dr. Donna Arnett to be continued on Videotape
7  Number Three. We're off the record at
8  12:04 p.m.
9       (Off the record.)
10      THE VIDEOGRAPHER: This is the beginning
11  of Tape Number Three in the continued deposition
12  of Dr. Donna Arnett. We're on the record at
13  12:57 p.m.
14 BY MS. FRIEWALD:
15     Q.   Doctor, isn't -- in connection with your
16  work for Circulation you've never reviewed any
17  articles related to COX-2 or nonspecific NSAIDs, have
18  you?
19     A.   I have not.
20     Q.   And that would be true in connection --
21  there's no other editorial work that you've done
22  where you've reviewed any articles on COX-2s or
23  nonspecific NSAIDs, is there?
24     A.   That's correct.
25     Q.   You've never reviewed the FDA regulations

Page 123

1  with regard to drug labeling; is that correct?
2     A.   Not in my recent history.
3     Q.   Same would be true if I asked you about
4  the FDA regulations regarding submission of an NDA.
5     A.   I reviewed documents in the '80s about
6  submission requirements for NDAs.
7     Q.   For a particular purpose?
8     A.   Educational.
9     Q.   You mean your own education?
10    A.   Yes.
11    Q.   As part of your schooling?
12    A.   Yes.
13    Q.   But since then you haven't reviewed any
14  of the FDA regulations?
15    A.   Specifically about NDAs?
16    Q.   Correct.
17    A.   I have no need to.
18    Q.   Are there any FDA regulations that you
19  have reviewed?
20    A.   I've reviewed their ethics policy.
21  That's not a regulatory document. I was offered the
22  position of senior executive director for antigens
23  for epidemiology two years ago, and as part of that I
24  had to become familiar with some of the regulatory
25  aspects. So I educated myself about that. But I

Page 124

1  didn't specifically go and review documents for the
2  FDA.
3     Q.   That's a position you ended up not
4  taking?
5     A.   I ended up coming here instead.
6       Before we get started there were two
7  things I wanted to clear up from before.
8     Q.   Sure.
9     A.   Okay. Is now a good time?
10    Q.   Yeah, but let me just let Kirstin walk by
11  and then you can do that.
12    A.   Thanks, Kirstin.
13      It's just my memory -- I just wanted to
14  make sure that to clarify that I did work on an
15  angioedema study that was funded by Bristol-Myers
16  Squibb. They came to me and Eric Corwin, my
17  colleague in Houston, to look for genetic predictors
18  for angioedema in response to ACE inhibition. So
19  that was an example of a toxic effect from a drug
20  where our goal was to identify if there was a genetic
21  cause to that toxicity.
22      So you asked me before had I had any
23  experience, and we didn't find anything, didn't
24  publish that study, so it wasn't on my radar screen.
25    Q.   Was there something else you wanted to

Page 125

1  correct?
2     A.   The only other thing was about expertise
3  because, you know, I don't have a Ph.D. in drug
4  labeling. I have a Ph.D. in endothelial function. I
5  don't even know where you get that kind of label.
6  But I certainly have broad expertise in
7  cardiovascular system pathophysiology as an
8  epidemiologist.
9     Q.   I understand you have expertise as an
10  epidemiologist, and I understand you have expertise
11  in cardioepidemiology. You don't consider yourself
12  an expert in the biology of endothelial function?
13    A.   I haven't run basic science experiments
14  about that, but in the State of Alabama an expert
15  means knowing more than the average person. So I
16  would say I know more than the average person about
17  that.
18    Q.   Well, I think I probably know more than
19  the average person about that too. But I wouldn't
20  hold myself out as an expert. You have not had any
21  training in vascular biology, correct?
22    A.   I've had graduate-level courses in
23  pathophysiology.
24    Q.   Have you had any training in vascular
25  biology?

Donna K. Arnett

Page 126

1    A.    I've had within that course in my
2    master's program and pathophysiology there was
3    training about vascular biology.
4    Q.    So there was part of one course in your
5    master's program?
6    A.    Yes.
7    Q.    And you've never published on the subject
8    of vascular biology?
9    A.    I've published on arterial stiffness.
10   I've published on endothelial function as risk
11   factors for cardiovascular disease. My dissertation
12   was on something called, Ventricular vascular
13   coupling where I evaluated the effect of vascular
14   compliance in relation to cardiovascular outcomes.
15   So, yes, I have published in that area.
16   Q.    And your focus in that area has always
17   been on cardiovascular outcomes, correct?
18   A.    Correct.
19   Q.    You have not ever studied the role of
20   prostacyclin and endothelial function?
21   A.    Not specifically.
22   Q.    You've never studied on the level of the
23   vascular biology the progression of atherosclerotic
24   plaques, correct?
25   A.    That is not true. I have. As part of

Page 127

1    the ARIC study, Atherosclerosis Risks In Community
2    study, I have a publication about the effect of
3    systolic blood pressure on progression of carotid
4    intermedial thickness, which is the marker of
5    vascular disease. I've coauthored papers on plaque
6    in the NHLBI Family Heart Study.
7    Q.    Again, these are all outcome studies.
8    I'm not disputing that you have papers that look at
9    the outcome measurements. But my question is you
10   have never studied the specific -- you've never
11   studied the bio -- at the biologic level? You didn't
12   review most of the pharmacology literature, correct,
13   because you would consider that outside your area of
14   expertise?
15   A.    I agree that the pharmacologic level and
16   of the level of being a rat doctor I've not reviewed
17   those -- that work. As a cardiovascular
18   epidemiologist I have to have understanding about
19   mechanisms or else I can't do my job.
20   Q.    You have never offered an opinion
21   anywhere that the balance between prostacyclin and
22   thromboxane is -- explains any potential
23   cardiovascular effect of the coxibs or of Vioxx
24   specifically; is that correct?
25        MR. GARRISON: Object to the form.

Page 128

1    A.    That's correct.
2    Q.    And most of your work has been on the
3    role of hypertension in affecting endothelial
4    function, right?
5    A.    That's incorrect. I have very broad
6    publication base in hypertension, lipids, genetic
7    epidemiology, drugs.
8    Q.    You've studied how hypertension is
9    involved in the progression of atherosclerotic
10   disease?
11   A.    Correct.
12   Q.    And you've studied the long-term effects
13   of hypertension, correct?
14   A.    I have as one of many of my areas of
15   expertise.
16   Q.    And you agree that hypertension is one of
17   the independent risk factors for atherosclerosis,
18   correct?
19   A.    Correct.
20   Q.    And is there a -- do you have an opinion
21   as to for how long somebody needs to have
22   hypertension or elevated blood pressure and at what
23   level in order to have that affect endothelial
24   function in some way?
25        MR. GARRISON: Object to the form.

Page 129

1    A.    Can you clarify because -- can you
2    clarify that question?
3    Q.    Sure. Are you going to offer an opinion
4    that elevated blood pressure to a particular level or
5    for a particular period of time is needed to cause a
6    clinically significant outcome?
7    A.    The epidemiologic data suggests -- I have
8    not specifically addressed timelines. It varies. In
9    a population level I can address that question. For
10   an individual, I cannot answer that question.
11   Q.    Is that a not answerable question?
12   A.    It's a not answerable question for me.
13   Q.    And at a population level what's the
14   answer you would give?
15   A.    We could look at results from Cardia
16   which you've cited before. We could look at results
17   from the ARIC study, and there is no specific time
18   duration or natural history that would say -- that
19   would give us a specific time. I can tell you that
20   there's a quantitative risk that increases with
21   increasing blood pressure for atherosclerosis.
22   Q.    Okay. Are you going to say that a
23   patient who goes from a blood pressure of 130 to 132
24   systolically for a week is at clinically significant
25   increased risk of having a cardiovascular event?

33 (Pages 126 to 129)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 130

1    A.   I don't speak relative to individual
2 subjects.
3    Q.   Okay. So for any individual patient you
4 can't say that the move from one blood pressure point
5 to another was clinically significant?
6    A.   I'm not a medical doctor and would not
7 offer a clinical opinion.
8    Q.   On a population basis are you going to
9 offer an opinion that a move from 130 to 132 for a
10 week would have a clinical impact?
11       MR. GARRISON: Object to the form.
12    A.   I can't answer it relative to a clinical
13 impact. I can say that graduated increased blood
14 pressure is associated with increased risk.
15    Q.   Are you prepared to say that increased
16 blood pressure at a particular level or a particular
17 -- or for a particular period of time -- let me start
18 that again.
19       At a population level are you going to --
20 do you believe that there is any incremental upward
21 change that is needed before, on a population level,
22 you would see an increased risk?
23       MR. GARRISON: Object to the form.
24    A.   The epidemiological data would suggest
25 that there is no such number that risk is continuous

Page 131

1 over a scale of blood pressure.
2    Q.   Well, are you -- what epidemiologic data
3 would show that an incremental risk of let's say two
4 or three points for 30 days would have any clinical
5 effect?
6       MR. GARRISON: Object to the form.
7    A.   There is no such data to my knowledge.
8    Q.   Is there any data that would say that an
9 incremental increase of four or five points for 30
10 days would have a clinically significant effect?
11    A.   I've answered your question.
12    Q.   Is there any epidemiologic data that
13 would say that an incremental risk at any level for
14 30 days would have a clinically significant effect?
15       MR. GARRISON: Object to the form.
16    A.   Epidemiologists don't evaluate questions
17 in that way.
18    Q.   Is there any epidemiologic data that
19 would allow you to offer an opinion as to how long
20 one would need to elevate blood pressure before one
21 would expect to see a clinical impact on a
22 population?
23    A.   You'd have to define for me clinical
24 impact.
25    Q.   Some cardiovascular adverse effect. You

Page 132

1 define for me what that would be.
2    A.   One would -- some would argue that
3 endothelial dysfunction leads to hypertension. So in
4 some ways it may be the endothelial dysfunction
5 that's leading to the hypertension.
6    Q.   Let's limit it to heart attack. Is there
7 any -- is there any epidemiologic data that would --
8 that you would rely on to say that you need X amount
9 of blood pressure increase for Y amount of time
10 before you would expect to see on a population basis
11 an increased risk in heart attack?
12       MR. GARRISON: Object to the form.
13    A.   I'm not aware of that specific data.
14    Q.   Okay. So you would say that you cannot
15 answer the question of whether one would need to see
16 a certain level of increase in blood pressure for a
17 certain period of time before one would see any
18 increased incidents of heart attacks in the
19 population?
20       MR. GARRISON: Object to the form.
21    A.   I've answered your question relative to
22 the fact that risk is graded in terms of an increased
23 risk with increased blood pressure over time.
24    Q.   I understand that. But at -- I think you
25 accept the fact that there is some limited increased

Page 133

1 risk for some limited period of time that's not going
2 to have any clinical effect. Do you accept that?
3    A.   I've not asked the question that way.
4 Epidemiological data don't -- are not collected in
5 that way. So there is no way for me to answer that
6 question.
7    Q.   Well, do you accept from your work as an
8 epidemiologist in this area that people have rises
9 and falls in blood pressure all day long?
10    A.   I would accept that.
11    Q.   Okay. And when you talk about somebody
12 or some group of patients as having a certain blood
13 pressure, what level of measurement are you relying
14 on to say -- let me ask the question better because
15 it started off badly.
16       If Patient A's typical blood pressure is
17 120 over 70 and Patient A has a day where he's at 122
18 over 70, you're -- you wouldn't offer an opinion that
19 that would have a clinical impact, would you?
20    A.   I'm not going to offer any opinions about
21 clinical impact.
22    Q.   What about on a population basis, if you
23 had a cohort of patients who all were normally at 120
24 over 70 and for one day they went to 122 over 70, you
25 wouldn't expect that that would result in a clinical

34 (Pages 130 to 133)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 134

1   impact, would you?
2        MR. GARRISON: Object to the form.
3        A.    Epidemiologists don't address questions
4   like that.
5        Q.    They don't address clinical outcomes?
6        A.    They address clinical outcomes, but we --
7   there -- I am not aware -- and there may be data out
8   there, but I'm aware of no data that looked at
9   day-to-day blood pressure over time in the way that
10  you're asking me the question.
11       Q.    Isn't it true, Doctor, that when
12  epidemiologists talk about incremental increases in
13  blood pressure, they're talking about some period of
14  time of years before you would expect to see an
15  increase in number of heart clinical events as a
16  result of blood pressure rises?
17       A.    Epidemiological study designs tend to
18  have intermittent re-examinations of patients or
19  participants that are on the average of a year to
20  three years in between. So when you ask me questions
21  about day-to-day, I cannot answer them as an
22  epidemiologist.
23       Q.    Okay. Fair to say that typically the
24  epidemiologic studies that have looked at population
25  adverse effects of blood pressure have looked at

Page 135

1   those effects over periods of years, correct?
2        A.    The population-based epidemiologic
3   studies have tended to look over one to three year
4   periods.
5        Q.    And you can't point me to any
6   population-based study that has looked at a period of
7   less than a year and concluded that any particular
8   increase in blood pressure caused an adverse effect
9   within that time period?
10       A.    I cannot agree with that because I have
11  not extensively reviewed the literature, and there
12  could be possibly some study out there that I haven't
13  seen.
14       Q.    My question was you haven't reviewed.
15       A.    I have not reviewed, but that doesn't
16  mean it doesn't exist.
17       Q.    Okay. Now, are you going to offer an
18  opinion -- you accept, I gather, that all NSAIDs
19  increase blood pressure, correct?
20       A.    I cannot answer the question for all
21  NSAIDs. I can only address what I've observed for
22  Vioxx.
23       Q.    Have you looked at any of the literature
24  on the other NSAIDs to see their effects on blood
25  pressure?

Page 136

1        A.    I have not.
2        Q.    And that would be true of the COX-2s as
3   well as the nonselectives?
4        A.    That's true.
5        Q.    Have you looked at any of the studies
6   done by Merck with regard to Vioxx that use
7   comparator NSAIDs to see their effect?
8        A.    There are data in the NDA application
9   that show Vioxx's effect relative to I believe
10  ibuprofen and diclofenac and Naprosyn.
11       Q.    Have you tried to synthesize those data
12  in terms of the impact of those other NSAIDs on blood
13  pressure?
14       A.    I haven't given it the attention I've
15  given cardiovascular disease, myocardial infarction.
16  But in general Vioxx increases blood pressure more
17  than the comparators.
18       Q.    Are you going to offer an opinion as to
19  how much more?
20       A.    I didn't find it relevant in this
21  particular review.
22       Q.    Are you going to offer an opinion that
23  blood pressure increase is the mechanism of -- to use
24  your term -- Vioxx's cardiotoxicity?
25       A.    Could you restate that?

Page 137

1        Q.    Are you going to offer an opinion -- put
2   it this way -- that Vioxx causes adverse cardiac
3   events by virtue of raising blood pressure?
4        A.    I will agree that Vioxx raises blood
5   pressure. And I will agree that I will agree to
6   that.
7        Q.    That Vioxx raises blood pressure?
8        A.    Yes.
9        Q.    But you're not going to say that because
10  it raises blood pressure it causes heart attack or
11  any other cardiovascular event?
12       A.    The totality of evidence that I've
13  reviewed relative to the effect of hypertension on
14  mediating the excess cardiovascular risk associated
15  with Vioxx has been to -- has been negative, that it
16  is not the reason solely for the increased risk.
17       Q.    You said solely.
18       A.    Uh-huh.
19       Q.    Are you going to offer an opinion that it
20  -- that there is a partial effect of blood pressure,
21  or can you not say at this point?
22       A.    I can say that adjustment for blood
23  pressure in some of the data that I have reviewed did
24  not explain the excess risk associated with Vioxx.
25       Q.    Put in plain English that means that in

Golkow Litigation Technologies - 1.877.DEPS.USA

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 138

1 the data reviewed you couldn't see a correlation
2 between blood pressure increases and bad outcomes?
3         MR. GARRISON: Object to the form.
4     A.    The data have not been provided to me in
5 that way.
6     Q.    Okay.
7     A.    In the published literature they have not
8 asked the independent question about blood pressure
9 and cardiovascular outcomes.
10    Q.    I just -- I just want to make sure that I
11 understood in plain English your answer which was
12 that you -- the data that you've looked at don't
13 establish a cause-and-effect relationship between
14 patients who had an increase in blood pressure in
15 studies and patients who had MIs?
16        MR. GARRISON: Object to the form.
17    A.    From the data I reviewed I cannot answer
18 that question.
19    Q.    You agree that stroke is more -- that I'm
20 sorry, that blood pressure increase is more directly
21 correlated with stroke than with heart attack?
22    A.    They're both directly related to heart
23 attack and stroke. Hypertension is a risk factor for
24 both.
25    Q.    Fair enough. Do you agree -- I've seen

Page 139

1 this in the epi literature. So do you agree that
2 hypertension is a greater risk factor for stroke than
3 it is for heart attack?
4     A.    At the population level hypertension is
5 the -- usually one of the leading causes of stroke.
6 It's also a leading cause of heart attack.
7     Q.    And it is a greater cause of stroke than
8 it is of heart attack?
9     A.    You'll have to define what you mean by
10 greater.
11    Q.    It's a significant risk factor for heart
12 attack and stroke?
13    A.    Correct.
14    Q.    You would expect to see -- to the extent
15 that hypertension is playing a role in causing
16 adverse effects, you would expect to see both heart
17 attacks and stroke?
18    A.    Correct. If it were purely mediated
19 through hypertension.
20    Q.    If hypertension were playing a
21 significant role, you would expect to see both heart
22 attacks and stroke?
23        MR. GARRISON: Object to the form.
24    A.    Not necessarily because heart attacks and
25 strokes are multicausal.

Page 140

1     Q.    Explain that to me. I understand they're
2 multicausal, but I don't understand the not
3 necessarily part.
4     A.    Could you repeat your question?
5     Q.    Well, I said to you if hypertension was
6 playing a major role you would expect to see both
7 heart attacks and stroke. That's true, isn't it?
8     A.    It's not true.
9     Q.    Why not?
10    A.    Because the imbalance between the
11 prostacyclin and thromboxane and platelet aggregation
12 may have a differential effect on cardiovascular
13 versus stroke.
14    Q.    Okay. Let's just keep that out --
15    A.    If it's mediated by blood pressure, which
16 it may be, then, no, you would not expect that. It
17 may or may not be true.
18    Q.    Let's keep the prostacyclin imbalance
19 piece straight for a minute because I didn't ask you
20 a question about whether you would expect to see the
21 same number of strokes as heart attack or not. Isn't
22 it true that if hypertension were playing a
23 significant role you would expect to see an increase
24 in the risk of stroke?
25        MR. GARRISON: Object to the form.

Page 141

1     A.    I've answered your question.
2     Q.    I don't think you have. And this is a
3 slightly different question. Isn't it true that if
4 hypertension were playing a role you would expect to
5 see an increase in the number of strokes?
6         MR. GARRISON: Object to the form.
7 Incomplete hypothetical.
8     A.    One -- in a population I would agree that
9 that is true in a general population. This is a
10 treated population. And the pharmacologic properties
11 of the drug may interact differently with
12 hypertension.
13    Q.    So there might be things about the drug
14 that undo any potential adverse effects of the
15 hypertension on stroke that counterbalance it?
16    A.    I can't say undo, but it could be
17 plausible that the coronary arteries have a different
18 pathophysiologic reaction --
19    Q.    I'm not asking --
20    A.    -- with Vioxx and hypertension.
21    Q.    I'm not asking heart attack versus
22 stroke. I'm just asking stroke generally. If you --
23 if hypertension played a role, you would expect to
24 see an increase in strokes, right?
25        MR. GARRISON: Object to the form.

36 (Pages 138 to 141)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

## Page 142

1     Q.    Unless there's something about Vioxx
2 that's stroke protective and that offsets the effect
3 of hypertension?
4         MR. GARRISON: Object to the form.
5 Incomplete hypothetical.
6     A.    So in a population, untreated general
7 population, of individuals like were examined in
8 Cardia or the ARIC study, hypertension is a cause of
9 stroke and heart attack in both those populations.
10     Q.    Okay. And if Vioxx were causing adverse
11 effects by virtue of raising blood pressure, you
12 would expect based upon what you know from the
13 general epi literature to see more strokes, wouldn't
14 you?
15     A.    No, I wouldn't. And the reason is
16 myocardial infarction heart attack is the number one
17 cause of death. Stroke is the number three cause of
18 death. By sheer numbers you wouldn't expect to see
19 equal numbers.
20     Q.    Have you done any kind of a power
21 calculation or anything to see -- looking at all of
22 the studies that we have on Vioxx and the other
23 COX-2s, you know, how many more strokes should you
24 expect to see or how many patients would need to be
25 studied to see more strokes?

## Page 143

1     A.    I have evaluated the Konstam article
2 which is related to the 069 article which combines
3 all the OA studies together. And there to find the
4 aggregate outcome which combines all of your outcomes
5 together, you had a less than 5 percent chance of
6 finding the correct answer about Vioxx being causal
7 in terms of cardiovascular disease.
8         So I as an epidemiologist would not
9 expect you to see more strokes or more heart attacks
10 because you didn't have enough power to see the
11 primary endpoint.
12     Q.    Where did you get that from?
13     A.    I created -- I worked my -- I conducted
14 my own power analysis.
15     Q.    Is that written down somewhere?
16     A.    It is.
17     Q.    Is it -- it's in your notes?
18     A.    Uh-huh.
19     Q.    Okay. Can you show me where your power
20 analysis is?
21     A.    (Indicating.)
22     Q.    So your power analysis is a one-page
23 handwritten piece of eight-by-ten paper or
24 eight-by-eleven, whatever, that is clipped to the
25 Konstam article?

## Page 144

1     A.    Correct.
2     Q.    Okay. Why don't we mark that as 4C and
3 it will still be copied with the other materials.
4         (Exhibit Arnett Number 4C
5         was marked for identification.)
6     Q.    Doctor, have you done any power analyses
7 of any other clinical trials individually or as a
8 group or any of the epi data to say that there was
9 insufficient power to see an adverse effect in terms
10 of stroke caused by Vioxx?
11     A.    I have not conducted an analysis
12 regarding stroke.
13     Q.    So you can't tell me whether you should
14 have seen, if hypertension were playing a role, an
15 increase in stroke in APPROVe, in VIGOR, in any of
16 the observational studies?
17     A.    I haven't evaluated that question. In
18 aggregate, with the aggregate outcome, I did a
19 sensitivity analysis to evaluate my power three
20 different ways using three different programs. And
21 in one program it won't even run because the power is
22 too low to even calculate.
23     Q.    That's in regard to the Konstam
24 meta-analysis?
25     A.    Correct. I also have looked at the

## Page 145

1 Shapiro meta-analysis and done some more work. I
2 haven't done power calculations within VIGOR because
3 it was statistically significant.
4     Q.    For stroke?
5     A.    For the overall outcome combined.
6     Q.    Okay. Did you look at the results for
7 stroke?
8     A.    I have not looked separately at the
9 results for stroke.
10     Q.    You agree that male gender is an
11 independent risk factor for cardiovascular events?
12     A.    I agree with that.
13     Q.    You agree that age is an independent risk
14 factor, increasing age?
15     A.    I agree.
16     Q.    Age over 50 is a risk factor for men?
17     A.    Aging is a risk factor. I'll agree that
18 aging is a risk factor.
19     Q.    You agree that on a population basis men
20 between the ages of 50 and 60 is the largest group of
21 heart attack patients in this country?
22     A.    I haven't looked at the actual numbers.
23 But increasing age is associated with increasing
24 events. So it would not surprise me because they're
25 more abundant in 65 and older.

Golkow Litigation Technologies - 1.877.DEPS.USA

Donna K. Arnett

Page 146

1    Q.    Nothing surprising based on the
2 epidemiology about a man in his 50s having a heart
3 attack?
4    A.    The absolute risk for a male in his 50s
5 is lower than the absolute risk for a man in his 60s.
6    Q.    If that were the only risk factor?
7    A.    Yes.
8    Q.    Am I right that you published that
9 socioeconomic status can be a risk factor?
10   A.    I have.
11   Q.    You believe it's an independent risk
12 factor?
13   A.    I believe it's mediated through other
14 risk factors.
15   Q.    Which are?
16   A.    Poor nutrition, sedentary lifestyle
17 primarily.
18   Q.    Is poor nutrition a risk factor for a
19 heart attack?
20   A.    Overnutrition is a risk factor.
21   Q.    Being too fat?
22   A.    Although it's not consistent -- that
23 relationship is not as consistent as other risk
24 factors across all studied population.
25   Q.    You agree that abdominal fat, visceral

Page 147

1 fat is cardiotoxic?
2    A.    It's -- I will agree that visceral fat is
3 associated with a worse metabolic profile.
4    Q.    Do you agree that visceral fat is now
5 considered to be not just inert fat anymore; it's
6 actually considered to have an active role in causing
7 adverse cardiac effects?
8         MR. GARRISON: Object to the form.
9    A.    The mechanisms whereby it is mediating
10 the excess cardiovascular risk are thought to be
11 related to metabolic consequences of the viscerally
12 adipose.
13   Q.    Have you reviewed the literature on
14 abdominal adiposity on visceral fat?
15   A.    I've authored papers about it.
16   Q.    Are they on your CV?
17   A.    They are. Genetics of Metabolic
18 Syndrome.
19   Q.    So these are looking at genetic causes of
20 metabolic syndrome?
21   A.    Or a common gene that would mediate
22 metabolic syndrome.
23   Q.    Any literature on the actual role of
24 visceral fat in causing cardiovascular disease?
25   A.    I've written a lot of papers. So let me

Page 148

1 think back because I've had students that have worked
2 in this area. So I'm happy to review my CV if you'd
3 like me to.
4    Q.    I don't want to take up too much time,
5 but on a break I'll be happy to let you take a look.
6 I'll make a note of it, and I'll even try to remind
7 you.
8         Do you have some quantitative way of
9 defining sedentary lifestyle?
10   A.    The papers that I publish regarding
11 sedentary lifestyle have -- this is the Minnesota
12 Heart Survey that I conducted in Minnesota. And we
13 quantified it based on self-report. But we didn't
14 evaluate in relation to risk.
15   Q.    So if I reported I'm sedentary, I don't
16 do anything active?
17   A.    It's usually quantified -- I'm thinking
18 back because I worked in the ARIC study and the
19 Minnesota Heart Study on physical activity. In the
20 ARIC study we used the Bocci questionnaire, which is
21 a standard epidemiological form for collecting
22 physical activity. And the Heart Survey we used the
23 Taylor questionnaire, another systematic way of
24 collecting activity measures. And it was on the
25 basis of a home interview question, "Do you exercise

Page 149

1 more than three times per week regularly," that we
2 quantified physical inactivity.
3    Q.    So if somebody exercised less than three
4 times weekly regularly, they would be considered
5 inactive?
6    A.    Correct, in Minnesota Heart Survey.
7 Other studies may do it differently.
8    Q.    Sleep apnea, have you reviewed that
9 literature related to risk of heart attack?
10   A.    I'm generally aware of the association.
11 I have not written about sleep apnea.
12   Q.    Do you believe that sleep apnea is
13 associated with increased risk of heart attack?
14   A.    In general I would agree with that
15 statement, but I have not reviewed specific detailed
16 studies.
17   Q.    Do you believe that sleep apnea causes
18 heart attack?
19   A.    I've already answered I haven't reviewed
20 the literature. It's generally accepted that it is a
21 risk factor.
22   Q.    Okay. What I'm trying to understand is
23 you said it's associated with, and I didn't know if
24 there is a difference -- there is a difference, am I
25 correct, between association and causation?

38 (Pages 146 to 149)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 150

```
1     A.    There is indeed.
2     Q.    And can you define for me the
3  difference?
4     A.    In epidemiology we deal with association
5  primarily to form opinions about causation.  And if
6  you're a true -- in the truest sense of the
7  scientific process no one can prove causation.  We
8  can only fail to disprove causation.
9     Q.    Is there a line that you think of as
10 crossing in terms of the quality or the quantity of
11 the data when one moves from association to
12 causation?
13    MR. GARRISON:  Object to the form.
14    A.    I rely on evidence that fits into the
15 general terms of the Bradford Hill criteria.
16    Q.    Do you believe -- do you believe that --
17 would you say that -- and it's perfectly fair if you
18 say you haven't reviewed the literature enough to
19 have an opinion.  Would you say that sleep apnea is
20 known to be a cause of heart attack?
21    MR. GARRISON:  Objection, asked and
22 answered.
23    A.    I can't answer that.  I haven't reviewed
24 the literature.
25    Q.    Would you say that hypertension is known
```

Page 151

```
1  to be a cause of heart attack?
2     A.    Based on the clinical trial evidence that
3  suggests that reducing blood pressure lowers risk, I
4  will agree that hypertension is a cause of
5  cardiovascular disease.
6     Q.    Including heart attack or can you not be
7  that specific?
8     A.    Including heart attack.
9     Q.    Would you say that abnormal lipids cause
10 heart attacks?
11    MR. GARRISON:  Object to the form.
12    A.    Can you define abnormal lipids?
13    Q.    I'll break it up for you.  Would you say
14 that reduced HDL is a cause of heart attacks?
15    MR. GARRISON:  Object to the form.
16    A.    It is associated with heart attacks.
17    Q.    In your mind it hasn't been proved as a
18 cause?
19    A.    They're -- as an epidemiologist I rely
20 most substantially on clinical trial data.  And there
21 are very few -- I'm not aware of -- there may be
22 studies done.  I've not extensively reviewed the
23 literature on raising HDL and reducing events because
24 I haven't reviewed that literature, so I can't
25 comment on the specifics.  I will say there's an
```

Page 152

```
1  association.
2     Q.    Can you answer the question if I asked
3  you about elevated LDL?
4     A.    Elevated LDL I will agree because the
5  clinical trial evidence is a cause of myocardial
6  infarction.
7     Q.    What about triglycerides?
8     A.    Triglycerides is an ambiguous area.
9  There is no defined answer.
10    Q.    And would you agree with me that there is
11 a great deal of data on HDL even if it's not enough
12 to get from association to causation?
13    A.    There have been epidemiologic data that
14 have established the association between low HDL and
15 myocardial infarction.
16    Q.    Lipids and hypertension have been very
17 extensively studied, correct?
18    A.    That's correct.
19    Q.    And in literally hundreds of thousands of
20 patients?
21    A.    By studies you mean epidemiologically?
22    Q.    Yes.
23    A.    Yes.
24    Q.    Literally hundreds of thousands of
25 patients --
```

Page 153

```
1     A.    Yes.
2     Q.    -- over generations?
3     A.    Well, I won't say over generations, but
4  over a generation, the Framingham Heart Study.
5     Q.    Over decades?
6     A.    Over decades, I will agree with that.
7     Q.    And those data are very robust because
8  they show a consistent association between those risk
9  factors and bad cardiac outcomes, correct, including
10 heart attack?
11    A.    Correct.
12    Q.    Do you consider depression to be
13 associated with heart attack?
14    A.    I have not reviewed that literature.  In
15 general I know that there are reports of an
16 association.
17    Q.    But that's not something you consider
18 yourself an expert enough to have an opinion on one
19 way or the other?
20    A.    I do not have an opinion one way or the
21 other.
22    Q.    Now, did you ever form an opinion based
23 on the observational data as to whether hormone
24 replacement therapy was or was not protective against
25 heart attack risk?
```

39 (Pages 150 to 153)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 154

1    MR. GARRISON: Object to the form.
2    A.   I won't take it. No, I have not. I have
3  not -- the literature -- after the Women's Health
4  Initiative --
5    Q.   I'm really asking you before the Women's
6  Health Initiative.
7    A.   Could you restate the question?
8    Q.   Okay. Would -- I'm asking it badly.
9  Based -- at the time where there was a fair bit of
10  observational data on hormone replacement therapy but
11  no controlled clinical trial, did you have an opinion
12  as to whether it was protective?
13    MR. GARRISON: Object to the form.
14    A.   The evidence at that time was suggestive
15  but not consistent about its protective role. That's
16  why they launched the Women's Health Initiative.
17    Q.   And in what way was that data not
18  consistent?
19    A.   It was suggestive that women who took
20  hormone replacement therapy may be better educated.
21  And, therefore, it may just simply be a marker for
22  other, education, lifestyle.
23    Q.   Fair to say there were observational
24  studies that repeatedly suggested a reduced risk of
25  heart attack with hormone replacement therapy, but it

Page 155

1  wasn't clear if those studies were confounded by
2  other things that were going on, like socioeconomic
3  status or education?
4    A.   I have not reviewed those data in many,
5  many years. And I can't tell you specifically if
6  it's risk because risk as an epidemiologist implies
7  very carefully done studies prospective in nature.
8  And I have not reviewed that literature.
9    Q.   Would you agree with me that hormone
10  replacement therapy is an example of an situation
11  where the observational data seem to lead to one
12  conclusion and then the controlled clinical trial
13  came out and it undermines the conclusion of the
14  observational data?
15    A.   The observational data about hormone
16  replacement therapy were, as I already said,
17  inconsistent. And so I can't say that it disagreed
18  with the totality of evidence. There was sufficient
19  question about its causal role to launch a clinical
20  trial.
21    Q.   And you consider placebo-controlled
22  clinical trials the gold standard for determining
23  causation?
24    A.   I consider randomized blinded clinical
25  trials to be the highest form of testing causation.

Page 156

1  But, again, causation as an epidemiologist is a
2  failure to refute a hypothesis. It doesn't prove it,
3  but we fail to refute it.
4    Q.   The -- would you agree that diabetes
5  causes heart attack?
6    A.   There's longstanding evidence about
7  associations between diabetes and heart attack.
8  There is -- the data, however, about the role of
9  prevention of the diabetic state -- here I'm talking
10  about hyperglucose levels, for instance, in some of
11  the trials -- is not as clearcut about whether
12  reducing the effects of diabetes are -- prevent
13  cardiovascular disease. That data is not as sound.
14  The association data for diabetes and cardiovascular
15  disease are robust. But I can't tell you whether it
16  meets what I would hold as causal.
17    Q.   You haven't reviewed that literature well
18  enough to say whether it's causal or not?
19    A.   Actually I have reviewed that
20  literature. I just wrote a grant. It didn't make
21  the grade for funding yet but -- on the
22  cardiovascular consequences of diabetes. So that's
23  why I know quite a bit about diabetes and
24  cardiovascular disease.
25    Q.   Okay. But you're not prepared to say

Page 157

1  whether there's a causal relationship between
2  diabetes and heart attack?
3    A.   I've already said there's an association.
4    Q.   That's what I want to know, whether it
5  rises to the level of causation in your mind or not?
6    A.   In my mind I -- the clinical trial data
7  from the DCCT with only one study don't give me
8  sufficient consistency between studies to label it
9  causation.
10    Q.   What's the one study?
11    A.   The DCCT.
12    Q.   Okay.
13    A.   You know, there's ongoing studies now
14  about this very question. The ACCORD study, for
15  instance.
16    Q.   Doctor, I'm not asking you about glucose
17  levels. I'm asking you about diabetes.
18    A.   Diabetes is a syndrome. It's
19  characterized by glucose levels.
20    Q.   Doctor, would you agree that diabetes was
21  one of the things that was looked at in the
22  Framingham studies?
23    A.   When you say looked at, could you be more
24  specific?
25    Q.   As one of the risk factors in the list of

40 (Pages 154 to 157)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 158

1 risk factors that was considered.
2    A.    Type II diabetes in Framingham has been
3 evaluated.
4    Q.    And multiple studies have found that
5 diabetes increases the risk of having a
6 cardiovascular event including heart attack?
7    A.    That is true.
8    Q.    And that's looking at that question in
9 hundreds of thousands of patients?
10    A.    I don't know about the hundreds of
11 thousands.  But there is consistent evidence about
12 its risk factor status for cardiovascular disease.
13    Q.    Okay.  Now, in looking at the question of
14 causation you're looking for consistency in studies
15 over time, correct?
16    A.    That's one of my criteria.
17    Q.    What are your other criteria?
18    A.    First, I evaluate the role of chance, the
19 role of bias in studies, in internal and external
20 validity of studies.  I evaluate the strength of the
21 association, the biological plausibility of the risk
22 factor, the consistency across studies, and the
23 hierarchy of study type.  As I said clinical trials,
24 randomized double-blinded clinical trials, to me
25 provide the best evidence.

Page 159

1    Q.    Did you say placebo-controlled?
2    A.    I did not.
3    Q.    And do you not think that
4 placebo-controlled clinical trials provide better data than
5 trials against an active comparator if you're looking
6 at absolute risk?
7    A.    Can you describe better?  Better to me
8 means probably something different than to you.
9    Q.    Well, if you do a study against an active
10 comparator, one of the questions in your analysis is
11 going to be whether your study drug is causing the
12 effect or whether there's something going on with the
13 active comparator, correct?
14        MR. GARRISON:  Object to the form.
15    A.    If there's been an -- if that active
16 comparator in its development has been compared to
17 placebo and we can quantify its effects through that,
18 then I don't see them as different.
19    Q.    But if the active comparator has not been
20 compared to placebo or if there's insufficient data
21 to say whether it's comparable to placebo, then you
22 can have a problem of not knowing whether your study
23 drug is causing the effect or the active comparator
24 is causing the effect?
25        MR. GARRISON:  Object to the form.

Page 160

1    A.    There you would have to rely on the
2 totality of the evidence for that comparator.
3    Q.    And if the totality of evidence on the
4 comparator is insufficient, you might not be able to
5 know whether there's -- you're seeing an effect of
6 your drug or of the comparator?
7        MR. GARRISON:  Object to the form.
8    A.    I can't agree with that.
9    Q.    Why not?
10    A.    Because you look at the totality of the
11 pharmacologic data, animal studies, studies done in
12 the early dose ranging studies.  You look at the
13 totality of all work done on that project.
14    Q.    Yeah, but a totality may be inadequate.
15 Totality may not have answered the question.  And if
16 it doesn't then -- and you've given me examples of
17 situations where people have done lots of studies on
18 lots of patients and still you would say there
19 remains a question out there about whether something
20 causes an effect or not, right?
21        MR. GARRISON:  Object to the form.
22    Q.    We've just been spending 15 or 20 minutes
23 talking about that, correct, situations where there's
24 lots of study, lots of data, but you still -- you
25 can't quite draw a conclusion yet?

Page 161

1    A.    Well, no. Let's be very specific about
2 what I said.  Specifically I said that I use
3 randomized trials, randomized clinical trials.  So I
4 don't want to go under this broad group of studies.
5 In the absence of randomized clinical trial
6 experimental data, I reserve my opinions about
7 causation.
8    Q.    Okay.
9    A.    And even in the presence of the
10 randomized clinical studies, if they're not well
11 done, they don't have good internal validity and
12 external validity, I couldn't answer the questions
13 about causation.
14    Q.    Okay.  If they're not adequate randomized
15 controlled clinical trials to answer the question of
16 whether a particular agent is or is not comparable to
17 placebo and if that agent is used as a comparator for
18 another agent at trial, you would have the problem of
19 not knowing whether the effects you were seeing in
20 the trial were the result of the drug you were
21 studying or the result of something going on with the
22 comparator?
23        MR. GARRISON:  Object to the form.
24 Incomplete hypothetical.
25    A.    I've answered your question.  And I'm

Donna K. Arnett

Page 162

1   assuming -- I'm not going to assume anything. I've
2   answered your question.
3       Q.    I don't think you have.
4           MS. FRIEWALD: Can you read back the
5   question. And I'm going to ask the doctor to
6   answer it.
7           (Requested portion read.)
8           MR. GARRISON: Object to the form. Asked
9   and answered.
10          If you feel like you've answered it, you
11  don't need to answer it again.
12          MS. FRIEWALD: You don't need to coach
13  the witness.
14  BY MS. FRIEWALD:
15      Q.    You can answer the question.
16          MR. GARRISON: Keep asking questions that
17  are repetitive and I'm going to tell her.
18          MS. FRIEWALD: Are you instructing the
19  witness not to answer?
20          MR. GARRISON: I think she's already
21  answered it. It's up to her whether she wants
22  to answer it again. She's already --
23          MS. FRIEWALD: Actually it's not.
24  BY MS. FRIEWALD:
25      Q.    Can you answer --

Page 163

1       A.    This is my last time. In the total -- in
2   that situation you use the totality of evidence about
3   each agent, the active agent you're studying and the
4   comparator.
5       Q.    Okay.
6       A.    You don't function in a vacuum as a
7   scientist.
8       Q.    And if the totality of the evidence about
9   the comparator is inconclusive or you just don't know
10  or nobody has ever really looked at the question
11  before, you have to -- you have to acknowledge that
12  and deal with it, right?
13      A.    Well, tell me how it got through the FDA
14  if it's so inconclusive.
15      Q.    I'm asking a general question.
16      A.    I'm answering generally.
17      Q.    You can only go on what you know,
18  correct?
19          MR. GARRISON: Object to the form. I
20  will -- what you know about what?
21      Q.    Let me ask you this question. Are you
22  going to testify that at the time of the VIGOR study
23  that there was adequate clinical data to know that
24  naproxen was comparable to placebo?
25      A.    I will testify that at the time of VIGOR

Page 164

1   there were no clinical trials of Naprosyn versus
2   placebo, but there were substantial numbers of
3   observational studies that had evaluated -- that have
4   subsequently evaluated the effect of Naprosyn. But
5   Naprosyn had been evaluated -- has been on the market
6   for years, and no one has used it as a cardiovascular
7   protective drug.
8       Q.    I didn't ask you that question. Do you
9   --
10          MR. GARRISON: She's answering your
11  question. Objection, argumentative.
12          MS. FRIEWALD: I'm going to ask you to
13  stop coaching the witness.
14          MR. GARRISON: I'm not coaching the
15  witness. But when you start bullying the
16  witness and being argumentative with her, I'm
17  going to step in. I'm telling you that right
18  now.
19          MS. FRIEWALD: I think the record will
20  reflect that I'm being about as unbullying --
21          MR. GARRISON: Well, argumentative.
22  Let's put it that way.
23          MS. FRIEWALD: -- as I can be.
24          MR. GARRISON: Argumentative, a better
25  word.

Page 165

1           MS. FRIEWALD: Yeah, I think the image of
2   me as a bully would be a hard one for you to
3   pull over.
4           MR. GARRISON: Point made on that one.
5   Argumentative.
6   BY MS. FRIEWALD:
7       Q.    Doctor, are you pointing me to any
8   observational study where Naprosyn was dosed 500
9   milligrams twice a day in the manner it was used in
10  VIGOR and where the data failed to show a reduced
11  risk of MI with Naprosyn?
12          MR. GARRISON: Object to the form.
13      A.    I have not reviewed the Naprosyn data.
14      Q.    Do you know what, if any, studies were
15  done to look at the cardiovascular risks or benefits
16  of Naprosyn before it was approved as a prescription
17  pharmaceutical?
18      A.    I can only speak generally that the FDA
19  requires placebo-controlled studies.
20      Q.    Do you know if there were any done on CV
21  effect with Naprosyn?
22      A.    I have not reviewed the literature or the
23  FDA or the NDA for Naprosyn.
24      Q.    And, in fact, there are observational
25  data that do show a protective effect with Naprosyn,

42 (Pages 162 to 165)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 166

1  right?
2      A.    There are clinical trials now that show
3  the cardiovascular damage from Naprosyn.
4      Q.    There are observational studies that show
5  protective effect, correct?
6      A.    There is a -- I have not reviewed the
7  Naprosyn data.
8      Q.    So are you --
9      A.    Somewhere in my -- in reading through
10  reports I recall that Graham, I believe, published
11  that there was a somewhat protective effect, but a
12  very slight protective effect, in his meta-analysis.
13      Q.    Have you attempted to gather and review
14  all of the data and form an opinion as to whether the
15  totality of data shows whether Naprosyn may have a
16  protective effect?
17      A.    I have not. I've reviewed the Juni
18  article where Juni also did the meta-analysis of the
19  observational studies for Naprosyn.
20      Q.    Are you aware that the FDA has as
21  recently as April of 2005 concluded that the Naprosyn
22  may be cardioprotective when dosed at 500 milligrams
23  twice a day?
24      A.    I'm not aware of that. But I am aware of
25  the ADAPT trial that showed it to be -- to cause

Page 167

1  cardiovascular disease.
2      Q.    Do you know what the results of ADAPT
3  were?
4      A.    On the NIH Web site they discuss the
5  excess risk associated with Naprosyn.
6      Q.    Did you actually read ADAPT?
7      A.    It's not public that I've been able to
8  find.
9      Q.    Do you know how Naprosyn was dosed in
10  ADAPT?
11      A.    I do not.
12      Q.    And do you -- so you have not reviewed
13  the FDA's statement that Naprosyn may be protective?
14          MR. GARRISON: Objection, asked and
15  answered.
16      A.    I have not reviewed it. If you have it,
17  I'd be happy to review it now.
18      Q.    Doctor, is your primary authority on
19  Naprosyn the Juni study?
20          MR. GARRISON: Object to the form.
21      A.    I have not reviewed the Naprosyn
22  literature. I have reviewed the Juni study and
23  recall seeing it in the Graham meta-analysis.
24      Q.    Do you use Framingham risk factors in
25  your work?

Page 168

1      A.    Could you restate --
2      Q.    Do you use the Framingham studies to --
3  I'm going to start that one more time. Have you in
4  the course of your normal work, not your litigation
5  work, but your regular academic work, have you used
6  the Framingham studies to say that any particular
7  risk factor carries a specific point estimate of
8  risk?
9      A.    I'm aware of the Framingham risk
10  calculation. I have not personally used it in my
11  work.
12      Q.    Do you agree that you can't use the
13  Framingham data that looks at population-wide risk
14  and attempt to say that that proves that in any
15  individual patient those risk factors would have a
16  particular point level of risk?
17          MR. GARRISON: Object to the form.
18      A.    I would agree that as epidemiologists
19  we've been concerned for years about the
20  extrapolation of Framingham to other populations.
21  And so I'm not -- I know that people have done that
22  and have used that. I personally haven't put a great
23  deal of value on that and haven't interacted with
24  individuals to --
25      Q.    I think you've answered a slightly

Page 169

1  different question, but it was a helpful answer. So
2  let me see if I understand what you said. Framingham
3  looked at a very particular population of people,
4  correct, the population of Framingham, Massachusetts?
5      A.    Correct.
6      Q.    And that was a predominantly white
7  cohort, for example, correct?
8      A.    Correct.
9      Q.    And it was a predominantly middle-class
10  cohort, correct?
11      A.    Correct.
12      Q.    And they looked at patients who were, if
13  I have my numbers right, generally between the ages
14  of 20 and 74, correct?
15      A.    In their original cohort, they were older
16  than 20. As they've aged they've added the
17  offspring.
18      Q.    Okay. I was less certain about the
19  bottom end of the age range. But I did remember --
20  and I think you're telling me I'm right -- that the
21  original cohort, they didn't even look at anybody
22  over the age of 74?
23      A.    I haven't -- it's been a while since I
24  looked at Framingham.
25      Q.    Fair enough. Fair enough. So one of the

43 (Pages 166 to 169)

Donna K. Arnett

Page 170

1 risks of epidemiology is taking the results that were
2 found when that group was looked at over a period of
3 about ten years in terms of cardiovascular risk and
4 cardiovascular outcomes and trying to apply those to
5 other populations, correct?
6      A.    There have been sensitivity analyses that
7 have looked at the utility of Framingham and other
8 cohorts including the ARIC cohort in which I was
9 involved.  And surprisingly across different
10 populations the risk estimate has been robust.  But I
11 have not reviewed that literature recently and would
12 not -- will not offer an opinion about that.
13     Q.    I thought that you were trying to suggest
14 to me that one has to at least be cautious in
15 applying Framingham to other kinds of populations.
16     A.    As epidemiologists we are cautious.
17     Q.    The first question I tried to ask was a
18 little bit different.  And that was about the danger
19 -- the question I was trying to ask was about the
20 dangers of taking population data like Framingham and
21 trying to apply directly to any individual patient.
22 And would you agree with me that that is a -- an
23 inappropriate thing to try to do?
24         MR. GARRISON:  Object to the form.
25     A.    Well, it's interesting because I think

Page 171

1 about an hour ago you were asking me to do that very
2 thing for blood pressure, will 120 to 122 increase a
3 person's risk.
4      Q.    We were having a discussion about
5 population, okay?
6      A.    No.  Actually you wanted me to talk about
7 individuals at that time.  So we have to be
8 consistent.
9      Q.    Fine.  That's fine.  I was actually
10 probably asking my question badly.  I'm happy to
11 ask -- that's the question I was asking before on a
12 population basis.  And if it wasn't clear, I'll go
13 back.
14     A.    No.  We beat that one up pretty badly.
15     Q.    Okay.  Do you agree that it is
16 inappropriate to try and take risk calculations, risk
17 numbers, that are derived from Framingham on a
18 population basis and apply them directly to any
19 individual patient?
20     A.    I will not agree to that.
21     Q.    Why not?
22     A.    As I've said, I'm not going to testify to
23 the expertise about how different equations fit among
24 different populations.  Generally I will say as an
25 epidemiologist that the Framingham risk function has

Page 172

1 served well across multiple populations.
2      Q.    Okay.
3      A.    So you would have to invoke caution, but
4 I --
5      Q.    Under the heading of, I guess, we have to
6 make sure that we don't try to have it both ways, you
7 didn't want to apply what you knew generally about
8 blood pressure to an individual patient earlier.  And
9 I assume that it is true that you would say it would
10 be improper for -- just by way of example to say in
11 Framingham the relative risk of smoking, for example,
12 was X, therefore, Mr. Jones' risk as a smoker is X?
13         MR. GARRISON:  Object to the form.
14 Argumentative.
15     A.    So the Framingham risk -- can you
16 describe to me how the Framingham risk equation is
17 used?
18     Q.    I'm going to ask the questions in the
19 deposition.
20     A.    Well, in order for me to answer your
21 question I need to understand that you're asking me
22 the question that I think you're asking.
23     Q.    Okay.  If I need to clarify my question,
24 I will.  But I'm not -- I'm not understanding what
25 the clarification needed is.

Page 173

1      A.    So I don't understand your question.
2      Q.    Okay.  Do you agree that it would be
3 improper to say that you -- that if Framingham found
4 on a population basis that there was a certain point
5 estimate associated with a certain risk that that
6 necessarily means that there is the same point
7 estimate, not just on a population basis, but applied
8 to an individual patient?
9         MR. GARRISON:  Object to the form.  Asked
10 and answered.
11     A.    I won't agree with the "improper"
12 comment.  I won't agree that you would not use
13 Framingham risk equations to evaluate for a given
14 individual what his or her probability of disease is
15 for that very finite small number of risk factors
16 that go into that equation.
17     Q.    Framingham does include a very small
18 number of risk factors.  Is that what you're saying?
19     A.    In their risk equation?
20     Q.    Yes.
21     A.    I think that it's the major six risk
22 factors.  And the purpose of using it on any
23 individual would be to estimate a risk over a certain
24 period.
25     Q.    Okay.  So Framingham looks at a risk over

44 (Pages 170 to 173)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 174

1 a period of time, correct?
2     A.    Correct.
3     Q.    And you can't say, well, if the risk in
4 one Framingham study, for example, in the Wilson
5 study in 1998 found a 1.68 risk of smoking that that
6 means that in every patient in the world that the
7 relative risk of smoking is 1.68?  You can't say
8 that, can you?
9          MR. GARRISON:  Object to the form.
10     A.    I'm not trying to not answer your
11 question.  I'm trying to be very careful and precise
12 about how I answer your question.  That equation is
13 derived as a risk function.  A risk function is a
14 probability of having an event given these parameters
15 that are estimated from the composite of data in the
16 Framingham study.  So that equation is derived in
17 Framingham.  That equation from my general knowledge
18 has held up across other populations.  And all that
19 would be derived out of that for an individual would
20 be their probability of an event over a specified
21 time given their status of risk factors.  That's all
22 you get.  Whether a person has or hasn't any event is
23 a one or zero phenomenon.
24     Q.    So you can't say -- you certainly can't
25 use Framingham to say that because the person smoked

Page 175

1 they had a heart attack?
2          MR. GARRISON:  Object to the form.
3     A.    We could say that smoking is a
4 contributor to the heart attack.
5     Q.    On a population basis you can say that
6 smoking contributes to heart attack, but you can't
7 use Framingham to say that smoking contributed to the
8 heart attack in any individual patient?
9          MR. GARRISON:  Object to the form.
10     A.    The whole risk -- the whole goal of
11 epidemiology is to identify risk factors.  So it is a
12 risk factor.
13     Q.    On a population basis.  But what goes on
14 in an individual patient may be that that person
15 would have had a heart attack whether he smoked or
16 not because he had such a strong family history,
17 right?
18          MR. GARRISON:  Object to the form.
19     Q.    Or because he was morbidly obese?
20          MR. GARRISON:  Object to the form.
21     Q.    Correct?
22     A.    I will agree that cardiovascular disease
23 is multicausal.  I would agree that we evaluate risk
24 factors for individuals.
25     Q.    And that in any given individual you

Page 176

1 can't say whatever you know about the general
2 relative risk on the population, you can't say what
3 the actual cause was?  You can make assumptions based
4 on the population, but you can't actually say in this
5 patient it was the cause?
6          MR. GARRISON:  Object to the form.
7     A.    I'm not answering about clinical
8 questions about a particular subject.  So in general
9 we use these estimates from populations to inform
10 patients about their risk.  So in that way we're
11 assuming that subjects are using them.  The American
12 Heart Association uses Framingham all the time to
13 advise patients.
14     Q.    In terms of risk modification going
15 forward, but not in terms of ferreting out the cause
16 of an event after it's happened?
17     A.    I'm not -- I don't deal with clinics and
18 patients.  I don't know what doctors do at any given
19 point.
20     Q.    Doctor, do you agree that patients who
21 are based on population estimates in low risk
22 categories still have heart attacks?
23     A.    On a population basis our risk factors
24 don't explain all of the events.
25     Q.    There are -- scientists such as yourself

Page 177

1 have theorized that there may well be many other risk
2 factors that are not fully understood at this point
3 and that will explain or contribute to our
4 understanding of the explanation of heart attacks?
5     A.    Could you restate that question?
6     Q.    There are quite likely many risk factors
7 that we don't yet know about and that are
8 contributing to heart attacks in our population.
9     A.    I disagree with that statement.
10     Q.    Okay.
11     A.    The major risk factors for cardiovascular
12 disease have been well described.  The newer ones
13 that have come on the market, so to speak, like CRP
14 have not conclusively been shown to add more than the
15 standard risk factors.  So I don't know that there
16 are hundreds of risk factors out there waiting to be
17 discovered.  I hope they're genetic, though.
18     Q.    Do you believe that there are -- you said
19 that the current list of risk factors do not fully
20 explain why people have heart attacks.
21     A.    Uh-huh.
22     Q.    Correct?
23     A.    Correct.
24     Q.    People have heart attacks sometimes for
25 no reason that we can explain looking at risk

45 (Pages 174 to 177)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 178

1  factors, correct?
2        MR. GARRISON: Object to the form.
3     A.    That's true.
4     Q.    People who appear to have few risk
5  factors or no risk factors have heart attacks?
6     A.    It's rare but it is true.
7     Q.    And sometimes people with many risk
8  factors manage not to have heart attacks?
9     A.    Eventually everyone dies and usually it's
10  of a heart attack.
11     Q.    So if somebody has a lot of risk factors
12  for a heart attack, you would expect that sooner or
13  later they're going to have a heart attack?
14        MR. GARRISON: Object to the form.
15     A.    Over the course of a lifetime. Over the
16  course of a lifetime MI is the leading cause of
17  death.
18     Q.    And so --
19     A.    So mathematically one would assume that.
20     Q.    You talked about consistency of studies,
21  Doctor. And when you look at observational data you
22  have to look at whether they are consistent in terms
23  of showing an effect across patient populations,
24  correct?
25     A.    One of the consistency features is across

Page 179

1  populations.
2     Q.    And when you're looking at whether a
3  medication has in effect one of the consistency
4  features is whether it consistently has the effect at
5  a particular dose?
6     A.    Dose response is a criteria that would be
7  evaluated, but not all drugs function in the typical
8  dose response fashion.
9     Q.    I think that's a little bit different
10  question than what I was asking, but let's go with
11  that for starters. You would expect -- a dose
12  response relationship which I understand to mean you
13  see more bad stuff happening at higher doses than
14  lower doses, it's typically viewed as important to
15  confirming that a drug is having an adverse effect,
16  correct?
17     A.    I can't say that for all drugs because
18  each drug is different. Some have a plateau effect
19  after a certain dose.
20     Q.    Dose response is one of the Bradford Hill
21  criteria?
22     A.    That is correct. But that was based on
23  epidemiological data and not pharmacologic data.
24     Q.    And epidemiologically for most drugs you
25  would expect one of the things that you look for and

Page 180

1  that is confirmation of an adverse drug effect is
2  that there are worse effects with higher doses,
3  correct?
4     A.    I can't say that for all drugs. As I've
5  said, some drugs have a plateau effect. And once you
6  get to that plateau raising the dose is not going to
7  increase efficacy or toxic effects.
8     Q.    Assuming there is no plateau effect and
9  assuming that it's related to -- assuming there is no
10  plateau effect you would expect to see a dose
11  response relationship between dose and adverse
12  outcome?
13        MR. GARRISON: Object to the form.
14  Incomplete hypothetical.
15     A.    For every drug there could be a unique
16  profile. I'd want to know the pharmacological
17  properties of that drug.
18     Q.    Let's just keep it general. As a general
19  matter dose response is considered an important thing
20  to look for in confirming that a drug is causing an
21  effect?
22     A.    Generally speaking that's true.
23     Q.    And --
24     A.    But if you -- if your lowest dose is
25  already above the threshold, then you won't see dose

Page 181

1  response.
2     Q.    And seeing a lack of an effect at a lower
3  dose -- strike that.
4        Seeing an effect at a higher dose doesn't
5  mean that you will see that same effect at a lower
6  dose?
7     A.    It depends on the pharmacological
8  properties of the drug.
9     Q.    And one of the things you look for in
10  terms of consistencies in a study is seeing that at a
11  given dose the adverse effect continues to appear?
12     A.    That depends on how well powered studies
13  are to detect such an effect.
14     Q.    So if you have several observational
15  studies and some show an effect and some don't show
16  an effect, that would be an inconsistency in the
17  studies?
18     A.    As I've said, I don't simply look at
19  statistical evidence. I look at the totality of
20  evidence including internal and external validity,
21  bias, confounding by other indications.
22     Q.    Are there any studies, any observational
23  studies of Vioxx, that failed to show an increased
24  risk of heart attack and that you will say failed to
25  show that effect because they were underpowered or

46 (Pages 178 to 181)

Donna K. Arnett

Page 182

1  improperly designed in some way or confounded by some
2  bias?
3      A.    I have not reviewed the observational
4  data. As I've said, I relied on the clinical trial
5  evidence because to me it has the strongest
6  scientific relevance.
7      Q.    You haven't reviewed the observational
8  data even to see whether it confirmed or rebutted
9  what you say are the conclusions of the clinical
10  trials?
11      A.    It was to me irrelevant once the clinical
12  trial data showed what they did.
13      Q.    And the clinical trial data that you're
14  relying on is 010, 070?
15      A.    017.
16      Q.    I'm sorry 017, 023, the Konstam analysis
17  of the 0A studies, Alzheimer's, VIGOR, ADVANTAGE.
18  Did I miss anything?
19      A.    APPROVe.
20      Q.    APPROVe. How could I forget. Are there
21  any placebo-controlled trials -- do you agree that
22  there are no placebo-controlled trials before APPROVe
23  that show a statistically significant increased risk
24  of heart attack with Vioxx?
25      A.    As an epidemiologist, as I've said, I

Page 183

1  evaluate a number of factors. Statistical
2  significance is one of five things that are
3  relevant. So while there was -- I agree that there
4  was no statistically significant finding, the power
5  to detect such a finding was less than one in 20 or 5
6  percent.
7      Q.    So before APPROVe -- putting aside
8  whatever limitations you think there were on the
9  study before APPROVe you agree that there was no
10  placebo-controlled trial that showed a statistically
11  significant increase risk of heart attack with Vioxx?
12      MR. GARRISON: Object to the form. Asked
13  and answered.
14      A.    I will say that there was no statistical
15  significant finding versus placebo, but you had a one
16  in 20 shot in really finding the truth.
17      Q.    And that was based on the power
18  calculation you did?
19      A.    Yes.
20      Q.    And when you did that power calculation,
21  had you already read Dr. Ray's report?
22      A.    I read Ray's report in April or May, and
23  I did this power calculation two weeks ago so --
24      Q.    So yes?
25      A.    So yes. But I can't remember Ray.

Page 184

1      Q.    Did you read Dr. Topol's statements that
2  at the time of VIGOR one couldn't tell whether the
3  increase in MI seen was the result of a
4  cardiovascular risk with Vioxx or a protective effect
5  of naproxen?
6      A.    I don't recall reading the Topol
7  arguments, but I know the FDA had concerns about that
8  hypothesis.
9      Q.    And do you know that the FDA considered
10  it a plausible hypothesis?
11      A.    Well, the Villalba memo of 2000 did not
12  consider it a plausible hypothesis.
13      Q.    Is that the one FDA memo that you're
14  relying on?
15      MR. GARRISON: Object to the form.
16      A.    It's not only the FDA memo. It's the
17  evidence from the Juni meta-analysis from the
18  observational studies.
19      Q.    I just want to limit myself to the FDA
20  stuff for right now, and then we can talk about
21  Juni. Is the Villalba memo from 2000 the one FDA
22  document that you're relying on for your opinion that
23  the FDA didn't consider naproxen being
24  cardioprotective a plausible hypothesis?
25      A.    I've read many memos so I -- and it may

Page 185

1  be elsewhere. So I don't want to limit myself to
2  saying it's not somewhere else in this folder.
3      Q.    But that's your primary authority on
4  that?
5      MR. GARRISON: Object to the form. Asked
6  and answered. Not what she said.
7      A.    About the FDA, yes.
8      Q.    The FDA was aware that Merck believed
9  that naproxen was the likely explanation for the
10  results of VIGOR?
11      A.    Could you restate that?
12      Q.    The FDA knew in 2000 that Merck believed
13  that naproxen was the likely explanation for the
14  results of VIGOR?
15      A.    I can't say what Merck believed. I can
16  say they were asserting that.
17      Q.    The FDA knew that it was Merck's
18  assertion that you're relying on for the results of VIGOR in 2000?
19  for the results of VIGOR in 2000?
20      A.    Yes.
21      Q.    And you also mentioned 023. Now you --
22  what are you using 023 for?
23      A.    So 023 was a small clinical study
24  conducted in 12 healthy subjects that looked at the
25  excretion of urinary prostacyclin.

47 (Pages 182 to 185)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 186

1    Q.    And you say that you put that into your
2  analysis of I think your words were the totality of
3  evidence before VIGOR. In what way did you put that
4  into your analysis?
5    A.    It confirmed the FitzGerald hypothesis
6  about what Vioxx would do in terms of prostacyclin.
7    Q.    Did 023 demonstrate that the prostacyclin
8  was coming from the coronary vasculature?
9    A.    Urinary excretion of prostacyclin would
10  indicate that it's coming from somewhere in the body.
11    Q.    And what were the possible sites?
12    A.    I have no pharmacologic expertise about
13  that subject.
14    Q.    Doctor, you also said you relied on I
15  think my notes say the RA studies and increase in
16  blood pressure. Do I have that wrong?
17    A.    I don't recall saying things about RAs
18  and increasing blood pressure.
19    Q.    Okay. Maybe I have that wrong. What are
20  you relying on from 010?
21    A.    So in 010 there was large increases in
22  blood pressure with the administration of Vioxx.
23    Q.    And --
24    A.    I'm sorry. Forgive me. Strike that.
25       Yeah, that was true. I'm sorry. I have

Page 187

1  too many notes.
2    Q.    And was there any correlation between
3  those increases and clinical outcome?
4    A.    It was a very small study that lasted six
5  weeks.
6    Q.    And what --
7    A.    So the answer was it wasn't powered
8  adequately to test that.
9    Q.    Well, it wasn't a matter of power. It
10  wasn't designed to look at long-term CV outcomes?
11    A.    But you asked me did it show. And in
12  fairness, it can't show it if it's not powered to do
13  so.
14    Q.    Well, you said that it was part of your
15  thinking on the totality of data. So what I was
16  really trying to ask is how are you using 010?
17    A.    The totality of data derived from 010
18  indicates that there were substantial increases in
19  blood pressure that fit the cardiorenal profile that
20  four were discharged early for having edema on the
21  125 dose. And that it dramatically at the very large
22  dose raised blood pressure by almost 11 millimeters
23  of mercury.
24    Q.    And what was the very large dose?
25    A.    125 milligrams.

Page 188

1    Q.    And what was the normal dose of Vioxx?
2    A.    The doses being tested in 017 and 010 are
3  between 25 and 175.
4    Q.    And what was -- once the drug was
5  licensed, what were the normal therapeutic doses?
6    A.    25 milligrams.
7    Q.    And are you saying that Merck should have
8  drawn some conclusion from 010 based on -- are you
9  saying that they should have drawn some conclusion
10  from 010 that Vioxx would or wouldn't have had a
11  specific cardiovascular outcome?
12    A.    It's the totality of 010 and the presence
13  of the mechanism outlined in the FitzGerald
14  hypothesis.
15    Q.    Even today you're not prepared to say
16  that hypertension plays a major role in causing any
17  adverse effects that you say are seen in the clinical
18  studies?
19       MR. GARRISON: Object to the form.
20    A.    I answered earlier that statistical
21  control of blood pressure did not explain the
22  findings.
23    Q.    Okay.
24    A.    Which is different than what you stated.
25    Q.    Well, what does it mean?

Page 189

1    A.    It means that accounting for blood
2  pressure at the time of the trial did not attenuate
3  the significant findings of excess risk.
4    Q.    You couldn't correlate blood pressure
5  increases with excess risk?
6    A.    The trials did not show that data. The
7  independent effect of blood pressure was never
8  shown. To my knowledge I haven't seen it.
9    Q.    When you see the FitzGerald hypothesis,
10  are you going to offer an opinion that that isn't an
11  explanation or partial explanation for an alleged
12  adverse effects of Vioxx?
13    A.    I am not going to speak about my
14  expertise related to pharmacology which the
15  FitzGerald hypothesis gets to.
16    Q.    Okay.
17    A.    What I would say is that in the totality
18  of the evidence up to that point when they have the
19  confirmation of the biological mechanism that should
20  have been a red flag.
21    Q.    Were there biological mechanisms that
22  argued in favor of cardiovascular benefit at the
23  time?
24    A.    I'm not aware of them.
25    Q.    Do you know if there was published

48 (Pages 186 to 189)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 190

1  peer-reviewed literature at the time of VIGOR where
2  scientists had discussed potential cardiovascular
3  benefits of Vioxx and other COX-2s based upon their
4  biological mechanisms?
5    A.   I'm not aware, but causing platelet
6  aggregation would not lend itself to cardiovascular
7  protection.
8    Q.   Have you reviewed the totality of the
9  biological mechanisms which could be potentially
10 helpful or harmful?
11   A.   I have not.
12       MS. FRIEWALD: I think we have to change
13 the tape.
14       THE VIDEOGRAPHER: This is the end of
15 Tape Number Three in the deposition of Dr. Donna
16 Arnett to be continued on tape number four.
17 We're off the record at 2:27 p.m.
18       (Off the record.)
19       THE VIDEOGRAPHER: This is the beginning
20 of Tape Number Four in the continued deposition
21 of Dr. Donna Arnett. We're on the record at
22 2:37 p.m.
23 BY MS. FRIEWALD:
24   Q.   Doctor, what, if any, conclusions are you
25 going to say could be drawn from the results of VIGOR

Page 191

1  about whether or not Vioxx -- I'll use the word
2  caused; if you want to change that word, you can --
3  MIs?
4    A.   So the evidence from VIGOR would indicate
5  that the excess cardiovascular risk for Vioxx
6  relative to Naprosyn was associated with a five-fold
7  increase of myocardial infarction.
8    Q.   And is that what you think could and
9  should have been reasonably said in publications
10 following VIGOR?
11   A.   Absolutely.
12   Q.   And is there any other conclusion that
13 you believe could have appropriately been asserted?
14   A.   The conclusions -- well, first of all,
15 there could have been a table in the paper itself
16 devoted to cardiovascular disease, and there wasn't.
17 And, secondly, they could have -- instead of couching
18 it as cardioprotective effect of Naprosyn -- could
19 have and should have labeled it as a cardiotoxic
20 effect of Vioxx.
21   Q.   And how would you have known that it was
22 a cardiotoxic effect of Vioxx?
23   A.   From the totality of data that have come
24 heretofore.
25   Q.   Well, what data before showed that there

Page 192

1  was a cardiotoxic effect of Vioxx in terms of
2  actually causing MIs?
3    A.   Numerically there was an excess of MIs in
4  earlier studies. The ADVANTAGE study, which was done
5  concurrently with VIGOR, showed eight-to-one increase
6  in cardiovascular events. So that alone should have
7  -- that should have devalued the Naprosyn
8  hypothesis. It was a Naprosyn comparator.
9    Q.   Was it eight-to-one for heart attack?
10   A.   Hold on and I'll be exactly precise. In
11 ADVANTAGE it was confirmed within the APTC endpoint
12 cardiac events were seven-to-one.
13   Q.   And what were they for heart attack?
14   A.   For acute MI it was five-to-one.
15   Q.   And was that a statistically significant
16 finding?
17   A.   It's numerically higher. And it was
18 inappropriately powered to address the question and
19 still showed an effect.
20   Q.   What was seen for stroke in ADVANTAGE?
21   A.   They did not -- they did not separate out
22 stroke. I don't have the results for stroke.
23   Q.   If there was a -- if Vioxx looked better
24 for stroke, would it have been proper or improper to
25 claim that Vioxx was protective for stroke based on

Page 193

1  that numeric disparity?
2    A.   Let me look to the Braunstein article to
3  confirm what they said about stroke because I don't
4  recall them saying anything about stroke in the
5  Braunstein article, but I don't want to misrepresent
6  the facts. So if you'll just bear with me and see
7  the madness to my filing system.
8        So in table two of the Braunstein article
9  relative to ADVANTAGE there was six cerebral vascular
10 events in the Naprosyn group versus zero in the
11 rofecoxib group.
12   Q.   And would it have been proper at that
13 time to say that Naproxyn caused stroke or that Vioxx
14 was protective against stroke?
15   A.   The totality of evidence to date for
16 Naprosyn versus stroke wasn't as compelling as that
17 for Vioxx and heart attacks.
18   Q.   What do you know of the totality of
19 evidence? You said you didn't review any of the
20 literature in Naprosyn.
21   A.   It seems that the FDA at that point would
22 have raised concerns about that. So I'm relying on
23 the FDA for that.
24   Q.   So you're assuming that there must have
25 been data out there that confirmed that Naprosyn was

49 (Pages 190 to 193)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 194

1  already known to be better and that this had to be an
2  aberrant finding. You're making an assumption. You
3  don't actually know what was known about Naprosyn and
4  the risk of stroke?
5     A.   I do not know the literature on Naprosyn
6  and stroke.
7     Q.   And it would have been improper assuming
8  there was no more literature on Naprosyn and stroke
9  than there was for Vioxx and heart attack, it would
10 have been improper to conclude at that time that
11 Naprosyn caused stroke or that Vioxx protected
12 against stroke?
13    A.   I -- since this study was not well
14 powered to detect that, I can't answer that
15 question. Certainly there was no -- I can't answer
16 that question.
17    Q.   And can you tell me based upon either
18 pharmacology or vascular biology or epidemiology
19 whether you should expect to see, if an agent is
20 causing thrombotic events as a result of either
21 prostacyclin imbalance or a hypertension effect or
22 something else, an increase in stroke as well as an
23 increase in heart attack?
24        MR. GARRISON: Object to the form.
25    A.   What was -- what is compelling to me --

Page 195

1  and this will answer your question indirectly -- is
2  that if all of this was simply due to random chance,
3  the excess of MIs, then throughout the studies if it
4  were random you would expect sometimes for there to
5  be fewer MIs on the other side. There's consistently
6  elevated numbers of MIs on Vioxx where there weren't
7  for -- in the Naprosyn group this finding, I don't
8  know how --
9     Q.   Well, what studies are you saying
10 consistently? Because 023 didn't have anything to do
11 with heart attacks, right, and the pre-NDA studies
12 you're not saying there were any heart attacks,
13 right, or 010 you're not saying showed heart attack
14 disparity?
15    A.   017 did.
16    Q.   Statistically significant?
17    A.   There was numerically one in the Vioxx
18 group.
19    Q.   Would you ever as an epidemiologist draw
20 a conclusion based upon the fact that in a study
21 there was one event in one arm and no events in the
22 other arm?
23    A.   As I said, you have to rely on the
24 biological mechanisms proposed. There's studies done
25 by Merck that showed the confirmation of that

Page 196

1  biological mechanism and the evidence up to the point
2  of VIGOR that showed numerical excesses of MI.
3     Q.   Doctor, would you ever as an
4  epidemiologist say that a difference of one event in
5  one arm of a study and zero in another arm is
6  something that you can hang your hat on?
7         MR. GARRISON: Object to the form. Asked
8  and answered.
9     A.   You'll have to define hang your hat on.
10    Q.   Rely on. Say it was important enough to
11 --
12    A.   I can say as an epidemiologist that in
13 reviewing the literature relative to Vioxx before
14 today that I'm convinced that there's a
15 cardiotoxicity to the drug.
16    Q.   I have no doubt that you are -- you're
17 testifying here today because you believe what you
18 believe. But my question to you was as an
19 epidemiologist have you ever asserted anywhere, at an
20 academic convention, at a talk, in your public
21 writings, in anything, that a study where one arm
22 showed one event and another arm showed zero events
23 was meaningful in terms of proving that there was an
24 excess in risk caused by an agent?
25    A.   I would agree that in the absence of all

Page 197

1  other information I would not make that statement.
2     Q.   And, Doctor, there's no statistically
3  significant finding in ADVANTAGE, right, for
4  increased MI?
5     A.   There was no statistical power to address
6  the MI question and yet they still showed this large
7  increase in MI events.
8     Q.   Do you know if there are other studies
9  where there are numeric differences that are
10 comparable and go the other way?
11    A.   For MI, for myocardial infarction?
12    Q.   Yes.
13    A.   I'm not aware of them.
14    Q.   What about for stroke or for composite
15 endpoints?
16    A.   For stroke within the Fall article, let
17 me confirm with my --
18        I recall reading something about Fall so
19 I just want to make sure that I'm correct. I'd have
20 to read the fine points. I seem to recall in the
21 Fall study there was an excess of stroke in the
22 comparator versus Vioxx. So that is one study I
23 recall seeing.
24    Q.   Okay. Doctor, what studies did Juni look
25 at in doing his analysis?

50 (Pages 194 to 197)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 198

1    A.    There were -- I didn't write them down.
2  But there were about 23,000 patients.  And for his,
3  he used the 18 randomized clinical trials conducted
4  using Vioxx so there were by the conclusion 21,432
5  patients.
6    Q.    And was that all the controlled clinical
7  trials that were available at the time?
8    A.    He had restrictions on what could enter
9  into the study in terms of the length of the
10  treatment.
11   Q.    Yeah.  Okay.  Was it all the controlled
12  clinical trials that met his restrictions in terms of
13  duration of treatment?
14   A.    Well, if I -- if I believe what he said
15  in the peer-reviewed literature, which would have
16  been peer reviewed by scientific experts at the time,
17  he say he included all randomized clinical trials
18  with adult patients with musculoskeletal disorders
19  that compared 12.5 to 16 milligrams daily with other
20  NSAIDs or placebo.
21   Q.    Do you know if he excluded any controlled
22  clinical trials that were available?
23   A.    According to this peer-reviewed
24  publication there's no evidence in here that he did.
25   Q.    Doctor, did you do a power analysis for

Page 199

1  ADVANTAGE?
2    A.    I did not do one for ADVANTAGE.
3    Q.    And where do you get your power
4  calculation for ADVANTAGE?
5    A.    Well, there were a large number of
6  subjects.  But the absolute risk levels were small
7  and consistent with the other OA studies.
8    Q.    Would you agree --
9    A.    However -- you know, to me the reason I
10  didn't do it to answer you honestly is that in the
11  aggregate of the OA studies there was insufficient
12  power, you know, less than one in 20.  So there
13  wasn't much sense in me doing one small piece of that
14  pie.
15   Q.    Well, you did it for one, right?
16   A.    I did it for the Konstam article.
17   Q.    You did it for the Konstam article in
18  totality?
19   A.    Yeah.
20   Q.    Fair enough.  You agree with me that
21  power is a concept that you look at when you're
22  designing a study, but that once you have the results
23  epidemiologists, people who do clinical trials, don't
24  talk about power.  They talk about what is the
25  relative risk and what are the confidence intervals

Page 200

1  around that relative risk?
2    A.    I would disagree with that statement.  I
3  as a responsible epidemiologist often do power
4  calculations if the finding is nonsignificant and
5  there is an indication of something going on.  And in
6  fairness to this particular drug the primary outcomes
7  were not cardiovascular.  And so they weren't
8  designed or powered intentionally for cardiovascular
9  disease.
10   Q.    Because that -- it wasn't a
11  cardiovascular drug?
12   A.    Correct.
13   Q.    What is it that you mean specifically
14  when you say that Vioxx is cardiotoxic?
15   A.    I mean specifically that ingestion of
16  Vioxx is associated with an increased risk of
17  cardiovascular events﹒
18   Q.    Which cardiovascular events?
19   A.    If we look at the combined endpoints that
20  the group at Merck decided to look at, it would be
21  all confirmed CV thrombotic events or their
22  APTC endpoints.
23   Q.    Are you going to offer any criticism of
24  the decision to use either one of those endpoints?
25   A.    It's a matter of debate in the field of

Page 201

1  clinical trial work whether or not to use combined
2  endpoints or not.  So it is a very contentious area.
3  Certainly for statistical power I could see that it
4  was reasonable for them to lump all endpoints
5  together to augment their statistical power.  I'm
6  assuming -- and, again, I'm just assuming -- that's
7  the reason they did so.  What really sticks out
8  consistently is acute MI, though.
9    Q.    Are there any individual cardiovascular
10  events that you're saying were increased by Vioxx
11  other than MI?
12   A.    MI is the most common cause of death in
13  the U.S.  MI occurs much more frequently than the
14  other endpoints.  And there's also good clinical
15  criterion that define an MI.  So it's a very clean
16  definition and the most common definition.  So since
17  the studies were underpowered in general for the
18  combined endpoint, you know, less than one in 20
19  chance of finding a true excess risk, then they would
20  be grossly underpowered for the other seven points.
21   Q.    Okay.  I'm not -- that wasn't my
22  question.  My question is simply when you talk about
23  Vioxx being cardiotoxic, are you saying that there's
24  evidence of Vioxx causing some adverse cardiovascular
25  endpoint other than MI?

51  (Pages 198 to 201)