Donna K. Arnett

Page 202

1    A.    I'm saying that as an epidemiologist
2  statistically we can't evaluate this question because
3  we're not adequately powered.  We're only finding
4  that the endpoint that sticks out most is myocardial
5  infarction, but we would expect that because it's the
6  most common cause of cardiovascular disease.
7    Q.    And as an epidemiologist are you saying
8  that the studies were not adequately powered even
9  today to evaluate the magnitude of any claimed risk
10  of MI?
11       MR. GARRISON:  Object to the form.
12    A.    Can you restate that question?
13    Q.    Are you saying that this -- that there
14  remains insufficient data to determine the magnitude
15  of any increased MI risk?
16    A.    No, I think there's sufficient data.
17    Q.    What is the magnitude of the risk?
18    A.    For myocardial infarction according to
19  the Juni study it would be about two-and-a-half fold.
20    Q.    Is that your sole source of information
21  for that?
22       MR. GARRISON:  Object to the form.
23    A.    It's the one, one area where all of the
24  data are combined.
25    Q.    And that includes the VIGOR data?

Page 203

1    A.    Yes.
2    Q.    Do you know what the magnitude of the
3  risk would be if you took out the VIGOR data?
4    A.    Shapiro did a sensitivity analysis
5  regarding that.  I could go back and look at it and
6  tell you precisely if you want precise numbers.  But
7  what is apparent is the consistency of findings
8  across the different studies.  The sensitivity
9  analysis was not significant.  It did not indicate
10  significant in heterogeneity.  Juni's didn't either.
11    Q.    For MI?
12    A.    For MI.
13    Q.    You're saying that for MI you didn't find
14  heterogeneity?
15    A.    Since you're looking at me with those
16  questioning eyes, I shall verify that.
17         Tests for heterogeneity were not
18  significant for --
19    Q.    For what endpoint?
20    A.    For myocardial infarction.
21    Q.    And that wasn't my question.  When you --
22  can I see what page you're looking at?
23    A.    They aren't numbered.
24    Q.    That's the studies versus placebo?
25    A.    Correct.

Page 204

1    Q.    What about --
2    A.    Well, that would be the place where you
3  would most reasonably address that.
4    Q.    Okay.  Do you know whether she found that
5  you could combine the VIGOR data with the other
6  studies appropriately in just looking at MI
7  endpoints?
8    A.    Define appropriately.
9    Q.    In doing a meta-analysis.
10    A.    If there's no evidence for heterogeneity,
11  it's completely appropriate to combine.
12    Q.    And that's what you believe was found?
13    A.    Yes.
14    Q.    Doctor, do you know -- you have it in
15  front of you.  You can look if you want or -- or I
16  won't hold you to an exact point estimate.  But did
17  you know what the relative risk would have been in
18  Juni's analysis if you took out VIGOR?
19    A.    It would be irrelevant to take out VIGOR
20  given there was no indication of heterogeneity.
21    Q.    So you wouldn't want to account for
22  whether naproxen was cardioprotective or not?
23    A.    There was no statistical evidence of
24  differences in the relative risk associated with
25  Vioxx according to comparators.  There was a

Page 205

1  significant finding, though, for prefunded studies.
2  And that was a significant factor for heterogeneity.
3    Q.    Okay.
4    A.    And they were Merck studies.
5    Q.    Doctor, do you agree that when you do
6  subgroup analyses of any study you can often result
7  -- you can often run into problems of bias or
8  erroneous results caused by the effect of small
9  numbers?
10    A.    Could you restate your question?
11    Q.    Sure.  I may not have asked it very well.
12  But hopefully you -- maybe you'll give it back to me
13  better.  Do you agree that when one attempts -- in
14  attempting to do any subgroup analysis in a study
15  that one has to be very careful about the conclusions
16  one reaches?  Start out there generally.
17    A.    Epidemiologists and biostatisticians
18  tends to approach this differently.  One always looks
19  at numbers and draws conclusions based on adequate
20  power and -- in the subgroup to which you're
21  evaluating the question.
22    Q.    And subgroup analyses can often be tricky
23  because you can get into small numbers that can
24  generate large relative risk, but the results in fact
25  are not real.  They can appear more real than they

Donna K. Arnett

Page 206

1  are.
2      A.    And so there you look at the totality of
3  evidence and consistency of evidence across studies.
4      Q.    And --
5      A.    And if you did that here, you would find
6  consistency of the MI finding.
7      Q.    A subgroup analysis for MI, is that what
8  you're talking about?
9      A.    Uh-uh.
10     Q.    Would you consider that to be a subgroup
11 analysis?
12     A.    As an epidemiologist I'm not -- I'm not
13 one of these subgroup analysis gurus about the
14 statistical implications of subgroup. I know about
15 the statistical indications of multiple testing. But
16 I don't -- clinical trialists are very pristine about
17 a priori naming subgroups.
18     Q.    That's fair enough. And I never mean to
19 pull you out of an area of your comfort or
20 expertise.
21     A.    Let's not call it not comfort.
22     Q.    Okay.
23     A.    I don't think it's a big deal.
24     Q.    Okay. What do you mean you don't think
25 it's a big deal?

Page 207

1      A.    So if we -- for instance, in the Juni
2  study I'm a person that combines data, tests for
3  significance of the relative risk across these
4  different subgroups. And if there's no statistical
5  evidence that they are different, then why create a
6  subgroup. So that's what I'm saying, that I look for
7  the statistical evidence of heterogeneity as a
8  starting point and would not stratify data into
9  subgroups.
10     Q.    And in that situation you would be
11 talking about, for example, a combined endpoint of
12 APTC or cardiovascular thrombotic endpoint as the big
13 group and MI as the subgroup?
14     A.    Actually, I was talking -- thinking more
15 along the lines of hypertensives or diabetics.
16     Q.    Okay. Then I don't think I understood
17 your answer.
18     A.    Okay.
19     Q.    You would say you wouldn't break it out
20 by subgroups?
21     A.    If there was no evidence for
22 heterogeneity of the relative risk effect across
23 subgroups.
24     Q.    Have you looked at the -- have you looked
25 at that question in any particular setting?

Page 208

1      A.    There is very little subgroup analysis
2  presented for different risk factors.
3      Q.    And --
4      A.    And --
5      Q.    Go ahead. I didn't mean to cut you off.
6      A.    That's okay. I'm done.
7      Q.    And you don't intend to offer any
8  opinions with regard to any particular subgroup
9  analysis; is that correct?
10     A.    There were hints about a more than
11 additive risk of risk factors with Vioxx in terms of
12 several of the endpoints. But to me the overall
13 effect is -- speaks to the cardiotoxicity. I
14 haven't -- I don't need the subgroup analysis.
15     Q.    Are you going to offer any opinion that
16 any particular type of patient group of people is at
17 greater risk or lesser risk with Vioxx than any
18 other?
19     A.    Currently I would say I'm not going to
20 offer that opinion, but I would like to conduct
21 analyses to look for evidence for additivity
22 effects. And what I mean by that is the additive
23 effects of Vioxx plus the effect of a risk factor on
24 the overall risk for the endpoint. And the models
25 that have been run to date heretofore have relied on

Page 209

1  tests of multiplicity -- multiplicative risks which
2  are estimated from a COX proportional hazards model.
3      Q.    Explain that to me.
4      A.    In the COX proportional hazards model
5  essentially what's being done is your -- they are --
6  the model itself is evaluating the interaction on a
7  multiplicate scale which means that you would take
8  the relative risk for your subgroup risk factor, say,
9  hypertension, multiply it by the risk of Vioxx for
10 your endpoint. And it would have -- the combination
11 of those two attributes would have to be more than
12 the multiplication of those two individual relative
13 risks. That's called interaction on a multiplicative
14 scale. That's how the COX model accesses
15 interaction.
16        I have not yet done calculations because
17 I haven't been able to access the data the way I
18 would like to, to evaluate the additive effects of
19 those risk factors, not the multiplicative effect.
20     Q.    And what would be learned by added --
21 doing an additive effect rather than a multiplicative
22 effect analysis?
23     A.    The subgroup analyses done to date
24 suggest that the presence of cardiovascular risk
25 factors, if you're at excess cardiovascular risk

Golkow Litigation Technologies - 1.877.DEPS.USA

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 210

1  based on your risk factors, I think the relative risk
2  estimates done by Vioxx were greater than nine, a
3  nine-fold risk. But the p-value for the test for
4  that interaction was nonsignificant. It was .096.
5  But that's measuring the interaction on a
6  multiplicative scale. I would like to look to see if
7  on an additive scale, if you added those risk factors
8  together, would it be more than the sum of their
9  parts.
10    Q.    Is that a method that is used in any
11  epidemiologic study that you can point me to?
12    A.    Yes. It's in textbooks. I can show you
13  in Klinbaum, Cooper, and Morganstern [phonetic] how
14  I'd do it. But you need the beta coefficients.
15    Q.    You haven't done that yet?
16    A.    I haven't had access to the data to do
17  so.
18    Q.    And, Doctor, are you going to offer an
19  opinion that there's any subgroup of patients who is
20  not at increased risk or -- strike that.
21          Are you going to offer an opinion that
22  there's any subgroup of patients for whom Vioxx is
23  not associated with an increased risk of heart
24  attack?
25    A.    I will not be offering that opinion.

Page 211

1    Q.    Have you reviewed statements by other
2  experts in the field where they have said that for
3  the majority of patients Vioxx should pose no excess
4  cardiovascular risk?
5    A.    I have not reviewed those. Are they
6  published?
7    Q.    I'm asking about published statements,
8  FDA statements, other statements. Anything?
9    A.    (Shakes head.)
10    Q.    No? I'm sorry. You have to say no for
11  the record.
12    A.    No.
13    Q.    Doctor, do you agree that hypertension is
14  an inflammatory process? And if this is not within
15  your expertise, feel free to say so.
16    A.    I will agree that there's an association
17  between inflammation and hypertension. But it's not
18  well articulated and well known.
19    Q.    What about -- tell me what your
20  understanding of the science is in terms of the
21  relationship between cholesterol, high cholesterol,
22  and inflammation.
23    A.    There -- I have not reviewed this
24  literature. So generally speaking
25  hypercholesterolemia is associated with

Page 212

1  atherosclerosis which may be associated with
2  inflammation. The directions of that causal pathway
3  from my knowledge as an epidemiologist are not well
4  worked out.
5    Q.    Okay. So you accept that atherosclerosis
6  is an inflammatory process but whether the process of
7  laying down the lipids or generating the lipids is an
8  inflammatory process, you're not going to offer an
9  opinion on that?
10    A.    That's correct.
11    Q.    What about diabetes, do you believe that
12  that's an inflammation mediated disease?
13    A.    Type I or type II?
14    Q.    Type II.
15    A.    Type II diabetes is associated with other
16  risk factors which are associated with an
17  inflammatory condition like obesity. So in its
18  interaction with other risk factors diabetics tend to
19  have higher inflammatory markers.
20    Q.    Obesity is an inflammatory condition?
21    A.    Some would argue that it is.
22    Q.    What about stress and depression, do they
23  promote inflammation?
24    A.    I do not know the answer.
25    Q.    Rheumatoid arthritis is an inflammatory

Page 213

1  condition?
2    A.    It is.
3    Q.    And it's associated with increase in
4  cardiovascular events?
5    A.    That is not well worked out.
6    Q.    Have you reviewed that literature?
7    A.    Not recently.
8    Q.    You told me one of your opinions is going
9  to be that the risk of Vioxx is early and
10  continuous. Tell me what the basis is for that.
11    A.    That is from the variety of studies that
12  I reviewed and also most importantly the Shapiro
13  meta-analysis where we look at the K-M plots for
14  particularly myocardial infarction, you see the risk
15  separates early and is continuous.
16    Q.    In what study?
17    A.    This is the meta-analysis.
18    Q.    Can you show me which K-M plot you're
19  relying on?
20    A.    Actually there are more than one.
21          This is the MI endpoint versus the
22  placebo.
23    Q.    I'm sorry. It's --
24    A.    This is the MI endpoint time-to-event
25  plot versus placebo.

54 (Pages 210 to 213)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 214

1  Q.  Okay. And that's the curve that you're
2  looking at to say that the risk is early?
3  A.  Yes.
4  Q.  Was there a statistically significant
5  separation of risk?
6  A.  As we've indicated, we were not
7  adequately powered to assess the statistical
8  significance.
9  Q.  So what are you looking at, a visual gap
10 in the K-M plot, that you --
11 A.  It's not just a visual gap. Look at the
12 number of MI events that happen and you can see, you
13 know, most of your studies are these short six week
14 studies. But you see all of these little bumps
15 represent events for MI, and most of them happen very
16 early.
17 Q.  And do you know at any given point in
18 time how many MIs one might expect to see just as a
19 virtue of chance?
20 A.  Well, if it's chance, it would be equal
21 in the two groups, wouldn't it?
22 Q.  Doesn't it depend on whether the groups
23 have been appropriately randomized for MI risk which
24 wasn't an endpoint of the study?
25 A.  There's no evidence that randomization

Page 215

1  failed in your studies.
2  Q.  Is there any evidence that randomization
3  was accurate in the studies in terms of CV risks?
4  A.  The baseline characteristics I reviewed
5  consistently have been dead on for the randomization.
6  Q.  And what's the risk of chance in a study
7  with very small numbers of patients?
8  A.  Chance is just another way of saying
9  statistically significant.
10 Q.  And there wasn't any?
11 A.  There wasn't, but they weren't powered to
12 test it. Numerically you consistently show access.
13 Q.  If you don't have a study that shows a
14 result, you can't say the result is there just
15 because there's a numeric disparity, can you?
16 A.  There you have to rely again on the
17 totality of evidence. So you have a biologic
18 plausible explanation. You have studies showing
19 numerically consistently higher event rates. It's
20 the totality of that data.
21 Q.  So it's the biological plausibility.
22 Now, we talked about HRT. That's a situation where
23 it was biologically plausible that hormone
24 replacement therapy would reduce MI risk. And that
25 hasn't proven to be true, correct?

Page 216

1  A.  HRT is not a simple drug.
2  Q.  Are there any simple drugs?
3  A.  Actually there are some that are simple.
4  Q.  Which ones?
5  A.  Fenofibrate, simple drug. I'm only going
6  to speak to that one because I --
7  Q.  And it --
8  A.  -- I'm not a pharmacologist so --
9  Q.  But it also can cause kidney toxicity,
10 right, and muscle toxicity and GI effects, right?
11 A.  Right.
12 Q.  Fenofibrate has a whole bunch of
13 complications with it. It might do something simple
14 in terms of its effect, but lots of bad things can
15 happen with fenofibrate, right?
16 A.  And lots of bad things happened with HRT.
17 Q.  Okay.
18 A.  And lots of bad things happened with
19 Vioxx.
20 Q.  And some of those -- so it's not -- when
21 you say -- I don't know what a simple drug means I
22 guess is my problem.
23 A.  What I defined as simple is we know a
24 clear biological pathway wherein the drug works.
25 Q.  That's different from biological

Page 217

1  plausibility. Biological pathway is how it works in
2  the metabolism of the body.
3     MR. GARRISON: Object to the form.
4  A.  That's what I meant by simple.
5  Q.  Okay. But that's not biological
6  plausibility. Vioxx is metabolized through a
7  particular pathway, but that's different from what
8  you're saying about prostacyclin and thromboxane
9  imbalance.
10    MR. GARRISON: Object to the form.
11 A.  The pharmaco-dynamic properties of Vioxx
12 indicates it leads to a prothrombotic state.
13 Q.  Where has that been proved?
14 A.  023.
15 Q.  023 proves that Vioxx leads to a
16 prothrombotic state?
17 A.  As I said before, it's the totality of
18 evidence. And so you have this hypothesis about
19 prostacyclin reductions with Vioxx. You have a
20 clinical trial in 12 people that shows reduced
21 urinary excretion of prostacyclin in Vioxx. You're
22 worried enough about it that you go and patent new
23 products that combine Vioxx with thromboxane-2
24 inhibitors. So I don't know what more you need.
25 Q.  Should aspirin undo the effects of Vioxx?

55 (Pages 214 to 217)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 218

1   A.   There's not sufficient data yet on
2 aspirin use to show.
3   Q.   And if it's -- if it is a prothrombotic
4 mechanism, do you know enough to say whether aspirin
5 would counterbalance any prothrombotic effect?
6   A.   I can't say that the FDA wasn't
7 convinced.
8   Q.   Does that mean that aspirin doesn't
9 counterbalance the prothrombotic mechanism or that
10 the prothrombotic mechanism just isn't the right
11 explanation?
12   A.   I can't answer what the -- I've not
13 reviewed the pharmacology of aspirin. The Villalba
14 memos consistently are concerned about the having
15 insufficient numbers of people on aspirin to test
16 whether or not that hypothesis is true. That would
17 have been very helpful to me.
18   Q.   Do you know if there is a -- if it is a
19 prothrombic mechanism, do you know if aspirin should
20 undo any potential prothrombic effect, or is that an
21 area of pharmacology you wouldn't get into?
22   A.   I prefer not to get into it.
23   Q.   Anything else besides that K-M plot that
24 you're using to support your conclusion that the
25 effects of Vioxx are --

Page 219

1   A.   Cardiotoxic?
2   Q.   -- early and continuous?
3   A.   The clinical trials, the major clinical
4 trials, that I'm relying on which include VIGOR and
5 APPROVe show very early discontinuations due to
6 hypertension, elevated blood pressure, and edema.
7 And those are cardiorenal consequences of Vioxx.
8   Q.   Was there any correlation found between
9 those discontinuances and MI?
10   A.   Well, it's hard to correlate when they
11 discontinue. They aren't there to be treated and get
12 an event.
13   Q.   What about in APPROVe? What about in
14 APPROVe, the all-star of extension data?
15   A.   They've -- the people who withdraw are
16 not available to take the drug and have follow-up
17 data.
18   Q.   Doctor, other than -- okay. So you have
19 the K-M plot. You have the dropouts you say from
20 hypertension or edema which --
21   A.   For -- you know, four-fold more dropouts
22 on Vioxx. And that was consistent throughout all of
23 the studies.
24   Q.   And we don't know if those correlate with
25 actual clinical events?

Page 220

1   A.   Because they're not there to have them.
2   Q.   But we don't know. I mean, regardless of
3 whether -- if you don't know, you don't know. As an
4 epidemiologist you have to admit what you just don't
5 know.
6       MR. GARRISON:  Object to the form.
7   A.   Let me say that if you have a sensitivity
8 to a drug, then you're more likely to drop out. And
9 so those that were sensitive to the cardiovascular
10 effects dropped out before they could get their MI.
11 So the risks are probably underestimated for your
12 drug.
13   Q.   Well -- or it may be that people who take
14 Vioxx in the general population and have increased
15 blood pressure stop taking the medication if they're
16 properly monitored, and so the risk is lower.
17   A.   Do you -- I don't want to start down a
18 path of talking about the risk levels of people in
19 the community who took Vioxx.
20   Q.   Okay.
21   A.   Because they were extremely high and not
22 tested in any of the studies.
23   Q.   Well, what --
24   A.   To my knowledge.
25   Q.   And what's the basis for the statement

Page 221

1 that they were extremely high?
2   A.   If you look at the observational data
3 like from the Kaiser Permanente study by Graham,
4 their risk factor levels are very high.
5   Q.   I thought you testified that you didn't
6 review the observational --
7   A.   Not in detail, but I said I skimmed them.
8   Q.   So based on skimming the observational
9 data you're going to testify as to what their risk
10 levels were?
11   A.   I particularly went and looked at the
12 Graham paper table for their baseline case control
13 status just to see what -- how high the risk factors
14 were given that people were at such a low risk in
15 your clinical trials. It's an external validity
16 question that any decent epidemiologist would ask.
17   Q.   And what did you find?
18   A.   That their risk factor levels in the
19 people that actually took the drugs are really high.
20   Q.   I don't understand. What is it that
21 you're saying that Graham found?
22   A.   Just bear with me.
23   Q.   Sure. Take your time.
24   A.   I went this week to check -- it wasn't.
25 It was Levesque.

56 (Pages 218 to 221)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 222

1    Q.    So Graham didn't find an excess in risk?
2    A.    I do not know about Graham. I skimmed
3    the articles until I found baseline characteristics
4    of people taking Vioxx. And so they -- you know,
5    almost 60 percent had hypertension, 30 percent -- 16
6    to 30 percent had coronary disease.
7    Q.    But they didn't have coronary disease
8    because of Vioxx. That was in the -- that was as
9    they were enrolled in the study?
10   A.    Right, but in the clinical trials
11   conducted to date people at risk of cardiovascular
12   disease were underrepresented. But people who were
13   actually using the drug in the general population are
14   not.
15   Q.    But are you saying that Levesque or any
16   other study found a higher relative risk than what
17   was found in the controlled trials and that,
18   therefore, you can conclude that patients in the
19   free-living population were at greater risk than they
20   were in the controlled trials?
21         MR. GARRISON: Object to the form.
22   A.    No. What I was saying is the external
23   validity of the clinical trial relative risk
24   estimates for Vioxx are probably underestimated
25   because people not at risk were not included and

Page 223

1    people who were at risk for hypertension when they
2    started the drug dropped out.
3    Q.    Are you testifying that the controlled
4    clinical trials didn't include hypertensives?
5    A.    I'm not -- no, I'm not testifying to
6    that.
7    Q.    They did include hypertensives, right?
8    A.    But at -- as I said, you know, 25 to 30
9    percent perhaps were hypertensive at best. Whereas,
10   in the clinical population taking the drug it was
11   much higher.
12   Q.    What about percentage of people with more
13   than one cardiovascular risk factor?
14   A.    Very rare.
15   Q.    Very rare --
16   A.    You know, the 0A trials themselves are
17   almost all women.
18   Q.    What about Alzheimer's?
19   A.    The Alzheimer's were men, predominantly
20   men. They did have risk factors, but they also were
21   cognitively impaired when they entered the study.
22   Q.    And what are you saying is the
23   significance of that?
24   A.    That their recall or ability to discuss
25   their cardiovascular symptoms would be really --

Page 224

1    Q.    Doctor, that's just speculation. You
2    know that in the Alzheimer's trials there were, one,
3    patients without actual Franco [phonetic]
4    Alzheimer's, right? They were mild cognitive
5    impaired. And, two, they were in a controlled trial
6    setting. You're not saying that heart attacks were
7    missed because the patients had Alzheimer's?
8    A.    Well, 46 -- there was a 46 percent
9    increased risk of Alzheimer's disease on Vioxx.
10   Q.    That's not my question.
11   A.    Well --
12   Q.    Now, you're --
13         MR. GARRISON: Well, you can answer it.
14   Keep going. You can answer it.
15   A.    They're cognitively impaired and it got
16   worse if they were on Vioxx so --
17   Q.    My question is you're not actually going
18   to testify that patients in the Alzheimer's studies
19   had MIs unreported because they were pre-Alzheimer's
20   or Alzheimer's patients?
21         MR. GARRISON: Objection. Argumentative,
22   asked and answered.
23   A.    I will state if the --
24   Q.    There's no evidence of that?
25         MR. GARRISON: Let her finish.

Page 225

1    A.    There is evidence of more cardiovascular
2    deaths in the Vioxx group versus the placebo.
3    Q.    There's no evidence --
4          MR. GARRISON: You're interrupting --
5          MS. FRIEWALD: I want my --
6          MR. GARRISON: You're interrupting her
7    answer.
8          MS. FRIEWALD: She's not answering my
9    question.
10         MR. GARRISON: No, you're --
11   BY MS. FRIEWALD:
12   Q.    There's no evidence that there was a
13   failure to obtain the accurate MI reporting because
14   the patients had mild cognitive impairment in the
15   Alzheimer's studies?
16   A.    You -- there is no evidence that I see
17   with the tremendous dropout rates, with the -- with
18   the 15 extra weeks the placebo group got studied
19   relative to Vioxx, with being brought in and
20   cognitively impaired at baseline, I can't believe as
21   a sound epidemiologist that you would have
22   equivalence of reporting of events in mildly
23   cognitively impaired people.
24   Q.    There's no basis at all other than
25   speculation to say that there wasn't accurate

57 (Pages 222 to 225)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 226

1  reporting of events?
2      MR. GARRISON: Object to the form. Asked
3  and answered. She's answered it. Let's move
4  on.
5      Q.   You're going to offer us an opinion that
6  you have factual basis for thinking that events were
7  not reported, or did you just -- you got that from
8  Dr. Krumholz's testimony?
9      A.   No. As an epidemiologist who designs
10 studies, if you have mild cognitive impairment, you
11 have to be very careful about data collection.
12     Q.   Fair enough. And there's no evidence
13 that the data collection wasn't careful?
14     A.   Well, there's evidence that many, many
15 dropped out. So there wasn't good attention to
16 follow-up.
17     Q.   Well, there was -- they may have dropped
18 out for whatever reason people drop out of studies?
19     A.   Well, they dropped out more on Vioxx.
20 That I can argue.
21     Q.   And that's not linked to any clinical
22 event? You can't link that to any clinical event?
23     A.   I can link it to cardiorenal hypertension
24 and edema.
25     Q.   Hypertension and edema?

Page 227

1      A.   I can.
2      Q.   And you know what the rate of those
3  events are? And you haven't looked at the rates of
4  those events for any other -- any other COX-2 or
5  nonselective NSAIDs?
6      A.   I've only been asked to comment on
7  Vioxx. So the answer is no.
8      Q.   You're not going to offer an opinion that
9  it was improper to study an Alzheimer patient
10 population?
11     A.   No.
12     Q.   Doctor, sitting here today are you aware
13 of the fact that there is -- that all NSAIDs are
14 associated with an increased risk of hypertension and
15 edema?
16     A.   I am not aware of that. I have not
17 reviewed the literature. I can say that in the
18 clinical studies I reviewed as part of the Vioxx that
19 Vioxx had greater rates of hypertension than the
20 comparators that were evaluated.
21     Q.   Than which comparators?
22     A.   Naprosyn, diclofenac, placebo, which of
23 course isn't an NSAID.
24     Q.   So that would be in the -- in the OA
25 studies you looked at?

Page 228

1      A.   (Indicating.)
2      Q.   And what's the magnitude of the
3  difference?
4      A.   Can you be -- can you ask --
5      Q.   Can you say what the magnitude of the
6  difference is in terms of point, point difference?
7          MR. GARRISON: Object to the form.
8      A.   I don't recall the exact numbers because
9  they varied by study and patient population.
10     Q.   Some studies showed no magnitude of
11 difference. Some may be a point or something like
12 that?
13     A.   They weren't a point. Remember too there
14 were four-fold more dropouts in general. In APPROVe
15 it was 4.3-fold for hypertension.
16     Q.   Okay. Would you agree that you can't use
17 a relative risk number derived from a clinical trial
18 or a population-based study to tell you how -- what
19 the specific risk was for any individual patient?
20         MR. GARRISON: Object to the form.
21     A.   I disagree with that statement.
22     Q.   All right. Tell me how you disagree.
23     A.   In a randomized clinical trial you
24 balanced potential confounding between the two
25 groups. And you've created an unbiased estimator of

Page 229

1  the population risk from your treatment or benefit
2  for your treatment. So on average that is the
3  benefit that will be realized by or worsening by any
4  individual in their population.
5      Q.   But it doesn't mean that any individual
6  would actually have the average level of risk?
7  Certainly -- right?
8      A.   Individuals would go into making up that
9  composite mean risk for that population.
10     Q.   It doesn't mean that any individual would
11 have the average level of risks in the study?
12     A.   The average is made up of individuals.
13     Q.   But by --
14     A.   By definition --
15     Q.   By definition they won't?
16     A.   You -- one could never tell. You can't
17 say yes or no because you don't know where they fall
18 within that spectrum.
19     Q.   And whatever the level of risk is, some
20 patients won't have the adverse event even though
21 there is on average an increased risk, correct?
22         MR. GARRISON: Object to the form.
23     A.   This is a statistical just common biostat
24 101. And the answer is that a mean is made up of the
25 sum of individual risks.

58  (Pages 226 to 229)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 230

1    Q.    And when you have an adverse event that
2  happens commonly in the general population, you know
3  that even if an agent increases the risk you know
4  that some of those people who have the event would
5  have had the event anyway, right?
6        MR. GARRISON: Object to the form.
7  Incomplete hypothetical.
8    A.    There is an endemic risk in the
9  background population.
10   Q.    And that --
11   A.    That is correct.
12   Q.    What that means is that if you have a
13  common event like a heart attack you know that some
14  number of people in the population are going to have
15  the heart attack anyway, right?
16   A.    There -- that is true but what the
17  clinical trial has shown you is that on average you
18  have X amount of risk associated with your treatment
19  or benefit.  And you can't stand in front of a
20  chalkboard and figure out if everyone is lined up
21  which one of those guys is in which tail of that
22  distribution.
23   Q.    So you can't look at the distribution and
24  say I know some people in this group are going to
25  have a heart attack anyway, some people who wouldn't

Page 231

1  have had a heart attack anyway did because of the
2  medication, and say I know who is who?
3        MR. GARRISON: Object to the form.
4    Q.    You can't do that?
5    A.    We as epidemiologists try to evaluate the
6  totality of evidence for that person.  But as I said,
7  I deal with populations, but we can apply these risk
8  functions to individuals.
9    Q.    But you can't say who was who?  You can't
10  say which one is the heart attack that happened
11  because of the additional risk of the drug as opposed
12  to the heart attack that would have happened anyway?
13       MR. GARRISON: Object to the form.
14   A.    This is a clinical versus epidemiological
15  perspective, and we've been on and off about this all
16  day long.
17   Q.    That's fine.  I just want to understand
18  the limits of epidemiology.  That's not what
19  epidemiology does?  It doesn't allow you to say --
20   A.    I don't consider that a limit.
21   Q.    I don't mean it pejorative.  It's with --
22  it's the inherent restrictions of epidemiology.  It
23  doesn't allow you to say which one is the drug -- is
24  the "but for the addition of the drug this person
25  wouldn't the heart attack" heart attack as

Page 232

1  opposed to the heart attack that would have happened
2  anyway?
3    A.    Alternatively I could say if I'm going to
4  randomize this group to this drug, then on average I
5  expect a 2.4-fold excess risk of events in this group
6  versus that group.
7    Q.    Doctor, I'm just going to ask you to
8  answer my question.  You can't say when you have
9  something like heart attacks that happens commonly
10  that the level of any individual patient you can use
11  the general clinical studies to say this patient was
12  a heart attack that wouldn't have happened but for
13  the drug and this patient is a heart attack that
14  would have happened anyway?
15   A.    I disagree with that statement.
16   Q.    How?
17   A.    Because in randomized clinical trials,
18  and the trials that were done in Vioxx, we have
19  temporality established.  You give a drug.  The risk
20  of heart attack goes up.
21   Q.    But some number --
22       MR. GARRISON: Let her answer.
23       MS. FRIEWALD: Okay.
24   Q.    Go on.  Go on.  Fair enough.
25   A.    So if we have temporality established and

Page 233

1  we have a person who may or may not have risk factors
2  and goes on a drug and has an MI, how can you not say
3  that it's the drug that's contributing to it when
4  we've shown on average and in population it's
5  associated with a 2.4-fold increased risk.
6    Q.    Well, because we know that heart attacks
7  happen at random points in time and that the fact
8  that somebody hasn't had a heart attack yesterday
9  doesn't mean you won't have a heart attack tomorrow.
10       MR. GARRISON: Objection, argumentative.
11   Q.    Right?
12   A.    To me it's an irrelevant concept.
13   Q.    It's an irrelevant concept --
14   A.    Where you --
15   Q.    Let me finish now.  Isn't it true that
16  most people who have heart attacks in this country,
17  it's their first presentation of any cardiovascular
18  disease?
19   A.    Actually sudden cardiac death is the
20  usual first presentation.
21   Q.    Okay.  Heart attacks happen all the time
22  in people with risk factors and without any known
23  risk factors.
24       MR. GARRISON: Object to the form.
25   Q.    Correct?

59 (Pages 230 to 233)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 234

1     A.    Correct.
2     Q.    And by definition the risk of kind of
3  stating the so obvious it sounds stupid, every first
4  heart attack happens in somebody who's never had a
5  heart attack before?
6     A.    I'm failing to see the logic of your
7  questioning.
8     Q.    Can you just -- I'm not asking you to.
9  It may be illogical. I'm just asking you to answer
10 it.
11         Every first heart attack happens in
12 somebody who's never had a heart attack before?
13    A.    By first, by definition, I have to agree
14 with you. But I want to comment that I don't
15 understand the logic.
16    Q.    Patients have first heart attacks after
17 years of having risk factors and they don't know why
18 they've suddenly had that heart attack?
19         MR. GARRISON: Object to the form.
20    A.    I still don't understand the relevance of
21 this --
22    Q.    Is that true or not?
23    A.    -- to Vioxx.
24    Q.    Is that true or not?
25    A.    Here we're talking about a pharmacologic

Page 235

1  agent --
2     Q.    I just want to know --
3     A.    -- with a known increased risk.
4     Q.    I just want to know if what I'm saying,
5  if I understand it right, is true or not. If
6  people -- you studied the epidemiology of cardiac
7  events. People have heart attacks having lived years
8  with risk, cardiovascular risk factors, then -- they
9  might not have had a heart attack for years. And
10 then one day they have a heart attack. It's the
11 nature of the disease, right?
12         MR. GARRISON: Object to the form.
13         Argumentative.
14    A.    I don't understand the line of
15 questioning.
16    Q.    I'm not asking if you understand the line
17 of questioning. If you understand my question, can
18 you answer it yes or no?
19         MR. GARRISON: You don't need to answer a
20    question you don't understand.
21    A.    I don't understand the question.
22    Q.    Do you understand that people in this
23 country who have risk factors for often years and
24 manage to not have heart attacks then eventually have
25 heart attacks?

Page 236

1     A.    Generally, I would agree with that
2  statement. But it's irrelevant for the specific
3  question at hand relative to Vioxx because it's not a
4  risk factor. It is a drug that was given and
5  promoted by Merck with a known excess risk of
6  cardiovascular disease. That's a different thing
7  than a risk factor.
8     Q.    So Vioxx is not a risk factor for heart
9  attacks?
10    A.    It is. It's shown to be a risk factor.
11    Q.    You just said it's a different thing than
12 a risk factor --
13    A.    It's different. It's different in that
14 it's a pharmacologic agent with clear temporality
15 that you can establish with a person.
16    Q.    Why does the fact that it's a
17 pharmacologic agent make it any different from
18 hypertension or diabetes or dyslipidemia or other
19 things we've studied in hundreds of thousands of
20 patients, many more than we've studied with Vioxx and
21 we know they're causative to heart attacks? Why does
22 it matter that it's a drug?
23    A.    Because it's a choice of a person to take
24 it, and it's the responsibility of a reasonable drug
25 company to make sure it's safe.

Page 237

1     Q.    Well, Doctor, I'm not asking you that
2  because you haven't told me that you're going to
3  offer opinions on reasonable drug companies or that
4  you're an expert in those areas. I'm only asking you
5  about epidemiology. And if --
6         MR. GARRISON: Object to the form.
7     Q.    Do you agree with me that it is the
8  nature of heart attacks for them to happen in people
9  who have had risk factors for years and never had a
10 heart attack and then one day they have a heart
11 attack?
12    A.    Are they on or off Vioxx?
13    Q.    Off Vioxx.
14    A.    I would agree with that statement.
15    Q.    Okay. And in any group of patients
16 taking Vioxx regardless of what you think of the risk
17 of Vioxx or the lack of risk of Vioxx, in any
18 population you would have expected that some number
19 of those patients would have had a heart attack
20 anyway?
21         MR. GARRISON: Object to the form.
22    Q.    Vioxx playing no role. You know that
23 because in a placebo group of patients you're going
24 to have some number of patients having heart attacks
25 anyway, right?

Donna K. Arnett

Page 238

1      A.    Generally I would agree but I still do
2  not understand the relevance of this question.
3      Q.    So when you look at a group, whatever the
4  increased risk is that you believe may exist, you
5  can't look at the group and say but I know that
6  Mr. Smith is one of the patients who wouldn't have
7  had a heart attack except for Vioxx or that Ms. Jones
8  is one of the patients who would have had a heart
9  attack anyway?
10      A.    See, this is where your limitations of
11  epidemiology are what I value in the field of
12  epidemiology. And that is that the field is designed
13  to evaluate risks in populations. So we have defined
14  the risk factors for cardiovascular disease, and we
15  have identified Vioxx as a risk factor.
16      Q.    The epidemiologists have identified Vioxx
17  as a risk factor?
18      A.    I'm one. I think it's a risk factor.
19      Q.    Is there some consensus statement of
20  epidemiologists?
21      A.    I'll restrict my comment to myself.
22      Q.    Okay.
23      A.    And Dr. Farquhar and Dr. Ray.
24      Q.    Who are paid experts for plaintiffs?
25      A.    I'd be happy to review any other data you

Page 239

1  bring before me or any other opinions.
2      Q.    Okay. Doctor, you mentioned tables in
3  the VIGOR study. Is that something you got from
4  looking at some document?
5      A.    No, I got it from reading the VIGOR
6  paper.
7      Q.    No, no, no, there should have been some
8  tables, is that the idea you got --
9      A.    I was shocked when I read it that they
10  buried it in text and had no table.
11      Q.    You didn't get that from reading it
12  somewhere else?
13      A.    No. It's obvious.
14      Q.    Did you read the Expression of Concern?
15      A.    I did read the Expression of Concern.
16      Q.    Before or after you became shocked?
17      A.    After I became shocked.
18      Q.    And was it clear to you -- what was the
19  text that you read?
20      A.    You have to -- it's in General Safety on
21  page 1523. There were two -- four lines or so.
22      Q.    And they say what?
23      A.    They say, The rate of death from
24  cardiovascular causes was 0.2 percent in both groups,
25  ischemic -- let me make sure I have VIGOR -- ischemic

Page 240

1  cardio -- cerebrovascular events occurred in 2
2  percent of the patients -- .2 percent of the patients
3  in each group. Myocardial infarctions were less
4  common in the Naprosyn group than the rofecoxib
5  group, .1 percent versus .4 percent. And they give
6  the 65 percent confidence interval.
7      Q.    So that shows you in text what the
8  differences were?
9      A.    It tells you in text buried under a
10  general safety statement.
11      Q.    And VIGOR was not designed as a
12  cardiovascular study?
13      A.    I'll agree with that.
14      Q.    Okay.
15      A.    But you have the totality of evidence
16  before that date of VIGOR.
17      Q.    But I'm just talking about, you know,
18  whether it's a big deal it's in a table or a text.
19  It wasn't a cardiovascular study. Do you know how
20  often or not often data may be presented in text as
21  opposed to tables when they're not part of the
22  primary endpoint of the study?
23          MR. GARRISON: Object to the form.
24      A.    In looking at the totality of the
25  information we have evidence that there is a biologic

Page 241

1  concern about this drug. We have numerous studies
2  showing elevated hypertension rates. We have
3  Scolnick going out and making new patent applications
4  at the same time this goes in though they're
5  concerned about the cardiovascular risk. And then
6  you see five-fold more and you bury it in a general
7  safety note, not even a table, a paragraph.
8      Q.    Doctor, you were able to find that text,
9  right, and it was pretty clear?
10      A.    As a practicing physician -- I'm not a
11  practicing physician, but practicing physicians don't
12  read the fine print.
13      Q.    Doctor, what basis do you have to testify
14  to what practicing physicians do? You're not a
15  medical doctor.
16          MR. GARRISON: You opened the door.
17      Object to the form.
18          THE WITNESS: I did.
19      A.    I'll withdraw that statement.
20      Q.    Okay. And you don't know how frequently
21  or infrequently results may be presented in text
22  versus a table because of page limitations or any
23  other reason when -- particularly when it's not a
24  primary endpoint of the study?
25      A.    In this particular instance with all of

61 (Pages 238 to 241)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 242

1  the background information that Merck had, that they
2  didn't highlight that information to me was
3  unethical.
4      Q.   Is it in the -- is it up front?
5          MR. GARRISON:  Object to the form.
6      A.   They -- it's up front in the abstract.
7  Is that what you mean by up front?
8      Q.   Yeah, it's in the abstract.
9      A.   It's in the abstract as a protective
10 effect.
11     Q.   And it -- that it may be attributed to a
12 protective effect and that was one of the things
13 debated among your colleagues, correct?
14     A.   As I said, I was -- I only heard this in
15 hallways.
16     Q.   Okay.  They debated was it protective or
17 was it Vioxx or was it naproxen?
18     A.   I never testified to the debate about
19 Naprosyn versus Vioxx.  What I testified to earlier
20 was that I heard people in the hallways talking about
21 Vioxx.  So just to be specific, that's what I said.
22         MS. FRIEWALD:  Okay.  Why don't we take a
23 short break.  I'm going to look through my notes
24 and see where I am.
25         THE VIDEOGRAPHER:  We're off the record

Page 243

1  at 3:44.
2          (Off the record.)
3          THE VIDEOGRAPHER:  This is the beginning
4  of Tape Number Five in the continued deposition
5  of Dr. Donna Arnett.  We're on the record at
6  4:16 p.m.
7  BY MS. FRIEWALD:
8      Q.   Okay, Doctor.  I asked you about a bunch
9  of risk factors before, and I neglected to ask you
10 about smoking.  You agree that smoking causes heart
11 attacks?
12     A.   I agree that smoking is a risk factor and
13 associated with heart attack.
14     Q.   Do you think the data are not
15 sufficiently robust to conclude that smoking causes
16 heart attacks?
17     A.   It would be unethical to do a clinical
18 trial to definitively test that hypothesized
19 association, but there's considerable evidence to
20 suggest that smoking is associated with heart attack.
21     Q.   Is it your position that in the absence
22 of a randomized control clinical trial, an
23 epidemiologist cannot and should not assert
24 causation?
25         MR. GARRISON:  Object to the form.

Page 244

1      A.   No, that's not my viewpoint as an
2  epidemiologist.  We look at -- I, in particular, look
3  at the totality of the data and types of study
4  designs, the validity of those designs.  And
5  certainly, smoking has been implicated in most of the
6  major cardiovascular follow-up studies as a risk
7  factor.  But cause is a very strong word to an
8  epidemiologist.
9      Q.   Well, what is missing, in your view, from
10 the puzzle that prevents you from saying smoking
11 causes heart attacks?
12     A.   I -- it's just my general discomfort in
13 saying "cause" in the absence of experimental
14 evidence.  So I'll give it to you that smoking is a
15 cause of heart attack.
16     Q.   I don't want you to give me something you
17 don't believe.  I just want to understand where
18 you're drawing your lines.  Does the Surgeon General
19 say that smoking causes heart attacks?
20     A.   I haven't read the Surgeon General's
21 report, but I certainly know there are strong
22 warnings about smoking and there are warning labels
23 on cigarettes.  So I imagine that the Surgeon General
24 has listed it as a cause of not only heart attack,
25 but lung cancer.

Page 245

1      Q.   So I just want to make sure I understand
2  where we are.  You would put hypertension and high
3  LDL as causes; is that right?
4      A.   I -- I believe I agreed to that.  And
5  it's not -- this -- because in both hypertension and
6  LDL, we have clinical trial evidence that by reducing
7  the levels of those two risk factors, you lower
8  risk.  So you truly establish temporality.
9      Q.   And with those two risk factors, do
10 you -- do you require any specific level of risk?
11 And what I mean by that is -- well, really I want to
12 make sure that you and I are on the same page when we
13 talk about hypertension.  Are you talking about any
14 elevated blood pressure, or are you saying if you
15 have 140 over 90 or above, it's causative, but at
16 some lesser level, it may not be causative?
17         MR. GARRISON:  Object to the form.
18     A.   My earlier testimony and what I truly
19 believe is that -- and is born in the data, is that
20 blood pressure has a continuous gradient with
21 increasing risk with increasing level, and there's no
22 threshold at which risk becomes nonexistent.
23     Q.   And so blood pressure is clearly a risk
24 factor for cardiovascular events.  Is that different
25 from causing heart attacks?

Golkow Litigation Technologies - 1.877.DEPS.USA

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 246

1    A.    Cause -- from an epidemiologist's
2  perspective, how I view causation is the totality of
3  evidence that we've already discussed previously.
4    Q.    Is it just -- can you tell me generally,
5  is there a difference between something being a risk
6  factor and something causing an event?
7        MR. GARRISON: Objection. Asked and
8  answered.
9    A.    I've -- I've discussed this already.
10   Q.    Well, I -- it may be that I don't
11 understand.  I think we've discussed a lot of these
12 issues, but I don't think I ever asked this
13 particular question.
14       Is there a difference between something
15 being a risk factor and something causing an event?
16   A.    Risk is a very precise epidemiologic
17 term, which means that the presence of a factor is
18 associated with an increased probability of
19 occurrence in those exposed to that
20 factor versus those who are not.
21   Q.    Okay. And that's not the same thing as
22 causation because you may need to examine the
23 presence of the risk factor through multiple lines of
24 evidence before you say there's causation?
25       MR. GARRISON: Object to the form.

Page 247

1    A.    Multiple lines of evidence, consistency
2  across studies, the internal/external validity of
3  those studies, coherence with animal models, et
4  cetera.
5    Q.    Okay. So you would need coherence with
6  animal models, consistency across studies.  You
7  talked about biological plausibility. Do you need
8  more than that -- at a certain point, do you need to
9  know whether the biological plausibility theory
10 actually has been proved?
11       MR. GARRISON: Object to the form. Asked
12 and answered.
13   A.    I previously stated that proved is a very
14 abstract concept.
15   Q.    Well, do you need animal data or other
16 things to confirm that the biologic theory actually
17 plays out?
18       MR. GARRISON: Object to the form. Asked
19 and answered.
20   A.    I've answered this question.
21   Q.    Well, I may just not be that swift. But
22 I understand that biological plausibility is a theory
23 that something could happen on a biological level.  I
24 want to know, as an epidemiologist, do you need to
25 have tested that biological hypothesis and shown that

Page 248

1  it's real?
2    A.    Epidemiologists generally do not test the
3  biological hypothesis.
4    Q.    Do you need to have the right kind of
5  scientist test it for you?
6    A.    It depends on where you are in the
7  evaluation.
8    Q.    At some point, wherever you are in the
9  evaluation, if the biological theory is unconfirmed,
10 do you then have to take biologic plausibility off
11 your list or downgrade it in some way?
12   A.    As an epidemiologist who is --
13 epidemiology is the fundamental field of public
14 health.  As a public health activist, if I have shown
15 an excess risk in a population with a particular
16 exposure or drug, then understanding the biological
17 relevance in terms of public health action would be
18 irrelevant.
19   Q.    Okay. But when you're doing things
20 prospectively, when you haven't yet proved the risk,
21 is one of the things you want to do to try and
22 confirm that the biological theory actually works,
23 actually is true in an animal model or in a test tube
24 model or in a human model?
25       MR. GARRISON: Object to the form.

Page 249

1    A.    Generally speaking that is true, but it's
2  not always required.
3    Q.    And you want to see dose response?
4  That's one of the other things you want to see?
5    A.    We discussed this earlier.
6    Q.    Okay. Now, and you -- the best data
7  would be either randomized controlled clinical trials
8  against a placebo or against a comparator that you
9  knew was equivalent to a placebo?
10       MR. GARRISON: Object to the form.
11   A.    Not equivalent to a placebo.
12       MR. GARRISON: Mischaracterization of
13 testimony.
14   Q.    What's wrong with that? Isn't that what
15 you said?
16   A.    You just said use the comparator as
17 equivalent to the placebo.
18   Q.    In terms of risk.
19       MR. GARRISON: Object to the form.
20   Q.    I thought that's what you told me
21 earlier, that you either -- that you can use a
22 comparator if you know the comparator has the same
23 level of risk as the placebo, and then you don't have
24 to worry about being confounded by some effect of the
25 comparator?

63 (Pages 246 to 249)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 250

1      A.    I've answered the question previously.
2  And specifically my testimony is if the comparator
3  has been tested against the placebo, you can use --
4  that the comparator tested against the drug of
5  interest is an appropriate design.
6      Q.    Because you've tested it against a
7  placebo to confirm that it is comparable to a placebo
8  in terms of its risk?
9      A.    No. I did not say that. I don't agree
10  with that statement.
11      Q.    Well, then what's the purpose of
12  comparing it to the placebo?
13      A.    To get it approved by the FDA.
14      Q.    No, no, no. I'm not talking about
15  approval for the comparator.
16      MR. GARRISON: Objection.
17  Argumentative.
18      Q.    If -- I thought I understood this, but I
19  apparently didn't. So I want to make sure I
20  understand it. I thought what you told me is that a
21  placebo comparator trial wasn't necessarily better
22  than an active comparator trial in terms of looking
23  at the risk of a particular drug, if the active
24  comparator's level of risk was known and was
25  comparable to that of a placebo?

Page 251

1      A.    You are correct up until the "comparable
2  to that of placebo." What I said was it would be
3  known.
4      Q.    Okay. So you have to be able to quantify
5  the level of risk firmly that you have with the
6  comparator?
7      A.    Most clinical studies, most randomized
8  controlled studies used active comparators.
9      Q.    Not to test safety.
10      MR. GARRISON: Object to the form.
11  Argumentative.
12      That's not a question. You don't need to
13  --
14  BY MS. FRIEWALD:
15      Q.    Did the FDA allow a drug company to make
16  a safety claim looking at a comparator?
17      A.    I don't know that specific regulatory
18  requirement of a placebo. But certainly in the
19  Villalba memos there was concern about safety with
20  Vioxx.
21      Q.    Okay.
22      A.    And a request for more study for
23  cardiovascular events. I don't recall the FDA
24  requiring Merck to conduct placebo-controlled studies
25  for safety.

Page 252

1      Q.    Fair enough. Fair enough. I just -- you
2  would have to know the level of risk for a particular
3  side effect with the comparator before you could know
4  whether your drug was at increased risk or not when
5  you did your study against the comparator, right?
6      A.    I would disagree in the evidence from
7  Vioxx because in the test for heterogeneity across
8  different comparators, there's no evidence that the
9  safety for Vioxx differs across different
10  comparators.
11      Q.    With regard to MI?
12      A.    Yes.
13      Q.    As a general proposition, would you agree
14  with the statement?
15      A.    Restate it.
16      Q.    Generally speaking, if you're going to
17  test your drug against a comparator, you should know
18  what the level of risk is with the comparator, or you
19  should go against the placebo, if what you're trying
20  to prove is risk compared to a placebo?
21      MR. GARRISON: Object to the form.
22      A.    I would disagree because it's -- it
23  depends on the objectives of the study --
24      Q.    If you --
25      A.    -- and the ethics of withholding active

Page 253

1  treatment.
2      Q.    If you want to know whether Vioxx
3  increases the risk of heart attack compared to taking
4  nothing and you use naproxen as an active comparator
5  in your study, do you need to know how much naproxen
6  increases or decreases the risk of heart attack?
7      A.    It's irrelevant because the APPROVe study
8  tested against placebo and found excess risk.
9      Q.    Well, I'm not talking about -- let me --
10  let's go back and live in the time period of VIGOR.
11  Before APPROVe, would you agree that if you want to
12  know whether Vioxx increased the risk of heart
13  attacks or not comparing it to naproxen, you have to
14  know what naproxen's effect is on heart attacks?
15      A.    In the totality of evidence preceding
16  VIGOR, there was all of these other avenues of
17  causation that we discussed that were showing red
18  flags.
19      Q.    Which were what? Nonstatistically
20  significant results and an edema hypertension effect?
21      MR. GARRISON: Object to the form. This
22  is -- you've already gone into this. This is
23  repetitive. She's already answered all this.
24  You're asking her the same questions, just a
25  different way. We've already been down this.

64 (Pages 250 to 253)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 254

1    Q.    Finish your answer.
2          MR. GARRISON:  You don't have to finish
3    your answer if you feel like you want to stand
4    on what you've already testified to.
5    Q.    I asked you at the time of VIGOR, and you
6    referred me to APPROVe, so --
7    A.    I started APPROVe, and then you went back
8    to VIGOR.
9    Q.    Because I was trying to ask you about the
10   VIGOR time period.
11   A.    Are you ready for me to talk?
12   Q.    Sure.
13   A.    In the Konstam article, which is the
14   composite of OA, RA, and AD studies, many of which
15   were done prior to VIGOR, there's numerical excess of
16   events in Vioxx-treated people.
17   Q.    Did it find any statistically significant
18   increased risk compared to any comparator?
19   A.    We've -- we've talked about this before.
20   It's irrelevant given the context that they were
21   powered one chance out of 20 to find the truth.
22   Q.    Well, let me see if I can -- I just want
23   to back up a little bit.  Because before we get to
24   the studies that you say were underpowered and before
25   we get to VIGOR, the only thing we had was biological

Page 255

1    plausibility, right?
2          MR. GARRISON:  Object to the form.
3    Q.    No?
4    A.    We've discussed this.
5    Q.    Well, before you had the OA studies,
6    which showed no effect, you had biological
7    plausibility; that's what you're saying?
8    A.    I disagree with that statement.  That's
9    not what I said.
10   Q.    Okay.  Then correct me, if you would,
11   because I'm not understanding it.
12   A.    I've testified about this before, and so
13   I'm repeating what I've already mentioned.
14   Q.    I'm not -- I apologize, but I thought
15   that's what you told me, that you had biological
16   plausibility, and then you had studies which showed
17   no statistically significant effect, you say,
18   because --
19   A.    Oh, no, I never said that.
20         MR. GARRISON:  Let me just say something
21   for the record here.
22   Q.    What is it you had before -- before the
23   studies?
24         MR. GARRISON:  Asked and answered.  It's
25   repetitious.  If you want to start something

Page 256

1    new, fine.  But if you're going to keep going
2    down this road, I'm going to end this
3    deposition.
4    BY MS. FRIEWALD:
5    Q.    I just want to know this because I truly
6    do not know.  Is there anything before the OA
7    studies -- you did mention 023.  That's fine.  But
8    that's the biologic plausibility.  Is there anything
9    before the OA studies that you're relying on that is
10   part of the totality of evidence other than
11   biological plausibility?
12   A.    Yes, the NDA application.
13   Q.    Did you review the NDA application?
14   A.    I reviewed NDA 21-042.
15   Q.    I'm sorry.  What document are you looking
16   at?  Because I don't know what that is.
17   A.    It's entitled "Food and Drug
18   Administration Division of Anti-Inflammatory
19   Analgesic in Ophthalmic Drug Products, HSD 550" --
20   Q.    Okay.  You're --
21   A.    MDA 21-042.
22   Q.    The FDA review.
23   A.    Submission date --
24   Q.    The medical review?
25   A.    Yes, by Villalba.

Page 257

1    Q.    Okay.  And what -- was there a page there
2    particularly that you were starting to refer me to or
3    that you were saying?  I'm really just trying to get
4    in terms of the pieces of the epidemiologic puzzle
5    that you need what it is you said you had other than
6    biological plausibility before these OA studies.
7    A.    On page 104 of the Villalba medical
8    review of the NDA application --
9    Q.    Uh-huh.
10   A.    -- she cites that there is theoretical
11   concern, that we've already discussed, in terms of
12   biological plausibility.  She states evaluation of CV
13   thromboembolic events regardless of seriousness shows
14   a numerically higher incident of ischemic and
15   thrombotic events in patients taking rofecoxib.
16   Q.    So that's the studies.  But my question
17   is before the studies and the numeric disparity, was
18   there anything other than biologic plausibility.
19   A.    I've asked and answered -- what else than
20   studies do you have?
21   Q.    Okay.  You say have -- you had biologic
22   plausibility, and then you have studies that you say
23   show a numeric disparity.
24   A.    Uh-huh.
25   Q.    Okay.  And then you have VIGOR; is that

65 (Pages 254 to 257)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 258

1  basically right?
2      A.   Oh, no.  In between you have a patent
3  application where you admit the drug is
4  prothrombotic.
5          MR. GARRISON:  Object to the form.
6      Whatever the previous --
7      Q.   Where does the --
8          MR. GARRISON:  -- record says.
9  BY MS. FRIEWALD:
10     Q.   Where does the patent application contend
11  an admission?
12     A.   It's under the Rationale.
13     Q.   Okay.  Oh, by the way, do -- and maybe I
14  asked this before.  I apologize if I did.
15          Did you read everything that was on the
16  first two disks that we discussed or just you read
17  some things you thought were important to you and
18  didn't read other things?
19     A.   Correct.
20     Q.   Okay.  Do you agree that the traditional
21  independent risk factors are multiplicative in their
22  effect?
23     A.   I don't dis -- I don't agree with that
24  statement.
25     Q.   Why not?

Page 259

1          MR. GARRISON:  He's trying to get your
2      attention.
3          (Off the record.)
4  BY MS. FRIEWALD:
5      Q.   Okay.  So I think my last question was --
6  my next to last question was just to confirm that the
7  two disks that I had handed Kirstin contained
8  information that you had looked at selectively.  You
9  didn't read everything on those disks; you made
10  decisions about what to read and what not to read.
11     A.   Correct.
12     Q.   And if we -- I believe there's an index
13  to those disks; is that right?
14     A.   There is not.  On one of them, the
15  Scientific Article disk, there were folders.
16     Q.   Is there any way for me to know which
17  articles you looked at and which ones you didn't look
18  at?
19     A.   I -- on the Scientific Articles disk, I
20  only looked at the articles related to clinical
21  studies.
22     Q.   Okay.  And on the other disk?  I'm not
23  even sure that I know what was on the other disk.
24          MS. MAZZEO:  8/28/06.
25     A.   That, I opened each of the files and

Page 260

1  skimmed some -- I couldn't tell you now after
2  reviewing as much as I reviewed this 100 hours.
3      Q.   So on the 8/28/06, because that might not
4  have gotten picked up, you skimmed --
5      A.   Uh-huh.
6      Q.   Fine.  And it looks to me like that disk
7  contained kind of a mix of some published literature,
8  some depositions, some company documents?
9      A.   I didn't open any of the depositions.  I
10  requested the company documents after my Google
11  search.
12     Q.   Tell me -- my second question was that
13  you agree that risk factors are multiplicative in
14  their effect.  And if the answer is no, tell me why.
15     A.   The answer is no because -- well, there
16  are some risk factors that may add -- act together in
17  a multiplicative way.  The -- I'm not aware of
18  striking interactions between cardiovascular risk
19  factors.  I'm not aware of them, and I've been a
20  cardiovascular epidemiologist for 20 years.  There
21  are some, but they're not all.  So as I said before,
22  there's statistical ways of testing.
23     Q.   Isn't it true that somebody who has high
24  blood pressure and abnormal lipids and smokes is at
25  greater risk than they -- than one might think just

Page 261

1  by adding those risk factors together?
2          MR. GARRISON:  Object to the form.
3      A.   I -- I can't -- I cannot agree with that
4  statement.
5      Q.   Is there proof that you can point me to
6  that would say that that was wrong?
7      A.   If you're willing to, I can test this in
8  the ARIC database and -- and answer the question from
9  middle-aged Americans.
10     Q.   I just want to know whether there's any
11  published literature that actually exists that would
12  confirm or deny that belief I have.
13     A.   There may be literature that exists.  To
14  my knowledge, I -- it's not a well-known concept
15  among epidemiologists.
16     Q.   Doctor, you believe that any time a
17  patient lives with a blood pressure that is any level
18  above normal, they're taking on some incremental
19  increased risk of having a cardiovascular event?
20          MR. GARRISON:  Object to the form.
21     A.   My testimony is as an epidemiologist, as
22  previously stated, is there an increased risk that
23  is monotonic with increasing blood pressure with
24  cardiovascular events.  I don't speak to specific
25  patients.

66 (Pages 258 to 261)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 262

1   Q.   Does it -- you can't tell me whether it
2   translates to the patient level?  Would -- would you
3   give guidance?  Do you think that you can use your
4   epidemiology to give guidance to a doctor to say, you
5   shouldn't be satisfied with patients being at, say,
6   130 over 80 without telling them that they are at a
7   certain degree of greater risk than if they were at
8   125 over 75?
9        MR. GARRISON:  Object to the form.
10   A.   I'm not a clinician.
11   Q.   So you don't feel qualified to say that
12   that's what the epidemiological data tells doctors?
13   A.   I am not a practicing physician, and I'm
14   not answering the question.
15   Q.   Based on your work as an epidemiologist,
16   do you have an opinion as to what degree in heart
17   attack reduction aspirin provides?
18   A.   I haven't reviewed the literature.
19   Generally speaking, it's between 15 and 20 percent
20   reduction.  But that's a general statement.  I'd have
21   to review the literature carefully.
22   Q.   Okay.  When was the last time you
23   reviewed that literature?
24   A.   When the Physicians' Health Study came
25   out, which was in the 1980s.

Page 263

1   Q.   Would you agree that there are hazards,
2   problems in trying to take out -- trying to study
3   populations with multiple risk factors and tease out
4   the actual contribution of specific individual risks?
5        MR. GARRISON:  Object to the form.
6   A.   You need to restate that question.
7   Q.   Okay.  If you -- are -- are there limits
8   that epidemiologists such as yourself recognize when
9   they do studies where they look at populations that
10   have a whole bunch of risk factors for cardiovascular
11   events and then try to quantitate the effect of those
12   -- of each individual risk factor separately?
13       MR. GARRISON:  Object to the form.
14   A.   That's the beauty of our field.  That's
15   what our field does.
16   Q.   And there are hazards, there are limits
17   to doing that?
18   A.   None to my knowledge.
19   Q.   Well, aren't there all kinds of potential
20   problems that can come about when you try to -- I may
21   be using my term wrong, but take -- do a multivariant
22   analysis and say that that can be used to predict how
23   each individual risk factor affects patients?
24   A.   I'm not speaking about specific patients.
25   Q.   "Patients" is a population.  I'm using

Page 264

1   that as a population.
2   A.   There are parameters in the modeling
3   itself that have to be followed.  But this has been
4   the fundamental mainstay of our field for years.
5   Q.   Okay.  And what are some of the modeling
6   parameters?
7   A.   In the proportional hazards model,
8   proportionality of the hazard over time must be met.
9   That's the critical one.  You have to reach
10   multiplicativity of the effects.  That's the second.
11   And we've discussed that earlier.
12   Q.   And are there hazards in doing population
13   studies where you're looking at healthy populations
14   and potentially underestimating the risks?  I'm not
15   talking about controlled clinical trials, but I'm
16   looking at -- why don't you talk to me about how the
17   Framingham results might not be reproducible.  Is one
18   of the limitations that that was looking at a
19   relatively healthy population?
20   A.   The limitation regarding Framingham was
21   the external validity or generalizability question,
22   so --
23   Q.   And what does that mean in
24   plain English?
25   A.   In plain English, which is getting hard

Page 265

1   to say after eight hours, it's evaluating the -- how
2   you can generalize findings from one population to
3   another, but the risk for that particular population
4   can be very well parameterized.
5   Q.   Okay.  Have you looked at any of the
6   literature on whether any analgesics, NSAIDs, whether
7   traditional or not, or other pain medications affect
8   prostacyclin, other than Vioxx or other than COX --
9   other COX-2s?
10   A.   I have not.
11   Q.   Do you agree that when people are
12   offering their opinions on scientific subjects, not
13   just in medical journals, but in the popular press as
14   well, it's important for them to disclose any
15   conflicts of interest that they might have?
16   A.   Actually, I don't agree with that.  I
17   think as a scientist, I do what is ethical and
18   responsible.  But I know that there are many opinions
19   about that, that people should disclose conflicts.
20   Q.   You don't think that conflicts should be
21   disclosed?
22   A.   As a scientist, I'm not driven by
23   particular conflicts.  I don't engage -- I don't
24   engage in conflict.  In other words, I'm, you know,
25   exclusively funded by NIH.  I have no conflicts.

67 (Pages 262 to 265)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 266

1    Q.   I'm not asking about your conflicts. I'm
2  asking you as a general proposition, do you agree
3  that conflicts of interest should be disclosed?
4    A.   In general, I'll agree to that --
5    Q.   Okay.
6    A.   -- although personally, I feel that all
7  scientists should be ethical.
8    Q.   And you assume that they are? Regardless
9  of whether they have done work for one company or
10 not, you assume that they're driven by their science?
11   A.   I assume that.
12   Q.   Okay. But would you agree that if people
13 are making statements, whether it's in the scientific
14 journal or in the popular press, that might affect
15 people's perceptions of the safety or risks of the
16 drug, that they should identify their conflicts?
17   A.   I don't understand the logic of this
18 questioning. In general, I would say that people
19 should identify conflicts.
20   Q.   Okay.
21   A.   I have no conflicts.
22   Q.   I'm sorry?
23   A.   I have no conflicts.
24   Q.   Doctor, have you looked at the -- whether
25 the number of MIs in the population in this country

Page 267

1  generally increased, decreased, or stayed the same
2  during the time that Vioxx was on the market?
3    A.   I have not reviewed the data. There are
4  no surveillance systems in the U.S. to evaluate that
5  question.
6    Q.   Do you know whether there are reports,
7  annual reports, on rates of MI?
8    A.   There are not any reports of rates of
9  MI. There are deaths, but not reports of MI.
10   Q.   Reports of cardiovascular deaths?
11   A.   Correct.
12   Q.   And do you know if those reports of
13 cardiovascular deaths show an increase, decrease, or
14 consistency during the time period that Vioxx was on
15 the market?
16   A.   I have not reviewed that data.
17   Q.   And would you agree that if the rates did
18 not increase, that would be inconsistent with a
19 substantial adverse effect of Vioxx?
20        MR. GARRISON: Object to the form.
21   A.   I would not agree.
22   Q.   Why not?
23   A.   They're -- the -- the relative risk, the
24 number of people exposed -- can you restate the
25 question?

Page 268

1    Q.   Yeah. If you weren't seeing any
2  significant increase in heart attack deaths or in
3  cardiovascular deaths while Vioxx was on the market,
4  that's an important piece of information that goes
5  against the idea of Vioxx having a big safety impact?
6        MR. GARRISON: Object to the form.
7  Assumes facts not in evidence. Incomplete
8  hypothetical.
9    A.   I don't agree that that would be a
10 strategy that a reasonable epidemiologist would take.
11   Q.   Why not?
12   A.   You would have to know in the population
13 as a whole the exposure prevalence of Vioxx. You
14 would have to know that there were no other competing
15 improvements in medical care that are improving the
16 heart attack survivability. So accrued death rate is
17 not a good indicator --
18   Q.   Well --
19   A.   -- of the question that you're asking.
20   Q.   Well --
21   A.   There have been improvements in
22 cardiovascular care over the last five years.
23   Q.   Well, it certainly would tell you whether
24 there was a big difference in outcomes.
25   A.   It wouldn't tell me anything.

Page 269

1    Q.   It would tell you whether more people
2  were dying from heart attacks while Vioxx was on the
3  market or not.
4        MR. GARRISON: Objection.
5  Argumentative.
6    A.   I've answered --
7    Q.   It wouldn't -- I mean, if there was no
8  increase in deaths, it wouldn't tell you that more
9  people weren't dying?
10        MR. GARRISON: Objection. Assumes facts
11 not in evidence. Argumentative.
12   A.   As I stated before, there could be
13 secular trends in other parts of health care that
14 could be improving the survivability of heart
15 attacks, so, therefore, the overall death rate could
16 be going down while Vioxx was killing people.
17   Q.   So you would have to look at
18 confounders. But it would still be a piece of
19 information that would be pretty important, wouldn't
20 it, if you were going to claim that Vioxx was causing
21 a -- a big safety problem?
22   A.   As a reasonable epidemiologist, I would
23 not evaluate that as one of my criteria.
24   Q.   And what about if you were looking --
25 would your answer be different if you were looking at

68 (Pages 266 to 269)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 270

1   just MIs or strokes?
2       A.   No. I would not look at that data.
3       Q.   Okay. So if you -- if you wanted to know
4   if Vioxx was causing more heart attacks in this
5   country, you wouldn't think it reasonable to look to
6   see whether there were more heart attacks while Vioxx
7   was on the market?
8       A.   As I said, there are no surveillance
9   systems in the U.S. to define heart attacks, to
10  identify them.
11      Q.   Okay. The money that you're getting in
12  this litigation, is that going directly to you, or is
13  that going to the University?
14      A.   It's coming -- actually, I haven't gotten
15  any money.
16      Q.   What you expect to get?
17      A.   It's coming to me.
18      Q.   And is there any limitation the
19  University sets on the percentage of income that you
20  can receive from litigation and/or other kinds of
21  consulting work?
22      A.   This is my -- there are limits in terms
23  of hours or days per week. One day per week can be
24  spent. But I'm not aware of any -- and this is my
25  first case. So it's not like I've had to deal with

Page 271

1   this before.
2       Q.   Okay. You agree that the FDA has never
3   said that blood pressure, hypertension, edema
4   explains any claimed adverse effects from Vioxx?
5           MR. LOCKLAR: Object to the form.
6       A.   I -- I don't understand. You want me to
7   answer about the FDA?
8   BY MS. FRIEWALD:
9       Q.   Yeah. Have you seen anywhere where the
10  FDA has concluded that any alleged risk of Vioxx were
11  the result of hypertension caused by Vioxx?
12          MR. LOCKLAR: Object to the form.
13      A.   I don't recall this. I've reviewed many
14  documents.
15      Q.   You agree that the APPROVe study is not
16  consistent with the FitzGerald hypothesis?
17      A.   The APPROVe study showed an excess risk,
18  substantially significantly excess risk of
19  cardiovascular disease --
20      Q.   So do you --
21      A.   -- which would be consistent with a
22  reduction in prostacyclin and imbalance and that
23  thromboxane process, prostacyclin relationship.
24      Q.   It showed no excess in risk for the first
25  18 months and no statistically significant increase

Page 272

1   in risk before the first 36 months, right?
2           MR. LOCKLAR: Object to the form.
3       A.   You're actually wrong about that.
4       Q.   Okay. Well, tell me where.
5       A.   There was a retraction that came out
6   where the p-value for that 18-month period was
7   retracted in the New England Journal of Medicine.
8       Q.   Well, I didn't ask you actually about
9   that analysis. I asked you isn't it true that, just
10  looking at the event rates, there is no statistically
11  significant increased risk before 18 -- before 36
12  months?
13      A.   t's not true. Investigator-reported
14  event rates were high and consistent throughout
15  the 36-month period.
16      Q.   There's a statistically significant
17  increased risk in confirmed events before 36 months?
18      A.   Investigator-reported events.
19      Q.   So you're using investigator-reported
20  events and not confirmed events?
21      A.   Well, investigators are there with their
22  patients. Don't discount their events.
23      Q.   What --
24      A.   But to me, the concept is irrelevant when
25  there's no statistical evidence.

Page 273

1       Q.   So you would rely on nonstatistically
2   significant evidence sometimes, but not other times?
3       A.   When you find statistical evidence of a
4   statistically increased risk, then power in that
5   situation is irrelevant.
6       Q.   As a general matter, if you saw something
7   with a p-value of .07, would you say, no, I don't --
8   I don't consider that because it's not .05, or would
9   you sometimes in your general work say that that's
10  worth looking at?
11      A.   So it's the totality of evidence. So if
12  you ask me is that P of .07 important for the APTC, I
13  would say no because the totality of evidence for the
14  investigator reports from that same study show an
15  early separation of the lines.
16      Q.   Is there any statistically significant
17  increased risk in heart attacks before 36 months in
18  APPROVe?
19      A.   I haven't reviewed the data on a
20  month-by-month basis, nor do I know if it's
21  available.
22      Q.   And would you agree that the FitzGerald
23  hypothesis would predict not a delay in events; it
24  would predict early events?
25      A.   I would agree that the imbalance in

69 (Pages 270 to 273)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 274

1 prostacyclin and thromboxane would show events
2 early. And if you look at the investigator initiator
3 reports, that would -- that's what you see if you
4 look at the Shapiro report, the meta-analysis of MI.
5 That's what you see.
6    Q.   Where do you see statistically
7 significant increased risk early in APPROVe?
8    A.   You see numerically an increase early on.
9    Q.   And are you claiming that there wasn't
10 power to see statistical significance if there was
11 one?
12    A.   Not early on.
13    Q.   And what's the basis for that?
14    A.   You have very limited follow-up time at
15 that point.
16    Q.   But why would that matter if you have a
17 large cohort of patients and FitzGerald knocks you
18 out of balance right away? You should have plenty of
19 power.
20    A.   There are five factors that go into
21 evaluating power: Incidence rates, sample size, the
22 alpha level, the beta level, and the effect size. So
23 your incidence rate at that point is still small
24 because you have very little accrual time into the
25 trial. So, therefore, you aren't powered at that

Page 275

1 alpha level with that sample size to detect a
2 statistically significant risk.
3    Q.   Well, you have to assume that the rate of
4 events is very low. But if you assume, as you do,
5 that the risk is great and it's caused by immediate
6 imbalance, then you have plenty of power?
7       MR. GARRISON: Objection.
8 Argumentative.
9    A.   I've answered there are five pieces to
10 that puzzle. You have to consider all five.
11    Q.   Okay. But there's no evidence of a
12 statistically significant increased risk in MI in
13 APPROVe before 36 months, right?
14    A.   I have not seen an analysis where it's
15 been separated, and certainly, a retraction in the
16 New England Journal of Medicine would indicate that
17 it was not statistically significantly different by
18 period 18 months versus 36 months.
19    Q.   Doctor, I'm going to mark an exhibit --
20 what's my next number?
21       MR. GARRISON: Just so you know, when
22 it's 5:15, we're leaving. Okay? We've got 15
23 minutes.
24       MS. FRIEWALD: Can we mark this as Arnett
25 6, please?

Page 276

1       (Exhibit Arnett 6 was marked
2        for identification.)
3 BY MS. FRIEWALD:
4    Q.   This is the FDA memo, Doctor, that you
5 glanced at earlier when we were looking at your
6 binder. Am I right, you have not reviewed this memo;
7 is that correct?
8    A.   As far as I know, I have not seen this.
9    Q.   Okay. Are -- can you tell me -- are you
10 -- do you have an opinion at this point -- can you
11 say you agree or disagree or you have no opinion as
12 to whether the three approved COX-2 selective NSAIDs
13 are associated with an increased risk of serious
14 adverse CV events compared to a placebo; the
15 available data do not permit a rank ordering that
16 these drugs with regard to the CV risk? That's the
17 first bullet on the first page.
18    A.   I have not reviewed this, and I have not
19 reviewed the data for celecoxib or valdecoxib, so I
20 cannot offer an opinion in this case.
21    Q.   Okay. And then the next bullet says,
22 "Data from large controlled clinical trials that have
23 included a comparison of selective and nonselective
24 NSAIDs do not clearly demonstrate that the COX-2
25 selective NSAIDs conferred greater risk of adverse CV

Page 277

1 events than nonelective NSAIDs."
2       Do you have an opinion as to that, or do
3 you feel that you've reviewed enough material to
4 offer an opinion as to that?
5    A.   This is the first I've seen this memo.
6 Certainly, from the COX-2 data for Vioxx that I've
7 reviewed, I would not agree with that statement. But
8 I have not reviewed this document before. And I
9 don't understand what they're defining as "CV
10 events." It really would require much more careful
11 review.
12    Q.   Okay. And you haven't read the totality
13 of the data on the nonselective NSAIDs?
14    A.   That's correct.
15    Q.   So similarly, you wouldn't be able to
16 offer an opinion as to whether you agree or disagree
17 with long-term placebo-controlled clinical trial data
18 are not available to adequately assess the potential
19 for the nonselective NSAIDs to increase the risk of
20 serious adverse CV events?
21       MR. GARRISON: Objection.
22    Q.   You haven't looked at that yet?
23       MR. GARRISON: Do you feel like you need
24 to review that whole document --
25       THE WITNESS: Yes.

70 (Pages 274 to 277)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 278

1    MR. GARRISON: -- before you -- by all
2  means, before you answer a question, feel free
3  to review it.
4  BY MS. FRIEWALD:
5    Q.   What I want to know --
6    MR. GARRISON: -- instead of taking it
7  out of context.
8  BY MS. FRIEWALD:
9    Q.   No.  Independent of this memo, have you
10 looked at the -- you have not looked at the totality
11 of the data on the nonselective NSAIDs to have an
12 opinion on how they compare to the COX-2s generally
13 or to Vioxx specifically?
14   A.   I only have data that I've reviewed in
15 conjunction with Vioxx clinical data, which included
16 ibuprofen, Naprosyn, nabumetone, and diclofenac.
17   MR. GARRISON: Diclofenac.
18   THE WITNESS: Thank you.
19 BY MS. FRIEWALD:
20   Q.   From the OA studies?
21   A.   Yes.
22   Q.   Fair enough.  Now, Doctor -- one minute.
23   Have you looked at the -- let me ask it
24 this way.  Do you have an opinion as to what the
25 background rate of heart attacks should be in a

Page 279

1  placebo population?
2    MR. GARRISON: Object to the form.
3    A.   You can't answer that question.
4    Q.   Why not?
5    A.   You have to understand the risk factor
6  levels of the population being evaluated, and also
7  clinical trial participants tend to be healthier,
8  tend to be less likely to have an event.  So there's
9  absolutely no way I could offer an opinion about
10 that.
11   Q.   So would you expect to see that in
12 different placebo studies, you might have different
13 placebo rates?
14   MR. GARRISON: Object to the form.
15   A.   It would -- it would depend on the
16 population characteristics.
17   Q.   Right.  That's what I'm asking.  Would
18 you expect that in different clinical trials that
19 look at CV event rates, you might find different
20 background rates in the placebo arms of those trials?
21   A.   I would agree with that.  I -- I know
22 that the Vioxx studies were designed to have a very
23 low background rate.
24   Q.   Okay.  But -- but from one study to the
25 other, you would expect to see different background

Page 280

1  rates depending upon the population that you're
2  looking at?
3    A.   I would agree with that.
4    Q.   And would you agree that because of that,
5  there's hazards in trying to extrapolate background
6  rates across studies?
7    A.   No.
8    Q.   Why not?
9    A.   Statistically, you can control for that.
10   Q.   What do you mean?
11   A.   Well, statistically, in these
12 meta-analysis approaches, you've combined the data.
13 You're testing for whether or not the relative effect
14 differs across studies, and that's a test for
15 heterogeneity, which was not significant in the Vioxx
16 data.
17   Q.   I'm asking a different question
18 actually.  What I'm asking is would you agree that
19 you can't, say, take an aspirin trial and say the
20 placebo rate in this aspirin trial was X and,
21 therefore, that's what the placebo rate should be,
22 and I'll use that as a basis for finding out whether
23 a particular drug causes heart attacks just by
24 saying, well, the rate in the drug is higher than it
25 was in this background rate in the aspirin trial?

Page 281

1    MR. GARRISON: Object to the form.
2    A.   I don't understand what kind of trial
3  you're designing.
4    Q.   Okay.  Well, let's say that I designed a
5  trial where I looked at some studies that already
6  existed -- okay -- and that had background heart
7  attack rates in them.  And I said in that -- in that
8  study, there was a background rate of .5, okay?
9    A.   .5?
10   Q.   For heart attacks.
11   A.   .5 percent, .5 --
12   Q.   .5 per whatever you want, .5 per thousand
13 patients -- okay -- for heart attacks.
14   A.   All right.
15   Q.   And you couldn't just take that number
16 and say, well, that is the objective background rate,
17 and I'm going to use that to try and decide whether a
18 particular drug that has -- that's never been tested
19 against a placebo has an increased risk.
20   A.   I'm confused about this line of
21 questioning because there weren't such studies that
22 I've reviewed.  So I don't understand its relevance
23 to what I've reviewed.
24   Q.   You've never seen that done?  Would that
25 strike you as an odd thing to do?

71 (Pages 278 to 281)

Donna K. Arnett

Page 282

1    A.   It's not an odd thing to do in the
2  absence of having a placebo-controlled data, but
3  it's -- it's not -- I don't have an opinion.
4    Q.   Okay.  Does it run the risk of generating
5  wrong results because you don't --
6    A.   I don't have an opinion.
7    Q.   Okay.
8    A.   I haven't thought about that question.
9    Q.   You took some notes as we were talking
10  today, and I would ask if I could just take a quick
11  look at those notes.
12   A.   I was just writing down key words.
13   Q.   I thought there were other notes earlier
14  in the day, but --
15   A.   Your names.
16   Q.   It's a very nice picture.
17   A.   Thank you.
18   Q.   The work that you did for Merck, are you
19  allowed to say whether you were compensated or not?
20   A.   I'm not sure, so I just won't say.
21       MS. FRIEWALD:  Fine.  I think that's all
22  I have.  Just one minute.
23       THE VIDEOGRAPHER:  Off the record.  The
24  time is 5:08.
25       (Off the record.)

Page 283

1        MS. FRIEWALD:  I do want to ask one
2  specific question, if I can.
3        THE VIDEOGRAPHER:  Let me go back on the
4  record.
5        Back on the record.  The time is 5:08.
6  BY MS. FRIEWALD:
7    Q.   Doctor, I'm just looking at this Graham
8  Powerpoint.  And did you actually -- I wasn't clear.
9  Did you actually review this document?
10   A.   When I pulled it from the web site, I
11  skimmed through it.  I haven't looked at it recently.
12   Q.   And the published Graham study is
13  something you looked at, not carefully?
14   A.   Not carefully.
15       MS. FRIEWALD:  Fine.  That's all.  Thank
16  you.
17       MR. GARRISON:  No questions.
18       THE VIDEOGRAPHER:  This is the end of
19  Tape Number Five and concludes the deposition of
20  Dr. Donna Arnett taken on September 6th, 2006.
21  We're off the record.  The time is 5:09 p.m.
22       (Off the record.)
23       MS. FRIEWALD:  On the paper record, can
24  we just agree that Dr. Arnett is going to give
25  us an updated CV, and we'll work it in as the

Page 284

1  last exhibit?
2        MR. GARRISON:  Sure.  Fine.  No problem.
3  No problem.
4        COURT REPORTER:  Lew, do you want a copy?
5        MR. GARRISON:  Yes.
6        MR. LOCKLAR:  Do you send it by e-mail?
7        COURT REPORTER:  Yes, E-trans.
8        MR. LOCKLAR:  Can you send it to me with
9  that?
10       COURT REPORTER:  Sure.
11       MR. BROSS:  Yeah, send it to me by e-mail
12  too.  Do you still have my address?
13       COURT REPORTER:  Yes.
14       Thank you.
15
16
17       (End of deposition.)
18
19
20
21
22
23
24
25

Page 285

1        SIGNATURE OF WITNESS
2
3    I, _____, do hereby
4  certify that on this _____ day of
5  _____ 2006, I have read the foregoing
6  transcript and to the best of my knowledge it
7  constitutes a true and accurate transcript of my
8  testimony taken by oral deposition on September 6,
9  2006.
10
11
12  _____
13  DONNA ARNETT
14
15
16  Subscribed and sworn to
17  before me this _____
18  day of _____,
19  2006.
20
21
22  _____
23  NOTARY PUBLIC
24
25

72 (Pages 282 to 285)

735bbe96-d720-4029-ad8a-be286c23a797

Donna K. Arnett

Page 286

```
1        E R R A T A  S H E E T
2
3    PAGE   LINE   CORRECTION      REASON
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 287

```
1         C E R T I F I C A T E
2
3    STATE OF ALABAMA  )
4    JEFFERSON COUNTY  )
5
6        I hereby certify that the above and
7    foregoing deposition was taken down by me in
8    stenotype, and the questions and answers thereto were
9    reduced to computer print under my supervision, and
10   that the foregoing represents a true and correct
11   transcript of the deposition given by said witness
12   upon said hearing.
13       I further certify that I am neither of
14   counsel nor of kin to the parties to the action, nor
15   am I in anywise interested in the result of said
16   cause.
17
18
19   _____
20       Lisa Bailey, Commissioner
21
22
23
24
25
```

Golkow Litigation Technologies - 1.877.DEPS.USA

735bbe96-d720-4029-ad8a-be286c23a797

# EXHIBIT  D

Donna Arnett, Ph.D.

Page 1

                IN THE UNITED STATES DISTRICT COURT

                EASTERN DISTRICT OF LOUISIANA

CASE NO:  2:05-CV2524

ANTHONY WAYNE DEDRICK,

V.

MERCK, et al.,

            VIDEOTAPED DEPOSITION OF:

               DONNA ARNETT, Ph.D

          S T I P U L A T I O N S

        IT IS STIPULATED AND AGREED, by and

between the parties through their respective

counsel, that the deposition of:

            DONNA ARNETT, Ph.D.,

may be taken before Lisa Bailey, CSR, Notary

Public, State at Large, at Heninger, Garrison,

Davis, 2224 1st Avenue North, Birmingham, Alabama,

on October 20, 2006 commencing at approximately

9:00 a.m.



EXHIBIT
D
tabbies

# Donna Arnett, Ph.D.

Page 2

1           EXAMINATION INDEX
2
    DONNA ARNETT, Ph.D.
3     BY MS. FREIWALD . . . . . . . .  8
4           EXHIBIT INDEX
5                     MAR
    Defendant's
6    1   Notice of Deposition           8
7    2   Minutes, March '05 advisory        13
8    3   Excerpted comments            13
9    4   Weaver article          13
10   5   Zhang article          13
11   6   Scolnick e-mail          13
12   7   CV outcome study           13
13   8   NIH news release          13
14   9   Sample size printout          13
15  10   Cards            16
16  11   CV            22
17  12   Arnett report          24
18  13   Patent applications          108
19  14   Index cards          203
20  15   FDA review          248
21  16   Arm Laceration Study          248
22
23
24
25

Page 4

1           A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4
     BENJAMIN LOCKLAR
5    LEIGH O'DELL
     Attorneys at Law
6    ben.locklar@beasleyallen.com
     Beasley, Allen, Crow, Methvin, Portis & Mills
7    218 Commerce Street
     Post Office Box 4160
8    Montgomery, Alabama  36103-4160
     334-269-2343
9
10   FOR THE DEFENDANT:
11   HOPE FRIEWALD
     Attorney at Law
12   Dechert LLP
     Cira Centre, 2929 Arch Street
13   Philadelphia, Pennsylvania  19104-2808
     215-994-4000
14
15
16
17
18
19
20   ALSO PRESENT:  Karen Kelley, Videographer
21
22
23
24
25

Page 3

1          IT IS FURTHER STIPULATED AND AGREED that
2    the signature to and reading of thedeposition by
3    the witness is not waived, the deposition to have
4    the same force and effect as if full compliance
5    had been had with all laws and rules of Court
6    relating to the taking of depositions.
7          IT IS FURTHER STIPULATED AND AGREED that it
8    shall not be necessary for any objections to be
9    made by counsel to any questions, except as to
10   form or leading questions, and that counsel for
11   the parties may make objections and assign grounds
12   at the time of the trial, or at the time said
13   deposition is offered in evidence, or prior
14   thereto.
15
16
17               * * * * *
18
19
20
21
22
23
24
25

Page 5

1          I, Lisa Bailey, a court reporter of
2    Birmingham, Alabama, and a Notary Public for the
3    State of Alabama at large, acting as commissioner,
4    certify that on October 20, 2006 pursuant to the
5    rules of Civil Procedure and the foregoing
6    stipulation of counsel, there came before me at
7    Heninger, Garrison, Birmingham, Alabama,
8    DONNA ARNETT, Ph.D., witness in the above cause,
9    for oral examination, whereupon the following
10   proceedings were had:
11          THE VIDEOGRAPHER:  We are on the
12   record.  This is Tape Number One in the
13   videotaped deposition of Donna Arnett, Ph.D.,
14   taken by defendants in the District Court,
15   Eastern District of Louisiana, Case Number
16   2:05-CV2524.  Anthony Wayne Dedrick,
17   plaintiff, versus Merck and Company,
18   Incorporated, defendants.  This deposition is
19   being held at the offices of Heninger,
20   Garrison, Davis, located at 2224 First Avenue
21   North, Birmingham, Alabama.
22          Today's date is October 20, 2006, and
23   the time is 9:03 a.m.  The court reporter is
24   Lisa Bailey and the videographer is Karen
25   Kelly, both on behalf of Esquire Deposition

Golkow Litigation Technologies - 1.877.DEPS.USA

55a210ee-308b-4267-ba95-cd6434e81231