# Donna Arnett, Ph.D.

**Page 6**

1  Services located in Birmingham, Alabama.
2      Would counsel, and all present, please
3  introduce yourself, after which the court
4  reporter will swear in the witness.
5      MS. FREIWALD: I'm Hope Freiwald. I
6  represent Merck.
7      MR. LOCKLAR: I'm Ben Locklar. I
8  represent the plaintiff, Mr. Dedrick.
9      MS. O'DELL: Leigh O'Dell. I represent
10 the plaintiff.
11      DONNA ARNETT, Ph.D.
12 being first duly sworn, was examined and testified
13 as follows:
14      EXAMINATION
15 BY MS. FREIWALD:
16  Q.  Dr. Arnett, I'm going to mark and hand
17 you Exhibit 1 to your deposition, which is the
18 Notice of Deposition, and ask you to take a quick
19 look at it.
20      (Defendant's Exhibit Number 1
21      was marked for identification.)
22  Q.  Have you seen this before today?
23  A.  I have.
24  Q.  Okay. And if you would, turn with me to
25 the schedule attachment A, which asked you to bring

**Page 7**

1  a bunch of materials with you. And I see that you
2  do have some materials with you today. Is there
3  anything in the pile that's in front of you that is
4  new since you and I last talked?
5  A.  There is. And I separated them so that
6  you wouldn't have to go hunting through my notebook.
7  Q.  Thank you. Can you show me what's new?
8  A.  Yes. I have downloaded the meeting
9  minutes for the advisory and this is dated 3/7/05.
10 This is the FDA advisory that was held February 16th
11 2005. And I also, adjunctive to that, abstracted
12 out the actual votes from the committee members from
13 the full report. That's an executive summary report
14 of the vote.
15      I have a deposition of Dr. Avorn dated
16 June 29, 2006. This is in the case, the MDL docket
17 Litigation 1657. Do you need more information?
18  Q.  That's fine.
19  A.  Okay. And I haven't read the entire
20 deposition, but I brought it with me.
21  Q.  You said that's 6/29/06?
22  A.  The case number 619.
23  Q.  No, the date.
24  A.  The date, yeah, 6/29/2006.
25  Q.  I don't know off the top of my head. Is

**Page 8**

1  that the discovery deposition, or is that the trial
2  preservation deposition?
3  A.  It was videotaped, but it appears that
4  there was both. He was cross-examined so my guess
5  is it was a deposition, but it was --
6      MS. O'DELL: It's the trial deposition.
7      MS. FREIWALD: It's the trial deposition?
8  Fine. Thank you.
9  BY MS. FREIWALD:
10  Q.  Anything else?
11  A.  Yes. This isn't new. I just have two
12 copies.
13  Q.  What's this?
14  A.  This -- I apologize. This is the -- this
15 is the memorandum from April 6, 2005 from John
16 Jenkins and Paul C. Likman. [phonetic]
17  Q.  And have you read that?
18  A.  I have read it. These are not new. I
19 also have downloaded a few new articles. The first
20 is by Weaver published in Clinical
21 Rheumatology in 2006. The second is by Zhang, which
22 is the meta-analysis of randomized trials published
23 recently in JAMA.
24      These are -- we discussed at the last
25 deposition when we were together that these were

**Page 9**

1  e-mails that I had requested from counsel regarding
2  Scolnick's claims about the CV events in VIGOR. So
3  I have those.
4  Q.  May I see those, please?
5  A.  Yes, this is the VIGOR. And also as a
6  request from counsel, this is the CV outcome study
7  that was canceled.
8  Q.  And you had not read these at the time of
9  your last deposition?
10  A.  I had read them.
11  Q.  That's what I thought. Okay.
12  A.  And this -- I had also read and just -- I
13 brought up at the last deposition, that is the ADAPT
14 study that I pulled from the NIH Web site. I
15 actually went back and downloaded it.
16  Q.  What it actually is a --
17  A.  Correct.
18  Q.  -- a news release about the ADAPT study?
19  A.  Correct. And the final pieces that I have
20 redone my power calculations another time, and I
21 have the program description of the mechanisms for
22 calculating power in the power estimates from this
23 data program.
24  Q.  Have your results changed?
25  A.  No.

Donna Arnett, Ph.D.

Page 10

1    Q.   Are the handwritten power calculations you
2  gave me the last time different in any way from this
3  printed document you just handed me?
4    A.   No.
5    Q.   Anything else?
6    A.   That's it.
7    Q.   So you have a blue binder in front of you,
8  but that represents the same blue binder I got to
9  see the last time?
10    A.   It's not the same binder because I put
11  everything in so I wouldn't have things falling
12  out.  So it's a new binder that has three hole
13  punches.
14    Q.   A new, better binder, but exactly the same
15  materials inside?
16    A.   Correct.
17    Q.   Fine.  What I'd like to do is mark some of
18  these new documents as exhibits.  And we can do it
19  one of two ways.  If you don't mind an exhibit
20  sticker on your document, I'll just mark the
21  originals, and you can just get a copy back later,
22  or we can make a copy at the break and just preserve
23  the exhibit numbers.
24    MR. LOCKLAR:  I don't think it matters if
25    it has --

Page 11

1    MS. FREIWALD:  Fine.  So let's do
2  this.  I'm going to mark the minutes from the
3  March '05 advisory as Arnett 2.
4    (Defendant's Exhibit Number 2
5    was marked for identification.)
6    MS. FREIWALD:  I'll mark the excerpted
7  comments, which appear to be pages 328 to 343
8  from the transcript, as Arnett 3.
9    (Defendant's Exhibit Number 3
10    was marked for identification.)
11    MS. FREIWALD:  The Weaver article will
12  be 4, and the Zhang article will be 5.  The
13  Scolnick e-mail will be 6 and the e-mail
14  regarding the CV outcome study dated 3/13/02
15  will be 7, and the NIH news release will be
16  8.  And the sample size printout power
17  calculation will be 9.
18    (Defendant's Exhibit Numbers 4-9
19    were marked for identification.)
20  BY MS. FREIWALD:
21    Q.   Doctor, it appears to me that you've
22  not taken any notes or done any underlining on the
23  Avorn transcript; is that correct?
24    A.   That's correct.
25    Q.   In that case I'm not going to mark it.

Page 12

1  Just note for the record that's the June 29 and
2  June 30th testimony of Dr. Avorn.
3    Doctor, are all the materials that you
4  just showed me, with the exception of the two
5  Merck e-mails, documents that you either found on
6  your own or generated on your own?
7    A.   Yes.
8    Q.   Is there anything else that you've
9  looked at since your last deposition that you deem
10  to relate to the testimony you're going to give in
11  this case?
12    A.   No.
13    Q.   Have you made any additional notes
14  since we last spoke that I haven't seen?
15    A.   Within my notebook, no, I have not.
16    Q.   Anywhere else?
17    A.   I added one statement on a card -- one
18  of my cards.
19    Q.   Can you show me which one, please?
20    A.   It was The Mechanism of Action card.
21  That's on the bottom.  You can see it's in
22  different pen.
23    And, Hope, these were two cards that I
24  had and didn't bring with me last time.
25    Q.   Okay.  Thanks.

Page 13

1    So last time I got to copy a half dozen or
2  so index cards of notes from you.  I don't think
3  they were marked as a separate exhibit number.  I
4  think they were part of the composite exhibit.
5    A.   Correct.
6    Q.   And you just showed me that on one of
7  those cards which was Mechanism of Action, you've
8  now added a sentence that says Vioxx lacks
9  antiplatelet effect of aspirin and disables the
10  body's defense against platelet aggregation, slash,
11  clumping, correct?
12    A.   Correct.
13    Q.   Okay.  And so -- and then there's a new
14  card that says Time Lines and has some text under it
15  and another card relates to protocol 023.
16    A.   Yes.
17    Q.   And why don't we mark these --
18    MR. LOCKLAR:  Why don't we get a copy of
19  those?
20    MS. FREIWALD:  Fine.
21    MR. LOCKLAR:  And we'll mark the copy.
22    MS. FREIWALD:  That's great.  We can get a
23  photocopy of them, and you can just put them
24  together, and then we'll mark them as a
25  composite exhibit -- it will be 10.

4  (Pages 10 to 13)

Donna Arnett, Ph.D.

Page 14

1       (Defendant's Exhibit Number 10
2       was marked for identification.)
3   BY MS. FREIWALD:
4       Q.   Was there a particular document, or
5   documents, that caused you to add the thought about
6   Vioxx disabling the body's mechanism against
7   platelet aggregation?
8       A.   No.  I had -- in all of my readings of the
9   new articles, I was -- it was just a way to remind
10  myself about saying things in more simplistic
11  terms.  So clumping is an easier term to understand
12  about platelets.
13      Q.   Have there been any changes to your CV
14  since we last spoke?
15      A.   Yes.  I have a new copy for you.
16      Q.   And can you point me to what's different
17  on your CV?
18      A.   In the honor section I have listed that I
19  now serve as chair of the study section for
20  cardiovascular epidemiology for the National
21  Institutes of Health.  That's a new appointment
22  since October.
23      Q.   What page are we looking on?
24      A.   Page two.
25      Q.   Cardiovascular and Sleep Epidemiology

Page 15

1   study section?
2       A.   Yes, that's a standing study section in
3   NIH that reviews all cardiovascular epidemiology
4   studies.
5       Q.   Are there any studies that you are
6   currently reviewing that relate to COX-2s?
7       A.   No.
8       Q.   That relate to NSAIDs?
9       A.   No.
10      Q.   And how large of a section is this?
11      A.   This is the largest section on
12  cardiovascular -- it is the only cardiovascular
13  epidemiology section for NIH.  We reviewed about 90
14  grants in this most recent October meeting.
15      Q.   How many people sit on your panel?
16      A.   About 30.
17      Q.   Is there a list of people who sit on the
18  panel that I could find if I went on the NIH Web
19  site?
20      A.   If you go on the NIH Web site and look for
21  study sections, chartered memberships, it's CASE,
22  C-A-S-E, for Cardiovascular And Sleep Epidemiology.
23  And it's under the Health of Populations, H-O-P,
24  major category.
25      Q.   Why is sleep grouped with cardiovascular?

Page 16

1       A.   Because there was a recent
2   reorganization.  Our prior name was Epidemiology of
3   Chronic Disease.  And because sleep is related to
4   cardiovascular disease, in the reorganization they
5   moved sleep into cardiovascular and named it within
6   that section.
7       Q.   Sleep is related to cardiovascular disease
8   in the sense that sleep disorders are --
9       A.   Associated with cardiovascular disease.
10      Q.   With increased risk of heart attack and
11  arrhythmias?
12      A.   Yes.  I can't speak for arrhythmias.  But
13  increased risk of myocardial infarction.
14      Q.   Okay.  And you -- and part of what you
15  would be reviewing would be studies that look at the
16  relationship between sleep disorders including, for
17  example, sleep apnea, and acute cardiovascular
18  events like heart attacks?
19      A.   The primary studies that are reviewed in
20  CASE are cardiovascular.  I believe out of our last
21  round there may have been two relative specifically
22  to sleep.  The vast majority are cardiovascular.
23      Q.   Did they include stroke studies?
24      A.   There are studies that include stroke if
25  they also include cardiovascular disease.  There is

Page 17

1   a separate study section for stroke epidemiology.
2       Q.   So if the primary endpoint of the study is
3   one related to cardiovascular effects but it
4   incidentally looks at strokes, that will come within
5   you.  But if the primary goal is to look at stroke
6   risk, that would go to somebody else; is that
7   right?
8       A.   Correct.
9       Q.   Anything else new on your CV?
10      A.   I updated my publications list, and my
11  current publications are about 207 peer-reviewed
12  literature.
13      Q.   Is there anything new that you deem to be
14  relevant to what you're doing in the Vioxx
15  litigation?
16      A.   Indirectly through my expertise as a
17  cardiovascular epidemiologist, yes, but nothing
18  specifically directed at Vioxx or COX-2 or NSAIDs.
19      Q.   Anything that you'll say as to your --
20  that you would point to specifically related to
21  endothelial function, mechanism of heart attack?
22      A.   Let me review it.
23      Q.   Okay.
24      A.   For instance, I know I just coauthored a
25  paper with the first author Lakoski that evaluates

5 (Pages 14 to 17)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 18

1   the relationship of C-reactive protein in augmenting
2   a prediction of cardiovascular disease as measured
3   by coronary artery calcification.
4       Q.   Can you point me to that one?
5       A.   It's number 185.  It's titled,
6   Implications of C-Reactive protein or coronary
7   artery calcium score as an adjunct to global risk
8   assessment for primary prevention of CHD.
9       Q.   What was the conclusion of that study?
10      A.   That C-reactive protein is not an
11  important adjunct to global risk assessment, and I'd
12  have to review the -- because I read it almost a
13  year ago, I'd have -- in the authorship procedures,
14  so I would have to review the specifics about what
15  coronary artery calcification did.
16      Q.   What was your role in this study?
17      A.   I'm an investigator in the MESA study,
18  where these data were derived, and I helped edit and
19  analyze the -- review the analysis and edit the
20  manuscript.
21      Q.   What does it mean when you say you helped
22  review the analysis?  Reviewed it with regard to
23  statistical methods?
24      A.   Reviewed it with regard to tables, were
25  the tables understandable, were there more analyses

Page 19

1   that needed to be done.
2       Q.   You didn't do any of the primary analysis
3   yourself, did you?
4       A.   I did not do any of the programming or the
5   primary analysis.  We have a coordinating center at
6   the MESA study that does that.
7       Q.   Okay.  Anything else?
8       A.   There was another paper that I -- that's
9   related to coronary artery calcified plaque in
10  clinical coronary heart disease.  Number 201
11  published with Paul Hopkins that points to the
12  relationship between subclinical markers of
13  cardiovascular disease as measured in the
14  calcification of plaques and its relation with
15  clinical coronary heart disease.  And the finding
16  was there was a positive and a strong association as
17  one would predict.
18      Q.   There was a strong association between
19  adverse clinical events and calcification in the
20  arteries?
21      A.   Specifically prevalent coronary heart
22  disease and calcification in the arteries.
23      Q.   Is prevalent disease a term of art in some
24  sense?
25      A.   In epidemiology prevalence is a term

Page 20

1   that's used to define existing cases.
2       Q.   So you're -- all right.  You're using it
3   as a true epidemiology term?  Fine.
4       A.   Yes.
5       Q.   You're not using it as a quantitative
6   term, which is how I misinterpreted it to begin
7   with.  You're not talking about the degree of
8   atherosclerotic changes.  You're talking about the
9   presence of calcification in the arteries?
10      A.   And self-report of clinical coronary
11  disease.
12      Q.   Fine.  Anything else?
13      A.   No.
14      Q.   Then let's mark your new CV as 11.
15          (Defendant's Exhibit Number 11
16          was marked for identification.)
17      Q.   Doctor, I had a chance to review the
18  expert report that you produced in the Dedrick
19  case.  Am I correct in understanding that the
20  opinions that you intend to offer here are the same
21  as the opinions that you offered when we spoke in
22  the Arnett [sic] case?
23      A.   The Arnett case?
24      Q.   That was the -- that's terrible.  I've
25  really been sleep deprived.  In the Albright case.

Page 21

1   I apologize.
2       A.   That's okay.  Correct, the opinions are
3   the same as I expressed in the Albright case about
4   four weeks ago.
5       Q.   And was it only four weeks ago?  It seems
6   longer than that to me.
7           And there are no changes that you intend
8   to make to your opinions; is that correct?
9       A.   As new -- as I indicated new papers came
10  out that further supported my opinions.  If new
11  papers come out between now and the time we go to
12  trial, my opinion may be augmented by that new
13  information.  But I currently intend -- have the
14  same opinions expressed in my report.
15      Q.   Is there any additional opinion, or
16  opinions, that you intend to offer that are not
17  expressed -- we did not discuss at -- during the
18  time of the Albright deposition?
19      A.   Today?
20      Q.   Yes.
21      A.   No.
22      Q.   And am I correct in understanding that the
23  few new articles that you brought with you today do
24  not change your opinion?
25      A.   They strengthen my belief in the opinion

6 (Pages 18 to 21)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 22

1  of Vioxx can be cardiotoxic.
2      Q.   Are there any additional materials or
3  pieces of evidence that you currently intend to rely
4  on other than the ones that you've brought with you
5  today?
6      A.   No.
7      Q.   Am I still correct that none of the
8  advisory work you've done on any of the working
9  groups you've been involved in related to COX-2s or
10  NSAIDs generally?
11      A.   I don't understand the question.
12      Q.   Okay.  Let me do this.  Let me mark as
13  Albright -- Arnett 12, I apologize, your report in
14  this case.
15          (Defendant's Exhibit Number 12
16          was marked for identification.)
17      Q.   And if you would look at the second page
18  of your report.  In the second paragraph you list
19  some groups or committees where you've served in
20  some capacity.  And my question is am I right still
21  that on none of those committees have you done any
22  work that specifically relates to COX-2s or NSAIDs?
23      A.   That is true.  My work on these committees
24  comes from my experience as a cardiovascular
25  epidemiologist.

Page 23

1      Q.   And with regard to your work on the
2  editorial board of the American Journal of
3  Epidemiology is it still true that you have not
4  reviewed any papers related to the subject of COX-2s
5  or NSAIDs?
6      A.   As an editor I am assigned to diet and
7  nutrition studies within the American Journal of
8  Epidemiology.  So it would not be under my purview
9  to review COX-2 papers.
10      Q.   Has that always been your assignment?
11      A.   It's my primary -- my primary assignment,
12  but I do get a lot of other manuscripts that don't
13  fit into neat categories in any other editorial
14  positions.
15      Q.   Is that because that's a significant area
16  of research interest for you generally?
17      A.   It's because I'm the newest kid on the
18  block on the editorial board.
19      Q.   Everybody else there is more senior than
20  you?
21      A.   I won't say more senior, but they have
22  been an editor longer than I have and have
23  significantly more gray hair.  No disrespect
24  intended.
25      Q.   Looking at the third page of your report,

Page 24

1  I'm sorry, I just noticed the pages aren't
2  numbered.  But under issues addressed and opinions
3  am I right the categories and materials you intend
4  to rely on are the ones we've already discussed, the
5  published literature for Vioxx including the meta-
6  analysis conducted by Merck, correct?
7      A.   Correct.
8      Q.   And you're referring to the Konstam meta-
9  analyses?
10      A.   I'm referring to the Konstam as well as
11  the Shapiro meta-analysis.
12      Q.   That would not be a published meta-
13  analysis?
14      A.   That is correct.  To my knowledge, it was
15  not published.
16      Q.   And then the major Vioxx-related studies
17  conducted by Merck and the FDA published Vioxx-
18  related documents, correct?
19      A.   Correct.
20      Q.   And are there any studies that you're
21  considering major studies that we haven't yet
22  discussed?
23      A.   The additional study that we have not
24  discussed that I consider major is the JAMA article
25  by Zhang, which is a meta-analysis of the adverse

Page 25

1  effect of COX-2 inhibitors in renal and arrythmia
2  events.
3      Q.   Now, on the last time we talked, if I
4  remember right, you mentioned that you had done some
5  looking around the FDA Web site and you couldn't --
6  you didn't keep everything you looked at.  So I just
7  wanted to ask you have you previously reviewed this
8  document, which is the background package, prior to
9  the 3/05 advisory committee hearing dated December
10  '04?
11      A.   As part of the Web site on the FDA?
12      Q.   Well, I'll ask that question first.
13      A.   Parts of this look familiar.  But I don't
14  recall if it was from the Web site.  It doesn't
15  indicate a Web site URL on this document.
16      Q.   I didn't pull my copy off the Web site.
17  It's a document that's been produced in the
18  litigation.  But I believe it is on the Web site.
19      A.   I don't recall reading this from the Web
20  site in detail.
21      Q.   Is that a document that you reviewed in
22  connection with work you did for Merck?
23      A.   I have a confidentiality agreement with
24  Merck, and I'd be happy to discuss that if I have a
25  written waiver from them to discuss that.

7 (Pages 22 to 25)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 26

1    Q.    At this point you don't feel that you can
2  say whether you have reviewed this or not?
3    A.    I don't feel that because of the
4  confidentiality agreement that I am at liberty to
5  say that. I'd be happy to talk about it if Merck
6  wants me to talk about it and gives me written
7  documentation.
8    Q.    Is this document familiar to you without
9  saying from where? Is this document familiar to
10  you?
11    A.    I really can't say for the reasons already
12  described. My opinions, however, are based today on
13  the documentation in this blue binder, which are
14  primarily related to published articles and then
15  also the FDA documents.
16    Q.    When you say the FDA documents, what are
17  you talking about?
18    A.    Specifically the cardiovascular review of
19  the original NDA, the Medical Officer Review dated
20  5/20/99 by Dr. Villalba and Hyde. The Medical
21  Officer Review again by Villalba of the supplemental
22  information to the NDA dated June 29th 2000 for the
23  submission date, the FDA advisory committee briefing
24  for the NDA 21042 Vioxx GI safety. And the date on
25  this is February 8th 2001. The Targum memo for the

Page 27

1  FDA medical review for the cardiovascular analysis
2  from February of 2001, the Villalba review from
3  March of 2002 that was an addendum regarding
4  cardiovascular data and the Alzheimer's study.
5        The December 2004 Villalba memo regarding
6  the review of the NDA, again, update of the
7  cardiovascular thrombotic events in the Alzheimer's
8  studies. There was, in addition to the study meta-
9  analysis, a study done by Ingenix sponsored by Merck
10  that supports the other observational data relative
11  to the cardiovascular toxic effects of Vioxx that
12  show it has an increased cardiovascular toxicity in
13  their population.
14    Q.    Is it still the case that you have not
15  done a full review of the observational data?
16    A.    When -- when I have clinical trial
17  evidence of an excess risk from cardiovascular
18  disease, the observational data are only supportive
19  of that finding. So, yes, I haven't reviewed the
20  observational data with the same intensity as I did
21  the clinical trial data because I believe more
22  strongly in the inference among the clinical
23  trials.
24    Q.    Can you tell me what -- are you aware that
25  there are observational studies that show no

Page 28

1  increased risk with Vioxx?
2        MR. LOCKLAR: Excuse me. Object to the
3    form of the question.
4    A.    Whether there are observational studies or
5  not is irrelevant given that in multiple clinical
6  trials we have evidence of an excess cardiovascular
7  risk with Vioxx.
8    Q.    I just want to know whether you're aware
9  that there are observational studies that show no
10  increased risk?
11    A.    That there may be. It's irrelevant.
12    Q.    Are you aware that there are -- you've
13  pointed to certain observational studies as
14  relevant. So I want to know whether you've looked
15  at other observational studies that may come out
16  differently.
17    A.    The only observational study I pointed to
18  as relevant was the one that Merck generated
19  themselves which was the Ingenix study.
20    Q.    And you don't know if there are other
21  observational studies that show no increased risk at
22  certain doses?
23    A.    It would be irrelevant to me.
24    Q.    And you don't know if there are
25  observational studies that show no increased risk in

Page 29

1  short-term use?
2    A.    Again, it's irrelevant because the
3  clinical trial data are consistent and compelling
4  that Vioxx is cardiotoxic. It all --
5    Q.    And can you tell me which clinical trials
6  show a statistically significant increased risk of
7  heart attack with Vioxx compared to a placebo?
8    A.    Well, first of all, let me --
9    Q.    No, I need you to answer my question. Can
10  you tell me which clinical trials show a
11  statistically significant increased risk of heart
12  attack compared to a placebo?
13        MR. LOCKLAR: Object to the form.
14    A.    The APPROVe study shows a significant
15  increase in the combined endpoint. And let me
16  review this carefully because you're asking me a
17  different question than our prior time together,
18  which was specifically about heart attack as opposed
19  to the predefined endpoint that Merck used in all
20  the other studies.
21        So in the APPROVe study relative to
22  placebo, there were 46 confirmed thrombotic events
23  which includes fatal and nonfatal MI, which would be
24  the majority of events. Unstable angina is included
25  as well as sudden cardiac death, fatal and nonfatal

8 (Pages 26 to 29)

Donna Arnett, Ph.D.

Page 30

1  stroke, TIA, peripheral arterial disease, and
2  pulmonary embolism.
3      Q.   Okay.  So the APPROVe study shows a
4  statistically significant increased risk in heart
5  attack compared to placebo.  Are there any other
6  studies?
7      A.   I didn't say heart attack.  I said
8  confirmed thrombotic event.  I want to be specific.
9      Q.   Do you -- my question was heart attack.
10  Do you know if APPROVe shows a statistically
11  significant increased risk in heart attack compared
12  to placebo?
13      A.   There is a -- in my review on one of the
14  disks that I brought that we copied last time, I can
15  go back to the actual clinical report that was
16  produced and speak specifically to myocardial
17  infarction.  It was not -- I can look in the article
18  too.  I don't recall it since Merck focused
19  primarily on this combined endpoint.
20      Q.   Do you know if there are any other studies
21  that show a statistically significant increased risk
22  of heart attack compared to a placebo?
23      MR. LOCKLAR:  Object to the form.
24      A.   Statistical significance is --
25      Q.   I don't want to know what you think about

Page 31

1  statistical significance.  I just want to know
2  whether there were any other studies that you can
3  identify that point to a statistically significant
4  increased risk of heart attack compared to placebo?
5      A.   With safety there is -- safety is more of
6  a concern.
7      Q.   I don't want to know what you think about
8  what to make of the data.  I just want to know
9  whether there are any studies that you can identify
10  other than APPROVe that show -- that report a
11  statistically significant increased risk of heart
12  attack compared to a placebo?
13      MR. LOCKLAR:  Object to the form.
14      A.   I will not take the -- I will not answer
15  out of context.  Because with this power of any
16  other study prior to VIGOR --
17      Q.   Is the answer no?  I actually am entitled
18  to a yes-or-no answer.
19      MR. LOCKLAR:  She's permitted to answer
20  the question.
21      MS. FREIWALD:  No, she has to answer my
22  question, not ones she wants to answer.  So my
23  question I want is a yes-or-no question.
24  BY MS. FREIWALD:
25      Q.   Can you point me to any study that reports

Page 32

1  a statistically significant increased risk of heart
2  attack compared to placebo other than APPROVe?
3      MR. LOCKLAR:  Object to the form.
4      A.   As an epidemiologist it would be unethical
5  for me to answer that question out of context to
6  studies that were inadequately powered to -- and
7  this is about safety.
8      Q.   Doctor, this is a litigation proceeding.
9  I have a right -- I'm not asking you what you think
10  of the study.  I'm not asking you what conclusions
11  you wish to draw.  And your lawyer will have plenty
12  of time to let a jury one day hear the arguments you
13  want to make.  But I have an absolute right to an
14  answer to a yes-or-no question.
15      Yes or no, is it out there, can you point
16  me to any study other than APPROVe that reports a
17  statistically significant increased risk of heart
18  attack compared to a placebo?
19      A.   It is unethical for me to answer that in a
20  yes-or-no fashion as an epidemiologist.
21      Q.   Answer it yes or no, and then we can later
22  have a discussion.  Yes or no?  I want to know what
23  the data is because you've told me about the
24  consistency of the data.  I want to know what study
25  there is -- I mean, the answer is no, right?

Page 33

1  There's no other study besides APPROVe that reports
2  a statistically significant increased risk of heart
3  attack compared to placebo?
4      MR. LOCKLAR:  Object to the form.
5      A.   The signal --
6      Q.   Doctor, I --
7      A.   The power --
8      Q.   I'm going to move to strike.  I'm going to
9  move to strike.
10      This is a simple question.  You know what
11  the answer to it is.  It's a litigation proceeding.
12  It's a deposition.  This is not your chance to make
13  speeches.  Yes or no.  If you can't point me to
14  another study -- your lawyer can ask questions
15  later -- then just say it, and we'll move on.
16      A.   As an epidemiologist knowing the power of
17  those studies to detect that finding, I cannot sit
18  here ethically and say no unqualified.
19      Q.   I'm not asking you, Doctor, whether the
20  studies had internal flaws.  I'm not -- all I want
21  to know is can you -- when you get on the stand is
22  there any study that you're going to be able to
23  point to and say that study in addition to APPROVe
24  showed a statistically significant increased risk of
25  heart attack compared to a placebo?

9 (Pages 30 to 33)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 34

1    A.   The cardiovascular safety, the signal was
2  present --
3    Q.   Doctor, I want an answer to my question.
4  This is not a time to play games. You want to make
5  speeches later, you can make speeches. You can
6  answer your lawyer's questions. Yes or no.
7        MR. LOCKLAR: You know, if there's a
8    yes-or-no answer, you're entitled to a yes-or-no
9    answer. If it is not --
10       MS. FREIWALD: If --
11       MR. LOCKLAR: Excuse me, you had your
12   opportunity. If it's not a yes-or-no answer,
13   then you cannot compel a witness to answer with
14   a --
15       MS. FREIWALD: But there is. Either she
16   knows -- studies report statistically
17   significant findings. If she wants to say she
18   doesn't want to agree with that or she wants to
19   qualify it, she can do that later. But either
20   something exists or it doesn't.
21 BY MS. FREIWALD:
22   Q.   Is there any study other than APPROVe that
23 is in the published literature you've looked at or
24 any unpublished things you've looked at that reports
25 a statistically significant increase in heart

Page 35

1  attacks compared to placebo?
2        MR. LOCKLAR: Object to the form.
3    A.   Hope, I will not answer the question in an
4  unqualified or no because it would be unethical
5  for me as a public health scientist, as a
6  epidemiologist, to answer about statistical
7  significance with a drug that has a safety signal of
8  excess cardiovascular risk.
9    Q.   Okay. Well, you can't tell me -- sitting
10 here today you can't point me to any study -- if
11 it's out there, show me the study that shows a
12 statistically significant increased risk over
13 placebo.
14       MR. LOCKLAR: Object to the form. Asked
15   and answered.
16   A.   The studies were not designed with
17 cardiovascular outcomes as an endpoint.
18   Q.   So there's no study you can point me to?
19   A.   It's unethical for me to --
20   Q.   It's unethical for you to answer a
21 question yes or no under oath?
22   A.   Yes, it is unethical for me to answer a
23 question yes or no unqualified.
24   Q.   So you don't know --
25   A.   If you allow me to qualify my answers --

Page 36

1    Q.   Tell me first whether it exists or not,
2  whether there's anything that reports it. And then
3  we can talk lots about what you think of the data.
4  Is there any other study besides APPROVe that shows
5  a statistically significant increased risk of heart
6  attack compared to placebo?
7    A.   As a cardiovascular epidemiologist and
8  public health practitioner I will not answer that
9  question unqualified as a yes or no.
10   Q.   Okay. Then we'll have to take that up
11 with the judge. I'll move to strike your opinions
12 on the grounds that you're not willing to answer the
13 questions about the data that's available.
14   A.   Oh, I'm happy to answer questions about
15 the data that is available.
16   Q.   No, you only want -- you only want to
17 make the speeches you want to make, and that's not
18 what this deposition is. I have a right to the
19 answers to my questions. It's a yes-or-no
20 question. You don't like the answer so you don't
21 want to give it.
22       But am I right, there is no other study
23 you can point to that reports a statistically
24 significant increased risk of heart attack compared
25 to placebo?

Page 37

1        MR. LOCKLAR: Object to the form. It's
2    been asked and answered. And she has the -- she
3    has the right to answer the questions -- she
4    doesn't have to give you the answer you want,
5    Hope. She's entitled to give you --
6        MS. FREIWALD: She has to give me a
7    yes-or-no answer to a yes-or-no question.
8        MR. LOCKLAR: Not if there's not a yes-or-
9    no answer.
10       MS. FREIWALD: Everybody in this room
11   knows there's a yes-or-no answer if it does
12   exist or it doesn't exist.
13       THE WITNESS: I could see you taking this
14   completely out of context. I won't let my
15   testimony be that because I believe the studies
16   were not designed -- I have done power
17   calculations to show they were not designed to
18   find a statistically significant effect. And
19   statistical significance is counterbalanced with
20   power. If you're not powered to find it, then,
21   no, you're not going to find it.
22 BY MS. FREIWALD:
23   Q.   Doctor, if I ask you the question are
24 there any studies that show a statistically
25 significant increased risk of heart attack in people

10  (Pages 34 to 37)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 38

1  who suffer from sleep apnea, can you answer that
2  question, yes, no, or I don't know?
3      A.   I can answer that I don't know the --
4  where to point you exactly in the literature.  I
5  have not reviewed that literature.
6      Q.   And do you know whether the studies were
7  powered to show the effect?
8      A.   Yes, I do.
9      Q.   And if -- could you answer that question
10 if this was something that you -- where there was no
11 effect seen, could you say the data don't exist?
12     A.   You'll have to --
13     Q.   As an epidemiologist have you had the
14 experience of somebody asking you a question, is
15 there any data that shows the statistically
16 significant risk of X, pick your thing, and you've
17 said the data doesn't exist?  Have you been able to
18 answer that question before?
19     A.   I've never been asked that question as an
20 epidemiologist in that way.
21     Q.   So you don't have the experience answering
22 questions about whether a study exists or doesn't
23 exist?
24     A.   If I were sitting at my computer, I would
25 go on to the PubMed and find it.

Page 39

1      Q.   It's just a question of -- it's just a
2  factual question.  Does this study show it's
3  significant or doesn't it?
4      A.   As epidemiologists we were trained to
5  pursue causation in a much broader scope than
6  statistically significant.
7      Q.   And that's a different question.
8      A.   And if you --- if I'm allowed to answer in
9  a way that lets me qualify the answer, I would.  But
10 I can't take it --
11     Q.   Just answer my question first and then you
12 can qualify it.  Is there any study that shows a
13 statistically significant increased risk in heart
14 attack compared to placebo?
15         MR. LOCKLAR:  Object to the form.  Asked
16     and answered.
17     A.   I've answered.
18     Q.   You don't want to answer even if I tell
19 you it's a yes-or-no question but then you can
20 qualify it afterwards?
21     A.   If you allow me to qualify it when I
22 answer, I will do so.
23     Q.   Okay.  I want a yes-or-no answer first,
24 and then I'll ask you a question and say if you have
25 to qualify it you can.

Page 40

1      A.   I don't -- I won't answer in a yes or no
2  without being able to continue in my answer.
3      Q.   Okay.  Do you not know whether there were
4  other studies that show a statistically significant
5  increased risk compared to placebo?
6      A.   I reviewed all of the published
7  literature, and the data that's in the FDA memos.
8      Q.   So you know whether or not there are any
9  other studies that show a statistically significant
10 increased risk?
11     A.   I have reviewed all the studies.
12     Q.   No, you know the answer.
13     A.   I know that there were no studies that
14 were powered to find an effect.
15     Q.   There were no studies that show an effect?
16     A.   There were no studies that were powered
17 to.
18     Q.   Fine.  There was no studies that show an
19 effect?
20         MR. LOCKLAR:  Object to the form.  I think
21     that's as clear an answer as you can get.
22 BY MS. FREIWALD:
23     Q.   Doctor, are there any studies that you say
24 show a statistically significant increased risk in a
25 combined cardiovascular endpoint compared to placebo

Page 41

1  other than APPROVe?
2      A.   Can you restate your question?
3      Q.   Sure.  What I'm trying to do is broaden us
4  outside just MI because you made the point about
5  looking at endpoints other than MI.  So my question
6  is are there any studies other than APPROVe that you
7  would point to that you believe would show a
8  statistically significant increased risk in a
9  combined cardiovascular endpoint compared to
10 placebo?
11     A.   For a safety issue, where you have --
12     Q.   It's a -- Doctor, you need to answer my
13 question.  It's a yes-or-no question.
14     A.   I cannot answer unless you let me qualify
15 it with that no studies were adequately powered to
16 find --
17     Q.   So the answer is no.  The answer is no,
18 and then you wish to add your qualification?
19         MR. LOCKLAR:  Object to the form.
20     A.   Ethically it's a safety concern where
21 there are multiple signals and the totality of
22 evidence pointing to your --
23     Q.   Doctor, you'll have --
24     A.   Based on the power --
25     Q.   Doctor -- move to strike as

11  (Pages 38 to 41)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 42

1 nonresponsive. You'll have ample opportunity to
2 tell me and presumably to tell a jury what you think
3 at some point. But I have a right to ask my
4 questions and get answers to my questions. And all
5 I want to know is the answer to my question is no,
6 isn't it?
7     A.   As a witness I have a right to express my
8 opinion --
9     Q.   No, actually you don't. You have an
10 obligation to answer questions. And you're --
11    A.   I was --
12    Q.   Your answers -- but this is not an
13 opportunity to just state whatever opinions you wish
14 to state. It's an opportunity for me to ask
15 questions and you to give answers. And when I ask a
16 yes-or-no question, I have a right to a yes-or-no
17 answer.
18        Am I right that the answer to my question
19 is you can't point me to any studies other than
20 APPROVe that shows a statistically significant
21 increased risk in heart attack compared to placebo?
22        MR. LOCKLAR: I'm going to object to the
23    form of the question. And I'm going to state on
24    the record since you've told her what the rules
25    are, there is no rule that requires -- that

Page 43

1     allows you to get a yes-or-no answer to a
2     question that there is no yes-or-no answer.
3         MS. FREIWALD: There's so obviously a
4     yes-or-no answer, Ben. So does she know if it
5     exists. Yes, no, I don't know. Those are the
6     only three options, not I know that it doesn't
7     exist but I'm unhappy about it. I get to know,
8     yes, no, I don't know.
9         THE WITNESS: I disagree with that
10    approach.
11 BY MS. FREIWALD:
12    Q.   Doctor, well, I'm sorry you disagree with
13 that approach. But I believe that I'm entitled to a
14 yes-or-no answer to a yes-or-no question.
15        I'll do it one more time. Are there any
16 studies -- let me put it this way. Are there any
17 studies that when you testify you're going to point
18 to and say demonstrate an increased risk of some
19 combined cardiovascular endpoint with Vioxx compared
20 to a placebo that is statistically significant?
21    A.   I'm going to point to studies that are
22 clinically significant and meaningful in terms of
23 expressing an excess in cardiovascular risk with
24 Vioxx.
25    Q.   Numeric risk, not statistically

Page 44

1 significant?
2     A.   With the safety issue numerical risk is
3 incredibly important.
4     Q.   Well, we'll talk about the magnitude of
5 numeric risk and the size of the studies you're
6 talking about later. But you are not going to point
7 to any study that shows a statistically significant
8 increased risk?
9     A.   I'll point to plenty studies that show
10 inadequate statistical power to find any such
11 significant --
12    Q.   You're not going to point to any studies
13 that show a statistically significant --
14    A.   It's irrelevant with inadequate power to
15 find.
16    Q.   You're not going to point to it. Because
17 I want to know. If you're going to be able to get
18 up there on the stand and show me a statistically
19 significant study, I want to see it today.
20    A.   You're not going to be able to point me to
21 a study that has adequate power to find it either.
22    Q.   Doctor, the answer to that question is no?
23    A.   Asked and answered.
24    Q.   Doctor, with all due respect, I've enjoyed
25 your instructions on what Alabama law is. But

Page 45

1 you're not a lawyer, and you don't have a right
2 to be a lawyer in this proceeding.
3     A.   But I do have a right to be an expert who
4 has reviewed this data with 25 years of
5 cardiovascular epidemiology experience, with being a
6 public health practitioner --
7     Q.   Doctor, move to strike, not responsive.
8         There wasn't a question pending. You have
9 -- you're not going to point me to any such study,
10 correct? Correct?
11    A.   The totality of --
12    Q.   Doctor, yes, correct? You're either going
13 to show me a statistically significant study or
14 you're not. Are you going to?
15    A.   Statistical significance is irrelevant and
16 --
17    Q.   You're not going to show me a
18 statistically significant --
19    A.   I'm not going to show you a study powered
20 to find it.
21    Q.   Okay. You're not going to show me a
22 statistically significant study?
23    A.   I'm not going to show you a study powered
24 find it.
25    Q.   We'll talk about power later. But I won't

Donna Arnett, Ph.D.

Page 46

1  be surprised? I'm not going to see a study showing
2  statistically significant that I didn't know about?
3      A.   You won't show a study powered to find it.
4      Q.   Doctor, we have to change the tape. And
5  I'm going to move to strike the last response as
6  nonresponsive.
7          THE VIDEOGRAPHER: This is the end of Tape
8  Number One in the continued deposition of
9  Dr. Donna Arnett to be continued on Tape Number
10  Two. The time is 10:01.
11          (Off the record.)
12          THE VIDEOGRAPHER: This is the beginning
13  of Tape Number Two in the continued deposition
14  of Donna Arnett. We're on the record at 10:09.
15  BY MS. FREIWALD:
16      Q.   Doctor, I want to take a look at the power
17  calculations that you gave me last time. And I
18  don't mind using the typed one that you just
19  provided, but the one-page handwritten sheet from
20  last time I actually marked as 4C to your last
21  exhibit. And when it got stapled for me, it got
22  stapled next -- along with the Konstam article. So
23  it's kind of helpful because your calculations
24  relate to the Konstam article. So we can look at
25  them that way.

Page 47

1          MS. FREIWALD: Is there -- the document
2  that we've marked as the printed power
3  calculation, is it on the table? Is it over by
4  you?
5          MR. LOCKLAR: I thought I put all the --
6  under your arm right there.
7          MS. FREIWALD: Great, I have it. The
8  printed one is 9 for this deposition.
9  BY MS. FREIWALD:
10      Q.   If I understand correctly, what you did is
11  you used a computer program that calculates power,
12  correct?
13      A.   I used three different computer programs
14  that calculate power.
15      Q.   And what are the names of those three
16      Different programs?
17      A.   One is called PS, Power and Sample Size.
18  The other is called STATA. It's a statistical
19  programming package. And the third is one that's
20  specific to proportional hazards models. And it is
21  from SWOG. The Web site, swogstat.org.
22      Q.   Is that an acronym?
23      A.   No, it's the Web site, the URL.
24      Q.   Okay.
25      A.   You go to this Web site and you can

Page 48

1  calculate power for proportional hazard survival.
2      Q.   What you gave me that we marked as 4C the
3  last time, was that done using the PS method?
4      A.   The PS method, that's two different
5  methods within the PS method. One attempted to
6  calculate exact power calculations using a Fisher's
7  exact method and the other using a case-controlled
8  method.
9      Q.   Okay. Now, I'm going to try and muddle
10  along here with my understanding, and I'm going to
11  ask you to correct me where I go wrong and to add
12  where I go wrong because I want to make sure I
13  understand what you did.
14          One of the things unique in a power
15  calculation is an alpha which represents the level
16  of statistical significance you're looking to
17  achieve, correct?
18      A.   Correct.
19      Q.   And the default alpha is .05. P equals
20  .05?
21      A.   Correct.
22      Q.   And we talked about that as the level for
23  statistical significance all the time, right?
24      A.   Yes.
25      Q.   And then there is a beta, and what is the

Page 49

1  beta?
2      A.   Beta is what you're attempting to
3  calculate with the power calculation.
4      Q.   Okay. And -- go on.
5      A.   Beta is the probability of the Type Two
6  error.
7      Q.   And what is a Type Two error?
8      A.   It's the error in calling something a null
9  finding when it isn't.
10      Q.   It's the risk that you will say that
11  there's no effect when you just haven't seen it?
12      A.   Correct.
13      Q.   And what is a Type One error?
14      A.   The risk -- or the probability -- it's not
15  exactly a risk. It's a probability of calling
16  something significant when it isn't. It's the flip
17  side of the beta.
18      Q.   So it may be that something shows up as
19  statistically significant but, in fact, it's not,
20  correct?
21      A.   The Type One error specifically is the
22  times that you would find something that is not true
23  in terms of being significant but when, in fact, it
24  isn't significant.
25      Q.   Okay. So really a better way of asking

13 (Pages 46 to 49)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 50

1  that question is it's the times that something would
2  show up as statistically significant and you would
3  conclude that there's a real finding but, in fact,
4  there's not. It falls into the range of .05, the
5  chance that even a statistically significant result
6  is not a real finding, correct?
7      A.   Specifically it's .05 or smaller.
8      Q.   But other -- but what I said is right,
9  isn't it?
10     A.   Yes.
11     Q.   And then the flip side of that is there's
12 a risk that you don't see a statistically
13 significant result, but whatever you're looking for
14 really exists; you just haven't found it, correct?
15     A.   In that particular test.
16     Q.   In that particular test. And that's with
17 the -- basically the .05 in lay terms margin of
18 error. The .05 chance that you're going to see a
19 risk that's not real or not see a risk that is real,
20 correct?
21     A.   Correct.
22     Q.   Now, why don't you tell me what you did in
23 terms of putting numbers into your power calculation
24 to see if there was power in the Konstam analysis.
25     A.   Okay. In the Konstam analysis we have a

Page 51

1  number of tables that report for three various types
2  of comparators and study designs or populations. So
3  in Table Three we have a pooled analysis of the APTC
4  endpoint for Vioxx relative to placebo. And there
5  are three groups, the rheumatoid arthritis group,
6  osteoarthritis group, and the Alzheimer group.
7      Q.   I'm going to stop you for a second. And
8  you looked at each of those three groups separately,
9  correct?
10     A.   Correct.
11     Q.   You looked to see if there was power to
12 find an APTC event statistically significant in each
13 patient population separately, right?
14     A.   Correct.
15     Q.   You did not at any point ask the question
16 of whether there was power if you put the three
17 groups of patients together to find a statistically
18 significant effect?
19     A.   Correct. But there were -- the power was
20 so low I didn't see the relevance, and the
21 populations are so different I didn't see the
22 relevance in combining them.
23     Q.   Well, Konstam did the combined analysis.
24 He looked at all populations together, correct?
25     A.   He did both, individually and combined.

Page 52

1      Q.   And, in fact, you talked about Juni
2  before. Juni did the combined analysis. He put the
3  populations together, right?
4      A.   Yes.
5      Q.   And you've relied on Juni's combined
6  numbers, correct?
7      A.   I have not looked at Juni's numbers in
8  terms of power.
9      Q.   I understand you haven't looked at them in
10 terms of power. But what I'm asking you is the way
11 he looked at the data was by combining the studies
12 except for he didn't include Alzheimer's studies.
13     A.   I'm verifying that because I don't want to
14 misspeak. My recollection was, as yours, that the
15 Alzheimer's disease were not included.
16     Q.   But he aggregated the data -- I think Ben
17 will stipulate I'm right on that so we don't have to
18 spend time.
19         MR. LOCKLAR: I think the question is
20     whether he looked at it individually or
21     combined --
22         MS. FREIWALD: I think she's looking,
23     though, to confirm that the Alzheimer's patients
24     weren't in Juni, and I think we can agree that
25     that is true.

Page 53

1          MR. LOCKLAR: Yes.
2      A.   Yes, it was all osteo and rheumatoid
3  arthritis.
4      Q.   Okay. And then you also confirmed that he
5  looked at that -- those two populations together?
6      A.   Yes.
7      Q.   So Konstam and Juni both looked at the
8  populations together. You did your power analysis
9  just looking at each population separately?
10     A.   Yes.
11     Q.   Then tell me what you did within any of
12 the three populations. I'm going to assume your
13 methodology was the same for each population so you
14 can just walk me through one.
15     A.   Sure. Let me go through Table Three. And
16 so in Table Three you'll see that there are a total
17 of four events.
18     Q.   Right.
19     A.   And it reflects the number of individuals
20 in the population per case. So here we had 622 --
21 sorry. I haven't had to calculate these since I did
22 these a month ago. So there were about 2500, 1622
23 plus 989. And take that total --
24     Q.   I'm sorry. What number are you looking
25 at?

14 (Pages 50 to 53)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 54

1    A.   Number of patients.
2    Q.   Right.
3    A.   For the RA, 622 on Vioxx.
4    Q.   Right.
5    A.   And 989 on placebo.
6    Q.   Uh-huh.
7    A.   So you would sum those.
8    Q.   Uh-huh.
9    A.   And you would divide by four because there
10   were four cases.  And that would give you the number
11   of individuals per case.
12   Q.   So you treated this as if this were a
13   case-controlled study, right?
14   A.   The only way that I could calculate power
15   in the absence of knowledge of the recruitment time
16   and follow-up time since these are aggregated data
17   was to do a test of the difference of proportions
18   essentially between the two groups.
19   Q.   You treated this as if this was a case-
20   controlled study where there were cases and controls
21   as if -- as opposed to a clinical trial in which all
22   the patients were enrolled, correct?
23   A.   I treated it as a two-by-two table and
24   evaluated the proportions.
25   Q.   What does that mean, a two-by-two table,

Page 55

1    that means as if it were a case-controlled study?
2    A.   No.  That implies different -- something
3    different, that it was designed as a case-controlled
4    study.
5    Q.   Okay.
6    A.   The analysis was done with individual
7    level data of cases and noncases --
8    Q.   And you --
9    A.   -- of Vioxx.
10   Q.   I'm sorry.  I didn't mean to cut you off.
11   A.   Vioxx and placebo.
12   Q.   You treated the three Vioxx events as
13   cases, and you treated the one event on placebo as a
14   controlled in the RA line of the table; is that
15   right?
16   A.   No.  Could you restate the question?
17   Q.   Am I right that you treated the three APTC
18   events on the RA line of Table Three as your three
19   cases, correct?
20   A.   Well, there are -- plus the other -- one
21   other case.
22   Q.   Okay.  The other case you -- was the case
23   from the placebo arm.  So you treated it as if there
24   were four cases?
25   A.   Four cases.

Page 56

1    Q.   All right.
2    A.   And then there are 652 noncases per case.
3    Q.   Okay.
4    A.   And then we have the R, which stands for
5    the relative risk, which you see here.  R equals
6    1.78 in my table, and then the Konstam table the
7    relative risk is 1.78.
8    Q.   And you get 1.78 with a confidence
9    interval that does not allow you to know whether
10   that's statistically significant or not?
11   A.   These are the actual findings.  So in
12   power you're working backwards from the actual
13   findings to derive at the power for this particular
14   set of data with this specific point estimate of the
15   effect of rofecoxib versus placebo in the RA.
16   Q.   Okay.  If you had looked at -- did you
17   ever do the analysis where you looked at three
18   events out of 337 on the rofe arm and one out of 202
19   and combined those numbers?
20   A.   The -- essentially what this analysis is
21   doing is giving you a test of the difference in
22   proportions of cases in the rofecoxib group versus
23   the proportions of cases in the placebo group by
24   working through the relative risk estimate, the
25   number of cases and how many noncases there were.

Page 57

1    Q.   Did you ever look to see what your answer
2    would -- what power you would get if you did the
3    aggregate number of patients, if you looked at all
4    of the groups together?
5    A.   I did not.
6    Q.   Okay.
7    A.   And the reason I didn't is that it was so
8    low I didn't see the utility.
9    Q.   And did you ever look to see what the
10   power would be if you assumed a five times increase
11   in heart attack which is as I understand how you
12   read the VIGOR study?
13   A.   Power -- I did not make such a calculation
14   because power is specific to the data that are
15   generated.
16   Q.   Well --
17   A.   I wasn't designing the study.  I was
18   calculating the power based on the extent of the
19   data in the Konstam article.
20   Q.   Do you assume sitting here today that the
21   five-fold disparity in VIGOR is a real finding?
22   A.   Could you define what you mean by real?
23   Q.   Do you believe that there's anybody today
24   that thinks that the relative risk with Vioxx is a
25   five times risk?

15  (Pages 54 to 57)

Donna Arnett, Ph.D.

Page 58

1      MR. LOCKLAR:  Object to the form.
2      A.   The VIGOR data, the best point estimate
3  that fits that data is a five-fold excess risk.
4      Q.   There's no other data that supports that
5  magnitude of risk, correct?
6      A.   I have not seen other relative risk
7  estimates of five.
8      Q.   And do you have a number that you --
9      A.   I take that back.  In the ADVANTAGE study
10 there was a comparable relative risk numerically.  A
11 numerical excess --
12     Q.   There was no statistically significant
13 risk?
14     A.   The power to detect that risk is quite
15 small.
16     Q.   Okay.  You can often have huge relative
17 risks with small numbers; do you agree with me on
18 that?  You can have a study where there's one event
19 in one arm and five in the other arm, and that
20 generates a big relative risk.  But that's because
21 you are playing with small numbers.
22     A.   Yes, that's true.  But you have then to
23 look at the consistency of that data with other
24 data, and in the case of ADVANTAGE the consistency
25 was equal with the VIGOR.

Page 59

1      Q.   Well, VIGOR was a study against naproxen,
2  and you've already told me that the magnitude of the
3  risk hadn't been replicated in any study against
4  placebo or any other comparator?
5      A.   I qualified it by saying that in
6  ADVANTAGE, which had a similar comparator, there was
7  a very comparable relative risk estimate.
8      Q.   Well -- but not a statistically
9  significant one?
10     A.   Was not.  Again, it wasn't powered to
11 detect that.
12     Q.   Doctor, have you -- we'll get back to
13 ADVANTAGE in a minute.  You're not going to come
14 into court and testify that the relative risk of
15 Vioxx versus placebo is in the order of five?
16     A.   The best estimate -- correct, I am not.
17     Q.   Okay.
18     A.   The best estimate that we have for placebo
19 from the APPROVe study would put it in the
20 neighborhood of two.
21     Q.   Okay.  And if it were in the neighbor --
22 if the actual risk was in the neighborhood of two,
23 do you know how much power there would be in the
24 Konstam analysis to detect that magnitude of risk?
25     MR. LOCKLAR:  Object to the form.

Page 60

1      A.   It would not be -- one cannot calculate
2  power for estimated relative risk.  You have to
3  calculate power from the actual relative risk for
4  this given set of data with the Type One error of
5  .05 in this number of cases and these number of
6  noncases and this relative risk.  I can calculate
7  power.  I can't make up data.
8      Q.   Well, the reason you concluded that there
9  was no insufficient power was because you had too
10 big a confidence band around your risk estimate,
11 correct?
12     A.   Could you restate --
13     Q.   Am I right that what you found was a
14 number that showed a risk, but there was such a
15 large confidence band around the estimate that you
16 concluded there was insufficient power?
17     A.   There's insufficient power in the RA
18 trials in aggregate in the Konstam article to detect
19 the true excess risk of Vioxx.  There were few
20 events.
21     Q.   To detect the true risk.  Well, that's
22 exactly right.  If you assumed -- you can do a
23 calculation where you make an assumption about what
24 the true risk is and ask yourself if I believe that
25 the true risk is X, should I have seen that in the

Page 61

1  study.  You can do that retrospectively, right?
2      A.   One could do it.  As epidemiologists the
3  best indicator of risk is the point estimate at
4  hand.
5      Q.   Well, that's going -- you did an analysis
6  looking forward.  But if you want to verify that you
7  wouldn't have seen a result in Konstam and you're
8  sitting here today telling me that you think you
9  know what the magnitude of the risk is, wouldn't it
10 be a valid exercise to say, well, if the magnitude
11 of the risk is somewhere around two, should I have
12 seen a risk of that size in the Konstam analysis?
13     A.   As an epidemiologist I approach the data
14 as the data that are extant and ask the question
15 given these data what was the power to detect an
16 excess risk.
17     Q.   You've never done the analysis of if you
18 assume that the risk in APPROVe is what you claim,
19 would it have showed up in the Konstam analysis?
20     A.   I didn't see any, as an epidemiologist,
21 any reason to do that.
22     Q.   So I just want to be clear.  You haven't
23 done that?  You don't know what that reveals?
24     A.   I do not.
25     Q.   And you don't know what the -- what the

16 (Pages 58 to 61)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 62

1  power analysis would show doing it exactly the way
2  you did it but putting the groups together?
3      A.  I did not do a combined analysis.
4      Q.  And tell me one more time so I'm clear on
5  this how you got your 652 number.
6      A.  Sure.  I added 1622, which is the number
7  of RA patients in rofecoxib, plus 989, which are the
8  number of patients on placebo.  And that total is
9  just over 2500.  I subtracted out the four cases
10 from that sum and took the residual number and
11 divided it by four to give me the number of noncases
12 per case.
13     Q.  Okay.  You didn't do an analysis where you
14 looked at the total number of patients who had
15 events compared to the total number of patients
16 identified in the denominator for each group here,
17 the 337 plus 201?
18     A.  My calculation incorporates that because I
19 define the relative risk as 1.78.
20     Q.  Okay.  And then you did the same analysis
21 for the OA and for the AD groups, correct?
22     A.  Correct.
23     Q.  What did you do on Table Four?
24     A.  On Table Four, since the RA finding was
25 significant, power was an irrelevant point there.  I

Page 63

1  looked only at the OA studies.
2      Q.  You said the RA finding was --
3      A.  Statistically significant with the
4  relative risk of 1.74 for rofecoxib versus Naprosyn.
5      Q.  So there was sufficient power?
6      A.  When you have a significant finding, power
7  is irrelevant.
8      Q.  Okay.
9      A.  Because you're saying that you've
10 correctly identified the true excess risk.
11     Q.  So once you have a finding, then you don't
12 go back and ask whether the study was sufficiently
13 powered or not, correct?
14     A.  Correct.
15     Q.  So you wouldn't criticize a study for
16 being insufficiently powered once it showed a
17 statistically significant result, correct?
18     A.  Correct.
19     Q.  All right.  Go on.  I think I interrupted
20 you.
21     A.  So for the OA I followed the same
22 procedure.
23         Sorry.  I was looking at Table Five.
24 Table Four.
25     Q.  I was going to ask you where you got the

Page 64

1  1.74 from.
2      A.  Okay.
3      Q.  You were looking at Table Five when you
4  told me that there was a statistically significant
5  finding in the RA group?
6      A.  Yes.
7      Q.  Okay.
8      A.  In Table Four we only have data for
9  osteoarthritis.  Again, there are 14 exposed Vioxx
10 who are cases.  There are 14 exposed in non-Naprosyn
11 NSAIDs.  The sum of those two numbers, 21 plus 14
12 equals 35.  There were a total number of patients of
13 4559 in the rofecoxib group and 2755 in the
14 non-Naprosyn NSAID group.  I summed those and
15 subtracted 35 from them, took that derived number,
16 and divided by 35 to get my end value which are the
17 number of noncases per case.
18     Q.  Okay.  So you treated it as all of the
19 people who had events were cases and all of the
20 people who didn't have events were noncases,
21 correct?
22     A.  Correct.
23     Q.  Regardless of whether they were randomized
24 to placebo -- I'm sorry, randomized to a
25 non-naproxen or randomized to rofecoxib?

Page 65

1      A.  Mathematically we get to that same
2  answer.  So mathematically it's irrelevant.  But,
3  no, I did not.
4      Q.  Okay.  So as the -- there was a
5  statistically significant finding when you looked at
6  Vioxx compared to naproxen but not compared to the
7  other comparators or compared to a placebo control?
8      A.  I didn't find adequate power in any of
9  those settings.
10     Q.  Okay.
11     A.  To detect --
12     Q.  Okay.  Now, the sample size wasn't any --
13 strike that.
14         Do you know if you had done the -- a power
15 analysis for naproxen versus rofecoxib if it would
16 have come out any differently from how you say the
17 power analyses for the data in Table Three and Four
18 came out?
19     A.  I didn't evaluate that.
20     Q.  Now, isn't it true that when you do a
21 power calculation, if you're doing it correctly, you
22 can't get a power that's less than .05?
23     A.  It was interesting that when I attempted
24 to do this within the Fisher's exact, which would
25 have given me an exact probability, that the data

Donna Arnett, Ph.D.

Page 66

1  observed in these tables were data more extreme than
2  that observed in the tables.
3      Q.   Isn't that an indicator you're doing
4  something wrong?
5      A.   The consistency of findings across four
6  different attempts at -- four different types of
7  analyses with three different programs is
8  consistent.
9      Q.   Well, isn't the problem that you set it up
10 as a case-controlled study rather than as a clinical
11 trial and so you ended up with a result that doesn't
12 make sense, it doesn't make sense to have a power
13 that's less than .05?
14     A.   The power was calculable with a Fisher's
15 exact, which would give you an exact probability of
16 a two-by-two table which is a valid estimator of the
17 proportional hazards ratio derived from the clinical
18 trial.
19     Q.   If this was a different study, but not a
20 clinical trial because this isn't a case-controlled
21 study.
22     A.   That's not true.
23     Q.   Okay.  Why is it not true?
24     A.   The two-by-two table is using count data
25 as opposed to a hazard rate data.  A cumulative

Page 67

1  incidence ratio, which would evaluate the cumulative
2  incidence it made on Vioxx, versus the cumulative
3  incidence on any other comparator would fall out in
4  a two-by-two table in exactly the way that it's laid
5  out here.  And the cumulative incidence ratio is a
6  valid estimator of the hazard rate ratio.
7      Q.   As a general proposition if you get a
8  power of less than .05 isn't that an indicator that
9  there's something wrong with the calculation method
10 you used?
11     A.   I've not heard that before, and there was
12 consistency across three different programs in my
13 estimates of power.
14     Q.   As a general proposition shouldn't you
15 expect that the lowest power calculation you ever
16 see is .05?
17     A.   Statistically speaking if you set your
18 Type One error rate, that would be true, but all of
19 my power calculations were right around the value of
20 that.
21     Q.   If you set your point one -- your Type Two
22 error rate at .05 -- is that what you said, or did I
23 mishear you?
24     A.   No.  You misheard me.
25     Q.   Okay.  Say it again.

Page 68

1      A.   If the Type One error rate -- if you're
2  saying your Type One error rate is .05, then there
3  should be -- theoretical, these are -- the Type One
4  and Type Two errors are distributionally -- there is
5  an overlap between the distributions.
6      Q.   So if you set your Type One error rate of
7  .05, you should not see a power of less than .05,
8  correct?
9      A.   Which is probably why my -- the power
10 couldn't even be calculated under the Fisher's exact
11 test.  On some of these estimates they were .05.
12 And some were .086.  They were all very low
13 indicating that there was very low power.  There was
14 consistency across programs.  I did a sensitivity
15 analysis to make sure that I wasn't misreading the
16 numbers or misinterpreting the numbers.
17     Q.   Okay.  And just so I'm clear, isn't it
18 true, though, that if nothing -- as a general
19 proposition you would expect to see a power of at
20 least five percent, and if you get a number that's
21 less than that, the chances are that you've done
22 something wrong along the way in doing your
23 calculation?
24     A.   I disagree with that.  And that if you
25 evaluate, for instance, Table Three in the

Page 69

1  rheumatoid arthritis group, there were -- there was
2  one case in the placebo group, three in the exposed
3  group.  That's a very small number of cases.  So
4  there seems to be a little bit more instability
5  around those numbers.  And that's because there were
6  few events, which means it was inadequately powered
7  to detect them.
8      Q.   So what you have here are -- strike that.
9          You are saying that there was not power to
10 see an effect based upon the calculation that you
11 did, correct?
12     A.   Let me qualify by saying I did three
13 different calculations with three different
14 programs.
15     Q.   Is there some difference in the
16 methodology from program to program that I need to
17 know about?
18     A.   No, there isn't.  But I wanted to make
19 sure that it was a spurious small --
20     Q.   What's the -- if it's -- what's the value
21 of the different programs if they all do the same
22 thing?
23     A.   That you have tested with different
24 software under different -- not circumstances in
25 terms of the numbers but --

18  (Pages 66 to 69)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 70

1    Q.   Well, I'm just asking -- the numbers are
2    the numbers.
3    A.   It's just being thorough.
4    Q.   Okay.  But what I'm asking you is you're
5    going to come into court I assume, and you're going
6    to say I checked my program out three different
7    ways.  And I want to know really what value does
8    program two and three add to the mix?  All you're
9    doing is running the same numbers in the same way
10   again with a computer.  So you're not -- it's not
11   like you're checking your hand math to see if you
12   made a mistake.  What is it you're claiming you're
13   getting out of program two and three?
14   A.   If there was some kind of programming bug
15   in program one that had never been detected before
16   by any other statistician or epidemiologist that had
17   run the program, I wanted to make sure that I didn't
18   make that mistake.
19   Q.   Okay.  So, otherwise, these are
20   essentially fungible programs, and what you were
21   doing is putting your numbers into the same computer
22   the same way three times?
23   A.   With three different methods.
24   Q.   Okay.  Which you would expect would yield
25   the same result three times because it's just the

Page 71

1    computer running the same numbers according to the
2    same methodology?
3    A.   With the caveat that these were -- the
4    STATA program that I most recently used is a well-
5    respected well-utilized extant statistical analysis
6    package used in training programs and statistical
7    analysts throughout the country, probably the world,
8    and I wanted something that was a well-respected
9    tool.
10   Q.   But it does the same thing as the other
11   one?
12   A.   It did the same thing.
13   Q.   So assuming that there wasn't, as you say,
14   a programming glitch that no other epidemiologist or
15   statistician in the world had yet come across,
16   basically you were running the same numbers the same
17   way three times, and you wouldn't have expected the
18   results to change from time to time?
19   A.   I did not expect the results to change
20   from time to time.
21   Q.   Okay.  It's not like when I add -- the
22   days when I used to add up my checkbook by hand, and
23   I could get a different result every time.  The
24   computer is doing it, and the computer doesn't make
25   those kinds of changes in what it does from each

Page 72

1    time it runs the program, correct?
2    A.   I don't -- I'm not a programmer.  I don't
3    write code for programming.  So as an epidemiologist
4    who applies programs I wanted to make completely 100
5    percent sure the numbers were consistent across the
6    packages.
7    Q.   Okay.  But the point is just that you
8    weren't looking at any kind of human error, you
9    weren't really looking with the expectation of any
10   kind of programming error.  So there was no reason
11   to think that by changing programs you would have
12   increased your chance of finding a different result
13   because each program was doing the same thing as the
14   other one.
15       MR. LOCKLAR:  Object to the form.  Asked
16   and answered several times.
17   Q.   Right?
18   A.   It was calculating proportions within
19   treated versus comparator groups and with the
20   observed relative risk estimates and the number of
21   participants and calculating power.  So, yes, in all
22   three, that's how it worked.
23   Q.   And just so I'm absolutely clear, you
24   never exercised in the question -- you never asked
25   yourself the question of whether the Konstam

Page 73

1    analysis was sufficiently powered to find a relative
2    risk on the order of magnitude seen in the APPROVe
3    study, for example?
4    A.   I did not.  As an epidemiologist I did not
5    evaluate power on the basis of the observed data.
6    Q.   And that is something that can be done,
7    right?  You can do that formula?
8    A.   There are graphical ways -- it could be
9    done.
10   Q.   Okay.
11       MS. FREIWALD:  Let's just take a quick
12   break.
13       THE VIDEOGRAPHER:  We're off the record.
14   The time is 10:48.
15       (Off the record.)
16       THE VIDEOGRAPHER:  We are on the record.
17   The time is 10:59.
18   BY MS. FREIWALD:
19   Q.   Doctor, after your last deposition you
20   gave me some CDs which had some materials on them,
21   and included in those materials were some patent
22   applications.  And I believe that you had also made
23   reference at your past deposition, as you made
24   reference in your current report, to relying on
25   certain patent applications, correct?

19 (Pages 70 to 73)

Donna Arnett, Ph.D.

Page 74

1    A.   Correct.
2    Q.   And what I did was I printed out,
3  unfortunately just one copy, but a copy of the
4  patent applications that were on that disk. And I
5  want to ask you which, if any, of these patent
6  applications are you relying on for any opinions
7  you're offering in the Dedrick case.
8    A.   The first one is patent number 6136804
9  submitted or filed on March 12th 1999 by
10 Nichtberger. The second is -- was filed on March
11 12th 1999 by -- again, by Nichtberger. And this is
12 patent 613680 -- that's the same one. 613680. Same
13 one. You have two copies.
14      And the third one was, again, by
15 Nichtberger, 6511968 filed October 23rd 2000. And I
16 also skimmed the one by application -- this is an
17 international number. And I'm not sure if it
18 represents the same compound. But the international
19 number is W0, or O, 01/87343.
20   Q.   Okay. You skimmed that one. And there's
21 one more in your file. Did you look at that or not?
22   A.   This one is by Scolnick with another
23 combined COX-2 with thromboxane inhibitor, and I did
24 skim this one as well. And this number is in U.S.
25 patent application 20020016342.

Page 75

1    Q.   All right. But it's the three Nichtberger
2  patents that you're relying on?
3    A.   I believe that, given that these have the
4  same number, that the first two are one and the same
5  because they have the same application date. So
6  there's one by Nichtberger dated October -- the date
7  of the patent generated was October 24th 2000. The
8  second date of the patent generated was by
9  Nichtberger dated January 28th 2003 filed October
10 23rd 2000.
11   Q.   So the -- it's the Nichtberger patents
12 that you're relying on for your opinions?
13   A.   Yes.
14   Q.   Is that different from what you were
15 relying on at the time of the Albright deposition?
16   A.   It is not different.
17   Q.   And what I'd like you to do is take a pen,
18 if you wouldn't mind, and show me on the Nichtberger
19 patents where it is -- and now I'm reading from your
20 report -- that you believe that these patents
21 delineate the cardiovascular risk associated with
22 unopposed COX-2 inhibition consistent with the
23 mechanism -- with the above mechanism of action.
24   A.   Let me clear off my space here.
25      So in the abstract it states, This

Page 76

1  invention provides a method for treating,
2  preventing, or reducing the risk of developing a
3  condition selected from the group consisting of
4  acute coronary ischemic syndrome thrombosis,
5  thromboembolism, thrombotic occlusion and
6  reocclusion, restenosis, TIAs, transient ischemic
7  attacks, and first or subsequent stroke in a
8  patient. Do you want me to continue?
9    Q.   Mark that if that's language you're
10 relying on. Does that say anywhere in a patient as
11 a result of taking Vioxx or any other COX-2?
12   A.   It does say in a patient comprising
13 administering to a patient a therapeutically
14 effective amount of an antiplatelet agent in
15 combination with therapeutic amounts of COX-2.
16   Q.   That's the patent. That's the combination
17 product for which they're seeking a patent?
18   A.   Correct.
19   Q.   It doesn't say anything about an increased
20 risk of those events in patients taking Vioxx or
21 conventional COX-2, does it?
22   A.   What it's saying is that it's to prevent
23 that by providing something that is an antiplatelet
24 agent.
25   Q.   Where does it say in that paragraph that

Page 77

1  it's trying to prevent an increased risk of a
2  thrombotic event in a patient consuming Vioxx or a
3  another COX-2?
4    A.   It's saying that it is combining these to
5  provide an antiplatelet effect.
6    Q.   Okay.
7    A.   In the presence of COX-2.
8    Q.   So all it's saying is that is a
9  combination product to provide a cardiovascular
10 benefit to patients who are at risk of thrombotic
11 events and are taking COX-2s?
12      MR. LOCKLAR: Object to the form of the
13 question.
14   A.   Given that it's --
15   Q.   That's what it's saying, right?
16   A.   Well, in saying that it's combining an
17 antiplatelet agent, which is the known downside of
18 using Vioxx.
19   Q.   Where is that the known downside of using
20 Vioxx?
21   A.   In studies that were conducted by Merck --
22   Q.   Which ones?
23   A.   Including 023. The FitzGerald Hypothesis
24 was supported in 023.
25   Q.   How does the FitzGerald Hypothesis prove

20 (Pages 74 to 77)

Donna Arnett, Ph.D.

Page 78

1  that Vioxx has an antiplatelet effect?
2      A.   Because of the known mechanism of action
3  of reducing prostacyclin which inhibits thromboxane
4  A2.
5      Q.   What do you think that 023 shows?
6      A.   It shows a reduction in urinary excretion
7  of prostacyclin with Vioxx administration.
8      Q.   From where?  Where was the prostacyclin
9  coming?
10     A.   From the systemic circulation through the
11 kidneys.
12     Q.   Okay.  Was there any evidence in 023 that
13 it was coming from the vasculature?
14     A.   It had to come from the body somewhere to
15 get out in the urine.
16     Q.   Do you know if there's more than one
17 possible state of prostacyclin in the body?
18     A.   Prostacyclin is ubiquitous --
19     Q.   Do you know if there's any evidence that
20 the source, or even the primary source, of
21 prostacyclin metabolite in 023 was the coronary
22 vasculature?
23     A.   We know that administration of Vioxx --
24     Q.   No, I just want to know if you know if 023
25 demonstrates that the source of the metabolites seen

Page 79

1  in the urine was because of a reduction of
2  prostacyclin in the coronary vasculature?
3      A.   No.  Giving -- by giving the
4  administration of an agent known to have that effect
5  and observing --
6      Q.   How was --
7      A.   -- the downstream effect of having a
8  reduced prostacyclin --
9      Q.   Well, that --
10     A.   -- level in the kidney.
11     Q.   Doctor, that's circular.  How is the agent
12 known to have the effect?  You told me that 023 was
13 the one that showed you effect.
14         MR. LOCKLAR:  Object to the form.  I don't
15 think she said only 023 --
16     A.   Prior work by FitzGerald in the '80s had
17 led to this hypothesis about thromboxane and
18 prostacyclin balance.
19     Q.   What prior work by FitzGerald in the '80s
20 had demonstrated that COX-2s caused an imbalance of
21 prostacyclin and thromboxane?
22     A.   It was hypothesized early in the '80s.
23     Q.   What has showed a reduction of
24 prostacyclin prior to 023?
25     A.   To my knowledge 023 was the first clinical

Page 80

1  study conducted by Merck in humans that demonstrated
2  that the FitzGerald Hypothesis worked.
3      Q.   What study was -- was conducted by anybody
4  else prior to 023 to show a reduction in vascular
5  prostacyclin in humans?
6      A.   I haven't reviewed that literature.  But
7  we do know that other evidence from the FitzGerald
8  Hypothesis were borne out in very early studies
9  relative to the dramatic elevation in blood
10 pressures that was also part of the FitzGerald
11 Hypothesis.
12     Q.   Well, I want to separate that out because
13 I think you said that you don't -- you're not going
14 to testify to whether the blood pressure effect that
15 you've talked to is a -- is related to a
16 prostacyclin mechanism or related to some other
17 mechanism, correct?
18     A.   I will testify about the blood pressure
19 elevations observed with Vioxx.  And that's what
20 I'll limit my testimony to.
21     Q.   You're not going to use the blood pressure
22 elevations as proof of reduction in vascular
23 prostacyclin?
24     A.   The mechanism proposed for that is through
25 this prostacyclin imbalance.

Page 81

1      Q.   Well, no, not at all.  I mean, there's a
2  -- there's a renal explanation too, isn't there?
3      A.   In the FitzGerald Hypothesis it combined
4  all of those effects.
5      Q.   There's a renal explanation for blood
6  pressure increased with all NSAIDs, right, or don't
7  you know that because you haven't reviewed the NSAID
8  literature?
9      A.   I have not reviewed the NSAID literature.
10     Q.   And there's a renal explanation for blood
11 pressure effects with the COX-2s, or don't you know
12 that because you haven't reviewed the mechanism
13 literature?
14         MR. LOCKLAR:  Object to the form.
15     A.   I reviewed the FDA literature which
16 suggests that the renal implications -- I focus my
17 attention on Vioxx.  And there's equivocal evidence
18 that Vioxx causes elevated blood pressure.
19     Q.   Through a renal mechanism?
20         MR. LOCKLAR:  Object to the form.
21     A.   I don't know that they have defined the
22 mechanism in the FDA memos or the papers that I
23 reviewed.
24     Q.   Okay.  So you don't know what the
25 mechanism is.  You don't -- and you're not going to

21 (Pages 78 to 81)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 82

1  speak to the mechanism. You're just going to speak
2  to the evidence that you believe exists of the
3  clinical effect?
4      A.  I'm speaking as an epidemiologist about
5  the evidence from the studies that I reviewed which
6  are primarily the clinical trials.
7      Q.  Okay. So we don't have to talk about the
8  blood pressure effect as being evidence of a
9  prostacyclin thromboxane imbalance because you're
10 not going to state that you're the expert to talk
11 about that?
12     A.  I'll let the cardiologists talk about
13 that.
14     Q.  And so that brings me full circle back to
15 where we were with 023. Is there any study that you
16 know of before 023, Merck-sponsored or not,
17 that demonstrates that Vioxx or any other COX-2
18 causes a reduction in prostacyclin in the coronary
19 vasculature?
20     A.  The totality of evidence from the Merck
21 documents suggests --
22     Q.  Doctor, I'm going to move to strike.
23        I just need to know whether there's any
24 study. Because at one point you said there was
25 stuff before 023. So was there a study that you're

Page 83

1  relying on before 023 that you say demonstrates a
2  reduction in prostacyclin in the coronary
3  vasculature?
4      A.  As a cardiovascular epidemiologist with
5  experience in endothelial function and vascular
6  significance and vascular compliance, I would -- I
7  would propose that the extreme elevations in blood
8  pressure observed in the early studies with Vioxx
9  would warrant justification of a renal effect and
10 perhaps also lead to an endothelium.
11     Q.  I'm not asking you about what questions
12 might have been raised by a blood pressure effect.
13 I just want to know -- and if you want to tell me
14 you didn't mean to say what I think you said or that
15 I understood it wrong and it wasn't what you said,
16 that's fine too. But I'm pretty sure I heard you
17 say that there were studies before 023 that
18 demonstrated a reduction in prostacyclin in the
19 coronary vasculature.
20        So my first question is am I right you
21 said that. And my second question is if you said
22 that, which studies.
23     A.  First, I don't recall ever saying anything
24 specific about the coronary vasculature. I think
25 those were your words.

Page 84

1      Q.  Then was there any study that you know of
2  before 023 that demonstrates a reduction in
3  prostacyclin in the coronary vasculature caused by
4  Vioxx or another COX-2?
5      A.  As an epidemiologist looking at the trail
6  of how studies were --
7      Q.  Doctor, I'm going --
8      A.  -- there must have been. Because,
9  otherwise, they wouldn't have done the study.
10     Q.  Well, there's -- you're saying there's no
11 reason for the 023 study other than the existence of
12 prior studies that already proved what 023 couldn't
13 prove?
14     A.  Something made them suspicious about the
15 effect, and there was the FitzGerald Hypothesis
16 sitting out there and internal Merck documents
17 concerned about the effect.
18     Q.  Do you know when the FitzGerald Hypothesis
19 -- what we've dubbed as the FitzGerald Hypothesis
20 was originated?
21     A.  When it was originated?
22     Q.  Yeah.
23     A.  In the late '80s.
24     Q.  From what paper or what study?
25     A.  I have to be honest. I haven't read the

Page 85

1  first paper that discussed it. I only looked at it
2  through the documents provided in the clinical trial
3  publications.
4      Q.  And are you going to testify there is any
5  study post-023 that demonstrates a reduction of
6  prostacyclin in the coronary vasculature in humans
7  taking Vioxx?
8      A.  I'm going to point to the epidemiologic
9  evidence from the clinical trial data that exists,
10 and it doesn't speak to the prostacyclin levels. It
11 speaks to the excess risk from Vioxx in terms of
12 cardiovascular disease.
13     Q.  So you're not going to talk about the
14 prostacyclin mechanism and say that you know that
15 prostacyclin is the mechanism that explains any
16 clinical effects that you believe to exist?
17        MR. LOCKLAR:  Object to the form of the
18 question.
19     A.  As an epidemiologist who has to understand
20 pathophysiology in order to design and interpret
21 studies, I rely on the published literature. And to
22 the extent of the published literature in 023, that
23 would be the extent of my testimony relative to
24 prostacyclin.
25     Q.  Are you saying that 023 would be the

22 (Pages 82 to 85)

Donna Arnett, Ph.D.

Page 86

1  extent of your testimony relative to prostacyclin?
2      A.   And other published literature.
3      Q.   What other published literature?
4      A.   On mechanisms.
5      Q.   What literature on mechanisms are you
6  relying on?
7      A.   There is the paper by FitzGerald.  There
8  are summary reviews in the FDA memos about
9  mechanism.
10     Q.   Is there any FDA memo that you're relying
11 on that says that prostacyclin imbalance or
12 prostacyclin reduction explains any perceived
13 cardiovascular increased risk associated with Vioxx?
14     A.   That was the hypothesized mechanism.
15     Q.   I understand it was a hypothesis.  I'm
16 asking whether you're going to tell me that there is
17 any place where the FDA says that that's been
18 proved.
19         MR. LOCKLAR: Object to the form.
20     A.   Other than 023?
21     Q.   You and I are going to have to disagree
22 over what 023 shows.  But other than -- yes, my
23 question actually related to the FDA publications
24 because you had referenced them earlier.  Is there
25 any place you're going to say that the FDA has

Page 87

1  stated that the FitzGerald Hypothesis had been
2  proved?
3          MR. LOCKLAR: Object to the form.
4      A.   Not to my knowledge.  But, again, as an
5  epidemiologist with a hypothesized mechanism
6  corresponding with a patent application, that is --
7      Q.   I just want to know whether there was --
8  whether you're claiming that the FDA says the
9  FitzGerald Hypothesis has been proved.
10     A.   In that exact language?
11     Q.   Yes.
12     A.   I will -- there is no exact language to my
13 knowledge.  But I've read thousands of pages.
14     Q.   And --
15     A.   It could be there.
16     Q.   And is there any place where
17 Dr. FitzGerald has said that his hypothesis of an
18 imbalance between prostacyclin and thromboxane has
19 now been shown to explain any perceived adverse
20 cardiovascular effect of Vioxx?
21     A.   I --
22         MR. LOCKLAR: Go ahead.
23     A.   I recall hearing these at meetings.  I
24 haven't reviewed the papers.  But I do recall
25 hearing him say that.

Page 88

1      Q.   Where do you recall hearing him say that?
2      A.   In -- I don't remember the context, if it
3  was at the American Heart Association or some other
4  adjunctive symposium with the American Heart
5  Association.  I don't remember where I heard it.
6      Q.   Do you know Dr. FitzGerald personally?
7      A.   I do not.
8      Q.   You've just heard him speak?
9      A.   Uh-huh.
10     Q.   At a meeting or two?
11     A.   Correct.
12     Q.   And you haven't read his more recent
13 publications, correct?
14     A.   I have not.  I focused on the
15 epidemiologic literature.
16         MS. FREIWALD: We need to change the tape.
17         THE VIDEOGRAPHER: This is the end of Tape
18 Number Two in the continued deposition of Donna
19 Arnett to be continued on Tape Number Three.
20 We're off the record at 11:19 a.m.
21         (Off the record.)
22         THE VIDEOGRAPHER: This is the beginning
23 of Tape Number Three in the continued deposition
24 of Donna Arnett.  We're on the record at
25 11:20 a.m.

Page 89

1  BY MS. FREIWALD:
2      Q.   Let's go back to the patents, Doctor.  And
3  you pointed me to the first paragraph.  Is there any
4  other language in the patent application that you're
5  relying on to say the patents constitute a statement
6  about increased cardiovascular risk with Vioxx?
7      A.   On page three, or column three, of the
8  March 12th 1999 patent, it states that NSAIDs have
9  been shown to prevent production of prostaglandin,
10 which as we know is the mechanism or the enzyme
11 above the thromboxane prostacyclin.  And the recent
12 discovery that there are two isoforms of the COX
13 enzyme, COX-1, involved in physiological functions
14 which are the thromboxane.
15     Q.   I just want to --
16     A.   And COX-2 which --
17     Q.   Finish your thought and then I'll ask my
18 question.
19     A.   So while conventional NSAIDs brought both
20 forms, the identification of the inducible COX-2
21 associated with inflammation is a targeted
22 inhibition.  And it indicates that COX-1 is not
23 being involved, and then under the detailed
24 description, it says that --
25     Q.   Let me just stop you before we go on to

23 (Pages 86 to 89)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 90

1 the detailed description because I have a question
2 about what you just read. The reference to NSAIDs
3 there is generic. It's not talking about just COX-2
4 inhibitors, correct?
5    A.   It's talking about generic COX NSAIDs.
6    Q.   NSAIDs that inhibit both COX-1 and COX-2?
7    A.   Yes.
8    Q.   And there's nothing there that talks about
9 any adverse effect in terms of increased thrombotic
10 events as a result of COX-2 inhibition, correct?
11    A.   In the patent application itself there --
12 when I had this searchable form, it was easy to get
13 to. But they talk about --
14    Q.   Just answer my question. There's nothing
15 in that paragraph that talks about increased risk of
16 cardiovascular events as a result of COX-2
17 inhibition?
18    A.   In that paragraph, no.
19    Q.   Okay. Then go on. You wanted to point me
20 to some other language.
21    A.   In the detailed description of the
22 invention it talks about the instant -- invention
23 involves a novel combination therapy comprising
24 administration of a therapeutically effective amount
25 of a COX-2 inhibitor, which is in this case

Page 91

1 rofecoxib or Vioxx, in combination with a
2 therapeutically effective amount of an antiplatelet
3 agent to a mammal, and more particularly to a
4 human. And this combination therapy is used to
5 inhibit platelet aggregation in mammals who are in
6 need of such inhibition.
7    Q.   Right. And did you see the place in the
8 -- well, first of all, let me ask you this
9 question. It doesn't say anything about needing
10 such inhibition because there is an increase in
11 platelet aggregation as a result of taking the
12 COX-2.
13       MR. LOCKLAR: Object to the form.
14    Q.   Right?
15    A.   Well, we have --
16    Q.   Does it? Does it say that?
17       MR. LOCKLAR: Same objection.
18    Q.   Does it?
19    A.   Let me read through.
20    Q.   Well, just read where you were before.
21    A.   In that paragraph?
22    Q.   In what you just read, it doesn't say
23 anything about needing platelet inhibition because
24 you're taking a COX-2?
25    A.   It says the combination is used to inhibit

Page 92

1 platelet aggregation in people who need it.
2    Q.   And there are people who need it who don't
3 take COX-2s, right? There are lots of people on
4 aspirin, right?
5    A.   Yes.
6    Q.   And it's known that aspirin has -- can
7 have a deleterious effect on the stomach, correct?
8    A.   In high doses.
9    Q.   And it's known that aspirin can interact
10 adversely with some NSAIDs, correct?
11    A.   I haven't reviewed that literature, but I
12 --
13    Q.   Okay. Do you know that some NSAIDs can
14 actually offset the antiplatelet effects of aspirin?
15       MR. LOCKLAR: Object to the form.
16    A.   I haven't reviewed that literature.
17    Q.   And so you do accept, don't you, that
18 there are patients who independent of taking a COX-2
19 need platelet inhibition, correct?
20       MR. LOCKLAR: Object to the form.
21    A.   People at increased cardiovascular risk or
22 with risk factors depending on their gender, there
23 are different recommendations depending on gender
24 and risk factor levels for aspirin use.
25    Q.   So you have a patient who comes needing a

Page 93

1 COX-2 and also independently needs platelet
2 inhibition because of their cardiovascular risk
3 factors, right?
4       MR. LOCKLAR: Object to the form.
5    A.   I could see that happening.
6    Q.   Well, it's --
7    A.   But it's the totality of evidence to date.
8    Q.   Doctor, there's lots of -- in all the
9 studies -- we talked about the fact that there were
10 studies that allowed patients who were aspirin
11 indicated that took aspirin. And there were
12 patients that didn't allow -- there were studies
13 that didn't allow patients that were aspirin
14 indicated, right?
15    A.   Well, on line six --
16    Q.   Just am I right about that?
17    A.   Could you repeat it?
18    Q.   We've already talked about the fact that
19 in various studies, not just studies by Merck but
20 studies by Pfizer as well, there were sometimes
21 patients who were aspirin indicated and took aspirin
22 and sometimes patients who were not aspirin
23 indicated and didn't take aspirin, correct?
24    A.   Correct.
25    Q.   And that was independent of their use of

24 (Pages 90 to 93)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 94

1 the coxib. That was because they were deemed to be
2 in need of aspirin for cardiac health --
3        MR. LOCKLAR: Object to the form.
4    A.   I don't -- I can't testify why they were
5 taking it. Presumably they were under the care of a
6 physician and taking it as indicated by their
7 physician. I'm not a physician.
8    Q.   Okay. But these were patients who were on
9 aspirin independent of their decision to take a
10 COX-2?
11    A.   I can't testify to what patients --
12    Q.   You don't know --
13    A.   -- are taking.
14    Q.   You don't know that about the studies?
15    A.   About the studies, I can testify that
16 there were -- when they started to allow aspirin
17 after the VIGOR study that there were up to 20
18 percent in some studies of aspirin use allowed.
19    Q.   And that was aspirin use because the
20 patients just happened to be taking aspirin?
21        MR. LOCKLAR: Object to the form of the
22 question.
23    Q.   They weren't put on aspirin because they
24 were put in a study where they might have been
25 prescribed a COX-2. They were patients who were

Page 95

1 already taking aspirin for cardiovascular
2 prophylaxis?
3    A.   It would be a reasonable I would think
4 practice once the VIGOR results were out --
5    Q.   Doctor, I'm not asking you what reasonable
6 practice is. Don't you know that the aspirin
7 patients in these studies were aspirin patients just
8 because they were taking aspirin?
9        MR. LOCKLAR: Object to the form.
10    A.   I don't know that.
11    Q.   You don't?
12    A.   I don't know that.
13    Q.   Okay.
14    A.   I don't know that they didn't go to their
15 doctor and say I'm thinking about going into this
16 study, and the doctor says, well, if you're going
17 into that study you need to be on aspirin because it
18 causes heart attacks.
19    Q.   Do you know -- so enroll in the study but
20 take an aspirin because I think it causes heart
21 attacks, you think that happened? You're just
22 speculating now, right?
23    A.   Well, I happen to know in one --
24    Q.   You're just speculating?
25    A.   No, actually I have direct evidence of

Page 96

1 that, but it's irrelevant for this particular case.
2    Q.   What direct evidence do you have, Doctor?
3    A.   It pertains to another case.
4    Q.   Okay. A case that you've reviewed?
5    A.   I did not review the medical records.
6    Q.   Okay. A case that is --
7    A.   It's hearsay. So I'll move to leave that.
8    Q.   Is there some personal knowledge,
9 something personal in your family or that you feel
10 you have some connection to the Vioxx litigation?
11    A.   No.
12    Q.   Okay. Is there some friend or
13 acquaintance that you have some knowledge that you
14 think is -- bears on the testimony that you're
15 giving in this case?
16    A.   No.
17    Q.   Do you understand what aspirin indicated
18 meant in the Vioxx studies?
19    A.   Yes.
20    Q.   What is your understanding of what aspirin
21 indicated meant in the Vioxx studies?
22    A.   That if a person was on aspirin -- wanted
23 to take aspirin during the trial that they were
24 allowed to take it, up to 20 percent of those who
25 wanted to take aspirin were allowed to take it post-

Page 97

1 VIGOR.
2    Q.   And do you know why they were taking it?
3    A.   I'd like -- the answer is I don't know. I
4 would like to review the case report, the total form
5 to contrast the risk factor levels of aspirin users
6 versus nonusers because I'm assuming that you think
7 they were at higher risk.
8    Q.   My point is simply that the aspirin
9 indicated patients were patients who were taking
10 aspirin because their doctors wanted them to be on
11 aspirin independent of their use of Vioxx.
12        MR. LOCKLAR: Object to the form.
13    A.   In the Minnesota Heart Survey I was survey
14 director and principal investigator, we found
15 aspirin use was very common in the community for
16 cardiovascular prevention. So it may or may not
17 have been indicated by a doctor. That's why -- I'm
18 not trying to be evasive. I'm just trying to be an
19 honest epidemiologist.
20    Q.   I'm not getting -- you're trying to get
21 ahead of me, frankly. And you're trying to think
22 about issues that I'm not asking. I'm not asking
23 you about whether there was a disparity of risk
24 level in the aspirin indicated versus the aspirin
25 nonindicated patients. And I'm not asking you about

25 (Pages 94 to 97)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 98

1  whether or not you think there might be variability
2  in physician prescribing habits for aspirin.
3       All I'm asking you is a very simple
4  factual question that in the Vioxx studies as well
5  as in the Celebrex studies patients were allowed who
6  were taking aspirin for cardiovascular prophylaxis
7  independent of their use of the COX-2.
8       MR. LOCKLAR: Object to the form.
9    Q.   Correct?
10   A.   I'm not testifying about Celebrex. I
11 don't know how that came in there.
12   Q.   Okay. You haven't read the Celebrex
13 studies to talk -- to speak to them?
14   A.   No, I haven't.
15   Q.   So then I'll limit my question to the
16 Vioxx studies. Can you answer it?
17   A.   Could you repeat it?
18   Q.   Sure. All I have -- I think it's really a
19 uncontroversial thing so I don't know why we're
20 going round and round about this. Isn't it true,
21 Doctor, that in the Vioxx studies, some of the Vioxx
22 studies, there were patients who were on aspirin for
23 cardiovascular prophylaxis independent of their use
24 of Vioxx or independent of their enrollment in the
25 study?

Page 99

1       MR. LOCKLAR: Object to the form.
2    A.   I can -- I can agree that there were
3  people taking aspirin in post-VIGOR studies. I
4  can't tell you why they were taking aspirin.
5    Q.   Then let's go on. You wanted to point me
6  to some other language in the patent.
7    A.   In number -- on page six they get more --
8  this is organized according to column. They talk
9  about what a prophylactically effective amount
10 means, that it will reduce the risk of occurrence of
11 the medical event that's -- and then in the next
12 paragraph below that they specifically define acute
13 coronary ischemic syndrome. So they have created a
14 compound to offset the risk from the COX-2.
15   Q.   Where does it say that?
16   A.   In one of these documents it says that.
17       It says on page 23 that it's expected that
18 a combination therapy of the GT 2B 3A receptor
19 agonist was -- antagonist with orally administered
20 COX-2 could be used in response to an acute medical
21 event where inhibition of platelet aggregation is
22 needed.
23   Q.   Where does that say that the medical event
24 is caused by the COX-2? I mean, that's what aspirin
25 does, right?

Page 100

1    A.   This specifically is about the GT 2B 3A.
2    Q.   Right. But my point is that when people
3  have heart attacks that's why they take aspirin, and
4  that is -- they do that whether they're taking Vioxx
5  or not.
6    A.   On 25, In accordance to this devention, a
7  therapeutically effective amount of COX-2 inhibitor
8  and a therapeutic effective amount of an
9  antiplatelet agent can be used for preparation.
10 Medicine useful for inhibiting platelet aggregation
11 for treating, preventing, or reducing the risk of
12 developing acute ischemic syndrome in humans.
13   Q.   Okay. But it still doesn't say caused by
14 the COX-2. And we all know that acute ischemic
15 syndromes happen in people, right?
16   A.   As I see it as an epidemiologist, we had
17 023 --
18   Q.   Could you just answer --
19   A.   -- which was right before VIGOR came out.
20 And so certainly they knew at that point through
21 monitoring data by a Data Safety Monitoring Board,
22 and certainly they were monitoring that
23 study that there was this excess risk.
24   Q.   And --
25   A.   They were putting together a product that

Page 101

1  would take away that cardiovascular risk.
2    Q.   Do you know that if at the time there were
3  also theories about cardiovascular protective
4  benefits of COX-2 inhibition by reducing
5  inflammation?
6    A.   I'm not aware that that was ever promoted
7  as a benefit.
8    Q.   You don't --
9    A.   Certainly none of the studies have borne
10 that out.
11   Q.   You don't -- you don't know if there were
12 studies that have shown that?
13   A.   There were no clinical trials that show
14 that Vioxx is protective for cardiovascular
15 disease. And, in fact, the FDA voted 32 to one --
16 to zero in a panel that it was cardiotoxic.
17   Q.   Do you know if -- that's what you think
18 the FDA vote was?
19   A.   The advisory?
20   Q.   Yes.
21   A.   Yes, it was 32 to zero.
22   Q.   That it was cardiotoxic?
23   A.   Yes.
24   Q.   That's the words you're saying the FDA
25 used?

26 (Pages 98 to 101)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 102

1    A.   I'll get the exact words.
2    Q.   Okay. Well, we'll do that later. But
3  going back, have you reviewed the literature with
4  regard to the scientific hypothesis that Vioxx and
5  other COX-2s could reduce the cardiovascular risk by
6  reducing inflammation?
7    A.   I have not reviewed that literature and it
8  has not been in any of the publications related to
9  the trials or the meta-analyses.
10   Q.   Have you ever as an epidemiologist before
11 you were hired to work in this lawsuit reviewed a
12 patent application in forming your epidemiologic
13 opinion?
14   A.   I've participated in patent applications
15 for my own work.
16   Q.   That's not my question.
17   A.   So, yes, that would form my opinions.
18   Q.   Have you ever relied on a patent
19 application as evidence of what was in the thought
20 process of a company before you were retained in
21 this litigation?
22   A.   I have never been involved in litigation
23 prior to this.
24   Q.   And so you haven't offered the opinions --
25   A.   So I never -- never had the need to go and

Page 103

1  look at patent applications.
2    Q.   And you've never relied on a patent
3  application as evidence of an epidemiologic
4  conclusion before?
5       MR. LOCKLAR: Object to the form.
6    A.   I haven't had to -- I've not used it, but
7  I am writing a paper now on patent applications
8  relative to one that I put in.
9    Q.   What kind of patent application?
10   A.   On a patent for -- I can't disclose the
11 gene or enzyme. But it's related to one of my
12 studies. So I'm reviewing patent applications and
13 writing in epidemiologic treatises on this area in
14 one of my funded studies.
15   Q.   What I want to know is what does the
16 patent application have to do with an epidemiology
17 treatise?
18   A.   Because we're deriving the information in
19 the patent -- you know, patents have an abstract.
20 They have all of the rationale for the background of
21 the invention, the summary of the invention, the
22 details about the invention. And there's a lot of
23 information in patents about the product.
24   Q.   Let me just ask an open-ended -- what is
25 it you're writing about patents now independent of

Page 104

1  this lawsuit? In your regular work, what is it that
2  you're writing?
3    A.   I was asked by the editor of a journal
4  called Cardiovascular Therapeutics to select a
5  particular gene or protein to review patents for
6  cardiovascular relevance. And I selected one that's
7  related to my work.
8    Q.   I'm sorry. I'm just not understanding
9  your answer. You were asked to select a particular
10 gene or protein and review patents related to that
11 particular gene or protein?
12   A.   Right, for cardiovascular therapeutic
13 indications.
14   Q.   And what is the epidemiologic piece of the
15 writing?
16   A.   I'm summarizing the data within those
17 patents and the purpose and looking at whether the
18 -- my particular area, where it stands in terms of
19 patents and potential therapeutic indications. So I
20 have worked in terms of reading patents and
21 understanding them. I've also participated in my
22 own -- two of my own patents --
23   Q.   I'm not disputing with you that in
24 medicine there are patents and that there are
25 patents that relate broadly speaking to areas of

Page 105

1  cardiovascular epidemiology. But what I'm asking
2  you is have you ever used a patent application in
3  your work as evidence that a drug or a compound has
4  a cardiovascular effect?
5    A.   I just commented on the one that I'm
6  doing. I can't name the protein or gene, but I am
7  doing one now.
8    Q.   Is there anything else in the patent
9  applications that you rely on as evidence that Merck
10 was acknowledging an increased risk of
11 cardiovascular events with Vioxx?
12   A.   The timing, the date of the application.
13   Q.   And why is that relevant in your mind?
14   A.   Because the date of the application came
15 out after the 023 trial was conducted.
16   Q.   And the 023 trial, if I understand your
17 testimony right, you don't know if that actually
18 shows reduction in prostacyclin in the coronary
19 vasculature or not, correct?
20      MR. LOCKLAR: Object to the form. Asked
21   and answered.
22   A.   It shows reduction in prostacyclin as
23 measured through urinary excretion.
24   Q.   Somewhere but we don't know where?
25      MR. LOCKLAR: Object to the form. Asked

27 (Pages 102 to 105)

55a210ee-308b-4267-ba95-cd6434e81231