Donna Arnett, Ph.D.

Page 106

1  and answered.
2      A.   It comes out the kidneys.
3      Q.   And was there any increase in the number
4  of heart events in 023?
5      A.   They were two, three subjects, and they
6  were all healthy.  So the answer is, no, but it
7  wasn't designed to test that.
8      Q.   It was a mechanism study?
9      A.   Correct.
10     Q.   What I'd like to do is take the patent
11  applications and --
12         MR. LOCKLAR:  Does it matter if this is a
13  duplication?
14         MS. FREIWALD:  No.  If I had a duplicate
15  in there, that's fine.  What I'll do is there's
16  four patent applications, the two Nichtberger
17  ones, the international one, and the Scolnick
18  one.  And I'm going to put them together as one
19  exhibit.  And it will be 13.
20         (Defendant's Exhibit Number 13
21          was marked for identification.)
22  BY MS. FREIWALD:
23     Q.   Doctor, are there any studies before VIGOR
24  that you're going to point to where you'll say that
25  there was a numerically significant disparity in the

Page 107

1  number of heart attacks?
2      A.   I've done most of my assessment on the
3  combined endpoint.  And in the combined endpoint I
4  would say that I would point to studies that show a
5  numerical increase.
6      Q.   Before VIGOR which ones?
7      A.   So in the cardiovascular review of the
8  NDA, the Villalba memo dated 5/17/99 page 104 it
9  says, Evaluation of cardiovascular thromboembolic
10  events regardless of seriousness shows a numerically
11  higher incidence of ischemic thromboembolic events
12  inclusive of angina, myocardial infarction, CVA and
13  TIA, in patients taking rofecoxib versus placebo.
14     Q.   You're looking at the 5/20/99 Medical
15  Officer Review?
16     A.   5/17/99 is the date on the bottom of the
17  page in the Villalba memo.
18     Q.   What page are you looking at?
19     A.   Page 104 entitled, Thromboembolic and
20  Vascular Safety.  And presumably the NDA had the
21  totality of data.
22     Q.   Okay.  You have no reason to think that
23  any of the data were withheld from the FDA, correct?
24     A.   I have no reason to believe that.
25     Q.   And so the FDA was aware of these -- of

Page 108

1  the numerical results of the studies at the time
2  that the NDA was approved, correct?
3          MR. LOCKLAR:  Object to the form.
4      A.   They were aware, but there were concerns
5  expressed by the officer.  And specifically that it
6  was impossible to answer with certainty about
7  cardiovascular and thrombotic risk --
8      Q.   Okay.  So that --
9      A.   -- in patients on Vioxx.
10     Q.   So that was discussed with the FDA prior
11  to the approval of NDA, correct?
12         MR. LOCKLAR:  Object to the form.
13     A.   It was in -- it was in Villalba's memo.
14     Q.   So there was a discussion with the FDA
15  about the numeric differences before Vioxx was
16  approved, correct?
17         MR. LOCKLAR:  Object to the form.
18     A.   The Villalba memo states that a larger
19  database will be needed to answer cardiovascular
20  safety.
21     Q.   Doctor, the FDA was aware of the numeric
22  differences before the NDA for Vioxx was approved,
23  correct?
24         MR. LOCKLAR:  Object to the form as to
25  what the FDA knew.

Page 109

1      Q.   Well, it's right in the FDA memo.
2      A.   So this was a Medical Officer Review for
3  cardiovascular disease that the safety --
4      Q.   Okay.  So the medical officer in charge of
5  reviewing the cardiovascular safety of Vioxx wrote
6  an official memo, right, where she laid out the
7  numeric results of the studies with regard to
8  composite cardiovascular endpoints, correct?
9      A.   Correct, and stated that it's impossible
10  to answer with certainty whether or not there was an
11  increased risk, but there was concern.
12     Q.   Okay.  So there was a question raised
13  you're saying that was known to be a question by the
14  FDA at the time that the Vioxx NDA was approved?
15         MR. LOCKLAR:  Object to the form of the
16  question.
17     A.   According to -- obviously it was approved,
18  but there were concerns expressed by the FDA about
19  the cardiovascular safety and that there needed to
20  be more patients in order to evaluate the
21  cardiovascular risk.
22     Q.   And so that was known to the FDA, and they
23  knew that they were going to need more data if they
24  were going to come to a conclusion, correct?
25         MR. LOCKLAR:  Object to the form.

28 (Pages 106 to 109)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 110

1    A.   I have what is stated by Villalba.
2    Q.   And that's what it says?
3    A.   And to what extent she represents the FDA,
4   I agree with that statement.
5    Q.   And do you know how typical it is that at
6   the time that drugs are approved the FDA knows that
7   there are questions that cannot be answered except
8   for with longer and much larger studies or exposure
9   in the general population?
10       MR. LOCKLAR:  Object to the form of the
11   question.
12   A.   Vioxx is being approved for treatment of a
13   different condition.  Cardiovascular disease was a
14   serious adverse event.
15   Q.   All I want to know is if you know how
16   common or not common it is for the FDA to approve
17   agents knowing that there may be certain adverse
18   events that have not yet been seen and that will
19   only be seen with further follow-up or exposure in
20   the general population?
21       MR. LOCKLAR:  Object to the form.
22   A.   I cannot comment.  I know there's been
23   senate testimony by experts about the need for
24   increased regulation post-marketing because of the
25   issues with Vioxx.

Page 111

1    Q.   So you don't -- you don't know -- you're
2   relying on what you read in the news now or see on
3   TV?
4    A.   No.  I downloaded it from senate
5   testimony.
6    Q.   Okay.  So that's the same kind of stuff
7   that any person could get off the Internet, right?
8    A.   Uh-huh.  Yes.
9    Q.   And you don't have expertise in the FDA
10   review process, right?
11   A.   I do not have expertise in the review
12   process.  Although it's --
13   Q.   But --
14   A.   -- it's apparent from the documentation
15   how reviews occur.
16   Q.   That's what I want to know.  You don't
17   know how the process works in terms of how
18   frequently there are, just as a result of the
19   limitations of the study design, questions about
20   safety or efficacy that cannot be fully answered at
21   the time that a medicine is approved?
22       MR. LOCKLAR:  Object to the form.
23   A.   That is -- that is true.
24   Q.   Now, other than the -- I should ask you
25   since you cited Villalba as one of the things you

Page 112

1   rely on.  Is there anything else in the Villalba
2   5/99 Medical Officer Review that you would cite in
3   support of any of the opinions you intend to offer?
4    A.   She also at that point emphasizes the need
5   for aspirin use for cardiovascular reasons.
6    Q.   Can you tell me where you're reading?
7    A.   It's on page 105 in her summary statement
8   she says, We need a larger database.  We need
9   patients that have indications for aspirin to
10   continue aspirin when taking rofecoxib.  And then
11   she expresses concerns that that will offset the GI
12   benefit of Vioxx.
13   Q.   Okay.  So here she's not talking about the
14   need to have patients who are taking Vioxx out in
15   the general world to use aspirin.  She's talking
16   about the need to study Vioxx in aspirin indicated
17   patients?
18   A.   Actually, I don't agree with that
19   interpretation.  Her first paragraph in the summary
20   says we need a larger database to answer this
21   important safety question.  Paragraph two, Patients
22   who need aspirin for cardiovascular reasons should
23   not stop taking aspirin when taking Vioxx.  That's
24   not a research question.  That's a directive.
25   Q.   And it was known at that time that Vioxx

Page 113

1   didn't have the antiplatelet effect of aspirin,
2   correct?
3    A.   I don't know that they measured platelets
4   in the -- I can't answer that question.  There was
5   the FitzGerald Hypothesis and 023 suggesting
6   reduction of prostacyclin which would lead to
7   platelet aggregation.
8    Q.   Okay.  So you don't know whether it was
9   known at that time that Vioxx had an antiplatelet
10   effect like aspirin?
11       MR. LOCKLAR:  Object to the form.
12   A.   I think the converse was known.
13   Q.   So it was known at that time that Vioxx
14   was not a substitute for aspirin, correct?
15   A.   It was known that it would cause platelet
16   aggregation.
17   Q.   Doctor, where was it known that it would
18   cause platelet aggregation, 023?
19   A.   The hypothesized mechanism and the numeric
20   excess of cardiovascular events from the drug.
21   Q.   Well, the fact that there's a clinical
22   outcome doesn't prove the mechanism, right?  So even
23   if you assume that the numeric and not statistically
24   significant excess is meaningful in some way, you
25   can't use that to back-door your way in to proving

Donna Arnett, Ph.D.

Page 114

1  your mechanism?
2      A.   I can't, but Dr. Villalba did.
3      Q.   How did she?
4      A.   Because she said you should -- you
5  shouldn't stop taking aspirin.  You should take
6  aspirin.
7      Q.   Well, but even if you're taking a
8  medication that's completely neutral on platelets,
9  you still need to take your aspirin.
10          MR. LOCKLAR:  Object to the form.
11      Q.   Patients could believe that because
12  they're taking an NSAID and aspirin is an NSAID,
13  they should stop taking their aspirin.
14          MR. LOCKLAR:  Object to the form.
15      Q.   But they can't because Vioxx doesn't have
16  an antiplatelet effect, right?
17          MR. LOCKLAR:  Object to the form.
18      A.   I can say that there's an excess numeric
19  risk of cardiovascular events in Vioxx in the NDA
20  application originally and that she recommends that
21  people not stop taking aspirin, which is a preventer
22  of cardiovascular disease through an antiplatelet
23  mechanism.
24      Q.   And it wasn't an excess of cardiovascular
25  risk that Dr. Villalba or the FDA thought was

Page 115

1  significant enough to prevent the approval of the
2  medication, correct?
3          MR. LOCKLAR:  Object to the form.
4      A.   It was approved with the caveat that they
5  need to follow it for safety closely.
6      Q.   Anything else in the Villalba memo that
7  you're relying on?
8      A.   No.
9      Q.   Is there any other -- I think we've
10  already talked about 090.  And is there anything --
11  any other source of information that you're relying
12  on as evidence of an increased risk of MI with Vioxx
13  before VIGOR?
14      A.   In reviewing the data that came out from
15  the recent paper by Zhang, which was the meta-
16  analysis of all randomized trials, there's
17  compelling data about the blood pressure elevating
18  effects of Vioxx relative to other COX-2 and other
19  NSAIDs.  And from that review, I would say that
20  prior to VIGOR the studies uniformly show a much
21  greater drop-out rate for hypertension events and
22  blood pressure elevations.
23      Q.   Is there anything in Zhang that
24  demonstrates a correlation between blood pressure
25  events and increased MI?

Page 116

1      A.   It wasn't an objective, but elevated blood
2  pressure is a known risk factor for cardiovascular
3  disease.
4      Q.   We talked about it -- we talked last time
5  about it being a risk factor over time, correct?
6      A.   Correct.
7      Q.   And most of the studies that look at it as
8  a risk factor over time being one- to three-year
9  studies, correct?
10          MR. LOCKLAR:  Object to the form.
11      A.   I'd be happy to review my testimony.
12      Q.   Well, am I right that most of the blood
13  pressure studies that show a clinical effect from
14  increased blood pressure look at a period of at
15  least one year and often more like three years?
16      A.   It depends on the outcome.
17      Q.   If you're looking for an outcome of heart
18  attack or stroke?
19      A.   I would agree that they tend to be longer
20  term trials depending on the age of the population
21  recruited and the underlying cardiovascular disease
22  rate within that population, the risk factor level
23  in the population.
24      Q.   Is there any epidemiologic data that you
25  can point me to that demonstrates an increased risk

Page 117

1  of heart attack as a result of blood pressure
2  elevation for a period of less than a year?
3      A.   As epidemiologists we look at graded
4  levels of risk with increasing levels of blood
5  pressure over time.  I -- we don't typically ask
6  that year-to-year question.  In epidemiologic
7  studies we don't tend to recruit people and evaluate
8  them every year.
9      Q.   Well, what I -- my understanding and
10  correct me if I'm wrong -- is that the studies that
11  have looked at the risk of blood pressure have
12  essentially all been long-term studies.
13      A.   Can you define long-term?
14      Q.   At least a year, if not three, five, ten
15  year studies.
16      A.   The largest study done for blood pressure
17  known to date is the ALLHAT study, the
18  antihypertensive and lipid-lowering trial.  And it
19  had 42,000 subjects, and the main follow-up in that
20  trial was four years.
21      Q.   Okay.  And what I'm trying to --
22      A.   If that answers your question.  I'm sorry.
23      Q.   Well, it certainly answers by way of
24  example.  I don't think it gives -- it answers the
25  question of exclusion that I was trying to ask,

30 (Pages 114 to 117)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 118

1  which is are there any studies that you know of that
2  were designed to look for a correlation between
3  blood pressure increase and a hard cardiac event
4  like a heart attack and that only followed patients
5  for a period of less than a year?
6       MR. LOCKLAR: Object to the form.
7    A.   I'm -- there haven't been recent studies
8  since I became an expert in cardiovascular
9  epidemiology over the last 25 years.
10   Q.   Okay. So that's what I want to know. Is
11 there any data that you could point to that says
12 that epidemiologists have been able to correlate an
13 increase in blood pressure to an increased risk of a
14 hard cardiac event like a heart attack where the
15 blood pressure increase is for a shorter period of
16 time than a year?
17       MR. LOCKLAR: Object to the form.
18   A.   I can't point you to that. But it's a
19 well-established risk factor that there is a graded
20 increase in cardiovascular risk with increase in
21 blood pressure.
22   Q.   Right, but over time. Not immediately.
23   A.   And, once again, Vioxx is a pharmacologic
24 agent that has a --
25   Q.   Doctor, can you just answer my question.

Page 119

1  There is no -- there is no study that shows an
2  immediate effect? You're talking about a huge spike
3  in blood pressure. That usually causes stroke more
4  than heart attack, right?
5    A.   In the early -- some of the early dose
6  ranging studies --
7    Q.   Now, Doctor --
8    A.   Protocol 010 there were fairly serious
9  elevations in blood pressure --
10   Q.   Doctor, I'm not asking you about --
11   A.   -- with Vioxx.
12   Q.   -- blood pressure in patients on Vioxx.
13 I'm asking you about the epidemiologic data. I
14 understand that blood pressure is a graded risk.
15 But it is a -- it is a risk that has two components,
16 right? One is magnitude of increase in blood
17 pressure, and the other is time, right?
18       MR. LOCKLAR: Object to the form of the
19 question.
20   Q.   Yes?
21   A.   Yes.
22   Q.   Okay.
23   A.   But it --
24   Q.   And there's no -- I want to know if
25 there's any data that I just don't know about that

Page 120

1  shows that on a population basis an increased risk
2  of blood pressure of three points or five points, or
3  any number you want to pick, has been correlated
4  with an increased risk of a hard cardiac event like
5  a heart attack within a period of time of less than
6  a year?
7       MR. LOCKLAR: Object to the form of the
8  question.
9    A.   In epidemiologic studies I would agree.
10 But this is not. That is a clinical trial where
11 you're intervening by giving individuals a drug that
12 is known to have --
13   Q.   I don't -- all I was --
14   A.   -- hypertensive effect.
15   Q.   -- asking you about is what the
16 epidemiologic data allows us to say.
17   A.   And recall too that the --
18   Q.   Doctor --
19   A.   What we --
20   Q.   I'm going to move to strike as
21 nonresponsive. I just want to ask you a question
22 about what the epi studies show. And we're in
23 agreement that there are no epi studies that you're
24 going to be able to point me to that says they
25 looked at patients for six months, and they found

Page 121

1  six months of raising your blood pressure five
2  points resulted in an increase in heart attacks of X
3  magnitude, right?
4    A.   I would agree with that, but this is a
5  drug --
6    Q.   That's all I need. That is --
7    A.   I haven't been able to --
8       MR. LOCKLAR: No, she's allowed to answer
9  the question.
10   A.   To finish my answers.
11   Q.   My question had nothing to do with Vioxx.
12 My question had to do with the epidemiologic data.
13       MR. LOCKLAR: She's entitled to finish her
14 question.
15       MS. FREIWALD: No, she's only entitled to
16 give me responsive answers.
17       THE WITNESS: That you want to hear.
18       MR. LOCKLAR: Excuse me, you don't need to
19 argue with her.
20       THE WITNESS: Sorry.
21       MR. LOCKLAR: That's my job. She's
22 entitled to finish her answer.
23       MS. FREIWALD: No, she's not. She's
24 entitled to answer the question which was
25 related to epidemiologic data. So --

Golkow Litigation Technologies - 1.877.DEPS.USA

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

| Page 122 | Page 124 |
|---|---|
| 1    MR. LOCKLAR: I tell you what I'll do.<br>2 We'll make a deal. As long as you don't stand<br>3 up in front of the judge and say, Judge, this<br>4 was not her -- or in front of a jury and say<br>5 this was not answered in her deposition -- if<br>6 you're going to cut her off, we're certainly not<br>7 going to limit her when it comes to time of<br>8 trial.<br>9    If you want her deposition to be thorough<br>10 and you want it to be complete, then as an<br>11 expert witness she's entitled to complete her<br>12 answer. So it's your choice.<br>13    MS. FREIWALD: That's fine. I'll take the<br>14 answer to my question.<br>15 BY MS. FREIWALD:<br>16    Q.  Now, Doctor, in any of the studies that<br>17 you looked at for Vioxx that you show -- say show an<br>18 increase in blood pressure effect, were you able to<br>19 correlate the increase in blood pressure effect with<br>20 an increase in heart attack or in any other hard<br>21 cardiac event?<br>22    A.  There are not available to me to do<br>23 that. However, we know from clinical trial evidence<br>24 as well as epidemiologic evidence that an increase<br>25 in blood pressure over time leads to an increase in | 1 nonselective NSAIDs, correct?<br>2    A.  It includes the comparators used in the<br>3 Vioxx clinical studies.<br>4    Q.  And do you know whether the methods for<br>5 monitoring blood pressure from study to study were<br>6 the same?<br>7    A.  For Vioxx?<br>8    Q.  For any of the studies in the Zhang<br>9 article.<br>10    A.  I don't know how -- I did not review each<br>11 individual protocol because they're not available to<br>12 me.<br>13    Q.  Do you know if any of the studies were<br>14 designed as blood pressure studies?<br>15    A.  I assume that none of them, since their<br>16 purpose for getting approved for Vioxx was to treat<br>17 OA and eventually RA, that they were designed for<br>18 that purpose. I can say that every clinical trial<br>19 that I've been involved with has a very standard way<br>20 of collection of blood pressure and other<br>21 measurements.<br>22    Q.  Is there a --<br>23    A.  With --<br>24    Q.  I'm sorry. Go on.<br>25    A.  With a standardized protocol. |

| Page 123 | Page 125 |
|---|---|
| 1 events. And recall that in these protocols that<br>2 were implemented like 010 and 017 where you're<br>3 getting, you know, 16 millimeters of mercury<br>4 increase in blood pressure on average, there could<br>5 be a range of effect from no sensitivity to blood<br>6 pressure on Vioxx to maybe huge changes of 40 to 50<br>7 millimeters of mercury. So it -- when we're looking<br>8 at the average population, we can't extrapolate to<br>9 individuals.<br>10    Q.  Doctor, have you done an analysis of what<br>11 the blood pressure effect is with any other NSAIDs<br>12 either taken acutely or taken chronically?<br>13    A.  By analysis do you mean have I gone and<br>14 retrieved data and run STATA programs on them?<br>15    Q.  Yes, or done something comparable to what<br>16 you've done for Vioxx.<br>17    A.  I haven't but others have.<br>18    Q.  And when you say others, you're relying on<br>19 the Zhang article?<br>20    A.  Correct.<br>21    Q.  And have you done anything to look at the<br>22 magnitude of the effect with other NSAIDs other than<br>23 read the Zhang article?<br>24    A.  I have not. I focused on Vioxx.<br>25    Q.  And that would include COX-2s as well as | 1    Q.  Is there a difference in how blood<br>2 pressure may be collected or measured if one of the<br>3 endpoints of the study is testing blood pressure as<br>4 opposed to if you're simply doing blood pressure<br>5 monitoring during the course of the study?<br>6    A.  There -- certainly trials designed to test<br>7 blood pressure, if that is their main outcome, would<br>8 have rigorous methodology around testing that.<br>9    Q.  So if --<br>10    A.  And I cannot answer for -- since Merck had<br>11 a very specific standard operating procedure for<br>12 cardiovascular events, I don't know whether or not<br>13 their blood pressure measurement was included in a<br>14 very standardized way as well.<br>15    Q.  And do you know if there's any differences<br>16 in how blood pressure was monitored in the Merck<br>17 studies for Vioxx from how it was monitored in the<br>18 Celebrex studies?<br>19    A.  I haven't reviewed Celebrex studies.<br>20    Q.  And do you know if there was any<br>21 difference in how blood pressure has been monitored<br>22 in any study that used any nonselective NSAID as a<br>23 comparator?<br>24    A.  I've reviewed the Vioxx literature and the<br>25 memos from the FDA. There was no protocol listed in |

Donna Arnett, Ph.D.

Page 126

1  that.
2      Q.   Would you agree that as a general matter
3  blood pressure studies will have more rigorous
4  mechanisms for testing blood pressure than studies
5  that are not designed with the primary endpoint of
6  monitoring blood pressure?
7      MR. LOCKLAR:  Object to the form.
8      A.   I can't say that with certainty.  In my
9  studies we have very strict protocols, and they're
10 not all blood pressure studies.  So it would vary
11 depending on the protocol.
12     Q.   And what are the protocols that you use?
13     A.   In detail or in superficial?
14     Q.   Well, give me the general first.
15     A.   In general for the Minnesota Heart Survey
16 we required people to be in a quiet room with legs
17 uncrossed for five minutes with no talking prior to
18 measurement.
19     Q.   Did you require the blood pressure reading
20 always be at the same time of day?
21     A.   No.
22     Q.   Did you require that it be done with a
23 certain level of frequency?
24     A.   Usually two to three times.  In the
25 Minnesota Heart Survey it was two.

Page 127

1      Q.   And two during the time of the entire
2  study?
3      A.   Two during that visit.
4      Q.   Two during the visit.  And is there any
5  confirmation of the blood pressure that's required?
6  Do you require a repeat measurement each time or not?
7      A.   We follow a standardized protocol.  So
8  there are two measurements that were taken in the
9  Minnesota Heart Survey.
10     Q.   I'm sorry.  I'm just not following.  Each
11 visit there needs to be two readings of the blood
12 pressure?
13     A.   There's only one visit for the Minnesota
14 Heart Survey.  It's a cross-sectional survey.
15     Q.   Okay.  Maybe we're too into the details of
16 a particular study.  When you do a study and you
17 require blood pressure monitoring, do you require
18 that the reading that is done at a particular visit
19 be done twice or just once?
20     A.   If blood pressure is my primary outcome?
21     Q.   Okay.
22     A.   If blood pressure is my primary outcome, I
23 would have three readings at a minimum.
24     Q.   And what if it's not your primary outcome?
25     A.   I have had one reading.

Page 128

1      Q.   All right.  You said that you also looked
2  at the Villalba memo from June of 2000 in forming
3  your opinion.  Could you tell me specifically what
4  it is you're relying on there?
5      A.   This was in response to this supplement
6  which included data on three new studies, 088, 85
7  and 90.  And here they were evaluating the
8  cardiovascular safety.  And they discussed that the
9  cumulative rate for serious vascular and thrombotic
10 events was 1.8, this is page four, versus .6 in the
11 rofecoxib versus Naprosyn group, which is data from
12 the VIGOR study.  And they go on after this to
13 discuss subgroup analyses as well as the hypothesis
14 about the cardioprotective effect of Naprosyn.  And
15 here the FDA has raised several issues about that
16 interpretation and that's what I will be relying on.
17     Q.   Okay.
18     A.   They also recommend that patients with
19 known cardiovascular risk be given prophylactic
20 aspirin.  But they, again, state they're unsure
21 about the advantage of the GI system and they're
22 unsure about whether differences were between
23 rofecoxib and Naprosyn will be meliorated by
24 aspirin.
25     Q.   And are you saying the FDA has formed any

Page 129

1  conclusions at that point with regard to the
2  protective effect of naproxen?
3      A.   There was no conclusion summary paragraph
4  as there was in Villalba's earlier memo.  But let me
5  verify that.
6      MR. LOCKLAR:  Were you asking about the
7  time of the memo?  Is that what you were
8  asking?
9      MS. FREIWALD:  Yes.
10     MR. LOCKLAR:  Sorry.
11     A.   So recommendations for regulatory action
12 at that point were that they needed more data
13 particularly from the ADVANTAGE study.
14     Q.   And, in fact, the FDA had told Merck that
15 it wouldn't make a labeling change to incorporate
16 the results of the VIGOR study until it had the data
17 from ADVANTAGE, correct?
18     MR. LOCKLAR:  Object to the form.
19     A.   Correct.
20     Q.   And --
21     A.   But also note that they were -- they were
22 upset about not having received the ADVANTAGE data.
23     Q.   Where does it say that?
24     A.   Well, the study was completed in March of
25 2000, but they have not submitted the report to the

33 (Pages 126 to 129)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 130

1  FDA.
2     Q.   Okay.  And so they were waiting to get the
3  results of the ADVANTAGE data before they would let
4  Merck change the label for VIGOR, correct?
5        MR. LOCKLAR:  Object to the form.
6     A.   They requested specifically -- the FDA to,
7  quote, Medical reviewers have requested that the
8  complete report of study 102 be submitted for
9  review.
10    Q.   And on page three which is the first page
11  of text, under that recommendation paragraph it
12  says, The applicant should be informed that labeling
13  changes could not be made until review of safety
14  database from the ADVANTAGE study is complete,
15  correct?
16    A.   It does say that.
17    Q.   And it doesn't say in here that the belief
18  that Merck had that naproxen explained the results
19  of VIGOR was untenable or wrong, does it?
20        MR. LOCKLAR:  Object to the form.
21    A.   Well, they say several issues are raised.
22  So to me that indicates that they're not 100 percent
23  behind the concept.
24    Q.   Okay.  So there's a question about it,
25  correct?

Page 131

1     A.   They question the Naprosyn hypothesis in
2  this specific letter.
3     Q.   And they're aware at the time that the
4  alternative explanation is that there's an increased
5  risk of Vioxx in terms of causing heart attacks,
6  correct?
7     A.   The composite inference I'll agree with.
8     Q.   You don't feel comfortable saying that you
9  can talk about VIGOR for the MI risk alone?  You
10  won't talk about VIGOR for the composite endpoints?
11        MR. LOCKLAR:  Object to the form.
12    A.   I'm happy to talk about VIGOR and the
13  myocardial risk, but I don't want to mix apples with
14  oranges.  So I just want to be very pristine about
15  which outcomes I'm defining.
16    Q.   So let me just make sure I understand
17  this.  Do you agree with me that at the time of
18  Dr. Villalba's review in June of 2000 she was
19  expressing that Naprosyn had been proposed as one
20  explanation for the disparity in the rate of MI in
21  the VIGOR study, but the FDA was also aware that
22  another explanation might be that there was an
23  effect being caused by Vioxx?
24        MR. LOCKLAR:  Object to the form.
25    A.   In fact, her point B suggests that there

Page 132

1  is an effect.  And actually her review date is not
2  June 29th.  That was the submission date.  It was
3  March --
4     Q.   It's March 30, 2001.  Sorry.  I was
5  reading the top date.  Fair enough.
6        So the FDA had reviewed the VIGOR data,
7  concluded that there were -- there was more than one
8  possible interpretation of the VIGOR data, correct?
9        MR. LOCKLAR:  Object to the form.
10    A.   More than -- correct.
11    Q.   Okay.
12    A.   But there was consistency evidence in the
13  other studies, and they wanted the ADVANTAGE study
14  before making a label change.
15    Q.   Okay.
16        MS. FREIWALD:  We need to change the tape.
17        THE VIDEOGRAPHER:  This is the end of Tape
18  Number Three in the continued deposition of
19  Donna Arnett to be continued on Tape Number
20  Four.  We're off the record at 12:22.
21        (Off the record.)
22        THE VIDEOGRAPHER:  This is the beginning
23  of Tape Number Four in the continued deposition
24  of Donna Arnett.  We're on the record at 1:01.
25  BY MS. FREIWALD:

Page 133

1     Q.   Doctor, you told me earlier this morning
2  that another FDA document you have reviewed was the
3  FDA briefing package from February of '01.
4     A.   Let me confirm the date, but I believe I
5  said that.
6     Q.   Does your document have a Bates number at
7  the bottom?  Not the P number that you have, But
8  there should be a MRK number on it as well.
9     A.   Yes, it is MRK ABX000, and it looks like
10  something may have been cut off.  I don't know if
11  it's more than three zeros.
12    Q.   Can you turn to the next page.  There
13  should be something that has --
14    A.   It looks like it's just ABX000.
15    Q.   No, there's some other numbers there.
16  There would have to be some kind of -- some kind of
17  an actual number.  The zeros are just placeholders,
18  but your copy may be cut off.
19    A.   I have nothing more than zeros.
20        MR. LOCKLAR:  Yeah, it's cut off in the
21  margin.
22    Q.   It doesn't matter.  You're talking about
23  the February 8, 2001 FDA advisory review document,
24  correct?
25    A.   This is the review of the cardiovascular

34 (Pages 130 to 133)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 134

1 safety update database dated February 1, 2001 from
2 Shari Targum.
3    Q.   Can you tell me what in that document you
4 are relying on?
5    A.   Most of the document. It's a composite of
6 the cardiovascular safety profile to that date.
7    Q.   And are you using anything in that
8 document to prove or to support any specific
9 assertion you're making?
10    A.   I'll use this document to discuss study
11 085 and 090 and the aggregate data.
12    Q.   What do you mean by the aggregate data?
13    A.   Well, it's presented in -- the beginning
14 is about the VIGOR. But there are more tables in
15 this report than just simply in VIGOR alone.
16    Q.   This document is primarily relevant to you
17 because of the discussion of 085 and 090?
18    A.   In addition to 085 and 090, which are
19 relevant, there is also more description about
20 the -- more detailed descriptions that aren't
21 present in the VIGOR publication about the increase
22 in hypertension and edema and the increase in
23 congestive heart failure adverse events with the
24 rofecoxib group. It's page ten.
25    Q.   And what about 085 and 090 are you relying

Page 135

1 on from this document?
2    A.   The subgroup analyses performed relative
3 to -- this is -- you asked me specifically about
4 085. And I have -- so I'm relying on the
5 description of the study design, the results of 085,
6 and the description of the study population and the
7 clinical adverse event summary.
8    Q.   So the FDA had the data set for 090 and
9 085 at the time of this report, correct?
10    A.   I -- there are data from 085 and 090. I
11 don't know if it reflects the clean finalized data
12 set or not.
13    Q.   There's a discussion by the FDA as to the
14 results of 090 and 085, correct?
15    A.   So far I have lots of tables. I haven't
16 gotten to the discussion.
17        There's a description of 085. There are
18 results in summary form. There are discussions of
19 who has completed the study, who were randomized,
20 and who had adverse events.
21    Q.   You agree that the FDA was aware of the
22 results of the 085 and 090 at the time of this
23 report?
24        MR. LOCKLAR: Object to the form.
25    A.   Well, I can see now it doesn't jump out at

Page 136

1 you like the VIGOR results do. You have to go
2 hunting for it. So I'm not sure how -- the level of
3 detail about VIGOR in this report is much more
4 detailed than 085 and 090.
5    Q.   085 and 090 were smaller studies, correct?
6        MR. LOCKLAR: Smaller than?
7        MS. FREIWALD: VIGOR.
8    A.   They were smaller than VIGOR.
9    Q.   And they showed no statistically
10 significant increased risk in heart attack with
11 Vioxx compared to the comparators?
12    A.   090 showed a 4.4 percent incidence of
13 cardiovascular events versus 2 percent.
14    Q.   And it was not statistically significant?
15    A.   It was inadequately powered to detect
16 statistical significance. There were only 390
17 subjects randomized to Vioxx and 392 to nabumetone
18 and 196 to --
19    Q.   Have you done a power calculation for 090?
20    A.   I have not. But I can tell you with the
21 relative risk estimate and the number randomized it
22 would be in close proximity to the other OA studies
23 I presented earlier.
24    Q.   If you use the same method that you used
25 earlier?

Page 137

1    A.   Uh-huh. And it's an appropriate method
2 that I used earlier.
3    Q.   Okay. The -- but if you did the math the
4 same way that you did it earlier, you think you'd
5 get a similar result, but putting aside whether they
6 were adequately powered or not, the fact is they did
7 not show a statistically significant increased risk;
8 correct?
9    A.   Correct. But they weren't powered to show
10 it so it's --
11    Q.   Do you agree that when you have a study
12 that isn't powered to show a result and doesn't show
13 a result, it is improper to then draw from that
14 study the conclusion that with more power the result
15 would prove to be statistically significant?
16        MR. LOCKLAR: Object to the form.
17    A.   I can't agree to that. What I can say is
18 assuming the power for this study is comparable to
19 the others, which is about a 10 percent at best, a
20 10 percent shot of getting it right. You know, they
21 only had one in ten chances of finding the true
22 answer of excess risks.
23    Q.   Doctor, I want to be sure that you're
24 saying what I think you're saying because it
25 surprises me. Are you saying that you disagree with

35 (Pages 134 to 137)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 138

1  the statement as a scientist that if a study fails
2  to show a result it is improper to, nevertheless,
3  make the conclusion that had the study had more
4  power, you would have seen a statistically
5  significant result?
6      MR. LOCKLAR: Object to the form.
7    A.   Power and statistical significance are
8  interrelated concepts. So as you increase power,
9  assuming the same alpha level, you would expect to
10 see a true finding if it exists.
11   Q.   If it exists. But you can't assume that
12 it exists from the lack of proof one way or another?
13   A.   But the totality of data to date before
14 that show that there's an excess in the
15 cardiovascular events --
16   Q.   Doctor, you keep relying --
17   A.   -- within that study -- let me finish.
18   Q.   You keep relying on the totality of the
19 data. But the totality of the data is just other
20 studies that don't prove your point. They're just
21 other studies that fail to show a result.
22      MR. LOCKLAR: Object to the form.
23   Q.   So if I have -- if I have one study that
24 doesn't show a result and another study that doesn't
25 show a result and another study that doesn't show a

Page 139

1  result, I understand that one might argue that you
2  may have a hypothesis that more data would show the
3  result, but you're not really telling me that you
4  can use that lack of evidence as proof that the
5  evidence is really there, are you?
6    A.   May I answer now?
7    Q.   Sure.
8    A.   You have the VIGOR finding. You have 14
9  events in 090, a numerical increase in 090, that's
10 consistent with the VIGOR finding. You have the
11 totality of that evidence to date.
12   Q.   You mean the totality being two studies,
13 one against a comparator that might be
14 cardioprotective and one that's not statistically
15 significant?
16      MR. LOCKLAR: Object to the form.
17   A.   There's no evidence that -- presented that
18 I've seen that Naprosyn is cardioprotective.
19   Q.   Well, have you seen the FDA memo in 2005
20 that says that that's still a real question that
21 Naprosyn might be cardioprotective?
22      MR. LOCKLAR: Object to the form.
23   A.   I've seen the observational studies and
24 the ADAPT study that I presented to you that show an
25 excess risk for Naprosyn on cardiovascular disease.

Page 140

1    Q.   Has anybody shown you or have you found
2  for yourself the ones that show that there is a
3  decreased risk with Naprosyn?
4      MR. LOCKLAR: Object to the form.
5    Q.   And some of those -- have you seen those?
6    A.   In the meta-analyses of observational
7  studies there's either no effect of Naprosyn or a
8  slightly protective effect.
9    Q.   Okay.
10   A.   On the order of 10 percent.
11   Q.   And do you know if in those studies the
12 patients were being dosed with Naprosyn the way they
13 were being dosed in the VIGOR studies, 500
14 milligrams twice a day?
15   A.   It was a meta-analysis. And I have not
16 reviewed, but I will, individual levels of drugs. I
17 know I've reviewed it, but I've reviewed hundreds of
18 documents.
19   Q.   Do you know if that makes a difference
20 with Naprosyn?
21   A.   I do not know. I have not studied the
22 Naprosyn --
23   Q.   Do you know what the -- whether the
24 platelet inhibition with Naprosyn is permanent or
25 whether it has a -- is a temporary platelet

Page 141

1  inhibition?
2    A.   As I just answered, I haven't studied
3  Naprosyn.
4    Q.   Okay.
5    A.   But I didn't really get to finish my
6  answer about --
7    Q.   Well, we'll get back to 090. But I -- but
8  I really want to know whether you're prepared to say
9  as a scientist that when you have a study that
10 doesn't show a result you can stand up and say -- or
11 that you would stand up and say in front of peers,
12 in a written publication, in a symposium that even
13 in the absence of evidence of the result, you can
14 conclude that the result would be there?
15      MR. LOCKLAR: Object to the form of the
16     question.
17   A.   In using the totality of evidence as an
18 epidemiologist, I would look for consistency of
19 findings of that study. I would look at its
20 statistical power to detect such an effect. And
21 given the results that I know from VIGOR and seeing
22 a two-fold excess risk of cardiovascular events in
23 090, that's numerically higher in -- opposed to
24 Vioxx. I mean, 17 events in Vioxx versus eight in
25 nabumetone. But I would say that's very consistent

Donna Arnett, Ph.D.

Page 142

1 data with VIGOR.
2    Q.   And have you had the experience as an
3 epidemiologist of studies showing numerical
4 disparities and then that proving to be not a real
5 result?
6    A.   I'm sure you could point me to such
7 studies.
8    Q.   And --
9    A.   But that's not the issue here.
10    Q.   Well -- and have you ever as an
11 epidemiologist in any grant you've submitted, in any
12 paper you've written, in any course you've taught,
13 in any lecture you've given, in anything where your
14 professional reputation is on the line, have you
15 ever said this study or these series of studies have
16 not shown a statistically significant result, yet I
17 am prepared to conclude to a reasonable degree of
18 expert certainty that the result is there?
19        MR. LOCKLAR:  Object to the form.
20    A.   I would as a scientist be able to say
21 that.
22    Q.   When?
23    A.   Because when you have consistency of
24 evidence from other studies, when you have a numeric
25 increase consistent with the direction of the effect

Page 143

1 from prior studies.
2    Q.   Have you ever said that as a scientist in
3 your whole career, ever said I've got repeated
4 studies that don't show a result, small numbers,
5 that are 8 and 10, there are 3 and 8.  They're
6 whatever they are, and they don't show a result.
7 The studies weren't powered, weren't designed to
8 show the result, but yet I'm prepared to stake my
9 reputation that the result is there without needing
10 anymore data, without needing any follow-up studies?
11        MR. LOCKLAR:  Object to the form of the
12 question.
13    A.   In the absence of VIGOR and that
14 significant finding, in the absence of APPROVe and
15 that significant finding, I would agree with you.
16 But here we have a totality of data suggesting that
17 the cardiovascular risks are definitely present for
18 Vioxx, and then you have the committee that
19 overwhelmingly called it cardiotoxic.
20    Q.   So you can -- I'm going to move to strike
21 because I don't think anywhere does it say
22 cardiotoxic.  But does -- so you can backtrack from
23 APPROVe to say that these earlier studies really
24 would have shown the result had they been
25 differently designed, differently powered, gone

Page 144

1 longer, had more patients?
2    A.   You're asking me today how I would act.
3    Q.   I'm asking you is that an appropriate
4 thing to do, to backtrack from the results of
5 APPROVe to say that these earlier studies, had they
6 been differently powered, would have shown a result?
7    A.   Yes, you could.
8    Q.   And have you ever done that before where
9 you've used one clinical study to say that that
10 proves that earlier studies that didn't show the
11 result should have, would have?
12        MR. LOCKLAR:  Object to the form.
13    A.   I've not conducted such grossly
14 underpowered studies in my practice as an
15 epidemiologist so I -- I've never had the occasion
16 to need to.
17    Q.   Have you ever made that conclusion of
18 other studies that are out there?  I mean, have you
19 ever drawn a conclusion from the existence of one
20 placebo-controlled study and said that proves that
21 the earlier studies which didn't show the result
22 would have as opposed to, for example, saying, well,
23 this one placebo-controlled study now furthers our
24 hypothesis and we still need to do further studies
25 and other adequately powered placebo-controlled or

Page 145

1 comparable studies?
2        MR. LOCKLAR:  Object to the form.
3    A.   I would say with the presence of the data
4 from 085 and 090 coupled with VIGOR that there was
5 compelling evidence for the cardiovascular toxicity
6 of Vioxx.
7    Q.   What from 085?
8    A.   There was an increase in cardiovascular --
9 this is from the Targum memo on page 28.  There's
10 evidence of an increase in cardiovascular disease.
11 Let me specifically state the evidence for my
12 opinion.
13        Because this is the comment by the
14 reviewer from the FDA, quote, Because of the smaller
15 sample size and event rates the study of this -- of
16 this -- the results, pardon me -- of this study do
17 not convince this reviewer that there is no safety
18 issue with rofecoxib.
19    Q.   Okay.  Well, there's a difference between
20 not proving the negative and using a study that
21 doesn't prove the negative to say that it's proof of
22 the positive.
23        MR. LOCKLAR:  Object to the form.
24    Q.   Isn't there?
25    A.   When safety is an issue -- again, safety

37 (Pages 142 to 145)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 146

1  is about signals. And we see signals consistently.
2  It's not about statistical significance.
3      Q.  Well, it's about having -- you don't
4  change your rules? I mean, epidemiologists use
5  rules, don't they, have --
6      A.  Safety and public health protection, there
7  is a difference.
8      Q.  Doctor, you tell --
9          MR. LOCKLAR: She's trying to answer the
10  question.
11     Q.  Go on. Go on.
12     A.  It's a different approach. If you have a
13  drug that is causing cardiovascular disease events
14  in a population and there are other drugs that could
15  be used to treat the population, there is a public
16  health relevant reason to look for these signals.
17     Q.  Okay. But you're putting the rabbit in
18  the hat, Doctor. If you have a drug that causes the
19  event, you can't use your hypothesis as its only
20  proof, can you? I mean, you have a hypothesis that
21  the drug causes the event, and you're trying to use
22  the fact that the question has been raised as the
23  answer to the question itself.
24         MR. LOCKLAR: Object to the form.
25  Compound question, argumentative, asked and

Page 147

1  answered.
2      A.  I've answered.
3      Q.  Well, isn't that true? Isn't that what
4  you're doing? You're using the question as its own
5  answer?
6          MR. LOCKLAR: Object to the form.
7      A.  I'm using that totality. You have 023
8  showing that effect. You've got --
9      Q.  Not of the heart attack effect. We've
10  been through this, Doctor. 023 shows a metabolite
11  change and you can't tell me where. So you then
12  have a study that doesn't show a result. And I
13  understand that you've just read language that says,
14  I'll paraphrase, I can't use this study to prove
15  that there is an absence of a possible adverse
16  effect, right? That's what he says. That's what
17  the reviewer says there.
18         MR. LOCKLAR: Object to the form.
19     Q.  You can't prove the negative with 085?
20         MR. LOCKLAR: Object to the form of the
21  question.
22     Q.  Right, that's what it says?
23     A.  I can't say that --
24     Q.  Isn't that -- just answer my question.
25  Isn't that right? That's what the statement that

Page 148

1  you read is saying to me.
2      A.  The reviewer was saying that because of
3  the sample size he can't say that there isn't an
4  adverse effect, but there were 21 -- 24 in the Vioxx
5  group that discontinued versus eight in the placebo
6  group due to an adverse effect. And serious adverse
7  events were four in the rofecoxib versus one in the
8  placebo group.
9      Q.  Nowhere does the reviewer say that you can
10  use the findings to prove that there is a real
11  adverse effect?
12         MR. LOCKLAR: Object to the form of the
13  question. Asked and answered. The document
14  speaks for itself.
15     Q.  The reviewer never says that?
16         MR. LOCKLAR: Object to the form.
17     A.  The study is too small, which was my
18  earlier point about all of the Vioxx studies.
19     Q.  And as a general matter as a
20  epidemiologist do you usually want to see more than
21  one statistically significant controlled clinical
22  trial before you say that there's cause and effect?
23     A.  For a primary outcome or for a safety
24  outcome?
25     Q.  Well, a safety outcome can be a primary

Page 149

1  outcome.
2      A.  It was never a primary outcome in any
3  Vioxx study for cardiovascular disease.
4      Q.  Are you saying that the 203, the naproxen
5  trial, it wasn't a primary outcome for CV risk?
6      A.  It was not. There was a protocol put
7  together to analyze that.
8      Q.  And there was a -- and it was an inherent
9  part of the study design to look for a
10  cardiovascular safety signal, correct?
11     A.  In 203?
12     Q.  Yes.
13     A.  They had a secondary aim of looking at the
14  cardiovascular --
15     Q.  And primary and secondary makes no
16  difference. It was a predetermined endpoint.
17     A.  It makes a huge difference.
18     Q.  Why?
19     A.  First of all, safety.
20     Q.  No, why does it make a difference in terms
21  of generating accurate results? It doesn't?
22         MR. LOCKLAR: She's trying to answer your
23  question.
24     Q.  That's my question.
25     A.  Because you're focusing your entire

38 (Pages 146 to 149)

Donna Arnett, Ph.D.

## Page 150

1   argument in this case on statistical significance.
2   And there are a priori rules if you're going to
3   abide by them about primary and secondary hypotheses
4   in accompanying corrections for p-values.
5       Q.   Is there any rule that you're going to
6   point me to that says for a secondary outcome you
7   don't need statistical significance?
8           MR. LOCKLAR:  Object to the form.
9       Statistical significance for what?
10      A.   Statistical significance for what?
11      Q.   For the safety outcome.  You know what I
12  mean.
13      A.   No, safety outcome is a different --
14      Q.   Doctor --
15      A.   -- different -- cardiovascular disease was
16  a safety concern.
17      Q.   Doctor, you said to me -- to kind of recap
18  where I think we are, you said to me there's a big
19  difference between secondary and primary.  And I
20  said not in terms of the accuracy of the data.  And
21  you said, I'm paraphrasing, yes, there are rules.
22  And I said to you are you going to tell me --
23          This is my question now:  Are you going to
24  tell me that there are different statistical rules
25  that are written in some textbook of epidemiology or

## Page 151

1   some guidance that you can point me to that say that
2   for a secondary safety outcome you don't need to see
3   a statistically significant result?
4           MR. LOCKLAR:  Object to the form of the
5       question.
6       A.   I probably could find rules for that.  I
7   could probably find something for safety.  I haven't
8   gone into textbooks and identified a priori.  But
9   safety issues are a very different concern than
10  efficacy outcomes.
11      Q.   I'm not asking about it from a policy
12  standpoint.  I'm asking about it from a science
13  standpoint.
14      A.   As a science standpoint.
15      Q.   Sitting here today you can't point me to
16  anything that says you don't need statistical
17  significance to prove or disprove a safety concern?
18      A.   Statistical significance is one component
19  when evaluating the overall value of a study.  If a
20  study is not statistically significant but has a 1
21  in 20 chance of finding a statistically significant
22  finding and truthful finding, if it exists, then you
23  could claim statistical insignificance all day.  I
24  could care less.
25      Q.   Well, isn't that the -- is it the Type One

## Page 152

1   or the Type Two error where you assumed that its
2   effect is real and it's not, and you're in a big
3   band of likely to get it wrong?  Which one is that,
4   Type One or Type Two?
5       A.   That's Type One.
6       Q.   And for safety findings you worry about
7   Type One errors, right?  Just as much for any other
8   kind of epi work you worry about a Type One error?
9       A.   No.  Actually you worry about a Type Two
10  error.
11      Q.   You worry about both?
12      A.   You mostly worry about a Type Two error.
13  Because if the finding is truthfully real and you
14  miss it, that's important.
15      Q.   Doctor, I'm not asking from a policy
16  standpoint because I'm assuming you're not here to
17  testify about what the FDA regulations should have
18  been or how they should have been changed.  But I'm
19  asking you from an epidemiologic standpoint.  You
20  worry about Type One and Type Two errors when you're
21  standing up and you're saying I can tell you that
22  this drug causes this effect.
23      A.   If I were to approach this problem from a
24  Bayesian statistical perspective, I could quantify
25  the prior probability of the cardiovascular risk

## Page 153

1   from 090 into VIGOR and weigh the evidence based on
2   prior evidence.  There are statistical methods to do
3   that.  These clinical trials are all using the
4   frequentist perspective which is what you are
5   focusing on today.
6           But, no, there -- epidemiologists and
7   biostatisticians use prior evidence to support
8   claims about causation.
9       Q.   That wasn't my question.
10          MS. FREIWALD:  Can you read back my
11      question.
12          (Requested portion read.)
13      Q.   That's my question.  It's you have to use
14  statistical significance.  You have to be aware of
15  Type One and Type Two errors when you're saying that
16  any findings, whether it's a safety or an efficacy
17  finding, is real.
18          MR. LOCKLAR:  Object to the form.
19      A.   I answered the question.  I didn't answer
20  it in a simplistic layperson's terms.
21      Q.   Maybe I didn't understand it.
22      A.   There are two major approaches to
23  inference.  There's a Bayesian approach where you
24  evaluate prior probabilities.  And there's a
25  frequentist approach where you look at p-values from

Donna Arnett, Ph.D.

Page 154

1  statistical tests. And I'm saying that both are
2  valid methods and both utilized in the practice of
3  epidemiology.
4      Q.   So you're saying based upon APPROVe you
5  could give a calculation of what the probability is
6  that 090 or 085 would have shown a statistically
7  significant result had it been a different kind of
8  study?
9          MR. LOCKLAR: Object to the form.
10     A.   You can build in a prior probability. And
11 actually APPROVe you can -- it's working backwards.
12     Q.   The only way to test that hypothesis is to
13 do another study, right?
14     A.   I don't understand your question.
15     Q.   The only way to prove whether your
16 hypothesis about what the earlier study would have
17 shown is, is to do yet another study, another longer
18 study to see whether the results were real or not?
19     A.   I wouldn't say that because as a
20 epidemiologist the data were convincing that there
21 was a cardiovascular signal.
22     Q.   At what point, Doctor?
23     A.   After 023 and 090.
24     Q.   After 023 and 090. Okay. So you would
25 stake your professional reputation that there was a

Page 155

1  cardiovascular signal with Vioxx based upon a
2  mechanism study that showed a reduction in
3  prostacyclin metabolism from someplace in the body,
4  you don't know where, and a study in -- that you say
5  was not adequately powered and didn't show a
6  statistically significant increased risk in heart
7  attacks?
8          MR. LOCKLAR: Object to the form of the
9  question.
10     A.   It showed 17 cardiovascular events versus
11 eight, and then the nabumetone group versus six in
12 the placebo group that's a signal on top of a
13 biologically meaning hypothesis with a finding that
14 supported it. And then you go on to VIGOR where you
15 have a five-fold excess risk of myocardial --
16     Q.   I just want to stick with -- because you
17 said that there was evidence that you would stake
18 your professional reputation on.
19         MR. LOCKLAR: Object.
20     Q.   That Vioxx caused heart attacks based on
21 just 023 and 090?
22         MR. LOCKLAR: Object to the form of the
23 question.
24     Q.   So I want to spend some time on that
25 because you told me last time we talked that you

Page 156

1  weren't sure you could say that diabetes caused
2  heart attacks.
3          MR. LOCKLAR: Object to the form.
4      Q.   So with a safety issue like whether
5  diabetes causes heart attacks that's been looked at
6  in hundreds of thousands of patients, right?
7      A.   I'm not sure that there are hundred
8  thousands of patients, but I'll say there are
9  thousands of patients.
10     Q.   Okay. And multiple studies have looked at
11 diabetes as a risk for heart attack, right?
12         MR. LOCKLAR: Object to the form.
13     A.   I wouldn't say multiple. There are some.
14     Q.   Long epidemiologic studies going out years
15 and years, right?
16     A.   That were recruited specifically among
17 diabetics?
18     Q.   No, looking at population, Framingham
19 data.
20         MR. LOCKLAR: Object to the form.
21     A.   There are Framingham data that show
22 diabetes is a risk factor.
23     Q.   Okay. You wouldn't dispute with me that
24 there's a lot more evidence about diabetes as a risk
25 for heart attack than there was for VIGOR at the

Page 157

1  time of 023 and 090?
2      A.   For VIGOR?
3      Q.   For Vioxx at the time of 023 and 090.
4          MR. LOCKLAR: Excuse me, I didn't mean to
5  talk over you. Object to the form of the
6  question.
7      A.   There was a red flag. When VIGOR came
8  out, that was confirmatory.
9      Q.   So there was a -- you're now not saying
10 you're going to stake your professional reputation
11 on 023 and 090 proving that Vioxx causes heart
12 attack. You're now saying those two studies were a
13 red flag?
14         MR. LOCKLAR: Object to the form of the
15 question. Argumentative. Asked and answered.
16     A.   A red flag.
17     Q.   Okay. And you agree with me that there's
18 a lot more evidence with diabetes than there was
19 with Vioxx at the time of 023 and 090, and you
20 wouldn't tell me that diabetes is actually even a
21 cause of heart attacks, right?
22         MR. LOCKLAR: Object to the form.
23     A.   This is my only second deposition. I
24 don't know that that deposition -- you've asked me
25 nothing about that deposition. I don't know how

40 (Pages 154 to 157)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 158

1  that fits into the Dedrick case.
2      Q.   Well, are you prepared to say that
3  diabetes is a cause of heart attacks?  You told me
4  it was -- that was my recollection.  But if you're
5  -- if that's not your opinion, tell me it's not your
6  opinion.
7      A.   It is my opinion that in an observational
8  study, and my prior deposition stated this, that
9  defining cause and effect is harder.  In clinical
10  trials where you give a drug, you establish
11  temporality and you establish that the exposure
12  happens.  That to me is a very different mode of
13  causal inference than the observational studies.
14      Q.   Well, 023 wasn't a clinical trial to look
15  at an outcome.  It was a mechanism study.  We've
16  already established that, right?
17      A.   Done in a clinical trial.
18      Q.   It was a mechanism study, Doctor, right?
19  You can't say that 023 shows heart attacks.
20      A.   It wasn't designed to show heart attacks.
21      Q.   And nor are most mechanism studies
22  designed to show clinical effects?  They're
23  mechanism studies?
24          MR. LOCKLAR:  Object to the form.
25      A.   In epidemiology we don't quantify these

Page 159

1  kind of mechanism studies.
2      Q.   You don't do them, right?
3      A.   Actually some of us do them.  I have one
4  on influenza and C-reactive protein and looking at
5  the influenza vaccine on CRP.  So, yes, I've looked
6  at mechanisms in clinical settings.
7      Q.   Okay.  What's the study that you've looked
8  at?
9      A.   It's in my CV.  It's effect of taking an
10  influenza vaccine on measures of inflammation
11  defining the time duration of the inflammatory
12  response.
13      Q.   And it didn't look for a clinical outcome?
14      A.   It all depends if you define CRP and I06
15  [phonetic] as a clinical outcome.
16      Q.   Well, are you aware that the FDA talks
17  about outcome studies and studies that are not
18  outcome studies that are just designed to show
19  biologic changes?
20      A.   Yes, I would agree with that.
21      Q.   And you're aware, for example, there had
22  been hundreds of trials on statins that show
23  reduction in cholesterol parameters, but statin
24  manufacturers haven't been allowed to make claims
25  that they actually reduce the risk of heart attack

Page 160

1  or other events without doing the outcome study,
2  correct?
3      A.   I won't comment on statin trials.  I've
4  not reviewed them.
5      Q.   Okay.  Are you familiar with that concept,
6  though, that in good science you may not be allowed
7  to make a claim about an outcome just by virtue of
8  effecting a biological parameter?
9      A.   I don't -- I would not agree with the good
10  science.
11      Q.   Are you aware that that's -- that the FDA
12  has not let, for example, statin manufacturers make
13  claims about a proved outcome based upon just
14  changing lipid levels?
15      A.   I've already answered I haven't evaluated
16  the statin literature.
17      Q.   So let's go back to diabetes.  Are you
18  prepared to say that diabetes causes heart attacks
19  or not?
20      A.   I'm prepared to say that diabetes is a
21  risk factor for heart attack.
22      Q.   But with the amount of data that exists
23  for diabetes you won't say it causes heart attacks.
24  But you will say -- are you saying that Vioxx is a
25  risk factor for heart attacks or that it causes

Page 161

1  heart attacks?
2      A.   I say that it cause -- it's a causal
3  factor because of the temporality of evidence and
4  consistency of evidence across studies and the fact
5  that the review panel voted unanimously.
6      Q.   And is it because -- you agree that
7  there's way more data out there for diabetes than
8  there is for Vioxx?
9          MR. LOCKLAR:  Object to the form.
10      A.   I would not agree with that.  I agree that
11  there's different data for diabetes.
12      Q.   You agree that diabetes had been studied
13  for many, many more years?
14      A.   I would agree that diabetes as a risk
15  factor for cardiovascular disease has been studied
16  for a number of years.
17      Q.   Many more years than the COX-2s have been
18  around?
19          MR. LOCKLAR:  Object to the form.
20      A.   I don't see the relevance.
21      Q.   Can you answer the question truthfully
22  whether you know why I'm asking it or not?
23      A.   There are different study designs and so a
24  clinical trial --
25      Q.   Doctor, it's just a question of do you

41 (Pages 158 to 161)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 162

1  know or would you agree with me that diabetes has
2  been studied for years before COX-2s were even
3  available?
4     A.   I wish you wouldn't interrupt me.
5     Q.   Well, I just need my question answered and
6  I'm getting speeches. It's a simple question. Yes
7  or no. Are you aware that diabetes has been
8  answered -- has been studied since way before COX-2s
9  were available?
10       MR. LOCKLAR: Object to the form.
11    A.   I will agree with that.
12    Q.   Okay.
13    A.   But I would put the caveat in that we
14  don't randomize people to getting diabetes or
15  inducing diabetes in them. So the causal inference
16  is different for diabetes as a risk factor than it
17  is for Vioxx as a risk factor.
18    Q.   Are you saying there are no controlled
19  clinical trials looking at the development of
20  diabetes or looking at the correlation between
21  diabetes and heart attack?
22    A.   There are ongoing studies now with type II
23  diabetes evaluating interventions and the long-term
24  risk of cardiovascular disease.
25    Q.   It's been studied in controlled clinical

Page 163

1  trials, hasn't it?
2     A.   No, it's only recently.
3     Q.   There are data out there of controlled
4  clinical trials looking at interventions for
5  diabetes, looking at the correlation between
6  developing diabetes and heart attacks, correct?
7        MR. LOCKLAR: Object to the form.
8     A.   Only for type I diabetes. For type II
9  diabetes the ACCORD study is now being conducted to
10  evaluate intensive risk factor modification in
11  diabetics and its impact on cardiovascular disease.
12    Q.   Are you -- would you agree with me that
13  there's a lot more data out there for lipids and
14  hypertension than there is for Vioxx?
15    A.   Yes.
16    Q.   Are you prepared to call cholesterol
17  elevation causally related to heart attack, or are
18  you just prepared to say that it's a risk factor?
19    A.   Again, I'm not sure how much of my last
20  deposition is relevant here but -- in my last
21  deposition we discussed that there have been
22  clinical trials that lower cholesterol that show a
23  reduction in cardiovascular events. So I claimed
24  that it was a causal relationship based on that
25  observation.

Page 164

1     Q.   And hypertension you called causal?
2     A.   Yes.
3     Q.   And smoking you weren't sure if that was
4  causal or not?
5     A.   It didn't -- it didn't meet my criterion
6  of being an experimentally-induced risk factor.
7     Q.   So you would be comfortable saying that
8  Vioxx, based upon one placebo controlled study and
9  one study against the naproxen comparator and some
10  other studies that didn't show statistically
11  significant risk, is causal for heart attacks. But
12  you're not yet sure if you can say that smoking is
13  causal for heart attacks?
14       MR. LOCKLAR: Object to the form.
15    A.   It's not simply two studies, one placebo
16  controlled and one naproxen. It's the totality of
17  the studies done with Vioxx and the cardiovascular
18  sequelae of taking Vioxx.
19    Q.   But you're prepared to say Vioxx is causal
20  and not smoking is causal?
21    A.   What I said specifically is that
22  biological factors that have -- or treatments where
23  you have an intervention and you show temporality
24  clearly before and after exposure are the strongest
25  evidence base for defining causation.

Page 165

1     Q.   And you're not sure you can get there with
2  smoking?
3     A.   I'm not going to randomize anyone to
4  smoking.
5     Q.   Okay. So you're not prepared to say that
6  with smoking?
7        MR. LOCKLAR: Object to the form.
8     A.   Not to the same level.
9     Q.   And the totality of the evidence with
10  Vioxx is APPROVe, VIGOR, the mechanism study 023,
11  and then you put in several studies that don't show
12  a statistically significant result and you say we
13  are not powered to show a statistically significant
14  result, right?
15       MR. LOCKLAR: Object to the form. I think
16  -- object to the form.
17    A.   085, 090, ADVANTAGE. Yes.
18    Q.   Okay. I thought you --
19    A.   And I --
20    Q.   Go on.
21    A.   I'm not saying this in isolation. The FDA
22  panel that reviewed the evidence agreed unanimously
23  32 to zero with that opinion.
24    Q.   We'll get back to that. I thought you
25  told me that you had, in addition to the February

42 (Pages 162 to 165)

55a210ee-308b-4267-ba95-cd6434e81231

# Donna Arnett, Ph.D.

## Page 166

1  '01 Targum memo, looked at the FDA advisory
2  committee briefing document from February '01.
3  Something that looks like this. Do you have that in
4  your package?
5      A.   February 8th 2001?
6      Q.   You got it.
7      A.   I have it.
8      Q.   I want to ask you basically the same
9  questions as before. Is there any -- tell me what
10  in this document you're relying on.
11      A.   This is a longer one. So pardon me. In
12  the summary statement of recommendations -- let me
13  recall the recommendations to be precise. In the
14  background of the documents the FDA states concerns
15  with cardiovascular safety. The data pertaining to
16  cardiovascular safety presented an aggregate
17  starting on page -- not an aggregate in terms of
18  combining of 085 and 090 with VIGOR. But there are
19  tables defining the serious adjudicated thrombotic
20  events in VIGOR. And the second appendix described
21  them in more detail.
22      Q.   Would you agree that -- I didn't mean to
23  cut you off. Are you finished?
24      A.   Yeah. I was just coughing.
25      Q.   Would you agree that in February of 2001

## Page 167

1  in preparation for the advisory committee hearing
2  the FDA rereviewed the existing data that was
3  available with regard to Vioxx including VIGOR and
4  earlier studies that we've discussed previously?
5          MR. LOCKLAR: Object to the form.
6      A.   Interestingly, though, I don't see tables
7  with 085 and 090. They may be here and I just
8  haven't -- don't have them.
9      Q.   And --
10      A.   I don't -- I don't have a complete list.
11  That's why I'm confused. There are pages here that
12  are missing on my copy.
13      Q.   Was your copy given to you by counsel or
14  did you pull it off the Internet?
15      A.   This one was given to me by counsel.
16      Q.   Have you reviewed -- I think you told me
17  the answer to this.
18          One of the documents we marked earlier was
19  the transcript -- I'm now not remembering --
20          MR. LOCKLAR: 2005.
21          MS. FREIWALD: 2005, that's what I
22  thought. This is not from 2001.
23  BY MS. FREIWALD:
24      Q.   Have you reviewed any of the transcript of
25  the 2001 advisory committee hearing?

## Page 168

1      A.   I may have reviewed it. It's not clear to
2  me now. I don't recall anything specific from it.
3  But I'll go back to my files and look.
4      Q.   Would you --
5      A.   But this is what I am basing my opinion
6  on.
7      Q.   Would you agree that in February of 2001
8  there was a discussion between Merck and the FDA and
9  including outside advisors at the advisory committee
10  hearing where the question of -- was asked what is
11  the appropriate interpretation of the VIGOR results?
12          MR. LOCKLAR: Object to the form.
13      A.   I don't have that so I can't comment on
14  it.
15      Q.   Are you aware that in 2001 at the advisory
16  committee hearing there was a debate about what
17  would be an appropriate warning with regard to the
18  labeling for Vioxx in light of VIGOR?
19      A.   Labeling is outside of my expertise. So
20  I'm going to restrict my testimony to epidemiologic
21  interpretation.
22      Q.   Without asking you to pass on the quality
23  of the label itself, all I want to know is if you
24  know that there was a debate about what the labeling
25  should be with regard to the VIGOR study?

## Page 169

1      A.   In fairness, I haven't focused any of my
2  readings on issues about labeling.
3      Q.   Fair enough. Are you aware that different
4  outside advisors in February of 2001 concluded that
5  one could not draw a conclusion from VIGOR with
6  regard to whether naproxen was cardioprotective or
7  Vioxx was creating a cardiovascular risk?
8          MR. LOCKLAR: Object to the form.
9      A.   I would want to read through the minutes
10  of that in order to make an informed opinion.
11      Q.   And you haven't done that. You're not
12  prepared to --
13      A.   I have not.
14      Q.   You're not prepared to answer that today?
15      A.   I am not today. But I'd like to reserve
16  the right to be able to look at it.
17      Q.   I'll leave that to the Court and the rules
18  for Judge Fallon. I just want to know what you're
19  prepared to testify to today and what you consider
20  to be part of your report. And as I understand it,
21  you don't consider that to be part of your report
22  today?
23      A.   Not today.
24      Q.   Have we covered the February 2001 advisory
25  committee meeting document?

Donna Arnett, Ph.D.

Page 170

1    A.   With the exception of anything that occurs
2  after page 26.
3    Q.   I suppose I can only ask you questions
4  about what you've looked at?
5    A.   Yes.
6    Q.   And if you don't have it, I can't ask you
7  --
8    A.   Unfortunately, it's the critical pieces of
9  085 and 090 on this one.  But they were in the
10  Shapiro analysis, I believe.
11    Q.   Doctor, there was some language in your
12  report where you talk about the FDA warning Merck.
13  It's on the third page from the back.  And it's the
14  bottom paragraph.  It begins, The FDA warned Merck
15  that -- and then you have one, two, three.
16    A.   Uh-huh.
17    Q.   What's your source for that?
18    A.   The FDA documents themselves.
19    Q.   Can you tell me where in the FDA documents
20  the FDA warned Merck that there was a cardiovascular
21  risk associated with Vioxx?
22    A.   From the Targum memo on page 37.
23    Q.   Which Targum memo?
24    A.   February 1st 2001.  Specifically it
25  states, It would be helpful if the sponsor could

Page 171

1  provide further cardiovascular safety data regarding
2  longer term, that is, greater than two months of
3  exposure of rofecoxib.
4    Q.   Is there any --
5    A.   And that's in the cardiovascular
6  recommendations.
7    Q.   Is there any other language that you're
8  characterizing as a warning to Merck that there was
9  a cardiovascular risk associated with Vioxx?
10    A.   The original NDA Villalba memo where there
11  was concern expressed because of the numerically
12  higher incidence.  So there's the Villalba memo from
13  the original NDA --
14    Q.   No.  There wasn't --
15    A.   -- stating concerns.
16    Q.   I'm sorry.  I didn't mean to cut you off.
17    A.   Stating that there was a concern about the
18  higher incidence of events.
19    Q.   Okay.  Well, a concern, would you give me,
20  is different from proof of a cardiovascular risk?
21    A.   In the original NDA there was concern.
22    Q.   So did you write your own report?
23    A.   Yes.
24    Q.   Did you have any assistance writing your
25  report from any of the lawyers?

Page 172

1    A.   I ran it by them after I wrote it.  I
2  basically abstracted from my deposition.
3    Q.   I just want to be clear on language.  You
4  say the FDA warned Merck that, one, there was a
5  cardiovascular risk associated with Vioxx.  So I'm
6  asking a really narrow question.  I'm not asking
7  about places where the FDA discussed a possible risk
8  or a question was raised or a hypothesis or a need
9  for more studies.  I want to know if there is a
10  place where you say the FDA warned Merck that there
11  was a cardiovascular risk?
12    A.   Well, as an epidemiologist throughout the
13  documentation from Villalba and Targum, to me that
14  was a warning.  If I had been a drug company, I
15  would have taken that as a warning that there were
16  concerns over the cardiovascular safety.
17    Q.   Concerns over cardiovascular safety and
18  questions raised is not the same thing as a
19  conclusion, right?
20    A.   I interpret warning a bit differently than
21  you do.
22    Q.   That's fine.  You tell me how you're using
23  warning and then we'll have our vocabulary
24  straight.
25    A.   Okay.  So we have an initial NDA where

Page 173

1  they're concerned about the excess cardiovascular
2  risk.  We have 085 and 090, both small studies, and
3  yet showing a numeric increased risk.  And then we
4  have VIGOR that comes out with a whopping five-fold
5  increased risk for myocardial infarction.  And we go
6  back to the FDA and there are people at the FDA
7  saying that there's concerns that there is this
8  excess risk that Naprosyn hypothesis is, in my
9  words, not salient explanation for that excess
10  risk.  And to me that's a warning.
11    Q.   There's nowhere in the documents you've
12  reviewed and are relying on where the FDA says at
13  any point before 2005 we've concluded that Vioxx
14  causes heart attacks?
15    MR. LOCKLAR:  Object to the form.
16    A.   What I -- now you're asking about 2005.
17    Q.   Well, really what I'm trying to do is take
18  you up there -- I'm not asking you about 2005.  I'm
19  trying to cover the time period before the 2005
20  advisory committee hearing so that we're not
21  throwing that into the mix.
22    A.   So in every FDA piece of documentation I
23  see there's concerns expressed about the excess
24  risk.  There's concerns expressed about not having
25  adequately powered studies to define the excess

44 (Pages 170 to 173)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 174

1 cardiovascular risk even as late as the Alzheimer
2 study, which I have as my next point in my expert
3 report. The summary discussion of the 12/18/04
4 interim review says that these studies in Alzheimer
5 were not -- they were not specifically designed or
6 powered to address CV outcomes. And so throughout
7 that -- and, you know, in every documentation you
8 see concerns. That to me is a warning.
9     Q.   So there were -- there was nothing that is
10 -- you're interpreting the concerns as a warning.
11 But would you give me that in all of those documents
12 there's also discussion about the need for
13 additional data and the fact that the conclusions
14 cannot be drawn based upon the data that existed at
15 the time?
16         MR. LOCKLAR: Object to the form.
17     A.   At the same time, well, what 20 million
18 people were taking a drug that --
19     Q.   Doctor, move to strike as nonresponsive.
20 I'm just asking about the documents. I'm not asking
21 for your speech.
22     A.   Reading it as a epidemiologist there were
23 consistent concerns raised by the FDA.
24     Q.   The FDA was well aware of issues with
25 regard to what the data showed and what the

Page 175

1 didn't show, correct, or couldn't show?
2     A.   I can't say with respect to what the FDA
3 did or did not know.
4     Q.   You just said it.
5     A.   Only through documentation.
6     Q.   Okay. Through the documentation the FDA
7 was well aware of what the data showed and what the
8 limitations of the data were?
9         MR. LOCKLAR: Object to the form.
10     A.   I would say that it's even stronger than
11 that.
12     Q.   Just answer that question first.
13     A.   Could you restate it?
14     Q.   The FDA was well aware of what the data
15 showed and what the limitations of the data were.
16     A.   I will say that with the caveat in this
17 memo dated -- on page 14 of 12/18/04 interim review,
18 it says, Furthermore, the FDA repeatedly requested
19 that these data be updated at the same time other
20 studies collecting placebo-controlled cardiovascular
21 safety data were being conducted.
22     Q.   Okay.
23     A.   So there's this -- reading in the FDA's
24 memos, it appears to me as an epidemiologist that
25 there was concerns about the data and them not

Page 176

1 providing data or studies to test it.
2         THE VIDEOGRAPHER: This is the end of Tape
3 Number Four in the continued deposition of Donna
4 Arnett to be continued on Tape Number Five.
5 We're off the record at 2:02.
6         (Off the record.)
7         THE VIDEOGRAPHER: This is the beginning
8 of Tape Number Five in the continued deposition
9 of Donna Arnett. We're on the record at
10 2:09 p.m.
11 BY MS. FREIWALD:
12     Q.   Doctor, just to finish up the last series
13 of questions, am I right you would agree that the
14 FDA documents up to and including the time of the
15 advisory committee hearing in 2001 reflect that the
16 FDA was reviewing the data, was asking questions
17 about the appropriate interpretation of the data,
18 and was aware of what additional data would in their
19 minds be desirable?
20         MR. LOCKLAR: Object to the form.
21     A.   I will agree that there were consistent
22 concerns raised about the cardiovascular safety of
23 Vioxx and that they wanted additional studies done
24 and additional data delivered to them about
25 cardiovascular risk.

Page 177

1     Q.   In order to form a conclusion?
2     A.   I won't make that assumption. But I don't
3 know what the FDA's intent was.
4     Q.   Well, they were looking for more
5 information from which they could draw a conclusion
6 whether the risk was real and what the magnitude of
7 the risk was if it was real, correct?
8     A.   I can't -- I don't know what their
9 objectives were. As an epidemiologist, I would have
10 wanted to see additional studies, and they requested
11 additional studies throughout their reviews of
12 Vioxx.
13     Q.   You had -- you looked -- you told me
14 earlier in the day that you looked at the three -- I
15 think it was the 3/12/2002 Villalba memo; is that
16 right?
17     A.   Yes.
18     Q.   Okay. Are we talking about the one that
19 has a rating line of cardiovascular data in
20 Alzheimer's studies?
21     A.   Yes.
22     Q.   And how are you using that document?
23     A.   Essentially using all the documents
24 because it lists all of the data from the
25 pre-Alzheimer's studies 091, 078, and 126. And we

Donna Arnett, Ph.D.

Page 178

1  -- and discusses total mortality as well as
2  cardiovascular mortality from the studies.
3     Q.   Okay.  And do you see where on page three
4  it refers to Dr. Targum's review?  I'm looking at
5  the second full paragraph on page three.
6     A.   Yes.
7     Q.   And it says, There was no excess of CV
8  thrombotic events, in particular no excess of
9  myocardial infarction in the rofecoxib group upon
10 review of the data?
11    A.   I see where it says that.
12    Q.   And then if you look on the bottom of the
13 memo -- also on page three it says, If we were to
14 take into consideration those patients for which the
15 investigator --
16       MR. LOCKLAR:  Let us find out where you
17 are.
18    Q.   Sure.  I'm on the last paragraph of page
19 two.
20    A.   Yes.  My copy was printed on another
21 printer with little toner so we're having --
22    Q.   Are you going to read it?  Can you read
23 it?
24    A.   If we go slow.
25    Q.   Give me one second.

Page 179

1     A.   The last paragraph I have starts with, As
2  noted above there was an imbalance in the number.
3     Q.   Here I can give you a better copy if you
4  want.
5         Yes, we're looking at the same place.
6     A.   Okay.
7     Q.   In the middle of that paragraph it says,
8  If we were to take into consideration those patients
9  for which the investigator, the medical records, or
10 the FDA reviewer had entertained the diagnosis of a
11 myocardial infarction but there was insufficient
12 information, the numbers would still suggest no
13 increased risk of MI in the rofecoxib 25 milligram
14 group as compared to placebo in this population.  Do
15 you see where it says that?
16    A.   I see where it says that.  I don't
17 understand why they point out myocardial infarctions
18 when they have a protocol to look at the combined
19 APTC endpoint.
20    Q.   Are you aware that the statistically
21 significant result in VIGOR was the MI result?
22    A.   The overall result was statistically
23 significant.
24    Q.   Primarily driven by MI?
25    A.   There were 46 versus 20 -- fewer than half

Page 180

1  the events were MI in VIGOR, 45 Vioxx events of
2  which 20 were MI according to the data in the paper.
3     Q.   And the results for -- were you looking
4  off of your card?
5     A.   My card.
6     Q.   I'll look at that.  What results are you
7  saying were statistically significant other than the
8  MI result?
9     A.   The overall cardiovascular APTC, 45 Vioxx
10 versus 19 Naprosyn for a relative risk estimate of
11 2.38, confidence bound of 1.39 to 4.0.
12    Q.   Okay.  Are you aware that the primary
13 event that was noted in the VIGOR study was the
14 disparity in the rate of MI?
15    A.   I would agree that there were five-fold
16 more MIs in the Vioxx versus the Naprosyn group, but
17 -- of which resulted in a five-fold relative risk.
18 But overall there were events from other sources as
19 well, sudden cardiac death, unstable angina, stroke,
20 DVTs, et cetera.
21    Q.   Okay.
22    A.   So there were 25 events that were not MI
23 in the way that they defined it in the paper.
24    Q.   And are you aware that at the time of this
25 March 2002 memo Dr. Villalba was still debating

Page 181

1  whether the appropriate explanation was the
2  cardioprotective effect of naproxen or a
3  prothrombotic or otherwise cardiovascular detriment
4  caused by Vioxx?
5         MR. LOCKLAR:  Object to the form.
6     Q.   Why don't you take a look at the
7  conclusion section, Doctor.
8     A.   You've asked me until that date.
9     Q.   So I really -- I don't want to go back
10 over the -- what we've already looked at.  I'm
11 trying to bring us current actually.  If you'll look
12 at the conclusion section, see where it says, These
13 data support the hypothesis that the excess of MI
14 found with rofecoxib, 50 milligrams in the VIGOR
15 study as well as the trends observed in ADVANTAGE
16 and the RA database with 25 milligram dose relative
17 to naproxen may in part be explained by the lack of
18 an antiplatelet effect of rofecoxib relative to
19 naproxen.
20       MR. LOCKLAR:  Object to the form.
21    Q.   Do you see where it says that?
22    A.   I see where it says that.
23    Q.   However, the existence of a biologically
24 plausible prothrombotic effect as a known effect
25 from fluid retention, edema, hypertension, may play

Donna Arnett, Ph.D.

Page 182

1 a role in the different cardiovascular safety
2 profiles of rofecoxib as compared to naproxen. Do
3 you see where it says that?
4    A.   I do.
5    Q.   And you see -- so they are -- would you
6 agree that Dr. Villalba at this point is discussing
7 all the possible mechanisms and different
8 explanations and has not drawn a conclusion as to
9 which one --
10       MR. LOCKLAR:  Object to the form.
11    Q.   Would you agree?
12    A.   I will not agree that she has described
13 all of them.  And, in fact, above this she says that
14 the studies were inadequately powered.
15    Q.   Well, that --
16    A.   And my own power calculations would
17 suggest that. And that's for MI.  And we brought --
18 do you want me to continue?
19    Q.   Well, actually, no because you -- my
20 question originally was -- strike that.
21       Part of my question originally was she's
22 discussing all the possible mechanisms, and you said
23 I won't agree she's discussing all of them.  But
24 then I think you kind of veered off away from
25 mechanism.  Is there something -- some other

Page 183

1 possible mechanism that you're saying is not
2 discussed here?
3    A.   The mechanisms were Vioxx in terms of
4 overall cardiovascular disease endpoints, or
5 outcomes, is related to the antiplatelet effect and
6 the prothrombotic effect.  There's also an
7 atherosclerotic effect of plaque tendency and plaque
8 rupture.  So to me this doesn't discuss all.  It
9 discussed the two -- the one major one at the time
10 which was thought to be the antiplatelet effect.
11    Q.   There's no clinical trial data that
12 supports an atherosclerotic effect, is there?
13    A.   It depends on if you -- I considered
14 myocardial infarction an athersclerotic endpoint.
15 So in my estimation I would say, yes, there is.
16    Q.   There's no clinical trial data that shows
17 that Vioxx increases atherosclerosis?
18       MR. LOCKLAR:  Object to the form.
19    A.   I define atherosclerosis to be outcomes
20 that are atherosclerotically based.
21    Q.   Doctor, now come on.  I mean, you can't
22 say that just because studies show more
23 cardiovascular events that that proves that those
24 events are happening because there's more
25 atherosclerosis being developed?

Page 184

1       MR. LOCKLAR:  Object to the form.  Asked
2 and answered.
3    A.   The number one cause of myocardial
4 infarction is atherosclerosis.
5    Q.   Doctor, are you really saying that any
6 clinical trial demonstrates that Vioxx increases
7 atherosclerosis?
8    A.   I will say that myocardial infarction,
9 coronary artery disease, and to some extent ischemic
10 stroke all have an atherosclerotic foundation.
11    Q.   I think we will agree with that.  And
12 would you agree -- let' see if we agree on this.
13 You agree in the absence of underlying
14 atherosclerosis you wouldn't -- even you wouldn't
15 expect to see any effect of Vioxx in terms of
16 increasing the risk of heart attack?
17       MR. LOCKLAR:  Object to the form.
18    A.   I wouldn't agree with that.
19    Q.   Are you saying that somebody who has no
20 atherosclerosis is at increased risk of a heart
21 attack with Vioxx?
22    A.   I -- yes, I would agree that you could
23 have an extreme elevation in blood pressure.  You
24 could strain.  You could have -- pick up something
25 too heavy and have a stroke.  That wouldn't be

Page 185

1 atherosclerotically placed.  There are many multiple
2 mechanisms.
3    Q.   It would be atherosclerotically based.
4    A.   Not necessarily.
5    Q.   Well, you still have to have a plaque
6 rupture.
7       MR. LOCKLAR:  Object to the form.
8    A.   For myocardial infarction or for stroke?
9    Q.   For myocardial infarction.
10    A.   You have platelet adhesion and clumping of
11 platelets in the absence of a plaque.  I am not sure
12 that you would not have a heart attack.
13    Q.   Do you know what the likelihood is of
14 platelet adhesion in the absence of plaque and
15 platelets rushing through the coronary artery and
16 just adhering to each other?
17       MR. LOCKLAR:  Object to the form.
18    Q.   Or are we getting outside of your area?
19    A.   I'll let the cardiologist answer that.
20    Q.   Okay.  And just to close it out a little
21 bit, do you -- if platelet adhesion in the absence
22 of plaque rupture were a real mechanism here, do you
23 know if you would expect to see more venous events?
24    A.   I'll let the cardiologist answer that.
25       Can we talk about -- never mind.

47 (Pages 182 to 185)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 186

1    Q.   Would you agree with me then -- I'm really
2  trying to distinguish between studies that I
3  understand you believe show an adverse outcome and
4  studies that explain the mechanism for that believed
5  outcome, okay.  I'm trying to separate them, and I
6  think you understand there's a difference.  We
7  talked about that earlier.  We talked about the fact
8  there's a difference between statin trials that show
9  LDL lowering and statin trials that show actually a
10  reduction in heart attacks.
11        Okay.  So if we can keep that difference
12  in our minds for a minute.  Would you agree with me
13  that you have not reviewed any literature that looks
14  at and answers the question of whether Vioxx
15  increases the formation of atherosclerotic plaques?
16    A.   I have not reviewed that literature but
17  that literature does exist.
18    Q.   Are you saying that there are controlled
19  clinical trials that demonstrate that Vioxx
20  increases the formation of atherosclerotic plaque in
21  humans?
22        MR. LOCKLAR:  Object to the form.
23    A.   Not in humans, but in animal studies.
24    Q.   Are there animal studies that fail to
25  demonstrate that?

Page 187

1    A.   There may be.  I have -- as I said before,
2  I have not reviewed that literature.
3    Q.   Are there animal studies that show that
4  Vioxx stabilizes or reduces the formation of
5  athersclerotic plaque?
6    A.   I haven't reviewed the literature.
7    Q.   And if I asked you the same questions for
8  plaque rupture, would you agree that there are no
9  studies in humans that demonstrate that Vioxx
10  increases the prevalence or the incidence of plaque
11  rupture?
12    A.   I can't completely agree with that
13  statement because the most common source of a
14  myocardial infarction is a plaque rupture.
15    Q.   Well, I --
16    A.   And Vioxx certainly showed an excess of
17  myocardial infarction.
18    Q.   Well, one possibility consistent with the
19  FitzGerald Hypothesis would be that Vioxx doesn't
20  increase plaque rupture at all, but it increases
21  clot formation after a plaque rupture, right?
22        MR. LOCKLAR:  Object to the form.
23    Q.   Do you understand that?
24    A.   I understand that.
25    Q.   Okay.

Page 188

1    A.   Myocardial --
2    Q.   So you don't need -- go on.  Answer my --
3    A.   The prevailing hypotheses about myocardial
4  infarction is that there is a plaque rupture, and
5  you get a thrombosis at the point of plaque rupture.
6    Q.   No disagreement with you there.  But the
7  Vioxx studies don't demonstrate that the mechanism
8  is increasing the incidence of plaque rupture,
9  correct?
10    A.   It's -- to me as an epidemiologist it's
11  irrelevant because there's a statistically
12  significant increased risk of heart attack.
13    Q.   I understand that.  I understand you're
14  focused on the outcomes.  All I want to do is make
15  sure I'm not going to hear you tell me about some
16  mechanism that as far as I know has not been
17  proved.
18        So would you agree with me putting aside
19  the outcome studies or the studies that you think
20  show an increased adverse outcome, there are no
21  studies in human beings that demonstrate that taking
22  Vioxx makes it more likely that an arterial plaque
23  will rupture?
24    A.   I don't know that such a study could be
25  designed.

Page 189

1    Q.   You have not reviewed any such studies?
2    A.   I have not but I'm not sure that it would
3  be ethical or feasible.
4    Q.   All I want to know is whether you have
5  data that you could point to or not.
6    A.   I can say that there are no data, but I'm
7  not sure that it would be ethical or feasible to
8  create such data.
9    Q.   Okay.
10    A.   It would be hard to walk around with a
11  angiography constantly going as a human.
12    Q.   Well, putting aside whether you can do a
13  study or you can't do the study, I assume that
14  you're not going to say that you can conclude that
15  plaque rupture happens more commonly in Vioxx with
16  the absence of the data?
17        MR. LOCKLAR:  Object to the form.
18    A.   Again, here, an epidemiologist like myself
19  would use the totality of the animal data, the
20  clinical data to form that opinion.
21    Q.   Well, you're mixing apples and oranges,
22  aren't you?  Because you're mixing the outcome data
23  with the mechanism data.  I'm not asking you about
24  outcome.  I'm asking you about mechanism.  And if
25  you want to know if increased plaque rupture is the

48  (Pages 186 to 189)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 190

1  mechanism that is causing the alleged adverse event,
2  you have to study that. And if you don't have data
3  to show that you can't say you know it to be true,
4  can you?
5      MR. LOCKLAR: Object to the form.
6      A. I would say it would be irrelevant once
7  you have the statistical evidence of an excess risk
8  with Vioxx for cardiovascular disease.
9      Q. All I want to know is, not whether you
10 think it's relevant or not, but whether you're going
11 to tell me to a reasonable degree that you know that
12 the mechanism is increased plaque rupture, and if
13 you are, what data do you have to support it.
14     A. I can't completely exclude that I would
15 state that plaque rupture would be one of the
16 mechanisms.
17     Q. Are you going to state to a reasonable
18 degree of expert certainty that Vioxx increases
19 plaque rupture and that you can point me towards any
20 human study that shows that?
21     A. I will point you to studies that say that
22 plaque rupture is a cause of myocardial infarction.
23 And I will point you to studies that show that Vioxx
24 causes an excess of myocardial infarction.
25     Q. But that doesn't prove that it's caused by

Page 191

1  plaque rupture.
2      MR. LOCKLAR: Object to the form. That's
3  a legal issue.
4      Q. It doesn't demonstrate scientifically that
5  the mechanism is plaque rupture, does it?
6      MR. LOCKLAR: Object to the form.
7      Q. Why are we fighting over this? You know
8  this is true.
9      A. Actually, I don't know that this is true.
10 As a scientist if you have a -- a hypothesized
11 effect or mechanism and you know that this in animal
12 studies happens and you put a drug in humans and
13 then you notice an excess of mycardial infarction
14 and the mechanism of myocardial infarction is plaque
15 rupture, I mean, it's not rocket science to draw
16 that causal relationship.
17     Q. Well, the problem is, Doctor, you've
18 identified several possible mechanisms. And you
19 can't tell me that any of them are proved or that
20 any of them are even identified by the data you
21 have. If there was only one possible mechanism, I
22 understand you might draw the inference but even
23 then you wouldn't have proved it, right? But you've
24 told -- you've identified platelet aggregation as a
25 possible mechanism. You've identified increased

Page 192

1  atherosclerosis as a possible mechanism. You've
2  identified plaque rupture as a possible mechanism.
3  But you've told me there's no clinical trial data on
4  the atherosclerosis.
5      A. Actually, that's not what I said. I said
6  atherosclerosis is the leading underlying cause of
7  myocardial infarction and other forms of
8  cardiovascular disease which was shown to be
9  elevated with treatment with Vioxx.
10     Q. Yes. But we know that people have
11 atherosclerosis who don't take Vioxx, right?
12     A. Yes.
13     Q. And we know that people have
14 atherosclerotic plaque rupture that don't take
15 Vioxx, right?
16     A. Right.
17     Q. And we know that it is possible that even
18 if Vioxx does increase the risk of a heart attack,
19 like you say it does, it doesn't have to be by
20 plaque rupture or by increasing atherosclerosis. It
21 could be by another mechanism, whether a mechanism
22 we understand or don't, includes -- right?
23     MR. LOCKLAR: Object to the form.
24     Q. You just don't know?
25     A. It's -- well -- but you've -- in this case

Page 193

1  when you have a risk factor that's been shown, in
2  this case a drug, not a risk factor, a drug that's
3  been shown to increase cardiovascular disease, to me
4  the mechanism, it doesn't matter. The person still
5  had a heart attack and died or maybe lived through
6  it and has permanent damage.
7      Q. I'm not asking you whether the mechanism
8  matters or not. I'm just asking you whether you can
9  state to a reasonable degree of expert certainty
10 that Vioxx causes plaque rupture. And if you're
11 going to go out and say that, I want to know what
12 controlled clinical trial on human beings actually
13 looked at that endpoint and proved that endpoint.
14     MR. LOCKLAR: Object to the form.
15     A. I would say that that type of study is
16 probably not feasible, and that's why we use animal
17 models for such mechanistic studies.
18     Q. And are there any animal studies that can
19 prove or can demonstrate that Vioxx causes plaque
20 rupture even in animals?
21     A. According to the introductions I've read
22 in these papers, yes. I have not reviewed the
23 actual data in the papers themselves.
24     Q. You haven't read all the animal studies,
25 correct?

49 (Pages 190 to 193)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 194

1    A.   Correct.
2    Q.   And studies in animals can often not bear
3  out in human beings?
4    A.   I would disagree with that statement.
5    Q.   You think that studies in animals always
6  bear out in human beings?
7    A.   Why would we continue to test them in
8  animals?
9    Q.   Well, there are lots of reason you may not
10 want to test something in humans for starters.  Does
11 saccharin cause cancer in human beings when it
12 causes cancer in rats?
13        MR. LOCKLAR:  Object to the form.
14   A.   I don't understand the relevance of that
15 example.
16   Q.   Well, you don't understand the relevance.
17 Was saccharin shown to cause cancer in rats?
18   A.   I frequently use animal models in my
19 work --
20   Q.   Was saccharin --
21   A.   I don't know the saccharin literature.
22   Q.   You don't want to agree that humans and
23 animals are biologically different and that you
24 sometimes see results in animals that aren't
25 repeated in human models?

Page 195

1    A.   I would say occasionally, but it's the
2  exception, not the rule.
3    Q.   It's the exception?
4    A.   I would say it's the exception.
5  Otherwise, we would quit working with animals.
6    Q.   Doctor, isn't it true that there are all
7  kinds of reasons you work with animals?  You don't
8  want to test the drug in humans first.  You have the
9  control in an animal model.  There are all kinds of
10 reasons.  You're not actually saying to me that you
11 can say if it causes this effect in a dog or a rat
12 or a rabbit that that's the effect it's going to
13 have in a human being?
14        MR. LOCKLAR:  Object to the form.  Asked
15   and answered.  Continue to --
16   A.   I answered.
17   Q.   Are you really going to say that?
18   A.   Yes.  Otherwise, we would not continue to
19 use animal models as scientists.  It would be
20 unethical.
21   Q.   Do you do animal study?
22   A.   I have -- I have an animal study I'm
23 working with now.
24   Q.   What is your animal study now?
25   A.   For the gene that we are in the midst of

Page 196

1  patenting we have a transgenic rat and we were doing
2  studies with that transgenic rat.
3    Q.   To see what?
4    A.   To see what pharmacologic modification of
5  the receptor does to heart size.
6    Q.   And are you at some point going to have to
7  test that model in humans?
8    A.   We hope to.
9    Q.   And are you going to make a claim that
10 whatever works in the animals works in humans
11 without testing it first in the humans?
12   A.   That would be the purpose of the phase one
13 study.
14   Q.   You are -- the end of phase one you're
15 going to make a claim that you saw this in animals,
16 and you then have to go forward and test it in
17 humans?
18        MR. LOCKLAR:  Object to the form.
19   A.   Phase one studies are conducted in humans.
20   Q.   I'm sorry.  The purpose of the phase one
21 study will be to see if the results you see in
22 animals are repeated in humans?
23   A.   Correct.
24   Q.   Okay.  And you're not going to make a
25 claim before you actually do the testing in humans

Page 197

1  that the results you saw in the animals would
2  necessarily be reproduced in humans?
3    A.   Not until I tested it in humans.
4    Q.   Of course not.  Okay.
5        Doctor, I think the last FDA document you
6  identified was the 12/18/04 interim review.  Is
7  there anything in particular that you're relying on
8  there?
9    A.   There will be many parts of this report
10 that are relevant, but the particular relevance is
11 page six where they discuss the cardiovascular
12 deaths and the excess of deaths in the Vioxx groups
13 relative to placebo that were confirmed by an
14 adjudication committee.
15   Q.   Okay.  And was that a statistically
16 significant finding?
17   A.   The study had less than one in three
18 chance of finding a statistically significant
19 result.
20   Q.   Did you do that -- did you do a power
21 analysis yourself?
22   A.   I did.
23   Q.   Did you write out your power analysis
24 anywhere the way you did for the Konstam study?
25   A.   Yes.  I believe it's in the Konstam study

50 (Pages 194 to 197)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

1  which I -- Konstam includes --
2      Q.    So when I look at what you had under the
3  Alzheimer disease column for Konstam, that's where
4  you're getting your --
5      A.    My notes came from the Konstam article
6  itself.
7      Q.    I need you to just repeat something for me
8  because I'm not sure that I understood what you said
9  way back when we were talking about power.
10        When I asked you, first off, if you did
11 your power analysis as if this were a case-
12 controlled study, you said something along the lines
13 of you couldn't do it another way because there was
14 some piece of data that you were missing. Do you
15 remember that discussion?
16     A.    Yes.
17     Q.    Can you go over that one more time for me
18 so I'm sure I understand you?
19     A.    First of all, as an epidemiologic
20 principle under the rare disease assumption using
21 the actual count -- what we call count data, so it's
22 the number of people in each of the A, B, C, or D
23 cells which reflect different exposure levels and
24 different case levels, diseased or not diseased or
25 whatever outcome you've defined.

1        Under that type of analysis under the rare
2  disease model which most of these -- all of these
3  studies fit into, that approximation of risk is
4  nearly identical to the proportional hazards ratio
5  or incidence rate ratio that's based on incident
6  rate data.
7        In order to calculate the incident rate
8  data power calculations, one needs to know the
9  number of months over which the accrual of the
10 patients occurred and the number of months, of
11 average time in this study for each person, the
12 censoring time. So in the absence of having clear
13 -- you know, I had aggregate data.
14       Not knowing the detail data for each one
15 of the studies, I could not make those assumptions.
16 So knowing that the case control count method of
17 calculating power would give me almost virtually the
18 same answer as the other, that's the reason that I
19 used the other.
20     Q.    Okay. Doctor, when did you first read the
21 VIGOR study?
22     A.    I don't remember when I first read it.
23     Q.    Did you read it before you were retained
24 as an expert in this litigation?
25     A.    Yes.

1      Q.    Do you think you read it at or about the
2  time that it was published?
3      A.    I can't recall.
4      Q.    Did you -- are you familiar with the
5  Medical Letter?
6      A.    No.
7      Q.    Are you familiar with a publication called
8  the Prescriber Letter?
9      A.    It sounds familiar. But I haven't seen
10 one.
11     Q.    Did you read what was sometimes called the
12 Mukherjee article, sometimes called the Topol
13 article, from JAMA in September of 2001?
14     A.    I've seen the Mukherjee article. But I
15 haven't read it recently.
16     Q.    Have you read any of the popular graphs
17 that came out around the time of the VIGOR study or
18 the change in the VIGOR label with regard to -- I'll
19 limit myself to the time of the VIGOR study. Have
20 you read any popular press that came out at the time
21 the VIGOR results were released?
22     A.    No.
23     Q.    Have you done any review of the literature
24 to look to see what existed by way of commentary or
25 editorial discussion on the interpretation of the

1  VIGOR results in the scientific media?
2      A.    Could you put a time frame on that?
3      Q.    Anywhere from around November 2000 up
4  through the spring of 2002?
5      A.    No. But during that time my research was
6  focused on the Minnesota Heart Survey and my
7  HyperGEN study.
8      Q.    Sure. Just to be clear, I'm not limiting
9  my question to whether you looked at those
10 publications contemporaneous with their appearance.
11 I'm also asking whether in the course of your expert
12 work you've gone back and looked at those
13 publications.
14     A.    I can't recall reading the Mukherjee in
15 detail. I know I've seen the name.
16     Q.    I want to ask you a few questions about
17 your index card notes. So why don't we mark what
18 you gave me at the last deposition as --
19        MS. FREIWALD:  What number are you on?
20        COURT REPORTER:  14.
21        MS. FREIWALD:  14.
22        (Defendant's Exhibit Number 14
23        was marked for identification.)
24     Q.    And what you gave me today I thought was
25 in the pile. I thought we marked it as 10.

Donna Arnett, Ph.D.

Page 202

1        (Off-the-record discussion.)
2    BY MS. FREIWALD:
3        Q.   On your first card on 14 where you look at
4    the Thal publication, you note that there is a
5    disparity in blood pressure and edema between Vioxx
6    and placebo, correct?
7        A.   I'm looking for -- where on the card are
8    you --
9        Q.   You have a line greater CV --
10       A.   Yes.
11       Q.   -- on Vioxx.
12       A.   Right.  9 --
13       Q.   And then you have two percent as right.
14       A.   Right.
15       Q.   And then you have a parenthetical, edema,
16   increased blood pressure, high blood pressure?
17       A.   Right.
18       Q.   And I'm reading that line to mean that the
19   9.4 and 6.8 refers to the parenthetical outcome,
20   edema, blood -- and increased blood pressure.
21       A.   Correct.
22       Q.   Okay.  So my question to you is do you
23   agree that you would have expected to see with any
24   NSAID a higher number of blood pressure and edema
25   events than with placebo?

Page 203

1        A.   I can't address it for all NSAIDs.
2        Q.   Do you know that one would have expected
3    with a COX -- with any COX-2 to see more edema and
4    blood pressure increase than with placebo?
5        A.   Basing only my claims on the Zhang
6    article, the meta-analysis it would appear that the
7    effects were worse for rofecoxib than other COX-2
8    for blood pressure and edema-related events.
9        Q.   You know that you wouldn't have expected
10   to see the same result with placebo with any NSAIDs
11   or any COX-2s?
12       MR. LOCKLAR:  Object to the form.
13       A.   I know there is consistency of evidence
14   from the Vioxx program since inception of an
15   increase in hypertension and hypertension-related
16   adverse events.
17       Q.   And are you aware that there is increased
18   edema and hypertension with both the COX -- the
19   other COX-2s and the nonselective NSAIDs?
20       A.   Only through the Zhang article.  As I
21   said, I haven't reviewed the other literature.
22       Q.   Now, let's look at ADVANTAGE, and I just
23   want to ask you a quick question.  The inclusion
24   criteria, that's your second card at least in my
25   pile.  Inclusion criteria, you have OA, greater than

Page 204

1    40 years, aspirin for CVD.  Does that remind you
2    that patients who were on aspirin for controlled
3    cardiovascular disease before they took COX-2 were
4    enrolled in ADVANTAGE?
5        A.   That would be what my notes suggest.
6        Q.   Now, I gather you don't know what the
7    Vioxx label said with regard to edema and blood
8    pressure effects; is that right?
9        A.   I'm not commenting on labels.
10       Q.   You don't know what the other NSAID or
11   COX-2 labels said with regard to edema and blood
12   pressure effect, right?
13       A.   I'm not commenting on labels.
14       Q.   Now, let's look at the card you did on
15   203, the combined CV outcome study.  You have not
16   addressed in any of your comments in your report the
17   ViP study.  Why is that?
18       A.   It's not published.
19       Q.   You were able to find that there was no
20   evidence of increased risk in ViP for Vioxx?
21       A.   I noticed that I derived much of this from
22   the internal meta-analysis from Shapiro.  I think
23   it's listed which slide number.  So that it wasn't
24   published I re -- pardon me, I am relying on the
25   published literature for the most part.

Page 205

1        Q.   Where it says, See slide, that's in
2    reference to Dr. Shapiro's slides?
3        A.   I think so.  But they're not numbered.
4    This was actually -- it's from that document PL -- I
5    don't think it's the Shapiro meta-analysis.  It was
6    on my disks that you copied.
7        Q.   Okay.
8        A.   And I'm not -- I didn't print -- as I
9    said, the things on the disks I brought you I didn't
10   print.
11       Q.   It's from PL-1238?
12       A.   On whichever disk that was on.
13       Q.   Let's look at just the last page.  You
14   have a brief summary of 010 and 017, and with 010
15   you note there were no serious cardiovascular
16   events, correct, that's what your note said?
17       A.   These were my notes, not my cards.  I've
18   got to switch to my notes.
19       Q.   Sorry.  Somehow I got it all stapled
20   together.
21       MS. FREIWALD:  Off the record.
22       (Off the record.)
23       MS. FREIWALD:  Just so the record is
24   clear, I said I'm going to mark as Exhibit 14
25   your cards, but I put the notes with it.  And

55a210ee-308b-4267-ba95-cd6434e81231