Donna Arnett, Ph.D.

Page 206

1  that's fine as long as we all know what I've
2  done.
3     A.   Back on the record?
4     Q.   Sure.
5     A.   Okay. This was a very short-term small
6  study, six weeks in duration that was essentially a
7  dose ranging study, one of the very early studies
8  done. And they found a very large increase in blood
9  pressure with the dose ranging studies. And while
10 there were no serious adverse -- no MIs detected or
11 APTC endpoints, they noted significant blood
12 pressure, edema, and weight gain.
13    Q.   And what was the high range of the dose of
14 010?
15    A.   125.
16    Q.   And what was the typical recommended dose
17 after Vioxx was approved?
18    A.   I'm not a labels expert.
19    Q.   Do you know whether any -- do you know
20 whether a dose of 125 milligrams was ever approved
21 by the FDA?
22    A.   I would assume that it was not. I know
23 that the original approval was 12.5 or 25
24 milligrams.
25    Q.   So the results in blood pressure that

Page 207

1  you're saying in 010 is for a dose that's five to
2  ten times higher than the recommended dose?
3     A.   Actually it was dose ranging so there were
4  people on 25 as well. I don't know how many were on
5  the 125 dose.
6     Q.   Have you correlated the numeric increases
7  in blood pressure with which patient was on which
8  dose?
9     A.   I have not and -- but I believe that is in
10 the -- I have a page number. And I believe it's in
11 that same document. I believe that there -- they
12 did that and there were greater drop-outs.
13    Q.   But you can't tell me --
14    A.   It's table 55.
15    Q.   To the extent that 010 shows a
16 particularly large increase in blood pressure
17 effects, you can't tell me how many of those
18 patients were patients who were taking five to ten
19 times the approved therapeutic dose of Vioxx?
20    A.   If I had my computer and opened the file,
21 I could tell you that. But I don't have the data in
22 front of me now.
23    Q.   You didn't make a note of that here
24 anywhere?
25    A.   No.

Page 208

1     Q.   And on 017 can you just walk me through
2  what it is your notes are trying to show?
3     A.   These were not intended for public
4  consumption. My apologies for not being as clear as
5  my cards.
6     Q.   That's okay. I understand they were
7  merely meant for your own reference.
8     A.   Protocol 017 was conducted in RA. That's
9  what RA stands for. It was a six-week study. It
10 involved two different doses, 175 or 125 milligrams
11 of Vioxx. There were -- and I don't have the number
12 of subjects. And this I derived from table 48 of
13 that same large document. So I'd have to go back
14 and look at the details. There was one MI in the
15 Vioxx 125 milligram group, none in placebo. And I
16 don't -- it says adverse CV experiences, 10.1
17 percent Vioxx versus 29 percent placebo. I don't
18 know what the adverse cardiovascular experiences
19 were. I'd have to go back and look at the table
20 itself.
21    Q.   And if you need the table to tell you --
22 do you know if the table would tell you at what
23 doses or how the adverse experience is distributed
24 across doses?
25    A.   I would not -- I was not specific enough

Page 209

1  to be able to answer that question. And I didn't
2  print a huge file out.
3     Q.   On the card that we had marked as 10 I
4  just have a quick question about the mechanisms of
5  action card. You talk about the FitzGerald
6  Hypothesis and some of the mechanisms we talked
7  about, blood pressure, atherosclerosis, exaggerated
8  thrombotic response. Is that derived from a
9  particular publication, or publications?
10    A.   I don't recall which -- there were so many
11 publications that discussed these.
12    Q.   Have you read the FitzGerald publications
13 from 2004 or 2006?
14    A.   I have the paper. I have not reviewed
15 it. So I derived this mechanism of action through a
16 combination of sources, the FDA documents and the
17 published literature within the Vioxx meta-analyses.
18    Q.   Let's look at -- I want to ask you a
19 couple questions about the Juni study. And you
20 noted that Juni tested for heterogeneity and found
21 that there was -- I always forget the way of saying,
22 but there was no heterogeneity such that it was
23 appropriate to pull from the results of different
24 studies, correct?
25    A.   That's not entirely correct.

Donna Arnett, Ph.D.

Page 210

1    Q.   Okay. Can you clean it up for me,
2  please?
3    A.   I'll clean it up for you. She tested for
4  heterogeneity of the facts which means that among
5  all of these osteoarthritis and rheumatoid arthritis
6  studies that had different comparators that there
7  was no evidence of difference in the relative risk
8  estimates statistically depending on the comparator.
9    Q.   So what --
10   A.   There was one specific test of
11  heterogeneity and that was studies that were funded
12  by Merck had a larger cardioprotective effect of
13  Naprosyn.
14   Q.   So what he found was not the affirmative
15  that the studies were homogeneous but rather he was
16  unable to prove heterogeneity, correct? He did a
17  test to prove heterogeneity, and he could not prove
18  it to a statistically significant degree?
19   A.   Actually he did prove heterogeneity
20  regarding a source of funding.
21   Q.   With regard to the type of study he was
22  not able to prove heterogeneity to a statistically
23  significant degree, correct?
24       MR. LOCKLAR: Object to the form.
25   A.   Can you define what you mean by type of

Page 211

1  study.
2    Q.   OA, RA.
3    A.   There was no evidence for heterogeneity by
4  type of treated disorder.
5    Q.   And he was not able to prove heterogeneity
6  by comparator?
7    A.   Correct.
8    Q.   Again, the way the question is asked when
9  you're looking at heterogeneity is can you prove
10  that the studies are dissimilar or heterogenous to a
11  statistically significant degree, correct?
12   A.   It's specifically testing whether the
13  point estimates differ from one another. And so
14  it's saying that all of these -- and if you look at
15  figure two, that these, even though these boxes
16  which represent the point estimates are not exactly
17  the same, that there's no evidence that one study's
18  point estimate statistically differs from another.
19   Q.   So when you say there's no evidence, what
20  you're saying is that there -- you were not able to
21  show a statistically significant difference in the
22  point estimate, correct?
23   A.   Specifically saying that the pooled
24  estimate does not differ statistically from any of
25  these individual pieces on that graph.

Page 212

1    Q.   And do you know what power Juni had to
2  show a statistically significant difference in the
3  point estimates?
4    A.   I do not.
5    Q.   Do you know if his --
6    A.   Although, he --
7    Q.   -- test --
8    A.   He did find one significant one.
9    Q.   Do you know if his test for heterogeneity
10  was powered any better than you say the Konstam
11  study was powered?
12   A.   They're -- they're different study designs
13  with different questions.
14   Q.   Sure. But either way if you're looking to
15  ask yourself can I see a statistically significant
16  effect, Juni is asking a different question. He's
17  asking can I see a statistically significant
18  difference in the point estimates based upon these
19  different studies. You still have to ask whether
20  you have adequate power to answer your question,
21  right?
22       MR. LOCKLAR: Object to the form.
23   A.   In the -- in the Konstam article the goal
24  was to -- and the power calculation was saying given
25  this observed data and the point estimate, for

Page 213

1  instance, in the RA of 1.78, what was the power that
2  a finding of that or finding more extreme could be
3  detected if there was a true excess risk.
4    Q.   That's fine.
5    A.   And that's a different question than Juni
6  would be asking, does the combined point estimate
7  differ from any individual point estimate.
8    Q.   Sure. I mean, epidemiologists ask all
9  kinds of questions. But if you wanted to
10  know whether Juni had proved that these studies were
11  similar and appropriate for pooling or whether he
12  was merely unable to show a statistically
13  significant difference, you have to know whether he
14  had adequate power to answer the question he was
15  asking, right?
16   A.   Well, as I said earlier with -- you asked
17  me why I didn't calculate power from VIGOR. And I
18  said once you find a significant effect power is
19  meaningless. So he did find a significant reaction
20  for funding source. So he obviously had power to
21  find interaction.
22   Q.   Well, Konstam found a significant effect
23  with naproxen versus Vioxx, and you weren't willing
24  to say there, well, he found a significant effect at
25  one comparator so he must have had power for all of

Donna Arnett, Ph.D.

Page 214

1  them?
2      A.   I said specifically that within the VIGOR
3  study where there was evidence of a statistically
4  significant elevated risk that power was
5  irrelevant.  What I'm saying here is in the Konstam
6  article one could argue that since a specific
7  heterogeneity effect was detected for a funding
8  source that there must be enough power to detect
9  some interactions.
10     Q.   Well, how can you make that conclusion?
11     A.   It's simple.  They found one.
12     Q.   They found one for a funding source which
13 was driven by the results of VIGOR?
14     A.   But they didn't find it for a comparator,
15 Naprosyn versus other.
16     Q.   Do you know -- you asked yourself the
17 question whether Juni had adequate power to find if
18 there was heterogeneity?
19     A.   Frankly, once I saw the funding source,
20 significant finding, I didn't ask myself that
21 question.
22     Q.   Okay.
23     A.   Because I --
24     Q.   Do you know if the absolute numbers --
25 absolute numeric differences that Konstam found were

Page 215

1  large numeric differences?  That's a poorly asked
2  question.
3      MS. FREIWALD:  Let's change the tape.
4      THE VIDEOGRAPHER:  This is the end of Tape
5  Number Five in the continued deposition of Donna
6  Arnett to be continued on Tape Number Six.  We
7  are off the record at 3:07.
8          (Off the record.)
9          (Requested portion read.)
10         THE VIDEOGRAPHER:  This is the beginning
11 of tape number six in the continued deposition
12 of Donna Arnett.  We're on the record at 3:15.
13 BY MS. FREIWALD:
14     Q.   Doctor, would you agree that there is a
15 meaningful numeric difference between a relative
16 risk of .79 and a relative risk of 1.69?
17     A.   Meaningful would be determined by
18 confidence bounds around those point estimates.  So
19 I couldn't say that .69 is different than 1.79 [sic]
20 in a study of two or four people.  Now, it would
21 depend on the sample size, how adequately powered
22 the study was, the true effect size.
23     Q.   Would you say that a difference of eight
24 to three was a meaningful numeric difference without
25 knowing all the things you just identified?

Page 216

1      A.   In the absence of prior knowledge of an
2  effect from other studies?
3      Q.   Yes.
4      A.   I would agree to that in the absence of
5  that.  But that's not what we have here.
6      Q.   Okay.  Would you agree that small numbers
7  can create misleading impressions or lead to
8  misleading conclusions?
9      A.   I would agree with that and that's why we
10 look at totality of evidence.
11     Q.   And would you agree that small numbers can
12 tend to magnify the risk or the benefit that is
13 seen?
14     A.   I would not agree to that.
15     Q.   Well, what I mean is that a disparity in
16 small numbers will generate a larger relative risk
17 than the same disparity in big numbers?
18     A.   I would agree there's more stability of
19 the relative risk with larger numbers, but that's
20 why we look at consistency particularly in issues
21 about safety, consistency of findings across
22 multiple studies.
23     Q.   What I'm asking is if you see a difference
24 of one to five, it's much harder to interpret what
25 that means, if anything, than a difference of 2001

Page 217

1  to 2005?
2      A.   I would agree with that.  But in the case
3  of Vioxx in almost uniformly across studies there
4  were numeric excesses always falling on the side of
5  Vioxx.
6      Q.   All I want to know is would you agree that
7  when you have small numbers you can generate what
8  looks to be meaningful numeric differences and that
9  can be misleading?
10     A.   It could only be misleading if there was
11 inconsistency in findings.
12     Q.   Well, it's mislead -- if I -- if I go out
13 to a ball field and I hit two pitches and I knock
14 them both out of the park, that doesn't tell you
15 that if I hit 100 pitches I'm going to knock 100
16 pitches out of the park or even 80 pitches out of
17 the park or even 20 pitches out of the park, right?
18     A.   It would depend on who the pitcher is.
19     Q.   But you need -- it might depend on who the
20 pitcher is.  It might depend on how good a batter I
21 really am which you can't tell from just two
22 pitches.  It might depend on the weather.  It might
23 depend on how I was feeling that day.  It might
24 depend on a lot of things that you can't tell from
25 just watching me take two pitches, right?

55 (Pages 214 to 217)

55a210ee-308b-4267-ba95-cd6434e81231

## Donna Arnett, Ph.D.

Page 218

1     A.   By if day after day, study after study,
2  you saw an excess of hits by your team, that would
3  point to consistency of evidence that you're a
4  pretty darn good batter.
5     Q.   You would need to see that in large
6  numbers over long periods of time, right?
7        MR. LOCKLAR:  Object to the form.
8     A.   For a safety question I would argue no.
9  Because here we're not dealing with simple things
10 like people hitting balls.  We're dealing with
11 people having heart attacks, and we have consistency
12 of evidence across the studies about the excess
13 numerically in cardiovascular events.
14    Q.   Have you ever submitted a grant looking
15 for a safety signal where you have said that you're
16 going to attempt to draw a conclusion whether or not
17 you achieve statistical significance?
18    A.   Yes.
19    Q.   When?
20    A.   In the fenofibrate intervention study that
21 we're working on that I'm the principal investigator
22 of that I designed, I created ways to assess safety
23 relative to liver tests and we asked multiple
24 questions about the expected GI side effects from
25 the drug.  And we collected that data and we're now

Page 219

1  looking at genetic predictors of that.
2     Q.   Where in that mix did you say that you
3  were going to draw any conclusion in the absence of
4  finding a statistically significant effect?
5     A.   It's -- our goal is description, not
6  statistical testing.  And I know of no --
7     Q.   So what are you -- what did your grant --
8  I'm just trying to understand.  What did your grant
9  propose to do?
10    A.   To measure the adverse events self-
11 reported using a likard scale type approach to
12 questions about expected side effects.  And we are
13 looking at those reported side effects in relation
14 to level of drug and to genetic predictors.
15    Q.   And what conclusions do you expect to
16 draw?
17    A.   We're in analysis mode.  I don't expect to
18 draw conclusions.  I'll report what we find.
19    Q.   Well, when you did your grant application,
20 did you say that you expected that you would be able
21 to reach some conclusion from this study?
22    A.   We -- we purely had descriptive objectives
23 in mind when we wrote the grant and it was funded.
24    Q.   Okay.  So if I'm getting it, your study is
25 going to end up with conclusions along the lines of

Page 220

1  in patients taking fenofibrate compared to -- is
2  there a placebo comparator?
3     A.   No.
4     Q.   Is there any comparator?
5     A.   No.  This is a mechanism study.
6     Q.   Okay.  So your study is going to end up
7  saying something like in patients taking fenofibrate
8  X number of such-and-such an effect was observed?
9     A.   And that effect correlates this amount
10 with fenofibric acid level.
11    Q.   Okay.
12    A.   Or measured liver function test.
13    Q.   And you're not going to be able to say
14 from this study that there was an excess risk
15 compared to placebo, right?
16    A.   Correct.  It's purely descriptive.
17    Q.   And you're not going to be able to say
18 from this study that fenofibrate caused any
19 particular outcome?
20    A.   We will -- actually we disagree.  We would
21 say that ingestion of fenofibrate was associated
22 with this effect, whatever, excess GI bloating, and
23 that that effect was correlated with drug level.
24    Q.   Okay.  So it was associated with.  Is
25 there any other study --

Page 221

1     A.   Let me be precise about words.  Associated
2  with would imply that the drug didn't cause this.
3  So we have people not on drug, they take drug, they
4  get an effect.
5     Q.   And these are biological effects, right?
6     A.   Yes.
7     Q.   They're not clinical adverse outcomes?
8     A.   Not always.  An elevated liver function
9  test would be considered a clinically adverse
10 outcome.  Pancreatitis is another adverse outcome
11 that we --
12    Q.   Well, you're not going to say you're going
13 to draw a conclusion from elevated liver functions
14 that fenofibrate causes liver failure?
15    A.   No.
16    Q.   You're not going to draw a conclusion that
17 fenofibrate -- what other parameters are you looking
18 at, pancreatitis you said?
19    A.   Well, we have one adverse event effect,
20 pancreatitis.  Primarily we're looking at
21 gastrointestinal side effects.
22    Q.   Is there any other study, any study
23 against a placebo comparator, for example, or
24 against another active comparator where you've
25 written a grant that was not intended to lead to a

Donna Arnett, Ph.D.

Page 222

1  descriptive result, but that was intended to draw a
2  causal conclusion?  And you -- your grant proposal
3  was structured such that you said in the absence of
4  the statistically significant results we still
5  expect that we're going to be able to draw a
6  conclusion that X causes or doesn't cause Y?
7      A.   Safety outcomes are not usually the
8  rationale for conducting a study with NIH.  It would
9  not -- and I've done all my work with the National
10 Institutes of Health.
11     Q.   So you've never had the opportunity to see
12 if you could get a grant approved that proposed to
13 draw a conclusion as to safety in the absence of a
14 statistically significant conclusion?
15     A.   First, it would have to be a serious
16 safety issue or else the NIH I wouldn't imagine
17 would have an interest in doing it.  Secondly, it
18 would -- the cost would be excessive and beyond what
19 NIH would typically fund.
20     Q.   It would be the kind of thing that a
21 pharmaceutical company would fund?
22     A.   I'm not even sure a pharmaceutical company
23 would fund everything that needs to be done.
24     Q.   Well, pharmaceutical companies fund safety
25 studies all the time, large long-term studies that

Page 223

1  cost a great deal of money?
2          MR. LOCKLAR:  Object to the form.
3      A.   There was no safety -- there was no
4  cardiovascular safety study done.
5      Q.   Doctor, I'm not asking for a speech about
6  Vioxx.  Pharmaceutical companies fund long and
7  expensive safety studies all the time.
8      A.   I would -- I will not speak to what
9  companies do.  I can say that in the case of Vioxx
10 there was never a --
11     Q.   I asked --
12     A.   -- a safety study.
13     Q.   I'm not asking about Vioxx.  I'm asking
14 you say -- you offered that NIH can't afford to fund
15 any long-term safety studies.  I was asking that it
16 is true that a lot of these studies get done because
17 pharmaceutical companies fund them.
18         MR. LOCKLAR:  Object to the form.
19     A.   I'm not aware that there are that many
20 long-term safety studies being conducted.
21     Q.   So are you -- so the answer to my initial
22 question is that you just don't know or you don't
23 have any experience in this?  I was trying to ask if
24 you've ever submitted a grant where you proposed to
25 draw a conclusion as to safety in the absence of a

Page 224

1  statistically significant finding?
2          MR. LOCKLAR:  Object to the form.  Asked
3      and answered.
4      A.   I have not conducted studies specifically
5  designed with the primary endpoint of safety.
6      Q.   And do you use -- are you saying that when
7  you look at safety signals in studies you don't do
8  statistical analyses at all, or are you saying you
9  just don't feel constrained by absolute adherence
10 to a P of .05?
11     A.   First of all, I do a lot of NIH studies.
12 I'm in the 95 percentile of funding by NIH.  I don't
13 design studies that are using investigational
14 drugs.  So most of these studies for safety are --
15 that I think you're describing, and maybe I have it
16 wrong, are about safety for investigational drugs.
17 I haven't conducted those types of studies.
18     Q.   When you say that you don't need
19 statistical significance in safety studies, what
20 experience are you drawing from?
21     A.   I'll take an example from my ALLHAT GenHAT
22 study.  It's an NIH funded study to review genetics
23 of antihypertensive response to treatment using four
24 already marketed drugs.  There's a side effect
25 called angioedema that happens with ACE inhibition

Page 225

1  therapy.  In all of the ALLHAT participants, and
2  there were 40-some-odd-thousand, 42,113 or something
3  like that, about 8300 were randomized to ACE
4  inhibitors.  Of those there were only, in a very
5  long-term follow-up 4.3, 4.2 years or 4.6 years of
6  follow-up, just over 200 cases of angioedema, which
7  is still a large number of cases, still would not
8  probably be statistically significant.  I'm not sure
9  that we would have to find a statistical test around
10 that.
11     Q.   What you were you looking for?  What was
12 the hypothesis of the study?
13     A.   Of the GenHAT study?
14     Q.   Yeah.
15     A.   We were looking at genetic predictors or
16 treatment response including adverse events.
17     Q.   Well, you weren't looking -- or were you
18 looking to say there is a genetic predictor?
19     A.   Yes.
20     Q.   And were you going to draw a conclusion
21 that there is a genetic predictor in the absence of
22 statistical significance -- statistically
23 significant evidence of a genetic predictor?
24     A.   We haven't found one yet.
25     Q.   Okay.  You haven't.  So -- but your grant

57 (Pages 222 to 225)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 226

1  I'm assuming didn't say we're going to go look to
2  see if there's genetic predictors for this bad type
3  of ACE inhibitors, and we're going to prove that
4  there is one even if we don't come up with
5  statistically significant results?
6      A.   It was not a primary nor secondary aim of
7  our study.  And, again, out of 42,000 people there
8  was just over 200 cases.  So there's no -- it
9  wouldn't be feasible at all to design such a study
10 with NIH dollars.
11     Q.   Do you have any experience that would
12 allow you to say that there is any study anywhere
13 which has looked at the question of safety with a
14 prescription pharmaceutical and that has been
15 designed without regard to looking to see if there
16 is a statistically significant outcome?
17     A.   That was a very long question.
18     Q.   It was.
19     A.   Could you restate that question?
20         MS. FREIWALD:  I'm going to ask you to
21 read it back.
22         (Requested portion read.)
23     A.   Could you restate the question?
24     Q.   Sure.  That was not -- what I want to know
25 is if you can point me in your experience to any

Page 227

1  study that was designed to answer a question about
2  whether a prescription pharmaceutical carried a
3  safety risk and in its design said we're going to
4  draw a conclusion about the safety of this
5  medication whether or not we generate a
6  statistically significant result?
7      A.   I can think of one.
8      Q.   Okay.
9      A.   Systolic hypertension in the elderly
10 program where they were randomizing elderly
11 subjects, and by elderly they were people over the
12 age of 65 years, to Chlorthalidone, a diuretic or
13 placebo.  And there was a question about whether or
14 not isolated systolic hypertension in and of itself
15 is worth treating in the elderly because of the
16 potential adverse effects of taking a diuretic;
17 falls, hyponatremia, et cetera.  So they conducted
18 that study.  They didn't power the study based on
19 the secondary adverse outcome.  But they fully
20 intended as a public health question to validate
21 that as a secondary -- as a side question.
22     Q.   What was the secondary outcome?
23     A.   Primary outcome was total mortality.
24 Secondary outcomes were stroke.
25     Q.   And was there some conclusion reached?

Page 228

1      A.   That overall that there was -- it was
2  protect -- that taking Chlorthalidone was protective
3  for stroke.  There was an increased risk of falls, I
4  believe, and low potassium levels.
5      Q.   And were any of those still statistically
6  significant?
7      A.   I don't recall.  But it was not -- it was
8  a safety concern.  There was not a focus on
9  statistical significance.  In fact, in that paper --
10 I believe it was that paper because we used to teach
11 this as an example of bad paper -- they presented
12 all the safety data by Z scores and not by p-values.
13     Q.   It was an example -- what you just said to
14 me was an example of a bad paper?
15     A.   Well, that -- they don't even put the
16 statistical test on it.  They put the Z -- a Z is
17 the test statistic, not the p-value associated with
18 it.
19     Q.   So what was bad about the paper was that
20 it --
21     A.   It was obtuse.
22     Q.   It didn't have the statistical data in it?
23     A.   It had the statistical data in it, but it
24 obscured the data in such a way that it was hard to
25 interpret.

Page 229

1      Q.   And it would be important in that study to
2  be able to interpret the statistical data?
3      A.   Just like in VIGOR I complained about
4  having no table that did the cardiovascular summary.
5      Q.   Doctor, you just told me I think about a
6  study that you're saying was bad because it was a
7  safety study, and it didn't have the statistical
8  test laid out and -- in a way that you could read
9  it?
10     A.   No.  What I said was they presented the
11 statistical test in an obscure way.
12     Q.   But they had a statistical test?
13     A.   Yes.
14     Q.   Okay.  Where was that study published?
15     A.   This was from the late 1990s.  I believe
16 it was published in JAMA.  And it was a cooperative
17 group called the Systolic Hypertension in the
18 Elderly Program.
19     Q.   So that was a safety study that did have a
20 statistically significant -- that was set up to look
21 for statistical significance with regard to a safety
22 endpoint?
23     A.   The primary question, primary outcome, was
24 stroke or total mortality.  I don't remember.  The
25 other was a secondary.  They also valuated whether

Donna Arnett, Ph.D.

Page 230

1  there was an effect from taking the drug in the
2  elderly population.
3     Q.   And they did a statistical analysis?
4     A.   Yes.
5     Q.   And you don't remember whether it was
6  statistically significant or not?
7     A.   I don't remember.  It's been too long.
8     Q.   And you don't remember exactly what
9  conclusions they drew in the presence or absence of
10 the statistical significance?
11    A.   They recommended at the conclusion of that
12 trial to treat elderly people with isolated systolic
13 hypertension.
14    Q.   Okay.  Doctor, in your work as an
15 editorial board member have you ever asked authors
16 to go back and put data in a table or reorganize the
17 presentation of data?
18    A.   Absolutely.
19    Q.   And is that something that editorial
20 boards or editorial board members in your experience
21 do?
22    A.   It depends on the editor.
23    Q.   But certainly when you review journal
24 articles one of the things you look for is whether
25 certain information would be better conveyed in a

Page 231

1  table, correct?
2     A.   From my experience, having data in tables
3  makes it more transparent to the reader.
4     Q.   So you have -- I gather sometimes authors
5  put certain data in tables and sometimes they don't,
6  correct?
7     A.   Epidemiologists tend to put things in
8  tables.
9     Q.   But if you were to read articles in JAMA,
10 cardiovascular publications, Annals of Internal
11 Medicine, you would see variability in how data are
12 presented, correct?
13    A.   Very little because it takes a lot more
14 space to convey complex data in words than in a
15 table.  And if you have a table and augment it with
16 words, it's much -- takes much less space and it's
17 much clearer.
18    Q.   Doctor, isn't it really indisputable that
19 if you were to read ten articles you would be able
20 to find in each of those articles some pieces of
21 information that were put in tables and some pieces
22 that weren't put in tables?
23    A.   I find it much more homogenous than you're
24 referring to.
25    Q.   Okay.  So do you believe that journal

Page 232

1  editors as a general rule, when they think there is
2  evidence that -- there is some finding that's
3  important to put in a table will point that out to
4  the authors?
5            MR. LOCKLAR:  Object to the form.
6     A.   I can't speak for other editors.  I can
7  only speak for myself, and I would do -- if it were
8  an important piece of data that were obscured in
9  text, I would have a table put in.
10    Q.   Okay.  And have you had that experience to
11 be able to say to an author, you know, I think this
12 should really be put in a table or I think the table
13 should be presented differently?
14    A.   I've had the occasion of having tables
15 presented differently or pieces of data deleted.
16    Q.   You've had the experience of pieces of
17 data deleted?
18    A.   Of saying that a particular table isn't
19 required for the overall story that the -- that is
20 being told by the paper.
21    Q.   So sometimes you put -- you might have a
22 piece submitted and the author puts in a table and
23 then you say, you know what, we don't really need
24 the table?
25    A.   It's rare but it's happened.  There are

Page 233

1  page limits and not only page restrictions, but
2  number of words restrictions that we have to follow
3  as editors.  But generally there's more -- strike
4  that.
5     Q.   Sometimes the decisions about how data are
6  presented are driven by things like space
7  constraints?
8     A.   I'd qualify that by there are space
9  constraints, but if there are data that are not
10 critical to the message of the paper and it's over
11 the space limit, then there would be suggestions
12 about cutting.  The authors can always decline, and
13 I've had that happen as well.
14    Q.   You've had authors who you've wanted to
15 put -- who you said, you know what, I think you
16 should put this information in a table and they've
17 said no?
18    A.   I've had authors that I've asked them to
19 cut tables, and they've given me a reason not to.
20 And I always abide by their reasons.
21    Q.   And what about the other way, have you had
22 authors who you wanted something in a table and they
23 thought that was not -- what you wanted in a table
24 was not best conveyed in a table?
25    A.   I've not had that happen.

59 (Pages 230 to 233)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 234

1    Q.   Have you ever asked anybody to -- you have
2  asked somebody to put information in a table that
3  they presented originally in a text, correct?
4    A.   I have not.
5    Q.   Oh, okay.  I thought you said that there
6  have been times where you -- where in your review of
7  articles you've noted that information could be
8  better conveyed in a table and you've had that
9  discussion with the author.
10       THE WITNESS:  Could you read back my
11    testimony?  Because I don't recall how --
12    Q.   Well, the record will speak for itself.  I
13  want you if I'm wrong just tell me --
14    A.   Well, I don't want -- you know, we've been
15  talking almost six and a half hours.  I don't want
16  to be inconsistent in my testimony just because it's
17  six and a half hours into it.
18    Q.   Well, I'm giving you -- I'll start fresh.
19  Have you had the experience of asking an author to
20  convey data in a table that the author had
21  originally presented in text?
22    A.   I -- is it okay for me to hear what I said
23  because I really want to be consistent?
24    Q.   Sure.
25    A.   It's not that I'm lying about it, but I

Page 235

1  just want to make sure.
2       (Requested portion read.)
3    A.   I believe your question is different.
4    Q.   Can you clarify your answer for me?
5    A.   Could you restate the question?
6    Q.   You just heard your answer.  And I think I
7  probably didn't fully understand it.  So could you
8  just clarify your answer for me?
9    A.   So what I -- in my statement I said there
10  have been occasions where I've asked authors to
11  delete tables in entirety or reduce parts of the
12  table.  I don't recall ever having an experience
13  where I've asked people to move something from text
14  into table.
15    Q.   Okay.
16    A.   Because epidemiologists tend to write in
17  tables.
18    Q.   And have you had the experience that
19  whether data is presented in table or text can be
20  dependent upon whether the data relates to the
21  primary endpoint of the study or whether it's
22  related to an unexpected finding or secondary
23  endpoint of the study?
24    A.   I have no experience in that respect.  For
25  data that would be important safety issues in a

Page 236

1  clinical trial, I would demand as an editor to have
2  a table.
3    Q.   And that's something that in your
4  experience editors would look for, whether any
5  safety findings from a study were presented in a
6  table?
7    A.   I -- I would consider it usual practice.
8    Q.   Okay.  And it would be usual practice if
9  they thought it was important to ask for the
10  information to be put in a table?
11    A.   It would be my practice.  I can't speak
12  for all editors.
13    Q.   Dr. Arnett, have you taken a look at how
14  much additional time or -- you've spent working on
15  Vioxx-related work between your last deposition and
16  today?
17    A.   37 hours.
18    Q.   At your rate of -- was it $400 an hour; is
19  that correct?
20    A.   Correct.
21    Q.   Have you been paid for any of your time to
22  date?
23    A.   I have not.
24    Q.   Have you submitted any bills?
25    A.   I have submitted the bill we discussed at

Page 237

1  my first deposition, and I submitted a bill after my
2  deposition.  But I haven't submitted anymore.
3    Q.   Have all the bills you've submitted been
4  to Med-Expertise, or have any of them been directly
5  to a law firm?
6    A.   The latter bill was directly to Ben's law
7  firm.
8    Q.   To Mr. Locklar's law firm?
9    A.   Yes.
10    Q.   What do you mean the latter bill?
11    A.   There was only two.  So there was the one
12  sent to Med-Expertise that was around 70-something-
13  odd hours and then the one for the work prior to my
14  deposition and my deposition.
15       MS. FREIWALD:  Okay.  I'm going to ask if
16    you would produce those.  I don't know what the
17    practice is in the MDL, assuming they're being
18    produced.  I'll ask if you make them available
19    to Mark is fine with me.  I don't need to get
20    them directly.  If you would send them to Mark,
21    that would be terrific.
22       MS. O'DELL:  I'd be happy to.
23       MS. FREIWALD:  Thank you.
24  BY MS. FREIWALD:
25    Q.   Is there any author or article that you're

Donna Arnett, Ph.D.

Page 238

1   relying on -- let me start that again.
2        Can you point me to any written document
3   or any author that said before the results of the
4   APPROVe study were published that Vioxx caused heart
5   attacks?
6        A.   Any study?
7        Q.   Uh-huh.
8        A.   I'm sure there is at least one published
9   study out there.  So you're asking me or any author?
10       Q.   I'm asking you.  I'm asking you if there's
11  any authority, you know, any scientist who you
12  respect or any publication that you respect that
13  you're saying said based upon what was known up to
14  and including VIGOR that Vioxx causes heart attacks.
15       A.   The VIGOR publication itself showed a
16  five-fold excess risk of heart attacks.
17       Q.   Yeah, but that's not what I'm asking.  I'm
18  asking you whether anybody at the time that you can
19  point to drew the conclusion from VIGOR or anything
20  that preceded it that it was known that Vioxx caused
21  heart attacks?
22       MR. LOCKLAR:  Object to the form.
23       A.   I interpreted the Villalba's memos to say
24  that.
25       Q.   Where did Villalba's memos say that?

Page 239

1        A.   In those specific words, "cause"?  Well,
2   in the -- you and I may disagree on interpretation.
3   But on the advisory from February 8, 2001, the
4   conclusion on page 21 states, The relative risk of
5   cardiovascular thrombotic events was twice that in
6   rofecoxib compared to Naprosyn.  And she goes on to
7   describe the cumulative instance rate.  These
8   differences were statistically significant.  Safety
9   profiles must be carefully analyzed based on events
10  of comparable severity and seriousness.  Number
11  four, the sponsor recommends that patients with
12  known cardiovascular risk should be on prophylactic
13  aid, aspirin.
14       Q.   So what that represents is there was a
15  relative risk to Vioxx compared to naproxen in the
16  VIGOR study?
17       A.   Yes.
18       Q.   Is it your testimony that the VIGOR
19  publication demonstrated that Vioxx increased the
20  risk of heart attacks?
21       A.   It did.
22       Q.   And is it your testimony that reading the
23  VIGOR publication, one would reasonably draw the
24  conclusion that Vioxx caused heart attacks?
25       A.   Only by a careful examiner.

Page 240

1        Q.   And the VIGOR publication, if you read the
2   VIGOR publication, you would see a disparity in
3   rates between Vioxx and naproxen, correct?
4        A.   You would see a disparity of rates, but
5   the data were presented as protective for Naprosyn
6   and not harmful for Vioxx, which was inconsistent
7   with the way they presented their primary efficacy
8   outcome.
9        Q.   And so you would say to yourself the
10  alternative, if the glass isn't half full, the
11  alternative is that it's half empty and that the
12  result is coming from VIGOR [sic] and not naproxen?
13       A.   I'm an epidemiologist with 25 years of
14  training in cardiovascular disease, epidemiology,
15  critically reviewing studies on a daily basis.  I
16  may say that.  I don't know what other scientists
17  would say.
18       Q.   Okay.  But you could discern from reading
19  the VIGOR publication that the two possibilities
20  were either Vioxx was causing heart attacks or
21  naproxen was preventing or some combination?
22       A.   That's what the authors attempted to say.
23  I would not agree with that.
24       Q.   Okay.  But that's what the author is
25  attempting to convey in the VIGOR publications?

Page 241

1        A.   What they contempted to -- contempted.
2   Slip of the tongue.
3        Let me be specific because I don't think
4   they offered up that Vioxx caused heart attacks as a
5   possible explanation.  Specifically they say the
6   incidence of myocardial infarction was lower among
7   patients in the Naprosyn group than among those in
8   the rofecoxib group.  This is in the abstract.  And
9   then buried in the general safety, The mortality
10  rate was 0.5 percent in the rofecoxib group, 0.4
11  percent in the Naprosyn group.  The death from
12  cardiovascular causes was .2 percent in both groups
13  -- I'm sorry.  I'll slow down.
14       Myocardial infarctions were less common in
15  the Naprosyn group than the rofecoxib group.  And it
16  wasn't until the end of the discussion that they
17  bring up the cardiovascular issue at all.  And there
18  they talk about platelet aggregation.
19       Q.   Well --
20       A.   And state, Our results are consistent with
21  the theory that Naprosyn has a cardioprotective
22  effect.
23       Q.   And --
24       A.   So they do not say anything about an
25  alternative explanation.

61 (Pages 238 to 241)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 242

1    Q.   The results of VIGOR with regard to
2  myocardial infarction are right in the front of the
3  abstract, right?
4    A.   Specifically what is in the abstract,
5  after their main efficacy finding.
6    Q.   Which was the point of the study, right?
7    A.   It was the point of the study.  They talk
8  about safety first relative to GI events.
9    Q.   That was the point of the study?
10    A.   And then they bring up the incidence in
11  myocardial infarction was lower.  Again, the first
12  statement out is lower.
13    Q.   Okay.  And then the naproxen group?
14    A.   Than in the naproxen group.
15    Q.   And it gives the numbers, right?
16    A.   It does.
17    Q.   And says the overall mortality rate of
18  death from CV causes is similar, right?
19    A.   That's what it says.
20    Q.   Okay.  And we've gone over a lot of
21  information today where the FDA discussed the
22  possibility of naproxen being cardioprotective and
23  the possibility of Vioxx causing an increased risk.
24    A.   The totality of my interpretation of the
25  FDA data is that they refute the Naprosyn

Page 243

1  hypothesis.
2    Q.   Doctor, I'm not asking you for your
3  interpretation, but we looked at a lot of data along
4  the way today that repeatedly says that naproxen
5  being cardioprotective is a possible explanation,
6  correct?
7    A.   Could you restate your question?
8    Q.   We looked at multiple FDA memos today that
9  repeatedly state that naproxen being
10  cardioprotective is a possible mechanism?
11    MR. LOCKLAR:  Object to the form.
12    A.   I disagree.  And I have read in these
13  memos -- and if you would like to take the time,
14  I'll go through them -- that they did not consider
15  the Naprosyn hypothesis as a salient explanation for
16  the finding.
17    Q.   What do you mean by salient?
18    A.   Salient means valid.  Valid.
19    Q.   Well, I'm not going to go over it again.
20  I think that we reviewed earlier today several memos
21  where the FDA reviewers say naproxen may explain the
22  effect or there may be other explanations; do you
23  remember that?
24    A.   No, I do not.
25    I need to take a break too.

Page 244

1    Q.   Sure.  Actually just one second.
2    MR. LOCKLAR:  For the record, she's
3  looking at a complete copy of the 2001 Targum
4  memo which was on the CD that you previously
5  received a copy of.  I don't know why she didn't
6  get the full copy back.  I don't know if it was
7  a copy error when it was submitted in a previous
8  deposition or not, but she has that in front of
9  her.
10    MS. FREIWALD:  Okay.
11  BY MS. FREIWALD:
12    Q.   Just by way of example from the 3/12/02
13  memo, the last page under Conclusions, you may
14  remember we read earlier, "These data support the
15  hypothesis that the excess of MI found with
16  rofecoxib, 50 milligrams, in the VIGOR study as well
17  as the trends observed in the ADVANTAGE and the RA
18  databases with the 25 milligram dose relative to
19  naproxen may in part be explained by the lack of a
20  antiplatelet effect of rofecoxib relative to that
21  naproxen."
22    A.   I said that's what it stated in that
23  specific part of the FDA's review.
24    Q.   Okay.  Do you want to take a break?
25  That's fine.

Page 245

1    A.   But in this document page 34 of the Targum
2  review, which I didn't have access to before and I
3  kept saying I know I have read that the FDA didn't
4  -- am I on record?
5    Q.   Sure.
6    A.   -- didn't buy into the Naprosyn
7  hypothesis.  It says the hypothesis is not supported
8  by any prospective placebo control trials.  One
9  could further argue that no matter what the
10  attribution, the results are favorable for
11  Naprosyn.  And then they go on to, "This claim has
12  not convinced this medical reviewer the VIGOR data
13  are consistent even in patients who do not fall into
14  the aspirin indicated group."  So to me that
15  indicates that this medical examiner reviewer did
16  not buy that claim.
17    Q.   I want to take a look at that last page
18  while you take a break.
19    THE VIDEOGRAPHER:  We're off the record at
20  3:59.
21    (Off the record.)
22    THE VIDEOGRAPHER:  We are on the record.
23  The time is 4:08.
24  BY MS. FREIWALD:
25    Q.   First of all, what I want to do is I want

62  (Pages 242 to 245)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

1  to mark -- I have a copy of the full FDA review
2  since you were just looking at -- Doctor, confirm
3  that my copy is the same as you were just looking
4  at, and then we can mark that as the next exhibit
5  number.
6          It could easily have different Bates
7  numbers on it. It wouldn't surprise me if multiple
8  copies have been produced.
9      A.  It has the same Merck number 0002368.
10     Q.  Fine. So we'll just mark that as the next
11 exhibit number, okay.
12         (Defendant's Exhibit Number 15
13             was marked for identification.)
14     Q.  In the documents I pulled off the disk, I
15 found these two pages titled Arm Laceration Study,
16 and I just wanted to know if you reviewed that.
17     A.  I did not.
18     Q.  I'll mark them as 16.
19         (Defendant's Exhibit Number 16
20             was marked for identification.)
21     Q.  I believe it was in your report you
22 referred to external and internal validity of
23 clinical studies. Can you tell me what you meant by
24 that?
25     A.  By external validity I refer to the

1  ability to generalize to -- externally from the
2  study to people that would be similar in terms of
3  characteristics, clinical and demographic, of the
4  study participants.
5      Q.  And what about internal validity?
6      A.  Internal validity is a host of
7  different factors that we review as
8  epidemiologists. So in terms of the clinical
9  trial we would evaluate whether it was randomized,
10 placebo controlled, whether the randomization
11 worked or didn't work in terms of distribution of
12 baseline risk factors. We would evaluate how well
13 blinding, if it was blinding, was adhered to. We
14 would look at the quality and adherence to follow
15 up by study participants. We would evaluate the
16 criteria that were established for finding primary
17 endpoints, secondary endpoints. And then in the
18 interpretation phase we would be evaluating
19 whether the analysis was done appropriately.
20 That's generally -- those are the main areas that
21 would be covered.
22     Q.  And with the internal validity am I
23 right that one has to be cautious in extrapolating
24 the findings of one study to populations that are
25 not the same as the population that was

1  represented in the study?
2      A.  That is a general -- a generally held
3  principle of epidemiology. In the Vioxx example one
4  of the concerns was that most of the populations
5  were fairly healthy and not representative of who
6  would be taking the drug in clinical practice.
7      Q.  Do you know anywhere where that was
8  actually the case where anybody expressed a concern
9  that the patients were not the kind of patients who
10 would be taking the medication?
11     A.  I know from the senate testimony I
12 reviewed for Vioxx that there was a study cited that
13 evaluated the risk factor levels among people in an
14 HMO who had taken Vioxx and they were markedly
15 higher in terms of risk factor levels than any of
16 the trial participants.
17     Q.  And have you done an analysis of how many
18 patients in the trials were hypertensive, had one or
19 more risk factor for cardiovascular disease?
20     A.  I have not but in general they were
21 healthier. The other evidence came from the
22 Canadian study where they documented the risk factor
23 level of the people in the community and health
24 system that had taken Vioxx. And they also have
25 much higher levels of risk factors than the trial

1  participants.
2      Q.  And did you look to see whether patients
3  who took Vioxx in observational studies tended to be
4  less healthy than patients who were on other NSAIDs?
5      A.  I have not seen that data. It doesn't
6  mean it doesn't exist. I haven't looked for it.
7      Q.  And with regard to other kinds of
8  epidemiologic data, like Framingham data, for
9  example, is it also true that one has to be careful
10 about extrapolating those results to other
11 populations?
12     A.  Can you be more --
13     Q.  One has to be careful in using Framingham
14 data, for example, in extrapolating those results to
15 other populations and drawing conclusions about what
16 the relative risk of an event would be in a
17 different kind of population?
18     A.  Interestingly the Framingham score has
19 held up consistently across populations.
20     Q.  It is true that what the Framingham risk
21 score is doing is looking to predict risk based on
22 population data in the absence of clinical diagnoses
23 of cardiovascular disease?
24     A.  Specifically the Framingham risk score was
25 derived in people without clinical disease, and

63 (Pages 246 to 249)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 250

1  prediction equations were calculated for expected
2  probability of an event over a specified time period
3  based on risk factor levels in the model.
4      Q.   And so it doesn't really apply to patients
5  who have known diagnosed cardiovascular disease?
6      A.   I can't say that it doesn't apply in terms
7  of the risk factor functions. In other words, if
8  you're hypertensive -- I'm not sure if they have an
9  -- let me go back.
10         I'm not sure if the Framingham risk score
11 hasn't been evaluated in people with disease for
12 predicting recurring disease. And I'm not surprised
13 there aren't publications out there that have done
14 that.
15     Q.   Good point for predicting recurring
16 disease. But, for example, if you take somebody who
17 is -- who meets a certain demographic model and you
18 might extrapolate from Framingham that they had
19 let's say a 10 percent risk of having a
20 cardiovascular event over the next ten years, okay?
21     A.   Okay.
22     Q.   If you -- you couldn't apply Framingham to
23 that person if you already knew that they had
24 clinically evident atherosclerosis?
25         MR. LOCKLAR: Object to the form.

Page 251

1      A.   I have -- I would have to -- I have not
2  reviewed that data. I am -- I'm pretty sure that
3  that kind of question has been asked. I just
4  haven't reviewed that data. And so I can't answer
5  that with certainty about whether you could or
6  couldn't. I'm sure there are equations that exist.
7      Q.   Okay. But what Framingham was designed to
8  do was look -- it started out looking at healthy
9  patients who were assumed to have not yet developed
10 disease or not yet developed any clinically
11 significant cardiovascular event and see what the
12 likelihood was that they would develop it over a
13 ten-year period, correct?
14     A.   Correct.
15     Q.   You agree that it's wrong to cherry pick
16 data?
17     A.   I don't -- define cherry pick.
18     Q.   To be selective and only rely on the
19 studies that support you and ignore the studies that
20 don't support you?
21     A.   I would agree that you look at the
22 totality of evidence stemming from all types of
23 studies and study designs and give greater weight to
24 clinical trials in terms of making an inference.
25     Q.   And do you agree that it is wrong to over-

Page 252

1  interpret data to try to argue the data stands for
2  more than what it was intended to stand for by
3  virtue of the study design?
4          MR. LOCKLAR: Object to the form.
5      A.   I would not agree that -- what I would say
6  as an epidemiologist is I would look at the totality
7  of the data in relation to other published data,
8  other studies, particularly clinical trials that
9  have been done to make an interpretation of that
10 data.
11     Q.   Is the term over-interpreting data one
12 that you're familiar with?
13     A.   I'm familiar with that term.
14     Q.   And what does it mean to you?
15     A.   To me over-interpret means to go beyond
16 the meaning of the number.
17     Q.   And you agree that's something that one
18 should not do in epidemiology?
19     A.   As a careful epidemiologist I review
20 internal validity, external validity, statistical
21 power, all of the pieces that went into internal
22 validity I described before in order to interpret a
23 number. A number in and of itself has very little
24 meaning to me.
25     Q.   So it's important not to go beyond what

Page 253

1  the meaning or bounds of the study were?
2      A.   Could you be more specific?
3      Q.   It's important -- when you say it's
4  important not to over-interpret data, it's important
5  not to try to make it stand for more than it
6  reasonably stands for?
7      A.   I don't know what reasonable means.
8      Q.   More than it was intended to prove by its
9  design.
10     A.   I'm not being wishy-washy here. As an
11 epidemiologist if we designed a study, if we got an
12 equivocal answer about a particular hypothesis, we
13 would look at studies prior, we would develop
14 studies to address the limitations in that study,
15 and interpret the data as they are.
16     Q.   Do you consider a p-value of .07 to be a
17 strong signal? Is that a meaningful p-value to you?
18     A.   It just means that that result or one more
19 extreme could have happened seven out of -- in seven
20 out of 100 attempts.
21     Q.   I guess what I'm asking is when you look
22 at statistical significance do you say it's either P
23 of .05 or it's not, or do you allow for some band
24 around that .05?
25     A.   As an epidemiologist I look at the

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 254

1  totality of evidence. So if I had a P value of .07
2  but I had very low statistical power to detect that
3  finding, then I may be more inclined to give it more
4  weight.
5      Q.  So P of .07 under certain circumstances
6  can be a strong indicator to you?
7      A.  It could be. In a case of APPROVe where
8  you have a very large sample and have a power of P
9  of .07 it is not as meaningful to me.
10     MS. FREIWALD:  I guess we need to change
11  the tape.
12     THE VIDEOGRAPHER:  This is the end of Tape
13  Number Six in the continued deposition of Donna
14  Arnett to be continued on Tape Number Seven. We
15  are off the record at 4:22 p.m.
16        (Off the record.)
17     THE VIDEOGRAPHER:  This is the beginning
18  of Tape Number Seven in the continued deposition
19  of Donna Arnett. We are on the record at 4:24.
20  BY MS. FREIWALD:
21     Q.  Doctor, do you believe that APPROVe was
22  adequately powered to find cardiovascular effect?
23     A.  As I stated for the VIGOR study, when you
24  have a statistically significant finding,
25  statistical power is not relevant.

Page 255

1      Q.  Did you do a power calculation?
2      A.  I did not.
3      Q.  And do you know what the power was to
4  detect proportional hazard over time?
5      A.  I do not. But there was a significant
6  effect of Vioxx over time.
7      Q.  Do you know -- the test for
8  non-proportionality was -- P is .07, correct?
9      A.  For -- it varies by different endpoints
10  selected so that it wasn't true for all endpoints.
11     Q.  And you don't know what the power was to
12  see if the results were non-proportional?
13     A.  I do not.
14     Q.  Do you know what -- whether there was a
15  relative -- an increased relative risk in the
16  Alzheimer studies in the first 18 months?
17     A.  If you give me time, I'll go back and
18  review it.
19     Q.  That's okay. Sitting here today do you
20  know?
21     A.  I don't want to sound like I'm not
22  knowledgeable about the topic. I don't recall there
23  being a difference in the effect over time.
24     Q.  Okay. Do you know if the Alzheimer's test
25  -- Alzheimer study had ended at 18 months whether

Page 256

1  you would have seen an increased risk of relative
2  risk in Vioxx?
3      A.  For what outcome?
4      Q.  For MI.
5          MR. LOCKLAR:  Object to the form.
6      A.  Could you restate the question?
7      Q.  If Alzheimer's had ended in 18 months do
8  you know if you would have seen increased relative
9  risk with Vioxx?
10         MR. LOCKLAR:  Object to the form.
11     A.  For myocardial infarction I have concerns
12  about the data quality from the Alzheimer disease
13  study because, number one, it was associated with an
14  increase in Alzheimer's disease development by their
15  definition of their endpoint, which would lead to
16  differential reporting in my estimation of
17  myocardial infarction.
18     Q.  Okay. Move to strike as nonresponsive.
19  Do you know the answer to my question?
20     A.  You'll have to restate your question.
21     Q.  Whether there was any increased relative
22  risk in the first 18 months?
23         MR. LOCKLAR:  Object to the form.
24     A.  For?
25     Q.  MI.

Page 257

1      A.  Myocardial infarction --
2          MR. LOCKLAR:  Same objection.
3      A.  There was an -- a significant and numeric
4  increase in cardiovascular deaths.
5      Q.  Do you know about for MI?
6      A.  As I said, as an epidemiologist I don't
7  have confidence in the myocardial infarction
8  reporting ability of people with cognitive decline.
9      Q.  Doctor, have you ever had an experience
10  where you've done a study with Alzheimer's patients
11  to look for this to know whether this can be done
12  appropriately or not?
13     A.  I have evaluated studies for defining
14  outcomes in the elderly. And there is poor
15  reporting in the elderly --
16     Q.  And there --
17     A.  -- for cardiovascular events.
18     Q.  And there are ways to do the studies,
19  right? There are ways to do the studies that are
20  appropriate, correct?
21     A.  If you do serial electrocardiograms, if
22  you have adequate follow-up.
23     Q.  Have you looked into any of that?
24     A.  Well, I can tell you that there was quite
25  a bit more drop-out in those who were randomized

65 (Pages 254 to 257)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

1  with Vioxx in the Alzheimer's disease study. There
2  was less compliance --
3     Q.   Doctor, have you --
4     A.   -- and more cardiovascular outcome,
5  adverse events for dropping out.
6     Q.   I'm just looking for an answer to my
7  question, Doctor. Move to strike as nonresponsive.
8       Did you look to see whether there was --
9  there were appropriate measures to see if the
10  reporting was accurate in the Alzheimer's study?
11    A.   I have -- they did not publish their
12  method. It's not reported to the best of my memory,
13  and I'll check this in the FDA memos. But there's
14  certainly publications in the cardiovascular
15  epidemiology world and gerontology that indicates
16  that reporting differs.
17       And there's also evidence that silent
18  myocardial infarctions are as common or more
19  common. By silent I mean asymptomatic. And so if
20  one has cognitive decline, it would seem that
21  reporting would be differential.
22    Q.   Well, there's no evidence that there's a
23  correlation between cognitive decline and an
24  increase in silent MI. And cognitive decline
25  doesn't block pain response, right?

1     A.   No. But your ability to define pain would
2  be questionable.
3     Q.   Doctor, you don't have any evidence other
4  than speculation that in the Alzheimer's studies
5  heart attacks weren't appropriately reported in
6  patients with mild cognitive impairment?
7       MR. LOCKLAR: Object to the form.
8     A.   I don't have evidence to convince me that
9  it was either.
10    Q.   Okay. So you want to prove that something
11  was done wrong by an absence of evidence, correct?
12      MR. LOCKLAR: Object to the form.
13    Q.   You could be neutral on this. You could
14  say you don't know.
15    A.   I'm actually not neutral about this. I do
16  -- there was an excess of development of Alzheimer's
17  disease among those randomized for Vioxx. And it is
18  my -- knowing what I do about the frequency of
19  misreporting of symptoms for myocardial infarction
20  in general, it is my assertion that if you have
21  cognitive decline that's increased by taking a drug,
22  that you would be more likely to misreport the
23  symptoms.
24    Q.   Is there any evidence that there's a
25  correlation between the patients who had MI and the

1  patients who had an increase in cognitive decline?
2     A.   I haven't looked at the -- the data are
3  not presented in that way.
4     Q.   Is there any evidence that the patients
5  had cognitive decline to a level where they would be
6  incapable of reporting a heart attack or having
7  somebody else know that they had a heart attack?
8     A.   I can't say either way. I haven't
9  evaluated that question.
10    Q.   Fine.
11      MS. FREIWALD: That's all I have.
12      MR. LOCKLAR: Let me just state for the
13  record very quickly on Exhibit Number 16 this
14  looks to be attorney work product. Dr. Arnett
15  says that she has not seen it before. It looks
16  to perhaps be prepared for the Plunkett, Irvin
17  trial. We're going to move to have it stricken
18  from the record. I don't know what the process
19  necessarily will be. But I want to make sure
20  that I state my objection and belief that it's
21  attorney work product. I don't know how we go
22  about doing that but I just want to --
23      MS. FREIWALD: Okay. I pulled it off the
24  disk.
25      MR. LOCKLAR: Which she says she's not

1  seen.
2     MS. FREIWALD: Okay. That's fine.
3     THE VIDEOGRAPHER: This is the end of Tape
4  Number Seven and concludes the deposition of
5  Donna Arnett, Ph.D. taken October 20th 2006.
6  We're off the record at 4:32 p.m.
7     (End of deposition, 4:32 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

66 (Pages 258 to 261)

55a210ee-308b-4267-ba95-cd6434e81231

Donna Arnett, Ph.D.

Page 262

SIGNATURE OF WITNESS

1
2      I, _____, do hereby
3   certify that on this _____ day of
4   _____ 2006, I have read the foregoing
5   transcript and to the best of my knowledge it
6   constitutes a true and accurate transcript of my
7   testimony taken by oral deposition on October 20,
8   2006.
9
10
11   _____
12   DONNA ARNETT, Ph.D.
13
14   Subscribed and sworn to
15   me this _____ day of _____,
16   2006.
17
18
19
20   _____
     NOTARY PUBLIC
21
22
23
24
25

Page 264

CERTIFICATE

1
2
3   STATE OF ALABAMA )
4   JEFFERSON COUNTY )
5
6
7      I hereby certify that the above and
8   foregoing deposition was taken down by me in
9   stenotype, and the questions and answers thereto
10   were reduced to computer print under my
11   supervision, and that the foregoing represents a
12   true and correct transcript of the deposition
13   given by said witness upon said hearing.
14      I further certify that I am neither of
15   counsel nor of kin to the parties to the action,
16   nor am I in anywise interested in the result of
17   said cause.
18
19
20
21
22      _____
              Lisa Bailey, Commissioner
23
24
25

Page 263

ERRATA SHEET

1
2
3   PAGE   LINE    CORRECTION      REASON
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

67 (Pages 262 to 264)

55a210ee-308b-4267-ba95-cd6434e81231

# EXHIBIT  E

To:                          Van Adelsberg, Janet <janet_vanadelsberg@merck.com>; Kashuba, Maureen
<maureen_kashuba@merck.com>
From:                        Ng, Jennifer </O=MERCK/OU=NORTHAMERICA/CN=RECIPIENTS/CN=NGJ>
Cc:                          Bolognese, James A. <james_bolognese@merck.com>; Braunstein, Ned S.
<ned_braunstein@merck.com>; Curtis, Sean P. <sean_curtis@merck.com>; Selwyn, Murray R
<murray_selwyn@merck.com>; Ko, Amy T. <amy_ko@merck.com>
Bcc:
Received Date:               2005-02-01 14:15:38
Subject:                     Preliminary VICTOR CV counts

---

Attached are the preliminary findings from the VICTOR study -- we're still double checking the programs but I
don't expect the overall picture to change.  These counts are based on the prime therapy dates received from
Oxford on 1-28-05, including the data handling rules that were agreed upon last week.    It appears that the
TCVSAE result is statistically significant (4 in placebo vs. 12 in rofecoxib, RR and 95% CI: 3.13 (1.01, 9.71)).
The APTC counts are 3 (pbo) vs 7 (rofe), RR 2.46 (0.56, 14.72) -- too few to be statistically significant.


Jennifer

---

Attachments:

aptc14_cnt145.rtf
APTC145.doc
tcvsae14_cnt145.rtf
TCVSAE145.doc

EXHIBIT

E

tabbies

MRK-AFK0190650



Kaplan Meier Plot of Time to Confirmed Thrombotic CV Events for Protocol 145

| | | | | | |
|---|---|---|---|---|---|
| # Patients at Risk | | | | | |
| Placebo | 1172 | 759 | 411 | 218 | 62 |
| Rofecoxib 25 mg | 1169 | 724 | 386 | 185 | 57 |
| # Cumulative Events | | | | | |
| Placebo | 0 | 3 | 3 | 4 | 4 |
| Rofecoxib 25 mg | 0 | 8 | 10 | 12 | 12 |

Events Within 14 Days After Last Dose
Plots were truncated when the risk size in any arm is < 50.
No event occurred after the truncation point.

MRK-AFK0190651



Kaplan Meier Plot of Time to APTC SAEs for Protocol 145

# Patients at Risk

| | | | | | |
|---|---|---|---|---|---|
| Placebo | 1172 | 760 | 412 | 218 | 62 |
| Rofecoxib 25 mg | 1169 | 725 | 387 | 185 | 57 |

# Cumulative Events

| | | | | | |
|---|---|---|---|---|---|
| Placebo | 0 | 2 | 2 | 3 | 3 |
| Rofecoxib 25 mg | 0 | 4 | 6 | 7 | 7 |

Events Within 14 Days After Last Dose
Plots were truncated when the risk size in any arm is < 50.
No event occurred after the truncation point.

MRK-AFK0190652

# EXHIBIT  F



## Table of Contents

1. Executive Summary ..................................................................................... 6

2. Introduction ............................................................................................. 7

3. Rationale for the APPROVe Study ................................................................. 8

4. Efficacy ................................................................................................... 8

5. Cardiovascular Safety ................................................................................. 9

5.1  Cardiovascular Events ............................................................................ 10

5.2  Statistical Methodology ........................................................................... 13

6.  Demographic and Other Patient Characteristics .............................................. 14

7.  Results of Cardiovascular Safety ................................................................. 18

7.1  Accounting of Events .............................................................................. 18

7.2  Mortality ............................................................................................... 20

7.3  Confirmed Thrombotic Events ................................................................... 21

7.4  Confirmed APTC Events .......................................................................... 29

7.5  Investigator-Reported Cardiovascular Events ............................................... 33

7.6  New Ischemic Events .............................................................................. 39

7.7  Subgroup Analyses of Confirmed Thrombotic Cardiovascular Events ............... 43

7.8  Relationship Between Blood Pressure and Cardiovascular Events ..................... 46

8.  Discussion ............................................................................................... 55

9.  Conclusions ............................................................................................. 56

Reference ................................................................................................... 56

Supplemental Tables .................................................................................... 57



MRK-AHD0075757



## List of Tables

Table 1 Adjudicated Confirmed Thrombotic Cardiovascular and APTC[†] Combined Endpoints .................................................................................................... 12

Table 2 Baseline Patient Characteristics ...................................................................... 14

Table 3 Baseline Cardiovascular Related Characteristics .............................................. 17

Table 4 Post-Randomization Cardiovascular Related Characteristics ............................ 18

Table 5 Summary of Confirmed Thrombotic Cardiovascular Events by Class of Terms (Events on Treatment through 14 Days After the Last Dose of Study Therapy) ...... 22

Table 6a Summary of Confirmed Thrombotic Cardiovascular Events by Time Interval (6 Months) (Events on Treatment through 14 Days After the Last Dose of Study Therapy) .......................................................................................................... 25

Table 6b Summary of Confirmed Thrombotic Cardiovascular Events by Time Interval (18 Months) (Events on Treatment through 14 Days After the Last Dose of Study Therapy) .......................................................................................................... 25

Table 7 Analysis of Cardiovascular Saftey Endpoints  (Events on Treatment through 14 Days After the Last Dose of Study Therapy) .......................................................... 26

Table 8 Analysis of Confirmed Thrombotic Cardiovascular Events by Class of Terms (Events on Treatment through 14 Days After the Last Dose of Study Therapy) ...... 28

Table 9 Summary of Confirmed APTC Events by Class of Terms  (Events on Treatment through 14 Days After the Last Dose of Study Therapy) ........................................ 29

Table 10a Summary of Confirmed APTC Events by Time Interval (6 Months) (Events on Treatment through 14 Days After the Last Dose of Study Therapy) ...................... 32

Table 10b Summary of Confirmed APTC Events by Time Interval (18 Months) (Events on Treatment through 14 Days After the Last Dose of Study Therapy) .................. 32

Table 11 Summary of Investigator-Reported Cardiovascular Events by Class of Terms (Events on Treatment through 14 Days After the Last Dose of Study Therapy) ...... 34

Table 12a Summary of Investigator Reported Cardiovascular Events by Time Interval (6 Months) (Events on Treatment through 14 Days After the Last Dose of Study Therapy) .......................................................................................................... 38

MRK-AHD0075758



Table 12b Summary of Investigator Reported Cardiovascular Events by Time Interval (18 Months) (Events on Treatment through 14 Days After the Last Dose of Study Therapy)......................................................................................................... 38

Table 13 Summary of New Ischemic Events by Class of Terms  (Events on Treatment through 14 Days After the Last Dose of Study Therapy)......................................... 39

Table 14a Summary of New Ischemic Events by Time Interval (6 Months)  (Events on Treatment through 14 Days After the Last Dose of Study Therapy)....................... 42

Table 14b Summary of New Ischemic Events by Time Interval (18 Months)  (Events on Treatment through 14 Days After the Last Dose of Study Therapy)  ...................... 42

Table 15 Subgroup Analysis of Confirmed Thrombotic Events  (Events on Treatment through 14 Days After the Last Dose of Study Therapy)......................................... 44

Table 16 Post-Randomization Subgroup Analysis of Confirmed Thrombotic Cardiovascular Events  (Events on Treatment through 14 Days After the Last Dose of Study Therapy)................................................................................................... 45

Table 17 Baseline Blood Pressure and Confirmed Thrombotic Events  (Events on Treatment through 14 Days After the Last Dose of Study Therapy)....................... 46

Table 18 Baseline Diastolic Blood Pressure and Confirmed Thrombotic Events  (Events on Treatment through 14 Days After the Last Dose of Study Therapy) .................. 46

Table 19 Baseline Systolic Blood Pressure and Confirmed Thrombotic Events  (Events on Treatment through 14 Days After the Last Dose of Study Therapy) .................. 47

Table 20 Confirmed Thrombotic Events by Equally Sized Subgroup of Change from Baseline  in Mean Arterial Pressure at Week 4  (Events on Treatment through 14 Days After the Last Dose of Study Therapy).......................................................... 47

Table 21 Confirmed Thrombotic Events by Equally Sized Subgroup of Average Change from Baseline in Mean Arterial Pressure at Weeks 4 and 17  (Events on Treatment through 14 Days After the Last Dose of Study Therapy)....................................... 48

Table 22a Post-Randomization Blood Pressure Subgroup Analysis of Confirmed Thrombotic Events (Blood Pressure Measurements during the Entire Treatment Period were Included) (Events on Treatment through 14 Days After the Last Dose of Study Therapy)................................................................................................... 49

Table 22b Post-Randomization Blood Pressure Subgroup Analysis of Confirmed Thrombotic Events (Blood Pressure Measurements on or After CV Event Day Were Censored) (Events on Treatment through 14 Days After the Last Dose of Study Therapy)................................................................................................... 49

3



Table 23a Post-Randomization Blood Pressure Subgroup Analysis of Confirmed Thrombotic Events ................................................................................................ 49

Table 23b Post-Randomization Blood Pressure Outlier and Confirmed Thrombotic Events ............................................................................................................ 50

Table 24 Blood Pressure and Confirmed Thrombotic Events (Events on Treatment through 14 Days After the Last Dose of Study Therapy) ........................................ 51

Table 25 Actual Observed versus Framingham Model Based Expected Cumulative Incidence of Myocardial Infarction (Events on Treatment through 14 Days After the Last Dose of Study Therapy) ................................................................................ 53

Table 26 List of Cardiovascular Adverse Experiences or Deaths Eligible for Adjudication and the Adjudication Outcome Events on Treatment through 14 Days After the Last Dose of Study Therapy ..................................................................................... 57

Table 27 List of Cardiovascular Adverse Experiences or Deaths Eligible for Adjudication and the Adjudication Outcome Events between 15 Days and 28 Days after the Last Dose of Study Therapy ..................................................................................... 66

Table 28 List of Cardiovascular Adverse Experiences or Deaths Eligible for Adjudication and the Adjudication Outcome Events 28 Days after the Last Dose of Study Therapy ........................................................................................................... 67

MRK-AHD0075760


Restricted
Confidential
limited access

## List of Figures

Figure 1 Accounting of Cardiovascular Related Events (Patients) for the Base Study .... 20

Figure 2 Kaplan-Meier Plot for Confirmed Thrombotic Cardiovascular Events (Events on Treatment through 14 Days After the Last Dose of Study Therapy) ...................... 23

Figure 3 Hazard Plot for Confirmed Thrombotic Cardiovascular Events (Events on Treatment through 14 Days After the Last Dose of Study Therapy) ...................... 24

Figure 4 Kaplan-Meier Plot for Confirmed APTC Events (Events on Treatment through 14 Days After the Last Dose of Study Therapy) .................................................. 30

Figure 5 Hazard Plot Confirmed APTC Events (Events on Treatment through 14 Days After the Last Dose of Study Therapy) ................................................................. 31

Figure 6 Kaplan-Meier Plot for Investigator-Reported Cardiovascular Events (Events on Treatment through 14 Days After the Last Dose of Study Therapy) ...................... 36

Figure 7 Hazard Plot for Investigator Reported Cardiovascular Events (Events on Treatment through 14 Days After the Last Dose of Study Therapy) ...................... 37

Figure 8 Kaplan-Meier Plot for New Ischemic Events (Events on Treatment through 14 Days After the Last Dose of Study Therapy) .......................................................... 40

Figure 9 Hazard Plot for New Ischemic Events (Events on Treatment through 14 Days After the Last Dose of Study Therapy) ................................................................. 41

Figure 10 Actual Observed versus Framingham Model Based Expected Cumulative Incidence of MI (Events on Treatment through 14 Days After the Last Dose of Study Therapy) ................................................................................................... 54

MRK-AHD0075761