UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL DOCKET No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L - DIVISION 3 |
| | * | |
| This document relates to | * | JUDGE FALLON |
| CASE NO. 2:05CV2524 | * | |
| | * | |
| ANTHONY WAYNE DEDRICK, | * | MAG. JUDGE KNOWLES |
| an Individual, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |

## PLAINTIFF'S OPPOSITION TO MERCK'S MOTION TO EXCLUDE THE OPINION TESTIMONY OF EGIL FOSSLIEN, M.D.

Plaintiff Anthony Dedrick, based on the arguments and evidence set out below, urges the Court to deny Merck's Motion to Exclude the Opinion Testimony of Egil Fosslien, M.D. Dr. Fosslien is qualified to proffer each of the opinions challenged in Merck's motion, and his testimony is both reliable and relevant.

## I. INTRODUCTION

The instant motion seeks to exclude testimony of Dr. Fosslien that purportedly addresses Merck's state of mind and Merck's compliance with FDA regulations regarding the adequacy of the Vioxx label. Merck's remaining arguments are premature, speculative and unlikely to arise at trial.

1

Merck's concerns are more appropriately addressed in the context of trial, rather than in the vacuum that presently exists.

In the Court's ruling in *Barnett,* the Court found: "[T]he Court finds that Dr. Fosslien may testify as to what was known in the relevant medical/scientific community based upon the literature and studies available at the time, and based on this knowledge, what the Defendant should have known regarding the risks associated with Vioxx.  To the extent that Dr. Fosslien attempts to go beyond this limit, the Defendant's motion is GRANTED." *Barnett v. Merck & Co.*, Order of July 29, 2006, at 1-2. Plaintiff does not intend to offer expert testimony from Dr. Fosslien about Merck's state of mind or Merck's compliance with FDA regulations.

## II.   STATEMENT OF FACTS

This action for personal injuries arises from Plaintiff Anthony Dedrick's use of Vioxx, which caused a heart attack on January 8, 2003, and resulting damage to his heart, necessitating coronary artery bypass surgery five days later.  Mr. Dedrick was approximately 47 years old when he was prescribed Vioxx by his physician in July 2002, and he had been taking the drug for approximately 6 months at the time of his heart attack.

Plaintiff contends that his heart attack was caused by a clot in one of his coronary arteries which resulted from a plaque rupture as well as the acceleration of atherogenesis due to Vioxx use.  Dr. Esmeraldo Herrera, Mr. Dedrick's treating physician, testified that had Merck disclosed the known risks of Vioxx he would not have prescribed Vioxx to Mr. Dedrick.  However, because Dr. Herrera was unaware of the risks of Vioxx, and Merck failed to disclose and warn what it knew regarding the dangers of Vioxx, Mr. Dedrick continued to take the drug even after his heart attack, until June 2003.

As a result of the heart attack and 4-way bypass surgery at the early age of 47, Mr. Dedrick suffers from permanent damage to his heart, which has reduced his life expectancy.  In addition, he is

now at a much greater risk of suffering another heart attack, and the bypass surgery has placed him at a greater risk for heart failure.

III.   **ARGUMENT**

    A.   **DR. FOSSLIEN'S TESTIMONY REGARDING MERCK'S KNOWLEDGE OF THE CARDIOVASCULAR RISKS POSED BY VIOXX IS ADMISSIBLE AS IT ADDRESSES ISSUES OF NOTICE, NOT CORPORATE INTENT, NOR STATE OF MIND.**

In preparing his report, Dr. Fosslien was provided with numerous internal documents produced by Merck during discovery.   Discussions within Merck informed Dr. Fosslien about Merck's ever developing knowledge about the cardiovascular risks posed by Vioxx.   Plaintiff concedes that even paranoids have enemies, but Merck's sensitivity to Dr. Fosslien's interpretation of Dr. Scolnick's email that the CV events are clearly there.... this is real....this will limit the class somewhat...., Fosslien Report at 39 (Ex. "A"), as an expression of concern takes Merck's sensitivities to new limits.   Merck uses this reference by Dr. Fosslien to boot-strap a preclusion argument to Dr. Fosslien's discussion about the VIGOR study results.   Merck overreaches.

Mr. Dedrick is not attempting to use Dr. Fosslien to invade the province of the jury by having him offer opinions that are based upon his own scientific interpretation of the results of the VIGOR study or to testify that his assessment of the risks known by Merck at the time are corroborated by Dr. Skolnick's email.   In opining in this fashion, Dr. Fosslien's testimony will aide the jurors by offering a perspective about the knowledge available to the scientific community at the time of the VIGOR study results and Merck's contemporaneous reaction.   An appropriate interrogation can readily be fashioned well within the strictures of the Federal Rules of Evidence, as well as Merck's expressions of concern.

Previously, this Court in *In re Vioxx Products Liability Litigation*, 401 F. Supp. 2d 565, 587 (E.D.La. Nov. 18, 2005), recognized that similar testimony by Mr. Irvin's experts could be admissible if properly presented. The Court [specifically reserved] ruling on these issues until such time as they

[were] presented at trial. *Id.* Plaintiff submits that this is the only appropriate ruling at this time as Dr. Fosslien will not simply read his report into the record but will be asked questions instead. Only at the time that the questions are asked will Merck or the Court be able to determine whether they are objectionable.

The rationale for introducing such testimony is straight forward. Merck, as the manufacturer of Vioxx, is reasonably held to the standards of an expert in the field. See *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1277 (5th Cir.) (A drug manufacturer is held to the skill of an expert in his field and is presumed to posses an expert's knowledge of the arts, materials and processes of the pharmaceutical business. Included in such expertise must be a familiarity with practices and knowledge common in the drug industry as to distribution and administration of pharmaceutical products.), cert. denied, 419 U.S. 1096 (1974). Dr. Fosslien, as an unchallenged expert in pathology, is amply qualified to testify about what experts in the field knew or should have known about the potential for Vioxx causing cardiovascular risks. See *Erickson v. Baxter Healthcare, Inc.*, 151 F .Supp. 2d 952, 964 (N.D.Ill. 2001). Therefore, Dr. Fosslien should be entitled to opine upon what Merck should have known or, in fact, knew (as evidenced by Dr. Scolnick's email).

Accordingly, Plaintiff respectfully requests that the Court reserve ruling on Merck's motion unless and until a specific objection arises at trial.[1]

Merck's challenge against Dr. Fosslien raises trivial issues that waste the Court's time and unnecessarily multiplies the litigation burden of the parties and the Court in violation of 28 U.S.C.

---

[1] Merck also challenges Dr. Fosslien's response to Merck's counsel's questions at his deposition regarding whether he had an opinion about FDA's approval of Vioxx. Dr. Fosslien candidly answered each question posed to him by informing Merck's counsel that he had such an opinion but was not offering that opinion unless Merck's counsel asked for it at trial. *See* Fosslien Depo. June 8, 2006 at p. 91 (Ex. "B"). In its motion, Merck now objects to Dr. Fosslien having an opinion that he is on record as having no intent to offer at trial. Merck's motion is much ado about nothing.

1927.  There is no merit to the instant motion.  It should be denied prejudice to the rights of Merck to raise an appropriate objection if the need ever arises at trial.

## B.   DR. FOSSLIEN'S TESTIMONY THAT VIOXX CAUSES ATHROSCLEROSIS IS RELIABLE AND BASED UPON SCIENTIFICALLY VALID REASONING AND METHODOLOGY.

Defendant Merck, in their Memorandum in Support of Motion for an Order Excluding Testimony of Dr. Fosslien (Memorandum) claims that Dr. Fosslien "has prepared an all-purpose report on 'the pathogenesis of adverse cardiovascular complications induced by rofecoxib.'"  What Merck fails to share with the Court is the fact that Dr. Fosslien, *prior to being retained by an expert by the plaintiffs*, wrote, and subjected to peer-review, multiple articles pertaining to the COX-2 inhibitors, the class of drugs to which rofecoxib belongs.  These publications, an "all-purpose" review of biochemistry, molecular pathology, gastrointestinal and cardiovascular complications, are

- "The Biochemistry of Cyclooxygenase (COX)-2 Inhibitors and Molecular Pathology of COX-2 in Neoplasia"[2]

- "The Molecular Pathology of Cyclooxygenase-2 in Cancer-Induced Angiogenesis"[3]

- "Adverse Effects of Nonsteroidal Anti-Inflammatory Drugs on the Gastrointestinal System"[4]

- "Review: Cardiovascular Complications of Nonsteroidal Anti-inflammatory Drugs"[5]

Collectively, these publications cite 921 "all-purpose" references. These four articles, "subjected to peer review and publication," contain scientific fact and data which have gained "widespread acceptance," have a "known or potential rate of error" and been subjected to the "test" of scientific

---

[2] Fosslien E.  The biochemistry of cyclooxygenase (COX)-2 inhibitors and molecular pathology of COX-2 in neoplasia. *Crit Rev Clin Lab Sci* 2000;37(5):431-502. (Ex. "C").

[3] Fosslien E.  Molecular pathology of cyclooxygenase-2 in cancer-induced angiogenesis. *Ann Clin Lab Sci* 2001;31(4):325-47. (Ex. "D").

[4] Fosslien E. Adverse effects of nonsteroidal anti-inflammatory drugs on the gastrointestinal system. Ann Clin Lab Science, 28;2:67-81. (Ex. "E").

scrutiny. They have been cited, in turn, by two hundred and twenty seven (227) subsequent medical and scientific articles *including* **the following articles authored or co-authored by Merck scientists:**

- Langman et al., "Adverse Upper Gastrointestinal Effects of rofecoxib Compared with NSAIDs"[6]

- Hawkey et al. "Comparison of the Effect of Rofecoxib (A Cyclooxygenase 2 Inhibitor), Ibuprofen, and Placebo on the Gastroduodenal Mucosa of Patients with Osteoarthritis: A Randomized, Double-Blind, Placebo-Controlled trial"[7]

- Brater DB, Harris C, Redfern JS, Gertz BJ.  Renal Effects of COX-2-Selective Inhibitors[8]

- Hunt RH, Harper S, Callegari P., et al.   Complementary studies of the gastrointestinal safety of the cyclo-oxygenase-2-selective inhibitor Etoricoxib[9]

- Marshall J.K, Pellissier J.M., Attard C.L. Kong S.X., Marentette M.A. Incremental Cost-Effectiveness Analysis Comparing Rofecoxib with Nonselective NSAIDs in Osteoarthritis: Ontario Ministry of Health Perspective[10]

- Schwartz JI, Agrawal NG, Wong PH, Gertz BJ, et al. Lack of pharmacokinetic interaction between rofecoxib and methotrexate in rheumatoid arthritis patients[11]

- Korn S, Vassil TC, Kotey PN, Fricke JR Jr. Comparison of rofecoxib and oxycodone plus acetaminophen in the treatment of acute pain: a randomized, double-blind, placebo-controlled study in patients with moderate to severe postoperative pain in the third molar extraction model[12]

---

[5]  Fosslien E. Review: Cardiovascular complications of nonsteroidal anti-inflammatory drugs. *Ann Clin Lab Sci* 2005 Fall;35(4):347. (Ex. "F").

[6]  Langman, MJ, Jensen DM, Watson DJ., et al. Adverse upper gastrointestinal effects of rofecoxib compared with NSAIDs. JAMA. (1999) 282;20:1929-33. (Ex. "G").

[7]  Hawkey C, Laine L, Simon T, et al. Comparison of the effect of rofecoxib (a cyclooxygenase 2 inhibitor), ibuprofen, and placebo on the gastroduodenal mucosa of patients with osteoarthritis: A randomized, double-blind, placebo-controlled trial. (2000) Arthritis & Rheum, 43;2:370-377. (Ex. "H").

[8]  Brater DB, Harris C, Redfern JS, Gertz BJ. Renal effects of COX-2-Selective Inhibitors. (2001) Am J Nephrol 21:1-15. (Ex. "I").

[9]  Hunt RH, Harper S, Callegari P., et al. Complementary studies of the gastrointestinal safety of the cyclo-oxygenase-2-selective inhibitor Etoricoxib. Alim Pharm & Therapeutics (2003) 17;2:201-2. (Ex. "J").

[10]  Marshall J.K, Pellissier J.M., Attard C.L. Kong S.X., Marentette M.A. Incremental Cost-Effectiveness Analysis Comparing Rofecoxib with Nonselective NSAIDs in Osteoarthritis: Ontario Ministry of Health Perspective. PharmacoEconomics, (2001) 19;10:1039-1049. (Ex. "K").

[11]  Schwartz JI, Agrawal NG, Wong PH, Gertz BJ, et al. Lack of pharmacokinetic interaction between rofecoxib and methotrexate in rheumatoid arthritis patients. J Clin Pharmacol (2001) 41 (10):1120. (Ex. "L").

[12]  Korn S, Vassil TC, Kotey PN, Fricke JR Jr. Comparison of rofecoxib and oxycodone plus acetaminophen in the treatment of acute pain: a randomized, double-blind, placebo-controlled study in patients with moderate to severe postoperative pain in the third molar extraction model. Clin Ther. (2004) May;26(5):769-78. (Ex. "M").

- Schwartz JI, Mukhopadhyay S, Gertz BJ, et al. Effect of rofecoxib on prednisolone and prednisone pharmacokinetics in healthy subjects[13]

Merck next argues that "The major thrust of Dr. Fosslien's opinion is that Vioxx causes or accelerates atherosclerosis.... (but) there is no scientific support for that theory." This is an argument taking directly out of the briefs filed by the tobacco companies in years past. Dr. Fosslien's "opinion" is based upon generally accepted medical theories and has already been subjected to peer review and published. In his article entitled, "Review: Cardiovascular Complications of Nonsteroidal Anti-inflammatory Drugs,"[14] Dr. Fosslien wrote:

Several mechanisms may be involved in the pathogenesis of such complications. First, selective inhibition of COX-1 lowers platelet synthesis of thromboxane ($TXA_2$), a thrombogenic and atherogenic eicosanoid. Selective inhibition of COX-2 limits endothelial cell synthesis of prostacyclin ($PGI_2$), an arachidonic acid product that opposes the effects of thromboxane. In apoE-/- mice, interruption of $TXA_2$ signaling by deletion of its receptor (TP) limits atherogenesis, whereas interruption of PGI2 signaling by deletion of its receptor (IP) accelerates atherogenesis. This suggests that selective inhibition of COX-2 can disrupt the physiological balance between thromboxane and prostacyclin and thus increase atherosclerosis, thrombogenesis, and the risk of cardiovascular complications. Second, COX inhibition can raise levels of arachidonic acid, which can inhibit mitochondrial oxidative phosphorylation (OXPHOS) and increase OXPHOS generation of reactive oxygen species. Several NSAIDs, including coxibs and meloxicam, directly uncouple or inhibit OXPHOS. Studies of apoE-/- mice indicate that mitochondrial dysfunction plays an early role in atherogenesis. Third, many NSAIDs exhibit COX-independent properties. For example, in animal models, short-term treatment with celecoxib reduces monocyte chemotaxis by reducing expression of monocyte chemoattractant protein (MCP)-1. However, long-term treatment results in the opposite effect and accelerates atherogenesis.

This article has 317 references which Dr. Fosslien reviewed, analyzed and relied upon as the bases for several of his opinions. The primary goal of Dr. Fosslien's article was to "elucidate the pathophysiology and molecular pathology of cardiovascular complications of NSAIDs, especially COX-2-selective inhibitors such as coxibs."

---

[13] Schwartz JI, Mukhopadhyay S, Gertz BJ, et al. Effect of rofecoxib on prednisolone and prednisone pharmacokinetics in healthy subjects. J Clin Pharmacol. 2003 Feb;43(2):187-92. (Ex. "N")

[14] Fosslien E. Review: Cardiovascular complications of nonsteroidal anti-inflammatory drugs. *Ann Clin Lab Sci* 2005 Fall;35(4):347. (Ex. "O").

There exists an abundance of medical and scientific information, some of it Merck's own studies, which will establish the mechanism by which Vioxx accelerates atherosclerosis.

At the time Dr. Fosslien wrote this article he relied upon peer-reviewed medical articles for the statement that "COX-2 is induced in atherosclerotic plaques, during angiogenesis, and during wound healing."[15,16] Furthermore, Dr. Fosslien also wrote "In animal models, selective inhibition of COX-2 promotes hypertension, atherogenesis, and formation of thrombi, all risk factors for acute myocardial infarction." It should be noted that not a single Letter to the Editor was published criticizing Dr. Fosslien's opinions and publication despite Merck's contention that "there is no scientific support for (Dr. Fosslien's) theory."

Dr. Fosslien recognized that, "As inhibition of COX-2 reduces inflammation, it was hoped that COX-2-selective inhibitors, when used to reduce pain and inflammation in joint disease, might also inhibit atherogenesis and reduce the rates of myocardial infarction" citing Niederberger et al.[17]

However, while in vitro and animal studies can *suggest* an effect in humans, it is the epidemiological study which confirms the effect.[18] Dr. Fosslien wrote: "For reasons not entirely agreed

---

[15] Kiefer W, Dannhardt G. Novel insights and therapeutical applications in the field of inhibitors of COX-2. Curr Med Chem 2004;11:3147–3161. (Ex. "P").

[16] Ohori S, Takahashi K, Aoki Y, Doya H, Ozawa T, Saito T, Moriya H. Spinal neural cyclooxygenase-2 mediates pain caused in a rat model of lumbar disk herniation. J Pain 2004;5:385–391. (Ex. "Q").

[17] Niederberger E, Manderscheid C, Grosch S, Schmidt H, Ehnert C, Geisslinger G. Effects of the selective COX-2 inhibitors celecoxib and rofecoxib on human vascular cells. Biochem Pharmacol 2004;68:341–350. (Ex. "R").

[18] Merck would have the Court believe that *in vitro* human testing is always 'trumped' by animal studies. Nothing could be further from the truth. In fact, the applicability of animal studies, alone, to human beings is, itself, beset with scientific uncertainty because of cross-species extrapolation. However, as noted by the Reference Manual on Scientific Evidence, "....because it is often unethical to experiment on humans by exposing them to known doses of chemical agents, animal toxicological evidence often provides the best scientific information about the risk of disease from a chemical exposure." Each and every accepted scientific method has inherent weakness: The 'gold standard of epidemiology, the randomized controlled clinical trial, may, in fact, be unethical to perform if the end result is harmful to people. Observational epidemiological studies have inherent weaknesses and biases. In fact, scientists such as Dr. Fosslien look at the entire spectrum of scientific evidence available.

It is because of this inherent weakness of looking at scientific methodology in a vacuum, as the defense would have this court do, that Sir Bradford Hill published his guidelines on causation. These guidelines include Biological Plausibility, Consistency, Temporality, Strength, Dose response, Analogy, Specificity Coherence, and Experimental Evidence. Animal studies are one piece of the puzzle and Dr. Fosslien has cited animal study after study which, when compared with the

upon, the opposite was observed in several, but not all, clinical studies associated with use of coxib inhibitors, particularly after long-term use, and in a few clinical studies on the use of traditional NSAIDs such as aspirin and naproxen."

Dr. Fosslien noted that:

> Therapeutic doses of coxibs can increase the risk of thrombosis by reducing endothelial cell synthesis of prostacyclin ($PGI_2$), a vital vasodilator and platelet inhibitor. This disrupts the normal balance between prostacyclin and COX-1-derived thromboxane ($TXA_2$), a vasoconstrictive eicosanoid that promotes platelet aggregation and thrombus formation. Furthermore, inhibition or gene knockout of thromboxane receptors (TP) and inhibition or gene knockout of prostacyclin receptors (IP) significantly inhibits and accelerates atherogenesis, respectively, showing the importance of proper balance of thromboxane and prostacyclin signaling.

This mechanism is not only biologically plausible but also generally accepted within the medical community at this time as documented by each of the Plaintiff's expert witness and the medical literature at-large.

Dr. Fosslien cited FitzGerald[19] and Monsuez[20] when writing:

> Like traditional NSAIDs, coxibs can cause hypertension, which is a thrombogenesis risk factor and an independent risk factor for atherosclerosis. Arterial constriction and renal sodium retention may contribute to the development of hypertension, which together with a coxib-induced prothrombotic state increases the risk of myocardial infarction and thrombotic stroke.

Thus, there is significant support for the fact that Vioxx, as a coxib, causes hypertension, itself an independent and generally accepted cause of atherosclerosis. A consistently elevated blood pressure expedites the formation of plaque or fatty deposits within the blood vessels which causes atherosclerosis.

---

experimental evidence, confirms the consistency of these findings. In fact, Dr. Fosslien's published articles and his Rule 26 Report are careful to explore ALL scientific evidence available, as a good research scientist should do. (Ex. "S").

[19] Fitzgerald GA. Coxibs and cardiovascular disease. NEJM 2004;351:1709–1711. (Ex. "T").

[20] Monsuez JJ. Specific cyclooxygenase-2 inhibitors in cardiovascular pathology. Arch Mal Coeur Vaiss 2004; 97:632–640. (Ex. "U").

### Thromboxane

Dr. Fosslien wrote in 2005 in his "Review: Cardiovascular Complications of Nonsteroidal Anti-Inflammatory Drugs" (*Review*) that:

> Platelet COX-1 is rate-limiting for conversion of arachidonic acid to prostaglandin $H_2$, the substrate for synthesis of thromboxane $A_2$ by thromboxane synthase. Thromboxane causes platelet aggregation and contraction of mural smooth muscle cells, which constricts vessels. It also increases leukocyte interaction with endothelial cells. **All are important steps in the development of atherosclerosis.** (Emphasis added). Thromboxane promotes atherosclerosis by activating platelets and contracting arteries.[21]

### Prostacyclin.

Dr. Fosslien also wrote

> Prostacyclin participates in cardio-protective functions in various ways. It inhibits platelet aggregation on the endothelium, reduces leukocyte interaction with endothelial cells, and hinders atherogenesis. Prostacyclin also protects mitochondrial function. Cyclooxygenases in endothelial cells and activated macrophages convert arachidonic acid to $PGH_2$, which is then converted by prostacyclin synthase (PGIS) to prostacyclin, which dilates vessels by relaxing vascular smooth muscle cells.[22]

While Merck claims that the imbalance between prostacyclin and thromboxane (first enumerated by Dr. Garrett FitzGerald) is speculative and remains unproven that was not their position in company-sponsored meetings, FDA filings and published medical literature.  For example, in the Merck sponsored 2005 New England Journal of Medicine (NEJM) article publishing the results of the APPROVe study, Merck unequivocally adopted the biologic mechanism of action which Merck euphemistically refers to as "the FitzGerald hypothesis."

> Thromboxane $A_2$, a major COX-1-mediated product of arachidonic acid metabolism, causes irreversible platelet aggregation, vasoconstriction, and smooth-muscle proliferation, whereas prostacyclin is an inhibitor of platelet aggregation, a vasodilator, and an inhibitor of smooth-muscle proliferation.  COX-2 is the chief source of systemic prostacyclin synthesis, and COX-2 is the chief source of systemic prostacyclin synthesis, and COX-2 inhibitors may increase the cardiovascular risk by shifting the functional

---

[21] Fosslien E.  Review: Cardiovascular complications of nonsteroidal anti-inflammatory drugs. *Ann Clin Lab Sci* 2005 Fall;35(4):347. (Ex. "V").

[22] *Id.*

balance of these vasoactive eicosanoids toward the promotion of thrombosis or atherosclerosis. COX-2 inhibition combined with thromboxane-receptor antagonism may also lead to the destabilization of atheromatous plaque.[23]

This biologically plausible mechanism was described by Dr. Fosslien in his *Review* as:

This is the most frequently proposed mechanism to explain the adverse prothrombotic effects of coxibs: they inhibit vascular synthesis of prostacyclin and thereby remove the platelet-inhibitory effect of prostacyclin[24]. Rofecoxib administration to patients reduced systemic prostacyclin synthesis to one-half or less of normal levels. This mechanism may, at least in part, explain the hypertension and increased frequency of thromboembolic events observed in clinical studies of rofecoxib.[25]

General acceptance of the biologic effects of COX-2 suppression by coxibs such as Vioxx contributing to the progression of atherosclerosis was demonstrated by the presentation of Dr. FitzGerald to the FDA Advisory Committee considering the risks ands benefits of specific COX-2 inhibitors in February, 2005, transcript Vol. 1, pp 93-95:

Let's think of a more chronically unfolding cardiovascular hazard. These data arbitration taken from Narumiya. They are looking at the development of atherosclerosis in a genetically prone mouse, and you can see that deletion of prostacyclin receptor accelerates atherosclerosis in male ApoeE-deficient mice. In fact, the impact was most particularly marked at initiation and early development of atherosclerosis.

By contrast, deletion of the thromboxane receptor does the complete reverse, and other studies conducted by us and others have shown that inhibition of COX-1 selectively or antagonism of the thromboxane receptor will have the same effect as deleting the thromboxane receptor, as shown here.

So, as far as atherosclerosis is concerned, we see this buffering capacity between COX-1 and COX-2. Furthermore, we have shown recently that in a different genetically probe mouse model deletion of the prostacyclin receptor and inhibition of COX-2 dependent formation of prostacyclin is important in affording the atheroprotection conferred by estrogen in female mice.

So, as far as **this other manifestation of a cardiovascular hazard is concerned, initiation and acceleration of early atherogenesis occurs in response to deletion of the prostacyclin receptor**. (Emphasis added) I haven't gotten into mechanism but it

---

[23] Bresalier, RS, et al. Cardiovascular events associated with rofecoxib in a Colorectal Adenoma chemoprevention trial. NEJM 2005;352:1092-1102 at 1098. (Ex. "W").
[24] Rabausch K, Bretschneider E, Sarbia M, Meyer-Kirchrath J, Censarek P, Pape R, Fischer JW, Schror K, Weber AA. Regulation of thrombomodulin expression in human vascular smooth muscle cells by COX-2-derived prostaglandins. Circ Res 2005;96:e1–e6. (Ex. "X").
[25] Weir MR, Sperling RS, Reicin A, Gertz BJ. Selective COX-2 inhibition and cardiovascular effects: a review of the rofecoxib development program. Am Heart J 2003; 46:591–604. (Ex. "Y").

fosters platelet and neutrophil activation and vascular interactions of theses cells, and removes the constraint on attendant oxidant stress.

Now, we know that **hypertension, which is also a consequence of inhibition of this pathway, itself accelerates atherogenesis**. (Emphasis added)  So, one could imagine that the direct and indirect effect could converge to transform cardiovascular risk. Finally, again COX-1 is playing a modulatory role.

## Monocytes/Macrophages

Dr. Fosslien, again writing in his *Review*, noted that:

"Monocyte chemotaxis plays a central role in atherogenesis. Increased expression of CCR2, the most important monocyte chemotaxis receptor, increases monocyte binding to monocyte chemoattractant protein-1 (MCP)-1 and facilitates the entry of monocytes into the subendothelial space, where they become macrophages and may develop into lipid-laden foam cells."

Dr. Fosslien stated in his Rule 26 report:

"Rofecoxib increases chemotaxis, it stimulates circulating monocytes to express receptors that bind to endothelial cells, thus increasing monocyte migration into the arterial wall, an important component in the initiation and progression of atherosclerosis", (citing Lang et al[26]., and Hernandez-Diaz[27], both peer-reviewed scientific articles).

As stated above, Merck states unequivocally "The major thrust of Dr. Fosslien's opinion is that Vioxx causes or accelerates atherosclerosis…. (but) there is no scientific support for that theory".  This truly is a remarkable statement inasmuch as Merck itself funded a study that proposed three (3) possible mechanism of action by which specific COX-2 inhibitors could increase atherogenesis.[28]  While this particular study was performed in a mouse model, that study was corroborated in several other animal studies by Dr. FitzGerald.  In February, 2005, Dr. FitzGerald presented three (3) separate "Mechanism-Based Cardiovascular Hazards" to the 32 members of the Joint FDA Advisory panel convened to evaluate the fate of the specific COX-2 inhibitors. Dr. FitzGerald's oral presentation was accompanied

---

[26] Lang, S., Lauffer, L., Clausen, C. Impaired monocyte function in cancer patients: restoration with a cyclooxygenase-2 inhibitor. *FASEB J* (2003) 17(2):286-8. (Ex. "Z").
[27] Hernandez-Diaz, S., Varas-Lorenzo, C., Garcia Rodriguez, L.A. Non-steroidal antiinflammatory drugs and the risk of acute myocardial infarction. *Basic Clin Pharmacol Toxicol*. (2006) Mar;98(3):266-74. (Ex. "AA").

by a number of slides representing the scientific literature supportive of each mechanism.  Mechanism Hazard 3 addressed the interaction and acceleration of early atherogenesis by COX-2 inhibition which specifically included Vioxx.  When Merck presented their data and viewpoint immediately following Dr. FitzGerlad, Merck did not question anything by Dr. FitzGerald.  In fact, Merck acknowledged existence of peer-reviewed literature linking Vioxx with atherosclerotic progression and plaque destabilization.[29]

## IV. CONCLUSION

For these reasons, Plaintiff urges the Court to deny Merck's motion for an order excluding the testimony of Egil Fosslien M.D.

Respectfully submitted this 7th day of November, 2006.

ANDY BIRCHFIELD
P. LEIGH O'DELL
*BEASLEY, ALLEN, CROW,*
*METHVIN, PORTIS & MILES, P.C.*
234 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103
(334) 269-2343 telephone
(334) 954-7555 facsimile

---

[28] Rott D, Zhu J, Burnett MS, et al. Effects of MF-tricyclic, a selective cyclooxygenase-2 inhibitor, on atherosclerosis progression and susceptibility to cytomegalovirus replication in apolipoprotein-E knockout mice. J Am Coll Cardiol, 2003, 41:1812-1819. (Ex. "BB").
[29] Bresalier, RS, et al.  Cardiovascular events associated with rofecoxib in a Colorectal Adenoma chemoprevention trial. NEJM 2005;352:1092-1102 at 1099. (Ex. "CC").

**Russ M. Herman** (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
**Plaintiffs' Liaison Counsel**

**Christopher A. Seeger**, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
& WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiff's Opposition to Merck's Motion to Exclude the Opinion Testimony of Egil Fosslien, M.D. has been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail or by hand delivery and e-mail, on Merck's Counsel, Douglas R. Marvin and Philip S. Beck, by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 7th day of November, 2006.

Andy D. Birchfield
Attorney for Plaintiff
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.

# EXHIBIT  A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISANA,
NEW ORLEANS DIVISION

IN RE VIOXX PRODUCTS )
LIABILITY LITIGATION )          MDL DOCKET No. 1657
_____ )
)
THIS DOCUMENT RELATES TO: )
)
ALL ACTIONS )
_____ )

## EXPERT WITNESS REPORT AND DECLARATION
## OF EGIL FOSSLIEN, MD

I, Egil Fosslien, MD, hereby state as follows:

I.      BACKGROUND AND QUALIFICATIONS

1.  I am a Professor (Emeritus) of Pathology, Department of Pathology (M/C 847),
    College of Medicine, The University of Illinois at Chicago, 1819 West Polk Street,
    Chicago, Illinois 60612. My last Service Position was Co-Director, Autopsy Service,
    University of Illinois Medical Center

2.  **Medical Education** - I received my Medical Degree (MD) in 1965 from the
    University of Heidelberg, Medical School, Germany. From 1962 - 1966 I engaged in
    Graduate Studies for my Doctoral Thesis in Pediatrics, also from the University of
    Heidelberg, Germany and was awarded my academic doctoral degree (Dr. Med.,
    Magna Cum Laude in 1966. From 1966 to 1968 I spent 24 months of clinical
    rotations for certification in Germany (19 months of internal medicine and Ob-Gyn
    in Germany, along with 5 months in surgery in Denmark, University of Odense).

1

From 1968 to 1969 I engaged in a U.S. Rotating Internship, La Crosse Lutheran Hospital and Gundersen Clinic, La Crosse, Wisconsin. From 1969 to 1971 I was a Resident in Clinical Pathology, University of Chicago. From 1971 to 1972 I was an Instructor and Trainee in the Department of Pathology, at the University of Chicago. From 1973 to 1975 I was a Resident in Anatomic Pathology (and Assistant Professor), at the University of Missouri, Columbia, Missouri.

3. **Academic Appointments** – From 2004 to the present time, I hold the academic rank of Professor Emeritus at the University of Illinois. From 1984 until 2004 I held the rank of Professor of Pathology, Department of Pathology, College of Medicine, University of Illinois at Chicago, Chicago, Illinois. My responsibilities included teaching anatomic and clinical pathology to medical and dental students and pathology residents. From 1985 until 2004 I was a Member of the Graduate Faculty, University of Illinois. My responsibilities included teaching pathophysiology and molecular biology research methodologies. supervising research by medical students and M.S. and Ph.D. degree graduate students, and performing research in co-operation with a visiting international scholar.

4. From 1999 until 2004 I was Co-director of the Autopsy Service at the University of Illinois Medical Center, Chicago, Illinois. My responsibilities included interacting with Medical Staff regarding autopsy finding; supervising and teaching residents, performing autopsies, and evaluating resident performance. I had the responsibility for finalized autopsy reports and prepared and directed Autopsy Conferences. I reported to Head of the Department of Pathology and interacted with The Cook

County Medial Examiner's Office in forensic autopsy cases. I also testified at legal depositions regarding autopsy findings.

5. From 1986 until 1999 I was a staff pathologist in the Division of Anatomic Pathology, at the Department of Pathology, College of Medicine, University of Illinois at Chicago, Chicago, Illinois. My service responsibilities at that time included the teaching of autopsy pathology to pathology residents and serving as expert witness in medical-legal litigations.

6. From 1983 to 1985 I was an Associate Member of the Graduate Faculty, University of Illinois. My academic responsibilities at that time included the teaching of pathophysiology and molecular biology research methodologies and collaborating in research by medical students and M.S. and Ph.D. degree graduate students, and co-operating in research with Postgraduate Fellows and a Visiting Professor.

7. From 1980 to 1984 I was an Associate Professor of Pathology in the Department of Pathology, University of Illinois College of Medicine at Chicago. My responsibilities then included teaching anatomic and clinical pathology to medical and dental students and pathology residents. I also collaborated with the Chairman of Pathology and post-graduate researchers to develop suitable pilot study data for the Chairman's grant proposals.

8. From 1980 until 1986 I was the Director of the Division of Clinical Pathology, Department of Pathology, College of Medicine, and Director of Hospital Clinical Laboratories of the University of Illinois Hospital, the University of Illinois at Chicago. My areas of responsibility then included responsibility to the Head of Pathology (and to the Hospital) for daily operation, budgeting, renovation, and

3

strategic planning for the Hospital Clinical Laboratories, which at that time included the following sections: Hematology, Blood Bank, Microbiology and Parasitology, Clinical Chemistry, Immunology, and virology, each having a Ph.D. or M.D. or both as section Head(s). The Clinical Laboratories had a staff of 214 FTE technologists and technicians, excluding the blood-drawing team. Also, I was responsible for the training of resident and medical technologist in the Division of Clinical Pathology.

9.  From 1978 to 1979 I was a Clinical Associate Professor of Pathology at the University of Alabama, Birmingham, and Associate Pathologist, Norwood Clinic and Carraway Methodist Medical Center, Birmingham, Alabama. My areas of responsibility included surgical pathology and cytology sign-outs, on call responsibility, directing the Clinical Chemistry Section, and the performance of autopsies.

10. From 1976 until 1978 I was an Associate Professor in Pathology at the University of South Florida, Tampa, and Director of the Clinical Laboratory at the University of South Florida College of Medicine Clinics, Tampa, Florida. My primary areas of responsibility then were the teaching of clinical and anatomic pathology to M2 medical students. I also conducted NIH-funded research on hemoglobinopathies at that time while directing day-to-day operations of the Pathology Laboratories in the University Clinic.

11. From 1972 until 1976 I was an Assistant Professor of Pathology, College of Medicine, and Assistant Professor of Bioengineering and Chemical Engineering in the College of Engineering at the University of Missouri, Columbia, Missouri. My areas of responsibility then was to conduct NIH-funded research as the primary

4

investigator on hemoglobinopathies in co-operation with Department of Bioengineering and Department of Chemical Engineering, School of Engineering. I also taught pathophysiology, laboratory analytical methods and principles of instrumentation to medical students, pathology residents, and medical technologists. I headed the biotechnology course for graduate students in bio-engineering and chemical engineering.

12. From 1971 until 1972 I was an instructor in Pathology at the University of Chicago. My responsibilities were to assist the Chairman of the department and visiting researchers in lipid metabolism research using animal models of atherogenesis. I also taught residents in Clinical Pathology.

13. **Licensures** - In 1967 I received my ECFMG, No. 092-478, by examination in Copenhagen, Denmark. In 1971 I was licensed to practice medicine by the State of Illinois, No. 36-45209 by FLEX Examination. During other periods of time I was licensed to practice medicine in the states of Missouri, Florida and Alabama. In each case I chose to not renew the license after my time in each state.

14. **Board Certification** - In 1973 I passed the Clinical Pathology Specialty Board Exam of the American Board of Pathology, and in 1975 I passed the Anatomic Pathology Specialty Board Exam, also administered by the American Board of Pathology, I am board certified in both Clinical Pathology and Anatomic Pathology.

15. **Society Memberships** – I hold membership in the Association of Clinical Scientists and Sigma Xi and I am an Emeritus Member of the American Heart Association. I am a former member of the Illinois Medical Society, and the Academy of Clinical

Laboratory Physician and Scientists. I am also a former Fellow of both the College of American Pathologists and the Association of Clinical Pathologists.

16. **Awards and honors** – In 1976 and again in 1979 I received the American Medical Association Physician's Recognition Award.

17. From 1983 to 1984 I prepared pilot data for the Chairman's application on Multi-Center Study on Pathobiological Determinants of Atherosclerosis in Youth, National Heart, Lung and Blood Institute, DHEW.

18. From 1987 until 1988, I was granted sabbatical leave by the Board of Trustees of the University of Illinois in order to conduct research with Dr. Karl Weisgraber, Dr. Mahley, and others on apolipoprotein E expression in human uterine leiomyomas (as a model of smooth muscle cell proliferation in atherosclerotic lesions) at the Gladstone Foundation Laboratories for Cardiovascular Disease, University of California, San Francisco.

19. In 1999 I became a member of the COX-2 Technology Group, supported by GD Searle's unrestricted education grant to the University of Illinois.

20. In 2001 I was selected as "Clinical Scientist of the Year" by the Association of Clinical Scientists.

21. In 2004 I was granted the title of Professor Emeritus by the University of Illinois Board of Trustees

22. **Reviewer for scientific journals** - I am, or have been a peer reviewer for the following medical and scientific journals: Annals of Clinical and Laboratory Science; Archives of Pathology & Laboratory Medicine; Biochemical Pharmacology; British Journal of Cancer; Cancer Detection and Prevention; Cancer

6

Investigation; Cancer Research; Cellular and Molecular Life Sciences; Clinical & Experimental Metastasis; Clinical Endocrinology; Expert Opinion on Investigational Drugs; Expert Opinion on Pharmacotherapy and Emerging Drugs; GUT; Journal of Clinical Oncology; Journal of Pediatric Gastroenterology and Nutrition; Journal of Pharmacy and Pharmacology; Neurotoxicity Research; Oncogene; and Pharmacological Research.

23. **Presentations and Abstracts** - Over the years I have made many scientific presentations including but not limited to:

    a.   Fosslien E, Stastny J, Robertson Jr. AL. Protein Composition of Human Atherosclerotic Intima vs. Isolated Aortic Cells. Fed Proc 43:713, 1984.

    b.   Fosslien E, Stastny J, Song J, Shek H, Yamashiroya H, Robertson AL. Arterial proteins in human aging and atherogenesis. Hugh Loefland Conference, 1985 Boston, MA.

    c.   Stastny J, Fosslien E, Robertson AL. Aortic intima protein composition in "early" human atheroma. Fed Proc 44:1136, 1985

    d.   Fosslien E. The pathogenesis of cardiovascular disorders. 75th meeting of the Association of Clinical Scientists, Louisville, Kentucky, 1985.

    e.   Fosslien E. The relationship of lipid disorders to coronary heart disease. 75th meeting of the Association of Clinical Scientists, Louisville, Kentucky, 1985

    f.   Fosslien E. Alterations in mitochondrial structure and function in aging. Presented at the Applied Seminar on Clinical Science of Aging; Nov. 16-20,

1994, Tampa, Florida; Annual meeting of the Association of Clinical Scientists.

g.  <u>Fosslien E</u>. "Adverse effects of drugs on the gastrointestinal system"; 115th Meeting, Association of Clinical Scientists, Atlanta, Georgia, fall 1997.

h.  <u>Fosslien, E</u>.  "Gastrointestinal toxicity of nonsteroidal anti-inflammatory drugs", Practical Clinical Pharmacology and Toxicology, Medical College of Wisconsin, Milwaukee, Wisconsin; June 25th 1998 (invited paper; invited by Dr. Steven H. Wong, Professor of Pathology, Department of Pathology, and Scientific Director, Toxicology, Milwaukee County Medical Examiner's Office).

i.  <u>Fosslien E</u>. "Molecular pathology of cyclooxygenase-2 in neoplasia", 118th Meeting Association of Clinical Scientists, Academic Host: Ohio State University College of Medicine of Medicine, Columbus, Ohio, Spring 1999.

j.  <u>Fosslien E</u>. "Molecular Pathology of Cyclooxygenase-2 (COX-2) in Cancer-induced Angiogenesis", Association of Clinical Scientists, 121st Meeting, University of North Caroline Medical School, Chapel Hill, NC, 2001

k.  <u>Fosslien  E</u>.   "Cardiovascular  Complications  of  Nonsteroidal  Anti-Inflammatory Drugs".  Presented at the 125th meeting of the Association of Clinical Scientists", Troy, MI, May 12–16, 2005.

l.  <u>Fosslien, E</u>. "Role of Mitochondrial Dysfunction in the Etiology of neoplasia".  Presented at the 126th meeting of the Association of Clinical Scientists", Amelia Island Plantation, Florida and the University of Florida, May 1-20, 2006".

8

24. **Current Scientific Interests** – include the pathophysiology and molecular pathology of cyclooxygenase-2 in carcinogenesis, angiogenesis, and morphogenesis, the role of bimodal growth factors in morphogenesis, mitochondrial medicine and Parkinson's disease.

25. **Publications** - As a result of my education, training, experience and research I have published extensively within the world's peer-reviewed medical and scientific literature. A complete listing of my publications is contained with my CV attached as Appendix A to this report. A sampling of my publications germane to the opinions I will proffer in this report include, but is not limited to the following:

    a. Stastny J, Fosslien E, Robertson AL. **Human aortic intima protein composition during initial stages of atherogenesis.** *Atherosclerosis* 1986;60:131-139.

    b. Song J, Stastny J, Fosslien E, Robertson AL. **Study on proteins of human aortic intima and atherosclerotic lesions.** *Journal of China Medical University* 1987;16:34-40.

    c. Stastny JJ, Fosslien E. **Quantitation of some intimal proteins in aortic intimas with and without atherosclerosis.** *Mol Exp Path* 1992;57(3):305-14.

    d. Fosslien E. **Molecular pathology of cyclooxygenase-2 in neoplasia.** *Annals of Clinical and Laboratory Science* 2000;30(1):3-21.

    e. Fosslien E. **The biochemistry of cyclooxygenase (COX)-2 inhibitors and molecular pathology of COX-2 in neoplasia.** *Crit Rev Clin Lab Sci* 2000;37(5):431-502.

9