Song J, Stastny J, Fosslien E, Robertson AL.  Effect of aging on human aortic protein composition.  II. Two-dimensional polyacrylamide gel electrophoretic analysis of tissue extracts.  Exp Mol Path 1985;43:297-304.

Fosslien E.  Clinical aspects of lipid analysis.  Diagnostic Medicine, 1985;April:43-47.

Stastny J, Fosslien E, Robertson AL.  Human aortic intima protein composition during initial stages of atherogenesis.  Atherosclerosis 1986;60:131-139.

Stastny J, Robertson AL, Fosslien E.  Basic proteins in the human aortic intima.  Non-equilibrium two-dimensional electrophoresis analysis of tissue extracts.  Exp Mol Path 1986;45: 279-286.

Stastny J, Fosslien E.  Determination of relative amounts of silver stained proteins on two-dimensional gels using internal calibrator.  Electrophoresis 1986; 7:544-551.

Shek YH, Stastny J, Fosslien E.  Effect of menstrual cycle on protein expression in human uterine leiomyomas.  Obstet Gynecol 1987;70:128-133.

Song J, Stastny J, Fosslien E, Robertson AL.  Study on proteins of human aortic intima and atherosclerotic lesions.  Journal of China Medical University 1987;16:34-40.

Song J, Stastny J, Fosslien E, Robertson AL.  Aging of human aortic intima proteins.  Chinese Journal of Cardiology 1987;15:356-360.

Daikos GL, Kathpalia SB, Lolans VT, Jackson GG, Fosslien E.  Long-term oral ciprofloxacin: Experience in the treatment of incurable infective endocarditis.  A J Med 1988;84:786-790.

Stastny JJ, Fosslien E.  Quantitation of some intimal proteins in aortic intimas with and without atherosclerosis.  Mol Exp Path 1992;57(3):305-14.

## B. Reviews and Theoretical

Fosslien E.  Molecular pathology of cyclooxygenase-2 in neoplasia.  Annals of Clinical and Laboratory Science 2000;30(1):3-21.

Fosslien E.  The biochemistry of cyclooxygenase(COX)-2 inhibitors and molecular pathology of COX-2 in neoplasia.  Crit Rev Clin Lab Sci 2000;37(5):431-502.

Fosslien E.  Mitochondrial medicine: Molecular pathology of defects in oxidative phosphorylation.  Ann Clin Lab Sci 2001;31(1):25-67.

Fosslien E.  Molecular pathology of cyclooxygenase-2 in cancer-induced angiogenesis.  Ann Clin Lab Sci 2001;31(4):325-47.

Fosslien E.  Establishment and maintenance of curvature in biology.  Medical

Hypotheses 2002; 59(3):233-238.

Fosslien E.  Mitochondrial medicine--cardiomyopathy caused by defective oxidative phosphorylation.  Ann Clin Lab Sci. 2003;33(4):371-95.

Fosslien E.  Review: Cardiovascular complications of nonsteroidal anti-inflammatory drugs.  Ann Clin Lab Sci 2005 Fall;35(4):347-85.

Fosslien E.  Review: Mitochondrial dysfunction and inflammation in Parkinson's disease.  In preparation

## XI. EXPERT VITNESS

Served as expert witness in cases involving private and university medical practices, hospitals, and nursing homes.  Evaluated procedures, charts, and clinical and anatomic pathology reports and testified as to the probable cause of death.  Details available during personal interview.

# EXHIBIT B

In the last four years I have testified, either at deposition or in trial for the following
cases:

**Outside Cases**

A) 1/14/2004 – 9/30/2004; Consultation Order No. 008315, regarding Forensic Pathology
(review and analysis of medical records and coroner's report), paid by American Institute
for Research, 1000 Thomas Jefferson St., HW, Washington, DC 2007.  Consultation for
James L. Reed, Jr., Esq., Assistant Regional Council, US DHHS OFFICE OF GENERAL
COUNCIL, Region V, 233 North Michigan Avenue, Suite 700, Chicago, IL 60601-5502;
Phone (312) 353-1640; Facsimile: (312) 886-1718.


B) File No. 431.8993, for Robert J. Feldt, Esq, EICHHORN & EICHHORN, Attorneys at
Law, Hammond Office, 200 Russel Street, Hammond, Indiana, 46325; Phone (219) 931-
0560, Telecopier: (219) 931-5370.  Consultation activity: Review of medical records,
photographs, autopsy reports, and microscopic slides, rendering opinion as to the cause
of death.  Case settled at mediation, February 13, 2004


**Inside Cases**

Documents regarding depositions for the defense for UIC internal (autopsy) cases should
be available from the Office of Legal Council, University of Illinois at Chicago.  I have
retained no copies of those cases.

87

IN THE UNITED STATES DISTRICT COURT
FOR THE EASSTERN DISTRICT OF LOUISANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE VIOXX PRODUCTS | ) | |
| LIABILITY LITIGATION | ) | MDL DOCKET No. 1657 |
| | ) | |
| | ) | SECTION:   L |
| THIS DOCUMENT RELATES TO: | ) | JUDGE FALLON |
| | ) | MAG. JUDGE KNOWLES |
| ALL ACTIONS | ) | |
| | ) | |

SUPPLEMENTAL EXPERT WITNESS DISCLOSURE AS TO
OF EGIL FOSSLIEN, MD (FED.R.CIV.PROC. 26(a)(2)(c); 26(e)(1))

1.  Since I submitted my Rule26 report on May 22nd 2006, Preston Mason and colleagues have published a paper on a new series of experiments on the effects of rofecoxib on human low-density lipoprotein (LDL) and membrane lipids (*J Cardiovasc Pharmacol 2006;47 Suppl 1:S7-S14*).   The investigators found that rofecoxib caused formation of reactive metabolites and alteration in membrane lipid structure.   These alterations include increased reactive oxygen species (ROS) formation, non-enzymatic (COX-2-independent) increases of isoprostanes formation, and increased formation of oxidized LDL (oxLDL).   Moreover, the pro-oxidant activities of rofecoxib depleted the antioxidant capacity of human plasma.   In additional experiments they demonstrated that astaxanthin, a strong antioxidant, could block these pro-oxidant effects of rofecoxib.

2.  In order to elucidate the pathogenesis of these effects of rofecoxib, the researchers examined the topography of rofecoxib integration into phospholipids membranes. Using small angle x-ray diffraction techniques, they observed that rofecoxib locates in the head groups of membrane phospholipids, which causes disorder of the hydrocarbon moieties (tails) of the phospholipids.   They noted that similar disorders

of tails of membrane phospholipids are induced by reactive oxygen species during oxidative damage to lipid membranes.

3. The investigators opined that the physiochemical alterations caused by rofecoxib are in part due to the specific inherent chemical structure of this compound that causes it to integrate into the head groups of such membranes.  Their opinion is supported by additional experiments that showed that celecoxib, which integrates into the hydrocarbon moieties, lacked similar detrimental effects on phospholipids membrane structures.

4. These recent experimental findings support and extend the prior findings by Mary F. Walter and collaborators (Rule26 report reference # 43) that rofecoxib causes oxidative modification of lipids and lipid membranes.  The latest experimental results by Mason et al demonstrate a direct integration of rofecoxib into phospholipids membranes and formation of isoprostanes, which causes loss of membrane fluidity: Jason D. Morrow and colleagues (*Proc Natl Acad Sci USA; 89:10721-10725*) have reported that isoprostanes form in situ in membranes, and because of they are "kinked molecules", they reduce membrane fluidity and cause deterioration of cellular functions that depend upon proper membrane structure. Importantly, Morrow et al found that isoprostanes that are formed in membranes *in situ* remain in membranes as a storage depot form *in vivo,* until they are released by phospholipase.

5. Recently, Zalewski et al (*Clin Chem 2006, 52(9):1645-50*) reported that lipoprotein-associate phospholipase $A_2$ (Lp-PLA$_2$) is a risk factor for cardiovascular events.  It is present in circulating LDL particles and is highly expressed in atherosclerotic lesions and contributes to plaque vulnerability. Figure 12 is an illustration of the above findings.

Figure 12.  Adverse cardiovascular effects of rofecoxib.  1:  Increased oxidation of low-density lipoprotein (LDL); 2: Formation of isoprostanes (iso-P) in LDL and cell membranes; 3: Selective inhibition of COX-2 lowers prostacyclin (PGI$_2$) synthesis; 4: renal effects.  For details see text and references.



6.  CONCLUSION: These additional findings corroborate my opinion that rofecoxib accelerates atherogenesis.

Egil Fosslien, M.D.

# EXHIBIT  B

## Egil Fosslien, M.D.

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX                        )

PRODUCTS LIABILITY LITIGATION )

                                    ) MDL Docket

This document relates to:    ) No. 1657

GERALD BARNETT and           ) Section L

CORRINE BARNETT,             )

            Plaintiffs,      ) Judge Fallon

    -vs-                      )

MERCK & CO., INC.,           ) Magistrate Judge

            Defendant.       ) Knowles

                             )

Civil Action No. 2:06cv485   )


    THE DEPOSITION OF EGIL FOSSLIEN, M.D.


            June 8, 2006

# Egil Fosslien, M.D.

## Page 2

```
 1
 2
 3
 4      The deposition of EGIL FOSSLIEN, M.D., called
 5  by the Defendant for examination, taken pursuant to
 6  the Federal Rules of Civil Procedure of the United
 7  States District Courts pertaining to the taking of
 8  depositions, taken before CORINNE T. MARUT, C.S.R.
 9  No. 84-1968, a Notary Public within and for the
10  County of DuPage, State of Illinois, and a
11  Certified Shorthand Reporter of said state, at the
12  Park Hyatt Chicago, Fairbanks Room, 800 North
13  Michigan Avenue, Chicago, Illinois, on the 8th day
14  of June, A.D. 2006, commencing at 9:09 a.m.
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
 1  PRESENT:
 2     LOPEZ, HODES, RESTAINO, MILMAN & SKIKOS,
 3     (625 Market Street, 11th Floor,
 4     San Francisco, California 94105,
 5     415-956-5257), by:
 6     MR. MARK G. CRAWFORD,
 7     mcrawford@lopez-hodes.com,
 8         appeared on behalf of the Plaintiffs;
 9     FULBRIGHT & JAWORSKI L.L.P.,
10     (2200 Ross Avenue, Suite 2800,
11     Dallas, Texas 75201-2784,
12     214-855-8000), by:
13     MR. JOE W. TOMASELLI, JR.,
14     jtomaselli@fulbright.com,
15         -and-
16     BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP,
17     (54 West Hubbard Street, Suite 300,
18     Chicago, Illinois 60610,
19     312-494-4400), by:
20     DR. KEN BAUM,
21     ken.baum@bartlit-beck.com,
22         appeared on behalf of the Defendant.
23
24  REPORTED BY: CORINNE T. MARUT, C.S.R. No. 84-1968
```

## Page 4

```
 1         (WHEREUPON, the witness was duly
 2  sworn.)
 3         EGIL FOSSLIEN, M.D.,
 4  called as a witness herein, having been first duly
 5  sworn, was examined and testified as follows:
 6             EXAMINATION
 7  BY MR. TOMASELLI:
 8     Q.  Dr. Fosslien.  Did I pronounce that
 9  correctly?
10     A.  That's correct.
11     Q.  My name is Joe Tomaselli and we've never
12  met before, have we?
13     A.  No.
14     Q.  Okay.  You understand I represent Merck
15  in this lawsuit?
16     A.  Yes.
17     Q.  Have you had your deposition taken
18  before?
19     A.  Not in this case.
20     Q.  Okay.  Have you had your deposition
21  taken before at any time?
22     A.  Yes.
23     Q.  Okay.  So, you're familiar with the
24  process?
```

## Page 5

```
 1     A.  Not this type of process but -- this is
 2  different.
 3     Q.  Okay.
 4     A.  Different room.
 5     Q.  A different room, right.  How many times
 6  have you had your deposition taken?
 7     A.  I don't have an account -- a count.
 8  Correction.  Probably more than five, less than 15.
 9     Q.  Okay.  So you're familiar with the
10  process and I will go over a couple ground rules
11  just to make sure that you and I are on the same
12  page.
13         Because we are in a deposition and we
14  have a Court Reporter taking down every single word
15  we say, we need to try to speak one at a time and I
16  will try to wait for you to finish your answer if
17  you will try to wait for me to finish my question
18  before you answer and before I ask another
19  question.  Is that fair?
20     A.  Yes.
21     Q.  And you're doing a great job so far, but
22  we have to have verbal answers.  Shakes of the head
23  and nods and things like that and uh-huhs and
24  uh-uhs don't come down very well on the transcript.
```

Golkow Litigation Technologies - 1.877.DEPS.USA

d1c48430-8b50-46ac-99d5-274a6d1abffd

Egil Fosslien, M.D.

**Page 6**

1 If you wouldn't mind speaking audibly, I would
2 appreciate it. Fair?
3    A.  Yes.
4    Q.  And if you don't understand one of my
5 questions, feel free to say you don't understand it
6 and I will try my best to rephrase it. But, of
7 course, if you do answer I will assume you
8 understood it. Is that fair?
9    A.  That's fair.
10    Q.  Okay. Any reason you can't answer
11 truthfully and honestly today?
12    A.  No.
13    Q.  And, of course, if you need a break,
14 this isn't a marathon or anything. So, if you need
15 to get some water or coffee or whatever, just say,
16 "I need a break," and we will stop and take a
17 break. Okay?
18    A.  Okay.
19      (WHEREUPON, a certain document was
20      marked Fosslien Deposition Exhibit
21      No. 1, for identification, as of
22      6-8-06.)
23 BY MR. TOMASELLI:
24    Q.  I'm handing you what I have marked as

**Page 7**

1 Deposition Exhibit No. 1 and ask you to take a look
2 at that, if you don't mind.
3    MR. CRAWFORD: Thank you.
4 BY MR. TOMASELLI:
5    Q.  That's your Deposition Notice in this
6 case. Have you seen that before?
7    A.  I think so.
8    Q.  Okay. On the last page -- I'm sorry.
9    On the second-to-last page, there is a
10 page entitled "Attachment A."
11    Do you see that?
12    A.  Yes. But before that there is a
13 correction that's necessary.
14    Q.  Okay.
15    A.  Because my name is misspelled.
16    Q.  Right. You are F-o-s-s-l-i-e-n?
17    A.  Correct.
18    Q.  Okay. We apologize for that but no
19 disrespect intended. Okay?
20    A.  Okay.
21    Q.  The last -- second-to-last page again,
22 Attachment A, has some document requests. Do you
23 see that?
24    A.  Yes.

**Page 8**

1    Q.  And right before we got started
2 Mr. Crawford handed me a stack of documents and I
3 assume that these are all the documents that are
4 responsive to those requests?
5    A.  Those are --
6    MR. CRAWFORD: Object to form.
7 BY THE WITNESS:
8    A.  Those are the -- from the e-mail binder,
9 the correspondence is put in there and I took what
10 the content was in the binder and gave it to
11 Dr. Restaino and Mr. Crawford.
12 BY MR. TOMASELLI:
13    Q.  Okay. Are there other documents that
14 are requested on Attachment A that you haven't
15 brought?
16    A.  Well, in the report I referred to a
17 number of publications and I didn't bring those
18 because they are just reprints of publications.
19    Q.  Okay.
20    A.  And those are available, of course, from
21 PubMed or from Google.
22    Q.  Okay.
23    A.  So I thought that wasn't necessary to
24 bring those.

**Page 9**

1    Q.  All right. Anything else that was
2 requested and you didn't bring or is that it?
3    A.  That's what I brought, the e-mail
4 correspondence. So...
5    Q.  Nothing else, right?
6    A.  Well, some of the e-mail was lost
7 because my computer break down last year.
8    Q.  Okay. So other than --
9    A.  That's it. That's it.
10    Q.  Other than e-mails that you may have
11 lost last year and reprints of articles that you
12 reference in your -- in your report, as far as
13 other documents you're relying on, et cetera, those
14 I have here?
15    A.  Well, I have other reprints because I
16 have been in this field for a long time and also I
17 have written several articles and I have stacks of
18 reprints. I have boxes of reprints.
19    Q.  So you have additional articles other
20 than the articles referenced in your report?
21    A.  Yes.
22    Q.  As well as other articles that you
23 yourself have authored?
24    A.  Yeah, that also, yes, sir.

3 (Pages 6 to 9)

d1c48430-8b50-46ac-99d5-274a6d1abffd

Egil Fosslien, M.D.

Page 10

1    Q.   Okay.  Anything else that you're relying
2  on?
3    A.   Well, there are all versions, the draft
4  and so on.  Most of those were erased.  But they
5  were really the same thing as we have here in the
6  report.
7    Q.   When you say "drafts," you're saying
8  that you have draft reports as you went along but
9  you ultimately had a final report?
10   A.   Right.  When you are writing an
11 article -- I approached this as writing an article;
12 and when you write an article, you write it in
13 pieces.  You don't sit down and write the whole
14 thing straight off the top of your head.  You do it
15 in pieces and gradually you fuse those pieces into
16 a final form.
17   Q.   Okay.  And you don't keep all those
18 pieces; you just keep the final form?
19   A.   Well, some pieces are there, but I
20 don't -- most of them are shredded because
21 otherwise I have all the paper.
22   Q.   Okay.  Just so I'm clear, there is
23 published medical literature that you didn't bring
24 with you?

Page 11

1    A.   Right.
2    Q.   And maybe some of your own articles.
3  Otherwise we have everything that you are relying
4  on?
5    A.   That is the correspondence, yes.
6    Q.   And we have got everything you are
7  relying on for your opinions?
8    A.   That I don't know because I haven't gone
9  through that.
10   Q.   Okay.
11   A.   I just took it out of the two binders,
12 you know.
13   Q.   We will come back to that in a second.
14   A.   There may be things in there that are
15 irrelevant because I didn't use it.  I do not know.
16   Q.   You said you've been an expert witness
17 maybe more than five but less than 15 times in the
18 past, correct?
19   A.   I think that's correct.
20   Q.   And I'm not trying to get the exact
21 number.  I'm just trying to get a ballpark.  Fair?
22   A.   That's fair.
23   Q.   Okay.  When was the last time that you
24 served as an expert witness?

Page 12

1    A.   Well, I can see in my report if I may
2  have the CV.
3    Q.   I will tell you what.  I will mark your
4  CV as Fosslien Deposition Exhibit No. 2 and hand
5  that to you.
6          (WHEREUPON, a certain document was
7          marked Fosslien Deposition Exhibit
8          No. 2, for identification, as of
9          6-8-06.)
10 BY MR. TOMASELLI:
11   Q.   Is that a true and correct copy of your
12 CV, sir?
13   A.   I assume so because I submitted one.  I
14 assume this is the one I submitted, sir.
15   Q.   If you could flip through it and just
16 confirm that, that would be great.
17   A.   Well, I can only say it looks like it.
18 I can't compare line by line.
19   Q.   Nothing jumps out at you as being --
20 that it's an incorrect CV?
21   A.   No.
22   Q.   All right.
23   A.   I will take this apart.
24   Q.   On the last page of Exhibit 2 there is a

Page 13

1  page called Exhibit B.
2    A.   Is this Exhibit 2?
3    Q.   Yes.  The whole document is Exhibit 2.
4    A.   Oh, so the last page.
5    Q.   If you look at the last page, there is
6  an Exhibit B.
7    A.   Oh, here.  Okay.
8    Q.   Is that what you were looking for?
9    A.   Yes, sir.
10   A.   And --
11   A.   Okay.
12   Q.   So, in answer to my question of the last
13 time you served as an expert witness.
14   A.   It was in, let me see, 2004.
15   Q.   And is it the case that's referenced
16 with A?
17   A.   Yes, sir.  It's from the DHHS office of
18 general counsel for the Region 5 on Michigan Avenue
19 here.
20   Q.   And that is the Department of Health and
21 Human Services?
22   A.   That's right.
23   Q.   And what was the subject of your
24 testimony generally in that case?

4  (Pages 10 to 13)

d1c48430-8b50-46ac-99d5-274a6d1abffd

Egil Fosslien, M.D.

1    A.    Am I free to talk about it?
2    Q.    I'm just asking. I'm not asking you to
3  divulge names or anything like that. Just was
4  it --
5    A.    Cause of death.
6    Q.    Cause of death?
7    A.    Yes.
8    Q.    So you looked at medical records, an
9  autopsy report and determined cause of death?
10   A.    To my recollection, yes. Pictures also
11 I think.
12   Q.    Also tissue slides?
13   A.    That I don't recall, but there was
14 photographs.
15   Q.    Oh, photographs of the person?
16   A.    Yes.
17   Q.    Photographs that may typically be in an
18 autopsy file?
19   A.    I think these photographs were clinical
20 photographs, but I don't recall the other
21 photographs.
22   Q.    Okay. And do you remember the time that
23 you served as an expert witness before that? Is
24 that B?

1    A.    That's to my recollection the one before
2  that, yes, an outside case.
3    Q.    Okay. And what was the -- it says the
4  consultant activity was reviewing medical records,
5  photographs, autopsy report, microscopic slides and
6  rendering opinion as to cause of death.
7          So basically the same types of things?
8    A.    No. As a matter of fact, a much more
9  extensive one because they sent the slides, they
10 sent the courier from Indiana, gave it to me
11 personally, had to sign for it. I looked at the
12 slide, I looked at the records and then I rendered
13 an opinion. Then I came and picked up the slide
14 also by courier from Indiana.
15   Q.    So, in addition, this time you actually
16 looked at the tissue slides of parts of the body?
17   A.    I do remember, yeah, having looked at
18 all the tissue slides that had been made on that
19 particular patient and all the autopsy slides and
20 report.
21   Q.    In these five to 15 cases that you've
22 served as an expert witness, is most of your
23 testimony related to autopsy findings?
24   A.    Not necessarily.

1    Q.    And cause of death?
2    A.    No.
3    Q.    No. Other than autopsy findings, cause
4  of death, what types of expert witness work have
5  you done?
6    A.    Well, there was one case I seem to
7  remember where a patient had died and there was a
8  question, you know, of medication the patient had
9  received. So, it was not solely the autopsy
10 result. And review of the records to see if were
11 all the entries made sequentially or was any
12 indication that they had been -- any indication
13 that the records had been changed, altered.
14   Q.    Okay.
15   A.    That was one of the questions also.
16   Q.    All right. Other than -- is that a
17 medical malpractice type of case?
18   A.    That was a medical malpractice type of
19 case.
20   Q.    Okay. Other than medical malpractice
21 types of cases and rendering opinions regarding
22 autopsy findings and cause of death, any other
23 areas of expert witness testimony that you can
24 recall?

1    A.    Can't think of any now.
2    Q.    Okay. But you have testified about
3  gross observations in an autopsy report before?
4    A.    Gross and microscopic, diagnosis,
5  interpretation, review of chart records, review of
6  laboratory records to render an opinion as to the
7  cause of death.
8    Q.    Okay. And I assume that you've -- well,
9  have you ever testified about a sudden cardiac
10 death or a fatal myocardial infarction?
11   A.    I think so, but many of these cases I
12 don't remember because there were inside cases and
13 I'm not supposed to keep any records of those.
14   Q.    Okay. And when you refer to "inside
15 cases," what are you referring to?
16   A.    Those are cases from the University of
17 Illinois. Let's say we did the autopsy and there
18 is a question about the autopsy. Or let's say
19 there is a person that dies in the street, is
20 brought to the hospital, death on arrival. We need
21 to find the cause of death.
22          Or let's say that the patient is
23 transferred from another hospital and comes
24 essentially to the hospital, to university

5 (Pages 14 to 17)

d1c48430-8b50-46ac-99d5-274a6d1abffd

Egil Fosslien, M.D.

**Page 18**

1  hospital, to die. So it doesn't appear on the
2  death certificates or records for that other
3  hospital. And we then have to determine why the
4  patient died. Sudden cardiac death would be one of
5  them.
6      Q.  Okay. And do you perform those
7  autopsies yourself or do other people do that and
8  you consult with them?
9      A.  No. That depends upon the situation.
10 Right before I left I was the core director of the
11 autopsy service. Before that I served probably 10,
12 15 years as a staff pathologist on that service.
13     Q.  How many autopsies do you think you
14 performed each year over that 10 or 15 years?
15     A.  We used to have over 300 autopsies in
16 the year. Of course, in the recent years that
17 declined somewhat like everywhere. I did a portion
18 of those.
19     Q.  In those autopsies I assume you saw
20 cases of sudden cardiac death and fatal myocardial
21 infarction?
22     A.  Indeed I did and particularly I was
23 close to Dr. Eckner, who just died unfortunately,
24 and his area of interest was cardiovascular

**Page 19**

1  pathology. We dissected hearts together.
2      Q.  Okay.
3      A.  So, I saw a lot of atherosclerotic
4  disease, yes.
5      Q.  Have you ever testified as an expert
6  witness regarding atherosclerosis in coronary
7  arteries or a fatal myocardial infarction that you
8  can recall?
9      A.  I can't recall but I may have, you know.
10 This is several years back now.
11     Q.  Have you ever provided testimony under
12 oath regarding an NSAID or a COX-2 inhibitor?
13     A.  No.
14     Q.  Have you ever testified that a COX-2
15 inhibitor was a cause of death?
16     A.  Do you mean testify in court now?
17     Q.  Testified under oath that a COX-2
18 inhibitor was a cause of death.
19     A.  I have not been subpoenaed to do that.
20     Q.  Okay. So that's no, you haven't?
21     A.  Not to my recollection, no.
22     Q.  Okay. Have you ever testified that a
23 COX-2 inhibitor was a cause of a myocardial
24 infarction?

**Page 20**

1      A.  No, but I have been invited to speak
2  many times about it.
3      Q.  Okay.
4      A.  National meetings.
5      Q.  And I'm --
6      A.  And --
7      Q.  Let me try to be a little bit more
8  clear.
9          You've never testified regarding your
10 opinion that a COX-2 inhibitor was a cause of a
11 myocardial infarction?
12     A.  Not in a legal setting. As I said, I
13 have spoken at national meetings several times
14 about these NSAIDs for several years now. I was
15 invited to the Medical College of Wisconsin to
16 speak.
17         I have spoken at the Association of
18 Clinical Scientists meeting several times about
19 this and similar problems, about NSAIDs in general,
20 gastrointestinal complications, heart complication
21 and so on.
22     Q.  But as far as providing testimony,
23 you've never done that?
24     A.  Not been asked to do that, no.

**Page 21**

1      MR. CRAWFORD: Do you mean under oath type of
2  thing?
3      MR. TOMASELLI: Correct.
4      MR. CRAWFORD: Okay.
5      MR. TOMASELLI: He's told me that he's spoken
6  at conferences and I'm trying to --
7  BY THE WITNESS:
8      A.  I've been invited to speak about this.
9  BY MR. TOMASELLI:
10     Q.  Okay. Have you ever testified under
11 oath that a COX-2 inhibitor caused any type of
12 adverse event?
13     A.  You mean like Vioxx? No.
14     Q.  Okay. Have you ever testified
15 previously that a COX-2 inhibitor was responsible
16 for the buildup of atherosclerosis in a person's
17 arteries?
18     MR. CRAWFORD: Can I interject something?
19 When you say "testify," you mean under oath because
20 there may be some confusion here. In lay terms
21 "testify" may mean, I don't know, may mean give a
22 speech or a conference. I think let's clarify that
23 you mean under oath like in a deposition or trial
24 or a hearing or something like that.

6 (Pages 18 to 21)

Golkow Litigation Technologies - 1.877.DEPS.USA

d1c48430-8b50-46ac-99d5-274a6d1abffd

Egil Fosslien, M.D.

Page 22

1    MR. TOMASELLI: Okay.
2    MR. CRAWFORD: Right?
3    BY MR. TOMASELLI:
4    Q.   Have you ever testified under oath that
5    a COX-2 inhibitor was responsible for the buildup
6    of atherosclerosis in a person's arteries?
7    A.   This is the first testimony. As I said,
8    I have spoken many, many times. I have written
9    many articles about this. I have studied this
10   field many years now.
11   Q.   Have you ever authored an autopsy report
12   where you concluded that a COX-2 inhibitor was a
13   cause of death?
14   A.   Not to my recollection. I authored
15   several or many autopsy reports. I cannot recall
16   at this time specifically one that involved NSAIDs.
17   Could have been.
18   Q.   Don't recall, though?
19   A.   Don't recall because, I mean, there is
20   so many of these cases.
21   Q.   There are so many cases of people having
22   atherosclerosis?
23   A.   Oh, yes. It's a very predominant
24   disease. It's the one that kills the most

Page 23

1    Americans.
2    Q.   Have you ever testified under oath in a
3    case regarding a prescription pharmaceutical drug
4    before?
5    A.   Not under oath. I have talked, as I
6    mentioned, for example, at the University of
7    Wisconsin in Milwaukee about the toxic effects of
8    NSAIDs.
9    Q.   And I'm trying to separate giving talks
10   at universities --
11   A.   Yes, I think I --
12   Q.   -- or lectures versus testifying under
13   oath.
14       Have you ever testified under oath in a
15   pharmaceutical drug case?
16   A.   Not till today.
17   Q.   In these -- let me ask you. Is this the
18   first time you've ever worked for a or been hired
19   by a Plaintiff's attorney?
20   A.   Could you clarify that question because
21   this relates to a specific drug and are you
22   referring to Plaintiff's attorney when it comes to
23   any case? For example, when I was hired by the
24   Department of Health and Human Services, that was

Page 24

1    for the Plaintiff's side.
2    Q.   Okay.
3    A.   So, yes, I have testified or provided
4    expert testimony in Plaintiff's cases.
5    Q.   Okay. Setting aside the testimony for
6    the Department of Health and Human Services or the
7    potential inside cases with the University of
8    Illinois, can you tell me how many times you've
9    been hired outside of that setting?
10   A.   Well, as we sit here now and recall
11   these things, it seems to be another case where
12   there was -- a Plaintiff's case, cause of death and
13   so on, involved a patient who died in another
14   hospital. Not ours. But...
15   Q.   Okay. So, most of the -- I guess I am
16   hearing most of your cases are for the Plaintiffs?
17   A.   On the contrary. Most of the cases were
18   on the defensive side because it involved in many
19   cases where we did the autopsies at university and
20   maybe there was a suit against one of the
21   physicians.
22   Q.   Right.
23   A.   And in that case the -- my testimony was
24   very helpful for the defense.

Page 25

1    Q.   Okay. And setting aside the University
2    of Illinois cases and the Department of Health and
3    Human Services cases, how does that
4    Plaintiff-Defendant split come out?
5    A.   Well, majority for the defense.
6    Q.   Okay.
7    A.   By far.
8    Q.   How many cases would that be?
9    A.   I don't know how many. The university
10   has all those records. Must be a good number.
11   Q.   Okay. I'm trying to set aside the --
12   A.   Probably.
13   Q.   -- testimony?
14   A.   Ten plus/minus.
15   Q.   Ten plus or minus cases?
16   A.   Yeah, maybe of the 10 to 15, maybe five
17   maximum were for the Plaintiff and maybe ten for
18   the defense.
19   Q.   And those ten for the defense, does that
20   include the University stuff?
21   A.   Yes. There may be more. I don't recall
22   those things. I didn't keep any records of those.
23   Q.   Okay. So, and I don't want to hold you
24   necessarily to the number 15, but let's say --

7 (Pages 22 to 25)

d1c48430-8b50-46ac-99d5-274a6d1abffd

Egil Fosslien, M.D.

**Page 26**

1    A.   It's a rough estimate because I really
2 don't recall that. As I said, I never kept any
3 records. University keeps the records and so they
4 probably have the records.
5    Q.   Okay. And, so, maybe ten times you've
6 testified for the university or on behalf of the
7 university and the other five times are Plaintiffs'
8 cases?
9    A.   That is a very rough estimate.
10    Q.   Fair enough. Have you ever been found
11 unqualified by a Court to give expert testimony?
12    A.   No.
13    Q.   You understand you've been disclosed as
14 an expert witness in the Gerald Barnett case?
15    A.   Barnett case?
16    Q.   Barnett.
17    A.   Could you give me some information
18 there.
19    Q.   Do you know if you've been designated as
20 an expert in the Gerald Barnett case?
21    A.   I need to see the documentation before I
22 can say anything about that.
23    Q.   You just -- you don't have a
24 recollection one way or the other?

**Page 27**

1    A.   The name seems familiar.
2    Q.   Okay.
3    A.   But I'd like to see the documentation.
4    Q.   Okay. Do you plan to attend the trial
5 of the Gerald Barnett case?
6    A.   Well, I have no plans at this point. I
7 would have to be asked first to do so.
8    Q.   Haven't made any flight arrangements?
9    A.   Not at all.
10    (WHEREUPON, a certain document was
11    marked Fosslien Deposition Exhibit
12    No. 3, for identification, as of
13    6-8-06.)
14 BY MR. TOMASELLI:
15    Q.   I'm going to hand you what I've marked
16 as Fosslien Deposition Exhibit No. 3 and is -- is
17 that your expert report, sir?
18    A.   This is the Rule 26 report as requested
19 by the company. They have asked me to do this
20 thing.
21    Q.   The Plaintiff's attorneys that asked you
22 to do it?
23    A.   It is the -- just a moment. The company
24 is called Lopez, Hodes, Restaino, Milman & Skikos.

**Page 28**

1    Q.   And they represent Plaintiffs suing
2 Merck, correct?
3    A.   It's my understanding that it's called
4 Plaintiffs consortium.
5    Q.   Okay. You understand they are attorneys
6 representing Plaintiffs?
7    A.   Yes, sir.
8    Q.   Okay.
9    (WHEREUPON, a certain document was
10    marked Fosslien Deposition Exhibit
11    No. 4, for identification, as of
12    6-8-06.)
13 BY MR. TOMASELLI:
14    Q.   I'm going to hand you what I've marked
15 as Fosslien Exhibit No. 4 and ask you to identify
16 that for the record.
17    A.   Yes, sir.
18    Q.   What is that?
19    A.   This is the cumulative billing listing.
20    Q.   Okay.
21    A.   My simple bookkeeping.
22    Q.   Fair enough. Keeps track of how much
23 time you've spent?
24    A.   Approximately. I spend much more time

**Page 29**

1 on this than is listed here, but it shows what I
2 charge for.
3    Q.   Okay. And the first page of that
4 document, the first entry appears to be on
5 November 1, 2005, is that right?
6    A.   Correct.
7    Q.   And that was a conversation with
8 Dr. Restaino?
9    A.   Correct.
10    Q.   Is that the first time you were
11 contacted by someone involved in the Vioxx
12 litigation?
13    A.   I think the initial contact was by
14 e-mail, but I -- I'm not so sure of that anymore
15 because, you know, it's several months ago.
16    Q.   Okay. Do you think that's about the
17 time you were contacted the first time by someone
18 involved --
19    A.   Yes, I think it was about the time, yes,
20 because it was several months after the -- my last
21 publication was published, the one that dealt with
22 the cardiovascular complication of COX-2
23 inhibitors.
24    Q.   Okay.

8 (Pages 26 to 29)

Egil Fosslien, M.D.

**Page 30**

1      (WHEREUPON, certain documents were
2           marked Fosslien Deposition Exhibit
3           No. 5, for identification, as of
4           6-8-06.)
5  BY MR. TOMASELLI:
6      Q.   I'm going to hand you a stack of
7  documents that I've marked as Fosslien Deposition
8  Exhibit No. 5.
9           Are those all the e-mails that you were
10  able to retrieve between you and counsel for the
11  Plaintiffs?
12     A.   A lot of e-mails was lost. I had
13  several computer breakdowns, three of mine and also
14  my wife's computer, and they are all on the same IP
15  address and I have the university, corporate
16  edition, but I also had two Linux computers.
17     Q.   Did you try to get your e-mails off of
18  all those different places?
19     A.   Yeah, I -- you know, I spent a lot of
20  time.
21     Q.   Sure.
22     A.   Frustrating.
23     Q.   I understand that --
24     A.   These are the more recent ones that I

**Page 31**

1  printed out because the first ones I lost
2  completely.
3      Q.   Let me just try to finish my question
4  before you answer, if you don't mind.
5           I understand that you're not able to
6  retrieve all of your e-mails for various reasons.
7  But all the ones you are able to retrieve, those
8  are in Exhibit No. 5?
9      A.   Correct.
10     Q.   All right. And if there was an e-mail
11  in there that was prior to November 1, 2005, then
12  you were contacted before then?
13     A.   Well, that e-mail is lost and all. I
14  used the Linux computer at the time because I had
15  many problems with my Sony computers; loaded with
16  all sort of things, TV programs and all sorts of
17  things. The files kept accumulating, accumulating.
18  One day the whole thing failed. I had to reload
19  and clean that out.
20          The Linux computer I had to take back to
21  the store and have them try to recover the files.
22  I couldn't do that. They said no, you have to
23  reboot the whole thing.
24     Q.   Believe me, I am not faulting you. I'm

**Page 32**

1  just trying to make sure that we have all that you
2  were able to retrieve. Is that fair?
3      A.   That's correct.
4      Q.   Do you mind handing me back
5  Exhibit No. 4, that --
6      A.   This one?
7      Q.   This one. That's right.
8           Have you been in contact with any other
9  attorneys representing Plaintiffs other than from
10  the Lopez, Hodes firm?
11     A.   Not that I can recall.
12     Q.   Okay. Those are your main contacts for
13  this litigation?
14     A.   That's my understanding.
15     Q.   Okay. Have you had any in-person
16  meetings with counsel?
17     A.   You mean with Dr. Restaino.
18     Q.   Dr. Restaino or someone else from his
19  firm.
20     A.   Yes, I have.
21     Q.   And tell me about the first time you had
22  an in-person meeting with Dr. Restaino.
23     A.   Well, it was this year, earlier this
24  year, out in Pomona, California where my daughter

**Page 33**

1  is in college. I met with Dr. Restaino and one
2  other attorney. I don't recall the name.
3      Q.   How long did you all meet?
4      A.   One hour.
5      Q.   One hour?
6      A.   One hour.
7      Q.   And this was before you started writing
8  your expert report?
9      A.   Was it before? I started writing
10  already.
11     Q.   Okay. So you started -- let me back up.
12          The first time you talked to
13  Dr. Restaino, let's say it's early November '05,
14  what did you all talk about?
15     A.   He sent me, to my recollection, an
16  e-mail saying -- stating that he had read the
17  article that I had published about the adverse
18  effects of COX-2 inhibitors on the cardiovascular
19  system and that he was interested in some of the
20  things I had discussed there, some of the opinions
21  I had.
22     Q.   And the first time you all were able to
23  speak substantively, what did you all talk about?
24     A.   We talked about many things. We met for

9 (Pages 30 to 33)

Egil Fosslien, M.D.

Page 34

1　more than two hours, but we had lunch and we talked
2　about marshal arts. We are both interested in
3　marshal arts. So, we spent quite a bit of time on
4　that.
5　　　　And I was particularly interested when
6　it came to the business meeting, which I put down
7　one hour for, about the structure requirement for a
8　Rule 26 report since I have never done that before
9　and it was somewhat unclear to me.
10　　　I had approached it by writing kind of
11　an article type, what I'm used to. And I then
12　asked for advice, how do you actually format these
13　for the Court.
14　　Q.　How many meetings, in-person meetings,
15　do you think you've had with anyone from the Lopez,
16　Hodes law firm?
17　　A.　Well, there was a second meeting. I
18　went to the American Heart Association meeting in
19　Denver on atherosclerosis and related diseases,
20　thrombotic diseases. Dr. Restaino was there too,
21　and we spent quite a bit of time together.
22　　Q.　Do you remember when that was?
23　　A.　Do I have my bag here? Give me a minute
24　and I can tell you.

Page 35

1　　MR. CRAWFORD: Would this refresh your
2　recollection? It's the exhibit.
3　　THE WITNESS: The program will tell me
4　exactly. Thank you very much.
5　BY THE WITNESS:
6　　A.　It was -- okay -- April 27 through 29.
7　BY MR. TOMASELLI:
8　　Q.　April?
9　　A.　Yes.
10　　Q.　Of this year?
11　　A.　Yes.
12　　Q.　Okay. And that was the second time that
13　you all met in person?
14　　A.　Yes.
15　　Q.　Okay. Any other in-person meetings
16　after that that you can recall?
17　　A.　Well, here, at the hotel.
18　　Q.　Yesterday?
19　　A.　Yeah, yesterday.
20　　Q.　Okay. So, you've basically had three
21　in-person meetings with counsel?
22　　A.　To my recollection, that's correct.
23　　Q.　And how long did you all meet yesterday?
24　　A.　About three hours.

Page 36

1　　Q.　And what did you all talk about?
2　　A.　We talked about the meeting today, the
3　formalities and so on, what is going to happen
4　today.
5　　　　And I had made some comments in my --
6　some small corrections, you know, the things that
7　through my typing that I made mistakes, for
8　example, a D at the end of a verb and other small
9　corrections. I pointed those out. There should be
10　a copy here about that.
11　　Q.　And those are grammatical changes?
12　　A.　Most of them are, yes.
13　　Q.　Are there any substantive --
14　　A.　In one case --
15　　Q.　-- changes?
16　　A.　Well, I think there may be two
17　substantive changes, namely, towards the end of the
18　writing of this report, things got very hectic
19　because I had a meeting in Florida at the same time
20　and the two things coincided.
21　　　　And so the signature page on the report
22　was on a separate page. There was nothing else on
23　the signature page. So I called Dr. Restaino and
24　asked it doesn't look so good to have a page with

Page 37

1　only a signature on it. It doesn't say page 25 of
2　50.
3　　Q.　Okay.
4　　A.　So he recommended why don't you just
5　move some lines down from the previous page and put
6　some pages -- some lines on the last signature
7　page so you have some substance on the signature
8　page.
9　　　　While I did that, I must have lost one
10　line. So, it's in here that the line is lost. If
11　I can see my -- the copy that I have comments in,
12　should be here somewhere.
13　　Q.　Can you tell me in that Exhibit 3 where
14　you're talking about?
15　　A.　I could. It will take some time to do
16　that because I have the notes in the other one.
17　　Q.　Okay. Well, the last --
18　　A.　If you don't mind the time, I don't
19　mind.
20　　Q.　The last page is page 58 it appears?
21　　A.　Yes, it's not on the last page because I
22　moved several lines from previous pages over and
23　during that process one line was -- went into
24　cyberspace.

Egil Fosslien, M.D.

Page 38

1    Q.   Maybe we can track that down in a little
2    bit.
3    A.   It's here.  If I can get the draft that
4    I made comments in, I can find it.
5    Q.   Well, if you can turn to page 58.  If
6    you can turn to page 58 of Exhibit 3 if you don't
7    mind.
8    A.   Yes, yes.
9    Q.   Are you there?
10   A.   Yes.
11   Q.   Okay.  Is that your signature on that
12   page?
13   A.   That's a copy of my signature I think.
14   Q.   And did you in fact sign it on May 21,
15   2006?
16   A.   Yes, I did, and it was sent
17   electronically through a company out in Glen Ellyn.
18   Q.   If you turn to the page before, page 57.
19   A.   Yes.
20   Q.   The last paragraph is 125.  Do you see
21   that?
22   A.   Yes, I do.
23   Q.   And if you turn back to page 58.
24   A.   Okay.

Page 39

1    Q.   Do you see where the last paragraph is
2    page -- is paragraph 85?
3    A.   Yeah, that's strange.
4    Q.   Can you explain that?
5    A.   No.  Must have happened when I did the
6    last-minute changes.  Is that in the --
7    MR. CRAWFORD:  Let me check.
8    BY THE WITNESS:
9    A.   I don't know what that means.
10   BY MR. TOMASELLI:
11   Q.   Did you actually --
12   A.   Maybe I lost another line there.
13   Q.   Did you actually write paragraphs 86
14   through 125?
15   A.   I wrote everything here and then
16   Dr. Restaino reformatted that to be -- to satisfy
17   the formats of the Court.
18   Q.   Okay.  Did Dr. Restaino make any
19   substantive changes to your work?
20   A.   No, because, you know, this was the big
21   difference in doing this than writing an article
22   because you write an article and you discuss with
23   people.  And he didn't say a word.  We went to
24   meetings together.  He just listened.

Page 40

1    So, that was for me a completely new
2    experience and somewhat frustrating.  Nobody could
3    talk to you.
4    Q.   All right.  You obviously hold yourself
5    out as a pathologist.  True?
6    A.   I'm a pathologist, yes.
7    Q.   You don't hold yourself out as a
8    gastroenterologist?
9    A.   I do not.
10   Q.   Or a rheumatologist?
11   A.   I do not.  But neither -- you know, this
12   is an interesting point because if you want to say
13   I cannot say anything about any diseases involving
14   those areas because I'm not a rheumatologist or
15   gastroenterologist, you would have to apply the
16   same to rheumatologists or gastroenterologists,
17   they can't talk about pathology.
18   Q.   I'm just asking if you hold yourself out
19   to the medical community as a gastroenterologist?
20   A.   I'm a pathologist.
21   Q.   You're not a cardiologist?
22   A.   I'm a pathologist.
23   Q.   You're not an epidemiologist,
24   biostatistician or a pharmacologist?

Page 41

1    A.   I'm a pathologist.
2    Q.   You're not any of those things that I
3    said.  You're a pathologist?
4    A.   I'm a pathologist.
5    Q.   Okay.  And what school are you
6    affiliated with?
7    A.   University of Illinois.
8    Q.   And they have many locations I assume?
9    A.   Yes.  Their main location is Chicago and
10   their satellite locations in Champaign, Peoria and
11   Rockford.
12   Q.   And are you -- do you work in the
13   Chicago campus?
14   A.   I'm retired.
15   Q.   Okay.  When did you retire?
16   A.   2004.
17   Q.   Okay.
18   A.   So I'm an emeritus professor.  I am on
19   the staff still.
20   Q.   Do you currently teach medical students
21   or did that in 2004 when you retired?
22   A.   I have not volunteered to teach at this
23   point.
24   Q.   So that's no?

11 (Pages 38 to 41)

d1c48430-8b50-46ac-99d5-274a6d1abffd

Egil Fosslien, M.D.

**Page 42**

1    A.   Well, yes, I have not volunteered
2  because once you retire, then you don't get paid to
3  do it. So you would have to volunteer, which I
4  have not done so far.
5    Q.   So the last time you taught patients was
6  in 2004?
7    A.   Not taught patients. Taught medical
8  students, residents and so on.
9    Q.   I'm sorry. The last time you taught
10 medical students and residents, et cetera?
11   A.   Dental students, medical students,
12 residents, clinicians.
13   Q.   That was in 2004?
14   A.   Yes, sir.
15   Q.   Do you currently have --
16   A.   Although I should add that since I go to
17 national meetings and speak there every year, I
18 talk to physicians there and there are clinicians
19 and rheumatologists and all sort of specialties,
20 although mainly pathologists and laboratory people.
21   Q.   Other than national conferences that you
22 might speak at and talk to physicians or others --
23   A.   Yes.
24   Q.   -- you're not formally teaching any

**Page 43**

1  students these days?
2    A.   No.
3    Q.   Do you have a current clinical practice?
4    A.   No, because it would require liability
5  insurance, medical liability, which is very
6  expensive. If you amortize that over a small
7  number of patients, if you work part time, it
8  doesn't pay. It's a big problem.
9    Q.   You're not currently a practicing
10 physician. Fair?
11   A.   I've been asked to do, but I have said
12 no because of the insurance.
13   Q.   You don't want to buy the insurance?
14   A.   Well, you have to -- insurance is so
15 much. You have to do a lot to pay for it.
16   Q.   I'm not criticizing you, sir. I'm just
17 trying to make sure I understand.
18        So, you don't currently treat patients
19 because malpractice insurance is high?
20   A.   That's one reason. But, yes, I don't
21 treat any patients at this point.
22   Q.   Okay.
23   A.   I do have -- I'm asked questions by
24 patients. They want to know many things and I will

**Page 44**

1  tell them this is not medical advice. This is
2  educational advice.
3    Q.   So, you provide educational but not
4  necessarily medical advice?
5    A.   Correct.
6    Q.   All right. And when's the last time you
7  provided medical advice?
8    A.   In a university setting? 2004.
9    Q.   Prior -- outside the university setting?
10   A.   Well, some of the meetings we go to are
11 university-affiliated so I may have spoken at the
12 university.
13   Q.   Okay. Did you ever treat living
14 patients during your career?
15   A.   I'm a pathologist.
16   Q.   I don't know what that is. Is that a
17 yes or a no?
18   A.   Well, I'm surprised you don't know
19 because a pathologist usually doesn't treat
20 patients.
21   Q.   Okay. I'm not a doctor.
22   A.   Yeah, okay. It's a separate -- okay.
23 It's a separate specialty.
24   Q.   I apologize.

**Page 45**

1    A.   As a pathologist, there is biopsies,
2  autopsies, runs the laboratories, including blood
3  bank and so on, and many people don't know what the
4  pathologist does. They look at TV and see the
5  forensic pathologist, which is somewhat different,
6  although I have done that too.
7        But a pathologist really is their
8  background is kind of the physician's physician.
9  If you have a biopsy, for example, the surgeon will
10 take it out, send it over to pathology, they will
11 look at it and render a diagnosis. We then will
12 send the diagnosis back to the clinician. He would
13 talk to you.
14   Q.   So, your practice when you were
15 practicing medicine was autopsies and biopsies and
16 things like that?
17   A.   That's not correct. That was part of
18 the practice and -- but there were times where we
19 in the past went on rounds to look at patient
20 charts, look at patients.
21   Q.   When is the last time you went on
22 rounds?
23   A.   That must be, well, when I was in the
24 laboratory, which was the laboratory director to

12 (Pages 42 to 45)

Egil Fosslien, M.D.

Page 46

1  1986 would be my recollection.  Would be making
2  rounds, '86, talking directly to patients, although
3  there have been patients have called me,
4  particularly in the lawsuits.  They would like to
5  know "What did you find, Doctor?  What do you
6  think?"
7       But in those cases I usually would
8  decline to say anything because of internal
9  policies which state — stated that the clinician
10  talks to patients.
11     Q.  Okay.  And you weren't classified as a
12  clinician, then?
13     A.  No, a pathologist is not classified as a
14  clinician.  A clinician is the patient's doctor who
15  sees the patient.  But there are pathologists who
16  see patients too.  It depends upon the situation.
17  You cannot make a generalized statement really.
18     Q.  Do you have a current license to
19  practice medicine?
20     A.  Yes, I do.
21     Q.  In what state?
22     A.  Illinois.
23     Q.  Any other states?
24     A.  No.  I don't — did not retain those

Page 47

1  because of the cost of doing so.
2     Q.  I saw that you were Board certified in
3  clinical pathology and anatomic pathology, is that
4  right?
5     A.  Correct.
6     Q.  Are you still Boarded today?
7     A.  Correct.
8     Q.  Going back to your litigation report,
9  Exhibit 4 I think it is.  It's a fairly lengthy
10  report.  True?
11     A.  It got longer than I visualized.  It's
12  much more complicated.  Not from the point of view
13  of what was involved in the pathogenesis, but the
14  logistics around this was extremely difficult for
15  me.  Having no secretary and no help, I have to do
16  it all myself.  Not being a particularly good
17  typist, it was extensive.
18     Q.  Okay.  I may have referenced Exhibit 4
19  but —
20     A.  What is the Exhibit —
21     Q.  The litigation report is Exhibit — can
22  you look at which one?
23     A.  I apologize.
24     Q.  It's right down at the bottom there,

Page 48

1  sir.
2     A.  Which one?
3     Q.  The bottom sticker on the bottom.
4     A.  Exhibit — oh, okay.
5     Q.  3?
6     A.  That's Exhibit 3.
7     Q.  Okay.  So your litigation report is
8  Exhibit 3?
9     A.  All right.  So, Exhibit 4, is that the
10  one you are talking about?
11     Q.  I'm not.  I made a mistake.  I was
12  referring to your report and I think I called it 4,
13  but it is 3.
14     A.  I assumed you meant this one.
15     Q.  I did, sir.
16       I assume that lengthy report contains
17  all the opinions that you intend to offer in this
18  case?
19     A.  I don't understand that question really.
20     Q.  Okay.  Are there various other topics
21  that you intend to testify about that are not in
22  that report?
23     A.  Well, the problem here is there is a lot
24  of stuff coming out as we speak even being

Page 49

1  published and I have reserved the right to change
2  my report if new data becomes available in the
3  peer-review literature.
4     Q.  I'm not arguing with that, sir.  I'm
5  just trying to figure out if that report contains
6  all the topics that you're going to testify about
7  or if there is a whole list of topics that you feel
8  comfortable talking about that aren't in the
9  report.
10     A.  I think at this point the report was
11  finished the 22nd and this is my report here as you
12  see it.
13     Q.  Okay.  So, you feel like it's fairly
14  complete except for obviously literature coming out
15  that you might want to update.  Fair?
16     A.  I think it represents what I thought was
17  relevant at the time I wrote it.
18     Q.  As of the day you signed it, May 21,
19  2006?
20     A.  Yes, it should be understood that there
21  may be things that I didn't look at because there
22  is a vast amount of literature out there.  I looked
23  at the literature that I thought was pertinent to
24  this case and that might explain the pathogenesis.

13 (Pages 46 to 49)

d1c48430-8b50-46ac-99d5-274a6d1abffd

Egil Fosslien, M.D.

Page 50

1    So, what I tried to do here was to find
2 out, you know, why is it that Vioxx causes these
3 adverse cardiovascular effects because I started
4 working on that and had rendered opinions about
5 that in the publication that came out last fall.
6 And, so, what you have here in the report is my
7 opinion about how this came about.
8    Q.   And this report is limited to Vioxx,
9 right, sir?
10    A.   To the extent that I was able to do so
11 because, you know, there are other COX-2
12 inhibitors. And the question comes up many times
13 is it a class effect or not. But I tried to limit
14 it to Vioxx although in here I talked about certain
15 effects of celecoxib in addition.
16    Q.   I think in the report you said you spent
17 a couple hundred hours writing the report. Fair?
18    A.   At least, at least.
19    Q.   You relied on your general knowledge and
20 research to write that report?
21    A.   Well, I had written several papers about
22 COX-2 in general before that and the COX-2
23 specifically in cardiovascular -- its
24 cardiovascular effects before that. So I had this

Page 51

1 background to build on.
2    Q.   And that's why I said you relied on your
3 general knowledge and experience and research?
4    A.   I think that's fair, yes.
5    Q.   Did the Plaintiff's attorneys or the
6 people who hired you put any limits on the time you
7 could spend writing the report?
8    A.   No. This was really confusing for me
9 because you have a goal you are striving towards
10 and it was not clear to me what exactly the goal
11 was, how long is the report going to be, 20 pages,
12 40 pages. And my impression was that was up to me
13 how much I wanted to put in there.
14    So, I decided to write what you see here
15 as I think that really reflects my opinions at this
16 time.
17    Q.   Okay. And I think you've said before
18 you didn't necessarily sit down and write that
19 whole report in one session. It was over a period
20 of time?
21    A.   It was over a period of time and it was
22 revised by me several times, you know.
23    Q.   Can you give me an idea of how long over
24 a period of time that was?

Page 52

1    A.   Well, I started fairly shortly after
2 Dr. Restaino contacted me and the first I did was
3 to look through my own publications and old files
4 and so on to see what can be reused, frankly,
5 instead of having to retype everything. And I
6 ended up really retyping most of it.
7    Q.   I see. So, you looked at your prior
8 publications --
9    A.   Right.
10    Q.   -- before you started typing?
11    A.   Yes.
12    Q.   Did you do your own research or did
13 Plaintiff's counsel forward you articles and
14 whatnot?
15    A.   They would -- since I, you know -- let
16 me make this perfectly clear, to quote a famous
17 person.
18    I am an emeritus professor at University
19 of Illinois. As such, I have access to on-line
20 articles. So, I used the PubMed system to find out
21 what's relevant. Then I can go into the university
22 library and enter and get a full text article
23 downloaded on many of these articles, but there are
24 some that I cannot get.

Page 53

1    So, then I would ask Dr. Restaino to get
2 those articles so he would then -- I would send him
3 a request and give the PubMed number and the first
4 author and the year. Whereupon, he then would in
5 most cases be able to procure that document and
6 send it to me.
7    Q.   But you did your own research?
8    A.   I didn't get any help whatsoever, which
9 was the frustrating part.
10    Q.   Okay. Now, your billable rate I think
11 it says in your report is $350 an hour?
12    A.   That's correct.
13    Q.   I'm going to hand back Exhibit 4, which
14 is your bookkeeping that you told me.
15    A.   My simplified bookkeeping.
16    Q.   Your simplified bookkeeping.
17    A.   Yes.
18    Q.   And is there a grand total that you've
19 charged the Plaintiff's firm so far?
20    A.   If you look at probably the last page.
21 Let's see what page. Probably page 6. Draw your
22 attention to -- you can't see that. If you go to
23 page 1, you see the headings A, B, C, D, E, F, G,
24 H.

14 (Pages 50 to 53)

d1c48430-8b50-46ac-99d5-274a6d1abffd

Egil Fosslien, M.D.

Page 54

1    Q.   Okay.
2    A.   And heading H underneath it says
3  "Sum Paid." That's what has been paid as of the
4  last payment.
5    Q.   Okay.
6    A.   And as you can see on page 6 it comes up
7  with 35,000, which has been paid at this point.
8    Q.   Have you incurred further dollars to be
9  charged to the Plaintiff's firm?
10   A.   Then it's listed on page 6 there is some
11  things here, the more recent things. And I have
12  not charged for yesterday yet. I have not charged
13  for today yet and there are many things I didn't
14  charge for, if I send out the Fed Ex, so I paid.
15        One reason is at the beginning I used a
16  much smaller format. I didn't have any space to
17  put in costs or other expenses incurred and as I
18  progressed in my knowledge about how this is done,
19  I expanded the format to legal size now so I can
20  put in more things.
21   Q.   Okay. But prior to yesterday you had
22  incurred about 35,000 in charges?
23   A.   That's correct.
24   Q.   All right. How many hours do you think

Page 55

1  you've -- I know you say you may not have charged
2  for all of them. But how many hours do you think
3  you've put into this Vioxx litigation?
4    A.   For this particular report, at least
5  200. I put down 200. I think it's more than that.
6    Q.   Okay. So, we will just call it 200 for
7  the report since that's what you put in there.
8  Fair?
9    A.   Fair.
10   Q.   Other than the 200 for the report how
11  many hours do you think you've spent?
12   A.   Could you explain the question. I don't
13  understand the question.
14   Q.   Okay. It looks like you spent 200 hours
15  reviewing the literature and writing this report.
16  Okay?
17        Have you spent time other than that in
18  the 200 hours, I mean have you spent time above and
19  beyond the 200 hours, other than, say, for
20  yesterday and today?
21   A.   Well --
22   MR. CRAWFORD: Objection; vague.
23  BY THE WITNESS:
24   A.   Well, I'm not quite clear about this

Page 56

1  question.
2    MR. CRAWFORD: Do you mean after he was
3  retained or --
4    MR. TOMASELLI: I asked him how many hours he
5  spent on the Vioxx litigation.
6    MR. CRAWFORD: Vioxx litigation.
7    MR. TOMASELLI: That's what I'm interested in.
8  BY THE WITNESS:
9    A.   Well, it's a very difficult question to
10  answer precisely because of the following: When
11  you work like I do, I'm a pathologist and I go on
12  the Internet. I will look at something, say, maybe
13  rofecoxib, and there may be something else of
14  interest and so I click on that and I go on to
15  mitochondria, which I am very interested in and
16  other things, and then I come back to the rofecoxib
17  story.
18        So, there are many things I didn't
19  include because I wanted to focus on this
20  particular report, what I have been asked to do.
21        But I work a little different I think
22  from the legal profession in that I don't focus
23  specifically on the legal part. I look at the
24  scientific and medical part.

Page 57

1        So, the other things I may have done
2  when I surfed the Internet, so to speak, and when
3  I --
4    Q.   Let me --
5    A.   When I am surfing the Internet, I'm
6  talking about the PubMed National Library of
7  Medicine.
8    Q.   So, most of the time, in fact, the great
9  majority of the time spent in the Vioxx litigation,
10  is reviewing medical publications, scientific
11  publications and writing your report. Is that
12  fair?
13   A.   Well, for this report, what you see
14  here, probably 200 hours I actually spent on it.
15  But I spent time on other things that I didn't
16  pursue further because I wanted to finish this.
17        I have to finish by a certain date. I
18  could have written three times as much if I had had
19  time to do that, but there was a deadline. And so
20  I had to stick within the deadline.
21   Q.   Okay. Has your hourly rate changed for
22  deposition testimony or is it still $350 an hour?
23   A.   Well, the -- to my recollection there
24  was a -- I think the following. I don't have that

15 (Pages 54 to 57)

d1c48430-8b50-46ac-99d5-274a6d1abffd

Egil Fosslien, M.D.

Page 58

1  with me here. I think it's 1,400 for the first
2  four hours and then more if it goes beyond four
3  hours. But I would have to look in the contract to
4  see that.
5      Q.   So, there is a contract between you and
6  the Plaintiff's firm?
7      A.   Yes.
8      Q.   Did you bring that with you today?
9      A.   I didn't know that was requested. That
10 is not correspondence. It's a contract. I did not
11 work that out --
12     Q.   The answer is, "No, I didn't bring it
13 today"?
14     A.   You can say that is the answer, but that
15 contract was worked out between my lawyer and their
16 lawyer.
17     Q.   Okay. I just want to know --
18     A.   That is not my correspondence.
19     Q.   Okay.
20     MR. CRAWFORD: Do you have a copy of it? We
21 didn't bring it because I don't have it. I'm
22 sorry.
23     MR. TOMASELLI: And that's fine. I'm just
24 wanting to know if he brought it today.

Page 59

1      MR. CRAWFORD: We will get you a copy.
2      MR. TOMASELLI: It's not a big deal.
3      MR. CRAWFORD: We will get you a copy.
4      DR. BAUM: We would like a copy.
5      MR. CRAWFORD: Yes.
6  BY THE WITNESS:
7      A.   See, what I did to --
8  BY MR. TOMASELLI:
9      Q.   Is the -- is the hourly rates that you
10 describe for me for the deposition, is that carried
11 over for any trial testimony? Do you recall?
12     A.   I don't recall because this is all
13 worked out with my lawyer and their lawyer.
14     Q.   Whatever it is, it's --
15     A.   They suggested the hourly rate and they
16 suggested for the testimony and so on.
17     Q.   Whatever it is, it's in the contract?
18     A.   I would think so.
19     Q.   Okay. I assume -- I think we talked
20 about this a little bit before. But in writing
21 your litigation report, you wanted to be, you know,
22 as thorough as possible and do your best to look at
23 the totality of the data with respect to Vioxx,
24 right?

Page 60

1      A.   Well, I think that is a very strange
2  question because I don't think anybody can look at
3  the totality of the whole field. It's an enormous
4  field. And that is why I said I retained the right
5  to modify my report should new data become
6  available because I don't think anybody -- there is
7  anybody around in the world who knows the whole
8  field.
9          What I did, I was setting out to find
10 out and render an opinion on pathogenesis, namely,
11 the development of the cardiovascular complications
12 caused by this specific inhibitor.
13     Q.   At least you approached this assignment
14 like you would approach a question that you had in
15 your professional life as a pathologist. Fair?
16     A.   Initially I approached this as I would
17 approach writing an article because that's what I
18 was -- felt comfortable with and I was not really
19 knowledgeable about the Rule 26 report. I had no
20 idea about that when we started.
21     Q.   Okay. So, whatever process you brought
22 to writing a scientific article, you tried to bring
23 to writing this litigation report. Fair?
24     A.   I think that's a fair statement. Of

Page 61

1  course, in the -- in the scientific article you
2  can -- you can discuss things. There was nobody to
3  discuss with in this case, which was, as I said,
4  frustrating at times.
5      Q.   And when you write a scientific article,
6  I assume you don't look at just one piece of data,
7  but you look at several pieces of data and try to
8  harmonize that, is that correct?
9      A.   Well, this is an interesting question
10 because it gets to the core of the problem, what is
11 believable and what's not believable, what can
12 support an opinion, what cannot support an opinion.
13         We know there was a problem here. We
14 know that this particular drug has been linked to
15 cardiovascular complications. And the question was
16 then how does this come about.
17         That's what I set out to try to find out
18 based upon what I had published before also before
19 I was asked to render an opinion here. I had
20 already rendered an opinion in the literature.
21         I'm sorry if I'm talking too fast.
22     Q.   Again, it's like you do when you write a
23 scientific article. When you try to figure out why
24 something is happening, you don't look at one

16  (Pages 58 to 61)

Egil Fosslien, M.D.

1 article or one piece of data and think you've got
2 the answer. You have to look at -- look at the
3 totality or at least a great -- try to get your
4 hands around what the medical literature as a whole
5 says and then try to harmonize that. Is that -- I
6 mean that's fair, right?
7     A. I'm happy you brought that up because
8 it's very important. For example, when I look at
9 an article, I first look at the conclusion. First
10 the abstract and the conclusion. To see does the
11 conclusion have anything to do with the problem at
12 hand or does the author talk about something else.
13         Secondly I look at the references. Are
14 the references up to date? Do the references
15 include the recent papers in the field?
16         And then I look at the discussion. And
17 then I will look at how it was done, you know, what
18 sort of animals did they use, what sort of diet did
19 they give the animals.
20         But it's important to prescreen I think
21 instead of spending a lot of time on articles that
22 I don't think are relevant.
23     Q. And the same thing could be done with
24 your papers, looking at the references you cite

1 and --
2     A. Well, that happens of course --
3     Q. -- are they up to date --
4     A. Pardon. When you submit a paper for
5 publication to a journal, they will then send it
6 out to three references, sometimes more.
7         I have served as a referee on many
8 papers in the recent years, including British
9 Journal of Cancer and others and -- the list is in
10 my CV there.
11         And so then you get the feedback from
12 the reviewers, which is not always, you know,
13 supportive. They are different views. But --
14     Q. Is that the peer-review process?
15     A. That's the peer-review process.
16     Q. Okay.
17     A. And I serve on the editorial boards.
18 And so I developed this particular way of looking
19 at things because I found it really worked.
20     Q. Okay.
21     A. So, then you get the feedback from the
22 reviewers and you can then do -- there is usually a
23 recommendation from the editor what to do with the
24 article, you know, we like your article, I'd like

1 to publish it or it needs to have revisions, the
2 reviewers have pointed out these concerns they
3 have, will you please explain more in detail about
4 this, or you can get a flat rejection.
5     Q. Right.
6     A. As a -- I rejected a few papers myself.
7     Q. Sounds like a pretty rigorous process?
8     A. Well, it's very costly in time.
9     Q. Lots of people looking at it and lots of
10 eyes on the papers, huh?
11     A. Well, I cannot speak for all journals,
12 you know, but I can speak for the journals I know.
13     Q. And the journals you know take that
14 peer-review process fairly seriously I guess?
15     A. I would think so. The British Journal
16 of Cancer I would think would do so.
17     Q. And I guess it's something that would
18 come out in the peer-review process that if, for
19 example, somebody submits a paper and they speak
20 heavily about one paper in particular, one study,
21 and the peer reviewers know that there are, I don't
22 know, seven or eight papers and studies that are
23 100 percent contrary or at least bear on the same
24 issue that that one paper said, the peer reviewers

1 might put that back and say you should include a
2 discussion of all the data?
3     A. Usually you don't say include any
4 discussion of all the data, but pertinent data.
5 Let's say that somebody submits a paper and it has
6 ten authors. You see that nowadays. And you find
7 that one of the authors has actually published a
8 paper last year that is, you know, almost the same
9 from one paper. They had the same drawing. They
10 went to the library to make sure. The editor says
11 there is a duplication of data here.
12         But I don't think you can actually
13 review everything. That is not possible I think.
14 That's why it's sent to experts, people who work in
15 that field.
16     Q. Right. I guess I'm trying to understand
17 the process a little bit more. But if there is a
18 scientific issue and there is one paper on one side
19 of the issue and there are eight papers on the
20 other side of the issue, it's probably not good
21 science just to cite the one paper on one side and
22 say that is the Gospel. Is that fair?
23     MR. CRAWFORD: Objection; form.
24 BY THE WITNESS:

17 (Pages 62 to 65)