Dr. Colin Funk

| Page 18 |
|---|
| 1  inhibitors and 5-lipoxygenase? |
| 2      A. Yeah, 5-lipoxygenase. |
| 3      Q. I'm sorry, can you spell lipoxygenase? |
| 4      A. L-i-p-o-x-y-g-e-n-a-s-e. |
| 5      Q. And what, what drugs are in that |
| 6  family? |
| 7      A. There are a number of different drugs |
| 8  one of them is called -- well used to be called bay... |
| 9  bay...something 1001 or something like that. But now it |
| 10  goes under the name DG31. There's a clinical trial going |
| 11  on with that right now. |
| 12      There are other inhibitors in this pathway |
| 13  that I'm also interested in. |
| 14      Q. What clinical trials for COX-2 |
| 15  inhibitors have you followed through the course of your |
| 16  career? |
| 17      A. Studies relating to rofecoxib, Vioxx |
| 18  celecoxib, Celebrex, and some of the comparator drugs in |
| 19  those studies, naproxen. |
| 20      Q. You followed NSAID drugs -- or do you |
| 21  follow NSAID drugs outside of when they're being compared |
| 22  to COX-2 inhibitors? |
| 23      A. Yes, I do. |
| 24      Q. You do. And can you give me some |
| 25  examples of those? |

| Page 19 |
|---|
| 1      A. Other NSAID studies? |
| 2      Q. Yes, sir. |
| 3      A. Well, for instance, the studies dealing |
| 4  with low-dose aspirin. |
| 5      Q. Okay. Any others besides low-dose |
| 6  aspirin? |
| 7      A. Naproxen. |
| 8      Q. What studies have you reviewed on |
| 9  naproxen? |
| 10      A. I've looked at one by Patrono. |
| 11      Q. Is that when naproxen was compared to |
| 12  aspirin? |
| 13      A. I can't remember right now, no. |
| 14      Q. Okay. Any others? |
| 15      A. I've looked at some other trials with |
| 16  COX-2 inhibitors. Parecoxib, p-a-r-e-c-o-x-i-b; |
| 17  Valdecoxib, v-a-l-d-e-c-o-x-i-b; I've looked at some |
| 18  trials with lumiracoxib, l-u-m-i-r-a-c-o-x-i-b. |
| 19      Q. Have you looked at trials with |
| 20  ibuprofen? |
| 21      A. I've looked at some meta-analysis |
| 22  studies that have included ibuprofen. |
| 23      Q. Can you recall off the top of your head |
| 24  which one that is? |
| 25      A. I can't recall the main author. |

| Page 20 |
|---|
| 1      Q. Okay. Have you tried to look at the |
| 2  clinical trials for diclofenac? |
| 3      A. I've looked at some of them, yeah. |
| 4      Q. Which ones? |
| 5      A. Again, I can't recall off the top of my |
| 6  head. |
| 7      Q. Okay. How much do you charge to be an |
| 8  expert witness? |
| 9      A. It's 350 for reading/report |
| 10  preparation, 400 for the deposition. |
| 11      Q. What about trial testimony? |
| 12      A. 400. |
| 13      Q. Do you keep the money that you earn? |
| 14      A. I haven't earned anything yet, so -- |
| 15  well I did get a $5,000 retainer fee -- |
| 16      Q. Did you put that in your bank account? |
| 17      A. -- which I kept, yes. |
| 18      Q. Have you served as an expert before at |
| 19  any time? |
| 20      A. No. |
| 21      Q. Did you have a fee schedule before this |
| 22  case? |
| 23      A. A fee schedule? |
| 24      Q. Yeah. You said 350 for review and |
| 25  writing your report and 400 for deposition testimony and |

| Page 21 |
|---|
| 1  400 for trial testimony? |
| 2      A. I've done various other types of |
| 3  document work in the past. |
| 4      Q. Consulting work? |
| 5      A. Consulting mainly, yes. |
| 6      Q. And you charged $350 an hour for that |
| 7  time? |
| 8      A. No, I've -- well it's varied anywhere |
| 9  from a daily rate of about 2,500 to an hourly rate |
| 10  anywhere probably in the 150 to 250 range. |
| 11      Q. And how did you decide on your fee |
| 12  schedule for this case? |
| 13      A. Just by mutual agreement, I guess. |
| 14      Q. So when you're a consultant in the |
| 15  medical community, you charge a certain amount of money |
| 16  per day and then about -- what did you say per hour? |
| 17      A. Uh... It could be anywhere from 150 to |
| 18  250 an hour, something like that. |
| 19      Q. Okay. Who was your first contact in |
| 20  terms of a lawyer for this case? |
| 21      A. For this case? |
| 22      Q. Yes, sir. |
| 23      A. It would be -- |
| 24      Q. This is the only case you've ever been |
| 25  on, right? |

6 (Pages 18 to 21)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 22

1          A. Yeah as an expert, yeah. Shelly
2  Sanford.
3          Q. Ms. Sanford?
4          A. Ms. Sanford, yeah.
5          Q. And when did Ms. Sanford give you a
6  call?
7          A. That would have been, let's see...
8  Somewhere around the end of June/beginning of July,
9  something like that.
10         Q. Of this year?
11         A. Yeah.
12         Q. Okay. And have you had phone
13  conversations with Ms. Sanford?
14         A. A couple.
15         Q. Have you had e-mail correspondence with
16  Ms. Sanford?
17         A. Yes.
18         Q. Okay. And we'll request a copy of
19  that, so. Is that okay, will you produce that?
20  U/A     MS. SANFORD: I'll look for the e-mails of
21  mine and give them to Andy and take them under advisement.
22         MR. TOMASELLI: You all have any problem
23  producing those, as you sit here today?
24         MR. BIRCHFIELD: Any e-mails that he has
25  between counsel. Right.

Page 23

1          MR. TOMASELLI: You don't have a problem
2  with that?
3          MR. BIRCHFIELD: I don't have a problem
4  with that.
5          BY MR. TOMASELLI:
6          Q. And that first conversation, did
7  Ms. Sanford give you a call in your office?
8          A. It might have been an e-mail asking to
9  schedule a meeting.
10         Q. And what did you write back, do you
11  recall?
12         A. Umm, sure, I'd be willing to meet you.
13         Q. Okay. And did she come up to meet you
14  here in Toronto or did ya'll meet somewhere else?
15         A. She came to Kingston to meet me.
16         Q. Okay, how far is Kingston from Toronto?
17         A. It's about a two-and-a-half hour car
18  drive.
19         Q. Okay. And do you remember when you
20  first met with Ms. Sanford?
21         A. I think it was actually around July
22  11th, I think, somewhere, the first time.
23         Q. And was anyone with her or was she
24  alone?
25         A. She was alone.

Page 24

1          Q. And what sorts of things did ya'll talk
2  about?
3          A. She mentioned about the, I guess the
4  multi-district litigations and the possibility of being an
5  expert witness.
6          Q. And did you say in that meeting that
7  you would agree to do that?
8          A. Well we discussed the -- I think we
9  discussed the possibility that I would do it. I'm not
10  sure if I actually agreed that day or not.
11         Q. How long did ya'll meet?
12         A. A few hours, maybe, three/four hours.
13         Q. Did you discuss the science of COX-2
14  inhibitors?
15         A. Well we talked about some of my
16  research on COX-2 drugs, yeah.
17         Q. And what -- do you remember what
18  research you talked to her about?
19         A. Probably some of my recent studies that
20  are published in this year, in 2006.
21         Q. Would one of those be the Cheng 2006
22  article?
23         A. Yes.
24         Q. That's C-h-e-n-g?
25         A. Yeah.

Page 25

1          Q. Okay. And what did you tell her about
2  that study?
3          A. I can't really remember. We might have
4  talked a little bit about the results in that publication.
5          Q. Can you recall anything else ya'll
6  talked about other than the litigation and whether you
7  might be willing to serve as an expert and some of your
8  recent publications?
9          A. I can't recall anything else.
10         Q. Okay. Have ya'll had any further
11  in-person meetings after July 11th?
12         A. I think I met her after that. I'm not
13  sure if it was maybe once after that.
14         Q. In Kingston again?
15         A. No.
16         Q. Where was that?
17         A. I think it was actually New Orleans.
18         Q. Did you fly to New Orleans?
19         A. Yeah.
20         Q. Specifically to meet her there?
21         A. I think I was acting as a consultant at
22  that time.
23         Q. Okay. A consultant for the Plaintiffs
24  in the litigation?
25         A. Yeah.

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 26

1      Q. Did you meet with anybody other than
2  Ms. Sanford in New Orleans?
3      A. Yeah. I was meeting with a few other
4  lawyers, Bert Black and Mark Robinson.
5      Q. And when was this meeting?
6      A. Let's see, that would have been... Was
7  that in the end of July, I think, sometime around there.
8      Q. The end of July?
9      A. I think it was around there.
10     Q. Was a trial going on down there, did
11 you know?
12     A. There was one going on, yeah.
13     Q. There was one going on. And you met
14 with -- did you know if any of the lawyers were actively
15 participating in the trial at the time?
16     A. If any lawyers, which?
17     Q. If any of the lawyers you met with were
18 actually participating in the trial at the time?
19     A. Well I knew there was -- I was acting
20 as a consultant for -- with Bert Black and Mark Robinson.
21     Q. Okay. Did you know Mr. Robinson was
22 trying the case at the time?
23     A. Yes.
24     Q. You did. Where did you stay when you
25 were in New Orleans?

Page 27

1      A. At the W Hotel.
2      Q. And that's where Mr. Robinson was
3  staying; right?
4      A. Yes.
5      Q. And when did you agree to consult with
6  the Plaintiffs? I assume you agreed prior to the end of
7  July to come down; right?
8      A. I, I --
9      Q. Sometime between July 11th when you met
10 with Ms. Sanford in Kingston and July, the end of July
11 when you were down in New Orleans?
12     A. Sometime, yeah, in that June/July area.
13     Q. Well it would have to be after July
14 11th, correct?
15     A. Well actually I was acting as
16 consultant before I met Ms. Sanford.
17     Q. Oh you were. Who were you consulting
18 with?
19     A. Bert Black.
20     Q. Okay --
21     MS. SANFORD: Did you finish your
22 answer? I'm sorry, were you finished with your answer?
23     THE WITNESS: I think so.
24     BY MR. TOMASELLI:
25     Q. I thought I asked you who your first

Page 28

1  contact in litigation was and you said Ms. Sanford, so --
2      A. You said in relation to this case, I
3  thought.
4      Q. Okay. Well let me back up. Who's the
5  first contact you ever met with regarding Vioxx
6  litigation?
7      A. It was Bert Black.
8      Q. Okay. And when were you first
9  contacted by Mr. Black?
10     A. It was around the first or second week
11 in June of 2006.
12     Q. Okay. Did he e-mail you or call you?
13     A. I think he, -yeah, he called me.
14     Q. And what did he say?
15     MS. SANFORD: I'll just make a general
16 statement here. I can't instruct you not to answer, but I
17 am obligated to tell you that if you were not retained as
18 a testifying expert at that time, you are under no
19 obligation to talk about the substance of conversations
20 where you were a consulting expert only.
21     MR. TOMASELLI: I completely disagree with
22 that now that he's been designated as a testifying expert,
23 so.
24     BY MR. TOMASELLI:
25     Q. Be that as it may, if you take her

Page 29

1  instruction we'll deal with that in due course.
2      But what did Mr. Black say to you the first
3  time that ya'll talked?
4      MS. SANFORD: I give you the same
5  statement, Dr. Funk.
6      THE WITNESS: He asked if I was willing to
7  be a consultant.
8      BY MR. TOMASELLI:
9      Q. Okay. And what did you say?
10     A. I said I would consider it.
11     Q. And when did you say you would be a
12 consultant?
13     A. I can't remember the exact date. It
14 might have been sometime in the middle of June.
15     Q. Okay. So in the middle of June you
16 made up your mind that you would consult for Plaintiff's
17 lawyers who were suing Merck; right?
18     A. I think I agreed to be a consultant;
19 yes.
20     Q. Did Mr. Black ask you to consult with
21 any particular case or just in general?
22     A. I'm not sure exactly -- there was, he
23 mentioned that a case was about to go to trial.
24     Q. And did you meet in person with
25 Mr. Black at any time prior to your in-person meeting with

8 (Pages 26 to 29)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 30

1   Ms. Sanford?
2        A. Yes.
3        Q. Yes?
4        A. Yeah.
5        Q. And how many times?
6        A. Once, I think.
7        Q. And where did ya'll meet?
8        A. In Kingston.
9        Q. How long was your meeting?
10       A. It was a few hours one day.
11       Q. Okay. And do you remember generally
12  what you talked about, Dr. Funk?
13       MS. SANFORD: If you don't mind I'll just
14  say I'll give you the same statement. And let that be a
15  running statement to him that he's under no obligation to
16  disclose the content of any consulting-only testimony
17  although I cannot instruct you not to answer the question.
18       Can I have that running statement as to any
19  content or do you want me to make that every time?
20       MR. TOMASELLI: Sure. I don't mind.
21       MS. SANFORD: Okay.
22       BY MR. TOMASELLI:
23       Q. Do you remember what you talked about
24  with Mr. Black?
25       A. Primarily my science and, I think, my

Page 31

1   paper that we published, Cheng et al.
2        Q. Cheng 2006 again?
3        A. Yes.
4        Q. So if I got the time lines straight:
5        Mr. Black calls you sometime in June and
6   thereafter you agreed to serve as a consultant for
7   Plaintiff's lawyers who were suing Merck; and then
8   sometime thereafter Ms. Sanford called you about the
9   Dedrick case and sometime -- and that was in June or July;
10  and then on July 11th you met with Ms. Sanford in
11  Kingston; and then toward the end of July you went down
12  and met with Ms. Sanford, Mr. Black and Mr. Robinson in
13  New Orleans.
14       Is that summarized; is that fair?
15       A. I didn't meet with Ms. Sanford then.
16  This was part of the consulting arrangement with Bert
17  Black and Mark Robinson.
18       Q. Okay. So you did not meet with
19  Ms. Sanford in New Orleans?
20       A. She was there, but I didn't meet with
21  her.
22       Q. Okay. So Ms. Sanford was in New
23  Orleans and you were in New Orleans but you all didn't
24  meet at the end of July?
25       A. No. We crossed each other's paths but

Page 32

1   I was talking with Bert Black and Mark Robinson.
2        Q. Okay. And did you, did you -- do you
3   know Dr. Douglas Zipes?
4        A. Yes.
5        Q. Did you, did you talk with Dr. Zipes at
6   the W Hotel in late July/early August?
7        A. Well I was consulting with Mark
8   Robinson and Bert Black then, yeah.
9        Q. Right, right. Did you meet with
10  Dr. Zipes, though?
11       A. We shook hands, I guess. I'd never met
12  him before.
13       Q. But you met him and you talked to him?
14       A. Yeah, just informally.
15       Q. Did you talk about the science?
16       A. I don't think I talked directly with
17  him about science, no.
18       Q. You don't think you did or you didn't?
19       MS. SANFORD: Object to the form.
20       THE WITNESS: I was hired as a consultant
21  to work with Mark Robinson and Bert Black.
22       BY MR. TOMASELLI:
23       Q. Okay. Do you ever remember talking
24  with Dr. Zipes about the science of COX-2 inhibitors or
25  Vioxx?

Page 33

1        A. No.
2        Q. Never have?
3        A. I don't think so, no.
4        Q. Okay. Dr. Zipes has testified that he
5   talked to you about the science of COX-2 inhibitors that
6   just is not right; is that what I'm hearing?
7        MS. SANFORD: Object to the form.
8        BY MR. TOMASELLI:
9        Q. It's okay that she objects.
10       A. I was talking in a room with Mark
11  Robinson and Bert Black, it's possible he heard some of
12  the things I was saying.
13       Q. So let me get this straight. While you
14  didn't directly to Dr. Zipes, you all were all sitting in
15  a room and Mr. Robinson and Mr. Black were talking to you
16  about the science and Dr. Zipes was welcome to sit in and
17  listen?
18       A. Umm, it's possible, yeah. I wasn't
19  looking after Dr. Zipes.
20       Q. Right. But you weren't talking
21  directly, you've never talked directly to Dr. Zipes about
22  the science?
23       A. No.
24       Q. Okay. And if I understand your
25  testimony, sometime in July you agreed to serve as an

9 (Pages 30 to 33)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 34

1  expert witness or consult in the Dedrick case?
2          A.  I actually never heard about the
3  Dedrick -- the word about the person Dedrick until I think
4  it was yesterday.  I didn't know anything about this case.
5  I just was asked to write an expert opinion on a couple of
6  things.
7          Q.  Okay.  And do you know when the Dedrick
8  case is going to trial?
9          A.  I think it's scheduled for the end of
10 November.
11         Q.  Do you know where it is?
12         A.  Probably New Orleans.
13         Q.  Are you planning on coming?
14         A.  Possibly if I'm asked to give my
15 opinion.
16         Q.  So far you haven't been asked to --
17         A.  No.
18         Q.  -- come to New Orleans?
19         A.  Not officially, no.
20         Q.  Unofficially have you been asked to
21 come to New Orleans?
22         A.  There's been the possibility that I
23 might come there, yeah.
24         Q.  You know it's a possibility but you
25 haven't made any flight arrangements?

Page 35

1          A.  No, I haven't.
2          Q.  Okay.  And after this -- how long did
3  you spend in New Orleans?
4          A.  When?
5          Q.  I'm sorry, good question.  At the end
6  of July when you were meeting with Mr. Robinson and
7  Mr. Black in New Orleans, how long were you there?
8          A.  A couple of days.
9          Q.  A couple of days.  Did you charge for
10 your time?
11         A.  Yeah.  As part of my consulting
12 arrangement, yes.
13         Q.  Okay.  And how long -- or how many
14 hours have you spent with respect to your consulting
15 arrangement, not necessarily with respect to the Dedrick
16 case but just in general; how many hours have you spent in
17 that consulting arrangement with the Plaintiff's lawyers
18 who are suing Merck?
19         MS. SANFORD:  Object to the form.
20         BY MR. TOMASELLI:
21         Q.  Do you understand what I was trying to
22 ask?
23         A.  The number of hours consulting.
24         Q.  Right.  So can you give me an estimate?
25         A.  Well, I spend most of my time in

Page 36

1  research and dealing with this whole area so I can't give
2  you an exact estimate since I'm dealing with this whole
3  area all the time.
4          Q.  Okay.  And the Plaintiff's lawyers,
5  they're not paying for your research time; right?
6          A.  No.
7          Q.  Okay.  So how many hours have the
8  Plaintiff's lawyers paid you for your consulting time?
9          A.  Actually I haven't been paid anything
10 yet--
11         Q.  Mr. Black --
12         A.  -- for any of my consulting.  I haven't
13 been paid anything.
14         Q.  Sorry, I didn't mean to interrupt you.
15         Mr. Black and Mr. Robinson haven't paid you
16 any money for the time you spent in New Orleans?
17         A.  No.  Not yet at least.
18         Q.  Have you billed them for that time?
19         A.  Yes.
20         Q.  When did you bill them for that time?
21         A.  I bill them monthly.
22         Q.  Okay.  And how many months have you
23 sent out invoices?
24         A.  I think there were three months of
25 invoices.

Page 37

1          Q.  Three invoices so far?
2          A.  Yeah.
3          Q.  And what are the total of those
4  invoices?
5          A.  I think it's -- for the three months
6  it's about a bit over 30,000.
7          Q.  So about a hundred hours of work or so?
8          A.  Somewhere around there, yes.
9          Q.  Were you reimbursed for your flight
10 down to New Orleans?
11         A.  Not yet, no.
12         Q.  Starting to get a little anxious?
13         A.  Well, it would be nice to get
14 reimbursed for some of those expenses.
15         Q.  I'll bet.
16         When was the next time you met with any
17 Plaintiff's lawyers after your couple-day meeting in New
18 Orleans in the end of July of 2006?
19         A.  Well after New Orleans -- I'm trying to
20 think here...  I don't recall meeting anybody else after
21 my New Orleans trip.
22         Q.  Okay.  So, did you meet with -- did you
23 meet with anybody before today?
24         A.  Oh, yeah, I did meet Ms. Sanford.
25         Q.  And when did you meet with Ms. Sanford?

10  (Pages 34 to 37)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 38

1        A.  That would have been -- let's see.  A
2  few weeks ago, I think.
3        Q.  Okay.  And so that was the last time
4  you met with the Plaintiff's lawyer prior to -- or since
5  your meeting in New Orleans, was a couple of weeks ago?
6        A.  From New Orleans to, the next meeting I
7  think was with Ms. Sanford a few weeks ago.
8        Q.  Okay.
9        A.  Yeah.
10        Q.  And how long did you meet with
11  Ms. Sanford a couple of weeks ago?
12        A.  I think it was about three hours or
13  something like that.
14        Q.  And was that, was that meeting about
15  your expert report?
16        A.  Yes.
17        Q.  Okay.  And did she provide comments to
18  you on any of your expert report?
19        A.  I think she had looked at the report
20  and we discussed -- I'm not sure exactly what was in the
21  report, but...
22        Q.  You can't really remember what ya'll
23  discussed?
24        A.  Just the general format of the report.
25        Q.  Okay.  Did you spend any other part of

Page 39

1  the three hours talking about anything else?
2        A.  We might have talked a bit about
3  preparing for the deposition.
4        Q.  Okay.  So you talked about the format
5  of your report and how a deposition goes?
6        A.  Yeah.
7        Q.  Is that all that ya'll talked about?
8        A.  That's all I can recall right now.
9        Q.  Okay.  Have you ever asked for any
10  scientific literature, medical literature from Plaintiff's
11  counsel?
12        A.  I don't think I've ever asked for
13  anything, no.
14        Q.  Have they sent you stuff?
15        A.  Well I was sent stuff but that was more
16  in relation to my consulting previously.
17        Q.  So Mr. Black sent you some stuff?
18        A.  Yes.
19        Q.  Okay.  How much stuff did he send you?
20        A.  He sent me some papers, a few
21  documents.
22        Q.  He sent you medical literature?
23        A.  I'm not sure.  He sent me some
24  publications, probably, to look at.
25        Q.  Okay.  And did he send you anything

Page 40

1  other than peer-reviewed published literature?
2        A.  He might have, yeah.
3        Q.  He might have?
4        A.  Yeah.
5        Q.  I guess you didn't look at it?
6        A.  Well, there were some -- I guess there
7  was some documents relating to that Barnett trial but that
8  was my consulting role.
9        Q.  Okay.  What kinds of documents did
10  you -- were you sent for the Barnett trial?
11        A.  Well, I'm not sure exactly.  These were
12  my consulting-type arrangements.  I don't know if I have
13  to tell everything that I was consulting about.
14        MS. SANFORD:  I'll give you the same
15  admonition, Dr. Funk.
16        BY MR. TOMASELLI:
17        Q.  If you're telling me you're not going
18  to tell me, that's fine, just say; I'm not going to tell
19  you'.
20        What types of documents did you receive
21  relating to the Barnett trial?
22        A.  Well, I guess, since this was the
23  consulting aspect of my -- of that, I don't need to say
24  exactly what I was sent.
25        Q.  Okay.  Have you used any of that

Page 41

1  material in preparing for the Dedrick trial?
2        A.  No, I haven't.
3        Q.  Okay.  In preparation for your report
4  in the Dedrick trial and -- have you looked at any
5  documents other than the peer-reviewed published
6  literature?
7        A.  I was actually handed a document
8  yesterday.
9        Q.  What document is that?
10        A.  That was the -- an expert report by
11  Nicholas Flavahan.
12        Q.  Okay.  Were you -- did you ever receive
13  an expert report from anybody else other than
14  Dr. Flavahan?
15        A.  No.
16        Q.  Okay.  And the first time you saw the
17  expert report for Dr. Flavahan was yesterday?
18        A.  Yes.
19        Q.  So you never saw the expert report for
20  Dr. Flavahan at any time prior to yesterday?
21        A.  Well for the -- this particular case I
22  saw this report dated September 15th or 19th, yesterday
23  for the first time.
24        Q.  Okay.  Have you ever seen any other
25  expert report for Dr. Flavahan?

11  (Pages 38 to 41)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 42

1       A. I have in relation to that consulting
2 agreement previously.
3       Q. Okay. So the opinions of Dr. Flavahan
4 that you were handed yesterday weren't a surprise to you?
5       A. No.
6       Q. You took a look at the report and said
7 'this is, this is something I've already seen'?
8       A. I scanned through it and it seemed
9 pretty much the same as what I'd seen before with a few
10 modifications.
11       Q. Okay. When did you form your opinions
12 that you state in your report for the Dedrick case?
13       MS. SANFORD: Object to the form.
14       THE WITNESS: I've been forming my opinions
15 on all of this for many years, from all of my research and
16 from reading the scientific literature.
17       BY MR. TOMASELLI:
18       Q. Okay. And the references that you list
19 at the back of your report, you'd obviously reviewed all
20 of those by the time you wrote your report?
21       A. Yeah. All these papers I had read
22 anywhere from 20-something years ago to up until some of
23 them were published in 2006.
24       Q. Okay. And I assume for the Dedrick
25 case, for this case, you approached your role as an expert

Page 43

1 as neither an advocate for the Plaintiff nor the defendant
2 but as an impartial expert?
3       A. That's true.
4       Q. And did you approach your assignment in
5 a fair and objective manner?
6       A. Yes.
7       Q. You reviewed data on both sides of the
8 question?
9       A. Yes.
10       Q. And you -- I assume you agree it's
11 important to consider the totality of the data on the
12 subject and not ignore any data that may not support your
13 opinion?
14       A. Yes, that's true.
15       Q. And I understand that you've published
16 various items on COX-2 inhibitors but ultimately your
17 opinions in this case deal with rofecoxib or Vioxx; you
18 understand that, right?
19       A. Yes.
20       Q. Did you try to seek out all the data
21 you could on Vioxx and consider that for your report? The
22 scientific data?
23       A. I attempted to go through the bulk of
24 the literature.
25       Q. You did your own searches on PubMed --

Page 44

1       A. Yeah.
2       Q. -- and scientific literature to try to
3 satisfy yourself that you had looked at the relevant body
4 of literature?
5       A. Yes.
6       Q. Did you try to acknowledge doubt in
7 your report where doubt exists in the scientific
8 community?
9       MS. SANFORD: Object to the form.
10       THE WITNESS: I tried to put together my
11 report based on the totality of the evidence and my
12 scientific research on the area.
13       BY MR. TOMASELLI:
14       Q. Did you try to cite scientific
15 literature that tended to disprove your opinions to
16 present an unbiased view of the literature?
17       A. I tried to present an opinion formed on
18 the basis of the literature that I had read, yes.
19       Q. Is there any scientific literature or
20 scientific data that you left out of your report because
21 it didn't necessarily support your opinion?
22       A. I tried to list in as concise a fashion
23 my viewpoints in this particular report.
24       Q. Did you ask any of the Plaintiff's
25 lawyers for any scientific literature that Merck says

Page 45

1 supports its position in the case?
2       MS. SANFORD: Object to the form.
3       THE WITNESS: No, I didn't need any lawyer
4 help in preparing this report.
5       BY MR. TOMASELLI:
6       Q. I'm sure you didn't need any lawyer
7 help to prepare the report. But my question was a little
8 different.
9       My question was, did you ask the lawyers
10 for any scientific literature that Merck contends supports
11 its opinions in the case?
12       A. No.
13       Q. Okay. Did -- when you, when you passed
14 by Dr. Zipes in New Orleans, did he tell you that he was
15 working for the lawyers suing Merck?
16       A. In New Orleans, I'm not sure if he --
17 I'm not sure if he mentioned that or not. I knew already
18 from Mr. Robinson that he was working on that case.
19       Q. Okay. But as far as -- I mean I know
20 you said you never spoke to Dr. Zipes about the science of
21 Vioxx, and this may seem like an odd question but I'm
22 going to ask it so, we'll try.
23       Have you ever spoken to Dr. Zipes about the
24 science of COX-2 inhibitors or Vioxx prior to the end of
25 July and the meeting in New Orleans?

12 (Pages 42 to 45)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 46

1    MS. SANFORD: Object to the form.
2    THE WITNESS: I actually, I think there was
3 a call once before New Orleans.
4    BY MR. TOMASELLI:
5    Q. There was?
6    A. A call.
7    Q. A call from?
8    A. Mark Robinson.
9    Q. There was a call from Mark Robinson
10 prior to the end of July of this year by Mr. Robinson to
11 you?
12    A. Yes.
13    Q. And was anybody else on the phone?
14    A. Well there was a conference call and I
15 think Douglas Zipes actually was on that call.
16    Q. Okay. When was the conference call
17 that you attended?
18    A. I don't remember. It was probably in
19 July.
20    Q. In July as well?
21    A. Sometime, yeah, it could have been.
22    Q. Can you put a finer point on that at
23 all?
24    A. No. I don't remember the exact date.
25    Q. Let me see if I can help.

Page 47

1    Do you remember if the conference call was
2 before or after Ms. Sanford came up to Kingston?
3    A. I don't remember.
4    Q. And who was on this conference call?
5    A. I think Mark Robinson and Doug Zipes.
6    Q. So Mark Robinson and Doug Zipes gave
7 you a call. Did they get an appointment on your calendar
8 or did they just call up one day?
9    A. I don't remember.
10    Q. Okay. And how long was this conference
11 call between you and Dr. Zipes and Mr. Robinson?
12    A. It could have been 30 minutes or so.
13    Q. Okay. And what did you ya'll talk
14 about?
15    MS. SANFORD: I give you the same
16 admonition, doctor.
17    THE WITNESS: It was part of this
18 consulting arrangement.
19    BY MR. TOMASELLI:
20    Q. So you're not going to answer my
21 question?
22    A. No.
23    Q. Okay. You're going to refuse to answer
24 any of my questions about your conversation with Dr. Zipes
25 and Mr. Robinson on a conference call; is that fair?

Page 48

1    MS. SANFORD: Object to the form.
2    THE WITNESS: Yeah, this was part of the
3 consulting so I guess I don't have to mention this.
4    BY MR. TOMASELLI:
5    Q. Okay. Well it's not that you don't
6 have to. You're not going to answer my questions; is that
7 right?
8    A. Yeah.
9    Q. Okay. Do you remember who set up that
10 conference call?
11    A. No.
12    Q. Did ya'll talk -- no, you're not going
13 to answer that.
14    MS. SANFORD: He's answered all of your
15 "who", "what", "who" "when", what he's just not answered
16 is the substance questions that you've asked him, so.
17    MR. TOMASELLI: Right. And this was going
18 to be a substance question so that's why I said "you're
19 not going to answer it".
20    MS. SANFORD: Right. I just didn't want to
21 keep you from asking a question.
22    BY MR. TOMASELLI:
23    Q. I think we covered it but now let me
24 see if I got the "who", "what" and "when" right just to
25 make sure I understand.

Page 49

1    The "who" is, for this conference call, is
2 you, Dr. Zipes and Mr. Robinson; right?
3    A. Yeah.
4    Q. The "when" is we don't really remember;
5 right? And the "where", you were in your office in
6 Kingston?
7    A. Yeah.
8    Q. Okay. Do you remember if this
9 conference call was prior to July 9th?
10    A. Prior to July 9th?
11    Q. Yes, sir.
12    A. It could have been. I'm not sure.
13    Q. Were you trying to explain things on
14 that call to Dr. Zipes that he didn't understand?
15    A. No, I don't think so.
16    Q. Have you spoken to any other people who
17 have been hired by Plaintiff's lawyers in this case?
18    A. This Dedrick case?
19    Q. Well let's start with this Dedrick
20 case.
21    Have you spoken with anyone else that's
22 been hired by the Plaintiff's lawyers?
23    MS. SANFORD: I object to the form.
24    BY MR. TOMASELLI:
25    Q. You understand my question?

13  (Pages 46 to 49)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 50

1     A. Have I spoken to anyone else other
2  than?
3     Q. Well we're talking about the Dedrick
4  case --
5     A. -- yeah, other than Ms. Sanford?
6     Q. Right. But actually people that have
7  been hired by Ms. Sanford or somebody else?
8     MS. SANFORD: I object to the form.
9     THE WITNESS: I think the only others I've
10  met are Mr. Birchfield and Ms. O'Dell.
11     BY MR. TOMASELLI:
12     Q. Okay. Have you spoken with a
13  Dr. Weiner or Weiner?
14     A. No.
15     Q. Have you spoken with a Dr. Gelb?
16     A. No.
17     Q. Okay. Have you ever spoken to a
18  Dr. Sander?
19     A. No.
20     Q. Have you ever spoken to a Dr. Furman?
21     A. No.
22     Q. Dr. Baldwin?
23     A. No.
24     Q. Dr. Fosslien?
25     A. No, not as part of this case.

Page 51

1     Q. Okay. Now let's take it out of the
2  Dedrick case.
3     As part of any other of your work in the
4  Vioxx litigation, have you spoken with any other
5  Plaintiff's experts?
6     A. This last person you mentioned, I met
7  him.
8     Q. Dr. Fosslien?
9     A. Fosslien.
10     Q. When did you meet him?
11     A. As part of my consulting arrangement
12  with Mark Robinson.
13     Q. Okay. When was that; do you remember?
14     A. That was in New Orleans.
15     Q. That was in New Orleans as well?
16     A. Yes.
17     Q. And describe for me the surroundings
18  that you met Dr. Fosslien in?
19     A. I think I meet him in one of the
20  meeting rooms there in New Orleans.
21     Q. As part of the --
22     A. As part of this consulting arrangement.
23     Q. As part of your two-day trip to New
24  Orleans you met with Dr. Fosslien as well?
25     A. Yeah, he was there. I didn't know him

Page 52

1  before, he happened to be down there and I met him.
2     Q. You never met him in your life before?
3     A. No.
4     Q. Never heard of him before?
5     A. No.
6     Q. Okay. Did you talk substantively with
7  Dr. Fosslien?
8     A. We talked about science, yeah.
9     Q. Okay. How long did ya'll talk?
10     A. A couple of hours, maybe.
11     Q. Was Mr. Robinson in the room?
12     A. Umm... He might have been for a part
13  of the time, yeah.
14     Q. Was anybody else in the room for all or
15  part of the time?
16     A. There were people coming in and out of
17  the room.
18     Q. Do you remember any of their names?
19     A. Bert Black probably was in and out of
20  the room, I think.
21     Q. Anybody else?
22     A. Let's see... I can't think of any
23  others right now.
24     Q. Did you read Dr. Fosslien's report
25  before you talked to him?

Page 53

1     A. Umm -- no, I don't think so.
2     Q. Did Dr. Fosslien tell you what his
3  opinions in the litigation were?
4     A. Well we were discussing science so I
5  guess some of his opinions came out, yes.
6     Q. Okay. Do you remember commenting on
7  any of those opinions?
8     A. We talked about various scientific
9  aspects and my viewpoints and probably his, yeah.
10     Q. Okay. Do you remember any specifically
11  or are you going to claim that as part of your consulting
12  arrangement?
13     A. Well I had no sort of agreement with
14  him. I just happened to meet him down there so we just
15  started talking. So I just -- that was more informal. So
16  we had no sort of arrangement to meet with him or talk
17  with him.
18     Q. You did not have an arrangement to meet
19  with him or talk with him before?
20     A. No. We just were in the same room, we
21  weren't doing anything at the time, we just started
22  talking.
23     Q. Okay. So ya'll were both waiting to do
24  something else and ya'll happened to be in this same room
25  and you happened to strike up a conversation; is that how

14 (Pages 50 to 53)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 54

1  I understand it?
2         A. I think so, yes.
3         Q. Okay. And that conversation happened
4  to be about the science of Vioxx and happened to last a
5  couple of hours?
6         A. Well we were talking about -- yeah, all
7  sorts of areas of science. And then we weren't doing
8  anything at the time, we just went to dinner. So we ended
9  up talking about everything.
10        Q. Okay. So you met for -- you met with
11 Dr. Fosslien for a couple of hours in a conference room
12 and then you went to dinner with him?
13        A. Yeah.
14        Q. Do you remember any specific opinions
15 that he had in the litigation?
16        A. Not in particular.
17        Q. Okay.
18        A. He just mentioned some of his
19 atherosclerosis work. That's about it.
20        Q. Do you recall any details of that or
21 not?
22        A. No. I think it was more generalities
23 about atherosclerosis.
24        Q. Okay. Did you know that he was also
25 retained by Plaintiff's lawyers who were suing Merck?

Page 55

1         A. I think, yeah, he told me that he was
2  retained. Yeah.
3         Q. Okay. Did he tell you that he was down
4  there to testify in that trial?
5         A. Well, I think he said he might be
6  testifying at that trial.
7         Q. That's the only reason he was in New
8  Orleans, did he tell you that?
9         MS. SANFORD: Object to the form.
10        THE WITNESS: Yeah, I'm really not sure why
11 he was -- if it was just for testifying or for some other
12 reason. If he had been -- I didn't really know his exact
13 hiring agreement.
14        BY MR. TOMASELLI:
15        Q. You didn't know if he was in New
16 Orleans to testify at trial or whether it was some other
17 consulting-type of arrangement that you had; is that
18 right?
19        A. Yeah, I didn't know if it was -- well I
20 knew he had written a report and that possibly he might
21 testify. Yeah.
22        Q. Did you know he wrote a report because
23 you read it or because he told you?
24        A. I think he told me. I'm not sure if it
25 was sent to me. There was a possibility that it was sent

Page 56

1  to me, I'm not sure.
2         Q. But you've said you never actually sat
3  down and took a read of it?
4         A. I don't recall, no.
5         Q. Okay. Switching gears a little bit.
6         I assume that you would agree there's a
7  difference between association and causation in science?
8  Those are two different concepts to scientists; agree?
9         A. Yeah.
10        Q. Okay. And, I don't know, it may be
11 a -- it may be an example you and I can agree upon, but
12 you've taken airplane flights obviously?
13        A. Yes.
14        Q. And when the seat belt light comes on
15 and then a few seconds later or a few minutes later
16 there's turbulence, we would say that there's an
17 association between the seat belt light turning on and
18 turbulence in an airplane; right?
19        MS. SANFORD: Object to the form.
20        THE WITNESS: I'm not sure of the exact
21 question.
22        BY MR. TOMASELLI:
23        Q. Okay. Well there's an association
24 between a seat belt light turning on and turbulence in an
25 airplane; right?

Page 57

1         A. I guess you could say that.
2         Q. Kind of like there's an association
3  between summertime and drowning?
4         A. I don't know about that.
5         Q. You don't know about that?
6         A. Maybe not the best analogy.
7         Q. Okay. My simple point is that, that
8  those things are associated with each other, the seat belt
9  light turning on and turbulence in an airplane, but we
10 certainly wouldn't say that the seat belt light turning on
11 caused the turbulence; right?
12        MS. SANFORD: Object to the form.
13        THE WITNESS: Well there could be some
14 associations, yeah.
15        BY MR. TOMASELLI:
16        Q. Right. There's an association between
17 the light turning on and turbulence but there has to be
18 plausibility and other things like that for causation.
19        And you know that just because a seat belt
20 light -- the captain turns on the seat belt light doesn't
21 mean that there's going to be turbulence ahead --
22        MS. SANFORD: Object to the form.
23        BY MR. TOMASELLI:
24        Q. -- that the seat belt light turning on
25 causes the turbulence; right?

15 (Pages 54 to 57)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 58

1   MS. SANFORD: Same objection.
2   BY MR. TOMASELLI:
3   Q. Are you not following me?
4   A. Not really, no.
5   Q. Not really.
6       If you do one of your studies in mice and
7   you give them a drug and something happens to the mice for
8   the first time, you would probably characterize it as an
9   association and not necessarily that there was causation
10  there, right, because you've never seen it before?
11      A. Well when we do animal studies we're
12  looking for mechanisms, and we try to look for the
13  appropriate responses where we can decide the exact
14  mechanistic response.
15      Q. Right. And when you test the first
16  time and you see it happen, that gives you a good clue is
17  that you might be on the right track. But obviously one
18  of the hallmarks of science is repeatability; right?
19      MS. SANFORD: Object to the form.
20      THE WITNESS: You mean scientific
21  experiments, yes, we try to reproduce our findings. Yes.
22      BY MR. TOMASELLI:
23      Q. Right. And so if people like yourself
24  and people in other laboratories like Dr. FitzGerald can
25  repeat the findings over and over again, then ya'll can

Page 59

1   become more comfortable that actually there is a causal
2   relationship between whatever you've done and the result;
3   is that fair?
4       A. When we can reproduce findings and
5   that, yeah, there's good reason to postulate a mechanism
6   that can explain the findings that have come about.
7       Q. Right. And the first time it happens
8   that's interesting and you take note of it. But if it
9   happens over and over again that's when you become
10  comfortable that there's a true causal relationship; is
11  that fair?
12      MS. SANFORD: Object to the form.
13      THE WITNESS: Well we look at the available
14  evidence in the literature and we carry out our studies in
15  a way where we reproduce our findings and try to come up
16  with a logical explanation for what's happening.
17      BY MR. TOMASELLI:
18      Q. How do you, in your laboratory,
19  determine whether something's just associated with a
20  result or whether there's actually cause relationship
21  between whatever you've done and the result? How do you
22  try to distinguish those?
23      A. We could try to come up with the most
24  plausible explanation for our research findings based on
25  the experiments we've performed.

Page 60

1       Q. You don't make any differentiation
2   between association and causation necessarily in your
3   work? You just go out and try to find a plausible
4   mechanism for what you've seen?
5       MS. SANFORD: Object to the form.
6       THE WITNESS: Well when we carry out our
7   scientific studies we do it in a way where we are trying
8   to evaluate mechanistic -- the whole mechanism side of
9   things.
10      And what a scientist does is there's a
11  hypothesis, and he tests that hypothesis. If you can come
12  up with experiments that validate your hypothesis, then
13  you can then have some mechanistic insight into what's
14  happening.
15      BY MR. TOMASELLI:
16      Q. Okay. Do you make any distinction
17  between association and causation in your work, sir?
18      A. I think you'd have to give me sort of
19  an example from one of my studies.
20      Q. Okay. Well, you have the opinion that
21  Vioxx causes cardiovascular events; right?
22      A. Yes.
23      Q. And what do you base that on? What
24  studies?
25      A. The clinical trial literature.

Page 61

1       Q. Okay, let me stop you there.
2       MS. SANFORD: You can finish your answer,
3   doctor. You've asked him generally what he bases it on.
4       MR. TOMASELLI: Right, I was going to let
5   him but that's fine.
6       THE WITNESS: The clinical trial literature
7   and then a variety of animal studies.
8       BY MR. TOMASELLI:
9       Q. Okay. So there's two pieces of
10  evidence that you feel support your opinion. One is the
11  clinical trial literature and one is the basic science
12  literature; is that fair?
13      A. Yes.
14      Q. Okay. Let's talk about the clinical
15  trial literature for a second.
16      What clinical trial literature do you rely
17  on?
18      A. I rely on the VIGOR study, the APPROVE
19  study and a number of other more recent studies that have
20  come out.
21      Q. And which -- recent studies with Vioxx,
22  sir?
23      A. Various analyses of different COX-2
24  inhibitors, some of them including Vioxx.
25      Q. Okay. And what analyses are those,

16 (Pages 58 to 61)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 62

1  sir?
2      A. Well there is some evaluations of Vioxx
3  epidemiology studies that have been carried out. I can't
4  recall the names of the authors off the top of my head.
5      Q. How many of those do you think you've
6  reviewed?
7      A. Oh, at least four or five other ones.
8  Some that just came out a couple of weeks ago. I think it
9  was in the Journal of American Medical Association.
10     Q. You know Dr. Suissa; don't you?
11     A. Suissa?
12     Q. Suissa.
13     A. No, I don't.
14     Q. You mentioned VIGOR and APPROVE. Have
15 you reviewed any other clinical trials with Vioxx?
16     A. I've looked at some other clinical
17 trial literature, and I can't remember some of that
18 information right now.
19     Q. What did that clinical trial literature
20 deal with, sir?
21     A. Well there has been some -- one study
22 was dealing with the early affects of rofecoxib on
23 cardiovascular events. It was actually a Canadian study,
24 I can't remember the first author.
25     Q. Her name was Levesque; right?

Page 63

1      A. Yeah, I think so.
2      Q. And in that study she found an
3  increased risk of Vioxx in the first 30 days but not
4  thereafter; is that true?
5      A. I think, yes, there was an increase in
6  the early time period.
7      Q. So for somebody like Mr. Dedrick, which
8  you're here on, who used Vioxx for several months there
9  would not be an increased risk according to that study; is
10 that true?
11     MS. SANFORD: Object to the form.
12     THE WITNESS: I don't know anything about
13 this case, so I can't comment on.
14     BY MR. TOMASELLI:
15     Q. Okay. Well Levesque is an
16 observational epidemiology study; is that correct?
17     A. That would be correct.
18     Q. And what other clinical trials -- you
19 understand there's a difference between clinical trials
20 and observational studies?
21     A. Yes.
22     Q. And what other clinical trials have you
23 reviewed, sir, other than VIGOR and APPROVE?
24     A. I can't recall any others right now.
25     Q. You understand there's other long-term

Page 64

1  placebo-controlled trials comparing Vioxx to placebo that
2  don't show an increased number of thrombotic events
3  between Vioxx and placebo?
4      MS. SANFORD: Object to the form.
5      BY MR. TOMASELLI:
6      Q. You understand those are out there,
7  sir?
8      MS. SANFORD: Same objection.
9      THE WITNESS: In reviewing the bulk of the
10 evidence, I'm aware that there is an enhanced risk of
11 using -- taking Vioxx in cardiovascular risk.
12     BY MR. TOMASELLI:
13     Q. Okay. You refer to the bulk of the
14 evidence. And, again, I'm just trying to understand what
15 comprising the bulk. And I understand you've reviewed
16 VIGOR and APPROVE. What else comprises the "bulk" that
17 you're talking about?
18     A. Well that would be some of the other
19 literature I just mentioned, some that came out more
20 recently in September.
21     Q. Okay. From a clinical trial
22 standpoint, can you recall any study other than VIGOR and
23 APPROVE that you have reviewed?
24     A. Well I'm referring to some of these
25 meta-analysis, these putting together large data sets and

Page 65

1  examining them that way.
2      Q. Okay. And the meta-analysis in JAMA
3  that recently came out that you referenced, those don't
4  have anything to do with thrombotic events; do they?
5      A. Well there was one dealing with
6  hypertension, yeah.
7      Q. Okay. As far as you're review of the
8  clinical literature related to Vioxx specifically, you've
9  reviewed VIGOR and APPROVE but you can't remember any
10 other studies; is that fair?
11     MS. SANFORD: Object to the form.
12     THE WITNESS: I've looked at other
13 literature, I just can't recall them right now.
14     BY MR. TOMASELLI:
15     Q. Have you reviewed any pooled analyses
16 of the Vioxx data?
17     A. Well, some of these meta-analysis had
18 been pooled data from various studies have been in this
19 clinical literature.
20     Q. And just so I'm clear of what
21 meta-analysis you're talking about, can you tell me which
22 ones those are?
23     A. Well, again, there's one of these
24 recent articles that came out in -- a couple of weeks ago.
25     Q. Is that the one in JAMA, sir?

17  (Pages 62 to 65)

Dr. Colin Funk

Page 66

1          A. I think it was in JAMA.
2          Q. Okay. And that's the one that talks
3    about hypertension?
4          A. Yeah.
5          Q. What about meta-analysis or pooled
6    analyses of thrombotic events where they looked at the
7    clinical trials of Vioxx and looked at the number of
8    thrombotic events on Vioxx versus the number of thrombotic
9    events on placebo or other NSAIDs; have you reviewed
10   those?
11         MS. SANFORD: Object to the form.
12         THE WITNESS: Like I say, I have looked at
13   other, other, umm, publications but I'm drawing a bit
14   blank on them right now.
15         BY MS. TOMASELLI:
16         Q. Okay. Have you reviewed a publication
17   by Dr. Reicin in 2002?
18         A. I don't recall it right now.
19         Q. Okay. Have you reviewed a publication
20   by Dr. Konstam in 2001?
21         A. Konstam?
22         Q. Yes, sir.
23         A. That doesn't sound familiar.
24         Q. Okay. Have you reviewed a publication
25   by Dr. Weir in 2003?

Page 67

1          A. Sometimes I don't recognize the first
2    author, I might recognize somebody else. So I'm not sure.
3          Q. Okay. But that one doesn't ring a
4    bell?
5          A. No.
6          Q. Have you reviewed a publication by Drs.
7    Reins or Thal with respect to Vioxx versus placebo in
8    alzheimers patients?
9          MS. SANFORD: I object to the form. What
10   was the name again, sorry?
11         THE WITNESS: Maybe you could show me the
12   paper.
13         BY MR. TOMASELLI:
14         Q. Reins, R-e-i-n-s, in 2004. Or Thal,
15   T-h-a-l, in 2005. Do either of those ring a bell?
16         MS. SANFORD: I'll object to the form.
17         THE WITNESS: It's possible I read them,
18   yeah...
19         BY MR. TOMASELLI:
20         Q. And when you read those you saw that
21   there was no difference in thrombotic events between Vioxx
22   and placebo; right?
23         MS. SANFORD: Object to the form.
24         THE WITNESS: I said it was possible I've
25   read them. I haven't -- I can't recall if I have.

Page 68

1          BY MR. TOMASELLI:
2          Q. Okay. And, you know, if those studies
3    did show that there was no difference between -- in
4    thrombotic events between Vioxx and placebo, those would
5    be different than what was shown in the APPROVE study;
6    right?
7          MS. SANFORD: Same objection.
8          THE WITNESS: Well the totality of the
9    evidence is pointing towards Vioxx causing increased
10   cardiovascular events and that's one of the reasons, I
11   guess, it was removed from the market.
12         BY MR. TOMASELLI:
13         Q. Okay. And one of the -- I guess you
14   would agree the totality of the evidence is that all
15   NSAIDs selective for COX-2, traditional and non-selective
16   also increase cardiovascular events; correct?
17         MS. SANFORD: Object to the form.
18         THE WITNESS: I wasn't asked to give my
19   opinion on that.
20         BY MR. TOMASELLI:
21         Q. Okay. So but you have looked at the
22   totality -- you think you've looked at the totality of the
23   data with respect to Vioxx?
24         A. I think I've given a pretty good survey
25   of the literature, yeah.

Page 69

1          Q. Okay. Did you look at what the FDA has
2    said about increased risk with Vioxx?
3          A. No, I haven't.
4          Q. You said you reviewed some
5    observational studies with respect to Vioxx. Do you think
6    you've reviewed them all?
7          A. Probably not.
8          Q. Yeah. Do you remember reading a study
9    by Dr. Ray in 2002?
10         A. I can't recall that, no.
11         Q. Do you remember reading a study by
12   Dr. Mamdani published in 2003?
13         A. The name sounds familiar. I could have
14   read that one.
15         Q. And that one showed there was no
16   difference between Vioxx and the comparator?
17         MS. SANFORD: Object to the form.
18         BY MR. TOMASELLI:
19         Q. Do you remember that?
20         A. No, I don't.
21         Q. Okay. Do you remember reviewing a
22   study by Dr. Shaya in 2005?
23         A. No.
24         Q. Would it surprise you that that one
25   showed no difference between Vioxx and the comparator?

18 (Pages 66 to 69)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 70

1      MS. SANFORD: Object to the form.
2      THE WITNESS: In reviewing all the
3  literature, the overall picture I gathered from the
4  studies is that Vioxx increases cardiovascular adverse
5  events.
6      BY MR. TOMASELLI:
7      Q. And just so I'm clear, the two studies
8  you can recall sitting here today are VIGOR and APPROVE;
9  fair?
10     A. Those are the two main ones, yes.
11     Q. And did you notice in the APPROVE study
12 that there was no difference in the thrombotic events from
13 zero up to 18 months?
14     MS. SANFORD: Object to form.
15     BY MR. TOMASELLI:
16     Q. Do you recall that?
17     MS. SANFORD: Same objection.
18     THE WITNESS: Well I wasn't really asked to
19 give my opinion on this particular area, on the --
20     BY MR. TOMASELLI:
21     Q. So you're not going to -- when you come
22 to trial, you're going to leave the clinical trials to
23 somebody else. You're going to focus on the other -- I
24 think -- let me back up.
25     You said you're focussing on the clinical

Page 71

1  trials that support your opinion and you're focussing on
2  the mechanistic literature, I think we talked about that
3  earlier; right?
4      A. Well I will be mentioning, if I do
5  testify, I will mention clinical trial data, yeah.
6      Q. Okay. And the clinical trial data that
7  you've reviewed, one of those studies is APPROVE?
8      A. Um-hmm.
9      Q. Is that a "yes"?
10     A. Yes.
11     Q. That's one of times for the "uh-huhs"
12 and "uh-uhs". Sorry about that. I'm trying not to be
13 rude but it's just for the record. Okay, sir?
14     A. Yes.
15     Q. And do you recall in the APPROVE study
16 that at the 18-month point there was no difference between
17 the number of thrombotic events that occurred on Vioxx and
18 placebo?
19     MS. SANFORD: Object to the form.
20     THE WITNESS: My recollection was that in
21 that study that, when it was first published was there was
22 a divergence in cardiovascular events at 18 months. But
23 that in subsequent analyses that the, the events were
24 shown to occur before that because there were some errors
25 in the analyses.

Page 72

1      BY MR. TOMASELLI:
2      Q. What errors were those; sir?
3      A. I think there was some statistical
4  errors in the study.
5      Q. Did the statistical error that occurred
6  in the study, did that change the number of events?
7      A. Well there were some issues about
8  non-reporting of some the cardiovascular events in the
9  original -- from the original publication.
10     Q. You understand that the number of
11 events that occurred while people were on the drug or
12 within 14 days of stopping the drug, that did not change
13 because of the statistical error? You realize that,
14 right?
15     MS. SANFORD: Object to the form.
16     THE WITNESS: I realize there were some
17 problems in the -- that came up after the original
18 publication and that there was a lot of correspondence in
19 the peer-reviewed literature about some potential flaws in
20 the study.
21     BY MR. TOMASELLI:
22     Q. Flaws in the study --
23     A. Flaws of reporting of data and also
24 related to some statistical tests that were carried out.
25     Q. Is it fair that you really don't know

Page 73

1  the details of all that?
2      MS. SANFORD: Object to the form.
3      THE WITNESS: Oh, well, I wasn't asked to
4  give my opinion on that in this report.
5      BY MR. TOMASELLI:
6      Q. And so you don't know the details of
7  all those things; is that fair?
8      MS. SANFORD: Same objection.
9      BY MR. TOMASELLI:
10     Q. Do you know the details?
11     MS. SANFORD: Same objection.
12     THE WITNESS: I read through the papers
13 describing them.
14     BY MR. TOMASELLI:
15     Q. Do you understand, sir, that at the end
16 of 18 months there were 22 thrombotic events that occurred
17 in people taking Vioxx and within 14 days of stopping
18 there were 20 events on placebo; do you understand that?
19     MS. SANFORD: Object to the form.
20     THE WITNESS: I realize from the total
21 evidence of that paper that there were very significant
22 differences between those taking Vioxx and those not
23 taking.
24     BY MR. TOMASELLI:
25     Q. Yes, sir. And those differences

19 (Pages 70 to 73)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Page 74

1 occurred beyond taking the drug for 18 months; is that
2 fair?
3       MS. SANFORD:  Same objection.
4       THE WITNESS:  I'm aware that there was a
5 difference between -- in that study was the reason they
6 took the drug off the market.
7       BY MR. TOMASELLI:
8       Q.  Have you talked to anybody about why
9 they took the drug off the market?
10       A.  Like who?  Talk to anybody, scientists?
11       Q.  Anybody at Merck why they took the drug
12 off?
13       A.  Why they took it off?
14       Q.  Yes, sir.
15       A.  I don't recall, no.
16       Q.  Okay.  And my question is this, do you
17 recall that at the end of 18 months the number of events
18 were 22 to 20?
19       MS. SANFORD:  Same objection.
20       BY MR. TOMASELLI:
21       Q.  Do you recall that?
22       A.  No, I don't.
23       Q.  You don't recall that in the paper?
24       A.  No.
25       Q.  Do you know if the statistical tests

Page 75

1 changed those numbers in any way, sir?
2       A.  I know there was a divergence in the
3 results that started at 18 months in the original analyses
4 and then something came up later that showed it was before
5 18 months.
6       Q.  Are you saying that the statistical
7 error that occurred in the trial changed the Kaplan-Meier
8 curve, sir?
9       A.  I'm not aware of the details, no.
10       Q.  Okay.  So you'll leave all the details
11 to somebody else; is that fair?
12       A.  I wasn't asked to talk about the
13 epidemiology.
14       Q.  But you rely on the clinical trials and
15 the epidemiology in your report; right?
16       A.  I rely on the, on the -- yeah, the
17 outcomes of those trials.
18       Q.  And the outcome of the APPROVE trial
19 was that after 18 months there were 22 events on people
20 taking Vioxx and 20 on placebo; correct?
21       MS. SANFORD:  Object to the form.
22       THE WITNESS:  There were other time points
23 in that study and the divergence in the original one was
24 apparent at 18 months.
25       BY MR. TOMASELLI:

Page 76

1       Q.  That's still true today; isn't it, sir?
2       A.  What's true?
3       Q.  That there's a divergence that begins
4 at 18 months?
5       MS. SANFORD:  Object to form.
6       THE WITNESS:  There seems to be a
7 divergence much earlier than that.
8       BY MR. TOMASELLI:
9       Q.  And what's your basis for that, sir?
10       A.  Some of these other pooled analyses.
11       Q.  A pooled analyses can't tell you what
12 happened in the APPROVE study; is that fair?
13       A.  Well combining data from one study with
14 many studies, you can get some significant trends with the
15 data.
16       Q.  Okay.  So if you combined all the Vioxx
17 studies and pooled them all together, if somebody had done
18 that that's a good thing to do and to look at?
19       A.  In general, yes, it's a good thing.
20       MR. TOMASELLI:  Okay, why don't we take a
21 couple-minute break.
22       --- Upon recess at 10:26 a.m.
23       --- Upon resuming at 10:35 a.m.
24       EXHIBIT NO. FUNK-1:  Expert report of Colin
25 D. Funk, PhD.  Dated September 18, 2006.

Page 77

1       BY MR. TOMASELLI:
2       Q.  Dr. Funk, I'm going to hand you what
3 I've marked as Funk Number 1, which is a copy of your
4 expert report; is that right?
5       A.  That's right.
6       Q.  Okay.  And I think that's a complete
7 copy but if you can just flip through it to make sure?
8       A.  It looks like a complete copy, yes.
9       Q.  Okay.  And you wrote this report
10 yourself?
11       A.  Yes.
12       Q.  And the comments that you received on
13 it were more, if I understand what you're saying, the
14 format that it needed to go in?
15       A.  That's correct.
16       Q.  Okay.  Any substantive comments that
17 you recall?
18       A.  No.
19       Q.  All right.  And it looks like -- or is
20 this report that you have, Funk Number 1, does it contain
21 all of the opinions that you have in this case?
22       MS. SANFORD:  Object to the form.
23       THE WITNESS:  They're my opinions, they may
24 not be all my opinions.  I was asked to address two main
25 areas.

Dr. Colin Funk

Page 78

1    BY MR. TOMASELLI:
2        Q.  Okay.  Are there any other main areas
3  of opinions that I need to ask you about today that aren't
4  in this report?
5        A.  Well I was asked to give my opinion on
6  COX-2 derived prostacyclin in the vasculature and this
7  FitzGerald hypothesis.  Those are the two things that I
8  was addressing in this report.
9        Q.  And both of those appear to be covered
10  in that report?
11       A.  Yeah.
12       Q.  Okay.  And the references are towards
13  the back of the report.  It looks like there's 148 or so?
14       A.  Yeah, that's right.
15       Q.  And I assume you're relying on those
16  references for the opinions that you state in your report?
17       A.  I will be relying mainly on these 148
18  that I've listed here.
19       Q.  There's not 50 articles waiting in the
20  wings that I need to read or anything?
21       A.  It's possible there are a few other
22  publications that weren't listed here that...
23       Q.  Can I make a deal with you that if
24  there's other publications that are important to you that
25  you intend to rely on at trial that you give those to

Page 79

1  counsel so they can provide us with a copy.  Is that fair?
2  U/T      A.  Yeah, that's fair.
3        Q.  Okay.  I understand that you've worked
4  with not only Merck but other people in the pharmaceutical
5  industry before?
6        A.  Yes, that's true.
7        Q.  And are you -- are you relying on any
8  specific interactions with anyone at Merck for your
9  opinions in this case?
10       A.  No, I'm not.
11       EXHIBIT NO. FUNK-2: Copy of Dr. Funk's CV
12  BY MR. TOMASELLI:
13       Q.  Okay.  I'm going to hand you what I've
14  marked as Exhibit Number 2, which is a complete copy of
15  your CV.  Is that right?
16       A.  Yes, that is.
17       Q.  And it should be a complete copy,
18  unless there were any copying errors or anything.  So if
19  you could take a look at that real fast?
20       A.  This looks like a complete copy of my
21  CV.
22       Q.  Okay.  If you turn to page 4 of your
23  CV.  It looks like you've received some money in the past
24  for research from pharmaceutical companies; is that right?
25       A.  I don't see anything on page 4 that I

Page 80

1  received from a pharmaceutical company.
2        Q.  Okay.  Over the top of page 5.  At
3  least it seems you've received money from Merck to do
4  research?
5        A.  Yeah, that's true.
6        Q.  Okay.  Have you received, in your role
7  as researcher, have you received money from other
8  pharmaceutical manufacturers to do research?
9        A.  I received money from other
10  pharmaceutical companies but not for a particular study.
11       Q.  Okay.  But just for your general
12  research lab?
13       A.  No, I haven't received anything else.
14       Q.  Okay, I'm confused.
15       A.  I've received money for providing
16  reagents to pharmaceutical industry but not directly to
17  fund a specific project that I'm working on.
18       Q.  Okay.  But your research is no less
19  rigorous and no less reliable when it's funded by someone
20  in the pharmaceutical industry versus an academic
21  institution or a governmental institution; is that fair?
22       A.  Yeah, regardless of the source of the
23  funding it should be always rigorous scientifically.
24       Q.  You don't compromise any of your
25  scientific rigor or standards or principles when you're

Page 81

1  doing research just because where the funding comes from;
2  is that fair?
3        A.  Yeah, that's true.
4        Q.  Okay.  In fact, I think in this case
5  you've relied on a study by, the first author is
6  Catella-Lawson and Dr. FitzGerald is the senior author,
7  from 1999 relating to Vioxx and PGIM --
8        A.  Yes.
9        Q.  -- results?
10       A.  Yeah.
11       Q.  And you understand that that was a
12  study that was funded by Merck?
13       A.  Yes, I do.
14       Q.  And that they were Merck authors that
15  were on that paper?
16       A.  Yes.
17       Q.  And but, nonetheless even though it's
18  funded by the industry and there's Merck authors on the
19  paper, that doesn't mean it's not a reliable or careful
20  study in any way; correct?
21       A.  In general it should be a -- hopefully
22  it would be a reliable study regardless of who's on the
23  author list.
24       Q.  Right.  And if people tried to suggest
25  that just because certain studies, whether your own or

Dr. Colin Funk

Page 82

1  people you know like Dr. FitzGerald, just because their
2  studies are funded by industry doesn't make them any less
3  reliable; would you agree with that?
4        MS. SANFORD: Object to the form.
5        THE WITNESS: There are certain
6  circumstances if conflicts of interest are not declared,
7  that could compromise a study.
8        BY MR. TOMASELLI:
9        Q. But in the course of things, if
10  conflicts of interest are declared, and that's why we do
11  that so we can evaluate and reflect on potential biases,
12  but that doesn't mean the research is any less credible
13  just in and of itself?
14        MS. SANFORD: Object to the form.
15        THE WITNESS: I'm not sure exactly what
16  you...
17        BY MR. TOMASELLI:
18        Q. Well, for example, when Dr. FitzGerald
19  writes an article and discloses the fact that he's
20  received research money from Bayer and Merck and other
21  pharmaceutical companies, that fact in and of itself
22  doesn't mean that his research is any less reliable or
23  anything like that?  I mean that's your practice; isn't
24  it?
25        A. Yeah, as a scientist we're supposed to

Page 83

1  declare any conflicts of interest and it shouldn't
2  compromise the integrity of the study.
3        Q. And it doesn't compromise your
4  integrity?
5        A. If you declare your -- any conflicts
6  then there should be no compromizing to the integrity of
7  the person or research.
8        Q. Okay.  And it looks like you've -- by
9  reading your CV -- you've worked with and consulted with
10  Merck on several occasions?
11        A. Yeah, that's true.
12        Q. You've done some research with the
13  scientists at Merck?
14        A. Yes.
15        Q. Same scientists that try to come up
16  with new and inventive ways to improve the public health?
17        MS. SANFORD: Object to the form.
18        BY MR. TOMASELLI:
19        Q. That's what we're all after; isn't it?
20        MS. SANFORD: Same objection.
21        THE WITNESS: I've worked with Merck
22  scientists, yeah, in the past.
23        BY MR. TOMASELLI:
24        Q. Okay.  And it's been in the recent
25  past, right?

Page 84

1        A. Well, I was, yeah, funded just a year
2  ago or so with some Merck money to carry out a study.
3        Q. And it's not been your experience that
4  Merck scientists are not trying to improve the public
5  health?
6        MS. SANFORD: Object to the form.
7        THE WITNESS: Well I can't vouch for all
8  their conduct in every study.
9        BY MR. TOMASELLI:
10        Q. But the studies that you've been
11  involved with, the people that you know, they're
12  competent, knowledgeable and careful scientists; right?
13        MS. SANFORD: Object to the form.
14        THE WITNESS: Well, again, I can't vouch
15  for their conduct under every circumstance.  There are
16  some Merck scientists that I've dealt with in the past
17  that I've known and seem to be very nice people.
18        BY MR. TOMASELLI:
19        Q. Not only nice but competent?
20        MS. SANFORD: Object to the form.
21        THE WITNESS: Once again, I can't, like,
22  vouch for their conduct in every, like, study that they've
23  carried out.
24        BY MR. TOMASELLI:
25        Q. I'm not asking you to.  I'm just saying

Page 85

1  in your interactions with Merck scientists, you found them
2  to be competent; have you not?
3        MS. SANFORD: Same objection.
4        THE WITNESS: Umm... I can say that in the
5  studies we've published, that I have published with Merck
6  scientists that these have generally been good studies
7  and...
8        BY MR. TOMASELLI:
9        Q. And the people that you worked with at
10  Merck, the scientists, have they been competent?
11        MS. SANFORD: Same objection.
12        THE WITNESS: In this -- in the studies
13  that I've dealt with I've -- where we've worked together,
14  yes, I've seen that they are competent to carry out their
15  particular piece of the project.
16        BY MR. TOMASELLI:
17        Q. Right.  Like yourself, they're
18  knowledgeable, they're careful; would you agree?
19        MS. SANFORD: Same objection.
20        THE WITNESS: I can't generalize in all
21  circumstances but for our studies I've seen that they've
22  been competent, yes.
23        BY MR. TOMASELLI:
24        Q. And in your studies they've been,
25  they've been knowledgeable, the Merck scientists?

22  (Pages 82 to 85)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 86

1      MS. SANFORD: Object to the form.
2      THE WITNESS: Yes. The studies that I've
3  done with Merck scientists, yeah.
4      BY MR. TOMASELLI:
5      Q. The studies that you've done with Merck
6  scientists, have the Merck scientists taken their studies
7  very seriously?
8      MS. SANFORD: Objection to form.
9      THE WITNESS: Once again, I think in the
10  studies that we've carried out together they have been
11  good scientists.
12      BY MR. TOMASELLI:
13      Q. Like yourself, they were interested in
14  advancing scientific knowledge?
15      MS. SANFORD: Object to the form.
16      BY MR. TOMASELLI:
17      Q. When ya'll came up with that IP -- I'm
18  sorry was it the EP1 receptor?
19      A. EP1 receptor.
20      Q. Right. And when you were doing work
21  with the Merck scientists, that's interest in advancing
22  scientific knowledge; right?
23      A. Yes. We both had the common goal of
24  figuring out what this particular DNA that I had cloned,
25  what it was actually doing in the cell, yeah.

Page 87

1      Q. Ya'll both had the goal of advancing
2  scientific knowledge; is that fair?
3      MS. SANFORD: Object to the form.
4      THE WITNESS: We were working towards a
5  common goal of figuring out what the function of that
6  prostaglandin E receptor was doing, yes.
7      BY MR. TOMASELLI:
8      Q. And that's an advantage of scientific
9  knowledge, no one really know before that and so ya'll
10  were trying to help scientists understand how that EP1
11  receptor works; right?
12      A. Yeah, that's true.
13      Q. Okay. If you can go back to your
14  report, which is number 1. If you go to page 7. You have
15  a section there entitled:
16      "The Development of Selective COX-2
17  Inhibitors (Coxibs).
18      Right?
19      A. Yes.
20      Q. I assume if we refer to coxibs and
21  COX-2 selective inhibitors and COX-2 inhibitors, we're
22  going to be on the same page today?
23      A. Yeah.
24      Q. All right. And in that section you
25  stated that gastric bleeding and ulceration can be caused

Page 88

1  by traditional NSAIDs like ibuprofen, for example, is that
2  right?
3      A. I'm not sure if I mentioned ibuprofen
4  in there. But I did mention that, in general, NSAIDs can
5  cause gastric problems.
6      Q. You didn't mention ibuprofen but
7  ibuprofen is an NSAID; right?
8      A. That's correct.
9      Q. So ibuprofen, since it's an NSAID, it's
10  one of those that can promote gastric bleeding and
11  ulceration; right?
12      A. That's true, right.
13      Q. And gastric bleeding and ulceration
14  that's generally a bad thing for humans; correct?
15      A. Yeah, that's true.
16      Q. And you agree that the gastrointestinal
17  complications of NSAIDs are and have been well known for
18  some time?
19      MS. SANFORD: Object to the form.
20      THE WITNESS: The side effects of NSAIDs,
21  yes, have been known for quite some time.
22      BY MR. TOMASELLI:
23      Q. And one of those side effects is these
24  gastrointestinal complications; right?
25      A. Yes, it is.

Page 89

1      Q. And the ulceration -- that side effect
2  of ulceration, especially in the stomach, can lead to
3  perforation, obstruction and bleeding; right?
4      MS. SANFORD: Object to the form.
5      THE WITNESS: There are, yes, it's known
6  that NSAIDs can cause ulceration and bleeding, yeah.
7      BY MR. TOMASELLI:
8      Q. And what happens is, is the acid in
9  your stomach can eat through the stomach wall and may hit
10  a blood vessel and that's how you get bleeding; right?
11      MS. SANFORD: Object to the form.
12      BY MR. TOMASELLI:
13      Q. You're aware of that?
14      MS. SANFORD: Same objection.
15      THE WITNESS: Well it's known that NSAIDs
16  can promote gastric bleeding, yeah.
17      BY MR. TOMASELLI:
18      Q. And the perforation, if that acid
19  doesn't hit a blood vessel and goes through the lining of
20  the stomach, the contents of the stomach can go into the
21  body cavity and possibly result in a life-threatening
22  infection?
23      MS. SANFORD: Object to the form.
24      BY MR. TOMASELLI:
25      Q. You're aware of that; aren't you?

23  (Pages 86 to 89)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 90

1      MS. SANFORD:  Same objection.
2      THE WITNESS:  I'm aware that NSAIDs do
3  cause, as a potential side effect, gastric ulceration and
4  bleeding and can lead to complications, yes.
5      BY MR. TOMASELLI:
6      Q.  And one of those complications can be
7  death?
8      A.  Yes.
9      Q.  And that's a major health problem not
10  only here in Canada but in the United States?
11      MS. SANFORD:  Object to the form.
12      THE WITNESS:  There are NSAID-induced side
13  effects that should be dealt with, yes.
14      BY MR. TOMASELLI:
15      Q.  Is that, 'yes, they are, those side
16  effects can be a major problem not only here in Canada but
17  in the United States'?
18      A.  Yeah, around the world they can cause
19  problems.
20      Q.  Okay.  And when we found out that
21  prostaglandin is derived from COX-1, are important to the
22  protective gastric-mucosal lining, that was an important
23  discovery; right?
24      A.  When COX-1 was involved in
25  prostaglandin --

Page 91

1      Q.  Yes, sir.  And with respect
2  relationship to the gastric-mucosal lining of the stomach?
3      A.  Yeah, all the -- finding out all the
4  different roles of the prostaglandin in the stomach and
5  elsewhere was an important finding.
6      Q.  And the problem with traditional NSAIDs
7  is that they block COX-1 and thus they block the
8  manufacture of those protective prostaglandins or
9  chemicals in the stomach?
10      MS. SANFORD:  Object to the form.
11      THE WITNESS:  Well the original idea that
12  was around in the, in the early 1990s was that COX-1 was
13  responsible for the formation of prostaglandins that were
14  involved in gastric protection.  Although that early idea
15  has evolved somewhat over the -- over time.  It's not just
16  COX-1, COX-2 can also be involved as well.
17      BY MR. TOMASELLI:
18      Q.  Right.  But definitely we know that
19  COX-1 is involved.  And so when you block COX-1, by the
20  traditional NSAIDs, that blocks some of the manufacture of
21  the prostaglandins in the stomach that protect the stomach
22  lining; right?
23      A.  Yeah, it's known that -- yeah, if you
24  block COX-1-derived prostaglandins, you're removing some
25  of that gastric site protection.

Page 92

1      Q.  And also when you block COX-1, that
2  inhibits platelets and that can promote or increase
3  bleeding in the stomach; right?
4      A.  Well blocking COX-1 will also promote
5  other things to happen.  COX-1, you can block
6  prostaglandins, yeah, with general NSAIDs.  Did I miss --
7  what was your -- if you can repeat the question?
8      Q.  Sorry.  Well, a traditional NSAID, for
9  example, blocks COX-1 and when you block COX-1 you inhibit
10  platelet formation and that can promote or increase
11  bleeding in the stomach for example; right?
12      A.  Well there's a few things that aren't
13  exactly right with what you said.
14      Traditional NSAID blocks not only COX-1 but
15  also COX-2 and it doesn't block platelet formation, I
16  think you said.  You said platelet formation --
17      Q.  I'm sorry, inhibiting platelet
18  aggregation.
19      A.  Okay, yeah.  Blocking out COX-1 will --
20  can inhibit platelet aggregation.
21      Q.  Okay.  And that inhibiting platelet
22  aggregation can promote or increase bleeding?
23      A.  Yeah, you can get an increase in
24  bleeding.
25      Q.  Okay.  And on page 7 and 8 of your

Page 93

1  report you mention drugs like misoprostal,
2  m-i-s-o-p-r-o-s-t-a-l.
3      A.  Yeah.
4      Q.  So on 7 and 8 in your report you
5  mention drugs like misoprostal that were developed to try
6  to limit the side effect of traditional NSAIDs?
7      A.  Yes.
8      Q.  And we all know that all drugs have
9  side effects; right?
10      A.  Yes.
11      Q.  And misoprostal, although trying to
12  limit the side effect of GI complications, has its own
13  side effects; as you mentioned, right?
14      MS. SANFORD:  Object to the form.
15      THE WITNESS:  Well there are side effects
16  also associated with misoprostal.
17      BY MR. TOMASELLI:
18      Q.  And those side effects can be bad
19  enough that people can't take misoprostal?
20      A.  Well, they, they can be unpleasant some
21  of the side effects, yeah.
22      Q.  And unpleasant side effects, no one
23  likes those and we don't take the medicine; right?
24      MS. SANFORD:  Object to the form.
25      THE WITNESS:  People don't like to take --

24  (Pages 90 to 93)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 94

1    BY MR. TOMASELLI:
2        Q. Nothing controversial about that?
3        A. People don't like to take drugs with
4    side effects.
5        Q. Okay. And so when we have this as a
6    background, we have the development of COX-2 selective
7    inhibitors where we might reduce pain and inflammation
8    through the inhibition of the COX-2 enzyme but keep the GI
9    mucosa in tact by not inhibiting the COX-1 enzyme; right?
10   That was the thought?
11       A. Well the idea, yeah, behind developing
12   COX-2 inhibitors was to potentially spare these gastric
13   prostaglandins.
14       Q. Hold down the pain and potentially
15   spare the gastro-protective prostaglandins?
16       A. Yeah, that was the idea behind it.
17       Q. And that was a sound scientific and
18   medical rationale; right?
19       MS. SANFORD: Object to the form.
20       THE WITNESS: Well, yes, it was a good
21   thing to try to block those potential NSAID-induced side
22   effects and to also limit inflammation.
23       BY MR. TOMASELLI:
24       Q. And people that you respect like
25   Dr. John Vane were even promoting the development of COX-2

Page 95

1    inhibitors, saying they could lead to advances in therapy?
2        A. Well I'm not sure what he said
3    personally. You'll have to bring out some publication to
4    show me.
5        EXHIBIT NO. FUNK-3: Vane article, entitled
6    Mechanism of Action of Nonsteroidal Anti-inflammatory
7    Drugs, published 1998.
8        BY MR. TOMASELLI:
9        Q. I'm going to hand you what I've marked
10   as Funk-3. Which is an article by Dr. John Vane; right?
11       A. Yeah.
12       Q. And it's published in 1998?
13       A. Yes, it is.
14       Q. And the last sentence of the abstract
15   of the paper says that:
16       "The identification of selective inhibitors
17   of COX-2 will therefore lead to advances in therapy."
18       Do you see that?
19       A. I see that, yeah. I think he's
20   referring to in the GI side of things.
21       Q. That's -- exactly. And that's what
22   we've been talking about how this trying to hold down the
23   pain but protect the GI mucosal was a good, sound
24   scientific and medical basis for the development of COX-2
25   inhibitors and people like John Vane were behind that;

Page 96

1    right?
2        A. Well he was one of the pioneers working
3    with NSAIDs from the beginning. He didn't have that much
4    to do with the COX-2 side of things himself. But it was,
5    according to him here on this paper, that he thought it
6    was a good idea, yeah.
7        Q. And you respect Dr. Vane; right?
8        A. Well I've interacted with him a few
9    times at scientific meetings in the past, yeah.
10       Q. Okay. And so it wasn't necessarily
11   just drug companies that were trying to develop COX-2s but
12   scientists and doctors were advocating their development
13   as well; right?
14       MS. SANFORD: Object to the form.
15       THE WITNESS: There was, yeah, a movement
16   among -- primarily among the pharmaceutical companies, but
17   other scientists were interested in studying the roles of
18   COX-2-derived prostaglandins in their particular systems.
19       BY MR. TOMASELLI:
20       Q. Clearly Nobel Prize winners like
21   Dr. John Vane were behind the development of COX-2
22   inhibitors; right?
23       A. Well Dr. Vane was involved in the early
24   work trying to look at the mechanism of action of how
25   these NSAIDs -- traditional NSAIDs work.

Page 97

1        His work never really dealt that much with
2    the COX-2 side of things, at least on the -- at least at
3    the forefront of the research, he wasn't involved in that.
4        Q. You, yourself, were behind the
5    development of COX-2 inhibitors and thought that they
6    might be a good way to hold down pain and protect the GI
7    mucosa? You understood that yourself; right?
8        MS. SANFORD: Object to the form.
9        THE WITNESS: Well I was involved in the
10   trying to dissect out the roles of COX-1- and
11   COX-2-derived prostaglandins at various stages of the, of
12   the development, yes.
13       BY MR. TOMASELLI:
14       Q. And back in the mid '90s, this was a
15   perfectly good thought to develop COX-2 inhibitors; right?
16       MS. SANFORD: Object to the form.
17       THE WITNESS: Well in the early '90s, just
18   after the discovery of COX-2, there was a lot of interest
19   in trying to develop potential blockers for specific for
20   COX-2 and to define the roles of the different COX-1- and
21   COX-2-derived prostaglandins.
22       BY MR. TOMASELLI:
23       Q. And scientists back in the mid '90s and
24   early '90s were -- understood or came to understand that
25   aspirin works by inhibiting platelet COX-1 and

25 (Pages 94 to 97)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 98

1  thromboxane; is that right?
2         A.  Well, yeah, they knew already back in
3  the '80s that traditional NSAIDs could block, and aspirin
4  in particular, could block thromboxane production by
5  platelets.
6         Q.  Okay.  And so, I guess, since people
7  knew that both aspirin and traditional NSAIDs could
8  inhibit the COX-1 enzyme and therefore inhibit platelet
9  aggregation in thromboxane production, that there
10  potentially could be cardiovascular consequences to the
11  COX-2-selective drugs in that they do not block COX-1 and
12  they do not block platelet aggregation or the production
13  of thromboxane; is that right?
14        A.  Did you mention a year, did you say
15  something --
16        Q.  The mid '90s, yes, sir.
17        A.  If the COX-2 inhibitors had the
18  potential to not block the thromboxane, is that what
19  you're asking me?
20        Q.  Correct.
21        A.  Well there were, in the '90s,
22  suggestions that COX-2 was in the vasculature that the
23  potential was there that could cause some cardiovascular
24  effects.
25        Q.  Maybe we're just not communicating

Page 99

1  here. I'm not talking about COX-2 in the vasculature right
2  now.
3         I think what I'm saying is people
4  understood back in the mid 1990s that aspirin, as you've
5  told me, aspirin and NSAIDs inhibit COX-1 and thus inhibit
6  platelet aggregation and production of thromboxane and
7  that could potentially be a good thing in preventing
8  cardiovascular events; right?
9         MS. SANFORD:  Object to the form.
10        THE WITNESS:  Well it was known for quite
11  some time that aspirin had beneficial effects in the
12  cardiovascular system.  The other NSAIDs can also block
13  COX-2 so their effects are not really as well known.
14        BY MR. TOMASELLI:
15        Q.  Right.  But the other NSAIDs,
16  traditional NSAIDs, they block COX-1 which would decrease
17  platelet aggregation and decrease thromboxane; right?
18        A.  Well traditional NSAIDs don't just
19  block COX-1 they also block COX-2.  So depending which one
20  you're talking about.
21        So, I'm not sure where you're -- what
22  you're asking.
23        Q.  Okay.  Well, you know, regardless of
24  whether they block COX-2 or not, they do block COX-1.  And
25  so it was a reasonable hypothesis to think that

Page 100

1  traditional NSAIDs might be beneficial in some way on the
2  heart because they inhibit platelet aggregation and they
3  inhibit thromboxane?
4         MS. SANFORD:  Object to the form.
5         THE WITNESS:  I don't think it's that
6  simple because traditional NSAIDs also can effect other
7  things than just platelet thromboxane production.
8         BY MR. TOMASELLI:
9         Q.  So it was an unreasonable thing to
10  think that traditional NSAIDs might have some
11  cardio-protective benefit through inhibition of COX-1 back
12  in the mid '90s?
13        MS. SANFORD:  Object to the form.
14        THE WITNESS:  Depends what you -- when
15  you're referring to in the mid '90s in that --
16        BY MR. TOMASELLI:
17        Q.  I'm saying before the urine studies
18  came out, for example.
19        A.  So --
20        Q.  '95/'96, how's that?
21        A.  Well aspirin and other NSAIDs were
22  known to block COX-1-derived thromboxane but they could
23  also have other effects in the cardiovascular system
24  besides just blocking the thromboxane formation from the
25  platelets.

Page 101

1         Q.  Was it reasonable to think and to
2  theorize in 1995 and 1996 that traditional NSAIDs, because
3  they inhibit COX-1 and platelet aggregation and
4  thromboxane production, that they might have a beneficial
5  effect on the heart in not the same way but in a similar
6  way to the way aspirin does?
7         MS. SANFORD:  Object to the form.
8         THE WITNESS:  Once again, aspirin is
9  different than the other traditional NSAIDs in its
10  mechanism of action.
11        So in -- based on dosing and the amount of
12  drug, you could also get inhibition of other
13  prostaglandins.  So the effect of traditional NSAIDs was
14  less clear cut than aspirin.
15        BY MR. TOMASELLI:
16        Q.  Right.  Aspirin was understood at the
17  time, back in the mid '90s, to be cardio protective.
18  Mainly due to its inhibition of COX-1 and platelet,
19  platelet aggregation and inhibition of thromboxane; is
20  that right?
21        A.  Yeah.  At the right dose, low-dose
22  aspirin that -- the idea was that you could block platelet
23  COX-1-derived thromboxane formation without, without
24  touching the prostacyclin being made or at least minor
25  effect on the prostacyclin being made by the blood

26 (Pages 98 to 101)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 102

1  vessels.
2        Q. So it was already known back in the mid
3  '90s that not effecting prostacyclin was part of the
4  reason for aspirin being an effective drug from a
5  cardiovascular standpoint?
6        A. It was already known in the '80s that
7  it was a good thing to not touch the prostacyclin from the
8  vasculature but try and just to block the thromboxane
9  formation from the platelets.
10        Q. But that wasn't, that wasn't the main
11  reason people believed aspirin to be cardio protective?
12  People believed aspirin to be cardio protective because it
13  inhibited thromboxane 95 percent; right?
14        MS. SANFORD: Object to the form.
15        THE WITNESS: No. Even going back into the
16  '80s the cardio-protective actions were believed not to be
17  just as a result of blocking the thromboxane formation of
18  platelets, but also to protect, with the low-dose aspirin,
19  the prostacyclin being made by the blood vessels.
20        BY MR. TOMASELLI:
21        Q. Is it your opinion that low-dose
22  aspirin does not inhibit prostacyclin production?
23        A. If you're right with the dosing, you
24  can minimize the amount of prostacyclin made by the blood
25  vessel that is inhibited by low-dose aspirin.

Page 103

1        Q. What you're saying is that when you
2  take controlled-release aspirin, low-dose
3  controlled-release aspirin you can inhibit thromboxane but
4  not inhibit prostacyclin production; right?
5        A. Well that was the idea behind this,
6  yeah, the controlled release was trying to get a
7  formulation where you could inactivate all the platelets,
8  COX-1 and thus the thromboxane production and try to
9  minimize the impact on prostacyclin formation in the blood
10  vessel.
11        Q. Immediate-release aspirin, on the other
12  hand, does inhibit prostacyclin production; correct?
13        A. There is some reduction, yeah, in
14  prostacyclin production with immediate-release aspirin.
15        Q. And are the studies that show aspirin
16  as cardio protective, the clinical trials that have shown
17  that, were those done with immediate-release aspirin or
18  controlled-release aspirin?
19        A. I can't recall right now. It was
20  probably the immediate release.
21        Q. Right. So when the study that showed
22  aspirin was cardio protective and aspirin reduced
23  cardiovascular events, actually what was happening was
24  that aspirin was inhibiting thromboxane production but it
25  was also inhibiting prostacyclin production; right?

Page 104

1        A. The inhibition of prostacyclin
2  synthesis would have been most likely quite small at
3  low-dose aspirin.
4        Q. It's your opinion that inhibition of
5  prostacyclin by low-dose aspirin is, what, sir?
6        A. The inhibition by low-dose aspirin of
7  prostacyclin production is quite low.
8        Q. "Quite low" meaning how much percent?
9        A. Well it depends on the dose and the
10  interval of the drug, the dosing interval.
11        Q. Let's say low-dose aspirin every day
12  approximately 81 milligrams. What's the reduction in
13  prostacyclin?
14        A. Probably around in the area of 20/30
15  percent.
16        Q. When you came up with 20 to 30 percent,
17  what was jumping in your mind as the basis for that?
18        A. I'm trying to go back to the original
19  FitzGerald studies back in the '80s and in particular
20  paper, around 1990 or so, where he -- they were trying to
21  get at the dose and the interval for giving the low-dose
22  aspirin to create the most benefit for blocking
23  platelet-derived COX-1 and leaving in tact the
24  prostacyclin formation.
25        Q. I'll just let you look at my copy

Page 105

1  because I think we're talking about the same study. It's
2  by Clarke, with Dr. FitzGerald, as the lead author from
3  1991. You recall that?
4        A. Yes.
5        Q. And I'm just going to hand you my copy
6  which has been highlighted.
7        Is Clarke, 1991, the study with Garett
8  FitzGerald as the lead author; is that one of the studies
9  that you were thinking about?
10        A. Yeah, that was one of the studies.
11        Q. Okay and if I can direct your attention
12  to page 1140 of that study, Figure 5 if you see that?
13        MS. SANFORD: If you need time to read it,
14  doctor, take your tame.
15        MR. TOMASELLI: Yeah, sure.
16        THE WITNESS: I see that Figure 5.
17        BY MR. TOMASELLI:
18        Q. And if we look at placebo, the placebo
19  line goes up to about 550?
20        A. Yup.
21        Q. And 75 milligrams of aspirin goes up to
22  about 150; right?
23        A. 650.
24        Q. That's the controlled-release aspirin?
25        A. Oh.

27 (Pages 102 to 105)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

1    Q. I'm looking at the 75 milligrams of
2  immediate-release aspirin?
3    MR. BIRCHFIELD: What page are you on?
4    MR. TOMASELLI: 1140.
5    THE WITNESS: Somewhere around 150/175,
6  yeah.
7    BY MR. TOMASELLI:
8    Q. So 550 minus 150 is 400. 400 divided
9  by 550, that's what? I'll look, I have a calculator. 72
10  percent. You can do the math if you want.
11    A. Well, it looks like about it could be,
12  yeah, 70 percent reduced there.
13    Q. So based on this study,
14  immediate-release low-dose aspirin reduces prostacyclin a
15  little more than 70 percent; fair?
16    A. Yeah, I guess for this study, yeah, it
17  shows that.
18    Q. Okay. And that's one of the studies
19  that came to your mind -- this Clarke study was one of the
20  studies that came to your mind when we started talking
21  about whether low-dose immediate-release aspirin inhibits
22  prostacyclin production; correct?
23    A. I think I mentioned to you the
24  controlled-release when I mentioned this study.
25    Q. Okay. And I think we're on the same

1  page but just so I'm clear. There's a difference between
2  how controlled-release aspirin effects prostacyclin
3  production and how immediate-release aspirin effects
4  prostacyclin production. Would you agree with that?
5    A. Well during the dosing interval and
6  that and, yeah, the releasing of the drug, you'll get more
7  potential for reduction in prostacyclin with the
8  immediate-release than compared to the controlled-release.
9    Q. Right. And regardless of the dosing
10  and the dosing interval, both controlled-release aspirin
11  and immediate-release aspirin are COX-1 selective?
12    A. Well that's -- it's not exactly true.
13  Aspirin can also hit COX-2, so -- aspirin can also block
14  COX-2.
15    So it is a little bit more selective to
16  COX-1 but it can disrupt COX-2.
17    Q. Would you agree that low-dose aspirin
18  is COX-1 selective?
19    A. Again, it depends where -- what you're
20  talking about, what system and how the drug is interacting
21  with that particular tissue. So how much particular cell
22  type is seeing of that drug. So if it's seeing a certain
23  amount of aspirin it can, it can block both COX-1 and it
24  can block COX-2 as well.
25    Q. High-dose aspirin does inhibit both

1  COX-1 and COX-2; correct?
2    A. Yeah.
3    Q. Okay. But low-dose aspirin selectively
4  inhibits COX-1 whereas high-dose aspirin inhibits both
5  COX-1 and COX-2; would you agree with that?
6    A. What are you reading from?
7    Q. I'm reading from Dr. Patrono's article
8  in 2005 in the New England Journal of Medicine, he says
9  "Low-dose aspirin selectively inhibits
10  COX-1 whereas high-dose aspirin inhibits both COX-1 and
11  COX-2."
12    A. Well you can show me where exactly he
13  said that, in which paper?
14    Q. Sure. It's in the Figure 1 in the --
15    MS. SANFORD: You can feel free to look at
16  the whole paper, Dr. Funk.
17    While he's looking at that I saw you had an
18  extra copy of the other paper. Can we mark that as
19  Exhibit 4?
20    MR. BAUM: No, that's mine. It's been
21  written and highlighted.
22    MR. TOMASELLI: You can mark my copy.
23    MS. SANFORD: If you don't mind the
24  highlights in there, that will be great.
25    MR. TOMASELLI: I don't think the

1  highlights will show up but the underlining will.
2    MS. SANFORD: Just note for the record
3  that's yours and not somebody else's.
4    EXHIBIT NO. FUNK-4: Clarke study, entitled
5  Suppression of Thromboxane A2 but not of Systemic
6  Prostacyclin by Controlled-Release Aspirin.
7    BY MR. TOMASELLI:
8    Q. Dr. Funk, while you review that, I'm
9  going to hand you back Funk Exhibit 4, which is my copy of
10  the Clarke study. Is that correct?
11    A. That's correct.
12    Q. Okay. So you can go back to reviewing
13  the article.
14    A. This is a general statement. Like I
15  was saying before, aspirin, depending on how it's
16  interacting with certain cell types, can block both COX-1
17  and COX-2.
18    Q. At least according to Carlo Patrono and
19  Luis Rodriguez, Raffaele Landolfi and Colin Baigent,
20  low-dose aspirin is selective for COX-1; correct?
21    A. Well this is, I think, a general
22  blanket statement that they're making that, yeah, in
23  general you can think of it that way. That COX --
24  low-dose aspirin would preferentially hit the platelets,
25  but it can also affect COX-2.

28  (Pages 106 to 109)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

## Page 110

1      Q.  Would you agree with Dr. John Vane that
2  low-dose aspirin is 150-fold more selective for COX-1 than
3  COX-2?
4          MS. SANFORD:  Object to the form.
5          THE WITNESS:  In what paper are you
6  referring to?
7          MR. TOMASELLI:  It's the top right.
8          THE WITNESS:  It refers to Reference A, so
9  I need to look to see what that is.
10         I don't seem to think that that value
11 matches some of his later studies, 150-fold.  One of the
12 studies I referenced there, that he did later on, I don't
13 recall anyone ever saying that it was 150-fold more
14 selective for COX-1 than COX-2.
15         BY MR. TOMASELLI:
16         Q.  Can we agree that it's much more
17 selective for COX-1 than COX-2?
18         A.  No, I don't think we can agree on that.
19 We'd have to look in one of the -- my publication -- we
20 can actually look at one of the -- one of the papers that
21 I mention in my report.
22         Q.  Okay.  So COX -- so lo-dose aspirin, in
23 your mind, is about the same as a non-selective NSAID
24 inhibiting both COX-1 and COX-2; correct?
25         A.  That's about correct, yeah.

## Page 111

1      Q.  Okay.  So at the time in 1995 and 1996
2  when aspirin was shown to be beneficial, the NSAIDs were,
3  likewise, not unreasonable to think that they might be
4  beneficial on the heart as well?
5          A.  No, that's not really correct.  It's
6  because aspirin has a different mechanism of action.
7  Aspirin acetylates COX-1 and aspirin hits the platelets
8  a lot quicker than the other traditional NSAIDs when it's
9  going through this presystemic circulation in the portal
10 blood.  Aspirin is hitting the COX-1 immediately.
11         So it has an effect that can be separated
12 from some of the other traditional NSAIDs because of the
13 mechanism of action.
14         Q.  Some of the traditional NSAIDs, you
15 would agree, while may not be reversible inhibition of the
16 platelets, or have reversible inhibition of the platelets
17 that if dosed correctly could act just like aspirin;
18 right?
19         MS. SANFORD:  Object to the form.
20         THE WITNESS:  Well you sort of changed in
21 mid sentence about reversible and, so--
22         BY MR. TOMASELLI:
23         Q.  I'm sorry, let me try again.
24         A.  Yeah.
25         Q.  You would agree that some traditional

## Page 112

1  NSAIDs can act like -- or it could be theorized that they
2  could act like aspirin if they could have the same
3  mechanism of action on COX-1 and the platelets like
4  aspirin does?
5          MS. SANFORD:  Object to the form.
6          THE WITNESS:  The thing is, the other
7  traditional NSAIDs don't have the same mechanism of action
8  as aspirin.  So you can't really compare them because of
9  this, this covalent binding of aspirin to the platelet
10 COX-1.
11         The other traditional NSAIDs don't act that
12 way, so you can't really say that they're going to be
13 acting by the same mechanism.
14         BY MR. TOMASELLI:
15         Q.  Prior to the urine studies being known
16 with COX-2 inhibitors, would you agree that the thought
17 was that COX-2 inhibitors would be neutral on the heart?
18         MS. SANFORD:  Object to form.
19         THE WITNESS:  I can't really comment on
20 that, I guess.
21         BY MR. TOMASELLI:
22         Q.  You don't know?
23         A.  I'm not sure, no.
24         Q.  You don't have any reason to believe
25 that prior to the urine studies they would be detrimental

## Page 113

1  in terms of cardiovascular effects?  Is that basically the
2  way of saying it in the reverse?
3          A.  At the time, traditional NSAIDs were
4  thought to block both COX-1 -- or they're known to block
5  both thromboxane and prostacyclin, so it could have been
6  theorized that they might be neutral in the cardiovascular
7  system.
8          Q.  Prior to the urine studies it was
9  theorized that they would be neutral to the cardiovascular
10 system; right?
11         MS. SANFORD:  Object to the form.
12         BY MR. TOMASELLI:
13         Q.  In 1995/1996/1997 time frame prior to
14 the urine studies coming out, it was theoried that COX-2
15 selective inhibitors would be neutral in terms of
16 cardiovascular effects; would you agree?
17         MS. SANFORD:  Object to the form.
18         THE WITNESS:  Well it was known that COX-2
19 was in the vasculature already prior to that.  So, I'm not
20 sure really what other investigators were thinking at that
21 time.
22         BY MR. TOMASELLI:
23         Q.  In your mind, prior to the urine
24 studies, did you believe COX-2 selective inhibitors would
25 be neutral in terms of cardiovascular effects?

29 (Pages 110 to 113)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

## Page 114

1    A. I can't say that I was really
2  considering it at that time point. You'd have to give me
3  some sort of specific reference.
4    Q. Well, I'm just asking you, prior to the
5  urine studies coming out and there potentially being an
6  imbalance in prostacyclin and thromboxane that you wrote
7  about on page 11 of your report; did you have any reason
8  to believe that COX-2 inhibitors would be anything but
9  neutral in terms of cardiovascular effects?
10    MS. SANFORD: Object to the form.
11    THE WITNESS: Are you referring to some
12  specific statement I made on the report, did you say, on
13  page 11 or?
14    BY MR. TOMASELLI:
15    Q. Well let's start with page 11. The
16  FitzGerald hypothesis, do you see that?
17    A. Yeah.
18    Q. Okay. And you write:
19    "COX-1 was generally regarded as the main
20  enzyme capable of forming both thromboxane and
21  prostacyclin in blood platelets and the vascular wall
22  prior to the striking observations by McAdam and
23  FitzGerald in 1999 which ascribed prostacyclin
24  biosynthesis in humans predominantly to COX-2 instead of
25  COX-1."

## Page 115

1    Did I read that right?
2    A. You did.
3    Q. And prior to that time, prior to these
4  findings, did you, yourself, have any reason to believe
5  that COX-2 selective inhibitors would be anything but
6  neutral on the cardiovascular system?
7    A. Well we had known about COX-2 in the
8  vasculature prior to 1999 but it wasn't really until this
9  study came out that we had to really examine this in more
10  detail why, why COX-2 inhibitors were causing this
11  profound release in prostacyclin.
12    Q. And the reason is because before these
13  studies came out, Dr. John Vane, yourself and everybody
14  else in the medical community believed that prostacyclin
15  and thromboxane were both manufactured or coming from
16  COX-1; right?
17    MS. SANFORD: Object to the form. Object
18  to the form.
19    THE WITNESS: Well it was known that COX-2
20  was in the vasculature prior to that but nobody had made
21  the firm, I guess, connection until, really, this finding.
22  This did surprise the community when this paper was
23  published.
24    BY MR. TOMASELLI:
25    Q. Prior to this time, did the medical

## Page 116

1  community believe that prostacyclin was manufactured by
2  COX-1?
3    MS. SANFORD: Object to the form.
4    THE WITNESS: I guess the consensus was
5  that there was mainly COX-1 in the vasculature, although
6  people knew that there was COX-2 there. This connection
7  with prostacyclin was really made with that observation by
8  those urinary studies.
9    BY MR. TOMASELLI:
10    Q. Right. So I think we're on the same
11  page. But prior to the urine studies, everybody thought
12  prostacyclin and thromboxane were both made by COX-1;
13  right?
14    MS. SANFORD: Object to the form.
15    THE WITNESS: I don't know if everyone
16  thought that but --
17    BY MR. TOMASELLI:
18    Q. Did you think that?
19    A. Well I knew that COX-2 was made in the
20  vasculature. I didn't know the exact relative amounts
21  though.
22    Q. Well you say here "COX-1 was generally
23  regarded as the main enzyme capable of forming both
24  thromboxane and prostacyclin"; is that right?
25    A. Yeah.

## Page 117

1    Q. Okay.
2    A. That it was generally regarded, yeah.
3    Q. Okay. Are you one of the "generally"?
4    A. I would have to be included in there
5  since I wrote this, yes.
6    Q. Okay. And so what was striking and
7  surprising was that the McAdam and FitzGerald studies
8  showed that prostacyclin might be coming from COX-2 and
9  not COX-1; right?
10    A. Well this was one of the key findings,
11  yeah, of that study, that prostacyclin was coming from
12  COX-2.
13    Q. Right. And prior to this study, prior
14  to you and the medical community knowing this fact,
15  traditional NSAIDs that inhibit both COX-1 and COX-2,
16  would inhibit both thromboxane and prostacyclin because
17  they inhibit COX-1; right?
18    MS. SANFORD: Object to the form.
19    THE WITNESS: That traditional NSAIDs would
20  block both COX-1 and COX-2 wherever they were formed or
21  wherever they were situated in the body.
22    BY MR. TOMASELLI:
23    Q. Right. And since you told us that
24  COX-1 was regarded as making both prostacyclin and
25  thromboxane, a traditional NSAID would inhibit both;

30 (Pages 114 to 117)

f216df5d-b006-4e08-978e-b9fe8ea6cfa7