UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL DOCKET No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L - DIVISION 3 |
| | * | |
| This document relates to | * | JUDGE FALLON |
| CASE NO. 2:05CV2524 | * | |
| | * | |
| ANTHONY WAYNE DEDRICK, | * | MAG. JUDGE KNOWLES |
| an Individual, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF CORNELIA PECHMANN, PH.D.

Plaintiff Anthony Dedrick hereby opposes Merck's Motion to Exclude the Testimony of Cornelia Pechmann, Ph.D. and urges the Court to deny the Motion in its entirety.

The Court denied Merck's Motion to exclude Dr. Pechmann in *Barnett*. Though Dr. Pechmann was not called to testify by the plaintiff, the Court found that Dr. Pechmann was qualified to testify regarding marketing, specifically Merck's integrated marketing communications campaign. In addition, in *Mason*, the Court similarly ruled that Dr. Pechmann was qualified to testify and is expected to testify.

Dr. Pechmann was retained by Plaintiff primarily to review and provide opinions on a

comprehensive integrated marketing communications campaign by Merck to neutralize concerns among doctors and consumers regarding the potential cardiovascular risk associated with Vioxx. Her expertise was and remains necessary to describe and explain the strategy and objectives of the campaign, the nature of the marketing and research studies performed by Merck to achieve those objectives, the methodology used in those studies, the consultants used by Merck to perform those studies, the results of those studies, Merck's evaluation of those studies, how Merck adjusted its campaign to better achieve its objectives and the success of the campaign as measured the data collected. Dr. Pechmann's testimony is at the core of Plaintiff's case for fraud and failure to warn of the cardiovascular risk associated with the drug.

As the Court is well aware, Dr. Cornelia Pechmann is a professor of marketing at the Paul Merage School of Business at the University of California, Irvine. Her specialty is integrated marketing communications campaigns, which are comprehensive and sophisticated marketing programs intended to convey a seamless integration of discrete marketing messages. She has worked in this area for over 20 years, published over 50 articles on this subject, and has been retained by government agencies and businesses as a consultant and advisor on large integrated marketing communications campaigns.

Marketing is a behavioral science and, like other behavioral sciences such as psychology and economics, is the proper subject of expert testimony. Marketing campaigns at the level employed by Merck involve the same expertise as the natural and other behavioral sciences, in that they require identification of hypotheses, testing the hypotheses using valid methods and controlled studies, and analysis and preparation of reports. Numerous courts have upheld and allowed presentation of testimony of experts on marketing techniques.

-2-

Merck submits that Plaintiff can simply present at trial some of the marketing detail pieces and ads and that jurors will be able to discern on their own the complex integrated marketing communications campaign employed by Merck to shape marketplace perceptions regarding cardiovascular risk.  If it is that simple, then Merck should not have had to hire the many consultants and spend hundreds of millions of dollars on research and on its campaign to neutralize doctor and consumer concerns about the cardiovascular risk associated with Vioxx. Merck will have available to it at trial its marketing expertise in the form of its witness employees who designed and handled the campaign.  Plaintiff similarly should be allowed to have its own expert with specialization in this scientific, technical and complex area to explain the manner in which Merck used a sophisticated marketing campaign to neutralize any concern in the marketplace regarding Vioxx's cardiovascular risk.

## I.   BACKGROUND

### A.   Dr. Pechmann Is Qualified As An Expert In Marketing And Integrated Marketing Communications Campaigns

Dr. Pechmann is a full tenured professor of marketing at the University of California, Irvine School of Business.  (Pechmann Report, p. 1; Depo., Vol. 1, 288:14-17.)  Dr. Pechmann has approximately 50 refereed publications in academic journals, books and conference proceedings on topics relating to integrated marketing communications campaigns.  (Report, p. 4; Depo., Vol. 1, 288:18-20.)  Her 2002 article in the *Journal of Consumer Research* about cigarette advertising and adolescents won that journal's "best paper in 2002" award.  (Report, p. 4)  A recent scientific study to determine the top 50 marketing scholars based on a citation index (i.e. impact of work on academia) included Dr. Pechmann.  (Depo., Vol. 1, 290:5-16.)  Dr. Pechmann has been a member of the editorial boards of three of the top marketing journals,

including the *Journal of Consumer Research.* (Depo., Vol. 1, 289:6 to 290:1.)[1]

Additionally, Dr. Pechmann has substantial practical experience in designing, implementing and advising on integrated marketing communications campaigns. For example, Dr. Pechmann was retained by the United States Office of National Drug Control Policy to develop an anti-drug integrated marketing communications campaign over a five year period from 1998 to 2004. (Report, p. 1.) This was the largest integrated social marketing communications campaign in U.S. history. *Id.* She was one of six members of the behavioral change expert panel and was chosen to oversee research conducted for the campaign. This involved copy testing and tracking of reactions to the campaign. (Depo., Vol. 1, 8:10 to 11:11.) Dr. Pechmann developed strategy (core messages); reviewed focus group work before filming; tested storyboards and preliminary ads; reviewed tracking research after ads ran (designed research and analyzed data); reviewed findings and statistical analyses of the data; and adjusted the campaign based on the results. (Report, pp. 1-2; Depo. Vol. 1, 293:21 to 294:7.) Dr. Pechmann worked with an affiliate of the same marketing communications campaign, and during the same time period at issue here.

Based on Dr. Pechmann's qualifications, she is an expert in integrated marketing campaigns (Report, p. 1; Depo., Vol. 1, 288:21-23); misleading advertising (Report, p. 3; Depo., Vol. 1, 157:2-7); the role of the U.S. federal and state governments in identifying and preventing misleading advertising, particularly the FTC (she published peer-reviewed articles regarding the

---

[1] Plaintiff attaches hereto the following exhibits: Exhibit 1, Dr. Pechmann's May 26, 2006 deposition transcript (herein "Depo., Vol.1"); Exhibit 2, Dr. Pechmann's June 15, 2006 deposition transcript (herein "Depo., Vol. 2"); Exhibit 3, Dr. Pechmann's "Abstract" concerning Exhibit 5 of her initial deposition, and attached as Exhibit 8 of her subsequent deposition (herein "Abstract re Exhibit 5"); and Exhibit 4, Dr. Pechmann's curriculum vitae. Dr. Pechmann's main report is attached to Merck's motion as Exhibit A.

FTC's role in identifying and preventing misleading advertising) and the FDA (she assisted in the American Psychological Association's response to the FDA's proposed regulations restricting tobacco products to children) (Report, p. 3.); and experimental and quasi-experimental research and designs and statistics in marketing. *Id.*

Dr. Pechmann's numerous other qualifications in the marketing field and especially in the sub-field of integrated marketing communications campaigns are set forth in her expert report and attached curriculum vitae. (Report, pp. 1 to 5 and Exhibit 2 to Report.) Indeed, Merck cannot and does not challenge Dr. Pechmann's expertise in these areas.

**B.**     **Dr. Pechmann's Expert Analysis and Opinions**

Dr. Pechmann's expert opinions and testimony primarily concern Merck's integrated marketing communications campaign that was implemented to neutralize doctor and patient concerns about cardiovascular risks associated with Vioxx. The textbook definition of an integrated marketing communications campaign is as follows:

> A concept of marketing communications planning that recognizes the added value of a comprehensive plan that evaluates the strategic roles of a variety of communication disciplines - for example, general advertising, direct response, sales promotion and public relations - and combines these disciplines to provide clarity, consistency, and maximum communications impact through the seamless integration of discrete messages. (Report, p. 1 and Report, Exhibit 1, p. 1.)

An integrated marketing communications campaign utilizes extremely sophisticated marketing concepts and tools which, as indicated above, are the subject of numerous articles and academic discussions as well as practical applications. The concepts and tools used in integrated marketing communications campaigns apply across industries. (Depo., Vol. 1, 291:2-10.) For example, as mentioned above Dr. Pechmann has been retained by government agencies and private business in many different areas to work and advise them on their integrated marketing

communications campaigns, and she has published articles on the techniques used for those campaigns as were used by Merck in its Vioxx campaign. (Report, pp. 1 to 2; Depo., Vol. 1, 8:10 to 11:11; 293:21 to 294:7; and Vol. 2, 52:10 to 53:5.)  Additionally, Dr. Pechmann has prepared with a former Ph.D. student a paper for publication entitled "Information Formats for Presenting Unfavorable Efficacy Information, Managerial and Regulatory Perspectives."  The paper concerns controlled experiments and research they conducted involving products from three industries, namely, the automobile, topical sun screen and pharmaceutical industries. (Depo., Vol. 2 37:14 to 40:15.)

The integrated marketing communications campaign conducted by Merck with regard to Vioxx and its cardiovascular risk requires application of the same marketing techniques and methodologies employed in other natural and behavioral sciences.  Merck used these techniques to identify issues that were affecting sales of the drug, design and develop marketing tools to address those issues, conduct research studies of those tools prior to their release in the marketplace to gauge their effectiveness, track the results of their campaign through research studies, analyze the results of the campaign and make any adjustments to the campaign to continue to achieve the campaign goals. *See* Depo., Vol. 1, 9:3 to 10:8; 290:21 to 292:1.

Based upon her review and analysis of Merck's integrated marketing communications campaign, Dr. Pechmann will testify as to Merck's marketing goals and objectives concerning Merck's campaign, namely, to neutralize doctor and consumer concerns about Vioxx's cardiovascular risks and to convince doctors to prescribe Vioxx regardless of their patients' cardiovascular risk profile. *See* Depo., Vol. 1, 305:11-22 and 340:11-22.

In addition to testifying as to Merck's overall campaign, Dr. Pechmann will focus on six

specific areas of the campaign, namely: (1) copy testing by Merck of detail pieces with doctors; (2) doctor tracking and doctor promotional message recall; (3) doctor behavioral and prescription tracking; (4) doctor attribute tracking; (5) Merck's awareness and action on chronic pain consumer tracking study; and (6) consumer ad copy testing. *See* Report; Abstract re Exhibit 5; and Depo., Vol. 1, 295:12 to 326:1, Vol. 2 pp. 84 to 157. For each area, Dr. Pechmann explains the objectives of the studies, the methodology of the studies, the consultants used to conduct the studies, the results of the studies and how the studies fit into Merck's overall integrated marketing communications campaign both in guiding Merck's marketing efforts and cross-checking the results of those efforts to determine whether they accomplished Merck's marketing goals. *See* Abstract re Exhibit 5 and references to main Report therein. Dr. Pechmann will testify as to the quality of the studies and that they were done in a manner that accomplished Merck's marketing goals and objectives. (Depo., Vol. 1, 327:8-15.)

As a result of Merck's integrated marketing communications campaign, Dr. Pechmann concludes that doctors had a misunderstanding about the cardiovascular risks associated with Vioxx, and that the detail pieces and other information provided to doctors in the campaign about Vioxx and its safety continued to mislead them regarding the potential risk. (Depo., Vol. 2 64:19 to 65:6.) In addition, consumers were reassured by Merck's safety messages about Vioxx and those perceptions remained stable throughout the campaign. In other words, consumers did not get the message that their use of Vioxx exposed them to a cardiovascular risk. (143:1 to 144:23.)

## II.      DISCUSSION

### A.      Legal Background

Federal Rule of Evidence 702 allows a witness with sufficient expertise in a field to testify as to matters in which "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . .: The qualifications of the expert witness are judged under Rule 702 by his or her knowledge, skill, experience, training, or education." Finally, Rule 702 requires that "(1) the testimony be based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

The principles behind Rule 702 as set forth in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny are well known by the Court and discussed extensively in its decision in *In re Vioxx Products Liability Litigation,* 401 F.Supp.2d 569 (E.D. La. 2005), and in Plaintiff's other briefs filed in conjunction with this litigation. In sum, as the gatekeeper of scientific evidence, the Court must make a preliminary assessment to ensure the proffered expert testimony meets the requirements of Rule 702 and the factors set forth in *Daubert. Id.* at 573-74. "In satisfying its 'gatekeeper' duty, the Court will look at the qualifications of the experts and the methodology used in reaching their opinions and not attempt to determine the accuracy of the conclusion reached by the expert. The validity or correctness of the conclusion is for the fact finder to determine." *Id.* at 574.

Rule 702 and the factors set forth in *Daubert* have been applied by courts to admit and uphold testimony of marketing experts in complex litigation matters. For example, in *Schwab v. Philip Morris USA, Inc.,* 2005 WL 2401647 (E.D.N.Y. 2005), the plaintiffs proffered a marketing expert to testify that defendant cigarette manufacturers intentionally marketed and advertised low tar and light cigarettes in a manner that conveyed they had a health benefit over

regular, full flavor cigarettes and "that defendants 'knew' that smokers switched to low tar brands for 'health' reasons, and that 'successful advertising had to allay consumers' fears about company documents and thereby identifying seven 'lights are safer' cues that defendants allegedly employed in low tar advertising." *Id.* The district court noted that the plaintiffs' expert was a "Professor Emeritus of Marketing with adequate credentials in his field." *Id.* The district court denied the defendants' motion to exclude testimony, stating:

> The charge of fraud makes relevant both what defendants knew and intended and how their activities were designed to influence the beliefs and activities of consumers. It can be assumed that the tobacco companies' advertising budgets and programs affected consumer reactions. Dr. Pollay's experience, analytical techniques and reports meet all the elements of *Daubert* and Rule 702's requirements. His report could be reliable and helpful to the jury. It is not excludable under Rule 403 of the Federal Rules of Evidence. Advertising methodologies are esoteric; the average juror could be helped by an explanation of how they work and were used by defendants.

*Id.*

Other courts similarly have upheld the admission of testimony by marketing experts or reversed trial courts for failing to allow such testimony under Rule 702 and *Daubert* or similar evidentiary rules. <u>See, e.g.</u>, *Novartis Corp. v. Fed. Trade Commission,* 223 F.3d 783, 787-88 (holding that expert testimony admissible as to whether "advertising played a 'substantial role' in creating or reinforcing a false belief" in a drug product's efficacy); *Blue Cross and Blue Shield of New Jersey v. Philip Morris, Inc.,* WL 1738338 (E.D.N.Y. 2000) (also upholding expert testimony with regard to marketing low tar and light cigarettes); *Edina Realty v. The ML Sonline.com,* WL 737064 (D. Minn. 2006) (allowing marketing expert testimony in trademark infringement); *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134 (9th Cir. 1997) (reversing district court's exclusion of testimony of plaintiff's marketing research expert in false advertising

Lanham Act action concerning how defendants' advertisements mislead the consuming public); *Nestle Food Co., v. Abbott Laboratories,* WL 8578 (9th Cir. 1997) (allowing expert in consumer psychology to testify as to defendants' motivations concerning direct to consumer marketing to reduce breast feeding and promote use of infant formula); *Tyus v. Urban Search Management,* 102 F.3d 256, 264 (7th Cir 1996) (holding that district court abused discretion in refusing to allow psychologist to testify concerning how an advertising campaign sends message to its target market, and stating that materials on which expert relied and methodology used "were well within the range contemplated by *Daubert* for expert scientific testimony"); *Betterbox Communications v. BB Technologies,* 300F.3d 325 (E.D. Pa. 2002) (allowing expert testimony of marketing expert on trademark confusion based on 20 years marketing expertise).

### B. Dr. Pechmann's Testimony Meets The Standards of Admissibility Set Forth In The Federal Rules Of Evidence And *Daubert*

In the present case, Dr. Pechmann's expert testimony meets all legal and evidentiary standards for admission under Rule 702 and *Daubert.*

It cannot be seriously disputed that Dr. Pechmann has the knowledge, skill, experience, training and education to testify as to her opinions and these areas of marketing science and expertise. She has worked in these areas for 20 years, teaches courses in these subject areas, has published over 50 peer reviewed articles and is considered one of the top 50 scholars in these areas, has substantial practical experience working in these areas, has degrees in these areas and has participated on editorial boards of major marketing journals. Merck cannot and does not even attempt to challenge her marketing expertise.

Moreover, Dr. Pechmann's opinions and testimony meet all the factors and standards required by Rule 702 and *Daubert* as enumerated by this Court in its earlier decision in this

litigation.  As set forth in detail above, Dr. Pechmann engaged in a considerable review of Merck's documents and marketing materials and research, she reviewed and analyzed the methodology utilized by Merck for its integrated marketing communications campaign, she reviewed and analyzed the results of Merck's campaign, and she made an assessment of the methods used by Merck and the success of the campaign.  She has drawn from her own research and articles and has reviewed articles on campaigns utilized by the pharmaceutical industry to formulate her opinions and conclusions.  In sum, Dr. Pechmann's testimony is based on sufficient facts and data (Merck's own data and her knowledge in this area), her analysis is based on widely accepted and reliable principles and methods and she has applied those methods satisfactorily to the facts of this case.

Finally, Dr. Pechmann's testimony is essential for the trier of fact to have a complete understanding of Merck's integrated marketing communications campaign and how it worked to neutralize concerns in the marketplace amongst doctors and patients regarding the cardiovascular risks associated with Vioxx.  Almost certainly the jurors will not have an understanding of what an integrated marketing communications campaign entails.  Nor will jurors have an understanding of how market research studies of marketing messages and advertising and promotional pieces are used to subtly shape doctor and patient views concerning the safety of Vioxx and also to document that doctor and patient views and behaviors have been successfully affected.  Indeed, the complexity of Merck's advertising campaign required an infusion by Merck of hundreds of millions of dollars and the retention of numerous consultants to implement.  Courts have found that such expert testimony is essential in the marketing context. In *Tyus v. Urban Search Management,* the Court reversed the district court's decision to exclude

the plaintiff's marketing expert, stating:

> Dr. Tarini was prepared to testify about the way an advertising campaign sends a message to its target market and how an all-White campaign affects African Americans. This kind of social research, which would demonstrate the way one of the most important industries in our country actually operates, ***would have given the jury a view of the evidence well beyond their everyday experience.*** Indeed, anyone who watches television knows that the major consumer product companies in the country ***spend billions crafting their advertising campaigns, to reach exactly the right audience, with exactly the right pitch.*** It is doubtful they are making these decisions by asking six or twelve random people on the street what might appeal to them.

*Tyus*, 102 F.3d at 264 (emphasis added).

For these reasons, Merck's motion to exclude Dr. Pechmann's testimony must be denied and she should be allowed to testify as to Merck's integrated marketing communications campaign.

### C.   Merck's Arguments Are Unavailing And Actually Underscore The Need For Dr. Pechmann's Testimony

Merck raises a number of arguments that not only lack merit, but underscore the tactics it intends to use at trial and the need for Dr. Pechmann's testimony in order to avoid having the jury misled.

It is undisputed that Dr. Pechmann is not a physician. Plaintiff does not seek to offer specific causation opinion testimony through Dr. Pechmann. Dr. Pechmann specifically stated at her deposition that she is not offering an expert medical opinion as to relationship between Vioxx and cardiovascular events. (Depo., Vol. 1 294:12-15.) Rather, as a component of her opinion on marketing matters she determined from the documents that Merck was aware of a potential cardiovascular risk associated with Vioxx. (294:16-20.) Dr. Pechmann testified as to the importance of this awareness to her opinion:

> [The] internal documents and statements [made] by the Merck executives... are part of the whole picture. You have to understand what was the objective of the campaign and then you test the hypothesis that that objective has met. And the answer to that hypothesis test based on all of the research is, yes, they obtained the objective that they sought, which was to neutralize the CV risks.

(Depo., Vol. 1 329:4-18.) Plaintiff intends to offer testimony regarding the marketing messages contained in the "Dear Doctor Letters" and PIRs received by Dr. Esmeraldo Herrera, Plaintiff's prescribing physician. In addition, Plaintiff intends to offer the testimony of Dr. Pechmann to describe the marketing messages contained in the CV Card which was used by sales representatives when detailing Dr. Herrera. Dr. Pechmann is fully qualified to offer testimony regarding the marketing messages contained in these Merck documents without commenting on Dr. Herrera's impressions or thoughts about those documents.

Merck seeks to exclude any opinion by Dr. Pechmann regarding regulatory matters. These include FDA regulations Dr. Pechmann reviewed concerning impermissible marketing and advertising regarding pharmaceutical drugs. Such regulations provide Dr. Pechmann with the framework and guidelines within which Merck was to operate in its marketing efforts, and Dr. Pechmann found that they were in line with overall marketing guidelines that preclude misleading advertising. Dr. Pechmann is qualified to review these regulations and incorporate them into her testimony, since she not only has expertise in marketing matters but specifically with regard to the application of FTC and FDA regulations to marketing campaigns. (Report, p. 3.) Indeed, much marketing is governed by regulations and it is not surprising that experts like Dr. Pechmann have sufficient expertise to be able to apply those regulations to marketing efforts.

Finally, Merck further argues that Dr. Pechmann should not testify as to how much Merck spent on its marketing and its Vioxx revenue. (Merck Memorandum at 4-5.) These

-13-

amounts, however, will assist in understanding the sheer scope of Merck's marketing efforts. The resources expended will inform the jury of the comprehensive, multi-layered nature of the integrated marketing plan.  This information is relevant to Plaintiff's claims of failure to warn and fraud.

In sum, the arguments raised by Merck either lack any basis or are more suited to arguments before the jury concerning credibility issues.  None of the arguments raise any legitimate basis to preclude Dr. Pechmann from testifying.

## CONCLUSION

~~For the foregoing reasons, Plaintiff respectfully requests that Merck's motion to exclude~~ the expert testimony of Dr. Pechmann be denied.

Respectfully submitted this ___ day of November, 2006.

_____
ANDY BIRCHFIELD
P. LEIGH O'DELL
Attorney for Plaintiff
*BEASLEY, ALLEN, CROW,*
*METHVIN, PORTIS & MILES, P.C.*
234 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103
(334) 269-2343 telephone
(334) 954-7555 facsimile

Russ M. Herman (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
 Plaintiffs' Liaison Counsel

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
Co-Lead Counsel

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
& WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

PLAINTIFF'S STEERING COMMITTEE

CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiff's Memorandum in Opposition to Defendant's Motion to Exclude Testimony of Cornelia Pechmann, Ph.D. has been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail or by hand delivery and e-mail, on Merck's Counsel, Douglas R. Marvin and Philip S. Beck,  by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this _7th_ day of November, 2006.

Andy D. Birchfield
Attorney for Plaintiff
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.



LEXISNEXIS' FILE & SERVE
11636609
E-SERVICE
Jun 26 2006
7:11PM

# Plaintiffs' Response re PECHMANN

# Exhibit 1A of 4

Ex 1 - 5-26-06 depo transcript

0001
1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF LOUISIANA
3
4   In re:  VIOXX                        )
    PRODUCTS LIABILITY LITIGATION        ) MDL Docket No. 1657
5                                        )
    This document relates to             ) Section L
6                                        )
    GERALD BARNETT,                      ) Judge Fallon
7                                        )
                    Plaintiff,           ) Civil Action No.
8                                        ) 2:06cv485
                    vs                   )
9                                        )
    MERCK & CO., INC.,                   )
10                                       )
                    Defendant.           )
11   _____    )
12
13
14
15         DEPOSITION OF CORNELIA PECHMANN, Ph.D.
16               Newport Beach, California
17               Friday, May 26, 2006
18
19
20
21
22   Reported by:
23   DIANA JANNIERE
     CSR NO. 10034
24   LA JOB No. 918215
     PHIL JOB No. 2153
25

0002
1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF LOUISIANA
3
4   In re:  VIOXX                        )
    PRODUCTS LIABILITY LITIGATION        ) MDL Docket No. 1657
5                                        )
    This document relates to             ) Section L
6                                        )
    GERALD BARNETT,                      ) Judge Fallon
7                                        )
                    Plaintiff,           ) Civil Action No.
8                                        ) 2:06cv485
                    vs                   )
9                                        )
    MERCK & CO., INC.,                   )
10                                       )
                    Defendant.           )
11   _____    )
12
13
14
15        DEPOSITION of CORNELIA PECHMANN, Ph.D., taken
16   on behalf of Defendant at 660 Newport Center, Suite 330,
17   Newport Beach, California, beginning at 8:30 A.M., and
18   ending at 7:30 P.M., Friday, May 26, 2006, before Diana
19   Janniere, Certified Shorthand Reporter No. 10034.
20

Page 1

PLAINTIFF'S
EXHIBIT

tabbies

1

Ex 1 - 5-26-06 depo transcript

```
21
22
23
24
25
0003
 1   APPEARANCES:
 2
 3   For Plaintiff:
 4           ROBINSON, CALCAGNIE & ROBINSON
             BY:  MARK ROBINSON, ESQ.
 5           620 Newport Center Drive, 7th Floor
             Newport Beach, California  92660
 6           (949) 720-1288
 7           LOPEZ, HODES, RESTAINO, MILAN & SKIKOS
             BY:  STEVEN J. SKIKOS, ESQ.
 8           625 Market Street, 11th Floor
             San Francisco, California  94105
 9           (415) 956-5257
             sskikos@lopez-hodes.com
10
11   For Defendant:
12           BARTLIT, BECK, HERMAN, PALENCHAR & SCOTT, LLP
             BY:  ANDREW L. GOLDMAN, ESQ.
13           54 West Hubbard Street, Suite 300
             Chicago, Illinois  60610
14           (312) 494-4400
             andrew.goldman@bartlit-beck.com
15
16   For Stewart Grossberg/California Case:
17           GIRARDI AND KEESE
             BY:  JAMES G. O'CALLAHAN, ESQ.
18           1126 Wilshire Boulevard,
             Los Angeles, California  90017-1904
19           (213) 977-0211
20
21
22
23
24
25
0004
 1                         INDEX
 2   WITNESS                        EXAMINATION
 3   CORNELIA PECHMANN, Ph.D.
 4
 5               MR. GOLDMAN           6, 336
 6               MR. SKIKOS              288
 7               MR. O'CALLAHAN          330
 8
 9                       EXHIBITS
10   DEFENDANT'S      DESCRIPTION          PAGE
11      1    Deposition Notice              12
12      2    Dr. Pechmann's Expert Report   35
13      3    Dr. Pechmann's Invoice         35
14      4    Merck Vioxx Case: Involved Parties
             and Technical Terms 4-06       55
15
16      5    Handwritten Notes/Scientific Testing   68
17      6    Blank Sheet with Exhibit Stamp on it   91
        7    The National Yough Anti-drug Media
```

Page 2

Ex 1 - 5-26-06 depo transcript

```
18                  Campaign Copy Test System           155
19        8         Do Consumers Over generalize one-sided
                    Comparative Price Claims and Are.
20                  More Stringent Regulations Needed?   286
21        9         An Assessment of U.S. and Canadian
                    Smoking Objectives for the year 2000 286
22
          10        Quasi-Experimentation Design and
23                  Analysis Issues                      286
24        11        Outline of Pechmann Expert Report    287
25        12        Expert Report Exhibit Binder, 1 of 3 287
```

0005
1                       INDEX (Continued):
2
3                           EXHIBITS
4       DEFENDANT'S       DESCRIPTION            PAGE

```
5        13        Expert Report Exhibit Binder, 1 of 2  287
6        14        Expert Report Exhibit Binder, 1 of 3  287
7        15        Various E-mail Correspondence         287
```

8
9
10                  INSTRUCTED NOT TO ANSWER
11                  PAGE      LINE
12                  121        6
13
14
15
16
17
18
19
20
21
22
23
24
25
0006
1          Newport Beach, California, Friday, May 26, 2006
2                    8:30 A.M. - 7:30 P.M.
3
4                 CORNELIA PECHMANN, Ph.D.,
5         having been duly sworn, testified as follows:
6
7                        EXAMINATION
8       BY MR. GOLDMAN:
9          Q    Good morning, Dr. Pechmann.
10         A    Yes.
11         Q    Can you please state your name for the record?
12         A    Cornelia Pechmann.
13         MR. ROBINSON:  Better known as Connie.
14         THE WITNESS:  Better known as Connie.
15      BY MR. GOLDMAN:
16         Q    Do you understand that you have been designated
17      as an expert witness in the Barnett case in the federal
18      litigation?
19         A    Yes.
20         Q    I am going to remind you of some of the ground
21      rules for deposition.  I know we have been through this
22      drill before.  And I am going to ask you some questions.
23              If you don't understand what I am asking,
24      please ask me to rephrase.  Okay?
25         A    Okay.

                        Page 3

Ex 1 - 5-26-06 depo transcript

0007
```
 1      Q     Try not to interrupt each other.  Please let me
 2   finish my question and I will try to let you finish your
 3   answer.
 4      A     Okay.
 5      Q     And if you need to take a break for any reason,
 6   Dr. Pechmann, let me know, and we will take a break.
 7      A     Okay.
 8      Q     Can you tell me what you did to prepare for
 9   your deposition today?
10      A     I reviewed several boxes of documents regarding
11   Merck's integrated marketing integrations campaign for
12   Vioxx, and I focused particular attention of the science
13   of the campaign.
14            There were six major types of research that
15   they conducted to evaluate the campaign and fine-tuned
16   it.  So I spent about 200 hours total at least on these
17   documents.
18            And about half of that, I spent on the
19   different research studies trying to understand the
20   methods, the findings, the validity of the research;
21   what it all meant.
22      Q     Was -- were the boxes that you reviewed boxes
23   of documents that you prepared or that you were given by
24   plaintiff's lawyers?
25      A     I met every couple of weeks with one of the
```
0008
```
 1   attorneys at Robinson, Calcagnie and Robinson and worked
 2   with that attorney to get the documents I needed.
 3            I worked on a similar integrated marketing
 4   campaign.  So I knew what key words to use, to search
 5   for the documents.  So working with him, primarily Chris
 6   Spiro, we identified the documents that I needed.
 7            I mean, we did not find everything, but we
 8   found a reasonable amount.  The rest he said that he
 9   could not find anywhere.
10      Q     What similar integrated marketing
11   communications campaign had you worked on before?
12      A     I worked on the anti-drug ad campaign for about
13   five years.  That was run by the office of National
14   Control Drug Policy, the U.S. Office of National Control
15   Drug Policy.  It is under the White House.
16            And I was one of the six members of the
17   behavioral change expert panel and I was specifically
18   chosen for that panel to oversee all the research, the
19   science.
20      Q     Oversee the research and science in what?
21      A     In that integrated marketing campaign and it
22   was very similar to the science that you see here in
23   this campaign.
24            So I worked with the different marketing
25   research firms.  I evaluated their methods.  I evaluated
```
0009
```
 1   their findings for that campaign, and I, basically, did
 2   the same thing with this campaign.
 3      Q     Tell me what you mean by "science," when you
 4   say you reviewed and evaluated the science involved in
 5   the anti-drug ad campaign?
 6      A     Okay.  Well, marketing -- I think a lot of
 7   people think marketing is just some creative-type
 8   sitting down and figuring out some creative ads; but
 9   marketing has become a very, very sophisticated science.
10            And we do two basic types of research.  One is
```

Page 4

Ex 1 - 5-26-06 depo transcript

11   a controlled experiment where you expose people to
12   different campaign materials before you are using it and
13   test the effectiveness of it.
14        So a pretest, and do statistical analyses and
15   compare one approach to another and compare different
16   groups, how different people react in statistically.
17        One of the things in the anti-drug campaign
18   that we tried to make sure that none of the ads were --
19   had unintended effects or misleading or confusing to the
20   audience members, which is a challenge.
21        But anyway, we tested all of these ads and all
22   of these ads we tested before they were aired and they
23   did the same thing here in this campaign.
24        Q    I'm sorry.  Who did that?
25        A    The Merck research people.  They had several
0010
1    different research people, research firms.  The primary
2    firm they used was Millward Brown, which we actually
3    used, too, because I worked with Ogilvy and they worked
4    with Ogilvy.  There is two different groups of Ogilvy.
5         Anyway, they were using major vendors and we
6    were using major vendors.  And so there was overlap in
7    the venders that we used and even considerable overlap
8    of the research.
9         (Discussion held off the record.)
10   BY MR. GOLDMAN:
11        Q    What was your role on the anti-drug ad
12   campaign, your role specifically?
13        A    Well, I was a member of this behavioral change
14   expert panel and I was responsible for these two types
15   of research:  Copy testing, and the other type is
16   tracking.
17        So tracking is what you do once the ads have
18   aired.  You continually are surveying members of your
19   target audience every month and asking them their
20   perception of the brand and their behaviors.
21        In this campaign, they actually had sales data.
22   In the case of marijuana, we did not have sales data.
23   It is illegal.  So we cannot track, but they had
24   pharmacy data.  So they could actually look at sales.
25        So what you are doing with tracking is that you
0011
1    are looking for the effect of your campaign out in the
2    field, and that is important because other factors could
3    occur.
4         For in the case of marijuana, you could have a
5    movie that is pro marijuana.  It can really screw up
6    your campaign, temporarily at least.
7         And in this campaign, you had events like the
8    "New York Times" article or a JAMA article; and so they
9    would track what was the effect of those external events
10   on people's perception relative to what was the effect
11   of their campaign; and these were statistical analyses.
12        Q    I am going to come back to the anti-drug
13   campaign in a minute and talk about the similarities
14   that you see in this case.
15        A    Okay.
16        Q    I want to focus first on what you did to
17   prepare for your deposition and you said that you
18   reviewed several boxes of documents on Merck's
19   integrated marketing communications campaign?
20        A    Correct.
21        Q    What else did you do?

Page 5

                    Ex 1 - 5-26-06 depo transcript
22       A    I met on occasion with the attorneys to request
23  more documents.
24       Q    Um-hmm.
25       A    And yesterday I met with Steve and started to
0012
1   explain to him my findings and what was the science and
2   what was the science telling me; what was the different
3   types of studies.
4            But up until yesterday, we did not have a
5   chance to talk about what I found is pretty much what is
6   in my report.  I had -- I would have spoken to Mark,
7   too, but except he was sick.
8        Q    Let me hand you Exhibit 1.
9            MR. GOLDMAN:  And I should have said this at
10  the beginning of the deposition to be clear, but it is
11  my understanding that this deposition is being taken for
12  purposes of the Barnett case and the MDL.
13           (Discussion held off the record.)
14           (Defendant's Exhibit 1 was marked
15           for identification by the court
16           reporter.)
17           MR. O'CALLAHAN:  Let me interject that this was
18  also noticed in California JCP 4247 Vioxx case and your
19  firm, of course, is involved in that case as well.
20           I spoke yesterday with Ralph Camateo, who
21  indicated that to the extent that Dr. Pechmann's
22  opinions were opinions that would extend to what
23  happened in California, that he would -- he would have
24  no objection to the deposition going forward in
25  California as well.
0013
1            MR. GOLDMAN:  Okay.  I'm not sure about that
2   conversation, but you can sort that out with
3   Mr. Camateo.  All I know is, I am here to take the
4   deposition for purposes of the Barnett case in the MDL.
5            THE WITNESS:  Okay.  I want to just point out
6   that my name is misspelled here.  It is two C's and mine
7   has one C -- P-E-C-H-M-A-N-N -- in the real world.
8   BY MR. GOLDMAN:
9        Q    Okay.
10       A    It's okay.
11       Q    If you turn to the third page of Exhibit 1 or
12  fourth page, Dr. Pechmann, do you see that there are six
13  items asking for documents for you to produce?
14       A    That is on the third page of my document.
15       Q    Okay.  Do you see that?
16       A    Yes.
17       Q    Have you seen this list before?
18       A    No, but I was verbally told what to produce.
19       Q    Looking at the first request, "All
20           Materials that Dr. Pechmann has
21           reviewed prior to and since the time
22           she was retained as an expert in this
23           litigation that relate to Vioxx."
24           Have you produced those materials here today?
25       A    Yes.
0014
1        Q    No. 2 says, "All materials that
2            Dr. Pechmann relies and support for
3            her opinions in the Vioxx
4            litigation."
5            Have you produced all of those materials today?
6        A    Yes.

                        Page 6

```
                              Ex 1 - 5-26-06 depo transcript
      7      Q     No. 3 says, "All work product other
      8            Than draft reports that Dr. Pechmann
      9            has prepared in the Vioxx
     10            litigation."
     11            Have you brought those here today?
     12      A     I brought them here.  Some of them I have with
me here.  Like, you know, a note that I created.  And I
     13
     14  had given this, but I'm not sure you got a copy.  This
     15  is just another sheet.
     16      Q     I don't think I have.
     17      A     Okay.  Well, I can make you copies.
     18            MR. GOLDMAN:  Let's go off the record for a
     19  second.
     20            (Brief recess.)
     21  BY MR. GOLDMAN:
     22      Q     No. 4 says, "All statements
     23            Reflecting time, Dr. Pechmann has
     24            spent on Vioxx and bills she
     25            submitted for payment."
0015
      1            Have you brought those here today?
      2      A     Yes.
      3      Q     Have you billed the plaintiffs' lawyers for all
      4  of the time that you spent on Vioxx work, and is that
      5  reflected in those bills?
      6      A     Yes, I -- yes.
      7      Q     No. 5, "All notes and other
      8            Memorandum Dr. Pechmann prepared in
      9            the Vioxx litigation."
     10            Have you brought those here today?
     11      A     Yes.
     12      Q     No. 6 says, "All communications
     13            Dr. Pechmann has had with any
     14            plaintiffs' counsel in the Vioxx
     15            litigation."
     16            Have you brought those?  That would include the
     17  E-mails.
     18      A     It might -- yeah, there might -- I did not keep
     19  copies of the E-mail correspondence.
     20            For example, I would say, I am coming to UCI
     21  Irvine tomorrow.  I am going to pick up boxes.  I am
     22  going to be there at 3:00 P.M.  Have the boxes ready.
     23  That kind of thing.
     24            So there were on occasion that type of -- a few
     25  of those, and I did not print those out because I didn't
0016
      1  know I was supposed to.  And there might be a few -- a
      2  couple in my E-mail, which we can pull out at some
      3  point.
      4      Q     Would you please produce all the E-mails that
      5  you have on your hard drive whether in your sent mail or
      6  in your in-box or anywhere on your computer that relate
      7  to communications with plaintiffs' counsel in the Vioxx
      8  litigation?
      9      A     Sure.  I don't -- will I have time to do it at
     10  lunch?
     11      Q     That would be great if you can work any
     12  Internet connection and print them out.
     13            MR. ROBINSON:  And you can get it after the
     14  depo, whatever you prefer.
     15  BY MR. GOLDMAN:
     16      Q     I would prefer at lunch.
     17      A     Yes, whatever is easy.  There aren't many, but
```

Ex 1 - 5-26-06 depo transcript

```
18    they are there.
19         Q     Have you kept notes of conversations that you
20    have had with plaintiffs' counsel in the Vioxx
21    litigation?
22         A     No.
23         Q     Did you have notes at one point and then
24    discarded them, or did you not take notes at all?
25         A     I didn't take notes.
0017
1          Q     When were you first contacted, Dr. Pechmann, to
2     be an expert in this case?
3          A     December of 2005 -- end of December.
4          Q     Who contacted you?
5          A     Mark Robinson.
6          Q     What did Mr. Robinson ask you to do?
7          A     He first explained the case said that he had a
8     case on Vioxx and asked if I would be interested in
9     working as an expert, reviewing the integrated marketing
10    campaign, or the marketing campaign he probably said.
11    I'm not sure if he used the words integrated marketing.
12         And then we discussed the case a little bit
13    more and realized that Ogilvy was involved, which was
14    the same firm that I worked on the anti-drug campaign.
15         And so at that point, I knew that this was a
16    highly-sophisticated integrated marketing campaign with
17    extensive research because that is the way Ogilvy is.
18         And so I became interested in serving as an
19    expert because I knew there would be a lot of studies to
20    review and a lot of research.  And it wouldn't just be
21    my opinion.  There would be a lot of data and
22    statistics.
23         That is my area of expertise.  I really am a
24    scientist.  That is what I am comfortable doing and I
25    knew that I would know this research because we did
0018
1     similar research in the anti-drug -- let me just say,
2     too, that I also helped oversee the census ad campaign.
3          They did an big integrated campaign to get
4     people to fill out the census, and I have been involved
5     in other integrated campaigns; but the anti-drug one was
6     the most comparable; similar research techniques, and
7     vendors; and I was most involved in this one.
8          Q     So in late December 2005, Mr. Robinson, who is
9     one of the plaintiffs' lawyers in these cases, called
10    you up and explained the case to you; right?
11         A     Well, I think -- not really explained the case.
12    He just said there was a Vioxx case and he thought he
13    might want a marketing expert.
14         Then I tried to explain -- and then I explained
15    to him that -- we spoke and then he said Ogilvy.  And I
16    said, oh, I worked at Ogilvy.
17         And I tried to explain to him that it was
18    probably a very sophisticated marketing campaign with
19    lots of research.  And that I think I would be able to
20    help out.  That is my area of expertise.
21         And so then that is when he decided to retain
22    me.  And then as I looked at the documents, I realized I
23    was correct.
24         Q     Why did Mr. Robinson say he was considering
25    using you as a marketing expert?
0019
1          A     Because we -- I was involved in a tobacco
2     litigation called Daniels.  And he -- that was a class
```

Page 8