Ex 1 - 5-26-06 depo transcript

3    action case, and he had another related class action
4    case.
5            So the lawyer in Daniels asked me if I would
6    work with Mark, too.  So I think we met once -- maybe
7    not with Mark, but with someone else at his firm.  So
8    they knew who I was.
9            You will have to ask Mark exactly why he
10   thought of me.  The reason he knew me was that I was --
11   I had worked with him for -- for a few hours on that
12   other case.
13           Their other case ended up not going anywhere.
14   So I don't think that I ever submitted a bill or
15   anything, but I do recall that at one point we met with
16   somebody at his firm.  I don't remember -- really
17   remember if it was Mark or someone else.  He probably
18   remembers.
19       Q    What specifically did Mr. Robinson ask you to
20   do after you expressed an interest in the case?
21       A    To -- he asked me to come get the documents and
22   start looking at them.
23       Q    When did he formally retain you as an expert
24   witness?
25       A    I -- I think maybe even the first day we spoke,
0020
1    he made it clear that he wanted me to start working on
2    it.
3       Q    So you were retained the end of 2005?
4       A    Right.
5       Q    When did you start your work on the case?
6       A    I would have to refer to my invoices.
7            MR. ROBINSON:  They are coming.
8            THE WITNESS:  I think it was December or
9    probably early January.  I recall it being right around
10   New Year's.  So I believe I started after and in January
11   after New Year's, but maybe I started it at the end of
12   December.
13   BY MR. GOLDMAN:
14       Q    When did you form the opinions, Dr. Pechmann,
15   that you express in your report?
16       A    I finalized my opinions when I finalized the
17   report at the -- I prepared a semifinal report at the
18   end of last month, end of April.
19       Q    Had you reached your opinions about Merck's
20   marketing campaign before you finalized your report at
21   the end of April, 2005?
22       A    No.
23       Q    So you were actually forming your opinions as
24   you were writing them?
25       A    As I was looking at the research -- looking at
0021
1    the research and what the research said, and it took a
2    while to get the documents.  So they kind of trickled
3    in.
4            It wasn't really until then when I had the
5    complete set of documents and all -- by "documents," I
6    mean these extensive research reports and data and
7    interpretations of the data; and the statistical
8    analyses.
9            And I looked at each set of findings, assessed
10   the validity of the research, the validity of their
11   conclusions.  Stepped back:  What does this really mean
12   in terms of what the campaign was doing?
13           And then by the end of last month, I had

Page 9

Ex 1 - 5-26-06 depo transcript

```
14   reached the conclusions that are in my report.
15        Q    When did you begin to receive documents to
16   review that were sent by Mr. Robinson's firm?
17        A    Early January or maybe end of December.  I
18   can't remember the first date that we met.
19             After we spoke on the phone, I came to his
20   offices and picked up some documents then.
21        Q    When did you begin to review the extensive
22   research reports that you say that you reviewed?
23        A    In January.
24        Q    Well, you said it took a while for you to get
25   all of the documents --
0022
1         A    Well, some of them were --
2         Q    -- and so I am trying to get a sense from when
3    you received the materials that you really wanted to
4    review.
5         A    I started to receive them in January, yeah.  So
6    we received -- I received some of the materials right
7    away.  And some I received in February.
8              I received a huge slue towards the end of
9    February.  And then I received some in March.  And then
10   I think we uncovered a few more in early April.
11             After that, I don't think there were any new
12   ones.  It was just a matter of me going through them
13   all.
14        Q    So the big shipment of documents that you
15   received from the plaintiffs' lawyers came in February
16   of 2005?
17        A    Right.
18        Q    At the end of February?
19        A    Towards the end.  I can also --
20             MR. ROBINSON:  We are going to get them.  Why
21   don't we defer those questions until we get her bills
22   back?
23             THE WITNESS:  Yeah.  Mid to end of February.
24   BY MR. GOLDMAN:
25        Q    If we need to see your invoices for this, we
0023
1    can wait for this, too, but do you know how much time
2    you have actually spent reviewing documents prior to the
3    time you formed your opinions in this case?
4         A    I would have to look to give you the exact
5    number.  I would have to look at the invoices.
6         Q    Okay.
7         A    But, roughly, 200 hours.
8         Q    Do you know how many pages of documents you've
9    reviewed in those 200 hours?
10        A    I reviewed the documents that are in those
11   boxes.  So I have no idea how many pages that is.
12        Q    We will mark the boxes later, but you have
13   produced to me here --
14        A    Five boxes.
15        Q    -- one, two, three, four, five.  Five boxes of
16   documents; right?
17        A    Right.
18        Q    And we will inventory those five boxes of
19   documents shortly.  Okay.
20             How much are you charging the plaintiffs'
21   lawyers to testify in this litigation, ma'am?
22        A    $350 an hour.
23        Q    Do you keep that money or does it go somewhere?
24   Like charity?
```

Page 10

Ex 1 - 5-26-06 depo transcript
```
25    A    I am putting it in my child's college fund.
0024
1     Q    Good idea.
2     A    She is four.  So I have some time, but college
3   costs a lot.
4     Q    How many different meetings or conversations
5   have you had with plaintiffs' counsel in the Vioxx
6   litigation?
7          And if you could try to give it to me in
8   chronological order, great.  If you need your invoices
9   to be able to do that, then we can wait.
10    A    I think I could do it.
11         So we spoke at the end of December on the
12  phone.  We met in January.
13    Q    How long did you speak on the phone in
14  December?
15    A    An hour.  And then we met for -- well, you
16  know, it might help to look at the invoices, to tell you
17  the truth.
18    Q    You mentioned that you had served as an expert
19  witness for Mr. Robinson's firm.  Was that against
20  tobacco companies?
21         MR. ROBINSON:  I think I am going to object.
22         THE WITNESS:  I didn't actually say I worked
23  for his firm.  They approached me about being an expert
24  in the case, but the case never went anywhere, so I
25  never --
0025
1          MR. ROBINSON:  Were you actually deposed in
2   Daniels?
3          THE WITNESS:  Yes.
4          MR. ROBINSON:  I wasn't a lawyer on Daniels.
5   So I --
6   BY MR. GOLDMAN:
7     Q    Have you done any consulting work for the
8   Robinson, Calcagnie, and Robinson firm relating to
9   tobacco?
10    A    No.
11         MR. ROBINSON:  I want to say I did meet --
12         (Telephonic interruption.)
13         THE WITNESS:  "Work" meaning paid work or --
14  BY MR. GOLDMAN:
15    Q    Paid or pro bono work?
16    A    I would say it was a preliminary meeting.
17         MR. ROBINSON:  We had a consultation meeting.
18         THE WITNESS:  Well, yeah --
19         MR. GOLDMAN:  Mark, I am trying to get the
20  witness to answer, not you.
21         MR. ROBINSON:  Okay.
22         THE WITNESS:  In my mind, I would not
23  characterize it as working for them because I was not
24  billing.  It was just a meet -- an initial meeting where
25  we met as a group and talked about some issues regarding
0026
1   the case.
2          And I believe I mostly just sat in and listened
3   to what another expert was saying and that is my
4   recollection.  I was really there for the Daniels' case;
5   but in the back of my mind, I knew that the Robinson,
6   Calcagnie, Robinson firm had another case that I might
7   get involved in; but it never went anywhere, so --
8   BY MR. GOLDMAN:
9     Q    Would it be incorrect then to say that you were
```

Page 11

Ex 1 - 5-26-06 depo transcript

10    a consultant, or did consulting for Mr. Robinson's firm
11    in the tobacco litigation in 2004?
12       A   I don't know how you want to characterize it.
13    I met with some of the attorneys for an afternoon.  I
14    was never retained as an expert or paid, so --
15       Q   Dr. Pechmann, let me ask you whether you agree
16    with this or not:  Were you a consultant, whether you
17    were paid or not, for Mr. Robinson's firm in the tobacco
18    litigation in 2004?
19       A   To be conservative, I would say yes
20    because I did meet with him that afternoon.
21       Q   Your C.V. indicates that you have been a
22    consultant to that firm from 2004 to the present in
23    tobacco litigation; is that not accurate?
24       A   It is not accurate.  My C.V. says that?
25       Q   Page 11.
0027

1       A   Wow, that is wrong.  I know at the time that I
2    wrote that -- I am thinking about this.  I knew that the
3    case could warm up or could reappear.
4       So at the time I wrote that, I knew I was on
5    hold, but when I spoke to Mark on this case, he said
6    that other case had pretty much died.
7       I should fix that now.
8       Q   Have you served as an expert witness in cases
9    involving tobacco?
10       A   Yes.
11       Q   Have you served as an expert witness in any
12    other type of case?
13       A   Yes.
14       Q   What other cases have you been an expert in?
15       A   One of my first -- I participated in a case
16    involving comparative advertising and --
17       Q   What is comparative advertising?
18       A   Comparative advertising is advertising where
19    the sponsoring brand names the competitor brand and
20    shows their trademark and uses their trademark.
21       And this case involved a Canadian trademark law
22    and whether the comparative ad complied or did not
23    comply with Canadian trademark law.
24       Q   Other than tobacco cases and this Canadian
25    trademark case, what other cases have you testified as
0028

1    an expert witness in?
2       A   I testified in an arbitration for Rogers and
3    Sheffield involving sales force negotiations.
4       Q   Are you looking somewhere on your C.V.?
5       A   Yes.  Right here, on Page 12.
6       Q   Which entry is that?
7       A   Rogers and Sheffield about halfway down the
8    list on Page 12.
9       Q   Did you testify as an expert in this case?
10       A   In an arbitration, yes.
11       Q   And what was that case about?
12       A   It was a long time ago, but it had to do with
13    sales representatives discussion of a product.
14       Q   What product?
15       A   I believe it was a high tech product.
16       Q   Where did the sales representatives work?  What
17    company?
18       A   I have no idea.  I cannot remember.
19       Q   Do you have any transcripts or reports that you
20    generated in that case?

Ex 1 - 5-26-06 depo transcript

```
21    A    No.
22    Q    What was the name of the lawyer who you worked
23  with at Rogers and Sheffield on the arbitration?
24    A    I can't remember.  It was a long time ago.
25    Q    When was it?
0029
 1    A    Late '80's.
 2    Q    Can you be anymore specific about your expert
 3  testimony in the case that you worked on for Rogers and
 4  Sheffield in the late 1980's?
 5    A    I believe it had to do with whether the sales
 6  representatives were complying with a contract.  They
 7  had a contract to maybe sell this product and not a
 8  competitive product; and what they were doing was
 9  selling the competitor product in violation of the
10  contract.
11    Q    So what was your role?
12    A    I think it was just to discuss what would
13  typically happen in these types of conversations and
14  how -- what typically would happen compared to what did
15  happen.  And I really can't remember the details.
16    Q    When you say it was part of your role to
17  testify about what typically happens in these types of
18  conversations, what are you talking about?
19    A    A face-to-face sales meeting.
20    Q    With whom?
21    A    So it was with a sales rep and a company, a
22  buyer at a company versus a sales rep.
23    Q    And what expertise do you have in knowing what
24  types of conversations typically occur between buyers at
25  companies and sales reps?
0030
 1    MR. ROBINSON:  I'm sorry.  Are we back on the
 2  1988 thing?
 3    MR. GOLDMAN:  Yes.
 4    THE WITNESS:  I teach a course that covers that
 5  topic.  Sales -- that covers as part of the material.
 6  BY MR. GOLDMAN:
 7    Q    What is the course that you teach on sales
 8  representative's interactions with buyers at companies?
 9    A    Marketing Management -- actually, it was called
10  Principles of Marketing.
11    Q    What types of --
12    A    Or manage -- or Marketing Management, one of
13  those two titles.
14    Q    What types of sales reps do you discuss in that
15  course?
16    A    We discuss a variety of sales rep encounters.
17  I stress that what happens between a sales rep and a
18  buyer is very consistent across industries.
19    Q    What does that mean?
20    A    Meaning, that the same techniques apply.
21    Q    What are the techniques?
22    MR. ROBINSON:  I am going to object.  This
23  calls for a narrative.
24  BY MR. GOLDMAN:
25    Q    You can answer.
0031
 1    A    Okay.  Well, you get to know the buyer.  You
 2  know your product.  You figure out the match between
 3  your product and what the buyer wants.  You interview
 4  the buyer.  You --
 5    Q    So these --
```

Page 13

```
                         Ex 1 - 5-26-06 depo transcript
 6              MR. SKIKOS:  Let her finish.
 7   BY MR. GOLDMAN:
 8        Q    I now get the point.
 9        A    Okay.
10        Q    The types of interactions that you are
11   describing between the sales representatives and buyers
12   of companies are different between the noninteractions
13   between sales reps that sell drugs and doctors; true?
14        A    No, they are similar.  I mean, that is an
15   extensive encounter with a sales representative; but
16   then there could be brief encounters, too, where you
17   just drop off a sample or drop off information; pop in
18   and ask if they have any questions or concerns.
19              So there is a variety of different sales
20   encounters and I taught that in the course.
21        Q    Are you holding yourself as an expert,
22   Dr. Pechmann, in the interactions between sales
23   representatives and physicians?
24        A    I am holding myself out as an expert in
25   integrated marketing communications, and one major
0032
 1   communication is between a sales rep and the doctor.
 2        Q    Have you ever surveyed doctors about their
 3   interactions with pharmaceutical sales representatives?
 4        A    No.  I have not personally done the surveys.
 5        Q    Have you ever --
 6              MR. SKIKOS:  She is not finished.
 7              MR. ROBINSON:  Were you finished with your
 8   answer?
 9              THE WITNESS:  Yes.
10   BY MR. GOLDMAN:
11        Q    Had you ever conducted any surveys or research
12   of pharmaceutical representatives?
13        A    I have not done research on pharmaceutical
14   representatives.
15        Q    Have you ever -- go ahead.
16        A    I have done extensive reading on -- in ad
17   journals about those types of encounters.  So I am
18   familiar with the research, quite familiar with the
19   research, but myself have not done that research.
20        Q    What publications are you thinking about that
21   discuss interactions between pharmaceutical sales
22   representatives and doctors?
23        A    Well, in my -- one of my folders, I have
24   several articles.  A whole pile of articles, actually.
25        Q    Would you find those for me on a break?
0033
 1        A    Sure.
 2        Q    Okay.  Other than the comparative advertising
 3   case where you testified about Canadian trademark law
 4   and the case in the late 1980's when you were talking
 5   about sales representatives and their interactions with
 6   buyers of products, what other cases have you worked as
 7   an expert witness in other than tobacco?
 8        A    I was involved in the case against Orange
 9   County.  Munger, Tolls and Olson was the law firm and I
10   conducted research for them regarding changing the venue
11   from Orange County to some other neutral county.
12              And I did an analysis of the media coverage of
13   the Orange County bankruptcy to argue that -- to reach
14   the conclusion that, that citizens of Orange County had
15   seen extensive negative coverage of -- you know, of --
16   actually, it is the -- it was one of the financial firms
```

```
                     Ex 1 - 5-26-06 depo transcript
17  that worked with Orange County.
18          One of the accounting firms that worked at
19  Orange County that worked through Munger, Tolls and
20  Olson -- I can't remember.  Maybe it was Merrill Lynch.
21  I'm not sure what firm it was in.
22          Orange County was in bankruptcy.  There was an
23  accounting firm that worked with Orange County.  They
24  were faced with litigation and I assessed the media
25  coverage in Orange County with regard to moving the
0034
1   venue outside of Orange County.
2       Q    Remind me, and jurors, who might hear this --
3       A    Oh, here it is.  It is Merrill Lynch.  Yes.  It
4   was on my vitae.  Sorry.
5       Q    What was the -- why were you -- withdrawn.
6            Tell me about the issue about moving the venue
7   of Orange County, briefly.
8            what does that have to do --
9       A    Well, they wanted to find out what the
10  newspapers were saying about Merrill Lynch.
11      Q    Oh, you are talking about a litigant, who was
12  interested in knowing whether they should move a case
13  away from Orange County based on publicity that was
14  made?
15      A    Correct.
16      Q    Okay.  Can you name any other cases that you
17  have testified or consulted as an expert?
18      A    No.
19      Q    Have you ever consulted or testified as an
20  expert in a case involving prescription drugs?
21      A    No.
22      Q    Let me hand you a corrected copy of your
23  report.
24      A    Okay.
25           MR. GOLDMAN:  I will mark this as Exhibit 2.
0035
1            (Defendant's Exhibit 2 was marked
2             for identification by the court
3             reporter.)
4   BY MR. GOLDMAN:
5       Q    Just for the record, the corrected copy
6   contains a few corrected citations; right?
7       A    Correct.
8       Q    The opinions that you expressed and the
9   substantive changes that you made in your original
10  report have not changed?
11      A    Correct.
12      Q    When did you start writing your report,
13  Dr. Pechmann?
14      A    I think towards the end of January, mid to --
15  middle of January, yes.  So as you see here on the
16  invoice there was a week in January where I started to
17  work on the report.
18      Q    Can I get a copy now of the time entries?
19           MR. ROBINSON:  We gave you one.  I handed you a
20  stack of stuff.
21           MR. GOLDMAN:  I will mark as Exhibit 3, your
22  time records for the time you have spent in the Vioxx
23  litigation.
24           (Defendant's Exhibit 3 was marked
25            for identification by the court
0036
1            reporter.)
```

Page 15

Ex 1 - 5-26-06 depo transcript

```
 2   BY MR. GOLDMAN:
 3       Q    Is that right, Dr. Pechmann?
 4       A    Yes.  I have to state now that it was actually
 5   March that things were -- is it was not February.  It
 6   was March when --
 7              MR. ROBINSON:  When what?
 8              THE WITNESS:  -- when I started to get a lot of
 9   documents.  I was one month off.
10   BY MR. GOLDMAN:
11       Q    So you --
12       A    I didn't do any work in February.
13       Q    You started to prepare your report in January
14   of 2006 and then you received the bulk of your materials
15   to review in March of 2006; right?
16       A    I received a lot of materials in January.  So I
17   said I spent about half of the time on research and half
18   of the time understanding other aspects of the case like
19   the depositions of the marketing experts and what the
20   FDA said about the product.
21              Right from the beginning, I could see all of
22   the ads that they used.  So there was quite a bit that I
23   had received in January.  And then I found many --
24   working with the attorneys, I found many additional
25   documents that I was receiving in February and reviewing
0037
 1   in February and March.
 2              MR. ROBINSON:  I'm sorry.  February?
 3              THE WITNESS:  I'm sorry.  I keep saying it
 4   wrong.
 5              MR. ROBINSON:  Right.
 6              THE WITNESS:  March and April.
 7   BY MR. GOLDMAN:
 8       Q    Can you tell me looking at the first page of
 9   Exhibit 1 -- Exhibit 3, what these handwritten notes
10   mean?  Are they your handwritten notes?
11       A    I'm sorry.  Page 1?
12       Q    Yes.
13       A    Yes.  So these are hours that I spent just over
14   the past week on refreshing, getting back up to speed on
15   my report and on all of the studies that I had reviewed.
16       Q    So today is May 26th; right?
17       A    Is it?
18       Q    And you worked two hours on May 20th,
19   four-and-a-half hours on May 22nd, five-and-a-half hours
20   on May 23rd; right?
21       A    Well, I am a little confused because you said
22   today is the 26th.  So something must be wrong with the
23   dates.
24              MR. ROBINSON:  Thursday was not May 24th.
25              THE WITNESS:  Okay.  Thursday was the 25th.
0038
 1              Got it.  That's right.  Okay.  I'm sorry.
 2   Can you ask me the question again?
 3   BY MR. GOLDMAN:
 4       Q    Did you work two hours on May 20,
 5   four-and-a-half hours on May 22nd, five-and-a-half hours
 6   on May 23rd?
 7       A    Correct.
 8       Q    Did you work at all yesterday May 24th
 9   preparing for your deposition?
10       A    Yesterday was May 25th.  That is where I made
11   the typo.
12       Q    Got it.
```

Page 16

Ex 1 - 5-26-06 depo transcript

```
13      A     Yes.  I did work yesterday.  I spent most of
14  the day with Steve.  I think we started at 10:00 in the
15  morning and finished -- I should have written it down --
16  maybe 7:00 at night.
17      Q     Can I write that down on this exhibit?
18      A     Sure.
19      Q     So on May 25th, you worked with Steve and
20  Steve's last name is Skikos?
21      A     Skikos.
22      Q     And he is one of the plaintiffs' lawyers in the
23  case?
24      A     Yes.
25      Q     So you worked with Steve Skikos from 10:00 A.M.
0039
 1  to 7:00 P.M.?
 2      A     Yes.
 3      Q     What did you guys work on?
 4      A     I went through each of the studies that I
 5  reviewed and described what the study was, what was the
 6  method; what I called -- what I called the method; what
 7  my background was in that type of research; what was the
 8  findings; and how did I reach my conclusions; and my
 9  opinions based on those findings.
10      Q     Can you identify each of the studies that you
11  just referred to?
12      A     Yes.  In fact, I took -- I should have asked
13  for copies to be made.  I'm sorry.
14            I took notes as I was going through the
15  documents and so these are all of the different studies
16  and the findings.
17      Q     If you can make a copy on that and I can ask
18  you some questions about that.
19      A     I'm sorry.  I was not thinking.
20      Q     Looking at the second page, Dr. Pechmann, on
21  Exhibit 3, it indicates that between December 28, 2005
22  and January 19th, 2006, you worked for 123 1/2 hours for
23  a total of $43,225; right?
24      A     Yes.
25      Q     And do you know based on the entries on this
0040
 1  page, which of the entries relate to discussions with
 2  plaintiffs' counsel, and which related to your own
 3  independent work?
 4      A     Well, I know that the -- though, I am not 100
 5  percent certain.  I know that one of these -- I would
 6  assume -- my guess would be that the 28th -- the time on
 7  the 20th is when we met.  And then --
 8      Q     That was for two-and-a-half hours with
 9  Mr. Robinson?
10      A     I am not 100 percent certain, but that is what
11  I believe it represents, yes.  And I am not -- I don't
12  remember meeting with him again at all at that time.
13      Q     What about meetings --
14      A     With anyone.  Let me explain that.
15            There is another attorney in the office, Lexi
16  Myer --
17      Q     Um-hmm.
18      A     -- who lives right by my house.  So she would
19  drop off boxes of documents at my house.  I wasn't
20  teaching in January.  So I was not down there that much.
21      Q     Which of the entries on Exhibit 3 in the first
22  page where you list your hours relate to meetings with
23  plaintiffs' counsel other than Mr. Robinson?
```

Page 17

```
                         Ex 1 - 5-26-06 depo transcript
24          MR. SKIKOS:  I think you mean the second page;
25     don't you?
0041
 1          MR. GOLDMAN:  The first page with the detail.
 2     Let me ask the question again.
 3          Q    On Exhibit 3, second page, can you tell me
 4     which of the entries there relate to meetings or
 5     telephone conversations you had with plaintiffs' counsel
 6     other than Mr. Robinson?
 7          A    I don't recall there being any other meetings,
 8     but there could have possibly been a brief phone
 9     conversation saying more documents were coming or
10     describing the documents, or me requesting documents of
11     Lexi when she dropped them off.
12          Q    Okay.  Second page indicates that from March 10
13     to March --
14          MR. ROBINSON:  Actually, this is the third
15     page.  I'm sorry.
16          THE WITNESS:  Yeah.
17     BY MR. GOLDMAN:
18          Q    The third page of Exhibit 3 indicates that you
19     worked 34 hours from March 10th, 2006, through
20     March 17th, 2006; right?
21          A    Yes.
22          Q    So you did not work on the Vioxx litigation or
23     your report at any point between January 19th and
24     February 10, 2006; correct?
25          A    March 10th.  You are doing the same thing as
0042
 1     me.
 2          Q    Sorry.
 3          A    March 10, correct.
 4          Q    Am I right, Dr. Pechmann, that you didn't work
 5     on the Vioxx litigation or your report or reading
 6     documents at any point between January 19, 2006 and
 7     March 10, 2006?
 8          A    Correct.
 9          Q    Are any of the entries on the third page of
10     Exhibit 3 meetings you had with plaintiffs' counsel?
11          A    Yes.
12          Q    Which ones?
13          A    I believe it is 3/15/06 and I can check with my
14     organizer, but I think the 4:00 P.M. to 11:00 P.M. was
15     the trip I took to San Jose to meet with Steve Skikos.
16          Q    And during your meeting with Steve Skikos on
17     March 15 of 2006, did you review your draft report with
18     him?
19          A    I actually should clarify that Mark was also
20     there.  So Mark was up there.  Steve was there, and I
21     was there.
22               No, we didn't spend much time.  Maybe we spent
23     a little time on the draft report, but I spent a lot of
24     time describing the type of research that I know goes
25     into this campaign and describing the types of documents
0043
 1     I still wanted to see to help me understand what was
 2     going on with this campaign.
 3          Q    Did you meet with Mr. Robinson and Mr. Skikos
 4     to obtain feedback on the report that you had drafted in
 5     January of 2006?
 6          A    They didn't tell me why we were meeting.
 7          Q    That wasn't my question.
 8               When you met with plaintiffs' counsel on March
```

                            Page 18

Ex 1 - 5-26-06 depo transcript

```
 9  15th of 2006, did you obtain feedback on the report that
10  you had drafted in January?
11       A    Yes, I received something back.
12       Q    Did you discuss strategy with Mr. Robinson and
13  Mr. Skikos on March 15th, 2006?
14       A    What do you mean by "strategy"?
15       Q    Well, you wrote it down on the third page and
16  you say, "Tasks:  Discuss strategy."
17            So tell me what strategy you discussed with
18  Mr. Robinson and Mr. Skikos on March 15 of 2006.
19       A    I can't be certain what I was thinking when I
20  wrote that, but my recollection is that we extensively
21  discussed the general orientation of the report.
22            And I said that I wanted it to be focused on
23  marketing and the marketing research and not just -- not
24  on the medical issues.  So not on, you know, what the
25  FDA said or what any of their other medical experts
0044
 1  said; or what the articles were that I wanted to focus
 2  and research -- I wanted to focus the report on what my
 3  area of expertise was, which was marketing research.
 4            And they agreed that it was a good thing to do.
 5       Q    Did you then revise your report after you
 6  obtained feedback from plaintiffs' counsel on March 15,
 7  2006?
 8       A    I would say I extended the report and I put the
 9  medical part of it in the Appendix.  So I reorganized
10  it.
11       Q    When you say the medical part of your report,
12  you are referring to your opinion about what Merck knew
13  or should have known about the cardiovascular risks
14  associated with Vioxx?
15       A    Yes, and I am also referring to the FDA
16  regulations.
17       Q    Would you agree with me, Dr. Pechmann, you are
18  not an expert of what Merck knew or should have known
19  about the cardiovascular risks associated with Vioxx?
20       A    I formed an opinion about what they knew or
21  should have known.  I think that I have enough expertise
22  as a scientist to understand what the FDA was telling
23  them and what some of the basic studies were about.
24            And, yes, I do think I have expertise to answer
25  that question.
0045
 1       Q    Dr. Pechmann, are you holding yourself out as
 2  an expert in what Merck knew or should have known about
 3  the cardiovascular risks associated with Vioxx?
 4       A    Yes.
 5       Q    What experience do you have, ma'am, in the
 6  cardiovascular risks associated with COX-2 inhibitors?
 7       A    I read what the FDA reports were on Vioxx.
 8       Q    What reports?
 9       A    Of the Advisory Committee Report.
10       Q    And you read that after you were retained as an
11  expert in this case; correct?
12       A    Yes.
13       Q    Okay.
14       A    I read the -- the reports of the staff at FDA
15  that -- that preceded the Advisory Committee Report, so
16  the medical officers reviews.
17            I read the Vigor Study that was published in
18  the Journal of American -- I mean, New England Journal
19  of Medicine.
```

Page 19

Ex 1 - 5-26-06 depo transcript

```
20        I read all of the subsequent editorials and
21   rejoiners that appeared in the New England Journal of
22   Medicine.  Let's see, what else?
23        And I read the label -- the proposed label for
24   Vioxx and all of the labels for Vioxx -- the proposed
25   labels and the actual labels.
0046
 1        Q     Have you told me all of the reasons why you
 2   think you are an expert in what Merck knew or should
 3   have known about the cardiovascular risks associated
 4   with Vioxx?
 5        A     I believe I have, but I may have missed
 6   something.
 7        Q     We will examine the Appendix a little bit
 8   later.  Okay?
 9        A     Okay.
10        Q     Why did you tell the plaintiffs' lawyers that
11   you wanted to put the section about what Merck knew or
12   should have known in an Appendix and not in the thrust
13   of your report?
14        A     Because I wanted the main body of the report to
15   talk about the integrated marketing campaign.
16        Q     Would you agree that at least you think you
17   have the experience to offer the opinions in the thrust
18   of your report, but you have real questions about
19   whether you have the experience to offer opinions about
20   what is in Appendix A?
21        A     No, I don't agree with that at all.  Really, it
22   was more of an editorial thing.  That it didn't flow
23   well to have that material in the Appendix in the front
24   end.
25        If I had been uncertain about my opinion, I
0047
 1   would not put it in the Appendix.  I would have taken it
 2   out completely.
 3        Q     In Exhibit 3, Page 3, you bill Mr. Robinson
 4   $11,942 for 34 hours work; right?
 5        A     Well, I billed $42 for the taxi.  So 11,900 for
 6   the work.
 7        Q     And the only meeting that you think occurred
 8   and the only material communications you think occurred
 9   here were on March 15, 2006?
10        A     That's my recollection, yes.
11        Q     Okay.  If you can turn to the next page.
12        This is the time you spent from March 30, 2006
13   through April 28, 2006, and you worked 67 hours during
14   that time frame; right?
15        A     Yes.
16        Q     For a total of $23,450; right?
17        A     Correct.
18        Q     And then here under Tasks, you wrote:
19        "Reviewed additional documents,
20        revised expert report, and met with
21        Paul Sizemore, Chris Spiro" --
22        A     Spiro.
23        Q     -- "Mark Robinson, Shannon Lukei --
24        A     Lukei.
25        Q     -- "other attorneys and a Vioxx
0048
 1        Sales representative."
 2        A     Yes.
 3        Q     Let's talk about that meeting.  How did that
 4   come about?
```

```
                            Ex 1 - 5-26-06 depo transcript
 5              MR. ROBINSON:  The sales reps, you mean?
 6  BY MR. GOLDMAN:
 7      Q    Is this one meeting that you had with Paul
 8  Sizemore, Chris Spiro, Mark Robinson, Shannon --
 9      A    No.
10      Q    Different meetings?
11      A    Yes.  Well, I believe on one day, I met with
12  Paul Sizemore and Mark Robinson briefly.  I met with
13  Shannon Lukei very briefly -- actually, I spoke with
14  Shannon Lukei over the phone.  I'm not sure I met her in
15  person.
16      Q    Um-hmm.
17      A    But she was the one that arranged the meeting
18  with a Vioxx representative because it was her friend.
19      Q    Who is Shannon Lukei?
20      A    She works part-time in Mark Robinson's office
21  as an attorney.
22      Q    You also indicate that you met with Chris
23  Spiro.  When did you meet with him?
24      A    Chris Spiro.
25      Q    Sorry.
0049
 1      A    He was the person who helped me pull the
 2  documents.  At this point, I was teaching at UCI Irvine
 3  and I would stop by their offices after teaching and
 4  pick up documents from him and asked him to look for
 5  certain documents.
 6      Q    When did you meet with Mr. Sizemore and
 7  Mr. Robinson in this time frame?
 8      A    I'm not sure which date it was.
 9      Q    Can you look at the times and try to refresh
10  your recollection as to how much time you spent with
11  them?
12      A    It was a very short period of time.  I remember
13  it was late in the day and Paul wanted to meet with me
14  and so maybe an hour and a half.  And then maybe 15
15  minutes of that Mark was there.
16      Q    And what did you talk about with Mr. Sizemore?
17      A    He discussed the case that he was involved in
18  that he would like me to be an expert on.  It is a case
19  in Florida.
20      Q    Another Vioxx case?
21      A    Yes.  It is in one of these handouts.  It is,
22  actually, in one of these handouts.  It is a case
23  involving Rafik Kozic, K-O-Z-I-C, and it is going to
24  take place -- the trial date is expected to be July 31,
25  2002 in Tampa, Florida.  And it might be televised on
0050
 1  Court TV.
 2      Q    I feel sorry for the viewers.
 3      A    Me, too.
 4      Q    You indicate here that you met with Chris
 5  Spiro.  Do you have any idea how much time you spent
 6  with him as you were discussing the documents?
 7              MR. ROBINSON:  I --
 8              THE WITNESS:  Maybe a total of half an hour to
 9  an hour.  It is mostly just picking things up and --
10  BY MR. GOLDMAN:
11      Q    You also reference here other attorneys.
12           Do you know what other attorneys you met within
13  this time frame, April of 2006?
14      A    I met with an attorney -- Ted is an attorney;
15  right?
```

Page 21

Ex 1 - 5-26-06 depo transcript

```
16              MR. ROBINSON:  Right.
17              THE WITNESS:  Ted Wacker.
18  BY MR. GOLDMAN:
19       Q   Of Mr. Robinson's firm?
20       A   Yes.  I think maybe the same meeting with Paul
21  Sizemore.  He came in and showed us the label or --
22  clarified an issue.  At one point, he came in and
23  clarified an issue with regard to a document.
24       Q   Who did?
25       A   Ted Wacker.
0051
 1       Q   What was the issue he clarified?
 2       A   We were looking -- I can't remember, but I
 3  believe it was where something was on the label -- on
 4  the Vioxx label.
 5       Q   Do you remember what the something was or where
 6  it was?
 7       A   Or maybe he just brought in the labels.
 8       Q   Is that the first time you have ever seen the
 9  Vioxx labels?
10       A   Oh, no.
11       Q   Have you seen the Vioxx labels before this
12  litigation?
13       A   No, I had not.
14       Q   Do you remember any substantive discussions you
15  had with Mr. Wacker about Vioxx's label?
16       A   No, I don't remember.  I believe I just met
17  with him and he gave us the different versions of the
18  label, and possibly explained that there were more than
19  one version.
20              But in terms of cardiovascular risk, they were
21  all about the same until the label changed in April of
22  2002.
23       Q   That is what Mr. Wacker told you?
24       A   He showed us -- he showed me the documents, and
25  then I reviewed them for myself and that is when I
0052
 1  reached the conclusion.
 2       Q   That?
 3       A   That they -- the labels were substantively the
 4  same with regard to cardiovascular risk unless the
 5  labels changed and included the Vigor Study.
 6       Q   On the last page of Exhibit 3, you spent 19
 7  hours between May 15 and May 19th and billed $6,650;
 8  right?
 9       A   Correct.
10       Q   You indicate that you reviewed additional
11  documents.  Do you know, as you sit here today, what
12  documents you reviewed then?
13       A   I remember some of the documents I got towards
14  the end were additional Dear Doctor letters.  The
15  documents that were specific to the Barnett case.  Some
16  of the depositions weren't even taken.
17              And so towards the end, I was reviewing
18  depositions that had just been taken for the Barnett
19  case.  So that was either in May -- well, it was either
20  of these documents involving May hours.
21       Q   How much time did you spend reviewing
22  documents specific to the Barnett case before you
23  reached the conclusions about what Mr. Barnett knew or
24  didn't know about the cardiovascular risk associated
25  with Vioxx?
0053
```

Page 22

Ex 1 - 5-26-06 depo transcript

1  A   I don't remember exactly, but it was however
2  long it took me to read those depositions and read
3  through all of the exhibits that accompanied the
4  depositions -- the relevant depositions that went with
5  the depositions.
6  Q   So the basis of your opinion about what
7  Mr. Barnett was told and knew about the cardiovascular
8  risks associated with Vioxx is based upon your review of
9  his deposition and the exhibits?
10  A   No.
11  Q   What else is it based on?
12  A   Well, he was part of the integrated -- he was a
13  subject of the integrated marketing communications
14  campaign.
15      So all of the work I did to understand the
16  campaign applies to what happened to him and the
17  doctors.
18  Q   Have you ever met with Mr. Barnett?
19  A   I think, as I recall, one day when I was
20  picking up boxes he happened to be there and I said
21  hello to him.
22  Q   Have you ever spoken to Mr. Barnett about
23  Vioxx?
24  A   No, not that I recall.
25  Q   Have you ever spoken with Mr. Barnett about
0054
1  what effect, if any, and how much -- withdrawn.
2      Have you ever spoken with Mr. Barnett about
3  what importance he attaches to advertising when he makes
4  decisions?
5  A   So what was the question again?  Have I ever
6  spoken to Mr. --
7  Q   To Mr. Barnett what impact, if any, he thinks
8  advertisements has on his decisions?
9  A   I don't believe so.  When we met briefly, we
10  may have spoken a few minutes, but I am not quite sure
11  what we spoke about.  I don't believe we spoke about
12  that.
13  Q   Okay.  On the last page of Exhibit 3, you
14  indicate that you reviewed additional documents, revised
15  your expert report, and met with Paul Sizemore, Chris
16  Spiro and Mark Robinson.
17      Did you meet with those individuals at the same
18  time, on the same day?
19  A   Again, I believe the meeting with Paul Sizemore
20  and Mark was on the same day, and Chris was just picking
21  up documents.
22  Q   Did you review your report with Mr. Robinson
23  and Mr. Sizemore and Mr. Spiro?
24  A   Paul Sizemore went through and commented on
25  typos.  He found a few typos and commented on a couple
0055
1  of words and said, do you want to make -- use that exact
2  word?  Is that precise?
3      You know, basically, said don't overstate your
4  opinion.  Make sure that what you state is something
5  that you can defend, but he didn't get into any
6  specifics.
7  Q   Did you get into any specifics about your
8  expert report with Mr. Robinson or Mr. Spiro?
9  A   No, not that I recall.
10  MR. GOLDMAN:  I am going to mark as Exhibit 4,
11  a document you produced today.  It is a document called

Page 23

```
                        Ex 1 - 5-26-06 depo transcript
12    Merck Vioxx Case Involved Parties and Technical Terms,
13    April, 2006.
14              (Defendant's Exhibit 4 was marked
15              for identification by the court
16              reporter.)
17    BY MR. GOLDMAN:
18        Q    Do you see that?
19        A    Yes.
20        Q    Now -- or April 6th; right?  Is that what that
21    means?
22        A    April, 2006.
23        Q    That is not a day of April; that is the year
24    that you are reflecting?
25        A    Correct.
0056
 1        Q    Who prepared this document?
 2        A    I did.
 3        Q    And it starts off by saying, "Barnett case."
 4             "Barnett took Vioxx from late
 5             December, '99 or early January,
 6             2000 through September, 2004
 7             when it was taken off the market."
 8             Who told you that?
 9        A    I received that information from the depos of
10    the physicians that treated Barnett.  And possibly, he
11    also said it in his depo, but it was from the
12    depositions in this case.
13        Q    Are you sure about that?
14             MR. ROBINSON:  Well, --
15             THE WITNESS:  Yes.
16    BY MR. GOLDMAN:
17        Q    Did you read all of Mr. Barnett's deposition?
18        A    I skimmed through it and then spent more time
19    on parts that were more of greater relevance.  I had it
20    on a PDF on my computer.  Actually, a text file on my
21    computer.
22        Q    Actually, the materials that you reviewed,
23    according to your report, were certain excerpts of
24    Mr. Barnett's deposition.
25             Do you remember those certain pages?
0057
 1        A    No, I reviewed the whole deposition.  I cited
 2    certain parts in my report.
 3        Q    So if, at the end of your report, you have a
 4    table or an index listing pages of depositions, are you
 5    saying that you actually reviewed the entire deposition
 6    and just cited to those particular pages?
 7        A    Correct.
 8        Q    So the next sentence says, "The
 9             Initial prescribing physician was
10             Dr. McCaffrey who refilled Barnett's
11             prescriptions without seeing him
12             through late 2000."
13             How did you know that?
14        A    From the depositions.  I believe from
15    McCaffrey's deposition.
16        Q    "In the meantime, internist
17             Dr. Micola took over Barnett's care
18             and filled Barnett's Vioxx
19             prescriptions after McCaffrey."
20             How did you know that?
21        A    From the depositions.
22        Q    "Trial date July 24, 2006.
                        Page 24
```

Ex 1 - 5-26-06 depo transcript
23          New Orleans (MDL) Mark Robinson lead
24          attorney."
25          How did you know that?
0058
1       A    Mark -- well, either Mark or Lexi Myer told me
2    the date and that he was lead attorney.
3       Q    Then there is a reference to Manzo case, and
4    there is a discussion about Tony Manzo.
5            "Tony Manzo took Vioxx August 1, 2003
6            to December 29, 2003 when he had his
7            heart attack."
8            Do you see that?
9       A    Yes.
10      Q    How did you know that?
11      A    I believe -- I believe Mark Robinson told me
12   that.
13      Q    Do you think that it is possible that
14   Mr. Sizemore told you that, or was it the Kozic case
15   Mr. Sizemore's case?
16      A    Kozic is Sizemore.  This -- I'm pretty sure
17   Mark Robinson told me this.
18      Q    "Rafik Kozic, a former professional
19           Athlete, who still played in club
20           leagues, took Vioxx in February, 2001
21           through April, 2001, when he had a
22           heart attack, caused by a thrombotic
23           clot."
24           Who told you that?
25      A    Paul Sizemore.
0059
1       Q    Does it appear to you, Dr. Pechmann, that this
2    document reflects notes that you took during a meeting
3    with Mr. Robinson and Mr. Sizemore?
4       A    These were two separate meetings, yes.  Um-hmm.
5    Probably.
6       Q    And then you list drugs and you have
7    Naproxen -- actually, let me go back.  What is a
8    thrombotic clot?
9       A    I have -- I probably have it described.
10      Q    Well, without looking at your report, can you
11   just tell me --
12      A    Well, it is basically a blocked blood vessel --
13   well, thromboembolic event is a blood clot.  So
14   thrombotic is just a blood clot.
15      Q    And who told you that?
16      A    I think -- basically, I looked these things up
17   in a dictionary.
18      Q    Under drugs, you wrote "Naproxen equals
19           Aleve, comparator in Vigor Study."
20           That was something that Mr. Robinson or
21   Mr. Sizemore told you; right?
22      A    No.  I believe that -- I believe I read that in
23   a document.  In one of the many documents that I read
24   about the Vigor Study.
25      Q    Did you read -- do you see "Celebrex = first
0060
1    COX-2 inhibitor Pharmacia/Pfizer" -- Did you read that
2    somewhere?
3       A    In the marketing documents.  There is a lot
4    about Celebrex in the marketing documents because that
5    is the competitor.  That is the major competitor to
6    Vioxx.
7       Q    Do you see under Studies it says, "Vigor," and

Page 25

Ex 1 - 5-26-06 depo transcript

```
 8    then there is a description about the Vigor Study?
 9            Do you see that?
10        A   Yes.
11        Q   Did you write that based on your own review of
12    the Vigor Study?
13        A   Yes.
14        Q   Do you see in the middle of the paragraph it
15    says, "Three Vioxx deaths were excluded
16            That if included it would show a
17            fivefold increase of aspirin
18            indicated patients and a threefold
19            marginal significant increase in
20            nonaspirin indicated patients."
21            Do you see that?
22        A   Yes.
23        Q   Where did you get that?
24        A   From the corrected findings reporter in the New
25    England Journal of Medicine, December 29, 2005.
0061
 1        Q   And the plaintiffs gave you that to read?
 2        A   Yes, I believe they gave it to me.
 3        Q   The Vigor on Label section, is it your
 4    testimony that you prepared that after doing your own
 5    review of the vigor label?
 6        A   Yes.
 7        Q   What was the Advantage Study? Without looking
 8    at your notes, can you tell me what the Advantage Study
 9    was?
10        A   It was a study that --
11        Q   You are looking at your notes.
12        A   Oh, I'm sorry.
13        Q   Can you tell me what the Advantage Study was?
14        A   Yes.  It was a study that Merck conducted that
15    was -- I believe it was against a placebo as opposed to
16    Naproxen and they found an increased risk --
17    cardiovascular risk.
18            And so they recommended that it be put on the
19    -- in the label because there was a distinct pattern and
20    it was against a placebo.  So --
21        Q   Was Naproxen in the Advantage Study?
22        A   Oh, no.  I was incorrect.  Wow.  So it was
23    against Naproxen but anyway it was similar to -- it
24    was -- the results were very similar.
25        Q   To what?
0062
 1        A   To the Vigor Study.
 2        Q   How were the results of the Vigor Study similar
 3    to the results of the Advantage Study?
 4        A   Both of them indicated an increase
 5    cardiovascular risk relative to the comparater --
 6    competitor drug for Vioxx.
 7        Q   Is it your testimony that there was a higher
 8    statistically significant risk of thrombotic events seen
 9    in the Vioxx arm of Advantage compared to the Naproxen
10    arm of Placebo?
11            MR. ROBINSON:  Calling for an expert opinion.
12            THE WITNESS:  What I would like to do is refer
13    to my description of the Advantage Study.  I don't have
14    everything memorized in here.
15            Later on, I have the information about the
16    Advantage Study that was in the proposed label.  Let's
17    see -- oh, I remember what happened here.  They used
18    aspirin.  That is what was -- that is what they -- in
```

Page 26

Ex 1 - 5-26-06 depo transcript

```
19   the Advantage Study, they used aspirin.
20        So that is why it was very interesting because
21   it was -- even though there was a change in the
22   protocol, you got very similar results.
23   BY MR. GOLDMAN:
24     Q    What results were similar?
25     A    You saw elevated cardiovascular events for
0063
1    Vioxx versus the comparator drug.
2      Q    Were there more strokes seen in the Vioxx arm
3    than the Naproxen arm of Advantage?
4      A    I would have to refer to the study.  I have a
5    copy of the study and I looked at the study.
6          At this point, I cannot remember what the --
7    exactly what the specifics were.
8      Q    Did you review the Approve Study?  Because all
9    you wrote here is "randomized trial of placebo calls
10   Vioxx withdrawal of September, 2004."
11     A    I believe I was not given it and did not ask
12   for and did not review it -- I'm not sure.  I can't
13   remember.  I have to check.  I may have the article that
14   came out from Approve.
15     Q    Did you review the Alzheimer's studies?
16     A    I reviewed the FDA discussion of these studies.
17     Q    Did you review the Alzheimer's studies?
18     A    You mean the actual studies themselves, no.
19     Q    Yes.
20     A    No.
21     Q    You referred to class on the second -- the back
22   page here, and there is a description of class; is that
23   a description that the plaintiffs' attorneys told you?
24     A    No.  I wrote all of this myself.
25     Q    I know you wrote it yourself, but the
0064
1    information that you were writing --
2      A    No.
3      Q    You read the study?
4      A    I read the study.  I am a scientist.  I read
5    studies all of the time.
6      Q    But you are not a medical doctor?
7      A    No, but I review for the American Medical
8    Association and I review scientific work all of the
9    time.  And I also review medical protocols that come to
10   the institutional review board.
11     Q    Let's skip down to Marketers and Marketing
12   Research.  Is this information that the plaintiffs'
13   attorneys gave to you?
14     A    I don't understand the question.  Can you
15   rephrase?
16     Q    Were you typing this information based on a
17   discussion you had with the plaintiffs' attorneys in
18   this case?
19     A    No.
20     Q    Do you see under Terms, PIR equals Professional
21   Information Request?
22     A    Yes.
23     Q    Did you know that before you became an expert
24   in this case?
25     A    That particular term, I did not know.  I
0065
1    learned it in going through the documents.
2      Q    Did you know the term OBR before you became
3    retained in this case?
```

Page 27

Ex 1 - 5-26-06 depo transcript

4      A    No, I did not.  I learned it in the case.
5      Q    If you turn to the next page, did you know what
6   TRX meant before you became an expert in this case?
7      A    No, I did not.  I had to find that in the
8   documents.
9      Q    How about A&A?  Did you know what that meant
10  before you were retained as an expert in this case?
11      A    Not this meaning, no.  I learned how they
12  defined it in reviewing the materials in this case.
13      Q    Do you see APTC?  And you describe what that
14  is?
15      A    Yes.
16      Q    Where did you get that meaning of APTC from?
17           "The Anti-platelet Trial
18           Collaboration = cardiovascular (CV),
19           hemorrhagic (heavy bleeding), and
20           unknown death."
21      A    Found in a document.  I am not sure which one,
22  but I found it in a document.  I don't remember which
23  one.
24           But as I read a document and I see a term, I
25  would stop and add it to my list here in case it was
0066
1   important.
2           So some things I left out that I should have
3   put in, and some things that I put in, that maybe I
4   didn't end up using that much.
5           But that was one term that I figured I better
6   define because it was complicated.
7      Q    Did you see under Merck -- skip the FDA to now
8   Merck?
9      A    Yes.
10      Q    The individuals you name here:  Gilmartin,
11  Anstice, Scolnick, Weiner, et cetera -- where did you
12  get those from?
13      A    I was given their depositions.  Or oftentimes,
14  they were on -- their names were on documents that I
15  had.  Marketing documents that I had.
16      Q    On the fourth page, you have Academics and you
17  list Kurfm and Bombardier.
18           Do you see that?
19      A    Yes.
20      Q    Why did you write them down?
21      A    Well, those are the -- two of the articles that
22  I reviewed.  At that point, I stopped writing down every
23  academic.  It would have been too much.
24      Q    Why did you choose the article that reflected
25  the worst on Merck?
0067
1      A    I believe those are the first two articles that
2   I did look at.  That is the Vigor and then the
3   comment -- the editorial on Vigor.
4      Q    In that order?
5      A    No.  I'm sure I reviewed the New England
6   Journal 2000 first.
7      Q    And then you have a bunch of names under
8   Robinson, Calcagnie and Robinson, and why did you write
9   down those names?
10      A    So I would remember who they were.
11      Q    And then under MDL, you wrote down other names
12  including the name of the judge in New Orleans, Judge
13  Fallon.  Why did you write down his name?
14      A    Because if someone mentions the name, I would

Page 28

Ex 1 - 5-26-06 depo transcript

15    know who they are talking about.
16         Q    Who gave you this information about the MDL?
17         A    I believe that Mark gave me the names --
18    Robinson.
19         Q    And then Vioxx Label Change Information, is it
20    your testimony that you wrote all of this after
21    independently reading the material as opposed to
22    being -- the material being explained to you by lawyers?
23         A    I wrote it all myself.  I pulled it off the
24    label and typed it in myself because I felt it was
25    important that I had notes of it.  So I wouldn't have to
0068
1     refer to the original document.
2              If you want to know what I knew about
3     Advantage, it is here on Page 5 -- some of it.
4          Q    Did you read the Victor Study?
5          A    Victor?
6          Q    V-I-C-T-O-R.
7          A    I'm not sure.  What else -- can you describe
8     the study in greater detail?
9              MR. ROBINSON:  We just got that data this week.
10             MR. GOLDMAN:  No, I mean the original.
11         Q    Have you ever read any articles or information
12    about cancer studies that were done with Vioxx?
13         A    I read several articles about Vioxx and they
14    are in my files.  And there is a possibility that one of
15    them involved cancer.
16             I don't remember at the moment because I can't
17    answer that question without referring to my documents.
18             MR. GOLDMAN:  Let me mark this as an exhibit.
19    This is Exhibit 5.
20             (Defendant's Exhibit 5 was marked
21             for identification by the court
22             reporter.)
23    BY MR. GOLDMAN:
24         Q    It is this, Dr. Pechmann.
25         A    Okay.
0069
1          Q    What is Exhibit 5?
2          A    Again, this is Exhibit 5; correct?  This one?
3          Q    The one that has handwriting on it, it starts
4     Scientific Testing of Details with Specific M.D.'s.
5          A    Okay.
6          Q    Can you tell me what this document is?
7          A    This is a document that I prepared yesterday
8     when I met with Steve Skikos.  I started to discuss the
9     science with Steve, and he started to realize that the
10    depth of this -- the depth of this information and the
11    level of detail.
12             And he suggested that I write down relevant
13    information about each study.  So that is what I did.  I
14    went through, pulled out the exhibits and for my own
15    purposes, wrote down relevant information about the
16    method; my background on the method; and then the
17    results.
18             And as I worked on it, I would discuss it with
19    him, certain key parts or I would show him a graph.  He
20    started to become familiar with the scientific studies.
21         Q    Did the attorneys for the plaintiffs assist you
22    in drafting your expert report?
23         A    No, they did not.
24         Q    Did they provide any input?
25         A    They provided the documents.

Page 29

Ex 1 - 5-26-06 depo transcript

0070
1     Q     Did you ever get any request by the plaintiffs'
2  attorney -- plaintiffs' lawyers to include certain
3  information in your report?
4     A     No.
5     Q     How long did you spend drafting your report?
6     A     I don't have a record of it exactly.
7     Q     Can you give me a ballpark?
8     A     I mean, it would be hard to describe because I
9  might spend two or three hours looking at a study and
10  going page to page; and then I might write a couple of
11  paragraphs or a paragraph.
12          So would that count as half an hour that I
13  wrote the paragraph or the two and a half?  But I don't
14  know how you would describe it, but that is how I
15  basically worked.
16     Q     Can you tell me how much time you sat at your
17  computer and typed out your report?
18     A     No, I can't.
19     Q     Do you intend to give opinions at trial,
20  Dr. Pechmann, other than those contained in your report?
21     A     No, I do not.
22     Q     The most current version of your Curriculum
23  Vitae is in your report?
24     A     Vitae, yes.
25     Q     And it is an accurate and complete description
0071
1  of your education and experience?
2     A     Yes.
3     Q     Anything that you want to add to your C.V. that
4  you think is important?
5     A     No.
6     Q     Would you agree, Dr. Pechmann, that the vast
7  majority of your professional life has been spent
8  analyzing the effect of cigarette advertisements on
9  youth?
10     A     No, I would not agree with that.
11     Q     Do you think a lot of your professional life
12  has been analyzing the effect of cigarette ads on youth?
13     A     No.
14     Q     Well, in your report, you say that your two
15  primary areas of experience -- you talk about how you
16  have an international reputation for your work on
17  controversial forms of advertising and their effects on
18  consumers on Paragraph 4 of your report.
19          Do you remember that?
20     A     Yes.
21     Q     What are controversial forms of advertising?
22     A     Well, it is actually described in there in my
23  report; right?  So controversial forms of advertising --
24  let's see.  What page are you on?
25     Q     Two, Paragraph 4.
0072
1     A     I mean advertising that receives a high degree
2  of scrutiny and criticism by public courts or the
3  government.  And I indicate that I have done work on
4  comparative advertising.
5     Q     And then you --
6     A     And also, tobacco-related -- what I mean by
7  that is, both cigarette ads and anti-smoking ads and
8  also various other communications; product placement in
9  movies; in sit-coms; that sort of thing.
10     Q     Would you agree then, Dr. Pechmann, that the

Page 30

Ex 1 - 5-26-06 depo transcript

11   majority of your professional life has been devoted to
12   analyzing the effect of cigarette advertisements,
13   anti-smoking advertisements, and other forms of
14   communication relating to tobacco?
15        MR. ROBINSON:  Andy, when you say "professional
16   life," she teaches things like that, you are excluding?
17        THE WITNESS:  Right.  And I don't agree with
18   that statement, no.  Not the majority.
19   BY MR. GOLDMAN:
20        Q    Have you spent a lot of time, Dr. Pechmann,
21   focusing on cigarette advertisements, anti-smoke
22   advertisements and other forms relating to tobacco?
23        A    Yes, I have spent a lot of time on that topic.
24        Q    It is your view that tobacco advertising
25   entices young people to want to start smoking; right?
0073
1         A    Well, no.  Some -- certain types of tobacco ads
2    entice young people, yes, but not all tobacco
3    advertising.
4         Q    If I represented a tobacco company, I would
5    explore that with you, and I don't.  So I am going to do
6    you a favor.
7         MR. ROBINSON:  Thank you.  Since my case has
8    been dismissed --
9    BY MR. GOLDMAN:
10        Q    Can you describe the type of research that you
11   did, Dr. Pechmann, before forming the view that tobacco
12   advertising at least entices some adolescents to use
13   cigarettes?
14        A    I conducted controlled experiments.
15        Q    Can you be a little more specific about that?
16   What type of experiments?
17        A    Well, just like what Merck did in this case.  I
18   conducted controlled studies where people saw different
19   stimuli, and I compared their reaction statistically and
20   I compared the reactions of different groups of people
21   to different stimuli; and saw that -- that, actually, in
22   my case, regardless of the group, that cigarette ads
23   that I studied increased the youths intent to smoke.
24        Q    How many controlled experiments would you say
25   you have done concerning tobacco advertising?
0074
1         A    All tobacco advertising?
2         Q    Yes.
3         A    Well, let's see.  We can look at my
4    publications.  I would say pretty much all of them have
5    resulted in publications.
6         So I have -- I have publication No. 11 in my
7    vitae on Page 3.  Publication No. 15, 16, 21, 24, 27 and
8    then one other study that is ongoing -- actually, two
9    that are ongoing.
10        So that is one, two, three, four, five, six --
11   eight.
12        Q    So you have conducted in your -- in your career
13   eight different controlled experiments on the effects of
14   tobacco advertising?
15        A    Yes.  And by "tobacco advertising," I mean the
16   broad definition that I described, anti-smoking.
17        Q    How many controlled experiments have you done
18   on pharmaceutical advertising?
19        A    I have not done any.  I just reviewed the
20   studies that were conducted.  Just like I review the
21   studies for journals all the time as a reviewer or on

Page 31

                              Ex 1 - 5-26-06 depo transcript
22    the editorial review board.
23         Q    My question was a little bit different.
24              How many controlled experiments have you
25    performed on pharmaceutical advertising?
0075
1          A    None.
2          Q    Okay.  How much time do you think you spent
3     researching the question of the effects on adolescents
4     of tobacco advertising in whatever form?
5          A    I have no idea.
6          Q    Thousands?
7          A    But I have been working on the topic since
8     1990.
9          Q    So you spent years focusing on the question of
10    the effects of cigarette advertising on the youth?
11         A    Well, that was one of the things I was working
12    on.  Correct.
13         Q    How many tobacco advertisements have you
14    reviewed in your life you think?
15         A    Hundreds.
16         Q    Do you have a database of tobacco
17    advertising -- advertisements?
18         A    No.
19         Q    Did you ever have a database of tobacco
20    advertisements?
21         A    No.
22         Q    Have you ever used a database of tobacco
23    advertisements?
24         A    Well, by "tobacco," you mean cigarettes or you
25    mean anti-smoking?
0076
1          Q    Yeah, cigarettes.
2          A    Yeah.  Have I ever used?  No.
3          Q    Have you ever actually observed young people as
4     they watch a television advertisement or some other form
5     of advertising for tobacco?
6          A    No.
7          Q    You never sat and actually watched how a
8     particular adolescent responds, reacts to a form of
9     tobacco advertising?
10         A    That's correct.  I have not.  My team of
11    researchers collect the data.
12         Q    Okay.  So you have had teams of people who have
13    gone out and looked at young people and how they react
14    to different forms of tobacco advertising?
15         A    No.  What we do in our studies, just like they
16    did, is we do not take any measures of how people are
17    reacting to the ads, you know, observe them, try to code
18    their reactions.  That is not the type of research I do.
19              What I do is, I ask people to complete surveys
20    and bring the surveys back, and analyze the surveys.
21    Just like Merck did, Merck's people.
22         Q    How many different surveys have you reviewed
23    concerning the effects of tobacco advertising in
24    whatever form?
25         A    How many -- tell me again what is the question?
0077
1          Q    How many surveys have you conducted or reviewed
2     concerning the effects of tobacco advertising on the
3     youth?
4          A    Well, we just established how many I conducted;
5     right?
6          Q    Yes.

                                Page 32

Ex 1 - 5-26-06 depo transcript

```
 7     A     Wasn't it eight?
 8     Q     Um-hmm.
 9     A     And then in terms of how many more articles I
10  have reviewed, maybe 10.
11     Q     When you did your research to form an opinion
12  on the effects of tobacco advertising on adolescents,
13  did you focus on one tobacco company or more than one
14  tobacco company's ads?
15     A     More than one tobacco company.
16     Q     Why didn't you just focus on one?
17     A     I am trying to remember at the time.  I think I
18  wanted to show the subjects of representative samples of
19  cigarettes from different firms.  So I could draw
20  conclusions about cigarette advertising in general.
21     Q     About how many tobacco companies have you
22  looked at in terms of their advertising in your research
23  concerning the effects of tobacco advertising on the
24  youth?
25     A     I haven't studied any of the tobacco companies.
0078
 1     Q     Their advertisements you studied?
 2     A     Yeah.  I said I looked at a couple of hundred
 3  ads over the whole time I have been --
 4     Q     What particular companies?  Phillip Morris?  Or
 5  others in the tobacco industry, have you looked at in
 6  terms of what advertisements they used in your analysis
 7  of the question of the effect of the advertisement on
 8  the youth?
 9     A     I don't understand the question.  I'm sorry.
10     Q     You said before that you have reviewed research
11  and conducted research on the effect of tobacco ads on
12  the youth, and that those ads were not just limited to
13  one tobacco company, but to more than one; right?
14     A     Okay.  If you are asking me which companies
15  were representative of the ads that I studied?
16     Q     Yes.
17     A     Reynolds and Morris -- Phillip Morris, and
18  maybe some others, but those are the two.
19     Q     Have you ever compared the type of marketing
20  campaigns that one tobacco company has used compared to
21  a marketing campaign of another tobacco company?
22     A     No.
23     Q     Have you ever assessed the integrated marketing
24  communications campaign of tobacco companies?
25     A     I have reviewed papers that address that topic.
0079
 1  I myself have not conducted research on tobacco
 2  companies integrated campaigns, but I have reviewed
 3  papers that have done that.
 4     Q     What companies have you conducted research on
 5  in terms of their integrated marketing communications
 6  campaigns?
 7     A     I was an expert panel -- panelist that reviewed
 8  the integrated marketing communications campaigns of the
 9  Census Bureau, the anti-drug ad campaign, the
10  Massachusetts anti-smoking campaign.
11     I am trying to think if there were any others.
12  That might be the only ones that I served as an expert
13  panel; but in teaching courses, I reviewed a large
14  number other of integrated marketing communications
15  campaign that have been taught to the students.
16     Q     Have you ever analysed any integrated marketing
17  communications campaigns for any pharmaceutical company
```

Page 33