Ex 1 - 5-26-06 depo transcript

```
0196
 1      A    I don't understand that question.
 2      Q    I didn't understand the statement that you made
 3 in here about testimony.  Maybe I can find it.
 4           Okay.  Let's talk about Dr. McCaffrey.  You
 5 said that he was mislead by Merck's marketing campaign;
 6 right?
 7      A    Yes.
 8      Q    And your basis for that is based on your
 9 skimming of his deposition; correct?
10      A    No.
11           MR. SKIKOS:  Objection.
12 BY MR. GOLDMAN:
13      Q    Did you ever talk with Dr. McCaffrey?
14      A    No, I did not.
15      Q    Did you ever read his deposition carefully?
16      A    Parts of it, I read very carefully and I read
17 all of it.
18      Q    You didn't skim the deposition?
19      A    No.  Actually, not with these guys.  I read
20 through --
21      Q    Did you take notes on Dr. McCaffrey's
22 deposition?
23      A    No, I don't believe I did.
24      Q    Did you highlight anything in Dr. McCaffrey's
25 deposition?
0197
 1      A    No, I watched -- saw it on a computer screen.
 2      Q    What do you mean, you saw it on a computer
 3 screen?
 4      A    I pulled it up on a computer screen.
 5      Q    What did Dr. McCaffrey know about the potential
 6 cardiovascular risks of Vioxx?
 7      A    He testified that he didn't know.
 8      Q    Is that --
 9      A    I'm sorry.  I will tell you exactly what he
10 testified to.  It's very interesting.
11           So in Exhibit 5, he was asked, "During
12           The two years you prescribed Vioxx
13           for Dr. Barnett, were you ever given
14           a warning by Merck that Vioxx caused
15           heart attacks?"
16           And he said, "No, sir."
17           And he went into quite a bit of detail -- at
18 least two points in his depo about how -- as to when the
19 label was changed and Vigor was put on the label, he and
20 the rep sat down.
21           And the rep said, I don't know how to make
22 heads or tails out of this.
23           And he said, I didn't see any evidence that
24 Vioxx was causing heart attacks.
25      Q    Do you think that the jury is capable of
0198
 1 understanding that testimony without your help?
 2           MR. SKIKOS:  Objection.
 3           THE WITNESS:  What I want to talk about is the
 4 research that puts this in the context.  I don't think
 5 they understand.
 6 BY MR. GOLDMAN:
 7      Q    My question is do you think that the jury can
 8 understand the testimony by Dr. McCaffrey without your
 9 help?
10           MR. ROBINSON:  You mean just the testimony
```

Page 82

Ex 1 - 5-26-06 depo transcript

```
11   itself?
12           MR. GOLDMAN:  Yes.
13           THE WITNESS:  No, I don't think they can really
14   understand it unless they have a context of
15   understanding the whole integrated marketing
16   communications campaign and what the research was
17   showing and what --
18   BY MR. GOLDMAN:
19      Q    Okay.  Sorry?
20      A    Yeah.  And so I think other -- I think this is
21   the crux of why it is misleading is because this was
22   happening across the country.
23           And it was because that was the goal of their
24   campaign to neutralize the heart attack risks, and they
25   did extensive research to make sure that this was
0199
1   happening.  And they adjusted things when it looked like
2   things weren't going right.
3           So I don't think they would understand this
4   testimony unless they understood the research --
5      Q    Do you think --
6      A    -- as it relates to the testimony.
7      Q    You think that you need to come to trial to
8   help the jury understand as to what Dr. McCaffrey had
9   testified about as to his knowledge of the
10   cardiovascular risks of Vioxx?
11      A    No.  I think that they can understand his words
12   and what he is saying, yes, I think they will understand
13   that.
14      Q    Okay.  Do you have any idea what the sales
15   representative who called on Dr. McCaffrey said to him
16   about Vioxx and any cardiovascular risks?
17      A    Yes, there is research on that.
18      Q    There is research on what the sales
19   representative told Dr. McCaffrey?
20      A    Yes, we have the call notes.
21      Q    The call notes?
22      A    Right.
23      Q    Okay.  Let's look at the call notes.
24           MR. ROBINSON:  Can she get a copy of it or do
25   we have a copy?
0200
1           THE WITNESS:  It should be Exhibit 7.
2   BY MR. GOLDMAN:
3      Q    In your binder?
4      A    Yes.
5      Q    Let's look in your binder, Exhibit 7.
6      A    And they were also notes indicating how many
7   meetings they had had, which I don't think I have in
8   here, but there was every single meeting he had.
9      Q    Let's talk about one that you mention in your
10   report.
11           MR. ROBINSON:  She said 7.  Let's go to 7.
12           THE WITNESS:  Yeah, Exhibit 7.
13   BY MR. GOLDMAN:
14      Q    And Exhibit 7 in your binder --
15      A    Yes.
16      Q    -- you point out that on September 14 of 1999,
17   there is an indication that Sherry Elder, who is a
18   representative, wrote a note that said, three S's of
19   Vioxx; is that what you are talking about?
20      A    Yes.
21      Q    What did Sherry Elder tell Dr. McCaffrey on
```

Ex 1 - 5-26-06 depo transcript
```
22   that date about the three S's, ma'am?
23          MR. SKIKOS:  Objection.
24          MR. ROBINSON:  Go ahead.
25          THE WITNESS:  Well, I am saying that she said
0201
 1   she discussed the three S's.  So that means strength,
 2   safety and QD simplicity.  So she discussed safety at
 3   that meeting.
 4   BY MR. GOLDMAN:
 5       Q    What about safety did Ms. Elder say to
 6   Dr. McCaffrey?
 7       A    I don't know for certain, but I know what the
 8   research says that in general was happening.
 9       Q    You don't know what any particular sales
10   representative said to Dr. McCaffrey; do you, ma'am?
11       A    I know what they are instructed to tell
12   McCaffrey.
13       Q    What were they instructed to tell
14   Dr. McCaffrey?
15       A    They were given detailed instructions on what
16   to stay.  That was part of the integrated marketing
17   campaign.  So they had detailing pieces.
18       Q    What did -- withdrawn.
19            You don't know, Dr. Pechmann, what the sales
20   representatives of South Carolina said to Dr. McCaffrey
21   or to Dr. Micola; do you, ma'am, about Vioxx or its
22   cardio -- withdrawn.
23       A    I have research that it --
24       Q    You don't know what the sales representatives
25   of South Carolina said to Drs. Micola or McCaffrey about
0202
 1   the cardiovascular risks associated with Vioxx; do you,
 2   ma'am?
 3       A    Yes, he testified.
 4       Q    Other than the testimony you read, you don't
 5   have any other knowledge about what the sales
 6   representatives said to Dr. Micola and Dr. McCaffrey
 7   about the cardiovascular risk associated with Vioxx?
 8       A    Yes, I do.
 9       Q    What sales representatives have you spoken with
10   from South Carolina?
11       A    I am saying in order to understand what the
12   sales reps were saying to the physicians, Merck spent
13   hundreds of millions of dollars.
14            And based on that research, we have a
15   statistical understanding or prediction of what they
16   were hearing.
17       Q    What --
18       A    So I do have a statistical basis for predicting
19   what they were told.
20       Q    What did Ms. Elder tell Dr. McCaffrey on
21   September 4th of 2002?
22            MR. SKIKOS:  He is asking if you were in the
23   room.
24            THE WITNESS:  No.  I know the general topics
25   they discussed and I know what they were told
0203
 1   specifically to say on each topic.
 2            But as to how the exact statistic applies in
 3   this case, I cannot state what happened in that one
 4   instance, but I can give you statistics about it.
 5   BY MR. GOLDMAN:
 6       Q    Try to answer my question yes or no.  Without
```

Page 84

Ex 1 – 5-26-06 depo transcript

```
 7    talking about statistics.
 8             MR. ROBINSON:  Objection.
 9             You don't have to answer yes or no.  You just
10    answer his question.
11    BY MR. GOLDMAN:
12        Q    Dr. Pechmann, do you know what the sales
13    representatives of South Carolina told Dr. McCaffrey and
14    Dr. Micola about the cardiovascular risk associated with
15    Vioxx?
16        A    Yes, I have a statistical prediction of what
17    they were told.
18        Q    Did you speak to any sales representative in
19    South Carolina?
20        A    I don't believe so.
21        Q    Did you ever read any depositions of any sales
22    representatives in South Carolina?
23        A    I didn't read the depositions.  No.
24        Q    Did you ever speak to Dr. Micola and
25    Dr. McCaffrey about what the sales representatives
0204
 1    telling them about cardiovascular risks associated with
 2    Vioxx?
 3        A    No, I read it in their depositions.
 4             THE WITNESS:  I have to take a break.
 5             (Brief recess.)
 6    BY MR. GOLDMAN:
 7        Q    Do you know, Dr. Pechmann, what promotional
 8    pieces or advertisements Dr. Micola and Dr. McCaffrey
 9    actually saw?
10        A    I know what promotional pieces the sales reps
11    were instructed to show them and I know when there was
12    enough -- because they actually had a meeting and they
13    recorded it.  And so I have a pretty good idea of what
14    they say, but I would not know with certainty.
15        Q    You don't know, Dr. Pechmann, what the sales
16    representatives actually showed Dr. Micola and
17    Dr. McCaffrey; do you, ma'am?
18        A    Yes, I do.
19        Q    How do you know what promotional pieces sales
20    representatives actually showed those doctors?
21        A    Because there was one that they were required
22    to show.
23        Q    How do you know they showed it?
24        A    I mean, he might not have seen it, but they
25    showed it to him because that is what they were required
0205
 1    to do.  And they used for several months.  So there is
 2    no way they would not have shown it to them.
 3        Q    Are you talking about the CV card?
 4        A    No.  The core promotional pieces.
 5        Q    Were you ever with the sales representatives
 6    and the doctors when they had their discussions?
 7        A    No, I was not.
 8        Q    You don't know, ma'am, what sales promotional
 9    pieces or advertisements Dr. Micola and Dr. McCaffrey
10    actually saw; true?
11        A    I know what they were shown by the sales reps.
12        Q    Did you talk to the sales reps to see what they
13    actually showed Dr. Micola and Dr. McCaffrey?
14        A    They were given one piece.  They had to show
15    that to the doctor.  That was their job.
16        Q    Did you talk to any sales representatives to
17    see what they showed Dr. Micola and Dr. McCaffrey?
```

Page 85

Ex 1 - 5-26-06 depo transcript

```
18     A    No.
19     Q    You don't know what the sales representatives
20  actually showed Dr. Micola and Dr. McCaffrey; true?
21     A    False.  They have -- the sales reps were
22  scripted and they were required to show a certain
23  brochure.  It is the core piece.  I don't know what else
24  they showed, but I do know they showed that core piece.
25     Q    Do you know that sales representatives were
0206
1   instructed to discuss the label change in April of 2002
2   with doctors?
3      A    Yes, I saw the bulletin.
4      Q    Did the sales representatives in South Carolina
5   talk to Dr. Micola and Dr. McCaffrey about the changes
6   to the April, 2002 label?
7      A    We just saw that Micola -- I'm sorry.
8           McCaffrey did discuss the change with the sales
9   rep.
10     Q    Ma'am, I understand that --
11     A    So that -- so that was testimony.  So, yes, I
12  know that they discussed it.
13     Q    I understand that you have read training
14  materials and you have interpreted Merck's documents,
15  and you believe you know what the sales representatives
16  were instructed to do.  Okay.  I know that.
17     A    Okay.
18          MR. ROBINSON:  But she did say she read the
19  deposes of Micola and McCaffrey.
20  BY MR. GOLDMAN:
21     Q    You do not know what materials the sales reps
22  actually showed Dr. Micola and Dr. McCaffrey; true?
23     A    With virtual certainty -- I don't know a
24  hundred percent, but with a very, very high probability,
25  I know.
0207
1           I don't know what ads they saw, but I know what
2   brochure that they showed.  They were required to show
3   that.  It -- they can't get away with not showing that.
4           That is their job.  That is their one thing
5   they had to do, and they had that one brochure for
6   several months.
7      Q    Dr. Pechmann, you do not know what the sales
8   representatives actually showed Dr. Micola and
9   Dr. McCaffrey concerning the cardiovascular risks
10  associated with Vioxx; do you, ma'am?
11     A    Oh, concerning the cardiovascular risks?
12     Q    Yes.
13     A    Oh, you reworded the question.
14          Not with certainty.  I just have a statistical
15  probability.  A statistical estimate based on the
16  research that they conducted for the very reason to
17  answer that question.  That is why they did the research
18  to answer that question.
19     Q    Ma'am, you are really not answering my
20  question.  My question really calls for a yes or no.
21     A    I am a scientist.  No, that is not how
22  scientists --
23     Q    Can you answer it yes or no?
24     A    No.  I said I know the statistical estimate
25  whether they saw -- what they said to them.  I have a
0208
1   statistical estimate.
2      Q    See, if you can answer this question yes or no
```

Page 86

```
                        Ex 1 - 5-26-06 depo transcript
  3   and then we can talk about your statistical estimate.
  4   Okay?
  5           Do you know what materials the sales
  6   representatives showed Dr. Micola and Dr. McCaffrey?
  7       A    With virtual certainty, yes.
  8       Q    How do you know with virtual certainty what the
  9   sales representatives showed those doctors when you
 10   never talked to the sales representatives?
 11       A    Because they only had one core marketing
 12   brochure.  That is their job.  They have to.  There are
 13   other reps coming into the office.  If they didn't show
 14   that material, they would be fired.  I mean --
 15       Q    How do you know?
 16       A    How do I know?
 17       Q    How many sales representatives got fired from
 18   Merck because they didn't show certain materials?
 19       A    In there -- you see, the three S's.  There is a
 20   brochure that goes with that.  So the person recorded --
 21   I showed them that -- the core thing, the three S's
 22   because I have the call notes --
 23       Q    Dr. Pechmann --
 24       A    -- and I know what brochure was being used, and
 25   the person is saying, I did the three S's -- I guess,
0209
  1   the person could be lying.
  2           So there is a slight chance.
  3       Q    Dr. Pechmann --
  4       A    That is why I am saying, I am not 100 percent
  5   sure, but I am virtually sure.
  6       Q    I am going to ask you one more time and see if
  7   you can answer this one yes or no.
  8           Do you know what materials the sales
  9   representatives in South Carolina showed Dr. Micola and
 10   Dr. McCaffrey?
 11           MR. ROBINSON:  Objection.  Asked and answered
 12   about three times.
 13           THE WITNESS:  I know.
 14   BY MR. GOLDMAN:
 15       Q    Can you answer it yes or no?
 16       A    I don't have a different answer than what I
 17   said.
 18       Q    So you think you know?
 19       A    Yes, with virtually --
 20       Q    Without speaking to Dr. Micola and
 21   Dr. McCaffrey; right?
 22           MR. ROBINSON:  Same objections.  Repeated.
 23   Repeated.
 24           THE WITNESS:  Merck monitored these people.
 25
0210
  1   BY MR. GOLDMAN:
  2       Q    What is your statistical estimate of the
  3   chances that the Merck representatives used this
  4   brochure with Dr. Micola and Dr. McCaffrey?
  5       A    Oh, the statistical -- they used the brochure?
  6       Q    Yes.
  7       A    It is virtually 100 percent.
  8       Q    Where is your support for that?
  9       A    Because the sale reps had one promotional
 10   brochure.  The main core -- I cannot tell you what else
 11   they showed, but the whole point of their job was to
 12   show the core brochure.
 13       Q    So your statistical estimate --
                           Page 87
```

Ex 1 - 5-26-06 depo transcript

```
14      A    And their call notes indicate that they did
15 three times.
16      Q    Your statistical estimate is based on
17 instructions that were given to sales representatives?
18      A    No.  No.  My statistical estimate was whether
19 they talked to them about -- told them there was no M.I.
20 risk.  That is what I have a --
21      Q    I didn't ask you about that.  You are talking
22 about statistical estimates.
23      A    Yeah.  Well, you did, I believe, ask that
24 question because that is what I was answering in
25 response to -- in response to:  Did they see a
0211
 1 particular brochure?  The core brochure, I said virtual
 2 certainty.
 3      Q    Do you plan to come to trial and tell the jury
 4 what you think that Dr. Micola and Dr. McCaffrey were
 5 shown by sales representatives?
 6      A    No, I am going to use the call notes and the
 7 instructions and say the call notes indicated they
 8 showed this brochure, which they are required to do, and
 9 this is the brochure they saw.
10      Q    You point out a few different times that
11 Dr. Micola was called on 374 times and there were a
12 number of samples left?
13           MR. ROBINSON:  That was McCaffrey.
14 BY MR. GOLDMAN:
15      Q    You point out a few times in your report the
16 number of times that sales representatives visited the
17 doctors in the Barnett case.
18           Do you know that, ma'am?
19      A    Yes, I counted those numbers.
20      Q    Do you think the jury can count those numbers,
21 too?
22      A    Well, I don't think they could -- well, they
23 would count, but they could, I guess, if you want to
24 spend the time.
25      Q    The jury does not need you to add up the number
0212
 1 of call visits that the sales representatives made on
 2 Dr. Micola and Dr. McCaffrey; do they, ma'am?
 3      A    I'm sorry.  What was the question?
 4      Q    The jury does not need you to add up the number
 5 of call visits that the sales representatives made on
 6 Dr. Micola and Dr. McCaffrey; do they?
 7           MR. SKIKOS:  Objection.
 8           THE WITNESS:  They need someone to count it up.
 9 BY MR. GOLDMAN:
10      Q    Do they need you to do that?
11      A    No.  Someone else could do it I can explain the
12 context, what it means.
13      Q    What do the 374 call visits mean?
14      A    That they saw him a lot.
15      Q    What number of times out of the 374 visits did
16 Dr. McCaffrey did they actually speak with
17 Dr. McCaffrey?
18      A    Those are what the call notes tell us.  So,
19 roughly, once a -- what did I say?  Once every week.
20           MR. SKIKOS:  No.  That was --
21           THE WITNESS:  No.  That is what McCaffrey said.
22 Most reps have to see me every week, but in
23 terms of the call notes, it was about once a month, I
24 believe.  I had this in here somewhere.  Yeah, I believe
```

Ex 1 - 5-26-06 depo transcript

```
25   it was once a month.
0213
 1   BY MR. GOLDMAN:
 2       Q    You believe that the sales representatives
 3   actually spoke with Dr. McCaffrey once a month?
 4           MR. ROBINSON:  No, I am going to object.  She
 5   said there were contacts once a week.
 6           MR. GOLDMAN:  Just object.  Don't insert the
 7   testimony, Mr. Robinson.
 8           THE WITNESS:  I'm sorry.  What was the
 9   question?
10   BY MR. GOLDMAN:
11       Q    The question was how many visits out of the 374
12   with Dr. McCaffrey, do you believe the sales
13   representatives actually spoke with Dr. McCaffrey?
14       A    Well, according to the call notes, when they
15   had lengthy discussions, it was about once a month; but
16   when they were brief discussions, it was much more
17   frequently than that.
18       Q    Do you know what the sales representatives told
19   Dr. McCaffrey in their brief discussions?
20       A    No.  No, not specifically.
21       Q    Do you know --
22       A    I have a statistical estimate as to what they
23   likely said based on the research that Merck did.
24       Q    Do you know what, if any, significance
25   Dr. McCaffrey -- strike that.
0214
 1           Do you know whether Dr. McCaffrey considered
 2   what he was told about the sales representatives in his
 3   decision to prescribe Vioxx?
 4           MR. SKIKOS:  Asked and answered.
 5           THE WITNESS:  I'm sorry.  State the question
 6   again.
 7   BY MR. GOLDMAN:
 8       Q    Do you know whether Dr. McCaffrey took into
 9   account what sales representatives told him when he
10   decided to prescribe Vioxx?
11       A    Yes.
12       Q    What is that based on?
13       A    Well, he, Dr. McCaffrey, states that he talked
14   to the sales representative about the label.  So it is
15   clear that he is getting advice from the sales rep and
16   he is listening to the sales rep.
17       Q    Is it your opinion about what Dr. McCaffrey
18   considered based on his discussions with the sales reps
19   when he prescribed Vioxx based on your interpretation of
20   Dr. McCaffrey's deposition testimony?
21       A    I don't know what the question was.  I'm sorry.
22       Q    As I understand your testimony, Dr. Pechmann,
23   you believe that Dr. McCaffrey relied on information
24   that he received from sales representatives when he
25   decided to prescribe Vioxx to Mr. Barnett; is that your
0215
 1   testimony?
 2       A    When he decided to -- well, he wouldn't even
 3   know that Vioxx existed if the sales rep didn't tell him
 4   about it.
 5       Q    Why not?  Don't doctors hear about medicine
 6   from other people other than sales reps?
 7       A    Not exactly at the time that it's available.
 8       Q    I don't understand.
 9       A    I mean, he clearly had talked to sales reps
```

Page 89

Ex 1 - 5-26-06 depo transcript

```
10   about Vioxx and has relied on information from the sales
11   reps because he said he was trying to get the sales reps
12   to explain the label to him.
13        Q    Is your opinion that what Dr. McCaffrey and
14   what Dr. Micola considered -- withdrawn.
15        Let me ask you this way:  You believe that Drs.
16   Micola and McCaffrey used information that they obtained
17   from sales representatives in their decision to
18   prescribe Vioxx; is that your testimony?
19        A    Yes.  Yes.
20        Q    And your opinion is based on your review of
21   Dr. Micola and Dr. McCaffrey's testimony; true?
22        A    And the research that I have seen.
23        Q    The question about whether Dr. Micola and
24   Dr. McCaffrey specifically relied on information about
25   the risks of Vioxx that they learned from sales
0216
1    representatives, my question to you is --
2         A    They said they didn't know.  They were never
3    told of the heart attack risks, and they said they
4    wouldn't have prescribed it had they known it was a
5    relevant fact.
6         Q    Actually, that is not what they say.
7         A    I'm sorry.  They would have appreciated
8    knowing.  So if they had appreciated knowing, they
9    indicated that they thought it was relevant.
10        So the ultimate decision is unclear, but they
11   said it would have influenced their decision making
12   about it because McCaffrey said he wanted to know about
13   it.
14        Q    I am going to ask this one more time.
15        Is your opinion about what Dr. Micola and Dr.
16   McCaffrey relied on in terms of their conversations with
17   sales representatives and their decision to prescribe
18   Vioxx based on your review of the deposition testimony
19   of those witnesses?
20        MR. ROBINSON:  Asked and answered.  She said
21   that and the research.
22        THE WITNESS:  The research and the call notes
23   and the instructions to the sales reps.  The whole
24   picture not just the depositions, no.
25   BY MR. GOLDMAN:
0217
1         Q    If Dr. Micola testified that he makes his
2    prescribing decisions based on medical articles and not
3    based on what sales representatives tell him, you agree,
4    that you have no reason to dispute that?
5         A    They are one and the same thing.  The sales
6    representatives gave out the articles.
7         Q    Do you understand my question?
8         A    No, I didn't understand your question because
9    you said there was a difference between what the sales
10   reps gave them and the article.
11        Q    Dr. Pechmann, do you have any reason to dispute
12   Dr. Micola's testimony that he said that he does not
13   rely on information that a sales rep tells him about
14   safety and instead he relies on medical journals
15   published in the medical community?
16        MR. SKIKOS:  Objection.
17        THE WITNESS:  They gave him the article.
18   BY MR. GOLDMAN:
19        Q    Can you answer my question?  Do you dispute his
20   testimony; yes or no?
```

Page 90

Ex 1 - 5-26-06 depo transcript

```
21      A    Yes.  And there is extensive research that
22  shows that people don't have a thorough understanding of
23  how they make decisions and how they underestimate the
24  influence of marketing on that.
25      Q    So you are going to come tell the jury that
0218
1   Dr. Micola doesn't know why he made decisions about
2   prescribing Vioxx?
3
4           MR. SKIKOS:  Objection.
5           THE WITNESS:  No.  I am going to tell them the
6   research.
7   BY MR. GOLDMAN:
8       Q    You added on to my question before.  So I am
9   going to ask again and see if you can answer this yes or
10  no.
11          Do you dispute Dr. Micola's testimony about
12  what he relies on in deciding to prescribe medicine like
13  Vioxx; yes or no?
14      A    His testimony is conflicting about whether he
15  does or does not rely on the sales reps.
16      Q    Do you believe --
17      A    And he said at least at one point, that he
18  relies on the sales reps and I believe that testimony
19  where he said he relies on the sales rep.
20      Q    You don't believe the testimony where he says
21  he didn't rely on the sales rep?
22      A    Correct.
23      Q    And do you think that you are in a better
24  position to assess credibility of Dr. Micola on whether
25  or not he relied on sales representatives in making
0219
1   treatment decisions than a jury?
2       A    It's the whole reason that this research was
3   done was to understand what the doctors are doing
4   without asking them directly because they don't know.
5       Q    Do you believe that?
6       A    They don't necessarily know.  So, yes, I think
7   I am an expert on his behavior.  And I know things about
8   his behavior that he may not know about because I looked
9   at the research very carefully.
10      Q    Do you believe that you are in a better
11  position to assess Dr. Micola's credibility concerning
12  whether he relied on sales representatives or not than
13  the jury is?
14          MR. ROBINSON:  Objection.  Credibility?
15          THE WITNESS:  I am not addressing his
16  credibility.
17  BY MR. GOLDMAN:
18      Q    How about the accuracy of his testimony?
19      A    He has conflicting testimony.  Obviously,
20  something is wrong.  He has conflicting testimony.
21      Q    Was Dr. Micola aware of the April, 2002 label
22  change containing the Vigor data?
23      A    Yes.  I mean, at some point, he was familiar
24  with the Vigor Study.
25      Q    Do you know what advertisements Dr. Micola and
0220
1   Dr. McCaffrey saw concerning Vioxx or what role they
2   played in their decision to prescribe Vioxx to Mr.
3   Barnett?
4
5           MR. ROBINSON:  Do you want to go to your
```

Page 91

Ex 1 - 5-26-06 depo transcript

6    reporter?
7    BY MR. GOLDMAN:
8        Q    No.  Answer the question.
9        MR. ROBINSON:  She can see her report if she
10   wants to.
11   BY MR. GOLDMAN:
12       Q    Do you know what advertisements Dr. Micola and
13   Dr. McCaffrey saw concerning Vioxx, ma'am?
14       MR. ROBINSON:  Objection.  Compound.  You threw
15   in Micola and McCaffrey.
16       THE WITNESS:  Right.  Shouldn't we talk about
17   Dr. Micola?
18   BY MR. GOLDMAN:
19       Q    Do you know what advertisements Dr. Micola saw
20   concerning Vioxx?
21       A    Well, I can tell by the call notes what people
22   were talking about.  They were showing the main
23   promotional brochure because that is the three S's.
24       Q    I am talking about the television advertising.
25       A    Oh, television advertising.
0221
1        Q    Do you know what television advertising
2    Dr. Micola or Dr. McCaffrey saw about Vioxx?
3        A    No, I know what ads were running at different
4    times.  Not what they say saw, no.
5        Q    Do you know what ads Mr. Barnett saw concerning
6    Vioxx?
7        A    Yes, he testified.
8        Q    What ads?
9        A    That he saw the Dorothy Hamill.  All of which
10   were very similar.  Remember, it is a very integrated
11   marketing campaign, they all basically said the same
12   thing.
13       Q    Did Dr. -- sorry.  Withdrawn.
14       Is it your opinion that Mr. Barnett relied on
15   the Dorothy Hamill ad when he decided to use Vioxx?
16       A    He said it factored into his decision both to
17   take it and to continuing to take it.
18       Q    And that is based on deposition testimony you
19   read?
20       A    Yes.  Plus the research that shows 85 percent
21   of people in the target audience did see these ads and
22   were well-aware of the brand.
23       MR. GOLDMAN:  Move to strike the last part of
24   that answer.
25       THE WITNESS:  Well, you asked me, what I was
0222
1    relying on.
2    BY MR. GOLDMAN:
3        Q    No, I didn't.
4        A    Oh, I thought you did.
5        Q    Dr. -- withdrawn.
6        Your testimony is that you believe Mr. Barnett
7    relied on Dorothy Hamill's advertisement about Vioxx when
8    he decided to use Vioxx; right?
9        MR. ROBINSON:  Object.  Not when he decided to.
10       MR. GOLDMAN:  Yes, she did.  Stop coaching.
11       Q    Ma'am, I don't know what you are looking at.
12       A    I am looking at the deposition.
13       Q    What page of the deposition are you looking at?
14       A    Page 25.
15       Q    Are you looking at your report?
16       A    Exhibit 13.  Right.  I'm sorry.  The verbatim

```
                         Ex 1 - 5-26-06 depo transcript
17    quote from the deposition.  So this is with regard to
18    Micola, not when he initially -- let's see, is this
19    Dr. Micola?
20              MR. ROBINSON:  He is asking about Mr. Barnett
21    now.
22              THE WITNESS:  I know.  I'm sorry.  I am
23    confused.
24              So let's see -- so, yeah.
25    BY MR. GOLDMAN:
0223
 1        Q    Okay.  Now, I am going to move to a different
 2    question.
 3              MR. ROBINSON:  Let's slow down.
 4              THE WITNESS:  So, yes, I misunderstood your
 5    question.
 6    BY MR. GOLDMAN:
 7        Q    Do you know if Mr. Barnett saw advertisements
 8    other than Dorothy Hamill?
 9        A    Based on the research, we have a statistical
10    probability of which of the ads that he saw.  We know
11    ads were running and we know what percentage of the
12    audience saw those ads and --
13        Q    Do you know what advertisements Mr. Barnett saw
14    for Vioxx other than Dorothy Hamill?
15        A    Not with certainty, no.
16        Q    Mr. Barnett relied on his doctors to decide
17    what medicine he should take; right?
18        A    In part, yes.
19        Q    And did you read Mr. Barnett's wife's testimony
20    about whether she thinks he was influenced by
21    advertising?
22        A    His wife's testimony?
23        Q    Yes.
24        A    No.
25        Q    Did you read any of Dr. Micola's and
0224
 1    Dr. McCaffrey's testimony about whether they thought
 2    Mr. Barnett is a type of person who relied on
 3    commercials to decide what medicine to use?
 4        A    I believe I recall seeing that, but I mean,
 5    it's not valid.
 6        Q    "It's not valid," what do you mean?
 7        A    Well, he is not an expert.  Neither of those
 8    doctors are an expert on what ads people did or did not
 9    see or if that is the type of person -- I mean, that
10    requires expertise.  They don't have expertise.
11        Q    Who spent more time --
12        A    Unless they had direct -- they had a
13    conversation about it and they did not say they did.
14        Q    Who is more familiar with Mr. Barnett and his
15    medical care and the type of patient he is; you or
16    Dr. Micola?
17        A    The type of patient he is in general?
18        Q    Um-hmm.
19        A    His doctor.
20        Q    Who is more familiar with Mr. Barnett's
21    knowledge about risks of medicine that he uses; you or
22    his doctors?
23        A    I would hope his doctors.
24        Q    Do you know whether Mr. Barnett takes any
25    medication today because of advertisements he saw on TV?
0225
 1        A    No, I don't.
```

Page 93

Ex 1 - 5-26-06 depo transcript

```
 2     Q    You said --
 3     A    Most customers don't know that either.
 4     Q    You said in your report --
 5          MR. GOLDMAN:  Move to strike the last answer.
 6     Q    You said in your report that Merck never
 7   disclosed the potential cardiovascular risk of Vioxx to
 8   the public?  Is that your testimony?
 9     A    Yes.
10     Q    Did Merck publish the Vigor Study?
11     A    Merck authors did, yes.
12     Q    Did Merck inform the FDA about the Vigor Study?
13     A    Yes.
14     Q    Did Merck send press releases about the Vigor
15   Study?
16     A    Yes.
17     Q    Did Merck talk about potential cardiovascular
18   risks at a Advisory Committee Meeting held by the FDA in
19   February of 2001?
20     A    Did Merck talk about the --
21     Q    Um-hmm.
22     A    At the Advisory Committee Meeting?  I don't
23   know.
24     Q    Have you ever read any of the materials that
25   were presented at the Advisory Committee Meeting in
0226
 1   February of 2001?
 2     A    Yes.
 3     Q    What materials did you review?
 4     A    Well, I read the -- the report and I read the
 5   medical officer reviews.
 6     Q    What report?  The Targum Memo?
 7     A    The Advisory Committee Report.
 8     Q    You think --
 9     A    Well, we can look at it in the Appendix.  It is
10   in the Appendix, Exhibit 24.
11     Q    Exhibit 24, FDA Advisory Committee Briefing
12   document, did you review that?  This is in your
13   notebook; right?
14     A    Yes.
15     Q    You reviewed it?
16     A    Yes.
17     Q    Did you make any markings on it when you
18   reviewed it?
19     A    Probably.
20     Q    Where are they?
21     A    Well, this is a clean copy from the exhibit.
22          MR. SKIKOS:  They would be in one of the boxes.
23          THE WITNESS:  You know, these are all clean
24   copies.
25          MR. SKIKOS:  The exhibits are clean.  The boxes
0227
 1   are dirty.
 2          THE WITNESS:  My originals are in there.
 3          MR. GOLDMAN:  Okay.  We will look at that in a
 4   minute.
 5     Q    You said in your report that promotional pieces
 6   emphasized Vioxx's safety profile in elderly patients
 7   even though Vioxx posed a significantly higher potential
 8   CV risks in elderly patients with preexisting
 9   cardiovascular problems?
10     A    Their own research shown that.
11     Q    You are not qualified to say that there were
12   significantly higher potential cardiovascular risks of
```

Page 94

Ex 1 - 5-26-06 depo transcript

13   Vioxx in elderly patients; are you, ma'am?
14        A    In patients with cardiovascular risks, yes,
15   that was in Vigor.
16        Q    What was in Vigor?
17        A    That cardiovascular risk was higher among
18   people with preexisting cardiovascular problems.
19        Q    Dr. Pechmann, is your basis for concluding that
20   there was a significantly higher potential
21   cardiovascular risk in elderly patients, who had
22   preexisting cardiovascular problems based on your review
23   of the Vigor Study?
24        A    Yes.
25        Q    Anything else?
0228
1         A    Not that I can think of at the moment.
2         Q    You say that Merck's research reports show that
3    doctors were confused by cardiovascular information in
4    promotional pieces shown by representatives.
5              Do you remember that?
6         A    Yes.
7         Q    Did you ask Dr. Micola and/or Dr. McCaffrey if
8    they were confused about promotional pieces they saw?
9         A    No, but it is in their testimony.
10        Q    Are you relying on your interpretation of
11   their -- withdrawn.
12             Are you relying on the deposition testimony of
13   Dr. Micola and Dr. McCaffrey concerning whether they
14   were confused by promotional pieces?
15        A    In part.  And in part on the research where
16   they tested.
17        Q    They tested what?
18        A    The promotional pieces.
19        Q    What research reports are you relying on when
20   you say doctors were confused by cardiovascular
21   information in promotional pieces?
22        A    Well, one study is in here.  I am getting
23   tired.
24             MR. ROBINSON:  Why don't we take a break?
25             THE WITNESS:  That's okay.  I am just getting
0229
1    tired.  It is taking me a little longer to find.
2              Yes, it is Exhibit 59.
3    BY MR. GOLDMAN:
4         Q    Let's take a look at 59 in your books.
5         A    It is one of the pieces of information that
6    suggests that.
7         Q    I want to know all.  Tell me your list of all
8    of the sources that you are relying on that doctors were
9    confused about cardiovascular information in promotional
10   pieces.
11        A    Okay.  I believe 59 is in there.  So in here --
12   this was a major detailing piece that they used and I
13   can show you the detail piece itself.
14        Q    I want you to show me how you know that the
15   doctors were confused.
16        A    They said they were.  Most pointed to being
17   confused about the CV risk.  That's the General Points.
18        Q    What page is that?
19        A    Page 6.
20        Q    What drug is that talking about?
21        A    It is talking about Vioxx.  As it is clear
22   later on, too.
23        Q    Wait a minute.  The page that you are talking

Page 95

Ex 1 - 5-26-06 depo transcript

24   about is Bates stamped MRK --
25        A    Yes, but that is General Points.  So it is not
0230
1    specific.  You see, there is Celebrex, Bextra.  The next
2    heading is General Points.
3        Q    Okay.
4        A    So it should have been put on a different page.
5        Q    So you are interpreting Page 6 of this research
6    finding to mean that doctors were confused about
7    cardiovascular risk?
8        A    That is one place that says that they were
9    confused.
10       Q    How was that study done?
11       A    They did one-to-one interviews --
12       Q    How many --
13       A    -- with doctors.
14       Q    How many doctors were interviewed?
15       A    45 minute in-depth interviews with 31 doctors,
16   which is generally accepted practice.  Actually, that is
17   a high number of subjects and a long interview.
18       Q    So is it your position that because that
19   research report indicates that some of the doctors were
20   confused about cardiovascular risks that Dr. Micola and
21   Dr. McCaffrey were confused about it?
22       A    Well, they said that they were never told that
23   it had a cardiovascular risk by Merck.
24       Q    That is based on your review of their
25   testimony?
0231
1        A    Yes.
2        Q    Which the jury can understand as well as you;
3    right?
4        A    No, I don't think -- they can understand the
5    words, but not the whole context in which the program is
6.   existing.
7             They need to understand the whole integrated
8    marketing communications campaign to understand the
9    specific testimony.  They need to understand the
10   context.
11       Q    What other sources are you relying on showing
12   that doctors were confused about the cardiovascular
13   risks in promotional pieces?
14       A    There are several points in here that says --
15       Q    That is the same document; right?
16       A    Yes.
17       Q    What other documents are you relying on other
18   than Exhibit 59 in your book?
19       A    Well, shouldn't I go what they say here?
20       Q    No, that is just one study; right?
21       A    Yes.
22       Q    I want to know what other studies that you are
23   relying on that supports your opinions that doctors were
24   confused about cardiovascular risks in Merck's
25   promotional pieces?
0232
1        A    There are several other studies that show
2    attributes towards -- attribute ratings on Vioxx and
3    sales of Vioxx, prescriptions of Vioxx.  That show that
4    there was no discernible change in perceptions of Vioxx
5    or prescribing for Vioxx --
6        Q    That was not my question.
7        A    -- except when there was like the JAMA article
8    or when the label changed you saw --

Page 96

Ex 1 - 5-26-06 depo transcript

9      Q      So, Dr. Pechmann, other than Exhibit 59 in your
10  binder, what other materials are you relying on to
11  support your opinion that doctors were confused by the
12  cardiovascular information in promotional pieces for
13  Vioxx?
14      A      I will show you the other.
15      Q      What are you looking at?
16      A      My notes about the different research products
17  which you have a copy of.
18      Q      Okay.  That is Exhibit 5 for the record.
19      A      Well, okay, this is a good one.  Exhibit 56.
20      Q      If you could just name them.  What did that one
21  say?  Tell me what you think it says.
22      A      18 to 47 percent of the physicians said that
23  the sales reps said that Vioxx does not increase the
24  risk of M.I. or stroke.
25      Q      Does that tell you that -- does Exhibit 56 say
0233
1  that doctors are confused, ma'am, about the
2  cardiovascular risks in promotion material?
3      A      It says that they were mislead by the sales
4  reps.
5      Q      It is your testimony that Exhibit 56 in your
6  binder, which is a document called Vioxx Monthly EAR
7  review November, 2001, that, that says that doctors were
8  confused about what the cardiovascular information was
9  contained in Vioxx's promotional pieces?
10      A      It shows that they were mislead.
11      Q      That was not my question.
12      A      Yes, I think it means they were confused.
13      Q      Okay.  So you relied on that, Exhibit 56.
14          What else do you rely on to support your
15  opinion that?
16      A      20 to 33 percent said the reps said that Vioxx
17  was safe for the elderly.  So they were getting the
18  impression that Vioxx was safe.  The elderly could have
19  CV risks.
20          E58 shows the same thing.
21      Q      Does Exhibit 58 in your binder say that doctors
22  were confused about the cardiovascular risks as
23  described in promotional pieces?
24      A      They were concluding that the --
25      Q      Can you answer that yes or no?
0234
1      A      Yes.
2      Q      Okay.  Your testimony is that Exhibit, what?
3      A      58.
4      Q      58 in your binder, showed that doctors were
5  confused about cardiovascular risks in promotional
6  pieces.
7          Anything else that supports your opinion that
8  doctors were confused about cardiovascular information?
9      A      Exhibit 48.
10      Q      What else?
11      A      Exhibit 55.
12      Q      What else?
13      A      Exhibit 56.
14      Q      We talked about that.
15      A      Exhibit 54, Exhibit 48, Exhibit 47 -- that's
16  it.
17      Q      Do you plan to --
18      A      You know, there are other -- there could be
19  other documents that would lead me to reach the same

Page 97

                        Ex 1 - 5-26-06 depo transcript
20   opinion.
21        Q    Do you plan to use the documents that you just
22   mentioned to tell the jury that doctors were either
23   confused by cardiovascular information in Merck's
24   promotional pieces or mislead by them?
25        A    Yes.
0235
1         Q    You talked about Obstacle Handlers in your
2    report. Do you remember that?
3         A    Yes.
4         Q    Did you ever hear of Merck's explanation as to
5    what Obstacle Handlers are?
6         A    Yes.
7         Q    What is it? What is Merck's explanation?
8         A    Merck's explanation is that -- well, that when
9    physicians felt hesitant about prescribing Vioxx, they
10   tried to reassure them or convince them to prescribe it
11   by telling them what the Obstacle Handlers -- you know,
12   by stating the Obstacle Handler.
13        Q    What is the basis for your testimony there?
14        A    With regard to the cardio --
15        Q    No, with regard to the --
16        A    Well, I think the Obstacle Handling materials
17   were misleading.
18        Q    And that is based on your interpretation of
19   Merck's documents; right?
20        A    It is based on the face of what the documents
21   state versus what Merck knew or should have know.
22        Q    Because you still hold yourself out as an
23   expert about what Merck knew or should have known about
24   the cardiovascular risks?
25        A    Yes.
0236
1         Q    You talk about the CV card in your report.
2              Do you know whether there are any false
3    statements on the CV card?
4         A    I -- I used the standard misleading, not out
5    right false lies. So I didn't evaluate it based on a
6    higher standard of false statements.
7         Q    If you could answer my question.
8              Is there anything untrue or false about the
9    statements on the CV card?
10        A    I don't recall there being any outright false
11   statements that were misleading.
12        Q    Can you answer my question?
13        A    I did. I can't recall at the moment there
14   being any false statements.
15        Q    You don't have any reason to believe that
16   there were untrue or false statements on the CV card;
17   correct?
18        A    They were misleading.
19        Q    I did not ask you that, ma'am.
20        A    Okay. I already said the answer to that other
21   question; didn't I?
22        Q    Dr. Pechmann, you have no reason to believe
23   that the statements in the CV card are untrue --
24        A    At this point, I don't recall any false
25   statements in the CV card.
0237
1         Q    -- am I right?
2              Do you know whether any of the sales
3    representatives in South Carolina used the CV card with
4    Dr. Micola or Dr. McCaffrey?

                        Page 98

Ex 1 - 5-26-06 depo transcript

5    A    I didn't see it on the call notes.  So I have
6  no -- I don't know one way or the other.
7    Q    Do you -- did you watch the Be The Power video?
8    A    Yes, I did.
9    Q    Do you know if any of the sales representatives
10 who called on Dr. Micola and Dr. McCaffrey watched the
11 Be The Power video?
12   A    No.
13   Q    Do you know whether it is common that drug
14 companies do things sometimes that are meant to motivate
15 the sales force to sell?
16   A    Yes, it is very common.
17   Q    And having a Be The Power video or something
18 like that, that is meant to motivate the sales force is
19 not necessarily a campaign to deceive doctors; is it,
20 ma'am?
21         MR. O'CALLAHAN:  Assumes facts not in evidence.
22         THE WITNESS:  That video was providing
23 misleading information.
24 BY MR. GOLDMAN:
25   Q    Okay.  Did you understand my question?
0238
1         When sales representatives are shown videos or
2  go to launch parties, and there is motivational things
3  that happen, that is not an effort or campaign to
4  mislead doctors; is it?
5         MR. SKIKOS:  Objection.
6         THE WITNESS:  You mean as a general rule?
7         MR. O'CALLAHAN:  Join.
8  BY MR. GOLDMAN:
9    Q    Yes.
10   A    I don't know.  I have not done research on
11 that.  I would hope not.
12   Q    By the way, it is common, isn't it, in the
13 pharmaceutical industry for sales representatives to
14 call on doctors?
15   A    Yes.
16   Q    It is common for pharmaceutical reps of all
17 different companies to drop off samples; right?
18   A    Yes.
19   Q    You don't have any reason to think that Merck's
20 sales representatives visited doctors more often than
21 sales representatives of other companies; do you, ma'am?
22         MR. SKIKOS:  Objection.
23         MR. O'CALLAHAN:  Join.
24         THE WITNESS:  Yes.  There is data on the
25 frequency, which the Merck representatives saw the
0239
1  physicians versus Celebrex and others.  They kept
2  detailed records on that.
3  BY MR. GOLDMAN:
4    Q    Is it your testimony, Dr. Pechmann, that Merck
5  sales representatives visited doctors more often about
6  Vioxx than Pfizer sales representatives visited doctors
7  about Celebrex and Bextra?
8    A    I would have to review that data, but I didn't
9  review that prior to being here.  There is data on that
10 to answer that question.
11   Q    You don't know the answer?
12   A    At this point in time, no.
13   Q    You talked about an audio conference by Peter
14 Holt.  Do you remember that --
15   A    Yes.

Page 99

Ex 1 - 5-26-06 depo transcript

```
16      Q     -- in your report?
17            Did you listen to that audio conference?
18      A     No.
19      Q     Did Dr. McCaffrey or Dr. Micola attend that
20  audio conference?
21      A     They didn't testify that they had.
22      Q     Did Merck respond --
23      A     I believe they said they did not.
24      Q     Did Merck respond appropriately when the FDA
25  sent its warning letter about Peter Holt?
0240
1       A     I don't think they responded appropriately to
2   that warning letter, no.
3       Q     What did Merck do with respect to Pete Holt
4   after Merck got the warning letter from the FDA?
5       A     As I recall, they sent out a letter to correct
6   the problem to the people that were at the seminar.
7       Q     What did the FDA say after they received a
8   letter from Merck advising them of what Merck was going
9   to do in response to the FDA's letter -- strike that.
10            Do you know whether the FDA took any further
11  action after Merck sent out letters correcting
12  misstatements that were made by Dr. Holt?
13      A     I didn't see that they did anything else, no.
14      Q     Did you ever see Merck's response to the FDA
15  warning letter?
16      A     I saw the correction letters that -- but, no, I
17  did not. I don't recall seeing a response to the
18  warning letter from Merck.
19      Q     The plaintiffs' lawyers never showed you that?
20      A     I don't recall seeing it.
21      Q     By the way, do you know whether you have
22  received and reviewed all of the research reports that
23  were done concerning Merck's marketing efforts for
24  Vioxx?
25      A     Well, I -- I asked for very specific reports
0241
1   and I got what I asked for.
2       Q     Do you know whether you have received and
3   reviewed all of the research that Merck has done on
4   Vioxx?
5       A     Well, I am positive I haven't, no -- well, I am
6   not positive, but I think there is research that we
7   don't have, but -- that wasn't in the deposit --
8   repository.  Is that what it is called?
9             It seems like there is missing pieces of
10  research, but I think I got everything that we could get
11  my hands on.  There clearly seems to be missing research
12  because they said they were going to do this subsequent
13  research, and there is no record of it.
14      Q     Dr. Pechmann, throughout your report, you quote
15  from Merck's internal documents and then you express
16  your opinions about them; right?
17      A     No, I would not say it is throughout the
18  report.  Part of the report, I do that.
19      Q     Okay.  Let's look as an example at 29 and do
20  you see in Paragraph C, you are talking about a March,
21  2000, Vioxx promotional piece for physicians which
22  features an elderly woman Ms. Guzman.  It is Exhibit 26
23  in your binder.
24      A     Yes.
25      Q     And you quote from it and you say,
0242
```

Ex 1 - 5-26-06 depo transcript

1      "The promotional piece went on to
2      state that in a specific six-week
3      study of patients 80-years-of-age or
4      older" and then it continues, and
5      then it says, "As with all NSAIDs,
6      Vioxx should be used with caution in
7      patients with fluid retention,
8      hypertension and heart failure."
9      Do you see that?
10  A   Yes.
11  Q   And then you add, "However, the
12      Overall message of the promotional
13      piece was that Vioxx was safe to use
14      in the elderly, more effective than
15      other nonsteroidal pain relievers and
16      simpler to use."
17      Do you see that?
18  A   Yes.
19  Q   You are just offering your interpretation of
20  that promotional piece; right?
21  A   No, we actually have research on that
22  promotional piece and that is why I put it in there.
23  Q   Do you cite any of the research here?
24  A   I believe I do.  Well, it must be in a
25  different part of the report, but I did cite the

0243
1   research on this because I chose -- is it this one?
2   Let's see.  Okay.  Okay.  I'm sorry.  It is not
3   that one.  It is the first quarter of 2003, that we have
4   research on.
5   Q   You are offering your subjective interpretation
6   of this March, 2000 promotional piece?
7   A   No.  We have tracking research that shows what
8   physicians believed about Vioxx, what they said the
9   sales reps were telling them when they were shown these
10  promotional brochures --
11  Q   Dr. Pechmann --
12  A   -- and it shows that they were getting the
13  impression that Vioxx was safe to use in the elderly.
14  The statistics are --
15  Q   Dr. Pechmann, I am not asking about statistics.
16  Please focus with me.
17      MR. SKIKOS:  I think you did.
18      THE WITNESS:  -- 18 to 40 percent, that is the
19  basis on which I am reaching the conclusion that it was
20  safe.
21  BY MR. GOLDMAN:
22  Q   Are you talking about the promotional ad?
23  A   Yes, I have data from when they were shown that
24  promotional piece.
25  Q   Show me the data that shows that the overall

0244
1   message of the March, 2000, Vioxx promotional piece was
2   that Vioxx was safe to use in the elderly, more
3   effective than nonsteroidal pain relievers, and simpler
4   to use.
5   A   I'm not sure if I have it from that exact
6   promotional piece, but I have it from a very similar
7   promotional piece.
8   Q   I want to talk about this one because that is
9   the one I am on now.
10  A   Okay.  Well, March, 2000, I believe that
11  particular data is missing.

Page 101

Ex 1 - 5-26-06 depo transcript

```
12        Q      You are expressing your subjective view,
13   Dr. Pechmann, about your interpretation of this March,
14   2000 promotional piece?
15        A      No, because there are other promotional pieces
16   that have the exact same wording and we have research on
17   those.  So there should be no difference in the
18   response.
19               You see, they kept using the exact same wording
20   over and over again.  You know, in the integrated
21   marketing communications campaign that is what you do.
22   You repeat the same thing over and over again.  You
23   change the cover.  You change -- you know, if it is not
24   Liz Guzman, it is someone else.
25        Q      Is it your testimony that every time you say in
0245
1    your report that the "overall message of a promotional
2    piece was that Vioxx was safe to use in the elderly"
3    that that is based on research and that is not your own
4    subjective opinion?
5         A      Yes, that is my testimony.
6         Q      Turn with me, please, to Page 61, Paragraph
7    C -- actually, Paragraph E.
8         A      E, okay.
9         Q      Do you see that you are talking about the FDA
10   recommending that a Vioxx product label be changed to
11   include a cardiovascular warning?
12               Do you see that?
13        A      Yes.
14        Q      And then you say, "If a cardiovascular
15               warning had been included in the new
16               Vioxx product label, Merck had to
17               prominently convey such a warning in
18               all Vioxx television and print
19               advertisements."
20               Do you see that?
21        A      Yes.
22        Q      And then you say, "However, Merck
23               Executives put intense pressure on
24               the FDA and persuaded the agency to
25               allow them to move Vioxx
0246
1                cardiovascular risk information from
2                the warning section to the precaution
3                section of the new Vioxx label."
4         A      Yes, I saw evidence on that.
5         Q      What is your basis that Merck executives put
6    intense pressure on the FDA?
7         A      Memos that I saw.
8         Q      It is your basis for concluding that Merck
9    executives put intense pressure on the FDA based on your
10   review of the selective documents that the plaintiffs'
11   lawyers gave you?
12        A      And also, what the outcome was, that the FDA
13   said very clearly, there should be a warning about CV
14   risks, and they proposed that warning.  And the outcome
15   was no warning.
16        Q      Did you review all of the correspondence
17   between Merck and the FDA and their discussions about
18   the Vigor label?
19        A      I reviewed a lot of it.  I am not sure --
20        Q      Did you review all of the correspondence
21   between the FDA and Merck concerning the addition of the
22   Vigor label?  I'm sorry.  Withdrawn.
```

Page 102

```
                        Ex 1 - 5-26-06 depo transcript
23      A    I'm not sure because I know I reviewed a lot of
24   it, but I am not sure if it was 100 percent of what it
25   was.
0247
 1      Q    Do you know, Mr. Pechmann, whether you reviewed
 2   all of the correspondence between Merck and the FDA
 3   concerning the addition of the vigor data into the Vioxx
 4   package insert?
 5      A    No, I don't know with certainty.
 6      Q    And you are expressing your opinion here --
 7   your subjective opinion about Merck putting pressure on
 8   the FDA; are you not?
 9      A    I looked at the documents, yes.
10      Q    And a juror could look at the same documents
11   and reach the same conclusions or disagree with you,
12   they don't need your help to reach a conclusion; right?
13      A    I think in this case, yes, they could probably
14   understand it.  Although it would help to provide the
15   marketing context of it in terms of what the research
16   showed had the warning been in the ad -- in the TV ad.
17           There is research -- they started to do
18   research on what would happen if they had to put the
19   warning label on TV.  And basically, that research
20   showed --
21      Q    Did you hear my question?
22           MR. O'CALLAHAN:  I'm sorry.  She is answering
23   your question.
24           MR. GOLDMAN:  No, she is not answering.
25           THE WITNESS:  I am not?  What was your
0248
 1   question?
 2           MR. SKIKOS:  I think she is on this one.
 3   BY MR. GOLDMAN:
 4      Q    What was my question?
 5           MR. SKIKOS:  No.  Finish your answer.  She gets
 6   to finish her answer.
 7   BY MR. GOLDMAN:
 8      Q    I don't mean to interrupt you, but
 9   Dr. Pechmann, my question was really straightforward.
10           MR. O'CALLAHAN:  You know, for the record, I
11   think she has got to be allowed to finish the answer.
12           MR. GOLDMAN:  Go ahead.
13           THE WITNESS:  Because I have had innumerable
14   times, I have been interrupted and I have never been
15   able to finish my answer, and I was trying very hard to
16   answer your question.
17   BY MR. GOLDMAN:
18      Q    Oh, if there is anything that you would like to
19   say that you haven't said in this deposition, say it
20   now.
21      A    Well, I can't remember back, but there were
22   several times that I wanted to say something and I --
23           MR. SKIKOS:  Just finish this answer.
24           THE WITNESS:  So what I was saying is that
25   there is research that shows what would -- that there
0249
 1   was concern about having -- significant concerns about
 2   having a heart attack warning in their television ads,
 3   and they were doing research, and, basically, said, that
 4   if the warning -- heart attack warning was on the TV
 5   ads, then they might not even run product ads any longer
 6   because it would be devastating.  It would be
 7   de-marketing the product.
```

Page 103

Ex 1 - 5-26-06 depo transcript

```
 8   BY MR. GOLDMAN:
 9     Q    Are you finished?
10     A    Yes.
11     Q    You said that you feel like I haven't let you
12   finish your answers.  I don't want to hear at trial, if
13   your going to testify, Dr. Pechmann, that you wanted to
14   say something, but I didn't let you say it.
15          So I would like you to tell me whatever it is
16   that you would like to tell me that I have not let you
17   say.
18     A    Well, the one thing is I misunderstood your
19   question with regard to what ad Barnett saw and when he
20   saw the ad, so --
21     Q    Did you talk to the plaintiffs' lawyers about
22   that issue at a break?
23     A    No.  I've tried to correct my thing --
24     Q    Okay.
25     A    -- but you just jumped ahead.  And I couldn't
0250
 1   correct what I was trying to say.
 2     Q    Go ahead and correct it.
 3     A    That was the most recent example.  I have to
 4   look at the Barnett material, but the Hamill ads were
 5   played later.  So it was when he was continuing, not
 6   when he originally got the drug because the Hamill ads
 7   were not appearing in 1999 or 2000.
 8     Q    Is that all you wanted to say about that
 9   issue?
10     A    Yes, I just misunderstood your question.  So I
11   answered it improperly and then I did not get a chance
12   to correct.
13          So thank you for giving me the chance now.
14     Q    Did Mr. Barnett --
15     A    If I can think of other things, I will bring
16   them up.
17     Q    Did Mr. Barnett rely on the Dorothy Hamill ad
18   in deciding to use Vioxx?
19     A    To continue to use Vioxx, yes.
20     Q    Anything else that you feel I didn't give you
21   an opportunity to say because I don't want to hear at
22   trial that you felt like I was cutting you off.  So I
23   want to give you the chance to say whatever you would
24   like to say.
25          MR. O'CALLAHAN:  I have to interpose an
0251
 1   objection here.  When you throughout the course of the
 2   deposition, you cut her off repeatedly.  I think it is
 3   unfair to, at this point, ask her to recall every answer
 4   that you cut off, that she now needs to fill in the rest
 5   of the answer.  Notwithstanding that --
 6          THE WITNESS:  I feel the same way.  It is
 7   impossible, but if I think of anything that really
 8   sticks out, I will let you know; but I felt that way
 9   several times.
10          MR. SKIKOS:  Let's take a short break.
11          MR. GOLDMAN:  Okay.  Because I will take the
12   deposition again.
13          (Lunch recess.)
14          MR. SKIKOS:  We are going to agree to put the
15   boxes of documents that Dr. Pechmann reviewed and
16   replied upon in the possession of the court reporter and
17   then we are going to send something from Robinson,
18   Calcagnie to the court reporter's office to index all of
```

Page 104

Ex 1 - 5-26-06 depo transcript

```
19      the documents by Bates number; right?
20              MR. GOLDMAN:  (Nods head.)
21              MR. SKIKOS:  And to avoid having to attach the
22      five boxes of documents as exhibits to the deposition?
23              MR. GOLDMAN:  Yes.
24              Ready?
25              THE WITNESS:  So, the entire box -- all of the
0252
1       boxes?
2               MR. GOLDMAN:  Um-hmm.
3               MR. SKIKOS:  What about the exhibits?
4               MR. GOLDMAN:  We will attach the three binders
5       of exhibits that we have been referring to throughout
6       the deposition, which are the documents that have
7       actually been cited in Dr. Pechmann's report; right?
8               THE WITNESS:  Okay.
9       BY MR. GOLDMAN:
10          Q    Dr. Pechmann, I want to have an understanding
11      that at trial, you are not going to suggest to the jury
12      that you weren't given an opportunity to explain your
13      answers or that I cut you off in a way that didn't allow
14      you to give complete, full, honest answers.
15              That is not --
16          A    Good for you.
17          Q    It is not only not good for me.  It is not at
18      all what I think.  I certainly did not intend for that
19      to happen and I don't want you to leave here thinking
20      that that happened.
21          A    Okay.
22          Q    So if there are things that -- anything that
23      you want to say, that you feel I didn't let you say,
24      please say it.
25          A    Okay.  I would like to say one more thing.
0253
1           Q    Yes.
2           A    When you asked me about the Naproxen hypothesis
3       and did they continue to -- did Merck continue to
4       promulgate the Naproxen hypothesis after the warning
5       letter, I felt that I did not have a chance to
6       adequately respond.
7           Q    Okay.
8           A    The Naproxen hypothesis, of course, is in the
9       New England Journal of Medicine article on Vigor and
10      those reprints were still out there.  So I am not sure
11      if they were being given out, but they were out there.
12              As an expert in misleading ads, I know that if
13      there is something that you did to mislead the public,
14      in order to correct that misperception, you have to
15      overtly correct it.  It does not just correct itself.
16              So not surprisingly what the research shows is
17      that, that perception persisted.  It was never
18      corrected.
19              And one of the doctors in the case states
20      exactly that.  Page 19 in my report, Micola says that
21      his conclusions from the Vigor trial was that Naproxen
22      blocked platelet aggregation and that was never
23      corrected.
24              And also, later on, they just used slightly
25      different words in the brochures that talked about how
0254
1       Vioxx doesn't affect platelets.  So it used wording that
2       would be consistent with the Naproxen hypothesis.
3               So people knowing that Naproxen hypothesis and
```

Page 105

Ex 1 - 5-26-06 depo transcript

```
 4   reading that, would think it is consistent with the
 5   Naproxen hypothesis.
 6       Q    Have you now said everything that you wanted to
 7   say that you felt that I prevented you from saying?
 8       A    That is all I can recall at the moment.  Maybe
 9   in the middle of the night, I think of something else,
10   but, no, I feel good that these were the two issues that
11   I felt that I didn't have a chance to adequately
12   address.
13            And you should know my opinion; right?  And it
14   is good that you know them.
15       Q    Can we have an understanding that,
16   Dr. Pechmann, at trial you are not going to say that I
17   cut you off and you did not explain your answer?
18       A    Yes, as long as it doesn't keep happening.
19            MR. GOLDMAN:  Off the record.
20            (Discussion held off the record.)
21   BY MR. GOLDMAN:
22       Q    Can you turn, Dr. Pechmann, please to Page 62
23   of your report and I just want to focus on Paragraph F
24   where you are describing Merck's label that added the
25   Vigor data to it.
0255
 1       A    Yes.
 2       Q    Do you see that you say, "Further,
 3            Merck avoided having to prominently
 4            feature cardiovascular risk
 5            information in the Vioxx print
 6            advertisements, instead Merck simply
 7            put some vague and ambiguous
 8            cardiovascular information in the
 9            fine print of the Vioxx print
10            advertisements"?
11       A    Yes.
12       Q    Am I right that you are just expressing your
13   opinion and your personal view that the language in the
14   print advertisements was vague and ambiguous?
15       A    No, they had research on that.
16       Q    So you can point me to studies showing that the
17   cardiovascular information in the Vigor label was vague
18   and ambiguous?
19       A    I'm sorry.  The cardiovascular information in
20   the print advertisements that consumers saw once the
21   label changed was vague and ambiguous.  It was consumer
22   research.
23       Q    Okay.  So let me ask about, first, the label.
24            Okay.  Is it your opinion that the language
25   that the FDA approved and included in the April, 2002
0256
 1   label about the Vigor study was vague and ambiguous?
 2       A    Yes, I found it to be vague and ambiguous.
 3       Q    And that is your personal view and not based on
 4   any research?
 5       A    No.  What the research shows --
 6            MR. SKIKOS:  He is asking about the specific
 7   FDA label, not about the print ads or the integrated
 8   marketing campaign.  He is just asking about the label.
 9            THE WITNESS:  Well, there is research that
10   shows the effects of the label on physicians and there
11   was a downward turn in sales.  So some -- some people
12   got it.
13   BY MR. GOLDMAN:
14       Q    What research can you point me to that says
```

Page 106