Ex 1 - 5-26-06 depo transcript
15  that the language about cardiovascular information in
16  the April, 2002 label was vague and ambiguous?
17       A    Well, the research that I am going to refer to
18  is the, the focus group data we talked about earlier
19  when they did the focus group, with similar
20  cardiovascular information and the people said that they
21  were confused.
22           The doctors in this case, who said they didn't
23  understand the risks and other research that shows
24  that -- that overall perceptions of Vioxx, the
25  cardiovascular risks remained remarkably positive over
0257
1   the entire period of the campaign.
2        Q    Do any of the research reports that you just
3   referred to state that doctors believed the language in
4   the April, 2002 label was vague and ambiguous?
5        A    I haven't seen any research where they showed
6   doctors that label exactly and they said that, no.
7        Q    Am I right, Dr. Pechmann, that you are not an
8   expert in the wording of labels for prescription drugs?
9        A    Yes, I would say you are correct.  I am not an
10  expert in that.
11       Q    Let's turn a -- let's turn to Appendix A, which
12  is on Page 72.
13       A    Okay.
14       Q    Who wrote this?
15       A    I did, except where I typed in verbatim and
16  then I didn't write the quotes because they were
17  verbatim quotes.
18       Q    Now, in the text of your report on Page 9, you
19  say in Paragraph 16 that Appendix A to your report,
20  discusses in greater detail your opinion regarding what
21  Merck's marketing executives knew or should have known
22  about Vioxx's potential cardiovascular risk and my basis
23  for that opinion?
24       A    Yes.
25       Q    Now, when you turn to Appendix A, do you see
0258
1   that you're talking -- at least the title of this
2   Appendix says, "Merck's knowledge of Vioxx's
3   Cardiovascular Risk Potential"?
4        A    No.  What was in here is actually what I meant,
5   they knew or should have known.
6        Q    Did you review any of the deposition testimony
7   of any of the scientists at Merck, rather than just the
8   marketing executives?
9        A    Yes.
10       Q    What depositions did you review of a Merck
11  scientist?
12       A    Dr. Demopoulos, on Page 23 of in my report, is
13  a scientist.  This individual was the senior director of
14  cardiovascular clinical research.
15       Q    Is that it?
16       A    Yes.
17       Q    Did any of the plaintiffs' lawyers have input
18  to what you wrote in Appendix A?
19       A    No.
20       Q    How long did you spend reviewing Merck's
21  documents and depositions before you prepared Exhibit A?
22       A    I -- I can't answer that question exactly
23  because I didn't keep a record of that particular task
24  but --
25       Q    I'm sorry.

                        Page 107

Ex 1 - 5-26-06 depo transcript

0259
1    A    -- but, I mean, days of looking things over
2    would be a good start of what kind of time I spent on
3    this.
4    Q    So before you wrote Exhibit A to your report,
5    you spent several days reviewing documents and
6    depositions; is that right?
7    A    Mostly documents.
8    Q    About how many hours total would you say in
9    those days you spent reviewing materials that allowed
10   you to prepare Exhibit A?
11   A    I'm sorry.  How many hours in each day?
12   Q    Um-hmm.
13   A    Oh, I am assuming eight hour days.
14   Q    So you spent 16 hours reviewing documents or
15   deposition testimony before preparing Exhibit A?
16   A    I don't know that exact.  I mean --
17   Q    Is that about right?
18   A    I'm sure it is not exactly accurate, but it is
19   rough.
20   Q    When do you think Merck knew about the
21   cardiovascular risks that are potentially associated
22   with Vioxx?
23   A    Well, on Page 80, I have a report from 1998 and
24   on Page 79, I have a document from 1997.  So those
25   documents indicate they knew quite a while ago that
0260
1    there could be a potential risk.
2    Q    How can you say that, Dr. Pechmann, when you've
3    only been shown selected documents that the plaintiffs'
4    attorneys gave you and you haven't --
5         MR. SKIKOS:  Objection.
6    BY MR. GOLDMAN:
7    Q    -- and you haven't reviewed all of the
8    documents to be able to say what Merck knew or should
9    have known about cardiovascular risks?
10   A    Well, I am just saying it's potential risk, not
11   a certainty.  And then combining that with the fact that
12   they got the statistically significant results in Vigor,
13   and the FDA told them they couldn't with certainty
14   include or that it was Naproxen; and it could be that,
15   that Vioxx was causing the heart attacks.
16   Q    Do you think there was scientific evidence --
17   A    It is not my opinion that as to exactly when
18   they knew or should have known the risk exactly what
19   date because that is beyond my area of expertise; but
20   certainly, by the time of the Vigor findings, that is
21   when I feel confident in saying.  I mean, it has a
22   statistically significant effect.  So, I mean, I
23   understand that.  I am a scientist and --
24   Q    Do --
25   A    And then the FDA hits them own the head with
0261
1    it, but even when the Vigor study came out, its -- I
2    mean, it is a statistically significant effect.  They
3    knew -- they should have known.
4    Q    Dr. Pechmann, did you understand that there was
5    no placebo arm in the Vigor study?
6    A    Yes.
7    Q    Did you also understand that one interpretation
8    of the results in Vigor could be that Naproxen was
9    cardioprotective, not that Vioxx was harmful for the
10   heart?

Page 108

Ex 1 - 5-26-06 depo transcript

11       MR. O'CALLAHAN:  Objection.  Foundation and
12  scope.
13       THE WITNESS:  That that was a possible
14  explanation, yes.
15  BY MR. GOLDMAN:
16       Q    And your reading of the FDA's letter in
17  September of 2001, is that -- told Merck that it wasn't
18  a certainty that Naproxen explained the different heart
19  attack events in the Vigor study?
20       A    I did not understand that question.  Can you
21  rephrase it?
22       Q    Is it your testimony, Dr. Pechmann, that the
23  FDA's warning letter told Merck that it wasn't a
24  certainty that the Naproxen hypothesis, if you will, was
25  the explanation for the difference in heart attacks seen
0262
1  in the Vigor study?
2       A    I mean, the thrust of the letter was, it was
3  misleading to put that out as the sole explanation.
4       Q    Would you agree with me, Dr. Pechmann, that a
5  jury could read the FDA's warning letter and would
6  understand it, and wouldn't need your help in
7  interpreting it?
8       MR. O'CALLAHAN:  Objection.  Compound.
9       THE WITNESS:  I guess, I disagree.  In order to
10  interpret it, they need to understand the integrated
11  marketing communications campaign.
12  BY MR. GOLDMAN:
13       Q    You think the jury has to understand the
14  integrated marketing communications campaign to be able
15  to understand the meaning of the FDA's warning letter?
16       A    Yes.
17       Q    Why?
18       A    Because what that was telling Merck is that
19  their integrated marketing communications campaign that
20  they worked so hard on was -- was misleading; and so
21  what they had done was created a misleading impression
22  on people that then was perpetuated.
23       So I think they have to understand it in the
24  context of the whole picture, so that the FDA put out
25  this warning letter, but the damage was already done.
0263
1       And the evidence shows that the damage was done
2  and just writing to Dr. Holt's seminar participants and
3  correcting it, doesn't undue the damage as the research
4  shows.  They wouldn't understand that on their own.
5       Q    Based on your review of the research reports,
6  would you agree, Dr. Pechmann, that Vioxx was affective
7  for the vast majority of people who used it without
8  causing them any side effects?
9       MR. SKIKOS:  Objection.  You are asking a
10  medical opinion now.
11       THE WITNESS:  Yeah, that is not in my area of
12  expertise.
13  BY MR. GOLDMAN:
14       Q    It is also not in your area of expertise to be
15  able to say what Merck knew or should have known about
16  cardiovascular risks?
17       A    I disagree with that We look at science all of
18  the time and we look at the statistically significant
19  effects to see if we can make claims or not make claims.
20       And it is similar to what marketers had to do
21  here.  You have to have that expertise.  Otherwise, you

Ex 1 - 5-26-06 depo transcript

22  cannot run the campaign because you could be misleading
23  people.
24      Q    What did Merck know about potential
25  cardiovascular risks in 1997?
0264
1       A    That is beyond my expertise to describe in
2  detail. I know one memo that I included in here, which
3  I thought was particularly telling.
4       Q    What did Merck know about the cardiovascular
5  risks of Vioxx in 1998?
6       A    Merck had evidence that there could be a
7  problem. It started to obtain evidence that there could
8  be a problem based on these memos.
9       Q    Are you basing that on the one scientific
10  advisors meeting from May of 1998?
11      A    Well, that is important, a scientific advisors
12  meeting. I mean, that is not some guy shooting off a
13  memo to someone else, you know.
14      Q    Do you understand --
15      A    -- but like I said, I don't have an opinion on
16  exactly who knew, how much they knew, you know, whether
17  there was disagreement.
18      I know that there was some evidence available
19  to them, and I put a couple of representative memos in
20  the report.
21      Q    Is it true, Dr. Pechmann, that you don't have
22  an opinion on exactly what Merck knew, how much they
23  knew, and whether there was any disagreement about the
24  cardiovascular effects of Vioxx?
25      A    I have an opinion that they knew or should have
0265
1  known by the time the Vigor study was completed.
2       Q    So --
3       A    Because that is the kind of study that we would
4  look at to run any other integrated marketing campaign.
5  At that point, it was clear it was a statistically
6  significant effect.
7       Q    Are you aware of any evidence that came out
8  after the Vigor study or evidence that predated the
9  Vigor study that suggested that Naproxen could explain
10  the difference in the Vigor study as opposed to Vioxx
11  being responsible for the increased heart attacks?
12      A    I see what the FDA said about that.
13      Q    Is that all that you know about that topic?
14      A    No, I have seen other material on it.
15      Q    Do you feel that you are in a position,
16  Dr. Pechmann, to be able to assess whether there is
17  merit to the Naproxen hypothesis?
18      A    Not medical expertise. I --
19      Q    Have you looked at any observational studies
20  involving cardiovascular risks of COX-2 inhibitors?
21      MR. O'CALLAHAN:  I object. It's not the gold
22  standard.
23      THE WITNESS:  I know that there were some
24  studies -- I don't recall seeing any observational
25  studies, but I may have seen one.
0266
1  BY MR. GOLDMAN:
2       Q    Okay. I am going to now focus on the documents
3  that you have produced here at deposition. Okay. And I
4  have some questions about them.
5       A    Okay.
6       Q    We are going to index all of these and there is

Page 110



11636609

Jun 26 2006
7:11PM

# Plaintiffs' Response re PECHMANN

# Exhibit 1D of 4

Ex 1 - 5-26-06 depo transcript

```
 7   going to be an index attached to the deposition and that
 8   is how we will know exactly what you produced here
 9   today.
10        A    Yes.  Can I make a statement, though?  There
11   were sometimes when we had a -- sales brochures that
12   they were very large number of detailing pieces and so
13   after going through them, I didn't keep all of them in
14   the box.
15            So to match updates to the research, which
16   makes sense to do, I may have to add a few of those
17   detailing pieces.  You know, they are very -- I mean, I
18   found them to be -- the wording to be identical, but I
19   have to prove that.
20        Q    I am going to start with the first redwell in
21   Box I and I am not going to go through each of these
22   documents, but just a few.  Okay?
23        A    Okay.
24        Q    This is a document called Monthly Report for
25   Vioxx, September, 2001.  It is has got a Bates stamp at
0267
 1   the bottom MRK-AJT 0061075 through 1126.
 2            Whose handwriting is on the right side?
 3        A    Mine.
 4        Q    What does this say?
 5        A    I didn't have time -- "Didn't review.  No
 6   time."
 7        Q    So the document we just described, you didn't
 8   have time to review before you formulated your opinions
 9   and wrote your report?
10        A    I didn't review it thoroughly.  In other words,
11   I went through, skimmed it, saw if it was consistent
12   with what documents I had because there are ERA reports
13   every month.  So there is quite a bit -- it is just like
14   the detailing.
15            There is a very, very large number of similar
16   pieces, but I didn't -- when I looked at it and it
17   looked similar to the others, I decided not to include
18   it in the report.
19        Q    Do you stand by your statement that you didn't
20   review this September, 2001 Monthly Report because you
21   didn't have time?
22        A    What I mean is I didn't review it thoroughly.
23   I just skimmed through it.  By "review," I mean read
24   every page, be very careful.
25        Q    There is an October, 2001 Monthly Report for
0268
 1   Vioxx MRK-AKC 39095 through 39149.  This document also
 2   says, "Didn't review.  No time."
 3            Is that in your handwriting?
 4        A    They are exactly the same.  I wrote the notes
 5   at the same time and I meant the same in both.
 6        Q    This is a document called Vioxx Monthly EAR,
 7   May 2002, MRK-ADA 0057461 through 603.
 8            Whose handwriting is this?
 9        A    Mine.
10        Q    And this here, too, on the left side?
11        A    Yes.  I call myself Connie.
12        Q    Whose handwriting is up in the right-hand
13   corner?
14        A    Mine.
15        Q    So the handwriting on the entire page is yours?
16        A    Yes.
17        Q    Did you make these notes as you were reviewing
```

Ex 1 - 5-26-06 depo transcript

18   this document or were these notes that you made when you
19   were talking to plaintiffs' counsel?
20        A    When I was reviewing it initially.  Sometimes I
21   would change my opinion in looking at something again.
22        Q    Did you sit down with the plaintiffs' lawyers
23   to review these documents and talk about what was
24   significant in them?
25        A    No.  I'm not sure if they even know I had them.
0269
1         Q    This is another document that is MRK-ADN 010988
2    through 919.  It is the ANA Physician Attribute Tracker,
3    September, 2002, Top Line Results.
4              Is this your handwriting on the first page?
5         A    Yes.
6         Q    Were those notes you made when you reviewed the
7    document?
8         A    When I initially reviewed it, yes.
9         Q    On some of these, such as Situation Analysis
10   March, 2003, MRK-AKC 0068277 through 316, there is a
11   Post-it that says, "Physician Message Tracking."
12             It shows increasing concern over non-G.I.
13   safety, whose handwriting is that?
14        A    Chris Spiro.
15        Q    And did he prepare this Post-it and put it on
16   the document for your benefit?
17        A    No, I didn't ask him to do that, and I ignored
18   what he put, but he did put that on there.  I guess
19   because he was an eager beaver and thought it was
20   helpful, but it wasn't because I am drawing my own
21   conclusions because I, basically, ignored what he said
22   on those Post-it notes.
23        Q    Why would you ignore what he said?
24        A    Well, I am the marketing expert.  He is not.
25        Q    Okay.  This is an Attribute Tracker MDS
0270
1    Summary, MRK-AKP 0038549 through 659.
2              Whose handwriting is on the first page of the
3    document?
4         A    Mine.
5         Q    And whose handwriting is on the Post-it that
6    says, "Competitive need to boost non-G.I. safety"?
7         A    That's Chris Spiro's.
8         Q    This is a five-page handwritten document that
9    doesn't have a Bates number because it is your
10   handwritten notes, I think, on the five yellow pages.
11   Is this your handwriting?
12        A    Yes, it is.
13        Q    And what does it say at the top?
14        A    "New docs and report."
15        Q    Do you know when you prepared this document?
16        A    It was a while ago.  So it was probably after I
17   completed all of this work in April.  That I added those
18   to the report.
19        Q    These were documents -- these were your notes
20   based on documents that you were sent in April of
21   2005 -- 2006?
22        A    No, I might have had those earlier.
23        Q    What does No. 3 say?
24        A    "Be The Power Video on day one of McDarby/Cona
25   versus Merck Trial, 3:00 p.m. segment."
0271
1         Q    What does that mean?
2         A    That was one of the things that I added to the

Page 112

Ex 1 - 5-26-06 depo transcript

3    report.  I watched that video.
4        Q    You watched the Cona/McDarby trial in New
5    Jersey?
6        A    No, I just watched that part of it.  We did not
7    have a copy of the video, just the video.  So I watched
8    it in the trial.  And then I got a copy of the video.
9        Q    There is highlighting on some of the original
10   documents, Dr. Pechmann, is that your handwriting or was
11   it handwriting on documents that you received?
12       A    You mean highlighting?
13       Q    Yes.
14       A    That is my highlighting.
15       Q    This is another handwritten document that you
16   have here.  It is just before the response to the
17   expression to concern or expression of concern.
18       A    Okay.
19       Q    This is your handwriting, too?  It is a
20   two-page document.  It says, "Be The Power"?
21       A    Yes.
22       Q    What does that document say?
23       A    Mark McDarby; New Jersey; Mark McDarby/Cona
24   versus Merck.  So these were part of the notes that I
25   took when I saw the video as part of that trial.
0272
1        Q    So you were taking notes while as you were
2    watching the Be The Power video?
3        A    Well, I stopped it and then take notes.
4        Q    Did you watch anything else in the Cona/McDarby
5    Vioxx trial other than Be The Power video?
6        A    I saw what Anstice looked like, but I think he
7    was there, Anstice, but that was all.  I forwarded it
8    through the video and that is all I watched.
9        Q    Did you watch Mr. Anstice's trial testimony in
10   the Cona/McDarby case?
11       A    No.
12       Q    Why not?
13       A    I didn't have time.  I am a professor and I
14   have a day job.  I am not a, you know, professional
15   expert witness or anything.
16       Q    These are some handwritten notes that you took
17   on the back of the Waxman report.
18            Did you read the Waxman report?
19       A    Yes.
20       Q    Can you tell me what this page means on the
21   very back with your handwritten notes where you are
22   identifying numbers?
23       A    Those are his references.  The reports referred
24   to other documents.
25       Q    So you read the Waxman record to find certain
0273
1    documents that you then wanted to see?
2        A    Well, no, I read it to find out what Waxman had
3    to say about the CV card or Merck.  And then I found it
4    useful to make a list of documents that he cited in case
5    I might want to look at them.
6        Q    Okay.  Bear with me.
7             This is a printout of portions of
8    Dr. McCaffrey's deposition testimony.  And there are
9    excerpts and then there are certain things that are
10   bolded.
11            Do you see that?  It goes from Page 1 to 41.
12       A    Let's see, yes, I bolded that myself.
13       Q    Did you read the entire deposition or just the

Page 113

Ex 1 - 5-26-06 depo transcript

14    excerpts that you were sent there?
15        A    Oh, no, the entire thing.  I had it in my
16    computer.
17        Q    Yes.
18        A    And then when there was a page that I thought I
19    really needed, I bolded it and printed it out.  Isn't
20    much of it printed out or is it just each page where I
21    bolded?  Does it jump around?
22             Oh, yeah, so if I bolded something on a page,
23    then, I guess, I printed just that page, so that I would
24    have it.  And I stopped doing that because it wasn't
25    really helpful, really.
0274
1        Q    Do you have any experience, Dr. Pechmann,
2    reviewing call notes that are prepared by sales
3    representatives, other than in your work in this case?
4        A    I reviewed very similar documents in the past,
5    not -- I mean the same type of data.  You know,
6    instances of something.  Coding -- it is -- from a
7    scientific perspective, I have done that type of
8    research before; and I am familiar with that type of
9    data.
10        Q    Do you --
11        A    I'm sorry.  In answer to your question, I never
12    prior to this case analyzed the sales call notes
13    involving pharmaceuticals.
14        Q    Prior to this case, Dr. Pechmann, you never
15    reviewed sales call notes for pharmaceutical sales
16    representatives; right?
17        A    That's correct.
18        Q    Prior to this case, you never reviewed the
19    number of visits that were paid on a particular doctor
20    by sales representatives; correct?
21        A    Is that a different question from the other
22    one?
23        Q    Yes.
24        A    So have I ever --
25        Q    You have reviewed documents in this case,
0275
1    Dr. Pechmann, that reflects the number of sales calls,
2    not just sales notes, but sales calls on Drs. Micola and
3    McCaffrey; right?
4        A    Yes.
5        Q    And am I right that before this case, you have
6    never reviewed documents like that?
7        A    No, I disagree with that statement.  I had
8    never reviewed sales call -- what would you call that
9    one?  Sales call documents?  Because you are
10    distinguishing between sales call notes and sales call
11    records.
12        Q    The documents that you reviewed showing the
13    number of visits between sales representatives and
14    Dr. Micola and Dr. McCaffrey, those types of documents
15    you never reviewed before for any pharmaceutical
16    company; true?
17        A    For any pharmaceutical company, no.
18        Q    I am correct; right?
19        A    That is correct.
20        Q    Down to two more boxes.
21        A    Okay.
22        Q    It will go fast.
23             Were you sent depositions from the plaintiffs'
24    lawyers in this case?

Page 114

```
                              Ex 1 - 5-26-06 depo transcript
25        A    Yes.
0276
1         Q    And I am going to --
2              MR. O'CALLAHAN:  Read the titles into the
3    record.
4              MR. GOLDMAN:  Yes.
5         Q    Read the depositions here and ask you whether
6    you reviewed them in their entirety.  Okay?
7         A    Okay.
8         Q    The deposition of Dr. Michael Micola, April 25,
9    2006?
10        A    Yes.
11        Q    Is the copy that I am holding in my hand the
12   version that you reviewed?
13        A    I read an electronic version of that.
14        Q    Did you review in its entirety of Marilyn
15   Krahe, K-R-A-H-E?
16        A    My recollection is yes.
17        Q    Did you review the exhibits that were attached
18   to Marilyn Krahe's deposition?
19        A    Yes.
20        Q    Did you review the deposition in its entirety
21   of Mary Elizabeth Blake?
22        A    Yes.
23        Q    Did you review in its entirety the deposition
24   of David Anstice from March 16, 2005, March 17, 2004,
25   March 18, 2005, and April 12, 2005, and May 20, 2005?
0277
1         A    No.  My recollection is that I received one of
2    those early and I looked through that one and then the
3    other ones I skimmed through.
4         Q    So you at least skimmed through all of the
5    deposition transcripts for the dates I just mentioned
6    for David Anstice?
7         A    No, I cannot testify to that.  I might have
8    missed -- I believe I received some of those kind of
9    late.  And so I did not -- by "skim," I mean to see what
10   is on each page.
11             And what I did, as I recall, is look for key
12   words to see if I could find relevant things in there
13   because it was too much.  I did not have time to go
14   through all completely.
15             I think there was one deposition that I got
16   early.  Can we -- I mean, are they all -- are some of
17   them during trial and some --
18        Q    Yes.
19        A    Yes, I think I received -- what was his actual
20   deposition?
21        Q    I believe -- the video deposition, the first
22   one that you were given of David Anstice is March 16,
23   2005, and that was in the New Jersey case, as well as
24   the Ernst case, Texas.
25        A    So that was just one day.  Yeah, I believe I
0278
1    got that early and I looked at that completely.  And
2    then the other ones --
3         Q    And there was the second day March 17, 2004,
4    did you review that one?
5         A    Can I see it?
6         Q    Sure.
7         A    I can't recall.  My recollection is that I
8    reviewed the original deposition.  There is only one day
9    in 2004.
```

Page 115

Ex 1 - 5-26-06 depo transcript

```
10      Q     March 17, 2004, deposition of David Anstice,
11   you remember that?
12      A     Yes.  And I remember going in key word search
13   trying to find relevant text in these others.
14      Q     Okay.  Did you review the following depositions
15   of Debra Shapiro?
16      A     I don't believe so, no.
17      Q     So you did not review any depositions of Debra
18   Shapiro?
19      A     No, that's not my recollection.
20      MR. GOLDMAN:  Can I take it out of here?
21      MR. SKIKOS:  (Nods head.)
22      THE WITNESS:  Yeah.
23   BY MR. GOLDMAN:
24      Q     Did you review any of the depositions of
25   Dr. Scolnick, S-C-O-L-N-I-C-K.
0279
1       A     I reviewed -- my recollection is that I
2    reviewed part of it.
3       Q     Let me hand you --
4       A     No, let --
5       Q     I am handing you three transcripts:  April 29,
6    2005, June 1st, 2005, and August 16, 2005 of
7    Dr. Scolnick?
8       A     This first one looks familiar.  I do believe I
9    went through at least parts of these -- or at least the
10   first one.
11      Q     So you believe you reviewed parts of
12   Dr. Scolnick's April 29, 2005, deposition transcript?
13      A     Right.
14      Q     How about the others?
15      A     I don't recall looking at these.
16      Q     Okay.  So we are going to just keep in the box
17   the one that you do remember reading April 29, 2005.
18      A     Okay.
19      Q     Did you review the deposition transcript of
20   Susan Baumgartner on February 25, 2005?
21      A     I did review the deposition transcript, yes.  I
22   will rely on you for the date.
23      Q     Did you review Susan Baumgartner's deposition
24   of March 11, 2005?
25      A     I recall reviewing everything I had with
0280
1    those -- with regard to her depo.
2       Q     Do you remember reading Susan Baumgartner's
3    September 30, 2005 deposition?
4       A     I need to look -- well, let me see all three to
5    be absolutely sure.
6             Yes, I believe I did review this.
7       Q     So the three deposition dates that I just read
8    of Susan Baumgartner's --
9       A     My recollection is that I went through her -- I
10   forgot those three dates, but I remember going through
11   Baumgartner's.
12      Q     Do you remember reviewing the entire deposition
13   of Gerald Barnett?
14      A     Yes.
15      Q     Did you review the entire deposition of Michael
16   McCaffrey?
17      A     Yes, both Michael McCaffrey's.
18      MR. SKIKOS:  Didn't you say yes on that one?
19      MR. GOLDMAN:  Yes.  There is two of them here.
20      Q     Did you review the deposition of Dr. Kurfm,
```

Page 116

Ex 1 - 5-26-06 depo transcript

```
21   November 21, 2005, January 24, 2006?
22      A    No.
23      Q    Did you review the deposition testimony of
24   Charlotte McKines?
25      A    McKines?
0281
 1      Q    Yes.
 2      A    Yes.
 3      Q    How do you know how to pronounce her last name?
 4      A    Well, that is how I pronounce it.  I really
 5   don't know.
 6      Q    Do you know Charlotte McKines?
 7      A    No.  You might be right and I may be wrong.
 8      Q    I have no idea.
 9           Did you review Charlotte McKines's deposition
10   of August 3rd and August 4th, 2005?
11      A    My recollection is yes.
12      Q    Did you review the depositions of Dr. Alise
13   Reicin?
14      A    No.
15      Q    Let me just identify the three depositions of
16   Charlotte McKines:  August 3rd, 2005, August 4, 2005,
17   September 9, 2005.
18           Did you review the deposition of good old
19   Dr. Topol?
20      A    No.
21      Q    Did you review the deposition of Jan Weiner?
22      A    Yes.
23      Q    There is an August 10, August 11, and
24   August 12th?
25      A    Yes.
0282
 1      Q    Did you review the deposition testimony of
 2   Ellen Westrick?
 3      A    Yes.
 4      Q    Okay.  That is all of the depositions and now,
 5   I will go through the box of binders.
 6           I have here what probably will end up being Box
 7   4 and 4(b), which are blue binders one, two, three,
 8   four, five from Mr. Robinson's firm and the first is a
 9   deposition of Laura Demopolous, D-E-M-O-P-O-L-O-U-S.
10           Did you read that?
11      A    Yes.
12      Q    The second binder looks like it has a bunch of
13   documents?
14      A    Yes.
15      Q    Maybe you can tell me what this consists of
16   because I don't want to go through each one.  I will, if
17   I have to, but maybe you can summarize what that binder
18   contains.
19      A    Okay.  The first set of documents has to do
20   with the FDA regulations.  And then there is documents
21   from the FDA Advisory Committee Meeting or -- let me
22   see, and the teleconference; and then there is a
23   discussion, instructions on how the sales reps should go
24   through the Bombardier reprint; and then -- I mean, it
25   is a set of miscellaneous documents.  I guess, we have
0283
 1   to go through every one.
 2      Q    No.
 3      A    Some of them are repeats that you saw in
 4   another binder.
 5      Q    Did you review all of the materials that are
```

Ex 1 - 5-26-06 depo transcript

```
 6      contained in the second binder that we are going through
 7      right now?
 8          A      This binder?
 9          Q      Yes.
10          A      Yes.
11          Q      Okay.  This is a binder of documents called
12      Tracking Documents DTW Physician Messages?
13          A      Yes.
14          Q      Did you review this entire binder?
15          A      No.
16          Q      Did you review any of it?
17          A      Yes.
18          Q      Well, can you, as best you can, indicate what
19      documents you reviewed in this Tracking Docs Binder?
20          A      Well, I reviewed the summary sheets.  It is by
21      month, so they are summary sheets and I reviewed the
22      questionnaire.  This is the tracking of the sales reps
23      messages by DTW.
24          Q      Okay.
25          A      And you know, scanned through and stopped at
0284
 1      certain pages to see what the different questions were
 2      that were being asked.
 3                 But I mostly focused on the summary sheets at
 4      the beginning of each one when there was one.  Some of
 5      them we didn't have summary sheets, but sometimes we
 6      did.
 7                 And I spent time on -- you know, the sample,
 8      so each document gives you the sample.  So who was it
 9      that, that they were interviewing; but I did not spend a
10      lot of time on the raw data.  You know, I looked at the
11      summaries.
12          Q      Okay.  The fourth binder is -- has a binder
13      label that has 1996 to 2005.  And it contains in
14      chronological order what looks like plaintiffs' trial
15      exhibits, starting with P1.0020 and then that was in
16      1996 and it goes all the way to P1 through 1238.
17                 Did you review this?
18          A      Can I see it?
19          Q      Yes.
20          A      To the best of my recollection, no.
21          Q      So you are not going to include the fourth
22      binder and so we will not copy it because you did not
23      review that?
24          A      Right.
25          Q      The fifth binder starts with FDA, AAC, which is
0285
 1      the Advisory Committee, February 8, 2001, Statistical,
 2      Bates No. MRK-ABT 0003756 and it ends at MRK-HBH 0013917
 3      and it contains numerous documents separated by blue
 4      sheets?
 5          A      And documents in that.
 6          Q      And there are documents in the left sleeve as
 7      well.  Did you review this, what will be the fourth
 8      binder?
 9          A      Yes.
10          Q      In its entirety?
11          A      There may be some parts that I did not look at.
12      Farquhar, I did not review.
13          Q      You did not review.  Can I take a quick look at
14      that?
15          A      Ray, I didn't review.  Yeah, so I reviewed up
16      to that.
```

Page 118

```
                         Ex 1 - 5-26-06 depo transcript
17     Q     Okay.  So I am going to take out --
18     A     Let's see I did not see that.
19     Q     Okay.  So I am going to reidentify the fourth
20  binder because we took out documents that you had not
21  reviewed.
22           The new ending is MRK-CAAD 0001757 and it
23  starts -- MRK-ABT 0003756.
24           Did you review the documents on the left sleeve
25  also?
0286
1      A     Yes.
2      Q     Okay.  Let me just look at my notes to see if I
3   have anymore questions.
4      A     If you have an Internet, I can print out the
5   E-mails.
6      Q     Yes.
7      A     Do we have a printer?
8            MR. SKIKOS:  We can go to Robinson's office,
9   but I have some questions, too.
10           MR. GOLDMAN:  Let's go off the record for a
11  second.
12           (Discussion held off the record.)
13           MR. GOLDMAN:  Okay.  Exhibit 8 is
14  Dr. Pechmann's article called Do Consumers Over
15  generalize one-sided Comparative Price Claims and Are
16  More Stringent Regulations Needed?
17           Exhibit 9 is an article by Dr. Pechmann called
18  An Assessment of U.S. and Canadian Smoking Objectives
19  for the year 2000.
20           Exhibit 10 is a printout of a book on
21  Amazon.Com called Quasi-Experimentation Design and
22  Analysis Issues.
23           (Defendants' Exhibits 8 through 10
24           were marked for identification by
25           the court reporter.)
0287
1            THE WITNESS:  In Field Settings.  It says it on
2   the book.
3   BY MR. GOLDMAN:
4      Q     In Field Settings.
5            Do you intend to go to trial in New Orleans in
6   July?
7      A     Yes.
8            MR. GOLDMAN:  Okay.  Those are all of the
9   questions that I have right now subject to me reviewing
10  your E-mails, and then I might have some more questions.
11           THE WITNESS:  Okay.
12           MR. SKIKOS:  Let's go off the record for a
13  second.
14           (Brief recess.)
15           MR. GOLDMAN:  We are just going to mark as a
16  Exhibit 15 a compilation of E-mails that Dr. Pechmann
17  just printed off and it consists of eleven E-mails and
18  then we are going to have somebody inventory the four --
19  it may turn into five boxes that we discussed today.
20           (Defendant's Exhibits 11 through 15
21           were marked for identification by
22           the court reporter.)
23           MR. GOLDMAN:  And we will attach a copy of the
24  inventory of documents to the deposition.
25           Thank you, Dr. Pechmann.
0288
1            THE WITNESS:  You're welcome.
                         Page 119
```

Ex 1 - 5-26-06 depo transcript

```
2
3                       EXAMINATION
4    BY MR. SKIKOS:
5         Q     Dr. Pechmann, I am going to ask you about 25,
6    to 30 minutes worth of questions and then you can go
7    home.
8         A     Okay.
9         Q     It is almost about 6 o'clock.
10              Are you a Ph.D.?
11        A     Yes.
12        Q     In what?
13        A     In marketing management.
14        Q     Are you a full professor?
15        A     Yes, I am.
16        Q     You are tenured?
17        A     Yes.
18        Q     About approximately how many peer-reviewed
19   articles have you published?
20        A     Fifty.
21        Q     Have you -- do you consider yourself an expert
22   in integrated marketing campaigns?
23        A     Yes.
24        Q     Approximately how long have you been working in
25   the area of integrated marketing campaigns?
0289
1         A     Twenty years.
2         Q     Of the 50 peer-reviewed articles published in
3    journals, how many of them relate to aspects of
4    integrated marketing campaigns?
5         A     All of them.
6         Q     You mentioned before editorial boards?
7         A     Yes.
8         Q     What is that?
9         A     I am on several editorial boards, meaning that
10   I am one of a small group that -- that is considered to
11   be a top reviewer and would review -- when someone from
12   the review board reviews these papers to help ensure
13   that the quality of the journal is maintained.
14              It is very prestiges to be on the review
15   board because it means that you are just below an
16   editor.
17        Q     At one point, you were on three review boards
18   on three prestiges journals at the same time?
19        A     Yes.  The three top journals in marketing are
20   Journal of Consumer Research, Journal Marketing and
21   Journal Marketing Research and not one person is on all
22   three reviews boards and I was on all three review
23   boards for a while.
24        Q     Have you peer-reviewed articles on aspects of
25   integrated marketing campaigns?
0290
1         A     Yes, I have all of the time.
2         Q     Do you teach as a full professor on aspects of
3    integrated marketing campaigns?
4         A     Yes.
5         Q     There is something in your C.V. about top 50
6    Marketing Scholars.  Can you describe that?
7         A     Yes.  Someone did a study of the impact of
8    different marketing scholars based on the citation index
9    and I appeared in the top 50 in terms of people citing
10   my work.  So, basically, the impact of my work on
11   academia.
12              And I also was named the top scholar in
```

Page 120

Ex 1 - 5-26-06 depo transcript
13  economics for my citation count.  Even though, I am not
14  technically in economics.
15      Q    Is marketing a science?
16      A    Yes.
17      Q    Is it a subspecialty of any particular science?
18      A    It is a behavioral science.
19      Q    What are other behavioral sciences?
20      A    Psychology, economics.
21      Q    Do you in marketing use the scientific method?
22      A    Yes.
23      Q    Can you describe that?
24      A    The scientific method?
25      Q    As applied in marketing.
0291
1       A    Okay.  Well, you identify hypotheses.  You
2   tests hypotheses using a controlled study and using
3   valid methods and run statistical analysis; and write up
4   reports.
5       Q    Is there any difference in the scientific
6   methods used in marketing versus the scientific methods,
7   say, used in medical research, to your knowledge?
8       A    No, they are very similar.
9       Q    Are there scientific principles and
10  methodologies applied to integrated marketing campaigns?
11      A    Yes.  I mean I wouldn't say all, but integrated
12  marketing campaigns, these days virtually all -- well,
13  many apply the scientific method to test the messages,
14  understand their impact before they go out, and then to
15  track the messages afterwards.
16      Q    Does the scientific method used by Merck in
17  conducting its integrated marketing campaign in
18  conducting the studies that it used in this
19  integrated --
20      A    Can you rephrase your question?
21      Q    Let me get to that in a second -- I will do it
22  now.
23           Did Merck researchers who did work on their
24  integrated marketing campaign use the scientific method
25  to conduct their studies?
0292
1       A    Yes.
2       Q    Is there any distinction, in your mind, as an
3   expert in integrated marketing campaigns whether the
4   integrated marketing campaign is done by a
5   pharmaceutical company, versus a tobacco industry,
6   versus the government, versus the university, versus a
7   small company?
8            MR. GOLDMAN:  Object to the form.
9            THE WITNESS:  No.  No, there is no difference
10  based on industry.
11  BY MR. SKIKOS:
12      Q    Would you use the same scientific methodology
13  used to perform an integrated marketing campaign studies
14  no matter what the industry was?
15      A    Yes.  What really determines it is how much
16  money you have.
17      Q    Your experience in running integrated marketing
18  campaigns for the anti-drug -- can you describe that?
19      A    My experience?
20      Q    Yes.
21      A    I was involved in developing the strategy to
22  the campaign, the core messages.  I developed the
23  scientific method for testing the messages.

Page 121

Ex 1 - 5-26-06 depo transcript

24          I reviewed the focus group work that was done
25  on the messages as before they were filmed because it
0293
1   costs about -- a lot of money to film the TV ads.  So we
2   did extensive testing of the storyboards and preliminary
3   ads.
4          As I said, I developed overall the protocol and
5   statistical analyses involved in testing the final TV
6   ads.
7          And then I was also heavily involved in
8   reviewing the tracking research that we did after the
9   ads were running.  We tracked both youth and parents.
10  So we tracked adults as well as kids because it was a
11  campaign that included ads for adults, parents and for
12  kids.  It wasn't just a youth campaign.
13         I mean, it was designed to prevent youth from
14  using drugs, but parents was one of the target markets.
15  And so with regard to tracking, I helped to oversee the
16  design of the studies, learned about all of the
17  findings, was involved in the statistical analyses; was
18  involved in adjusting the campaign based on the results.
19         So I was heavily involved in the research at
20  all levels and also strategy decisions.
21     Q    When you did the anti-drug campaign, you did
22  that from the standpoint of a marketing science;
23  correct?
24         MR. GOLDMAN:  Object to the form.
25         THE WITNESS:  I was chosen because of my
0294
1   expertise in the science of integrated marketing of the
2   people who chose me said that I was chosen for that
3   purpose.
4          The campaign was required to have testing.  I
5   believe it was in the bill that passed in Congress and
6   so then they wanted to find someone who had expertise
7   and they chose me because people knew me.
8   BY MR. SKIKOS:
9      Q    I think there has been some confusion about
10  where you are rendering opinions.  So let me try and
11  clarify that in this particular case.
12         From a medical standpoint, are you offering
13  cause and effect opinions on the relationship between
14  Vioxx and cardiovascular events?
15     A    No.
16     Q    Okay.  From a marketing standpoint, are you
17  offering opinions on whether the Merck marketing
18  executives knew or should have known that there was a
19  cardiovascular risk?
20     A    Yes.
21     Q    From a marketing standpoint, are you offering
22  opinions whether Merck did perform a integrated
23  marketing campaign on Vioxx?
24     A    Yes.
25     Q    What is your opinion?
0295
1      A    That they did clearly perform an integrated
2   marketing communications campaign.  It is even in their
3   documents.
4      Q    Now, are you offering opinions on your analysis
5   of the tests performed by Merck to determine whether the
6   cardiovascular risk was being conveyed and received by
7   the doctors and patients?
8          MR. GOLDMAN:  Objection to form.

Page 122

Ex 1 - 5-26-06 depo transcript

9       THE WITNESS:  Can you state that again?
10   BY MR. SKIKOS:
11      Q    Sure.  Let me do it in two steps.
12           In your review of the materials that were
13   provided to you on the studies conducted by Merck in
14   performing your integrated marketing campaign, did you
15   actually see categories of studies performed?
16      A    Yes, I did.  I saw six categories of studies.
17      Q    And did you as an integrated marketing campaign
18   expert analyze those studies?
19      A    Yes, each of them.
20      Q    Okay.  Can you tell me what the six categories
21   of studies were that were performed by Merck in their
22   integrated marketing campaign?
23      A    Yes.  So there was tracking of the sales reps
24   visits to the physicians.
25           There was tracking of the perception -- the
0296
1    physicians' perceptions of Vioxx and Celebrex and their
2    prescribing behavior.  That was a panel of physicians.
3            And then there was tracking of overall sales
4    data that was purchased from -- from pharmacies.  That
5    was the complete data on prescriptions -- filled
6    prescriptions at pharmacies.
7            Then there was consumer tracking of their
8    perception of the different brands and the different
9    attributes and their behavior -- their stated behavior.
10           And let me say that the tracking of the sales
11   and the pharmacies was a combination of physicians
12   prescribing and the consumers filling it out.  You know
13   what I am saying?  So it is a combination of both.
14           And then the final study was -- let's see,
15   there is two more -- there is a copying testing of the
16   physician material and the copying testing of the
17   patient material.
18      Q    Now, the categories of studies that you
19   reviewed and analyzed, did you use the same scientific
20   methods in analyzing those studies that you did -- that
21   you would do in performing integrated marketing
22   campaigns as a university professor?
23      A    I didn't understand the question.
24      Q    Bad question.
25           You analyzed each of the categories of studies?
0297
1    A    Yes, I analyzed the methods, the statistics,
2    the results, the validity of the study --
3       Q    Is there --
4       A    -- their findings.
5       Q    I'm sorry.  I should not have cut you off.  It
6    is a theme we have.
7            Is there a statement or analysis of each of the
8    categories of studies in any of the documents that we
9    have looked at today.
10      A    Yes, in my report.
11      Q    Okay.  Yesterday you prepared an exhibit that
12   counsel put as Exhibit 5, can you describe what that is?
13      A    Yes.  When I discussed the studies with you
14   yesterday, it became apparent that, that it would be
15   useful to have a document that clearly stated these six
16   types of studies and describe the methods and my
17   background on the method and the results.
18           I hadn't structured my report that way, but
19   that is how I structured it in my own mind.

Page 123

```
20                      Ex 1 - 5-26-06 depo transcript
21           And so explaining it to you yesterday, I was
22   basically describing each study this way.  And so I
23   decided to write it all down because it might come up
     today.
24      Q    Okay.  Let's -- Can you briefly go through for
25   each category of study what you have in Exhibit 5?
0298
1       A    Yes.  So let me say, I just did this in random
2    order.  So it is not in the same order -- or maybe I
3    should go back in the same order that -- I don't
4    remember the order that I originally gave you.
5       Q    It doesn't matter.
6       A    Okay.  Fine.
7            So one type of study is the Scientific Testing
8    of the Detail Pieces with the M.D.'s and they used
9    accepted practice for doing this type of research.
10           They did in-depth interviews with about -- I
11   have one example where they spoke to 31 doctors in two
12   different cities.  That is a standard approach.
13           They have to have it in a couple of cities and
14   they showed them detailing pieces in counter-balanced
15   order, and asked open-ended questions to try to
16   understand their perceptions of the material.
17      Q    All right.  Are those studies referenced in the
18   exhibit binders?
19      A    Yes.
20      Q    That are attached to your report?
21      A    Yes.
22      Q    What exhibits?
23      A    Exhibits 28 and 29, and 59, and Exhibit 5 --
24   This is Exhibit 5.  It does not look like the right
25   number.  Right.  This is Exhibit 5 now.
0299
1       Q    It's Andrew's Exhibit 5 for his reports.
2       A    Right.  This is the type of research we did in
3    the anti-drug campaign and in the U.S. Census Campaign.
4    I did this a long time ago when I worked at the National
5    Consulting Group.  It is a type of research that I talk
6    a lot about in teaching.
7       Q    What were the findings of this?
8       A    Well, overall the physicians said, first of
9    all, they responded very favorably to the material about
10   safe for the elderly.
11           This was a population that -- that felt that
12   Vioxx had concerns -- had some possible problems with
13   elderly due to their CV risks and they felt that the
14   materials helped them to overcome obstacles.
15           And they said that they were confused about the
16   CV information and they wanted more information about
17   it.  They did not understand how to interpret it.
18           They said it was conflicting and the brochure
19   was not changed to address that issue.  It was changed
20   to address some other issues but not that issue.
21      Q    In reviewing the conclusions and the methods
22   and the design of this particular study, do you agree
23   with the conclusions?
24      A    Yes.
25      Q    And was the methodology used by Merck, in your
0300
1    opinion, scientifically valid?
2       A    Yes.
3       Q    Okay.  Let's go to the next.
4       A    Okay.  The second -- let's see.  Let's see if
                        Page 124
```

Ex 1 - 5-26-06 depo transcript

5  we have notes here. Hold on.
6       In that same study, they found that only one
7  physician said that he proactively warned his patients
8  about Vioxx's cardiac risk.
9    Q   One out of the 31?
10    A   Right. And the rest of them said that
11  primarily the patients were concerned or there was bad
12  press and so they didn't warn their patients.
13      MR. GOLDMAN: Objection. Move to strike as
14  nonresponsive.
15      THE WITNESS: What did I do wrong?
16  BY MR. SKIKOS:
17    Q   You are still talking about the first study?
18    A   Yes, I am.
19    Q   Okay. I will accept that answer with respect
20  to the first category of studies.
21    A   Yes, and those exhibits are 41 -- did I already
22  say 41?
23      Okay. So, now, I remember this -- I'm sorry.
24      Also, this type of study was discussed in
25  Exhibit 41.
0301
1      MR. GOLDMAN: Which one are we on now?
2      THE WITNESS: The same first type of study.
3  BY MR. SKIKOS:
4    Q   We are going to go back to the first type of
5  study.
6    A   Yes, we are still -- I have not gone to the
7  second type of study. This is all the first type of
8  study. I'm sorry.
9    Q   Okay.
10    A   And Exhibit 41 also describes another similar
11  study where people were asked to look at the Efficacy
12  Confidence Program -- it had two names, but that is one
13  of the names -- and assess, you know, was it a
14  convincing program. Would they prescribe more Vioxx?
15      And you had 10 to 15 percent saying that they
16  felt that -- that overall they said they would expect a
17  10 to 15 percent increase in prescriptions for Vioxx
18  from that program.
19      And the -- yeah. So they were very favorable
20  towards that program when they saw the detailing
21  materials about it.
22    Q   Okay. What is the second category?
23      MR. GOLDMAN: Can you just be clear? What
24  category of studies were you just talking about?
25      THE WITNESS: Well, Copy Testing of Detailed
0302
1  Pieces with M.D.'s.
2      MR. GOLDMAN: Okay.
3      THE WITNESS: Let me make sure that is how it
4  is labeled. It's Scientific Copy Testing with Detail
5  Pieces with M.D.'s, which is what I sort of called it.
6      Okay. Another type of study is the Scientific
7  Testing of Promotion Message Recall. So another way of
8  saying it is Tracking of Promotion Message Recall.
9      And that study involved about 300 interviews a
10  month with a detail survey of about 25 questions. It
11  was initially conducted by DTW Research, and then it was
12  picked up by Impact Rx.
13      And it looks like -- we don't know how much --
14  DTW did the research in 2001 and Impact RX took over in
15  2002.

Page 125

Ex 1 - 5-26-06 depo transcript

```
16              And just to give you some sense of the amount
17   of money that proposal that DTW had put in to get the
18   work in 2002, that was ultimately rejected, it was
19   600,000 for a year's worth of work.  So it is a lot of
20   money.  And they studied high NSAID and high Coxib
21   doctors and they --
22   BY MR. SKIKOS:
23      Q    You mean prescribing doctors?
24      A    Yes.
25      Q    Okay.
0303
1       A    And the relevant exhibits are 55, 56, and 58.
2              The method I did not include in my binders, but
3    it is in my exhibits, but it is in the binder that says
4    Tracking Research.  That we saw a little bit earlier.
5       Q    Okay.
6       A    And we tracked promotional message recall on
7    the anti-drug campaign and I routinely teach classes
8    where they did this type of research.
9       Q    What were the findings?
10      A    The findings were that a substantial number of
11   physicians said that the reps told them Vioxx does not
12   increase the risk of M.I. or stroke.
13             So in this one time period that I looked at, it
14   was 18 to 47 percent of physicians said the reps told
15   them that Vioxx does not increase the risk of M.I. or
16   stroke.
17             And in the time period I looked at, basically,
18   the research shows a substantial number of reps were
19   telling physicians that Vioxx was safe for the elderly.
20             So in this one period of time, it was 20 to
21   33 percent and in another period of time, it was 34 to
22   47 percent.  They have this plotted out.
23             So we don't have a complete list of every month
24   and every, you know, data point, but there were several
25   figures that describe for various periods of time, what
0304
1    these percentages were and they were high.
2       Q    What exhibits are you referring to now?
3       A    55, 56, 58.  There is also some data in 48.
4       Q    Do you -- is it your opinion that you have
5    sufficient data to come up with an opinion on whether
6    this study is valid?
7       A    Yes.
8       Q    What is your opinion?
9       A    It is valid.
10      Q    Okay.  Is that all you have for the second
11   category of studies or is there more?
12      A    I also did my independent coding of some of the
13   data to see what I came up with and the month I looked
14   at, it was 20 percent.  So it was consistent with what
15   they said.
16      Q    20 percent what?
17      A    20 percent of -- I'm sorry -- of the doctors
18   recalled the reps saying that Vioxx doesn't increase the
19   risk of M.I. or stroke.
20      Q    Okay.  Go to the next category, please.
21      A    Another category is Tracking of the Behavior,
22   so that the prescriptions -- the filled prescriptions at
23   the retail level.
24      Q    Oh, I'm sorry.  Before I go back, go back to
25   the second category.
0305
```

Page 126

Ex 1 - 5-26-06 depo transcript

1      Assume the data is valid at 20 percent of the
2  sales reps told the doctors that Vioxx does not increase
3  cardiovascular risk and the doctors recalled it a
4  sufficient time later, did Merck in any of the documents
5  that you reviewed, change their detailing methods to fix
6  that potential problem?
7      A    No, I didn't see any evidence of that.  The
8  numbers are very consistent.
9      Q    Go ahead.
10      Oh, in any of the internal documents that you
11  reviewed, that are contained in your report or in the
12  files there, did anyone at Merck work to combat the
13  potential problems that physicians were being told by
14  their sales reps that there is no increase of
15  cardiovascular --
16      MR. GOLDMAN:  Object to the form.  Assumes
17  facts not in evidence.
18      THE WITNESS:  Okay.  What was the question
19  again?
20  BY MR. SKIKOS:
21      Q    The question sucked.  Go to the next one.
22      A    Well, I did want to say something which is
23  related -- I think it was the answer -- the question
24  that you were asking.
25      But there is -- there is documentation that an
0306
1  objective of the campaign of the integrated marketing
2  communications campaign, was to convince doctors to
3  prescribe Vioxx regardless of the patient's
4  cardiovascular risk because Vioxx does not cause heart
5  attacks.
6      That was a major communication objective of the
7  campaign.
8      MR. GOLDMAN:  I move to strike as
9  nonresponsive.
10  BY MR. SKIKOS:
11      Q    Pretend that I asked that at the end, would the
12  answer be the same?
13      A    Yes.  I thought you asked something related to
14  that.
15      Q    I did.
16      A    You asked, did they do something about it?  And
17  I was saying, no, they didn't do anything about it
18  because that was the objective of the campaign.
19      Q    Okay.  What is the third category?
20      A    The third category was Tracking of Behavior
21  through Prescription -- through prescriptions at
22  pharmacies.
23      So pharmacies that sell data on the
24  prescriptions filled overall and by doctor.  They don't
25  identify the patient, but they identify the doctor.
0307
1      So you are able to track how the sales are
2  doing and they have -- the way it is tracked is total
3  prescriptions and then new prescriptions.  So,
4  obviously, one is subtracted from the other are refills.
5      So total and new and the other is refills.  So
6  total, minus new would be the refilled prescriptions.
7  And so this is the count of prescriptions.
8      Now, this type of collection of data -- of
9  sales data is what I teach in a course -- a whole course
10  on how to use this data.  It is called Micromarketing.
11      Also, the tracking of behavioral data is

Page 127

Ex 1 - 5-26-06 depo transcript

```
12   something that I have expertise in and I have published
13   on that topic.
14            I have American Journal Public Health Article
15   with Dickson and Lane on, you know, analyzing this type
16   of data.
17            In a drug case, we didn't have that because,
18   obviously, we will not be tracking marijuana purchases.
19   And even with the tobacco, because it is adolescent.  So
20   there is no data on adolescents.
21       Q    And what are the findings?
22       A    The findings indicate that sales were high for
23   Vioxx and they were neck to neck with Celebrex.  And
24   there were, what we call shock to the system where there
25   were a decline in sales.
0308
1            Primarily when the market learned about the CV
2   risk from the New York Times and the JAMA article in
3   2002, not what they learned from Merck.
4            And then there was another reaction when the
5   label came out in April, 2002.
6       Q    Now, in a jury or a court --
7       A    And then -- wait.  I'm sorry.  Can I finish?  I
8   did not finish the answer.
9       Q    Of course.  Of course.
10      A    And the integrated marketing communications
11   campaign managed to improve the situation and so that
12   over time sales inched back up.
13      Q    Okay.  If a jury wanted to see those graphs are
14   they in the binders somewhere?
15      A    Yes.  And those are Exhibits 56 and 54.
16      Q    Okay.
17      A    There could be others, but those are -- but
18   anyway that is the date -- one of the sets of data that
19   is in the EAR report, the Early Assessment and Response.
20      Q    Did Merck, in your review of their studies,
21   keep track of what you called shocks to the system that
22   affected the overall COX-2 market in addition to its
23   own?
24      A    Yes.
25      Q    Those are in those exhibits?
0309
1       A    Yes.
2       Q    So -- I'm sorry.
3       A    So in the shocks to the system from both of
4   those, as I recall, was to both Vioxx and Celebrex.
5            And the shock to the system from the Vioxx
6   label change was to Vioxx only and then --
7       Q    Those are supported in the graphs?
8       A    Yes, graphs.  Yes.
9            And the rebound from the campaign -- from the
10   integrated campaign is largely seen among new patients
11   and is attributed to the Efficacy Confidence Program
12   because it started to rebound the very month that that
13   program started.
14      Q    Can you briefly describe the Efficacy
15   Confidence Program?
16      A    That was the program where they offered
17   satisfaction guaranteed or your money back to patients.
18      Q    And do you have an opinion as to why that
19   program was successful in helping Vioxx rebound?
20      A    Because it -- well, the research shows that --
21   shows that it increased physicians' confidence in Vioxx
22   and it motivated the sales force.
```

Page 128

Ex 1 - 5-26-06 depo transcript

23   Q   Have you done studies on or researched on
24 guaranteed -- money back guarantees?
25   A   I haven't personally done that type of
0310
1 research, but I read it all of the time.
2   Q   And what is the general understanding or the
3 general accepted belief on the impact of a guarantee
4 money back on a marketing campaign?
5       MR. GOLDMAN:  Object to the form.
6       THE WITNESS:  It is a signal of quality and
7 confidence in the product.  So it, generally, does have
8 an effect of improving sales.
9 BY MR. SKIKOS:
10   Q   Now, in particular the Merck Guaranteed
11 Program, did you note any difference between the
12 physician guarantee and the patient guarantee?
13   A   Yes.  Let me just state that the ads were ads
14 for the program appeared in both the physician and --
15 there were physician ads and there were patient ads.
16 And so one -- I could compare what was stated in those
17 two types of ads.
18       And to answer your question, in the consumer ad
19 it just said, "Satisfaction guaranteed or your money
20 back," but in the physician ad in fine print, it was
21 clarified that it was only money back, if it was a
22 problem with pain relief.
23   Q   An efficacy problem?
24   A   Yes, an efficacy problem.  And that is why it
25 was sometimes called Efficacy Guarantee.  And then other
0311
1 times -- it was initially called Efficacy Guarantee and
2 then Efficacy Confidence.  And I think they changed it
3 because they had learned from their research that it
4 built confidence.
5   Q   Is that all of the studies that you reviewed in
6 the third category of studies?
7       MR. GOLDMAN:  Fourth.
8       MR. SKIKOS:  This is the fourth or is this the
9 third?
10       THE WITNESS:  I think this is the third; right?
11       MR. SKIKOS:  Third.  From the impartial juror.
12       THE WITNESS:  So the first type of study was
13 the Copy Testing of the Detail Pieces with the
14 Physician.
15       The second type of study was the Tracking of
16 Promotional Message Recall among physicians and their
17 behavior.
18       And the third type of message was a complete
19 census of prescription -- prescriptions filled overtime
20 by month.
21       In the second case, it is just a sample and in
22 the third case, it is all of the prescriptions.
23 BY MR. SKIKOS:
24   Q   Now, can you describe the fourth category of
25 the scientific study performed by Merck on the
0312
1 integrated marketing program?
2   A   It is another study of physicians.  I call it
3 the Attribute Tracking Study of Physicians.
4       So this was a study where you had about a
5 little over 300 -- 315 to 325 physicians from a panel,
6 randomly selected each month to complete a written
7 survey and record their prescribing behavior.

Page 129

Ex 1 - 5-26-06 depo transcript

8   And, initially, it was done via phone and fax,
9  and on the Internet on something called WebMD Survey.
10   And they asked a host of questions.  I did not
11  write down the number, but a large number of questions
12  about Vioxx, Celebrex, Bextra.
13   And the questions would say, how well does the
14  statement describe Vioxx?  One, does not describe it at
15  all.  Ten, describes it very well.
16   And the firm that I saw them using was Ziment,
17  Z-I-M-E-N-T.  And the time period I started to see this
18  was 2002 and it went through 2003.  And it is not clear
19  when it ended, but that is where I stopped seeing data.
20   And the sample included a third Vioxx users or
21  heavy users of Vioxx; a third Celebrex and a third
22  NSAID.  So they had a nice sample.
23   And also, a third was chronic pain.  A third
24  acute and a third recurrent.  And so they had a very
25  sophisticated sampling plan.  So that the results would
0313
1  not change based on the sample.  This was called the ANA
2  Attribute Tracker.
3   Q   Is there an exhibit for that one in your
4  binder?
5   A   Yes.  It is Exhibit 48 and then I actually have
6  another Merck exhibit that I wrote down which described
7  the method in greater detail.
8   I read that and it is in the binders, but it
9  isn't in my exhibits.  I can give you the Merck number.
10   Q   Yeah.
11   A   MRK-AKP 0038549.
12   Q   And those are the documents that you reviewed
13  and relied on in the boxes that some nice person is
14  going to copy tonight?
15   A   Yes.  They were originally sticking up, so we
16  could see them, but they are not anymore.
17   Q   What were the findings of these studies?
18   A   Well, the one finding was that what physicians
19  said they were relying on in terms of deciding what
20  prescriptions to write and what they were actually
21  relying on weren't the same.  There were marked
22  differences.
23   The way they were able to do that is they did a
24  very sophisticated drive importance analysis.  The
25  equations are on the exhibit.  It is a mathematical
0314
1  equation linking the ratings to the actual behavior.
2   And so from then on, they used the attributes
3  that were really important, not the ones that the
4  doctors said; but the ones that were really important in
5  the survey; and they tracked those carefully over time
6  to see how those were changing.
7   And the most important attributes were doesn't
8  cause edema, doesn't increase blood pressure, doesn't
9  increase risk of M.I, safe to use in the elderly.
10   So what they found was that their -- these
11  non-G.I. safety attributes were becoming a key
12  differentiator between Celebrex and Vioxx.
13   And so then what they decided to do was launch
14  the Efficacy Confidence Program.  And then the research
15  showed that once that program was launched, you saw
16  improvements on all of these attributes.
17   Improvements in M.I. perceptions, safe for the
18  elderly -- significant improvement in safe for the

Page 130