elderly. Improvements in the blood pressure, which was another thing they measured. Increase in self-reported new prescriptions for Vioxx.

And a pattern where instead of losing so much sales to Bextra, Vioxx was losing a lot of sales to Bextra and that was stent. And it was Celebrex that was losing a little bit more rather than Vioxx.

0315

Q So the Efficacy Campaign helped stent the loss of sales to Bextra; is that what you are saying?

MR. GOLDMAN: Object to form.

THE WITNESS: Correct.

BY MR. SKIKOS:

Q Okay.

A And then this research also showed that overall perceptions of Vioxx does not increase risk of M.I. or stroke remained remarkably stable.

And so it never got below -- I don't know why I don't have the notes, but I recall they didn't get below -- I think it might have been 6.5. I think was the lowest they ever dropped on a 10-point scale. So they were above the mean of 5.

Q And I saw graphs on those yesterday. Are those graphs in the binders or Exhibits?

A Yes.

Q And those are graphs you can show a court in terms of the analysis of the awareness of the cardiovascular risk?

A The perception of the cardiovascular risks, right, or awareness. Those similar words, yes.

Q Did you notice any change in the marketing messages that was designed to increase physician awareness of the cardiovascular risk of Vioxx exposure?

0316

A No, I didn't see any evidence of that.

Q What is the next category of study?

A Okay. It was an Attribute Tracking Study of Consumers and it was called the Awareness and Action or Chronic Pain Study. They had two different names for that one, too.

And that was a telephone survey with chronic pain consumers. 3600 a year conducted every day of the year.

The company was Millward Brown. That is exactly what we did with Millward Brown with the anti-drug campaign.

It was related to the type of a research I did that is published in the American Journal of Public Health -- no, actually, that is incorrect. That is not correct.

Q What part is incorrect?

A That last part. This is different from the American Journal of Public Health.

Q But the same for Millward Brown?

A The Millward -- okay. The American Journal of Public Heath just studied behaviors and this studies attributes. And so I think it is best -- I think it is a unique study.

So it is probably best to say that my

0317

familiarity with this -- I have a strong familiarity with this exact type of study from the anti-drug ad campaign. And I also see this type of data and teach

cases on this at U.C. Irvine.
Q What were the findings?
A The findings were -- I'm sorry. I am not -- I didn't finish with the method, actually.
Q Oh, I'm sorry. I cut you off.
He has got a free card now.
A So is it okay?
Q You can keep going.
A The exhibits that are relevant are E30 and E32 and the method --
MR. GOLDMAN: What is E30? Is that in one of the binders?
THE WITNESS: It is Exhibits 30 and 32 in the binders.
Okay. So the time period that this was conducted -- best I could tell, it started around May, 2000 and it was still going in December '03.
50 percent of the subjects were 55 years or older. All of them had chronic pain. One of the findings was that -- I'm sorry. This is in Exhibit 31 (b).
They have findings that, essentially, say a lot

0318

of these people were in hypertension and many had heart disease. Like, 40 to 50 percent had hypertension and 20 to 22 percent had heart disease depending on the month because they were randomly selecting people, calling them up on the phone.
And that a lot of these people were taking Vioxx. They actually tracked how many took Vioxx on each of these conditions -- I mean, with each of these conditions and whether that changed over time, and whether they were switching to Celebrex.
Q And what were the findings?
A And the findings were -- let me say, I am still going to method. They also asked awareness of the brand as part of this research. And I believe awareness of the ads.
Anyway, the awareness of the brand started out low and it went up to 85 percent in '02, and remained about 85 percent in '03 and then characterized it as a universal awareness.
Q Is that for Vioxx?
A For Vioxx. Because you cannot get 100 percent awareness if you don't watch TV or whatever. So they were very pleased.
They showed that Vioxx was up there with Tylenol in terms of brand awareness. Let's see, what

0319

else they showed.
They showed the trial was high even in 2003 of Vioxx. There was a slight decrease in current usage of Vioxx towards the end of the study. It was down from 15 percent to 13 percent.
Q What does trial mean?
A I'm sorry. That 15 percent and 13 percent, as I recall, is current usage.
~~And trial was, you know, did they get a new~~ prescription. And current usage includes new and refills.
And they carefully studied why people didn't fill prescriptions and they found that most people did, the vast majority; but there was a creeping up in the

percentage, who didn't fill because of safety issues; but it wasn't clear what the safety issues were.

And let me say that, in this study, they never asked about heart attacks because that would get the word out. I believe one -- well, I can't infer as to why they didn't do it, but they did not ask about heart attack as a risk.

The questions they asked were vague questions. Like, brands you can trust. Is it effective as a pain reliever? Is it safe as a sugar pill? That sort of thing.

0320

And the numbers for brand you can trust, the top box, meaning, they rated it highly on brand you can trust was 40 percent in 2002 and 41 percent in 2003.

Q Is that a very positive finding in your experience in looking at integrated marketing campaign studies like this one?

A Yes, given that it was what we call a top box score. And it was one of the highest attributes in which -- in other words, they received very high attributes on this, relative to other attributes they measured.

Like, effective pain relief wasn't much higher than 40 percent. You know what I am saying? You don't get that much higher. So it was not like effective pain relief was 90 percent and this was 40 percent. And maybe effective pain relief was maybe 40 something -- in the 40's also.

Q What exhibits are we talking about now?

A 30, 31, 32, 31(b).

Let's see, we also found, you know, brand awareness increased dramatically, like I said, from '00 to '02 and then stabilized.

Q Are there any documents --

A There was some trend -- people trying to get off both Vioxx and Celebrex. But when they tried to

0321

figure out why that was happening, the safety attributes that they measured remained stable.

And when there was a decline, the brand you can trust -- let's see. There was some problems with the New York Times article and the JAMA article in terms of you saw little change in perception of the brand.

But oddly enough mostly in efficacy, not safety. So there was -- it tainted the brand a little bit, those events -- those external events.

So that is the type of result that you get. This is a very, very good study. I mean a very sophisticated study and I believe in the validity of the study and the conclusions.

Q Okay. What is the next category of study you looked at?

A There is the direct-to-consumer copy testing of the ads and warning that might be in the ads. And Millward Brown did this type of research, too, for them and they called it the Link TV Commercial Copy Test.

~~And I have several of the results, I think,~~ starting in 1999 to 2000 and then they stopped. So I'm not sure why that is, but in -- they tested not only their own ad, but they tested Celebrex's ads to see how their ad compared to Celebrex.

And this is similar to the research that I

0322

published in the American Journal of Public Health with Foley.

In fact, this type of copy test research described virtually all of my research and that is what I worked on in the anti-drug campaign and the Massachusetts' campaign. I worked on it way back when I worked for the National Consulting Group. So this is the type of research I do all of the time.

Q What were the findings of this particular series of studies?

A Well, one thing they did was they measured whether consumers were concerned about side effects from seeing the ads.

And they said that people did notice the side effects, but they did a statistical comparison of the people who remembered the side effects or who were concerned about the side effects and weren't concern on motivation to ask the doctor more about the drug; and there was no statistical difference.

So, in other words, whether they -- I'm not sure if it was recall or were concerned about the side effects, but the way they segmented the consumers on the side effects issue was not a predictor of whether they were going to ask the doctor about the drug.

So they said -- their conclusion it doesn't

0323

keep us from our product claim. It doesn't affect motivation to ask, so we don't need to worry about it.

They also said that 40 percent of the ads -- 40 percent of the people said the ad strongly gave a safety impression, which was high.

And they said that they tested some warnings and they found no problem with the vague wording that they test, which is somewhat similar to the one that they ended up using. So it wasn't the same. And they said they were going to do more research, but I was not able to get that research.

Q Did they test in that particular study the impact of saying that there might be a cause and effect relationship between Vioxx exposure and a heart attack?

A No, they did not. The warning wasn't -- did not talk about the cause and effect relationship. It was a vaguely worded warning about heart attacks have been observed in some people taking Vioxx, something like that.

And they found, again, no difference between people who remembered that warning and didn't. So they said it wasn't a concern.

But if they did find -- if they tested the final warning and found -- which they knew that they would eventually have to need, so there would be a final

0324

warning, if the research showed otherwise and showed that it was what they called keeping us from the product claim or affecting people's willingness to talk to the doctor, that they would reassess the media options.

And they would not use product advertising at all. They would -- they considered using reminder advertising and help-seeking advertising.

So it indicates what they might do with the results if the results came out differently. And we know that they didn't. They continued to use product

advertising.
Does that make sense?
Q Sort of. He got it.
A So what they said is if these ads are -- if they put in the final warning that they had to use, they found that the ad -- that the warning was having a negative effect on consumers, they would stop running product ads.
Q I see.
A See, because product ads required the warning. You know, required the information.
If -- you know, it is a risk disclosure. I guess is what you would call it. This listing of the risk.
I don't know if you would actually -- I don't

0325

know whether you would actually call all of the fine print in the ads a warning or not, but it is a list of the risks.
So instead they would do help seek, which means if you have this general problem of pain, go get help, or a reminder where you just say Vioxx, but with no information.
Neither of those would require this risk information in the ad.
Q That is what the study showed?
A That was -- the conclusion was the risk messages that they put in, there was no problem. It didn't effect -- adversely effect consumers.
But if in a subsequent research when they tested the final version, it did slow an adverse reaction that they said they should -- Merck should reassess the media options and just consider using reminders and help-seeking ads.
Q Because it would impact sales if they continued to do direct-to-consumer advertising in the face of that warning?
MR. GOLDMAN: Object to form.
THE WITNESS: Exactly.
BY MR. SKIKOS:
Q Go to the next study.

0326

A That's it.
Q Okay. Now, let's run to the conclusions -- oh, you did not give an Exhibit for that one; did you, for the sixth category?
An exhibit to your report in one of the binders look in the sixth category is there an exhibit?
A Oh, I'm sorry. I understand the question now.
MR. O'CALLAHAN: 66; isn't it?
THE WITNESS: 64 and 66 -- 65, 67, and 68, I had several of those copy tests.
BY MR. SKIKOS:
Q Okay. These are the exhibits to your report?
A Correct.
Q Let me go to a clarification before we go to conclusions. You're not saying that your an expert ~~in how the FDA determines what goes into a label;~~ correct?
A That is correct.
Q But is it correct that your expertise of integrated marketing campaigns includes all aspects of the messaging to the consumer and in this particular

place, one of the aspects of the messaging includes a label?
MR. GOLDMAN: Object to the form.
THE WITNESS: Yes.

0327

BY MR. SKIKOS:
Q Now, did we ask what percentage of time you spent in reviewing documents was actually reviewing the studies?
A I would estimate it is about half as you can tell by the piles of documents that are on this type in the boxes.
Q In any of the categories of studies or study that you described, did you find any methodological flaws used by Merck in conducting those studies?
A No. They used generally accepted practices for doing this type of research.
Q The results of these studies, did they show any consistency?
A Yes, they did.
Q Okay. Is that part of the integrated marketing campaign analysis, is to look at the results of various studies and category of studies and determine if there is consistent application?
A Yes. Because the hypothesis that you are testing is that you are giving a consistent messages.
Q Okay. And the consistent message is contained in the report, in X number of page report, that we have been going over today; correct?
A Correct.

0328

MR. GOLDMAN: What was your question? I'm sorry.
BY MR. SKIKOS:
Q The consistent methods that these studies were designed to ensure that were getting out to the patients, what that message is, is contained in this report?
A Yes.
Q And the internal documents that you reviewed and are referenced in this report, are they consistent with the messages that you found were trying to be promoted in the studies?
A I don't understand your question.
Q Okay. You reference a number of internal documents in this report?
A Yes.
Q All right. Is the statements that were contained in the internal documents by the Merck employees --
A You mean with regard to their -- because they are all internal documents in the sense that we, ultimately, got them from Merck is, as I recall.
Q Right. Let me do it again.
There are statements that defense counsel used in the examination of you that said you were just

0329

reading documents.
Do you remember that?
A Yes.
Q The importance of those internal documents and the statements contained by the Merck executives when they made those statements, how does that relate to the

studies that were conducted in the integrated marketing campaign?
A You mean the statements made about the objectives of the campaign?
Q Yes. Sorry.
A Well, the statements are part of the whole picture. You have to understand what was the objective of the campaign and then you test the hypothesis that that objective has met.
And the answer to that hypothesis test based on all of the research is, yes, they obtained the objective that they sought, which was to neutralize the CV risks.
MR. SKIKOS: Okay. Let me take a quick second.
(Brief recess.)
MR. SKIKOS: Back on the record.
Q Turning to Exhibit 3 on your binders, which is your C.V. Very early in the day, you mentioned a change -- an error that needs to be fixed in the Robinson, Calcagnie & Robinson, Newport Beach, on Page

0330

11, how are you going to fix that?
A I am going to just change that to 2004 because the case -- I never did any subsequent work and I didn't -- I didn't know until I met with Mark on this case that the case is over. There will never be any work on it.
Q So you would change the word present and cross that out; is that correct?
A Correct. So it will be 2004 and I am crossing out dash present.
Q And when did you discover that the case was dead?
A I asked him when he contacted me about this case.
MR. SKIKOS: Okay. That is all I have.

EXAMINATION

BY MR. O'CALLAHAN:
Q Dr. Pechmann, my name is Jim O'Callahan and I represent the various plaintiffs in California JCCP Vioxx action and I wanted to ask you a couple of questions, first of all, about your report.
If I turn to Page 11 of your report and that is Paragraph 19, subparagraphs A, B, and C are paragraphs that deal specifically with the Barnett case; correct?

0331

A Yes.
Q And then if we turn to Page 15 starting at Paragraph 21, and going through Page 21, up to the part where Paragraph 24 starts, is it correct that those are the only pages of your report that deal specifically with the Barnett case?
A Yes, that is correct.
Q And your report is a total of 87 pages; correct?
A Yes.
Q So, essentially, we got about six pages out of ~~the 87 pages that deal specifically with the Barnett~~ issues; correct?
A Yes.
Q Now, it is correct that this integrated marketing campaign that Merck utilized was a national campaign; correct?

MR. GOLDMAN: Objection to form.
THE WITNESS: That's correct.
BY MR. O'CALLAHAN:
Q And with respect to the 81 pages of your report that don't deal with the Barnett case, would the opinions and the basis for the opinions that you layout in your report be just as true for a case in California, as a case that came out of South Carolina?

0332

A Yes.
Q One of the things that interested me is your statements regarding the effectiveness of the Vioxx integrated marketing campaign.
And it is my understanding that people are usually reluctant to admit that they are influenced by ads; is that correct?
A Yes, that is what the research shows.
MR. GOLDMAN: Objection to form.
BY MR. O'CALLAHAN:
Q And does research also show that notwithstanding people's reluctance to admit that they were influenced by ads that, in fact, they are influenced by them?
A Yes.
Q And is that something that has been proven through scientific studies?
A Yes.
Q And if, for example, we look at the direct-to-consumer ads that Merck utilized in advertising Vioxx, did they do calculations as to how effective the money that they spent on ads prove to be with respect to sales of Vioxx?
A They did not do specific financial calculations, but they concluded that many of the ads

0333

were effective.
Q And was the -- was the underlying premise of the money that Merck spent on ads, the premise that direct-to-consumer ads would be effective in generating sales of Vioxx?
A Yes. I mean, they had data statistics that showed what percentage of consumers were likely to initiate a discussion with their doctors about Vioxx having seen the ads and it was about 6 percent.
So -- and that, of course, is the first step to getting a prescription and affecting sales.
Q Now, one of the other terms, I think, you used during the course of the deposition was the word "impressions."
Do you recall using that word?
A Yes.
Q I wasn't sure exactly what you meant when you used the word impressions in the context of advertising.
A Well, that was, as I recall, that was used in the context of the press releases. The press releases, they did not -- I didn't see any consumer research on the press releases per se in the sense that they didn't interview, track consumers, or the general public saying what was your impression or that sort of thing.
What they did was, they -- as a standard with

0334

PR, they looked at the coverage in the media of Vioxx, and for each publication where there was coverage, they

weighted it by the estimated viewership or listenership; and so it is really opportunity to see. And that is what they call impression.

So it is not the actual verified -- it is a number that -- of how many people could have seen that coverage.

Q Does it also factor into the idea that somebody can be told about something by another viewer, so they use the word impressions to incorporate people who are told about products by other people?

MR. GOLDMAN: Objection to the form.

THE WITNESS: Generally not.

BY MR. O'CALLAHAN:

Q How do they describe that?

A That is called word of mouth and they did not quantify that.

Q Okay.

A I just -- okay. Well --

Q I'm sorry.

In the course of an integrated market campaign by a pharmaceutical company, would you expect to see, in this case, Merck making efforts to shape scientific discussions to support their core messages about Vioxx?

0335

A I don't have an opinion about that.

Q Is that a part of the material that you reviewed for purposes of -- or did you review any material of that nature for purposes of your report and deposition?

A I didn't see any material about that one way or the other.

Q With respect to -- with respect to your -- your opinions, you reviewed training materials that were used to prepare Merck's sales people for their job?

A Yes.

Q And in addition, did you utilize materials that was provided to sales representatives as the promotion and marketing of Vioxx went on after its introduction in 1999?

A Yes.

Q And are those the materials which you either identified in your report or have otherwise provided in the boxes that Mr. Goldman went through?

A Well, there are some materials that I looked at that were very similar to the ones that I kept. That I did not keep because the wording was identical and I felt that I had a representation -- a representative sample of the promotional materials.

MR. O'CALLAHAN: That's all I have.

0336

MR. GOLDMAN: Just a few questions, Dr. Pechmann.

FURTHER EXAMINATION

BY MR. GOLDMAN:

Q Dr. Pechmann, do you agree that Exhibit 5 that you reviewed with Mr. Skikos is different in many ways ~~from the report that you wrote in the Barnett case?~~

A No.

Q The Exhibit 5 that you discussed and the methodology that you discussed and the findings, and the nature of the different studies are not described in that type of detail in your report; are they, ma'am?

A The findings are and I was told -- my understanding was to state my opinions and the documents on which they were based. So I -- I my report includes the studies and the conclusions, but does not include the method.
That is the main thing that is different here, but in terms of substantive opinions, they are identical.
Q Is it your testimony, Dr. Pechmann, that what you said in response to Mr. Skikos' questions is in your report?
A As I said, the method is sometimes in the

0337

report, but not systematically in the report.
Q The findings that you described to Mr. Skikos and the question about the validity of the studies that you discussed with Mr. Skikos, and the description of the six different studies that you described with Mr. Skikos, you agree that that is not in your report, and that is why you prepared Exhibit 5 yesterday?
A No, I disagree. If you would ask each question separately, I can answer each question separately. That was a compound question.
MR. SKIKOS: Do you want to do it with the court reporter?
THE WITNESS: However, you want to do it.
BY MR. GOLDMAN:
Q Dr. Pechmann, we will be able to compare what you said in response to Mr. Skikos' questions and what is in your report later; but would you acknowledge, Doctor, that what you said in Exhibit 5 and your discussions with the methods used in these studies is not anywhere in your report?
A Some of it is not. Some of it is. That is correct.
Q Your description about all of the findings that you mentioned in response to Mr. Skikos' questions, those aren't all in your report; are they?

0338

A Yes, the findings are there.
Q So it is your testimony that all of the findings that you described with Mr. Skikos are in your report?
A Let me -- yes, except that if I found the same thing twice, I would only state it once. So if the same study found something repeatedly, I would only state it once.
Q Your conclusions that the studies were valid are not contained in your report?
A It is not explicitly stated, but since I relied on the studies to reach my conclusions, I obviously assumed they were valid.
Q Do you comment about the validity of any of the studies that you discussed with Mr. Skikos in your report?
A I do not explicitly discuss the validity, no.
Q You were asked by Mr. Skidos whether you agreed with the conclusions that the different studies found. Do you remember that?
A Yes.
Q Nowhere in your report do you state that you agree with the conclusions that are evident in these six studies; correct?

A I do believe I state that in the report, yes.

0339

Q Show me where you say that you agree with the conclusions of the different studies in your report?

A Well, I state the findings and by not questioning their validity, I am assuming that you are going to believe that they are valid. So that is why I didn't bother to say it.

Q Am I right, Dr. Pechmann, that you do not say anywhere in your report that you agreed with the conclusions reached in these six studies?

A I did not exclusively state --

Q You agree, Dr. Pechmann, your reporter in the Barnett case, do you state your opinion that you think that the conclusions in these six different studies are correct?

MR. O'CALLAHAN: I'm going to object. The document speaks for itself.

THE WITNESS: Well, that is what I said. Yeah, so the reason I didn't explicitly state that was because I thought it was clear from the way I was describing the results, that I believed the results.

I never -- if I didn't believe them, I would have said, this is the result. I don't believe the result.

By putting them in with no qualification, I thought it was very clear that I believed them. It

0340

never occurred to me someone would be confused by that.

BY MR. GOLDMAN:

Q What hypothesis did you test in this case, Dr. Peckman?

MR. SKIKOS: I am Skidos and your Peckman now.

MR. GOLDMAN: It's a long day. Sorry.

THE WITNESS: I tested the hypothesis that the campaign was effective in obtaining the objectives -- the stated objectives.

BY MR. GOLDMAN:

Q What were the stated objectives of Merck's integrated marketing campaign that you tested?

A To neutralize safety concerns. To encourage doctors to prescribe Vioxx to patients regardless of their CV risk because Vioxx does not cause heart attacks or strokes or maybe it said M.I. or strokes.

And with consumers, I believe the objective was -- I have to find my other document. Give me one second.

Basically, the objectives are very similar because it was an integrated campaign. So they were disseminating similar messages across the groups.

Q You mentioned that as part of the scientific method that you typically use, you use a controlled study approach?

0341

A Well, by "controlled," I mean there is a comparison group, maybe another ad, or another point in time.

Q You didn't use a controlled study approach in your analysis in this case; did you, ma'am?

MR. SKIKOS: Objection.

THE WITNESS: All of the studies involved control. All of the studies were controlled studies.

BY MR. GOLDMAN:

Q You mentioned a statistical analysis. Did you apply one in this case?
A I evaluated their statistical analyses.
Q Did you create any separate analysis -- statistical analysis of the material that you reviewed in this case?
A In one case, I validated the count of physicians that said the sales rep told them there was an M.I. -- there was no M.I. risk or stroke risk from Vioxx that validated that statistic.
Q Other than that one statistic, did you prepare any other statistical analyses in this case?
A No, I relied on their statistics.
MR. GOLDMAN: I have to make clear that even though Mr. O'Callahan asked questions, my questions to you are not meant to respond to his because I am not

0342

here on behalf of Merck in the California cases.
So I just wanted to make that clear for the record. My questions were in response to the Barnett case and I'm sure the lawyers in the California case will want to take their own deposition.
THE WITNESS: Okay.
MR. O'CALLAHAN: Just so the record reflects, we are all laughing and we are all looking at Mr. Goldman as part of the Bartlit Beck firm, which is also trying one of the cases in the California case.
MR. GOLDMAN: That is true. I do work with Bartlit Beck.
However, I was here to ask you questions about the Barnett case and that is why I spent as much time as I did on the Barnett case.
MR. SKIKOS: She does not have to answer. There is no question pending. He is just commenting.
MR. GOLDMAN: That's correct.
MR. O'CALLAHAN: I propose we relieve the court reporter of her duties under the Code. That the original of the deposition be sent to Mr. --
MR. SKIKOS: -- Robinson.
MR. O'CALLAHAN: Mr. Robinson, who will in turn provide it to Dr. Pechmann. Dr. Pechmann will review it and notify Mr. Robinson of any changes.

0343

And in turn, Mr. Robinson will notify Mr. Goldman or the appropriate individual at his law firm of those changes.
In the event that no one is notified of any changes, a certified copy can be used for any and all purposes including trial of the matter.
MR. GOLDMAN: I agree with that with the MDL. We still have this dispute about California.
MR. SKIKOS: I agree, but on behalf of California.
///
///

0344

I, CORNELIA PECHMANN, Ph.D., do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this __________ day of

_________________,

20__, at ________________________________, ____________.
(City) (State)

________________________________

CORNELIA PECHMANN, Ph.D.

0345

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: ______________________________

______________________________
Diana Janniere
CSR No. 10034

0346

- - - - - -
E R R A T A
- - - - - -

Ex 1 - 5-26-06 depo transcript

| PAGE | LINE | CHANGE |
|---|---|---|
| | | |

IN RE VIOXX CASES
DEPOSITION OF CONNIE PECHMANN, Ph.D.
THURSDAY, JUNE 15, 2006
VOLUME I

UNCERTIFIED REALTIME ROUGH DRAFT

This realtime draft is unedited and uncertified and may contain untranslated stenographic symbols, an occasional reporter's note, a misspelled proper name and/or nonsensical word combinations.

This is an unedited version of the deposition transcript and should not be used in place of a certified copy. This document should not be duplicated or sold to other persons or businesses. This document is not to be relied upon in whole or in part as the official transcript. This uncertified realtime rough draft version has not been reviewed or edited by the certified shorthand reporter for accuracy. This unedited transcript is computer generated and random translations by the computer may be erroneous or different than that



LEXISNEXIS FILE & SERVE
11636609
E-SERVICE
Jun 26 2006
7:11PM



which will appear on the final certified transcr

Due to the need to correct entries pr[ior to] certification, the use of this realtime draft is only for the purpose of augmenting counsel's notes and cannot be used to cite in any court proceeding or be distributed to any other parties.

Acceptance of this realtime draft is an automatic final copy order.

CONNIE PECHMANN, Ph.D.,

the witness, having been administered an oath in accordance with CCP Section 2094, testified as follows:

EXAMINATION

BY MR. CAMPILLO:

Q. Would you be kind enough to state your full name for the record, please.

A. Cornelia Pechmann, but I go by Connie.

Q. It is pronounced Pechmann?

A. Yes.

Q. If I misstate it, mispronounce it, I apologize in advance. I have been saying Pechmann for a few weeks and I will probably make a mistake a few times.

A. That's okay.

Q. Dr. Pechmann, what is your understanding as to





the name of the case or cases that this deposition that I'm starting right now is being taken in?

A. Yes. It's two L.A. cases, Arrigale and Gross -- let's see. Grossberg.

Q. And when did you first hear either the name of Mr. Arrigale or the name of Mr. Grossberg?

A. A month or two ago.

Q. And in what context did you hear either name?

A. Jim Cunningham sent me materials.

Q. Do you mean Jim O'Callahan?

A. O'Callahan. Sorry.

MR. O'CALLAHAN: It's an Irish name, so it's the same thing.

MR. CAMPILLO: Just to be sure we are talking about the same person.

Q. So Mr. O'Callahan sent you some materials about a month or so ago?

A. Un-hmm.

Q. Yes?

A. Yes.

Q. And let me show you a series of e-mails that I believe you produced at your prior deposition which we will mark as Exhibit No. 1 for this deposition and ask you to look at the sixth page of Exhibit 1?

MR. SKIKOS: Do you have your own copy?





MR. CAMPILLO: I have one for the witness, one core counsel and one for the court reporter. I didn't know that you were going to have a group of four.

(Deposition Exhibit 1 was marked for identification and is annexed hereto.)

BY MR. CAMPILLO:

Q. Preliminarily, do you recognize what we have now marked as Exhibit No. 1?

(Witness reviews document.)

THE WITNESS: Yes.

BY MR. CAMPILLO:

Q. Could you tell us what that is, your understanding of what Exhibit 1 is.

A. It's a series of correspondence between me and various people primarily at the law firm of Robinson, Calcagne & Robinson with regard to my first depo, finalizing the exhibits, giving them the final report, letting me know when the depo was taking place and so on.

Q. These documents were produced either by you or by counsel for the plaintiff in that other action in connection with your deposition, correct?

A. Correct.

Q. Okay. Let me refer your attention to I think I said the fifth page of the exhibit.

MS. TUCKER: Sixth.





MR. CAMPILLO: Sixth? No, actually it's the third. I'm sorry.

MR. SKIKOS: Is it the e-mail from Jim O'Callahan?

MR. CAMPILLO: Yes. Maybe they are stapled together.

THE WITNESS: I've got it.

BY MR. CAMPILLO:

Q. There is an e-mail dated May 22, 2006 at 8:46 A.M. Do you see that?

A. Yes.

Q. Was that the first time that you heard from Mr. O'Callahan in connection with any aspect of the Vioxx litigation?

A. I'm not sure. There might have been a prior e-mail.

Q. You're not certain?

A. I'm not certain.

Q. Is this approximately the time that you first heard of the Arrigale or Grossberg cases?

A. Yes, approximately.

Q. Okay. For the record, this e-mail is dated May 22, 2006. Did you request this information that's referenced in the e-mail from Mr. O'Callahan or from anyone else?





A. No, I did not.

Q. So this came to you unsolicited, if you will?

A. Yes.

Q. And upon receipt of this information and the e-mail, what you did was to forward it to Alexis Myer and Mark Robinson and basically asked them what you ought to do with this?

A. Correct.

Q. Okay. Now, prior to this exchange on May 22, 2006, had you had any conversations with anyone about being or potentially being an expert in the cases that you have referred to, the Arrigale and Grossberg cases?

A. Not those cases. Mark Robinson was involved in a third L.A. case.

Q. That was the man so he case?

A. The man so he case, exactly. And we had discussed that case briefly, and he had said that had been postponed. And I knew that was tied to two other cases but at the time we did not discuss the other cases.

Q. So prior to receiving this e-mail from Mr. O'Callahan your work on Vioxx or your involvement in Vioxx, as you understood it, involved the Barnett case that's moving forward in the MDL, the case in Florida , I believe the name is Kozic.

A. Yes, correct.





Q. And the man so he case; is that correct?

A. I would say it was primarily Barnett.

Q. But those are the three cases that you understood you were potentially going to be a witness in, at least as of May 22, 2006; is that correct?

A. Well, I also knew that I could potentially be a witness in the two other L.A. cases but I didn't know the names of the plaintiffs or anything or the names of the attorneys or anything.

Q. Okay. Now, prior to May 22, 2006 had you given consent in writing or verbally in any fashion to any attorneys to list you as a witness or as a retained expert for the Arrigale and Grossberg plaintiffs specifically?

A. Well, when I discussed the cases with Mark he said he was going to list me as an expert on all three. So at that time I did give permission for me to be the expert for the other two, even though I didn't know anything about them.

Q. You didn't even know the names of them, correct?

A. Correct.

Q. As of May 22, 2006 had you received any materials of any sort specifically related to Arrigale or Grossberg cases?

A. I may have received something and not opened it.





I received some materials around this time in e-mail and FedEx, mail, but I was very busy finalizing the Barnett case so I didn't pay attention to anything else that came.

Q. Let me ask you this. To the present time have you received any information, any materials, I should say, that specifically pertains to the Arrigale and/or Grossberg plaintiffs?

A. By "plaintiffs" you mean material from the plaintiffs or with the plaintiffs' name on it?

Q. Any of the above.

A. Okay. Well, I have the call notes for both plaintiffs and the list of visits, Doctor visits. I have those here with me right now.

Q. What else have you received that relates directly to or makes reference to Mr. Arrigale or Mr. Grossberg?

A. Well, I read the deposition of Krahe, which is a Southern California regional sales representative and part of the cross-functional Vioxx team.

Q. And does that deposition mention either Grossberg or Arrigale in any way that you can remember?

A. I don't believe by name, although it might. I read through it for a general understanding as to what was going on in Southern California.

Q. But do you recall one way or the other as you sit here right now whether or not the names Arrigale or Grossberg appear anywhere in her deposition?

A. I wouldn't know, because at the time I read it I didn't know these were the plaintiffs, so I wouldn't have noticed one way or the other.

Q. Anything else you have received from anyone that you understood pertains specifically to the Arrigale or Grossberg plaintiffs?

A. I did receive deposition transcripts but I did not review them.

Q. Do you remember the names of the deponents whose transcripts you received but did not read?

A. No.

Q. And who did you receive those from?

A. I'm not sure. One of the firms. I don't even know -- are they in the same firm or different firms?

Q. I think they are three different firms.

A. Different firms. Okay. So I'm not sure.

Q. And when did you receive those depositions?

A. At some point after May 22nd.

Q. And can you be more precise in terms of was it yesterday, was it closer to May 22nd; any kind of time frame you can provide?

A. Let's see. Probably late May, early June.





Q. Any particular run haven't read those materials? The depositions I'm talking about.

A. The depositions, yes. Well, I discussed them with Steve Skikos, because he was at original deposition and was told not to read those materials.

Q. So to this point in time you have not read them and you have no intention of reading them; is that correct?

A. That is correct.

MR. SKIKOS: And she will not be offering opinions as to the content of those depositions at trial.

MR. CAMPILLO: I would hope not if she has not read them. But I appreciate that.

Q. Now, had you met any of the attorneys next to Mr. Skikos prior to today?

A. I met Jim O'Callahan at my last deposition. He was there the entire time and made a few objection, as I recall.

Q. I read them. That was the first time you met Mr. O'Callahan, at your deposition?

A. As I recall, yes.

Q. Had you ever met Mr. Sizemore before?

A. Yes.

Q. When did you meet him?

A. I met him for a couple of times for short





periods in mark Robinson's office, as discussed in my last depo.

Q. Had you ever met Mr. Brandi before?

A. No.

Q. You met him today?

A. Yes, I met him today.

Q. Now, when did you receive the call notes and the list of doctor visits that you mentioned a few minutes ago?

A. Around the same time as the other materials, end of May, early June.

Q. They all came together?

A. Not necessarily. Maybe two or three envelopes.

Q. But about the same time?

A. Roughly. Within a week or so of each other.

Q. And have you read the call notes and listing of doctor visits?

A. I counted the listing of doctor visits and I read the call notes, yes.

Q. And when did you do that, the counting and the reading?

A. I did it initially a week ago and I did it again just before this deposition, except the counting. I didn't redo the counting.

Q. Now, other than the call notes and the listing





of doctor visits and the deposition of Miss Krahe to the extent it addresses Arrigale or Grossberg, if any, have you received any other materials that you have read or looked at or considered for purposes of your expected testimony in the Grossberg and Arrigale cases?

A. Well, all of the material I looked at for Barnett I'm going to be using in this case. And then I met with a Los Angeles-based sales representative, as I discussed in my last deposition.

Q. Okay. Let me ask it this way. It's probably a good way of shortcutting it.

After your deposition and up until today what new materials have you looked at, considered or reviewed in connection with the Vioxx issues and Vioxx litigation?

A. Well, the call notes and the doctor visits. And I went through some additional materials to respond to your queries, Query 1 and Query 7 in particular.

Q. Okay. Other than that, and we will identify those more precisely later, other than those categories of materials, have you received and reviewed any other materials that pertain to the Vioxx issues in a summary way to shortcut this since your deposition?

A. Well, I also identified a paper that I worked on that relates to pharmaceutical marketing where I did experiments on pharmaceutical markets and advertising as

the fourth experiment in the series of studies, and I brought that paper along.

Q. Is that in the set that you have provided?

A. Yes.

Q. Anything else you have reviewed, relied on or considered since the conclusion of your deposition in the Barnett case and up through today that deals in any way with the Vioxx issues or any lawsuit involving Vioxx?

A. I spoke with Steve Skikos this Thursday and last Thursday.

Q. We will get to materials later but I'm just talking about materials now, just so we have a clear index.

A. Nothing comes to mind.

Q. And if something does you will let me know?

A. I will.

Q. Thank you. How much time did you spend reviewing the call notes and the listing of doctor visits that you made reference to?

A. I didn't record the exact amount of time but I would say two hours.

Q. That's including your review approximately a week ago and whatever time you spent relooking at those materials today?

A. Yes.





Q. Is it your understanding, Dr. Pechmann that those materials will form some basis of whatever opinions you will be expressing at the trial of the Arrigale or Grossberg cases?

A. Yes, I think it might come up.

Q. Okay. What is your understanding as to what you will be addressing that pertains to those documents?

A. Well, as you know, I reviewed the Merck integrated marketing campaign for the whole United States and in reviewing the call notes and the visits I was checking to see whether there was any difference in what happened in this situation versus what I had been seeing from all the research and documents nationwide.

Q. And what did you find?

A. And I found that there was no difference. They are virtually identical patterns in terms of the number of visits, what was talked about and so on. So the opinion I would express is that -- I have the same opinion as the opinion I stated in the Barnett case are the same as the ones I'm going to state in these cases with the exclusion of the specific opinions that had to do with Barnett.

Q. So is it fair to say, maybe to see if we can shortcut this a little bit, that when I'm referring to your general opinions that apply to any -- strike that.





Let me reword that.

Putting aside your specific opinions about Barnett, the rest of your testimony that you expressed either in your report that was produced in the Barnett case or was discussed in your deposition taken in the Barnett case is the extent of what you will be testifying about in the Arrigale and Grossberg cases?

MR. SKIKOS: And the answers to your questions. Everything else is correct but you she answered questions in your e-mails and you have those. Other than that, yes. Does that make sense?

MR. CAMPILLO: No. I thought I had it.

MR. SKIKOS: Her opinions are limited to what's in Barnett, her deposition -- that she expressed in her deposition. And you sent an e-mail asking certain questions and she prepared documents to speed the response to those answers to the questions. And those are the documents that we provided to you prior to the deposition (indicating).

THE WITNESS: And the call notes and call visits that are specific to this case would also be discussed in this case.

BY MR. CAMPILLO:

Q. Okay. How much time have you spent in total reviewing any of the materials that we have already





identified on the record since the conclusion of the deposition in the Barnett case?

A. I should have brought my bill with me. Let's see. Well, I know I spent all day yesterday. Well, let's see. All of this week, basically, working on it. Let me think. Did I work on it last Friday?

Well, several days. I would say five, six eight-hour days. But I could tell you exactly if I had my billing with me, which I didn't bring.

Q. I'll make a request on the record for your billing since the deposition to the present time to be provided to Mr. Skikos.

Is that agreeable?

MR. SKIKOS: Yes.

THE WITNESS: I should have brought it.

BY MR. CAMPILLO:

Q. Because I think there has been a pretty clear identification of your activities through the time of your deposition. I just want to update it from the conclusion to the present time.

MR. SKIKOS: No problem.

Q. Has all of the time that you have spent since the conclusion of your deposition been involved either preparing the responses to the list of questions that I intended to address today and/or reviewing the materials

that pertain to the call notes and listing of doctor visits in the Arrigale and Grossberg situations?

A. Yes.

Q. Anything else that you have done in that interim time that pertains to the Vioxx litigation?

A. Not that I recall.

Q. Is it fair to say, and I know I'm jumping to a conclusion here, but a lot of the time you spent this week was trying to find the materials that you produced that will be identified in a few minutes that are in response to the list of issues that I had identified?

A. I spent Monday doing that. Just Monday.

Q. So Monday you spent looking for the literature?

A. Yes. That would address your issue 7.

Q. So Monday was for Issue 7, literature. And you said you spent five to six hours that day, roughly?

A. Yeah. Up to eight.

Q. Okay.

A. Six to eight.

Q. Let's say four to eight.

A. Six to eight.

Q. Six to eight. All right. And then what activity did you engage in on Tuesday that had to do with the preparation of your deposition for these cases?

A. I prepared the response about Exhibit 5. And





yesterday I continued to work on the response to Exhibit 5 and also read my other deposition, my deposition transcript.

Q. And is it fair to say that both Tuesday and Wednesday you spent six to eight hours each of those two days?

A. Yes. And also this morning.

Q. Okay. What did you do this morning?

A. Reviewed all of the materials. Everything, basically.

Q. Just kind of refresh your memory on what you worked on so far?

A. Right, and answered some questions in my own mind. I took some notes, which are right here (indicating).

Q. Now, in terms of meetings with counsel or discussions with counsel, have you had any such events since the conclusion of your deposition in Barnett?

A. Yes.

Q. Okay. Could you identify those for me, please.

A. Yes. Last Thursday I met with Steve Skikos from 4:00 to 6:00 P.M. and he explained that this depo was going to take place. He showed me the list of the seven questions. We discussed briefly how I would approach each of these questions. I gave suggestion. He mostly





agreed with what I said. I think he did agree with everything I said.

And we took care of scheduling and that sort of thing.

Q. Okay. Now, let me ask you this. Since the conclusion of your deposition in the Barnett case and your meeting with Mr. Skikos last Thursday, had you had any discussions of substance other than scheduling or something like that with any of the lawyers involved in this litigation?

A. Not that I recall.

Q. You certain had certainly not had any discussions with Mr. O'Callahan since the conclusion of the Bar net deposition, correct?

A. Correct.

Q. So basically the first time you did anything since the Barnett deposition related to this litigation was last Thursday when you met with Mr. Skikos?

A. As I recall, yes.

Q. And this week you did some work to prepare for the deposition and your involvement at trial?

A. Right. And I can't remember what I did on Friday at the moment.

Q. Did you do something last Friday that related to this litigation?





A. Let's see. I could check my organizer.

Q. Sure.

A. -- if I did. No. Very little. I was at a conference.

Q. I'm sorry?

A. I was at a conference last Friday.

Q. So you didn't do anything related to this litigation last Friday?

A. Maybe just a few hours worth.

Q. Doing what?

A. Looking over some materials I brought to the conference in my hotel room.

Q. Do you remember what those materials were?

A. They were related to this (indicating), to my response to Exhibit 7 on integrated marketing communications. I stopped by my office to get materials after I met with Steve Skikos on Thursday night and brought them to the hotel and at a break went up -- skipped a session and went up and looked at some of the materials.

Q. Okay. Now, other than meeting with Mr. Skikos last Thursday had you met with any other attorneys relating to this litigation since the conclusion of the Bar net deposition?

A. Not that I recall.

Q. Today did you meet with any of the attorneys that are here today?
A. I met with Steve Skikos.
Q. When did you meet Mr. Skikos?
A. 1:30 P.M.
Q. Until approximately 3:00?
A. Quarter of 3:00.
Q. And was anyone else present during your meeting with Mr. Skikos?
A. Mark Robinson came in for a second.
Q. Anyone else?
A. Someone brought the boxes. That's it.
Q. The other Mr. Skikos?
MR. SKIKOS: Yes.
THE WITNESS: The other Mr. Skikos.
BY MR. CAMPILLO:
Q. So is it fair to say, Dr. Pechmann that other than speaking with Mr. O'Callahan at the Barnett deposition while he was there -- I'm sure you had some pleasantries before and at the conclusion -- that you have had no meetings directly to discuss your testimony in the Vioxx litigation with any of the lawyers that represent Mr. Grossberg and/or Mr. Arrigale in the lawsuits that we are here on?
MR. SKIKOS: That Mr. Sizemore represents?





MR. O'CALLAHAN: Yeah. He is pro hac vice in the California case, just like Mr. Ismail.
MR. CAMPILLO: You are counsel of record for Arrigale and Grossberg.
MR. SIZEMORE: Right.
MR. CAMPILLO: Or just in the coordinating proceeding?
MR. O'CALLAHAN: I don't think it makes any difference.
MR. CAMPILLO: I'm wondering whether he made an appearance for Grossberg or Arrigale specifically?
MR. O'CALLAHAN: He just got into town today.
BY MR. CAMPILLO:
Q. Have you had any discussions with Mr. Sizemore since the Barnett deposition about the Arrigale and Grossberg cases?
A. Yes.
Q. Okay. When?
A. I talked to him on the phone today.
Q. Okay. ~~And when did you do that,~~ the time?
A. About noon, 11:30 and then at about 2:30.
Q. Okay. And did you discuss the substance of your testimony in the Grossberg and Arrigale cases?
A. No. We discussed just some of the facts of the case.





Q. Okay. Why don't you tell me what you discussed with Mr. Sizemore about either the Arrigale or Grossberg cases today at 11:30.
A. He told me the dates on which they took Vioxx.
Q. What did he tell you about that?
A. Arrigale, November '01 to March '02. Grossberg, July '99 to September '01 and then again from '02 to August '04 intermittently.
Q. Did he give you any other details beyond what you just stated on the record?
A. No.
Q. Any other information on any other subject that Mr. Sizemore gave you today provided you during your telephone conversation at 11:30?
A. Yes. We discussed the medical issues.
Q. Okay. What do you mean by that?
A. I wanted to go over with him the indications of Vioxx and exactly when each was approved.
Q. And what did you learn in that regard?
A. That -- well, I knew a lot already from the labels that I had but I confirmed that it was originally approved in '99, May of '99 for osteoarthritis, rheumatoid arthritis in adults and acute pain and men central pain, acute men central pain, which is a very complicated title, label.





And then I knew that it was approved for rheumatoid arthritis in adults in April '02. And then I learned that in '04 it was approved sometime in the spring, like April, for migraine. And in the fall of '04, close to when it was withdrawn, for rheumatoid arthritis with youth.
Q. I don't want to confuse you but I believe you said rheumatoid arthritis as to adults both in May of '99 and April of '02. I expect you may have misspoken. I just want to clear that up.
A. What did I say?
Q. I thought you said that the May '99 approval was to osteoarthritis, acute point, rheumatoid arthritis in adults and menstrual pain.
A. Yes.
Q. Is that correct?
A. Yes.
Q. Because you said that in April of '02 it was approved for rheumatoid arthritis in adults.
A. Oh, you're right. I was wrong. Rheumatoid arthritis is adults was not until '02. I misspoke.
Q. That's what I'm trying to clarify.
A. Thank you. Oh, I did have it written down.
Q. You just said it wrong?
A. Yeah.

Q. Okay. Any other information that you gleaned or learned from Mr. Sizemore in your conversation today at approximately 11:30?
A. Not that I recall.
Q. Any other topics discussed?
A. Not that I recall.
Q. Okay. Then you say you had a second conversation with him at around 2:30, correct?
A. Correct.
Q. And what did you discuss during the second conversation?
A. I got the dates for Grossberg in the first conversation. I got the dates for Arrigale in the second conversation.
Q. The dates that they ingested Vioxx?
A. Correct.
Q. So the afternoon was Grossberg?
A. The afternoon was Arrigale.
Q. So that's when you learned that he had used Vioxx between November of 2001 and -- did you say March of 2002?
A. Correct.
Q. Did you learn anything else about Arrigale's use of Vioxx during either phone conversation than what you have already told us?





A. Not that I recall.
Q. Did you learn anything else about Mr. Grossberg's use of Vioxx during either telephone conversation?
A. Not that I recall.
Q. Did you learn anything else about any of the facts of either case other than what you have already told us during either telephone conversation?
A. Not that I recall.
Q. Other than your phone conversations with Mr. Sizemore today, your meeting with Mr. Skikos last Thursday, have you had any other meetings or discussions with any of the lawyers representing any of the plaintiffs in the Vioxx litigation since the conclusion of your Barnett deposition?
A. Just about scheduling this deposition.
Q. Nothing of substance?
A. Correct. Not that I recall.
Q. Now, you have some notes of your conversations with Mr. Sizemore?
A. Yes. That was what I should have referred to where it gave the dates of those approvals.
Q. You have a note pad with several pages with handwriting on it. What is that pad?
A. This pad I prepared, started last night and then





this morning. And what I did was just to go back through the research, each of the six studies that I had identified, to see what were the range of dates for which there are data available.

Because each document just talks about a slice of the data and there is not one document that has all six studies or all the data from all the studies, so I just went through each of the documents that was originally in my report and then was recited in Exhibit 5 and is now rediscussed in the new document. And I just went through to see what time period we are talking about where we had research and concluded that for three of the studies we have three years of data, summer/fall 2000 to fall/winter '03.

And it's roughly a thousand people per month for three years that were interviewed, 700 physician, 300 consumers.

And then there's just examples, two examples of copy testing with consumers, one example of copy testing with physicians where small groups or medium-size groups reacted to the materials. I don't have continual studies of that.

And then I have another study for which I have the tracking of the message recall from the sales reps. It goes from September to December '01 and then picks up





again in May '02 to May '03. We just don't have the -- I was never provided with the data for the other year. It just basically cites the years.
Q. We are going to get into that in a little more. I'm trying to understand what you have in front of you so I can decide whether I need to copy it or not.

So you have some notes of the materials you reviewed previously that went into, I guess, your update of what was referred to as Exhibit 5 in the Barnett deposition; is that correct?
A. Correct.
Q. How many pages of your handwritten notes relate to that?
A. Two.
Q. All right. And then what's the third page?
A. So three, four, five and six are the chronology of events from 2000 to 2003. So basically just going through what were different marketing materials that I looked at in chronological order and different events that occurred, like the JAMA article or the FDA warning letter in chronological order just so I could see it, if I needed to.
Q. Okay. When did you prepare those pages?
A. This morning.
Q. So a refresher for yourself from documents you

Q. Okay. Any other information that you gleaned or learned from Mr. Sizemore in your conversation today at approximately 11:30?
A. Not that I recall.
Q. Any other topics discussed?
A. Not that I recall.
Q. Okay. Then you say you had a second conversation with him at around 2:30, correct?
A. Correct.
Q. And what did you discuss during the second conversation?
A. I got the dates for Grossberg in the first conversation. I got the dates for Arrigale in the second conversation.
Q. The dates that they ingested Vioxx?
A. Correct.
Q. So the afternoon was Grossberg?
A. The afternoon was Arrigale.
Q. So that's when you learned that he had used Vioxx between November of 2001 and -- did you say March of 2002?
A. Correct.
Q. Did you learn anything else about Arrigale's use of Vioxx during either phone conversation than what you have already told us?





A. Not that I recall.
Q. Did you learn anything else about Mr. Grossberg's use of Vioxx during either telephone conversation?
A. Not that I recall.
Q. Did you learn anything else about any of the facts of either case other than what you have already told us during either telephone conversation?
A. Not that I recall.
Q. Other than your phone conversations with Mr. Sizemore today, your meeting with Mr. Skikos last Thursday, have you had any other meetings or discussions with any of the lawyers representing any of the plaintiffs in the Vioxx litigation since the conclusion of your Barnett deposition?
A. Just about scheduling this deposition.
Q. Nothing of substance?
A. Correct. Not that I recall.
Q. Now, you have some notes of your conversations with Mr. Sizemore?
A. Yes. That was what I should have referred to where it gave the dates of those approvals.
Q. You have a note pad with several pages with handwriting on it. What is that pad?
A. This pad I prepared, started last night and then





this morning. And what I did was just to go back through the research, each of the six studies that I had identified, to see what were the range of dates for which there are data available.
Because each document just talks about a slice of the data and there is not one document that has all six studies or all the data from all the studies, so I just went through each of the documents that was originally in my report and then was recited in Exhibit 5 and is now rediscussed in the new document. And I just went through to see what time period we are talking about where we had research and concluded that for three of the studies we have three years of data, summer/fall 2000 to fall/winter '03.
And it's roughly a thousand people per month for three years that were interviewed, 700 physician, 300 consumers.
And then there's just examples, two examples of copy testing with consumers, one example of copy testing with physicians where small groups or medium-size groups reacted to the materials. I don't have continual studies of that.
And then I have another study for which I have the tracking of the message recall from the sales reps. It goes from September to December '01 and then picks up





again in May '02 to May '03. We just don't have the -- I was never provided with the data for the other year. It just basically cites the years.
Q. We are going to get into that in a little more. I'm trying to understand what you have in front of you so I can decide whether I need to copy it or not.
So you have some notes of the materials you reviewed previously that went into, I guess, your update of what was referred to as Exhibit 5 in the Barnett deposition; is that correct?
A. Correct.
Q. How many pages of your handwritten notes relate to that?
A. Two.
Q. All right. And then what's the third page?
A. So three, four, five and six are the chronology of events from 2000 to 2003. So basically just going through what were different marketing materials that I looked at in chronological order and different events that occurred, like the JAMA article or the FDA warning letter in chronological order just so I could see it, if I needed to.
Q. Okay. When did you prepare those pages?
A. This morning.
Q. So a refresher for yourself from documents you

had already seen before?

A. Yes.

Q. And how many pages after that?

A. Then there is a page where I took the notes from Paul Sizemore about the approved uses for Vioxx.

Q. That's your conversations from today?

A. Correct.

Q. Okay.

A. And then a couple of notes to myself to check exhibits, which I then did when I got here.

Q. Okay. What's the next page?

A. Find out years involved in L.A. cases.

Q. That was a note that you had written to yourself before you spoke to Mr. Sizemore or after?

A. This was a note after.

Q. What is the question you are asking?

A. I had written a note to myself with no answer. I had written this part, "Find out years involved in L.A. cases" maybe yesterday. And then when he gave me the answer I put the answer on the same page.

Q. Okay. Anything else?

A. And then this is an overview of my opinion as I was practicing with Steve before we came.

Q. Okay. That's fine. I didn't mean to cut you off. I'm sorry.





A. That's it.

Q. All right. Do me a favor. Without commenting or editorializing just read verbatim your summary of your opinions that you wrote with Mr. Skikos today when you were practicing. Just read it verbatim slowly for the reporter to take it down.

A. Okay. "In integrated marketing communication based on science. Science isn't industry specific. Merck's integrated marketing communications campaign was intense, sophisticated and science based.

"Research studied CV risk awareness and awareness low. They did nothing to increase awareness and actively tried to reduce awareness.

"California equals the U.S. Sales rep, call notes, Krane, senior business director Southern California, cross-functional team for Vioxx. Details in Barnett report."

Q. Now, Dr. Pechmann, is it accurate to say that those pages on the pad that you have already described is the totality of the materials that you have created for the Arrigale and -- in connection with the Arrigale and Grossberg cases except for the other materials that you have handed to me that I have yet to identify on the record?

A. Yes, I believe so.





MR. CAMPILLO: We can at some point in time make a copy of those sheets and we will mark those as Exhibit 2 collectively.

THE WITNESS: I'm sorry my handwriting is so messy.

BY MR. CAMPILLO:

Q. That's why I asked you that one part that's more significant to me.

(Deposition Exhibit 2 was marked for identification and is annexed hereto.)

BY MR. CAMPILLO:

Q. All right. Now, is my understanding, Mr. O'Callahan, just to see if we can shortcut this deposition a little bit, that she is not going to express any specific opinions about Arrigale and Grossberg as she did in the Barnett case other than to say that whatever was happening in California was similar or consistent with what was being done everywhere else, but she is going to testify about what the prescribing doctors in Mr. Grossberg's or Arrigale's case knew and things of that nature? Do I have I it correct?

MR. O'CALLAHAN: I think that's generally a fair statement. She does have specific -- she has reviewed the call notes and records regarding the physicians who were prescribing Vioxx to the trial plaintiffs in this





case.

And as I understand her testimony, she believes that those notes and so on are consistent with what she observed with respect to the Barnett case. That, I think, further confirms that this was a national integrated marketing plan that was put into effect.

I don't want to put words in the witness' mouth but I think that's a summary of what she has done.

MR. SKIKOS: We are going to go off the record for a second.

(Recess taken.)

BY MR. CAMPILLO:

Q. Dr. Pechmann would you tell me your own understanding of what opinions, and just the opinions. Don't worry about the bases of the opinions for now -- oh, she needs her notes?

MR. O'CALLAHAN: I'm going to object to the extent it's cumulative. She prepared a 87-page report that contains her opinions. Do you want her to read her report into the record?

MR. CAMPILLO: Just make your objection, Mr. O'Callahan. I'm really trying to shorten this, not belabor the point.

MR. O'CALLAHAN: Ralph, we all know what you are trying to do here. So just go ahead.

MR. BRANDI: Can we also reflect that there was an off-the-record discussion. I told you that the doctor was not going to testify to as to what any prescribing physician had actual knowledge of but, rather, based on her knowledge, skill, training and experience and review of the materials what information they had and what they likely were told and what effect it was designed to produce.

MR. CAMPILLO: Okay. I will just for now say that that is way beyond what was stated to Judge Cheney that she was being proffered for when we agreed that the deposition could be limited to three hours. I will continue but I want to make sure I'm not waiving my right to seek additional time to the extent she is going to say anything about the specific physicians that are involved in the care and treatment of Mr. Arrigale, because those would be case-specific opinions. Whether it's what they were told or what they knew or what was available for them to be told, it's still case-specific and I just want the record to be clear what our position is.

MR. BRANDI: Okay. Let's go.

MR. SKIKOS: Now she is confused.

THE WITNESS: No, it's okay. You will ask questions and I will answer.

MR. CAMPILLO: We will clarify it. Let me mark





these other documents just so that we have a clean record.

Let's start with the call notes and the listing of Dr. Visits that you made reference to, Dr. Pechmann if you could. Let me look at them really quickly and I will give them back to you.

(Documents handed to counsel.)

MR. CAMPILLO: Exhibit No. 3 will be a document entitled "Call Notes" which has nine pages and it lists the call notes relating to Dr. Shaw and Mr. Grossberg.

(Deposition Exhibit 3 was marked for identification and is annexed hereto.)

MR. CAMPILLO: Exhibit No. 4 is a similar document. This one identifies Mr. Arrigale, Dr. Caceres, Dr. Chung, Dr. Nguyen.

(Deposition Exhibit 4 was marked for identification and is annexed hereto.)

And Exhibit No. 5 is another document. This one does not have a title.

(Deposition Exhibit 5 was marked for identification and is annexed hereto.)

THE WITNESS: Contact said --

BY MR. CAMPILLO:

Q. Dr. Pechmann is that your handwriting?

A. Yes.





Q. And it says ID case --

A. Those are the headings for the columns but this says contacts and what does this say? Samples.

Q. Okay.

A. I would call it a contacts and sample documents.

Q. Are these documents, Exhibits 3, 4 and 5, the totality of information that you have received other than what Mr. Sizemore told you on the phone today that pertain specifically to either Mr. Grossberg or Mr. Arrigale or the prescribing physicians?

A. Unless Krahe's depo said something about it.

Q. So what I said is correct with that caveat?

A. Yes.

Q. Okay. Have you looked at any of the medical records that pertain to Mr. Arrigale or Mr. Grossberg?

A. No.

Q. Have you looked at any pharmacy records that pertain to either Mr. Arrigale or Mr. Grossberg or the pharmacies through which they acquired any medical products?

A. No.

Q. Have you looked at -- do you know anything about the background of Dr. Caceres, Dr. Shaw or any of the other doctors that are listed or mentioned in Exhibits 3, 4 and 5?





A. No.

Q. Other than the information that was related to you by Mr. Sizemore on the telephone today, do you have any other knowledge or information relating to when Mr. Arrigale or Mr. Grossberg used Vioxx, the doses that they used, the time during which they used Vioxx, the duration of use or anything else relating to those topics?

A. No.

MR. SKIKOS: Ralph, I don't want to speak out of school, but this might be them.

MR. CAMPILLO: Sure.

MR. SKIKOS: Prior to the deposition Dr. Pechmann and I prepared what she read to you, those seven points. And we did that in an effort to limit her opinions and create a cut off so that certain case-specific opinions that you are concerned about would not be discussed, for example, what was specifically told to the treating physicians is a perfect example am.

Unfortunately, my brother took the document, but the seven general topics are the topics that she intends to testify to at trial. Of course, they are supplemented by whatever data is in her Barnett report and whatever she is providing to you here and in response to your e-mails.

That is our best effort to narrow the opinions so that you have a clear understanding before going to trial about what she is going to talk about.

MR. CAMPILLO: That's very helpful. I just want to make sure that counsel of record, who will be the ones, I assume, at trial agree with what your characterization of what her involvement in this case will be.

Can you do that?

MR. BRANDI: Yeah.

MR. CAMPILLO: Good enough for me. Then when we get the document back I will clarify what those are and we are probably fine. Thank you.

Q. Now, do you have some other materials, Dr. Pechmann in front of you that I just want to make sure I know what they are so I can decide whether I need to mark them. You can just walk me through them in whatever order you want.

A. This document entitled "Information Formats for Presenting Unfavorable Efficacy Information, Managerial and Regulatory Perspectives" .

Q. What is that?

A. It is a document I am working on with a former Ph.D. student, Dipayan Biswas.

I brought this because the fourth study is a





controlled experiment of a real Merck label for Maxalt tablets, which is for migraine headache. It's a prescription drug for migraine headache.

So this study shows that I have done controlled experiments, independent research on pharmaceutical marketing. The reason I didn't bring it up at the last deposition was because I didn't conceive of the paper as a paper on pharmaceutical marketing.

When I do research I talk about general topics, like the topic here, how do you present unfavorable efficacy information. And the first study is about sun screen, I believe, first and second studies are about sun screen and it's an over-the-counter sun screen. One of the study is about cars and car crash results and the final study is about prescription drugs.

And that epitomizes what we do. We try to do research that transcends industries, because we couldn't do a study about every single industry or we would never get anywhere.

~~So when I was originally asked at my last~~ deposition had I done independent research and so on I had said no because I hadn't thought of this paper. But once I understood their definition of what pharmaceutical research is, I realized that clearly this would qualify.

Q. Okay.





A. So I wanted to make sure that you knew I have this paper.

Q. Now, basically, this is significant to your experience and expertise in marketing and particularly how it relates to pharmaceutical products?

A. Absolutely, yes.

Q. When was this research conducted, just a general time frame?

A. Well, he started it for his dissertation, so it was started three years ago. He graduated two years ago already. It takes a long time.

And I think that study was done in May full. The last study was done last fall.

Q. Fall of 2005?

A. Yes.

Q. And that part of the work that the student is doing is complete?

A. Yes.

Q. But his dissertation is not complete?

A. No, his dissertation is complete. His dissertation was the first three studies.

Q. So what is the status of this document? Is this a draft in process or has it been published? Where does this stand?

A. This is a draft paper that we are still working





on. And within a month we hope to submit it to a journal.

Q. Any particular journals you have in mind at this point?

A. Yes. Journal of marketing research.

MR. CAMPILLO: All right. Can we mark this as Exhibit No. 6.

(Deposition Exhibit 6 was marked for identification and is annexed hereto.)

MR. CAMPILLO: Mr. Skikos and I have discussed the fact that since this paper is in process, if you will, and not published, that it will not be used for any purpose whatsoever other than possibly to cross-examine Dr. Pechmann and will not be made available to anyone for any other purpose.

MR. SKIKOS: Yes. Thank you.

BY MR. CAMPILLO:

Q. Another document that you have in front of you, Dr. Pechmann I believe, is a set of reprints with a summary in front of it.

A. Yes.

Q. And those are articles that you have personally located and copied for us that address literature which discusses, describes or critiques integrated marketing communication campaigns of pharmaceutical companies?