UNCERTIFIED REALTIME ROUGH DRAFT

```
1      A.   Yes.  Most of them discuss that.
2      Q.   And these are the ones that you searched for and
3  located earlier this week?
4      A.   Yes.
5      Q.   And did you do that solely because that was an
6  area that I had identified personally as an or that I
7  wanted to ask you questions about before you took the
8  stand in the Grossberg and Arrigale cases?
9      A.   Yes.  And also because it was a blank exhibit in
10 my last depo.
11     Q.   Because you were asked some questions about
12 studies but no studies were identified during the Barnett
13 deposition?
14     A.   Correct.
15     Q.   So these are the studies that at least you
16 believe were responsive to those questions and you have
17 now had the opportunity to look for, identify and
18 provide?
19     A.   Correct.
20          MR. CAMPILLO:  So we will have this entire set
21 and the summary sheet which is two-sided marked as
22 Exhibit No. 7.
23          (Deposition Exhibit 7 was marked for
24          identification and is annexed hereto.)
25 BY MR. CAMPILLO:
```

41

UNCERTIFIED REALTIME ROUGH DRAFT

```
1      Q.   And these are your questions about Exhibit 7,
2  Dr. Pechmann.  The summary, the two-sided or two-page
3  summary, is that something you prepared yourself?
4      A.   Yes.
5      Q.   Did anyone help you with the searching and
6  identification of these articles or is this something you
7  did personally?
8      A.   I did it personally.
9      Q.   Okay.  And just in very general terms how did
10 you go about conducting the research that identified
11 these articles?
12     A.   I went to the Harvard cases, Stanford cases and
13 Ivy cases that are available on line to proceed
14 professors and I identified ones that dealt with
15 pharmaceutical marketing and integrated market
16 communications.  The only thing I did get help with was
17 my account had expired, so my Ph.D. student, Dip,
18 actually bought them for me.  And then I --
19          MR. SRIKOS:  He dipped into his own account.
20          THE WITNESS:  I also looked at two textbooks,
21 one in consumer behavior and one in marketing management,
22 because they talk about marketing being a science and the
23 different types of science that are involved
24 specifically.
25          I did that because it reinforces my point that
```

42

UNCERTIFIED REALTIME ROUGH DRAFT

```
1  integrated marketing communications are based on science.
2  That are well known techniques, validated tech next for
3  studying these campaigns and their effects.
4          And the next case from Harvard shows that Merck
5  employed this science, that they changed their approach
6  from a non-science-based to a very marketing
7  science-based approach to integrated marketing
8  communications.
9          And then after that I just show examples of how
10 these types of research are used in other pharmaceutical
11 contexts.
12     Q.   Okay.  Dr. Pechmann had you read any of the
13 materials or articles that are included within Exhibit 7
14 prior to your locating them this week?
15     A.   Some of them, yes.
16     Q.   Which ones had you read before locating them
17 this week?
18     A.   1, 2, 4, 8, 10, 11.
19     Q.   And any others?
20     A.   Not that I recall, no.
21     Q.   I assume you had read those particular items
22 other than in connection with your work in the Barnett
23 case or the cases we are here on today?
24     A.   Yes.  I would like to point out that the last
25 one is about the link between pharmaceutical marketing
```

43

UNCERTIFIED REALTIME ROUGH DRAFT

```
1  and tobacco marketing, which was specifically asked for
2  at my last deposition.
3      Q.   Do any of these materials, which obviously I
4  don't have the time to read at the moment, mention Vioxx
5  or marketing of Vioxx specifically?
6      A.   Yes.
7      Q.   Which one or ones?
8      A.   10.
9      Q.   That's one of the ones you had read before?
10     A.   Yes.
11     Q.   And just in very brief fashion what does that
12 item tell you about Vioxx and the marketing of Vioxx?
13     A.   It gives statistics about Vioxx's advertising
14 expenditures relative to other consumer goods like Pepsi
15 and indicates that the expenditures are very high, say
16 double that compared to what was spent on Campbell's Soup
17 and 50 percent higher than Pepsi.  That sort of thing.
18     Q.   Any other references to Vioxx in any of the
19 materials contained within Exhibit 7 that you can think
20 of?
21     A.   Not that I recall.
22     Q.   And you also provided me with a document
23 entitled "Information about Pechmann Deposition Exhibit
24 No. 5."  To be honest with you, I'm not sure I understand
25 what this is.  Can you try to explain that for me.
```

44

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.  Sure.  When I was preparing for the first
2    deposition the issue arose as to whether I would meet the
3    standards of an expert, of which I knew nothing about
4    because I'm not a lawyer.  But Steve Skikos talked to me
5    the day before and said that -- something to the effect
6    that there has to be a scientific basis for the opinions.
7        And I said that half of what I looked at were
8    these studies, that there was extensive research, which
9    is why initially I said I was interested in the case
10    because I knew that there would be a lot of research and
11    that was my background and I felt comfortable with that.
12        And he said there is probably going to be a
13    direct exam on these studies and they are not clearly
14    laid out in your report because they are kind of
15    interspersed with other things, which is how in many
16    documents they are.  You talk about that topic and all
17    the research about that topic as opposed to a
18    research-by-research layout.
19        I started to go through the studies with him and
20    he said, "Why don't you write that down because it's so
21    much work -- so much material that it might be difficult
22    for you; you won't remember."
23        So I prepared this document?
24    Q.  The handwritten Exhibit 5?
25    A.  Exactly.  And then we read that you wanted more

45

UNCERTIFIED REALTIME ROUGH DRAFT

1    information about this Exhibit 5.  And I said to myself
2    you would be better off with something that was typed
3    than something that was handwritten and something that
4    clearly showed that mostly what I did with Exhibit 5 is
5    just pull the researchers out of Exhibit 5 and put them
6    in my own handwriting.
7        The only other thing I did was do it study by
8    study so that the format was different and talked about
9    the method at the beginning, which makes sense when you
10    start talking study by study.
11        So what I did was, since you wanted more
12    information about No. 5, was to make a document that I
13    thought would be helpful would you where I typed it up so
14    the method is now typed up very clearly stating where
15    everything was in the original exhibits from my expert
16    report.  And then everything in bold is cut and paced
17    from my original expert report to show that virtually
18    everything in therein terms of results was in my original
19    report.
20        The only thing I did was reorganize it and add
21    the method.  So that's what this is.  It's just a way to
22    clarify what I was doing with Exhibit 5.
23    Q.  So another way of putting it is that you have
24    taken the handwritten Exhibit 5 from the Barnett
25    deposition and you have now typed it up, organized it,

46

UNCERTIFIED REALTIME ROUGH DRAFT

1    added details to make it more complete and more thorough?
2    Is that a fair summary?
3    A.  Well, I organized it the same way but I added
4    details, because last time for results I would just write
5    very brief results.  And this time I just cut and paced
6    all the results, the detailed results I had in my
7    original expert report.  So I gave a more complete set of
8    results.
9    Q.  Now, if you will recall, Dr. Pechmann during the
10    Barnett deposition Mr. Skikos towards the end asked you a
11    series of questions and you identified six types of
12    studies that you had comments about.  Do you remember
13    that?
14    A.  Yes.
15    Q.  How does that series of questions and your
16    discussion about those six types of studies relate to
17    Exhibit 5, if it does at all?
18    A.  It directly relates to Exhibit 5, because as he
19    was asking me those questions I was using these notes to
20    respond.
21    Q.  I see.  All right.  So this exhibit, when I have
22    a chance to read it, should teach, if you will, your
23    testimony in response to Mr. Skikos' questions in the
24    Barnett deposition, possibly with more detail of course,
25    but in a sense discusses those opinions and the bases for

47

UNCERTIFIED REALTIME ROUGH DRAFT

1    those opinions?
2    A.  Yes.
3    Q.  So it's not something different from the
4    opinions you express on the record during the questions
5    by Mr. Skikos, it's just a written version of that with
6    added detail?
7    A.  Correct.  The added detail is a little bit more
8    about the method and a little bit more about the
9    findings.  But what I would like to point out is
10    everything in bold was from my original report, so if you
11    read my expert report you will just be repeating the same
12    thing here.
13        MR. CAMPILLO:  Let's mark -- what do we want to
14    call this?
15        MR. SKIKOS:  The answer to Ralph's question.
16        MR. CAMPILLO:  We will just call it information
17    about Pechmann's Deposition on Exhibit 5.  That will be
18    Exhibit No. 8 to this deposition.
19        (Deposition Exhibit 8 was marked for
20        identification and is annexed hereto.)
21    BY MR. CAMPILLO:
22    Q.  Okay.  Any other materials, Dr. Pechmann that
23    you brought with you today that we have not already
24    discussed or identified on the record?  And I do
25    understand, by the way, that you have the boxes of

48

UNCERTIFIED REALTIME ROUGH DRAFT

1  materials that you relied on, read or considered and I
2  assume those are the same five, quote, unquote, boxes
3  that were at the Barnett deposition?
4      A.  Yes.
5      Q.  So there is nothing new in the boxes that were
6  not present at the time of your Barnett deposition,
7  correct?
8      A.  Correct.
9      Q.  Okay.  Because I'm not going to copy those as
10 long as they are the same thing that we already have.  Is
11 that correct?
12     A.  Correct.
13     Q.  Anything else that you have here today that we
14 have not already identified on the record?
15     A.  Yes.
16     Q.  Okay.  What is that?
17     A.  To help you go through this --   ...   ...
18     Q.  I should ask for more things.  She is so
19 helpful.  I could have thought about ten more questions
20 if I knew she was going to be so responsive.
21         MR. SKIKOS:  You should have.
22         MR. CAMPILLO:  I will next time.
23     Q.  Thank you, Dr. Pechmann.  I appreciate it.
24     A.  To assist you with this document that's called
25 information about Pechmann Deposition Exhibit 5 we

49

UNCERTIFIED REALTIME ROUGH DRAFT

1  created a binder that provides the exhibits in the order
2  in which they appear.
3      Q.  Could we see the binder?
4      A.  Yes.
5          MR. SKIKOS:  While you are looking, my wife just
6  called.
7          MR. CAMPILLO:  We will go off the record.
8          (Recess taken.)
9          MR. CAMPILLO:  Just to complete the
10 housekeeping, Exhibit 9 to this deposition is going to be
11 a binder, very beautifully organized, tabbed binder
12 prepared by Dr. Pechmann or someone at your request --
13         THE WITNESS:  Someone at my request.
14         MR. CAMPILLO:  And the first one, as I
15 understand it, is a list -- well, it contains all of the
16 exhibits from your original Barnett report.  So when it
17 says Exhibit 59, that's referring to Exhibit 59 to the
18 Barnett expert report.
19     A.  Correct.
20     Q.  And these are the exhibits that correspond to
21 your comments and opinions that relate to the six types
22 of studies that you discussed on the record during the
23 Barnett deposition?
24     A.  Right, that were identified as Exhibit 5 from
25 the deposition.

50

UNCERTIFIED REALTIME ROUGH DRAFT

1      Q.  Okay.
2          (Deposition Exhibit 5 was marked for
3          identification and is annexed hereto.)
4  BY MR. CAMPILLO:
5      Q.  And the next binder which we will mark as No. 10
6  is somewhat similar to No. 9 but it differences that for
7  some of the documents in Exhibit 10 you only have the
8  specific pages that are referenced in Exhibit 5 and not
9  the entire document, correct?
10     A.  Correct.
11     Q.  And there's also some documents under tabs 25,
12 26, 27 and 28 which are some other Merck documents that
13 are also referenced in Exhibit 5?
14     A.  Yes, as Merck documents.
15     Q.  As opposed to an exhibit to your expert report?
16     A.  Correct.  Those were mostly the red papers that
17 I original didn't put in the report because I didn't put
18 the method of the research in the report.
19     Q.  But the number that you use in your column is
20 just the first Bates number for each document but each
21 document is actually multi-paged?
22     A.  Correct.
23     Q.  All right.  Okay.
24 BY MR. CAMPILLO:
25     Q.  And I think with the identification of Exhibits

51

UNCERTIFIED REALTIME ROUGH DRAFT

1  9 and 10, Dr. Pechmann we have now covered everything
2  that you have brought with you to this deposition and
3  also I think with the materials contained in the five
4  boxes that we are not going to mark it's the totality of
5  the materials you have read, relied on or considered for
6  your opinions in this case?  I see there is an exception
7  to that.
8      A.  Just one more item.
9      Q.  Okay.
10     A.  This was the special issue of a journal that
11 described the integrated marketing campaign that we did
12 for the antidrug program.
13     Q.  May I see that, please?
14     A.  It's my only copy (handing).
15         MR. CAMPILLO:  This is -- what do we call this?
16 A periodical?
17         THE WITNESS:  Yes.  Called social marketing
18 quarterly.
19         MR. CAMPILLO:  Social marketing quarterly.  This
20 particular one is Volume 10, No. 2 from the summer of
21 2004.
22     Q.  And the significance of this particular
23 publication, Dr. Pechmann is what?
24     A.  That we used the same scientific studies for
25 that campaign as was used in the Merck campaign.

52

UNCERTIFIED REALTIME ROUGH DRAFT

1    Q.  Meaning the types of studies, the methodology?

2    A.  Exactly.  Merck did more studies but we did many

3  of the same studies that they did.  I had already

4  provided my own article from that issue but this gives

5  you the totality of the articles that are written.

6    Q.  All right.  Is it all right if we take this, the

7  court reporter takes it, makes a copy, marks the copy and

8  returns the original to you?

9    A.  Okay.

10    Q.  Is that okay with you?

11    A.  Yes.

12    MR. SKIKOS:  Would you be happier if Mr. Skikos

13  over there copied it and gave it to Mr. Campillo?

14    THE WITNESS:  Yes.

15    MR. CAMPILLO:  That's okay with me.  I'm not

16  going to ask you any questions about it, so he can take

17  ...it.

18    MR. SKIKOS:  Good luck, Mr. Skikos.

19    THE WITNESS:  All right.  That's it.

20  BY MR. CAMPILLO:

21    Q.  One more exhibit.  This is not the one that you

22  brought.

23    No. 11 will be the marketing journal that we

24  just identified.  And Exhibit 12 will be the plaintiff's

25  expert witness list and declaration served in connection

53

UNCERTIFIED REALTIME ROUGH DRAFT

1  with the Arrigale and Grossberg cases dated April 21,

2  2006.

3    (Deposition Exhibit 12 was marked for

4    identification and is annexed hereto.)

5  BY MR. CAMPILLO:

6    Q.  From Pechmann you pointed to something on the

7  first page of Exhibit 12 and kind of chuckled.  Can you

8  tell us what that was about.

9    A.  I said that I got a raise because I'm charging

10  $350 an hour.  But they are going to pay me $400 an hour.

11    Q.  All right.

12    A.  According to this statement.

13    Q.  Well, what is your normal and customary hourly

14  rate for consultation that you are involved in here?

15    A.  $350 an hour.

16    Q.  So this is a mistake, you believe?

17    A.  I don't know.

18    Q.  Well, have you discussed with counsel of record

19  for Mr. Grossberg and Mr. Arrigale what rate you will be

20  charging them for the work you do in this case?

21    A.  No.

22    Q.  Will it be $350 an hour?

23    A.  Yes.  Also my name has two N's at the end of it.

24    Q.  Okay.  As of April 21, 2006 -- well, let me ask

25  you:  Had you seen this document before this afternoon?

54

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.  No, I had not.

2    MR. O'CALLAHAN:  Mr. Campillo, let me just put

3  on the record that we are an hour and a half into the

4  deposition.  It's a three-hour time limit imposed by the

5  court.  And I don't think you have gotten to the seven

6  areas of questioning you wanted to get so.  I hope that

7  you are able to do that in the next hour and a half.

8    MR. CAMPILLO:  What was my last question?

9    (The last question was read.)

10  BY MR. CAMPILLO:

11    Q.  And had you given your consent to anyone at the

12  law firm of Girardi and Keese to list you as a retained

13  expert in connection with either the Grossberg or

14  Arrigale cases?

15    MR. SKIKOS:  That's asked and answered.  She has

16  already answered that one.

17    MR. CAMPILLO:  I said to Girardi and Keese.

18    Q.  Have you specifically given your consent to

19  anyone at the Girardi and Keese law firm to use you as an

20  expert?

21    A.  I told mark Robinson that it would be okay.

22    Q.  And that was before April 21, 2006?

23    A.  Yes.

24    Q.  Thank you.  Dr. Pechmann do you have any

25  knowledge as you sit here today about the credentials or

55

UNCERTIFIED REALTIME ROUGH DRAFT

1  the professional training and experience of any of the

2  prescribing physicians or physicians who prescribed Vioxx

3  to either Mr. Grossberg or Mr. Arrigale?

4    A.  No.

5    Q.  Do you have any knowledge as to what any of

6  those individuals knew about the risks and benefits of

7  Vioxx at any point in time in between 1999 and 2004?

8    A.  Yes.

9    Q.  Other than the information that you have gleaned

10  from the review of the documents that have already been

11  identified, do you have any specific information about

12  what any of those prescribing physicians knew about the

13  risk and benefits of Vioxx during the time frame 1999

14  through 2004?

15    A.  Beyond what we have already -- beyond my other

16  depo and the report and everything, not that I recall.

17    Q.  Now, you mentioned earlier that you had talked

18  to -- let's see the way you described it -- a sales

19  representative I think you said from the Southern

20  California area.

21    A.  Correct.

22    Q.  Who did you talk to?

23    A.  I don't know.  I don't remember her name.

24    MR. SKIKOS:  She went over this in the last

25  depo.

56

UNCERTIFIED REALTIME ROUGH DRAFT

1      MR. CAMPILLO:  I was going to clarify.
2      Q.  You were referring to the same person you had
3  mentioned in the Barnett deposition?
4      A.  Yes.
5      Q.  Have you talked to that person again?
6      A.  No.
7      Q.  Just the one time described in the Barnett
8  deposition?
9      A.  Correct.
10      Q.  All right.  Have you talked to anyone else
11  involved in any way with the marketing or promotion of
12  Vioxx in the State of California other than that person?
13      A.  Have I spoken with anyone else?
14      Q.  Yes.
15      A.  No.
16      Q.  Do you have any knowledge or information,
17  Dr. Pechmann as to whether or not Mr. Arrigale and/or
18  Mr. Grossberg saw any direct to consumer advertising
19  related to Vioxx at any time?
20      A.  No, I don't know.
21      Q.  Do you have any knowledge as to whether or not
22  any of the physicians that prescribed Vioxx to
23  Mr. Grossberg or Mr. Arrigale attended any events
24  sponsored by Merck at any time pertaining to Vioxx?
25      A.  I believe the call notes make reference to some

57

UNCERTIFIED REALTIME ROUGH DRAFT

1  events.
2      Q.  Would that be the extent of your knowledge,
3  whatever is reflected in the call notes?
4      A.  Correct.
5      Q.  As you sit here today do you have in mind any
6  particular demonstrative exhibits or audio visual aids
7  that you would use at the trial of the Arrigale and
8  Grossberg cases?
9      A.  Yes.
10      Q.  Okay.  What have you considered?  What do you
11  have in mind as you sit here today?
12      A.  The exhibits that are referred to in this report
13  we call information about Pechmann Deposition Exhibit 5
14  that talks about the science.
15      Q.  If we can call it Deposition Exhibit No. 8.
16      A.  Exhibit 8.  Okay.  And there are several
17  documents throughout my expert report that I would think
18  would be good to show to the jury.
19      Q.  By that you mean that the actual document may be
20  put up on a screen or shown to the jury in some way?
21      A.  I guess.  We haven't really discussed it but
22  that's one way.
23      MR. SKIROS:  That's a good idea.  I'll do that.
24  BY MR. CAMPILLO:
25      Q.  Okay.  Other than displaying documents that are

58

UNCERTIFIED REALTIME ROUGH DRAFT

1  referenced in Deposition Exhibit 8 or your Barnett
2  report, have you given any thought to what demonstrative
3  exhibits or any audio visual aids that would be used at
4  the trial of these two plaintiffs' cases?
5      A.  Yes.  And we talked about using the "Be the
6  Power" video.
7      Q.  Okay.  When you say "we talked about using" who
8  are you referring to?
9      A.  I believe Steve Ann I talked about it.
10      Q.  Mr. Skikos?
11      A.  Yes.  Or perhaps mark -- actually, it was mark
12  Robinson when he was originally going to do the L.A.
13  trial.
14      Q.  Anything else you have considered to this point
15  in time in terms of audio visual aids or other
16  demonstrative exhibits that you would use to complement
17  along with your testimony?
18      A.  We might show some of the TV ads, the Dorothy
19  Hamill ads.
20      Q.  Anything else?
21      A.  I haven't thought about it yet.
22      Q.  So you have told us at least what you have
23  thought about or considered to this point in time?
24      A.  Yes.  I haven't gone into the specifics.  It
25  would take quite a while to go through every page of my

59

UNCERTIFIED REALTIME ROUGH DRAFT

1  report and say which documents.
2      Q.  I'm not asking you to tell me which of your
3  exhibits you would display but I'm saying conceptually
4  any other ideas that you have come up within terms of
5  what you would want to do to demonstrate your testimony
6  in front of the jury.
7      A.  We might put some summary opinions up in a
8  PowerPoint or something.
9      Q.  Have you discussed that with any of the
10  attorneys representing either Mr. Arrigale or
11  Mr. Grossberg?
12      A.  No.
13      Q.  Have you began work on any such aids?
14      A.  No.
15      Q.  Dr. Pechmann have you located any published
16  articles authored by anyone in which the Merck integrated
17  marketing campaign for Vioxx is critiqued?
18      A.  I believe there is a case in Europe, and I tried
19  to get a copy of it but I haven't managed to get it yet.
20      Q.  And what is it that you have been trying to get?
21  Can you refer to it by authority or what you have heard
22  about it.
23      A.  It's a case on Vioxx that's disseminated from
24  the European clearing house.
25      Q.  When you say "a case" you mean a lawsuit?

60

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.   No.  I'm sorry.  In business we refer to cases
2  as business cases.
3    Q.   All right.
4    A.   So many of the materials that I gave you that
5  were in the big packet are business cases; discussions,
6  descriptions of integrated marketing campaigns, the
7  research, et cetera.
8    Q.   Where did you hear there may be such a case on
9  Vioxx in Europe?
10   A.   I looked it up online.
11   Q.   So you found some kind of identification of such
12  a thing and you are trying to get your hands on it?
13   A.   Correct.
14   Q.   Can you tell us what it is you identified, the
15  name of it or title or whatever description you have been
16  able to locate?
17   A.   I could provide that off of my computer later.
18  Basically it's a case if you go to the European business
19  case clearing house, it's the case on Vioxx.
20      MR. CAMPILLO:  I will make a request,
21  Mr. Skikos, if you can give us that information, it would
22  be helpful.
23      MR. SKIKOS:  And you'll let it into evidence at
24  trial?
25      MR. CAMPILLO:  I don't think I can make that

61

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  stipulation today.  It's under advisement.
2      MR. SKIKOS:  You'll think about it.
3      MR. CAMPILLO:  Yes.
4    Q.   Dr. Fechmann you obviously have not located it
5  yet so you don't know what it says, correct?
6    A.   Correct.
7    Q.   Other than possibly that document, have you seen
8  anything else published anywhere to date that purports to
9  be some kind of a critique of the Vioxx integrated
10  marketing campaign of Merck or by Merck?
11   A.   There are some articles that discuss aspects of
12  the case that Vioxx as an example of excessive
13  spending or something like that.
14   Q.   Those are the ones in Exhibit -- that would be
15  the one you reference in what is Exhibit No. 7 to the
16  deposition?
17   A.   I didn't include those, but they are in the
18  boxes.
19   Q.   Those have been identified before?  I mean, they
20  were in the boxes you produced in the Barnett case?
21   A.   Correct.
22   Q.   Okay.  Anything that comes to mind other than
23  the items you just described on the record that is in your
24  mind or in your judgment appear to be a critique of the
25  Vioxx integrated marketing campaign by Merck?

62

---

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.   Not that I can think of.
2    Q.   Do you have any knowledge of what the case on
3  Vioxx from Europe deals with, what the topic is or
4  anything are more than what you saw on your hit, I guess?
5    A.   No.  I didn't even know this clearing house
6  existed until I went to France a couple of months ago,
7  and they said, "Oh, we have a couple of cases that are in
8  English," and when I was looking I looked in this new
9  repository that I otherwise wouldn't have even looked at.
10   Q.   Have you come across in any of the work you have
11  done so far of any published articles that critiqued the
12  integrated marketing campaigns of any other manufacturers
13  of COX 2 inhibitors, like Celebrex or Bextra?
14   A.   I did order a few other cases that I couldn't
15  get my hands on.  I don't think any of them involved
16  Celebrex.  But one of the cases I did give you involves
17  Naproxen -- Naproxs.
18   Q.   Naproxen?
19   A.   Naproxen is, I guess, the medical term but the
20  brand name is Naproxs.
21   Q.   That would be included in Exhibit 7?
22   A.   Yes.
23   Q.   Anything else?
24   A.   Other than what I have said, no.
25   Q.   Now I want to turn your attention to the first

63

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  type of study that you discussed in Exhibit 5, the old
2  Exhibit 5 and the new Deposition Exhibit 8 and I think in
3  response to Mr. Skikos' questions in the Barnett
4  deposition.  If I understand it, those involved copy
5  testing of detailed pieces with doctors?
6    A.   Correct.
7    Q.   And the exhibits that you have identified were
8  not necessarily in the same order but 28, 29, 41 and 59;
9  is that correct?
10   A.   I have 59, 28, 29, 41.
11   Q.   Okay.  Any others that pertain to that first
12  group of studies for or that first type of studies?
13  Those are the same four that I have.
14   A.   Yes, I don't believe there are any others that
15  we were able to find.
16   Q.   What is your opinion about these studies?
17   A.   Well, my opinion is that --
18      (Telephonic interruption.)
19      THE WITNESS:  My opinion is twofold.  One is
20  that the physicians who participated in the research
21  indicate misunderstanding of the cardiovascular,
22  potential cardiovascular risk of Vioxx.  And when they
23  saw these detailed pieces, that they remained
24  misinformed.
25  BY MR. CAMPILLO:

64

UNCERTIFIED REALTIME ROUGH DRAFT

1  Q.  That's the first part or is that both?
2  A.  No.  The first part was that they were
3  misinformed from earlier aspects of the integrated
4  marketing campaign.  And when they saw this new piece of
5  the campaign they remained misinformed because the
6  campaign was misleading.
7  Q.  Now, specifically, if we can look at Exhibit
8  28 -- would it help you to have the binder?
9  A.  I have them.  I have my copies, so I'll look.
10  I'm trying to think the best way to do it.
11  Q.  I'm going to be asking you about Exhibit 28
12  first.
13  A.  So you are going to be referring to these based
14  on my original exhibit numbers?
15  Q.  Yes, from your Barnett report.  Does that work
16  for you?
17  A.  Yeah, I think that will work.  And this should
18  do it.  And if not I will get the other box with my
19  original exhibits.
20     MR. SKIKOS:  Since there is so much science it's
21  so heavy.
22  BY MR. CAMPILLO:
23  Q.  All right.  You are on 28?
24  A.  Yes.
25  Q.  That's the brochure, strength, safety, QV

65

UNCERTIFIED REALTIME ROUGH DRAFT

1  simplicity?
2  A.  With the woman with her hands up, yes.
3  Q.  What about this exhibit specifically tells you
4  that the physicians were confused?  I'm sorry,
5  misinformed about the CV risks of Vioxx?
6  A.  Okay.  So you are talking about my opinion No.
7  2?
8  Q.  Let me see if I have it right.  You said with
9  regard to this type of study your opinion was that the
10  physician who participated in the study has some
11  misunderstandings about the potential cardiovascular
12  risks of Vioxx and that the detailed pieces that they saw
13  allowed them to continue to be misinformed?
14  A.  Correct.
15  Q.  Did I mistake that in any significant way?
16  A.  Not that it appears to me.
17  Q.  Okay.
18  A.  So you're asking me about the second part?
19  Q.  Yes.
20  A.  Okay.
21  Q.  And if you can refer me to the portion of the
22  brochure or the detailed piece which you believe caused
23  them to remain miss informed.
24  A.  Well, what they said in response to this is that
25  they want the company to address the CV safety issue.  So

66

UNCERTIFIED REALTIME ROUGH DRAFT

1  what they were misled about was the omission about
2  anything about CV risks that would be helpful to these
3  physicians.
4  Q.  Okay.  What was it that was omitted from Exhibit
5  28 that in your judgment should have been included?
6  A.  Vioxx could cause heart attacks and strokes.
7  Q.  In those words?
8  A.  Something to that effect to let people know that
9  there is research indicating that this drug could cause
10  heart attacks.
11  Q.  Okay.
12  A.  Particularly among high-risk elderly consumers
13  with cardiovascular risk factors.
14  Q.  So if I understand you correctly, your criticism
15  of Exhibit 28 as it relates to your first pair of
16  opinions is that the brochure or this detailed piece
17  should have had language to the effect in substance that
18  Vioxx could cause heart attacks and strokes?
19  A.  Right.
20  Q.  And it's your judgment that it didn't?
21  A.  Correct.
22  Q.  Anything else that in your judgment was omitted
23  from Exhibit 28 that pertains to this first group of
24  studies?
25  A.  On Page 2 where it talks about the safety

67

UNCERTIFIED REALTIME ROUGH DRAFT

1  profile in elderly patients it says "No substantial
2  difference in safety and effectiveness were observed
3  between older and younger patients."  And it shows the
4  percentages of people who took the drug who were over 65,
5  over 75 and over 80 and applies a very significant number
6  of the patients saying Vioxx are elderly and it clearly
7  indicates it's safe to use in the elderly.
8  Q.  Are you aware of any data anywhere that would
9  show the safety risk or events, adverse events in elderly
10  are higher than in younger patients?
11  A.  It's not age.  It's that the CV risks are higher
12  in the elderly.
13  Q.  And what do you base that opinion on, that the
14  CV risks are higher in the elderly population?
15  A.  Well, the doctors were saying it themselves in
16  this research.
17  Q.  Okay.  Are you aware of any data that elderly
18  patients that use Vioxx have a higher rate of CV events
19  than younger patients who use Vioxx?
20  A.  What I'm saying is that elderly patients in
21  general have an increase in cardiovascular risk with age.
22  Q.  Okay.
23  A.  Independent of Vioxx use.
24  Q.  Okay.  Do you know whether that's a well-known
25  fact or knowledge that's well known among the medical

68

UNCERTIFIED REALTIME ROUGH DRAFT

1    profession across the United States?

2        A.   Well, I heard the physicians stating it

3    throughout the research that I reviewed.

4        Q.   Okay.  So, then, given that -- I'm not sure I

5    understand what your criticism is of Exhibit 28.

6        A.   My criticism is to the extent that CV risks are

7    increased in the elderly and the risk of Vioxx is higher

8    in people with a CV risk, then putting those two together

9    there is an increased potential for CV adverse effects in

10   elderly patients with CV risk factors.

11       Q.   Okay.  And where -- I'm sorry, I didn't mean to

12   interrupt you.

13       A.   And this implies that there is no difference, no

14   problem.

15       Q.   Can you refer me, Dr. Pechmann to any

16   publication, any document that says that older patients

17   on Vioxx have a higher incident of CV events than younger

18   patients?

19       A.   As I said, I's not -- the publication I'm

20   referring to is the bigger study that shows that people

21   with higher CV risk have more of a problem on Vioxx.

22       Q.   That's your interpretation of the VIGOR data?

23       A.   Yes.

24       Q.   Okay.  And what else?

25       A.   And there is a correlation between age and CV

69

---

UNCERTIFIED REALTIME ROUGH DRAFT

1    risk, so it's a two-part argument that I'm making.

2        Q.   Okay.  Anything else in Exhibit 28 that you

3    believe is inappropriate or help keep the physicians who

4    sold these detailed pieces misinformed?

5        A.   Well, the next page is similar, again implying

6    that a lot of people who are elderly use Vioxx, and so

7    it's just a follow-up on what was on the last page.

8        Q.   Are you aware of any data anywhere that would

9    say that -- indicate that any of the data that's reported

10   or any of the numbers that are reported in Exhibit 28 are

11   inaccurate?

12       A.   No.

13       Q.   So it's not lack of accuracy.  What is it that

14   you think is misleading about this document?

15       A.   Omissions.

16       Q.   Okay.  You told us about the omission that it

17   didn't say in substance that Vioxx could cause heart

18   attacks and strokes.  Anything else?

19       A.   And it's even more likely to cause heart attacks

20   and strokes in people with CV risk.

21       Q.   And you believe that there was data available at

22   the time this brochure was used that indicated that?

23       A.   This particular brochure was used -- let's see.

24   Which one is this.  This is my original Exhibit 28?

25       Q.   Yes.

70

---

UNCERTIFIED REALTIME ROUGH DRAFT

1        A.   Yes.  This was used in the first quarter of

2    2003.

3        Q.   Is that when it was tested or is that when it

4    was end used in the public?

5        A.   End used.  It was tested in November of '02.

6        Q.   Anything else about Exhibit 28 specifically?

7        A.   No.

8        Q.   Can I assume that for Exhibit 29 it's basically

9    the same opinions?  Let me ask you:  Is there anything

10   different about Exhibit 29 -- this is a very similar or

11   you mean -- than what you just told us about Exhibit 28?

12       A.   It is different.

13       Q.   Okay.

14       A.   29 includes the efficacy competency program.  I

15   guess on the fourth page, fifth page it describes that

16   program and there is extensive research to show that

17   people interpreted the program to mean that Vioxx was

18   safer than they had originally thought.

19            So it improved -- there is quite extensive

20   research to know that this program has a sale effect on

21   safety perceptions.  It created the perception that there

22   was less cardiovascular risks and increased people's

23   confidence in Vioxx, which was the objective.

24       Q.   The brochure itself, Exhibit 29, your criticism

25   is it referred to the confidence program?

71

---

UNCERTIFIED REALTIME ROUGH DRAFT

1        A.   It shows the confidence program has been

2    extended through 2003.

3        Q.   Okay.  Go ahead.  I'm sorry.

4        A.   So it's stating that Merck stands behind Vioxx,

5    is going to provide this money-back guarantee for another

6    year.  It was started in, I think, August of 2002.  And

7    Merck had data to show that this created the misleading

8    perception.

9            Well, they didn't say it was misleading.  I'm

10   saying it's misleading.  But in any event, created the

11   perception that Vioxx was safer than people had thought

12   and stemmed to decline in prescribing behavior, and so

13   they decided to extend it.

14            This is an example where they had research

15   showing that instead of increasing awareness of the CV

16   risks they were purposefully trying to decrease awareness

17   in extending a program that was proven to decrease

18   awareness of the risk.

19            MR. SKIKOS:  Are those research studies in

20   Exhibit 8?

21            THE WITNESS:  In this exhibit?

22            MR. SKIKOS:  Yes.

23            THE WITNESS:  Yes.  See, it's a different type

24   of study.  That's the efficacy study.

25       BY MR. CAMPILLO:

72

UNCERTIFIED REALTIME ROUGH DRAFT

1  Q.  Let me ask you this, Dr. Pechmann.  You just
2  stated there was data or you have seen indications that
3  perk purposely tried to decrease the CV awareness.  Is
4  that what you said?
5  A.  What I'm saying is --
6  Q.  Did you say that or mean to say that?
7  A.  I said they continued to the program when they
8  knew it was decreasing concerns about CV safety.  They
9  purposefully decided to continue the program.  They
10  indicated they were pleased with the results and with the
11  sales by stating it was successful and they wanted to
12  continue the program.
13  Q.  Are you aware of any indication from any
14  documents that you can point us to today that would say
15  to you that Merck purposefully was trying to decrease
16  awareness of CV risks with Vioxx?
17  A.  I did not find a document in which they stated
18  that exactly.
19  Q.  Are there documents in which you are inferring
20  that?
21  A.  Yes.
22  Q.  Okay.  Which documents are you using to infer
23  from that Merck purposefully was trying to decrease the
24  awareness of CV risks with Vioxx?
25  A.  It's later in this report, so it will take a

73

UNCERTIFIED REALTIME ROUGH DRAFT

1  minute to find it.
2  Q.  Sure.
3  (Witness reviews document.)
4  MR. SKIKOS:  While she is doing that, my wife is
5  calling.  Let's take three or four minutes.
6  MR. CAMPILLO:  Whatever you need.
7  (Recess taken.)
8  BY MR. CAMPILLO:
9  Q.  Dr. Pechmann while we were on the break you were
10  able to look through Exhibit 8 to try to answer my last
11  question?
12  A.  Yes.
13  Q.  Can we have the reporter read the last question
14  back.
15  (The last question was read.)
16  THE WITNESS:  I'm going to be using Exhibits 47
17  and 48 that are referred to in this Deposition Exhibit 8.
18  BY MR. CAMPILLO:
19  Q.  All right.  I have Exhibit 47.  Let's go to
20  Exhibit 47 first.  What about 47 allows you to infer that
21  Merck was trying to decrease CV risk awareness?
22  A.  Well, I would rather start with 48, if I could.
23  Q.  Sure.
24  A.  Because that's where it begins.
25  Q.  It's your opinion.  Just give me one second.

74

UNCERTIFIED REALTIME ROUGH DRAFT

1  Okay.
2  A.  Well, Exhibit 47 describes research that Merck
3  did to figure out why they were starting to have some
4  problems with Vioxx versus Celebrex.
5  Q.  We are on 47?  If I just want to make sure we are
6  not misspeaking here.
7  A.  47, yes.
8  Q.  Okay.  Go ahead.
9  A.  Oh, golly.  48.  We are on 48.
10  Q.  Okay, 48.
11  A.  It's very confusing.  Okay.  Hold on.
12  The original research is described in Exhibit
13  48, yes.  So they found out what physicians said was the
14  most important was efficacy but what actually was the
15  most important was does not cause edema, does not cause
16  significance increases in blood pressure, does not
17  increase the risk of MI or stroke and it's safe to use
18  in the elderly.
19  And they said, quote, possible implication was
20  to prevent movement off center on non-GI safety.  So, in
21  other words --
22  Q.  Where in the document does it say that?
23  A.  Exhibit 48, Pages 8 through 12.  I hope we have
24  the right exhibit here.  That does not look like the
25  right exhibit.

75

UNCERTIFIED REALTIME ROUGH DRAFT

1  MR. SKIKOS:  I was just flipping through.
2  THE WITNESS:  I'm counting on you.
3  BY MR. CAMPILLO:
4  Q.  I have all these exhibits.
5  A.  No, we've got it.
6  Q.  I brought extra copies which I was going to ask
7  you about, which are the same ones in your binder.
8  Dr. Pechmann I have here a copy of Exhibit 48 to
9  your original report.  Will this help you?
10  A.  Okay.  Same thing?
11  Q.  Yes.  We don't have to remark it.  I will
12  represent to you that's Exhibit 48 to your Barnett
13  report.
14  A.  Okay.  Yeah, that looks like it.  So I say it's
15  8 to 12.
16  Well, on Page 11 it says "The most important
17  attributes that must be defended are non-GI safety
18  attributes.  More work needs to be done to understand
19  what comprises what's safe for the elderly.  It's likely
20  driven largely by GI, CV and renal risk."
21  Q.  Okay.
22  A.  So Page 12, "Possible implication should prevent
23  movement 'off center' on non-GI safety."
24  So the implication on this is they were starting
25  to see some concerns about safety with this one among

76

UNCERTIFIED REALTIME ROUGH DRAFT

1  the physicians.  So right after, very close after this
2  was done, this report, they launched this new efficacy
3  guarantee program which they later called efficacy
4  confidence.  And the whole point of it was to, as they
5  say bolster physicians' and consumers' confidence in
6  Vioxx.
7       I have the specific goals somewhere here.
8  That's in my main report.
9       So they launched the program to bolster the
10  confidence and what they found, as shown in Exhibit 47,
11  is a series of very positive results indicating that they
12  had succeeded in preventing movement, any further
13  movement off center on non-GI safety and otherwise
14  neutralizing safety concerns, neutralizing physicians'
15  safety concerns, which of course was an objective of
16  their campaign, the stated objective of their campaign.
17       Q.  Let me see if I understand correctly.  Are you
18  saying that on Page 12 of Exhibit 48, because there is a
19  reference to possible implications, bullet point under
20  that that says "prevent movement 'off-center' on non-GI
21  safety," that you read into that or your interpretation
22  of that or your opinion about that is that Merck was
23  intentionally, purposefully trying to decrease awareness
24  in the field, in the real world of CV risks?
25       A.  Well, that's part of the evidence.  The evidence

77

UNCERTIFIED REALTIME ROUGH DRAFT

1  continues when you actually look at fact that they
2  launched this efficacy guarantee program which stated to
3  consumers and physicians it's a satisfaction back
4  guarantee.  And then they bothered to write up a huge
5  power point in which they focus on all these changes in
6  safety showing that they were preventing movement off
7  center with this program.
8       Q.  Okay.  What support do you have for your
9  statement that the efficacy guarantee or efficacy
10  confidence program was implemented specifically to affect
11  the perceptions and minimize or decrease the awareness of
12  physicians about CV risks of Vioxx?
13       A.  They never state that explicitly.  What they
14  state is when they describe the goals of the program they
15  state that it's to increase confidence.
16       Q.  And you are reading that to mean that Merck was
17  purposefully trying to decrease CV awareness of the
18  doctors?
19       A.  When I look at everything together, particularly
20  their focus on the results once it was launched, that's
21  when I think the other shoe falls and it's clear that the
22  program did decrease awareness of or concern or
23  neutralized physicians' concerns about safety risks.  And
24  then they continued the program even though the research
25  showed they were doing this.  So it's a series of these

78

UNCERTIFIED REALTIME ROUGH DRAFT

1  events that when you put them together it looks like the
2  point of the program -- well, in any event, they knew
3  that the program was reducing perceptions about CV risk
4  and they continued it.
5       Q.  Where do you have the support for your statement
6  that they knew that the program was decreasing awareness
7  of CV risks?
8       A.  In Exhibit 47.
9       Q.  Okay.  Let's go to Exhibit 47 now.
10      A.  Okay.  Had I known, you were going to be so
11  organized I wouldn't have made all these beautiful
12  binders.
13          This is not a very good copy of this one.
14          MR. SKIKOS:  This one is a better copy.
15          THE WITNESS:  So this is August.  This is
16  October of 2002.  The program was launched in August and
17  they are saying on Page 7 that efficacy perceptions of
18  Vioxx and Celebrex remain fairly consistent.  But on Page
19  8 it says in August, which is when this program launched,
20  and you would expect to see the biggest effects more
21  physicians rated Vioxx and Celebrex equally on the MI
22  stroke which could have contributed to the narrowing of
23  the new prescription shared gap between Vioxx and
24  Celebrex.
25          So basically that was good, because people had

79

UNCERTIFIED REALTIME ROUGH DRAFT

1  been rating Vioxx worse than Celebrex.  In fact, they
2  rated them equally showed them in the direction they
3  wanted.
4          In August significant changes were seen in the
5  percentage of physicians that rated Vioxx and Bextra the
6  same in the elderly and MI stroke attributes.
7          In August the mean rating for Vioxx and the safe
8  for the elderly attributes stabilized and the gap between
9  Vioxx and Celebrex/Bextra narrowed.  So it just goes on
10  and on.  If you want me to keep going, there's blood
11  pressure, edema, CV risk.
12          The original slide showed improvement in
13  prescribing, more new prescriptions.
14      Q.  Let me see -- maybe my questions are not very
15  precisely drafted or articulated.  I'm trying to identify
16  the basis for your statement; earlier that Merck was
17  purposefully attempting to decrease the awareness of
18  physicians concerning CV risks, they were purposefully
19  doing that.
20      A.  Right.
21      Q.  And have you now told me your entire basis for
22  making that assertion?
23          MR. SKIKOS:  Well, objection.  You mean as to 47
24  and 48?
25          MR. CAMPILLO:  Well, if there is anything else.

80

UNCERTIFIED REALTIME ROUGH DRAFT

1    I want to look at it.
2            MR. SKIKOS:  Her entire Barnett report has all
3    that in there.
4            THE WITNESS:  Right.  And there's a lot of
5    evidence.  Like I said, there were six studies, which we
6    have three years of data on, a thousand people a month.
7    There's a lot of data showing for multiple different
8    studies that Merck was neutralizing the safety risks
9    perceptions.
10   BY MR. CAMPILLO:
11       Q.   Can you point to any document anywhere that
12   states that that was a goal of any of the programs,
13   projects, studies or marketing campaigns conducted by
14   Merck at any time?
15       A.   Yes.
16       Q.   Okay.  Which one?
17       A.   In my expert report.  Let me see if I can find
18   it.  Okay.  Page 24 and 25 of my report, which is Exhibit
19   19 in a document entitled "2001 Profit Plan for Vioxx"
20   Merck stated that "A key objective of the 2001 Vioxx
21   campaign was to 'neutralize' safety concerns about
22   hypertension, edema and MI."
23           And then in describing the objectives for each
24   physician group repeatedly stated that a key goal was to
25   convey Vioxx's, quote, comparable safety versus Celebrex

81

UNCERTIFIED REALTIME ROUGH DRAFT

1    and NSAIDS.  This safety -- then it said high COX
2    inhibitors, physician tended to view Vioxx as slightly
3    better on efficacy see but having some concern relative
4    to hypertension, edema, MI.
5            And since they repeat the same thing in 2002 and
6    they repeat -- something similar, not exactly the same
7    thing but related thing about safety in their plan for
8    consumers.
9        Q.   Is it your testimony, Dr. Pechmann, where any
10   document someone writes that one objective of the Vioxx
11   campaign is to neutralize safety concerns around
12   hypertension, edema and MI, that that means to you that
13   they are purposely trying to decrease the awareness in
14   the physicians' minds about the CV risks of Vioxx?
15       A.   Yes.
16       Q.   That's your interpretation of that language?
17           MR. SKIKOS:  Asked and answered.
18   BY MR. CAMPILLO:
19       Q.   Any other basis for you to make that statement?
20       A.   The statement that you just quoted?
21       Q.   Yes, that Merck was purposefully trying to
22   decrease the awareness in the doctors' minds about the CV
23   risks of Vioxx.
24       A.   Yes.  I have lots of other things to say about
25   that.

82

UNCERTIFIED REALTIME ROUGH DRAFT

1        Q.   My question is:  Is there any document that in
2    your opinion state that as an objective of Merck's
3    campaign.
4        A.   Ok, state that as an objective.  As I said,
5    there is a comparable statement in 2001 in Exhibit 20.
6    It says "The campaign was designed to ensure that
7    physicians prescribed Vioxx for all patients needing pain
8    relief independent of CV risk factors because Vioxx does
9    not increase the risk of MI, heart attack or stroke."
10       Q.   Okay.  Any other documents that you can point us
11   to where you believe Merck identified as a stated
12   objective of their campaign to minimize the awareness of
13   physicians of the CV risks of Vioxx?
14       A.   Yes.
15       Q.   Okay.  What else?
16       A.   On Page 6, of my report, referring again to
17   Exhibit 19, "In 2001 profit plan for Vioxx the
18   communication objective for consumers was to get them to
19   believe that Vioxx offers a safety of tolerability
20   advantage over traditional medicines."
21       Q.   Okay.
22       A.   It's not as explicit because their ads to
23   consumers were not a medically oriented but it has the
24   same thrust to it and it was an integrated campaign.
25       Q.   Any other documents that in your opinion

83

UNCERTIFIED REALTIME ROUGH DRAFT

1    indicate to you that there was a stated objective by
2    Merck to decrease physicians' awareness of the CV risks
3    of Vioxx?
4        A.   Not that I can recall.
5        Q.   Going back to the first group of studies that we
6    have been talking about, the copy testing of detailed
7    pieces with medical doctors.
8        A.   Yes.
9        Q.   Do you have any other opinions about those
10   studies other than what you have already stated on the
11   record today?
12           MR. SKIKOS:  Objection.  Or that was done in a
13   previous deposition.  Because, remember, I asked her a
14   bunch of questions in the last deposition.
15           MR. CAMPILLO:  I'm asking specifically about
16   study type 1, the copy testing of detailed pieces with
17   M.D.'s.
18       Q.   Have we now heard all your opinions that you
19   have about that group of studies or that type of study?
20       A.   So if I stated something in my report I have to
21   restate it here?  Is that what you're saying.
22       Q.   I mean, if this a part of your report that
23   addresses copy testing of detailed pieces with doctors
24   and that is something other than what you have told us --
25   and I'll represent to you what I understood you to say is

84

UNCERTIFIED REALTIME ROUGH DRAFT

1    the physicians who participated in these studies
2    indicated that they were misinformed about the potential
3    CV risks of Vioxx and that when they saw these detailed
4    pieces they remained misinformed and you are critical
5    about that for some reason.
6        A.   Right.
7        Q.   Are there any other opinions about the copy
8    testing of detailed pieces with medical physicians other
9    than that?
10       A.   Well, then I would like to just point out that
11   in Exhibit 41, from the copy testing they had done, they
12   found out that this efficacy confidence program would
13   increase new prescriptions, because physicians did find
14   it impressive that Merck was giving a money-back
15   guarantee. I believe it was very unusual to do that.
16       Q.   And how does that translate into Merck -- how
17   does that translate into these detail pieces leading the
18   physicians to be misinformed? That's what I'm trying to
19   have you connect.
20       A.   Yes. Well, it was clear that when the results
21   came out that this campaign isn't affecting efficacy
22   perception. It was affecting safety perception. That's
23   why prescriptions were going up. Physicians were feeling
24   confident that this product was safer than they were
25   worried about.

85

UNCERTIFIED REALTIME ROUGH DRAFT

1        As they indicated, they had some concerns. And
2    knowing that, Merck continued the program basically until
3    they pulled the product from the market.
4        Q.   Okay. Anything else?
5        A.   They focused much of their research on CV
6    awareness of various types, because they wanted to know
7    the effect. They sent a lot of time on the power points,
8    on the slides. It was a very relevant issue to them. It
9    wasn't that they didn't notice the results.
10       Q.   Which parts of Exhibit 41 were you referring to
11   for your last comments?
12       A.   Page 71.
13       Q.   71, is that a Bates number?
14       A.   Exhibit 41, Page 71.
15       Q.   The document is not numbered.
16       A.   It's tab 4 here. Oh, I know. That's one of
17   those that wasn't numbered, right. That's why I made the
18   binder that only had the one page in it so you could find
19   it.
20       Q.   But if you can find it in your binder, tell me
21   the Bates number and I can find it.
22       A.   Okay. I've got it right here. Tab 4. That's
23   the one with just the page numbers. MRK ADG 0057471.
24       Q.   It is 71 of the Bates number. Okay. Will you
25   point me to the portion of that page that you believe

86

UNCERTIFIED REALTIME ROUGH DRAFT

1    supports your opinion.
2        A.   The second bullet point. They did a qualitative
3    study, which is focus group copy test.
4        Q.   Okay. Give me one second. If I read the bullet
5    point correctly, it's saying 20 out of 30 physicians felt
6    the efficacy guarantee program might increase by 10 to 15
7    percent of the prescriptions, correct?
8        A.   Correct. And they actually did increase, which
9    the other data showed. They did increase prescriptions.
10       Q.   I guess I'm at a little bit of a -- I'm trying
11   to figure out where is there a connection between what
12   they say in this exhibit and their concerns for safety.
13       A.   Well, these people were concerned about safety.
14       Q.   They were or were not? I didn't hear you.
15       A.   They were. And yet they said now they were
16   going to have increased in prescribing 10 to 15 percent.
17       Q.   And what concerns did they have, Dr. Pechmann?
18       A.   The safety concerns of the physicians were
19   described in this report.
20       Q.   You are talking about Exhibit 47 or somewhere
21   else?
22       A.   59. Back to 59. It's quite confusing because
23   they are different pieces.
24       Q.   I will agree with you.
25       A.   Right. Having done the antidrug campaign I'm

87

UNCERTIFIED REALTIME ROUGH DRAFT

1    used to this. It's the same way.
2        MR. SKIKOS: Which is why you need an expert to
3    testify in this area.
4        THE WITNESS: Because it's little pieces pulled
5    by different people.
6    BY MR. CAMPILLO:
7        Q.   If I understood you correctly, Exhibit 41 is a
8    document prepared in 2001 sometime; is that right?
9        A.   We can check the date.
10       Q.   Let's start over to make sure we are on the same
11   page. You made a comment about the physicians who are
12   referenced in the second bullet point of Page 71 of
13   Exhibit 41, that they had safety concerns.
14       A.   Yes.
15       Q.   These 20 to 30 physicians had safety concerns;
16   is that what you're saying?
17       A.   I'm saying that based on the physicians that
18   they interviewed that is discussed in Exhibit 59.
19       Q.   All right. Here is my question. Let's start
20   over.
21       There is a reference in Exhibit 41, Page 71 to
22   the effect that certain physicians who were queried
23   believed that the efficacy guarantee program might result
24   in increased writing of prescriptions. Are we together
25   so far?

88

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.   Yes.

2    Q.   All right.  And I believe you stated that those

3    physicians had safety concerns.  So my first question is:

4    Is that what you meant, that the physicians that were

5    being interviewed who gave their opinions about the

6    effect of the efficacy guarantee program, they themselves

7    had safety concerns?

8    A.   I'm inferring that based on the fact that the

9    other study which had 31 physicians and also said they

10   liked the efficacy program had safety concerns at the

11   same time.  So I would assume that these guys, which are

12   pulled from the same population, would be like the

13   population for which we know that they had safety

14   concerns.

15   Q.   So first of all, do you have any documentation

16   or support for the proposition that the 30 physicians

17   interviewed and discussed in Exhibit 41, Page 71 had any

18   safety concerns themselves?

19   A.   Not directly.

20   Q.   Do you have any information or any data, any

21   support for the proposition that the 30 physicians

22   described in Exhibit 41, Page 71 are the same 31

23   physicians that are reported in Exhibit 59?

24   A.   Not directly.  That's why I answered not

25   directly to your first question.

---

UNCERTIFIED REALTIME ROUGH DRAFT

1    Q.   I'm just trying to get the record to be clear.

2    A.   Very good.

3    Q.   Thank you.  So you have no information that you

4    could point us to that would indicate that the physicians

5    discussed in Exhibit 41 -- physicians being

6    discussed in Exhibit 41 are the same as the ones

7    discussed in 59 or that they have the same impressions

8    and attitudes about Vioxx?

9    A.   Well, I do have based on my experience.  When we

10   did these focus groups you about the same issue you don't

11   go to radically different groups of people.

12   Q.   But you have no knowledge, Dr. Pechmann as to

13   what these particular groups were for the Vioxx studies,

14   do you?

15   A.   I know just based on standard practice that it

16   would be a similar group, but I cannot state with

17   certainty, no.

18   Q.   So you don't know if, for whatever reason, the

19   physicians discussed in Exhibit 41 had a certain level of

20   awareness about CV risk and whether that level of

21   awareness of CV risk was any different than the group as

22   discussed in Exhibit 59; is that fair?

23   A.   I can't state with certainty.

24   Q.   One way or the other?

25   A.   Correct.

---

UNCERTIFIED REALTIME ROUGH DRAFT

1    Q.   They could be similar or they could be

2    dissimilar?

3    A.   Correct.

4    Q.   Any other way that Exhibit 41 supports your

5    opinion that the physicians who saw the detailed pieces,

6    Exhibits 28 and 29, remained misinformed about CV risks

7    of Vioxx?  Or have we now covered all the bases of that

8    opinion?

9    A.   I believe we have covered everything.

10   Q.   The second group of studies I think you

11   described as testing of promotion message recall.  Did I

12   get that right?

13   A.   Yes.

14   Q.   Very briefly, what does it mean?

15   A.   Actually, I want to call it M.D. promotion

16   message recall because what it means is it's a study of

17   physicians to determine what they remembered the

18   salespeople telling them about Vioxx and Celebrex and

19   Bextra.

20   Q.   Doctors as opposed to users or patients?

21   A.   Correct.

22   Q.   And I believe the documents that you would refer

23   us to in this particular type of study would be Exhibits

24   55, 56, 58 and 48; is that correct?

25   A.   Well, also the MRK AJT 006750 document through

---

UNCERTIFIED REALTIME ROUGH DRAFT

1    Page 62.

2    Q.   Okay.  I might have to resort to one of your

3    binders for that one.

4    A.   Yeah.  That describes the method.  It's at the

5    very end of the binder that has that.

6    Q.   Let's take it one at a time.  We will get to

7    that one.

8    A.   So which exhibits did you say?

9    Q.   I identified Exhibits 55, 56, 58 and 48.  Is

10   that a complete-

11   A.   It looks like it.

12   Q.   -- inventory with the exception of the other

13   document?

14   A.   Looks good, yes.

15   Q.   Give me the number of the document again, the

16   one that's not in the exhibit to your report.

17   A.   MRK AJT 0060750 to 62.

18   Q.   Which is the final tab in your new binder.

19   A.   That's the one that got lost when copies were

20   made.

21   Q.   First I want to understand what your opinion is

22   about this type of testing.  Okay?

23   A.   Okay.

24   Q.   Give me one minute.

25        As I understand it, Dr. Pechmann these are

UNCERTIFIED REALTIME ROUGH DRAFT

1  studies where physicians are being asked what they recall
2  about visits from sales representatives?
3      A.  Correct.
4      Q.  And what is your opinion about these studies?
5      A.  That a very significant number of physicians
6  state or recall that the sales rep told them that Vioxx
7  does not cause heart attacks.  Does not increase the risk
8  of heart attack or stroke and a very substantial number
9  also recalled the reps telling them Vioxx is safe to use
10  in the elderly.
11          And we have data for two years.  There is a year
12  in the middle where we weren't able to get the data.
13      Q.  All right.  Now, what is your criticism of that?
14  They found out this information, according to you.  What
15  is wrong with finding out that information?
16      A.  The sales reps were aggressively telling
17  physicians that Vioxx doesn't cause heart attacks when
18  they knew -- this was already September '01 -- that there
19  was research to suggest that that was not true; that
20  Vioxx did cause heart attacks or had a significant
21  potential to cause heart attacks.
22          MR. CAMPILLO:  Could you read the response back,
23  please.
24          (The last question was read.)
25          THE WITNESS:  I would like to clarify.  When I

93

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  said, "They" I mean: Merck.  I don't know whether the
2  sales reps knew but Merck knew.
3  BY MR. CAMPILLO:
4      Q.  Okay.  So I gather your opinion is that they
5  shouldn't have been making those statements to the
6  physicians because it wasn't true?  Is it that simple or
7  is there something more to it that I'm missing?
8      A.  Right, that's it.
9      Q.  So your opinion assumes that it is true that
10  Vioxx does increase the risk of MI's and strokes?
11      A.  No.
12      Q.  No?  Okay.  If it wasn't known and it wasn't
13  believed that Vioxx increased the risk of MI's and
14  strokes, then what would be wrong with the sales reps
15  making those representations to physicians?
16      A.  That representation wasn't true.  They didn't
17  know that it didn't cause heart attacks; There was at
18  least as much a likelihood if not a greatly likelihood
19  that it did cause heart attacks.
20      Q.  I'm just trying to understand your opinion.  So
21  your opinion is that it was unknown whether or not Vioxx
22  increased the risk of heart attacks in this time frame
23  and therefore, in your view, it would have been wrong for
24  the sales reps to make representations to the effect that
25  Vioxx decreased or did not increase the risk of heart

94

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  attacks, because that wasn't known one way or the other?
2          MR. SKIKOS:  Vague.  I interpose an objection
3  that it's a vague question.
4          MR. CAMPILLO:
5      Q.  Did you follow me?  I can restate it.  Let me
6  restate it because I want the record to be clear.
7          The research that you are referring to indicated
8  that the doctors recalled or some doctors recalled that
9  sales reps had said in substance that Vioxx did not
10  increase the risk of MI's and strokes, correct?
11      A.  Correct.
12      Q.  And that Vioxx was safe in the elderly?
13      A.  Correct.
14      Q.  Okay.  I want to talk about just the first one
15  first, the Vioxx increasing or not increasing the risk of
16  MI's and strokes, because they may be different.  Okay?
17  Are you with me?
18      A.  Yes.
19      Q.  And as to that first recall, if you will, that
20  physicians reported, your opinion is that that was
21  inappropriate for the representative to be making these
22  statements because at that time it was unknown whether or
23  not Vioxx did or did not increase the risk of MI's and
24  strokes; is that correct?
25      A.  Yes.

95

---

UNCERTIFIED REALTIME ROUGH DRAFT

1      Q.  Okay.  So anything else about this research that
2  you are critical about?
3      A.  You mean about the findings?
4      Q.  Yes, any other opinions that you have about the
5  results of this research and why you feel that this shows
6  some misconduct on the part of Merck.
7      A.  Yes.  The company's code is what people recall.
8  You see almost no one stating that the rep told them that
9  Vioxx could cause heart attacks.
10      Q.  Just the converse of what we just said?
11      A.  Exactly, yes.  Well, they could have told them
12  both.  They could have caused heart attacks, might not
13  have caused heart attacks.  People would have recalled
14  both but instead they just recalled the one.
15      Q.  If I understand this testing, it's asking the
16  doctors what they recalled.  That doesn't necessarily
17  mean, Dr. Fechmann that something was not said; it's
18  simply what the doctor recalled, correct?
19          MR. BRAKO:  Argumentative.
20          MR. O'CALLAHAN:  Compound.
21          THE WITNESS:  That is true.
22          MR. CAMPILLO:  Before we go on, one of you can
23  make objections but not both.  Take your pick.
24          MR. O'CALLAHAN:  I was making the objection on
25  behalf of Mr. Grossberg.

96

UNCERTIFIED REALTIME ROUGH DRAFT

1  MR. BRANDI:  I was making the objection on
2  behalf of Mr. Arrigale.  I actually thought
3  Mr. O'Callahan was working on something else.
4       MR. CAMPILLO:  I would one is going to be making
5  the objections.
6       MR. SKINOS:  Go ahead.
7       MR. BRANDI:  Go ahead.
8       MR. CAMPILLO:  No.  I want to know who is going
9  to be making the objections.
10      MR. BRANDI:  Or what?
11      MR. SKINOS:  Let's not have a fight.  I'm make
12 the objections.  Go ahead.  Argumentative and compound.
13      MR. CAMPILLO:  Could you read me the last
14 question back, please.
15      (The last question was read.)
16      THE WITNESS:  That is correct, but it's the
17 standard method of doing the research and Merck knew the
18 results.  So if they were concerned that people were
19 getting the wrong impression they could have told their
20 sales reps. Correct this problem.
21 BY MR. CAMPILLO:
22      Q.  Okay.  Thank you.  Now, anything else about that
23 part of the recall before we go to the elderly issue that
24 you are critical about?
25      A.  Well, I went through one month of data where we

97

UNCERTIFIED REALTIME ROUGH DRAFT

1  had all the verbatim comments.  We have a whole binder
2  from one of the companies.  And to see exactly what they
3  were saying about what the reps said.
4       So it wasn't just a coding.  It was their
5  actually comments, what they said.  And those are
6  summarized here.
7       I found a comparable number to what they were
8  reporting, 20 percent or one in five physicians recalled
9  that the reps saying that Vioxx didn't cause heart
10 attacks.
11      If you read the comments it's clear that's what
12 they were recalling; there's no cardiovascular risk from
13 using Vioxx, safe from a cardiovascular standpoint, safe
14 and effective and not associated with cardiac deaths,
15 does not cause heart disease.
16      So there is no problem with how the data are
17 treated.  It accurately reflects what people are saying
18 that they recall.
19      Q.  Okay.
20      A.  And also there were some things that weren't
21 coded by the coders that I found striking.  A lot of them
22 said that the Merck representatives criticized the
23 studies concerning Vioxx's having a potential
24 cardiovascular risk, saying the studies were weak or the
25 that pros six hypothesis held that Naproxen was cardiac

98

UNCERTIFIED REALTIME ROUGH DRAFT

1  protective, which the FDA stated they could not state.
2       So it looks like the reps were bad-mouthing any
3  study that indicated that there was a risk.
4       Q.  Okay.
5       A.  And you also had reps complaining about media
6  hype and saying oh, you know, it's just media hype.
7       "Merck felt that recent press about Vioxx was
8  inaccurate.  Vioxx is not cardiac protective but it
9  doesn't cause heart attacks.  No cardiac detriment.  Bad
10 reporting in the press.  Stroke issue not new.  Being
11 blown out of proportion."
12      So, in other words, there is even more evidence
13 that the reps are trying very hard to convey that there
14 was no risk, the one side of the story.  And they were
15 bad-mouthing the press and bad-mouthing other studies and
16 using the Naproxen hypothesis and so on to persuade these
17 physicians to believe there was no problem.
18      Q.  Did you see any data in the materials that you
19 looked at that asked the sales reps what kind of messages
20 they were conveying to physician as opposed to what
21 messages were being remember or what attributes were
22 being recalled by the physicians?
23      A.  Yes.  The call notes say that.  The call notes
24 are the notes from the reps.
25      Q.  Okay.

99

UNCERTIFIED REALTIME ROUGH DRAFT

1       A.  And they say in this case and other cases, they
2  frequently say vague things about safety.  But some of
3  them are quite explicit.  I think in some of the call
4  notes, as I recall, they state much of the same thing.
5  They said Vioxx doesn't cause heart attacks.
6       Q.  We will come to the call notes later.
7       A.  Okay.
8       Q.  Anything else about this group of studies or
9  this type of study that you have not already told us
10 about?
11      A.  Well, only one physician out of 166 said that
12 the rep told them that Vioxx might cause a heart attacks.
13      Q.  You are saying one physician recalled?
14      A.  Yes.
15      Q.  The second part of your original answer was that
16 physicians recalled being told that Vioxx was safe in the
17 elderly.
18      A.  Yes.
19      Q.  Okay.  And you believed that that should not
20 have been stated, if it was stated, because it wasn't
21 true?
22      A.  Correct.
23      Q.  Okay.  What basis do you have for saying that
24 Vioxx was not safe in the elderly?
25      MR. SKINOS:  I'm going to interpose an

100

UNCERTIFIED REALTIME ROUGH DRAFT

1  objection. What Merck knew or should have known
2  questions were gone over very detailed by Andy Goldman in
3  the last deposition. And her opinions relating to
4  medical causation versus what was gone from a marketing
5  standpoint I thought were clarified at that last
6  deposition.
7       So to the extent that you're asking again for
8  what Merck knew or should have known, we have done that
9  in the last deposition. I'm fine with you going through
10 the studies. I'm willing to let you go even a little
11 longer to get this work done, but to rehash what Merck
12 knew or should have known from a medical standpoint or a
13 marketing standpoint, that's what Mr. Goldman did.
14 BY MR. CAMPILLO:
15      Q.  Let me ask it this way, Dr. Pechmann. Your
16 opinion that the sales reps should not have made comments
17 to the effect that Vioxx was safe for the elderly, if
18 they made those statements, is based on because of your
19 belief that it wasn't safe for the elderly; is that true?
20      A.  It's based on the logic that I told you earlier
21 about the VIGOR study showing increased risk among people
22 with CV risk and there is a correlation between the
23 elderly and the CV risk, which many physicians point out
24 at various points in time.
25      Q.  Are there any documents that you have seen in

101

UNCERTIFIED REALTIME ROUGH DRAFT

1  connection with your work for this case and the other
2  cases that indicated that Merck had any information other
3  than what you just told us about your interpretation of
4  the VIGOR study that showed that Vioxx was not safe for
5  the elderly?
6       A.  No, not that I can think of.
7       Q.  Have we now covered all of the opinions that you
8  have that relate to the second type of study, the M.D.
9  promotion message recall studies?
10      A.  I believe I have covered everything.
11      Q.  Okay. The third type of study that you
12 addressed I think you referred to as tracking behavior of
13 prescribers by looking at pharmacy records of new and
14 refills of prescriptions.
15      A.  Correct.
16      Q.  Is that a good way to summarize it?
17      A.  Yes. I just called it behavioral prescription
18 tracking for short.
19      Q.  Okay. And I understood from your direct
20 examination or by your response to Mr. Skikos' questions
21 in the Barnett deposition that these studies are
22 referenced or described in Exhibits 54 and 56. Is that
23 true? Or is that a complete listing?
24      A.  I have 56, I have 47, 56, 54. Did I read the
25 same ones that you had?

102

UNCERTIFIED REALTIME ROUGH DRAFT

1       Q.  I have 54 and 56. And you had in addition to
2  that 47 and 56?
3       A.  56, yes. And what was the other one?
4       Q.  I think you said 47.
5       A.  47, yes, because that's about the efficacy of
6  the guarantee program. This is the behavioral tracking
7  of that program.
8       Q.  First of all I want to make sure I understand
9  what your opinion is. First of all, I assume that
10 tracking sales of your product is not a bad thing in your
11 judgment.
12      A.  Correct.
13      Q.  So what is it about tracking the sales via
14 pharmacy records of prescriptions that you are critical
15 about?
16      A.  I'm not critical of the research at all, as you
17 point out.
18      Q.  Okay.
19      A.  What I am critical about is what the research
20 shows. We have three years of data, very accurate data
21 because these are the actual records. It's not
22 self-report.
23      And you see that the only time you get drops in
24 sales for the most part is when there is an external
25 factor, external party that discloses the cardiovascular

103

UNCERTIFIED REALTIME ROUGH DRAFT

1  risk such as the August 2001 Journal of the American
2  Medical Association article by Topol and The New York
3  Times article.
4       And so what you see is the market reaction when
5  they were told about the risks. But Merck actually
6  states in the documents that they launched programs to
7  improve the situation to bolster sales and it shows
8  arrows for the various programs and show the line inching
9  back up, because people forget.
10      So what it indicates is people were being
11 informed mostly by external factors, not by Merck, and
12 that Merck then launched programs to improve sales, one
13 of these being the efficacy confidence program.
14      Q.  In your opinion, I gather, to launch programs to
15 increase sales is a bad thing?
16      A.  If by doing that you are neutralizing risk
17 perceptions and therefore misleading the public, I do
18 think that's wrong.
19      Q.  So assumed in your opinion or subsumed in your
20 opinion is that the perceptions -- well, strike that.
21      Let me hear her answer back, please.
22      (The last answer was read.)
23 BY MR. CAMPILLO:
24      Q.  So in general terms -- let's not talk about
25 Merck or Vioxx right now so I understand the comment or

104

UNCERTIFIED REALTIME ROUGH DRAFT

1   the point that you are making -- a company sees that the
2   market is going in the wrong direction for their product
3   and they launch a campaign to try to reverse that trend
4   and get the sales to go back to where they were or even
5   higher, that's what you do professionally, you advise
6   companies on people to do that, right?
7       A.   Absolutely.
8       Q.   And you teach students how to accomplish that so
9   they can work with clients on how to accomplish that?
10      A.   Exactly.
11      Q.   So that's not the part that's troublesome for
12  you, right?
13      A.   Correct.
14      Q.   What you are saying is that in your opinion
15  Merck was trying to change perceptions that were accurate
16  but that Merck wanted to change to something else?
17      A.   Correct.
18      Q.   All right.  So in other words, people felt X and
19  X was true and Merck wanted them to think something other
20  than X?
21      A.   Correct.
22      Q.   All right.  And that's why you are critical of
23  this?
24      A.   Yes.
25      Q.   Okay.  So in that opinion you are assuming that

105

---

UNCERTIFIED REALTIME ROUGH DRAFT

1   X was true?
2       A.   No.  I'm assuming -- well, X meaning what was
3   true is Vioxx could have had a cardiovascular risk.
4   These articles that came out in the press did not say it
5   a hundred percent did.  It just disclosed the possibility
6   that there was a significant concern that it could pose a
7   cardiovascular risk.
8            And so what people weren't told that it
9   definitely did cause cardiovascular risks, which you
10  would get plummeting sales like you see now with
11  Celebrex.  It isn't what the sales were before.
12           So what it did is it informed people that there
13  was a cardiovascular risk potential.  And what Merck then
14  did was launch programs to minimize awareness of that or
15  neutralize concerns about that.
16      Q.   Now, let me ask you this.  In the work that you
17  do for companies and clients of yours or in your
18  teachings to students who might be doing that in the
19  nature, if there is a misperception or bad press that's
20  not fair or accurate about your product it would be
21  appropriate for the company who makes that product to
22  launch a campaign to respond to misguided or misinformed
23  criticisms, correct?
24      A.   Yes.
25      Q.   So you are assuming here whatever was said in

106

---

UNCERTIFIED REALTIME ROUGH DRAFT

1   the JAMA article that you made reference to or The New
2   York Times article that it was accurate and fair and it
3   would be inappropriate to try to affect whatever
4   perceptions those publications yielded?
5       A.   No.  What I'm saying is that I
6   there was a significant cardiovascular risk and that
7   this -- risk potential and that these publications
8   managed to convey that information.
9       Q.   You are not assuming that whatever potential
10  risk is true and accurate for purposes of your opinion?
11           MR. SKIMOS:  I'm not sure I understand that
12  question.
13           THE WITNESS:  What I'm not saying is that I
14  could say for a fact that every single word in the
15  article was true.  What I'm saying is what the reserve
16  shows is that it conveyed to people that there was a
17  concern.
18           If you look at other research the rating on a
19  ten-point scale never dropped below six but it had been
20  up like eight and was dropping lower.  It should have
21  been at five, I guess, at 50/50 but lower than what it
22  was and it was way up much.
23           And that what these publications managed to do was
24  convey that there was a concern.
25  BY MR. CAMPILLO:

107

---

UNCERTIFIED REALTIME ROUGH DRAFT

1       Q.   Let me ask, first of all, are there any other
2   events or external -- what did you call them?  I think
3   external publications, that yielded or caused sales to
4   drop other than the two that you have identified?
5       A.   Sometimes they put Wall Street Journal on there
6   but it didn't seem to have much of an impact.
7       Q.   Any others that you can think of?
8       A.   The label change.
9       Q.   The April 2 label change?
10      A.   Yes.
11      Q.   Okay.  Anything else that you have been able to
12  find in your work?
13      A.   In terms of reducing perceived risk and
14  increasing sales?
15      Q.   Yes.
16      A.   Not that I can think of.
17      Q.   Let's take them each at one time.  With regard
18  to The New York Times article, what was the program or
19  the strategy that Merck launched to address whatever
20  negative impact The New York Times article had?
21      A.   The launch confidence guarantee.  I mean,
22  efficacy confidence.
23      Q.   Is there a document that indicates that they
24  specifically implemented or launched the efficacy
25  confidence program or the efficacy guarantee program in

108

UNCERTIFIED REALTIME ROUGH DRAFT

1   response to The New York Times article or is that an
2   assumption you are making based on timing?
3        MR. O'CALLAHAN:  Objection; compound.
4        THE WITNESS:  In describing the efficacy
5   confidence they state that they are trying to increase
6   the physicians' and the sales reps' confidence in the
7   drug.
8   BY MR. CAMPILLO:
9        Q.   I understand that.
10       A.   That's basically how they word it.
11       Q.   Can you point us to any document, any exhibit
12   that would indicate or you interpret as saying -- well,
13   first of all, that says in substance that the efficacy
14   confidence program was implemented in response to The New
15   York Times article or the effect of the New York Times
16   article?
17       A.   What I can state is that in this one exhibit,
18   which is Exhibit 54, it states "The 2002 promotional
19   campaigns for Vioxx lead to new prescription volume
20   rebounds" and then the campaigns are listed as efficacy
21   confidence, Divide and Conquer and Project Jump Start.
22       Q.   Is there any reference in Exhibit 54 that this
23   is in response to The New York Times article?
24       A.   No.  That's from the other exhibit where they
25   did research over the summer and they found that there

109

UNCERTIFIED REALTIME ROUGH DRAFT

1   was this mounting concern.  And that was right before
2   they launched it.  And they said we need to prevent
3   movement off center or whatever it was.  And then we got
4   the efficacy confidence.
5        So in this document it says that the campaigns
6   have led to the volume rebounds and it implies very
7   strongly that that was the goal of the campaign.
8        Q.   I'm trying to try to ask very specifically
9   whether you can point us to any document that would
10   indicate that the efficacy confidence program was
11   implemented specifically or at least in part to deal with
12   The New York Times article publication that you made
13   reference to.
14       A.   The research did not specifically cite New York
15   Times.  It just said that there was a concern.
16       Q.   Now, the same question as to the August '01 JAMA
17   article.  Can you point us to any document, any exhibit
18   before us among all the boxes that we have here that
19   would indicate that the efficacy confidence program was
20   implemented-in-part-or-as-a-whole-to respond to the
21   publication of the JAMA Topol article?
22       A.   No.  It just said it was in response -- I mean,
23   that there was concern.
24       Q.   Isn't it true that any time a company has
25   concern about sales dropping, that they will consider

110

UNCERTIFIED REALTIME ROUGH DRAFT

1   implementing programs, because they care about their
2   product, to get the sales back up?
3        A.   Yes, as long as they are not misleading or
4   deceptive programs.
5        Q.   I want to know if you can point us to anything
6   that would suggest to you that the -- well, not suggest
7   to you.  That states in substance that the program was
8   implemented either because of the New York Times article
9   or the JAMA article.
10       A.   Well, I think that this figure clearly, at least
11   very strongly, I am price that that was the point.
12       Q.   Okay.  Which one implies that?
13       A.   Exhibit 54.
14       Q.   Do you have a page reference?
15       A.   It says Page 31 and 45.  So it's one of those
16   two pages.
17       Q.   Okay.  Page 31 --
18       A.   It says the promotional campaigns lead to volume
19   rebounds.  I mean, it states that.
20       Q.   Can you go to Page 31.  Here is 54 (handing).
21       A.   So I'm looking at Exhibit 54, Page 31?
22       Q.   You said 31 and 45.
23       A.   Yeah.  That's the label change and that's the
24   increased resources.
25       Q.   We will come to the label change in a minute.

111

UNCERTIFIED REALTIME ROUGH DRAFT

1   Right now we are on the toe pop JAMA article and The New
2   York Times article.
3        A.   Yes.  So I'm talking about 30 and 31, Pages 30
4   and 31.
5        Q.   Okay.  Can you describe what you see on Page 30
6   that to you is a strong indication that the confidence,
7   its efficacy confidence program was implemented in
8   response to the effect of the JAMA Topol article or the
9   New York Times article?
10       A.   Well, actually I think the best one is Page 45.
11       Q.   First of all, is there anything on Page 30?
12       A.   I think 30.  Total share for Vioxx has
13   stabilized following label change and increased
14   promotional resources.  So what it is indicating is they
15   put in new resources to stabilize the decline.
16       Q.   Okay.  I'm just trying to keep faux is caned.
17   And I know you are trying to be helpful, so I'm not being
18   critical at all.
19       A.   Okay.
20       Q.   I think you said something about Exhibit 54,
21   Pages 30, 31 and 45 that was a strong indication to you
22   that the confidence, efficacy confidence program was
23   implemented in response to the JAMA article and The New
24   York Times article, correct?
25       A.   Yes.  And what I'm saying is, the answer to that

112

UNCERTIFIED REALTIME ROUGH DRAFT

1    question here is the heading and the little arrow
2    pointing to increased resources.  So it is stating
3    that -- and the arrow showing the JAMA, the drop from
4    JAMA.
5         So you see a drop from JAMA and then you see
6    this heading saying -- but it managed to stabilize it by
7    putting in resources.  Well, I think that pretty clearly
8    implies that they put in the resources because of the
9    problems.
10        Q.  Okay.  The reference to resources, if I'm
11   reading this chart appropriately, seems to be in the
12   September '02 or August '02 time frame; am I correct?
13        A.  August.  It's the efficacy confidence program.
14        Q.  August of '02?
15        A.  Yes.
16        Q.  When was The New York Times Article published
17   that you referenced before?
18        A.  I think New York Times was May.
19        Q.  Of what year?
20        A.  Of '02, I believe.
21        Q.  Do you have anything that would identify that?
22        A.  Wait a minute.  New York Times.  I have Exhibit
23   4, May 2002.
24        Q.  Okay.  Let's assume that to be the case.  When
25   was the Topol article published in JAMA?

113

UNCERTIFIED REALTIME ROUGH DRAFT

1         A.  8/02.  Wait.  Wow.  There is something wrong
2    with this.
3         Q.  I will represent to you that it was published in
4    the fall of 2001.
5         A.  Yes.  This is wrong.
6         MR. SKIROS:  That's what it says on the graph.
7         THE WITNESS:  They have it wrong.  Geez.
8    BY MR. CAMPILLO:
9         Q.  On what do you base your opinion that the
10   efficacy confidence program that was implemented in
11   August of '02 was in response to the publishing of the
12   August '01 JAMA article by Topol?
13        A.  Well, I told you.  I don't know what else I
14   could say other than the fact that they said they put in
15   increased resources and now things have stabilized.  And
16   so the implication is they put in the resources to
17   stabilize the problem which began with JAMA.
18        And I think there are some other power points
19   that make that explicit, too.  And for why it took a
20   whole year, having worked on these campaigns, it takes a
21   while.  I mean, you can't just come up with a program.
22   It had to be approved, it had to be tested.  You can't
23   just launch something within three months.  I mean, a
24   year is good.
25        Q.  If I'm reading this graph correctly, still on

114

UNCERTIFIED REALTIME ROUGH DRAFT

1    Page 30, the market share of Vioxx actually continued to
2    decline and flattened out at around 38.6 percent but
3    didn't go anywhere close to where it had been at the time
4    before, which was above 48 percent, correct?
5         A.  Correct.  It went up slightly.  It's not the
6    total share.  The new share showed increases.  Not back
7    up to the original.
8         I think you can see that on Page 31, yes.
9         Q.  Can anything else in your judgment, in your
10   opinion that Merck implemented other than the efficacy
11   confidence program that you believe was done directly in
12   response to the three events that you have discussed;
13   that is the JAMA article in August '01, the label change
14   in April '02 and The New York Times article in May of
15   '02?
16        A.  Yes, I do think there were other events that
17   occurred.  If you look on Page 45 you'll see then.
18        Q.  My question is what other programs did you
19   implement.
20        A.  Yeah.  That's on Page 45.  Project offensive is
21   one thing they launched right after the JAMA that is
22   shown here.
23        Q.  Okay.  What was that?
24        A.  That's something I reviewed a couple of months
25   ago so I can't remember it.  I don't have a lot of

115

UNCERTIFIED REALTIME ROUGH DRAFT

1    information on it but it was promotional campaign to get
2    people excited.
3         Q.  As you sit here now do you recall what the
4    program was?
5         A.  I can't at the moment.
6         Q.  Okay.
7         A.  But I do remember reading quite a bit about it.
8         Q.  Okay.  What else did Merck do other than the
9    efficacy confidence program?
10        A.  Well, they also did this divide and concur and
11   project jump start.  I couldn't find anything on Divide
12   and Conquer but I did read some information about Jump
13   Start.
14        Q.  Did you have any knowledge whether or not Divide
15   and Conquer was anything that was ever implemented as
16   opposed to perceived?
17        A.  Oh, no, these were implemented programs.  Divide
18   and Conquer, I don't know.  Project Jump Start I heard
19   described and it was clearly implemented as a project.
20        MR. SKIROS:  It looks like it says Divide and
21   Conquer if you look at the top.  It's obvious.
22        THE WITNESS:  It certainly looks like it was
23   implemented.
24   BY MR. CAMPILLO:
25        Q.  Let me ask you with respect to any of these

116

UNCERTIFIED REALTIME ROUGH DRAFT

1  programs that you believe were implemented to respond to
2  the publication in JAMA, the VIGOR label change or The
3  New York Times article where you can specifically point
4  us to something that says that they were implemented for
5  that reason?
6     A.  Just figures like this.
7     Q.  Where you are surmising the intent from
8  something else?
9     A.  Like I said, I think it's very strongly
10  suggested, yes.
11     Q.  Is there anything you can show us, you can point
12  us to where it actually said that Merck implemented any
13  of these programs in part or in full as a result of the
14  events that you have identified, the JAMA article, the
15  New York Times article and the label change?
16     A.  I didn't -- can't point you to any right now but
17  there may be some.
18     Q.  And you would agree, Dr. Pechmann that there
19  were events in this time frame such as the entry of
20  Bextra into the market and other events unrelated to the
21  three that you have identified that affected Merck's
22  Vioxx market share?
23     A.  I agree with that.
24     Q.  Do you have any criticism of Merck attempting to
25  minimize the loss of market share by the entry of other

117

UNCERTIFIED REALTIME ROUGH DRAFT

1  products into the market or other events that may occur
2  that may affect their sales?
3     A.  No, but I have -- I am very troubled by the fact
4  that they could see improvement on the safety attributes.
5     Q.  Okay.  What do you mean by that?
6     A.  That when they launched the efficacy confidence
7  program, that there were these improvements on safety
8  attributes.
9     MR. SKIROS:  You mean perceptions?
10     THE WITNESS:  Exactly.  Safety attribute
11  perceptions.
12  BY MR. CAMPILLO:
13     Q.  What document, in your judgment, indicates that
14  there were changes in the attribute perceptions of
15  physician after these programs?
16     A.  The document we were looking at earlier.
17     Q.  Which one is that?  Is that 48?
18     A.  47.
19     Q.  Are we still --
20     A.  That was a prior study.  You know, that was a
21  prior type of study.
22     Q.  What do you mean by "prior"?
23     A.  This is tracking the behavior.  The prior study
24  we talked about was tracking the attribute perceptions.
25  So we talked about this in the context of the other

118

UNCERTIFIED REALTIME ROUGH DRAFT

1  study.
2     Q.  You said 47 as opposed to 48?
3     A.  47 is what I have here.
4     Q.  Okay.  I'm sorry.  What is it?
5     A.  We went through all of these -- well, maybe it
6  wasn't clear at the time.  There are a series of power
7  points that indicate that perceptions of Vioxx relative
8  to Celebrex improved.  Remember, I said one was rated the
9  same whereas before people had rated Vioxx inferior,
10  unsafe for the elderly and MI stroke.
11     So basically what I'm saying is this program
12  affected safety perceptions and that was what they had
13  identified the summer before as being the problem.
14     Q.  I'm sorry, I don't mean to interrupt you but
15  when you say "this program affected perceptions" --
16     A.  Efficacy confidence.
17     Q.  Affected perceptions about safety?
18     A.  The physicians' perceptions, yes.
19     Q.  Okay.  Is there something after the
20  implementation of the efficacy confidence program that
21  looks at any changes over time in the perceptions of the
22  physicians?
23     A.  Yes.
24     Q.  Okay.
25     A.  I think the most important one is the month in

119

UNCERTIFIED REALTIME ROUGH DRAFT

1  which it was launched, because having had experience in
2  this, that's the time when you're going to see the big
3  improvement, if there is going to be one.
4     Q.  And what month was this launched?
5     A.  August.
6     Q.  All right.  And you're saying that Exhibit 47
7  shows a change in the perceptions of physicians in
8  September of 2002?
9     A.  No.  In August.
10     Q.  The same month that it was launched?
11     A.  That's what it should be, yes.
12     Q.  Show me where in Exhibit 47 it shows this
13  increase in August of 2002 and the perception of the
14  physicians.
15     A.  Okay.  How would I best show you this.  I still
16  have you copy.
17     Q.  That's an extra one.  Page 8?
18     A.  Yes.  The interesting thing is there is no
19  change in efficacy perceptions.  Even though it is
20  called efficacy confidence program it was affected
21  efficacy of safety.
22     So Page 8 on the top and the bottom, Page 9 the
23  top and the bottom.  These are really bad copies.  Page
24  10, the top and the bottom.
25     Q.  What is the change that you are referring to in

120

UNCERTIFIED REALTIME ROUGH DRAFT

1   the safety perceptions of physicians in August.

2      A.   Okay.  So it says on Page 8 "In August more

3   physicians rated Vioxx and Celebrex equally on the MI

4   attribute which could have contributed to the narrowing

5   of the new shared gap between Vioxx and Celebrex," which

6   meant that Celebrex was way ahead and now Vioxx is

7   catching up.

8      Q.   You are assuming, are you not, Dr. Fechmann,

9   that whatever change there was in August of 2002 in that

10   particular measurement was somehow relate to the

11   implementation of the efficacy confidence program?

12      A.   Yes.  And plus they said that, too.

13      Q.   Okay.  Where did they say this was due to the

14   efficacy confidence program's implementation?

15      A.   I'm not sure I could put my finger on it right

16   now.

17      Q.   Are you confident that is one document or more

18   than one document that said in August of 2002 in the

19   perception of physicians that the safety of Vioxx was due

20   to the implementation of the efficacy confidence program?

21      A.   That's what I recall reading, yes.

22      Q.   In one of the documents you have identified in

23   this deposition?

24      A.   Yes.

25      Q.   Okay.  If it's not in the exhibits that -- in

121

UNCERTIFIED REALTIME ROUGH DRAFT

1   the binders, then --

2      A.   They are in the boxes.  It might be in the

3   report.

4      Q.   Take a minute to see if you can find it.

5      A.   This is important.

6      (Witness reviews document.)

7      MR. O'CALLAHAN:  Let me just put on the record

8   that we are past the three-hour mark now, well past it.

9   How much longer do you expect to go?  Ralph, how much

10   longer do you expect to go?

11      MR. CAMPILLO:  I'm looking at my notes to see if

12   I can try to give you an estimate.  I would say probably

13   another hour.

14      MR. O'CALLAHAN:  Let's go off the record for a

15   second.

16      MR. CAMPILLO:  Sure.

17      (Recess taken.)

18   BY MR. CAMPILLO:

19      Q.   Dr. Fechmann when we took the break I think you

20   were trying to find a document that may indicate that the

21   change in perceptions concerning the safety of Vioxx had

22   improved in August of 2002 as a result of the

23   implementation of the efficacy confidence program.

24      A.   Yes.  And I haven't been able to -- I wasn't

25   able to identify that document.  I think it exists,

122

UNCERTIFIED REALTIME ROUGH DRAFT

1   although it's also possible that I just put two and two

2   together and inferred that.

3      It could be in my expert report and it could be

4   in quotes.  But rather than spending another five minutes

5   looking for it, maybe we could move on.  It may be in my

6   expert report and it would be in quotes.

7      Q.   I will look at the expert report later.  That's

8   fine.

9      Let me ask you this.  Do you know what date the

10   efficacy confidence program actually started?

11      MR. O'CALLAHAN:  Ralph, I'm going to interrupt

12   you to say we are going to go until 7:00.  I'll give you

13   another half an hour.

14      MR. CAMPILLO:  I'll do my best.  Thank you.

15      THE WITNESS:  I cannot recall the date right

16   off, but I would believe it's in the materials.

17   BY MR. CAMPILLO:

18      Q.   Do you know when the survey that's reflected in

19   Exhibit 47, when the actual questions for the August time

20   frame are posed to the physicians?

21      A.   That's a good question.  Let's see.  The

22   behavior is tracked on a continual basis, so some of the

23   graphs were behavior.  The attribute tracking is

24   described -- it doesn't say here.  It just says

25   interviews occurring every month.

123

UNCERTIFIED REALTIME ROUGH DRAFT

1      Q.   So you have no specific knowledge as you sit

2   here today when the interviews were conducted, correct?

3      A.   Correct.

4      Q.   Switching on study type No. 4, which I think we

5   have discussed indirectly, as described in your

6   deposition testimony as attribute tracking studies of

7   physicians or AKA attribute tracker.

8      A.   Yes, uh-hmm.

9      Q.   This is where physicians are selected from a

10   panel at random and then questioned about certain things?

11      A.   Yes.

12      Q.   And what opinion do you have about these if I

13   can types of studies conducted by Merck or for Merck?

14      A.   Let me just clarify that it's a random sample,

15   so it's not panelist technically.

16      Q.   Okay.

17      A.   A panelist is someone who is agreed is a

18   priority.

19      Q.   So randomly selected by the vendor who is doing

20   this work?

21      A.   Yes.  So basically they identified the groups

22   they were interested in and the company would contact

23   physicians at random from those.

24      Q.   If I understood your testimony before, it was

25   that somehow the attributes of actual importance were

124

UNCERTIFIED REALTIME ROUGH DRAFT

```
 1   different than the attributes of stated importance.
 2       A.   Correct.
 3       Q.   Can you in lay terms explain to me what that
 4   means.
 5       A.   Yes.  The doctors were asked to rate the
 6   importance on a ten-point scale, I believe.  They rated
 7   each brand on each attribute and then they indicated the
 8   prescribing, so you could run a regression analysis, a
 9   simple regression, to see what actually affected
10   prescribing as opposed to what they said was affected
11   prescribing.
12       Q.   What are you referring to that led the physician
13   to actually prescribe it?
14       A.   Statistical analysis.  So if they said that safe
15   for the elderly was the least important attribute but
16   every brand -- when a brand was rated high on safe for
17   the elderly they prescribed it and if a brand was rated
18   low on safe for the elderly they never prescribed it.
19   And the best predictor of their prescribing was how that
20   brand was rated on that attribute.
21            It's not the least important.  It's in fact the
22   most important.  So that's how it's done.  Does that make
23   sense?
24       Q.   Honestly?
25       A.   It's a statistical comparison where they -- I
```

125

UNCERTIFIED REALTIME ROUGH DRAFT

```
 1   don't know how to describe it.  Where they see the actual
 2   behavior and see how they rated the brands.
 3       Q.   Maybe you can't answer this, but how does a
 4   study identify why the doctor wrote the prescription
 5   without asking the doctor for a given prescription?  What
 6   led you to write this prescription?
 7       A.   As I said, if they have the doctors' opinions
 8   about all the brands and then they know what the doctor
 9   actually prescribed, then they link the opinion to actual
10   behavior.
11       Q.   But knowing the intent of the physician at the
12   time they write the prescription?
13       A.   Because they collect the data at the same time.
14       Q.   You mean they ask the physician why are you
15   writing the prescription?
16       A.   No.  They say give us your records on
17   prescribing for this past time period and rate these
18   brands.  See, because if they ask them, then you run into
19   the problem of finding them.  People say one thing is
20   important but another thing ends up being important.
21       Q.   I think your opinion is that somehow Merck used
22   the efficacy confidence program again, the program we
23   have been talking about to some extent, to direct the
24   attention of the physicians to the attributes of actual
25   importance versus the attributes of stated importance; is
```

126

UNCERTIFIED REALTIME ROUGH DRAFT

```
 1   that correct?
 2       A.   No.
 3       Q.   That's not your opinion?
 4       A.   Unh-uh.
 5       Q.   Okay.  Then you state it, please.
 6       A.   Okay.  So my opinion is that they started doing
 7   the sophisticated type of research, which is difficult to
 8   explain, to be able to infer why people were prescribing
 9   at the same time they were giving their prescribing
10   records they asked them to rate their opinion of each
11   brand and then through statistical techniques were able
12   to tell which opinions really mattered.
13            So the opinion about edema, the opinion about
14   safe for the elderly and effectiveness, they found -- and
15   they did this for a couple of years, actually, and they
16   found that actually the attributes that were
17   differentiating between -- that was causing people to
18   choose between Vioxx versus Celebrex was not efficacy but
19   safety, despite the fact that they said efficacy was the
20   most important thing, in fact safety was.
21            So from that they concluded we've got to do
22   something about the slippage.  And also they were seeing
23   a slippage in the safety of Vioxx and a reduction in sale
24   of Vioxx, especially new prescriptions of Vioxx.
25            So they said geez, we need to fix that.  And
```

127

UNCERTIFIED REALTIME ROUGH DRAFT

```
 1   right after that is when they launched the program.
 2       Q.   Is it your opinion, if I'm reading between the
 3   lines, that by focusing on the efficacy by using the
 4   efficacy confidence program, that in a sense it
 5   distracted the attention of the physician from safety
 6   issues to efficacy issues?
 7       A.   No.
 8       Q.   That's not your opinion?
 9       A.   No.  What actually happened is it created the
10   perception that it was safe because you were giving a
11   money-back guarantee.  So that's like pretty much any
12   guarantee creates perceptions of higher quality.  And
13   here the quality perceptions that were weak were the ones
14   with regard to safety, so those were the ones you would
15   most expect to improve.
16       Q.   So you are saying they conceive that by saying
17   we're going to give you money back if the product didn't
18   help your pain, that that led the physicians to believe
19   that the product was safer?
20       A.   Well, they didn't say if it didn't relief your
21   pain.  What they said is satisfaction guaranteed or your
22   money back.  That's what they told the consumers and
23   that's what most of the ads said for physicians.  In the
24   fine principle for physicians it said pain.  But with the
25   consumers it was just any problem satisfaction to get
```

128

UNCERTIFIED REALTIME ROUGH DRAFT

1  your money back.

2      Q.   For any reason you are not satisfied, let us

3  know and we will give you your money back?

4      A.   Right.

5      Q.   What is your criticism of that program?

6      A.   I mean, in general I'm not critical of that type

7  of program but what I'm saying is that here what they

8  were doing was trying to neutralize safety concerns and

9  create the perception that we stand by this product, that

10  we stand firmly behind the product in its entirety.

11          And the part of the product that was weak was

12  the cardiovascular perception.  So that was the part that

13  improved.  And, likewise, you saw improvements in sales

14  because what were driving sales were the safety

15  perceptions.

16      Q.   And how are you able to measure that --

17          Can you read the answer back.

18          (The last answer was read.)

19  BY MR. CAMPILLO:

20      Q.   Did you see any indication anywhere that Merck

21  was not standing behind the Vioxx from the moment it put it

22  on the market until the time it was drawn?

23          MR. SKINOS:  Vague.  Objection.

24          You can still answer.

25          THE WITNESS:  I didn't see indications of that.

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  I saw every indication that they did stand behind their

2  product.

3  BY MR. CAMPILLO:

4      Q.   All right.  So --

5      A.   Having an efficacy confidence program is

6  aggressive.  It's a very strong signal to the market.

7      Q.   That, I understand, too.  I'm trying to

8  understand how the implementation of the efficacy

9  confidence program was an effort, as you said, to

10  neutralize safety concerns.

11      A.   Because what we know is when you offer a

12  guarantee it reassures people about the parts, the

13  attributes of the product that they are worried about,

14  whatever those happen to be.  That's what a guarantee is

15  designed to do, to give a signal that you don't have to

16  worry because you can buy the product with confidence, no

17  problem.

18          So if you -- people know that the company would

19  not offer a guarantee if the product was crappy because

20  they would go out of business and everyone would return

21  it.

22      Q.   Okay.

23      A.   So the whole idea is to reassure people,

24  especially about things for which they can't directly

25  observe problems.  It might be not identifiable.  It

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  might not happen for a long period of time or whatever

2  ever.

3          So they use that technique which is well

4  established and well known in a very unique context

5  because it's not very common at all to may have money 0

6  back guarantees for prescription drugs, and it sent a

7  very strong signal to the physicians and you could see it

8  in the data.

9      Q.   Can you point us to any exhibit to your report

10  or any documents here that we have here that indicate

11  that Merck's purpose for I am me. Ing the efficacy

12  confidence program was to neutralize safety concerns?

13      A.   I think we went through that.  I said that -- I

14  kind of went through the documents that we talked about

15  before.

16      Q.   We are talking about a different type of study,

17  I believe.  Is it the same document?  Is that what you're

18  saying?

19      A.   Yeah.  We jumped into this study and back to the

20  other study.  I was talking about a variety of studies

21  when I answered that question before.

22      Q.   Let me ask it this way.  Can you identify any

23  documents that we can point to right now that indicate

24  that the efficacy confidence program was implemented to

25  neutralize the safety concerns which had been identified

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  via the sophisticated studies that sought were to infer

2  the real reasons why the people prescribed the

3  medication?

4      A.   The graphs that I showed you that showed

5  increased resources.

6      Q.   That's it?

7      A.   Those are the ones I can identify right now.

8      Q.   Are there any documents that have words in

9  substance that indicate this is being done to neutralize

10  safety concerns, either in that phrase or any other

11  phrase?

12          MR. SKINOS:  You mean the efficacy safety

13  programs as opposed to the whole integrated marketing?

14          MR. CAMPILLO:  Correct.

15          MR. SKINOS:  Because you already answered about

16  integrated marketing.

17          MR. CAMPILLO:  Correct.

18          THE WITNESS:  The documents that prescribed that

19  had the objectives did not state it explicitly

20  BY MR. CAMPILLO:

21      Q.   Have we covered all the opinions that you

22  anticipate expressing concerning the sophisticated

23  studies done to infer the real attributes for physicians

24  prescribing Vioxx and your criticisms thereof, of how

25  that was used?

UNCERTIFIED REALTIME ROUGH DRAFT

A. With regard to that sophisticated study, I have
stated everything I can think of that I want to state.
This type of study yielded other data as well, and so I
have opinions about the other results of this type of
study. He didn't just do sophisticated analysis. They
did some basic analysis, too.

Q. What other opinion do you have that relates to
these studies?

A. They tracked over time the ratings of Vioxx on
no increased risk heart attack, stroke and safety of the
attribute and compared year to year and month to month
for three years and showed that overall ratings on both
of those attributes remained very high through -- let's
see. I think mid-2003 is where I stopped. We couldn't
find any data after that. Actually as late as December
of 2003.

Q. What exhibit, if any, are you referring to?

A. Okay. So let's see. One exhibit is MRK AD
00194820.

Q. Which is contained in tab 26 of Exhibit 10?

A. Page 48, 49.

Q. An orthopedic program for Vioxx?

A. Is that the right page?

Q. Give me the Bates number again. I'm sorry.

A. MRK AD 019 -- I'm sorry. MRK AD 00194820, Page

133

---

UNCERTIFIED REALTIME ROUGH DRAFT

48. Is it a big exhibit?

Q. Uh-hmm.

A. Okay.

Q. I'm looking at Page 48. Why don't you take a
look and see if maybe Page 48 is the wrong reference.

A. Where are you finding the page numbers? There
are no page numbers on this.

Q. There is a small number at the bottom.

A. I think I hand counted these numbers. That's
why. Let me see if I can find it.

Yeah, here it is. That's this page.

Q. Why don't you tell us what the number is on the
bottom, just the last five digits.

A. 4869.

Q. May I see that?

(Document handed to counsel.)

BY MR. CAMPILLO:

Q. Can you tell us what the significance of this
is?

A. Even as late of September '03, you still have
reasonably high ratings and there is no indication that
there is a consistent trend down. So, in other words, we
have three years of this data we can put all together and
it declined maybe one point in the entire time.

So there is no clear trend. If Merck was

134

---

UNCERTIFIED REALTIME ROUGH DRAFT

disclosing this as a concern you would see a big, you
know, decline from the minute they start doing it. You
would see a big decline. And you don't see that. You
see it kind of bouncing around.

Q. If Merck had done what?

A. Had stated, had conveyed there was a possible
risk of heart attack or a stroke. You would see a very
different pattern.

Q. That's an assumption you are making or
conclusion you are reaching?

MR. SKINOS: That was answered in the last
deposition.

MR. CAMPILLO: I don't recall any discussion of
this particular document at all.

MR. SKINOS: Whether it was known or should have
been known.

MR. CAMPILLO: That's not what I'm trying to do.

Q. You are saying the fact that this exhibit, which
is in tab 26 of Exhibit 10, that shows that the ratings
of Vioxx did not decrease significantly over time somehow
shows that Merck did something wrong?

A. It shows that they did not have a campaign to
disclose the risk.

Q. So is it your opinion they should have had a
campaign that disclosed the risk?

135

---

UNCERTIFIED REALTIME ROUGH DRAFT

A. Yes.

Q. What risk, in your opinion, should Merck have
been advising physicians of?

A. The risk of heart attack from the VIGOR study.

Q. Is it your position that nowhere did Merck
advise physicians of the results of the VIGOR study
before December of 2003?

A. They did advise them of the results of the VIGOR
study but in such a way to reassure physicians that it
wasn't a problem. For example, they focused on the four
percent of patients that were very high risk and should
have had aspirin and said if you look at everyone else it
was a nonsignificant change in risk. And the FDA adviser
panel said that that type of analysis was not valid.

Q. Have you read the findings of the advisory
committee that looked at Vioxx and the VIGOR data in 2001
and which ultimately led to the change of the label?

A. Yes.

Q. Okay. And it's your testimony that you believe
that Merck did not put out the information to physicians
consistent with what was recommended by that advisory
committee?

A. Yes?

Q. Okay. And is that based on anything other than
your comparison of reviewing the advisory committee

136

UNCERTIFIED REALTIME ROUGH DRAFT

1   materials and looking at the label from April '02?

2   A.   Well, it wasn't just the label.  Looking at the

3   detailing pieces that they gave physicians, the CV card,

4   the letters that they sent out, the dear doctor letters,

5   solicited and unsolicited.

6   Those materials contained information that an

7   advisory report was described as invalid.  And also the

8   FDA warning letter had more information about that.

9   Q.   Let's start in April of '02.  Are there any

10   materials that were promulgated, distributed, used by

11   Merck, to your knowledge, after April of '02 that in your

12   opinion is contrary or inconsistent with the advisory

13   committee's recommendations?

14   A.   Yes.

15   Q.   Okay.  Which pieces?

16   A.   That's why I prepared this chronological list.

17   Q.   I just want you to identify the pieces without

18   necessarily any discussions so we can try to get this

19   moved along as much as we can.

20   A.   Which date do you want to talk about?

21   Q.   After April 9th of 2002.

22   A.   Okay.  You can see the ones.  So there was a

23   bulletin on how to present the label change, which is

24   also related to the Cannell PowerPoint.

25   Q.   Which page are we looking at?  Because we don't

137

UNCERTIFIED REALTIME ROUGH DRAFT

1   need to go into it in detail.

2   A.   Anything after the April '02 label change.

3   Q.   So there are four items on your list, correct?

4   A.   Well, let's see.  For this year there's three

5   and this year there's four.  And that's it.

6   Q.   Okay.  Just so we can inventory what you're

7   talking about, there are three items, the April 11

8   bulletin to the sales reps.

9   A.   Yes.

10   Q.   There is the power point by Mr. Cannell in 2002?

11   A.   Yes.

12   Q.   And there is an August of 2002 -- well,

13   implementation of the efficacy confidence program?

14   A.   Yes.

15   Q.   And you are saying there are representations in

16   each of those which are inconsistent with the

17   recommendations of the advisory committee from 2001?

18   A.   Yes.

19   Q.   That's also true for the three items on the next

20   page, which are the first quarter 2003 --

21   A.   Well, four items.

22   Q.   I'm sorry.  I misread it.  But the first one is

23   two detailed pieces.  Are those the same ones we have

24   talked about, 28 and 29?

25   A.   I believe those were the numbers.

138

UNCERTIFIED REALTIME ROUGH DRAFT

1   Q.   Okay.  And the next one is --

2   A.   The obstacle response guide, which basically

3   refers back to that same April 11, 2002 bulletin.

4   Q.   Okay.  Is there a dear doctor letter -- the one

5   you are referring to specifically, the one to Dr. Mikola?

6   A.   Yes.

7   Q.   And you believe that that letter, whatever it

8   was, since I don't know what it is, was inconsistent in

9   some way with the advisory committee recommendation from

10   2001?

11   A.   Yes.

12   Q.   And then the fourth one is -- you are really

13   talking about the bulletin and the --

14   A.   Related to the bulletin is the -- attached to

15   the bulletin is the obstacle handlers.

16   Q.   I just want to make sure we have the inventory.

17   In terms of material that would have disseminated to

18   physician, we are talking about the bulletin and the

19   attached materials?  Go ahead.

20   A.   Those were sent to the sales reps who then used

21   it with physicians.

22   Q.   That's what I'm trying to identify, the material

23   that went to the physicians.

24   A.   Oh, the physicians directly.

25   Q.   You are referring to whatever was attached to

139

UNCERTIFIED REALTIME ROUGH DRAFT

1   the bulletin that the sales reps were supposed to or

2   could use.

3   A.   Yes.

4   Q.   That's one item.  Secondly, you are talking

5   about the two detailed pieces, Exhibits 28 and 29.

6   A.   Yes.

7   Q.   And any dear doctor letters such as the one that

8   went to Dr. Mikola?

9   A.   Yes.

10   Q.   Is there anything else that would have gone to

11   the physicians?

12   A.   The efficacy confidence ads.

13   Q.   And the efficacy confidence ads as a class?

14   A.   Yes.

15   Q.   Okay.  So those four items are the ones that you

16   are based your opinion on that Merck was making

17   statements after April of 2002 which were inconsistent

18   with what the advisory committee had recommended in 2001?

19   A.   There could be others but those are the main

20   ones.

21   Q.   Well, are there any others that you are basing

22   your opinions on in this case?

23   A.   There could be something in the report that

24   would be clearly labeled with a date, but when I went

25   through my notes this morning, these are the ones I wrote

140