UNCERTIFIED REALTIME ROUGH DRAFT

1    down.

2        Q.   And then are, then, the items in your opinion

3    that were used by Merck to reinforce, improperly

4    reinforce decisions on the safety attributes of Vioxx?

5        A.   Yes.

6        Q.   Any other basis upon which you base that opinion

7    besides these four documents or categories of documents?

8        A.   Well, the research.  I mean, the research we

9    have been talking about also has led me to the

10   conclusion.

11            So I looked at the materials and then I looked

12   at all the research.

13       Q.   In terms of documents or materials that would

14   have been used out in the field, shown and given to a

15   physician, can you identify anything else?

16       A.   Well, the detailed pieces that we saw, I think

17   Exhibits 28 and 29, there were other versions of that.

18   That was just for first quarter.

19       Q.   Others that are similarly deficient, in your

20   opinion?

21       A.   Correct.

22       Q.   Is your opinion that these pieces were deficient

23   based on anything other than your comparison of your

24   understanding and your reading of the April or the 2001

25   advisory committee recommendations and then comparing

                                                        141

UNCERTIFIED REALTIME ROUGH DRAFT

1    that to your looking at the pieces?

2            MR. SKINOS:  Asked and answered.

3            THE WITNESS:  It's also based on all the

4    research that was done.

5    BY MR. CAMPILLO:

6        Q.   The last group of studies are the direct to

7    consumer advertisements testing, copy testing, correct?

8        A.   Well, there's two more.  There is the consumer

9    tracking and then the consumer copy testing.

10       Q.   You have thrown me for a loop.

11           MR. SKINOS:  It's all Wendy's fault.

12           MS. TUCKER:  No, we have it.

13           THE WITNESS:  It's a very sophisticated,

14   thoroughly researched campaign.

15   BY MR. CAMPILLO:

16       Q.   By the way, Dr. Pechmann in the materials that

17   you reviewed, the entirety of any materials that were

18   disseminated to the public or the physicians, did you see

19   anything where Merck described Vioxx as a miracle drug or

20   used the word "miracle" anywhere in the actual piece?

21       A.   I didn't see that, no.

22       Q.   There is a telephone survey of chronic pain

23   consumers.  Is that the fifth category of studies that

24   you have opinions about?

25       A.   Yes.

                                                        142

UNCERTIFIED REALTIME ROUGH DRAFT

1        Q.   Okay.  Can you just briefly summarize what the

2    opinion is about those studies or that you have come up

3    within the context of those studies.

4        A.   Yes.  It's not something directly relevant but I

5    think important to know is that awareness of Vioxx was

6    about 85 percent.  You can't get much higher than that.

7            The other thing we learned is a lot of these

8    people were at high risk in that they had hypertension or

9    heart disease.  So that was apparent from the survey.

10   They had age criteria for these people and a lot of them

11   were high risk.

12           The average age of those interviewed was 55.

13       Q.   First if you can just summarize your opinions.

14   Because I want to ask you about 5 and 6 and we may not

15   have time to get into any details.

16       A.   So basically consumer perceptions of the brand

17   remained stable.  What shot up was awareness of the brand

18   but what remained stable throughout was the perception of

19   the safety of the brand much.

20           They didn't ask about heart attack because I

21   think people would have been shocked to even be asked a

22   question about heart attack.  But they asked them about

23   safe as a sugar pill and a brand that you could trust by

24   way of safety perceptions.

25       Q.   What is it that in your opinion Merck did or

                                                        143

UNCERTIFIED REALTIME ROUGH DRAFT

1    didn't do that they should have in connection with these

2    studies?

3        A.   What this research shows is that the message to

4    the consumer -- that they didn't get a message to the

5    consumer that Vioxx posed a potential cardiovascular

6    risk.

7        Q.   So your criticism in a nutshell is Merck should

8    have but didn't convey messages to the patients that

9    Vioxx could cause increased CV events; is that it?  I

10   mean, in a nutshell.  I'm trying to summarize it.  If you

11   can't, please tell me.

12       A.   No, that's exactly it.

13       Q.   So it's your opinion that they should have sent

14   out information telling the patients that Vioxx use could

15   increase their risks of CV events?

16       A.   They could have put it in the advertisements, in

17   the print advertisements.  Because this included data

18   post -- when the label changed.  And they did have a

19   vague statement in the advertisements about

20   cardiovascular risk but it did not seem to have any

21   effect on people's perceptions of the brand.

22       Q.   So your opinion is they should have done more

23   than that?

24       A.   Yes.  They should have had a much clearer label.

25       Q.   They should have done something other than the

                                                        144

UNCERTIFIED REALTIME ROUGH DRAFT

1  patient insert that was prepared and distributed after
2  April of '02?  Have you seen that?
3      A.  I think so, yeah.  The patient label?
4      Q.  Yes.
5      A.  It's exactly the same thing that was in the
6  print ads.
7      Q.  Your opinion is that was not sufficient and
8  Merck should have provided additional information beyond
9  that contained in the ads and in the patient insert?
10     A.  Yes.
11     Q.  What exactly is your opinion that should have
12 been stated by Merck, let's say in the year June of 2002,
13 that was not said about the risks, CV risks of Vioxx in
14 those source of materials?
15     A.  That some research suggested that it could cause
16 heart attacks.
17     Q.  As long as they said that in substance you would
18 be satisfied?
19     A.  Well, no, because I'm a research-based person,
20 so I would do research just like there did.  But what
21 they did in their research -- that's the next category of
22 studies, so maybe it's good that we are moving ahead.
23         In their research they chose a label that had no
24 affect on peel's likely behavior to talk to their
25 physicians.  They saw no significant difference with

145

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  people that said they were very concerned about the risks
2  that were reported and people that were not.  That's what
3  they wanted.  They didn't want the warning label to
4  distract people from our message or they had euphemisms.
5  Basically they didn't want the risk information to have
6  any effect on people's behavior.
7          What I would do is choose a risk message where
8  you actually see a decline in behavior because people are
9  paying attention to the message and getting the message
10 that it's a problem.
11     Q.  Let me move to the sixth type of study which
12 are, I think, described as copy testing of direct to
13 consumer ads.
14     A.  Yes.
15     Q.  If you can summarize what your opinion is about
16 those tests or the testing.
17     A.  Well, the data indicate that people thought the
18 ads were good and increased their interest in talking to
19 the doctor and finding out about the product.  That's
20 fine.
21         What worries me is that they did these tests of
22 the warnings that I was talking about where they
23 specifically looked at -- compared a motivation to talk
24 to the doctor based on people who indicated that they
25 were very concerned about the warning or not.  And they

146

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  found no difference.
2          In the warning that they were using they found
3  that even though some people said they were concerned it
4  didn't affect their likelihood to talk to the doctor or
5  do anything proactively to get the drug.
6          So it's kind of like the same thing we were
7  talking about with the physician attributes; it's one
8  thing what people say and another thing what they
9  actually do.  They actually state in the research
10 documents that if they found that the ad did adversely
11 affect willingness to talk to the doctor, they would not
12 have run the ads.
13     Q.  Do you agree, Dr. Pechmann that the primary
14 purpose of direct to consumer advertising is to encourage
15 the patient to go and talk to the physician about the
16 product or about their problem?
17     A.  Well, that was the goal of this research.  I
18 mean, of this direct to consumer ads.
19     Q.  Isn't that the primary goal of the direct to
20 consumer advertising, to get the patient to go and talk
21 to the physician as an intermediary?
22     A.  Yes.
23     Q.  So to the extent an ad would not motivate the
24 patient to go and talk to the physician, then it wouldn't
25 be very effective, would it?

147

---

UNCERTIFIED REALTIME ROUGH DRAFT

1      A.  The whole point of the warning is to warn
2  people.  So if you do research and tinker with the
3  warning, you get a warning that's worded so vaguely that
4  it has absolutely no effect on their purpose to purchase
5  it.  So it defeats the purpose of the warning.
6          So what I'm saying is the direct to consumer ads
7  are supposed to have warnings and the warnings are
8  supposed to actually warn.
9      Q.  What's basically your opinion that direct to
10 consumer ads have to have warnings?
11     A.  Well, they have to have disclosed risks.  That's
12 what the FDA says.
13     Q.  First of all, do you have any information, any
14 indication that any of the direct to consumer ads that
15 were used by Merck with Vioxx were not in compliance with
16 the FDA guidelines?
17         MR. SRIKOS:  We did that one last time, whether
18 she is going to give opinions about what the FDA should
19 or should not put into an ad.  She is not giving opinions
20 on the FDA.
21         MR. O'CALLAHAN:  I would point out it's after
22 7:00.
23         MR. SRIKOS:  That's okay.  I want you to get the
24 full information.
25         MR. CAMPILLO:  Well, if I can go another five,

148

UNCERTIFIED REALTIME ROUGH DRAFT

1  ten minutes we can stop.  If I haven't gotten full
2  information I'll have to figure out what I can do about
3  that at some other point in time.
4        MR. BRANDI:  I just want you to know that there
5  is a timer underneath that that's going to eject you in
6  seven minutes.
7        MR. CAMPILLO:  I'm looking forward to that.
8        MR. BRANDI:  The record should reflect people
9  smiled and laughed but that there is no tension in the
10  room.
11        MR. CAMPILLO:  Absolutely.
12  Q.  I could have misheard you, Dr. Feenmann, but I
13  thought you said that one of your criticisms was that the
14  DTC ads that were tested by Merck were -- some of them
15  indicated to Merck that these ads would not cause the
16  patient to go and talk to the physician.
17  A.  No, that's not what I was saying.  What I was
18  saying is they tested different types of warnings in the
19  same ad.
20  Q.  By the way, which exhibit addresses these
21  particular ads?
22  A.  Exhibit 84.
23  Q.  Where the warnings are being tested.
24  A.  And 65.
25  Q.  All right.

149

UNCERTIFIED REALTIME ROUGH DRAFT

1  A.  And maybe 67.
2  Q.  I think you identified in your deposition 84,
3  65, 66, 67 and 68 as documents referencing this
4  specifically.
5  A.  Yes.
6  Q.  With regard to the warnings on DTC ads that were
7  being tested, do all of these address that or is it only
8  some of these?
9  A.  Well, let's see.  Sometimes it states it.  Okay.
10  So 67 and 64 and 65, according to this report, have
11  something about warnings in them.
12  Q.  All right.
13  And side effects.
14  Q.  Your opinion is that the DTC ads should have
15  included more information, more warnings about potential
16  CV risks, so you are critical Merck for not including
17  those additional warnings or additional information on
18  the DTC ads?  That's No. 1?
19  A.  Yes.
20  Q.  In addition to that you are critical of what
21  else?
22  A.  Of the fact that they compared -- they tested
23  different warnings looking for the wording that would not
24  affect people's behavior.
25  Q.  Okay.

150

UNCERTIFIED REALTIME ROUGH DRAFT

1  A.  Which seems to under cut the whole point of a
2  warning.
3  Q.  Which document indicates to you that Merck was
4  looking for warnings that would not affect people?
5  A.  Well, in document 64 --
6  Q.  Just pick one and let's see if we can find one
7  example of it, understanding there may be others.  I just
8  want to understand your point.  64?  Okay.  Do you want
9  to see 64?
10        (Document handed to the witness.)
11        THE WITNESS:  I'm not sure which document has
12  exactly what in it.  But 64 has information that I found
13  problematic, troubling.  On Page 14.
14  Q.  VIGOR assessment?
15  A.  Yes.  The last bullet point.  CV and other
16  aspirin fair balance.
17        So the one they tested is people who need to
18  take aspirin with Vioxx are at greater risk of developing
19  stomach ulcer.  Vioxx is not a substitute for the
20  prevention of heart attack.  Rarely heart attacks have
21  been reported.
22  Q.  Okay.  They tested that?
23  A.  Yes.
24  Q.  And what was the result of the test of that
25  particular message?

151

UNCERTIFIED REALTIME ROUGH DRAFT

1  A.  It didn't keep them from the product claim.  If
2  you look at the other research you understand what that
3  means.  That it means on the willingness to talk to the
4  doctor that was the criteria for that.
5  Q.  So this language that they tested did not drive
6  the patient to go and talk to the physician?
7  A.  That did not affect their willingness to go talk
8  to the physician about the drug, to basically ask about
9  whether they should take the drug.
10  Q.  And did they use this language in the DTC?
11  A.  No, they did not.  They used what might even be
12  considered weaker language.  Although we looked carefully
13  for it and they said they were going to do the research,
14  we were not able to get documents on the final label.
15  Q.  Do you know how they came up with the language
16  that was actually used in the final version of the DTC
17  ads?
18  A.  Based on this information, they did comparable
19  research.
20  Q.  But you have even seen that research or what led
21  them to select the particular language that was
22  ultimately used?
23  A.  Well, they state the criteria here for
24  selecting.
25  Q.  Okay.  What's the criteria?

152

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.   They say here do not keep from product claim.
2  But from a statistical standpoint what that meant is that
3  there was no change in your motivation to talk to the
4  doctor about getting the drug.  Because other graphs show
5  that.
6       And they said that if in fact adding the warning
7  reduced their likelihood to talk to the doctor, then they
8  would not continue to use product advertising.
9    Q.   Where do you see that?  Where is it saying that?
10   A.   "It's incorrect to reassess media options
11 reminder and help seeking advertising."  So what that
12 means is there is product advertising for which you have
13 to have a statement of the risks.
14      And then there is reminder in help seeking
15 advertising, both of which do not require that statement.
16 It's what's called the brief summary.
17   Q.   Okay.  What is the statement that you believe . . .
18 should have been given?
19   A.   Well, that's what I was trying to get amount I
20 would do research to see what statement accurately
21 conveyed the risk.
22   Q.   What is it --
23   A.   It would be something more explicit than what
24 they ended up using, which is -- oh, boy, I can't
25 remember exactly.  Something like heart attacks have been

                              153

UNCERTIFIED REALTIME ROUGH DRAFT

1  observed in some people taking Vioxx.  I mean, it doesn't
2  even -- just looking at the face value of that statement,
3  it doesn't state that there could be a cause
4  relationship.  It could mean old people take Vioxx and
5  also have heart attacks.
6       MR. CAMPILLO:  I think we better stop.  I mean,
7  I have more.  I probably can spend another two hours
8  going through this but I think under the circumstances
9  this is as good as we can do.  I will, you know, work
10 with counsel and see if we can do something.  If not, we
11 will take things up with the judge.
12      MR. SKIKOS:  The only speech I'm going to make
13 is that --
14      MR. CAMPILLO:  I didn't mean to suggest by that
15 that in anybody is acting inappropriately in any way.  I
16 think the witness has been cooperative.  Mr. Skikos, I
17 think you have been very cooperative as well to move this
18 along.  I didn't mean to suggest anything by my comment
19 other than I'm not true.  To prepare for trial I think I
20 need at least another two, three hours of deposition.
21      MR. SKIKOS:  All right.  My only speech is that
22 we did do a lot of work to try and make sure this was
23 efficient and that we've gone now.  I don't know, four
24 hours and 15 minutes, which is pretty good.  And that we
25 tried to make sure that the opinions are contained in the

                              154

UNCERTIFIED REALTIME ROUGH DRAFT

1  report or in the documents we provided you and we put
2  together a binder.  So hopefully this will be done.
3       MR. CAMPILLO:  First of all, for once I agree a
4  hundred percent with what you have said on the record.  I
5  have absolutely no qualifications or reservations about
6  that.  And I will look at everything that has been
7  produced, which is a lot of material, which obviously I
8  have not been able to read it.  And I will do that before
9  I make any further inquiry or effort to continue or take
10 a further deposition of the witness.  I'm not blaming you
11 or her for the predicament that I find myself in.
12      MR. BRANDI:  So we are absolutely clear, we
13 would oppose any further deposition.  Merck has deposed
14 her now for going on 13 hours.
15      MR. CAMPILLO:  I understand a hundred percent,
16 Mr. Brandi.  I didn't expect anything to the contrary.
17      MR. BRANDI:  And I think you inadvertently left
18 out my name and Mr. O'Callahan's name when you talked
19 about being cooperative.
20      MR. CAMPILLO:  No.  I meant what I said.
21      MR. BRANDI:  And Miss Pechmann's name as well.
22 She has been very cooperative.
23      MR. SKIKOS:  I have one more request.  If there
24 is something brought on Dr. Pechmann, please include me
25 on the notice.

                              155

UNCERTIFIED REALTIME ROUGH DRAFT

1       MR. CAMPILLO:  For deposition purposes.  I think
2  there is a motion being filed to prevent her for
3  testifying on Kelly Frye grounds but nothing to do with
4  her deposition time or commitment.
5       MR. O'CALLAHAN:  Speaking of time, do you have a
6  check for her?
7       MR. CAMPILLO:  I sure do.  And it was done at
8  $400 an hour.  Since we went over, I probably owe you
9  something.  That or that the deposition has been signed
10 actually thought three hours at $400 an hour based on --
11      THE REPORTER:  Do either Mr. Sizemore or Mr.
12 O'Callahan need a copy of the transcript?
13      MR. O'CALLAHAN:  Send me a copy.
14      MR. CAMPILLO:  Let me propose the stipulation
15 that the original transcript be sent directly to
16 Mr. Skikos and he will provide the witness' review of the
17 transcript as well as corrections and signature; that
18 Mr. Skikos thereafter will provide the original to my
19 office and will give notice to all counsel of any changes
20 and the fact that the deposition has been signed and
21 corrected; that the reporter is relieved of her statutory
22 obligations concerning the original once she has sent the
23 original off to Mr. Skikos; that the deposition can be
24 signed under penalty of perjury without the necessity of
25 a notary and that if the original is lost after it has

                              156

UNCERTIFIED REALTIME ROUGH DRAFT

1    been sign, that any certified copy can be us used.

2            MR. SHIROS:  I agree.  The one question I have

3    is the trial starts in a week, so you are probably going

4    to want any corrections/revisions before that, I would

5    guess.  But I need to know when we are going to get the

6    transcript.

7            MR. CAMPILLO:  We are requesting it to be

8    expedited.  I'm not sure what that means exactly, but we

9    will get it to you as soon as possible.  I think given

10   the circumstances you just do your best to get it signed

11   and returned at least before the witness takes the

12   witness stand.

13           MR. SHIROS:  Yes, I will agree to that.

14

15           (TIME NOTED:  7:22 P.M.)

16

17

18

19

20

21

22

23

24

25

137



# Plaintiffs'
# Response re
# PECHMANN

# Exhibit 3 of 4

Information About Pechmann Deposition "Exhibit 5"

ABSTRACT:

Pechmann deposition "Exhibit 5" contains a subset of the information provided in
Pechmann's Expert Report plus some additional details on the 6 marketing research studies.

NOTE: Bolded text below was copied verbatim from Pechmann's Expert Report

**A. Pechmann Deposition "Exhibit 5" Pages 1-3 Regarding "Copy Testing of Detail Pieces with
MDs" Contains a Subset of the Information Provided in Pechmann's Expert Report Plus Some
Additional Details.**

1) Pechmann Deposition "Exhibit 5" Page 1 describes the methodology used in these types of
Copy Testing Studies with MDs, from Exhibit 59.

    a) Research Objectives (Expert Report Exhibit 59, p.2): **"For the two new detail pieces
for VIOXX® for use in the 1st quarter of 2003:**

    --- **Assess physicians' reactions to the messages in the pieces**

    — **Determine the main message communication and flow in each detail aid and the
extend to which it is believable and compelling**

    — **Quantitatively evaluate the complementary role, if any, of the two detail pieces"**

    b) Methodology (Expert Report Exhibit 59, p.3): **"31 in-depth interviews (IDI's) ~ 45
minutes each, conducted in**

    — **Rockville, MD on November 21st and 22nd, 2002 &**

    — **Scottsdale, AZ on November 25th and 26th, 2002**

    **The research was conducted by Thomas A. Hinkel, TRIAD Research and Consulting,**

**Inc. Generally:**

**Detail piece for Group A focuses on the safety of VIOXX® in the elderly.**



1

Detail piece for Group B focuses on efficacy and GI superiority.

All physicians were exposed to both detail ads with the order rotated to avoid position bias."

c) This methodology was briefly described in Pechmann's Expert Report, page 59.

**Merck also tested the two promotional (detail) pieces used with physicians during the first quarter of 2003. The front cover of these pieces showed an older woman and an older man with arms raised in a V. (See Exhibit 28 and Exhibit 29.) A research firm conducted 31 in-depth interviews with physicians in Maryland and Arizona in November 2002. A standard research method was employed. The findings were summarized in a report entitled "Market Research Findings. VIOXX© 1S03 Detail Piece Assessment." (Exhibit 59, page 1.)**

2) Pechmann Deposition "Exhibit 5" Page 1 describes MDs that participated in this particular Copy Testing Study, from Exhibit 59.

a) Research Participants (Expert Report Exhibit 59, p. 4-6):

"Physicians interviewed perceived VIOXX® as an effective agent …

— but also a little less safe (causing hypertension and edema) than other Coxibs. Therefore:

— many physicians tend to prescribe it mainly for short-term treatment of acute pain …

These physicians also report that these safety concerns also limits their use in elderly patients who often have cardiovascular problems." (page 3)

"Physicians interviewed perceive Celebrex as an effective anti-inflammatory agent that

— has not been as associated with safety issues to the same extent as VIOXX®"

… (page 4)

"Physicians interviewed perceive Bextra as being more similar to Celebrex than to VIOXX®" … (page 5)

"General points:

Most pointed to being confused about CV risk, but mostly around the bad press and the patient perception of the issue. Even physicians, who initially mentioned being concerned about the CV profile, when asked directly if they thought any COXIB was safer than the other, said no." ... (page 5)

b) These research participants were briefly described in Pechmann's Expert Report, p. 59. **The physicians who were interviewed perceived VIOXX as "a little less safe (causing hypertension and edema) than other Coxibs." However, "Most pointed to being confused about CV [cardiovascular] risk, but mostly around the bad press and the patient perception of the issue."** (Exhibit 59, pages 2, 4 and 6.)

3) Pechmann Deposition "Exhibit 5" Pages 2-3 summarize the results of the Copy Testing Studies with MDs, from Exhibit 59. These results are also summarized in Pechmann's Expert Report, pages 59-60, as shown below. Note that Piece A was about safety in the elderly whereas Piece B discussed Merck's Efficacy Confidence Program for Vioxx. **When shown the detail piece with the older woman (piece A) that emphasized Vioxx's safety profile in elderly patients, physicians "responded positively" and stated that they "like that it focuses on the use of VIOXX in the elderly – a population avoided due to safety issues." However, "some physicians would like the company to address the CV safety issue."** (Exhibit 59, pages 7, 11.)[1] **The research also assessed physicians' reactions to the cardiovascular information that appeared in the detail piece with the older man (piece B). The research found: "Physicians do not know how to interpret the information regarding the CV data – to some, it appears to contain conflicting results. Some said that they would have to see more information, some said they have never**

---

[1] "Exhibit 5" also cites Expert Report Exhibit 59, page 8 indicating that "most physicians received this [elderly data] very well, and felt it was important." Further, "Exhibit 5" cites Expert Report Exhibit 59, page 10 indicating that "some physicians want to know how the prescribing of VIOXX has changed since CV safety has come to light."

believed VIOXX has CV [cardiovascular] issues, and yet cannot, and will not, fight
patients who might ask for another COXIB by name. Only one physician (in Scottsdale)
said that he proactively warns he [his] patients, and rarely starts any patients on
Vioxx." The market research report noted that "information perceived missing from
this detail" included a "better explanation of CV mortality data." (Exhibit 59, pages 16-
17.)

4) Pechmann Deposition "Exhibit 5" Page 3 also refers to Exhibit 41. Exhibit 41 describes the
   results of another Copy Testing Study of MDs. Those results are summarized Pechmann's
   Expert Report, page 50, as shown below.

   In a 2002 presentation, Cannell stated that "Market Research" showed that "Physicians
   thought the Efficacy Guarantee Program conveyed Merck's confidence in Vioxx©" and
   that "... on average, physicians qualitatively estimated Vioxx© might receive an
   additional 10-15 prescriptions out of 100 prescriptions for Cox-2 inhibitors." (See
   Exhibit 41, page 71.)

5) Pechmann Deposition "Exhibit 5" Pages 1-3 and similar information in Pechmann's Expert
   Report substantiate Pechmann's opinion as stated on page 53 of the Expert Report that:
   Merck's marketing executives purchased extensive marketing research to ensure that
   their misleading integrated marketing communications campaign for Vioxx was
   effective at neutralizing physicians' concerns that Vioxx posed a potential
   cardiovascular risk.


B. Pechmann Deposition "Exhibit 5" Pages 4-5 Regarding "MD Tracking: MD Promotional
Message Recall" Contains a Subset of the Information Provided in Pechmann's Expert Report
Plus Some Additional Details.

1) Pechmann Deposition "Exhibit 5" page 4 describes the methodology used for "MD Tracking: MD Promotional Message Recall" from "2002 Target Rx and dtw Proposals" (See MRK-AJT0060750-62).[2]

a) Research Objectives (See MRK-AJT0060750-62). Note that Merck used dtw Marketing Research Group from May to Dec. 2001, and then switched to Impact Rx (TargetRx).

— Dtw. "The objectives of this message monitoring research are as follows:

- To determine what top messages physicians recall, on an unaided basis, from the in-person sales promotions (details) for selected C2SI [Cox-2 Selective Inhibitor] products;

- To examine what features and benefits are being promoted by sales professionals (aided recall);

- To understand what specific patient types sales professionals are discussing (unaided recall) and what specific patients the physicians believe are most appropriate for the selected products (unaided);

- To learn the specific details around what product comparisons, if any, are being made (unaided);

- To compare the rate of closing the sales call as well as the wording used in making the close;

- To ascertain the impact of the detail on physicians' perceptions and predicted future prescribing behavior for each product;

- To gain a better understanding of what physicians find to be the most important advantages and disadvantages of each of the products." (page 10)

— Impact Rx. "The TargetRx Detail Audit[SM] will assist the Vioxx team to:

---

[2] The Bates-stamped documents cited in this document were not included in Pechmann's Expert Report but were contained in the boxes of materials that were provided after Pechmann's deposition, day 1.

- Track key messages delivered by the pharmaceutical sales force for Vioxx and its key competitors

- Assess and compare message delivery and impact, type and length of call, product sequence, use of detail piece/support materials, and aggressiveness of close" (page 3).

b) Methodology (See MRK-AJT0060750-62). Note that Merck used dtw Marketing Research Group from May to Dec. 2001, and then switched to Impact Rx (TargetRx).

— Dtw. "Merck will provide a list of the 2002 physician target universe to use. We will use the list to select the sample of physicians from our COM.DAT panel who will participate in the study.... The monthly target mix of sample physicians is as follows:

- Primary Care Physicians, including Internal Medicine (75%)

- Rheumatologists (10%)

- Orthopedic Surgeons (15%)" (page 11)

"Merck Market Research desires to track the following products:

- Product Celebrex (Pfizer/Pharmacia) Target Details/Month 120

- Product Vioxx (Merck) Target Details/Month 120

- Product Bextra (Pfizer/Pharmacia) Target Details/Month 120 ..." (page 11)

"Based on the above research protocols and deliverables, our estimated cost for this project is $596,800.00 +/- 10% and is based upon a target of 4800 reported details gathered over the course of 2002 resulting in a cost per reported detail of $124.33." (page 11)

— Impact Rx. "The TargetRx Detail Audit[SM] for the Chronic Pain market is a monthly tracking study with 480 physician responses in the Chronic Pain market per month. Each physician response is a self-administered on-line questionnaire. The audit can include additional custom questions or products based upon the specific needs of Merck" (page 3). "High prescribing physicians within the Chronic Pain market will

6

be randomly contacted, retrospectively, e.g., 'have you interacted with a representative on the following product(s) in the past 7 days?" (page 4). "The standard deliverables in the TargetRx Detail Audit meets or exceeds many of the objectives in the RFP sent from Merck. These include:

- Tracking of physician recall of the detail for:
  - Top message recall on an unaided basis from the in-person sales call
  - Frequency of competitive comparisons made by representatives
  - Comparisons of rate of closing." (page 3)

"Annual subscription, 2002 – 12 monthly reports by specialty (PCP and Rheum) for Vioxx, Celebrex, valdecoxib … for a total of 480 physician responses per month (5,760 responses per year). Two semi-annual reports by region. 2002 Cost: $266,000." (page 4)

c) This methodology was briefly described in Pechmann's Expert Report, pages 53-54.
**Merck purchased monthly marketing research reports that "tracked" physicians' recall of the messages the Vioxx sales representatives were communicating to them, physicians' beliefs about Vioxx and its competitors, and physicians' prescribing behavior. In 2001, Merck purchased these reports from a company called "dtw Marketing Research Group." In 2002, Merck purchased these reports from a company called "Impact Rx."**

2) Pechmann Deposition "Exhibit 5" Pages 4-5 summarize the results regarding "MD Tracking: MD Promotional Message Recall." These results are also summarized in Pechmann's Expert Report, pages 54-59, as shown below.

— **Pechmann Expert Report Page 57.** A Merck report entitled **"VIOXX Monthly EAR November 2001"** contained results from the dtw tracking study of physicians, for the time period from September through December 2001, regarding how physicians responded to the question: "Which of the product features listed below were discussed by the sales representative?" From 20% - 33% of the participating

physicians responded that Vioxx sales representatives had discussed whether Vioxx "Is safe to use in the elderly," and 18% to 47% of the participating physicians responded that they had discussed that Vioxx "Does not increase the risk of myocardial infarction [heart attack] or stroke." (Exhibit 56, page 17.)[3]

— Pechmann Expert Report Pages 58-59. Yet another Merck report entitled "April 2003 EAR Core Meeting Vioxx" showed that Vioxx continued to do well in 2003, and that the marketing messages for Vioxx remained unchanged ... The report ... stated "Efficacy, Safety, and Tolerability continue to be the top Vioxx messages recalled by PCPs [primary care physicians]." A chart showed that, from May 2002 to May 2003, 34% to 47% of the primary care physicians interviewed recalled that a Vioxx sales representative told them Vioxx was "Safe in the Elderly." (Exhibit 58, page 29.)

— Pechmann Expert Report Pages 54-56: A document entitled "Promotion Message Recall Data" contains data from dtw Marketing Research Group for the period of September to October 2001. The document shows how each member of a physician panel responded to the following written survey question: "What did the sales representative tell you about the product" with the product being Vioxx. (A physician panel is a group of representative physicians who agree to participate in marketing research surveys on a regular basis, in exchange for being paid.) About 166 physicians wrote down what they recalled the Merck sales representatives saying about Vioxx. The findings indicate as follows:

    i)   About 20% or 1 in 5 physicians recalled that the Merck sales representatives stated that Vioxx did not cause heart attacks or other cardiovascular problems.

---

[3] "Exhibit 5" cites similar results from Expert Report Exhibit 48, p. 19. Those results indicate that in June 2001, 25.5% of MDs reported that the Vioxx sales reps said that Vioxx "does not increase the risk of myocardial infarction or stroke."

- "Safe and effective and not associated with cardiac deaths." (Exhibit 55, page 4.)
- "Safe from a cardiovascular standpoint." (Exhibit 55, page 5.)
- "More effective than codeine. Much less edema and HTN [hypertension] than thought or purported by competitors. Does not cause heart disease." (Exhibit 55, page 6.)
- "There is no cardiovascular risk from using Vioxx." (Exhibit 55, page 10.)
- "Safe and not a cardiovascular danger and in the 50 mg [dose] as effective as percocet for pain control." (Exhibit 55, page 11.)

ii) A substantial number of physicians recalled that Merck sales representatives criticized studies concerning Vioxx and cardiovascular risk, stating the studies were weak, or merely showed either that Vioxx wasn't cardioprotective, or naproxen (Aleve) was cardioprotective.

- "The study showing cardiac problems with Vioxx was not well done. Safe for pts [patients]. Good pain relief." (Exhibit 55, page 5.)
- "Very successful drug, safe, effective and does not contribute to heart disease as some recent articles suggested." (Exhibit 55, page 6.)
- "It does not increase the risk for heart attacks. He discussed the study used to make this deduction. Was a study comparing Naprosyn to Vioxx. It was intended to look at GI [gastro-intestinal] effects, therefore all patients taking preventive aspirin were excluded. Since Naprosyn has some platelet inhibiting activity, naturally one would expect a lower incidence of MIs [heart attacks] in this group ..." (Exhibit 55, page 7.)

9

- "Showed safety data that heart risk was mostly increased in patients who stopped their aspirin while taking Vioxx. ... So there has not yet been any study showing increase risk of stroke or heart disease with Vioxx if people continue to use their usual meds ..." (Exhibit 55, page 10.)

- "... talked about the recent published study which seemed to imply that Vioxx caused heart attacks. He said that the study was worthless, that what it really showed [was] that Vioxx does not have any anti-platelet effect. That patients taking Vioxx who are at high risk for heart attacks and strokes should take a baby aspirin every day." (Exhibit 55, page 10.)

iii) A substantial number of physicians recalled that Merck sales representatives characterized concerns about Vioxx and cardiovascular risk as "media hype."

- "Despite all the negative publicity about Vioxx it is a safe and effective medication." (Exhibit 55, page 4.)

- "That Merck felt that the recent press about Vioxx was inaccurate. Vioxx is not cardioprotective but it does not cause heart attacks." (Exhibit 55, page 5.)

- "No cardiac detriment – Bad reporting by press. It's just that it doesn't prevent [heart attacks] since there is no platelet action...." (Exhibit 55, page 6.)

- "Stroke issue is not new and is being blown out of proportion." (Exhibit 55, page 6.)

- "Safe despite media hype regarding cardiovascular morbidity/mortality." (Exhibit 55, page 7.)

iv) Only one physician recalled being told by a Merck sales representative that Vioxx might cause heart attacks, that "It did increase the risk of heart disease or heart attacks." (Exhibit 55, page 11.) Several physicians recalled talking to Merck sales representatives about Vioxx and cardiovascular risk but did not state that they were warned that Vioxx might cause heart attacks or strokes. Some mentioned that studies were ongoing, e.g., "Ongoing studies about stroke and Vioxx." (Exhibit 55, page 4.)

3) Pechmann Deposition "Exhibit 5" Pages 4-5 and similar information in Pechmann's Expert Report substantiate Pechmann's opinion as stated on page 53 of the Expert Report that: Merck's marketing executives purchased extensive marketing research to ensure that their misleading integrated marketing communications campaign for Vioxx was effective at neutralizing physicians' concerns that Vioxx posed a potential cardiovascular risk.

C.  Pechmann Deposition "Exhibit 5" Pages 6-7 Regarding "Behavioral or Prescription Tracking" Contains a Subset of the Information Provided in Pechmann's Expert Report Plus Some Additional Details.

1)  Pechmann Deposition "Exhibit 5" Page 6 describes the methodology used for "Behavioral or Prescription Tracking" and states as follows:  Method. Pharmacies sell prescription info to IMS and other providers who resell it to companies like Merck. (page 6)[4]

---

[4] See "Turning Medicine Into Snake Oil" pages 19 and A4 (in the materials copied after Pechmann deposition day 1) for a brief discussion of how pharmaceutical firms buy data on doctor's prescribing habits from pharmacies and use these data for marketing purposes.

2) <u>Pechmann Deposition "Exhibit 5" Pages 6-7 summarize the results of the "Behavioral or Prescription Tracking." These results are also summarized in Pechmann's Expert Report, as shown below.</u>

&mdash; **<u>Pechmann Expert Report, Page 57.</u> A Merck report entitled "VIOXX Monthly EAR <u>[early assessment and response]</u> November 2001" indicated that Merck had neutralized the physicians' concerns about Vioxx that had been raised by the August 2001 Journal of the American Medical Association article on COX-2's potential cardiovascular risk. A chart showed that Vioxx's share of new prescriptions in the analgesic and anti-inflammatory market had declined from 17.3% in July 2001 to 15% in September 2001. However, by November 2001, Vioxx's share had risen to 15.5% and showed a strong positive trajectory.  <u>(Exhibit 56, page 8.)</u>**

&mdash; **<u>Pechmann Expert Report, Page 51:</u>  By offering this "Efficacy Guarantee" program for Vioxx, and offering consumers complete satisfaction or their money back, Merck succeeded in bolstering physicians' confidence in Vioxx's safety profile including its cardiovascular safety profile. The program's effects on physicians' beliefs about Vioxx and their prescribing behavior are summarized in Exhibit 44, the "VIOXX© Monthly EAR" dated October 8, 2002.  Slide 3 on page 2 states "Issue #1: VIOXX© Market Share Performance, Promotion, and Attitudes" and states "The rate of decline of NRx [new prescriptions] for VIOXX has slowed recently." It also states that "Recall of Efficacy Confidence increased to levels near those of the core messages for VIOXX within one week of launch, without impacting recall of the core messages." <u>(See Exhibit 47, page 2.)</u>**

&mdash; **<u>Pechmann Expert Report, Page 53.</u> A Merck report entitled "Operations Review for VIOXX January 31, 2003" showed that ... "2002 Promotional Campaigns for VIOXX lead to NRx [new prescription] volume rebounds" and the 2002 campaigns**

are listed as: "Efficacy Confidence," "Divide and Conquer," and "Project Jump Start." Another graph shows "VIOXX has narrowed the NRx share gap with Celebrex." (Exhibit 54, pages 31 and 45.) The report also indicates that the consumer promotions for Vioxx were working well: "Consumer requests drive brand choice: Consumers are generally knowledgeable, willing to ask for a brand by name, and highly influential in physicians' brand choice. Brand awareness of 85% among targets. Physicians honor 90% of requests for VIOXX. Net action is 27%." (Exhibit 54, page 57.) The report also notes that: "VIOXX Controllable Income exceeded the original Profit Plan by 11%," and shows that Vioxx's controllable income in 2002 was $1,494 million (i.e., nearly $1.5 billion). (Exhibit 54, page 27.)

— Pechmann Expert Report, Page 58. Yet another Merck report entitled "April 2003 EAR Core Meeting Vioxx" showed that Vioxx continued to do well in 2003 ... Specifically, the report stated that Vioxx's share of total coxib prescriptions "was 37.6% in April 2003, beating plan of 36.6%." (Exhibit 58, page 7.)

3) Pechmann Deposition "Exhibit 5" Pages 6-7 includes some "Behavioral or Prescription Tracking" results that were not contained in Pechmann's Expert Report, but were from the same Expert Report Exhibits and the results were similar. These results are discussed below.

— Expert Report Exhibit 56, page 4, states: "Overall Coxib class continues to recover from the negative impact of NY Times/JAMA articles.

  - NRx [new prescription] and TRx [total prescription] shares of Coxib class continue to increase in November
  - Brand-level shares have flattened after early separation favoring Celebrex"

— Expert Report Exhibit 56, page 7, states: "NRx share for Coxib Class has been slowly climbing since September 2001." [to 31.7%]

— Expert Report Exhibit 54, page 29, states: "Current Performance. Coxib class penetration rebounded, and reached a new peak in December 2002." Note that this graph shows that Cox 2's (Vioxx and Celebrex) share of total prescriptions declined immediately after the 8/22/01 JAMA article but then rebounded, reaching a new peak of 48.5% in Dec. 2002.

— Expert Report Exhibit 54, page 30, states: "Current Performance. TRx share for VIOXX has stabilized, following label change and increased promotional resources." Note that this graph shows that Vioxx's share of total prescriptions within the Coxib class declined immediately after the 8/22/01 JAMA article, and declined even more after the 4/11/02 Vioxx label change that added the VIGOR study to the Vioxx label. But then Vioxx's share gradually rebounded through 1/3/03, to 38.6%. The rebound is attributed to "Increased Resources (DTC, details) Efficacy Confidence Program 8/12/02."

— Expert Report Exhibit 54, page 31, states: "VIOXX has narrowed the NRx share gap with Celebrex." Note that this graph shows that Vioxx's share of new prescriptions within the Coxib class declined immediately after the 8/22/01 JAMA article, and declined even more after the 4/11/02 Vioxx label change that added the VIGOR study to the Vioxx label. But then Vioxx's share gradually rebounded through 1/3/03, to 39.3%. The rebound is attributed to "Increased Resources (DTC, details) Efficacy Confidence Program 8/12/02."

4) Pechmann Deposition "Exhibit 5" Pages 6-7 and similar information in Pechmann's Expert Report substantiate Pechmann's opinion as stated on page 53 of the Expert Report that: **Merck's marketing executives purchased extensive marketing research to ensure that their misleading integrated marketing communications campaign for Vioxx was effective at neutralizing physicians' concerns that Vioxx posed a potential cardiovascular risk.**

14

**D. Pechmann Deposition "Exhibit 5" Pages 8-11 Regarding "MD Attribute Tracking" Contains a Subset of the Information Provided in Pechmann's Expert Report Plus Some Additional Details.**

1) Pechmann Deposition "Exhibit 5" page 8 describes the methodology used for "MD Attribute Tracking" from a document labeled "A&A Attribute Tracker MDs" (MRK-AKP0038549).

a) Research Objectives (See MRK-AKP0038549, page 3).

   ❖ "What are the patterns of use for various patient types?

   ❖ Which attributes drive prescribing of coxibs?

   ❖ What is the impact of non-GI safety issues on physician's Rx?

   ❖ Which attributes are of less importance in the decision process?

   ❖ What are the strengths and weaknesses of each brand?

   ❖ How does Vioxx stack up?

      ❖ Are the non-GI [gastrointestinal] safety issues for Vioxx a problem?

      ❖ If so, does Vioxx's strength in GI make up for that problem?"

b) Methodology and Participants (See MRK-AKP0038549, page 8).

   ❖ "Method: Changed from phone-fax to internet (WebSurveyMD, Ziment's Internet Panel) in January/February, 2002.

   ❖ Timing: Interviews occurring every month of the year, with a longer 'trimesterly interview' occurring in March, August and November.

   ❖ Sample: Random sample taken from Merck's list of targeted physicians.

   ❖ Quota: 315 Physicians interviewed per month, (mix of PCPs, Rheums, Orthopedic Surgeons)"

c) The methodology was also described in Pechmann's Expert Report, Pages 47-48.

**For at least two years beginning in early 2002, Merck purchased monthly marketing research reports called "A&A [analgesic and anti-inflammatory pain reliever] Attribute Tracker" from a company called Ziment. Ziment created these reports by paying a panel (group) of representative physicians to rate the attributes of different pain**

15

relievers (Vioxx, Celebrex, etc.) on numerical scales, and to record the number of
prescriptions that they wrote for each brand. For instance, physicians were asked:
"How well does 'safe to use in elderly' describe Vioxx, 1=Does Not Describe At All,
10=Describes Very Well." (See Exhibit 47 entitled VIOXX© Monthly EAR [early
assessment and response], August 2002, Michael Stanton, dated October 8, 2002, page
6.) Every six months, a "derived importance analysis" was conducted to determine
which attributes were "really important in the Rx [prescription] decision-making
process without directly asking for [attribute] importance ratings." (See Exhibit 48
entitled "A New Paradigm for Understanding Physician Behavior Christopher Posner,"
page 6.)

2)  Pechmann Deposition "Exhibit 5" Pages 9-11 summarize the results of the MD Attribute
   Tracking Study, focusing particular attention on how the results were used to monitor the
   effects of the "Efficacy Guarantee" promotional program for Vioxx and other related
   programs. These results are also summarized in Pechmann's Expert Report, as shown below.

   —– **Pechmann Expert Report Pages 56-57.** A Merck analysis entitled "Awareness,
       Action & Attributes for the A & A Franchise" shows that Merck had succeeded in
       neutralizing the physicians' concerns about Vioxx's potential cardiovascular risk
       that had been raised by the May 2001 New York Times article on the VIGOR study.
       The document states: 'Some safety and efficacy attributes registered a significant
       change in the period surrounding the NY Times article 5/22/01. Nearly all attributes
       for Vioxx dropped between June and July of 2001, but have recovered since then."
       (See Exhibit 31a, page 27.)

   — **Pechmann Expert Report Pages 57-58.** A Merck report entitled "VIOXX Monthly
       EAR November 2001" contained results from the dtw tracking study of physicians,
       for the time period from September through December 2001… The report also
       showed a corresponding increase in physicians' "Mean rating for VIOXX© on

'Does not increase the risk of MI [heart attack]/stroke' attribute increased versus
Celebrex among High coxib [Vioxx-prone] Physicians." (Exhibit 56, page 24.) From
August to November 2001, when physicians were asked how well the statement
"Does not increase the risk of MI or stroke" described Vioxx, the mean response
was 6.7 on a 10 point scale where 10=describes very well and 0=does not describe at
all. Although Naproxen received a higher 7.7 rating, Vioxx's 6.75 rating was still
favorable because it was well above the midpoint of 5. (Exhibit 56, page 38.)

— Pechmann Expert Report Pages 48-49. The research showed that, by about 2001,
physicians began to differentiate between Vioxx and Celebrex on non-
gastrointestinal safety issues such as cardiovascular risk and safety in the elderly.
~~Merck executive Posner explained the research findings as follows: "A Derived~~
Importance analysis in 2001 suggested that non-GI [gastrointestinal] safety was
becoming a key [brand] differentiator" and that "High Coxib/Celebrex physicians
place a premium on non-GI safety in choosing between Vioxx© and Celebrex." The
results were similar in 2002: "From the derived importance 2002 analysis, it
appears some physicians do feel stronger in the 'non-GI safety' advantage for
Celebrex and this does impact their preferences." In 2002, the attributes that were
important to physicians' prescribing decisions in order of their derived importance
were: "Does not cause edema (9.9/10)," "Does not cause significant increases in
blood pressure (9.1)," "Does not increase the risk of myocardial infarction [heart
attack] or stroke (7.0)" and "Is safe to use in the elderly (3.7)." Overall, the research
"suggests Celebrex would be used preferentially in select 'at-risk' populations," that
it was "likely this preferential use of Celebrex would be a subset of chronic
[patients] presenting a more meaningful revenue downside" and so "the most
important attributes that must be defended are non-GI safety attributes." The

"Possible Implication" was to "Prevent movement off-center on non-GI safety." (See Exhibit 48, pages 8-12.)

— Pechmann Expert Report Pages 49, 51-52. "In August 2002, Merck's marketing executives introduced a marketing program called "Efficacy Guarantee" that was designed to bolster physicians' and consumers' confidence in Vioxx. The program guaranteed patients their money back if they were not completely satisfied with Vioxx and was targeted primarily at physicians, but also at consumers. (See Exhibit 49, Merck's April 31, 2002 memo on the "Efficacy Guarantee" program.)  " ... the "Efficacy Guarantee" program had an immediate and discernible impact in terms of bolstering physicians' beliefs about the cardiovascular safety of Vioxx, and persuading physicians to prescribe more Vioxx." (See Exhibit 47.)

    i.   "In August, more physicians rated VIOXX and Celebrex equally in the MI [heart attack]/Stroke attribute, which could have contributed to the narrowing of the NRx [new prescription] share gap between VIOXX and Celebrex." (Exhibit 47, Slide 15, page 8.)

    ii.   "In August, significant changes were seen in the percentage of physicians that rated VIOXX© and Bextra the same in the [Safe for the] Elderly and MI/Stroke attributes." (Exhibit 47, Slide 16, page 8.)

    iii.   "In August, the mean rating for VIOXX on the Safe for the Elderly attribute stabilized and the gap between VIOXX and Celebrex/Bextra narrowed." (Exhibit 47, Slide 17, page 9.)

    iv.   "The mean rating for VIOXX on the Blood Pressure attribute increased [improved] in August, and the gap between VIOXX and Celebrex, Bextra, and Naproxen narrowed." (Exhibit 47, Slide 18, page 9.)

18

v. "Ratings on the edema attribute declined less for VIOXX© than for the other tracked products in August." <u>(Exhibit 47, Slide 19, page 10.)</u>

vi. "In August, New to Market Chronic patients increased for VIOXX© BY 0.5%, while NTM [new to market] patients decreased for Celebrex by 3.5% and increased for Bextra by 8.8%." <u>(Exhibit 47, Slide 39, page 20.)</u>

vii. "More chronic patients switching to Bextra came from Celebrex than from VIOXX© in August 2002." <u>(Exhibit 47, Slide 43, page 22.)</u>

— <u>Pechmann Expert Report Page 58.</u> A Merck document entitled "Project 'Power Play'" indicates that physicians continued to give Vioxx a favorable rating on cardiovascular safety in 2003. In January 2003, when physicians were asked how well the statement "No increased risk of MI [heart attack]/stroke" described Vioxx, the mean response was 6.5 rating on a 10 point scale, where 10=describes very well and 0=does not describe at all. Although Naproxen received a higher 7.9 rating, Vioxx's 6.5 rating was still favorable because it was well above the midpoint of 5. On the attribute of "Safe for Elderly" Vioxx received a rating of 7.0, which was much better than Naproxen's 4.9 rating. <u>(Exhibit 57, pages 7.)</u>

— <u>Pechmann Deposition "Exhibit 5" page 11 included similar results from a document entitled the 'Specialty Review for VIOXX, December 8, 2003 as shown below (MRK-ADO0194820).</u> "Performance [Vioxx] TRx [total prescription] volume trending on plan" (page 48). "Does Not Increase the Risk of MI [heart attack] or Stroke - Total Respondents" (page 49). A graph on page 49 indicated that Vioxx's rating on the "does not cause heart attack/stroke" attribute ranged from about 6.5 to 7.0 on a 10 point scale from Jan. 02 through Sept. 03, with 10 being the most favorable.