U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

FILED  11-07-06
LORETTA G. WHYTE
CLERK

| |
|---|
| **In Re: Vioxx** |
| **PRODUCTS LIABILITY LITIGATION** |
| |
| THIS DOCUMENT RELATES TO: |
| Case No. 2:06cv810 |
| |
| CHARLES LARON MASON v. |
| MERCK & CO., INC. |

**MDL DOCKET NO. 1657**

Section L

Judge Fallon
Mag. Judge Knowles

# TRANSCRIPT OF THE DEPOSITION OF GREGORY CURFMAN, M.D. PLAYED TO JURY ON NOVEMBER 3 and 6, 2006

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

Case Clip(s) Detailed Report
Saturday, October 28, 2006, 6:16:34 PM

## Mason v. Merck

 **Curfman, Gregory D. (Vol. 01) - 11/21/2005**          1 CLIP  (RUNNING 01:14:13.259)

 curfman trial

CURFMAN 1                    74 SEGMENTS  (RUNNING 01:14:13.259)          

**1. PAGE 12:13 TO 12:14  (RUNNING 00:00:03.269)**

```
13      Q.  Good morning, Dr. Curfman.
14      A.  Good morning.
```

**2. PAGE 13:11 TO 13:19  (RUNNING 00:00:23.608)**

```
11      Q.  And what is your current employment, sir?
12      A.  I am the executive editor of The New
13 England Journal of Medicine.
14      Q.  How long have you held that position?
15      A.  Since July of 2000.
16      Q.  Did you have prior positions at New England
17 Journal?
18      A.  For the previous 14 years I was a deputy
19 editor at The New England Journal.
```

**3. PAGE 13:20 TO 14:18  (RUNNING 00:01:21.000)**

```
20      Q.  What is the role of a deputy editor?
21      A.  Deputy editor is an in-house editor who is
22 involved in editing manuscripts, reviewing
23 manuscripts, medical data, and moving those
24 manuscripts to publication in The New England
00014:01 Journal.
02          Deputy editor also is involved in
03 soliciting editorial articles to comment on the
04 original scientific work and to -- is involved in
05 bringing articles into The Journal.
06      Q.  What is the difference between the role of
07 deputy editor and executive editor?
08      A.  The executive editor has administrative
09 responsibilities that a deputy editor does not.
10 The executive editor reports directly to the
11 editor-in-chief and serves in the capacity of
12 filling in for the editor-in-chief when he is
13 traveling or otherwise unavailable.
14          Executive editor is in charge of the
15 editorial office, of the day-to-day operations of
16 the editorial office, and is involved in setting
17 editorial policy, editorial directions for The
18 Journal.
```

**4. PAGE 20:22 TO 22:01  (RUNNING 00:01:38.643)**

```
22          Is it -- how would you characterize the
23 role you had in the review process concerning the
24 VIGOR study in the year 2000?
00021:01      A.  Well, each manuscript that is submitted to
02 The Journal is assigned to an editor, an associate
03 editor, who's job it is to handle that article
04 through the review process.
05          In addition, that associate editor is
06 teamed with a deputy editor.  So there are two
07 editors who work in tandem to handle the article
08 through the review process.
09          I was not either the associate editor
10 nor the deputy editor on the VIGOR article.
```

Case Clip(s) Detailed Report
Saturday, October 28, 2006, 6:16:34 PM

## Mason v. Merck

```
11              During the time that the VIGOR
12  manuscript was being handled in our office, between
13  May and July, I was still a deputy editor.
14              In July, I became the executive editor.
15  So it was during the time that the VIGOR article
16  was being reviewed that I had a change in my
17  position.
18              I did, however, attend all of the
19  editorial meetings where the VIGOR article was
20  discussed.  I was a part of those discussions.
21              I had the opportunity to express
22  opinions about the manuscript and the data, and so
23  I was a part of the process in that sense, but I
24  was not the primary editor who was responsible for
00022:01  taking that article through the process.
```

**5. PAGE 23:02 TO 24:12  (RUNNING 00:02:00.000)**

```
02      Q.  Dr. Curfman, marked as Exhibit 2 is a
03  document bearing the heading of "The New England
```

📄 **CURFMAN2 - curfman2**                            

```
04  Journal of Medicine," entitled "Information For
05  Authors," dated January 6, 2000.
06              Are you familiar with this document?
07      A.  Yes, I am.
08      Q.  Does this document express the policy of
09  The New England Journal of Medicine as of the year
10  2000?
11      A.  Yes, that's correct, in terms of the
```

📄 **CURFMAN2A - curfman2a**                           

```
12  submission of manuscripts.
13      Q.  Directing your attention to the second full
14  paragraph on the left-hand side under the heading
15  "Manuscripts," there is a statement, "A covering
16  letter signed by all authors should identify the
17  person, with the address and telephone number,
18  responsible for negotiations concerning the
19  manuscript.  The letter should make it clear that
20  the final manuscript has been seen and approved by
21  all authors and that they have taken due care to
22  ensure the integrity of the work ."
23              Was that part of the policy of The New
24  England Journal of Medicine in the year 2000?
00024:01      A.  Yes.
02      Q.  And with respect to that quoted language,
03  what does the phrase "ensure the integrity of the
04  work" mean?
05      A.  "The integrity of the work" refers to the
06  accuracy of the work, the completeness of the data,
07  and the conclusions flowing from the data being
08  appropriate and accurate.
09      Q.  Does the phrase "ensure the integrity of
```

📄 **-KECURFMAN2A - Clear Attached Exhibit CURFMAN2a**

```
10  the work" include ensuring that the actual data are
11  accurately presented in the manuscript?
12      A.  Yes.
```

**6. PAGE 44:01 TO 45:11  (RUNNING 00:01:47.000)**

```
00044:01      Q.  Doctor, Exhibit 8 is from The New England
02  Journal of Medicine, Volume 336.  It's got a
```

Case Clip(s) Detailed Report
Saturday, October 28, 2006, 6:16:34 PM

## Mason v. Merck

📄 **CURFMAN8 - curfman8**

```
03  copyright "1997" in the lower right.
04      A.  Right.
05      Q.  The page is entitled "Uniformed
06  Requirements For Manuscripts Submitted to
07  Biomedical Journals."
08          Is this a document you are familiar
09  with?
10      A.  Yes.  This is an earlier version of the
11  document that we were just -- that you were just
12  reading from.
13          So it has gone through a number of
14  iterations over the years.  This would, I believe,
15  have been the document in place at the time of the
16  consideration of the VIGOR trial.
17      Q.  And this again is a joint statement of The
18  International Committee of Medical Journal Editors
19  that The New England Journal has adopted for its
20  own policies; is that right?
21      A.  That's right.
```

📄 **CURFMAN8A - curfman8a**

```
22      Q.  Turning to Page 315, underneath the heading
23  "Sending the Manuscript to the Journal," there is a
24  statement that, "Manuscripts must be accompanied by
00045:01  a covering letter, signed by all co-authors," and
02  underneath that there is Subparagraph C that states
03  the following:  "A statement that the manuscript
04  has been read and approved by all the authors, that
05  the requirements for authorship as stated earlier
06  in this document have been met, and that each
07  author believes that the manuscript represents
08  honest work."
09          Did that establish the policy of The
10  New England Journal from 1997 forward?
11      A.  Yes.
```

**7.  PAGE 45:17 TO 46:03  (RUNNING 00:00:38.000)**

```
17      Q.  Dr. Curfman, Exhibit 9 is a copy of a
18  letter date May 18, 2000 from Claire Bombardier and
```

📄 **CURFMAN9 - curfman9**

```
19  to Robert Utiger, Deputy Editor, New England
20  Journal of Medicine, dated May 18, 2000.
21          Have you seen this letter before?
22      A.  Yes, I have.
23      Q.  Is it correct that The New England Journal
24  received a draft manuscript of the VIGOR study from
00046:01  Claire Bombardier, along with that letter dated May
02  18, 2000?
03      A.  That's correct.
```

**8.  PAGE 46:08 TO 46:24  (RUNNING 00:00:57.028)**

```
08      Q.  The letter itself, Dr. Curfman, is
09  consecutively Bates numbered at Page 2000 NEMJ 1
```

📄 **CURFMAN9A - curfman9a**

```
10  and 2, is that correct, in the document that you
11  have?
12      A.  Yes, uh-huh.
13      Q.  And are the pages marked ending in the
```

CONFIDENTIAL

Case Clip(s) Detailed Report
Saturday, October 28, 2006, 6:16:34 PM

## Mason v. Merck

```
14   numbers 5, 7 and 16 the author statements signed by
15   Drs. Bombardier, Alise Reicin -- that's R-E-I-C-I-N
16   -- and Deborah Shapiro that were submitted with the
17   manuscript?
18      A.  Correct.
19      Q.  In those letters, each of the signatories
20   attested that they had fulfilled the authorship
21   criteria of the uniform requirements that we read a
```

📄 **-KECURFMAN9A - Clear Attached Exhibit CURFMAN9a**

```
22   few moments ago from the 1997 standards; is that
23   right?
24      A.  That is right.
```

### 9. PAGE 47:01 TO 48:08 (RUNNING 00:02:00.000)

```
00047:01      Q.  Doctor, how long after The New England
02   Journal received the draft with the May 18, 2000
03   letter were you assigned in any capacity to the
04   review process?
05      A.  I was not assigned to handle this
06   manuscript through the review process.
07         So my colleagues Dr. Utiger, Dr. Kaplan
08   and Dr. Steinbrook were the three editors who
09   handled this manuscript through the review process.
10         Dr. Utiger and Dr. Steinbrook are
11   deputy editors, and Dr. Steinbrook was the primary
12   deputy editor.  When he was away, Dr. Utiger would
13   step in for him in that capacity; and Dr. Kaplan,
14   Marshall Kaplan, was the associate editor who was
15   primarily responsible for selecting the reviewers
16   and taking the manuscript through the review
17   procedures.
18      Q.  Was the VIGOR article sent for external
19   review?
20      A.  Oh, yes.
21      Q.  Was there a standard as to how many
22   reviewers you would send an article to?
23      A.  Well, in this particular case, the article
24   was sent to two outside reviewers.  It was also
00048:01   reviewed by a statistical consultant who works in
02   that capacity for The Journal.
03         It would have also been read very
04   carefully by Dr. Kaplan, by Dr. Steinbrook,
05   Dr. Utiger; and then toward the end of the process,
06   I also read the manuscript before it was finally
07   approved, and then accepted by Dr. Jeffrey Drazen,
08   the editor-in-chief.
```

### 10. PAGE 48:10 TO 49:23 (RUNNING 00:02:10.000)

```
10      Q.  Doctor, the court reporter has marked as
11   Exhibit 10 a draft version of the study submitted
12   by Bombardier, et al.
```

📄 **CURFMAN10 - curfman10**

```
13         Does this appear to be a copy of the
14   manuscript submitted on May 18, 2000.
15      A.  Yes, it does.
16      Q.  If you would turn to the page that is
17   marked with the Post-It -- this document was not
18   Bates-stamped, since it came from a diskette -- but
```

📄 **CURFMAN10A - curfman10a**





Case Clip(s) Detailed Report
Saturday, October 28, 2006, 6:16:34 PM

## Mason v. Merck

```
19   if you turn to the page that's marked with the
20   Post-It.
21       A.  Right.
22       Q.  Do you see the reference in the middle of
23   the page to "myocardial infarctions"?
24       A.  Uh-huh, yes.
00049:01      Q.  And do you see the statement, "Myocardial
02   infarction were less common in the naproxen group
03   than rofecoxib group:  0.1 percent versus 0.4
04   percent (95 percent confidence interval of
05   difference 0.1 to 0.6 percent"?
06       A.  Yes.
07       Q.  And reading on, it states, "Four percent of
08   the study population met FDA criteria for aspirin
09   use for secondary cardiovascular prophylaxis
10   (history of myocardial infarction, unstable or
11   stable angina, cerebrovascular accident, transient
12   ischemic attack, angioplasty, coronary bypass) but
13   were not on low-dose aspirin therapy.  These
14   patients accounted for 38 percent of the myocardial
15   infarctions in the study.  The difference in
16   myocardial infarction rate between treatments in
17   the other 96 percent of patients was much less
18   apparent:  Rofecoxib 0.2 percent versus naproxen
```

-KECURFMAN10A - Clear Attached Exhibit CURFMAN10a



```
19   0.1 percent.  95 percent confidence interval of
20   difference, negative 0.1 to 0.3 percent."
21           Did you see that text in the manuscript
22   that you reviewed?
23       A.  Yes, uh-huh.
```

**11. PAGE 51:10 TO 51:14  (RUNNING 00:00:15.312)**

```
10       Q.  Did you get the message from that
11   statement, Doctor, that the authors intended to
12   characterize the significant difference as being
13   found in those patients who are at risk to begin
14   with?
```

**12. PAGE 51:16 TO 52:05  (RUNNING 00:00:52.574)**

```
16       A.  Yes.  I interpreted this that the authors
17   interpreted their data as indicating that the
18   difference in myocardial infarction rate was more
19   important in those patients who would qualify for
20   aspirin therapy; i.e., patients who were at risk
21   for coronary heart disease to begin with; but that
22   that risk was less apparent or less important in
23   those patients who were not eligible by FDA
24   criteria to receive aspirin, and therefore, were at
00052:01   lower risk at baseline for coronary heart disease.
02       Q.  Now, was the VIGOR manuscript ultimately
03   published on November 23, 2000?
04       A.  That's correct.
05           EXHIBIT NO. 11 MARKED
```

**13. PAGE 52:06 TO 53:11  (RUNNING 00:01:47.649)**

```
06       Q.  Is Exhibit 11 a copy of the published
07   article, "Comparison of Upper Gastrointestinal
```

CURFMAN11 - curfman11



```
08   Toxicity of Rofecoxib and Naproxen in Patients with
09   Rheumatoid Arthritis," by Bombardier et al., from
10   The New England Journal, dated November 23, 2000?
```

Case Clip(s) Detailed Report
Saturday, October 28, 2006, 6:16:34 PM

## Mason v. Merck

```
11    A.  Yes.
12    Q.  And turning to Page 1523 of the document,
```

**CURFMAN11A - curfman11a**

```
13    do you see under the heading "General Safety" the
14    same statistical information about the rates of
15    myocardial infarction in the aspirin-indicated and
16    nonaspirin-indicated groups that appeared in the
17    earlier draft?
18    A.  Yes.
19    Q.  The article states that, "The aspirin-
20    indicated patients accounted for 38 percent of the
21    patients in the study who had myocardial
22    infarctions"; is that correct?
23    A.  That is correct.
24    Q.  And it then goes on to state, "In the other
00053:01  patients, the difference in the rate of myocardial
02    infarction between groups was not significant (0.2
03    percent in the rofecoxib group and 0.1 percent in
04    the naproxen group)."
05       Do you see that text?
06    A.  Yes, I do.
```

**-KECURFMAN11A - Clear Attached Exhibit CURFMAN11a**

```
07    Q.  So this article conveyed to readers that
08    the difference in the rate of myocardial infarction
09    between groups was not significant for the patients
10    who are not aspirin-indicated; is that right?
11    A.  Yes.
```

**14.  PAGE 54:05 TO 54:09  (RUNNING 00:00:18.182)**

```
05    Q.  Now, is it correct that the authors
06    submitted a revised manuscript with a diskette
07    containing three versions of the VIGOR manuscript,
08    with a letter dated August 20, from Dr. Bombardier?
09    A.  That's correct.
```

**15.  PAGE 54:11 TO 54:21  (RUNNING 00:00:36.549)**

```
11    Q.  Dr. Curfman, is Exhibit 12 a copy of the
12    August 20, 2000 letter from Bombardier to
```

**CURFMAN12 - curfman12**

```
13    Dr. Steinbrook at New England Journal?
14    A.  Yes, it is.
15    Q.  And if you look at Page 3 of the letter,
16    which is the Bates-stamp ending in 042, just before
17    the final paragraph, is it stated that, "We have
18    included two triple-spaced copies of the revised
19    manuscript as well as a diskette with the
20    manuscript files"?
21    A.  Right.
```

**16.  PAGE 55:16 TO 58:15  (RUNNING 00:04:31.779)**

```
16    Q.  Dr. Curfman, the diskette was received
17    shortly after August 20, 2000; is that right?
18    A.  Yes.  The original diskette.
19       This would be a copy, but that original
20    diskette was received with this letter
21    (indicating).
22    Q.  Did the folders on the disk include three
23    draft versions of the VIGOR study from May, July
24    and August of 2000?
```

Case Clip(s) Detailed Report
Saturday, October 28, 2006, 6:16:34 PM

## Mason v. Merck

```
00056:01        A.  That's correct.
      02        Q.  Did you personally review any part of the
      03   contents of the disk at any time before the
      04   publication of the VIGOR study on November 23,
      05   2000?
      06        A.  No.
      07             And as explanation, at that time, we
      08   were still receiving, editing and handling
      09   manuscripts in paper form.  We were in transition
      10   from a paper format to an electronic format, but we
      11   had not completed that transition.
      12             So we were requesting diskettes from
      13   authors, but this was in anticipation of moving to
      14   an electronic platform, which we had not yet done.
      15             So in the case of this diskette, the
      16   authors, at our request, had submitted a diskette,
      17   but we never accessed it, because we were doing all
      18   of our editing on paper.  So Dr. Bombardier also
      19   provided paper copies, and we worked on those.
      20             The diskette, however, was saved, put
      21   into an envelope, stapled into the manuscript file
      22   and made a permanent part of the manuscript file,
      23   but was not used in any way in the handling of the
      24   VIGOR manuscript at that time in the year 2000.
00057:01        Q.  Is it correct then that based on your
      02   investigation to prepare for this deposition that
      03   none of the editors at The New England Journal
      04   reviewed the contents of the diskette before
      05   November 23, 2000?
      06        A.  Yes, that's correct.
      07        Q.  At some point before today, have you seen
      08   the contents of the disk, the diskette?
      09        A.  Yes, I have.
      10        Q.  And, in particular, have you seen the
      11   contents of the May 2000 version on the diskette?
      12        A.  Yes, I have.
      13        Q.  When did you first see the contents?
      14        A.  We first accessed the contents of the
      15   diskette on Tuesday, October 5th, 2004, during the
      16   afternoon.
      17        Q.  And when you say "we," who are you
      18   referring to?
      19        A.  The editor in the office who first found
      20   the disk is our managing editor, the managing
      21   editor of The Journal, Dr. Stephen Morressey.
      22        Q.  What were the circumstances under which the
      23   diskette was viewed?
      24        A.  On September 30, 2004, rofecoxib had been
00058:01   removed from the market; and in the wake of that
      02   decision, we wanted to take a look at the VIGOR
      03   file to refresh our memories about certain aspects
      04   of the manuscript.
      05             We did that, on October 5th, and it was
      06   on that day that Dr. Morressey found the diskette,
      07   and we accessed it.  We put it into one of our
      08   drives, and brought it up and looked at it on the
      09   computer screen, and we also made hard copy
      10   printouts of the three files that were on the
      11   diskette, and then read them.
      12        Q.  And during that review, did you determine
```

📄 -KECURFMAN12 - Clear Attached Exhibit CURFMAN12                    

```
      13   that there were marked-up, edited, tracked changes
      14   versions of the manuscripts on the diskette?
      15        A.  That's correct.
```

CONFIDENTIAL

## Mason v. Merck

**17. PAGE 59:08 TO 59:20  (RUNNING 00:00:57.992)**

```
08        Q.  Dr. Curfman, please take a look at what has
09   been marked as Exhibit 14, that has been Bates-
10   stamped 2000 NEJM 000235 through 282, and can you
11   tell me if this is an accurate copy of the May 2000
12   draft of the VIGOR study that you observed at the
13   time you reviewed the contents of the diskette in
14   October 2004, as you've testified earlier?
15        A.  Yes, it is.
16        Q.  You'll notice that we talked a little
17   before the break about the word "tracked changes."
18             Do tracked changes show when deletions
19   or insertions are made to a manuscript?
20        A.  That's correct.
```

**18. PAGE 60:01 TO 61:02  (RUNNING 00:01:46.000)**

```
00060:01        Q.  And is that done by using the mouse to
02   hover over a specific insertion or deletion --
03        A.  Yes.
04        Q.  -- until some information appears on the
05   screen showing that a particular insertion or
06   deletion was made at a particular time by a
07   particular person?
08        A.  Right.  So it tracks the change and also
09   the individual and the time and date when the
10   change was made.
11        Q.  Now, when you observed this document on
12   screen in October 2004, did you observe that there
13   had been deletions with respect to the text that we
14   looked at earlier?
15             In particular, if you look at Page 251,
```

CURFMAN14 - curfman14   

```
16   under the general "Safety Heading," do you see that
17   there is a reference to "Deleted:  8 and 0 patients
18   with myocardial infarction in the rofecoxib and
19   naproxen treatment groups respectively"?
20        A.  Yes.
21        Q.  And do you see that in the next sentence
22   the information that was deleted refers to the
23   absolute numbers of myocardial infarctions in the
24   nonaspirin indicated group, 9 for rofecoxib and 4
00061:01   for naproxen?
02        A.  Yes, I do.
```

**19. PAGE 61:10 TO 62:04  (RUNNING 00:00:57.527)**

```
10        Q.  Okay.  Let's look at the Table 5 on the
11   last page, that's 282.
```

CURFMAN14A - curfman14a   

```
12             There's highlighting there that was on
13   this copy when we received it.
14        A.  Right.
15        Q.  Was that highlighting visible to you on the
16   computer screen?
17        A.  On the computer screen, yes.
18        Q.  And does this Table 5 on the last page,
19   282, show "deleted" at the top?
20        A.  Yes, it does.
21        Q.  And does it show tracked change indicating
22   that the deletion was made by Merck?
23        A.  That's correct.
24        Q.  Does it show that the deletion was made by
```

## Mason  v.  Merck

```
00062:01    Merck on May 16, 200 at 8:02 p.m.?
     02         A.  Correct.
     03         Q.  And what was the content of Table 5 that
     04    was deleted?
```

**20.  PAGE 62:06 TO 62:19  (RUNNING 00:00:57.000)**

```
     06         A.  Well, as you can see, this was a table that
     07    never -- well, what we have in front of us is -- I
     08    interpret this as a table that had been proposed,
     09    but the data themselves had not been entered into a
     10    table.
     11              In the highlighted area, the yellow
     12    highlighting, in Footnote No. 1, I think that we
     13    can conclude that these were the data categories
     14    that would have been included in this table had the
     15    data been introduced into the table, but what we
     16    had in this May version was an incompleted table.
     17         Q.  And in particular, Table 5 referred to
```

📄 -KECURFMAN14A - Clear Attached Exhibit CURFMAN14a

```
     18    cardiovascular events; is that correct?
     19         A.  That's the title of the events, yes.
```

**21.  PAGE 75:24 TO 77:20  (RUNNING 00:02:53.764)**

```
     24         Q.  Now, Doctor, Exhibit 18 is a memo from
00076:01    Deborah Shapiro to Alise Reicin and others dated
     02    July 5, 2000.
     03              Do you recognize the names of Shapiro
     04    and Reicin as the two Merck authors on the VIGOR
     05    study?
     06         A.  Yes, I do.
     07         Q.  Now, I take it you have never seen this
     08    document before, or have you?
     09         A.  I have probably seen some of these data on
     10    the FDA Website, I think, but I have never seen it
     11    as a document per se.
     12         Q.  If you could take a look -- certainly you
     13    didn't see it on the FDA Website before the
     14    publication of the --
     15         A.  No.
     16         Q.  -- the article?
     17         A.  No.  Oh, no.  No.  No.
     18         Q.  Could you take a look at Table 7, which is
```

📄 CURFMAN18 - curfman18

```
     19    on Pages 9 and 10 of the document.  You have to use
     20    the column headings from Page 9 to follow the
     21    information onto Page 10.
     22              But do you see that there is
     23    information in this document dated July 5, 2000
     24    concerning the number of patients with different
00077:01    adverse events?
     02         A.  (Nodding.)
     03         Q.  You have to answer out loud, sir.
     04         A.  Yes, sorry.
     05         Q.  And under the "Aspirin Indicated" row on
     06    Page 9, do you see the MI listing of 8 versus 0 for
     07    rofecoxib versus naproxen?
     08         A.  Yes, I do.
     09         Q.  And there, do you see that the -- on Page
     10    10, the "Aspirin Not Indicated" group MI row shows
     11    12 for Vioxx and 4 for naproxen?
     12         A.  That's correct.
```

## Mason v. Merck

```
13      Q.  Now, the data that had been in the deleted
14 text from the May 2000 version showed 9 versus 4
15 for the nonaspirin-indicated; is that correct?
16      A.  That's correct.
17      Q.  And by July 5, 2000, the data of the Merck
18 authors showed that those numbers were 12 versus 4;
19 is that correct?
20      A.  That's correct.
```

**22.  PAGE 80:20 TO 81:03  (RUNNING 00:00:29.900)**

```
20         Q.  Considering the severity of the endpoint,
21 myocardial infarction, and the fact that there was
22 additional data showing a larger number than
23 initially represented in the manuscript submitted
24 to The Journal, would it have been of interest to
00081:01 readers of The Journal to know that the results for
02 the nonaspirin-indicated group achieved a level
03 that was at least borderline significant?
```

**23.  PAGE 81:05 TO 81:09  (RUNNING 00:00:19.293)**

```
05      A.  Oh, absolutely.
06         The difference between 9 MIs and 12 MIs
07 is absolutely of importance and quite relevant, and
08 I certainly would have wanted to have access to
09 these data, absolutely.
```

**24.  PAGE 84:14 TO 84:18  (RUNNING 00:00:14.514)**

```
14      Q.  Exhibit 20 is a letter dated July 7th,
```

CURFMAN20 - curfman20                                    

```
15 2000, with attachment, from Bombardier to
16 Dr. Kaplan.
17         Have you seen this before?
18      A.  Yes, I have.
```

**25.  PAGE 89:02 TO 89:06  (RUNNING 00:00:17.129)**

```
02      Q.  And the July 17th letter from the authors
03 12 days after this July 5 memo does not anywhere
04 inform The New England Journal of the 12 versus 4
05 figures, does it?
06      A.  That's correct.
```

**26.  PAGE 89:07 TO 89:15  (RUNNING 00:00:23.000)**

```
07      Q.  Now, is it The Journal's policy to rely on
08 the manuscript authors to submit true and accurate
09 statements of the data?
10      A.  Yes.  That is imperative.
11      Q.  Do The Journal's readers rely on the truth
12 and accuracy of the authors' statements of the data
```

-KECURFMAN20 - Clear Attached Exhibit CURFMAN20         

```
13 in making decisions as to treatment of their
14 patients?
15      A.  Yes, they do.
```

**27.  PAGE 89:17 TO 90:23  (RUNNING 00:01:42.000)**

```
17      Q.  Is it The Journal's policy to require
18 authors to correct the statements in drafts of the
19 articles on the basis of information that becomes
20 known after an initial draft has been submitted?
21      A.  Our expectation is that if there is an
22 important relevant update to a piece of data during
```

## Mason v. Merck

```
    23   the review process, that we would be informed about
    24   that update, yes.
00090:01        Q.  Is it correct that the authors did not
    02   inform The New England Journal as to the change
    03   from 9 versus 4 to 12 versus 4 in the nonaspirin-
    04   indicated patients for Vioxx versus naproxen at any
    05   time prior to the publication of the article?
    06        A.  Well, not only did they not inform us that
    07   the 9 was actually a 12, but you'll recall,
    08   Attorney Arbitblit, that none of those data were in
    09   the manuscript at all, none of the raw numbers of
    10   heart attacks appeared in any version of the
    11   manuscript, and therefore, are not in the published
    12   article either.
    13             So 9 versus 4 was not in there; 8
    14   versus 0 was not there; 17 versus 4 was not in
    15   there; and certainly 20 versus 4 was not in there.
    16        Q.  Now, on the basis of the difference between
    17   the data in the July 5 memo and the published
    18   article, would you agree that physicians who read
    19   The Journal for accurate information about efficacy
    20   and toxicity did not receive accurate information
    21   about the relative risk of MI and other
    22   cardiovascular events in the Vioxx patients
    23   compared to naproxen?
```

**28.  PAGE 91:01 TO 91:02  (RUNNING 00:00:06.507)**

```
00091:01        A.  Yes.  The risk would have appeared lower
    02   than the real data would support.
```

**29.  PAGE 190:15 TO 191:04  (RUNNING 00:00:57.463)**

```
    15        Q.  Generally speaking, what's the purpose of
    16   the peer-review process at The New England Journal?
    17        A.  There are two general purposes:  The first
    18   is for us to have a process for selecting that
    19   research among a huge body of medical research that
    20   we and our reviewers believe will have the highest
    21   impact on the practice of medicine and healthcare;
    22   and secondly, to try to present that information in
    23   the clearest manner, the most accurate manner, to
    24   our readers.
00191:01             So there is a selection part of the
    02   process, and there is an editing part of the
    03   process; and in the broadest frame, those are the
    04   two parts of our procedures.
```

**30.  PAGE 191:13 TO 191:21  (RUNNING 00:00:20.900)**

```
    13             And there are quite a few steps to the
    14   peer-review process at The New England Journal; is
    15   that fair?
    16        A.  Yes.
    17        Q.  One of the things that that means is that
    18   there are a lot of different people, both at The
    19   Journal and outside The Journal, who see drafts of
    20   manuscripts before they are ever published in The
    21   New England Journal?
```

**31.  PAGE 191:23 TO 192:10  (RUNNING 00:00:33.711)**

```
    23        A.  That's correct.
    24        Q.  And I believe -- and you can feel free to
00192:01   refer to this if it is helpful -- is the first step
    02   in that process that the editor-in-chief, or the
    03   executive editor if the editor-in-chief is not
    04   available, reviews each manuscript as it comes in
```

Case Clip(s) Detailed Report
Saturday, October 28, 2006, 6:16:34 PM

## Mason v. Merck

```
05  briefly?
06      A.  Yes.
07      Q.  And do you know whether that occurred with
08  the VIGOR manuscript?
09      A.  I have to assume.  I wasn't in the room.
10  So I can't -- but it must have, yes.
```

**32. PAGE 192:18 TO 193:02 (RUNNING 00:00:28.365)**

```
18          Q.  And what is the purpose of that initial
19  review conducted by the editor-in-chief?
20          A.  The editor-in-chief is trying to, first of
21  all, make a determination if it is an article that
22  we want to review at all.
23              Then, if it is, which editor is the
24  most appropriate editor to be the point person on
00193:01  that manuscript, and then to assign that manuscript
02  to that editor.
```

**33. PAGE 193:14 TO 195:09 (RUNNING 00:01:56.000)**

```
14          Q.  And how is the -- I think you mentioned
15  that the editor-in-chief will try to select an
16  appropriate editor.
17              How is that selection made?
18          A.  Primarily based on the topic of the article
19  in question.
20          Q.  And do you know who the associate editor
21  was who was selected with respect to the VIGOR
22  manuscript?
23          A.  Yes, I do.
24          Q.  Who was that?
00194:01        A.  Dr. Marshall Kaplan.
02          Q.  And do you know, Dr. Kaplan is a medical
03  doctor?
04          A.  He is a medical doctor, and his training is
05  in gastroenterology; and since the primary focus of
06  the VIGOR trial was a gastrointestinal endpoint,
07  the manuscript was assigned to Dr. Kaplan to
08  handle.
09          Q.  Okay.  And what -- I believe your article
10  states that the associate editor, at least
11  initially, is assessing the value and the validity
12  of the manuscript; is that right?
13          A.  Yes.  The associate editor would then take
14  another read.  It might be a fairly quick read.
15  Again, to determine in his or her mind if it was
16  something that would be appropriate for The New
17  England Journal; and if so, go on to identify the
18  outside reviewers for the manuscript.
19          Q.  Okay.  And if it -- if at that step the
20  associate editor determines that the piece is not
21  valid or the piece is not fairly written, does --
22  can the associate editor at that point reject the
23  piece?
24          A.  Yes.
00195:01        Q.  And I think your article, I think your
02  article mentions that, should the associate editor
03  determine that the piece is not appropriate, it
04  could go to a deputy editor for a second opinion;
05  is that correct?
06          A.  Yes.  Our general procedure is that we
07  don't reject manuscripts with only one pair of eyes
08  having seen it.  We like two pairs of eyes to have
09  seen it.
```

**CONFIDENTIAL**

## Mason v. Merck

**34. PAGE 195:12 TO 196:10 (RUNNING 00:00:58.691)**

```
        12                Did Dr. Kaplan on his initial
        13  assessment of the value and validity of the piece
        14  determine that it should be further reviewed, or
        15  did Kaplan reject the piece and therefore require a
        16  second opinion from a deputy editor?
        17      A.  No.  He determined that it was worthy of
        18  review, and then went ahead and assigned the
        19  reviewers.
        20      Q.  And so that is -- that is the next step, as
        21  your article mentioned -- mentioned, and as you
        22  just testified, that Dr. Kaplan would assign the
        23  manuscript to outside reviewers; is that correct?
        24      A.  That's correct.
00196:01      Q.  And there can be -- there can be two
        02  reviewers with certain manuscripts?
        03      A.  Oh, sure.
        04      Q.  And I believe -- I believe VIGOR actually
        05  received a review from three viewers; is that
        06  correct?
        07      A.  Yes.  Two of the reviewers were outside
        08  reviewers, and one of the reviewers was a
        09  statistical consultant who is a part-time member of
        10  our staff.
```

**35. PAGE 196:17 TO 197:17 (RUNNING 00:01:23.574)**

```
        17      Q.  And what is the -- what's the purpose of
        18  the review conducted by the external reviewers as
        19  well as the statistical consultant?
        20      A.  The external reviewers are asked to
        21  carefully read and evaluate the manuscript and give
        22  us their opinion on its suitability for publication
        23  in terms of the novelty of the research, the
        24  accuracy and the validity of the research, the
00197:01  composition of the manuscript -- how it is written,
        02  how the data are displayed -- and the overall
        03  interest to the readership of The New England
        04  Journal of Medicine.  So there are four categories
        05  of evaluation that they are asked to make.
        06                Reviewers serve as advisors to the
        07  editors.  We ask them for a judgment on the
        08  suitability for the publication of the manuscript
        09  in The New England Journal, but the final decision
        10  is really made by the editors, collectively.
        11                We meet together, discuss the
        12  manuscript in quite a lot of detail.  All of the
        13  editors are there.  The statistical consultants are
        14  there, and we have an opportunity then to take the
        15  reviewers' comments and put them into a larger
        16  context, a larger discussion, with input from all
        17  the editors.
```

**36. PAGE 198:24 TO 200:06 (RUNNING 00:01:21.730)**

```
        24                Can the reviewers, if they feel
00199:01  additional data would appropriate, request that the
        02  authors provide additional data that was not
        03  provided in the manuscript?
        04      A.  Yes.
        05      Q.  And if the reviewers believe that data --
        06  data are presented inappropriately or in a
        07  misleading way in the manuscript, is that something
        08  the reviewers are permitted to comment on?
        09      A.  Yes.
        10      Q.  And similarly, separate from the data, but
```

Case Clip(s) Detailed Report
Saturday, October 28, 2006, 6:16:34 PM

## Mason v. Merck

```
        11   with the conclusions and the interpretations that
        12   are drawn from that data, if the reviewers believe
        13   those invalid or inappropriate, the reviewers have
        14   the right to comment on that as well?
        15       A.  That's right.
        16       Q.  Now, I believe you mentioned that the next
        17   step, once the reviewers return their reviews to
        18   The New England Journal, is that the associated
        19   editor, who has control of the manuscript or has
        20   been assigned to the manuscript, has the
        21   opportunity to discuss the reviews and the
        22   manuscript with the entire editorial board; is that
        23   correct?
        24       A.  Yes.
00200:01       Q.  And mentioned in the case of the VIGOR
        02   manuscript, I believe you said that that was the
        03   stage at which you first became involved, was
        04   during these discussions with the entire editorial
        05   board; is that right?
        06       A.  Yes.  That's correct.
```

**37. PAGE 204:07 TO 204:11  (RUNNING 00:00:14.899)**

```
        07       Q.  So you had -- is it fair to say that you,
        08   therefore, received the input of medical doctors
        09   and at least one statistical consultant that had
        10   expertise in a variety of different fields?
        11       A.  Correct.
```

**38. PAGE 204:12 TO 206:10  (RUNNING 00:02:18.669)**

```
        12       Q.  I think you mentioned before, Doctor, that
        13   you're board-certified in internal medicine and
        14   cardiology; is that correct?
        15       A.  That's right.
        16       Q.  Are there other cardiologists, to your
        17   knowledge, that participated in the review of the
        18   VIGOR manuscript, with the exception, of course, of
        19   the anonymous reviewers?
        20       A.  Yes.  Dr. Lagakos is a board-certified
        21   cardiologist, and he would have had an opportunity
        22   to weigh in as well.
        23       Q.  And ultimately -- ultimately, after this
        24   group deliberates, the editors have to determine
00205:01   ultimately that a piece is appropriate for
        02   publication before it is published in The New
        03   England Journal; is that correct?
        04       A.  That's correct.
        05       Q.  But usually there is an intervening step,
        06   which there was here, which is that the paper is
        07   sent back to the authors for some revision based on
        08   the comments of reviewers and perhaps the editors
        09   as well; is that right?
        10       A.  That's right.
        11       Q.  And I think I said this, but that actually
        12   did happen with the VIGOR paper?
        13       A.  Correct.
        14       Q.  And, in fact, there can be multiple
        15   requests for revisions where the paper is sent to
        16   the authors for revision, and the authors make
        17   certain revisions, and the editors determine that
        18   more revisions are appropriate; is that correct?
        19       A.  That's correct.
        20       Q.  And, again, that did -- that did in fact
        21   happen with the VIGOR manuscript?
        22       A.  Yes.
        23       Q.  And so what -- what that means is that on
```

## Mason v. Merck

```
         24   more than one occasion editors at The Journal sent
00206:01   the paper back to the authors of the manuscript and
       02   told them that changes would be required before it
       03   could be published in The New England Journal, and
       04   the authors then made changes and sent it back to
       05   the editors for review; is that right?
       06        A.  That's right.
       07        Q.  Is it fair to say that The New England
       08   Journal has one of the most rigorous peer-review
       09   processes of any peer-review journal?
       10        A.  It's rigorous.
```

**39. PAGE 219:07 TO 220:16  (RUNNING 00:01:25.867)**

```
       07        Q.  Doctor, I would ask you to take a look at
       08   the Bombardier article as it was published, which
```

📄 **CURFMAN11B - curfman11b**

```
       09   was marked as Exhibit 11 earlier today, and for now
       10   I am just going to be looking at the first page of
       11   the article.
       12             First of all, looking at the top of the
       13   page, it appears that there are 12 authors listed
       14   as authors of this article right under the title;
       15   is that correct?
       16        A.  Correct.
       17        Q.  And, in fact, is -- The New England Journal
       18   has a limit of 12 authors that can be listed in
       19   that position on the page right below the title; is
       20   that correct as well?
       21        A.  At that time there was a limit.  There is
       22   no longer a limit.
       23        Q.  And if you look down at the bottom of this
```

📄 **CURFMAN11C - curfman11c**

```
       24   page in the footnote, in the very last two lines,
00220:01   there is note that Arthur Weaver, M.D. from the
       02   Arthritis Center of Lincoln, Nebraska was another
       03   author.
       04             Do you see that?
       05        A.  Yes, I do.
       06        Q.  He is listed down there rather than above
       07   because of the rule at the time that you mentioned
       08   that there could only be 12 listed at the top of
       09   page; is that correct?
       10        A.  That's correct.
       11        Q.  And the footnote at the -- or not the
```

📄 **CURFMAN11D - curfman11d**

```
       12   footnote, but the smaller text at the bottom of the
       13   page describes where the authors -- the various
       14   authors are from.
       15             Do you see that?
       16        A.  Yes, I do.
```

**40. PAGE 221:03 TO 223:10  (RUNNING 00:02:16.360)**

```
       03        Q.  And if you look at the bottom of the page,
       04   these doctors come from a variety of institutions.
       05             For example, the lead author, Claire
       06   Bombardier, is listed as coming from the Institute
       07   For Work and Health as well as Mount Sinai Hospital
       08   and the University Health Network of Toronto.
       09             Do you see that?
```

Case Clip(s) Detailed Report
Saturday, October 28, 2006, 6:16:34 PM

## Mason v. Merck

```
      10      A.  Yes, I do.
      11      Q.  The second author, Loren Laine, is from the
      12  gastrointestinal Division, Department of Medicine
      13  at the University of Southern California School of
      14  Medicine in Los Angeles.
      15          Do you see that as well?
      16      A.  Yes.
      17      Q.  And then there is the notation that two of
      18  the authors, Dr. Alise Reicin and Dr. Deborah
      19  Shapiro, are from Merck.
      20          Do you see that?
      21      A.  Yes.
      22      Q.  Those are the only two of the 12 authors --
      23  13 if you count Dr. Weaver -- that are actually
      24  from Merck.  All of the other -- all of the other
00222:01  authors are from outside institutions; is that
      02  correct?
      03      A.  That's correct.
      04      Q.  And I won't go through all of them, in the
      05  interest of time, but they are from a variety of
      06  respected institutions, both within the United
      07  States and around the world, including, just for
      08  example, the University of Texas, Houston School of
      09  Public Health; the Division of Rheumatology and
      10  Clinical Immunology at the University of Maryland
      11  in Baltimore; the Office of Clinical Research and
      12  Training at Northwestern University School of
      13  Medicine in Chicago, just as examples.
      14          Do you see those?
      15      A.  Yes.  Those are U.S. examples.
      16      Q.  I named the U.S. examples, yes; and there
      17  are also examples from Australia, Brazil, Mexico
      18  and other countries around the world; is that
      19  right?
      20      A.  That's right.
      21      Q.  Now, in order to be an author on the New
      22  England -- on a paper within The New England
      23  Journal of Medicine, there are certain requirements
      24  that The New England Journal has; is that correct?
00223:01      A.  That's correct.
      02      Q.  One of those requirements is that each of
      03  the authors must sign a statement that attests that
      04  they have met certain requirements that The New
      05  England Journal imposes in order to be an author on
      06  the paper; is that right?
      07      A.  Correct.
      08          MR. FITZPATRICK:  I am going to mark
      09  another document.
      10          EXHIBIT NO. 45 MARKED
```

**41. PAGE 223:11 TO 224:24 (RUNNING 00:01:34.899)**

```
      11      Q.  And, Doctor, do you recognize this as the
      12  signed statements by the authors on the VIGOR
```

CURFMAN145 - curfman45

```
      13  publication?
      14      A.  Yes, I do.
      15      Q.  And these came from your files.
      16          They are all submitted as part of The
      17  New England Journal's requirement that these
      18  attestations be submitted before someone can appear
      19  as an author on the article; is that correct?
      20      A.  That's correct.
      21      Q.  And just taking a look at the language of
      22  the attestation, each of these doctors attest that
```

Case Clip(s) Detailed Report
Saturday, October 28, 2006, 6:16:34 PM

## Mason v. Merck

```
    23   they have done several things in order to fulfill
    24   the authorship criteria of what are known as the
00224:01   uniform requirements; is that correct?
    02       A.  That's correct.
    03       Q.  And those include stating that they have
    04   made substantial contributions to (A) the
    05   conception and design and/or analysis and
    06   interpretation of the data.
    07           That's one of the -- that's one the
    08   substantial contributions, correct?
    09       A.  Correct.
    10       Q.  And, two, they have made substantial
    11   contributions to drafting the article or revising
    12   it critically for important intellectual content;
    13   is that correct?
    14       A.  That's correct.
    15       Q.  And the third requirement that they have to
    16   attest to is that they have made substantial
    17   contributions to the final approval of the version
    18   of the article to be published; is that correct?
    19       A.  Correct.
    20       Q.  And each of the -- each of the authors that
    21   appeared as an author in The New England Journal
    22   for the VIGOR manuscript signed these statements
    23   attesting to each of those facts; is that correct?
    24       A.  That's correct.
```

**42.  PAGE 225:11 TO 225:22  (RUNNING 00:00:27.021)**

```
    11       Q.  Do you have Exhibit 46, Doctor?
    12       A.  Yes, I do.
```

📄 CURFMAN46 - curfman46                                    

```
    13       Q.  And you recognize this as the letter that
    14   you spoke about this morning, which was the May 18,
    15   2000 letter which submitted the original VIGOR
    16   manuscript to The New England Journal; is that
    17   correct?
    18       A.  That's correct.
    19       Q.  And I think you mentioned the letter is
    20   from Dr. Bombardier, who is a medical doctor and is
    21   also at the University of Toronto?
    22       A.  That's correct.
```

**43.  PAGE 226:23 TO 229:05  (RUNNING 00:02:30.082)**

```
    23           If you turn to the -- just moving down
    24   to the next sentence, it reads, "Given that NSAIDs
00227:01   are among the most commonly used medications in the
    02   world and the significant benefit for patients from
    03   the reduction in gastrointestinal morbidity, we ask
    04   that you please consider this manuscript for an
    05   expedited review."
    06           Do you see that sentence?
    07       A.  I do.
    08       Q.  You would agree in that sentence
    09   Dr. Bombardier is asking that The Journal give this
    10   manuscript an expedited review?
    11       A.  That's correct.
    12       Q.  Does The Journal have a specific procedure
    13   whereby it can give a manuscript an expedited
    14   review?
    15       A.  Yes, we do.
    16       Q.  And what is that procedure?
    17       A.  Requests for expedited review are
    18   considered by the editors based on the substance of
```

Case Clip(s) Detailed Report
Saturday, October 28, 2006, 6:16:34 PM

## Mason v. Merck

```
     19  the research; and in particular, as I have alluded
     20  to earlier, it's our estimation of the overall
     21  impact on the health of the public and whether
     22  people in our society and around the world will be
     23  immediately impacted, immediately impacted in an
     24  important way in terms of their health.
00228:01          In addition, the other qualifying
     02  factor is:  Can this research be reviewed
     03  adequately in an expedited fashion, or are there
     04  other complexities that will need to be dealt with
     05  in the review process that will take more time?
     06          So those are the two considerations
     07  that go into a determination of whether we will do
     08  an expedited review.
     09      Q.  And is the effect of an expedited review,
     10  if it is granted and the piece is in fact
     11  published, that the manuscript would be published
     12  faster than it would in the normal -- in the
     13  ordinary course of peer review?
     14      A.  Yes.
     15      Q.  And so what Dr. Bombardier was requesting
     16  was an expert review that, if granted, would have
     17  resulted in a faster publication of the VIGOR
     18  results than had expedited review not been granted?
     19      A.  Correct.
     20      Q.  Was expedited review in fact granted for
     21  the VIGOR manuscript?
     22      A.  No, it was not.  And I guess I should
     23  qualify my answers to your questions about
     24  expedited review.
00229:01          What we -- what we commit ourselves to,
     02  if we agree to expedited review, is an expedited
     03  review.  We do not commit to publication,
     04  necessarily.  We commit to a review process that
     05  will take less time.
```

**44.  PAGE 236:22 TO 237:22  (RUNNING 00:01:22.000)**

```
     22      Q.  And, Doctor, do you have Exhibit 47 in
     23  front of you?
     24      A.  I do, uh-huh.
```

📄 CURFMAN47 - curfman47                                   

```
00237:01      Q.  Could you identify that, please.
     02      A.  This is a letter written by the deputy
     03  editor primarily responsible for the VIGOR
     04  manuscript, Dr. Robert Steinbrook, to Dr. Claire
     05  Bombardier, asking for some additional information,
     06  pretty early on in the process, about the efficacy
     07  of the two drugs in the treatment of rheumatoid
     08  arthritis, and those data, in his mind, had not
     09  been really very clearly displayed in the first
     10  version of the manuscript, and he wanted to know
     11  about that.
     12      Q.  Okay.  So Dr. Steinbrook basically wanted
     13  to know some additional data about the efficacy of
     14  rofecoxib or Vioxx in the treatment of rheumatoid
     15  arthritis, and he requested that Dr. Bombardier
     16  provide that data to him; is that fair?
```

📄 CURFMAN47A - curfman47a                                 

```
     17      A.  Right.  And then an additional question had
     18  to do with prior history of gastrointestinal events
     19  and proton-pump-inhibitor therapy or misoprostol
     20  therapy, yes.
```

Case Clip(s) Detailed Report
Saturday, October 28, 2006, 6:16:34 PM

## Mason v. Merck

```
21              So these are issues he wanted more
22  information about as the editor.
```

**45. PAGE 240:05 TO 241:24  (RUNNING 00:02:30.000)**

```
05      Q.  Doctor, do you have Exhibit 48 in front of
06  you?
07      A.  Yes, I do.
```

CURFMAN48 - curfman48

```
08      Q.  And does this appear to be Dr. Bombardier
09  response to Dr. Steinbrook's letter that we just
10  looked at?
11      A.  Yes, it does.
12      Q.  And just looking, just looking generally at
13  this response, does it appear to provide a fair bit
```

CURFMAN48A - curfman48a

```
14  of detail on the efficacy data requested by
15  Dr. Steinbrook in his letter?
16      A.  Yes.
17      Q.  For example, Dr. Bombardier provides,
18  although they are not very clear in this copy, what
19  appear to be several -- several figures depicting
20  various measurements of efficacy in the treatment
21  of rheumatoid arthritis; is that correct?
22      A.  That's correct.
23      Q.  And so it is fair to say that when
24  Dr. Steinbrook did request this specific piece of
00241:01  data, specifically the efficacy data in the
02  treatment of rheumatoid arthritis, Dr. Bombardier
03  was responsive and cooperative in providing that
04  data; is that fair?
05      A.  Yes.
06      Q.  Doctor, if you could take a look at what
07  was marked this morning as Exhibit 19.
```

CURFMAN19 - curfman19

```
08              Do you have Exhibit 19, Doctor?
09      A.  Yes, I do.
10      Q.  And I believe you already described this
11  document this morning.
12              Is it correct that this is a June 30
13  letter from Dr. Kaplan at The New England Journal
14  to Dr. Bombardier?
15      A.  Yes.
16      Q.  And this letter discusses the -- among
17  other things, it discusses some of the comments of
18  the reviewers to the VIGOR manuscript?
19      A.  Correct.
20      Q.  And I apologize, I think you told us
21  before, but who is Dr. Kaplan?
22      A.  He is the associate editor who was
23  responsible for handling this manuscript, and he is
24  a gastroenterologist by background.
```

**46. PAGE 242:11 TO 243:04  (RUNNING 00:00:48.441)**

```
11      Q.  And as Dr. Kaplan writes, "While the
12  editors are interested in your manuscript" -- and
```

CURFMAN19A - curfman19a

```
13  then he gives the title of the manuscript -- "we
14  could not accept it for publication without
```

## Mason v. Merck

```
15  substantial revision"; is that correct?
16      A.  That's correct.
17      Q.  And so Dr. Kaplan is basically saying that
18  unless the comments of the reviewers and the
19  editors are addressed to the editors' satisfaction,
20  the manuscript will not be published in The New
21  England Journal of Medicine; is that correct?
```

-KECURFMAN19A - Clear Attached Exhibit CURFMAN19a

```
22      A.  Correct.
23      Q.  Okay.  And the letter also goes through a
24  variety of requirements for a manuscript in order
00243:01  to be published in The Journal, generally speaking,
02  and in addition to the comments of the specific
03  reviewers; is that correct?
04      A.  Yes.
```

**47. PAGE 244:03 TO 244:16  (RUNNING 00:00:36.827)**

```
03      Q.  And specifically, in this letter Dr. Kaplan
04  gave some specific instructions regarding figures
```

CURFMAN19B - curfman19b

```
05  in the next paragraph, figures and tables.
06          He stated that Table 1 should be an
07  appendix.  All of the figures should be deleted and
08  summarized in the text as needed, and then
09  Tables 2, 3, 4 and 5 should be maintained and an
10  additional table about efficacy should be added; is
11  that correct?
12      A.  Right.
13      Q.  And that would -- that would meet the
14  target of five figures and tables that The Journal
15  had set?
16      A.  That's correct.
```

**48. PAGE 245:04 TO 245:12  (RUNNING 00:00:18.500)**

```
04      Q.  The last sentence of that paragraph reads,
05  "All numerical data should be rounded to a
```

CURFMAN19C - curfman19c

```
06  reasonable number of significant figures in
07  accordance with the precision of the data."
08          Do you see that sentence?
```

-KECURFMAN19C - Clear Attached Exhibit CURFMAN19c

```
09      A.  Yes, I do.
10      Q.  Is that standard practice in The New
11  England Journal?
12      A.  Yes, it is.
```

**49. PAGE 250:19 TO 251:01  (RUNNING 00:00:16.729)**

```
19      Q.  Okay.  Okay.  I don't need to show you the
20  letter, Doctor, but this morning we did look at the
21  letter from Dr. Drazen to Dr. Bombardier in which
22  Dr. Drazen, as the editor-in-chief of The New
23  England Journal, accepted the VIGOR manuscript for
24  publication; is that correct?
00251:01      A.  Yes, uh-huh.
```

**50. PAGE 252:10 TO 252:14  (RUNNING 00:00:10.400)**

```
10      Q.  So in their judgment -- well, the editors
```

## Mason v. Merck

```
11   of The New England Journal would not accept for
12   publication a piece where they believed the data
13   were presented in a misleading way, for example; is
14   that correct?
```

**51. PAGE 252:16 TO 253:03  (RUNNING 00:00:48.000)**

```
16        A.  If we were presented with a manuscript
17   where data were presented in a way that we
18   knowingly knew was misleading, that's correct.
19            We would not accept the manuscript at
20   that point if we -- if we had certain knowledge
21   that the data were presented in some misleading
22   way, or if we had knowledge that there was
23   additional information that was not there, that if
24   we had known about it, we thought that maybe it
00253:01   should be there, that would have been grounds for
02   turning the manuscript down, turning it back and
03   trying to fix that.
```

**52. PAGE 255:09 TO 256:03  (RUNNING 00:00:59.865)**

```
09        Q.  Okay.  Let's take a look again at the
10   published article, which is Exhibit 11.  If you
11   could get that, please, Doctor, and, Doctor, I
12   would likes to take a look at some of the data that
13   are presented in this article, and first I would
14   ask you to just take a look at the abstract on the
15   first page of the article.
16            Is it fair to say that, generally
17   speaking, the abstract is meant to be a summary of
18   the important information in the article?
19        A.  Yes.
20            Summary.
21        Q.  Summary, yes.
22        A.  Yes.
23        Q.  So if we go to the results part of just the
24   abstract, there is a brief summary of some of the
00256:01   information that appears later on in more detail in
02   the article; is that correct?
03        A.  That's right.
```

**53. PAGE 259:04 TO 259:19  (RUNNING 00:00:49.000)**

```
04        Q.  Then if you go a little further down in the
05   "Results" section of the abstract on the first
```

📄 CURFMAN11E - curfman11e



```
06   page, it reads, "The incidence of myocardial
07   infarction was lower among patients in the naproxen
08   group than among those in the rofecoxib group, 0.1
09   percent versus 0.4 percent; relative risk, 0.2.  95
10   percent confidence interval, 0.1 to 0.7."
11            Do you see that?
12        A.  I do.
13        Q.  So based on that, if a person read -- if a
14   reader of this article read the first -- just the
15   first page of this article, they would see that
16   there was a -- there was a difference in lower
17   incidences of heart attacks in the patient taking
18   naproxen than in the patient taking Vioxx; is that
19   correct?
```

**54. PAGE 259:21 TO 261:09  (RUNNING 00:02:01.000)**

```
21        A.  Well, that's what it says, yes.
22        Q.  And I would like to ask you specifically a
```

**Case Clip(s) Detailed Report**
**Saturday, October 28, 2006, 6:16:34 PM**

## Mason  v.  Merck

```
        23   few questions about the way the data are presented
        24   there, and specifically the relative risk
00260:01     presentation there of 0.2.
        02             Could you describe what a relative risk
        03   of 0.2 means?
        04        A.   The relative risk is a measure of the risk
        05   of one therapy versus another with respect to this
        06   particular endpoint.
        07             The confidence intervals reflect the
        08   variation on that point estimate of .2.  So the
        09   point estimate of .2 means that the risk of having
        10   a myocardial infarction with naproxen was only 20
        11   percent that of taking naproxen --
        12        Q.   Than taking Vioxx; is that right?  I'm
        13   sorry, Doctor, I think you may have misspoken.
        14        A.   Oh, did I?
        15        Q.   The relative risk of naproxen was 20
        16   percent --
        17        A.   Of rofecoxib.
        18        Q.   Of rofecoxib?
        19        A.   Yeah.
        20        Q.   I'm sorry.  Go ahead.
        21        A.   That's okay.  Go ahead.
        22        Q.   So that's another way of saying, if someone
        23   read this, that's another way of saying that the
        24   rate of heart attacks on naproxen was one-fifth the
00261:01     rate of heart attacks on Vioxx, roughly; is that
        02   correct?
```

-KECURFMAN11E - Clear Attached Exhibit CURFMAN11e          

```
        03        A.   Yes.
        04        Q.   And, conversely, and I think we discussed
        05   this this morning, that's another way of saying
        06   that the relative risk -- that the risk of
        07   myocardial infarctions on Vioxx was five times that
        08   of the relative risk -- sorry, the risk of heart
        09   attacks on naproxen; is that correct?
```

**55. PAGE 261:11 TO 262:04  (RUNNING 00:00:50.946)**

```
        11        A.   Yeah, it doesn't say that here.  The
        12   authors chose and the editors allowed to go through
        13   the statement that naproxen was protective.
        14             So that is the way it is stated here in
        15   this summary, but it doesn't acknowledge the other
        16   hypothesis here in the abstract.
        17        Q.   Well --
        18        A.   The other hypothesis being just what you
        19   said:  That the risk of heart attack is five times
        20   greater with naproxen -- with rofecoxib than with
        21   naproxen.
        22        Q.   Well, it's fair to say, isn't it, Doctor,
        23   that neither hypothesis is really discussed in this
        24   abstract?
00262:01             What is discussed in the abstract is
        02   that the incidence on naproxen was lower than that
        03   on the Vioxx and that the magnitude of that
        04   difference was about fivefold; is that fair?
```

**56. PAGE 262:06 TO 262:09  (RUNNING 00:00:13.000)**

```
        06        A.   Yes.  But again, that's only one
        07   possibility.  The implication here is that naproxen
        08   is protective.  Now, of course, we know -- we know
        09   now that that is not true at all.
```

Case Clip(s) Detailed Report
Saturday, October 28, 2006, 6:16:34 PM

## Mason v. Merck

**57. PAGE 262:13 TO 263:17 (RUNNING 00:01:15.000)**

```
         13        Q.  Yes.  But specifically, at least anyone
         14  reading this first page of this article would know
         15  that there was a fivefold difference between the
         16  incidence of heart attacks on Vioxx and naproxen.
         17  Whether that was a result of a protective effect of
         18  naproxen or some effect of Vioxx, they would know
         19  from reading this first page that there was a
         20  fivefold difference in heart attacks?
         21        A.  No.  I disagree with that.
         22            They are being told that there are
         23  fewer events with naproxen.  The clear implication
         24  there is that naproxen is protective and not that
00263:01  rofecoxib is deleterious.
         02        Q.  Right.  I understand -- and I understand
         03  that that is your view, Doctor, but my question is
         04  just, specifically, they wouldn't -- a person
         05  reading the first page of this article would know
         06  that there was a fivefold difference between the
         07  two -- that there were different rates of heart
         08  attacks on naproxen and rofecoxib?  They wouldn't
         09  have had to read past the abstract to understand
         10  that particular fact?
         11            MR. ARBITBLIT:  Objection.
         12        A.  Yes.  They would know that particular fact,
         13  but they would also take away the secondary fact
         14  that the clear implication is that naproxen is
         15  protective.
         16        Q.  Okay.
         17        A.  And we know now that that is not true.
```

**58. PAGE 263:21 TO 264:03 (RUNNING 00:00:13.977)**

```
         21            The further -- the "Results" section
         22  goes on further to state that, "The overall
```

📄 **CURFMAN11F - curfman11f**                            

```
         23  mortality rate and the rate of death from
         24  cardiovascular causes were similar in the two
00264:01  groups."
         02            Do you see that?
         03        A.  Yes, I do.  With very low statistical
```

**59. PAGE 264:11 TO 264:16 (RUNNING 00:00:15.000)**

```
         11        Q.  And the same -- the same really holds true
         12  with all of the cardiovascular events that are
         13  being discussed here.  We are talking about low
         14  number of events, and there is fairly low power to
         15  make any determinations about the cardiovascular
         16  events in this study; is that correct?
```

**60. PAGE 264:18 TO 265:07 (RUNNING 00:01:05.000)**

```
         18        A.  No.  I wouldn't agree with that.
         19            It's true that cardiovascular endpoints
         20  were not the primary endpoints in the trial; but
         21  the numerical data that we went through this
         22  morning, I think that valid conclusions about
         23  cardiac toxicity can be drawn from those data.
         24            It's not that there are too few of them
00265:01  that we can't say anything about it, that we can't
         02  validly assess cardiovascular toxicity from all of
         03  those tables of data that we reviewed this morning.
         04            There is very important information in
```

## Mason v. Merck

📄 -KECURFMAN11F - Clear Attached Exhibit CURFMAN11f

```
05   those tables of data that indicate a very clear
06   signal about the cardiac toxicity of rofecoxib, and
07   we shouldn't sweep that under the rug.
```

**61. PAGE 267:15 TO 269:16  (RUNNING 00:02:07.773)**

```
         15            Doctor if you could also take a look at
         16   Exhibit 16, which -- I'm sorry -- 17, which is one
         17   of the exhibits we looked at this morning, and I
         18   would refer you specifically to Page 25 of that
         19   exhibit, which is one -- which is the table that
         20   you talked about this morning.
         21            Are you there, Doctor?
         22      A.  Yes, I am.
         23      Q.  Okay.  Thanks.
         24            Just taking a look at this table, this
00268:01   was the table that you talked about this morning,
         02   and this table did not ultimately appear in the
         03   final published VIGOR article as a table, correct?
         04      A.  That's correct.
```

📄 CURFMAN17 - curfman17

```
         05      Q.  I just want to go over some of the -- I
         06   just want to go over the percentages that appear in
         07   that table and confirm that those percentages do in
         08   fact appear in the text of the final VIGOR article
         09   with you.
         10            Specifically, if you look at the first
         11   row on Table 5 on Page 25, you have all deaths and
         12   the percentages there are 0.5 percent and 0.4
         13   percent.
         14            Do you see those?
         15      A.  Yes, I do.
```

📄 CURFMAN11J - curfman11j

```
         16      Q.  And if you look at the second sentence
         17   under "General Safety" it states that, "The
         18   mortality rate was 0.5 percent in the rofecoxib
         19   group and 0.4 percent in the naproxen group."
         20            Do you see that?
         21      A.  Yes.
         22      Q.  So those percentage were disclosed in the
         23   text of the article; is that correct?
         24      A.  That's correct.
```

📄 CURFMAN17B - curfman17b

```
00269:01      Q.  And then if you go to the -- back to Page
         02   25 of Exhibit 17, if you look at cardiovascular
         03   deaths, the percentages are 0.2 percent and 0.2
         04   percent.
         05            Do you see that?
         06      A.  Yes, I do.
         07      Q.  And in the next sentence, moving to the
```

📄 CURFMAN11L - curfman11l

```
         08   next sentence of the published VIGOR article, it
         09   states, "The rate of death from cardiovascular
         10   causes was 0.2 percent in both groups"; is that
         11   correct?
         12      A.  Correct.
```

CONFIDENTIAL

Case Clip(s) Detailed Report
Saturday, October 28, 2006, 6:16:34 PM

## Mason v. Merck

```
13      Q.  So, again, the percentage of cardiovascular
14  deaths from Table 5 do appear in the text of the
15  final published VIGOR article; is that correct?
16      A.  The percentages do, yes.
```

**62. PAGE 269:19 TO 270:06  (RUNNING 00:00:38.000)**

```
19      Q.  Then if you go to -- I am going to skip the
20  third row, which is composite endpoint, and go to
```

CURFMAN17C - curfman17c

```
21  the next row, which is myocardial infarction, and
22  that has -- the percentages from the table are 0.4
23  percent and 0.1 percent; is that correct?
24      A.  Right.
00270:01    Q.  The corresponding sentence in the published
```

CURFMAN11K - curfman11k

```
02  paper states that, "Myocardial infarctions were
03  less common in the naproxen group than in the
04  rofecoxib group, 0.1 percent versus 0.4 percent,"
05  and then gives the 95 percent confidence interval
06  and relative risk; is that correct?
```

**63. PAGE 270:08 TO 270:14  (RUNNING 00:00:16.760)**

```
08      A.  Yes, uh-huh.
09      Q.  So, again, the percentages of the
10  myocardial infarction that occurred in both the
11  Vioxx arm and the naproxen arm of the study from
12  this Table 5 here do appear in the text of the
13  final published VIGOR article; is that correct?
14      A.  The percentages do, yes.
```

**64. PAGE 270:20 TO 271:17  (RUNNING 00:00:55.131)**

```
20              And the final row of Table 5 is
```

CURFMAN17E - curfman17e

```
21  ischemic cerebrovascular accidents, which are
22  essentially a type of stroke; is that correct,
23  Doctor?
24      A.  Correct.
00271:01    Q.  And the percentages in that table are 0.2
02  percent on Vioxx and 0.2 percent in the naproxen.
03              Do you see that?
04      A.  Yes, I do.
05      Q.  And I think I skipped this sentence before.
```

CURFMAN11I - curfman11i

```
06  It's above the prior one in the final published
07  article, but it states, "Ischemic cerebrovascular
08  events occurred in 0.2 percent of the patients in
09  each group"; is that correct?
10      A.  Yes.
11      Q.  So, again, the percentages of stroke in
12  both the Vioxx arm -- the percentage of patients
13  who suffered from a stroke in both the Vioxx arm
14  and the naproxen arm that were in this table also
15  appeared in the text of the final published
16  article; is that correct?
17      A.  The percentages did, yes.
```

Case Clip(s) Detailed Report
Saturday, October 28, 2006, 6:16:34 PM

## Mason  v.  Merck

**65. PAGE 279:15 TO 280:23 (RUNNING 00:01:25.771)**

```
15      Q.  And, Doctor, just continuing with our
16  discussion of some of the data that were presented
17  in the "General Safety" section of the VIGOR study,
```

CURFMAN11H - curfman11h 

```
18  which is 1523 of Exhibit 11.
19          Are you there?
20      A.  Yes.
21      Q.  After the data we talked about, the article
22  describes that four percent of the study subjects
23  met the criteria of the FDA for the use of aspirin
24  for secondary cardiovascular prophylaxis -- and
00280:01  then it describes that indication -- but were not
02  taking low-dose aspirin therapy.
03          Do you see that?
04      A.  Yes.
05      Q.  And the article states that these patients
06  accounted for 38 percent of the patients in the
07  study who had myocardial infarctions, or heart
08  attacks; is that correct?
09      A.  Yes.
```

CURFMAN11G - curfman11g

```
10      Q.  And then the article goes on to describe
11  the difference that was seen in the patients who
12  were not indicated for low-dose aspirin, and states
13  that, "In the other patients, the difference in the
14  rate of myocardial infarction between groups was
15  not significant, 0.2 percent in the rofecoxib group
16  and 0.1 percent in the naproxen group."
17          Do you see that?
18      A.  Yes.
19      Q.  So you -- would you agree, at least, that
```

-KECURFMAN11G - Clear Attached Exhibit CURFMAN11g

```
20  the fact that there was still a difference, albeit
21  not statistically significant, in the rate of heart
22  attacks among the nonaspirin-indicated patients is
23  disclosed in the article?
```

**66. PAGE 281:01 TO 281:08 (RUNNING 00:00:19.425)**

```
00281:01     A.  Well, your clients held back three of the
02  heart attacks.
03      Q.  Yes.
04          But my question, Doctor, was
05  specifically, is the fact that there is a
06  difference in the rate of heart attacks in the
07  patients who were not indicated for low-dose
08  aspirin disclosed in the article; is that correct?
```

**67. PAGE 281:10 TO 281:12 (RUNNING 00:00:07.772)**

```
10      A.  Your client withheld three of the heart
11  attacks, and therefore, these numbers are not
12  really the final accurate numbers.
```

**68. PAGE 281:13 TO 281:16 (RUNNING 00:00:09.418)**

```
13      Q.  When you say -- when you say Merck withheld
14  heart attacks, you are -- you are not stating Merck
15  withheld any of the heart attacks from the FDA, are
16  you?
```

## Mason v. Merck

**69. PAGE 281:18 TO 283:01 (RUNNING 00:01:12.751)**

```
     18        A.   No.
     19        Q.   In fact, Merck disclosed those heart
     20   attacks to the FDA, as far as you can tell; is that
     21   correct?
     22        A.   That's the way I learned about them.
     23        Q.   Right.  And that's how you learned about
     24   them --
00282:01        A.   After this was published.
     02        Q.   Right.  I understand.  But so Merck did --
     03        A.   I am the responsible editor and I find out
     04   after --
     05        Q.   Right.
     06        A.   -- it was published.
     07        Q.   But we do -- we are in agreement that Merck
     08   did disclose the three heart attacks that you are
     09   referring to to the FDA; is that correct?
     10        A.   To the FDA, but not to us.
     11        Q.   Right.
     12             And are you aware, Doctor, that this --
     13   that the analysis that was presented of the data
     14   that was given to The New England Journal of
     15   Medicine was an analysis of the events that had
     16   occurred as of a certain date?
     17        A.   I am very well aware of that, and I also
     18   think that, regardless of that arbitrary date, that
     19   we are talking about peoples lives, and one trumps
     20   the other.
     21        Q.   No.  I understand.
     22             Are you aware that the date cutoff that
     23   I mentioned was pre-specified in the protocol as
     24   the primary analysis of safety that would be done
00283:01   in the study?
```

**70. PAGE 283:03 TO 283:05 (RUNNING 00:00:10.817)**

```
     03        A.   Yes.  And that I still contend is a minor
     04   technicality compared to the overriding importance
     05   of these sorts of data to the health of the public.
```

**71. PAGE 285:10 TO 285:14 (RUNNING 00:00:09.200)**

```
     10             But can you -- can you answer my
     11   question with respect to the data that existed
     12   prior to the pre-specified cutoff point, and were
     13   in fact the percentages presented accurately with
     14   respect to that?
```

**72. PAGE 285:17 TO 286:14 (RUNNING 00:00:40.000)**

```
     17        A.   They were, but I don't think that's the
     18   relevant question.
     19        Q.   Fair enough.
     20        A.   You are talking to a doctor and a
     21   cardiologist who cares and who has cared for many
     22   patients with heart attacks, and to withhold three
     23   of them like that is wrong.
     24        Q.   I understand.
00286:01             I just -- I want just to make sure the
     02   record is clear.
     03             When you're referring to withholding,
     04   you are referring to what was submitted to editors
     05   of The New England Journal, but these heart attacks
     06   were in fact disclosed to the FDA.
     07        A.   Are we not important?
     08        Q.   Of course not.  No, of course not, Doctor.
     09        A.   Is The New England Journal not important?
```

Case Clip(s) Detailed Report
Saturday, October 28, 2006, 6:16:34 PM

## Mason v. Merck

```
10      Q.  Of course not.  We are in agreement.
11      A.  Then why weren't we given the data?
12      Q.  We are in agreement about the importance
13  of --
14      A.  Why weren't we given the data?
```

**73. PAGE 287:11 TO 287:14  (RUNNING 00:00:10.000)**

```
11      Q.  So, Doctor, my specific question now is the
12  data you are referring to, the myocardial
13  infarction data from VIGOR, was disclosed to the
14  FDA; is that correct?
```

**74. PAGE 287:16 TO 287:16  (RUNNING 00:00:03.306)**

```
16      A.  Yes.  They are on the FDA Website, yes.
```

| TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 01:14:13.259) |
| --- |