## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 06-0810 | * | |
| | * | MAGISTRATE JUDGE |
| CHARLES L. MASON, | * | KNOWLES |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * | | |

### MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") FOR JUDGMENT AS A MATTER OF LAW

Merck moves, at the close of plaintiff's case, for judgment in its favor as a matter of law. While Merck believes it is entitled to judgment on all claims, it especially urges the Court to consider entering judgment at this time on plaintiff's non-core claims – *i.e.*, non-failure to warn claims – that plainly are barred by Utah law.   These include plaintiff's "Deceptive Trade Practices Act" claim, strict liability and negligent design defect claims, and common law fraud claims.   The Court should also use this opportunity to apply Utah's statutory bar on punitive damages claims against makers of FDA-approved prescription drugs.

Getting rid of these extraneous claims now will reduce the chance of error in charging the jury or in the verdict.   As a leading practice guide notes, "there need not be an instruction on an issue neither presented by the pleadings nor effectively raised at the trial by the parties."   9A

Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE – CIVIL § 2556

(2d ed. 1987). The Fifth Circuit has recognized as much, explaining:

> The trial court has no duty to give the jury an exegesis of legal principles that
> might enable a plaintiff to recover or to instruct the jury on issues not fairly raised
> by the pleadings, the pretrial order, or the course of the trial. It has no obligation
> to introduce issues inferentially suggested by incidental evidence in the record.

*Laird v. Shell Oil Co.*, 770 F.2d 508, 510-11 (5th Cir. 1985) (internal citations, quotation marks,

and punctuation omitted); *see also Rohner v. Capital City Bank*, 655 F.2d 571, 577 (5th Cir.

1981); *Feemster v. Dehntjer*, 661 F.2d 87, 90 (8th Cir. 1981) ("The plaintiff is master of his

claim. He may abandon a theory of liability during the trial, and if he does the jury should be

clearly instructed only on those issues that it will consider."). This reasoning is especially

compelling in a case such as this one, where instructing the jury on superfluous claims would

add nothing to plaintiff's case and would serve only to confuse the issues. The Court should

grant Merck's motion in its entirety, but, at a minimum, should enter judgment in Merck's favor

on plaintiff's various illegitimate and unproven claims.

## I.    THE LEGAL STANDARD.

A motion for judgment as a matter of law should be granted if, "after a party has been

fully heard by the jury on an issue, 'there is no legally sufficient evidentiary basis for a

reasonable jury to have found for that party with respect to that issue.'" *Aetna Cas. & Sur. Co. v.

Pendleton Detectives of Miss., Inc.*, 182 F.3d 376, 377-78 (5th Cir. 1999) (quoting FED. R. CIV.

P. 50). "[A] party has been fully heard when he rests his case." *Echeverria v. Chevron USA

Inc.*, 391 F.3d 607, 610 (5th Cir. 2004). At that time, the court "may grant a motion for

judgment as a matter of law against that party with respect to a claim or defense that cannot

under the controlling law be maintained or defeated." FED. R. CIV. P. 50(a)(1). "A mere

scintilla of evidence is insufficient to present a question for the jury." *Rutherford v. Harris*

*County*, 197 F.3d 173, 179 (5th Cir. 1999). Instead, "[t]here must be a conflict in substantial evidence to create a jury question." *Id.*

## II.   PLAINTIFF'S CLAIM FOR "DECEPTIVE TRADE PRACTICES" HAS NO APPLICATION TO THIS CASE.

The Court should enter judgment in Merck's favor on plaintiff's so-called "Deceptive Trade Practices" claim. Mr. Mason purports to bring this claim under UTAH CODE ANN. § 13-11a-3, which is actually part of the "Utah Truth in Advertising Act," UTAH CODE ANN. § 13-11a-1 to § 13-11a-5.[1] The cause of action – which appears to have been pled in error, as evidenced by the fact that plaintiff's proposed jury instruction on the claim references an *entirely different statute*[2] – fails for at least third reasons. First, plaintiff has not complied with the Act's pre-suit notice requirement. Second, the Act applies only to advertisements, and there is no evidence in the record to suggest that any Vioxx ads "injured" Mr. Mason. Third, because there is an explicit exemption in the Act for advertisements that are in compliance with government regulations, section 13-11a-3 does not apply here in any case.

The stated purpose of the "Truth in Advertising Act" is to "prevent deceptive, misleading, and false advertising practices and forms in Utah." UTAH CODE ANN. § 13-11a-1. The term "advertisement" is defined as "any written, oral, or graphic statement or representation made by a supplier in connection with the solicitation of business." UTAH CODE ANN. § 13-11a-2(1). It includes "communication by noncable television systems, radio printed brochures,

---

[1] There is no "Deceptive Trade Practices Act" in Utah. The "Truth in Advertising Act" has never been alleged or applied in any reported cases involving prescription drugs.

[2] Plaintiff's Proposed Instruction No. 9, titled "Deceptive Trade Practices," does not cite UTAH CODE ANN. § 13-11a-3. Instead, it references UTAH CODE ANN. §§ 13-11-2, 13-11-3, 13-11-3(6), and 13-11-4(1)-(2) and three cases interpreting these statutes, which are part of the "Utah Consumer Sales Practices Act," UTAH CODE ANN. § 13-11-1 to § 13-11-23. No "Consumer Sales Practices Act" claim was alleged in plaintiff's Complaint or included in the Pre-Trial Order.

3

newspapers, leaflets, flyers, circulars, billboards, banners, or signs." *Id.* It expressly excludes, however, "any oral, in person, representation made by a sales representative to a prospective purchaser." *Id.*

A person may sue under the Act for an injunction and damages if he is "injured" by a violation. UTAH CODE ANN. § 13-11a-4(2)(a). But, as a prerequisite to filing suit, the plaintiff must provide ten days' pre-suit notice to the defendant and an opportunity to correct the allegedly deceptive advertisement. UTAH CODE ANN. § 13-11a-4(5); *Proctor & Gamble Co. v. Haugen*, 947 F.Supp. 1551, 1555 (D. Utah 1996) (requiring proof of such notice as a prerequisite to claims for injunctions or damages). Mr. Mason provided no such notice in this case. Therefore, and on this ground alone, Merck is entitled to judgment in its favor on plaintiff's claim for "Deceptive Trade Practices."

In addition to the procedural defect in plaintiff's claim, he has not met his burden to show that he was "injured" by any Merck advertisements. He alleges that Merck violated the Act by using "false and misleading misrepresentations of material fact in connection with the sale of Vioxx" and by communicating the purported benefits of Vioxx without disclosing the risk of serious side effects. (Compl. at ¶ 89.) The alleged "misrepresentations" are not defined, but elsewhere in his Complaint he alleges that Merck hired former Olympic athletes Dorothy Hamill and Bruce Jenner to star in direct-to-consumer advertising.[3] (*Id.* at ¶ 42; *see also* Pre-Trial Order at ¶ 8(b); Oct. 30, 2006 Tr. at 104:16-24 (Pl.'s Opening Statement).) At trial, however, Mr. Mason made clear that he decided to take Vioxx based on his own favorable experience trying the Vioxx prescribed to his son-in-law – not Merck's advertising. (Nov. 6, 2006 Tr. at 1303:19-

---

[3] Mr. Mason premises his claim on section 13-11a-3, which enumerates twenty-one "deceptive trade practices," but does not identify which of the listed offenses he attributes to Merck.

4

1305:1, 1306:4-10, 1325:19-1326:1.) He thus cannot show that he was damaged by any Vioxx-related Merck advertisements.

Finally, plaintiff has failed to adduce any evidence to satisfy section 13-11a-5(1), which exempts "conduct in compliance with the orders or rules of, or a statute administered by, a federal, state, or local governmental agency." UTAH CODE ANN. § 13-11a-5(1). Even assuming Mr. Mason could show he was "injured" by Merck advertisements, he has not shown that the advertisements were not in compliance with FDA regulations. Plaintiff's marketing expert, Professor Pechmann, was unable to point to a single instance of the FDA complaining about any marketing materials relating to plaintiff's claim. Merck is thus entitled to judgment in its favor on plaintiff's "Deceptive Trade Practices Act" claim as a matter of law.

## III. MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S DESIGN DEFECT CLAIMS.

The Court should likewise enter judgment in Merck's favor on plaintiff's strict liability and negligent design defect claims. Plaintiff has all but abandoned these claims. He tendered no proposed jury instruction on the strict liability cause of action, and made no mention of it during opening statements, when counsel explained to the jury:

> ... [A]t the end of the case you're going to ask [*sic*] some questions that you're going to deliberate and decide. And the questions will be whether or not, Number 1, Merck adequately warned the family nurse practitioner about whether Vioxx could cause heart attacks. That's one issue. Another issue is whether Merck was negligent in designing Vioxx. And a third issue is whether or not Vioxx was a, not "the" but "a" cause of Mr. Mason's heart attack.

(Oct. 30, 2006 Tr. at 91:12-92:2.) Although counsel did reference plaintiff's negligent design defect cause of action during his remarks, it was the first and last time he did so. The actual design of Vioxx, whether defective or not, was not mentioned *once* in plaintiff's case. Nor did plaintiff present sufficient evidence to support either design defect claim.

5

That plaintiff did not even attempt to try this as a design defect case, and focused instead on his failure to warn claims, is understandable. As explained further below, Utah has expressly abolished strict liability design defect claims relating to FDA-approved prescription drugs. It has never recognized negligent design defect claims for prescription drugs, and has telegraphed that it would not do so. Thus, plaintiff does not have a viable design defect claim – whether grounded in strict liability or negligence – under Utah law. And, even if he could overcome this hurdle, he has not proffered legally sufficient evidence to show Vioxx was so "unreasonably dangerous" as to qualify as a "defective" product under the Utah Products Liability Act ("UPLA"). *See* UTAH CODE ANN. § 78-15-6(1). The Court thus need not instruct the jury on plaintiff's design defect claims.

## A.    Plaintiff's Design Defect Claims Are Not Cognizable Under Utah Law.

Even if plaintiff *had* made some effort to pursue his design defect claims, judgment in Merck's favor would still be warranted. Applying "comment k," the Supreme Court of Utah has extended a "broad grant of immunity" from strict liability design defect claims to "FDA-approved prescription drugs" such as Vioxx. *Grundberg v. Upjohn Co.*, 813 P.2d 89, 90, 99 (Utah 1991). Both the language and the rationale underlying this decision apply with equal force to a negligent design defect claim alleged in the prescription drug context. As the Fifth Circuit has recognized, claims for strict liability encompass negligent (and even intentional) conduct. "While a greater showing (*i.e.*, the additional proof of negligence) may be required" to prove negligent design defect, "in no event is 'less' required." *Garrett v. Hamilton Standard Controls, Inc.*, 850 F.2d 253, 265 n.4 (5th Cir. 1988) (citation omitted).[4]    Thus, if strict liability design

---

[4] *See also id.* at 256-57 ("Under both negligence and strict liability theories the plaintiff must, of course, prove causation. Thus, although a negligence claim requires a different showing from a strict liability claim, a manufacturer logically cannot be held liable for failing to exercise

(*footnote continued next page*)

6

defect claims have been abolished under Utah law, so have negligent design defect claims –
meaning that both of Mr. Mason's claims for design defect fail as a matter of law.

In *Grundberg v. Upjohn Co.*, a case involving the prescription drug Halcion, the Supreme
Court of Utah adopted comment k to section 402A of the Restatement (Second) of Torts.
*Grundberg*, 813 P.2d at 91-95.    Under comment k, prescription drugs are considered
"unavoidably unsafe," in that they are "incapable of being made safe for their intended and
ordinary use" but have benefits that outweigh the hazards of their use.[5]  RESTATEMENT (SECOND)
OF TORTS § 402A cmt. k (1965); *Schaerrer v. Stewarts' Plaza Pharmacy*, 79 P.3d 922, 928 (Utah
2003).    An "unavoidably unsafe product" is not "unreasonably dangerous" *per se*.
RESTATEMENT (SECOND) OF TORTS § 402A cmt. k.  To the contrary, "[s]uch a product, properly
prepared, and accompanied by proper directions and warning, is not defective, nor is it
unreasonably dangerous." *Id.* (emphasis removed).  Therefore, "[t]he seller of such products,
again with the qualification that they are properly prepared and marketed, and proper warning is
given, where the situation calls for it, is not to be held to strict liability for unfortunate
consequences attending their use, merely because he has undertaken to supply the public with an
apparently useful and desirable product, attended with a known but apparently reasonable risk."
*Id.*

Applying comment k, the Utah Supreme Court in *Grundberg* held that "a drug approved
by the [FDA], properly prepared, compounded, packaged, and distributed, cannot as a matter of

---

ordinary care when producing a product that is not defective . . . ." internal citation omitted));
*accord Kallassy v. Cirrus Design Corp.*, No. 3:04-CV-0727-N, 2006 U.S. Dist. LEXIS 34347,
*13 (N.D. Tex. May 30, 2006).

[5] Plaintiffs in *Grundberg* argued that the applicability of comment k should be evaluated "on a
case-by-case basis," but the Court rejected this approach – instead "characterizing all FDA-
approved prescription medications as 'unavoidably unsafe.'" *Grundberg*, 813 P.2d at 90.

law be 'defective' in the absence of proof of inaccurate, incomplete, misleading, or fraudulent information furnished by the manufacturer in connection with FDA approval."[6] *Grundberg*, 813 P.2d at 90; *accord Schaerrer*, 79 P.3d at 928. Thus, under Utah law, a prescription drug manufacturer may not be held liable for design defect. *See Grundberg*, 813 P.2d at 95 ("manufacturers of unavoidably unsafe dangerous products should not be liable for a claim of design defect").

Although the *Grundberg* court only had occasion to address strict products liability, its reasoning – and much of its language – applies as well to negligent design defect claims alleged in prescription drug cases.[7] The court rooted its decision, in large part, on the following four factors:

- First, prescription drugs have unique and beneficial characteristics that we value as a society, in that they "sav[e] lives and alleviat[e] human suffering." *Grundberg*, 813 P.2d at 95. As the court acknowledged, "[d]espite inherent risks, and in contrast to any other product, society has determined that prescription medications provide a unique benefit and so should be available to physicians with appropriate warnings and guidance as to use." *Id.* at 96.

- Second, these drugs are subject to an "extensive regulatory scheme capable of and appropriate for making the preliminary determination regarding whether a prescription drug's benefits outweigh its risks." *Id.* at 97. In fact, "[n]o other class of products is subject to such special restrictions or protections in our society." *Id.* at 96.

- Third, given the "complex" and sometimes moral questions involved in weighing a drug's benefits against its risks, as well as the "inherent limitations of the trial process," the civil courts are not the best forum for addressing prescription drug products liability claims. *Id.* at 98. "Under a case-by-case

---

[6] This language appears to permit a design defect claim if there is proof of fraud on the FDA. If that is the case, the exception to the *Grundberg* rule is preempted as a matter of federal law. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001).

[7] In *Grundberg*, plaintiffs alleged both negligence and strict liability claims, but only their strict liability design defect claim was before the Court. 813 P.2d at 90. The defendant filed a motion for summary judgment on the claim, arguing that it was precluded as a matter of law under comment k. *Id.* The United States District Court for the District of Utah certified the question to the Utah Supreme Court, which had not yet adopted or addressed comment k at the time. *Id.*

approach, courts or juries must ask which is a more significant interest: efficacy with respect to group A versus harm to group B? The FDA must ask the same question: Does the benefit of this product outweigh its risk? The distinction is that the FDA is in a more objective and informed posture to make that determination." *Id.* at 98, n.8.

• Finally, there are "significant public policy considerations" that weigh in favor of immunizing prescription drug manufacturers from design defect liability – including society's interest in incentivizing the development of new drugs and consumers' interest in the "prompt availability" of these products at an affordable price. *Id.* at 94, 95 (citing *Brown v. Superior Court*, 44 Cal. 3d 1049 (1988)).

Based on these factors, the *Grundberg* court concluded that "manufacturers of unavoidably dangerous products should not be liable for a claim of design defect" – and, specifically, that claims against a prescription drug manufacturer for strict liability design defect are barred by comment k. *Grundberg*, 813 P.2d at 95.

For exactly these same reasons, comment k precludes Mr. Mason's claim for negligent design defect. The elements of the two claims are the same, except that the strict liability claim encompasses all defendants, whether they are negligent or not. And, the justifications for leaving the evaluation of a drug's risks and benefits to the FDA – whose officers have "the benefit of years of experience in reviewing [prescription drugs], scientific expertise in the area, and access to the volumes of data they can compel manufacturers to produce," *id.* at 98 – weigh in favor of protecting prescription drug manufacturers from all design defect liability, no matter what theory of recovery is alleged. Moreover, the requirements of the UPLA apply to any "action for damages for personal injury, death, or property damage allegedly caused by a defect in a product," again regardless of the theory advanced. UTAH CODE ANN. § 78-15-6. Thus, although "it is possible to simultaneously bring a negligence and a strict liability claim" for products liability under Utah law, *Slisze v. Stanley-Bostitch*, 979 P.2d 317, 319 (Utah 1999), Utah courts have recognized that claims alleging the same essential "defect" are factually and legally indistinguishable, and rise or fall together. *Brown v. Sears, Roebuck & Co.*, 328 F.3d

1274, 1283 (10th Cir. 2003) (defective lawnmower case applying Utah law).[8]  Other "avenues of recovery" are available to plaintiffs, such as claims for "inadequate warning, mismanufacture, improper marketing, or misrepresenting information to the FDA." *Grundberg*, 813 P.2d at 99; *see also Schaerrer*, 79 P. 3d at 928 ("comment k does not extinguish strict liability claims based on manufacturing flaws or inadequate warnings").  But, design defect claims – like those alleged by plaintiff in this case – are barred as a matter of law.  Thus, in accordance with the *Grundberg* reasoning, both of plaintiff's design defect claims fail as a matter of law.

## B.  Assuming, *Arguendo*, That Plaintiff Could State A Negligent Design Defect Claim, He Has Failed To Prove It.

Even if plaintiff's negligent design defect claim were viable under Utah law, it would still fail, because plaintiff has not offered legally sufficient evidence to satisfy its essential elements.

In Utah, products liability causes of action are created by common law, although the UPLA articulates and imposes additional "conditions" that must be satisfied. *See, e.g., Brown*, 328 F.3d at 1278-79.  The UPLA provides that "[n]o product shall be considered to have a defect or to be in a defective condition, unless at the time the product was sold by the manufacturer or other initial seller, there was a defect or defective condition in the product which made the product *unreasonably dangerous* to the user or consumer." UTAH CODE ANN. § 78-15-6(1)

---

[8] Other states have also recognized that, when comment k applies, "[t]he standard for liability under strict liability and negligence is essentially the same." *Werner v. Upjohn Co.*, 628 F.2d 848, 858 (4th Cir. 1980) (applying Maryland law); *see also Klem v. E.I. DuPont De Nemours & Co.*, 19 F.3d 997, 1003 (5th Cir. 1994) (applying Louisiana law); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1353-54 (3d Cir. 1992) (applying Pennsylvania law); *Basko v. Sterling Drug. Inc.*, 416 F.2d 417, 426 (2d Cir. 1969) (applying Connecticut law); *Chambers v. G.D. Searle & Co.*, 441 F. Supp. 377, 381 (D. Md. 1975); *Feldman v. Lederle*, 479 A.2d 374 (N.J. 1984); *Smith v. E.R. Squibb & Son, Inc.*, 273 N.W.2d 476 (Mich. 1979); *Ortho Pharm. Corp. v. Champman*, 388 N.E.2d 541 (Ind. App. 1979).

(emphasis added).[9]  "Unreasonably dangerous" is defined as "dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer or user of that product in that community considering the product's characteristics, propensities, risks, dangers, and uses together with any actual knowledge, training, or experience possessed by that particular buyer, user or consumer."  UTAH CODE ANN. § 78-15-6(2); *see also* RESTATEMENT (SECOND) OF TORTS § 402A cmt. i (1965).  As interpreted by the United States District Court in *Brown*, this language means that Utah applies a "consumer expectations" test, not a "risk-benefit" test.  In *Brown*, the court decided that this statute "impos[es] an objective consumer expectations test and supplement[s] it with a subjective test based on the individual knowledge, training, and experience of the particular buyer, user, consumer, or, possibly, victim."  *Brown*, 328 F.2d at 1282.

Merck's legal research has not uncovered a single Utah case in which negligent design defect was alleged in the prescription drug context.  However, given that Utah has adopted the learned intermediary doctrine, *Schaerrer*, 79 P.3d at 928, the expectations of the "ordinary and prudent" user in the *Brown* court's "consumer expectation" test must be evaluated from the perspective of an ordinary and prudent prescriber.  After all, "[i]t is the physician who is best situated to weigh the potential risks associated with a prescription drug against the possible

---

[9] The Utah Supreme Court ruled the UPLA invalid in *Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985) – finding section 78-15-3 unconstitutional as a statute of repose and further finding that it was not severable from the remainder of the Act.  The legislature subsequently "repealed and amended certain sections in an apparent effort to comply with the court's concerns."  *Grundberg*, 813 P.2d at 97.  Although section 78-15-6 was not repealed, amended, or specifically reenacted, the Utah Supreme Court has noted its continuing validity.  *Id.*; *Heurie v. Northrop Grumman Corp.*, No. 2:04-CV-00296 PGC, 2006 WL 1129399, *4 (D. Utah Apr. 24, 2006).

11

benefits of the drug and the unique needs and susceptibilities of each patient." *Id.*[10] So, too, must the subjective component of the test, which takes into account the particular understanding of the user, be evaluated from the point of view of the prescriber. As the *Brown* court noted, this case-specific information "ordinarily increase[s] the particular person's appreciation of the product's danger" and thus "can only work against a plaintiff's claim that a product is unreasonably dangerous." *Id.* Thus, if the prescriber in a case such as this one has unique training, making him or her aware of the product's risks, the manufacturer can be exonerated even though an ordinary prescriber would not have shared those expectations.

Here, plaintiff failed to show that an ordinary and prudent prescriber would have found Vioxx "unreasonably dangerous" in late 2002 and early 2003, given the information available at the time. Nurse Practitioner Olson-Fields's testimony revealed that she was sent at least two letters from Merck regarding VIGOR and other Vioxx-related clinical data, reviewed the April 2002 Vioxx label, and thus had the benefit of the most current information at the time in making her prescribing decision. (Nov. 3, 2006 Tr. at 1036:12-1037:7, 1039:9-1043:8, 1044:7-1048:5, 1065:23-1074:10, 1076:9-1081:12, 1094:20-25; *see also* Def.'s Exs. 453, 2119, 2331.)  Dr. Vogeler, Mr. Mason's primary physician, was also aware of the cardiovascular risks associated with Vioxx, and still thought it was appropriate for some people – including himself. (*See* Nov. 3, 2006 Tr. at 1023:14-25 (Test. of N.P. Olson-Fields).)  He and a number of plaintiff's treating physicians continued to take Vioxx, even after Merck withdrew the drug from the market, because they found it safe and effective. (*See, e.g., id.*; Nov. 6, 2006 Tr. at 1409:21-1410:4 (Test. of Dr. Symkoviak).)  More generally, the evidence showed that Merck turned over all relevant information to the FDA, and that the VIGOR data was disseminated to the medical

---

[10] Plaintiff's proposed jury instructions indicate that there is no disagreement on this point.

community through medical journals and other trusted resources. In short, there is no evidence that physicians were unaware of the VIGOR data or any other safety information concerning Vioxx. Plaintiff thus failed to show that Vioxx was "unreasonably dangerous" as designed, as required by the UPLA.

In addition, plaintiff failed to meet at least one common law element of his purported design defect claim. Under Utah law, "a showing of an alternative, safer design, practicable under the circumstances and available at the time of defendants' placing the [product] in the stream of commerce" is required. *Allen v. Minnstar, Inc.*, 8 F.3d 1470, 1479 (10th Cir. 1993) (applying Utah law); *accord Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866-67 (10th Cir. 2003) (applying Utah law); *Brown*, 328 F.3d at 1280 (noting this requirement is in addition to the elements stated in the UPLA). Without *any* evidence of an alternative design – whether feasible or not – plaintiff did not come close to meeting his burden. And, even if he had offered evidence of an alternative formulation for Vioxx, without proof of feasibility the claim would also fail.[11]

Finally, and for many of the reasons stated above, plaintiff did not proffer evidence sufficient to overcome Utah's presumption in favor of products such as Vioxx that were designed in "conformity with government standards." UTAH CODE ANN. § 78-15-6(3) ("a product is free from any defect or defective condition where the alleged defect in the plans or designs for the product . . . were in conformity with government standards established for that industry which were in existence at the time the plans or designs for the product . . . were adopted.") In Utah, a product that complies with pertinent government regulations is presumptively not defective or unreasonably dangerous. *Id.* Here, it is undisputed that the FDA approved Vioxx as "safe and

---

[11] Plaintiff introduced some limited risk-benefit testimony on Vioxx, but none on any supposed alternative products. The feasibility of an alternative is essentially "a risk-utility balancing test, weighing the costs of an alternative design against its benefits." *Brown*, 328 F.3d at 1280.

13

effective" in 1999 and in 2002, in the latter instance following a full review of the results of the

VIGOR trial. (*See* Pre-Trial Order at 7.)  These approvals trigger Utah's statutory presumption

that Vioxx was not defective or unreasonably dangerous, and plaintiff has the burden of

demonstrating otherwise.  As explained above, plaintiff failed to meet this burden.  Merck is thus

entitled to judgment in its favor on plaintiff's negligent design defect claim, even assuming he

can state such a claim under Utah law.[12]

## IV.   PLAINTIFF CANNOT PREVAIL ON HIS COMMON LAW FRAUD CLAIMS.

Plaintiff recognizes that this is a failure to warn case, not a fraud case, and has tried his

case accordingly.  For example, during voir dire, plaintiff's counsel repeatedly stated that the

plaintiff has the burden of proving his case by the "greater weight of the evidence."  (Oct. 30,

2006 Tr. at 48:6-49:10.)  While the preponderance of the evidence standard applies to failure to

warn claims, fraud must be proved by *clear and convincing* evidence.  *See Taylor v. Gasor, Inc.*,

607 P.2d 293, 294-95 (Utah 1980) ("fraud is a wrong of such nature that it must be shown by

---

[12] For all the reasons discussed above, it is highly unlikely that Utah would recognize a negligent design defect claim against a prescription drug manufacturer.  If the Court concludes that it would, however, it should apply section 6(c) of the Restatement (Third) of Torts, Products Liability.  That is what other district courts have done in similar situations.  *See, e.g., Sita v. Danek Med., Inc.*, 43 F. Supp. 2d 245, 255 (E.D.N.Y. 1999) (holding that design defect claims regarding pedicle screws failed under standards articulated in section 6(c)); *Gebhardt v. Mentor Corp.*, 191 F.R.D. 180, 185 (D. Ariz. 1999) (applying section 6(c) to grant summary judgment in favor of manufacturer under Arizona law); *Taylor v. Danek Med., Inc.*, No. 95-7232, 1998 U.S. Dist LEXIS 20265, *20 (E.D. Pa. Dec. 29, 1998) (predicting that Pennsylvania will adopt section 6(c)).  The section provides:

> A prescription drug or medical device is not reasonably safe due to defective design if the foreseeable risks of harm posed by the drug or medical device are sufficiently great in relation to its foreseeable therapeutic benefits that reasonable health-care providers, knowing of such foreseeable risks and therapeutic benefits, would not prescribe the drug or medical device for any class of patients.

RESTATEMENT (THIRD) OF TORTS, PRODUCTS LIABILITY § 6(c) (1998).  Of course, Mr. Mason cannot satisfy this test.  As noted in text above, his own doctors testified that they would continue to prescribe Vioxx for themselves and for their patients.

clear and convincing proof and will not lie in mere suspicion or innuendo" (citation omitted)).

Because fraud is not a theory upon which plaintiff has tried his case, and his fraud claims also

are not supported by Utah law or the evidence, the Court should enter judgment on these claims

as well.

## A.      Plaintiff's Fraud Claims Are Incompatible With Learned Intermediary Doctrine.

As noted above, Utah is a "learned intermediary" state, meaning a prescription drug

manufacturer's duty to warn runs only to the prescribing physician:

> It is the physician who is best situated to weigh the potential risks associated with
> a prescription drug against the possible benefits of the drug and the unique needs
> and susceptibilities of each patient.  The physician thus has the ability to combine
> medical knowledge and training with an individualized understanding of the
> patient's needs, and is the best conduit for any warnings that are deemed
> necessary.

*Schaerrer*, 79 P.3d at 928 (internal citation omitted).  Although the Utah Supreme Court has not

yet addressed the issue, courts applying the learned intermediary rule in other jurisdictions have

rejected consumer fraud claims against drug manufacturers as an improper end-run around the

learned intermediary doctrine.  As one court put it, "the only valid claim in a prescription drug

suit is th[at] defendants failed to adequately warn the plaintiff's prescribing physician about the

drug, which caused the plaintiff's injuries."  *Hackett v. G.D. Searle & Co.*, No. A-01-CA-399-

SS, 2002 U.S. Dist. LEXIS 16246, at *7 (W.D. Tex. June 25, 2002) (in a personal injury suit

involving Celebrex, granting summary judgment on claims of breach of express and implied

warranties, intentional and negligent misrepresentation and fraud, and intentional infliction of

emotional distress on this ground).

*Burton v. American Home Products Corp. (In re Norplant Contraceptive Products*

*Liability Litigation)*, 955 F. Supp. 700, 710 (E.D. Tex. 1997), illustrates this point.  In that case,

plaintiffs brought suit against the makers of Norplant under theories of strict liability, negligence,

15

misrepresentation, breach of implied warranty of merchantability, and alleged violations of the

Texas Deceptive Trade Practices Act ("DTPA"). *Id.* at 702-03. The court explained:

> The gravamen of all of Plaintiffs' causes of action, including misrepresentation
> and violations of the DTPA, is that Wyeth failed to adequately warn of or disclose
> the severity of Norplant's side effects. Therefore, the learned intermediary
> doctrine applies to all of Plaintiffs' causes of action. . . . [W]hether the failure to
> warn is couched as an affirmative misrepresentation or a misrepresentation by
> concealment, the allegation collapses into a charge that the drug manufacturer
> failed to warn.

*Id.* at 709. The court reasoned, in part, that "[i]f the [learned intermediary] doctrine could be

avoided by casting what is essentially a failure to warn claim under a different cause of action,

then the doctrine would be rendered meaningless." *Id*; *see also, e.g., Talley v. Danek Med., Inc.*,

179 F.3d 154, 162-63 (4th Cir. 1999); *Catlett v. Wyeth, Inc.*, 379 F. Supp. 2d 1374, 1381 (M.D.

Ga. 2004); *Alexander v. Danek Med., Inc.*, 37 F. Supp. 2d 1346, 1350 (M.D. Fla. 1999).

So, too, in this case. To allow plaintiff to avoid application of the doctrine by recasting

his failure to warn claim under alternate theories such as fraud would defeat the important

purposes of the doctrine. The Court should thus follow the other courts to have considered this

issue, and should reject plaintiff's common law fraud claims. *See Wyeth-Ayerst Labs. Co. v.

Medrano*, 28 S.W.3d 87, 94 (Tex. App. 2000) (applying the learned intermediary doctrine to "all

of [plaintiff's] causes of action" against the manufacturer of Norplant); *Talley*, 179 F.3d at 162-

63 (fraud claims barred because the learned intermediary doctrine applied); *Catlett*, 379 F. Supp.

2d at 1381 (learned intermediary doctrine encompasses any fraud, fraudulent concealment, or

misrepresentation claim related to prescription drugs); *Alexander*, 37 F. Supp. 2d at 1350

(approving of defendant's argument that failure to warn claims brought under the theories of

negligence, strict liability, and fraud fail because of the application of the learned intermediary

doctrine).

16

## B.     Plaintiff's Fraud Claims Suffer From A Failure of Proof.

Even if Utah were to cast aside the learned intermediary rule in order to allow a fraud claim by a consumer against a pharmaceutical company for failure to warn, plaintiff could not prevail on his claims for other reasons.    To make out a *prima facie* case of fraudulent misrepresentation under Utah law, plaintiff must show that: (i) a representation was made by the defendant (ii) concerning a presently existing material fact (iii) which was false and (iv) which the defendant either knew to be false or made recklessly, knowing that there was insufficient knowledge upon which to base such a representation (v) for the purpose of inducing the other party to act upon it; and that (vi) the other party, acting reasonably and in ignorance of its falsity, (vii) did in fact rely upon it and (viii) was thereby induced to act to that party's injury and damage.[13] *See Armed Forces Ins. Exch. v. Harrison*, 70 P.3d 35, 40 (Utah 2003) (fraud action by insurer against contractor).    A claim for fraudulent concealment requires that the plaintiff establish that the defendant had a legal duty to disclose certain facts, but instead remained silent or otherwise acted to conceal material facts from the plaintiff. *Jensen v. IHC Hosps., Inc.*, 82 P.3d 1076, 1101-02 (Utah 2003).  Mr. Mason has not introduced sufficient evidence to establish any of these elements, but the Court need focus only on one: whether Merck made any material misrepresentations.

---

[13] There appear to be no published Utah opinions addressing fraud in a products liability case involving prescription drugs, so the Utah courts have not had occasion to address whether the reliance the plaintiff must establish is the prescriber's, the plaintiff's, or both.  The UPLA, however, applies regardless of the particular products liability theory alleged, and it lends some guidance.  Because the expectations of the prescriber govern under UTAH CODE ANN. § 78-15-6(2) in a prescription drug case, *see supra* at p. 11-12, it follows that the reliance the plaintiff must establish to show fraud is that of his prescriber.  Plaintiff's proposed jury instructions concede this point.

The evidence shows that, at the time of Nurse Practitioner Olson-Fields's prescribing decision, Merck had not only disclosed the results of the VIGOR data and other clinical data to the medical community – in publications such as the *New England Journal of Medicine* – but that it had also sent this information directly to Ms. Olson-Fields. (Nov. 3, 2006 Tr. at 1036:12-1037:7, 1039:9-1043:8, 1044:7-1048:5, 1051:17-19, 1055:5-1064:15, 1065:23-1074:10 (Test. of N.P. Olson-Fields; *see also* Def.'s Ex. 453 (April 2002 "Dear Doctor" Ltr. Re April 2002 Vioxx Label), Def.'s Ex. 2119 (Nov. 19, 2001 Ltr. Re CV Risks of Vioxx).) She testified she "appreciated" this information, thought it was "important," and discussed it with Dr. Vogeler. (*Id.*) She also reviewed the April 2002 label – which contained the VIGOR data and precautions against the use of Vioxx in patients with risk factors for heart disease – "well in advance" of her decision to prescribe Vioxx to Mr. Mason. (Nov. 3, 2006 Tr. at 1076:9-1081:12, 1094:20-5, 1095:1-1096:1; *see also* Def.'s Ex. 2331 (April 2002 Vioxx Label).) Because there is no evidence that any of these communications were "misleading," they cannot form the basis of common law fraudulent misrepresentation or concealment claims under Utah law. Accordingly, the Court should enter judgment on behalf of Merck on Mr. Mason's common law fraud claims.

## V.    THE COURT SHOULD ENTER JUDGMENT IN MERCK'S FAVOR ON PLAINTIFF'S FAILURE TO WARN CLAIMS.

Although plaintiff brought claims for failure to warn under both strict liability and negligence theories, the Utah Supreme Court has recognized that, where recovery under Utah's strict products liability statute would be sufficient to compensate the plaintiff, a negligence claim is superfluous and should be dismissed. *See Slisze*, 979 P.2d 317, 321 (in a failure to warn case, affirming the lower court's dismissal of plaintiff's negligence claim, in part, because "if the product were to be determined defective, recovery under the strict products liability statute would be sufficient to compensate plaintiff, making a negligence claim superfluous"). Indeed,

18

the rule in many jurisdictions that, like Utah, have adopted comment k to section 402A of the Restatement (Second) of Torts is that a failure to warn claim is the same whether brought under strict liability or negligence. *See supra* n. 8.

Under comment k, a manufacturer of an "unavoidably unsafe" product will not be held liable if it has provided adequate warnings of potential risks that are known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge at the time of manufacture and distribution. *See Barson v. E.R. Squibb & Sons*, 682 P.2d 832, 835 (Utah 1984); RESTATEMENT (SECOND) OF TORTS § 402A cmt. j (1965); *Carlin v. Super. Ct. (Upjohn Co.)*, 13 Cal. 4th 1104, 1112 (1996); *Brooks v. Medtronic, Inc.*, 750 F.2d 1227, 1230-31 (4th Cir. 1984). Because comment k imports a knowledge requirement in determining liability for such products, the analysis under strict liability and negligence becomes identical. *See supra* n.8.

As will be explained, Mr. Mason's failure to warn claims fail as a matter of law. First, consistent with the Restatement, Merck has a duty to warn only of known or reasonably scientifically knowable risks. *Barson*, 682 P.2d at 835. Merck *did* warn Mr. Mason's prescriber, Nurse Practitioner Olson-Fields, of a potential risk of heart attacks. It included the VIGOR results in the April 2002 Vioxx label, which was in effect at the time of her prescribing decision, and provided her with additional information about that study. There was no evidence that she or Mr. Mason's primary care physician, Dr. Vogeler, were not adequately warned or did not otherwise have sufficient information. In fact, as explained below, Ms. Olson-Fields admitted having knowledge of the cardiovascular risks associated with Vioxx, meaning that Merck's warning was adequate and any alleged failure to warn was not the proximate cause of Mr. Mason's injury. Second, Mr. Mason failed to meet his burden of showing that Merck's alleged failure to warn proximately caused his heart attack. *See id.* at 836-37. In fact, Nurse Practitioner

19

Olson-Fields has continued to prescribe Celebrex and NSAIDS to patients with Mr. Mason's profile – *including Mr. Mason himself* – even though they carry "black-box" cardiovascular warnings.

### A.     Because Merck Warned Of The Potentially Knowable Heart Attack Risk In the April 2002 Vioxx Label, There Is Insufficient Evidence That The Warning Was Inadequate.

Mr. Mason claims that Merck failed to warn that Vioxx could cause heart attacks. As noted above, the sufficiency of the warning in this case should be evaluated under the "learned intermediary doctrine." *Schaerrer*, 79 P.3d at 928; *see also* 2 MADDEN & OWEN ON PRODUCTS LIABILITY § 22:9 at 568 (3d ed. 2000) ("the learned intermediary doctrine has gained virtually unanimous adoption"). This doctrine recognizes the reality that doctors are in a better position than pharmaceutical manufacturers to evaluate the suitability of a drug for a particular patient. As a result, the manufacturer's duty to warn extends only to the prescribing physician and not to the ultimate consumer. *Id.*

The April 2002 label fully disclosed the significant clinical data then available, including the VIGOR results. (*See* Def.'s Ex. 2331 (April 2002 Vioxx Label).) Merck's warnings were thus sufficient to apprise health care providers of the alleged heart attack risk associated with Vioxx. Moreover, Merck brought the warning "home" to Nurse Practitioner Olson-Fields.[14] Although already mentioned above, it bears repeating: Merck sent this information directly to her, on at least two occasions. (Nov. 3, 2006 Tr. at 1036:12-1037:7, 1039:9-1043:8, 1044:7-1048:5, 1051:17-19, 1055:5-1064:15, 1065:23-1074:10; *see also* Def.'s Exs. 453 (Apr. 2002 "Dear Doctor" Ltr. Re April 2002 Vioxx Label), 2119 (Nov. 19, 2001 Ltr. Re CV Risks of

---

[14] Ms. Olson-Fields stated that, had VIGOR reported 20 MIs in the Vioxx arm as compared to 4 in the naproxen arm instead of 17 to 4, that would not have had any impact on her prescribing decision for Mr. Mason. (Nov. 3, 2006 Tr. at 1031:9-1032:3.)

Vioxx).)  Further, she reviewed the April 2002 label – which contained the VIGOR data and precautions against the use of Vioxx in patients with risk factors for heart disease – "well in advance" of her decision to prescribe Vioxx to Mr. Mason.  (Nov. 3, 2006 Tr. at 1076:9-1081:12, 1094:20-5, 1095:1-1096:1; *see also* Def.'s Ex. 2331 (April 2002 Vioxx Label).)

It cannot matter that the information was not in the "warnings" section of the label.  Once a physician knows the information, there is no further duty to warn.  Stated simply, the common-sense rule is that "[n]o one needs notice of that which he already knows."  *Lindsay v. Ortho Pharm. Corp.*, 637 F.2d 87, 92 (2d Cir. 1980) (internal quotation marks and citations omitted). Because Nurse Practitioner Olson-Fields understood the facts, no further warning was needed; *see Odom v. G.D. Searle & Co.*, 979 F.2d 1001, 1003 (4th Cir. 1992) (affirming summary judgment for manufacturer in failure to warn case in part because physician had independent knowledge of the risks); *see also Stanback v. Parke, Davis & Co.*, 657 F.2d 642, 644-45 (4th Cir. 1981) (holding that manufacturer is not liable for failure to warn when doctor knew of risk and said it was not his practice to warn); *Plummer v. Lederle Labs.*, 819 F.2d 349, 358-59 (2d Cir. 1987) (finding no causation when doctor failed to warn even though knew of risk of polio); *Kirsch v. Picker Int'l., Inc.*, 753 F.2d 670 (8th Cir. 1985) (affirming directed verdict because physician knew of cancer risk related to X-ray treatment); *Mampe v. Ayerst Labs.*, 548 A.2d 798 (D.C. App. 1988) (holding manufacturer was not liable where prescribing physician acquired knowledge of risks from a variety of other sources); *Dunn v. Lederele Labs.*, 328 N.W.2d 576 (Mich. App. 1982) (finding no proximate cause where physician had knowledge of the risks associated with a drug); *Leibowitz v. Ortho Pharm. Corp.*, 307 A.2d 449 (Pa. Super. 1973) (finding no causal nexus where physician had other sources of information).  Since Mr. Mason's

21

prescriber knew of the alleged cardiovascular risks associated with Vioxx, plaintiff cannot and has not shown that Merck's warnings were in any way inadequate or "defective" under Utah law.

### B.     There Is Insufficient Evidence Of Proximate Cause Or "But For" Causation.

Even if Merck's warning were inadequate, Mr. Mason could not prevail unless he established that Nurse Practitioner Olson-Fields would have prescribed a different course of treatment if an adequate warning had been given. *Barson*, 682 P.2d at 836-37 (explaining, in a prescription drug case, that the plaintiff must prove that an adequate warning would have altered his use of the product to avoid injury); *see also Odom*, 979 F.2d at 1003 (upholding trial court's granting of summary judgment because plaintiff failed to prove that her doctor would have prescribed a different course of treatment if more drastic warnings had been given). However, Nurse Olson-Fields testified that she prescribed Celebrex to Mr. Mason in the summer of 2005, following his MI, and continues to prescribe the drug to other patients, even though it contains a "black-box" cardiovascular warning:

> Q:    The July 2005 Celebrex label has what's called a black-box warning concerning cardiovascular risks; correct?
>
> A:    Yes.
>
> Q:    The July 2005 label says: "Celebrex may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal. All NSAIDs may have a similar risk. This risk may increase with duration of use. Patients with cardiovascular disease or risk factors for cardiovascular disease may be at greater risk."
>
> That's what the Celebrex label says that you were shown a couple months ago; right?
>
> A:    Yes.
>
> Q:    Do you agree that as of July 2005, when the prescriptions were refilled for Mr. Mason, that he certainly was somebody with cardiovascular disease or a risk factor for cardiovascular disease?
>
> A:    Yes.

Q:   In fairness, this label didn't come out until July 2005 and your prescription to Mr. Mason was June of 2005; right?

A:   Right.

Q:   So you had not seen this label because it hadn't come out on the day that you prescribed Celebrex for Mr. Mason; correct?

A:   Correct.

Q:   But you did continue to prescribe Celebrex for other patients all the way – well, up until today; right?

A:   Yes.  Some patients, yes.

(Nov. 3, 2006 Tr. at 1090:24-1091:24 (Test. of N.P. Olson-Fields); *see also id.* at 1003:12-17 (admitting she still prescribes Celebrex), 1087:19-22 (admitting she prescribed Celebrex to Mr. Mason in June 2005; Nov. 6, 2006 Tr. at 1324:12-1325:1 (Test. of Mr. Mason regarding Celebrex).)

Thus, Merck's alleged failure to warn did not happen and did not cause Mr. Mason's injuries.  Therefore, Merck is entitled to judgment as a matter of law on plaintiff's strict liability and negligent failure to warn claims.

## VI.   MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE PLAINTIFF DID NOT PROFFER LEGALLY SUFFICIENT EVIDENCE TO PROVE MEDICAL CAUSATION.

In order to prevail on any of his claims, Mr. Mason was required to establish that the use of Vioxx at the 25 mg dose for approximately ten and a half months caused the injuries he allegedly sustained.  *See* MUJI 3.13 ("A proximate cause of an injury is that cause which in natural and continuous sequence produces injury and without which the injury would not have occurred . . . .").  Plaintiff has failed to meet this burden.  Because there is no legally sufficient evidence to show that Vioxx was the proximate cause of Mr. Mason's alleged injuries, the Court should enter judgment in Merck's favor as a matter of law.

23

Proving medical causation is a two-step process: plaintiff must prove both general and specific causation. General causation requires proof that Vioxx *can* cause heart attacks, while specific causation requires proof that Vioxx *did* cause Mr. Mason's heart attack. *See, e.g., McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005). Under Utah law, medical causation must be proved to a reasonable medical probability with expert medical testimony. *Fitz v. Synthes*, 990 P.2d 391, 393 (Utah 1999).

Although plaintiff was required to prove both general and specific causation, he proved neither. Instead, he offered the speculative and unreliable testimony of expert witnesses – Drs. Avorn and Sander – who opined, without reliable foundation, that: (i) "it is now universally agreed the Vioxx causes heart attacks" (Oct. 31, 2006 Tr. at 328:3-12 (Test. of Dr. Avorn)); (ii) they "think that Vioxx does cause heart attacks" (Nov. 1, 2006 Tr. at 442:7 (Test. of Dr. Sander)); and (iii) Vioxx was "a substantial contributing cause" of Mr. Mason's heart attack (*id.* at 487:11-12 (Test. of Dr. Sander)). It is well-established that "[a] mere possibility of . . . causation is not enough, and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." PROSSER ON TORTS 245 (3d ed. 1964); *accord Fitzgerald v. Manning*, 679 F.2d 341, 348 (4th Cir. 1982). Because plaintiff proffered no legally sufficient evidence to show that Vioxx both could have and did cause his alleged injuries, all of his claims necessarily fail.

## A. The Record Contains No Legally Sufficient Evidence of General Causation.

Plaintiff has failed to satisfy his burden to prove general causation, for two reasons. First, he has introduced no relevant and reliable studies to show that use of Vioxx at the 25 mg dose for less than eleven months causes heart attacks. The studies upon which his experts rely do not and cannot show a statistically significant association between Vioxx and increased risk.

Second, plaintiff was also required to prove a biologically plausible mechanism by which Vioxx caused his claimed injury.  He did not do so.

> **1.    Plaintiff Introduced No Evidence Of A Statistically Significant Study Showing That Vioxx, At The Same Dose And Duration As Taken By Mr. Mason, Is Capable of Causing CV Events.**

Plaintiff's causation experts opined that the use of Vioxx at the 25 mg dose can cause heart attacks, but the data on which they relied do not support their opinions.  There is no reliable, statistically significant data from *any* study relied upon by plaintiff's experts that using 25 mg Vioxx for less than eleven months can increase the risk of cardiovascular events.

First, to be meaningful, the study must be statistically significant, meaning that the confidence interval does not include a value of 1.0 or below.  *See, e.g., Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 313 (5th Cir. 1989), *modified on reh'g*, 884 F.2d 166, 167 (reversing verdict in Bendectin litigation given plaintiff's failure to present statistically significant epidemiological proof); *LeBlanc v. Merrell Dow Pharms., Inc.*, 932 F. Supp. 782, 784 (E.D. La. 1996) (granting summary judgment in Bendectin litigation given absence of "statistically significant [ ] epidemiological studies"); *Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 664-66 (M.D. La. 2000) (excluding expert's testimony based on absence of "statistically significant epidemiological proof").

Second, an epidemiologic study cannot establish causation unless it also shows that the drug more than doubles the relative risk of injury.  *See, e.g., Deluca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941, 958-59 (3d Cir. 1990) ("[A] relative risk of '2' means that, on the average, there is a fifty per cent likelihood that a particular case of the disease was caused by the event under investigation and a fifty per cent likelihood that the disease was caused by chance alone."); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 718-23 (Tex. 1997) (statistically

significant epidemiological studies showing doubling of risk required to prove causation); REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 539.

None of the studies referenced by plaintiff's experts meet these standards, including the ones discussed below.

### a.   VIGOR.

Although plaintiff purports to use VIGOR[15] to establish causation, VIGOR involved a 50 mg dose of Vioxx – twice the dose taken by Mr. Mason.  Because "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect," *McClain*, 401 F.3d at 1242 (internal citations and quotation marks omitted), the results of VIGOR, which involved the use of high-dose Vioxx, cannot and do not provide a generally accepted scientific basis for concluding that the use of Vioxx at the 25 mg dose was capable of causing Mr. Mason's alleged heart attack.

Second, VIGOR involved an elderly population with rheumatoid arthritis, a condition that put the study's patients at increased risk of CV problems.  Here, Mr. Mason did not have rheumatoid arthritis and cannot be described as elderly.

Third, VIGOR did not compare Vioxx against a placebo; rather, it compared it with naproxen.  Thus, it is impossible to determine based on the results of VIGOR whether the relative increase of adverse cardiovascular events seen in the Vioxx arm of the study was attributable to: (i) a cardiovascular risk associated with high-dose Vioxx; (ii) a cardio-protective effect associated with naproxen; (iii) chance, either in whole or in part; or (iv) or some combination of these factors.

---

[15] Bombardier C et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, N ENGL J MED 2000 Nov 23;343:1520-1528.

Accordingly, VIGOR cannot support a finding that Vioxx taken for less than eleven months at the 25 mg dose increases the risk of heart attack.

### b.   APPROVe.

Nor can plaintiff's experts rely on the results of the APPROVe[16] study. The study did *not* associate a statistically significant risk of heart attacks or sudden cardiac death with under eleven months of use of 25 mg Vioxx. Thus, regardless of what opinions APPROVe purportedly supports concerning a longer duration of Vioxx use, its results cannot establish to a reasonable degree of medical and scientific certainty that Mr. Mason's use of Vioxx was capable of causing a thrombotic cardiovascular event. *See, e.g., Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991) ("If the . . . duration of exposure to [substance is] the type[] of information upon which experts reasonably rely when forming opinions on the subject, then the district court was justified in excluding Dr. Miller's opinion that is based upon critically incomplete or grossly inaccurate . . . duration data."); *Thompson v. S. Pac. Transp. Co.*, 809 F.2d 1167, 1169 (5th Cir. 1987) (expert's opinion on dioxin as source of plaintiff's illness had "insufficient factual basis" in part because expert had no knowledge of duration of exposure); *Gulf S. Insulation v. U.S. Consumer Prod. Safety Comm'n*, 701 F.2d 1137, 1146 (5th Cir. 1983) (usefulness of epidemiological studies was diminished based on "failure to consider either the length of time the workers were exposed to formaldehyde"); *Edwards v. Safety-Kleen Corp.*, 61 F. Supp. 2d 1354, 1359 (S.D. Fla. 1999) (excluding opinion of expert who was not aware of any studies which define the minimum duration of exposure to benzene necessary to be toxic).[17]

---

[16] Bresalier R et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, N ENGL J MED 2005 Mar 17;352(11):1092-1102.

[17] Merck hereby incorporates by reference its Motion to Exclude Expert Testimony that Short-Term Vioxx Use Increases Cardiovascular Risk (Merck's Expert Challenge No. 10) and its

*(footnote continued next page)*

###### c.     **Solomon.**

Plaintiff also identifies a retrospective, observational study conducted by Dr. D.H. Solomon in 2004, which was based on a review of patient records in a Medicare database.[18]  This study, however, does not support plaintiff's claim that his alleged ten and one-half months of Vioxx use increased his CV risk.  Solomon found a risk when comparing Vioxx and Celebrex, both active drugs, during the first 90 days of therapy.  But, the risk for acute heart attacks for Vioxx versus Celebrex was nearly identical after 90 days of therapy, the only duration of therapy relevant here.[19]  Further, contrary to plaintiff's claims, the study found *no* excess risk of acute heart attacks with Vioxx versus no-NSAID use, much less a doubling of the risk.

###### d.     **Protocol 090.**

Plaintiff also purports to rely on Protocol 090.[20]  In Protocol 090, however, there was no statistically significant difference in the rate of adverse cardiovascular events in patients taking Vioxx versus placebo or Vioxx versus the comparator drug, Nabumetone.  Indeed, the study's conclusion was that "the number of patients with cardiovascular events was *too few to support any meaningful comparison*."    Accordingly, it is impossible for Protocol 090 to support plaintiff's theory of causation.

---

Opposition to Plaintiff's Motion to Exclude Argument or Opinion Testimony That An Increased Risk of Heart Attack Exists Only After 18 Months of Vioxx Use (Pl.'s Expert Challenge No. 1).

[18] Solomon D et al., *Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults*, CIRCULATION 2004 May; 109:2068-2073.

[19] *Id.* at 2071.

[20] Weaver A et al., *Treatment of Patients With Osteoarthritis With Rofecoxib Compared With Nabumetone*, J CLIN RHEUMATOL. 2006 Feb;12(1):17-25.

### e.     ADVANTAGE.

Although plaintiff also purports to rely upon ADVANTAGE,[21] the study itself makes clear that it does not support causation. It provides:

> *The rofecoxib [Vioxx] and naproxen groups did not differ significantly in the number of cardiovascular events*, as defined by the combined Antiplatelet Trialists' Collaboration end points (10[0.4%] vs. 7 [0.3%]; P>0.2). Five myocardial infarctions occurred in the rofecoxib group, and 1 occurred in the naproxen group (P>0.2). No strokes occurred in the rofecoxib group and 6, all thrombotic, occurred in the naproxen group (P=0.015).

ADVANTAGE at 543.

### f.     Lévesque.

Finally, Dr. Sander relied on the Lévesque study to support his claim that short-term use of Vioxx could increase cardiovascular risk. (Nov. 1, 2006 Tr. at 444:25-445:14.) But on cross-examination, he conceded that this particular study showed that people who took Vioxx for more than 54 days – as Mr. Mason did – had a relative risk of 1.02. he agreed that is "the same thing as saying that there's zero increase in risk." (*Id.* at 565:9-567:5.)

### 2.     Plaintiff Presented No Evidence Of Any Biologically Plausible Mechanism By Which Vioxx Could Cause A Heart Attack.

In a drug or toxic tort case, a statistical association between injury and exposure cannot prove causation absent proof of a biologically plausible mechanism by which exposure to the drug or suspected toxin causes injury. *See Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir. 1999). Biological plausibility "depends upon existing knowledge about *the mechanisms* by which the disease develops." REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 522 (emphasis added). As the Fifth Circuit said in *Food Lion*:

---

[21] Lisse JR et al., *Gastrointestinal Tolerability and Effectiveness of Rofecoxib versus Naproxen in the Treatment of Osteoarthritis*, ANN INTERN MED 2003 Oct 7;139:539-546 ("ADVANTAGE").

> The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur. Based on such predicate knowledge, it may then be possible to fasten legal liability for a person's disease or injury.

*Food Lion*, 171 F.3d at 314. As this Court put it:

> In this case, at best, Drs. Shell and Eckberg have discovered an event, but not a cause. They fail to identify the exact mechanism by which a person's QT interval can become permanently prolonged well after that person has ceased taking Propulsid. . . . They have theories but they have no proof to support those theories. . . . Under the prevailing logic of *Daubert* and *Black*, their testimony is unreliable.

*In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 617 (E.D. La. 2003); *accord McClain*, 401 F.3d at 1253 (expert must offer a "reliable explanation of the physiological process by which [the agent] causes [the alleged harm]"). Without proof of *how* an agent can cause a disease, there can be no proof that the agent in fact *does* cause the disease. *In re Phenylpropanolamine Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1247 (W.D. Wash. 2003) ("'[n]ot knowing the mechanism whereby a particular agent causes a particular effect'" can be "'fatal to a plaintiff's claim'" where there is no "'sufficiently compelling proof that the agent must have caused the disease *somehow*'") (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1314 (9th Cir. 1995)).

In this case, plaintiff's expert, Dr. Sander, proposed a single theory for how Mr. Mason's Vioxx use could have caused his heart attack: the FitzGerald Hypothesis.[22] He testified that Vioxx "works by the fact that it is inhibiting prostacyclin production and allowing thromboxane activity to go on 'unopposed.'" (Nov. 1, 2006 Tr. at 453:3-5.) Dr. Sander's opinion that Vioxx

---

[22] Dr. Sander conceded that Vioxx did not cause Mr. Mason's plaque (Nov. 1, 2006 Tr. at 496:4-497:4) or his plaque rupture (*id.* at 503:12-23).

causes a prostacyclin/thromboxane imbalance in the vasculature is scientifically unreliable and insufficient to meet plaintiff's burden to show general causation.

As the Court knows, Dr. FitzGerald hypothesized in an article published in 1999 that *if* COX-2 inhibitors reduced prostacyclin levels *in blood vessels* – a question his study could neither assess nor determine – then such drugs *might* promote increased clotting and, therefore, increased CV risks since they do not simultaneously interfere with the normal production of thromboxane, a known vasoconstrictor.[23] But, as Dr. FitzGerald has recognized on multiple occasions since the 1999 publication, his hypothesis remains just that – a hypothesis – that remains unproven. In a follow-up article published in 2002, Dr. FitzGerald further explained that "[t]he clinical sequela of inhibiting prostacyclin activity in the absence of concomitant inhibition of [thromboxane] *are not currently clear*" and that "for the present, the *perception* of a cardiovascular hazard in humans exceeds the evidential basis for this notion."[24]

Nor is Dr. FitzGerald alone in conceding that his hypothesis remains unproven. After observing that selective COX-2 inhibitors were associated with an increased risk of adverse CV events, the FDA confirmed this fact in April 2005:

> *It remains unclear, however, that it is the presence of, or the degree of, COX-2 selectivity that accounts for these observations, as some have hypothesized.* As noted above, in various controlled clinical trials, COX-2 selective drugs have been indistinguishable from non-selective NSAIDs (*i.e.*, ibuprofen, diclofenac) in studies of substantial size and duration. Further, although on theoretical grounds the addition of low-dose aspirin (a COX-1 inhibitor) to a COX-2 selective drug should resolve any increased CV risk caused by COX-2 selectivity, this effect has not in fact been observed in several studies in which such comparisons are possible. *Taken together, these observations raise serious questions about the so-*

---

[23] Catella-Lawson et al., *Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics, and Vasoactive Eicosanoids*, J. PHARM. AND EXP. THERP. 1999; 289:735-741.

[24] FitzGerald GA, *Cardiovascular Pharmacology of Nonselective Nonsteroidal Anti-inflammatory Drugs and Coxibs: Clinical Considerations*," AM J CARDIOL 2002; 89 (suppl):26D, 32D (emphasis added).

31

called "COX-2 hypothesis," which suggests that COX-2 selectivity contributes to increased CV risk.

(Def.'s Ex. 338 at 8 (FDA Memo; emphasis added).)   Thus, the FitzGerald hypothesis remains speculative and cannot form the basis for Dr. Sander's opinion that the prostacyclin/thromboxane imbalance was capable of causing or did cause Mr. Mason's heart attack.

## B.   Plaintiff Failed To Prove Specific Causation.

Finally, plaintiff has failed to prove specific causation by a preponderance of the evidence.  First of all, Dr. Sander assumed – incorrectly – that Mr. Mason was taking Vioxx at the time of his heart attack, but he wasn't.  (*See* Nov. 6, 2006 Tr. at 1347:16-1349:22 (Test. of Mr. Mason).)   There is no scientifically valid evidence for Dr. Sander's specific causation opinion that Vioxx caused Mr. Mason's heart attack.  Indeed, Dr. Sander testified that there is no way medically to say whether Vioxx caused Mr. Mason's heart attack.  He agreed that Mr. Mason's heart attack is no different from the "thousands and thousands" of heart attacks that Dr. Sander has seen, saying "a heart attack is a heart attack." (Nov. 1, 2006 Tr. at 499:9-12.)  Like everyone else who has a heart attack, Mr. Mason had plaque in his arteries, and the formation of that plaque had nothing to do with Vioxx.  (*Id.* at 500:1-9.)

> Q:   .... And then in 100 percent of the heart attacks, what happens is that there is a plaque rupture; right?
>
> A:   Yes.
>
> Q:   And Mr. Mason had a plaque rupture; right?
>
> A:   Yes.
>
> Q:   And it's no different from anybody else's plaque rupture who has had a heart attack; right?
>
> A:   Correct.

(*Id.* at 500:10-17.)  Dr. Sander also agreed that, when the plaque comes into contact with the blood as a result of the rupture, a clot forms – and that there is nothing about Mr. Mason's clots

that make them any different than any other. (*Id.* at 505:10-18.) Indeed, Dr. Sander testified that, if Mr. Mason were one of his patients, and he knew of Mr. Mason's risk factors, Mr. Mason's "heart attack would not be the least bit unusual." (*Id.* at 502:16-23.)

Dr. Sander based his specific causation opinion on "attributable risk exposed" ("ARE"), a statistical concept he learned of after he was retained as an expert in these cases. (*Id.* at 512:16-513:9.) Obviously, that concept cannot be used to determine whether a particular individual's heart attack actually was caused by Vioxx, as Dr. Sander himself acknowledged: "I don't identify it as a Vioxx problem in a given case because if there is a 60 percent chance there was Vioxx in that individual, it's either one [*sic*] or 100 percent. So in a given case there is no little molecules that say V [for Vioxx] on them that are stuck on the clot; however, the process is the same and the risks all would drive this." (*Id.* at 466:17-22.) In other words, Dr. Sander conflated general and specific causation. He testified that, because Vioxx is associated with increased risks in some clinical trials, the odds are that it caused Mr. Mason's heart attack. Utah, however, requires *proof* of medical causation – not speculation based on the odds. *Fitz*, 990 P.2d at 393-94.

Merck is also entitled to judgment as a matter of law because Dr. Sander failed to eliminate other possible causes of Mr. Mason's heart attack. To establish specific causation, plaintiff must "rule out" the possibility that his heart attack was caused by something *other* than Vioxx. *Wheat v. Pfizer, Inc.*, 31 F.3d 340, 343 (5th Cir. 1994) (upholding judgment as a matter of law because plaintiff failed to prove that decedent had not contracted hepatitis from a source other then defendant's pharmaceutical); *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1139 (D. Minn. 2003) ("Having failed to "rule out" other factors for the Plaintiff's skin cancer, the Plaintiff has not established a submissible showing of causation"); *Nat'l Bank of*

33

*Commerce of El Dorado v. Associated Milk Producers, Inc.*, 22 F. Supp. 2d 942, 963 (E.D. Ark. 1998), *aff'd*, 191 F.3d 858 (8th Cir. 1999) (recognizing that an expert must "rule in" the suspected cause as well as "rule out" other possible causes); *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1209 (8th Cir. 2000) (affirming grant of summary judgment in favor of defendant manufacturer where plaintiff "failed to 'rule out' all other possible causes"); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 609 (D.N.J. 2002) (excluding expert testimony because "[t]he defendants pointed to some likely alternative cause and the expert offered no reasonable explanation as to why he or she still believed that defendant's actions were a substantial factor in bringing about plaintiff's illness").

Plaintiff failed to carry this burden. It is undisputed that Mr. Mason had vascular disease, multiple risk factors, and obvious triggers – exercise and eating a heavy meal – that could have caused his heart attack. (Nov. 1, 2006 Tr. at 498:10-25 (Test. of Dr. Sander) (acknowledging strenuous exercise and eating a big meal as triggers); Nov. 6, 2006 Tr. at 1350:5-23 (Test. of Mr. Mason) (admitting to hiking and eating a fried turkey dinner before his heart attack).) His risk factors include:

- *Age*: Mr. Mason was 61 years old at the time of his heart attack;
- *Family History*: Mr. Mason's sister died of coronary artery disease at the age of 55;
- *High Cholesterol*: Mr. Mason suffered from hyperlipidemia;
- *Obesity*: Mr. Mason was obese at the time of his MI;
- *Gender:* Mr. Mason is male;
- *Hypertension*: Mr. Mason had labile blood pressure before he took Vioxx;
- *Depression*: Mr. Mason suffered from depression, for which he took antidepressant medication;
- *Stress*: Mr. Mason was "very stressed"; and
- *Sleep Apnea*: Mr. Mason suffered from sleep apnea.

(Nov. 1, 2006 Tr. at 568:9-572:10 (Test. of Dr. Sander).)

It is not enough for an expert to proclaim that he has ruled out other possible causes – he must also give a "good explanation as to why his or her conclusion remain[] reliable" despite the existence of these alternative risk factors. *Magistrini,* 180 F. Supp. 2d at 609. Dr. Sander did not even attempt to rule out other possible causes during his testimony. Rather, he testified as follows:

Q:   Based on the risk factors that he had and the plaque that you also testified that he had, Mr. Mason could very well have had a heart attack in July of 2003 whether or not he ever took Vioxx; wouldn't you agree with that?

A:   He could have.

(Nov. 1, 2006 Tr. at 573:11-15.)

And he was impeached with the following testimony.

Q:   Certainly you cannot state to a reasonable degree of medical probability that Mr. Mason could have avoided having a heart attack in July of 2003 had he never taken Vioxx; right?

A:   That is true.

(*Id.* at 574:24-575:6.) Thus, Merck is entitled to judgment as a matter of law.[25]

## VII.   PLAINTIFF'S CLAIMS ARE PREEMPTED BY FEDERAL LAW.

Plaintiff's experts, including Dr. Graham, challenge the FDA's approval of Vioxx and the content of the post-VIGOR label approved by the FDA. Such claims are preempted by federal law. In *Buckman Company v. Plaintiffs' Legal Committee,* 531 U.S. 341 (2001), the Supreme Court recognized the importance of allowing the FDA to police its regulatory process to achieve the difficult balance between the various competing goals of the FDCA, and it held that the FDCA impliedly preempts state law tort claims alleging that a pharmaceutical company

---

[25] Merck filed a number of challenges to expert testimony before trial under Rule 702 and *Daubert,* as well as other grounds. Merck reasserts those motions. Testimony admitted in error is unreliable and does not constitute substantial evidence of causation.

defrauded FDA or violated FDCA disclosure requirements. *Id.* at 350, 353 (preempting claims that the defendant made fraudulent statements to the FDA to obtain approval to market a medical device and that, had the misrepresentations not been made, the devices would not have been approved and plaintiff would not have been injured).[26] The federal regulatory scheme empowers the FDA to control the details of the approval process and to punish and deter fraud where it occurs. *See id.* at 348. This balance is important as "the FDA is charged with the difficult task of regulating the marketing and distribution of medical devices without intruding upon decisions statutorily committed to the discretion of health care professionals." *Id.* at 350.

In making the arguments about the 2002 label, plaintiff ignores that the contents of the label reflect the balance the FDA struck in approving the post-VIGOR label. The FDA has determined that because state-law claims like plaintiff's prevent the FDA from maintaining strict control over label content and format, they are preempted by the FDA's labeling regulations. *See* 71 Fed. Reg. at 3923-35 (preemption applies, *inter alia*, to claims like plaintiff's that are "based on the failure to include in labeling or advertising a statement the substance of which the FDA has prohibited"); *see also Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514, 538 (E.D. Pa. 2006) (plaintiff's state-law failure to warn claims were preempted because the drug approval "process required that the labeling be the same as that approved for the innovator drug" and "the FDA would have deemed any post-approval enhancements 'false or misleading'"); *In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*, No. M: 05-1699 CRB, 2006 WL

---

[26] Although *Buckman* involved medical devices, its reasoning and holding apply equally to cases involving pharmaceuticals. *See, e.g., Bouchard v. Am. Home Prods. Corp.*, 213 F. Supp. 2d 802, 812 (N.D. Ohio 2002) ("The Court does not need to engage in searching analysis of *Buckman* to determine that claims of fraud on the FDA are preempted with respect to pharmaceuticals.") (citing *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 236 (6th Cir. 2000)).

2374742 (N.D. Ca. Aug. 16, 2006). For this reason too, Merck is entitled to judgment as a matter of law.

## VIII.   PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES IS BARRED UNDER UTAH AND FEDERAL LAW.

As set forth in Merck's concurrently-filed Supplemental Brief on the Applicability of Utah Code § 78-18-2 to Plaintiff's Punitive Damages Claim, plaintiff is not entitled to punitive damages in this case. Accordingly, and for the reasons explained in Merck's Supplemental Brief (incorporated here by reference), the Court should enter judgment in Merck's favor on plaintiff's punitive damages claim. This should be done immediately – or, in the alternative, after considering an offer of proof by plaintiff.

## IX.   CONCLUSION.

For the reasons stated above, the Court should enter judgment in favor of Merck on all claims, pursuant to Rule 50 of the Federal Rules of Civil Procedure. In the alternative, the Court should enter judgment on each of the claims plaintiff has failed to prove in his case.

Dated: November 7, 2006                         Respectfully submitted,


                                                s/ Dorothy H. Wimberly
                                                Phillip A. Wittmann, 13625
                                                Dorothy H. Wimberly, 18509
                                                STONE PIGMAN WALTHER
                                                WITTMANN L.L.C.
                                                546 Carondelet Street
                                                New Orleans, Louisiana 70130
                                                Phone: 504-581-3200
                                                Fax:    504-581-3361

                                                Defendants' Liaison Counsel

                                                Philip S. Beck

Tarek Ismail
Shayna Cook
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:    312-494-4440

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax:    213-430-6407

And

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: 202-434-5000
Fax:    202-434-5029


Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of Motion for Judgment as a Matter of Law has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 7th day of November, 2006.

s/ Dorothy H. Wimberly