| AOC-056-11<br>Rev 12-87<br><br>Commonwealth of Kentucky<br>Court of Justice | <br><br>CERTIFICATE<br>OF QUALIFICATION | Case No. _03- P-00098_<br><br>County _____Shelby_____<br><br>Court District _Probate_ |

ENTERED

MAY 1 2 2003

KATHY H. NICHOLS CLERK
SHELBY DISTRICT COURT
BY _____ D.C.

IN Re: Estate of _____Sarah G. Nichols_____

    Proper petition having been filed and the Court having appointed Hilliard Lyons Asset Management formerly known as Hilliard Lyons Trust Company _____ as ____Executor____

of the above estate on the _____12_____ day of _____May_____, 2003, and the fiduciary having

filed in Court bond in the sum of $ _750,000.00_____, the amount fixed, with out _____

_____ as surety which

was approved by the Court, said fiduciary was thereupon duly sworn as required by law and thus qualified on

the above date.

    The above Order and Qualification is in full force and effect this _____.

Attest: ___KATHY H. NICHOLS_____ Clerk

By_____
                   Deputy Clerk

276061.1

ENTERED
SEP - 9 2005

**NO. 03-P-00098**

**SHELBY DISTRICT COURT**

**PROBATE DIVISION**

**IN RE:  ESTATE OF SARAH G. NICHOLS, DECEASED**

**ORDER**

Upon the verified Petition of Sarah Nichols, by counsel, and the Court being sufficiently advised, it is hereby ordered that the Estate of Sarah G. Nichols be reopened and Sarah Nichols, be appointed Administrator W/W/A thereof for the purpose of obtaining and reviewing medical records to determine the propriety of filing a wrongful death or similar action and executing any and all documents necessary to accomplish said filing along with negotiating or accepting any settlement agreements thereof.

It is further ordered that the Clerk of this Court be authorized to issue two (2) certified copies of Petitioner's Certificate of Qualification.

_____
JUDGE

_____09/09/05_____
DATE

TENDERED BY:

_____
Jefferey M. Yussman
WYATT, TARRANT & COMBS, LLP
2700 PNC Plaza
Louisville, Kentucky  40202-2898
(502) 589-5235

10243074.1

A TRUE COPY ATTEST:
DATE:___10/23/06___
KATHY H. NICHOLS, CLERK
SHELBY CIRCUIT/DISTRICT COURTS
BY_____D.C.

3

AOC-056-11
Rev. 2-00

ENTERED
SEP 9 2005

Commonwealth of Kentucky
Court of Justice

**CERTIFICATE OF QUALIFICATION**

Case No. **03-P-00098**

County **Shelby**

Court District **Probate**

IN Re: Estate of   **Sarah G. Nichols**

Proper petition having been filed and the Court having appointed

**Sarah Nichols**   as   **Administrator W/W/A**

of the above estate on the ___9___ day of ___Sept___, **2005**, and the fiduciary having

filed in Court bond in the sum of $_____, the amount fixed, with **out**

_____ surety, which was

approved by the Court, said fiduciary was thereupon duly sworn as required by law and thus qualified on the above date.

The above Order and Qualification is in full force and effect this_____.

Attest: _Kathy Nichols_   Clerk   By _Emily McKinney_

Deputy Clerk

CASE NO. **05CI 08369**

**JEFFERSON CIRCUIT COURT**
**DIVISION _____**

**JUDGE _____**

SARAH E. NICHOLS,
as Personal Representative
of the Estate of SARAH G. NICHOLS

**PLAINTIFF**

vs.

**COMPLAINT**

MERCK & COMPANY, INC.
One Merck Drive, WS3AB-05
Whitehouse Station, NJ 08889

      SERVE:   C.T. Corp. System
                    Ky. Home Life Bldg., Room 1102
                    Louisville, KY 40202

And

JOHN DOE ONE

And

JOHN DOE TWO

And

G. RANDOLPH SCHRODT JR., M.D.
105 N. Lyndon Lane #106
Louisville, Kentucky 40222

And

INTEGRATIVE PSYCHIATRY PLLC

      SERVE:   G. Randolph Schrodt Jr.
                    2394 Valley Vista Road
                    Louisville Ky 40205

**DEFENDANTS**

Comes now Sarah E. Nichols, as Personal Representative of the Estate of Sarah G. Nichols, by counsel, and for a Complaint and cause of action against Defendants states as follows:

## PARTIES, JURISDICTION AND VENUE

1.    Sarah G. Nichols was at all times applicable hereto a resident of Simpsonville, Shelby County, Kentucky. Beginning on or about November 4, 1999, and continuing through approximately May 1, 2003, Sarah G. Nichols took the prescription drug Vioxx® manufactured, marketed and sold by Merck and Co., Inc., and prescribed by G. Randolph Schrodt Jr., M.D. On or about May 1, 2003, Sarah G. Nichols suffered a pulmonary embolus and died. Sarah G. Nichols's use of Vioxx® was a substantial factor in causing the pulmonary embolus and subsequent treatment, injury and death of Sarah G. Nichols.

2.    Sarah E. Nichols is the duly appointed Personal Representative of the Estate of Sarah G. Nichols, deceased. A copy of the Certificate of Qualification is attached hereto.

3.    Sarah E. Nichols, as Personal Representative of the Estate of Sarah G. Nichols, is hereafter referred to as Plaintiff.

4.    The Defendant, Merck and Co., Inc. (hereafter referred to as "Merck"), is a New Jersey corporation with its principal place of business in New Jersey. At all times material hereto, Merck was engaged in the business of testing, developing, manufacturing, labeling, marketing, distributing, promoting, and/or selling, either directly or indirectly, through third parties or related entities, anti-inflammatory and other drugs, including Vioxx®.

5.    The Defendants, John Doe One and John Doe Two, are fictitious parties representing drug sales representatives, supervisors or "detail persons" who, on behalf of Merck, marketed and promoted Vioxx® in the Commonwealth of Kentucky to the health care provider(s) treating Sarah G. Nichols, and prescribing or otherwise supplying Vioxx® to

Sarah G. Nichols. On information and belief, at all times material hereto, John Doe One and John Doe Two were residents of the Commonwealth of Kentucky.

6.  The Defendant, G. Randolph Schrodt Jr., M.D. (hereafter referred to as "Dr. Schrodt"), is and was at all times relevant hereto a resident of Louisville, Jefferson County, Kentucky with professional offices located at 105 N. Lyndon Lane #106, Louisville, Kentucky 40222. Dr. Schrodt was at all times relevant hereto a physician duly licensed to practice medicine in the Commonwealth of Kentucky.  Dr. Schrodt's address for service of process is 105 N. Lyndon Lane #106, Louisville, Kentucky 40222. At all times relevant hereto, Dr. Schrodt was an employee or agent of Integrative Psychiatry PLLC (hereafter referred to as "Integrative") and was acting within the scope and course of that employment or agency.

7.  Integrative is a Kentucky corporation with its principal place of business in Louisville, Jefferson County, Kentucky, and has an office and employees in Louisville, Jefferson County, Kentucky, where Dr. Schrodt works. Its agent for service of process is G. Randolph Schrodt Jr., 2394 Valley Vista Road, Louisville Ky 40205.

8.  The Defendant, Merck, at all times relevant hereto, was a foreign corporation, duly licensed and authorized to do business in the Commonwealth of Kentucky and has designated CT Corp. System, Ky. Home Life Bldg., Room 1102, Louisville KY 40202 as its registered agent for service of process.  Said Defendant is subject to the jurisdiction of this Court pursuant to KRS 454.210, and other applicable law.

9.  The damages claimed herein are in excess of the minimum jurisdictional requirements of this Court.

3

10.     Venue is proper pursuant to KRS 452.450 and 452.460.

## FACTUAL BACKGROUND

### Properties of COX Inhibitors

11.     Vioxx® (Rofecoxib) is a prescription drug designed and used to treat pain and inflammation.   As discussed below, Vioxx® is a COX-2 selective non-steroidal anti-inflammatory agent ("NSAID").

12.     NSAIDs were developed in the 1960s and 1970s, and prescribed to provide relief of pain and inflammation. They were widely used by the 1990s, especially by older people suffering from osteoarthritis and rheumatoid arthritis. Epidemiological studies in the 1980s demonstrated that long term use of NSAIDs increased the risk of gastrointestinal ("GI") problems by 4-6 times, with the risk being more pronounced in the elderly.  As a result, researchers and pharmaceutical companies began seeking alternative treatments with fewer gastrointestinal side effects.

13.     NSAIDs work by inhibiting the action of the cyclooxygenase (COX) enzyme which is involved in the production of prostaglandins, thereby reducing inflammation and the associated pain. Research into the causes of gastrointestinal toxicity showed that prostaglandins also play a role in protecting the stomach lining from the effects of gastric acid.

14.     In 1989, it was postulated that there were two forms of the COX enzyme: COX-1 and COX-2. It was believed that COX-2 played a role in the release of prostaglandin from inflammatory sites, while COX-1 helped maintain the integrity of the GI tract. Typical NSAIDs inhibit both forms of the COX enzyme. It was theorized that a drug which

4

inhibited only COX-2 would reduce inflammation without adverse GI effects. This class of drugs is known as the coxibs.

15. COX-2 is involved in more than the inflammatory process. It plays a role in normal renal function, reproductive biology and neurological functioning. COX-2 also plays a role in maintaining normal functioning of the vascular endothelium and in the production of prostacyclin ("$PGI_2$").

16. COX-2 is associated with the production of $PGI_2$ by the vascular endothelium. $PGI_2$ inhibits platelet aggregation (clotting) and is a vasodilator. In contrast, COX-1 is associated with the production of thromboxane $A_2$ ("$TXA_2$") by platelets. $TXA_2$ is a potent platelet aggregator and vasoconstrictor. Under normal circumstances $PGI_2$ and $TXA_2$ have offsetting effects resulting in a homeostatic balance within the body.

17. NSAIDs are non-selective COX inhibitors that inhibit both COX-1 and COX-2, thereby inhibiting production of both $PGI_2$ and $TXA_2$, and maintaining a rough balance between the two. Selectively inhibiting COX-2 upsets the natural balance between $PGI_2$ and $TXA_2$ by inhibiting primarily $PGI_2$, thereby giving free rein to $TXA_2$'s clotting and vasoconstriction properties.

18. COX-2 also helps maintain the normal functioning of the vascular endothelium where not only $PGI_2$ but other anti-coagulants such as nitric oxide, thrombomodulin, heparin sulfates and t-PA are produced. COX-2 inhibition therefore blocks redundancies in the vascular system by suppressing production of these other anti-coagulants by the vascular endothelium.

19. This impact on endothelial function is especially important given that many likely users of COX-2 inhibitors will have pre-existing or pre-disposing factors for cardiovascular

5

risks, including some degree of atherosclerotic plaque which damages the vascular endothelium. A damaged vascular endothelium causes an imbalanced pro-thrombotic state because the damaged endothelium contributes to narrowed arteries and also produces less $PGI_2$ and other anti-coagulants which would otherwise inhibit platelet aggregation.

20. Many users of COX-2 inhibitors are at a heightened risk and even more susceptible to the pro-thrombotic effects of selective COX-2 inhibition.

21. With selective COX-2 inhibition, there is no corresponding suppression of the platelet aggregation and vasoconstriction effects of $TXA_2$.

22. Internal Merck documents indicate that Vioxx® is at least 5 times more COX-2 selective than its competitor, Celebrex®. Research by others suggests that Vioxx® may be as much as 9 times more COX-2 selective than Celebrex®.

## The Vioxx® Timeline

23. On or about November 23, 1998, Merck submitted to the Food and Drug Administration ("FDA") a New Drug Application ("NDA") for Rofecoxib (Vioxx®).

24. Before submittal of its NDA, Merck knew that selective COX-2 inhibition could be pro-thrombotic and dangerous to the potential users of Vioxx®. Merck actively contrived to conceal and minimize this fact for fear that it would "kill" the drug.

25. Before submittal of its NDA, Merck declined to study the cardiovascular effects of COX-2 inhibition in the patients expected to use Vioxx®, even though Merck was aware that many users of Vioxx® would already be at risk of serious adverse cardiovascular events. Merck never advised physicians or patients of its failure to conduct such studies.

26.    Before approval of its NDA, Merck was aware that other researchers had also confirmed in both human and animal studies the likelihood of serious cardiovascular risk with the use of COX-2 inhibitors and that further trials were necessary to determine whether a COX-2 inhibitor would be both efficacious and safe in its intended population.

27.    On or about May 17, 1999, the FDA safety review of the Merck NDA for Vioxx® also noted Merck's inability to provide an answer to the actual risk of adverse cardiovascular and thromboembolic events for patients on Vioxx®.

28.    Merck has never conducted any testing meant to determine the risk of cardiovascular and thromboembolic events in the intended patient population of Vioxx® users.

29.    On or about May 20, 1999, the FDA approved Vioxx®.

30.    Merck immediately launched aggressive advertising and public relations campaigns to promote Vioxx®.

31.    On or about June 22, 1999, Merck hired Peter Holt, M.D. to promote the use of Vioxx® to physicians.

32.    The FDA later found that parts of Dr. Holt's presentations to physicians promoting the use of Vioxx® were false or misleading.

33.    On or about July 16, 1999, the FDA issued a warning letter to Merck regarding Vioxx® direct to consumer ("DTC") advertising.

34.    On or about January 1, 1999, Merck began the VIOXX Gastrointestinal Outcomes Research ("VIGOR") trial to substantiate a gastrointestinal safety claim for the drug.

35.    On or about November 18, 1999, the VIGOR Data Safety Monitoring Board expressed concern about the "excess deaths and cardiovascular events" in the group of study participants taking Vioxx®.

36.     On or about December 16, 1999, the FDA sent Merck a letter noting that several promotional pieces were false or misleading because they misrepresented the safety profile of Vioxx®, contained unsubstantiated comparative claims and promoted unapproved uses.

37.     On or about December 1999, Merck began patient screening for the APPROVe trial, a study to evaluate whether Vioxx® prevented the recurrence of colon polyps.

38.     On or about March 2000, Merck revealed the initial VIGOR results showing that patients using Vioxx® had double the rate of serious cardiovascular events than those on the comparator drug, Naproxen (a non-selective NSAID). The data also showed a four-fold increase in heart attack risk. When the complete data was reanalyzed, the actual increase in relative risk of a heart attack was 5.04, compared to a relative risk of 1.0 in the participants taking Naproxen rather than Vioxx®. The relative risk of a serious cardiovascular event, which included heart attacks, strokes, sudden death and unstable angina, was 2.3.

39.     Merck acknowledged internally that the VIGOR results raised serious questions regarding the safety of Vioxx® for its intended users.  Nevertheless, Merck set out to minimize, obfuscate and misrepresent the results of the VIGOR study in order to conceal the cardiovascular risks attributable to Vioxx®.

40.     During this time, Merck continued to be aware of the adverse cardiovascular effects associated with the use of Vioxx®.  Merck also became aware of studies indicating that the COX-2 enzyme selectively suppressed by Vioxx® is cardio-protective.

41.     Once again, Merck decided not to conduct a study designed to determine the extent of cardiovascular risks associated with Vioxx®.

8

42. Instead, Merck continued to dispute these and other studies indicating increased cardiovascular risks associated with Vioxx® and the cardio-protective effects of the COX-2 enzyme.

43. On or about November 2000, Merck published the VIGOR results in the New England Journal of Medicine and downplayed the cardiovascular risks, suggesting that the drug presented no risk to those with healthy hearts and omitting detailed information about other cardiovascular complications like strokes. The article prominently discussed the reduction of stomach bleeds in patients taking Vioxx®, but did not mention that patients on Vioxx® had more serious adverse events and more hospitalizations than patients on Naproxen. The true rates for cardiovascular thrombotic adverse events, hypertension and congestive heart failure – all of which were higher in the Vioxx® group - were not disclosed.

44. On or about February 8, 2001, an FDA Advisory Panel recommended that the Vioxx® labeling be changed to reflect the cardiovascular risks.

45. On or about August 29, 2001, the Journal of the American Medical Association published a peer reviewed study by the Cleveland Clinic Foundation which conducted a meta-analysis of several clinical trials, including the VIGOR trial. The authors concluded that the VIGOR results showed a 2.2 times greater risk of a serious cardiovascular event in those taking Vioxx® as compared to Naproxen. The relative risk between Vioxx® and Naproxen among aspirin-indicated patients (i.e., those already at some cardiac risk) was 4.89. The authors theorized that COX-2 inhibitors "by decreasing $PGI_2$ production may tip the natural balance between prothrombotic thromboxane $A_2$ and antithrombotic $PGI_2$, potentially leading to an increase in thrombotic cardiovascular events." The authors

9

concluded with the observation: "Given the remarkable exposure and popularity of this new class of medications, we believe that it is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of these agents." Mukherjee, D., et al., *Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors*, J. Amer. Med. Assn. 286:8, 954, 957, August 22/29, 2001.

46.     Two of the Cleveland Clinic study authors, Drs. Topol and Nissen, were lobbied by Merck to temper their criticisms prior to publication.

47.     On or about September 17, 2001, the FDA sent a Warning Letter to Merck regarding promotional audio conferences conducted by Dr. Holt, a Merck press release regarding the safety profile of Vioxx®, and oral representations made by Merck sales representatives to promote the sale of Vioxx®. The letter began:

> You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx.

48.     The FDA further stated that Dr. Holt's assertions "minimize the potentially serious MI risk that may be associated with Vioxx® therapy."

49.     The FDA noted in the letter that Merck's "misrepresentation of the safety profile for Vioxx® is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx® that also misrepresented Vioxx®'s safety profile."

50.     In the Warning Letter, the FDA also noted repeated misrepresentations of the actual VIGOR study results. For example, Dr. Holt had asserted that the overall safety profile of

10

COX-2 inhibitors, including Vioxx®, was safer than that of other NSAIDs. The FDA

noted that "such an advantage has not been demonstrated," and further stated:

> In fact, in the VIGOR study the incidence of serious adverse events was **higher** in the Vioxx treatment group than in the naproxen treatment group (9.3% and 7.8% for Vioxx and naproxen, respectively). The results of safety analyses that were pre-specified in the protocol for the VIGOR trial, such as CHF related adverse events and discontinuations due to edema-related adverse events, hepatic-related adverse events, hypertension-related adverse events, and renal-related adverse events were all numerically higher (in some cases statistically significantly higher) in the Vioxx treatment group than in the naproxen treatment group.

51.     The FDA criticized Merck for other misleading actions:

> We have identified a Merck press release entitled, "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx," dated May 22, 2001, that is also false or misleading for similar reasons stated above. Additionally, your claim in the press release that Vioxx has a "favorable cardiovascular safety profile," is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to naproxen.

52.     Finally, the FDA determined that Merck sales representatives had engaged in false or

misleading promotional activities.

53.     Because of the seriousness of the violations and the fact that Merck had previously been

notified of similar violations, FDA required Merck to issue a "Dear Healthcare Provider"

letter correcting the false or misleading impressions and information.

54.     Throughout this time period, a number of healthcare organizations asked Merck to test

whether Vioxx® increased the risk of heart attack and stroke.

55.     On or about December 15, 2001, the FDA reviewed a Supplemental NDA ("SNDA") to

approve Vioxx® for the treatment of rheumatoid arthritis. After evaluating VIGOR and

other studies, the FDA reviewer concluded that "the potential advantage of decreasing the

risk of complicated [GI adverse events] was counterbalanced by the increased rate of developing serious non-GI events (particularly cardiovascular events)."

56. By 2003 Merck still had not conducted a study specifically designed to assess cardiac and thrombotic risks associated with Vioxx®. The need for such a study was especially great given inherent limitations in the FDA's Adverse Event Reporting System. That system is useful for identifying unusual events, but practically worthless for common events such as heart attack and stroke.

57. Independent researchers continued to conclude that the use of Vioxx® and other COX-2 inhibitors lead to increased vascular and thrombotic events and that their poor safety performance could not be excused by the attempted explanations of Merck.

58. On or about April 11, 2002, over two years after the initial VIGOR results became available and despite much resistance from Merck, the FDA ordered new labeling for Vioxx®. Merck was allowed to place the revised GI labeling up front, followed by a graphical presentation of the cardiovascular data. The revised label urged doctors to use caution in prescribing Vioxx® for patients with ischemic heart disease. The label also stated that Vioxx® 50 mg. was not recommended for chronic use and that the 25 mg. dose was associated with a higher risk of hypertension compared to Naproxen. The cardiac data was presented in the "Precautions" section, not in the warnings. There was no Black Box warning. Despite the findings of other researchers, Merck stated in its label that the significance of the cardiovascular findings seen in VIGOR and other studies was unknown.

59. On or about September 2002, Merck began the MEDAL study, which included over 23,000 patients and was specifically designed to assess the cardiovascular safety of

12

Arcoxia®, Merck's planned successor to Vioxx®. No comparable study was ever done by Merck to evaluate Vioxx®.

60.     Both independent researchers and studies funded by Merck continued to show the increased cardiovascular risk of Vioxx®.   Merck nevertheless continued to ignore adverse findings and attempted to obstruct and minimize the import of these studies.

61.     On or about August 25, 2004, Dr. David Graham of the FDA presented preliminary research findings at a conference in Bordeaux, France. Dr. Graham had conducted a study prompted by the VIGOR results and funded by the FDA intended to assess cardiac risk in patients taking Vioxx®.   Based on his analysis, Graham concluded that Vioxx® was responsible for over 27,700 heart attacks and sudden coronary deaths between 1999 and 2003; 14,845 of these adverse events were at doses less than or equal to 25 mg. and 12,940 at higher doses. Graham has since increased that estimate to almost 140,000 heart attacks and sudden coronary deaths.

62.     On or about August 27, 2004, Merck issued a press release stating that it "strongly disagrees" with Graham's findings and "stands behind the efficacy and safety, including cardiovascular safety, of Vioxx." On or about the same day, the APPROVe Data Safety Monitoring Board (the colon polyp prevention study begun on or about December 1999) confirmed that Vioxx® tripled cardiac risk, and more than doubled the relative risk for a cerebrovascular event (2.33).

63.     On or about September 27, 2004, Merck advised the FDA that data from the APPROVe trial indicated a tripled risk of heart attack.

64.     On or about September 30, 2004, Merck publicly announced that it was pulling Vioxx® from the market.

65.  On or about November 5, 2004, <u>The Lancet</u> published online a cumulative meta-analysis of earlier Vioxx® clinical trial data, in which the authors concluded that Vioxx® should have been withdrawn from the market several years earlier. The authors asserted that "an increased risk of myocardial infarction was evident from 2000 onwards," and that by the end of 2000, "the effect was both substantial and unlikely to be a chance finding." The authors further rejected Merck's efforts "to explain [away] the findings of VIGOR." The authors also commented on the exclusion criteria of most of the trials, noting that patients with a history of cardiovascular disease routinely were excluded. Noting that many such patients were likely taking the drug, the researchers pointed out that the risk of MI in this already at risk population was over eight (8) times higher.  Merck never attempted to test the cardiovascular risks of Vioxx® in this population, even though it knew that many patients taking the drug were at increased cardiovascular risk.

66.  Despite a known risk potential, repeated calls for study and results from the VIGOR and other trials, Merck recklessly and willfully failed to conduct adequate studies to establish the safety of Vioxx®.

67.  Merck never disclosed on its warning labels that such testing had not been performed, thereby fraudulently inducing physicians and patients alike to use Vioxx®  under the false assumption that it had been sufficiently tested.

68.  By the end of 1999, less than 5 million prescriptions had been written for Vioxx® according to the Merck Annual Report. By the time the drug was pulled in 2004, over 105 million prescriptions had been written.

69.  Vioxx® was only tested and approved for up to five days of use at the 50mg dosage.

14

**Fraudulent Concealment, Tolling and Estoppel**

70.   Any applicable statutes of limitations have been tolled by the knowing and active concealment and denial by Merck of the facts as alleged herein.

71.   Plaintiff has been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.

72.   Plaintiff could not reasonably have discovered the dangerous nature of and unreasonable adverse side effects associated with Vioxx® before the publicity surrounding the drug's withdrawal from the market.

73.   Merck should be estopped from relying on any statute of limitations defense because Merck is and was under a continuing duty to disclose the true character, quality, and nature of Vioxx® to Plaintiff and it failed to do so.

74.   Plaintiff did not have any factual basis to be aware of the claims asserted herein until September 30, 2004, or later.

75.   Merck should be estopped from asserting the affirmative defense that any of Sarah G. Nichols's health care providers were learned intermediaries since Merck actively misrepresented and concealed vital safety information regarding the cardiovascular risks of Vioxx®.

## CAUSES OF ACTION

### COUNT I – STRICT LIABILITY
**(Against Merck)**
**Restatement of Torts (Second) §402A**
**or**
**Restatement of Torts (Third): Prod. Liab. §6**

76.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length.

77.   Vioxx® as sold by Merck was defective and unreasonably dangerous to consumers, including Sarah G. Nichols.

78.   Vioxx® was expected to reach, and did reach, prescribing physicians and consumers throughout the United States, including Sarah G. Nichols, without substantial change in the condition in which it was originally sold by Merck.

79.   Vioxx® was defective and unreasonably dangerous at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

    a.    Vioxx® had unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting Sarah G. Nichols to risks which exceeded any benefits of the drug;

    b.    Vioxx® was defective in design and formulation, because making use of the drug was more dangerous than an ordinary consumer would expect and Merck failed to adequately warn of the risks associated with the use of said drug;

    c.    Merck failed to conduct adequate pre- and post-clinical testing and research to determine the safety of Vioxx® despite overwhelming evidence of the need for such testing and research; and

    d.    The benefits of using Vioxx® were outweighed by the risks of a serious cardiovascular adverse event.

80.   The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to Plaintiff and for which Merck is legally responsible.

### COUNT II - NEGLIGENCE
### (Against Merck)

81.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length.

82.   At all relevant times, Merck had a duty to exercise reasonable care to properly prepare, design, research, develop, test, manufacture, inspect, label, market, promote, and sell

16

Vioxx®, including a duty to insure that users did not suffer from unreasonable, dangerous or untoward adverse side effects.

83.   At all relevant times, Merck owed a duty to properly warn consumers and their physicians of the risks, dangers, and adverse side effects of Vioxx®.

84.   Merck failed to exercise ordinary care in the preparation, design, research, development, testing, manufacturing, inspection, labeling, marketing, promotion, and selling of Vioxx®.

85.   Merck knew, or in the exercise of reasonable care, should have known, that Vioxx® was likely to cause injury to a significant number of those taking the drug if Merck failed to exercise ordinary care.

86.   Merck was negligent in the preparation, design, research, development, testing, manufacturing, inspection, labeling, marketing, promotion, and selling of Vioxx® in that it:

   a.   Developed a drug with known potential to increase cardiovascular risk, which risks were not outweighed by any potential benefit;

   b.   Failed to adequately test pre-market to determine actual potential extent of adverse cardiovascular events;

   c.   Failed to accurately and completely report known risks of Vioxx® to the FDA;

   d.   Failed to fully and completely inform prescribers and the public about known risks of Vioxx®;

   e.   Overstated the benefits of Vioxx® relative to other safer drugs, to the FDA, prescribers, and consumers.

   f.   Despite direct knowledge that they were indicated and required, Merck refused to conduct any studies designed to determine the extent of the actual potential of adverse cardiovascular events.

   g.   Made no meaningful effort to report actual adverse events to the FDA, or to inform prescribers and consumers of the same;

17

h.   Minimized, attempted to conceal and actively concealed information as it became available about the adverse cardiovascular events attributable to Vioxx®; and

i.   Was otherwise careless and negligent.

87.   Despite the fact that Merck knew or should have known that Vioxx® caused unreasonable and dangerous side effects which many users would be unable to remedy by any means, Merck continued to promote and market said drug to consumers, including Sarah G. Nichols, when safer and more effective treatments were available.

88.   Merck knew or should have known that consumers such as Sarah G. Nichols would foreseeably suffer injury as a result of Merck's failure to exercise ordinary care as described herein.

89.   The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to Plaintiff and for which Merck is legally responsible.

**COUNT III – FAILURE TO WARN**
**(Against Merck)**
**Restatement of Torts (Second) § 388**
**or**
**Restatement of Torts (Third): Prod. Liab. §6**

90.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length.

91.   Merck had a continuing duty to warn the prescribing physicians and users of Vioxx® of the risks and benefits associated with said drug.

92.   Vioxx® was defective and unreasonably dangerous when it left the possession of Merck because:

a.   The labeling was misleading regarding the purported risks and benefits associated with said drug; and,

    b.    Their labeling was inadequate to alert physicians and consumers, such as Sarah G. Nichols, to the dangerous risks and adverse cardiovascular events associated with said drug.

93.    Merck, as a manufacturer of pharmaceutical medications, is held to the level of knowledge of an expert in the field.

94.    The warnings that were given by Merck to the prescribing physicians and users of Vioxx® were defective in that they misrepresented what Merck knew, or should have known, and were not adequate, accurate, clear, or complete.

95.    Merck had a continuing duty to warn the prescribing physicians and users of Vioxx® of the dangers associated with said drug, and breached that duty.

96.    The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to Plaintiff and for which Merck is legally responsible.

## COUNT IV – FRAUD AND FALSE ADVERTISING
### (Against Merck)

97.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length.

98.    Merck owed a duty to provide complete and accurate information regarding Vioxx® to Sarah G. Nichols, physicians, and anyone else it knew or should have known would ingest, prescribe or recommend the ingestion of said drug.

99.    Merck misrepresented material facts regarding the safety and efficacy of Vioxx® and failed to inform and did conceal these material facts from Sarah G. Nichols, physicians and the general public.

100.    Merck fraudulently, intentionally and/or with gross negligence and recklessness misrepresented to Sarah G. Nichols, physicians, and the general public that Vioxx® was safe and effective, that the benefits of taking said drug outweighed any risks, and/or

19

fraudulently, intentionally and/or in a grossly negligent and reckless manner misrepresented and concealed safety and effectiveness information regarding said drug, including but not limited to the propensity of said drug to cause serious physical harm.

101.  The continuous and ongoing course of action constituting fraud and misrepresentation on Sarah G. Nichols, physicians, and the general public started as early as 1999, if not earlier, and continued through repeated acts and non-disclosure every year since then, throughout the United States and elsewhere.

102.  Vioxx® was in fact unsafe and its use posed a risk of injury and death which outweighed the purported benefits of such use, thereby causing injury to Sarah G. Nichols and others.

103.  Merck made misrepresentations and actively concealed adverse information at a time when Merck knew, or should have known, that Vioxx® had defects, dangers, and characteristics that were other than what Merck had represented to the prescribing doctors or other dispensing entities, the FDA, and the consuming public, including Sarah G. Nichols.

104.  Specific misrepresentations and/or active concealment by Merck include, but are not limited to, the following:

a.   Failure to disclose that there had been insufficient studies regarding the safety and efficacy of Vioxx®;

b.   Marketing, promoting and/or selling Vioxx® as if it were fully and adequately tested, when it was not;

c.   Misrepresenting the safety and efficacy of Vioxx® in the labeling, advertising, product inserts, promotional materials, and/or other marketing and/or safety surveillance efforts;

d.   Misrepresenting the existence and adequacy of testing of Vioxx® both pre-and post-marketing; and

20

e.  Concealing or failing to disclose the severity and frequency of adverse health effects caused by Vioxx®.

105.  The misrepresentations and/or active concealment alleged above were perpetuated directly and/or indirectly by Merck, and those acting on its behalf.

106.  The fraudulent misrepresentations of Merck took the form of, among other things, express and implied statements, publicly disseminated misinformation, misinformation provided to regulatory agencies, inadequate, incomplete and misleading warnings about Vioxx®, failure to disclose important safety and injury information regarding said drug, and elaborate marketing, promotional, and advertising activities designed to conceal and mislead regarding the safety of said drug, all while having a duty to disclose such information to Sarah G. Nichols and others.

107.  Merck knew or should have known that these representations were false and material at the time they were made or omitted or concealed, and made the representations with the intent or purpose that patients, including Sarah G. Nichols, and their physicians would rely on them, leading to the use of Vioxx® by such patients, including Sarah G. Nichols.

108.  Sarah G. Nichols had no knowledge of the information concealed and/or suppressed by Merck.

109.  Sarah G. Nichols was misled and/or relied on and/or was induced by the misrepresentations and/or active concealment by Merck, and was misled and relied on the absence of safety information which Merck did suppress, conceal or fail to disclose thereby causing injury and damage to Sarah G. Nichols.

110.  Merck made the misrepresentations and/or actively concealed information with the intention and specific desire that Sarah G. Nichols and the general public would rely on

such misrepresentations or on the absence of information concealed by Merck in selecting and using Vioxx®.

111.    Merck undertook marketing strategies which included advertising campaigns to aggressively promote and sell Vioxx® by misleading and failing to warn potential users about the serious health effects that Merck knew, or should have known, could result from the use of said drug.

112.    This advertising campaign on the whole, through its affirmative misrepresentations and omissions, falsely and fraudulently created the impression that the use of Vioxx® was safe and had fewer adverse health and side effects than were actually known to Merck at the time it made these representations.

113.    The misrepresentations and/or active concealment by Merck constitute a continuing tort in violation of both common law and KRS 217.175(5).

114.    The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to Plaintiff and for which Merck is legally responsible.

**COUNT V - MISREPRESENTATION BY SELLER OF CHATTEL**
**(Against Merck)**
**Restatement of Torts (Second) § 402B**
**or**
**Restatement of Torts (Third): Prod. Liab. § 9**

115.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length.

116.    At all relevant times herein, Merck was in the business of selling prescription drugs, including Vioxx®.

117.    Through its actions and omissions in advertising, labeling, promotional literature, moving pictures, product brochures, and otherwise, Merck made public misrepresentations of

22

material fact concerning the character, safety, and effectiveness of Vioxx® to both the general public and treating and prescribing physicians.

118.    These public misrepresentations and representations include, but are not limited to those set forth in other Counts of this Complaint.

119.    The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to Plaintiff and for which Merck is legally responsible.

### COUNT VI - BREACH OF EXPRESS AND IMPLIED WARRANTY
### (Against Merck)

120.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length.

121.    Merck, through description, affirmation of fact, and promises relating to Vioxx®, and made to the FDA, to prescribing physicians, and to the general public, including Sarah G. Nichols, expressly warranted that Vioxx® was both effective and safe for its intended use.

122.    These warranties came in the form of: (i) publicly-made written and verbal assurances of the safety and efficacy of Vioxx® by Merck; (ii) press releases, interviews and dissemination via the media of promotional information, the sole purpose of which was to create and increase demand for Vioxx®, and which failed utterly to warn of the risks inherent to the ingestion and use of said drug; (iii) verbal assurances made by Merck, or its agents, regarding Vioxx®, and the downplaying of any risk associated with said drug; (iv) false and misleading written information, supplied by Merck, and published in the *Physicians Desk Reference* on an annual basis, upon which physicians relied in prescribing Vioxx® during the period of Sarah G. Nichols's ingestion of said drug; (v) promotional pamphlets and brochures published and distributed by Merck, and directed

23

to consumers; and (vi) advertisements.  The documents referred to in this paragraph were created by and at the direction of Merck, and, therefore, are in its possession and control.

123.  Merck also impliedly warranted that Vioxx® was of merchantable quality and was fit for its intended use and particular purpose.

124.  At the time of these express and implied warranties, Merck had knowledge of the purpose for which Vioxx® was to be used and warranted said drug to be in all aspects safe, effective, and proper for such purpose.

125.  Vioxx® did not conform to these express and implied warranties in that it is neither safe nor effective and its use produces serious adverse side effects, and as such, Vioxx® was not in conformity with the promises, descriptions or affirmations of fact made about said drug nor was it adequately contained, packaged, labeled or fit for the ordinary purposes for which such goods are used.

126.  Merck further breached express and implied warranties to Sarah G. Nichols by: (i) manufacturing, marketing, packaging, labeling, and selling Vioxx® in a way that misstated the risks of injury, without warning or disclosure thereof by package and label of such risks to Sarah G. Nichols or prescribing physicians or pharmacists, and without modifying or excluding such express and implied warranties; and (ii) manufacturing, marketing, packaging, labeling, and selling Vioxx® to Sarah G. Nichols which caused serious physical injury and pain and suffering.

127.  The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to Plaintiff and for which Merck is legally responsible.

## COUNT VII – CONSUMER PROTECTION ACT
### (Against Merck)

128. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length.

129. Merck misrepresented the efficacy and safety of Vioxx® to Plaintiff through its advertising, promotion and sales efforts, as directed to Plaintiff, the local community, prescribing physicians and the FDA.

130. Merck's actions and failures to act as alleged in this Complaint constitute unfair, false, misleading and deceptive acts and practices in the conduct of trade and commerce in violation of the Kentucky Consumer Protection Act, KRS 367.170.

131. As a result of Merck's deceptive and unconscionable conduct, Sarah G. Nichols was prescribed Vioxx®, Sarah G. Nichols purchased Vioxx® and Sarah G. Nichols did in fact consume Vioxx®. Sarah G. Nichols's use of Vioxx® was entirely for Sarah G. Nichols's personal purposes.

132. Sarah G. Nichols is within the class of people intended to be protected by the Kentucky Consumer Protection Act.

133. The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to Plaintiff and for which Merck is legally responsible.

134. In addition, the Court should award Plaintiff reasonable attorneys' fees and costs as allowed by the Kentucky Consumer Protection Act, KRS 367.220(3).

## COUNT VIII – JOHN DOES
### (Claims against the John Doe Sales Representative Defendants)

135. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length.

136.   At all times material hereto, the Defendants, John Doe One and John Doe Two (hereinafter called the "Sales Representative Defendants") as employees of Merck were in the business of marketing and promoting the pharmaceutical drug Vioxx® within the Commonwealth of Kentucky.

137.   As set forth more completely herein, the Sales Representative Defendants owed various duties to Sarah G. Nichols, but breached those duties by committing positive tortious actions including but not limited to their interactions and misrepresentations to Sarah G. Nichols's prescribing health care provider(s) regarding Vioxx®.

138.   The Sales Representative Defendants owed a duty to provide complete and accurate information regarding Vioxx® to Sarah G. Nichols, Sarah G. Nichols's health care provider(s), and anyone else they knew or should have known would ingest, prescribe or recommend the ingestion of Vioxx®.

139.   The Sales Representative Defendants misrepresented material facts regarding the safety and efficacy of Vioxx®, and failed to inform and did conceal from Sarah G. Nichols, the public and health care providers these material facts.   The Sales Representative Defendants also supplied Sarah G. Nichols and Sarah G. Nichols's health care provider(s) with labeling information supplied by the manufacturer when they knew or should have known that the labeling information that was supplied with Vioxx® was inaccurate, misleading and incomplete.

140.   The Sales Representative Defendants fraudulently, intentionally and/or with gross negligence and recklessness misrepresented to Sarah G. Nichols, Sarah G. Nichols's health care provider(s), and the general public that Vioxx® was safe and effective, that the benefits of taking the drug outweighed any risks, and/or fraudulently, intentionally

26

and/or in a grossly negligent and reckless manner misrepresented and concealed safety and effectiveness information regarding Vioxx®, including but not limited to the propensity of Vioxx® to cause serious physical harm.

141. Vioxx® was in fact unsafe and the use of it posed a risk of injury and death which outweighed the purported benefits from its use, such that injury was in fact caused to Sarah G. Nichols and others.

142. The Sales Representative Defendants made misrepresentations and actively concealed adverse information at a time when they knew, or should have known, that Vioxx® had defects, dangers, and characteristics that were other than what had been represented to the prescribing health care provider(s) or other dispensing entities, the FDA, and the consuming public, including Sarah G. Nichols.

143. The Sales Representative Defendants knew, or should have known, or consciously or recklessly chose not to know, that these representations were false and material at the time they were made or omitted or concealed, and made the representations with the intent or purpose that Sarah G. Nichols and Sarah G. Nichols's health care provider(s) would rely on them, leading to the use of Vioxx® by Sarah G. Nichols.

144. The Sales Representative Defendants made the misrepresentations and/or actively concealed this information with the intention and specific desire that Sarah G. Nichols and Sarah G. Nichols's health care provider(s) or other dispensing entities and the consuming public would rely on such or the absence of information in selecting Vioxx® as a treatment for Sarah G. Nichols.

145. Sarah G. Nichols and Sarah G. Nichols's health care provider(s) relied on and/or were induced by the misrepresentations and/or active concealment and on the absence of safety

27

information which the Sales Representative Defendants did suppress, conceal or fail to disclose.

146. The misrepresentations of and/or active concealment by the Sales Representative Defendants constitute a continuing tort.

147. The tortious acts by the Sales Representative Defendants include, but are not limited to, the following:

    a. The Sales Representative Defendants were in the business of marketing, promoting, selling and/or distributing the unreasonably dangerous drug, Vioxx®, which caused harm to Sarah G. Nichols;

    b. The Sales Representative Defendants negligently distributed, marketed, advertised and/or promoted the dangerous drug Vioxx®;

    c. The Sales Representative Defendants failed to adequately warn prescribing health care providers of the dangers Vioxx® posed and failed to discuss the lack of efficacy of the drug;

    d. The Sales Representative Defendants made negligent and/or intentional misrepresentations regarding the safety and efficacy of the dangerous drug, Vioxx®.

148. The Sales Representative Defendants were directly involved in selling the defective product Vioxx® to Sarah G. Nichols in that they each made visits to the office of Sarah G. Nichols's prescribing health care provider(s), specifically intending to cause said health care provider(s) to prescribe Vioxx®.

149. The Sales Representative Defendants detailed the health care provider(s) who prescribed Vioxx® for Sarah G. Nichols, and during such detailing encouraged the use of Vioxx® in situations where such use was not indicated, and/or gave the health care provider(s) a copy of an article or articles which reported favorably on the safety of Vioxx®. The Sales Representative Defendants understated or misrepresented associated risks and/or

28

overstated the safety and effectiveness of the drug, and/or provided materially incomplete information in those respects.

150.   The Sales Representative Defendants knew that it was wrongful to understate or withhold information regarding the risks of Vioxx® and to overstate its safety and effectiveness, or to make representations to health care providers that were not based on complete information.

151.   The Sales Representative Defendants had knowledge of the circumstances, of their duties, and of the actionable wrongs set out herein – such as the over-promotion of Vioxx® and misrepresentations and omissions – but nonetheless participated in and/or contributed to the commission of the wrongdoing.

152.   The Sales Representative Defendants developed a professional relationship with Sarah G. Nichols's prescribing health care provider(s).

153.   Part of that relationship involved the Sales Representative Defendants providing information to Sarah G. Nichols's prescribing health care provider(s) about Vioxx®.

154.   Sarah G. Nichols's prescribing health care provider(s) relied upon the information provided by the Sales Representative Defendants.

155.   Having developed this relationship with Sarah G. Nichols's prescribing health care provider(s), the Sales Representative Defendants owed a duty to Sarah G. Nichols's prescribing health care provider(s) and consequently to the patients of said health care provider(s) to provide adequate warnings about Vioxx®.

156.   Further, by this relationship, the Sales Representative Defendants owed a duty to Sarah G. Nichols's prescribing health care provider(s) not to exaggerate the efficacy or minimize the risk of Vioxx®.

29

157.    As a direct result of the efforts of the Sales Representative Defendants, Sarah G.

Nichols's prescribing health care provider(s) prescribed Vioxx® to Sarah G. Nichols.

158.    The Sales Representative Defendants breached their duty to Sarah G. Nichols, as a

foreseeable ultimate consumer of the product being sold, in that:

     a.     They knew or should have known of the cardiovascular risks associated
with Vioxx®, alleged above, but did not adequately inform Sarah G.
Nichols's prescribing health care provider(s);

     b.     They knew or should have known that Vioxx® was not reasonably safe
but did not tell Sarah G. Nichols's prescribing health care provider(s); and,

     c.     They failed to adequately stress the limited efficacy of Vioxx®, while
simultaneously over-stating the safety of the drug and misrepresenting its
safety profile.

159.    The Sales Representative Defendants breached their duties alleged above and such breach

constituted a foreseeable and substantial factor contributing to Sarah G. Nichols's

damages.

160.    The Sales Representative Defendants made the misrepresentations set forth in this Count

either knowing that they were untrue or recklessly without regard for the truth or falsity

of such representations.

161.    The misrepresentations of and/or active concealment alleged above were perpetuated

directly and/or indirectly by the Sales Representative Defendants, acting in both their

individual and corporate capacity.

162.    The actions set forth in this Count were a substantial factor in causing damages, as set out

in the Counts below, to Plaintiff and for which the Sales Representative Defendants are

legally responsible.

30

## COUNT IX - NEGLIGENCE
### (Against G. Randolph Schrodt Jr., M.D. and Integrative Psychiatry PLLC)

163. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length.

164. At all times relevant hereto, Sarah G. Nichols had a healthcare provider-patient relationship with Dr. Schrodt.

165. Beginning on or about November 4, 1999, and continuing through approximately May 1, 2003, Dr. Schrodt prescribed or otherwise provided Vioxx® to Sarah G. Nichols.

166. Despite the fraud of Merck and its attempts to conceal and to misrepresent the safety profile of Vioxx®, Defendant, Dr. Schrodt, nevertheless failed to exercise reasonable care in prescribing Vioxx® to Sarah G. Nichols, all as more fully set forth in this Count.

167. Defendant, Dr. Schrodt, in the exercise of reasonable care and in compliance with the relevant standard of care knew or should have known that Vioxx® posed real and substantial risks of adverse cardiovascular events, but failed to fully and adequately consider those risks or disclose them to Sarah G. Nichols before dispensing or prescribing Vioxx®.

168. In dispensing or prescribing Vioxx® to Sarah G. Nichols, Dr. Schrodt was negligent and deviated from the relevant standard of care in several particulars, including, but not limited to: failing to be aware of or consider the real and substantial risks that Vioxx® posed of adverse cardiovascular events; failing to determine whether treatment with a COX-2 selective inhibitor was appropriate or indicated because of gastrointestinal or other risks to Sarah G. Nichols; failing to obtain informed consent, including the failure to inform Sarah G. Nichols of adverse events associated with Vioxx® and failing to provide adequate and complete instructions for safe use of the drug.

31

169.   At all times relevant hereto, Dr. Schrodt was an employee or agent of Integrative and was acting within the course and scope of that employment or agency.

170.   Defendant, Integrative, is legally responsible and liable for the acts or omissions of its employees, agents and servants, including Dr. Schrodt, and for any damages resulting therefrom.

171.   The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to Sarah G. Nichols and for which Dr. Schrodt and Integrative are legally responsible.

### COUNT X – DAMAGES, WRONGFUL DEATH AND SURVIVAL
### (Against All Defendants)

172.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length.

173.   As a result of the actions and failures to act of defendants, as set forth in this Complaint, Sarah G. Nichols has sustained pain and suffering, physical, emotional and mental, including the loss of enjoyment of life.

174.   As a result of the actions and failures to act of defendants, as set forth in this Complaint, Sarah G. Nichols and Sarah G. Nichols's Estate have incurred medical and other expenses for Sarah G. Nichols's care, rehabilitation and treatment, including the expense of hospitalization, nursing care and other treatments.

175.   As a result of the actions and failures to act of defendants, as set forth in this Complaint, Sarah G. Nichols has suffered loss of earnings and permanent impairment of the power to labor and earn money.

176.   As a result of the actions and failures to act of defendants, as set forth in this Complaint, Sarah G. Nichols was caused to sustain severe injuries resulting in her death.

177.   As a result of the actions and failures to act of defendants, as set forth in this Complaint, Sarah G. Nichols's Estate has been damaged by reason of the destruction of Sarah G. Nichols's power to labor and earn money and has incurred funeral and other expenses.

178.   Defendants are jointly and severally liable for the compensatory damages of Plaintiff as set forth herein.

**COUNT XI- PUNITIVE DAMAGES**
**(Against Merck)**

179.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length.

180.   Plaintiff is entitled to punitive damages because Merck's actions and failure to act as set forth herein were reckless and without regard for the public's safety and welfare. Merck misled both the medical community and the public at large, including Plaintiff, by making false representations about the safety of Vioxx®. Merck downplayed, understated and disregarded its knowledge of the serious adverse events and side effects associated with the use of Vioxx®, despite available information demonstrating that Vioxx® was likely to cause serious and sometimes fatal side effects to users.

181.   Merck was or should have been in possession of evidence demonstrating that Vioxx® caused serious adverse events and side effects.  Merck failed to conduct appropriate and necessary testing, despite repeated indications and calls therefore, and continued to market Vioxx® by providing false and misleading information with regard to the safety and efficacy of said drug.

182.   Merck acted willfully, wantonly, intentionally, outrageously, maliciously and with reckless and conscious disregard for the health, welfare, safety and rights of Plaintiff and the general public.

33

183.   Merck is liable to Plaintiff for punitive damages in an amount as supported by the evidence and the law of the Commonwealth of Kentucky.

## PRAYER FOR RELIEF

**WHEREFORE**, Sarah E. Nichols, as Personal Representative of the Estate of Sarah G. Nichols requests that this Court enter judgment against Defendants, and award relief as follows:

A.   Compensatory damages against Merck & Co., Inc., John Doe One, John Doe Two, G. Randolph Schrodt Jr., M.D., and Integrative Psychiatry PLLC, jointly and severally, in an amount supported by the evidence at trial;

B.   An award of attorneys' fees, pre-judgment and post-judgment interest, and costs of suit, as provided by law against Merck & Co., Inc., John Doe One, John Doe Two, G. Randolph Schrodt Jr., M.D., and Integrative Psychiatry PLLC, jointly and severally;

C.   Punitive damages against Merck & Co., Inc., in an amount to be determined at trial;

D.   Trial by jury on all issues so triable; and,

E.   Such other legal and equitable relief as this Court deems just and proper.

**JURY TRIAL DEMANDED**

34

Respectfully submitted,

By:

Gregory J. Bubalo
D. Brian Rattliff
BUBALO & HIESTAND, PLC
401 South Fourth St., Suite 800
Louisville, Ky. 40202
Telephone: (502) 753-1600
Facsimile: (502) 753-1601
*Counsel for Plaintiff*

| AOC-056-11<br>Rev. 2-00<br><br>Commonwealth of Kentucky<br>Court of Justice | ENTERED<br>SEP - 9 2005 | **CERTIFICATE OF QUALIFICATION** | Case No. __03-P-00098__<br><br>County__Shelby__<br><br>Court District__Probate__ |

IN Re: Estate of __Sarah G. Nichols__

Proper petition having been filed and the Court having appointed_____

__Sarah Nichols__ as __Administrator W/W/A__

of the above estate on the ___9___ day of ___Sept___, __2005__; and the fiduciary having

filed in Court bond in the sum of $_____, the amount fixed, with__out__

_____ ■ surety, which was
approved by the Court, said fiduciary was thereupon duly sworn as required by law and thus qualified on the above
date.

The above Order and Qualification is in full force and effect this___Sept 09, 2005___.

Attest:___Kathy H. Nichols___ Clerk        By___Betty Jane Case___

Deputy Clerk

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

SARAH NICHOLS,                          )
as Personal Representative              )
of the Estate of SARAH G. NICHOLS       )
                                        )
          PLAINTIFF,                    )
                                        )          Civil Action No. 3:05CV693-R
v.                                      )
                                        )          *ELECTRONICALLY FILED*
MERCK & CO., INC., et al.               )
                                        )
          DEFENDANTS                    )
_____    )

### ANSWER OF G. RANDOLPH SCHRODT, JR., M.D. AND INTEGRATIVE PSYCHIATRY, PLLC

#### FIRST DEFENSE

The Complaint may fail to state a claim for relief upon which relief can be granted with respect to these Defendants.

#### SECOND DEFENSE

The Complaint may be barred by the applicable statute of limitation.

#### THIRD DEFENSE

1.    These defendants admit so much of Paragraph No. 1 as states that Sarah Nichols was a patient of Dr. Schrodt who resided in Kentucky, that he prescribed VIOXX® for Ms. Nichols (but not from November 4, 1999 until approximately May 1, 2003), and that VIOXX® is manufactured, marketed, and sold by Merck and Co., Inc.  These Defendants further state that Ms. Nichols' prescription for VIOXX® was begun by her prior treating physician; Dr. Schrodt continued the prescription for her when she became his patient in approximately January 2002.  These defendants deny the remaining averments set forth in Paragraph No. 1.

1

2.  These Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments set forth in Paragraph No. 2.

3.  These defendants admit Paragraph No. 3.

4.  These Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments set forth in Paragraph Nos. 4 and 5.

5.  These defendants admit Paragraph Nos. 6 and 7.

6.  These Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments set forth in Paragraph Nos. 8 and 9.

7.  These defendants admit Paragraph No. 10.

8.  These defendants admit Paragraph No. 11.

9.  These defendants admit Paragraph No. 12, except the characterization "especially by older people suffering from osteoarthritis or rheumatoid arthritis."

10. These defendants admit Paragraph No. 13.

11. These defendants admit Paragraph No. 14, except for the following:  1989 would be an approximation, the term "traditional" is more commonly used in Dr. Schrodt's experience than "typical," and the term "COX-2 inhibitors" is more commonly used in Dr. Schrodt's experience than "coxibs."

12. These defendants admit so much of Paragraph No. 15 as states that COX-2 is involved in various bodily functions including those listed.  With respect to the remainder of

Paragraph No. 15, to the extent counsel's averments are simplified explanations and characterizations of complex biochemical functions, these Defendants neither admit nor deny the averments as articulated.

13. With respect to Paragraph Nos. 16, 17, and 18, to the extent counsel's averments are simplified explanations and characterizations of complex biochemical functions, these Defendants neither admit nor deny the averments as articulated.

14. These defendants deny Paragraph Nos. 19 and 20 as to Ms. Nichols.

15. The averment set forth in Paragraph No. 21 is a matter of scientific debate. No responsive pleading is required because that debate has occurred primarily since May 2003, thus the averment is not relevant to Ms. Nichols' case. To the extent a responsive pleading would be required, Dr. Schrodt denies the averment.

16. No responsive pleading is required for Paragraph No. 22 because the item(s) referenced speaks for itself, and these Defendants refer the Court to the full text of the item(s).

17. No responsive pleading is required for Paragraph Nos. 23-42 given that the averments do not apply to these Defendants.

18. No responsive pleading is required for Paragraph No. 43 because the item(s) referenced speaks for itself, and these Defendants refer the Court to the full text of the item(s).

19. No responsive pleading is required for Paragraph No. 44 because the averments do not apply to these Defendants.

20.     No responsive pleading is required for Paragraph No. 45 because the item(s) referenced speaks for itself, and these Defendants refer the Court to the full text of the item(s).

21.     No responsive pleading is required for Paragraph Nos. 46-52 because the averments do not apply to these defendants, and because the item(s) referenced speaks for itself, and these Defendants refer the Court to the full text of the item(s).

22.     No responsive pleading is required for Paragraph No. 53 because the averments do not apply to these Defendants.

23.     These Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments set forth in Paragraph No. 54.

24.     No responsive pleading is required for Paragraph No. 55 because the averments do not apply to these Defendants, and because the item(s) referenced speaks for itself, and these Defendants refer the Court to the full text of the item(s).

25.     These defendants acknowledge so much of Paragraph No. 56 as states that it is impossible to have a perfect Adverse Event Reporting System, but otherwise disagrees with the characterizations set forth in the last sentence. These Defendants are without knowledge or information sufficient to form a belief as to so much of Paragraph No. 56 as states that Merck had not studied the cardiac and thrombotic risks associated with VIOXX® by 2003.

26.     The averments set forth in Paragraph No. 57 are a matter of scientific debate. No responsive pleading is required because that debate has occurred primarily since May

2003, thus the averment is not relevant to this case.  To the extent a responsive pleading would be required, Dr. Schrodt denies the averment.

27.    These Defendants are without knowledge or information sufficient to form a belief as to so much of Paragraph No. 58 as states that Merck resisted new labeling for VIOXX®, and exact timing of the new labeling.  No responsive pleading is required for the remaining averments in Paragraph No. 58 because the item(s) referenced speaks for itself, and these Defendants refer the Court to the full text of the item(s).

28.    No responsive pleading is required for Paragraph No. 59 because the averments do not apply to these Defendants.

29.    The averments set forth in Paragraph Nos. 60, 61, and 62 are a matter of scientific debate.  No responsive pleading is required because that debate has occurred primarily since May 2003, thus the averment is not relevant to Ms. Nichols' case.  To the extent a responsive pleading would be required, Dr. Schrodt denies the averments.

30.    No responsive pleading is required for Paragraph Nos. 63 and 64 because the averments do not apply to these Defendants.

31.    No responsive pleading is required for Paragraph No. 65 because the averments do not apply to these Defendants, and because the item(s) referenced speaks for itself, and these Defendants refer the Court to the full text of the item(s).

32.    These Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments set forth in Paragraph Nos. 66, 67, and 68.

33.     These defendants deny Paragraph No. 69.

34.     No responsive pleading is required for Paragraph Nos. 70-147 because the averments do not apply to these Defendants.

35.     These Defendants deny Paragraph No. 148 with respect to Dr. Schrodt's treatment of Ms. Nichols.

36.     Upon information and belief, these Defendants deny so much of Paragraph No. 149 as states that the Sales Representative Defendants encouraged the use of VIOXX® in situations where it was not indicated, or understated, misrepresented or provided materially incomplete information concerning the associated risks, safety or effectiveness of VIOXX®.  These Defendants are without recall sufficient to form a belief as to the truth of the averment that the Sales Representative Defendants provided any articles on VIOXX® to them.

37.     No responsive pleading is required for Paragraph Nos. 150 and 151 because the averments do not apply to these Defendants.

38.     These Defendants admit Paragraph Nos. 152 and 153.

39.     These Defendants deny Paragraph No. 154 to the extent it alleges that Ms. Nichols was started on VIOXX® because of information provided by the Sales Representative Defendants to Dr. Schrodt.

40.     No responsive pleading is required for Paragraph Nos. 155 and 156, because these set forth conclusions of law.

41.     No responsive pleading is required for Paragraph Nos. 157 - 162 because the averments do not apply to these Defendants.

42.     These Defendants hereby incorporate and restate all prior defenses and responses in connection with Paragraph No. 163.

43.     These defendants admit so much of Paragraph No. 164 as states that they had a healthcare provider relationship with Ms. Nichols from approximately January 2002 until May 2003.  These defendants deny the remainder of Paragraph No. 164.

44.     These defendants deny Paragraph Nos. 165, 166, 167, and 168.

45.     These defendants admit Paragraph No. 169.

46.     No responsive pleading is required for Paragraph No. 170 because this sets forth a conclusion of law.

47.     These defendants deny Paragraph No. 171.

48.     These Defendants hereby incorporate and restate all prior defenses and responses in connection with Paragraph No. 172.

49.     These defendants deny Paragraph Nos. 173, 174, 175, 176, 177, and 178.

50.     No responsive pleading is required for Paragraph Nos. 179-182 because the averments do not apply to these Defendants.

## FOURTH DEFENSE

The losses which Plaintiff claims may have been caused by the acts or omissions of other parties, persons, or entities over whom this Defendant exercised no control.

## FIFTH DEFENSE

If it is found that these Defendants were fraudulently joined in an effort to establish diversity of citizenship as between the Plaintiff and Merck, then these Defendants should be dismissed from this action.  On the other hand, if it is found that these Defendants were not fraudulently joined, then diversity jurisdiction is not proper and the case should be remanded to Jefferson Circuit Court (Kentucky) where the Plaintiff originally filed.

## SIXTH DEFENSE

These Defendants give notice that they may rely upon such other defense(s) as may become available or known during discovery proceedings in this case, and hereby reserve the right to amend or supplement this Answer to assert any such defense at such future time and in conformity with applicable rules of Civil Procedure.

**WHEREFORE**, these Defendants, G. Randolph Schrodt, Jr., M.D. and Integrative Psychiatry, LLC, respectfully demand:

1. That the Complaint against them be dismissed with prejudice.

2. Trial by jury.

3. Award of their reasonable costs and attorneys' fees incurred in defending this action.

4. Any and all other proper relief to which these Defendants may appear entitled.

8

Respectfully submitted

/s/ Stephen C. Hall
  Stephen C. Hall
  Ogden Newell & Welch PLLC
  1700 PNC Plaza
  500 West Jefferson Street
  Louisville, KY 40202
  (502) 582-1601


## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served via U.S. mail, postage prepaid, this 2nd day of December, 2005 upon the following:

Gregory J. Bubalo, Esq.
D. Brian Ratliff, Esq.
Bubalo & Hiestand, PLC
401 S. Fourth St., Suite 800
Louisville, KY 40202

Susan Pope, Esq.
John A. Combs, Esq.
Frost Brown Todd LLC
250 W. Main Street, Ste. 2700
Lexington, KY 40507

Tyler Thompson, Esq.
Dolt, Thompson, Shepherd & Kinney
455 South Fourth St., Suite 310
Louisville, KY 40202

Winston Miller, Esq.
400 W. Market St., 32nd Floor
Louisville, KY 40202


  /s/ Stephen C. Hall
  Counsel for Defendants

9

341073.1

## Rosenfeld, Martha S.

| | |
|---|---|
| **From:** | kywd-ecf-notice@kywd.uscourts.gov |
| **Sent:** | Friday, December 02, 2005 3:09 PM |
| **To:** | kywd-ecf-notice@kywd.uscourts.gov |
| **Subject:** | Activity in Case 3:05-cv-00693-CRS Nichols v. Merck and Company, Inc. et al "Answer to Complaint" |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### Western District of Kentucky

Notice of Electronic Filing

The following transaction was received from Hall, Stephen C. entered on 12/2/2005 at 3:08 PM EST and filed on 12/2/2005

| | |
|---|---|
| **Case Name:** | Nichols v. Merck and Company, Inc. et al |
| **Case Number:** | 3:05-cv-693 |
| **Filer:** | G. Randolph Schrodt, Jr |
| | Integrative Psychiatry,PLLC |

**Document Number:** 12

**Docket Text:**
ANSWER to Complaint with Jury Demand by G. Randolph Schrodt, Jr, Integrative Psychiatry,PLLC. (Hall, Stephen)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1036078947 [Date=12/2/2005] [FileNumber=425844-0]
[a74ee4db05c0f35b2cfd871f9c27d94ea7bf32f22d0e01dee3878a8074975b9d3fd5
1aa5fa77445bfbd0c57d65a73ce277c2bae6599d1b7d2433eef3c70c93b2]]

**3:05-cv-693 Notice will be electronically mailed to:**

Gregory J. Bubalo    gbubalo@bhtriallaw.com,

John A. Combs    jcombs@fbtlaw.com

Stephen C. Hall    shall@ogdenlaw.com

Ann B. Oldfather    aoldfather@omky.com, mam@omky.com; towens@BHTrialLaw.com

12/2/2005

Susan J. Pope     spope@fbtlaw.com, spannell@fbtlaw.com; ahorger@fbtlaw.com

D. Brian Rattliff     brattliff@bhtriallaw.com,

Tyler S. Thompson     tthompson@kytrial.com

**3:05-cv-693 Notice will be delivered by other means to:**

Winston E. Miller
Frost Brown Todd LLC
400 W. Market Street
32nd Floor
Louisville, KY 40202

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

In re: VIOXX® PRODUCTS          *          MDL Docket No. 1657
LIABILITY LITIGATION            *

                                *
                                *

THIS DOCUMENT RELATES TO        *          Judge Eldon Fallon
      06-CV-1951                *          Magistrate Judge Knowles

                                *
*  *  *  *  *  *  *  *  *  *  *  *  *

## NOTICE - MOTION - ORDER

**PLEASE TAKE NOTICE** that the undersigned, on Thursday, December 14, 2006, at the hour of 9:00 a.m. Central Standard Time, in the courtroom of the above Court, will make the following Motion, and tender the attached Order.

## MOTION FOR SUMMARY JUDGMENT

Defendants, G. Randolph Schrodt, Jr., M.D. and Integrative Psychiatry, LLC, by counsel, respectfully move the Court to grant Summary Judgment in their favor pursuant to Fed. R. Civ. P. 56, and Local Rule 56.

Grounds for this motion are stated in Defendants' Memorandum in Support of Motion for Summary Judgment, filed simultaneously herewith.