U. S. DISTRICT COURT
EASTERN DI~                ~UISIANA
                          11-7-06
                          WHYTE
                          CLERK

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In Re: Vioxx** | **MDL DOCKET NO. 1657** |
| **PRODUCTS LIABILITY LITIGATION** | |
| | Section L |
| THIS DOCUMENT RELATES TO: | |
| Case No. 2:06cv810 | |
| | Judge Fallon |
| CHARLES LARON MASON v. | Mag. Judge Knowles |
| MERCK & CO., INC. | |

# TRANSCRIPT OF THE DEPOSITION OF SUSAN BAUMGARTNER PLAYED TO JURY ON NOVEMBER 6, 2006

Fee_____
Process_____
X  Dktd_____
___CtRmDep_____
___Doc. No._____

Case Clip(s) Detailed Report
Tuesday, October 31, 2006, 7:04:26 PM

## Mason v. Merck

📁 **Baumgartner, Susan (Vol. 01) - 02/25/2005**          **1 CLIP  (RUNNING 00:31:18.533)**

 created on 10-16-06 by TB

Baumgartner 1                    **75 SEGMENTS  (RUNNING 00:31:18.533)**

**1. PAGE 12:14 TO 12:15  (RUNNING 00:00:05.733)**

```
14      Q.      State your full name for the record.
15      A.      My name is Susan Lynn Baumgartner.
```

**2. PAGE 13:11 TO 13:18  (RUNNING 00:00:21.116)**

```
11      Q.      Now, I take it today you're an
12 employee for Merck; is that right?
13      A.      Yes.
14      Q.      And I want to focus probably in the
15 time period from '99/2000/2001 for a lot of this
16 deposition.  You were an employee for Merck at that
17 time; is that right?
18      A.      Correct.
```

**3. PAGE 13:19 TO 14:01  (RUNNING 00:00:15.214)**

```
19      Q.      Why don't you give us a brief
20 overview of your education.
21      A.      I have a Doctor of Pharmacy and a
22 Master's of Business Administration from the
23 University of Florida.
24      Q.      Both degrees are from the University
25 of Florida?
00014:01 A.      They are.
```

**4. PAGE 14:02 TO 14:23  (RUNNING 00:01:13.338)**

```
02      Q.      Why don't you give us just a brief
03 chronological history of your work background.
04      A.      I started with Merck in the role of a
05 cardiovascular consultant.
06      Q.      What year was that?
07      A.      In 1996.
08      Q.      Then what did you do?
09      A.      I went to our U.S. headquarters.
10      Q.      That was in Philadelphia?
11      A.      Correct.  Outside of Philadelphia.
12      Q.      Okay.
13      A.      In May of 1997 and worked on a
14 marketing team for our male pattern baldness
15 product, Propecia.
16              In mid-1998 I joined the team for
17 Vioxx and worked with our analgesic and
18 anti-inflammatory product, Vioxx, and moved to the
19 marketing team in May of 1999 where I worked on that
20 team for about two-and-a-half years.
21      Q.      I saw some documents where you were
22 designated as marketing manager; is that right?
23      A.      That's correct.
```

**5. PAGE 19:20 TO 20:14  (RUNNING 00:01:18.252)**

```
20      Q.      Now, the first paragraph in that
21 document gives a description of the results of your
22 work; is that right?
23      A.      To which paragraph are you referring?
24      Q.      Number I.
```

Case Clip(s) Detailed Report
Tuesday, October 31, 2006, 7:04:26 PM

## Mason v. Merck

```
          25        A.        That outlines our brand goals.  The
00020:01  year-end employee input form is the employee's
      02  opportunity to provide information about what they
      03  achieve throughout the year.  So, we have brand
      04  objectives, and we also have individual performance
      05  objectives that you see under number II.
      06        Q.        So, what is the first objective,
```

☐ BAUM2 -                                                          

```
      07  brand objective, with regard to Vioxx listed under
      08  Paragraph Number I?
      09        A.        It was to "Achieve gross sales" --
      10  actually, that was the result.  Sorry.  That was to
      11  "Achieve gross sales of $2.9 billion for Vioxx. "
      12        Q.        Let's stop there.  So, your number
      13  one job was to help achieve gross sales of 2.9
      14  billion for Vioxx that year; correct?
```

**6. PAGE 20:17 TO 20:19 (RUNNING 00:00:06.905)**

```
      17                  THE WITNESS:  That was a result that
      18  was achieved by a number of individuals within
      19  Merck.
```

**7. PAGE 20:21 TO 21:22 (RUNNING 00:01:47.239)**

```
      21        Q.        But that is listed as your first job
      22  duty; right?
      23        A.        The result of the work in 2001.
      24        Q.        For example, during the year, did you
      25  have a way to see how the sales were going on Vioxx
00021:01  during the year, say, 2001?
      02        A.        Yes.
      03        Q.        How did you do that?
```

☐ -KEBAUM2 - Clear Attached Exhibit BAUM2                          

```
      04        A.        We received performance data on
      05  sales.
      06        Q.        So, you knew, for example -- I don't
      07  know if you divide up 12 into 2.9 billion, but you'd
      08  know that you made 200 million or 400 million or
      09  whatever that month in sales?
      10        A.        That's correct.
      11        Q.        Were you given some sort of a bonus
      12  in working for Merck during this period?
      13        A.        Yes. Yes.
      14        Q.        How was the bonus calculated?
      15        A.        The bonus is calculated based on the
      16  company achieving certain objectives, our United
      17  States division achieving certain objectives, our
      18  marketing team achieving certain objectives, and my
      19  individual performance, which included specific
      20  objectives that were set at the beginning of the
      21  year and also factors such as leadership and
      22  compliance.
```

**8. PAGE 22:03 TO 22:04 (RUNNING 00:00:05.148)**

```
      03        Q.        First one says, "Refined integrated
      04  Coxib advocate plan."
```

**9. PAGE 22:05 TO 22:19 (RUNNING 00:00:36.577)**

```
      05        A.        (Witness nods.)
      06        Q.        Why don't you tell the jury what an
      07  advocate is.
```

CONFIDENTIAL

## Mason v. Merck

```
08          A.      An advocate is an individual who
09  understands the information about our product,
10  believes in that information and supports the use of
11  the product in appropriate patients.
12          Q.      So, an advocate is a doctor, right, a
13  medical doctor?
14          A.      A doctor or another healthcare
15  professional.
16          Q.      So, part of your job was to develop
17  advocates all over the country on behalf of Vioxx;
18  right?
19          A.      That's correct.
```

**10.  PAGE 23:03 TO 23:04  (RUNNING 00:00:05.365)**

```
03          Q.      But you'd give money to doctors who
04  prescribe Vioxx; right?
```

**11.  PAGE 23:07 TO 23:10  (RUNNING 00:00:12.318)**

```
07          THE WITNESS:  There are a number of
08  examples of providing physicians compensation; for
09  example, for services provided, consulting services
10  provided, which is part of my responsibility.
```

**12.  PAGE 24:09 TO 24:20  (RUNNING 00:00:52.152)**

```
09          Q.      Let me ask you this.  Was another
10  part of your job to neutralize doctors who had
11  spoken against Vioxx?
12          A.      Part of my responsibility was to
13  develop advocates for the product, and in doing so,
14  we identified a number of individuals who had
15  misinformation, had incomplete information or a lack
16  of information and were not supportive of Merck or
17  Vioxx and may have been supporters of Celebrex at
18  the time.  And my responsibility was to provide
19  those individuals with accurate information and
20  bring them to a more neutral or a balanced position.
```

**13.  PAGE 28:23 TO 29:10  (RUNNING 00:00:31.668)**

```
23          Q.      Let's go to this Exhibit, Number 2.
24  You were one of the authors of this memo; is that
```

📄 BAUM3 -

```
25  right?
00029:01        A.      Yes.
02          Q.      The subject is "Advocate Development
03  Opportunity: Physicians to Neutralize."  Did I read
04  that right?
05          A.      Yes.
06          Q.      This is dated July 1st, 1999; right?
07          A.      Correct.
08          Q.      So, you were then up and running as a
09  marketing manager at that time?
10          A.      Yes.
```

**14.  PAGE 37:19 TO 37:19  (RUNNING 00:00:00.546)**

```
19          Q.      Let me go to Exhibit Number 5.  Is
```

**15.  PAGE 37:20 TO 37:22  (RUNNING 00:00:08.103)**

```
20  Exhibit Number 5 one of the documents that you
```

📄 BAUM4 -

```
21  reviewed over the last couple of months?
```

Case Clip(s) Detailed Report
Tuesday, October 31, 2006, 7:04:26 PM

## Mason v. Merck

```
        22        A.      Yes.
```

**16. PAGE 39:12 TO 39:16 (RUNNING 00:00:15.061)**

```
        12        Q.      Do you see where it says, "Leo, As we
        13  discussed, attached is the list of 'problem'
        14  physicians that we must, at a minimum, neutralize."
        15  That's what you wrote; right?
        16        A.      Yes.
```

**17. PAGE 41:20 TO 41:21 (RUNNING 00:00:04.059)**

```
        20        Q.      Let me go to the next exhibit, which
        21  is number 6.
```

**18. PAGE 41:25 TO 41:25 (RUNNING 00:00:01.314)**

```
        25                MR. TSOUGARAKIS:  Thank you.
```

**19. PAGE 42:02 TO 42:19 (RUNNING 00:00:54.397)**

```
        02        Q.      Is this one of the exhibits that you
```

BAUM6 -

```
        03  reviewed before you came here today?
        04        A.      Yes.
        05        Q.      In this exhibit, once again, the
        06  subject is "Physicians to Neutralize," right?
        07        A.      Correct.
        08        Q.      And Leonardo Mendez is writing back
        09  to you, Susan Baumgartner, with this e-mail; right?
        10        A.      Right.
        11        Q.      He's saying, "Susan great Job!!! in
        12  formatting and gathering this information.  Now that
        13  we have a formal document to circulate, I would
        14  recommend we remove the word 'problem' from the
        15  emails...(just in case...) we should use 'future
        16  opportunity,'  etc."  Did I read that right?
        17        A.      Yes.
        18        Q.      So, he was saying, this isn't smart
        19  to use the word "problem" in our e-mails; right?
```

**20. PAGE 42:21 TO 42:22 (RUNNING 00:00:03.425)**

```
        21                THE WITNESS:  That's what he was
        22  suggesting in his communication to me.
```

**21. PAGE 51:02 TO 51:02 (RUNNING 00:00:02.332)**

```
        02        Q.      Let me show you the next exhibit,
```

**22. PAGE 51:03 TO 51:03 (RUNNING 00:00:09.930)**

```
        03  Number 8.  It's Bates Number AFI-0000026.
```

**23. PAGE 51:11 TO 51:11 (RUNNING 00:00:03.594)**

```
        11        Q.      This is part of your personal daily
```

**24. PAGE 51:12 TO 51:21 (RUNNING 00:00:26.959)**

```
        12  record; right?
        13        A.      Yes.
        14        Q.      So, this is in your handwriting?
        15        A.      It is.
        16        Q.      Now, I want to go down to about the
        17  fifth line there.  Do you see where it says,
        18  "Rheumatological Consulting Meeting."  It says,
        19  "David Anstice will attend.  Action plan for David
        20  or Doug Greene to call."  Did I read that right?
```

Case Clip(s) Detailed Report
Tuesday, October 31, 2006, 7:04:26 PM

## Mason v. Merck

```
       21      A.      Yes.
```

**25. PAGE 52:14 TO 52:14 (RUNNING 00:00:01.023)**

```
       14      Q.      So, this document is dated February
```

**26. PAGE 52:15 TO 52:19 (RUNNING 00:00:16.897)**

```
       15  7, right, of 2001?
       16      A.      Correct.
       17      Q.      Exhibit Number 7, the Sherwood
```

BAUM8 -

```
       18  letter, was dated January 23rd, 2001, just two weeks
       19  before; correct?
```

**27. PAGE 52:21 TO 52:21 (RUNNING 00:00:03.075)**

```
       21              THE WITNESS:  Yes.
```

**28. PAGE 52:23 TO 53:10 (RUNNING 00:00:43.332)**

```
       23      Q..     The subject of Exhibit Number 7 is
```

BAUM9 -

```
       24  "Academic Interactions."  Right?
       25      A.      Right.
   00053:01      Q.      And let's just do this.  Let's just
       02  go to Exhibit Number 8 for a second and look at the
       03  doctors that you reference here.  Do you see the
       04  first line?  Will you read into the record the
       05  doctors that you reference in that note?
       06      A.      McMillen, Singh, Whelton, Lee Simon,
       07  Stillman, Yocum, Lipsky.
       08      Q.      Do you see where it says "Compilation
       09  in one report"?
       10      A.      Yes.
```

**29. PAGE 53:23 TO 54:01 (RUNNING 00:00:12.088)**

```
       23      Q.      So, you've listed the same one, two,
       24  three, four, five, six, seven, eight, nine doctors
```

BAUM10 -

```
       25  that are mentioned in Exhibit Number 7 in Exhibit
   00054:01  Number 8; right?
```

**30. PAGE 54:04 TO 54:05 (RUNNING 00:00:02.050)**

```
       04              THE WITNESS:  I'm going to need a
       05  minute to read through this.
```

**31. PAGE 54:15 TO 54:15 (RUNNING 00:00:03.736)**

```
       15      Q.      Okay.  We have to move on here.
```

**32. PAGE 54:16 TO 54:20 (RUNNING 00:00:30.967)**

```
       16  Basically, let's just go down the two exhibits.
       17  These were the problem doctors that Dr. Sherwood was
       18  talking about in Exhibit Number 7; right?  McMillen,
       19  Singh, Whelton, Lee Simon, Stillman, Yocum, Lipsky,
       20  Petri and John Fries?
```

**33. PAGE 54:23 TO 54:24 (RUNNING 00:00:02.088)**

```
       23              THE WITNESS:  Could you please repeat
       24  the question.
```

CONFIDENTIAL

Case Clip(s) Detailed Report
Tuesday, October 31, 2006, 7:04:26 PM

## Mason v. Merck

**34. PAGE 55:01 TO 55:03 (RUNNING 00:00:04.549)**

```
00055:01         Q.       These were the problem doctors that
      02   you referred to, the same ones you've got in your
      03   memo; right?
```

**35. PAGE 56:16 TO 57:06 (RUNNING 00:00:33.662)**

```
      16         A.       It looks like they're similar to some
      17   of the ones in here.
      18         Q.       Let me ask you.  Let's go through
```

📄 BAUM11 -                                                         ‖‖‖‖‖‖‖‖‖‖‖‖

```
      19   Exhibit Number 8.  You have some interlineation up
      20   above these doctors.  Will you read that into the
      21   record.
      22                  For example, above Dr. McMillen, it
      23   says something.  What's it say?
      24         A.       It says "done this week."
      25         Q.       So, he was neutralized this week?
00057:01         A.       I don't remember what that refers to.
      02         Q.       Well, what does "done" mean?  He
      03   wasn't cooked; was he?
      04         A.       I don't know.
      05         Q.       I mean, "done" meant neutralized;
      06   right?
```

**36. PAGE 57:08 TO 57:10 (RUNNING 00:00:06.754)**

```
      08                  THE WITNESS:  I don't know what it
      09   meant.  These were notes in my planner.  I'm not
      10   sure what discussions I had around them.
```

**37. PAGE 57:12 TO 58:06 (RUNNING 00:01:05.006)**

```
      12         Q.       What's the next -- what's the note
      13   above Dr. Singh?
```

📄 BAUM12 -                                                         ‖‖‖‖‖‖‖‖‖‖‖‖

```
      14         A.       "Done last summer, no reports."
      15         Q.       So, the analysis on him was done back
      16   then, no reports?
      17         A.       I don't know what that refers to.
      18         Q.       What's it say about Dr. Whelton?
```

📄 BAUM13 -                                                         ‖‖‖‖‖‖‖‖‖‖‖‖

```
      19         A.       "Done 2 weeks ago."
      20         Q.       What's it say about Dr. Simon?
      21         A.       "No reports."
      22         Q.       Dr. Stillman?
      23         A.       "No reports."
      24         Q.       Do you see in Exhibit Number 7 where
```

📄 BAUM14 -                                                         ‖‖‖‖‖‖‖‖‖‖‖‖

```
      25   in the third paragraph Dr. Sherwood says to Dr.
00058:01   Anstice, your superior:  "During the past three
      02   years, as the COX-2 wars have been waged, there have
      03   been several instances in which I have heard
      04   repeated messages from the field and headquarters
      05   about problem individuals."  Did I read that right?
      06         A.       Yes.
```

**38. PAGE 88:06 TO 88:19 (RUNNING 00:00:30.669)**

```
      06         Q.       Let me ask you this.  Would it be
```

Case Clip(s) Detailed Report
Tuesday, October 31, 2006, 7:04:26 PM

## Mason v. Merck

```
07   part of your job to neutralize a doctor who was
08   hostile to Merck and to Vioxx by giving them money
09   to change their attitude?
10         A.       No.  It would not be a part of my
11   job.
12         Q.       Why?
13         A.       Because that's not the way we conduct
14   business.
15         Q.       Would it be wrong to do that?
16         A.       Yes.
17         Q.       It would not meet the company
18   standards?
19         A.       Correct.
```

**39. PAGE 89:11 TO 90:02 (RUNNING 00:00:52.628)**

```
11         Q.       What was your job duty with regard to
12   neutralizing physicians?
13         A.       My involvement with regard to those
14   physicians that we discussed was to collect the
15   information that was sent from the sales
16   representatives and our health science associates
17   who were interacting with these individuals on a
18   regular basis and to try to understand why these
19   individuals were not at a neutral or balanced
20   position with regard to the product.  And to the
21   extent that I could collect that information and do
22   what we could to communicate balanced information to
23   those individuals or put them in touch with
24   individuals within the company or --
25         Q.       Was part of your job to consider
00090:01   giving funding to the doctors or the hospitals or
02   the universities that they were affiliated with?
```

**40. PAGE 91:04 TO 91:09 (RUNNING 00:00:17.204)**

```
04                  THE WITNESS:  We had policies and
05   procedures in place for how we provide funding such
06   as in the form of grants, and we have a separate
07   department that handles that and evaluates grant
08   proposals that are submitted by institutions or
09   individuals.
```

**41. PAGE 121:11 TO 121:15 (RUNNING 00:00:28.327)**

```
11         Q.       Bates Number AFI0193472.  It's dated
12   January 29, 2001.  It's a memo from Michael T.
```

📄 BAUM15 -



```
13   Phelan to Susan L. Baumgartner, copies going to
14   Messrs. Bazmi, Coppola and Miller.  The subject is
15   "Medical School Grant Application."
```

**42. PAGE 124:02 TO 125:06 (RUNNING 00:01:53.541)**

```
02         Q.       Tell me what this is about.
03         A.       The e-mail exchange is around a
04   proposed study of Vioxx that looks like was
05   submitted to our medical school grant committee for
06   consideration.
07         Q.       Who was the proposed medical school?
08         A.       It looks like the VA Medical Center
09   in Albany.
10         Q.       Why was it coming to you?
11         A.       They were checking on the status of
12   it.  I sat on the medical school grant committee,
13   and they were trying to find out when it would be
```

Case Clip(s) Detailed Report
Tuesday, October 31, 2006, 7:04:26 PM

## Mason v. Merck

```
14  reviewed.
15       Q.       Who was on the medical school grant
16  committee with you?
17       A.       Primarily the scientists from MRL and
18  CDP, our two groups of researchers within the
19  company.
20       Q.       In your e-mail on the front page at
```

BAUM16 - 

```
21  the bottom, do you see where you say, "Sounds like
22  this is important from a business perspective
23  relative to the VA based on the brief background
24  that you provided.  We have supported many similar
25  studies, so it is not critical from either a
00125:01  scientific or strategic perspective that we support
02  it.  However, clearly there are business reasons
03  that justify us providing funding.  I'll keep you
04  posted.  Thank you."  Signed "Susan."  Did I read
05  that right?
06       A.       Yes.
```

### 43. PAGE 132:18 TO 132:21 (RUNNING 00:00:11.845)

```
18       Q.       Okay.  Let's see if I can find some
19  more work that will help you from a business
20  standpoint.  Let's go to the next exhibit, which is
```

BAUM17 - 

```
21  going to be 14.
```

### 44. PAGE 133:05 TO 133:17 (RUNNING 00:00:35.452)

```
05       Q.       But this is a document that you got
06  from Caroline Yarbrough; right?  The Bates was AFI,
07  which is your Bates Number, 0043312.  Do you see
08  that?
09       A.       Yes.
10       Q.       Who is Caroline Yarbrough?
11       A.       She was my boss when I first started
12  with the marketing team.
13       Q.       Now, she asked you if you could
14  attend a meeting, right, regarding this HealthSouth
15  program?
16       A.       Let me read through very quickly.
17                (Witness reviewing document.)
```

### 45. PAGE 133:18 TO 134:03 (RUNNING 00:00:33.659)

```
18       Q.       I want to get through this before we
19  break for lunch.
20                So, just looking at this document, it
21  says, "Re:  HealthSouth programs."  Who is
22  HealthSouth?
23       A.       There is a reference in here to
24  HealthSouth being the "Nation's leading health care
25  provider of comprehensive outpatient surgery and
00134:01  rehab."
02       Q.       They're a nationwide outfit; right?
03       A.       Uh-huh.
```

### 46. PAGE 134:13 TO 134:19 (RUNNING 00:00:20.393)

```
13       Q.       So, it says, "This is the group that
14  we partnered with," meaning HealthSouth, "they're
```

CONFIDENTIAL

## Mason v. Merck

**BAUM18 -**

```
15   all over the US."  Did I read that right?
16        A.     Yes.
17        Q.     Then it says, "We're committing
18   $700,000 to them."  Right?
19        A.     Right.
```

**47. PAGE 134:24 TO 134:25 (RUNNING 00:00:05.117)**

```
24        Q.     So, this could be a big business
25   connection, right, for you guys, HealthSouth?
```

**48. PAGE 135:03 TO 135:04 (RUNNING 00:00:03.257)**

```
03             THE WITNESS:  I'm not sure what she
04   meant by that, but it's stated in here.
```

**49. PAGE 135:06 TO 135:20 (RUNNING 00:00:42.686)**

```
06        Q.     Then it says, "They also have over
```

**BAUM19 -**

```
07   6500 monitors in all patient rooms and waiting rooms
08   and we will be running an arthritis segment and our
09   commercial when it is available."  Did I read that
10   right?
11        A.     Yes.
12        Q.     So, you committed 700,000 to them,
13   and you're going to be running your commercial and
14   an arthritis segment in all of their patient rooms
15   and waiting rooms; right?
```

**BAUM20 -**

```
16        A.     That's how this reads.
17        Q.     Then it says, "In order to 'lock them
18   in,' we had to start paying them in May."  Did I
19   read that right?
20        A.     Yes.
```

**50. PAGE 167:22 TO 167:23 (RUNNING 00:00:12.030)**

```
22        Q.     The Bates Number on number 20 is
```

**BAUM21 -**

```
23   AFI0044662 through 665.  This is an e-mail from you
```

**51. PAGE 167:24 TO 168:16 (RUNNING 00:01:05.071)**

```
24   to Bruce Freundlich; right?  Who is Bruce
25   Freundlich?
00168:01        A.     He's a region medical director with
02   Merck.
03        Q.     The subject was "Physicians to
04   Neutralize."  Right?
05        A.     Yes.
06        Q.     Under Dr. McMillen do you see down
07   here about midway through, "met with" him -- "met
08   with and fired a shot across the bow as Lou Sherwood
09   would say - but he bashed Vioxx a few days later -
10   some docs have told us that he is so biased that he
11   has poor credibility and does not do a service to
12   Searle - maybe worse things could happen."  Did I
13   read that right?
14        A.     Yes.
```

Case Clip(s) Detailed Report
Tuesday, October 31, 2006, 7:04:26 PM

## Mason v. Merck

        15        Q.        So, what was the "shot across the

📄 BAUM22 -

        16    bow" that Lou Sherwood would use?

**52. PAGE 168:18 TO 168:18 (RUNNING 00:00:01.208)**

        18                  THE WITNESS:  I don't know.

**53. PAGE 168:20 TO 169:22 (RUNNING 00:01:13.310)**

        20        Q.        You dealt with Dr. Sherwood before;
        21    right?
        22        A.        I've never heard the term "shot
        23    across the bow."
        24        Q.        But you got this e-mail; right?
        25        A.        Right.
00169:01        Q.        Did you ask Mr. Freundlich what he
        02    meant by that?
        03        A.        No.  I don't remember doing that at
        04    the time.
        05        Q.        Let's look down below.  Your e-mail

📄 BAUM23 -

        06    to him says -- actually, to him and others says, "I
        07    thought you should be aware of our most challenging
        08    (and also some of the most vocal and influential)
        09    national and regional physicians for Vioxx.  The
        10    attached document lists 36 physicians who the
        11    National HSAs and A&A Specialty Representatives have
        12    identified as being:
        13                  "1) Important from a business
        14    perspective in terms of influence and/or
        15    prescribing, and
        16                  "2) Not as supportive of Merck and/or
        17    Vioxx as we would like."
        18                  Did I read that right?
        19        A.        Yes.
        20        Q.        So, the first group includes people
        21    that were actually influential, but also people who
        22    were potential prescribers of Vioxx; right?

**54. PAGE 169:24 TO 169:25 (RUNNING 00:00:04.017)**

        24                  THE WITNESS:  It could be either/or
        25    or both.

**55. PAGE 170:02 TO 170:15 (RUNNING 00:00:50.338)**

        02        Q.        So, you were looking at these 36
        03    physicians as possible people who could be
        04    prescribing Vioxx?
        05        A.        They were either using pain medicine
        06    or they were influencing.  Based on their reputation
        07    or their knowledge or their position, they were
        08    communicating information about pain medicine to
        09    others.
        10        Q.        Let's go on here.  It says number 2,
        11    "Not as supportive of Merck and/or Vioxx as we would

📄 BAUM24 -

        12    like."  So, this list, and we'll go to the list, but
        13    these 36 included people that weren't supportive of
        14    Vioxx; right?
        15        A.        Correct.

Case Clip(s) Detailed Report
Tuesday, October 31, 2006, 7:04:26 PM

## Mason  v.  Merck

**56. PAGE 199:22 TO 199:23  (RUNNING 00:00:07.275)**

```
    22        Q.      Let's go.  Here's Exhibit 25 that I
```
📄 BAUM25 ·

```
    23  previously referenced.
```

**57. PAGE 206:23 TO 207:02  (RUNNING 00:00:15.878)**

```
    23        Q.      Let me ask it this way.  Does this
    24  appear to be, first of all, work product done by
    25  your department at Merck, "this" being the
 00207:01  attachment?
    02        A.      It looks like a list that I compiled.
```

**58. PAGE 207:09 TO 207:12  (RUNNING 00:00:20.866)**

```
    09        Q.      So, whether it's the 36 that were
```
📄 BAUM26 ·

```
    10  attached to this memo of July 23rd or not, you did
    11  compile a list that appears like this list; correct?
    12        A.      Yes.
```

**59. PAGE 208:12 TO 208:14  (RUNNING 00:00:10.971)**

```
    12        Q.      Going through, the first name on
```
📄 BAUM27 ·

```
    13  there is Roy Altman.
    14        A.      Yes.
```

**60. PAGE 208:20 TO 209:15  (RUNNING 00:01:39.023)**

```
    20        Q.      Then if you go to the third page of
    21  this document which is AFI0201418, it says "Roy
    22  Altman."  And then under the category called
    23  "Recommendations (in addition to continued focus by
    24  the specialists and HSAs)," would you read into the
    25  record what it says in the box next to Roy Altman
 00209:01  including quotes?
    02        A.      It says "'Show me the money.' -
    03  clinical trials
    04              "- funding greater than $50,000,
    05  Rheum Fellowship Program.
    06              "- Task Force to continue to work
    07  with him.
    08              "- Task force in place - Dr. Bruce
    09  Freundlich SBD (J.G.) RMD K. Edwards, M. Halpin &
    10  local reps."
    11        Q.      When that "Show me the money" is in
    12  quotes, is that something that was attributed to Dr.
    13  Altman, or is that something that your
    14  representative as part of the task force that
    15  interviewed him made up?
```

**61. PAGE 209:17 TO 209:20  (RUNNING 00:00:10.313)**

```
    17              THE WITNESS:  I don't know.  In
    18  compiling this information, I cut and paste
    19  information provided in e-mails from our sales team
    20  and our health science associates.
```

**62. PAGE 210:11 TO 210:19  (RUNNING 00:00:24.117)**

```
    11        Q.      It says "Show me the money" and then
```

Case Clip(s) Detailed Report
Tuesday, October 31, 2006, 7:04:26 PM

## Mason  v.  Merck

📄 BAUM28 -

```
12   there's a "- clinical trials."  What does that refer
13   to?
14        A.      I don't know.
15        Q.      I mean, this is your document.  I'm
16   asking what you meant when you put that down.
17        A.      I have nothing further to add to what
18   I previously communicated about how the information
19   was collected.
```

**63. PAGE 213:20 TO 214:16  (RUNNING 00:01:01.982)**

```
20        Q.      Then under Jane and Pat Box, it says,
21   "Continue to support with clinical studies.  Visit
```

📄 BAUM29 -

```
22   by Dr. Greg Geba, CDP."  Do you know Greg Geba?
23        A.      Yes.
24        Q..     How do you know him?
25        A.      I worked with him throughout my
00214:01  career.  He's a researcher in our clinical
```

📄 BAUM30 -

```
02   development department.
03        Q.      Then it says "If continue to
04   support," the Boxes, they "will be neutralized."
05   Right?  That's what it appears to say.
06        A.      That's what it says.
07        Q.      What does that mean "If continue to
08   support" -- oh, with clinical studies?
09        A.      Again, this is information that I cut
10   and paste provided by others.
11        Q.      Okay.  But I mean, if you had to tell
12   someone that was superior to you at your company
13   what you meant by "If continue to support, will be
14   neutralized," would that mean that if you continued
15   to support with clinical studies, they'll be
16   neutralized?
```

**64. PAGE 214:20 TO 214:23  (RUNNING 00:00:06.064)**

```
20        Q.      Correct?
21        A.      I would inform my superior that I did
22   not write this statement and that I'm not sure what
23   was meant by it.
```

**65. PAGE 218:16 TO 219:04  (RUNNING 00:01:04.358)**

```
16        Q.      Let's go to William Dillin and go to
```

📄 BAUM31 -

```
17   "Recommendations."  That's 1424, Bates Number 1424.
18   Do you see that one?  Will you read into the record
19   the recommendations for William Dillin?
20        A.      "Weekend Consultants' Meeting in an
21   elegant location (New York, Hawaii) or a five-day
22   International Meeting with the top thought leaders
23   on pain management.  Visit from L. Mendez or M.
24   Thomas to open door.  Would prefer to stay with
25   Specialty Senior Management."
00219:01  Q.      Was it your practice at Merck to set
02   up weekend consultant meetings in Hawaii or elegant
03   places in order to convince the doctor to be
```

Case Clip(s) Detailed Report
Tuesday, October 31, 2006, 7:04:26 PM

## Mason v. Merck

```
        04  neutral?
```

**66. PAGE 219:07 TO 219:10  (RUNNING 00:00:09.924)**

```
        07              THE WITNESS:  I'm not familiar with
        08  any meeting in Hawaii, and the purpose of our
        09  consultants meetings was to conduct market research
        10  with physicians.
```

**67. PAGE 219:25 TO 220:04  (RUNNING 00:00:22.486)**

```
        25      Q.      Is it wrong for Merck to promise
```

📄 -KEBAUM31 - Clear Attached Exhibit BAUM31



```
00220:01  trips to Hawaii or a five-day international trip in
      02  order to induce or entice a doctor such as Dr.
      03  Dillin to change his position from anti-Vioxx to
      04  neutral?
```

**68. PAGE 220:07 TO 220:08  (RUNNING 00:00:02.840)**

```
      07              THE WITNESS:  It's -- I'm limited to
      08  my experience with --
```

**69. PAGE 220:10 TO 220:13  (RUNNING 00:00:10.349)**

```
      10      Q.      Is it right or wrong?
      11      A.      I've never seen a meeting conducted
      12  for that purpose, and the consultants meetings that
      13  I'm aware of were used for market research.
```

**70. PAGE 225:14 TO 225:21  (RUNNING 00:00:31.385)**

```
      14      Q.      Now, under James McMillen, under his
```

📄 BAUM32 -



```
      15  name it says "Discredit."  Right?
      16      A.      Yes.
      17      Q.      And then under the recommendation,
      18  the recommendation says, "Strong recommendation to
      19  discredit him."  Is that what it says?
      20      A.      Yes.
      21      Q.      Was that part of your attempt to give
```

**71. PAGE 225:22 TO 225:24  (RUNNING 00:00:14.756)**

```
      22  information to doctors when you were neutralizing
      23  physicians, that you would discredit some doctors as
      24  well?
```

**72. PAGE 226:02 TO 226:03  (RUNNING 00:00:04.354)**

```
      02              THE WITNESS:  I'm not familiar with
      03  instances where Merck discredited individuals.
```

**73. PAGE 226:07 TO 226:09  (RUNNING 00:00:07.124)**

```
      07              Did Merck attempt to discredit Dr.
```

📄 -KEBAUM32 - Clear Attached Exhibit BAUM32



```
      08  McMillen?
      09      A.      I don't know.
```

**74. PAGE 228:15 TO 229:02  (RUNNING 00:00:45.795)**

```
      15      Q.      By the way, how was the term
      16  "neutralized" first used?  Do you know who first
      17  used it at Merck?
```

Case Clip(s) Detailed Report
Tuesday, October 31, 2006, 7:04:26 PM

## Mason  v.  Merck

```
18          A.      I don't remember.
19          Q.      Was that a term that was already
20   being used in documents when you first were hired by
21   Merck?
22          A.      I don't recall.
23          Q.      Well, we saw there was a document in
24   April of 1999 that you were listed as an author
25   using the term "Physicians to Neutralize."  Is that
00229:01   the first time you used that term or had you used it
   02   previous to April of '99?
```

**75.  PAGE 229:05 TO 229:05  (RUNNING 00:00:01.949)**

```
05                  THE WITNESS:  I just don't remember.
```

TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:31:18.533)

## Mason v. Merck

 **Baumgartner, Susan (Vol. 02) - 03/11/2005**　　　　　　　　1 CLIP  (RUNNING 00:02:28.793)

 baumgartner trial

**BAUMGARTNER 2**　　　　　　**8 SEGMENTS  (RUNNING 00:02:28.793)** 

**1. PAGE 567:25 TO 568:09  (RUNNING 00:00:29.316)**

```
        25        Q.      I want to ask you some questions
00568:01  about Plaintiff's counsel's examination regarding
        02  threatening -- Merck threatening physicians.  Do you
        03  recall that?
        04        A.      Yes.
        05        Q.      And Plaintiff's counsel asked you
        06  questions regarding whether or not certain
        07  statements in your own view constituted threats to
        08  physicians.  Do you recall that?
        09        A.      Yes.
```

**2. PAGE 568:12 TO 568:13  (RUNNING 00:00:05.008)**

```
        12        Q.      And what was your opinion as to
        13  whether or not those constituted threats?
```

**3. PAGE 568:15 TO 568:20  (RUNNING 00:00:25.009)**

```
        15        THE WITNESS:  They were so far from
        16  the reality of what I saw in terms of Merck
        17  personnel interacting with physicians, it wasn't
        18  consistent with my experience.  I have not seen or
        19  heard about Merck personnel threatening physicians.
        20  And that's all I thought about.
```

**4. PAGE 568:22 TO 569:04  (RUNNING 00:00:27.312)**

```
        22        Q.      To your knowledge, did you or anyone,
        23  to your knowledge, at Merck threaten physicians?
        24        A.      No.
        25        Q.      We also heard a lot in your testimony
00569:01  about the word neutralize.  Can you explain to the
        02  ladies and gentlemen of the jury what you meant when
        03  you used the word neutralized in those documents
        04  that you offered?
```

**5. PAGE 569:06 TO 569:14  (RUNNING 00:00:28.211)**

```
        06        THE WITNESS:  Neutralize refers to
        07  bringing physicians to a more neutral or balanced
        08  position.  We identified selected individuals,
        09  selected physicians, who either had misinformation
        10  or lack of information, incorrect information, and
        11  presented those individuals with accurate and
        12  balanced information about the product in an effort
        13  to bring them to a more neutral or balanced
        14  position.
```

**6. PAGE 569:16 TO 569:24  (RUNNING 00:00:28.758)**

```
        16        Q.      Did you ever pay physicians to change
        17  their minds about Vioxx?
        18        A.      No.
        19        Q.      Did you ever pay physicians to
        20  improperly influence them?
        21        A.      No.
        22        Q.      During the course of your deposition,
```

Case Clip(s) Detailed Report
Monday, October 23, 2006, 2:08:04 PM

## Mason v. Merck

```
        23  did you feel that that is what Plaintiff's counsel
        24  was accusing you of doing?
```

**7. PAGE 570:01 TO 570:01 (RUNNING 00:00:00.500)**

```
  00570:01               THE WITNESS:  Yes.
```

**8. PAGE 570:03 TO 572:05 (RUNNING 00:00:04.679)**

```
        03      Q.      And how did those accusations make
        04  you feel?
        05      A.      They were offensive.
        06      Q.      And why is that?
        07      A.      Because that was not what we were
        08  doing.  It's in no way reflective of what I saw or
        09  what the company did during that period.
        10      Q.      During the time that you had
        11  responsibility for Vioxx, did you become aware of
        12  the VIGOR results?
        13      A.      Yes.
        14      Q.      And could you tell the jury what the
        15  results of the VIGOR trial were?
        16      A.      The VIGOR trial demonstrated that
        17  Vioxx was associated with less stomach problems than
        18  naproxen and those stomach problems included
        19  perforations, ulcers, bleeds and obstructions.  And
        20  the other result from VIGOR was that naproxen was
        21  associated with fewer heart attacks than Vioxx
        22  because it behaved like aspirin.  It was
        23  cardioprotective in that study.
        24      Q.      Did you believe, when you received
        25  the VIGOR results, that Vioxx caused heart attacks?
  00571:01      A.      No, I did not.
        02      Q.      Did anybody, to your knowledge, at
        03  Merck believe that Vioxx caused heart attacks?
        04      A.      No.
        05      Q.      What was your basis for your belief
        06  that Vioxx did not cause heart attacks?
        07      A.      Our researchers at Merck.
        08  Individuals who studied the data that was available
        09  had concluded that Vioxx did not cause heart
        10  attacks.  We had data supporting the safety of
        11  Vioxx, the cardiovascular safety profile of Vioxx
        12  relative to placebo and non-naproxen NSAIDS, and
        13  the reason for the results in the view of the MRL
        14  researches who evaluated that information,
        15  physicians, was that the reason for the difference
        16  in heart attacks in the VIGOR study was due to the
        17  cardioprotective effects of naproxen.
        18      Q.      That was the explanation provided by
        19  the scientists at MRL?
        20      A.      Correct.  But that was also confirmed
        21  in my interactions with physicians in various
        22  specialties as part of the work that I did in
        23  understanding what the perspectives of the medical
        24  and scientific community were.  The consensus from
        25  those meetings was consistent with MRL's
  00572:01  interpretation of the data or our researchers --
        02  interpretation of the data by our researchers at
        03  Merck.  So the consensus from the physicians that we
        04  spoke with in the community was that Vioxx did not
        05  cause heart attacks.
```

**TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:02:28.793)**

CONFIDENTIAL

Case Clip(s) Detailed Report
Monday, October 23, 2006, 2:08:37 PM

## Mason v. Merck

---

📁 **Baumgartner, Susan (Vol. 02) - 03/11/2005**            **1 CLIP  (RUNNING 00:02:28.793)**

 baumgartner trial



**BAUMGARTNER 2**            **8 SEGMENTS  (RUNNING 00:02:28.793)**

**1. PAGE 567:25 TO 568:09 (RUNNING 00:00:29.316)**

```
       25          Q.      I want to ask you some questions
00568:01  about Plaintiff's counsel's examination regarding
       02  threatening -- Merck threatening physicians.  Do you
       03  recall that?
       04          A.      Yes.
       05          Q.      And Plaintiff's counsel asked you
       06  questions regarding whether or not certain
       07  statements in your own view constituted threats to
       08  physicians.  Do you recall that?
       09          A.      Yes.
```

**2. PAGE 568:12 TO 568:13 (RUNNING 00:00:05.008)**

```
       12          Q.      And what was your opinion as to
       13  whether or not those constituted threats?
```

**3. PAGE 568:15 TO 568:20 (RUNNING 00:00:25.009)**

```
       15          THE WITNESS:  They were so far from
       16  the reality of what I saw in terms of Merck
       17  personnel interacting with physicians, it wasn't
       18  consistent with my experience.  I have not seen or
       19  heard about Merck personnel threatening physicians.
       20  And that's all I thought about.
```

**4. PAGE 568:22 TO 569:04 (RUNNING 00:00:27.312)**

```
       22          Q.      To your knowledge, did you or anyone,
       23  to your knowledge, at Merck threaten physicians?
       24          A.      No.
       25          Q.      We also heard a lot in your testimony
00569:01  about the word neutralize.  Can you explain to the
       02  ladies and gentlemen of the jury what you meant when
       03  you used the word neutralized in those documents
       04  that you offered?
```

**5. PAGE 569:06 TO 569:14 (RUNNING 00:00:28.211)**

```
       06          THE WITNESS:  Neutralize refers to
       07  bringing physicians to a more neutral or balanced
       08  position.  We identified selected individuals,
       09  selected physicians, who either had misinformation
       10  or lack of information, incorrect information, and
       11  presented those individuals with accurate and
       12  balanced information about the product in an effort
       13  to bring them to a more neutral or balanced
       14  position.
```

**6. PAGE 569:16 TO 569:24 (RUNNING 00:00:28.758)**

```
       16          Q.      Did you ever pay physicians to change
       17  their minds about Vioxx?
       18          A.      No.
       19          Q.      Did you ever pay physicians to
       20  improperly influence them?
       21          A.      No.
       22          Q.      During the course of your deposition,
```

Case Clip(s) Detailed Report
Monday, October 23, 2006, 2:08:37 PM

## Mason v. Merck

```
        23  did you feel that that is what Plaintiff's counsel
        24  was accusing you of doing?
```

**7. PAGE 570:01 TO 570:01 (RUNNING 00:00:00.500)**

```
  00570:01                    THE WITNESS:  Yes.
```

**8. PAGE 570:03 TO 572:05 (RUNNING 00:00:04.679)**

```
        03      Q.        And how did those accusations make
        04  you feel?
        05      A.        They were offensive.
        06      Q.        And why is that?
        07      A.        Because that was not what we were
        08  doing.  It's in no way reflective of what I saw or
        09  what the company did during that period.
        10      Q.        During the time that you had
        11  responsibility for Vioxx, did you become aware of
        12  the VIGOR results?
        13      A.        Yes.
        14      Q.        And could you tell the jury what the
        15  results of the VIGOR trial were?
        16      A.        The VIGOR trial demonstrated that
        17  Vioxx was associated with less stomach problems than
        18  naproxen and those stomach problems included
        19  perforations, ulcers, bleeds and obstructions.  And
        20  the other result from VIGOR was that naproxen was
        21  associated with fewer heart attacks than Vioxx
        22  because it behaved like aspirin.  It was
        23  cardioprotective in that study.
        24      Q.        Did you believe, when you received
        25  the VIGOR results, that Vioxx caused heart attacks?
  00571:01      A.        No, I did not.
        02      Q.        Did anybody, to your knowledge, at
        03  Merck believe that Vioxx caused heart attacks?
        04      A.        No.
        05      Q.        What was your basis for your belief
        06  that Vioxx did not cause heart attacks?
        07      A.        Our researchers at Merck.
        08  Individuals who studied the data that was available
        09  had concluded that Vioxx did not cause heart
        10  attacks.  We had data supporting the safety of
        11  Vioxx, the cardiovascular safety profile of Vioxx
        12  relative to placebo and non-naproxen NSAIDS, and
        13  the reason for the results in the view of the MRL
        14  researches who evaluated that information,
        15  physicians, was that the reason for the difference
        16  in heart attacks in the VIGOR study was due to the
        17  cardioprotective effects of naproxen.
        18      Q.        That was the explanation provided by
        19  the scientists at MRL?
        20      A.        Correct.  But that was also confirmed
        21  in my interactions with physicians in various
        22  specialties as part of the work that I did in
        23  understanding what the perspectives of the medical
        24  and scientific community were.  The consensus from
        25  those meetings was consistent with MRL's
  00572:01  interpretation of the data or our researchers --
        02  interpretation of the data by our researchers at
        03  Merck.  So the consensus from the physicians that we
        04  spoke with in the community was that Vioxx did not
        05  cause heart attacks.
```

CONFIDENTIAL

Case Clip(s) Detailed Report
Monday, October 23, 2006, 2:08:37 PM

## Mason  v.  Merck

 **Baumgartner, Susan (Vol. 03) - 09/30/2005**          1 CLIP  (RUNNING 00:28:46.715)

 created on 10-16-06 by TB

Baumgartner 3 _____ 33 SEGMENTS  (RUNNING 00:28:46.715) 

### 1. PAGE 18:16 TO 18:24  (RUNNING 00:00:23.482)

```
16        Q.    And was part of that your
17   responsibility to provide those
18   individuals with accurate information
19   about the product Vioxx?
20        A.    It was providing information
21   about Vioxx, as well as other pain
22   medicine that was available, and getting
23   thoughts on all of those areas.  But I
24   did present scientific data for Vioxx.
```

### 2. PAGE 21:19 TO 22:02  (RUNNING 00:00:16.048)

```
19        Q.    And in order for them to
20   have any understanding of the scientific
21   data, it was important that that
22   information be accurate that you gave
23   them; is that correct?
24        A.    It was my hope that the
00022:01   information that was communicated by the
02   presenters there was accurate, yes.
```

### 3. PAGE 23:06 TO 23:08  (RUNNING 00:00:04.174)

```
06             THE WITNESS:  We want
07        physicians to be fully informed
08        about the products.
```

### 4. PAGE 23:10 TO 23:23  (RUNNING 00:00:22.222)

```
10        Q.    And why is it important that
11   they be fully informed about the
12   products?
13        A.    So they can use the products
14   appropriately.  The --
15        Q.    Is part -- excuse me.  I
16   don't mean to cut you off.  Were you
17   finished there?
18        A.    And make the right decisions
19   about use of the product.
20        Q.    So, in other words, it's
21   important that you give the doctor the
22   correct information so they can use it
23   properly; is that correct?
```

### 5. PAGE 24:02 TO 24:04  (RUNNING 00:00:04.002)

```
02             THE WITNESS:  It is
03        important that we give accurate
04        information.
```

### 6. PAGE 30:15 TO 30:16  (RUNNING 00:00:02.672)

```
15        Q.    Well, let me just show you
16   what I'm talking about.
```

### 7. PAGE 33:01 TO 33:17  (RUNNING 00:00:27.195)

```
00033:01        Q.    So, before I had asked you,
```

Case Clip(s) Detailed Report
Monday, October 23, 2006, 2:08:37 PM

## Mason v. Merck

```
02   remember, before I showed you this
03   document, whether one of the things that
04   you did was to review medical literature
05   and give your impressions about that
06   literature.  Do you remember me asking
07   you that question?
08       A.   Correct.
09       Q.   So, this document, obviously
10   that's what you did in this document, you
11   reviewed a piece of medical literature in
12   the JAMA.  Tell the jury what that is.
13       A.    The Journal of the American
14   Medical Association.
15       Q.   And you gave your
16   impressions; is that correct?
17       A.   Of this publication.
```

**8. PAGE 34:12 TO 35:06 (RUNNING 00:00:46.079)**

```
12       Q.   Well, do you see where it
13   says "Threats" there, Ms. Baumgartner?
14       A.   Yes.
15       Q.   Let's read.  It says,
16   "'Available data raise a cautionary flag
17   about the risk of cardiovascular events
18   with COX-2 inhibitors...Our findings
19   suggest a potential increase in CV event
20   rates for the presently available COX-2
21   inhibitors...We believe that it is
22   mandatory to conduct a trial specifically
23   assessing CV risk and benefit of these
24   agents.'"
00035:01         Now, I want to ask you some
02   questions since this is the beginning of
03   this deposition.  What is a "CV risk"?
04   What does that mean?
05       A.   It typically refers to
06   cardiovascular risk.
```

**9. PAGE 38:18 TO 38:19 (RUNNING 00:00:03.773)**

```
18       Q.   You wrote that underneath
19   the heading that says "Threats."
```

**10. PAGE 38:24 TO 39:06 (RUNNING 00:00:13.053)**

```
24       Q.   Do you see this on your
00039:01  screen, where it says "Threats"?  So, you
02   wrote "Threats," and then underneath
03   "Threats" you wrote, "VIGOR," Which was a
04   study that was conducted by Merck; is
05   that correct?
06       A.   Correct.
```

**11. PAGE 48:02 TO 48:13 (RUNNING 00:00:23.136)**

```
02       Q.   In terms of this document,
03   we want to talk about definitions here.
04   "Threat" means what to Susan Baumgartner?
05       A.   When I look at this document
06   today?
07       Q.   Yes.
08       A.   I defined it as inconsistent
09   with Merck's position about the product
10   and other products.
11       Q.   You would say bad for
12   Merck's position; right?  Bad?
13       A.   Different.  Not consistent.
```

Case Clip(s) Detailed Report
Monday, October 23, 2006, 2:08:37 PM

## Mason v. Merck

**12. PAGE 55:01 TO 55:07  (RUNNING 00:00:16.721)**

```
00055:01              You chose to write down
     02    underneath "Threats," Susan Baumgartner,
     03    not anybody else, chose to write down
     04    that there's an "Increased relative risk
     05    of developing CV events."  Correct?
     06    Susan Baumgartner chose to write that
     07    down underneath "Threats"?
```

**13. PAGE 55:11 TO 55:14  (RUNNING 00:00:03.538)**

```
     11         Q.    Nobody else but Susan
     12    Baumgartner wrote that?
     13         A.    That's what this e-mail
     14    indicates.
```

**14. PAGE 57:01 TO 57:08  (RUNNING 00:00:23.769)**

```
00057:01         Q.    And so we're talking about
     02    in this document that you created, we're
     03    talking about increased risk, relative
     04    risk of developing CV events, and you're
     05    also talking about MI rates; correct?
     06    "MI" is heart attack.  They were higher
     07    according to what you wrote down here
     08    also, weren't they?
```

**15. PAGE 57:11 TO 57:17  (RUNNING 00:00:12.644)**

```
     11              THE WITNESS:  It's stated
     12         here.  As I mentioned, I believe
     13         this is a summary of what the
     14         authors in that publication
     15         concluded, because these were
     16         contrary to Merck's beliefs and
     17         conclusions about the product.
```

**16. PAGE 245:02 TO 245:18  (RUNNING 00:00:30.018)**

```
     02         Q.    Now, I believe you've seen
     03    this document.  Take a minute, but it
     04    says, "To:  Baumgartner, Susan L."
     05    That's you, correct?
     06         A.    Yes.
     07         Q.    From Charlotte McKines?  Is
     08    it McKines?
     09         A.    McKines.
     10         Q.    McKines.  Okay.  From
     11    Charlotte McKines.  Tell us who Charlotte
     12    McKines is.
     13         A.    She was the head of our
     14    marketing team.
     15         Q.    Do you see the date on that
     16    letter, that memo, was it 1999, 8-23-99;
     17    correct?
     18         A.    Correct.
```

**17. PAGE 248:05 TO 249:02  (RUNNING 00:00:50.415)**

```
     05         Q.    The document I want to go to
     06    now is, please take that down, is 1260
     07    that you have in front of you, and that's
     08    to Susan Baumgartner, that's you, and it
     09    says, "Background - Dr. Andrew Welton,"
     10    Do you see that?  And it says, "for bad
     11    guys list."  What's the "bad guys list"?
     12    Are you putting Dr. Whelton on a bad guys
     13    list in 1999?
```

CONFIDENTIAL

Case Clip(s) Detailed Report
Monday, October 23, 2006, 2:08:37 PM

## Mason  v.  Merck

```
14          A.    The list that we were
15  probably referring to is the list of
16  physicians that did not have complete
17  information.
18          Q.    Well --
19          A.    That we're collecting
20  background information about.  So, it's
21  --
22          Q.    Why do you call them "bad
23  guys"?  They don't have complete
24  information, so you put them on a bad
00249:01  guys list?  What does "bad guys" mean to
02  you?
```

**18. PAGE 249:05 TO 249:06 (RUNNING 00:00:02.082)**

```
05              THE WITNESS:  I didn't call
06      them that.
```

**19. PAGE 249:08 TO 249:10 (RUNNING 00:00:04.218)**

```
08          Q.    Well, did you write back and
09  say, why are we calling these guys bad
10  guys?
```

**20. PAGE 249:13 TO 249:14 (RUNNING 00:00:01.894)**

```
13              THE WITNESS:  I don't
14      remember.
```

**21. PAGE 498:02 TO 498:24 (RUNNING 00:00:47.893)**

```
02          Q.    Okay, Ms. Baumgartner, you
03  are on camera.  I'm George Tsougarakis.
04  I think everybody in the room would agree
05  it is a good thing that I'm not on
06  camera, but you should address your
07  remarks to the camera.  I represent Merck
08  & Company, and I'm going to ask you a few
09  questions.
10              Let's begin by introducing
11  yourself to the jury.  Can you tell the
12  jury where you were born and raised?
13          A.    My name is Susan Lynn
14  Baumgartner.  I was born in DeLand,
15  Florida and raised in Gainesville,
16  Florida where I went to high school at
17  would Buchholz High School.
18              Spent a couple of years
19  doing prepharmacy work at the University
20  of Florida in Tampa, Florida, and then
21  did five years of work to obtain my
22  Doctor of Pharmacy degree and Master of
23  Business Administration degree from the
24  University of Florida in Gainesville.
```

**22. PAGE 499:01 TO 501:12 (RUNNING 00:02:26.021)**

```
00499:01          Q.    Can you tell the jury what
02  year you graduated with your joint degree
03  in pharmacy and your M.B.A.?
04          A.    I graduated in 1996.
05          Q.    In 1996, did you become
06  employed?
07          A.    I did.  In August of 1996, I
08  was employed by Merck & Company.
09          Q.    Can you tell the jury a
10  little bit about -- firstly, why did you
11  choose a career in pharmacy?
```

Case Clip(s) Detailed Report
Monday, October 23, 2006, 2:08:37 PM

## Mason v. Merck

```
12        A.    The main reason I chose a
13   career in pharmacy is that my father is a
14   pharmacist, and I wanted to follow in his
15   footsteps.  I wanted to be involved in
16   healthcare because I believe it's an
17   important part of life, and I believe
18   pharmacy is a very noble profession.
19        Q.    Can you tell the jury in
20   1996 when you graduated with your degree
21   in pharmacy and your M.B.A., how is it
22   that you became employed by Merck?
23        A.    I was actually recruited by
24   an individual within Merck who was aware
00500:01  of the dual Doctor of Pharmacy and Master
02   of Business Administration degree
03   program, and asked one of my teachers at
04   the time about -- one of the faculty
05   members there about the program.  I
06   talked with them, I had a number of
07   different opportunities that I was
08   exploring and did a lot of research about
09   the company and talked with a lot of
10   different individuals who had experiences
11   with the company, and I felt it was a
12   great opportunity.
13        Q.    Can you tell the jury when
14   you were researching what issues were
15   important to you in choosing a career?
16        A.    It was important to me that
17   I was with a company that had ethics and
18   values that were similar to my own.  I
19   had just finished training as a
20   pharmacist, so, it was important that the
21   company had good products that
22   represented medical advances and
23   breakthroughs.  It was important to me
24   how they communicated information about
00501:01  the products and the use of their
02   products to produce good outcomes in
03   patients.  And their financial
04   information was very good.  Their
05   opportunities in terms of career were
06   good as well.  And their reputation and
07   scientific integrity and everything they
08   stood for was also very strong.
09        Q.    Can you tell the jury what
10   you learned in your research about
11   Merck's ethics in the scientific
12   integrity?
```

**23. PAGE 501:20 TO 501:23  (RUNNING 00:00:14.825)**

```
20        A.    I learned that Merck's
21   mission from the very beginning was to
22   help patients, and their ethics were very
23   strong.  They did the right thing.
```

**24. PAGE 503:12 TO 503:20  (RUNNING 00:00:24.230)**

```
12        THE WITNESS:  The decisions
13   that were made, I felt, were
14   consistent with values, scientific
15   integrity, presenting information
16   to allow prescribers to make
17   decisions, making decisions with a
18   patient in mind.  Those were all
19   very important to me, and I felt
```

CONFIDENTIAL

Case Clip(s) Detailed Report
Monday, October 23, 2006, 2:08:37 PM

## Mason v. Merck

```
        20          Merck exemplified that.
```

**25. PAGE 503:22 TO 503:24 (RUNNING 00:00:05.121)**

```
        22          Q.    How was your experience at
        23   Merck compared to the research you did
        24   before you joined Merck?
```

**26. PAGE 504:01 TO 508:18 (RUNNING 00:04:36.704)**

```
00504:01          A.    My experience with Merck .has
     02   been very positive, and it has exceeded
     03   the expectations that I had before I came
     04   in to the company.
     05          Q.    When did you first get
     06   responsibility for Vioxx?
     07          A.    I joined the market
     08   integration team for Vioxx in the middle
     09   of 1998.
     10          Q.    How many years of experience
     11   did you have at Merck when you joined the
     12   marketing team for Vioxx?
     13          A.    Just under two years --
     14   well, just under two years.
     15          Q.    During the time you had
     16   responsibility for marketing of Vioxx,
     17   who was the most junior member of that
     18   team?
     19          A.    I was.
     20          Q.    How many people reported to
     21   you, Ms. Baumgartner, when you were on
     22   the marketing team for Vioxx?
     23          A.    No individuals reported to
     24   me.
00505:01          Q.    Can you tell the jury what
     02   your responsibilities were for Vioxx
     03   while you were on the marketing team?
     04          A.    My responsibilities included
     05   interacting with physicians, and the
     06   majority of my time was spent in
     07   coordinating advisory board meetings and
     08   consultant meetings.  And by that I mean
     09   setting up the logistics of those
     10   programs, putting together agendas,
     11   inviting presenters or Merck scientists
     12   or external physicians and thought
     13   leaders to present information at those
     14   meetings, and inviting physicians to
     15   those meetings and facilitating the
     16   gathering of the information and the
     17   reporting of the data within Merck.
     18   Those meetings were primarily designed to
     19   understand the perspective of physicians,
     20   understand what they thought.  We had a
     21   product that we were marketing and
     22   communicating information about.  We
     23   wanted to understand how physicians were
     24   receiving it and what they thought of it,
00506:01   and so we brought groups together.  And
     02   my role was around the things -- the
     03   activities that I mentioned in putting
     04   together those meetings.
     05          Q.    I want to be very clear as
     06   to your role.
     07                Can you tell the ladies and
     08   gentlemen of the jury, when putting
     09   together those consultant meetings and
```

Case Clip(s) Detailed Report
Monday, October 23, 2006, 2:08:37 PM

## Mason v. Merck

```
        10    advisory board meetings, what exactly it
        11    is that you did?
        12        A.    When organizing the
        13    meetings, I usually worked with a
        14    third-party company to help with some of
        15    the tasks, but my responsibilities
        16    included identifying the location for the
        17    meeting, extending invitations to
        18    attendees, and determining who was going
        19    to attend that meeting, putting together
        20    an agenda and working with others to
        21    decide what questions we had, what
        22    feedback we wanted, and, therefore, what
        23    presentations -- what presenters we
        24    needed to invite to present information
00507:01    about different topics.  I extended the
        02    invitation to those presenters and
        03    brought them in.  And the presenters put
        04    together the content of the slides that
        05    were presented there, and the -- I helped
        06    with the logistics, the location and the
        07    organization of the day, and actual
        08    implementation of the meeting.
        09        Q.    Who is responsible for the
        10    presentation -- the decision of what
        11    scientific data to present and the
        12    presentation of that scientific data at
        13    those meetings?
        14        A.    Each of the presenters was
        15    responsible for the data, the scientific
        16    data and information that was presented
        17    during that meeting.
        18        Q.    Did you take the time to
        19    become intimately familiar with all the
        20    data that was presented at those
        21    meetings?
        22        A.    No, I did not.  The
        23    presenters were the ones responsible for
        24    content and who had access to those data
00508:01    and information.
        02        Q.    Now, can you tell the jury a
        03    little bit more about the consultants
        04    meetings and the advisory board meetings
        05    that you had responsibility for?  What
        06    were the purposes of those meetings?
        07        A.    The purpose of those
        08    meetings were to conduct market research,
        09    and what that means is just understanding
        10    what those physicians thought about new
        11    scientific data, about the current
        12    market, about the use of pain medicines,
        13    about our product Vioxx.  So, it was
        14    really a chance for us to get insight
        15    into what these doctors thought about and
        16    what these experts in their areas thought
        17    about the product and the data and the
        18    information that was out there.
```

**27. PAGE 509:06 TO 515:03 (RUNNING 00:06:01.858)**

```
        06        Q.    Can you tell the ladies and
        07    gentlemen of the jury what the methods of
        08    communicating -- Merck had communicating
        09    the benefits and limitations of its
        10    products to the medical community?
        11        A.    I wouldn't consider
        12    consultants meetings or advisory board
```

## Mason v. Merck

```
13    meetings a vehicle for communicating
14    information.  We did have to present
15    information to get their responses and
16    feedback, but there were many mechanisms,
17    many vehicles for communication that were
18    used to communicate with physicians, such
19    as scientific sessions, publications, the
20    sales representatives, the professional
21    information requests that were physician
22    to physician communications, educational
23    programs.  There were many vehicles that
24    were used by Merck to communicate with
00510:01  the scientific community and the medical
02    community.
03        Q.   Do you know how many doctors
04    were potential prescribers of Vioxx
05    during the time you had responsibility
06    for marketing Vioxx?
07        A.   I do not know.
08        Q.   Did you invite all the
09    doctors who were potential prescribers of
10    Vioxx to your consultants meetings and
11    advisory board meetings?
12        A.   No.  They were samples of
13    the physicians.  They were smaller groups
14    of those physicians that represented the
15    views of the universe.  So, they were
16    small groups of physicians that were
17    assembled to understand their
18    perspectives.
19        Q.   Who did you invite to the
20    consultant meetings or advisory board
21    meetings?
22        A.   Our advisory board group was
23    a set group of about 15 individuals who
24    met with us on a quarterly basis.  So,
00511:01  they were a fixed group that met with us
02    at regular times throughout the marketing
03    of the product.  The consultants meetings
04    were more of a one-time activity where we
05    identified a group of attendees and
06    consulted with them on specific research
07    questions and on specific things that we
08    wanted feedback on.
09        Q.   We've heard the term
10    "thought leaders."  Can you tell the
11    ladies and gentlemen of the jury what a
12    thought leader is?
13        A.   A thought leader is someone
14    who leads thought.  It is a physician who
15    is an expert in a specific area as
16    determined by his or her peers.  So, this
17    is not Merck deciding that someone is a
18    thought leader, but actually the medical
19    community or scientific community
20    determining that someone is an expert or
21    has expertise or knowledge in a given
22    area.
23        Q.   Did you invite thought
24    leaders to participate on your advisory
00512:01  boards and consultants meetings?
02        A.   Yes.  We included thought
03    leaders in both of those meetings.
04        Q.   Were the participants that
05    you invited to be on your advisory boards
06    and to your consultants meetings, were
```

CONFIDENTIAL

## Mason  v.  Merck

```
07    they all supporters of Merck?
08          A.    No.  It was important for us
09    to get feedback from all of the
10    individuals out there.  We didn't just
11    want individuals who were supportive of
12    our views.  We wanted to hear from those
13    who were not supportive as well.  So, we
14    invited physicians who had a range of
15    levels of support for the product and the
16    company.
17          Q.    Did you invite to your
18    consultants meetings and advisory boards
19    physicians who were critical of Merck or
20    Vioxx?
21          A.    The -- by the nature of the
22    meetings, we did want feedback on the
23    product, we did include physicians who
24    were not supportive of the product and
00513:01    who were critical, but that was important
02    because the purpose of the meeting was to
03    understand their thoughts and views, and
04    that to the extent that they didn't agree
05    with the conclusions that the Merck
06    scientists arrived at, we wanted to hear
07    why and understand their perspectives.
08          Q.    Was scientific data
09    presented at these advisory board
10    meetings and consultant meetings?
11          A.    Yes, it was.
12          Q.    And what was the purpose of
13    presenting data at these meetings?
14          A.    The purpose was to present
15    information that the physicians in
16    attendance could respond to or react to
17    and to serve as a basis for the
18    discussion that we had and the questions
19    that we wanted to ask them.
20          Q.    Did you solicit feedback
21    from the attending physicians on the data
22    presented at these meetings?
23          A.    Yes.  That was a primary
24    purpose of the meeting, to present
00514:01    scientific information and to have them
02    respond, react, give us their thoughts,
03    ask any questions, and also help us
04    communicate that ultimately to others.
05          Q.    And in your experience in
06    soliciting feedback from the physicians
07    who attended the consultant meetings and
08    the advisory board meetings, did those
09    groups of physicians reach unanimity on
10    any issue that you presented?
11          A.    I can't remember an instance
12    where the physicians in attendance
13    reached unanimity, and it's probably
14    consistent with other forums for
15    scientific discussion and debate.  There
16    were physicians who held different views,
17    and that was the purpose of that meeting,
18    to express that and to discuss and debate
19    the different views on the product and on
20    the information in general.
21          Q.    During the time that you
22    had -- what was the period that you had
23    responsibility for the marketing of
24    Vioxx?
```

CONFIDENTIAL

Case Clip(s) Detailed Report
Monday, October 23, 2006, 2:08:37 PM

## Mason v. Merck

```
00515:01          A.     I was actually on the
      02  marketing team from mid-1999 through the
      03  third quarter of 2001.
```

**28. PAGE 516:05 TO 522:03 (RUNNING 00:06:04.805)**

```
      05          Q.     And during the time you had
      06  responsibility for Vioxx, did you learn
      07  the results of the VIGOR study?
      08          A.     Yes, I did.
      09          Q.     Can you tell the ladies and
      10  gentlemen of the jury what you learned
      11  about the results of the VIGOR study?
      12          A.     The VIGOR study was designed
      13  to look at stomach problems for Vioxx
      14  compared to naproxen, and it was a
      15  landmark study of over 8,000 patients.
      16  And the results of that study were that
      17  Vioxx showed a lower number of stomach
      18  problems than naproxen.
      19          Q.     Were there also
      20  cardiovascular results of that VIGOR
      21  study?
      22          A.     Yes, there were.
      23          Q.     Can you tell the ladies and
      24  gentlemen of the jury what the
00517:01  cardiovascular results of the study were?
      02          A.     In that study, there was a
      03  five-fold difference in the rate of
      04  cardiovascular events between Vioxx and
      05  naproxen.
      06          Q.     Did Merck disclose the VIGOR
      07  data?
      08          A.     Yes.
      09          Q.     Can you tell the jury how
      10  Merck disclosed the VIGOR data and what
      11  the timing of it was?
      12          A.     The VIGOR data was disclosed
      13  starting -- I'm not sure when the actual
      14  first disclosure took place, but after
      15  the results were received in March of
      16  2000, Merck communicated that information
      17  through press release, through
      18  professional information requests that
      19  our representatives had available in the
      20  event there were questions about the
      21  product and that specific study.
      22          There were numerous
      23  scientific sessions starting in May of
      24  2000.  There was a big gastroenterology
00518:01  meeting in May of 2000 at which Merck
      02  presented the scientific data in a
      03  scientific session.  There were numerous
      04  other scientific sessions at which the
      05  data was discussed and throughout the
      06  rest of 2000 as well.
      07          There were advisory board
      08  meetings and consultant meetings at which
      09  we communicated the information to obtain
      10  physicians' views and thoughts on those
      11  data.  And there were publications,
      12  support for CME programs, there were
      13  communications with investigators, and,
      14  obviously, within the company there was
      15  communication as well.
      16          Q.     Based on your experience, do
      17  you have a view as to whether or not
```

Case Clip(s) Detailed Report
Monday, October 23, 2006, 2:08:37 PM

## Mason v. Merck

```
      18    Merck's efforts to disclose the data were
      19    successful?.
      20         A.    In my view, Merck's efforts
      21    were very successful.  I think it was
      22    widely communicated, and I know in my
      23    research, physicians were aware of the
      24    study, aware of the results, and it
00519:01    was -- there were many, many different
      02    communication vehicles and multiple
      03    communication vehicles used in order to
      04    communicate that.
      05         Q.    Were you ever provided with
      06    an explanation of the results, the
      07    cardiovascular results of the VIGOR
      08    trial?
      09         A.    Yes.
      10         Q.    What was that explanation?
      11         A.    The explanation for the
      12    results of the VIGOR study was that
      13    naproxen was acting as a cardioprotective
      14    agent in the study due to its platelet
      15    effect.  It was acting similar to
      16    aspirin.
      17         Q.    And who provided you that
      18    explanation or what group provided you
      19    with that explanation?
      20         A.    The Merck scientists arrived
      21    at that conclusion after reviewing the
      22    available data.
      23         Q.    Was the VIGOR data ever the
      24    subject of any consultants meetings or
00520:01    advisory board meetings?
      02         A.    Definitely.  We had many
      03    discussions with our advisors as well as
      04    at consultants meetings following the
      05    presentation of the information to get
      06    views on those data.
      07         Q.    Were the cardiovascular
      08    results of the VIGOR study presented to
      09    these groups of physicians?
      10         A.    Yes.
      11         Q.    What was the purpose to
      12    provide the cardiovascular results of the
      13    VIGOR study to these physicians at the
      14    consultants meetings and the advisory
      15    board meetings?
      16         A.    The purpose of presenting
      17    the information was to, as I mentioned,
      18    understand the thoughts of the
      19    physicians, understand their
      20    interpretation of the data in light of
      21    all the other data available for the
      22    coxibs and for Vioxx and the NSAIDs and
      23    for naproxen.  So, the purpose was to
      24    present that information and also to see
00521:01    if external thought leaders, people
      02    outside of the company, experts and
      03    thought leaders in different specialties
      04    came to the same conclusion as the Merck
      05    scientists did, so, kind of a check for
      06    the interpretation that our own
      07    scientists had of those data.
      08         Q.    Did the Merck scientists who
      09    presented the data to these physicians
      10    present only data that supported Merck's
      11    conclusions?
```

Case Clip(s) Detailed Report
Monday, October 23, 2006, 2:08:37 PM

## Mason v. Merck

```
    12         A.    No.  They presented all of
    13    the data in all of the possible -- or all
    14    of the discussions that were taking place
    15    in the medical community and debate that
    16    was taking place.  They tried to frame
    17    all of that up in order to discuss and
    18    debate all of the different angles that
    19    were being taken outside of the company
    20    on the data.
    21         Q.    Did you solicit feedback
    22    from these physicians as to their
    23    reactions to the cardiovascular results
    24    of the VIGOR study?
00522:01         A.    Yes.
    02         Q.    Can you tell the jury what
    03    you learned in soliciting that feedback?
```

**29. PAGE 522:08 TO 522:22 (RUNNING 00:00:37.201)**

```
    08         A.    The consensus from those
    09    advisory board meetings and consultant
    10    meetings were that the conclusion that
    11    Merck reached, the Merck scientists
    12    reached about naproxen being
    13    cardioprotective and that being the
    14    explanation for the results in VIGOR was
    15    the explanation for that result in light
    16    of the other data that was available on
    17    the product.
    18         Q.    Do you recall whether the
    19    physicians were unanimous in believing
    20    that the most plausible explanation was
    21    that naproxen was acting
    22    cardioprotectively?
```

**30. PAGE 523:05 TO 523:15 (RUNNING 00:00:31.246)**

```
    05         A.    I can't recall any meeting
    06    where there was a unanimous view on the
    07    data.  There were a vast majority whose
    08    conclusion was that naproxen was acting
    09    as a cardioprotective agent in that
    10    study.  Naproxen was cardioprotective in
    11    that study.  And there were some who
    12    could not arrive at a conclusion based on
    13    the data that was available.  And there
    14    were some who felt that it could have
    15    been caused by Vioxx.
```

**31. PAGE 524:02 TO 524:20 (RUNNING 00:00:53.487)**

```
    02         Q.    I ask you to identify that,
    03    please.
    04         A.    This is a market research
    05    report from a national rheumatology
    06    consultants meeting that took place in
    07    February of 2001.
    08         Q.    If I can direct your
    09    attention to Page 6 of that report, and I
    10    would ask you to read the sentence under
    11    cardiovascular CV outcomes that begins
    12    with the word "The consensus."  Can you
    13    read that into the record, please?
    14         A.    "The consensus seemed to be
    15    that coxibs did not pose an increased
    16    risk for cardiovascular or
    17    cerebrovascular thromboembolic events."
    18         Q.    Is that consistent with your
```

Case Clip(s) Detailed Report
Monday, October 23, 2006, 2:08:37 PM

## Mason v. Merck

```
      19    recollection at other meetings with
      20    consultants and advisory boards?
```

### 32. PAGE 524:24 TO 525:03 (RUNNING 00:00:06.754)

```
      24              THE WITNESS:  It was
   00525:01    definitely consistent with what I
      02    saw in the many meetings that I
      03    attended.
```

### 33. PAGE 525:05 TO 525:16 (RUNNING 00:00:25.435)

```
      05          Q.    Ms. Baumgartner, in your
      06    time at Merck, did you ever intimidate or
      07    threaten any physicians?
      08          A.    No, I did not.
      09          Q.    In your time at Merck, did
      10    you ever improperly influence any
      11    physicians?
      12          A.    No, I did not.
      13          Q.    During the time of your
      14    responsibility for Vioxx, did you believe
      15    that Vioxx could cause heart attacks?
      16          A.    No.
```

TOTAL: 2 CLIPS FROM 2 DEPOSITIONS (RUNNING 00:31:15.508)

**Baumgartner Def Direct**

| Scene | Designation | Source | Tx Duration | Barcode |
|---|---|---|---|---|
| 1 | 498:10 -499:8 | Baumgartner, Susan 2005-09-30 | 00:00:48 | Z7.1 |

498:10 Let's begin by introducing
498:11 yourself to the jury. Can you tell the
498:12 jury where you were born and raised?
498:13 A: My name is Susan Lynn
498:14 Baumgartner. I was born in DeLand,
498:15 Florida and raised in Gainesville,
498:16 Florida where I went to high school at
498:17 would Buchholz High School.
498:18 Spent a couple of years
498:19 doing prepharmacy work at the University
498:20 of Florida in Tampa, Florida, and then
498:21 did five years of work to obtain my
498:22 Doctor of Pharmacy degree and Master of
498:23 Business Administration degree from the
498:24 University of Florida in Gainesville.
499:1 Q: Can you tell the jury what
499:2 year you graduated with your joint degree
499:3 in pharmacy and your M.B.A.?
499:4 A: I graduated in 1996.
499:5 Q: In 1996, did you become
499:6 employed?
499:7 A: I did. In August of 1996, I
499:8 was employed by Merck & Company.

| 2 | 500:13 -501:3 | Baumgartner, Susan 2005-09-30 | 00:00:37 | Z7.15 |

500:13 Q: Can you tell the jury when
500:14 you were researching what issues were
500:15 important to you in choosing a career?
500:16 A: It was important to me that
500:17 I was with a company that had ethics and
500:18 values that were similar to my own. I
500:19 had just finished training as a
500:20 pharmacist, so, it was important that the
500:21 company had good products that
500:22 represented medical advances and
500:23 breakthroughs. It was important to me
500:24 how they communicated information about
501:1 the products and the use of their
501:2 products to produce good outcomes in
501:3 patients.                    (Edited)

| 3 | 504:15 -504:24 | Baumgartner, Susan 2005-09-30 | 00:00:13 | Z7.3 |

504:15 Q: During the time you had

| | | |
|---|---|---|
| 504:16 | responsibility for marketing of Vioxx, | |
| 504:17 | who was the most junior member of that | |
| 504:18 | team? | |
| 504:19 | A: I was. | |
| 504:20 | Q: How many people reported to | |
| 504:21 | you, Ms. Baumgartner, when you were on | |
| 504:22 | the marketing team for Vioxx? | |
| 504:23 | A: No individuals reported to | |
| 504:24 | me. | |

| 4 | 506:5 - 507:8 | Baumgartner, Susan 2005-09-30 | 00:01:14 | Z7.4 |
|---|---|---|---|---|
| | 506:5 | Q: I want to be very clear as | | |
| | 506:6 | to your role. | | |
| | 506:7 | Can you tell the ladies and | | |
| | 506:8 | gentlemen of the jury, when putting | | |
| | 506:9 | together those consultant meetings and | | |
| | 506:10 | advisory board meetings, what exactly it | | |
| | 506:11 | is that you did? | | |
| | 506:12 | A: When organizing the | | |
| | 506:13 | meetings, I usually worked with a | | |
| | 506:14 | third-party company to help with some of | | |
| | 506:15 | the tasks, but my responsibilities | | |
| | 506:16 | included identifying the location for the | | |
| | 506:17 | meeting, extending invitations to | | |
| | 506:18 | attendees, and determining who was going | | |
| | 506:19 | to attend that meeting, putting together | | |
| | 506:20 | an agenda and working with others to | | |
| | 506:21 | decide what questions we had, what | | |
| | 506:22 | feedback we wanted, and, therefore, what | | |
| | 506:23 | presentations -- what presenters we | | |
| | 506:24 | needed to invite to present information | | |
| | 507:1 | about different topics. I extended the | | |
| | 507:2 | invitation to those presenters and | | |
| | 507:3 | brought them in. And the presenters put | | |
| | 507:4 | together the content of the slides that | | |
| | 507:5 | were presented there, and the -- I helped | | |
| | 507:6 | with the logistics, the location and the | | |
| | 507:7 | organization of the day, and actual | | |
| | 507:8 | implementation of the meeting. | | |

| 5 | 508:2 - 508:18 | Baumgartner, Susan 2005-09-30 | 00:00:42 | Z7.5 |
|---|---|---|---|---|
| | 508:2 | Q: Now, can you tell the jury a | | |
| | 508:3 | little bit more about the consultants | | |
| | 508:4 | meetings and the advisory board meetings | | |
| | 508:5 | that you had responsibility for? What | | |
| | 508:6 | were the purposes of those meetings? | | |
| | 508:7 | A: The purpose of those | | |

|         |         |                                                                |        |
|---------|---------|----------------------------------------------------------------|--------|
|         | 508:8   | meetings were to conduct market research,                      |        |
|         | 508:9   | and what that means is just understanding                      |        |
|         | 508:10  | what those physicians thought about new                        |        |
|         | 508:11  | scientific data, about the current                             |        |
|         | 508:12  | market, about the use of pain medicines,                       |        |
|         | 508:13  | about our product Vioxx. So, it was                            |        |
|         | 508:14  | really a chance for us to get insight                          |        |
|         | 508:15  | into what these doctors thought about and                      |        |
|         | 508:16  | what these experts in their areas thought                      |        |
|         | 508:17  | about the product and the data and the                         |        |
|         | 508:18  | information that was out there.                                 |        |

| 6 | **509:6 - 510:2** | Baumgartner, Susan 2005-09-30       00:00:56 | Z7.6 |
|---|-------------------|----------------------------------------------|------|

|         | 509:6   | Q:  Can you tell the ladies and                                |
|---------|---------|----------------------------------------------------------------|
|         | 509:7   | gentlemen of the jury what the methods of                      |
|         | 509:8   | communicating -- Merck had communicating                       |
|         | 509:9   | the benefits and limitations of its                            |
|         | 509:10  | products to the medical community?                             |
|         | 509:11  | A:  I wouldn't consider                                        |
|         | 509:12  | consultants meetings or advisory board                         |
|         | 509:13  | meetings a vehicle for communicating                           |
|         | 509:14  | information. We did have to present                            |
|         | 509:15  | information to get their responses and                         |
|         | 509:16  | feedback, but there were many mechanisms,                      |
|         | 509:17  | many vehicles for communication that were                      |
|         | 509:18  | used to communicate with physicians, such                      |
|         | 509:19  | as scientific sessions, publications, the                      |
|         | 509:20  | sales representatives, the professional                        |
|         | 509:21  | information requests that were physician                       |
|         | 509:22  | to physician communications, educational                       |
|         | 509:23  | programs. There were many vehicles that                        |
|         | 509:24  | were used by Merck to communicate with                         |
|         | 510:1   | the scientific community and the medical                       |
|         | 510:2   | community.                                                      |

| 7 | **511:9 - 512:16** | Baumgartner, Susan 2005-09-30       00:01:18 | Z7.7 |
|---|--------------------|----------------------------------------------|------|

|         | 511:9   | Q:  We've heard the term                                       |
|---------|---------|----------------------------------------------------------------|
|         | 511:10  | 'thought leaders.' Can you tell the                            |
|         | 511:11  | ladies and gentlemen of the jury what a                        |
|         | 511:12  | thought leader is?                                             |
|         | 511:13  | A:  A thought leader is someone                                |
|         | 511:14  | who leads thought. It is a physician who                       |
|         | 511:15  | is an expert in a specific area as                             |
|         | 511:16  | determined by his or her peers. So, this                       |
|         | 511:17  | is not Merck deciding that someone is a                        |
|         | 511:18  | thought leader, but actually the medical                       |
|         | 511:19  | community or scientific community                              |

511:20   determining that someone is an expert or
511:21   has expertise or knowledge in a given
511:22   area.
511:23   Q:  Did you invite thought
511:24   leaders to participate on your advisory
512:1    boards and consultants meetings?
512:2    A:  Yes. We included thought
512:3    leaders in both of those meetings.
512:4    Q:  Were the participants that
512:5    you invited to be on your advisory boards
512:6    and to your consultants meetings, were
512:7    they all supporters of Merck?
512:8    A:  No. It was important for us
512:9    to get feedback from all of the
512:10   individuals out there. We didn't just
512:11   want individuals who were supportive of
512:12   our views. We wanted to hear from those
512:13   who were not supportive as well. So, we
512:14   invited physicians who had a range of
512:15   levels of support for the product and the
512:16   company.

| 8 | 513:8 -514:4 | Baumgartner, Susan 2005-09-30 | 00:00:49 | Z7.8 |

513:8    Q:  Was scientific data
513:9    presented at these advisory board
513:10   meetings and consultant meetings?
513:11   A:  Yes, it was.
513:12   Q:  And what was the purpose of
513:13   presenting data at these meetings?
513:14   A:  The purpose was to present
513:15   information that the physicians in
513:16   attendance could respond to or react to
513:17   and to serve as a basis for the
513:18   discussion that we had and the questions
513:19   that we wanted to ask them.
513:20   Q:  Did you solicit feedback
513:21   from the attending physicians on the data
513:22   presented at these meetings?
513:23   A:  Yes. That was a primary
513:24   purpose of the meeting, to present
514:1    scientific information and to have them
514:2    respond, react, give us their thoughts,
514:3    ask any questions, and also help us
514:4    communicate that ultimately to others.

| 9 | 516:5 -519:16 | Baumgartner, Susan 2005-09-30 | 00:03:44 | Z7.9 |

516:5    Q:  And during the time you had

516:6   responsibility for Vioxx, did you learn
516:7   the results of the VIGOR study?
516:8   A: Yes, I did.
516:9   Q: Can you tell the ladies and
516:10   gentlemen of the jury what you learned
516:11   about the results of the VIGOR study?
516:12   A: The VIGOR study was designed
516:13   to look at stomach problems for Vioxx
516:14   compared to naproxen, and it was a
516:15   landmark study of over 8,000 patients.
516:16   And the results of that study were that
516:17   Vioxx showed a lower number of stomach
516:18   problems than naproxen.
516:19   Q: Were there also
516:20   cardiovascular results of that VIGOR
516:21   study?
516:22   A: Yes, there were.
516:23   Q: Can you tell the ladies and
516:24   gentlemen of the jury what the
517:1   cardiovascular results of the study were?
517:2   A: In that study, there was a
517:3   five-fold difference in the rate of
517:4   cardiovascular events between Vioxx and
517:5   naproxen.
517:6   Q: Did Merck disclose the VIGOR
517:7   data?
517:8   A: Yes.
517:9   Q: Can you tell the jury how
517:10   Merck disclosed the VIGOR data and what
517:11   the timing of it was?
517:12   A: The VIGOR data was disclosed
517:13   starting -- I'm not sure when the actual
517:14   first disclosure took place, but after
517:15   the results were received in March of
517:16   2000, Merck communicated that information
517:17   through press release, through
517:18   professional information requests that
517:19   our representatives had available in the
517:20   event there were questions about the
517:21   product and that specific study.
517:22   There were numerous
517:23   scientific sessions starting in May of
517:24   2000. There was a big gastroenterology
518:1   meeting in May of 2000 at which Merck
518:2   presented the scientific data in a
518:3   scientific session. There were numerous

518:4    other scientific sessions at which the
518:5    data was discussed and throughout the
518:6    rest of 2000 as well.
518:7    There were advisory board
518:8    meetings and consultant meetings at which
518:9    we communicated the information to obtain
518:10   physicians' views and thoughts on those
518:11   data. And there were publications,
518:12   support for CME programs, there were
518:13   communications with investigators, and,
518:14   obviously, within the company there was
518:15   communication as well.
518:16   Q:  Based on your experience, do
518:17   you have a view as to whether or not
518:18   Merck's efforts to disclose the data were
518:19   successful?
518:20   A:  In my view, Merck's efforts
518:21   were very successful. I think it was
518:22   widely communicated, and I know in my
518:23   research, physicians were aware of the
518:24   study, aware of the results, and it
519:1    was -- there were many, many different
519:2    communication vehicles and multiple
519:3    communication vehicles used in order to
519:4    communicate that.
519:5    Q:  Were you ever provided with
519:6    an explanation of the results, the
519:7    cardiovascular results of the VIGOR
519:8    trial?
519:9    A:  Yes.
519:10   Q:  What was that explanation?
519:11   A:  The explanation for the
519:12   results of the VIGOR study was that
519:13   naproxen was acting as a cardioprotective
519:14   agent in the study due to its platelet
519:15   effect. It was acting similar to
519:16   aspirin.

10    **519:23 -520:10**    Baumgartner, Susan 2005-09-30    00:00:27    Z7.10

519:23   Q:  Was the VIGOR data ever the
519:24   subject of any consultants meetings or
520:1    advisory board meetings?
520:2    A:  Definitely. We had many
520:3    discussions with our advisors as well as
520:4    at consultants meetings following the
520:5    presentation of the information to get

**Baumgartner Def Direct**

|  |  |  |  |
|---|---|---|---|
| | 520:6 | views on those data. | |
| | 520:7 | Q: Were the cardiovascular | |
| | 520:8 | results of the VIGOR study presented to | |
| | 520:9 | these groups of physicians? | |
| | 520:10 | A: Yes. | |

| 11 | 521:8 - 522:3 | Baumgartner, Susan 2005-09-30      00:00:46 | Z7.11 |
|---|---|---|---|
| | 521:8 | Q: Did the Merck scientists who | |
| | 521:9 | presented the data to these physicians | |
| | 521:10 | present only data that supported Merck's | |
| | 521:11 | conclusions? | |
| | 521:12 | A: No. They presented all of | |
| | 521:13 | the data in all of the possible -- or all | |
| | 521:14 | of the discussions that were taking place | |
| | 521:15 | in the medical community and debate that | |
| | 521:16 | was taking place. They tried to frame | |
| | 521:17 | all of that up in order to discuss and | |
| | 521:18 | debate all of the different angles that | |
| | 521:19 | were being taken outside of the company | |
| | 521:20 | on the data. | |
| | 521:21 | Q: Did you solicit feedback | |
| | 521:22 | from these physicians as to their | |
| | 521:23 | reactions to the cardiovascular results | |
| | 521:24 | of the VIGOR study? | |
| | 522:1 | A: Yes. | |
| | 522:2 | Q: Can you tell the jury what | |
| | 522:3 | you learned in soliciting that feedback? | |

| 12 | 522:8 - 522:17 | Baumgartner, Susan 2005-09-30      00:00:25 | Z7.12 |
|---|---|---|---|
| | 522:8 | A: The consensus from those | |
| | 522:9 | advisory board meetings and consultant | |
| | 522:10 | meetings were that the conclusion that | |
| | 522:11 | Merck reached, the Merck scientists | |
| | 522:12 | reached about naproxen being | |
| | 522:13 | cardioprotective and that being the | |
| | 522:14 | explanation for the results in VIGOR was | |
| | 522:15 | the explanation for that result in light | |
| | 522:16 | of the other data that was available on | |
| | 522:17 | the product. | |

| 13 | 523:16 - 523:19 | Baumgartner, Susan 2005-09-30      00:00:07 | Z7.13 |
|---|---|---|---|
| | 523:16 | MR. TSOUGARAKIS: Let me | |
| | 523:17 | show you what we'll mark as | |
| Link > BAU1.2 | 523:18 | Baumgartner Exhibit 1. | |
| | 523:19 | - - - | |

| 14 | 523:20 - 524:20 | Baumgartner, Susan 2005-09-30      00:00:53 | Z7.24 |
|---|---|---|---|
| | 523:20 | (Whereupon, Deposition | |

|  |  |
|---|---|
| 523:21 | Exhibit Baumgartner-1, Market |
| 523:22 | research report, February 2001, |
| 523:23 | was marked for identification.) |
| 523:24 | - - - |
| 524:1 | BY MR. TSOUGARAKIS: |
| 524:2 | Q: I ask you to identify that, |
| 524:3 | please. |
| 524:4 | A: This is a market research |
| 524:5 | report from a national rheumatology |
| 524:6 | consultants meeting that took place in |
| 524:7 | February of 2001. |
| 524:8 | Q: If I can direct your |
| 524:9 | attention to Page 6 of that report, and I |
| 524:10 | would ask you to read the sentence under |
| 524:11 | cardiovascular CV outcomes that begins |

Link > BAU1.7

| 524:12 | with the word 'The consensus.' Can you |
|---|---|
| 524:13 | read that into the record, please? |

Link > BAU1.7.1

| 524:14 | A: 'The consensus seemed to be |
|---|---|
| 524:15 | that coxibs did not pose an increased |
| 524:16 | risk for cardiovascular or |
| 524:17 | cerebrovascular thromboembolic events.' |

Link > Hide

| 524:18 | Q: Is that consistent with your |
|---|---|
| 524:19 | recollection at other meetings with |
| 524:20 | consultants and advisory boards? |

---

15   524:24 - 525:3   Baumgartner, Susan 2005-09-30   00:00:07                         Z7.14

| 524:24 | THE WITNESS: It was |
|---|---|
| 525:1 | definitely consistent with what I |
| 525:2 | saw in the many meetings that I |
| 525:3 | attended. |

---

16   525:9 - 525:16   Baumgartner, Susan 2005-09-30   00:00:15                         Z7.23

| 525:9 | Q: In your time at Merck, did |
|---|---|
| 525:10 | you ever improperly influence any |
| 525:11 | physicians? |
| 525:12 | A: No, I did not. |
| 525:13 | Q: During the time of your |
| 525:14 | responsibility for Vioxx, did you believe |
| 525:15 | that Vioxx could cause heart attacks? |
| 525:16 | A: No. |

---

Play Time for this Script:   **00:13:21**

**Baumgartner Def Direct**

**Total time for all Scripts in this report:    00:13:21**