U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED   11-13-06
LORETTA G. WHYTE
CLERK

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: Vioxx
**PRODUCTS LIABILITY LITIGATION**

THIS DOCUMENT RELATES TO:
Case No. 2:06cv810

CHARLES LARON MASON v.
MERCK & CO., INC.

**MDL DOCKET NO. 1657**

Section L

Judge Fallon
Mag. Judge Knowles

# TRANSCRIPT OF THE DEPOSITION OF GREGORY CURFMAN, M.D., PLAYED TO JURY ON NOVEMBER 9, 2006

___ Fee _____
___ Process _____
_X_ Dktd _____
___ CtRmDep _____
___ Doc. No. _____

Case Clip(s) Detailed Report
Friday, November 03, 2006, 1:07:17 AM

## Mason  v.  Merck

 **Curfman, Gregory D. (Vol. 01) - 11/21/2005**                    1 CLIP  (RUNNING 01:09:07.350)

 curfman trial

**CURFMAN 1**                    **76 SEGMENTS  (RUNNING 01:09:07.350)**

**1. PAGE 12:13 TO 12:14 (RUNNING 00:00:03.269)**

```
        13      Q.  Good morning, Dr. Curfman.
        14      A.  Good morning.
```

**2. PAGE 13:11 TO 13:19 (RUNNING 00:00:23.608)**

```
        11      Q.  And what is your current employment, sir?
        12      A.  I am the executive editor of The New
        13  England Journal of Medicine.
        14      Q.  How long have you held that position?
        15      A.  Since July of 2000.
        16      Q.  Did you have prior positions at New England
        17  Journal?
        18      A.  For the previous 14 years I was a deputy
        19  editor at The New England Journal.
```

**3. PAGE 13:20 TO 14:18 (RUNNING 00:01:21.000)**

```
        20      Q.  What is the role of a deputy editor?
        21      A.  Deputy editor is an in-house editor who is
        22  involved in editing manuscripts, reviewing
        23  manuscripts, medical data, and moving those
        24  manuscripts to publication in The New England
 00014:01  Journal.
        02          Deputy editor also is involved in
        03  soliciting editorial articles to comment on the
        04  original scientific work and to -- is involved in
        05  bringing articles into The Journal.
        06      Q.  What is the difference between the role of
        07  deputy editor and executive editor?
        08      A.  The executive editor has administrative
        09  responsibilities that a deputy editor does not.
        10  The executive editor reports directly to the
        11  editor-in-chief and serves in the capacity of
        12  filling in for the editor-in-chief when he was
        13  traveling or otherwise unavailable.
        14          Executive editor is in charge of the
        15  editorial office, of the day-to-day operations of
        16  the editorial office, and is involved in setting
        17  editorial policy, editorial directions for The
        18  Journal.
```

**4. PAGE 20:22 TO 22:01 (RUNNING 00:01:38.643)**

```
        22          Is it -- how would you characterize the
        23  role you had in the review process concerning the
        24  VIGOR study in the year 2000?
 00021:01  A.  Well, each manuscript that is submitted to
        02  The Journal is assigned to an editor, an associate
        03  editor, who's job it is to handle that article
        04  through the review process.
        05          In addition, that associate editor is
        06  teamed with a deputy editor.  So there are two
        07  editors who work in tandem to handle the article
        08  through the review process.
        09          I was not either the associate editor
        10  nor the deputy editor on the VIGOR article.
```

**Case Clip(s) Detailed Report**
**Friday, November 03, 2006, 1:07:17 AM**

## Mason v. Merck

```
11              During the time that the VIGOR
12  manuscript was being handled in our office, between
13  May and July, I was still a deputy editor.
14              In July, I became the executive editor.
15  So it was during the time that the VIGOR article
16  was being reviewed that I had a change in my
17  position.
18              I did, however, attend all of the
19  editorial meetings where the VIGOR article was
20  discussed.  I was a part of those discussions.
21              I had the opportunity to express
22  opinions about the manuscript and the data, and so
23  I was a part of the process in that sense, but I
24  was not the primary editor who was responsible for
00022:01  taking that article through the process.
```

**5. PAGE 23:02 TO 24:08 (RUNNING 00:01:46.143)**

```
02      Q.  Dr. Curfman, marked as Exhibit 2 is a
03  document bearing the heading of "The New England
\cf0    04  Journal of Medicine," entitled "Information For
```

📄 **CURFMAN2 - curfman2**

```
05  Authors," dated January 6, 2000.
06              Are you familiar with this document?
07      A.  Yes, I am.
08      Q.  Does this document express the policy of
09  The New England Journal of Medicine as of the year
10  2000?
11      A.  Yes, that's correct, in terms of the
\cf0    12  submission of manuscripts.
```

📄 **CURFMAN2A - curfman2a**

```
13      Q.  Directing your attention to the second full
14  paragraph on the left-hand side under the heading
15  "Manuscripts," there is a statement, "A covering
16  letter signed by all authors should identify the
17  person, with the address and telephone number,
18  responsible for negotiations concerning the
19  manuscript.  The letter should make it clear that
20  the final manuscript has been seen and approved by
21  all authors and that they have taken due care to
22  ensure the integrity of the work ."
23              Was that part of the policy of The New
24  England Journal of Medicine in the year 2000?
00024:01      A.  Yes.
02      Q.  And with respect to that quoted language,
03  what does the phrase "ensure the integrity of the
04  work" mean?
05      A.  "The integrity of the work" refers to the
06  accuracy of the work, the completeness of the data,
07  and the conclusions flowing from the data being
08  appropriate and accurate.
```

**6. PAGE 24:09 TO 24:12 (RUNNING 00:00:10.000)**

```
09      Q.  Does the phrase "ensure the integrity of
10  the work" include ensuring that the actual data are
11  accurately presented in the manuscript?
12      A.  Yes.
```

**7. PAGE 44:01 TO 45:11 (RUNNING 00:01:47.000)**

```
00044:01      Q.  Doctor, Exhibit 8 is from The New England
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 1:07:17 AM

## Mason v. Merck

### 📄 CURFMAN8 - CU

```
02  Journal of Medicine, Volume 336.  It's got a
03  copyright "1997" in the lower right.
04      A.  Right.
05      Q.  The page is entitled "Uniformed
06  Requirements For Manuscripts Submitted to
07  Biomedical Journals."
08          Is this a document you are familiar
09  with?
10      A.  Yes.  This is an earlier version of the
11  document that we were just -- that you were just
12  reading from.
13          So it has gone through a number of
14  iterations over the years.  This would, I believe,
15  have been the document in place at the time of the
16  consideration of the VIGOR trial.
17      Q.  And this again is a joint statement of The
18  International Committee of Medical Journal Editors
19  that The New England Journal has adopted for its
20  own policies; is that right?
21      A.  That's right.
```

### 📄 CURFMAN8A - curfman8a

```
22      Q.  Turning to Page 315, underneath the heading
23  "Sending the Manuscript to the Journal," there is a
24  statement that, "Manuscripts must be accompanied by
00045:01  a covering letter, signed by all co-authors," and
02  underneath that there is Subparagraph C that states
03  the following:  "A statement that the manuscript
04  has been read and approved by all the authors, that
05  the requirements for authorship as stated earlier
06  in this document have been met, and that each
07  author believes that the manuscript represents
08  honest work."
09          Did that establish the policy of The
10  New England Journal from 1997 forward?
11      A.  Yes.
```

**8. PAGE 45:17 TO 46:03  (RUNNING 00:00:38.000)**

```
17      Q.  Dr. Curfman, Exhibit 9 is a copy of a
```

### 📄 CURFMAN9 -

```
18  letter date May 18, 2000 from Claire Bombardier and
19  to Robert Utiger, Deputy Editor, New England
20  Journal of Medicine, dated May 18, 2000.
21          Have you seen this letter before?
22      A.  Yes, I have.
23      Q.  Is it correct that The New England Journal
24  received a draft manuscript of the VIGOR study from
00046:01  Claire Bombardier, along with that letter dated May
02  18, 2000?
03      A.  That's correct.
```

**9. PAGE 46:08 TO 46:24  (RUNNING 00:00:57.028)**

```
08      Q.  The letter itself, Dr. Curfman, is
09  consecutively Bates numbered at Page 2000 NEMJ 1
10  and 2, is that correct, in the document that you
11  have?
12      A.  Yes, uh-huh.
13      Q.  And are the pages marked ending in the
14  numbers 5, 7 and 16 the author statements signed by
```

## Mason v. Merck

📄 **CURFMAN9A -**

```
15  Drs. Bombardier, Alise Reicin -- that's R-E-I-C-I-N
16  -- and Deborah Shapiro that were submitted with the
17  manuscript?
18      A.  Correct.
19      Q.  In those letters, each of the signatories
20  attested that they had fulfilled the authorship
21  criteria of the uniform requirements that we read a
```

📄 **-KECURFMAN9A - Clear Attached Exhibit CURFMAN9A**

```
22  few moments ago from the 1997 standards; is that
23  right?
24      A.  That is right.
```

**10. PAGE 47:01 TO 48:08 (RUNNING 00:02:00.000)**

```
00047:01      Q.  Doctor, how long after The New England
02  Journal received the draft with the May 18, 2000
03  letter were you assigned in any capacity to the
04  review process?
05      A.  I was not assigned to handle this
06  manuscript through the review process.
07          So my colleagues Dr. Utiger, Dr. Kaplan
08  and Dr. Steinbrook were the three editors who
09  handled this manuscript through the review process.
10          Dr. Utiger and Dr. Steinbrook are
11  deputy editors, and Dr. Steinbrook was the primary
12  deputy editor.  When he was away, Dr. Utiger would
13  step in for him in that capacity; and Dr. Kaplan,
14  Marshall Kaplan, was the associate editor who was
15  primarily responsible for selecting the reviewers
16  and taking the manuscript through the review
17  procedures.
18      Q.  Was the VIGOR article sent for external
19  review?
20      A.  Oh, yes.
21      Q.  Was there a standard as to how many
22  reviewers you would send an article to?
23      A.  Well, in this particular case, the article
24  was sent to two outside reviewers.  It was also
00048:01  reviewed by a statistical consultant who works in
02  that capacity for The Journal.
03          It would have also been read very
04  carefully by Dr. Kaplan, by Dr. Steinbrook, by
05  Dr. Utiger; and then toward the end of the process,
06  I also read the manuscript before it was finally
07  approved, and then accepted by Dr. Jeffrey Drazen,
08  the editor-in-chief.
```

**11. PAGE 48:10 TO 49:23 (RUNNING 00:02:10.000)**

```
10      Q.  Doctor, the court reporter has marked as
11  Exhibit 10 a draft version of the study submitted
12  by Bombardier, et al.
13          Does this appear to be a copy of the
```

📄 **CURFMAN10 -**

```
14  manuscript submitted on May 18, 2000.
15      A.  Yes, it does.
16      Q.  If you would turn to the page that is
17  marked with the Post-It -- this document was not
18  Bates-stamped, since it came from a diskette -- but
19  if you turn to the page that's marked with the
```

## Mason v. Merck

```
20  Post-It.
21      A.  Right.
```

📄 CURFMAN10A -

```
22      Q.  Do you see the reference in the middle of
23  the page to "myocardial infarctions"?
24      A.  Uh-huh, yes.
00049:01    Q.  And do you see the statement, "Myocardial
02  infarctions were less common in the naproxen group
03  than rofecoxib group:  0.1 percent versus 0.4
04  percent (95 percent confidence interval of
05  difference 0.1 to 0.6 percent"?
06      A.  Yes.
07      Q.  And reading on, it states, "Four percent of
08  the study population met FDA criteria for aspirin
09  use for secondary cardiovascular prophylaxis
10  (history of myocardial infarction, unstable or
11  stable angina, cerebrovascular accident, transient
12  ischemic attack, angioplasty, coronary bypass) but
13  were not on low-dose aspirin therapy.  These
14  patients accounted for 38 percent of the myocardial
15  infarctions in the study.  The difference in
16  myocardial infarction rate between treatments in
17  the other 96 percent of patients was much less
18  apparent:  Rofecoxib 0.2 percent versus naproxen
19  0.1 percent.  95 percent confidence interval of
20  difference, negative 0.1 to 0.3 percent."
21              Did you see that text in the manuscript
```

📄 -KECURFMAN10A - Clear Attached Exhibit CURFMAN10A

```
22  that you reviewed?
23      A.  Yes, uh-huh.
```

**12.  PAGE 52:02 TO 52:04  (RUNNING 00:00:06.700)**

```
02      Q.  Now, was the VIGOR manuscript ultimately
03  published on November 23, 2000?
04      A.  That's correct.
```

**13.  PAGE 52:06 TO 53:11  (RUNNING 00:01:47.649)**

```
06      Q.  Is Exhibit 11 a copy of the published
```

📄 CURFMAN11 -

```
07  article, "Comparison of Upper Gastrointestinal
08  Toxicity of Rofecoxib and Naproxen in Patients with
09  Rheumatoid Arthritis," by Bombardier et al., from
10  The New England Journal, dated November 23, 2000?
11      A.  Yes.
12      Q.  And turning to Page 1523 of the document,
13  do you see under the heading "General Safety" the
```

📄 CURFMAN11A -

```
14  same statistical information about the rates of
15  myocardial infarction in the aspirin-indicated and
16  nonaspirin-indicated groups that appeared in the
17  earlier draft?
18      A.  Yes.
19      Q.  The article states that, "The aspirin-
20  indicated patients accounted for 38 percent of the
21  patients in the study who had myocardial
22  infarctions"; is that correct?
23      A.  That is correct.
24      Q.  And it then goes on to state, "In the other
```

## Mason v. Merck

```
00053:01   patients, the difference in the rate of myocardial
      02   infarction between groups was not significant (0.2
      03   percent in the rofecoxib group and 0.1 percent in
      04   the naproxen group)."
      05          Do you see that text?
      06       A.  Yes, I do.
```

📄 **-KECURFMAN11A - Clear Attached Exhibit CURFMAN11A**

```
      07       Q.  So this article conveyed to readers that
      08   the difference in the rate of myocardial infarction
      09   between groups was not significant for the patients
      10   who are not aspirin-indicated; is that right?
      11       A.  Yes.
```

**14. PAGE 54:05 TO 54:09  (RUNNING 00:00:18.182)**

```
      05       Q.  Now, is it correct that the authors
      06   submitted a revised manuscript with a diskette
      07   containing three versions of the VIGOR manuscript,
      08   with a letter dated August 20, from Dr. Bombardier?
      09       A.  That's correct.
```

**15. PAGE 54:11 TO 54:21  (RUNNING 00:00:36.549)**

```
      11       Q.  Dr. Curfman, is Exhibit 12 a copy of the
      12   August 20, 2000 letter from Bombardier to
```

📄 **CURFMAN12 - curfman12**

```
      13   Dr. Steinbrook at New England Journal?
      14       A.  Yes, it is.
      15       Q.  And if you look at Page 3 of the letter,
      16   which is the Bates-stamp ending in 042, just before
      17   the final paragraph, is it stated that, "We have
      18   included two triple-spaced copies of the revised
      19   manuscript as well as a diskette with the
      20   manuscript files"?
      21       A.  Right.
```

**16. PAGE 55:16 TO 58:15  (RUNNING 00:04:31.779)**

```
      16       Q.  Dr. Curfman, the diskette was received
      17   shortly after August 20, 2000; is that right?
      18       A.  Yes.  The original diskette.
      19          This would be a copy, but that original
      20   diskette was received with this letter
```

📄 **-KECURFMAN12 - Clear Attached Exhibit CURFMAN12**

```
      21   (indicating).
      22       Q.  Did the folders on the disk include three
      23   draft versions of the VIGOR study from May, July
      24   and August of 2000?
00056:01       A.  That's correct.
      02       Q.  Did you personally review any part of the
      03   contents of the disk at any time before the
      04   publication of the VIGOR study on November 23,
      05   2000?
      06       A.  No.
      07          And as explanation, at that time, we
      08   were still receiving, editing and handling
      09   manuscripts in paper form.  We were in transition
      10   from a paper format to an electronic format, but we
      11   had not completed that transition.
      12          So we were requesting diskettes from
      13   authors, but this was in anticipation of moving to
      14   an electronic platform, which we had not yet done.
```

## Mason v. Merck

```
      15           So in the case of this diskette, the
      16  authors, at our request, had submitted a diskette,
      17  but we never accessed it, because we were doing all
      18  of our editing on paper.  So Dr. Bombardier also
      19  provided paper copies, and we worked on those.
      20           The diskette, however, was saved, put
      21  into an envelope, stapled into the manuscript file
      22  and made a permanent part of the manuscript file,
      23  but was not used in any way in the handling of the
      24  VIGOR manuscript at that time in the year 2000.
00057:01     Q.  Is it correct then that based on your
      02  investigation to prepare for this deposition that
      03  none of the editors at The New England Journal
      04  reviewed the contents of the diskette before
      05  November 23, 2000?
      06     A.  Yes, that's correct.
      07     Q.  At some point before today, have you seen
      08  the contents of the disk, the diskette?
      09     A.  Yes, I have.
      10     Q.  And, in particular, have you seen the
      11  contents of the May 2000 version on the diskette?
      12     A.  Yes, I have.
      13     Q.  When did you first see the contents?
      14     A.  We first accessed the contents of the
      15  diskette on Tuesday, October 5th, 2004, during the
      16  afternoon.
      17     Q.  And when you say "we," who are you
      18  referring to?
      19     A.  The editor in the office who first found
      20  the disk is our managing editor, the managing
      21  editor of The Journal, Dr. Stephen Morressey.
      22     Q.  What were the circumstances under which the
      23  diskette was viewed?
      24     A.  On September 30, 2004, rofecoxib had been
00058:01  removed from the market; and in the wake of that
      02  decision, we wanted to take a look at the VIGOR
      03  file to refresh our memories about certain aspects
      04  of the manuscript.
      05           We did that, on October 5th, and it was
      06  on that day that Dr. Morressey found the diskette,
      07  and we accessed it.  We put it into one of our
      08  drives, and brought it up and looked at it on the
      09  computer screen, and we also made hard copy
      10  printouts of the three files that were on the
      11  diskette, and then read them.
      12     Q.  And during that review, did you determine
      13  that there were marked-up, edited, tracked changes
      14  versions of the manuscripts on the diskette?
      15     A.  That's correct.
```

**17. PAGE 59:08 TO 59:20  (RUNNING 00:00:57.992)**

```
      08     Q.  Dr. Curfman, please take a look at what has
      09  been marked as Exhibit 14, that has been Bates-
      10  stamped 2000 NEJM 000235 through 282, and can you
      11  tell me if this is an accurate copy of the May 2000
      12  draft of the VIGOR study that you observed at the
      13  time you reviewed the contents of the diskette in
      14  October 2004, as you've testified earlier?
      15     A.  Yes, it is.
      16     Q.  You'll notice that we talked a little
      17  before the break about the word "tracked changes."
      18           Do tracked changes show when deletions
      19  or insertions are made to a manuscript?
      20     A.  That's correct.
```

## Mason v. Merck

**18. PAGE 60:01 TO 61:02 (RUNNING 00:01:46.000)**

```
00060:01      Q.  And is that done by using the mouse to
      02  hover over a specific insertion or deletion --
      03      A.  Yes.
      04      Q.  -- until some information appears on the
      05  screen showing that a particular insertion or
      06  deletion was made at a particular time by a
      07  particular person?
      08      A.  Right.  So it tracks the change and also
      09  the individual and the time and date when the
      10  change was made.
      11      Q.  Now, when you observed this document on
      12  screen in October 2004, did you observe that there
      13  had been deletions with respect to the text that we
      14  looked at earlier?
      15          In particular, if you look at Page 251,
```

📄 CURFMAN14 - curfman14                                    

```
      16  under the general "Safety Heading," do you see that
      17  there is a reference to "Deleted:  8 and 0 patients
      18  with myocardial infarction in the rofecoxib and
      19  naproxen treatment groups respectively"?
      20      A.  Yes.
      21      Q.  And do you see that in the next sentence
      22  the information that was deleted refers to the
      23  absolute numbers of myocardial infarctions in the
      24  nonaspirin indicated group, 9 for rofecoxib and 4
00061:01  for naproxen?
      02      A.  Yes, I do.
```

**19. PAGE 61:10 TO 62:04 (RUNNING 00:00:57.527)**

```
      10      Q.  Okay.  Let's look at the Table 5 on the
      11  last page, that's 282.
```

📄 CURFMAN14A -                                             

```
      12          There's highlighting there that was on
      13  this copy when we received it.
      14      A.  Right.
      15      Q.  Was that highlighting visible to you on the
      16  computer screen?
      17      A.  On the computer screen, yes.
      18      Q.  And does this Table 5 on the last page,
      19  282, show "deleted" at the top?
      20      A.  Yes, it does.
      21      Q.  And does it show tracked change indicating
      22  that the deletion was made by Merck?
      23      A.  That's correct.
      24      Q.  Does it show that the deletion was made by
00062:01  Merck on May 16, 200 at 8:02 p.m.?
      02      A.  Correct.
      03      Q.  And what was the content of Table 5 that
      04  was deleted?
```

**20. PAGE 62:06 TO 62:19 (RUNNING 00:00:57.000)**

```
      06      A.  Well, as you can see, this was a table that
      07  never -- well, what we have in front of us is -- I
      08  interpret this as a table that had been proposed,
      09  but the data themselves had not been entered into a
      10  table.
      11          In the highlighted area, the yellow
      12  highlighting, in Footnote No. 1, I think that we
      13  can conclude that these were the data categories
      14  that would have been included in this table had the
```

## Mason v. Merck

```
        15   data been introduced into the table, but what we
```

**-KECURFMAN14A - Clear Attached Exhibit CURFMAN14A**

```
        16   had in this May version was an incompleted table.
        17   Q.  And in particular, Table 5 referred to
        18   cardiovascular events; is that correct?
        19   A.  That's the title of the events, yes.
```

**21.  PAGE 75:24 TO 76:08  (RUNNING 00:00:32.932)**

```
        24       Q.  Now, Doctor, Exhibit 18 is a memo from
00076:01   Deborah Shapiro to Alise Reicin and others dated
     02   July 5, 2000.
     03           Do you recognize the names of Shapiro
     04   and Reicin as the two Merck authors on the VIGOR
     05   study?
     06   A.  Yes, I do.
     07   Q.  Now, I take it you have never seen this
     08   document before, or have you?
```

**22.  PAGE 76:09 TO 77:20  (RUNNING 00:02:10.797)**

```
     09   A.  I have probably seen some of these data on
     10   the FDA Website, I think, but I have never seen it
     11   as a document per se.
     12   Q.  If you could take a look -- certainly you
     13   didn't see it on the FDA Website before the
     14   publication of the --
     15   A.  No.
     16   Q.  -- the article?
     17   A.  No.  Oh, no.  No.  No.
     18   Q.  Could you take a look at Table 7, which is
\cf0     19   on Pages 9 and 10 of the document.  You have to use
```

**CURFMAN18 - curfman18**

```
     20   the column headings from Page 9 to follow the
     21   information onto Page 10.
     22           But do you see that there is
     23   information in this document dated July 5, 2000
     24   concerning the number of patients with different
00077:01   adverse events?
     02   A.  (Nodding.)
     03   Q.  You have to answer out loud, sir.
     04   A.  Yes, sorry.
     05   Q.  And under the "Aspirin Indicated" row on
     06   Page 9, do you see the MI listing of 8 versus 0 for
     07   rofecoxib versus naproxen?
     08   A.  Yes, I do.
     09   Q.  And there, do you see that the -- on Page
     10   10, the "Aspirin Not Indicated" group MI row shows
     11   12 for Vioxx and 4 for naproxen?
     12   A.  That's correct.
     13   Q.  Now, the data that had been in the deleted
     14   text from the May 2000 version showed 9 versus 4
     15   for the nonaspirin-indicated; is that correct?
     16   A.  That's correct.
     17   Q.  And by July 5, 2000, the data of the Merck
     18   authors showed that those numbers were 12 versus 4;
     19   is that correct?
     20   A.  That's correct.
```

**23.  PAGE 80:20 TO 81:03  (RUNNING 00:00:29.900)**

```
     20   Q.  Considering the severity of the endpoint,
     21   myocardial infarction, and the fact that there was
     22   additional data showing a larger number than
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 1:07:17 AM

## Mason v. Merck

```
         23  initially represented in the manuscript submitted
         24  to The Journal, would it have been of interest to
00081:01  readers of The Journal to know that the results for
         02  the nonaspirin-indicated group achieved a level
         03  that was at least borderline significant?
```

**24. PAGE 81:05 TO 81:09 (RUNNING 00:00:19.293)**

```
         05      A.  Oh, absolutely.
         06              The difference between 9 MIs and 12 MIs
         07  is absolutely of importance and quite relevant, and
         08  I certainly would have wanted to have access to
         09  these data, absolutely.
```

**25. PAGE 84:14 TO 84:18 (RUNNING 00:00:14.514)**

```
         14      Q.  Exhibit 20 is a letter dated July 7th,
```

📄 **CURFMAN20 - curfman20**                                   

```
         15  2000, with attachment, from Bombardier to
         16  Dr. Kaplan.
         17              Have you seen this before?
         18      A.  Yes, I have.
```

**26. PAGE 89:02 TO 89:06 (RUNNING 00:00:17.129)**

```
         02      Q.  And the July 17th letter from the authors
         03  12 days after this July 5 memo does not anywhere
         04  inform The New England Journal of the 12 versus 4
         05  figures, does it?
         06      A.  That's correct.
```

**27. PAGE 89:07 TO 89:15 (RUNNING 00:00:23.000)**

```
         07      Q.  Now, is it The Journal's policy to rely on
         08  the manuscript authors to submit true and accurate
         09  statements of the data?
         10      A.  Yes.  That is imperative.
```

📄 **-KECURFMAN20 - Clear Attached Exhibit CURFMAN20**          

```
         11      Q.  Do The Journal's readers rely on the truth
         12  and accuracy of the authors' statements of the data
         13  in making decisions as to treatment of their
         14  patients?
         15      A.  Yes, they do.
```

**28. PAGE 89:17 TO 90:15 (RUNNING 00:01:13.560)**

```
         17      Q.  Is it The Journal's policy to require
         18  authors to correct the statements in drafts of the
         19  articles on the basis of information that becomes
         20  known after an initial draft has been submitted?
         21      A.  Our expectation is that if there is an
         22  important relevant update to a piece of data during
         23  the review process, that we would be informed about
         24  that update, yes.
00090:01      Q.  Is it correct that the authors did not
         02  inform The New England Journal as to the change
         03  from 9 versus 4 to 12 versus 4 in the nonaspirin-
         04  indicated patients for Vioxx versus naproxen at any
         05  time prior to the publication of the article?
         06      A.  Well, not only did they not inform us that
         07  the 9 was actually a 12, but you'll recall,
         08  Attorney Arbitblit, that none of those data were in
         09  the manuscript at all, none of the raw numbers of
         10  heart attacks appeared in any version of the
         11  manuscript, and therefore, are not in the published
```

## Mason v. Merck

```
        12  article either.
        13          So 9 versus 4 was not in there; 8
        14  versus 0 was not there; 17 versus 4 was not in
        15  there; and certainly 20 versus 4 was not in there.
```

### 29. PAGE 91:01 TO 91:02 (RUNNING 00:00:06.507)

```
  00091:01      A.  Yes.  The risk would have appeared lower
       02  than the real data would support.
```

### 30. PAGE 190:15 TO 191:04 (RUNNING 00:00:57.463)

```
        15      Q.  Generally speaking, what's the purpose of
        16  the peer-review process at The New England Journal?
        17      A.  There are two general purposes:  The first
        18  is for us to have a process for selecting that
        19  research among a huge body of medical research that
        20  we and our reviewers believe will have the highest
        21  impact on the practice of medicine and healthcare;
        22  and secondly, to try to present that information in
        23  the clearest manner, the most accurate manner, to
        24  our readers.
  00191:01          So there is a selection part of the
       02  process, and there is an editing part of the
       03  process; and in the broadest frame, those are the
       04  two parts of our procedures.
```

### 31. PAGE 191:13 TO 191:21 (RUNNING 00:00:20.900)

```
        13          And there are quite a few steps to the
        14  peer-review process at The New England Journal; is
        15  that fair?
        16      A.  Yes.
        17      Q.  One of the things that that means is that
        18  there are a lot of different people, both at The
        19  Journal and outside The Journal, who see drafts of
        20  manuscripts before they are ever published in The
        21  New England Journal?
```

### 32. PAGE 191:23 TO 192:10 (RUNNING 00:00:33.711)

```
        23      A.  That's correct.
        24      Q.  And I believe -- and you can feel free to
  00192:01  refer to this if it is helpful -- is the first step
       02  in that process that the editor-in-chief, or the
       03  executive editor if the editor-in-chief is not
       04  available, reviews each manuscript as it comes in
       05  briefly?
       06      A.  Yes.
       07      Q.  And do you know whether that occurred with
       08  the VIGOR manuscript?
       09      A.  I have to assume.  I wasn't in the room.
       10  So I can't -- but it must have, yes.
```

### 33. PAGE 192:18 TO 193:02 (RUNNING 00:00:28.365)

```
        18      Q.  And what is the purpose of that initial
        19  review conducted by the editor-in-chief?
        20      A.  The editor-in-chief is trying to, first of
        21  all, make a determination if it is an article that
        22  we want to review at all.
        23          Then, if it is, which editor is the
        24  most appropriate editor to be the point person on
  00193:01  that manuscript, and then to assign that manuscript
       02  to that editor.
```

### 34. PAGE 193:14 TO 195:09 (RUNNING 00:01:56.000)

```
        14      Q.  And how is the -- I think you mentioned
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 1:07:17 AM

## Mason v. Merck

15    that the editor-in-chief will try to select an
16    appropriate editor.
17              How is that selection made?
18       A.   Primarily based on the topic of the article
19    in question.
20       Q.   And do you know who the associate editor
21    was who was selected with respect to the VIGOR
22    manuscript?
23       A.   Yes, I do.
24       Q.   Who was that?
00194:01       A.   Dr. Marshall Kaplan.
02       Q.   And do you know, Dr. Kaplan is a medical
03    doctor?
04       A.   He is a medical doctor, and his training is
05    in gastroenterology; and since the primary focus of
06    the VIGOR trial was a gastrointestinal endpoint,
07    the manuscript was assigned to Dr. Kaplan to
08    handle.
09       Q.   Okay.  And what -- I believe your article
10    states that the associate editor, at least
11    initially, is assessing the value and the validity
12    of the manuscript; is that right?
13       A.   Yes.  The associate editor would then take
14    another read.  It might be a fairly quick read.
15    Again, to determine in his or her mind if it was
16    something that would be appropriate for The New
17    England Journal; and if so, go on to identify the
18    outside reviewers for the manuscript.
19       Q.   Okay.  And if it -- if at that step the
20    associate editor determines that the piece is not
21    valid or the piece is not fairly written, does --
22    can the associate editor at that point reject --
23    piece?
24       A.   Yes.
00195:01       Q.   And I think your article, I think your
02    article mentions that, should the associate editor
03    determine that the piece is not appropriate, it
04    could go to a deputy editor for a second opinion;
05    is that correct?
06       A.   Yes.  Our general procedure is that we
07    don't reject manuscripts with only one pair of eyes
08    having seen it.  We like two pairs of eyes to have
09    seen it.

**35.  PAGE 195:12 TO 196:10  (RUNNING 00:00:58.691)**

12              Did Dr. Kaplan on his initial
13    assessment of the value and validity of the piece
14    determine that it should be further reviewed, or
15    did Kaplan reject the piece and therefore require a
16    second opinion from a deputy editor?
17       A.   No.  He determined that it was worthy of
18    review, and then went ahead and assigned the
19    reviewers.
20       Q.   And so that is -- that is the next step, as
21    your article mentioned -- mentioned, and as you
22    just testified, that Dr. Kaplan would assign the
23    manuscript to outside reviewers; is that correct?
24       A.   That's correct.
00196:01       Q.   And there can be -- there can be two
02    reviewers with certain manuscripts?
03       A.   Oh, sure.
04       Q.   And I believe -- I believe VIGOR actually
05    received a review from three viewers; is that
06    correct?
07       A.   Yes.  Two of the reviewers were outside
08    reviewers, and one of the reviewers was a

## Mason v. Merck

```
        09  statistical consultant who is a part-time member of
        10  our staff.
```

**36.  PAGE 196:17 TO 197:17  (RUNNING 00:01:23.574)**

```
        17        Q.  And what is the -- what's the purpose of
        18  the review conducted by the external reviewers as
        19  well as the statistical consultant?
        20        A.  The external reviewers are asked to
        21  carefully read and evaluate the manuscript and give
        22  us their opinion on its suitability for publication
        23  in terms of the novelty of the research, the
        24  accuracy and the validity of the research, the
00197:01  composition of the manuscript -- how it is written,
        02  how the data are displayed -- and the overall
        03  interest to the readership of The New England
        04  Journal of Medicine.  So there are four categories
        05  of evaluation that they are asked to make.
        06        Reviewers serve as advisors to the
        07  editors.  We ask them for a judgment on the
        08  suitability for the publication of the manuscript
        09  in The New England Journal, but the final decision
        10  is really made by the editors, collectively.
        11        We meet together, discuss the
        12  manuscript in quite a lot of detail.  All of the
        13  editors are there.  The statistical consultants are
        14  there, and we have an opportunity then to take the
        15  reviewers' comments and put them into a larger
        16  context, a larger discussion, with input from all
        17  the editors.
```

**37.  PAGE 198:24 TO 200:06  (RUNNING 00:01:21.730)**

```
        24        Can the reviewers, if they feel
00199:01  additional data would appropriate, request that the
        02  authors provide additional data that was not
        03  provided in the manuscript?
        04        A.  Yes.
        05        Q.  And if the reviewers believe that data --
        06  data are presented inappropriately or in a
        07  misleading way in the manuscript, is that something
        08  the reviewers are permitted to comment on?
        09        A.  Yes.
        10        Q.  And similarly, separate from the data, but
        11  with the conclusions and the interpretations that
        12  are drawn from that data, if the reviewers believe
        13  those invalid or inappropriate, the reviewers have
        14  the right to comment on that as well?
        15        A.  That's right.
        16        Q.  Now, I believe you mentioned that the next
        17  step, once the reviewers return their reviews to
        18  The New England Journal, is that the associated
        19  editor, who has control of the manuscript or has
        20  been assigned to the manuscript, has the
        21  opportunity to discuss the reviews and the
        22  manuscript with the entire editorial board; is that
        23  correct?
        24        A.  Yes.
00200:01        Q.  And mentioned in the case of the VIGOR
        02  manuscript, I believe you said that that was the
        03  stage at which you first became involved, was
        04  during these discussions with the entire editorial
        05  board; is that right?
        06        A.  Yes.  That's correct.
```

**38.  PAGE 204:07 TO 204:11  (RUNNING 00:00:14.899)**

```
        07        Q.  So you had -- is it fair to say that you,
```

## Mason v. Merck

```
08   therefore, received the input of medical doctors
09   and at least one statistical consultant that had
10   expertise in a variety of different fields?
11       A.  Correct.
```

**39.  PAGE 204:12 TO 206:06  (RUNNING 00:01:59.000)**

```
12       Q.  I think you mentioned before, Doctor, that
13   you're board-certified in internal medicine and
14   cardiology; is that correct?
15       A.  That's right.
16       Q.  Are there other cardiologists, to your
17   knowledge, that participated in the review of the
18   VIGOR manuscript, with the exception, of course, of
19   the anonymous reviewers?
20       A.  Yes.  Dr. Lagakos is a board-certified
21   cardiologist, and he would have had an opportunity
22   to weigh in as well.
23       Q.  And ultimately -- ultimately, after this
24   group deliberates, the editors have to determine
00205:01   ultimately that a piece is appropriate for
02   publication before it is published in The New
03   England Journal; is that correct?
04       A.  That's correct.
05       Q.  But usually there is an intervening step,
06   which there was here, which is that the paper is
07   sent back to the authors for some revision based on
08   the comments of reviewers and perhaps the editors
09   as well; is that right?
10       A.  That's right.
11       Q.  And I think I said this, but that actually
12   did happen with the VIGOR paper?
13       A.  Correct.
14       Q.  And, in fact, there can be multiple
15   requests for revisions where the paper is sent to
16   the authors for revision, and the authors make
17   certain revisions, and the editors determine that
18   more revisions are appropriate; is that correct?
19       A.  That's correct.
20       Q.  And, again, that did -- that did in fact
21   happen with the VIGOR manuscript?
22       A.  Yes.
23       Q.  And so what -- what that means is that on
24   more than one occasion editors at The Journal sent
00206:01   the paper back to the authors of the manuscript and
02   told them that changes would be required before it
03   could be published in The New England Journal, and
04   the authors then made changes and sent it back to
05   the editors for review; is that right?
06       A.  That's right.
```

**40.  PAGE 206:07 TO 206:10  (RUNNING 00:00:10.371)**

```
07       Q.  Is it fair to say that The New England
08   Journal has one of the most rigorous peer-review
09   processes of any peer-review journal?
10       A.  It's rigorous.
```

**41.  PAGE 219:07 TO 220:16  (RUNNING 00:01:25.867)**

```
07       Q.  Doctor, I would ask you to take a look at
08   the Bombardier article as it was published, which
```

📄 CURFMAN11B - curfman11b



```
09   was marked as Exhibit 11 earlier today, and for now
10   I am just going to be looking at the first page of
11   the article.
```

## Mason  v.  Merck

```
12              First of all, looking at the top of the
13  page, it appears that there are 12 authors listed
14  as authors of this article right under the title;
15  is that correct?
16      A.  Correct.
17      Q.  And, in fact, is -- The New England Journal
18  has a limit of 12 authors that can be listed in
19  that position on the page right below the title; is
20  that correct as well?
21      A.  At that time there was a limit.  There is
22  no longer a limit.
23      Q.  And if you look down at the bottom of this
```

### CURFMAN11C - curfman11c



```
    24  page in the footnote, in the very last two lines,
00220:01  there is note that Arthur Weaver, M.D. from the
02  Arthritis Center of Lincoln, Nebraska was another
03  author.
04              Do you see that?
05      A.  Yes, I do.
06      Q.  He is listed down there rather than above
07  because of the rule at the time that you mentioned
08  that there could only be 12 listed at the top of
09  page; is that correct?
10      A.  That's correct.
11      Q.  And the footnote at the -- or not the
12  footnote, but the smaller text at the bottom of the
```

### CURFMAN11D -



```
13  page describes where the authors -- the various
14  authors are from.
15              Do you see that?
16      A.  Yes, I do.
```

### 42.  PAGE 221:03 TO 223:10  (RUNNING 00:02:16.360)

```
03      Q.  And if you look at the bottom of the page,
04  these doctors come from a variety of institutions.
05              For example, the lead author, Claire
06  Bombardier, is listed as coming from the Institute
07  For Work and Health as well as Mount Sinai Hospital
08  and the University Health Network of Toronto.
09              Do you see that?
10      A.  Yes, I do.
11      Q.  The second author, Loren Laine, is from the
12  gastrointestinal Division, Department of Medicine
13  at the University of Southern California School of
14  Medicine in Los Angeles.
15              Do you see that as well?
16      A.  Yes.
17      Q.  And then there is the notation that two of
18  the authors, Dr. Alise Reicin and Dr. Deborah
19  Shapiro, are from Merck.
20              Do you see that?
21      A.  Yes.
22      Q.  Those are the only two of the 12 authors --
23  13 if you count Dr. Weaver -- that are actually
24  from Merck.  All of the other -- all of the other
00222:01  authors are from outside institutions; is that
02  correct?
03      A.  That's correct.
04      Q.  And I won't go through all of them, in the
05  interest of time, but they are from a variety of
06  respected institutions, both within the United
07  States and around the world, including, just for
```

### Mason v. Merck

```
08   example, the University of Texas, Houston School of
09   Public Health; the Division of Rheumatology and
10   Clinical Immunology at the University of Maryland
11   in Baltimore; the Office of Clinical Research and
12   Training at Northwestern University School of
13   Medicine in Chicago, just as examples.
14        Do you see those?
15   A.  Yes.  Those are U.S. examples.
16   Q.  I named the U.S. examples, yes; and there
17   are also examples from Australia, Brazil, Mexico
18   and other countries around the world; is that
19   right?
20   A.  That's right.
```

-KECURFMAN11D - Clear Attached Exhibit CURFMAN11D



```
21        Q.  Now, in order to be an author on the New
22   England -- on a paper within The New England
23   Journal of Medicine, there are certain requirements
24   that The New England Journal has; is that correct?
00223:01  A.  That's correct.
02   Q.  One of those requirements is that each of
03   the authors must sign a statement that attests that
04   they have met certain requirements that The New
05   England Journal imposes in order to be an author on
06   the paper; is that right?
07   A.  Correct.
08        MR. FITZPATRICK:  I am going to mark
09   another document.
10        EXHIBIT NO. 45 MARKED
```

**43.  PAGE 223:11 TO 224:24  (RUNNING 00:01:34.899)**

```
11        Q.  And, Doctor, do you recognize this as the
12   signed statements by the authors on the VIGOR
```

CURFMAN45 - curfman45

```
13   publication?
14   A.  Yes, I do.
15   Q.  And these came from your files.
16        They are all submitted as part of The
17   New England Journal's requirement that these
18   attestations be submitted before someone can appear
19   as an author on the article; is that correct?
20   A.  That's correct.
21   Q.  And just taking a look at the language of
22   the attestation, each of these doctors attest that
23   they have done several things in order to fulfill
24   the authorship criteria of what are known as the
00224:01  uniform requirements; is that correct?
02   A.  That's correct.
03   Q.  And those include stating that they have
04   made substantial contributions to (A) the
05   conception and design and/or analysis and
06   interpretation of the data.
07        That's one of the -- that's one the
08   substantial contributions, correct?
09   A.  Correct.
10   Q.  And, two, they have made substantial
11   contributions to drafting the article or revising
12   it critically for important intellectual content;
13   is that correct?
14   A.  That's correct.
15   Q.  And the third requirement that they have to
16   attest to is that they have made substantial
17   contributions to the final approval of the version
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 1:07:17 AM

## Mason v. Merck

```
18   of the article to be published; is that correct?
19      A.  Correct.
20      Q.  And each of the -- each of the authors that
21   appeared as an author in The New England Journal
22   for the VIGOR manuscript signed these statements
23   attesting to each of those facts; is that correct?
24      A.  That's correct.
```

**44. PAGE 225:11 TO 225:22  (RUNNING 00:00:27.021)**

```
11      Q.  Do you have Exhibit 46, Doctor?
12      A.  Yes, I do.
```

📄 **CURFMAN46 - curfman46**                                    

```
13      Q.  And you recognize this as the letter that
14   you spoke about this morning, which was the May 18,
15   2000 letter which submitted the original VIGOR
16   manuscript to The New England Journal; is that
17   correct?
18      A.  That's correct.
19      Q.  And I think you mentioned the letter is
20   from Dr. Bombardier, who is a medical doctor and is
21   also at the University of Toronto?
22      A.  That's correct.
```

**45. PAGE 226:23 TO 229:05  (RUNNING 00:02:30.082)**

```
23          If you turn to the -- just moving down
24   to the next sentence, it reads, "Given that NSAIDs
00227:01   are among the most commonly used medications in the
02   world and the significant benefit for patients from
03   the reduction in gastrointestinal morbidity, we ask
04   that you please consider this manuscript for an
05   expedited review."
06          Do you see that sentence?
07      A.  I do.
08      Q.  You would agree in that sentence
09   Dr. Bombardier is asking that The Journal give this
10   manuscript an expedited review?
11      A.  That's correct.
12      Q.  Does The Journal have a specific procedure
13   whereby it can give a manuscript an expedited
14   review?
```

📄 **-KECURFMAN46 - Clear Attached Exhibit CURFMAN46**          

```
15      A.  Yes, we do.
16      Q.  And what is that procedure?
17      A.  Requests for expedited review are
18   considered by the editors based on the substance of
19   the research; and in particular, as I have alluded
20   to earlier, it's our estimation of the overall
21   impact on the health of the public and whether
22   people in our society and around the world will be
23   immediately impacted, immediately impacted in an
24   important way in terms of their health.
00228:01          In addition, the other qualifying
02   factor is:  Can this research be reviewed
03   adequately in an expedited fashion, or are there
04   other complexities that will need to be dealt with
05   in the review process that will take more time?
06          So those are the two considerations
07   that go into a determination of whether we will do
08   an expedited review.
09      Q.  And is the effect of an expedited review,
10   if it is granted and the piece is in fact
```

## Mason v. Merck

```
      11   published, that the manuscript would be published
      12   faster than it would in the normal -- in the
      13   ordinary course of peer review?
      14       A.  Yes.
      15       Q.  And so what Dr. Bombardier was requesting
      16   was an expert review that, if granted, would have
      17   resulted in a faster publication of the VIGOR
      18   results than had expedited review not been granted?
      19       A.  Correct.
      20       Q.  Was expedited review in fact granted for
      21   the VIGOR manuscript?
      22       A.  No, it was not.  And I guess I should
      23   qualify my answers to your questions about
      24   expedited review.
00229:01            What we -- what we commit ourselves to,
      02   if we agree to expedited review, is an expedited
      03   review.  We do not commit to publication,
      04   necessarily.  We commit to a review process that
      05   will take less time.
```

**46.  PAGE 236:22 TO 237:22  (RUNNING 00:01:22.000)**

```
      22       Q.  And, Doctor, do you have Exhibit 47 in
      23   front of you?
      24       A.  I do, uh-huh.
```

CURFMAN47 - curfman47

```
00237:01       Q.  Could you identify that, please.
      02       A.  This is a letter written by the deputy
      03   editor primarily responsible for the VIGOR
      04   manuscript, Dr. Robert Steinbrook, to Dr. Claire
      05   Bombardier, asking for some additional information,
      06   pretty early on in the process, about the efficacy
      07   of the two drugs in the treatment of rheumatoid
      08   arthritis, and those data, in his mind, had not
      09   been really very clearly displayed in the first
      10   version of the manuscript, and he wanted to know
      11   about that.
      12       Q.  Okay.  So Dr. Steinbrook basically wanted
      13   to know some additional data about the efficacy of
      14   rofecoxib or Vioxx in the treatment of rheumatoid
      15   arthritis, and he requested that Dr. Bombardier
      16   provide that data to him; is that fair?
```

CURFMAN47A - curfman47a

```
      17       A.  Right.  And then an additional question had
      18   to do with prior history of gastrointestinal events
      19   and proton-pump-inhibitor therapy or misoprostol
      20   therapy, yes.
      21            So these are issues he wanted more
      22   information about as the editor.
```

**47.  PAGE 240:05 TO 241:05  (RUNNING 00:01:12.577)**

```
      05       Q.  Doctor, do you have Exhibit 48 in front of
```

CURFMAN48 -

```
      06   you?
      07       A.  Yes, I do.
\cf0      08       Q.  And does this appear to be Dr. Bombardier
      09   response to Dr. Steinbrook's letter that we just
      10   looked at?
      11       A.  Yes, it does.
      12       Q.  And just looking, just looking generally at
```

## Mason v. Merck

```
         13  this response, does it appear to provide a fair bit
\cf0     14  of detail on the efficacy data requested by
```

📄 **CURFMAN48A - curfman48a**

```
         15  Dr. Steinbrook in his letter?
         16       A.  Yes.
         17       Q.  For example, Dr. Bombardier provides,
         18  although they are not very clear in this copy, what
         19  appear to be several -- several figures depicting
         20  various measurements of efficacy in the treatment
         21  of rheumatoid arthritis; is that correct?
         22       A.  That's correct.
         23       Q.  And so it is fair to say that when
         24  Dr. Steinbrook did request this specific piece of
00241:01  data, specifically the efficacy data in the
      02  treatment of rheumatoid arthritis, Dr. Bombardier
      03  was responsive and cooperative in providing that
      04  data; is that fair?
      05       A.  Yes.
```

**48. PAGE 241:06 TO 241:07 (RUNNING 00:00:03.983)**

```
      06       Q.  Doctor, if you could take a look at what
      07  was marked this morning as Exhibit 19.
```

**49. PAGE 241:08 TO 241:24 (RUNNING 00:00:46.507)**

```
      08           Do you have Exhibit 19, Doctor?
      09       A.  Yes, I do.
      10       Q.  And I believe you already described this
```

📄 **CURFMAN19 -**

```
      11  document this morning.
      12           Is it correct that this is a June 30
      13  letter from Dr. Kaplan at The New England Journal
      14  to Dr. Bombardier?
      15       A.  Yes.
      16       Q.  And this letter discusses the -- among
      17  other things, it discusses some of the comments of
      18  the reviewers to the VIGOR manuscript?
      19       A.  Correct.
      20       Q.  And I apologize, I think you told us
      21  before, but who is Dr. Kaplan?
      22       A.  He is the associate editor who was
      23  responsible for handling this manuscript, and he is
      24  a gastroenterologist by background.
```

**50. PAGE 242:11 TO 243:04 (RUNNING 00:00:48.441)**

```
      11       Q.  And as Dr. Kaplan writes, "While the
      12  editors are interested in your manuscript" -- and
```

📄 **CURFMAN19A - curfman19a**

```
      13  then he gives the title of the manuscript -- "we
      14  could not accept it for publication without
      15  substantial revision"; is that correct?
      16       A.  That's correct.
      17       Q.  And so Dr. Kaplan is basically saying that
      18  unless the comments of the reviewers and the
      19  editors are addressed to the editors' satisfaction,
      20  the manuscript will not be published in The New
      21  England Journal of Medicine; is that correct?
      22       A.  Correct.
      23       Q.  Okay.  And the letter also goes through a
      24  variety of requirements for a manuscript in order
```

## Mason v. Merck

```
00243:01  to be published in The Journal, generally speaking,
      02  and in addition to the comments of the specific
      03  reviewers; is that correct?
      04      A.  Yes.
```

**51. PAGE 244:03 TO 244:16 (RUNNING 00:00:36.827)**

```
      03      Q.  And specifically, in this letter Dr. Kaplan
      04  gave some specific instructions regarding figures
```

**CURFMAN19B - curfman19b** 

```
      05  in the next paragraph, figures and tables.
      06          He stated that Table 1 should be an
      07  appendix.  All of the figures should be deleted and
      08  summarized in the text as needed, and then
      09  Tables 2, 3, 4 and 5 should be maintained and an
      10  additional table about efficacy should be added; is
      11  that correct?
      12      A.  Right.
      13      Q.  And that would -- that would meet the
      14  target of five figures and tables that The Journal
      15  had set?
      16      A.  That's correct.
```

**52. PAGE 245:04 TO 245:12 (RUNNING 00:00:18.500)**

```
      04      Q.  The last sentence of that paragraph reads,
```

**CURFMAN19C -** 

```
      05  "All numerical data should be rounded to a
      06  reasonable number of significant figures in
      07  accordance with the precision of the data."
      08          Do you see that sentence?
      09      A.  Yes, I do.
      10      Q.  Is that standard practice in The New
      11  England Journal?
```

**-KECURFMAN19C - Clear Attached Exhibit CURFMAN19C** 

```
      12      A.  Yes, it is.
```

**53. PAGE 250:19 TO 251:01 (RUNNING 00:00:16.729)**

```
      19      Q.  Okay.  Okay.  I don't need to show you the
      20  letter, Doctor, but this morning we did look at the
      21  letter from Dr. Drazen to Dr. Bombardier in which
      22  Dr. Drazen, as the editor-in-chief of The New
      23  England Journal, accepted the VIGOR manuscript for
      24  publication; is that correct?
00251:01      A.  Yes, uh-huh.
```

**54. PAGE 255:09 TO 256:03 (RUNNING 00:00:59.865)**

```
      09      Q.  Okay.  Let's take a look again at the
      10  published article, which is Exhibit 11.  If you
      11  could get that, please, Doctor, and, Doctor, I
      12  would likes to take a look at some of the data that
      13  are presented in this article, and first I would
      14  ask you to just take a look at the abstract on the
      15  first page of the article.
      16          Is it fair to say that, generally
      17  speaking, the abstract is meant to be a summary of
      18  the important information in the article?
      19      A.  Yes.
      20          Summary.
      21      Q.  Summary, yes.
      22      A.  Yes.
```

### Mason v. Merck

```
        23      Q.  So if we go to the results part of just the
        24  abstract, there is a brief summary of some of the
00256:01  information that appears later on in more detail in
        02  the article; is that correct?
        03      A.  That's right.
```

**55. PAGE 259:04 TO 259:19  (RUNNING 00:00:49.000)**

```
        04      Q.  Then if you go a little further down in the
```

📄 CURFMAN11E -



```
        05  "Results" section of the abstract on the first
        06  page, it reads, "The incidence of myocardial
        07  infarction was lower among patients in the naproxen
        08  group than among those in the rofecoxib group, 0.1
        09  percent versus 0.4 percent; relative risk, 0.2.  95
        10  percent confidence interval, 0.1 to 0.7."
        11          Do you see that?
        12      A.  I do.
        13      Q.  So based on that, if a person read -- if a
        14  reader of this article read the first -- just the
        15  first page of this article, they would see that
        16  there was a -- there was a difference in lower
        17  incidences of heart attacks in the patient taking
        18  naproxen than in the patient taking Vioxx; is that
        19  correct?
```

**56. PAGE 259:21 TO 261:09  (RUNNING 00:02:01.000)**

```
        21      A.  Well, that's what it says, yes.
        22      Q.  And I would like to ask you specifically a
        23  few questions about the way the data are presented
        24  there, and specifically the relative risk
00260:01  presentation there of 0.2.
        02          Could you describe what a relative risk
        03  of 0.2 means?
        04      A.  The relative risk is a measure of the risk
        05  of one therapy versus another with respect to this
        06  particular endpoint.
        07          The confidence intervals reflect the
        08  variation on that point estimate of .2.  So the
        09  point estimate of .2 means that the risk of having
        10  a myocardial infarction with naproxen was only 20
        11  percent that of taking naproxen --
        12      Q.  Than taking Vioxx; is that right?  I'm
        13  sorry, Doctor, I think you may have misspoken.
        14      A.  Oh, did I?
        15      Q.  The relative risk of naproxen was 20
        16  percent --
        17      A.  Of rofecoxib.
        18      Q.  Of rofecoxib?
        19      A.  Yeah.
        20      Q.  I'm sorry.  Go ahead.
        21      A.  That's okay.  Go ahead.
        22      Q.  So that's another way of saying, if someone
        23  read this, that's another way of saying that the
        24  rate of heart attacks on naproxen was one-fifth the
00261:01  rate of heart attacks on Vioxx, roughly; is that
```

📄 -KECURFMAN11E - Clear Attached Exhibit CURFMAN11E



```
        02  correct?
        03      A.  Yes.
        04      Q.  And, conversely, and I think we discussed
        05  this morning, that's another way of saying
        06  that the relative risk -- that the risk of
```

## Mason v. Merck

```
07   myocardial infarctions on Vioxx was five times that
08   of the relative risk -- sorry, the risk of heart
09   attacks on naproxen; is that correct?
```

**57. PAGE 260:22 TO 261:03 (RUNNING 00:00:16.296)**

```
22       Q.  So that's another way of saying, if someone
23   read this, that's another way of saying that the
24   rate of heart attacks on naproxen was one-fifth the
00261:01   rate of heart attacks on Vioxx, roughly; is that
```

-KECURFMAN11E - Clear Attached Exhibit CURFMAN11E        

```
02   correct?
03       A.  Yes.
```

**58. PAGE 261:11 TO 262:04 (RUNNING 00:00:50.946)**

```
11       A.  Yeah, it doesn't say that here.  The
12   authors chose and the editors allowed to go through
13   the statement that naproxen was protective.
14           So that is the way it is stated here in
15   this summary, but it doesn't acknowledge the other
16   hypothesis here in the abstract.
17       Q.  Well --
18       A.  The other hypothesis being just what you
19   said:  That the risk of heart attack is five times
20   greater with naproxen -- with rofecoxib than with
21   naproxen.
22       Q.  Well, it's fair to say, isn't it, Doctor,
23   that neither hypothesis is really discussed in this
24   abstract?
00262:01           What is discussed in the abstract is
02   that the incidence on naproxen was lower than that
03   on the Vioxx and that the magnitude of that
04   difference was about fivefold; is that fair?
```

**59. PAGE 262:06 TO 262:09 (RUNNING 00:00:13.000)**

```
06       A.  Yes.  But again, that's only one
07   possibility.  The implication here is that naproxen
08   is protective.  Now, of course, we know -- we know
09   now that that is not true at all.
```

**60. PAGE 262:13 TO 263:10 (RUNNING 00:00:58.150)**

```
13       Q.  Yes.  But specifically, at least anyone
14   reading this first page of this article would know
15   that there was a fivefold difference between the
16   incidence of heart attacks on Vioxx and naproxen.
17   Whether that was a result of a protective effect of
18   naproxen or some effect of Vioxx, they would know
19   from reading this first page that there was a
20   fivefold difference in heart attacks?
21       A.  No.  I disagree with that.
22           They are being told that there are
23   fewer events with naproxen.  The clear implication
24   there is that naproxen is protective and not that
00263:01   rofecoxib is deleterious.
02       Q.  Right.  I understand -- and I understand
03   that that is your view, Doctor, but my question is
04   just, specifically, they wouldn't -- a person
05   reading the first page of this article would know
06   that there was a fivefold difference between the
07   two -- that there were different rates of heart
08   attacks on naproxen and rofecoxib?  They wouldn't
09   have had to read past the abstract to understand
10   that particular fact?
```

## Mason v. Merck

**61. PAGE 263:12 TO 263:17  (RUNNING 00:00:13.546)**

```
12      A.  Yes.  They would know that particular fact,
13  but they would also take away the secondary fact
14  that the clear implication is that naproxen is
15  protective.
16      Q.  Okay.
17      A.  And we know now that that is not true.
```

**62. PAGE 267:15 TO 267:20  (RUNNING 00:00:19.000)**

```
15          Doctor if you could also take a look at
16  Exhibit 16, which -- I'm sorry -- 17, which is one
17  of the exhibits we looked at this morning, and I
18  would refer you specifically to Page 25 of that
19  exhibit, which is one -- which is the table that
20  you talked about this morning.
```

**63. PAGE 267:21 TO 269:16  (RUNNING 00:01:44.841)**

```
21          Are you there, Doctor?
22      A.  Yes, I am.
23      Q.  Okay.  Thanks.
24          Just taking a look at this table, this
```

📄 **CURFMAN17 -**

```
00268:01  was the table that you talked about this morning,
      02  and this table did not ultimately appear in the
      03  final published VIGOR article as a table, correct?
      04      A.  That's correct.
\cf0  05      Q.  I just want to go over some of the -- I
      06  just want to go over the percentages that appear in
      07  that table and confirm that those percentages do in
      08  fact appear in the text of the final VIGOR article
      09  with you.
      10          Specifically, if you look at the first
      11  row on Table 5 on Page 25, you have all deaths and
      12  the percentages there are 0.5 percent and 0.4
      13  percent.
      14          Do you see those?
      15      A.  Yes, I do.
\cf0  16      Q.  And if you look at the second sentence
```

📄 **CURFMAN11J - curfman11j**

```
      17  under "General Safety" it states that, "The
      18  mortality rate was 0.5 percent in the rofecoxib
      19  group and 0.4 percent in the naproxen group."
      20          Do you see that?
      21      A.  Yes.
      22      Q.  So those percentage were disclosed in the
      23  text of the article; is that correct?
      24      A.  That's correct.
\cf0  00269:01      Q.  And then if you go to the -- back to Page
```

📄 **CURFMAN17B - curfman17b**

```
      02  25 of Exhibit 17, if you look at cardiovascular
      03  deaths, the percentages are 0.2 percent and 0.2
      04  percent.
      05          Do you see that?
      06      A.  Yes, I do.
      07      Q.  And in the next sentence, moving to the
\cf0  08  next sentence of the published VIGOR article, it
```

### Mason v. Merck

**CURFMAN11L - curfman11L**

```
09    states, "The rate of death from cardiovascular
10    causes was 0.2 percent in both groups"; is that
11    correct?
12        A.   Correct.
13        Q.   So, again, the percentage of cardiovascular
14    deaths from Table 5 do appear in the text of the
15    final published VIGOR article; is that correct?
16        A.   The percentages do, yes.
```

**64. PAGE 269:19 TO 270:06  (RUNNING 00:00:37.100)**

```
19        Q.   Then if you go to -- I am going to skip the
20    third row, which is composite endpoint, and go to
```

**CURFMAN17C - curfman17c**

```
21    the next row, which is myocardial infarction, and
22    that has -- the percentages from the table are 0.4
23    percent and 0.1 percent; is that correct?
24        A.   Right.
00270:01      Q.   The corresponding sentence in the published
```

**CURFMAN11K - curfman11k**

```
02    paper states that, "Myocardial infarctions were
03    less common in the naproxen group than in the
04    rofecoxib group, 0.1 percent versus 0.4 percent,"
05    and then gives the 95 percent confidence interval
06    and relative risk; is that correct?
```

**65. PAGE 270:08 TO 270:14  (RUNNING 00:00:16.760)**

```
08        A.   Yes, uh-huh.
09        Q.   So, again, the percentages of the
10    myocardial infarction that occurred in both the
11    Vioxx arm and the naproxen arm of the study from
12    this Table 5 here do appear in the text of the
13    final published VIGOR article; is that correct?
14        A.   The percentages do, yes.
```

**66. PAGE 270:20 TO 271:17  (RUNNING 00:00:55.131)**

```
20                 And the final row of Table 5 is
```

**CURFMAN17E - curfman17e**

```
21    ischemic cerebrovascular accidents, which are
22    essentially a type of stroke; is that correct,
23    Doctor?
24        A.   Correct.
00271:01      Q.   And the percentages in that table are 0.2
02    percent on Vioxx and 0.2 percent in the naproxen.
03                 Do you see that?
04        A.   Yes, I do.
05        Q.   And I think I skipped this sentence before.
```

**CURFMAN11I - curfman11i**

```
06    It's above the prior one in the final published
07    article, but it states, "Ischemic cerebrovascular
08    events occurred in 0.2 percent of the patients in
09    each group"; is that correct?
10        A.   Yes.
11        Q.   So, again, the percentage of stroke in
12    both the Vioxx arm -- the percentage of patients
```

### Mason v. Merck

```
13   who suffered from a stroke in both the Vioxx arm
14   and the naproxen arm that were in this table also
15   appeared in the text of the final published
16   article; is that correct?
17        A.   The percentages did, yes.
```

**67. PAGE 279:15 TO 280:23 (RUNNING 00:01:25.771)**

```
15        Q.   And, Doctor, just continuing with our
16   discussion of some of the data that were presented
17   in the "General Safety" section of the VIGOR study,
```

CURFMAN11H - curfman11h

```
18   which is 1523 of Exhibit 11.
19             Are you there?
20        A.   Yes.
21        Q.   After the data we talked about, the article
22   describes that four percent of the study subjects
23   met the criteria of the FDA for the use of aspirin
24   for secondary cardiovascular prophylaxis -- and
00280:01   then it describes that indication -- but were not
02   taking low-dose aspirin therapy.
03             Do you see that?
04        A.   Yes.
05        Q.   And the article states that these patients
06   accounted for 38 percent of the patients in the
07   study who had myocardial infarctions, or heart
08   attacks; is that correct?
09        A.   Yes.
10        Q.   And then the article goes on to describe
```

CURFMAN11G -

```
11   the difference that was seen in the patients who
12   were not indicated for low-dose aspirin, and states
13   that, "In the other patients, the difference in the
14   rate of myocardial infarction between groups was
15   not significant, 0.2 percent in the rofecoxib group
16   and 0.1 percent in the naproxen group."
17             Do you see that?
18        A.   Yes.
```

-KECURFMAN11G - Clear Attached Exhibit CURFMAN11G

```
19        Q.   So you -- would you agree, at least, that
20   the fact that there was still a difference, albeit
21   not statistically significant, in the rate of heart
22   attacks among the nonaspirin-indicated patients is
23   disclosed in the article?
```

**68. PAGE 281:01 TO 281:08 (RUNNING 00:00:19.425)**

```
00281:01        A.   Well, your clients held back three of the
02   heart attacks.
03        Q.   Yes.
04             But my question, Doctor, was
05   specifically, is the fact that there is a
06   difference in the rate of heart attacks in the
07   patients who were not indicated for low-dose
08   aspirin disclosed in the article; is that correct?
```

**69. PAGE 281:10 TO 281:12 (RUNNING 00:00:07.772)**

```
10        A.   Your client withheld three of the heart
11   attacks, and therefore, these numbers are not
12   really the final accurate numbers.
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 1:07:17 AM

## Mason v. Merck

**70. PAGE 281:13 TO 281:16 (RUNNING 00:00:09.418)**

    13      Q.  When you say -- when you say Merck withheld
    14  heart attacks, you are -- you are not stating Merck
    15  withheld any of the heart attacks from the FDA, are
    16  you?

**71. PAGE 281:18 TO 283:01 (RUNNING 00:01:12.751)**

    18      A.  No.
    19      Q.  In fact, Merck disclosed those heart
    20  attacks to the FDA, as far as you can tell; is that
    21  correct?
    22      A.  That's the way I learned about them.
    23      Q.  Right.  And that's how you learned about
    24  them --
 00282:01  A.  After this was published.
    02      Q.  Right.  I understand.  But so Merck did --
    03      A.  I am the responsible editor and I find out
    04  after --
    05      Q.  Right.
    06      A.  -- it was published.
    07      Q.  But we do -- we are in agreement that Merck
    08  did disclose the three heart attacks that you are
    09  referring to to the FDA; is that correct?
    10      A.  To the FDA, but not to us.
    11      Q.  Right.
    12          And are you aware, Doctor, that this --
    13  that the analysis that was presented of the data
    14  that was given to The New England Journal of
    15  Medicine was an analysis of the events that had
    16  occurred as of a certain date?
    17      A.  I am very well aware of that, and I also
    18  think that, regardless of that arbitrary date, that
    19  we are talking about peoples lives, and one trumps
    20  the other.
    21      Q.  No.  I understand.
    22          Are you aware that the date cutoff that
    23  I mentioned was pre-specified in the protocol as
    24  the primary analysis of safety that would be done
 00283:01  in the study?

**72. PAGE 283:03 TO 283:05 (RUNNING 00:00:10.817)**

    03      A.  Yes.  And that I still contend is a minor
    04  technicality compared to the overriding importance
    05  of these sorts of data to the health of the public.

**73. PAGE 285:10 TO 285:14 (RUNNING 00:00:09.200)**

    10          But can you -- can you answer my
    11  question with respect to the data that existed
    12  prior to the pre-specified cutoff point, and were
    13  in fact the percentages presented accurately with
    14  respect to that?

**74. PAGE 285:17 TO 285:23 (RUNNING 00:00:18.057)**

    17      A.  They were, but I don't think that's the
    18  relevant question.
    19      Q.  Fair enough.
    20      A.  You are talking to a doctor and a
    21  cardiologist who cares and who has cared for many
    22  patients with heart attacks, and to withhold three
    23  of them like that is wrong.

**75. PAGE 287:11 TO 287:14 (RUNNING 00:00:10.000)**

    11      Q.  So, Doctor, my specific question now is the

Case Clip(s) Detailed Report
Friday, November 03, 2006, 1:07:17 AM

## Mason v. Merck

```
12  data you are referring to, the myocardial
13  infarction data from VIGOR, was disclosed to the
14  FDA; is that correct?
```

**76. PAGE 287:16 TO 287:16  (RUNNING 00:00:03.306)**

```
16     A.  Yes.  They are on the FDA Website, yes.
```

| TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 01:09:07.350) |

**Case Clip(s) Detailed Report**
**Friday, November 03, 2006, 8:26:05 AM**

## Mason v. Merck

 **Curfman, Gregory D. (Vol. 02) - 01/24/2006**          **1 CLIP  (RUNNING 02:05:16.630)**



**curfman trial**

**CURFMAN 2**          **260 SEGMENTS  (RUNNING 02:05:16.630)**

### 1. PAGE 18:21 TO 19:04 (RUNNING 00:00:22.000)

```
        21          Q.    Dr. Curfman, are you
        22   currently actively practicing medicine?
        23          A.    A very small fraction of my
        24   time is in medical practice in teaching,
00019:01   but my main responsibility is I'm the
        02   executive editor of the New England
        03   Journal of Medicine, which is a full-time
        04   job.
```

### 2. PAGE 20:08 TO 21:07 (RUNNING 00:01:10.802)

```
        08          Q.    I'd like to take a few
        09   minutes and just establish with you, sir,
        10   a basic chronology of some of the key
        11   events that we'll be talking about.
        12          You recall that the VIGOR
        13   manuscript was submitted to the New
        14   England Journal of Medicine in May of
        15   2000; is that right?
        16          A.    Well, it was submitted -- it
        17   was received into our system on May 23rd
        18   of 2000.  For the record, I think it's
        19   important that we note that the letter of
        20   transmission from the corresponding
        21   author was dated May 18th.
        22          Q.    Do you remember that the
        23   authors asked for expedited treatment of
        24   the VIGOR manuscript?
00021:01          A.    Yes, I do.
        02          Q.    Do you remember that the New
        03   England Journal of Medicine determined
        04   not to grant the expedited treatment?
        05          A.    Yes.  The editor who made
        06   that decision decided that it was not
        07   indicated in that case, yes.
```

### 3. PAGE 21:20 TO 21:24 (RUNNING 00:00:22.999)

```
        20          Q.    Again, because we'll be
        21   referring to it during the deposition, do
        22   you recognize Exhibit 1 as a copy of the
        23   VIGOR manuscript as it eventually was
        24   published in November of 2000?
```

### 4. PAGE 22:08 TO 22:16 (RUNNING 00:00:23.999)

```
        08          THE WITNESS:  Well, this is
        09   a very poor photocopy of the
        10   article, I will say that.  A lot
        11   of the typeface is very unclear,
        12   so, I hope we won't be using this
        13   document to refer to.  This does
        14   seem to be a photocopy of the
        15   article, but I can't read
        16   everything in it.
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

**5. PAGE 22:18 TO 22:21 (RUNNING 00:00:06.000)**

```
18          Q.    Well, if we have trouble,
19    I'm sure that we can come up with another
20    copy.
21          A.    Okay.
```

**6. PAGE 23:23 TO 24:23 (RUNNING 00:01:26.020)**

```
23          Q.    Continuing with the
24    chronology, do you recall that in
00024:01    February 2001 the FDA convened an
02    Advisory Committee?
03          A.    Yes.  I did not have that
04    information in February, but I did learn
05    about that at a later time, later in
06    2001, yes.
07          Q.    Do you remember when you
08    learned in 2001 that the FDA had convened
09    an Advisory Committee?
10          A.    To the best of my
11    recollection, it was in August or perhaps
12    September of 2001 that I first learned
13    about that.
14          Q.    And did you learn that the
15    FDA had information that they had posted
16    on their website concerning VIGOR?
17          A.    Yes.  I learned about that
18    from a colleague, again, it was perhaps
19    late August or September of 2001, and
20    there was -- I guess I should point out
21    that the authors of the VIGOR article
22    didn't inform us that additional data
23    were being posted.
```

**7. PAGE 26:23 TO 27:02 (RUNNING 00:00:13.264)**

```
23          Q.    Eventually, did you read a
24    memorandum that was part of the FDA's
00027:01    file on this that was posted on line
02    called the Targum memorandum?
```

**8. PAGE 27:03 TO 27:03 (RUNNING 00:00:00.834)**

```
03          A.    That's right.
```

**9. PAGE 27:14 TO 27:14 (RUNNING 00:00:03.239)**

```
14          Q.    Is Exhibit 2, does that
```

**10. PAGE 27:15 TO 27:15 (RUNNING 00:00:06.999)**

```
15    appear to you to be a copy of the Targum
```

**11. PAGE 27:16 TO 27:24 (RUNNING 00:00:24.398)**

```
16    memorandum?
17          A.    (Witness reviewing
18    document.)
19          Yes, it does.
20          Q.    When did you first read the
21    Targum memorandum?
22          A.    I first became aware of the
23    data on the FDA website in late August or
24    perhaps September of 2001.
```

**12. PAGE 28:23 TO 30:01 (RUNNING 00:01:15.700)**

```
23          Q.    Continuing in the
24    chronology, in 2004, did you learn that
```

**CONFIDENTIAL**                                                                                    **page 2**

## Mason v. Merck

```
00029:01    Merck had voluntarily withdrawn Vioxx
      02    from the marketplace?
      03         A.    That's correct.
      04         Q.    And when in 2004 did you
      05    learn that?
      06         A.    I believe that the date was
      07    September 30th, 2004, plus or minus a day
      08    or two.
      09         Q.    Did you learn around that
      10    time or soon after the withdrawal that
      11    the FDA was convening another Advisory
      12    Committee?
      13         A.    Right.
      14         Q.    And you understood that this
      15    Advisory Committee would be looking at
      16    all COX-2 inhibitors; is that right?
      17         A.    Right.
      18         Q.    As well as other NSAIDs.
      19    Did you understand that?
      20         A.    Yes.
      21         Q.    Did the New England Journal
      22    of Medicine ask the people who were
      23    writing up the APPROVe study to submit it
      24    to the New England Journal of Medicine
00030:01    for possible publication?
```

**13. PAGE 30:23 TO 31:23 (RUNNING 00:01:16.325)**

```
      23         A.    There were discussions
      24    between our editor-in-chief and one of
00031:01    the authors about that possibility, yes,
      02    but I honestly don't know who made the
      03    first phone call.  I was not involved in
      04    those conversations.
      05         Q.    Was it the case that even
      06    though Vioxx had been voluntarily
      07    withdrawn from the market, the New
      08    England Journal of Medicine was
      09    interested in publishing the APPROVe
      10    study so that it would be available to
      11    the public before the Advisory Committee
      12    met?
      13         A.    I don't recall that.  I
      14    think that we were interested in
      15    publishing the data, because it seemed to
      16    us to be an important data set, very
      17    informative data set, that would inform
      18    physicians and the rest of the medical
      19    community about this drug and this class
      20    of drugs, but I don't recall anything
      21    about trying to publish it before an
      22    Advisory Committee.  I don't recall that
      23    at all.
```

**14. PAGE 32:23 TO 33:03 (RUNNING 00:00:19.521)**

```
      23         Q.    Did there come a time when
      24    people in the medical community began
00033:01    criticizing the New England Journal of
      02    Medicine for the way that it handled the
      03    VIGOR publication?
```

**15. PAGE 33:10 TO 35:01 (RUNNING 00:02:42.980)**

```
      10    I can't recall exactly criticism.  I do
      11    recall discussions.  There wasn't a lot
      12    of discussion, but I'm not sure that I
      13    would have recognized it as criticism.
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

```
      14        Q.     By the middle of 2005, was
      15   the senior editorial group at the New
      16   England Journal of Medicine meeting on a
      17   regular basis with a public relations
      18   firm?
      19        A.     Excuse me?  Could you repeat
      20   that?
      21        Q.     Sure.
      22             By the middle of 2005, was
      23   the New England Journal of Medicine
      24   editorial folks, you and the other senior
00034:01   editors, were you meeting on a regular
      02   basis with a public relations firm?
      03        A.     I personally did attend some
      04   meetings with a public relations firm,
      05   yes.
      06        Q.     Was one of the subjects that
      07   you discussed in late 2005 continuing
      08   into early 2006, one of the subjects that
      09   you discussed with the public relations
      10   firm was how to deal with criticism of
      11   the New England Journal of Medicine for
      12   the way it handled the VIGOR publication?
      13        A.     Well, I don't recall that as
      14   being the focus of discussion myself.  I
      15   think the topic of COX-2 inhibitors, that
      16   topic probably did come up, but I don't
      17   recall that we were talking about -- I
      18   don't think so.
      19        Q.     So, you don't remember that
      20   in November and December, in fact, you
      21   were communicating almost on a daily
      22   basis with this PR firm on subjects
      23   including the criticisms of the New
      24   England Journal of Medicine concerning
00035:01   how they handled the VIGOR publication?
```

**16.  PAGE 35:11 TO 35:18 (RUNNING 00:00:25.817)**

```
      11        Q.     Do you -- are you saying
      12   that as you sit here today that you don't
      13   know that the New England Journal of
      14   Medicine in November and December was
      15   communicating with this PR firm on almost
      16   a daily basis about criticisms of the New
      17   England Journal of Medicine on how it
      18   handled the VIGOR publication?
```

**17.  PAGE 36:19 TO 36:23 (RUNNING 00:00:14.924)**

```
      19             THE WITNESS:  Well, all I
      20   can do is tell you that I was not
      21   talking with people at a PR firm
      22   about, what did you say, how to
      23   handle the VIGOR article or --
```

**18.  PAGE 37:22 TO 38:06 (RUNNING 00:00:27.018)**

```
      22        Q.     My question to you, sir, is,
      23   is it your testimony today that you don't
      24   know that back in November and December,
00038:01   the New England Journal of Medicine was
      02   communicating on a regular basis with a
      03   PR firm about how to handle criticism of
      04   the manner in which the New England
      05   Journal of Medicine handled the VIGOR
      06   publication?
```

**CONFIDENTIAL**                                                    **page 4**

## Mason v. Merck

**19. PAGE 38:12 TO 40:06  (RUNNING 00:02:43.752)**

```
        12          A.    Okay.  To the best of my
        13    recollection, to the best of my memory,
        14    there was a member of the, what you call
        15    the PR firm, Morrissey & Company, that
        16    would provide us with e-mail updates
        17    about articles in the media that would be
        18    of interest to the New England Journal of
        19    Medicine, to the editors, other staff
        20    members at the journal.  And I would be
        21    copied on these e-mails.  I have to say
        22    that I didn't open all of them, but I did
        23    open some.  They would contain sometimes
        24    copies of articles in the media that
00039:01    relate to journal activities, and some of
        02    those, I'm sure, related to rofecoxib,
        03    other COX-2 inhibitors, and this general
        04    topic which was being written about in
        05    the media at that time.  So, that's the
        06    best of my recollection, that the
        07    communications that were coming to me
        08    from Morrissey & Company, the ones that I
        09    can remember, were articles from the
        10    public media, again, not dealing only
        11    with rofecoxib or COX-2 inhibitors, but a
        12    whole variety of topics in healthcare and
        13    sometimes articles about articles that
        14    were published in the New England Journal
        15    of Medicine, because we do try to keep
        16    track of what's going on in the media
        17    with respect to our journal and with
        18    respect to important issues in
        19    healthcare, in medicine and the
        20    healthcare community.  So, that's the
        21    best of my recollection about the
        22    communications that I would have been
        23    copied on with respect to Morrissey &
        24    Company.
00040:01          Q.    Don't you remember that they
        02    coached you on what to say to the media
        03    when the media asked any questions that
        04    might be critical of the way that the New
        05    England Journal of Medicine handled the
        06    VIGOR publication?
```

**20. PAGE 40:13 TO 41:24  (RUNNING 00:01:40.852)**

```
        13          THE WITNESS:  Well, I don't
        14    recall specifically receiving any
        15    coaching about how to handle the
        16    VIGOR publication.  Now, I do
        17    recall -- it is standard practice
        18    for the media team, and it's not
        19    just a PR company, by the way, we
        20    have several people in our own
        21    organization who are responsible
        22    for dealing with the media, and
        23    when an issue comes up, it's
        24    standard practice for them to
00041:01    develop some points called -- we
        02    call them talking points, that
        03    would cover certain aspects of
        04    issues that one of us, one of us
        05    editors might be called upon to
        06    ask questions -- to answer
        07    questions about.  And I would
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason  v.  Merck

```
08          receive copies of these talking
09          points.  And I will have to say
10          that I didn't use them very often.
11          Sometimes they were useful.
12          Sometimes they weren't useful to
13          me.  But if that's what you're
14          referring to, if I understood your
15          question correctly, I assume that
16          you were referring to the talking
17          points that were prepared.  But
18          they weren't prepared only by a PR
19          firm.  It's important -- there are
20          several people inside our
21          organization who've worked at the
22          Journal for some time who are
23          involved as well in developing.
24          talking points.
```

**21. PAGE 42:17 TO 42:19 (RUNNING 00:00:17.999)**

```
17          Q.    And then moving on with our
18  chronology, did you and your colleagues,
19  Dr. Morrissey and Dr. Drazen, prepare and
```

**22. PAGE 42:20 TO 42:22 (RUNNING 00:00:12.649)**

```
20  post on your website a document called an
21  "Expression of Concern"?
22          A.    That's correct.
```

**23. PAGE 43:22 TO 44:03 (RUNNING 00:00:15.564)**

```
22          Q.    What date did you release
23  this and post it on your website?
24          A.    I believe it was December
00044:01  8th or 9th, somewhere in that area.
02          Q.    I think we'll see as we go
03  forward that it was December 8.
```

**24. PAGE 44:09 TO 45:03 (RUNNING 00:01:02.873)**

```
09          Q.    And do you remember that on
10  December 8th, Thursday, the day that you
11  decided to release this Expression of
12  Concern, that that was the day of closing
13  argument and submission to the jury of
14  the case called the Irvin case?
15          A.    Well, I certainly know that
16  a case was going on.  I'm not familiar
17  with the term "Irvin case," but I know
18  that a case is going on.  But I honestly
19  didn't know exactly what was going on in
20  the case on that particular day.
21          Q.    Did you know that there was
22  a case being tried in Federal Court in
23  Houston in early December?
24          A.    Yes.
00045:01          Q.    And, in fact, you got daily
02  updates on that trial, didn't you, from
03  your PR team and the others?
```

**25. PAGE 45:06 TO 45:09 (RUNNING 00:00:05.866)**

```
06          THE WITNESS:  I don't -- I
07          don't know if they were daily
08          updates.  I think that there were
09          updates from time to time.
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason  v.  Merck

**26.  PAGE 45:11 TO 46:18  (RUNNING 00:01:22.105)**

```
        11          Q.     And --
        12          A.     Newspaper articles.
        13          Q.     And when you released the
        14    Expression of Concern --
        15          A.     Uh-huh.
        16          Q.     -- which I think you'll
        17    agree was critical of the authors of the
        18    VIGOR study, is that a fair statement?
        19          A.     That was not the purpose of
        20    the Expression of Concern.
        21          Q.     Whether it was its purpose
        22    or not, would you agree that the
        23    Expression of Concern was critical of the
        24    authors of the VIGOR study?
00046:01          A.     The Expression of Concern
        02    was focused on an article that was
        03    published in the New England Journal of
        04    Medicine, a document, scientific document
        05    that we had obtained evidence that made
        06    us concerned about the procedures that
        07    led to the publication of that document.
        08    And our Expression of Concern was focused
        09    on the scientific document in order to
        10    correct the scientific record.  It was
        11    not focused on individuals.
        12          Q.     Well, do you remember that
        13    you went out and gave a bunch of
        14    interviews after the Expression of
        15    Concern was published where you were
        16    critical of the authors of the VIGOR
        17    study?
        18          A.     I did not --
```

**27.  PAGE 46:21 TO 46:23  (RUNNING 00:00:02.999)**

```
        21                THE WITNESS:  I did not go
        22    out and give a bunch of
        23    interviews.
```

**28.  PAGE 47:01 TO 47:06  (RUNNING 00:00:07.845)**

```
00047:01          Q.     You didn't?
        02          A.     No, I did not.
        03          Q.     How many did you give?
        04          A.     The way the --
        05          Q.     Can you just answer how many
        06    you gave?
```

**29.  PAGE 47:11 TO 48:21  (RUNNING 00:01:41.729)**

```
        11                THE WITNESS:  The way the --
        12    we were surprised that there were
        13    so many press calls.  We did not
        14    issue a press release about the
        15    Expression of Concern.  We posted
        16    it on our website, and after it
        17    was posted, we began to receive
        18    calls from the media.  I was
        19    surprised that they were
        20    interested in this.  For us --
        21    this was standard editorial
        22    procedure for us.  We have issued
        23    a total of three Expressions of
        24    Concern since 2002, and we were
00048:01    following standard procedures.
        02                When calls from the media
```

**CONFIDENTIAL**                                                                 **page 7**

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

```
03        came in, they were screened by the
04        people in our organization who
05        screen the media calls.  They
06        attempted to answer as many of the
07        questions as possible.  And when
08        there were questions more of a
09        technical nature that they felt
10        that an editor needed to answer,
11        they were referred to me.  And I
12        took the calls in my office.  I
13        didn't go out anywhere.  I was in
14        my office, and the calls were
15        referred to me, and I did the best
16        that I could to answer the
17        questions objectively so that the
18        media would get the right story
19        about why we had issued this
20        Expression of Concern.  And that
21        is how this unfolded.
```

**30. PAGE 48:24 TO 49:02 (RUNNING 00:00:05.738)**

```
24        and my question was, how many interviews
00049:01  did you give?  Can you answer that
02        question?
```

**31. PAGE 49:07 TO 49:11 (RUNNING 00:00:11.198)**

```
07              THE WITNESS:  I can't
08        really.  Probably more than four
09        and less than ten.  I don't know.
10        I didn't count the number of
11        telephone calls that came in.
```

**32. PAGE 49:13 TO 49:23 (RUNNING 00:00:19.795)**

```
13        Q.    When you said under oath a
14        minute ago that you did not issue a press
15        release, in fact, the New England Journal
16        of Medicine sent out an e-mail alert to
17        the media --
18        A.    Right.
19        Q.    -- informing the media that
20        this Expression of Concern that you say
21        was routine was going to be posted later
22        that day?
23        A.    Yes.
```

**33. PAGE 50:10 TO 50:14 (RUNNING 00:00:08.353)**

```
10        Q.    And are you claiming that
11        the New England Journal of Medicine
12        treated this Expression of Concern as a
13        routine matter, nothing out of the
14        ordinary?
```

**34. PAGE 50:23 TO 50:24 (RUNNING 00:00:01.670)**

```
23              THE WITNESS:  I didn't say
24        that.
```

**35. PAGE 51:06 TO 51:10 (RUNNING 00:00:09.144)**

```
06        Q.    Are you claiming that the
07        New England Journal of Medicine treated
08        this Expression of Concern as a routine
09        matter that was nothing out of the
10        ordinary?
```

**CONFIDENTIAL**

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

**36. PAGE 51:13 TO 52:23 (RUNNING 00:01:40.957)**

```
         13              THE WITNESS:  This is part
         14      of the responsibility of editors.
         15      It's part of our job that when,
         16      after an article has been
         17      published in a journal, and it's
         18      not just our journal, it's any
         19      medical journal, if an article is
         20      published in a journal and at a
         21      later time new evidence comes to
         22      light that causes the editors to
         23      be concerned about some aspect of
         24      that article, the process by which
00052:01      it was published, the data, the
         02      content, issuing an Expression of
         03      Concern is part of the standard
         04      operating procedure.  It's set
         05      down in the uniform requirements
         06      of the International Committee of
         07      Medical Journal Editors of which
         08      the New England Journal is one of
         09      the founding members.
         10              And so that, fortunately, we
         11      have not had to issue Expressions
         12      of Concern very often.  We feel
         13      very fortunate about that.  But
         14      since 2002, we have issued three
         15      of them.  And when we have to do
         16      it, it's part of our job, and we
         17      do it.  And we are accustomed --
         18      we know the protocol, we follow
         19      the same procedure each time that
         20      we've done this, and as I've said,
         21      it's a part of the
         22      responsibilities.  Editors
         23      sometimes have to do this.
```

**37. PAGE 53:08 TO 53:08 (RUNNING 00:00:02.512)**

```
         08      Q.     What's Exhibit 4?
```

**38. PAGE 54:17 TO 55:01 (RUNNING 00:00:22.048)**

```
         17              To the best of my
         18      recollection, when the Expression
         19      of Concern was posted on the
         20      website, I believe that this may
         21      have been a statement that was
         22      placed below it or next to it,
         23      below it, I guess, to provide
         24      additional explanation for why it
00055:01      was being released.
```

**39. PAGE 55:03 TO 55:17 (RUNNING 00:00:31.777)**

```
         03      Q.     So, this was a statement
         04      issued by the New England Journal of
         05      Medicine on December 8th, the same day as
         06      the Expression of Concern, and it
         07      accompanied the Expression of Concern on
         08      the New England Journal of Medicine's
         09      website?  Isn't that true?
         10      A.     Well, if you tell me -- to
         11      the best of my recollection -- it doesn't
         12      say that here, but that's the best of my
         13      recollection.  If you tell me that that's
         14      where you got it, I believe you.
```

**CONFIDENTIAL**

## Mason v. Merck

```
    15        Q.    And you'd never done that
    16   before in connection with an Expression
    17   of Concern, had you?
```

**40. PAGE 55:20 TO 55:21  (RUNNING 00:00:02.774)**

```
    20              THE WITNESS:  I don't
    21   recall.  I don't recall.
```

**41. PAGE 55:23 TO 56:03  (RUNNING 00:00:11.422)**

```
    23        Q.    Well, you don't recall one
    24   way or another whether you issued a
00056:01   one-page statement accompanying either
    02   one of those other two Expressions of
    03   Concern that you talked about?
```

**42. PAGE 56:13 TO 56:24  (RUNNING 00:00:29.589)**

```
    13              helpful, because I didn't write
    14   this statement, and I do remember
    15   being informed that, would it be
    16   advisable to provide some
    17   explanation given the technical
    18   nature of the Expression of
    19   Concern, would it be advisable to
    20   have such a statement?  And I
    21   remember discussing that, and
    22   so -- but I did not write the
    23   statement.  I remember discussing
    24   it.
```

**43. PAGE 57:02 TO 58:14  (RUNNING 00:01:30.782)**

```
    02        Q.    You said before that you
    03   handled this Expression of Concern the
    04   same way you handled the other two?
    05        A.    Yes.  In terms of --
    06        Q.    And my question for you,
    07   sir, is, in either one of the other two
    08   Expressions of Concern, did the New
    09   England Journal of Medicine release a
    10   statement that accompanied the Expression
    11   of Concern?
    12        A.    Again, I don't recall the
    13   answer to that, but what I was referring
    14   to was the -- in terms of handling the
    15   Expression of Concern, what I was talking
    16   about is the steps that we took, how
    17   the -- how we made the decision to write
    18   an Expression of Concern, how that
    19   Expression of Concern was written, who
    20   read it and reviewed it, and when it was
    21   released.  Those kinds of steps were the
    22   same steps that we followed in each of
    23   these three cases.  And that's what I was
    24   referring to.
00058:01        Q.    Now, you say that you did
    02   not write this statement, Exhibit 4, that
    03   was posted on the website.  Did Dr.
    04   Morrissey write it?  He was one of the
    05   co-authors with you of the Expression of
    06   Concern, right?
    07        A.    Yes, he was.
    08        Q.    Did Dr. Morrissey write this
    09   statement that was posted on your
    10   website?
    11        A.    I don't know who wrote this
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

```
        12    statement, to be honest with you.
        13         Q.    Well, don't you know, in
        14    fact, that it was written by your PR guy?
```

**44. PAGE 58:17 TO 58:18 (RUNNING 00:00:02.048)**

```
        17              THE WITNESS:  No, I don't
        18    know who wrote the statement.
```

**45. PAGE 58:20 TO 59:09 (RUNNING 00:00:29.491)**

```
        20         Q.    Did you have a chance to
        21    spend some time reviewing this statement
        22    before it was posted on behalf of the New
        23    England Journal of Medicine on your
        24    website?
  00059:01         A.    I believe I saw it briefly,
        02    but I did not spend a lot of time with
        03    it, no.
        04         Q.    Do you remember that you
        05    weren't even shown this statement that
        06    was posted on your website until the day
        07    it was posted?
        08         A.    I think that's certainly
        09    possible, yes.
```

**46. PAGE 59:23 TO 60:04 (RUNNING 00:00:12.782)**

```
        23         Q.    Ed, do you remember Ed?
        24         A.    Ed?
  00060:01         Q.    The PR guy named Ed?  Do you
        02    remember a PR guy named Ed that you
        03    talked with almost every day during this
        04    period?
```

**47. PAGE 60:15 TO 60:17 (RUNNING 00:00:03.999)**

```
        15              THE WITNESS:  You mean Ed
        16    Cafasso?  Is that who you mean, Ed
        17    Cafasso?
```

**48. PAGE 60:19 TO 60:20 (RUNNING 00:00:03.000)**

```
        19         Q.    Yes.  The PR guy, Ed.
        20         A.    Yes.
```

**49. PAGE 61:20 TO 62:02 (RUNNING 00:00:21.190)**

```
        20         Q.    During early December, were
        21    the senior editors of the New England
        22    Journal of Medicine following the trial
        23    down there in Houston so closely that
        24    they were actually reading or being
  00062:01    informed of the contents of the testimony
        02    that was coming in during that trial?
```

**50. PAGE 62:05 TO 62:07 (RUNNING 00:00:04.736)**

```
        05              THE WITNESS:  I can really
        06    only speak for myself, and the
        07    answer is unequivocally no.
```

**51. PAGE 62:15 TO 62:16 (RUNNING 00:00:04.431)**

```
        15         Q.    I'm handing you what we've
        16    marked as Exhibit 5.
```

**52. PAGE 62:19 TO 64:10 (RUNNING 00:01:29.269)**

```
        19         Q.    Do you see here, sir, that
        20    this is an e-mail, internal e-mail from
```

## Mason v. Merck

```
         21   or among the senior editors of the New
         22   England Journal of Medicine?
         23        A.    Yes.
         24        Q.    And it's from Dr. Drazen;
00063:01   right?
         02        A.    Well, there are two e-mails
         03   here.  Are you talking --
         04        Q.    The one on the top.
         05        A.    The one on the top.  Yes.
         06   From Dr. Drazen, yes.
         07        Q.    He's the editor-in-chief of
         08   the New England Journal of Medicine,
         09   right?
         10        A.    Yes, he is.
         11        Q.    It's dated Saturday,
         12   December 3rd; correct?
         13        A.    Right.
         14        Q.    And it's to you, right?
         15        A.    Uh-huh.
         16        Q.    And to Dr. Morrissey,
         17   correct?
         18        A.    Right.
         19        Q.    And you would be the three
         20   top editors of the New England Journal of
         21   Medicine, right?
         22        A.    We're three of the top
         23   editors, yes.
         24        Q.    And do you see here where
00064:01   the editor-in-chief of the New England
         02   Journal of Medicine is reporting to you
         03   concerning the contents of the deposition
         04   testimony of Dr. Reicin?
         05        A.    Uh-huh.
         06        Q.    Why was the editor-in-chief
         07   of the New England Journal of Medicine
         08   giving you updates concerning the
         09   contents of Dr. Reicin's testimony down
         10   there in the Houston trial?
```

**53. PAGE 65:09 TO 65:10 (RUNNING 00:00:01.470)**

```
         09        Q.    And I will read it into the
         10   record.
```

**54. PAGE 65:13 TO 65:20 (RUNNING 00:00:21.909)**

```
         13        Q.    "Steve and Greg, in her
         14   depositional testimony Reicin says that
         15   there were also GI events that were not
         16   recorded but came in late.  We should
         17   make this clear in the note of concern
         18   and ask them to provide full reporting of
         19   all data they had on or before October
         20   13, 2000."
```

**55. PAGE 66:20 TO 67:18 (RUNNING 00:00:52.178)**

```
         20        Q.    You know there are
         21   depositions, then there are trials.
         22   You're in a deposition now.  The thing
         23   that was going down in Houston with a
         24   jury was a trial.
00067:01             Now, when you read this, did
         02   you understand it to refer to trial
         03   testimony by Dr. Reicin or deposition
         04   testimony or which?
         05        A.    Well, I'll have to be very
         06   honest with you.  I only vaguely remember
```

CONFIDENTIAL

## Mason v. Merck

```
07   this e-mail message.  I remember that it
08   was on a Saturday late in the morning.  I
09   was working at my desk in my home.
10        Q.    Actually, it says 11:31 p.m.
11        A.    Oh, p.m., I'm sorry.
12        Q.    Almost midnight he's telling
13   you about this testimony, right?
14        A.    I don't think I was awake
15   then.  I try to be in bed earlier than
16   that.  So, I think that I got it perhaps
17   the next morning, maybe it was actually
18   Sunday morning, I was working at my desk.
```

**56. PAGE 67:18 TO 68:03 (RUNNING 00:00:27.000)**

```
18        Sunday morning, I was working at my desk.
19   And I have to say, I didn't pay too much
20   attention to this message.  It's a
21   three-line message.  It didn't -- it
22   wasn't very informative to me, and I
23   wasn't sure where we would actually take
24   something like this.  So, I don't think
00068:01   there was any followup action on this,
02   so, I can't really comment much more than
03   that.
```

**57. PAGE 68:14 TO 69:08 (RUNNING 00:00:59.424)**

```
14        Q.    When you released the
15   editorial on December 8th, I think you
16   indicated before you didn't know, you
17   say, precisely what was going on in the
18   trial down in Houston.  Is that right?
19        A.    Right.
20        Q.    You knew that the trial was
21   still going on down in Houston?
22        A.    Yes.
23        Q.    You also knew, obviously,
24   that Vioxx was not being prescribed and
00069:01   sold on December 8th, 2005; right?
02        A.    Yes.  That's right.  We
03   generally -- we have referred to it as
04   rofecoxib, but, yes, that's right.
05        Q.    And so on December 8th, when
06   you released this Expression of Concern,
07   there was no public health emergency --
08        A.    No.
```

**58. PAGE 71:11 TO 72:17 (RUNNING 00:01:16.459)**

```
11        Q.    You've got what we've marked
12   as Defendant's Exhibit 6 in front of you,
13   right?
14        A.    Right.  Uh-huh.
15        Q.    And do you see that the
16   first page of Defendant's Exhibit 6 is an
17   e-mail string of e-mails from December
18   8th?
19        A.    Right.
20        Q.    And the first one is from
21   Karen Pedersen --
22        A.    Pedersen, yes.
23        Q.    Pederson to you?
24        A.    Right.
00072:01        Q.    With a copy to Dr.
02   Morrissey?
03        A.    That's right.
04        Q.    And it says she's forwarding
```

## Mason v. Merck

```
05    something called talking points; right?
06         A.    Yes.  That's what I referred
07    to earlier.
08         Q.    And Karen Pedersen, is she
09    an internal PR person for the New England
10    Journal of Medicine?
11         A.    She's the manager of media
12    relations.  We don't call her a PR
13    person, but she is our interface with the
14    media.
15         Q.    And she's forwarding on
16    talking points that were sent to her by
17    Ed Cafasso; right?
```

**59. PAGE 73:02 TO 73:20 (RUNNING 00:00:33.000)**

```
02         Q.    But do you see right
03    underneath the first e-mail --
04         A.    Yeah.
05         Q.    -- that we looked at, which
06    would have been the most recent e-mail,
07    there's an e-mail -- she's forwarding the
08    thing that she got right below from Ed
09    Cafasso to her --
10         A.    Right.
11         Q.    -- "Subject:  Talking
12    points," "Importance:  High"?
13         A.    Uh-huh.  Yep.
14         Q.    And Ed Cafasso, he's the
15    outside PR guy; right?
16         A.    Yes.
17         Q.    So, he's attaching the
18    talking points and the Q&A, he says;
19    correct?
20         A.    Right.
```

**60. PAGE 74:03 TO 75:09 (RUNNING 00:01:09.747)**

```
03         Q.    Are you on the page that has
04    at the top the title "Expression of
05    Concern:  Key Points and Q&A."
06         A.    Right.
07         Q.    Are these the kind of
08    talking points that you referred to
09    earlier in your testimony that people
10    would give you to use?
11         A.    Sometimes they would, yes.
12         Q.    And they did this time;
13    right?
14         A.    They did.  I can't say that
15    I used these talking points because I
16    don't think I did, but...
17         Q.    Well, let's take a look down
18    at the one that says "Why Did we Release
19    this Today?"
20         A.    Uh-huh.
21         Q.    And the talking point says,
22    "We felt it was important to release this
23    information as soon as we understood how
24    it impacted the conclusions of the paper
00075:01    we had published.  We felt we should
02    announce this once we had completed our
03    investigation of the data, which included
04    a statistical analysis, and had raised
05    our concerns with the authors."
06              Did you follow that talking
07    point when members of the media asked you
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

```
        08    why you released the Expression of
        09    Concern when the jury was out in Houston?
```

**61.  PAGE 75:15 TO 75:15  (RUNNING 00:00:01.143)**

```
        15              THE WITNESS:  I don't --
```

**62.  PAGE 76:01 TO 76:11  (RUNNING 00:00:34.043)**

```
00076:01            Q.    Is it still your testimony
        02    that you didn't know on December 8th when
        03    you released the Expression of Concern
        04    that the jury was out in Houston?
        05            A.    I don't know how I could
        06    have known that.  I mean, you know, it's
        07    not something that I would have known.
        08            Q.    Did you use this talking
        09    point when you answered questions from
        10    the media about why you released that
        11    Expression of Concern on that date?
```

**63.  PAGE 76:16 TO 76:21  (RUNNING 00:00:16.104)**

```
        16            Q.    Well, you were asked about
        17    why in the media, weren't you?
        18            A.    I don't recall, but what I
        19    can say is that I didn't use this talking
        20    point because I didn't need to use this
        21    talking point.  Because the truth --
```

**64.  PAGE 77:01 TO 78:19  (RUNNING 00:02:02.133)**

```
00077:01              THE WITNESS:  The truth of
        02    the matter is that we released the
        03    Expression of Concern when we had
        04    all of the data assembled, when we
        05    had deliberated, we had the facts
        06    in hand.  We very carefully
        07    deliberated.  The editors had come
        08    together, reviewed all the
        09    information that we had, including
        10    information that we obtained on
        11    November 21st, 2005.  We made our
        12    best judgment as editors of the
        13    New England Journal of Medicine
        14    with many years of experience
        15    collectively, and we sat down and
        16    wrote the document, the Expression
        17    of Concern.  We worked very hard
        18    on every word of that document.
        19    Every word was a focus.
        20              We then had the document
        21    peer reviewed by someone who we
        22    have a lot of respect for and who
        23    is very good with numbers and
        24    statistical analysis, who went
00078:01    over things for us.  And when we
        02    finally reached what we considered
        03    to be a final version after going
        04    through many versions of the
        05    Expression of Concern we released
        06    it, which is our responsibility as
        07    editors under the uniform
        08    requirements of the International
        09    Committee of Medical Journal
        10    Editors.  And that's what we did.
        11    We followed the standard protocol
        12    that we've followed in the past,
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason  v.  Merck

```
         13            and we released the information
         14            when we had it ready in order to
         15            inform the medical community that
         16            we had some concerns about this
         17            work and had referred these
         18            concerns to the authors of the
         19            article for a response.
```

**65. PAGE 80:17 TO 80:19 (RUNNING 00:00:06.670)**

```
         17            Q.    We've been looking at the
         18     December 8 talking points.  Let me show
         19     you Exhibit 7.
```

**66. PAGE 81:08 TO 81:09 (RUNNING 00:00:02.107)**

```
         08            Q.    Do you see that this
         09     document is the December 5th version of
```

**67. PAGE 81:10 TO 81:10 (RUNNING 00:00:04.247)**

```
         10     the talking points?
```

**68. PAGE 81:13 TO 81:13 (RUNNING 00:00:02.000)**

```
         13                  THE WITNESS:  Yes.
```

**69. PAGE 81:15 TO 81:16 (RUNNING 00:00:04.554)**

```
         15            Q.    Down at the bottom it says,
         16     "Why Did We Release This When We Did?"
```

**70. PAGE 82:15 TO 83:07 (RUNNING 00:00:38.014)**

```
         15            Q.    I apologize.  I've got the
         16     date wrong.  So, now we're talking about
         17     after it's been released and out there in
         18     the public for a while; right?
         19            A.    Right.  Uh-huh.
         20            Q.    And so this was a later
         21     version of the talking points.  And down
         22     at the bottom it says "Why Did We Release
         23     This When We Did?"  Could you read for me
         24     the first sentence --
   00083:01            A.    Sure.
         02            Q.    -- of the talking points?
         03            A.    Sure.  "We made this
         04     information public as soon as we could,
         05     without regard to the trial."
         06            Q.    Now, that statement in the
         07     talking points was false, wasn't it?
```

**71. PAGE 83:11 TO 83:15 (RUNNING 00:00:13.933)**

```
         11            Q.    In fact, when you were
         12     planning the release of the Expression of
         13     Concern, you were planning it to coincide
         14     with specific events of the trial down in
         15     Houston.  Isn't that true?
```

**72. PAGE 83:22 TO 84:02 (RUNNING 00:00:12.437)**

```
         22                  You were planning to release
         23     the Expression of Concern based on
         24     specific events that you had been told
   00084:01     would take place down in the trial in
         02     Houston, isn't that true, sir?
```

**73. PAGE 84:06 TO 84:06 (RUNNING 00:00:00.869)**

```
         06                  THE WITNESS:  No.
```

**CONFIDENTIAL**                                                                                      **page 16**

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

**74. PAGE 84:14 TO 84:14 (RUNNING 00:00:03.238)**

```
14              Q.    What is Exhibit 8?
```

**75. PAGE 84:18 TO 84:22 (RUNNING 00:00:22.000)**

```
18                    THE WITNESS:  Right.  This
19          is some e-mail from December 8th
20          among the various editors of the
21          Journal about the Expression of
22          Concern.
```

**76. PAGE 84:24 TO 85:18 (RUNNING 00:01:01.717)**

```
24              Q.    And on the bottom, which
00085:01    would be the earliest of the three
02          e-mails printed on this page; is that
03          correct?
04              A.    Yes.  December 7th, right.
05              Q.    And it's December 7th, 6:00
06          p.m. from Tad Campion.  Who is Tad
07          Campion?
08              A.    He's the senior deputy
09          editor at the journal.
10              Q.    Then it says to -- and it
11          has Lisa Scott, Karen Pedersen, Sandra
12          Jacobs, Andrea Graham and Julie Mooza.
13          Are they all employees of the New England
14          Journal of Medicine?
15              A.    This is the web team, yes.
16              Q.    And then cc, that means
17          copies; right?
18              A.    That's right.
```

**77. PAGE 87:06 TO 88:02 (RUNNING 00:00:43.841)**

```
06              Q.    And then you're copied on
07          this December 7th 6:00 p.m. e-mail;
08          right?
09              A.    Yes.
10              Q.    Dr. Drazen, the
11          editor-in-chief is also copied; correct?
12              A.    Correct.
13              Q.    Then the subject, what does
14          the subject line read?
15              A.    "Probable Early Release
16          Tomorrow P.M.," is that what you're
17          referring to?
18              Q.    Yes.  Underneath where it
19          says "Probable Early Release Tomorrow
20          P.M.," there's a line that says
21          "Importance," and what did Mr. Campion
22          say was the importance of this e-mail?
23              A.    It says "High."
24              Q.    Then the e-mail says,
00088:01    "Steve."  Who would that be?  Is that
02          Steve Morrissey?
```

**78. PAGE 88:04 TO 88:05 (RUNNING 00:00:02.772)**

```
04                    THE WITNESS:  That would
05          probably be Dr. Morrissey, yes.
```

**79. PAGE 88:07 TO 89:16 (RUNNING 00:01:23.926)**

```
07              Q.    "Steve wants us to know
08          that we need to get ready to post as an
09          early release the Expression of Concern
10          that is scheduled for the editorial pages
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason  v.  Merck

```
        11    of the December 29th issue."
        12            Let me ask you first, as of
        13    December 7 at 6 p.m., in fact, the
        14    Expression of Concern had been scheduled
        15    to be printed on December 29th with the
        16    regular edition of the journal, right?
        17        A.    Yes.
        18        Q.    And then it says, "The
        19    reason," that's the reason for this early
        20    release; right?
        21        A.    Right.
        22        Q.    "The reason is that
        23    tomorrow's testimony in the Vioxx trial
        24    may involve part of a deposition that
00089:01    Greg gave about the NEJM and the VIGOR
        02    trial."  "Greg" is you; right?
        03        A.    That's right.
        04        Q.    And then it says, "If so,
        05    there will be press attention, and we
        06    want the press to know about the official
        07    NEJM statement.  That is being laid out
        08    and needs to be ready to go" on the
        09    website "as an early release."  Right?
        10        A.    Correct.
        11        Q.    "Steve or Greg or I will
        12    let you know when it's time to go.
        13    Things in a trial can always get pushed
        14    back a day or two, so we cannot yet be
        15    positive."  Right?
        16        A.    Uh-huh.
```

**80. PAGE 89:20 TO 90:15 (RUNNING 00:00:55.733)**

```
        20        Q.    And that's what you were
        21    told on December 7, 6:00 p.m.; correct?
        22        A.    Right.
        23        Q.    Then earlier you said that
        24    you were surprised at the press reaction
00090:01    to the --
        02        A.    Yes.
        03        Q.    -- Expression of Concern?
        04        A.    Yes, I was.
        05        Q.    Do you see the last line, it
        06    says, "It will be essential to notify the
        07    press and make it prominent on the press
        08    site"?  Do you see that?
        09        A.    Yes, I do.
        10        Q.    Now, how is it that you and
        11    your colleagues at the New England
        12    Journal of Medicine knew that the
        13    plaintiffs' lawyers were hoping to play
        14    your deposition on the next day, December
        15    8, as is reflected in this e-mail?
```

**81. PAGE 90:19 TO 90:22 (RUNNING 00:00:07.284)**

```
        19            THE WITNESS:  I don't -- you
        20    know, Dr. Campion didn't tell me
        21    where he got the information, so,
        22    I can't answer that.
```

**82. PAGE 90:24 TO 91:21 (RUNNING 00:00:51.999)**

```
        24        Q.    Well, do you know who it was
00091:01    from the New England Journal of Medicine
        02    who was gathering information about what
        03    was expected to be done down there in the
        04    Houston trial and when it was expected to
```

CONFIDENTIAL                                                                    page 18

## Mason v. Merck

```
        05    happen?
        06            A.     I don't know who was
        07    collecting that, no.
        08            Q.     Do you know whether somebody
        09    at the New England Journal of Medicine
        10    was in communication with the plaintiffs'
        11    lawyers to find out what they were
        12    planning to do each day?
        13            A.     I certainly am not aware of
        14    that, no.
        15            Q.     Well, did you ever ask Tad
        16    Campion how he came to know that the
        17    plaintiffs' lawyers were hoping to play
        18    your deposition on December 8th?
        19            A.     I didn't ask him, no.  I
        20    received the e-mail, and that was really
        21    the extent of the communication.
```

**83. PAGE 91:22 TO 92:05 (RUNNING 00:00:33.872)**

```
        22            Q.     Did you ever tell any of the
        23    newspaper or broadcast media folks that
        24    you gave interviews to that, in fact, the
   00092:01    reason that you released the Expression
        02    of Concern on December 8th instead of
        03    waiting until December 9th was because of
        04    what you expected was going to happen
        05    down in the Vioxx trial?
```

**84. PAGE 92:08 TO 92:11 (RUNNING 00:00:05.780)**

```
        08            THE WITNESS:  I don't recall
        09            getting that question or giving
        10            that kind of answer.  I don't
        11            recall.
```

**85. PAGE 92:13 TO 92:21 (RUNNING 00:00:18.100)**

```
        13            Q.     Did you ever tell anybody
        14    that the reason that you released the
        15    Expression of Concern in the middle of
        16    the trial in Houston was because you'd
        17    been told that they were planning on
        18    playing your testimony, and you wanted to
        19    coordinate the release of the Expression
        20    of Concern with the playing of your
        21    testimony in Houston?
```

**86. PAGE 93:13 TO 93:14 (RUNNING 00:00:02.224)**

```
        13            THE WITNESS:  Could you
        14            repeat the question?
```

**87. PAGE 93:16 TO 94:01 (RUNNING 00:00:19.670)**

```
        16            Q.     Sure.
        17            Did you ever tell anybody
        18    that the reason you released the
        19    Expression of Concern in the middle of
        20    the trial in Houston was because you'd
        21    been told that they were planning on
        22    playing your testimony, and you wanted to
        23    coordinate the release of the Expression
        24    of Concern with the playing of your
   00094:01    testimony down in Houston?
```

**88. PAGE 94:05 TO 96:02 (RUNNING 00:01:57.753)**

```
        05            THE WITNESS:  Well, I
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

```
06          can't -- I can't imagine that I
07          would have said that because Dr.
08          Campion articulates very precisely
09          in his e-mail what the issue was
10          with respect to my testimony.  And
11          the issue with respect to my
12          testimony was that my testimony
13          consisted, as it does today, with
14          a series of questions and answers.
15          And I did the best that I could in
16          that deposition of November 21st
17          to answer the questions.  But it
18          was not a written, an official
19          written statement of the journal.
20          It was testimony, it was oral
21          testimony.
22              We believed that in order to
23          make sure that the Expression of
24          Concern was clearly understood by
00095:01    those who would be interested in
02          the public, that we needed to have
03          our official statement out before
04          the deposition was played.
05              Now, to my way of thinking,
06          this is not the trial.  It's my
07          deposition, it's things that I
08          said in deposition which, as I
09          said, was a free flowing
10          conversation just like we're
11          having here today, questions and
12          answers, questions and answers,
13          but deposition does not allow me
14          to sit down and actually write out
15          and think very carefully in
16          written form, as you would in an
17          official written statement, which
18          the Expression of Concern was
19          intended to be an official written
20          statement.  So, we felt that the
21          official written statement, as Dr.
22          Campion indicates in this e-mail,
23          needed to be out in advance of the
24          testimony, which might have been
00096:01    misinterpreted given the free
02          flowing nature of testimony.
```

**89. PAGE 96:04 TO 96:08 (RUNNING 00:00:12.827)**

```
04          Q.    Well, do you now admit that
05          the timing of the release of the
06          Expression of Concern was, in fact,
07          dictated by what was happening down in
08          the Houston trial?
```

**90. PAGE 96:11 TO 96:19 (RUNNING 00:00:18.813)**

```
11              THE WITNESS:  Well, that's
12          not what -- as I just said, as far
13          as the trial is concerned, I was
14          not following the trial closely.
15          The issue was my personal
16          testimony and when that would be
17          played and how that might be
18          interpreted or misinterpreted by
19          members of the media.
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

### Mason v. Merck

**91. PAGE 96:24 TO 98:24 (RUNNING 00:00:01.785)**

```
    24                THE WITNESS:  So, yeah, it's
```

**92. PAGE 97:01 TO 97:08 (RUNNING 00:00:15.801)**

```
00097:01        not a matter of admitting to
    02          anything.  It's what I have just
    03          said and said a moment ago.  I
    04          think the explanation is quite
    05          clear and coherent, and that's my
    06          answer to your question.  I can't
    07          really say any more about it than
    08          that.
```

**93. PAGE 97:10 TO 97:14 (RUNNING 00:00:09.920)**

```
    10          Q.    Well, do you remember
    11      earlier this morning saying that the
    12      Expression of Concern, the timing of its
    13      release had nothing to do with what was
    14      going on in the trial in Houston?
```

**94. PAGE 97:16 TO 98:01 (RUNNING 00:00:20.437)**

```
    16                THE WITNESS:  Well, what I
    17          recall is that you asked, you
    18          know, did it have something to do
    19          with the trial.  And it did have
    20          something to do with my testimony.
    21          But it turned out that my
    22          testimony was not part of the
    23          trial at all anyway.  It never was
    24          played, and, therefore, was not
00098:01        part of the trial.
```

**95. PAGE 98:03 TO 98:18 (RUNNING 00:00:37.000)**

```
    03          Q.    But you released the
    04      Expression of Concern early anyway --
    05          A.    Yes, we did.
    06          Q.    -- even though there was no
    07      need to in order to have the record
    08      straight concerning your deposition;
    09      right?
    10          A.    Yes.  But we were prepared,
    11      and as I explained to you, according to
    12      the uniform requirements, and that's an
    13      important word, "requirements," of the
    14      International Committee of Medical
    15      Journal Editors, this is what was
    16      expected of us as editors.  We had the
    17      information put together, and we released
    18      it.
```

**96. PAGE 99:16 TO 100:15 (RUNNING 00:01:28.360)**

```
    16          Q.    Dr. Curfman, is it your
    17      testimony that the New England Journal of
    18      Medicine did not do anything out of the
    19      ordinary in terms of press relations with
    20      the Expression of Concern concerning the
    21      VIGOR article compared to what it did
    22      with those other two Expressions of
    23      Concern you mentioned?
    24          A.    Well, in fact, one of those
00100:01    three Expressions of Concern was released
    02      last Friday, and there was some media
    03      attention given to that Expression of
```

**CONFIDENTIAL**

## Mason v. Merck

```
04    Concern as well.  So, the first one that
05    we released back in 2002, my
06    recollection, did not generate as much
07    media attention.
08          Q.    Looking still at Exhibit 8,
09    we were looking at the bottom of the
10    three e-mails, which would have been the
11    earliest.  If you look up to the middle
12    one, you see that that's from Dr. Drazen
13    at 6:57 a.m. on December 8th to several
14    people, including you?
15          A.    Right.
```

**97. PAGE 100:20 TO 101:05 (RUNNING 00:00:21.764)**

```
20          Q.    And Dr. Drazen says "All," I
21    guess that means to everybody whose name
22    appears on the e-mail; right?
23          A.    Right.
24          Q.    And he says, "I think it
00101:01  would make sense for me to contact" and
02    then there's a name I can't pronounce.
03    Can you pronounce that name?
04          A.    Yes.  Her name is Snigdha
05    Prakash.
```

**98. PAGE 101:14 TO 101:20 (RUNNING 00:00:17.323)**

```
14          Q.    Who is Snigdha Prakash, and
15    how did you learn how to pronounce that
16    name so well?
17          A.    Snigdha Prakash is a
18    reporter for National Public Radio.
19          Q.    She follows the Vioxx
20    litigation?
```

**99. PAGE 101:22 TO 101:24 (RUNNING 00:00:04.470)**

```
22          THE WITNESS:  I think she
23    follows a lot of things.  She
24    probably follows that too, yes.
```

**100. PAGE 102:02 TO 102:04 (RUNNING 00:00:04.758)**

```
02          Q.    Well, as you know, it's not
03    just probably.  You know that she follows
04    it quite closely, don't you?
```

**101. PAGE 102:09 TO 102:11 (RUNNING 00:00:03.861)**

```
09          THE WITNESS:  She's done
10    stories on NPR about the
11    litigation, yes.
```

**102. PAGE 102:13 TO 102:16 (RUNNING 00:00:06.595)**

```
13          Q.    And she's quoted people from
14    the New England Journal of Medicine about
15    the litigation, hasn't she?
16          A.    I believe she has.
```

**103. PAGE 102:24 TO 103:13 (RUNNING 00:00:26.715)**

```
24          Q.    In any event, here is the
00103:01  editor-in-chief asking whether it makes
02    sense in connection with the probable
03    early release of the Expression of
04    Concern to contact this reporter from
05    National Public Radio; right?
06          A.    Uh-huh.
```

CONFIDENTIAL

**Mason v. Merck**

```
07        Q.     And then if we look up to
08 the next e-mail, you see that that's from
09 you?
10        A.     That's right.
11        Q.     To Dr. Drazen and others;
12 right?
13        A.     Correct.
```

**104. PAGE 103:15 TO 104:01 (RUNNING 00:00:22.990)**

```
15               Read what you said in your
16 e-mail back to Dr. Drazen about
17 contacting the NPR reporter in connection
18 with the early release of the Expression
19 of Concern.
20        A.     "I have some concerns about
21 giving her an exclusive.  Langreth has
22 been following the situation closely.  I
23 think that maybe both of them could be
24 called at the time the media e-mail is
00104:01 sent out."
```

**105. PAGE 104:10 TO 104:16 (RUNNING 00:00:19.488)**

```
10        Q.     Did the New England Journal
11 of Medicine send out a media e-mail
12 alerting members of the media to the
13 Expression of Concern?
14        A.     That's our routine for any
15 kind of early web release, to inform
16 people that it's there, yes.
```

**106. PAGE 108:02 TO 108:23 (RUNNING 00:00:48.239)**

```
02        Q.     Certainly it's not part of
03 the regular procedure with Expressions of
04 Concern to call up individual members of
05 the media and give them exclusive
06 interviews, is it?
07        A.     Well, we've only done three
08 Expressions of Concern since 2002, so, we
09 don't have a big track record with these.
10        Q.     Your e-mail referred to
11 Langreth.  Who's Langreth?
12        A.     Robert Langreth is a
13 reporter with Forbes magazine.
14        Q.     Is he also someone who
15 followed the Vioxx litigation closely?
16        A.     Well, I learned that he did.
17 Yes.
18        Q.     In fact, that's what you
19 meant when you said that "Langreth has
20 been following the situation closely."
21 Isn't that right?
22        A.     That's right.  I learned
23 that he was.
```

**107. PAGE 110:09 TO 110:14 (RUNNING 00:00:21.661)**

```
09        Q.     How about Ms. Prakash, did
10 you give her an interview?
11        A.     I believe so.  You can
12 probably show me -- I think I did.  I
13 think so.  Yes, I think I did.  I think
14 that may have been on the second day.
```

**108. PAGE 111:08 TO 112:10 (RUNNING 00:01:18.912)**

```
08        Q.     Did you personally tell Dr.
```

## Mason v. Merck

```
        09   Bombardier that you were going to have an
        10   early release of the Expression of
        11   Concern rather than wait until December
        12   29th?
        13       A.    I don't recall personally
        14   talking with her about that.  The
        15   conversations that we had, I think, were
        16   earlier and went over the fact that we
        17   would be releasing this and that we would
        18   be sending a series of questions to her
        19   that she could respond to at a later time
        20   at her leisure.
        21       Q.    Don't you remember that you
        22   told her when you first talked with her
        23   that you were scheduling the Expression
        24   of Concern for December 29th?
00112:01       A.    Well, my colleague, Dr.
        02   Morrissey, does all the scheduling for
        03   the Journal, and so perhaps he said
        04   something, but I don't recall saying
        05   anything myself.
        06       Q.    Do you recall when it was
        07   that the New England Journal of Medicine
        08   notified Dr. Bombardier -- and what's the
        09   correct pronunciation of her name?
        10       A.    That would be Bombardier.
```

**109. PAGE 112:13 TO 113:06 (RUNNING 00:00:47.999)**

```
        13       Q.    Do you recall when it was
        14   that the New England Journal of Medicine
        15   notified Dr. Bombardier that the
        16   Expression of Concern was going to be
        17   subject to this early release on December
        18   8, 2005?
        19       A.    I don't recall.
        20       Q.    Do you recall whether they
        21   gave her more than three hours' notice,
        22   "they" being the New England Journal of
        23   Medicine, that this thing was going to be
        24   released early?
00113:01       A.    I don't know.
        02       Q.    Do you remember that when
        03   Merck learned of your plans for an early
        04   release on December 8 that Merck asked
        05   you to consider some information to
        06   perhaps include in the Expression of
```

**110. PAGE 113:07 TO 113:11 (RUNNING 00:00:10.744)**

```
        07   Concern?
        08       A.    If you have a document that
        09   you can show me, that might jog my
        10   memory, but I am a little foggy about
        11   that.
```

**111. PAGE 114:05 TO 114:05 (RUNNING 00:00:02.909)**

```
        05       you what I've marked as Exhibit 9.
```

**112. PAGE 114:14 TO 114:16 (RUNNING 00:00:04.000)**

```
        14       Q.    This is another e-mail
        15   string; correct?
        16       A.    Right.
```

**113. PAGE 114:22 TO 115:04 (RUNNING 00:00:21.772)**

```
        22       Q.    And there's an e-mail to you
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

```
        23    and Dr. Morrissey; right?
        24         A.    Right.
00115:01              Q.    And he is basically
        02    attaching an e-mail that he got from a
        03    lawyer for Merck, right?
        04         A.    Mr. Fitzpatrick.
```

**114. PAGE 115:08 TO 115:21 (RUNNING 00:00:30.565)**

```
        08              Q.    And then there are some --
        09    he says, "Paul," that's Mr. Shaw, "Please
        10    see the points below concerning the
        11    proposed editorial," and then there's
        12    three points made.  And without going
        13    through each one in detail, do you now
        14    remember --
        15         A.    Yes, I now remember.  Thank
        16    you.
        17         Q.      -- that, in fact, Merck
        18    did ask you to consider some points
        19    before you released -- made the early
        20    release of the Expression of Concern?
        21         A.    Yes.
```

**115. PAGE 116:12 TO 116:18 (RUNNING 00:00:11.644)**

```
        12              Q.    You say that you've
        13    considered these points?
        14         A.    Well, I read the points,
        15    yes.
        16         Q.    Do you see that you received
        17    this e-mail from Mr. Shaw at 2:59 p.m.?
        18         A.    Uh-huh.
```

**116. PAGE 117:13 TO 117:14 (RUNNING 00:00:04.554)**

```
        13         Q.    I'm handing you what we've
        14    marked as Exhibit 10.
```

**117. PAGE 117:17 TO 118:06 (RUNNING 00:00:30.000)**

```
        17              Q.    This is an e-mail -- let me
        18    state that your name is not on this one.
        19         A.    Right.
        20         Q.      -- from Karen Pedersen.
        21    That's the in-house, I think you had
        22    something other than PR person, right?
        23         A.    Media relations.
        24         Q.    Media relations?
00118:01         A.    Media relations specialist.
        02         Q.    So, the media relations
        03    specialist is sending it to the outside
        04    PR person's, "Subject:  For talking
        05    points."  Do you see that?
        06         A.    Right.
```

**118. PAGE 119:16 TO 120:15 (RUNNING 00:01:12.207)**

```
        16         Q.    Then at the bottom, it says,
        17    "Also, Paul Shaw called and said the
        18    Merck attorney (Fitzpatrick) who
        19    cross-examined Greg e-mailed him saying
        20    he knows we're releasing a statement at 3
        21    and he wants to send some information for
        22    us to consider including in the
        23    statement, which we're not going to do,
        24    regardless of what it says, of course."
00120:01              Did you talk with Karen
        02    Pedersen about this subject and about
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

```
03   whether you would refuse to consider the
04   information regardless of what it said?
05        A.    I don't recall talking with
06   Karen Pedersen about this, but as I
07   indicated previously, Expressions of
08   Concern are statements from the editors,
09   and they're not subject to negotiation.
10   They're simply not that kind of document.
11   It's an explicit document written by the
12   editors expressing the concern of the
13   editors, and it's really not a document
14   that can be the subject of negotiation
15   with outside parties.
```

**119. PAGE 121:06 TO 121:06  (RUNNING 00:00:01.875)**

```
06        Q.    You mentioned before the
```

**120. PAGE 121:07 TO 122:08  (RUNNING 00:01:20.441)**

```
07   standards for -- that you say you
08   followed, and I think you said they were
09   the standards of some organization?
10        A.    The International Committee
11   of Medical Journal Editors.  We sometimes
12   call it the ICMJE.
13        Q.    They have standards that
14   you're supposed to follow in connection
15   with things like Expressions of Concern?
16        A.    Well, the uniform
17   requirements is a fairly lengthy
18   document, the uniform requirements for
19   the preparation of manuscripts, and it's
20   a document that deals with guidelines
21   about a whole range of issues relating to
22   medical publication.  So, I believe --
23   it's probably about a 25 or 30-page
24   document.  It's contained on the website.
00122:01   And among other things, it does deal with
02   retractions and Expressions of Concern.
03   That is one part of a much larger
04   document.
05        Q.    So, the answer is yes, they
06   do have standards on Expressions of
07   Concern?
08        A.    Yes, that's right.
```

**121. PAGE 122:22 TO 123:01  (RUNNING 00:00:11.000)**

```
22             Do you recognize this as a
23   printout of the ICMJE standards that you
24   were referring to?
00123:01        A.    Right.
```

**122. PAGE 123:16 TO 123:24  (RUNNING 00:00:20.865)**

```
16        Q.    And I just want to take a
17   few minutes walking you through some of
18   these.
19             The first sentence says,
20   "Editors must assume initially that
21   authors are reporting work based on
22   honest observations."  You agree that
23   that's appropriate; right?
24        A.    Yes, indeed.
```

**123. PAGE 125:15 TO 125:24  (RUNNING 00:00:22.000)**

```
15             Continuing on then with that
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

```
16   paragraph, it says, "If substantial
17   doubts arise about the honesty or
18   integrity of work, either submitted or
19   published, it is the editor's
20   responsibility to ensure that the
21   question is appropriately pursued,
22   usually by the authors' sponsoring
23   institution."  Right?
24        A.   Yes.
```

**124. PAGE 126:11 TO 127:01 (RUNNING 00:00:38.630)**

```
11        Q.   So, this procedure says then
12   it's the editors, that would be the New
13   England Journal's editors' --
14        A.   Right.
15        Q.   -- "responsibility to ensure
16   that the question is appropriately
17   pursued, usually by the authors'
18   sponsoring institution."  So, in the case
19   of Dr. Bombardier, for example, who would
20   the sponsoring institution be?
21        A.   Her university in Toronto.
22        Q.   But you did not follow the
23   procedure of referring this matter to her
24   university to pursue in the first
00127:01   instance, did you?
```

**125. PAGE 127:17 TO 127:19 (RUNNING 00:00:05.021)**

```
17             THE WITNESS:  We have been
18        in touch with her superiors at the
19        University of Toronto, yes.
```

**126. PAGE 129:16 TO 129:21 (RUNNING 00:00:17.893)**

```
16        Q.   Before you published your
17   conclusions in your Expression of Concern
18   on December 8th, did you give the
19   university a chance to conduct its own
20   investigation?
21        A.   No.
```

**127. PAGE 131:10 TO 131:14 (RUNNING 00:00:09.451)**

```
10        Q.   Before you published your
11   conclusions in the Expression of Concern,
12   did you give any of the authors an
13   opportunity to respond to what you were
14   proposing to publish?
```

**128. PAGE 131:19 TO 132:01 (RUNNING 00:00:14.599)**

```
19             THE WITNESS:  Yes, we did.
20        But their response follows the
21        publication of the Expression of
22        Concern.  But we did discuss with
23        them before we published it that
24        they would have an opportunity to
00132:01   respond.  Yes.
```

**129. PAGE 132:03 TO 132:18 (RUNNING 00:00:42.047)**

```
03        Q.   Actually, what you told them
04   before when you first contacted them was
05   that they would have an opportunity to
06   comment before you published the
07   Expression of Concern, isn't that true?
08        A.   I don't -- I can't imagine
```

## Mason v. Merck

```
09    that's true because that's not the
10    protocol for an Expression of Concern.
11             Q.    Didn't you tell Dr.
12    Bombardier that you -- didn't you send
13    her a copy of the draft Expression of
14    Concern ask her for her comments to be
15    received in a couple of weeks so that
16    they could accompany any publication of
17    the Expression of Concern?
18             A.    No.
```

**130. PAGE 133:02 TO 133:15 (RUNNING 00:00:39.454)**

```
02             Did the New England Journal
03    of Medicine, when it first communicated
04    with Dr. Bombardier about this, tell her
05    that you had a draft Expression of
06    Concern that you were planning on
07    publishing it on December 29, that you
08    asked for her comments in response in
09    advance of December 29th so that they
10    could be considered in connection with
11    the publication of the Expression of
12    Concern?
13             A.    No.  Because the response
14    from the authors is intended to follow
15    the Expression of Concern.
```

**131. PAGE 133:23 TO 133:23 (RUNNING 00:00:02.999)**

```
23             Q.    What is Exhibit 12?
```

**132. PAGE 134:01 TO 134:02 (RUNNING 00:00:03.037)**

```
00134:01             THE WITNESS:  (Witness
02    reviewing document.)
```

**133. PAGE 134:03 TO 134:14 (RUNNING 00:00:49.894)**

```
03             This is -- on the bottom of
04    Page 1 and the top of Page 2 is an
05    e-mailed letter that I and Dr.
06    Morrissey and Dr. Drazen sent to
07    Dr. Bombardier on December 5th
08    informing her about the Expression
09    of Concern, and I believe we
10    attached to this a series of
11    questions that we wanted her to
12    address in her response.
13             And then above that, a
14    couple of days later is a response
```

**134. PAGE 134:15 TO 134:19 (RUNNING 00:00:19.395)**

```
15    saying that she and Dr. Loren
16    Laine, who was her co --
17    corresponding author on the VIGOR
18    trial, wanted to have a conference
19    call.  And we then set that up.
```

**135. PAGE 134:21 TO 135:16 (RUNNING 00:00:52.710)**

```
21             Q.    Focusing on the e-mail from
22    you and your colleagues to Dr.
23    Bombardier --
24             A.    Yes.
00135:01             Q.    -- the first sentence says
02    you're writing concerning the VIGOR
03    study; correct?  And then the second
```

**CONFIDENTIAL**

## Mason v. Merck

```
04    sentence says, "Recently we obtained new
05    information that has led us to be
06    concerned about the accuracy of certain
07    data and conclusions in your article.
08    The specific points at issue are"
09    addressed "in the attached Expression of
10    Concern, which we plan to publish in an
11    upcoming issue of the Journal."
12            As of December 5th, 2005,
13    the plan was to publish this in the
14    December 29th edition of the Journal;
15    correct?
16        A.    Yes.
```

**136. PAGE 136:06 TO 136:14 (RUNNING 00:00:20.031)**

```
06        Q.    And then in the next
07    sentence, you ask her to submit a
08    correction for publication in the
09    Journal, and you ask her to do that by
10    December 22nd; right?
11        A.    That's right.
12        Q.    So, a few weeks after this
13    e-mail; right?
14        A.    Correct.
```

**137. PAGE 137:07 TO 137:13 (RUNNING 00:00:22.685)**

```
07        Q.    You talked before about two
08    earlier or two other Expressions of
09    Concern.
10        A.    Yes.
11        Q.    And let me ask you to take a
12    look at Exhibit 12 -- or am I on 13 now?
13            Exhibit 13.
```

**138. PAGE 138:05 TO 138:12 (RUNNING 00:00:19.411)**

```
05        Q.    Is that one of the
06    Expressions of Concern that you were
07    talking about?
08        A.    Yes, it is.
09        Q.    Would you agree with me that
10    this one is different in kind from what
11    you published concerning VIGOR?
12        A.    Oh, I think it's very
```

**139. PAGE 138:13 TO 139:05 (RUNNING 00:00:52.000)**

```
13    different in kind, yes.
14        Q.    And in this one, you report
15    in a single paragraph that concerns were
16    raised concerning the data published in
17    one of your articles, right?
18        A.    Correct.
19        Q.    And you say, "We have
20    informed the director of Dr. Subdo's" --
21        A.    Subdo.
22        Q.    -- "Subdo's institution...
23    and await the results of his
24    investigation."  Correct?
00139:01        A.    Correct.
02        Q.    And you do not set forth any
03    conclusions that you reached in advance
04    of hearing from the author's institution;
05    right?
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

**140. PAGE 139:08 TO 139:11 (RUNNING 00:00:08.356)**

```
08                THE WITNESS:  Oh, there are
09        preliminary conclusions in this
10        paragraph, yes, that we had
11        reached, yes.
```

**141. PAGE 139:13 TO 140:10 (RUNNING 00:00:52.756)**

```
13        Q.    Well, the paragraph says,
14   "In the issue of April 26, 2001, we
15   published a study by John Sudbo.  Figure
16   3B and Figure 3C of that article, which
17   purport to represent two different
18   patients and stages of oral" -- what's
19   the next word?
20        A.    -- "epithelial dysplasia."
21        Q.    -- "are in fact different
22   magnifications of the same
23   photomicrogram."
24        A.    That's right.
00140:01        Q.    "Because the results of
02   another study of Dr. Sudbo, published in
03   the issue of April 1, 2004 were derived
04   from the same subjects followed through
05   the same database, we have similar
06   concerns."  Then you say, "We have
07   informed the director...and [we] await
08   the results of his investigation."
09   Right?
10        A.    Uh-huh.
```

**142. PAGE 141:06 TO 142:19 (RUNNING 00:01:19.937)**

```
06        Q.    Do you have in front of you
07   the document that I've marked as Exhibit
08   14?
09        A.    Yes.
10        Q.    Was this the other
11   Expression of Concern that you testified
12   about earlier?
13        A.    This is one of the three,
14   yes.
15        Q.    Okay.
16              And we talked about the one
17   concerning VIGOR, we just talked about
18   the one concerning Dr. Sudbo, and this is
19   the third; right?
20        A.    That's right.
21        Q.    This concerns an article by
22   Dr. Schiff; is that right?
23        A.    Schiffl.
24        Q.    Schiffl.  I'm sorry.  What
00142:01   it says is that it has come to your
02   attention that there was an "ongoing
03   investigation into potential scientific
04   misconduct" concerning this article that
05   you published?
06        A.    (Witness nods.)
07        Q.    And you said you will inform
08   your readers of the outcome of the
09   investigation when it's complete.  Right?
10        A.    That's right.
11        Q.    And that investigation that
12   you referred to was the investigation by
13   Dr. Schiffl's sponsoring institution;
14   correct?
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

```
15      A.    Correct.
16      Q.    And then later on they told
17 you that they had not found sufficient
18 evidence of misconduct, and you,
19 therefore, retracted the Expression of
```

**143. PAGE 142:20 TO 142:21 (RUNNING 00:00:03.542)**

```
20 Concern, right?
21      A.    Right.
```

**144. PAGE 143:06 TO 143:06 (RUNNING 00:00:03.821)**

```
06      Q.    Do you recognize Exhibit 15?
```

**145. PAGE 143:11 TO 143:11 (RUNNING 00:00:01.999)**

```
11            THE WITNESS:  Yes, I do.
```

**146. PAGE 143:13 TO 143:21 (RUNNING 00:00:24.904)**

```
13      Q.    Is this a message from you
14 and Dr. Morrissey to Dr. Bombardier
15 informing her of the early release of the
16 Expression of Concern?
17      A.    It's an e-mail from me and
18 Dr. Morrissey to Dr. Bombardier regarding
19 the release, yes.
20      Q.    What's the date and time of
21 your e-mail to Dr. Bombardier?
```

**147. PAGE 144:08 TO 144:16 (RUNNING 00:00:22.855)**

```
08      A.    December 8 at 11:59 a.m.
09      Q.    When do you tell her that
10 the Expression of Concern is going to be
11 released?
12      A.    At 3:00.
13      Q.    So, you gave her three hours
14 and one minute notice?
15      A.    Of the exact release time,
16 yes.
```

**148. PAGE 146:04 TO 146:12 (RUNNING 00:00:23.813)**

```
04      Q.    I guess in between 11:59
05 a.m. when you first told her you were
06 going to do it and 3:00 when you did it,
07 did she tell you that that didn't give
08 her time to respond?
09      A.    Well, I don't recall.  I
10 don't think I spoke with her.  I don't
11 recall anything about that.  But --
12      Q.    Please look at Exhibit 16.
```

**149. PAGE 147:07 TO 147:24 (RUNNING 00:00:40.262)**

```
07      Q.    This is an e-mail from Dr.
08 Bombardier to Mr. Morrissey.
09      A.    Dr. Morrissey.
10      Q.    Dr. Morrissey, excuse me.
11            It says, "Dr. Morrissey,
12 Thank you for sending this in advance,
13 given the nature of your expression of
14 concern, we want the opportunity to
15 respond but as you can well imagine it
16 will not be possible to respond by the
17 deadline of 3:00 p.m. this afternoon."
18            Did Dr. Morrissey
19 communicate to you this message from Dr.
```

**CONFIDENTIAL**

## Mason v. Merck

```
20    Bombardier?
21          A.    Yes, he did.
22          Q.    But you went ahead with the
23    publication anyway at 3 p.m., didn't you?
24          A.    Yes, we did.
```

### 150. PAGE 149:12 TO 149:16 (RUNNING 00:00:11.624)

```
12          Q.    Did you personally decide to
13    go ahead with the publication, even
14    though she had told you, the New England
15    Journal of Medicine, that she wanted an
16    opportunity to respond in advance?
```

### 151. PAGE 149:19 TO 150:01 (RUNNING 00:00:11.356)

```
19                THE WITNESS:  The final
20    decision -- the final decision, as
21    is always the case at the New
22    England Journal about any
23    decisions, comes from the
24    editor-in-chief.  And I'm not the
00150:01    editor-in-chief.
```

### 152. PAGE 150:20 TO 151:16 (RUNNING 00:01:26.455)

```
20          Q.    Later on, were you involved
21    in sending Dr. Bombardier a seven-point
22    letter telling her what points the New
23    England Journal of Medicine wanted her to
24    make when she responded?
00151:01    A.    Yes.  She had -- my
02    recollection is that she had asked for
03    additional clarification from us about
04    what specifically we wanted her to
05    respond to.  Up until that time, we had
06    only given her a copy of the Expression
07    of Concern itself.  And she wanted more
08    guidance from us about our points of
09    concern.  And in response to that
10    request, I believe Dr. Morrissey and I
11    were the authors of that seven-point
12    document that you mentioned.  And we
13    tried to bring out in that document some
14    additional explanation of our reasons for
15    concern about the article so that that
16    could focus her response more directly.
```

### 153. PAGE 151:24 TO 152:01 (RUNNING 00:00:07.214)

```
24          Q.    Please look at Exhibit 17.
00152:01    Do you recognize that?
```

### 154. PAGE 152:04 TO 152:16 (RUNNING 00:00:37.472)

```
04                Well, this, I think, begins
05    with an e-mail from Dr. Bombardier to me
06    and Dr. Morrissey along the lines of what
07    I just said, requesting some
08    additional -- I mean, we can read this.
09          Q.    We could, but what you had
10    said was she asked you for guidance about
11    how she should respond.  In fact, if you
12    read this, what she asks you for is a
13    copy of the information that you referred
14    to in your Expression of Concern so that
15    she could write her own response.  Isn't
16    that true?
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason  v.  Merck

**155. PAGE 153:02 TO 154:12  (RUNNING 00:01:08.545)**

```
02              THE WITNESS:  Okay.  Well,
03     what she says is that "You
04     requested a submission from the
05     authors of that study that
06     addresses the additional data and
07     the issues set forth in the
08     Expression of Concern that you
09     published this week, and I agreed
10     to your request as lead author of
11     that study.
12              "We have already started on
13     that task, and I seek your
14     assistance for the project.  In
15     order for us to fully and properly
16     evaluate the data and the issues,
17     we will need to have copies of all
18     the materials that the New England
19     Journal of Medicine has that you
20     referred to in your telephone call
21     as well as those to which the
22     Expression of Concern referred.
23     While you suggested earlier that
24     we obtain these materials from
00154:01  Merck, in light of the questions
02     that you have raised about
03     confidence in the provenance of
04     data and information, we believe
05     that it is essential for us to
06     obtain such materials directly
07     from the New England Journal of
08     Medicine in order to ensure that
09     the material we are reviewing is
10     in fact the same data that is
11     referred to in your Expression of
12     Concern."
```

**156. PAGE 154:14 TO 154:17  (RUNNING 00:00:07.692)**

```
14              Q.   You agree, sir, that all she
15     asked you for here was a copy of the data
16     and the materials that you referenced in
17     your Expression of Concern?
```

**157. PAGE 154:22 TO 154:22  (RUNNING 00:00:00.879)**

```
22              A.   Yes.
```

**158. PAGE 156:02 TO 156:04  (RUNNING 00:00:08.159)**

```
02              Q.   So, point number 7 of your
03     seven-point letter to her basically said
04     get these from the Merck lawyer; right?
```

**159. PAGE 156:05 TO 157:15  (RUNNING 00:01:43.473)**

```
05              A.   Yes.  And I think that it's
06     fairly explicit.
07              Q.   Yes, I agree.
08              But now what you also did is
09     you and Dr. Morrissey attempted to
10     dictate to Dr. Bombardier the content of
11     her response?
12              A.   We did not attempt to
13     dictate.  We attempted to articulate or
14     provide additional explanation of points
15     of our concern.  We are the editors.  We
16     had concerns.  It's not a matter of
```

## Mason  v.  Merck

```
      17    dictating.  It's a matter of expressing
      18    what the concerns were so that she could
      19    respond to those concerns.  That's what
      20    an Expression of Concern is.  That's why
      21    it's called an Expression of Concern.
      22    It's an expression of our concern that
      23    then we ask her to address.  We thought
      24    this would be helpful to her in framing a
00157:01    response.
      02         Q.    Didn't you tell her "We will
      03    explain herein what we expect this
      04    correction to include"?
      05         A.    Uh-huh.
      06         Q.    The very first point you
      07    say, "You should acknowledge."  Then you
      08    go on to tell her what she's supposed to
      09    acknowledge in her response, right?  Is
      10    that right?
      11         A.    That's the way the sentence
      12    reads, yes.
      13         Q.    And then basically you tell
      14    her that she's supposed to say she's
      15    sorry, don't you?
```

**160. PAGE 157:19 TO 158:20 (RUNNING 00:01:00.212)**

```
      19         Q.    Point number 6.  You're
      20    telling the author of this study that,
      21    number 6, "These omissions and
      22    inaccuracies are regrettable, and this
      23    should be acknowledged in your
      24    statement."  You're telling her to
00158:01    apologize for her article, aren't you?
      02         A.    We asked her for a response,
      03    and --
      04         Q.    And you told her what you
      05    wanted --
      06         A.    She --
      07         Q.    -- it to include?
      08         A.    She can respond in any way
      09    that she wishes.  We were laying out our
      10    concerns.  And one of our concerns was
      11    that there were omissions and
      12    inaccuracies that were regrettable.  And
      13    we had evidence to back it up.  And she
      14    can respond to that statement in any way
      15    that she wants.
      16         Q.    And she did, in fact,
      17    respond to that statement, did she not?
      18         A.    She did, yes.
      19         Q.    And she told you that you
      20    were wrong, right?
```

**161. PAGE 159:02 TO 159:03 (RUNNING 00:00:01.762)**

```
      02              THE WITNESS:  I don't
      03    recall.
```

**162. PAGE 159:05 TO 159:16 (RUNNING 00:00:13.777)**

```
      05         Q.    You don't recall --
      06         A.    No, I don't.
      07         Q.    -- what she said in her
      08    response?
      09         A.    No.
      10         Q.    Have you looked at her
      11    response?
      12         A.    Only very cursorily at this
```

**CONFIDENTIAL**

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

```
        13   point.  We just received the response,
        14   and, in fact --
        15         Q.    Well, you received it more
        16   than a week ago, didn't you?
```

**163. PAGE 159:19 TO 159:24 (RUNNING 00:00:16.443)**

```
        19               THE WITNESS:  We didn't
        20   receive one response, and part of
        21   the complexity now of the issue is
        22   that we received two separate
        23   responses from two different
        24   groups of authors, and --
```

**164. PAGE 160:18 TO 160:19 (RUNNING 00:00:04.266)**

```
        18         Q.    My question is, you received
        19   it more than a week ago, didn't you?
```

**165. PAGE 161:10 TO 161:12 (RUNNING 00:00:04.418)**

```
        10         A.    We received two responses,
        11   and I don't remember the exact dates of
        12   receipt.
```

**166. PAGE 161:23 TO 161:23 (RUNNING 00:00:01.735)**

```
        23         Q.    What is Exhibit 18?
```

**167. PAGE 162:07 TO 162:08 (RUNNING 00:00:07.999)**

```
        07         Q.    Is this some transmittal
        08   e-mail and then the response from Dr.
```

**168. PAGE 162:09 TO 162:09 (RUNNING 00:00:03.532)**

```
        09   Bombardier?
```

**169. PAGE 162:12 TO 162:12 (RUNNING 00:00:01.305)**

```
        12               Yes, it is.
```

**170. PAGE 162:13 TO 162:20 (RUNNING 00:00:20.823)**

```
        13         Q.    Dr. Bombardier responded on
        14   behalf of herself and the other nine
        15   authors who were not Merck employees;
        16   right?
        17         A.    Yes.
        18         Q.    And in this response, these
        19   ten non-Merck authors told you that you
        20   were wrong; right?
```

**171. PAGE 162:24 TO 163:11 (RUNNING 00:00:28.798)**

```
        24         A.    No.  I don't read it that
  00163:01   way.  But, again, I want to make it clear
        02   that I have not had an opportunity to go
        03   through this, and I'm not prepared to
        04   discuss this document.  I wasn't -- we
        05   have read these documents, and, again, I
        06   think that the most important aspect of
        07   the response from the authors so far is
        08   the fact that we received not one
        09   response --
        10         Q.    I'll get to the other one.
        11         A.    -- but two responses.
```

**172. PAGE 163:20 TO 164:24 (RUNNING 00:01:06.825)**

```
        20         Q.    Now, are you telling me --
        21   you've certainly known that your
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason  v.  Merck

```
        22    deposition was going to be taken in
        23    connection with the Expression of
        24    Concern.  You've known that for certainly
00164:01    over a week, right?
        02         A.    Right.
        03         Q.    And you've had the answer
        04    from the ten non-Merck authors --
        05         A.    Right.
        06         Q.    -- to your Expression of
        07    Concern, and you say you haven't read it
        08    carefully enough to be prepared to
        09    discuss it?
        10         A.    I have -- we have -- a
        11    document like this requires reading by
        12    more than one person, deliberation,
        13    meeting together among the head editors
        14    of the Journal.  And we have not had the
        15    opportunity to do that yet.  I could go
        16    into reasons why that is, logistic
        17    reasons of getting a Journal out every
        18    week, logistic reasons that our
        19    editor-in-chief is currently attending in
        20    the intensive care unit at Brigham and
        21    Women's Hospital and is working basically
        22    almost 20 hours a day in the intensive
        23    care unit, but I won't bore you and take
        24    up your time with that.
```

**173. PAGE 165:02 TO 165:12  (RUNNING 00:00:27.079)**

```
        02         A.    My answer to your question
        03    -- yes.  My answer to your question is, I
        04    have not had time to adequately digest
        05    this.  And one of the key issues in
        06    digesting this is that we are going to
        07    have to decide what to do about receiving
        08    two different responses when we asked for
        09    one.  And it suggests to me, raises the
        10    question that there may be some sort of
        11    schism between the authors here that may
        12    have to be worked out.
```

**174. PAGE 166:16 TO 166:24  (RUNNING 00:00:21.439)**

```
        16         Q.    Do you recognize Exhibit 21
        17    to be a response on behalf of Drs. Reicin
        18    and Shapiro who are both affiliated with
        19    Merck?
        20         A.    Right.  It's being
        21    communicated by a medical communications
        22    person.
        23         Q.    Right.
        24         A.    Right.
```

**175. PAGE 170:02 TO 170:16  (RUNNING 00:00:39.009)**

```
        02         Q.    And you had not only Dr.
        03    Bombardier's response on behalf of the
        04    ten non-Merck authors for over a week
        05    before today, you also had Dr. Reicin's
        06    response on behalf of herself and Dr.
        07    Shapiro, the Merck authors, for over a
        08    week before today, right?
        09         A.    If you say so.  I'll take
        10    your word for it.  Sure.
        11         Q.    And here you are, you know
        12    this is the only chance that I get to ask
        13    you questions about the Expression of
```

## Mason v. Merck

```
14   Concern, and you didn't take the time to
15   read either one of these to comment on
16   their substance?
```

**176. PAGE 171:14 TO 171:23 (RUNNING 00:00:32.161)**

```
14         Q.    My question is simply that
15   knowing that your deposition was going to
16   be taken today and that the main subject
17   was your Expression of Concern, and
18   having the responses filed by both the
19   non-Merck lawyer -- the non-Merck authors
20   and the Merck authors for over a week,
21   it's your testimony that you didn't take
22   the time to read them so that you could
23   talk about the substance of them?
```

**177. PAGE 172:02 TO 172:20 (RUNNING 00:00:49.528)**

```
02              THE WITNESS:  Our response
03   to these documents will require
04   very careful deliberation.
05   Editors of journals don't do
06   things on a knee jerk.  We can't
07   afford to do that.  I did not set
08   the date for this deposition, and,
09   in fact, we received these when we
10   received them.  And we will need
11   time to very carefully digest the
12   situation, and then we'll have an
13   official response to it.  I'm not
14   prepared to do that now.  We do
15   things carefully in our office.
16   That's how we do things.  That's
17   the way we do things.  And I'm
18   sorry if that doesn't fit with
19   your timetable, but that's the
20   reality of the situation.
```

**178. PAGE 172:22 TO 173:09 (RUNNING 00:00:27.000)**

```
22         Q.    Have you looked at these two
23   responses enough to know whether they're
24   in basic agreement or whether there's any
00173:01   points of disagreement?
02         A.    No.  I can't really comment
03   about that.
04         Q.    So, it's not just that you
05   haven't had, you know, conferences with
06   your colleagues to talk it all through,
07   you just haven't read them carefully in
08   advance of your deposition.  Is that your
09   testimony?
```

**179. PAGE 173:12 TO 174:01 (RUNNING 00:00:32.000)**

```
12              THE WITNESS:  I'm saying
13   that we -- documents of this kind
14   will demand careful deliberation
15   among the editors at the New
16   England Journal of Medicine, and
17   we have not gone through that
18   process yet.  And anything that I
19   might say today might not be fully
20   accurate because we've not gone
21   through this process of
22   deliberating together and
23   interpreting these two documents.
```

### Mason v. Merck

```
        24          And that's all I can say about
00174:01          this.
```

**180. PAGE 174:03 TO 174:07  (RUNNING 00:00:19.094)**

```
        03          Q.    Well, getting back to your
        04    Expression of Concern, you indicated it
        05    got a lot of media attention, and you and
        06    your outside PR people followed the media
        07    attention pretty closely, didn't you?
```

**181. PAGE 174:12 TO 174:13  (RUNNING 00:00:02.063)**

```
        12                THE WITNESS:  No.  I
        13    certainly didn't.  I mean --
```

**182. PAGE 174:15 TO 174:19  (RUNNING 00:00:14.850)**

```
        15          Q.    Did you get daily updates on
        16    how many people were accessing the
        17    Expression of Concern on the website and
        18    how many reports were in the newspaper
        19    about the Expression of Concern?
```

**183. PAGE 174:21 TO 174:23  (RUNNING 00:00:04.000)**

```
        21                THE WITNESS:  If I got the
        22    updates, I wasn't reading them
        23    carefully.
```

**184. PAGE 175:01 TO 175:06  (RUNNING 00:00:18.893)**

```
00175:01          Q.    Did the people at the New
        02    England Journal of Medicine monitor at
        03    least the major newspapers to see how
        04    they were reporting on the Expression of
        05    Concern and whether there were any errors
        06    that should be corrected?
```

**185. PAGE 175:09 TO 175:22  (RUNNING 00:00:29.345)**

```
        09                THE WITNESS:  Our media
        10          relations specialist always
        11          monitors the news.  That's what
        12          her job is.  She does that every
        13          day about everything that we
        14          publish to see what the media is
        15          writing about it.  That's what her
        16          job is.  And part of it is to make
        17          sure that they're reporting
        18          accurately on articles that we
        19          publish, not just the Expression
        20          of Concern.  This happens every
        21          day for every article.  We get
        22          news updates every day.
```

**186. PAGE 176:16 TO 177:01  (RUNNING 00:00:38.390)**

```
        16          Q.    Dr. Curfman, you were quoted
        17    in the Forbes article as saying you were
        18    somewhere between surprised and stunned
        19    that some cardiovascular data that was in
        20    a presubmission draft, a draft that was
        21    prepared before it was submitted to the
        22    New England Journal of Medicine, had been
        23    deleted before the draft was submitted.
        24    Do you remember that and were you
00177:01    accurately quoted?
```

CONFIDENTIAL

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

**187. PAGE 177:10 TO 177:24 (RUNNING 00:00:44.983)**

```
10              THE WITNESS:  Well, I can
11      tell you what I was somewhere
12      between surprised and stunned
13      about, and that was the document
14      that was presented to me for the
15      first time on November 21st, 2005,
16      Exhibit 18, among the exhibits on
17      that day, which was an internal
18      memorandum dated July 5th, 2000,
19      which contained an extensive body
20      of data on the cardiovascular
21      adverse events in VIGOR that I had
22      never seen before.  And that put
23      me somewhere between surprised and
24      stunned.
```

**188. PAGE 179:22 TO 180:04 (RUNNING 00:00:29.423)**

```
22              My question is, from your
23      review of the materials, are you aware
24      that all of the data that was collected
00180:01 in the July 2000 memorandum and including
02      the tables and the statistical analyses,
03      that all of that was communicated to the
04      FDA in the fall of 2000?
```

**189. PAGE 180:08 TO 180:12 (RUNNING 00:00:07.999)**

```
08              THE WITNESS:  Yes.  I'm
09      aware that it was communicated to
10      the FDA.  It was not posted by the
11      FDA until the following year,
12      months --
```

**190. PAGE 180:14 TO 180:17 (RUNNING 00:00:06.614)**

```
14      Q.    In February?
15      A.    -- months after, months
16      after the publication of the misleading
17      New England Journal article.
```

**191. PAGE 183:02 TO 183:19 (RUNNING 00:00:46.264)**

```
02      Q.    How about in the materials
03      communicating the information to the FDA,
04      was there a mention there of a
05      prespecified cutoff date?
06      A.    I don't recall.  It's a big
07      document, and I'd have to go back through
08      it.
09      Q.    How about in the FDA
10      materials prepared by people within the
11      FDA, is there an indication in the FDA
12      materials that this additional
13      information that was transmitted to them
14      in October had come in after a
15      prespecified cutoff date that was used in
16      the VIGOR study?
17      A.    Well, I don't know.  I don't
18      know about that.  What I can tell you is
19      that in the VIGOR --
```

**192. PAGE 185:05 TO 185:12 (RUNNING 00:00:25.869)**

```
05      Q.    Did you ever look at the
06      Targum memo that we talked about earlier,
07      that internal FDA memo that analyzes
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

```
08   data?  Did you ever look at the Targum
09   memo to see whether it explains that that
10   information that was provided in the fall
11   of 2000 had come in after a prespecified
12   cutoff date for the VIGOR study?
```

**193. PAGE 185:17 TO 185:19  (RUNNING 00:00:03.065)**

```
17        Q.    Did you ever look at the
18   Targum memo to see that?
19        A.    Yes, I did.
```

**194. PAGE 192:10 TO 193:12  (RUNNING 00:01:21.442)**

```
10        Q.    Let me turn to another
11   subject that is addressed in your
12   Expression of Concern, and that is
13   information that was in a draft before
14   the draft was submitted to the New
15   England Journal of Medicine, but then was
16   taken out in the draft that was submitted
17   to the New England Journal of Medicine.
18             Do you understand what topic
19   I'm talking about?
20        A.    Right.
21        Q.    Now, this is not the three
22   MIs, right?
23        A.    No.  This has nothing to do
24   with the three MIs.
00193:01   Q.    Okay.
02             And this has to do with a
03   table that at least the shell or the form
04   of the table was in an electronic version
05   of the manuscript that you could see that
06   it had been in the draft before it had
07   been submitted to the New England Journal
08   of Medicine, but that had been taken out
09   before the submission was actually made;
10   is that right?
11        A.    Well, that's part of the
12   story.
```

**195. PAGE 194:03 TO 194:07  (RUNNING 00:00:12.658)**

```
03             Am I correct that the New
04   England Journal of Medicine requested the
05   authors of the VIGOR manuscript to
06   provide an electronic version to the New
07   England Journal?
```

**196. PAGE 194:10 TO 194:15  (RUNNING 00:00:10.794)**

```
10             THE WITNESS:  I don't know
11   whether we requested it or not.
12   They did send it.  I'd have to --
13   you know, you can show me a
14   document with a sentence in there,
15   but they provided the disk.
```

**197. PAGE 194:17 TO 194:20  (RUNNING 00:00:06.134)**

```
17        Q.    Okay.
18             And they provided the disk
19   in August of 2000, right?
20        A.    Yes.
```

**198. PAGE 194:23 TO 195:04  (RUNNING 00:00:14.000)**

```
23        Q.    And when they provided you
```

## Mason  v.  Merck

```
          24    with this disk, the electronic version,
    00195:01    they gave it to you with a feature called
          02    track changes that was turned on when
          03    they gave it to you, right?
          04        A.    Yes.
```

**199. PAGE 195:06 TO 195:23 (RUNNING 00:00:50.817)**

```
          06                And this disk, little
          07    computer disk, had three versions of the
          08    VIGOR manuscript on it; is that right?
          09        A.    That's correct.
          10        Q.    So that you could compare,
          11    if you wanted to, you know, how the
          12    versions evolved over time?
          13        A.    Yes, you could.
          14        Q.    And even within a single
          15    version with the track changes feature
          16    turned on, or it's sometimes called a red
          17    lining feature, are you familiar with
          18    that term?
          19        A.    Sure.
          20        Q.    And you can see, because the
          21    computer keeps track of any language or
          22    tables or data that was taken out during
          23    the drafting process; correct?
```

**200. PAGE 196:22 TO 197:03 (RUNNING 00:00:18.576)**

```
          22                With the track changes
          23    feature turned on, within a single
          24    version of the manuscript you can see,
    00197:01    because the computer keeps track of what
          02    language or data is added and what
          03    language or data is taken out, right?
```

**201. PAGE 197:06 TO 197:06 (RUNNING 00:00:01.539)**

```
          06                THE WITNESS:  Right.
```

**202. PAGE 201:18 TO 201:24 (RUNNING 00:00:17.988)**

```
          18        Q.    And my question is, when you
          19    wrote that Expression of Concern focusing
          20    on the fact that the table was taken out,
          21    did you take into account the fact that
          22    the authors showed you that when they
          23    gave you the electronic version with the
          24    track changes feature turned on?
```

**203. PAGE 202:03 TO 202:06 (RUNNING 00:00:09.087)**

```
          03                THE WITNESS:  Yes.  We took
          04        that into consideration.  The
          05        table was not the only data that
          06        were removed from the manuscript.
```

**204. PAGE 204:09 TO 205:04 (RUNNING 00:01:04.625)**

```
          09        Q.    Now, even though the authors
          10    gave you the electronic version with the
          11    track changes turned on back in August of
          12    2000, am I correct from your Expression
          13    of Concern that it looked like you never
          14    looked at the electronic version until
          15    sometime in the fall of 2004; is that
          16    right?
          17        A.    That's right.
          18        Q.    Now, did you ever tell,
```

## Mason v. Merck

```
           19    "you" being Dr. Curfman, covering you,
           20    personally, first, back during the
           21    editorial process in 2000, when the
           22    authors gave you the electronic version
           23    with the track changes turned on, did you
           24    communicate in any way to them that you
  00205:01    and your colleagues were not going to
           02    look at the electronic version, "you,"
           03    personally, now?
           04         A.   Yeah, no.
```

**205. PAGE 205:15 TO 206:04  (RUNNING 00:00:43.984)**

```
           15         Q.     In terms of tables in
           16    articles published in the New England
           17    Journal of Medicine, is there some kind
           18    of guideline or limit on the number of
           19    tables that are supposed to be included?
           20         A.    There's a guideline.
           21    There's not a limit.
           22         Q.    What does the guideline say
           23    as to the number of tables?
           24         A.    We generally go for five or
  00206:01    six tables in the print version.  We can
           02    publish additional information on our
           03    website, or sometimes we will publish
           04    additional tables in print as well.
```

**206. PAGE 206:09 TO 206:17  (RUNNING 00:00:17.058)**

```
           09         Q.    You say there's a guideline
           10    of five or six.  You know that that's not
           11    true, don't you?  You know the guideline
           12    is five, right?
           13         A.    Well, the guideline in that
           14    information of authors at that time
           15    probably said five.
           16         Q.    Well, you know it said five,
           17    don't you?
```

**207. PAGE 207:03 TO 207:05  (RUNNING 00:00:04.999)**

```
           03              THE WITNESS:  The letter
           04    that I send out to the authors at
           05    the moment says five or six.
```

**208. PAGE 207:07 TO 207:10  (RUNNING 00:00:07.347)**

```
           07         Q.    How about back in 2000 when
           08    VIGOR was written, what was the guideline
           09    then?
           10         A.    It was probably five then.
```

**209. PAGE 209:02 TO 209:03  (RUNNING 00:00:04.253)**

```
           02         Q.    The next exhibit is Exhibit
           03    Number 19.
```

**210. PAGE 211:19 TO 212:06  (RUNNING 00:00:26.568)**

```
           19              And do you see here in the
           20    very middle of the page that the VIGOR
           21    authors -- up at the top it says,
           22    "Suggestion for Transmittal to Authors."
           23    Right?  Right?
           24         A.    Yes.
  00212:01         Q.    Assuming that the suggestion
           02    was followed, right there in the middle
           03    of the page, it says, "The total number
```

**Case Clip(s) Detailed Report**
**Friday, November 03, 2006, 8:26:05 AM**

## Mason  v.  Merck

```
      04   of figures plus tables should not total
      05   more than five."  Do you see that?
      06         A.    Yes.
```

**211. PAGE 214:01 TO 214:03  (RUNNING 00:00:09.985)**

```
00214:01               So, look through Exhibit 1
      02   and tell the jury how many tables there
      03   were in the VIGOR article.
```

**212. PAGE 214:06 TO 214:07  (RUNNING 00:00:01.942)**

```
      06               There were five tables and
      07   one figure for a total of six pieces of
```

**213. PAGE 214:08 TO 214:08  (RUNNING 00:00:05.071)**

```
      08   documentation.
```

**214. PAGE 217:05 TO 218:11  (RUNNING 00:01:11.863)**

```
      05         Q.    Look at Exhibit 20.  Is
      06   Exhibit 20 some comments by a reviewer,
      07   or is this a direct communication from an
      08   editor of the New England Journal of
      09   Medicine to the lead author of the VIGOR
      10   publication?
      11         A.    It is a letter from
      12   associate editor Marshall Kaplan to the
      13   corresponding author of the VIGOR
      14   article, correct.
      15         Q.    And Marshall Kaplan, in
      16   terms of this time frame in June of
      17   2000 --
      18         A.    Right.
      19         Q.    -- in terms of
      20   communications with Dr. Bombardier,
      21   Marshall Kaplan was really the voice of
      22   the New England Journal of Medicine,
      23   right?
      24         A.    He was the associate editor,
00218:01   yes.
      02         Q.    But he was the one who was
      03   in charge of communicating the views and
      04   instructions --
      05         A.    In this particular letter.
      06         Q.    -- of the New England
      07   Journal of Medicine to the author, Dr.
      08   Bombardier --
      09         A.    He wrote this letter, yes.
      10         Q.    -- Dr. Bombardier; right?
      11         A.    Yes.  Uh-huh.
```

**215. PAGE 219:18 TO 219:24  (RUNNING 00:00:11.207)**

```
      18         Q.    And why don't you read the
      19   rest of that sentence that talks about
      20   how it should be no longer than 3,000
      21   words.  What does it say right after
      22   that?
      23         A.    "With a total of no more
      24   than five figures and tables."  And I
```

**216. PAGE 221:10 TO 221:15  (RUNNING 00:00:29.348)**

```
      10         Q.    Doctor, on the subject of
      11   the significance of the deletion of Table
      12   5, did Dr. Drazen tell you that he
      13   thought that that whole subject did not
```

## Mason v. Merck

```
14    even have enough significance to be
15    mentioned in the Expression of Concern?
```

**217. PAGE 221:18 TO 221:19  (RUNNING 00:00:02.424)**

```
18            THE WITNESS:  Not to my
19    knowledge.
```

**218. PAGE 222:03 TO 223:06  (RUNNING 00:01:20.648)**

```
03        Q.    I've handed you Exhibit 22.
04    Do you see that this is an e-mail from
05    Dr. Drazen, the editor-in-chief, to you
06    and Dr. Morrissey, "Subject: Expression
07    of Concern"?
08        A.    I do, yes.
09        Q.    And it's dated December 4th.
10    Was that pretty early in the drafting of
11    the Expression of Concern?
12        A.    That was still pretty early,
13    yes.
14        Q.    Okay.
15            And do you see here on the
16    e-mail he's attached a document.  And
17    when explaining his attachment, he says,
18    "I attach another edited version of the
19    expression.  The biggest change is the
20    deletion of the stuff about Table 5.  I
21    think it attributes more to this table
22    than it deserves and the numbers speak
23    for themselves.  This piece is cleaner
24    without it."
00223:01            So, does that refresh your
02    recollection that the editor-in-chief of
03    the New England Journal told you that he
04    didn't think that the stuff about Table 5
05    was even significant enough to be
06    included in the Expression of Concern?
```

**219. PAGE 223:09 TO 223:10  (RUNNING 00:00:01.999)**

```
09            THE WITNESS:  He changed his
10    mind.
```

**220. PAGE 223:12 TO 223:17  (RUNNING 00:00:16.561)**

```
12        Q.    Well, my question is, does
13    this refresh your recollection that, in
14    fact, he told you, at least on December
15    4th, that this whole table 5 stuff was
16    not even a big enough deal to be included
17    in the Expression of Concern?
```

**221. PAGE 224:19 TO 224:22  (RUNNING 00:00:11.732)**

```
19        A.    Yes.  That's what he said.
20    I, frankly, don't exactly remember this
21    e-mail because he changed his mind, and
22    we did include the material on Table 5.
```

**222. PAGE 225:18 TO 226:19  (RUNNING 00:01:15.144)**

```
18        Q.    And I will show you Exhibit
19    23, which is the attachment to the e-mail
20    that we just looked at.
21        A.    Yes.
22        Q.    And this is kind of a
23    printed out version of that track changes
24    feature that we talked about, isn't it?
```

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

```
00226:01   This is a draft of the Expression of
      02   Concern, and you can see on the right
      03   things that have been deleted and things
      04   that have been added?
      05       A.    Right.  Yep.
      06       Q.    Okay.
      07             And do you see over here on
      08   this attachment to the editor-in-chief's
      09   e-mail to you that that last square over
      10   there that shows what was deleted, at
      11   least as of December 4, he wanted to take
      12   out the entire paragraph having to do
      13   with Table 5, right?
      14       A.    Yes, at that time.  And then
      15   he changed his mind.  That was an early
      16   version.  And we went through many
      17   versions of this document and a lot of
      18   editing was done.  The final version, of
      19   course, did include that material.
```

**223. PAGE 236:14 TO 236:15 (RUNNING 00:00:20.152)**

```
      14       Q.    Let me hand you the next
      15   document, Exhibit 26.  Now, again, this
```

**224. PAGE 236:16 TO 236:19 (RUNNING 00:00:14.000)**

```
      16   is a series of e-mails, and you see that
      17   you're on these first two at least on
      18   Page 1.
      19       A.    Right.
```

**225. PAGE 237:04 TO 237:05 (RUNNING 00:00:13.802)**

```
      04             So, let's go to Page 3 of
      05   this exhibit, and this is an e-mail that
```

**226. PAGE 237:06 TO 237:11 (RUNNING 00:00:17.818)**

```
      06   you got a copy of from Caryn Sandrew on
      07   behalf of Dr. Drazen.  Do you see that?
      08       A.    Yes, I do.
      09       Q.    And it's, again, to Ms.
      10   Prakash of NPR; right?
      11       A.    Right.
```

**227. PAGE 239:15 TO 239:21 (RUNNING 00:00:15.957)**

```
      15       Q.    Let's go down to the very
      16   bottom where he says, "It is generally
      17   inappropriate to mine a data set for
      18   endpoints that were not pre- specified in
      19   the research protocol."
      20       A.    Yes.  The problem is that in
      21   a safety study, that does not apply.
```

**228. PAGE 240:14 TO 240:23 (RUNNING 00:00:20.023)**

```
      14       Q.    My focus is, he's making a
      15   general observation about whether it is
      16   appropriate or not to mine a data set for
      17   endpoints that were not prespecified in
      18   the research protocol.
      19       A.    Except for safety endpoints.
      20       Q.    But he doesn't say that,
      21   does he?
      22       A.    Well, that's fine, but I'm
      23   telling you what the facts are.
```

CONFIDENTIAL

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

**229. PAGE 241:10 TO 242:13 (RUNNING 00:01:10.232)**

```
10          Q.     Does he go on to say to the
11   NPR author, "Such a fishing expedition
12   can lead to misleading conclusions, both
13   positive and negative"?
14          A.     They could, but he had never
15   seen this document.  And this is a
16   critical document that no editor or
17   physician would ever overlook, the
18   importance of this document.  These are
19   critical safety endpoints, safety
20   endpoints.  And safety endpoints are
21   often not prespecified in a protocol.
22          Q.     But, in fact, when he made
23   that observation about how that's
24   inappropriate and it's a fishing
00242:01   expedition, he was talking about the
02   safety endpoints of the VIGOR article,
03   was he not, sir?
04          A.     He was not -- he was not
05   privy to this document.
06          Q.     Was he talking about the
07   safety endpoints of the VIGOR article
08   when he said that "It is generally
09   inappropriate to mine a data set for
10   endpoints that were not pre-specified to
11   the research protocol.  Such a fishing
12   expedition can lead to misleading
13   conclusions, both positive and negative"?
```

**230. PAGE 242:14 TO 242:21 (RUNNING 00:00:11.000)**

```
14          A.     He doesn't say --
15          Q.     Was the subject he was
16   talking about --
17          A.     It's not clear from this.
18   It's a new paragraph.
19          Q.     The entire subject of the
20   NPR article was the safety endpoints --
21          A.     The words don't say that.
```

**231. PAGE 242:24 TO 242:24 (RUNNING 00:00:01.184)**

```
24                 THE WITNESS:  Thank you.
```

**232. PAGE 243:18 TO 244:04 (RUNNING 00:00:02.494)**

```
18          Q.     Good afternoon, Doctor.
19          A.     Good afternoon.
20                      -  -  -
21                 (Whereupon, Deposition
22   Exhibit Curfman-27, Letter
23   6-30-00, with attachments, 2000
24   NEMJ000025 - 2000 NEMJ000027;
00244:01   2000 NEMJ000134 - 2000
02   NEMJ000138, was marked for
03   identification.)
04                      -  -  -
```

**233. PAGE 244:06 TO 244:07 (RUNNING 00:00:03.999)**

```
06          Q.     The exhibit in front of you
07   has been marked as Exhibit 27.
```

**234. PAGE 244:12 TO 245:02 (RUNNING 00:00:53.328)**

```
12          Q.     If you'll notice, if you go
13   through the document to the seventh page,
```

## Mason v. Merck

```
14   I believe you will find the previously
15   introduced suggestion for transmittal to
16   authors, which mentioned that the total
17   number of figures plus tables should not
18   total more than five.  That's on the page
19   number ending 136 at the bottom right.
20   Do you see that, sir?
21        A.   Yes, I do.
22        Q.   And can you take a look at
23   the entire document, and does this appear
24   to be a letter from Dr. Kaplan to Dr.
00245:01   Bombardier enclosing the comments from
02   Reviewers A and B on the VIGOR study?
```

**235. PAGE 245:05 TO 245:07  (RUNNING 00:00:04.781)**

```
05              THE WITNESS:  Right.  And I
06        think A, B and C actually for
07        reviewers, yes.
```

**236. PAGE 245:16 TO 246:03  (RUNNING 00:00:26.222)**

```
16        Q.   Do you see that?
17        A.   Yes.
18        Q.   Now, the date on this letter
19   is June 30, 2000; is that correct?
20        A.   Yes.
21        Q.   Is it also correct that in
22   your Expression of Concern, you and the
23   other editors who authored that
24   Expression of Concern noted that the
00246:01   information that was deleted from the
02   manuscript was deleted two days before
03   the manuscript was submitted?
```

**237. PAGE 246:07 TO 246:11  (RUNNING 00:00:08.746)**

```
07              THE WITNESS:  Yes.  That is
08        correct.  There were a number of
09        edits during the previous week
10        before submission of the
11        manuscript.
```

**238. PAGE 246:13 TO 247:01  (RUNNING 00:00:41.939)**

```
13        Q.   Now, when did you receive
14   the manuscript for the first time?
15        A.   We received it, the receipt
16   date was May 23rd, 2000.  The letter of
17   transmission was dated May 18, 2000.
18              (Phone interruption).
19              THE WITNESS: There was some
20        kind of interval of time between
21        Dr. Bombardier's signing of the
22        letter and the actual submission
23        of the manuscript.  But with that
24        detail, the submission date was
00247:01   May 23rd.
```

**239. PAGE 247:03 TO 247:07  (RUNNING 00:00:15.390)**

```
03        Q.   Could the authors of the
04   VIGOR study have removed Table 5 before
05   submitting the manuscript in response to
06   a letter from the New England Journal
07   dated six weeks later?
```

CONFIDENTIAL

Case Clip(s) Detailed Report
Friday, November 03, 2006, 8:26:05 AM

## Mason v. Merck

**240. PAGE 247:13 TO 248:04 (RUNNING 00:00:27.333)**

```
13              Q.      Doctor, this letter is dated
14      June 30 with the suggestion that there
15      should be five tables; right?
16              A.      Right.
17              Q.      And the table that you are
18      concerned about in the Expression of
19      Concern was deleted before the manuscript
20      was even submitted to you; wasn't it?
21              A.      That's correct.
22              Q.      So, the authors didn't
23      suddenly decide that they should only
24      have five tables and should delete the
00248:01      cardiovascular event table because of
02      some letter written on June 30, 2000
03      when, in fact, it had been removed before
04      that; correct?
```

**241. PAGE 248:09 TO 248:10 (RUNNING 00:00:01.999)**

```
09              THE WITNESS:  That would be
10      correct.
```

**242. PAGE 248:12 TO 249:09 (RUNNING 00:01:01.999)**

```
12              Q.      Doctor, you had your
13      deposition taken on November 21st, 2005?
14              A.      Yes.
15              Q.      Did you have any intention
16      of writing an Expression of Concern about
17      the VIGOR study before that date?
18              A.      No, we did not.
19              Q.      Did you formulate an
20      intention to write an Expression of
21      Concern on or after November 21st, 2005?
22              A.      At 8:30 in the morning on
23      November 22nd, Dr. Morrissey and I
24      initiated discussions about some kind of
00249:01      editorial intervention, and then we
02      continued those discussions in the
03      subsequent days, leading eventually to an
04      Expression of Concern.
05              Q.      Now, the Expression of
06      Concern itself has previously been marked
07      as Exhibit 3, and do you have that in
08      front of you?
09              A.      I can get that.  Yes, I have
```

**243. PAGE 249:10 TO 249:10 (RUNNING 00:00:01.783)**

```
10      it.
```

**244. PAGE 260:14 TO 261:13 (RUNNING 00:01:22.801)**

```
14              Q.      Doctor, in the Expression of
15      Concern, did you state the relative risks
16      in terms of an increase in risk with
17      rofecoxib or Vioxx, rather than a
18      decrease in risk with naproxen?
19              A.      Yes, that's correct.
20              Q.      Why did you do that?
21              A.      Well, the original VIGOR
22      article presented the relative risks in
23      the opposite direction, the implication
24      being from that presentation that
00261:01      naproxen was protective against
02      cardiovascular disease, not that
03      rofecoxib increased the risk of heart
```

## Mason v. Merck

```
04    disease.
05                 We now know that that is not
06    the case, and in order to set the record
07    straight, we made the decision in this
08    Expression of Concern to express the
09    relative risks as if rofecoxib increased
10    the risk of cardiovascular disease.
11                 And, again, it was our
12    interest here to correct the scientific
13    record on this important point.
```

**245. PAGE 264:08 TO 264:11 (RUNNING 00:00:21.948)**

```
08         Q.    Can you please look at the
09    document marked as Exhibit 17 earlier
10    today which consists of the NEJM 000011
11    through 14, and the last two pages.
```

**246. PAGE 264:19 TO 264:19 (RUNNING 00:00:00.999)**

```
19                 THE WITNESS:   Right.
```

**247. PAGE 264:21 TO 264:23 (RUNNING 00:00:08.987)**

```
21         Q.    The last two pages being the
22    letter to Dr. Bombardier.
23         A.    Right.   I've got it.
```

**248. PAGE 266:01 TO 268:04 (RUNNING 00:02:28.371)**

```
00266:01        Q.    Now, going on to Paragraph 2
02    of your letter to Dr. Bombardier, could
03    you please read the first sentence of
04    Paragraph 2?
05         A.    "Inclusion of the three
06    myocardial infarctions would have
07    invalidated your claim in the article
08    that there was a difference in the risk
09    of myocardial infarction only in
10    high-risk patients (i.e., those in the
11    aspirin indicated group)."
12         Q.    Can you explain what you
13    mean by that?
14         A.    The authors in the VIGOR
15    article concluded that the difference in
16    rate of myocardial infarction between the
17    two treatment groups was present only in
18    high-risk patients, high risk for heart
19    disease, but not in low-risk patients,
20    low risk for heart disease.
21                 If you add in the three
22    additional heart attacks that were not
23    reflected in the data and do the
24    appropriate statistical analysis for
00267:01    interaction, this conclusion in the
02    article is no longer sustained, and
03    that's what this point is about.
04         Q.    Can you explain what a test
05    for interaction means?
06         A.    There are two variables, the
07    drug variables, rofecoxib versus
08    naproxen; and second variable, aspirin
09    indicated high-risk group, aspirin not
10    indicated low-risk group.   And an
11    interaction means that these two terms
12    will interact statistically, and the
13    appropriate test involves a determination
14    of whether there's an interaction.
```

**CONFIDENTIAL**

## Mason  v.  Merck

```
        15        Q.    And was such a test
        16  performed by a statistician at your
        17  request in connection with the Expression
        18  of Concern?
        19        A.    Yes, it was.
        20        Q.    Can you summarize the result
        21  of that test?
        22        A.    The test indicated that the
        23  risk -- the increased risk of
        24  cardiovascular disease associated with
00268:01  the use of rofecoxib or Vioxx was found
        02  in both the high risk and the low-risk
        03  groups, and it was not restricted to the
        04  high-risk group.
```

**249. PAGE 268:16 TO 270:03  (RUNNING 00:01:47.351)**

```
        16        Q.    Could you please take a look
        17  at the July 5th memorandum, July 5, 2000
        18  memorandum, I believe it's been marked
        19  today as Exhibit 24 --
        20        A.    Right.
        21        Q.    -- but it also has the
        22  exhibit sticker 18 from the previous
        23  deposition.
        24        A.    Right.
00269:01        Q.    Is this the table you're
        02  referring to in Paragraph 2 of the letter
        03  to Dr. Bombardier?
        04        A.    Yes.  It's Table 4.  This is
        05  what I was referring to.
        06        Q.    Does this table indicate a
        07  statistically significant increased risk
        08  of Vioxx in both aspirin indicated and
        09  aspirin not indicated patients?
        10        A.    Yes, it does.  Again, in
        11  this particular table, the relative risks
        12  are indicated in the reverse direction.
        13  But the fact is that this table clearly
        14  indicates that the increase in risk
        15  associated with the use of rofecoxib was
        16  present and statistically significant in
        17  both the aspirin indicated, the high-risk
        18  patients, high risk for heart disease,
        19  and the lower risk group for heart
        20  disease in whom aspirin was not
        21  indicated.
        22            So, the risk is present in
        23  both groups.  When you look at the
        24  totality of the adjudicated
00270:01  thromboembolic serious adverse events,
        02  the conclusion in the article is not
        03  sustained by this table.
```

**250. PAGE 306:24 TO 307:11  (RUNNING 00:00:37.000)**

```
        24        Q.    Now, Doctor, are you
00307:01  familiar with the claim by the authors
        02  that there was a cutoff date of February
        03  10 for cardiovascular events, February
        04  10, 2000?
        05        A.    I am now, yes.
        06        Q.    Please take a look at
        07  Exhibit 34, which is a letter from Alise
        08  Reicin to Michael Weinblatt.  I take it
        09  you haven't seen this one either; is that
        10  correct?
```

**CONFIDENTIAL**

## Mason  v.  Merck

```
        11          A.     That's correct.
```

**251.  PAGE 308:11 TO 309:07  (RUNNING 00:01:04.546)**

```
        11          Q.     Do you see that there's a
        12   reference to a cutoff date for reporting
        13   of these events to Merck will be February
        14   10th?
        15          A.     I do.
        16          Q.     And do you consider that a
        17   prespecified cutoff date?
        18          A.     Well, let's just say that
        19   the letter is dated February 7th, and the
        20   cutoff date is designated February 10th,
        21   and this is called prespecified?  Not
        22   according to any definition of
        23   prespecified that I've ever heard, which,
        24   as I said earlier in testimony, involves
00309:01   specifying the item in advance of the
        02   beginning of the trial.
        03          So, I haven't ever heard of
        04   a definition of prespecified that would
        05   come that late in the trial.  That's
        06   three days shy of when they want to shut
        07   down tabulation of the endpoints.
```

**252.  PAGE 319:02 TO 319:21  (RUNNING 00:01:14.967)**

```
        02          Q.     Can you please take a look
        03   at the document marked as Exhibit 36,
        04   which is a memorandum to Alise Reicin
        05   from Linda Nelson dated May 26, 2000,
        06   "Subject:  Adjudication results for 11
        07   events after 2/10/2000."  Do you see this
        08   document?
        09          A.     Right.
        10          Q.     If you could turn to the
        11   second page, do you see that there are
        12   three myocardial infarctions with the
        13   report dates of February 22nd, 2000,
        14   February 17, 2000 and February 16, 2000?
        15          A.     Right.
        16          Q.     At any time during the
        17   review process for the VIGOR manuscript,
        18   did Alise Reicin inform you that she knew
        19   the confirmed status of the three MIs
        20   reported after February 10, 2000 no later
        21   than May 26, 2000?
```

**253.  PAGE 319:24 TO 320:02  (RUNNING 00:00:05.708)**

```
        24          THE WITNESS:  None of the
00320:01          authors informed the Journal about
        02          the three myocardial infarctions.
```

**254.  PAGE 320:24 TO 321:06  (RUNNING 00:00:36.961)**

```
        24          Q.     Doctor, what is Exhibit 37?
00321:01          A.     This is a series of three
        02   e-mail messages involving our media
        03   specialist Karen Pedersen, myself and Dr.
        04   Drazen and some of the other editors.  It
        05   has to do with an editorial that was
        06   published in the Washington Post in early
```

**255.  PAGE 321:07 TO 322:08  (RUNNING 00:01:28.277)**

```
        07   January that Karen Pedersen brought to
        08   our attention because she thought that it
```

## Mason v. Merck

```
09   might contain some factual inaccuracies
10   and is asking us if we wanted to perhaps
11   respond in some way.
12        Q.    And did Ms. Pedersen send
13   you an e-mail suggesting four points that
14   you might make in response to the
15   editorial?
16        A.    Right.
17        Q.    Just to back up and identify
18   it for the record, it's dated January
19   3rd, 2006, NEJM 000280.
20             Doctor, did you respond to
21   Ms. Pedersen's e-mail concerning point
22   number 2 which stated, "The 3 MIs are a
23   trivial amount of the total data
24   withheld"?
00322:01        A.    Yes.  I think that she
02   wasn't correct about that, and I wanted
03   to give her some feedback about that so
04   we could correct that statement.
05        Q.    Could you read the first
06   paragraph, the e-mail that you sent to
07   Ms. Pedersen on January 3rd, 2006 into
08   the record, please?
```

**256.  PAGE 322:14 TO 323:16  (RUNNING 00:01:32.819)**

```
14        A.    "The only comment I have is
15   about # 2.  I would not characterize the
16   3 MIs as trivial exactly.  It is never
17   appropriate to withhold data, under any
18   circumstances, and we don't want to
19   appear as if we are endorsing that
20   practice.  It's just that they were
21   withheld" -- "that they withheld not only
22   3 MI's, but 9 tables and two figures of
23   additional data, all of which, in total,
24   painted a very ominous picture regarding
00323:01   cardiovascular toxicity of Vioxx.  They
02   never revealed these data to the editors,
03   and therefore readers never saw them.
04   They were disclosed to FDA, but not
05   posted on the FDA website until 2001,
06   months after the New England Journal of
07   Medicine VIGOR article was published.  In
08   any case, the FDA Web site does not
09   constitute publication in the usual
10   sense; doctors don't read the FDA Web
11   site - they read journals.  The cardiac
12   toxicity data from VIGOR have never been
13   published in any medical journal.  The
14   company wanted to keep the Journal
15   article pristine for purposes of
16   marketing.  And it worked - for a while."
```

**257.  PAGE 325:19 TO 326:17  (RUNNING 00:01:12.081)**

```
19        Q.    My question, whether you
20   choose to answer it or not, sir, is, you
21   testified about various matters that you
22   said you could not understand concerning
23   the prespecified cutoff date and the
24   rationale for it.  Did you make any
00326:01   effort to look at what the authors said
02   and their response to the Expression of
03   Concern to understand their reasoning for
04   using the prespecified cutoff date?
```

**Case Clip(s) Detailed Report**
**Friday, November 03, 2006, 8:26:05 AM**

## Mason v. Merck

```
05          A.    Well, we will be looking
06   very carefully at their responses to that
07   question to see if we learn any new
08   information.  So far, as of today, we
09   haven't learned any new information.  But
10   we will be looking very, very carefully
11   at that crucial point to see what their
12   response is.
13          Q.    So, in terms of your
14   testimony about what you cannot
15   understand, you haven't tried to take
16   into account yet the responses of the
17   authors; is that right?
```

**258. PAGE 326:22 TO 326:23  (RUNNING 00:00:02.165)**

```
22               THE WITNESS:  You said one
23   question.
```

**259. PAGE 327:01 TO 327:01  (RUNNING 00:00:01.347)**

```
00327:01        Q.    Well, is that right, sir?
```

**260. PAGE 327:05 TO 327:06  (RUNNING 00:00:01.573)**

```
05          Q.    Do you refuse to answer that
06   question?
```

| TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 02:05:16.630) |
| --- |