# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No. 05-2524** | * | |
| | * | **MAGISTRATE JUDGE KNOWLES** |
| **ANTHONY WAYNE DEDRICK**, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| **MERCK & CO., INC.**, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") FOR ORDER EXCLUDING <u>TESTIMONY OF MARK I. FURMAN, M.D., F.A.C.C., F.A.H.A</u>.

## (EXPERT CHALLENGE NO. 11)

It is undisputed that Mr. Dedrick had a large number of pre-existing cardiovascular risk factors that increased his chances of having a heart attack.  In the face of all of these risk factors, Mr. Dedrick proffers Dr. Mark Furman, an interventional cardiologist, to testify that Mr. Dedrick's heart attack was caused by Vioxx®.  Although he cannot point to anything differentiating Mr. Dedrick's heart attack from what one would expect from a person with the same "very high" pre-existing cardiovascular risk who had not taken Vioxx, Dr. Furman nevertheless opines:  "[T]o a reasonable degree of medical certainty, the Vioxx taken by Mr. Dedrick, prior to January 8, 2003, substantially contributed to the development of the inferior

wall ST segment elevation myocardial infarction on January 8, 2003 . . . ." (Expert Report of Mark. I. Furman, M.D., F.A.C.C., F.A.H.A. ("Furman Report") at 4, attached hereto as Ex. A.) Dr. Furman's own testimony undermines his opinion and demonstrates that Dr. Furman is neither qualified to proffer such an opinion here nor did he have a scientifically reliable basis to do so. Accordingly, the Court should grant Merck's motion and exclude his testimony under Federal Rule of Evidence 702 and the standards enunciated in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

## I.  LEGAL STANDARD

The legal standard for the admission of expert testimony in federal court is set forth at pages 3-4 of Merck's Memorandum In Support of Motion For Order Excluding Testimony of Ira J. Gelb, M.D., F.A.C.C., which was filed on October 30, 2006 and is incorporated herein by reference.

In addition to the qualifications and reliability requirements of Federal Rule of Evidence 702 and *Daubert*, expert testimony must—like all evidence—satisfy the admissibility requirements of the Federal Rules of Evidence, including Rules 401 and 403.

## II.  DR. FURMAN IS NOT QUALIFIED TO OPINE ON SPECIFIC CAUSATION.

Dr. Furman is not qualified to opine on whether Vioxx caused Mr. Dedrick's heart attack. While Dr. Furman is a cardiologist, he has no experience with Vioxx. (Deposition of Mark I. Furman, M.D., F.A.C.C., F.A.H.A. ("Furman Dep."), at 14:15-15:5, 30:3-11, 27:20-28:18, 29:15-18, 30:12-18, 30:19-31:1, 39:24-40:14, attached hereto as Ex. B.) More importantly, as discussed below, he bases his specific cause opinion principally on an attributable risk analysis. But he has never used this methodology in the "real world." (*Id.* at 176:14-16.)

## III.   DR. FURMAN DOES NOT HAVE A SCIENTIFICALLY RELIABLE BASIS FOR OPINING ON SPECIFIC CAUSATION.

Even assuming, however, that Dr. Furman was qualified to opine on specific causation, his report and deposition testimony reflect that he did not have a scientifically reliable basis to do so.  Among other things, Dr. Furman admits that he cannot determine whether Mr. Dedrick would have had a heart attack without his Vioxx use.  And, despite Mr. Dedrick's host of other significant and pre-existing cardiovascular risk factors, Dr. Furman makes no effort whatsoever to rule out other potential causes for Mr. Dedrick's heart attack.  Indeed, Dr. Furman cannot even identify with any degree of reliability the mechanism that allegedly caused Vioxx to induce Mr. Dedrick's injuries, but instead relies exclusively (and inappropriately) on flawed general causation theories to support his specific causation opinion.  And, in the end, Dr. Furman (like other plaintiff experts) is still unable to identify even one clinical trial that recognizes a statistically significant increase in cardiovascular events resulting from Mr. Dedrick's level and duration of Vioxx use (*i.e.*, 25 mg daily for approximately 6 months).  For all these reasons, and as explained in more detail below, the Court should exclude Dr. Furman's testimony.

### A.   Dr. Furman Cannot Say Whether Vioxx Was A Cause In Fact Of Mr. Dedrick's Heart Attack.

Dr. Furman admits that he cannot determine whether Vioxx was a cause in fact of Mr. Dedrick's injuries, *i.e.*, whether Mr. Dedrick's heart attack would have occurred even absent his six-month use of 25 mg of Vioxx.  That concession dooms his specific causation opinion since, under Tennessee law, cause in fact is a necessary element of causation.  *See Kilpatrick v. Bryant*, 868 S.W.D.2d 594, 598 (Tenn. 1993); *Richardson v. GlaxoSmithKline*, 412 F. Supp. 2d 863, 868 (W.D. Tenn. 2006) ("[T]he cause 'must be such that had it not happened the injury would not have been inflicted.'") (citing *Shouse v. Ortis*, 448 S.W.2d 673, 676 (1969)).  That Tennessee courts utilize the "substantial factor" test in analyzing causation does nothing to minimize the

importance of this requirement. *See, e.g.*, *Waste Mgmt., Inc. of Tenn. v. S. Cent. Bell Tel. Co.*, 15 S.W.3d 425, 432 (Tenn. Ct. App. 1997) ("[T]he 'substantial factor' test, like the 'but for' test, incorporates the concept that conduct cannot be a cause in fact of an injury if the injury would still have occurred even if the conduct had never taken place."). Thus, for expert testimony on causation to be admissible, the expert must be able to testify not only that an agent was a "substantial factor" in bringing about the plaintiff's injury, but also that—to a "reasonable degree of medical certainty"—the injury would not have occurred absent plaintiff's exposure to the agent. *See, e.g.*, *Bara v. Clarksville Memorial Hosp. Sys., Inc.*, 104 S.W.3d 1, 10 (Tenn. Ct. App. 2002).

Dr. Furman's deposition testimony reflects that he completely ignored whether Mr. Dedrick's Vioxx use was a cause in fact in offering his specific causation opinion. Indeed, when asked whether he could say to a reasonable degree of medical certainty that Mr. Dedrick would not have had a heart attack if he had not been taking Vioxx, Dr. Furman responded: "I can't say that." (Furman Dep. at 153:14-154:8.) Dr. Furman later repeated that response during the following exchange:

> Q.    Okay.  If he didn't take Vioxx --
>
> A.    I believe I answered the question, though.
>
> Q.    Well, I want a nice clear answer.  He didn't take -- if he never took Vioxx, right, can you say to a reasonable degree of medical certainty that he would not have had a heart attack?
>
>         MR. BIRCHFIELD:  Object to form
>
> A.    I cannot say that.
>
> Q.    Can you say therefore to a reasonable degree of medical certainty that if he had not taken Vioxx he would not have had a heart attack on January 8, 2003?

A.    But the issue is that he did take the Vioxx.

Q.    Okay, I understand he took Vioxx, all right?  My question is, if he did not take the Vioxx, you cannot say to a reasonable degree of medical certainty that he would not have had that same heart attack on January 8, 2003, correct?

A.    I couldn't say what would happen that didn't happen; yes, I agree.

Q.    So you agree with my statement, correct?

A.    Yes.

(*Id.* at 156:18-157:17; *see also id.* at 186:20-187:3.)[1]

Dr. Furman's candid admission that he cannot say that Mr. Dedrick would not have suffered a heart attack absent his Vioxx use renders his causation opinion inadmissible.  *See Bara*, 104 S.W.3d at 10 ("[I]f the doctor cannot testify as to cause in fact to a reasonable degree of medical certainty, his testimony is not admissible before the jury . . . .").

**B.    Dr. Furman Has Not Even Attempted To Rule Out The Myriad Of Other  Admittedly More "Well-Established" Cardiovascular Risk Factors That Mr. Dedrick Exhibited Prior To His Vioxx Use.**

Not only does Dr. Furman fail to show a legally-required cause in fact, he also fails to rule out (or even attempt to address the effects of) other, far more likely, causes of Mr. Dedrick's heart attack.  Before an expert can testify that an individual's exposure to an agent resulted in injury, the expert must first rule out alternative explanations.  *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 423-24 (5th Cir. 1987); *Easter v. Aventis Pasteur, Inc.*, 358 F. Supp. 2d 574, 576 (E.D. La. 2005); *In re Propulsid Prods. Liability Litig.*, 261 F. Supp. 2d 603, 618 (E.D. La. 2003).[2]

---

[1] Dr. Furman later changed his answer by testifying that he believed Mr. Dedrick probably would not have had his heart attack on January 8, 2003 absent his Vioxx use, but that he could not say whether Mr. Dedrick would have suffered a heart attack at any other time, such as the next day. (Furman Dep. at 158:3-159:15.)

[2] *See also Glastetter v. Novartis Pharma. Corp.*, 107 F. Supp. 2d 1015, 1045 n.29 (E.D. Mo. (*footnote continued next page*)

Prior to his Vioxx use and January 2003 heart attack, Dr. Furman admitted Mr. Dedrick had a long litany of serious cardiovascular risk factors . Specifically, Mr. Dedrick exhibited at least the following risk factors for heart attack before he ever began taking Vioxx:

- Hypertension (high blood pressure) (Furman Report at 9; Furman Dep. at 102:23-24; Deposition of Anthony Wayne Dedrick ("Dedrick Dep.") at 118:22-25, attached hereto as Ex. C.)

- Uncontrolled diabetes (Mr. Dedrick refused insulin treatment until July 2004) (Furman Report at 9; Furman Dep. at 103:1-2; Dedrick Dep. at 118:14-21, 119:12-120:1)

- Hyperlipidemia (high cholesterol) (Furman Report at 9; Furman Dep. at 103:3-4; Dedrick Dep. at 119:1-3)

- Low levels of high density lipoprotein (HDL) (Furman Dep. at 103:8-10)

- Smoking, with an elevated risk due to long-term use (2 packs a day for more than thirty years) (Furman Report at 9; Furman Dep. at 102:21-22, 109:21-23; Dedrick Dep. at 79:23-81:5)

- Family history of cardiovascular disease, with an elevated risk due to prior heart attack in a sibling (Mr. Dedrick's brother had heart attack at age 41) (Furman Report at 3; Furman Dep. at 102:19-20; Dedrick Dep. at 59:6-62:3, 107:24-111:6)

- Obesity (Furman Dep. at 103:14-19)

- Age (Furman Report at 9; Furman Dep. at 102:15-16)

- Male gender (Furman Report at 9; Furman at 102:17-18)

- Physical inactivity (Furman Dep. at 103:11-13)

---

2000) (holding that plaintiff's expert specific causation conclusions were inadmissible because the expert was "unable to demonstrate that [drug], as opposed to [other associated] risk factors . . . , caused the injury to [plaintiff]"); *Chester Valley Coach Works, Inc. v. Fisher-Price Inc.*, No. CIV. A. 99 CV 4197, 2001 WL 1160012, at *10 (E.D. Pa. Aug. 29, 2001) (holding that failure to rule out alternative causes of fire through investigation and testing as opposed to experience and education required exclusion of opinion); *In re Paoli R.R. Yard PCB Litig.*, No. 86-2229, 2000 WL 1279922, at *5 (E.D. Pa. Sept. 6, 2000) (excluding specific causation testimony where expert failed to eliminate other possible diagnoses).

- Erectile Dysfunction ("ED")[3] (Furman Dep. at 93:16-20; Dedrick Dep. at 121:16-122:4)

- Metabolic syndrome (increased risk due to a combination of obesity, high triglycerides, low HDL, physical inactivity, and possibly glucose intolerance) (Furman Dep. at 122:13-124:13)

- Alcohol abuse (Dedrick Dep. at 81:6-82:19)

- Drug use, including a history of cocaine and marijuana abuse (Dedrick Dep. at 145:22-149:3)

- Pre-existing, established cardiovascular disease (Furman Report at 10)

- Unhealthy diet (Dedrick Dep. at 150:15-151:17)

- Stress Anxiety (Mr. Dedrick admitted that he was under stress resulting from two-and-a-half years he spent in prison just prior to his heart attack) (Dedrick Dep. at 36:15-39:15)

Given these numerous risk factors, even Dr. Furman admits that Mr. Dedrick was already at a "very high risk" of having a heart attack prior to his short-term Vioxx ingestion:

> Q.    Mr. Dedrick had many, or all of the traditional risk factors for heart attack, correct?
>
> A.    Correct.
>
>         . . . .
>
> Q.    He was at very high risk of serious heart attack, even without the Vioxx, correct?
>
> A.    He was at very high risk for developing a heart attack in his lifetime because of the risk factors he possess.
>
> Q.    Even without the Vioxx?
>
> A.    Even without the Vioxx.

(Furman Dep. at 132:3-12, 133:2-6.)

---

[3] Dr. Furman described ED not as a "risk factor", *per se*, but rather as a "marker" of cardiovascular disease—*i.e.*, a symptom that makes the existence of established cardiovascular disease more likely.  (*See* Furman Dep. at 93:16-24.)

Yet, despite his pre-existing "very high" cardiovascular risk, Dr. Furman did not even attempt to rule out any of these numerous risk factors as possible alternative causes of Mr. Dedrick's not-unexpected heart attack:

> Q.     Did you make a determination about whether the other risk factors substantially contributed to his heart attack the way you did for Vioxx?
>
> A.     Not the way I did for Vioxx, no.

(*Id.* at 178:6-10; *see also id.* at 171:13-18 ("I can't say which [risk factor] did or didn't" cause Mr. Dedrick's heart attack.).)

In fact, Dr. Furman explicitly admits that he does not have the factual basis to opine on these matters. For example, when asked whether he could opine to a reasonable degree of medical certainty whether Mr. Dedrick would have had his heart attack if he did not have hypertension, Dr. Furman responded: "I have no opinion -- I have no factual -- I have no way of making that opinion. I don't know the relative risk of the population of hypertensives with all the other risk factors, if you subtract hypertension, what his relative risk, or attributed relative risk of developing a heart attack is. So have no basis to make that assessment. Same thing with smoking." When pressed, Dr. Furman had the same answer—*i.e.*, that he had insufficient data to make a determination—with respect to "all the risk factors, except Vioxx." (*Id.* at 160:5-161:6; *see also* 171:13-18.)

Instead, Dr. Furman impermissibly came to his specific causation opinion by relying only on the assumption that "[e]ach risk factor independently increase[d Mr. Dedrick's cardiovascular] risk." (Furman Report at 9; *see also* Furman Dep. at 180:4 (noting that among

the risk factors, "they all contributed" to Mr. Dedrick's heart attack).)[4]   But this type of "one

factor contributes, therefore all must be causes" theory is exactly the type of speculation-based

"expert" opinion that courts have consistently refused to put before a jury.   For example, in

*Cano*, various cancer victims brought a claim against a uranium mining company, alleging that

their cancers were a result of exposure to uranium ore.   The defendant moved to exclude the

plaintiff's specific causation expert.   The court granted the motion because the expert failed to

reliably rule out other possible causes of plaintiff's injuries.   Specifically, the court noted:

> An expert who fails to scientifically rule out or quantify alleged
> risk factors to arrive at the most likely causes offers a specific
> causation opinion that is not relevant because it is nothing more
> than pure speculation.   *A specific causation expert cannot merely
> assert that every risk factor is a cause, but must provide a
> scientific basis to identify the most likely cause. . . .*  Dr. Dollinger
> affirmatively refuse[d] to do so, claiming that 'one identifies
> several risk factors/causes, and they are all causes and substantial
> contributing factors.

*Id.* (emphasis added).

Here, like the excluded expert in *Cano*, Dr. Furman does not attempt to rule out other risk

factors as potential causes.   Rather, in coming to his opinion, Dr. Furman relies principally on the

supposed attributable risk of Vioxx (which, he admits, is statistically insignificant for patients

using 25 mg Vioxx users for less than 18 months, as Mr. Dedrick did in this case, *see infra*).

(Furman Dep. at 233:11-15 ("Q.  So your opinion that Vioxx substantially contributed to Mr.

Dedrick's heart attack is based on the fact that Vioxx imposed on him a relative risk of 4.89 of

having a heart attack, correct?  A.  Correct."); *see also id.* at 162:2-5 ("Patients on Vioxx like

Mr. Dedrick had more heart attacks than those not on Vioxx.  Therefore, in my opinion, Vioxx

---

[4] Dr. Furman even admits that Vioxx is not considered a traditional risk factor and is not as
"currently well-established" as the other "traditional risk factors" Mr. Dedrick exhibited.
(Furman Dep. at 141:11-19.)

was a substantial contributor to his heart attack.")[5]

But, as this Court previously ruled in *Plunkett I* and plaintiff's expert biostatistician, Dr. Moye, testified during the *Smith* trial, attributable risk *cannot* be used to determine whether Vioxx caused a heart attack in a specific case.  (*See* Dec. 1, 2005 *Plunkett v. Merck* Tr. at 705:25-706:22; Testimony of Dr. Lemuel Moye, Sept. 18, 2006 *Smith* Tr. ("Moye Test.") at 1707:20-1708:10.)[6]  To do so conflates general and specific cause.

Indeed, Dr. Furman himself acknowledges that he has never used attributable risk— outside this litigation—to diagnosis a patient.  (*Id.* at 176:14-16 ("Q.  Have you ever used [attributable risk] in diagnosing or treating a patient?  A.  No.").).  Using attributable risk is especially improper here, as Dr. Furman admits that he does not even know the attributable risks for "any of the other risk factors."  (*Id.* at 163:16-22.)  That Dr. Furman relies on attributable risk

---

[5] Using Dr. Furman's specific causation theory, one would have to determine—assuming, *arguendo*, that there is an attributable risk from Vioxx use—that Vioxx was a specific cause for every heart attack suffered by a Vioxx user.  (*See*, *e.g.*, Furman Dep. at 200:3-6 ("Q.  So of all the people in the high risk category of the VIGOR study if they had a heart attack while on the Vioxx then Vioxx substantially contributed to their heart attack, in your view, correct?  A.  Correct.").  That result would effectively assume causation in every case..

[6] Specifically, Dr. Moye testified as follows:

> Q.  The role of statistics in diagnosing any particular individual is severely limited, right?
>
> A.  Well, I would say that, when it comes to a particular person and we have a good deal more information about them, then, certainly, statistical considerations are not very important at all.
>
> Q.  . . . .  It would be appropriate for a statistician to say that just because you have an elevated odds ratio and are, that this patient the cause is due to the drug, right?
>
> A.  If that is all we know -- if we know nothing about the individual except that they were exposed to the drug, then it would be inappropriate to say that we know with statistical certainty that that individual's event was caused by the drug . . . .

(Moye Test. at 1707:20-1708:10.)

in this case despite acknowledging its limited diagnostic value only further exemplifies why courts more carefully scrutinize expert opinions that are purely litigation-driven. *See, e.g., Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 197 n.3 (5th Cir. 1996); *United States v. Eff*, No. 9:06:cr-16, 2006 WL 3196922, at *4 (E.D. La. Nov. 6, 2006) ("Another factor [weighing against admission of expert testimony] is whether the testimony offered by the . . . expert[] is based on research the expert ha[s] conducted independent of litigation.") (citing *Daubert v. Merrell Dow Pharma., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995)); *Cano*, 362 F. Supp. 2d at 846 n.37.

Because Dr. Furman failed to rule out the panoply of other pre-existing cardiovascular risk factors Mr. Dedrick possessed independent of his Vioxx use, the Court should—like the courts did in *Cano*, *Glastetter*, *Chester Valley*, *Paoli*, and *Soldo*—exclude his specific causation opinions.

## C.   Dr. Furman Admits That He Cannot Identify The Specific Mechanism That Resulted In Mr. Dedrick's Heart Attack.

Dr. Furman also cannot opine, to a reasonable degree of medical certainty, on the mechanism by which Vioxx supposedly caused Mr. Dedrick's heart attack. In evaluating causation testimony in a pharmaceutical case, the Court must determine whether the expert's opinion has "tied" the defendant's product "by some specific train of medical evidence" to the alleged injury. *Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999). To meet this burden, an expert must offer a "reliable explanation of the physiological process by which [the agent] causes [the alleged harm]." *McClain*, 401 F.3d at 1253. The Fifth Circuit explained this requirement as follows:

> The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur. Based on such predicate knowledge, it may then be possible to fasten legal liability for a person's disease or injury.

*Black*, 171 F.3d at 314; *see also Propulsid*, 261 F. Supp. 2d at 616-17 (expert testimony unreliable where experts "fail[ed] to identify the exact mechanism" by which plaintiff's injury occurred or offer an "explanation of how or why it happen[ed]")

Here, Dr. Furman does not (and cannot) identify the mechanism for the alleged increase in cardiovascular events associated with Vioxx.   Rather, Dr. Furman speculates that "the increased thrombotic events seen with the use of Vioxx *may be* related to alteration in the balance of thromboxane A$_2$ and prostacyclin [*i.e.*, the "Fitzgerald Hypothesis"], enhanced plaque instability, or both."  (Furman Report at 7 (footnote omitted and emphasis added).)  As if that speculation were not enough, Dr. Furman goes on to throw out a number of other possible effects of Vioxx, including enhanced risk of atherosclerotic plaque progression, elevated blood pressure, cardiac arrhythmia, composite and/or adverse renal events, and peripheral edema.  (*See id.*)[7]

Dr. Furman's "shotgun approach" to theorizing the mechanism of Mr. Dedrick's alleged Vioxx-induced heart attack is clearly insufficient under the standards enunciated by the Fifth Circuit in *Black*.  In fact, as he himself admits, Dr. Furman simply does not know the mechanism for a Vioxx-induced cardiovascular injury, let alone one that would "fit" the facts surrounding Mr. Dedrick's injury:  "The exact mechanism of the Vioxx-induced injury [is] unclear.  There's a hypothesis, FitzGerald hypothesis -- we've been through this before -- suggesting that there's

---

[7] For reasons stated in Merck's Motion For Order Excluding Testimony Of Colin Funk, Ph.D., filed October 30, 2006 and incorporated hereto by reference, the theory that Vioxx causes atherosclerotic plaque formation and/or progression lacks a foundation in reliable science and should be excluded from evidence.

Furthermore, Dr. Furman admitted during his deposition testimony that Mr. Dedrick did not suffer from Vioxx-induced elevated blood pressure, cardiac arrhythmia, composite and/or adverse renal events, or peripheral edema.  (Furman Dep. at 108:14-109:1, 312:13-22, 315:19-316:3.)  He also admitted that the "Fitzgerald Hypothesis" was just that—a hypothesis—not an established scientific fact.  (*Id.* at 243:21-23.)  Accordingly, those aspects of Dr. Furman's report are irrelevant, and his opinions in those areas should be excluded.

some animal evidence suggesting plaque instability.  The weight of each of the factors in Mr.

Dedrick's case [is] unclear."  (Furman Dep. at 313:9-17; *see also id.* at 191:18-192:10.)

   And, notably, Dr. Furman cannot identify anything at all distinctive about Mr. Dedrick's

medical history or the appearance of his thrombus that would "fit" any of his own Vioxx

theories.  (*Id.* at 194:4-13.); *see Soldo v. Sandoz Pharma. Corp.*, 244 F. Supp. 2d 434, 565-67

(W.D. Pa. 2003) (holding that expert medical testimony was inadmissible because "plaintiff's

expert [were] unable to point to reliable evidence in plaintiff's medical records indicative of

vasoconstriction, 'ergotism,' or alleged Parlodel-induced ICH," the causation theories upon

which his opinion relied).  Dr. Furman does not know whether Vioxx caused a prostacyclin-

thromboxane imbalance in Mr. Dedrick.  (*Id.* at 259:2-10,; *see also id.* at 260:5-11.)  Nor does he

know whether Vioxx caused plaque formation, instability, or rupture in Mr. Dedrick's arteries.

(*Id.* at 191:13-193:8.)  Likewise, Dr. Furman does not know whether Vioxx contributed to Mr.

Dedrick's already pre-existing atherosclerosis.  (*Id.* at 311:21-24.)

   Neither can Dr. Furman point to any symptoms of Mr. Dedrick's heart attack that would

be distinguishable from already-existing cardiovascular disease unrelated to Vioxx:

> Q.    So thrombosis comes along with coronary artery disease in
>       general, regarding of whether somebody's taking Vioxx, correct?
>
> A.    Correct.
>
> Q.    And same thing with inflammation; coronary artery disease is an
>       inflammatory condition generally regardless of whether somebody
>       is or isn't taking Vioxx?
>
> A.    Yes.
>
> Q.    And same thing with the development of plaque.  That goes with
>       coronary artery disease whether you are or are not taking Vioxx?
>
> A.    Yes.

Q.    And does coronary artery disease put an individual in a prothrombotic state?

A.    Yes.

Q.    And that again is true whether or not somebody is or is not taking Vioxx?

A.    Yes.

Q.    The vast majority of your patients have coronary artery disease, correct?

A.    Yes.

Q.    And in the vast majority of them, their coronary artery disease doesn't have anything to do with Vioxx or Cox-2 inhibitors, correct?

A.    Yes.

Q.    And atherosclerotic vascular disease is the leading cause of morbidity and mortality in the United States?

A.    Yes.

(*Id.* at 87:14-88:19.)  In fact, Dr. Furman admits that the sequence of events that he believes led to Mr. Dedrick's heart attack (*i.e.*, "plaque buildup, plaque rupture, and a clot that gets too big") are the same sequence of events that have led to the "vast majority" of heart attacks in the population, even before Vioxx was on the market.  (*Id.* at 98:17-99:9.)

In short, since even Dr. Furman himself is unwilling or unable to identify a single definitive mechanism as the method by which Vioxx allegedly caused Mr. Dedrick's heart attack, the Court should exclude his specific causation testimony under *Black* and its progeny.

**D.    Dr. Furman Admits That His Specific Causation Opinion Is Based Exclusively On General Causation Theories, On Which He Is Unqualified And Has No Reliable Basis To Opine.**

Unable to distinguish Mr. Dedrick's heart attack from the tens of thousands of heart attacks that occur each year in people who never took Vioxx, Dr. Furman relies completely on

his belief that Vioxx *can* cause such events.  But specific causation and general causation are distinct elements, and an expert cannot rely exclusively on a general causation theory (particularly a scientifically unreliable one) to establish specific causation.  *See, e.g.*, *Kemp v. Metabolife Int'l, Inc.*, No. 00-3513, 2004 WL 2095618, at *6 (E.D. La. Sept. 13, 2004) (granting defendant's motion for summary judgment even though plaintiff sufficiently establish general causation, because plaintiff "failed to meet her burden to provide evidence of actual injury" resulting from the allegedly defective drug).[8]  But that is exactly what Dr. Furman has done here, as he admits his specific causation opinion relies exclusively on "population studies" allegedly showing a link between Vioxx use and cardiovascular risk.  (Furman Dep. at 236:16-237:4.)

Yet, even assuming, *arguendo*, that establishing general causation *could* be sufficient to prove specific causation, Dr. Furman's opinion would still be lacking for several reasons.  First, as explained above, Dr. Furman is not qualified to testify on general causation, as he lacks any direct clinical or research experience involving Vioxx, Cox-2, or NSAIDs in general.

Second, Dr. Furman admits to inappropriately relying on statistically insignificant data in forming his causation opinions.  Courts have held that it is "unreasonable as a matter of law" for an expert to base causation opinions on statistically insignificant data.  *Kelly v. Am. Heyer-Sculte Corp.*, 957 F. Supp. 873, 878 (W.D. Tex 1997); *In re Norplant Contraceptive Prods. Liab. Litig.*, No. MDL 1038, 1997 WL 81093, at *1 (E.D. La. Feb. 21, 1997) (granting motion in limine because "[e]pidemiological data that is not 'statistically significant' cannot provide a scientific

---

[8] *See also Martin v. Home Depot U.S.A., Inc.*, 369 F. Supp. 2d 887, 891 (W.D. Tex. 2005) ("[E]ven assuming a causal link between exposure to a substance and an increased risk of disease," the plaintiff must introduce evidence showing a specific link between the agent and the plaintiff's injury.).

basis for an opinion on causation).[9]   In defiance of this rule, and contrary to well-established

scientific principles, Dr. Furman explicitly admits that he relied on statistically insignificant data

to form the basis of his causation opinions.

> Q.     So to you, it was not important whether the relative risk evidence
>         that you had showed a statistically significant difference?
>
> A.     In this instance, yes.
>
> Q.     That's correct?
>
> A.     That's correct.

(*See* Furman Dep. at 242:7-12.).

Third, while Dr. Furman reviewed some literature on Vioxx, his deposition demonstrates

that he lacks a basic understanding of many of the studies he cited in his report.   This Court

excluded Dr. Baldwin's causation testimony in *Plunkett I* for similar reasons.   *See In re VIOXX*

*Prod. Liab. Litig.*, 2005 WL 3541045, at *3 ("Throughout his deposition, Dr. Baldwin was

unable to explain or recount the results and implication of the numerous tests and studies

conducted with Vioxx and other Cox-2 inhibitors.   Simply put, his reliance on the relevant

scientific literature was completely undermined by his inability to firmly understand this

literature."); *see also Doe v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 472-74

(M.D.N.C. 2006) (While a "literature review can be an appropriate part of a method of

---

[9] In order to be admissible on the issue of causation, epidemiological studies must be statistically significant and show more than a doubling of the risk.  *See LeBlanc v. Merrell Dow Pharmas., Inc.*, 932 F. Supp. 782, 784 (E.D. La. 1996) (granting summary judgment in Bendectin litigation given absence of "statistically significant epidemiological studies"); *Deluca v. Merrell Dow Pharmas., Inc.*, 911 F.2d 941, 958-59 (3d Cir. 1990). Regardless of whether the purported findings of epidemiological studies are statistically significant and show more than a doubling of the risk, such studies cannot prove causation in the absence of additional reliable scientific evidence supporting the causal inference to be drawn from the studies.  *See, e.g.*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 480 ("[I]t should be emphasized that an association is not equivalent to causation.").

determining general causation," that "review must still be performed appropriately."). Dr. Furman's understanding of the literature upon which he relied in forming his opinion is no less deficient than Dr. Baldwin's. For example:

- Dr. Furman testified that his causation opinion relied principally on the finding of a 4.89 relative cardiovascular risk from patients taking Vioxx, as reported in the Mukherjee study, a meta-analysis of several studies (including the VIGOR trial). But "he [did not] know the right answer" concerning how much time you had to be exposed to Vioxx to be subject to that putative 4.89 relative risk. Rather, he speculated, "there's probably a degree of run-up to achieve Vioxx risk." (*Id.* at 169:20-170:1.) What's more, Dr. Furman conceded that he is "not a meta-analysis expert," or an expert in epidemiology, biostatistics, endocrinology, hematology, molecular biology, or rheumatology. (*Id.* at 349:14-15, 9:2-13:8.)

- Dr. Furman attached a "bibliography" of 895 references that he allegedly relied upon to form his opinion, but he admitted that he had not read many of the sources (in fact, some were not even in English), only glanced at others, and included some on that list because "it was just easier not to delete them and look through the ones that are important." (*Id.* at 74:3-15.)[10]

- Dr. Furman testified that it was important in forming an opinion to take into account *all* of the data, including studies going against his opinion, and he said that he had researched all published Vioxx research. However, Dr. Furman could not recall several key studies and documents, including, for example, the April 2005 FDA Memorandum, which concluded that it was impossible to rank the Cox-2 inhibitors and other NSAIDs with respect to cardiovascular risk. (*See id.* at 146:1-147:2.)

- On multiple occasions, Dr. Furman could not recall why he cited a source in his report or how that source supported the statement he cited it for. For example, Dr. Furman could not remember why he cited the Hennan study— which related to Celecoxib, not Vioxx—for his opinion that increased thrombotic events after Vioxx use could be caused by increased plaque instability. (*See id.* at 252:3-254:14.)[11]

---

[10] Dr. Furman testified that he spend approximately 50-60 hours reviewing these 895 references, which would calculate out to about four minutes per reference. (*See* Furman Dep. at 75:13-24.)

[11] During his deposition, Dr. Furman was repeatedly unable to apply the results of his "review" to support his opinions. For example, Dr. Furman cited the McAdam study in support of his opinion that most endothelial-derived prostacyclin is derived from Cox-2. But when asked about how the study supported that assertion, Dr. Furman could not answer and eventually conceded
(*footnote continued next page*)

- Dr. Furman testified that he could not recall why he did not cite anything to support his statement that "numerous studies" suggest a link between Cox-2 inhibition and plaque formation and instability, and he could not recall any studies during his deposition to support that claim.  (*Id.* at 312:1-314:18.)

Given his demonstrated inability to explain the studies he cited in his report, let alone the uncited studies that he indicated he relied upon, the Court should exclude his testimony.[12]

**E.     There Is No Scientifically Reliable Evidence That Use Of Vioxx At 25 Mg For Six Months Is Capable Of Causing A Heart Attack.**

Even ignoring all the other deficiencies in Dr. Furman's testimony, it is still the case that (like plaintiffs' other experts) Dr. Furman cannot cite one clinical study showing a statistically significant increase in cardiovascular risk resulting from use of 25 mg of Vioxx for approximately 6 months, the amount and duration of Mr. Dedrick's Vioxx use:

> Q.     Is it true that no placebo-controlled clinical trail has ever shown that taking 25 milligrams of Vioxx for around six months increases the CV risk?
>
> A.     There is no clinical trial that I'm aware of.

---

that he "can't identify a study or article that shows that endothelial-derived prostacyclin is derived from Cox-2." (*See* Furman Dep. at 275:18-280:24.)

[12] Even accepting Dr. Furman's methodology as reliable (which it is not), Dr. Furman himself admits that many of his cited studies are unreliable and irrelevant to Mr. Dedrick's case, because they did not involve Vioxx and/or used far different doses than Mr. Dedrick used.  Dr. Furman concedes, for example, that the Hennan study—upon which he relies heavily to support his opinion that Vioxx induces thrombosis (*see, e.g.*, Furman Report at 7)—did not involve Vioxx and showed a prothrombotic effect only on dogs that (unlike Mr. Dedrick) were taking aspirin. (*See* Furman Dep. at 286:2-291:11.)  Likewise, Dr. Furman admits that the Buerkle study— which he cites to support his theory of Vioxx-induced accelerated platelet adhesion (*see, e.g.*, Furman Report at 7)—used cell cultures (not live arteries) and did not involve Vioxx, but rather an experimental drug never approved by the FDA for human use.  (*See* Furman Dep. at 291:20-293:20.)  Dr. Furman also admits that the Borgdorff study—which he cited to support his theory that Vioxx may cause stress-induced platelet aggression (*see, e.g.*, Furman Report at 7)—did not involve Vioxx, but rather a dose of Bextra that was 35 to 70 times higher than the dose approved for human use.  (*See* Furman Dep. at 297:17-301:4.)

Moreover, a vast majority of the studies he cites are animal studies, for which even he admits "[y]ou need to be careful [with] in extrapolating data" to humans.  (Furman Dep. at 107:9-108:4; *see also id.* at 286:24-287:1.)

Q.      That shows that?

A.      Correct.

Q.      And no randomized control trial has ever shown that 25-milligram Vioxx for about six months increases cardiovascular risk, right?

A.      There is no randomized clinical trial that shows what you just said, yes.

Q.      And --

A.      For six months, because there is no randomized clinical trial at six months.

Q.      Can you identify any clinical trial that showed a statistically significant increased risk of cardiovascular events for patients taking 25 milligrams of Vioxx for less than 18 months?

A.      Randomized clinical trial, no.  For less than 18 months?

Q.      Right

        . . . .

A.      There is no clinical trial designed for CV events 18 months or less, taking 25 milligrams of aspirin -- excuse me; of Vioxx.  Therefore, there is no study showing that, what you said.

(Furman Dep. at 323:14-325:3.)  Dr. Furman's opinion that Mr. Dedrick's daily use of 25 mg of Vioxx for six months caused his heart attack must therefore be excluded.[13]

---

[13] As discussed in Merck's Memorandum In Support Of Motion To Exclude Expert Testimony That Short-Term Vioxx Use Increases Cardiovascular Risk, filed on October 30, 2006 and incorporated by reference herein, there is no scientifically reliable evidence that the use of Vioxx at this dosage and duration is capable of causing thrombotic cardiovascular events.

## IV.    CONCLUSION

For the reasons stated above, Merck respectfully requests that this Court grant Merck's

Motion For Order Excluding Testimony of Mark I. Furman, M.D., F.A.C.C., F.A.H.A.

Dated:  November 13, 2006                                     Respectfully submitted,


                                                             s/ Dorothy H. Wimberly
                                                             Phillip A. Wittmann, 13625
                                                             Dorothy H. Wimberly, 18509
                                                             STONE PIGMAN WALTHER
                                                             WITTMANN L.L.C.
                                                             546 Carondelet Street
                                                             New Orleans, Louisiana  70130
                                                             Phone:  504-581-3200
                                                             Fax:      504-581-3361

                                                             Defendants' Liaison Counsel

                                                             Philip S. Beck
                                                             Mark Ouweleen
                                                             Carrie Jablonski
                                                             BARTLIT BECK HERMAN PALENCHAR
                                                             & SCOTT LLP
                                                             54 West Hubbard Street, Suite 300
                                                             Chicago, Illinois  60610
                                                             Phone:  312-494-4400
                                                             Fax:      312-494-4440

                                                             Douglas Marvin
                                                             Elaine Horn
                                                             WILLIAMS & CONNOLLY LLP
                                                             725 Twelfth Street, N.W.
                                                             Washington, D.C.  20005
                                                             Phone:  202-434-5000
                                                             Fax:      202-434-5029

                                                             And

                                                             Brian S. Currey
                                                             A. Patricia Klemic
                                                             O'MELVENY & MYERS LLP
                                                             400 South Hope Street

Los Angeles, CA 90071
Phone:  213-430-6000
Fax:      213-430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of Merck's Motion for Order Excluding Testimony of Mark I. Furman, M.D., F.A.C.C., F.A.H.A. has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail, upon counsel for Mr. Dedrick, Andy Birchfield, by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 13th day of November, 2006.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel