UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL DOCKET No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L - DIVISION 3 |
| | * | |
| This document relates to | * | JUDGE FALLON |
| CASE NO. 2:05CV2524 | * | |
| | * | |
| ANTHONY WAYNE DEDRICK, | * | MAG. JUDGE KNOWLES |
| an Individual, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |

## PLAINTIFF'S MOTION TO REASSERT REPLIES IN SUPPORT OF *DAUBERT* MOTIONS PREVIOUSLY CONSIDERED BY THE COURT

Plaintiff Anthony Dedrick previously reasserted the *Daubert* motions filed by plaintiffs in prior MDL trial cases.  Plaintiff now reasserts the following replies support of his motions:

1.    Plaintiff's "Reply in Support of Motion to Exclude the Testimony of Dr. Nicholas Flavahan, Ph.D." which was filed and considered by the Court in *Barnett v. Merck & Co.* (Ex. "A").

2.    Plaintiff's "Reply in Support of Motion to Exclude Argument or Opinion Testimony That an Increased Risk of Heart Attack Exists Only after 18 Months of Vioxx Use" which was filed and considered by the Court in *Smith v. Merck & Co.* (Ex. "B").

1

These replies in support of Plaintiff's motions are incorporated herein by reference and attached as exhibits.

For the reasons set forth in the original motions and these replies, Plaintiff respectfully moves the Court to exclude the testimony of Dr. Janet Arrowsmith-Lowe and Dr. Nicholas Flavahan, and to exclude evidence and argument that an increased risk of heart attack exists only after 18 months of Vioxx use.  Where the Court is not inclined to change its prior rulings, Plaintiff reasserts these motions to preserve his record on appeal.

Respectfully submitted this 14th day of November, 2006.

*P. Leigh O'Dell*

**ANDY BIRCHFIELD**
P. LEIGH O'DELL
Attorney for Plaintiff
***BEASLEY, ALLEN, CROW,***
***METHVIN, PORTIS & MILES, P.C.***
234 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103
(334) 269-2343 telephone
(334) 954-7555 facsimile

**Russ M. Herman** (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
  **Plaintiff's Liaison Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box
1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN,
DAVID, MEUNIER
& WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS,
MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

**Christopher A. Seeger**, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD
LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT,
L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE &
ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

## CERTIFICATE OF SERVICE

  I hereby certify that the above and foregoing Plaintiff's Motion to Reassert

Replies in Support of *Daubert* Motions Previously Considered by the Court has been

served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-

mail or by hand delivery and e-mail, on Merck's Counsel, Douglas R. Marvin and Philip

S. Beck,  by e-mail, and upon all parties by electronically uploading the same to

LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that

the foregoing was electronically filed with the Clerk of the Court of the United States

District Court for the Eastern District of Louisiana by using the CM/ECF system which

will send a Notice of Electronic Filing in accord with the procedures established in MDL

1657 on this <u>14th</u> day of November, 2006.

          <u>P. Leigh O'Dell</u>

          P. Leigh O'Dell
          Attorney for Plaintiff
          Beasley, Allen, Crow,
          Methvin, Portis & Miles, P.C.

# EXHIBIT  A



LEXISNEXIS' FILE & SERVE
11695630
E-SERVICE
Jul 3 2006  3:51PM

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| | * | |
| Gerald Barnett v. Merck & Co, Inc. | * | CASE NO. 02:06CV00485 |

---

### PLAINTIFF'S REPLY IN SUPPORT OF
### MOTION TO EXCLUDE THE OPINION TESTIMONY
### OF NICHOLAS FLAVAHAN, Ph.D.

---

PLAINTIFF, Gerald Barnett, files this Reply to Merck & Co.'s Opposition to Plaintiff's Motion to Exclude the Opinion Testimony of Nicholas Flavahan, Ph. D. For the reasons outlined in Plaintiff's original motion and the reply below, Plaintiff's motion is due to be granted.

Merck opposes Plaintiff's motion by stating that Dr. Flavahan is a vascular biologist and pharmacologist[1] who Merck has designated to provide expert opinion concerning the pharmacological effects of COX-2 inhibitors, particularly Vioxx, on the blood vessel wall and endothelium of human beings. Merck claims Plaintiff's motion ignores Dr. Flavahan's "testimony and record of experience" which establish his expertise

---

[1] Dr. Flavahan's Ph.D. is actually in Physiology, rather than Pharmacology, though he testified that pharmacology was his primary focus. See Flavahan dep. at 204:6-204:19 (Excerpts of Dr. Flavahan's deposition are attached as Exhibit "A."). Physiology is a much broader discipline than pharmacology. Id. at 204:20-206:11. Dr. Flavahan is not a medical doctor. Id.



PLAINTIFF'S
EXHIBIT
A
tabbies

in the pharmacology of COX-2 inhibitors and his well-founded methodology. (Merck's Opp. at 2.)

As this Court has noted on numerous occasions, in order for an expert to testify to general causation, he or she must have knowledge of the relevant scientific literature concerning Vioxx, much have knowledge about Vioxx, and must have had some knowledge of COX-2 inhibitors prior to being retained to give expert testimony in this litigation. In the Court's Order of November 18, 2005, in *Irvin I v. Merck & Co.,* the Court outlined it decisions regarding *Daubert* challenges filed by both parties. As to each expert, the Court denied the *Daubert* challenge and allowed the expert to offer expert testimony, but noted that the expert in question had reviewed (and in some cases, had written) the relevant published, peer-reviewed medical literature and pointed out when the expert had actively followed the literature before being retained as an expert.

During the course of *Irvin I* and *Irvin II*, the Court found that an expert must have knowledge and experience relating to Vioxx, or other COX-2 inhibitors. The expert must have conducted research on Vioxx or other COX-2 inhibitors. See Irvin *I v. Merck & Co.,* Court's Order on Plaintiff's Motion to Reconsider, at 2-6 (Dec. 3, 2005). According to the Court, an expert must have familiarity with Vioxx. See *Irvin II v. Merck & Co.,* transcript at 738-740, 744 (Feb. 8, 2006).

Plaintiff does not challenge Dr. Flavahan's qualifications as a vascular cell biologist. Rather, the issue before the Court and the basis of Plaintiff's challenge are his qualifications and knowledge of Vioxx. In his motion and supporting memorandum, Plaintiff put forth ample evidence from Dr. Flavahan's deposition testimony that Dr. Flavahan, though seemingly knowledgeable about vascular biology, is not knowledgeable about the clinical trials involving Vioxx that have been published in the medical literature.

2

Because Merck failed to provide Dr. Flavahan with the data and findings of Merck's internal studies, Dr. Flavahan also has no knowledge and has no opinions that take into account the relevant information contained in those studies.

Rather than focus on the basis of Plaintiff's motion, Merck attempts to confuse the issue by stating that Plaintiff must put forth "reliable evidence of the biological mechanism by which Vioxx supposedly could have caused his alleged heart attack." Plaintiff agrees that his theory of how Vioxx contributed to his injuries must be biologically plausible. Plaintiff, however, has met this burden. As the Court is well aware, the medical literature is replete with the results of studies, including VIGOR, APPROVe, among others, establishing the biological plausibility that Vioxx caused Mr. Barnett's heart attack and accelerated his atherosclerosis.

Merck further argues that Dr. Flavahan's opinions are relevant and should be admitted into evidence because they address the "flaws" in Fitzgerald's "imbalance theory." (Merck's Opp. at 3.) In his deposition, Dr. Flavahan testifies that one of the theories of biologic plausibility that Plaintiff puts forward, the "Fitzgerald hypothesis," is incorrect. (Flavahan dep. 117:19-119:3.) Dr. Flavahan is unable to point to any specific peer-review studies that state that the Fitzgerald hypothesis is unsound. (Flavahan dep. at 192:9-192:20.)

Moreover, Dr. Flavahan, in his report and deposition, offers opinions regarding biological mechanism that are completely at odds with the results of the clinical trials – many of them indicating a statistically significant increase in thrombotic events among those taking Vioxx as compared with placebo or a comparator drug. Even Dr. Flavahan agrees there should be some relationship between a theory of mechanism and the results of clinical trials. Yet, as Plaintiff pointed out in his initial motion, Dr. Flavahan is not familiar with the clinical

3

trials involving Vioxx, and he did not consider the results of clinical trials in rendering his opinions in this case:

> page 56
> 19    Q. Okay. Sir, if a scientist like yourself has
> 20  a theory of mechanism of action of a drug, that the
> 21  drug is not harmful, but in randomized clinical
> 22  trials it turns out that in human beings the drug is
> 23  harmful, is the human being experience in randomized
> 24  clinical controls -- in randomized clinical trials
> 25  the best evidence of whether or not your mechanism
> page 57
> 1  of action is correct?
> 2        MR. KREPS: Objection to form of the
> 3  question.
> 4    A. (Continuing) Medicine involves collaboration
> 5  between basic science and clinical science. The
> 6  reason why I'm in a division of cardiology and I'm a
> 7  Ph.D. is because of that collaboration.
> 8        If both sets of data aren't coming out the
> 9  same, then there has to be a discussion between the
> 10  clinic -- clinicians and the scientists to find out,
> 11  you know, what -- what is happening and how things
> 12  should be changed to adequately test hypotheses.
> 13    Q. Doctor, in your opinion of Vioxx, do you
> 14  consider at all the results of the randomized
> 15  clinical trials involving Vioxx?
> 16    A. As I said, I am not involved in the design
> 17  or the interpretation of clinical trials. My role
> 18  in these proceedings is to discuss the mechanisms of
> 19  COX-2 action within the blood vessel wall and the
> 20  pharmacological action of Vioxx and other COX-2
> 21  inhibitors.
> 22    Q. I understand. What my question is -- is
> 23  your opinion or opinions regarding the plausible
> 24  mechanisms of Vioxx mechanism of action entirely
> 25  independent of any evidence produced in the
> page 58
> 1  randomized clinical trials involving Vioxx?
> 2    A. As far as I'm aware, the randomized clinical
> 3  trials were not getting at mechanism. Now, I have
> 4  not analyzed the results of the clinical trials.
> 5  It's not what I do. That -- my role in these
> 6  proceedings is to look at the mechanisms of COX
> 7  activity within the blood vessel wall in the action
> 8  of the -- of the inhibitors.
>
> . . . .

page 58
18  review the interpretations of the studies.
19     Q. Doctor, did the statistically significant
20  excess of cardiovascular events, including MIs,
21  found in VIGOR and APPROVe form any part of your
22  consideration of the plausible biological mechanism
23  of action of Vioxx?
24           MR. KREPS:  Objection to form of the
25  question.
page 59
1     A. (Continuing) As I said, I did not review or
2  assess the interpretation of those clinical trials.

Flavahan dep. at 56:19-59:1.

Throughout his deposition, Dr. Flavahan persistently refused to acknowledge the results of clinical trials while stating that "Vioxx does not increase the thromobotic risk."

page 121
4       Do you have an opinion as to whether or not
5  there is an increased hazard from COX -- specific
6  COX-2 inhibitory drugs with those who already are
7  predisposed to thrombosis?
8     A. There is already data within the literature
9  which basically goes against this point.  That
10  coxibs do not increase the thrombotic risk.  And
11  particularly Vioxx does not increase the thrombotic
12  risk.
13     Q. Doctor, in the VIGOR study was there an
14  increased relative risk in those patients who were
15  ASA, or aspirin indicated, as opposed to those who
16  were not?
17     A. Again, I'm not here to discuss, interpret,
18  assess clinical trials.
19     Q. Doctor, did you understand from the
20  Bresalier article in the New England Journal on the
21  APPROVe data that for symptomatic atherosclerotic
22  disease the relative risk was nine and a half times
23  that of placebo?
24       Did you understand that?
25     A. Again, I'm not here to interpret -- analyze,
page 122
1  interpret clinical trials.
2     Q. Doctor, do you agree that for a scientific
3  hypothesis to have validity, it should be
4  predicted -- predictive of future events?
5       Does that make sense or should I rephrase
6  that?
7     A. You should rephrase that.
8     Q. Okay.  Is a scientific principle -- if you

9  have a hypothesis, one way to test whether the
10  hypothesis is valued or not is whether it has
11  predictive value; that is, what the hypothesis says
12  is likely to happen, in fact, happens in people?
13      A.  There's already data, and the references are
14  contained in the report, that demonstrate the Vioxx
15  and the other COX-2 inhibitors do not increase
16  thrombotic risk.
17      Q.  In -- in intact human beings?
18      A.  In -- in human beings.
19      Q.  Show -- tell me that reference, Doctor.
20      A.  Well, basically it's the whole -- from pages
21  4 through -- pages 4 through 7.
22      Q.  Tell me the specific --
23      A.  Not, in fact -- 4 through 8.
24      Q.  Okay.
25      A.  Oh, no.
page 123
1      Q.  Tell --
2      A.  4 through 7 and then page 11.
3      Q.  Is there any paper that you cite that looks
4  at Vioxx administered to patients versus a
5  comparator?
6      A.  Yes, for sure I think they are in there.
7      Q.  Okay.  Are -- but -- it does not include any
8  randomized clinical trials of Vioxx administered to
9  patients versus comparators.  Is that true?
10      A.  I've referenced, as part of this, clinical
11  studies or clinical experiments performed in
12  individuals that were placebo-controlled and
13  analyzed the activity of Vioxx and other COX-2
14  inhibitors in human volunteers.  I did not reference
15  and did not analyze the clinical trials that you are
16  referring to.
17      Q.  Tell me, what is the reference that -- that
18  you rely on to show that patients administered Vioxx
19  did not have an increase in CV events?
20      A.  No.  We were talking about thrombotic
21  events.
22      Q.  Okay.  I'll make "CV" thrombotic events.
23      A.  Okay.  All right.  If we go to -- well,
24  first of all, the -- the whole basis for the
25  argument underlying the imbalance theory is
page 124
1  addressed with studies in human beings and in human
2  tissue in pages 4, 5, 6, 7, addressing the
3  implausibility of the theory.
4          And then specifically with regard to
5  the -- some studies in humans looking at the
6  imbalance theory -- they are defined, also, on
7  page 11.

8    Q. Okay.

9    A. So if the imbalance theory were correct,

10 then the COX-2 inhibitors should increase platelet

11 activity, should increase thrombosis, right?

12    Q. Well, Doctor, my question was -- was, I

13 think, a little more precise. I thought --

14 let -- let me see if I can make it very precise.

15        I want your references in intact human

16 beings where Vioxx administered to patients versus

17 a -- a comparator does not increase excess CV

18 thrombotic events.

19            MR. KREPS: Object to form of the

20 question.

21    A. (Continuing) Within page 11 there are

22 studies looking at individuals both healthy and with

23 apparent increased thrombotic activity given Vioxx

24 or given other COX-2 inhibitors.

25    Q. Doctor, I'm talking very specifically about

page 125

1 a patient on Vioxx, versus a com -- versus a

2 comparator who had a CV thrombotic event. I'm not

3 asking for platelet inhibition or anything. I want

4 the events that you -- and a cite that you rely on.

5    A. You're talking about thrombotic events.

6 Now, a thrombotic event involves platelet activity

7 and platelet aggravation. That is addressed

8 specifically on page 11.

9    Q. Doctor, do any of the citations on page 11

10 involve patients administered Vioxx against a

11 comparator and a review or comparison of CV

12 thrombotic events in the two groups?

13    A. Again, you need to -- to define your CV

14 thrombotic events.

15    Q. Doctor, could you --

16    A. No, no. Let me finish.

17        This is directly analyzing the activity of

18 platelets within living human beings and is

19 therefore analyzing the activity of Vioxx and the

20 other inhibitors of COX-2 on that platelet activity.

21 And so it's directly relevant to what you're saying.

22        If you have some other concept of CV

23 thrombotic events, then you need to define them.

24    Q. Well, Doctor, I understand why you may think

25 it would be relevant. I'm asking you an endpoint.

page 126

1        You understand what an endpoint is in a

2 study, don't you?

3    A. Everything is an endpoint.

4    Q. Okay.

5    A. This is an endpoint.

6    Q. Here -- here is the endpoint I'm looking at.

7

7 In a actual adverse cardiovascular thrombotic event
8 comparison between Vioxx-administered patients and
9 compare.
10    A.  I think what you're looking for is a
11 clinical trial.  And I told you --
12    Q.  I'm just --
13    A.  Well, this is -- you're looking at the
14 endpoint of platelet activity, which is the level of
15 thromboxane and other platelet mediators within
16 human beings with or without Vioxx in individuals
17 that are both healthy and also in individuals
18 which -- which have an increased activity of the
19 platelets and an increased risks for thrombosis.
20 And the levels are the same.  Vioxx doesn't affect
21 them.
22    Q.  Not asking for the levels, Doctor.  I'm
23 asking for actual CV events in human beings.
24    A.  But these --
25       MR. KREPS:  Wait.  You've -- that
page 127
1 wasn't a question.  That was a statement.  If there
2 is a question --
3       MR. HORNBECK:  No.
4    Q.  (By Mr. Hornbeck, continuing) I said I am
5 asking about your reference for a comparison of CV
6 thrombotic events in patients administered Vioxx
7 against a comparator?
8    A.  And I --
9       MR. KREPS:  Object to -- to form.  It's
10 been asked and answered several times.  You're
11 asking if he has a clinical trial.
12       MR. HORNBECK:  No, I --
13       MR. KREPS:  And he's told you he
14 doesn't.
15       MR. HORNBECK:  No, I'm not.  No, I'm
16 not.
17    A.  (Continuing) I think what you're asking for
18 is a different endpoint than the endpoint I'm giving
19 you.
20    Q.  Okay.  All right.
21    A.  This endpoint that's described here is an
22 endpoint that reflects the activity of platelets and
23 therefore reflects the activity of CV thrombotic
24 events.
25    Q.  Well, Doctor --
page 128

. . . .

8    Q.  (By Mr. Hornbeck, continuing) Doctor, is it
9 true that if your opinions on page 11 were relevant

8

10 to whether or not Vioxx was -- was cardiotoxic, the
11 proof would be in the randomized clinical trials and
12 whether that -- there's statistically significant
13 increased CV events on Vioxx versus a comparator?
14 Isn't that right?
15          MR. KREPS:  Object to form.
16     A.  (Continuing) The studies that -- referenced
17 within the report were all done on humans -- humans.
18          You're asking me to interpret clinical
19 trials again.  And that's -- I'm not here to do
20 that.

Flavahan dep. at 120:25-128:20.  Dr. Flavahan further testified:

page 176
15     Q.  Doctor Flavahan, would you agree that any
16 potential plausible biological mechanism of Vioxx
17 with regard to its propensity to increase blood
18 pressure should be measured against clinical trial
19 data in human beings in randomized clinical trials?
20          MR. KREPS:  Objection to the form of
21 the question.
22     A.  (Continuing) Well, that -- that's a long
23 question.
24     Q.  That's a long question.  I'll break it up.
25     A.  Right.
page 177
1     Q.  Would -- would you agree that one way to
2 test a hypothesis for a biologically plausible
3 mechanism of Vioxx in hypertension is to look at
4 clinical trials that actually had increased
5 hypertension as an endpoint?
6     A.  I think one way -- and the most direct way
7 would be to administer the agent to hypertensives
8 and then follow them for specified period of time to
9 see what happens to blood pressure.
10     Q.  That, in fact, was done in the VIGOR trial,
11 as well as at the APPROVe trial, wasn't it?
12     A.  Again, I can -- have not reviewed or
13 evaluated the data from those trials.  I know that
14 some studies have done clinical experiments where
15 they've provided Vioxx to individuals and followed
16 blood pressure.
17     Q.  Sir, are you aware that in clinical trials
18 such as Vioxx and APPROVe there were demographics of
19 each patient enrolled that documented whether or not
20 the patient entered the trial with hypertension?
21          MR. KREPS:  Objection to the form of
22 the question.
23     A.  (Continuing) Again, you're getting to the
24 specifics of the design and analysis of the -- the

25 clinical trials, which is -- is not why I'm here.

Flavahan dep. 176:15-177:25; see also Flavahan dep. 193:21-195:20; 202:7-203:2.

*Daubert* and Rule 702 require that in order for expert testimony to be admissible it must be relevant and reliable. The testimony must be based "upon sufficient facts or data" and the witness must "have applied the principles and methods reliability to the facts of the case." Fed. R. Evid. 702. Dr. Flavahan acknowledges that it is necessary to test a biological mechanism theory in human clinical trials. Dr. Flavahan asserts that Vioxx "has not been demonstrated to increase vascular thrombotic events." (Flavahan dep. at 213:24-214:2; see also 215:9-215:16.) Dr. Flavahan, however, is not familiar with and refuses to acknowledge the results of human clinical trials involving Vioxx. Moreover, the results of the human clinical trials involving Vioxx, including VIGOR, APPROVe, among others, do not support Dr. Flavahan's conclusion and evidence that in fact Vioxx is prothrombotic. Dr. Flavahan's lack of knowledge regarding the results of clinical trials involving Vioxx and his failure to factor in the results of those clinical trials render his opinions unreliable and irrelevant.

For these reasons and those set forth in Plaintiff's initial memorandum, Dr. Flavahan's opinions are unreliable and irrelevant. Plaintiff respectfully requests that the Court issue an order precluding Dr. Flavahan from offering expert opinion in this case, and for such other and further relief to which Plaintiff may be entitled.

Date: July 3ʳᵈ, 2006

Respectfully submitted,

By: *P. Leigh o'Dell*

**Andy D. Birchfield, Jr.**
P. Leigh O'Dell
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160

**Mark Robinson**
Kevin Calcagnie
**ROBINSON, CALCAGNIE &**
**ROBINSON**
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660

**Counsel for Plaintiff**

**Russ M. Herman** (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
**PLAINTIFFS' LIAISON COUNSEL**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

**Christopher A. Seeger**, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Shelly A. Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS,
MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telefonee)
(850) 497-7059 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing **Plaintiff's Reply in Support of Plaintiff's Motion to Exclude the Opinion Testimony of Nicholas Flavahan, Ph. D.** has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U. S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File and Serve Advanced in accordance with PreTrial Order No. 8, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 3rd day of July, 2006.

G. Hugh O'Dell



Jul 3 2006  3:51PM

daubert reply

Barnett v. Merck & Co.

\* Flavahan -- Daubert Reply

[120:25] - [128:23] 6/14/2006 Nicholas Flavahan

\* Flavahan -- Daubert Reply

page 120
25     Q.  Okay.  The next is the "Hazard -- Hazard
page 121
1  from coxibs, particularly in those otherwise
2  predisposed to thrombosis."
3        Do you know -- strike that.
4        Do you have an opinion as to whether or not
5  there is an increased hazard from COX -- specific
6  COX-2 inhibitory drugs with those who already are
7  predisposed to thrombosis?
8      A.  There is already data within the literature
9  which basically goes against this point.  That
10  coxibs do not increase the thrombotic risk.  And
11  particularly Vioxx does not increase the thrombotic
12  risk.
13     Q.  Doctor, in the VIGOR study was there an
14  increased relative risk in those patients who were
15  ASA, or aspirin indicated, as opposed to those who
16  were not?
17     A.  Again, I'm not here to discuss, interpret,
18  assess clinical trials.
19     Q.  Doctor, did you understand from the
20  Bresalier article in the New England Journal on the
21  APPROVe data that for symptomatic atherosclerotic
22  disease the relative risk was nine and a half times
23  that of placebo?
24        Did you understand that?
25     A.  Again, I'm not here to interpret -- analyze,
page 122
1  interpret clinical trials.
2      Q.  Doctor, do you agree that for a scientific
3  hypothesis to have validity, it should be
4  predicted -- predictive of future events?
5        Does that make sense or should I rephrase
6  that?
7      A.  You should rephrase that.
8      Q.  Okay.  Is a scientific principle -- if you
9  have a hypothesis, one way to test whether the
10  hypothesis is valued or not is whether it has
11  predictive value; that is, what the hypothesis says
12  is likely to happen, in fact, happens in people?
13     A.  There's already data, and the references are
14  contained in the report, that demonstrate the Vioxx
15  and the other COX-2 inhibitors do not increase
16  thrombotic risk.

Page 1



PLAINTIFF'S
EXHIBIT
A

daubert reply

17    Q. In -- in intact human beings?
18    A. In -- in human beings.
19    Q. Show -- tell me that reference, Doctor.
20    A. Well, basically it's the whole -- from pages
21 4 through -- pages 4 through 7.
22    Q. Tell me the specific --
23    A. Not, in fact -- 4 through 8.
24    Q. Okay.
25    A. Oh, no.
page 123
1     Q. Tell --
2     A. 4 through 7 and then page 11.
3     Q. Is there any paper that you cite that looks
4 at Vioxx administered to patients versus a
5 comparator?
6     A. Yes, for sure I think they are in there.
7     Q. Okay. Are -- but -- it does not include any
8 randomized clinical trials of Vioxx administered to
9 patients versus comparators. Is that true?
10    A. I've referenced, as part of this, clinical
11 studies or clinical experiments performed in
12 individuals that were placebo-controlled and
13 analyzed the activity of Vioxx and other COX-2
14 inhibitors in human volunteers. I did not reference
15 and did not analyze the clinical trials that you are
16 referring to.
17    Q. Tell me, what is the reference that -- that
18 you rely on to show that patients administered Vioxx
19 did not have an increase in CV events?
20    A. No. We were talking about thrombotic
21 events.
22    Q. Okay. I'll make "CV" thrombotic events.
23    A. Okay. All right. If we go to -- well,
24 first of all, the -- whole basis for the
25 argument underlying the imbalance theory is
page 124
1 addressed with studies in human beings and in human
2 tissue in pages 4, 5, 6, 7, addressing the
3 implausibility of the theory.
4         And then specifically with regard to
5 the -- some studies in humans looking at the
6 imbalance theory -- they are defined, also, on
7 page 11.
8     Q. Okay.
9     A. So if the imbalance theory were correct,
10 then the COX-2 inhibitors should increase platelet
11 activity, should increase thrombosis, right?
12    Q. Well, Doctor, my question was -- was, I
13 think, a little more precise. I thought --
14 let -- let me see if I can make it very precise.
15        I want your references in intact human
16 beings where Vioxx administered to patients versus
17 a -- a comparator does not increase excess CV
18 thrombotic events.
19        MR. KREPS: Object to form of the

Page 2

daubert reply

20  question.
21     A. (Continuing) Within page 11 there are
22  studies looking at individuals both healthy and with
23  apparent increased thrombotic activity given Vioxx
24  or given other COX-2 inhibitors.
25     Q. Doctor, I'm talking very specifically about
page 125
1  a patient on Vioxx, versus a corn -- versus a
2  comparator who had a CV thrombotic event.  I'm not
3  asking for platelet inhibition or anything.  I want
4  the events that you -- and a cite that you rely on.
5     A. You're talking about thrombotic events.
6  Now, a thrombotic event involves platelet activity
7  and platelet aggravation.  That is addressed
8  specifically on page 11.
9     Q. Doctor, do any of the citations on page 11
10  involve patients administered Vioxx against a
11  comparator and a review or comparison of CV
12  thrombotic events in the two groups?
13     A. Again, you need to -- to define your CV
14  thrombotic events.
15     Q. Doctor, could you --
16     A. No, no.  Let me finish.
17        This is directly analyzing the activity of
18  platelets within living human beings and is
19  therefore analyzing the activity of Vioxx and the
20  other inhibitors of COX-2 on that platelet activity.
21  And so it's directly relevant to what you're saying.
22        If you have some other concept of CV
23  thrombotic events, then you need to define them.
24     Q. Well, Doctor, I understand why you may think
25  it would be relevant.  I'm asking you an endpoint.
page 126
1        You understand what an endpoint is in a
2  study, don't you?
3     A. Everything is an endpoint.
4     Q. Okay.
5     A. This is an endpoint.
6     Q. Here -- here is the endpoint I'm looking at.
7  In a actual adverse cardiovascular thrombotic event
8  comparison between Vioxx-administered patients and
9  compare.
10     A. I think what you're looking for is a
11  clinical trial.  And I told you --
12     Q. I'm just --
13     A. Well, this is -- you're looking at the
14  endpoint of platelet activity, which is the level of
15  thromboxane and other platelet mediators within
16  human beings with or without Vioxx in individuals
17  that are both healthy and also in individuals
18  which -- which have an increased activity of the
19  platelets and an increased risks for thrombosis.
20  And the levels are the same.  Vioxx doesn't affect
21  them.
22     Q. Not asking for the levels, Doctor.  I'm

daubert reply

23  asking for actual CV events in human beings.
24    A.  But these --
25        MR. KREPS:  Wait. You've -- that
page 127
1  wasn't a question. That was a statement. If there
2  is a question --
3        MR. HORNBECK:  No.
4    Q.  (By Mr. Hornbeck, continuing) I said I am
5  asking about your reference for a comparison of CV
6  thrombotic events in patients administered Vioxx
7  against a comparator?
8    A.  And I --
9        MR. KREPS:  Object to -- to form. It's
10  been asked and answered several times. You're
11  asking if he has a clinical trial.
12        MR. HORNBECK:  No, I --
13        MR. KREPS:  And he's told you he
14  doesn't.
15        MR. HORNBECK:  No, I'm not. No, I'm
16  not.
17    A.  (Continuing) I think what you're asking for
18  is a different endpoint than the endpoint I'm giving
19  you.
20    Q.  Okay. All right.
21    A.  This endpoint that's described here is an
22  endpoint that reflects the activity of platelets and
23  therefore reflects the activity of CV thrombotic
24  events.
25    Q.  Well, Doctor --
page 128
1        MR. WEISS:  Move to strike the answer
2  as nonresponsive because the question repeatedly
3  was, "In any of these studies were patients given
4  Vioxx or another COX-2 inhibitor."
5        That was the question. And you haven't
6  answered it yet, Doctor. So I'm moving to strike
7  it. The whole line.
8    Q.  (By Mr. Hornbeck, continuing) Doctor, is it
9  true that if your opinions on page 11 were relevant
10  to whether or not Vioxx was -- was cardiotoxic, the
11  proof would be in the randomized clinical trials and
12  whether that -- there's statistically significant
13  increased CV events on Vioxx versus a comparator?
14  Isn't that right?
15        MR. KREPS:  Object to form.
16    A.  (Continuing) The studies that -- referenced
17  within the report were all done on humans -- humans.
18        You're asking me to interpret clinical
19  trials again. And that's -- I'm not here to do
20  that.
21        MR. HORNBECK:  Okay, motion to strike.
22  We'll just keep going.
23        MR. KREPS:  Well, Counsel, let's talk

daubert reply

[176:15] - [177:25] 6/14/2006 Nicholas Flavahan

* Flavahan -- Daubert Reply

page 176
15    Q. Doctor Flavahan, would you agree that any
16 potential plausible biological mechanism of Vioxx
17 with regard to its propensity to increase blood
18 pressure should be measured against clinical trial
19 data in human beings in randomized clinical trials?
20          MR. KREPS: Objection to the form of
21 the question.
22    A. (Continuing) Well, that -- that's a long
23 question.
24    Q. That's a long question. I'll break it up.
25    A. Right.
page 177
1     Q. Would -- would you agree that one way to
2 test a hypothesis for a biologically plausible
3 mechanism of Vioxx in hypertension is to look at
4 clinical trials that actually had increased
5 hypertension as an endpoint?
6     A. I think one way -- and the most direct way
7 would be to administer the agent to hypertensives
8 and then follow them for specified period of time to
9 see what happens to blood pressure.
10    Q. That, in fact, was done in the VIGOR trial,
11 as well as at the APPROVe trial, wasn't it?
12    A. Again, I can -- have not reviewed or
13 evaluated the data from those trials. I know that
14 some studies have done clinical experiments where
15 they've provided Vioxx to individuals and followed
16 blood pressure.
17    Q. Sir, are you aware that in clinical trials
18 such as Vioxx and APPROVe there were demographics of
19 each patient enrolled that documented whether or not
20 the patient entered the trial with hypertension?
21          MR. KREPS: Objection to the form of
22 the question.
23    A. (Continuing) Again, you're getting to the
24 specifics of the design and analysis of the -- the
25 clinical trials, which is -- is not why I'm here.


[191:5] - [191:12] 6/14/2006 Nicholas Flavahan

* Flavahan -- Daubert Reply

page 191
5     Q. Well, why don't -- why don't you identify
6 for us the articles that, to your mind, call -- or
7 refute the imbalance theory.
8     A. I know there's -- you'll need to give me a
9 couple of days to get the exact list to you, but I
10 know there's articles from Mitchell, there's

Page 5

daubert reply

11  articles from Cipollone, and there's articles from
12  Patro -- Patrono, as far as I'm aware.


[192:9] - [192:20] 6/14/2006 Nicholas Flavahan

* Flavahan -- Daubert Reply

page 192
9  Doctor Flavahan, I am asking you for articles
10  referenced in your expert report that directly
11  contradict or -- or refute the imbalance theory by
12  that name.  That is, they look at the imbalance
13  theory, as -- as we've just looked at in
14  FitzGerald's article, and they say, this is
15  scientifically unsound.
16    A.  Nobody obviously says that, but they obvious
17  -- the way they say it is to discuss the imbalance
18  theory and demonstrate or discuss the fact that it's
19  implausible.  I don't think they use the word --
20  that it's unsound.


[193:21] - [195:20] 6/14/2006 Nicholas Flavahan

* Flavahan -- Daubert Reply

page 193
21  something that I've addressed.
22    Q.  As a general matter, do you think it is
23  important for a scientific hypothesis to have
24  predictive capacity?
25    A.  It's -- it's important for a scientific
page 194
1  hypothesis to be evaluated within humans and to be
2  relevant to humans.
3    Q.  Okay.  Doctor, in -- in -- as I read your
4  report, I see that you disagree with the FitzGerald
5  and others imbalance theory.  I don't see that
6  you've put forth another or alternative biologic
7  explanation to explain any of the data in the
8  clinical trials.
9      Have -- have you done that and I've missed
10  it or you have not done that?
11    A.  What I've done is an extensive review of the
12  actions of Vioxx and an extensive review of the
13  function of COX-2 within the blood vessel wall.  And
14  both of them -- both components of the report come
15  to the conclusion that a Vioxx and other COX-2
16  inhibitors will not have a detrimental effect on the
17  cardiovascular system.
18    Q.  Okay.  So -- so -- and -- and so there can't
19  be any ad -- there can't be any plausible biologic
20  mechanism of action if, in fact, the drug is -- is
21  not cardio harmful.  Is that true?

daubert reply

22   A.  Say again?
23   Q.  Yeah.  If -- your -- your -- your position
24  now, today, is that Vioxx is not cardiotoxic,
25  correct?
page 195
1    A.  That's correct.
2    Q.  Okay.  And you base that on all the papers
3  that you have in your expert report, correct?
4    A.  That's correct.
5    Q.  Okay.  And so there is no, in your mind,
6  reason to have a potential biological explanation
7  for any adverse cardiovascular properties of Vioxx.
8  Is that true?
9       MR. KREPS:  Objection to form of the
10  question.
11   A.  (Continuing) I -- I've been -- I didn't go
12  specifically looking for data to support either side
13  of this issue.  I went to look at the data.  And the
14  data suggests that it has no cardiotoxic effect.
15   Q.  Okay.  That's -- that's the -- does not
16  include the randomized clinical trial data, though.
17  Is that true?
18   A.  Includes looking at the randomized clinical
19  trial publications, but I did not look at or assess
20  the data within those clinical trials.


[202:7] - [203:2] 6/14/2006 Nicholas Flavahan

* Flavahan -- Daubert Reply

page 202
7    Q.  Okay.  If your theory of -- of that -- that
8  a selective COX-2 inhibitor is not cardiotoxic
9  is -- is correct, would you expect there to be an
10  excess of thrombotic events in CABAG patients
11  administered a selective COX-2 inhibitor?
12   A.  It shouldn't increase thrombotic events.
13  And that's been demonstrated numerous times in -- in
14  individuals.
15   Q.  Okay.  So if there were one or two
16  randomized clinical trials that showed an excess of
17  thrombotic events in CABAG patients, your theory
18  could not explain that result.  Is that true?
19   A.  Again, you're asking me to interpret the
20  clinical trials, which --
21   Q.  Just ask --
22   A.  -- I can't do.
23   Q.  I'm sorry.  I'm sorry.  I'm just asking you
24  a hypothetical question.
25   A.  Vioxx has been demonstrated not to increase
page 203
1  thrombotic events in humans.
2    Q.  Okay.

Page 7

daubert reply

[204:6] - [204:19] 6/14/2006 Nicholas Flavahan

* Flavahan -- Daubert Reply

page 204
6    Q. Okay.  Do you have a Ph.D. in pharmacology?
7    A. Well, it was a pharmacological degree.
8 Whether it was actually within the pharmacology
9 department -- I think my mentor was a pharmacologist
10 working within physiology, so it's -- it was --
11   Q. Okay.
12   A. -- it was a pharmacology degree.
13   Q. Okay.  I thought I read it to be a -- a
14 Ph.D. in physiology.  Is that -- is that what your
15 actual Ph.D. is in?
16   A. The department I was working in at the time
17 was a department of physiology, but it -- the degree
18 was a pharmacology degree.  I spent the whole time
19 doing pharmacological analysis.


[204:20] - [206:11] 6/14/2006 Nicholas Flavahan

* Flavahan -- Daubert Reply

page 204
20   Q. Okay.  Did -- are you familiar with
21 Steadman's Medical Dictionary for health
22 professions, Doctor?
23   A. I don't think I've used it.
24   Q. Okay.  They -- the only reason I ask is I
25 wasn't familiar with -- with what exactly physiology
page 205
1 entailed and I -- I looked it up in that -- that
2 treatise.  And I wanted to read the definition they
3 gave and -- and see if that fairly accurately
4 summarizes what physiology involves.
5      You following me?
6    A. Yep.
7    Q. Okay.  And I apologize for not having a copy
8 there in front of you, but I -- I'll read it to the
9 best of my ability here.
10      "Physiology is the science concerned with
11 the normal vital processes of animal and vegetable
12 organisms, especially as to how things normally
13 function in the living organism, rather than their
14 anatomical structure, their biochemical composition,
15 or how they are affected by drugs or disease."
16      Is that a fairly accurate description of
17 what physiology involves, Doctor?
18   A. It's different from the one I would give.  I
19 think it's different from the way that the subjects
20 evolved.  I didn't even realize it stretched to
21 vegetables or plants.

Page 8

daubert reply

22    Q. Okay. Is there any particular -- any
23  particular aspect of that definition you would
24  disagree with, but you -- aside from the vegetable
25  reference?
page 206
1        MR. KREPS: Well, object to the form of
2  the question, but he hasn't been able to see it.
3  Obviously, as counsel said, he heard him read it
4  once.
5        But go ahead.
6    A. (Continuing) Right. I mean, certainly,
7  it -- most physiology now extends to cell and
8  molecular physiology, but the -- the kind of -- the
9  kind of global picture behind the discipline is to
10  analyze how the systems function. It's like in a
11  systems label approach to everything.


[210:21] - [210:25] 6/14/2006 Nicholas Flavahan

* Flavahan -- Daubert Reply

page 210
21    Q. Okay. Doctor, what is the mechanism of
22  action by -- by which Vioxx increases the risk of
23  heart attacks and strokes?
24    A. Again, that's interpreting clinical trial
25  data. And I'm not doing that.


[211:1] - [211:2] 6/14/2006 Nicholas Flavahan

* Flavahan -- Daubert Reply

page 211
1    Q. Okay. Again, would that be something you
2  have no opinion on?


[211:5] - [211:22] 6/14/2006 Nicholas Flavahan

* Flavahan -- Daubert Reply

page 211
5    A. (Continuing) I have opinion on what Vioxx
6  does within the -- the cardiovascular system and
7  blood vessels of humans. I have no opinion on the
8  validity or the interpretation of the clinical
9  trials.
10    Q. Let me rephrase my question then, Doctor,
11  and see if we can come to an understanding.
12        What is the mechanism of action by which
13  Vioxx increases the risk of heart attack and strokes
14  in Vioxx clinical trials then?
15    A. Same question. Similar answer. I have

Page 9

daubert reply

16  not evaluated the validity or the data or the
17  interpretations of the clinical trials.
18      Q.  So you have no opinion on that particular
19  question, is that true?
20      A.  As of detail during the course of today, I
21  think there's strong data demonstrating the Vioxx
22  does not increase the atherothrombotic process.


[214:12] - [216:24] 6/14/2006 Nicholas Flavahan

* Flavahan -- Daubert Reply

page 214
12      Q.  Okay.  That's what I'm trying to get at
13  here.  You -- you've been very definitive in -- in
14  what you're saying and describing that Vioxx is not
15  demonstrated -- or not been demonstrated to increase
16  vascular thrombotic events.
17          Are you making a distinguish --
18  distinguishment between thrombotic events and other
19  cardiovascular adverse events?
20      A.  Well, no.  I was -- I was trying to make a
21  distinction between the term "event" and the fact
22  that your definition of "event" may rely on clinical
23  trials, my definition of an "event" would be from
24  the clinical experiments and clinical studies.
25      Q.  Okay.  Your -- your definition of -- of --
page 215
1  strike that question.
2          Your statement that Vioxx is not -- or has
3  been demonstrated not to increase vascular
4  thrombotic events does not rely in any way upon
5  information from the Vioxx clinical trials, correct?
6      A.  That's correct.
7      Q.  Okay.  Now, I -- I think I understand now,
8  Doctor.  Thank you.
9          Doctor, aside from the specific term of
10  vascular thrombotic events, do you have any opinions
11  whether Vioxx increases cardiovascular adverse
12  events, in general?
13      A.  It's my opinion that based on the data
14  that -- I have reviewed for the report, that there's
15  no evidence that a Vioxx increases or causes adverse
16  cardiovascular events.
17      Q.  Again, Doctor, your last statement that
18  there's no evidence based upon the data you've
19  reviewed that Vioxx increases cardiovascular adverse
20  events -- that data does not include information
21  from the clinical trials involving Vioxx, correct?
22      A.  That's correct.  As I said before, I did not
23  review or evaluate the data from the clinical
24  trials.
25      Q.  Your opinions here today are -- are based
page 216

Page 10

daubert reply

1  upon -- upon the basic science and upon science
2  that's actually been done in animal -- animal models
3  inside and outside of Merck, is that correct?
4      A. My opinions are predominantly -- if you read
5  the report, my opinions are predominantly based on
6  data from human studies, both in living human
7  volunteers, as well as tissues obtained from humans.
8  All of that data has been published in the world's
9  literature.
10     Q. Okay. So -- just so I'm clear then, the --
11  the -- all of the human data upon which you are
12  basing your opinions in this case have appeared in
13  the published literature, correct?
14     A. That's correct.
15     Q. Doctor, I do note that you have cited or at
16  least referenced several animal studies. Is -- is
17  it -- is it fair to say then that the animal studies
18  referenced in your report have not helped form the
19  basis of the opinions that you've expressed in your
20  report?
21     A. Basically don't need them for the opinions
22  of the report. Restricted the animal studies and
23  mainly -- I think perhaps solely to the analysis of
24  the COX-2 inhibitors and atherosclerotic models.


[252:12] - [253:13] 6/14/2006 Nicholas Flavahan

* Flavahan -- Daubert Reply

page 252
12     Q. Okay. And -- and you've never published any
13  research or -- or medical literature specifically in
14  reference to Vioxx, have you?
15     A. We've used other COX inhibitors in our
16  publications. We haven't used Vioxx.
17     Q. Have you ever utilized Vioxx's sister
18  compounds, etoricoxib or arcoxia in any of your
19  studies?
20     A. No.
21     Q. Have you ever published any medical
22  literature in reference to arcoxia or etoricoxibs?
23     A. No.
24     Q. Are you familiar with arcoxia or
25  etoricoxibs?
page 253
1      A. I don't recall them.
2      Q. And I want to be clear on the record,
3  Doctor. You have not been given for review by
4  either Merck or the Merck-paid attorneys any of the
5  APPROVe follow-up data, is that correct?
6          MR. KREPS: Object to the form of the
7  question.

Page 11

daubert reply

8    A. (Continuing) I haven't looked through
9  everything that the Merck attorneys have given me.
10  I think you're going to be getting or receiving
11  documents -- or a list of documents that they did
12  provide. As far as I'm aware, they have not given
13  me that data.


[261:22] - [262:4] 6/14/2006 Nicholas Flavahan

* Flavahan -- Daubert Reply

page 261
22    Q. Prior to being -- being hired by Merck as an
23  expert back in December of 2005, had you come to an
24  independent conclusion as to whether or not the use
25  of a cyclooxygenate to specific inhibitor could
page 262
1  increase or decrease atherogenesis and
2  atherosclerotic progression?
3    A. I don't think I've had -- specifically
4  considered that question.

# EXHIBIT  B



Aug 28 2006
6:25PM

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re: VIOXX PRODUCTS LIABILITY LITIGATION** | **MDL No. 1657** |
| | **Section L** |
| **THIS DOCUMENT RELATES TO:** | |
| | **Judge Eldon E. Fallon** |
| *Robert G. Smith v. Merck & Co., Inc.* **Case No. 2:05-CV-04379** | **Magistrate Judge Daniel E. Knowles, III** |

### PLAINTIFF'S REPLY TO MERCK'S RESPONSE TO PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY THAT AN INCREASED RISK OF HEART ATTACK EXISTS ONLY AFTER 18 MONTHS OF VIOXX USE

Plaintiff writes in brief reply to Merck's Response to Plaintiff's Motion To Exclude Testimony That An Increased Risk of Heart Attack Exists Only After 18 Months of Vioxx Use. Merck's Response flatly misstates both applicable law and the newly corrected results of the APPROVe study.[1]

## I.        Defendant's Experts Must Satisfy *Daubert*

Merck first argues its 18 month opinion is admissible because Plaintiff has the burden of proof on causation. *See* Merck Response at 3 (Section I). This argument is meritless. Merck is not entitled, as a matter of law, to present scientific nonsense to a jury merely because it is a defendant. The proponent of scientific evidence, regardless of status as Plaintiff or Defendant, bears the burden of demonstrating reliability. *Moore v. Ashland Chem., Inc.*, 141 F.3d 269 (5th Cir. 1998).

---

[1] Although the Court previously ruled Merck's 18-month opinion was not excludable, the ruling pre-dated the corrected manuscript and was based upon the parties' then-agreement that the statistical methodology applied by the authors was correct. *In Re: Vioxx Products Liability Litigation*, MDL-1657, 401 F.Supp.2d 565, 597 (E.D. La 2005)  Because of the correction, this agreement no longer exists and necessitates the current motion.



**PLAINTIFF'S EXHIBIT**

**B**

## II.    Reliable Evidence Demonstrates Short-Term Use of Vioxx is Dangerous – APPROVe is Consistent With Other literature in demonstrating this risk

The majority of Merck's response is devoted to attacking Plaintiff's general interpretation of the body of scientific evidence surrounding Vioxx, rather than addressing Plaintiff's complaint about Merck's continued reliance upon statistical error in the APPROVe manuscript.  Plaintiff's Response In Opposition to Merck's Motion To Exclude Testimony That Short-Term Vioxx Use Increases Cardiovascular Risk is already on file with the Court, and Plaintiff adopts it for all purposes in response to Merck's contention here.  Furthermore, the Court has already rejected Merck's broader contention, re-urged here, that there is not adequate scientific evidence to show increased risk at short durations.  *See generally In Re: Vioxx Products Liability Litigation*, MDL-1657, 401 F.Supp.2d 565, 586 (E.D. La 2005) (Permitting Professor Ray's testimony of increased risk at less than 30 days exposure).

## III.    APPROVe Demonstrates An Early Increased Risk of Heart Attack

Merck claims, *inter-alia*, that (1) APPROVe documents no increased risk before 18 months; (2) Merck's 18-month analysis is not *post-hoc*; and (3) Merck's 18-month analysis is not subgroup analysis.  *See* Merck Response at 6-8, 10-12.  Each of these claims is plainly false.  We address each in turn.

First, the use of Vioxx in APPROVe doubled the risk of heart attack.  *See* Exhibit 1, Addendum to the Report of Dr. Richard A. Kronmal, May 23, 2006, at 4.  As Figures 1 and 2 of Dr. Kronmal's Addendum Report shows, the event rates for heart attack and congestive heart failure between Vioxx and placebo separated within just a few months

of exposure. *Id* at 6. [2]  The only generally accepted, statistically reliable interpretation of the corrected APPROVe data is to apply this doubling of risk to all time-periods within the study. *Id.* at 5 ("[revised] p-values show that there is no statistical support for any deviation from a constant RR over the follow-up time").

Second, Merck's claim that its 18-month analysis is not *post-hoc*, is inconceivable. The original manuscript explicitly described the analysis as "*post-hoc*." *See* Bresalier RS et al., *Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial*, NEW ENG. J. MED., March 17, 2005.  The relevant portion of the manuscript begins "In a *post-hoc* analysis, the difference between the two groups in the incidence of thrombotic events was evident in the second 18 months of the study. . ." *Id.*  Furthermore, as Dr. Kronmal explains, and as Merck agrees, this *post-hoc* analysis is unreliable:

> [Merck's 18-month claim] was based on a test done after examining the data and wasn't a prespecified hypothesis in the APPROVe protocol or statistical analysis plan.  Such tests are not considered by the scientific community as being proof of an effect, rather at best they are considered only worthy of consideration as hypotheses for which confirmation would be need in other studies before they would be accepted.  The results for MI and for hard CHD didn't support this hypothesis and the results from the MI meta-analysis clearly contradicted it since it showed increased risk in studies of less than 1 year of duration.

*See* Addendum to Kronmal Report at 4.  Merck presents not one shred of factual evidence from the APPROVe protocol in support its claim that the 18-month analysis was pre-specified.  There is none.

---

[2] Merck's use of the combined "APTC" endpoint, rather than heart attack or hard CHF, serves to dilute the early evidence of the pro-thrombotic danger of Vioxx in APPROVe.  This dilution occurs because the APTC endpoint includes events that are totally unrelated to the mechanism by which Vioxx causes injury.  Merck's scientists knew this when the chose the APTC endpoint instead of heart attack.  And Merck's lawyers continue the ruse in their papers before the Court.

Third and last, Merck's assertion that its 18-month opinion is not the result of "subgroup analysis" is also wrong.  *See* Merck Response at 10-11.  In truth, Merck's analysis does not compare entire study populations.  Rather, it compares the subgroup of patients who had events before 18 months with the subgroup of patients who had events after 18 months.  This is the very definition of an "improper subgroup" since, as Dr. Moye explains, the members of the pre- and post-18 month event groups cannot be ascertained at baseline.  *See* Affidavit of Dr. Lemuel Moye (attached as Exhibit C to Plaintiff's Motion).  Dr. Marks' creation of a distinction between "subset" and "subgroup" analysis, expressed nowhere in the scientific literature, is novel and should be excluded.

## IV.    Conclusion

Merck's response incorrectly proposes to relieve defense experts, as a matter of law, from the rigors of *Daubert* and its progeny.  As a fallback, Merck proposes to parade before the jury statements and figures in the original APPROVe manuscript that are now known to be without scientific support and/or misleading.  For the reasons set forth above, Plaintiff respectfully requests the Court grant his motion.

Respectfully submitted,

James L. "Larry" Wright
Texas Bar No. 22038500
**THE WATTS LAW FIRM LLP**
111 Congress Avenue, Suite 1010
Austin, Texas 78701
(512) 479-0500; fax (512) 473-0328

/s/ Grant Kaiser
Grant Kaiser
Texas Bar No. 11078900
**THE KAISER FIRM LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
(713)-223-0000; fax (713) 223-0440
**ATTORNEY IN CHARGE**

Walter Umphrey
Texas Bar No. 20380000
**PROVOST   UMPHREY   LAW   FIRM
LLP**
490 Park Street
Beaumont, Texas 77701
(409) 835-6000; fax (409) 838-8888


Drew Rainer
Louisiana Bar No. 8320
**RANIER, GAYLE & ELLIOT LLC**
1419 Ryan Street
Lake Charles, Louisiana 70601
(337) 494-7171; fax (337) 494-7218

John Eddie Williams, Jr.
Texas Bar No. 21600300
Amy M. Carter
Texas Bar No. 24004580
**WILLIAMS   BAILEY   LAW   FIRM
LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
(713) 230-2200; fax (713) 643-6226


Mikal Watts
Texas Bar No. 20981820
**THE WATTS LAW FIRM LLP**
Tower II Building, 14th Floor
555 North Carancahua Street
Corpus Christi, Texas 78478
(361) 887-0500; fax (361) 887-0055

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 28th day of August, 2006.

/s/ Grant Kaiser
Grant Kaiser
**THE KAISER FIRM LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
(713) 230-0000; fax (713) 230-0440
gkaiser@thekaiserfirm.com

cc:   By email only:

Robert Van Kirk        rvankirk@wc.com
**Williams & Connolly LLP**
725 Twelfth Street Northwest
Washington, D.C.  20005
(202) 434-5000; fax (202) 434-5029

Carrie A. Jablonski        carrie.jablonski@bartlit-beck.com
**Bartlit, Beck, Herman, Palenchar & Scott LLP**
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
(312) 494-4400; fax (312) 494-4440



LEXISNEXIS' FILE & SERVE
12206621
E-SERVICE
Aug 28 2006
6:25PM

# IN RE VIOXX LITIGATION

# ADDENDUM TO REPORT OF RICHARD A. KRONMAL

**May 23, 2006**

# Addendum to the Report of Richard A. Kronmal

### Introduction

This addendum supplements my Report, submitted on April 7, 2006 (the "Report"), in the following areas:

- Updates to the Alzheimer's section of the Report; and

- Updated analyses of the APPROVe study, including analyses of the data from the study extension.

I have not yet updated the section of my Report concerning Protocol 203 to incorporate the recently produced APPROVe extension data and Oxford VICTOR data, but specifically reserve the right to do so.

### Updates to Alzheimer's Analysis

The following material should be inserted after the second paragraph on page 22 of the Report:

Merck did consider instituting a DSMB for study 078. An urgent meeting was called to discuss this issue (MRK-AFW0019561). This was followed by a meeting at which it was decided by Merck that a DSMB was unnecessary (MRK-NJ0333568). However, had a DSMB been formed, a reasonable DSMB would have been compelled to take immediate steps, including terminating the trial, to protect the patients in the study who never consented to the extreme risks seen in that trial. Evidence for this is the actions taken by the ESMB of the Merck APPROVe study. The APPROVe ESMB recommended termination of the APPROVe trial based on results that were less extreme than was the situation for the Alzheimer's trials. A member of the APPROVe ESMB and a Merck consultant when asked about the decision to terminate the APPROVe trial said:

> *"The reason we recommended termination was that we felt the patients in the APPROVe study were not aware of this and had not been consented to this adverse effect. So, in our judgment, you know, from an ethical viewpoint if you were going to continue you would have to go back and re-consent them and that certainly wasn't practical at that point in time. So, that is the specific reason we*

*recommended termination."*
*(http://www.fda.gov/ohrms/dockets/ac/05/transcripts/2005-4090T1.htm)*

Applying this same logic to the Alzheimer's 078 study would have resulted in a DSMB stopping the trial. In my years of experience with many clinical trials (and the DSMBs associated with such trials), study 078 could not be reasonably continued in the face of such information. One could not reasonably ask patients to consent to a trial of a drug that had a statistically significant 3 fold increased risk of death associated with it for a speculative benefit. Nor would a reasonable DSMB or IRB charged with protecting patients exposed to the therapy permit the continuation of such a study.

In my opinion, Merck's failure to notify the appropriate organizations of the possible excess risk of death from taking rofecoxib and their decision to not terminate the study sharply deviates from accepted clinical trial practice. The decision by Merck to continue study 078 is in direct violation of the principles of the *DECLARATION OF HELSINKI* that provides the standards for the conduct of medical research involving human subjects. To emphasize the widespread acceptance of this standard, I have provided three website references to this document, one from the FDA, one from the Office of Human Subjects Research of the U.S. National Institutes of Health, and one from the World Medical Association (WORLD MEDICAL ASSOCIATION DECLARATION OF HELSINKI Ethical Principles for Medical Research Involving Human Subjects, http://www.fda.gov/oc/health/helsinki89.html, http://ohsr.od.nih.gov/guidelines/helsinki.html , or http://www.wma.net/e/policy/b3.htm ). Merck indicates on its website that they follow the tenets of the Declaration of Helsinki (http://www.merck.com/cr/science_innovation_and_quality/drug_development_process/clinical_trials/). Continuing the trial when there was strong evidence of excess mortality associated with the use of rofecoxib violated section I.4, which states: "*Biomedical research involving human subjects cannot legitimately be carried out unless the importance of the objective is in proportion to the inherent risk to the subject.*" This principle holds at all times during the trial and is a primary reason why DSMBs are widely utilized to monitor clinical trials. In April of 2001, there was a three times excess risk of mortality associated with the use of rofecoxib, a risk that far exceeded any likely benefits of the therapy for the subjects in the trial. Thus, by allowing the study to continue and thereby exposing the study subjects to the risk of premature death, Merck failed in its duty to the study subjects as specified in I.4.

Permitting study 078 to continue also violated the informed consent provisions of the Declaration of Helsinki by not informing the Alzheimer's study participants of the VIGOR MI results and the Alzheimer's mortality results. Section I.9 of the declaration states:

> "In any research on human beings, each potential subject must be adequately informed of the aims, methods, anticipated benefits and potential hazards of the study and the discomfort it may entail."

2

The Alzheimer's 078 study informed consent (MRK-AFK0205452) contains the following provision:

> *"NEW FINDINGS*
> *You will be told of any significant new findings developed during the course of this study which may relate to your willingness to continue your participation."*

Nowhere in the informed consent was there any mention of the adverse events seen in VIGOR, nor was there any mention of the excess mortality seen in the 091 and 078 trials. These 'significant new findings' were not conveyed to the participants in the Alzheimer's study 078 at any time. Further, all patients still in the trial were reconsented in 2002 and at that time they were not informed about the findings in VIGOR or the early mortality findings in the two Alzheimer's trials.

On Dec. 5, 2001, the FDA sent a letter to Merck asking for the answer to a question they had about the ethics of continuing study 078 based on the excess mortality seen in study 091. The question posed to Merck was:

> *"Please clarify whether the safety monitoring board and the IRB overseeing these studies are aware of the excess in total cause mortality in the Vioxx 25 mg group as compared to placebo (p=0.026) and the trend against Vioxx 25 mg on CV mortality compared to placebo.*
>
> *Have these oversight groups commented on the ethics of continuing study 078 in light of the mortality data ..."*

The letter is important from two standpoints. First, it shows that the FDA was concerned about the ethics of continuing study 078 and that they were unaware of the lack of a DSMB for the study. It further indicates that the FDA was not aware of the statistically significant excess of mortality seen in 078 and shown in the Chen report.

Merck was far from forthcoming in their response to the FDA (MRK-AAF0005014). It did not provide the ITT results shown in the Chen report. Instead the Company reiterated the on-drug mortality experience. Merck indicated that it hadn't informed the IRB's of the findings because the study investigators remain blinded to the study results. This response demonstrates that Merck withheld the crucial information concerning the ITT mortality analyses from the IRB's and the FDA.

**APPROVe Extension Analyses**

I have now analyzed the extended follow-up from the APPROVe study. The analysis below duplicates what I did in my Report with the addition of data from the follow-up that is now available. It is important to note that the extension did more than add additional follow-up time and events; it also made an intent-to-treat (ITT) analysis for

CV events possible for APPROVe. The extended follow-up included all trial participants who the investigators were able to contact and who agreed to the follow-up. This comprised 84% of the originally randomized participants.

For the analyses presented below I have included all available events and follow-up through 210 weeks from each study participant's entry date. This corresponds to the primary analysis specified in the Merck statistical analysis plan for the extension. As was done in my original Report, I present below the results for MI and hard CHD (MI + sudden cardiac death). I used the same statistical methods described in my Report.

For MI, the RR comparing rofecoxib to placebo is 2.11 (p=0.018, CI=1.13-3.90). This is a small increase in relative risk compared to the result for the "on-drug" analysis (RR= 2.07). The MI event rate curves are shown in Figure 1 of this addendum. Note that there is no evidence from the curves that the excess risk of MI starts after 18 months. Rather, it is clear that the curves separate within the first 6 months of follow-up. Merck's contention, founded on its post hoc analysis, that there is no excess risk for CV events until after 18 months of continuous use is not supported by these data. A statistical test for equality of RR across time is *not* rejected (proportional hazards p=0.43) and thus there is no statistical support for the Merck 18 month argument.

The results for hard CHD are quite similar. The RR is 2.45 (p=0.004, CI=1.34-4.47) compared to the on-drug RR of 2.17. The test for equality of RR across time is *not* rejected (proportional hazards p=0.47). Again, there is no evidence in support of Merck's contention that the risk associated with rofecoxib use is only manifest after 18 months of continuous use.

As I have discussed in my Report, Merck has based many of its arguments about the safety of rofecoxib on results using the APTC and thrombotic endpoints. Specifically, the Company's contention that the increased risk is only for patients who use rofecoxib for 18 months is based on an analysis of these endpoints. In the APPROVe report in the New England Journal of Medicine (NEJM), Merck supports this claim by presenting the event rate curves for the thrombotic endpoint and by doing a test for proportional hazards for the thrombotic endpoint. They report that this test was significant at the p=0.01 level. However, as I also discussed in my Report, this was based on a test done after examining the data and wasn't a prespecified hypothesis in the APPROVe protocol or statistical analysis plan. Such tests are not considered by the scientific community as being proof of an effect, rather at best they are considered only worthy of consideration as hypotheses for which confirmation would be needed in other studies before they would be accepted. The result for MI and for hard CHD didn't support this hypothesis and the results from the MI meta-analysis clearly contradicted it since it showed increased risk in studies of less than 1 year of duration.

The follow-up data from the APPROVe extension provides overwhelmingly convincing evidence that the 18 month hypothesis is not supportable even based on the APPROVe data. The additional follow-up not only tallied events that occurred during the one year extension, it also ascertained events that occurred during the first three years of the study

in participants who Merck did not follow for the entire period because they dropped out due to side effects or for other reasons. Thus, for the first three years of the study, the data now reflects more closely the ITT analyses that are the scientific standard for clinical trial results. Merck provided these analyses to the FDA in May of 2006 (MRK-S04020112023).

One of the striking findings shown in this report is that even for the thrombotic and APTC endpoint, the appearance of no increased RR for the first 18 months is no longer present and the test for proportional hazards is no longer near significant. This is shown in the two figures (B1, page 15 and B5, page 24 of the FDA submission) below for the thrombotic and APTC endpoint. Merck reports that the p-values of the test of proportional hazards are 0.75 for both the thrombotic and APTC endpoints. These p-values show that there is no statistical support for any deviation from a constant RR over the follow-up time, *e.g.,* the Merck 18 month hypothesis is no longer supported by the APPROVe data.

Finally, the extension also supports the possibility, first suggested by the Alzheimer's 078 trial results, that the elevated risk associated with rofecoxib might extend beyond the time when the patient stopped taking rofecoxib. In the Alzheimer's trial, this was seen in the continuation of an increased risk of both CHD and all cause mortality in the patients off drug. In the APPROVe trial, this argument is supported by the fact that the RR observed including the extension is virtually identical to that seen for the on drug analyses. For example, for thrombotic events, the on-drug RR reported in the NEJM paper is 1.86 (p=0.008). The ITT RR now is 1.74 (p=0.004), slightly reduced but with a smaller more significant p-value. For the APTC endpoint, the on-drug relative risk was increased from 2.06 in the NEJM paper to the ITT RR of 2.36 now. This indicates that the off-drug contribution to the ITT RR was actually greater than seen during the on-drug RR or the APTC endpoint. The overall implication of this is that it is likely that rofecoxib does some damage to the body that persists for some time after the drug is discontinued.

Richard A. Kronmal, PhD

Figure 1.  Cumulative MI rates by treatment in APPROVe for 210 weeks of follow-up.



Figure 2.  Cumulative CHD rates by treatment in APPROVe for 210 weeks of follow-up.



Figure B1   All Patients – Confirmed Thrombotic Cardiovascular Events – Week 210 Censoring - Kaplan Meier Plot



| Patients at Risk | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Rofecoxib 25 mg | 1287 | 1221 | 1187 | 1152 | 1131 | 1117 | 1092 | 1032 | 989 |
| Placebo | 1300 | 1247 | 1224 | 1189 | 1173 | 1157 | 1133 | 1071 | 1027 |

Figure B5 All Patients – Confirmed APTC Events – Week 210 Censoring - Kaplan-Meier



| Patients at Risk | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Rofecoxib 25 mg | 1287 | 1220 | 1188 | 1158 | 1140 | 1125 | 1102 | 1042 | 1002 |
| Placebo | 1300 | 1249 | 1228 | 1196 | 1181 | 1165 | 1140 | 1079 | 1036 |