# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 06-0810 | * | |
| | * | MAGISTRATE JUDGE |
| CHARLES L. MASON, | * | KNOWLES |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

## RENEWED MOTION OF MERCK & CO., INC.
## ("MERCK") FOR JUDGMENT AS A MATTER OF LAW

Defendant Merck, through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 50(a), hereby moves for entry of judgment in its favor on all claims.  In the alternative, Merck moves for judgment as a matter of law on each of the claims plaintiff has failed to prove in this case.  The facts and law supporting this motion are set forth in the accompanying memorandum, which is incorporated as if fully set forth herein.

Dated:  November 15, 2006                    Respectfully submitted,


                                                         /s/ Dorothy H. Wimberly
                                                        Phillip A. Wittmann, 13625
                                                        Dorothy H. Wimberly, 18509

STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Tarek Ismail
Shayna Cook
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

Brian S. Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:      213-430-6407

And

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:      202-434-5029

Attorneys for Merck & Co., Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Renewed Motion for Judgment as a Matter of Law has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 15th day of November, 2006.

*/s/ Dorothy H. Wimberly*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 06-0810 | * | |
| | * | MAGISTRATE JUDGE |
| CHARLES L. MASON, | * | KNOWLES |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF RENEWED MOTION OF
## MERCK & CO., INC. ("MERCK") FOR JUDGMENT AS A MATTER OF LAW

At the close of the evidence, two essential claims remain – plaintiff's failure to warn claim and his fraud claim.[1]  Each of these fails, for one simple reason: plaintiff has failed to present any credible evidence to show that Vioxx, which plaintiff stopped taking four days prior to his heart attack, actually caused his alleged injuries.  The only expert testimony Mr. Mason proffered on the subject, that of Dr. Sander, was based on the false premise that Mr. Mason took Vioxx daily prior to his heart attack, including on the day of the actual event.  This testimony

---

[1] Plaintiff has alleged his failure to warn claim under two theories, strict liability and negligence. Similarly, his fraud claim is based on both misrepresentation and concealment.  Plaintiff agreed to drop the remainder of his claims – including his strict liability and negligent design defect claims and his "Deceptive Trade Practices Act" claim – after Merck filed its November 7, 2006 motion for judgment as a matter of law at the close of plaintiff's case.

thus did not take into account the realities of this case – that Mr. Mason admittedly stopped taking Vioxx four days prior to his MI, and that he consequently did not have the drug in his system at the time of his heart attack. Nothing plaintiff put into evidence – not the hours of videotaped testimony from the so-called "medical establishment" of the United States nor the testimony of his "marketing expert" or other witnesses – could overcome this case-ending fact. Merck is accordingly entitled to judgment in its favor on all of plaintiff's claims as a matter of law.

On other issues as well, it is clear that plaintiff failed to present legally sufficient evidence for the jury to find in his favor. Among other things, Mr. Mason failed to present scientifically reliable evidence establishing general causation. He also failed to prove either his failure to warn or his fraud claims. Each of these points, explained in further detail below, leads to the same conclusion. Because plaintiff failed to introduce evidence raising a triable issue on any of his claims, the Court should enter judgment in favor of Merck. In the alternative, Merck requests that the Court enter judgment on each of the claims plaintiff has failed to prove in this case.

## I.    THE LEGAL STANDARD.

A motion for judgment as a matter of law should be granted if, "after a party has been fully heard by the jury on an issue, 'there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue.'" *Aetna Cas. & Sur. Co. v. Pendleton Detectives of Miss., Inc.*, 182 F.3d 376, 377-78 (5th Cir. 1999) (quoting FED. R. CIV. P. 50). "[A] party has been fully heard when he rests his case." *Echeverria v. Chevron USA Inc.*, 391 F.3d 607, 610 (5th Cir. 2004). At that time, the court "may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated." FED. R. CIV. P. 50(a)(1).    "A mere

scintilla of evidence is insufficient to present a question for the jury." *Rutherford v. Harris County*, 197 F.3d 173, 179 (5th Cir. 1999).  Instead, "[t]here must be a conflict in substantial evidence to create a jury question."  *Id.*

## II.   MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ALL CLAIMS BECAUSE PLAINTIFF DID NOT PROFFER LEGALLY SUFFICIENT EVIDENCE OF MEDICAL CAUSATION.

In order to prevail on any of his claims, Mr. Mason was required to establish that his use of Vioxx at the 25 mg dose for approximately ten and a half months both *could have caused* and *did cause* his alleged injuries.  *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005) (medical causation requires proof of both general and specific causation); MUJI 3.13 ("A proximate cause of an injury is that cause which in natural and continuous sequence produces injury and without which the injury would not have occurred . . . .").  Plaintiff failed to meet this burden.  First, the testimony of his experts failed to establish that the use of Vioxx at the 25 mg dose for less than eleven months – the dose and duration at issue in this case – causes heart attacks.  Second, plaintiff offered no credible evidence to support his claim that Vioxx was a substantial contributing factor to his own heart attack.  Indeed, the only testimony he proffered on specific cause – from one of his experts, Dr. Sander – was predicated on the entirely false assumption that Mr. Mason took Vioxx every day, up to and including the day of his heart attack. But, as Mr. Mason's own testimony revealed, the truth is that he stopped taking Vioxx four days prior to his MI.  He thus had no Vioxx in his system on July 25, 2003 – meaning that Vioxx could not have contributed in any way to his heart attack.

Given this fact, plaintiff fell far short of his burden to show medical causation.  Under Utah law, plaintiff was required to prove both general and specific causation to a reasonable degree of medical probability, with medical expert testimony.  *Fitz v. Synthes*, 990 P.2d 391, 393 (Utah 1999).  He failed to do so.  Instead, he offered the speculative and unreliable testimony of

3

expert witnesses – Drs. Avorn and Sander – who opined, without reliable foundation, that: (i) "it is now universally agreed the Vioxx causes heart attacks" (Oct. 31, 2006 Tr. at 328:3-12 (Test. of Dr. Avorn)); (ii) they "think that Vioxx does cause heart attacks" (Nov. 1, 2006 Tr. at 442:7 (Test. of Dr. Sander)); and (iii) Vioxx was "a substantial contributing cause" of Mr. Mason's heart attack (*id.* at 487:11-12 (Test. of Dr. Sander)).

Because plaintiff failed to offer legally  sufficient evidence to show that Vioxx was the proximate cause of his alleged injuries, the Court should enter judgment in Merck's favor on all claims as a matter of law.

### A.      The Record Contains No Legally Sufficient Evidence of General Causation.

For at least two reasons, plaintiff failed to satisfy his burden to prove general causation. First, he introduced no relevant and reliable studies to show that the use of Vioxx at the 25 mg dose for less than eleven months causes heart attacks.  The studies upon which his experts relied do not and cannot show a statistically significant association between Vioxx and increased risk. Second, plaintiff did not prove a biologically plausible mechanism by which Vioxx caused his claimed injury.

#### 1.      Plaintiff Introduced No Evidence Of A Statistically Significant Study Showing That Vioxx, At The Same Dose And Duration As Taken By Mr. Mason, Is Capable of Causing Cardiovascular Events.

Plaintiff's causation experts opined that the use of Vioxx at the 25 mg dose can cause heart attacks, but the data on which they relied do not support their opinions.  There is no reliable, statistically significant data from *any* study relied upon by plaintiff's experts that using 25 mg Vioxx for less than eleven months can increase the risk of cardiovascular events.  (*See* Nov. 13, 2006 Tr. at 2189:6-13 (Test. of Dr. Pratt).)

First, to be meaningful, the study must be statistically significant, meaning that the confidence interval does not include a value of 1.0 or below.  *See*, *e.g.*, *Brock v. Merrell Dow*

*Pharms., Inc.*, 874 F.2d 307, 313 (5th Cir. 1989), *modified on reh'g*, 884 F.2d 166, 167 (reversing verdict in Bendectin litigation given plaintiff's failure to present statistically significant epidemiological proof); *LeBlanc v. Merrell Dow Pharms., Inc.*, 932 F. Supp. 782, 784 (E.D. La. 1996) (granting summary judgment in Bendectin litigation given absence of "statistically significant [ ] epidemiological studies"); *Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 664-66 (M.D. La. 2000) (excluding expert's testimony based on absence of "statistically significant epidemiological proof").

Second, an epidemiologic study cannot establish causation unless it also shows that the drug more than doubles the relative risk of injury. *See, e.g., Deluca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941, 958-59 (3d Cir. 1990) ("[A] relative risk of '2' means that, on the average, there is a fifty per cent likelihood that a particular case of the disease was caused by the event under investigation and a fifty per cent likelihood that the disease was caused by chance alone."); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 718-23 (Tex. 1997) (statistically significant epidemiological studies showing doubling of risk required to prove causation); REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 539.

None of the studies referenced by plaintiff's experts, including the ones discussed below, meet these standards.

### a.    VIGOR[2]

Although plaintiff purports to use VIGOR to establish causation, VIGOR involved a 50 mg dose of Vioxx – twice the dose taken by Mr. Mason.  Because "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse

---

[2] Bombardier C et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, N ENGL J MED 2000 Nov 23;343:1520-1528.

effect," *McClain*, 401 F.3d at 1242 (internal citations and quotation marks omitted), the results of VIGOR, which involved the use of high-dose Vioxx, cannot and do not provide a generally accepted scientific basis for concluding that the use of Vioxx at the 25 mg dose was capable of causing Mr. Mason's alleged heart attack.

Second, VIGOR involved an elderly population with rheumatoid arthritis, a condition that put the study's patients at increased risk of cardiovascular problems. Here, Mr. Mason did not have rheumatoid arthritis and cannot be described as elderly.

Third, VIGOR did not compare Vioxx against a placebo; rather, it compared it with naproxen. Thus, it is impossible to determine based on the results of VIGOR whether the relative increase of adverse cardiovascular events seen in the Vioxx arm of the study was attributable to: (i) a cardiovascular risk associated with high-dose Vioxx; (ii) a cardio-protective effect associated with naproxen; (iii) chance, either in whole or in part; or (iv) or some combination of these factors.

Accordingly, VIGOR cannot support a finding that Vioxx taken for less than eleven months at the 25 mg dose increases the risk of heart attack.

### b.   APPROVe[3]

Nor can plaintiff's experts rely on the results of the APPROVe study. The study did not associate a statistically significant risk of heart attacks or sudden cardiac death with under eleven months of use of 25 mg Vioxx. Thus, regardless of what opinions APPROVe purportedly supports concerning a longer duration of Vioxx use, its results cannot establish to a reasonable degree of medical and scientific certainty that Mr. Mason's use of Vioxx was capable of causing

---

[3] Bresalier R et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, N ENGL J MED 2005 Mar 17;352(11):1092-1102.

a thrombotic cardiovascular event.  *See*, *e.g.*, *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991) ("If the . . . duration of exposure to [substance is] the type[] of information upon which experts reasonably rely when forming opinions on the subject, then the district court was justified in excluding Dr. Miller's opinion that is based upon critically incomplete or grossly inaccurate . . . duration data."); *Thompson v. S. Pac. Transp. Co.*, 809 F.2d 1167, 1169 (5th Cir. 1987) (expert's opinion on dioxin as source of plaintiff's illness had "insufficient factual basis" in part because expert had no knowledge of duration of exposure); *Gulf S. Insulation v. U.S. Consumer Prod. Safety Comm'n*, 701 F.2d 1137, 1146 (5th Cir. 1983) (usefulness of epidemiological studies was diminished based on "failure to consider either the length of time the workers were exposed to formaldehyde"); *Edwards v. Safety-Kleen Corp.*, 61 F. Supp. 2d 1354, 1359 (S.D. Fla. 1999) (excluding opinion of expert who was not aware of any studies which define the minimum duration of exposure to benzene necessary to be toxic).[4]

> **c.     Solomon[5]**

Plaintiff also identifies a retrospective, observational study conducted by Dr. D.H. Solomon in 2004, which was based on a review of patient records in a Medicare database.  This study, however, does not support plaintiff's claim that his alleged ten and one-half months of Vioxx use increased his CV risk.  Solomon found a risk when comparing Vioxx and Celebrex, both active drugs, during the first 90 days of therapy.  But, the risk for acute heart attacks for Vioxx versus Celebrex was nearly identical after 90 days of therapy, the only duration of therapy

---

[4] Merck hereby incorporates by reference its Motion to Exclude Expert Testimony that Short-Term Vioxx Use Increases Cardiovascular Risk (Merck's Expert Challenge No. 10) and its Opposition to Plaintiff's Motion to Exclude Argument or Opinion Testimony That An Increased Risk of Heart Attack Exists Only After 18 Months of Vioxx Use (Pl.'s Expert Challenge No. 1).

[5] Solomon D et al., *Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults*, CIRCULATION 2004 May; 109:2068-2073.

relevant here.[6]   Further, contrary to plaintiff's claims, the study found *no* excess risk of acute heart attacks with Vioxx versus no-NSAID use, much less a doubling of the risk.

### d.      Protocol 090[7]

Plaintiff also purports to rely on Protocol 090.  In that study, however, there was no statistically significant difference in the rate of adverse cardiovascular events in patients taking Vioxx versus placebo or Vioxx versus the comparator drug, Nabumetone.  Indeed, the study's conclusion was that "the number of patients with cardiovascular events was *too few to support any meaningful comparison*."   Accordingly, it is impossible for Protocol 090 to support plaintiff's theory of causation.

### e.      ADVANTAGE[8]

Although plaintiff also purports to rely upon ADVANTAGE, the study itself makes clear that it does not support causation.  It provides:

> *The rofecoxib [Vioxx] and naproxen groups did not differ significantly in the number of cardiovascular events*, as defined by the combined Antiplatelet Trialists' Collaboration end points (10[0.4%] vs. 7 [0.3%]; P>0.2).   Five myocardial infarctions occurred in the rofecoxib group, and 1 occurred in the naproxen group (P>0.2).  No strokes occurred in the rofecoxib group and 6, all thrombotic, occurred in the naproxen group (P=0.015).

ADVANTAGE at 543.

---

[6] *Id.* at 2071.

[7] Weaver A et al., *Treatment of Patients With Osteoarthritis With Rofecoxib Compared With Nabumetone*, J CLIN RHEUMATOL. 2006 Feb;12(1):17-25.

[8] Lisse JR et al., *Gastrointestinal Tolerability and Effectiveness of Rofecoxib versus Naproxen in the Treatment of Osteoarthritis*, ANN INTERN MED 2003 Oct 7;139:539-546 ("ADVANTAGE").

### f.      Lévesque[9]

Finally, Dr. Sander relied on the Lévesque study to support his claim that less than eleven months' use of Vioxx increases cardiovascular risk.  (Nov. 1, 2006 Tr. at 444:25-445:14.)  But on cross-examination, he conceded that this particular study showed that people who took Vioxx for more than 54 days – as Mr. Mason did – had a relative risk of 1.02.  He agreed that is "the same thing as saying that there's zero increase in risk."  (*Id.* at 565:9-567:5.)

### 2.      Plaintiff Presented No Evidence Of Any Biologically Plausible Mechanism By Which Vioxx Could Cause A Heart Attack.

In a drug or toxic tort case, a statistical association between injury and exposure cannot prove causation absent proof of a biologically plausible mechanism by which exposure to the drug or suspected toxin causes injury.  *See Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir. 1999).  Biological plausibility "depends upon existing knowledge about *the mechanisms* by which the disease develops."  REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 522 (emphasis added).  Without proof of *how* an agent can cause a disease, there can be no proof that the agent in fact *does* cause the disease.  *In re Phenylpropanolamine Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1247 (W.D. Wash. 2003) ("'[n]ot knowing the mechanism whereby a particular agent causes a particular effect'" can be "'fatal to a plaintiff's claim'" where there is no "'sufficiently compelling proof that the agent must have caused the disease *somehow*'") (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1314 (9th Cir. 1995)).

As the Fifth Circuit said in *Food Lion*:

> The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur.

---

[9] Lévesque LE, *The Risk for Myocardial Infarction with Cyclooxygenase-2 Inhibitors:  A Population Study of Elderly Adults*, ANN INTERN MED 2005; 142:481-489.

Based on such predicate knowledge, it may then be possible to fasten legal liability for a person's disease or injury.

*Food Lion*, 171 F.3d at 314.

And, as this Court put it:

In this case, at best, Drs. Shell and Eckberg have discovered an event, but not a cause. They fail to identify the exact mechanism by which a person's QT interval can become permanently prolonged well after that person has ceased taking Propulsid. . . . They have theories but they have no proof to support those theories. . . . Under the prevailing logic of *Daubert* and *Black*, their testimony is unreliable.

*In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 617 (E.D. La. 2003); *accord McClain*, 401 F.3d at 1253 (expert must offer a "reliable explanation of the physiological process by which [the agent] causes [the alleged harm]").

In this case, plaintiff's expert, Dr. Sander, proposed a single theory for how Mr. Mason's Vioxx use could have caused his heart attack: the FitzGerald Hypothesis.[10] He testified that Vioxx "works by the fact that it is inhibiting prostacyclin production and allowing thromboxane activity to go on 'unopposed.'" (Nov. 1, 2006 Tr. at 453:3-5.) Dr. Sander's opinion that Vioxx causes a prostacyclin/thromboxane imbalance in the vasculature is scientifically unreliable and insufficient to meet plaintiff's burden to show general causation.

As the Court knows, Dr. FitzGerald hypothesized in an article published in 1999 that *if* COX-2 inhibitors reduced prostacyclin levels *in blood vessels* – a question his study could neither assess nor determine – then such drugs *might* promote increased clotting and, therefore, increased CV risks since they do not simultaneously interfere with the normal production of

---

[10] Dr. Sander conceded that Vioxx did not cause Mr. Mason's plaque (Nov. 1, 2006 Tr. at 496:4-497:4) or his plaque rupture (*id.* at 503:12-23).

thromboxane, a known vasoconstrictor.[11]   But, as Dr. FitzGerald has recognized on multiple occasions since the 1999 publication, his hypothesis remains just that – a hypothesis – that remains unproven.   In a follow-up article published in 2002, Dr. FitzGerald further explained that "[t]he clinical sequela of inhibiting prostacyclin activity in the absence of concomitant inhibition of [thromboxane] *are not currently clear*" and that "for the present, the *perception* of a cardiovascular hazard in humans exceeds the evidential basis for this notion."[12]

Nor is Dr. FitzGerald alone in conceding that his hypothesis remains unproven.   After observing that selective COX-2 inhibitors were associated with an increased risk of adverse cardiovascular events, the FDA confirmed this fact in April 2005:

> *It remains unclear, however, that it is the presence of, or the degree of, COX-2 selectivity that accounts for these observations, as some have hypothesized.*   As noted above, in various controlled clinical trials, COX-2 selective drugs have been indistinguishable from non-selective NSAIDs (*i.e.*, ibuprofen, diclofenac) in studies of substantial size and duration.   Further, although on theoretical grounds the addition of low-dose aspirin (a COX-1 inhibitor) to a COX-2 selective drug should resolve any increased CV risk caused by COX-2 selectivity, this effect has not in fact been observed in several studies in which such comparisons are possible.   *Taken together, these observations raise serious questions about the so-called "COX-2 hypothesis," which suggests that COX-2 selectivity contributes to increased CV risk.*

(Def.'s Ex. 338 at 8 (FDA Memo; emphasis added).)   Thus, the FitzGerald hypothesis remains speculative and cannot form the basis for Dr. Sander's opinion that the prostacyclin/thromboxane imbalance was capable of causing or did cause Mr. Mason's heart attack.

---

[11] Catella-Lawson et al., *Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics, and Vasoactive Eicosanoids*, J. PHARM. AND EXP. THERP. 1999; 289:735-741.

[12] FitzGerald GA, *Cardiovascular Pharmacology of Nonselective Nonsteroidal Anti-inflammatory Drugs and Coxibs: Clinical Considerations*," AM J CARDIOL 2002; 89 (suppl):26D, 32D (emphasis added).

### B.     Plaintiff Failed To Prove Specific Causation.

Finally, plaintiff failed to prove specific causation by a preponderance of the evidence. Dr. Sander, who was proffered to show specific cause, based his testimony on the erroneous factual assumption that Mr. Mason was taking Vioxx at the time of his heart attack.  (Nov. 1, 2006 Tr. at 463:4-11.)  By Mr. Mason's own admission, he wasn't.  (Nov. 6, 2006 Tr. at 1347:16-1349:22 (Test. of Mr. Mason).)  In fact, Mr. Mason testified that he stopped taking Vioxx a full four days prior to his heart attack – meaning that the drug  was entirely out of his system by the time he woke up with chest pains on July 25th.  (*See* Nov. 8, 2006 Tr. at 1693:21-1694:18 (Test. of Dr. Morrison); Nov. 13, 2006 Tr. at 2189:21-2190:4 (Test. of Dr. Pratt).)  As Merck's experts explained, given these facts, there is no way Vioxx contributed in any way to Mr. Mason's heart attack.[13]

Accordingly, there is no scientifically valid evidence for Dr. Sander's specific causation opinion that Vioxx caused Mr. Mason's heart attack.  Indeed, Dr. Sander  himself testified that there is no way  medically to say whether Vioxx caused Mr. Mason's heart attack or not.  He agreed that Mr. Mason's heart attack is no different from the "thousands and thousands" of heart attacks that Dr. Sander has seen, saying "a heart attack is a heart attack."  (Nov. 1, 2006 Tr. at 499:9-12.)  Like everyone else who has a heart attack, Mr. Mason had plaque in his arteries, and the formation of that plaque had nothing to do with Vioxx.  (*Id.* at 500:1-9.)

> Q:     . . . .  And then in 100 percent of the heart attacks, what happens is that there is a plaque rupture; right?
>
> A:     Yes.
>
> Q:     And Mr. Mason had a plaque rupture; right?

---

[13] Dr. Rothkopf provided testimony on this point.  The November 14, 2006 Transcript is not yet available, so Merck is unable to provide the Court a specific citation to this testimony.

> A:      Yes.
>
> Q:      And it's no different from anybody else's plaque rupture who has had a heart attack; right?
>
> A:      Correct.

(*Id.* at 500:10-17.)  Dr. Sander also agreed that, when the plaque comes into contact with the blood as a result of the rupture, a clot forms – and that there is nothing about Mr. Mason's clots that make them any different than any other.  (*Id.* at 505:10-18.)  On that point, Dr. Sander testified that, if Mr. Mason were one of his patients, and he knew of Mr. Mason's risk factors, Mr. Mason's "heart attack would not be the least bit unusual."  (*Id.* at 502:16-23.)

Dr. Sander based his specific causation opinion on "attributable risk exposed" ("ARE"), a statistical concept he learned of after he was retained as an expert in these cases.  (*Id.* at 512:16-513:9.)  Obviously, that concept cannot be used to determine whether a particular individual's heart attack actually was caused by Vioxx, as Dr. Sander himself acknowledged: "I don't identify it as a Vioxx problem in a given case because if there is a 60 percent chance there was Vioxx in that individual, it's either one [*sic*] or 100 percent.  So in a given case there is no little molecules that say V [for Vioxx] on them that are stuck on the clot; however, the process is the same and the risks all would drive this."  (*Id.* at 466:17-22; *see also* Nov. 13, 2006 Tr. at 2197:14-2198:8 (Test. of Dr. Pratt).)  In other words, Dr. Sander conflated general and specific causation.  He testified that, because Vioxx is associated with increased risks in some clinical trials, the odds are that it caused Mr. Mason's heart attack.  Utah, however, requires *proof* of medical causation – not speculation based on the odds.  *Fitz*, 990 P.2d at 393-94.

Merck is also entitled to judgment as a matter of law because Dr. Sander failed to eliminate other possible causes of Mr. Mason's heart attack.  To establish specific causation, plaintiff must "rule out" the possibility that his heart attack was caused by something *other* than

Vioxx. *Wheat v. Pfizer, Inc.*, 31 F.3d 340, 343 (5th Cir. 1994) (upholding judgment as a matter of law because plaintiff failed to prove that decedent had not contracted hepatitis from a source other then defendant's pharmaceutical).[14]  Plaintiff failed to carry this burden.  It is undisputed that Mr. Mason had vascular disease, multiple risk factors, and obvious triggers – exercise and eating a heavy meal – that could have caused his heart attack.  (Nov. 1, 2006 Tr. at 498:10-25 (Test. of Dr. Sander) (acknowledging strenuous exercise and eating a big meal as triggers); Nov. 6, 2006 Tr. at 1350:5-23 (Test. of Mr. Mason) (admitting to hiking and eating a fried turkey dinner before his heart attack).)  His risk factors include:

- *Age*:  Mr. Mason was 61 years old at the time of his heart attack;

- *Family History*:  Mr. Mason's sister died of coronary artery disease at the age of 55;

- *High Cholesterol*:  Mr. Mason suffered from hyperlipidemia;

- *Obesity*:  Mr. Mason was obese at the time of his MI;

- *Gender*:  Mr. Mason is male;

- *Hypertension*:  Mr. Mason had labile blood pressure before he took Vioxx;

- *Depression*:  Mr. Mason suffered from depression, for which he took antidepressant medication;

- *Stress*:  Mr. Mason was "very stressed"; and

- *Sleep Apnea*:  Mr. Mason suffered from sleep apnea.

---

[14] *See also Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1139 (D. Minn. 2003) ("Having failed to 'rule out' other factors for the Plaintiff's skin cancer, the Plaintiff has not established a submissible showing of causation"); *Nat'l Bank of Commerce of El Dorado v. Associated Milk Producers, Inc.,* 22 F. Supp. 2d 942, 963 (E.D. Ark. 1998), *aff'd,* 191 F.3d 858 (8th Cir. 1999) (recognizing that an expert must "rule in" the suspected cause as well as "rule out" other possible causes); *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1209 (8th Cir. 2000) (affirming grant of summary judgment in favor of defendant manufacturer where plaintiff "failed to 'rule out' all other possible causes"); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 609 (D.N.J. 2002) (excluding expert testimony because "[t]he defendants pointed to some likely alternative cause and the expert offered no reasonable explanation as to why he or she still believed that defendant's actions were a substantial factor in bringing about plaintiff's illness").

(Nov. 1, 2006 Tr. at 568:9-572:10 (Test. of Dr. Sander); *see also* Nov. 13, 2006 Tr. at 2162:17-2163:18 (Test. of Dr. Keep), 2371:6-12 (Test. of Dr. Vogeler).)

It is not enough for an expert to proclaim that he has ruled out other possible causes – he must also give a "good explanation as to why his or her conclusion remain[] reliable" despite the existence of these alternative risk factors. *Magistrini,* 180 F. Supp. 2d at 609. Dr. Sander did not even attempt to rule out other possible causes during his testimony. Rather, he testified as follows:

> Q: Based on the risk factors that he had and the plaque that you also testified that he had, Mr. Mason could very well have had a heart attack in July of 2003 whether or not he ever took Vioxx; wouldn't you agree with that?
>
> A: He could have.

(Nov. 1, 2006 Tr. at 573:11-15.)

And he was impeached with the following testimony:

> Q: Certainly you cannot state to a reasonable degree of medical probability that Mr. Mason could have avoided having a heart attack in July of 2003 had he never taken Vioxx; right?
>
> A: That is true.

(*Id.* at 574:24-575:6.) Thus, on the ground of plaintiff's failure to prove specific cause alone, Merck is entitled to judgment on all claims as a matter of law.[15]

## III.   THE COURT SHOULD ENTER JUDGMENT IN MERCK'S FAVOR ON PLAINTIFF'S FAILURE TO WARN CLAIMS.

Even if plaintiff had proffered sufficient evidence to show medical causation – which he did not – his failure to warn claims would still fail as a matter of law. Under comment k, a manufacturer of an "unavoidably unsafe" product will not be held liable if it has provided

---

[15] Merck filed a number of challenges to expert testimony before trial under Rule 702 and *Daubert*, as well as other grounds. Merck reasserts those motions. Testimony admitted in error is unreliable and does not constitute substantial evidence of causation.

adequate warnings of potential risks that are known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge at the time of manufacture and distribution. *See Barson v. E.R. Squibb & Sons*, 682 P.2d 832, 835 (Utah 1984); RESTATEMENT (SECOND) OF TORTS § 402A cmt. j (1965); *Carlin v. Super. Ct. (Upjohn Co.)*, 13 Cal. 4th 1104, 1112 (1996); *Brooks v. Medtronic, Inc.*, 750 F.2d 1227, 1230-31 (4th Cir. 1984). Here, Merck provided adequate warnings. Plaintiff thus cannot maintain either his strict liability or negligent failure to warn claims.[16]

Mr. Mason's failure to warn claims fail as a matter of law. First, consistent with the Restatement, Merck has a duty to warn only of known or reasonably scientifically knowable risks. *Barson*, 682 P.2d at 835. Merck *did* warn Mr. Mason's prescriber, Nurse Practitioner Olson-Fields, of a potential risk of heart attacks. Second, Mr. Mason failed to meet his burden to show that Merck's alleged failure to warn proximately caused his heart attack. *See id.* at 836-37. In fact, Nurse Practitioner Olson-Fields has continued to prescribe Celebrex and NSAIDS to patients with Mr. Mason's profile – *including Mr. Mason himself* – even though they carry "black-box" cardiovascular warnings.

---

[16] Although plaintiff brought claims for failure to warn under both strict liability and negligence theories, the Utah Supreme Court has recognized that, where recovery under Utah's strict products liability statute would be sufficient to compensate the plaintiff, a negligence claim is superfluous and should be dismissed. *See Slisze*, 979 P.2d at 321 (in a failure to warn case, affirming the lower court's dismissal of plaintiff's negligence claim, in part, because "if the product were to be determined defective, recovery under the strict products liability statute would be sufficient to compensate plaintiff, making a negligence claim superfluous"). This comports with the rule in many jurisdictions that, like Utah, have adopted comment k to section 402A of the Restatement (Second) of Torts. These courts have found that, when comment k applies, "[t]he standard for liability under strict liability and negligence is essentially the same." *Werner v. Upjohn Co.*, 628 F.2d 848, 858 (4th Cir. 1980) (applying Maryland law); *see also Klem v. E.I. DuPont De Nemours & Co.*, 19 F.3d 997, 1003 (5th Cir. 1994) (applying Louisiana law); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1353-54 (3d Cir. 1992) (applying Pennsylvania law).

**A.   Because Merck Warned Of The Potentially Knowable Heart Attack Risk In the April 2002 Vioxx Label, There Is Insufficient Evidence That The Warning Was Inadequate.**

Mr. Mason claims that Merck failed to warn that Vioxx could cause heart attacks.  Under Utah law, the sufficiency of the warning is evaluated under the "learned intermediary doctrine." *Schaerrer v. Stewarts' Plaza Pharmacy*, 79 P.3d 922, 928 (Utah 2003); *see also* 2 MADDEN & OWEN ON PRODUCTS LIABILITY § 22:9 at 568 (3d ed. 2000) ("the learned intermediary doctrine has gained virtually unanimous adoption").  This doctrine recognizes the reality that doctors are in a better position than pharmaceutical manufacturers to evaluate the suitability of a drug for a particular patient.  As a result, the manufacturer's duty to warn extends only to the prescribing physician and not to the ultimate consumer.  *Id*.

Here, plaintiff failed to show that an ordinary and prudent prescriber would have found Vioxx "unreasonably dangerous" in late 2002 and early 2003, given the information available at the time.  The April 2002 label fully disclosed the significant clinical data then available, including the VIGOR results.  (*See* Def.'s Ex. 2331 (April 2002 Vioxx Label).)  Merck's warnings were thus sufficient to apprise health care providers of the alleged heart attack risk associated with Vioxx.

Moreover, Merck brought the warning "home" to Nurse Practitioner Olson-Fields.  It sent this information directly to her, on at least two occasions.  (Nov. 3, 2006 Tr. at 1036:12-1037:7, 1039:9-1043:8, 1044:7-1048:5, 1051:17-19, 1055:5-1064:15, 1065:23-1074:10; *see also* Def.'s Exs. 453 (Apr. 2002 "Dear Doctor" Ltr. Re April 2002 Vioxx Label), 2119 (Nov. 19, 2001 Ltr. Re CV Risks of Vioxx).)  Further, she testified that she reviewed the April 2002 label – which contained the VIGOR data and precautions against the use of Vioxx in patients with risk factors for heart disease – "well in advance" of her decision to prescribe Vioxx to Mr. Mason.  (Nov. 3, 2006 Tr. at 1076:9-1081:12, 1094:20-5, 1095:1-1096:1; *see also* Def.'s Ex. 2331 (April 2002

17

Vioxx Label).)[17]   Dr. Vogeler, Mr. Mason's primary care physician, was also aware of the cardiovascular risks associated with Vioxx, and still though it was appropriate for some patients – including himself.  (*See* Nov. 3, 2006 Tr. at 1023:14-25 (Test. of N.P. Olson-Fields.)  In short, plaintiff failed to present evidence to show  that either Nurse Practitioner Olson-Fields or Dr. Vogeler was not adequately warned.

It cannot matter that the cardiovascular risk information was not in the "warnings" section of the Vioxx label.  Once a physician knows the information, there is no further duty to warn.  Stated simply, the common-sense rule is that "[n]o one needs notice of that which he already knows."  *Lindsay v. Qrtho  Pharm. Corp.*, 637 F.2d 87, 92 (2d Cir. 1980) (internal quotation marks and citations omitted).  Because Nurse Practitioner Olson-Fields understood the facts, no further warning was needed.  *See Odom v. G.D. Searle & Co.*, 979 F.2d 1001, 1003 (4th Cir. 1992) (affirming summary judgment for manufacturer in failure to warn case in part because physician had independent knowledge of the risks); *see also Stanback v. Parke, Davis & Co.*, 657 F.2d 642, 644-45 (4th Cir. 1981) (holding that manufacturer is not liable for failure to warn when doctor knew of risk and said it was not his practice to warn); *Plummer v. Lederle Labs.*, 819 F.2d 349, 358-59 (2d Cir. 1987) (finding no causation when doctor failed to warn even though knew of risk of polio); *Kirsch v. Picker Int'l., Inc.*, 753 F.2d 670 (8th Cir. 1985) (affirming directed verdict because physician knew of cancer risk related to X-ray treatment); *Mampe v. Ayerst Labs.*, 548 A.2d 798 (D.C. App. 1988) (holding manufacturer was not liable where prescribing physician acquired knowledge of risks from a variety of other sources); *Dunn v. Lederele Labs.*, 328 N.W.2d 576 (Mich. App. 1982) (finding no proximate cause where

---

[17]  Ms. Olson-Fields also testified that, had VIGOR reported 20 MIs in the Vioxx arm as compared to 4 in the naproxen arm instead of 17 to 4, that would not have had any impact on her prescribing decision for Mr. Mason.  (Nov. 3, 2006 Tr. at 1031:9-1032:3.)

physician had knowledge of the risks associated with a drug); *Leibowitz v. Ortho Pharm. Corp.*, 307 A.2d 449 (Pa. Super. 1973) (finding no causal nexus where physician had other sources of information).  Since Mr. Mason's prescriber knew of the alleged cardiovascular risks associated with Vioxx, plaintiff cannot and has not shown that Merck's warnings were in any way inadequate or "defective" under Utah law.

      **B.**    **There Is Insufficient Evidence Of Warning Causation.**

Even assuming Merck's warnings were inadequate, Mr. Mason could not prevail unless he established that Nurse Practitioner Olson-Fields would have prescribed a different course of treatment had an adequate warning been given.  *Barson*, 682 P.2d at 836-37 (explaining, in a prescription drug case, that the plaintiff must prove that an adequate warning would have altered his use of the product to avoid injury); *see also Odom*, 979 F.2d at 1003 (upholding trial court's granting of summary judgment because plaintiff failed to prove that her doctor would have prescribed a different course of treatment if more drastic warnings had been given).  However, Nurse Olson-Fields testified that she prescribed Celebrex to Mr. Mason in the summer of 2005, following his MI, and continues to prescribe the drug to other patients, even though it contains a "black-box" cardiovascular warning:

> Q:    The July 2005 Celebrex label has what's called a black-box warning concerning cardiovascular risks; correct?
>
> A:    Yes.
>
> Q:    The July 2005 label says:  "Celebrex may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal.  All NSAIDs may have a similar risk.  This risk may increase with duration of use.  Patients with cardiovascular disease or risk factors for cardiovascular disease may be at greater risk."
>
> That's what the Celebrex label says that you were shown a couple months ago; right?
>
> A:    Yes.

Q:     Do you agree that as of July 2005, when the prescriptions were refilled for Mr. Mason, that he certainly was somebody with cardiovascular disease or a risk factor for cardiovascular disease?

A:     Yes.

Q:     In fairness, this label didn't come out until July 2005 and your prescription to Mr. Mason was June of 2005; right?

A:     Right.

Q:     So you had not seen this label because it hadn't come out on the day that you prescribed Celebrex for Mr. Mason; correct?

A:     Correct.

Q:     But you did continue to prescribe Celebrex for other patients all the way – well, up until today; right?

A:     Yes.  Some patients, yes.

(Nov. 3, 2006 Tr. at 1090:24-1091:24 (Test. of N.P. Olson-Fields); *see also id.* at 1003:12-17 (admitting she still prescribes Celebrex), 1087:19-22 (admitting she prescribed Celebrex to Mr. Mason in June 2005); Nov. 6, 2006 Tr. at 1324:12-1325:1 (Test. of Mr. Mason regarding Celebrex).)   Thus, even a hypothetical failure to warn would not have caused Mr. Mason's injuries – entitling Merck to judgment in its favor on plaintiff's strict liability and negligent failure to warn claims.

## IV.   PLAINTIFF CANNOT PREVAIL ON HIS COMMON LAW FRAUD CLAIMS.

Nor can plaintiff prevail on either of his fraud claims, fraudulent misrepresentation and fraudulent concealment.  Plaintiff recognizes that this is a failure to warn case, not a fraud case, and has tried his case accordingly.  For example, during voir dire, plaintiff's counsel repeatedly stated that the plaintiff has the burden of proving his case by the "greater weight of the evidence."  (Oct. 30, 2006 Tr. at 48:6-49:10.)  While the preponderance of the evidence standard applies to failure to warn claims, fraud must be proved by *clear and convincing* evidence.  *See Taylor v. Gasor, Inc.*, 607 P.2d 293, 294-95 (Utah 1980) ("fraud is a wrong of such nature that it

20

must be shown by clear and convincing proof and will not lie in mere suspicion or innuendo" (internal quotation marks and citation omitted)).   Because fraud is not a theory upon which plaintiff has tried his case, and his fraud claims also are not supported by Utah law or the evidence, the Court should enter judgment on these claims as well.

A.      **Plaintiff's Fraud Claims Are Incompatible With Learned Intermediary Doctrine.**

As noted above, Utah is a "learned intermediary" state, meaning a prescription drug manufacturer's duty to warn runs only to the prescribing physician:

> It is the physician who is best situated to weigh the potential risks associated with a prescription drug against the possible benefits of the drug and the unique needs and susceptibilities of each patient.  The physician thus has the ability to combine medical knowledge and training with an individualized understanding of the patient's needs, and is the best conduit for any warnings that are deemed necessary.

*Schaerrer*, 79 P.3d at 928-29 (internal citation omitted).  Although the Utah Supreme Court has not yet addressed the issue, courts applying the learned intermediary rule in other jurisdictions have rejected consumer fraud claims against drug manufacturers as an improper end-run around the learned intermediary doctrine.   As one court put it, "the only valid claim in a prescription drug suit is th[at] defendants failed to adequately warn the plaintiff's prescribing physician about the drug, which caused the plaintiff's injuries."   *Hackett v. G.D. Searle & Co.*, No. A-01-CA-399-SS, 2002 U.S. Dist. LEXIS 16246, at *7 (W.D. Tex. June 25, 2002) (in a personal injury suit involving Celebrex, granting summary judgment on claims of breach of express and implied warranties, intentional and negligent misrepresentation and fraud, and intentional infliction of emotional distress on this ground).

*Burton v. American Home Products Corp. (In re Norplant Contraceptive Products Liability Litigation)*, 955 F. Supp. 700, 710 (E.D. Tex. 1997), illustrates this point.  In that case, plaintiffs brought suit against the makers of Norplant under theories of strict liability, negligence,

21

misrepresentation, breach of implied warranty of merchantability, and alleged violations of the

Texas Deceptive Trade Practices Act ("DTPA").  *Id.* at 702-03.  The court explained:

> The gravamen of all of Plaintiffs' causes of action, including misrepresentation and violations of the DTPA, is that Wyeth failed to adequately warn of or disclose the severity of Norplant's side effects.   Therefore, the learned intermediary doctrine applies to all of Plaintiffs' causes of action. . . . [W]hether the failure to warn is couched as an affirmative misrepresentation or a misrepresentation by concealment, the allegation collapses into a charge that the drug manufacturer failed to warn.

*Id.* at 709.  The court reasoned, in part, that "[i]f the [learned intermediary] doctrine could be

avoided by casting what is essentially a failure to warn claim under a different cause of action,

then the doctrine would be rendered meaningless."  *Id*; *see also, e.g.*, *Talley v. Danek Med., Inc.*,

179 F.3d 154, 162-63 (4th Cir. 1999);  *Catlett v. Wyeth, Inc*., 379 F. Supp. 2d 1374, 1381 (M.D.

Ga. 2004);  *Alexander v. Danek Med., Inc*., 37 F. Supp. 2d 1346, 1350 (M.D. Fla. 1999).

So, too, in this case.  To allow plaintiff to avoid application of the doctrine by recasting

his failure to warn claim under alternate theories such as fraud would defeat the important

purposes of the doctrine.  The Court should thus follow the other courts to have considered this

issue, and should reject plaintiff's common law fraud claims.  *See Wyeth-Ayerst Labs. Co. v.

Medrano*, 28 S.W.3d 87, 94 (Tex. App. 2000) (applying the learned intermediary doctrine to "all

of [plaintiff's] causes of action" against the manufacturer of Norplant);  *Talley*, 179 F.3d at 162-

63 (fraud claims barred because the learned intermediary doctrine applied);  *Catlett*, 379 F. Supp.

2d at 1381 (learned intermediary doctrine encompasses any fraud, fraudulent concealment, or

misrepresentation claim  related  to  prescription  drugs);  *Alexander*, 37 F. Supp. 2d at 1350

(approving of defendant's argument that failure to warn claims brought under the theories of

negligence, strict liability, and fraud fail because of the application of the learned intermediary

doctrine).

### B.    Plaintiff's Fraud Claims Suffer From A Failure of Proof.

Even if Utah were to cast aside the learned intermediary rule in order to allow a fraud claim by a consumer against a pharmaceutical company for failure to warn, plaintiff could not prevail on his claims for other reasons.   To make out a *prima facie* case of fraudulent misrepresentation under Utah law, plaintiff must show that: (i) a representation was made by the defendant (ii) concerning a presently existing material fact (iii) which was false and (iv) which the defendant either knew to be false or made recklessly, knowing that there was insufficient knowledge upon which to base such a representation (v) for the purpose of inducing the other party to act upon it; and that (vi) the other party, acting reasonably and in ignorance of its falsity, (vii) did in fact rely upon it and (viii) was thereby induced to act to that party's injury and damage.[18]  *See Armed Forces Ins. Exch. v. Harrison*, 70 P.3d 35, 40 (Utah 2003) (fraud action by insurer against contractor).   A claim for fraudulent concealment requires that the plaintiff establish that the defendant had a legal duty to disclose certain facts, but instead remained silent or otherwise acted to conceal material facts from the plaintiff.  *Jensen v. IHC Hosps., Inc.*, 82 P.3d 1076, 1101-02 (Utah 2003).  Mr. Mason has not introduced sufficient evidence to establish any of these elements, but the Court need focus only on one: whether Merck made any material misrepresentations or omissions.

As noted above, the evidence shows that, at the time of Nurse Practitioner Olson-Fields's prescribing decision, Merck had not only disclosed the results of the VIGOR data and other

---

[18] There appear to be no published Utah opinions addressing fraud in a products liability case involving prescription drugs, so the Utah courts have not had occasion to address whether the reliance the plaintiff must establish is the prescriber's, the plaintiff's, or both.  The UPLA, however, applies regardless of the particular products liability theory alleged, and it lends some guidance.  Because the expectations of the prescriber govern under Utah Code Ann. § 78-15-6(2) in a prescription drug case, it follows that the reliance the plaintiff must establish to show fraud is that of his prescriber.

clinical data to the medical community – in publications such as the *New England Journal of Medicine* – but that it had also sent this information directly to Ms. Olson-Fields.  (Nov. 3, 2006 Tr. at 1036:12-1037:7, 1039:9-1043:8, 1044:7-1048:5, 1051:17-19, 1055:5-1064:15, 1065:23-1074:10 (Test. of N.P. Olson-Fields); *see also* Def.'s Ex. 453 (April 2002 "Dear Doctor" Ltr. Re April 2002 Vioxx Label), Def.'s Ex. 2119 (Nov. 19, 2001 Ltr. Re CV Risks of Vioxx).)  She testified she "appreciated" this information, thought it was "important," and discussed it with Dr. Vogeler.  (*Id.*)  Because there is no evidence that any of these communications were "misleading," they cannot form the basis of common law fraudulent misrepresentation or concealment claims under Utah law.  Accordingly, the Court should enter judgment on behalf of Merck on Mr. Mason's fraud claims.

## V.     PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES IS BARRED UNDER UTAH AND FEDERAL LAW.

As set forth in Merck's Supplemental Brief on the Applicability of Utah Code § 78-18-2 to Plaintiff's Punitive Damages Claim, filed November 7, 2006, plaintiff is not entitled to punitive damages in this case.  For the reasons explained in that brief, incorporated here by reference, the Court should enter judgment in Merck's favor on plaintiff's punitive damages claim.  This should be done immediately – or, in the alternative, after considering an offer of proof by plaintiff.

## VI.    PLAINTIFF'S CLAIMS ARE PREEMPTED BY FEDERAL LAW.

Finally, all of plaintiff's claims fail as a matter of law under federal preemption principles.  Plaintiff's experts, including Dr. Graham, challenge the FDA's approval of Vioxx and the content of the post-VIGOR label approved by the FDA – but, such claims are preempted under well-settled United States Supreme Court precedent.

In *Buckman Company v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), the Supreme Court recognized the importance of allowing the FDA to police its regulatory process to achieve the difficult balance between the various competing goals of the FDCA, and it held that the FDCA impliedly preempts state law tort claims alleging that a pharmaceutical company defrauded FDA or violated FDCA disclosure requirements. *Id.* at 350, 353 (preempting claims that the defendant made fraudulent statements to the FDA to obtain approval to market a medical device and that, had the misrepresentations not been made, the devices would not have been approved and plaintiff would not have been injured).[19] The federal regulatory scheme empowers the FDA to control the details of the approval process and to punish and deter fraud where it occurs. *See id.* at 348. This balance is important, as "the FDA is charged with the difficult task of regulating the marketing and distribution of medical devices without intruding upon decisions statutorily committed to the discretion of health care professionals." *Id.* at 350.

In making the arguments about the 2002 label, plaintiff ignores that the contents of the label reflect the balance the FDA struck in approving the post-VIGOR label. The FDA has determined that, because state-law claims like plaintiff's prevent the FDA from maintaining strict control over label content and format, they are preempted by the FDA's labeling regulations. *See* 71 Fed. Reg. at 3923-35 (preemption applies, *inter alia*, to claims like plaintiff's that are "based on the failure to include in labeling or advertising a statement the substance of which the FDA has prohibited"); *see also Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514, 538 (E.D. Pa. 2006) (plaintiff's state-law failure to warn claims were preempted because the

---

[19] Although *Buckman* involved medical devices, its reasoning and holding apply equally to cases involving pharmaceuticals. *See, e.g., Bouchard v. Am. Home Prods. Corp.*, 213 F. Supp. 2d 802, 812 (N.D. Ohio 2002) ("The Court does not need to engage in searching analysis of *Buckman* to determine that claims of fraud on the FDA are preempted with respect to pharmaceuticals.") (citing *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 236 (6th Cir. 2000)).

drug approval "process required that the labeling be the same as that approved for the innovator drug" and "the FDA would have deemed any post-approval enhancements 'false or misleading'"); *In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*, No. M: 05-1699 CRB, 2006 WL 2374742 (N.D. Ca. Aug. 16, 2006).  For this reason too, Merck is entitled to judgment as a matter of law.

**VII.    CONCLUSION.**

For the reasons stated above, the Court should enter judgment in favor of Merck on all claims, pursuant to Rule 50 of the Federal Rules of Civil Procedure.  In the alternative, the Court should enter judgment on each of the claims plaintiff has failed to prove in this case.

Dated:  November 15, 2006                                            Respectfully submitted,

_/s/ Dorothy H. Wimberly_
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Tarek Ismail
Shayna Cook
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Brian S. Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:      213-430-6407

And

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:      202-434-5029


Attorneys for Merck & Co., Inc.

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Memorandum in Support of Renewed Motion for Judgment as a Matter of Law has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 15th day of November, 2006.

_/s/ Dorothy H. Wimberly_