Page 36

1   research and dealing with this whole area so I can't give
2   you an exact estimate since I'm dealing with this whole
3   area all the time.
4              Q.   Okay.  And the Plaintiff's lawyers,
5   they're not paying for your research time; right?
6              A.   No.
7              Q.   Okay.  So how many hours have the
8   Plaintiff's lawyers paid you for your consulting time?
9              A.   Actually I haven't been paid anything
10  yet--
11             Q.   Mr. Black --
12             A.   -- for any of my consulting.  I haven't
13  been paid anything.
14             Q.   Sorry, I didn't mean to interrupt you.
15             Mr. Black and Mr. Robinson haven't paid you
16  any money for the time you spent in New Orleans?
17             A.   No.  Not yet at least.
18             Q.   Have you billed them for that time?
19             A.   Yes.
20             Q.   When did you bill them for that time?
21             A.   I bill them monthly.
22             Q.   Okay.  And how many months have you
23  sent out invoices?
24             A.   I think there were three months of
25  invoices.

Page 37

1                    Q.   Three invoices so far?

2                    A.   Yeah.

3                    Q.   And what are the total of those

4    invoices?

5                    A.   I think it's -- for the three months

6    it's about a bit over 30,000.

7                    Q.   So about a hundred hours of work or so?

8                    A.   Somewhere around there, yes.

9                    Q.   Were you reimbursed for your flight

10   down to New Orleans?

11                   A.   Not yet, no.

12                   Q.   Starting to get a little anxious?

13                   A.   Well, it would be nice to get

14   reimbursed for some of those expenses.

15                   Q.   I'll bet.

16                   When was the next time you met with any

17   Plaintiff's lawyers after your couple-day meeting in New

18   Orleans in the end of July of 2006?

19                   A.   Well after New Orleans -- I'm trying to

20   think here... I don't recall meeting anybody else after

21   my New Orleans trip.

22                   Q.   Okay.  So, did you meet with -- did you

23   meet with anybody before today?

24                   A.   Oh, yeah, I did meet Ms. Sanford.

25                   Q.   And when did you meet with Ms. Sanford?

Dr. Colin Funk

Page 38

1            A.    That would have been -- let's see.  A

2    few weeks ago, I think.

3            Q.    Okay.  And so that was the last time

4    you met with the Plaintiff's lawyer prior to -- or since

5    your meeting in New Orleans, was a couple of weeks ago?

6            A.    From New Orleans to, the next meeting I

7    think was with Ms. Sanford a few weeks ago.

8            Q.    Okay.

9            A.    Yeah.

10           Q.    And how long did you meet with

11   Ms. Sanford a couple of weeks ago?

12           A.    I think it was about three hours or

13   something like that.

14           Q.    And was that, was that meeting about

15   your expert report?

16           A.    Yes.

17           Q.    Okay.  And did she provide comments to

18   you on any of your expert report?

19           A.    I think she had looked at the report

20   and we discussed -- I'm not sure exactly what was in the

21   report, but...

22           Q.    You can't really remember what ya'll

23   discussed?

24           A.    Just the general format of the report.

25           Q.    Okay.  Did you spend any other part of

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

1  the three hours talking about anything else?

2              A.  We might have talked a bit about

3  preparing for the deposition.

4              Q.  Okay.  So you talked about the format

5  of your report and how a deposition goes?

6              A.  Yeah.

7              Q.  Is that all that ya'll talked about?

8              A.  That's all I can recall right now.

9              Q.  Okay.  Have you ever asked for any

10 scientific literature, medical literature from Plaintiff's

11 counsel?

12             A.  I don't think I've ever asked for

13 anything, no.

14             Q.  Have they sent you stuff?

15             A.  Well I was sent stuff but that was more

16 in relation to my consulting previously.

17             Q.  So Mr. Black sent you some stuff?

18             A.  Yes.

19             Q.  Okay.  How much stuff did he send you?

20             A.  He sent me some papers, a few

21 documents.

22             Q.  He sent you medical literature?

23             A.  I'm not sure.  He sent me some

24 publications, probably, to look at.

25             Q.  Okay.  And did he send you anything

Page 40

1    other than peer-reviewed published literature?

2              A.   He might have, yeah.

3              Q.   He might have?

4              A.   Yeah.

5              Q.   I guess you didn't look at it?

6              A.   Well, there were some -- I guess there

7    was some documents relating to that Barnett trial but that

8    was my consulting role.

9              Q.   Okay.  What kinds of documents did

10   you -- were you sent for the Barnett trial?

11             A.   Well, I'm not sure exactly.  These were

12   my consulting-type arrangements.  I don't know if I have

13   to tell everything that I was consulting about.

14             MS. SANFORD:   I'll give you the same

15   admonition, Dr. Funk.

16             BY MR. TOMASELLI:

17             Q.   If you're telling me you're not going

18   to tell me, that's fine, just say; I'm not going to tell

19   you'.

20             What types of documents did you receive

21   relating to the Barnett trial?

22             A.   Well, I guess, since this was the

23   consulting aspect of my -- of that, I don't need to say

24   exactly what I was sent.

25             Q.   Okay.  Have you used any of that

Page 41

1    material in preparing for the Dedrick trial?

2                    A.  No, I haven't.

3                    Q.  Okay.  In preparation for your report

4    in the Dedrick trial and -- have you looked at any

5    documents other than the peer-reviewed published

6    literature?

7                    A.  I was actually handed a document

8    yesterday.

9                    Q.  What document is that?

10                   A.  That was the -- an expert report by

11   Nicholas Flavahan.

12                   Q.  Okay.  Were you -- did you ever receive

13   an expert report from anybody else other than

14   Dr. Flavahan?

15                   A.  No.

16                   Q.  Okay.  And the first time you saw the

17   expert report for Dr. Flavahan was yesterday?

18                   A.  Yes.

19                   Q.  So you never saw the expert report for

20   Dr. Flavahan at any time prior to yesterday?

21                   A.  Well for the -- this particular case I

22   saw this report dated September 15th or 19th, yesterday

23   for the first time.

24                   Q.  Okay.  Have you ever seen any other

25   expert report for Dr. Flavahan?

Page 42

1            A.   I have in relation to that consulting

2    agreement previously.

3            Q.   Okay.  So the opinions of Dr. Flavahan

4    that you were handed yesterday weren't a surprise to you?

5            A.   No.

6            Q.   You took a look at the report and said

7    'this is, this is something I've already seen'?

8            A.   I scanned through it and it seemed

9    pretty much the same as what I'd seen before with a few

10   modifications.

11           Q.   Okay.  When did you form your opinions

12   that you state in your report for the Dedrick case?

13                MS. SANFORD:  Object to the form.

14                THE WITNESS:  I've been forming my opinions

15   on all of this for many years, from all of my research and

16   from reading the scientific literature.

17                BY MR. TOMASELLI:

18           Q.   Okay.  And the references that you list

19   at the back of your report, you'd obviously reviewed all

20   of those by the time you wrote your report?

21           A.   Yeah.  All these papers I had read

22   anywhere from 20-something years ago to up until some of

23   them were published in 2006.

24           Q.   Okay.  And I assume for the Dedrick

25   case, for this case, you approached your role as an expert

Page 43

1    as neither an advocate for the Plaintiff nor the defendant

2    but as an impartial expert?

3                    A.    That's true.

4                    Q.    And did you approach your assignment in

5    a fair and objective manner?

6                    A.    Yes.

7                    Q.    You reviewed data on both sides of the

8    question?

9                    A.    Yes.

10                   Q.    And you -- I assume you agree it's

11   important to consider the totality of the data on the

12   subject and not ignore any data that may not support your

13   opinion?

14                   A.    Yes, that's true.

15                   Q.    And I understand that you've published

16   various items on COX-2 inhibitors but ultimately your

17   opinions in this case deal with rofecoxib or Vioxx; you

18   understand that, right?

19                   A.    Yes.

20                   Q.    Did you try to seek out all the data

21   you could on Vioxx and consider that for your report?  The

22   scientific data?

23                   A.    I attempted to go through the bulk of

24   the literature.

25                   Q.    You did your own searches on PubMed --

Page 44

1          A.   Yeah.

2          Q.   -- and scientific literature to try to

3  satisfy yourself that you had looked at the relevant body

4  of literature?

5          A.   Yes.

6          Q.   Did you try to acknowledge doubt in

7  your report where doubt exists in the scientific

8  community?

9          MS. SANFORD:   Object to the form.

10         THE WITNESS:   I tried to put together my

11 report based on the totality of the evidence and my

12 scientific research on the area.

13         BY MR. TOMASELLI:

14         Q.   Did you try to cite scientific

15 literature that tended to disprove your opinions to

16 present an unbiased view of the literature?

17         A.   I tried to present an opinion formed on

18 the basis of the literature that I had read, yes.

19         Q.   Is there any scientific literature or

20 scientific data that you left out of your report because

21 it didn't necessarily support your opinion?

22         A.   I tried to list in as concise a fashion

23 my viewpoints in this particular report.

24         Q.   Did you ask any of the Plaintiff's

25 lawyers for any scientific literature that Merck says

Page 45

1    supports its position in the case?

2                    MS. SANFORD:  Object to the form.

3                    THE WITNESS:  No, I didn't need any lawyer

4    help in preparing this report.

5                    BY MR. TOMASELLI:

6                    Q.   I'm sure you didn't need any lawyer

7    help to prepare the report.  But my question was a little

8    different.

9                    My question was, did you ask the lawyers

10   for any scientific literature that Merck contends supports

11   its opinions in the case?

12                   A.   No.

13                   Q.   Okay.  Did -- when you, when you passed

14   by Dr. Zipes in New Orleans, did he tell you that he was

15   working for the lawyers suing Merck?

16                   A.   In New Orleans, I'm not sure if he --

17   I'm not sure if he mentioned that or not.  I knew already

18   from Mr. Robinson that he was working on that case.

19                   Q.   Okay.  But as far as -- I mean I know

20   you said you never spoke to Dr. Zipes about the science of

21   Vioxx, and this may seem like an odd question but I'm

22   going to ask it so, we'll try.

23                   Have you ever spoken to Dr. Zipes about the

24   science of COX-2 inhibitors or Vioxx prior to the end of

25   July and the meeting in New Orleans?

Dr. Colin Funk

Page 46

1          MS. SANFORD:  Object to the form.

2          THE WITNESS:  I actually, I think there was

3  a call once before New Orleans.

4          BY MR. TOMASELLI:

5          Q.  There was?

6          A.  A call.

7          Q.  A call from?

8          A.  Mark Robinson.

9          Q.  There was a call from Mark Robinson

10  prior to the end of July of this year by Mr. Robinson to

11  you?

12          A.  Yes.

13          Q.  And was anybody else on the phone?

14          A.  Well there was a conference call and I

15  think Douglas Zipes actually was on that call.

16          Q.  Okay.  When was the conference call

17  that you attended?

18          A.  I don't remember.  It was probably in

19  July.

20          Q.  In July as well?

21          A.  Sometime, yeah, it could have been.

22          Q.  Can you put a finer point on that at

23  all?

24          A.  No.  I don't remember the exact date.

25          Q.  Let me see if I can help.

1                    Do you remember if the conference call was
2    before or after Ms. Sanford came up to Kingston?
3                    A.   I don't remember.
4                    Q.   And who was on this conference call?
5                    A.   I think Mark Robinson and Doug Zipes.
6                    Q.   So Mark Robinson and Doug Zipes gave
7    you a call.  Did they get an appointment on your calendar
8    or did they just call up one day?
9                    A.   I don't remember.
10                   Q.   Okay.  And how long was this conference
11   call between you and Dr. Zipes and Mr. Robinson?
12                   A.   It could have been 30 minutes or so.
13                   Q.   Okay.  And what did you ya'll talk
14   about?
15                   MS. SANFORD:  I give you the same
16   admonition, doctor.
17                   THE WITNESS:  It was part of this
18   consulting arrangement.
19                   BY MR. TOMASELLI:
20                   Q.   So you're not going to answer my
21   question?
22                   A.   No.
23                   Q.   Okay.  You're going to refuse to answer
24   any of my questions about your conversation with Dr. Zipes
25   and Mr. Robinson on a conference call; is that fair?

Dr. Colin Funk

1          MS. SANFORD:  Object to the form.

2          THE WITNESS:  Yeah, this was part of the

3    consulting so I guess I don't have to mention this.

4          BY MR. TOMASELLI:

5          Q.   Okay.  Well it's not that you don't

6    have to.  You're not going to answer my questions; is that

7    right?

8          A.   Yeah.

9          Q.   Okay.  Do you remember who set up that

10   conference call?

11         A.   No.

12         Q.   Did ya'll talk -- no, you're not going

13   to answer that.

14         MS. SANFORD:  He's answered all of your

15   "who", "what", "who" "when", what he's just not answered

16   is the substance questions that you've asked him, so.

17         MR. TOMASELLI:  Right.  And this was going

18   to be a substance question so that's why I said "you're

19   not going to answer it".

20         MS. SANFORD:  Right.  I just didn't want to

21   keep you from asking a question.

22         BY MR. TOMASELLI:

23         Q.   I think we covered it but now let me

24   see if I got the "who", "what" and "when" right just to

25   make sure I understand.

Dr. Colin Funk

Page 49

1          The "who" is, for this conference call, is

2   you, Dr. Zipes and Mr. Robinson; right?

3          A.   Yeah.

4          Q.   The "when" is we don't really remember;

5   right?  And the "where", you were in your office in

6   Kingston?

7          A.   Yeah.

8          Q.   Okay.  Do you remember if this

9   conference call was prior to July 9th?

10          A.   Prior to July 9th?

11          Q.   Yes, sir.

12          A.   It could have been.  I'm not sure.

13          Q.   Were you trying to explain things on

14   that call to Dr. Zipes that he didn't understand?

15          A.   No, I don't think so.

16          Q.   Have you spoken to any other people who

17   have been hired by Plaintiff's lawyers in this case?

18          A.   This Dedrick case?

19          Q.   Well let's start with this Dedrick

20   case.

21          Have you spoken with anyone else that's

22   been hired by the Plaintiff's lawyers?

23          MS. SANFORD:  I object to the form.

24          BY MR. TOMASELLI:

25          Q.   You understand my question?

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 50

1              A.   Have I spoken to anyone else other

2    than?

3              Q.   Well we're talking about the Dedrick

4    case --

5              A.   -- yeah, other than Ms. Sanford?

6              Q.   Right.  But actually people that have

7    been hired by Ms. Sanford or somebody else?

8              MS. SANFORD:  I object to the form.

9              THE WITNESS:  I think the only others I've

10   met are Mr. Birchfield and Ms. O'Dell.

11             BY MR. TOMASELLI:

12             Q.   Okay.  Have you spoken with a

13   Dr. Weiner or Weiner?

14             A.   No.

15             Q.   Have you spoken with a Dr. Gelb?

16             A.   No.

17             Q.   Okay.  Have you ever spoken to a

18   Dr. Sander?

19             A.   No.

20             Q.   Have you ever spoken to a Dr. Furman?

21             A.   No.

22             Q.   Dr. Baldwin?

23             A.   No.

24             Q.   Dr. Fosslien?

25             A.   No, not as part of this case.

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 51

1                    Q.   Okay.  Now let's take it out of the

2     Dedrick case.

3                         As part of any other of your work in the

4     Vioxx litigation, have you spoken with any other

5     Plaintiff's experts?

6                    A.   This last person you mentioned, I met

7     him.

8                    Q.   Dr. Fosslien?

9                    A.   Fosslien.

10                   Q.   When did you meet him?

11                   A.   As part of my consulting arrangement

12    with Mark Robinson.

13                   Q.   Okay.  When was that; do you remember?

14                   A.   That was in New Orleans.

15                   Q.   That was in New Orleans as well?

16                   A.   Yes.

17                   Q.   And describe for me the surroundings

18    that you met Dr. Fosslien in?

19                   A.   I think I meet him in one of the

20    meeting rooms there in New Orleans.

21                   Q.   As part of the --

22                   A.   As part of this consulting arrangement.

23                   Q.   As part of your two-day trip to New

24    Orleans you met with Dr. Fosslien as well?

25                   A.   Yeah, he was there.  I didn't know him

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Page 52

1    before, he happened to be down there and I met him.

2                    Q.   You never met him in your life before?

3                    A.   No.

4                    Q.   Never heard of him before?

5                    A.   No.

6                    Q.   Okay.  Did you talk substantively with

7    Dr. Fosslien?

8                    A.   We talked about science, yeah.

9                    Q.   Okay.  How long did ya'll talk?

10                   A.   A couple of hours, maybe.

11                   Q.   Was Mr. Robinson in the room?

12                   A.   Umm...  He might have been for a part

13   of the time, yeah.

14                   Q.   Was anybody else in the room for all or

15   part of the time?

16                   A.   There were people coming in and out of

17   the room.

18                   Q.   Do you remember any of their names?

19                   A.   Bert Black probably was in and out of

20   the room, I think.

21                   Q.   Anybody else?

22                   A.   Let's see...  I can't think of any

23   others right now.

24                   Q.   Did you read Dr. Fosslien's report

25   before you talked to him?

1              A.   Umm -- no, I don't think so.

2              Q.   Did Dr. Fosslien tell you what his

3    opinions in the litigation were?

4              A.   Well we were discussing science so I

5    guess some of his opinions came out, yes.

6              Q.   Okay.  Do you remember commenting on

7    any of those opinions?

8              A.   We talked about various scientific

9    aspects and my viewpoints and probably his, yeah.

10             Q.   Okay.  Do you remember any specifically

11   or are you going to claim that as part of your consulting

12   arrangement?

13             A.   Well I had no sort of agreement with

14   him. I just happened to meet him down there so we just

15   started talking.  So I just -- that was more informal.  So

16   we had no sort of arrangement to meet with him or talk

17   with him.

18             Q.   You did not have an arrangement to meet

19   with him or talk with him before?

20             A.   No.  We just were in the same room, we

21   weren't doing anything at the time, we just started

22   talking.

23             Q.   Okay.  So ya'll were both waiting to do

24   something else and ya'll happened to be in this same room

25   and you happened to strike up a conversation; is that how

Page 54

1    I understand it?

2                    A.   I think so, yes.

3                    Q.   Okay.  And that conversation happened

4    to be about the science of Vioxx and happened to last a

5    couple of hours?

6                    A.   Well we were talking about -- yeah, all

7    sorts of areas of science.  And then we weren't doing

8    anything at the time, we just went to dinner.  So we ended

9    up talking about everything.

10                   Q.   Okay.  So you met for -- you met with

11   Dr. Fosslien for a couple of hours in a conference room

12   and then you went to dinner with him?

13                   A.   Yeah.

14                   Q.   Do you remember any specific opinions

15   that he had in the litigation?

16                   A.   Not in particular.

17                   Q.   Okay.

18                   A.   He just mentioned some of his

19   atherosclerosis work.  That's about it.

20                   Q.   Do you recall any details of that or

21   not?

22                   A.   No.  I think it was more generalities

23   about atherosclerosis.

24                   Q.   Okay.  Did you know that he was also

25   retained by Plaintiff's lawyers who were suing Merck?

Dr. Colin Funk

Page 55

1    A.    I think, yeah, he told me that he was

2    retained.  Yeah.

3    Q.    Okay.  Did he tell you that he was down

4    there to testify in that trial?

5    A.    Well, I think he said he might be

6    testifying at that trial.

7    Q.    That's the only reason he was in New

8    Orleans, did he tell you that?

9    MS. SANFORD:  Object to the form.

10   THE WITNESS:  Yeah, I'm really not sure why

11   he was -- if it was just for testifying or for some other

12   reason.  If he had been -- I didn't really know his exact

13   hiring agreement.

14   BY MR. TOMASELLI:

15   Q.    You didn't know if he was in New

16   Orleans to testify at trial or whether it was some other

17   consulting-type of arrangement that you had; is that

18   right?

19   A.    Yeah, I didn't know if it was -- well I

20   knew he had written a report and that possibly he might

21   testify.  Yeah.

22   Q.    Did you know he wrote a report because

23   you read it or because he told you?

24   A.    I think he told me.  I'm not sure if it

25   was sent to me.  There was a possibility that it was sent

Dr. Colin Funk

Page 56

1    to me, I'm not sure.

2                    Q.   But you've said you never actually sat

3    down and took a read of it?

4                    A.   I don't recall, no.

5                    Q.   Okay.  Switching gears a little bit.

6                    I assume that you would agree there's a

7    difference between association and causation in science?

8    Those are two different concepts to scientists; agree?

9                    A.   Yeah.

10                   Q.   Okay.  And, I don't know, it may be

11   a -- it may be an example you and I can agree upon, but

12   you've taken airplane flights obviously?

13                   A.   Yes.

14                   Q.   And when the seat belt light comes on

15   and then a few seconds later or a few minutes later

16   there's turbulence, we would say that there's an

17   association between the seat belt light turning on and

18   turbulence in an airplane; right?

19                   MS. SANFORD:  Object to the form.

20                   THE WITNESS:  I'm not sure of the exact

21   question.

22                   BY MR. TOMASELLI:

23                   Q.   Okay.  Well there's an association

24   between a seat belt light turning on and turbulence in an

25   airplane; right?

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Dr. Colin Funk

Page 57

1          A.   I guess you could say that.
2          Q.   Kind of like there's an association
3    between summertime and drowning?
4          A.   I don't know about that.
5          Q.   You don't know about that?
6          A.   Maybe not the best analogy.
7          Q.   Okay.  My simple point is that, that
8    those things are associated with each other, the seat belt
9    light turning on and turbulence in an airplane, but we
10   certainly wouldn't say that the seat belt light turning on
11   caused the turbulence; right?
12              MS. SANFORD:  Object to the form.
13              THE WITNESS:  Well there could be some
14   associations, yeah.
15              BY MR. TOMASELLI:
16         Q.   Right.  There's an association between
17   the light turning on and turbulence but there has to be
18   plausibility and other things like that for causation.
19              And you know that just because a seat belt
20   light -- the captain turns on the seat belt light doesn't
21   mean that there's going to be turbulence ahead --
22              MS. SANFORD:  Object to the form.
23              BY MR. TOMASELLI:
24         Q.   -- that the seat belt light turning on
25   causes the turbulence; right?

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Page 58

1                    MS. SANFORD:   Same objection.

2              BY MR. TOMASELLI:

3                    Q.   Are you not following me?

4                    A.   Not really, no.

5                    Q.   Not really.

6                    If you do one of your studies in mice and

7         you give them a drug and something happens to the mice for

8         the first time, you would probably characterize it as an

9         association and not necessarily that there was causation

10        there, right, because you've never seen it before?

11                   A.   Well when we do animal studies we're

12        looking for mechanisms, and we try to look for the

13        appropriate responses where we can decide the exact

14        mechanistic response.

15                   Q.   Right.   And when you test the first

16        time and you see it happen, that gives you a good clue is

17        that you might be on the right track.   But obviously one

18        of the hallmarks of science is repeatability; right?

19                   MS. SANFORD:   Object to the form.

20                   THE WITNESS:   You mean scientific

21        experiments, yes, we try to reproduce our findings.   Yes.

22                   BY MR. TOMASELLI:

23                   Q.   Right.   And so if people like yourself

24        and people in other laboratories like Dr. FitzGerald can

25        repeat the findings over and over again, then ya'll can

1    become more comfortable that actually there is a causal

2    relationship between whatever you've done and the result;

3    is that fair?

4                    A.    When we can reproduce findings and

5    that, yeah, there's good reason to postulate a mechanism

6    that can explain the findings that have come about.

7                    Q.    Right.   And the first time it happens

8    that's interesting and you take note of it.   But if it

9    happens over and over again that's when you become

10   comfortable that there's a true causal relationship; is

11   that fair?

12                   MS. SANFORD:   Object to the form.

13                   THE WITNESS:   Well we look at the available

14   evidence in the literature and we carry out our studies in

15   a way where we reproduce our findings and try to come up

16   with a logical explanation for what's happening.

17                   BY MR. TOMASELLI:

18                   Q.    How do you, in your laboratory,

19   determine whether something's just associated with a

20   result or whether there's actually cause relationship

21   between whatever you've done and the result?   How do you

22   try to distinguish those?

23                   A.    We could try to come up with the most

24   plausible explanation for our research findings based on

25   the experiments we've performed.

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Page 60

1             Q.   You don't make any differentiation

2    between association and causation necessarily in your

3    work?  You just go out and try to find a plausible

4    mechanism for what you've seen?

5             MS. SANFORD:  Object to the form.

6             THE WITNESS:  Well when we carry out our

7    scientific studies we do it in a way where we are trying

8    to evaluate mechanistic -- the whole mechanism side of

9    things.

10            And what a scientist does is there's a

11   hypothesis, and he tests that hypothesis.  If you can come

12   up with experiments that validate your hypothesis, then

13   you can then have some mechanistic insight into what's

14   happening.

15            BY MR. TOMASELLI:

16            Q.   Okay.  Do you make any distinction

17   between association and causation in your work, sir?

18            A.   I think you'd have to give me sort of

19   an example from one of my studies.

20            Q.   Okay.  Well, you have the opinion that

21   Vioxx causes cardiovascular events; right?

22            A.   Yes.

23            Q.   And what do you base that on?  What

24   studies?

25            A.   The clinical trial literature.

Page 61

1              Q.   Okay, let me stop you there.

2              MS. SANFORD:   You can finish your answer,

3    doctor.   You've asked him generally what he bases it on.

4              MR. TOMASELLI:   Right, I was going to let

5    him but that's fine.

6              THE WITNESS:   The clinical trial literature

7    and then a variety of animal studies.

8              BY MR. TOMASELLI:

9              Q.   Okay.   So there's two pieces of

10   evidence that you feel support your opinion.   One is the

11   clinical trial literature and one is the basic science

12   literature; is that fair?

13             A.   Yes.

14             Q.   Okay.   Let's talk about the clinical

15   trial literature for a second.

16             What clinical trial literature do you rely

17   on?

18             A.   I rely on the VIGOR study, the APPROVE

19   study and a number of other more recent studies that have

20   come out.

21             Q.   And which -- recent studies with Vioxx,

22   sir?

23             A.   Various analyses of different COX-2

24   inhibitors, some of them including Vioxx.

25             Q.   Okay.   And what analyses are those,

Page 62

1    sir?

2              A.   Well there is some evaluations of Vioxx

3    epidemiology studies that have been carried out.  I can't

4    recall the names of the authors off the top of my head.

5              Q.   How many of those do you think you've

6    reviewed?

7              A.   Oh, at least four or five other ones.

8    Some that just came out a couple of weeks ago.  I think it

9    was in the Journal of American Medical Association.

10             Q.   You know Dr. Suissa; don't you?

11             A.   Suissa?

12             Q.   Suissa.

13             A.   No, I don't.

14             Q.   You mentioned VIGOR and APPROVE.  Have

15   you reviewed any other clinical trials with Vioxx?

16             A.   I've looked at some other clinical

17   trial literature, and I can't remember some of that

18   information right now.

19             Q.   What did that clinical trial literature

20   deal with, sir?

21             A.   Well there has been some -- one study

22   was dealing with the early affects of rofecoxib on

23   cardiovascular events.  It was actually a Canadian study,

24   I can't remember the first author.

25             Q.   Her name was Levesque; right?

Page 63

1          A.   Yeah, I think so.

2          Q.   And in that study she found an

3  increased risk of Vioxx in the first 30 days but not

4  thereafter; is that true?

5          A.   I think, yes, there was an increase in

6  the early time period.

7          Q.   So for somebody like Mr. Dedrick, which

8  you're here on, who used Vioxx for several months there

9  would not be an increased risk according to that study; is

10  that true?

11          MS. SANFORD:   Object to the form.

12          THE WITNESS:   I don't know anything about

13  this case, so I can't comment on.

14          BY MR. TOMASELLI:

15          Q.   Okay.   Well Levesque is an

16  observational epidemiology study; is that correct?

17          A.   That would be correct.

18          Q.   And what other clinical trials -- you

19  understand there's a difference between clinical trials

20  and observational studies?

21          A.   Yes.

22          Q.   And what other clinical trials have you

23  reviewed, sir, other than VIGOR and APPROVE?

24          A.   I can't recall any others right now.

25          Q.   You understand there's other long-term

Page 64

1  placebo-controlled trials comparing Vioxx to placebo that

2  don't show an increased number of thrombotic events

3  between Vioxx and placebo?

4                  MS. SANFORD:  Object to the form.

5                  BY MR. TOMASELLI:

6                  Q.  You understand those are out there,

7  sir?

8                  MS. SANFORD:  Same objection.

9                  THE WITNESS:  In reviewing the bulk of the

10  evidence, I'm aware that there is an enhanced risk of

11  using -- taking Vioxx in cardiovascular risk.

12                  BY MR. TOMASELLI:

13                  Q.  Okay.  You refer to the bulk of the

14  evidence.  And, again, I'm just trying to understand what

15  comprising the bulk.  And I understand you've reviewed

16  VIGOR and APPROVE.  What else comprises the "bulk" that

17  you're talking about?

18                  A.  Well that would be some of the other

19  literature I just mentioned, some that came out more

20  recently in September.

21                  Q.  Okay.  From a clinical trial

22  standpoint, can you recall any study other than VIGOR and

23  APPROVE that you have reviewed?

24                  A.  Well I'm referring to some of these

25  meta-analysis, these putting together large data sets and

Dr. Colin Funk

1   examining them that way.

2           Q.  Okay.  And the meta-analysis in JAMA

3   that recently came out that you referenced, those don't

4   have anything to do with thrombotic events; do they?

5           A.  Well there was one dealing with

6   hypertension, yeah.

7           Q.  Okay.  As far as you're review of the

8   clinical literature related to Vioxx specifically, you've

9   reviewed VIGOR and APPROVE but you can't remember any

10  other studies; is that fair?

11          MS. SANFORD:  Object to the form.

12          THE WITNESS:  I've looked at other

13  literature, I just can't recall them right now.

14          BY MR. TOMASELLI:

15          Q.  Have you reviewed any pooled analyses

16  of the Vioxx data?

17          A.  Well, some of these meta-analysis had

18  been pooled data from various studies have been in this

19  clinical literature.

20          Q.  And just so I'm clear of what

21  meta-analysis you're talking about, can you tell me which

22  ones those are?

23          A.  Well, again, there's one of these

24  recent articles that came out in -- a couple of weeks ago.

25          Q.  Is that the one in JAMA, sir?

f216df5d-b006-4e08-978e-b9fe8ea6cfa7

Page 66

1            A.   I think it was in JAMA.

2            Q.   Okay.  And that's the one that talks

3   about hypertension?

4            A.   Yeah.

5            Q.   What about meta-analysis or pooled

6   analyses of thrombotic events where they looked at the

7   clinical trials of Vioxx and looked at the number of

8   thrombotic events on Vioxx versus the number of thrombotic

9   events on placebo or other NSAIDs; have you reviewed

10  those?

11           MS. SANFORD:  Object to the form.

12           THE WITNESS:  Like I say, I have looked at

13  other, other, umm, publications but I'm drawing a bit

14  blank on them right now.

15           BY MS. TOMASELLI:

16           Q.   Okay.  Have you reviewed a publication

17  by Dr. Reicin in 2002?

18           A.   I don't recall it right now.

19           Q.   Okay.  Have you reviewed a publication

20  by Dr. Konstam in 2001?

21           A.   Konstam?

22           Q.   Yes, sir.

23           A.   That doesn't sound familiar.

24           Q.   Okay.  Have you reviewed a publication

25  by Dr. Weir in 2003?