**HOMER   G.   PHILLIPS** 2601 Whittier Street,  Apt  622
**RESIDENT ASSOCIATION** St. Louis, Missouri 63113-2987
Telephone 314-388-8077

August 30, 2006

Charles R Fulbruge III
Chief Clerk Fifth Circuit Court
600 S Maestri Place
New Orleans, La 70130-3408

Dear Charles R Fulbruge III

My Name is Deloris Powell and I am writing you to solicit your help, I am the president of a Resident Association. We are being sued for being in the business of promoting, distributing and/or selling the Pharmaceutical VIOXX (see page 3 paragraph numbered 4). I have enclosed a copy of our BY-LAWS to explain our purpose.

Homer G Phillips Senior Living Community has never promoted, distributed or sold the pharmaceutical VIOXX or any other drug. The Law firm who has brought this suit refuses to contact me they have refused to return our telephone calls, I am told attorney is unavailable.

We have tried to contact the Public Defenders Office and also the Legal Aid Society both have stated that since we are incorporated they are prevented from assisting us and can help in no way. Our income is less than $1,000 per year and it would be impossible to pay an attorney to handle the case, one attorney offered to represent us for cost but I was notified that the case was being transferred to New Orleans, La.

I have enclosed a copy of our By-Laws and also a copy of the summons.

Any assistance that you can give us would be greatly appreciated

Sincerely,

Deloris Powell
President
Enclosures (2)

CC:
Robert D. Rowland (Atty)                              Sylvester Brown (St Louis Post Dispatch)
The Kaiser Firm LLP
Charles  R Fulburge III (Fifth Circuit Court)
    Chief Clerk
Senators
    Christopher Bond (Missouri)
    James Talent (Missouri)
    Richard Durbin (Illinois)
    Barak Obama (Illinois)
Russ Mitchell (The Early Show)
Bill McClellan (St Louis Post Dispatch)

# THE HOMER G. PHILLIPS
## SENIOR LIVING RESIDENTIAL
## ASSOCIATION

## BY-LAWS

These by-laws were adopted the first day of December
The year, two- thousand and three, by the members of
The Homer G. Phillips Residential Association.

## MISSION

To support each other with understanding, to voice our
Needs and wants without confusion and disturbances,
To intellectually present our problems to management, if
Any. To maintain a respectful attitude to one another, to
Keep all information confidential and only among members.
To solicit and encourage new members to join. Most
importantly to maintain peace and contentment within
ourselves. To support our community and be supportive and
prayerful toward one another.

## OBJECTIVES

To raise standards and improve the environment of the facil
To provide a forum for members to discuss problems and to
Provide a solution, through management to erase the proble
and for mutual self-improvement.
To facilitate cooperation from all residents and visitors.
To promote a broader understanding of the managerial staf
And their effort to provide the necessary corrections and
Improvements that we need.

# MEMBERSHIP

Membership will consist of persons who pay their dues and who are interested in the up keep and betterment of the Community.

One who will vote for or against, but will vote and voice an Opinion without arguments, but with the understanding thast the majority rules.

Each member shall be required to pay $2.00 per month. Dues May be paid to floor captains or at the monthly meeting, to the Financial Secretary, who will record the amount paid and then Release the monies to the treasurer, who will deposit the monies into an established account.

The Association will not intervene with tenants dispute agains Each other.

# THE OFFICERS

The officers will consist of a president, vice-president, secretary, financial secretary, treasurer, and parliamentarian And chaplin.

The terms of all officers will be for one year. Election to be held the first Monday in December.

New elected officials will take office in January of the new year.

The president may appoint the nominating committee.

Nominations will be accepted from the floor(membership).

Any vacancies of any office, by death or by resignation or Cancellation of membership, may be filled by the president Calling for a vote from the membership, or the position mat l filled by the president appointing someone to that position.

## DUTIES OF ALL OFFICERS:

**President:** the president presides over all meetings, appoints chairman of each committee, maintain a fair snd good rapport with all members. The president may call special meetings of the membership. The president may appoint a nominating committee from the membership, which should not include incumbent officers.

**Vice-President:** to assist the president and in the absence of the president, exercise the power of the president. Serve as chairman of program and publicity committee. In event of the Vacancy of the president, the vice-president will preside until election.

**Secretary:** shall be responsible fir maintaining accurate records of all meetings, correspondence, and transactions of the association. Must be familiar with all procedures, by-laws, policies of the association and make sure all business transactions are carried out properly.

**Treasurer:** shall be responsible for the depositing and recording of all monies, deposited or withdrawn from established account. Must prepare a monthly report explainir all deposits, withdrawals, expenditures. The treasurer and secretaries names will appear on the association account. No monies may be withdrawn without membership approval.

**Financial Secretary:** to record all monies collected, disbursed withdrawn or deposited. Prepare and give monthly report a monthly meetings.

**Parliamentarian/Chaplin;** opens and closes all meetings with prayer and see that meetings are carried out according to

agenda.  Visit the sick and shut-in, send cards of bereavement/encouragement.

- The Association will have an annual membership dinner for members and friends as voted on by the membership
- All reports should be prepared before the monthly meetings, so that they may be promptly and intellectuall presented.
- These By-Laws may be amended or changed with 2/3rds of  membership votes.

## PURPOSE OF DUES:

To be used to aide and support members in time of bereavement.( For immediate family only )( PARENTS, CHILDREN, GRANDCHILDREN, GRANDPARENTS AND SIBLINGS) Send or Give card with $25.
Sick and Bereavement Committee will send cards to sick Members and others . To purchase supplies and pay any Fee, Association may incur. Pay for Annual Dinner Fellowship.

# MISSOURI CIRCUIT COURT

## TWENTY-SECOND JUDICIAL CIRCUIT

(St. Louis City)

PATRICIA A SANDERS

PETITIONER/PLAINTIFF

VS

HOMER G PHILLIPS RESIDENT ASSOCIATION

RESPONDENT/DEFENDANT

NO. 052-09423
DIV. 01

SUMMONS

THE STATE OF MISSOURI TO DEFENDANT:

YOU ARE HEREBY SUMMONED TO APPEAR BEFORE THE ABOVE NAMED COURT AND TO FILE YOUR PLEADING TO THE PETITION, COPY OF WHICH IS ATTACHED HERETO, AND TO SERVE A COPY OF YOUR PLEADING UPON ATTORNEY ROWLAND, ROBERT DEAN FOR THE PETITIONER WHOSE ADDRESS IS 2227 S STATE ROUTE 157, P O BOX 959, EDWARDSVILLE, IL 62025-

ALL WITHIN 30 DAYS AFTER SERVICE OF THIS SUMMONS UPON YOU, EXCLUSIVE OF THE DAY OF SERVICE. IF YOU FAIL TO DO SO, JUDGEMENT BY DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE PETITION .

WITNESS, MARIANO V. FAVAZZA, CLERK OF SAID COURT, WITH THE SEAL THERE OF HEREUNTO AFFIXED, AT ST. LOUIS, MISSOURI, THIS 30TH DAY OF AUGUST, 2005

DEFENDANT

---

Sheriff of  ST. LOUIS CITY
CIVIL

No.   052-09423
Div.   01

**SUMMONS**

In the case of

PATRICIA A SANDERS

Vs.

HOMER G PHILLIPS RESIDENT ASSO

DEFENDANT

LRP

DELORIS   POWELL

PATRICIA A SANDERS

PLAINTIFF

HOMER G PHILLIPS RESIDENT ASSO
CITATION
2601 WHITTIER APT 622
ST LOUIS MO  63113

HOMER G PHILLIPS RESIDENT ASSO
CITATION

STATE OF MISSOURI    )
                    ) SS

CITY OF ST. LOUIS    )

## MISSOURI CIRCUIT COURT
### TWENTY-SECOND JUDICIAL CIRCUIT
(City of St. Louis)

| | |
|---|---|
| PATRICIA A. SANDERS,                   ) | Cause No. 052-0943 |
| Plaintiff,         ) | Division: |
| vs.                 ) | |

PATRICIA A. SANDERS,  )
                   )
       Plaintiff,       )
                   )
vs.                  )
                   )
MERCK & CO., INC., also    )
d/b/a MERCK, SHARP AND   )
DOHME and d/b/a MSD SHARP  )
& DOHME GmbH         )
Served through its Register Agent  )
The Corporation Company, 120 South Central )
Avenue, Clayton, Missouri, 63105,  )
and                  )
ST. LOUIS CONNECTCARE,  )
Served through its Registered Agent  )
Gregg J. Lepper, 10 S. Broadway/2000 )
Equitable, St. Louis, Missouri 63102,  )
and                  )
HOMER G. PHILLIPS RESIDENT  )
ASSOCIATION,       )
Served through its Registered Agent,  )
Deloris Powell, 2601 Whittier, Apt. 622 )
St. Louis, Missouri, 63113    )
                   )
       Defendants.    )
                   )

**JURY TRIAL REQUESTED**

## PLAINTIFF'S ORIGINAL PETITION

COMES NOW Plaintiff, PATRICIA A. SANDERS, by and through her attorneys, and for this cause of action against Defendants, states to the Court as follows:

## I. THE PARTIES

1.      Plaintiff, PATRICIA A. SANDERS, is a resident of the City of St. Louis, Missouri. Plaintiff brings this action to recover for personal injuries she sustained as a result of ingestion of and exposure to Vioxx.

2.      Defendant, MERCK & COMPANY, INC., is a New Jersey corporation with its principal place of business at One Merck Drive, Whitehouse Station, New Jersey, 08889-0100. Merck & Company, Inc. is a foreign corporation doing business in the State of Missouri and maintains an office and/or other facilities within this Judicial District. Merck & Company, Inc. conducts business in the United States and Canada as Merck & Company, Inc. Outside of the United States and Canada, Merck conducts business as Merck, Sharp and Dohme, LLC, with the exception of Germany where it conducts business as MSD Sharpe & Dohme, GmbH. Collectively, these Defendants will be referred to hereinafter as "Merck." Merck manufactured, tested, distributed, marketed, and/or sold the drug rofecoxib under the brand name Vioxx for the treatment of pain associated with osteoarthritis, rheumatoid arthritis, acute pain and menstrual pain. Defendant may be served with process through its registered agent, The Corporation Company, 120 South Central Avenue, Clayton, Missouri, 63105.

3.      Defendant, ST. LOUIS CONNECTCARE (hereinafter "SLCC"), is a non-profit corporation doing business in the State of Missouri and maintains an office and/or other facilities within this Judicial District. At all relevant times, SLCC was in the business of promoting, marketing, distributing and/or selling the pharmaceutical Vioxx. SLCC does business in Missouri and at all relevant times it promoted, marketed, distributed and/or sold Vioxx in the City of St. Louis, Missouri. This Defendant may be served by serving its registered agent, Gregg J. Lepper, 10 S. Broadway/2000 Equitable, St. Louis, Missouri, 63102.

4.      Defendant, HOMER G. PHILIPS RESIDENT ASSOCIATION (hereinafter "HPRA"), is

a corporation doing business in the State of Missouri and maintains an office and/or other

facilities within this Judicial District.  At all relevant times, HPRA was in the business of

promoting, distributing and/or selling the pharmaceutical Vioxx.  HPRA does business in

Missouri and at all relevant times it promoted, distributed and/or sold Vioxx in the City of St.

Louis, Missouri.  This Defendant may be served by serving its registered agent, Deloris Powell,

2601 Whittier, Apartment 622, St. Louis, Missouri, 63113.

## II. JURISDICTION AND VENUE

5.      Jurisdiction in this Court exists because the tort and breach of warranty claims and causes

of action presented herein occurred in the State of Missouri and the injuries of Plaintiff were

suffered in this state.

6.      Jurisdiction is also proper in this state because Plaintiff asserts only state law cases of

action under Missouri state law and expressly declines any assertion of federal claims, claims

under any federal laws or statutes, claims involving any federal question, or claims involving any

interpretation of any federal law or statute.

7.      Jurisdiction is also proper in this Court because the Plaintiff is a resident and citizen of

the State of Missouri and one or more of the defendants are residents and citizens of the State of

Missouri such that diversity does not exist.

8.      Venue is proper in the City of St. Louis based upon the fact that Plaintiff resides in the

City of St. Louis, SLCC and HPRA have offices for the transaction of its ordinary business

within the City of St. Louis, and a significant number of the acts and/or omissions that are the

basis of this lawsuit including, but not limited to, the purchase and ingestion of Vioxx, occurred

in the City of St. Louis.

### III.  INTRODUCTION

9.      This action arises from the sale and distribution of Vioxx (rofecoxib).  Vioxx is the brand name used by Defendant Merck to market and distribute rofecoxib.  Vioxx has been proven to cause adverse cardiovascular effects including, but not limited to, heart attack and stroke.

10.     During all relevant times herein, Defendant has been engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, inspecting, distributing, marketing, labeling, promoting, packaging and advertising the prescription drug known as Vioxx for ingestion by consumers.  Vioxx was manufactured, sold, designed, supplied, prescribed, distributed, marketed and processed by Defendant, who was at all times acting through its servants, employees, representatives and agents, who placed Vioxx in the market to be purchased and used by the public.

11.     Defendant Merck participated in, authorized and directed the production and promotion of Vioxx when it knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of Vioxx and thereby actively participated in the tortuous conduct which resulted in the injuries suffered by the Plaintiff.

12.     Vioxx is a member of a class of drugs known as "NSAIDs" (non-steroidal anti-inflammatory drug) but, more specifically, contains cycloosygenase 2 ("COX-2") inhibitory properties.  Generally, NSAIDs prevent the formation of fatty acid cyclooxygenases, of which there are two known types ("COX-1" and "COX-2").  Vioxx is generally different than NSAIDs.  Merck marketed, sold, distributed, advertised and pushed Vioxx for the relief of short term pain contending the drug is safer for the gastrointestinal system than typical anti-inflammatory drugs (NSAIDs) such as ibuprofen.

13.     Merck obtained FDA approval for Vioxx on May 20, 1999, for treatment of dysmenorrheal (painful menstrual cramps), management of acute pain in adults, and relief for the symptoms of osteoarthritis.

14.     Merck obtained Vioxx's FDA approval for marketing, sale, and distribution based on inaccurate, false, and misleading information, contained in the New Drug Application, which was on a "fast-track," 6-month approval process to the FDA.  Subsequent to FDA approval, Defendant advertised and marketed Vioxx as safe and effective pain relief medication throughout the United States.

15.     Plaintiff, Patricia A. Sanders, received a prescription for Vioxx and took the drug, purchased from SLCC and HPP, as prescribed by a medical professional.  While taking Vioxx, Plaintiff suffered a stroke.  Plaintiff's use of Vioxx was the direct, producing and proximate cause of her injuries.

16.     At all relevant times, Plaintiff was ignorant of the dangerous nature of Vioxx, and the adverse cardiovascular effects that could occur because of consumption of and exposure to Vioxx.

17.     Through industry and medical studies, unknown to Plaintiff, Merck knew or should have known the adverse cardiovascular effects inherent in Vioxx.  Merck ignored or deliberately and fraudulently concealed the increased cardiovascular risk in order to sell Vioxx, avoid the costs of safety precautions, and avoid litigation by people injured by Vioxx.  Merck's conduct constitutes gross negligence and demonstrates a reckless disregard for the rights and safety of others justifying punitive damages against Defendant.

## IV.  FACTUAL BACKGROUND

A.     **VIOXX'S PRE-APPROVAL:**

18.     In the mid to late 1990's, Defendant Merck faced the loss of patent protection of its top

selling and most profitable drugs. In 1996, Merck began plans for a proposed study to prove

Vioxx was gentler on the stomach than older painkillers.

19.     In need of a new blockbuster drug, Merck pushed forward with plans for the study and

ignored a November 1996 memo from a top Merck official that stated, "there is a substantial

chance that significantly higher rates" of cardiovascular problems would result form Vioxx.

Further, Merck concealed or ignored a February 1997 e-mail regarding the study from another

Merck official that revealed, "you will get more thrombotic events" or blood clots unless the

Vioxx receiving patients in the study also received aspirin.

20.     In response to the February 1997 e-mail, Merck Vice President for Clinical Research, Dr.

Elise Reicin, wrote, "the possibility of increased cardiovascular risk (from Vioxx) is of great

concern." To remedy this problem and conceal Vioxx's adverse cardiovascular effects, Dr.

Reicin proposed people with risk of cardiovascular problems be kept out of the study to ensure

that cardiovascular effects would not be evident. Despite its internal knowledge and information

relating to cardiovascular-related adverse health effects, Merck forged ahead, aggressively

promoting and marketing Vioxx as safe and effective for persons such as Plaintiff in efforts to

obtain FDA approval.

21.     While it is not clear as to what became of this 1996-97 proposed study, it is clear that

Merck concealed its knowledge of the serious cardiovascular risks associated with Vioxx

because a successful launch of Vioxx was viewed as financially critical for Merck to retain its

current market share and to sustain stock value. Vioxx's chief competing drug Celebrex

(Celecoxib) was placed into the market by Merck's competitors, Pharmacia and Pfizer, three

months prior to the launch of Vioxx.

22.     Merck's disclosure of the safety concerns over hypertension, thrombosis, edema and/or cardiovascular events would have drastically impacted Merck's positioning in the market.

**B.     VIOXX'S POST-APPROVAL:**

23.     Merck intentionally and knowingly chose to market Vioxx, despite its pre-FDA-approval knowledge, its knowledge at product launch, and its post-FDA-approval data thereafter, that the use of Vioxx carried significant risk factors.  These risks were further realized in adverse event reports, in clinical trials where such events were adjudicated by primary investigators with Merck's assistance, and in numerous studies shortly after market launch which showed statistically significant increases in adverse cardiovascular events among Vioxx users.

24.     In early 1999, Merck started the 8,000 person VIGOR (Vioxx Gastrointestinal Outcomes Research study) to prove the drug's gastrointestinal safety benefits.  The March 2000 VIGOR results revealed precisely what the above discussed internal Merck documents anticipate – a significant increase in the number of blood-clot related problems among Vioxx users.  The heart attack rate in the Vioxx group was five times that of the other group taking naproxen.

25.     Merck research chief Dr. Scolnick confessed that there was an inherent risk in Vioxx, and stated in an internal March 9, 2000 e-mail, that cardiovascular events are "clearly there" and called it a "shame" that it is mechanism (Vioxx) based.  Dr. Scolnick recognized that the cardiovascular effects could not have come from naproxen's protective effect.  Merck's research chief wrote that like all Merck's big selling drugs, Vioxx too had side effects but assured Merck that it would "do well."

26.     In March of 2000, however, Merck issued a news release that the trial results' cardiovascular findings were "consistent with" naproxen's favorable effects.  To date, and not surprisingly, the only studies to report a protective cardiovascular effect with naproxen are those

funded and assisted by Merck.  Contrary to the studies funded by Merck, a number of independent studies have reported no reduction in risk with naproxen use.  In fact, an FDA researcher recently published a report that contradicts Merck's position and holds naproxen is not protective against coronary heart disease and, if anything, actually confers an increase in risk. Merck intentionally and knowingly made false assertions relating to the VIGOR trial with a blatant disregard for the public welfare to conceal Vioxx's adverse cardiovascular effects in order to profit, maintain, and gain market position.

27.     Merck repeatedly and purposefully downplayed, understated, and concealed the health hazards of Vioxx evident in the VIGOR study.  In April of 2000, Merck issued its response to the VIGOR results in a news release headlined, "Merck confirms favorable cardiovascular safety profile of Vioxx."  This and other similar Merck-generated news releases were strategically designed and calculated to deceive and mislead the public about Vioxx's serious adverse effects.

28.     In June of 2000, industry sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, showed that Vioxx use resulted in statistically significant increases in hypertension and myocardial infarction.  Merck did nothing to publish these studies, which were again reported and denied by Merck as to the hypertension problems in the official publication of the American Pharmaceutical Association, Pharmacy, Today, *Spin War Aside, Lessons Emerge From COX_2 Trials*, in August 2000, page 3.

29.     Merck continuously and systematically denied the adverse health effects associated with Vioxx while at the same time reaping the profits obtained through the non-disclosure.  Merck engaged in an aggressive and expansive advertising and sampling program and gained continued increases in market share.  Merck spent over $160 million on direct-to-consumer television

advertising on Vioxx in 2000.  The resultant effect for this multi-million dollar advertising blitz combined with Merck's concealing and failing to reveal and warn of the risks was more that $2 billion in profits in the year 2000 alone to Merck and an approximately twenty-three percent market share.

30.     Merck's multi-million dollar advertising campaign created the image and impression and belief that the use of Vioxx was safe for adults, had fewer side effects and adverse reactions than other pain relief medications and would not interfere with daily life, even though Merck knew these representations to be false.  The advertisements, combined with its other promotional literature, audio conferences, professional meetings and press releases, deceived potential consumers by relaying positive information, including testimonials from satisfied consumers. Merck manipulated the statistics to suggest widespread acceptability and safety of the product, while intentionally understating the known adverse and serious risks associated with the use of Vioxx.  Merck's advertising and marketing campaign conveyed the false impression that Vioxx was a drug of first choice when it should not have been.

31.     In the fall of 2000, Merck again sunk to new levels in its efforts to conceal information by employing a barrage of ruthless intimidation and retaliation tactics against those who spoke out regarding Vioxx's adverse effects.  In October of that year, Merck official Louis Sherwood contacted James Fries, MD, a Stanford University Medical Professor, to inform him that if his "irresponsibly anti-Merck and specifically anti-Vioxx" lectures did not stop, that he would "flame out."  Dr. Fries responded in a letter to Merck Chief Executive Gilmartin stating, "that Merck had crossed (an ethical) line, that you can't go across."  Dr. Fries also explained that several other top medical schools complained of "a consistent pattern of intimidation by Merck" on Vioxx.

32.     Lee Simon, MD, a rheumatologist at Beth Israel Deaconess Medical Center in Boston, reported being the victim of similar intimidation tactics when he publicly mentioned data suggesting that Vioxx might be associated with a risk of high blood pressure and swelling.  Dr. Simon was "shocked that a phone call was made" to his superior to complain that his lectures were slanted against Vioxx; Dr. Simon rightfully believed that Merck was "attempting to suppress discussion about this data."

33.     In November of 2000, Merck caused the publication of a study in the New England Journal of Medicine and knowingly downplayed and/or withheld from this publication the severity of cardiovascular risks associated with Vioxx consumption over naproxen consumption. The article simply failed to provide critical information about Vioxx related cardiovascular complications such as stroke or blood clots.

34.     The year 2001 proved to be more of the same; huge efforts by Merck to conceal and hide Vioxx's adverse effects from the public and, in turn, Merck reaped huge profits.  In 2001, Merck spent $135 million to promote the drug in the United States alone; Merck was rewarded with $2.6 billion in revenue making Vioxx the world's tenth best selling medicine.

35.     In February of 2001, when the FDA received the results of the VIGOR study, the FDA wanted to highlight the cardiovascular risk prominently on Vioxx's label.  Merck resisted and fought to maintain its warning/caution free label, which remained unchanged until April 2002 when Merck and FDA reached a compromise.  Merck's relentless and aggressive efforts to keep the public in the dark enabled them to maintain market position and profits for yet another year, all at the expense of persons such as Plaintiff.

36.     On or about August 29, 2001, the Journal of the American Medical Association, ("JAMA") published a peer reviewed human epidemiologic study by the Cleveland Clinic

Foundation that showed the risk of a thrombotic cardiovascular event or myocardial infarction among Vioxx users in Merck's trials at a 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.39 compared to naproxen users, and 4.89 for developing serious cardiovascular events among aspirin patients.  See *Mukherjee, D., et al., Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors,* JAMA. 286:8, 954-959, Aug. 22/29, 2001. In addition, the annualized myocardial infarction rates for Vioxx users compared to placebo revealed a statistically significant increase among Vioxx users.  *Id.*

37.     The JAMA study authors set forth the theory that "by decreasing PG12 production [Vioxx] may tip the natural balance between pro-thrombotic thromboxane A2 and anti-thrombotic PG12 , potentially leading to an increase in thrombotic events."  *Id.* At 957.  In a follow-up peer-reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the COX-2 inhibitor "tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular thrombotic events."  Bing, R., & Lomnicka, M., *Why Do Cylo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?,*  J.A.C.C., 39:3, Feb. 6, 2002.  This biological plausibility is further supported by studies completed at the University of Pennsylvania.  Cheng, T., et al., *Role of Prostacyclin in the Cardiovascular Response to Thromboxane A2,* Journal of Science, V. 296: 539-541, Apr. 19, 2002.

38.     The JAMA study's release was followed by a relentless series of publications and peer reviewed literature by Merck employees and consultants again setting forth the blatantly false theory that naproxen had anti-thrombotic effects which accounted for the appearance of cardiovascular risk among Vioxx users.  Again, the only studies to ever make this assertion were

funded by Merck. Merck's theory has been debunked by numerous medical journals and, moreover, the FDA recently stated that this theory could not be further from the truth.

39.     In mid-September 2001, Merck received a third warning letter from the FDA stating, in part, that Defendant's promotional activities are "false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug and Cosmetic Act (the Act) and applicable regulations." The FDA stated that Merck's promotional campaign "minimizes the potentially serious cardiovascular findings" from a Vioxx study and "misrepresents the safety profile on Vioxx." As to a Merck press release, dated May 22, 2001, the FDA wrote "your claim in the press release that Vioxx has a 'favorable safety profile' is simply incomprehensible, given the rate of MI (myocardial infarction) and serious cardiovascular events compared to naproxen. The implication that Vioxx's cardiovascular events were twice as frequent in the Vioxx group...as in the naproxen treatment group..."

40.     Further, the FDA warning letter reprimanded Merck for setting forth this false theory relating to the VIGOR study that Naproxen had anti-thrombotic effects and went on to state that, "it is also possible that Vioxx has pro-thrombotic effects."

41.     Nevertheless, Merck continued its course of action and continued its aggressive marketing campaign of Vioxx primarily through direct-to-consumer advertising.

42.     In the midst of these adverse events, Merck took an offensive approach to marketing, providing all Vioxx field personnel with an "obstacle handling guide" to overcome doctors' objections to Vioxx relating to its cardiovascular problems. The training document was appropriately titled "Dodge Ball Vioxx." Merck's massive Vioxx sales force was instructed to avoid and "DODGE" serious, life threatening concerns of both health care professionals and the

general public; Merck's corporate philosophy became one of "RUN" and "DODGE" as opposed to being that of "HONEST" and "TRUTHFUL."

43.     In April 2002, Merck was required to place information about cardiovascular implications on its Vioxx labeling based on the results of the VIGOR study.  In addition, Merck was required to place new label information that Vioxx 50 mg per day is not recommended for chronic use.  These warnings were based on information that had been in Merck's possession since approximately January of 2000 at the latest and, as such, Merck did not meet its obligation to provide adequate "direction or warnings" as to the use of Vioxx within the meaning of Section 402 of the Restatement (Second) of Torts or otherwise.  Nor did Merck fulfill its alleged obligation to warn the prescribing health care provider of these risks.

44.     Merck's internal documents reveal that Merck was set to begin a major cardiovascular study of Vioxx in 2002, but company officials abruptly dropped the project just before it was set to start.  This proposed study, which became known as the VALOR trial, was set to begin in June of 2002.  On March 13, 2002, however, Merck sent an e-mail to Merck employees worldwide that simply stated the trial was being put on hold and did not cite any details leading to the decision.  Although Merck officials have publicly denied it, it is far more than a coincidence that its decision to cancel the trial fell amidst their negotiations with the FDA over the April 2002 cardiovascular warnings mentioned above.  Merck's decision to cancel the VALOR trial is in concert with its corporate strategy to conceal information relating to Vioxx's adverse cardiovascular effects.

45.     In the summer of 2002, Merck conducted its most inflammatory and aggressive measures via its intimidation and retaliation tactics to suppress and conceal speech and publicity relating to the adverse cardiovascular effects of Vioxx.  Dr. Joan-Ramon Laporte of the Catalan Institute of

Pharmacology in Barcelona, Spain, publicly criticized Merck's handling of Vioxx. Merck then had the audacity to send him a "rectification" that they insisted Dr. Laporte publish, which Dr. Laporte refused. Merck then filed suit against the doctor in Spanish Court demanding a public correction. In early 2004, the judge ruled that the publication accurately reflected the cardiovascular safety (or lack thereof) of Vioxx and ordered Merck to pay all court costs.

46.     In October of 2002, the prestigious British medical journal, Lancet, published a study that analyzed the medical data of close to 300,000 people and determined that people who take Vioxx are at almost twice the risk of developing heart disease, including heart attack. Lancet also concluded that there was no anti-thrombotic or protective effect of naproxen, effectively discounting Merck's theory. Again, Merck did not publicize or warn of these findings and instead stuck to its same story for another two years. Merck continued to spend more than $100 million annually in direct-to-consumer advertising and expanded its distribution to more than eighty (80) countries.

47.     On August 25, 2004, FDA researcher, Dr. David Graham, presented the results of a database analysis of 1.4 million patients at a medical conference that concluded Vioxx users are more likely to suffer a heart attack or sudden cardiac death than patients taking Celebrex. In fact, the report shows there is a 3.7-fold increase in risk compared with those taking Celebex. With 92,791,000 prescriptions for Vioxx filed between 1999 and 2003, the FDA conservatively estimates an excess of 27,785 cases of AMI (Acute Myocardial Infarction) and SCD (Sudden Cardiac Death) for those years alone.

48.     Merck was still not ready to concede the truth. On August 26, 2004, true to form, Merck attempted to minimize and downplay the adverse findings and authorized a press release refuting

Dr. Graham's study entitle, "Merck stands behind the efficacy and overall safety and cardiovascular safety of Vioxx."

49.     On September 23, 2004, Merck claims it had an epiphany.  Merck had been sponsoring a small 2600 patient (APPROVe) study in order to gain additional FDA approval for Vioxx to treat the recurrence of colon polyps.  The APPROVe study was stopped prematurely on the instruction of the Data and Safety Monitoring Board after the investigators found that after eighteen (18) months of treatment, patients taking Vioxx had twice the risk of a myocardial infarction compared with those receiving placebo.  Merck alleges that this small study which was by no means intended to test for Vioxx's overall safety is what triggered the collapse of its previous defenses.  The results of the APPROVe study, combined with mounting pressure from the FDA, compelled Merck to finally acknowledge Vioxx's dangerous propensities.  Merck then opted to back out rather than be forced out.

50.     On September 30, 2004, Merck withdrew Vioxx from the U.S. market and the more than eighty (80) countries around the world.  This came only after an estimated 80 million patients had taken the drug and Merck's annual sales had topped $2.5 billion.  This represents the largest prescription drug withdrawal in history.

## V.  MISNOMER/ALTER EGO

50.     In the event any parties are misnamed or not included herein, it is Plaintiff's contention that such as a "misnomer" and/or such parties are/were "alter egos" of parties named herein. Alternatively, Plaintiff contends that such "corporate veils" should be pierced to hold such parties properly included in the interest of justice.

## VI. CAUSES OF ACTION

51. Critics have described the rise and fall of Vioxx as a cautionary tale of masterful public relations and aggressive marketing. At all times relevant to this litigation, Defendant Merck had a significant market share based upon claims of Vioxx's efficacy, a very aggressive marketing program that included financial incentives to sales teams, infusion of some 700 new sales representatives, and a massive direct-to-consumer advertising and physician sampling program.

52. As a result of such marketing, Vioxx gained a significant market share in competition with Celebrex that Merck would not have gained if Merck had not suppressed and concealed information about Vioxx and/or made false representations of Vioxx's superiority and efficacy.

53. If Defendant had not engaged in this conduct, physicians would not have prescribed Vioxx and patients, like Plaintiff, would have switched from Vioxx to safer products or would have refrained wholly from any use of Vioxx.

54. From approximately 1999 through September 30, 2004, Defendant continued to engage in a common scheme in marketing, distributing and/or selling Vioxx under the guise that it was safe and effective for persons such as Plaintiff before, during and after Plaintiff experienced this confirmed adverse cardiovascular event.

55. Plaintiff alleges that the marketing strategies, including, without limitation, the detail and sampling programs and direct-to-consumer advertising, of the Defendant targeted Plaintiff to purchase Vioxx. At the time the Defendant distributed, manufactured and marketed Vioxx, Defendant intended that Plaintiff and Plaintiff's health care professional would rely on the marketing advertisements and product information propounded by Defendant.

56. The actions of Defendant, in failing to warn of the clear and present danger posed to others by the use of its drug Vioxx, in suppressing evidence relating to this danger, and in

making deliberate and misleading misrepresentations of fact to minimize the danger or to mislead prescribers and patients as to the true risk, are the direct and proximate cause of Plaintiff's injuries.  Plaintiff seeks compensation for the damages she has sustained relating to her past, present, and future physical pain and mental anguish, loss of earning capacity, disfigurement, physical impairment, and medical care expenses.  Additionally, Defendant's actions constitute gross negligence and a reckless disregard for the lives of others ("malice" under Missouri law) and warrant the imposition of punitive damages against Defendant.

## A.  BREACH OF WARRANTIES (EXPRESS and IMPLIED) - MERCK

57.     Plaintiff incorporates by reference all of the paragraphs of this Petition as if fully set forth herein.

58.     Merck through descriptions, affirmations of fact, and promises relating to its Vioxx drugs to the FDA, prescribing physicians, and the general public, including the Plaintiff, expressly warranted that Vioxx was both safe and efficacious for its intended use.

59.     These warranties came in the form of:

   a.     Publicly made written and verbal assurances of the safety and efficacy of Vioxx by Merck;

   b.     Press releases, interviews and dissemination via the media of promotional information, for the sole purpose of which was to create an increased demand for Vioxx, which failed to warn of the risks inherent to the ingestion of Vioxx;

   c.     Verbal assurances made by Merck regarding Vioxx and the downplaying of any risk associated with the drug;

   d.     False and misleading written information, supplied by Merck, and published in the Physician's Desk Reference on an annual basis, upon which physicians were forced to rely in prescribing Vioxx during the period of Plaintiff's ingestion of Vioxx including, but not limited to, information relating the recommended duration of the use of the drugs;

e.     Promotional pamphlets and brochures published and distributed by Merck and marketed directly to consumers, which contradicted the information that was set forth in the package insert and the <u>Physician's Desk Reference</u>; and

f.     Advertisements, including but not limited to direct to consumer advertising.

60.     The documents referred to above were created by and at the direction of Defendant.

61.     At the time of these express warranties, Merck had knowledge of the purpose for which Vioxx was to be used and warranted it to be in all aspects safe, effective and proper for such purpose, when it was not.

62.     Merck knew and had reason to know that Vioxx did not conform to these express representations in that Vioxx is neither safe nor as effective as represented, and that Vioxx produces serious adverse side effects.

63.     As such, Merck's products were neither in conformity to the promises, descriptions or affirmations of fact made about Vioxx nor adequately contained, packaged, labeled or fit for the ordinary purpose for which these goods were sold and used.

64.     Merck breached these express warranties to Plaintiff in violation of the applicable provisions of the Uniform Commercial Code by:

a.     manufacturing, marketing, packaging, labeling and selling Vioxx to Plaintiff in such a way that misstated the risks of injury, without warning or disclosure thereof by package or label of such risks to the Plaintiff or the prescribing physicians or pharmacist, and without modifying or excluding such express warranties;

b.     manufacturing, marketing, packaging, labeling, advertising and selling Vioxx to Plaintiff, which failed to counteract the negative health effects and increased risks in a safe and permanent manner; and

c.     manufacturing, marketing, packaging, labeling, advertising, promoting and selling Vioxx to Plaintiff, thereby causing the increased risk of serious physical injury and death, pain and suffering.

65.    Merck possessed or should have possessed evidence that Vioxx causes serious side effects.  Nevertheless, Merck continued to market Vioxx and provided false and misleading information without regard to the safety and efficacy of Vioxx.

66.    Merck's actions, as described above, were performed willfully, intentionally and with reckless disregard for the rights of Plaintiff and the public.

B.  STRICT PRODUCTS LIABILITY

67.    Additionally, or in the alternative, Plaintiff re-alleges and incorporates the foregoing allegations.

68.    Plaintiff pleads the doctrine of strict liability.  Defendant is strictly liable to Plaintiff under Section 402A, Restatement (Second) of Torts, for the defective design of the Vioxx.  At the time Vioxx was designed, manufactured and sold by Merck, safer alternative designs existed, which included designs other than those actually used, that had they been selected by said defendant, would have prevented or significantly reduced the likelihood of Plaintiff's injuries, and such designs were both economically and technologically feasible at the time these products left the possession of said Defendant and, had they been used, would not have impaired the utility of the product.  Defendant's defectively designed drug was a producing cause of the occurrence in question and Plaintiff's injuries.

69.    Defendant is strictly liable to Plaintiff under Section 402A, Restatement (Second) of Torts, for the defective marketing of Vioxx.  Defendant failed to provide adequate warnings and instructions for safe use of Vioxx. Defendant's defectively marketed drug was a producing cause of the occurrence in question and Plaintiff's injuries.

70.    Defendant is also strictly liable to Plaintiff under Section 402B of the Restatement (Second) of Torts in misrepresenting to the public that its product was safe and without defect,

which statement and representation was false and involved a material fact concerning the character of quality of the product in question, and upon which representations the consumer constructively relied, and which constituted a producing cause of the injury at issue.

71.     Further, each of the above and foregoing acts or omissions of Defendant were more than momentary thoughtlessness, inadvertence, or error of judgment.   Such acts or omissions constituted such entire want of care as to establish that the acts or omissions were the result of actual conscious indifference to the rights, safety, or welfare of the person or persons affected. Plaintiff is entitled to recover judgment against Defendant for exemplary damages.

C. NEGLIGENCE AND GROSS NEGLIGENCE

72.     Plaintiff re-alleges and incorporates the foregoing allegations.

73.     Plaintiff would further show that at all times material hereto, the manufacture, sale, design, supply, distribution, or prescription of Vioxx with which Plaintiff came in contact, was under the exclusive control of the Defendant Merck, its agents, servants and employees, and that had the Defendant herein not been guilty of negligence, Plaintiff would not have sustained her injuries.  Accordingly, Plaintiff is entitled to recover from Defendant Merck under the doctrine of *res ipsa loquitur*.

74.     The law imposed a duty on Defendant Merck, as a manufacturer and marketer of pharmaceutical drugs, to exercise reasonable care.  Defendant knew, or in the exercise of ordinary or reasonable care should have known, that the Vioxx it manufactured, sold, designed, supplied, distributed, promoted, or marketed was dangerous, unsafe, and highly harmful to Plaintiff's health, notwithstanding which:

     a.     Defendant negligently failed to design a reasonably safe product;

     b.     Defendant negligently placed Vioxx into the market;

c.      Defendant negligently failed to remove Vioxx from the market;

d.      Defendant negligently failed to fund and conduct medical and scientific studies to determine the risks of the overall safety of Vioxx, in the alternative, failed to heed the warnings and risks of Vioxx;

e.      Defendant negligently failed to conduct sufficient testing on Vioxx that would have shown Vioxx had serious side effects, including, but not limited to the cardiovascular events described above;

f.      Defendant negligently failed to conduct adequate post-marketing surveillance to determine the overall safety of Vioxx;

g.      Defendant negligently failed to accurately disclose the results of its post-marketing surveillance to advise the Plaintiff, consumers, and the medical community of the aforementioned risks to individuals when the drugs were ingested;

h.      Defendant negligently failed to investigate the adverse event reports relating to Vioxx;

i.      Defendant negligently marketed its products;

j.      Defendant negligently failed to provide Plaintiff with visible, understandable warnings that were adequate to convey and alert Plaintiff the severity of the risks and serious thrombotic cardiovascular side effects of Vioxx ingestion;

k.      Defendant negligently failed to take any reasonable precautions or exercise reasonable care to warn Plaintiff of the potential risks and serious thrombotic and cardiovascular side effects of Vioxx ingestion;

l.      Defendant negligently failed to take any reasonable precautions or exercise reasonable care to warn Plaintiff's health care providers of the potential risks and serious thrombotic and cardiovascular side effects of Vioxx ingestion;

m.      Defendant negligently failed to take any reasonable precautions or exercise reasonable care to warn the health care industry of the potential risks and serious thrombotic and cardiovascular side effects of Vioxx ingestion;

n.      Defendant negligently failed to provide adequate post-marketing warnings or instructions after the Defendant knew or should have known of the significant risks of personal injury and death as identified herein among other serious side effects from the use of Vioxx;

o.  Defendant negligently failed to warn Plaintiff that Vioxx should not be used in conjunction with any risk factors for these adverse events such as a family history of ischemic heart disease, or risk factors for ischemic cardiovascular disease; and,

p.  Defendant negligently failed to warn Plaintiff that she undertook the risk of adverse events and death relating to Vioxx as described herein.

75.  Defendant's acts of negligence, as described above but not limited to these specific acts, proximately caused the Plaintiff's injuries and the occurrence in question.

D. NEGLIGENCE – SALE OF PRODUCT - MERCK:

76.  Plaintiff re-alleges and incorporates the foregoing allegations.

77.  Defendant, during some or all relevant times, manufactured, sold, marketed, and/or distributed Vioxx that was supplied to Plaintiff for use.

78.  Plaintiff was exposed to and ingested this hazardous product.

79.  Defendant had the duty, as product sellers, to exercise reasonable care for the safety of the Plaintiff.

80.  These duties included the responsibility for the following safety and health matters relating to Vioxx:

a.  the investigation of the health risks;

b.  writing and publishing adequate and timely precautionary product labels and other health and safety information.

c.  writing and publishing adequate and timely specifications and standards about the true risks of injury associated with the products;

d.  writing and publishing adequate and timely specifications and standards about the symptoms of such injuries;

e.  writing and publishing adequate and timely specifications and standards about the scope of such injuries; or

    f.     writing and publishing adequate and timely specifications and standards about the severity of the known risks associated with these products.

81.    Defendant knew, or in the exercise of reasonable care should have known, that Vioxx would cause adverse cardiovascular effects to its consumers like the Plaintiff.

82.    Defendant breached its duty of reasonable care to Plaintiff and was negligent, without regard to whether the acts were intentional, knowing, malicious or reckless.

83.    Defendant's negligent acts and omissions were the direct and proximate causes of the occurrence in question and Plaintiff's injuries and damages.

E.  COMMON LAW FRAUD - MERCK:

84.    Plaintiff re-alleges and incorporates the foregoing allegations.

85.    Defendant committed common law fraud against Plaintiff.

86.    Defendant had a duty to disclose the risks associated with the use of Vioxx.

87.    Defendant made numerous material misrepresentations about the safety and efficacy of Vioxx, with full knowledge of the falsity of these representations and/or made these misrepresentations with such utter disregard and recklessness as to whether the statements were true or false, that knowledge may be inferred.

88.    Additionally, or in the alternative, Defendant failed to disclose material facts within its knowledge.

89.    Additionally, or in the alternative, Defendant concealed material facts within its knowledge.

90.    Defendant knew that Plaintiff was ignorant of the fact and did not have an equal opportunity to discover the truth about the dangers presented by Vioxx.

91.    Defendant intended to induct consumers such as Plaintiff to take some action, among other things, to buy and ingest Vioxx, by failing to disclose the material facts.

92.     Plaintiff justifiably relied on Defendant's material misrepresentations to her detriment; but for Defendant's fraud, Plaintiff would not have been exposed to Vioxx would not have suffered the injuries and occurrence in question.

## F.  STRICT PRODUCTS LIABILITY/SALE OF DEFECTIVE PRODUCT – SLCC and HPRA

93.     Plaintiff re-alleges and incorporates the foregoing allegations.

94.     The Vioxx sold by SLCC and HPRA was defective and unreasonably dangerous when sold and unaccompanied by proper and adequate warnings regarding all possible adverse side effects associated with the use of Vioxx and the comparative severity and duration of the adverse effects.  The warnings accompanying the Vioxx did not accurately reflect the symptoms, type, scope, or severity of the side effects.  SLCC and HPRA knew or should have known of these side effects due to the FDA sanctioning Merck for its misleading advertising and "Dear Doctor" letters Merck was required to send, as well as other information available to a prudently informed seller of Vioxx.

95.     The Vioxx sold to Plaintiff was unaccompanied by a warning to Plaintiff that numerous other methods of pain relievers were safer.

96.     As a direct and proximate result of SLCC and HPRA selling a defective product, it is strictly liable for the damages the Vioxx caused Plaintiff.

## G.  NEGLIGENCE – FAILURE TO WARN – SLCC and HPRA

97.     Plaintiff re-alleges and incorporates the foregoing allegations.

98.     SLCC and HPRA owed a duty to warn of any dangerous defects or side effects; a duty to assure the product it sells did not cause users unreasonable and dangerous risks, reactions, and side effects; and a duty to provide adequate post-sale warnings as it learned of Vioxx's substantial dangers.

99.     SLCC and HPRA knew or should have known that Vioxx caused unreasonably dangerous risks and serious side effects of which the general public would not be aware, including but not limited to, the FDA sanctions against Merck, the "Dear Doctor" letters Merck sent to doctors and other health care providers, and the medical literature regarding Vioxx. The Medicine Shoppe nevertheless sold Vioxx without adequate warnings of the dangerousness of Vioxx and knowing that there were safer methods and products for pain control.

100.    SLCC and HPRA breached its duty of reasonable care to Plaintiff in that it failed to:

    a.  Warn that Vioxx had serious side effects, including heart attacks, strokes, hypertension, artheriosclerosis, blood clots, ulcers and others, and warn users of those risks that Defendants knew or should have known; and/or

    b.  Include adequate warnings with Vioxx that would alert users to the potential risks and side effects of the drugs which SLCC and HPRA knew or should have known of; and/or

    c.  Warn Plaintiff that the use of Vioxx carried the risk of death or disability from heart attacks, strokes, blood clots, ulcers and other cardiovascular disorders, and other serious side effects of which SLCC and HPRA knew or should have known; and/or

    d.  Give other appropriate warnings.

101.    As a direct and proximate result of SLCC and HPRA's negligence and breaches of their duty of reasonable care, Plaintiff has been damaged.

## H.  BREACH OF CONTINUING DUTY TO WARN

102.    Plaintiff incorporates by reference all factual allegations as if set out word for word in this paragraph.

103.   All defendants are liable to Plaintiff for breaching their continuing duty to warn Plaintiff of adverse health effects and complications associated with Vioxx.

104.   Each defendant was involved in the manufacturing, designing, testing, marketing, distributing, and/or selling of Vioxx.  Accordingly, each Defendant was involved in creating the risks associated with the products.

105.   Each defendant knew, should have known, or should have discovered risks associated with the subject products that were the result of their design, testing, marketing, and/or manufacturing.

106.   Each defendant had a continuing duty to warn Plaintiff.  Each defendant breached this duty.

107.   Defendants' breach of this duty was a proximate cause of Plaintiff's injuries as set forth below.

108.   Accordingly, all defendants are jointly and severally liable for Plaintiff's damages,  including punitive damages.

I.  MISSOURI D.T.P.A.

109.   Plaintiff incorporates by reference all factual allegations as if set out word for word in this paragraph.

110.   Plaintiff meets the definition of "consumer" as that term is defined by statute. Defendants made misrepresentations of material facts to potential users of Vioxx, including the Plaintiff, that were false, including representations that Vioxx was adequately tested and proven safe.   These representations by Defendants violate the DTPA in that they constitute representations that: (1) goods have approval, characteristics, ingredients, uses, or benefits which they do not have; and 2) goods are of a particular standard, quality, or grade when they are of

another.  The Plaintiff justifiably relied on Defendants' representations in purchasing Vioxx.  As a direct and proximate result of Defendants' misrepresentations, Plaintiff suffered and will continue to suffer damages as alleged herein.

111.   Defendants further violated the DTPA by failing to disclose information concerning goods which was known at the time of the transaction when the failure to disclose such information was intended to induce Plaintiff into a transaction into which the consumer would not have entered had the information been disclosed.

112.   Defendants failed to disclose to Plaintiff the dangers associated with Vioxx.  As a direct and proximate result of Defendants' failure to disclose information, Plaintiff was induced into a transaction which she would not have entered had this information been disclosed and she suffered and will continue to suffer physical injury, mental anguish, harm and economic loss as alleged herein.

113.   The conduct of the Defendants as described above was committed knowingly, allowing Plaintiff to recover damages for mental anguish and an award of up to three times the amount of economic damages.

114.   As further cause of action, Plaintiff pleads that the manufacturers and sellers of Vioxx at the time of sale had reason to know of the particular use of Vioxx.  Plaintiff, who purchased the Vioxx, was relying on the sellers' skill or judgment to select and furnish suitable and safe products.

115.   Defendants breached these implied warranties by providing an unsafe product and such breaches of the implied warranty of fitness for intended purposes was a proximate cause of Plaintiff's injuries as alleged herein.

116.   The conduct of the Defendants as described above was committed knowingly,

allowing Plaintiff to recover damages for mental anguish and an award of up to three times the amount of economic damages.

117.    The conduct of the Defendants as described herein consisted of unconscionable actions or courses of actions, as defined in the DTPA.  By such conduct, Defendants took advantage of the lack of knowledge, ability, experience or capacity of Plaintiff to a grossly unfair degree.  The conduct of the Defendants as described above was committed knowingly, allowing Plaintiff to recover damages for mental anguish and an award of up to three times the amount of economic damages.

## VII.  ACTUAL DAMAGES

118.    Plaintiff seeks compensation for the damages she has sustained relating to her past, present, and future physical pain and mental anguish, loss of earning capacity, disfigurement, physical impairment and medical care expenses.

## VIII.  PUNITIVE DAMAGES

119.    Plaintiff re-alleges and incorporates the foregoing allegations.

120.    Plaintiff is entitled to punitive damages because Merck's failure to warn was reckless and without regard for the public safety and welfare and constitutes "malice" under Missouri law. Merck misled both the medical community and the public at large, including Plaintiff, by making misrepresentations about the safety of Vioxx.  Merck concealed, downplayed, understated and/or disregarded its knowledge of the serious and permanent side effects associated with the use of Vioxx, despite available information demonstrating that Vioxx was likely to cause fatal side effects to users.

121.    Merck, its agents, representatives and employees possessed or should have possessed evidence demonstrating that its products cause serious cardiovascular side effects.  Nevertheless,

Merck continued to aggressively market and advertise Vioxx by providing false and misleading information with regard to safety and comparative efficacy.

122.    Merck failed to provide warnings that would have persuaded medical providers from prescribing Vioxx, and failed to provide adequate and accurate information in its advertising, promotions and marketing campaign, thus depriving medical providers and consumers from weighing the true risks against the benefit of prescribing and/or purchasing and consuming Vioxx.

123.    Merck's acts and omissions were grossly negligent, malicious and constitute an egregious fraud.  Further, Merck acted in reckless disregard of the safety of Plaintiff and others, justifying the imposition of punitive damages.  Plaintiff is entitled to punitive damages because of Merck's maliciousness and reckless disregard of Plaintiff's safety.

## IX.  DISCOVERY RULE AND FRAUDULENT CONCEALMENT

124.    The nature of Plaintiff's injuries and the relationship to Vioxx use were inherently undiscoverable; and consequently the discovery rule should be applied to toll the statute of limitations until Plaintiff knew or through the exercise of reasonable care and diligence should have known of the existence of potential claims against Defendants.  Plaintiff did not discover and through the exercise of reasonable care and due diligence could not have discovered her injuries earlier nor could she have discovered her injuries were due to the negligent action of Defendants until the withdrawal of Vioxx from the market in September of 2004.

125.    Because Merck fraudulently concealed its wrongful conduct as alleged above and Plaintiff using reasonable diligence, could not and did not discover her right of action until very recently, Merck is estopped from asserting any and all potentially applicable statues of limitations, if any.

126.    Any and all potentially applicable statues of limitations have been tolled by Merck's affirmative and intentional acts of fraudulent conduct, concealment, and misrepresentation, alleged above.  Such acts include by are not limited to intentionally concealing and refusing to disclose the material risks associated with the use of Vioxx.

127.    Merck is estopped from relying on any statutes of limitation because of its fraudulent concealment and misrepresentation alleged above.  Merck was under a duty to disclose the risks of adverse cardiovascular events associated with the use of Vioxx because this is nonpublic information over which it had exclusive control.  Defendant knew this information was not readily available to Plaintiff and was relevant to Plaintiff in deciding whether to use Vioxx.

128.    Until very recently, Plaintiff had no knowledge that Merck engaged in the wrongdoing alleged herein.  Because of the fraudulent and active concealment of the wrongdoing by Merck, including but not limited to deliberate efforts to give Plaintiff the materially false impression that Merck undertook all feasible safety precautions to reduce the risk of adverse cardiac events, Plaintiff could not have discovered the wrongdoing any time prior to this time, nor could Plaintiff have, as a practical matter, taken legally effective action given the unavailability, until very recently, of the internal memoranda and other documents (as generally described herein) as evidence in support of Plaintiff's claims.

## X.  JURISDICTIONAL LIMITS

129.    Plaintiff's damages are in excess of this Court's minimum jurisdiction.

## XI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants, Merck and Company, Inc., St. Louis ConnectCare and Homer G. Phillips Resident Association, and in favor of the Plaintiff, and to award the following relief:

a.     General damages in the sum in excess of the jurisdictional minimum of this Court;

b.     Compensatory damages;

c.     Consequential Damages;

d.     Punitive and exemplary damages;

e.     Pre-judgment and post-judgment interest as provided by law;

f.     Costs including, but not limited to, discretionary Court costs of this cause, and those costs available under the law, as well as expert fees and attorney fees and expenses, and costs of this action; and,

g.     Such other relief as the Court deems just and proper.

* * * [The remainder of this page intentionally left blank] * * *

## XII.  JURY DEMAND

The Plaintiff demands a trial by jury.

Dated:  August 25, 2005

Respectfully submitted,

Kara Lindsay Rakers (06276763)
Keith D. Short (06210044)
Robert D. Rowland (~~06198915~~) 39079
E-mail: rrowland@gmhalaw.com
**GOLDENBERG, MILLER, HELLER
& ANTOGNOLI, P.C.**
2227 South State Route 157
P.O. Box  959
Edwardsville, IL  62025
Tel: 618-656-5150
Fax: 618-656-6230

Grant Kaiser (11078900)
*Pending pro hac admission*
E-mail: gkaiser@thekaiserfirm.com
**THE KAISER FIRM, LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5001
713.223.0000
713.223.0440 (fax)
**ATTORNEYS FOR PLAINTIFF**