FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 NOV 14  PM 2:59

LORETTA G. WHYTE
CLERK

## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

Lonnie Allen, Jr., et al.,

§
§
§
§
§
§
§
§

Civil Action No. 06-6633

06-6633

Section L

Judge Eldon E. Fallon

           Plaintiffs,

   v.

Merck & Co., Inc., and John Does 1-25,

           Defendants.

---

### <u>First Amended Complaint For Damages:  Statute Of Limitations Tolled As Result Of Merck's Fraudulent Concealment; Strict Liability Pursuant To 402(A) Of The Restatement (Second) Of Torts; Negligence; Gross Negligence; Negligent Misrepresentation; Deceptive Trade Practices; Breach Of Express Warranty; Breach Of Implied Warranty; Wrongful Death; And Loss Of Consortium</u>

COME NOW Lonnie Allen, Jr.; Glen Bailey; Henry Bennett; Jimmie Birden; Richard Bloom; Barbara Burdette, individually and for the Estate of Bill Burdette; Jay Busch; Darrell Camp; Yvette Cid, individually and for the Estate of Louis Cid; John Cunningham; Jacqueline Daniels; Dwane Evans; Elizabeth Fitzgerald; Richard Freeman; James R. Gibson, Jr.; Judith Lynne Gibson; Caroline Holmes; Donna Holsten; Paul Hunt individually and for the Estate of Allie R. Hunt; Estate of Barbara Huskey; Cleve Jackson; Paul Kangas; Mabel Ruth Kutscher; Karen Lishman for the Estate of Rosalind Whetsel; Bessie Payne Mallow for the Estate of Gary K. Payne; Bonnie McAlpin; Dolores Milligan for the Estate of Lois E. Comstock; Janice Norwood for the Estate of Stanley Robinson; Magdalen Nunn for the Estate of Geneva Hobson; Billy Overall; Della Parker; Kathleen Price; Phyllis M. Samuels; Walter Saunders; Daniel Sliger, individually and for the Estate of Marie Sliger; Dorris Spittler; Albert Stadalski; Velma Treece; Rena Turner for the Estate of Clarice Nobles; Josephine Wells; Marion Wendlar, individually and for the Estate of Herman F. Wendler; and Annie Wilson, and file this Complaint


Fee_____
Process_____
X  Dktd_____
____CtRmDep_____
____Doc. No_____

against Defendants Merck & Co., Inc. and John Does 1 through 25 (collectively, "DEFENDANTS"), for the following causes of action:

## THE PARTIES

1.      Plaintiff LONNIE ALLEN, JR. is an individual who resided at all relevant times herein in Spokane, Washington.

2.      Plaintiff GLEN BAILEY is an individual who resided at all relevant times herein in the Central City, Nebraska.

3.      Plaintiff HENRY BENNETT is an individual who resided at all relevant times herein in Ferrisburg, Vermont.

4.      Plaintiff JIMMIE BIRDEN is an individual who resided at all relevant times herein in Oakland, California.

5.      Plaintiff RICHARD BLOOM is an individual who resided at all relevant times herein in Lincoln, Nebraska.

6.      Plaintiff BARBARA BURDETTE, individually and for the Estate of BILL BURDETTE, is an individual who resided at all relevant times here in Sioux City, Iowa, and is the surviving spouse ("Spouse") of decedent BILL BURDETTE. At all times relevant herein, decedent BILL BURDETTE ("Decedent") resided in the State of Iowa.

7.      Plaintiff JAY BUSCH is an individual who resided at all relevant times here in Valley City, Utah.

8.      Plaintiff DARRELL CAMP is an individual who resided at all relevant times here in Mount Vernon, Washington.

9.      Plaintiff YVETTE CID, individually and for the Estate of LOUIS CID, is an individual who resided at all relevant times here in Jersey City, New Jersey, and is the

surviving spouse ("Spouse") of decedent LOUIS CID.  At all times relevant herein, decedent LOUIS CID ("Decedent") resided in the State of New Jersey.

10.     Plaintiff JOHN CUNNINGHAM is an individual who resided at all relevant times in Farwell, Texas.

11.     Plaintiff JACQUELINE DANIELS is an individual who resided at all relevant times in Olympia, Washington.

12.     Plaintiff DWANE EVANS is an individual who resided at all relevant times in Salt Lake City, Utah.

13.     Plaintiff ELIZABETH FITZGERALD is an individual who resided at all relevant times here in Lacey, Washington.

14.     Plaintiff RICHARD FREEMAN is an individual who resided at all relevant times here in Issaquah, Washington.

15.     Plaintiffs JAMES R. GIBSON and JUDITH LYNNE GIBSON are individuals who resided at all relevant times here in Brentwood, Tennessee.  At all times relevant herein, JUDITH LYNNE GIBSON ("Spouse") was the legal spouse of JAMES R. GIBSON.

16.     Plaintiff CAROLINE HOLMES is an individual who resided at all relevant times here in Spokane Valley, Washington.

17.     Plaintiff DONNA HOLSTEN is an individual who resided at all relevant times here in Salt Lake City, Utah.

18.     Plaintiff PAUL HUNT, individually and for the Estate of ALLIE R. HUNT, is an individual who resided at all relevant times herein in Boley, Oklahoma, and

is the surviving spouse ("Spouse") of decedent ALLIE R. HUNT ("Decedent").  At all times relevant herein, Decedent resided in the State of Oklahoma.

19.     Plaintiff ESTATE OF BARBARA HUSKEY is an individual who resided at all relevant times here in Porterville, California.

20.     Plaintiff CLEVE JACKSON is an individual who resided at all relevant times here in Lincoln, Nebraska.

21.     Plaintiff PAUL KANGAS is an individual who resided at all relevant times here in Seattle, Washington.

22.     Plaintiff MABEL RUTH KUTSCHER is an individual who resided at all relevant times here in Keller, Texas.

23.     Plaintiff KAREN LISHMAN for the Estate of ROSALIND WHETSEL is an individual who resided at all relevant times here in Coarse Gold, California.  At all relevant times herein, decedent ROSALIND WHETSEL ("Decedent") resided in the State of California.

24.     Plaintiff BESSIE PAYNE MALLOW for the Estate of GARY K. PAYNE is an individual who resided at all relevant times here in Oroville, California.  At all relevant times herein, decedent GARY K. PAYNE ("Decedent") resided in the State of California.

25.     Plaintiff BONNIE MCALPIN is an individual who resided at all relevant times here in Gallatin, Tennessee.

26.     Plaintiff DOLORES MILLIGAN for the Estate of LOIS E. COMSTOCK is an individual who resided at all relevant times here in Seaford, Delaware.  At all

relevant times herein, decedent LOIS E. COMSTOCK ("Decedent") resided in the State of Delaware.

27.     Plaintiff JANICE NORWOOD for the Estate of STANLEY ROBINSON is an individual who resided at all relevant times here in Philadelphia, Pennsylvania.  At all relevant times herein, decedent STANLEY ROBINSON ("Decedent") resided in the State of Pennsylvania.

28.     Plaintiff MAGDALEN NUNN for the Estate of GENEVA HOBSON is an individual who resided at all relevant times here in Chicago, Illinois.  At all relevant times herein, decedent GENEVA HOBSON ("Decedent") resided in the State of Illinois.

29.     Plaintiff BILLY OVERALL is an individual who resided at all relevant times herein in Soap Lake, Washington.

30.     Plaintiff DELLA PARKER is an individual who resided at all relevant times herein in Central Falls, Rhode Island.

31.     Plaintiff KATHLEEN PRICE is an individual who resided at all relevant times herein in Maysville, West Virginia.

32.     Plaintiff PHYLLIS M. SAMUELS is an individual who resided at all relevant times here in Washington, D.C.

33.     Plaintiff WALTER SAUNDERS is an individual who resided at all relevant times here in Union Gap, Washington.

34.     Plaintiff DANIEL SLIGER, individually and on behalf of the Estate of MARIE SLIGER is an individual who resided at all relevant times here in Marysville, California, and at all relevant times was the legal spouse ("Spouse") of decedent MARIE

SLIGER ("Decedent").  At all relevant times herein, Decedent was resided in the State of California.

35.     Plaintiff DORRIS SPITTLER is an individual who resided at all relevant times here in Spokane, Washington.

36.     Plaintiff ALBERT STADALSKI is an individual who resided at all relevant times here in Woonsocket, Rhode Island.

37.     Plaintiff VELMA TREECE is an individual who resided at all relevant times here in Baton Rouge, Louisiana.

38.     Plaintiff RENA TURNER for the Estate of CLARICE NOBLES is an individual who resided at all relevant times here in Vallejo, California.

39.     Plaintiff JOSEPHINE WELLS is an individual who resided at all relevant times here in Olympia, Washington.

40.     Plaintiff MARION WENDLER, individually and for the Estate of HERMAN F. WENDLER, is an individual who resided at all relevant times here in Yuba City, California, and at all relevant times herein was the legal spouse ("Spouse") of decedent HERMAN F. WENDLER (Decedent").  At all relevant times herein, Decedent resided in the State of California.

41.     Plaintiff ANNIE WILSON is an individual who resided at all relevant times here in Paris, Tennessee.

42.     All Plaintiffs, Spouses and Decedents set forth and identified above will collectively be referred to herein as "PLAINTIFFS."

43.     Defendant Merck & Co., Inc. ("MERCK"), an American pharmaceutical company, is a corporation organized and incorporated under the law of the State of New

Jersey and is authorized to do business in the States of the Plaintiffs, with its principal place of business at 1 Merck Drive, Whitehouse Station, New Jersey 08889.  At all times relevant herein, MERCK had continuing and systematic contacts with the States of the Plaintiffs by delivering its products into the stream of commerce with the expectation that they would reach and be used in the States of the Plaintiffs.  MERCK had minimum contacts with the States of the Plaintiffs, and was doing business in these states by, among other things, designing, manufacturing, promoting, and/or distributing pharmaceuticals, such as that involved in this litigation, in the Plaintiffs.  The causes of action set out herein arise from such contacts.

44.     John Doe Defendants 1 through 25 ("DEFENDANTS"), whose names are not currently available but who are believed to be employees, administrator(s), agents, servants, representatives, officers, directors, designees, physicians, nurses, radiologists, contractors and/or technicians, were at all times material hereto, employees of DEFENDANTS and/or authorized to perform work at DEFENDANTS' facilities or for DEFENDANTS, and who were acting within the course and scope of their employment and/or authorization at the time of the incidents complained of herein.  Unless otherwise stated herein, MERCK and DEFENDANTS will be collectively referred to herein as "DEFENDANTS."

## JURISDICTION AND VENUE

45.     Subject matter jurisdiction exists in this Court because there is complete diversity between the parties.  28 USC § 1331(a).  PLAINTIFFS are legal residents of the States of Texas, Nebraska, Oklahoma, Delaware, Rhode Island, Washington, D.C., Washington, California, Vermont, Pennsylvania, New Jersey, Tennessee, Iowa, Illinois,

Utah, Louisiana, and West Virginia, and MERCK is a corporation organized under the laws of the State of New Jersey.

46.    The amount in controversy exceeds the minimum sum required by 28 USC § 1331(a).

47.    The Court has in personam jurisdiction over DEFENDANTS because DEFENDANTS have done and continue to do business in the states of each Plaintiff, have committed a tort, in whole or in part in the state of each Plaintiff, have continuing and systematic contacts in the state of each Plaintiff, have purposefully directed its business activities toward the forum, and are amenable to service by a Court in the state of each Plaintiff.

48.    Venue is proper pursuant to 28 USC 1332, 28 USC § 1407, and Minute Order dated September 7, 2005 in MDL 1657 by the Honorable Judge Eldon E. Fallon.

## FACTUAL ALLEGATIONS

49.    In 1992, MERCK or its predecessor began researching a "blockbuster drug," in other words, a drug with tremendous profit potential, which scientists quoted as being a "super aspirin." This "super aspirin" was a class of drug known as a Cox-II selective inhibitor.

50.    In that same year, however, other U.S. pharmaceutical companies also had versions of "Cox-II selective inhibitors" in development and therefore, in order to avoid potential threat to the tremendous profit potential that MERCK saw from this "super aspirin," MERCK stepped up its efforts to develop, patent and markets its version of the selective inhibitor of Cox-II.

51.    In order to be the first to market this drug, MERCK took certain critical shortcuts in its clinical trial tests, including but not limited to, removing patients who suffered side effects from its study in order to keep an expressed pattern from developing in its clinical trials of its version of the selective inhibitor of Cox-II.

52.    MERCK's Cox-II selective inhibitor was later named Vioxx as its registered trade name; its chemical name is rofecoxib.  Vioxx was approved in the U.S. in October of 1999 after only seven years of development.  The defective product will be hereinafter referred to as "VIOXX."

53.    MERCK's first worry in the mid to late 1990s was that its drug would show greater heart risk than cheaper painkillers.

54.    Indeed, outside studies have shown that VIOXX greatly increases the risk of heart attacks, stroke and blood clots, and that complete heart failure can occur within months of the first dose.

55.    MERCK, however, concealed critical information regarding serious flaws in its studies until September 30, 2004, when MERCK voluntarily recalled VIOXX, and removed it from the market.

56.    This action arises from the sales and efficacy of VIOXX, an osteoarthritis and pain relief drug containing rofecoxib.

57.    MERCK obtained FDA approval on VIOXX in approximately May of 1999 and began its distribution and sale throughout the United States in approximately May of 1999.  VIOXX is a brand name used by MERCK to market and distribute rofecoxib.

58.    PLAINTIFFS ingested the VIOXX as prescribed until they were struck by cardiovascular events.

59.    MERCK distributed and sold VIOXX to consumers such as PLAINTIFFS. This rofecoxib was approved for marketing based on information in the New Drug Application, which was on a fast track, six-month approval process to FDA.

60.    Despite knowledge in its clinical trials and post marketing reports, studies and information relating to cardiovascular related adverse health effects, MERCK promoted and marketed VIOXX as safe and effective for persons such as PLAINTIFFS.

61.    MERCK concealed the serious cardiovascular risks associated with VIOXX because a successful launch of VIOXX was viewed as critical for MERCK and safety concerns over hypertension, edema and/or cardiovascular events would have drastically impacted MERCK's positioning in the market as compared to its competition drug, Celebrex ("celecoxib") placed into the market by MERCK's competitors "Pharmacia" and "Pfizer" some three months prior to the launch of VIOXX.

62.    MERCK knowingly chose to place these adverse health risks on its consumers despite its knowledge at product launch and in post marketing data thereafter that use of VIOXX carried significant risk factors.  These adverse effects were realized in adverse event reports, in clinical trials where such events were adjudicated by primary investigators with MERCK's assistance, and in one or more studies shortly after market launch, which showed statistically significant increases in adverse cardiovascular events among VIOXX users including strokes.

63.    In industry sponsored studies presented at the European United League Against Rheumatism ("EULAR"), an organization in which MERCK is a member and

corporate sponsor, in June of 2000, it was shown that VIOXX use resulted in statistically significant increase in hypertension, myocardial infarction, and cerebrovascular accidents. MERCK did nothing to further accurately publish these studies, which were again reported and denied by MERCK as to the hypertension problems in the official publication of the American Pharmaceutical Association, Pharmacy Today, Spin War Aside, Lessons Emerge From COX-2 Trials, in August 2000, page 3.

64.     MERCK continued to deny the ill health effects associated with VIOXX while at the same time reaping the profits obtained through the non-disclosure. MERCK engaged in a massive advertising and sampling program and gained continued increase in market share, which enhanced MERCK'S financial stability to the detriment of its consumers. The resultant effect to MERCK in concealing and failing to reveal and warn of the risks was a more than $2 billion profit in 2000 alone to MERCK and an approximately 23 percent share of the market.

65.     The profits to MERCK were realized as it continued to withhold relevant data from PLAINTIFFS, and the health care industry and public generally. For example, in November of 2000, MERCK caused the publication of a study in the New England Journal of Medicine and knowingly downplayed and/or withheld from this publication the severity of cardiovascular risks associated with VIOXX consumption over Naproxen consumption.

66.     On or about August 29, 2001, the Journal of the American Medical Association published a peer-reviewed human epidemiologic study of the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mujherjee, et al., showing what MERCK had concealed – that the relative risk of developing a confirmed adjudicated thrombotic

cardiovascular event (defined in the article as myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks) among VIOXX users in MERCK trials at a 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to Naproxen users, and 4.89 for developing serious cardiovascular events among aspirin indicated patients.  See Mukherjee, D., et al., Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors, A.M.A 286:8, 954-59, Aug. 22-29, 2001.  In addition, the annualized myocardial infarction rates for VIOXX users compared to placebo revealed a statistically significant increase among VIOXX users.  Id.

67.     In the JAMA study the authors set forth the theory that by decreasing PGI 2 production I [VIOXX] may tip the natural balance between prothrombotic thromboxande A2 and antithrombotic PGI2, potentially leading to an increase in thrombotic cardiovascular events.  Id. at 957.  In a follow-up peer-reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the Cox-2 inhibitor A tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular and thrombotic events, Bing, R., & Lomnicka, M., Why Do Cyclo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?, J.A.C.C., 39:3, Feb. 6, 2002.

68.     In response to MERCK-authored studies, MERCK set forth the theory that Naproxen had a cardio-protective effect and, therefore, accounted for the cardiovascular risks among VIOXX users.  However, this theory was debunked in approximately January of 2002, by a Vanderbilt University School of medicine human epidemiologic

peer-reviewed study published in The Lancet concluding that there is an absence of a protective effect of Naproxen or other non-aspirin non-steroidal anti-inflammatory drugs on risk of coronary heart disease. Ray, W., et al., Non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease: an observational cohort study, The Lancet, 359: 118-123, Jan. 12, 2002.

69.     In approximately September of 2001, MERCK received a rare third Warning Letter from FDA stating, in part, that MERCK'S promotional activities and materials are false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations. The FDA stated that MERCK'S campaign minimized potentially serious cardiovascular findings from a VIOXX study and misrepresented VIOXX safety profile. The FDA concluded that VIOXX has a favorable safety profile is simply incomprehensible given the rate of MI [myocardial infarction] and serious cardiovascular events compared to Naproxen.

70.     On September 30, 2004, the FDA acknowledged the voluntary withdrawal from the market of VIOXX (Rofecoxib) by MERCK after a long-term study of the drug was halted because of an increased risk of serious cardiovascular events, including heart attacks and strokes among study patients taking VIOXX compared to patients received placebo. The FDA also issued a Public Health Advisory to inform patients of this action and to advise them to consult with a physician about alternative medications.

71.     At all times relevant to this litigation, MERCK had a significant market share based upon claims of VIOXX'S efficacy, a very aggressive marketing program which involved financial incentives to sales teams, infusion of some 700 new sales representatives, and a massive advertising and sampling program.

72.    As a result of such marketing, VIOXX gained a significant market share in competition with Celebrex that MERCK would not have gained if MERCK had not suppressed information about VIOXX and/or made false representations of VIOXX'S superiority and efficacy.

73.    If MERCK had not engaged in this conduct, consumers, including PLAINTIFFS would have switched from VIOXX to safer products or refrained wholly from its use.

74.    The suppression of this information constituted a common scheme by MERCK to conceal material information from PLAINTIFFS.

75.    The marketing strategies, including without limitation the detail and sampling programs and direct-to-consumer advertising of MERCK targeted PLAINTIFFS to induce them to purchase VIOXX.  At the time MERCK distributed, manufactured and marketed VIOXX, MERCK intended that PLAINTIFFS would rely on the marketing, advertisements and product information propounded by MERCK.

76.    PLAINTIFFS, including Decedents, and each of them, ingested VIOXX as prescribed and/or instructed by their physicians and, suddenly and without warning, PLAINTIFFS, including Decedents, and each of them, suffered heart attacks, strokes, and/or other cardiovascular events or serious injuries, hospitalization and, with respect to Decedents, death.

### COUNT I
### STRICT LIABILITY PURSUANT TO 402(A) OF THE
### RESTATEMENT (SECOND) OF TORTS

77.    PLAINTIFFS repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further allege:

78.   DEFENDANTS were engaged in the business of manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning, and otherwise distributing VIOXX in interstate commerce, which they sold and distributed throughout the world and to PLAINTIFFS.

79.   PLAINTIFFS used VIOXX in a manner for which it was intended or in a reasonably foreseeable manner.

80.   VIOXX was expected to and did reach PLAINTIFFS without substantial change in its condition as manufactured, created, designed, tested, labeled, sterilized, packaged, supplied, marketed, sold, advertised, warned, and otherwise distributed.

81.   PLAINTIFFS were not aware of and reasonably could not have discovered the dangerous nature of VIOXX.

82.   VIOXX caused increased risks of heart attack and strokes upon consumption, and therefore constituted a product unreasonably dangerous for normal use due to its defective design, defective manufacturing, as well as DEFENDANTS' misrepresentations and inadequate facts disclosed to PLAINTIFFS.

83.   As a direct and proximate result of DEFENDANTS' manufacturing, creating designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning, and otherwise distributing VIOXX in interstate commerce, PLAINTIFFS were at an increased risk of developing heart attacks, strokes and death, and PLAINTIFFS have suffered compensatory and punitive damages in an amount to be proven at trial.

## COUNT II
## NEGLIGENCE

84.     PLAINTIFFS repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further allege:

85.     It was DEFENDANTS' duty to use reasonable care in the manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning, and otherwise distributing VIOXX.

86.     DEFENDANTS are responsible for one or more of the following negligent acts and/or omissions:

a.      Failing to adequately and properly test and inspect VIOXX so as to ascertain whether or not it was safe and proper for the purpose for which it was designed, manufactured and sold;

b.      Failure to utilize and/or implement a reasonably safe design in the manufacture of VIOXX;

c.      Failure to manufacture VIOXX in a reasonably safe condition for which it was intended;

d.      Failure to adequately and properly warn DECEDENTS of the risks of complications from VIOXX when used in a manner for which it was intended;

e.      Failure to adequately and properly warn DECEDENTS of the risk of disease from VIOXX when used in a manner for which it was intended;

f.      Failure to adequately and properly label VIOXX so as to warn PLAINTIFFS of risks of complications;

g.   Failure to adequately and properly label VIOXX so as to warn PLAINTIFFS of the risks of heart attack and stroke;

h.   Manufacturing, selling, distributing, and/or prescribing VIOXX, a drug that constituted a hazard to health;

i.   Manufacturing, selling, distributing, and/or prescribing VIOXX, a drug which caused adverse side effects; and

j.   Other negligent acts and/or omissions.

87.   As a direct and proximate result of DEFENDANTS' manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning, distributing, and/or prescribing VIOXX, PLAINTIFFS were at an increased risk of developing heart attacks, strokes, and/or other cardiovascular events and, ultimately, death, and PLAINTIFFS have suffered compensatory and punitive damages in an amount to be proven at trial.

## COUNT III
## GROSS NEGLIGENCE

88.   PLAINTIFFS repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further allege:

89.   The negligent acts and/or omissions of DEFENDANTS as set forth above constitute an entire want of care so as to indicate that the acts and/or omissions in question were the result of conscious indifference to the rights, safety and welfare of others, including PLAINTIFFS, or that they constitute malice, as that term is defined by law, so as to give rise to an award of exemplary damages. The negligent acts and/or omissions of DEFENDANTS, when viewed objectively from the standpoint of DEFENDANTS at the time of the occurrence, involved an extreme degree of risk,

considering the probability and magnitude of the potential harm to others; and of which DEFENDANTS had actual, subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety and welfare of others.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION**

90.     PLAINTIFFS repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further allege:

91.     DEFENDANTS are also strictly liable to PLAINTIFFS under sections 323, 402(a), and 402(b), of the Restatement (Second) of Torts, in misrepresenting to the public that its product was safe and without defect; which statement and representation was false and involved a material fact concerning the character or quality of the product in question, and upon which representation the consumer, constructively relied, and which constituted a producing cause of PLAINTIFFS damages herein.

92.     DEFENDANTS made misrepresentations and actively concealed adverse information at a time when DEFENDANTS knew, or should have known, that VIOXX had defects, dangers and characteristics that were other than what DEFENDANTS had represented to the FDA and the consuming public, including PLAINTIFFS. Specifically, DEFENDANTS misrepresented to and/or actively concealed from PLAINTIFFS, FDA and the consuming public that:

a.     VIOXX had statistically significant increase in side effects such as hypertension, edema, and/or myocardial infarction, which could result in death;

b.     There had been insufficient studies regarding the safety and efficacy of VIOXX before its product launch;

18

c. VIOXX was not fully and adequately tested;

d. Prior studies showed serious adverse risks from ingesting VIOXX;

e. The risk of stroke and hypertension was much higher than had been reported in the scientific literature; and

f. The results of the Vigor study which showed serious cardiovascular events occurred in 101 patients who took VIOXX, compared to 46 patients who took Naproxen (a type of over-the-counter NSAID); and, myocardial infarctions occurred in 20 patients in the VIOXX treatment group as opposed to only four patients in the Naproxen treatment group.

93. These misrepresentations and/or active concealments were perpetuated directly and/or indirectly by DEFENDANTS. DEFENDANTS knew or should have known that these representations were false and made the representations with the intent or purpose that PLAINTIFFS would rely on them leading to the use of VIOXX.

94. At the time of the fraudulent misrepresentations, PLAINTIFFS were unaware of the falsity of the statements being made and believed them to be true. PLAINTIFFS justifiably relied on or were induced by the misrepresentations to PLAINTIFFS' detriment. These misrepresentations constitute a continuing tort against PLAINTIFFS and other persons who ingested VIOXX.

## COUNT V
## BREACH OF IMPLIED WARRANTY

95. PLAINTIFFS repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further allege:

96.     PLAINTIFFS bring this cause of action pursuant to applicable state law, federal law, and common law.

97.     Prior to the time that VIOXX was used by PLAINTIFFS, DEFENDANTS impliedly warranted to PLAINTIFFS that VIOXX was of merchantable quality and safe and fit for the use for which it was intended.

98.     PLAINTIFFS were and are unskilled in the research, design and manufacture of VIOXX and reasonably relied entirely on the skill, judgment and implied warranty of DEFENDANTS in using VIOXX.

99.     VIOXX was neither safe for its intended use nor of merchantable quality, as warranted by DEFENDANTS, in that it had dangerous propensities when put to its intended use and would cause severe injuries to the user.

100.    As a direct and proximate result of DEFENDANTS' breaches of warranties, PLAINTIFFS were or are at an increased risk of developing heart attack and stroke and PLAINTIFFS have suffered compensatory and punitive damages in an amount to be proven at trial.

101.    DEFENDANTS breached the implied warranty of merchantability and the implied warranty that its product would be fit for a particular purpose, as set forth in the Uniform Unfair Practices Act and applicable state and federal law.  These warranties were breached by DEFENDANTS' failure to adequately design, manufacture, and market their product and/or warn of dangers DEFENDANTS knew or should have known about associated with a defective product.  The above described acts and/or omissions were singularly and/or cumulatively approximate and/or producing cause of the occurrence in question and the resulting injuries and damages sustained by PLAINTIFFS.

## COUNT VI
## WRONGFUL DEATH

102.    PLAINTIFFS repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further allege:

103.    The negligent acts of DEFENDANTS were a direct and proximate cause of the death of PLAINTIFFS for which PLAINTIFFS are entitled to recover damages as provided by law.

## COUNT VII
## LOSS OF CONSORTIUM

104.    PLAINTIFFS repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further allege:

105.    A further direct and proximate result of the aforementioned negligent acts and/or omissions and/or breaches of DEFENDANTS as set forth and described above, PLAINTIFFS, and each of them, have suffered a loss of consortium and will suffer a loss of consortium in the future, all in an amount not presently determinable but to be proven at the time of trial.

## DAMAGES

106.    PLAINTIFFS repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further allege:

107.    As a proximate cause of the above described acts and/or omissions and/or breaches on the part of DEFENDANTS, by and through their vice principals, agents and/or representatives, PLAINTIFFS have sustained damages and harm.  PLAINTIFFS seek all damages to which they are entitled at law for personal, emotional, economic, and

physical injuries sustained in the past, as well as damages they will continue to sustain in the future as a result of the occurrence in question.

108.    PLAINTIFFS have suffered personal injuries and are entitled to damages as a result of the conduct of DEFENDANTS including, but not limited to:

      a.    medical, hospital, pharmaceutical and funeral expenses;

      b.    loss of earning capacity, past and future; and

      c.    mental anguish, past and future;

      d.    loss of consortium.

109.    PLAINTIFFS seek all damages to which they are entitled at law and/or equity for the physical, emotional and/or economic damages which they have sustained since the incident, and the losses, which in reasonable probability, they will sustain in the future. PLAINTIFFS also seek punitive damages in an amount to be determined by the jury.

### PRAYER

110.    PLAINTIFFS respectfully pray that the DEFENDANTS be cited to appear and answer herein, and that upon final hearing hereof, PLAINTIFFS receive a judgment from DEFENDANTS for:

      a.    Damages as plead, including, but not limited to, compensatory, actual, consequential, direct and/or punitive damages;

      b.    Costs of court, attorneys' fees and expenses necessary for the preparation of this case to trial;

c.      Judgment interest at the highest lawful rate and to the maximum extent allowed by law;

d.      Interest on the judgment at the highest legal rate from the date the judgment is entered; and

e.      All further relief; at law and/or equity to which PLAINTIFFS may show themselves justly entitled.

### JURY DEMAND JURY DEMAND

PLAINTIFFS respectfully request a trial by a six (6)-person jury of all issues brought in this cause of action.

Dated: November 10 , 2006                     BRANCH LAW FIRM


TURNER W/ BRANCH
2025 Rio Grande Boulevard NW
Albuquerque, NM  87104
(505) 243-3500 (telephone)
(505) 243-3534 (facsimile)
*Attorneys for Plaintiffs*