

11497892
Jun 9 2006
5:48PM

# EXHIBIT "A"

9 Ex A MIL 9  Humeston Trial 10-07-05

3313

SUPERIOR COURT OF NEW JERSEY ATLANTIC
COUNTY/CIVIL DIVISION DOCKET NO. ATL-L-
2272-03MT

-----------------------------x

FREDERICK HUMESTON, et al.,

      PLAINTIFFS,

       VS.             STENOGRAPHIC TRANSCRIPT
                    OF:

MERCK & CO.,INC.,

                    - TRIAL -

        DEFENDANT.

-----------------------------x

      PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
              1201 BACHARACH BOULEVARD
              ATLANTIC CITY, NJ 08401

      DATE:   OCTOBER 7, 2005

B E F O R E:

     THE HONORABLE CAROL E. HIGBEE, P.J.Cv.

TRANSCRIPT ORDERED BY:
     DIANE P. SULLIVAN, ESQUIRE
     DAVID R. BUCHANAN, ESQUIRE

A P P E A R A N C E S:

     DAVID R. BUCHANAN, ESQUIRE
     CHRISTOPHER SEEGER, ESQUIRE SEEGER, WEISS,
     LLC
ATTORNEYS FOR THE PLAINTIFFS

        DIANE P. SULLIVAN, ESQUIRE
    DECHERT, LLP
    STEPHEN D. RABER, ESQUIRE WILLIAMS AND
    CONNOLLY, LLP CHRISTY D. JONES, ESQUIRE
      BUTLER, SNOW, O'MARA, STEVENS & CANNADA,
      PLLC ATTORNEYS FOR THE DEFENDANT
      *     *     *     *     *     *
           REGINA A. TELL, CSR-CRR-RPR
           OFFICIAL COURT REPORTER
           1201 BACHARACH BOULEVARD ATLANTIC CITY, NJ
           08401

3314

Colloquy

1         P R O C E E D I N G S

2        THE COURT:  You can be seated.

3        In addition to discussing this issue of

4  Dr. Morrison's testimony on the record yesterday

9 Ex A MIL 9  Humeston Trial 10-07-05

5  counsel met with the Court, we discussed it in chambers

6  for a long period of time.  I stayed here late last

7  night reviewing the transcript, rereading the

8  transcript, rereading everything else that I have been

9  given, anything I thought might be pertinent to the

10  issue, and this morning I was given about 85 pages of

11  additional information from the defendants in

12  opposition to plaintiffs' motion to strike, and I have

13  reviewed that, and, in addition, I have reviewed the --

14  although quickly skimming it really -- the deposition

15  of Dr. Gaziano.

16          All right.  At this point, counsel, do you

17  want to make your motion for relief and they can make

18  their opposition?

19          MR. BUCHANAN:  Yes, Your Honor.  The

20  arguments have been fairly well laid out orally both

21  privately and on the record earlier yesterday.  The

22  concern, Your Honor is fundamentally whether the

23  witness -- whether we had notice of what the witness

24  was going to be testifying to in these arenas.  You

25  have seen the testimony and the highlights plaintiffs

3315

Colloquy

1  have provided in that area.  He was asked specifically

2  about what studies supported his conclusions on

3  particular issues at deposition.  None of the testimony

4  · that was elicited yesterday was ever elicited in

5  response to those questions.  I'm referring

6  specifically to his deposition on December 18th, 2003,

7  Page 72, 73 where he was asked about the prostacyclin

9 Ex A MIL 9  Humeston Trial 10-07-05

8   hypothesis and whether it had been refuted or accepted.

9   He stated that it has never been confirmed, and I would

10   suggest at least with regard to VIOXX its been refuted.

11   The witness was asked what studies refuted that

12   hypothesis.  Then he went on to highlight the clinical

13   data on VIOXX, as we have gone through the entire

14   development program has never shown at least any

15   increased thrombotic risk to patients who take VIOXX,

16   the impression clearly because the witness with respect

17   to the viability of the so-called

18   prostacyclin/thromboxane hypothesis turned on at least

19   in his eyes the reflection in the clinical trial

20   results of any increased risk of cardiovascular events.

21            That's certainly not what we heard yesterday.

22   And we didn't hear in any of his prior testimony an

23   extrapolation from animal studies in bunny hearts and

24   people that there's no COX-2 in the endothelial lining

25   of humans or that, therefore, VIOXX would not be

3316

Colloquy

1   expected to have an impact on the human vasculature.

2   We provided the specific sites to Your Honor from the

3   prior transcripts.  There's also a reference from the

4   February 16th, 2005 transcript.  We highlighted

5   yesterday -- I'll highlight it again.  Page 165 and 166

6   where there was the discussion about plaque ruptures,

7   what role plaque ruptures have in the formation of a

8   thrombus.  And he basically disqualified himself as

9   somebody knowledgeable in this area and said, again, so

10   this is not my area of expertise, so I'm giving you

Page 3

9 Ex A MIL 9  Humeston Trial 10-07-05

11  sort of what I remember from cardiovascular physiology

12  from 10 years ago.

13          He then goes on later in the same page on 166

14  and, again, talking about the formation of clots via

15  prostacyclin and thromboxane he said, again, outside my

16  area of expertise.  I don't think the jury is left with

17  the impression yesterday that any of what he was

18  talking about was beyond his area of expertise, and

19  this is right in the same area that he was examined on

20  only six months ago.

21          As Your Honor is aware, too, in our

22  conversations yesterday about this matter you know both

23  as side-bar and privately we were certainly left with

24  the impression that the particular studies he was

25  testifying to there were three animal studies that he

3317

Colloquy

1  walked through from the '98 -- maybe it was '97 but

2  '98, '99 time frame prior to approval.  We were led to

3  believe that the witness actually had personal

4  knowledge about those, and that he was not testifying

5  as an expert in this litigation that this was, in fact,

6  information that he was familiar with prior to the time

7  that he came into this court.  Of course, we were

8  surprised it hadn't been elicited in prior testimony.

9  The suggestion was we hadn't asked the right questions,

10  but --

11          THE COURT:  Mary, can you take this back to

12  Chris?  Go ahead.  I'm sorry.

9 Ex A MIL 9  Humeston Trial 10-07-05

13      MR. BUCHANAN:  That's fine, Your Honor.  We

14  heard, you know, through Your Honor's voir dire, and,

15  frankly, we were surprised to hear that the studies

16  that he highlighted, you know, the first two or three

17  of those were those that were shown to him subsequent

18  to his deposition and in preparation for testimony.

19  Um, that's expert testimony, Your Honor.  There should

20  have been an expert disclosure if they intended to use

21  even somebody who may have fact testimony, but they

22  wanted to extend him as an expert, we were entitled to

23  expert disclosure as to his opinions, and, frankly,

24  entitled to probe them of that particular witness.

25  We're entitled to know what he is going to say and the

3318

Colloquy

1  pertinent issues to this case, and, frankly, given his

2  prior testimony we thought the scope of his knowledge

3  had been neatly confined to the preapproval period and

4  certainly not animal studies or mechanism of action

5  items that he expressly disclaimed knowledge of in his

6  deposition.

7      Your Honor, this is further complicated, I

8  think, by the fact that Mr. Morrison is highlighted in

9  defendant's opening statement as the face of Merck.  He

10  sat here for three weeks.  He is called as the first

11  witness.  They extend the first witness beyond his

12  scope of knowledge while on the VIOXX team to animal

13  studies.  They use him to expressly rebut an expert

14  which was improper.  They use him as an expert, period,

15  on areas that are beyond his area of expertise, and the

Page 5

9 Ex A MIL 9  Humeston Trial 10-07-05

16    prejudicial effect of it is substantial. It shouldn't
17    have happened. We tried to raise that, and I think,
18    Your Honor, plaintiffs, frankly, until the voir dire
19    were under the impression that he was, in fact, exposed
20    to these animal studies as part of his role in the
21    project team. And I think we're all surprised to learn
22    that that wasn't the case.

23          He doesn't have personal knowledge. There's
24    a 601 problem testifying as to matters that he did not
25    observe, wasn't a witness to, doesn't have personal

3319

Colloquy

1    knowledge to. Then if you want to extend that to the
2    702 issue whether he is an expert there's been no
3    disclosure of expert opinion in the case. There was no
4    opportunity to explore this with him and he has done
5    things, frankly, that are beyond what other witnesses
6    in the case who are pharmacologists have done.

7          So from a surprise perspective, Your Honor,
8    we took depositions, we probed into his areas of
9    expertise. We thought we understood what the basis of
10   his views on particular issues were. It is pretty
11   clear that his views are now different. That's a
12   surprise. It is also pretty clear that they have used
13   him as an expert in this case, which was improper
14   without an expert disclosure. Now the defendants have
15   raised one other issue, and that's that, you know this
16   is lay opinion, and this may be the proper subject of
17   lay opinion.

18          Well, you know, the classic examples of lay

9 Ex A MIL 9 Humeston Trial 10-07-05

19 opinion, Your Honor, somebody observing a speeding car,

20 well, you know, how fast do you think he was going,

21 okay, based on things that you witnessed at the time.

22 Extrapolating personal observations to an opinion based

23 on personal observations. This, Your Honor, is taking

24 information that the witness testified to he was shown

25 three months ago in preparation for today in drawing

3320

Colloquy

1 conclusions about it. He took animal studies even --

2 let's take the rabbit study because that's one I think

3 he said he was exposed to in 2000 or 2001. What he did

4 yesterday was he extrapolated expressly or impliedly

5 the conclusions of that to humans. He said that that

6 rabbit study shows an absence of COX-2 in normal

7 endothelium, and there may be some in dysfunctional

8 endothelium or endothelium that's got atherosclerosis.

9 But, in fact, when you put VIOXX in the test tubes with

10 this endothelium you don't see a result, you don't see

11 an effect. So from that we know VIOXX doesn't affect

12 prostacyclin in the endothelium. Then if you remember

13 at the conclusion of the morning he got up on the board

14 and he said, okay, so we're going to look at other

15 organ systems where this prostacyclin metabolite in the

16 urine must have been from, okay. He extrapolated from

17 the rabbit study to humans to go through, and let's

18 rule out where else it is coming from.

19          Remember he had the lung, he had, I think, it

20 was the uterus or the ovaries. He had some other organ

21 systems on the board that he was going to go to, next I

Page 7

9 Ex A MIL 9  Humeston Trial 10-07-05

22    assume, after lunch, but he plainly extrapolated from

23    an animal study that he was exposed to in 2000 or 2001

24    to what Merck's next steps were in this process.  He is

25    telling the story of what Merck did when he wasn't

3321

Colloquy

1    involved in it.  That's not lay opinion.  It is not

2    proper.  It is expert testimony.  It should have been

3    in a disclosure, and his testimony should be stricken,

4    Your Honor.

5            Thank you.

6            MR. RABER:  Good morning, Your Honor, I don't

7    want to repeat everything we said yesterday or

8    everything that's in our brief, and I don't intend to

9    do that.  I want to address a couple of things that

10    Mr. Buchanan has said, however.

11            On the notice question Mr. Buchanan pulled

12    out Pages 73 and 74 from the December 18th, 2003

13    deposition and said that the witness was asked -- let

14    me make sure I get this right, he was asked

15    specifically about studies that supported the view that

16    the prostacyclin in the endothelium doesn't come from

17    COX-1, and I would like to look at what the transcript

18    actually says because the right questions were clearly

19    not asked.

20            On Page 73 this is the page Mr. Buchanan was

21    referring to, the question is, Has that hypothesis ever

22    been confirmed or refuted.  It has never been

23    confirmed, and I would suggest that at least with

24    regards to VIOXX it's been refuted.  Question, what

Page 8

9 Ex A MIL 9  Humeston Trial 10-07-05
25   studies have refuted that hypothesis?  Answer, all of

                                                    3322
                              Colloquy
1    the data.   If you combine all of the studies that have
2    ever been done with VIOXX, and he goes on and answers
3    the question that way.  Here is what's interesting.
4    Here's what's interesting on the next page.  On Page
5    74.  He said, So I would say the hypothesis that was
6    put in place at least with regards to partial
7    inhibition of prostacyclin has been refuted.  Then the
8    question is, To your knowledge has Merck designed or
9    begun conducting a study to test that hypothesis
10   specifically.  Your Honor, that's the right question.
11   That's the right question, but look what happens.  We
12   have an objection to form.  The witness says, Maybe you
13   can ask that question again, and the questioner gives
14   up.  Let me ask it a different way.  I'm kind of
15   jumping ahead, and he goes on and he never asks the
16   question.  He never asks the question that he started
17   to ask there.  And the witness clearly does not have an
18   obligation in a deposition to volunteer information.
19   He goes on and he says, Let me do it this way, and he
20   puts in front of him an exhibit, and it is Exhibit
21   Number 5, and he starts talking about something called
22   the pink sheet, changes the subject and moves on.
23          So I don't think the description of what
24   happened at that deposition is in accord with what's
25   actually in the transcript.

                         Page 9

9 Ex A MIL 9  Humeston Trial 10-07-05

3323
Colloquy

1        The second thing we have is this suggestion
2    that no pharmacologist could testify that as to what
3    Dr. Morrison said yesterday and that they were hearing
4    it for the first time in the trial and that they were
5    surprised.  Well, on April 1st of 2005 we deposed
6    Dr. Alan Nies, and there's no dispute that Alan Nies is
7    a pharmacologist.  He was the head of pharmacology at
8    the University of Colorado Medical School for several
9    years before he came to Merck.  He wrote sections of
10   the textbook on pharmacology that medical students like
11   Dr. Morrison studied, and Dr. Morrison, as he said
12   yesterday, learned pharmacology from Alan Nies in his
13   job.

14        Dr. Nies was asked Page 429 to 431 whether
15   Merck ever sponsored or supported any studies that were
16   along the lines of those suggested by FitzGerald, Oates
17   and Patrono he says, Well, Merck did studies.  There's
18   a lab in Montreal that was equipped to do the types of
19   measurements.  He said Merck did studies in animal
20   models in that laboratory and those were actually
21   ongoing at this time, meaning 1998, 1999.  How are
22   those studies similar or different?  He goes on to say
23   that we were trying to directly look at the blood
24   vessel to see whether the lining of the blood vessel,
25   the endothelium it is called, was the source of

3324
Colloquy
1    prostacyclin that was made by COX-2.  That's -- and he
Page 10

9 Ex A MIL 9  Humeston Trial 10-07-05

2    says in animals you can actually get those blood

3    vessels and look at them directly.  He is talking about

4    the rabbit study there.  What those animal studies

5    show.  Witness says, In normal animals the major

6    source, if not the only source, of prostacyclin in the

7    endothelium is from COX-1 that was not touched by

8    VIOXX.

9              I submit, Your Honor, that is almost

10   identical to what Dr. Morrison said when he was

11   describing the results of the rabbit study.  Granted,

12   there was a question that said a hypothetical that

13   said, well, if there was a plaque rupture what effect

14   would prostacyclin -- how would prostacyclin or how

15   would VIOXX affect that, and he said there would be no

16   effect.

17             But I'll note that there was no objection to

18   that question at the time it was made, and so we're

19   faced with a situation where -- excuse me, we're in a

20   prejudicial spot, Your Honor, where having no objection

21   to that question, the jury goes home, we revisit the

22   issue, and we have gone out on this limb and to have

23   the limb cut off behind us would be extremely

24   prejudicial.

25             I would also note that when I asked to put up

3325
                            Colloquy

1    the specific rabbit slide I said are those results

2    summarized anywhere in Defense Exhibit 316?  That is

3    the rabbit study, and the chart that we looked at.  I

                            Page 11

9 Ex A MIL 9  Humeston Trial 10-07-05

4   said, Any objection to putting this on the Elmo?  I'm

5   sorry which document are you talking about?  Exhibit

6   316.  Then he says, Well, Your Honor, I have the same

7   objection to the extent it is with this witness, but,

8   you know, I'm not sure that gets resolved by putting it

9   up on the Elmo.  This study he is at least involved

10  with.  This one he isn't -- he can talk about it.

11  Defense counsel -- or plaintiffs' counsel said he can

12  talk about it.  So we put it up on the slide.  Your

13  Honor said, Is this a VIOXX study?  Yes.  I'll allow it

14  by Merck.

15          So, Your Honor, it would be extremely

16  prejudicial under these circumstances to after these

17  questions have been asked after plaintiffs' counsel has

18  said it is okay to talk about it, after it has been

19  ruled that we can talk about it to then let

20  Dr. Morrison and me walk out to the end of that limb

21  and have it sawed off behind us, and I fear that the

22  prejudicial impact would be great to us, and that there

23  clearly is no surprise.  Dr. Morrison was asked

24  questions about these issues, but there was no specific

25  follow-up to say, well, tell me about the animal

3326

Colloquy

1   studies or tell me what specific studies you're talking

2   about.  If there's any foundation question about

3   Dr. Morrison we can clearly cure that with other

4   witnesses, Dr. Gertz, for example, whose name is on all

5   those memos, who can establish that that information

6   was known to the VIOXX project team when those memos

9 Ex A MIL 9  Humeston Trial 10-07-05

7   were done in 1998 and 1999.

8           And, finally, to the extent there's any

9   question, any question about Dr. Morrison's

10   qualifications to talk about pharmacology I think he

11   pointed out very clearly yesterday what his role is and

12   working for a pharmaceutical company that's what you

13   do, you do pharmacology.  And I would also note that

14   Dr. Morrison has a patent for a COX-2 inhibitor to

15   treat prostate cancer, and that patent clearly involves

16   and relies on the pharmacology of a COX-2 inhibitor.

17           So I think this notion that Dr. Morrison is

18   not qualified or has no knowledge of pharmacology,

19   again, is not supported by the records.  And as he

20   pointed out he did see the rabbit study

21   contemporaneously, and with regard to the other three

22   studies he said he did not see the data when it came

23   out but that he had communications and conversations

24   with the project team members at that time and knew

25   about those results.

3327

Colloquy

1           So for all those reasons, Your Honor, we

2   believe that his testimony is not expert testimony.  It

3   is permissible fact testimony about what Merck did and

4   what the information told Merck.  It comes in under

5   Rule 701 as an opinion from somebody who has personal

6   knowledge based on either conversations or looking at

7   the data, and the other side clearly had notice of this

8   issue, and it would be extremely prejudicial to

Page 13

9 Ex A MIL 9  Humeston Trial 10-07-05

9   instruct the jury in any manner to disregard any

10  portion of his testimony.

11        MR. BUCHANAN:  Your Honor, just a couple more

12  points.  Specifically, turning back to the December 18,

13  2003 transcript of Dr. Morrison the question that was

14  asked was, Has the hypothesis, the

15  prostacyclin/thromboxane hypothesis ever been confirmed

16  or refuted?  He said, It has never been confirmed, and

17  I would suggest at least with regard to VIOXX it has

18  been refuted.  He then noted what studies have refuted

19  that hypothesis, and he said, All of the data.  If you

20  combine all the studies that have ever been done with

21  VIOXX which from biochemical studies we had done, okay,

22  biochemical and then he continues to talk about

23  clinical data.  Not an animal study referenced in that

24  answer.

25        Counsel is criticizing a lack of follow-up.

3328

Colloquy

1   There's no reference to animal studies.  That's what he

2   is saying refutes it.  That's what he testified to

3   yesterday, that there's nothing in the blood -- there's

4   no COX-2 in the endothelium.  Now, look, if they want

5   to call Dr. Nies, if they want to play his videotape

6   deposition testimony that's all fine, okay, it really

7   comes down to this particular witness, what his scope

8   of knowledge is, whether he had that scope of knowledge

9   from at the time, okay, not two months ago getting

10  ready for today, okay, what was in his wheel house of

11  information getting ready as an employee of Merck, not

Page 14

9 Ex A MIL 9  Humeston Trial 10-07-05

12    as a corporate representative who they want to walk

13    through the whole VIOXX story.  And that's precisely

14    what they did yesterday, and it was improper.

15            And I want to highlight the comment by

16    counsel that an absence of an objection and because of

17    that now they're on a limb getting ready to be sawed

18    off.  We were all under the impression that this was

19    based on his experience in the project team in '98 and

20    '99.  We raised those objections early on.  They were

21    highlighted on several occasions.  The Court was

22    assured by representations implicitly that that was the

23    case, and it wasn't the case.  We learned that on voir

24    dire at 4:00 yesterday.  We didn't learn that in

25    chambers when we spoke for an hour and a half yesterday

3329

Colloquy

1    about it.  We learned it here from the witness.

2            I'm sure that defense counsel was aware of

3    that when the questions were being asked.  We weren't

4    aware of that, and Your Honor wasn't aware of that, and

5    now they want to use that as a basis to permit improper

6    testimony to go to the jury.  That's not the right

7    result.  It is prejudicial.  It absolutely is

8    prejudicial.  They're the only ones who knew the

9    circumstances through which he had the information he

10    did.  They exploited it on the stand with an absence of

11    knowledge on our part and Your Honor's part, and they

12    shouldn't be entitled to benefit from it now because

13    the questions have been asked and answered.

Page 15

9 Ex A MIL 9  Humeston Trial 10-07-05

14    There's one other point, I think, Your Honor.

15  The extrapolation that Dr. Morrison did yesterday from

16  particular animal studies that he may have been aware

17  of to humans, okay, and the ticking through the

18  different organ systems as they were ruling things out

19  as they were doing that there's no testimony he was

20  involved in that process at Merck for these particular

21  trials.  That's information based on studies and now he

22  is telling the story.  That is expert testimony.  It is

23  summary testimony from a witness who wasn't involved in

24  that tick list at the time.  He couldn't have been.  He

25  was off the project team at that point in time, and he

3330

Colloquy

1  was using studies that he was just shown for the first

2  time two, three months ago.  That is expert testimony,

3  not lay opinion testimony and not fact testimony.  It

4  is expert testimony, and it needed to be disclosed.

5  This isn't the right witness for it.  It should be

6  stricken.

7         MR. RABER:  Two things, Your Honor.  He did

8  have personal knowledge.  He told you although he was

9  not on the VIOXX project team after the drug was

10  approved he continued working on another COX-2

11  inhibitor and kept abreast of what was going on with

12  VIOXX, and in that context learned about and reviewed

13  the rabbit study in either 2000 or 2001.

14         And as to extrapolation to humans, you know,

15  I suppose they could infer that they could cover that

16  on cross-examination, but I did not ask him anything

Page 16

9 Ex A MIL 9  Humeston Trial 10-07-05

17  about humans.  I have gone back and looked at the

18  transcript.  It doesn't talk about humans.  It is clear

19  in the transcript he is talking about the rabbit study,

20  what the rabbit study showed, the dog study, what the

21  dog study showed.  And, you know, again, I would just

22  point out that their entire expert testimony on this

23  issue from Dr. Lucchesi comes from a doctor who has

24  never been licensed to treat any patient, any human

25  being in the world ever, and all of his studies are in

3331

Colloquy

1  dogs, so I don't understand this talk about how you can

2  object to using data from animal studies for

3  mechanistic purposes when their only expert relies

4  entirely on animal data.  They can use animal data, we

5  can't.  That doesn't make sense to me, Your Honor.

6         MR. BUCHANAN:  Your Honor, just one point.

7  I'm sorry to keep doing this, but, first of all, the

8  issue isn't Dr. Lucchesi.  He served expert reports.

9  They were offered depositions of Dr. Lucchesi on his

10  expert opinions, okay?  They had the opportunity to

11  discover what the bases were, whether they disagree

12  with them or not, they had the opportunity to explore

13  his extrapolation from animal studies to humans, okay,

14  so let's just take that off the table.

15         But the one thing that does highlight it is

16  expert testimony.  That's exactly what that highlights.

17  That testimony came in in plaintiffs' case through an

18  expert.  Here it is coming in through, quote, "a fact

Page 17

9 Ex A MIL 9  Humeston Trial 10-07-05

19  witness" which isn't proper, and I want to note, Your

20  Honor, they say he got this information through his

21  involvement on another project team in 2000, 2001.  I

22  don't think it was until April or May of this year that

23  we even got documents on another COX-2.  There was a

24  motion for a protective order, a motion to compel that

25  was filed in the summer of 2004 relating to other Merck

3332

Colloquy

1  drugs.  If we had inquired as to, well, what did you

2  learn in the other project teams in February of 2005

3  would we have gotten those answers?  It wasn't until

4  April of this year that any Arcoxia information was

5  produced.  I don't know if that's the other -- I do

6  remember he testified it was, but now we're charged

7  with not having asked questions about a subject matter

8  that was foreclosed at the time of his deposition.

9  That's not proper either.

10          MR. RABER:  Your Honor, that's just not a

11  fair characterization.

12          MR. BUCHANAN:  It is.

13          MR. RABER:  I have a Bates stamped document

14  that was produced two years ago that the subject is

15  Rabbit Aorta Prostacyclin Study dated March 16th, 1999

16  circulated to the VIOXX project team.  This document

17  was given to them in discovery more than a year ago, so

18  the idea that they say they didn't have this stuff

19  that's just not true.  It is just not true.  They had

20  it.  These documents have been on our exhibit list from

21  day one.  They have had this information.  They just

Page 18

9 Ex A MIL 9  Humeston Trial 10-07-05

22    didn't ask him the right questions about it.

23         MR. BUCHANAN:  Your Honor, the issue is not

24    the document.  Nobody takes issue with what is in the

25    medical literature.  It is his use of the document as a

3333

Colloquy

1    person who, frankly, shouldn't be using it as a

2    nonexpert extrapolating from it and telling the jury

3    what it means.

4         I mean, I appreciate counsel's statement that

5    they didn't elicit a specific question to suggest that

6    it was humans you could extrapolate to, but, come on,

7    if the word "human" didn't appear in that testimony we

8    all knew what we were talking about.  He extrapolated

9    to it, and he went through all the organ systems, we

10   could rule out the endothelium.  We could rule out

11   there's COX-2 in the rabbit's endothelium, what was the

12   next testimony?  Talking about lungs were we ruling out

13   there was COX-2 in the rabbit's lungs is the next

14   question?  They were talking about people.  It is not

15   really -- it is not really consistent with the

16   testimony to suggest that Dr. Morrison wasn't trying to

17   get the jury to infer that those rabbit findings

18   directly applied to human endothelium, which is expert

19   testimony.

20         THE COURT:  Do you have the Lucchesi -- I

21   couldn't find where you gave the documents to Lucchesi.

22   Do you have that?

23         MR. RABER:  I have some of that.  I don't

24   have -- I couldn't find in the record the listing of

Page 19

25   the various documents, but --

3334
Colloquy
1              THE COURT:  I just want to know if you saw
2    it.
3              MR. RABER:  Yes, but I do have where he did
4    testify a little bit about some of the studies.
5              THE COURT:  The dog studies.
6              MR. RABER:  Mr. Seeger said, I have a
7    handful of these, I'm not going to ask you about all of
8    them, I want to ask you about a couple of them.  That's
9    what the transcript says.  I have got it right here.
10             THE COURT:  I saw that.
11             MR. SEEGER:  We're not disputing --
12             THE COURT:  Yesterday you were saying I gave
13   him this and gave the number, but I didn't see it in
14   the record, but that doesn't mean it didn't happen,
15   okay.
16             MR. SEEGER:  It wasn't handed to me.  I'm not
17   disputing it is on the rabbit study.  It was not one of
18   the studies I was given.
19             MR. RABER:  I would dispute that.
20             MR. SEEGER:  I'm not going to argue about
21   that, but it was the dog studies, and if you remember
22   Dr. Lucchesi's testimony I handed him the stack and he
23   said all of these, A, don't involve VIOXX and, B, don't
24   test for thrombosis, and I had him go through the
25   studies.  Those were the ones I was given, but, again,

9 Ex A MIL 9  Humeston Trial 10-07-05

3335

Colloquy

1   I'm not disputing it was on the exhibit list.  Can I
2   just say one brief statement because to the extent we
3   have a courtroom full of people and counsel continues
4   to refer to Dr. Lucchesi as somebody who never treated
5   patients, he is a man who has received 38 years of
6   continuous funding from the United States government,
7   spent 10 years as a merit award winner, I think he
8   earned his stripes in pharmacology and doesn't deserve
9   to be torn down.
10          THE COURT:  This case was filed in 2003, and
11   we have spent -- I have spent a lot of time since then
12   with the attorneys for defense and the attorneys for
13   the plaintiffs.  We have had monthly meetings with you.
14   We have gone through all of the discovery, and we spent
15   all that time up until the day of the trial because the
16   purpose of this trial was to make sure that we had a
17   fair trial under the New Jersey standards.  And the New
18   Jersey standards -- and it is not the same in every
19   state.  Some states allow a lot more than we do as far
20   as surprise, but in New Jersey everything is supposed
21   to be disclosed.  You have to identify your expert
22   witnesses.  You have to identify their reports.  You
23   have to say what they're going to testify to.  They're
24   deposed on their reports.  The other side has the
25   opportunity to hire other experts to counter expert

3336

Colloquy

1   reports.  There's very specific rules that are designed

Page 21

9 Ex A MIL 9  Humeston Trial 10-07-05

2   for one purpose and one purpose only, and that is so

3   that everybody knows what everybody else is going to be

4   able to produce at trial, and there's no question that

5   that's basic.

6          In this case we have Dr. Morrison coming on

7   as the first witness.  And I have looked at the

8   information that was provided today by counsel.

9   Yesterday on the record counsel acknowledged that

10  there were -- plaintiffs' counsel said there was really

11  no expert that could address this issue.  Defense

12  counsel on the record said that they agreed that none

13  of their nine experts mentioned this issue.  This

14  morning they have shown me where one of their experts

15  did, in fact, refer to it, referred to an article about

16  it.  And that's in the volumes of stuff I got.

17         And in the millions of documents that were

18  produced these animal studies were produced along with

19  those other documents, and they were included on the

20  exhibit list with hundreds of other exhibits.  It has

21  been consistently through the case Dr. Scolnick

22  testified, plaintiffs played different people's

23  testimony, that there was a FitzGerald hypothesis, and

24  the plaintiffs and Dr. Lucchesi and their experts one

25  after another have basically said that that hypothesis

3337

Colloquy

1   came to fulfillment, and they have based their entire

2   case on that.

3          The defense has taken the position, it

4   appears to me, through everything I have seen over the

Page 22

9 Ex A MIL 9  Humeston Trial 10-07-05
5  last year and a half, that it is just a hypothesis,

6  nothing is confirmed, that it was possible but not

7  necessarily -- it wasn't proven.  It was proven -- some

8  things prove it, some things don't prove it, and they

9  can't prove that this hypothesis is true.

10        Yesterday Dr. Morrison took the stand, and it

11  was never represented at any time that he was an expert

12  witness, and, in fact, counsel for the defense

13  repeatedly told me he wasn't an expert witness.  He was

14  a fact witness.  He was the project manager for VIOXX

15  up until 1999.  He was to testify about what Merck knew

16  and didn't know about the risks of VIOXX.  He was going

17  to testify about the e-mail that he wrote and what he

18  meant by it and what he said.  And, certainly, he had

19  the right to do those things.

20        But what he did was go way beyond that, and,

21  quite frankly, I felt sick yesterday afternoon, and I

22  felt sick last night when I looked over the transcript

23  and I talked about this with counsel, and I realized

24  how I had gotten sucked into this because my job as a

25  judge is to make sure that there's a fair field here.


3338
Colloquy

1  That's all I have to do.  I have to make sure that the

2  right evidence gets in and the witnesses that are

3  called to testify within the realm of evidence and

4  within the realm of what's fair under the Court rules,

5  and I feel that I was mislead repeatedly yesterday

6  during that testimony.  And because I was mislead

7  repeatedly I allowed in things that never should have
Page 23

9 Ex A MIL 9  Humeston Trial 10-07-05

8  come in, and that really makes me -- it doesn't even

9  make me angry, it makes me sad.

10        A case where everybody supposedly wanted to

11  try this case on the science, everybody wanted to get

12  here and try this case on the facts.  Nobody, you know,

13  please, Judge, don't let in any evidence that shouldn't

14  come in, and I have been very scrupulous in trying to

15  keep out evidence that both sides wanted in, and I have

16  ruled on both sides.  I have kept out lots of things

17  that the plaintiffs wanted in, lots of things that the

18  defense wanted in that I thought weren't focused and

19  weren't on the evidence and weren't proper under the

20  rules for various reasons.  It is not a free for all.

21  You don't get to just throw in anything you want into

22  the pot.  You have to have given notice to the other

23  side, and you have to have informed the Court and your

24  adversary of what you're doing.

25        In the case of Summit Trust versus Baxt,


3339

Colloquy

1  B-A-X-T, the Supreme Court states that the mandate of

2  New Jersey court rules is that fair dealing with

3  opposing parties is an absolute requirement even in an

4  adversary system.  There has to be fair dealing.  There

5  has to be fair representations.  I have to rely on the

6  attorneys who make representations to me that they're

7  officers of the Court, that they're making true

8  representations, that they're letting me know what the

9  facts are, and that I'm making my rulings based on what

Page 24

9 Ex A MIL 9   Humeston Trial 10-07-05

10    they say to me.

11          So what happened in this case?   Mr. Morrison

12    gets called as defense's first witness.  Before he gets

13    called defendants have allowed him to be deposed.

14    Plaintiffs have taken his deposition.   In his

15    deposition, which I had not read in its entirety, he

16    had said repeatedly that he was not qualified as an

17    expert in pharmacology, that his -- that his physiology

18    training was 10 years old -- was from back when he was

19    in school basically was what he was saying, 10 years

20    ago.  He said that he wasn't qualified to give opinions

21    on things like these studies, and he talked about the

22    hypothesis, and as far as I'm concerned he was

23    specifically asked what he knew about that hypothesis,

24    what he knew about studies that didn't -- and, you

25    know, when you try to argue to me, counsel, that at one

3340

Colloquy

1    point he says all the data, well, when he took his dep

2    he didn't know about all the data.  He didn't know

3    about all the data because he had never even seen the

4    animal studies he testified to yesterday, and there was

5    no way I had a hint of that until after the jury was

6    sent home.

7          As a matter of fact, in the transcript

8    yesterday as soon as he started testifying Mr. Seeger

9    objected.  Well, you know, a lot of times attorneys

10    object for a lot of reasons, so he comes over to the

11    bench, and I'm like what are you objecting to and he

12    says, I expect this witness to testify on documents.  I

9 Ex A MIL 9  Humeston Trial 10-07-05

13    don't expect him to come in here and try to pass

14    himself off as a pharmacological expert.  They have

15    their expert witnesses.  He should limit his testimony.

16    Mr. Raber responds, He is here to testify as to what he

17    thought at the time.  Why he wrote what he did and what

18    we're talking about why he wrote what he did in the

19    nineties.  The e-mail that he wrote in the nineties.

20    He is here to testify as to what he thought at the

21    time.

22          Well, that's certainly appropriate testimony,

23    so I basically told Mr. Seeger that I wasn't going to

24    let him use the pharmacological book because he wasn't

25    an expert, so he couldn't lecture on pharmacology but

3341
Colloquy
1     that he could answer questions.

2           And Mr. Raber goes on in the next page he

3     needs to be able to testify as to what was in his mind

4     when he was writing the e-mail.  He has to say what he

5     meant.  He has to testify as to what he meant and what

6     was in his mind.  Okay.  So now I'm assuming that his

7     testimony is based on what he knew in the nineties and

8     what he was thinking in those -- at that time.  And

9     that is certainly relevant testimony, and it is

10    important testimony.

11          Then again later in the deposition he is

12    asked about studies, and Mr. Seeger says he doesn't do

13    these type of studies, he wasn't involved with that

14    Page 29.  This is the other transcript.  He wasn't

15    involved with that.  And Mr. Raber says to the witness,
Page 26

9 Ex A MIL 9  Humeston Trial 10-07-05

16    Do you have personal knowledge of the protocols that

17    were done at Merck such as bleeding time, and he says,

18    I have personal knowledge.  I have reviewed all of that

19    data as I gave talks about it at Merck.

20           And then Mr. Seeger says he shouldn't be

21    allowed to give an expert opinion, and Mr. Raber says

22    I'm not asking for an expert opinion, he is just being

23    called as a fact witness to testify to the facts of

24    what Merck was considering, what it knew, what it did

25    and didn't do.

3342

Colloquy

1           And then later he is asked a question which

2    seems like an innocuous question, it is not objected

3    to.  You say, without COX-1 inhibition you'll get more

4    thrombotic event and kill the drug, what are you

5    referring to there?  And then he starts on a long

6    answer, and as part of that answer he says -- he goes

7    on to talk about the studies and the -- and he says

8    there's no pharmacological reason why VIOXX would cause

9    this.  Later he talks about there's a number of things

10   that led me to believe what I said when I wrote the

11   e-mail.  He starts criticizing what Dr. Lucchesi said.

12   And then he goes on basically to describe the studies,

13   animal studies and the rabbit study and in great detail

14   with charts and diagrams and drawings to explain to the

15   jury not only that this was only a hypothesis, but that

16   it has been absolutely proven false what the plaintiffs

17   have tried to prove and that everything that they had

18   testified to in their case is untrue based on my review

Page 27

9 Ex A MIL 9  Humeston Trial 10-07-05

19   of these animal studies, the dog and rabbit studies.
20   He basically says nothing Lucchesi said is accurate, he
21   was wrong, dead wrong, and he was wrong because there
22   is no COX-2 in the endothelium.  There is no -- or
23   COX-2 isn't responsible for prostacyclin being produced
24   in the endothelium, and, as a matter of fact, he says
25   repeatedly there's no COX-2 machinery in the blood

3343

Colloquy

1   vessels.
2           And that strikes at the very heart of
3   plaintiffs' case.  It is critical information which is
4   brought which if brought out by the proper expert with
5   proper notice might be perfectly appropriate but was
6   certainly not appropriate with this witness, unless he
7   was talking about what he knew at the time and what his
8   thoughts were at the time.  And, again, on Page 74 when
9   we're nearing the end Mr. Seeger is objecting again, He
10   is not an expert in this field, judge, using this
11   article wouldn't be appropriate.  This is proper to
12   show what Merck did in response to the FitzGerald
13   theory, what they considered.  It explains their
14   conduct, Mr. Raber said to me.
15           Mr. Seeger again later they're trying to do
16   stuff with him that they can't do with an expert and
17   that's what the problem is.  And then we get to the
18   objection, and I think at this point we're actually
19   talking about the rabbit study, and he says, Mr. Seeger
20   says, You need to have an expert.  I can cross his

Page 28

9 EX A MIL 9  Humeston Trial 10-07-05

21  expert, but what am I going to do with him?  And Mr.

22  Raber says, This is something he looked at.  This is

23  what he did.

24          And then he was asked did Merck do any tests

25  in animals, yes.  And then he asks him, And what

3344
Colloquy

1  questions were you trying to answer about the urine

2  cup.  We were trying to figure out -- he says, We were

3  trying to figure out, now I find out he wasn't involved

4  in the studies at all, didn't do them and not only

5  didn't do them, which was really revealed during his

6  testimony, but he didn't even see them.  He had never

7  seen them in the 1990's.  He had never seen them until

8  2005 for most of them.  And for the one study he had

9  seen it when he was working on something other than

10  VIOXX.  He was the project manager for VIOXX, and these

11  animal studies were never shown to him, and these

12  animal studies were never shown to him, none of them

13  were shown while he was the project manager.

14          And I understand counsel for defense has said

15  today, Oh, he was told about them, he had conversations

16  about them.  Well, I asked the witness about that.  I

17  asked him did you ever see any documents, how were you

18  told about the studies, did you get memos about them.

19  I mean, I didn't ask him just did you see the raw data.

20  I asked him did you see the data, did you see the

21  studies, did you get anything, how did you get it.

22  Well, I had some conversations with some people who

23  told me they were doing some kind of animal studies,

Page 29

9 Ex A MIL 9   Humeston Trial 10-07-05

24   and that's a heck of a lot different than him saying he

25   knew what it was.


                                                    3345
                            Colloquy

1          The impression he gave -- not the impression,

2    his statements yesterday confirmed that he really had

3    never looked at these animal studies until right before

4    the trial.  And the rabbit study was something he had

5    never looked at until after he was sent over to do a

6    different COX, so it has nothing to do with what the

7    VIOXX team knew or didn't know when they were working

8    on VIOXX.

9          Did Merck do animal studies to try to answer

10   this question?  Yes, and then he goes through each of

11   the studies.  And, again, Mr. Seeger objects.  Your

12   Honor, could he just establish that he had involvement

13   in it and I allow him to testify because I believe him

14   that he has involvement at least to the degree that if

15   he is not doing the study, which I knew he didn't do at

16   least I assume he is talking about it and has memos on

17   it and has been discussing it and has the study itself

18   and has looked at it because if this is the key study

19   that proves that VIOXX is safe wouldn't you think the

20   VIOXX project team wouldn't have known about it?  I

21   mean, he testified he didn't see it.

22         I mean, I think it was a reasonable

23   assumption for me to assume, and I don't think it was

24   just an assumption, I think I was told repeatedly that

25   he was involved.  And, again, when Mr. Seeger later

                          Page 30

9 EX A MIL 9  Humeston Trial 10-07-05

3346

Colloquy

1   says we need some foundation, I need to know what he

2   knows about this.  Mr. Raber says, Your Honor, this

3   witness is a co-author on the paper, he is a co-author

4   on the FitzGerald paper, he is talking about the study

5   Merck did to answer the questions that were raised.

6   What more foundation do we need?  And, again, that

7   leads me to believe he is talking about what he knew as

8   a fact witness at that time.

9        Repeatedly in this transcript Mr. Raber says

10  he is not an expert, we're not calling him as an

11  expert, he is a fact witness.  And his ultimate opinion

12  that there's no way that VIOXX can affect this blood

13  vessel because it doesn't even have COX-2 machinery

14  appears to be far beyond anything that any expert has

15  said or any other witness has said, and I understand

16  that counsel has other quotes in here and I have read

17  them from people who -- from Nies or Nies and from

18  Gertz, but none of them have the strong language that

19  he has, the guy who didn't even see these studies.  And

20  then Mr. Raber says to him after he is done talking

21  about all these studies, Okay, and when did the

22  scientists at Merck actually have this data.  Early in

23  1999.  Well, I guess some scientists in Merck had the

24  data in early 1999, but Dr. Morrison didn't.  Dr.

25  Morrison hadn't seen any of that data in 1999.  This

9 Ex A MIL 9  Humeston Trial 10-07-05
3347
Colloquy

1    question certainly suggests to the jury that he had.

2           It certainly suggests to the jury that the

3    scientists at Merck working on VIOXX of which he was

4    the project manager knew about this, and, yet,

5    afterwards he admits to me, and, candidly, and I don't

6    really fault Dr. Morrison, he was shown these studies

7    and asked to testify to them.  But to try to present to

8    the jury the idea that these were known to him in 1999

9    or at least -- and that's what the implication is in

10   the testimony, and that's what the implication was to

11   me, and that's why it was allowed to go to the jury

12   because it was supposed to be what Merck factually knew

13   or didn't know at the time, and what it really was was

14   expert testimony elicited after the fact by someone who

15   was never named as an expert whose testimony was never

16   provided.

17          His testimony differs very substantially from

18   his deposition.  Referring to the Supreme Court case

19   2001 of Gerald McKenny versus Jersey City Medical

20   Center in this case a witness a defense counsel found

21   out a witness was going to change her testimony and say

22   something different than she said in deposition.  The

23   Supreme Court of our state stated as recently as 2001,

24   A party has a continuing duty to disclose the opinions

25   of its experts.  Where an attorney knows his client or

3348

Colloquy

1    a material witness, which this certainly is, intends to

Page 32

9 Ex A MIL 9  Humeston Trial 10-07-05

2  deviate from his deposition testimony in a crucial way,

3  which this certainly was, the attorney has an ethical

4  obligation to convey that fact to his adversary.  New

5  Jersey's procedures for discovery are designed to

6  eliminate surprise at trial requiring a litigant to

7  disclose the fact upon which a cause of action or

8  defense is based.  The search for truth is paramount.

9  The outcome of litigation should depend on the merit --

10  on its merits in light of all the available facts, not

11  on the craftiness of the parties or the guideline of

12  their counsel.  An attorney is under a duty to apprise

13  his adversary where he obtains information upon the

14  basis of which he knows that his witness' prior dep was

15  incorrect or while it was correct will no longer be

16  true, and certainly where it is going to -- and it

17  basically talks about differing from what they were

18  going to say before.

19         I have considered the case law, I have

20  considered the transcript.  I have talked to counsel

21  for hours.  I have considered the new submissions, and

22  it is my ruling that the entire testimony of

23  Dr. Morrison will be stricken from the record, that the

24  jury will be advised that they cannot consider any of

25  his opinions and we'll proceed.  If you want to call

3349

Colloquy

1  Dr. Morrison as a witness you're going to have to play

2  his deposition.  That's the only way you'll be able to

3  present his testimony as it existed before he was shown

4  things and reviewed studies that he had never reviewed

Page 33

9 Ex A MIL 9  Humeston Trial 10-07-05

5  before this case started.  The only way to be fair to

6  try to figure out how to do this I was going to

7  consider having you start over and call him back to the

8  stand.  That won't work.  You can't do that now based

9  on what's happened.  The only way you could present

10  Morrison's testimony is to produce his video

11  deposition.  If you want to play his deposition for the

12  jury then they can see every single thing that was his

13  opinion before this trial started, and that's fair.

14  They can see what defense counsel and what plaintiffs'

15  counsel knew he was going to say before he came to

16  court, which is fair.

17          what he won't be allowed to say is a bunch of

18  additional things that were not revealed to counsel,

19  that are outside the scope of his testimony, so you

20  have a choice at this point that Dr. Morrison is not

21  going to testify in this case again except by his

22  videotape.

23          So you have two choices, counselor.  You

24  either call Dr. Morrison by videotape now or you call

25  your next witness, and I'm going to take a short break

3350

Colloquy

1  so you can decide.

2          MR. RABER:  May I be  heard?

3          MS. SULLIVAN:  we would like to make a

4  record, your Honor.

5          THE COURT:  No, you may not.

6          MS. SULLIVAN:  Your Honor, we need to make a

7  record.

Page 34

9 Ex A MIL 9  Humeston Trial 10-07-05

8          THE COURT:  No, counselor, you don't need to

9  make a record.

10          MS. SULLIVAN:  Yeah, we do, Your Honor.

11          THE COURT:  You made a record for hours.

12  Counsel, you talk before I speak not after.

13          MS. SULLIVAN:  Your Honor, you have permitted

14  them to testify.

15          THE COURT:  You talk before I speak, not

16  after.

17          MS. SULLIVAN:  You have allowed plaintiffs'

18  experts to talk about things over our objection beyond

19  the scope of their expert report.  Dr. DePace talked

20  about the prostacyclin/thromboxane hypothesis --

21          THE COURT:  Miss Sullivan, Miss Sullivan --

22          MS. SULLIVAN:  -- over our objection, even

23  though it is outside the scope of his expert report.

24          THE COURT:  Miss Sullivan, sit down and be

25  quiet.

3351

Colloquy

1          MS. SULLIVAN:  Your Honor, you talk about --

2          THE COURT:  Miss Sullivan, sit down.

3          MS. SULLIVAN:  -- fairness and fair hearing.

4  What is going on here is not fair, and it is not right.

5          THE COURT:  Miss Sullivan, sit down.

6          MS. SULLIVAN:  You talk about Dr. Kronmal as

7  an expert --

8          THE COURT:  Miss Sullivan, sit down.

9          MS. SULLIVAN:  Dr. Kronmal talked --

9 Ex A MIL 9  Humeston Trial 10-07-05

10        THE COURT:  Sit down.

11        MS. SULLIVAN:  -- about opinions way beyond

12   the scope of his report --

13        THE COURT:  Miss Sullivan, sit down or I will

14   have you taken out of the courtroom.

15        MS. SULLIVAN:  -- over objections.

16        THE COURT:  Sit down.  Miss Sullivan, I gave

17   you an opportunity to argue.  I gave you all the

18   opportunity you wanted.  I sat here and said tell me

19   what you want to tell me about this issue.  I looked at

20   85 pages of your submission.  I listened to you

21   yesterday for hours.  You have every right to tell me

22   anything you want and to make your record before I

23   rule.  You have no right to do it afterwards.  Once I

24   rule it is over and then you can make your record to

25   the Appellate Division.

3352

Colloquy

1        MR. RABER:  Your Honor, I just would like to

2   address the ethical issues that were raised.

3        THE COURT:  We can address them in the back.

4        MR. RABER:  I would like to do it on the

5   record.

6        THE COURT:  You can put it on the record

7   later.

8        (Break taken.)

9        THE COURT:  You can be seated.  Counsel you

10   want to put something on the record?

11        MS. SULLIVAN:  Yes.  In light of Your Honor's

12   ruling to strike Dr. Morrison's testimony Merck with

Page 36

9 Ex A MIL 9  Humeston Trial 10-07-05

13   like to move for reconsideration and request that the

.14   Court reconsider its ruling, given the foundation that

15   Mr. Morrison did lay.  There is no dispute that Merck

16   did these animal studies.  Dr. Morrison testified he

17   specifically reviewed the rabbit study and he was in

18   discussions concerning the other two as part of the

19   VIOXX development team as it relates to the other two.

20         We think the Court's ruling is

21   disproportionate in light of the fact that

22   Dr. Morrison -- his testimony involved matters in

23   addition to the animal studies, and to strike the

24   entirety of his testimony, including testimony about

25   e-mails and things unrelated to the animal studies is

3353

Colloquy

1   disproportional, and precluding his testimony is a

2   drastic and unfair and materially prejudice sanction,

3   so we would ask the Court to reconsider its ruling.

4         If the Court is not inclined to do that, Your

5   Honor, we would ask the Court stay its ruling so Merck

6   can take an emergent appeal to the Appellate Division

7   this afternoon or over the weekend so the Appellate

8   Division can rule whether any striking or sanction is

9   appropriate, and, if so, what the appropriate remedy

10   would be.

11         We also would ask, Your Honor, that Merck be

12   permitted to submit an offer of proof as to what

13   Dr. Morrison's additional testimony would be beyond the

14   animal studies he talked about.  We would like to put

15   Dr. Morrison back on the stand as a Merck scientist as

9 Ex A MIL 9  Humeston Trial 10-07-05

16   part of a project development team, so that he can in

17   defense of the serious charges against Merck talk to

18   the jury about some of the things Merck did and what

19   Merck knew and what the science was at the time.  And

20   to prevent Merck from doing that, and to prevent Merck

21   from defending itself by putting on one of the

22   scientists involved in the VIOXX development program is

23   material prejudice, Your Honor, so we would like at

24   least to put on an offer of proof as to what

25   Dr. Morrison's testimony would have been in that

3354

Colloquy

1   regard.

2          And, Your Honor, if the Court is going the

3   refuse to reconsider and also refuse the request for

4   the stay we would like to ask for a mistrial in view of

5   the material prejudice to Merck that an instruction to

6   this jury striking the entirety at Dr. Morrison's

7   testimony presents.

8          Thank you, Your Honor.

9          MR. BUCHANAN:  Your Honor, it is, indeed, a

10   drastic remedy and an appropriate remedy.  Substantial

11   prejudice here is that the testimony was allowed to go

12   to the jury based on the explicit and implicit

13   representations that he had knowledge that he did not.

14   Then his subsequent testimony on expert issues

15   extrapolating from animal studies to human studies only

16   served to further highlight the expert nature of the

17   testimony of which plaintiffs have no knowledge at the

18   time prior to trial this testimony would be elicited

Page 38

9 Ex A MIL 9  Humeston Trial 10-07-05

19  based on both his deposition testimony and the absence

20  of any expert report on the topic.

21          The remedy is drastic.  It is appropriate.

22  There's no way to shield the jury, I think,

23  notwithstanding the instruction, from that improper

24  testimony.  Your Honor's remedy, I think, is the

25  appropriate one and really the best we can do at this

3355

Colloquy

1  point.  The plaintiffs believe we have been prejudiced.

2  We hope the curative instruction will ameliorate that,

3  but, frankly, there's no basis to soften that in any

4  way by allowing Mr. Morrison to testify to other

5  matters of which he was not present for or to the

6  extent that he was present for matters that should come

7  in through his videotaped deposition because he has

8  been, frankly, taking the VIOXX role over the last

9  several months, and that's the proper subject of expert

10  testimony not fact testimony.  The motion for

11  reconsideration should be denied.  And you have already

12  afforded the defense an opportunity to play excerpts of

13  his deposition testimony to the extent they wish to do

14  so.  That's an appropriate remedy.

15          THE COURT:  There's no question it is a

16  strong remedy, and there's no question that it took me

17  a long time to reach it, and that's why we recessed

18  yesterday, and I thought about it overnight.  There's

19  no question there's some prejudice to Merck.  I think

20  there's been more prejudice to Mr. Humeston, and that

21  in the end there's been a lot more prejudice to the

Page 39

9 Ex A MIL 9  Humeston Trial 10-07-05

22  plaintiff by the testimony than there will be to the

23  defense if the testimony is stricken.

24            And I really don't think I have any other

25  option at this point, other than to strike the

3356
Colloquy

1   testimony.  I did indicate this morning that -- and I

2   can't pick through it, I tried to try to pick sections

3   that I can tell the jury -- I don't even know how I

4   would do it.  I would have to read them the transcript

5   and say, you can remember this and then read them

6   another part and say you can't remember this.  It just

7   really wouldn't work.  I considered that.

8            The only alternative I think I have at this

9   point is to strike the testimony.  I do -- I have

10  indicated that you could play Dr. Morrison's testimony.

11  I will consider -- the only other thing that I'm

12  willing to reconsider is that, and I'm willing to

13  consider whether there's anything that's not in his

14  deposition that he needs to testify to, something

15  that's not covered by his deposition that you intended

16  to cover with him, and if that's the case I'll consider

17  what it is and how important it is and whether it can

18  be covered by other witnesses or, most important, if it

19  is not covered in his deposition, and in that case I

20  may allow him to resume the stand and tell the jury

21  that they should consider his testimony at this point

22  as part of the evidence, the testimony that they hear

23  at that point.  So I'll consider that.

24            The request for a stay is denied.  We're

Page 40

9 Ex A MIL 9  Humeston Trial 10-07-05

25   going to proceed.  You can certainly go to the


3357

Colloquy

1   Appellate Division at the end of the day.  This is not

2   the kind of issue the Appellate Division usually deals

3   with, quite frankly, but you can certainly try.  I'm

4   not going to hold up the trial for it.  I'm going to

5   order that the testimony be stricken and that the jury

6   disregard it.  The motion for a mistrial is denied,

7   and, as I said, I'm sure you're going to need an order

8   to go to appeal.  At the next break I'll file an order,

9   and if you want to take a written appeal you can do so.

10           You can bring the jury in.

11           THE COURT:  You can be seated.  Ladies and

12   gentlemen, I apologize for the delay.  I know you have

13   been here a long time.  I hope you found -- I know you

14   enjoy each other's company, Mary tells me, so at least,

15   hopefully, you're not having a terrible time sitting in

16   there waiting for us.  There's legal issues.  It is not

17   anybody's fault.  It is just things come up, and I have

18   to spend time on them.

19           I made a legal determination about the

20   testimony yesterday of Dr. Briggs Morrison should be

21   stricken from the record.  You, therefore, are not to

22   consider any of his testimony.  Any testimony that I

23   strike from the record is not evidence.  It should not

24   be considered by you in your deliberations.  This means

25   that even though you may remember the testimony you

Page 41

9 Ex A MIL 9  Humeston Trial 10-07-05

3358
Colloquy

1   should not use it in your deliberations or even in your

2   own thought process as far as analyzing what the

3   verdict should be.  You have to disregard that

4   testimony.  You shouldn't consider why.  It doesn't

5   matter.  It is a legal decision.  And you shouldn't --

6   I am trusting you'll be able to do that.  It is sort of

7   a difficult instruction to follow, obviously.  We know

8   that you can't forget something, but I believe that if

9   you're instructed by me to not consider it as part of

10  the evidence that you'll do that.  And that's my

11  instruction.

12          All right.  We'll proceed, and counsel is

13  going to call a witness at this time.

14          MS. SULLIVAN:  Yes, Your Honor.  Merck would

15  like to call Merck scientist, Dr. Alan Nies, by video.

16          (Whereupon, the video was played for the

17  jury.)

18          THE COURT:  We don't have his picture.  Is

19  this Dr. Scolnick?

20          MR. RABER:  No.

21          THE COURT:  No problem.  Take a minute and

22  deal with it.

23          (Whereupon, the videotape is played for the

24  jury.)

25          MR. RABER:  Can we stop?  This is the wrong

3359
Colloquy

9 Ex A MIL 9  Humeston Trial 10-07-05

1   document.   It may be the top of an e-mail chain.

2          THE COURT:   All right.   Why don't we take a

3   break and you can fix it.

4          (Break taken.)

5          THE COURT:   You can be seated.   You got it

6   fixed, counselor?

7          MR. RABER:   Yes.   What it was we have an

8   e-mail that has a message on top and not below.   We

9   fixed it, and we're going to start again with the

10  document.

11         THE COURT:   Okay.   You can bring in the jury.

12         MR. RABER:   And one more about scheduling, we

13  have -- there's probably only another minute left of

14  this and maybe 10 minutes of theirs, and we're at a

15  point with Scolnick where we haven't quite worked out

16  all of the things that need to go to Your Honor, so

17  given the hour, I don't know if we want to end today

18  with 10 -- the remaining 10 minutes here.   We're

19  prepared to have a live witness on Tuesday, Tuesday

20  morning.

21         THE COURT:   How long is Scolnick?

22         MR. RABER:   He is at least an hour and 15

23  minutes.

24         MR. BUCHANAN:   Probably it could take the

25  typical 20 minutes for us to work out the objections

3360

Colloquy

1   with Your Honor and then the 10 minutes to fix the

2   tape, so, realistically, the jury wouldn't start

3   hearing it until --

Page 43

9 Ex A MIL 9  Humeston Trial 10-07-05

4          MR. RABER:  4:00 probably.

5          MR. BUCHANAN:  45 minutes from now.

6          THE COURT:  Okay.  We'll do it Monday, I

7    guess.  So who is your witness Monday?

8          MR. RABER:  We're not sure exactly who, but

9    we'll let them know 48 hours is what we have been

10   operating on before Tuesday.

11         MR. BUCHANAN:  We'll be on pins and needles

12   until Sunday morning, Your Honor.

13         THE COURT:  You can bring the jury in.

14         (The jury enters the courtroom.)

15         THE COURT:  You can be seated.

16         MR. RABER:  Okay.  We have squared away our

17   technical problem, and we're going to start with the

18   document again, Your Honor.

19         THE COURT:  Okay.

20         (Whereupon, the videotape is played for the

21   jury.)

22         MR. RABER:  Your Honor, that concludes our

23   portion.  I understand the plaintiff has some video

24   they wish to play, as well.

25         MR. SEEGER:  Your Honor, it is only about


                                        3361
                   Colloquy

1    four or five minutes.

2          (Whereupon, the videotape is played for the

3    jury.)

4          THE COURT:  That's it?

5          MR. SEEGER:  That is it.

                   Page 44

9 Ex A MIL 9  Humeston Trial 10-07-05
6       THE COURT:  Okay.  You can get the lights.  I
7   hate to do this, but counsel has advised me that we'll
8   have a full day on Tuesday, and we'll start with a live
9   witness on Tuesday hopefully.
10          MS. SULLIVAN:  Yes, Your Honor.
11          THE COURT:  But there's another tape that
12   they need to edit and a couple other things we have to
13   do, so I'm going to let you go for the day.  I'll ask
14   you to report on Tuesday at 9:30.  It is a long weekend
15   but I hope you enjoy it, and don't talk to anybody
16   about the case.  Enjoy your weekend.  We'll see you
17   9:30 on Tuesday.
18              (The jury leaves the courtroom.)
19          MR. RABER:  I would like a moment to address
20   a couple things from this morning.
21          THE COURT:  You can.
22          MR. RABER:  Your Honor, as Your Honor knows,
23   I was admitted especially to practice in this court
24   under the pro hac vice procedures in New Jersey, and I
25   consider it a privilege to be here.

3362
Colloquy
1           I also want to assure Your Honor that I take
2   my duties as an Officer of the Court very seriously,
3   and I feel that some of the statements that were made
4   this morning suggesting conduct on my part, I don't
5   think there's a basis for that, Your Honor, with all
6   due respect, and the gist of it seemed to be that there
7   was somehow misleading statements about the witness'
8   personal knowledge of the events about which he

Page 45

9 Ex A MIL 9   Humeston Trial 10-07-05

9    testified, and, Your Honor, this morning said that

10   Dr. Morrison was the head of the VIOXX project team and

11   that it was, therefore, unusual that he wouldn't get

12   documents in that capacity.  He was not the head of the

13   VIOXX project team; Alan Nies was.  Dr. Morrison worked

14   for Barry Gertz.  He worked for Dr. Nies, and so I

15   think the suggestion that someone in Dr. Morrison's

16   position would necessarily have gotten those documents

17   I don't think is supported, Your Honor, by the position

18   that he had at that time.

19            THE COURT:  I stand corrected on that point.

20   I don't think it makes any difference in anything I

21   ruled.

22            MR. RABER:  I also note that when Your Honor

23   described the basis for Dr. Morrison's lack of personal

24   knowledge he testified yesterday that his first

25   exposure to the results were in conversations with

3363
Colloquy

1    other Merck scientists, Dr. Nies, Dr. Gertz and they

2    described to me that in follow-up to Garret's paper

3    some of the basic scientists were doing additional

4    animal experiments to understand where the urinary

5    PGI-M came from, and they explained, and, obviously, I

6    was an author on the paper.  We knew what the

7    possibilities were, and they explained to me that there

8    were scientists in the pharmacology group doing animal

9    experiments to rule out those possibilities that we had

10   hypothesized, and they conveyed to me at that point it

11   looked like those were all being ruled out.  And then

Page 46

9 Ex A MIL 9  Humeston Trial 10-07-05

12    the next question they were working out is where in the

13    body does the prostacyclin come from.  So that was

14    communicated to me in day-to-day business working at

15    Merck with Dr. Gertz and Dr. Nies.

16         Your Honor, that's what the transcript says.

17    I know Your Honor has an interpretation of how strong

18    that is.  I would simply state that that is a clear

19    statement from the witness of personal knowledge based

20    on his day-to-day work at Merck, his day-to-day

21    communication with his supervisors, and the suggestion

22    that there was no factual basis for me asking him

23    questions on the grounds that he had no personal

24    knowledge I do not think is supported by the record,

25    and I can assure Your Honor that I'm here taking my

3364 Colloquy

1    duties as an officer of the Court seriously.  I will

2    contend to conduct myself in that matter, and I

3    appreciate having the opportunity to say these

things.

4         THE COURT:  Okay.  I'll see you Tuesday,

and

5    if you can do the -- if you can come back with

anything

6    on Scolnick so we can get that done that would be

7    helpful.

8         MR. BUCHANAN:  We'll come right back, Your

9    Honor.

10         (End of proceedings.)

Page 47

9 Ex A MIL 9  Humeston Trial 10-07-05

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3365

C E R T I F I C A T I O N

    I, REGINA A. TELL, C.S.R., C.R.R., License Number
30x100161000, an Official Court Reporter in and for the
State of New Jersey, do hereby certify the foregoing to
be prepared in full compliance with the current
Transcript Format for Judicial Proceedings and is a true
and accurate compressed transcript to the best of my
knowledge and ability.

Page 48

9 Ex A MIL 9  Humeston Trial 10-07-05

_____ 10-7-05
Regina A. Tell, CSR-CRR Official
Court Reporter Atlantic County
Courthouse
Mays Landing, New Jersey



Jun 23 2006
7:02PM

# EXHIBIT "B"

# EXHIBIT "B"

*Proc. Natl. Acad. Sci. USA*
Vol. 96, pp. 272–277, January 1999
Pharmacology

# Systemic biosynthesis of prostacyclin by cyclooxygenase (COX)-2: The human pharmacology of a selective inhibitor of COX-2

(prostaglandins/platelets/monocytes/ibuprofen/celecoxib)

B. F. McADAM*, F. CATELLA-LAWSON, I. A. MARDINI, S. KAPOOR, J. A. LAWSON, AND G. A. FITZGERALD†

EUPENN Group of Investigators, Center For Experimental Therapeutics, University Of Pennsylvania, Philadelphia, PA 19104

Edited by Michael A. Gimbrone, Jr., Brigham and Women's Hospital, Boston, MA, and approved October 20, 1998 (received for review July 8, 1998)

**ABSTRACT**   Prostaglandins (PG) are synthesized by two isoforms of the enzyme PG G/H synthase [cyclooxygenase (COX)]. To examine selectivity of tolerated doses of an inhibitor of the inducible COX-2 in humans, we examined the effects of celecoxib on indices of COX-1-dependent platelet thromboxane (Tx) $A_2$ and on systemic biosynthesis of prostacyclin *in vivo*. Volunteers received doses of 100, 400, or 800 mg of celecoxib or 800 mg of a nonselective inhibitor, ibuprofen. Ibuprofen, but not celecoxib, significantly inhibited $TxA_2$-dependent aggregation, induced *ex vivo* by arachidonic acid ($83 \pm 11\%$ vs. $11.9 \pm 2.2\%$; $P < 0.005$) and by collagen. Neither agent altered aggregation induced by thromboxane mimetic, U46619. Ibuprofen reduced serum $TxB_2$ ($-95 \pm 2\%$ vs. $-6.9 \pm 4.2\%$; $P < 0.001$) and urinary excretion of the major Tx metabolite, 11-dehydro $TxB_2$ ($-70 \pm 9.9\%$ vs. $-20.3 \pm 5.3\%$; $P < 0.05$) when compared with placebo. Despite a failure to suppress $TxA_2$-dependent platelet aggregation, celecoxib had a modest but significant inhibitory effect on serum $TxB_2$ 4 hr after dosing. By contrast, both ibuprofen and celecoxib suppressed a biochemical index of COX-2 activity (endotoxin induced $PGE_2$ in whole blood *ex vivo*) to a comparable degree ($-93.3 \pm 2\%$ vs. $-83 \pm 6.1\%$). There was no significant difference between the doses of celecoxib on COX-2 inhibition. Celecoxib and ibuprofen suppressed urinary excretion of the prostacyclin metabolite 2,3 dinor 6-keto $PGF_{1\alpha}$. These data suggest that (*i*) platelet COX-1-dependent aggregation is not inhibited by up to 800 mg of celecoxib; (*ii*) comparable COX-2 inhibition is attained by celecoxib (100–800 mg) and ibuprofen (800 mg) after acute dosing; and (*iii*) COX-2 is a major source of systemic prostacyclin biosynthesis in healthy humans.

Prostaglandins (PGs) are autacoidal lipid mediators of importance in physiological responses, inflammation and thrombosis (1). They are formed from arachidonic acid by the catalytic activity of prostaglandin G/H synthase, also known colloquially as cyclooxygenase (COX) (2). This rate-limiting, committed step in the formation of prostaglandins results in the formation of an unstable endoperoxide intermediate, $PGH_2$. In turn, $PGH_2$ serves as substrate for cell-specific isomerases and synthases to produce the prostaglandins $PGE_2$, $PGD_2$, prostacyclin ($PGI_2$), and thromboxane (Tx) $A_2$ (3, 4). It is now recognized that there are two related but distinct gene products that possess COX activity, termed COX-1 and COX-2 (5–7). COX-1 is expressed constitutively in most tissues (8). It is thought to release prostaglandins involved in cellular "house-keeping" functions, such as the maintenance of gastrointestinal integrity and vascular homeostasis (9). COX-2 is undetectable in most tissues in the absence of stimulation but

is induced as an intermediate–early gene in a limited repertoire of cells, notably in monocytes, macrophages, neutrophils, and endothelial cells (10–12). Among the stimulants of COX-2 induction are bacterial lipopolysaccharides (LPS), growth factors, cytokines, and phorbol esters (13–16). Increased expression of COX-2, but not of COX-1, has been demonstrated in rheumatoid synovial tissues *in vivo* (17). Conversely, expression of this isoform is inhibited by glucocorticoids and by the anti-inflammatory cytokines interleukin 10 and interleukin 4 (18–20). These observations have led to the hypothesis that COX-2 expression mediates the enhanced prostanoid release, which characterizes the inflammatory response (21). COX-2 also has been implicated in tumorigenesis (22).

Inhibition of prostaglandin synthesis is thought to account for both the therapeutic and adverse effects associated with the administration of conventional nonsteroidal antiinflammatory drugs (NSAIDs) (23, 24). These compounds do not discriminate markedly between the two isozymes. For example, their $IC_{50}$ selectivity ratios for COX-2/COX-1 *in vitro* tend to be <10 (25, 26). It is thought that the therapeutic effects of these agents are related to the inhibition of COX-2 at sites of inflammation whereas the adverse gastrointestinal effects and bleeding associated with NSAIDs are attributed to inhibition of COX-1 in gastric epithelium and in platelets, respectively (27). Although both COX isoforms share similar catalytic activities and conserve critical amino acid residues, they differ particularly in the topography of the substrate binding pocket at the active site (28). Thus, it has been possible to develop small molecules that differ radically in their potencies for inhibition of COX-2 vs. COX-1 *in vitro* (29). Celecoxib is highly selective for COX-2 *in vitro* (30), with a selectivity ratio of >375 in a baculovirus expression system (31). However, it is unclear how usefully such *in vitro* assay systems may predict selectivity for COX-2 in humans.

$TxA_2$ is the major product of platelet COX-1 (5, 32), and inhibition of serum $TxB_2$, its inactive hydrolysis product, reflects inhibition of this isoform *ex vivo*. Actual Tx synthesis *in vivo* is reflected by urinary Tx metabolite excretion (33). Monocytes and macrophages express COX-2 when induced by LPS *in vitro* (34), producing $PGE_2$ and $TxA_2$ as major products in a time-dependant manner. Inhibition of COX-1 with aspirin followed by stimulation of whole blood with LPS results in COX-2-dependant formation of $PGE_2$ (35). Thus, inhibition of $PGE_2$ formation may be used to reflect COX-2 inhibition *ex vivo*. We report that celecoxib and ibuprofen potently and

This paper was submitted directly (Track II) to the *Proceedings* office.

Abbreviations: PG, prostaglandin; COX, cyclooxygenase; LPS, lipopolysaccharide; Tx, thromboxane; NSAID, nonsteroidal antiinflammatory drugs.

*Current address: Division of Cardiology, Vanderbilt University Medical Center, Nashville, TN 37232.

†To whom reprint requests should be addressed at: Center for Experimental Therapeutics, 905 Stellar Chance Laboratories, 422 Curie Boulevard, University of Pennsylvania, Philadelphia, PA 19104. e-mail: garret@spirit.gcrc.upenn.edu.

The publication costs of this article were defrayed in part by page charge payment. This article must therefore be hereby marked "*advertisement*" in accordance with 18 U.S.C. §1734 solely to indicate this fact.

© 1999 by The National Academy of Sciences 0027-8424/99/96272-6$2.00/0
PNAS is available online at www.pnas.org.

MRK-AAZ0001006

reversibly inhibit COX-2 *ex vivo* in volunteers. Although ibuprofen inhibits COX-1 and COX-2 to a comparable degree, inhibition of COX-1 is much less pronounced, although detectable, with celecoxib. Unlike the conventional NSAID, celecoxib did not inhibit platelet function but suppressed excretion of both the hydration product, 6-keto $PGF_{1\alpha}$, and the major urinary metabolite of prostacyclin, 2,3 dinor-6-keto $PGF_{1\alpha}$ (PGI-M).

## METHODS

**Study Design.** The study protocol was approved by the Institutional Review Board of the University of Pennsylvania Health System (Philadelphia) and by the Advisory Council of the General Clinical Research Center (University of Pennsylvania, Philadelphia). All volunteers were healthy individuals who refrained from smoking and using any medication for 2 weeks before the start of the study. Volunteers with a history of coagulation disorders, a bleeding tendency, drug allergy, or gastrointestinal disorders were excluded from participation in the study.

**Subjects.** Thirty-seven subjects, 22 females and 15 males, aged from 21–49 years (median age 28), were randomized under double blind conditions to receive a single dose of celecoxib (100, 400, or 800 mg), 800 mg of ibuprofen, or placebo. There were seven subjects in each group. The drugs were administered between 0700 and 0800 hr on the study morning. Volunteers remained in the General Clinical Research Center for the duration of the study. Routine hematology, biochemistry, and urinalysis were assessed at baseline and at 24 hr after administration of the drugs on completion of the study.

**Platelet Aggregation.** Platelets were harvested as described (36). In brief, platelet-rich plasma was prepared by centrifugation of citrated blood sample at $160 \times g$ for 10 min followed by centrifugation of platelet-poor plasma at $900 \times g$ for 10 min at room temperature. Platelet number was adjusted to $2 \times 10^8$ platelets/ml with platelet-poor plasma. Platelet aggregation was assessed at 37°C in platelet-rich plasma by using a Biodata PAP-4 Aggregometer (Biodata, Hatboro, PA). Platelet responses to three agonists, collagen (0.5 and 2 $\mu$g/ml), arachidonate (20 M), and U46619 (4 $\mu$M), were assessed at baseline, 3, 8, and 24 hr after administration of the inhibitors. For each agonist, maximum aggregation was calculated as the percentage of maximal light transmission achieved within 5 min of addition of the agonist. Collagen and U46619 were purchased from Biodata. The arachidonic acid and all deuterated internal standards were obtained from Cayman Chemicals (Ann Arbor, MI).

**Biochemical Analyses.** Whole blood samples without anticoagulant were drawn at baseline and at 2, 4, 6, and 24 hr after drug ingestion for measurement of $TxB_2$ as described (37). Heparinized blood, drawn at baseline and at 2, 4, 6, and 24 hr after drug administration, was treated with 10 $\mu$g/ml LPS (*Escherichia coli* serotype 026:B6) after addition of aspirin (10 $\mu$g/ml) as described (35). Plasma was separated by centrifugation and was kept at −70°C until assayed for $PGE_2$. Aspirin and LPS *E. coli* 026:B6 were purchased from Sigma. Urine samples were saved at baseline (−2–0 hr) and at 0–2, 2–4, 4–6, 6–12, and 12–24 hr after dosing for the measurement of 11-dehydro thromboxane (Tx-M) and PGI-M, the major urinary metabolites of thromboxane and prostacyclin, respectively, indices of their systemic formation *in vivo* (38). Selected samples also were analyzed for urinary 6-keto $PGF_{2\alpha}$, an index that reflects predominantly renal biosynthesis of prostacyclin. Plasma samples were analyzed for celecoxib by HPLC. The assay involved the extraction of SC-58635 and the internal standard, SC-59751, from 30 $\mu$l of human plasma by using an Isolute Confirm 130-mg Solid Phase Extraction Column (Jones Chromatography, Lakewood, CO). The extract was analyzed

by HPLC by using a 15-cm × 3.9-mm × 4-mm Novapak C18 column (Waters) equipped with a 15- × 3.2- × 7-mm RP-18 New Guard cartridge, and fluorescence detection (excitation = 240 nm, emission = 380 nm). The HPLC mobile phase was acetonitrile: 0.01 M sodium phosphate (50:50, vol/vol). The standard curve ranged from 10.0 to 5,000 ng SC-58635/ml. A 1:10 dilution quality control sample was validated. Acceptable precision (coefficient of variation) and accuracy (analytical recovery) were obtained from both between and within run studies with quality control samples in the range 10.0 to 5,000 ng SC-58635/ml. Stability through three freeze/thaw cycles also was proven. Blood hemolysis had no effect on the quantitation. A run size of 72 standards, quality controls, and unknowns was established.

**GC/Mass Spectrometry Analyses.** All analyses by GC/mass spectrometry were performed on a Fissons MD-800 (VG Organic, Manchester, U.K.) equipped with a split/splitless injector operated in the splitless mode at 260°C. The interface was maintained at 300°C, and the ion source was maintained at 260°C. The mass spectrometer was operated in the negative ion, chemical ionization mode, using ammonia as the reagent gas. All solvents used in sample preparation for GC/mass spectrometry were of HPLC grade and were obtained from J. T. Baker. The LK 60 silica gel plates (0.25 mm thick) were from Whatman. Analysis of prostanoids was performed as described (39–42).

**Statistical Analysis.** Results are expressed as mean and SEM. Statistical comparisons were made by using analysis of variance with subsequent application of Duncan's Multiple Range test, as appropriate.

## RESULTS

**Clinical.** Celecoxib was well tolerated at all doses given. No volunteer withdrew from the study or experienced serious adverse events. There were no clinically significant changes identified in hematology, biochemistry, urinalysis, supine vital signs, or physical examination during the course of the study period.

**Platelet Aggregation *ex Vivo.*** As expected, ibuprofen reversibly inhibited platelet function. The aggregation response to collagen was significantly inhibited with 800 mg ibuprofen 3 hr after dosing ($P < 0.05$) but returned toward normal 8 hr after drug administration. Collagen induced aggregation showed no consistent trend with time after placebo or celecoxib administration. Neither celecoxib nor ibuprofen inhibited aggregation induced by U46619. Aggregation responses to arachidonate 20 $\mu$M were significantly inhibited at 3 [−83 ± 6.5 (ibuprofen) vs. −2 ± 1% (placebo) expressed as percent change from baseline; $P < 0.005$] and 8 hr (−41 ± 15% vs. −2.2 ± 3.4%; $P < 0.05$) after dosing with ibuprofen but returned to baseline 24 hr after drug administration. Celecoxib did not significantly inhibit the aggregation response to arachidonic acid (Fig. 1).

**Serum $TxB_2$.** Inhibition of serum $TxB_2$ was >95% inhibited between 2, 4, and 6 hr after dosing with ibuprofen ($P < 0.001$) with recovery evident at 24 hr. Although doses of celecoxib tended also to suppress serum $TxB_2$ to a minor degree, this change was statistically different from that observed after placebo (−28 ± 4.8% vs. −5.8 ± 3.2%; $P < 0.05$) only with 800 mg, at 4 hr after dosing (Fig. 2A). There was a variable relationship between the plasma concentration of SC-58635 and the degree of inhibition of serum $TxB_2$. However, even at plasma concentrations of >500 ng/ml, <10% of samples exhibited >50% inhibition of serum $TxB_2$ (Fig. 2B).

**Pharmacokinetics.** The area under the plasma concentration-time curve ($AUC_{(0-24)}$) and the average maximal plasma and ($C_{max}$) concentrations of celecoxib attained in the study are shown in Table 1. The dose-response effect was nonlinear

MRK-AAZ0001007

274    Pharmacology: McAdam *et al.*

*Proc. Natl. Acad. Sci. USA 96 (1999)*



FIG. 1. Inhibition of arachidonic acid-induced platelet aggregation *ex vivo* in volunteers 3 hr after dosing with placebo, 800 mg ibuprofen, and various doses of celecoxib. **, $P < 0.01$ for comparisons with placebo.

across the range of doses administered. The median time to maximum plasma concentration ($T_{max}$) was 4.2 hr.

**Urinary Tx-M.** Ibuprofen significantly reduced urinary Tx-M; maximal effects were observed 4–6 hr ($-70.2 \pm 4\%$) and 6–12 hr ($-70.4 \pm 6.3\%$) after administration ($P < 0.05$). Suppression of Tx-M by celecoxib at the 100 mg, 400 mg, and 800 mg was not statistically different from that by placebo ($-16 \pm 5.3\%$, $-28.4 \pm 8\%$, and $43 \pm 5.3\%$ vs. $-20.6 \pm 9.9\%$), respectively (Fig. 3).

**Levels of Whole Blood Monocyte COX-2 Activity.** $PGE_2$ in stimulated whole blood varied with placebo administration,





FIG. 2. (A) Inhibition of serum $TxB_2$, an index of COX-1 activity *ex vivo* in volunteers 4 hr after receiving placebo, 800 mg ibuprofen, or various doses of celecoxib. *, $P < 0.05$; **, $P < 0.01$ for comparisons with placebo. (B) The relationship between log plasma concentration of celecoxib taken 2, 4, 6, and 24 hr after dosing and inhibition of serum $TxB_2$ expressed as the percentage change from baseline values. A shallow but variable dose response effect is evident (see *Results*).

showing an average decrease of 35% compared with baseline at each time interval. Nonetheless, ibuprofen caused significantly greater inhibitory effect 2, 4, and 6 hr after treatment compared with placebo. The maximal inhibitory effect occurred at 4 hr after dosing [$-93.3 \pm 2\%$ vs. $-93.3 \pm 2\%$ vs. $-35.9 \pm 10.45$ (placebo)]. Celecoxib produced similar inhibitory effects on this index of monocyte COX-2 activity, but the effect was not dose-dependent ($-75.3 \pm 8.6\%$ vs. $-86.3 \pm 3.1$ vs. $-83.2 \pm 6.1\%$; 100, 400, and 800 mg, respectively) (Fig. 4A). Interindividual variability of response was again evident in the relationship of plasma concentration of celecoxib to inhibition of COX-2 activity. However, in contrast to the relationship with serum $TxB_2$, the plasma concentration-response relationship was steeper (Fig. 4B). For example, at plasma concentration >500 ng/ml, 75% of samples reflected >80% inhibition of this *ex vivo* index of COX-2 activity whereas only 16% of samples exhibited 40% inhibition of COX-1 activity.

**Urinary 2,3-dinor-6 keto $PGF_{1\alpha}$ and 6-keto $PGF_{1\alpha}$.** Urinary excretion of 2,3-dinor 6-keto $PGF_{1\alpha}$, an index of systemic prostacyclin biosynthesis, remained unchanged after placebo. However, it was reduced to a similar degree by 400and 800 mg of celecoxib as well as by ibuprofen compared with placebo at both 4–6 and 6–12 hr after dosing (Table 2; $P < 0.01$). There were no significant differences between the effects of celecoxib and ibuprofen on PGI-M excretion. The effects of 800 mg celecoxib had tended to revert back toward predosing values ($288 \pm 82$ pg/mg creatine) in the sample collected 12–24 hr after dosing with 800 mg ($155.4 \pm 69$ pg/mg creatine) but was still significantly depressed ($P < 0.05$). Urinary 6-keto $PGF_{1\alpha}$ also was depressed by celecoxib 800 mg. Thus, predosing values ($172 \pm 73.4$ pg/mg creatine) fell to $88.5 \pm 17.4$ pg/mg creatinine ($P < 0.05$) 4–6 hr after dosing, partially recovering to $109.9 \pm 27.6$ pg/mg creatine 12–24 hr after dosing.

## DISCUSSION

The results of this study demonstrate that single doses of celecoxib, a highly selective COX-2 inhibitor *in vitro*, are well tolerated by healthy volunteers. All doses inhibited LPS-stimulated monocyte $PGE_2$ formation *ex vivo*, an index of COX-2 activity, to a degree that approximated that attained after 800 mg ibuprofen, a therapeutic dose of a nonselective, conventional NSAID. Although interindividual differences in response were apparent and the biochemical selectivity of Celecoxib for COX-2 was relative, rather than absolute, in humans, it did not influence $TxA_2$-dependent platelet aggregation *ex vivo*. Surprisingly, celecoxib and ibuprofen had comparable suppressive effects on the excretion of PGI-M. Celecoxib also suppressed urinary 6-keto $PGF_{1\alpha}$. This implies

MRK-AAZ0001008

Table 1.  Pharmacokinetics of celecoxib in healthy volunteers

| Dose | $AUC_{(0-24)}$, ng/hr/ml | $C_{max}$ at 4 h, ng/ml | $T_{max}$, hours |
|---|---|---|---|
| 100 mg, | | | |
|   mean ± SEM | 4,513.6 ± 531.2 | 549.9 ± 65.0 | 4.1 ± 0.6 |
| 400 mg, | | | |
|   mean ± SEM | 11,282.4 ± 1,339.0 | 970.6 ± 115.0 | 4.3 ± 0.9 |
| 800 mg, | | | |
|   mean ± SEM | 23,109.0 ± 6,318.0 | 2,928.6 ± 437.0 | 4.0 ± 0.1 |

a major role for COX-2 in the biosynthesis of both systemic and renal $PGI_2$ under physiological conditions in young volunteers.

The two COX isoforms are distinct gene products prone to differential patterns of regulation (5–9, 13–17). Although their subcellular localization may be similar (43), it is thought that they have distinct roles in human biology and during development (44). Given its induction by growth factors and tumor promoters (14, 15), attention has focused on COX-2 as the likely source of prostaglandin formation during inflammation (17, 21), embryogenesis (44), and tumor growth (45). The COX isoforms exhibit marked conservation of their primary sequences (46). Differences in the topography of their active sites (47, 48) have permitted development of compounds highly selective for inhibition of COX-2 (49, 50). Biochemical selectivity for COX-2 inhibition has been assessed by assays based on measuring either oxygen consumption or prostaglandin formation (51), involving either nonhuman or human isozymes in a variety of expression systems (52, 53). Ranking of "conventional" NSAIDs for COX-2 inhibitory activity has reflected this variability (24–26). Presently, several compounds have emerged from such screening that exhibit a particularly high degree of selectivity for COX-2 ($IC_{50}$s for COX-2/COX-1 >500). At least two such compounds are at an advanced stage of clinical development. However, such inhibitors have been highly effective in models of inflammation (21, 60, 54, 55) and cancer (56) and exhibit minimal gastrotoxicity in clinical trials (57); there is little information as to their actual biochemical and functional selectivity for inhibition of COX-2 at doses tolerated by humans.

To address the hypothesis that celecoxib is highly selective for COX-2 in humans, we took advantage of assays (35, 37, 56) that reflect isozyme activity *ex vivo*. In the case of COX-2, pretreatment of heparinized blood with aspirin is used to inhibit constitutively expressed COX-1. Blood esterases deacetylate and inactivate aspirin rapidly. Thus, it does not interfere with $PGE_2$ formation by COX-2, which subsequently is induced by LPS. Although considerable baseline variability is apparent in this assay (35, 58), both celecoxib and ibuprofen



FIG. 3.  Urinary excretion of 11-dehydro $TxB_2$, a major $TxB_2$ metabolite largely derived from platelets after placebo (■—■), 800 mg of ibuprofen (▲—▲), and celecoxib at 100 (●—●), 400 (◆—◆), and 800 mg (▼—▼).





FIG. 4.  (*A*) Inhibition of LPS-stimulated plasma $PGE_2$, an index of COX-2 activity, *ex vivo* in volunteers receiving placebo, 800 mg of ibuprofen, and various doses of celecoxib. **, *P* < 0.01 when compared with placebo. (*B*) The relationship between LPS-stimulated plasma $PGE_2$ *ex vivo*, an index of COX-2 activity, and log plasma concentrations of celecoxib at 2, 4, 6, and 24 hr after dosing. $PGE_2$ is expressed as a percentage of predosing values. A steep but variable dose-response is evident. **, *P* < 0.01 for comparisons with placebo.

significantly suppressed this index of COX-2 activity *ex vivo*. Of importance, celecoxib does not induce COX-2 expression in monocytes *in vitro* (P. Isakson, personal communication). Although the average maximal plasma concentration of celecoxib related to dose, there was no clear distinction between the maximal effect of acute doses in the range 100–800 mg with respect to inhibition of COX-2. This accords with the failure to discriminate between most indices of symptomatic relief afforded by chronic administration of these doses of celecoxib to patients with osteoarthritis (57). Although interindividual variability in the dose-response relationship was apparent, the relationship of plasma concentration to enzyme inhibition was sigmoidal. The $IC_{50}$ for COX-2 inhibition by celecoxib in *in vitro* systems ranges from 0.025 to 0.075 μM (31), which is lower than the range (1–3 μM) at which clinical efficacy in arthritis is expected (57). This is expected because the *in vitro* assays are performed in the absence of plasma

Table 2.  Urinary PGI-M (pg/mg creatinine) after treatment with placebo, 400 and 800 mg of celecoxib, or 800 mg of ibuprofen

| Treatment | Hours after dosing | |
|---|---|---|
| | 4–6 h | 6–12 h |
| Placebo | 117.1 ± 49.4 | 126.2 ± 63.8 |
| Celecoxib, 400 mg | 34.2 ± 7.3** | 25.1 ± 5.4** |
| Celecoxib, 800 mg | 22.8 ± 8.8** | 27.0 ± 11.8** |
| Ibuprofen, 800 mg | 51.3 ± 18.8* | 39.8 ± 6.3** |

**, *P* < 0.01; *, *P* < 0.05 for comparisons with placebo.

MRK-AAZ0001009

proteins that bind the drug. It also raises the possibility that near-maximal inhibition of COX-2 is necessary for anti-inflammatory efficacy, although this remains to be established.

The biochemical selectivity of celecoxib for COX-2 was assessed by measurement of indices of COX-1 activity. Platelets possessing only the COX-1 isozyme are known to be the predominant source of $TxB_2$ formed in serum (5, 37, 58). Dose-dependant inhibition of serum $TxB_2$ *ex vivo* by aspirin (59) and Tx synthase inhibitors (60) has been reported. All doses of celecoxib in this study had some inhibitory effect on serum $TxB_2$. However, this effect was modest compared with celecoxib's effects on COX-2 activity. It is not surprising that $TxA_2$-dependent platelet aggregation induced by arachidonic acid was prevented by an efficient COX-1 inhibitor (ibuprofen) but not by celecoxib. It has been demonstrated that the relationship between inhibition of the capacity of platelets to form $TxA_2$ (serum $TxB_2$) and $TxA_2$-dependant platelet aggregation is nonlinear; a residual 5–10% capacity to form $TxA_2$ is sufficient to sustain aggregation (61). Neither celecoxib nor ibuprofen affected Tx-independent platelet aggregation induced by the $TxA_2$ receptor agonist U44619. We also examined the effect of celecoxib on urinary 11-dehydro $TxB_2$, an index of $TxA_2$ biosynthesis *in vivo* (33). Previous studies have demonstrated that platelets are the predominant but not exclusive contributors to the excretion of Tx-M in healthy volunteers (33, 62). Ibuprofen, as expected, suppressed Tx-M, reflective of its action as a reversible inhibitor of COX-1 and COX-2. Celecoxib 800 mg also tended to suppress Tx-M, although this failed to attain statistical significance. Thus, although single doses of celecoxib exhibit relative rather than absolute biochemical specificity for inhibition of COX-2, they demonstrated functional specificity, at least with respect to the platelet. Whether this also will be true for other sites of COX-1 function, such as gastric epithelium and the brain, remains to be determined.

Prostacyclin is the major COX product of macrovascular endothelium. Urinary excretion of PGI-M reflects predominately extrarenal formation of this eicosanoid in healthy volunteers (63). Physical (64) or chemical (65) stimulation of the vasculature in humans results in increased excretion of PGI-M, as does systemic infusion of the eicosanoid (66). Administration of conventional NSAIDs and aspirin suppresses PGI-M excretion in volunteers (36, 67, 68). COX-1 is expressed constitutively in vascular endothelial cells and in smooth muscle cells (69, 70). However, COX-2 may be induced in these tissues by LPS and cytokines (69–71). Recently, Topper *et al.* (72) have shown that laminar, but not turbulent, shear will up-regulate COX-2 in endothelial cells. In the present study, ibuprofen, as expected, caused a marked reversible, inhibitory effect on PGI-M excretion. Surprisingly, celecoxib also depressed PGI-M excretion to comparable degree at doses (400 and 800 mg) that inhibited monocyte COX-2 activity to the same extent as 800 mg ibuprofen. We also found that celecoxib suppressed urinary 6-keto $PGF_{1\alpha}$. Although this index predominantly reflects renal biosynthesis of prostacyclin, in contrast to the metabolite, these distinctions are not absolute (38). Similar effects on both urinary 6-keto $PGF_{1\alpha}$ and PGI-M with a structurally distinct COX-2 inhibitor—Vioxx (MK 966)—under chronic dosing conditions in elderly humans recently have been reported[‡]. Thus, this appears to be a feature of this class of compounds, rather than a COX-2-independent effect of celecoxib alone.

Although these results clearly implicate COX-2 as a major source of $PGI_2$ biosynthesis in humans, the effects of this compound and a structurally distinct COX-2 inhibitor on this eicosanoid under chronic dosing conditions in therapeutically

relevant populations remain to be determined. $PGI_2$ is a potent vasodilator and platelet inhibitor. However, its importance *in vivo* has remained speculative in the absence of a pharmacological antagonist of the $PGI_2$ receptor (IP). Recently, Narumiya and colleagues (73) have generated data in mice deficient in the IP receptor that suggest an important role for $PGI_2$ in mediating inflammation and in preventing thrombosis. It has been demonstrated that PGI-M excretion is increased in patients with syndromes of platelet activation, such as unstable angina, severe atherosclerosis, and periprocedurally, during angioplasty (64, 74, 75). Given the role of cytokines, growth factors, and thrombin in the induction of COX-2 by vascular tissues *in vitro*, it might be expected that this isozyme also would contribute to the augmented $PGI_2$ biosynthesis observed in these conditions.

Celecoxib exhibits relative rather than absolute biochemical selectivity for COX-2 at doses tolerated in humans. Nonetheless, it does not modify $TxA_2$-dependent platelet aggregation, reflective of its modest inhibitory effect on COX-1. Ibuprofen and 800 mg celecoxib inhibit COX-2 *ex vivo* and suppress urinary PGI-M to a comparable degree. This appears to extend to the class of COX-2 inhibitors. It remains to be determined whether this effect is sustained during chronic dosing in age groups at risk for cardiovascular disease. If this is so, trials much larger than those necessary to detect efficacy and safety in arthritis (57) will be necessary to determine whether cardiovascular consequences of inhibiting $PGI_2$ biosynthesis will modulate the anti-inflammatory benefit to be derived from chronic administration of COX-2 inhibitors in humans.

I.A.M. was supported by National Institutes of Health/National Institute of General Medical Sciences Grant T32-GM07612.

1. FitzGerald, G. A. (1996) in *Cecil Loeb Textbook of Medicine* (Saunders, Philadelphia), pp. 1187–1193.
2. Pace-Asciak, C. R. & Smith, W. L. (1983) *Enzyme* **16**, 543–603.
3. Vane J. R. & Botting, R. (1987) *FASEB J.* **1**, 89–96.
4. Smith, W. L. (1992) *Am. J. Physiol* **263**, F181–F191.
5. Funk, C. D., Funk, L. B., Kennedy, M. E., Pong, A. S. & FitzGerald, G. A. (1991) *FASEB J.* **5**, 2304–2312.
6. Xie, W., Chipman, J. G., Robertson, D. L., Erikson, R. L. & Simmons, D. L. (1991) *Proc. Natl. Acad. Sci. USA* **88**, 2692–2696.
7. O' Bannion, M. K., Winn, V. D. & Young, D. A. (1992) *Proc. Natl. Acad. Sci. USA* **89**, 4888–4892.
8. O'Neill, G. P. & Ford-Hutchinson, A. W. (1993) *FEBS Lett.* **330**, 156–160.
9. Smith, W. L. (1989) *Biochem J.* **259**, 315–324.
10. Fu, J., Masferrer, J. L., Siegel, N. & Needleman, P. (1990) *J. Clin. Invest.* **86**, 1375–1379.
11. Niiro, H., Otsuka, T., Izuhara, K., Yamaoka, K., Ohshima, K., Tanabe, T., Hara, S., Nemoto, Y., Tanaka, Y., Nakashima, H., *et al.* (1997) *Blood* **89**, 1621–1628.
12. Hla, T. & Neilson, K. (1992) *Proc. Natl. Acad. Sci. USA* **89**, 7384–7388.
13. O'Sullivan, M. G., Huggins, E. M., Meade, E. A., DeWitt, D. L. & McCall, C. E. (1992) *Biochem. Biophys. Res. Commun.* **187**, 1123–1127.
14. Jones, D. A., Carlton, D. P., McIntyre, T. M., Zimmerman, G. A. & Prescott, S. M. (1993) *J. Biol. Chem.* **268**, 9049–9054.
15. Kujubu, D. A., Reddy, S. T., Fletcher, B. S. & Herschman, H. R. (1993) *J. Biol. Chem.* **268**, 5425–5430.
16. Evett, G. E., Xie, W., Chapman, J. G., Robertson, D. L. & Simmons, D. L. (1993) *Arch Biochem. Biophys.* **306**, 169–177.
17. Crofford, L. J., Wilder, R. L., Ristimaki, A. P., Sano, H., Remmers, E. F., Epps, H. R. & Hla, T. (1994) *J. Clin. Invest.* **93**, 1095–1101.
18. Masferrer, J. L., Zweifel, B. S. Seibert, K. & Needleman, P. (1990) *J. Clin. Invest.* **86**, 1375–1379.
19. Mertz, P. M, DeWitt, D. L., Steller-Stevenson, W. G. & Wahl, L. M. (1994) *J. Biol. Chem.* **269**, 21322–21329.
20. Dworski, R. & Sheller, J. R. (1997) *Prostaglandins* **53**, 237–251.

---

[‡]Catella-Lawson, F., McAdam, B., Morrison, B., Kapoor, S., Kujubu, D., Anes, L., Tournier, B., Green, S., Lasseter, K. & FitzGerald, G. A. Vascular Biology Symposium, April 15–18, 1998, San Francisco.

Pharmacology: McAdam *et al.*

*Proc. Natl. Acad. Sci. USA 96* (1999) 277

21. Masferrer, J. L., Zweifel, B. S., Manning, P. T., Hauser, S., Leahy, K. M., Smith, W. G., Isakson, P. & Seibert, K. (1994) *Proc. Natl Acad. Sci. USA* 91, 3228–3232.

22. Eberhart, C. E., Coffey, R. J., Radhika, A., Giardiello, F. M., Ferrenbach, S. & DuBois, R. N. (1994) *Gastroenterology* 107, 1183–1188.

23. Vane, J. R. (1971) *Nature (London)* 231, 232–235.

24. Vane, J. R. & Botting, R. M. (1995) *Adv. Prostaglandin Thromboxane Leukotriene Res.* 23, 41–48.

25. Price, A. H. & Fletcher, M. (1990) *Drugs* 40, Suppl. 5, 1–11.

26. Smith, W. L., Meade, E. A. & DeWitt, D. L. (1994) *Ann. N.Y. Acad. Sci.* 722, 50–57.

27. Masferrer, J. L., Isakson, P. C. & Seibert, K. (1996) *Gastroenterol. Clin. North Am.* 25, 363–372.

28. Smith, W. L. & DeWitt, D. L. (1996) *Adv. Immunol.* 62, 167–215.

29. Penning, T. D., Talley, J. J., Bertenshaw, S. R., Carter, J. S., Collins, P. W., Docter, S., Graneto, M. J., Lee, L. F., Malecha, J. W., Miyashiro, J. M., *et al.* (1997) *J. Med. Chem.* 40, 1347–1365.

30. Khanna, I. K., Weier, R. M., Yu, Y., Collins, P. W., Miyashiro, J. M., Koboldt, C. M., Veenhuizen, A. W., Currie, J. L., Seibert, K. & Isakson, P. C. (1997) *J. Med. Chem.* 40, 1619–1633.

31. Seibert, K., Zhang, Y., Leahy, K., Hauser, S., Masferrer, J., Perkins, W., Lee, L. & Isakson, P. C. (1994) *Proc. Natl. Acad. Sci. USA* 91, 12013–12017.

32. Hamberg, M., Svensson, J. & Samuelsson, B. (1975) *Proc. Natl. Acad. Sci. USA* 72, 2294–2298.

33. Catella, F. & FitzGerald, G. A. (1987) *Throm. Res.* 47, 647–656.

34. Hempel, S. L., Monick, M. M. & Hunninghake, G. W. (1994) *J. Clin. Invest.* 93, 391–396.

35. Patrignani, P., Panara, M. R., Greco, A., Fusco, O., Natoli, C., Iacobelli, S., Cipollone, F., Garci, A., Creminon, C. & Maclouf, J. (1994) *J. Pharmacol. Exp. Ther.* 271, 1705–1712.

36. FitzGerald, G. A., Oates, J. A., Hawiger, J. A., Maas, R. L., Roberts, L. J. & Brash, A. R. (1983) *J. Clin. Invest.* 71, 676–688.

37. Patrono, C., Ciabattoni, G., Pinca, E., Pugilese, F., Castrucci, G., De Salvo, A., Satta, M. A. & Peskar, B. A. (1980) *Thromb. Res.* 17, 317–327.

38. FitzGerald, G. A., Pedersen, A. K. & Patrono, C. (1983) *Circulation* 67, 1174–1177.

39. FitzGerald, G. A., Brash, A. R., Blair, I. A. & Lawson, J. (1985) in *Advances in Prostaglandin Thromboxane and Leukotriene*, eds. Hayaishi, O. & Yamamoto, S. (Raven, New York), pp. 87–90.

40. Catella, F. & FitzGerald, G. A. (1990) *Methods Enzymol.* 187, 42–50.

41. Ferretti, A. & Flanagan, V. P. (1979) *Lipids* 14, 483–491.

42. Knapp, H. R., Healy, C., Lawson, J. A. & FitzGerald, G. A. (1988) *Thromb. Res.* 50, 377–386.

43. Morita, I., Schindler, M., Reiger, M. K., Otto, J. C., Hori, T., DeWitt, D. L. & Smith, W. L. (1995) *J. Biol. Chem.* 270, 10902–10908.

44. Morham, S. G., Langenbach, R., Loftin, C. D., Tiano, H. F., Vouloumanos, N., Jennette, J. C., Mahler, J. F., Kluckman, K. D., Ledford, A. & Lee, C. A. (1995) *Cell* 83, 473–482.

45. Tsujii, M. & DuBois, R. N. (1995) *Cell* 83, 493–501.

46. Smith, W. L. & DeWitt, D. L. (1995) *Semin. Nephrol.* 15, 179–194.

47. Luong, C., Miler, A., Barnett, J., Chow, J., Ramesha, C. & Browner, M. F. (1996) *Nat. Struct. Biol.* 3, 926–933.

48. Gierse, J. K., McDonald, J. J., Hauser, S. D., Rangwala, S. H., Koboldt, C. M. & Seibert, K. (1996) *J. Biol. Chem.* 271, 15810–15814.

49. Khanna, I. K., Weier, R. M., Yu, Y., Xu, X. D., Koszyk, F. J., Collins, P. W., Koboldt, C. M., Veenhuizen, A. W., Perkins, W. E., Casler, J. J., *et al.* (1997) *J. Med. Chem.* 40, 1634–1647.

50. Kurumbail, R. O., Stevens, A. M., Gierse J. K., McDonald, J. J., Stegeman, R. A., Pak, J. Y., Gildehaus, B., Miyashiro, J. M., Penning, T. D., Seibert, K., *et al.* (1996) *Nature (London)* 384, 644–648.

51. Laneuville, O., Breuer, D. K., DeWitt, D. L., Hla, T., Funk, C. D. & Smith, W. L. (1994) *J. Biol. Chem.* 271, 927–934.

52. Mitchell, J. A., Akarasereenont, P., Thiermermann, C. & Flower, R. J. (1994) *Proc. Natl. Acad. Sci. USA* 90, 11693–11697.

53. Riendeau, D., Percival, M. D., Brideau, C., Charleson, S., Cromlish, W., Ethier, D., Evans, J., Falgueyret, J.-D., Ford-Hutchinson, A. W., Gordon, R., *et al.* (1997) *Br. J. Pharmacol* 121, 105–117.

54. Sheng, H., Shao, J., Kirkland, S. C., Isakson, P., Morrow, J., Beauchamp, R. D. & DuBois, R. N. (1997) *J. Clin. Invest.* 99, 2254–2259.

55. Kalgutkar, A. S., Crews, B. C., Rowlinson, S. W., Garner, C., Seibert, K. & Marnett, L. J. (1998) *Science* 280, 1268–1270.

56. Panara, M. R., Greco, A., Santini, G., Sciulli, M. G., Rotondo. M. T., Padovano, R., di Giamberardino, M., Cipollone, F., Cuccurullo, F., Patrono, C., *et al.* (1995) *Br. J. Pharmacol.* 116, 2429–2434.

57. Simon, L. S., Lanza, F. L., Lipsky, P. E., Hubbard, R. C., Talwalker, S., Schwartz, B. D., Isakson, P. C. & Geis, S. (1998) *Arthritis Rheum.* 41, 1591–1602.

58. Patrignani, P., Filabozzi, P. & Patrono, C. (1982) *J. Clin. Invest.* 69, 1366–1372.

59. Pedersen, A. K. & FitzGerald, G. A. (1984) *N. Engl. J. Med.* 311, 1206–1211.

60. FitzGerald, G. A., Reilly, I. A. G. & Pedersen, A. L. (1985) *Circulation* 72, 1194–1201.

61. Reilly, I. A. G. & FitzGerald, G. A. (1987) *Blood* 69, 180–186.

62. Catella, F., Healy, D., Lawson, J. A. & FitzGerald, G. A. (1986) *Proc. Natl. Acad. Sci. USA* 83, 5861–5865.

63. FitzGerald, G. A., Brash, A. R., Falardeau, P. & Oates, J. A. (1981) *J. Clin. Invest.* 68, 1271–1274.

64. Braden, G. A., Knapp, H. R. & FitzGerald, G. A. (1991) *Circulation* 84, 679–685.

65. Clarke, R. J., Mayo G., Price P. & FitzGerald, G. A. (1991) *N. Eng. J. Med.* 32, 1137–1141.

66. Brash A. R., Jackson, E. K., Saggese, C., Lawson, J. A., Oates, J. A. & FitzGerald, G. A. (1983) *J. Pharmacol. Exp. Ther.* 226, 78–87.

67. Pancera, P., Arosio, E., Minuz, P., Pirante, F., Ribul, M. & Lechi, A. (1996) *Prostaglandins Leukotrienes Essent. Fatty Acids* 54, 217–222.

68. FitzGerald, G. A., Lupinetti, M., Charman, S. A. & Charman, W. N. (1991) *J. Pharmacol. Exp. Ther.* 259, 1043–1049.

69. Habib, A., Creminon, C., Frobert, Y., Grassi, J., Pradelles, P. & Maclouf, J. (1993) *J. Biol. Chem.* 268, 23448–23545.

70. Rimarachin, J. A., Jacobson, J. A., Maclouf, J., Creminon, C. & Weksler, B. B. (1994) *Arterioscler. Thromb.* 14, 1021–1031.

71. Maier, J. A., Hla, T. & Maciag, T. (1990) *J. Biol. Chem* 265, 10805–10808.

72. Topper, J. N., Jiexing, C., Falb, D. & Gimbrone, J. R. (1996) *Proc. Natl. Acad. Sci. USA* 93, 10417–10422.

73. Murata, T., Ushikubi, F., Matsuoka, T., Hirata, M., Yamasaki, A., Sugimoto, Y., Ichikawa, A., Aze, Y., Tanaka, T., Yoshida, N., *et al.* (1997) *Nature (London)* 388, 678–682.

74. FitzGerald, G. A., Smith, B., Pedersen, A. K. & Brash, A. R. (1984) *N. Engl. J. Med.* 310, 165–1068.

75. Fitzgerald, D. J., Roy, L., Catella, F. & FitzGerald, G. A. (1986) *N. Engl. J. Med.* 315, 983–989.

MRK-AAZ0001011