# Exhibit C

**Dedrick v. Merck Co., Inc.**
Case 2:05-md-01657-EEF-DEK   Document 8843-3   Filed 11/20/06   Page 2 of 16
Plaintiff's and Defendant's Designations of James Fries, M.D.

| Designated Testimony | | | Objections | Rulings |
|---|---|---|---|---|

**Plaintiff = Red**
**Defendant = Blue**

| 11:8 | - 14:6 | Fries, James 2006-06-16 | 00:02:36 | | |
|---|---|---|---|---|---|
| | 11: 8 | Q.  Could you state your name | | | |
| | 11: 9 | for the jury, please, Doctor. | | | |
| | 11: 10 | A.  James Franklin Fries. | | | |
| | 11: 11 | Q.  You are a medical doctor, | | | |
| | 11: 12 | correct? | | | |
| | 11: 13 | A.  That's correct. | | | |
| | 11: 14 | Q.  We're here at Stanford | | | |
| | 11: 15 | University to take your deposition today. | | | |
| | 11: 16 | Is this where you're currently employed? | | | |
| | 11: 17 | A.  That's right. | | | |
| | 11: 18 | Q.  And what is your current | | | |
| | 11: 19 | position here? | | | |
| | 11: 20 | A.  I'm a professor of medicine, | | | |
| | 11: 21 | emeritus active. | | | |
| | 11: 22 | Q.  Okay. | | | |
| | 11: 23 | And how long have you been a | | | |
| | 11: 24 | professor of medicine here at Stanford? | | | |
| | 12: 1 | A.  At one grade or another, a | | | |
| | 12: 2 | professor since 1971. | | | |
| | 12: 3 | Q.  Okay. | | | |
| | 12: 4 | Do you have a particular | | | |
| | 12: 5 | specialty? | | | |
| | 12: 6 | A.  I'm a rheumatologist.  I | | | |
| | 12: 7 | also do work in clinical epidemiology, in | | | |
| | 12: 8 | aging research and health public policy | | | |
| | 12: 9 | and in information technology. | | | |
| | 12: 10 | Q.  Okay. | | | |
| | 12: 11 | In terms of your specialty, | | | |
| | 12: 12 | rheumatology, have you done particular | | | |
| | 12: 13 | research in regards to NSAIDs? | | | |
| | 12: 14 | A.  Yes.  I should probably give | | | |
| | 12: 15 | you a little bit of background because it | | | |
| | 12: 16 | will be important probably for everything | | | |
| | 12: 17 | that happens. | | | |
| | 12: 18 | Q.  Sure. | | | |
| | 12: 19 | A.   30 years ago, about 30 years | | | |
| | 12: 20 | ago, I founded ARAMIS, that's | | | |
| | 12: 21 | A-R-A-M-I-S, the Arthritis, Rheumatism & | | | |
| | 12: 22 | Aging Medical Information System.  And | | | |
| | 12: 23 | we've tracked some 17,000 people in total | | | |
| | 12: 24 | from when we get ahold of them until they | | | |
| | 13: 1 | die or just say good-bye to us in another | | | |
| | 13: 2 | way.  And we follow them for everything | | | |
| | 13: 3 | that happens to them medically.  We get | | | |
| | 13: 4 | their clinical information, we go to them | | | |
| | 13: 5 | with questionnaires about health status | | | |
| | 13: 6 | each six months.  We collect information | | | |
| | 13: 7 | at that time on the drugs that they've | | | |
| | 13: 8 | taken, the disability level that their | | | |
| | 13: 9 | arthritis has inflicted on them, the pain | | | |
| | 13: 10 | they have, their use of medical care | | | |
| | 13: 11 | services, the drugs they're taking and | | | |
| | 13: 12 | any side effects that they've had for | | | |
| | 13: 13 | those drugs, whether they're symptoms | | | |
| | 13: 14 | side effects or side effects that cause | | | |
| | 13: 15 | hospitalizations or that cause death. | | | |
| | 13: 16 | We tally these and we write | | | |
| | 13: 17 | papers with regard to the comparative | | | |

**Dedrick v. Merck Co., Inc.**
Case 2:05-md-01657-EEF-DEK   Document 8843-3   Filed 11/20/06   Page 3 of 16
Plaintiff's and Defendant's Designations of James Fries, M.D.

| | Designated Testimony | | Objections | Rulings |
|---|---|---|---|---|
| | 13: 18 | toxicity of different drugs. So, this is | | |
| | 13: 19 | the first chronic disease databank system | | |
| | 13: 20 | that has existed. It's also the longest | | |
| | 13: 21 | in duration. There are about 1,000 | | |
| | 13: 22 | papers that have emerged from it on a | | |
| | 13: 23 | series of different subjects. Probably | | |
| | 13: 24 | my guesstimate would be around 20 on the | | |
| | 14: 1 | subject that we're discussing today, | | |
| | 14: 2 | which are side effects of the -- side | | |
| | 14: 3 | effects assessment in general and side | | |
| | 14: 4 | effects of the nonsteroidal | | |
| | 14: 5 | anti-inflammatory drugs in particular, | | |
| | 14: 6 | so... | | |
| **16:9** - **16:15** | | | | |
| | 16: 9 | October 28, 2000, did you | | |
| | 16: 10 | have a conversation with Dr. Sherwood? | | |
| | 16: 11 | A.   Well, now you're going to | | |
| | 16: 12 | have to apologize for my memory of dates | | |
| | 16: 13 | and sequences five years ago. Anything | | |
| | 16: 14 | that's in the written record I would | | |
| | 16: 15 | prefer to refer to than to my memory. | | |
| **17:4** - **17:11** | | Fries, James 2006-06-16     00:00:18 | | |
| | 17: 4 | Q.   I'm going to go ahead and | | |
| | 17: 5 | hand you what's been marked as | | |
| | 17: 6 | Plaintiff's Exhibit 1.0176, which is a | | |
| | 17: 7 | copy of the letter on Stanford University | | |
| | 17: 8 | letterhead addressed to Dr. -- or, I'm | | |
| | 17: 9 | sorry, Mr. Ray Gilmartin, and you can | | |
| | 17: 10 | feel free to refer to this. | | |
| | 17: 11 | A.   Yeah. Thank you. | | |
| **18:3** - **18:15** | | Fries, James 2006-06-16     00:00:19 | | |
| | 18: 3 | Q.   So, getting back, on October | | |
| | 18: 4 | 28, 2000, did you receive a call from Dr. | | |
| | 18: 5 | Sherwood? | | |
| | 18: 6 | A.   Yes. | | |
| | 18: 7 | Q.   Okay. | | |
| | 18: 8 | And at that time, did he | | |
| | 18: 9 | identify himself as being with Merck? | | |
| | 18: 10 | A.   Yes, I believe so. | | |
| | 18: 11 | Q.   And during that | | |
| | 18: 12 | conversation, where did you -- where did | | |
| | 18: 13 | you receive the phone call? | | |
| | 18: 14 | A.   Well, I received that call | | |
| | 18: 15 | at home. | | |
| **18:16** - **18:22** | | Fries, James 2006-06-16     00:00:07 | | |
| | 18: 16 | Q.   Okay. | | |
| | 18: 17 | Had you ever received a call | | |
| | 18: 18 | from a pharmaceutical company like that | | |
| | 18: 19 | at home before? | | |
| | 18: 20 | A.   No. | | |
| | 18: 21 | Q.   Did you find that unusual? | | |
| | 18: 22 | A.   Yes. | | |
| **19:2** - **19:23** | | Fries, James 2006-06-16     00:00:54 | | |
| | 19: 2 | Q.   Was it during the week or on | | |
| | 19: 3 | a weekend? | | |
| | 19: 4 | A.   It was on a Saturday. | | |
| | 19: 5 | Q.   On a Saturday. Okay. | | |

**Dedrick v. Merck Co., Inc.**
Case 2:05-md-01657-EEF-DEK   Document 8843-3   Filed 11/20/06   Page 4 of 16
Plaintiffs' and Defendants' Designations of James Fries, M.D.

| Designated Testimony | | | Objections | Rulings |
|---|---|---|---|---|
| | 19: 6 | What was Dr. Sherwood | | |
| | 19: 7 | calling to discuss with you at that time? | | |
| | 19: 8 | A.  He was concerned that a | | |
| | 19: 9 | doctor, research associate on my staff, | | |
| | 19: 10 | Gurkipal Singh, had been giving talks in | | |
| | 19: 11 | public which were critical of Merck's | | |
| | 19: 12 | Vioxx, and in particular, had emphasized | | |
| | 19: 13 | the potential cardiovascular toxicity of | | |
| | 19: 14 | Vioxx. | | |
| | 19: 15 | Q.  In particular, what was he | | |
| | 19: 16 | complaining about, Dr. Sherwood? | | |
| | 19: 17 | A.  He believed that the talks | | |
| | 19: 18 | in question were unbalanced and that this | | |
| | 19: 19 | was something that I, as his immediate | | |
| | 19: 20 | supervisor, should know about and take | | |
| | 19: 21 | some action.  And he also contacted the | | |
| | 19: 22 | chairman of the department and the | | |
| | 19: 23 | chairman of our division. | | |
| 20:9    -  20:12 | | Fries, James 2006-06-16         00:00:10 | | |
| | 20: 9 | What did Dr. Sherwood say at | | |
| | 20: 10 | that time?  Did he imply to you any | | |
| | 20: 11 | consequences if -- or what did he want | | |
| | 20: 12 | you to do in regards to Dr. Singh? | | |
| 20:18   -  20:20 | | Fries, James 2006-06-16         00:00:06 | | |
| | 20: 18 | A.  Yeah.  He wanted Dr. Singh | | |
| | 20: 19 | to stop making the kinds of statements | | |
| | 20: 20 | that he had been making -- | | |
| 20:22   -  21:11 | | Fries, James 2006-06-16         00:00:25 | | |
| | 20: 22 | A.   -- and he wanted, you know, | | |
| | 20: 23 | me to assist him in that task. | | |
| | 20: 24 | Q.  Okay. | | |
| | 21: 1 | And did he indicate to you | | |
| | 21: 2 | that there would be any kind of | | |
| | 21: 3 | consequences if you didn't or if Dr. | | |
| | 21: 4 | Singh did not? | | |
| | 21: 5 | A.  Well, he did, and I wrote | | |
| | 21: 6 | up, when I was much closer to the time, | | |
| | 21: 7 | some of the things that he said, that Dr. | | |
| | 21: 8 | Singh would flame out if he didn't change | | |
| | 21: 9 | his behavior and that there would be | | |
| | 21: 10 | consequences for Stanford, and he implied | | |
| | 21: 11 | that there might be consequences for me. | | |
| 21:13   -  21:23 | | Fries, James 2006-06-16         00:00:21 | | |
| | 21: 13 | At that time, did you take | | |
| | 21: 14 | that to mean that Stanford or yourself | | |
| | 21: 15 | would not be receiving research funds if | | |
| | 21: 16 | that didn't stop? | | |
| | 21: 17 | A.  Well, that was never stated. | | |
| | 21: 18 | Q.  Is that what you -- | | |
| | 21: 19 | A.  And it's always a question, | | |
| | 21: 20 | sort of an implied thing.  When you say | | |
| | 21: 21 | how would it be bad for Stanford, I guess | | |
| | 21: 22 | it would be bad for Stanford if the | | |
| | 21: 23 | research funding dried up. | | |
| 22:12   -  23:21 | | Fries, James 2006-06-16         00:01:29 | | |
| | 22: 12 | After that conversation with | | |
| | 22: 13 | Dr. Sherwood, did you contact Dr. Singh? | | |
| | 22: 14 | A.  Yes.  I took this the same | | |

**Dedrick v. Merck Co., Inc.**
Case 2:05-md-01657-EEF-DEK   Document 8843-3   Filed 11/20/06   Page 5 of 16
Plaintiffs' and Defendants' Designations of James Fries, M.D.

| Designated Testimony | | Objections | Rulings |
|---|---|---|---|
| 22: 15 | way that I think anybody should who hears | | |
| 22: 16 | about it.  You want to determine if it's | | |
| 22: 17 | true or not.  And so I did ask Dr. Singh, | | |
| 22: 18 | and I told Dr. Sherwood that I would do | | |
| 22: 19 | this, that I would ask Dr. Singh what had | | |
| 22: 20 | transpired and I would check out.  And if | | |
| 22: 21 | there was action that was required, I | | |
| 22: 22 | would take the action.  And I did that. | | |
| 22: 23 | Q.   When you say you "did that," | | |
| 22: 24 | did you actually review the -- or did you | | |
| 23: 1 | talk to Dr. Singh specifically about his | | |
| 23: 2 | presentation? | | |
| 23: 3 | A.   I talked with him about the | | |
| 23: 4 | presentation.  He felt that it was a | **[23:4-23:6]** | **Barnett:** Sustained. |
| 23: 5 | balanced presentation.  That's what he | **Deft's Obj.:** 801/802 | **Smith:** Sustained |
| 23: 6 | maintained.  And I said, well, can I see | Dr. Fries' conversation | **Mason:** Sustained |
| 23: 7 | the slides?  And so I looked at the | with Dr. Singh is hearsay | |
| 23: 8 | PowerPoint slides that he had.  There | and should be excluded. | |
| 23: 9 | were, I don't remember, maybe 30 of them. | Also irrelevant and | |
| 23: 10 | I counted up the ones which were pro -- | prejudicial. | |
| 23: 11 | much of the talk was on -- much of his | | |
| 23: 12 | talks were on GI NSAID safety in general | | |
| 23: 13 | not connected with a particular product. | | |
| 23: 14 | But there was mention of both the VIGOR | | |
| 23: 15 | trial and the CLASS trial and of | | |
| 23: 16 | celecoxib and of rofecoxib during that | | |
| 23: 17 | talk.  And I counted the slides for | | |
| 23: 18 | rofecoxib and for celecoxib, and there | | |
| 23: 19 | were the same number, and they were both | | |
| 23: 20 | from similar studies and were really | | |
| 23: 21 | quite parallel. | | |
| **24:9    -   25:8** | Fries, James 2006-06-16                    00:00:51 | | |
| 24: 9 | Q.   Did you find the | | |
| 24: 10 | presentation to be balanced? | | |
| 24: 11 | A.   It looked to me to be | | |
| 24: 12 | reasonably balanced.  You can't tell by | | |
| 24: 13 | looking at a set of slides what someone | | |
| 24: 14 | is saying when they have those slides on. | | |
| 24: 15 | So, I went a little bit further and I | | |
| 24: 16 | checked with three people who had been in | | |
| 24: 17 | the audience of the most offending of | | |
| 24: 18 | these, and none of them were particularly | | |
| 24: 19 | offended or thought it particularly | | |
| 24: 20 | unbalanced. | | |
| 24: 21 | So, it was a funny | | |
| 24: 22 | situation, because the data that were of | | |
| 24: 23 | interest were on something that would | | |
| 24: 24 | almost automatically unbalance a balanced | | |
| 25: 1 | presentation, because there was negative | | |
| 25: 2 | information on one product of different | | |
| 25: 3 | degrees of certainty, and there wasn't | | |
| 25: 4 | any balancing information.  So, if you | | |
| 25: 5 | really were explaining things at that | | |
| 25: 6 | point, one would tend to probably | | |
| 25: 7 | overemphasize or emphasize more the Vioxx | | |
| 25: 8 | data. | | |
| **26:22   -   27:3** | Fries, James 2006-06-16                    00:00:08 | | |
| 26: 22 | When you say the American | | |
| 26: 23 | College of Rheumatology or ACR, when was | | |
| 26: 24 | that?  Was that in November of 2000, | | |
| 27: 1 | Page 27 | | |

**Dedrick v. Merck Co., Inc.**
Case 2:05-md-01657-EEF-DEK   Document 8843-3   Filed 11/20/06   Page 6 of 16
Plaintiffs and Defendants Designations of James Fries, M.D.

| Designated Testimony | | | | Objections | Rulings |
|---|---|---|---|---|---|
| | 27: 2 | approximately? | | | |
| | 27: 3 | A. It must have been, yes. | | | |
| 34:5 | - 34:11 | Fries, James 2006-06-16 | 00:00:47 | | |
| | 34: 5 | You also reference in these | | | |
| | 34: 6 | -- or during that time of the ACR | | | |
| | 34: 7 | meeting, did it also come to your | | | |
| | 34: 8 | attention that other doctors had | | | |
| | 34: 9 | complaints of Merck contacting either | | | |
| | 34: 10 | themselves or their bosses in an effort | | | |
| | 34: 11 | to intimidate them? | | | |
| 34:14 | - 35:1 | | | | |
| | 34: 14 | THE WITNESS: Yes. It was | | | |
| | 34: 15 | kind of at that time that the | | | |
| | 34: 16 | rumor mill was going, and once | | | |
| | 34: 17 | people started talking about this, | | | |
| | 34: 18 | there were other people that had | | | |
| | 34: 19 | similar experiences. And they | | | |
| | 34: 20 | reported them, and a number of | | | |
| | 34: 21 | them had the same reaction that I | | | |
| | 34: 22 | did, that this was a way of | | | |
| | 34: 23 | influencing academic debate, which | | | |
| | 34: 24 | was not appropriate and could not | | | |
| | 35: 1 | continue. | | | |
| 35:20 | - 36:1 | Fries, James 2006-06-16 | 00:00:13 | | |
| | 35: 20 | Did you actually talk with | | | |
| | 35: 21 | Dr. Sherwood about these different | | | |
| | 35: 22 | allegations prior to writing your letter? | | | |
| | 35: 23 | A. Yes. But my recollection is | | | |
| | 35: 24 | that was a telephone call after the | | | |
| | 36: 1 | meetings. | | | |
| 36:3 | - 36:20 | Fries, James 2006-06-16 | 00:00:42 | | |
| | 36: 3 | Tell me about that telephone | | | |
| | 36: 4 | call. | | | |
| | 36: 5 | A. We'd gone backwards and | | | |
| | 36: 6 | forwards and got a connection, and then | | | |
| | 36: 7 | we discussed these issues much as they're | | | |
| | 36: 8 | laid out there. I put some quotes in | | | |
| | 36: 9 | that letter that were not recorded | | | |
| | 36: 10 | quotes, but they were ones that I had | | | |
| | 36: 11 | remembered from the -- from one | | | |
| | 36: 12 | discussion. | | | |
| | 36: 13 | One ironic one was that he | | | |
| | 36: 14 | had said that the side effects didn't | | | |
| | 36: 15 | occur at all, they had internal data to | | | |
| | 36: 16 | indicate that they didn't occur, but that | | | |
| | 36: 17 | anyway it was only at high doses. I | | | |
| | 36: 18 | thought that that was an interesting way | | | |
| | 36: 19 | to put an affirmation and a denial into | | | |
| | 36: 20 | the same sentence. | | | |
| 37:9 | - 37:17 | Fries, James 2006-06-16 | 00:00:22 | | |
| | 37: 9 | So, after having the phone | | | |
| | 37: 10 | conversation on October 28, 2000, seeing | | | |
| | 37: 11 | Dr. Sherwood at the ACR meeting, seeing | | | |
| | 37: 12 | the VIGOR posters at the ACR meeting, | | | |
| | 37: 13 | talking with Dr. Sherwood again on the | | | |
| | 37: 14 | phone, you then wrote this letter on | | | |
| | 37: 15 | January -- or sent the letter on January | | | |

**Dedrick v. Merck Co., Inc.**
Case 2:05-md-01657-EEF-DFK  Document 8843-3  Filed 11/20/06  Page 7 of 16
Plaintiffs and Defendants' Designations of James Fries, M.D.

| | Designated Testimony | | Objections | Rulings |
|---|---|---|---|---|
| | 37: 16 | 9, 2001, correct? | | |
| | 37: 17 | A.  Yes. | | |
| **37:19  -  38:9** | | Fries, James 2006-06-16         00:00:18 | | |
| | 37: 19 | And you wrote this letter to | | |
| | 37: 20 | Mr. Raymond Gilmartin, correct? | | |
| | 37: 21 | A.  Yes. | | |
| | 37: 22 | Q.  Had you ever met Mr. | | |
| | 37: 23 | Gilmartin before? | | |
| | 37: 24 | A.  No. | | |
| | 38: 1 | Q.  He is the -- or at the time | | |
| | 38: 2 | was the Chief Executive Officer of Merck, | | |
| | 38: 3 | correct? | | |
| | 38: 4 | A.  Yes. | | |
| | 38: 5 | Q.  Okay. | | |
| | 38: 6 | Had you ever written a | | |
| | 38: 7 | letter to the CEO of a pharmaceutical | | |
| | 38: 8 | company before? | | |
| | 38: 9 | A.  No. | | |
| **38:11  -  38:14** | | Fries, James 2006-06-16         00:00:09 | | |
| | 38: 11 | Had you ever written a | | |
| | 38: 12 | letter with these kind of allegations in | | |
| | 38: 13 | them to a pharmaceutical company before? | | |
| | 38: 14 | A.  No. | | |
| **54:21  -  54:24** | | Fries, James 2006-06-16         00:00:43 | | |
| | 54: 21 | The contact that you had | | |
| | 54: 22 | from Dr. Sherwood and from Merck in | | |
| | 54: 23 | regards to Vioxx, did you feel that was | | |
| | 54: 24 | at all appropriate? | | |
| **55:3  -  55:21** | | | | |
| | 55: 3 | THE WITNESS:  I felt that | | |
| | 55: 4 | belief in the scientific | | |
| | 55: 5 | marketplace where you have freedom | | |
| | 55: 6 | of expression on all sides without | | |
| | 55: 7 | overt intimidation, let alone this | | |
| | 55: 8 | kind of thing, really was a threat | | |
| | 55: 9 | to academic freedom.  And I saw it | | |
| | 55: 10 | and phrased my position in terms | | |
| | 55: 11 | of the academic freedom issues, | | |
| | 55: 12 | not in terms of is it toxic or is | | |
| | 55: 13 | it not toxic issues.  That was | | |
| | 55: 14 | irrelevant to the question that | | |
| | 55: 15 | they would come down on people | | |
| | 55: 16 | that said something they didn't | | |
| | 55: 17 | like.  And if everybody did that, | | |
| | 55: 18 | we would not have a scientific | | |
| | 55: 19 | process.  So, I became incensed on | | |
| | 55: 20 | academic freedom issues, and that | | |
| | 55: 21 | was my real motivating factor. | | |
| **59:17  -  59:23** | | Fries, James 2006-06-16         00:00:39 | | |
| | 59: 17 | Let me just very quickly ask | | |
| | 59: 18 | you one question backing up. | | |
| | 59: 19 | During the conversation of | | |
| | 59: 20 | October 28, 2000 with Dr. Sherwood, did | | |
| | 59: 21 | he ever tell you that the data that Dr. | | |
| | 59: 22 | Singh was relying upon or presented by | | |
| | 59: 23 | Dr. Singh was incorrect? | | |
| **60:1  -  60:2** | | | | |

**Dedrick v. Merck Co., Inc.**
Case 2:05-md-01657-EEF-DEK   Document 8843-3   Filed 11/20/06   Page 8 of 16
Plaintiffs and Defendants' Designations of James Fries, M.D.

| | | **Designated Testimony** | | **Objections** | **Rulings** |
|---|---|---|---|---|---|
| | 60: 1 | THE WITNESS: No, I don't | | | |
| | 60: 2 | believe so. | | | |
| **68:19** | - **69:15** | Fries, James 2006-06-16 | 00:00:39 | | |
| | 68: 19 | Why did you write Ray | | | |
| | 68: 20 | Gilmartin a letter? | | | |
| | 68: 21 | A. I was concerned with some | | | |
| | 68: 22 | internal practices at Merck which I felt | | | |
| | 68: 23 | infringed on academic freedom, and I felt | | | |
| | 68: 24 | it was not in Merck's interest to | | | |
| | 69: 1 | continue those. I attempted to make that | | | |
| | 69: 2 | case to them, and it concerned, in | | | |
| | 69: 3 | particular, a lot of allegations around | | | |
| | 69: 4 | the Vioxx drug. | | | |
| | 69: 5 | Q. Had you had some | | | |
| | 69: 6 | interactions with Merck at this point? | | | |
| | 69: 7 | A. No. Prior to the Sherwood | | | |
| | 69: 8 | call, I had no interactions whatsoever | | | |
| | 69: 9 | with Merck. | | | |
| | 69: 10 | Q. Now, by "Sherwood call," are | | | |
| | 69: 11 | you talking about Louis Sherwood? | | | |
| | 69: 12 | A. Yes. | | | |
| | 69: 13 | Q. The Merck vice president? | | | |
| | 69: 14 | A. Yes. He was vice president | | | |
| | 69: 15 | for medical affairs or some such title. | | | |
| **80:12** | - **81:2** | Fries, James 2006-06-16 | 00:00:21 | | |
| | 80: 12 | Q. Did you go to a lot of care | | | |
| | 80: 13 | to make sure it was accurate? | | | |
| | 80: 14 | A. Yes. | | | |
| | 80: 15 | Q. Did you write it and rewrite | | | |
| | 80: 16 | it and rewrite it? | | | |
| | 80: 17 | A. Yes. | | | |
| | 80: 18 | Q. How long did it take you to | | | |
| | 80: 19 | finally get that in final form? | | | |
| | 80: 20 | A. Well, we saw a draft a | | | |
| | 80: 21 | little while ago which was back in | | | |
| | 80: 22 | November I think, and then it came out on | | | |
| | 80: 23 | January 9. | | | |
| | 80: 24 | Q. About six weeks? | | | |
| | 81: 1 | A. So, I'd say six weeks or so, | | | |
| | 81: 2 | yes. | | | |
| **81:9** | - **82:5** | Fries, James 2006-06-16 | 00:00:44 | | |
| | 81: 9 | Q. I want you to focus on that | | | |
| | 81: 10 | for a minute because I want to ask you, | | | |
| | 81: 11 | did you get a followup phone call or two | | | |
| | 81: 12 | from people at Merck after you sent your | | | |
| | 81: 13 | letter? | | | |
| | 81: 14 | A. Yes. | | | |
| | 81: 15 | Q. Do you remember anything at | | | |
| | 81: 16 | all about those conversations and what | | | |
| | 81: 17 | was said? | | | |
| | 81: 18 | A. Yes, a little bit. One was | | | |
| | 81: 19 | from a vice president who offered to show | | | |
| | 81: 20 | me any data that I wanted to see. That | | | |
| | 81: 21 | wasn't my major thing. I knew the data | | | |
| | 81: 22 | would come out, so, I had other things to | | | |
| | 81: 23 | do, so, I declined that. | | | |
| | 81: 24 | A. second one was from Dr. | | | |
| | 82: 1 | Anstice, and he told the -- of a | | | |
| | 82: 2 | four-part plan that Merck had to remedy | | | |
| | 82: 3 | the problem and that they were taking | | | |

**Dedrick v. Merck Co., Inc.**
Plaintiffs' and Defendants' Designations of James Fries, M.D.

Case 2:05-md-01657-EEF-DEK   Document 8843-3   Filed 11/20/06   Page 9 of 16

| Designated Testimony | | | | Objections | Rulings |
|---|---|---|---|---|---|
| | 82: 4 | action in terms of changing their | | | |
| | 82: 5 | internal operations -- | | | |
| 82:9 | - 83:13 | Fries, James 2006-06-16 | 00:00:46 | | |
| | 82: 9 | Q.  -- first of all, there is a | | | |
| | 82: 10 | David Anstice who is the head at the time | | | |
| | 82: 11 | of Merck health, the whole Merck health | | | |
| | 82: 12 | end. | | | |
| | 82: 13 | A.  Yes. | | | |
| | 82: 14 | Q.  He's not actually a doctor, | | | |
| | 82: 15 | though, so when you say Dr. Anstice, you | | | |
| | 82: 16 | may have assumed he was a doctor -- | | | |
| | 82: 17 | A.  I may have assumed that -- | | | |
| | 82: 18 | Q.  All right. | | | |
| | 82: 19 | That's the same David | | | |
| | 82: 20 | Anstice? | | | |
| | 82: 21 | A.  It is the same person. | | | |
| | 82: 22 | Q.  Okay. | | | |
| | 82: 23 | Now, David Anstice has | | | |
| | 82: 24 | testified in this case, and David Anstice | | | |
| | 83: 1 | has said that he was charged with | | | |
| | 83: 2 | investigating your letter by Ray | | | |
| | 83: 3 | Gilmartin. | | | |
| | 83: 4 | A.  Yes. | | | |
| | 83: 5 | Q.  Are you aware of that? | | | |
| | 83: 6 | A.  Well, Dr. Gilmartin said | | | |
| | 83: 7 | that he was going to do that in his | | | |
| | 83: 8 | letter to me. | | | |
| | 83: 9 | Q.  I don't mean to interrupt | | | |
| | 83: 10 | you, but you call him Dr. Gilmartin, and | | | |
| | 83: 11 | I know he's the head of all of Merck, but | | | |
| | 83: 12 | he wasn't a doctor, either.  He's an | | | |
| | 83: 13 | M.B.A. from Harvard in the business -- | | | |
| 83:16 | - 83:17 | | | | |
| | 83: 16 | THE WITNESS:  Yes, I am | | | |
| | 83: 17 | positive you are correct. | | | |
| 89:1 | - 89:9 | Fries, James 2006-06-16 | 00:00:17 | | |
| | 89: 1 | Q.  Well, by the way, are you | | | |
| | 89: 2 | the Dr. Fries who is behind the longest | | | |
| | 89: 3 | running, largest arthritis study there | | | |
| | 89: 4 | is, the ARAMIS study? | | | |
| | 89: 5 | A.  Yes. | | | |
| | 89: 6 | Q.  How many people in that | | | |
| | 89: 7 | study? | | | |
| | 89: 8 | A.  In the various data banks, | | | |
| | 89: 9 | about 17,000. | | | |
| 89:12 | - 89:14 | Fries, James 2006-06-16 | 00:00:03 | | |
| | 89: 12 | Q.  How long has that been going | | | |
| | 89: 13 | on? | | | |
| | 89: 14 | A.  30 years. | | | |
| 89:15 | - 89:23 | Fries, James 2006-06-16 | 00:02:00 | | |
| | 89: 15 | Q.  30 years.  A lot of those | | | |
| | 89: 16 | people take naproxen? | | | |
| | 89: 17 | A.  Yes. | | | |
| | 89: 18 | Q.  Have you written up any | | | |
| | 89: 19 | papers or anybody else written up any | | | |
| | 89: 20 | papers from the largest, longest running | | | |
| | 89: 21 | study that says naproxen is five times | | | |
| | 89: 22 | better than aspirin at stopping heart | | | |

**Dedrick v. Merck Co., Inc.**
Case 2:05-md-01657-EEF-DEK   Document 8843-3   Filed 11/17/2006   Page 10 of 16
Plaintiffs' and Defendant's Designations of James Fries, M.D.

| Designated Testimony | | Objections | Rulings |
|---|---|---|---|
| 89: 23 | attacks? | | |
| **90:1   -   92:8** | | | |
| 90: 1 | THE WITNESS:  Our research | | |
| 90: 2 | is not -- the data banks aren't | | |
| 90: 3 | set to answer that specific | | |
| 90: 4 | question.  But we have studied the | | |
| 90: 5 | general overall toxicities, and | | |
| 90: 6 | certainly nothing jumped out with | | |
| 90: 7 | regard to cardiovascular events | | |
| 90: 8 | being protective.  Internally at | | |
| 90: 9 | what was then Syntex, who had | | |
| 90: 10 | developed naproxen -- | | |
| 90: 11 | BY MR. LANIER: | | |
| 90: 12 | Q.   Syntex is a company? | | |
| 90: 13 | A.   Syntex was a company which | | |
| 90: 14 | is now, if I'm correct, it has, in a | | |
| 90: 15 | series of big fish eating littler fish, | | |
| 90: 16 | arrived as a part of Pfizer. | | |
| 90: 17 | Q.   Oh, okay.  All right. | | |
| 90: 18 | So, the company that started | | |
| 90: 19 | naproxen, go ahead. | | |
| 90: 20 | A.   Yes, yes. | | |
| 90: 21 | Q.   What happened with them and | | |
| 90: 22 | naproxen? | | |
| 90: 23 | A.   Well, Syntex.  Well, they | | |
| 90: 24 | were looking for indications of it, and | | |
| 91: 1 | one obvious indication was that you could | | |
| 91: 2 | prevent heart attacks, because the then | | |
| 91: 3 | theory of how aspirin prevented heart | | |
| 91: 4 | attacks, which was known, was that it was | | |
| 91: 5 | an action on the platelets.  And the | | |
| 91: 6 | action of the platelets by aspirin is | | |
| 91: 7 | irreversible, so that for the entire life | | |
| 91: 8 | of the platelet, it -- | | |
| 91: 9 | Q.   Will never clump. | | |
| 91: 10 | A.   -- will never clump.  Okay. | | |
| 91: 11 | And naproxen has a similar effect on the | | |
| 91: 12 | platelet, but it lasts only while the | | |
| 91: 13 | drug is still circulating in the | | |
| 91: 14 | bloodstream, not for the life of the | | |
| 91: 15 | platelet.  So, it's called reversible | | |
| 91: 16 | inhibition of cyclooxygenase in the | | |
| 91: 17 | platelets.  Okay. | | |
| 91: 18 | But nevertheless, because | | |
| 91: 19 | it's longer acting, one could make the | | |
| 91: 20 | case that it would prevent heart attacks, | | |
| 91: 21 | and so they did a lot of internal | | |
| 91: 22 | speculation because it would be a big | | |
| 91: 23 | market if they could make the case that | | |
| 91: 24 | it prevented heart attacks, and they | | |
| 92: 1 | never could make that case.  And the | | |
| 92: 2 | studies both before and after, if you | | |
| 92: 3 | take them in the aggregate, indicate that | | |
| 92: 4 | this is not the case. | | |
| 92: 5 | Q.   Naproxen is not the -- | | |
| 92: 6 | A.   It does not prevent heart | | |
| 92: 7 | attacks to any degree which is measurable | | |
| 92: 8 | in any studies. | | |
| **94:21   -   95:10** | Fries, James 2006-06-16          00:00:30 | | |
| 94: 21 | Q.   In fact, when he said -- | | |
| 94: 22 | when you specifically told him -- or did | | |

| Designated Testimony | | | Objections | Rulings |
|---|---|---|---|---|
| | 94: 23 | you specifically tell him that you had | | |
| | 94: 24 | never heard of harassment of | | |
| | 95: 1 | investigators through their institutions | | |
| | 95: 2 | before this, what was his response to | | |
| | 95: 3 | you? | | |
| | 95: 4 | A.  Well, it was clear that his | | |
| | 95: 5 | response was that he believed this to be | | |
| | 95: 6 | an appropriate action.  And at the | | |
| | 95: 7 | closing sentence of that telephone | | |
| | 95: 8 | conversation, I said, "Lou, you ought to | | |
| | 95: 9 | be ashamed of yourself," and then hung | | |
| | 95: 10 | up. | | |
| **99:7** | **- 99:7** | Fries, James 2006-06-16        00:00:01 | | |
| | 99: 7 | Q.  Good afternoon, Dr. Fries. | | |
| **99:13** | **- 100:4** | Fries, James 2006-06-16        00:00:44 | | |
| | 99: 13 | I want to follow up on | | |
| | 99: 14 | questions about your reasons for writing | | |
| | 99: 15 | the letter to Mr. Gilmartin.  I think you | | |
| | 99: 16 | said that you wanted to deal with some | | |
| | 99: 17 | things in a private way? | | |
| | 99: 18 | A.  That's right.  I started, | | |
| | 99: 19 | and I tried to indicate in the letter my | | |
| | 99: 20 | great approval of Merck as a company, and | | |
| | 99: 21 | I followed it over the years with, you | | |
| | 99: 22 | know, top five respected companies in the | | |
| | 99: 23 | United States and so forth.  And I | | |
| | 99: 24 | respected a lot of the things that they | | |
| | 100: 1 | did, respected their previous chairman | | |
| | 100: 2 | immensely, who I now know a little bit, | | |
| | 100: 3 | Roy Vagelos, who did extraordinary things | | |
| | 100: 4 | for Merck from the scientific side. | | |
| **100:21** | **- 101:13** | Fries, James 2006-06-16        00:00:38 | | |
| | 100: 21 | Q.  You received a letter from | | |
| | 100: 22 | Mr. Gilmartin in response to your letter? | | |
| | 100: 23 | A.  Yes. | | |
| | 100: 24 | Q.  What was your reaction to | | |
| | 101: 1 | receiving that letter? | | |
| | 101: 2 | A.  Well, I think any of us -- I | | |
| | 101: 3 | was pleased that rather promptly a | | |
| | 101: 4 | response had come which had taken the | | |
| | 101: 5 | letter seriously and which had promised | | |
| | 101: 6 | some action.  I recognized that it was -- | | |
| | 101: 7 | that I was going to be running into | | |
| | 101: 8 | damage control types of activities, so, I | | |
| | 101: 9 | interpreted that and subsequent | | |
| | 101: 10 | conversations as having in part some | | |
| | 101: 11 | degree of damage control.  People wanted | | |
| | 101: 12 | me to be happy with the actions that were | | |
| | 101: 13 | being taken. | | |
| **102:20** | **- 103:2** | Fries, James 2006-06-16        00:00:16 | | |
| | 102: 20 | Were you satisfied with | | |
| | 102: 21 | Merck's response to your concerns? | | |
| | 102: 22 | A.  Yes.  And I thought about -- | | |
| | 102: 23 | I mean, they didn't say specifically what | | |
| | 102: 24 | they were going to do with Dr. Sherwood, | | |
| | 103: 1 | but they said that something was going to | | |
| | 103: 2 | happen. | | |
| **104:6** | **- 104:24** | Fries, James 2006-06-16        00:00:47 | | |

**Dedrick v. Merck Co., Inc.**
Case 2:05-md-01657-EEF-DEK   Document 8843-3   Filed 11/17/2006   Page 12 of 16
Plaintiffs' and Defendant's Designations of James Fries, M.D.

| Designated Testimony | | | Objections | Rulings |
|---|---|---|---|---|
| 104: 6 | Q. Sir, did you receive the | | | |
| 104: 7 | data relating to Vioxx that you had | | | |
| 104: 8 | requested? | | | |
| 104: 9 | A. I didn't request data per se | | | |
| 104: 10 | for me. I requested the data be made | | | |
| 104: 11 | available to others. I wasn't | | | |
| 104: 12 | specifically studying -- | | | |
| 104: 13 | Q. Were you satisfied that | | | |
| 104: 14 | Merck made that data available to others? | | | |
| 104: 15 | A. I believe so, yes. | | | |
| 104: 16 | Q. Is it fair to say then that | | | |
| 104: 17 | as of about March of 2001, as far as you | | | |
| 104: 18 | were concerned, the matter was closed? | | | |
| 104: 19 | A. My job here was done. | | | |
| 104: 20 | Q. Dr. Fries, I take it that | | | |
| 104: 21 | Merck chose not to rebut the points in | | | |
| 104: 22 | your letter, but, rather, to address your | | | |
| 104: 23 | concerns. Is that a fair assessment? | | | |
| 104: 24 | A. That's true. | | | |
| **105:4   -   105:5** | | | **[105:4-105:5]** | |
| 105: 4 | Q. Yes? | | **Pl's obj.**: Asked & . | |
| 105: 5 | A. Yes. | | answered. | |
| **105:24   -   106:9** | Fries, James 2006-06-16 | 00:00:21 | | |
| 105: 24 | Q. Dr. Fries, I want to talk to | | | |
| 106: 1 | you a little bit about, you referred to | | | |
| 106: 2 | an investigation that you did into things | | | |
| 106: 3 | that you had heard in the rumor mill. Do | | | |
| 106: 4 | you remember that? | | | |
| 106: 5 | A. Yes. | | | |
| 106: 6 | Q. I take it that you didn't | | | |
| 106: 7 | have firsthand knowledge about the | | | |
| 106: 8 | matters that you've testified about in | | | |
| 106: 9 | your letter. Is that fair to say? | | | |
| **106:12   -   107:7** | Fries, James 2006-06-16 | 00:00:46 | | |
| 106: 12 | THE WITNESS: I believe | | | |
| 106: 13 | that's probably true. That was | | | |
| 106: 14 | one reason I tried to be as | | | |
| 106: 15 | careful and as balanced as I | | | |
| 106: 16 | could, because I was getting | | | |
| 106: 17 | dangerously toward what I would | | | |
| 106: 18 | even call hearsay if I got too | | | |
| 106: 19 | far. | | | |
| 106: 20 | BY MR. RABER: | | | |
| 106: 21 | Q. And, of course, you can't be | | | |
| 106: 22 | expected to have firsthand knowledge of | | | |
| 106: 23 | all these things with the different | | | |
| 106: 24 | doctors that you were writing about, | | | |
| 107: 1 | right? | | | |
| 107: 2 | A. That's right. | | | |
| 107: 3 | Q. And is it fair to say that | | | |
| 107: 4 | certain doctors and Dr. Singh told you | | | |
| 107: 5 | things, and then you relayed that | | | |
| 107: 6 | information to Merck? | | | |
| 107: 7 | A. Yes. | | | |
| **115:11   -   115:17** | Fries, James 2006-06-16 | 00:00:26 | | |
| 115: 11 | Let me go back to your | | | |
| 115: 12 | letter. You've told us that you relied | | | |
| 115: 13 | on what you were told by doctors and Dr. | | | |
| 115: 14 | Singh. Did you talk to any third parties | | | |

| | Designated Testimony | Objections | Rulings |
|---|---|---|---|
| 115: 15 | to confirm or verify what you had been | | |
| 115: 16 | told by any of those doctors? | | |
| 115: 17 | A. No. | | |
| **115:18 - 116:5** | | | |
| 115: 18 | Q. So, for example, if we look | **[115:18-116:5]** | **Barnett:** Sustained. |
| 115: 19 | at Exhibit P 1.0176, which is your | **Pl's Obj.:** Discussions | **Smith:** Not included by |
| 115: 20 | January 9, 2001 letter, on the third page | with doctors were not | Defendant. |
| 115: 21 | of that letter, towards the top, it says, | allowed previously in | **Mason:** Denied as Moot. |
| 115: 22 | "Dr. McMillen believes that his VCF | Plaintiff's designations. | |
| 115: 23 | appointment at Hershey was revoked | Discussions with this | |
| 115: 24 | because of these accusations." Do you | doctor were not allowed | |
| 116: 1 | see that? | in Plaintiff's direct. If | |
| 116: 2 | A. Yes. | Pl's objection denied, Pl. | |
| 116: 3 | Q. Now, is that something that | counter-designates | |
| 116: 4 | Dr. McMillen told you? | 116:6-21. | |
| 116: 5 | A. That's right. | | |
| **116:22 - 117:2** | | | |
| 116: 22 | Q. Sir, the question was, did | **Pl's Obj.:** Same | **Barnett:** Sustained. |
| 116: 23 | you speak with anybody from the Hershey | | **Smith:** Not included by |
| 116: 24 | Medical Center to verify what Dr. | | Defendant. |
| 117: 1 | McMillen had told you? | | **Mason:** Testimony was |
| 117: 2 | A. No. | | played. No objection. |
| **117:20 - 119:21** | | | |
| 117: 20 | Q. Dr. Fries, you have in front | **Pl's Obj.:** Discussions | **Barnett:** Sustained. |
| 117: 21 | of you Defense Exhibit Number 952. Does | with doctors were not | **Smith:** Not included by |
| 117: 22 | this appear to be a letter from the | allowed previously in | Defendant. |
| 117: 23 | Hershey Medical Center dated February | Plaintiff's designations. | **Mason:** Testimony was |
| 117: 24 | 1st, 2000? | Discussions with this | played; objection to |
| 118: 1 | A. Yes. | doctor were not allowed | 119:12-21 was Denied |
| 118: 2 | Q. From a -- | in Plaintiff's direct. If | as Moot. |
| 118: 3 | A. I'm familiar with this | Pl's objection denied, Pl. | |
| 118: 4 | letter. | counter-designates | |
| 118: 5 | Q. Okay. | 116:6-21. | |
| 118: 6 | This letter was among the | | |
| 118: 7 | documents that Dr. McMillen gave to you? | | |
| 118: 8 | A. Probably. | | |
| 118: 9 | Q. It was in your file? | | |
| 118: 10 | A. Yes. | | |
| 118: 11 | Q. And does this letter | | |
| 118: 12 | describe Dr. McMillen's status with the | | |
| 118: 13 | Hershey Medical Center? | | |
| 118: 14 | A. Yes. It purports to. | | |
| 118: 15 | Q. Okay. | | |
| 118: 16 | And it says in the second | | |
| 118: 17 | paragraph, "Dr. McMillen held an | | |
| 118: 18 | appointment as Clinical Assistant | | |
| 118: 19 | Professor of Medicine from" July 1st, | | |
| 118: 20 | 1978 to December 31st, 1999, "at the | | |
| 118: 21 | Milton S. Hershey Medical Center of the | | |
| 118: 22 | Pennsylvania State University College of | | |
| 118: 23 | Medicine," correct? | | |
| 118: 24 | A. Yes. | | |
| 119: 1 | Q. All right. | | |
| 119: 2 | At the bottom of the first | | |
| 119: 3 | page, it says, "Dr. McMillen currently | | |
| 119: 4 | has an intensive and ongoing commitment | | |
| 119: 5 | to clinical studies and a very active | | |

| | Designated Testimony | | Objections | Rulings |
|---|---|---|---|---|
| | 119: 6 | speaking schedule," true? | | |
| | 119: 7 | A.   Yes.  That's what it says. | | |
| | 119: 8 | Q.   And that speaking schedule | | |
| | 119: 9 | you understood was on behalf of Pfizer? | | |
| | 119: 10 | A.   I have no knowledge of what | | |
| | 119: 11 | components of his speaking schedule are. | | |
| | 119: 12 | Q.   Then the letter from the | | |
| | 119: 13 | Hershey Medical Center states, | | |
| | 119: 14 | "Recognizing his past teaching | | |
| | 119: 15 | contributions but acknowledging that he | | |
| | 119: 16 | has not been actively involved in | | |
| | 119: 17 | teaching our students or housestaff in | | |
| | 119: 18 | recent years, his clinical faculty | | |
| | 119: 19 | position has not been renewed."  Do you | | |
| | 119: 20 | see that? | | |
| | 119: 21 | A.   Yes. | | |
| **125:17** - **126:18** | | | **Pl's Obj.**: Discussions with doctors were not allowed previously in Plaintiff's designations. Discussions with this doctor were not allowed in Plaintiff's direct. If Pl's objection denied, Pl. counter-designates 116:6-21. | **Barnett:** Sustained. **Smith:** Not included by Defendant. **Mason:** Testimony was played. No objection. |
| | 125: 17 | Q.   Dr. Fries, let's go back to | | |
| | 125: 18 | your letter.  On Page 3 of your letter, | | |
| | 125: 19 | you state near the top that "Dr. Simon | | |
| | 125: 20 | believes that one of his two academic | | |
| | 125: 21 | appointments has been jeopardized."  Do | | |
| | 125: 22 | you see that? | | |
| | 125: 23 | A.   Yes. | | |
| | 125: 24 | Q.   Is that something Dr. Simon | | |
| | 126: 1 | told you? | | |
| | 126: 2 | A.   Yes. | | |
| | 126: 3 | Q.   Did you talk with Dr. | | |
| | 126: 4 | Simon's boss or anybody to verify that? | | |
| | 126: 5 | A.   No. | | |
| | 126: 6 | Q.   No? | | |
| | 126: 7 | A.   And I tried when I wrote | | |
| | 126: 8 | this to be as careful as I could with | | |
| | 126: 9 | words.  So, it was me, not you, that said | | |
| | 126: 10 | Dr. Simon believes.  He did believe that. | | |
| | 126: 11 | I know that for sure.  But I don't know | | |
| | 126: 12 | that his belief was correct, and I tried | | |
| | 126: 13 | to indicate that. | | |
| | 126: 14 | Q.   Is it possible that his | | |
| | 126: 15 | belief was incorrect? | | |
| | 126: 16 | A.   Of course.  Just like it was | | |
| | 126: 17 | possible that Dr. McMillen's belief was | | |
| | 126: 18 | incorrect. | | |
| **149:6** - **149:14** | | | 00:00:24 | |
| | 149: 6 | Q.  And you talk about in your | | |
| | 149: 7 | letter, it was your experience that | | |
| | 149: 8 | certainly your mindset in 2001 was that | | |
| | 149: 9 | the COX-2 inhibitors looked like a | | |
| | 149: 10 | significant "medical advance" for dealing | | |
| | 149: 11 | with the serious GI problems from | | |
| | 149: 12 | traditional pain relievers? | | |
| | 149: 13 | A.  Yes.  I even took credit for | | |
| | 149: 14 | having created them. | | |
| **150:6** - **150:6** | | Fries, James 2006-06-16 | 00:00:02 | |
| | 150: 6 | Q.   Sir, at the time -- | | |
| **150:9** - **150:18** | | Fries, James 2006-06-16 | 00:00:26 | |
| | 150: 9 | Q.  -- though, if you look at | | |
| | 150: 10 | Page 3 of your letter, in the middle of | | |
| | 150: 11 | the page you say, "These drugs should on | | |

| Designated Testimony | | | Objections | Rulings |
|---|---|---|---|---|
| | 150: 12 | balance, save a substantial number of | | |
| | 150: 13 | lives." | | |
| | 150: 14 | A.   Yeah, that was actually my | | |
| | 150: 15 | mindset.  That's fair. | | |
| | 150: 16 | Q.   Okay. | | |
| | 150: 17 | Back in 2001. | | |
| | 150: 18 | A.   Yes. | | |
| **155:4** | **-   155:16** | Fries, James 2006-06-16                                  00:00:27 | | |
| | 155: 4 | Q.   Dr. Fries, we've put in | | |
| | 155: 5 | front of you Defense Exhibit 245.  Can | | |
| | 155: 6 | you identify this? | | |
| | 155: 7 | A.   Yes.  We've spoken to this | | |
| | 155: 8 | before.  This is a letter from Mr. | | |
| | 155: 9 | Gilmartin to me. | | |
| | 155: 10 | Q.   Dated January 23rd, 2001? | | |
| | 155: 11 | A.   Yes. | | |
| | 155: 12 | Q.   And I think this is the | | |
| | 155: 13 | letter that you've described as a | | |
| | 155: 14 | "thoughtful" and positive letter? | | |
| | 155: 15 | A.   Yes, it was a response to my | | |
| | 155: 16 | letter of January 9th. | | |
| **156:4** | **-   156:17** | Fries, James 2006-06-16                                  00:00:30 | | |
| | 156: 4 | Q.   Dr. Fries, I'm putting in | | |
| | 156: 5 | front of you a document marked as Defense | | |
| | 156: 6 | Exhibit 264.  Can you tell us what that | | |
| | 156: 7 | is? | | |
| | 156: 8 | A.   It's a letter to me from | | |
| | 156: 9 | David Anstice, the copy to Doug Greene. | | |
| | 156: 10 | Q.   Dated February 16th, 2001? | | |
| | 156: 11 | A.   February 16th, 2001. | | |
| | 156: 12 | Q.   And is this the letter that | | |
| | 156: 13 | came with the data that you received from | | |
| | 156: 14 | Merck? | | |
| | 156: 15 | A.   Yes.  I don't remember | | |
| | 156: 16 | receiving any data.  There must have been | | |
| | 156: 17 | some.  There are attachments noted here. | | |
| **157:5** | **-   158:6** | Fries, James 2006-06-16                                  00:00:52 | | |
| | 157: 5 | And by this time, there had | | |
| | 157: 6 | been an Advisory Committee concerning | | |
| | 157: 7 | Vioxx and Celebrex.  Do you recall that | | |
| | 157: 8 | in February of 2001? | | |
| | 157: 9 | A.   Yeah.  As I say, | | |
| | 157: 10 | reconstructing these dates and what order | | |
| | 157: 11 | they are is really hard for me, but there | | |
| | 157: 12 | was one roughly around there.  Yeah.  So, | | |
| | 157: 13 | these data had already in that interval | | |
| | 157: 14 | been, I guess, released pretty generally. | | |
| | 157: 15 | Q.   And have you been on FDA | | |
| | 157: 16 | Advisory Committees before? | | |
| | 157: 17 | A.   Yes. | | |
| | 157: 18 | Q.   And has it been your | | |
| | 157: 19 | experience that data from studies before | | |
| | 157: 20 | the Advisory Committee are discussed at | | |
| | 157: 21 | those meetings? | | |
| | 157: 22 | A.   The data are discussed, yes, | | |
| | 157: 23 | at the meeting.  I don't recall the exact | | |
| | 157: 24 | details.  Sometimes it's long, and | | |
| | 158: 1 | sometimes it's short. | | |
| | 158: 2 | Q.   Has it been your experience | | |
| | 158: 3 | that members of FDA Advisory Committees | | |

**Dedrick v. Merck Co., Inc.**
Case 2:05-md-01657-EEF-DEK   Document 8843-3   Filed 11/17/2006   Page 16 of 16
Plaintiffs' and Defendant's Designations of James Fries, M.D.

| Designated Testimony | | | | Objections | Rulings |
|---|---|---|---|---|---|
| | 158: 4 | are respected scientists in the relevant | | | |
| | 158: 5 | fields? | | | |
| | 158: 6 | A.  Yes, for the most part. | | | |
| **168:13** | **- 168:22** | Fries, James 2006-06-16 | 00:00:23 | | |
| | 168: 13 | Q.  Are you familiar, just in | | | |
| | 168: 14 | your 40 years of medicine, with the idea | | | |
| | 168: 15 | of drug companies choosing to neutralize | | | |
| | 168: 16 | and discredit doctors? | | | |
| | 168: 17 | A.  I was amazed earlier when we | | | |
| | 168: 18 | saw something that said somebody was | | | |
| | 168: 19 | going to control me as part of -- that's | | | |
| | 168: 20 | hard to do.  So, no, I've never seen | | | |
| | 168: 21 | anything like this.  This is really | | | |
| | 168: 22 | unprecedented in my experience. | | | |
| **170:23** | **- 171:6** | Fries, James 2006-06-16 | 00:00:23 | | |
| | 170: 23 | Q.  You believe in safety first? | | | |
| | 170: 24 | A.  No.  I believe that you have | | | |
| | 171: 1 | a balance with pharmaceutical treatments | | | |
| | 171: 2 | between the good and the harm that they | | | |
| | 171: 3 | do.  Things that do a whole lot of good, | | | |
| | 171: 4 | they can do quite a bit of harm.  And you | | | |
| | 171: 5 | still would say that on balance, they're | | | |
| | 171: 6 | good drugs.  So, it's a balance issue. | | | |