UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | : | MDL NO. 1657 |
| IN RE: VIOXX | : | |
| PRODUCTS LIABILITY LITIGATION | : | SECTION:  L |
| | : | |
| | : | JUDGE FALLON |
| | : | |
| | : | MAG. JUDGE KNOWLES |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

THIS DOCUMENT RELATES TO ALL CASES

<u>ORDER & REASONS</u>

Before the Court is the Plaintiffs' Steering Committee's ("PSC") Motion for Certification of a Nation-Wide Class Action for Personal Injury and Wrongful Death (Rec. Doc. 2171).  The Court heard oral argument and took this motion under submission.  For the following reasons, the PSC's motion is DENIED.

I.      BACKGROUND

This multidistrict products liability litigation involves the prescription drug Vioxx, known generically as Rofecoxib.  Merck & Co., Inc. ("Merck"), a New Jersey corporation, researched, designed, manufactured, marketed, and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches.  On May 20, 1999, the Food and Drug Administration ("FDA") approved Vioxx for sale in the United States.  Vioxx remained on the market until September 30, 2004, at which time

Merck withdrew it from the market when data from a clinical trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarctions (heart attacks) and ischemic strokes.  Thereafter, thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various tort and products liability claims.  It is estimated that 105 million prescriptions for Vioxx were written in the United States between May 20, 1999 and September 30, 2004.  Based on this estimate, it is thought that approximately 20 million patients have taken Vioxx in the United States.[1]

On February 16, 2005, the Judicial Panel on Multidistrict Litigation ("JPML") conferred multidistrict litigation status on Vioxx lawsuits filed in federal court and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407.  *See* 360 F. Supp. 2d 1352.[2]  This multidistrict litigation is designated MDL-1657 and is captioned *In re Vioxx Products Liability Litigation*.  The first status conference in this MDL was held on March 18, 2005.  Shortly thereafter, the Court appointed committees of counsel to represent the parties and discovery in this litigation commenced.[3]  Conferences to

---

[1]  For a more detailed factual and medical background, see *In re Vioxx Prods. Liab. Litig.*, 448 F. Supp. 2d 741, 743-44 (E.D. La. 2006); *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565 (E.D. La. 2005).

[2]  Section 1407 provides that "[w]hen civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings" if the JPML determines "that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions."  28 U.S.C. § 1407(a).

[3]  The Court appointed twelve attorneys to serve on the Plaintiffs' Steering Committee ("PSC"), see Pretrial Order No. 6 (Apr. 8, 2005), and five attorneys to severe on the Defendant's Steering Committee, see Pretrial Order No. 7 (Apr. 8, 2005).

review the status of the proceedings and to deal with various issues coming before the Court

have been held on a monthly basis.[4]

    In addition to thousands of individual claims, this MDL currently includes over 160 class

actions emanating from nearly every state.  These class actions allege three types of claims:  (1)

personal injury and wrongful death claims; (2) medical monitoring claims; and (3) purchase

claims.  On June 2, 2005, the Court issued Pretrial Order No. 16 which directed the PSC to file

master complaints in this Court with respect to each type of class action.  Accordingly, on

August 2, 2005, the PSC filed a Master Class Action Complaint for Cases Involving Personal

Injury and Wrongful Death.  The PSC also filed a Medical Monitoring Master Class Action

Complaint and a Purchase Claims Master Class Action Complaint, however these two putative

---

[4] Throughout this period over 7,000 cases have been filed or transferred into this MDL, Merck has produced approximately 22 million pages of documents and a terabyte of data to the PSC, more than 310 depositions have been noticed relating to 168 witnesses, depositions have been taken for more than 145 days and now comprise over 35,000 pages of testimony, the Court has ruled on over 270 substantive motions and has dealt with more than 1,000 ongoing procedural motions, and the Court has conducted 4 bellwether trials in individual cases and will have conducted 5 such trials by the end of 2006.

The first bellwether trial, *Evelyn Irvin Plunkett v. Merck & Co., Inc.*, No. 05-4046 (E.D. La. filed Aug. 23, 2005), was conducted while the Court was temporarily located in Houston, Texas because of Hurricane Katrina, and resulted in a hung jury.  The case was subsequently re-tried in New Orleans and resulted in a verdict for Merck.  The second bellwether trial, *Gerald Barnett, et al. v. Merck & Co., Inc.*, No. 06-485 (E.D. La. filed Jan. 31, 2006), resulted in a $51 million verdict for the Plaintiff.  The Court has ordered a new trial on the issue of damages in *Barnett*, finding the $50 million compensatory damage award excessive.  *See In re Vioxx Prods. Liab. Litig.*, 448 F. Supp. 2d 737 (E.D. La. 2006).  However, the parties have asked the Court to reconsider its decision in *Barnett*.  The third bellwether trial, *Robert Smith v. Merck & Co.*, Inc., No. 05-4379 (E.D. La. filed Sept. 29, 2005), resulted in a verdict for Merck.  The fourth bellwether trial, *Charles Mason v. Merck & Co., Inc.*, No. 06-810 (E.D. La. filed Feb. 16, 2006), also resulted in a verdict for Merck.  The fifth bellwether trial, *Anthony Dedrick v. Merck & Co.,Inc.*, No. 05-2524 (E.D. La. filed June 21, 2005), is scheduled to begin on November 27, 2006.

Further developments in this MDL are routinely posted on the Court's dedicated website. *See* http://vioxx.laed.uscourts.gov.

class actions are not presently before the Court.  Thus, this opinion deals only with the personal injury and wrongful death class actions.

Master complaints help the Court and the parties focus on common issues in an efficient and effective manner and they apply to all pending class actions and to those subsequently filed, removed, or transferred to this Court as part of MDL 1657.  In the Master Class Action Complaint for Cases Involving Personal Injury and Wrongful Death ("Master Complaint"), the PSC alleges that Vioxx was a defective product; that Merck misrepresented the safety of Vioxx and negligently manufactured, marketed, advertised, and sold Vioxx as a safe prescription medication, when in fact Merck knew or should have known that Vioxx was not safe for its intended purpose; and that Vioxx caused serious medical problems, and in certain patients, catastrophic injuries, and death.

On December 8, 2005, the PSC filed the instant motion to certify a nationwide class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure consisting of:

> All persons residing in the United States who took Vioxx in any dose at any time between May 20, 1999 when Vioxx was first approved by the United States Food & Drug Administration ("FDA"), and September 30, 2004, when Vioxx was withdrawn from the market, and who claim personal injuries or assert wrongful death claims arising from ingestion of Vioxx.

The PSC presents Rosemary Lawrence and Raymond Gibney, both New Jersey residents, as class representatives on behalf of themselves and all others similarly situated in the United States.  Ms. Lawrence is a 59-year-old woman who took Vioxx for at least eight months and suffered a pulmonary embolism on July 30, 2002.  Mr. Gibney is a 76-year-old man who took Vioxx for approximately one year and suffered a heart attack on December 29, 2002.  Both Ms. Lawrence and Mr. Gibney allege that their injuries were caused by Vioxx.

-4-

The PSC contends that New Jersey substantive law can and should be applied to all personal injury and wrongful death claims made by United States residents.  The basic thrust of the PSC's argument in favor of applying New Jersey products liability law is that (1) Merck is headquartered in New Jersey and, thus, all of its decisions regarding the manufacturing, testing, labeling, marketing, and advertising of Vioxx originated in and emanated from New Jersey and (2) New Jersey has a unique and strong interest in regulating the conduct of its corporate citizens and specifically in deterring wrongful conduct by New Jersey pharmaceutical companies.

Merck opposes certification of a nationwide class action on two grounds.  First, Merck argues that the proposed class members' claims must be adjudicated under the substantive laws of the states in which they resided, ingested, and were allegedly injured by Vioxx and, thus, there is no commonality of law.  Second, Merck contends that certification is inappropriate because each plaintiff's claim involves separate and distinct factual issues.[5]

---

[5]  If the Court does not certify a nationwide personal injury class, the PSC alternatively moves for certification of individual state class actions, consisting of:

> All residents of [state] who took Vioxx in any dose at any time between May 20, 1999, when Vioxx was first approved by the United States Food and Drug Administration ("FDA"), and September 30, 2004, when Vioxx was withdrawn from the market, and who claim personal injuries or assert wrongful death claims arising from ingestion of Vioxx.

The PSC asks, however, that this Court file a suggestion of remand pursuant to JPML Rule 7.6 to sever the question of single-state class certification and remand to the transferor forum each state class action as to which certification is sought, solely for purposes of addressing the class certification question.  The PSC further requests, in the interest of uniformity and judicial efficiency, that the JPML suggest to the Chief Judge of each transferor court that this Court be appointed to sit by *ad hoc* designation over the class certification issues.

This proposal would allow appellate review under Rule 23(f) to be sought in the relevant United States Court of Appeals encompassing the district in which the original complaint was filed, thereby guaranteeing that no party is prejudiced by the random selection of an MDL transferee forum whose procedural jurisprudence would determine the class certification issue

## II.     LAW & ANALYSIS

Before determining whether a nationwide class action may be certified under Rule 23 of the *Federal Rules of Civil Procedure*, the Court must first determine which state's or states' substantive law will govern the class.  *See Spence v. Glock*, 227 F.3d 308, 311 (5th Cir. 2000); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741-42 (5th Cir. 1996).  To make this determination, the Court must conduct a choice-of-law analysis.  Each state has its own choice-of-law rules that its courts use to select the applicable law.  Therefore, the Court must first decide which state's choice-of-law rules to apply.  The Court will then apply these rules to determine which state's or states' substantive law will govern the class.  Only then can the Court determine whether or not the putative nationwide class of Vioxx users satisfies the requirements of Rule 23.

### A.     CHOICE OF LAW

#### i.     Selecting the Applicable Choice-of-Law Rules

Federal courts sitting in diversity must apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941).  In MDL cases, the forum state is typically the state in which the action was initially filed before being transferred to the MDL court.  In the present case, the proposed class representatives originally filed their class action complaint in the United States District Court for the District of New Jersey; however, the PSC also subsequently filed a Master Complaint in this Court.  Therefore, the Court could conceivably apply the choice-of-law rules of either New Jersey or Louisiana.

---

differently from the transferor forum.  This somewhat novel alternative has not been fully briefed and, therefore, the Court will not address the issue of individual state certification at this time.

In *In re Propulsid Products Liability Litigation*, 208 F.R.D. 133, 140-41 (E.D. La. 2002), this Court was faced with the similar decision of whether to apply Indiana or Louisiana choice-of-law rules in an MDL class certification proceeding.  In *Propulsid*, the Court determined that a master complaint is only an administrative device used to aid efficiency and economy and, thus, should not be given the status of an ordinary complaint.  *Id*.  Accordingly, the Court looked to the underlying Indiana complaint and applied Indiana's choice-of-law rules.  *Id*. at 142.[6]

The Court finds no reason to depart from its prior holding, especially given that the parties in this case have not urged the Court to reconsider its view and apparently agree that New Jersey choice-of-law rules should be applied.  Therefore, the Court will once again look to the specific action brought before it for class certification—the New Jersey complaint—and will apply New Jersey's choice-of-law rules to determine which state's or states' substantive law would govern the proposed nationwide class.

### ii.    Selecting the Applicable Substantive Law

New Jersey applies a flexible "governmental interests" choice-of-law test to determine which state has the greatest interest in governing the specific issue in the underlying litigation. *See Erny v. Estate of Merola*, 792 A.2d 1208, 1216 (N.J. 2002); *Fu v. Fu*, 733 A.2d 1133, 1138 (N.J. 1999); *Veazey v. Doremus*, 510 A.2d 1187, 1189 (N.J. 1986).  New Jersey's governmental interests test is a two-step inquiry.  The first step is to determine whether an actual conflict exists between the laws of New Jersey and any other state with an interest in the litigation.  *Erny*, 792

---

[6]  In *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069, 1078 (S.D. Ind. 2001), an MDL court reached the contrary conclusion and applied the choice-of-law rules of the forum in which it sat and in which the master complaint had been filed.  The court did not examine the issue in detail, however, because the parties before it agreed on this course of action.  *Id.*

A.2d at 1216; *Fu*, 733 A.2d at 1138; *Veazey*, 510 A.2d at 1189.  In the present case, both the PSC and Merck acknowledge that there are conflicts between the law of New Jersey and the laws of the other fifty jurisdictions in regard to negligence, strict liability, failure to warn, learned intermediary, and defective design.  The Court agrees, and therefore will advance to the second step.

The second step of New Jersey's governmental interests test is to determine which state has the most significant relationship to the occurrence and to the parties.  *Fu*, 733 A.2d at 1138. In reaching this decision, the Court must identify the governmental policies of each state and how those policies are affected by the states' contacts to the litigation and to the parties.  *Id.* at 1138-39.  There are five factors that the Court must use to guide its decision:  (1) the interests of interstate comity; (2) the interests underlying the field of tort law; (3) the interests of the parties; (4) the interests of judicial administration; and (5) the competing interests of the states.  *Id.* at 1040-41.  The third and fourth factors are the least significant.  *Erny*, 792 A.2d at 1217.  The fifth factor is the most important factor.  *Fu*, 733 A.2d at 1142.  The Court will now consider these five factors to determine which state has the most significant relationship to the occurrence and to the parties and, therefore, which state's or states' substantive law will govern the class.[7]

---

[7] Before beginning its analysis, the Court notes that the PSC has failed to satisfy its duty of evaluating the strengths, weaknesses, and policies of all fifty-one interested jurisdictions.  *See In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 177 F.R.D. 360, 370-71 (E.D. La. 1997). Parties seeking to have the law of a single jurisdiction applied to a nationwide class must assess the laws of all interested jurisdictions, not just the one of their choosing.  *Id.*  Without this appraisal, not only is the Court's choice-of-law analysis weakened, but the PSC's ability to satisfy its burden on class certification suffers.  *See Castano*, 84 F.3d at 743.

### a.     Interests of Interstate Comity and Tort Law

In this case, the interests of interstate comity and tort law, the first two factors, merge and will be considered together.  The interests of interstate comity, the first factor, require the Court to consider whether the application of one state's law will frustrate the policies of other interested states.  *Fu*, 733 A.2d at 1141.  In the present case, the issue before the Court is not whether a specific aspect of a state's law, such as the learned intermediary doctrine or punitive damages, should be applied, but whether the entire scope of one state's products liability law, and all aspects arising thereunder, should be applied to the class.  Thus, this situation requires the Court to consider the purpose of products liability laws in general, rather than just the purpose behind a specific state law.[8]

The interests underlying the field of tort law, the second factor, require the Court to consider the degree to which deterrence and compensation, the two fundamental goals of tort law, would be furthered by the application of one state's law versus the application of every state's law.  *Fu*, 733 A.2d at 1141.  Not surprisingly, products liability laws are motivated by the same

---

[8]  Citing *Perez v. Wyeth Labs., Inc.*, 734 A.2d 1245 (N.J. 1999), the PSC asserts that New Jersey has a compelling interest in the application of its learned intermediary doctrine, which justifies the application of New Jersey products liability laws *in toto* to the entire class.  In *Perez*, the Supreme Court of New Jersey traced the history of its learned intermediary doctrine and held that it does not apply when pharmaceutical manufacturers advertise their products directly to consumers.  Accordingly, the PSC's argument is actually that New Jersey has an interest in the non-application of its learned intermediary doctrine in this case, that is, in ensuring that Merck be required to adequately warn the ultimate consumers of Vioxx rather than the learned intermediaries.

While New Jersey's interest may indeed be strong, this is not the specific choice-of-law issue before the Court.  *Cf. In re Norplant Contraceptive Prods. Liab. Litig.*, 215 F. Supp. 2d 795, 813-17 (E.D. Tex. 2002).  The Court cannot allow New Jersey's interest in one specific aspect of its laws to preclude the application of every other state's products liability laws.  Instead, the Court must consider New Jersey's interests as just one of many factors.

underlying purposes as the field of tort law in general, and therefore the interests of interstate

comity and the interests underlying the field of tort law align in this case.  *See Bussell v. DeWalt*

*Prods. Corp.*, 614 A.2d 622, 628-29 (N.J. Super. Ct. App. Div. 1992).

　　With regard to these two factors, the Court finds that each plaintiff's home jurisdiction has

a stronger interest in deterring foreign corporations from personally injuring its citizens and

ensuring that its citizens are compensated than New Jersey does in deterring its corporate

citizens' wrongdoing.  *See In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D.

332, 348 (D. N.J. 1997); *Laufer v. U.S. Life Ins. Co.*, No. L-9082-04, 2005 WL 1869211, at *8-9

(N.J. Super. Ct. Law Div. Aug. 8, 2005); *Bussell*, 614 A.2d at 628-29.  These interests arise by

virtue of each state being the place where the plaintiffs reside and, therefore, the states in which

the plaintiffs were prescribed Vioxx, where the plaintiffs ingested Vioxx, and where the alleged

injuries occurred.  *See In re Ford Ignition Switch*, 174 F.R.D. at 348; *Laufer*, 2005 WL 1869211,

at *8.  Therefore, the Court finds that the first and second factors weigh in favor of applying the

law of each plaintiff's home jurisdiction to his or her respective claims.[9]

---

[9]  The PSC asks the Court to follow the holdings in *International Union of Operating Engineers Local #68 Welfare Fund v. Merck & Co., Inc.*, 894 A.2d 1136 (N.J. Super. Ct. App. Div. 2006), and *Rowe v. Hoffmann-La Roche Inc.*, 892 A.2d 694 (N.J. Super. Ct. App. Div. 2006), and apply New Jersey law to the entire class.

　　*Local #68* arises out of the consolidated Vioxx proceedings currently pending in the Law Division of the Superior Court of New Jersey.  In *Local #68*, the Appellate Division affirmed Judge Higbee's conclusion that New Jersey's Consumer Fraud Act applied to a national class of third-party payors who had purchased Vioxx for their insureds.  The Supreme Court of New Jersey has agreed to hear the case.  *See* 902 A.2d 1232 (N.J. 2006).  New Jersey courts have reached varying conclusions with respect to choice-of-law issues in consumer fraud cases.  *Compare Local #68*, 894 A.2d at 1153 (applying New Jersey law to a nationwide consumer fraud class), *with Margulies v. Chase Manhattan Mort. Corp.*, No. L-5812-03, 2005 WL 2923580, at *6-9 (N.J. Super. Ct. App. Div. Nov. 7, 2005) (refusing to apply New Jersey law to a Maryland resident's consumer fraud claims), *Laufer*, 2005 WL 1869211, at *6-9 (refusing to apply New Jersey law to a nationwide consumer fraud class), *and Fink v. Ricoh Corp.*, 839 A.2d

### b.    Interests of the Parties

The interests of the parties, the third factor, require the Court to consider each party's

justified expectations and the need for predictability of result.  *Erny*, 792 A.2d at 1217; *Fu*, 733

A.2d at 1141.  This factor often plays a small role in the field of tort law because a party who

---

942, 982-86 (N.J. Super. Ct. Law Div. 2003) (same).

While *Local #68* will be extremely informative to the Court's consideration of the Purchase Claims Master Class Action Complaint, it does not address the choice-of-law question in this personal injury action.  As the Appellate Division noted, in consumer fraud cases "the primary purpose of the tort rule involved is to deter or punish misconduct" and therefore "the place where the conduct occurred has peculiar significance."  *Local #68*, 894 A.2d at 1148.  On the other hand, in personal injury cases the focus shifts to compensation and therefore "the place of injury" has peculiar significance.  *See Erny*, 792 A.2d at 1217-18.  The Appellate Division noted that the personal injury cases cited by Merck were not analogous to the consumer fraud action before it, and held that Judge Higbee did not abuse her discretion in refusing to follow such cases.  *See Local #68*, 894 A.2d at 1152.  Accordingly, this Court finds that the consumer fraud cases cited by the PSC are not analogous to the personal injury action before it.

Although *Rowe* is more instructive to the Court's analysis, it is nevertheless distinguishable, and also on appeal to the Supreme Court of New Jersey.  In *Rowe*, the Appellate Division found that New Jersey law applied to a Michigan resident's failure-to-warn claims against a New Jersey drug company.  The Appellate Division noted that "the place where a product manufactured [in New Jersey] ultimately comes to rest and causes injury is a matter of pure fortuity."  *Rowe*, 892 A.2d at 703 (quoting *Gantes v. Kason Corp.*, 679 A.2d 106, 113 (N.J. 1996)).  Therefore, "although place of injury is a significant factor in many tort actions, it does not warrant undue weight in product liability cases."  *Id.*

*Rowe* and *Gantes* are distinguishable from the instant action in several respects.  First, both cases were individual actions in which the application of non-New Jersey law would have barred the plaintiffs' claims.  In *Gantes*, Georgia's statute of limitations had run, whereas New Jersey's had not.  *See Gantes*, 679 A.2d at 109.  In *Rowe*, Michigan's preemption law would have barred the plaintiff's failure-to-warn claims, whereas New Jersey's did not.  *See Rowe*, 892 A.2d 699-700.  These realities heavily influenced the choice-of-law analyses in those cases. Second, unlike in *Rowe* and *Gantes*, there are currently thousands of similar Vioxx personal injury lawsuits pending in New Jersey state court.  New Jersey law will apply to many of these cases, ensuring that New Jersey's interest in deterrence will ultimately be furthered.  This reality necessarily influences the present analysis, as it previously has in somewhat similar circumstances.  *See In re Vioxx Prods. Liab. Litig.*, 448 F. Supp. 2d 741, 749 (E.D. La. 2006) (dismissing putative classes of Italian and French residents who ingested Vioxx and noting that the interests of Italy and France outweighed any American interests given the "enormous volume" of Vioxx litigation in the American courts).

causes an unintentional injury is generally not cognizant of the law that may be applied.  *See Erny*, 792 A.2d at 1217; *Fu*, 733 A.2d at 1141.  Nevertheless, the Court finds that this factor supports Merck's argument.

The PSC contends that Merck's choice to operate in New Jersey means that it should reasonably expect to abide by New Jersey's laws.  While this is true, it is just as true that Merck, an international corporation providing its drugs to every state in the nation, should expect to abide by every jurisdiction's laws.  To the extent that problems developed with respect to Vioxx, Merck could have reasonably expected to be sued in every jurisdiction and be subject to every jurisdiction's laws.  As to the individual plaintiffs, it is highly unlikely that a plaintiff residing outside of New Jersey could have reasonably expected that his or her personal injury claims would be governed by New Jersey law.  As such, the Court finds that the third factor weighs in favor of applying the laws of each plaintiff's home jurisdiction to his or her respective claims.

### c.      Interests of Judicial Administration

The interests of judicial administration, the fourth factor, require the Court to consider the practicality of applying one jurisdiction's law in a specific instance.  *Erny*, 792 A.2d at 1217; *Fu*, 733 A.2d at 1142.  This factor weighs heavily in favor of applying New Jersey law.  From the Court's perspective, the application of a single jurisdiction's law is more practical than the application of fifty-one different jurisdictions' laws.  *See Margulies*, 2005 WL 2923580, at *9.  Therefore, the Court finds that the fourth factor weighs in favor of applying New Jersey law to the entire class.  Ease of administration, however, is of minimal importance and must give way to the other factors.  *See Erny*, 792 A.2d at 1217.

### d.      Competing Interests of the States

The competing interests of the states, the fifth factor, is the most important factor under New Jersey's choice-of-law scheme.  *See Fu*, 733 A.2d at 1142.  In deciding the competing interests factor, the Court must consider four separate sub-elements:  (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship between the parties is centered.  *Fu*, 733 A.2d at 1142.  Furthermore, in personal injury litigation, the place of injury is especially important, and when the conduct and injury occur in the same state, that jurisdiction's laws will generally apply except when another jurisdiction has a demonstrably dominant interest and no policy of the situs state would be frustrated.  *See Erny*, 792 A.2d at 1217-18; *Fu*, 733 A.2d at 1142.  Throughout this analysis, the Court must focus on what a given legislature intended to protect by enacting the law at issue and how that legislature's concerns will be furthered by applying its law to the multistate situation. *Erny*, 792 A.2d at 1217; *Fu*, 733 A.2d at 1142.

Regarding the place of injury, the Court finds that the jurisdiction where each plaintiff resides qualifies as the place of injury.  *See In re Norplant Contraceptive Prods. Liab. Litig.*, 215 F. Supp. 2d 795, 814 (E.D. Tex. 2002).  There is no evidence indicating otherwise and such a conclusion is based on common sense.  Each plaintiff most likely was prescribed Vioxx, ingested Vioxx, and allegedly suffered personal injury in his or her state of residence.  As such, in the present case, the injuries occurred in fifty-one jurisdictions, fifty of which are not New Jersey.

Regarding the conduct causing the injury, the Court finds that the jurisdiction where each plaintiff resided also qualifies as the place where the injury-causing conduct occurred.  *See id*.; *In*

-13-

*re Consol. Parlodel Litig.*, 22 F. Supp. 2d 320, 326-27 (D. N.J. 1998).  The PSC, however, would have the Court conclude that New Jersey was the place where the injury-causing conduct occurred because New Jersey is where the majority, if not all, of the relevant corporate decisions occurred.  However, Vioxx was advertised in, marketed in, shipped into, prescribed in, sold in, ingested in, and allegedly caused harm in fifty-one jurisdictions.  Merck's conduct may have originated in New Jersey, but it was effectuated and felt by every plaintiff in their own home jurisdiction.  *See Laufer*, 2005 WL 1869211, at *8.  Accordingly, the conduct causing the plaintiffs' injuries occurred, and the plaintiffs' claims arose, in fifty-one jurisdictions, fifty of which are not New Jersey.  *See In re Parlodel*, 22 F. Supp. 2d at 326-27.

Regarding the residence, domicile, nationality, place of incorporation, and place of business of the parties, Merck is a New Jersey corporation that predominantly operates its business in New Jersey.  On the other hand, the plaintiffs reside in fifty-one jurisdictions, fifty of which are not New Jersey.

Regarding the place where the relationship is centered, the Court finds that the relationship between each plaintiff and Merck is centered in the state where each plaintiff resides.  *See In re Norplant*, 215 F. Supp. 2d at 815.  This is where each plaintiff most likely was prescribed, purchased, ingested, and allegedly harmed by Vioxx.  Moreover, it is difficult to fathom how the relationship could have been centered only in New Jersey.  To the extent that any of the plaintiffs knew that Merck was the manufacturer of Vioxx, which in most cases is unlikely, it is even more doubtful that any of the plaintiffs knew that Merck was incorporated in and operated out of New Jersey.  Furthermore, to the extent that any non-New Jersey resident knew both of these facts, it still would not change the center of the relationship unless he or she actively

-14-

choose to travel to New Jersey, saw a doctor in New Jersey, was prescribed Vioxx in New Jersey, purchased Vioxx in New Jersey, and consumed Vioxx in New Jersey.  Conversely, Merck consciously choose to advertise and market Vioxx throughout the United States, which ultimately led to the writing of Vioxx prescriptions, the sale of Vioxx, and the ingestion of Vioxx across the country.  As such, the parties' relationships are centered in fifty-one jurisdictions, fifty of which are not New Jersey.

Accordingly, the Court finds that the competing interests of the states, the fifth and most important factor, weighs in favor of applying the law of each plaintiff's home jurisdiction to his or her respective claims.

### iii.        Choice-of-Law Conclusion

The Court has applied New Jersey's choice-of-law rules in this case and therefore has considered the interests of interstate comity, the policies of deterrence and compensation, the interests of the parties, the interest of practicality, and the competing interests of the states to determine which state's or states' substantive law would be applied to the class.  The relevant choice-of-law factors confirm that New Jersey substantive law should not be applied to the entire class, but instead, that the substantive law of each plaintiff's home jurisdiction must be applied to his or her respective claims.  With this in mind, the Court now turns to Rule 23 of the Federal Rules of Civil Procedure to determine whether the putative class should be certified.

### B.        CLASS CERTIFICATION

Rule 23(a) sets forth four prerequisites to any class action:  (1) a class "so numerous that joinder of all members is impracticable"; (2) the existence of "questions of law or fact common to the class"; (3) class representatives with claims or defenses "typical . . . of the class"; and (4)

class representatives that "will fairly and adequately protect the interests of the class."  Fed. R.
Civ. P. 23(a).  In addition to these prerequisites, a party seeking class certification under Rule
23(b)(3) must also demonstrate that "questions of law or fact common to the members of the class
predominate over any questions affecting only individual members" and that the class action is
"superior to other available methods for the fair and efficient adjudication of the controversy."
Fed. R. Civ. P. 23(b)(3).  As the party seeking class certification, the PSC bears the burden of
showing that all of these criteria are satisfied.  *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th
Cir. 2005).

At the outset, the Court notes that its choice-of-law analysis presents significant hurdles to
certification of a nationwide class of Vioxx users because the application of the laws of fifty-one
jurisdictions to the claims of the proposed class creates problems for the typicality, adequacy,
predominance, and superiority requirements of Rule 23.  *See Castano v. Am. Tobacco Co.*, 84
F.3d 734, 741 (5th Cir. 1996); *In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*, 288
F.3d 1012, 1018-21 (7th Cir. 2002); *In re Am. Med. Sys.*, 75 F.3d 1069, 1085 (6th Cir. 1996); *In
re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555, 561 (E.D. Ark. 2005) (noting that the choice-of-
law issue "pervades every element" of Rule 23); *Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 698-
99 & nn.91-92 (Tex. 2002) (collecting cases); *see also* Jeremy T. Grabill, Comment, *Multistate
Class Actions Properly Frustrated by Choice-of-Law Complexities:  The Role of Parallel
Litigation in the Courts*, 80 Tul. L. Rev. 299, 307-09 (2005); Rory Ryan, Comment,
*Uncertifiable?:  The Current Status of Nationwide State-Law Class Actions*, 54 Baylor L. Rev.
467, 469-70 & nn.4-5 (2002) (collecting authorities).

Moreover, even if New Jersey law could be applied to the entire class, individualized factual issues concerning specific causation and damages dominate this litigation and create independent hurdles to certification.  *See, e.g., Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006).  Nevertheless, the Court will carefully analyze the requirements of Rule 23 to determine whether these apparent hurdles can be overcome.

### i.       Numerosity

To demonstrate numerosity, the PSC must establish that joinder is impracticable through "some evidence or reasonable estimate of the number of purported class members."  *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000).  With approximately 20 million Vioxx users in the United States, the numerosity requirement is clearly satisfied.

### ii.      Commonality

Rule 23(a)(2) requires that there be issues of law or fact common to the class.  The commonality requirement is satisfied if at least one issue's resolution will affect all or a significant number of class members.  *See James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999).  There is a low threshold for commonality, and the fact that some plaintiffs have different claims or require individualized analysis does not defeat commonality.  *James*, 254 F.3d at 570.

The Master Complaint identifies several common questions of fact.  Specifically, common questions of fact exist regarding the development, manufacturing, and testing of Vioxx.  Moreover, common questions of fact exist regarding Vioxx's effects on the human body.  These common questions relate to "general causation," that is, whether or not Vioxx is capable of causing adverse cardiovascular events.  Having presided over several bellwether trials in this

MDL, the Court need not speculate on the issue of commonality, but rather is confident that

common questions exist.  *Cf. In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 194 F.R.D.

484, 490 (D. N.J. 2000) ("Resolution of the 'general causation' question . . . does not show

commonality under Rule 23(a)(2).").

### iii.    Typicality

Rule 23(a)(3) requires that the claims of the class representatives be typical of the claims

of the class.  Typicality does not require that these claims be identical, but rather that they share

the same essential characteristics—a similar course of conduct, or the same legal theory.  *James*,

254 F.3d at 571.  In this case, both the proposed class representatives and the putative class

members assert various products liability claims against Merck under theories of negligence,

strict liability, failure to warn, and defective design.  "While these claims involve common issues,

they also involve individual issues such as injury, causation, the learned intermediary doctrine

and comparative fault."  *In re Baycol Prods. Liab. Litig.*, 218 F.R.D. 197, 205 (D. Minn. 2003).

Judge Davis's analysis in the Baycol multidistrict litigation applies with equal force here:

> [T]he underlying facts and circumstances of this case do not make the proposed
> personal injury class amenable to class certification.  This case involves a vast
> number of persons who took different dosages of [Vioxx], at different times, and
> possibly took [Vioxx] concomitantly with other prescription drugs.  Because the
> theories asserted by this putative class are based on what [Merck] knew at the time
> [Vioxx] was prescribed, and whether [Merck] acted reasonably based on such
> knowledge, the claims of the named representatives are not typical of the class.

*In re Baycol*, 218 F.R.D. at 205-06.  Accordingly, the Court finds that the class representatives'

claims are not typical of the class given these factual variations.

Moreover, the Court's choice-of-law analysis suggests that while the proposed class

representatives' claims will be governed by New Jersey law, the putative class members' claims

will be governed by the substantive laws of their respective jurisdictions.  The applicability of multiple substantive laws also precludes a finding of typicality.  *See, e.g., Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002) ("Given the differences among the state laws, it cannot be said that [the class representatives'] claims are 'typical' of the class . . .").

### iv.   Adequacy of Representation

The adequacy requirement mandates an inquiry into "the zeal and competence of the representative[s'] counsel and . . . the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees."  *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479-80 (5th Cir. 2001).

The Court has no doubts about the zeal and competence of the representatives' counsel in this case.  However, the "adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class *representative* has no incentive to pursue the claims of the other class members."  *In re Am. Med. Sys.*, 75 F.3d at 1083 (emphasis added).  Thus, despite Herculean efforts by the PSC, the Court finds that because of the factual and legal differences among class members' claims, the proposed class representatives cannot satisfy the adequacy requirement.

### v.   Predominance

Rule 23(b)(3) requires that common questions of law or fact "predominate over any questions affecting only individual [class] members."  *Unger*, 401 F.3d at 320.  To predominate, common issues must form a significant part of individual cases.  *Mullen*, 186 F.3d at 626.  The predominance requirement of Rule 23(b)(3) is "far more demanding" than the commonality requirement of Rule 23(a), because it "tests whether proposed classes are sufficiently cohesive to

warrant adjudication by representation." *Unger*, 401 F.3d at 320.  Lastly, the cause of action as a whole must satisfy Rule 23(b)(3)'s predominance requirement.  *Exxon Mobil Corp.*, 461 F.3d at 601.

It has been said that "[n]o class action is proper unless all litigants are governed by the same legal rules." *In re Bridgestone/Firestone*, 288 F.3d at 1015.  This is because "variations in state law may swamp any common issues and defeat predominance." *Castano*, 84 F.3d at 741.  The PSC bears the burden of demonstrating that variations among the fifty-one applicable state laws do not "pose 'insuperable obstacles' to certification." *Spence v. Glock*, 227 F.3d 308, 313 (quoting *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986)).  Notwithstanding valiant efforts, the PSC has not carried its burden in this respect and, therefore, the Court finds that common questions of law do not predominate.  Furthermore, courts have almost invariably found that common questions of fact do not predominate in pharmaceutical drug cases.  *See, e.g., In re Prempro*, 230 F.R.D. at 567; *Zehel-Miller v. AstraZenaca Pharm., LP*, 223 F.R.D. 659, 663 (M.D. Fla. 2004); *In re Baycol*, 218 F.R.D. at 204; *In re Paxil Litig.*, 212 F.R.D. 539, 551 (C.D. Cal. 2003); *In re Propulsid Prods. Liab. Litig.*, 208 F.R.D. 133, 144-45 (E.D. La. 2002); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 65-67 (S.D.N.Y. 2002).  This case is no different.

The plaintiffs' allegations that Merck failed to warn doctors adequately regarding the alleged health risks of Vioxx—whether they sound in strict liability or negligence—necessarily turn on numerous individualized issues such as:  the alleged injury; what Merck knew about the risks of the alleged injury when the patient was prescribed Vioxx; what Merck told physicians and consumers about those risks in the Vioxx label and other media, what the plaintiffs' physicians knew about these risks from other sources, and whether the plaintiffs' physicians

would still have prescribed Vioxx had stronger warnings been given.  These individualized

issues precluded certification in the Baycol litigation:

> Plaintiffs' claims of failure to warn turn on what Defendants knew at the time [Vioxx] was prescribed.  As the class members were prescribed [Vioxx] at different times, the issue of Defendants' knowledge will differ from case to case.  The same is true for the claims based on negligence.  For example, negligence claims depend on individual facts—whether there is a breach of duty or the foreseeability of harm will depend on what Defendants knew or should have known at the time [Vioxx] was prescribed and whether Defendants acted reasonably based on the knowledge it had at that time.

In re Baycol, 218 F.R.D. at 208.  These individualized issues likewise preclude a finding of

predominance in this litigation.  Moreover, during the approximately five years that Merck

marketed Vioxx, the package insert and label changed several times.  These changes further

frustrate a finding of predominance.  See In re Prempro, 230 F.R.D. at 567; In re Rezulin, 210

F.R.D. at 66-67.  In short, there is no uniform body of representations to which all physicians

and putative class members were exposed.

In refusing to certify a national class action in the Phenylpropanolamine multidistrict

litigation, Judge Rothstein recognized additional factual issues, many of which exist in this case,

such as

> an individual's family and medical history; age; gender; diet; lifestyle, including the use of alcohol, tobacco, and other legal or illegal drugs; . . . the timing of ingestion of the product; whether the individual followed the directions accompanying the product, exceeded the recommended dosage, or combined the product with other products and the effect of that combination; whether that individual suffered an injury, when the injury occurred, the type of injury suffered, and the number of occurrences of injury; the likelihood of injury; and/or the foundation as to whether a justifiable fear of injury exists.

In re Phenylpropanolamine (PPA) Prods. Liab. Litig., 208 F.R.D. 625, 631-32 (W.D. Wash.

2002) (footnotes omitted).

The United States Court of Appeals for the Fifth Circuit has recently stated that certification is inappropriate where each plaintiff's claim "will be highly individualized with respect to proximate causation, including individual issues of exposure, susceptibility to illness, and types of physical injuries." *Exxon Mobil Corp.*, 461 F.3d at 602.  As the court noted, "one set of operative facts would not establish liability and [ ] the end result would be a series of individual mini-trials which the predominance requirement is intended to prevent." *Id.* at 602; *see also Castano,* 84 F.3d at 744-45 (finding that certification was inappropriate where individual trials would be necessary to determine an element of the plaintiffs' fraud claims).  The plaintiffs' claims in this case that Vioxx proximately caused their injuries are no different; they are highly individualized and inappropriate for classwide adjudication.

While the majority of plaintiffs in this case allegedly suffered either a heart attack or stroke as a result of ingesting Vioxx, the extent of each plaintiff's subsequent injuries varies widely.  In addition, the plaintiffs allege as part of their claims for compensatory damages emotional and other intangible injuries.  "The very nature of these damages . . . necessarily implicates the subjective differences of each plaintiff's circumstances; they are an individual, not class-wide remedy.  The amount of compensatory damages to which any individual class member might be entitled cannot be calculated by objective standards." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 417 (5th Cir. 1998) (footnote omitted).  Moreover, the damage claims in this case "are not subject to any sort of formulaic calculation." *Exxon Mobil Corp.*, 461 F.3d at 602; *see Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003).

In this case, the PSC proposes a first-phase liability trial "designed to obtain a preliminary finding of liability," followed by "a second phase involving individual determination

of causation and damages." The PSC's proposal does not, however, eliminate the highly individualized inquiry of whether Vioxx specifically caused the injury alleged by each plaintiff in light of his or her medical history, family history, other risk factors, and use of the drug. The PSC cannot construct predominance through the creative use of bifurcation because "a cause of action, as a whole, must satisfy the predominance requirement of (b)(3)." *Castano*, 84 F.3d at 745 n.21; *see also Allison*, 151 F.3d at 421; *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 273 (S.D. Fla. 2003). Resolution of general causation is unlikely to affect the course of this litigation. As one commentator observed:

> Mass trials on the issue of "general" causation create substantial savings only when plaintiffs lose because this leads immediately to the dismissal of large numbers of mass tort claims, as the Bendectin case illustrates. Rarely, however, will a mass trial lead to the prompt entry of judgment in favor of a large group of plaintiffs against one or more defendants because even if the first jury finds, for example, that the defendant's product could have caused the plaintiff's injury, individual trials will still be necessary to determine specific causation, whether any affirmative defenses are available to the defendant, and the extent of the plaintiff's damages. Little or no time and expense will be saved in these individual trials by virtue of the preceding mass trial on general causation.

Roger H. Trangsrud, *Mass Trials in Mass Tort Cases: A Dissent*, 1989 U. Ill. L. Rev. 69, 79.

In *Exxon Mobil*, the parties agreed, and the Fifth Circuit appeared to accept, that the defendant's "negligence or strict liability for improperly installing the valve and causing the fire, can be determined on a class-wide basis." *Exxon Mobil Corp.*, 461 F.3d at 603. But this did "no more than prove that some common issues exist across the class." *Id.* Indeed, despite the common factual questions regarding general causation in these Vioxx cases, "each individual plaintiff must meet his or her own burden of medical causation, which in turn will depend on any number of the factors enumerated by the experts" who can be expected to testify at trial. *Id.*

The PSC relies on mass accident cases to support its argument that certification is appropriate here.  Despite early skepticism, mass accident, or single-situs torts, have generally been susceptible to class certification.  *See, e.g., Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625 (1997) ("Even mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement . . ."); *Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. 1992).  Indeed, "[f]aced with innovative district court solutions to seemingly intractable problems, the appellate courts have begun to be more sympathetic to class actions in mass tort cases."  Jack B. Weinstein & Eileen B. Hershenov, *The Effect of Equity on Mass Tort Law*, 1991 U. Ill. L. Rev. 269, 289; *cf. Exxon Mobil Corp.*, 461 F.3d at 604-05 (citing the Advisory Committee's notes to Rule 23(b)(3) suggesting that "mass accidents" are not appropriate for class certification); Martin L.C. Feldman, *Predominance and Products Liability Class Actions:  An Idea Whose Time Has Passed?*, 74 Tul. L. Rev. 1621 (2000).  Regardless, the PSC's reliance on mass accident class actions is misplaced in this pharmaceutical litigation.  The number, uniqueness, singularity, and complexity of the factual scenarios surrounding each case swamp any predominating issues.

### vi.    Superiority

Under Rule 23(b)(3), a district court must evaluate four factors to determine whether the class action format is superior to other methods of adjudication:  the class members' interest in individually controlling their separate actions; the extent and nature of existing litigation by class members concerning the same claims; the desirability of concentrating the litigation in the particular forum; and the likely difficulties in class management.  In this case, the difficulties in class management overwhelm any efficiencies that could be secured through classwide

adjudication.  Indeed, "the predominance of individual issues relating to the plaintiffs' claims for compensatory and punitive damages detracts from the superiority of the class action device in resolving these claims."  *Exxon Mobil Corp.*, 461 F.3d at 604-05; *see Allison*, 151 F.3d at 419; *Castano*, 84 F.3d at 745.

## III.   CONCLUSION

For the foregoing reasons, the PSC's Motion for Certification of a Nation-Wide Class Action for Personal Injury and Wrongful Death (Rec. Doc. 2171) is DENIED.


New Orleans, Louisiana, this 21st day of November, 2006.


_____

UNITED STATES DISTRICT JUDGE